QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  johnquinn@quinnemanuel.com
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
  Timothy L. Alger (Bar No. 160303)
  (timalger@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:   (213) 443-3000
Facsimile:    (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727 |
| vs. | |
| MATTEL, INC., a Delaware corporation, | [PUBLIC REDACTED] NOTICE OF MOTION AND MOTION OF MATTEL, INC. FOR ORDER COMPELLING PRODUCTION OF COMMUNICATIONS MADE IN FURTHERANCE OF CRIMES AND FRAUDS; |
| Defendant. | |
| AND CONSOLIDATED ACTIONS | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF |
| | [Declaration of Harry A. Olivar, Jr. filed concurrently herewith] |
| | Hearing Date:      August 4, 2008<br>Time:                  10:00 a.m.<br>Place:                 Courtroom 1 |
| | **Phase 1**<br>Pre-trial Conference:  May 19, 2008<br>Trial Date:               May 27, 2008 |

07209/2485897.2

1   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2        PLEASE TAKE NOTICE that in Courtroom 1 of the above-captioned court

3   located at 3470 Twelfth Street, Riverside, California, before the Honorable Steven

4   G. Larson, on August 4, 2008 at 10 a.m. or on such earlier date as the parties may be

5   heard, plaintiff Mattel, Inc. ("Mattel") will, and hereby does, move the Court:

6        (1) to compel MGA Entertainment, Inc. ("MGA") to produce Entry Nos. 374,

7   375, 548, 549, 550, 1327, 1328, 1643, 1820, 1821, and 1822 from MGA's

8   January 23, 2008 Privilege Log; and

9        (2) to compel Isaac Larian ("Larian") to produce Entry Nos. 69, 70, 72, 73,

10  79, 89, 90, 92, 95, 97, 100, 101, 113, 114, and 115 from his January 15, 2008

11  Privilege Log and Entry No. 63 from his January 30, 2008 Privilege Log.

12       Mattel brings this motion based on the crime-fraud exception to the attorney-

13  client privilege.   In the alternative, Mattel requests that the Court review these

14  communications *in camera* for possible production.

15       This Motion is based on this Notice of Motion and Motion, the accompanying

16  Memorandum of Points and Authorities, the Declaration of Harry A. Olivar, Jr.

17  dated May 23, 2008 filed concurrently herewith, the records and files of this Court,

18  all matters of which the Court may take judicial notice, and any other evidence and

19  argument as may be presented at the hearing on the Motion.

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................... 1

STATEMENT OF FACTS ........................................................................ 2

ARGUMENT ............................................................................................ 8

I.   THE ATTORNEY-CLIENT PRIVILEGE DOES NOT PROTECT COMMUNICATIONS FROM A CLIENT SEEKING TO FURTHER A CRIME OR FRAUD ............................................................................ 8

II.  LARIAN'S COMMUNICATIONS WITH GLASER FALL WITHIN THE CRIME FRAUD EXCEPTION TO THE ATTORNEY-CLIENT PRIVILEGE ....................................................................................... 10

A.   MGA Engaged in Criminal Infringement of Mattel's Copyrights ........ 12

1.   MGA Has Infringed Mattel's Copyrights in Bratz ..................... 12

2.   Defendants' Infringement Was Willful ..................................... 15

3.   Defendants' Infringement Was Unquestionably Profitable ........ 16

B.   Larian's Communications Were "In Furtherance of" MGA's Larceny of Mattel's Property ................................................................ 17

1.   Larian and MGA Took Property that Belonged to Mattel ......... 17

2.   Larian and MGA Intended to Permanently Deprive Mattel of Its Property ...................................................................... 17

3.   Larian and MGA Carried Away Mattel's Property and Controlled It by Removing It from Mattel's Possession ........... 18

C.   MGA Has Perpetrated a Fraud on the Court ....................................... 18

CONCLUSION ......................................................................................... 20

Case No. CV 04-9049 SGL (RNBx)

# TABLE OF AUTHORITIES

**Page**

## Cases

Appling v. State Farm. Mut. Auto. Ins. Co.,
340 F.3d 769 (9th Cir. 2003) .................................................... 18

Clark v. United States,
289 U.S. 1 (1933) ......................................................... 9, 16

Columbia Pictures Television, Inc. v. Krypton Broad.,
106 F.3d 284 (9th Cir. 1997) .................................................... 12

Dolman v. Agee,
157 F.3d 708 (9th Cir. 1998) .................................................... 12

Foreshee v. Runnels,
No. S-03-1647, 2007 WL 2505578 (E.D. Cal. Aug. 31, 2007) ............................ 17

In re Grand Jury Proceedings,
87 F.3d 377 (9th Cir. 1996) ................................................. 9, 10, 11

In re Grand Jury Proceedings,
727 F.2d 1352 (4th Cir. 1984) .................................................... 19

In re Grand Jury Subpoena 92-I (SJ),
31 F.3d 826 (9th Cir. 1994) ..................................................... 8

Int'l Tel. & Tel. Corp. v. United Tel. Co.,
60 F.R.D. 177 (M.D. Fla. 1973) .................................................. 19

In re Levander,
180 F.3d 1114 (9th Cir. 1999) ................................................... 18

In re Napster, Inc. Copyright Litig.,
479 F.3d 1078 (9th Cir. 2007) ............................................... *Passim*

People v. Avery,
27 Cal. 4th 49 (2002) ......................................................... 17

People v. Davis,
19 Cal. 4th 301 (1998) ........................................................ 18

People v. Kronemyer,
189 Cal. App. 3d 314 (1987) .................................................... 17

In re Sealed Cases,
676 F.2d 793 (D.C. Cir. 1982) .................................................. 19

In re St. Johnbury Trucking Co.,
184 B.R. 446 (Bankr. D. Vt. 1995) .............................................. 19

1   United States v. Chen,
        99 F.3d 1495 (9th Cir. 1996) .................................................. 10
2
3   United States v. Corona-Sanchez,
        234 F.3d 449 (9th Cir. 2000) .................................................. 17
4   United States v. Drebin,
        557 F.2d 1316 (9th Cir. 1977) ................................................ 12
5
6   United States v. Hodge & Zweig,
        548 F.2d 1347 (9th Cir. 1977) ............................................. 9, 10
7   United States v. Laurins,
        857 F.2d 529 (9th Cir. 1988) .................................................. 10
8
9   United States v. Martin,
        278 F.3d 988 (9th Cir. 2002) .................................................... 8
10  United States v. Thordarson,
        646 F.2d 1323 (9th Cir. 1981) ................................................ 17
11
12  United States v. Wise,
        550 F.2d 1180 (9th Cir. 1977) ................................................ 12
13  United States v. Zolin,
        491 U.S. 554 (1989) ......................................................... 8, 11
14

15                              **Statutes**

16  Cal. Labor Code § 2870 ............................................................ 3

17
                            **Other Authorities**
18
    3 Nimmer on Copyright § 1404[B] ............................................. 12
19
    8 Wigmore, Evidence § 2298 (McNaughton ed. 1961) ................... 19
20

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2

3    **Introduction**

4        Years before this litigation was commenced, on June 30, 2001, Isaac Larian

5    advised his then-attorney, Patricia Glaser, by e-mail that MGA had investigated

6    Carter Bryant's rights in Bratz.  Larian told Glaser that when Bryant pitched Bratz,

7    Bryant said he designed the dolls on nights and weekends and using his own

8    resources--apparently while working for Mattel.  Wholly absent from Larian's

9    account is any suggestion that Bryant had ever told MGA his story that he came up

10   with Bratz in 1998 when he was not a Mattel employee.  Larian further stated that

11   Bratz was about to be released, and expressed concern regarding possible litigation

12   by Mattel.

13       Mattel does not know what Glaser told Larian in response.  Mattel does know,

14   however, that there were a number of e-mails back and forth between Larian and

15   Glaser in the days that followed.  And, just last week, Mattel learned from Glaser's

16   deposition that on July 3, 2001--three days after Larian e-mailed Glaser--Larian

17   asked an MGA executive to fax Glaser a copy of Bryant's contract with MGA in

18   which both (1) the header reflecting that Bryant had sent it to MGA from a telefax

19   machine at Mattel and (2) the date of Bryant's contract with MGA--"as of

20   September 18, 2000"--were carefully redacted.  Thus, something Glaser said made

21   Larian want to misrepresent the facts to his own attorney, not to mention Mattel.

22   The deception had begun.

23       The fraud has continued for years, including right into this Courthouse.  In

24   their dealings with Mattel, filings with the Copyright Office and this Court, and in

25   litigation around the globe, Defendants concealed what Larian had reported to

26   Glaser concerning the development of Bratz.  Instead of disclosing that Bratz was

27   designed by Bryant while employed by Mattel in 1999-2000, MGA and Bryant

28   fashioned a story of Bryant's supposedly inspirational breakthrough while driving by

1   a Missouri high school in 1998 during a brief interruption of his Mattel employment.

2   By alleging that Bryant created Bratz while living in Missouri in 1998--rather than

3   on nights and weekends while employed by Mattel, as Larian knew to be true--

4   MGA was able to hide Defendants' willful infringement of Mattel's copyrights in

5   Bratz and its theft of Bryant's drawings, both crimes.  Larian's communications with

6   Glaser in the summer of 2001--both the original advice regarding the true origins of

7   Bratz and the subsequent effort to deceive even Glaser--were "in furtherance" of

8   MGA's willful infringement of Mattel's copyrights and theft of Mattel property and,

9   hence, were not privileged.  Those communications should either be ordered

10  produced, or reviewed for possible production *in camera*.[1]

11

12  <u>**Statement of Facts**</u>

13

14  <u>**MGA's Production of the June 30, 2001 E-Mail Message**</u>

15      On January 31, 2008, counsel for MGA produced, among other documents,

16  an e-mail message identified by Bates No. KS 07831.  The message was sent from

17  Isaac Larian to Patty Glaser on June 30, 2001.  It is identified on Larian's

18  January 15, 2008 Privilege Log, Entry No. 89, as a "message requesting legal advice

19  regarding Mattel litigation."

20      Eight days earlier, on January 23, 2008, Mattel had filed a motion asserting

21  that MGA had waived the attorney-client privilege with respect to at least 21

22  communications based on its assertion of "good faith" defenses.[2]  Mattel's motion

23

24

25      [1]  Mattel has seen the June 30, 2001 e-mail because it was produced by MGA.
26  However, recognizing its damning significance, MGA has since clawed it back,
    claiming it was supposedly inadvertently produced.
27      [2]  Motion of Plaintiff Mattel, Inc. for Order Finding Waiver and to Compel
    Production of Documents withheld as Privileged, dated January 23, 2008,
28  Declaration of David Harry A. Olivar, Jr. dated May 23, 2008 ("Olivar Decl.")
    Exh. 1.

1  specifically sought production of Entry No. 89 on Larian's Privilege Log.[3]  In its

2  Opposition filed January 31, 2008--the same day KS 07831 was produced--MGA

3  offered to produce 17 of the communications, tying its disclosure to its own requests

4  for privileged Mattel documents.[4]  The 17 documents specifically identified by

5  MGA included Entry No. 89 on Isaac Larian's Privilege Log of January 15, 2008.[5]

6  The same day, MGA produced that message voluntarily as part of the disclosure

7  noted earlier.  Thus, on January 31, 2008, MGA simultaneously produced KS 07831

8  and specifically called it out as one of 17 documents that it was willing to produce

9  voluntarily.

10  **The E-mail Message**

11      In the June 30, 2001 message Larian states that Mattel might seek an

12  injunction concerning Bratz.  He writes "[h]ere are some facts you should know,"

13  and states:  (1) when Bryant brought Bratz to MGA, he told them he was a designer

14  for Mattel, (2) Bryant said he designed his characters **at home and on the**

15  **weekends**, using his own resources, and (3) MGA took steps to confirm this.

16  Nowhere does the email say that Bryant had claimed to have created Bratz in 1998.

17  He did not say he created Bratz in Missouri.  Instead, he said he did it at home and

18  on weekends with his own resources--obviously while at Mattel.

19      Under California law, whether work in an employer's line of business is

20  performed at night or on weekends does not affect the employer's ownership interest

21

22

23

---

24  [3]  See id.  Mattel sought: (1) Entry Nos. 655-657 and 660 on MGA's August 14, 2007
     Supplemental Privilege Log; (2) Entry Nos. 12-19 and 21-27 on MGA's Supplemental

25  Revised Privileged and Redaction Log for MGA's 2005 Document Production; and
     (3) Entry Nos. 89 and 90 on Isaac Larian's Privilege Log of January 15, 2008.  Id. at 2:2-

26  16.
     [4]  MGA Entertainment Inc.'s Opposition to the Motion of Plaintiff Mattel, Inc.

27  for Order Finding Waiver and to Compel Production of Documents Withheld as
     Privileged, dated January 31, 2008 ("Opposition to Motion for Waiver"), Olivar

28  Decl. Exh. 2 at 10 n.7.
     [5]  Id. at 10 n.7.

-3-

Case No. CV 04-9049 SGL (RNBx)

1   under an inventions agreement.[6] Thus, what Bryant told Larian, as reflected by the

2   message sent by Larian, showed that Mattel owned the rights to Bratz and MGA

3   would indeed be liable if and when Mattel learned what MGA already knew.

4   Indeed, David Rosenbaum, the MGA attorney who represented the company in

5   negotiating Bryant's Bratz agreement,[7] testified that if Bryant created Bratz works

6   while employed by Mattel, the works were likely owned by Mattel.[8]

7        In the next three days after that email was sent, there were seven e-mail

8   communications between Larian and Glaser.[9]

9        Subsequently, just before her deposition last week, Glaser produced for the

10   first time a fax cover sheet showing that on July 3, 2001 she was sent a copy of the

11   Bryant/MGA Agreement by Victoria O'Connor, on Larian's instructions.  As the

12   Court will recall, Bryant had faxed his MGA agreement to MGA from Mattel's

13   Design Center.  MGA has never produced a copy of this agreement with the Mattel

14   fax header.  Victoria O'Connor, a former MGA executive, testified that Larian

15   instructed her to white out "Barbie Collectibles" from the MGA/Bryant contract and

16

17

---

18        [6]  Cal. Labor Code § 2870; see also Order Granting in Part, Denying In Part, and

19   Deferring in Part the Parties' Motions for Partial Summary Judgment ("Summary
     Judgment Order"), dated April 25, 2008 at 5, Olivar Decl. Exh. 3 ("Pursuant to that

20   statute (and its incorporation in the Inventions Agreement) . . . the factual question
     of whether Bryant worked on them on his own time, rather during his working hours

21   at Mattel, is not relevant").
          [7]  Deposition of David Rosenbaum ("Rosenbaum Dep.") at 38:14-22, 64:2-10,

22   Olivar Decl. Exh. 4.
          [8]  Id. at 90:9-17.  Moreover, Bryant was only one of a number of former Mattel

23   employees hired by MGA during this period, such as Paula Garcia (formerly
     Treantafelles), who also signed Inventions Agreements with Mattel.  See Garcia's

24   Employee Confidential Information and Inventions Agreement with Mattel, dated
     July 4, 1997, Olivar Decl. Exh. 5.  MGA also produced in discovery a

25   September 14, 2000 fax, sent from Bryant to Rosenbaum, enclosing Bryant's offer
     letter from Mattel, which specifically referenced Bryant's Confidential Information

26   and Inventions Agreement with Mattel, Olivar Decl. Exh. 6.  In the fax, Bryant
     advised Rosenbaum that he was "unable to look into this too much . . . without

27   risking suspicion" on Mattel's part.  Id.
          [9]  See Entry No. 63 on the January 30, 2008 Larian Privilege Log; Entry Nos.

28   69, 70, 89 from the January 15, 2008 Larian Privilege Log; and Entry Nos. 549,
     1327, and 1328 on the January 23, 2008 MGA Privilege Log, Olivar Decl. Exh. 7.

1  send it to Glaser.[10]  Consistent with that testimony, the Barbie Collectibles header is

2  missing from the version of the agreement Glaser received on July 3, 2001.[11]  Even

3  more remarkably, the September 18, 2000 date of the MGA/Bryant contract sent to

4  Glaser was also removed.[12]

5

6  **MGA Fabricates the Genesis of Bratz**

7          From the beginning, MGA tried mightily to hide Bryant's role in the creation

8  of Bratz and his relationship with Mattel.  Bryant acknowledged at deposition that

9  both MGA and Larian knew that he was a Mattel employee when he pitched his

10  ideas to MGA, accepted payments from it, worked with MGA, and entered into an

11  agreement with MGA.[13]  Rachel Harris of MGA, who attended a meeting with

12  Bryant and Larian in October 2000, testified that she and others knew that it would

13  be "bad" for Bryant if Mattel learned he was presenting drawings to MGA while still

14  employed by Mattel.[14]  Harris also testified that Larian told MGA employees that if

15  asked, he planned to say either that he came up with Bratz or that the inspiration

16  came from his daughter.[15]

17          Accordingly, after Bryant left Mattel, both Larian and Paula Garcia instructed

18  that no one at MGA was to discuss Bryant's involvement with Bratz outside MGA.[16]

19  Larian directed MGA personnel that "[t]here must be no mention about Mattel or

20  any of their properties, Carter, any MGA Bratz arts, etc."[17]  Similarly, MGA

21

22       [10]   Deposition of Victoria O'Connor ("O'Connor Dep.") at 18:5-19:4, Olivar
23  Decl. Exh. 8.
         [11]   Deposition of Patricia Glaser at 26:3-24, 28:3-12, 29:11-14 and Exh. 5905
24  thereto, Olivar Decl. Exh. 9.
         [12]   Id.
25       [13]   Deposition of Carter Bryant ("Bryant Dep.") at 67:7-21, 88:7-13, 21-24,
   Olivar Decl. Exh. 10.
26       [14]   Deposition of Rachel Harris ("Harris Dep.") at 167:20-169:11, 170:12-
   172:10, 262:21-264:11, Olivar Decl., Exh. 11.
27       [15]   Harris Dep. at 263:6-264:11, Olivar Decl. Exh. 11.
         [16]   Id.
28       [17]   E-mail message from Issac Larian, dated March 12, 2002, Bates-numbered
   MGA 3801819R-22R, Olivar Decl. Exh. 12.

1  employee Dee Dee Valencia wrote "I know we want to keep Carter under wraps" in

2  response to an e-mail message from Larian in which he proposed the development

3  of a limited edition model and asked "Signed by ....????"[18]  A later list of MGA

4  employees who came from Mattel notes Bryant's dates of employment at MGA as

5  "????-PRESENT" and his Mattel dates as "DON'T ASK."[19]

6      Publicly, Larian likewise sought to conceal Bryant's role in Bratz.  He

7  variously:  (1) identified himself, not Bryant, as the creator of Bratz; (2) claimed that

8  he, Larian, "was the inspiration behind the Bratz dolls;"[20] (3) averred that "he got the

9  idea for Bratz after seeing his own kids run around in navel-baring tops and hip-

10  huggers;"[21] (4) stated it was his son's "idea for Bratz;"[22] and (5) declared under

11  penalty of perjury to the U.S. Patent and Trademark Office that he personally

12  created the Bratz feet and packaging,[23] even though Bryant testified that he (Bryant)

13  had created that invention before even meeting MGA and had presented it to

14  MGA.[24]  MGA admits that no public statement recognizing Bryant as Bratz's creator

15  was issued until July 18, 2003, when the *Wall Street Journal* published an article

16  with that information.[25]

17

18

---

19  [18]  E-mail message from Isaac Larian to Dee Dee Valencia, dated February 6,

20  2003, Bates-numbered MGA 3801558-9, Olivar Decl. Exh. 14.
    [19]  MGA spreadsheet listing former Mattel employees ("Former Mattel

21  Employee List"), Bates-numbered MGA 1134723-30, dated April 20, 2006, Olivar
    Decl. Exh. 13 at MGA 1134726-20.

22  [20]  Affidavit of Isaac Larian in *MGA v. Metson*, dated May 14, 2004, Olivar
    Decl. Exh. 15, ¶ 8.

23  [21]  Palmeri, Christopher, "To Really Be a Player Mattel Needs Hotter Toys,"
    *Business Week*, July 28, 2003, Olivar Decl. Exh. 16 at 65.

24  [22]  Weiss, Jeff, "Immigrant's Company Shakes Up Toy Industry," *San Fernando
    Valley Business Journal*, March 29, 2004 ("My oldest son, seventeen year old Jason

25  is very creative . . . It was Jason's idea for Bratz."), Olivar Decl. Exh. 17 at 230.
    [23]  See United States Patent Application for a Doll with Aesthetic Changeable

26  Footgear, Matter No. 15904-142, Olivar Decl. Exh. 18.
    [24]  Bryant Dep. at 343:15-344:7, 1172:7-18, Olivar Decl. Exh. 10.

27  [25]  MGA Entertainment, Inc.'s Supplemental and Amended Responses to Mattel,
    Inc.'s Third Set of Requests for Admission to MGA Entertainment, Inc., dated

28  May 4, 2007, Response to Request for Admission Nos. 183-185, Olivar Decl.
    Exh. 19.

1    MGA's deceptions were not limited to keeping Bryant's role under wraps, or

2   to Bryant's own exit interview lies to Mattel and to co-workers.  Undoubtedly

3   working with MGA, Bryant wrote "1998" on drawings that even Bryant admits were

4   made later.[26]  MGA then used those drawings, and that date, to register its claims of

5   copyright in Bryant's Bratz drawings, listing the date of creation as 1998.[27]

6        Similarly, on November 2, 2004, Bryant filed a Complaint for Declaratory

7   Relief of Copyright Non-Infringement, representing to this Court that he created

8   Bratz in 1998 while living at his parents' home in Missouri.[28]  This was Defendants'

9   first public recitation of Bryant's "inspiration" story.  Bryant alleged that while he

10  was in Missouri, "he worked exclusively on his own ideas and drawings, with the

11  hopes of building a career as a freelance artist."[29]  While returning home from Old

12  Navy (where he worked to supplement his income), Bryant had a "eureka

13  moment."[30]  Allegedly "[i]nspired by the 'bratty' attitude he had observed, as well as

14  advertisements that he had seen relating to hip-hop fashion and other trends of the

15  time, Bryant started sketching multi-ethnic, urban youth, dressed in trendy fashions.

16  Bryant tried to capture in his sketches the 'bratty' attitude he had observed."[31]  He

17  claimed to have observed multi-ethnic, trendy students in August 1998 after he

18  passed Kickapoo High School in Springfield, Missouri while driving home one day

19

20  [26]  Carter Bryant's Responses to Mattel, Inc.'s Fifth Set of Requests for
    Admission to Carter Bryant, dated July 9, 2007, Response Nos. 27 and 29 at 25, 27-
21  28, Olivar Decl. Exh. 20.
        [27]  MGA's 2003 applications for copyright registration of the four original Bratz
22  drawings for (1) Yasmin, (2) Sasha,(3) Jade, and (4) Cloe, provide 1998 as the year
    of creation and identify Carter Bryant as the author.  MGA simultaneously applied
23  to register a group drawing of the four characters enumerated above.  That
    application also gave 1998 as the year of creation and identified Bryant as the
24  author.  Certificate of Registration VA 1-218-491 (Yasmin drawing), Certificate of
    Registration VA 1-218-488 (Sasha drawing), Certificate of Registration VA 1-218-
25  487 (Jade drawing), Certificate of Registration VA 1-218-490 (Cloe drawing),
    Certificate of Registration VA 1-218-489 (Bratz group drawing), Olivar Decl.
26  Exh. 21.
        [28]  Carter Bryant v. Mattel, Inc., Complaint for Declaratory Relief of Copyright
27  Non-Infringement, dated November 2, 2004 ¶¶ 31-33, Olivar Decl. Exh. 22.
        [29]  Id. ¶ 31.
    [30]  Id. ¶ 32.
28  [31]  Id. ¶ 32.

1   from Old Navy.[32]  Bryant averred that he made the drawings the same day.[33]  Bryant

2   also testified that he wrote the text related to the Bratz dolls in 1998, and that he also

3   came up with the "Bratz" name in 1998.[34]  According to Bryant, the name "Bratz"

4   was always attached to the project.[35]  Bryant's deposition was defended by counsel

5   for MGA even before MGA appeared in the case.[36]

6

7   **MGA Claws Back the E-mail**

8          On or about March 17, 2008, six weeks after MGA had identified the June 30,

9   2001 e-mail as one of the 17 documents identified to be produced to resolve a

10  discovery dispute, and the message was voluntarily produced, Mattel was notified

11  by MGA that the disclosure of the message in question was inadvertent, and that the

12  message was being clawed back on attorney-client privilege grounds.[37]  Mattel

13  returned the document.

14

15                          **Argument**

16  I.   **THE ATTORNEY-CLIENT PRIVILEGE DOES NOT PROTECT**

17       **COMMUNICATIONS FROM A CLIENT SEEKING TO FURTHER A**

18       **CRIME OR FRAUD**

19         The attorney-client privilege is not absolute.  In re Grand Jury Subpoena 92-I

20  (SJ), 31 F.3d 826, 829 (9th Cir. 1994).  When a lawyer's advice is solicited by a

21  client to further a crime or fraud, a communication loses its privilege.  See United

22  States v. Martin, 278 F.3d 988, 1000 (9th Cir. 2002) (holding that "when a lawyer's

23

24  [32]  Bryant Dep., Olivar Decl. Exh. 10 at 140:9-20, 141:7-21, 142:6-17.
    [33]  Id. at 142:24-143:1.
25  [34]  Id. at 139:23-140:8 ("Q: We've used the 'Bratz' name.  Did you come up with
    the 'Bratz' name as well?  A: Yes.  Q: And when did you come up with the name?
26  A: About the time of the creation of the Bratz.  About the same time").
    [35]  Id. at 156:5-8.
27  [36]  Id. at 3:23-24.
    [37]  March 17, 2008 Clawback Letter from Bryant Delgadillo to Juan Pablo
28  Albán, Olivar Decl. Exh. 23.  Mattel destroyed the e-mail message in accordance
    with the Protective Order and hence cannot lodge it with this motion.

                              -8-            Case No. CV 04-9049 SGL (RNBx)

1 advice is sought to further a crime or fraud, those communications are not

2 privileged").  The Supreme Court has long prohibited the misuse of the attorney-

3 client privilege to protect communications made for the purpose of obtaining advice

4 for the commission of a fraud or a crime.  In United States v. Zolin, 491 U.S. 554,

5 563 (1989), the Court held that "it is the purpose of the crime/fraud exception to the

6 attorney-client privilege to assure that the seal of secrecy between lawyer and client

7 does not extend to communications made for the purpose of getting advice for the

8 commission of a fraud or crime."

9        The Ninth Circuit has similarly recognized an exception to protect against the

10 abuse of the attorney-client relationship.  In United States v. Hodge & Zweig,

11 548 F.2d 1347, 1354-55 (9th Cir. 1977), the Ninth Circuit explained that because the

12 "attorney-client privilege is not to be used as a cloak for illegal or fraudulent

13 behavior, it is well established that the privilege does not apply where legal

14 representation was secured in furtherance of intended, or present, continuing

15 illegality."  Simply put, "the privilege takes flight if the relation is abused.  A client

16 who consults an attorney for advice that will serve him in the commission of a fraud

17 will have no help from the law."  Clark v. United States, 289 U.S. 1, 15 (1933), *cited*

18 *with approval by* In re Napster, Inc. Copyright Litig., 479 F.3d 1078, 1090 (9th Cir.

19 2007).

20        It is immaterial whether the attorney aided the crime or fraud.  All that is

21 required is that the client have made the communication because the client wanted

22 to advance a fraud or crime.  "[T]he crime-fraud exception does not require a

23 completed crime or fraud but only that the client have consulted the attorney in an

24 effort to complete one."  In re Grand Jury Proceedings, 87 F.3d at 381 (emphasis

25 added).

26        It is also well settled that the attorney need not have been aware that the client

27 had an improper purpose in seeking advice.  See Napster, 479 F.3d at 1090 ("The

28 attorney need not have been aware that the client harbored an improper purpose.

1  Because both the legal advice and the privilege are for the benefit of the client, it is

2  the client's knowledge and intent that are relevant"); In re Grand Jury Proceedings,

3  87 F.3d at 381-82 ("the attorney need not himself be aware of the illegality

4  involved; it is enough that the communication furthered, or was intended by the

5  client to further, that illegality"); United States v. Chen, 99 F.3d 1495, 1504 (9th

6  Cir. 1996) ("it is the client's knowledge and intentions that are of paramount concern

7  to the application of the crime-fraud exception; the attorney need know nothing

8  about the client's ongoing or planned illicit activity for the exception to apply");

9  Hodge & Zweig, 548 F.2d at 1354 ("[t]he crime or fraud exception applies even

10  where the attorney is completely unaware that his advice is sought in furtherance of

11  such an improper purpose").  It is the client's abuse of the attorney client-

12  relationship, irrespective of whether there is a successful criminal or fraudulent act,

13  that warrants piercing the privilege.  In re Grand Jury Proceedings, 87 F.3d at 381.

14

15  **II.    LARIAN'S COMMUNICATIONS WITH GLASER FALL WITHIN**

16      **THE CRIME FRAUD EXCEPTION TO THE ATTORNEY-CLIENT**

17      **PRIVILEGE**

18      A party seeking to establish the crime-fraud exception must satisfy a two-part

19  test.  First, the party must show that the party asserting the privilege "was engaged

20  in or planning a criminal or fraudulent scheme when it sought the advice of counsel

21  to further the scheme."  In re Grand Jury Proceedings, 87 F.3d 377, 381 (9th Cir.

22  1996); see also Napster, 479 F.3d at 1090 (emphasis added).  Second, the party must

23  show that "the attorney-client communications for which production is sought are

24  'sufficiently related to' and were made 'in furtherance of [the] intended, or present,

25  continuing illegality.'"  Napster, 479 F.3d at 1090 (emphasis in original); see also In

26  re Grand Jury Proceedings, 87 F.3d at 382-83.  In this Circuit, the "in furtherance"

27  requirement is met if there is "some relationship between the communications and

28  the illegality."  Napster, 479 F.3d at 1094-1095; United States v. Laurins, 857 F.2d

-10-    Case No. CV 04-9049 SGL (RNBx)

1    529, 540 (9th Cir. 1988). To pierce the privilege, the movant need only establish

2    these elements by a preponderance of the evidence. Napster, 479 F.3d at 1094-95.

3    An even lower standard is applied when *in camera* review, rather than disclosure, is

4    sought. Id. at 1096.

5         These standards are met here. The Ninth Circuit has recognized that a party

6    seeking to pierce the privilege is inevitably at a disadvantage in establishing how

7    communications it is not fully aware of furthered a crime or fraud. See id. at 1096;

8    Zolin, 491 U.S. at 569-70. Here, though, it is clear that MGA's claim of rights to

9    Bryant's drawings is grounded in its deceptions about the timing and substance of

10   Bryant's work. There is no doubt that the communication to Glaser seeking advice

11   regarding "potential" Mattel litigation was part of a scheme to claim ownership of

12   Bratz--and, as the e-mail itself shows, that scheme is based on lies. Nor can there be

13   any doubt that in the wake of the e-mail message disclosing that Bryant had created

14   Bratz on nights and weekends while working at Mattel, MGA and Bryant changed

15   their story--and the face of the drawings themselves--to support the new claim that

16   the design work was done in Missouri in 1998. Larian had no right to seek legal

17   "counsel" to assist him in infringing Mattel's copyrights and stealing its property.

18        It is not necessary that Ms. Glaser did anything unlawful. Indeed, it appears

19   that because of advice Larian received from Glaser, he then proceeded to alter facts

20   to deceive his lawyers. It is not even necessary that Larian or the MGA defendants

21   completed any crime or fraud, although they plainly did. All that is necessary is for

22   Mattel to establish by a preponderance of the evidence that the communications at

23   issue, instead of reflecting a proper effort to secure advice on compliance with the

24   law, were made in furtherance of unlawful action. Given the factual record here,

25   that is the case. The communication furthered at least two crimes, as discussed

26   below.

27

28

**A.   MGA Engaged in Criminal Infringement of Mattel's Copyrights**

The June 30, 2001 e-mail message demonstrates that MGA and Larian consulted Glaser in an "effort to complete" criminal willful copyright infringement, which has been ongoing from the introduction of Bratz to the present.  In re Grand Jury Proceedings, 87 F.3d at 381.  The facts in the message establish that MGA's production of Bratz was in violation of copyrights owned by Mattel.  MGA's subsequent, elaborate efforts to recreate the history of Bratz's creation and cover up the facts attest to its willful effort to infringe those copyrights.

Criminal copyright infringement consists of (1) infringement of a copyright, (2) committed willfully, (3) for profit.  United States v. Drebin, 557 F.2d 1316, 1326 (9th Cir. 1977); United States v. Wise, 550 F.2d 1180, 1190 (9th Cir. 1977).  Willfulness is defined as "with knowledge that [one's] conduct constitutes copyright infringement."  Dolman v. Agee, 157 F.3d 708, 715 (9th Cir. 1998); see also Columbia Pictures Television, Inc. v. Krypton Broad., 106 F.3d 284, 293 (9th Cir. 1997), rev'd on other grounds by Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340 (1998); 3 Nimmer on Copyright § 1404[B], at 14-40.2-.3.

**1.   MGA Has Infringed Mattel's Copyrights in Bratz**

Pursuant to the Inventions Agreement, Bryant agreed to "promptly and fully" disclose and assign to Mattel his "right, title, and interest in such inventions, and all [his] right, title, and interest in any . . . copyrights . . . [and] copyright applications" he conceived or reduced to practice while employed by Mattel.  "Inventions" included, but was not limited to, "all discoveries . . . [and] designs, whether patentable or unpatentable."[38]  Whether or not MGA ever saw Bryant's specific agreement, it was clearly familiar with such agreements:  MGA was populated with employees who had signed such agreements when they were at Mattel, such as

---

[38]  Carter Bryant's Confidential Information and Inventions Agreement with Mattel, Olivar Decl., Exh. 24.

-12-

Case No. CV 04-9049 SGL (RNBx)

1 | Paula Garcia.[39]  Rosenbaum, MGA's lawyer, testified that he knew the "likely"

2 | terms of Mattel's agreement that works created by Carter Bryant while employed by

3 | Mattel belonged to Mattel.[40]  And MGA made its own employees sign comparable

4 | agreements.[41]

5 |     Because Bryant's work for Mattel had always involved fashion dolls (*i.e.*,

6 | dolls whose clothing and accessories are intended to be changed) and Bratz is a

7 | competing fashion doll, Mattel clearly owned the Bratz copyrights if, as stated in the

8 | e-mail message, Bryant performed his work at night and on weekends without using

9 | Mattel's resources.  Thus, under the facts conveyed by Larian to Glaser, the Bratz

10 | copyrights clearly and unambiguously belonged to Mattel.

11 |     Of course, the evidence of Mattel's ownership is not limited to the e-mail

12 | message.  To the contrary, the evidence adduced to date overwhelmingly shows

13 | Mattel's ownership.  For example, forensic evidence shows that Bryant's first Bratz

14 | drawings, purportedly made in 1998, were drawn on pages torn from the middle of a

15 | notebook that has drawings, images, and entries for projects that Bryant worked on

16 | for Mattel in 1999 and 2000.[42]  Bryant would have had to make a three mile detour

17 | through a residential neighborhood to pass Kickapoo High School when commuting

18 | from his job at Old Navy;[43] and even if he had done so, he would not have seen

19 | ethnically diverse students who resembled the Bratz dolls because Kickapoo High

20 |

21 |

22 |

23 | [39]  Former Mattel Employee List, Olivar Decl. Exh. 13.
   [40]  Rosenbaum Dep, at 90:9-17, Olivar Decl. Exh. 4.
24 | [41]  Ward Confidentiality and Inventions Assignment Agreement, dated
   October 18, 2000, Olivar Decl. Exh. 38.
25 | [42]  Expert Report of Lloyd Cunningham, dated February 11, 2008, at 2-4, Olivar
   Decl. Exh. 25;  see also Deposition of Anna Rhee at 107:4-108:10; 109:5-25;
26 | 110:7-9, 112:21-113:12, 113:22-114:15; 127:8-14; 132:22-133:2; 138:9-22; 201:25-
   204:9, Olivar Decl. Exh. 26 (Anna Rhee, who painted the Bratz faces, testified that
27 | Bryant first asked her to work on Bratz in the summer of 2000 in the Mattel Design
   Center, not at home on a night or weekend).
28 | [43]  Map showing Kickapoo High School, Old Navy, and the Bryant home, Olivar
   Decl. Exh. 27.

1    School is not ethnically diverse.[44]  Bryant failed to retain the magazine that

2    supposedly inspired his work (his mother testified that she had not subscribed to

3    Seventeen in 20 years, and certainly did not while her son was living with her).[45]

4    Advertisements similar to the one he claimed to have seen in 1998 appeared in

5    Seventeen in 1999 and 2000, but the latter ads resembled Bratz much more

6    closely.[46]  In other litigation, Bryant himself denied under oath that he had done

7    anything in the design field while he was away from Mattel in 1998--at a time when

8    he had already made millions on Bratz.[47]  In another proceeding in Hong Kong,

9    MGA expressly admitted under oath that Bryant's drawings were created in 1999.[48]

10          Other forensic evidence is even more damning. "8/1998" shows up on

11   drawings that Bryant himself admits were not prepared in 1998.  They are, instead,

12   color drawings he created in 1999 or later.[49]  To "date" them, Bryant had some of

13   his Bratz drawings notarized by a Mattel notary in August 1999.  To "date" black-

14   and-white Bratz line drawings Bryant claims to have created in 1998, Bryant had

15   some of his Bratz drawings notarized by a Mattel notary in August 1999.[50]  Because

16   the notary refused his request to back-date the drawings, he claimed he asked her to

17   write in her notary book: "From Missouri 1998."[51]  However, the words "From

18

19     [44]  Deposition of Sarah Odom at 22:9-23:16 and Springfield Public Schools
20   Annual Report, 2006-2007, Exhibit B thereto, Olivar Decl. Exh. 28 at 6.
       [45]  Deposition of Janet Bryant at 305:14-306:3, 307:3-9, Olivar Decl. Exh. 29.
21     [46]  September 1999 Seventeen, Trial Exhibit 10132, December 1999 Seventeen,
     Trial Exhibit 10139, March 2000 Seventeen, Trial Exhibit 10142, April 2000
22   Seventeen, Trial Exhibit 10145, Olivar Decl. Exh. 39; see also Expert Rebuttal
     Report of Lee Loetz, dated March 17, 2008, Olivar Decl. Exh. 40.
23     [47]  Deposition of Carter Bryant in Gunther Wahl v. Mattel, taken Sept. 9, 2003,
     M 0061802-917 at M 0061890-91 (deposition transcript at 89:23-90:7), Olivar Decl.
24   Exh. 30.
       [48]  Affidavit of Raymond David Black from MGA Entertainment, Inc. (1st
25   Plaintiff), MGA Entertainment (HK) Limited (2nd Plaintiff) and Double Grand
     Corporation Limited (Defendant) HCA No. 1883/2003, dated June 3, 2003, Bates-
26   numbered MGA 0885348 - MGA 0885414 at 0885378, Olivar Decl. Exh. 41.
       [49]  Bryant Dep. at 151:12-25, Olivar Decl. Exh.10.
27     [50]  Id. at 55:22-56:7; See also Deposition of Jacqueline Ramona Prince at
     124:21-125:7; 138:20-139:21, Olivar Decl. Exh. 31.
28     [51]  Id. at 55:22-56:7; see also Deposition of Jacqueline Ramona Prince at
     124:21-125:7; 138:20-139:21, Olivar Decl. Exh. 31.

1  Missouri 1998" were added to the notary book after the fact, and were not present
2  when the original entry was written--in other words, the entry in the notary book
3  was forged.[52]

4       Nor is MGA's story of the creation of the name "Bratz" supportable.
5  According to MGA, Bryant had already attached the name "Bratz" when he first
6  pitched it.[53]

7

8  [54] Rachel Harris of MGA testified to the same thing.[55]  And Isaac
9  Larian has admitted the same thing on video.[56]

10       In short, with or without the e-mail message, the evidence of Mattel's
11  ownership, and of MGA's infringement, is overwhelming, and clearly meets the
12  preponderance threshold the Court must apply now.

13       **2.**   **Defendants' Infringement Was Willful**

14       Rather than own up to these facts, the MGA defendants have sought to cloak
15  their knowledge--an unprivileged fact--in the attorney-client privilege and create a
16  fictional account of the creation of Bratz to place it outside Mattel's ownership.
17  Once it became clear that the "nights and weekends" story would not protect them,
18  they told the Copyright Office and this Court that the project was created in 1998,
19  which is obviously not what Larian had previously said Bryant had told him.

20       Defendants went to great lengths to conceal the truth.  Extensive evidence of
21  this concealment has been set forth at length elsewhere[57] and will not be repeated

22

23  [52]  Expert Report of Valery Aginsky ("Aginsky Report"), dated February 8,
24  2008, Olivar Decl. Exh. 32 at 8.
    [53]  Deposition of Paula Garcia at 1073:18-1074:6, 1076:17-1077:14, Olivar
25  Decl. Exh. 42; Deposition of Isaac Larian at 180:22-181:4, Olivar Decl. Exh. 43.
26  [54]
    [55]  Harris Dep. at 57:5-58:1, 61:14-63:3, Olivar Decl. Exh. 11.
27  [56]  Joan Gaynor Video Interview of Isaac Larian at the 2001 Tokyo Toy Fair,
Trial Exh. 13182, Olivar Decl. Exh. 44.
28  [57]  See Mattel, Inc.'s Corrected Separate Statement of Uncontroverted Facts and
Conclusions of Law, dated March 10, 2008, Olivar Decl. Exh. 34; Notice of Motion
    (footnote continued)

REDACTED

1   here,  The fact that Larian sought to manipulate his own lawyer, Ms. Glaser, after

2   exchanging the e-mail messages now at issue with her is telling.  Mattel had known

3   since O'Connor was deposed that Larian instructed her to white-out "Barbie

4   Collectibles" from the header of the MGA/Bryant agreement and send it to Glaser.

5   But Mattel just learned last week that Larian did so--and apparently also instructed

6   O'Connor to redact the date of the agreement--after exchanging e-mails with Glaser

7   concerning MGA's obligations to Mattel vis-à-vis Bratz.  Also last week, Mattel

8   obtained evidence that in another action, Larian had instructed his brother Farhad

9   Larian to lie and withhold evidence from their attorneys.[58]  That Larian sought to

10  hide the relevant facts even from his own lawyer, when seeking her advice, shows

11  that these communications with her are not entitled to protection.  See, e.g., Clark,

12  289 U.S. at 15 ("A client who consults an attorney for advice that will serve him in

13  the commission of a fraud will have no help from the law.")

14              **3.    Defendants' Infringement Was Unquestionably Profitable**

15          Defendants' infringement of Mattel's copyright interests has been enormously

16  profitable.  Mattel's experts estimate the total net revenue of Bratz to be in excess of

17

18          Accordingly, the preponderance of the evidence demonstrates that defendants

19  engaged in criminal copyright infringement.  Under Larian's own version of the

20  facts, Mattel owned the Bratz copyrights.  Defendants therefore tried to conceal

21  Mattel's ownership of Bratz, and profited handsomely from their acts.  A

22  preponderance of the evidence--the legal standard--demonstrates both infringement

23  and willfulness.

24

25

26  and Corrected Motion of Mattel, Inc. for Partial Summary Judgment, dated
    March 10, 2008, Olivar Decl. Exh. 35.

27      [58]  Email identified as Bates No. CG 0009, produced May 13, 2008, Olivar Decl.
    Exh. 36.

28      [59]  Expert Report of Michael Wagner, dated February 11, 2008, at 11, Olivar
    Decl. Exh. 37.

Case No. CV 04-9049 SGL (RNBx)

REDACTED

**B.**     **Larian's Communications Were "In Furtherance of" MGA's**
**Larceny of Mattel's Property**

There is also a tangible, physical aspect to MGA's wrongdoing, as this Court recognized in concluding that Mattel's copyright claim did not preempt its allegations of conversion.  The criminal analogue for conversion is larceny.  To sustain a claim for larceny in California, a person must establish that (1) a person took personal property of some value belonging to another, (2) when the person took the property he had the specific intent to deprive the alleged victim permanently of his property; and (3) the person carried the property away by obtaining physical possession and control for some period of time and by some movement of the property.  United States v. Corona-Sanchez, 234 F.3d 449, 454 (9th Cir. 2000); United States v. Thordarson, 646 F.2d 1323, 1335 (9th Cir. 1981).

**1.**     **Larian and MGA Took Property that Belonged to Mattel**

This Court has ruled that any Bratz drawings or other Bratz-related inventions made while Bryant worked for Mattel belong to Mattel under the Inventions Agreement.[60]  The Court has also recognized that the Bratz drawings are "works of art that may have value of apart from the copyrights they represent."  *Id.* at 3.  It follows that in taking these drawings, which they unquestionably did, Larian and MGA took Mattel's property.

**2.**     **Larian and MGA Intended to Permanently Deprive Mattel of**
**Its Property**

The requirement of intent to deprive permanently is not interpreted literally in California.  People v. Avery, 27 Cal. 4th 49, 55 (2002) (noting that "the word permanently as used here is not to be taken literally") (internal citations omitted).  Rather, this requirement is "satisfied by the intent to deprive temporarily but for an unreasonable time so as to deprive the person of a major portion of its value or

---

[60] Summary Judgment Order at 4-5, Olivar Decl. Exh. 3.

1  enjoyment." Id. at 58; Foreshee v. Runnels, No. S-03-1647, 2007 WL 2505578

2  at *6 (E.D. Cal. Aug. 31, 2007) (noting that "California law requires an intent to

3  permanently deprive the owner of his or her property or to take the property

4  temporarily but for an unreasonable time to deprive the owner of a major part of its

5  value or enjoyment.").  For purposes of larceny, the relevant intent is the intent at

6  the time of taking.  People v. Kronemyer, 189 Cal. App. 3d 314, 363 (1987) (finding

7  that "a key element of larceny is that the perpetrator has the intent to permanently

8  deprive the victim of property at the time it was taken") (emphasis in original).

9       When he provided the Bratz drawings to Larian and MGA, Bryant

10  unquestionably had the requisite intent to deprive Mattel of their value and use, and

11  MGA and Larian intended to do the same.

12       **3.    Larian and MGA Carried Away Mattel's Property and**

13            **Controlled It by Removing It from Mattel's Possession**

14       The requirement of carrying away and controlling the victim's property is a

15  low threshold that can be satisfied by even the slightest movement.  People v. Davis,

16  19 Cal. 4th 301, 305 (1998) (holding that "if the taking has begun, the slightest

17  movement of the property constitutes a carrying away or asportation").  Here, there

18  is no dispute that Larian and MGA took the Mattel-owned Bratz drawings from

19  Bryant, and have retained both possession and control of the drawings from late

20  2000 to the present.  Thus, the final element is satisfied as well.

21       **C.    MGA Has Perpetrated a Fraud on the Court**

22       Defendants' fraud on the Court provides an additional and independent basis

23  for piercing the attorney-client privilege.  Fraud on the court embraces "that species

24  of fraud [that] does or attempts to defile the court itself, or is a fraud perpetrated by

25  officers of the court so that the judicial machinery cannot perform in the usual

26  manner its impartial task of adjudging cases that are presented for adjudication."  In

27  re Levander, 180 F.3d 1114, 1119 (9th Cir. 1999).  Fraud on the court requires "a

28  grave miscarriage of justice, and a fraud that is aimed at the court."  Appling v. State

1  <u>Farm. Mut. Auto. Ins. Co.</u>, 340 F.3d 769, 780 (9th Cir. 2003) (citations omitted).

2  The Ninth Circuit has held that isolated instances of perjury or the non-disclosure of

3  information do not ordinarily constitute fraud on the court. <u>Napster</u>, 479 F.3d

4  at 1096.

5          However, this is not a case of such isolated instances. Here, Defendants have

6  engaged in a continuous, complex, multi-year effort to directly mislead this Court.

7  Specifically, Defendants have <u>repeatedly</u> falsely stated to the Court in their various

8  pleadings and discovery responses that Bryant created Bratz in 1998 while in

9  Missouri, falsified and back-dated drawings, and otherwise attempted to hide the

10  truth. Their actions go to the core question in the litigation: ownership of Bratz.

11  Defendants have manipulated and subverted the judicial machinery, and continue to

12  do so to this day. It would be unconscionable to allow defendants to hide the truth

13  behind the privilege.[61]

14

15  _____

16          [61]  Notably, proof of an actual crime or fraud--which Mattel has shown--is not

17  required. Courts also pierce the attorney-client privilege where communications
   furthered torts and other misconduct. <u>In re Sealed Cases</u>, 676 F.2d 793, 812 (D.C.

18  Cir. 1982) (holding that crime-fraud exception applies to crimes, frauds, and "other
   type[s] of misconduct fundamentally inconsistent with the basic premises of the

19  adversary system"); <u>In re Grand Jury Proceedings</u>, 727 F.2d 1352, 1355 (4th Cir.

20  1984) (piercing the privilege on a number of grounds in a tax fraud case and holding

21  that "privilege applies only when the person claiming the privilege has as a client
   consulted an attorney for the purpose of securing a legal opinion or services and not

22  'for the purpose of committing a crime or tort'"); <u>Int'l Tel. & Tel. Corp. v. United</u>

23  <u>Tel. Co.</u>, 60 F.R.D. 177, 180 (M.D. Fla. 1973) (holding that the attorney-client
   privilege applies "not only where fraud or crime is involved, but also where there

24  are other substantial abuses of the attorney-client relationship); <u>In re St. Johnbury</u>

25  <u>Trucking Co.</u>, 184 B.R. 446, 456 (Bankr. D. Vt. 1995) (piercing the privilege based
   upon the filing of an unreasonable pleading for an improper purpose and noting that

26  "precedent and authority also recognize that not just technical crimes or frauds are

27  excluded from the attorney-client privilege"). <u>See</u> <u>also</u> 8 Wigmore, <u>Evidence</u>
   § 2298 (McNaughton rev. 1961) ("[I]t is difficult to see how any moral line can

28  properly be drawn at [the] crude boundary [of the definition of crime or fraud], or
          (footnote continued)

**Conclusion**

For the foregoing reasons, Mattel respectfully requests that the Court enter an Order compelling: (1) MGA to produce Entry Nos. 347, 375, 548, 549, 1325, 1326, 1641, 1818, 1819, and 1820 from MGA's January 23, 2008 Privilege Log, and (2) Larian to produce Entry Nos. 69, 70, 73, 79, 89, 90, 91, 95, 97, 100, 101, 113, 114, and 115 from his January 15, 2008 Privilege Log and Entry No. 63 from his January 30, 2008 Privilege Log. At a minimum, Mattel respectfully requests that the Court review those e-mails in camera to determine if disclosure is required under the standard set forth in Napster.

DATED: May 23, 2008

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By
John B. Quinn
Attorneys for Mattel, Inc.

how the law can protect a deliberate plan to defy the law and oust another person of his rights, whatever the precise nature of those rights may be").