ABC INTERNATIONAL TRADERS, INC.
North Hills, California

February 13, 2003
Page 2

It is also our opinion that as of December 31, 2000, the market value of a 45 percent interest in the shareholder's equity of ABC International Traders, Inc., on a control basis, as summarized in Table J, of the Addenda, was:

## $15,212,000

It is our opinion that a minority discount does not apply to the 45% interest as the other major shareholder holds an equal 45% interest.

Table J, in the Addenda presents our conclusions of market value under the income, market and excess earnings approach, and sets forth the calculations of the various appraised interests as of December 31, 2000.

In conjunction with our work, ABC provided us with audited and unaudited financial information and prospective financial and operational data. We accepted the historical data as fairly reflecting its operations, trends and financial position. We have not independently investigated the accuracy or completeness of the historical data provided to us and we express no opinion or other form of assurance regarding the accuracy or completeness of the data. The conclusions of value presented herein are based on numerous assumptions pertaining to prospective economic and operating conditions. Unanticipated events and circumstances may occur and actual results achieved during the period covered by our prospective financial analysis will vary from our estimates. The variations may be material. In accordance with ethical principles of the Institute of Business Appraisers, neither National Business Appraisers, LLC, nor any of its employees or subcontractors has any present or contemplated future interest in the business interests or assets herein appraised. Neither our employment nor our compensation is in any way contingent upon the values presented in this report. A copy of this report and the working papers from which it was prepared will be kept in our files for eight years.

Respectfully submitted,

NATIONAL BUSINESS APPRAISERS, LLC

By:_____
Ernest E. Dutcher, MCBA
Managing Member
Senior Valuation Counselor

**Attachments:** Professional Qualifications; Statement of Facts and Limiting Conditions; Addenda

1118ABCV

2 - 𝒢𝒟

NATIONAL BUSINESS APPRAISERS, LLC

000058

Exhibit C
Page 2 of 28


EXHIBIT _6_ PAGE _118_

**ABC INTERNATIONAL TRADERS, INC.**
**North Hills, California**

February 13, 2003
Page 3

## CERTIFICATION

We certify that, to the best of our knowledge and belief:

\*      The statements of fact contained in this report are true and correct.

\*      The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and is our personal, unbiased professional analyses, opinions, and conclusions.

\*      We have no present or prospective interest in the property that is the subject of this report, and we have no personal interest or bias with respect to the parties involved.

\*      Our compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in, or the use of, this report.

\*      Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

\*      No significant professional assistance was provided to the undersigned in connection with this assignment.

Appraiser_____
            Ernest E. Dutcher, MCBA

NATIONAL BUSINESS APPRAISERS, LLC

000059

Exhibit C
Page 3 of 28

EXHIBIT _6_ PAGE _19_

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

February 13, 2003
Page 4

# PROFESSIONAL QUALIFICATIONS

For

## ERNEST E. DUTCHER, MCBA

Designations

of

**Certified Business Appraiser**
**Master Certified Business Appraiser**

Awarded by

### THE INSTITUTE OF BUSINESS APPRAISERS

http://www.instbusapp.org

*The oldest business appraisal society in the nation.*

NATIONAL BUSINESS APPRAISERS, LLC

000060

Exhibit C
Page 4 of 28

EXHIBIT 6   PAGE 120

**ABC INTERNATIONAL TRADERS, INC.**
**North Hills, California**

February 13, 2003
Page 5

### ERNEST E. DUTCHER, MCBA

#### Professional Qualifications

**Experience:** Mr. Dutcher's full time appraisal experience began in 1975. He has been involved in the analysis and valuation of a broad variety of business enterprises in many industries, including electric power generation, healthcare, equipment leasing & rental, distribution, transportation, manufacturers in the communications, computer, electronics, rubber & chemical industries, shipping, engineering, oil & gas, and many others. He has consulted in marketing, manufacturing and management. He was CEO of an electronic equipment manufacturing company and has held executive positions in other manufacturing, distribution and sales companies.

**Employment:** Managing Member and Senior Valuation Counselor for National Business Appraisers, LLC. Was Senior Valuation Counselor for Valuation Counselors Group, Inc. for four years, following five years with Marshall and Stevens Incorporated. Previously, he was SW. Manager of Acquisitions for a public company; Business Opportunities Sales for Coldwell Banker; President and General Manager of an elevated work platform manufacturer; Vice President and Controller for an equipment sales and rental company; Vice President of Manufacturing and Division Manager of companies producing specialized heating devices and electronic heat controllers; President and CEO of a high technology public company in the electronics industry; and President and sole stockholder of an exclusive area distributor of Magnavox consumer electronics components and accessories.

**Education:** Mr. Dutcher attended Yale University, majoring in Communications; USAF Military Schools, attaining the rank of Captain, Radar and Communications. He also attended RCA Institute, UCLA Extension Division and Santa Monica City College in public relations, plus many seminars and home study courses in finance, taxation, computer courses in business related software etc. He has held California real estate and insurance licenses and is a licensed pilot.

**Professional Societies:** Mr. Dutcher is a senior member in the Institute of Business Appraisers (IBA), the premier professional society of business appraisers, with over 3,400 members. He has also served on the select Qualifications Review Committee. As of March 31, 1999, only about 250 IBA members were designated as Certified Business Appraisers (CBAs). *As of that date, Mr. Dutcher was one of only 15 Master Certified Business Appraisers (MCBAs), a designation requiring over 10 years of providing business appraisals on a full time basis as a CBA.*

**Court Testimony:** Mr. Dutcher has qualified and testified as an expert witness before Federal Tax Courts in Los Angeles and San Francisco California, and California Superior Courts of Los Angeles, Orange, and San Diego Counties. He has served as a consultant in valuation matters to numerous attorneys during the litigation process.

NATIONAL BUSINESS APPRAISERS, LLC

Exhibit C
Page 5 of 28

EXHIBIT __6__ PAGE _121_



**ABC INTERNATIONAL TRADERS, INC.**
**North Hills, California**

February 13, 2003
Page 6

## STATEMENT OF FACTS AND LIMITING CONDITIONS

**National Business Appraisers, LLC (NBA),** strives to clearly and accurately disclose the assumptions and limiting conditions that directly affect a valuation analysis, opinion or conclusion. In order to assist the reader in interpreting this report, such assumptions are set forth as follows:

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of the original assignment. If the need for subsequent services related to a valuation assignment (e.g., testimony, updates, conferences, reprint, or copy services) is contemplated, special arrangements acceptable to NBA must be made in advance. NBA, reserves the right to make adjustments to the analysis, opinion and conclusion set forth in the report as we deem necessary if the facts presented by ABC prove to be inaccurate or have been misinterpreted.

It is assumed that: no opinion is intended in matters that require legal, engineering or other professional advice which has been or will be obtained from professional sources; the valuation report will not be used for guidance in professional matters exclusive of the appraisal and valuation discipline; there are no regulations of any government entity to control or restrict the use of the property unless specifically referred to in the report; and the property will not operate in violation of any applicable government regulations, codes, ordinances or statutes.

Information furnished by others is presumed to be reliable, and where so specified in the report, has been verified; however, no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain. All facts and data set forth in the report are true and accurate to the best of NBA's knowledge and belief. No single item of information was completely relied upon to the exclusion of other information.

Financial data. operating histories and other data relating to income and expenses attributed to the business have been provided by management or it's representatives have been accepted without further verification except as specifically stated in the report.

Valuation reports may contain prospective financial information, estimates or opinions that represent the appraiser's view of reasonable expectations at a particular point in time, but such information, estimates or opinions are not offered as predictions or as assurances that a particular level of income or profit will be achieved, that events will occur or that a particular price will be offered or accepted. All opinions as to value are presented as NBA's considered opinion based on the facts and data obtained during the investigation and set forth in the report. Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material. It should be specifically noted that the valuation assumes the

NATIONAL BUSINESS APPRAISERS, LLC

000062

Exhibit C
Page 6 of 28

EXHIBIT _6_ PAGE _122_

**ABC INTERNATIONAL TRADERS, INC.**
**North Hills, California**

February 13, 2003
Page 7

property will be competently managed and maintained by financially sound owners over the expected period of ownership. This appraisal engagement does not entail an evaluation of man-agement's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

No effort has been made to determine the impact of possible energy shortages or the effect on this project of future federal, state or local legislation, including any environmental or ecological matters or interpretations thereof.

Neither the report nor any portions thereof, especially any conclusions as to value, the identity of the appraiser(s) or NBA, shall be disseminated to the public through public relations media, news media, sales media or any other public means of communications without the prior written consent and approval of NBA. The date(s) of the valuation to which the value estimate conclusions apply is set forth in the letter of transmittal and within the body of the report. The value is based on the purchasing power of the United States dollar as of that date. Unless otherwise noted, NBA assumes that there will be no changes in tax regulations.

No significant change is assumed in the supply and demand patterns indicated in the report. The valuation assumes market conditions observed as of the current date of our market research stated in the letter of transmittal. These market conditions are be-lieved to be correct; however, the appraisers assume no liability should market conditions materially change because of unusual or unforeseen circumstances.

The report and the final estimate of value and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed, solely for the purposes stated, and should not be relied upon for any other purpose. Any allocation of total price between tangible assets and various classes of intangible assets, if shown, is invalidated if used separately or in conjunction with any other report. Neither the appraisal report nor its contents nor any reference to the appraiser(s) or NBA, may be referred to or quoted in any registration statement, prospectus, offering memorandum, sales brochure, other appraisal, loan or other agreement or document given to third parties excepting governmental agencies or the extent required by law without our prior written consent. Permission will be granted only upon meeting certain conditions.

A copy of this report and the working papers from which it was prepared will be kept in our files for eight years.

Exhibit C
Page 7 of 28

NATIONAL BUSINESS APPRAISERS, LLC

000063

7.80

EXHIBIT __6__ PAGE __123__

**ABC INTERNATIONAL TRADERS, INC.**
North Hills, California

February 13, 2003
Page 8

**ADDENDA**

$8.80$

NATIONAL BUSINESS APPRAISERS, LLC

000064

Exhibit C
Page 8 of 28

EXHIBIT 6 PAGE 124

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

February 13, 2003
Page 9

## INDEX OF FINANCIAL TABLES

TABLE A      FIVE YEAR COMPARATIVE BALANCE SHEET – ASSETS

TABLE A-1  FIVE YEAR COMPARATIVE BALANCE SHEET – LIABILITIES

TABLE B      COMPARATIVE INCOME STATEMENT - 5 YEARS

TABLE C      INCOME STATEMENT ADJUSTMENTS

TABLE D-1    ADUSTED BOOK VALUE – PAGE 1

TABLE D-2    ADUSTED BOOK VALUE – PAGE 2

TABLE E      INCOME APPROACH  METHOD OF VALUATION

TABLE F      CAPITAL ASSET PRICING MODEL

TABLE H      FIXED ASSET APPRAISAL -- DETAIL

TABLE H-1  FIXED ASSET APPRAISAL - SUMMARY

TABLE I      MARKET COMPARABLES - PUBLIC COMPANIES

TABLE I-1    MARKET APPROACH

TABLE J      CONCLUSIONS OF MARKET VALUE

$q.q\mathcal{O}$

NATIONAL BUSINESS APPRAISERS, LLC

Exhibit C
Page 9 of 28

EXHIBIT __6__ PAGE _125_

**ABC INTERNATIONAL TRADERS, INC.**
North Hills, California

February 13, 2003
Page 10

## DESCRIPTION OF FINANCIAL SCHEDULES USED IN VALUATION

### TABLE A: Comparative Balance Sheet - Assets

This historical comparative balance sheet presents the changes in the asset items over the 5-year period. The dominant change is in current assets.

### TABLE A-1: Comparative Balance Sheet - Liabilities

This historical comparative balance sheet presents the changes in the liability items over the 5-year period. The dominant change is in current liabilities that increased to $24.223 million. This table also reflects the calculations of "Implied Working Capital", calculated as a percentage of revenues, which was substituted to minimize the dynamic nature of current assets and current liabilities that typically change on a daily basis. This allows the conclusions of value to remain valid over a longer period of time without material changes in value.

### TABLE B: Comparative Income Statement

This historical comparative income statement presents the book figures over the 5-year period. The information contained in this table provides the foundation, after the adjustments described in **Table C**, for the valuation approaches used in this appraisal. The most recent year's performance as presented in Column 5, represents the year-end book figures. To the concluded Pretax Income, we have added back depreciation and amortization to obtain "Pretax Cash Flow". Interest expense is added back to Cash Flow as this appraisal assumes a debt-free basis to yield "Operating Margin, or "Earnings Before Depreciation Interest, Taxes and Amortization" (EBDITA).

A study of this table indicated that ABC follows the somewhat erratic performance of the industry.

### TABLE C: Adjustments to Comparative Income Statement

This statement reflects certain essential income statement items extracted from **Table B** that is subject to adjustments to remove extraordinary income or expense items that would not be necessary for normal business operations. Following the Adjusted Net Income, Cash Flow and Operating Margin, we calculate the weighted average net income utilizing the 1997, 1998, 1999 and 2000 EBDITA as a percentage of sales. This results in adjusted Pretax Income, Net Income, Cash Flow and Operating Margin (EBDITA)

NATIONAL BUSINESS APPRAISERS, LLC

Exhibit C
Page 10 of 28

EXHIBIT 6 PAGE 126

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

February 13, 2003
Page 11

---

expenses. The resulting "Adjusted Operating Margin (EBDITA) is the key income stream upon which the "Income Approach" (Table E) and the "Excess Earnings Approach" (Table G) is based.

The result is used in **Table E** to calculate the EBDITA for each year of the forecast 5-year period.

### TABLE D-1: Adjusted Book Value

In this table, all current asset items are reversed out in the second column. We have substituted "Implied Working Capital" as explained in the description of Table A-1. The calculations of market value for the fixed assets (Table H-1) appear in the right hand column. The conclusion of market value for the intangible assets, as calculated in Table D-2, is also added to yield "Business Enterprise Value".

### TABLE D-1: Adjusted Book Value

This table presents the calculations of Total Asset Value and Adjusted Shareholder Equity based upon the Business Enterprise Value shown in Table J.

### TABLE E: Income Approach

Based upon historical growth rates and estimates of future performance a five-year forecast is made for net revenues. The value of the reversionary period following the 5-year forecast period would be a capitalization of the average of the fifth and sixth year, discounted to present value. The After Tax Earnings as Percent of Revenues was calculated in **Table C**, and is used to estimate the operating profit for each forecast year in Table E. Adding back the Depreciation yields the After Tax Cash Flow. Capital expenditures and changes in working capital are subtracted from this figure to produce the "Distributable Cash Flow". Applying the appropriate discount rate (calculated in Table F) returns these cash flow streams to present value. The total of the five discounted cash flows plus the discounted reversionary value represents the <u>Business Enterprise Value</u> under the Income Approach. The capitalization rate for the reversionary period is calculated using the formula shown in the notes following the schedule.

### TABLE F: Capital Asset Pricing Model

Widely used method of determining the discount rates that are used in Table E. The "Weighted Average Cost of Capital" represents the blending of the Company's estimated

NATIONAL BUSINESS APPRAISERS, LLC

Exhibit C
Page 11 of 28

EXHIBIT 6 PAGE 127

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

February 13, 2003
Page 12

cost of borrowing (the lowest rate) and the "cost of equity capital". The blending is based
upon the market average percent of equity and of debt as taken from the public market as
shown in Table G-1 under the assumption that the selected public companies could be
buyers for the Subject company, which would then reflect the capital structure of the
buyer. Borrowed capital is generally the lowest risk due to the security normally provided
to the lender. Equity capital, on the other hand, carries the greatest risk, as it does not
share the security available to lenders. The blending of these two rates yields the weighted
average cost of capital, or discount rate. The notes following **Table F** adds further insight.

## TABLE G: Capitalization of Excess Earnings

This represents one of three significant valuation approaches for small privately held
companies. The original simplified "formula method" had the disadvantage of ignoring
the value of the individual asset categories with differing economic lives. In **Table G, the**
"Earnings Before Capital Charges" is the estimated EBDITA for the year 2000, as
calculated in Table E. From these earnings, we subtract the return of the capital
investment represented by the "Economic Depreciation", and the return on the assets in
use as listed under the heading "Economic Return on Capital", yielding the "Total Excess
Earnings" of ABC. The "Net Excess Earnings", is then capitalized using the equity
multiple as developed in **Table F**. The value of the capitalized excess earnings is then
added to the "Total Assets in Use" to reflect the market value under the Excess Earnings
Approach on a control basis.

## TABLE H

The method for appraising fixed assets as herein described is known as the "Depreciated
Replacement Cost New Approach" (DRCN). This presents the appraised value of each of
the items of fixed assets, based upon the depreciation schedule of the income tax return
for 1999. As noted, each item is listed as to description, date of purchase, original cost,
estimated economic life, years in use, remaining economic life, price trend factor based
upon the consumer price index, replacement cost new, estimated remaining economic life
and fair market value. Items beyond their estimated economic life are valued at zero.

## TABLE H-1

This table summarizes the market value of each group of assets, and is used in Table D
and Table G.

NATIONAL BUSINESS APPRAISERS, LLC
000068

Exhibit C
Page 12 of 28

EXHIBIT _6_ PAGE _128_

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

February 13, 2003
Page 13

## TABLE I:  Market Comparable Companies from public marketplace.

The operating results of the listed public companies present various indicators that are useful in determining the market value of ABC. Listed are the Company's shares outstanding, market capitalization, annual sales, market capitalization/sales ratio, and Beta. We use the median of the market cap/sales ratios of the Public companies in our Market Approach that follows in Table I-1. We use the average of the Betas and the capital structures of the public companies for our calculations of the discount rates in Table F. These comparables are all involved in the same industry as ABC.

## TABLE I-1:  Market Approach Valuation

Gross revenues in 2000 for ABC is multiplied by the median revenue/market cap ratio to obtain the indicated market value on a minority basis. A discount[1] is applied to adjust for the differences in size of the public companies as compared with ABC. This yields the market value of the equity on a minority basis. To adjust the minority value to a control value we add the premium for control for comparison with the other approaches, which yields the market value of the equity on a control basis. To convert this value to the business enterprise value, we must add back the implied working capital to yield Business enterprise value on a control basis. This value is now comparable to the results of the other two approaches as reflected in Table J.

## TABLE I: Final Correlation

Each of the individual market values developed in the various approaches are listed, and weighted. The income approach is generally granted the greatest weight, as the driving force for the average investor is the anticipation of future benefits, however in this report we believe it appropriate to grant meaningful weight to both the excess earnings approach and the market approach as both are valid approaches for use with medium sized business valuations.

---

[1] Mergerstat Review 1999

$13.20$

NATIONAL BUSINESS APPRAISERS, LLC
000069

Exhibit C
Page 13 of 28

EXHIBIT _6_ PAGE _129_

**TABLE A**

**FIVE YEAR COMPARATIVE BALANCE SHEET**

F/Y End December 31

($000)

Job No. 1118ABCV
Appr Date 12/31/2000
Run Date 03/25/04

REVISED REPORT
ABC

| ASSETS | 1996 | % | 1997 | % | 1998 | % | 1999 | % | 2000 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| **Current assets** | | | | | | | | | | |
| Cash & equivalents | $438 | 2.5 | $797 | 3.8 | $860 | 5.1 | ($379) | -0.4 | $1,144 | 4.5 |
| Accounts Receivable-Trade | 3,760 | 21.8 | 10,067 | 47.7 | 7,674 | 44.8 | 17,154 | 63.5 | 8,744 | 34.3 |
| Inventories | 11,677 | 67.7 | 8,663 | 41.0 | 7,400 | 43.6 | 5,834 | 33.2 | 14,278 | 56.0 |
| Due from affiliate | 143 | 0.8 | 171 | 0.8 | – | 0.0 | (320) | -1.8 | 209 | 0.8 |
| Prepaid Expenses & Other | 786 | 4.6 | 768 | 3.6 | 379 | 2.2 | 373 | 2.1 | 190 | 0.7 |
| Total Current | $16,804 | 97.4 | $20,466 | 96.9 | $16,253 | 95.7 | $16,962 | 96.6 | $24,565 | 96.4 |
| **Property & Equipment** | | | | | | | | | | |
| Machinery & Equipment | $1,759 | 10.2 | $2,369 | 11.2 | $3,621 | 21.3 | $1,409 | 8.0 | $2,231 | 8.8 |
| Leasehold Improvements | 86 | | 86 | | 86 | | 86 | | 215 | |
| Less Accum. Depr. | (1,399) | -8.1 | (1,800) | -8.5 | (2,977) | -17.5 | (900) | -5.1 | (1,554) | -6.0 |
| Net Fixed Assets | $446 | 2.6 | $655 | 3.1 | $730 | 4.3 | $595 | 3.4 | $912 | 3.6 |
| Deposits & other | | 0.0 | | 0.0 | | 0.0 | | 0.0 | | 0.0 |
| TOTAL ASSETS | $17,250 | 100.0 | $21,121 | 100.0 | $16,983 | 100.0 | $17,557 | 100.0 | $25,477 | 100.0 |

* This information is from the fiscal year of 1996 to 2000.

Exhibit C
Page 14 of 28

000070

14.60

EXHIBIT 6 PAGE 130

| REVISED REPORT | | | TABLE A-1 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | FIVE YEAR COMPARATIVE BALANCE SHEET | | | | Job No. 1118ABCV | | |
| | | | F/Y End December 31 | | | | Appr Date 12/31/2000 | | |
| | | | ($000) | | | | Run Date 15-Dec-04 | | |
| | | | **LIABILITIES & SHAREHOLDERS EQUITY** | | | | | | |
| | 1996 | % | 1997 | % | 1998 | % | 1999 | % | 2000 | % |
| Current Liabilities | | | | | | | | | |
| Accounts Payable & Accrued | $ 7,222 | 41.9 | $ 11,134 | 52.7 | $ 6,904 | 40.7 | $ 6,611 | 37.7 | $ 12,951 | 50.8 |
| Bank Line-Revolving | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Current Port. L T Debt | 36 | 0.2 | 38 | 0.2 | 38 | 0.2 | 0 | 0.0 | 11,272 | 44.2 |
| Other current | 3 | 0.0 | 45 | 0.2 | 131 | 0.8 | 0 | 0.0 | 0 | 0.0 |
| Total current liabilities | $ 7,261 | 42.1 | $ 11,217 | 53.1 | $ 7,073 | 41.6 | $ 6,611 | 37.7 | $ 24,223 | 95.1 |
| Long Term Liabilities | | | | | | | | | |
| Notes payable to bank | $ 5,950 | 34.5 | $ 3,175 | 15.0 | $ 5,231 | 30.8 | $ 2,129 | 12.1 | $ 1,147 | 4.5 |
| Long term debt, less current | | 0.0 | | 0.0 | | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Subordinated notes payable & other | 2,718 | 15.8 | 3,028 | 14.3 | 3,247 | 19.1 | 3,255 | 18.5 | 3,590 | 14.1 |
| Total long term liabilities | $ 8,668 | 50.2 | $ 6,203 | 29.4 | $ 8,478 | 49.9 | $ 5,384 | 30.7 | $ 4,737 | 18.6 |
| Total Liabilities | $ 15,929 | 92.3 | $ 17,420 | 82.5 | $ 15,551 | 91.6 | $ 11,995 | 68.3 | $ 28,960 | 113.7 |
| Shareholders Equity | $ 1,321 | 7.7 | $ 3,701 | 17.5 | $ 1,432 | 8.4 | $ 5,562 | 31.7 | $ (3,483) | -13.7 |
| Total Liabilities & Shareholders Equity | $ 17,250 | 100.0 | $ 21,121 | 100.0 | $ 16,983 | 100.0 | $ 17,557 | 100.0 | $ 25,477 | 100.0 |
| Current Ratio | 2.31 | | 1.82 | | 2.30 | | 2.57 | | 1.01 | |
| Quick Ratio | 0.58 | | 0.97 | | 1.20 | | 1.68 | | 0.41 | |
| L T Debt / Net Worth | 6.56 | | 1.68 | | 5.92 | | 0.97 | | -1.36 | |
| Working Capital | $ 9,543 | 55.3 | $ 9,249 | 43.8 | $ 9,180 | 54.1 | $ 10,351 | 59.0 | $ 342 | 1.3 |
| IMPLIED WORKING CAPITAL | | | | | | | | | |
| Net Revenues | $ 46,980 | | $ 55,315 | | $ 40,732 | | $ 66,350 | | $ 77,489 | |
| W/C as a percent of revenues * | 12.23% | | 12.23% | | 12.23% | | 12.23% | | 12.23% | |
| Implied working capital | $ 5,747 | | $ 6,766 | | $ 4,982 | | $ 8,116 | | $ 9,479 | |
| Robert Morris Associates SIC #3944, Games, Toys etc. | | | | | | | | | $ 9,500 | |

Exhibit C
Page 15 of 28

000071

15. 90

EXHIBIT 6 PAGE 131

REVISED REPORT

**TABLE B**

**FIVE YEAR COMPARATIVE INCOME STATEMENT**

F/Y End December 31

($000)

ABC INTERNATIONAL TRADERS, INC.

Job No. 1118ABCV
Appr Date 12/31/2000
Run Date 23-Mar-04

| | 1996 | % | 1997 | % | 1998 | % | 1999 | % | (1) 2000 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| REVENUES - NET | $ 46,980 | 100.0 | $ 55,315 | 100.0 | $ 40,732 | 100.0 | $ 66,350 | 100.0 | $ 77,489 | 100.0 |
| Less cost of sales | 36,834 | 78.4 | 40,032 | 72.4 | 26,093 | 64.1 | 43,724 | 65.9 | 53,300 | 68.8 |
| GROSS PROFIT | $ 10,146 | 21.6 | $ 15,283 | 27.6 | $ 14,639 | 35.9 | $ 22,626 | 34.1 | $ 24,189 | 31.2 |
| Other income (loss) | (738) | -1.6 | 28 | 0.1 | (253) | -0.6 | 350 | 0.5 | 5,000 | 6.5 |
| TOTAL INCOME | $ 9,408 | 20.0 | $ 15,311 | 27.7 | $ 14,386 | 35.3 | $ 22,976 | 34.6 | $ 29,189 | 37.7 |
| **EXPENSES** | | | | | | | | | | |
| Advertising & promotion | $ 2,936 | 6.2 | $ 2,992 | 5.4 | $ 3,898 | 9.6 | $ 4,367 | 6.6 | $ 7,680 | 9.9 |
| Automobile expense | 74 | 0.2 | 47 | 0.1 | 64 | 0.2 | 67 | 0.1 | 70 | 0.1 |
| Bad debts | 289 | 0.6 | (6) | 0.0 | | 0.0 | 30 | 0.0 | | 0.0 |
| Bank charges | 312 | 0.1 | 294 | 0.5 | 181 | 0.4 | 196 | 0.3 | 200 | 0.3 |
| Commissions | 1,912 | 4.1 | 2,535 | 4.6 | 2,168 | 5.3 | 2,487 | 3.7 | 3,000 | 3.9 |
| Data processing & supplies | 22 | 0.0 | 27 | 0.0 | 64 | 0.2 | 66 | 0.1 | 70 | 0.1 |
| Depreciation | 732 | 1.6 | 585 | 1.1 | 589 | 1.4 | 540 | 0.8 | 634 | 0.8 |
| Delivery, postage | 130 | 0.3 | 242 | 0.4 | 191 | 0.5 | 323 | 0.5 | 375 | 0.5 |
| Insurance | 329 | 0.7 | 227 | 0.4 | 305 | 0.7 | 386 | 0.6 | 400 | 0.5 |
| Interest Expense | 663 | 1.4 | 390 | 0.7 | 552 | 1.4 | 842 | 1.3 | 1,179 | 1.5 |
| Legal, professional & accounting | 345 | 0.7 | 1,225 | 2.2 | 1,681 | 4.1 | 1,199 | 1.8 | 1,250 | 1.6 |
| Miscellaneous other | 187 | 0.4 | 105 | 0.2 | 379 | 0.9 | 62 | 0.1 | 4,910 | 6.3 |
| Molds | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 508 | 0.8 | 750 | 1.0 |
| Office Expenses | 77 | 0.2 | 61 | 0.1 | 71 | 0.2 | 132 | 0.2 | 150 | 0.2 |
| Product development | 1,028 | 2.2 | 463 | 0.8 | 1,008 | 2.5 | 1,711 | 2.6 | 2,000 | 2.6 |
| Rents | 467 | 1.0 | 346 | 0.6 | 382 | 0.9 | 455 | 0.7 | 431 | 0.6 |
| Repairs & maintenance | 11 | 0.0 | 11 | 0.0 | 22 | 0.1 | | 0.0 | | 0.0 |
| Salaries, officers | 696 | 1.5 | 704 | 1.3 | 1,104 | 2.7 | 1,194 | 1.8 | 1,200 | 1.5 |
| Salaries & wages | 2,009 | 4.3 | 2,384 | 4.1 | 2,223 | 5.5 | 3,379 | 4.8 | 3,874 | 5.0 |
| Taxes & licenses | 27 | 0.1 | 217 | 0.4 | 39 | 0.1 | 61 | 0.1 | 75 | 0.1 |
| Taxes, payroll | 229 | 0.5 | 176 | 0.3 | 219 | 0.5 | 254 | 0.4 | 260 | 0.3 |
| Telephone | 219 | 0.5 | 188 | 0.3 | 165 | 0.4 | 214 | 0.3 | 225 | 0.3 |
| Travel & entertainment | 341 | 0.7 | 226 | 0.4 | 277 | 0.7 | 399 | 0.6 | 450 | 0.6 |
| Utilities | 36 | 0.1 | 32 | 0.1 | 30 | 0.1 | 35 | 0.1 | 40 | 0.1 |
| TOTAL EXPENSES | $ 13,060 | 27.8 | $ 13,371 | 24.2 | $ 15,613 | 38.3 | $ 18,707 | 28.2 | $ 29,223 | 37.7 |
| PRETAX INCOME | $ (3,652) | -7.8 | $ 1,940 | 3.5 | $ (1,227) | -3.0 | $ 4,269 | 6.4 | $ (34) | 0.0 |
| Add Depreciation/Amort | 732 | 1.6 | 585 | 1.1 | 589 | 1.4 | 540 | 0.8 | 634 | 0.8 |
| PRETAX CASH FLOW (2) | $ (2,920) | -6.2 | $ 2,525 | 4.6 | $ (638) | -1.6 | $ 4,809 | 7.2 | $ 600 | 0.8 |
| Add Interest Charges | 663 | 1.4 | 390 | 0.7 | 552 | 1.4 | 842 | 1.3 | 1,179 | 1.5 |
| EBIDT (3) | $ (2,257) | -4.8 | $ 2,915 | 5.3 | $ (86) | -0.2 | $ 5,651 | 8.5 | $ 1,779 | 2.3 |

(1) Basic data from Delloite & Touche audited report.
(2) Pretax income plus depreciation.
(3) Pretax cash flow plus interest charges.

Exhibit C
Page 16 of 28

16. ED

EXHIBIT 6 PAGE 132

REVISED REPORT

TABLE C
INCOME STATEMENT ADJUSTMENTS
FYY End December 31
($000)

ABC INTERNATIONAL TRADERS, INC.

Job No. 1116A0CV
App' Date 12/31/2000
Run Date 25-Mar-04

| | 1996 | % | 1997 | % | 1998 | % | 1999 | % | 2000 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| REVENUES - NET | $ 46,980 | 100.0 | $ 55,315 | 100.0 | $ 40,732 | 100.0 | $ 66,350 | 100.0 | $ 77,489 | 100.0 |
| OPERATING INCOME (EBDIT) | $ (2,257) | (4.8) | $ 2,915 | 5.3 | $ (86) | (0.2) | $ 5,651 | 8.5 | $ 1,777 | 2.3 |
| ADJUSTMENTS TO INCOME | | | | | | | | | | |
| Legal, professional & accounting | 343 | 0.7 | 1,225 | 2.2 | 1,681 | 4.1 | 1,199 | 1.8 | 1,350 | 1.8 |
| Hallmark | 0 | | 0 | | 0 | | 0 | | 3,000 | 6.3 |
| Salaries Officers | 696 | 1.5 | 704 | 1.3 | 1,104 | 2.7 | 1,194 | 1.8 | 1,200 | 1.5 |
| Traveling Expenses | 341 | 0.7 | 226 | 0.4 | 277 | 0.7 | 399 | 0.6 | 450 | 0.6 |
| TOTAL ADJUSTMENTS TO INCOME | $ 1,380 | 2.9 | $ 2,155 | 3.9 | $ 3,062 | 7.5 | $ 2,792 | 4.2 | $ 7,500 | 10.2 |
| SUBTOTAL | $ (877) | (1.9) | $ 5,070 | 9.2 | $ 2,976 | 7.3 | $ 8,443 | 12.7 | $ 9,679 | 12.5 |
| LESS REASONABLE EXPENSES | | | | | | | | | | |
| Legal, professional & accounting 0.75% | (352) | (0.8) | (415) | (0.8) | (305) | (0.8) | (498) | (0.8) | (581) | (0.8) |
| Salaries Officers 1.50% | (705) | (1.5) | (830) | (1.5) | (611) | (1.5) | (995) | (1.5) | (1,162) | (1.5) |
| Traveling Expenses 0.60% | (282) | (0.6) | (332) | (0.6) | (244) | (0.6) | (398) | (0.6) | (465) | (0.6) |
| ADJUSTED PRETAX INCOME | $ (2,216) | (4.7) | $ 3,494 | 6.3 | $ 1,815 | 4.5 | $ 6,552 | 9.9 | $ 7,470 | 9.6 |
| Add Back Depreciation | 732 | 1.6 | 385 | 1.1 | 389 | 1.4 | 540 | 0.8 | 634 | 0.8 |
| ADJUSTED PRETAX CASH FLOW | $ (1,484) | (3.2) | $ 4,079 | 7.4 | $ 2,204 | 5.9 | $ 7,092 | 10.7 | $ 8,104 | 10.5 |
| Add Back Interest Expense | 663 | 1.4 | 390 | 0.7 | 332 | 1.4 | 842 | 1.3 | 1,179 | 1.5 |
| ADJUSTED EBDIT (1) | $ (821) | (1.7) | $ 4,469 | 8.1 | $ 2,955 | 7.3 | $ 7,934 | 12.0 | $ 9,283 | 12.0 |
| EBDIT AS % OF SALES | | (1.7) | | 8.1 | | 7.3 | | 12.0 | | 12.0 |
| Weighting | | 8 | | 2 | | 2 | | 2 | | 2 |
| Product - 3 Columns | | 79 | | 16.2 | | 14.5 | | 23.9 | | 24.0 |
| Divisor - Sum of Weights | | | | | | | | | | |
| WEIGHTED AVERAGE EBDIT | | 9.8 | Percent (Used in Table E) | | | | | | | |

Exhibit C
Page 17 of 28

000073

EXHIBIT 6 PAGE 133

**REVISED REPORT**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | **TABLE D-1** | | | Job No. | 1118ABCV | |
| | | **ADJUSTED BOOK VALUE** | | | Appr Date | 12/31/2000 | |
| | | F/Y End December 31 | | | Run Date | 25-Mar-04 | |
| | | ($000) | | | | | |

| ABC | Book 31-Dec-00 | % | Adjustments 31-Dec-00 | % | Adjusted 31-Dec-00 | % |
|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | |
| Cash & equivalents | 1,144 | 4.7 | ($1,144) | NM | $0 | 0.0 |
| Accounts Receivable-Trade | 8,744 | 35.6 | (8,744) | NM | 0 | 0.0 |
| Inventories | 14,278 | 58.1 | (14,278) | NM | 0 | 0.0 |
| Due from affilliate | 209 | | (209) | NM | 0 | 0.0 |
| Prepaid Expenses & Other | 190 | 0.8 | (190) | NM | 0 | 0.0 |
| Implied Working Capital | 0 | | 9,500 | NM | 9,500 | 19.9 |
| Total Current Assets | 24,565 | 100.0 | ($15,065) | NM | $9,500 | 19.9 |
| **Fixed Assets as Appraised** | | | | | | |
| Automotive Equipment | 0 | 0.0 | 11 | | 11 | 0.0 |
| Computer Equipment | 0 | 0.0 | 131 | | 131 | 0.3 |
| Furniture & Fixtures | 0 | 0.0 | 24 | | 24 | 0.1 |
| Leasehold Equipment | 0 | 0.0 | 23 | | 23 | 0.0 |
| Machinery & Equipment | 0 | 0.0 | 4 | | 4 | 0.0 |
| Molds & Tooling * | 0 | 0.0 | 1,031 | | 1,031 | 2.2 |
| Office Equipment | 0 | 0.0 | 4 | | | - |
| Net Fixed Assets | (1) | 0.0 | 0 | | 1,225 | 2.6 |
| **INTANGIBLE ASSETS** | - | 0.0 | $36,975 | NM | 36,975 | 77.5 |
| **BUSINESS ENTERPRISE VALUE** | 24,564 | 100.0 | | NM | 47,700 | 100.0 |

The right hand column represents the assets included in "Business Enterprise Value"(BEV). This represents the value of the assets required for normal business operations. To convert this number to Total Asset Value, subtract the Implied Working Capital. This will yield "Basic Business Value", or the value of the fixed, intangible and other assets only. See Table D-2 for calculations of Adusted Book Value.

Exhibit C
Page 18 of 28

000074

18. 8P

EXHIBIT 6 PAGE 134

**TABLE D-2**
**ADJUSTED BOOK VALUE**
F/Y End December 31

| | Job No. | 1118ABCV |
|---|---|---|
| | Appr Date | 12/31/2000 |
| | Run Date | 25-Mar-04 |

MARKET VALUE OF BUSINESS ENTERPRISE          $ 47,700
Less Implied Working Capital                          (9,500)

BASIC BUSINESS VALUE          Fixed Plus Intangibles        $ 38,200
Less Fixed Assets as Appraised                                     (1,225)

MARKET VALUE OF INTANGIBLES (GOODWILL)        $ 36,975
Add Fixed & Other Assets as Appraised (Table H)                1,225
Add Current Assets at 12/31/00 (Table A)                          24,565

ADJUSTED TOTAL ASSET VALUE                        $ 62,765
Less Total Liabilities at 12/31/00 (Table A-1)            (28,960)

ADJUSTED SHAREHOLDER EQUITY                    $ 33,805

See Table J for final conclusion.

000075

Exhibit C
Page 19 of 28

EXHIBIT 6 PAGE 135

| REVISED REPORT<br>ABC | | TABLE E<br>INCOME APPROACH<br>FY Ending Sept 30<br>($000) | | | | Job No.<br>Appr Date<br>Run Date | 111&ABCV<br>12/31/2000<br>25-Mar-04 |
|---|---|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **2004** | **2005** | **Reversion** |
| FORECAST REVENUE GROWTH | 25.00% | 10.00% | 5.00% | 5.00% | 5.00% | 5.00% |
| FORECAST OF REVENUE | $96,861 | $106,547 | $111,875 | $117,468 | $123,342 | |
| EBDIT as % of Revenues * | 9.8% | 9.8% | 9.8% | 9.8% | 9.8% | |
| EBDIT * | $9,510 | $10,461 | $10,984 | $11,534 | $12,110 | $10,919 |
| Less Capital Equipment Reserve | (347) | (381) | (401) | (421) | (442) | (Table G) |
| Less Working Capital (1) | (9,500) | (1,185) | (652) | (684) | (718) | |
| DISTRIBUTABLE CASH FLOW | ($337) | $8,895 | $9,932 | $10,429 | $10,950 | $11,224 |
| REVERSIONARY VALUE | | | | Factor (3) | 6.885 | $77,280 |
| Discount Rate (Table F) | 19.25% | 19.25% | 19.25% | 19.25% | 19.25% | 19.25% |
| Period Factor | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | 5.00 |
| Multiplier | 0.916 | 0.768 | 0.644 | 0.540 | 0.453 | 0.415 |
| NPV OF DIST. CASH FLOWS | ($308) | $6,831 | $6,396 | $5,632 | $4,959 | $32,046 |

| NPV OF DISTRIBUTABLE CASH FLOW FOR FIRST FIVE YEARS | $23,508 |
|---|---|
| NPV OF REVERSIONARY VALUE | 32,046 |
| | ---------- |
| | $55,554 |
| MARKET VALUE OF ENTERPRISE BY THE INCOME APPROACH     Rounded | $55,550 |

(1) Estimated percent of annual revenue and revenue growth required for working capit      -->      12.23%
Reference - RMA Annual Statement Studies.

(2) Income to be capped at end of 5th year was calculated by estimating 6th year's income considering a future growth of 5%, and averaging with the 5th year. This adjusts the fifth year from mid-year to the expected end-of-year-revenues.

(3) Calculated with the following formula: Cap Rate = (1+G)/(R-G), where G = estimated future growth rate. R = wtd avg cost of capital. (1+.05) / (.2025 -.05) or 1.05/.1525 =      6.885      or      14.52%

* Earnings Before Depreciation & Amortization, Interest and Taxes. (See Table C).

Exhibit C
Page 20 of 28



EXHIBIT 6 PAGE 136

| REVISED REPORT | TABLE F<br>CAPITAL ASSET PRICING MODEL<br>(CAPM) | | Job No. | 1118ABCV |
|---|---|---|---|---|
| | | | Appr Date | 12/31/2000 |
| | | | Run Date | 15-Dec-04 |

ABC INTERNATIONAL TRADERS, INC.

-------------------------------------------

**KEY ASSUMPTIONS**

| | | |
|---|---|---|
| Cost of debt - pretax (1) | | 10.00% |
| Federal tax rate (2) | Pretax Basis | 0.00% |
| State tax rate | | 0.00% |
| Combined marginal tax rate | Pretax Basis | 0.00% |
| Long-term treasury bond rate | | 6.00% |
| Market average beta | • | 1.00 |
| Market average percent of equity | • | 72.00% |
| Market average percent of debt | • | 28.00% |

| WEIGHTED AVG COST OF CAPITAL | 19.36% | Rounded | 19.25% |
|---|---|---|---|
| Formula: (1-T)*(Kd)(D)+(Ke)(E) | | | |
| T = Tax rate | | | 0.00% |
| Kd = Cost of debt | | | 10.00% |
| D = Proportion of debt in total capital | | | 28.00% |
| Ke = Cost of equity | | | 23.00% |
| E = Proportion of equity | | | 72.00% |

| COST OF EQUITY CAPITAL | 23.10% | Rounded | 23.00% |
|---|---|---|---|
| Formula: Ke = ((B*Rp)+Rs)+Rt | | | |
| Rf = Rate of return on risk-free security (3) | | | 5.00% |
| Rp = Risk premium (Rm - Rf) | | | 12.10% |
| Rs = Company-specific risk premium (4) | | | 5.00% |
| Rt = Current return on 30 Year treasury bills | | | 6.00% |
| B = Industry beta (5) | | | 1.00 |
| Rm = Market return (6) | | | 17.10% |

*Ibbotson Industry Studies for SIC Code 3944, Games, Toys, and Children's Vehicles

(1) Company's estimated cost of interest-bearing debt.

(2) Valuation based upon after tax income streams.

(3) Ibbotson & Associates Report 1926-1999, "Arithmetic Mean of Annual Returns for Long-Term U.S. Treasury Bonds" (riskless).

(4) Additional risk factor to adjust for specific risks of the subject company and industry.

(5) A measure of risk (variability) of common stocks in the industry. (Ibbotson Industry Studies for SIC Code 3944, Games, Toys, and Children's Vehicles)

(6) Ibbotson & Associates Report 1926-1997, "Arithmetic Mean of Annual Returns for The Common Stock of Small Companies".

Exhibit C
Page 21 of 28

21. 8W

EXHIBIT _6_ PAGE _137_

**REVISED REPORT**

**TABLE G**
**EXCESS EARNINGS APPROACH**
($000)

| | | | |
|---|---|---|---|
| Job No. | 1118ABCV |
| Appr Date | 12/31/2000 |
| Run Date | 25-Mar-04 |

**ABC**

**EARNINGS BEFORE CAPITAL CHARGES (Table E)**      **$10,919**

| CAPITAL CHARGES Economic Depreciation | Appraised Value | Est Life | | Return Of | |
|---|---|---|---|---|---|
| Automotive Equipment | $ 11 | 10 | Yrs | 1 | |
| Computer Equipment | 131 | 5 | Yrs | 26 | |
| Furniture & Fixtures | 24 | 15 | Yrs | 2 | |
| Leasehold Equipment | 23 | 10 | Yrs | 2 | |
| Machinery & Equipment | 4 | 10 | Yrs | 0 | |
| Molds & Tooling * | 1,031 | 3 | Yrs | 344 | |
| Office Equipment | 4 | 10 | Yrs | 0 | |
| Fixed Assets at Cost | $ 1,229 | 3.5 | | $347 | $ (347) |

| Economic Return | Adjusted Book | % | Return On | |
|---|---|---|---|---|
| Working Capital | $ 9,500 | 10.0% | $ 950 | |
| Automotive Equipment | 11 | 15.0% | 2 | |
| Computer Equipment | 131 | 20.0% | 26 | |
| Furniture & Fixtures | 24 | 15.0% | 4 | |
| Leasehold Equipment | 23 | 20.0% | 5 | |
| Machinery & Equipment | 4 | 12.5% | 1 | |
| Molds & Tooling * | 1,031 | 15.0% | 155 | |
| Office Equipment | 4 | 15.0% | 1 | |
| Adj. Tangible Net W. | $ 10,729 | | $ 1,142 | $ (1,142) |

**TOTAL EXCESS EARNINGS**      $ 9,430

| | | | |
|---|---|---|---|
| Excess Earnings Cap Rate | | 23.0% ** | $ 41,001 |
| Add Tangible Assets | | | 10,729 |

**BUSINESS ENTERPRISE VALUE BY EXCESS EARNINGS METHOD**   $ 51,730

* Includes Fixed Assets added in 2000.      Rounded      $ 51,750

**Equity Discount Rate

Exhibit C
Page 22 of 28

22.90

EXHIBIT 6 PAGE 138

**ABC INTERNATIONAL TRADERS, INC.**
16730 Schoenborn Street
North Hills, CA 91343-6122

Appraisal Date 12/31/00
Original Cost $2,417
Depreciated Replacement Cost New $1,229

## TABLE II
## FIXED ASSET APPRAISAL
## FROM DEPRECIATION SCHEDULES

| Owned/Leased | Entry Item Order No. | DESCRIPTION | Qty | Code | Valuation Date | Orig Cost ($) | Est Econ Life | Yrs In Use | Rem Econ Life | Price Trend Factor | Repl Cost New | Est'd Rmng Life | 12/31/00 Fair Market Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OWNED | 12 | TRUCK | — | AE | 01-Aug-93 | 35,951 | 10.0 | 7.4 | 2.6 | 1.202 | 43,213 | 26% | 11,141 |
| OWNED | 17 | COMPUTER | — | CE | 15-Oct-93 | 1,120 | 5.0 | 7.2 | (2.2) | | | -44% | 0 |
| OWNED | 18 | COMPUTER | — | CE | 15-Jul-94 | 750 | 5.0 | 6.5 | (1.5) | | | -29% | 0 |
| OWNED | 27 | COMPUTER | — | CE | 01-Oct-94 | 5,727 | 5.0 | 6.3 | (1.3) | | | -25% | 0 |
| OWNED | 59 | COMPUTER | — | CE | 01-Oct-94 | 1,476 | 5.0 | 6.3 | (1.3) | | | -23% | 0 |
| OWNED | 28 | COMPUTER | — | CE | 01-Dec-94 | 20,393 | 5.0 | 6.1 | (1.1) | | | -22% | 0 |
| OWNED | 29 | COMPUTER | — | CE | 01-Mar-95 | 22,714 | 5.0 | 5.8 | (0.8) | | | -17% | 0 |
| OWNED | 30 | COMPUTER | — | CE | 01-Jun-95 | 18,174 | 5.0 | 5.6 | (0.6) | | | -12% | 0 |
| OWNED | 31 | COMPUTER | — | CE | 15-Oct-95 | 10,448 | 5.0 | 5.2 | (0.2) | | | -4% | 0 |
| OWNED | 32 | COMPUTER | — | CE | 15-Nov-95 | 15,360 | 5.0 | 5.1 | (0.1) | | | -5% | 0 |
| OWNED | 33 | COMPUTER | — | CE | 15-Dec-95 | 4,923 | 5.0 | 5.0 | (0.0) | | | -3% | 0 |
| OWNED | 37 | COMPUTER | — | CE | 15-Dec-95 | 9,975 | 5.0 | 5.0 | (0.0) | | | -1% | 0 |
| OWNED | 38 | COMPUTER | — | CE | 15-Dec-95 | 8,445 | 5.0 | 5.0 | (0.0) | | | -1% | 0 |
| OWNED | 60 | COMPUTER | — | CE | 01-Jul-96 | 211,405 | 5.0 | 4.5 | 0.5 | 0.600 | 5,067 | 10% | 503 |
| OWNED | 61 | COMPUTER | — | CE | 01-Jul-96 | 1,309 | 5.0 | 4.5 | 0.5 | 0.600 | 126,843 | 10% | 12,580 |
| OWNED | 41 | COMPUTER | — | CE | 01-Jul-96 | 27,505 | 5.0 | 4.5 | 0.5 | 0.600 | 785 | 10% | 78 |
| OWNED | 62 | COMPUTER | — | CE | 01-Jul-97 | 2,762 | 5.0 | 3.5 | 1.5 | 0.700 | 19,254 | 30% | 5,760 |
| OWNED | 63 | COMPUTER | — | CE | 01-Jul-97 | 39,597 | 5.0 | 3.5 | 1.5 | 0.700 | 1,933 | 30% | 578 |
| OWNED | 45 | COMPUTER | — | CE | 01-Jun-98 | 36,668 | 5.0 | 2.6 | 2.4 | 0.700 | 31,678 | 48% | 15,292 |
| OWNED | 46 | COMPUTER | — | CE | 01-Jun-98 | 91,565 | 5.0 | 2.5 | 2.5 | 0.800 | 29,334 | 50% | 14,643 |
| OWNED | 47 | COMPUTER | — | CE | 01-Jan-99 | 11,243 | 5.0 | 2.5 | 2.5 | 0.800 | 82,409 | 60% | 49,445 |
| OWNED | 48 | COMPUTER | — | CE | 01-Feb-99 | 4,000 | 5.0 | 2.0 | 3.0 | 0.900 | 10,119 | 62% | 6,243 |
| OWNED | 49 | COMPUTER | — | CE | 01-Mar-99 | 4,125 | 5.0 | 1.9 | 3.1 | 0.900 | 3,600 | 63% | 2,276 |
| OWNED | 50 | COMPUTER | — | CE | 01-Mar-99 | 3,605 | 5.0 | 1.8 | 3.2 | 0.900 | 3,713 | 63% | 2,348 |
| OWNED | 51 | COMPUTER | — | CE | 01-Mar-99 | 2,733 | 5.0 | 1.8 | 3.2 | 0.900 | 3,245 | 63% | 2,052 |
| OWNED | 52 | COMPUTER | — | CE | 01-Apr-99 | 4,702 | 5.0 | 1.8 | 3.2 | 0.900 | 2,460 | 63% | 1,555 |
| OWNED | 53 | COMPUTER | — | CE | 01-Jun-99 | 20,684 | 5.0 | 1.8 | 3.2 | 0.900 | 4,232 | 65% | 2,748 |
| OWNED | 55 | COMPUTER | — | CE | 01-Aug-99 | 1,557 | 5.0 | 1.6 | 3.4 | 0.900 | 18,616 | 68% | 12,710 |
| OWNED | 54 | COMPUTER | — | CE | 01-Sep-99 | 1,687 | 5.0 | 1.4 | 3.6 | 0.900 | 1,401 | 72% | 1,004 |
| OWNED | | COMPUTER | — | CE | 01-Nov-99 | | 5.0 | 1.3 | 3.7 | 0.900 | 1,518 | 73% | 1,113 |
| OWNED | 4 | EXHIBIT BOOTH - FURN & FIX | — | FF | 01-Nov-89 | 14,443 | 15.0 | 11.2 | 3.8 | 1.368 | 19,758 | 26% | 5,041 |
| OWNED | 2 | FURNITURE & FIXTURES | — | FF | 01-Sep-90 | 6,837 | 15.0 | 10.3 | 4.7 | 1.320 | 9,051 | 31% | 2,812 |
| OWNED | 16 | FURNITURE & FIXTURES | — | FF | 01-Jul-91 | 13,606 | 15.0 | 9.5 | 5.5 | 1.274 | 17,334 | 37% | 6,345 |
| OWNED | 24 | FURNITURE & FIXTURES | — | FF | 15-Apr-94 | 1,404 | 15.0 | 6.7 | 8.3 | 1.172 | 1,645 | 55% | 900 |
| OWNED | | FURNITURE & FIXTURES | — | FF | 01-Aug-95 | 238 | 15.0 | 5.4 | 9.6 | 1.146 | 273 | 64% | 174 |

Exhibit C
Page 23 of 28
23.9...

EXHIBIT 6 PAGE 139

ABC INTERNATIONAL TRADERS, INC.
16730 Schoenborn Street
North Hills, CA 91343-6122

**TABLE II**
**FIXED ASSET APPRAISAL**
**FROM DEPRECIATION SCHEDULES**

Appraisal Date 12/31/00
Original Cost $2,417
Depreciated Replacement Cost New $1,229

| Owned Leased | Entry Item Order No. | DESCRIPTION | | Qty | Valuation Date | Orig Cost* ($) | Est Econ Life | Yrs In Use | Rem Econ | Price Trend Factor | Repl Cost New | Est'd Rmng Life | Fair Market Value 12/31/00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OWNED | 25 | FURNITURE & FIXTURES | FF | — | 01-Aug-95 | 299 | 15.0 | 5.4 | 9.6 | 1.146 | 343 | 64% | 219 |
| OWNED | 26 | FURNITURE & FIXTURES | FF | — | 01-Aug-95 | 1,069 | 15.0 | 5.4 | 9.6 | 1.146 | 1,225 | 64% | 781 |
| OWNED | 34 | FURNITURE & FIXTURES | FF | — | 15-Sep-95 | 1,295 | 15.0 | 5.3 | 9.7 | 1.146 | 1,484 | 65% | 960 |
| OWNED | 35 | FURNITURE & FIXTURES | FF | — | 15-Nov-95 | 1,000 | 15.0 | 5.1 | 9.9 | 1.146 | 1,146 | 66% | 754 |
| OWNED | 43 | FURNITURE & FIXTURES | FF | — | 01-Mar-98 | 1,659 | 15.0 | 2.8 | 12.2 | 1.065 | 1,767 | 81% | 1,433 |
| OWNED | 44 | FURNITURE & FIXTURES | FF | — | 01-Aug-98 | 643 | 15.0 | 2.4 | 12.6 | 1.065 | 685 | 84% | 574 |
| OWNED | 57 | FURNITURE & FIXTURES | FF | — | 01-May-99 | 3,601 | 15.0 | 1.7 | 13.3 | 1.043 | 3,756 | 89% | 3,337 |
| OWNED | 58 | FURNITURE & FIXTURES | FF | — | 01-Dec-99 | 1,115 | 15.0 | 1.1 | 13.9 | 1.043 | 1,163 | 93% | 1,079 |
| OWNED | 6 | LEASEHOLD IMPROVEMENTS | LI | — | 01-Oct-90 | 2,789 | 10.0 | 10.3 | (0.3) | | | -3% | 0 |
| OWNED | 7 | LEASEHOLD IMPROVEMENTS | LI | — | 01-Feb-91 | 2,295 | 10.0 | 9.9 | 0.1 | 1.274 | 2,921 | 1% | 23 |
| OWNED | 21 | LEASEHOLD IMPROVEMENTS | LI | — | 01-Sep-93 | 17,300 | 10.0 | 7.3 | 2.7 | 1.202 | 20,795 | 27% | 5,538 |
| OWNED | 19 | LEASEHOLD IMPROVEMENTS | LI | — | 15-Jan-94 | 8,633 | 10.0 | 7.0 | 3.0 | 1.172 | 10,118 | 30% | 3,071 |
| OWNED | 20 | LEASEHOLD IMPROVEMENTS | LI | — | 01-Nov-94 | 28,862 | 10.0 | 6.2 | 3.8 | 1.172 | 33,826 | 38% | 12,956 |
| OWNED | 36 | LEASEHOLD IMPROVEMENTS | LI | — | 15-Oct-95 | 2,814 | 10.0 | 5.2 | 4.8 | 1.146 | 3,225 | 48% | 1,543 |
| OWNED | 13 | MACHINERY & EQUIPMENT | ME | — | 15-Jan-94 | 1,004 | 10.0 | 7.0 | 3.0 | 1.172 | 1,177 | 30% | 357 |
| OWNED | 14 | MACHINERY & EQUIPMENT | ME | — | 15-Apr-94 | 1,111 | 10.0 | 6.7 | 3.3 | 1.172 | 1,302 | 33% | 427 |
| OWNED | 22 | MACHINERY & EQUIPMENT | ME | — | 01-Dec-94 | 2,444 | 10.0 | 6.1 | 3.9 | 1.172 | 2,864 | 39% | 1,121 |
| OWNED | 39 | MACHINERY & EQUIPMENT | ME | — | 01-Jul-97 | 628 | 10.0 | 3.5 | 6.5 | 1.088 | 683 | 65% | 444 |
| OWNED | 40 | MACHINERY & EQUIPMENT | ME | — | 01-Jul-97 | 2,936 | 10.0 | 3.5 | 6.5 | 1.088 | 3,194 | 65% | 2,075 |
| OWNED | 3 | MOLDS & TOOLING | MT | — | 01-Sep-90 | 3,220 | 5.0 | 10.3 | (5.3) | | | -107% | 0 |
| OWNED | 42 | MOLDS & TOOLING | MT | — | 01-Jul-98 | 877,864 | 5.0 | 2.5 | 2.5 | 1.065 | 934,025 | 50% | 466,694 |
| OWNED | 56 | MOLDS & TOOLING | MT | — | 01-Jul-99 | 773,751 | 5.0 | 1.5 | 3.5 | 1.043 | 807,022 | 70% | 564,252 |
| OWNED | 5 | EQUIPMENT | OE | — | 01-Sep-90 | 1,100 | 10.0 | 10.3 | (0.3) | | | -3% | 0 |
| OWNED | 8 | TELEPHONE SYSTEM | OE | — | 01-Nov-91 | 15,087 | 10.0 | 9.2 | 0.8 | 1.274 | 19,221 | 8% | 1,590 |
| OWNED | 9 | MAIL MACHINE | OE | — | 01-Dec-91 | 1,997 | 10.0 | 9.1 | 0.9 | 1.274 | 2,544 | 9% | 231 |
| OWNED | 10 | WATER PURIFIER | OE | — | 01-Jun-92 | 147 | 10.0 | 8.6 | 1.4 | 1.232 | 181 | 14% | 26 |
| OWNED | 23 | WATER PUMP | OE | — | 01-Feb-95 | 1,748 | 10.0 | 5.9 | 4.1 | 1.146 | 2,003 | 41% | 818 |
| OWNED | 11 | CELLULAR PHONE | OE | — | 01-Aug-92 | 784 | 5.0 | 8.4 | (3.4) | 0.500 | 392 | -68% | 0 |
| OWNED | 15 | TELECOM EQUIPMENT | OE | — | 15-Jul-94 | 2,426 | 10.0 | 6.5 | 3.5 | 1.172 | 2,843 | 35% | 1,004 |
| OWNED | 15 | MOLDS & TOOLING | OE | — | 30-Jun-00 | 822 | 5.0 | 0.5 | 4.5 | 1.172 | 963 | 90% | 866 |
| | | | | | ($000) | $2,417 | | | | | | FMV | $1,229 |

Exhibit C
Page 24 of 28

000080

24. ĒW

EXHIBIT 6 PAGE 140

## TABLE H-1
### FIXED ASSET APPRAISAL
From Depreciation Schedules
($000)

|  | | Original Cost | Estimated Econ. Life | FMV |
|---|---|---|---|---|
| **Job No.** | | | | 1118ABCV |
| **Appr Date** | | | | 12/31/2000 |
| **Run Date** | | | | 25-Mar-04 |
| SUMMARY BY ASSET CATEGORY | | | | |
| Automotive Equipment | AE | $      36 | 10.0 | $       11 |
| Computer Equipment | CE | 585 | 5.0 | 131 |
| Furniture & Fixtures | FF | 47 | 15.0 | 24 |
| Leasehold Equipment | LE | 63 | 10.0 | 23 |
| Machinery & Equipment | ME | 8 | 10.0 | 4 |
| Molds & Tooling * | MT | 2,477 | 5.0 | 1,031 |
| Office Equipment | OE | 23 | 10.0 | 4 |
| **TOTALS** | | $  3,239 | | $  1,229 |

Extracted from the detailed appraisal in Table H.

Exhibit C
Page 25 of 28

000081

25.2W

EXHIBIT _6_ PAGE _141_

**TABLE I**
**MARKET INFORMATION**
23-Oct-00

Job No. 1118ABCV
Appr Date 12/31/2000
Run Date 25-Mar-04

| COMPANY | Symbol | Shares Out (000) | Market Cap* ($000) | Annual Sales ($000) | Mkt Cap/ Sales (0) | Beta (0) |
|---|---|---|---|---|---|---|
| JAKKS PACIFIC | JAKK | 19,441 | 162,818 | 183,685 | 0.886 | 1.00 |
| HASBRO,INC | HAS | 172,309 | 1,744,629 | 4,232,263 | 0.412 | 1.00 |
| MATTEL | MAT | 426,371 | 5,036,507 | 5,514,950 | 0.913 | 0.38 |
| RADICA GAMES | RADA | 17,640 | 39,690 | 118,733 | 0.334 | 1.28 |
| TOYMAX INTERNATIONAL | TMAX | 10,598 | 22,521 | 138,985 | 0.162 | NA |
| AVERAGES (Beta is Median) | | 129,272 | 1,401,233 | 2,037,723 | 0.542 | 1.00 |
| AVERAGES OF SMALLER COMPANIES | | | | | 0.334 | 1.093 |

*Minority value. Should be converted to control value to use for valuation under the market approach.

Exhibit C
Page 26 of 28

000082

26.90

EXHIBIT 6 PAGE 142

REVISED REPORT

## TABLE I-1
### MARKET APPROACH
#### ($000)

| | Job No. | 1118ABCV |
| --- | --- | --- |
| | Appr Date | 12/31/2000 |
| | Run Date | 25-Mar-04 |

| | | |
| --- | --- | --- |
| GROSS REVENUES | | $ 96,861 |
| AVERAGE SMALL COMPANHY REVENUE/MARKET CAP RATIO | | 0.334 |
| MARKET VALUE OF EQUITY ON A MINORITY BASIS | | $ 32,379 |
| Less Public/Private discount for relative size | 10.0% | (3,238) |
| MINORITY VALUE OF EQUITY - SMALL PRIVATE COMPANY | | $ 29,141 |
| Add Control Premium | 35% | 10,199 |
| EQUITY MARKET VALUE ON A CONTOL BASIS | Rounded | $ 39,300 |
| Add Implied Working Capital | | 9,500 |
| ADJUSTED EQUITY MARKET VALUE ON A CONTROL BASIS | | $ 48,800 |
| | Rounded | $ 48,800 |

Exhibit C
Page 27 of 28

000083

21.9D

EXHIBIT 6 PAGE 143

| REVISED REPORT | TABLE J | | Job No. | 1118ABCV |
| | CONCLUSION OF MARKET VALUE | | Appr Date | 12/31/2000 |
| | ($000) | | Run Date | 25-Mar-04 |
| | Conclusion | Weight | | Product |
| ABC INTERNATIONAL TRADERS, INC. | | | | |
| INCOME APPROACH (Table E) | $ 55,550 | 0.50 | | $ 27,775 |
| MARKET APPROACH (Table I-1) | $ 48,800 | 0.25 | | 12,200 |
| EXCESS EARNINGS APPROACH (Table G) | $ 51,750 | 0.25 | | 12,938 |
| FMV OF BUSINESS ENTERPRISE (Includes working capital) | | Rounded | | $ 53,000 |
| Less Discount for Lack of Liquidity | | 10% | | (5,300) |
| MARKET VALUE OF BUSINESS ENTERPRISE | | | | $ 47,700 |
| Less Implied Working Capital | | | | (9,500) |
| BASIC BUSINESS VALUE | | | | $ 38,200 |
| Add Current Assets (Table A) | | | | 24,565 |
| FMV OF TOTAL ASSETS | | | | $ 62,765 |
| Less Total Liabilities (Table A-1) | | | | (28,960) |
| FMV OF SHAREHOLDERS EQUITY ON A CONTROL BASIS | | | | $ 33,805 |
| FMV OF SHAREHOLDER INTEREST ON A CONTROL BASIS | | 45% | | $ 15,212 |
| Less Minority Discount | | 25% | | (3,803) |
| FMV OF SHAREHOLDER INTEREST ON A MINORITY BASIS | | | | $ 11,409 |

Exhibit C
Page 28 of 28

28.9D

EXHIBIT 6 PAGE 124

**NATIONAL BUSINESS APPRAISERS, LLC**
16055 Ventura Boulevard, Suite 1200
Encino, California 914360211.
Phone (818) 528-2013     Fax (818) 528-2014
Email dutch7895@sbcglobal.net

## DRAFT – FOR DISCUSSION PURPOSES ONLY

May 1, 2004

Mr. Morad Zarabi, Arbitrator
**MGA ENTERTAINMENT, INC.**
20120 Plummer St.
Chatsworth, CA  91211-5448

Dear Mr. Zarabi:

At your request after receipt of additional relevant information, we are reappraising the
shareholders equity of MGA Entertainment, Inc. (MGA), formerly known as MGA
International Traders, Inc (MGA).  We were asked to express our opinion of the market
value on a control basis of a 45 percent interest in the shareholders equity of MGA.  Two
of the shareholders hold an equal 45% interest with a third shareholder holding the 10%
balance.

It is our understanding that this opinion will be used for supporting a value for a buy-out
of the Subject interest, and may be invalid if used for any other purpose.

MGA develops, produces and markets toys and related products. The company's products
are action figures and accessories featuring licensed characters, and mini dolls.

Purchasers of the company's products include discount retail chain stores, department
stores, toy specialty stores and wholesalers.  The company licenses numerous trademarks,
corporate, trade and brand names and logos from third parties.

According to the Toy Industry Association the size of the U.S. Toy industry, excluding
video games, was $19.8 billion for 1999, $20.4 billion for 2000, and $20.5 billion for
2001.  U. S. imports of toy products from China was $10.7 billion in 2000, and 10.4
billion in 2001. It is further estimated that the average child in the U.S. receives over
$400 (retail) worth of toys per year.  The industry, in spite of a relatively flat growth rate,
appears to be healthy and not seriously affected by the recession as is the case with so
may other U.S. industries.

This report covers only Phase I of a full narrative report therefore we issue only a brief
letter report.  All of the financial tables that are normally included in a full-narrative
report are presented in the Addenda, along with individual explanations for each table.

000085                          1.

Exhibit D
Page 1 of 34

EXHIBIT ___6___ PAGE _145_

**Table J**, in the Addenda presents our conclusions of market value under the income, market and excess earnings approach, and sets forth the calculations of the various appraised interests as of December 31, 2001.

Based upon the information and analyses presented in the Addenda, it is our opinion that as of the valuation date of December 31, 2001, the market value of the shareholder's equity of MGA International Traders, Inc, on a control basis, as summarized in Table J, of Addenda, was:

**$24,430,000**

It is also our opinion that as of December 31, 2001, the market value of a 45 percent interest in the shareholder's equity of MGA International Traders, Inc., on a control basis, as summarized in Table J, of the Addenda, was:

**$11,000,000**

It is our opinion that a minority discount does not apply to the 45% interest as the other major shareholder holds an equal 45% interest, and under California Corporations Code Section 2000 (the California corporate dissolution statute) the case law is generally interpreted to mean that a minority interest is valued as if it were a proportional share of a control value.[1]

In conjunction with our work, MGA provided us with audited and unaudited financial information and prospective financial and operational data. We accepted the historical data as fairly reflecting its operations, trends and financial position.

We have not independently investigated the accuracy or completeness of the historical data provided to us and we express no opinion or other form of assurance regarding the accuracy or completeness of the data.

Neither our employment nor our compensation is in any way contingent upon the values presented in this report.

---

[1] See, for example, *Roland v. 4-C's Electronic Packaging,* 168 Cal.App.3rd 290 (1985) and *Brown v. Allied Corrugated Box Co.,* 91 Cal.App.3rd 477 (1979)

2.

EXHIBIT _6_ PAGE _146_

MGM ENTERTAINMENT, INC.                                    May 1, 2004
North Hills, California        *DRAFT REPORT*                 Page 3

_____

A copy of this report and the working papers from which it was prepared will be kept in our files for eight years.

Respectfully submitted,

NATIONAL BUSINESS APPRAISERS, LLC

By: _____
Ernest E. Dutcher, MCBA
Managing Member
Senior Valuation Counselor

**Attachments:** Professional Qualifications; Statement of Facts and Limiting Conditions; Addenda
1131MGAV

3. *Ed*

NATIONAL BUSINESS APPRAISERS, LLC          Exhibit D
000087                                     Page 3 of 34

EXHIBIT __6__ PAGE __147__

**MGM ENTERTAINMENT, INC.**
**North Hills, California**          ***DRAFT REPORT***

May 1, 2004
Page 4

## CERTIFICATION

We certify that, to the best of our knowledge and belief:

*       The statements of fact contained in this report are true and correct.

*       The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and is our personal, unbiased professional analyses, opinions, and conclusions.

*       We have no present or prospective interest in the property that is the subject of this report, and we have no personal interest or bias with respect to the parties involved.

*       Our compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in, or the use of, this report.

*       Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

*       No significant professional assistance was provided to the undersigned in connection with this assignment.

Appraiser_____
        Ernest E. Dutcher, MCBA

**NATIONAL BUSINESS APPRAISERS, LLC**

**000088**

Exhibit D
Page 4 of 34

EXHIBIT ___6___ PAGE __148__

MGM ENTERTAINMENT, INC.
North Hills, California          *DRAFT REPORT*

May 1, 2004
Page 5

---

## PROFESSIONAL QUALIFICATIONS

For

### ERNEST E. DUTCHER, MCBA

Designations

of

**Certified Business Appraiser**
**Master Certified Business Appraiser**

Awarded by

## THE INSTITUTE OF BUSINESS APPRAISERS

*The oldest business appraisal society in the nation.*

**NATIONAL BUSINESS APPRAISERS, LLC**
16055 Ventura Blvd., Suite 1200
Encino, CA 91436

Phone (818) 528-2013     E-mail: dutch7895@sbcglobal.net     Fax (818) 528-2014

---

*5.*

**NATIONAL BUSINESS APPRAISERS, LLC**
**000089**

Exhibit D
Page 5 of 34

EXHIBIT 6 PAGE 149

## *Master Certified Business Appraiser Accreditation*

*The Master Certified Business Appraiser is the highest professional designation awarded in the business valuation industry, and recognizes the extraordinary competence of a few highly skilled and experienced individuals whose work has been widely accepted by clients and acknowledged by their most senior professional colleagues. It is a designation not commonly available except to the best-of-the-best professional appraisers, and is intended to indicate to users of appraisal services that the holder has achieved a high distinction of competence in his/her profession.*

### *Requirements for Accreditation as a Master Certified Business Appraiser*

1. *Education: Applicant must possess a 4-year college degree and a 2-year post-graduate degree or equivalent and provide proof of this to the IBA in the form specified by the Executive Director.*

2. *Appraisal Experience and Tenure: Applicant must have held the Certified Business Appraiser designation for not less than ten years, and must have fifteen-years full-time experience as a business appraiser. Applicants experience must include valuation of a variety of business types and appraisals for a variety of purposes. Proof in support of an applicants appraisal experience and tenure shall be provided in the form specified by the Executive Director.*

3. *Recognition by Other Professional Societies: Applicant must hold a journeyman level professional designation awarded by one or more compeer professional business appraisal societies. Acceptable professional designations include those issued by the American Society of Appraisers (Accredited Senior Appraiser - Business Valuation), the National Association of Certified Valuation Analysts (Certified Valuation Analyst), and the American Institute of Certified Public Accountants (Accredited in Business Valuation).*

4. *References: Applicant must provide satisfactory references from three individuals who have known the applicant for not less than five years, who hold the profess-sional designation Master Certified Business Appraiser, and who, based on their extensive personal knowledge and comprehensive review of the applicant's work-product, will vouch for 1) the excellence of his analytical skills and appraisal work-product, 2) his/her professional and ethical character, and 3) his/her contribution to the betterment of the profession of business valuation.*

5. Membership in IBA: Applicant must be a member-in-good-standing of the Institute of Business Appraisers.

6. *GH*

EXHIBIT 6 PAGE 150

MGM ENTERTAINMENT, INC.                                        **May 1, 2004**
**North Hills, California**          ***DRAFT REPORT***              **Page 7**

---

## - ERNEST E. DUTCHER, MCBA - Professional Qualifications

**Experience:** Mr. Dutcher's appraisal experience began in 1975. He has been involved in the analysis and valuation of a broad variety of business enterprises in many industries, including electric power generation, healthcare, equipment leasing & rental, distribution, transportation, manufacturers in the communications, computer, electronics, rubber & chemical industries, shipping, engineering, oil & gas, and many others. He has consulted in marketing, manufacturing and management. He was CEO of an electronic equipment manufacturing company and has held executive positions in other manufacturing, distribution and sales companies.

**Employment:** Managing Member and Senior Valuation Counselor for National Business Appraisers, LLC. Was Senior Valuation Counselor for Valuation Counselors Group, Inc. for four years, following five years with Marshall and Stevens Incorporated. Previously, he was SW. Manager of Acquisitions for a public company; Business Opportunities Sales for Coldwell Banker; President and General Manager of an elevated work platform manufacturer; Vice President and Controller for an equipment sales and rental company; Vice President of Manufacturing and Division Manager of companies producing specialized heating devices and electronic heat controllers; President and CEO of a high technology public company in the electronics industry; and President and sole stockholder of an exclusive area distributor of Magnavox consumer electronics components and accessories.

**Education:** Mr. Dutcher attended Yale University, majoring in Communications; USAF Military Schools. attaining the rank of Captain, Radar and Communications. He also attended RCA Institute, UCLA Extension Division and Santa Monica City College in public relations, plus many seminars and home study courses in finance, taxation, computer courses in business related software etc. He has held California real estate and insurance licenses and is a licensed pilot.

**Professional Societies: Mr. Dutcher is a senior member in the Institute of Business Appraisers (IBA), the premier professional society of business appraisers, with over 3,500 members. He has also served on the select Qualifications Review Committee. As of December 31, 2004, only about 350 IBA members had earned the professional designation of Certified Business Appraiser (CBA). *At that date, Mr. Dutcher was one of only 42 Master Certified Business Appraisers (MCBAs), a designation requiring over 10 years of providing business appraisals on a full-time basis as a CBA.***

Court Testimony: Mr. Dutcher has qualified and testified as an expert witness before Federal Tax Courts in Los Angeles and San Francisco California, and California Superior Courts of Los Angeles, Orange, and San Diego Counties. He has served as a consultant in valuation matters to numerous attorneys during the litigation process.

MGM ENTERTAINMENT, INC.
North Hills, California          *DRAFT REPORT*

May 1, 2004
Page 8

## EXPERT WITNESS QUALIFICATIONS

### LITIGATION SUPPORT

Working closely with attorneys and Clients to develop and refine strategies in litigation. Includes the preparation of business valuations and assisting the attorney in preparation for court action for a variety of purposes, such as U.S. Government challenges involving healthcare fraud & abuse issues, divorce proceedings; eminent domain litigation involving loss of business goodwill in condemnation or inverse condemnation actions, defending or supporting IRS actions against partnership interests in energy projects and medical groups, and other commercial litigation.

Assisting the attorney in the preparation of court documents and exhibits to support testimony. Review and critique of opposing appraisal reports and preparing questions there from for cross-examination. **Providing expert witness testimony in court actions.**

### CLIENT EXAMPLES

- **Van Duzer v. Commissioner** – San Francisco Federal Tax Court
  Prepared valuation of "Windfarms" and expert testimony in support of opinions for Petitioner's defense attorneys to prove that the purchase price paid by Petitioner for two electric power-generating facilities was not in excess of their fair market value. **Resulted in favorable opinion from the Tax Court.** (T.C. Memo. 1991-249) (Tax Court Docket No. 25802-88)

- **Ahadpour v. Commissioner** – Los Angeles Federal Tax Court
  Prepared valuation and expert testimony in support of opinions of market value of a marine salvage business in Iran that was lost during the Iran-Iraqi war, and subsequently claimed as a deduction from Federal taxes by Client. **(Tax Court Docket No. 4843-96)**

- **Contra Costa County v. Kenetech Corporation** – Contra Costa County Superior Court
  Prepared valuation of wind turbines condemned for road purposes. Gave deposition in support of concluded values. Assisted defense attorney in preparation for court. **Case settled in Mandatory Settlement Conference.**

- **T & W Converters, Inc. v. City of Glendale** – Los Angeles Superior Court (Jury Trial)
  Prepared valuation of "Loss of Business Goodwill resulting from Inverse Condemnation of the Company's premises, forcing move to less favorable location. Provided attorney with support in preparing court exhibits. Prepared questions for cross-examination of opposing appraisal report. Provided deposition and direct testimony. **Verdict rendered in Client's favor.**

*8. GD*

EXHIBIT __6__ PAGE __152__

MGM ENTERTAINMENT, INC.
North Hills, California        *DRAFT REPORT*

May 1, 2004
Page 9

• **Friendly Hills Medical Group v Commissioner** – **Settled before trial.**
        Provided financial appraisals used in the sale of the group to Loma Linda Medical Center, and to defend against IRS and OIG challenges to the inclusion of business goodwill in the sale of medical practices.

This became a landmark case in which the Service eventually accepted our position. The IRS's internal agent guidelines for proper methodologies for use in the determination of intangibles in appraisals of medical groups and practices are based upon this appraisal.

Numerous other business appraisals have resulted in favorable settlements prior to trial.

Over the past 20 years many other valuations have been prepared by this appraiser encompassing a wide variety of industries, including: resorts, clubs and hotels; restaurant chains, marine; agriculture; contracting; construction; manufacturing; communications; computer hardware and software; wholesaling; retailing; financing and services. Purposes included estate planning, mergers & acquisitions, litigation support, tax planning, partnership buy-outs, employee stock option plans, subsidiary spin-offs, etc.

## REFERENCES

| | | |
|---|---|---|
| Brian D. Newnan, Estate Trustee | (800) 800-1651 | Estate Tax Planning |
| Bradford S. Lovette, Principal | (561) 833-7029 | Healthcare Entities |
| Jerome L. Doff, Attorney | (310) 966-0031 | Patents & Intellectual Property |
| William J. Kellogg, Pres. LaJolla Beach & T/C | (858) 454-7126 | Estate Tax Planning |
| Ellis Stern, Attorney | (818) 458-3940 | Estate Tax Planning. |
| Mark Cahn – Esq. - Wilmer, Cutler & Pick. | (202) 663-6249 | FMV, Physician Contracts Etc. |
| Rosemary Wilson – Adm., Arkansas Urology | (501) 664-0530 | Healthcare Valuations |
| Steve Mopsick, Attorney at Law | (916) 558-6111 | IRS – Taxation Defenses |

NATIONAL BUSINESS APPRAISERS, LLC

Exhibit D
Page 9 of 34

EXHIBIT 6 PAGE 153

MGM ENTERTAINMENT, INC.
North Hills, California                  *DRAFT REPORT*

May 1, 2004
Page 10

## STATEMENT OF FACTS AND LIMITING CONDITIONS

**National Business Appraisers, LLC (NBA)**, strives to clearly and accurately disclose the assumptions and limiting conditions that directly affect a valuation analysis, opinion or conclusion. In order to assist the reader in interpreting this report, such assumptions are set forth as follows:

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of the original assignment. If the need for subsequent services related to a valuation assignment (e.g., testimony, updates, conferences, reprint, or copy services) is contemplated, special arrangements acceptable to NBA must be made in advance. NBA, reserves the right to make adjustments to the analysis, opinion and conclusion set forth in the report as we deem necessary if the facts presented by MGA prove to be inaccurate or have been misinterpreted.

It is assumed that: no opinion is intended in matters that require legal, engineering or other professional advice which has been or will be obtained from professional sources; the valuation report will not be used for guidance in professional matters exclusive of the appraisal and valuation discipline; there are no regulations of any government entity to control or restrict the use of the property unless specifically referred to in the report; and the property will not operate in violation of any applicable government regulations, codes, ordinances or statutes.

Information furnished by others is presumed to be reliable, and where so specified in the report, has been verified; however, no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain. All facts and data set forth in the report are true and accurate to the best of NBA's knowledge and belief. No single item of information was completely relied upon to the exclusion of other information. Management has provided financial data, operating histories and other data relating to income and expenses attributed to the business or its representatives have been accepted without further verification except as specifically stated in the report.

Valuation reports may contain prospective financial information, estimates or opinions that represent the appraiser's view of reasonable expectations at a particular point in time, but such information, estimates or opinions are not offered as predictions or as assurances that a particular level of income or profit will be achieved, that events will occur or that a particular price will be offered or accepted. All opinions as to value are presented as NBA's considered opinion based on the facts and data obtained during the investigation and set forth in the report. Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material. It should be specifically noted that the valuation assumes the property will be competently managed and maintained by financially sound owners over the expected period of ownership. This appraisal engagement does not entail an

Exhibit D
Page 10 of 34

EXHIBIT _6_ PAGE _154_

MGM ENTERTAINMENT, INC.
North Hills, California          *DRAFT REPORT*

May 1, 2004
Page 11

evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

The conclusions of value presented herein are based on numerous assumptions pertaining to prospective economic and operating conditions. Unanticipated events and circumstances may occur and actual results achieved during the period covered by our prospective financial analysis will vary from our estimates. The variations may be material.

No effort has been made to determine the impact of possible energy shortages or the effect on this project of future federal, state or local legislation, including any environmental or ecological matters or interpretations thereof.

Neither the report nor any portions thereof, especially any conclusions as to value, the identity of the appraiser(s) or NBA, shall be disseminated to the public through public relations media, news media, sales media or any other public means of communications without the prior written consent and approval of NBA. The date(s) of the valuation to which the value estimate conclusions apply is set forth in the letter of transmittal and within the body of the report. The value is based on the purchasing power of the United States dollar as of that date. Unless otherwise noted, NBA assumes that there will be no changes in tax regulations. No significant change is assumed in the supply and demand patterns indicated in the report. The valuation assumes market conditions observed as of the current date of our market research stated in the letter of transmittal. These market conditions are be-lieved to be correct; however, the appraisers assume no liability should market conditions materially change because of unusual or unforeseen circumstances.

The report and the final estimate of value and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed, solely for the purposes stated, and should not be relied upon for any other purpose. Any allocation of total price between tangible assets and various classes of intangible assets, if shown, is invalidated if used separately or in conjunction with any other report. Neither the appraisal report nor its contents nor any reference to the appraiser(s) or NBA, may be referred to or quoted in any registration statement, prospectus, offering memorandum, sales brochure, other appraisal, loan or other agreement or document given to third parties excepting governmental agencies or the extent required by law without our prior written consent. Permission will be granted only upon meeting certain conditions.

A copy of this report and the working papers from which it was prepared will be kept in our files for eight years.

NATIONAL BUSINESS APPRAISERS, LLC

000095

Exhibit D
Page 11 of 34

EXHIBIT 6 PAGE 155

MGM ENTERTAINMENT, INC.
North Hills, California          *DRAFT REPORT*

May 1, 2004
Page 12

**ADDENDA**

NATIONAL BUSINESS APPRAISERS, LLC
000096

Exhibit D
Page 12 of 34

EXHIBIT 6 PAGE 156

MGM ENTERTAINMENT, INC.
North Hills, California        *DRAFT REPORT*

May 1, 2004
Page 13

## INDEX OF FINANCIAL TABLES

TABLE A      FIVE YEAR COMPARATIVE BALANCE SHEET – ASSETS

TABLE A-1    FIVE YEAR COMPARATIVE BALANCE SHEET – LIABILITIES

TABLE B      COMPARATIVE INCOME STATEMENT - 5 YEARS

TABLE C      INCOME STATEMENT ADJUSTMENTS

TABLE D-1    ADUSTED BOOK VALUE – PAGE 1

TABLE D-2    ADUSTED BOOK VALUE – PAGE 2

TABLE E      INCOME APPROACH METHOD OF VALUATION

TABLE F      CAPITAL ASSET PRICING MODEL

TABLE H      FIXED ASSET APPRAISAL – DETAIL

TABLE H-1    FIXED ASSET APPRAISAL - SUMMARY

TABLE I      MARKET COMPARABLES - PUBLIC COMPANIES

TABLE I-1    MARKET APPROACH

TABLE J      CONCLUSIONS OF MARKET VALUE

*13. ED*

NATIONAL BUSINESS APPRAISERS, LLC

000097

Exhibit D
Page 13 of 34

EXHIBIT 6 PAGE 157

MGM ENTERTAINMENT, INC.
North Hills, California          **DRAFT REPORT**

May 1, 2004
Page 14

## DESCRIPTION OF FINANCIAL SCHEDULES USED IN VALUATION

### TABLE A: Comparative Balance Sheet – Assets

This historical comparative balance sheet presents the changes in the asset items over the 5-year period. The dominant changes appear in current assets for the years 2000 and 2001 caused mainly by increases in accounts receivable and inventories. Total assets changed from a low of about $17.6 million at 12/31/2000 to $30.6 million by 12/31/2001.

### TABLE A-1: Comparative Balance Sheet - Liabilities

This historical comparative balance sheet presents the changes in the liability items over the 5-year period. The dominant change is in current liabilities that increased from a low of $6.6 million at 12/31/1999 to $31.3 million at 12/31/2001. Total liabilities moved from $12 million at 12/31/1999 to $35 million by 12/31/2001. Shareholder equity dropped from a high of $5.6 million at 12/31/1999 to $(4.5) million at 12/31/2001. This table also reflects the calculations of "Implied Working Capital" as a percentage of revenues, which was substituted to minimize the dynamic nature of current assets and current liabilities that typically change on a daily basis. This allows the conclusions of value to remain valid over a longer period of time without material changes in value.

### TABLE B: Comparative Income Statement

This historical comparative income statement presents the book figures over the 5-year period. The information contained in this table provides the foundation, after the adjustments described in **Table C**, for the valuation approaches used in this appraisal. The most recent year's performance as presented in Column 5, represents the year-end book figures. To the concluded Pretax Income, we have added back depreciation and amortization to obtain "Pretax Cash Flow". Interest expense is added back to Cash Flow as this appraisal assumes a debt-free basis to yield "Operating Margin, or "Earnings Before Depreciation Interest, Taxes and Amortization" (EBITDA).

A study of this table indicated that MGA showed steady growth in revenues over the 5-year period, but pretax income follows the somewhat erratic performance of the industry.

### TABLE C: Adjustments to Comparative Income Statement

This statement reflects certain essential income statement items extracted from **Table B** that is subject to adjustments to remove extraordinary income or expense items that

NATIONAL BUSINESS APPRAISERS, LLC
**000098**

*14. &#x2125;*

**Exhibit D**
**Page 14 of 34**

EXHIBIT _6_ PAGE _158_

**MGM ENTERTAINMENT, INC.**
**North Hills, California**          *DRAFT REPORT*

May 1, 2004
Page 15

would not be necessary for normal business operations. Following the Adjusted Net Income, Cash Flow and Operating Margin, we calculate the weighted average net income utilizing the 1997, 1998, 1999 2000 and 2001 EBITDA as a percentage of sales. This results in adjusted Pretax Income, Net Income, Cash Flow and Operating Margin (EBITDA) expenses. The resulting "Adjusted Operating Margin (EBITDA) is the key income stream upon which the "Income Approach" (Table E) and the "Excess Earnings Approach" (Table G) is based.

### TABLE D-1: Adjusted Book Value

In this table, all current asset items are reversed out in the second column. We have substituted "Implied Working Capital" as explained in the description of Table A-1. The calculations of market value for the fixed assets (Table H-1) appear in the right hand column. The conclusion of market value for the intangible assets, as calculated in Table D-2, is also added to yield "Business Enterprise Value".

### TABLE E: Income Approach

Based upon historical growth rates and estimates of future performance a five-year forecast is made for net revenues. The value of the reversionary period following the 5-year forecast period would be a capitalization of the average of the fifth and sixth year, discounted to present value. The After Tax Earnings as Percent of Revenues was calculated in **Table C**, and is used to estimate the operating profit for each forecast year in **Table E**. Adding back the Depreciation yields the After Tax Cash Flow. Capital expenditures and changes in working capital are subtracted from this figure to produce the "Distributable Cash Flow". Applying the appropriate discount rate (calculated in **Table F**) returns these cash flow streams to present value. The total of the five discounted cash flows plus the discounted reversionary value represents the <u>Business Enterprise Value</u> under the Income Approach. The capitalization rate for the reversionary period is calculated using the formula shown in the notes following the schedule.

### TABLE F: Capital Asset Pricing Model

Widely used method of determining the discount rates that are used in **Table E**. The "Weighted Average Cost of Capital" represents the blending of the Company's estimated cost of borrowing (the lowest rate) and the "cost of equity capital". The blending is based upon the market average percent of equity and of debt as taken from the public market as shown in Table G-1 under the assumption that the selected public companies could be buyers for the Subject company, which would then reflect the capital structure of the buyer. Borrowed capital is generally the lowest risk due to the security normally provided

NATIONAL BUSINESS APPRAISERS, LLC
000099

Exhibit D
Page 15 of 34

EXHIBIT  6  PAGE  159

to the lender. Equity capital, on the other hand, carries the greatest risk, as it does not share the security available to lenders. The blending of these two rates yields the weighted average cost of capital, or discount rate. The notes following **Table F** adds further insight.

### TABLE G: Capitalization of Excess Earnings

This represents one of three significant valuation approaches for small privately held companies. The original simplified "formula method" had the disadvantage of ignoring the value of the individual asset categories with differing economic lives. In **Table G**, the "Earnings Before Capital Charges" is the estimated EBITDA for the year 2000, as calculated in Table E. From these earnings, we subtract the return of the capital investment represented by the "Economic Depreciation", and the return on the assets in use as listed under the heading "Economic Return on Capital", yielding the "Total Excess Earnings" of **MGA**. The "Net Excess Earnings", is then capitalized using the equity multiple as developed in **Table F**. The value of the capitalized excess earnings is then added to the "Total Assets in Use" to reflect the market value under the Excess Earnings Approach on a control basis.

### TABLE H

The method for appraising fixed assets as herein described is known as the "Depreciated Replacement Cost New Approach" (DRCN). This presents the appraised value of each of the items of fixed assets, based upon the depreciation schedule of the income tax return for 1999. As noted, each item is listed as to description, date of purchase, original cost, estimated economic life, years in use, remaining economic life, price trend factor based upon the consumer price index, replacement cost new, estimated remaining economic life and fair market value. Items beyond their estimated economic life are valued at zero.

### TABLE H-1

This table summarizes the market value of each group of assets, and is used in Table D and Table G.

### TABLE I: Market Comparable Companies from public marketplace.

The operating results of the listed public companies present various indicators that are useful in determining the market value of MGA. Listed are the Company's shares outstanding, market capitalization, annual sales, market capitalization/sales ratio, and

EXHIBIT 6 PAGE 160

Beta. We use the median of the market cap/sales ratios of the Public companies in our Market Approach that follows in **Table I-1**. We use the average of the Betas and the capital structures of the public companies for our calculations of the discount rates in **Table F**. These comparables are all involved in the same industry as MGA.

### TABLE I-1: Market Approach Valuation

Gross revenues in 2001 for MGA is multiplied by the median revenue/market cap ratio to obtain the indicated market value on a minority basis. A discount[1] is applied to adjust for the differences in size of the public companies as compared with MGA. This yields the market value of the equity on a minority basis. To adjust the minority value to a control value we add the premium for control for comparison with the other approaches, which yields the market value of the equity on a control basis. This value may now be compared to the results of the other two approaches as reflected in Table J

### TABLE J: Final Correlation

Each of the individual market values developed in the various approaches are listed, and weighted. The income approach is generally granted the greatest weight, as the driving force for the average investor is the anticipation of future benefits, however in this report we believe it appropriate to also grant meaningful weight the excess earnings approach as it also is a valid approach for use with medium sized business valuations. **Due to the growing instability in the public marketplace, we are not granting any weight to the market approach, but using it as a "sanity check" only.**

---

[1] Mergerstat Review 1999

Exhibit D
Page 17 of 34

EXHIBIT _6_ PAGE _101_

DRAFT REPORT
MGM ENTERTAINMENT, INC.

TABLE A
FIVE YEAR COMPARATIVE BALANCE SHEET
F/Y End December 31
($000)

Job No. 1131ABCV
Appr Date 12/31/2001
Run Date 10/19/04

| ASSETS | 1997 | % | 1998 | % | 1999 | % | 2000 | % | 2001 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| Current assets | | | | | | | | | | |
| Cash & equivalents | $797 | 3.8 | $860 | 5.1 | (879) | -0.4 | $1,144 | 4.5 | $556 | 1.8 |
| Accounts Receivable-Trade | 10,067 | 47.7 | 7,614 | 44.8 | 11,154 | 63.5 | 8,744 | 34.3 | 15,068 | 49.2 |
| Inventories | 8,663 | 41.0 | 7,400 | 43.6 | 5,834 | 33.2 | 14,278 | 56.0 | 13,893 | 45.4 |
| Due from affiliate | 171 | 0.8 | | 0.0 | (320) | -1.8 | 209 | 0.8 | 71 | 0.2 |
| Prepaid Expenses & Other | 768 | 3.6 | 379 | 2.2 | 373 | 2.1 | 189 | 0.7 | 314 | 1.0 |
| Total Current | $20,466 | 96.9 | $16,253 | 95.7 | $16,962 | 96.6 | $24,564 | 96.4 | $29,902 | 97.7 |
| Property & Equipment | | | | | | | | | | |
| Machinery & Equipment | $2,369 | 11.2 | $3,621 | 21.3 | $1,409 | 8.0 | $2,231 | 8.8 | $2,317 | 7.6 |
| Leasehold Improvements | 86 | | 86 | | 86 | | 215 | | 225 | |
| Less Accum. Depr. | (1,800) | -8.5 | (2,977) | -17.5 | (900) | -5.1 | (1,534) | -6.0 | (1,844) | -6.0 |
| Net Fixed Assets | $655 | 3.1 | $730 | 4.3 | $595 | 3.4 | $912 | 3.6 | $701 | 2.3 |
| Deposits & other | | 0.0 | | 0.0 | | 0.0 | | 0.0 | | 0.0 |
| TOTAL ASSETS | $21,121 | 100.0 | $16,983 | 100.0 | $17,557 | 100.0 | $25,476 | 100.0 | $30,603 | 100.0 |
| | | | | | | | (634) | | (307) | |

* This information is from the fiscal year of 1997 to 2001.

Exhibit D
Page 18 of 34

000102

18.2

EXHIBIT 6 PAGE 162

| DRAFT REPORT | | TABLE A-1 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| MGM ENTERTAINMENT, INC. | | FIVE YEAR COMPARATIVE BALANCE SHEET | | | | | Job No.: 1131ABCX | | |
| | | F/Y End December 31 | | | | | Appr Date: 12/31/2001 | | |
| | | ($000) | | | | | Run Date: 19-Oct-04 | | |
| | | | | | | | | | |
| | | **LIABILITIES & SHAREHOLDERS EQUITY** | | | | | | | |
| | | | | | | | | | |
| | 1997 | % | 1998 | % | 1999 | % | 2000 | % | 2001 | % |
| Current Liabilities | | | | | | | | | |
| Accounts Payable & Accrued | $ 11,134 | 52.7 | $ 6,904 | 40.7 | $ 6,611 | 37.7 | $ 12,951 | 50.8 | $ 14,479 | 47.3 |
| Bank Line-Revolving | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Current Port. L T Debt | 38 | 0.2 | 38 | 0.2 | 0 | 0.0 | 11,272 | 44.2 | 16,784 | 54.8 |
| Other current | 45 | 0.2 | 131 | 0.8 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | | | | |
| Total current liabilities | $ 11,217 | 53.1 | $ 7,073 | 41.6 | $ 6,611 | 37.7 | $ 24,223 | 95.1 | $ 31,263 | 102.2 |
| | | | | | | | | | |
| Long Term Liabilities | | | | | | | | | |
| Notes payable to bank | $ 3,175 | 15.0 | $ 5,231 | 30.8 | $ 2,129 | 12.1 | $ 1,147 | 4.5 | $ 1,125 | 3.7 |
| Long term debt, less current | | 0.0 | | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Subordinated notes payable & other | 3,028 | 14.3 | 3,247 | 19.1 | 3,255 | 18.5 | 3,590 | 14.1 | 2,683 | 8.8 |
| | | | | | | | | | |
| Total long term liabilities | $ 6,203 | 29.4 | $ 8,478 | 49.9 | $ 5,384 | 30.7 | $ 4,737 | 18.6 | $ 3,808 | 12.4 |
| | | | | | | | | | |
| Total Liabilities | $ 17,420 | 82.5 | $ 15,551 | 91.6 | $ 11,995 | 68.3 | $ 28,960 | 113.7 | $ 55,071 | 114.6 |
| | | | | | | | | | |
| Shareholders Equity | $ 3,701 | 17.5 | $ 1,432 | 8.4 | $ 5,562 | 31.7 | $ (3,484) | -13.7 | $ (4,468) | -14.6 |
| | | | | | | | | | |
| Total Liabilities & Shareholders Equity | $ 21,127 | 100.0 | $ 16,983 | 100.0 | $ 17,557 | 100.0 | $ 25,476 | 100.0 | $ 30,603 | 100.0 |
| | | | | | | | | | |
| Current Ratio | 1.82 | | 2.30 | | 2.57 | | 1.01 | | 0.96 | |
| Quick Ratio | 0.97 | | 1.20 | | 1.68 | | 0.41 | | 0.50 | |
| L T Debt / Net Worth | 1.68 | | 5.92 | | 0.97 | | -1.36 | | -0.85 | |
| Working Capital | $ 9,249 | 43.8 | $ 9,180 | 54.1 | $ 10,351 | 59.0 | $ 341 | 1.3 | $ (1,361) | -4.4 |
| | | | | | | | | | |
| IMPLIED WORKING CAPITAL | | | | | | | | | |
| Net Revenues | $ 55,315 | | $ 40,732 | | $ 66,350 | | $ 77,489 | | $ 96,370 | |
| W/C as a percent of revenues * | 12.23% | | 12.23% | | 12.23% | | 12.23% | | 12.23% | |
| | | | | | | | | | |
| Implied working capital | $ 6,766 | | $ 4,982 | | $ 8,116 | | $ 9,479 | | $ 11,788 | |
| | | | | | | | | | |
| * Robert Morris Associates SIC #3944, Games, Toys etc. | | | | | | | Rounded: | $ 11,800 | |

Exhibit D
Page 19 of 34

19. *(handwritten)*

EXHIBIT 6 PAGE 101 *(handwritten)*

| DRAFT REPORT | | | TABLE B | | | | | | Job No. | 1131ABCV | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | FIVE YEAR COMPARATIVE INCOME STATEMENT | | | | | | | | Appr Date | 12/31/2001 | |
| | | | F/Y End December 31 | | | | | | Run Date | 19-Oct-04 | |
| MGM ENTERTAINMENT, INC. | | | ($000) | | | | | | | | |
| | | | | | | | | | | (1) | |
| | 1997 | % | 1998 | % | 1999 | % | 2000 | % | 2001 | % | |
| REVENUES - NET | $ 55,315 | 100.0 | $ 40,732 | 100.0 | $ 66,350 | 100.0 | $ 77,489 | 100.0 | $ 96,370 | 100.0 | |
| Less cost of sales | 40,032 | 72.4 | 26,093 | 64.1 | 43,724 | 65.9 | 53,300 | 68.8 | 64,663 | 67.1 | |
| GROSS PROFIT | $ 15,283 | 27.6 | $ 14,639 | 35.9 | $ 22,626 | 34.1 | $ 24,189 | 31.2 | $ 31,707 | 32.9 | |
| Other income (loss) | 28 | 0.1 | (253) | -0.6 | 350 | 0.5 | | 0.0 | | 0.0 | |
| TOTAL INCOME | $ 15,311 | 27.7 | $ 14,386 | 35.3 | $ 22,976 | 34.6 | $ 24,189 | 31.2 | $ 31,707 | 32.9 | |
| EXPENSES | | | | | | | | | | | |
| Advertising & promotion | $ 2,992 | 5.4 | $ 3,898 | 9.6 | $ 4,367 | 6.6 | $ 7,680 | 9.9 | $ 9,482 | 9.3 | |
| Automobile expense | 47 | 0.1 | 64 | 0.2 | 67 | 0.1 | 70 | 0.1 | | 0.0 | |
| Bad debts | (6) | 0.0 | | 0.0 | 30 | 0.0 | | 0.0 | | 0.0 | |
| Bank charges | 294 | 0.5 | 181 | 0.4 | 196 | 0.3 | 200 | 0.3 | | 0.0 | |
| Commissions | 2,535 | 4.6 | 2,168 | 5.3 | 2,487 | 3.7 | 3,000 | 3.9 | | 0.0 | |
| Data processing & supplies | 27 | 0.0 | 64 | 0.2 | 66 | 0.1 | 70 | 0.1 | | 0.0 | |
| Depreciation | 585 | 1.1 | 589 | 1.4 | 540 | 0.8 | 2,531 | 3.3 | 2,609 | 2.7 | |
| Delivery, postage | 242 | 0.4 | 191 | 0.5 | 323 | 0.5 | 375 | 0.5 | | 0.0 | |
| Insurance | 227 | 0.4 | 305 | 0.7 | 386 | 0.6 | 400 | 0.5 | | 0.0 | |
| Interest Expense | 390 | 0.7 | 552 | 1.4 | 842 | 1.3 | 1,180 | 1.5 | 1,690 | 1.8 | |
| Legal, professional & accounting | 1,325 | 2.2 | 1,681 | 4.1 | 1,199 | 1.8 | 1,250 | 1.6 | 1,250 | 1.3 | |
| Miscellaneous other | 105 | 0.2 | 379 | 0.9 | 62 | 0.1 | | 0.0 | | 0.0 | |
| Molds | 0 | 0.0 | 0 | 0.0 | 508 | 0.8 | 750 | 1.0 | | 0.0 | |
| Office Expenses | 61 | 0.1 | 71 | 0.2 | 132 | 0.2 | 150 | 0.2 | | 0.0 | |
| Product development | 463 | 0.8 | 1,008 | 2.5 | 1,711 | 2.6 | 2,000 | 2.6 | | 0.0 | |
| Rents | 346 | 0.6 | 382 | 0.9 | 455 | 0.7 | 431 | 0.6 | 630 | 0.7 | |
| Repairs & maintenance | 11 | 0.0 | 22 | 0.1 | | 0.0 | 3,012 | 3.9 | | 0.0 | |
| Salaries, officers | 704 | 1.3 | 1,104 | 2.7 | 1,194 | 1.8 | 1,200 | 1.5 | 1,200 | 1.2 | |
| Salaries & wages | 2,284 | 4.1 | 2,223 | 5.5 | 3,179 | 4.8 | 3,873 | 5.0 | | 0.0 | |
| Taxes & licenses | 217 | 0.4 | 39 | 0.1 | 61 | 0.1 | 75 | 0.1 | | 0.0 | |
| Taxes, payroll | 176 | 0.3 | 219 | 0.5 | 254 | 0.4 | 260 | 0.3 | | 0.0 | |
| Telephone | 188 | 0.3 | 166 | 0.4 | 214 | 0.3 | 225 | 0.3 | | 0.0 | |
| Travel & entertainment | 226 | 0.4 | 277 | 0.7 | 399 | 0.6 | 450 | 0.6 | | 0.0 | |
| Utilities | 32 | 0.1 | 30 | 0.1 | 35 | 0.1 | 40 | 0.1 | | 0.0 | |
| Sales & Marketing | | | | | | | | | 11,075 | | |
| General & Administrative | | | | | | | | | 2,864 | | |
| TOTAL EXPENSES | $ 13,371 | 24.2 | $ 15,613 | 38.3 | $ 18,707 | 28.2 | $ 29,222 | 37.7 | $ 30,800 | 32.0 | |
| PRETAX INCOME | $ 1,940 | 3.5 | $ (1,227) | -3.0 | $ 4,269 | 6.4 | $ (5,033) | -6.5 | $ 907 | 0.9 | |
| Add Depreciation/Amort | 585 | 1.1 | 589 | 1.4 | 540 | 0.8 | 2,531 | 3.3 | 2,609 | 2.7 | |
| PRETAX CASH FLOW (2) | $ 2,525 | 4.6 | $ (638) | -1.6 | $ 4,809 | 7.2 | $ (2,502) | -3.2 | $ 3,516 | 3.6 | |
| Add Interest Charges | 390 | 0.7 | 552 | 1.4 | 842 | 1.3 | 1,180 | 1.5 | 1,690 | 1.8 | |
| EBITDA (3) | $ 2,915 | 5.3 | $ (86) | -0.2 | $ 5,651 | 8.5 | $ (1,322) | -1.7 | $ 5,206 | 5.4 | |

(1) Basic data from Delloitte & Touche audited report. Certain expense detail missing, but does not alter value opinions.
(2) Pretax income plus depreciation & amortization.
(3) Pretax cash flow plus interest charges. Earnings Before Interest, Taxes, Depreciation and Amortization.

Exhibit D
Page 20 of 34

20. Eb

EXHIBIT _6_ PAGE _164_

**[DRAFT REPORT]**

Job No. 1133 ADCV
Appr Date 7/25/2006
Run Date 19-Oct-06

**TABLE C**
**INCOME STATEMENT ADJUSTMENTS**
**F/Y End December 31**
**($000)**

| MGM ENTERTAINMENT, INC. | 1997 | % | 1998 | % | 1999 | % | 2000 | % | 2001 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| REVENUES - NET | $ 55,315 | 100.0 | $ 40,732 | 100.0 | $ 66,350 | 100.0 | $ 77,489 | 100.0 | $ 96,370 | 100.0 |
| OPERATING INCOME (EBITDA) | $ 2,915 | 5.3 | $ (86) | (0.2) | $ 5,651 | 8.5 | $ (1,322) | (1.7) | $ 5,206 | 5.4 |
| **ADJUSTMENTS TO INCOME** | | | | | | | | | | |
| Legal, professional & accounting | 1,225 | 2.2 | 1,681 | 4.1 | 1,199 | 1.8 | 1,250 | 1.6 | 1,250 | 1.3 |
| Salaries, Officers | 704 | 1.3 | 1,104 | 2.7 | 1,194 | 1.8 | 1,200 | 1.5 | 1,200 | 1.2 |
| Consulting fees - former stockholder | 0 | | 0 | | 0 | | 0 | | 90 | 0.1 |
| U.S. Customs reserve | | | | | | | 620 | | | |
| TOTAL ADJUSTMENTS TO INCOME | $ 1,929 | 3.5 | $ 2,785 | 6.8 | $ 2,393 | 3.6 | $ 3,070 | 4.0 | $ 2,540 | 2.6 |
| **SUBTOTAL** | $ 4,844 | 8.8 | $ 2,699 | 6.6 | $ 8,044 | 12.1 | $ 1,748 | 2.3 | $ 7,746 | 8.0 |
| **LESS REASONABLE EXPENSES** | | | | | | | | | | |
| Legal, professional & accounting (0.75%) | (415) | (0.8) | (305) | (0.8) | (498) | (0.8) | (581) | (0.8) | (723) | (0.8) |
| Salaries, Officers (1.50%) | (830) | (1.5) | (611) | (1.5) | (995) | (1.5) | (1,162) | (1.5) | (1,446) | (1.5) |
| ADJUSTED PRETAX INCOME | $ 3,599 | 6.5 | $ 1,783 | 4.4 | $ 6,551 | 9.9 | $ 4 | 0.0 | $ 5,578 | 5.8 |
| Add Back Depreciation | 585 | 1.1 | 589 | 1.4 | 540 | 0.8 | 2,331 | 3.3 | 2,609 | 2.7 |
| ADJUSTED PRETAX CASH FLOW | $ 4,184 | 7.6 | $ 2,372 | 5.8 | $ 7,091 | 10.7 | $ 2,335 | 3.3 | $ 8,187 | 8.5 |
| Add Back Interest Expense | 390 | 0.7 | 552 | 1.4 | 842 | 1.3 | 1,180 | 1.5 | 1,690 | 1.8 |
| **ADJUSTED EBITDA (1)** | $ 4,574 | 8.3 | $ 2,924 | 7.2 | $ 7,933 | 12.0 | $ 3,715 | 4.8 | $ 9,877 | 10.2 |
| **EBITDA AS % OF SALES** | | 8.3 | | 7.2 | | 12.0 | | 4.8 | | 10.2 |
| Weighting | | 1 | | 2 | | 2 | | 4 | | 4 |
| Product - 3 Columns | 79 | | | | | | | | 23.9 | |
| Divisor - Sum of Weights | 10 | | | | | | | | | |
| **WEIGHTED AVERAGE EBITDA** | 7.9 | Percent (Used in Table E) | | | | | | | | |

(1) Earnings Before Interest, Taxes, Depreciation and Amortization

Exhibit D
Page 21 of 34

| DRAFT REPORT<br>MGM ENTERTAINMENT, INC. | | | TABLE D-1<br>ADJUSTED BOOK VALUE<br>F/Y End December 31<br>($000) | | Job No.<br>Appr Date<br>Run Date | 1131ABCV<br>12/31/2001<br>19-Oct-04 | |
|---|---|---|---|---|---|---|---|
| | Book<br>31-Dec-01 | % | Adjustments<br>31-Dec-01 | % | Adjusted<br>31-Dec-01 | % | |
| **Current Assets** | | | | | | | |
| Cash & equivalents | 556 | 1.8 | ($556) | NM | $0 | 0.0 | |
| Accounts Receivable-Trade | 15,068 | 49.2 | (15,068) | NM | 0 | 0.0 | |
| Inventories | 13,893 | 45.4 | (13,893) | NM | 0 | 0.0 | |
| Due from affilliate | 71 | | (71) | NM | 0 | 0.0 | |
| Prepaid Expenses & Other | 314 | 1.0 | (314) | NM | 0 | 0.0 | |
| Implied Working Capital | 0 | | 11,800 | NM | 11,800 | 28.5 | |
| **Total Current Assets** | 29,902 | 97.7 | ($18,102) | NM | $11,800 | 28.5 | |
| **Fixed Assets as Appraised** | 701 | | | | | | |
| Automotive Equipment | 0 | 0.0 | 7 | | 7 | 0.0 | |
| Computer Equipment | 0 | 0.0 | 23 | | 23 | 0.1 | |
| Furniture & Fixtures | 0 | 0.0 | 21 | | 21 | 0.0 | |
| Leasehold Equipment * | 0 | 0.0 | 126 | | 126 | 0.3 | |
| Machinery & Equipment | 0 | 0.0 | 4 | | 4 | 0.0 | |
| Molds & Tooling * | (0) | 0.0 | 690 | | 690 | 1.7 | |
| Office Equipment | 0 | 0.0 | 1 | | | - | |
| **Net Fixed Assets** | 701 | 2.3 | | | 870 | 2.1 | |
| **INTANGIBLE ASSETS** | - | 0.0 | $28,730 | NM | 28,730 | 69.4 | |
| **BUSINESS ENTERPRISE VALUE** | 30,603 | 100.0 | | NM | 41,400 | 100.0 | |

The right hand column represents the assets included in "Business Enterprise Value"(BEV). This represents
the value of the assets required for normal business operations. To convert this number to Total Asset Value,
subtract the Implied Working Capital. This will yield "Basic Business Value", or the value of the fixed, intang-
ible and other assets only. Then add book current assets. See Table D-2 for calculations.

22, EW

000106

EXHIBIT 6 PAGE 166

## TABLE D-2
### MGM ENTERTAINMENT, INC.
### ADJUSTED BOOK VALUE
F/Y End December 31

| | Job No. | 1131ABCV |
|---|---|---|
| | Appr Date | 12/31/2001 |
| | Run Date | 19-Oct-04 |

**MARKET VALUE OF BUSINESS ENTERPRISE**
Less Implied Working Capital

$ 41,400
(11,800)

**BASIC BUSINESS VALUE**       Fixed Plus Intangibles
Less Fixed Assets as Appraised

$ 29,600
(870)

**MARKET VALUE OF INTANGIBLES (GOODWILL)**
Add Fixed & Other Assets as Appraised (Table H)
Add Current Assets at 12/31/01 (Table A)

$ 28,730
870
29,900

**ADJUSTED TOTAL ASSET VALUE**
Less Total Liabilities at 12/31/01 (Table A-1)

$ 59,500
(35,070)

**ADJUSTED SHAREHOLDER EQUITY**

$ 24,430

See Table J for weighting of approaches and final conclusion.

| DRAFT REPORT<br>MGM ENTERTAINMENT, INC. | **TABLE E**<br>**INCOME APPROACH**<br>FY Ending Sept 30<br>($000) | | | | Job No.<br>Appr Date<br>Run Date | 1131ABCV<br>12/31/2001<br>19-Oct-04 |
|---|---|---|---|---|---|---|

| | 2002 | 2003 | 2004 | 2005 | 2006 | Reversion |
|---|---|---|---|---|---|---|
| **FORECAST REVENUE GROWTH** | 10.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% |
| FORECAST OF REVENUE | $106,007 | $111,307 | $116,873 | $122,716 | $128,852 | |
| **EBITDA as % of Revenues \*** | 7.9% | 7.9% | 7.9% | 7.9% | 7.9% | |
| **EBITDA \*** | $8,333 | $8,749 | $9,187 | $9,646 | $10,128 | $9,208<br>(Table G) |
| Less Capital Equipment Reserve | 0 | 0 | 0 | 0 | 0 | |
| Less Working Capital (1) | (11,800) | (648) | (681) | (715) | (751) | |
| DISTRIBUTABLE CASH FLOW | (S3,467) | $8,101 | $8,506 | $8,931 | $9,378 | $9,612 |
| **REVERSIONARY VALUE** | | | | Factor (3) | 6.885 | $66,184 |
| Discount Rate (Table F) | 18.50% | 18.50% | 18.50% | 18.50% | 18.50% | 18.50% |
| Period Factor | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | 5.00 |
| Multiplier | 0.919 | 0.775 | 0.654 | 0.552 | 0.466 | 0.428 |
| **NPV OF DIST. CASH FLOWS** | (S3,185) | $6,280 | $5,565 | $4,931 | $4,369 | S28,325 |

| | |
|---|---|
| NPV OF DISTRIBUTABLE CASH FLOW FOR FIRST FIVE YEARS | $17,959 |
| NPV OF REVERSIONARY VALUE | 28,325 |
| | $46,284 |

MARKET VALUE OF ENTERPRISE BY THE INCOME APPROACH          Rounded   $46,300

(1) Estimated percent of annual revenue and revenue growth required for working capit      -->   12.23%
Reference - RMA Annual Statement Studies.

(2) Income to be capped at end of 5th year was calculated by estimating 6th year's income considering
a future growth of 5%, and averaging with the 5th year. This adjusts the fifth year from mid-year to the
expected end-of-year-revenues.

(3) Calculated with the following formula: Cap Rate = (1+G)/(R-G), where G = estimated future growth
rate. R = wtd avg cost of capital. (1+.05) / (.2025 -.05) or 1.05/.1525 =      6.885    or    14.52%

\* Earnings Before Interest, Taxes, Depreciation & Amortization. (See Table C).

Exhibit D
Page 24 of 34

24, ℰⅅ

EXHIBIT __6__ PAGE _168_

| DRAFT REPORT | TABLE F | | Job No. | 1131ABCV |
|---|---|---|---|---|
| | CAPITAL ASSET PRICING MODEL | | Appr Date | 12/31/2001 |
| | (CAPM) | | Run Date | 19-Oct-04 |

**MGM ENTERTAINMENT, INC.**

**KEY ASSUMPTIONS**

| | | | |
|---|---|---|---|
| Cost of debt - pretax (1) | | | 10.00% |
| Federal tax rate (2) | Pretax Basis | | 0.00% |
| State tax rate | | | 0.00% |
| Combined marginal tax rate | Pretax Basis | | 0.00% |
| Long-term treasury bond rate | | | 6.00% |
| Market average beta | * | | 1.34 |
| Market average percent of equity | * | | 60% |
| Market average percent of debt | * | | 40% |

| **WEIGHTED AVG COST OF CAPITAL** | 18.44% | Rounded | **18.50%** |
|---|---|---|---|
| Formula: (1-T)*(Kd)(D)+(Ke)(E) | | | |
| $T$ = Tax rate | | | 0.00% |
| $Kd$ = Cost of debt | | | 10.00% |
| $D$ = Proportion of debt in total capital | | | 39.70% |
| $Ke$ = Cost of equity | | | 24.00% |
| $E$ = Proportion of equity | | | 60.30% |

| **COST OF EQUITY CAPITAL** | 24.21% | Rounded | **24.00%** |
|---|---|---|---|
| Formula: Ke = ((B*Rp)+Rs)+Rt | | | |
| $Rf$ = Rate of return on risk-free security (3) | | | 5.00% |
| $Rp$ = Risk premium (Rm - Rf) | | | 12.10% |
| $Rs$ = Company-specific risk premium (4) | | | 2.00% |
| $Rt$ = Current return on 30 Year treasury bills | | | 6.00% |
| $B$ = Industry beta (5) | | | 1.34 |
| $Rm$ = Market return (6) | | | 17.10% |

*Ibbotson Industry Studies for SIC Code 3944, Games, Toys, and Children's Vehicles

(1) Company's estimated cost of interest-bearing debt.
(2) Valuation based upon pretax income streams.
(3) Ibbotson & Associates Report 1926-1999, "Arithmetic Mean of Annual Returns for Long-Term U.S. Treasury Bonds" (riskless).
(4) Additional risk factor to adjust for specific risks of the subject company and industry.
(5) A measure of risk (variability) of common stocks in the industry. (Ibbotson Industry Studies for SIC Code 3944, Games, Toys, and Children's Vehicles)
(6) Ibbotson & Associates Report 1926-1997, "Arithmetic Mean of Annual Returns for The Common Stock of Small Companies".

Exhibit D
Page 25 of 34

25. ℰℒ

EXHIBIT _6_ PAGE _109_

| | | | |
|---|---|---|---|
| RADICA GAMES | EQUITY | 62,052 | 68% |
| | DEBT | 28,777 | 32% |
| | | 90,829 | 100.00% |
| ZINDART | EQUITY | 77,268 | 55% |
| | DEBT | 62,936 | 45% |
| | | ####### | 100.00% |
| | AVERAGE | 69,660 | 60% |
| | | 45,857 | 40% |
| | | ####### | 100.00% |

26. ₤Ⓓ

EXHIBIT _6_ PAGE _170_

**DRAFT REPORT**

**TABLE G**
**EXCESS EARNINGS APPROACH**
**MGM ENTERTAINMENT, INC.**
($000)

| | | Job No. | 1131ABCV |
|---|---|---|---|
| | | Appr Date | 12/31/2001 |
| | | Run Date | 19-Oct-04 |

**EARNINGS BEFORE CAPITAL CHARGES (Table E)**    $9,208

| CAPITAL CHARGES<br>Economic Depreciation | Appraised<br>Value | Est<br>Life | | Return<br>Of | |
|---|---|---|---|---|---|
| Automotive Equipment | $ 7 | 10 | Yrs | 1 | |
| Computer Equipment | 23 | 5 | Yrs | 5 | |
| Furniture & Fixtures | 21 | 15 | Yrs | 1 | |
| Leasehold Equipment * | 126 | 10 | Yrs | 13 | |
| Machinery & Equipment | 4 | 10 | Yrs | 0 | |
| Molds & Tooling * | 690 | 3 | Yrs | 230 | |
| Office Equipment | 1 | 7 | Yrs | 0 | |
| Fixed Assets Total | S 871 | 3.6 | | $243 | S (243) |

| Economic Return | Adjusted<br>Book | % | Return<br>On | |
|---|---|---|---|---|
| Working Capital | $ 11,800 | 10.0% | $ 1,180 | |
| Automotive Equipment | 7 | 15.0% | 1 | |
| Computer Equipment | 23 | 20.0% | 5 | |
| Furniture & Fixtures | 21 | 15.0% | 3 | |
| Leasehold Equipment * | 126 | 20.0% | 25 | |
| Machinery & Equipment | 4 | 12.5% | 0 | |
| Molds & Tooling * | 690 | 15.0% | 104 | |
| Office Equipment | 1 | 15.0% | 0 | |
| Adjusted Tangible Assets | S 12,671 | | S 1,318 | S (1,318) |

| TOTAL EXCESS EARNINGS | | | | S 7,646 |
|---|---|---|---|---|
| Excess Earnings Cap Rate | | 24.0% ** | | S 31,860 |
| Add Tangible Assets | | | | 12,671 |

**BUSINESS ENTERPRISE VALUE BY EXCESS EARNINGS METHOD**   S 44,531

| * Includes Fixed Assets added in 2000 and 2001 | Rounded | S 44,550 |
|---|---|---|

**Equity Discount Rate

Exhibit D
Page 27 of 34

000111

27. ED

EXHIBIT 6 PAGE 171

MGM ENTERTAINMENT, INC.
16730 Schoenborn Street
North Hills, CA 91343-6122

Appraisal Date 12/31/01
Original Cost $2,541
Depreciated Replacement Cost New $871

**TABLE H**
**FIXED ASSET APPRAISAL**
**FROM DEPRECIATION SCHEDULES & FINANCIALS**

| Owned / Leased | Entry Item Order No. | DESCRIPTION | Qty | Valuation Date | Orig Cost ($) | Est Econ Life | Yrs In Use | Rem Econ Life | Price Trend Factor | Repl Cost New | Est'd Remng Life % | Fair Market Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OWNED | 12 | TRUCK | 1 | 01-Aug-93 | 35,951 | 10.0 | 8.4 | 1.6 | 1.208 | 43,429 | 16% | 6,855 |
| OWNED | 17 | COMPUTER | 1 | 15-Oct-93 | 1,120 | 5.0 | 8.2 | (3.2) | | | -64% | 0 |
| OWNED | 18 | COMPUTER | 1 | 15-Jul-94 | 750 | 5.0 | 7.5 | (2.5) | | | -49% | 0 |
| OWNED | 27 | COMPUTER | 1 | 01-Oct-94 | 5,727 | 5.0 | 7.3 | (2.3) | | | -45% | 0 |
| OWNED | 59 | COMPUTER | 1 | 01-Oct-94 | 1,476 | 5.0 | 7.3 | (2.3) | | | -45% | 0 |
| OWNED | 28 | COMPUTER | 1 | 01-Dec-94 | 20,393 | 5.0 | 7.1 | (2.1) | | | -42% | 0 |
| OWNED | 29 | COMPUTER | 1 | 01-Mar-95 | 22,714 | 5.0 | 6.8 | (1.8) | | | -37% | 0 |
| OWNED | 30 | COMPUTER | 1 | 01-Jun-95 | 18,174 | 5.0 | 6.6 | (1.6) | | | -32% | 0 |
| OWNED | 31 | COMPUTER | 1 | 15-Oct-95 | 10,448 | 5.0 | 6.2 | (1.2) | | | -24% | 0 |
| OWNED | 32 | COMPUTER | 1 | 15-Nov-95 | 15,360 | 5.0 | 6.1 | (1.1) | | | -23% | 0 |
| OWNED | 33 | COMPUTER | 1 | 15-Dec-95 | 4,923 | 5.0 | 6.0 | (1.0) | | | -21% | 0 |
| OWNED | 37 | COMPUTER | 1 | 15-Dec-95 | 9,975 | 5.0 | 6.0 | (1.0) | | | -21% | 0 |
| OWNED | 38 | COMPUTER | 1 | 01-Jul-96 | 8,445 | 5.0 | 5.5 | (0.5) | | | -10% | 0 |
| OWNED | 60 | COMPUTER | 1 | 01-Jul-96 | 211,405 | 5.0 | 5.5 | (0.5) | | | -10% | 0 |
| OWNED | 61 | COMPUTER | 1 | 01-Jul-96 | 1,309 | 5.0 | 5.5 | (0.5) | | | -10% | 0 |
| OWNED | 41 | COMPUTER | 1 | 01-Jul-97 | 27,505 | 5.0 | 4.5 | 0.5 | 0.075 | 2,063 | 10% | 205 |
| OWNED | 62 | COMPUTER | 1 | 01-Jul-97 | 2,762 | 5.0 | 4.5 | 0.5 | 0.075 | 207 | 10% | 20 |
| OWNED | 63 | COMPUTER | 1 | 01-Jun-98 | 39,597 | 5.0 | 3.6 | 1.4 | 0.800 | 31,678 | 28% | 8,955 |
| OWNED | 45 | COMPUTER | 1 | 01-Jul-98 | 36,668 | 5.0 | 3.5 | 1.5 | 0.800 | 29,334 | 30% | 8,775 |
| OWNED | 46 | COMPUTER | 1 | 01-Jan-99 | 91,565 | 5.0 | 3.0 | 2.0 | 0.085 | 7,783 | 40% | 3,115 |
| OWNED | 47 | COMPUTER | 1 | 01-Feb-99 | 11,243 | 5.0 | 2.9 | 2.1 | 0.085 | 956 | 42% | 400 |
| OWNED | 48 | COMPUTER | 1 | 01-Mar-99 | 4,000 | 5.0 | 2.8 | 2.2 | 0.085 | 340 | 43% | 145 |
| OWNED | 49 | COMPUTER | 1 | 01-Mar-99 | 4,125 | 5.0 | 2.8 | 2.2 | 0.085 | 351 | 43% | 150 |
| OWNED | 50 | COMPUTER | 1 | 01-Mar-99 | 3,605 | 5.0 | 2.8 | 2.2 | 0.085 | 306 | 43% | 130 |
| OWNED | 51 | COMPUTER | 1 | 01-Apr-99 | 2,733 | 5.0 | 2.8 | 2.2 | 0.085 | 232 | 43% | 100 |
| OWNED | 52 | COMPUTER | 1 | 01-Jun-99 | 4,702 | 5.0 | 2.6 | 2.4 | 0.085 | 400 | 45% | 180 |
| OWNED | 53 | COMPUTER | 1 | 01-Jun-99 | 20,684 | 5.0 | 2.6 | 2.4 | 0.085 | 1,758 | 48% | 850 |
| OWNED | 54 | COMPUTER | 1 | 01-Aug-99 | 1,557 | 5.0 | 2.4 | 2.6 | 0.085 | 132 | 52% | 70 |
| OWNED | 55 | COMPUTER | 1 | 01-Sep-99 | 1,687 | 5.0 | 2.3 | 2.7 | 0.085 | 143 | 53% | 75 |
| OWNED | 1 | EXHIBIT BOOTH - FURN & FIX | 1 | 01-Nov-89 | 14,443 | 15.0 | 12.2 | 2.8 | 1.382 | 19,960 | 19% | 3,760 |
| OWNED | 4 | FURNITURE & FIXTURES | 1 | 01-Sep-90 | 6,857 | 15.0 | 11.3 | 3.7 | 1.334 | 9,147 | 24% | 2,230 |
| OWNED | 2 | FURNITURE & FIXTURES | 1 | 01-Jul-91 | 13,606 | 15.0 | 10.5 | 4.5 | 1.280 | 17,416 | 30% | 5,215 |
| OWNED | 16 | FURNITURE & FIXTURES | 1 | 15-Apr-94 | 1,404 | 15.0 | 7.7 | 7.3 | 1.178 | 1,654 | 49% | 805 |
| OWNED | 24 | FURNITURE & FIXTURES | 1 | 01-Aug-95 | 238 | 15.0 | 6.4 | 8.6 | 1.178 | 280 | 57% | 160 |

MGM ENTERTAINMENT, INC.
16730 Schoenborn Street
North Hills, CA 91343-6122

TABLE II
FIXED ASSET APPRAISAL
FROM DEPRECIATION SCHEDULES & FINANCIALS

Appraisal Date 12/31/01
Original Cost $2,541
Depreciated Replacement Cost New $871

| Owned Leased | Entry Item Order No. | DESCRIPTION | Qty | Valuation Date | Orig Cost* ($) | Est Econ Life | Yrs In Use | Rem Econ Life | Price Trend Factor | Repl Cost New | Est'd Rmng Life | Fair Market Value 12/31/01 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OWNED | 25 | FURNITURE & FIXTURES | FF | 01-Aug-95 | 299 | 15.0 | 6.4 | 8.6 | 1.178 | 352 | 57% | 200 |
| OWNED | 26 | FURNITURE & FIXTURES | FF | 01-Aug-95 | 1,069 | 15.0 | 6.4 | 8.6 | 1.178 | 1,259 | 57% | 720 |
| OWNED | 34 | FURNITURE & FIXTURES | FF | 15-Sep-95 | 1,295 | 15.0 | 6.3 | 8.7 | 1.178 | 1,526 | 58% | 885 |
| OWNED | 35 | FURNITURE & FIXTURES | FF | 15-Nov-95 | 1,000 | 15.0 | 6.1 | 8.9 | 1.178 | 1,178 | 59% | 695 |
| OWNED | 43 | FURNITURE & FIXTURES | FF | 01-Mar-98 | 1,659 | 15.0 | 3.8 | 11.2 | 1.072 | 1,778 | 74% | 1,325 |
| OWNED | 44 | FURNITURE & FIXTURES | FF | 01-Aug-98 | 643 | 15.0 | 3.4 | 11.6 | 1.072 | 689 | 77% | 530 |
| OWNED | 57 | FURNITURE & FIXTURES | FF | 01-May-99 | 3,601 | 15.0 | 2.7 | 12.3 | 1.056 | 3,803 | 82% | 3,125 |
| OWNED | 58 | FURNITURE & FIXTURES | FF | 01-Dec-99 | 1,115 | 15.0 | 2.1 | 12.9 | 1.056 | 1,177 | 86% | 1,015 |
| OWNED | 6 | LEASEHOLD IMPROVEMENTS | LI | 01-Oct-90 | 2,789 | 10.0 | 11.3 | (1.3) | | | -13% | 0 |
| OWNED | 7 | LEASEHOLD IMPROVEMENTS | LI | 01-Feb-91 | 2,293 | 10.0 | 10.9 | (0.9) | | | -9% | 0 |
| OWNED | 21 | LEASEHOLD IMPROVEMENTS | LI | 01-Sep-93 | 17,300 | 10.0 | 8.3 | 1.7 | 1.208 | 20,898 | 17% | 3,475 |
| OWNED | 19 | LEASEHOLD IMPROVEMENTS | LI | 15-Jan-94 | 8,633 | 10.0 | 8.0 | 2.0 | 1.178 | 10,170 | 20% | 2,070 |
| OWNED | 20 | LEASEHOLD IMPROVEMENTS | LI | 01-Nov-94 | 28,862 | 10.0 | 7.2 | 2.8 | 1.178 | 33,999 | 28% | 9,620 |
| OWNED | 36 | LEASEHOLD IMPROVEMENTS | LI | 15-Oct-95 | 2,814 | 10.0 | 6.2 | 3.8 | 1.152 | 3,242 | 38% | 1,225 |
| OWNED | | LEASEHOLD IMPROVEMENTS | LI | 30-Jan-00 | 114,000 | 10.0 | 1.5 | 8.5 | 1.034 | 117,876 | 85% | 100,145 |
| OWNED | | LEASEHOLD IMPROVEMENTS | LI | 30-Jan-01 | 9,572 | 10.0 | 0.5 | 9.5 | 1.000 | 9,572 | 95% | 9,090 |
| OWNED | 13 | MACHINERY & EQUIPMENT | ME | 15-Jan-94 | 1,004 | 10.0 | 8.0 | 2.0 | 1.178 | 1,183 | 20% | 240 |
| OWNED | 14 | MACHINERY & EQUIPMENT | ME | 15-May-94 | 1,111 | 10.0 | 7.7 | 2.3 | 1.178 | 1,309 | 23% | 300 |
| OWNED | 22 | MACHINERY & EQUIPMENT | ME | 01-Dec-94 | 2,444 | 10.0 | 7.1 | 2.9 | 1.178 | 2,879 | 29% | 840 |
| OWNED | 39 | MACHINERY & EQUIPMENT | ME | 01-Jul-97 | 628 | 10.0 | 4.5 | 5.5 | 1.095 | 688 | 55% | 380 |
| OWNED | 40 | MACHINERY & EQUIPMENT | ME | 01-Jul-97 | 2,936 | 10.0 | 4.5 | 5.5 | 1.097 | 3,221 | 55% | 1,770 |
| OWNED | 3 | MOLDS & TOOLING | MT | 01-Sep-90 | 3,229 | 5.0 | 11.3 | (6.3) | | | -127% | 0 |
| OWNED | 42 | MOLDS & TOOLING | MT | 01-Jul-98 | 877,864 | 5.0 | 3.5 | 1.5 | 1.072 | 941,070 | 30% | 281,550 |
| OWNED | 56 | MOLDS & TOOLING | MT | 01-Jul-99 | 773,751 | 5.0 | 2.5 | 2.5 | 1.056 | 817,081 | 50% | 407,870 |
| OWNED | | MOLDS & TOOLING | MT | 30-Jun-00 | 822 | 5.0 | 1.5 | 3.5 | 1.034 | 850 | 70% | 595 |
| OWNED | 11 | CELLULAR PHONE | OE | 01-Aug-92 | 784 | 5.0 | 9.4 | (4.4) | | | -88% | 0 |
| OWNED | 5 | EQUIPMENT | OE | 01-Sep-90 | 1,100 | 10.0 | 11.3 | (1.3) | | | -13% | 0 |
| OWNED | 9 | MAIL MACHINE | OE | 01-Dec-91 | 1,997 | 10.0 | 10.1 | (0.1) | | | -1% | 0 |
| OWNED | 15 | TELECOM EQUIPMENT | OE | 15-Jul-94 | 2,426 | 10.0 | 7.5 | 2.5 | 1.178 | 2,858 | 25% | 725 |
| OWNED | 8 | TELEPHONE SYSTEM | OE | 01-Nov-91 | 15,087 | 10.0 | 10.2 | (0.2) | | | -2% | 0 |
| OWNED | 23 | WATER PUMP | OE | 01-Feb-95 | 1,748 | 10.0 | 6.9 | 3.1 | 1.152 | 2,014 | 31% | 620 |
| OWNED | 10 | WATER PURIFIER | OE | 01-Jun-92 | 147 | 10.0 | 9.6 | 0.4 | 1.238 | 182 | 4% | 5 |

Total at Cost ($000) 2,541

FMV ($000) $871

Exhibit D
Page 29 of 34

MGM ENTERTAINMENT, INC.
16730 Schoenborn Street
North Hills, CA 91343-6122

TABLE II
FIXED ASSET APPRAISAL
FROM DEPRECIATION SCHEDULES & FINANCIALS

Appraisal Date 12/31/01
Original Cost $2,541
Depreciated Replacement Cost New $871

| Owned Leased | Entry Item Order No. | DESCRIPTION | Qty | Valuation Date | Orig Cost* ($) | Est Econ Life | Yrs In Use | Rem Econ Life | Price Trend Factor | Repl Cost New | Ext'd Rmng Life | Fair Market Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |

000114

Exhibit D
Page 30 of 34

30. EO

EXHIBIT 6 PAGE 174

## TABLE H-1
### FIXED ASSET APPRAISAL
### MGM ENTERTAINMENT, INC.
($000)

Job No. 1131ABCV
Appr Date 12/31/2001
Run Date 19-Oct-04

| From Depreciation Schedules & Financial | | Original Cost | Estimated Econ. Life | FMV |
|---|---|---|---|---|
| Automotive Equipment | AE | $ 36 | 10.0 | $ 7 |
| Computer Equipment | CE | 585 | 5.0 | 23 |
| Furniture & Fixtures | FF | 47 | 15.0 | 21 |
| Leasehold Equipment * | LE | 186 | 10.0 | 126 |
| Machinery & Equipment | ME | 8 | 10.0 | 4 |
| Molds & Tooling * | MT | 1,656 | 10.0 | 690 |
| Office Equipment | OE | 23 | 7.0 | 1 |
| **TOTALS** | | $ ░░░░ | | $ ░░░░ |

Extracted from the detailed appraisal in Table H.

Exhibit D
Page 31 of 34

31. ℰ𝒟

EXHIBIT 6 PAGE 175

# TABLE I
## MARKET INFORMATION
### 31-Dec-01

| | | | | | | | Job No. | 1131ABCV | |
| | | | | | | | Appr Date | 12/31/2001 | |
| | | | | | | | Run Date | 19-Oct-04 | |

| COMPANY | Symbol | Price | Shares Out (000) | Market Cap* ($000) | Annual Sales ($000) | Mkt Cap/ Sales (0) | Beta (0) |
|---|---|---|---|---|---|---|---|
| JAKKS PACIFIC | JAKK | 18.95 | 19,556 | 370,580 | 284,309 | 1.303 | 1.00 |
| HASBRO, INC | HAS | 16.23 | 172,309 | 2,796,575 | 2,856,339 | 0.979 | 1.00 |
| MATTEL | MAT | 17.20 | 426,371 | 7,333,581 | 4,804,062 | 1.527 | 0.38 |
| RADICA GAMES | RADA | 4.14 | 17,640 | 73,030 | 98,554 | 0.741 | 1.28 |
| ZINDART LTD | ZND | 1.75 | 30,601 | 53,551 | 136,083 | 0.394 | 1.40 |
| | | | | | | | |
| AVERAGES (Beta is Median) | | | 133,295 | 2,125,463 | 1,635,869 | 0.989 | 1.00 |
| AVERAGES OF SMALLER COMPANIES | | | | | 117,319 | 0.567 | |

*Minority value. Should be converted to control value to use for valuation under the market approach.

Exhibit D
Page 32 of 34

000116

EXHIBIT 6 PAGE 176

DRAFT REPORT

# TABLE I-1
## MARKET APPROACH
### ($000)

|  | Job No. | 1131ABCV |
|---|---|---|
|  | Appr Date | 12/31/2001 |
|  | Run Date | 19-Oct-04 |
| GROSS REVENUES - FY 2001 |  | $ 96,370 |
| AVERAGE SMALL COMPANY REVENUE/MARKET CAP RATIO |  | 0.567 |
| MARKET VALUE OF EQUITY ON A MINORITY BASIS |  | $ 54,667 |
| Less Public/Private discount | 23.1% | (12,628) |
| MINORITY VALUE OF EQUITY - SMALL PRIVATE COMPANY |  | $ 42,039 |
| Add Control Premium | 35% | 14,714 |
| EQUITY MARKET VALUE ON A CONTOL BASIS |  | $ 56,800 |
| ADJUSTED EQUITY MARKET VALUE ON A CONTROL BASIS |  | $ 56,800 |
| Less discount for lack of ready market | 25% | $ (14,200) |
|  |  | ▓▓▓▓▓▓ |

Exhibit D
Page 33 of 34

EXHIBIT 6 PAGE 177

DRAFT REPORT

## TABLE J
## CONCLUSION OF MARKET VALUE
### ($000)

| | | Conclusion | | Job No. | 1131ABCV |
| | | | | Appr Date | 12/31/2001 |
| | | | | Run Date | 19-Oct-04 |
| MGM ENTERTAINMENT, INC. | | | Weight | | Product |
| INCOME APPROACH (Table E) | | $ 46,300 | 0.60 | | $ 27,780 |
| MARKET APPROACH (Table I-1) | | $ 42,600 | 0.00 | | - |
| EXCESS EARNINGS APPROACH (Table G) | | $ 44,550 | 0.40 | | 17,820 |
| | | | Rounded | | $ 46,000 |
| Less Discount for Lack of Liquidity | | | 10% | | (4,600) |
| FMV OF BUSINESS ENTERPRISE (Includes working capital) | | | | | $ 41,400 |
| Less Implied Working Capital | | | | | (11,800) |
| BASIC BUSINESS VALUE | | | | | $ 29,600 |
| Add Current Assets (Table A) | | | | | 29,900 |
| FMV OF TOTAL ASSETS | | | | | $ 59,500 |
| Less Total Liabilities (Table A-1) | | | | | (35,070) |
| FMV OF SHAREHOLDERS EQUITY ON A CONTROL BASIS | | | | | $ 24,430 |
| FMV OF SHAREHOLDER INTEREST ON A CONTROL BASIS | | | 45% | | $ 10,993 |
| | | | Rounded | | $ 11,000 |

000118

$34.\ \mathcal{E}\mathcal{D}$

Exhibit D
Page 34 of 34

EXHIBIT 6 PAGE 178

**EXHIBIT 7**

TRANSCRIPT OF AUDIOTAPED MEETING WITH

ERNEST DUTCHER, APPRAISER

## CERTIFIED
## COPY

Reported by:

JOHANNA M. BENNETT

CSR No. 5263

JOB No. 888989

ESQUIRE DEPOSITION SERVICES
(323) 938-2461

EXHIBIT 7 PAGE 179

KRANE 0039

1
2
3
4
5
6
7
8
9
10
11      Transcript of Audiotaped Meeting with
12   Ernest Dutcher, transcribed in Temple City,
13   California, on Wednesday, September 10, 2003,
14   by JOHANNA M. BENNETT, Certified Shorthand
15   Reporter No. 5263.
16
17
18
19
20
21
22
23
24
25

2

EXHIBIT 7 PAGE 180

KRANE 0040

```
 1   KNOWN APPEARANCES:

 2

 3

 4            MORAD ZARABI

 5            A MALE VOICE

 6            ERNEST DUTCHER

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

ESQUIRE DEPOSITION SERVICES
(323) 938-2461

EXHIBIT 7 PAGE 181

KRANE 0041

1                      *         *         *

2

3            MR. ZARABI:  Today is February 7.  I have a

4    meeting with Mr. Ernest.

5            MR. DUTCHER:  Ernest Dutcher.

6            MR. ZARABI:  Ernest, and -- today is February

7    7.  I have a meeting with Mr. Ernest and the gentleman,

8    he appraised ABC or MGA International and he allow me to

9    tape this conversation for the future if use it, if we

10   need it, even in the court.

11           Will you please say your name and everything,

12   please.

13           MR. DUTCHER:  My name is Ernest E. Dutcher.  My

14   designation is master certified business appraiser, and

15   my office is in Encino, California.

16           I received the instruction to provide a limited

17   letter report which means that the -- the valuation was

18   conducted in a manner that would be required for an

19   eventual full narrative report.

20           And at the time -- at the time of the appraisal

21   of December 31, 1999, I relied on information given to

22   me by management, and we provided the report and we've

23   come -- we've used three methodologies in trying to

24   determine or estimate the value of the company.

25           MR. ZARABI:  Mr. Ernest, I have a question for

                                                              4

EXHIBIT 7 PAGE 182

KRANE 0042

1   you.

2           MR. DUTCHER:  Uh-huh.

3           MR. ZARABI:  Have you appraised any toys

4   company before?

5           MR. DUTCHER:  I would have to research that

6   because I've been in this business for approximately 25

7   years, and I worked for some major companies and I'm

8   sure that during that time that that type of company

9   probably was one of the thing we did.

10          I can't say for sure, but I will say this, that

11  almost every company that is appraised is done almost

12  the same way.  It typically has many methodologies that

13  are available to the appraisers such as:  The income

14  approach, the market approach and the excess earnings

15  approach is three of them.  And that's the three I used

16  in doing this particular report.

17          And the reason that we can do it that way

18  instead of like one methodology -- one -- almost every

19  company that's appraised is appraised based on its

20  future earning potential.

21          And the fact that it's a toy company or a

22  manufacturer of doors and windows, it doesn't matter

23  because the basic bookkeeping, the basic financial

24  statements and so forth all resemble one another.

25          And based on that fact that we go through the

5

EXHIBIT 7 PAGE 183

KRANE 0043

1    potential of the company, we review the industry, which

2    in this case was rather, as I remember, rather volitile

3    at the time and probably still is, it's kind of a

4    volitile industry, up and down.

5        And so we felt and I still believe that we are

6    eminently qualified to do the job.

7        MR. ZARABI:  Okay.  My second question is:

8    Are you either, ah, licensee in this company?  Are you

9    base your appraisal is -- my (inaudible) there is the

10   (inaudible), if you see the licensee or you didn't see

11   the licensee affecting the appraisal or not?

12       MR. DUTCHER:  The licensee is a method to keep

13   the revenues rolling into the company.  We assume that

14   the licensee -- the license, which, by the way, can be

15   valued individually, with individual effort.  It would

16   not give the answers that you are looking for in this

17   appraisal.  You needed the overall value of the company

18   to determine what the buyout value of a 40 -- 45-percent

19   interest was.

20       It would serve no purpose to have a value of

21   each of the licenses.  And One other thing, licenses in

22   the toy industry, because of the fact that each toy

23   that's been designed has a quite a short life and there

24   has to be probably a lot of different licenses, so it

25   actually would be beyond the scope of what we were doing

                                                          6

EXHIBIT 7 PAGE 184

KRANE 0044

1    to try to evaluate each individual license.

2         MR. ZARABI:  All right.  I'm sure.

3         A MALE VOICE:  I'm sorry.  (Inaudible) Jerard.

4    I'm going to ask you a few questions myself.

5         MR. DUTCHER:  Sure.

6         A MALE VOICE:  You said that the valuation was

7    done December 31, 1999 or was that --

8         MR. DUTCHER:  Date of value.

9         A MALE VOICE:  In '99 you valued, end of '99

10   you valued or August or September of 2000?

11        MR. DUTCHER:  No.  That wasn't when I

12   valued it.  Somewhere probably in the mid -- I think

13   perhaps in July or August I probably received the

14   order.  I'd have to pull more of the file.  I didn't

15   have time to pull it all.

16        MR. ZARABI:  November -- the very first year

17   appraisal --

18        A MALE VOICE:  The appraisal is dated November

19   7, 2000, so your -- your --

20        MR. DUTCHER:  Let me see that.  I might be

21   looking at a different one.  I was looking at the first

22   one.  November 7, 2000.

23        A MALE VOICE:  So you --

24        MR. DUTCHER:  No, no, no, no.  The date of

25   valuation is December 31, 1999.  I have no right to use

                                                         7

EXHIBIT 7 PAGE 185

KRANE 0045

1   anything that happened after that date.  Unless we move

2   this date up to December 31, 2000, I couldn't consider

3   anything that happened subsequent to this date.

4           A MALE VOICE:  Okay.  So that's when the

5   valuation was done?

6           MR. DUTCHER:  That's the date --

7           A MALE VOICE:  And you met with who for this

8   valuation?

9           MR. DUTCHER:  I met with Morad and I met with

10   the two shareholders.

11          A MALE VOICE:  The two main shareholders?

12          MR. DUTCHER:  Yes.

13          A MALE VOICE:  Isaac and Farhad?

14          MR. DUTCHER:  Right.

15          A MALE VOICE:  You met with both of them?

16          MR. DUTCHER:  With both of them one time, as I

17   recall.

18          A MALE VOICE:  At the same time, meeting in the

19   same meeting?

20          MR. DUTCHER:  Yes.

21          A MALE VOICE:  So you never had a separate

22   meeting with Farhad or Isaac, separately --

23          MR. DUTCHER:  I don't think so.  I do recall

24   it's back a ways, but I don't remember having any

25   separate valuations -- separate meetings.

8

EXHIBIT __7__ PAGE _186_

KRANE 0046

1          A MALE VOICE:  And you had it sitting with both

2   of them?

3          MR. DUTCHER:  At the same time and I think

4   Morad was present?

5          A MALE VOICE:  Were you present at that

6   meeting?

7          MR. ZARABI:  I don't remember.  I don't recall.

8          A MALE VOICE:  So you --

9          MR. ZARABI:  I don't remember, when you say --

10          A MALE VOICE:  But you didn't have a separate

11   meeting with Isaac?

12          MR. DUTCHER:  I don't -- no, I don't think so.

13          A MALE VOICE:  Okay.  And --

14          MR. ZARABI:  Have you had a meeting with the

15   controller?

16          A MALE VOICE:  Did you have meetings with the

17   accounting people?

18          MR. DUTCHER:  Was it a lady?

19          MR. ZARABI:  A lady or a guy.

20          MR. DUTCHER:  Just to give them the information

21   I needed to provide the report.

22          A MALE VOICE:  Okay.  What information, may I

23   ask, you asked them to give you?

24          MR. DUTCHER:  The financial data is for five

25   years.  I believe --

9

EXHIBIT 7  PAGE 187

KRANE 0047

```
 1              A MALE VOICE:  Last five years?

 2         MR. DUTCHER:  The prior five years --

 3              A MALE VOICE:  Right.

 4         MR. DUTCHER:  -- ending December 31, 1999.

 5              A MALE VOICE:  Okay.

 6         MR. DUTCHER:  And then kind of a tour of the

 7    facilities and general description of what the business

 8    was and the fact I was not providing a full narrative

 9    report, the actual detailed description of the market

10    and so forth was not included with the report.  We have

11    what we call a phase 1 and a phase 2 in our appraisals.

12              The phase 1 covers a letter report which is not

13    a full narrative report.  The letter report is

14    restricted -- is restricted to providing the financial

15    data only.

16              A MALE VOICE:  Uh-huh.

17         MR. DUTCHER:  -- with this minimal description

18    of the data and that is typically enough for a

19    friendly --

20              A MALE VOICE:  Break up.

21         MR. DUTCHER:  Yeah.  -- for a friendly break

22    up.

23              A MALE VOICE:  So phase 1 would be for a

24    friendly buyout?

25         MR. DUTCHER:  Yes.
```

                                                            10

EXHIBIT 7 PAGE 188

KRANE 0048

1          A MALE VOICE:  And phase 2 would be?

2          MR. DUTCHER:  Phase 2 would be in case any

3    litigation was needed, and so forth, phase 2 had to be

4    created and it can be done at any time.

5          A MALE VOICE:  So for this purpose you only did

6    a phase 1?

7          MR. DUTCHER:  Phase 1, correct.

8          A MALE VOICE:  Okay.  So --

9          MR. ZARABI:  Let me ask a question.  The time

10   for the having meeting with Isaac, Farhad and his

11   controller or anybody in the MGA or ABC Corporation, did

12   they cooperate completely with you or not?

13         MR. DUTCHER:  They seemed to.  They seemed to

14   describe the business and so forth.  I had no reason to

15   believe that there was any problem between them and it's

16   not our --

17         MR. ZARABI:  Did you feel that anything they're

18   hiding for you something?

19         MR. DUTCHER:  I didn't get any -- any such

20   feeling, no.

21         MR. ZARABI:  No?

22         MR. DUTCHER:  I felt that everything was above

23   board.

24         A MALE VOICE:  I have further questions.

25         When you determined your future -- the

                                                    11

EXHIBIT 7 PAGE 189

KRANE 0049

1   future -- I mean, how did you determine the cost -- I

2   mean, did they give you any projections for the future

3   of the sales of this company?

4          MR. DUTCHER:  Typically I ask for their opinion

5   of what the future can be, and I just don't remember.

6   I'd have to go back and research the file completely,

7   and -- and if I didn't ask for them, it would be

8   unusual.

9          MR. ZARABI:  So you must have asked for them

10   and you would have kept --

11          MR. DUTCHER:  My guess, my best guess would be

12   that I would have asked what they thought the future was

13   because my -- again, as I repeat, in appraising is

14   not -- the value of the company doesn't lie on what it

15   has done.  It lies in what the future holds for that

16   company.

17          MR. ZARABI:  As well, yes.

18          MR. DUTCHER:  So very few people would invest

19   in Enron right now because it was a wonderful company in

20   the past.

21          MR. ZARABI:  Right.

22          MR. DUTCHER:  Right now it has zero value.  So

23   we try our best to get a forecast from the responsible

24   people, marketing, so forth, try to get a feel for what

25   they think that the future holds for the business.

12

EXHIBIT __7__ PAGE _190_

KRANE 0050

1          In addition, we check to see what the market

2     is, like our market approach consists of looking into

3     various public companies that are involved in the same

4     business such as Mattel and so forth.  We have a number

5     of them listed in the report.

6          We can get a feel for the -- actually, the toy

7     market or that type of market in general from that --

8     from that.  From -- from these sources, we then come up

9     with a conclusion of value based on our experience and

10    estimating what the likelihood of the continuation of

11    the company and whether it has any value related to the

12    future.  And the income approach and the other

13    approaches provide that for me.

14         A MALE VOICE:  I just have a couple of

15    questions.                Number one, you said that you

16    met with both of them.  Would you have written that in

17    your paperwork if you had met with both of them?

18         MR. DUTCHER:  Probably.  If I -- I could go

19    back and research that because I usually keep track for

20    my time.

21         A MALE VOICE:  I would like you, please, to do

22    that, doublecheck and make sure in that meeting when you

23    sat and gave them -- you wanted to sit down and discuss

24    with them, I want to make sure that both of them were

25    there or not, whether Fahrad's there or not.  I just --

13

EXHIBIT 7 PAGE 191

KRANE 0051

```
 1          MR. DUTCHER:  Yes.

 2          A MALE VOICE:  Are you sure?

 3          MR. DUTCHER:  I'm positive they are both there

 4   because Morad took me over to the location, which is

 5   over behind the airport somewhere.

 6          A MALE VOICE:  Right.

 7          MR. DUTCHER:  And I remember going in and

 8   meeting both of them at the time.

 9          A MALE VOICE:  And sitting in the same meeting

10   with both of them present, when they were giving you

11   projections for the future?

12          MR. DUTCHER:  I think it all happened in the

13   same meeting.  I don't think there was more than one

14   meeting on gathering the information directly from the

15   people.

16          A MALE VOICE:  So, then, basically they both

17   sat there and gave you --

18          MR. ZARABI:  All the information.

19          A MALE VOICE:  -- all the information of what

20   they thought?

21          MR. DUTCHER:  That's my -- that's my

22   recollection of it, yes.

23          A MALE VOICE:  If you could go back and

24   doublecheck, we appreciate --

25          MR. DUTCHER:  I'll check the company notes on
```

14

EXHIBIT __7__ PAGE _192_

KRANE 0052

1    it, yes.

2         A MALE VOICE:  -- if you can send a letter on

3    that.

4         And secondly, again, going back to that same

5    meeting, report of the potential future sales, you think

6    both of them gave you that or was one of them more vocal

7    than the other one?

8         MR. DUTCHER:  No, I don't remember any -- I

9    don't remember any outstanding big shining potential

10   that they brought out other than --

11        LEFT2:  (Inaudible.)

12        MR. DUTCHER:  -- doing in a normal course of

13   business.

14        A MALE VOICE:  So you just basically took the

15   normal increases on a yearly basis and that's what you

16   did?

17        MR. DUTCHER:  Yes.  Yes.

18        MR. ZARABI:  Let me ask a question.

19        MR. DUTCHER:  Uh-huh.

20        MR. ZARABI:  Even the time you -- first of all,

21   how long you have experience for the appraising the

22   business, completely?  10 years?  20 years?

23        MR. DUTCHER:  I have 20, 25 years.

24        MR. ZARABI:  20 years.

25        MR. DUTCHER:  I've owned my own businesses and

15

EXHIBIT __7__ PAGE _193_

KRANE 0053

1    I've --

2              MR. ZARABI:   And you -- because of your

3    conversation you say every court of law accept your

4    appraisal, right?

5              MR. DUTCHER:   I've never found one that didn't.

6              MR. ZARABI:   Okay.

7              MR. DUTCHER:   I've never been denied a position

8    of expertise.

9              MR. ZARABI:   My final question is:   If the

10   contract came to the table by September 18, year 2000 --

11             A MALE VOICE:   This was a license of September

12   18, 2000.

13             MR. DUTCHER:   Okay.

14             MR. ZARABI:   If you have on the table --

15             MR. DUTCHER:   Uh-huh.

16             MR. ZARABI:   -- with the other licensees, it

17   was affecting the price or no?

18             MR. DUTCHER:   It could have, but I'd have to

19   have a lot more information.   I can't say it wouldn't.

20             A MALE VOICE:   (Inaudible) check each license.

21             MR. ZARABI:   You never check any license?

22             A MALE VOICE:   He never checked any license.

23             MR. DUTCHER:   However, if there was one that

24   was really, really outstanding.

25             A MALE VOICE:   Did you check each license?

16

EXHIBIT 7 PAGE 194

KRANE 0054

1        MR. DUTCHER:  No.

2        A MALE VOICE:  No, you didn't.

3        MR. DUTCHER:  No.

4        A MALE VOICE:  And none of them were furnished

5   to you?

6        MR. DUTCHER:  Another thing, to answer that

7   probably better, we know that through the period of the

8   company, let's take a look at the --

9        MR. ZARABI:  The (inaudible) --

10       MR. DUTCHER:  -- history.  Let's go back here

11  five years.  In 1995, we had 64 million in revenues.  In

12  1996 it dropped to 46 million in revenues.

13       In 1997 it recovers somewhat to 55 million in

14  revenues but dropped to 40 million, you know, that's a

15  big drop, by 1998.  Then it jumped in 1999 to 66 million

16  which told me this:  That at times they had a hot

17  product.  A hot product here, and they probably had a

18  hot product here --

19       A MALE VOICE:  In '97.

20       MR. DUTCHER:  -- another hot product here --

21       A MALE VOICE:  In --

22       MR. DUTCHER:  -- which we picked up here, and

23  then for the future it says, "These hot products will

24  come and go because the toy business is that way."

25       I don't say that because I know the toy

17

EXHIBIT _7_ PAGE _195_

KRANE 0055

1    business itself.

2              A MALE VOICE:  Uh-huh.

3              MR. DUTCHER:  But I do know when you see an

4    industry, there is such volatility --

5              A MALE VOICE:  Volatility in the sales.

6              MR. DUTCHER:  -- that tells the appraiser, that

7    you better be careful on how much growth you are

8    forecasting into the future because that is the basis of

9    your value.

10             A MALE VOICE:  How much growth did you --

11             MR. DUTCHER:  And I think the growth was

12   probably estimated at 5 percent.  Yes.

13             A MALE VOICE:  Yes.

14             MR. DUTCHER:  We forecast a growth of 5 percent

15   a year because you know with that much -- a big jump and

16   a big drop and a big jump, there is no one on earth that

17   can forecast with any degree of accuracy of what's

18   really going to happen.

19             MR. ZARABI:  With your experience, there is any

20   way you can imagine this sale after two years instead of

21   5 percent jump to 25 percent?

22             MR. DUTCHER:  Well, I would say that --

23             A MALE VOICE:  Possible because --

24             MR. ZARABI:  (Inaudible.)

25             MR. DUTCHER:  -- might do that, but I recognize

                                                          18

EXHIBIT  7  PAGE  196

KRANE 0056

1    that, that it did do that.  It jumped from 40 to 60.

2    That's a huge jump and then it dropped back to 40.  No,

3    and that --

4         MR. ZARABI:  It was not established company the

5    way you see it?

6         MR. DUTCHER:  Pardon?

7         MR. ZARABI:  It was not established number

8    company.

9         MR. DUTCHER:  Well, the only thing I see is a

10   begun of of hot products that came along, hot products

11   that boosted it temporarily, but it didn't have a long

12   life.

13        A MALE VOICE:  I have another question for

14   you.  And this is I think that I would like to ask you

15   somewhat of your experience not relating to this.

16        What happens when you value a company and then

17   the company goes drastically lower in sales?  So let's

18   say they were doing an average of 60 and 70, went down

19   to 20?  What happens to them?

20        MR. DUTCHER:  What happens to them is not

21   important at the time I do the appraisal because we

22   don't know what's going to happen to them.

23        We only can say based on history that the trend

24   has been up, but how can you forecast anything when the

25   trend is up and down and up and down.

19

EXHIBIT  7  PAGE  197

KRANE 0057

```
 1          You could -- I could -- even if I knew the

 2   company went bankrupt the next year, I would still have

 3   to put the valuation based on what I could see if I was

 4   there on December 31, 1999.

 5          A MALE VOICE:  Right.

 6          MR. DUTCHER:  I could not change my opinion

 7   based on a subsequent event.

 8          A MALE VOICE:  Who gave you the authorization

 9   to go up to December 31, 1999?

10          MR. DUTCHER:  I think it was --

11          A MALE VOICE:  Morad?

12          MR. DUTCHER:  I think you had said --

13          A MALE VOICE:  Morad said to him that the

14   valuation has to be as of December 31 --

15          MR. ZARABI:  December 31, 1999.

16          A MALE VOICE:  I think (inaudible) I have a

17   question, from whatever happens?

18          MR. ZARABI:  I didn't have the experience to

19   say to --

20          A MALE VOICE:  (Inaudible.)

21          MR. ZARABI:  -- 1999, but I don't remember but

22   you said based on your expérience, you go to the 1999,

23   correct?

24          MR. DUTCHER:  Well --

25          MR. ZARABI:  Because I don't remember --
```

                                                                20

EXHIBIT 7 PAGE 198

KRANE 0058

1          MR. DUTCHER:  -- because 1999 was a full year.

2    December 31st was a full year.

3          A MALE VOICE:  Yes.

4          MR. DUTCHER:  And had we done a midyear which

5    we could do --

6          MR. ZARABI:  Uh-huh.

7          MR. DUTCHER:  -- I would do one as of the date

8    of that appraisal.

9          MR. ZARABI:  Because of the full year you had

10   the financial --

11         MR. DUTCHER:  Of course.

12         MR. ZARABI:  -- for 1999 --

13         MR. DUTCHER:  Of course.

14         MR. ZARABI:  -- you base it as of 1999?

15         MR. DUTCHER:  That is correct.

16         MR. ZARABI:  Even --

17         A MALE VOICE:  That was the record that they

18   could furnish him.  They couldn't furnish him -- if he

19   went there in September or October, he couldn't have

20   gotten information of what has happened in that -- in

21   that year because they wouldn't know because there would

22   be no physical audited information.  The only audited

23   information was end of '99.

24         MR. DUTCHER:  Plus the fact usually toward the

25   end of the year, there's year-end adjustments and things

21

EXHIBIT 7 PAGE 199

KRANE 0059

1  of that sort that happen.

2      So we have had -- we can do appraisals due at

3  the midyear, but we put lower weight on that simply

4  because it's speculation.

5      A MALE VOICE:  Not (inaudible).

6      MR. ZARABI:  Robert says after (inaudible) base

7  of the company going down instead of 50 million

8  business, comes to the $20 million which is the

9  (inaudible) assets.  Now I'm --

10     A MALE VOICE:  That's the valuation --

11     MR. DUTCHER:  If it went down the following

12  year, it would not change the valuation because I would

13  have to change the date of value.

14     A MALE VOICE:  Okay.  And then would any court

15  be able to cancel the contract because of that reason?

16     MR. DUTCHER:  If there were -- if the event,

17  the sale took place based on the appraisal and the

18  appraisal date was December 31, 1999, I could see no way

19  that they can rule any other way accept to state that

20  what happened in 1999, December 31, then prior to that

21  was the only thing that we can use.

22     A MALE VOICE:  But don't you think that if --

23  if there was things going on in December or even

24  January, but you had -- but in fact you had your

25  appraisal done six months to eight months later --

22

EXHIBIT 7 PAGE 200

KRANE 0060

1      MR. DUTCHER:  Uh-huh.

2      A MALE VOICE:  -- the fact still remains that

3   they would have known the trend for the following year,

4   and they would have been able to tell you that in their

5   meeting, wouldn't you -- they?

6      MR. DUTCHER:  Well, I would think so.  It -- if

7   there was something on the horizon that was unusual, I

8   would think they would have brought it out at that

9   meeting.  I don't remember that.

10      A MALE VOICE:  Let's take it --

11      MR. ZARABI:  Opposite way.

12      A MALE VOICE:  -- the opposite way, okay?

13      MR. ZARABI:  Say, the dates are to which date

14   is this affecting.

15      A MALE VOICE:  The question is this:  In the

16   year 2000, let's take it the other way now, instead of

17   it going to 60 average million in sales it suddenly

18   jumped to 90 or 80 or 90 and probably jumps the year

19   after to a hundred and the following year jumps to

20   200,000 -- $200 million.

21      MR. DUTCHER:  Well, in other words, we can only

22   base our judgment on what has historically happened in

23   the past.  Typically, if we were to give an estimate out

24   in the future that it was going to grow at some

25   astronomical rate, we'd have to put a heavy discount

23

EXHIBIT 7 PAGE 201

KRANE 0061

1    rate on that, on the probability or possibility it may

2    not happen.

3           So we used a discount rate here of 20.75

4    percent which was probably based on the fact it was --

5    even this number was -- had some risk in reaching it.

6    In other words, that discount rate is a --

7           MR. ZARABI:  But the final question is:  You

8    appraise this company based on fairness, based on your

9    experience.

10          There is any influence from either party, me --

11   I'm Morad, Isaac, Farhad, (inaudible), anything that is

12   affecting your appraisal or no?

13          MR. DUTCHER:  I would say that there was not

14   iota of pressure put on me one way or the other by

15   either yourself or the other two parties to have a

16   higher or lower number.

17          This is precisely my opinion of value at that

18   time and was not influenced by anyone else's input

19   except for the financial part of it.

20          MR. ZARABI:  Okay.  I thank you very much.  I

21   really appreciate it for you coming over here.

22          A MALE VOICE:  We might need you --

23          MR. ZARABI:  We might meet again.  Maybe we ask

24   you for the subpoena in the court of law, and I hope we

25   expecting to your cooperation.

24

EXHIBIT 7 PAGE 202

KRANE 0062

1            MR. DUTCHER:   There's no question.   It's part

2     of my job.

3            MR. ZARABI:   Thank you very much and thanks

4     again.

5            MR. DUTCHER:   Okay.

6                      *           *           *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              25

EXHIBIT __7__ PAGE _203_

KRANE 0063

1

2

3

4

5      I, the undersigned, a Certified Shorthand

6  Reporter of the State of California, do hereby certify:

7      That the foregoing audiotaped proceedings

8  were listened to and taken down by me using machine

9  shorthand which was thereafter transcribed under my

10  direction; further, that the foregoing is an accurate

11  transcription thereof.

12      I further certify that I am neither

13  financially interested in the action nor a relative or

14  employee of any attorney of any of the parties.

15      IN WITNESS WHEREOF, I have this date

16  subscribed my name.

17

18  Dated:_____ SEP 1 1 2003

19

20

21  _____

22  JOHANNA M. BENNETT
    CSR No. 5263

23

24

25

EXHIBIT 7 PAGE 204

KRANE 0064

**EXHIBIT 8**

Wachovia Corporation
Legal Division
NC0630
One Wachovia Center
301 South College Street
Charlotte, NC 28288

Tel 704 374-6611

Feu    M. Shepard
Vice President
Assistant General Counsel
Direct Dial 704-383-4448
Fax 704-383-0649
fenita.shepard@wachovia.com



**WACHOVIA**

November 15, 2005

**VIA FAX AND US MAIL**
Robert G. Wilson, Esq.
Cotkin, Collins, & Ginsburg
300 South Grand Avenue, 24th Floor
Los Angeles, CA 90071-3134

RE:    LARIAN V. LARIAN ARBITRATION

Dear Mr. Wilson:

Not only do I concur with Mr. Feldman's position, but also there is absolutely no way that I can produce the documents to you by tomorrow. There are three (3) boxes of loan documents that need to be reviewed for responsiveness and privilege. Only after such a review, can these documents be made available.

Also, Mr. Laugton will be on vacation from November 21, 2005 through November 28, 2005. Please let me know if you are agreeable to a stipulation as to the authenticity of the documents so that Mr. Laughton will not have to appear. Otherwise, please let me know when, this week, you will need Mr. Laughton to testify.

Very truly yours,

*Fenita M. Shepard*
Fenita M. Shepard

Cc:    Richard L. Kellner, Esq.
       Robert M. Turner, Esq.

CC 00570

EXHIBIT 8 PAGE 205



Wachovia Corporation
Legal Division
NC0630
One Wachovia Center
301 South College Street
Charlotte, NC 28288

Tel 704 374-6611

Fer    M. Shepard
Vice ..esident
Assistant General Counsel
Direct Dial 704-383-4448
Fax 704-383-0649
fenita.shepard@wachovia.com

**WACHOVIA**

November 15, 2005

**VIA FAX AND US MAIL**
Robert G. Wilson, Esq.
Cotkin, Collins, & Ginsburg
300 South Grand Avenue, 24th Floor
Los Angeles, CA 90071-3134

RE:    LARIAN V. LARIAN ARBITRATION

Dear Mr. Wilson:

It is my understanding that the Defendants in the above referenced matter have filed a Motion to Quash ("Motion") seeking to quash the third party subpoena (duces tecum) served on Bruce Laughton, an employee of Wachovia Bank, N.A.   Without waiving any objections it may have to the third party subpoena, Wachovia Bank, N.A. will await a ruling from the Arbitration panel on Defendant's Motion before it responds to the subpoena.  Should you wish to discuss this further, please feel free to contact me.

Very truly yours,

Fenita M. Shepard

Cc:    Richard L. Kellner, Esq.
       Robert M. Turner, Esq.

EXHIBIT 8 PAGE 206                    CC 00571

**EXHIBIT 9**

● ORIGINAL ●

William C. Conkle (SB# 076103)
Mark D. Kremer (SB# 100978)
Eric S. Engel (SB# 105656), members of
CONKLE & OLESTEN
Professional Law Corporation
3130 Wilshire Boulevard, Suite 500
Santa Monica, California 90403-2403

Telephone: (310) 998-9100

Attorneys for Plaintiff Farhad Larian

**FILED**
LOS ANGELES SUPERIOR COURT

FEB 2 8 2005

JOHN A. CLARKE, EXECUTIVE OFFICER/CLERK
BY_____
J. SUNGA, DEPUTY

Case assigned to.
Judge  Paul Gutman
D24

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

FARHAD LARIAN,

    Plaintiff,

v.

MORAD ZARABI, ISAAC LARIAN
AND KAMBIZ ZARABI AND DOES 1
through 5, INCLUSIVE

    Defendants.

CASE NO.  BC329501

VERIFIED COMPLAINT FOR:

1)   FRAUD

2)   NEGLIGENT MISREPRESENTATION

3)   CONSPIRACY

4)   DECLARATORY RELIEF

5)   CONSTRUCTIVE TRUST

6)   INJUNCTIVE RELIEF

Plaintiff alleges as follows:

1.    Plaintiff, Farhad Larian also known as Fred Larian ("FRED") is now and at all times relevant to this Complaint was a resident of Los Angeles County California.

2.    Defendant, Morad Zarabi ("MORAD") is now and at all times relevant to this Complaint was a resident of Los Angeles County California.

2221.002\9929

Complaint

EXHIBIT 9 PAGE 207

3. Defendant, Isaac Larian ("ISAAC") is now and at all times relevant to this Complaint was a resident of Los Angeles County California.

4. Defendant Kambiz Robert Zarabi ("KAMBIZ") is now and at all times relevant to this Complaint was a resident of Los Angeles County California.

5. Plaintiff is unaware of the true names and capacities of Does 1 through 5 and therefore sues such defendants by such fictitious names. Plaintiff will amend this Complaint to identify the true names and capacities of these defendants if and when additional information against them is ascertained. Plaintiff is informed and believes that each of the doe defendants is liable in some manner for the acts and omissions and the injuries and damages alleged in this Complaint.

6. At all times relevant to this Complaint, each defendant was the agent or employee of each of the other defendants as the case may have been, and was acting within the course of the scope of such agency or employment in performing the acts alleged in this Complaint.

7. FRED and ISAAC are brothers who for over 20 years engaged in business as partners through equal ownership of several businesses and ventures they co-founded. They shared profits and losses on an equal basis.

8. The businesses they co-founded included the companies known as ABC International Traders, Inc. ("ABC") and MGA Entertainment Hong Kong Ltd. ("MGAEHK"). ABC and MGAEHK collectively are referred to as "MGA". At all times relevant to this Complaint FRED and ISAAC each owned 45% of the outstanding stock, while their brother in law Jangahir Makabi ("MAKABI") owned 10% of MGA. FRED's 45% interest amounted to 10,000,000 shares of common stock in ABC and

2221.002\9929

-2-

Complaint

EXHIBIT 9 PAGE 208

1   450 shares of common stock in MGAEHK (collectively "FRED's Stock"). Over time
2   FRED and ISAAC divided responsibilities in MGA's business:  ISAAC, as CEO
3   assumed responsibility for finance, sales, marketing and product development while
4   FRED, as Executive Vice President was responsible for operations, including customs,
5   warehousing, distribution and facilities.

6

7        9.    MORAD is the uncle of ISAAC and FRED.

8

9        10.   In the spring of 2000 ISAAC offered to buy FRED's 45% interest in MGA
10  for $9,000,000 valuing MGA at $20,000,000.  FRED responded that he wanted an
11  appraisal of MGA to consider selling his interest.  Consequently, ISAAC and FRED
12  continued to negotiate a buy-sell agreement for ISAAC to buy FRED's Stock.  ISAAC
13  told FRED that he only wanted to appraise MGA as of December 31, 1999.  FRED
14  demanded a current appraisal.  To avoid an appraisal ISAAC suggested using a process
15  by which he or FRED would make an offer to buy the other's interest which if not
16  accepted would require the refusing party to purchase the offeror's interest for the same
17  price. FRED rejected the method telling ISAAC that FRED did not want to be a buyer.
18  Ultimately ISAAC refused to go through with a buy-sell agreement that required three
19  appraisals of MGA.

20

21       11.   From the inception of their partnership, FRED and ISAAC had agreed that
22  their salaries and other compensation from MGA would always be equal.  They had
23  followed this agreement for more than twenty years, taking equal raises and pay-cuts
24  at the same time.  In early 2000, however, while he was attempting to buy FRED out
25  of MGA,  ISAAC secretly gave himself a $100,000 raise to about $325,000. ISAAC
26  later demanded that the MGA Board of Directors raise his salary to $500,000, ratify
27  $750,000 as a bonus for 1999, authorize a $1,500,000 bonus for 2000, and give him a
28  4% royalty on items he "personally develops for MGA's 2001 line or products".

2221.002\9929                              -3-

1   Subsequently, Isaac's two brothers in-law purporting to act as MGA directors increased
2   ISAAC's salary to always be three times that of FRED's salary and authorized an
3   additional bonus of up to 50% of ISAAC's tripled salary. FRED is informed and
4   believes that ISAAC engineered the compensation increase to put additional pressure
5   on FRED to sell out his interests in MGA. FRED is further informed and believes that
6   in exchange for MAKABI's vote, ISAAC promised MAKABI some portion of FRED's
7   Stock if FRED agreed to sell it to ISAAC.

8

9       12.   In or around the summer of 2000, following ISAAC's refusal to proceed
10  with the buy-sell agreement, MORAD contacted FRED and urged him to let MORAD
11  arbitrate the impasse between ISAAC and FRED over the stock sale. MORAD told
12  FRED that FRED should not wait any longer to resolve his disputes with ISAAC as
13  ISAAC was attempting to "take over the company" by the enormous raise in
14  compensation which MORAD said was "just a part of ISAAC's plans to oust FRED".
15  MORAD suggested that he determine which brother should sell his interest in MGA
16  and at what price. FRED responded that he did not want to be a buyer and required for
17  any arbitration, that the price of his stock be determined by an appraisal of the current
18  value of MGA, as ISAAC had control of the financial and business information. FRED
19  also told MORAD he required a resolution of certain other partnership accounts. In
20  response MORAD promised FRED that the price of FRED's interest in MGA would
21  be determined by a current and accurate appraisal of MGA that MORAD would obtain.
22  MORAD called the appraisal "the central piece of the arbitration". MORAD also
23  promised to resolve the accounting of the other partnership accounts.

24

25      13.   In several communications with FRED, MORAD stressed his unique
26  position to serve as an arbitrator. MORAD held out his familial relationship to the
27  brothers as assuring his impartiality and trustworthiness. MORAD promised to treat
28  each brother "as one of his eyes", an expression meaning that MORAD would allow

2221.002\9929

-4-

Complaint

EXHIBIT 9 PAGE 210

1 no harm to come to either of them. MORAD claimed that his business experience
2 would assure the accuracy of the appraisal and the accounting and that he would hire
3 a CPA, Mike Shenassafar, to assist him. MORAD said that he would serve as an
4 arbitrator free of charge, requiring reimbursement only for expenses, such as fees for
5 the appraisal and the CPA. MORAD told FRED that he could trust MORAD to resolve
6 the brothers' dispute, ending the unhappiness it was causing their family.

7

8    14.   MORAD presented FRED with an Agreement for Arbitration and
9 Selection of Arbitrator ("Arbitration Agreement"), a copy of which is attached as
10 Exhibit 1 to this Complaint. FRED is informed and believes that MORAD's attorney
11 Ellis Stern drafted it. MORAD told FRED that he should not hire an attorney to advise
12 him about the Arbitration Agreement because "attorneys are in it for themselves and
13 would never allow this to end until they got all of the money for themselves".
14 MORAD reiterated to FRED that he could trust MORAD.

15

16    15.   In reliance on the representations of MORAD, on or about September 28,
17 2000 FRED signed the Arbitration Agreement without the advice of counsel and did
18 not hire counsel to represent him in the arbitration.

19

20    16.   Plaintiff is informed and believes that the representations of MORAD
21 were false when made in and around the summer of 2000 prior to FRED's execution
22 of the Arbitration Agreement.   MORAD engaged in misrepresentations and
23 concealments to induce FRED's agreement to allow MORAD to arbitrate the
24 controversy with ISAAC so that MORAD could fix the sale price without an appraisal.
25 MORAD never intended to engage in any neutral arbitration using an accurate and
26 current appraisal of MGA and never intended to use a CPA to assist him with the
27 appraisal. MORAD intended to trick FRED to sell his interest in MGA to ISAAC and
28 settle the other partnership accounts by making FRED believe the price for FRED's

2221.002\9929                          -5-
                                    Complaint

EXHIBIT 9 PAGE 211

1  Stock had been established by an accurate appraisal and accounting, but in fact was
2  pre-determined by MORAD. In furtherance of his plan, MORAD concealed from
3  FRED MORAD's inability to competently read and write English.

4

5      17.    Plaintiff is informed and believes that MORAD made his false
6  representations pursuant to an agreement and plan formed between MORAD and
7  ISAAC to induce FRED to give MORAD authority to determine a value for MGA and
8  trick FRED into selling his interests in MGA at a price pre-determined by ISAAC
9  without an appraisal. Under the plan and agreement with ISAAC, MORAD agreed to
10  induce FRED's consent to the Arbitration Agreement, by promising FRED an accurate
11  and complete appraisal, but would fix the price for which FRED would sell his Stock
12  to ISAAC and settle the partnership accounts, at or below the $9,000,000 ISAAC had
13  previously offered to pay for FRED's Stock, irrespective of the true appraised value
14  of MGA.

15

16      18.    Following execution of the Arbitration Agreement, MORAD took steps
17  in accordance with his intent and the plan to defraud FRED into accepting a price for
18  his interests not determined by an appraisal including the following:

19          18.1  Consistent with ISAAC's earlier proposal to avoid an appraisal,
20  prior to commissioning the appraisal MORAD induced FRED to give him a written
21  offer to purchase ISAAC's 45% interest in MGA based upon a value of $17,500,000.
22  FRED withdrew the offer the same day.

23          18.2  MORAD hired National Business Appraisers ("NBA") to perform
24  an appraisal of ABC, and in order to lower the appraised value of ABC, allowed NBA
25  to restrict the valuation period to the end of December 1999 thereby eliminating year
26  2000 financial and business information from the appraisal, including information
27  relating to the "Bratz" product line.

28

2221.002\9929                    -6-
                            Complaint

EXHIBIT 9 PAGE 2/2

1    18.3   MORAD allowed NBA to value only ABC and omit valuation of

2  MGAEHK.

3    18.4   Upon receiving the initial draft of NBA's appraisal of ABC with a

4  value of $26,942,000 as of December 31, 1999, MORAD instructed NBA to reduce the

5  valuation to get close to $20,000,000 which would yield a price of $9,000,000 for

6  FRED's interest.

7    18.5   MORAD subsequently concealed from FRED that the final reduced

8  appraisal of ABC was at $21,600,000 and represented that the appraisal found the value

9  of MGA to be $17,500,000.

10    18.6   On information and belief MORAD never involved the CPA in the

11  appraisal process, never showed the appraisal to the CPA, nor allowed him to review

12  it for accuracy.

13

14    19.   In or around late November or early December 2000, MORAD came to

15  FRED with a proposed price of $8,775,000 for sale of FRED's Stock to ISAAC

16  calculated on 45% of a combined valuation of $19,500,000 for MGA and the other

17  partnership accounts. MORAD represented to FRED that the appraisal placed the value

18  of MGA at $17,500,000.   MORAD said  the  $2,000,000 difference between  the

19  appraisal of $17,500,000 and the $19,500,000 was to satisfy the amount due from

20  ISAAC to FRED for the other partnership accounts. Believing in his uncle's integrity,

21  FRED trusted MORAD's representation of the value found by the appraisal.   In

22  reliance on MORAD's representations, FRED agreed to settle his disputes with ISAAC

23  by selling his interest at the price MORAD represented was determined by the appraisal

24  of MGA and the partnership accounts.

25

26    20.   MORAD's personal attorney Ellis Stern drew up agreements for the sale

27  and settlement of FRED's interest in MGA to ISAAC and the partnership accounts

28  including an Agreement for Sale of Stock, Pledge Agreement, Promissory Note, Mutual

2221.002\9929                              -7-
                                        Complaint

EXHIBIT 9 PAGE 213

1    Release and Consulting Agreement (collectively "December 2000 Agreement"). FRED
2    asked MORAD if FRED should have an attorney to advise him about the transaction.
3    MORAD said no. MORAD said that he would make sure the agreements accurately
4    reflected the transaction and protected both FRED and ISAAC. Based on MORAD's
5    representation, FRED did not have counsel advise him with respect to the transaction
6    and signed the December 2000 Agreement.

7

8        21.     In inducing FRED's agreement to sell FRED's Stock to ISAAC, MORAD
9    continued to conceal his fraud and deceit from FRED. MORAD assured FRED that the
10   sale price based on a combined valuation of $19,500,000 for MGA and the partnership
11   accounts was determined by the appraisal and accounting. MORAD convinced FRED
12   to agree to resolve any disputes with ISAAC over the December 2000 Agreement by
13   arbitrating them before MORAD or if MORAD was unavailable before his son
14   KAMBIZ. MORAD repeated to FRED that he should keep resolution of such matters
15   in the family and FRED could trust both MORAD and KAMBIZ. MORAD also
16   claimed that as a director of MGA and as the arbitrator, he would be in a position to
17   protect FRED's interest. In reliance on MORAD's representations including that the
18   appraised value of MGA had been $17,500,000 upon which the sale price for his
19   interest in MGA was based, FRED agreed to the provisions for resolving any disputes
20   over the December 2000 Agreement by arbitrating before MORAD (and if MORAD
21   was unavailable to serve, MORAD's son KAMBIZ) ("December Arbitration
22   Provisions").

23

24        22.     MORAD's representations to FRED that FRED should trust him to
25   continue to act as an impartial and honest arbitrator of disputes that might arise under
26   the December 2000 Agreement were false and were made to conceal MORAD's fraud
27   and deceit in the appraisal and valuation of MGA and to induce FRED's agreement to
28   the December Arbitration Provisions so to allow MORAD to hide his wrongful acts and

2221.002\9929                     -8-

Complaint

EXHIBIT 9 PAGE 214

1 omissions and/or conspiracy with ISAAC. MORAD had not honestly and impartially
2 acted as an arbitrator in the past and had no intent to arbitrate or otherwise act
3 impartially and honestly to resolve any disputes that might arise under the December
4 2000 Agreement. MORAD intended only to use his position as arbitrator to continue
5 to conceal his fraud and deceit and other wrongful acts and omissions toward FRED.
6
7    23.   Under the December 2000 Agreement, MORAD became a director of
8 MGA and took possession of the share certificates for FRED's Stock as Trustee to be
9 held as collateral for ISAAC's payment of the full purchase price to FRED.
10
11   24.   Following the execution of the December 2000 Agreement, MORAD
12 requested FRED to "return the favor" for what MORAD called his "pro-bono
13 arbitration work" in 2000. MORAD requested $10,000.00 from FRED for MORAD's
14 relative. MORAD told FRED that ISAAC had already paid an identical amount.
15 FRED paid the money MORAD requested. In June 2004 FRED's attorneys asked
16 MORAD to disclose and produce evidence of these payments. MORAD, through his
17 attorney Ellis Stern, refused. In or around June 2004, in relation to FRED's inquiry
18 about these payments, MORAD publicly threatened that he "will destroy FRED and
19 make him equal to dirt". On information and belief MORAD sought and obtained a
20 larger payment from ISAAC for MORAD's "pro-bono arbitration work" and for that
21 reason refused to disclose such payments.
22
23   25.   In 2001, ISAAC was unable to make the payment under the promissory
24 note given FRED as part of the December 2000 Agreement. MORAD induced FRED
25 to extend the due date of the note and advanced money on behalf of ISAAC to FRED
26 for payments on the promissory note.
27
28

2221.002\9929                        -9-
                                  Complaint

EXHIBIT 9 PAGE 215

26.     In or around the summer of 2002, FRED became aware of facts that suggested the valuation of MGA in 2000 represented by MORAD may have been inaccurate and that the actual valuation of MGA was significantly higher because of a license and plans for a product line called "Bratz" which were undisclosed to FRED. FRED requested a copy of the appraisal of MGA performed in 2000. MORAD refused, maintaining that he was legally not allowed to disclose it. FRED did not suspect MORAD of any wrong doing at this time, believing instead that ISAAC had withheld the Bratz information from both FRED and MORAD without MORAD's knowledge or consent.

27.     Subsequently FRED submitted to MORAD his claim that FRED had been defrauded by ISAAC.

28.     A few months after FRED's submission of his claim to MORAD for the fraud in the sale of FRED's Stock, MORAD called a meeting at his offices on January 26, 2003. He advised FRED that no lawyers would be allowed and that no evidence would be presented as this was an informal meeting. MORAD tape recorded the meeting which lasted less than two hours. After ISAAC left the meeting, he called MORAD and MORAD reported to FRED that ISAAC said "figure out a way to pay FRED something and get rid of him". On or about September 14, 2004 MORAD declared under oath that the meeting occurred on a different day and was an "arbitration hearing" upon which he "took the matter under submission"!

29.     After the January meeting in several communications, MORAD and KAMBIZ advised FRED ways to settle the claim against ISAAC including buying back a portion of FRED's Stock, which MORAD said he had convinced ISAAC to allow.

2221.002\9929

-10-

Complaint

EXHIBIT 9 PAGE 216

30.    In 2003, FRED learned that sometime after the January 26, 2003 meeting MORAD had commissioned another appraisal of MGA ("2003 Appraisal"). MORAD told FRED he had commissioned the 2003 Appraisal but did not show it to him. In December 2004 FRED learned that the valuation date of the 2003 Appraisal was as of December 31, 2000 (the effective date under the December 2000 Agreement) and that it found the value of ABC to be $33,805,000. In December 2004 FRED also learned that in or about April 2004, MORAD had commissioned yet another appraisal of MGA based on a valuation date ending December 31, 2001 ("2004 Appraisal").

31.    Throughout 2003, FRED again asked MORAD and also KAMBIZ to provide FRED a copy of the appraisals. They initially refused to disclose any of the documentation for the appraisals. FRED filed suit in August 2003 against ISAAC for fraud arising from the non-disclosure of the Bratz line (The "Bratz Action"). In September 2003, MORAD promised to give FRED all documents and records relating to the 2000 and 2003 appraisals in exchange for payment of $15,000. MORAD's attorney, Ellis Stern corroborated MORAD's promise to give FRED all of the documents and records related to the appraisal. FRED paid MORAD the $15,000 but then MORAD refused to provide all of the records to FRED. MORAD said instead he had turned over his records and files to his attorney Stern who refused to produce copies to FRED.

32.    When FRED continued to press for production of MORAD's entire file concerning the 2000 and 2003 appraisals, ISAAC opposed production and demanded that no records from the appraisal be produced. Finally after the Court in the Bratz Action ordered discovery, MORAD's attorneys produced certain of the documents related to the 2000 appraisal but refused to produce documents related to the 2003 Appraisal. MORAD's attorney Stern represented to have produced all of the 2000 appraisal documentation and provided a privilege log which he later filed in Court. No

2221.002\9929                            -11-
                                        Complaint

EXHIBIT  9  PAGE  217

1   draft appraisals were produced to FRED by MORAD personally or by his attorneys.
2   The draft of the 2000 appraisal, the 2004 Appraisal, and some correspondence from
3   NBA relating to the 2000 appraisals were neither produced nor listed on the privilege
4   log Stern had submitted to FRED and the Court. FRED pursued discovery of NBA and
5   the appraiser but both ISAAC and MORAD opposed it.  Ultimately it was not until
6   FRED went to NBA directly in December 2004 that he discovered the extent and nature
7   of MORAD's wrongful acts.  The documents and information provided by NBA also
8   revealed that MORAD's attorney, Stern  had submitted a false privilege log to FRED
9   and to the Court.

10

11      33.    In or around April to July 2004 FRED learned of translations that
12   MORAD had ordered including translations related to a January 30, 2003 letter
13   MORAD had received from FRED's attorney, and of MORAD's need to use translators
14   in the contemplated arbitration of FRED's claims against ISAAC.  These facts and
15   documents were suppressed from FRED by MORAD and his attorney.

16

17      34.    In or around January 2004, FRED demanded of MORAD that FRED's
18   Stock held by MORAD as trustee pursuant to the December 2000 Agreement be
19   maintained pending resolution of FRED's claims against ISAAC. Through his attorney
20   Stern, MORAD agreed. In or around December 2004, FRED demanded that MORAD
21   show FRED the stock certificates.  MORAD refused.

22

23      35.    In or around December 2004, FRED obtained documentation and
24   information directly from NBA disclosing that:

25          35.1  NBA had never provided MORAD with an appraisal valuing ABC
26   or MGA at $17,500,000 as MORAD had represented to FRED;

27          35.2  In or around October 2000 NBA transmitted to MORAD an initial
28   draft appraisal valuing ABC at $26,942,000. MORAD then instructed NBA to decrease

EXHIBIT   9   PAGE   218

1  the value to get close to $20,000,000 and allowed the valuation date to be as of
2  December 31, 1999;

3       35.3 NBA's final reduced appraisal in November 2000 was
4  $21,600,000.00 for the period ending December 31, 1999 and excluded MGAEHK
5  from the valuation;

6       35.4 Commencing in February 2003, NBA met with MORAD and
7  KAMBIZ concerning the November 2000 appraisal because of FRED's claim against
8  ISAAC for fraud;

9       35.5 In February 2003, MORAD commissioned the appraisal of MGA
10  as of December 31, 2000 (2003 Appraisal) without consideration of the Bratz License
11  and product line. This appraisal found the value to be $33,805,000.00;

12       35.6 MORAD subsequently requested NBA to reduce the 2003 Appraisal
13  by applying a minority shareholder discount.

14       35.7 In 2000, NBA had given the draft 2000 appraisal to MORAD and
15  his attorneys.

16       35.8 In 2004, MORAD's attorneys advised NBA to destroy any drafts
17  of the 2000 appraisal.

18       35.9 In 2004 MORAD commissioned the appraisal of ABC as of
19  December 31, 2001 (2004 Appraisal) to obtain a valuation lower than the 2003
20  Appraisal. The 2004 Appraisal, the draft 2000 appraisal, and some correspondence
21  from NBA relating to the 2000 appraisals had been suppressed from FRED and omitted
22  from the privilege log Stern submitted to both FRED and the Court.

23

24      36.   FRED is informed and believes that MORAD's suppression of the
25  appraisals, his attempts to destroy and prevent discovery of evidence, and his lies to
26  FRED were calculated to conceal his fraud in the inducement of the Arbitration
27  Agreement and December Arbitration Provisions, his corruption of the appraisal in
28

1  2000, and/or in furtherance of the conspiracy with ISAAC to trick FRED into selling

2  Fred's Stock at a price pre-determined by ISAAC and/or MORAD.

3

4  **FIRST CAUSE OF ACTION FOR PROMISSORY FRAUD INDUCING**

5  **CONSENT TO THE ARBITRATION AGREEMENT**

6  **AGAINST MORAD ZARABI**

7      37.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

8

9      38.    MORAD's representations to Plaintiff concerning MORAD's intention

10  to neutrally, honestly, completely and accurately appraise the current value of MGA,

11  and account for the other partnership matters, to resolve Plaintiff's disputes with

12  ISAAC were false and known by MORAD to be false when he made them.   The

13  misrepresentations and omissions were material and made to induce Plaintiff to consent

14  to the Arbitration Agreement and selection of MORAD as arbitrator.  The true facts

15  were that MORAD never intended to engage in an accurate, complete and current

16  appraisal of MGA or accounting of the other partnership matters, but rather to set a

17  pre-determined price for the sale of FRED's Stock to ISAAC.  In furtherance of this

18  intent, MORAD concealed his disability in reading and writing English.

19

20      39.    Reasonably relying on MORAD's representation of what MORAD

21  intended to do as an arbitrator and that Plaintiff could trust him, Plaintiff was induced

22  to sign the Arbitration Agreement and selection of MORAD as the arbitrator.  Had

23  Plaintiff known MORAD's true intentions, Plaintiff would not have signed the

24  Arbitration Agreement, and would not have agreed to the December Arbitration

25  Provisions.

26

27      40.    As a result of the fraud and deceit alleged herein, Plaintiff is entitled to

28  rescission of the Arbitration Agreement and the December Arbitration Provisions

2221.002\9929                          -14-
                                    Complaint

EXHIBIT 9 PAGE 220

1 │ proximately caused by it as well as restitution of all sums obtained by MORAD from

2 │ Plaintiff because of them.

3 │

4 │ **SECOND CAUSE OF ACTION FOR NEGLIGENT**

5 │ **MISREPRESENTATIONS INDUCING CONSENT**

6 │ **TO THE ARBITRATION AGREEMENT**

7 │ **AGAINST MORAD ZARABI**

8 │     41.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

9 │

10 │     42.    MORAD owed a duty of reasonable care in making representations and

11 │ statements to Plaintiff regarding MORAD's ability and intentions with respect to the

12 │ appraisal of MGA and the accounting of the other partnership matters.

13 │

14 │     43.    MORAD breached his duty to Plaintiff by making misrepresentations of

15 │ material facts and by omitting and failing to disclose material facts which he knew or

16 │ in the exercise of reasonable care should have known were untrue or inaccurate and

17 │ which he was under a duty to disclose to Plaintiff, including without limitation, his

18 │ inability to competently read and write English, his intent to set a pre-determined price

19 │ for Fred's Stock and the value of the other partnership accounts.

20 │

21 │     44.    MORAD made the misrepresentations and omissions with the intent to

22 │ induce Plaintiff to agree to the Arbitration Agreement consenting to arbitrate before

23 │ MORAD as the arbitrator of the disputes between Plaintiff and ISAAC over MGA and

24 │ the other partnership matters.

25 │

26 │     45.    Plaintiff actually, reasonably and justifiably relied upon the false

27 │ statements and omissions of MORAD and consented to the Arbitration Agreement.

28 │ Had Plaintiff known the true facts, Plaintiff would not have entered into the Arbitration

EXHIBIT 9 PAGE 221

1  Agreement and selection of MORAD as the arbitrator, and would not have given

2  MORAD authority as arbitrator to determine the price at which Plaintiff would sell his

3  interest in MGA and the other partnership accounts.

4

5      46.   As a result of the misrepresentation alleged herein, FRED is entitled to

6  rescission of the Arbitration Agreement and the December Arbitration Provisions

7  proximately caused by it and restitution of all sums obtained by MORAD from Plaintiff

8  because of them.

9

10  ## THIRD CAUSE OF ACTION FOR CONSPIRACY TO COMMIT

11  ## PROMISSORY FRAUD INDUCING CONSENT TO THE

12  ## ARBITRATION AGREEMENT

13  ### AGAINST MORAD ZARABI AND ISAAC LARIAN

14      47.   Plaintiff realleges paragraphs 1 through 36 of this Complaint.

15

16      48.   Plaintiff is informed and believes that commencing in or around the

17  summer and fall of 2000, ISAAC and MORAD conspired and agreed together to induce

18  FRED to give MORAD power and authority as an arbitrator to set a price

19  pre-determined by ISAAC and/or MORAD, at which ISAAC would purchase FRED's

20  shares in MGA.

21

22      49.   In furtherance of the conspiracy, MORAD made the misrepresentations

23  and omissions of material facts alleged in this Complaint to induce FRED to consent

24  to arbitration before MORAD and to execute the Arbitration Agreement. MORAD's

25  representations were false and known by MORAD and ISAAC to be false when made.

26

27      50.   In reasonable reliance on the representations of MORAD, Plaintiff

28  executed the Arbitration Agreement.

EXHIBIT 9 PAGE 222

51. Plaintiff is entitled to rescission of the Arbitration Agreement and the December Arbitration Provisions proximately caused by it and restitution of all sums obtained by MORAD from Plaintiff because of them.

## FOURTH CAUSE OF ACTION FOR DECLARATORY RELIEF
## OVER VALIDITY OF THE ARBITRATION AGREEMENT
## AND THE DECEMBER ARBITRATION PROVISIONS
## AGAINST MORAD ZARABI AND ISAAC LARIAN

52. Plaintiff reallages paragraphs 1 though 36 of this Complaint.

53. An actual justiciable controversy exists between Plaintiff on the one hand, and Defendants MORAD and ISAAC on the other hand in that Plaintiff contends that the Arbitration Agreement was void ab initio due to the fraud and deceit of MORAD and/or ISAAC inducing Plaintiff's consent to it; and that the December Arbitration Provisions are likewise void because they were proximately caused by Plaintiff's consent to the Arbitration Agreement. Plaintiff is informed and believes that Defendants MORAD and ISAAC contend that the Arbitration Agreement is valid and enforceable and that there is no basis for invalidating or voiding the Arbitration Agreement or the December Arbitration Provisions.

54. Plaintiff has no accurate remedy at law and the parties require a judicial declaration of their legal rights and obligations with respect to the Arbitration Agreement and the December Arbitration Provisions.

2221.002\9929

-17-

Complaint

EXHIBIT 9 PAGE 223

## FIFTH CAUSE OF ACTION FOR FRAUD IN THE INDUCEMENT
## OF THE DECEMBER ARBITRATION PROVISIONS
### AGAINST MORAD ZARABI

55.   Plaintiff realleges paragraphs 1 through 36 of this Complaint.

56.   MORAD's representations to FRED in or around the end of November or the beginning of December 2000 concerning the accuracy of the appraisal of MGA, the appraised value being $17,500,000, and MORAD's honesty and trustworthiness were false when made and known by MORAD to be false when made. The true facts were that MORAD concealed the appraisal showing the value of MGA to be significantly greater than the representation to Plaintiff, and concealed the fact that he had corrupted and acted to distort the appraisal of MGA by ordering the appraiser to reduce the value to close to $20,000,000. In making the misrepresentations and omissions, MORAD intended to induce Plaintiff to agree to resolve any disputes arising from the December 2000 Agreement by arbitration before MORAD and/or KAMBIZ, so that MORAD could continue to conceal his fraud and deceit and his wrongful acts and omissions.

57.   The misrepresentations and omissions to Plaintiff were material and Plaintiff reasonably relied on them to his detriment and by them was induced to enter into the December Arbitration Provisions.

58.   As the result of MORAD's fraud and deceit, Plaintiff is entitled to rescission of the December Arbitration Provisions and restitution of all sums obtained by MORAD from Plaintiff because of them.

EXHIBIT 9 PAGE 224

# SIXTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION INDUCING CONSENT TO THE DECEMBER ARBITRATION PROVISIONS AGAINST MORAD ZARABI

59.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

60.    MORAD owed a duty of reasonable care in making representations and statements to Plaintiff regarding the appraised value of MGA and the accounting of the other partnership matters.

61.    MORAD breached his duty to Plaintiff by making misrepresentations of material facts and by omitting and failing to disclose material facts which he knew or in the exercise of reasonable care should have known were inaccurate and which he was under a duty to disclose to Plaintiff, including without limitation, the true and correct valuation of MGA found by NBA's appraisal.

62.    MORAD made the misrepresentations and omissions with the intent to induce Plaintiff to consent to the December Arbitration Provisions selecting MORAD and his son KAMBIZ as the arbitrators with sole authority to determine disputes between Plaintiff and ISAAC arising from the December 2000 Agreement.

63.    Plaintiff actually, reasonably and justifiably relied upon the false statements and omissions of MORAD. Had Plaintiff known the true facts, Plaintiff would not have entered into the December Arbitration Provisions which selected MORAD and his son KAMBIZ as the arbitrators.

EXHIBIT 9 PAGE 225

64. As a result of MORAD's misrepresentations Plaintiff is entitled to rescission of the December Arbitration Provision and restitution of all sums obtained by MORAD from Plaintiff because of them.

## SEVENTH CAUSE OF ACTION FOR CONSPIRACY TO FRAUDULENTLY INDUCE EXECUTION OF THE DECEMBER ARBITRATION PROVISIONS AGAINST MORAD ZARABI AND ISAAC LARIAN

65. Plaintiff realleges paragraphs 1 through 36 of this Complaint.

66. Plaintiff is informed and believes that the misrepresentations and omissions by MORAD in late November to December 2000 were carried out pursuant to a conspiracy and agreement between MORAD and ISAAC to induce FRED to agree to arbitrate all disputes before MORAD and KAMBIZ so they could continue to conceal MORAD's and ISAAC's fraud and conspiracy.

67. In furtherance of the conspiracy, MORAD committed the acts alleged in this Complaint, including without limitation manipulating and corrupting the appraisal, lying to FRED about the appraised value of MGA and inducing FRED to resolve all disputes arising out of the agreement by arbitration before MORAD or KAMBIZ in order to conceal the conspiracy.

68. As the result of the misrepresentations by MORAD pursuant to the conspiracy of ISAAC and MORAD which induced FRED's consent to the December Arbitration Provisions, Plaintiff is entitled to rescission of the December Arbitration Provisions and restitution of all sums obtained by MORAD from Plaintiff because of them.

## EIGHTH CAUSE OF ACTION FOR DECLARATORY RELIEF
## OVER VALIDITY OF THE DECEMBER ARBITRATION PROVISIONS
## AGAINST ISAAC LARIAN

69. Plaintiff realleges paragraphs 1 though 36 of this Complaint.

70. An actual justiciable controversy exists between Plaintiff on the one hand and ISAAC on the other hand in that Plaintiff contends that the December Arbitration Provisions were void ab initio due to the fraud and deceit of MORAD and/or ISAAC inducing Plaintiff's consent to them while Plaintiff is informed and believes that ISAAC contends that the December Arbitration Provisions are valid and enforceable and that there is no basis for invalidating or voiding them, in whole or part.

71. Plaintiff has no adequate remedy at law and the parties require a judicial declaration of their legal rights and obligations with respect to the December Arbitration Provisions.

## NINTH CAUSE OF ACTION FOR DECLARATORY JUDGMENT
## OVER THE DISQUALIFICATION OF MORAD ZARABI
## AND KAMBIZ ROBERT ZARABI FROM SERVING AS ARBITRATORS
## AGAINST ISAAC LARIAN, MORAD ZARABI
## AND KAMBIZ ROBERT ZARABI

72. Plaintiff realleges paragraphs 1 through 36 of this Complaint.

73. An actual justiciable controversy exists between Plaintiff on the one hand and Defendants on the other hand in that Plaintiff contends that as a result of the position, facts and circumstances concerning MORAD and KAMBIZ alleged in this Complaint, they are disqualified under California law from exercising any power or authority as an arbitrator of any disputes between Plaintiff and Defendant ISAAC

2221.002\9929

-21-

Complaint

EXHIBIT 9 PAGE 227

1 | LARIAN; while Plaintiff is informed and believes that Defendants and each of them

2 | contend that MORAD and KAMBIZ are not so disqualified.

3

4 |     74.   Plaintiff has no adequate remedy at law and the parties require a judicial

5 | declaration of their legal rights and obligations with respect to the ability of MORAD

6 | and KAMBIZ to exercise power and authority as arbitrators under the December 2000

7 | Agreement.

8

9 | **TENTH CAUSE OF ACTION  FOR DECLARATORY JUDGMENT**

10 | **OVER ENFORCEABILITY OF ARBITRATION AGREEMENTS**

11 | **AGAINST ISAAC LARIAN**

12 |     75.   Plaintiff realleges paragraphs 1 through 36 of this Complaint.

13

14 |     76.   An actual justiciable controversy exists between Plaintiff on the one hand

15 | and Defendant ISAAC LARIAN on the other hand in that Plaintiff contends that the

16 | Arbitration Agreement and the December Arbitration Provisions are unenforceable in

17 | that they are agreements to arbitrate solely before MORAD ZARABI and in the case

18 | of the December Arbitration Provisions, KAMBIZ ZARABI if MORAD is unavailable

19 | or such arbitrators as either of them might appoint if MORAD and KAMBIZ are both

20 | unavailable. Because MORAD and KAMBIZ are disqualified under California law,

21 | neither may serve as arbitrator or appoint arbitrators. Plaintiff is informed and believes

22 | that Defendant ISAAC LARIAN disputes the disqualification of MORAD and

23 | KAMBIZ ZARABI and that notwithstanding any disqualification of MORAD and

24 | KAMBIZ, contends the arbitration agreements are legally enforceable.

25

26 |     77.   Plaintiff has no adequate remedy at law and the parties require judicial

27 | declaration of their rights and obligations with respect to the Arbitration Agreement

28 | and the December Arbitration Provisions and their enforceability.

2221.002\9929

-22-

Complaint

EXHIBIT  9  PAGE  228

### ELEVENTH CAUSE OF ACTION FOR RESCISSION
### OF THE DECEMBER 2000 AGREEMENT BASED ON PROMISSORY
### FRAUD INDUCING CONSENT TO ARBITRATION AGREEMENT
### AGAINST MORAD ZARABI AND ISAAC LARIAN

78.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

79.    The fraud and deceit of MORAD and/or conspiracy of MORAD and ISAAC to deceive and defraud, inducing Plaintiff to consent to the Arbitration Agreement proximately caused Plaintiff's consent to the December 2000 Agreement. As a consequence of Plaintiff's entitlement to rescission of the Arbitration Agreement, Plaintiff is also entitled to rescission of the December 2000 Agreement, including the Pledge Agreement and restitution of his stock in MGA subject to any accounting required by law.

80.    As a proximate result of Defendants wrongful conduct, Plaintiff has been damaged in an amount and of a nature according to proof at trial.

81.    MORAD's wrongful acts were conducted maliciously, oppressively and fraudulently with the intent to injure Plaintiff. Plaintiff is therefore entitled to an award of punitive damages sufficient to punish MORAD and deter such conduct in the future.

### TWELFTH CAUSE OF ACTION FOR RESCISSION
### OF THE DECEMBER 2000 AGREEMENT
### AGAINST MORAD ZARABI AND ISAAC LARIAN

82.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

83.    MORAD's fraud and deceit and/or the conspiracy of MORAD and ISAAC to defraud and deceive, inducing Plaintiff into believing that MORAD had carried out

2221.002\9929                                          -23-
                                                   Complaint



1   an accurate, complete, and current appraisal of MGA which purportedly had

2   determined the value of MGA to be $17,500,000 proximately caused Plaintiff to

3   consent to the December 2000 Agreement and consequently Plaintiff is entitled to

4   rescission of it, including the Pledge Agreement and restitution of his stock in MGA

5   subject to any accounting required by law.

6

7       84.   As a proximate result of Defendants wrongful conduct, Plaintiff has been

8   damaged in an amount and of a nature according to proof at trial.

9

10      85.   MORAD's wrongful acts were conducted maliciously, oppressively and

11   fraudulently with the intent to injure Plaintiff. Plaintiff is therefore entitled to an award

12   of punitive damages sufficient to punish MORAD and deter such conduct in the future.

13

### THIRTEENTH CAUSE OF ACTION FOR RESCISSION BASED ON
### NEGLIGENT MISREPRESENTATIONS INDUCING
### THE DECEMBER 2000 AGREEMENT
### AGAINST MORAD ZARABI

18      86.   Plaintiff realleges paragraphs 1 through 36 of this Complaint.

19

20      87.   MORAD owed a duty of reasonable care in making representations and

21   statements to Plaintiff regarding a) his purported intention to impartially arbitrate the

22   sale of Plaintiff's interest in MGA by an accurate, complete, and current appraisal and

23   b) the true and correct appraised value of MGA and the accounting of the other

24   partnership matters.

25

26      88.   MORAD breached his duty to Plaintiff by making misrepresentations of

27   material facts and by omitting and failing to disclose material facts which he knew or

28   in the exercise of reasonable care should have known were inaccurate and which he

EXHIBIT 9 PAGE 230

1    was under a duty to disclose to Plaintiff, including without limitation, MORAD's true

2    intentions regarding setting the price for Plaintiff's stock and the true and correct

3    valuation of MGA found by NBA's appraisal.

4

5        89.    MORAD's misrepresentations induced Plaintiff's execution of the

6    December 2000 Agreement and Plaintiff is entitled to rescission of it, including the

7    Pledge Agreement and to restitution of his stock in MGA subject to an accounting

8    required by law.

9

10       90.    As a proximate result of Defendants wrongful conduct, Plaintiff has been

11   damaged in an amount and of a nature according to proof at trial.

12

13        **FOURTEENTH CAUSE OF ACTION FOR DECLARATORY**

14   **RELIEF OVER VALIDITY OF THE DECEMBER 2000 AGREEMENT**

15            **AGAINST ISAAC LARIAN**

16       91.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

17

18       92.    An actual justiciable controversy exists between Plaintiff on the one hand

19   and Defendant ISAAC on the other hand in that Plaintiff contends that the December

20   2000 Agreement was void ab initio due to the fraud and deceit of MORAD and/or

21   ISAAC inducing Plaintiff's consent to it while Plaintiff is informed and believes that

22   ISAAC contends the December 2000 Agreement is valid, enforceable and that there is

23   no basis for invalidating or voiding it.

24

25       93.    Plaintiff has no accurate remedy at law and the parties require a judicial

26   declaration of their legal rights and obligations with respect to the December 2000

27   Agreement.

28

2221.002\9929                           -25-
                                      Complaint

EXHIBIT 9 PAGE 231

## FIFTEENTH CAUSE OF ACTION FOR CONSTRUCTIVE
## TRUST, PRELIMINARY INJUNCTION AND ACCOUNTING
## AGAINST MORAD ZARABI AND ISAAC LARIAN

94.     Plaintiff realleges paragraphs 1 through 36 of this Complaint.

95.     The share certificates for FRED's Stock were held in trust by MORAD pursuant to a pledge agreement made by ISAAC in connection with the December 2000 Agreement. Plaintiff has made demand on MORAD to show him the share certificates, but MORAD has failed and refused to do so. Plaintiff is informed and believes that MORAD has turned over the stock certificates or other instruments affecting the stock certificates to ISAAC.

96.     By virtue of their fraudulent acts, Plaintiff is entitled to rescission of the December 2000 Agreement and to restitution of his stock in MGA subject to an accounting by the Court of any amount of the consideration Plaintiff received for his stock that must be returned to Isaac, which Plaintiff hereby offers to restore. Defendants and each of them hold FRED's Stock as a constructive trustee for Plaintiff's benefit. Plaintiff is informed and believes that the stock certificates may be voided, lost or destroyed and Plaintiff's stock interest diluted or altered to Plaintiff's detriment unless Defendants and each of them are enjoined and restrained from taking any acts of any nature with respect to Plaintiff's stock certificates and stock interest.

97.     Plaintiff does not know what amounts, if any have accrued or been distributed on account of Plaintiff's MGA stock and an accounting is therefore necessary to determine what amounts, if any are due Plaintiff on account of his MGA stock.

2221.002\9929                                    -26-
                                              Complaint

EXHIBIT 9 PAGE 232

1   WHEREFORE, Plaintiff prays for judgment as follows:

2

3       1.      That the September 28, 2000 Agreement to Arbitrate and Selection of
4   Arbitrator is declared void ab initio or is rescinded;

5       2.      That the December Arbitration Provisions are declared void ab initio or
6   are rescinded;

7       3.      That MORAD ZARABI is judicially declared as disqualified from serving
8   as an arbitrator of any disputes between Plaintiff and Defendant ISAAC LARIAN;

9       4.      That KAMBIZ ROBERT ZARABI is judicially declared as disqualified
10  from serving as an arbitrator of any disputes between Plaintiff and Defendant ISAAC
11  LARIAN;

12      5.      That Defendants and each of them and their agents and employees hold
13  Plaintiff's MGA Stock as constructive trustees for Plaintiff's benefit;

14      6.      That Defendants and each of them, their agents, employees and all those
15  in active concert and participation with them are preliminarily and permanently
16  enjoining from transferring, disposing of, or altering FRED's Stock certificates or
17  interest in MGA;

18      7.      That the December 2000 Agreement (including all related agreements) is
19  declared void ab initio or is rescinded;

20      8.      That Plaintiff's stock in MGA be restored to him;

21      9.      For an accounting of all monies accruing to or distributed on account of
22  Plaintiff's stock in MGA;

23      10.     For damages as allowed by law and according to proof at trial;

24      11.     For reasonable attorneys fees;

25      12.     For costs as allowed by law;

26      13.     For punitive damages as allowed by law and according to proof at trial;
27  and

28

2221.002\9929                    -27-
                              Complaint

EXHIBIT 9 PAGE 233

1    14.   For such other relief as the Court deems just and proper.

2

3   Dated: February 24, 2005                William C. Conkle
                                            Mark D. Kremer
4                                           Eric S. Engel, members of
                                            CONKLE & OLESTEN
5                                           Professional Law Corporation

6

7                                    By: _____

8                                           Mark D. Kremer
                                            Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2221.002\9929                    -28-
                              Complaint

EXHIBIT 9 PAGE 234

## VERIFICATION

I have read the foregoing **Verified Complaint** and know its contents.

☒   I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐   I am _____ of _____, a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason.

☐   I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

☒   The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐   I am one of the attorneys for _____, a party to this action. Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on February 25, 2005.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_Farhad Larian_
Print Name of Signator

Signature

Verification to Complaint

EXHIBIT 9 PAGE 235

**ORIGINAL**

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Mark D. Kremer <br> Conkle & Olesten, Professional Law Corporation <br> 3130 Wilshire Blvd., Suite 500 <br> <br> Santa Monica, CA 90403 <br> TELEPHONE NO. 310-998-9100    FAX NO. 310-998-9109 <br> ATTORNEY FOR *(Name)*  Plaintiff | **FILED** <br> LOS ANGELES SUPERIOR COURT <br> <br> FEB 2 8 2005 <br> <br> JOHN A. CLARKE, EXECUTIVE OFFICER/CLERK <br> BY _____ <br> J. SUNGA, DEPUTY |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012-3014
BRANCH NAME: Central District

CASE NAME:  Farhad Larian v. Morad Zarabi, et al.

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: |
|---|---|---|
| [X] **Unlimited** (Amount demanded exceeds $25,000)  [ ] **Limited** (Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder <br> Filed with first appearance by defendant <br> *(Cal. Rules of Court, rule 1811)* | **BC 329501** <br> JUDGE: <br> DEPT: |

*All five (5) items below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

| **Auto Tort** | **Contract** | **Provisionally Complex Civil Litigation** (Cal. Rules of Court, rules 1800–1812) |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | [ ] Antitrust/Trade regulation (03) |
| [ ] Uninsured motorist (46) | [ ] Collections (09) | [ ] Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort** | [ ] Insurance coverage (18) | [ ] Mass tort (40) |
| [ ] Asbestos (04) | [X] Other contract (37) | [ ] Securities litigation (28) |
| [ ] Product liability (24) | **Real Property** | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | [ ] Eminent domain/Inverse condemnation (14) | [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41) |
| [ ] Other PI/PD/WD (23) | [ ] Wrongful eviction (33) | **Enforcement of Judgment** |
| **Non-PI/PD/WD (Other) Tort** | [ ] Other real property (26) | [ ] Enforcement of judgment (20) |
| [ ] Business tort/unfair business practice (07) | **Unlawful Detainer** | **Miscellaneous Civil Complaint** |
| [ ] Civil rights (08) | [ ] Commercial (31) | [ ] RICO (27) |
| [ ] Defamation (13) | [ ] Residential (32) | [ ] Other complaint *(not specified above)* (42) |
| [ ] Fraud (16) | [ ] Drugs (38) | **Miscellaneous Civil Petition** |
| [ ] Intellectual property (19) | **Judicial Review** | [ ] Partnership and corporate governance (21) |
| [ ] Professional negligence (25) | [ ] Asset forfeiture (05) | [ ] Other petition *(not specified above)* (43) |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Petition re: arbitration award (11) | |
| **Employment** | [ ] Writ of mandate (02) | |
| [ ] Wrongful termination (36) | [ ] Other judicial review (39) | |
| [ ] Other employment (15) | | |

2. This case [ ] is [X] is not  complex under rule 1800 of the California Rules of Court. If case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states or countries, or in a federal court
   f. [ ] Substantial post-judgment judicial supervision

3. Type of remedies sought *(check all that apply)*:
   a. [X] monetary   b. [X] nonmonetary; declaratory or injunctive relief   c. [X] punitive

4. Number of causes of action *(specify)*:  15

5. This case [ ] is [X] is not   a class action suit.

Date: February 24, 2005

Mark D. Kremer
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate, Family, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.)  Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet shall be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2003]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 201.8, 1800–1812;
Standards of Judicial Administration, § 19

Legal Solutions Plus

EXHIBIT  9  PAGE 236

# ORIGINAL

| SHORT TITLE. | Farhad Larian v. Morad Zarabi, et al. | CASE NUMBER | BC 329501 |
|---|---|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

> This form is required pursuant to LASC Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.

Item I.  Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL?  [X] YES   CLASS ACTION?  [ ] YES   LIMITED CASE?  [ ] YES   TIME ESTIMATED FOR TRIAL  7  [ ] HOURS/ [X] DAYS.

Item II.  Select the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III. Pg. 4):

**Step 1:**  After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column A, the Civil Case Cover Sheet case type you selected.

**Step 2:**  Check **one** Superior Court type of action in Column B below which best describes the nature of this case.

**Step 3:**  In Column C, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Los Angeles Superior Court Local Rule 2.0.

> Applicable Reasons for Choosing Courthouse Location (See Column C below)

1.  Class Actions must be filed in the County Courthouse, Central District.
2.  May be filed in Central (Other county, or no Bodily Injury/Property Damage).
3.  Location where cause of action arose.
4.  Location where bodily injury, death or damage occurred.
5.  Location where performance required or defendant resides.
6.  Location of property or permanently garaged vehicle.
7.  Location where petitioner resides.
8.  Location wherein defendant/respondent functions wholly.
9.  Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.

**Step 4:**  Fill in the information requested on page 4 in Item III; complete Item IV.  Sign the declaration.

| | A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action<br>(Check only one) | | C<br>Applicable Reasons - See Step 3 Above |
|---|---|---|---|---|
| Auto Tort | Auto (22) | [ ] A7100 | Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | [ ] A7110 | Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| Other Personal Injury/Property Damage/Wrongful Death Tort | Asbestos (04) | [ ] A6070 | Asbestos Property Damage | 2. |
| | | [ ] A7221 | Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | [ ] A7260 | Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | [ ] A7210 | Medical Malpractice - Physicians & Surgeons | 1., 2., 4. |
| | | [ ] A7240 | Other Professional Health Care Malpractice | 1., 2., 4. |
| | Other Personal Injury Property Damage Wrongful Death (23) | [ ] A7250 | Premises Liability (e.g., slip and fall) | 1., 2., 4. |
| | | [ ] A7230 | Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 2., 4. |
| | | [ ] A7270 | Intentional Infliction of Emotional Distress | 1., 2., 3. |
| | | [ ] A7220 | Other Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| Non-Personal Injury/Property Damage/Wrongful Death Tort | Business Tort (07) | [ ] A6029 | Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., 3. |
| | Civil Rights (08) | [ ] A6005 | Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | [ ] A6010 | Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | [ ] A6013 | Fraud (no contract) | 1., 2., 3. |
| | Intellectual Property (19) | [ ] A6016 | Intellectual Property | 2., 3. |

CIV 109 03-04
LASC Approved

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

LASC, rule 2.0
Page 1 of 4
LA-481

EXHIBIT ___9___ PAGE __237__

SHORT TITLE:  Farhad Larian v. Morad Zarabi, et al.    | CASE NUMBER

| A<br>Civil Case Cover<br>Sheet Category No. | B<br>Type of Action<br>(Check only one) | | C<br>Applicable Reasons<br>- See Step 3 Above |
|---|---|---|---|
| **Professional Negligence (25)** | ☐ | A6017  Legal Malpractice | 1., 2., 3. |
| | ☐ | A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| **Other (35)** | ☐ | A6025  Other Non-Personal Injury/Property Damage tort | 2., 3. |
| **Wrongful Termination (36)** | ☐ | A6037  Wrongful Termination | 1., 2., 3. |
| **Other Employment (15)** | ☐ | A6024  Other Employment Complaint Case | 1., 2., 3. |
| | ☐ | A6109  Labor Commissioner Appeals | 10. |
| **Breach of Contract/ Warranty (06) (not insurance)** | ☐ | A6004  Breach of Rental/Lease Contract (not Unlawful Detainer or wrongful eviction) | 2., 5. |
| | ☐ | A6008  Contract/Warranty Breach-Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | ☐ | A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | ☐ | A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| **Collections (09)** | ☐ | A6002  Collections Case-Seller Plaintiff | 2., 5., 6. |
| | ☐ | A6012  Other Promissory Note/Collections Case | 2., 5. |
| **Insurance Coverage (18)** | ☐ | A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| **Other Contract (37)** | ☒ | A6009  Contractual Fraud | 1., ②, 3., 5. |
| | ☐ | A6031  Tortious Interference | 1., 2., 3., 5. |
| | ☐ | A6027  Other Contract Dispute (not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Eminent Domain/Inverse Condemnation (14)** | ☐ | A7300  Eminent Domain/Condemnation   Number of parcels _____ | 2. |
| **Wrongful Eviction (33)** | ☐ | A6023  Wrongful Eviction Case | 2., 6. |
| **Other Real Property (26)** | ☐ | A6018  Mortgage Foreclosure | 2., 6. |
| | ☐ | A6032  Quiet Title | 2., 6. |
| | ☐ | A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer - Commercial (31)** | ☐ | A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| **Unlawful Detainer - Residential (32)** | ☐ | A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| **Unlawful Detainer - Drugs (38)** | ☐ | A6022  Unlawful Detainer-Drugs | 2., 6. |
| **Asset Forfeiture (05)** | ☐ | A6108  Asset Forfeiture Case | 2., 6. |
| **Petition re Arbitration (11)** | ☐ | A6115  Petition to Compel/Confirm/ Vacate Arbitration | 2., 5. |

*(Left margin vertical labels: Non-Personal Injury/Property Damage/ Wrongful Death Tort (Cont'd.); Employment; Contract; Real Property; Unlawful Detainer; Judicial Review)*

**CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION**


EXHIBIT 9 PAGE 238

| SHORT TITLE: Farhad Larian v. Morad Zarabi, et al. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review (Cont'd.)** | Writ of Mandate<br>(02) | ☐ A6151  Writ - Administrative Mandamus | 2., 8. |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review<br>(39) | ☐ A6150  Other Writ / Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade<br>Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007  Construction defect | 1., 2., 3. |
| | Claims Involving Mass<br>Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort<br>Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage<br>Claims from Complex<br>Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement<br>of Judgment<br>(20) | ☐ A6141  Sister State Judgment | 2., 9. |
| | | ☐ A6160  Abstract of Judgment | 2., 6. |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints<br>(Not Specified Above)<br>(42) | ☐ A6030  Declaratory Relief Only | 1., 2., 8. |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership/Corporation<br>Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions<br>(Not Specified Above)<br>(43) | ☐ A6121  Civil Harassment | 2., 3., 9. |
| | | ☐ A6123  Workplace Harassment | 2., 3., 9. |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | ☐ A6190  Election Contest | 2. |
| | | ☐ A6110  Petition for Change of Name | 2., 7. |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ A6100  Other Civil Petition | 2., 9. |

CIV 109 03-04
LASC Approved

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 3 of 4


EXHIBIT 9  PAGE 239

| SHORT TITLE  Farhad Larian v. Morad Zarabi, et al. | CASE NUMBER |
|---|---|

Item III. Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3** on Page 1, as the proper reason for filing in the court location you selected.

| REASON:  CHECK THE NUMBER UNDER COLUMN C WHICH APPLIES IN THIS CASE | ADDRESS: |
|---|---|
| ☐1. ☒2. ☐3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | 20120 Plummer Street |

| CITY: Chatsworth | STATE. CA | ZIP CODE: 91311 | |
|---|---|---|---|

Item IV. *Declaration of Assignment:* I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the <u>Stanley Mosk</u> _____ courthouse in the <u>Central</u> _____ District of the Los Angeles Superior Court (Code of Civ. Proc., § 392 et seq., and LASC Local Rule 2.0, subds. (b), (c) and (d)).

Dated: <u>February 24, 2005</u>

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

---

### PLEASE HAVE THE FOLLOWING DOCUMENTS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet form JC 982.2(b)(1).
4. Complete Addendum to Civil Case Cover Sheet form CIV 109 _____ (eff. Date).
5. Payment in full of the filing fee, unless fees have been waived.
6. Signed order appointing the Guardian ad Litem, JC form 982(a)(27), if the plaintiff or petitioner is a minor under 18 years of age, or if required by Court.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

CIV 109 03-04
LASC Approved

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 4 of 4

EXHIBIT 9 PAGE 240

**EXHIBIT 10**

Westlaw.

123 Cal.App.4th 751                                                                                          Page 1

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004·
Daily Journal D.A.R. 13,211
**(Cite as: 123 Cal.App.4th 751)**

**H**

Larian v. Larian
Cal.App. 2 Dist.,2004.

Court of Appeal, Second District, Division 5,
California.
Farhad LARIAN, Plaintiff and Respondent,
v.
Isaac LARIAN, Defendant and Appellant.
No. B171891.

Oct. 28, 2004.
As Modified on Denial of Rehearing Nov. 16, 2004.

**Background:** Shareholder in family corporation
sued president of corporation, alleging, inter alia,
fraud in arbitration process leading to shareholder's
sale of shares at below market value. President
moved to compel arbitration pursuant to parties'
agreement to arbitrate. The Superior Court, Los
Angeles County, No. BC301371,Rodney E. Nelson,
J., denied motion, and president appealed.

**Holding:** The Court of Appeal, Turner, P.J., held
that there was no evidence of fraud in inception or
execution of arbitration agreement, and thus
shareholder's claim that president's fraud was
sufficient to warrant nonenforcement of arbitration
agreement was to be resolved in arbitral forum.

Reversed with directions.

Mosk, J., filed an opinion concurring in the result.
West Headnotes
**[1] Alternative Dispute Resolution 25T ☞117**

25T Alternative Dispute Resolution
  25TII Arbitration

    25TII(A) Nature and Form of Proceeding
      25Tk117 k. Preemption. Most Cited Cases
      (Formerly 33k2.2 Arbitration)

**States 360 ☞18.15**

360 States
  360I Political Status and Relations
    360I(B) Federal Supremacy; Preemption
      360k18.15 k. Particular Cases, Preemption
or Supersession. Most Cited Cases
      (Formerly 33k2.2 Arbitration)
The United States Arbitration Act was inapplicable
to judicial resolution of arbitration agreement that
provided that California law applied. 9 U.S.C.A. § 1
et seq.

**[2] Alternative Dispute Resolution 25T ☞113**

25T Alternative Dispute Resolution
  25TII Arbitration
    25TII(A) Nature and Form of Proceeding
      25Tk113 k. Arbitration Favored; Public
Policy. Most Cited Cases
      (Formerly 33k1.2 Arbitration)
California law favors enforcement of arbitration
agreements.

**[3] Alternative Dispute Resolution 25T ☞139**

25T Alternative Dispute Resolution
  25TII Arbitration
    25TII(B) Agreements to Arbitrate
      25Tk136 Construction
        25Tk139 k. Construction in Favor of
Arbitration. Most Cited Cases
      (Formerly 33k7.1 Arbitration)
Any doubts as to whether an arbitration clause
applies to a particular dispute should be resolved in
favor of requiring the parties to arbitrate.

**[4] Alternative Dispute Resolution 25T ☞112**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT _10_ PAGE _211_

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
**(Cite as: 123 Cal.App.4th 751)**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(A) Nature and Form of Proceeding
         25Tk112 k. Contractual or Consensual Basis. Most Cited Cases
   (Formerly 33k2.2 Arbitration)

**Alternative Dispute Resolution 25T ☞134(1)**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
        25Tk131 Requisites and Validity
           25Tk134 Validity
              25Tk134(1) k. In General. Most Cited Cases
   (Formerly 33k6.2 Arbitration)
The right to compel arbitration depends upon the existence of a valid agreement to arbitrate between the parties, and this question is determined by reference to the law applicable to contracts generally.

**[5] Alternative Dispute Resolution 25T ☞112**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(A) Nature and Form of Proceeding
        25Tk112 k. Contractual or Consensual Basis. Most Cited Cases
   (Formerly 33k1.1 Arbitration)
Although California has a strong public policy in favor of arbitration, there is no preference for the arbitral forum when the parties have not agreed to arbitrate.

**[6] Alternative Dispute Resolution 25T ☞210**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(D) Performance, Breach, Enforcement, and Contest
        25Tk204 Remedies and Proceedings for Enforcement in General
         25Tk210 k. Evidence. Most Cited Cases
   (Formerly 33k23.10 Arbitration)
Before a party may be compelled to arbitrate a claim, the petitioning party has the burden of proving the existence of a valid arbitration clause and the dispute is covered by the agreement.

**[7] Alternative Dispute Resolution 25T ☞210**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(D) Performance, Breach, Enforcement, and Contest
        25Tk204 Remedies and Proceedings for Enforcement in General
         25Tk210 k. Evidence. Most Cited Cases
   (Formerly 33k23.10 Arbitration)
If a party moving to compel arbitration meets its burden of proving the existence of a valid arbitration clause and the dispute is covered by the agreement, the opponent of arbitration has to prove by a preponderance of the evidence any defense to the petition or motion to compel the dispute to be arbitrated.

**[8] Alternative Dispute Resolution 25T ☞134(3)**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
        25Tk131 Requisites and Validity
           25Tk134 Validity
              25Tk134(3) k. Validity of Assent. Most Cited Cases
   (Formerly 33k6.2 Arbitration)
There was no evidence of fraud in inception or execution of agreement to arbitrate between shareholder and president of family corporation, and thus shareholder's claim that president's fraud in arbitration process, leading to shareholder's sale of shares at below market value, was sufficient to warrant nonenforcement of arbitration agreement was to be resolved in arbitral forum; shareholder's evidence indicated only fraud in inducement, which was not sufficient to render agreement unenforceable.
*See 6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, §§ 501, 502; Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2003) ¶ 5:112 et*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 10 PAGE 242