123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004
Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

*seq. (CAADR Ch. 5-D); Cal. Jur. 3d, Arbitration
and Award, § 36; Cal. Civil Practice
(Thomson/West 2003) Procedure, § 26:49.*

**917 Kaye Scholer LLP, Larry R. Feldman,
Robert M. Turner, and J. Andrew Sjoblom, Los
Angeles, for Defendant and Appellant.
Howarth & Smith, Don Howarth, Suzelle M. Smith,
Brian D. Bubb, and Robert D. Brain, Los Angeles,
for Plaintiff and Respondent.TURNER, P.J.

*754 I. INTRODUCTION

Defendant, Isaac Larian, appeals from an order
denying his motion to compel arbitration. The
lawsuit containing numerous causes of action was
filed by plaintiff, Farhad Larian. Plaintiff and
defendant are brothers. We conclude there is no
evidence the parties signed the September 28, or
December 4, 2000, arbitration agreements because
of any fraud in the inception or execution as defined
by the California Supreme Court in *Rosenthal v.
Great Western Fin. Securities Corp.* (1996) 14
Cal.4th 394, 415-416, 58 Cal.Rptr.2d 875, 926 P.2d
1061. In the absence of evidence of fraud in the
inception or execution of the September 28 or
December 4, 2000, arbitration agreements, the trial
court was required to grant defendant's motion to
compel the parties to arbitrate their dispute. We
reverse the order denying the motion to compel
arbitration.

II. BACKGROUND

A. The Complaint

The complaint, containing 10 causes of action, was
filed on August 25, 2003. It alleges plaintiff and
defendant formed an equal partnership in 1979 to
import and distribute name brand consumer
products. In 1982, the partnership was
incorporated as a closely held corporation, ABC
International Traders, Inc. In 1985 or 1986, plaintiff
and defendant sold 10 percent of their stock to their
brother-in-law. After the sale, plaintiff and
defendant each owned 45 percent of the stock of the

company. In 1994, plaintiff and defendant became
equal 45 percent shareholders in MGA Hong Kong,
Limited and operated part of ABC International
Traders, Inc. through this entity. In 2002, the name
of ABC International Traders, Inc. was changed to
MGA Entertainment, Inc. In 1993, plaintiff and
defendant began having disputes over the operation
of the company. Plaintiff and defendant discussed
having one brother buy out the other's equity
interest. An outside appraisal of the company
valued the company at $35 million to $40 million.

**918 By 1999, defendant, as president, assumed
control of sales, product development, and financial
matters. Plaintiff was less involved in the
day-to-day sales and financial control of the
company. In late 1999 or early 2000, *755
defendant became aware of "Bratz" dolls, a new
product line which had a tremendous potential. The
complaint alleges that, after learning of the product
line, defendant devised a plan to keep the business
opportunity, the Bratz doll product line, secret from
plaintiff and to gain control of the company. The
complaint alleged that defendant intended to gain
control of MGA Entertainment, Inc. by buying
plaintiff's shares at a depressed value. The buyout
would not include the potential business opportunity
involving the new doll line.

In "early" 2000, defendant called a meeting to
discuss the new Bratz product line with selected
members of the company. Defendant concealed
the meeting and discussion about the proposed new
product line from plaintiff. In February 2000,
defendant tried to dissuade plaintiff from attending
the New York Toy Fair. Plaintiff had routinely
attended the New York Toy Fair in the past.
Defendant was furious with plaintiff for attending
the toy fair, where discussions and research for
market potential and new product lines take place.
Defendant expelled plaintiff from meetings plaintiff
tried to attend. Plaintiff was excluded from any
discussions defendant may have had relating to the
Bratz product line at the fair.

In early March 2000, defendant offered to purchase
all of plaintiff's 45 percent interest in the company,
MGA Entertainment, Inc., for $9 million. The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT _10_ PAGE _243_

123 Cal.App.4th 751                                                                                            Page 4

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004
Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

offer was based on a total value of the company at $20 million. This did not include plans and actions already taken regarding the Bratz product line, which allegedly would bring $3 billion in sales in the next few years. The financial information at the company was handled by defendant and its controller, Dennis Medici.

The complaint further alleged that throughout 2000, defendant repeatedly and routinely shared with plaintiff misleading financial information showing the company was performing poorly. In May 2000, defendant instructed Mr. Medici not to share any information about the financial operation of MGA Entertainment, Inc. with plaintiff. Defendant continued to conceal the company's plans and actions regarding the new doll line.

It is alleged that, on September 18, 2000, defendant caused the company to enter into a worldwide licensing agreement of the Bratz dolls and related items. Defendant concealed the existence of the licensing agreement from plaintiff. During September 2000, defendant continued to seek to buy plaintiff's interest in MGA Entertainment, Inc. The complaint alleges: "[Defendant] kept the Bratz opportunity and other information about the true financial *756 condition of the Company hidden from [plaintiff] in an effort to secure [plaintiff's] agreement to a proposed arbitration process with their uncle, Morad Zarabi. [Defendant] agreed, and induced [plaintiff] to agree, to the arbitration process without disclosing that during the arbitration he would conceal the Company's plans and actions undertaken regarding the Bratz line, and other financial information about the Company so that such information would not be included in Mr. Zarabi's valuation of the Company."

On September 28, 2000, plaintiff and defendant executed an "Agreement to Arbitrate and Selection of Arbitrator." Plaintiff alleges he was unaware of the true facts before executing the arbitration agreement; had he known the true facts, he would not have entered into the agreement to arbitrate and would not have **919 agreed to sell his shares; he would have placed greater restrictions and obligations on the powers of any arbitrator

including a requirement that the company be valued by an independent appraiser outside of the family; and defendant fraudulently concealed the true facts from plaintiff and the arbitrator during the arbitration process.

On December 4, 2000, as a result of the September 28, 2000, agreement to arbitrate the sale of the stock, the parties entered into a settlement and resolution of their differences, whereby plaintiff agreed to sell his shares to defendant at a below fair market price of less than $9 million. Plaintiff discovered the true facts in spring or summer 2002. Plaintiff requested rescission and damages based on the following theories: fraud and deceit in the inducement of the arbitration agreement (first); fiduciary duties breach (second); fraud and deceit in the arbitration process (third); breach of the implied covenant of good faith and fair dealing in the arbitration agreement (fourth); violation of California Corporations Code (fifth and sixth); fraud and deceit regarding the December 4, 2000 agreement (seventh); negligent misrepresentation (eighth); unfair competition in violation of Business and Professions Code section 17200 et seq. (ninth); and rescission based on mistake (10th).

B. The Motion to Compel Arbitration

On October 24, 2003, defendant moved to compel arbitration of the action on the grounds the parties entered into a broad arbitration agreement which covers the disputes alleged in the complaint; by executing the September 28, 2000, agreement, plaintiff agreed to submit the fraud claim asserted in the complaint to the arbitrator; and the arbitrator must decide the fraud claims as a matter of law. In support of the motion, defendant attached a copy of the *757 September 28, 2000, arbitration agreement. Paragraph 5 of the September 28, 2000, arbitration agreement gave an uncle, Morad Zarabi, the power to arbitrate the disputes between the brothers.

Defendant declared that the parties participated in the arbitration. The arbitrator, Mr. Zarabi, retained an appraiser, an accountant, and attorneys. Mr.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Zarabi also gathered information and conducted hearings. In December 2000, Mr. Zarabi, the arbitrator, issued his award. The December 4, 2000, agreement required defendant to purchase plaintiff's stock. According to defendant, "[The award] was embodied in the Agreement for Sale of Stock drafted by the arbitrator's attorneys, Stern & Goldberg." Under the terms of the December 4, 2000, agreement, plaintiff was to receive $8,775,000 for his stock. For the stock, defendant was to pay plaintiff $500,000 at the closing of escrow. Defendant was also obligated to execute a promissory note for the balance. Under the terms of the promissory note, defendant was required to pay plaintiff $2 million by April 15, 2001. Moreover, defendant was obligated to pay plaintiff $83,798.90 commencing the first of each month commencing June 1, 2001. Interest was to accrue at the rate of 9.5 percent per annum on unpaid sums. Paragraph 9 of the December 4, 2000, sales agreement contains the following arbitration clause: "[A]ny controversy between the parties arising out of this Agreement or the Agreements contained in the Exhibits attached hereto shall be submitted to [Mr. Zarabi] who shall serve as sole arbitrator with respect to said disputes. The decision of [Mr. Zarabi] shall be final and binding upon both parties. "

On January 26, 2003, plaintiff submitted a list of claims to the arbitrator, Mr. Zarabi. Plaintiff asserted these claims were subject to arbitration. The list included: "The December 2000 appraisal of MGA, **920 which the arbitrator relied upon to establish the value of MGA, was substantially understated as a result of [defendant's] concealment of the Bratz doll license agreement. That license agreement was material to the value of MGA but was not considered in setting MGA's value because of [defendant's] concealment from the arbitrator."

Plaintiff opposed the motion to compel arbitration on the grounds the court, not the arbitrator, must decide whether a party was fraudulently induced to consent to an arbitration agreement; fraud in the inducement of the arbitration agreement was not submitted to any arbitrator; and the court should resolve the fraud in the inducement claim because the arbitration proceedings could be void. Plaintiff declared that on September 18, 2000, defendant secretly finalized and obtained a worldwide license agreement for *758 the Bratz dolls. The September 18, 2000, agreement provided that defendant and MGA Entertainment, Inc. were the exclusive worldwide distributors of Bratz dolls and related products. Ten days later, on September 28, 2000, defendant induced plaintiff to sign the arbitration agreement without disclosing the Bratz opportunity and licenses. The Bratz product line has generated several hundred million dollars in revenues for MGA Entertainment, Inc. and is expected to earn more than $1 billion annually for the company. Further, according to plaintiff, Mr. Zarabi never returned an award. Rather, the December 4, 2000, stock sale agreement was the result of negotiations between plaintiff and defendant.

In reply to the opposition, defendant argued plaintiff did not dispute the critical facts which required arbitration of the dispute. Those facts included that the parties agreed to arbitrate the sale of the stock in September 2000. Mr. Zarabi, the arbitrator, decided which party should sell his stock to the other and the price. On December 4, 2000, the brothers signed the sales agreement incorporating the price and terms as determined by the arbitrator, Mr. Zarabi. The parties have fully performed the sales transaction. Defendant contended plaintiff submitted the fraud issue to the arbitrator in January 2003. Defendant further argued that the complaint only alleges fraud during the events leading up to the agreements; it does not allege facts showing fraud in the inducement or execution of the arbitration clauses. According to defendant, the issue of whether he fraudulently withheld information during the arbitration process must be decided by the arbitrator.

The trial court denied the motion to compel concluding that the allegation of fraud in the execution of the arbitration agreement as alleged in the complaint must be decided by the court. In denying the motion, the court cited Code of Civil Procedure section 1281 [FN1]; *Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 10 PAGE 245

123 Cal.App.4th 751                                                                    Page 6

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004
Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

page 419, 58 Cal.Rptr.2d 875, 926 P.2d 1061; and *Bolter v. Superior Court* (2001) 87 Cal.App.4th 900, 906, 104 Cal.Rptr.2d 888. The trial court ruled that the complaint adequately alleged that had plaintiff known about the pending Bratz product line, he would not have: signed the arbitration agreement, agreed to participate in the arbitration, and agreed to sell his shares in MGA Entertainment, Inc. The trial court further ruled: "It is true ... that there are references to the arbitration process in the [f]irst [c]ause of [a]ction. The concealment of the Bratz line from the arbitrator was a **921 ... piece of the process. That is, plaintiff would have no complaint if the full facts had been revealed in the arbitration. Both those references do not eliminate the allegations that he would not have entered into the arbitration agreement but for the alleged fraud."

> FN1. All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

*759 III. Discussion

A. Overview

[1][2][3][4][5] The outcome of this appeal is controlled by the provisions of the California Arbitration Act. The September 28, 2000, arbitration agreement explicitly provides it is subject to the California Arbitration Act. Further, the December 4, 2000, agreement provides it is to be applied pursuant to California law. Hence, the United States Arbitration Act, title 9 United States Code section 1 et seq., is inapplicable to this appeal. (*Volt Information Sciences, Inc. v. Board of Trustees of Leland* (1989) 489 U.S. 468, 470, 109 S.Ct. 1248, 103 L.Ed.2d 488; accord, *Mount Diablo Medical Center v. Health Net of California, Inc.* (2002) 101 Cal.App.4th 711, 714-726, 124 Cal.Rptr.2d 607.) California law favors enforcement of arbitration agreements. (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 97, 99 Cal.Rptr.2d 745, 6 P.3d 669; *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9, 10 Cal.Rptr.2d 183,

832 P.2d 899.)Section 1281 provides: "A written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." The trial court has authority to compel arbitration pursuant to section 1281.2, which provides in part: "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, unless it determines that ... [¶] (b) Grounds exist for the revocation of the agreement." Plaintiff argues that he was fraudulently induced to enter into the September 28, 2000, arbitration agreement. It is this fraud that plaintiff argues warrants revocation, or to be more precise, nonenforcement of the September 28, 2000, arbitration agreement. Any doubts as to whether an arbitration clause applies to a particular dispute should be resolved in favor of requiring the parties to arbitrate. (*Vianna v. Doctors' Management Co.* (1994) 27 Cal.App.4th 1186, 1189, 33 Cal.Rptr.2d 188; *United Transportation Union v. Southern Cal. Rapid Transit Dist.* (1992) 7 Cal.App.4th 804, 808, 9 Cal.Rptr.2d 702.) However, the right to compel arbitration depends upon the existence of a valid agreement to arbitrate between the parties. (*County of Contra Costa v. Kaiser Foundation Health Plan, Inc.* (1996) 47 Cal.App.4th 237, 245, 54 Cal.Rptr.2d 628; *Marsch v. Williams* (1994) 23 Cal.App.4th 250, 255, 28 Cal.Rptr.2d 398.) The question of whether a valid agreement to arbitrate exists is determined by reference to the law applicable to contracts generally.*760 *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 971-973, 64 Cal.Rptr.2d 843, 938 P.2d 903; *Kinney v. United HealthCare Services, Inc.* (1999) 70 Cal.App.4th 1322, 1327-1328, 83 Cal.Rptr.2d 348.) Although, as noted, California has a strong public policy in favor of arbitration, there is no preference for the arbitral forum when the parties have not agreed to arbitrate. (*Freeman v. State Farm Mut. Auto. Ins. Co.* (1975) 14 Cal.3d 473, 481, 121 Cal.Rptr. 477, 535 P.2d 341; *Cione v. Foresters Equity Services, Inc.* (1997) 58

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 10 PAGE 246

123 Cal.App.4th 751                                                                                   Page 7

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

Cal.App.4th 625, 634, 68 Cal.Rptr.2d 167.)

**922 [6][7] Before a party may be compelled to arbitrate a claim, the petitioning party has the burden of proving the existence of a valid arbitration clause and the dispute is covered by the agreement. (*Engalla v. Permanente Medical Group, Inc., supra,* 15 Cal.4th at p. 972, 64 Cal.Rptr.2d 843, 938 P.2d 903; *Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at pp. 413-414, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) If the moving party meets its burden, the opponent of arbitration has to prove by a preponderance of the evidence any defense to the petition or motion to compel the dispute to be arbitrated. (*Engalla v. Permanente Medical Group, Inc., supra,* 15 Cal.4th at p. 972, 64 Cal.Rptr.2d 843, 938 P.2d 903; *Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 413, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) Each case must be decided on its own facts. (*King v. Larsen Realty, Inc.* (1981) 121 Cal.App.3d 349, 357, 175 Cal.Rptr. 226; *Williams Constr. Co. v. Standard-Pacific Corp.* (1967) 254 Cal.App.2d 442, 454, 61 Cal.Rptr. 912.)

### B. Supreme Court Authority

Three Supreme Court decisions define the limited scope of judicial review of a claim that fraud prevents enforcement of an arbitration clause. In *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 315, 197 Cal.Rptr. 581, 673 P.2d 251, a lease contained an arbitration clause. A dispute arose about the air conditioning in the premises and the tenant, a law firm, filed suit. The tenant argued it was fraudulently induced to enter into the lease which contained the arbitration clause. The trial court accepted the tenant's fraudulent inducement defense to the arbitration clause contention. The trial court entered an order denying the lessor's motion to compel arbitration.

The Supreme Court held that claims of fraud in the inducement must be resolved by the arbitrator: " Therefore, in the absence of indication of contrary intent, and where the arbitration clause is

reasonably susceptible of such an interpretation, claims of fraud in the inducement of the contract (as distinguished from claims of fraud directed to the arbitration clause itself) *761 will be deemed subject to arbitration." (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street, supra,* 35 Cal.3d at p. 323, 197 Cal.Rptr. 581, 673 P.2d 251.) Associate Justice Joseph R. Grodin then explained that the trial court's order denying the motion to compel the parties to arbitrate because of the fraudulent representations which induced the tenant to execute the lease which contained the arbitration clause was in error: " Indeed, the claim of substantive breach-that the air conditioning did not perform properly-is totally embraced within the claim of fraud-that the lessor knew, at the time of the lease, that the air conditioning would not perform. Thus, if the trial court were to proceed to determine the fraud claim it would almost certainly have to decide the claim of substantive breach as well, and the original expectations of the parties-that such questions would be determined through arbitration-would be totally defeated. However the fraud claim were determined, there would be virtually nothing left for the arbitrator to decide. We conclude that the arbitration clause is broad enough to include this claim of fraud in the inducement." (*Id.* at p. 324, 197 Cal.Rptr. 581, 673 P.2d 251.)

In *Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at page 415, 58 Cal.Rptr.2d 875, 926 P.2d 1061, the Supreme Court explained the distinction between arbitrable and nonarbitrable fraud claims which are asserted as grounds for voiding an arbitration clause: **923 " California law distinguishes between fraud in the ' execution' or 'inception' of a contract and fraud in the 'inducement' of a contract. In brief, in the former case " 'the fraud goes to the inception or execution of the agreement, so that the promisor is deceived as to the nature of his act, and actually does not know what he is signing, or does not intend to enter into a contract at all, mutual assent is lacking, and [the contract] is *void.* In such a case it may be disregarded without the necessity of rescission.' "(*Ford v. Shearson Lehman American Express, Inc.* (1986) 180 Cal.App.3d 1011, 1028

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 10 PAGE 347

123 Cal.App.4th 751                                                                                           Page 8

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

[225 Cal.Rptr. 895].) Fraud in the inducement, by contrast, occurs when " 'the promisor knows what he is signing but his consent is *induced* by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is *voidable.* In order to escape from its obligations the aggrieved party must *rescind....*' " *(Ibid.)"(Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 415, 58 Cal.Rptr.2d 875, 926 P.2d 1061; see *Pacific State Bank v. Greene* (2003) 110 Cal.App.4th 375, 389, fn. 7, 1 Cal.Rptr.3d 739.)

The Supreme Court then explained that when fraud in the inception or execution of the *arbitration clause* is present (the first of the two types of fraud identified in the immediately preceding citation), the dispute is not arbitrable: "[C]laims of fraud in the execution of the entire agreement are not arbitrable under either state or federal law. If the entire contract is void *ab initio* because of fraud, the parties have not agreed to arbitrate any controversy . ... [¶] [By contrast,] fraud in the inducement relating to other *762 contractual terms does not render the arbitration agreement unenforceable, even when it might justify rescission of the contract as a whole. By entering into the arbitration agreement, the parties established their intent that disputes coming within the agreement's scope be determined by an arbitrator rather than a court; this contractual intent must be respected even with regard to claims of fraud in the inducement of the contract generally." *(Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 416, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) The Supreme Court summarized its analysis thusly: "Claims that a party has employed fraud in inducing consent specifically to the arbitration agreement (e.g., by actively concealing its existence or misrepresenting its meaning or value) are, under *Prima Paint [ v. Flood & Conklin* (1967) 388 U.S. 395, 404, 87 S.Ct. 1801], to be decided by the court, because they go to the valid making of the arbitration clause itself. Claims that, due to fraud in the execution of the agreement as a whole, the parties reached no contract containing an arbitration clause, are also to be decided by the court. But claims that the contract as a whole was obtained through fraud in the inducement are, in the absence of evidence of

the parties' contrary intent, arbitrable under *Prima Paint.* Included in this rule of arbitrability are claims of a 'grand scheme' of fraud, or fraud ' permeating' the transaction." *(Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 419, 58 Cal.Rptr.2d 875, 926 P.2d 1061.)

In *Rosenthal,* when defining fraud in the inception or execution as it relates to an arbitration clause, the Supreme Court adverted directly to section 163 of the Restatement Second of Contracts including comments a and c, at pages 443-444. *(Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 420, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) Section 163 of the Restatement Second of Contracts which is part of the discussion of misrepresentation states, "If a misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears**924 to be a manifestation of assent by one who neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract, his conduct is not effective as a manifestation of assent." Comment a to section 163 of the Restatement Second of Contracts which is cited in *Rosenthal* states in part: "*Rationale.* Under the general principle stated in § 19(2), a party's conduct is not effective as a manifestation of his assent unless he knows or has reason to know that the other party may infer from it that he assents. This Section involves an application of that principle where a misrepresentation goes to what is sometimes called the 'factum' or the 'execution' rather than merely the 'inducement.' If, because of a misrepresentation as to the character or essential terms of a proposed contract, a party does not know or have reasonable opportunity to know of its character or essential terms, then he neither knows nor has reason to know that the other party may infer from his conduct that he assents to that contract." Comment c to section 163 of the Restatement Second of *763 Contracts which is cited in *Rosenthal* part merely indicates that an agreement described in this provision is a "void contract."

In *Rosenthal,* the Supreme Court reviewed the evidence presented by the different plaintiffs in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



123 Cal.App.4th 751                                                                          Page 9

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

order to determine whether there was fraud in the inception or execution of the arbitration agreement. The fraud in the inception or execution evidence as it related to the arbitration clauses in *Rosenthal* differed amongst the plaintiffs. For varying reasons, some plaintiffs had not read the agreements containing the arbitration clauses. The Supreme Court adopted the following test for evaluating the fraud in the inception or execution claims of the plaintiffs which were asserted as a basis for voiding the arbitration clauses: "California law, like the Restatement, requires that the plaintiff, in failing to acquaint himself or herself with the contents of a written agreement before signing it, not have acted in an objectively unreasonable manner. One party's misrepresentations as to the nature or character of the writing do not negate the other party's apparent manifestation of assent, if the second party had ' reasonable opportunity to know of the character or essential terms of the proposed contract.' (Rest.2d Contracts, § 163, p. 443.) If a party, with such reasonable opportunity, fails to learn the nature of the document he or she signs, such 'negligence' precludes a finding the contract is void for fraud in the execution. (*C.I.T. Corporation v. Panac* [ (1944) ] 25 Cal.2d [547,] 549 [154 P.2d 710].)[¶] It follows that one party's *unreasonable* reliance on the other's misrepresentations, resulting in a failure to read a written agreement before signing it, is an insufficient basis, under the doctrine of fraud in the execution, for permitting that party to avoid an arbitration agreement contained in the contract." ( *Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 423, 58 Cal.Rptr.2d 875, 926 P.2d 1061; see *Lovejoy v. A T & T Corp.* (2004) 119 Cal.App.4th 151, 161, 14 Cal.Rptr.3d 117; *Pacific State Bank v. Greene, supra,* 110 Cal.App.4th at p. 393, 1 Cal.Rptr.3d 739.) Based on this legal premise concerning the scope of fraud in the inception or execution, the Supreme Court concluded some of the plaintiffs acted unreasonably in not reading the arbitration clauses. As to these plaintiffs, the trial court was not authorized to pass on their fraud defenses posited in response to the motion to compel arbitration. (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at pp. 425-426, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) But the Supreme Court noted that other plaintiffs

who executed investment contracts containing**925 arbitration clauses, some of whom had very limited understandings of English, were blind, or suffered from Alzheimer's disease, could reasonably rely on defendants' agents' representations as to the contents of the agreements including the arbitration clauses. This latter group of plaintiffs were entitled to have the trial judge evaluate their fraud defenses to the arbitration clauses. (*Id.* at pp. 427-428, 58 Cal.Rptr.2d 875, 926 P.2d 1061; *Jones v. Adams Financial Services* (1999) 71 Cal.App.4th 831, 837, 84 Cal.Rptr.2d 151 [legally blind signatory to agreement suffering from dementia entitled to void arbitration clause on fraud in execution grounds].)

*764 It bears emphasis that *Rosenthal* merely held that a fraud in the inception or execution defense to an arbitration demand was to be decided by a judge. A party is still entitled to argue a fraud defense before an arbitrator as a ground for invalidating the arbitration clause. The Supreme Court cautioned, " Whether a fraud claim that is insufficient as a defense to an arbitration demand may, if proven, nonetheless form the basis for equitable or other relief in the arbitral forum, is a separate issue, with which we have no concern in this case." (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 423, 58 Cal.Rptr.2d 875, 926 P.2d 1061.)

The third Supreme Court case to hold that courts evaluate fraud in the inception or execution defense to an arbitration demand was *Engalla v. Permanente Medical Group, Inc., supra,* 15 Cal.4th at pages 973-984, 64 Cal.Rptr.2d 843, 938 P.2d 903.
In *Engalla,* the plaintiffs presented evidence that defendant, a medical group, made misrepresentations concerning its arbitration clause. The relevant portion of the health care plan made the following representations as to the promised speed of the arbitration process provided by the medical group: " 'Within 30 days after initial service on a Respondent, Claimant and Respondent each shall designate an arbitrator and give written notice of such designation to the other, and Claimant shall forward $150, made payable to Kaiser Foundation [¶] Health Plan Arbitration Account, to Kaiser Foundation Health Plan.... This

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT  10  PAGE 249

123 Cal.App.4th 751                                                                                    Page 10

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004
Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

$150 will be deposited with Respondent's $150 in a special account maintained by Bank of America National Trust and Savings Association [and will] ... provide the initial funds to pay the fees of the neutral arbitrator and expenses of arbitration as approved by him or her.... Within 30 days after these notices have been given and payments made, the two arbitrators so selected shall select a neutral arbitrator and give notice of the selection to Claimant and all Respondents served, and the three arbitrators shall hold a hearing within a reasonable time thereafter ....”(*Id.* p. 962, fn. 3, 64 Cal.Rptr.2d 843, 938 P.2d 903.)There was evidence that in fact the arbitration process provided by the health care group took years to complete. The plaintiffs also presented evidence the medical group knew its agents would not timely appoint arbitrators nor move towards and arbitration hearing. (*Id.* at pp. 974-976, 64 Cal.Rptr.2d 843, 938 P.2d 903.) The Supreme Court concluded: “In sum, we conclude there is evidence to support the [plaintiffs'] claims that [the defendant] fraudulently induced [the plaintiffs] to enter the arbitration agreement in that it misrepresented the speed of its arbitration program, a misrepresentation on which [the plaintiffs'] employer relied by selecting [the defendant's] health plan for its employees, and that the [plaintiffs] suffered delay in the resolution of its malpractice dispute as a result of that reliance, despite [the plaintiffs'] own reasonable diligence. The trial court, on remand, must resolve conflicting factual evidence in order to properly adjudicate **926 [the defendant's] petition to compel arbitration.” (*Engalla v. Permanente Medical Group, Inc., supra,* 15 Cal.4th at pp. 981-982, 64 Cal.Rptr.2d 843, 938 P.2d 903, fns. omitted.) It bears emphasis that the misrepresentations constituting fraud in *765 the inception or execution related to whether the extraordinarily dilatory arbitral method at issue was really consistent with the promised arbitration process. In other words, in *Engalla,* there was evidence that the arbitral forum the defendant provided was far different from the promised manner in which arbitration hearings are normally conducted. (Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2003) ¶ 5:116.1, pp. 5-59-5-60 (rev.# 1, 2002).)

[8] In this case, there is no evidence of fraud in the inception or execution of the agreement as it relates to the arbitration clause. There is no evidence that plaintiff, to paraphrase section 163 of the Restatement Second of Contracts, as cited in *Rosenthal,*“neither kn[ew] nor ha[d a] reasonable opportunity to know of the character or essential terms of the” September 28 or December 4, 2000, arbitration agreements. Rather, the only evidence adduced by plaintiff indicates he was induced to enter into the September 28 arbitration and December 4, 2000, stock sale agreements because of defendant's misrepresentations concerning the prospective Bratz doll venture and the financial status of MGA Entertainment, Inc. which is fraud in the inducement. There is no evidence, as in *Engalla,* that the arbitration before Mr. Zarabi resulting from the September 28, 2000, arbitration agreement was other than as promised or reasonably expected. Further, there is no evidence of any false representations concerning any contemplated arbitral proceedings that will result from the arbitration clause in the December 4, 2000, stock sale agreement. Whether the alleged fraud concerning the concealment of the value and business prospects of MGA Entertainment, Inc. is legally or equitably sufficient to warrant nonenforcement of the September 28 or December 4, 2000, arbitration agreements is to be resolved in the arbitral forum. (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 423, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) Hence, the trial court was required to grant the motion to compel arbitration.

Given our resolution of the fraud in the inception or execution issues, we need not address the parties' remaining contentions. Further, our resolution of the fraud in the inception or execution issues renders all of defendant's judicial notice and additional evidence requests moot. They are denied on that basis. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1058, fn. 6, 60 Cal.Rptr.2d 225, 929 P.2d 544 [judicial notice]; *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 89, fn. 26, 118 Cal.Rptr. 34, 529 P.2d 66 [new evidence on appeal].)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT _10_ PAGE _250_

Page 11

123 Cal.App.4th 751

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

IV. DISPOSITION

The order denying the petition to compel arbitration is reversed. Upon issuance of the remittitur, the trial court is to grant the motion to compel *766 arbitration and stay civil proceedings. Defendant, Isaac Larian, is awarded his costs on appeal from plaintiff, Farhad Larian.

I concur: GRIGNON, J.MOSK, J., Concurring.
I concur in the result.

There was an arbitration pursuant to the September 28, 2000 Agreement to Arbitrate and Selection of Arbitrator. The arbitrator issued an award. Thus, because the arbitration had already taken place, there was no need to compel arbitration **927 under that agreement. The parties entered into a new agreement on December 4, 2000, and pursuant to that agreement signed mutual general releases. Therefore, the only existing agreement between the parties was the December 4, 2000 agreement. That agreement contained an arbitration provision. I believe that arbitration should be compelled on the basis of that arbitration provision.

The December 4, 2000 agreement that contains the operative arbitration provisions includes the following choice-of-law clause. "This agreement shall be construed in accordance with and be governed by the laws of the State of California." The majority conclude that this clause renders the Federal Arbitration Act, title 9, United States Code section 1, et seq. (FAA) "inapplicable."

I am not so certain that the choice-of-law clause does exclude the application of the FAA. The issue is whether the applicable choice-of-law clause manifests an intention to be governed by California procedural rules applicable to arbitrations. (See *Mount Diablo Medical Center v. Health Net of California, Inc.* (2002) 101 Cal.App.4th 711, 722, 124 Cal.Rptr.2d 607.) In *Mastrobuono v. Shearson Lehman Hutton, Inc.* (1995) 514 U.S. 52, 58-59, 115 S.Ct. 1212, 131 L.Ed.2d 76, the United States Supreme Court concluded that a choice-of-law clause dealing with a clause specifying that the agreement "shall be governed by

the laws of the State of New York" did not preclude the applicability of the FAA. In *Blue Cross of California v. Superior Court* (1998) 67 Cal.App.4th 42, 62-63, fn. 8, 78 Cal.Rptr.2d 779, we said that *Volt Information Sciences, Inc. v. Board of Trustees* (1989) 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 "does not stand for the proposition a general choice of law provision evidences in all cases an express intent to incorporate a state's arbitration rules into an arbitration agreement."

*767 If we did apply federal law, the result would be the same. Both federal and California state law have adopted the principle of separability by which the arbitrator is given the power to determine the validity of the contract without calling into question the validity of the arbitration clause from which he or she derives his or her power. (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 315, 197 Cal.Rptr. 581, 673 P.2d 251; *Prima Paint Corp. v. Flood & Conklin Mfg. Co.* (1967) 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270; 1 Domke on Commercial Arbitration (3d ed.2003) § 11.2, pp. 11.6-11.10.)

Accordingly, I agree with the conclusion of the majority.

Cal.App. 2 Dist.,2004.
Larian v. Larian
123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 10 PAGE 251

**EXHIBIT 11**

Morad Zarabi
20120 Plummer Street
Chatsworth, CA 91311

February 8, 2005

Facsimile Letter

Dear Gentlemen:

Please be advised that I am unavailable to act as an arbitrator regarding any disputes between Farhad Larian and Isaac Larian concerning the controversies that are the subject of my selection as arbitrator. For your reference, Kambiz Zarabi is also unavailable.

Accordingly, pursuant to paragraph 9 of the Sale Agreement, I am appointing Judicial Arbitration and Mediation Services, Inc. ("JAMS") as my successor arbitrator. The parties are instructed to select and hire one of the panel members with business dispute experience. If you are unable to agree upon an arbitrator within twenty (20) days after delivery of this letter, then JAMS is authorized to select the arbitrator for you in its discretion. Upon your advising me of the identity of the new arbitrator, I will forward all my files, including the original stock certificate evidencing the sale, to the new arbitrator. JAMS can be contacted at 213-620-1133.

Should you have any questions, please feel free to contact me in writing only.

Thank you and good luck,

Morad Zarabi

Cc:
By email:    Mr. Fred Larian
By email     Mr. Isaac Larian
           Mr. Ellis Stern
           Mr. Robert Turner Esq. – Attorney for Isaac Larian
           Mr. Mark D. Kremer – Attorney for Fred Larian

Exhibit 42
Page 1 of 1

EXHIBIT _11_ PAGE 252

**EXHIBIT 12**

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 05/04/05                                                                    DEPT. 46

HONORABLE RODNEY E. NELSON          JUDGE    E. LOPEZ          DEPUTY CLERK

HONORABLE                        JUDGE PRO TEM              ELECTRONIC RECORDING MONITOR

C. VAUGHN/CTRM ASST   Deputy Sheriff   NONE                    Reporter

---

8:30 am  BC301371

FARHAD LARIAN                        Plaintiff
VS                                   Counsel       NO APPEARANCES
ISAAC LARIAN ET AL                   Defendant
                                     Counsel

---

NATURE OF PROCEEDINGS:

COURT ORDER

The Court is in receipt of Defendant's notice that the parties are unable to agree to an arbitrator.

The Court hereby selects Retired Judge Alan B. Haber as Arbitrator.

Counsel are to contact the Arbitrator and ensure that proceedings are realized.

Clerk to give notice.

             CLERK'S CERTIFICATE OF MAILING/
                NOTICE OF ENTRY OF ORDER

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served Notice of Entry of the above minute order of 05/04/2005 upon each party or counsel named below by depositing in the United States mail at the courthouse in Los Angeles, California, one copy of the original entered herein in a separate sealed envelope for each, addressed as shown below with the postage thereon fully prepaid.

Date: May 4, 2005>

                    Page   1 of 2   DEPT. 46

                                                    MINUTES ENTERED
                                                    05/04/05
                                                    COUNTY CLERK

EXHIBIT 12 PAGE 253

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 05/04/05                                                           DEPT. 46

HONORABLE RODNEY E. NELSON           JUDGE   E. LOPEZ           DEPUTY CLERK

HONORABLE                            JUDGE PRO TEM              ELECTRONIC RECORDING MONITOR

         C. VAUGHN/CTRM ASST    Deputy Sheriff   NONE                    Reporter

8:30 am  BC301371                   Plaintiff
                                    Counsel
         FARHAD LARIAN                          NO APPEARANCES
         VS                         Defendant
         ISAAC LARIAN ET AL         Counsel

---

**NATURE OF PROCEEDINGS:**

John A. Clarke, Executive Officer/Clerk

By: _____/S/_____
         E. Lopez, Deputy Clerk


CONKLE & OLSTEN
ERIC ENGEL
3130 WILSHIRE BLVD., STE. 500
SANTA MONICA, CA 90403


KAY SCHOLER
LARRY FELDMAN
1999 AVENUE OF THE STARS, STE. 1700
LOS ANGELES, CA 90067


                    Page   2 of  2   DEPT. 46          ┌─────────────────────┐
                                                       │ MINUTES ENTERED     │
                                                       │ 05/04/05            │
                                                       │ COUNTY CLERK        │
                                                       └─────────────────────┘

EXHIBIT _12_ PAGE _254_

**EXHIBIT 13**

1   Honorable Alan B. Haber
    ADR SERVICES, INC
2   1900 Avenue of the Stars, Suite 250
    Los Angeles, California 90067-4303
3   (310) 201-0010 PH
    (310) 201-0016 FAX
4

5

6                    IN THE MATTER OF THE ARBITRATION BETWEEN

7

8

9

10  FARHAD LARIAN                          )
                                           )
11             Claimant                    )      ADR Case No. 05-2096-ABH
                                           )
12  vs.                                    )      LASC Case No. BC 301371
    ISAAC LARIAN                           )
13                                         )      FINAL ARBITRATION AWARD
                                           )
14             Respondent                  )      DISMISSAL OF ALL CLAIMS WITH
                                           )              PREJUDICE
15                                         )

16

17

18

19

20

21

22

23

24

25  CHRONOLOGY OF EVENTS:

26        This Binding Arbitration between the above-named claimant and respondent commenced

27  on November 16, 2005, at the ADR offices, Suite 250, 1900 Avenue of the Stars, Los Angeles,

28  90067.  This Arbitration was scheduled for hearings on November 16, 17, 18, 21, 22, 23 and

29  December 5, 2005.  Claimant Farhad was represented by Mr. Robert G. Wilson of the law firm

                                           1

CC 00546

EXHIBIT 13 PAGE 255

1    of Cotkin, Collins and Ginsburg and Mr. Richard Kellner of the law firm of Kabateck, Brown

2    and Kellner.    Respondent Isaac Larian was represented by Mr. Larry Feldman and Mr. Robert

3    Turner, both of the Kaye Scholer LLP law firm.  Also in attendance was Ms. Daphne Gronich,

4    counsel for third-party intervenor, MGA Entertainment, Inc.

5         On November 17, 2005, the second day of the Arbitration proceedings, towards the end

6    of the full-day session, following the testimony of a witness called by claimant, claimant's

7    counsel called claimant Farhad Larian to testify as a witness.  Upon taking his place at the

8    witness chair, claimant Farhad Larian requested that he be permitted to address me, and the

9    assemblage of counsel, and announced that he wishes to "go off the record". I then requested that

10   claimant Larian consult privately with both of his counsel.  Claimant Farhad Larian declined my

11   request that he consult with his attorneys.  Both of his attorneys appeared ready to leave the

12   hearing room and consult with claimant Farhad Larian.    However, claimant Farhad Larian

13   continued to insist that he be permitted to address me and the assemblage of attorneys. I again

14   suggested that claimant Farhad Larian meet with his attorneys.  For a second time he insisted

15   that he be allowed to address me and the assemblage, and refused my second suggestion that it

16   would be advisable for him to speak to his attorneys.    I informed him that any remarks or

17   statements that he made would have to be "on the record"(at all times during the Arbitration

18   proceding, a Certified Court Reporter was recording the proceedings).  Claimant Farhad Larian

19   then addressed the assemblage and explained that certain evidence presented thus far in the

20   proceedings caused him to conclude that his claims against respondent Isaac Larian were

21   unfounded and that it was his request that the proceedings be brought to a conclusion.

22   Thereupon, one of claimant's attorneys, Mr. Robert G. Wilson announced that he was resigning

23   as claimant's counsel.    In essence, and unquestionably, claimant Farhad Larian conceded that

24   his claims against Isaac Larian for breach of fiduciary duty, fraud, and unilateral mistake and

25   requests for monetary damages and recission should be "dropped", and the arbitration should be

26   terminated. I suggested that a recess would be appropriate.  Claimant and his counsel, Mr.

27   Richard Kellner then retired to a different room: I then left the hearing room and briefly spoke

28   with Mr. Kellner and claimant Farhad Larian and with Mr. Kellner's permission explained that if

29   his true intentions were to terminate the proceedings, that he and Mr. Kellner would have to

2

CC 00547

EXHIBIT 13 PAGE 256

1    return to the hearing room and agree "on the record" to dismiss all of the Arbitration claims,

2    and acknowledge that a dismissal with prejudice would mean that he would not be able to renew

3    or refile his claims in the future. Claimant Farhad then acknowledge on the record that he

4    understood the consequences of a dismissal of his Arbitrtion claims, and that he wished for a

5    dismissal with prejudice of the claims.

6

7    THE ARBITRATION AWARD:

8        Based on my satisfaction that claimant Farhad Larian knowingly and voluntarily wished

9    for all of his Arbitration claims in this proceeding against respondent Isaac Larian be dismissed

10   with prejudice, and his acknowledgment that there was no merit to any of his claims in this

11   proceeding, I am ordering that all of the claims made by claimant Farhad Larian in this

12   proceeding be forthwith dismissed with prejudice, and issue an award in favor of respondent

13   Isaac Larian.

14

15   DATED: November 18, 2005        _____

16                                        Hon. Alan B. Haber(ret.), Arbitrator

17

18

19

20

21

22

23

24

25

26

27

28

29

                                    3

CC 00548

EXHIBIT 13 PAGE 257

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is ADR Services, Inc., 1900 Avenue of the Stars, Suite 250 Los Angeles, California 90067.

On November 28, 2005, I served the foregoing document described as the **FINAL ARBITRATION AWARD** on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

Richard Kellner, Esq.
Michael R. Brown, Esq.
KABATECK BROWN & KELLNER LLP
350 South Grand Avenue, 39th Floor
Los Angeles, California 90071

Robert G. Wilson, Esq.                    Larry R. Feldman, Esq.
COTKIN COLLINS & GINSBURG                 KAYE SCHOLER
300 South Grand Avenue, 24th Floor        1999 Avenue of the Stars, Suite 1600
Los Angeles, California 90071             Los Angeles, California 90067

|   |   |
|---|---|
| **X** | **BY U.S. MAIL,** I caused such envelope with postage thereon to be placed in the United States mail at Los Angeles, California. |
| **X** | **BY FACSIMILE,** I caused such to be faxed to the attorneys on November 28, 2005. |
| | **BY PERSONAL SERVICE** I caused such envelope to be delivered by hand to: |
| **X** | **STATE** I declare under penalty of perjury under the laws of the State of California that the above is true and correct. |
| | **FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. |

Executed on November 28, 2005 at Los Angeles, California.

Terry Shea

H:\WordA\PROOF OF SERVICE.doc

CC 00549


EXHIBIT 13 PAGE 258

**EXHIBIT 14**

1-28-06

1    KABATECK BROWN KELLNER LLP
     Richard L. Kellner, SBN 171416
2    Alfredo Torrijos, SBN 222458
     350 South Grand Avenue, 39th Floor
3    Los Angeles, California 90071
     Telephone: (213) 217-5000
4    Facsimile: (213) 217-5010

5    COTKIN, COLLINS & GINSBURG
     A PROFESSIONAL CORPORATION
6    Robert G. Wilson, SBN 58653
     300 South Grand Avenue, 24th Floor
7    Los Angeles, California 90071
     Telephone: (213) 688-9350
8    Facsimile: (213) 688-9351

9    Attorneys for Claimant
     Farhad Larian
10

11              ARBITRATION BEFORE ADR SERVICES, INC.
12

13   FARHAD LARIAN,                    ADRS CASE. NO. 05-2096-ABH

14        Claimant,                    THE HONORABLE ALAN HABER

15        v.
                                       DECLARATION OF CLAIMANT
16   ISAAC LARIAN,                     FARHAD LARIAN IN SUPPORT OF HIS
                                       OPPOSITION TO RESPONDENT ISAAC
17        Respondent.                  LARIAN'S MOTION FOR ATTORNEYS'
                                       FEES
18

19                                     [Filed concurrently with Claimant Farhad
                                       Larian's Opposition to Respondent Isaac
20                                     Larian's Motion for Attorneys' Fees; and
                                       Declaration of Richard L. Kellner in Support
21                                     of Claimant Farhad Larian's Opposition to
                                       Respondent Isaac Larian's Motion for
22                                     Attorneys' Fees]
23

24

25

26   ///

27   ///

28   ///

─────────────────────────────────────────────
        DECLARATION OF CLAIMANT FARHAD LARIAN IN SUPPORT OF HIS OPPOSITION TO
            RESPONDENT ISAAC LARIAN'S MOTION FOR ATTORNEYS' FEES

CC 00694

EXHIBIT 14 PAGE 859

## DECLARATION OF FARHAD LARIAN

I, FARHAD LARIAN, do hereby declare as follows:

1.      I am the Claimant in this action. I have personal knowledge of the facts contained herein and if called to testify to the matters set forth herein, I could competently testify thereto.

2.      This case has not been easy for me. I am an extremely emotional person and I have struggled greatly with the impact that this case has had on my family. Despite our differences, Isaac and I are still brothers. We spent many years working hard trying to make MGA Entertainment, Inc. what it is today.  Some of those years were good, some were bad, but we were working together and we were family.

3.      I do not (and never have) begrudge the fact that my brother has become very wealthy by virtue of his full ownership of MGA Entertainment, Inc. He deserves it. My brother is an extremely talented business person; I have never doubted or denied that.

4.      I brought this action because I had real and genuine doubts as to whether I received a fair price for the December 2000 sale of my stock in ABC International Traders, Inc. and MGA Entertainment Hong Kong Limited (later collectively known as, "MGA Entertainment, Inc."). I genuinely believed that my brother Isaac had a responsibility for making up the difference in price between what my stock was actually worth (based on a valuation of December 2000) and what I was paid for that stock. This differential would only represent a fraction of the gains that Isaac has subsequently earned due to his purchase of my stock.

5.      A few weeks before the arbitration, I was at Santa Monica beach with my family. On that day, my wife Lisa and I lost our four year old daughter. Fortunately, after one terrible hour, we found our daughter at the police station. The whole ordeal was agonizing, but it reminded me that there are more important things in life than this case -- that there are things that I would rather do than spend my time trying to prove that my brother had engaged in wrongful conduct against me.

6.      During the arbitration, sitting in the same room as my brother and his wife was difficult, much more difficult than I could have ever imagined. As each hour of the arbitration progressed, I could not help but feel -- physically feel -- the hatred that Isaac had for me. Right

— 2 —

DECLARATION OF CLAIMANT FARHAD LARIAN IN SUPPORT OF HIS OPPOSITION TO
RESPONDENT ISAAC LARIAN'S MOTION FOR ATTORNEYS' FEES

CC 00695

EXHIBIT _14_ PAGE _260_

then, I made a decision to abandon my claims in the arbitration and issue a public apology, hoping (perhaps in vain) that one day my brother and I could reconcile.

7.     My brother was so moved by my public recant that he subsequently offered to pay me the difference between the appraised value of my stock in 2000 and the amount that I was paid for the stock. Attached hereto as Exhibit "A" is a true and correct copy of a print-out of the email that I received from my brother on November 29, 2005 and my responding email of December 1, 2005.

8.     I am not a wealthy man. I simply could not have made the generous gesture of publicly abandoning my claims, if had known that Isaac's lawyers would come after me for their attorneys' fees.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this _____ day of January 2006 at Los Angeles, California.


<div style="text-align:right">

FARHAD LARIAN

</div>

DECLARATION OF CLAIMANT FARHAD LARIAN IN SUPPORT OF HIS OPPOSITION TO
RESPONDENT ISAAC LARIAN'S MOTION FOR ATTORNEYS' FEES

CC 00696

EXHIBIT 14 PAGE 201

**EXHIBIT A**

EXHIBIT _14_ PAGE _262_

CC 00697

**From:** Fred Larian [mailto:fredlarian@sbcglobal.net]
**Sent:** Thursday, December 01, 2005 4:11 PM
**To:** 'Isaac Larian (President / CEO)'
**Subject:** RE: I am traveling

I did not call Shamsi. She called me and said she had suggested the new appraisal to you (and later to me). I told her Isaac and I are supposed to talk directly. When are you back in town?

---

**From:** Isaac Larian (President / CEO) [mailto:LarianI1@mgae.com]
**Sent:** Tuesday, November 29, 2005 6:37 PM
**To:** fredlarian@sbcglobal.net
**Subject:** I am traveling

Fred,

I am traveling.

I got a call from Shamsi saying that you want a new appraisal, as of year end 2000?

I thought we decided to talk directly?

I don't mind doing this if you want this and indeed have been asking for it. But, on one condition: A written contract that if the appraisal was less than what you got paid, you will pay the difference.

I am not going through this again.

I want me and my family to go on with our lives.

Let me know.

Isaac Larian
CEO

MGA Entertainment, Inc.
16380 Roscoe Blvd. Suite 200
Van Nuys, California 91406
Tel: 818-894-3150

CC 00698

EXHIBIT _14_ PAGE _263_

email: lariani1@mgae.com
fax: 818-894-1267

WWW. BRATZ.COM
www.mgae.com
www.alienracers.com

CC 00699

EXHIBIT 14 PAGE 264

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 350 South Grand Avenue, 39th Floor, Los Angeles, CA 90071.

On **January 20, 2006**, I caused the foregoing document described as **CLAIMANT FARHAD LARIAN'S OPPOSITION TO RESPONDENT ISAAC LARIAN'S MOTION FOR ATTORNEYS' FEES** on the interested parties in this action as follows:

Larry R. Feldman, Esq.
Kaye Scholer LLP
1999 Avenue of the Stars, Suite 1700
Los Angeles, CA 90067
FAX NO: 310-788-1200

Robert Wilson, Esq.
Cotkin Collins & Ginsburg
300 South Grand Avenue, 24th Floor
Los Angeles, CA 90071

[X]   **VIA OVERNIGHT EXPRESS** – I am readily familiar with the firm's practice of collection and processing for overnight delivery.   Under that practice it would be deposited in a box or other facility regularly maintained by Overnight Express, or delivered to an authorized courier or driver authorized by Overnight Express to receive documents, in an envelope or package designated by Overnight Express with delivery fees paid or provided for, addressed to the person on whom it is to be served, at the office address as last given by that person on any document filed in the cause and served on the party making service; otherwise at that party's place of residence.

[]   **VIA U.S. MAIL** - I deposited such envelope(s) with the United States Postal Service, enclosed in a sealed envelope, for collection and mailing with the United States Postal Service where it would be deposited for first class delivery, postage fully prepared, in the United States Postal Service that same day in the ordinary course of business. I am readily familiar with my employer's business practice for collection and processing of correspondence for mailing with the United States Postal Service.

Executed on **January 20, 2006**, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

IRMA DELEON

CC 00700

EXHIBIT 14 PAGE 265

Kabateck Brown Kellner LLP
350 South Grand Avenue, 39th Floor
Los Angeles, California 90071
(213) 217-5000
FAX (213) 217-5010

**EXHIBIT 15**

Honorable Alan B. Haber(Ret.)
ADR SERVICES, INC.
1900 Avenue of the Stars, Suite 250
Los Angeles, California 90067-4303
(310) 201-0010 PH
(310) 201-0016 FAX

IN THE MATTER OF THE ARBITRATION BETWEEN

FARHAD LARIAN,                                )        LASC CASE No. BC301371
                                              )
                    Claimant,                 )        ADR CASE No. 05-2096-ABH
                                              )
            Vs.                               )
                                              )        FINAL ARBITRATION AMENDMENT
ISAAC LARIAN,                                 )        FOR RESPONDENT'S MOTION FOR
                                              )        PREVAILING PARTY ATTORNEY'S
                    Respondent,               )        FEES
                                              )
                                              )

On November 28, 2005, my Arbitration Award was filed and served on counsel for the claimant and respondent. The Award entered a dismissal with prejudice of all claims in this arbitration proceeding.    This dismissal was requested by claimant on the second day of the Arbitration proceedings.    Respondent filed a Motion for Attorneys Fees, requesting fees and costs incurred by respondent during the course of this litigation.    I have considered the respondent's moving papers, and declaration, and have considered the respondent's opposition papers and the two declarations attached to the opposition papers.    The parties agreed to a telephonic conference call for oral argument in connection with this motion. On February 1, this matter was argued by the parties by way of a telephonic conference call. Present during the call for Claimant was Mr. Richard Kellner of the law firm of Kabateck Brown Kellner LLP, and present during the conference call for Respondent was Mr. Larry Feldman of the law firm of Kaye Scholer LLP.

1

CC 00518

EXHIBIT 15 PAGE 266

FINDINGS RE: THE JURISDICTION ISSUE

    Claimant's counsel alleged (1) that as the Arbitrator I had no jurisdiction to issue an Arbitration Award and therefore there was no prevailing party; (2) that I should use my discretion and not award attorney's fees to the respondent Isaac Larian, and (3) attorneys fees and costs should not be awarded because the respondent's application for fees and costs is not adequate.    I find that the claimant's claim of lack of jurisdiction is not well-taken. Judge Nelson appointed me as the arbitrator in this matter on May 4, 2005, following his having made a finding that the parties were unable to agree on an arbitrator.  Judge Nelson's ruling followed a remittitur from the Second District Court of Appeal, ordering that a prior ruling denying the respondent's request to arbitrate this matter be vacated, and that an arbitration go forward pursuant to Section 1281.6 of the California Code of Civil Procedure. The chronology of events leading up to my appointment as arbitrator establishes the hypocrisy of the claimant's claim that that my selection as arbitrator was improper.

    On March 2, 2005(following the Court of Appeal's mandate to grant an order compelling arbitration) Judge Nelson ordered each party to submit a list of at least five(5) nominees to serve as the arbitrator.   Judge Nelson informed counsel that he would then select five(5) names for the two submitted lists, indicating that in the event the parties could not agree from his list, that he would select the arbitrator, in accordance with Section 1281.6 of the Code of Civil Procedure. Respondent provided five(5) names; my name was not on the list.  Claimant provided five names and my name was on the list.(Interestingly, claimant in their submission of five names, objected to Judge Nelson's procedure, and asserted that a principal term of the arbitration agreement provided that the arbitrator serve without charging a fee).  Finding a retired Judge to serve as a neutral arbitrator without monetary compensation in a case where a claimant(as in this case) is seeking six million dollars in monetary damages($600,000,000.) is probably more difficult than trying to locate Judge Crater.

    On March 24, 2005, Judge Nelson selected retired Judge Robert Altman to serve as the arbitrator in this matter.  On April 4, 2005, Judge Nelson, having learned that Judge Altman withdrew as arbitrator, informed counsel that he would be sending a new list of five(5) arbitrator nominees. My name was on that list of five(5).   On April 15, claimant's counsel wrote to Judge

2

CC 00519


EXHIBIT 15 PAGE 267

1  Nelson listing claimant's nominees; once again my name was on claimant's list, and made
2  reference to the names of four of respondent's nominees. My name was not on the respondent's
3  list. Once again, the parties could not agree on Judge Nelson's list of five. On May 4, 2005,
4  Judge Nelson appointed me as the arbitrator pursuant to Section 1281.6 of the Code of Civil
5  Procedure.

6      The legal principles of estoppel and waiver have application to the claimant's claim of my
7  lacking jurisdiction to serve as the arbitrator. At no time from the receipt of Judge Nelson's
8  minute order transmitted to me on May 4, 2005 and through and including my involvement in
9  pre-Arbitration proceedings, and the Arbitration, had claimant ever asserted to me that I lacked
10  jurisdiction to serve as the arbitrator in this matter.   The first time that I learned of the lack of
11  jurisdiction claim was upon receiving claimant's counsel's opposition brief to the respondent's
12  Motion for attorneys fees and costs. I find that Judge Nelson's appointment of me as arbitrator is
13  the law of the case.

14

15  FINDINGS RE: ATTORNEYS FEES AND COSTS REQUESTS ·

16      As previously discussed, I find that the respondent is the prevailing party in this litigation.
17  The Stock Purchase Agreement provided that the prevailing party can recover attorneys fees and
18  costs.  I have considered and read respondent's moving papers and have reviewed all 97 exhibits
19  attached to respondent's declaration. This case involved a claim for $600,000,000. in monetary
20  damages and was intensely litigated over an approximately two-year period. The nature of this
21  case demanded skilled and experienced attorneys.   Claimant retained serially, three different law
22  firms to represent him over the period of this case, as did respondent in hiring two attorneys who
23  have more than 60 combined years of heavy litigation experience and are highly skilled in their
24  profession.  Considering the nature of this case, I am satisfied that the records of hours kept by
25  claimant's counsel, and their hourly rates for counsel and paralegals was justified; that the hours
26  for which the claimant was billed were spent.  A review of the 97 exhibits provided by
27  respondent demonstrates the nature of the litigation pre-Arbitration; the extensive motions that
28  were litigated, the appellate matters and the time spent for preparation of the arbitration
29  proceedings.  I find that the fees charged by counsel for the respondents was reasonable.

3

CC 00520

EXHIBIT 15 PAGE 268

THE ATTORNEYS FEES AWARD:

The attorneys fees award is the sum of $1,180,481.05:  Judgment for respondent Isaac Larian in the sum of $1,180,481.05 against respondent Farhad Larian.

DATED: February 3, 2006

_____

Arbitrator, Judge Alan B. Haber(ret.)

4

CC 00521

EXHIBIT  15  PAGE 269

FEB '03 2006 5:12PM   HP LASERJET 3200

P.6

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is ADR Services, Inc., 1900 Avenue of the Stars, Suite 250 Los Angeles, California 90067.

On February 3, 2006, I served the foregoing document described as the **FINAL ARBITRATION AMENDMENT FOR RESPONDENT'S MOTION FOR PREVAILING PARTY ATTORNEY'S FEES** on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

Richard Kellner, Esq.
Michael R. Brown, Esq.
KABATECK BROWN & KELLNER
350 South Grand Avenue, 39th Floor
Los Angeles, California 90071

Robert G. Wilson, Esq.
COTKIN COLLINS & GINSBURG
300 South Grand Avenue, 24th Floor
Los Angeles, California 90071

Larry R. Feldman, Esq.
Robert Turner, Esq.
KAYE SCHOLER
1999 Avenue of the Stars, Suite 1600
Los Angeles, California 90067

**X**   **BY U.S. MAIL,** I caused such envelope with postage thereon to be placed in the United States mail at Los Angeles, California.

**X**   **BY FACSIMILE,** I caused such to be faxed to the attorneys on February 3, 2006.

_____   **BY PERSONAL SERVICE** I caused such envelope to be delivered by hand to:

**X**   **STATE** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

_____   **FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on February 3, 2006 at Los Angeles, California.

Terry Shea

H:\U www.d\PROOF OF SERVICE - NONCERTIFIED MAIL.doc

Received   Feb-03-2006  05:14pm   From-         To-COTKIN COLLINS AND G   Page  006

CC 00522



EXHIBIT _15_ PAGE _270_

**EXHIBIT 16**

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 90378)
  Michael T. Zeller (Bar No. 196417)
  Shane H. McKenzie (Bar No. 228978)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Plaintiff and Counter-Defendant
Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MATTEL, INC., a Delaware corporation,<br><br>                    Plaintiff,<br><br>        v.<br><br>CARTER BRYANT, an individual<br><br>                    Defendant.<br>_____<br>CARTER BRYANT, on behalf of himself, all present and former employees of Mattel, Inc., and the general public,<br><br>                    Counterclaimant,<br><br>        v.<br><br>MATTEL, INC., a Delaware corporation,<br><br>                    Counter-defendant. | Case No. CV 04-09059 NM (RNBx)<br><br>MATTEL, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND TANGIBLE THINGS TO MGA ENTERTAINMENT INC. |

FIRST REQUEST FOR PRODUCTION TO MGA

EXHIBIT 16 PAGE 271

1    Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiff
2  and Counter-Defendant Mattel, Inc. hereby requests that MGA Entertainment Inc.
3  make available for inspection and copying the following documents and things
4  within thirty days of the service of these Requests, at the offices of Quinn Emanuel
5  Urquhart Oliver & Hedges, LLP, 865 South Figueroa Street, 10th Floor, Los
6  Angeles, California 90036.

7    These Requests shall be deemed to be continuing, and MGA
8  Entertainment Inc. shall be obligated to supplement its responses to these requests
9  at such times and to the extent required by Rule 26(e) of the Federal Rules of Civil
10  Procedure.

11

12    DEFINITIONS

13

14    For purposes of this Request for Production of Documents:

15    A.    "YOU" or "YOUR" means MGA Entertainment Inc. and any of
16  its current or former employees, officers, directors, agents, representatives,
17  attorneys, parents, subsidiaries, divisions, affiliates, predecessors-in-interest and
18  successors-in-interest, and any other PERSON acting on its behalf, pursuant to its
19  authority or subject to its control.

20    B.    "MATTEL" means Mattel, Inc. and any of its current or former
21  employees, officers, directors, agents, representatives, attorneys, subsidiaries,
22  divisions, affiliates, predecessors-in-interest and successors-in-interest, and any
23  other PERSON acting on its behalf, pursuant to its authority or subject to its
24  control.

25    C.    "DOCUMENT" or "DOCUMENTS" means all "writings" and
26  "recordings" as those terms are defined in Rule 34 of the Federal Rules of Civil
27  Procedure and Rule 1001 of the Federal Rules of Evidence, including, but not
28  limited to, all writings and records of every type and description including, but not

-2-

FIRST REQUEST FOR PRODUCTION TO MGA

EXHIBIT *16* PAGE *272*

1  limited to, contracts, agreements, correspondence, memoranda, letters, facsimiles,

2  electronic mail ("e-mail"), records of telephone conversations, handwritten and

3  typewritten notes of any kind, statements, reports, minutes, recordings, transcripts

4  and summaries of meetings, voice recordings, pictures, photographs, drawings,

5  computer cards, tapes, discs, printouts and records of all types, studies, instruction

6  manuals, policy manuals and statements, books, pamphlets, invoices, canceled

7  checks and every other device or medium by which or through which information

8  of any type is transmitted, recorded or preserved.  Without any limitation on the

9  foregoing, the term "DOCUMENT" shall include all copies that differ in any

10 respect from the original or other versions of the DOCUMENT, including, but not

11 limited to, all drafts and all copies of such drafts or originals containing initials,

12 comments, notations, insertions, corrections, marginal notes, amendments or any

13 other variation of any kind.

14        D.    "REFER OR RELATE TO" means constituting, embodying,

15 containing, referring to, commenting on, evidencing, regarding, discussing,

16 describing, mentioning, reflecting, expressing, pertaining to, concerning,

17 supporting, contradicting, negating, revoking or otherwise relating to in any

18 manner.

19        E.    "PERSON" or "PERSONS" means all natural persons,

20 partnerships, corporations, joint ventures and any kind of business, legal or public

21 entity or organization, as well as its, its or her agents, representatives, employees,

22 officers and directors and any one else acting on its, its or her behalf, pursuant to

23 its, its or her authority or subject to its, its or her control.

24        F.    "BRYANT" means Carter Bryant, any of his current or former

25 agents, representatives, attorneys, employees, partners, joint venturers,

26 predecessors-in-interest and successors-in-interest, and any other PERSON acting

27 on his behalf, pursuant to his authority or subject to his control.

28

1    G. "BRATZ" means any project ever known by that name
2 (whether in whole or in part and regardless of what such project is or has been
3 also, previously or subsequently called) and any doll or any portion thereof that is
4 now or has ever been known as, or sold or marketed under, the name or term
5 "Bratz" (whether in whole or in part and regardless of what such doll is or has
6 been also, previously or subsequently called) or that is now or has ever been sold
7 or marketed as part of the "Bratz" line, and all prototypes, models, samples and
8 versions of such doll or any portion thereof.

9    H. "ANGEL" means any project that is the subject of
10 MGA000706-08, MGA000710-12, MGA000714-16, MGA000718-20,
11 MGA000724-28 and MGA000734, and any doll (sometimes purportedly called
12 "Angel," "Angel Faces" and/or "Prayer Angels") or any portion thereof that is the
13 subject of MGA000706-08, MGA000710-12, MGA000714-16, MGA000718-20,
14 MGA000724-28 and MGA000734, including all prototypes, models, samples and
15 versions of such doll(s) or any portion thereof.  Without limiting the generality of
16 the foregoing, "ANGEL" means any project or any doll or any portion thereof that
17 is the subject of MGA000706-08, MGA000710-12, MGA000714-16,
18 MGA000718-20, MGA000724-28 and MGA000734, regardless of what any such
19 project or doll has in fact been called, and regardless of what any such project or
20 doll is or has been also, previously or subsequently called.

21    I. "DESIGNS" means any and all works, designs, artwork,
22 sketches, drawings, illustrations, representations, depictions, blueprints,
23 schematics, diagrams, descriptions, sculptures, prototypes, models, samples,
24 reductions to practice, developments, know-how, ideas, concepts, inventions
25 and/or improvements, as well as all other items, things and DOCUMENTS in
26 which any of the foregoing are or have been expressed, embodied, contained,
27 fixed or reflected in any manner, whether in whole or in part.

28

-4-

EXHIBIT /6   PAGE 270

1        J.    "COMMUNICATION" or "COMMUNICATIONS" means and

2  includes any disclosure, transfer or exchange of information between two or more

3  PERSONS, whether orally or in writing, including, without limitation, any

4  conversation or discussion by means of meeting, letter, telephone, note,

5  memorandum, telegraph, telex, telecopier, electronic mail, or any other electronic

6  or other medium, including without limitation in written, audio or video form.

7        K.    The singular form of a noun or pronoun includes within its

8  meaning the plural form of the noun or pronoun so used, and *vice versa*; the use of

9  the masculine form of a pronoun also includes within its meaning the feminine

10  form of the pronoun so used, and *vice versa*; the use of any tense of any verb

11  includes also within its meaning all other tenses of the verb so used, whenever

12  such construction results in a broader request for information; and "and" includes

13  "or" and *vice versa*, whenever such construction results in a broader disclosure of

14  documents or information.

15

16                         <u>INSTRUCTIONS</u>

17

18        A.    Unless otherwise specified, these requests call for

19  DOCUMENTS prepared on or after January 1, 1995 through the present.

20  Documents shall be produced in their original file folders, or in lieu thereof, any

21  writing on the file folder from which each such document is taken shall be copied

22  and appended to such document and the person for whom or department, division,

23  or office for which the document or the file folder is maintained shall be

24  identified.

25        B.    YOU are to produce all DOCUMENTS requested hereby that

26  are in YOUR possession, custody and control.

27        C.    In the event that any document called for by these requests is to

28  be withheld on the basis of a claim of privilege or immunity from discovery, that

07209/642197.1

FIRST REQUEST FOR PRODUCTION TO MGA

EXHIBIT / PAGE 275

1  document is to be identified by stating (i) any addressor and addressee; (ii) any

2  indicated or blind copy; (iii) the document's date, subject matter, number of pages,

3  and attachments or appendices; (iv) all persons to whom the document was

4  distributed, shown, or explained; (v) its present custodian; and (vi) the nature of

5  the privilege or immunity asserted.

6         D.   In the event that any document called for by these requests has

7  been destroyed or discarded, that document is to be identified by stating: (i) any

8  addressor and addressee; (ii) any indicated or blind copies; (iii) the document's

9  date, subject matter, number of pages, and attachments or appendices; (iv) all

10 persons to whom the document was distributed, shown, or explained; (v) the date

11 of destruction or discard, manner of destruction or discard, and reason for

12 destruction or discard; (vi) the persons who were authorized to carry out such

13 destruction or discard; and (vii) whether any copies of the document presently

14 exist and, if so, the name of the custodian of each copy.

15

16                  <u>REQUESTS FOR PRODUCTION</u>

17

18 <u>REQUEST FOR PRODUCTION NO. 1</u>:

19         All DOCUMENTS that REFER OR RELATE TO any agreement or

20 contract between YOU and BRYANT, including without limitation all drafts

21 thereof and all actual or proposed amendments, modifications and revisions

22 thereto.

23

24 <u>REQUEST FOR PRODUCTION NO. 2</u>:

25         All DOCUMENTS that REFER OR RELATE TO the performance of

26 any agreement or contract between YOU and BRYANT.

27

28

07209/642197.1

-6-

FIRST REQUEST FOR PRODUCTION TO MGA

EXHIBIT /6   PAGE 221

REQUEST FOR PRODUCTION NO. 3:

ALL DOCUMENTS that REFER OR RELATE TO the agreement dated as of September 18, 2000 between YOU and BRYANT, including without limitation all drafts thereof and any actual or proposed modifications, amendments or revisions thereto.

REQUEST FOR PRODUCTION NO. 4:

ALL DOCUMENTS that REFER OR RELATE TO the Modification and Clarification of the Agreement dated as of September 18, 2000 between YOU and BRYANT, including without limitation all drafts thereof and any actual or proposed modifications, amendments or revisions thereto.

REQUEST FOR PRODUCTION NO. 5:

ALL DOCUMENTS that REFER OR RELATE TO the agreement dated April 2001 between YOU and BRYANT, including without limitation all drafts thereof and any actual or proposed modifications, amendments or revisions thereto.

REQUEST FOR PRODUCTION NO. 6:

All DOCUMENTS prepared, created, received or transmitted (whether in whole or in part) prior to January 1, 2001 that REFER OR RELATE TO BRYANT.

REQUEST FOR PRODUCTION NO. 7:

All DOCUMENTS that REFER OR RELATE TO any work, activities or services, including without limitation any freelance work or consulting services, that BRYANT performed for or with YOU or on YOUR

-7-

EXHIBIT _16_ PAGE _277_

1  behalf prior to January 1, 2001 (regardless of when any such DOCUMENT was

2  prepared, created, received or transmitted, whether in whole or in part).

3

4  REQUEST FOR PRODUCTION NO. 8:

5       All DOCUMENTS that REFER OR RELATE TO any work,

6  activities or services, including without limitation any freelance work or

7  consulting services, that Anna Rhee performed for or with YOU or on YOUR

8  behalf prior to January 1, 2001 (regardless of when any such DOCUMENT was

9  prepared, created, received or transmitted, whether in whole or in part).

10

11  REQUEST FOR PRODUCTION NO. 9:

12       All DOCUMENTS that REFER OR RELATE TO any work,

13  activities or services, including without limitation any freelance work or

14  consulting services, that Veronica Marlow performed for or with YOU or on

15  YOUR behalf prior to January 1, 2001 (regardless of when any such DOCUMENT

16  was prepared, created, received or transmitted, whether in whole or in part).

17

18  REQUEST FOR PRODUCTION NO. 10:

19       All DOCUMENTS that REFER OR RELATE TO any work,

20  activities or services, including without limitation any freelance work or

21  consulting services, that Sarah Halpern performed for or with YOU or on YOUR

22  behalf prior to January 1, 2001 (regardless of when any such DOCUMENT was

23  prepared, created, received or transmitted, whether in whole or in part).

24

25  REQUEST FOR PRODUCTION NO. 11:

26       All DOCUMENTS that REFER OR RELATE TO any work,

27  activities or services, including without limitation any freelance work or

28  consulting services, that Jesse Ramirez performed for or with YOU or on YOUR

EXHIBIT  16  PAGE  208

1  behalf prior to January 1, 2001 (regardless of when any such DOCUMENT was
2  prepared, created, received or transmitted, whether in whole or in part).

3

4  REQUEST FOR PRODUCTION NO. 12:

5          All DOCUMENTS that REFER OR RELATE TO any work,
6  activities or services, including without limitation any freelance work or
7  consulting services, that Margaret Hatch (also known as Margaret Leahy and/or
8  Margaret Hatch-Leahy) performed for or with YOU or on YOUR behalf prior to
9  January 1, 2001 (regardless of when any such DOCUMENT was prepared,
10  created, received or transmitted, whether in whole or in part).

11

12  REQUEST FOR PRODUCTION NO. 13:

13          All DOCUMENTS that REFER OR RELATE TO any work,
14  activities or services, including without limitation any freelance work or
15  consulting services, that Elise Cloonan performed for or with YOU or on YOUR
16  behalf prior to January 1, 2001 (regardless of when any such DOCUMENT was
17  prepared, created, received or transmitted, whether in whole or in part).

18

19  REQUEST FOR PRODUCTION NO. 14:

20          All agreements and contracts between YOU and Anna Rhee,
21  including without limitation all drafts thereof and amendments, modifications and
22  revisions thereto.

23

24  REQUEST FOR PRODUCTION NO. 15:

25          All DOCUMENTS that REFER OR RELATE TO any agreement or
26  contract between YOU and Anna Rhee, including without limitation all
27  COMMUNICATIONS that REFER OR RELATE thereto.

28

EXHIBIT *16* PAGE *279*

REQUEST FOR PRODUCTION NO. 16:

All agreements and contracts between YOU and Veronica Marlow, including without limitation all drafts thereof and amendments, modifications and revisions thereto.

REQUEST FOR PRODUCTION NO. 17:

All DOCUMENTS that REFER OR RELATE TO any agreement or contract between YOU and Veronica Marlow, including without limitation all COMMUNICATIONS that REFER OR RELATE thereto.

REQUEST FOR PRODUCTION NO. 18:

All agreements and contracts between YOU and Margaret Hatch (also known as Margaret Leahy and/or Margaret Hatch-Leahy), including without limitation all drafts thereof and amendments, modifications and revisions thereto.

REQUEST FOR PRODUCTION NO. 19:

All DOCUMENTS that REFER OR RELATE TO any agreement or contract between YOU and Margaret Hatch (also known as Margaret Leahy and/or Margaret Hatch-Leahy), including without limitation all COMMUNICATIONS that REFER OR RELATE thereto.

REQUEST FOR PRODUCTION NO. 20:

All agreements and contracts between YOU and Sarah Halpern, including without limitation all drafts thereof and amendments, modifications and revisions thereto.

EXHIBIT //  PAGE 2XA

1  REQUEST FOR PRODUCTION NO. 21:

2          All DOCUMENTS that REFER OR RELATE TO any agreement or

3  contract between YOU and Sarah Halpern, including without limitation all

4  COMMUNICATIONS that REFER OR RELATE thereto.

5

6  REQUEST FOR PRODUCTION NO. 22:

7          All agreements and contracts between YOU and Jesse Ramirez,

8  including without limitation all drafts thereof and amendments, modifications and

9  revisions thereto.

10

11  REQUEST FOR PRODUCTION NO. 23:

12          All DOCUMENTS that REFER OR RELATE TO any agreement or

13  contract between YOU and Jesse Ramirez, including without limitation all

14  COMMUNICATIONS that REFER OR RELATE thereto.

15

16  REQUEST FOR PRODUCTION NO. 24:

17          All agreements and contracts between YOU and Elise Cloonan,

18  including without limitation all drafts thereof and amendments, modifications and

19  revisions thereto.

20

21  REQUEST FOR PRODUCTION NO. 25:

22          All DOCUMENTS that REFER OR RELATE TO any agreement or

23  contract between YOU and Elise Cloonan, including without limitation all

24  COMMUNICATIONS that REFER OR RELATE thereto.

25

26

27

28

1  **REQUEST FOR PRODUCTION NO. 26:**

2          All DOCUMENTS that REFER OR RELATE TO DESIGNS that

3  BRYANT produced, prepared, created, authored, conceived of or reduced to

4  practice, whether alone or jointly with others, prior to January 1, 2001.

5

6  **REQUEST FOR PRODUCTION NO. 27:**

7          All DOCUMENTS that REFER OR RELATE TO DESIGNS

8  produced, prepared, created, authored, conceived of or reduced to practice prior to

9  January 1, 2001 by BRYANT, whether alone or jointly with others, in which YOU

10  have purported at any time to purchase, acquire or own any right, title or interest

11  (whether in whole or in part).

12

13  **REQUEST FOR PRODUCTION NO. 28:**

14          All DOCUMENTS that REFER OR RELATE TO DESIGNS

15  produced, prepared, created, authored, conceived of or reduced to practice prior to

16  January 1, 2001 by Margaret Hatch (also known as Margaret Leahy and/or

17  Margaret Hatch-Leahy), whether alone or jointly with others, in which YOU have

18  purported at any time to purchase, acquire or own any right, title or interest

19  (whether in whole or in part).

20

21  **REQUEST FOR PRODUCTION NO. 29:**

22          All DOCUMENTS, including without limitation all

23  COMMUNICATIONS between YOU and any PERSON, that REFER OR

24  RELATE TO any agreement or contract between BRYANT and Mattel, Inc.

25

26  **REQUEST FOR PRODUCTION NO. 30:**

27          All DOCUMENTS, including without limitation all

28  COMMUNICATIONS between YOU and any PERSON, that REFER OR

EXHIBIT  16  PAGE  282

1  RELATE TO any agreement or contract between Margaret Hatch (also known as

2  Margaret Leahy and/or Margaret Hatch-Leahy) and Mattel, Inc.

3

4  REQUEST FOR PRODUCTION NO. 31:

5          All COMMUNICATIONS between YOU and BRYANT that REFER

6  OR RELATE TO Mattel, Inc. or any officer, director, employee or representative

7  of Mattel, Inc.

8

9  REQUEST FOR PRODUCTION NO. 32:

10          All DOCUMENTS prepared, written, transmitted or received

11  (whether in whole or in part) prior to January 1, 2001 that REFER OR RELATE

12  TO BRATZ.

13

14  REQUEST FOR PRODUCTION NO. 33:

15          All DOCUMENTS that REFER OR RELATE TO BRATZ that

16  REFER OR RELATE TO any time prior to January 1, 2001 (regardless of when

17  such document was prepared, written, transmitted or received, whether in whole or

18  in part).

19

20  REQUEST FOR PRODUCTION NO. 34:

21          All DOCUMENTS prepared, written, transmitted or received

22  (whether in whole or in part) prior to January 1, 2001 that REFER OR RELATE

23  TO ANGEL.

24

25  REQUEST FOR PRODUCTION NO. 35:

26          All DOCUMENTS that REFER OR RELATE TO ANGEL that

27  REFER OR RELATE TO any time prior to January 1, 2001 (regardless of when

28

1  such document was prepared, written, transmitted or received, whether in whole or

2  in part).

3

4  REQUEST FOR PRODUCTION NO. 36:

5          All DOCUMENTS that REFER OR RELATE TO the origin(s),

6  conception or creation of BRATZ, including without limitation all DOCUMENTS

7  that REFER OR RELATE TO the timing of, and the method and manner in which,

8  BRATZ first came to YOUR attention.

9

10  REQUEST FOR PRODUCTION NO. 37:

11          All declarations, affidavits and other sworn written statements of any

12  other type or form by YOU that REFER OR RELATE TO BRATZ (other than

13  those previously filed and served in this action).

14

15  REQUEST FOR PRODUCTION NO. 38:

16          All transcripts and video and/or audio recordings of statements made

17  by YOU under oath, including without limitation all deposition transcripts, trial

18  transcripts and arbitration transcripts, that REFER OR RELATE TO BRATZ

19  (other than those taken in this action when Mattel, Inc.'s counsel was in

20  attendance).

21

22  REQUEST FOR PRODUCTION NO. 39:

23          All declarations, affidavits and other sworn written statements of any

24  other type or form by any PERSON that REFER OR RELATE TO ANGEL (other

25  than those previously filed and served in this action).

26

27

28

FIRST REQUEST FOR PRODUCTION TO MGA

EXHIBIT  / /  PAGE  ʒR</

REQUEST FOR PRODUCTION NO. 40:

All transcripts and video and/or audio recordings of statements made by any PERSON under oath, including without limitation all deposition transcripts, trial transcripts and arbitration transcripts, that REFER OR RELATE TO ANGEL (other than those taken in this action when Mattel, Inc.'s counsel was in attendance).

REQUEST FOR PRODUCTION NO. 41:

All DOCUMENTS that REFER OR RELATE TO BRATZ and/or ANGEL filed, submitted or served in the suit and/or arbitration proceedings brought by Farhad Larian against Isaac Larian, including without limitation all declarations, affidavits and sworn testimony given by any PERSON in such suit or arbitration proceedings.

REQUEST FOR PRODUCTION NO. 42:

All DOCUMENTS that REFER OR RELATE TO any payment made to or on behalf of BRYANT prior to October 21, 2000 or for work or services performed by BRYANT prior to October 21, 2000 regardless of when such payment was actually made.

REQUEST FOR PRODUCTION NO. 43:

All DOCUMENTS that REFER OR RELATE TO any payment made to or on behalf of BRYANT for DESIGNS that BRYANT assigned or transferred to YOU prior to October 21, 2000, regardless of when such payment was actually made.

07209/642197.1

-15-

FIRST REQUEST FOR PRODUCTION TO MGA

EXHIBIT _16_ PAGE _285_

1  REQUEST FOR PRODUCTION NO. 44:

2          All DOCUMENTS that REFER OR RELATE TO invoices submitted

3  by BRYANT to YOU prior to January 31, 2001.

4

5  REQUEST FOR PRODUCTION NO. 45:

6          All of YOUR royalty statements to or for BRYANT.

7

8  REQUEST FOR PRODUCTION NO. 46:

9          All DOCUMENTS that REFER OR RELATE TO BRYANT'S

10  participation in the conception, creation, design, development, sculpting, tooling,

11  production or manufacture of BRATZ.

12

13  REQUEST FOR PRODUCTION NO. 47:

14          All DOCUMENTS that REFER OR RELATE TO BRYANT'S

15  participation in the conception, creation, design, development, sculpting, tooling,

16  production or manufacture of ANGEL.

17

18  REQUEST FOR PRODUCTION NO. 48:

19          All non-privileged COMMUNICATIONS between YOU and any

20  PERSON that REFER OR RELATE TO this action.

21

22  REQUEST FOR PRODUCTION NO. 49:

23          All DOCUMENTS that REFER OR RELATE TO any

24  indemnification that BRYANT has sought, proposed, requested or obtained in

25  connection with this action.

26

27

28

1  REQUEST FOR PRODUCTION NO. 50:

2         All DOCUMENTS that REFER OR RELATE TO any

3  indemnification that YOU have sought, proposed, requested or obtained in

4  connection with this action.

5

6  REQUEST FOR PRODUCTION NO. 51:

7         All DOCUMENTS that REFER OR RELATE TO each and every

8  sculpt of BRATZ (including without limitation any model, prototype or sample

9  thereof) prior to June 1, 2001.

10

11  REQUEST FOR PRODUCTION NO. 52:

12         All DOCUMENTS that REFER OR RELATE TO each and every

13  sculpt of ANGEL (including without limitation any model, prototype or sample

14  thereof).

15

16  REQUEST FOR PRODUCTION NO. 53:

17         All DOCUMENTS that REFER OR RELATE TO the procurement,

18  fabrication, preparation and production of each and every mold for BRATZ

19  (including without limitation for any model, prototype or sample thereof) prior

20  June 1, 2001, including without limitation all orders, purchase orders and invoices

21  relating thereto.

22

23  REQUEST FOR PRODUCTION NO. 54:

24         DOCUMENTS sufficient to show when any mold for ANGEL

25  (including without limitation for any model, prototype or sample thereof) was first

26  ordered, procured, fabricated, prepared and produced.

27

28

07209/642197.1

-17-

FIRST REQUEST FOR PRODUCTION TO MGA

EXHIBIT   16   PAGE   287

**REQUEST FOR PRODUCTION NO. 55:**

All DOCUMENTS that REFER OR RELATE TO the exhibition, or proposed, offered or requested exhibition, of BRATZ (including without limitation any model, prototype or sample thereof) to any third party prior to June 1, 2001.

**REQUEST FOR PRODUCTION NO. 56:**

DOCUMENTS sufficient to show when ANGEL (including without limitation any model, prototype or sample thereof) was first exhibited to any third party.

**REQUEST FOR PRODUCTION NO. 57:**

DOCUMENTS sufficient to show when and where BRATZ (including without limitation any model, prototype or sample thereof) was first marketed to any wholesaler, distributor and/or retailer.

**REQUEST FOR PRODUCTION NO. 58:**

DOCUMENTS sufficient to show when and where ANGEL (including without limitation any model, prototype or sample thereof) was first marketed to any wholesaler, distributor and/or retailer.

**REQUEST FOR PRODUCTION NO. 59:**

DOCUMENTS sufficient to show when and where BRATZ (including without limitation any model, prototype or sample thereof) was first offered for sale to any wholesaler, distributor and/or retailer.

FIRST REQUEST FOR PRODUCTION TO MGA

EXHIBIT _16_ PAGE _288_

**REQUEST FOR PRODUCTION NO. 60:**

DOCUMENTS sufficient to show when and where ANGEL (including without limitation any model, prototype or sample thereof) was first offered for sale by YOU to any wholesaler, distributor and/or retailer.

**REQUEST FOR PRODUCTION NO. 61:**

DOCUMENTS sufficient to show when and where BRATZ was first shipped, distributed and sold.

**REQUEST FOR PRODUCTION NO. 62:**

DOCUMENTS sufficient to show when and where ANGEL was first shipped, distributed and sold.

**REQUEST FOR PRODUCTION NO. 63:**

All DOCUMENTS that REFER OR RELATE TO the licensing, including without limitation the proposed or requested licensing, of BRATZ prior to December 31, 2001.

**REQUEST FOR PRODUCTION NO. 64:**

All COMMUNICATIONS between YOU and any manufacturer, or any contemplated, proposed or potential manufacturer, that REFER OR RELATE TO BRATZ prior to June 1, 2001.

**REQUEST FOR PRODUCTION NO. 65:**

DOCUMENTS sufficient to identify when YOU first contacted any manufacturer, or any contemplated, proposed or potential manufacturer, for the manufacture of ANGEL.

EXHIBIT 16 PAGE 289

1  REQUEST FOR PRODUCTION NO. 66:

2          All COMMUNICATIONS between YOU and any PERSON that

3  REFER OR RELATE TO the distribution or proposed or potential distribution of

4  BRATZ prior to June 1, 2001.

5

6  REQUEST FOR PRODUCTION NO. 67:

7          All COMMUNICATIONS between YOU and Universal Commerce

8  Corp., Ltd. prior to June 1, 2001.

9

10  REQUEST FOR PRODUCTION NO. 68:

11          All DOCUMENTS that REFER OR RELATE TO Mattel, Inc., or that

12  were prepared, authored or created by Mattel, Inc. or any officer, director,

13  employee or representative of Mattel, Inc., that BRYANT has ever provided to,

14  shown, described to, communicated to or disclosed in any manner to YOU.

15

16  REQUEST FOR PRODUCTION NO. 69:

17          All COMMUNICATIONS between YOU and BRYANT prior to

18  January 1, 2001, including without limitation all diaries, notes, calendars, logs,

19  phone records and letters, that reflect, record or memorialize or otherwise REFER

20  OR RELATE TO any such COMMUNICATIONS.

21

22  REQUEST FOR PRODUCTION NO. 70:

23          All COMMUNICATIONS between YOU and Elise Cloonan that

24  REFER OR RELATE TO BRYANT, Mattel, Inc., BRATZ and/or Anna Rhee,

25  including without limitation all diaries, notes, calendars, logs, phone records and

26  letters, that reflect, record or memorialize or otherwise REFER OR RELATE TO

27  any such COMMUNICATIONS.

28

EXHIBIT 16 PAGE 201

REQUEST FOR PRODUCTION NO. 71:

All COMMUNICATIONS between YOU and Elise Cloonan prior to June 11, 2002, including without limitation all diaries, notes, calendars, logs, phone records and letters, that reflect, record or memorialize or otherwise REFER OR RELATE TO any such COMMUNICATIONS.

REQUEST FOR PRODUCTION NO. 72:

All COMMUNICATIONS between YOU and Veronica Marlow prior to January 1, 2001, including without limitation all diaries, notes, calendars, logs, phone records and letters, that reflect, record or memorialize or otherwise REFER OR RELATE TO any such COMMUNICATIONS.

REQUEST FOR PRODUCTION NO. 73:

All COMMUNICATIONS between YOU and Mercedeh Ward prior to November 6, 2000, including without limitation all diaries, notes, calendars, logs, phone records and letters, that reflect, record or memorialize or otherwise REFER OR RELATE TO any such COMMUNICATIONS.

REQUEST FOR PRODUCTION NO. 74:

All COMMUNICATIONS between YOU and Margaret Hatch (also known as Margaret Leahy and/or Margaret Hatch-Leahy) prior to January 1, 2001, including without limitation all diaries, notes, calendars, logs, phone records and letters, that reflect, record or memorialize or otherwise REFER OR RELATE TO any such COMMUNICATIONS.

REQUEST FOR PRODUCTION NO. 75:

All COMMUNICATIONS between YOU and Anna Rhee prior to January 1, 2001, including without limitation all diaries, notes, calendars, logs,

1  phone records and letters, that reflect, record or memorialize or otherwise REFER

2  OR RELATE TO any such COMMUNICATIONS.

3

4  REQUEST FOR PRODUCTION NO. 76:

5          All COMMUNICATIONS between Veronica Marlow and Anna Rhee

6  prior to January 1, 2001, including without limitation all diaries, notes, calendars,

7  logs, phone records and letters, that reflect, record or memorialize or otherwise

8  REFER OR RELATE TO any such COMMUNICATIONS.

9

10  REQUEST FOR PRODUCTION NO. 77:

11          All COMMUNICATIONS between YOU and Sarah Halpern prior to

12  January 1, 2001, including without limitation all diaries, notes, calendars, logs,

13  phone records and letters, that reflect, record or memorialize or otherwise REFER

14  OR RELATE TO any such COMMUNICATIONS.

15

16  REQUEST FOR PRODUCTION NO. 78:

17          All COMMUNICATIONS between YOU and Jesse Ramirez prior to

18  January 1, 2001, including without limitation all diaries, notes, calendars, logs,

19  phone records and letters, that reflect, record or memorialize or otherwise REFER

20  OR RELATE TO any such COMMUNICATIONS.

21

22  REQUEST FOR PRODUCTION NO. 79:

23          Any personnel or vendor file that YOU have created or maintained

24  concerning BRYANT.

25

26  REQUEST FOR PRODUCTION NO. 80:

27          Any personnel file that YOU have created or maintained concerning

28  Paula Treantafellas.

07209/642197.1

-22-

EXHIBIT 16 PAGE 542

FIRST REQUEST FOR PRODUCTION TO MGA

1  REQUEST FOR PRODUCTION NO. 81:

2          Any personnel file that YOU have created or maintained concerning

3  Mercedeh Ward.

4

5  REQUEST FOR PRODUCTION NO. 82:

6          Any personnel or vendor file that YOU have created or maintained

7  concerning Margaret Hatch (also known as Margaret Leahy and/or Margaret

8  Hatch-Leahy).

9

10  REQUEST FOR PRODUCTION NO. 83:

11          Any personnel or vendor file that YOU have created or maintained

12  concerning Veronica Marlow.

13

14  REQUEST FOR PRODUCTION NO. 84:

15          Any personnel or vendor file that YOU have created or maintained

16  concerning Anna Rhee.

17

18  REQUEST FOR PRODUCTION NO. 85:

19          Any personnel or vendor file that YOU have created or maintained

20  concerning Jessie Ramirez.

21

22  REQUEST FOR PRODUCTION NO. 86:

23          Any personnel file that YOU have created or maintained concerning

24  Shirin Salemnia.

25

26  REQUEST FOR PRODUCTION NO. 87:

27          Any personnel file that YOU have created or maintained concerning

28  Victoria O'Connor.

FIRST REQUEST FOR PRODUCTION TO MGA

EXHIBIT 16 PAGE 293

1  REQUEST FOR PRODUCTION NO. 88:

2          Any personnel file that YOU have created or maintained concerning

3  Farhad Larian.

4

5  REQUEST FOR PRODUCTION NO. 89:

6          All telephone records for MGA Entertainment Inc. for the time period

7  from January 1, 1998 through January 1, 2001.

8

9  REQUEST FOR PRODUCTION NO. 90:

10         All DOCUMENTS that REFER OR RELATE TO any copyright,

11  patent or any other application or registration for BRATZ DESIGNS, including

12  without limitation all COMMUNICATIONS pertaining thereto.

13

14  REQUEST FOR PRODUCTION NO. 91:

15         All DOCUMENTS that REFER OR RELATE TO any copyright,

16  patent or any other application or registration for ANGEL DESIGNS, including

17  without limitation all COMMUNICATIONS pertaining thereto.

18

19  REQUEST FOR PRODUCTION NO. 92:

20         All DOCUMENTS that REFER OR RELATE TO any testing of or

21  sampling from any DOCUMENTS that REFER OR RELATE TO BRATZ or

22  BRYANT, including without limitation any such testing or sampling in connection

23  with any ink, paper or chemical analysis to date any such DOCUMENTS and

24  including without limitation all results and reports relating thereto.

25

26

27

28

-24-

EXHIBIT _16_ PAGE _294_

1   REQUEST FOR PRODUCTION NO. 93:

2          An electronic copy of each DOCUMENT that YOU have produced in

3   this action, or that is responsive to these Requests, that is or was created, prepared,

4   generated, maintained or transmitted in digital form.

5

6   REQUEST FOR PRODUCTION NO. 94:

7          The metadata for each DOCUMENT that YOU have produced in this

8   action, or that is responsive to these Requests, that is or was created, prepared,

9   generated, maintained or transmitted in digital form.

10

11  REQUEST FOR PRODUCTION NO. 95:

12         All DOCUMENTS that support, refute or otherwise REFER OR

13  RELATE TO any facts underlying YOUR Affirmative Defenses in this action.

14

15  REQUEST FOR PRODUCTION NO. 96:

16         All doll heads, sculpts, prototypes, models, samples and tangible

17  items that were created, prepared or made, whether in whole or in part, prior to

18  January 1, 2001 that REFER OR RELATE TO BRATZ.

19

20  REQUEST FOR PRODUCTION NO. 97:

21         All doll heads, sculpts, prototypes, models, samples and tangible

22  items that were created, prepared or made, whether in whole or in part, prior to

23  January 1, 2001 that REFER OR RELATE TO ANGEL.

24

25  REQUEST FOR PRODUCTION NO. 98:

26         All doll heads, sculpts, prototypes, models, samples and tangible

27  items that Anna Rhee painted, whether in whole or in part, for or with YOU or on

28  YOUR behalf or for or on behalf of BRYANT prior to January 1, 2001.

07209/642197.1

-25-

FIRST REQUEST FOR PRODUCTION TO MGA

EXHIBIT _10_ PAGE _295_

1  REQUEST FOR PRODUCTION NO. 99:

2           All doll heads, sculpts, prototypes, models, samples and tangible

3  items that REFER OR RELATE TO DESIGNS for dolls, doll accessories or toys

4  that BRYANT produced, created, authored, conceived of or reduced to practice,

5  whether alone or jointly with others, prior to January 1, 2001.

6

7  REQUEST FOR PRODUCTION NO. 100:

8           All doll heads, sculpts, prototypes, models, samples and tangible

9  items that support, refute or otherwise REFER OR RELATE TO any facts

10 underlying YOUR Affirmative Defenses in this action.

11

12 DATED:  March 14, 2005          QUINN EMANUEL URQUHART
13                                 OLIVER & HEDGES, LLP
14
                                   By _Shane McKenzie_____
15                                    Shane Heather McKenzie
16                                    Attorneys for Plaintiff/Counter-defendant
                                      Mattel, Inc.
17

18

19

20

21

22

23

24

25

26

27

28

07209/642197.1

-26-

EXHIBIT _16_ PAGE _296_

1

**PROOF OF SERVICE**

1013A(3) CCP Revised 5/1/88

2    STATE OF CALIFORNIA        )
                                ) SS
3    COUNTY OF LOS ANGELES      )

4         I am employed in the county of Los Angeles State of California. I am over the age of 18
     and not a party to the within action; my business address is: 865 South Figueroa Street, 10th Floor,
5    Los Angeles, California 90017.

6         On March 14, 2005, I served the foregoing document described as **Mattel, Inc.'s First Set**
     **of Requests For Production of Documents And Tangible Things to MGA Entertainment Inc.**
7    on all interested parties in this action.

8                              **Robert F. Millman, Esq.**
                               **Douglas A. Wickham, Esq.**
9                                  **Littler Mendelson**
                               **A Professional Corporation**
10                             2049 Century Park East, 5th Floor
                               Los Angeles, California 90067-3107
11                                  FAX: 310-553-5583

12   [    ]    By placing [ ] the original [ ] true copies thereof enclosed in sealed envelopes addressed as
               follows:

13   [ X ]    **BY MAIL:**    I deposited such envelope in the mail at Los Angeles, California. The
              envelope was mailed with postage thereon fully prepaid. As follows: I am "readily familiar"
14            with the firm's practice of collection and processing correspondence for mailing. Under that
              practice it would be deposited with U.S. postal service on that same day with postage thereon
15            fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that
              on motion of the party served, service is presumed invalid if postal cancellation date or
16            postage meter date is more than one day after date of deposit for mailing in affidavit.

17
18   [ X ]    **BY TELECOPIER** By transmitting the above listed document(s) to the fax number(s)
              set forth above on this date.

19   Executed on March 14, 2005, at Los Angeles, California.

20   [    ]    (State) I declare under penalty of perjury under the laws of the State of California that the
              above is true and correct.

21   [ X ]    (Federal) I declare that I am employed in the office of a member of the bar of this court at
              whose direction the service was made.

22
23
24   Rebecca A. Ramos                          _Signature_
     Print Name                                Signature
25
26
27
28

EXHIBIT _16_ PAGE _297_

1

## PROOF OF SERVICE
1013A(3) CCP Revised 5/1/88

2 **STATE OF CALIFORNIA** )
) SS
3 **COUNTY OF LOS ANGELES** )

4      I am employed in the county of Los Angeles State of California. I am over the age of 18 and not a party to the within action; my business address is: 865 South Figueroa Street, 10th Floor, 5 Los Angeles, California 90017.

6      On March 14, 2005, I served the foregoing document described as **Mattel, Inc.'s First Set of Requests For Production of Documents And Tangible Things to MGA Entertainment Inc.** on all interested parties in this action.
7

8                    **Paula E. Ambrosini, Esq.**
                     **O'Melveny & Meyers**
9                    400 So. Hope Street
                     Los Angeles, CA 90071
10                   (213) 430-6407

11 [   ]   By placing [ ] the original [ ] true copies thereof enclosed in sealed envelopes addressed as follows:

12 [   ]   **BY MAIL:**   I deposited such envelope in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid. As follows: I am "readily familiar" 13 with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon 14 fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or 15 postage meter date is more than one day after date of deposit for mailing in affidavit.

16

[ X ]   **BY TELECOPIER** By transmitting the above listed document(s) to the fax number(s)
17 set forth above on this date.

18 [ X ]   **BY PERSONAL SERVICE** I caused to be delivered such envelope by hand to the addressee.
19

Executed on March 14, 2005, at Los Angeles, California.

20 [   ]   (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.
21

22 [ X ]   (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

23

24

Rebecca A. Ramos
25 Print Name                               Signature

26

27

28

EXHIBIT 16 PAGE 298

**EXHIBIT 17**

*RDB cosy*

**HOWARTH & SMITH**
ATTORNEYS AT LAW
800 WILSHIRE BOULEVARD
SUITE 750
LOS ANGELES, CALIFORNIA 90017
TELEPHONE: (213) 955-9400
FAX: (213) 622-0791
www.howarth-smith.com

DON HOWARTH

April 6, 2004

DHowarth@howarth-smith.com
Direct Line: (213) 955-9400 Ext. 109

**VIA FACSIMILE AND U.S. MAIL**
Larry R. Feldman, Esq.
Kaye Scholer LLP
1999 Avenue of the Stars
Suite 1700
Los Angeles, California 90067

Re: *Larian v. Larian*

Dear Larry:

This letter is to follow up on our meeting at your office on February 26, 2004, and our conversation by phone more recently. Since then I have also received a letter from you dated March 29, 2004 asking about our progress in getting back to you. I trust you received my message that I was out of the office in Hawaii last week and that I would get back to you with a written response upon my return. This letter is the promised written response.

The facts of which we are presently aware clearly show that it is not correct, as you stated in our meeting, that at the end of 2000, Isaac believed Bratz was just another doll, or that Fred knew everything that Isaac knew. Indeed, even the limited evidence immediately available without discovery having yet occurred demonstrates just the reverse. For example:

> The July 18, 2003, Wall Street Journal reports that sometime in 1999 Isaac had a conversation with a buyer from Wal-Mart in which the idea for a Bratz-type doll germinated. The article quotes Isaac as saying that "he was motivated by a challenge from a Wal-Mart Stores, Inc. buyer to 'give me something that can compete with Barbie.'" Isaac kept this conversation secret from Fred, and Fred found out about it for the first time when he read the published article.

04 Lt81001 086

EXHIBIT *17* PAGE *899*

HS 03235

Larry R. Feldman, Esq.
April 6, 2004
Page 2

By late 1999, Isaac had decided that MGA's challenger to Barbie should be a fashion-type doll. MGA had previously distributed other types of dolls, but never a fashion doll, as the WSJ article confirms. For the first time ever, Isaac conducted a contest to select a design for the doll, and selected Carter Bryant's Bratz doll line as the winner of the contest. It is plain that Isaac did not consider Bratz to be just another doll for MGA. The existence of this contest was concealed from Fred, and, in fact, Fred was never told that the Company was looking for a fashion-type doll to compete with Barbie or that the Bratz line was being developed by Isaac and MGA during 1999 and 2000, despite Fred's position as Isaac's partner and a co-founder of MGA.

In late 1999, and continuing at least through the spring of 2000, Isaac ordered MGA employees to stop sharing financial information with Fred. Isaac threatened at least one employee's job if the employee did not follow Isaac's instructions and cut Fred out of the information loop. In addition, Isaac instructed an employee to stop sending Fred daily sales reports that up to that point, Fred had routinely received. The result of this concerted concealment effort was that Fred did not, and could not, know the complete financial picture of the Company.

In February 2000, Isaac tried to keep Fred from attending the N.Y. Toy Fair, the venue in which information about new, upcoming products is reviewed.

Beginning in early 2000, Isaac began systematically portraying Fred, both internally and to the outside world, as someone who had no role in the management and decision making of the Company; and that Isaac alone controlled the strategic moves for MGA. In or about February 2000, Isaac had Fred's name removed from the Company profile, and changed the document (and history) to list only Isaac as the founder of MGA. When Fred raised this issue with Isaac, he was told that "there is . . . a lot more to come."

In the Spring of 2000, before the Agreement to Arbitrate was signed and before Isaac had announced his plans for Bratz either publicly or to Fred, Isaac took steps to personally profit from the Bratz program. On April 11,

04:L181001.086

EXHIBIT _17_ PAGE _300_

HS 03236

Larry R. Feldman, Esq.
April 6, 2004
Page 3

2000, Isaac sought the following from the Company's Board of Directors:

Paying Isaac a royalty for anything that he "personally developed" was an absolute first for the Company, and the target figures in (3) and (4) plainly indicate an unannounced, but real plan to exploit the Bratz market beginning in 2001. A successful Bratz roll-out in 2001 would allow Isaac personally to profit (at the expense of his fiduciary Fred) from the Bratz opportunity.

In or about July or August 2000, Isaac called internal meetings with top management at MGA about Bratz and his plans for seizing the opportunity presented by the doll line. Isaac expressed optimism in these meetings that the Bratz line could directly compete with Barbie, would appeal to an even wider range of girls than did Barbie, and presented an opportunity he had been looking to find for years. Fred, a 45% shareholder and officer of MGA, was intentionally excluded from those meetings, and from the special handling of Bratz.

Roughly contemporaneously with these internal meetings, Isaac began negotiating with Carter Bryant and eventually obtained from him the worldwide licensing rights to Bratz. The license was unique in several important respects. For the first time in the Company's history, the Bratz license made Isaac and MGA the licensor of the product, allowing MGA to control the licensing in an unlimited number of product categories worldwide. In previous deals, MGA was just a distributor/licensee of a product. The difference between being a licensee and a licensor is enormous and becoming a licensor is something Isaac had wanted for a very long time. Further, the Bratz deal was unique because MGA paid more for that license of that doll than it ever had paid for a license of any other doll in the Company's history. Fred was not told anything about the unprecedented scope of the Bratz license prior to signing the Agreement to Arbitrate, or the Stock Sales Agreement in December 2000.

04.L181001.086

EXHIBIT _17_ PAGE _301_          HS 03237

REDACTED

Larry R. Feldman, Esq.
April 6, 2004
Page 4

- In the fall of 2000, Isaac began to develop the Bratz product line, including ordering prototypes and filing additional trademarks. Fred was intentionally kept unaware of the scope of Isaac's plans to develop and market Bratz at that time.

- During this time, including in the fall of 2000, Isaac followed a practice of passing along to Fred only negative financial news about the Company, such as                                        , thus making the Company seem worth much less than it actually was. Isaac did not disclose to Fred news which would have a positive financial effect on the value of the Company, such as his plans for Bratz or other potential revenue streams for the Company.

- On December 11, 2000 MGA filed, and Isaac personally signed, applications for five new trademarks, including one for each of the names of the Bratz dolls. Isaac's personally signing such applications facilitated a plan to keep knowledge about the scope of the Bratz program tightly controlled.

- Then, in February 2001, with Fred out of the picture after his execution of the December Stock Sale Agreement, Isaac went public about the scope and significance of Bratz. He introduced the dolls at the February 2001 N.Y. Toy Fair with the public assertion that it was now "a Bratz world."

- Isaac's view of Bratz was further documented in June 2001, confirming that Bratz was MGA's "first intellectual property" and his belief that it was "sure to revolutionize the world of fashion dolls."

All of this and other evidence strongly indicates Isaac made a concerted effort to get Fred out of the company so that he could exploit the unique Bratz opportunity without sharing the benefits with Fred.

When we met, you provided us with three e-mails which you claimed demonstrated that Fred knew all of what Isaac knew about Bratz when he signed the Agreement to Arbitrate. They do not. The e-mails – dated November 15, 2000, November 22, 2000, and April 30, 2001 – were all sent *after* execution of the September

04 L181001.086

EXHIBIT 17 PAGE 302

HS 03238

REDACTED

Larry R. Feldman, Esq.
April 6, 2004
Page 5

2000 Agreement to Arbitrate. Further, none of them give any indication of anything unusual about Bratz that would alert Fred to its impact on the valuation of the Company.

You also asserted that the e-mails illustrate Fred's awareness of the Bratz program earlier than the time alleged in the complaint on file in the action. Again that is not correct. Paragraph 28 of the Complaint alleges that in late spring or summer 2002, Fred first became aware of the "true scope of the Company's extraordinary plans, efforts and history regarding the Bratz product line and other financial information about the Company that had been concealed from him by Isaac, as the license had been concealed from him." Nothing in the three e-mails is inconsistent with this allegation.

Additional evidence that Isaac attempted to defraud Fred into signing the Agreement to Arbitrate and to pay him less than the true value of his shares comes from Mr. Dutcher's appraisal. As may have been reported to you from the hearing on our motion to take Mr. Dutcher's deposition, the Court recognized the significance of this information, saying that, "[t]his information is directly relevant as it goes to whether [plaintiff] was defrauded because information about this new product was withheld from him." From what we can tell from the November 7, 2000, appraisal we have (and have given to you), it seems apparent that Isaac did not provide Mr. Dutcher with information about the Company's plans for Bratz or projections of its revenue potential for 2000, 2001 and beyond. We are advised that Isaac engaged in regular financial modeling for the Company and that in those forecasts, revenue streams were projected for each item the Company sold or was planning to sell. There is nothing in the appraisal itself indicating that Mr. Dutcher received such 2000 or 2001 projections, either for the Company as a whole or for Bratz. Further, it does not appear that the value of MGA Entertainment, HK was included in the appraisal at all, and Fred's shares in that company were certainly part of what was covered in the Agreement to Arbitrate. In any event, we will know more about the information provided to Mr. Dutcher and how he proceeded when we get Mr. Dutcher's files and take his deposition now that our motion has been granted.

You indicated to me that the Company actually lost money for 2000 after realizing a profit in 1999, and thus using the 1999 figures in the appraisal worked in Fred's favor in valuing the Company. First, it is not apparent to us that the Company lost money in 2000, as Isaac has not provided to Fred the tax returns or necessary financial information to verify that claim. From what we know, both sales and profits were expected to be much greater in 2000 than they were in 1999. If there was a loss in 2000, it certainly could have been the result of any number of things which would be largely irrelevant to a valuation

04 L181001 086

EXHIBIT _17_ PAGE 303

HS 03239

Larry R. Feldman, Esq.
April 6, 2004
Page 6

of the Company – things such as one time writeoffs for non-repeating events, deferring revenue and profit recognition into the future (perhaps as to Hallmark?), payment of large bonuses to management, shifting profits into subsidiaries; etc. We do not yet know what reserves were taken that may have reduced profits and we do not know what revenues were attributed to or held by MGA Hong Kong. Until we are provided with the financial information that will enable us to analyze the Company's P/L statement, cash statement, cash flow analysis, and the like, and to have things fully audited, it is not helpful to be advised there was a stated loss, especially on rising revenues.

We do note that in the November 7, 2000 valuation, Mr. Dutcher states that "The most recent year (1999) was weighted only minimally as the EBDITA appears unreasonably high based on the two prior years." Mr. Dutcher was looking at EBDITA of

_____ Looking at just those numbers, one can see why he might assume that the 1999 numbers were "high" based on a 1998 loss of $86,000. However, as Isaac knew, the 1999 revenues were not at all "unreasonably high" compared to the prior years because in 1998 there was

_____ actual numbers for 2000 were consistent with the Company's strong growth, and had Mr. Dutcher had those numbers, he would have seen that the 1999 numbers were not unreasonably high.

Because they are not as subject to management and accounting choices – which we will need to examine – sales are important in looking at company valuation. It appears

_____ However, Dutcher used

Further evidence of how far off Mr. Dutcher was led by what Isaac gave him and

The Wall Street Journal article reports

04 LIS1001 086

EXHIBIT *17* PAGE *304*

HS 03240

REDACTED

Larry R. Feldman, Esq.
April 6, 2004
Page 8

such circumstances, the interests of the corporation are betrayed, the corporation may elect to claim all the benefits for itself, and the law will impose a trust in favor of the corporation upon the property, interests and profits so acquired.

The facts bring the case within the stated rule. While it has been applied so generally in corporation cases to have become known as the doctrine of corporate opportunity, _it is founded in the doctrine of loyalty in business which applies in all situations in which trust is reposed. The fiduciary is held to the utmost measure of loyalty and accordingly he may not use a trust opportunity for personal advantage._ "The policy of the law is to put fiduciaries beyond the reach of temptation by making it unprofitable for them to yield to it."

The primary duty of the parties was to take no advantage of each other within their fiduciary relationship by means of _the slightest concealment_, misrepresentation, or adverse pressure. Defendant was entitled to a complete disclosure as to the negotiations with Utah Fuel Co., and an equal opportunity to take advantage of them. Plaintiff contrived to appropriate for itself the major share of the profits with the result that the firm, when it took the contract and assumed the responsibility, stood committed to an unequal division. Defendant could not be deprived of its rights in this matter.

The judgment properly awarded defendant the amount by which plaintiff profited through breach of duty. Whether it be regarded as damages presumed to have been suffered through deprivation of a business opportunity or as profits unjustly received by a plaintiff is immaterial.

_Id._ at 284-85 (emphasis supplied; extensive internal citations omitted). _See also, e.g.,_ Witkin, 9 Summary of California Law § 20, p. 419 (9th ed. 1990) ("The fiduciary relationship . . . obviously makes applicable the rule which, in corporation law, is known as the doctrine of 'corporate opportunities'"); _Air Purification v. Carle_, 99 Cal. App. 2d 258, 265 (1950) (holding ("[In] a trust relationship . . . one of the parties will not be allowed to deal with the subject matter of the association for his own advantage.").

04:L131001 086

EXHIBIT _17_ PAGE 306

HS 03242

Larry R. Feldman, Esq.
April 6, 2004
Page 7

expected sales of $800 million for 2003, 65% of which is accounted for by Bratz. The appraisal without the information on Bratz was thus more than 10 times lower in its projection for 2003 than it should have been.

When Isaac chose not to share key pieces of information about the scope of the Bratz project with Fred, and to selectively provide him and the appraiser with other financial information about the Company during 1999 and 2000 and projections for the future, there is no doubt that he violated California law requiring him as a fiduciary to disclose all such information to his partner and co-venturer, Fred. Being a fiduciary means that each owes the other the "duty of highest loyalty and utmost good faith, being charged not to take any unfair advantage or secret profit." *Universal Sales Corp. v. California Press Mfg. Co.*, 20 Cal. 2d 751, 772 (1942); BAJI 12.36. A fiduciary has a duty to make a full and fair disclosure of all facts which materially affect the rights and interest of the person to whom the duty is owed. A fiduciary must give priority to the best interest of the persons to whom the duty is owed. When there is a "fiduciary relationship any transaction by which one of the co-adventurers secures an advantage over the other or others is presumptively fraudulent and casts a burden on such party gaining advantage to show fairness and good faith in all respects." *Boyd v. Bevilacqua*, 247 Cal. App. 2d 272, 291 (1966).

It is also a well-settled and fundamental precept that a fiduciary such as Isaac may not usurp business opportunities such as Bratz for himself at the expense of Fred as his co-fiduciary. In *MacIsaac v. Pozzo*, 81 Cal. App. 2d 278 (1947), the parties entered into a partnership to do business together and had agreed to split profits equally. However, plaintiff went out on its own and improperly made a deal with a customer, Utah Fuel Co., and got the defendant to agree to take only 15% of the profit. When the proceeds from the Utah Fuel deal came in, a declaratory judgment action was instigated by the plaintiff and Pozzo defended on the ground that the agreement to split the profits 85/15 was procured by fraud. In agreeing with Pozzo, the court held the following:

> [I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself. And, if in

04 L181001 086

EXHIBIT 17 PAGE 305

HS 03241

Larry R. Feldman, Esq.
April 6, 2004
Page 9

Based on just what we know without discovery it is clear that Isaac has ignored the requirement that he not engage in "the slightest concealment." When Isaac put together the licensing deal for Bratz without informing Fred of his plans or sharing with Fred the financial expectations and rewards deriving therefrom, Isaac violated his duties as a fiduciary, and he will have to account to Fred.

In addition to Isaac's duties to disclose to Fred all material information relating to the Company, and to refrain from usurping a business opportunity – both of which arose from his fiduciary relationship with Fred – Isaac's actions in isolating the Bratz and other financial information from Fred also created an independent duty of disclosure. As Witkin notes, "The duty to disclose may arise without any confidential relationship where the defendant alone has knowledge of material facts which are not accessible to the plaintiff." Bernard E. Witkin, 5 Summary of California Law, § 700, p. 801 (9th ed. 1990; citations omitted). Here, as recited above – from holding secret meetings to instructing Company employees not to give Fred information – Isaac went to great lengths to make sure the material facts about the Bratz doll project were "not accessible" to Fred, when he had a duty to inform him of the scope of the Bratz program before entering into the Agreement to Arbitrate and Stock Purchase Agreement. It was impermissible for Isaac to keep his plans for the scope of the Bratz program secret. Also, note that ¶ 6 of the buy/sell agreement itself makes clear that it is Isaac, not Fred, who has "full knowledge of business prospects."

Isaac has indicated to Fred a willingness to address the merits and provide us with documents in his possession and control, including those held by the companies. Our outstanding discovery requests are a good listing of what we need, but in summary, we certainly need each of the following:

1. All documents that relate to Bratz from 1999 through 2003, including trademarks, license agreement negotiations with Carter Bryant, notes or agendas of meetings re: Bratz, prototypes, designs, correspondence with attorneys re: the license agreement or trademarks, and financial documents, including sales and revenue projections, audited and unaudited;

2. All documents that relate to the value, revenues and costs of MGA, ABC and MGA Hong Kong from 1999 through the present, including all internal materials, projections and tax returns, all reserves, write downs and supporting documentation;

04 L181001 084

EXHIBIT 17 PAGE 307

HS 03243

Larry R. Feldman, Esq.
April 6, 2004
Page 10

    3. All information that Isaac and/or the companies provided to Morad and/or Mr. Dutcher;

    4. All corporate minutes, shareholder resolutions, stock options grants or proposals and related documentation, and general ledgers for ABC, MGA and MGA Hong Kong.

    In addition to this documentation from Isaac, we also need his reconfirmed agreement to allow Morad to release his file. We also need written confirmation by Isaac that he wants full and honest disclosure by any person who is a witness to the events herein; that he will not directly or indirectly retaliate against any person based on what they disclose; and that he is encouraging and requesting them to give Fred a candid, honest, and complete response to any questions Fred may have of them. In exchange for such complete disclosure, Fred is also willing to produce his records now.

    Once we have received the above, and do our homework in connection with what we find, we will be in a position to make a recommendation as to proceeding with a binding reference of this matter to a retired judge, and what the order of reference would provide. We also have some candidates to put forward in this regard. If in the meantime you are interested in a non-binding mediation, we are prepared to support that immediately, and without further discovery beyond production of the materials indicated. We have some thoughts as to who might be able to get this sorted out between these brothers, so that the matter can be closed. Please let me know if this is an option.

        Very truly yours,

        Don Howarth

04.E181001.086

EXHIBIT 17 PAGE 308                    HS 03244

Larry R. Feldman, Esq.
April 6, 2004
Page 11

bcc:   Mr. Farhad Larian (via U.S. Mail)

04-L181001.086

EXHIBIT _17_ PAGE 309

HS 03245

**Howarth & Smith**
ATTORNEYS AT LAW
800 Wilshire Boulevard
Suite 750
Los Angeles, California 90017
(213) 955-9400
Fax (213) 622-0791

# FAX COVER SHEET

*The information contained in this facsimile message is information protected by attorney-client and/or the attorney/work product privilege. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by facsimile. If the person actually receiving this facsimile or any other reader of the facsimile is not the named recipient or the employee or agent responsible to deliver it to the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address via U.S. Postal Service.*

FAX NUMBER TRANSMITTED TO: (310) 788-1200

To:          Larry R. Feldman, Esq.

From:        Brian D. Bubb, Esq.

Number of pages including this page: 11

*.     IF YOU DO NOT RECEIVE ALL PAGES, PLEASE TELEPHONE US IMMEDIATELY AT (213) 955-9400.

Sent by:     Jason Sickler                                    Date: April 6, 2004

Re:    Larian v. Larian

COMMENTS:

EXHIBIT _17_ PAGE _310_

HS 03246

Confirmation Report—Memory Send

```
                                    Time      : Apr-05-2004  11:37pm
                                    Tel line 1 :
                                    Tel line 2 :
                                    Name      : HOWARTH
```

| | | |
|---|---|---|
| Job number | : | 375 |
| Date | : | Apr-05 11:33pm |
| To | : | 5208#498#001#131#78#12008 |
| Document Pages | : | 011 |
| Start time | : | Apr-05 11:33pm |
| End time | : | Apr-05 11:37pm |
| Pages sent | : | 011 |
| Status | : | OK |

Job number    : 375

## *** SEND SUCCESSFUL ***

**Howarth & Smith**
ATTORNEYS AT LAW
808 Wilshire Boulevard
Suite 750
Los Angeles, California 90017
(213) 955-9400
Fax (213) 622-0791

# FAX COVER SHEET

*The information contained in this facsimile message is information protected by attorney-client and/or the attorney/work product privilege. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by facsimile. If the person actually receiving this facsimile or any other reader of the facsimile is not the named recipient or the employee or agent responsible to deliver it to the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address via U.S Postal Service*

FAX NUMBER TRANSMITTED TO: (310) 788-1200

To:              Larry R. Feldman, Esq.

From:            Brian D. Bubb, Esq

Number of pages including this page: 11

         IF YOU DO NOT RECEIVE ALL PAGES, PLEASE TELEPHONE US IMMEDIATELY AT (213) 955-9400

Sent by:         Jason Sickler

Re:    Larian v. Larian                                    Date: April 6, 2004

COMMENTS:

EXHIBIT *17* PAGE *311*

HS 03247

**EXHIBIT 18**

**Juan Pablo Alban**

**To:**          Jon Corey
**Subject:**     RE: Mattel/MGA

----- Original Message -----
From: Kennedy, Raoul <RKENNEDY@skadden.com>
To: Jon Corey
Cc: Park, Amy <APARK@skadden.com>; Allen, Jose <JRALLEN@skadden.com>
Sent: Wed Dec 05 10:09:13 2007
Subject: RE: Mattel/MGA

As previously mentioned, our clients have no objection in principle to this idea but we
have questions concerning the operative details. Jose Allen, who is handling a number of
third party subpoena issues, will be back to you no later than Thursday with the
specifics.



From: Jon Corey [mailto:joncorey@quinnemanuel.com]
Sent: Tuesday, December 04, 2007 11:51 AM
To: Kennedy, Raoul
Cc: Park, Amy
Subject: Mattel/MGA


Dear Raoul,

I am writing to follow up on Mattel's request that Isaac Larian agree that documents
sought from third parties related to the Larian v. Larian disputes may be produced
pursuant to the protective order operative in this case.  Please let me know what Mr.
Larian's position is at your earliest convenience.

Best regards,

Jon Corey
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Main Phone: (213) 443-3000
Main Fax:   (213) 443-3100
E-mail:   joncorey@quinnemanuel.com <blocked::mailto:username@quinnemanuel.com>
Web:   www.quinnemanuel.com <blocked::http://www.quinnemanuel.com/>

The information contained in this e-mail message is intended only for the personal and
confidential use of the recipient(s) named above.  This message may be an attorney-client
communication and/or work product and as such is privileged and confidential.  If the
reader of this message is not the intended recipient or agent responsible for delivering
it to the intended recipient, you are hereby notified that you have received this document
in error and that any review, dissemination, distribution, or copying of this message is
strictly prohibited.  If you have received this communication in error, please notify us
immediately by e-mail, and delete the original message.



---------------------------------------------------------------------
To ensure compliance with Treasury Department regulations, we advise you that, unless
otherwise expressly indicated, any federal tax advice contained in this message was not
intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-

1

EXHIBIT 18 PAGE 312

related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.

**************************************************
This e-mail and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified any dissemination, distribution or copying of this email, and any attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original copy and any copy of any e-mail, and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.
**************************************************
=====================================================================================

EXHIBIT _18_ PAGE _3/3_

**EXHIBIT 19**

12-06-07    12:50pm    From-CHR    SEN GLASER    310-556-29    T-202    P.002/002    F-252

LAW OFFICES

CHRISTENSEN, GLASER, FINK, JACOBS, WEIL & SHAPIRO, LLP

10250 CONSTELLATION BOULEVARD
NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90067
(310) 553-3000
FAX (310) 556-2920

DIRECT DIAL NUMBER
(310) 282-6287
EMAIL: AMORGENTHALER@CHRISCLASE.COM

December 6, 2007

MERITAS LAW FIRMS WORLDWIDE

VIA FACSIMILE AND U.S. MAIL

Juan Pablo Alban, Esq.
Quinn Emanuel Urquhart Oliver
   & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

Re:    Mattel v. Bryant, Case No. CV 04-9049 SGL (RNBx)

Dear Mr. Alban:

This is in response to your letter of November 26, 2007.

Farhad Larian will agree to modify the protective orders entered in Larian v. Larian, Los Angeles Superior Court Case No. BC 301371, and in Larian v. Larian, ADRS Case No. 05-2096-ABH, to allow for the production of documents which Mr. Larian otherwise agrees to produce in response to the subpoena served on him by Mattel provided that (i) the other parties to those actions similarly agree to such modification; and (ii) suitable arrangements are made to have the documents covered by the protective order entered in the Mattel litigation. It is of course understood that Mr. Larian is not agreeing at this time to produce all non-privileged documents responsive to Mattel's subpoena which are covered by the protective orders; he is merely agreeing at this time to modify the protective orders as specified above to allow the production of documents responsive to the subpoena which he has agreed to produce which are being held solely on the basis that they are covered by the protective orders.

Please do not hesitate to contact me if you have questions regarding the foregoing.

Very truly yours,

Alisa Morgenthaler Lever
of CHRISTENSEN, GLASER, FINK, JACOBS,
   WEIL & SHAPIRO, LLP

AML/eb
cc:   Patricia L. Glaser, Esq.
      Amy Park, Esq. (via facsimile)
      Scott Gizer, Esq.

611927.1

EXHIBIT 19 PAGE 314

12-06-07   12:50pm   From-CHR   SEN GLASER                310-556-2F           T-292   P.001/002   F-252

LAW OFFICES
# CHRISTENSEN, GLASER, FINK, JACOBS, WEIL & SHAPIRO, LLP
10250 CONSTELLATION BOULEVARD
NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90067
MERITAS LAW FIRMS WORLDWIDE

**FAX TRANSMISSION**

TELEPHONE NO.: (310) 553-3000
FACSIMILE NO.:  (310) 556-2920

FROM:   **Alisa Morgenthaler Lever, Esq.**

Number of Pages:
(including this page)        2

DATE:   **December 6, 2007**

Client Reference No.:   03460-009

TO:                                FAX NO.:              CONFIRMATION NO:

**Juan Pablo Albán, Esq.**            **213-443-3100**        **213-443-3000**

**Sender's Comments:**

**If you have received this Transmission in error, please call:  (310) 553-3000 and mail it to the above address.  Thank you.**

NOTE: THE INFORMATION CONTAINED IN THIS FAX MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS NAMED ABOVE.   THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION AND, AS SUCH, IS PRIVILEGED AND CONFIDENTIAL.  IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR, AND THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE BY MAIL.  THANK YOU.

606368-1

EXHIBIT _19_  PAGE _3/5_

**EXHIBIT 20**

11-14-05

DIANA M. TORRES (S.B. #162284)
PAULA E. AMBROSINI (S.B. #193126)
O'MELVENY & MYERS, LLP
400 South Hope Street
Los Angeles, California 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
email: dtorres@omm.com

DALE M. CENDALI (of counsel, not admitted in California)
O'MELVENY & MYERS, LLP
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

Attorneys for Third Party,
MGA Entertainment, Inc.

**ARBITRATION BEFORE**

**ADR SERVICES, INC.**

| | |
|---|---|
| FARHAD LARIAN, | ADRS Case No.: 05-2096-ABH |
| Plaintiff, | |
| v. | **THIRD PARTY MGA ENTERTAINMENT INC.'S MOTION FOR PROTECTIVE ORDER** |
| ISAAC LARIAN, | |
| Defendant. | |

CC 00342

MGA'S MOTION FOR PROTECTIVE ORDER

EXHIBIT 20 PAGE 3/6

## I.   INTRODUCTION

Third party, MGA Entertainment Inc., ("MGA") has received a subpoena from Plaintiff, Farhad Larian ("Farhad Larian"), requesting that MGA produce documents that contain an extensive amount of highly confidential, commercially sensitive material. Farhad Larian has already demonstrated a disregard for the confidentiality of MGA's proprietary and trade secret information *and* his willingness to cooperate with MGA's competitors and adversaries in other litigation. MGA has also received word that Farhad Larian has issued subpoenas to and intends to call as witnesses many of its key employees and former employees and contractors to testify about MGA's product development. MGA seeks a protective order, accordingly, to ensure that its documents, their contents, and testimony elicited in this arbitration concerning MGA's business operations cannot be disseminated to others outside of the arbitration and will not be used for any purpose other than the arbitration.

## II.   BACKGROUND FACTS

MGA is the maker of the highly successful "Bratz" line of dolls and related products. After its initial launch in Spain in June 2001, MGA introduced those dolls in the United States later that year. The "Bratz" dolls, with their hip, edgy fashions were a sudden – and surprising – hit among the "tween"-age girls who had years ago lost interest in the long-reigning but stale "Barbie" doll. (*See* Declaration of Daphne Gronich ("Gronich Decl.") filed concurrently ¶ 2.)

In April 2004, Mattel, Inc. filed suit against Carter Bryant, a consultant for MGA who had created the initial "Bratz" drawings. Bryant, a former Mattel employee, had twice left his employment at Mattel, the second time to work for MGA in October 2000. Although it had been three and a half years since Bryant had left Mattel, Mattel filed suit apparently after reading a 2003 *Wall Street Journal* article that inaccurately reported that MGA had begun working on the "Bratz" dolls in 1999 after conducting a fashion doll "contest." (*Id.* ¶ 3.) At that time, Mattel was suffering substantial losses in a variety of

MGA'S MOTION FOR PROTECTIVE ORDER

CC 00343

EXHIBIT _20_ PAGE _3/7_

1 | product lines including "Barbie," which reportedly was being dethroned even more
2 | rapidly with the increase in the "Bratz" dolls' popularity.  According to published reports,
3 | the "Barbie" line accounted for the great majority of Mattel's revenues. (*Id.*)

4       Since that time, MGA has learned that Mattel has been in contact with a wide
5 | variety of people involved in litigation against MGA.  First, Mattel entered into an
6 | information sharing agreement with a company in Hong Kong that was producing and
7 | distributing counterfeit "Bratz" products.  Second, Mattel has been in contact with Art
8 | Attacks, LLC, a company suing MGA for purported trademark infringement of its
9 | "Spoiled Brats" airbrush art.  Finally, and importantly, Mattel appears to have been
10 | providing Mr. Larian with assistance in this arbitration.  All of Mattel's efforts have been
11 | designed to undermine MGA's rights to the "Bratz" line of products in a last-ditch effort
12 | to save its ailing "Barbie" line. (*Id.* ¶ 4.)

13       Mattel has been unable to conduct discovery of MGA in its case against Bryant
14 | since May 2005 because of an interlocutory appeal Mattel filed at that time. (*Id.* ¶ 5.)  In
15 | Farhad Larian, however, Mattel has found an ally eager and willing to help Mattel bypass
16 | the discovery stay.  Using home address lists he improperly took from MGA, Farhad
17 | Larian has spent the past few months repeatedly calling MGA's current and former
18 | employees and contractors in an effort to obtain confidential information about MGA's
19 | product development.  He persisted in these efforts even though MGA – and those he
20 | called – complained about his harassing conduct.  MGA also learned that Mattel was
21 | calling many of these very same witnesses at or about the same time that Farhad Larian
22 | was calling them. (*Id.* ¶¶ 6-7.)  And, MGA has learned that Farhad Larian apparently has
23 | obtained information from Mattel and provided that information to Art Attacks. (*See*
24 | Declaration of Paula E. Ambrosini ("Ambrosini Decl.") filed concurrently ¶¶ 3-4.)

25       MGA is not a party to the instant dispute between its CEO Isaac Larian and his
26 | brother Farhad Larian, and has not participated in this matter.  MGA is nonetheless
27 | legitimately concerned that Farhad Larian seeks to use this arbitration as a means of
28 | obtaining information that he can then disclose, to MGA's detriment, to MGA's

- 3 -

MGA'S MOTION FOR PROTECTIVE ORDER

1   competitors and adversaries. (Gronich Decl. ¶ 8.)  Neither MGA's corporate interest nor

2   the interests of its many employees who have worked tirelessly on the "Bratz" line of

3   products should be compromised in this way because of what is essentially a dispute

4   among family members. (*Id.* ¶ 14.)

5   **III.    MGA IS ENTITLED TO PROTECT FROM DISCLOSURE THE**
        **CONFIDENTIAL, PROPRIETARY, TRADE SECRET AND**
6       **COMMERCIALLY SENSITIVE INFORMATION SOUGHT BY FARHAD**
        **LARIAN.**
7

8        The ADR rules specifically give the arbitrator power and authority to "issue orders

9   to protect the confidentiality of proprietary information, trade secrets or other sensitive

10  information."[1]  (*See* ADR Rule 27.)  A third party – such as MGA is here – is

11  presumptively entitled to a protective order limiting the disclosure of its confidential,

12  proprietary information. *See. e.g., Harris v. Sup. Ct.*, 3 Cal. App. 4th 661, 668 (1992)(trial

13  court required to limit the scope of inquiry to the extent necessary to a fair resolution of

14  the case).  Such an order is appropriate and should issue here.[2]

15  **A.    Farhad Larian Seeks To Obtain and Use Confidential and Trade**
        **Secret Documents Belonging to MGA.**

16       At the hearing, Farhad Larian seeks to obtain and use confidential and proprietary,

17  trade secret documents.  Farhad Larian has issued a subpoena for, among other things,

18  internal and private financial information relating to MGA's product pricing, costs, sales

19  and projections.  He also seeks documents that contain trade secret and proprietary details

20  relating to MGA's development, marketing, licensing and sale of a wide array of products,

21  including MGA's "Bratz" line of fashion dolls and related toys and accessories.  Indeed,

22  some of the documents depict trade secret ideas, designs and concepts that have not yet

23  _____

24  [1] Even if the ADR rules do not specifically apply to this arbitration, Rule 27 is representative of
    the powers the arbitrator has.  California and Federal Rules of Civil Procedure confer similar
25  power and authority on California and Federal Courts Judges to issue protective orders limiting
    the use and dissemination of confidential information. *See* Cal. Code Civ. Proc. 2031.060 (b)(5)
26  (authorizing court to order that "a trade secret or other confidential research, development, or
    commercial information not be disclosed, or be disclosed only to specified person or only in a
27  specified way"); Fed. R. Civ. Proc. 26 (c)(7) (authorizing court to order "that a trade secret or
    other confidential research, development, or commercial information not be revealed or be
28  revealed only in a designated way").
    [2] A Proposed Order is attached hereto as Exhibit A.

- 4 -                                                    MGA'S MOTION FOR PROTECTIVE
                                                                          ORDER
                                                         CC 00345

EXHIBIT 20  PAGE 319

1   been commercially marketed by MGA.  Others include detailed specifications for "Bratz'"
2   eye designs and facial features, including paint colors for the eyelids, eye shadow, iris
3   color, lip and cheek color and color placement, and detailed specifications for "Bratz" hair
4   characteristics, including color, weight and curl size.  Still others disclose confidential
5   product production and development information including production and development
6   schedules lead times, capacity information and ramp-up times.  Certain documents
7   additionally disclose confidential concept drawings and proposed names of "Bratz"
8   characters that have never been publicly revealed. (Gronich Decl. ¶ 9.)  Apart from the
9   fact that such information cannot reasonably be deemed relevant to a dispute relating to
10  events taking place in 2000 well before the "Bratz" dolls were fully developed, finalized
11  or commercially introduced, this type of information too is unquestionably proprietary,
12  trade secret or competitively sensitive information and, thus, entitled to protection.  ADR
13  Rule 27; *see Sprinturf, Inc. v. Southwest Recreational Industries, Inc.*, 216 F.R.D. 320,
14  324 (E.D.Pa. 2003)(finding proprietary information regarding the development of product
15  line to be confidential, sensitive and appropriate for protective order); *see also, e.g., Vacco*
16  *Inds., Inc. v. Van Den Berg*, 5 Cal. App. 4th 34 (1992)(drawings, plans, designs and
17  similar documents relating to a company's products may constitute trade secrets);
18  *Components for Research, Inc. v. Isolation Prods., Inc.*, 241 Cal. App. 2d 726, 728-29
19  (1966)(production techniques and manufacturing "know-how" may be trade secret); *MAI*
20  *Sys. Corp. v. Peak Computer, Inc*, 991 F.2d 511, 522 (9th Cir. 1993)(technical data, not
21  generally known to the public, is trade secret); *Formulabs, Inc. v. Hartley Pen Co.*, 318
22  F.2d 485 (9th Cir. 1963)(formulas and dyes used in product manufacturing, and product
23  testing procedures, are trade secret).
24        Indeed, the detailed information that Farhad Larian has asked MGA to produce
25  would provide a virtual road-map for the production of a "Bratz" doll and could obviously
26  be used to MGA's competitive injury and disadvantage. Collectively, the documents
27  disclose exactly how MGA took "Bratz" from idea, to concept, to design, to production,
28  how long it took, what steps MGA followed, what its internal approval processes were,

-5-

MGA'S MOTION FOR PROTECTIVE ORDER

CC 00346

EXHIBIT 20 PAGE 320

1   what designs it considered and rejected and similar information.  Such information would

2   be of great value to MGA's competitors and, in the wrong hands, could wreak havoc on

3   MGA's business, jeopardize its competitive position in the toy industry, and cause MGA

4   severe and extensive damage.

**B.   Farhad Larian Seeks Testimony From MGA Personnel and Contractors Concerning MGA Proprietary and Trade Secret Information.**

7      The disclosure of its documents is not MGA's only concern.  Many of the people

8   that Farhad Larian intends to call as witnesses at the arbitration, apparently to testify at the

9   arbitration about the conception and development of the "Bratz" dolls, will also be

10   prominent witnesses in MGA's litigation with Mattel on the same subjects.  Thus, the

11   testimony generated during the arbitration is also likely to disclose MGA trade secrets and

12   proprietary and confidential financial and product development information.  MGA, as a

13   third party, however, will not be able to object or otherwise attempt to curtail such

14   disclosures.  Nor will MGA be able to cross-examine the witnesses or present rebuttal

15   testimony and evidence.  MGA is, thus, also concerned about the potential disclosure of

16   information obtained through the testimony of its witnesses during the arbitration hearing.

**C.   MGA Has Legitimate Concerns That Farhad Larian May Share Its Confidential, Proprietary Trade Secret Information With MGA's Competitors And Adversaries.**

19      MGA is – and has reason to be – concerned that documents produced and

20   testimony generated during the course of this arbitration will be disclosed to its

21   competitors or to other parties adverse to MGA.  MGA is currently involved in a high-

22   stakes litigation with its fiercest competitor, Mattel, over the ownership rights to the

23   "Bratz" line of dolls (*Mattel v. Bryant,* case number CV 04-9059 NM (RnBx) in the

24   United States District Court for the Central District of California.)[3]).  In the course of that

25   litigation, MGA has learned that Mattel has entered into at least one document sharing

---

[3] In a nutshell, Mattel contends that it owns the rights to the "Bratz" line of dolls by virtue of the fact that the creator of the original "Bratz" artwork is a former Mattel employee.  Mattel sued the creator in April 2004, and MGA has intervened to protect its rights.  That case is pending in the United States District Court in Los Angeles but all discovery in the case is currently stayed pending the outcome of an interlocutory appeal over federal jurisdiction.

MGA'S MOTION FOR PROTECTIVE ORDER

CC 00347

EXHIBIT 20 PAGE 321

1   agreement with a party adverse to MGA in another litigation, through which Mattel has

2   received information and documents produced in that case. (Gronich Decl. ¶ 4;

3   Ambrosini Decl. ¶ 2.)  Because Mattel currently manufactures and sells fashion dolls that

4   directly compete with "Bratz" dolls in the same market for the same customers, it

5   obviously has a keen interest in obtaining any competitively sensitive information it can

6   regarding "Bratz," from any source.  The Protective Order in place in the *Mattel v. Bryant*

7   case, however, prevents Mattel from using the information that it obtains there for

8   purposes other than that litigation.  If Mattel could get the same information from another

9   source, however, such as Farhad Larian, it would potentially be free to use the information

10   in any way it chose. (Ambrosini Decl. ¶ 2.)

11          Farhad Larian appears to be in close, cooperative contact with Mattel and other

12   MGA adversaries.  He has already obtained a partial transcript of a deposition taken in the

13   Mattel litigation (which could have been obtained only from Mattel) and given it to

14   another party adverse to MGA, Art Attacks Ink, LLC, who is suing MGA for trademark

15   infringement in the Southern District of California. (Ambrosini Decl. ¶¶ 3-4.)  In addition

16   to this, Farhad Larian has moved to intervene in the Art Attacks' case for the sole purpose

17   of obtaining confidential MGA documents. (Ambrosini Decl. ¶ 5.)[4]  Indeed, Farhad

18   Larian has used this arbitration as an excuse for trying to obtain access to confidential

19   documents in the Art Attacks case – claiming he needs them for the arbitration when, in

20   fact, the arbitration will be over before his motion will be heard.[5]  (*Id.*)

21          **D.     MGA Is Entitled To Stringent Protective Measures To Prevent
22                   The Disclosure Of Its Confidential, Proprietary and Trade Secret
                     Information.**

23          There is no reason that MGA should have to run the risk that its confidential,

24   proprietary and trade-secret information may become freely available to all, just because it

25   and its employees have been served with third-party subpoenas.  On the contrary, the

26   Larian arbitration is a private proceeding, arranged by contract; it is not a public trial.  *See*

27   ────────────────
[4] A true and correct copy of the Motion is attached to the Ambrosini Declaration as Exhibit 1.
[5] Farhad Larian's Motion for Intervention to allow him access to confidential information in the
28   Art Attacks case is currently scheduled to be heard on December 12. (Ambrosini Decl. ¶ 5.)

-7-
                                                        MGA'S MOTION FOR PROTECTIVE
                                                        ORDER

CC 00348

EXHIBIT 20 PAGE 322

1   *O'Flaherty v. Belgum,* 115 Cal. App. 4th 1044, 9 Cal. Rptr. 3d 286 (2004)("Arbitration is

2   a private proceeding, arranged by contract.")(citing *Rifkind & Sterling, Inc., v. Rifkind,* 28

3   Cal. App. 4th 1282, 1290, 33 Cal. Rptr. 2d 282 (1994)). In fact, ADR Rule 13 requires

4   that "[t]he arbitrator and ADR Services shall maintain the privacy of the hearings unless

5   the law provides to the contrary." Thus, whereas a public Court may balance the public's

6   right to access against a litigant's need to protect confidential information, such

7   considerations have no application here. Indeed, as ADR notes on its website, the private,

8   confidential nature of arbitration is one of its attractive benefits. (*See*

9   adrservices.org/processes.htm (mentioning a number of advantages that arbitration

10   provides over a court trial, including that "the arbitration process is private and

11   confidential" and stating that "[c]ontractual arbitration and arbitration by stipulation are

12   private. . .").

13      An appropriate Protective Order restricting access to and use and dissemination of

14   MGA's documents and transcripts of the arbitration will fairly balance the interests of all

15   concerned, allowing Farhad Larian to arbitrate his claims, while guarding against

16   potentially harmful side effects that could compromise MGA's proprietary interests and

17   cause competitive injury and disadvantage to MGA. *See e.g., Moskowitz v. Sup. Ct.,* 137

18   Cal. App. 3d 313, 318-19 (1982)(limiting use of information to purposes related to lawsuit

19   and limiting access to persons with a legitimate interest in the lawsuit); *Brown Bag*

20   *Software v. Symantec Corp.,* 960 F.2d 1465, 1470 (9th Cir. 1992)(limiting access to trade

21   secret material to counsel of record); *see also, e.g., Liberty Felder v. Curtiss Anthony*

22   *Corp.,* 90 F.R.D. 80, 83 (S.D. Ohio 1981) (employing protective order to limit access and

23   use confidential information); *Chesa Intern., Ltd. v. Fashion Associates, Inc.,* 425 F.

24   Supp. 234, 237 (S.D.N.Y. 1977) (restricting access to competitive information to

25   "plaintiff's attorneys *only*")(emphasis in original); *Safe Flight Instr. Corp. v. Sundstrand*

26   *Data Control Inc.,* 682 F. Supp. 20, 22 (D. Del. 1988) (limiting access to attorneys only

27   of, among other things, confidential research and development information in patent

28   case); *Borden Co. v. Sylk,* 289 F. Supp. 847, 848-49 (E.D.Pa. 1968) (ordering discovery

- 8 -

MGA'S MOTION FOR PROTECTIVE ORDER

CC 00349

EXHIBIT 20 PAGE 323

1   on condition that it not be revealed or used for any purpose other than preparation for

2   trial); *Miles v. Boeing Co.*, 154 F.R.D. 112, 116 (E.D.Pa. 1994) (placing restrictions on

3   access and use of confidential information).

4          Specifically, MGA requests an order – such as that appended hereto as Exhibit A –

5   providing (1) that the documents that MGA produces pursuant to the subpoena, the

6   information contained therein, and the testimony elicited during the arbitration shall not

7   be used for any purpose other than arbitrating Farhad Larian's claims against Isaac Larian;

8   (2) that, in keeping with the protective orders entered by the United States District Courts

9   for the Central and Southern Districts of California (as well as other tribunals), the

10   documents produced by MGA or concerning MGA's business and the testimony about

11   same shall be deemed "Attorneys Eyes Only" and Farhad Larian shall not be permitted to

12   view, obtain, access or copy those documents or the transcripts of the arbitration and that

13   such documents, transcripts and any copies thereof, shall be destroyed at the completion

14   of the arbitration and the expiration of any appeal (or time to appeal) thereof; and (3) that

15   neither Farhad Larian nor his counsel shall be permitted to share or disseminate the

16   documents or transcripts to others, remove them from the arbitration, make copies of

17   them, or inform third parties of their existence or content or otherwise disclose the same to

18   anyone, unless compelled by law.  In other words, whatever may be disclosed about

19   MGA's business, in privacy and confidence during the course of the arbitration, should

20   remain private and confidential both during – and after – the arbitration.  In addition,

21   MGA respectfully requests that the arbitrator exercise discretion and not allow Farhad

22   Larian to explore areas of confidential information that have no bearing on the instant

23   arbitration.

24          ADR Rule 27 gives the arbitrator power and authority to issue such an order and to

25   exercise such discretion.  For the reasons discussed, there is ample reason to do so.

26   MGA's Motion should be granted.

27   **IV.   CONCLUSION**

28          MGA's should be granted a Protective Order to restrict access to confidential,

- 9 -

MGA'S MOTION FOR PROTECTIVE ORDER

CC 00350

EXHIBIT 20 PAGE 324

1   proprietary, trade secret and commercially and competitively sensitive information that

2   may be disclosed, in documents or testimony, during the course of this arbitration, limit

3   the use of such information to the purposes of this proceeding, and prohibit the

4   dissemination of such information to others not party to the proceeding.

5

6   Dated: November 14, 2005

7                           DIANA M. TORRES
                                 PAULA E. AMBROSINI

8                         O'MELVENY & MYERS LLP

9

10                By: _____

11                       Paula E. Ambrosini
                       Attorneys for Third-Party,

12                       MGA Entertainment, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                              CC 00351

28

MGA'S MOTION FOR PROTECTIVE ORDER

EXHIBIT _20_ PAGE _325_

# EXHIBIT A

CC 00352

EXHIBIT 20 PAGE 324

1   DIANA M. TORRES (S.B. #162284)
    PAULA E. AMBROSINI (S.B. #193126)
2   CARLOS M. LAZATIN (S.B. #229650)
    O'MELVENY & MYERS, LLP
3   400 South Hope Street
    Los Angeles, California 90071-2899
4   Telephone: (213) 430-6000
    Facsimile: (213) 430-6407
5   email:   dtorres@omm.com

6   DALE M. CENDALI (of counsel, not admitted in
    California)
7   O'MELVENY & MYERS, LLP
    7 Times Square
8   New York, New York 10036
    Telephone: (212) 326-2000
9   Facsimile: (212) 326-2061

10  Attorneys for Third Party,
    MGA Entertainment, Inc.

11

12              ARBITRATION BEFORE

13              ADR SERVICES, INC.

14

15  FARHAD LARIAN,                    ADRS Case No.: 05-2096-ABH

16              Plaintiff,            [PROPOSED] PROTECTIVE ORDER

17         v.

18  ISAAC LARIAN,

19              Defendant.

20

21

22

23

24

25

26

27

28

LA2:782144.1

CC 00353

EXHIBIT 20 PAGE 327

1. **PURPOSES AND LIMITATIONS**

This arbitration will involve the disclosure of documents and information that should be used only for the purpose of prosecuting, defending, or attempting to settle this arbitration and for no other purpose, including any other dispute involving any Party hereto or any non-party hereto.  Accordingly, the following Protective Order is hereby imposed upon the parties to this arbitration, Isaac Larian and Farhad Larian, and their employees, consultants, retained experts, counsel and support staff (the "Parties").

2. **SCOPE**

Protection is conferred by this Protective Order on all documents produced by third party MGA Entertainment, Inc. ("MGA") to Farhad Larian in response to a subpoena, all information copied or extracted therefrom, all copies, excerpts, summaries, or compilations thereof, and all testimony presented to the arbitrator, and transcripts of such testimony from any current or former MGA employee or contractor pertaining to MGA's business.  ("Protected Material").

3. **DURATION**

The obligations imposed by this Protective Order shall remain in effect during and after this arbitration and until the parties, Isaac Larian *and* Farhad Larian, and MGA agree otherwise, in writing, or an arbitrator or court order otherwise directs.

4. **ACCESS TO AND USE OF PROTECTED MATERIAL**

4.1    <u>**Basic Principles:**</u>  The Parties may use Protected Material in connection with this case only for prosecuting, defending or attempting to settle this arbitration and may not use such material for any other purposes, including in connection with any other matters, including between the same parties.  Protected Material may be disclosed only to the categories of persons and under the conditions described in this Protective Order.  When the arbitration has been terminated, the Parties must comply with the provision of section 5 below (FINAL DISPOSITION).  Protected Material must be stored and maintained by the Parties at a location and in a secure manner that ensure that access is

LA2:782144.1

- 2 -

**CC 00354**

EXHIBIT 20 PAGE 38

1    limited to the persons authorized and for the purposes permitted under this Protective

2    Order.

3        **4.2    Disclosure of Protected Material:**  Unless otherwise ordered by a court or

4    jointly permitted in writing by Isaac Larian *and* MGA, Protected Material may be

5    disclosed only to:

6             (a)     counsel of record in this arbitration and employees of said counsel to

7    whom it is reasonably necessary to disclose the information for this arbitration, and who

8    have specifically agreed to be bound by the terms of this Protective Order by executing

9    the undertaking attached hereto as Exhibit A;

10            (b)     experts to whom disclosure is reasonably necessary for this

11   arbitration, and who have specifically agreed to be bound by the terms of this Protective

12   Order by executing the undertaking attached hereto as Exhibit A;

13            (c)     the arbitrator and his personnel;

14            (d)     court reporters, their staffs, and professional vendors to whom

15   disclosure is reasonably necessary for this arbitration, and who have specifically agreed to

16   be bound by the terms of this Protective Order by executing the undertaking attached

17   hereto as Exhibit A;

18            (e)     witnesses in the arbitration to whom disclosure is reasonably

19   necessary, and who have specifically agreed to be bound by the terms of this Protective

20   Order by executing the undertaking attached hereto as Exhibit A; and

21            (f)     the author of the document or the original source of the information.

22       **4.3    Identifying Legend:**  Protected Material shall be appropriately identified

23   and marked with the legend "Confidential" or "Confidential – Attorneys Only."

24   Transcripts shall further include a statement substantially in the following form:

25       This transcript contains material subject to Protective Order.  The transcript may not

26       be used for any purpose other than this arbitration and its contents may not be

27       disclosed to anyone other than those persons permitted to access Protected Material

28       under the terms of the Protective Order.

LA2:782144.1                              - 3 -

CC 00355

EXHIBIT _20_ PAGE_329_

1       **4.4**   Other Restrictions on Access to and Use of Protected Material:  No

2    party or person shall be permitted to share or disseminate the documents produced by

3    MGA or the transcripts of these proceedings to others, remove them from the arbitration,

4    make copies of them, or inform third parties of their existence or content or otherwise

5    disclose the same to anyone, unless compelled by law.

6        In short, this is a private proceeding; whatever may be disclosed about MGA's

7    business, in privacy and confidence during the course of the arbitration, should remain

8    private and confidential both during – and after – the arbitration.

9    **5.**    **FINAL DISPOSITION**

10        Unless otherwise ordered or jointly agreed in writing by Isaac Larian *and*

11    Farhad Larian, within 10 days after the final termination of this arbitration and any appeal

12    (or, if no notice of appeal is filed, the deadline for filing a notice of appeal), all Protected

13    Material must be returned to its original source or destroyed, including all copies,

14    abstracts, compilations, summaries or any other form of reproducing or capturing any of

15    the Protected Material.  Whether the Protected Material is returned or destroyed, each

16    Party must submit a written certification to the other Party, *and* the person or entity from

17    whom the Protected Material was secured or subpoenaed, by the 10 day deadline that

18    identifies (by category, where appropriate) all of the Protected Material that was returned

19    or destroyed and that affirms that the Party has not retained any copies, abstracts,

20    compilations, summaries or other forms or reproducing or capturing any of the Protected

21    Material.  Notwithstanding this provision, counsel of record for each Party is entitled to

22    retain an archival copy of all pleadings, motion papers, legal memoranda, correspondence

23    or attorney work product.  Any such archival copies that contain or constitute Protected

24    Material, however, shall otherwise remain subject to this Protective Order.

25    **6.**    **PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED**
             **IN OTHER LITIGATION**

26

27        If a Party is served with a subpoena or an order issued in other litigation that

would compel disclosure of any Protected Material, the Party receiving the subpoena must

28

EXHIBIT 20 PAGE 330

1    notify the other Party *and* the person or entity from whom the Protected Material was

2    secured or subpoenaed, in writing, immediately and in no event more than two business

3    days after receiving the subpoena or order.  Such notification must include a copy of the

4    subpoena or court order.

5           The Party receiving the subpoena also must immediately inform, in writing, the

6    party who caused the subpoena or order to issue in the other litigation that some or all of

7    the material covered by the subpoena or order is the subject of this Protective Order.  In

8    addition, the Party receiving the subpoena must deliver a copy of this Protective Order

9    promptly to the Party in the other action that caused the subpoena or order to issue.

10          The purpose of imposing these duties is to alert the interested parties to the

11   existence of this Protective Order and afford the Parties in this case *and* the person or

12   entity from whom the Protected Material was secured or subpoenaed, an opportunity to try

13   to protect whatever confidentiality interest such Party may have in the court from which

14   the subpoena or order issued.

15

16   SO ORDERED:

17   DATED:_____          _____

18

19

20

21

22

23

24

25

26

27

28

LA2:782144.1                          - 5 -                    CC 00357

EXHIBIT 20 PAGE 331

1  UNDERTAKING RE
   PROTECTIVE ORDER
2

3                         UNDERTAKING OF _____

4

5

6  I, _____, declare:

7

8      My address is _____.

9  My present occupation is _____.

10

11     1.    I have received a copy of the Protective Order operative in this action,

12 ADRS Case No. 05-2096-ABH. I have carefully read and understand the provisions of

13 the Protective Order.

14     2.    I will comply with all of the provision of the Protective Order. I will hold in

15 confidence, and will not disclose to anyone other than those persons specifically

16 authorized by the Protective Order, and will not copy or use except for the proceedings

17 concerning the matters in issue between the parties, any and all Protected Material that I

18 receive.

19     Executed this _____ day of _____, at _____. I declare under

20 penalty of perjury under the laws of California that the foregoing is true and correct.

21

22                         _____

23

24

25

26

27

28

LA2:782144.1                      - 6 -                      **CC 00358**

EXHIBIT 20 PAGE 332

1

## PROOF OF SERVICE

2

I, Linda M. Rich, declare:

3

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 400 South Hope Street, Los Angeles, California 90071-2899.  On November 14, 2005, I served the within documents:

4

5

1.   **THIRD PARTY MGA ENTERTAINMENT INC.'S MOTION FOR PROTECTIVE ORDER**

6

7

| | |
|---|---|
| [X] | by transmitting via facsimile machine the document(s) listed above to the fax number(s) set forth below on this date.  The outgoing facsimile machine telephone number in this office is (213) 430-6407.  The facsimile machines used in this office create a transmission report for each outgoing facsimile transmitted.  A copy of the transmission report(s) for the service of this document, properly issued by the facsimile machine(s) that transmitted this document and showing that such transmission was (transmissions were) completed without error, is attached hereto. |
| [X] | by transmitting via e-mail the document(s) listed above to the e-mail address(s) set forth below on this date. |
| [X] | by putting a true and correct copy thereof, together with an unsigned copy of this declaration, in a sealed envelope designated by the carrier, with delivery fees paid or provided for, for delivery the next business day to the person(s) listed above, and placing the envelope for collection today by the overnight courier in accordance with the firm's ordinary business practices.  I am readily familiar with this firm's practice for collection and processing of overnight courier correspondence.  In the ordinary course of business, such correspondence collected from me would be processed on the same day, with fees thereon fully prepaid, and deposited that day in a box or other facility regularly maintained by Federal Express, which is an express carrier. |

### PLEASE SEE ATTACHED SERVICE LIST

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on November 14, 2005, at Los Angeles, California.

_____
LINDA M. RICH

CC 00359

EXHIBIT 20 PAGE 333

1

## SERVICE LIST

| Kabateck Brown Kellner LLP | Cotkin, Collins & Ginsburg |
|---|---|
| Michael R. Brown | Robert G. Wilson |
| Richard L. Kellner | 300 South Grand Avenue |
| 350 S. Grand Avenue | 24th Floor |
| 39th Floor | Los Angeles, CA 90071-3134 |
| Los Angeles, CA 90071 | (213) 688-9350 Telephone |
| (213) 217-5000 Telephone | (213) 688-9351 Fax |
| (213) 217-5010 Fax | rgw@ccglaw.cc |
| mrb@kbklawyers.com | |
| rlk@kbklawyers.com | |

LA2:782602.1

**CC 00360**

EXHIBIT _20_ PAGE _334_

**EXHIBIT 21**

CONFORMED COPY

FILED

Hon. Edward A. Infante (Ret.)
JAMS
Two Embarcadero Center
Suite 1500
San Francisco, CA  94111
415-774-2611
415-982-5287 (fax)

2007 JAN 26  PM 12: 25

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>              Plaintiff,<br><br>       v.<br><br>MATTEL, INC., a Delaware corporation,<br><br>              Defendant.<br><br>CONSOLIDATED WITH<br>MATTEL, INC. v. BRYANT and<br>MGA ENTERTAINMENT, INC. v. MATTEL, INC. | CASE NO. C 04-09049 SGL (RNBx)<br>JAMS Reference No. 1100049530<br><br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-2727<br><br>**ORDER GRANTING MATTEL'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS** |

I. INTRODUCTION

On January 3, 2007, Mattel, Inc. ("Mattel") submitted its Motion to Compel Production of Documents to the undersigned Discovery Master for disposition.[1]  On January 11, 2007, Carter Bryant ("Bryant") submitted his opposition brief, and on January 18, 2007, Mattel submitted a reply brief.  The matter was heard via telephonic conference call on January 24, 2007.  Having

---

[1] Pursuant to a stipulation and order filed December 6, 2006, the undersigned was designated Discovery Master in accordance with Rule 53 of the Federal Rules of Civil Procedure.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

1

1-26

EXHIBIT 21 PAGE 335

EXHIBIT 21 PAGE 336

1   considered the motion papers and comments of counsel at the hearing, Mattel's Motion to Compel

2   Production of Documents is GRANTED.

3                                    II.  BACKGROUND

4       At the heart of this lawsuit is a dispute over the rights to the "Bratz" dolls.  This highly

5   lucrative line of dolls was first conceived by Bryant, a former Mattel employee, and made

6

7   commercially available by MGA Entertainment, Inc. ("MGA") in the summer of 2001.  Sales of

8   Bratz dolls now rival Mattel's Barbie doll.

9       A.  Mattel's Original Complaint

10

11      On April 27, 2004, Mattel, the world's largest manufacturer and marketer of toys, filed

12  suit against its former employee Bryant in state court asserting claims for breach of contract,

13  breach of fiduciary duty, breach of duty of loyalty, unjust enrichment, and conversion.  Mattel

14  employed Bryant as a product designer from September 1995 through April 1998, and from

15

16  January 1999 through October 2000.  Upon starting his second term, Bryant signed an Employee

17  Confidential Information and Inventions Agreement which required him not to engage in any

18  employment or business other than for Mattel, or invest or assist in any manner any business

19  competitive with the business or future business plans of Mattel.  Bryant also assigned to Mattel

20  all rights, title, and interest in the "inventions" he conceived of, or reduced to practice, during his

21  employment.

22

23      In addition, Bryant completed Mattel's Conflict of Interest Questionnaire, certifying that

24  he had not worked for any of Mattel's competitors in the prior twelve months and had not

25  engaged in any business dealings creating a conflict of interest.  Bryant agreed to notify Mattel of

26  any future events raising a conflict of interest.

27

28      Mattel alleges that during his employment, Bryant secretly aided, assisted and worked for

29  a Mattel competitor (later identified as MGA).  Bryant entered into an agreement with MGA to

EXHIBIT 21 PAGE 337

provide product design services on a "top priority" basis.[2]  The agreement further provided that Bryant would receive royalties and other consideration for sales of products on which he provided aid or assistance; that all work and services furnished by Bryant to MGA under the agreement would be considered "works for hire"; and that all intellectual property rights to preexisting work by Bryant purportedly would be assigned to MGA.  Mattel further alleges that Bryant converted, misappropriated and misused Mattel property and resources while he was employed at Mattel.  In the complaint, Mattel claims ownership of all inventions and works created by Bryant during his Mattel employment and seeks to recover all benefits obtained as a result of his alleged breach of duties.

In May of 2004, Bryant removed the state court action to the U.S. District Court, asserting subject matter jurisdiction under both 28 U.S.C. §1331 (federal question jurisdiction) and 28 U.S.C. §1332 (diversity jurisdiction).  Mattel filed a motion to remand and submitted a copy of Bryant's agreement with Mattel's competitor, namely MGA.  The agreement was dated September 18, 2000 – a time when Bryant was still employed by Mattel — and required Bryant to provide MGA with design services for the Bratz dolls.  In return, MGA agreed to compensate Bryant at a monthly rate for a period of time and to pay Bryant a 3% royalty on sales of Bratz dolls.  In August of 2004, the district court remanded the action.

B.  Bryant's Cross-complaint

In September of 2004, after the case was returned to state court, Bryant filed a cross-complaint against Mattel to challenge the legality of Mattel's Employee Confidential Information and Inventions Agreement.  Bryant's cross-complaint included claims for unfair competition, rescission, declaratory relief, and fraud.

//

---

[2]  Bryant has already produced his agreement with MGA.  Therefore, the existence of the agreement does not appear to be in dispute.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                                                          3

EXHIBIT _21_ PAGE _336_

—

C. <u>Bryant's Second Notice of Removal (CV 04-9059)</u>

In November of 2004, Bryant filed a second notice of removal, once again invoking federal question and diversity jurisdiction. Bryant asserted that Mattel's complaint presented a federal question because events occurring since the first removal and remand demonstrated that Mattel's conversion claim involved the rights to the Bratz dolls, and therefore was preempted by the Copyright Act. Bryant also contended that there was diversity jurisdiction because he and Mattel were citizens of different states and the amount in controversy exceeded the $75,000 jurisdictional limit because the rights to the Bratz dolls were at stake. After the second notice of removal, MGA intervened as a defendant pursuant to a stipulation and order.

D. <u>Bryant's Declaratory Relief Action Against Mattel (CV 04-9049)</u>

On the same day that Bryant filed his second notice of removal, he also filed a complaint in federal court seeking a declaratory judgment that the Bratz dolls do not infringe Mattel's copyrights in a project known as "Toon Teens."

E. <u>MGA's Complaint Against Mattel (CV 05-2727)</u>

In April of 2005, MGA filed suit against Mattel alleging essentially unfair competition claims. MGA alleged that Mattel engaged in "serial copycatting" of Bratz dolls, Bratz "pets" and other Bratz products, Bratz television commercials, and Bratz packaging.

F. <u>Mattel's Second Motion to Remand its Complaint against Bryant</u>

Mattel filed another motion to remand its suit against Bryant. In March of 2005, the district court issued an order denying the motion to remand and certifying the order for interlocutory review. Mattel filed an appeal, and the district court stayed discovery in May of 2005. Discovery did not resume until May 2006, when the Ninth Circuit affirmed the district court ruling. After the stay was lifted the district court consolidated all three actions for all purposes. There is no scheduling order currently in place.

EXHIBIT 21 PAGE 339

### G. Court Dismisses Bryant's Cross-claims and Declaratory Relief Action

In July of 2006, the district court dismissed Bryant's cross-claims pursuant to Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim upon which relief may be granted. The district court also dismissed Bryant's declaratory relief action, finding there existed no reasonable apprehension of an imminent copyright infringement claim against him by Mattel based upon Mattel's Toon Teen intellectual property.

### H. Mattel's Counterclaims against MGA

Mattel sought leave to file an amended complaint in case no. CV 05-9059 to add five defendants and nine new legal claims alleging a wide range of commercial disputes. For example, Mattel's proposed amended complaint contains RICO claims, a trade secret misappropriation claim, and aiding and abetting claims predicated on allegations that MGA cherry-picked certain high ranking Mattel executives or designers and then enticed them to steal Mattel's trade and proprietary secrets and deliver them to MGA before beginning work with MGA. Mattel also sought leave to add a copyright infringement claim. Mattel has recently filed copyright registrations with the U.S. Copyright Office claiming ownership in various Bratz doll designs created by Bryant.

On January 11, 2007, the district court granted Mattel leave to file its proposed amendments, but only insofar as they are pled in the form of an amended answer and counterclaim in the case MGA filed against Mattel, CV 05-2727. The next day, Mattel filed its amendments as ordered in case no. CV 05-2727.

### I. Mattel's Requests for Production of Documents

Mattel served the requests for production of documents at issue in this motion on June 14, 2004. Bryant served objections and responses on July 16, 2004. The parties met and conferred, but ultimately Mattel moved to compel production in January of 2005. That motion, however,

1   was not heard before the district court stayed all discovery pending resolution of Mattel's appeal

2   to the Ninth Circuit on subject matter jurisdiction issues.

3        After the stay of discovery was lifted, the parties met and conferred on June 20, 2006, at

4   the courthouse, and were able to achieve apparent agreement on the bulk of the present motion to

5   compel.  The parties informed the court that they would submit a stipulation and order.  See

6   

7   Minutes dated June 20, 2006, Zeller Dec. Ex. 6 ("With respect to Mattel's Motion to Compel

8   Production of Documents, counsel will be submitting a stipulation and order which will be

9   dispositive of all the issues in dispute.").

10       Over the next several months, the parties exchanged draft stipulations and orders to

11  memorialize the parties' meet and confer session, but were unable to reach final agreement

12  because Bryant insisted upon including the following sentence in the stipulation:  "The stipulation

13  resolves all issues raised in Mattel's motion to compel, which is hereby withdrawn."  Bryant's

14  Opposition at 1:18-20.  By including this sentence, Bryant intended to prevent further law and

15  motion regarding the requests at issue in Mattel's original motion to compel.  Id. at 1:21-23.

16  From Mattel's perspective, however, the proposed sentence amounted to a demand that Mattel

17  waive its right to all further discovery in connection with its requests.  Mattel proposed the

18  following provision as an alternative:

19  

20         Except as, and only as set forth in the terms of Paragraph One above, nothing in
           this Stipulation shall preclude or limit Mattel from seeking further discovery on
21         any matter, including as to matter on which the parties could not reach complete
           agreement, or preclude or limit any right of Bryant to object or resist to such
22         discovery.

23  Bryant's Opposition at 7:5-11.  Apparently Mattel's alternative language was

24  unacceptable to Bryant.  At the direction of the Discovery Master, the parties met and

25  conferred again in late December 2006, but to no avail.

26       Despite the parties' inability to reach final agreement, Bryant produced approximately

EXHIBIT 21 PAGE 341

1,600 pages of documents to date.  Mattel contends, however, that the production is inadequate and consistent with a pattern of stonewalling.[3]  Accordingly, Mattel filed the instant motion to compel responsive documents, which includes a request for sanctions in the amount of $7,805.

J.  Mattel's Motion to Compel Production of Documents

Mattel's motion has three parts.  First, Mattel seeks an order compelling Bryant to produce the following categories of requested documents:  (a) documents relating to Bratz designs created by Bryant while employed by Mattel; (b) doll prototypes created by Bryant while working for Mattel; (c) documents that refer to the conception, creating or development of Bratz; (d) Mattel-related documents that Bryant disclosed to MGA; (e) communications between Bryant and MGA that relate to Mattel or Mattel employees; and (f) documents showing what dolls Bryant was exposed to while working at Mattel.  Mattel's Motion at 6.  Mattel asserts that these categories of documents are relevant to establish Bryant's liability and would reveal works rightfully owned by Mattel.

Second, as to other categories of documents which Bryant has agreed to produce, Mattel contends that Bryant has imposed unjustified limitations.  According to Mattel, Bryant will not produce any responsive documents that were created after the suit was filed; Bryant will not produce any communications with MGA "created" after the end of his Mattel employment; Bryant is limiting production of Bratz-related documents to designs that, in Bryant's view, "resulted in" the first line of Bratz dolls released in June 2001; Bryant has not produced known contracts between him and MGA and refuses to produce non-privileged communications relating to those contracts; and Bryant has withheld all but one category of financial documents relating to

---

[3]  According to Mattel, Bryant evaded a deposition until Mattel obtained a court order compelling him to appear. Similarly, MGA allegedly refused to permit its CEO, Isaac Larian, from being deposed.  Mattel again obtained a court order compelling the deposition and sanctions.  To date, only Bryant and Larian have been deposed.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

7

EXHIBIT 21 PAGE 342

his earnings from his work for MGA.  Mattel's Motion at 7.  Mattel seeks full production of responsive documents without any of the limitations described above.

Third, Mattel contends that the documents Bryant has produced are inadequate for a number of reasons: the financial documents are so heavily redacted they are useless; faxed documents are missing fax header information, including the sending and receiving parties[4]; e-mails and other electronic documents that are known to exist have not been produced; Bryant refuses to inspect, and refuses to permit Mattel to inspect, the hard drive of a computer he used during the relevant period; and Bryant's privilege log is facially incomplete and lists only four documents.

K. Bryant's Opposition to Mattel's Motion to Compel

Bryant opposes Mattel's motion to compel.  He views the motion as nothing more than Mattel's unwillingness to allow closure on any discovery matter after a lengthy meet and confer process which began back in 2004.  Bryant emphasizes that the document requests at issue were first propounded at a time when Mattel was attempting to remand the case, making the claim that it did not know whether $75,000 was in controversy and insisting that it was asserting solely state law claims.  Bryant explains that given Mattel's view of the case in 2004, he took the position that discovery should be limited to what occurred in his last days at Mattel and shortly thereafter.  See Bryant's Opposition at 4-5 ("Bryant's activities and earnings in connection with Bratz in later years could have no conceivable relevance to the case because if those activities and earnings were at stake, the case was worth millions, not pennies.").  Accordingly, in the summer and fall of 2004, he produced the following categories of documents:  documents evidencing the artwork used to create the "First Generation" of Bratz dolls – the first dolls sold to the public in the summer of 2001; hundreds of pieces of artwork he was permitted to retain from his employment

---

[4]   There is evidence that MGA's CEO instructed an employee to obliterate the fax header on a fax Bryant sent to MGA from Mattel's Design Center.  MGA denies the accusation.

EXHIBIT _21_ PAGE _343_

at Mattel; MGA statements revealing his earnings connected with the sale of the First Generation Bratz dolls and his 2000 contract with MGA; personal phone records and bank records; and hundreds of three dimensional doll parts and toy accessories that came into his possession over the years, including a prototype of the First Generation "Jade" doll.

Bryant generally agrees with Mattel's description of the meet and confer session held at the courthouse on June 20, 2006 and the parties' exchange of draft stipulations. According to Bryant, all the requests addressed in Mattel's original motion to compel and the instant motion led to agreement on the following points: (a) Bryant would produce all agreements for work he performed with or on behalf of MGA prior to June 30, 2001 (the approximate date the First Generation Bratz dolls were released to the public); (b) Bryant would waive the attorney-client privilege with respect to communications with the attorney who assisted him in negotiating his contract with MGA, so long as that waiver would be limited and in no way waive the privilege with respect to litigation counsel; (c) Bryant would produce any documents relating to any payments he received from MGA while employed at Mattel, irrespective of the date of creation; (d) Bryant agreed to make a diligent search for all computers referenced in his deposition and search them for responsive documents; (e) Bryant agreed to produce all documents and tangible things obtained from Mattel during the course of his employment at Mattel; (f) Bryant agreed to conduct a search and produce any patent, trademark or copyright applications, registrations and other non-privileged documents in his possession in connection with his work with MGA prior to June 2001; (g) Bryant agreed to identify documents responsive to particular requests if Mattel could demonstrate that the requests asked for such identification of documents; (h) Bryant agreed to sign a verification that none of the information redacted from his phone records related to Bratz or his work for MGA prior to June 30, 2001; (i) Bryant agreed to supplement his privilege log; and (j) the parties agreed that the stipulation modified Bryant's prior response to the discovery

EXHIBIT _21_ PAGE _344_

requests and that the stipulation controlled to the extent they were inconsistent.  Bryant's Opposition at 5:22-6:21.

Bryant emphasizes that the parties have engaged in an extensive meet and confer process and asks the Discovery Master to order the disposition of this motion in a manner consistent with the parties' draft stipulation.  If the draft stipulation is not adopted, Bryant fears the parties will have no incentive to compromise in the future.  Bryant's Opposition at 1:24-2:3. Bryant also asks the Discovery Master to order Mattel not to revisit any of the requests that were the subject of Mattel's original motion to compel or the instant motion to compel.  Id. at 2:11-13 and 10:9-10.

Furthermore, Bryant asserts that Mattel's requests are overbroad in numerous respects.  In particular, Bryant asserts that Mattel is not entitled to all communications with MGA relating to Mattel employees.  Bryant also asserts that Mattel is not entitled to unredacted personal phone records and financial information because these records are protected by privacy rights.  Lastly, Bryant asserts that Mattel is not entitled to all Bratz related documents created after the lawsuit was filed.

### III. DISCUSSION

A. The Parties Did Not Reach a Stipulation to Resolve the Instant Motion

The parties' extensive submissions make it clear that the parties did not resolve the issues raised in the instant motion.  The parties met and conferred extensively and in good faith, reaching compromises on virtually all categories of documents in dispute.  Despite their efforts, however, the parties were ultimately unable to execute a binding stipulation because they were unable to agree on any provision to govern Mattel's future right to pursue additional discovery from Bryant.  It is clear that the parties deemed it necessary to include such a provision in the draft stipulation in order to protect their respective positions.  Because the parties did not execute a binding stipulation, there is no legal basis to enforce the terms contained in the draft stipulation.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

10

EXHIBIT 21 PAGE 345

1   Therefore, Mattel's right to the discovery it seeks in the instant motion to compel is governed by

2   the familiar guidelines set forth in Rule 26 of the Federal Rules of Civil Procedure.

3       Furthermore, because the parties met and conferred in good faith and because they had a

4   legitimate dispute over language governing Mattel's future right to pursue additional discovery

5

6   from Bryant, the Discovery Master denies Mattel's request for sanctions.

7       B.  Rule 26 of the Federal Rules of Civil Procedure

8       Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain

9   discovery regarding any matter, not privileged, that is relevant to the claim or defense of any

10  party." Fed.R.Civ.P. 26(b)(1).  "Relevant information need not be admissible at trial if the

11

12  discovery appears reasonably calculated to lead to the discovery of admissible evidence." Id.

13  Discovery shall, however, be limited by the court if it determines that: "(i) the discovery sought is

14  unreasonably cumulative or duplicative, or is obtainable from some other source that is more

15

16  convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample

17  opportunity by discovery in the action to obtain the information sought; or (iii) the burden or

18  expense of the proposed discovery outweighs its likely benefit, taking into account the needs of

19  the case, the amount in controversy, the parties' resources, the importance of the issues at stake in

20

21  the litigation, and the importance of the proposed discovery in resolving the issues." Fed.R.Civ.P.

22  26(b)(2).

23      C.  Mattel's Requests for Production

24      Request Nos. 2, 13, 48:  Documents Relating to Bryant's Agreements with MGA

25      Mattel seeks documents relating to Bryant's agreements with MGA, including doll-related

26  agreements.  Bryant is withholding responsive documents, including (a) documents relating to his

27  Bratz agreements with MGA other than final signed agreements, including communications

28  exchanged by the parties and drafts of the agreements, (b) documents relating to doll-related

29

EXHIBIT 21 PAGE 346

agreements discussed or negotiated by Bryant and third parties while he was employed by Mattel other than signed agreements that were "reached" while Bryant was employed by Mattel, and (c) documents relating to Bryant's fee agreements with MGA or other indemnity agreements relating to this action.

The Discovery Master finds that the withheld documents are relevant to Mattel's claims. Among other things, the withheld documents could establish the timing, nature and scope of Bryant's work for MGA (or others), ongoing acts of copyright infringement, and damages. In addition, the withheld documents could be used for impeachment purposes. Further, documents relating to fee or indemnity agreements between MGA and Bryant are relevant to demonstrate bias and lack of credibility. Bryant has failed to establish that the requested discovery is barred by Rule 26(b)(2), Fed.R.Civ.P. Accordingly, Bryant is ordered to produce all non-privileged documents responsive to Request Nos. 2, 13, and 48.

Request Nos. 11, 12, 19, 37, 40, 41, 42, 43, 53, 54, 55: Documents Relating to Bratz's Development and Other Projects that Bryant Worked on for MGA

Mattel seeks documents relating to the Bratz project and any other projects Bryant worked on for MGA. Bryant produced documents relating only to the First Generation Bratz dolls. Bryant is prepared to produce additional documents relating to work he performed for MGA prior to June 30, 2001, acknowledging that those documents are relevant to Mattel's claim that Bryant breached his employee agreement by allegedly performing services for Mattel and MGA at the same time. Bryant objects to the requests to the extent they seek any additional documents on relevancy and overbreadth grounds.

The Discovery Master finds that Mattel's requests seek relevant information and are not overbroad. The lawsuit is much broader than the First Generation Bratz dolls issued in June 30, 2001. For example, Mattel alleges that it is entitled all works created by Bryant during his Mattel

EXHIBIT 21 PAGE 347

employment, regardless of whether they resulted in a Bratz doll released in June of 2001. Mattel also alleges that Bryant has breached his ongoing contractual duties not to use any of Mattel's confidential and proprietary information, not just information relating to the Bratz dolls released in June of 2001. Mattel also alleges that Bryant has infringed Mattel's alleged copyrights in Bratz works – works that are allegedly owned by Mattel because they were created while Bryant was employed by Mattel – through his ongoing conduct of reproducing and creating derivative works. Accordingly, Bryant is ordered to produce all non-privileged documents responsive to Request Nos. 11, 12, 19, 37, 40, 41, 42, 43, 53, 54, and 55.

Request Nos. 29, 30, 31, 32, 33, 34, 35, 36, 45, 46: Documents Relating to Bryant's Payments from MGA

Mattel seeks documents relating to Bryant's payments from MGA. Bryant acknowledges that Mattel is entitled to know how much money Bryant has earned from MGA, and represents that he has produced, in redacted form, all royalty statements he has received related to the First Generation Bratz dolls and his 2000 contract with MGA. Bryant asserts that his redactions are justified as a means to avoid disclosing the breakdown of MGA's revenue by particular product, which information Bryant believes constitutes MGA's trade secret information. Bryant also objects to producing tax returns, asserting that Mattel cannot show a "compelling need" for the returns. Bryant's Opposition at 29:21-27.

The Discovery Master finds that documents relating to MGA's payments to Bryant, including royalty statements and other payment information, are relevant to several Mattel claims. First, Mattel's claims against Bryant include breach of contract, breach of fiduciary duty, breach of duty of loyalty, unjust enrichment, and conversion. Mattel seeks to recover all benefits Bryant received as a result of his alleged violations of duties to Mattel. Payments to Bryant from MGA and others might be traceable to work Bryant performed while employed by Mattel, regardless of

EXHIBIT _21_ PAGE _348_

when the payments were actually made. Such payments might also lead to evidence to support Mattel's allegation that Bryant converted, misappropriated, or misused Mattel information.

Second, the payments are relevant to Mattel's recently added claim for copyright infringement. Mattel alleges that Bryant, MGA, and others have infringed Mattel's rights in the Bratz drawings and works by copying and preparing derivative works from those works. Under the Copyright Act, a plaintiff is entitled to recover profits from infringement as well as actual damages. 17 U.S.C. §504(b). The works that potentially infringe Mattel's copyrights, therefore, include all Bratz doll products that MGA released to the market. For this reason, and for reasons already discussed in the previous subsection, Bryant's limited production of documents relating to only the First Generation of Bratz dolls is inadequate.

Third, payments to Bryant are relevant to Mattel's recently added claims for trade secret misappropriation. Payments could show when and what trade secret information Bryant and other defendants allegedly misappropriated from Mattel. Any proof of trade secret theft is also relevant to Mattel's defense against MGA's unfair competition claims.

Lastly, the breakdown of gross royalty payments may be required to prove actual causation of damages.

The protective order filed on January 4, 2005, is sufficient to address any confidentiality concerns raised by Bryant. Among other things, the protective order provides protection for confidential trade secret information. It has two tiers of protection, allowing a party to designate documents as either "Confidential" or "Confidential – Attorney's Eyes Only." The protective order also requires the parties to use information produced in discovery only for purposes of this litigation and not for any other purpose.

Accordingly, Bryant is ordered to produce, without redactions, all non-privileged documents responsive to Request Nos. 29, 30, 31, 32, 33, 34, 35, 36, 45, and 46. Bryant,

EXHIBIT 21 PAGE 349

however, is not required to produce tax returns, provided that he otherwise fully complies with these requests as ordered.

Request Nos. 20, 23, 27, 28: Communications Between Bryant and MGA

Mattel seeks production of Bratz-related communications and communications with MGA. More specifically, Mattel seeks production of four categories of documents Bryant has refused to produce: (1) communications between Bryant and MGA or third parties that explicitly relate to designs Bryant created while employed by Mattel; (2) communications between Bryant and MGA that relate to Mattel employees; (3) communications between Bryant and MGA relating to Bryant's Mattel employment or work Bryant performed for Mattel, except those communications "created" prior to the close of Bryant's Mattel employment; and (4) communications between Bryant and MGA that post-date Bryant's Mattel employment. Bryant contends that the discovery requests for communications between Bryant and MGA are overbroad. Bryant asserts that there are many former Mattel employees and friends of his who have privacy rights that would be impinged upon if he were to disclose his communications. Bryant also asserts that he has his own confidentiality interest regarding any information that he shared with MGA. In particular, he objects to Mattel's discovery requests to the extent they would require him to reveal the identity of current Mattel employees seeking employment with MGA or Bryant.

The Discovery Master finds that Mattel's requests for all communications between Bryant and MGA unquestionably seek information relevant to Mattel's claims: they will reveal what Mattel information Bryant shared with MGA, if any, and when. The protective order is sufficient to address Bryant's confidentiality concerns. It allows parties to designate as "Confidential" private information about current or former employees, contractors or vendors (including employee, contractor and personnel records). Therefore, Bryant is ordered to produce all non-

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

15

EXHIBIT 21 PAGE 350

privileged documents responsive to Request Nos. 20, 23, 27, and 28.  However, Bryant may continue to redact his telephone records, and shall provide a signed verification that none of the telephone calls that were redacted relate or refer in any way to MGA, Bratz, or any other project that Bryant worked on, with, for, or on behalf of MGA.  Telephone calls that do not relate or refer in any way to MGA or Bratz are irrelevant.

### Request Nos. 49, 51:  Mattel-Related Documents

Mattel seeks production of Mattel-related documents, and Bryant agrees to produce them. Accordingly, Bryant is ordered to produce all documents responsive to Request Nos. 49 and 51.

### Request No. 9:  Documents re Registrations and Applications for Registrations

Lastly, in Request No. 9 Mattel seeks production of documents registrations and registrations and applications for registration.  Bryant deems the motion moot with respect to Request No. 9 because he agrees to produce any patent, copyright and trademark applications, registrations or other non-privileged documents in his possession, custody or control that constitute or relate to such applications and registrations obtained or applied in connection with (1) work on Bratz prior to January 1, 2001; (2) work related to the release of the First Generation Bratz dolls; and (3) work related to any work Bryant performed with, for or on behalf of MGA during the term of Bryant's employment with Mattel.

As discussed previously, the Discovery Master finds that the First Generation Bratz limitation is improper.  Therefore, Bryant is ordered to produce all non-privileged documents responsive to Request No. 9.

### IV. CONCLUSION

For the reasons set forth above, the Discovery Master orders as follows:

1.  Mattel's motion to compel production of documents responsive to its First Set of Requests for Production, Request Nos. 2, 9, 11, 12, 13, 19, 20, 23, 27, 28, 29, 30, 31, 32, 33, 34,

EXHIBIT 21 PAGE 351

35, 36, 37, 40, 41, 42. 43. 45, 46, 48, 49, 51, 53, 54, and 55, is GRANTED.  However, Bryant need not produce his tax returns, on the condition that he complies fully with Request Nos. 29, 30, 31, 32, 33, 34, 35, 36, 45, and 46.

2.  Bryant shall produce all redacted documents in un-redacted form, except for redactions that are justified by the attorney-client privilege or work product doctrine or his telephone records pursuant to the terms of this Order.

3.  Bryant shall serve a complete privilege log in conformity with Rule 26(b)(5), Fed.R.Civ.P.

4.  Pursuant to Rule 34, Fed.R.Civ.P., Bryant shall produce the hard drives of his computers for forensic imaging.

5.  Bryant shall complete his production by producing missing attachments, fax cover pages and all other missing responsive documents.

6.  Mattel's request for an award of sanctions in the amount of $7,805 is DENIED.

7.  Bryant shall comply with this Order no later than February 23, 2007.

Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery Master, Mattel shall file this Order with the Clerk of Court forthwith.

IT IS SO ORDERED.

Dated: January 25, 2007

HON. EDWARD A. INFANTE (Ret.)
Discovery Master

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

17

EXHIBIT 21 PAGE 352

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on January 25, 2007, I served the attached ORDER GRANTING MATTEL'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| Robert Millman Esq. | Littler Mendelson | rfmillman@littler.com |
| Douglas Wickham Esq. | Littler Mendelson | dwickham@littler.com |
| Keith Jacoby Esq. | Littler Mendelson | kjacoby@littler.com |
| Dominic Messiha Esq | Littler Mendelson | dmessiha@littler.com |
| Diba Restagar Esq. | Littler Mendelson | drestagar@littler.com |
| Michelle Park Esq. | Littler Mendelson | mpark@littler.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | jbq@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Valerie Nannery Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | valerienannery@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Morris Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgetmorris@quinnemanuel.com |
| Tamar Buchjaklian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchjakjian@quinnemanuel.com |
| Dale Cendali Esq. | O'Melveny & Myers LLP | dcendali@omm.com |
| Diana Torres Esq. | O'Melveny & Myers LLP | dtorres@omm.com |
| James Jenal Esq. | O'Melveny & Myers LLP | jjenal@omm.com |
| Alicia Meyer Esq. | O'Melveny & Myers LLP | ameyer@omm.com |
| Jennifer Glad Esq. | O'Melveny & Myers LLP | jglad@omm.com |
| Benjamin Kim Esq. | O'Melveny & Myers LLP | bjkim@omm.com |
| Hamid Jabbar Esq. | O'Melveny & Myers LLP | hjabbar@omm.com |
| Johanna Schmitt Esq. | O'Melveny & Myers LLP | jschmitt@omm.com |
| Patricia Glaser Esq. | Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP | pglaser@chrismill.com |

EXHIBIT _21_ PAGE _353_