1 "Bratz," as well as to produce certain documents -- that were not relevant to a claim

2 or defense prior to January 12, 2007, however, MGA is diligently working to

3 produce documents in response to many additional requests. [39]

4  Finally, consistent with the parties' agreement, MGA has produced all

5 documents relevant to "Bratz" or "Prayer Angels" that it received from Union Bank

6 in response to Mattel's subpoena. [40]  Pursuant to that agreement, MGA agreed to

7 review and produce documents provided to it by Union Bank for the years 1999 -

8 2001 concerning payments that it could identify as being for "Bratz" or an entirely

9 separate project, "Prayer Angels," discussed *infra*.  Indeed, Mattel itself

10 acknowledges that MGA's production of cancelled checks and wire transfers

11 related to payments made with regard to "Bratz" or "Prayer Angels." [41]  Mattel,

12 however, complains that other types of documents are missing.  Union Bank

13 provided no other documents that indicated they were related in any way to "Bratz"

14 or "Prayer Angels." [42]  Accordingly, Mattel's motion on this issue should be denied.

15  **b.** **MGA Has Agreed To Produce Documents Pertaining**
16   **To Subsequent Generations Of Released Bratz Dolls**
   **Based On The Changed Nature Of The Case But**
17   **Should Not Be Compelled To Do So Because They**
18   **Became Relevant Only In Mid January**

19  Mattel next attempts to argue that MGA's objection to producing documents

20 relating to "Bratz," other than "First Generation" "Bratz," was improper and that

21 the Court should compel MGA to produce such documents.  As Mattel is well

22 aware, however, subsequent generations of "Bratz" dolls became relevant to

23 Mattel's claims only on January 12, 2007, when Judge Larson granted Mattel leave

24

25

26 [39] Those requests are Request Nos.: 1, 2, 8, 10, 11, 43, 45, 46, 49, 50, 51, 53, 57, 59, 61, 63, 64, 66, 96, 97, 98, 99 and 100.
27 [40] Torres Decl., ¶ 21.
 [41] Mot. at 10.
28 [42] Torres Decl., ¶ 21.

MGA'S OPPOSITION TO
MATTEL'S MOTION TO COMPEL
CV 04-09049 SGL (RNBX)

EXHIBIT 31 PAGE 456

1  to amend its answer and assert counterclaims in the *MGA v. Mattel* litigation.[43]

2  That same date, Mattel asserted claims seeking a declaration of ownership of the

3  "Bratz" copyrights and demanding relief for MGA's "infringement" of Mattel's

4  purported rights in "Bratz," among various other claims.[44]  Prior thereto, Mattel had

5  repeatedly asserted that it was not claiming copyright infringement.  Accordingly,

6  MGA's prior objection to producing documents were appropriate as documents

7  related to subsequent "Bratz" products[45] were not relevant to any claims or defenses

8  of the parties.[46]  In fact, as recently as August 2006 (the last conference of counsel

9  concerning this issue), Mattel had agreed that MGA needed to produce documents

10 pertaining only to the "first generation Bratz" dolls.[47]  Given the changed nature of

11 the case, however, MGA already informed Mattel that it would produce documents

12 pertaining to subsequent generations of "Bratz" dolls that have been released on the

13 market.[48]  Accordingly, Mattel's request for an order compelling MGA to produce

14 such documents should be denied.

15                    c.    **MGA Has Agreed To Produce Royalty Statements To**
                          **Bryant Based On This Court's January 25th Order**
16

17        During the meet and confer, counsel for MGA also agreed to review the

18 Court's Order Granting Mattel's Motion To Compel with regard to Bryant to

19 determine if the Court's Order had any impact on MGA's obligation to produce

20

21 _____
[43] Notably, Mattel has not produced any documents of the same type they are seeking
22 from MGA -- those related to the creation or development of "DIVA STARZ" or "My
   Scene."  Such documents are clearly relevant and Mattel's failure to produce such
23 documents will be the subject of a forthcoming motion to compel.
   [44] Many of the new counterclaims asserted by Mattel are the subject of pending motions to
24 dismiss filed by MGA and Bryant.
   [45] MGA has never refused to produce documents pertaining to the specific products at
25 issue in its own claims against Mattel but those documents were not the subject of
   Mattel's document requests because discovery on those claims did not begin until last
26 month.
   [46] *See* FED. R. CIV. PROC. 26(b).
27 [47] Torres Decl. ¶ 12.
   [48] Torres Decl. ¶ 23.
28

MGA'S OPPOSITION TO
MATTEL'S MOTION TO COMPEL
CV 04-09049 SGL (RNBX)

documents to Mattel.[49]  After having reviewed this Court's recent Order, and so as to avoid further burdening the Court, MGA agrees to produce any remaining royalty statements for payments made to Bryant within 30 days.  Mattel never raised this issue again before filing its motion.

In short, the majority of Mattel's motion seeks documents that MGA has either already reproduced, or else has agreed to reproduce within a reasonable amount of time.  MGA should not be ordered to do that which it has already done, or which it has already agreed to do and on which it is diligently working.  Accordingly, Mattel's motion should be denied.

**B.**   **Mattel's Motion With Respect To The Remaining Requests Should Be Denied Because They Seek Documents Not Relevant To This Litigation, Documents Covered By A Protective Order, Or Documents Of The Type Mattel Itself Has Refused To Produce**

**1.**   **Mattel Is Not Entitled To MGA's Product Design Documents For Unreleased Products, Which Are Highly Valuable Trade Secrets That Have No Bearing On This Case**

**a.**   **MGA's Product Design Documents For Unreleased Products Are Highly Valuable Trade Secrets That Have No Bearing On This Case**

In connection with this Court's January 25, 2007 Order granting Mattel's motion to compel further production of documents from Bryant, Mattel has taken the position that the parties must produce drawings and designs for MGA products currently under development and not yet released to the public.  MGA's "Bratz" products, first released in the summer of 2001, are now sold worldwide and compete directly with certain products marketed by Mattel.[50]  As discussed *infra*, MGA's product design documents for its unreleased toy concepts, *i.e.*, those that

---

[49] Torres Decl. ¶ 18.

[50] *See* Declaration of Paula D. Garcia in Support of Carter Bryant and MGA's Request for Clarification, Reconsideration and/or Further Protection, dated February 9, 2007 ("Garcia Decl."), ¶ 3.

- 16 -

EXHIBIT 3 ] PAGE 458

MGA'S OPPOSITION TO
MATTEL'S MOTION TO COMPEL
CV 04-09049 SGL (RNBX)

1  have not been made public, are among its most highly valuable trade secrets.[51] The

2  drawings and designs for those concepts represent works in progress and ideas for

3  advancing and developing product lines.[52]

4    The creative development process is one that is fluid, not static.[53] To develop

5  a product, MGA and Bryant may create and develop scores of drawings that they

6  modify and improve throughout the development cycle.[54] At MGA, the

7  development process is constant and extremely rapid.[55] In fact, MGA, which is not

8  burdened by extensive corporate bureaucracy, is known in the toy industry for its

9  development speed and market responsiveness.[56] Often in this fast-paced

10  development process, MGA goes back to, or builds on, prior drawings.[57]

11    MGA protects its product designs and drawings through a number of ways.

12  For example, employees are required to sign confidentiality agreements, computers

13  are password protected, and MGA's product design buildings have security guards

14  who prohibit entry to unauthorized personnel and who check even authorized

15  personnel on their way out.[58] Even vendors, manufacturers, suppliers and other

16  third parties who may see a product design late in the development process are

17  required to sign strict confidentiality agreements.[59]

18    MGA's drawings for some of its yet-unreleased "Bratz" products are even

19  more closely protected.  When MGA begins to develop a new "Bratz" line, only a

20  very limited number of people know about it.[60] In fact, with respect to some new

21  "Bratz" products, there are *only two* people – Carter Bryant and Paula Garcia – who

22  

---

[51] Garcia Decl., ¶ 4.
23  [52] *Id.*
24  [53] *Id.* at 7.
    [54] *Id.*
25  [55] *Id.*
    [56] *Id.*
26  [57] *Id.*
27  [58] *Id.* at 5.
    [59] *Id.*
28  [60] *Id.* at 6.

- 17 -

EXHIBIT 31  PAGE 459

MGA'S OPPOSITION TO
MATTEL'S MOTION TO COMPEL
CV 04-09049 SGL (RNBX)

know what the concept is and who see the early product drawings.[61]  Even after Garcia approves, and Bryant and Garcia have finalized, the concept, only a small number of people on the "Bratz" development team have exposure to the drawings before they are nearly ready for release.[62]

Even if some of the "Bratz" drawings that Bryant created for MGA after June 30, 2001, may be relevant to claims at issue in this action,[63] drawings for unreleased products are not.[64]  Such documents are clearly not relevant to any of Mattel's claims in its original complaint, which alleged only that Bryant breached his confidentiality obligations *while employed by Mattel.*[65]  Indeed, Mattel has repeatedly confirmed that it stated only alleged claims for employment-based duties in the *Mattel v. Bryant* action.[66]  Designs and drawings for products currently under development, over six years later, therefore have no relevance to Mattel's original contract and fiduciary claims.  Mattel's new copyright counterclaims are also based on its allegation that Bryant created the original "Bratz" drawings *while employed at Mattel.*[67]  Mattel did not argue in its motion papers or at oral argument that drawings and designs for products *currently* under development – over six years after the termination of Bryant's employment at Mattel – are relevant to its copyright infringement or ownership claims.  Indeed, at oral argument on Mattel's motion for leave to amend its complaint, Mattel's lead counsel, John Quinn, stated that Mattel's copyright theories rest on its contention that Bryant created the

---

[61] *Id.*

[62] *Id.*

[63] While MGA has agreed to produce such documents, it does not concede that the majority have any relevance to the claims or defenses in this litigation.

[64] As an initial matter, Mattel cannot possibly have suffered any cognizable injury relating to MGA products that have not yet been released, and indeed has never before taken the position that such products are relevant.

[65] Complaint dated April 27, 2004, ¶ 12.

[66] *See* Torres Decl., ¶ 6, Exh. D (Order Denying Plaintiff Mattel, Inc.'s Motion to Remand and Certifying Question for Interlocutory Review, dated March 4, 2005).

[67] Complaint dated January 12, 2007, ¶ 26.

EXHIBIT 31  PAGE 460

1   original "Bratz" drawings while employed at Mattel.[68] Another Mattel attorney,

2   Michael Zeller, confirmed this during a conference of counsel on an unrelated issue

3   on February 12, 2007.[69]

4        Nor are such documents relevant to Mattel's other counterclaims.  Mattel's

5   trade secret claim is based on allegations of theft of *business information*, not of

6   designs and drawings.[70]  Consequently, designs and drawings are not relevant to

7   any of Mattel's counterclaims founded on its allegations of trade secret theft.

8   Moreover, even if designs and drawings were relevant to Mattel's trade secret

9   claims, Mattel has failed to provide a designation of its alleged trade secrets "with

10  reasonable particularity," as called for by the California Code of Civil Procedure

11  section 2019.210 (formerly 2019(d)), which provides that "before commencing

12  discovery relating to the trade secret, the party alleging the misappropriation shall

13  identify the trade secret with reasonable particularity." Further, discovery on all of

14  Mattel's other claims, which are factually dependent on its allegations of trade

15  secret misappropriation, must similarly be stayed pending a more particularized

16  identification of the trade secrets allegedly misappropriated.[71]

17       These documents should also be excluded from production because of the

18  broad scope of Mattel's requests.  In *Intersong-USA, Inc. v. CBS, Inc.*, a case of

19  alleged copyright infringement by Julio Iglesias and others, the plaintiff had

20

21  [68] Torres Decl., ¶ 22.
    [69] *Id.*

22  [70] *See* Declaration of Michael T. Zeller ("Zeller Decl.") filed in Support of Mattel's

23  Motion to Compel, ¶ 10, Exh. 8 (Mattel's Amended Answer and Counterclaims, filed
    January 12, 2007, ¶¶ 37, 48, 68, and 74).

24  [71] *Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826 (2d Dist.
    2005) (where all of the plaintiff's 10 claims were "factually dependent" on its trade secret

25  claim, discovery on any of the claims could commence only after the allegedly
    misappropriated trade secrets had been identified with reasonable particularity); *Computer*

26  *Economics, Inc. v. Gartner Group Inc.*, 50 F. Supp. 2d 980, 985 (S.D. Cal. 1999).
    (establishing the applicability of California's statutory provision to federal cases,

27  including cases where pendent jurisdiction applies to state law claims, under the Erie
    doctrine); *see also Vermont Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142 (2d Cir.

28  1996)(applying California trade secret law and specifically this provision without dispute
    or need for discussion).

1   requested information on *all* musical compositions that the defendants had
2   authored.[72]   Recognizing the overbreadth of this request, the Court held that the
3   defendants should produce information for musical compositions "actually
4   published" over a ten-year period.[73]   Similarly, Mattel's requests for all documents
5   pertaining to "Bratz" or to Bryant's work for MGA after June, 2001, are overbroad
6   and should be limited to drawings or work for "Bratz" products that have been
7   released to the public.

b.   **Drawings For Unreleased MGA Products In Development Are Extremely Valuable And The Protective Order Is Inadequate**

11          In the event the Special Master determines that drawings for unreleased
12   MGA products are somehow relevant and properly within the scope of the Court's
13   Order, MGA requests further protection pursuant to Federal Rule of Civil
14   Procedure 26(c).  Rule 26(c) provides for the issuance of "any order which justice
15   requires,"[74] and suggests various additional methods of protection that are not
16   available to MGA under the Protective Order currently in place.  Such an order
17   could provide for discovery "only on specified terms and conditions, including a
18   designation of the time or place."[75]  Specifically, the rule provides for an order "that
19   a trade secret or other confidential research, development, or commercial
20   information not be revealed or revealed only in a designated way."[76]

21          In determining whether such an order should be granted, the Ninth Circuit

---

[72] 1 Fed. R. Serv. 3d 609 (S.D.N.Y. 1985).
[73] *Id.*
[74] Rule 26(c) provides for the issuance of a protective order upon motion by a party that has conferred in good faith in an effort to resolve the dispute without court action, and for good cause shown.  MGA attempted to resolve this issue with Mattel in connection with drawings of unreleased products in Bryant's possession and may have reached agreement with respect to those limited drawings, but Mattel specifically stated that it would not extend the terms of any agreement reached with Bryant to documents pertaining to unreleased MGA products in *MGA's* possession.  (Torres Decl. ¶ 23).
[75] FED. R. CIV. P. 26(c)(2).
[76] FED. R. CIV. P. 26(c)(7).

EXHIBIT 31 PAGE 462

MGA'S OPPOSITION TO
MATTEL'S MOTION TO COMPEL
CV 04-09049 SGL (RNBX)

1  requires that a court balance the risk to the disclosing party of inadvertent

2  disclosure of trade secrets to competitors against the risk to the moving party that

3  protection of the trade secret would impair the prosecution of its claims.[77]  The fact

4  that MGA and Mattel are direct competitors weighs significantly in favor of

5  protection of confidential information.[78]

6      Drawings for unreleased products fit squarely within the scope of trade secret

7  information covered by Rule 26(c) and "should not be revealed" at all or, at the

8  least, "should not be revealed" prior to public release of the products.[79]  A trade

9  secret is defined under California law as information that "(1) derives independent

10  economic value, actual or potential, from not being generally known to the public

11  or to other persons who can obtain economic value from its disclosure or use; and

12  (2) is the subject of efforts that are reasonable under the circumstances to maintain

13  its secrecy."[80]

14      Both prongs of this test are met in this case. First, a toy manufacturer's

15  unreleased toy concepts, *i.e.*, those that have not been made public, are among its

16  most highly valuable trade secrets.[81]  Although such drawings and designs are

17  valuable even *after* the product's public release, their value is enormous prior to

18  their public release because they represent works in progress and new ideas for

19  advancing and developing product lines; it is the new ideas and designs that are

20  most likely to generate new sales.[82]  Second, because of their tremendous value,

21

22  [77] *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir.) (upholding protective order granting access to source codes and other trade secret materials only to an
23  independent consultant), *cert. denied sub nom.*, *BB Asset Mgmt., Inc. v. Symantec Corp.*, 506 U.S. 869 (1992).
24  [78] Garcia Decl. ¶ 3; *see Am. Heavy Moving & Rigging Co. v. Robb Techs., L.L.C.*, No. 2:04-CV-00933-JCM (GWF), 2006 U.S. Dist. LEXIS 51276, *10 (D. Nev. July 24, 2006)
25  ("The courts generally hold that there is a greater likelihood of harm where disclosure of trade secrets is sought in litigation between competitors") (citation omitted).
26  [79] FED. R. CIV. P. 26(c)(7).
27  [80] CAL. CIV. CODE, § 3426.1(d).
   [81] Garcia Decl., ¶ 4.
28  [82] *Id.*

MGA'S OPPOSITION TO
MATTEL'S MOTION TO COMPEL
CV 04-09049 SGL (RNBX)

EXHIBIT 3? PAGE 4/03

1   MGA protects its product drawings in a number of ways:  restricting access to a
2   very small number of people, requiring strict confidentiality agreements, using
3   password-protected computers, and employing security guards at their facilities
4   who prohibit entry to unauthorized personnel and who check even authorized
5   personnel on their way out.[83]

6        MGA takes even greater efforts to protect some of its yet-unreleased "Bratz"
7   products.  In fact, with respect to some new "Bratz" products, there are *only two*
8   people – Carter Bryant and Paula Garcia – who know what the concept is and who
9   see the early product drawings.[84]  Even after Garcia approves and Bryant and
10  Garcia have finalized the concept, only a small number of people on the "Bratz"
11  development team have exposure to the drawings.[85]

12        There is good cause for heightened protection of drawings for unreleased
13  products.  As set forth above, any relevance of such drawings to the issues in *Mattel*
14  *v. Bryant,* which, according to Mattel, has only ever stated alleged claims for
15  employment-based duties, is marginal at best.  In contrast, the potential damage to
16  MGA of any disclosure of the drawings, or even the concepts represented by the
17  drawings, is substantial.  This potential disclosure is real:  both sides have a
18  substantial number of personnel working on this case.  Indeed, Mattel's recent
19  filings with the special master reveal the names of 13 lawyers at Quinn Emanuel
20  working on behalf of Mattel in this matter.  Without question, there are numerous
21  other staff members and outside vendors -- such as copy services, couriers, court
22  reporters, experts and their respective staffs -- who also handle documents in this
23  case on a regular basis.  The current Protective Order allows disclosure to each of
24  these groups of people even for documents restricted as "Attorneys Eyes Only."
25  The fact that such a large number of people can have access to documents accorded
26

27  [83] *Id.* at 5-6.
    [84] *Id.* at 6.
28  [85] *Id.*

EXHIBIT _31_ PAGE _4 of 4_

MGA'S OPPOSITION TO
MATTEL'S MOTION TO COMPEL
CV 04-09049 SGL (RNBX)

1   even the highest level of confidentiality under the Protective Order, by necessity,

2   magnifies the potential for disclosure, which, even if inadvertent, could be

3   tremendously valuable to a competitor and hence tremendously harmful to MGA.

4       Moreover, it has been Mattel's practice to summarize or paraphrase the

5   contents of confidential documents or testimony in briefs and other papers filed

6   with the Court.[86] If Mattel's attorneys were allowed to review drawings of

7   unreleased MGA products in development and then summarize them -- even

8   conceptually -- in open court or in documents not filed under seal, that information

9   would be publicly available -- and hence available to Mattel itself and other MGA

10  competitors.  This possibility alone warrants protecting the drawings of MGA's

11  products in development until after the products themselves have been released.

12              c.    **In The Alternative, Drawings For Unreleased MGA**
13                    **Products Should Not Be Required Prior To Their**
                      **Public Release**
14

15      Finally, even if the Special Master determines that such documents *are*

16  relevant to any of Mattel's counterclaims and should be produced in discovery, they

17  should not be produced now.  Judge Larson recently issued a scheduling order

18  setting trial on Mattel's original claims, in *Mattel v. Bryant,* in February 2008, with

19  discovery continuing thereafter until March 2008, with trial in July 2008, on

20  MGA's Lanham Act and unfair competition claims against Mattel and Mattel's

21  counterclaims against MGA and Bryant.  Thus, even if it is determined that

22  drawings and designs relating to unreleased products may conceivably be relevant

23  ───────────────

[86] In fact, as recently as February 5, in its lengthy filing entitled "Mattel's Portions of Rule
24  26(f) Report," Mattel included confidential information regarding early "Bratz"
    development in its descriptions of documents designated "attorneys' eyes only" and of
    deposition testimony also designated "attorneys' eyes only." (*See* Torres Decl.¶ 26.) For
25  instance, Mattel described information found on a confidential invoice provided to MGA
    by one of its vendors, Veronica Marlow. (*Id.*)  Mattel also used information found in an
26  email designated "attorney's eyes only" to describe the work performed by Stephen Lee
    and Cecelia Kwok, employees of MGA Hong Kong, on "Bratz." (*Id.*)  Mattel also used
27  the AEO testimony of MGA's CEO, Isaac Larian, purportedly to describe the duties of
    Paula Garcia, MGA's Vice President of Product Design and Development and a product
28  manager on the "Bratz" line. (*Id*).

EXHIBIT 31 PAGE 465

MGA'S OPPOSITION TO
MATTEL'S MOTION TO COMPEL
CV 04-09049 SGL (RNBX)

1    to Mattel's counterclaims, the immediate production of such documents should not

2    be required at this time.

### C.  Mattel Is Not Entitled To Information Concerning Bryant's Attorneys' Fees

5    Mattel also seeks documents related to any indemnification agreements

6    between MGA and Bryant.[87]  First, MGA has already produced the only non-

7    privileged documents responsive to this request.[88]  Moreover, the existence of any

8    fee or indemnity agreement is not relevant to any claim or defense in this litigation

9    and has no bearing on any potential "bias" because there is no dispute that Bryant's

10   interests in this case are aligned with those of MGA, and that Bryant is "biased" in

11   that sense. *In fact, MGA and Bryant previously offered to stipulate to that, and

12   again offer to so stipulate now.*  Mattel, however, has refused any such stipulation.[89]

13   Accordingly, MGA should not be required to produce documents related to any fee

14   or indemnity agreement, even if any non-privileged documents existed.

### D.  Mattel Is Not Entitled To Irrelevant, One-Sided Discovery

#### 1.  Mattel Is Not Entitled To Review All Non-Public Witness Statements And Litigation Documents Concerning "Bratz"

18   Mattel also should not be allowed to conduct a far-flung fishing expedition

19   through a broad array of non-public documents from other legal proceedings.  First,

20   Mattel's request for documents related to prior sworn testimony should be denied

21   because Mattel has refused to produce similar types of documents.[90]  In particular,

22   MGA previously indicated that it would agree to produce such documents, subject

23   to any protective orders, if Mattel agreed to produce similar documents for "DIVA

---

[87] *See* Mattel's Second Set of Requests For Production, Request Nos. 49 and 50.

[88] Torres Decl., ¶ 14.

[89] *Id.*

[90] Mattel's Second Set of Requests For Production, Request Nos. 37-40 seek affidavits, declarations, transcripts and other public and non-public pleadings from other suits and legal proceedings that refer or relate to "Bratz" or "Prayer Angels."

- 24 -

EXHIBIT 31 PAGE 466

MGA'S OPPOSITION TO
MATTEL'S MOTION TO COMPEL
CV 04-09049 SGL (RNBX)

STARZ," "My Scene" and other products at issue in this litigation.[91]  Mattel refused.  Discovery is not a one way street and Mattel has not demonstrated the inability to obtain the underlying documents and testimony directly.  If such documents are to be produced by one side, they should be produced by both.

More importantly, however, Mattel's request is a blatant attempt to avoid the discovery limitations imposed by both the Federal Rules of Civil Procedure and those additional limitations imposed by this Court.  As Mattel is well aware, MGA is involved in litigation against a number of counterfeiters and blatant infringers in Asia.  Until 2003, those cases involved only one issue: whether the defendants in those cases had the right to produce counterfeit "Bratz" dolls.  In 2003, however, Mattel began feeding documents to those defendants concerning the abandoned Mattel project, "Toon Teens," referenced above, contending that those documents proved that Bryant created "Bratz" while working at Mattel.[92]  Thereafter, the defendants in those cases (and in other cases where the defendants were represented by lawyers who also represented Mattel) took the position that MGA did not own, and therefore could not enforce, the rights to "Bratz."  To defend itself against those spurious claims concerning "Toon Teens" – which Mattel has since renounced in open court before Judge Larson,[93] MGA has been forced to litigate the issue of ownership, as well as issues related to the specific defendants in those cases, in other tribunals not subject to the strict requirements of the Federal Rules of Civil Procedure.[94]  In effect, by prompting foreign counterfeiters to espouse a theory that Mattel now admits has no merit, Mattel has created a situation in which MGA has been forced to give testimony and provide evidence related to issues in this case that Mattel now seeks to obtain wholesale.  Such underhanded tactics should not be

---

[91] Torres Decl., ¶ 15.
[92] Jacoby Decl. ¶ 9.
[93] Torres Decl. ¶ 10 & Exh. G (Order Granting Motions to Dismiss, dated July 18, 2006, at 4).
[94] Torres Decl. ¶ 4.

EXHIBIT 31 PAGE 467

MGA'S OPPOSITION TO
MATTEL'S MOTION TO COMPEL
CV 04-09049 SGL (RNBX)

condoned.

### 2.   Mattel Is Not Entitled To Discovery Concerning A Family Dispute Involving MGA's Chief Executive Officer And His Brother

In a similar vein, Mattel seeks documents related to an arbitration proceeding between Isaac Larian and his brother Farhad Larian relating to the former's purchase of the latter's interest in MGA as well as any personnel file MGA maintains regarding Mr. Farhad Larian.[95]   Mattel's request should be rejected.   That arbitration, to which MGA itself was not a party, pertained to a family dispute (which Mr. Farhad Larian voluntarily dismissed) and was governed by a protective order that prohibits the use of any documents or testimony for any purpose other than that arbitration.[96]   Similarly, personnel files contain confidential information protected from disclosure, even in discovery, by California law.   Mattel has made no showing that either testimony from that arbitration or Mr. Farhad Larian's personnel file are in any way relevant to a claim or defense in the present litigation. Particularly given the privacy concerns involved in both family disputes and personnel files, MGA should not be required to produce documents in response to these requests.

### 3.   Mattel Is Not Entitled To Compel From MGA The Documents Of Its Indirect Subsidiary MGA HK, Ltd.

Mattel also seeks documents from MGA that belong to, and are in the possession, custody and control of, its indirect foreign subsidiary, MGA HK Ltd. Although this litigation has been going on for nearly three years, Mattel has never sought to obtain documents directly from that subsidiary and, notably, does not claim to have done so in its motion here.   Moreover, Mattel did not even raise this

---

[95] See Mattel's Second Set of Requests For Production, Request Nos. 41 (seeking documents related to the arbitration proceedings) and 88 (seeking Farhard Larian's personnel file).

[96] Torres Decl., ¶ 17.

EXHIBIT 31 PAGE 468

MGA'S OPPOSITION TO
MATTEL'S MOTION TO COMPEL
CV 04-09049 SGL (RNBX)

1   issue until a conference of counsel more than two years after Mattel filed its

2   complaint. At that time, MGA's counsel offered to explore a reciprocal

3   arrangement with respect to such documents. Mattel's response: that a reciprocal

4   arrangement would be too burdensome for it because Mattel supposedly has more

5   subsidiaries than does MGA.[97]  Mattel – the self-proclaimed world's largest toy

6   maker – should not be allowed to engage in such one-sided and inherently unfair

7   discovery tactics on the basis of supposed "burden."

8   **E.      Mattel Is Not Entitled To Expert Discovery At This Time**

9

10          Finally, Mattel seeks documents related to any testing that MGA or Bryant

11   may have performed on documents that refer or relate to "Bratz."[98]  Such a request

12   is premature. The time for designating experts has not yet arrived, and MGA has

13   made no determination as to whom it will be designating as its testifying experts in

14   this litigation. MGA will be prepared to produce expert reports, as well as any

15   other expert materials required by the Federal Rules of Civil Procedure, at the

16   appropriate time.

17          Mattel's argument that MGA has already designated at least one expert and

18   should be compelled now to produce expert documents is improper. In June 2006,

19   Mattel made the belated request that the Court appoint one document expert to test

20   all documents in this case, to be used jointly by the parties. In support of that

21   argument, Mattel implied in its motion papers that MGA and/or Bryant had

22   destroyed evidence by making holes in "Bratz" drawings.[99]  Mattel's insinuation in

23   its papers was so strong that Judge Larson issued an order to show cause as to why

24   the Court should not appoint an expert. At argument, however, Mattel's counsel

25   was forced to concede that *no evidence had been* compromised.[100]  In fact, as Judge

26   [97] Torres Decl., ¶ 16.

27   [98] *See* Mattel's Second Set of Requests For Production, Request No. 92.

     [99] Torres Decl. ¶ 11, Exh. I (Order Denying Motion For Appointment of Expert
28   Witnesses, dated August 10, 2006).

     [100] Torres Decl. ¶ 11, Exh. I (Order Denying Motion For Appointment of Expert

MGA'S OPPOSITION TO
MATTEL'S MOTION TO COMPEL
CV 04-09049 SGL (RNBX)

1  Larson later found, MGA and Bryant did the appropriate thing – very shortly after

2  Mattel filed its complaint, MGA and Bryant date-tested certain original "Bratz"

3  drawings while Mattel waited until the documents were too old to be dated and

4  therefore too old to confirm the merits of MGA and Bryant's defenses.[101]  To

5  convince Judge Larson of the complete inaccuracy of Mattel's accusations,

6  however, MGA and Bryant were forced to explain in general terms the testing they

7  had performed.[102]  They did not, at that time or at any time since, designate a

8  testifying expert in this area or disclose the results of their expert's work.  Mattel

9  should not be allowed to benefit from its false and unsubstantiated accusations that

10  required MGA and Bryant even to acknowledge the fact that they had performed

11  expert analysis.  Accordingly, Mattel's request should be denied.

12  **F.  Mattel's Assertions That MGA Has Withheld Documents Until**
13  **Mattel Receives Them From Other Sources And/Or Because Of**
14  **"Evidence" Concerning The Timing Of The Creation And**
    **Development of "Bratz" Are Without Merit**

15      Throughout its motion, Mattel argues that additional documents must exist

16  because, supposedly, (1) MGA has failed to produce documents until after Mattel

17  receives them from third parties and (2) Mattel has "learned" that extensive work

18  not reflected in the documents produced was performed on "Bratz" before Bryant

19  left Mattel.  Mattel's assertions are without merit, as are its theories concerning the

20  timing of "Bratz" to which these arguments relate.

21      First, Mattel argues that MGA failed to produce documents allegedly related

22  to work performed by Anna Rhee on "Bratz."  MGA initially produced documents

23  related to Ms. Rhee's work on "Bratz" in August 2004.[103]  On January 7, 2005,

24

25  Witnesses, dated August 10, 2006, at 13 (quoting transcript of hearing on July 24, 2006).

26  [101] Torres Decl. ¶ 11, Exh. I (Order Denying Motion For Appointment of Expert Witnesses, dated August 10, 2006, at 14).

27  [102] Torres Decl. ¶ 11, Ex. H (Response of Bryant and MGA to the Order to Show Cause Regarding the Appointment of Expert Witness(es), dated July 21, 2006, at 5).

28  [103] Torres Decl., ¶ 8.

MGA'S OPPOSITION TO
MATTEL'S MOTION TO COMPEL
CV 04-09049 SGL (RNBX)

1   through the attorney for which Mattel paid, Ms. Rhee produced separate invoices of

2   her work at MGA, including work she performed in June 2000 expressly for a

3   different project released in 2000 called "Prayer Angels" or "Angels" for short.

4   MGA thereafter supplemented its production to show that the work performed by

5   Ms. Rhee in June 2000 was in fact for MGA's "Prayer Angels" project, and was not

6   related to "Bratz."[104]   Since that time, MGA has produced numerous documents

7   showing that "Prayer Angels" preceded "Bratz" by a few months and that Ms.

8   Rhee's June 2000 work was for that project.[105]

9        Mattel, however, persists in its wishful belief that work began on "Bratz"

10   earlier than claimed.  Indeed, Mattel previously argued to the District Court that

11   MGA had altered the documents regarding Ms. Rhee's work in June 2000 to reflect

12   work on "Prayer Angels" when she was (allegedly) actually working on "Bratz"[106]

13   Mattel claims that its argument is supported by Ms. Rhee's deposition testimony, in

14   which she stated that the work she performed in June 2000 was for "Bratz" and that

15   references to "Angel" or "Prayer Angel" on her invoices was a cover for work she

16   performed on "Bratz."[107]   After reviewing the briefing on this issue, the District

17   Court rejected Mattel's argument, finding it "hard to accept."[108]   In particular, the

18   District Court noted that none of the invoices submitted by Ms. Rhee reflected any

19   work performed on "Bratz" until December 2000.[109]   Additionally, the District

20   Court stated that for Mattel's argument to be valid, MGA would have had to alter

21   the documents it produced, *as well as those produced by Ms. Rhee herself.*[110]   In

---

[104] *Id.*

[105] *Id.*

[106] *See* Torres Dec. ¶ 11, Exh. I (Order Denying Motion For Appointment of Expert Witnesses, dated August 10, 2006, at 8).

[107] *Id.*; Zeller Decl., ¶ 13; Mot. at 7.

[108] *See* Torres Dec. ¶ 11, Exh. I (Order Denying Motion For Appointment of Expert Witnesses, dated August 10, 2006, at 8).

[109] *See* Torres Dec. ¶ 11, Exh. I (Order Denying Motion For Appointment of Expert Witnesses, dated August 10, 2006, at 8-9).

[110] *See* Torres Dec. ¶ 11, Exh. I (Order Denying Motion For Appointment of Expert Witnesses, dated August 10, 2006, at 8-9).

1    conclusion, the District Court stated that "[a]n alternative and just as plausible

2    explanation is that Rhee is simply mistaken as to when she began performing work

3    on the Bratz project."[111]  Mattel should not now be allowed to persuade the Special

4    Master that MGA is withholding documents about "Bratz" because of Ms. Rhee's

5    mistaken testimony.[112]

6           Mattel next attempts to rely on documents and testimony from long-time

7    Mattel freelancer Steve Linker.  First, as Mattel is well aware, Mr. Linker did not

8    actually work on the original "Bratz" packaging and therefore was not identified as

9    a vendor about whom responsive documents would exist.[113]  Second, many of the

10   documents produced by Mr. Linker were the same drawings MGA produced to

11   Mattel in August 2004.[114]  Other documents were in the possession of Mr. Linker,

12   not MGA, thus MGA could not have produced them.[115]

13          Finally, Mattel's argument that Mr. Linker's testimony shows that "Bratz"

14   was developed earlier than MGA and Bryant claim also fails.  Indeed, Mr. Linker's

15   testimony is consistent with both the testimony previously offered by Bryant, and

16   the actual timing of the creation of "Bratz."  In September, 2006, Mr. Linker, who

17   was represented by the same Mattel-paid lawyer who represented Ms. Rhee,

18   testified that he had met with Bryant briefly in October 2000 and was given a

19   drawing that he understood to have been created for the "Bratz" doll's sculpt.[116]

20   Two years earlier, Bryant similarly testified that he first met with MGA in August

21   2000, first signed an agreement with MGA regarding "Bratz" on October 4, 2000,

22   ─────────────────────────
[111] *See* Torres Dec. ¶ 11, Exh. I (Order Denying Motion For Appointment of Expert
23   Witnesses, dated August 10, 2006, at 9).
[112] Notably, Ms. Rhee's deposition has not been concluded.
24   [113] Torres Decl., ¶ 20, Exh. K (Linker Dep. at 188:14-191:9, 193:18-194:14).
[114] *Id.*
25   [115] *Id.*  Those documents with Mr. Linker's notes or handwriting on them, however, were
26   only in the possession of Mr. Linker, and thus could not have been produced by MGA.
[116] Torres Decl., ¶ 20, Ex. K (Linker Dep. at 77-78).  Despite this testimony, even a
27   layman's comparison of the drawing provided by Mr. Linker, which had been produced to
     Mattel in this litigation years before, and the actual dolls shows that the drawing is *not* a
28   drawing of the sculpt.

                                          -30-                    MGA'S OPPOSITION TO
EXHIBIT 31   PAGE 472                  MATTEL'S MOTION TO COMPEL
                                                                  CV 04-09049 SGL (RNBX)

1   and that he met with Mr. Linker about possibly working on "Bratz" prior to leaving

2   Mattel, in early October 2000.[117]  Accordingly, Mr. Linker's testimony is not

3   inconsistent with testimony that has been of record in this case for over two years.

4          In short, Mattel's assertions that MGA has failed to produce documents until

5   Mattel receives them from third parties and that MGA must be withholding

6   documents because MGA has not produced documents in support of Mattel's

7   misguided theory that "Bratz" was created earlier than it actually was are wholly

8   unsupported and without merit.

9     **G.   Mattel's Motion To Compel Further Interrogatory Responses**

10         **Should Be Denied As Moot**

11         Mattel's arguments concerning MGA's responses to Mattel's Second Set Of

12  Interrogatories is equally bereft.  First, Mattel argues that MGA should be

13  compelled to answer those interrogatories because it failed to timely serve its

14  response.  Contrary to Mattel's assertion, however, MGA's response, which was

15  served on May 30, 2006, was timely.  On April 28, 2005, Mattel served its Second

16  Set of Interrogatories on MGA.  MGA's responses were originally due May 31,

17  2005.[118]  On May 20, 2005, however, Judge Manella issued an order staying the

18  proceedings.  At the time the stay was entered, eleven days remained for MGA to

19  respond to Mattel's interrogatories.  Thereafter, on May 17, 2006, Judge Larson

20  issued an order lifting the stay.  Although MGA's response would have been due

21  eleven days later, that date fell on Memorial Day weekend.  Thus, MGA's response

22  was due May 30, 2006.[119]  Consistent with this, MGA served its response to

23  ___

[117] Torres Decl. ¶ 5, Exh. C (Bryant Dep. taken on November 4, 2004, at 10, 22, 221:20-
24  222:14; Bryant Dep. taken on November 5, 2004, at 282, 380-81).

[118] Pursuant to Federal Rule of Civil Procedure 33(b), MGA's response to Mattel's
25  Second Set of Interrogatories would have been due 30 days later, on May 28, 2005.
    However, May 28, 2005, was a Saturday, and the following Monday, May 30, 2005, was a
26  legal holiday.  Thus, MGA's response to Mattel's interrogatories would not have been due
    until May 31, 2005.  See FED. R. CIV. PROC. 6(a).

[119] See FED. R. CIV. PROC. 6(a).  Mattel attempts to argue that MGA's response was due
27  May 24, 2006, only seven days after the stay was lifted.  However, the stay was not
28  designed to reduce the amount of time that the parties had to respond to discovery

MGA'S OPPOSITION TO
MATTEL'S MOTION TO COMPEL
CV 04-09049 SGL (RNBX)

1 | Mattel's interrogatories on May 30, 2006.[120]

2 |      Mattel next argues that MGA's responses to its interrogatories were deficient

3 | and implies that it was prejudiced by alleged deficiencies. In an attempt to avoid

4 | further burdening the Court with this issue, MGA is serving supplemental

5 | interrogatory responses to cure any alleged deficiencies in its responses. Notably,

6 | however, Mattel has not been prejudiced by any alleged deficiency in MGA's

7 | interrogatory responses -- MGA's responses are substantively identical to those

8 | provided by Bryant, which Mattel has possessed since June 2006. Accordingly,

9 | Mattel's motion to compel responses to its interrogatories should be denied.

10 | //

11 | //

12 | //

13 | //

14 | //

15 | //

16 | //

17 | //

18 | //

19 | //

20 | //

21 | //

22 | //

23 | //

24 | //

25 | //

26 | requests.

27 | [120] As Mattel is well aware, MGA's response to Mattel's Second Set of Interrogatories was post-marked May 30, 2006, and, contrary to Mattel's assertion, MGA did provide a

28 | certificate of service indicating service on May 30, 2006. *See* Torres Decl. ¶ 25.

- 32 -

MGA'S OPPOSITION TO
MATTEL'S MOTION TO COMPEL
CV 04-09049 SGL (RNBX)

**H.    If Sanctions Are Warranted, They Are Warranted Against Mattel**

Finally, Mattel argues that it is entitled to sanctions.  As set forth at length above, and contrary to Mattel's assertions, MGA has already produced or is diligently working to produce documents in response to Mattel's requests.  In contrast, Mattel filed this motion without specifically informing the Special Master of the documents it truly seeks to compel.  For that, Mattel should be sanctioned.

## IV.    CONCLUSION

For the reasons set forth above, the Court should deny Mattel's motion to compel and for sanctions.

Dated:  February 20, 2007                    O'MELVENY & MYERS LLP

By:  Diana M. Torres
Attorneys for MGA Entertainment, Inc.

LA2:824135.1

MGA'S OPPOSITION TO
MATTEL'S MOTION TO COMPEL
CV 04-09049 SGL (RNBX)

**EXHIBIT 32**

RECEIVED

MAY 3 0 2007

1  DALE M. CENDALI (admitted *pro hac vice*)
   MICHAEL KEATS (admitted *pro hac vice*)
2  DIANA M. TORRES (S.B. #162284)
   JAMES P. JENAL (S.B. # 180190)
3  O'MELVENY & MYERS LLP
   400 South Hope Street
4  Los Angeles, CA 90071-2899
   Telephone: (213) 430-6000
5  Facsimile: (213) 430-6407
   Email:      jjenal@omm.com
6
7  PATRICIA GLASER (S.B. #55668)
   CHRISTENSEN, GLASER, FINK, JACOBS,
8  WEIL & SHAPIRO, LLP
   10250 Constellation Boulevard, 19th Floor
9  Los Angeles, CA 90067
   Telephone: (310) 553-3000
10 Facsimile: (310) 557-9815

11 Attorneys for MGA Entertainment, Inc.

12                 UNITED STATES DISTRICT COURT

13                 CENTRAL DISTRICT OF CALIFORNIA

14                        EASTERN DIVISION

15

16 CARTER BRYANT, an individual,          Case No. CV 04-09049 SGL (RNBx)
                                          (consolidated with CV 04-9059 & 05-2727)
17              Plaintiff,
                                          **MGA ENTERTAINMENT INC.'S**
18      v.                                **NOTICE OF MOTION OBJECTING**
                                          **TO PORTIONS OF THE DISCOVERY**
   MATTEL, INC., a Delaware               **MASTER'S MAY 15, 2007 ORDER**
19 Corporation,                           **GRANTING MATTEL'S MOTION TO**
                                          **COMPEL PRODUCTION OF**
20              Defendant.                **DOCUMENTS AND**
                                          **INTERROGATORY RESPONSES BY**
21                                        **MGA**

22                                        **[Federal Rule of Civil Procedure 72(a);**
                                          **Local Rule 72-2.1]**
23
24 CONSOLIDATED WITH                      Hearing Date:  TBA
   MATTEL, INC. v. BRYANT and             Time:          TBA
25 MGA ENTERTAINMENT, INC. v.             Location:      Courtroom 1
   MATTEL, INC.
26
27
28

EXHIBIT 32 PAGE 476

TO THE CLERK OF COURT AND ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that MGA Entertainment, Inc. ("MGA") by and through its undersigned counsel of record, will and hereby does move for an Order from this Court vacating portions of the Discovery Master's May 15, 2007 Order Granting Mattel's Motion to Compel Production of Documents and Interrogatory Responses by MGA.

This Motion is based upon this Notice, the accompanying Memorandum of Points and Authorities, and the Declaration of Kendall J. Burr, filed and served concurrently, the pleadings and record herein, and such other argument or evidence as may properly come to the attention of the Court.

Dated: May 30, 2007

O'MELVENY & MYERS LLP

*Michael Keats*

By: Michael Keats
Attorneys for MGA Entertainment, Inc.

BLUEBIRD OFFICE SUPPLIES (888) 477-0700 www.bluebirdquote.com

**EXHIBIT 33**

DALE M. CENDALI (admitted *pro hac vice*)
MICHAEL KEATS (admitted *pro hac vice*)
JAMES P. JENAL (S.B. #180190)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
mkeats@omm.com

PATRICIA GLASER (S.B. #55668)
CHRISTENSEN, GLASER, FINK,
JACOBS, WEIL & SHAPIRO, LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, CA 90067
Telephone: (310) 553-3000
Facsimile: (310) 557-9815

Attorneys for MGA Entertainment, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>                   Plaintiff,<br><br>          v.<br><br>MATTEL, INC., a Delaware corporation,<br><br>                   Defendant.<br><br>AND CONSOLIDATED ACTIONS | Case No. CV 04-9049 SGL (RNBx)<br>(consolidated with CV 04-9059 & 05-2727)<br><br>**MGA'S EMERGENCY EX PARTE APPLICATION FOR REVIEW OF SPECIAL MASTER INFANTE'S ORDER DENYING MGA'S MOTION FOR STAY OR EXTENSION**<br><br>Hearing Date:<br>Time:<br>Judge: Hon. Stephen G. Larson |

## FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT 33 PAGE 478

EMERGENCY EX PARTE
APPLICATION FOR REVIEW
CASE NO. CV 04-9049

06122107

### *EX PARTE APPLICATION*

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that MGA Entertainment Inc. ("MGA") will and hereby does move the Court, pursuant to Federal Rules of Civil Procedure 72(a), Rules 72-1, 72 2, and 72-2.2 of the Local Rules Governing Duties of Magistrate Judges, and 28 U.S.C. § 636(b)(1)(A), for an ex parte order vacating the Special Master's Order dated June 21, 2007, denying in substantial part MGA's Request for Stay or Extension and grant MGA's Request for Stay or Extension.

The motion is based on this Ex Parte Application, the accompanying Memorandum of Points and Authorities, submitted herewith, as well as the records contained in the Court's file in this matter, and such further evidence, whether documentary or oral, as may be presented at the time of any hearing on this matter.

MGA would be irreparably prejudiced if this motion is heard according to regular noticed motion procedures because MGA cannot immediately complete its entire substantive document production in this case as required in the Special Master's Order dated May 15, 2007 (which required MGA to complete its production of documents responsive to 47 separate Requests for Production by May 31, 2007) (attached as Exhibit A) and the Special Master's June 21, 2007 refusal to grant MGA an extension or stay pending appeal (attached as Exhibit B).

Pursuant to Local Rule 7-19.1, counsel for Mattel received notice of this Ex Parte Application for Review by telephone on June 21, 2007. Mattel opposes the motion.

EXHIBIT 33 PAGE 429

EMERGENCY EX PARTE
APPLICATION FOR REVIEW
CASE NO. CV 04-9049

MGA Entertainment, Inc. ("MGA") respectfully submits this Memorandum of Points and Authorities In Support for its Emergency Ex Parte Application for Review of Special Master Infante's Order Denying MGA's Motion for Stay or Extension in the case originally captioned *Mattel, Inc. v. Bryant*, Case No. CV 04-9059 SGL (RNBx).

## PRELIMINARY STATEMENT

The Special Master has ordered MGA to complete its entire substantive production in the *Mattel v. Carter Bryant* case forthwith. The Special Master's Order is patently unreasonable. The discovery period in the Bryant case does not close until October 22, 2007 and the parties have long been producing documents on a rolling basis. The Special Master's refusal to grant MGA additional time to complete its production is particularly unwarranted because MGA already has produced more than 78,000 pages of documents to Mattel and has made available for inspection numerous physical objects such as sculpts, molds and dolls -- which Mattel has in fact inspected. MGA has been engaging in Herculean efforts to collect and produce. These efforts stand in direct contrast to Mattel which has not suspended its email auto delete policy and which MGA has only recently learned is not searching any form of backup, thereby reducing its own production burden -- while making it very difficult to recover evidence that should have been readily available.

The Special Master's Order requires MGA to do the impossible: to complete its collection and production of documents responsive to the 47 Requests immediately. Further, the Special Master's Order would effectively moot MGA's pending appeals before this Court. As such, MGA has no choice but to seek relief from the Special Master's Order of June 21, 2007 (the "Order") denying MGA's Request for Stay or Extension of the Special Master's May 15, 2007 order.

Accordingly, MGA respectfully requests that this Court vacate the Discovery Master's Order denying MGA's Motion for Stay or Extension.

EMERGENCY EX PARTE
APPLICATION FOR REVIEW
CASE NO. CV 04-9049

# FACTUAL BACKGROUND

1    On March 5, 2007, the Special Master heard oral argument concerning

2  Mattel's Motion to Compel MGA's Production of Documents and Interrogatory

3  Answers dated February 2, 2007. At the hearing, MGA understood that the Special

4  Master was going to grant the motion in part, but would issue a written opinion

5  detailing the scope of such order. Indeed, it took the Special Master two months to

6  resolve MGA's discovery obligations, which it delineated in a 15- page Order dated

7  May 15, 2007. Specifically, the Order directed MGA to complete its production of

8  documents with respect to more than 47 separate Requests for Production

9  (including to produce ALL documents from MGA's indirect Hong Kong

10  subsidiary) (the "Requests") and to supplement 10 detailed interrogatories. MGA

11  was surprised to discover in the Order, that MGA was compelled to complete its

12  production of documents responsive to Mattel's Requests by May 31, 2007.

13    In essence, MGA was given two weeks to complete its production with

14  respect to almost all of the facts at issue in the *Mattel v. Bryant* case, including

15  numerous requests concerning the origins of Bratz, Bryant's work for MGA, design

16  documents for unreleased products, and MGA's agreements with and payments to

17  Bryant and numerous others. Furthermore, some of the categories of documents

18  that the Special Master ordered produced were beyond the scope of permissible

19  discovery under the Federal Rules of Civil Procedure. As such, MGA substantively

20  appealed the Special Master's Order with respect to these particular categories of

21  documents.

22    As a result, MGA promptly attempted to negotiate an extension of time with

23  Mattel to fully comply with the Order. Although Mattel recognized that some

24  additional time would be needed, Mattel was not amenable to extending the

25  deadline for producing documents beyond June 11, 2007. In view of the foregoing,

26  MGA was forced to appeal the Special Master's Order with respect to timing.[1]  In

27  ───────────────────
[1] MGA's appeal with respect to substantive issues arising from the Special Master's Order
28  including that the Order requires MGA to produce (a) privileged documents regarding a non-
testifying expert's ink testing; and (b) unreleased product information is set for oral argument on

an effort to avoid burdening the Court with issue, MGA also sought relief from the

Special Master in the form of a stay pending appeal, or in the alternative, an

extension of time in which to comply. In a hearing before the Special Master on

June 19, 2007, the Special Master denied the requested stay and only extended

MGA's time to produce documents from Hong Kong until June 29, 2007. Mattel

immediately demanded compliance within an hour of the telephonic hearing,

apparently setting the stage for further motion practice -- even before providing the

Special Master with a requested proposed form of order. Upon receipt of the

written Order, MGA promptly filed this ex parte application for review.

## ARGUMENT

### A.    The Special Master's Ruling Is Clearly Erroneous

The Special Master's decision to direct only MGA -- a company with far

fewer resources than Mattel -- to complete its substantive document production on

two weeks notice is patently unfair and unreasonable. In this regard, the decision is

clearly erroneous and an abuse of discretion. A district court may modify a

magistrate judge's ruling on a non-dispositive matter, such as an order to compel

discovery, if the order is "clearly erroneous" or "contrary to law." *See Bahn v. NME

Hospitals, Inc.*, 929 F.2d 1404, 1414 (9th Cir. 1991); see also 28 U.S.C. §636

(b)(1)(A) ("a judge may reconsider any pretrial matter under this subparagraph (A)

where it has been shown that the magistrate judge's order is clearly erroneous or

contrary to law."). Generally, a magistrate judge's factual findings and

discretionary decisions made in connection with non-dispositive pretrial discovery

matters are subject to the "clearly erroneous" standard of review. *FDIC v. Fidelity

& Deposit Co. of Maryland*, 196 F.R.D. 375, 378 (S.D. Cal. 2000); *Wolpin v. Philip

Morris Inc.*, 189 F.R.D. 418 (C.D. Cal. 1999) ("The "clearly erroneous" standard

applies to the magistrate judge's findings of fact; legal conclusions are freely

reviewable de novo to determine if they are contrary to law). Under this standard,

July 30, 2007.

EXHIBIT 33 PAGE 4 488

1   factual findings are clearly erroneous when the "'reviewing court on the entire

2   evidence is left with the definite and firm conviction that a mistake has been

3   committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S. Ct.

4   1504, 84 L. Ed. 2d 518 (1985) (citation omitted).

5       The Special Master did not provide any reason for denying MGA's Request

6   for Stay or Extension beyond indicating that MGA was aware as of March 5, 2007

7   that Mattel's motion to compel was going to be granted. While MGA understood

8   that the Special Master intended to grant Mattel's motion, it certainly was not aware

9   of the scope of the Special Master's order, nor did it know that the Special Master

10  was going to effectively order MGA to complete its production nearly 4 ½ months

11  prior to the close of discovery. Mattel argued, and the Special Master apparently

12  accepted, that MGA should have divined the scope of the Special Master's intended

13  order which he indicated would be forthcoming at the March 5, 2007 hearing, but

14  which did not issue until May 15, 2007, and readied its entire production of

15  documents on that basis alone. Reversal of the Order is appropriate where, as here,

16  the magistrate's rulings are "cryptic" and make "no findings and offer no hint as to

17  [his or her] reasons for believing the [ruling] to be justified." *Quaker State Oil*

18  *Refining Corp. v. Garrity Oil Co., Inc.*, 884 F.2d 1510, 1517-18 (1st Cir. 1989)

19  (affirming district court's reversal of magistrate's ruling on nondispositive

20  amendment to counterclaim).

21      MGA simply cannot complete its production of documents within the time

22  frame allotted by the Special Master. While MGA did in fact begin to collect and

23  produce documents following oral argument on Mattel's motions,[2] MGA had no

24  notice that the Discovery Master would order broad discovery on an expedited

25  basis, particularly since Mattel never asked for expedited discovery either in its

26  moving papers or at oral argument. MGA, like Mattel, has been and is continuing

27  _____

28  [2] In fact, MGA has produced more than 78,000 pages of documents responsive to Mattel's
    requests since March 5, 2007 and continues to produce documents on a rolling basis. (See
    Declaration of Chris D. Nguyen dated June 21, 2007, ¶2.)

EMERGENCY EX PARTE
APPLICATION FOR REVIEW
CASE NO. CV 04-9049

EXHIBIT 33 PAGE 483

1   to produce responsive documents on a rolling basis. However, in stark contrast to

2   Mattel, MGA is collecting, reviewing and producing thousands of emails and other

3   electronic documents. Mattel has never suspended its email auto delete policy,

4   apparently only preserving enormous amounts of potentially relevant data on

5   backup media, and only since April 18, 2005. However, MGA has only recently

6   learned (in the deposition of Mattel's 30(b)(6) witness, Fred T. Kawashima, on

7   email preservation taken on June 19, 2007) that Mattel is not searching any form of

8   backup, thereby reducing its own production burden -- while making it very

9   difficult to recover evidence that should have been readily available. (See

10  Declaration of James P. Jenal dated June 22, 2007, ¶ 2, Ex. 1) ("Jenal Decl."). As

11  Mattel's 30(b)(6) witness stated in his deposition with respect to Mattel's auto-

12  delete policy:

13      "Q.   My question to you was: Do you know whether

14      subsequent to that E-mail [from Robert Normile, Mattel's General Counsel

15      dated April 18, 2005] whether the 90-day policy

16      by which E-mails are automatically deleted based on

17      the functionality in Mailbox Manager, if that was

18      ever suspended?

19          MR. COREY: Objection: vague and ambiguous.

20          THE WITNESS: If it was ever suspended?

21  BY MR. JENAL:

22      Q.   Correct.

23      A.   No.

24      Q.   Was it ever changed in any way in response

25  to Mr. Normile's E-mail?

26      A.   Changed such as?

27      Q.   Changed in any way.

28      A.   Not to my knowledge, no." (See Jenal Decl., Ex. 1 at 99:25-100:14)

EMERGENCY EX PARTE
APPLICATION FOR REVIEW
CASE NO. CV 04-9049

EXHIBIT 33 PAGE 184
6

Mr. Kawashima also testified:

"Q.   I believe you testified that as to the

backups that have been preserved on the -- the

Exchange mailboxes it's your understanding that no

restoration of those backup tapes has ever been

performed; is that correct?

A.   That is my understanding.

Q.   Do you know if any searches have ever been

made of files on this preservation system to find

files responsive to the litigation?

A.   I'm not aware -- I'm not aware of that." See Jenal Decl., Ex. 1 at 72:7-

16.

The task of collecting, reviewing and producing almost eight years worth of

email and other electronic documents is enormous.  Requiring MGA essentially to

complete its entire substantive production by May 31, 2007 -- including all

documents concerning the "origins" of "Bratz" from various entities around the

world -- is wholly unjustified, particularly when Mattel is not, nor is it being

required to, do the same.  Given that discovery does not close in the *Mattel v.*

*Carter Bryant* case until October 22, 2007, Mattel did not identify any basis for

requiring MGA to complete its document production many months before Mattel

apparently planned to complete its own document production and the Special

Master did not give any reason why this should be the case.  Moreover the Special

Master's Order is patently unfair and provides a distinct tactical advantage to

Mattel by forcing MGA to complete its production on an expedited basis (that no

one requested and that is utterly without basis) while allowing Mattel the additional

four months for completing its production that this Court's scheduling order

permits.

EXHIBIT 33  PAGE 485

1   Moreover, there are a number of documents that the Discovery Master
2   ordered MGA to produce -- for example, MGA's consulting expert's
3   communications with trial counsel -- to which MGA has substantively objected
4   before this Court. MGA's appeals are in good faith and it would defeat the purpose
5   of MGA's statutory right of appeal from magistrate judge orders (as the Discovery
6   Master's orders are treated in this case) to present MGA with the draconian choice
7   of producing those documents that are the subject of substantive appeals or facing a
    contempt motion.

## CONCLUSION

9   For the foregoing reasons, MGA respectfully requests that the Court vacate
10  the Special Master's Order denying MGA's Request for Stay or Extension and
11  grant MGA's Request for Stay or Extension.

13  Dated:          June 22, 2007

                                    DALE M. CENDALI
                                    MICHAEL C. KEATS
                                    O'MELVENY & MYERS LLP

                                    By: _Michael C. Keats_
                                        Michael C. Keats

                                    Attorneys for MGA Entertainment, Inc.

EXHIBIT 33 PAGE 486

## PROOF OF SERVICE

I, Karen A. Nakatsu, declare:

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 400 South Hope Street, Los Angeles, California 90071-2899. On June 22, 2007, I served the within document(s):

**MGA'S EMERGENCY EX PARTE APPLICATION FOR REVIEW OF SPECIAL MASTER INFANTE'S ORDER DENYING MGA'S MOTION FOR STAY OR EXTENSION**

☒    by causing to be personally served the document(s) listed above to the person(s) listed below.

Michael T. Zeller, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

☒    by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below. I am readily familiar with the firm's practice of collecting and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Patricia Glaser, Esq.
Christensen, Glaser, Fink, Jacobs,
Weil & Shapiro, LLP
10250 Constellation Blvd.,
19th Floor
Los Angeles, CA 90067

Michael H. Page, Esq.
Keker & Van Nest LLP
710 Sansome Street
San Francisco, CA 94111

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on June 22, 2007, at Los Angeles, California.

*Karen A. Nakatsu*

Karen A. Nakatsu

EXHIBIT 33 PAGE 487

LA2:817525.2

**EXHIBIT 34**

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

FILED - EASTERN DIVISION
CLERK, U.S. DISTRICT COURT

AUG 1 0 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CARTER BRYANT,

               Plaintiff,

v.

MATTEL, INC.,

               Defendant,

and related actions.

CASE NO.  CV 04-9049 SGL (RNBx)

(Consolidated with cases CV-04-9059 and CV-05-2727)

ORDER DENYING MOTION FOR APPOINTMENT OF EXPERT WITNESSES

Presently before the Court is Mattel, Inc.'s ("Mattel") motion for the appointment of expert witnesses pursuant to Federal Rule of Evidence 706, Carter Bryant and MGA Entertainment, Inc.'s ("MGA") opposition and response thereto, and Mattel's reply. For the reasons set forth below, the Court **DENIES** the motion for the appointment of expert witnesses.

Federal Rule of Evidence 706(a) provides

> The court may . . . on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witness of its own selection. An expert witness shall not be appointed by the court unless the witness consents to act.

DOCKETED ON CM

AUG 1 1 2006

BY                    044

(73)

EXHIBIT 34 PAGE 488

1          A witness so appointed shall be informed of the witness'
2          duties by the court in writing, a copy of which shall be filed
3          with the clerk, or at a conference in which the parties shall
        have opportunity to participate.

4       The appointment of an expert by a federal court is a rare occurrence.  Much of

5  this stems from a concept "[d]eeply ingrained" in the common law "that it is the

6  responsibility of the parties to produce the evidence while the court looks on to assure

7  that the rules are followed." 4 JOSEPH M. MCLAUGHLIN, WEINSTEIN'S FEDERAL EVIDENCE

8  § 706.02[1], at 706-6 (2nd ed. 2006).  The reluctance of courts to intrude into the

9  evidence-gathering function normally assigned to counsel is borne out of "the fear of

10  ex parte communications between the court and its expert," as well as the

11  unseemliness of "[c]ollecting a share of the expense [for the work performed by the

12  court appointed expert] from a party who has been damaged by the expert's report."

13  Id. at 706-6, 706-7.  As a result of these institutional concerns, "experts are usually

14  appointed only in exceptional cases that present unwieldy, complex, or technical

15  issues" or where "there is a need for an impartial, independent assessment of a

16  disputed issue." Id. § 706.02[3], at 706-8 706-9.

17       Here, Mattel seeks for the court to appoint experts in the fields of questioned

18  document examination, ink chemistry analysis, and paper chemistry analysis in order

19  to "analyze and date (1) the originals of 'BRATZ' design drawings, (2) the faxed-

20  version of the BRATZ-related contract between . . . Carter Bryant and MGA

21  Entertainment, Inc., (3) MGA's internal documents relating to work performed by Anna

22  Rhee on Bryant-related projects in the year 2000, and (4) a facsimile of BRATZ

23  drawings bearing a fax header date of April 10, 2000," as well as "(5) any other

24  documents that cannot be sampled or tested without destroying the sample tested or

25  analyzed." (Mattel's Mot. Appt. Expert, Preface at 2).  The reason proffered for such

26  an appointment is two-fold:  First, a generalized concern that, because the documents

27  sought to be examined are "highly relevant" to the litigation, having a neutral expert

28  perform the testing on the same may obviate a battle of the experts that would make

1  the jury's function of sorting out the truth much more arduous; and second, concerns,

2  deduced during discovery, about the possible spoliation of key documents in the case

3  by MGA/Bryant and their counsel.

4  A.    <u>AVERTING A BATTLE OF THE EXPERTS</u>

5      Mattel's argument that the Court should appoint an expert because otherwise

6  each side will perform "separate, partisan destructive analyses of separate samples of

7  the documents" with "wide divergence" of opinion "virtually assured" is not well-

8  founded. (Mattel's Mot. Appt. Expert at 18, 20). Explicit in Mattel's argument is that

9  this feared divergence in each side's retained expert's opinions has yet to materialize.

10  This is not surprising as it appears that discovery in this case is in its nascent stage,

11  owed largely to the fact that the Court had earlier stayed the case while Mattel

12  appealed the denial of its motion to remand the case to state court. Mattel's argument

13  instead is that the Court should appoint an expert now to avoid the <u>possibility</u> that

14  there <u>may</u> be such wide divergence in each side's privately retained expert in the

15  <u>future</u>. Needless to say from the jabs each party took at the credibility and even

16  trustworthiness of the other side's retained expert during the oral argument on this

17  motion (one going so far as to label the competing ink chemistry experts as being the

18  modern day equivalent of one's Hatfield to the other's McCoy), such a possibility may

19  be more easier to imagine occurring here than in ordinary cases. Nevertheless, such

20  divergence, even if likely, is still that – a possibility, not an inevitability.

21      In those cases where an expert has been appointed by a court on account of

22  the excessive partisanship in the expert opinions retained by counsel, the rationale for

23  the appointment was based on the fact that the feared wide divergence in opinion had

24  already materialized. <u>See Students of California Sch. for the Blind v. Honig</u>, 736 F.2d

25  538, 548 (9th Cir. 1984)("the judge could not decide the merits of the students' seismic

26  safety claims on the basis of evidence presented at trial, so he reopened the case and

27  appointed a neutral expert to evaluate the adequacy of seismic testing at the Fremont

28  site"), <u>vacated on other grounds</u>, 471 U.S. 148 (1985); <u>Eastern Air Lines, Inc. v.</u>

3

EXHIBIT 34 PAGE 490

1   McDonnell Douglas Corp., 532 F.2d 957 (5th Cir. 1976); 4 WEINSTEIN § 706App.100 at

2   706App.-5 (noting that legal commentators' "imprecations against the parties' 'battle of

3   experts'", not the potential for such a battle, "led to the drafting of the Uniform Expert

4   Testimony Act in 1937," the precursor to Federal Rule of Evidence 706).

5          In no instance uncovered by the Court's research (or by Mattel's citation to

6   authority) has a court appointed an expert because of a fear, even one that is well-

7   founded, that such wide divergence in privately-retained expert testimony may

8   materialize in the future.  Were the Court to adopt Mattel's analysis, appointment of

9   experts by courts would expand exponentially, limited only by a court's assessment of

10  how partisan the experts in a given case may become in the future.  Such a

11  proliferation has not occurred precisely because courts generally require that the

12  divergent "horse" be placed before the expert witness "cart."  See FED. R. EVID. 706

13  advisory committee's note ("actual appointment is a relatively infrequent occurrence").

14  Unless and until this feared divergence in opinion becomes reality, the Court finds that

15  the potential (which itself cannot be quantified at this point) for its occurrence does not

16  warrant the Court's intrusion into the adversarial process through the appointment of

17  an expert at this stage.

18  B.     SPOILATION OF EVIDENCE

19         The question is much closer with respect to Mattel's other reason for the Court

20  to appoint an expert in this case:  Concern that opposing counsel or their clients may

21  have destroyed or altered key documents in the case.  Mattel's basis for such concern

22  is predicated on three facts uncovered during discovery.

23         1.     Evidence of spoilation

24         Before being deposed Bryant was asked to bring all his original BRATZ design

25  drawings.  When he arrived at his deposition, however, Bryant only had in his

26  possession a few of the originals.  (Decl. Michael T. Zeller ¶ 13).  Among these some

27  "contained holes where plugs apparently had already been removed.  Bryant

28  acknowledged . . . that his drawings had no holes in them when he gave them to his

4

EXHIBIT 3⅃ PAGE 491

1  lawyers." (Mattel's Mot. Appt. Expert at 2; see also Decl. Michael T. Zeller ¶ 14).

2  Specifically, at Bryant's deposition the following exchange took place between Bryant

3  and counsel for Mattel:

4      Q.      (By Mr. Quinn) I wanted to ask you about one of
5              these original drawings that were produced today.
                   . . . .
6              – what we're talking about here.  This is – the Post-it
               says that's Bryant – that's the original of Bryant
7              192, Bates number 192, which has the heads on it,
               and this is one of the originals that your counsel was
8              kind enough to have shipped here today for us to
               look at.

9      A.      Yes

10     Q.      And we were just looking at these this afternoon and
11             we notice[d] that there's a bunch of holes on the
               page, including in the signature, as if somebody
12             were taking ink samples.

13     A.      Uh-huh.

14     Q.      Do you see that?

15     A.      Yes.

16     Q.      Do you know anything about why those holes were
               made or how or when?

17     A.      I have no idea what those are.

18     Q.      I mean, when you had – when you had possession
19             of this document did it have those holes in it?

20     A.      Not that I remember.

21     Q.      You certainly never had anything to do with that?

22     A.      No.  I don't know anything about those holes.

23     Q.      And, similarly, if you wouldn't mind holding this up to
               the camera, this is the original of Bryant 210 and it's
24             also – if you take a look at it, I think you'll see it has
               some of those holes in it, although not as many as
25             the last one we looked at.  Again, you don't know
               anything about how or why those holes got put on
26             there?

27     A.      I don't.

28  (Decl. Michael T. Zeller, Ex. 7 at 161-163).

EXHIBIT 5 34 PAGE 492

1    Mattel has submitted the declaration of a questioned document analysis expert,
2    Lloyd Cunningham, who has opined that the holes described in the document
3    mentioned above are consistent with those that would be generated by taking
4    microplug samples to perform analysis of the ink found on a document. (Decl. Lloyd
5    Cunningham ¶ 5). Bryant and MGA eventually conceded (although at first refusing to
6    do so under the veil of work-product privilege) that they tested some of the original
7    BRATZ drawings by an expert they retained in the field of forensic chemistry, Erich J.
8    Speckin. (Response to Order to Show Cause ("Response") at 1-2).
9    Mr. Speckin states that in June, 2004, he performed a series of tests "on
10   various 'Bratz' documents" at the request of MGA's counsel.[1] (Decl. Erich J. Speckin
11   ¶ 8). Those tests included examining the documents in question under an infrared
12   light as well as performing sidelight testing, which involves "visually inspecting a
13   document by holding a side light up to the document at an oblique angel . . . to
14   determine preliminarily whether the document contains impressions, or markings
15   impressed upon the document by drawing and writing done on a sheet of paper laid
16   on top of the document being tested." (Decl. Erich J. Speckin ¶¶ 9, 10). Mr. Speckin
17   also performed an electrostatic detection apparatus to see if there was indented
18   impressions on the documents. (Decl. Erich J. Speckin ¶ 11). Finally, Mr. Speckin
19   "performed ink identifications tests" on the documents. (Decl. Erich Speckin ¶¶ 12-
20   13). Such testing involved Mr. Speckin removing "very small microplug samples from
21   the document at issue and testing the microplug." (Decl. Erich Speckin ¶13).
22   Nowhere is it averred by MGA, Bryant, or Mr. Speckin which or how many of the
23   original BRATZ drawings were subjected to this microplug sampling procedure, nor is
24   it averred from what parts of the documents that were tested was the microplug taken.
25   Instead, Mr. Speckin simply notes that in taking the microplugs he "le[ft] more than
26
27   _____
     [1] At the time the testing was done by Mr. Speckin, Bryant had already been
28   sued by Mattel for violating the terms of the invention agreement he signed when he
     worked for them from 1999 to 2000. (Response at 1).

6

EXHIBIT 34 PAGE 493

1   sufficient material for another expert to test the exact same <u>documents</u>," but admits

2   that "another expert cannot test the very same microplug that I tested . . . ." (Decl.

3   Erich J. Speckin ¶14).

4            Another episode brought to light during discovery causing Mattel concern

5   relates to MGA's handling of the original Bryant/MGA contract before the inception of

6   the instant litigation.  At the deposition of a former MGA executive, Victoria O'Connor,

7   testimony was elicited that O'Connor, "on explicit instructions of MGA's [CEO] Isaac

8   Lariam, . . . [made] redact[ions from] the fax header . . . on the BRATZ contract

9   between Bryant and MGA for the year 2000 to conceal the fact that Bryant sent the

10  contract from Mattel's Design Center while he was still employed at Mattel." (Mattel's

11  Mot. Appt. Expert at 3).  O'Connor's deposition appears to indicate that such alteration

12  occurred before the present litigation began (indeed, perhaps even before MGA

13  marketed the BRATZ doll).

14          Q.    . . . Was there ever anything that you were asked to
15                do that you – made you feel kind of uncomfortable?

16          A.    Yes.
                                    . . . .
17          Q.    And what was that?

18          A.    When the original contract was executed by Carter
19                Bryant, it was sent to me <u>via</u> fax, and on the top of
                  the fax listed the phone number from where it was
20                faxed, which said "Barbie Collectibles," and at one
                  point my boss, Isaac Larian, asked me to white that
21                out and send it to a lawyer, Patty Glaser.

22  (Decl. Michael T. Zeller, Ex. 19 at 306).  Upon further examination, however,

23  O'Connor stated that she did not participate in or have knowledge of any other

24  instances in which any other agreement between Bryant and MGA was directed to be

25  altered:

26          Q.    Were you ever asked to change the date on any
27                agreements between Mr. Bryant and MGA?

28          A.    No.

7

EXHIBIT 34 PAGE 494

1    Q.    Are you aware of anybody being asked to change
         the date on any of those agreements?
2
3    A.    No.

4    Q.    I mean, do you have any reason to believe that any
         agreement that was entered into between Mr. Bryant
         and MGA had a date altered or changed?
5
6    A.    No.

7    Q.    You never heard that from -- from any source?

8    A.    No.

9    (Decl. Paula E. Ambrosini, Ex. 3).

10           Finally, Mattel speculates that a drawing of some BRATZ doll accessories

11   faxed on April 10, 2000, had the fax header altered, much in the same manner

12   described in O'Connor's testimony vis-à-vis the MGA/Bryant faxed contract, as the

13   fields on the fax header for the sender's name and the sender's telephone number are

14   missing. (Decl. Michael T. Zeller ¶ 23 & Ex. 24).[2] As explained by Mattel, "Because

15
     _____

16        [2] Mattel speculates that the time sheets produced by MGA for one of its
     employees, Anna Rhee (who did doll face painting work for the BRATZ mock-up), from
17   "mid-to-late 2000" were altered or recently created by MGA to show that Rhee worked
     on projects called "Angel" or "Prayer Angel," when in fact she was working at the time
18   painting faces for BRATZ dolls at the direction of Bryant. (Mattel's Mot. Appt. Expert at
     3). The basis for this speculation is based on the fact that the initial disclosure by MGA
19   of Rhee's time sheets comprised only 8 pages. (Decl. Michael T. Zeller ¶ 20). Then,
     on January 7, 2005, Rhee produced 20 separate invoices of her work at MGA during
20   mid-to-late 2000, indicating that Rhee performed work for MGA prior to Bryant's
     departure from Mattel, most notably on June 12, 2000. (Decl. Michael T. Zeller ¶ 21).
21   Within a couple of weeks after Rhee's production of invoices to Mattel, MGA
     supplemented its earlier production of Rhee's time sheets showing that during the mid-
22   to-late 2000 period Rhee was working on a MGA project known as "Angel" or "Prayer
     Angels" and was not involved in any BRATZ-related work until after Bryant's departure
23   from Mattel. (Decl. Michael T. Zeller ¶ 22). Mattel's surmise that the supplemental time
     sheets were altered is allegedly bolstered by the fact that Rhee testified during her
24   deposition that the only work she performed in mid-to-late 2000 was on BRATZ and
     that the supplemental time sheets reference to the "Angel" and "Prayer Angel" was
25   nothing but a cover or code word for BRATZ-related work. This argument is hard to
     accept. First, even the invoices Rhee turned over to Mattel contain the phrase "Angel"
26   for the mid-2000 project she worked on. (Decl. Michael T. Zeller, Ex. 22 at 356-60,
     362). It is not until December, 2000, that any of the invoices submitted by Rhee show
27

28

1   facsimile machines normally insert senders' names and numbers as a matter of

2   course, and indeed is required by law [to do so], it appears likely that the document

3   was altered to conceal the sender's information. See 47 U.S.C. § 227(d)(1)(B)."

4   (Mattel's Mot. Appt. Expert at 10).  The premise underlying Mattel's concern on this

5   topic is not unreasonable.  The law requires such information to be found on any

6   document, like the one in question, that has been faxed.  Additionally, the testimony

7   elicited from Ms. O'Connor that MGA altered the fax header for other documents

8   related to BRATZ from the same time period leads to an obvious inference that other

9   documents where spaces on other fax headers are absent suffered a similar fate.

10          2.      Analysis

11                  a.      Microplug Ink Testing

12          Bryant and MGA begin by downplaying the significance of the spoliation issue

13   in this case.  With respect to the holes on some of the original BRATZ design

14   drawings produced at Bryant's deposition, they note that, even with these holes,

15   nothing prevents Mattel from performing its own testing on the remaining portions of

16   the drawings on the document.  "Indeed, the very fact that Mattel is asking for court-

17   appointed experts to perform ink and paper testing only underscores the fact that

18   nothing has been 'destroyed.'" (Joint Opp. at 2).  Mr. Speckin makes similar assertions

19   in his declaration, stating that the fact that the same microplug cannot be tested "is

20   entirely irrelevant because there is more than enough ink on each of the documents I

21   tested to allow numerous microplug samples to be extracted and tested by different

22   experts." (Decl. Erich J. Speckin ¶ 14 (emphasis added); see also Response at 5-6

23   ("While another expert cannot test the very same microplug that Mr. Speckin tested,

24

25   ────────────────────────────

26   her doing work on the BRATZ doll, well after Bryant had left Mattel.  (Decl. Michael T. Zeller, Ex. 21 at 367, 370, 373).  To accept Mattel's argument, not only would MGA

27   have had to alter the invoices it produced in the supplemental production, but the documents produced by Rhee would also have to be similarly altered.  An alternative

28   and just as plausible explanation is that Rhee is simply mistaken as to when she began performing work on the BRATZ project.

EXHIBIT 34 PAGE 496

1   that fact is entirely irrelevant because, unlike in a situation where the entire object is

2   destroyed during the testing, there is more than enough ink on each of the <u>documents</u>

3   Mr. Speckin tested to allow numerous microplug samples to be extracted and tested"

4   (emphasis added))). This argument is not persuasive. This is not a case where

5   everyone concedes that the documents in question were created at one point in time,

6   but dispute what that date may have been. In such a circumstance all the ink

7   markings on the documents are comparable to one another as it is conceded that all

8   the marks came from one point in time.

9        Here, however, it is Mattel's theory that Bryant made drawings in 1998 and then

10  periodically touched up or made refinements/additions to those drawings, adding more

11  marks in 1999 and 2000 during the time he was employed by Mattel.   An ink mark

12  from one part of the document is not necessarily comparable to another set of ink

13  markings found elsewhere on the document. One ink mark on a drawing could have

14  been made in 1998, for example, while another ink mark found on the same drawing

15  could have been put there sometime later. In taking microplug samples from one of

16  these ink markings without the ability of the other side to test <u>the same mark</u> would

17  forever foreclose a potential avenue of crucial evidence in this case. It is on that point

18  that taking microplug samples of the marks on these drawings is akin to the spoliation.

19  Therefore the fact that another expert could test other parts of the document does not

20  mean that key relevant evidence found on that document has not been destroyed. As

21  MGA and Bryant make clear spoliation of evidence occurs through the "destruction or

22  significant alteration of evidence, or the failure to preserve property for another's use

23  as evidence in pending or reasonably foreseeable litigation." <u>West v. Goodyear Tire & </u>

24  <u>Rubber Co.</u>, 167 F.3d 776, 779 (2nd Cir. 1999).[3]

25        At this point, it should not be lost that the documents in question are not

26  _____

27        [3] The Court does not mean to suggest that Mattel's theory is correct.  Instead, the Court simply notes this theory as refuting MGA and Bryant's argument that only the

28  complete destruction of a document would amount to spoliation under the particular circumstances in this case.

EXHIBIT 3/ PAGE 497

1   peripheral to the case. At its heart, this case asks the question: Who owns the rights

2   to the Bratz dolls? Bryant asserts that he came up with the idea for the Bratz dolls

3   while on a break from his employment at Mattel in 1998, and that he sold his idea to

4   MGA when he went to work for them in October, 2000. Mattel claims, among other

5   things, that Bryant "developed" or "continued to develop" his idea for Bratz dolls while

6   he was working for them from January, 1999, to October, 2000, and that pursuant to

7   an inventions agreement he signed with the Mattel when he went to work for them,

8   that idea now belongs to Mattel. As this clash of factual contentions makes clear, the

9   dating of the original BRATZ drawings and the markings contained thereon is a

10  fundamental, perhaps despositive, issue to this case. That there are serious

11  questions concerning the handling of these critical documents certainly causes the

12  Court much concern about whether the truth seeking functions of the adversarial

13  system have been fundamentally compromised in this case. As Mattel rightly notes,

14  "The adversarial process is not an end in itself; its value is in its ability to promote a

15  search for truth." (Mattel's Reply at 9).

16        Bryant and MGA concede that the sections that were holed out contained

17  markings, be they handwritten dates or other words or letters, that may be crucial to

18  the case. Indeed, one of the drawings – Bryant 192 – had a portion of the signature

19  line sampled. What is left unclear is whether, for those portions of the document

20  where ink or signatures were sampled, enough of the _same_ part of the document in

21  question (meaning the _same mark_) remains to be sampled by Mattel. For instance, is

22  there enough of the signature line from Bryant 192 left to sample, or has too much of it

23  already been sampled? In that sense, MGA's and Bryant's argument that nothing has

24  been destroyed by the microplug testing procedure because other parts of the

25  document still exist is misplaced. Indeed, MGA and Bryant later admit that the

26  circumstances allowing for "multiple experts [to] remove multiple microplugs and test

27  the exact same paper and ink" is dependent upon there being the same exact paper

28  and ink there to test. (Joint Opp. at 15 ("[a]s long as there is paper and ink to test")).

11

1  The continued existence of the "exact same pen stroke" is the very issue that is now

2  left open because of the holes in some of Bryant's original BRATZ design drawings.

3  Is there anything left of that exact same pen stroke that was sampled by Mr. Speckin

4  remaining on the original drawing for Mattel to test?  None of these questions have

5  been addressed by MGA, Bryant, or Mr. Speckin in their papers.  Instead, they simply

6  make the observation that there remain other ink markings on the same drawings for

7  Mattel to test, a reason which, as explained above, is wholly insufficient to assure the

8  Court that Mattel has not been prejudiced by MGA's actions.

9        Given the absence of any representation by them on this point, the Court

10  pressed MGA's counsel about the same at oral argument:

11            THE COURT:  And part of your argument is that
             while a small portion of the small portion of the page may
12            be gone, as you in your most recent papers concede is
             gone, there are other portions of the page that can be
13            tested.  The concern I have, I guess – and maybe you can
             clear this up for me – I've seen some of the drawings and I
14            have a pretty good mental image of what the drawings look
             like.  But there is also writing on these drawings,
15            signatures, copyright registration indications; some are
             large, some are small.  As I gather from the plaintiff, from
16            Mattel, the concern is that these different drawings or
             writings were done at different times.  And I guess I can
17            understand why when those drawings or writings were
             done could be significant from an evidentiary standpoint.
18            So the concern is not so much there's another part of the
             paper that can be tested; it's whether or not the particular
19            marking in question has been so damages as to not permit
             a full further testing on that particular marking.  Does my
20            question make sense?

21            MS. CENDALI: Yes, it does, your Honor.  And I
             anticipated that.  Significant, we thought, in their papers
22            was that . . . they cited to the fact that Mr. Bryant admitted
             in his deposition that there were holes in some of the
23            documents that he didn't know how they got there
             originally.  As an example, if you look at part of Zeller,
24            Exhibit 17, Bates number Bryant 201, that's an example of
             one of the documents that's been tested.

25            THE COURT: One second so I have that in front of
26            me. Okay.

27            MS. CENDALI: There are many many others that were
             submitted that were also submitted to this type of ink
28            testing, but this is just an example of one of them.  And if

12

1    you look at the document, you would never know --
     granted, this is smaller, so the actual drawing is even larger
2    than this, so there's even more ink on the larger drawing
     than there would be available on this reproduction size.
3
           But if you look at it -- and I'll represent to you that we
4    didn't test the face; the face is absent before and after the
     testing -- but if you look at it, you couldn't even see that
5    there were any pin pricks to it. If you look very, very
     carefully at the signature at the bottom, you can maybe see
6    where it says "Ramona Prints, 8-26-99"; that maybe there
     was like a little tiny hole in one of the little slash marks; that
7    was a teeny little pin prick hole that showed the testing .
     There's ample amount of ink to do the testing on all of
8    these documents. This is the normal course of procedure
     that was done.
9

10         When asked by the Court whether it accepted MGA's representation that there

11   was "ample amount of ink" left on the same marks that the microplugs were taken

12   from for further microplug testing, Mattel, in seeming contradiction to its position in its

13   papers, said it did: "I agree with Ms. Cendali. We do not maintain any portion of the

14   ink on a signature or an image has been so obliterated that you couldn't take a plug

15   now on any of it; that's not our point." (Emphasis added).

16         In light of this concession by Mattel, the Court finds that no colorable claim of

17   spoliation has been established at this time vis-à-vis Mr. Speckin's testing of the

18   documents to warrant the appointment of an expert by the Court to investigate the

19   same. See Sedrati v. Allstate Life Ins. Co., 185 F.R.D. 388, 393 (M.D. Ga.

20   1998)(sanction warranted where because "defendant's expert has conducted

21   destructive tests on the original documents," plaintiff's expert "cannot duplicate the

22   conditions of the original documents"). If there was any evidence indicating that MGA,

23   Bryant, or their counsel had engaged in acts that could compromise Mattel's ability to

24   discover crucial information in this case, the Court would be sympathetic to the

25   appointment of an expert to investigate the same. Here, no such evidence exists.

26   The tests done by Mr. Speckin have not left the marks that were micro-sampled or the

27   documents that were handled so compromised that Mattel cannot perform the exact

28   same tests on those exact same marks as performed by Mr. Speckin.

EXHIBIT 34 PAGE 500

1        Indeed, the only basis for spoliation that Mattel has left to argue – that the

2  passage of time has left the ability to perform any meaningful ink testing at this time

3  problematic – is an argument that has nothing to do with MGA's conduct, but much

4  more with Mattel's own dereliction. As the Court understands it, the process of dating

5  when ink was placed on a document has only a limited window of time in which it can

6  be accomplished because, eventually, the ink dries (be it in 2 years or 3 to 4 years),

7  leaving nothing capable of being sampled after that point to test (save to acknowledge

8  that the ink in question was put on the paper some time more than 3 to 4 years ago).

9  Mattel essentially argues that the impossibility of testing ink after a certain period

10  mandates that, if the other side is going to test ink while "fresh" ink remains on the

11  document, that party has an obligation to inform the other side so that they can do the

12  same before the ink "dries out"; failure to do so renders the test performed something

13  that cannot be replicated.[4] By Mattel's own admission, they knew there had been

14  testing done on the BRATZ original drawings as far back as November, 2004, during

15  Bryant's deposition testimony when they saw some of the original BRATZ drawings

16  (drawings that had been tested by Mr. Speckin five months earlier). Rather than

17  immediately seeking the production of those documents and having its own expert

18  perform similar tests on them, Mattel sat idly by, waiting until June of this year to do

19  anything, either by way of court-pleadings or formal requests made to MGA and

20  Braynt, related to having ink tests performed on the documents. Nowhere has Mattel

21

22      [4] The basic factual assumption in Mattel's argument may indeed be faulty – that when MGA tested the ink there was enough "fresh" ink to test. Mr. Speckin states that

23  "[i]nk takes approximately 3 to 4 years to dry on paper. Thus, by testing the ink to

24  determine if it is dry, it can be determined whether the document was created within the last [3 to] 4 years, or whether the ink, and thus the drawing, is more than [3 to] 4 years

25  old." (Decl. Erich J. Speckin ¶ 13). Given that Mr. Speckin performed his ink dating test in June, 2004, at best he could determine whether the ink had been put on the

26  paper on or after June, 2000. Beyond that time frame his test could not tell when the

27  now-dried ink was marked on the document. Given that the relevant period in question in this case is from August, 1998, to October, 2000, Mr. Speckin's test results would

28  appear to be only marginally relevant in adducing proof as to when the BRATZ drawings were made.

1  explained how MGA or Bryant had anything to do with it not having the ability to

2  perform such testing until now.  Mattel's allusion to the fact that a stay on discovery

3  was put in place by this Court in 2005 is misguided.  If Mattel thought that it was losing

4  valuable time on account of the stay, it could have at any time filed with this Court an

5  emergency request for relief from the stay to have such tests performed.  All it needed

6  to do was inform the Court that it had only a short period of time to perform the test on

7  account of the fact that ink dries; something which it never did in this case.

8       Mattel's citation to the case <u>Edwardes v. Southampton Hospital Associates</u>,

9  278 N.Y.S.2d 283 (1967) is equally unhelpful to their argument.  In that case, the court

10 was presented with an application to prevent the testing of a intramedullary pin for

11 discovery and testing.  <u>Id</u>. at 284.  The court held that, "[s]ince the pin is crucial to the

12 action it is not too difficult to appreciate that any change, however slight, assumes an

13 importance magnified proportionately. And undoubtedly tests which would destroy or

14 alter most or all of a particular article ought not be permitted in the first instance

15 without providing adequate safeguards to protect all concerned."  <u>Id</u>. at 286.  Here,

16 such an argument cannot be made because, for the reasons cited above, Mattel has

17 conceded that even in performing the tests of the original BRATZ drawings Mr.

18 Speckin left enough ink of the same pen stroke for its own experts to test.  In short,

19 there has been no alteration, however slight, made to the documents insofar as

20 Mattel's ability to replicate the exact same test is concerned.  The only change that

21 has occurred is in Mattel's ability to retrieve any relevant information from such a test

22 <u>on account of the passage of time that has elapsed</u>.  The test Mr. Speckin performed

23 is not responsible for this negative occurrence.  MGA is similarly not responsible for

24 the passage of time or Mattel's inability to retrieve useful information from the testing

25 process.  On that point, Mattel should look itself in the mirror for any finding of fault or

26 blame.

27       Moreover, aside from the potential for "destroying" key portions of the original

28 documents, it is alleged that MGA and Bryant's actions carry other means of

EXHIBIT 34 PAGE 502

1   prejudicing Mattel's ability to pursue lines of potential evidence in this case.  The

2   expert declaration submitted by Mattel notes another possible spoliation of the original

3   drawings even if there remained enough of the pertinent portion of the document in

4   question to sample: The sampling process itself may have contaminated the

5   document in question by obliterating potential crucial clues that were on the document

6   or otherwise the sampling process led to the introduction of foreign materials onto the

7   documents themselves which may complicate any future analysis.  As explained by

8   Mattel's expert:

9           [P]erforming many such types of testing, even if described
            as "non-destructive," on a particular original document

10          carries the risk that potential evidence on it, including
            indentations in the paper fiber, might be contaminated or

11          destroyed in the process.  Furthermore, the order of the
            types of testing to be performed on a given document

12          might have an impact on developing potential evidence
            during subsequent examinations. . . .

13
            . . . . [With respect to the original BRATZ drawings

14          containing holes in them,] it is possible that the destructive
            testing performed on the document may have caused

15          some form of contamination and/or alteration, which carries
            the further prospect that subsequent examinations by

16          experts may not enable them to develop potential evidence
            or the same evidence that the other [earlier] expert

17          developed.

18   (Decl. Lloyd Cunningham ¶¶ 4-5).

19          MGA has rebutted this risk of contamination argument by proffering Mr.

20   Speckin's declaration, the expert who actually performed the tests in question.  Mr.

21   Speckin states that he "exercised the utmost care in handling the documents [he]

22   tested," that a number of the tests he performed on the documents "has absolutely no

23   effect on the tested document whatsoever," and that with respect to those tests that

24   could effect the document he followed established procedures in carrying out the test

25   in question.  (Decl. Erich J. Speckin ¶¶ 8, 9, 10, 11, 12, 13).  Nowhere has Mattel

26   proffered any evidence rebutting or calling into question Mr. Speckin's

27   representations.  The Court therefore finds that, based on the evidence that is

28   currently before it, Mattel has not established a colorable claim of spoliation by way of

EXHIBIT 34 PAGE 503

1   contamination in the tests MGA performed on the documents in question.

2           b.      Alteration of Fax Headers

3           Insofar as O'Connor's deposition testimony relating to the white out of the fax

4   header on the October, 2000, contract between Bryant and MGA, this too is

5   downplayed by MGA and Bryant as being irrelevant because "there is no dispute that

6   Mr. Bryant faxed his signed contract from a fax machine at Mattel and, indeed, Mr.

7   Bryant readily admitted that fact at his deposition, which took place before Ms.

8   O'Connor's deposition." (Joint Opp. at 8 (emphasis in original)). This argument seeks

9   to compare apples to oranges. While it may be true that now there is no dispute by

10  MGA and Bryant that he faxed his portion of the contract to MGA from his office at

11  Mattel, at the time O'Connor did the white out of the fax header such a lack of dispute

12  was not apparent. It is from that perspective in time – the prologue to the litigation —

13  that O'Connor's deposition testimony is to be judged. And from that perspective her

14  testimony calls into question MGA's handling of relevant documents in its possession.

15          When the contract was first executed there is no indication that MGA and/or

16  Bryant would admit to the fact that Bryant negotiated his contract with MGA while he

17  was still working at Mattel; rather, at that point, that issue appeared to be an open one.

18  Indeed, the fact that MGA's CEO would direct O'Connor to tamper with the contract's

19  fax header clearly indicates that they would not admit to the fact. If MGA mistreated

20  this document where an open issue existed, it is not unreasonable to infer that it may

21  have been just as cavalier with its obligations to maintain the other documents in their

22  possession – say, for instance, the original BRATZ drawings – where similar open

23  issues remained. This concern with MGA's handling of documents in its possession at

24  the prologue to this litigation is reinforced by MGA and Bryant's blasé mention in a

25  footnote to their opposition that the original to this contract, the one which they

26  describe as being irrelevant, "has not been found." (Joint Opp. at 15 n.6). Indeed, it

27  has been suggested that MGA and Bryant or their counsel have made representations

28  that they are not sure of the exact whereabouts of a number of the original BRATZ

17

EXHIBIT 34  PAGE 504

1  drawings. (Decl. Shane McKenzie ¶ 3 ("Mr. Bryant's counsel[, at the December 22 to

2  23, 2004, inspection of the originals by counsel for Mattel,] claimed not to have the

3  majority of the originals of BRATZ drawings and sketches, and further claimed not to

4  know where those originals were located")).

5          All that being said, the Court does not find that the alteration of the fax header

6  on the original Bryant/MGA contract warrants the appointment of an expert at this

7  time. Ms. O'Connor testified that, other than this one instance, she is aware of no

8  other documents that were purposefully altered by MGA. While the evidence related

9  to the missing fax header on the April, 2000, BRATZ accessories fax may indicate that

10  more than one document had been tampered with by MGA personnel, the Court has

11  nothing at this time to basis that conclusion on other than speculation and conjecture.

12  Without any tangible, concrete proof that MGA's mishandling of documents was more

13  widespread, the Court is left with what appears simply as an isolated instance of

14  tampering.

15          Accordingly, the motion for appointment of expert witnesses is **DENIED**.

16          IT IS SO ORDERED.

17

18  DATE:   *8-9-06* .

19

20                          *S Larso*

21                          STEPHEN G. LARSON
                            UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

EXHIBIT 34 PAGE 515

EXHIBIT 35

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | | |
|---|---|---|
| CARTER BRYANT, AN INDIVIDUAL, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| V. | ) | NO. CV 04-9040 SGL (RNBX) |
| | ) | |
| MATTEL, INC., A DELAWARE CORPORATION, | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |
| AND CONSOLIDATED ACTION (S). | ) | |
| | ) | |

# C O N F I D E N T I A L
### (FOR ATTORNEYS' EYES ONLY)

# DEPOSITION OF KENNETH LOCKHART

# VOLUME II

# JUNE 15, 2007



REPORTED BY:
ANGELA DUPRE
CSR NO. 7804
JOB NO. 07AD053

C O U R T   R E P O R T E R S
700 S. Flower Street
Suite 1100
Los Angeles, California 90017
Office: (213) 955-0070
Fax: (213) 955-0077

EXHIBIT 35 PAGE 506

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL,      )
                                   )
                  PLAINTIFF,       )
                                   ) CASE NO.:
        VS.                        ) CV 04-9049 SGL (RNBX)
                                   )
MATTEL, INC., A DELAWARE           )
CORPORATION,                       )
                                   )
                  DEFENDANT.       )
                                   )
_____)
                                   )
AND CONSOLIDATED ACTION(S).        )
_____)


C O N F I D E N T I A L
(THIS TRANSCRIPT HAS BEEN DESIGNATED
CONFIDENTIAL FOR ATTORNEYS' EYES ONLY)


VOLUME II


DEPOSITION OF KENNETH LOCKHART,
PERSON MOST KNOWLEDGEABLE FOR MGA
ENTERTAINMENT, INC., TAKEN ON
BEHALF OF DEFENDANT, AT 865 SOUTH
FIGUEROA STREET, TENTH FLOOR, LOS
ANGELES, CALIFORNIA, COMMENCING
AT 9:45 A.M., FRIDAY, JUNE 15,
2007, BEFORE ANGELA DUPRE, CSR 7804.

240

EXHIBIT 35 PAGE 507

```
 1   APPEARANCES OF COUNSEL:
 2
 3   FOR CARTER BRYANT:
 4       KEKER & VAN NEST, LLP
         BY:  MICHAEL PAGE, ESQ.
 5       710 SANSOME STREET
         SAN FRANCISCO, CALIFORNIA 94111
 6       (415) 391-5400
         (NOT PRESENT)
 7
 8
     FOR MATTEL, INC.:
 9
         QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
10       BY:  JON D. COREY, ESQ.
         865 SOUTH FIGUEROA STREET
11       TENTH FLOOR
         LOS ANGELES, CALIFORNIA 90017-2543
12       (213) 624-7707
13
14   FOR MGA ENTERTAINMENT, INC.:
15       O'MELVENY & MYERS, LLP
         BY:  JAMES PAUL JENAL, ESQ.
16       400 SOUTH HOPE STREET
         LOS ANGELES, CALIFORNIA 90071-2899
17       (213) 430-6000
18
19   ALSO PRESENT:
20       STEVEN TOGAMI - VIDEOGRAPHER
                         JTV LITIGATION SERVICES, INC.
21
22
23
24
25
```

241

EXHIBIT 35 PAGE 528

1

I N D E X

2

3    DEPONENT:                    EXAMINED BY:              PAGE:

4    KENNETH LOCKHART         MR. COREY                    244

5

6

7

8    EXHIBITS FOR IDENTIFICATION:                          PAGE:

9    DEFENDANT'S:

10   457 - DIAGRAM ENTITLED MGA VPN TUNNELS               293

11   458 - SYMANTEC BACKUP EXEC.
             DOCUMENTATION                               294
12

     459 - M.I.S. ORGANIZATIONAL CHART                    296
13

14   460 - LANAIR DISASTER RECOVER
             DOCUMENTATION DATED FRIDAY,
             OCTOBER 6, 2006                              299
15

16   461 - E-MAIL STRING (BATES STAMPED
             MGA0003485 THROUGH MGA003486)                302
17   462 - E-MAIL STRING (BATES STAMPED
             MGA003572 THROUGH MGA003573)                 302
18

     463 - POWERPOINT PRESENTATION
19           ENTITLED "PROTECTING TRADE
             SECRETS"                                     309
20

     464 - E-MAIL TO ALL IN LA OFFICE FROM
21           KEN LOCKHART DATED MARCH 5, 2007             315

22

23

24

25

242

EXHIBIT 35 PAGE 509

1    LOS ANGELES, CALIFORNIA; FRIDAY

2      JUNE 15, 2007

3       9:45 A.M.

4

5  VIDEOGRAPHER:  GOOD MORNING.  WE ARE BACK ON

6 THE RECORD AT 9:45 A.M.  TODAY'S DATE IS JUNE 15TH,

7 2007.

8    THIS IS TAPE NUMBER 1, OF VOLUME II, FOR

9 THE CONTINUED DEPOSITION OF KENNETH LOCKHART,

10 PERSON MOST KNOWLEDGEABLE FOR MGA ENTERTAINMENT, IN

11 THE ACTION ENTITLED CARTER BRYANT VERSUS MATTEL,

12 INC., AND CONSOLIDATED ACTIONS.

13    MAY WE PLEASE HAVE INTRODUCTIONS FOR THE

14 RECORD, BEGINNING WITH THE WITNESS.

15  THE DEPONENT:  MY NAME IS KENNETH LOCKHART.

16 I'M VICE PRESIDENT AND C.E.O. FOR -- C.I.O. FOR MGA

17 ENTERTAINMENT.

18  MR. JENAL:  JIM JENAL, WITH O'MELVENY & MEYERS,

19 FOR MGA ENTERTAINMENT, INC.

20  MR. COREY:  JON COREY, ON BEHALF OF MATTEL.

21  DEPOSITION OFFICER:  CAN YOU RAISE YOUR RIGHT

22 HAND.

23    YOU DO SOLEMNLY SWEAR THAT THE TESTIMONY

24 YOU GIVE IN THIS MATTER WILL BE THE TRUTH, THE

25 WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO HELP YOU

EXHIBIT 35 PAGE 570

1   GOD?

2       THE DEPONENT:  YES, I DO.

3

4                    KENNETH LOCKHART,

5              DEPONENT, WAS EXAMINED AND

6                 TESTIFIED AS FOLLOWS:

7

8              EXAMINATION (CONTINUED)

9   BY MR. COREY:

10      Q.    MR. LOCKHART, DID YOU -- TODAY ARE YOU

11  TAKING ANY MEDICATION OR UNDER THE INFLUENCE OF

12  ANYTHING THAT AFFECTS YOUR MEMORY OR ABILITY TO

13  TESTIFY?

14      A.    NO, I'M NOT.

15      Q.    OKAY.  ANY REASON YOU CAN'T -- THAT YOUR

16  DEPOSITION CAN'T GO FORWARD RIGHT NOW?

17      A.    NO.

18      Q.    DID YOU DO ANYTHING BETWEEN THE TIME THAT

19  WE BROKE YESTERDAY AND THIS MORNING TO FURTHER

20  PREPARE FOR YOUR DEPOSITION?

21      A.    NO.

22      Q.    DID YOU SPEAK WITH ANYONE ABOUT YOUR

23  DEPOSITION BETWEEN THE TIME WE BROKE YESTERDAY AND

24  TODAY?

25      A.    BRIEFLY WITH COUNSEL.

                                                    244

EXHIBIT 35 PAGE 511

1    THE DEPONENT:  I DON'T KNOW.  SORRY.

2    MR. JENAL:  THAT'S OKAY.  IF YOU DON'T KNOW,

3  YOU DON'T KNOW.

4  BY MR. COREY:

5    Q.    DO YOU UNDERSTAND WHAT I MEAN WHEN I SAY

6  TAKING AN IMAGE OF A HARD DRIVE?

7    A.    YES, I DO.

8    Q.    WHAT DO YOU UNDERSTAND THAT TO MEAN?

9    A.    I MEAN IT TO BE A SECTOR BY SECTOR COPY

10  OF ALL THE DATA THAT'S PHYSICALLY ON THE HARD

11  DRIVE, WITHOUT CONSIDERING THE CONTEXT OF OPERATING

12  SYSTEM AND FILE STRUCTURES.

13    Q.    ARE YOU AWARE OF THAT HAVING EVER BEEN

14  DONE AT MGA?

15    A.    FOR THE PURPOSE OF?

16    Q.    FOR ANY PURPOSE.

17    A.    YES, WE DO, FROM TIME TO TIME.

18    Q.    AND WHY DO YOU DO THAT?

19    A.    GENERALLY, FOR THE PURPOSE OF RECREATING

20  NEW MACHINES AND SO FORTH, WE TAKE GHOST IMAGES OF

21  DRIVES, AND THEN WE USE THOSE TO SET UP THE NEW

22  MACHINES.

23    Q.    HAVE YOU EVER HEARD OF IT BEING DONE IN

24  CONNECTION WITH ANY DISPUTE IN WHICH MGA HAS BEEN

25  INVOLVED?

254

EXHIBIT 35 PAGE 512

1    A.    NO.

2    Q.    HOW MANY COMPUTERS DOES ISAAC LARIAN USE

3    CURRENTLY?

4    MR. JENAL:  OBJECTION; OUTSIDE THE SCOPE, CALLS

5    FOR SPECULATION, LACKS FOUNDATION.

6    THE DEPONENT:  HE HAS TWO LAPTOPS, AS FAR AS I

7    KNOW; ONE WHICH HE'S USING IN ROUTINE AND ONE WHICH

8    IS SPARE.

9    BY MR. COREY:

10    Q.    DOES HE ALSO HAVE A HOME COMPUTER?

11    A.    I DON'T KNOW.

12    Q.    HOW OLD IS -- HOW OLD ARE THE LAPTOPS?

13    A.    LESS THAN SIX MONTHS OLD.

14    Q.    HOW FREQUENTLY DOES HE GO THROUGH LAPTOPS

15    OR COMPUTERS?

16    MR. JENAL:  OBJECTION --

17    THE DEPONENT:  PRETTY FREQUENTLY.

18    MR. JENAL:  LACKS FOUNDATION, CALLS FOR

19    SPECULATION, OUTSIDE THE SCOPE.

20    THE DEPONENT:  WE BUY A NEW PAIR OF LAPTOPS FOR

21    ISAAC AT LEAST ONCE PER YEAR.

22    BY MR. COREY:

23    Q.    AND WHAT HAPPENS TO THE OLD LAPTOPS?

24    A.    THEY'RE TYPICALLY REFORMATTED AND PUT

25    BACK INTO PRODUCTION, IF THEY'RE STILL IN WORKING

255

EXHIBIT 35 PAGE 513

1    ORDER.

2        Q.    WHAT DO YOU MEAN "IF THEY'RE STILL IN

3    WORKING ORDER"?

4        A.    MOST OF THE TIME WHEN WE'RE REPLACING

5    LAPTOPS FOR HIM, THEY'RE GENERALLY NONFUNCTIONAL.

6        Q.    WHY ARE -- WHY ARE THEY NONFUNCTIONAL?

7        A.    THEY GET DROPPED, SPILLED ON, OR

8    OTHERWISE DAMAGED.

9        Q.    THROWN?

10       A.    I --

11       MR. JENAL:    OBJECTION; LACKS FOUNDATION, CALLS

12   FOR SPECULATION.    IT'S ARGUMENTATIVE.

13   BY MR. COREY:

14       Q.    WHAT ARE THE OTHER INSTANCES?    WHAT ARE

15   THE OTHER CAUSES OF THE NONFUNCTIONALITY OF

16   MR. LARIAN'S LAPTOPS, OTHER THAN THOSE YOU'VE

17   IDENTIFIED?

18       A.    DON'T KNOW.

19       Q.    WHO TYPICALLY DOES THAT, REPLACES --

20   REPLACES THEM?

21       A.    COULD BE ONE OF A NUMBER OF PEOPLE IN OUR

22   TECH SUPPORT TEAM; THAT WOULD EITHER BE MR. SUMAN,

23   ANOTHER TECHNICIAN NAMED GILBERT KEY.

24       Q.    HAS MGA MADE ANY EFFORT TO PRESERVE THE

25   HARD DRIVES ON THE PRIOR LAPTOPS USED BY

256

EXHIBIT 35 PAGE 514

1   MR. LARIAN?

2        A.     NOT TO MY KNOWLEDGE.

3        Q.     DO YOU KNOW WHETHER IMAGES WERE TAKEN OF

4   THE HARD DRIVES OF THE LAPTOPS OF MR. LARIAN'S

5   PRIOR LAPTOPS?

6        A.     I DON'T THINK SO.

7        Q.     DO YOU KNOW WHERE THE HARD DRIVES OF

8   MR. LARIAN'S PRIOR LAPTOPS ARE LOCATED TODAY?

9        A.     NOT OFFHAND.

10       Q.     I MEAN, DO YOU KNOW IF THEY'RE IN USE?

11       A.     NOT THE ONES THAT WEREN'T FUNCTIONAL.

12  BUT SOME OF THEM ARE IN USE.   I KNOW THAT FOR SURE.

13       Q.     WITH THAT --

14       A.     I KNOW THAT.

15       Q.     NO, GO AHEAD.   I DIDN'T MEAN TO INTERRUPT

16  TILL YOU FINISHED YOUR ANSWER.

17       A.     I KNOW ONE WHERE AT LEAST ONE OF THEM IS,

18  WHICH IS STILL WORKING, AND IT'S STILL BEING USED

19  AS A LOANER IN THE M.I.S. DEPARTMENT.

20       Q.     AND WAS THE HARD DRIVE WIPED BEFORE IT

21  WAS GIVEN TO THE -- WHOEVER -- BEFORE IT BECAME A

22  LOANER IN THE M.I.S. DEPARTMENT?

23       A.   . YES.

24       Q.     HAVE ANY OF MR. LARIAN'S LAPTOPS THAT

25  HAVE BEEN REPLACED NOT BEEN WIPED?

257

EXHIBIT 35 PAGE 515

1    A.    NO.

2    Q.    THEY ALL HAVE BEEN WIPED?  WE HAD A

3  DOUBLE NEGATIVE THERE.

4         ALL OF THE LAPTOPS THAT MR. LARIAN -- ALL

5  OF THE HARD DRIVES OF THE LAPTOPS THAT MR. LARIAN

6  HAS REPLACED HAVE BEEN WIPED?

7    A.    THE ONES WHICH WERE -- WHERE THE COMPUTER

8  WAS STILL FUNCTIONAL GET REIMAGED BEFORE ANYONE

9  ELSE IS ALLOWED TO USE THEM.

10    Q.    OKAY.  AND YOU DON'T KNOW WHETHER HE HAS

11  A HOME COMPUTER THAT HE USES SEPARATE AND APART

12  FROM HIS LAPTOP?

13    A.    NO, I DON'T.

14    Q.    DO YOU KNOW WHETHER MGA HAS ISSUED

15  MR. BRYANT A LAPTOP?

16    A.    I DON'T BELIEVE SO.

17    Q.    ARE YOU AWARE OF THE LOCATION OF ANY HARD

18  DRIVE OR ANY IMAGE OF ANY HARD DRIVE THAT HAS BEEN

19  PRESERVED FOR LITIGATION PURPOSES?

20    A.    NO.

21    Q.    DO YOU -- DO YOU KNOW IF THERE ARE ANY?

22    A.    NO, I DON'T.

23    Q.    WHO WOULD KNOW THAT?

24    A.    I THINK MR. TIONGCO WOULD KNOW THAT.

25    Q.    DOES MR. TIONGCO WORK WITH COUNSEL MORE

EXHIBIT 35 PAGE 516

1   THAN YOU DO, FOR PURPOSES OF PRESERVING INFORMATION

2   OR COLLECTING INFORMATION FOR PURPOSES OF

3   LITIGATION?

4       MR. JENAL:   OBJECTION; LACKS FOUNDATION, CALLS

5   FOR SPECULATION.

6       THE DEPONENT:   AT CURRENT TIME, I'M THE PRIMARY

7   INVOLVEMENT WITH COUNSEL.   BUT IN DIFFERENT TIMES

8   IN THE PAST, AND BEFORE I WAS AT THE COMPANY,

9   MR. TIONGCO WAS INVOLVED.

10  BY MR. COREY:

11      Q.    HOW LONG HAVE YOU -- HAVE YOU HAD THAT

12  ROLE OF BEING THE PRIMARY CONTACT WITH COUNSEL?

13      A.    I WOULD SAY PROBABLY SINCE 2006,

14  BEGINNING OF 2006.

15      Q.    SINCE -- SINCE YOUR RESPONSIBILITY FOR

16  THE IMPLEMENTATION OF THE AXAPTA SOFTWARE ENDED?

17      A.    YES.

18      Q.    YEAH, YOU HAVE TO ANSWER -- YOU HAVE TO

19  ANSWER YES OR NO.   BECAUSE IF YOU DON'T ANSWER YES

20  OR NO, THEN WE WILL GET THE VIDEO OUT AND WE WILL

21  HAVE TO PLAY THE VIDEO.

22      A.    UNDERSTAND.

23      Q.    SINCE 2006, WHAT HAVE YOU DONE TO EITHER

24  PRESERVE OR COLLECT INFORMATION FOR PURPOSES OF

25  THIS DISPUTE BETWEEN MGA AND MATTEL?

259

EXHIBIT 35 PAGE 517

1   STATE OF CALIFORNIA     )
                         )   SS.

2   COUNTY OF LOS ANGELES    )

3           I,   ANGELA DUPRE   , CERTIFIED

4   SHORTHAND REPORTER, CERTIFICATE NUMBER 7804, FOR

5   THE STATE OF CALIFORNIA, HEREBY CERTIFY:

6          THE FOREGOING PROCEEDINGS WERE TAKEN

7   BEFORE ME AT THE TIME AND PLACE THEREIN SET FORTH,

8   AT WHICH TIME THE DEPONENT WAS PLACED UNDER OATH BY

9   ME;

10        THE TESTIMONY OF THE DEPONENT AND ALL

11   OBJECTIONS MADE AT THE TIME OF THE EXAMINATION WERE

12   RECORDED STENOGRAPHICALLY BY ME AND WERE THEREAFTER

13   TRANSCRIBED;

14        THE FOREGOING TRANSCRIPT IS A TRUE AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES SO TAKEN;

16        I FURTHER CERTIFY THAT I AM NEITHER

17   COUNSEL FOR NOR RELATED TO ANY PARTY TO SAID ACTION

18   NOR IN ANY WAY INTERESTED IN THE OUTCOME THEREOF.

19        IN WITNESS WHEREOF, I HAVE HEREUNTO

20   SUBSCRIBED MY NAME THIS _29th_ DAY OF

21   _June_____, 2007.

22

23   _____

24

25

                                         334

EXHIBIT 35 PAGE 518

**EXHIBIT 36**

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL,   )
                                )
                 PLAINTIFF,     )
                                )
        V.                      )          NO.  CV 04-9040 SGL (RNBX)
                                )
MATTEL, INC., A DELAWARE        )
CORPORATION,                    )
                 DEFENDANT.     )
————————————————————————————————)
                                )
AND CONSOLIDATED ACTION(S).     )
                                )

C O N F I D E N T I A L
FOR ATTORNEYS EYES ONLY

DEPOSITION OF LISA TONNU

VOLUME I

JULY 19, 2007



COURT REPORTERS
700 S. Flower Street
Suite 1100
Los Angeles, California 90017
Office: (213) 955-0070
Fax: (213) 955-0077

REPORTED BY:
APRIL PRAXMARER
CSR NO.  12437
JOB NO. 07AE487-AC

EXHIBIT 36  PAGE 519

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION


CARTER BRYANT, AN INDIVIDUAL,   )
                                )
        PLAINTIFF,              )
                                )
VS.                             )  CASE NO.
                                )  CV 04-9049 SGL (RNBX)
MATTEL, INC., A DELAWARE        )
CORPORATION,                    )
                                )
        DEFENDANT.             )
                                )
AND CONSOLIDATED ACTION(S).      )
_____)


C O N F I D E N T I A L

(THIS TRANSCRIPT HAS BEEN DESIGNATED CONFIDENTIAL FOR
ATTORNEYS' EYES ONLY)


    VOLUME I DEPOSITION OF LISA TONNU, TAKEN ON BEHALF OF
THE DEFENDANT, AT 865 SOUTH FIGUEROA STREET, TENTH FLOOR,
LOS ANGELES, CALIFORNIA, COMMENCING AT 10:00 A.M.,
THURSDAY, JULY 19, 2007, BEFORE APRIL CRUZ CACULITAN,
CERTIFIED SHORTHAND REPORTER NO. 12437.

EXHIBIT 36 PAGE 520

2

```
 1    APPEARANCES OF COUNSEL:
 2    FOR CARTER BRYANT:
 3         KEKER & VAN NEST, LLP
           BY:  MICHAEL PAGE, ESQ.
 4         710 SANSOME STREET
           SAN FRANCISCO, CALIFORNIA 94111
 5         (415) 391-5400
           (NOT PRESENT)
 6
      FOR MATTEL, INC.:
 7
           QUINN EMANUEL URQUART OLIVER & HEDGES, LLP
 8         BY:  JON COREY, ESQ.
           865 SOUTH FIGUEROA STREET
 9         TENTH FLOOR
           LOS ANGELES, CALIFORNIA 90017
10         (213) 624-7707
11    FOR MGA ENTERTAINMENT, INC.:
12
           O'MELVENY & MEYERS, LLP
13         BY:  JAMES PAUL JENAL, ESQ.
           400 SOUTH FIGUEROA STREET
14         LOS ANGELES, CALIFORNIA 90071-2899
           (213) 430-6000
15
      ALSO PRESENT:
16
           PHILIP CRUZ, VIDEOGRAPHER
17         J.T.V. LITIGATION SERVICES, INC.
18         CRAIG HOLDEN - MGA ENTERTAINMENT
19
20
21
22
23
24
25
```

EXHIBIT _36_ PAGE _521_

3

```
 1                              INDEX

 2

 3    DEPONENT      LISA TONNU                        PAGE

 4    EXAMINATION

 5    BY MR. COREY                                      7

 6

 7    EXHIBITS FOR IDENTIFICATION

 8

 9    NO.        DESCRIPTION                          PAGE

10    515          DIAGRAM                             47

11    516          FILING                             100

12    517          SPANISH LANGUAGE DOCUMENT          102

13    518          TAX RETURN                         108

14    519          ENGAGEMENT LETTER                  128

15    520          CONSULTING AGREEMENT               139

16    521          LIST                               164

17    522          DECLARATION                        165

18    523          DRAWING                            185

19    524          E-MAIL DATED 5/15/2004             199

20            (INSTRUCTIONS NOT TO ANSWER)

21        PAGE      LINE        PAGE       LINE

22         53        15          219        15

           54        17          219        25

23         55         2          220        11

           55        12          220        21

24         56         7          221         1

          163         9          224        23

25        163        19          225         8
```

EXHIBIT 36 PAGE 522

4

1          (INSTRUCTIONS NOT TO ANSWER)
2          PAGE      LINE          PAGE      LINE
3          163        25           225        13
           178         3           225        17
4          179         5           225        21
           179        22           226         2
5          180         2           226         7
           181         5           226        11
6          181        14           226        24
           181        23           227        22
7          182         5           228         6
           183         5           228        10
8          183        11           228        15
           185         3           228        19
9          189        12           228        25
           215        16           229         4
10         217        17
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

EXHIBIT 36 PAGE 523

5

|   |   |   |
|---|---|---|
| 1 | LOS ANGELES, CALIFORNIA; | |
| 2 | THURSDAY, JULY 19, 2007, 10:00 A.M. | |
| 3 | | |
| 4 | THE VIDEOGRAPHER:  OKAY.  GOOD MORNING.  WE | 10:01:25 |
| 5 | ARE NOW ON THE RECORD AT 10:00 A.M.  TODAY'S DATE IS | 10:01:28 |
| 6 | THURSDAY, JULY 19, 2007.  MY NAME IS PHILIP CRUZ, WITH | 10:01:31 |
| 7 | J.T.V. LITIGATION SERVICES IN LOS ANGELES, CALIFORNIA. | 10:01:38 |
| 8 | WE ARE TAPING THESE PROCEEDINGS AT 865 SOUTH | 10:01:41 |
| 9 | FIGUEROA STREET, THE TENTH FLOOR, IN DOWNTOWN LOS | 10:01:46 |
| 10 | ANGELES. | 10:01:48 |
| 11 | THIS IS TAPE NUMBER 1 FOR THE VIDEOTAPED | 10:01:49 |
| 12 | DEPOSITION OF MS. LISA TONNU IN THE ACTION ENTITLED | 10:01:53 |
| 13 | "BRYANT VERSUS MATTEL."  THIS DEPOSITION A BEING TAKEN | 10:01:57 |
| 14 | ON BEHALF OF THE DEFENDANTS.  THE CASE NUMBER IS | 10:02:00 |
| 15 | CV 04-9049 SGL. | 10:02:03 |
| 16 | AND MAY I HAVE INTRODUCTIONS FOR THE RECORD, | 10:02:07 |
| 17 | PLEASE. | 10:02:11 |
| 18 | MR. COREY:  I'M JON COREY, ON BEHALF OF | 10:02:12 |
| 19 | MATTEL. | 10:02:14 |
| 20 | MR. JENAL:  JIM JENAL, WITH O'MELVENY & | 10:02:15 |
| 21 | MEYERS, FOR DEFENDANT MGA ENTERTAINMENT, INC. | 10:02:19 |
| 22 | MR. HOLDEN:  CRAIG HOLDEN, MGA ENTERTAINMENT. | 10:02:21 |
| 23 | THE WITNESS:  LISA TONNU, FROM MGA. | 10:02:24 |
| 24 | THE VIDEOGRAPHER:  YOU MAY SWEAR IN THE | 10:02:25 |
| 25 | WITNESS. | 10:02:25 |

EXHIBIT 36 PAGE 524

6

| | | |
|---|---|---|
| 1 | /// | 10:02:25 |
| 2 | LISA TONNU, | 10:02:25 |
| 3 | HAVING BEEN FIRST DULY AFFIRMED BY THE REPORTER, WAS | 10:02:25 |
| 4 | EXAMINED AND TESTIFIED AS FOLLOWS: | 10:02:25 |
| 5 | | 10:02:25 |
| 6 | EXAMINATION | 10:02:25 |
| 7 | BY MR. COREY: | 10:02:35 |
| 8 | Q    GOOD MORNING, MS. TONNU.  IS THAT -- IS THAT | 10:02:35 |
| 9 | HOW YOU SAY YOUR NAME? | 10:02:39 |
| 10 | A    YES. | 10:02:42 |
| 11 | Q    TONNU? | 10:02:43 |
| 12 | A    TONNU. | 10:02:44 |
| 13 | Q    TONNU.  I'LL TRY AND GET THAT RIGHT. | 10:02:46 |
| 14 | HAVE YOU EVER HAD YOUR DEPOSITION TAKEN | 10:02:49 |
| 15 | BEFORE? | 10:02:50 |
| 16 | A    NO. | 10:02:51 |
| 17 | Q    I'M SURE YOUR COUNSEL HAS TALKED TO YOU A | 10:02:51 |
| 18 | LITTLE BIT ABOUT DEPOSITIONS, BUT JUST TO MAKE SURE | 10:02:56 |
| 19 | WE'RE ALL ON THE SAME PAGE, WE'RE GOING TO GO OVER | 10:02:59 |
| 20 | SOME -- A COUPLE OF GROUND RULES. | 10:03:02 |
| 21 | DO YOU UNDERSTAND THAT THE COURT REPORTER | 10:03:03 |
| 22 | SEATED TO YOUR RIGHT IS TAKING DOWN EVERYTHING THAT | 10:03:04 |
| 23 | EVERYONE IN THE ROOM SAYS? | 10:03:07 |
| 24 | A    YES. | 10:03:07 |
| 25 | Q    DO YOU UNDERSTAND THAT SHE WILL PREPARE A | 10:03:08 |

EXHIBIT 36 PAGE 525

7

1    Q.    AND HOW -- HOW DO YOU KNOW WHAT THE CORPORATE                    11:21:23

2    ORGANIZATION OF MGA AND ITS SUBSIDIARIES IS?                          11:21:35

3    A    I HAVE BEEN MAINTAINING THE STRUCTURE,                           11:21:38

4    CORPORATE STRUCTURE, SINCE JOINING THE COMPANY.                       11:21:40

5    Q    WHAT DO YOU MEAN, "MAINTAINING THE CORPORATE                     11:21:43

6    STRUCTURE"?                                                           11:21:46

7    A    THE ACTUAL PRESENTATION, THE ORGANIZATION                        11:21:46

8    CHART.                                                                11:21:51

9    Q    YOU KEEP TRACK -- YOU'RE RESPONSIBLE FOR THE                     11:21:51

10   ORGANIZATIONAL CHART AND MAKING SURE IT'S UP-TO-DATE?                 11:21:54

11   A    CORRECT.                                                         11:21:57

12   Q    AND THEN YOU'VE GOT -- ALL RIGHT.  LET'S JUST                    11:21:57

13   GO THROUGH THIS VERY -- LET'S JUST GO THROUGH THIS.                   11:22:17

14        YOU'VE GOT MGA ENTERTAINMENT?                                    11:22:20

15        MR. JENAL:  SORRY, JON.  I JUST NEED TO                          11:22:23

16   INTERJECT.                                                            11:22:24

17        GIVEN THAT WE'RE GOING TO GO INTO THE DETAILS                    11:22:24

18   ON THIS CHART, WE'LL DESIGNATE AT LEAST THIS PORTION OF               11:22:27

19   THE TESTIMONY ATTORNEYS' EYES.  THERE MAY BE OTHER                    11:22:30

20   SECTIONS AS WELL, BUT CERTAINLY THIS PART.                           11:22:33

21        MR. COREY:  OKAY.  AND I ASSUME, THEN, YOU'RE                    11:22:38

22   DESIGNATING THIS --                                                  11:22:40

23        MR. JENAL:  CORRECT.                                            11:22:41

24        MR. COREY:  -- EXHIBIT 515 AS ATTORNEYS EYES                    11:22:41

25   ONLY AS WELL?                                                        11:22:44

48

EXHIBIT 36 PAGE 520

| | | |
|---|---|---|
| 1 | MR. JENAL:   CORRECT. | 11:22:46 |
| 2 | BY MR. COREY: | 11:22:46 |
| 3 | Q     YOU'VE GOT MG -- MGA ENTERTAINMENT, INC. | 11:22:46 |
| 4 | IS THERE A -- IS THERE A HOLDING COMPANY | 11:22:52 |
| 5 | ABOVE MGA ENTERTAINMENT, INC.? | 11:22:53 |
| 6 | A     NO. | 11:22:58 |
| 7 | Q     JUST SHAREHOLDERS? | 11:22:58 |
| 8 | A     YES. | 11:22:59 |
| 9 | Q     ONE SHAREHOLDER?   HOW MANY SHAREHOLDERS ARE | 11:22:59 |
| 10 | THERE? | 11:23:03 |
| 11 | A     THERE ARE TWO SHAREHOLDERS. | 11:23:04 |
| 12 | Q     AND WHO ARE THEY? | 11:23:05 |
| 13 | A     MR. ISAAC LARIAN AND MR. ELI MAKABI. | 11:23:07 |
| 14 | Q     DID YOU SAY ELI? | 11:23:14 |
| 15 | A     ELI, E-L-I.   HIS -- I THINK -- I BELIEVE HIS | 11:23:16 |
| 16 | LEGAL NAME IS JAHANGIR MAKABI. | 11:23:22 |
| 17 | Q     CAN YOU SPELL THAT? | 11:23:24 |
| 18 | A     J-A-H-A-N-G-I-R. | 11:23:25 |
| 19 | Q     AND HOW DO YOU PRONOUNCE THAT? | 11:23:31 |
| 20 | A     JAHANGIR. | 11:23:34 |
| 21 | Q     JAHANGIR. | 11:23:35 |
| 22 | AND ARE THEY -- ARE THEY SHAREHOLDERS | 11:23:39 |
| 23 | INDIVIDUALLY, OR ARE THOSE THROUGH TRUSTS OR SOMETHING | 11:23:42 |
| 24 | LIKE THAT? | 11:23:45 |
| 25 | A     THEY'RE HELD THROUGH TRUSTS. | 11:23:45 |

49

EXHIBIT 36 PAGE 527

| | | | |
|---|---|---|---|
| 1 | Q | OKAY.   AND DO YOU KNOW WHAT THE PERCENTAGE OF | 11:23:47 |
| 2 | SHARE OWNERSHIP IS BETWEEN THE TWO? | | 11:23:51 |
| 3 | A | YES. | 11:23:54 |
| 4 | Q | WHAT IS THAT? | 11:23:54 |
| 5 | A | MR. ISAAC LARIAN HAS 81.82 AND MR. MAKABI HAS | 11:23:55 |
| 6 | THE REMAINDER. | | 11:24:03 |
| 7 | Q | WHEN YOU SAY -- 81.82? | 11:24:04 |
| 8 | A | CORRECT.   PERCENT. | 11:24:07 |
| 9 | 18.18. | | 11:24:15 |
| 10 | Q | AND THAT'S CURRENTLY.   HOW LONG HAS THAT | 11:24:16 |
| 11 | BEEN -- HAS THAT DIVISION OF SHARES BEEN LIKE THAT? | | 11:24:20 |
| 12 | A | DIVISION OF SHARES HAS BEEN LIKE THAT SINCE | 11:24:22 |
| 13 | 2002. | | 11:24:28 |
| 14 | Q | AND PRIOR TO 2002, WHAT WAS IT? | 11:24:28 |
| 15 | A | PRIOR TO 2002, IT WAS 90/10. | 11:24:36 |
| 16 | Q | BETWEEN MR. LARIAN AND MR. MAKABI? | 11:24:43 |
| 17 | A | CORRECT. | 11:24:49 |
| 18 | Q | AND DO YOU KNOW WHY THAT CHANGED? | 11:24:50 |
| 19 | A | I DO NOT KNOW WHY. | 11:24:55 |
| 20 | Q | WHO WOULD KNOW WHY THE SHARE DIVISION | 11:24:57 |
| 21 | CHANGED? | | 11:25:01 |
| 22 | A | I DO NOT KNOW. | 11:25:01 |
| 23 | Q | WELL, PRESUMABLY MR. LARIAN OR MR. MAKABI MAY | 11:25:02 |
| 24 | KNOW. | | 11:25:07 |
| 25 | A | YES. | 11:25:07 |

EXHIBIT 36 PAGE 528

50

| | | |
|---|---|---|
| 1 | Q    WOULD MR. WING? | 11:25:08 |
| 2 | A    KNOW?  IS THAT YOUR QUESTION? | 11:25:14 |
| 3 | Q    WOULD HE KNOW, YES. | 11:25:16 |
| 4 | A    YES.  I DO NOT KNOW IF HE WOULD KNOW. | 11:25:17 |
| 5 | Q    AND HOW LONG WAS IT 90/10? | 11:25:19 |
| 6 | A    PRIOR TO THAT, IT WAS A DIFFERENT OWNERSHIP. | 11:25:23 |
| 7 | PRIOR TO THE 90/10, THERE WAS A DIFFERENT OWNERSHIP. | 11:25:29 |
| 8 | Q    AND MR. -- MR. LARIAN ACQUIRED THE COMPANY, | 11:25:33 |
| 9 | IS THAT WHAT YOU'RE SAYING? | 11:25:35 |
| 10 | A    NO.  PRIOR TO THAT, MR. LARIAN HAD A | 11:25:36 |
| 11 | DIFFERENT OWNERSHIP AMOUNT. | 11:25:39 |
| 12 | Q    PERCENTAGE? | 11:25:41 |
| 13 | A    PERCENTAGE. | 11:25:41 |
| 14 | Q    OKAY.  HOW LONG -- AND HOW LONG WAS IT 90/10? | 11:25:41 |
| 15 | A    IT WAS 90/10 BETWEEN 2000 TO 2002. | 11:25:43 |
| 16 | Q    AND IN 2000 OR PRIOR TO 2000, WHAT WAS IT? | 11:25:48 |
| 17 | A    IT WAS 45 PERCENT WAS HELD BY MR. ISAAC | 11:25:58 |
| 18 | LARIAN; 45 HELD BY FAHAD LARIAN, FRED LARIAN, AND | 11:26:01 |
| 19 | 10 PERCENT WAS OWNED BY MR. MAKABI. | 11:26:09 |
| 20 | Q    DID ISAAC LARIAN ACQUIRE FRED LARIAN'S | 11:26:18 |
| 21 | OWNERSHIP INTEREST? | 11:26:32 |
| 22 | A    YES. | 11:26:33 |
| 23 | Q    AND THAT HAPPENED IN 2000? | 11:26:33 |
| 24 | A    THAT HAPPENED IN 2000. | 11:26:36 |
| 25 | Q    WHEN YOU WERE AT ERNST & YOUNG, WERE YOU -- | 11:26:42 |

EXHIBIT 30 PAGE 529

51

| | | |
|---|---|---|
| 1 | WERE YOU PROVIDING TAX ADVICE TO MGA ENTERTAINMENT | 11:26:48 |
| 2 | BEFORE YOU JOINED THEM? | 11:26:52 |
| 3 | A    NO. | 11:26:53 |
| 4 | Q    HOW LONG WAS THE OWNERSHIP OF MGA | 11:26:53 |
| 5 | ENTERTAINMENT, INC. 45/45/10? | 11:26:59 |
| 6 | MR. JENAL:  UP THROUGH OR BACK TO JANUARY 1, | 11:27:03 |
| 7 | 1999, THE TOPIC? | 11:27:05 |
| 8 | MR. COREY:  THAT'S FINE. | 11:27:10 |
| 9 | THE WITNESS:  I'M AWARE THAT FROM '99 TO 2000 | 11:27:12 |
| 10 | IT WAS 45/45/10. | 11:27:15 |
| 11 | BY MR. COREY: | 11:27:17 |
| 12 | Q    DO YOU KNOW WHAT IT WAS PRIOR TO '99? | 11:27:18 |
| 13 | MR. JENAL:  OBJECTION.  SCOPE.  CALLS FOR | 11:27:32 |
| 14 | SPECULATION. | 11:27:34 |
| 15 | THE WITNESS:  I DO NOT KNOW. | 11:27:35 |
| 16 | BY MR. COREY: | 11:27:37 |
| 17 | Q    NOW, OTHER THAN WHAT I ASSUME ARE PERSONAL | 11:27:37 |
| 18 | TRUSTS, THERE ARE NO OTHER COMPANIES BETWEEN MR. LARIAN | 11:27:58 |
| 19 | AND MGA ENTERTAINMENT, INC.? | 11:28:03 |
| 20 | A    NO. | 11:28:05 |
| 21 | Q    AND MR. MAKABI AND MGA ENTERTAINMENT, INC.? | 11:28:05 |
| 22 | A    NO. | 11:28:10 |
| 23 | Q    DO YOU HAVE ANY RESPONSIBILITY FOR THE | 11:28:11 |
| 24 | TRUSTS? | 11:28:15 |
| 25 | MR. JENAL:  THAT'S A "YES" OR "NO" QUESTION. | 11:28:20 |

EXHIBIT 36 PAGE 530

| | | |
|---|---|---|
| 1 | THE WITNESS:  WHAT DO YOU MEAN BY | 11:28:20 |
| 2 | "RESPONSIBILITY"? | 11:28:20 |
| 3 | BY MR. COREY: | 11:28:20 |
| 4 | Q    WELL, YOU'RE AN EMPLOYEE OF MGA | 11:28:20 |
| 5 | ENTERTAINMENT, INC.? | 11:28:22 |
| 6 | A    THAT'S CORRECT. | 11:28:23 |
| 7 | Q    AND LET ME -- LET ME TAKE IT BACK -- LET ME | 11:28:25 |
| 8 | TAKE YOU BACK A LITTLE BIT. | 11:28:31 |
| 9 | DO YOU PROVIDE ANY SERVICES TO MR. LARIAN | 11:28:33 |
| 10 | PERSONALLY WITH RESPECT TO THIS TAXATION? | 11:28:38 |
| 11 | A    YES. | 11:28:39 |
| 12 | Q    OKAY.  SO YOU HAVE RESPONSIBILITY FOR | 11:28:39 |
| 13 | PREPARING HIS TAX RETURNS FOR THE TRUSTS? | 11:28:43 |
| 14 | A    I DO NOT PREPARE THEM. | 11:28:44 |
| 15 | Q    WHAT ROLE DO YOU PLAY IN -- WELL, LET'S JUST | 11:28:46 |
| 16 | DO IT LIKE THIS: | 11:28:51 |
| 17 | HOW MANY TRUSTS FOR MR. LARIAN DO YOU HAVE | 11:28:52 |
| 18 | RESPONSIBILITY FOR? | 11:28:56 |
| 19 | MR. JENAL:  I'M GOING TO OBJECT.  FIRST OF | 11:28:56 |
| 20 | ALL, IT'S OUTSIDE THE SCOPE.  SECOND OF ALL, THE | 11:28:58 |
| 21 | STRUCTURING OF MR. LARIAN'S PERSONAL FINANCES IS NOT AT | 11:29:02 |
| 22 | ISSUE HERE AND MAY CALL FOR PRIVILEGED COMMUNICATIONS | 11:29:06 |
| 23 | WITH REGARDS TO ATTORNEYS INVOLVED WITH THAT. | 11:29:09 |
| 24 | SO I'LL -- YOU CAN ASK A "YES" OR "NO" | 11:29:14 |
| 25 | QUESTION AS TO WHETHER SHE WAS INVOLVEMENT WITH THAT, | 11:29:16 |

53

EXHIBIT 36 PAGE 531

| | | |
|---|---|---|
| 1 | BUT WE'RE GOING TO OBJECT ON PRIVILEGE AND PRIVACY | 11:29:19 |
| 2 | GROUNDS BOTH FOR QUESTIONS AS TO WHAT SHE MAY HAVE | 11:29:23 |
| 3 | DONE, ET CETERA, ON THAT. | 11:29:27 |
| 4 | SO CAN WE HAVE THE QUESTION BACK AND SEE IF | 11:29:31 |
| 5 | IT'S A "YES" OR "NO" ANSWER. | 11:29:33 |
| 6 | (RECORD READ.) | 11:29:47 |
| 7 | MR. JENAL:  I'M GOING TO INSTRUCT THE WITNESS | 11:29:48 |
| 8 | NOT TO ANSWER THAT QUESTION. | 11:29:50 |
| 9 | MR. COREY:  ON WHAT GROUNDS? | 11:29:52 |
| 10 | MR. JENAL:  ON THE GROUNDS JUST CITED FOR | 11:29:53 |
| 11 | BOTH PRIVILEGE AND PRIVACY.  AND OUTSIDE THE SCOPE, FOR | 11:29:55 |
| 12 | THAT MATTER. | 11:29:59 |
| 13 | BY MR. COREY: | 11:30:00 |
| 14 | Q   ARE YOU GOING TO FOLLOW YOUR COUNSEL'S | 11:30:00 |
| 15 | INSTRUCTION? | 11:30:03 |
| 16 | A   YES. | 11:30:03 |
| 17 | Q   IS THERE ONE TRUST THAT HOLDS THE SHARES FOR | 11:30:04 |
| 18 | MR. LARIAN IN MGA ENTERTAINMENT, INC.? | 11:30:14 |
| 19 | MR. JENAL:  SAME OBJECTIONS; SAME | 11:30:18 |
| 20 | INSTRUCTION. | 11:30:20 |
| 21 | MR. COREY:  IT'S A "YES" OR "NO" QUESTION. | 11:30:21 |
| 22 | MR. JENAL:  SAME OBJECTION; SAME INSTRUCTION. | 11:30:23 |
| 23 | BY MR. COREY: | 11:30:26 |
| 24 | Q   ARE YOU GOING FOLLOW YOUR COUNSEL'S | 11:30:26 |
| 25 | INSTRUCTION? | 11:30:28 |

EXHIBIT 30 PAGE 532

54

| | |
|---|---|
| 1 | A    YES. | 11:30:28 |
| 2 | Q    WHO IS THE TRUSTEE OF THE TRUSTS -- TRUST OR | 11:30:29 |
| 3 | TRUSTS? | 11:30:32 |
| 4 | MR. JENAL:  SAME OBJECTION; SAME INSTRUCTION. | 11:30:33 |
| 5 | BY MR. COREY: | 11:30:36 |
| 6 | Q    ARE YOU GOING TO FOLLOW YOUR COUNSEL'S | 11:30:36 |
| 7 | INSTRUCTION? | 11:30:39 |
| 8 | A    YES. | 11:30:40 |
| 9 | Q    DO YOU HAVE RESPONSIBILITY FOR MR. MAKABI'S | 11:30:40 |
| 10 | PERSONAL TAXES? | 11:30:44 |
| 11 | A    YES. | 11:30:45 |
| 12 | Q    IS THERE -- HOW MANY TRUSTS ARE THERE THAT | 11:30:45 |
| 13 | HOLD MR. MAKABI'S SHARES IN MGA ENTERTAINMENT? | 11:30:50 |
| 14 | MR. JENAL:  OBJECTION.  IT'S OUTSIDE THE | 11:30:56 |
| 15 | SCOPE.  CALLS FOR PRIVILEGED AND PRIVATE INFORMATION. | 11:30:58 |
| 16 | INSTRUCT THE WITNESS NOT TO ANSWER. | 11:31:01 |
| 17 | BY MR. COREY: | 11:31:03 |
| 18 | Q    ARE YOU GOING TO FOLLOW YOUR COUNSEL'S | 11:31:03 |
| 19 | INSTRUCTION? | 11:31:06 |
| 20 | A    YES. | 11:31:07 |
| 21 | MR. COREY:  CAN WE STIPULATE, MR. JENAL, THAT | 11:31:08 |
| 22 | THE WITNESS WILL FOLLOW YOUR INSTRUCTION? | 11:31:11 |
| 23 | MR. JENAL:  YES. | 11:31:15 |
| 24 | BY MR. COREY: | 11:31:16 |
| 25 | Q    DO YOU KNOW WHO THE TRUSTEE OR TRUSTEES ARE | 11:31:16 |

EXHIBIT 36 PAGE 533

55

| | | |
|---|---|---|
| 1 | OF MR. MAKABI'S TRUST? | 11:31:20 |
| 2 | MR. JENAL:  IT'S A "YES" OR "NO" QUESTION. | 11:31:21 |
| 3 | THE WITNESS:  DO -- DO I KNOW? | 11:31:22 |
| 4 | BY MR. COREY: | 11:31:23 |
| 5 | Q    YES. | 11:31:23 |
| 6 | A    YES. | 11:31:24 |
| 7 | Q    WHO ARE THEY? | 11:31:24 |
| 8 | MR. JENAL:  OBJECTION.  OUTSIDE THE SCOPE. | 11:31:26 |
| 9 | CALLS FOR PRIVILEGED COMMUNICATIONS. | 11:31:27 |
| 10 | AND INSTRUCT THE WITNESS NOT TO ANSWER. | 11:31:29 |
| 11 | BY MR. COREY: | 11:31:38 |
| 12 | Q    DID YOU ESTABLISH THE TRUSTS? | 11:31:38 |
| 13 | A    NO. | 11:31:40 |
| 14 | Q    WERE THEY ESTABLISHED PRIOR TO YOUR JOINING | 11:31:40 |
| 15 | MGA? | 11:31:43 |
| 16 | A    YES. | 11:31:43 |
| 17 | Q    DO YOU KNOW WHERE THE TRUSTS ARE BASED? | 11:31:44 |
| 18 | MR. JENAL:  OBJECTION.  VAGUE.  OUTSIDE THE | 11:31:52 |
| 19 | SCOPE CALLS FOR SPECULATION. | 11:31:55 |
| 20 | THE WITNESS:  I DO UNDERSTAND WHAT YOU MEAN. | 11:31:57 |
| 21 | BY MR. COREY: | 11:31:58 |
| 22 | Q    ARE THE TRUSTS DOMESTIC OR -- | 11:31:58 |
| 23 | A    YES. | 11:32:02 |
| 24 | Q    -- ARE THEY FOREIGN TRUSTS? | 11:32:02 |
| 25 | THEY'RE DOMESTIC? | 11:32:05 |

EXHIBIT 36 PAGE 534

56

STATE OF CALIFORNIA       )
                          )   SS.
COUNTY OF LOS ANGELES     )


I, APRIL CRUZ CACULITAN, CSR 12437, IN AND FOR THE STATE OF CALIFORNIA, DO HEREBY CERTIFY;

THAT, PRIOR TO BEING EXAMINED, THE DEPONENT NAMED IN THE FOREGOING DEPOSITION WAS BY ME DULY SWORN TO TESTIFY THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE TRUTH;

THAT SAID DEPOSITION WAS TAKEN DOWN BY ME IN SHORTHAND AT THE TIME AND PLACE THEREIN NAMED, AND THEREAFTER REDUCED TO TYPEWRITING UNDER MY DIRECTION, AND THE SAME IS A TRUE, CORRECT AND COMPLETE TRANSCRIPT OF SAID PROCEEDINGS;

I FURTHER CERTIFY THAT I AM NOT INTERESTED IN THE EVENT OF THE ACTION.

WITNESS MY HAND THIS _____2_____ DAY OF _August_____, 2007.


_____

CERTIFIED SHORTHAND

REPORTER FOR THE

STATE OF CALIFORNIA

EXHIBIT 36 PAGE 535

CERTIFIED COPY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, AN INDIVIDUAL,  ) | |
| ) | |
| PLAINTIFF,  ) | |
| ) | |
| V.  ) | NO.  CV 04-9040  SGL (RNBX) |
| ) | |
| MATTEL, INC., A DELAWARE  ) | |
| CORPORATION,  ) | |
| ) | |
| DEFENDANTS.  ) | |
| —————————————————  ) | |
| ) | |
| AND CONSOLIDATED ACTION (S).  ) | |
| ) | |

# C O N F I D E N T I A L

### ATTORNEYS' EYES ONLY

# DEPOSITION OF LISA TONNU

# VOLUME II

# SEPTEMBER 24, 2007



515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

REPORTED BY:
J'ANA SIEGERS
CSR NO.  10845
JOB NO. 07AE614-JS

EXHIBIT 36 PAGE 534

1      UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA

3      EASTERN DIVISION

4

5   CARTER BRYANT, AN INDIVIDUAL,)
                                ) CASE NO.
6              PLAINTIFF,        ) CV 04-9049 SGL (RNBX)
                                )
7      VS.                      )
                                )
8   MATTEL, INC., A DELAWARE    )
    CORPORATION,                )
9                               )
               DEFENDANT.       )
10                              )
    _____)
11                              )
    AND CONSOLIDATED ACTIONS.   )
12  _____)

13

14

15

16      CONFIDENTIAL - ATTORNEYS' EYES ONLY

17

         VOLUME II
18

19      VIDEOTAPED DEPOSITION OF LISA TONNU,

20   30(B)(6) WITNESS FOR MGA ENTERTAINMENT,

21   INC., TAKEN ON BEHALF OF THE DEFENDANT,

22   AT 865 SOUTH FIGUEROA STREET, TENTH FLOOR,

23   LOS ANGELES, CALIFORNIA, COMMENCING AT

24   10:07 A.M., MONDAY, SEPTEMBER 24, 2007,

25   BEFORE J'ANA SIEGERS, CSR NUMBER 10845.

EXHIBIT 36  PAGE 537

240

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR MATTEL, INC.:

 4         QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
           BY:  JON D. COREY, ESQ.
 5         865 SOUTH FIGUEROA STREET
           TENTH FLOOR
 6         LOS ANGELES, CALIFORNIA 90017-2543
           (213) 443-3000
 7         JONCOREY@QUINNEMANUEL.COM

 8

 9    FOR MGA ENTERTAINMENT, INC.:

10         CHRISTENSEN, GLASER, FINK,
           JACOBS, WEIL & SHAPIRO, LLP
11         BY:  ALISA MORGENTHALER LEVER, ESQ.
           10250 CONSTELLATION BOULEVARD
12         NINETEENTH FLOOR
           LOS ANGELES, CALIFORNIA 90067
13         (310) 553-3000
           AMORGENTHALER@CHRISGLASE.COM
14

15    ALSO PRESENT:

16         PHILIP CRUZ, VIDEOGRAPHER
17
           CRAIG HOLDEN, MGA ENTERTAINMENT, INC.
18         (PAGES 273-401)

19

20

21

22

23

24

25
```

EXHIBIT 36 PAGE 538                                241

CONFIDENTIAL 30(B)(6) DEPOSITION OF LISA TONNU, VOL. II

```
1                    I N D E X

2             DEPONENT:   LISA TONNU

3

4    FURTHER EXAMINATION                          PAGE

5    BY MR. COREY:                                246

6    (AFTERNOON SESSION)                          336

7

8    EXHIBITS FOR IDENTIFICATION                  PAGE

9    (BOUND UNDER SEPARATE COVER)

10   MATTEL, INC.'S:

11   654 MGA ENTERTAINMENT PRESS RELEASE          309
         (2 PAGES)

12
     655 MGA ENTERTAINMENT, INC.,                 322
13       CONSOLIDATED FINANCIAL STATEMENTS
         FOR THE YEARS ENDED DECEMBER 31,
14       2002 AND 2001, AND INDEPENDENT
         AUDITOR'S REPORT
15       (MGA 0863860-0863873)

16   656 CONSOLIDATED FINANCIAL STATEMENTS,       322
         MGA ENTERTAINMENT, INC., YEAR
17       ENDED DECEMBER 31, 2003, REPORT OF
         INDEPENDENT AUDITORS
18       (MGA 08638740863887)

19   657 CONSOLIDATED FINANCIAL STATEMENTS,       322
         MGA ENTERTAINMENT, INC., YEARS
20       ENDED DECEMBER 31, 2004 AND 2003
         (MGA 0863888-0863901)
21
     658 CONSOLIDATED FINANCIAL STATEMENTS,       322
22       MGA ENTERTAINMENT, INC., YEARS
         ENDED DECEMBER 31, 2005 AND 2004
23       (MGA 0868693-0868706)

24   659 CONSOLIDATED FINANCIAL STATEMENTS,       322
         MGA ENTERTAINMENT, INC., YEARS
25       ENDED DECEMBER 31, 2006 AND 2005
         (MGA 0868707-0868722)
```

EXHIBIT 36 PAGE 539

242

1

<u>I N D E X</u>

2

(*CONTINUED*)

3

4 <u>EXHIBITS FOR IDENTIFICATION</u>                    <u>PAGE</u>

5 (*BOUND UNDER SEPARATE COVER*)

6 MATTEL, INC'S:

7 660 BRATZ SALES 2001-2006                           380
       (MGA0868723-0868865)

8
   661 E-MAIL DATED 2005-05-25 FROM                   448
9       NINETTE PEMBLETON TO PAULA GARCIA
        AND OTHERS, WITH ATTACHMENT
10      (MGA 0101018-0101021)

11 662 MGA ENTERTAINMENT SALES SUMMARY,          448, 453
       BRATZ, STRUT-IT, LIL' BRATZ
12     2002/2003   (MGA 0815789)

13 663 RETAINER LETTER DATED JULY 19,                 488
       2007, FROM JOHN W. KEKER TO CRAIG
14     HOLDEN, WITH ATTACHMENT
       (BRYANT2 000017-000026)

15

16

17

18 <u>EXHIBITS PREVIOUSLY MARKED</u>                    <u>PAGE</u>

19 EXHIBIT 452                                        247

20 EXHIBIT 515                                        319

21 EXHIBIT 519                                        475

22 EXHIBIT 520                                        479

23

24

25

EXHIBIT 30 PAGE 546                                    <u>243</u>

1

I N D E X

2

(CONTINUED)

3

4

5

UNANSWERED QUESTIONS UPON ADVICE OF COUNSEL

6

PAGE        LINE

7          268          5

8          270          4

9          271         21

10         279          7

11         308        14

12         325        23

13         327        25

14         329         3

15         330         4

16         354         8

17         360        12

18         360        18

19

20

21

22

23

24

25

EXHIBIT 36 PAGE 311

244

| | |
|---|---|
| 1 | LOS ANGELES, CALIFORNIA |
| 2 | MONDAY, SEPTEMBER 24, 2007 |
| 3 | 10:07 A.M. |
| 4 | - - - |
| 10:07:29 5 | THE VIDEOGRAPHER:  GOOD MORNING.  WE ARE |
| 10:07:30 6 | NOW ON THE RECORD AT 10:07 A.M.  TODAY'S DATE IS |
| 10:07:33 7 | MONDAY, SEPTEMBER 24, 2007.  MY NAME IS PHILIP CRUZ |
| 10:07:38 8 | WITH JTV LITIGATION SERVICES IN LOS ANGELES, |
| 10:07:41 9 | CALIFORNIA.  WE ARE TAPING THESE PROCEEDINGS AT |
| 10:07:45 10 | 865 SOUTH FIGUEROA STREET, THE TENTH FLOOR, IN |
| 10:07:50 11 | DOWNTOWN LOS ANGELES. |
| 10:07:51 12 | THIS IS TAPE NUMBER 1 FOR THE VIDEOTAPED |
| 10:07:54 13 | DEPOSITION OF MS. LISA TONNU, VOLUME II, IN THE |
| 10:07:58 14 | ACTION ENTITLED "BRYANT VERSUS MATTEL."  THIS |
| 10:08:00 15 | DEPOSITION IS BEING TAKEN ON BEHALF OF THE |
| 10:08:03 16 | DEFENDANT.  THE CASE NUMBER IS CV 04-9049 SGL. |
| 10:08:11 17 | AND MAY I HAVE INTRODUCTIONS FOR THE |
| 10:08:13 18 | RECORD, PLEASE. |
| 10:08:15 19 | MR. COREY:  JOHN COREY ON BEHALF OF |
| 10:08:16 20 | MATTEL. |
| 10:08:17 21 | MS. MORGENTHALER LEVER:  ALISA |
| 10:08:19 22 | MORGENTHALER LEVER ON BEHALF OF MGA ENTERTAINMENT |
| 10:08:22 23 | AND RELATED ENTITIES. |
| 10:08:24 24 | THE DEPONENT:  LISA TONNU, MGA |
| 10:08:25 25 | ENTERTAINMENT. |

EXHIBIT 30  PAGE 540

245

10:08:25  1        **THE VIDEOGRAPHER:** AND YOU MAY SWEAR IN

10:08:25  2  THE WITNESS.

3               - - -

4           LISA TONNU,

5      HAVING BEEN FIRST DULY AFFIRMED

6       BY THE REPORTER, WAS EXAMINED,

7         AND TESTIFIED AS FOLLOWS:

8               - - -

9       **DEPOSITION OFFICER:** PLEASE RAISE YOUR

10  RIGHT HAND.

11        DO YOU SOLEMNLY SWEAR OR AFFIRM THAT THE

12  TESTIMONY YOU ARE ABOUT TO GIVE IN THIS DEPOSITION

13  SHALL BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT

14  THE TRUTH?

10:08:37  15        **THE DEPONENT:** YES.

16             - - -

17         <u>FURTHER EXAMINATION</u>

10:08:37  18  BY MR. COREY:

10:08:39  19     Q.  GOOD MORNING, MS. TONNU. HOW ARE YOU?

10:08:41  20     A.  GOOD.  THANK YOU.

10:08:44  21     Q.  WE'VE BEEN THROUGH THIS BEFORE. JUST A

10:08:45  22  COUPLE OF QUICK QUESTIONS.

10:08:47  23        DO YOU UNDERSTAND THAT THE OATH THAT YOU

10:08:48  24  JUST TOOK IS THE SAME OATH THAT YOU WOULD TAKE AS IF

10:08:51  25  YOU WERE TESTIFYING IN A COURT OF LAW?

EXHIBIT 36 PAGE 543

246

| | | |
|---|---|---|
| 02:00:50 | 1 | SHAREHOLDERS AFTER DECEMBER 31ST, 2006? |
| 02:00:53 | 2 | A.   YES. |
| 02:00:55 | 3 | Q.   AND DO YOU KNOW HOW MUCH THEY WERE? |
| 02:00:57 | 4 | A.   I DO NOT RECALL THE AMOUNT. |
| 02:00:58 | 5 | Q.   DO YOU HAVE AN ESTIMATE? |
| 02:01:04 | 6 | MS. MORGENTHALER LEVER:   CALLS FOR |
| 02:01:04 | 7 | SPECULATION.   LACK OF FOUNDATION.   OUTSIDE THE |
| 02:01:07 | 8 | SCOPE. |
| 02:01:09 | 9 | CAUTION THE WITNESS NOT TO GUESS. |
| 02:01:14 | 10 | THE DEPONENT:   I CANNOT RECALL. |
| 02:01:14 | 11 | BY MR. COREY: |
| 02:01:15 | 12 | Q.   HOW MANY DISTRIBUTIONS HAVE THERE BEEN? |
| 02:01:19 | 13 | MS. MORGENTHALER LEVER:   SAME OBJECTIONS. |
| 02:01:22 | 14 | THE DEPONENT:   ONE THAT I'M AWARE OF. |
| 02:01:23 | 15 | BY MR. COREY: |
| 02:01:24 | 16 | Q.   WHEN DID THAT TAKE PLACE? |
| 02:01:28 | 17 | MS. MORGENTHALER LEVER:   SAME OBJECTIONS. |
| 02:01:31 | 18 | THE DEPONENT:   IT WAS SOMETIME DURING THE |
| 02:01:33 | 19 | FIRST QUARTER OF THIS YEAR. |
| 02:01:38 | 20 | BY MR. COREY: |
| 02:01:42 | 21 | Q.   DO YOU KNOW WHY THAT DISTRIBUTION WAS |
| 02:01:44 | 22 | MADE? |
| 02:01:44 | 23 | MS. MORGENTHALER LEVER:   OBJECTION.   CALLS |
| 02:01:44 | 24 | FOR SPECULATION.   OUTSIDE THE SCOPE.   LACK OF |
| 02:01:48 | 25 | FOUNDATION.   AND ALSO CAUTION THE WITNESS NOT TO |

EXHIBIT 36 PAGE 544

362

| | | |
|---|---|---|
| 02:01:54 | 1 | DIVULGE ANY INFORMATION THAT DERIVES SOLELY FROM |
| 02:01:57 | 2 | ATTORNEY-CLIENT COMMUNICATIONS. |
| 02:02:01 | 3 | THE DEPONENT:   FOR TAX PAYMENTS. |
| 02:02:05 | 4 | BY MR. COREY: |
| 02:02:15 | 5 | Q.   DO YOU CALCULATE THE AMOUNT OF TAX OWED? |
| 02:02:18 | 6 | A.   NO. |
| 02:02:19 | 7 | Q.   DOES SOMEONE IN YOUR DEPARTMENT? |
| 02:02:21 | 8 | A.   NO. |
| 02:02:22 | 9 | Q.   WHO DOES THAT? |
| 02:02:26 | 10 | A.   A THIRD-PARTY ACCOUNTING FIRM. |
| 02:02:28 | 11 | Q.   YOUR OUTSIDE ACCOUNTANTS? |
| 02:02:32 | 12 | A.   MR. LARIAN'S AND MR. MAKABI'S OUTSIDE |
| 02:02:36 | 13 | ACCOUNTANTS. |
| 02:02:37 | 14 | Q.   MR. LARIAN'S AND MR. MAKABI'S OUTSIDE |
| 02:02:40 | 15 | ACCOUNTANTS CALCULATE THE TAXES THAT THEY OWE BASED |
| 02:02:45 | 16 | ON THE PERFORMANCE OF MGA ENTERTAINMENT AND ITS |
| 02:02:50 | 17 | SUBSIDIARIES? |
| 02:02:54 | 18 | MS. MORGENTHALER LEVER:   OBJECTION.   VAGUE |
| 02:02:55 | 19 | AND AMBIGUOUS.   OUTSIDE THE SCOPE. |
| 02:03:00 | 20 | THE DEPONENT:   YES. |
| 02:03:01 | 21 | BY MR. COREY: |
| 02:03:04 | 22 | Q.   AND THEN DOES -- I KNOW MGA HAS AN |
| 02:03:10 | 23 | INTERNAL TAX DEPARTMENT THAT YOU'RE THE HEAD OF, |
| 02:03:15 | 24 | RIGHT? |
| 02:03:15 | 25 | A.   YES. |

EXHIBIT 30 PAGE 515

363

| | | |
|---|---|---|
| 02:03:15 | 1 | Q.   OKAY.   AND DOES MGA ITSELF HAVE SEPARATE |
| 02:03:21 | 2 | OUTSIDE TAX ACCOUNTANTS? |
| 02:03:22 | 3 | A.   YES. |
| 02:03:32 | 4 | Q.   AND WHO ARE MGA'S TAX ACCOUNTANTS? |
| 02:03:35 | 5 | A.   ERNST & YOUNG. |
| 02:03:39 | 6 | Q.   AND WHO'S MR. LARIAN'S TAX ACCOUNTANT? |
| 02:03:42 | 7 | MS. MORGENTHALER LEVER:   OBJECTION. |
| 02:03:44 | 8 | VIOLATES RIGHT TO FINANCIAL PRIVACY. |
| 02:03:48 | 9 | IF YOU KNOW. |
| 02:03:49 | 10 | THE DEPONENT:   MOSS ADAMS. |
| 02:03:52 | 11 | BY MR. COREY: |
| 02:03:53 | 12 | Q.   ANYONE ELSE? |
| 02:03:56 | 13 | MS. MORGENTHALER LEVER:   OBJECTION.   CALLS |
| 02:03:56 | 14 | FOR SPECULATION.   ASKED AND ANSWERED.   LACK OF |
| 02:04:00 | 15 | FOUNDATION.   OUTSIDE THE SCOPE. |
| 02:04:04 | 16 | THE DEPONENT:   NOT THAT I'M AWARE OF. |
| 02:04:05 | 17 | BY MR. COREY: |
| 02:04:09 | 18 | Q.   DOES MGA HAVE TAX ACCOUNTANTS IN ADDITION |
| 02:04:13 | 19 | TO ERNST & YOUNG? |
| 02:04:14 | 20 | MS. MORGENTHALER LEVER:   OBJECTION.   ASKED |
| 02:04:15 | 21 | AND ANSWERED.   LACK OF FOUNDATION.   CALLS FOR |
| 02:04:18 | 22 | SPECULATION.   OUTSIDE THE SCOPE. |
| 02:04:22 | 23 | THE DEPONENT:   NO. |
| 02:04:22 | 24 | BY MR. COREY: |
| 02:04:30 | 25 | Q.   I CAN'T REMEMBER IF I ASKED YOU THIS OR |

EXHIBIT 36 PAGE 366

364

| | | |
|---|---|---|
| 02:04:32 | 1 | NOT:   DO YOU KNOW -- LOOKING AT THE "STOCKHOLDERS' |
| 02:04:33 | 2 | EQUITY" LINE ITEM, $107,687,000, DO YOU KNOW WHETHER |
| 02:04:39 | 3 | THAT AMOUNT HAS INCREASED OR DECREASED IN THE |
| 02:04:41 | 4 | LAST -- EXCUSE ME -- SINCE DECEMBER 31ST, 2006? |
| 02:04:49 | 5 | MS. MORGENTHALER LEVER:   CALLS FOR |
| 02:04:49 | 6 | SPECULATION.   LACK OF FOUNDATION. |
| 02:04:51 | 7 | YOU CAN ANSWER. |
| 02:04:56 | 8 | THE DEPONENT:   DO I KNOW?   YES, I DO KNOW. |
| 02:04:58 | 9 | BY MR. COREY: |
| 02:05:00 | 10 | Q.   HOW HAS THAT BALANCE CHANGED? |
| 02:05:07 | 11 | A.   I BELIEVE THE AMOUNT HAS DECREASED BASED |
| 02:05:10 | 12 | ON UNAUDITED INFORMATION. |
| 02:05:13 | 13 | Q.   BASED ON? |
| 02:05:20 | 14 | A.   UNAUDITED INFORMATION. |
| 02:05:20 | 15 | Q.   WHAT ABOUT THE FINANCIAL STATEMENTS -- THE |
| 02:05:20 | 16 | PERIODIC FINANCIAL STATEMENTS THAT YOU RECEIVE SHOW |
| 02:05:21 | 17 | THAT THAT HAS GONE DOWN -- THAT -- EXCUSE ME -- THAT |
| 02:05:24 | 18 | THE STOCKHOLDERS' EQUITY BALANCE HAS GONE DOWN? |
| 02:05:30 | 19 | MS. MORGENTHALER LEVER:   OBJECTION.   CALLS |
| 02:05:30 | 20 | FOR SPECULATION.   LACK OF FOUNDATION.   VAGUE AND |
| 02:05:33 | 21 | AMBIGUOUS. |
| 02:05:33 | 22 | BY MR. COREY: |
| 02:05:37 | 23 | Q.   I'M JUST TRYING TO UNDERSTAND THE |
| 02:05:38 | 24 | QUALIFICATION THAT YOU PUT ON IT. |
| 02:05:39 | 25 | A.   YES.   THE QUARTERLY INFORMATION I |

EXHIBIT 36 PAGE 547

365

<u>DEPOSITION OFFICER'S CERTIFICATE</u>

STATE OF CALIFORNIA        )
                           )    SS.
COUNTY OF ORANGE           )

    I, J'ANA SIEGERS, HEREBY CERTIFY:

    I AM A DULY QUALIFIED CERTIFIED SHORTHAND REPORTER IN THE STATE OF CALIFORNIA, HOLDER OF CERTIFICATE NUMBER CSR 10845 ISSUED BY THE COURT REPORTERS BOARD OF CALIFORNIA AND WHICH IS IN FULL FORCE AND EFFECT.  [FED. R. DIV. P. 28(A)].

    I AM AUTHORIZED TO ADMINISTER OATHS OR AFFIRMATIONS PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE, SECTION 2093(B) AND PRIOR TO BEING EXAMINED, THE DEPONENT WAS FIRST DULY SWORN BY ME. [FED. R. CIV. P. 28(A), 30(F)(1)].

    I AM NOT A RELATIVE OR EMPLOYEE OR ATTORNEY OR COUNSEL OF ANY OF THE PARTIES, NOR AM I A RELATIVE OR EMPLOYEE OF SUCH ATTORNEY OR COUNSEL, NOR AM I FINANCIALLY INTERESTED IN THIS ACTION. [FED. R. CIV. P. 28].

    I AM THE DEPOSITION OFFICER THAT STENOGRAPHICALLY RECORDED THE TESTIMONY IN THE FOREGOING DEPOSITION AND THE FOREGOING TRANSCRIPT IS A TRUE RECORD OF THE TESTIMONY GIVEN BY THE

EXHIBIT 36 PAGE 548

503

1    DEPONENT.   [FED. R. CIV. P. 30(F)(1)].

2         BEFORE COMPLETION OF THE DEPOSITION, REVIEW OF

3    THE TRANSCRIPT [X] WAS [ ] WAS NOT REQUESTED.   IF

4    REQUESTED, ANY CHANGES MADE BY THE DEPONENT (AND

5    PROVIDED TO THE REPORTER) DURING THE PERIOD ALLOWED

6    ARE APPENDED HERETO.   [FED. R. CIV. P. 30(E)].

7

8

9    DATED:   OCTOBER 7, 2007.

10

11

12

13

14                _____

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT _36_ PAGE _549_

504

A & E Court Reporters    (213) 955-0070    Fax: (213) 955-0077

RECEIVED

NOV 1 3 2007

LAW OFFICES

CHRISTENSEN, GLASER, FINK, JACOBS, WEIL & SHAPIRO, LLP

10250 CONSTELLATION BOULEVARD
NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90067
(310) 553-3000
FAX (310) 556-2920

DIRECT DIAL NUMBER
(310) 556-7852
EMAIL: BGIZER@CHRISGLASE.COM

November 12, 2007

Ⅲ MERITAS LAW FIRMS WORLDWIDE

## VIA FACSIMILE AND U.S. MAIL

Jon D. Corey, Esq.
QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543

Re:   Carter Bryant v. Mattel, Inc. (and consolidated cases)
        Case No. CV 04-9049 SGL (RNBx)

Dear Mr. Corey:

        MGA Entertainment, Inc.'s Rule 30(b)(6) witness, Lisa Tonnu, has the following revisions to the transcript of her deposition taken on September 24, 2007 and September 25, 2007:

        Page 256, line 2: "Jenna" should be "Jinna"
        Page 316, line 10: "Kaye Schuler" should be "Kaye Scholer"
        Page 322, line 6: "Yes" should be "Yes. Outside legal counsel were also involved"
        Page 357, line 19: "Mandana" should be "Mondana"
        Page 376, line 5: "No" should be "Yes"
        Page 393, line 14: "target" should be "Targit"
        Page 408, line 19: "target" should be "Targit"
        Page 454, line 6: "six" should be "sixty"
        Page 514, line 8: "Jenna" should be "Jinna"
        Page 529, line 3: "Jim Jenal and Janet Jenal" should be "Jim Jenal"
        Page 567, line 23: "other than confidential and" should be "that is confidential and"
        Page 600, line 21: "Filenet" should be "File Keepers"
        Page 618, line 14: "No" should be "Yes"
        Page 618, line 22: "No" should be "Yes"
        Page 619, line 1: "No" should be "Yes"
        Page 619, line 12: "No" should be "Yes"
        Page 620, line 1: "Filenet" should be "File Keepers"
        Page 621, line 1: "Yes" should be "He did"
        Page 621, lines 3-6 should read as follows: "Documents responsive to the requests were searched and collected"
        Page 621, line 16: "No" should be "Yes"

606247

EXHIBIT 36 PAGE 550

Jon D. Corey, Esq.
November 12, 2007
Page 2

Page 621, line 21: "don't" should be deleted and "are being" should be "were"
Page 622, line 16: "No" should be "Yes.
Page 626, line 16: "target" should be "Targit"
Page 634, line 10: "target" should be "Targit"

In addition, the word "Filenet" should be "File Keepers" wherever it appears in the transcript, and the word "target" should be "Targit" wherever it appears in the transcript.

Please do not hesitate to contact me if you have questions regarding the foregoing.

Very truly yours,

Alisa Morgenthaler Lever
of CHRISTENSEN, GLASER, FINK, JACOBS,
WEIL & SHAPIRO, LLP

cc:     Patricia Glaser, Esq.
        Thomas Nolan, Esq.

EXHIBIT 36 PAGE 551

60949

**EXHIBIT 37**

AOL Mail

| | | |
|---|---|---|
| Asunto: | RE: Mexico | |
| Fecha: | Mar, 23 Mar 2004 5:24:48 PM Hora estándar de México | |
| De: | Marlene Parker <MParker@mgae.com> | |
| Para: | "Isaac Larian (President / CEO)" <LarianI1@mgae.com>, "'Plot04@aol.com'" <Plot04@aol.com>, "'plot04@yahoo.com.mx'"<plot04@yahoo.com.mx> | |
| Copiar a:: | "Susana (Argentrade)" <argentrade@aol.com>,   "Tom Park (Chief Operating Officer)" <TPark@mgae.com> | |

Enviado desde Internet (Detalles)

Hello Gustavo,

As Isaac has referenced below Tom is currently traveling in Canada and returns to the office this Thursday (Mar 18).
Tom has asked that I contact you to schedule a conference call with you on Thursday upon his return. Can you please advise your availability and I will make arrangements for you and Tom to connect?  We will accommodate any timing that meets your schedule.

Kind regards,

Marlene
Marlene Parker
Executive Assistant to Chief Operating Officer
MGA Entertainment
Office: (818) 894-2525 x504
Fax:   (818) 894-7865
Mobile: (818) 207-0560

www.mgae.com

Meet the girls with a Passion for Fashion
www.BRATZpack.com

-----Original Message-----
**From:** Isaac Larian (President / CEO)
**Sent:** Monday, March 22, 2004 10:22 PM
**To:** 'Plot04@aol.com'; plot04@yahoo.com.mx
**Cc:** Susana (Argentrade); Tom Park (Chief Operating Officer)
**Subject:** RE: Mexico

Gustavo,

Thanks.

Responder

Reenviar

Responder a Todos

Agregar Direcciones

EXHIBIT 37 PAGE 552

M 0059790

Congratulations to Mariana. She better STOP smoking!

The package we offered you give all of you the same or MORE than what you asked for. It just has a performance clause ( bonuses) based on performance.

As a company policy, we do not give anyone signing bonus.

Tom is traveling to Canada and be back Thursday and will explain the offer.

Isaac Larian
CEO
Please note my new e mail address below
MGA ENTERTAINMENT
*A Consumer Entertainment Product Company*
16730 Schoenborn Street
North Hills, California, 91343-6122
Tel: 818-894-3150
Fax:818-894-1267
Larian11@MGAE.COM
www.MGAE.COM
Meet the girls with Passion for Fashion
www.Bratzpack.com

-----Original Message-----
**From:** Plot04@aol.com [mailto:Plot04@aol.com]
**Sent:** Monday, March 22, 2004 6:36 PM
**To:** Larian11@mgae.com; plot04@yahoo.com.mx
**Cc:** Argentrade@aol.com; TPark@mgae.com
**Subject:** Re: Mexico

EXHIBIT _37_ PAGE _553_

M 0059791

（翻译字段隐藏）

Dear Isaac & Tom,

Please find attached our analisys, for our further discussion. We will be available weeknights after 16:30 LA time, please confirm.

Regards.

| ☑ Guardar Como | ☑ Bo | ☑ Imr | | ☑ F- | 2 de 7 | ☑ F- |

☐ Incluir el texto original en respuesta.

EXHIBIT 37 PAGE 551

M 0059792

**EXHIBIT 38**

*(handwritten) Offer Letter – Nov 30*

## MGAE DE MÉXICO, S. DE R. L. DE C.V.

March 30, 2004

Carlos Gustavo Machado Gomez
Médanos 94-2, Las Aguilas
México D.F. 14210

Dear Carlos,

It is our pleasure to extend an offer of employment to you for the position of Director of Marketing with MGAE de Mexico, S. de R. de L. de C.V. (the "Company"). As we discussed, this is a full-time position, with employment commencing on _____ (the "Start Date").

Your base salary will be the equivalent in Mexican pesos to $11,000.00 USD, calculated in accordance with the exchange rate published by the Central Bank (*Banco de México*) in the Federal Official Gazette (*Diario Oficial de la Federación*) on the Start Date.  During the term of your employment, in order to facilitate the performance of your work activities, every three years counting as of the Start Date, you will be entitled to an allowance to be paid in accordance with the Company's regularly established policies, in the amount equal to the equivalent in Mexican pesos of $27,500.00 USD calculated in accordance with the exchange rate published by the Central Bank (*Banco de México*) in the Federal Official Gazzette (*Diario Oficial*) on the date of every third anniversary of the Start Date, which allowance shall be used exclusively for the purchase of a car, as a labor tool.  The employment term is indefinite.  Your employment terms shall be revised every eighteen (18) months plus a $40,000.00 USD severance payment, if required, paid at the end of the contract period, which end date shall be 18 months after the start date or on such later date as may be agreed to in writing between the Company and you.  You will also be entitled to receive employment benefits as generally provided by the Company's policies and benefit plans.  Additional benefits and bonus structure are outlined below:

- Christmas Bonus of 30 days salary
- Vacation of 15 business days annually
- Vacation Bonus of 100%
- Major Medical Insurance
- Life Insurance

EXHIBIT _38_ PAGE _535_

M 0059766

Page 2
Carlos Gustavo Machado Gomez
March 30, 2004

Sales Performance Bonus

| Sales | Bonus |
|---|---|
| $5.0 – 6.99 Million USD | $25,000.00 USD |
| $7.0 – 9.99 Million USD | $25,000.00 + $5,000.00 = $30,000.00 USD |
| $10.0 – 11.99 Million USD | $30,000.00 + $10,000.00 = $40,000.00 USD |
| $12.0 – 13.99 Million USD | $40,000.00 + $15,000.00 = $55,000.00 USD |
| $14.0 – 16.99 Million USD | $55,000.00 + $20,000.00 = $75,000.00 USD |
| $17.0 – 19.99 Million USD | $75,000.00 + $25,000.00 = $100,000.00 USD |
| $20.0 Million USD or more | $100,000.00 + .0025% for each million or $2,500.00 USD |

\* For example: If the company achieves $$17.0 million in sales your annual compensation would be $220,000.00 USD

We agree that you will devote your best efforts to the performance of your job; that you will not engage in any activity that might be competitive with the Company's business or pose a conflict of interest with that business; and that you will not misuse, nor improperly disclose, any confidential or other proprietary information of the Company. You will also be expected to comply with the Company's personnel policies, as set forth in the attached Employee Handbook, including referral of any disputes occurring between us to arbitration. This offer is contingent upon your signing our Arbitration, Confidentiality, and Proprietary Agreements.

Please indicate your agreement to the terms of this letter by signing one copy below and returning it to me.

Again, congratulations on your employment. We look forward to working with you.

Sincerely,

Isaac Larian, CEO

MGAE de México, S. de R. L. de C.V.

I understand and agree to the above terms.

Date: _____   Signature: _____
                                                     Carlos Gustavo Machado Gomez

EXHIBIT 38 PAGE 556

M 0059767

**EXHIBIT 39**

*Mariana Trueba*
*Offer Letter*

MGAE DE MÉXICO, S. DE R. L. DE C.V.

March 30, 2004

Mariana Trueba Almada
Cruz Verde 81, Torre A2, Depto. 009
Col. Coyoacan
Mexico D.F.

Dear Mariana,

It is our pleasure to extend on offer of employment to you for the position of Director of Marketing, Girls Division with MGAE de Mexico, S. de R. de L. de C.V. (the "Company"). As we discussed, this is a full-time position, with employment commencing on _____ (the "Start Date").

Your base salary will be the equivalent in Mexican pesos to $8,910.00 USD, calculated in accordance with the exchange rate published by the Central Bank (Banco de México) in the Federal Official Gazette (Diario Oficial de la Federación) on the Start Date.  During the term of your employment, in order to facilitate the performance of your work activities, every three years counting as of the Start Date, you will be entitled to an allowance to be paid in accordance with the Company's regularly established policies, in the amount equal to the equivalent in Mexican pesos of  $27,500.00 USD calculated in accordance with the exchange rate published by the Central Bank (Banco de México) in the Federal Official Gazette (Diario Oficial) on the date of every third anniversary of the Start Date, which allowance shall be used exclusively for the purchase of  a car, as a labor tool.  The employment term is indefinite.  Your employment terms shall be revised every eighteen (18) months plus a $40,000.00 USD severance payment, if required, paid at the end of the contract period, which end date shall be 18 months after the start date or on such later date as may be agreed to in writing between the Company and you.  You will also be entitled to receive employment benefits as generally provided by the Company's policies and benefit plans.  Additional benefits and bonus structure are outlined below:

- Christmas Bonus of 30 days salary

- Vacation of 15 business days annually

- Vacation Bonus of 100%

- Major Medical Insurance

- Life Insurance

EXHIBIT 39  PAGE 557

M 0059771

Page 2
Mariana Trueba Almada
March 30, 2004

- Sales Performance Bonus

| Sales | Bonus |
|-------|-------|
| $5.0 – 6.99 Million USD | $25,000.00 USD |
| $7.0 – 9.99 Million USD | $25,000.00 + $5,000.00 = $30,000.00 USD |
| $10.0 – 11.99 Million USD | $30,000.00 + $10,000.00 = $40,000.00 USD |
| $12.0 – 13.99 Million USD | $40,000.00 + $15,000.00 = $55,000.00 USD |
| $14.0 – 16.99 Million USD | $55,000.00 + $20,000.00 = $75,000.00 USD |
| $17.0 – 19.99 Million USD | $75,000.00 + $25,000.00 = $100,000.00 USD |
| $20.0 Million USD or more | $100,000.00 + .0025% for each million or $2,500.00 USD |

* For example: if the company achieves $17.0 million in sales your annual compensation would be $220,000.00 USD

We agree that you will devote your best efforts to the performance of your job; that you will not engage in any activity that might be competitive with the Company's business or pose a conflict of interest with that business; and that you will not misuse, nor improperly disclose, any confidential or other proprietary information of the Company. You will also be expected to comply with the Company's personnel policies, as set forth in the attached Employee Handbook, including referral of any disputes occurring between us to arbitration. This offer is contingent upon your signing our Arbitration, Confidentiality, and Proprietary Agreements.

Please indicate your agreement to the terms of this letter by signing one copy below and returning it to me.

Again, congratulations on your employment. We look forward to working with you.

Sincerely,

Isaac Larian, CEO

MGAE de México, S. de R. L. de C.V.

I understand and agree to the above terms.


Date: _____   Signature: _____
                                          Mariana Trueba Almada


EXHIBIT 39 PAGE 558

M 0059772

**EXHIBIT 40**

## MGAE DE MÉXICO, S. DE R. L. DE C.V.

March 30, 2004

Pablo Vargas San José
Loma de Guadalupe 135 Col. Lomas de Guadalupe
C.P. 01720 Ciudad de México, México

Dear Pablo,

It is our pleasure to extend on offer of employment to you for the position of Director of Sales with MGAE de Mexico, S. de R. de L. de C.V. (the "Company"). As we discussed, this is a full-time position, with employment commencing on _____ (the "Start Date").

Your base salary will be the equivalent in Mexican pesos to $11,000.00 USD, calculated in accordance with the exchange rate published by the Central Bank (Banco de México) in the Federal Official Gazette (Diario Oficial de la Federación) on the Start Date. During the term of your employment, in order to facilitate the performance of your work activities, every three years counting as of the Start Date, you will be entitled to an allowance to be paid in accordance with the Company's regularly established policies, in the amount equal to the equivalent in Mexican pesos of $27,500.00 USD calculated in accordance with the exchange rate published by the Central Bank (Banco de México) in the Federal Official Gazzette (Diario Oficial) on the date of every third anniversary of the Start Date, which allowance shall be used exclusively for the purchase of a car, as a labor tool. The employment term is indefinite. Your employment terms shall be revised every eighteen (18) months plus a $40,000.00 USD severance payment, if required, paid at the end of the contract period, which end date shall be 18 months after the start date or on such later date as may be agreed to in writing between the Company and you. You will also be entitled to receive employment benefits as generally provided by the Company's policies and benefit plans. Additional benefits and bonus structure are outlined below:

- Christmas Bonus of 30 days salary

- Vacation of 15 business days annually

- Vacation Bonus of 100%

- Major Medical Insurance

- Life Insurance

EXHIBIT _40_ PAGE _559_

M 0059776

Page 2
Pablo Vargas San José
March 30, 2004

- Sales Performance Bonus

| Sales | Bonus |
|---|---|
| $5.0 – 6.99 Million USD | $25,000.00 USD |
| $7.0 – 9.99 Million USD | $25,000.00 + $5,000.00 = $30,000.00 USD |
| $10.0 – 11.99 Million USD | $30,000.00 + $10,000.00 = $40,000.00 USD |
| $12.0 – 13.99 Million USD | $40,000.00 + $15,000.00 = $55,000.00 USD |
| $14.0 – 16.99 Million USD | $55,000.00 + $20,000.00 = $75,000.00 USD |
| $17.0 – 19.99 Million USD | $75,000.00 + $25,000.00 = $100,000.00 USD |
| $20.0  Million USD or more | $100,000.00 + .0025% for each million or $2,500.00 USD |

* For example: If the company achieves $$17.0 million in sales your annual compensation would be $220,000.00 USD

We agree that you will devote your best efforts to the performance of your job; that you will not engage in any activity that might be competitive with the Company's business or pose a conflict of interest with that business; and that you will not misuse, nor improperly disclose, any confidential or other proprietary information of the Company. You will also be expected to comply with the Company's personnel policies, as set forth in the attached Employee Handbook, including referral of any disputes occurring between us to arbitration. This offer is contingent upon your signing our Arbitration, Confidentiality, and Proprietary Agreements.

Please indicate your agreement to the terms of this letter by signing one copy below and returning it to me.

Again, congratulations on your employment. We look forward to working with you.

Sincerely,

Isaac Larian, CEO

MGAE de México, S. de R. L. de C.V.

I understand and agree to the above terms.

EXHIBIT 40   PAGE 560

M 0059777

Date: _____ Signature: _____

Pablo Vargas San José

EXHIBIT 40 PAGE 561

M 0059778

**EXHIBIT 41**

DIANA M. TORRES (S.B. #162284)
JAMES P. JENAL (S.B. #180190)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
Email: dtorres@omm.com

DALE M. CENDALI (admitted pro hac vice)
JOHANNA SCHMITT (admitted pro hac vice)
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
Email: dcendali@omm.com

PATRICIA GLASER (S.B. # 55668)
CHRISTENSEN, GLASER, FINK, JACOBS,
WEIL & SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, CA 90067
Telephone:   (310) 553-3000
Facsimile:   (310) 556-2920
Email: pglaser@chrisglase.com

Attorneys for Plaintiff
MGA Entertainment, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CARTER BRYANT, an individual,<br><br>       Plaintiff,<br><br>    v.<br><br>MATTEL, INC., a Delaware<br>Corporation,<br><br>       Defendant. | Case No.  CV 04-09049 SGL (RNBx)<br>(consolidated with CV 04-9059 & 05-2727)<br><br>**MGA ENTERTAINMENT, INC.'S<br>SUPPLEMENTAL RESPONSE TO<br>INTERROGATORY NO. 2 OF<br>MATTEL, INC.'S FIRST SET OF<br>INTERROGATORIES RE CLAIMS OF<br>UNFAIR COMPETITION** |
| CONSOLIDATED WITH<br>MATTEL, INC. v. BRYANT and<br>MGA ENTERTAINMENT, INC. v.<br>MATTEL, INC. | Judge:  Hon. Stephen G. Larson<br><br>Discovery Cut-Off:  March 3, 2008 |

**PROPOUNDING PARTY:**    MATTEL, INC.

**RESPONDING PARTY:**    MGA ENTERTAINMENT, INC.

**SET NO.:**    ONE

CONFIDENTIAL

MGA'S SUPPLEMENTAL RESPONSE TO
INTERROGATORY NO. 2 OF MATTEL'S FIRST SET
OF INTERROGATORIES

EXHIBIT 41  PAGE 562

0012017

## PRELIMINARY STATEMENT

MGA Entertainment, Inc. ("MGA") has not yet completed its investigation relating to the facts of this action and has not completed preparation for trial. MGA responds to this interrogatory based upon the information presently available to it and without prejudice to its right to amend or supplement its responses and to present evidence which may hereafter be discovered or become available.

MGA will respond to this interrogatory as it understands and interprets it. If Mattel, Inc. ("Mattel") subsequently asserts any interpretation of this interrogatory that differs from that of MGA, MGA reserves the right to supplement its objections and response.

By providing this response, MGA does not concede that any of the information sought by this interrogatory is relevant or discoverable. MGA provides this response and objections without waiving or intending to waive, but rather, on the contrary, preserving and intending to preserve: (a) the right to object on any grounds to the use or introduction into evidence of the information provided in response to this interrogatory; (b) the right to object to the use of the information provided in response to this interrogatory in any subsequent proceeding in, or the arbitration of this or any other action; and (c) the right to object on any ground at any time to other interrogatories or further discovery into any of the subject matters addressed in this interrogatory or the response thereto.

MGA's response to this interrogatory is conditioned on the terms of the Stipulated Protective Order that is in place in this action.

MGA shall not provide any privileged or protected information, including without limitation, information protected by the attorney-client privilege or the attorney work product doctrine, and nothing herein may be construed as a waiver of any applicable privilege or protection. Any inadvertent production of privileged or protected information shall not be construed as a waiver of any privilege or protection attaching thereto and MGA reserves the right, as set forth in the Stipulated Protective Order, to

1  correct the record with regard to any such information and to supplement or amend this

2  response, which supplemental or amended response shall become the operative response.

3

### GENERAL OBJECTIONS

4

5      1.    MGA objects to this interrogatory to the extent that it seeks

6  information protected from discovery by the attorney-client privilege, work-product

7  doctrine, right to privacy, or any other applicable legal, statutory or constitutional

8  privilege.

9      2.    MGA objects to this interrogatory to the extent that it seeks the

10  disclosure of confidential, proprietary or trade secret information.  MGA may provide

11  some such information subject to the terms and conditions of the protective order

12  governing this case.

13      3.    MGA objects to this interrogatory to the extent that it seeks

14  information that Mattel equally may otherwise obtain from public sources or with less

15  burden and expense by using other means of discovery.

16      4.    MGA objects to this interrogatory to the extent that it is premature,

17  since it asks or requires MGA to analyze or formulate contentions on matters for which

18  MGA's investigation and discovery have not yet been completed.

19      5.    MGA objects to this interrogatory to the extent that it may unfairly

20  seek to restrict the facts on which MGA may rely at trial.  Discovery has not been

21  completed and MGA is not yet necessarily in possession of all the facts and documents

22  upon which MGA intends to rely.  The response submitted herewith is tendered to Mattel

23  with the reservation that the response is submitted without limiting the evidence on which

24  MGA may rely to support the contentions that MGA may assert at the trial of this action

25  and to rebut or impeach the contentions, assertions and evidence that Mattel may present.

26  MGA reserves the right to supplement or amend this response at a future date.

27

28

CONFIDENTIAL                          - 3 -        MGA'S SUPPLEMENTAL RESPONSE TO
                                                   INTERROGATORY NO. 2 OF MATTEL'S FIRST SET
                                                   OF INTERROGATORIES

EXHIBIT _41_ PAGE _564_

1          6.    MGA objects to this interrogatory to the extent that it seeks

2    information that will be the subject of expert witness testimony and that is therefore

3    premature.

4          7.    MGA objects to Mattel's definitions of "MGA," "YOU," and

5    "YOUR" as overbroad and unduly burdensome, vague and ambiguous, and on the

6    grounds that the definitions call for legal conclusions.

7          8.    MGA objects to Mattel's definition of "IDENTIFY" on the grounds

8    that Mattel's instructions in this regard are overbroad, compound and unduly burdensome.

9          9.    MGA objects to Mattel's definition of "CONTESTED MGA

10   PRODUCTS" as overbroad, compound and unduly burdensome.

11         10.    MGA objects to Mattel's definition of "EMBODIMENT" as

12   overbroad, compound and unduly burdensome.

13         11.    MGA objects to this interrogatory to the extent that its subparts,

14   including those arising from the "definitions" and "instructions," actually constitute

15   separate interrogatories, thereby bringing the number of Mattel's interrogatories to well

16   over the 25 interrogatories allowed under the Federal Rules of Civil Procedure.

17

18   **INTERROGATORIES**

19

20   **INTERROGATORY No. 2:**

21

22       IDENTIFY, fully and separately, each and every concept, design, product, or

23   product packaging that YOU contend MATTEL copied or infringed (including without

24   limitation by internal job or product number, SKU, and bar code number) and, for each

25   such concept, design, product, or product packaging, describe, with specificity and in

26   detail, those attributes of the concept, design, product, or product packaging that were

27   copied or infringed by MATTEL and the alleged source(s) of those attributes.

28

CONFIDENTIAL          - 4 -      MGA'S SUPPLEMENTAL RESPONSE TO
INTERROGATORY NO. 2 OF MATTEL'S FIRST SET
OF INTERROGATORIES

EXHIBIT 41 PAGE 505

**RESPONSE TO INTERROGATORY NO. 2:**

MGA incorporates by reference the above-stated general objections as if fully set forth herein. MGA also specifically objects to this interrogatory to the extent it seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence and is, thus, overbroad, including, without limitation, seeking the "internal job or product number, SKU, and bar code number" of each "concept, design, product, or product packaging" identified in this response. MGA also objects to this interrogatory on the grounds that it seeks information that may be the subject of expert witness analysis and testimony and is premature.

Subject to and without waiving the foregoing, MGA responds as follows: Mattel has copied and infringed MGA's concepts, designs, products, and product packaging listed below:

- All "Bratz" female fashion dolls. The common attributes of the "Bratz" female fashion dolls that Mattel has copied or infringed include their disproportionately large heads; distinctive faces with artfully made-up, heavy-lidded, sultry, almond-shaped large eyes and large, overly-lined and lipsticked lips; trendy, hip clothes and hair styles; and oversized feet. The SKU numbers for the "Bratz" female fashion dolls that Mattel has copied or infringed are as follows: "Sasha" (SKU 248552); "Cloe" (SKU 248538); "Jade" (SKU 248545); "Yasmin" (SKU 248569); "Bratz Fall 2002 Funky Fashion! Collection Cloe" (SKU 254010); "Bratz Fall 2002 Funky Fashion! Collection Yasmin" (SKU 254027); "Bratz Fall 2002 Funky Fashion! Collection Jade" (SKU 254034); "Bratz Fall 2002 Xpress It! Sasha (TV) (SKU 254058); "Bratz Fall 2002 Funky Fashion! Collection Meygan" (SKU 254065); "Bratz Funk N' Glow (light-up clothes) Cloe (TV)" (SKU 255468); "Bratz Funk N' Glow (light-up clothes) Yasmin (TV)" (SKU 255475); "Bratz Funk N' Glow (light-up clothes) Jade (TV)" (SKU 255482); "Bratz Funk N' Glow (light-up clothes) Meygan (TV)" (SKU 255499); "Bratz Funk

CONFIDENTIAL                     - 5 -

MGA'S SUPPLEMENTAL RESPONSE TO
INTERROGATORY NO. 2 OF MATTEL'S FIRST SET
OF INTERROGATORIES

EXHIBIT _41_ PAGE _566_

N' Glow (light-up clothes) Sasha (TV)" (SKU 255505); "Bratz Slumber Party Sasha" (SKU 256311); "Bratz Slumber Party Cloe" (SKU 256328); "Bratz Slumber Party Jade" (SKU 256335); "Bratz Slumber Party Yasmin" (SKU 256342); "Bratz Slumber Party Meygan" (SKU 256359); "Bratz Strut It! Cloe" (SKU 257219); "Bratz Strut It! Yasmin" (SKU 257226); "Bratz Strut It! Jade" (SKU 257233); "Bratz Strut It! Sasha (TV)" (SKU 257240); "Bratz Strut It! Meygan" (SKU 257257); "Bratz Style It! Cloe" (SKU 258285); "Bratz Style It! Yasmin" (SKU 258292); "Bratz Style It! Jade" (SKU 258308); "Bratz Style It! Dana" (SKU 258315); "Bratz Style It! Sasha" (SKU 258322); "Bratz FM Cruiser Cloe" (SKU 258346); "Bratz FM Cruiser Sasha" (SKU 258360); "Bratz FM Cruiser Jade" (SKU 258360); "Bratz FM Cruiser Yasmin" (SKU 258377); "Bratz Wintertime Wonderland Collection Cloe" (SKU 260356); "Bratz Wintertime Wonderland Collection Yasmin" (SKU 260363); "Bratz Wintertime Wonderland Collection Dana" (SKU 260370); "Bratz Wintertime Wonderland Collection Jade" (SKU 260387); "Bratz Wintertime Wonderland Collection Sasha" (SKU 260394); "Bratz Formal Funk Collection Cloe" (SKU 260400); "Bratz Formal Funk Collection Yasmin" (SKU 260417); "Bratz Formal Funk Collection Dana" (SKU 260424); "Bratz Formal Funk Collection Jade" (SKU 260431); "Bratz Formal Funk Collection Sasha" (SKU 260448); "Yasmin" (SKU 260615); "Cloe" (SKU 263135); "Yasmin" (SKU 263142); "Jade" (SKU 263159); "Sasha" (SKU 263166); "Bratz Funk N' Glow Cloe" (SKU 264392); "Bratz Funk N' Glow Yasmin" (SKU 264408); "Bratz Funk N' Glow Jade" (SKU 264415); "Bratz Funk N' Glow Sasha" (SKU 264439); "Bratz Slumber Party Cloe" (SKU 265511); "Bratz Slumber Party Jade" (SKU 265528); "Bratz Slumber Party Yasmin" (SKU 265535); "Bratz Slumber Party Meygan" (SKU 265542); "Bratz Slumber Party Sasha" (SKU 265559); "Bratz Funk 'N' Glow Dana" (SKU 267133); "Bratz Funk Out! Cloe" (SKU 269380);

CONFIDENTIAL

- 6 -

MGA'S SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2 OF MATTEL'S FIRST SET OF INTERROGATORIES

EXHIBIT 41   PAGE 507