Expert Report of Paul K. Meyer

57.   Not only did Mattel acknowledge the importance of themes to the success of Bratz, Mattel also recognized that Barbie's success was dependent on its storylines.  For example, Mr. Kilpin confirmed that themes contribute significantly to a doll line's success.  In an April 16, 2004 article in the Wall Street Journal, Mr. Kilpin is quoted as saying, "It used to be I'd walk into a product meeting and say, 'Show me the toy'…Now I start by saying, 'Tell me a story.'"[70]

58.   The importance of themes associated with dolls is also evident in Mattel's efforts to reinvigorate Barbie sales.  Beginning in 2004, Mattel pursued a "worlds of" strategy for Barbie that placed Barbie in a variety of themes.[71]  Specifically, Mattel wanted to "establish [a] unifying brand message across all advertising vehicles, while reinforcing each World's unique point of difference."[72]  According to Mr. Kilpin, "The concept of the worlds theme was to pull together across a broad range of product both Mattel and licensees, a range of product that would be relevant to a certain theme.  It might be a beach theme.  It might be a party theme.  It could be any number of themes.  The idea is to tell a cohesive story about that theme and about the character and the brand's relationship to that story across a broad range of product."[73]  As was the case with Bratz, the success of the dolls depended upon the themes developed by Mattel.  Kevin Farr, Mattel's CFO, testified that Mattel's strategy was "to have a story" built around Barbie and to have a "Barbie product line built around that story."[74]  Mr. Farr explained that girls, "by buying the product line could bring that story to life play pattern."[75]

59.   A Mattel Worldwide Consumer Research memo dated December 15, 2003 with the subject "2004 Girls Full Year U.S. Viability Testing Report," explained why Mattel believed that themes were crucial to the success of Barbie.  "An examination of the worlds' strategy suggests that advertising and merchandising a world of products together is effective at creating a greater depth of purchase, particularly for some worlds of product…Content delivery will be very important to developing this type of lift for worlds with complementary items that need their storyline and context expanded to stimulate interest (i.e., Cali Girl and Fairytopia)."[76]

---

[70] Deposition of Timothy Kilpin (rough), January 25, 2008, p. 316-318; "Toy Makers Think Small to Reach Big Girls With Web Sagas," The Wall Street Journal, April 16, 2004, M0095772.
[71] "Barbie 2004 Marketing Plan," October 28, 2003, M0284970-96 at 85.
[72] "Barbie 2004 Marketing Plan," October 28, 2003, M0284970-96 at 87.
[73] Deposition of Timothy Kilpin (rough), January 25, 2008, p. 181-182.
[74] Deposition of Kevin Farr (rough), January 28, 2008, p. 199, 213.
[75] Deposition of Kevin Farr (rough), January 28, 2008, p. 199, 213.
[76] "2004 Girls Full Year U.S. Viability Testing Report," December 15, 2003, M0045646-707 at 646.

**EXHIBIT 23**
**PAGE 744**

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                EXHIBIT

PAGE                                                            21

Expert Report of Paul K. Meyer

60.     Mattel's "worlds of" strategy was important to the Barbie product line and warranted mention in Mattel's 10-K for the period ended December 31, 2003:

> "Mattel has announced plans to increase its focus on revenue growth in 2004...Management intends to re-establish the Barbie brand into content-driven product lines pursuant to a 'worlds of' strategy in which <u>stories will be told through movies, books, magazines and music</u>. Product lines, including dolls and accessories, will be created to complement these stories. The eight worlds of Barbie to be introduced in 2004 will be geared to different age segments in an attempt to maintain the brand's broad appeal among girls and their parents. For instance, for the younger girls, <u>there will be stories and products with a fantasy theme</u> such as princesses and fairies, while for older girls, the My Scene line will include the launch of a full-length DVD accompanies by a product line that targets fashion play and shopping."[77] (emphasis added)

61.     Mattel also mentioned its "worlds of" strategy in its earnings calls in 2003 and 2004. In its earnings call for the fourth quarter of 2003, Robert Eckert, Mattel's Chairman and CEO at the time, stated that "The new mantra for Barbie is not about a multitude of SKUs but a strategy based on story telling with technology and age-appropriate aspiration. The content-driven strategy is being expanded to encompass virtually every segment of Barbie."[78] During the next earnings call for the first quarter of 2004, Mr. Eckert again stressed the importance of the "worlds of" strategy, "We have a lot of confidence that this Worlds Of strategy is the right strategy. It goes back to looking at what has done well even in Barbie's tough period, that is, the entertainment properties like Swan Lake or Rapunzel or Nutcracker as well as My Scene,...this content driven strategy we know appeals to girls."[79]

62.     Mattel's senior management also emphasized the importance of the "worlds of" strategy to Barbie sales. In an email dated April 2, 2004 from Mr. Kilpin to various Mattel employees with the subject "Re: Confidential: The Barbie Call to Action – Road Trip Results," Mr. Kilpin wrote, "As you know, I've asked the team to accelerate development of our brand campaign, our package redesign, and our Spring 05 Worlds. The Barbie design, marketing, packaging and consumer products teams – along with help from our research and engineering teams – are

---

[77] Mattel Inc. Form 10-K for the period ended December 31, 2003, p. 17.
[78] Mattel Q4 2003 Earnings Call Transcript, p. 2.
[79] Mattel Q1 2004 Earnings Call Transcript, p. 11.

**EXHIBIT 23**
**PAGE 745**

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT

PAGE

22

Expert Report of Paul K. Meyer

moving together, quickly to address these issues. Simply stated, the old way of building the Barbie brand just doesn't work anymore. We have been out-thought and out-executed."[80]

63. In response to Mr. Kilpin's email, Steve Ross of Mattel, replied, in an email dated April 2, 2002, "We will be strategic and relentless in creating innovative, world-class content that results in a competitive advantage. My personal promise to you is that we will NOT rest until Barbie regains both relevance and share!!"[81]

64. A Mattel presentation titled "2005 Barbie Spring Line Review," dated April 15, 2004, also acknowledged the importance of the "worlds of" strategy to Barbie sales. On a slide called "Fight Fire With Fire!," one suggestion for how Mattel should "regain market share" was to "[l]aunch new 'wow' Worlds."[82] Other suggestions included "[d]evelop content that engages girls in the characters & stories" and "expand older girl Worlds."[83]

65. Mattel's Form 10-Q for the period ending September 30, 2004 commented on the importance of the "worlds of" strategy. "During the first half of 2004, approximately one-third of the Barbie products available at retail were developed using the 'worlds of' strategy, which should increase to approximately two-thirds during the 2004 holiday season. The full product line available to customers in 2005 will reflect the new strategy."[84] Mattel's CEO, Robert Eckert, addressed the effectiveness of the "worlds of" strategy in Mattel's earnings call for the third quarter of 2005":

> "Following the improved trend in Barbie sales at the end of last year, we haven't sustained or built upon the positive momentum into 2005. I believe part of the solution is providing additional resources behind our 'worlds of' strategy, then increasing the bandwidth in the Barbie organization...But that's just part of it. Beyond more and stronger 'worlds,' we also need to do a better job of tying the 'worlds' together, reintroducing products that satisfy play patterns that aren't covered in the 'worlds', and communicating to girls the essence of the Barbie brand."
>
> * * *
>
> "[O]ur 'worlds of' product approach has been hit or miss. We've missed too many segments. Clearly, one of the things we are looking forward to as we go forward is to improve the execution of the brand. That is getting the 'worlds' right, get the play patterns between the 'world' and tie

---

[80] Email, "FW: Confidential: The Barbie Call to Action – Road Trip Results," April 2, 2004, M0079846-47 at 46.
[81] Email, "FW: Confidential: The Barbie Call to Action – Road Trip Results," April 2, 2004, M0079846-7.
[82] "2005 Barbie Spring Line Review," April 15, 2004, M0079731-58 at 40.
[83] "2005 Barbie Spring Line Review," April 15, 2004, M0079731-58 at 42.
[84] Mattel Inc. Form 10-Q for the period ended September 30, 2004, p. 19.

**EXHIBIT 23**
**PAGE 746**

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT _____ ·23

PAGE _____

(                  (

**Expert Report of Paul K. Meyer**

together the brand in a statement to consumers...We have not done a good enough job of that with Barbie."[85]

66.    Third parties also corroborate the importance of themes to Barbie sales. In an August 10, 2000 analyst report from Salomon Smith Barney, Jill Krutick wrote that "lifestyle builds brand equity. Building a 'lifestyle' around each brand will be a key element of this strategy."[86] Ms. Krutik specifically addresses Mattel's "worlds of" strategy in a February 19, 2004 Salomon Smith Barney analyst report, writing, "After experiencing declining sales for Barbie in 2003, Mattel has completely changed direction with this leading Girls brand for 2004 and beyond...Barbie is now focused on creating Barbie 'worlds' that incorporate stories (e.g., content), dolls, and accessories...Each line is unique but contains common elements of story-telling to engage girls of different ages."[87]

       3.     **Fashions Sold With The Dolls**

67.    Based on discussions with Paula Garcia and Robert Tonner and reviewing documents produced in this matter, as well as review of research and deposition testimony, I understand that fashions and softgoods are important to MGA's generation of Bratz sales and profits.

68.    Bratz and Barbie are fashion dolls, which means that girls play with them in part by changing the dolls' fashions. Thus, the dolls' fashions are significant contributors to the dolls' success. For example, a presentation produced in Mattel's documents entitled, "My City, My Style, My Scene: Competitive Analysis" dated August 2003, identifies factors that contributed to the success of the Bratz product line. Under the heading, "Why Is Bratz Successful?," one of the factors listed was "Fashions and accessories are 'over the top' hip."[88] Doll fashions may play an even greater role in doll sales over time.[89] I understand the Bratz doll rotocast and body have generally not changed since introduction to the market, yet the Bratz fashions have continued evolving, keeping up with current and popular fashion trends.[90]

---

[85] Mattel Q3 2005 Earnings Call Transcript.
[86] "MAT: Beauty is More than Skin Deep; Analyst Meeting Review," Jill Krutik, Salomon Smith Barney, August 10, 2000, p.3.
[87] "MAT: New Worlds of Product Impress," Jill Krutik, Salomon Smith Barney, February 19, 2004, p. 2.
[88] "My City, My Style, My Scene: Competitive Analysis," August 2003, M0082139-46 at 39.
[89] Ms. Garcia believes the importance of fashion to the Bratz doll line has increased since its introduction.
[90] Discussions with Paula Garcia.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

**EXHIBIT 23**
**PAGE 747**

EXHIBIT _____

PAGE _____     24

**Expert Report of Paul K. Meyer**

69.  Bratz fashions reflect at least three different creative elements: (a) swatch selection, (b) pattern development and (c) graphic print application. Mr. Bryant played an active role with swatch selection which includes identification of fabrics and colors. Ms. Marlow was responsible for creating patterns for the dolls and both Ms. Marlow and Ms. Ward would evaluate and alter the fit of the patterns onto the doll. Sarah Halpern, a graphic artist, created prints that would be applied to the fashions. Ms. Garcia would provide input and creative direction in these areas.[91]

70.  In November 2007, a third party research study commissioned by MGA entitled "Bratz International A&U, US, UK, & Canada" found that "[a]cross all three countries, Bratz dolls are the most fashionable."[92] The study added, "In a head-to-head comparison, more moms agree that Bratz is the most fashionable doll."[93] A similar international study undertaken by the same third party research group in December 2006, found that 72% of US girls surveyed and 67% of US mothers surveyed described Bratz as "fashionable."[94] These percentages were even higher for girls and mothers in other countries.[95]

71.  Ms. Marlow, who worked on the fashions for the Bratz dolls, stated that she believed that the fashions of the Bratz dolls is one of the reasons for its success. Ms. Marlow stated, "It's a fashion doll, so it's all about the fashion."[96] Ms. Marlow also stated, "Girls love clothes…for themselves and the dolls because it's a fantasy thing. So while they are dressing up the dolls, they feel like they're dressing up themselves."[97] According to Ms. Marlow, fashion is the "No. 1" feature for a fashion doll.[98]

72.  Furthermore, Ms. Marlow stated that the fashions also influenced the ultimate shape of the doll body. When Ms. Marlow began making fashions for the first doll body she was given, she experienced problems getting the right fit for the clothing. For example, Ms. Marlow testified:

> "We could not move one leg apart. Because if the leg was movable, we
> could move it out and we could drape around it and get it right. But this

---

[91] Discussions with Paula Garcia.
[92] "Bratz International A&U, US, UK, & Canada," C&R Research Services, Inc., November 2007, MGA3823970-4075 at 4011. "A&U" refers to Attitude & Usage, see MGA3823970-4075 at 3972.
[93] "Bratz International A&U, US, UK, & Canada," C&R Research Services, Inc., November 2007, MGA3823970-4075 at 4045.
[94] "Bratz International A&U" C&R Research Services, Inc., December 2006, MGA295483-640 at 496.
[95] "Bratz International A&U" C&R Research Services, Inc., December 2006, MGA295483-640 at 497-503.
[96] Deposition of Veronica Marlow, December 28, 2007, p. 384.
[97] Deposition of Veronica Marlow, December 28, 2007, p. 398.
[98] Deposition of Veronica Marlow, December 28, 2007, p. 398.

**EXHIBIT 23**
**PAGE 748**

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT

PAGE

-25

Expert Report of Paul K. Meyer

start[ed] getting really complicated when you cannot move the butt around."[99]

\* \* \*

"And of course with these feet and—if you can imagine the width of her waist, something that had to fit in here (indicating) is really small, but at the same time had to fit here to go here (indicating). So imagine something being this big (indicating), okay, this big (indicating), and then I had to fit in here. So I had to open all the way down, and it looked horrible."[100]

73.   MGA provided her a revised doll body, which Ms. Marlow described as a "totally completely different animal," which permitted the fashions she had designed to fit better.[101] Ms. Marlow described the revisions as follows: "You saw the difference of the body, how the shape was completely different, her hips, the length of the legs, the shape of the legs, the thickness of the legs, the hip shape."[102]   MGA provided Ms. Marlow another revised doll body, which incorporated more changes, including differences in the shape of the bodice and a broader shoulder, "otherwise...we don't have enough room to do a seam allowance for the neck or the armhole."[103]

74.   Numerous internal MGA documents recognize that one of Bratz's strengths was MGA's attention to detail and high quality fashions.   In a document titled "Bratz Brainstorm 2002, Meeting Notes," two of the strengths listed were:

-   ■   "Attention to detail – BRATZ has been very strong in this area.  Using quality materials, detailed stitching, and fashion forward designs has been one of the most successful features on the BRATZ brand."

-   ■   "High quality – Again, quality and attention to detail, differentiates us from the competition."[104]

A MGA presentation called "Bratz, The Girls With A Passion For Fashion!" also stressed that Bratz fashions were "driven by detail and quality."[105]   Another MGA presentation, "Bratz, Fashion Doll Competition, listed the following strengths:

---

[99] Deposition of Veronica Marlow, December 28, 2007, p. 341.
[100] Deposition of Veronica Marlow, December 28, 2007, p. 342.
[101] Deposition of Veronica Marlow, December 28, 2007, p. 343.
[102] Deposition of Veronica Marlow, December 28, 2007, p. 343.
[103] Deposition of Veronica Marlow, December 28, 2007, p. 351.
[104] "Bratz Brainstorm 2002," January 22, 2001, MGA0186385-90 at 85.

**EXHIBIT 23**
**PAGE 749**

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT _____

PAGE _____

26

Expert Report of Paul K. Meyer

- "Attention to detail and quality"
- "Balance of fashion first, then theme lifestyle"
- "Never seen before approach to alternative looks and eclectic styles through fashion, hair and face deco"[106]

In addition, a MGA presentation titled "MGA Entertainment Welcomes Wal-Mart," confirmed that Bratz's "self expression and fashion savvy" qualities, along with "attention to details" were reasons for Bratz's success.[107]

75.   Mr. Kilpin, Mattel's former Senior Vice President of Design & Marketing for the Girls division, testified that he believed the Bratz's fashions were "hip." Mr. Kilpin testified:

> "Q:  What about here that the fashions and accessories are over the top hip?  Would you agree that the Bratz fashions and accessories were over the top hip?
>
> A:  It's not – I don't know how anybody is defining over the top.  Would I agree that they're hip?  Yes."[108]

76.   Mattel documents acknowledge the importance of fashion to Bratz's success.  In the presentation "My City, My Style, My Scene: Competitive Analysis" dated August 2003 that is discussed above, two of the reasons listed as to "Why Is Bratz Successful?" were the "fashions are…'over the top' hip" and the "themes are all fashion driven."[109]

77.   Similarly, a Mattel Worldwide Consumer Research memorandum dated December 24, 2004, with the subject "Girls Monthly Brand Tracking Study in the U.S. – November 2004" demonstrated that girls ages 8 to 10 consistently select Bratz dolls as having "clothes [they] most want to wear."[110]  Another "Girls Monthly Brand Tracking Study in the U.S. – February 2005," dated March 4, 2005, observed that "Bratz clearly dominates in most areas, most notably, play value, 'coolness,' and having appealing fashions and accessories…"[111]  The same study showed

---

[105] "Bratz, The Girls With A Passion For Fashion!," MGA0215156-261 at 181.
[106] "Bratz, Fashion Doll Competition," MGA0212249-60 at 52-53.
[107] "MGA Entertainment Welcomes Wal-Mart," MGA0203321-50 at 23.
[108] Deposition of Timothy Kilpin (rough), January 25, 2008, p. 293.
[109] "My City, My Style, My Scene: Competitive Analysis," August 2003, M0082139-46 at 39.
[110] "Girls Monthly Brand Tracking Study in the U.S. – November 2004," December 24, 2004, M0080101-110 at 106.
[111] "Girls Monthly Brand Tracking Study in the U.S. – February 2005," March 4, 2005, M0082090-99 at 90.

EXHIBIT 23
PAGE 750

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                    EXHIBIT                    27

PAGE

that girls ages 8 to 10 continued to choose Bratz dolls over Barbie and My Scene as most effectively displaying this attribute.[112]

78. Furthermore, a Mattel memorandum with the subject "State of Girls Report – Addendum," dated November 5, 2004 from Allison Willensky recognized that "consistently girls mention that Bratz have 'cooler' hairstyles and outfits than Barbie. This is also reflected in the tracking study where Barbie continues to be rated lower than Bratz on this key measure of appeal. The bar for Barbie has clearly been raised. Going forward, Barbie's aesthetics for transitional girls must pass this 'acid test' on hairstyles and outfits relative to Bratz."[113] In addition, Mattel's "Brand Comparison Chart," listed one of Bratz's "strengths" as "Status to own," "Edgy," "Trendy," and "Fashionable."[114]

79. Additionally, a Mattel presentation titled "2005 Barbie Spring Line Review," dated April 15, 2004, also acknowledged the importance of the fashion to Barbie sales. On a slide called "Fight Fire With Fire!," one suggestion for how Mattel should "regain market share" was to "[r]einvent key segments of Fashions, Accys, Kelly, and Essentials."[115] Other suggestions included "[b]e on top of the latest fashion styles and trends."[116]

### 4. Accessories Sold With The Dolls

80. Based on discussions with Paula Garcia and Robert Tonner and reviewing documents produced in this matter, as well as research and deposition testimony, I understand that doll accessories are important to MGA's generation of Bratz sales and profits.

81. According to the "Bratz International A&U, US, UK, & Canada" study prepared by C&R Research Services, Inc. in November 2007, "By far, girls feel that Bratz have the best accessories."[117] The survey added, "Not only do girls feel that Bratz comes with the best accessories, they also feel they come with the most accessories."[118] The December 2006 "Bratz International A&U" study, which covered the U.S., Spain, the UK, Canada, France, Mexico,

---

[112] "Girls Monthly Brand Tracking Study in the U.S. – February 2005," March 4, 2005, M0082090-99 at 95.
[113] "State of Girls Report – Addendum," November 5, 2004, M0082065.
[114] "Brand Comparison Chart," M006505.
[115] "2005 Barbie Spring Line Review," April 15, 2004, M0079731-58 at 40.
[116] "2005 Barbie Spring Line Review," April 15, 2004, M0079731-58 at 42.
[117] "Bratz International A&U, US, UK, & Canada," C&R Research Services, Inc., November 2007, MGA3823970-4075 at 4014. "A&U" refers to Attitude & Usage, see MGA3823970-4075 at 3972.
[118] "Bratz International A&U, US, UK, & Canada," C&R Research Services, Inc., November 2007, MGA3823970-4075 at 4019.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT _

PAGE

**EXHIBIT 23
PAGE 751**

28

Expert Report of Paul K. Meyer

Benelux and Germany, found that 56% of US girls surveyed and 48% of US mothers surveyed believed Bratz had the "best accessories."[119] These percentages were even higher in other countries.[120]

82.     As part of its theme and concept development, MGA expends significant creative resources to develop accessories. Accessories included with Bratz dolls vary from shoes and purses to musical instruments and sporting equipment. The accessories play an important role in emphasizing the theme.[121]

83.     Numerous documents produced by Mattel confirm that Bratz accessories played a large role in their success. For example, the presentation "My City, My Style, My Scene: Competitive Analysis" dated August 2003 that is discussed above, one of the reasons listed as to "Why Is Bratz Successful?" was that the "[f]ashions and accessories are 'over the top' hip."[122] Likewise, an internal Mattel memorandum dated July 29, 2003 with the subject, "Diagnostic Testing With Girls Ages 6 To 9," summarized the results of a focus group in which girls ages 6 to 9 were shown a prospective My Scene commercial. One of the recommendations arising out of the focus group highlighted the importance of accessories. "If possible,…more clearly communicate that accessories, such as purses, cell phones, make-up and perfume are included with the dolls. Prior research has indicated that girls find extensive piececount (eg. The numerous accessories accompanying the Bratz dolls) to be particularly appealing."[123]

84.     Another Mattel document dated November 14, 2003 and titled "The Bratz Brief" acknowledged the importance of accessories to the success of Bratz. "Girls were enamored by the piece count and 'stuff' that accompanied the dolls. Despite the high price points, moms perceived a definite 'value for money' and were willing to justify their purchase. Moms also endorsed the brand due to its whimsical humor that compensated for the irreverent attitude."[124] In Mattel's "Brand Comparison Chart" which lists Barbie's, My Scene's and Bratz's strengths, limitations and potential, "strong accessories" is listed as a strength under Bratz.[125]

---

[119] "Bratz International A&U" C&R Research Services, Inc., December 2006, MGA295483-640 at 496.
[120] "Bratz International A&U" C&R Research Services, Inc., December 2006, MGA295483-640 at 497-503.
[121] Discussions with Paula Garcia.
[122] "My City, My Style, My Scene: Competitive Analysis," August 2003, M0082139-46 at 39.
[123] "Diagnostic Testing With Girls Ages 6 To 9," July 29, 2003, Y&R000204-205.
[124] "The Bratz Brief," November 14, 2003, M0079765-71 at 69.
[125] "Brand Comparison Chart," M0065305.

**EXHIBIT 23**
**PAGE 752**

85. A Mattel Worldwide Consumer Research memorandum dated March 4, 2005, with the subject "Girls Monthly Brand Tracking Study in the U.S. – February 2005," showed that girls between ages 8-10 overwhelmingly believe Bratz "comes with better stuff."[126]  The memorandum also stated "Bratz clearly dominates in most areas, most notably, play value, 'coolness,' and having appealing fashions and accessories, although as seen previously, the brand posts slightly weaker scores on aesthetics."[127]    In addition, another Mattel Worldwide Consumer Research memorandum dated June 10, 2005 with the subject "Girls Monthly Brand Tracking Study in the U.S. – May 2005," showed that girls ages 8-10 consistently selected Bratz as having the "best accessories."[128]

   5.   Characters Associated With The Doll Line

86. Based on discussions with Paula Garcia and Robert Tonner and reviewing documents produced in this matter, as well as research and review of deposition testimony, characters and character development are important to MGA's generation of Bratz sales and profits.

87. MGA has introduced numerous Bratz doll characters since 2001 which are designed to emphasize different personalities, interests and ethnic backgrounds.[129,130]  Offering a variety of characters allows MGA's target consumers to identify with certain Bratz doll personalities and diversities.  An MGA presentation titled, "MGA Entertainment Welcomes Wal-Mart," stated that one reason for the "Power of the brand" was Bratz's "Universal appeal through multi-cultural demographics."[131]   In addition, girls saw Bratz as "girls who were teens that could do anything."[132]  Kumi Croom, an Associate Account Director at Young & Rubicam, an advertising agency that worked with Mattel on the marketing of Mattel's Flavas and My Scene doll lines, stated that one of the strengths of the Bratz doll line was that "they had found a niche with girls. In their strategy of being the girls with attitude, girls gravitated toward that…Their themes resonated well with girls."[133]

---

[126] "Girls Monthly Brand Tracking Study in the U.S. – February 2005," March 4, 2005, M0082090-99 at 97.
[127] "Girls Monthly Brand Tracking Sudy in the U.S. – February 2005," March 4, 2005, M0082090-99 at 90.
[128] "Girls Monthly Brand Tracking Study in the U.S. – May 2005," June 10, 2005, M0080111-120 at 118.
[129] Discussions with Paula Garcia and review of MGA sales data.
[130] Based on discussions with Paula Garcia, I understand that Charles O'Connor was responsible for writing the copy on the initial Bratz packaging, including developing and expanding the characters' personalities.
[131] "MGA Entertainment Welcomes Wal-Mart," MGA0203321-50 at 23.
[132] "Diagnostics With Girls Ages 7 To 9," May 24, 2004, Y&R000238-39.
[133] Deposition of Kumi Croom, December 20, 2007, p. 6-7, 21, 23-24, 32-33, 39-40.

**EXHIBIT 23**
**PAGE 753**

EXHIBIT

PAGE

Expert Report of Paul K. Meyer

88. Dominique Deiterman, a senior brand manager at Young & Rubicam, echoed this sentiment in a November 17, 2005 email that she sent to her supervisor, Susan Chittum.[134]  Attached to the email was a memorandum in which Ms. Deiterman wrote:

> "Girls ages 8-10 can't wait to grow up and therefore can't wait to step into their next life stage of being a teenager...MGA capitalized on this insight and invented Bratz – a teenage fashion doll. As Bratz was first to enter the teenage fashion doll category, they picked the most relevant and most aspirational aspect of being a teenage girl: Having a rebellious attitude. This is their leading thought that navigates their brand – starting with the brand name 'Bratz.'"[135]

89. Internal Mattel documents also underscore the notion that older girls were growing older at faster rates than in the past.  In a November 14, 2003 document titled "The Bratz Brief," Mattel acknowledged that in 2001, "the impact of media, TV, music and other external factors were pushing girls to mature faster than ever...They were aspiring to become teenagers and be associated with things that represented that stage in a girl's life."[136]  The document also recognized that "girls were more discriminating about the product and demanded more uniqueness and greater product differentiation.  Products that seemed to pique girls' interests possessed the ideal combination of content and features."[137] (emphasis not added)

90. In addition, Kevin Farr, Mattel's CFO since 2000, stated at his deposition that he believed that MGA "increased the market [for] fashion dolls" by "attracting girls at older ages that weren't buying fashion dolls."[138]

91. The success of the Bratz dolls was, in part, due to the ability of MGA to differentiate the dolls' characters from those of more traditional fashion dolls, such as Barbie and My Scene.  A Mattel presentation titled "2004 Marketing Plan Update," dated March 16, 2004, which Mr. Kilpin authored, further confirmed this belief.  Under the heading, "The House Is On Fire!," Mr. Kilpin wrote that "Barbie is perceived as more grown-up and more like a princess," while "Bratz has surpassed Barbie in appearance and aspiration, and play value."[139]  In the same presentation,

---

[134] Deposition of Kumi Croom, December 20, 2007, p. 16.
[135] Email, "My Scene," November 17, 2005, Y&R000152-154 at 153.
[136] "The Bratz Brief," November 14, 2003, M0079765-71 at 66.
[137] "The Bratz Brief," November 14, 2003, M0079765-71 at 67.
[138] Deposition of Kevin Farr (rough), January 28, 2008, p. 183-186.
[139] "2004 Marketing Plan Update," March 16, 2004, M0079848-55 at 53.

**EXHIBIT 23
PAGE 754**

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT ___ ___

PAGE ___ ___

31

Expert Report of Paul K. Meyer

Bratz led categories such as "Is more like a teenager," "Clothes you'd most want to wear," "Most want to be like," "More fun for pretending stories" and "Is more fun to play with." Barbie, on the other hand, led categories such as "Is more like a princess," "Is more grown up" and "Mom's Favorite."[140]

92.    The "Bratz Brief" also acknowledged that "Bratz was unique" and different from Barbie.[141]

> "Aesthetically, Bratz had a completely different animated look...In terms of the positioning, Bratz had a unique tone and manner as bratty teenagers, with a 'passion for fashion.' Older girls perceived them as the 'snotty popular' girls and saw them as anti-Barbie. In this case the competitive threat was based on a unique branding positioning and product execution that was relevant and resonated with older girls."[142]

93.    An April 25, 2005 Young & Rubicam presentation to Mattel titled "My Scene: Brand Platform" highlighted the differences that eight- to ten-year-old girls saw between Barbie, My Scene and Bratz.[143] According to the presentation, girls viewed Bratz as "Sexy, Rebellious Girls" and used words such as "rockstar," "rich," "cool," "stylish," "younger" and "who I want to be" to describe the dolls.[144] Barbie, on the other hand, was seen as "Pink and Adult" and was described as "older," "helpful," "boring," "smart," "nice" and "perfect."[145] Girls viewed My Scene as "Nice Shopping Girls" and used words such as "actress," "most like teens," "girly girl" and "trendy" to describe them.[146]

94.    Third parties also corroborate the notion that Bratz dolls were able to differentiate themselves from Barbie. In an article appearing in *The New York Times* on February 9, 2006, Michael Barbaro recognized that Bratz "hit the shelves wearing belly shirts, leggy skirts and a wide variety of other racy fashions that children's doll makers had long viewed as out of bounds."[147] Mr. Barbaro interviewed Jim Silver, "a longtime toy industry analyst," who said, "Bratz saw the trend and really pushed the envelope." Mr. Silver went on to say that Bratz appealed to older girls "who had begun to shun Barbie" because Bratz "struck the right mix of fashion and

---

[140] "2004 Marketing Plan Update," March 16, 2004, M0079848-55 at 53.
[141] "The Bratz Brief," November 14, 2003, M0079765-71 at 68.
[142] "The Bratz Brief," November 14, 2003, M0079765-71 at 68.
[143] "My Scene: Brand Platform," April 25, 2005, Y&R000032-62.
[144] "My Scene: Brand Platform," April 25, 2005, Y&R000032-62 at 40, 41.
[145] "My Scene: Brand Platform," April 25, 2005, Y&R000032-62 at 38, 39.
[146] "My Scene: Brand Platform," April 25, 2005, Y&R000032-62 at 42, 43.
[147] "A Makeover of a Romance," Michael Barbaro, *The New York Times*, February 9, 2006.

**EXHIBIT 23**
**PAGE 755**

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT

PAGE

32

Expert Report of Paul K. Meyer

attitude."[148] Furthermore, a research report titled "The U.S. Tween Market" written in February 2001 acknowledged that "tweens rejected Barbie's traditional outfits and packaging in favor of licensed dolls with a 'cool attitude' and hipper edge."[149]

95.   Not only was MGA successful in differentiating the Bratz's characters from Barbie and My Scene, MGA was also successful at creating characters with which older girls were able to identify. An internal Mattel memorandum dated July 19, 2004 with the subject, "Qualitative Research On The Bratz Video: Starrin' & Stylin' – Report," highlighted the key learnings garnered by showing the 60-minute video to girls ages 7 to 10. Among the findings were:

> "Girls were often able to identify themselves with <u>one or more of the characters</u> based on their specific interests (e.g., fashion, school, shopping, music, writing, prom committee) and hair color.
>
> > - 'They're just like us. They do things that we would do or will do when we go to high school,' one girl explained.
> > - 'I'm most like Cloe because I like to shop and I have blond hair,' mentioned another girl."[150] (emphasis added)
>
> \* \* \*
>
> "...<u>The individual portrayals of each character</u> further helped girls to identify with at least one or two characters.
>
> > - After the video, girls were able to recite most of the girls [sic] nicknames, further enhancing depth of identification with the Bratz characters."[151] (emphasis added)

96.   A Mattel Worldwide Consumer Research memorandum dated November 1, 2004, with the subject "State of Girls – Report," stated, "As found with My Scene and Bratz, girls like to be able to name and identify with different characters, i.e., 'she's like me, we both have brown hair' or 'I have a friend named Madison.'"[152]

97.   A Mattel Worldwide Consumer Research memorandum dated July 19, 2004, with the subject "Qualitative Research on the Bratz Video: Starrin' & Stylin' – Report," acknowledged that "Some non-Bratz girls responded [to] being more interested in Bratz after seeing the video

---

[148] "A Makeover of a Romance," Michael Barbaro, *The New York Times,* February 9, 2006.
[149] "The U.S. Tween Market," Packaged Facts, February 2001, p. 128.
[150] "Qualitative Research On The Bratz Video: Starrin' & Stylin' – Report," July 19, 2004, Y&R000240-41.
[151] "Qualitative Research On The Bratz Video: Starrin' & Stylin' – Report," July 19, 2004, Y&R000240-41.
[152] "State of Girls – Report," November 1, 2004, M0066490-93 at 92.

**EXHIBIT 23
PAGE 756**

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT

PAGE

33

because these girls were more easily able to identify with the style and personalities of the characters."[153]

98.     Another Mattel Worldwide Consumer Research memorandum dated July 26, 2004, with the subject "Ad Testing with Girls Ages 7 To 10, Diagnostics With Girls Ages 7 To 10," recognized that "girls thought it was important to highlight the different piececount with each doll, because as witnessed with learnings from the Bratz movie: Starrin' & Stylin', girls enjoy learning about the dolls' interests, style and personality as it helps them to better identify with each character."[154]   Another Mattel Worldwide Consumer Research memorandum dated July 19, 2005, stated that "furthermore, consistent with previous research conducted with girls on the Bratz movie, girls enjoyed watching Bratz dolls star in a movie and getting to know the dolls on a more intimate basis."[155]

99.     A Mattel memorandum dated October 13, 2003, with the subject "2004 My Scene Waves B & C Focus Group Report," emphasized that girls were able to recall the names of the Bratz characters, thereby demonstrating girls' familiarity with Bratz.   This document highlights Mattel's awareness of the importance of characters to the success of a fashion doll line.   The memorandum stated:

> "While there was some discussion of adding another character to My Scene, it has been subsequently determined that the focus of the brand should be to further develop existing character storylines (Barbie, Madison, Chelsea and Nolee) and soon to be launched dolls (Delancy and Kennedy), rather than introduce a new, younger character to the brand.   This decision was based on girls' current lack of developed knowledge of the individual My Scene characters (i.e., girls are only able to name one to two of the dolls and are not able to expand on their personalities or interests).   In fact, girls' knowledge of all the Bratz characters, personalities and interests is more apparent.   It should be noted that girls are more familiar with all the Bratz dolls and are somewhat knowledgeable of each character's interests."[156] (emphasis added)

[153] "Qualitative Research On The Bratz Video: Starrin' & Stylin' – Report," July 19, 2004, Y&R000240-1.
[154] "Ad Testing with Girls Ages 7 To 10, Diagnostics With Girls Ages 7 To 10," July 26, 2004, Y&R000164-167 at 165.
[155] "Qualitative Research on the My Scene Goes To Hollywood Video – Report," July 19, 2005, M0077590-95 at 92.
[156] "2004 My Scene Waves B & C Focus Group Report," October 13, 2003, M0747909-914 at 909.

EXHIBIT 23
PAGE 757

Expert Report of Paul K. Meyer

### 6.    Packaging In Which The Dolls Are Sold

100.    Based on discussions with Paula Garcia, Aileen Storer, Steffen Smith and Robert Tonner and the review of business and marketing documents produced in this matter, as well as research and review of deposition testimony in this matter, I understand that packaging is important to MGA's generation of Bratz sales and profits.

101.    MGA devotes significant resources to developing and producing packaging for Bratz dolls. According to Ms. Garcia, packaging accounts for approximately one-third of the total product cost, with the cost for more intricate packages accounting for over 40% of the total product cost. I understand that Packaging consists of two primary creative processes: (a) package design consisting of the package shape, graphics and product placement, and (b) copy that conveys attributes of the product.[157]

102.    Aileen Storer, with assistance from others, developed the initial trapezoidal package shape for the Bratz products and has continued to develop award-winning, innovative packaging designs.[158] Ms. Storer developed the concept of including handles on the Bratz products, which also served as items for the consumer on certain packages.[159]  Additionally, Ms. Storer developed the Bratz logo.[160]  Charles O'Connor developed the copy for the Bratz products and is credited for creating the "Passion for Fashion" tag line.[161]

103.    Key elements of MGA's packaging of Bratz products consist of using innovative shapes, such as a trapezoid, and clear packaging offering superior visibility of the package contents, and using unique colors and lettering printed directly to the plastic package.[162]

104.    Mr. Kilpin, Mattel's former Senior Vice President of Design & Marketing for Girls, testified that he liked the Bratz packaging because of how the packaging displayed a Bratz doll's accessories, "I thought they displayed the piece count nicely."[163]

105.    Documents produced by Mattel emphasize the effect of the Bratz packaging on the success of the Bratz dolls.  A presentation entitled, "My City, My Style, My Scene: Competitive Analysis"

---

[157] Discussions with Paula Garcia and Aileen Storer.
[158] Discussions with Aileen Storer.
[159] Discussions with Aileen Storer.
[160] Discussions with Aileen Storer.
[161] Discussions with Paula Garcia; Deposition of Carter Bryant, November 5, 2004, p. 287.
[162] Discussions with Paula Garcia and Aileen Storer.
[163] Deposition of Timothy Kilpin (rough), January 25, 2008, p. 295-296.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT 23
PAGE 758

EXHIBIT _____

35

PAGE _____

Expert Report of Paul K. Meyer

dated August 2003, identifies factors that contributed to the success of the Bratz product line. Under the heading, "Why Is Bratz Successful?," one of the answers was "packaging is innovative."[164]  Under the section called "Bratz Topline Strategy" in the same presentation, Mattel acknowledged that:

"Packaging: Unique Pyramid shape packaging with TOTY sticker

- Consistent line look with illustrations
- Embellish collector packaging with soft goods
- Color focus: raspberry and dark blue"[165]

106.   A Mattel presentation titled "The House Is On Fire! Packaging Improvement To Save Barbie" identified a "new packaging strategy" that was designed to "DRIVE SALES" of Barbie.[166] Among the suggestions to improve Barbie's packaging were:

- "All acetate boxes to show the details of the doll"
- "Add acetate to package sides to open the package and showcase the product"
- "A new innovative structure the [sic] gives girls a way to display & store their dolls"
- "Allows girls to keep their dolls special"
- "Create packaging that is innovative and reusable (i.e., end caps that become a storage box)"
- "Distinctive new shape"
- "Plush & jeweled handles"
- "Unique shape"
- "Plush/jeweled handle tied to theme"[167]

107.   A Mattel presentation titled "2005 Barbie Spring Line Review" dated April 15, 2004 also acknowledged the importance of packaging to improving Barbie's sales.

- "Product, packaging, marketing, and sales must be launched that is brilliant, tactical, aggressive, revolutionary, and ruthless"
- "Doing What It Takes...Packaging Innovation"

---

[164] "My City, My Style, My Scene: Competitive Analysis," August 2003, M0082139-46 at 39.
[165] "My City, My Style, My Scene, Competitive Analysis," August 11, 2003, M0082139-46 at 40.
[166] "The House Is On Fire! Packaging Improvements To Save Barbie," M0082011-8.
[167] "The House Is On Fire! Packaging Improvements To Save Barbie," M0082011-8.

EXHIBIT 23
PAGE 759

EXHIBIT

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

PAGE                                                                                 36

**Expert Report of Paul K. Meyer**

- Under "The Mission" of "Regain market share," Mattel listed "Create exciting, innovative packaging"[168]

108.   Another Mattel presentation called "Barbie Retail Experience" listed a variety of reasons why the Bratz packaging was a key to the success of Bratz:

- "Metallics and bright colors"
- "Cohesive color palette in shelf tags, wallpaper, packages – throughout the entire aisle"
- "Visual flow from segment to segment"
- "Edgy & appealing"
- "Peg-ables!"
- "Different packaging see more product all side except the back"
- "Overhead and hanging large displays"
- "Licensed product, room décor, lifestyle product merchandised together with dolls/all cohesive and consistent"
- "Smaller to bigger sizes of packages from top to bottom shelves (easy to merch)"[169]

109.   The Mattel document titled "My Scene & Bratz: What's Working & What's Not" emphasized other ways that MGA's packaging innovations contributed to the success of Bratz, including:

- "Clear packaging equities: themed handle, structure (shapes always similar even if not identical), strong logo"
- "Package copy is very in-line with brand positioning (very edgy)"
- "Copy on package"
- "Traded product cost (i.e. piececount) for packaging"
- "Packaging" [170]

110.   Finally, a Mattel memorandum dated October 13, 2003 with the subject "2004 My Scene Waves B & C Focus Group Report" also pointed out the uniqueness of the Bratz packaging. "Girls, however, were more attracted to structures with furry handles, storage capability and portability (i.e., Bratz packaging). Therefore, efforts should continue to explore unique and innovative

---

[168] "2005 Barbie Spring Line Review," April 15, 2004, M0079731-58 at 35, 37, 40.
[169] "Barbie Retail Experience," M0065497-538 at 511.
[170] "My Scene & Bratz: What's Working & What's Not," M0078511-2.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

**EXHIBIT 23**
**PAGE 760**

EXHIBIT

37

PAGE

packaging structures, while keeping in mind girls uses for storage and the ability to take them 'on the go.'"[171]

111.  Mattel documents also highlight the shortcomings of the Barbie and My Scene packaging and demonstrate that Mattel wanted to create packaging that was more similar to that of the Bratz dolls.  A Mattel presentation called "Barbie Retail Experience" contained a section on "How Do We Create Our Own Experience At Retail?," that recognized that Barbie packaging is not sufficiently "hip/cool/edgy."[172]  A later section in the same Mattel presentation listed new strategies for packaging that highlight the innovation of the Bratz packaging, including:

- "Competition has different shape and size of box (able to reach in and grab a box without hitting other boxes), ours is only square shaped"
- "Color: competition has holographic"
- "Pastels (ours) vs. cooler darker colors of the competition"[173]

112.  The Mattel document called "My Scene Go Forward Strategy" also underscored the effectiveness of the Bratz packaging.  Under the section titled "Strategies," one of the recommendations was to "focus on developing clear segmented hooks with great packaging that have a pop off the shelf consumer appeal.  Totally agree that packaging has to work much harder for us, as Bratz's does."[174]  Another presentation, "My City, My Style, My Scene, Competitive Analysis," dated August 27, 2003, recommended "chang[ing] color palette and structure."[175]

113.  Third parties also corroborate the importance of packaging to Barbie sales.  In an August 10, 2000 analyst report from Salomon Smith Barney, Jill Krutick wrote that "Barbie's resurgence this year is in part tied to this with new packaging, logo and look helping to drive sales."[176]

### 7.  MGA's Branding, Marketing And Advertising Efforts

114.  Based on discussions with Erich Joachimsthaler, Ph.D., Ken Kaufman and Robert Tonner and the review of documents produced in this matter, I understand that MGA's advertising and

---

[171] "2004 My Scene Waves B & C Focus Group Report," October 13, 2003, M0747909-14 at 9, 13.
[172] "Barbie Retail Experience," M0065497-538 at 502.
[173] "Barbie Retail Experience," M0065497-538 at 524.
[174] "My Scene Go Forward Strategy," M0086591-2.
[175] "My City, My Style, My Scene, Competitive Analysis," August 27, 2003, M0072014-60 at 45.
[176] "MAT: Beauty is More than Skin Deep; Analyst Meeting Review," Jill Krutik, Salomon Smith Barney, August 10, 2000, p.3.

**EXHIBIT 23**
**PAGE 761**

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT
PAGE

38

marketing strategy was important to MGA's generation of Bratz sales and profits. MGA devoted significant resources toward marketing and advertising. For example, between 2001 and 2006, MGA spent over $180 million for advertising media and production (see ATTACHMENT 8.C).

115.  I also understand from Erich Joachimsthaler, Ph.D., another expert retained on behalf of MGA, that MGA's Bratz branding efforts were important to the success of Bratz dolls. Dr. Joachimsthaler will address the importance of the Bratz brand, the price premium associated with the brand and the efforts undertaken by MGA to build its brand.

116.  A Mattel document titled "My Scene & Bratz: What's Working & What's Not" listed a variety of ways that MGA's marketing efforts contributed to the success of Bratz, including:

- "Strong branding"
- "Ability to execute on irreverence"
- "Product, packaging, & communication fit with brand image"
- "Girls & retailers clearly understand brand positioning"
- "High brand awareness"
- "Girl-relevant promos using/cross-selling Bratz lifestyle"
- "Relevant music in ads"
- "Strong placement at retail"
- "Good pricing strategies"
- "Strong relationship with Wal-Mart"
- "Good POP/merchandising"
- "Advertising highlights theme & brand name very clearly across the board"[177]

117.  One reason the Bratz dolls resonated with girls is that MGA has been able to establish Bratz as a "lifestyle" through its licensing program. For example, an MGA presentation titled, "MGA Entertainment Welcomes Wal-Mart," stated that one reason for the "Magic Behind Bratz" was MGA's licensing program for Bratz property. The presentation noted that MGA had over 350 licensees in over 65 countries for the Bratz property. Later in the presentation, on a slide called

---

[177] "My Scene & Bratz: What's Working & What's Not," M0078511-2.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

**EXHIBIT 23**
**PAGE 762**

EXHIBIT

PAGE                    39

"BRATZ – Beyond Dolls...," one of the strategies identified was "Define Bratz as a 'lifestyle' brand – Not a 'Toy' brand.'"[178]

118.  According to a presentation titled "My City, My Style, My Scene, Competitive Analysis," dated August 11, 2003, the "Bratz world is expanding beyond the toy aisle by launching consumer electronics, sporting goods, stationary, home décor & cosmetics...Bratz is creating a 'world' with licensed products."[179]  A later presentation dated August 27, 2003 called "My City, My Style, My Scene, Competitive Overview" pointed out that the "Bratz Overall Strategy" included creating "a 'world' through licensed products sold in & out of [the] toy aisle."[180]  Another Mattel document, "Barbie Retail Experience" emphasized the importance of licensing under the section "How Do We Create Our Own Retail Experience?"  "Licensing to have better shelf product...let's get more stuff on shelf, bags, make-up, clothes...Competition gets away with it, why can't we?"[181]

119.  Kumi Croom, an associate account director at Young & Rubicam Brands, an advertising agency that worked with Mattel on the marketing of Mattel's Flavas and My Scene doll lines, stated that "the Bratz line was marketing beyond dolls."[182]  For instance, a January 25, 2005 presentation created by Young & Rubicam for Mattel titled "My Scene Session 2005, Brand, Advertising and Media Perceptions of Girls Ages 7-12" included a section highlighting the fact that Bratz's marketing extended to a variety of other products.  In the section titled "Bratz: Being present in a girl's day, beyond play time" were pictures of a sleeping bag, a backpack, a chair, a video game and a toothbrush and toothpaste.[183]  According to Ms. Croom, this kind of marketing contributed to the strength of Bratz's brand identity.[184]

120.  Another reason why Bratz dolls have been so successful is the effectiveness of the Bratz television commercials.  In a November 1, 2004 email from Alexandra Legro (a Mattel employee) to Young & Rubicam regarding storyboards that Young & Rubicam had proposed for potential My Scene commercials, Ms. Legro expressed her critiques of the storyboards.  Ms.

---

[178] "MGA Entertainment Welcomes Wal-Mart," MGA0203321-50 at 26, 34.  See also MGA0203323.
[179] "My City, My Style, My Scene, Competitive Analysis," August 11, 2003, M0082139-46 at 39, 41.  See also "My City, My Style, My Scene, Competitive Overview," August 27, 2003, M0072014-60 at 17.
[180] "My City, My Style, My Scene, Competitive Overview," August 27, 2003, M0072014-60 at 22.
[181] "Barbie Retail Experience," M0065491-538 at 525.
[182] Deposition of Kumi Croom, December 20, 2007, p. 6-7, 16, 21, 23-24, 32-33, 58.
[183] Deposition of Kumi Croom, December 20, 2007, p. 56-59; "My Scene Session 2005, Brand, Advertising and Media Perceptions of Girls Ages 7-12," January 25, 2005, Y&R 000001-31 at 16.
[184] Deposition of Kumi Croom, December 20, 2007, p. 58-59.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXHIBIT

PAGE

**EXHIBIT 23**
**PAGE 763**

40

Legro often compared the shortcomings of the My Scene storyboards with the successes of the Bratz commercials:

> "In order to build brand equity we also need to make sure we use our tag lines & soundbites/Brand music in a consistent way so girls directly recognize MS Ads from the rest. **This has been one of the strengths of Bratz TVC.**"[185] (emphasis added)
>
> * * *
>
> "In current boards and also in MM edits, the product line branding prevails over My Scene branding which can result in girls not understanding which brand we are talking about. **In Bratz TVC the [B]ratz branding dominates over the product line, resulting in girls directly knowing which brand it is!**"[186] (emphasis added)
>
> * * *
>
> "Not driving character recognition. We know that girls like to know the names & personality behind each character and collect the different characters. **This is also something that Bratz does consistently and why girls can name and want all characters driving brand loyalty.**"[187] (emphasis added)

121.   Furthermore, an internal Mattel memorandum dated June 19, 2003 regarding "Ad Testing With Girls Ages 5 To 10, Diagnostics With Girls Ages 7 To 10," in which two prospective My Scene commercials were compared to a Bratz commercial, addressed another reason why Bratz commercials were effective. "Findings from previous diagnostic research conducted on Bratz advertising suggested that animation, integration of animation with real people, appropriate teenage settings, live action boys, edgy music, group shots of the dolls and memorable tagline were all elements that contributed to the appeal of the commercials."[188] In addition, "The Bratz Brief," also acknowledged that "Bratz advertising also appeared to be on target, with attitude, 'a passion for fashion' and intrusive techniques. The positioning, packaging and advertising were remarkably focused on luring the older girls away from Barbie."[189]

122.   Third party documents also confirm that one of the factors that contributed to the success of Bratz dolls was consumer awareness. The "Bratz International A&U," study commissioned by

---

[185] Email, "Re: My Scene – Spring 05 Boards," November 1, 2004, Y&R000134-140 at 136.
[186] Email, "Re: My Scene – Spring 05 Boards," November 1, 2004, Y&R000134-140 at 136.
[187] Email, "Re: My Scene – Spring 05 Boards," November 1, 2004, Y&R000134-140 at 137.
[188] "Ad Testing With Girls Ages 5 To 10, Diagnostics With Girls Ages 7 To 10," June 19, 2003, Y&R000195-203 at 198.
[189] "The Bratz Brief," November 13, 2004, M0079765-71 at 68.

**EXHIBIT 23
PAGE 764**

EXHIBIT

PAGE

MGA in December 2006 found that "Bratz has a very strong share of girls' minds and hearts...Given the vast difference in how long each have been in the marketplace, awareness, ownership and overall appeal of Bratz is very strong compared to Barbie...Bratz enjoys strong awareness among girls and moms and is top-of-mind for many girls."[190]  In addition, an internal Ogilvy memorandum from Kristine Hodgkin of Ogilvy (an advertising agency) to Anne Parducci, in which Mattel personnel were copied, with the subject "Short Term Bratz Defense," dated March 14, 2002, stated that "Ultimately, Mattel cannot compete with Bratz with Barbie. Bratz stands for an attitude that is inappropriate for Barbie and too risky for the Barbie brand."[191]

### C.   Apportionment Approaches

123.   As addressed in Section B, Apportionment Factors And Considerations, MGA contributed significant creative elements to the Bratz fashion doll line that were critical to MGA's generation of Bratz sales and profits.  The purpose of apportionment analyses in this matter is to determine the portion of MGA's profits attributable to the accused copyrighted property relative to the profits attributable to other factors, such as MGA's contributions.  As addressed earlier, the copyright statute allows the party accused of copyright infringement to prove "the elements of profit attributable to factors other than the copyrighted work."[192]  Apportioning profit to the accused copyrighted property is based on a variety of approaches.

124.   The apportionment percentages which result from the analyses in this Section C may be considered relative to the application of a profit-split approach, also referred to as the "25% Rule."[193]  The "25% Rule" is an analytical technique that shares profits derived from the sale of a product that utilizes a subject proprietary property between the property owner and the accused party.  In applying the "25% Rule," a percentage of profit is essentially apportioned to the accused intellectual property with the remaining profit apportioned to the accused party to cover other contributions provided by that entity.  The approach generally provides for using 25.0% of the accused product's operating profits as a starting point indicator of the financial benefits attributable to the subject intellectual property.  This profit split percentage is then adjusted, as

---

[190] "Bratz International A&U," C&R Research Services, Inc., December 2006, MGA0295483-640 at 487.
[191] "Short Term Bratz Defense," March 14, 2002, M0253419.
[192] 17 U.S.C. § 504(b).
[193] The "25% Rule" finds support as a starting point for apportioning profits (such as through determination of a royalty rate) when analyzing intellectual property under certain circumstances. Goldscheider, Jarosz and Mulhern, *Use Of The 25 Per Cent Rule In Valuing IP*, les Nouvelles, December 2002, p. 123-33.

EXHIBIT 23
PAGE 765

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT

PAGE

Expert Report of Paul K. Meyer

the particular circumstances warrant, to account for relative contributions of the subject property and other contributions provided by the accused party.

125.   In this Report, I identify various approaches to apportion MGA's profits attributable to the accused copyrighted property ("the copyrighted work"), including analysis and consideration of the following:

1. Mattel's studies of "Key Fashion Doll Attributes" in conjunction with the creative elements to develop a fashion doll;

2. Royalties paid by MGA to Mr. Bryant for his contributions to the Bratz doll line;

3. Work tasks to develop the original Bratz doll;

4. MGA's Bratz product development contributions;

5. MGA's "licensing in" and "licensing out" royalty rates;

6. MGA's investments in the Bratz product line; and

7. Sales variation among Bratz products.

126.   These approaches yield apportionment percentages that may be applied to MGA's profits on the sales of allegedly infringing products to calculate MGA's profits attributable to the accused copyrighted property.[194,195]   These apportionment approaches are described in the following paragraphs and summarized in **TABLE VII** below.

      1.   **Apportionment Approach: Mattel's studies of "Key Fashion Doll Attributes" in conjunction with the creative elements to develop a fashion doll**

127.   Beginning in the fall of 2003, Mattel initiated a monthly study to measure the appeal of "key fashion doll attributes" in the United States.   Mattel's Worldwide Consumer Research group conducted and prepared a "Girls Monthly Brand Tracking Study."   These studies addressed eight

**EXHIBIT 23**
**PAGE 766**

---

[194] Mattel acts as a licensor in connection with its fashion dolls, including Barbie and My Scene. To date, I understand that Mattel has produced licensing deals with royalty rates redacted. Without this Mattel information, I have not been able to perform analysis in this area. If Mattel produces unredacted licensing agreements, I may analyze those agreements in conjunction with relevant industry licensing information, if any, to determine whether this information would be instructive in the context of developing an apportionment percentage under the facts and circumstances of this case related to the accused copyrighted property.

[195] These apportionment analyses generally apply to use of the accused copyrighted property in a fashion doll. Identification of the specific products accused by Mattel and/or its experts may result in an update to the apportionment percentages.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

Expert Report of Paul K. Meyer
_____

"key attributes" for fashion dolls and recorded responses from 225 girls age five to ten for Barbie, Bratz and My Scene dolls.[196]

128.    The eight key fashion doll attributes studied by Mattel relate to specific aspects of the doll (such as its fashion), or to more intangible areas potentially reflecting several aspects of the doll.[197] The eight key attributes are listed in **TABLE II** below.

TABLE II – Mattel's Key Fashion Doll Attributes

| |
|---|
| 1.  Is More Fun To Play With |
| 2.  Is Cooler Than Other Dolls |
| 3.  Is Prettier Than Other Dolls |
| 4.  Clothes You'd Most Want To Wear |
| 5.  Most Want To Show Your Friends |
| 6.  Comes With Better Stuff |
| 7.  Most Want To Be Like |
| 8.  Prettiest Hair |

129.    The results of Mattel's monthly studies have been analyzed for the period November 2003 through June 2005 and are presented on **ATTACHMENT 7**.[198]  Mattel's study results demonstrate that Bratz dolls exhibited significant strength across the eight key fashion doll attributes identified by Mattel.  For the eight key attributes, Bratz scored the highest (compared to Barbie and My Scene) for a substantial number of the 20 months analyzed.   **TABLE III** below summarizes the number of months out of the twenty months analyzed where Bratz received the highest ranking for each attribute.

EXHIBIT 23
PAGE 767

_____
[196] "Mattel Girls Monthly Tracking Study in the U.S. – May 2005," June 10, 2005, M0080111-20 at 11.
[197] Mattel's studies indicate that "intangible areas" include coolness, play value and being socially acceptable. "Mattel Girls Monthly Tracking Study in the U.S. – May 2005," June 10, 2005, M0080111-20 at 11.
[198] The detailed results of Mattel's Girls Monthly Brand Tracking Studies for July and August 2005 have not been provided. Subsequent studies, if any, have also not been provided.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                                          44

Expert Report of Paul K. Meyer

TABLE III – Summary Of Bratz Key Attribute Rankings[199]

| Key Fashion Doll Attribute | Number Of Months Bratz Ranked Highest (Out Of 20 Months) | Percent Of Months Bratz Ranked Highest |
|---|---|---|
| 1. Is More Fun To Play With | 20 | 100% |
| 2. Is Cooler Than Other Dolls | 19 | 95% |
| 3. Is Prettier Than Other Dolls | 15 | 75% |
| 4. Clothes You'd Most Want To Wear | 20 | 100% |
| 5. Most Want To Show Your Friends | 19 | 95% |
| 6. Comes With Better Stuff | 18 | 90% |
| 7. Most Want To Be Like | 19 | 95% |
| 8. Prettiest Hair | 15 | 75% |

These results indicate that Bratz scored well on key fashion doll attributes that contribute to MGA's sales and profits. However, Bratz received its lowest scores on the attribute "Is Prettier Than Other Dolls" (see ATTACHMENT 7).[200] Mattel's study for the month of February 2005 acknowledged these results, stating, "Bratz clearly dominates in most areas, most notably, play value, 'coolness,' and having appealing fashions and accessories, although as seen previously, the brand posts slightly weaker scores on aesthetics."[201]

130.  Based on discussions with Robert Tonner and review of Mattel's Girls Monthly Brand Tracking Study summaries of key findings, each key fashion doll attribute identified by Mattel has been categorized as relating to one or more specific aspect of the doll. These aspects correspond to six of the seven creative apportionment factors contributing to the success of the Bratz fashion doll addressed in Section B (Apportionment Factors And Considerations) above. For example, the attribute "Clothes You'd Most Want To Wear" corresponds primarily to the apportionment factor/consideration "Fashions Sold With The Doll." Similarly, the attribute "Comes With Better Stuff" corresponds primarily to the apportionment factor/consideration "Accessories Sold As Part Of The Doll Line." Some of the key attributes are more intangible and may relate to several of the apportionment factors. Based on discussions with Robert Tonner, the key fashion doll attributes have been categorized into six of the seven apportionment factors (packaging not included) and are presented in TABLE IV below.

---

[199] Rankings are based on study results for girls ages 8 to 10 years old, which comprise Bratz's primary target consumer.
[200] Bratz's approximate scores for each attribute were compiled for the 20-month period, with the attribute "Is Prettier Than Other Dolls" scoring the lowest.
[201] "Girls Monthly Brand Tracking Study in the U.S. – February 2005," March 4, 2005, M0082090-99 at 90.

EXHIBIT 23
PAGE 768

Expert Report of Paul K. Meyer

TABLE IV – Identification Of Key Fashion Doll Attributes To Apportionment Factors

| Key Fashion Doll Attribute | Apportionment Factor[202] | | | | | | |
|---|---|---|---|---|---|---|---|
| | Doll Design (No Hair) | Design / Hair | Themes | Fashions | Accessories | Characters | Marketing |
| 1. Fun | √ | √ | √ | √ | √ | √ | |
| 2. Cooler | √ | | √ | √ | | √ | √ |
| 3. Prettier | √ | | | √ | | | |
| 4. Clothes | | | | √ | | | |
| 5. Friends | √ | | √ | √ | √ | √ | √ |
| 6. Stuff | | | | | √ | | |
| 7. Be Like | | | √ | √ | | | |
| 8. Hair | | √ | | | | | |
| Total | 4 | 2 | 4 | 6 | 3 | 4 | 3 |

131.   The results of the doll attribute monthly studies were important to Mattel and used by Mattel to set future product plans.  For example, Mattel's "2004 Marketing Plan Update," indicated that Barbie had its "worse attribute ratings in 45 years" on a slide titled "The House is on Fire!"[203] Another Mattel presentation, "2005 Barbie Spring Line Review," stated that "Barbie is losing key attribute ratings with girls."[204]  As discussed with Robert Tonner, since these eight key fashion doll attributes identified by Mattel relate to factors that determine the success of a fashion doll, they can also be used as a basis to apportion Bratz profits.

132.   Out of the seven apportionment factors, the accused copyrighted property relates primarily to the design of the doll category.  As addressed previously, the design of the doll category includes significant MGA development contributions in addition to the accused copyrighted property.  Based on the identification of the apportionment factors related to each of the eight key fashion doll attributes summarized in TABLE IV above, 4 out of a total of 26 entries relate to the apportionment factor "design of the doll."  This analysis indicates an apportionment percentage of approximately 15.4% of MGA's profits to the accused copyrighted property.

133.   The key attributes identified by Mattel do not include consideration of the contribution of product packaging to generating sales and profits.  As described in Section B, Mattel

---

[202] For purposes of this analysis, the apportionment factor called "Packaging" has not been considered.
[203] "2004 Marketing Plan Update," March 16, 2004, M0079848-55 at 55.
[204] "2005 Barbie Spring Line Review," M0079731-58 at 33.

EXHIBIT 23
PAGE 769

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT ................... 46

PAGE ..........

Expert Report of Paul K. Meyer

acknowledges that Bratz product packaging assisted in generating MGA's sales and profits. Consideration of Bratz packaging would lower the apportionment percentage determined above based on Mattel's study of key fashion doll attributes.

 2. **Apportionment Approach**: Royalties paid by MGA to Mr. Bryant for his contributions to the Bratz doll line

134.  The financial terms of Mr. Bryant's Consulting Agreement provide information instructive to apportioning MGA's profits to the accused copyrighted property.  Mr. Bryant's Consulting Agreement was negotiated between willing parties and reflects the actual percentage of profit that MGA was willing to pay for the accused copyrighted property and other significant contributions made by Mr. Bryant.

135.  Mr. Bryant entered a Consulting Agreement with MGA dated September 18, 2000 (the "Consulting Agreement").[205]  Pursuant to the Consulting Agreement, Mr. Bryant was to consult with and advise MGA "on the design and development by MGA of a line of dolls presently known as "Bratz" (the MGA Products")."  In exchange for his contributions, Mr. Bryant was to be paid a monthly fee of $5,500 for the first six months, and $5,000 for the next three months. Mr. Bryant was also to be paid a royalty equal to 3.0% of net sales of products developed by MGA on which Mr. Bryant provided his consulting services.[206]

136.  MGA and Mr. Bryant executed a "Modification And Clarification" to the September 18, 2000 Consulting Agreement in February 2004.[207]  This modification and clarification defined Mr. Bryant's services to include "all creative and production services and materials used to develop, create, design, render, produce, or deliver the Projects."[208]

---

[205] The Consulting Agreement indicates a print date of October 4, 2000. MGA Entertainment Consulting Agreement with Carter Bryant, September 18, 2000, MGA000001-6 at 1. Additionally, Mr. Bryant testified that the MGA Consulting Agreement was signed on October 4, 2000. Deposition of Carter Bryant, November 4, 2004, p. 43.
[206] The monthly consulting fees were to be credited against future royalties due to Mr. Bryant under the Consulting Agreement. MGA Entertainment Consulting Agreement with Carter Bryant, September 18, 2000, M000001-6 at 2.
[207] Modification And Clarification Of The Agreement Dated September 18, 2000, MGA0008951-6 at 56.
[208] "Projects" are defined to include any and all projects worked on by Mr. Bryant with respect to the Bratz property.  MGA would own all property resulting from the consulting services provided by Mr. Bryant, including the Bratz characters (including Sasha, Cloe, Dana, Yasmin, Jade and Meygan) and associated intellectual property and industrial rights, such as copyrights, patents, trademarks, industrial designs, design rights and trade dress.  The "materials" subject to Mr. Bryant's consulting services included all additions, deletions, alterations, revisions, drafts, notes, concepts, ideas, suggestions and approaches. Other "materials" such as artwork, sketches, specifications, designs, drawings, models, prototypes, sculptures, works of artistic craftsmanship or other tangible work developed, produced, created or furnished by Mr. Bryant were also included in the property owned by MGA.  Modification And Clarification Of The Agreement Dated September 18, 2000, MGA0008951-6.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 23
PAGE 770**

47

Expert Report of Paul K. Meyer

137.   The modification and clarification to the Consulting Agreement illustrates the extent of the continuing support and development of the Bratz product line provided by Mr. Bryant in exchange for the 3.0% royalty payment. Mr. Bryant provided on-going consulting and assistance in many areas beyond the scope of the accused copyrighted property.[209]

138.   Since the accused copyrighted property only represents a portion of the contributions provided by Mr. Bryant, the 3.0% royalty Mr. Bryant receives would represent the maximum value of the accused copyrighted property, prior to splitting the royalty payments between the accused copyrighted property and other contributions provided by Mr. Bryant.[210] The 3.0% royalty rate reflects a percentage of net sales MGA was willing to pay for the total contributions of Mr. Bryant, including the accused copyrighted property.[211] This apportionment analysis will be converted to a percentage of profits after MGA's profits for the relevant products are determined. For illustrative purposes, assuming a MGA profit margin of 20.0% would yield an apportionment percentage of 15.0%.[212]

   3.   Apportionment Approach: Work tasks to develop the original Bratz doll

139.   This approach compares the total work tasks of Mr. Bryant to the overall creative work tasks incurred by MGA to develop the original Bratz dolls. I compiled information related to developing the original Bratz dolls through interviews with MGA management personnel, review of MGA documents and correspondence and review of deposition transcripts. The approach to summarizing the total creative work tasks incurred by MGA in developing the initial Bratz dolls is described below. The resulting work task development schedule details the many creative contributions to the development of the initial Bratz dolls, illustrates the many tasks required to create a doll, and provides an indication of the time and effort dedicated to certain work tasks.

---

[209] For example, Mr. Bryant provided assistance in determining the strategy for the product, developing new products, fashions, character sketches and edits to doll samples.
[210] Under the Consulting Agreement, Mr. Bryant has been paid approximately $31.5 million from 2001 through 2006 (see ATTACHMENT 8).
[211] In exchange for the 3.0% royalty, MGA acquired exclusive rights to products where Mr. Bryant was involved with the development. The Consulting Agreement was an "arm's length" transaction between a willing licensor and a willing licensee and is indicative of a market royalty rate for the accused copyrighted property (including the other contributions of Mr. Bryant). Mattel released "Other Girl Brands" such as Diva Starz, Flavas and My Scene. Furthermore, a third party market research company wrote, "In a major effort to win back tween girls, in 2000 Mattel embarked on a makeover of Barbie...The first effort by Mattel to age up the Barbie brand occurred in 1999. The new line, called Generation Girl, included skateboards, urban fashion, and one doll with a pierced nose." "The U.S. Tween Market," Packaged Facts, February 2001, p. 128. In addition, Mr. Tonner states in his expert report, "It is my opinion that MGA, at the time, was probably the only company that could have turned Bratz into a hit." Expert Witness Report by Robert Tonner, February 8, 2008, p. 16.
[212] Calculated as 3.0% / 20.0% = 15.0%.

**EXHIBIT 23**
**PAGE 771**

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                              48

Expert Report of Paul K. Meyer

140.   In performing my analysis, MGA doll development schedules detailing the major areas of development and associated work tasks were analyzed. The general areas of creative contribution were summarized based on the "final Bratz schedule" dated January 2, 2001 and discussions with MGA personnel.[213] MGA's final development schedule for the Bratz doll set forth five major product development areas for the doll, including initial concept, design of the doll (or rotocast, which includes sculpting, painting and hair rooting and styling), tooling, fashions (softgoods) and packaging.[214] For purposes of this analysis, tooling-related product development activities are not considered creative contributions to the Bratz doll. Additionally, the review, edit and approval of counter-samples received from Hong Kong were not included as creative activities. The duration of the creative activities and individuals involved were then summarized based on the lead times presented in the final Bratz schedule and discussions with Paula Garcia.

141.   At least twelve people provided creative input into the initial Bratz dolls, including Carter Bryant, Margaret Leahy, Veronica Marlow, Mercedeh Ward, Anna Rhee, Aileen Storer, Paula Garcia, Charles O'Connor, Sarah Halpern, Steve Tarmichael, David Dees and Rachel Harris. The work task development schedule reflects a total development time of 103 weeks and is summarized by person by task over a 25-week period (see ATTACHMENT 6).[215]

142.   Mr. Bryant's time contributing to creative elements of the Bratz dolls during this development period totals approximately 21 weeks. Mr. Bryant's work efforts also include the initial two weeks he testified it took to develop the accused copyrighted property.[216] As addressed elsewhere, Mr. Bryant's efforts were related to both the accused copyrighted property and other contributions to the Bratz dolls. Including Mr. Bryant's estimate of the time he took to complete the sketches Mattel asserts are its copyrighted property of approximately "a couple of weeks,"[217] Mr. Bryant worked for a total of approximately 23 weeks. Mr. Bryant's development time

---

[213] "Final Bratz Schedule," January 2, 2001, MGA000358-361; Discussions with Paula Garcia.
[214] MGA's marketing and branding efforts are not addressed in the final Bratz product development schedule.
[215] Based on discussions with Paula Garcia, I understand a doll prototype could be prepared in a shorter timeframe. A third party source also indicated a shorter timeframe would be possible. In a Salomon Smith Barney analyst report dated June 18, 2003, Jill Krutik wrote, "Mattel is launching a new doll line (from inception to launch was a remarkable 19 weeks, instead of the more typical one-year cycle)..." "MAT: Rising to the Challenge; Marketing Blitz Expected to Pay Off," Jill Krutik, Salomon Smith Barney, June 18, 2003, p. 3.
[216] Deposition of Carter Bryant, November 4, 2004, p. 146-147.
[217] Deposition of Carter Bryant, November 4, 2004, p. 146-147.

**EXHIBIT 23**
**PAGE 772**

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT

PAGE

49

compared to the development time of 103 total weeks for the original Bratz dolls yields an apportionment percentage of approximately 22.3% (23 weeks divided by 103 weeks).

**4.   Apportionment Approach: MGA's Bratz product development contributions**

143.   As described in detail above, many factors other than the accused copyrighted property are important to generating the profits earned by MGA from the sale of Bratz products. I described in detail in Section B of this Report these factors, including: (1) the design of the doll; (2) the development of the characters associated with the doll line; (3) the themes associated with the dolls; (4) the development of fashions sold with the dolls; (5) the development of accessories sold with the dolls; (6) the packaging in which the dolls are sold; and (7) MGA's branding, marketing and advertising efforts.

144.   I understand that all seven MGA development activities and creative contributions are critical to MGA's generation of Bratz sales and profits. Therefore, MGA's profits can be apportioned based on these factors. Since each factor is critical to Bratz's success, weighting each of these doll development contributions equally would indicate an apportionment percentage of approximately 14.3% (or 1 factor out of 7) of MGA's profits to the accused copyrighted property.

**5.   Apportionment Approach: MGA's "licensing in" and "licensing out" royalty rates**

145.   MGA's Consulting Agreement with Mr. Bryant provided for MGA to own the rights to any products developed with Mr. Bryant. The Consulting Agreement provided that MGA would pay Mr. Bryant a royalty rate of 3.0% of net sales for any MGA products developed by MGA on which Mr. Bryant consulted. The cost to MGA of "licensing in" Mr. Bryant's contributions was a 3.0% royalty.

146.   MGA enters into licenses with third parties for rights to use MGA's Bratz property for royalty rates generally ranging between 10.0% and 16.0% of net sales ("licensing out"). These licenses have related to a variety of products over the last several years. MGA is able to achieve these enhanced levels of royalty rates in its "licensing out" agreements due to the many contributions MGA has made to design, develop, market and sell Bratz dolls. These MGA efforts have been significant, as described in other sections of this Report.

**EXHIBIT 23**
**PAGE 773**

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT _____ ____50

PAGE

Expert Report of Paul K. Meyer

147.   Comparing the "licensing in" royalty rate paid to Mr. Bryant to the average "licensing out" royalty rates for the Bratz property of approximately 12.0% (see ATTACHMENT 9) provides for an apportionment percentage of approximately 25.0%.[218]   This apportionment percentage recognizes MGA's significant contributions beyond the scope of the accused copyrighted property.

6.   Apportionment Approach: MGA's investments in the Bratz product line

148.   Comparing MGA's costs to acquire the accused copyrighted property to MGA's costs associated with developing and marketing the products alleged to embody the copyrighted work provides a method to apportion profits.  Economically, the profits a company earns may be viewed as a return on the investments required to generate the profits.  Therefore, MGA's profits may be attributed to the investments MGA made to develop and sell the Bratz doll line.

149.   This approach to apportioning profits is calculated based on comparing the costs of Mr. Bryant's Consulting Agreement to MGA's costs for product development and advertising.[219]  MGA's total costs for product development (including Mr. Bryant's royalties) and advertising represent MGA's investment in activities to develop the Bratz doll line and brand.[220]  The royalties paid to Mr. Bryant reflect MGA's investment in the accused copyrighted property, as well as other contributions from Mr. Bryant.  MGA's investment in the accused copyrighted property compared to MGA's investment for product development and advertising indicates an apportionment percentage of 24.3% (see ATTACHMENT 8).

150.   Additionally, this method of apportioning profits does not reflect substantial financial and business risk MGA bore related to the developing and supporting the Bratz doll line.  MGA made other investments that have contributed to the success of the Bratz products, such as establishing distribution channels and maintaining inventory.  As stated by Mr. Larian in an email he wrote to Victoria O'Connor dated September 12, 2000, "We [MGA] are going to RISK and spend MILLIONS to make this brand and line happen."[221]

---

[218] Calculated as 3.0% / 12.0% = 25.0%.  The average "licensing out" percentage of approximately 12.0% includes executed license agreements and does not reflect non-refundable advances and guaranteed minimum royalty payments, which may increase the effective royalty rate and decrease the apportionment percentage.
[219] The scope of Mr. Bryant's Consulting Agreement was broader than the accused copyrighted property.
[220] MGA's product development and advertising costs have been allocated to the products on which Mr. Bryant received royalty payments based on sales revenue.
[221] Email, "Re: Carter Bryant," September 12, 2000, MGA001474.

**EXHIBIT 23**
**PAGE 774**

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT

PAGE

51

Expert Report of Paul K. Meyer

151.   In its Second Amended Answer and Counterclaims, Mattel also recognized that in addition to advertising and marketing, other functions are part of the company's "intellectual infrastructure" and are "highly valuable." [222] Mattel's Second Amended and Counterclaims states:

> "Mattel also has invested substantial amounts over many years to develop its business methods and practices, including, without limitation, its marketing and advertising research, plans, methods and processes; its business research and forecasts; its costs, budgets, pricing, credit terms, deal terms and finances; its manufacturing, distribution, and sales methods and processes; and its inventory methods and processes. These represent a material part of the intellectual infrastructure of Mattel and are highly valuable." [223] (emphasis added)

152.   As described earlier, Mr. Bryant continued contributing to the Bratz product line after working on the initial Bratz doll. This apportionment percentage does not distinguish between Mr. Bryant's ongoing creative contributions and the accused copyrighted property. Consideration of this factor would decrease the apportionment percentage.

### 7.   Apportionment Approach: Sales variation among Bratz products

153.   Since 2001, MGA has introduced hundreds of Bratz dolls, each with generally the same doll design (rotocast and body). Although each of these dolls may contain the same accused copyrighted property, they do not collectively contain the same themes, fashions, packaging and characters. Therefore, variation in sales revenue levels among the different Bratz doll SKUs containing the same doll design (rotocast and body) can be attributed to factors other than the accused copyrighted property. Bratz doll sales over time can be segregated by SKU, by themes and by characters. Within a particular sales segregation, comparisons can be made between higher and lower sales revenue SKUs. This sales data may indicate an apportionment percentage for the accused copyrighted property by examining the sales patterns and levels between product SKUs in a particular segregation (e.g., May 2005 release and by theme) as compared against the segregation's overall sales statistics.

154.   TABLE V below identifies seven Bratz doll themes that were sold by MGA beginning in May 2005. Total sales of Bratz dolls within these six themes range from $3.2 million to $38.8

---

[222] Mattel's Second Amended Answer And Counterclaims, July 12, 2007, p. 33.
[223] Mattel's Second Amended Answer And Counterclaims, July 12, 2007, p. 33.

EXHIBIT 23<br>PAGE 775

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT ___                 52

PAGE ___

Expert Report of Paul K. Meyer

million.[224]   The theme with the lowest Bratz doll sales, Bratz Midnight Dance, contains the accused copyrighted property as does the theme with the highest Bratz doll sales, Bratz Rock Angelz. Therefore, the difference in sales between these two themes represents sales attributable to factors other than the accused property, such as themes.[225]   In this circumstance, the accused copyrighted property may contribute up to 10% of the sales for Bratz Rock Angelz themed Bratz dolls (                                          ).[226]   This table demonstrates wide variation in sales among Bratz doll themes and supports my opinion that Bratz doll sales and profits are attributable to factors other than the accused copyrighted property.

TABLE V – Bratz Doll Sales By Theme First Sold in May 2005[227]

| Bratz Doll Theme | Total Bratz Doll Sales (May 2005 Through October 2007) |
|---|---|
| Bratz Midnight Dance | |
| Bratz Step Out | |
| Bratz Birthday Bash | |
| Bratz Campfire | |
| Bratz Feelin' Pretty | |
| Bratz Wild Wild West | |
| Bratz Rock Angelz | |

155.   I also studied the variation of Bratz doll sales within the same theme.  Within a theme, MGA may offer different Bratz doll characters.  In **TABLE VI** below, sales of Bratz characters sold in connection with the Winter Wonderland theme are presented.[228]   The first sales of each character in the Winter Wonderland Theme occurred in June 2003.

156.   Sales of Bratz doll characters within the Winter Wonderland theme ranged from $1.0 million to $4.4 million.   The character with the lowest Bratz doll sales, Jade, contains the accused copyrighted property as does the character with the highest Bratz doll sales, Sasha.  Therefore, the difference in sales between these two characters represents sales attributable to factors other

**EXHIBIT 23**
**PAGE 776**

---

[224] Includes sales between May 2005 and October 2007.
[225] Based on discussions with Ms. Garcia, dolls sold in connection with each theme may contain different characters, packaging, fashions and accessories.
[226] The Bratz Midnight Dance themed doll includes creative elements beyond the scope of the accused copyrighted property, including fashions, packaging and accessories.
[227] MGA Targit sales data.
[228] Excludes sales of Winter Wonderland-themed Bratz dolls with insufficient data to determine the Bratz character.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT

PAGE

53

REDACTED

than the accused copyrighted property, such as the Bratz doll character and fashions.[229]   TABLE VI further demonstrates that sales of Bratz dolls within a theme can vary significantly and also supports my opinion that Bratz doll sales and profits are attributable to factors other than the accused copyrighted property.

TABLE VI – Bratz Doll Sales By Character for Winter Wonderland Theme[230]

| Bratz Character | Total Sales |
|---|---|
| Jade | |
| Dana | |
| Yasmin | |
| Cloe | |
| Sasha | |

157.   Data related to lower sales-achieving SKUs within a particular product segregation is instructive to determining apportionment percentages related to the accused copyrighted property.   As Mattel has not identified the accused products in this case, my apportionment calculations in this section would be based on additional information produced by Mattel.  Accordingly, at this time, I have not calculated an apportionment percentage for this approach.

       8.    Summary Of Apportionment Analyses

158.   Sections C.1 through C.7 above discuss various methods of apportioning MGA's profits to the accused copyrighted property.  These approaches yield apportionment percentages that may be applied to MGA's profits earned on the sales of allegedly infringing products to calculate MGA's profits attributable to the accused copyrighted property.

---

[229] Based on discussions with Ms. Garcia, each character within a specific theme is sold with different fashions particular to the character's style and personality.  The Jade character in the Winter Wonderland theme includes creative elements beyond the scope of the accused copyrighted property, including fashions, packaging and accessories.
[230] MGA Targit sales data.

EXHIBIT 23
PAGE 777

EXHIBIT _____

PAGE _____

CONFIDENTIAL – ATTORNEYS' EYES ONLY

54

REDACTED

Expert Report of Paul K. Meyer

159.   TABLE VII below provides a summary of the various apportionment methods and the resulting apportionment percentages.

TABLE VII – Summary Of Apportionment Approaches And Percentages

| Apportionment Approach | Profit Apportionment Percentage |
|---|---|
| 1.  Mattel's studies of "Key Fashion Doll Attributes" in conjunction with the creative elements to develop a fashion doll | 15.4% |
| 2.  Royalties paid by MGA to Mr. Bryant for his contributions to the Bratz doll line | Approx. 15.0%[231] (3.0% of net sales) |
| 3.  Work tasks to develop the original Bratz doll | 22.3% |
| 4.  MGA's Bratz product development contributions | 14.3% |
| 5.  MGA's "licensing in" and "licensing out" royalty rates | 25.0% |
| 6.  MGA's investments in the Bratz product line | 24.3% |
| 7.  Sales variation among Bratz products[232] | TBD |
| Range[233, 234, 235, 236] | 14.3% - 25.0% |

[231] For illustrative purposes, assuming a MGA profit margin of 20.0% would yield an apportionment percentage of 15.0%.
[232] As Mattel has not identified the accused products in this case, my apportionment calculations in this section would be based on additional information produced by Mattel. Accordingly, at this time, I have not calculated an apportionment percentage for this factor.
[233] The range of apportionment percentages of 14.3% to 25.0% is reasonable when considered in the context of the "25% Rule," which indicates a starting point is generally 25.0% of operating profits. See Section C, paragraph 124.
[234] I understand that Peter Menell, Ph.D., a professor of law at UC Berkeley and an expert for MGA, will testify that MGA's Bratz dolls do not infringe copyright in the Carter Bryant doll sketches. To the extent the Court accepts certain positions of Dr. Menell, this may put downward pressure on apportionment percentages summarized above in Section C, indicating percentages on the lower end of the range may be more appropriate under those circumstances. See Section B, paragraph 31.
[235] I understand that Robert Tonner, Tina Tomiyama and others will testify on behalf of MGA that the Bratz doll is actually designed and developed includes significant differences and enhancements over the accused copyrighted property. See additional observations in Section B, paragraph 31. To the extent the Court accepts positions of Mr. Tonner and Ms. Tomiyama on these issues, this may put downward pressure on the apportionment percentages summarized above in Section C, indicating percentages on the lower end of the range may be more appropriate under those circumstances.
[236] I have considered the importance of branding in Section B.7 (MGA's Branding, Marketing and Advertising Efforts). I understand that Erich Joachimsthaler, an expert retained on behalf of MGA, will testify that MGA developed the Bratz brand, and that the Bratz brand is an extremely significant contributor to MGA's success, sales and profits (e.g., allowing Bratz to obtain product pricing advantages). To the extent the Court accepts positions of Mr. Joachimsthaler on these issues, this may put downward pressure on the apportionment percentages summarized above in Section C, indicating percentages on the lower end of the range may be more appropriate under those circumstances.

EXHIBIT 23
PAGE 778

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT _____

PAGE _____

55

**EXHIBIT 24**

D. JAN DUFFY REBUTTAL OF REPORT OF BRUCE L. STEIN

### RE: IN THE MATTER OF CARTER BRYANT v. MGA ENTERTAINMENT, INC. AND CONSOLIDATED CASES

Case No. CV 04-9059

United States District Court
Central District of California
Eastern Division

**OPINIONS:**

Mattel, Inc. (hereinafter "Mattel") has designated Bruce L. Stein, a former Worldwide President, Chief Operating Officer and Board member of Mattel, as its expert on "commonly understood and accepted employment practices in the toy industry." Whatever Mr. Stein's service as an executive at Mattel or other toy companies, however, neither Mr. Stein's education nor his prior work experience would seem to equip him to offer expert opinion about "commonly understood and accepted employment practices" in the toy or any other industry. According to his biography, Mr. Stein's academic training is a bachelor's degree in psychology/biology and an MBA with concentrations in marketing and finance. His work experience prior to serving as President and COO at Mattel appears to include corporate marketing, advertising, and executive positions with other organizations. Mr. Stein apparently currently serves in a CEO position as well as on the Boards of several companies.

Thus, while Mr. Stein's executive level experience has been in organizations that employ professionals in Human Resources, employment law, and employment practices, Mr. Stein's own personal background would not appear to have included the relevant law or the practice of designing, implementing, administering or enforcing "commonly understood and accepted employment practices," that is, the policies, procedures, processes, or systems relating to managing employees or to Human Resources. His personal background would also not appear to have included the relevant law or the practice of designing, implementing, administering or enforcing agreements, policies, procedures, processes, or systems relating to protection of intellectual property. Moreover, even Mr. Stein's own experience of agreeing to and signing intellectual property agreements with Mattel would likely have been quite different from that of a rank and file employee such as Carter Bryant. For example, not only would he doubtless have had the resources to seek an attorney's assistance in comprehending any agreements Mattel was seeking to obtain from him, but he or his attorney may have had an opportunity, unlike Carter Bryant, to negotiate the terms of such agreements.

**Mr. Stein's Opinion 1:**
Mr. Stein nevertheless appears in his Report to offer several opinions on "accepted employment practices" in the toy industry. First, he opines that "[a]lthough some design group employees inside the toy companies envy the lifestyle and individual fortunes made by the small group of successful inventors....most [designers] choose not to [go the

1
CONFIDENTIAL -
ATTORNEYS' EYES ONLY

EXHIBIT _____

PAGE ___    EXHIBIT 24
            PAGE 779

independent route]."  He states that this is because of "individual risk tolerance and
lifestyle preferences," that cause them to opt for the "many benefits" such as a "regular
salary, performance bonuses, stock options, health insurance, vacation pay...etc." offered
to regular employees.  "In exchange for these pay and benefit packages," Mr. Stein
concludes, "it is industry practice for a toy company to require these design group
employees to execute contracts that assign their work product solely to the company."

In one sense, Mr. Stein is correct: it is the norm in any industry in which research and
design are important, not just the toy industry, to ask employees to enter into agreements
intended to protect the company's proprietary information and other intellectual property.
In fact, most current intellectual property protection programs have their modern roots in
the technology industry, but many other industries from defense contracting to biotech
and pharmaceuticals to fashion, seek agreements with employees concerning proprietary
information, confidentiality, and inventions assignments.

Mr. Stein is not correct, however, in his assumption or conclusion that Mattel's
intellectual property protection practices or the agreements that Carter Bryant was
required to sign in connection with his employment and termination from Mattel
conformed to the norms of similarly situated employers' agreements or employment
practices concerning them. Mr. Stein seems to opine somewhat sweepingly, that "The
universality of this type of invention assignment is reflected in the Bryant/Mattel and
Bryant/MGA agreements, as well as the other employment and consulting contracts used
by both Mattel and MGA that "were provided for [his] review."  As with the
confidentiality provisions...the invention assignment clauses in those contracts appear by
their terms to extend beyond patentable inventions to other types of protectable
intellectual property. Based on [his] experience, the scope of these provisions is
consistent with predominant industry practice..."

First, at no point in his report does Mr. Stein reference any specific language in the
documents Mr. Bryant signed while at Mattel to support his conclusions regarding their
scope and "consistenc[y] with predominant industry practice."  Moreover, as I concluded
in my extensive analysis and opinions concerning Mattel's intellectual property
protection program and related employment practices, (Expert Report of D. Jan Duffy,
February 11, 2008), the language of the 1995 and 1999 Confidentiality and Inventions
Assignments agreements signed by Mr. Bryant, as well as the Proprietary Information
Checkout he signed during his exit interview, constituted significant departures from the
usual and reasonable management practice of similar employers regarding such
agreements.  In brief, I concluded in my Report and continue to be of the opinion, that all
of the agreements Mattel required Mr. Bryant to sign were unclear, overly legalistic,
ambiguously worded, difficult to read or comprehend, inconsistent, and hardly capable of
effectively communicating their import to design employees such as Mr. Bryant.

Even more important, Mr. Stein completely ignored the manner and circumstances in
which, during Mr. Bryant's tenure, Mattel imposed its agreements upon employees.
Aside from outlining the defects associated with the language in the agreements
themselves, my Report contained significant analysis of the extreme deficiencies in
Mattel's relevant employment practices. These serious departures from reasonable
practice included, but are not limited to:  the failure of Mattel to offer employees a

2<br>CONFIDENTIAL -<br>ATTORNEYS' EYES ONLY

EXHIBIT _____

PAGE _____   **EXHIBIT 24
PAGE 780**

meaningful opportunity to review the agreements in question; Mattel's insistence that all employees sign such agreements in the course of a brief employee orientation session in which numerous other matters were addressed; failure of Mattel's top leadership to evince awareness of or knowledgeable commitment to the agreements or even Mattel's intellectual property protection program in general; Mattel's failure to educate human resources staff who were administering the agreements and related policies and procedures; and Mattel's failure to provide other knowledgeable or competent advisors to assist employees, or to meaningfully alert employees of the potential need to seek knowledgeable counsel on their own.

Additionally, Mr. Stein makes a significant error in asserting that "it is industry practice for a toy company to require these design group employees to execute contracts that assign their work product **solely** to the company." [Emphasis supplied.] As I discussed in my Report, it is anything but usual or reasonable practice in California for an employer to demand that **any and all** of an employee's inventions or ideas be assigned to the employer. Rather, given California's strong public policy protections of employees' privacy and other rights, California employers must, and ordinarily do, take care to exclude, and to communicate to employees the exclusion of, certain inventions belonging to the employee, rather than the employer. In fact, as also discussed in my Report, I am of the opinion that Mattel's failure to include the requisite exclusion plainly and conspicuously in the agreements it required Carter Bryant to sign at his orientation was a major deficiency in Mattel's employment related practices. Also seriously deficient is the extreme case of the "Proprietary Information Checkout" document that Mattel required Mr. Bryant to sign upon his resignation. As described, that agreement failed to include mention of the requisite exclusion at all and even actively misrepresented the nature of Mr. Bryant's previously signed agreements.

Even Mattel seems to have recognized, at least to some degree, that its agreements and the manner in which it imposed them upon employees failed to conform to "commonly understood and accepted employment practices in the toy [or other] industry." First, for example, at some point, it dropped the egregiously improper and misleading "Proprietary Information Checkout" form it had Mr. Bryant sign in 2000, ultimately replacing it in 2006 with the more appropriate and usual "Confidentiality Obligations" form. Mattel also amended its Employee Confidential Information and Inventions Agreement after Mr. Bryant's departure, making it at least marginally more comprehensible and user-friendly. Finally, although Mattel's executive leadership, including Executive Vice President of Human Resources, Alan Kaye, were too uninformed or unmindful of the program to provide details, it appears that Mattel made some effort to conduct employee meetings to explain the purport of its new confidentiality and inventions agreement before requesting employees to sign them.

In short, contrary to Mr. Stein's opinion, for the above reasons, I remain of the opinion that Mattel's intellectual property-related employment practices represent anything but "commonly understood and accepted employment practices" in the toy or any other industry. Rather, both in their language and in the manner in which they were imposed upon employees like Carter Bryant, they were a significant departure from usual and reasonable management practices of similar employers.

3
CONFIDENTIAL –
ATTORNEYS' EYES ONLY

EXHIBIT _____

PAGE _____                    **EXHIBIT 24**
                                      **PAGE 781**

**Mr. Stein's Opinion 2**

Related to his first opinion, Mr. Stein also opines that design jobs inside toy companies are "coveted by many creative types" because, he reasons, it is a place for "a creative designer to do their most creative work, have a company ready to bring their ideas to market, and have a lucrative set of benefits that remove the everyday worries of finances, health care, and the like from the joy they experience in being creative. In the end, in my experience, for most designers, the contracts they sign that give a toy company the rights to their work product are more liberating than restrictive." Regardless of whether "creative types" at other toy companies would consider the benefits they received to be particularly "lucrative" and the security of employment inside a toy company to guaranty them the "joy of being creative," many employees at Mattel, specifically, clearly did not consider Mattel to offer them the joy of job security of any kind.

First, Mattel's, in this case, quite clear, conspicuous and consistent policy language directly informs employees that they are "at will" and thus can be terminated at any time. In addition, Mattel has a history of layoffs that would clearly remind them that there was no job security whatsoever for them at Mattel. Moreover, perhaps because the high compensation and benefits such as stock options they obtained at Mattel created a cushion that would make them less mindful of the employees laid off during their tenure, Mattel executives such as Bob Eckert, Adrienne Fontanella, and Ivy Ross were unable to remember specific information or numbers about Mattel's layoffs when asked during their depositions.

The impact of Mattel's layoffs upon rank and file employees was, unsurprisingly, significant, however. For example, as Amy Myers, a former Mattel designer who was laid off, testified in her deposition, when it happened to her, she "just knew" she was going to be laid off because there was a "giant layoff" and "everybody knew there was going to be a big layoff." (Myers, 206: 3-4 and 207: 1-2.) Asked to characterize how often layoffs occurred at Mattel during her tenure she stated: "I really can't recall. I mean I know they had- every once in a while they would have a big layoff. It might not be in – in our group. It might be in a different group. It's – it happened a lot there." (Myers, 209: 6-9)

Elise Cloonan, a former Mattel designer and roommate of Carter Bryant, was also asked at her deposition about layoffs at Mattel:

Q: During the period of time you were at Mattel, was there, from time to time, layoffs of a number of individual employees?
A: Constantly
Q: "Constantly" meaning once every year? Once every two years?
A: About once every – Yeah, once every two years
Q: And did that engender a – sort of a feeling that you never knew when you would be gone?
The Deponent: The faster they happened, the more morale plunged. If they were spread out like over two, three years, it kind of – it went away. But when they were like every – when they were happening every year and we were constantly getting over – our leadership overhead was changing, absolutely.

4
CONFIDENTIAL –
ATTORNEYS' EYES ONLY

EXHIBIT _____

PAGE _____   **EXHIBIT 24
PAGE 782**

Q: What period of time was that that we're talking about when it happened more frequently?

A: It seemed—

Q: If I could finish, -- more frequently and there was a morale problem?

The Deponent: In my opinion, it – it seemed to increase more towards when – I call it the old regime left. After Jill Barad and all her people left, and Ivy Ross came on board, it increased a lot, because there was a huge turnover. [Lawyers' colloquy omitted.]

Thus, in accord with Mr. Stein's opinion that "creative types" seek secure employment inside companies, given Mattel's lay-off history, it is hardly surprising that some Mattel employees at least would seek safer employment elsewhere even while they were still employed at Mattel.

At any rate, Mr. Stein's opinion notwithstanding, nothing in the law, policy, usual practice or even logic would prohibit at least some "creative types" from taking the plunge into "risky" entrepreneurial pursuits or free-lance ventures rather than employment with a company. In fact, given California's public policy and general support for entrepreneurial enterprise, nothing even prohibits employees from undertaking "preparations to compete" with their current employer while they remain employed.

**Mr. Stein's Opinion 3:**

Mr. Stein also offers the opinion that "independent inventing....is a very challenging road that most inventors barely earn a living at. Most product ideas are rejected, and even if accepted it often takes years for an idea to make it to market and begin generating royalty income for the inventor. Also, for many independent inventors, the absence of a broad group of talented peers and the team process negatively impacts the quality of their ideas, their productivity and their enjoyment of their work."

In one sense, Mr. Stein is correct: the road employees like Carter Bryant elected to take is a dangerous one, fraught with delay, uncertainty and potential, and even likely, failure. What Mr. Stein, an executive with significant personal resources in the form of high compensation, stock options, and the "lucrative benefits" he extols, seems to miss is how the danger of the entrepreneurial or even freelance route affects rank and file employees like Carter Bryant. Lacking the resources of a Bruce Stein, it is not at all uncommon for rank and file employees to keep even a search for alternative employment quiet from an existing employer. In fact, as a result, most job application forms have a question that asks: "May we contact your current employer?" Knowing that the answer is understandably likely to be "no," a negative answer is seldom a bar to new employment. It is also not at all uncommon for an employee in search of a new position to slip away at lunch hour or on a free day to a job interview. Moreover, despite the chagrin that many employers feel at the practice, it is also hardly uncommon for employees searching for a new job to utilize their current employer's internet access, fax machine, or telephone line to help them obtain a new position. In fact, Mattel Human Resources employee Theresa Newcomb acknowledged in her deposition that Mattel had no policy against calling employees Mattel was recruiting at their places of employment and that it had likely happened in her experience at Mattel.

5
CONFIDENTIAL -
ATTORNEYS' EYES ONLY

EXHIBIT _____

PAGE ___

**EXHIBIT 24**
**PAGE 783**

Given how easily they can fail, employees like Carter Bryant who are taking the particular risks of pitching an idea in exchange for future royalties rather than another job, in particular, often exhibit these above-described common behaviors. Moreover, given the relatively small size of the toy industry, members of the toy industry design community are perhaps particularly unlikely to burn bridges with an existing employer by announcing prematurely or staging a "noisy withdrawal" that they are leaving to follow a risky entrepreneurial endeavor.

In short, Mattel's own expert Bruce Stein unwittingly seems to validate rather than undermine the position that Carter Bryant and MGA take in this litigation. That is, among other things, that given the failure of Mattel to guide employees like Carter Bryant differently than it did, through clear, comprehensible, fair, legal and appropriate policies, procedures, practices and agreements; given the normal behavior of employees under the uncertain circumstances to which they were subject in their employment with Mattel including its substantial history of layoffs; and given the natural reluctance of rank and file employees who choose the uncertain road of pitching an idea or seeking employment outside of their existing employer's organization to burn bridges, it is unreasonable for Mattel to believe that employees like Carter Bryant would have acted differently than they did. Rather, it is Mattel that departs from usual and reasonable practice by its significant failure to provide clear and meaningful guidance as to its expectations of employee conduct; its unwillingness or inability to invest the resources necessary to create fair and reasonable agreements with rank and file employees; and its failure to provide a working environment that would foster the benefits described by Mattel's former COO Bruce Stein and attract and retain talented designers such as Carter Bryant.

_3/17/08_
Date

D. Jan Duffy

6

CONFIDENTIAL -
ATTORNEYS' EYES ONLY

EXHIBIT _____

PAGE ____       **EXHIBIT 24
PAGE 784**

Appendix to D. Jan Duffy Rebuttal Expert Report dated March 17, 2008

## RE: IN THE MATTER OF CARTER BRYANT, MGA ENTERTAINMENT, INC. AND CONSOLIDATED CASES., Case No. CV 04-9059

In addition to the documents listed in Attachment 2 to my expert report dated February 11, 2008, I have considered the following materials in connection with this report:

### DEPOSITIONS

Amy Myers – February 22, 2008
Ivy Ross – January 17, 2008
Adrienne Fontanella – January 16, 2008

### BATES NUMBERED DOCUMENTS

MGA 001311-12 – Confidentiality Agreement
MGA 0875537-39 – Confidentiality and Inventions Assignment Agreement
MGA 0876068-70 – Confidentiality and Inventions Assignment Agreement
MGA 0875611-13 – Confidentiality and Inventions Assignment Agreement
MGA 0876705-07 – Confidentiality and Inventions Assignment Agreement
MGA 0876366-68 – Confidentiality and Inventions Assignment Agreement
MGA 0876456-58 – Confidentiality and Inventions Assignment Agreement
MGA 0875540-44 – Proprietary Information Agreement
MGA 0875690-94 – Proprietary Information Agreement
M 0097973 – Law Department Memorandum; Reminder Regarding Mattel Confidential & Proprietary Information

### MISCELLANEOUS

Expert Report of Bruce L. Stein dated February 11, 2008

Expert Report of Prof. Peter S. Menell dated February 11, 2008

Hon. Ming W. Chin, et al., California Practice Guide: Employment Litigation (The Rutter Group, 2006)

D. Jan Duffy

EXHIBIT ........................

PAGE ........

**EXHIBIT 24
PAGE 785**

EXHIBIT 25

RECEIVED

JAN - 8 2008

1  THOMAS J. NOLAN (Bar No. 066992)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2  300 South Grand Avenue
   Los Angeles, CA  90071-3144
3  Telephone:  (213) 687-5000
   Facsimile:  (213) 687-5600
4  E-mail:      tnolan@skadden.com

5  KENNETH A. PLEVAN (Admitted *Pro Hac Vice*)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
6  4 Times Square
   New York, NY  10036
7  Telephone:  (212) 735-3000
   Facsimile:  (212) 735-2000
8  E-mail:      kplevan@skadden.com

9  Attorneys for Counter-Defendants,
   MGA ENTERTAINMENT, INC., ISAAC LARIAN, MGA ENTERTAINMENT
10 (HK) LIMITED, AND MGAE de MEXICO S.R.L. de C.V.

11           UNITED STATES DISTRICT COURT

12          CENTRAL DISTRICT OF CALIFORNIA

13                  EASTERN DIVISION

14 CARTER BRYANT, an individual    )   CASE NO. CV 04-9049 SGL (RNBx)
                                   )
15              Plaintiff,         )   Consolidated with Case No. 04-9059
                                   )   and Case No. 05-2727
16      v.                         )
                                   )   **MGA'S RESPONSE TO**
17 MATTEL, INC., a Delaware        )   **MATTEL, INC.'S AMENDED**
   corporation                     )   **SUPPLEMENTAL**
18                                 )   **INTERROGATORY**
                Defendant.         )   **REGARDING DEFENDANTS'**
19                                 )   **AFFIRMATIVE DEFENSES**
                                   )
20                                 )   **CONFIDENTIAL --**
                                   )   **ATTORNEYS' EYES ONLY**
21                                 )
                                   )   Honorable Stephen G. Larson
22                                 )   Courtroom 1
                                   )
23 _____)   Discovery Cut-Off:  March 3, 2008

24

25

26

27

28                                              EXHIBIT 25
                                                PAGE 786
                        l-7
   MGA'S RESPONSE TO MATTEL'S AMEND. SUPP. ROG RE AFFIRM. DEFENSES    NO. CV 04-9049 SGL (RNBx)

1                    **PRELIMINARY STATEMENT**

2        The General Response set forth herein applies to all responses that MGA

3 Entertainment, Inc., Isaac Larian, MGA Entertainment (HK) Limited, and MGAE de

4 Mexico S.R.L. de C. V., (the "MGA Defendants") are providing in response to the

5 amended supplemental interrogatory regarding affirmative defenses (the

6 "Interrogatory") or may in the future provide in response to any discovery request in

7 this action. The Response is made without waiving, or intending to waive but, on the

8 contrary, expressly reserving: (a) the right to object, on the grounds of competency,

9 privilege, relevancy or materiality, or any other proper grounds, to the use of the

10 Response, for any purpose in whole or in part, in any subsequent step or proceeding in

11 this action or any other action; (b) the right to object on any and all grounds, at any

12 time, to other interrogatories or other discovery procedures; and (c) the right at any

13 time to revise, correct, add to, or clarify any of the responses propounded herein.

14        The Response reflects only the present state of the MGA Defendants'

15 discovery regarding the information that Mattel seeks. Discovery and other

16 investigation or research concerning this litigation are continuing. It is anticipated

17 that further discovery, independent investigation, and legal research and analysis will

18 supply additional facts and meaning to the known facts, as well as establish entirely

19 new factual conclusions, all of which may lead the MGA Defendants to discover other

20 information responsive to this Interrogatory. The MGA Defendants therefore reserve

21 the right to amend or supplement this Response at any time in light of future

22 investigation, research or analysis, and also expressly reserves the right to rely on, at

23 any time, including trial, subsequently discovered information omitted from this

24 Response as a result of mistake, error, oversight or inadvertence. The MGA

25 Defendants do not hereby admit, adopt or acquiesce in any factual or legal contention,

26 assertion or characterization contained in the Interrogatory or any particular request

27 therein, even where the MGA Defendants have not otherwise objected to a particular

28 interrogatory, or has agreed to provide information responsive to a particular

1 | interrogatory.

2 | No incidental or implied admissions are intended by this Response. These
3 | responses should not be taken as an admission that the MGA Defendants accept or
4 | admit the existence of any facts set forth or assumed by any instruction, definition or
5 | interrogatory.

6 | **SUPPLEMENTAL INTERROGATORY:**

7 | State the facts upon which YOU intend to rely at trial to support YOUR
8 | affirmative defenses, and IDENTIFY all PERSONS with knowledge of those facts
9 | and all DOCUMENTS that REFER OR RELATE TO those facts.

10 | **RESPONSE TO SUPPLEMENTAL INTERROGATORY:**

11 | A.    Failure to State a Claim

12 | Mattel's counterclaims fail to state a claim against the MGA Defendants upon
13 | which relief can be granted. This is a legal defense and does not require factual
14 | support.

15 | B.    Unclean Hands / *in Pari Delicto*

**EXHIBIT 25**
**PAGE 788**

16 | Mattel's counterclaims are barred in whole or in part by Mattel's unclean
17 | hands and wrongful acts. This affirmative defense is based, in part, on Mattel's
18 | efforts to undermine MGA's business and to "kill" Bratz at any cost which includes,
19 | but is not limited to, Mattel's efforts to infringe and dilute MGA's trade dress, copy
20 | MGA's products, packaging, themes, and advertising, and engage in other acts of
21 | unfair competition against MGA. Since the Bratz dolls were launched in 2001, Mattel
22 | has serially imitated and copied many of MGA's products, trade dress, trademarks,
23 | themes, ideas, advertising and product packaging, including, but not limited, to:

24 |     •    Mattel imitated and copied the disproportionately large heads, distinctive
25 |          faces with artfully made-up, heavy-lidded, sultry, almond-shaped large
26 |          eyes and large, overly-lined and lipsticked lips, trendy, hip clothes and
27 |          hair styles, and oversized feet of MGA's Bratz female fashion dolls with
28 |          Mattel's My Scene fashion dolls. Further, Mattel has systematically

2

1  proceeded to modify the faces of the My Scene fashion dolls since their
2  original release to copy and imitate the distinctive faces of the Bratz
3  fashion dolls more and more over time as detailed and illustrated with
4  photographs in pages 10-17 of MGA's Complaint.

5  • Mattel imitated and copied the distinctive packaging and overall look and
6  total image of Bratz fashion dolls, including the transparent and open
7  style of the Bratz fashion doll packaging, the *tout ensemble*-style of the
8  Bratz fashion doll packaging, and the "flying banner" ribbon-style slogan
9  running across the middle of the box of the Bratz fashion dolls. Further,
10  as detailed in pages 17-19 of MGA's complaint, Mattel has
11  systematically proceeded to change its "My Scene" packaging to copy
12  and imitate the Bratz doll packaging more and more over time.

13  • In September 2004, MGA was informed by a Wal-Mart Mexico buyer
14  that Mattel is packing its closed out Flava dolls in a trapezoid-shaped
15  packaging that is confusingly-similar to Bratz fashion doll packaging.

16  • Mattel copied and imitated the "Wintertime Wonderland" theme and
17  concept for Brat" fashion dolls with the "Chillin' Out!" theme for "My
18  Scene" fashion dolls, which are dressed in trendy winter clothes and are
19  packaged with winter sport accessories.

**EXHIBIT 25
PAGE 789**

20  • Mattel copied and imitated the "Formal Funk" theme and concept for
21  Bratz fashion dolls with the "Night on the Town" theme for My Scene
22  fashion dolls, which are dressed in trendy formal wear or evening gowns.

23  • Mattel copied and imitated the "Sun-Kissed Summer" theme, concept
24  and packaging for Bratz fashion dolls with the "Jammin' in Jamaica"
25  theme for "My Scene" fashion dolls, which are dressed in trendy bathing
26  suits and are packaged with beach gear and water sport accessories.

27  • Mattel copied and imitated the "Forever Diamondz" theme and concept
28  for Bratz fashion dolls with the "My Bling Bling" theme for "My Scene"

3

1  | fashion dolls, which are packaged real diamond jewelry that can be worn
2  | by girls.

3  | • Mattel copied and imitated Bratz television commercials for its My
4  | Scene commercials. The elements of these Bratz commercials copied
5  | and imitated by Mattel include the combination of live-action footage
6  | with cartoon or animated figures of the dolls featured in the commercial,
7  | the use of multi-ethnic, "tween"-aged female actresses to portray each of
8  | the dolls in the multi-ethnic line, "hip"- sounding theme songs or jingles
9  | repeating the name of the doll line being advertised and similar camera
10 | angles and techniques, including sweeping in to a close-up of the doll as
11 | the doll turns or twists and its hair flips in a dramatic fashion. Mattel
12 | copied and imitated these features in several "My Scene" advertisements,
13 | including those featuring the "My Scene" "Stylin' Head", the "My
14 | Scene" "My Bling Bling" theme and the "My Scene" "RollerGirls"
15 | theme.

16 | • In April 2002, Margo Eldridge informed Isaac Larian that Mattel was
17 | intentionally trying to book the same actresses who portrayed the Bratz
18 | girls in MGA's commercials in order to interfere with MGA's ability to
19 | shoot its own commercials. Further, in June 2003, Margo Eldridge
20 | informed Isaac Larian that Mattel was contacting and attempting to hire
21 | the same essential crew members used by MGA for Mattel's
22 | commercials.

23 | • Mattel hired at least one of the actresses who has appeared in several
24 | Bratz commercials. This actress now appears in "My Scene"
25 | commercials, including being featured prominently in the commercial for
26 | "My Scene" "My Bling Bling."

**EXHIBIT 25**
**PAGE 790**

27 | • Mattel filmed a Polly Pocket commercial in the same mall and featuring
28 | the same escalator as appeared in a previous Bratz commercial.

4

1    • Mattel copied and imitated the distinctive trapezoidal-shaped packaging
2      for MGA's "Bratz Formal Funk Super Stylin' Runway Disco" play set
3      with its trapezoidal-shaped packaging for its "My Scene Sound Lounge"
4      play set.

5    • Mattel copied and imitated MGA's "Bratz Funky Fashion Makeover"
6      heads with its "My Scene Stylin' Heads," which have distinctive faces
7      with artfully made-up, heavy-lidded, almond-shaped large eyes, and
8      large, overly-lined and lipsticked lips.

9    • Mattel copied and imitated a portion of the Bratz dolls famous
10     trademarked tag line "The Girls with a Passion for Fashion" on its
11     website for its Diva Starz dolls by asking users: "Do you have a passion
12     for fashion?"

13   • Mattel copied and imitated MGA's "Bratz Petz" plush toys (including,
14     but not limited to, "Bratz Dogz") with its "My Scene" plush pets, which
15     have large, human-like, made-up eyes with long eye lashes and wearing
16     trendy human clothing.

17   • Mattel copied and imitated MGA's packaging for "Bratz Petz" with its
18     packaging for "My Scene" plush pets, which consists of an open box
19     with no top and with partial side panels that slope from a narrow front
20     panel to a higher back panel.

21   • Mattel copied and imitated MGA's "4-Ever Best Friends" doll line with
22     its "Wee 3 Friends" doll line, which is a line of "little girl" fashion dolls
23     with a number in the name of the doll line, packaged together as
24     "friends" with themed accessories and mix-and-match outfits.

25   • Mattel copied and imitated MGA's packaging for the "4-Ever Best
26     Friends" doll line with its packaging for the "Wee 3 Friends" doll line,
27     which has the same pink and teal color schemes, rounded heart-like
28     shape and serves as a display/carrying case.

**EXHIBIT 25**
**PAGE 791**

5

1    Mattel's confusingly-similar products, packaging and commercials have
2  confused consumers, retailers, and members of the press:

3      •    In November 2002, confused consumers emailed MGA's customer
4           service department, seeking information about where to buy a "Madison
5           Bratz doll." These emails were produced to Mattel.

6      •    On March 17, 2004, a reporter for an Oregon newspaper mistakenly
7           identified a "My Scene Stylin' Head" as a Bratz hair and makeup doll
8           head.

9      •    On October 6, 2004, a BBC News Online Business Reporter listed Bratz
10          fashion dolls as the first of the "10 top-selling toys this Christmas," but
11          mistakenly included "My Scene Masquerade" fashion dolls (instead of
12          Bratz fashion dolls) in the photograph illustrating the top-selling toys.

13     •    In or around April 2005, retailers in a Target store in Atlanta, Georgia
14          mistakenly merchandized "My Scene" pets in the middle of the "Bratz
15          Petz" product display.

16     •    In or around November 2006, the main AOL shopping website
17          (shop.aol.ca) reported one of the "Top Picks by Toys 'R Us" is "Barbie
18          Diamondz by MGA."

19     •    In December 2006, a Kansas second-grade student asked for a "My
20          Scene Bling Bling Bratz Head" in a letter to Santa posted on the
21          Northeast USD 246 website.

22     •    In an eBay posting, dated February 2, 2006, a parent asked for a "Bratz
23          'Madison'" doll - "preferably in mint condition. It's for my daughter of
24          the same name. I think the company stopped making them. Or changed
25          the name."

26     •    In or around January 2007, on the website "La Papa," a seller advertised
27          a "Bratz Chelsea" doll (when the pictured item was a "My Scene
28          Chelsea" doll).

EXHIBIT 25
PAGE 792

6

- In or around January 2007, an eBay seller repeatedly referred to the pictured "Bratz Play Sportz Yasmin" doll as the "Barbie Bratz Doll Yasmin."

- In or around January 2007, an eBay seller described the "My Scene Convertible" that it was attempting to sell as a "Bratz My Scene Black Convertible."

- A "Customer Review" for the "My Scene Hudson" doll, dated May 26, 2003, on Amazon.com provided: "I got a Hudson for my 11th birthday and he was so nice.  I thought it was a Bratz...."

- During a visit to a Toys 'R Us store in Livingston, New Jersey in or around May 2006, Dan Cooney witnessed a woman buy a "My Scene Madison" doll that she mistakenly believed was a "Bratz Sasha" doll.

- Many of Mattel's own focus group studies and consumer research analyses have revealed consumer confusion between Bratz products and My Scene products.

In a further attempt to harm MGA's business, Mattel has threatened, manipulated, improperly influenced, and intimidated many people and companies (including, but not limited to, freelancers, employees, licensees, retailers, distributors, manufacturers, raw good suppliers, and industry bodies) to prevent them from working with MGA.  For example, Mattel has disseminated false information to retailers and others about MGA in order persuade retailers not to purchase MGA products and manipulate the retail market.

- Mattel falsely told Toys 'R Us that MGA was giving another major United States retailer below-market pricing.

- In August 2004, Barb Lubestine of Wal-Mart told Isaac Larian that Mattel representatives told her that Bratz is "dying" at Target and Toys 'R Us, which was false.

EXHIBIT 25
PAGE 793

7

- In May 2004, Lin Sherlock of Woolworths U.K. informed Isaac Larian that Mattel falsely informed her that two major U.S. retailers were delisting MGA's "4-Ever Best Friends" and that Mattel's copycat product ("Wee 3 Friends") was outselling "4-Ever Best Friends."
- In February 2005, Margo Eldridge informed Isaac Larian that Bob Moehl (creative head of Fisher Price advertising at FCB) told her that, at Toy Fair in February 2005, Mattel falsely told retailers that Bratz sales were off by 14% and that "Barbie" sales were up by 3%.
- In February 2005, Rosana Ferrer (a distributor and licensee of Bratz in Puerto Rico) informed Isaac Larian that Mattel sent an email to one of her customers, falsely stating that MGA had a big decline in sales worldwide and that Mattel was the # 1 brand worldwide.
- In or around June 2005, Mattel told Dean Gianoukas, an analyst at J.P. Morgan, that Mattel was gaining share and that Bratz was slowing, even though Bratz had grown by 17%.
- In February 2006, Neil Friedman falsely reported to the press that more than 51 million people visit the Barbie.com website per month when the number is much lower.

Mattel has also threatened and pressured distributors and retailers not to distribute Bratz products.

- In February 2002, "Michael D" of JNH informed Martin Hitch of MGA that Mattel (specifically Adrienne Fontanella and Matt Bousquette) were very upset that MGA used Bandai as distributors and thus would not allow Banda representatives into the "Barbie Gallery."
- In June 2003, Jose Antonio of Bandai Spain informed Isaac Larian that Mattel was threatening retailers.

**EXHIBIT 25**
**PAGE 794**

- Mattel has a relationship with Jumbo, the largest retailer in Greece. Jumbo refuses to sell MGA products, which MGA believes is due to

8

1    Mattel's improper influence and pressure. Moreover, in February 2006,
2    Berte Dario, Managing Director of Giochi Preziosi, informed Isaac
3    Larian that Fontini Karageorgi said that Mattel was blacklisting retailers
4    in Greece that sold Bratz.

5    Mattel's manipulation of the retail market also included Mattel's efforts to
6  tamper with retail displays and disseminate false information about the retail market.
7  Mattel merchandisers have tampered with MGA's retail displays to replace favorably-
8  placed MGA merchandise with Mattel merchandise.

9    •    In July 2006, Heather Hocut of Wal-Mart informed Isaac Larian that
10        Mattel merchandisers moved Bratz modulars from the front of a Wal-
11        Mart store to the back and replaced the modulars in the front of the store
12        with Barbie products. Ms. Hocut warned Erica Ashbrook that if she ever
13        caught them doing this again Mattel merchandisers would not be allowed
14        at Wal-Mart. Ms. Hocut also said that Ms. Ashbrook notified Connie
15        Hibbert (or Hebert) about this issue.

16   •    Mattel altered retails displays at Toys 'R Us by moving its products into
17        shelves reserved for MGA products. In August 2003, Yuval Caspi
18        visited a Toys 'R Us store in Van Nuys, California and saw Mattel's
19        Flava dolls set up between the Bratz dolls in the section reserved for
20        Bratz. Mattel's in-store merchandisers tampered with MGA shelf space
21        at Toys 'R Us in Santa Monica, California in or around March or April
22        2004.

23   •    In October 2002, Robin Hogel of Zellers (a Canadian retail chain)
24        informed Mark Robinson of MGA that Mattel was pressuring Zellers to
25        give Bratz less desirable aisle and shelf space.

26   Mattel has also intimidated former Mattel employees who have gone to work
27  for MGA by sending threatening letters to them warning them not to disclose
28  publicly-available information about Mattel.

**EXHIBIT 25**
**PAGE 795**

9

MGA'S RESPONSE TO MATTEL'S AMEND. SUPP. ROG RE AFFIRM. DEFENSES          NO. CV 04-9049 SGL (RNBx)

- On December 20, 2004, Mattel sent a letter to MGA regarding Dawn Whitaker, warning MGA that Ms. Whitaker had signed an Employee Confidential Information and Inventions ("ECII") Agreement with Mattel requiring that Ms. Whitaker maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Ms. Whitaker had been so informed.

- On February 18, 2005, Mattel sent a letter to MGA regarding Alice Kao, warning MGA that Ms. Kao had signed an ECII Agreement with Mattel requiring that Ms. Kao maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Ms. Kao had been so informed.

- On March 7, 2005, Mattel sent a letter to MGA regarding Joyce Kim, warning MGA that Ms. Kim had signed an ECII Agreement with Mattel requiring that Ms. Kim maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Ms. Kim had been so informed.

- On March 10, 2005, Mattel sent a letter to MGA regarding Janet Han, warning MGA that Ms. Han had signed an ECII Agreement with Mattel requiring that Ms. Han maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned

10

MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Ms. Han had been so informed.

- On May 20, 2005, Mattel sent a letter to MGA regarding Jim Huntley, warning MGA that Mr. Huntley had signed an ECII Agreement with Mattel requiring that Mr. Huntley maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information.  Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Mr. Huntley had been so informed.

- On June 13 and July 5, 2005, Mattel sent a letter to MGA regarding Michael Hinh, warning MGA that Mattel had advised Mr. Hinh that he had ongoing confidentiality and fiduciary duties to Mattel and that Mattel would pursue all available remedies against Mr. Hinh and MGA if those duties were violated.  Mattel further warned MGA that Mr. Hinh had signed an ECII Agreement with Mattel, requiring that Mr. Hinh maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information, and that Mattel "vigorously enforces" such agreements, including by seeking all available remedies.

- On August 1, 2005, Mattel sent a letter to MGA regarding Harvey Scott, warning MGA that Mr. Scott had signed an ECII Agreement with Mattel requiring that Mr. Scott maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information.  Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Mr. Scott had been so informed.

EXHIBIT 25
PAGE 797

11
MGA'S RESPONSE TO MATTEL'S AMEND. SUPP. ROG RE AFFIRM. DEFENSES        NO. CV 04-9049 SGL (RNBx)

- On August 16, 2005, Mattel sent a letter to MGA regarding Jier Su, warning MGA that Mr. Su had signed an ECII Agreement with Mattel requiring that Mr. Su maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Mr. Su had been so informed.

- On March 27, 2006, Mattel sent a letter to MGA regarding Jorge Castilla, warning MGA that Mr. Castilla had signed an ECII Agreement with Mattel requiring that Mr. Castilla maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Mr. Castilla had been so informed.

- On May 15, 2006, Mattel sent a letter to MGA regarding Daniel Cooney, warning MGA that Mr. Cooney had signed an ECII Agreement with Mattel requiring that Mr. Cooney maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Mr. Cooney had been so informed.

**EXHIBIT 25**
**PAGE 798**

- On August 21, 2006, Mattel sent a letter to MGA regarding John Bloodworth, warning MGA that Mr. Bloodworth had signed a Confidentiality and No Conflict Agreement and a Confidentiality and Non-Disclosure Agreement with Mattel requiring that Mr. Bloodworth maintain the secrecy of personnel information, forecasts, financial data,

12

1  business strategies, product plans, marketing plans, and inventions,
2  among other information. Mattel further warned MGA that Mattel
3  "vigorously enforces" such agreements, including by seeking all
4  available remedies, and that Mr. Bloodworth had been so informed.
5  • On September 5, 2006, Mattel sent a letter to MGA regarding Jill Hatch,
6  warning MGA that Ms. Hatch had signed an ECII Agreement with
7  Mattel requiring that Ms. Hatch maintain the secrecy of personnel
8  information, forecasts, financial data, business strategies, product plans,
9  marketing plans, and inventions, among other information. Mattel
10  further warned MGA that Mattel "vigorously enforces" such agreements,
11  including by seeking all available remedies, and that Ms. Hatch had been
12  so informed.
13  • On September 29, 2005, Mattel sent a letter to MGA regarding Janine
14  Brisbois, warning MGA that Ms. Brisbois had signed a proprietary rights
15  agreement with Mattel requiring that Ms. Brisbois maintain the secrecy
16  of personnel information, forecasts, financial data, business strategies,
17  product plans, marketing plans, and inventions, among other information.
18  Mattel further warned MGA that Mattel "vigorously enforces" such
19  agreements, including by seeking all available remedies, and that Ms.
20  Brisbois had been so informed.
21  • On November 27, 2006, Mattel sent a letter to MGA and Leland Ratleff,
22  warning that Mr. Ratleff had signed an Employee Patent and Confidence
23  Agreement with Mattel requiring that Mr. Ratleff maintain the secrecy of
24  personnel information, forecasts, financial data, business strategies,
25  product plans, marketing plans, and inventions, among other information.
26  Mattel further warned MGA that Mattel "vigorously enforces" such
27  agreements, including by seeking all available remedies, and that Mr.
28  Ratleff had been so informed.

**EXHIBIT 25**
**PAGE 799**

13

1     • On December 21, 2006, Mattel sent a letter to MGA regarding Jill
2     Larson, warning MGA that Ms. Larson had signed a Employee Patent
3     and Confidence Agreement with Mattel requiring that Ms. Larson
4     maintain the secrecy of personnel information, forecasts, financial data,
5     business strategies, product plans, marketing plans, and inventions,
6     among other information.  Mattel further warned MGA that Mattel
7     "vigorously enforces" such agreements, including by seeking all
8     available remedies, and that Ms. Larson had been so informed.

9    Mattel has threatened and warned a number of companies not to license MGA
10 properties or risk retribution in that Mattel would cease relations with the company or
11 decline to renew its licensing agreements.

12     • In September 2002, Morten Geschwendtner of Kidz Entertainment
13     informed Sandrine de Raspide that Euromic was under tremendous
14     pressure from Mattel not to sign an agreement for "Bratz."

15     • Neils Bucholst of Euromic sent a letter, dated December 4, 2002, to
16     Mitchell Kamarck, then-General Counsel of MGA.  The letter stated that,
17     on or around May 28, 2002, a regional manager of Mattel told Mr.
18     Bucholst that she was upset about rumors indicating that Euromic had
19     signed up with MGA/Kidz Entertainment on Bratz and told him "point
20     blank" that Mattel would discontinue relations with Euromic if Euromic
21     did not stop dealing with MGA/Kidz Entertainment.  Mr. Bucholst told
22     her that Euromic had no intention of stopping its co-operation with
23     MGA/Kidz Entertainment.  Mattel continued to urge Euromic to stop its
24     dealings with MGA/Kidz Entertainment, but Euromic "stood firm."  In
25     the fall of 2002, the regional manager of Mattel informed Euromic,
26     without explanation, that its contract with Mattel would not be
27     prolonged.

28        **EXHIBIT 25 PAGE 800**

14

1     &bull;    In September 2003, Stephen Graham of Character Licensing and
2             Marketing informed Sandrine de Raspide that Mattel was "absolutely
3             adamant that [CLM was] not to take on Bratz." Mr. Graham stated that
4             Mattel is "obviously extremely threatened by Bratz and they said that if
5             any Barbie licensees sign on for Bratz they will take away Barbie."

6     &bull;    In June 2002, Hayley Sussman of Endemol U.K. plc informed Sandrine
7             de Raspide that a number of companies, including Smith & Brooks
8             (apparel manufacturer), Zeon (watch manufacturer) and Gemma
9             International (greeting card licensee), were uncomfortable about
10            proceeding with a "Bratz" license because they are concerned about
11            losing their "Barbie" licenses.

12     &bull;    In or around September 2002, Hayley Sussman informed MGA that
13            Smith & Brooks (an apparel manufacturer) would love to manufacture
14            "Bratz" apparel but were "too scared to take the risk" of losing its license
15            from Mattel, which constitutes 50% of its business.

16     &bull;    In September 2002, Morten Geschwendtner informed MGA that Mattel
17            threatened or tried to pressure Egmont, Euromic, MV Sports, and Hart
18            Concepts not to license "Bratz."

19     &bull;    In October, 2002, Muki Agami, the managing director of JNH Israel (a
20            licensee of "Barbie"), visited MGA's showroom in Hong Kong and
21            advised MGA that he had received a call from the President of Sea Port
22            (the licensing agent for "Barbie" in Europe), warning Mr. Agami that he
23            will lose the "Barbie" license if he takes the "Bratz" license.

24     &bull;    In November 2002, Kate Kilmo of Random House told MGA that
25            Egmont told her that Mattel threatened to terminate its license if it
26            licensed "Bratz."

**EXHIBIT 25
PAGE 801**

27     &bull;    In January 2006, Melvin Thomas of The Licensing Company informed
28            MGA that Egmont had told him that it did not want to move forward

MGA'S RESPONSE TO MATTEL'S AMEND. SUPP. ROG RE AFFIRM. DEFENSES      NO. CV 04-9049 SGL (RNBx)

1             with publishing rights to "Bratz" because it would affect Egmont's

2             relationship with Mattel.

3     •    In May 2006, Morten Geschwendtner informed MGA that Egmont did

4             not want to move forward with "Bratz" publishing rights in the United

5             Kingdom and Germany, because Egmont does huge business with Mattel

6             in over 15 countries.

7     •    In January 2007, Frank Knau of Egmont in Germany denied a request by

8             MGA to start a "Bratz" magazine in Germany on the grounds that, "we

9             have a long term business relation with Mattel re Barbie.  Mattel

10           considers Bratz as a direct competitor to Barbie and hence we would not

11           like to irritate our good relation with Mattel by publishing a Bratz

12           magazine in competition to our Barbie magazine."

13     •    In May 2005, Larry Rosen, CEO of Rose Art Industries, Inc., informed

14             MGA that Mattel had cancelled all foreign and "Fun¬Dough"

15             agreements due to "Bratz."

16     •    In February 2005, Peter Carrero (an employee of ITC in Brazil) informed

17             MGA about Candide, an electronics company that was interested in

18             developing its own line of "Bratz" toys as well as importing "Bratz"

19             products from MGA.  Candide also had a "Barbie" licensing program.

20             Susana Kuemmerle indicated that Candide wanted to do electronics only,

21             that MGA's pricing did not work for Candide, and that Candide was not

22             interested in MGA's toy line.  In the same email Ms. Kuemmerle also

23             mentioned that she was informed that the order from Mattel was "do

24             whatever is necessary, no matter the cost, but do not let Bratz penetrate

25             the market."

26       On information and belief, Mattel has threatened and warned raw good

27 suppliers and toy manufacturers not to supply goods to MGA or to make MGA

28 products or they would lose business from Mattel.

                                                  **EXHIBIT 25**

                           16                           **PAGE 802**

1       •   On information and belief, in 2001, Mattel pressured Saran, a Japanese

2             doll hair supplier, not to supply doll hair to MGA.

3       •   In June or July 2003, Mattel informed Francis Choi of Early Light of its

4             new policy, namely that Mattel will not assign products for Early Light

5             to manufacture if Early Light makes "Bratz" products or products from

6             other customers that compete directly with similar Mattel products.

7       In February 2004, MGA was informed by Cory Schwartz of ConsumerQuest, a

8 market research firm, that Mattel asked him not to work with MGA.  In March 2005,

9 Nick Austin of Vivid Entertainment, Inc., a U.K. "Bratz" distributor, informed MGA

10 of aggressive pricing by Mattel in Europe, stating that "Our spies tell us that El

11 Segundo has authorized Mattel UK to 'burry us' and that this blitz of heavy TV

12 coupled with 25% off is just the start!"  In addition, Mr. Austin informed MGA that

13 Vivid was taking out a full page advertisement in the trade press to "shout about our

14 56.6% share because the trade mags will not cover in editorial because Mattel has

15 frightened the[m] off with threats of cutting their ad spend in the magazines."

16       Mattel also engaged in unfair practices relating to NPD as well as consumer

17 organizations, including TIA and CARU.  NPD is the leading supplier of sales

18 statistics and data in the toy industry, which are vital for efficient product-line

19 management by toy manufacturers. Without these statistics and data, it is difficult for

20 toy companies to assess and measure the relative success of their products in key

21 categories.  NPD is a subscription service and places restrictions on the use of its

22 information and statistics by subscribers.  Both Mattel and MGA subscribe to NPD's

23 services.  Mattel has more influence on NPD than does MGA because it generates

24 substantially more subscription revenue for NPD due to the fact that it sells a broader

25 range of toy products.  Mattel has improperly influenced NPD to employ a double

26 standard and not enforce the same rules against Mattel that NPD enforces against

27 MGA.  In September 2003, Mattel pressured NPD to terminate MGA's subscription

28 when MGA allegedly violated the terms of its NPD agreement by improperly

EXHIBIT 25
PAGE 803

1  referring to Mattel when publicly disclosing NPD data in a press release. Mattel

2  publicly disclosed NPD information on Mattel's comparative standing relative to

3  other companies in an earnings conference call and in a press release in September of

4  2004, but NPD did not take similar action against Mattel.

5      Mattel also pressured NPD into changing product classifications in order to

6  manipulate the data and artificially preserve Mattel's market share rankings in the

7  fashion doll category, thus lowering MGA's ranking and harming MGA's sales. In

8  February 2004, NPD announced proposed changes to doll categories, combining Mini

9  Dolls and Mini Doll Accessories into one category and placing fashion dolls packaged

10  with an accessory in the Accessory category provided that the accessory is of greater

11  or equal value within the set. In early 2005, Mattel lobbied NPD to get "Bratz Babyz"

12  placed out of the fashion doll category. In May 2006, NPD announced category

13  changes, which would place larger dolls such as Mattel's "American Girls" dolls in

14  the fashion doll category.                        **EXHIBIT 25**
                                                        **PAGE 804**

15      MGA believes that Mattel has improperly used its influence to induce CARU

16  to place onerous restrictions on MGA advertisements and require MGA to amend

17  aspects of its commercials that have gone unchallenged in other parties' commercials.

18  CARU is the toy industry's independent self-regulatory body in charge of maintaining

19  standards in advertising. CARU's approval is considered critical within the toy

20  industry to avoid regulatory action by the Federal Trade Commission. Mattel is a

21  major contributor to CARU's budget and thus has influence over CARU. Mattel has

22  influenced CARU to initiate (or has initiated on its own) proceedings against MGA

23  for techniques used in MGA's commercials that have also been employed in Mattel's

24  own commercials for "Barbie" and other products, such as alleged insufficient use of

25  hands to manipulate and move the dolls, use of a human hand and arm to manipulate

26  the doll that was allegedly improperly camouflaged by a person wearing a dark sleeve

27  against a dark background, use of computer graphics in which it was allegedly

28  impossible for a child to discern what was reality and what was computer-generated

1 fantasy, and allegedly showing dolls holding items when in reality dolls could not
2 hold any items without adhesives. To MGA's knowledge, CARU has never initiated
3 proceedings or undertaken an informal inquiry against Mattel for Mattel's use of these
4 same or similar techniques. While MGA was able to defeat many of Mattel's baseless
5 allegations, CARU found against MGA on the following issues: (1) CARU
6 recommended that MGA disclose that the "Bratz" dolls could not actually hold items
7 in its "Rock Angelz" commercial; (2) CARU found that MGA used improper
8 computer graphics in its "Big Bratz Babyz" commercial; and (3) CARU found against
9 MGA on the claims of insufficient hand usage for certain scenes in its "Genie Magic"
10 and "Big Bratz Babyz" commercials. As a result, MGA has been forced to incur
11 unnecessary costs for reshooting, reproducing and reediting its commercials.

12        Further, in the Spring of 2005, CARU issued an  inquiry about MGA's
13 Bratz.com website to comply with COPPA and instructed MGA to respond to make
14 changes to its website in excess of restrictions imposed on Mattel and others. In
15 March 2002, Margo Eldridge informed Isaac Larian that CARU has questioned
16 MGA's "Mermaid" commercial, and as it was the first time that CARU had every
17 questioned any commercial Ms. Eldridge had done since 1978, she believes the
18 inquiry was due to Mattel's improper influence. In addition, CARU has drafted press
19 releases regarding the outcome of Mattel's challenges against MGA, which exhibit a
20 negative bias towards MGA and a positive bias toward Mattel. In May 2006, CARU
21 drafted press releases regarding the "Big Bratz Babyz" and "Ponyz" decisions, which
22 created the misimpression that CARU found for Mattel on the majority of Mattel's
23 challenges, when in reality, CARU had rejected most of Mattel's challenges. Further,
24 in June 2006, CARU drafted a press release regarding Mattel's challenges against the
25 packaging for MGA's "Bratz Campfire" dolls, which put a negative slant on the
26 decision.

EXHIBIT 25
PAGE 805

27        Mattel also engaged in unfair business practices in connection with the TIA
28 Toy-of-the Year awards. Each year since 2000, the TIA presents the Toy-of-the-Year

19

1 awards, which generate substantial goodwill with retailers, distributors, licensees, and
2 customers for the winning toys. For the first three years of the awards (2000, 2001,
3 and 2002), the Toy-of-the-Year award was chosen by consumer vote. MGA's "Bratz"
4 dolls won the 2001 and 2002 Toy-of-the-Year awards. However, beginning with the
5 2003 Toy-of-the-Year award, the TIA changed the rules to have the award selected by
6 members of the industry (rather than by consumers). MGA believes that Mattel
7 orchestrated this change, as it is the largest, and accordingly, most influential member
8 of TIA, and the Chairman of TIA at the time was Neil Friedman, who was also the
9 President of Fisher Price (a subsidiary of Mattel). Under the new voting rules, Fisher
10 Price's "Hokey Pokey Elmo" won the 2003 Toy-of-the-Year award, beating out
11 MGA's "Bratz Super Stylin' Runway Disco." MGA asked TIA to substantiate the
12 vote count for the 2003 Toy-of-the-Year award in order to ensure that the voting
13 process was impartial, but the TIA refused.       **EXHIBIT 25**
                                                     **PAGE 806**

14        Other examples of Mattel's unfair competition and unclean hands include:
15 Mattel's efforts to create negative publicity or press about MGA, MGA products,
16 Bryant, Larian, or MGA employees; Mattel's efforts to fund or commission market
17 research or studies that portray Bratz or MGA products negatively; Mattel's efforts to
18 interfere with MGA's acquisition of or investment in Zapf Creation AG; Mattel's
19 efforts to include negative references to MGA or Bratz on Mattel's "We Believe in
20 Girls" website; Mattel's efforts or intent to interfere with business dealings or
21 contractual relations between MGA and Smoby Group; Mattel's influencing
22 Nickelodeon to reject MGA advertisements or to limit time slot for advertisements;
23 assisting parties in lawsuits against MGA; Mattel's monitoring, "spying on" or
24 gaining knowledge of MGA's trade secrets, non-public information, non-public
25 activities, unreleased products, and product development; gaining access, or attempts
26 to gain access, to MGA showrooms, Plan-o-Grams, merchandising displays, Toy Fair
27 displays on false pretenses; Mattel's wrongfully obtaining MGA's costs and sales
28 information through Mattel-employed category managers at retailers; Mattel's

1  inducing non-party customers to breach confidentiality agreements with MGA and
2  divulge non-public information about MGA's unreleased products; Mattel's covertly
3  investigating MGA, its officers and employees, and their family members; Mattel's
4  contacting persons under false pretense in order to interrogate them about Bratz and
5  this litigation; Mattel's coercing its employees to accept restrictive covenants (right
6  before a massive layoff) and non-compete clauses and other efforts to prevent
7  prospective MGA employees from accepting offers of employment; Mattel's delay in
8  suing Carter Bryant because, *inter alia*, Mattel wanted Bryant to testify in an
9  unrelated Mattel case; and Mattel's falsely inflating its Barbie sales figures in an
10 effort to mislead the public and retailers.  The MGA Defendants also incorporate by
11 reference its response below regarding its laches defense as though set forth fully
12 herein.

13      Discovery is ongoing and many third party subpoenas served by the MGA
14 Defendants are currently outstanding and the subject of meet-and-confers.  The MGA
15 Defendants reserve the right to supplement this response and, consistent with its
16 obligations under Federal Rule of Civil Procedure 26(e), the MGA Defendants will
17 supplement this response if they receive additional responsive information.

18      The following persons have knowledge of facts and circumstances
19 surrounding the foregoing: various current and former employees and contractors of
20 MGA and its affiliates, including, without limitation, Isaac Larian, Veronica Marlow,
21 Susana Kuemmerle, Sandrine de Raspide, Stephen Lee, Bruno Carlson, Paula Garcia,
22 Shirin Salemnia, Margo Eldridge, Gustavo Machado Gomez, Edmund Lee, Chuck
23 Scothon, Jaime Cygielman, Thomas Debrowski, Dave Malacrida, Thomas Pfau,
24 Yuval Caspi, Jim Huntley, Carter Bryant, and Dan Cooney; various current or former
25 employees and contractors of Mattel, including, without limitation, Matt Bousquette,
26 Erica Ashbrook, Lily Martinez, Ron Brawer, Adrienne Fontanella, Tim Kiplin, Neil
27 Friedman, Bob Eckert, Richard De Anda, Tina Patel, Ivy Ross, and Connie Hibbert
28 (or Hebert); current or former employees of Kidz Entertainment, including, without

21

EXHIBIT 25
PAGE 807

1  limitation, Morten Geschwendtner, Steffen Kragh, and Anna-Lisa McBride; current or
2  former employees of The Licensing Company, including, without limitation, Melvin
3  Thomas; current or former employees of Euromic, including, without limitation, Niels
4  Buchholst; current or former employees of Character Licensing and Marketing,
5  including, without limitation, Graham Stephen; current or former employees of
6  Egmont, including, without limitation, Frank Knau; current or former employees of
7  Saran; current or former employees of Endemol U.K. plc, including, without
8  limitation, Hayley Sussman; current and former employees of ConsumerQuest,
9  including, without limitation, Cory Schwartz; current or former employees of Smith
10  & Brooks; current or former employees of Zeon; current or former employees of
11  Gemma International; current or former employees of Hart Concepts; current or
12  former employees of MV Sports; current or former employees of JNH Israel,
13  including, without limitation, Muki Agami; current or former employees of Sea Port;
14  current or former employees of Random House, including, without limitation, Kate
15  Kilmo; current or former employees of Vivid Entertainment, Inc., including, without
16  limitation, Nick Austin; current or former employees of Early Light, including,
17  without limitation, Francis Choi; current or former employees of ITC, including,
18  without limitation, Peter Carrero; current or former employees of Candide; current or
19  former employees of Rose Art Industries, Inc., including, without limitation, Larry
20  Rosen; anyone who is familiar with MGA's and Mattel's products, including, without
21  limitation, consumers, retailers, licensees, distributors, and the trade press; various
22  current or former employees and contractors of Wal-Mart, including, without
23  limitation, Heather Hocut and Barb Lubestine; various current or former employees of
24  Toys 'R Us, including, without limitation, Manny Francione; current or former
25  employees of Zellers, including, without limitation, Robin Hogels; current or former
26  employees of Woolworth UK, including, without limitation, Lin Sherlock; current or
27  former employees of J.P. Morgan, including, without limitation, Dean Gianoukis;
28  Margo Eldridge; Michael D of JNH; Rosana Ferrer; Berte Dario; Fontini Karageorgi;

22

1  Jose Antonio; current and former employees of Vivid U.K., including, but not limited
2  to, Nick Austin and Emma Sherski; current or former employees of NPD, including,
3  but not limited to, Kelly Falco, Esther Han, Karyn Shonbart, and Frederique Tutt;
4  current or former employees and contractors of Mattel; Ketchum, Young & Rubicam
5  Brands, Peterson Milla Hooks, Brian Hooks, Ogilvy & Mather Worldwide; MTV
6  Networks / Nickelodeon.

7       The following documents may be relevant to the foregoing: the products, trade
8  dress, trademarks, themes, ideas, advertising and product packaging identified above;
9  letters and emails to MGA from Euromic, Character Licensing and Marketing,
10  Egmont, ConsumerQuest, Endemol, Kidz-Entertainment, Endemol U.K. plc, The
11  Licensing Company, Rose Art Industries, ITC, Early Light, and Vivid Imagination;
12  mails from consumers to MGA or Internet postings by consumers evidencing
13  confusion between "Bratz" and "My Scene," articles in the press evidencing
14  confusion between "Bratz" and "My Scene"; copies of web pages from eBay, La
15  Papa, and Amazon; and a photograph of display of "Bratz" products at Target, which
16  includes "My Scene" plush pet; emails to MGA from Toys 'R Us, Zellers, Woolworth
17  UK, Margo Eldridge, JNH, Rosanna Ferrer, and J.P. Morgan; and press releases and
18  articles with false information reported by Mattel; emails from Kelly Falco of NPD to
19  MGA; emails from Nick Austin of Vivid U.K. to MGA; Mattel's press releases and
20  communications with retailers and financial investors that improperly contain NPD
21  data; Mattel's focus group studies and consumer research campaigns for MyScene
22  products; documents regarding TIA's rules for the Toy-of-the-Year awards;
23  correspondence between MGA's representatives and TIA; and correspondence
24  between CARU and MGA representatives; documents produced by TIA in response
25  to subpoena (TIA00001-00400); documents produced by CARU in response to
26  subpoena; documents produced by NPD (NPD00001-00496)

27       C.    Laches

**EXHIBIT 25**
**PAGE 809**

28       Mattel's counterclaims are barred by the equitable doctrine of laches because,

23

1  among other things, Mattel intentionally delayed taking legal action against MGA or
2  Carter Bryant for several years after the launch of Bratz in the belief that Mattel
3  would be able to drive Bratz (and as a result, drive MGA) out of the market for
4  fashion dolls and/or the belief that Mattel did not have any rights under the
5  "Inventions Agreement" as against Bryant, based on its own interpretations of the
6  "Inventions Agreement," and on the advice that Mattel received from in-house and
7  outside counsel. As a result, Mattel only took legal action well after MGA had
8  invested substantial amounts of capital and creative and innovative efforts into the
9  Bratz line of dolls and had experienced enormous success in the marketplace.

10      A report from Bryant's exit interview at Mattel shows that Bryant told Mattel's
11  human resources representative he was leaving because an "[o]pportunity arose; had
12  to take it." Mattel has acknowledged that employees leaving under similar
13  circumstances to work for an unnamed competitor have "caused Mattel to begin
14  investigating their activities."

15      Furthermore, numerous Mattel employees knew and/or believed in the summer
16  of 2001 that Carter Bryant was involved in the development and introduction of the
17  Bratz line. This knowledge and/or these beliefs by Mattel employees went well
18  beyond mere "rumor and innuendo," as has been suggested by Mattel. In its
19  interrogatory responses, Mattel also asserts that Bryant used several "other Mattel
20  employees" to work on the Bratz dolls so that they "had been designed and were far
21  along in development during the time that Bryant was employed by Mattel."

22      Shortly after Bratz dolls were in retail stores in the United States in or about
23  September 2001, Mattel knew or was on notice that Carter Bryant was involved in the
24  development of that line. Mattel now asserts in this lawsuit that the idea for Bratz
25  was a violation of rights that Mattel had in a proposed flanker brand called "Toon
26  Teens," which Mattel was developing in the summer of 1999, but never introduced to
27  market. In this connection, during 2001, Toon Teens samples were taken out of

28

EXHIBIT 25
PAGE 810

24

1 storage by Mattel employees and delivered to Mattel's legal department for analysis

2 of possible copyright infringement and other claims against Bryant and MGA.

3       Mattel knew Bryant's role in Bratz and was investigating possible claims *at*

4 *least as early as summer 2001*, when Bratz came out. Margaret Leahy, the third-party

5 sculptor of Bratz, testified that in the summer of 2001 a friend from Mattel was

6 "grilling" her, "like somebody put her up to it," about whether "Carter [was] the

7 designer on the doll or what was [MGA employee and former Mattel employee] Paula

8 [Garcia's] involvement" in Bratz. Leahy testified that she told the Mattel employee

9 that "Carter initially came up with a design and Paula carried it out."

10       Mattel actively investigated Bryant's role in creating Bratz in 2001 and 2002.

11 Mattel's internal investigative files confirm that Mattel commenced an official

12 investigation into whether Bryant stole the Bratz idea in March 2002. Mattel admitted

13 that in 2002 it investigated "rumor and innuendo that Bryant may be working with

14 MGA on Bratz," including whether "Bryant ... plagiarized [Mattel product] 'Toon

15 Teens' and created Bratz dolls for MGA" and whether Bryant helped MGA create

16 Bratz "[w]hile he was working with Mattel." Mattel's CEO Robert Eckert received

17 an "anonymous letter" on or about August 5, 2002 that alleged that Bryant helped

18 MGA create Bratz while working for Mattel. As part of an official investigation

19 requested by Mattel CEO Robert Eckert in August 2002 as to whether Bryant helped

20 MGA create Bratz "[w]hile he was working with Mattel," Mattel's head of security,

21 Richard De Anda, wrote that he had been "aware of this situation and ... working on

22 it for several months" but it was in the hands of Mattel's attorneys. Testimony from

23 former Mattel employee Elise Cloonan confirms that by at least late 2001, Mattel's

24 lawyers were conducting an investigation involving Bryant's work on Bratz in the

25 design department.

26       On March 15, 2002, Mattel opened an investigative file on MGA and Isaac

27 Larian after receiving information from Evelyn Viohl and Ivy Ross that MGA had

28

EXHIBIT 25
PAGE 811

25

1 | recently hired Mattel employees and was reportedly manufacturing products that
2 | appeared to be Mattel designs.

3 |     Mattel has also forfeited any right it may have had to enforce Paragraph 3-a of
4 | the "Inventions Agreement" against Carter Bryant as a result of laches, estoppel,
5 | acquiescence, and waiver. MGA is informed and believes that it was common
6 | knowledge at Mattel that many Mattel employees employed in the Mattel design
7 | center worked on a freelance basis for third parties, including Mattel competitors,
8 | and/or on their own projects with the anticipation that such projects eventually would
9 | be offered for sale to third parties, including Mattel competitors. Mattel employees
10 | performed non-Mattel work while employed by Mattel and Mattel acquiesced to this
11 | moonlighting. For example, Robert Best developed a fashion line while employed at
12 | Mattel. Best disclosed this to Mattel and was not terminated. Joni Pratt created
13 | volleyball and basketball books for her daughter's high school outside of work, along
14 | with invitation and wrapping paper. Pratt testified that she showed these works to her
15 | supervisor at Mattel so there could be no misunderstanding that it was not related to
16 | her work at Mattel. Pratt has not disclosed everything she has drawn outside of work
17 | and testified that she does not feel she has an obligation to show her supervisors
18 | everything she has drawn outside of work. Lori Sipos, a designer at Mattel, created
19 | puppets as a hobby while she worked at Mattel. Sipos told Jill Nordquist about her
20 | hobby when showing her one of her puppets, but she did not tell Nordquist about the
21 | puppets in an effort to "report" her work. Nordquist testified that she was informed
22 | about the designs other people created outside of work in the course of sharing
23 | hobbies and not as part of an effort to report their works. Veronica Marlow helped
24 | Dianne Gavin develop a line of handbags while both were employed at Mattel. At her
25 | deposition, Veronica Marlow testified that Isabel Cabrera, Beatrice Morales, and
26 | Maria Elena Salazar worked with her on fashions for Bratz while they were employed
27 | by Mattel. Additionally, some of Mattel's sample makers made wedding gowns and
28 | did nails on the weekends and evenings and some of Mattel's hair rooters worked in

MGA'S RESPONSE TO MATTEL'S AMEND. SUPP. ROG RE AFFIRM. DEFENSES          NO. CV 04-9049 SGL (RNBx)

EXHIBIT 25
PAGE 812

1 | hair salons on weekends. During her deposition, Margaret Leahy testified that her
2 | Mattel supervisor, Michael Hebden, suggested to her while she was working for
3 | Mattel, that she seek out moonlighting work. During her deposition, Elise Cloonan
4 | testified that the practice was so widespread that there was even a name for it at
5 | Mattel: a "G-job." Indeed, Richard De Anda, Mattel's Vice President of Global
6 | Security, testified at his deposition that he also moonlighted as an expert witness and
7 | consultant while working for Mattel. De Anda further testified that he does not
8 | believe that Mattel owns or has a claim on the work he does for himself. Despite
9 | knowledge of this activity, Mattel rarely, if ever, enforced any rights it may have had
10 | to prohibit such moonlighting.

11 |     Issues concerning this defense are currently the subject of outstanding
12 | discovery requests. In particular, Mattel has staunchly refused to provide discovery
13 | that would address when, in fact, Mattel first had reason to suspect Bryant's
14 | involvement in Bratz, his alleged breach of contract, his work for MGA, and Mattel's
15 | alleged "true owner[ship] of Bratz," in spite of numerous interrogatory requests,
16 | document requests, requests for admission, and deposition notices. Defendants'
17 | concerns regarding Mattel's discovery abuses have recently been addresses in
18 | multiple motions to compel both before Judge Infante and Judge Larson. Indeed, on
19 | January 3, 2008, Judge Infante overruled all of Mattel's objections and compelled
20 | discovery relevant to Defendants' statute of limitations and laches defenses. Factual
21 | investigation and discovery is ongoing and the MGA Defendants reserve the right to
22 | supplement this response and, consistent with its obligations under Federal Rule of
23 | Civil Procedure 26(e), the MGA Defendants will supplement this response if they
24 | receive additional responsive information.       **EXHIBIT 25**
      **PAGE 813**

25 |     The following persons have knowledge of facts and circumstances regarding
26 | the foregoing: Richard De Anda; Robert Eckert; Alan Kaye; Michele McShane;
27 | Robert Normile; Margaret Leahy; Elise Cloonan; Veronica Marlow; Ilana Raynes;
28 | Michael Hebden; Frederick Jackson; Ray Moore; Joe Benet; Carolyn Oros; Hung

1 | Lee; Diana Troup; Cynthia Young; Margo Michelle; Kitty Black-Perkins; Janet
2 | Unalp; Debbie Meyer; Carol Spencer; Jennifer Kiernan; Bill Kelly; Steve McAdam;
3 | Howie Jesser, Ken Smith; Michael Moore; Jill Thomas; Tom Hodges; Julie Ashe
4 | Nobles; Morris Batay; Bruce Ryniker; Larry Wood; Eric Ostendorf; Steve Ryniker;
5 | Melody Hansen; Carter Bryant; Anna Rhee; Joe Feldman; Janet Blaser; Bill
6 | Greening; Roxanna Powell; Ken O'Leary; Lily Martinez; Cassidy Park; Ivy Ross; Joe
7 | Franke; Ann Driskill; Robert Best; Anne Olson; Dennis Soai; Kislap Ongchango;
8 | Nick Patean; Jerry Richardson; Spencer Davis; Bill Martinez; Barbara Meyer; Larry
9 | Clayton; Elon Dancer; Maury Kessel; Chris McAdam; Michael Norgren; Chris Sesto;
10 | Paul Sesto; Michael Hastey; Sullivan Hastey; Mark Rigger; Jeff Fuller; Tim Lewis;
11 | Tim Correa; Doc O'Connor; Myziue Hamilton; Joan Gaynor; Patty Gaynor; Mina
12 | Mirkazemi; Mercedeh Ward; Tony Yao; Aldo Fazilli; Isabel Cabrera; Beatrice
13 | Morales; Pedro Salazar; Maria Elena Salazar; Roger Simoneau, Jill Nordquist, Joni
14 | Pratt, Tina Tomiyama, and Evelyn Viohl.

15 | The following documents may be relevant to the foregoing: Transcript from
16 | the Deposition of Margaret Leahy, Transcript from the Deposition of Elise Cloonan,
17 | Transcript from the Deposition of Alan Kaye, Transcript from the Deposition of
18 | Richard De Anda, Transcript from the Deposition of Ann Driskill, Transcript from the
19 | Deposition of Jill Nordquist, Transcript from the Deposition of Veronica Marlow,
20 | Transcript from the Deposition of Joni Pratt, Mattel's Responses and Supplemental
21 | Responses to Defendants' Interrogatories, Mattel's Internal Investigative Files
22 | regarding its investigations into Carter Bryant, MGA, or Isaac Larian, all Mattel
23 | worldwide consumer research reports produced by Mattel, internal marketing
24 | documents analyzing the performance of Bratz in the marketplace, M0001654-55,
25 | M0074397-74402, and M0074307-0074396.

**EXHIBIT 25**
**PAGE 814**

26 | D.    Statute of Limitations

27 | Mattel's counterclaims are barred by the applicable statutes of limitations,
28 | including but not limited to, 18 U.S.C. § 1961 *eq seq.*, 17 U.S.C. § 507(b), and Code

1  of Civil Procedure §§ 337, 339, 343 and 338(c).  Mattel intentionally delayed taking
2  legal action against MGA or Carter Bryant for several years after the launch of Bratz
3  in the belief that Mattel would be able to drive Bratz (and as a result, drive MGA) out
4  of the market for fashion dolls and/or the belief that Mattel did not have any rights
5  under the "Inventions Agreement" as against Bryant, based on its own interpretations
6  of the "Inventions Agreement," and on the advice that Mattel received from in-house
7  and outside counsel.  As a result, Mattel only took legal action well after MGA had
8  invested substantial amounts of capital and creative and innovative efforts into the
9  Bratz line of dolls and had experienced enormous success in the marketplace.

10     A report from Bryant's exit interview at Mattel shows that Bryant told Mattel's
11  human resources representative he was leaving because an "[o]pportunity arose; had
12  to take it."  Mattel has acknowledged that employees leaving under similar
13  circumstances to work for an unnamed competitor have "caused Mattel to begin
14  investigating their activities."

15     Furthermore, numerous Mattel employees knew and/or believed in the summer
16  of 2001 that Carter Bryant was involved in the development and introduction of the
17  Bratz line.  This knowledge and/or these beliefs by Mattel employees went well
18  beyond mere "rumor and innuendo," as has been suggested by Mattel.  In its
19  interrogatory responses, Mattel also asserts that Bryant used several "other Mattel
20  employees" to work on the Bratz dolls so that they "had been designed and were far
21  along in development during the time that Bryant was employed by Mattel."

22     Shortly after Bratz dolls were in retail stores in the United States in or about
23  September 2001, Mattel knew or was on notice that Carter Bryant was involved in the
24  development of that line.  Mattel now asserts in this lawsuit that the idea for Bratz
25  was a violation of rights that Mattel had in a proposed flanker brand called "Toon
26  Teens," which Mattel was developing in the summer of 1999, but never introduced to
27  market.  In this connection, during 2001, Toon Teens samples were taken out of
28

**EXHIBIT 25**
**PAGE 815**

MGA'S RESPONSE TO MATTEL'S AMEND. SUPP. ROG RE AFFIRM. DEFENSES          NO. CV 04-9049 SGL (RNBx)

1 storage by Mattel employees and delivered to Mattel's legal department for analysis
2 of possible copyright infringement and other claims against Bryant and MGA.

3         Mattel knew Bryant's role in Bratz and was investigating possible claims *at*
4 *least as early as summer 2001*, when Bratz came out. Margaret Leahy, the third-party
5 sculptor of Bratz, testified that in the summer of 2001 a friend from Mattel was
6 "grilling" her, "like somebody put her up to it," about whether "Carter [was] the
7 designer on the doll or what was [MGA employee and former Mattel employee] Paula
8 [Garcia's] involvement" in Bratz. Leahy testified that she told the Mattel employee
9 that "Carter initially came up with a design and Paula carried it out."

10        Mattel actively investigated Bryant's role in creating Bratz in 2001 and 2002.
11 Mattel's internal investigative files confirm that Mattel commenced an official
12 investigation into whether Bryant stole the Bratz idea in March 2002. Mattel admitted
13 that in 2002 it investigated "rumor and innuendo that Bryant may be working with
14 MGA on Bratz," including whether "Bryant ... plagiarized [Mattel product] 'Toon
15 Teens' and created Bratz dolls for MGA" and whether Bryant helped MGA create
16 Bratz "[w]hile he was working with Mattel." Mattel's CEO Robert Eckert received
17 an "anonymous letter" on or about August 5, 2002 that alleged that Bryant helped
18 MGA create Bratz while working for Mattel. As part of an official investigation
19 requested by Mattel CEO Robert Eckert in August 2002 as to whether Bryant helped
20 MGA create Bratz "[w]hile he was working with Mattel," Mattel's head of security,
21 Richard De Anda, wrote that he had been "aware of this situation and ... working on
22 it for several months" but it was in the hands of Mattel's attorneys. Testimony from
23 former Mattel employee Elise Cloonan confirms that by at least late 2001, Mattel's
24 lawyers were conducting an investigation involving Bryant's work on Bratz in the
25 design department.

26        On March 15, 2002, Mattel opened an investigative file on MGA and Isaac
27 Larian after receiving information from Evelyn Viohl and Ivy Ross that MGA had
28

**EXHIBIT 25**
**PAGE 816**

1 recently hired Mattel employees and was reportedly manufacturing products that
2 appeared to be Mattel designs.

3       Issues concerning this Defense are currently the subject of outstanding
4 discovery requests. In particular, Mattel has staunchly refused to provide discovery
5 that would address when, in fact, Mattel first had reason to suspect Bryant's
6 involvement in Bratz, his alleged breach of contract, his work for MGA, and Mattel's
7 alleged "true owner[ship] of Bratz," in spite of numerous interrogatory requests,
8 document requests, requests for admission, and deposition notices. Defendants'
9 concerns regarding Mattel's discovery abuses have recently been addresses in
10 multiple motions to compel both before Judge Infante and Judge Larson. Indeed, on
11 January 3, 2008, Judge Infante overruled all of Mattel's objections and compelled
12 discovery relevant to Defendants' statute of limitations and laches defenses. Factual
13 investigation and discovery is ongoing and the MGA Defendants reserve the right to
14 supplement this response and, consistent with its obligations under Federal Rule of
15 Civil Procedure 26(e), the MGA Defendants will supplement this response if they
16 receive additional responsive information.                      **EXHIBIT 25**
                                                                  **PAGE 817**

17       The following persons have knowledge of Facts and circumstances regarding
18 the foregoing: Richard De Anda; Robert Eckert; Alan Kaye; Michele McShane;
19 Robert Normile; Margaret Leahy; Elise Cloonan; Veronica Marlow; Ilana Raynes;
20 Michael Hebden; Frederick Jackson; Ray Moore; Joe Benet; Carter Bryant; Carolyn
21 Oros; Hung Lee; Diana Troup; Cynthia Young; Margo Michelle; Kitty Black-Perkins;
22 Janet Unalp; Debbie Meyer; Carol Spencer; Jennifer Kiernan; Bill Kelly; Steve
23 McAdam; Howie Jesser, Ken Smith; Bob Tomamora; Tom Hodges; Julie Ashe
24 Nobles; Morris Batay; Bruce Ryniker; Larry Wood; Eric Ostendorf; Steve Ryniker;
25 Melody Hansen; Carter Bryant; Anna Rhee; Joe Feldman; Janet Blaser; Bill
26 Greening; Roxanna Powell; Ken O'Leary; Lily Martinez; Cassidy Park; Ivy Ross; Joe
27 Franke; Ann Driskill; Robert Best; Anne Olson; Dennis Soai; Kislap Ongchango;
28 Nick Patean; Jerry Richardson; Spencer Davis; Bill Martinez; Barbara Meyer; Larry

1 | Clayton; Elon Dancer; Maury Kessel; Chris McAdam; Michael Norgren; Chris Sesto;

2 | Paul Sesto; Michael Hastey; Sullivan Hastey; Mark Rigger; Jeff Fuller; Tim Lewis;

3 | Tim Correa; Doc O'Connor; Myziue Hamilton; Joan Gaynor; Patty Gaynor; Mina

4 | Mirkazemi; Mercedeh Ward; Tony Yao; Aldo Fazilli; Isabel Cabrera; Beatrice

5 | Morales; Pedro Salazar; Maria Elena Salazar; Roger Simoneau, Tina Tomiyama, and

6 | Evelyn Viohl.

7 |      The following documents may be relevant to the foregoing:  Transcript from the

8 | Deposition of Margaret Leahy, Transcript from the Deposition of Elise Cloonan

9 | Depo, Mattel's Responses and Supplemental Responses to Defendants'

10 | Interrogatories, Mattel's Internal Investigative Files regarding its investigations into

11 | Carter Bryant, MGA, or Isaac Larian, all Mattel worldwide consumer research reports

12 | produced by Mattel, internal marketing documents analyzing the performance of

13 | Bratz in the marketplace, M0001654-55, M0074397-74402, and M0074307-0074396.

14 |      E.    *Bona Fide* Purchaser for Value

15 |      Mattel cannot maintain its counterclaims against MGA Defendants because

16 | MGA Defendants paid valuable consideration for Bryant's assignment of his rights in

17 | the original Bratz drawings to MGA Defendants, and MGA Defendants acted with a

18 | good faith belief that Bryant owned the rights to his original Bratz drawings and that

19 | his assignment of such rights to MGA Defendants was valid and permissible.  The

20 | MGA Defendants also incorporate by reference its response below regarding its good

21 | faith defense as though set forth fully herein.

22 |      Discovery is ongoing and the MGA Defendants reserve the right to supplement

23 | this response and, consistent with its obligations under Federal Rule of Civil

24 | Procedure 26(e), the MGA Defendants will supplement this response if they receive

25 | additional responsive information.

**EXHIBIT 25**
**PAGE 818**

26 |      The following persons have knowledge of facts and circumstances regarding

27 | the foregoing:  Carter Bryant; Bryant's mother, Janet Bryant; Bryant's father, Thomas

28 | Bryant; Isaac Larian; Jeanne Galvano; Richard Irmen; Elise Cloonan; Ramona Prince;

MGA'S RESPONSE TO MATTEL'S AMEND. SUPP. ROG RE AFFIRM. DEFENSES    NO. CV 04-9049 SGL (RNBx)

1  Margaret Leahy; Veronica Marlow; Mercedeh Ward; Sarah Halpern; Paula Garcia;
2  Steve Tarmichael; Rebecca Harris; Cecilia Kwok; David Dees; Jesse Ramirez;
3  Samuel Wong; Edmond Lee; Steven Lee; Aileen Storer; Eric Yip; Leon Djiguerian;
4  Steffen Smith; Rachel Harris; Maggie Siu; Ben Ton; Sam Wong; Ray Wong; Ann
5  Wang; David Rosenbaum.

6          The following documents are relevant to the foregoing: Carter Bryant's
7  August and September 1998 drawings that he called "Bratz" (including, but not
8  limited to, those drawings identified by Carter Bryant in Exhibit 5 of his deposition as
9  being sketched in August 1998); publicly available materials that Bryant identified in
10  his deposition testimony as inspiring his conception of a line of dolls in August or
11  September of 1998, including but not limited to the August 1998 issue of *Seventeen*
12  *Magazine*; all of Carter Bryant's sketches and/or modifications of sketches relating to
13  Bratz concepts which were made by him after January 4, 1999 and prior to October
14  21, 2000; each and every document, prototype, and sample produced by Margaret
15  Leahy, including Documents and items marked as exhibits at her deposition and those
16  not marked as exhibits at her deposition; castings produced by Veronica Marlow at
17  her deposition, including photographs of such castings marked as exhibits at her
18  deposition; invoices submitted from Carter Bryant, Veronica Marlow, Anna Rhee,
19  Victoria O'Connor, and other invoices submitted by freelancers for work performed
20  on the Bratz project, all documents that refer to or evidence the work performed by
21  MGA employees and freelancers toward the reduction to practice of the first
22  generation of Bratz dolls during the period after October 19, 2000 through June 1,
23  2001, including but not limited to: Documents showing the development of the first
24  generation of Bratz dolls; Documents showing exchanges with the Hong Kong factory
25  regarding the development of the first generation of Bratz dolls; Documents showing
26  the timing of the development of packaging, fashion, and accessories for the first
27  generation of Bratz dolls; documents related to the January 2001 Hong Kong toy fair;
28  Documents related to the February 2001 New York toy fair; polyurethane samples of

1 | prototypes; rotocasts and sculpts in Hong Kong; all prototypes, samples, and tangible
2 | items produced by Margaret Leahy and Veronica Marlow, including items marked as
3 | exhibits at their depositions and those not marked as exhibits at their depositions;
4 | invoices submitted from Carter Bryant, Veronica Marlow, Anna Rhee, Victoria
5 | O'Connor, and other invoices submitted by freelancers for work performed on the
6 | Bratz project; Carter Bryant's August and September 1998 drawings that he called
7 | "Bratz" (including, but not limited to, those drawings identified by Carter Bryant in
8 | Exhibit 5 of his deposition as being sketched in August 1998); and all of Carter
9 | Bryant's sketches and/or modifications of sketches relating to Bratz concepts which
10 | were made by him after January 4, 1999 and prior to October 21, 2000, Carter
11 | Bryant's August and September 1998 drawings that he called "Bratz" (including, but
12 | not limited to, those drawings identified by Carter Bryant in Exhibit 5 of his
13 | deposition as being sketched in August 1998); publicly available materials that Bryant
14 | identified in his deposition testimony as inspiring his conception of a line of dolls in
15 | August or September of 1998, including but not limited to the August 1998 issue of
16 | *Seventeen Magazine*; Mattel's Brand Directional Outlines; analyses and assessments
17 | of Mattel's marketing strategies prepared and/or produced by Young and Rubicam
18 | Brands and Peterson Milla Hooks; Mattel's Marketing Department assessments of
19 | Mattel's advertising and branding strategies; Mattel's Creative Briefs; Documents
20 | generated by Mattel Worldwide Consumer Research relating to any aspect of the
21 | market for fashion dolls, including without limitation Bratz, My Scene, and Barbie;
22 | each and every document, prototype, and sample produced by Margaret Leahy,
23 | including Documents and items marked as exhibits at her deposition and those not
24 | marked as exhibits at her deposition; castings produced by Veronica Marlow at her
25 | deposition, including photographs of such castings marked at her deposition; invoices
26 | submitted from Carter Bryant, Veronica Marlow, Anna Rhee, Victoria O'Connor, and
27 | other invoices submitted by freelancers for work performed on the Bratz project; all of
28 | Carter Bryant's sketches and/or modifications of sketches relating to Bratz concepts

EXHIBIT 25
PAGE 820

1 which were made by him after January 4, 1999 and prior to October 21, 2000; written
2 agreement between MGA and Carter Bryant, dated September 18, 2000 (M0001547-
3 M0001552).

4      F.     17 U.S.C. § 205(d)

5      Mattel cannot maintain its counterclaims against MGA Defendants because,
6 among other things, MGA Defendants acted with a good faith belief that Bryant
7 owned the rights to his original Bratz drawings and that his assignment of such rights
8 to MGA Defendants was valid and permissible. MGA acted in good faith when
9 Bryant transferred and MGA acquired all rights to the Bratz concept, because of the
10 following facts of which MGA was aware in the September to October 2000 time
11 period: (i) Bryant had an idea in August or September of 1998, when he was not
12 employed by Mattel, for a series of characters that he named Bratz that could be used
13 to create a line of fashion dolls; (ii) at the same time, Bryant sketched a series of
14 drawings to illustrate his conception; (iii) Bryant was the rightful owner of the
15 concepts reflected in his drawings and other representations of his ideas and of his
16 drawings; (iv) Bryant and his counsel, who MGA understood to have conducted an
17 investigation, represented and warranted to MGA that Bryant was the exclusive
18 originator and owner of his Bratz ideas and drawing and that no third party had any
19 interest or rights in the drawings or the ideas reflected in the drawings; (v) Bryant
20 came recommended by Veronica Marlow, a trusted freelancer who had worked for
21 MGA in the past; (vi) immediately upon entering into a written freelance agreement
22 with Bryant, Isaac Larian, the CEO of MGA, instructed Bryant to immediately resign
23 from Mattel (and to the extent that anyone at MGA knew or had reason to know that
24 Bryant had given two-weeks' notice at Mattel, his continuing presence at Mattel
25 during that notice period had nothing to do with MGA's efforts to invest in and
26 develop a line of dolls based on Bryant's concepts); (vii) assuming some part of the
27 Bratz concept was a feature that could have been protected by a design patent, any
28 such invention was not "conceived of" or "reduced to practice" prior to October 21,

35

1  2000, and such conception and reduction to practice were effectuated by Margaret
2  Leahy, working on behalf of MGA, after October 20, 2000 and before June 1, 2001,
3  along with other MGA agents and employees such as employees in Hong Kong and
4  Mercedeh Ward; and (viii) MGA perceived (correctly) that Bryant's concept for a
5  new line of dolls was one that needed considerable original, creative contributions and
6  development by skilled artists who would be retained by MGA.  MGA also perceived
7  (correctly) while Bryant's idea provided a starting point, a significant amount of time,
8  skill, resources, and original creative effort would be required to create a line of dolls
9  that would have a chance of succeeding in the highly competitive fashion doll market,
10  historically dominated by Mattel's Barbie.  MGA thus retained for that purpose
11  skilled artists, including Margaret Leahy, who worked for MGA as a sculptor
12  throughout the relevant time period, and face painter Anna Rhee.  Considerable
13  contributions to the development of this product were also made by, among others,
14  Paula Garcia, who was responsible for the overall supervision of the project, Isaac
15  Larian, Mercedeh Ward, Veronica Marlow, and those involved in package design.
16  This major investment by MGA, and the risks it faced, confirms MGA's good faith.

17       Discovery is ongoing and the MGA Defendants reserve the right to supplement
18  this response and, consistent with its obligations under Federal Rule of Civil
19  Procedure 26(e), the MGA Defendants will supplement this response if they receive
20  additional responsive information.

21       The following persons have knowledge of facts and circumstances regarding
22  the foregoing: Carter Bryant; Bryant's mother, Janet Bryant; Bryant's father, Thomas
23  Bryant; Isaac Larian; Jeanne Galvano; Richard Irmen; Elise Cloonan; Ramona Prince;
24  Margaret Leahy; Veronica Marlow; Mercedeh Ward; Sarah Halpern; Paula Garcia;
25  Steve Tarmichael; Rebecca Harris; Cecilia Kwok; David Dees; Jesse Ramirez;
26  Samuel Wong; Edmond Lee; Steven Lee; Aileen Storer; Eric Yip; Leon Djiguerian;
27  Steffen Smith; Rachel Harris; Maggie Siu; Ben Ton; Sam Wong; Ray Wong; Ann
28  Wang; David Rosenbaum.

**EXHIBIT 25**
**PAGE 822**

1    The following documents are relevant to the foregoing: Carter Bryant's
2  August and September 1998 drawings that he called "Bratz" (including, but not
3  limited to, those drawings identified by Carter Bryant in Exhibit 5 of his deposition as
4  being sketched in August 1998); publicly available materials that Bryant identified in
5  his deposition testimony as inspiring his conception of a line of dolls in August or
6  September of 1998, including but not limited to the August 1998 issue of *Seventeen*
7  *Magazine*; all of Carter Bryant's sketches and/or modifications of sketches relating to
8  Bratz concepts which were made by him after January 4, 1999 and prior to October
9  21, 2000; each and every document, prototype, and sample produced by Margaret
10  Leahy, including Documents and items marked as exhibits at her deposition and those
11  not marked as exhibits at her deposition; castings produced by Veronica Marlow at
12  her deposition, including photographs of such castings marked as exhibits at her
13  deposition; invoices submitted from Carter Bryant, Veronica Marlow, Anna Rhee,
14  Victoria O'Connor, and other invoices submitted by freelancers for work performed
15  on the Bratz project, all documents that refer to or evidence the work performed by
16  MGA employees and freelancers toward the reduction to practice of the first
17  generation of Bratz dolls during the period after October 19, 2000 through June 1,
18  2001, including but not limited to: documents showing the development of the first
19  generation of Bratz dolls; documents showing exchanges with the Hong Kong factory
20  regarding the development of the first generation of Bratz dolls; documents showing
21  the timing of the development of packaging, fashion, and accessories for the first
22  generation of Bratz dolls; documents related to the January 2001 Hong Kong toy fair;
23  documents related to the February 2001 New York toy fair; polyurethane samples of
24  prototypes; rotocasts and sculpts in Hong Kong; all prototypes, samples, and tangible
25  items produced by Margaret Leahy and Veronica Marlow, including items marked as
26  exhibits at their depositions and those not marked as exhibits at their depositions;
27  invoices submitted from Carter Bryant, Veronica Marlow, Anna Rhee, Victoria
28  O'Connor, and other invoices submitted by freelancers for work performed on the

37

EXHIBIT 25
PAGE 823

1  Bratz project; Carter Bryant's August and September 1998 drawings that he called
2  "Bratz" (including, but not limited to, those drawings identified by Carter Bryant in
3  Exhibit 5 of his deposition as being sketched in August 1998); all of Carter Bryant's
4  sketches and/or modifications of sketches relating to Bratz concepts which were made
5  by him after January 4, 1999 and prior to October 21, 2000, Carter Bryant's August
6  and September 1998 drawings that he called "Bratz" (including, but not limited to,
7  those drawings identified by Carter Bryant in Exhibit 5 of his deposition as being
8  sketched in August 1998); publicly available materials that Bryant identified in his
9  deposition testimony as inspiring his conception of a line of dolls in August or
10 September of 1998, including but not limited to the August 1998 issue of *Seventeen*
11 *Magazine*; Mattel's Brand Directional Outlines; analyses and assessments of Mattel's
12 marketing strategies prepared and/or produced by Young and Rubicam Brands and
13 Peterson Milla Hooks; Mattel's Marketing Department assessments of Mattel's
14 advertising and branding strategies; Mattel's Creative Briefs; documents generated by
15 Mattel Worldwide Consumer Research relating to any aspect of the market for fashion
16 dolls, including without limitation Bratz, My Scene, and Barbie; each and every
17 document, prototype, and sample produced by Margaret Leahy, including documents
18 and items marked as exhibits at her deposition and those not marked as exhibits at her
19 deposition; castings produced by Veronica Marlow at her deposition, including
20 photographs of such castings marked at her deposition; invoices submitted from
21 Carter Bryant, Veronica Marlow, Anna Rhee, Victoria O'Connor, and other invoices
22 submitted by freelancers for work performed on the Bratz project; all of Carter
23 Bryant's sketches and/or modifications of sketches relating to Bratz concepts which
24 were made by him after January 4, 1999 and prior to October 21, 2000.

25         G.    Information Readily Ascertainable            **EXHIBIT 25**
                                                              **PAGE 824**
26         MGA Defendants cannot be liable, either on their own account or by
27 association with other defendants, for misappropriation of information that was
28 readily ascertainable by proper means at the time of the alleged acquisition or use.

1  Such information includes, but is not limited to, the identity of suppliers,
2  manufacturers, distributors and retailers; contact information for the same; and sales,
3  marketing and media data. In particular, the identity of suppliers of doll hair is not
4  trade secret or otherwise legally protected information. To date, Mattel has never
5  provided a complete account of what trade secret or confidential information it alleges
6  the MGA Defendants misused or misappropriated.

7      Discovery is ongoing and the MGA Defendants reserve the right to supplement
8  this response and, consistent with its obligations under Federal Rule of Civil
9  Procedure 26(e), the MGA Defendants will supplement this response if they receive
10 additional responsive information, including but not limited to information regarding
11 the bases for Mattel's misappropriation, conversion, and any similar contentions.

12      H.    Acts or Omissions of Others

13      Mattel's damages, if any, were caused by Mattel's own acts or omissions in not
14 drafting an enforceable Inventions Agreement that covers Carter Bryant's work and in
15 not acting on its alleged claims in a timely fashion. Mattel's damages, if any, were
16 also caused by Mattel's own commercial failures. In addition, even if Bryant had
17 presented his Bratz idea to Mattel (which he was not obligated to do), Mattel would
18 not have pursued it or achieved success in the market. Mattel avoids producing
19 products that would potentially "cannibalize" its Barbie sales, and carefully restricts
20 its so-called "flanker" brands to avoid such cannibalization. Mattel also resists
21 "edgy" product ideas like Bryant's Bratz idea, and has "watered down" such ideas in
22 the past. For example, in part for these reasons, Mattel has not achieved commercial
23 success at all comparable to that of Bratz with either its My Scene or Flavas products.
24 Mattel also decided not to proceed to market with the Toon Teens project, in part due
25 to Mattel's market research and focus groups indicating that some of the very features
26 Mattel claims Bratz shares with Toon Teens meant that the dolls would not appeal to
27 girls.

28

**EXHIBIT 25**
**PAGE 825**

1      The following persons have knowledge of facts and circumstances regarding

2 the foregoing:  Lilly Martinez, Elise Cloonan, Kislap Onchangco, and Cassidy Park;

3 other current and former Mattel employees, freelancers, or contractors involved in

4 fashion doll development and marketing, including but not limited to Toon Teens, My

5 Scene, and Flavas; current or former employees and contractors of Mattel's outside

6 marketing and advertising agencies, including Young & Rubicam Brands, including

7 but not limited to Kumi Croom, Peterson Milla Hooks, Brian Hooks, and Ogilvy &

8 Mather Worldwide.

9      The following documents are relevant to the foregoing: Mattel documents

10 related to development and marketing of flanker products; documents produced by

11 Mattel's outside marketing and advertising agencies, including Young & Rubicam

12 Brands, including but not limited to Kumi Croom, Peterson Milla Hooks, Brian

13 Hooks, and Ogilvy & Mather Worldwide; M12536-39, M14279-82, M14264-72,

14 PMH002340-48; Deposition Transcripts of Kumi Croom, Lilly Martinez, Elise

15 Cloonan, Kislap Onchangco, and Cassidy Park.

16      Discovery is ongoing and the MGA Defendants reserve the right to supplement

17 this response and, consistent with its obligations under Federal Rule of Civil

18 Procedure 26(e), the MGA Defendants will supplement this response if they receive

19 additional responsive information.

20      I.    Estoppel

EXHIBIT 25
PAGE 826

21      Mattel's counterclaims are barred in whole or in part by the equitable doctrine

22 of estoppel because, among other things, Mattel intentionally delayed taking legal

23 action against MGA or Carter Bryant for several years after the launch of Bratz in the

24 belief that Mattel would be able to drive Bratz (and as a result, drive MGA) out of the

25 market for fashion dolls and/or the belief that Mattel did not have any rights under the

26 "Inventions Agreement" as against Bryant, based on its own interpretations of the

27 "Inventions Agreement," and on the advice that Mattel received from in-house and

28 outside counsel.  As a result, Mattel only took legal action well after MGA had

1 invested substantial amounts of capital and creative and innovative efforts into the
2 Bratz line of dolls and had experienced enormous success in the marketplace.

3     A report from Bryant's exit interview at Mattel shows that Bryant told Mattel's
4 human resources representative he was leaving because an "[o]pportunity arose; had
5 to take it." Mattel has acknowledged that employees leaving under similar
6 circumstances to work for an unnamed competitor have "caused Mattel to begin
7 investigating their activities."

8     Furthermore, numerous Mattel employees knew and/or believed in the summer
9 of 2001 that Carter Bryant was involved in the development and introduction of the
10 Bratz line. This knowledge and/or these beliefs by Mattel employees went well
11 beyond mere "rumor and innuendo," as has been suggested by Mattel. In its
12 interrogatory responses, Mattel also asserts that Bryant used several "other Mattel
13 employees" to work on the Bratz dolls so that they "had been designed and were far
14 along in development during the time that Bryant was employed by Mattel."

15     Shortly after Bratz dolls were in retail stores in the United States in or about
16 September 2001, Mattel knew or was on notice that Carter Bryant was involved in the
17 development of that line. Mattel now asserts in this lawsuit that the idea for Bratz
18 was a violation of rights that Mattel had in a proposed flanker brand called "Toon
19 Teens," which Mattel was developing in the summer of 1999, but never introduced to
20 market. In this connection, during 2001, Toon Teens samples were taken out of
21 storage by Mattel employees and delivered to Mattel's legal department for analysis
22 of possible copyright infringement and other claims against Bryant and MGA.

23     Mattel knew Bryant's role in Bratz and was investigating possible claims *at
24 least as early as summer 2001*, when Bratz came out. Margaret Leahy, the third-party
25 sculptor of Bratz, testified that in the summer of 2001 a friend from Mattel was
26 "grilling" her, "like somebody put her up to it," about whether "Carter [was] the
27 designer on the doll or what was [MGA employee and former Mattel employee] Paula
28

**EXHIBIT 25**
**PAGE 827**

41

1 [Garcia's] involvement" in Bratz. Leahy testified that she told the Mattel employee
2 that "Carter initially came up with a design and Paula carried it out."

3        Mattel actively investigated Bryant's role in creating Bratz in 2001 and 2002.
4 Mattel's internal investigative files confirm that Mattel commenced an official
5 investigation into whether Bryant stole the Bratz idea in March 2002. Mattel admitted
6 that in 2002 it investigated "rumor and innuendo that Bryant may be working with
7 MGA on Bratz," including whether "Bryant ... plagiarized [Mattel product] 'Toon
8 Teens' and created Bratz dolls for MGA" and whether Bryant helped MGA create
9 Bratz "[w]hile he was working with Mattel." Mattel's CEO Robert Eckert received
10 an "anonymous letter" on or about August 5, 2002 that alleged that Bryant helped
11 MGA create Bratz while working for Mattel. As part of an official investigation
12 requested by Mattel CEO Robert Eckert in August 2002 as to whether Bryant helped
13 MGA create Bratz "[w]hile he was working with Mattel," Mattel's head of security,
14 Richard De Anda, wrote that he had been "aware of this situation and ... working on
15 it for several months" but it was in the hands of Mattel's attorneys. Testimony from
16 former Mattel employee Elise Cloonan confirms that by at least late 2001, Mattel's
17 lawyers were conducting an investigation involving Bryant's work on Bratz in the
18 design department.

19        On March 15, 2002, Mattel opened an investigative file on MGA and Isaac
20 Larian after receiving information from Evelyn Viohl and Ivy Ross that MGA had
21 recently hired a number of former Mattel employees and was reportedly
22 manufacturing products that appeared to be Mattel designs.          **EXHIBIT 25**
                                                                       **PAGE 828**
23        Mattel has also forfeited any right it may have had to enforce Paragraph 3-a of
24 the "Inventions Agreement" against Carter Bryant as a result of laches, estoppel,
25 acquiescence, and waiver. MGA is informed and believes that it was common
26 knowledge at Mattel that many Mattel employees employed in the Mattel design
27 center worked on a freelance basis for third parties, including Mattel competitors,
28 and/or on their own projects with the anticipation that such projects eventually would

                                          42

1  be offered for sale to third parties, including Mattel competitors. Mattel employees
2  performed non-Mattel work while employed by Mattel and Mattel acquiesced to this
3  moonlighting. For example, Robert Best developed a fashion line while employed at
4  Mattel. Best disclosed this to Mattel and was not terminated. Joni Pratt created
5  volleyball and basketball books for her daughter's high school outside of work, along
6  with invitation and wrapping paper. Pratt testified that she showed these works to her
7  supervisor at Mattel so there could be no misunderstanding that it was not related to
8  her work at Mattel. Pratt has not disclosed everything she has drawn outside of work
9  and testified that she does not feel she has an obligation to show her supervisors
10 everything she has drawn outside of work. Lori Sipos, a designer at Mattel, created
11 puppets as a hobby while she worked at Mattel. Sipos told Jill Nordquist about her
12 hobby when showing her one of her puppets, but she did not tell Nordquist about the
13 puppets in an effort to "report" her work. Nordquist testified that she was informed
14 about the designs other people created outside of work in the course of sharing
15 hobbies and not as part of an effort to report their works. Veronica Marlow helped
16 Dianne Gavin develop a line of handbags while both were employed at Mattel. At her
17 deposition, Veronica Marlow testified that Isabel Cabrera, Beatrice Morales, and
18 Maria Elena Salazar worked with her on fashions for Bratz while they were employed
19 by Mattel. Additionally, some of Mattel's sample makers made wedding gowns and
20 did nails on the weekends and evenings and some of Mattel's hair rooters worked in
21 hair salons on weekends. During her deposition, Margaret Leahy testified that her
22 Mattel supervisor, Michael Hebden, suggested to her while she was working for
23 Mattel, that she seek out moonlighting work. During her deposition, Elise Cloonan
24 testified that the practice was so widespread that there was even a name for it at
25 Mattel: a "G-job." Indeed, Richard De Anda, Mattel's Vice President of Global
26 Security, testified at his deposition that he also moonlighted as an expert witness and
27 consultant while working for Mattel. De Anda further testified that he does not
28 believe that Mattel owns or has a claim on the work he does for himself. Despite

43

1 knowledge of this activity, Mattel rarely, if ever, enforced any rights it may have had
2 to prohibit such moonlighting.

3         Issues concerning this defense are currently the subject of outstanding
4 discovery requests. In particular, Mattel has staunchly refused to provide discovery
5 that would address when, in fact, Mattel first had reason to suspect Bryant's
6 involvement in Bratz, his alleged breach of contract, his work for MGA, and Mattel's
7 alleged "true owner[ship] of Bratz," in spite of numerous interrogatory requests,
8 document requests, requests for admission, and deposition notices. Defendants'
9 concerns regarding Mattel's discovery abuses have recently been addresses in
10 multiple motions to compel both before Judge Infante and Judge Larson. Indeed, on
11 January 3, 2008, Judge Infante overruled all of Mattel's objections and compelled
12 discovery relevant to Defendants' statute of limitations and laches defenses. Factual
13 investigation and discovery is ongoing and the MGA Defendants reserve the right to
14 supplement this response and, consistent with its obligations under Federal Rule of
15 Civil Procedure 26(e), the MGA Defendants will supplement this response if they
16 receive additional responsive information.                    **EXHIBIT 25**
                                                                 **PAGE 830**
17         The following persons have knowledge of facts and circumstances regarding
18 the foregoing: Richard De Anda; Robert Eckert; Alan Kaye; Michele McShane;
19 Robert Normile; Margaret Leahy; Elise Cloonan; Veronica Marlow; Ilana Raynes;
20 Michael Hebden; Frederick Jackson; Ray Moore; Joe Benet; Carolyn Oros; Hung
21 Lee; Diana Troup; Cynthia Young; Margo Michelle; Kitty Black-Perkins; Janet
22 Unalp; Debbie Meyer; Carol Spencer; Jennifer Kiernan; Bill Kelly; Steve McAdam;
23 Howie Jesser, Ken Smith; Michael Moore; Jill Thomas; Tom Hodges; Julie Ashe
24 Nobles; Morris Batay; Bruce Ryniker; Larry Wood; Eric Ostendorf; Steve Ryniker;
25 Melody Hansen; Carter Bryant; Anna Rhee; Joe Feldman; Janet Blaser; Bill
26 Greening; Roxanna Powell; Ken O'Leary; Lily Martinez; Cassidy Park; Ivy Ross; Joe
27 Franke; Ann Driskill; Robert Best; Anne Olson; Dennis Soai; Kislap Ongchango;
28 Nick Patean; Jerry Richardson; Spencer Davis; Bill Martinez; Barbara Meyer; Larry

44

1 Clayton; Elon Dancer; Maury Kessel; Chris McAdam; Michael Norgren; Chris Sesto;
2 Paul Sesto; Michael Hastey; Sullivan Hastey; Mark Rigger; Jeff Fuller; Tim Lewis;
3 Tim Correa; Doc O'Connor; Myziue Hamilton; Joan Gaynor; Patty Gaynor; Mina
4 Mirkazemi; Mercedeh Ward; Tony Yao; Aldo Fazilli; Isabel Cabrera; Beatrice
5 Morales; Pedro Salazar; Maria Elena Salazar; Roger Simoneau, Jill Nordquist, Joni
6 Pratt, Tina Tomiyama, and Evelyn Viohl.

7        The following documents may be relevant to the foregoing: Transcript from
8 the Deposition of Margaret Leahy, Transcript from the Deposition of Elise Cloonan,
9 Transcript from the Deposition of Alan Kaye, Transcript from the Deposition of
10 Richard De Anda, Transcript from the Deposition of Ann Driskill, Transcript from the
11 Deposition of Jill Nordquist, Transcript from the Deposition of Veronica Marlow,
12 Transcript from the Deposition of Joni Pratt, Mattel's Responses and Supplemental
13 Responses to Defendants' Interrogatories, Mattel's Internal Investigative Files
14 regarding its investigations into Carter Bryant, MGA, or Isaac Larian, all Mattel
15 worldwide consumer research reports produced by Mattel, internal marketing
16 documents analyzing the performance of Bratz in the marketplace, M0001654-55,
17 M0074397-74402, and M0074307-0074396.

18        J.    Acquiescence

19        Mattel's counterclaims are barred in whole or in part by acquiescence because,
20 Mattel intentionally delayed taking legal action against MGA or Carter Bryant for
21 several years after the launch of Bratz in the belief that Mattel would be able to drive
22 Bratz (and as a result, drive MGA) out of the market for fashion dolls and/or the belief
23 that Mattel did not have any rights under the "Inventions Agreement" as against
24 Bryant, based on its own interpretations of the "Inventions Agreement," and on the
25 advice that Mattel received from in-house and outside counsel.  As a result, Mattel
26 only took legal action well after MGA had invested substantial amounts of capital and
27 creative and innovative efforts into the Bratz line of dolls and had experienced
28 enormous success in the marketplace.

**EXHIBIT 25**
**PAGE 831**

45

1      A report from Bryant's exit interview at Mattel shows that Bryant told Mattel's
2  human resources representative he was leaving because an "[o]pportunity arose; had
3  to take it." Mattel has acknowledged that employees leaving under similar
4  circumstances to work for an unnamed competitor have "caused Mattel to begin
5  investigating their activities."

6      Furthermore, numerous Mattel employees knew and/or believed in the summer
7  of 2001 that Carter Bryant was involved in the development and introduction of the
8  Bratz line. This knowledge and/or these beliefs by Mattel employees went well
9  beyond mere "rumor and innuendo," as has been suggested by Mattel. In its
10 interrogatory responses, Mattel also asserts that Bryant used several "other Mattel
11 employees" to work on the Bratz dolls so that they "had been designed and were far
12 along in development during the time that Bryant was employed by Mattel."

13     Shortly after Bratz dolls were in retail stores in the United States in or about
14 September 2001, Mattel knew or was on notice that Carter Bryant was involved in the
15 development of that line. Mattel now asserts in this lawsuit that the idea for Bratz
16 was a violation of rights that Mattel had in a proposed flanker brand called "Toon
17 Teens," which Mattel was developing in the summer of 1999, but never introduced to
18 market. In this connection, during 2001, Toon Teens samples were taken out of
19 storage by Mattel employees and delivered to Mattel's legal department for analysis
20 of possible copyright infringement and other claims against Bryant and MGA.

21     Mattel knew Bryant's role in Bratz and was investigating possible claims *at
22 least as early as summer 2001*, when Bratz came out. Margaret Leahy, the third-party
23 sculptor of Bratz, testified that in the summer of 2001 a friend from Mattel was
24 "grilling" her, "like somebody put her up to it," about whether "Carter [was] the
25 designer on the doll or what was [MGA employee and former Mattel employee] Paula
26 [Garcia's] involvement" in Bratz. Leahy testified that she told the Mattel employee
27 that "Carter initially came up with a design and Paula carried it out."

28

**EXHIBIT 25**
**PAGE 832**

46

1    Mattel actively investigated Bryant's role in creating Bratz in 2001 and 2002.
2 Mattel's internal investigative files confirm that Mattel commenced an official
3 investigation into whether Bryant stole the Bratz idea in March 2002. Mattel admitted
4 that in 2002 it investigated "rumor and innuendo that Bryant may be working with
5 MGA on Bratz," including whether "Bryant ... plagiarized [Mattel product] 'Toon
6 Teens' and created Bratz dolls for MGA" and whether Bryant helped MGA create
7 Bratz "[w]hile he was working with Mattel." Mattel's CEO Robert Eckert received
8 an "anonymous letter" on or about August 5, 2002 that alleged that Bryant helped
9 MGA create Bratz while working for Mattel. As part of an official investigation
10 requested by Mattel CEO Robert Eckert in August 2002 as to whether Bryant helped
11 MGA create Bratz "[w]hile he was working with Mattel," Mattel's head of security,
12 Richard De Anda, wrote that he had been "aware of this situation and ... working on
13 it for several months" but it was in the hands of Mattel's attorneys. Testimony from
14 former Mattel employee Elise Cloonan confirms that by at least late 2001, Mattel's
15 lawyers were conducting an investigation involving Bryant's work on Bratz in the
16 design department.

17    On March 15, 2002, Mattel opened an investigative file on MGA and Isaac
18 Larian after receiving information from Evelyn Viohl and Ivy Ross that MGA had
19 recently hired a number of former Mattel employees and was reportedly
20 manufacturing products that appeared to be Mattel designs.      **EXHIBIT 25**
                                                                   **PAGE 833**

21    Mattel has also forfeited any right it may have had to enforce Paragraph 3-a of
22 the "Inventions Agreement" against Carter Bryant as a result of laches, estoppel,
23 acquiescence, and waiver. MGA is informed and believes that it was common
24 knowledge at Mattel that many Mattel employees employed in the Mattel design
25 center worked on a freelance basis for third parties, including Mattel competitors,
26 and/or on their own projects with the anticipation that such projects eventually would
27 be offered for sale to third parties, including Mattel competitors. Mattel employees
28 performed non-Mattel work while employed by Mattel and Mattel acquiesced to this