1  moonlighting.  For example, Robert Best developed a fashion line while employed at
2  Mattel.  Best disclosed this to Mattel and was not terminated.  Joni Pratt created
3  volleyball and basketball books for her daughter's high school outside of work, along
4  with invitation and wrapping paper.  Pratt testified that she showed these works to her
5  supervisor at Mattel so there could be no misunderstanding that it was not related to
6  her work at Mattel.  Pratt has not disclosed everything she has drawn outside of work
7  and testified that she does not feel she has an obligation to show her supervisors
8  everything she has drawn outside of work.  Lori Sipos, a designer at Mattel, created
9  puppets as a hobby while she worked at Mattel.  Sipos told Jill Nordquist about her
10  hobby when showing her one of her puppets, but she did not tell Nordquist about the
11  puppets in an effort to "report" her work.  Nordquist testified that she was informed
12  about the designs other people created outside of work in the course of sharing
13  hobbies and not as part of an effort to report their works.  Veronica Marlow helped
14  Dianne Gavin develop a line of handbags while both were employed at Mattel.  At her
15  deposition, Veronica Marlow testified that Isabel Cabrera, Beatrice Morales, and
16  Maria Elena Salazar worked with her on fashions for Bratz while they were employed
17  by Mattel.  Additionally, some of Mattel's sample makers made wedding gowns and
18  did nails on the weekends and evenings and some of Mattel's hair rooters worked in
19  hair salons on weekends.  During her deposition, Margaret Leahy testified that her
20  Mattel supervisor, Michael Hebden, suggested to her while she was working for
21  Mattel, that she seek out moonlighting work.  During her deposition, Elise Cloonan
22  testified that the practice was so widespread that there was even a name for it at
23  Mattel: a "G-job."  Indeed, Richard De Anda, Mattel's Vice President of Global
24  Security, testified at his deposition that he also moonlighted as an expert witness and
25  consultant while working for Mattel.  De Anda further testified that he does not
26  believe that Mattel owns or has a claim on the work he does for himself.  Despite
27  knowledge of this activity, Mattel rarely, if ever, enforced any rights it may have had
28  to prohibit such moonlighting.

**EXHIBIT 25**
**PAGE 834**

MGA'S RESPONSE TO MATTEL'S AMEND. SUPP. ROG RE AFFIRM. DEFENSES                NO. CV 04-9049 SGL (RNBx)

1   Issues concerning this defense are currently the subject of outstanding
2 discovery requests.  In particular, Mattel has staunchly refused to provide discovery
3 that would address when, in fact, Mattel first had reason to suspect Bryant's
4 involvement in Bratz, his alleged breach of contract, his work for MGA, and Mattel's
5 alleged "true owner[ship] of Bratz," in spite of numerous interrogatory requests,
6 document requests, requests for admission, and deposition notices.  Defendants'
7 concerns regarding Mattel's discovery abuses have recently been addresses in
8 multiple motions to compel both before Judge Infante and Judge Larson.  Indeed, on
9 January 3, 2008, Judge Infante overruled all of Mattel's objections and compelled
10 discovery relevant to Defendants' statute of limitations and laches defenses.  Factual
11 investigation and discovery is ongoing and the MGA Defendants reserve the right to
12 supplement this response and, consistent with its obligations under Federal Rule of
13 Civil Procedure 26(e), the MGA Defendants will supplement this response if they
14 receive additional responsive information.

15   The following persons have knowledge of facts and circumstances regarding
16 the foregoing:  Richard De Anda; Robert Eckert; Alan Kaye; Michele McShane;
17 Robert Normile; Margaret Leahy; Elise Cloonan; Veronica Marlow; Ilana Raynes;
18 Michael Hebden; Frederick Jackson; Ray Moore; Joe Benet; Carolyn Oros; Hung
19 Lee; Diana Troup; Cynthia Young; Margo Michelle; Kitty Black-Perkins; Janet
20 Unalp; Debbie Meyer; Carol Spencer; Jennifer Kiernan; Bill Kelly; Steve McAdam;
21 Howie Jesser, Ken Smith; Michael Moore; Jill Thomas; Tom Hodges; Julie Ashe
22 Nobles; Morris Batay; Bruce Ryniker; Larry Wood; Eric Ostendorf; Steve Ryniker;
23 Melody Hansen; Carter Bryant; Anna Rhee; Joe Feldman; Janet Blaser; Bill
24 Greening; Roxanna Powell; Ken O'Leary; Lily Martinez; Cassidy Park; Ivy Ross; Joe
25 Franke; Ann Driskill; Robert Best; Anne Olson; Dennis Soai; Kislap Ongchango;
26 Nick Patean; Jerry Richardson; Spencer Davis; Bill Martinez; Barbara Meyer; Larry
27 Clayton; Elon Dancer; Maury Kessel; Chris McAdam; Michael Norgren; Chris Sesto;
28 Paul Sesto; Michael Hastey; Sullivan Hastey; Mark Rigger; Jeff Fuller; Tim Lewis;

49

EXHIBIT 25
PAGE 835

1 Tim Correa; Doc O'Connor; Myziue Hamilton; Joan Gaynor; Patty Gaynor; Mina
2 Mirkazemi; Mercedeh Ward; Tony Yao; Aldo Fazilli; Isabel Cabrera; Beatrice
3 Morales; Pedro Salazar; Maria Elena Salazar; Roger Simoneau, Jill Nordquist, Joni
4 Pratt, Tina Tomiyama, and Evelyn Viohl.

5       The following documents may be relevant to the foregoing:  Leahy Depo,
6 Cloonan Depo, Kaye Depo, De Anda Depo, Driskill Depo, Nordquist Depo, Marlow
7 Depo, Pratt Depo Mattel's Responses and Supplemental Responses to Defendants'
8 Interrogatories, Mattel's Internal Investigative Files regarding its investigations into
9 Carter Bryant, MGA, or Isaac Larian, all Mattel worldwide consumer research reports
10 produced by Mattel, internal marketing documents analyzing the performance of
11 Bratz in the marketplace, M0001654-55, M0074397-74402, and M0074307-0074396.

12       K.      Failure to Mitigate

13       MGA Defendants deny that Mattel suffered any damages, but even if it did,
14 Mattel failed to take reasonable steps to mitigate those purported damages. Mattel
15 intentionally delayed taking legal action against MGA or Carter Bryant for several
16 years after the launch of Bratz in the belief that Mattel would be able to drive Bratz
17 (and as a result, drive MGA) out of the market for fashion dolls and/or the belief that
18 Mattel did not have any rights under the "Inventions Agreement" as against Bryant,
19 based on its own interpretations of the "Inventions Agreement," and on the advice that
20 Mattel received from in-house and outside counsel.  As a result, Mattel only took
21 legal action well after MGA had invested substantial amounts of capital and creative
22 and innovative efforts into the Bratz line of dolls and had experienced enormous
23 success in the marketplace.

24       A report from Bryant's exit interview at Mattel shows that Bryant told Mattel's
25 human resources representative he was leaving because an "[o]pportunity arose; had
26 to take it." Mattel has acknowledged that employees leaving under similar
27 circumstances to work for an unnamed competitor have "caused Mattel to begin
28 investigating their activities."

EXHIBIT 25
PAGE 836

50

1    Furthermore, numerous Mattel employees knew and/or believed in the summer
2  of 2001 that Carter Bryant was involved in the development and introduction of the
3  Bratz line.  This knowledge and/or these beliefs by Mattel employees went well
4  beyond mere "rumor and innuendo," as has been suggested by Mattel.  In its
5  interrogatory responses, Mattel also asserts that Bryant used several "other Mattel
6  employees" to work on the Bratz dolls so that they "had been designed and were far
7  along in development during the time that Bryant was employed by Mattel."

8    Shortly after Bratz dolls were in retail stores in the United States in or about
9  September 2001, Mattel knew or was on notice that Carter Bryant was involved in the
10  development of that line.  Mattel now asserts in this lawsuit that the idea for Bratz
11  was a violation of rights that Mattel had in a proposed flanker brand called "Toon
12  Teens," which Mattel was developing in the summer of 1999, but never introduced to
13  market.  In this connection, during 2001, Toon Teens samples were taken out of
14  storage by Mattel employees and delivered to Mattel's legal department for analysis
15  of possible copyright infringement and other claims against Bryant and MGA.

16    Mattel knew Bryant's role in Bratz and was investigating possible claims *at*
17  *least as early as summer 2001*, when Bratz came out.  Margaret Leahy, the third-party
18  sculptor of Bratz, testified that in the summer of 2001 a friend from Mattel was
19  "grilling" her, "like somebody put her up to it," about whether "Carter [was] the
20  designer on the doll or what was [MGA employee and former Mattel employee] Paula
21  [Garcia's] involvement" in Bratz.  Leahy testified that she told the Mattel employee
22  that "Carter initially came up with a design and Paula carried it out."      **EXHIBIT 25**
                                                                                   **PAGE 837**

23    Mattel actively investigated Bryant's role in creating Bratz in 2001 and 2002.
24  Mattel's internal investigative files confirm that Mattel commenced an official
25  investigation into whether Bryant stole the Bratz idea in March 2002.  Mattel admitted
26  that in 2002 it investigated "rumor and innuendo that Bryant may be working with
27  MGA on Bratz," including whether "Bryant ... plagiarized [Mattel product] 'Toon
28  Teens' and created Bratz dolls for MGA" and whether Bryant helped MGA create

                                         51

1 Bratz "[w]hile he was working with Mattel." Mattel's CEO Robert Eckert received
2 an "anonymous letter" on or about August 5, 2002 that alleged that Bryant helped
3 MGA create Bratz while working for Mattel. As part of an official investigation
4 requested by Mattel CEO Robert Eckert in August 2002 as to whether Bryant helped
5 MGA create Bratz "[w]hile he was working with Mattel," Mattel's head of security,
6 Richard De Anda, wrote that he had been "aware of this situation and ... working on
7 it for several months" but it was in the hands of Mattel's attorneys. Testimony from
8 former Mattel employee Elise Cloonan confirms that by at least late 2001, Mattel's
9 lawyers were conducting an investigation involving Bryant's work on Bratz in the
10 design department.

11     On March 15, 2002, Mattel opened an investigative file on MGA and Isaac
12 Larian after receiving information from Evelyn Viohl and Ivy Ross that MGA had
13 recently hired a number of former Mattel employees and was reportedly
14 manufacturing products that appeared to be Mattel designs.          **EXHIBIT 25**
                                                                        **PAGE 838**

15     Mattel has also forfeited any right it may have had to enforce Paragraph 3-a of
16 the "Inventions Agreement" against Carter Bryant as a result of laches, estoppel,
17 acquiescence, and waiver. MGA is informed and believes that it was common
18 knowledge at Mattel that many Mattel employees employed in the Mattel design
19 center worked on a freelance basis for third parties, including Mattel competitors,
20 and/or on their own projects with the anticipation that such projects eventually would
21 be offered for sale to third parties, including Mattel competitors. Mattel employees
22 performed non-Mattel work while employed by Mattel and Mattel acquiesced to this
23 moonlighting. For example, Robert Best developed a fashion line while employed at
24 Mattel. Best disclosed this to Mattel and was not terminated. Joni Pratt created
25 volleyball and basketball books for her daughter's high school outside of work, along
26 with invitation and wrapping paper. Pratt testified that she showed these works to her
27 supervisor at Mattel so there could be no misunderstanding that it was not related to
28 her work at Mattel. Pratt has not disclosed everything she has drawn outside of work

MGA'S RESPONSE TO MATTEL'S AMEND. SUPP. ROG RE AFFIRM. DEFENSES          NO. CV 04-9049 SGL (RNBx)

1  and testified that she does not feel she has an obligation to show her supervisors
2  everything she has drawn outside of work. Lori Sipos, a designer at Mattel, created
3  puppets as a hobby while she worked at Mattel. Sipos told Jill Nordquist about her
4  hobby when showing her one of her puppets, but she did not tell Nordquist about the
5  puppets in an effort to "report" her work. Nordquist testified that she was informed
6  about the designs other people created outside of work in the course of sharing
7  hobbies and not as part of an effort to report their works. Veronica Marlow helped
8  Dianne Gavin develop a line of handbags while both were employed at Mattel. At her
9  deposition, Veronica Marlow testified that Isabel Cabrera, Beatrice Morales, and
10  Maria Elena Salazar worked with her on fashions for Bratz while they were employed
11  by Mattel. Additionally, some of Mattel's sample makers made wedding gowns and
12  did nails on the weekends and evenings and some of Mattel's hair rooters worked in
13  hair salons on weekends. During her deposition, Margaret Leahy testified that her
14  Mattel supervisor, Michael Hebden, suggested to her while she was working for
15  Mattel, that she seek out moonlighting work. During her deposition, Elise Cloonan
16  testified that the practice was so widespread that there was even a name for it at
17  Mattel: a "G-job." Indeed, Richard De Anda, Mattel's Vice President of Global
18  Security, testified at his deposition that he also moonlighted as an expert witness and
19  consultant while working for Mattel. De Anda further testified that he does not
20  believe that Mattel owns or has a claim on the work he does for himself. Despite
21  knowledge of this activity, Mattel rarely, if ever, enforced any rights it may have had
22  to prohibit such moonlighting.

**EXHIBIT 25**
**PAGE 839**

23      Issues concerning this defense are currently the subject of outstanding
24  discovery requests. In particular, Mattel has staunchly refused to provide discovery
25  that would address when, in fact, Mattel first had reason to suspect Bryant's
26  involvement in Bratz, his alleged breach of contract, his work for MGA, and Mattel's
27  alleged "true owner[ship] of Bratz," in spite of numerous interrogatory requests,
28  document requests, requests for admission, and deposition notices. Defendants'

1  concerns regarding Mattel's discovery abuses have recently been addresses in
2  multiple motions to compel both before Judge Infante and Judge Larson. Indeed, on
3  January 3, 2008, Judge Infante overruled all of Mattel's objections and compelled
4  discovery relevant to Defendants' statute of limitations and laches defenses. Factual
5  investigation and discovery is ongoing and the MGA Defendants reserve the right to
6  supplement this response and, consistent with its obligations under Federal Rule of
7  Civil Procedure 26(e), the MGA Defendants will supplement this response if they
8  receive additional responsive information.

9      The following persons have knowledge of facts and circumstances regarding
10 the foregoing:  Richard De Anda; Robert Eckert; Alan Kaye; Michele McShane;
11 Robert Normile; Margaret Leahy; Elise Cloonan; Veronica Marlow; Ilana Raynes;
12 Michael Hebden; Frederick Jackson; Ray Moore; Joe Benet; Carolyn Oros; Hung
13 Lee; Diana Troup; Cynthia Young; Margo Michelle; Kitty Black-Perkins; Janet
14 Unalp; Debbie Meyer; Carol Spencer; Jennifer Kiernan; Bill Kelly; Steve McAdam;
15 Howie Jesser, Ken Smith; Michael Moore; Jill Thomas; Tom Hodges; Julie Ashe
16 Nobles; Morris Batay; Bruce Ryniker; Larry Wood; Eric Ostendorf; Steve Ryniker;
17 Melody Hansen; Carter Bryant; Anna Rhee; Joe Feldman; Janet Blaser; Bill
18 Greening; Roxanna Powell; Ken O'Leary; Lily Martinez; Cassidy Park; Ivy Ross; Joe
19 Franke; Ann Driskill; Robert Best; Anne Olson; Dennis Soai; Kislap Ongchango;
20 Nick Patean; Jerry Richardson; Spencer Davis; Bill Martinez; Barbara Meyer; Larry
21 Clayton; Elon Dancer; Maury Kessel; Chris McAdam; Michael Norgren; Chris Sesto;
22 Paul Sesto; Michael Hastey; Sullivan Hastey; Mark Rigger; Jeff Fuller; Tim Lewis;
23 Tim Correa; Doc O'Connor; Myziue Hamilton; Joan Gaynor; Patty Gaynor; Mina
24 Mirkazemi; Mercedeh Ward; Tony Yao; Aldo Fazilli; Isabel Cabrera; Beatrice
25 Morales; Pedro Salazar; Maria Elena Salazar; Roger Simoneau, Jill Nordquist. Joni
26 Pratt, Tina Tomiyama, and Evelyn Viohi.

EXHIBIT 25
PAGE 840

27      The following documents may be relevant to the foregoing: Transcript from
28 the Deposition of Margaret Leahy, Transcript from the Deposition of Elise Cloonan,

54

1 Transcript from the Deposition of Alan Kaye, Transcript from the Deposition of

2 Richard De Anda, Transcript from the Deposition of Ann Driskill, Transcript from the

3 Deposition of Jill Nordquist, Transcript from the Deposition of Veronica Marlow,

4 Transcript from the Deposition of Joni Pratt, Mattel's Responses and Supplemental

5 Responses to Defendants' Interrogatories, Mattel's Internal Investigative Files

6 regarding its investigations into Carter Bryant, MGA, or Isaac Larian, all Mattel

7 worldwide consumer research reports produced by Mattel, internal marketing

8 documents analyzing the performance of Bratz in the marketplace, M0001654-55,

9 M0074397-74402, and M0074307-0074396.

10    L.    No Statutory Damages or Attorneys' Fees

11    Mattel is barred from recovering statutory damages and/or attorneys' fees

12 because it failed to register the copyrights that are purportedly at issue within the time

13 required by 17 U.S.C. § 412.

14    The following documents may be relevant to the foregoing: Mattel's copyright

15 registrations at issue in this case, including but not limited to Mattel's registration for

16 Toon Teens (M12564-M12565) and My Scene (M62033-62116), and Bratz (M59698-

17 M59761; M59579-M59609).

18    M.    Waiver

EXHIBIT 25
PAGE 841

19    Mattel's counterclaims are barred in whole or in part by waiver because,

20 among other things, Mattel intentionally delayed taking legal action against MGA or

21 Carter Bryant for several years after the launch of Bratz in the belief that Mattel

22 would be able to drive Bratz (and as a result, drive MGA) out of the market for

23 fashion dolls and/or the belief that Mattel did not have any rights under the

24 "Inventions Agreement" as against Bryant, based on its own interpretations of the

25 "Inventions Agreement," and on the advice that Mattel received from in-house and

26 outside counsel. As a result, Mattel only took legal action well after MGA had

27 invested substantial amounts of capital and creative and innovative efforts into the

28 Bratz line of dolls and had experienced enormous success in the marketplace.

55

1       A report from Bryant's exit interview at Mattel shows that Bryant told Mattel's
2   human resources representative he was leaving because an "[o]pportunity arose; had
3   to take it." Mattel has acknowledged that employees leaving under similar
4   circumstances to work for an unnamed competitor have "caused Mattel to begin
5   investigating their activities."

6       Furthermore, numerous Mattel employees knew and/or believed in the summer
7   of 2001 that Carter Bryant was involved in the development and introduction of the
8   Bratz line. This knowledge and/or these beliefs by Mattel employees went well
9   beyond mere "rumor and innuendo," as has been suggested by Mattel. In its
10  interrogatory responses, Mattel also asserts that Bryant used several "other Mattel
11  employees" to work on the Bratz dolls so that they "had been designed and were far
12  along in development during the time that Bryant was employed by Mattel."

13      Shortly after Bratz dolls were in retail stores in the United States in or about
14  September 2001, Mattel knew or was on notice that Carter Bryant was involved in the
15  development of that line. Mattel now asserts in this lawsuit that the idea for Bratz
16  was a violation of rights that Mattel had in a proposed flanker brand called "Toon
17  Teens," which Mattel was developing in the summer of 1999, but never introduced to
18  market. In this connection, during 2001, Toon Teens samples were taken out of
19  storage by Mattel employees and delivered to Mattel's legal department for analysis
20  of possible copyright infringement and other claims against Bryant and MGA.

21      Mattel knew Bryant's role in Bratz and was investigating possible claims *at*
22  *least as early as summer 2001*, when Bratz came out. Margaret Leahy, the third-party
23  sculptor of Bratz, testified that in the summer of 2001 a friend from Mattel was
24  "grilling" her, "like somebody put her up to it," about whether "Carter [was] the
25  designer on the doll or what was [MGA employee and former Mattel employee] Paula
26  [Garcia's] involvement" in Bratz. Leahy testified that she told the Mattel employee
27  that "Carter initially came up with a design and Paula carried it out."

28

1    Mattel actively investigated Bryant's role in creating Bratz in 2001 and 2002.
2  Mattel's internal investigative files confirm that Mattel commenced an official
3  investigation into whether Bryant stole the Bratz idea in March 2002. Mattel admitted
4  that in 2002 it investigated "rumor and innuendo that Bryant may be working with
5  MGA on Bratz," including whether "Bryant ... plagiarized [Mattel product] 'Toon
6  Teens' and created Bratz dolls for MGA" and whether Bryant helped MGA create
7  Bratz "[w]hile he was working with Mattel." Mattel's CEO Robert Eckert received
8  an "anonymous letter" on or about August 5, 2002 that alleged that Bryant helped
9  MGA create Bratz while working for Mattel. As part of an official investigation
10  requested by Mattel CEO Robert Eckert in August 2002 as to whether Bryant helped
11  MGA create Bratz "[w]hile he was working with Mattel," Mattel's head of security,
12  Richard De Anda, wrote that he had been "aware of this situation and ... working on
13  it for several months" but it was in the hands of Mattel's attorneys. Testimony from
14  former Mattel employee Elise Cloonan confirms that by at least late 2001, Mattel's
15  lawyers were conducting an investigation involving Bryant's work on Bratz in the
16  design department.

17    On March 15, 2002, Mattel opened an investigative file on MGA and Isaac
18  Larian after receiving information from Evelyn Viohl and Ivy Ross that MGA had
19  recently hired a number of former Mattel employees and was reportedly
20  manufacturing products that appeared to be Mattel designs.                    **EXHIBIT 25**
                                                                                 **PAGE 843**

21    Mattel has also forfeited any right it may have had to enforce Paragraph 3-a of
22  the "Inventions Agreement" against Carter Bryant as a result of laches, estoppel,
23  acquiescence, and waiver. MGA is informed and believes that it was common
24  knowledge at Mattel that many Mattel employees employed in the Mattel design
25  center worked on a freelance basis for third parties, including Mattel competitors,
26  and/or on their own projects with the anticipation that such projects eventually would
27  be offered for sale to third parties, including Mattel competitors. Mattel employees
28  performed non-Mattel work while employed by Mattel and Mattel acquiesced to this

1  moonlighting. For example, Robert Best developed a fashion line while employed at
2  Mattel. Best disclosed this to Mattel and was not terminated. Joni Pratt created
3  volleyball and basketball books for her daughter's high school outside of work, along
4  with invitation and wrapping paper. Pratt testified that she showed these works to her
5  supervisor at Mattel so there could be no misunderstanding that it was not related to
6  her work at Mattel. Pratt has not disclosed everything she has drawn outside of work
7  and testified that she does not feel she has an obligation to show her supervisors
8  everything she has drawn outside of work. Lori Sipos, a designer at Mattel, created
9  puppets as a hobby while she worked at Mattel. Sipos told Jill Nordquist about her
10 hobby when showing her one of her puppets, but she did not tell Nordquist about the
11 puppets in an effort to "report" her work. Nordquist testified that she was informed
12 about the designs other people created outside of work in the course of sharing
13 hobbies and not as part of an effort to report their works. Veronica Marlow helped
14 Dianne Gavin develop a line of handbags while both were employed at Mattel. At her
15 deposition, Veronica Marlow testified that Isabel Cabrera, Beatrice Morales, and
16 Maria Elena Salazar worked with her on fashions for Bratz while they were employed
17 by Mattel. Additionally, some of Mattel's sample makers made wedding gowns and
18 did nails on the weekends and evenings and some of Mattel's hair rooters worked in
19 hair salons on weekends. During her deposition, Margaret Leahy testified that her
20 Mattel supervisor, Michael Hebden, suggested to her while she was working for
21 Mattel, that she seek out moonlighting work. During her deposition, Elise Cloonan
22 testified that the practice was so widespread that there was even a name for it at
23 Mattel: a "G-job." Indeed, Richard De Anda, Mattel's Vice President of Global
24 Security, testified at his deposition that he also moonlighted as an expert witness and
25 consultant while working for Mattel. De Anda further testified that he does not
26 believe that Mattel owns or has a claim on the work he does for himself. Despite
27 knowledge of this activity, Mattel rarely, if ever, enforced any rights it may have had
28 to prohibit such moonlighting.

**EXHIBIT 25**
**PAGE 844**

1    Issues concerning this defense are currently the subject of outstanding
2  discovery requests.  In particular, Mattel has staunchly refused to provide discovery
3  that would address when, in fact, Mattel first had reason to suspect Bryant's
4  involvement in Bratz, his alleged breach of contract, his work for MGA, and Mattel's
5  alleged "true owner[ship] of Bratz," in spite of numerous interrogatory requests,
6  document requests, requests for admission, and deposition notices.  Defendants'
7  concerns regarding Mattel's discovery abuses have recently been addresses in
8  multiple motions to compel both before Judge Infante and Judge Larson.  Indeed, on
9  January 3, 2008, Judge Infante overruled all of Mattel's objections and compelled
10  discovery relevant to Defendants' statute of limitations and laches defenses.  Factual
11  investigation and discovery is ongoing and the MGA Defendants reserve the right to
12  supplement this response and, consistent with its obligations under Federal Rule of
13  Civil Procedure 26(e), the MGA Defendants will supplement this response if they
14  receive additional responsive information.                **EXHIBIT 25**
                                                              **PAGE 845**
15    The following persons have knowledge of facts and circumstances regarding
16  the foregoing:  Richard De Anda; Robert Eckert; Alan Kaye; Michele McShane;
17  Robert Normile; Margaret Leahy; Elise Cloonan; Veronica Marlow; Ilana Raynes;
18  Michael Hebden; Frederick Jackson; Ray Moore; Joe Benet; Carolyn Oros; Hung
19  Lee; Diana Troup; Cynthia Young; Margo Michelle; Kitty Black-Perkins; Janet
20  Unalp; Debbie Meyer; Carol Spencer; Jennifer Kiernan; Bill Kelly; Steve McAdam;
21  Howie Jesser, Ken Smith; Michael Moore; Jill Thomas; Tom Hodges; Julie Ashe
22  Nobles; Morris Batay; Bruce Ryniker; Larry Wood; Eric Ostendorf; Steve Ryniker;
23  Melody Hansen; Carter Bryant; Anna Rhee; Joe Feldman; Janet Blaser; Bill
24  Greening; Roxanna Powell; Ken O'Leary; Lily Martinez; Cassidy Park; Ivy Ross; Joe
25  Franke; Ann Driskill; Robert Best; Anne Olson; Dennis Soai; Kislap Ongchango;
26  Nick Patean; Jerry Richardson; Spencer Davis; Bill Martinez; Barbara Meyer; Larry
27  Clayton; Elon Dancer; Maury Kessel; Chris McAdam; Michael Norgren; Chris Sesto;
28  Paul Sesto; Michael Hastey; Sullivan Hastey; Mark Rigger; Jeff Fuller; Tim Lewis;

                                        59

1 │ Tim Correa; Doc O'Connor; Myziue Hamilton; Joan Gaynor; Patty Gaynor; Mina
2 │ Mirkazemi; Mercedeh Ward; Tony Yao; Aldo Fazilli; Isabel Cabrera; Beatrice
3 │ Morales; Pedro Salazar; Maria Elena Salazar; Roger Simoneau, Jill Nordquist, Joni
4 │ Pratt, Tina Tomiyama, and Evelyn Viohl.

5 │      The following documents may be relevant to the foregoing: Transcript from
6 │ the Deposition of Margaret Leahy, Transcript from the Deposition of Elise Cloonan,
7 │ Transcript from the Deposition of Alan Kaye, Transcript from the Deposition of
8 │ Richard De Anda, Transcript from the Deposition of Ann Driskill, Transcript from the
9 │ Deposition of Jill Nordquist, Transcript from the Deposition of Veronica Marlow,
10 │ Transcript from the Deposition of Joni Pratt, Mattel's Responses and Supplemental
11 │ Responses to Defendants' Interrogatories, Mattel's Internal Investigative Files
12 │ regarding its investigations into Carter Bryant, MGA, or Isaac Larian, all Mattel
13 │ worldwide consumer research reports produced by Mattel, internal marketing
14 │ documents analyzing the performance of Bratz in the marketplace, M0001654-55,
15 │ M0074397-74402, and M0074307-0074396.

16 │      N.    Abandonment                                    **EXHIBIT 25**
                                                              **PAGE 846**

17 │      Mattel has abandoned any interest in may have had in the alleged copyrighted
18 │ works. Mattel intentionally delayed taking legal action against MGA or Carter Bryant
19 │ for several years after the launch of Bratz in the belief that Mattel would be able to
20 │ drive Bratz (and as a result, drive MGA) out of the market for fashion dolls and/or the
21 │ belief that Mattel did not have any rights under the "Inventions Agreement" as against
22 │ Bryant, based on its own interpretations of the "Inventions Agreement," and on the
23 │ advice that Mattel received from in-house and outside counsel. As a result, Mattel
24 │ only took legal action well after MGA had invested substantial amounts of capital and
25 │ creative and innovative efforts into the Bratz line of dolls and had experienced
26 │ enormous success in the marketplace.

27 │      A report from Bryant's exit interview at Mattel shows that Bryant told Mattel's
28 │ human resources representative he was leaving because an "[o]pportunity arose; had

1 | to take it." Mattel has acknowledged that employees leaving under similar
2 | circumstances to work for an unnamed competitor have "caused Mattel to begin
3 | investigating their activities."

4 |     Furthermore, numerous Mattel employees knew and/or believed in the summer
5 | of 2001 that Carter Bryant was involved in the development and introduction of the
6 | Bratz line. This knowledge and/or these beliefs by Mattel employees went well
7 | beyond mere "rumor and innuendo," as has been suggested by Mattel. In its
8 | interrogatory responses, Mattel also asserts that Bryant used several "other Mattel
9 | employees" to work on the Bratz dolls so that they "had been designed and were far
10 | along in development during the time that Bryant was employed by Mattel."

11 |     Shortly after Bratz dolls were in retail stores in the United States in or about
12 | September 2001, Mattel knew or was on notice that Carter Bryant was involved in the
13 | development of that line. Mattel now asserts in this lawsuit that the idea for Bratz
14 | was a violation of rights that Mattel had in a proposed flanker brand called "Toon
15 | Teens," which Mattel was developing in the summer of 1999, but never introduced to
16 | market. In this connection, during 2001, Toon Teens samples were taken out of
17 | storage by Mattel employees and delivered to Mattel's legal department for analysis
18 | of possible copyright infringement and other claims against Bryant and MGA.

19 |     Mattel knew Bryant's role in Bratz and was investigating possible claims *at*
20 | *least as early as summer 2001*, when Bratz came out. Margaret Leahy, the third-party
21 | sculptor of Bratz, testified that in the summer of 2001 a friend from Mattel was
22 | "grilling" her, "like somebody put her up to it," about whether "Carter [was] the
23 | designer on the doll or what was [MGA employee and former Mattel employee] Paula
24 | [Garcia's] involvement" in Bratz. Leahy testified that she told the Mattel employee
25 | that "Carter initially came up with a design and Paula carried it out." **EXHIBIT 25 PAGE 847**
26 |     Mattel actively investigated Bryant's role in creating Bratz in 2001 and 2002.
27 | Mattel's internal investigative files confirm that Mattel commenced an official
28 | investigation into whether Bryant stole the Bratz idea in March 2002. Mattel admitted

1 | that in 2002 it investigated "rumor and innuendo that Bryant may be working with
2 | MGA on Bratz," including whether "Bryant ... plagiarized [Mattel product] 'Toon
3 | Teens' and created Bratz dolls for MGA" and whether Bryant helped MGA create
4 | Bratz "[w]hile he was working with Mattel." Mattel's CEO Robert Eckert received
5 | an "anonymous letter" on or about August 5, 2002 that alleged that Bryant helped
6 | MGA create Bratz while working for Mattel. As part of an official investigation
7 | requested by Mattel CEO Robert Eckert in August 2002 as to whether Bryant helped
8 | MGA create Bratz "[w]hile he was working with Mattel," Mattel's head of security,
9 | Richard De Anda, wrote that he had been "aware of this situation and ... working on
10 | it for several months" but it was in the hands of Mattel's attorneys. Testimony from
11 | former Mattel employee Elise Cloonan confirms that by at least late 2001, Mattel's
12 | lawyers were conducting an investigation involving Bryant's work on Bratz in the
13 | design department.

14 |     On March 15, 2002, Mattel opened an investigative file on MGA and Isaac
15 | Larian after receiving information from Evelyn Viohl and Ivy Ross that MGA had
16 | recently hired a number of former Mattel employees and was reportedly
17 | manufacturing products that appeared to be Mattel designs.

EXHIBIT 25
PAGE 848

18 |     Mattel has also forfeited any right it may have had to enforce Paragraph 3-a of
19 | the "Inventions Agreement" against Carter Bryant as a result of laches, estoppel,
20 | acquiescence, and waiver. MGA is informed and believes that it was common
21 | knowledge at Mattel that many Mattel employees employed in the Mattel design
22 | center worked on a freelance basis for third parties, including Mattel competitors,
23 | and/or on their own projects with the anticipation that such projects eventually would
24 | be offered for sale to third parties, including Mattel competitors. Mattel employees
25 | performed non-Mattel work while employed by Mattel and Mattel acquiesced to this
26 | moonlighting. For example, Robert Best developed a fashion line while employed at
27 | Mattel. Best disclosed this to Mattel and was not terminated. Joni Pratt created
28 | volleyball and basketball books for her daughter's high school outside of work, along

1 │ with invitation and wrapping paper. Pratt testified that she showed these works to her
2 │ supervisor at Mattel so there could be no misunderstanding that it was not related to
3 │ her work at Mattel. Pratt has not disclosed everything she has drawn outside of work
4 │ and testified that she does not feel she has an obligation to show her supervisors
5 │ everything she has drawn outside of work. Lori Sipos, a designer at Mattel, created
6 │ puppets as a hobby while she worked at Mattel. Sipos told Jill Nordquist about her
7 │ hobby when showing her one of her puppets, but she did not tell Nordquist about the
8 │ puppets in an effort to "report" her work. Nordquist testified that she was informed
9 │ about the designs other people created outside of work in the course of sharing
10 │ hobbies and not as part of an effort to report their works. Veronica Marlow helped
11 │ Dianne Gavin develop a line of handbags while both were employed at Mattel. At her
12 │ deposition, Veronica Marlow testified that Isabel Cabrera, Beatrice Morales, and
13 │ Maria Elena Salazar worked with her on fashions for Bratz while they were employed
14 │ by Mattel. Additionally, some of Mattel's sample makers made wedding gowns and
15 │ did nails on the weekends and evenings and some of Mattel's hair rooters worked in
16 │ hair salons on weekends. During her deposition, Margaret Leahy testified that her
17 │ Mattel supervisor, Michael Hebden, suggested to her while she was working for
18 │ Mattel, that she seek out moonlighting work. During her deposition, Elise Cloonan
19 │ testified that the practice was so widespread that there was even a name for it at
20 │ Mattel: a "G-job." Indeed, Richard De Anda, Mattel's Vice President of Global
21 │ Security, testified at his deposition that he also moonlighted as an expert witness and
22 │ consultant while working for Mattel. De Anda further testified that he does not
23 │ believe that Mattel owns or has a claim on the work he does for himself. Despite
24 │ knowledge of this activity, Mattel rarely, if ever, enforced any rights it may have had
25 │ to prohibit such moonlighting.

EXHIBIT 25
PAGE 849

26 │     Issues concerning this defense are currently the subject of outstanding
27 │ discovery requests. In particular, Mattel has staunchly refused to provide discovery
28 │ that would address when, in fact, Mattel first had reason to suspect Bryant's

63

1 involvement in Bratz, his alleged breach of contract, his work for MGA, and Mattel's
2 alleged "true owner[ship] of Bratz," in spite of numerous interrogatory requests,
3 document requests, requests for admission, and deposition notices. Defendants'
4 concerns regarding Mattel's discovery abuses have recently been addresses in
5 multiple motions to compel both before Judge Infante and Judge Larson.  Indeed, on
6 January 3, 2008, Judge Infante overruled all of Mattel's objections and compelled
7 discovery relevant to Defendants' statute of limitations and laches defenses. Factual
8 investigation and discovery is ongoing and the MGA Defendants reserve the right to
9 supplement this response and, consistent with its obligations under Federal Rule of
10 Civil Procedure 26(e), the MGA Defendants will supplement this response if they
11 receive additional responsive information.

12      The following persons have knowledge of facts and circumstances regarding
13 the foregoing: Richard De Anda; Robert Eckert; Alan Kaye; Michele McShane;
14 Robert Normile; Margaret Leahy; Elise Cloonan; Veronica Marlow; Ilana Raynes;
15 Michael Hebden; Frederick Jackson; Ray Moore; Joe Benet; Carolyn Oros; Hung
16 Lee; Diana Troup; Cynthia Young; Margo Michelle; Kitty Black-Perkins; Janet
17 Unalp; Debbie Meyer; Carol Spencer; Jennifer Kiernan; Bill Kelly; Steve McAdam;
18 Howie Jesser, Ken Smith; Michael Moore; Jill Thomas; Tom Hodges; Julie Ashe
19 Nobles; Morris Batay; Bruce Ryniker; Larry Wood; Eric Ostendorf; Steve Ryniker;
20 Melody Hansen; Carter Bryant; Anna Rhee; Joe Feldman; Janet Blaser; Bill
21 Greening; Roxanna Powell; Ken O'Leary; Lily Martinez; Cassidy Park; Ivy Ross; Joe
22 Franke; Ann Driskill; Robert Best; Anne Olson; Dennis Soai; Kislap Ongchango;
23 Nick Patean; Jerry Richardson; Spencer Davis; Bill Martinez; Barbara Meyer; Larry
24 Clayton; Elon Dancer; Maury Kessel; Chris McAdam; Michael Norgren; Chris Sesto;
25 Paul Sesto; Michael Hastey; Sullivan Hastey; Mark Rigger; Jeff Fuller; Tim Lewis;
26 Tim Correa; Doc O'Connor; Myziue Hamilton; Joan Gaynor; Patty Gaynor; Mina
27 Mirkazemi; Mercedeh Ward; Tony Yao; Aldo Fazilli; Isabel Cabrera; Beatrice
28 Morales; Pedro Salazar; Maria Elena Salazar; Roger Simoneau, Jill Nordquist, Joni

MGA'S RESPONSE TO MATTEL'S AMEND. SUPP. ROG RE AFFIRM. DEFENSES      NO. CV 04-9049 SGL (RNBx)

EXHIBIT 25
PAGE 850

1 | Pratt, Tina Tomiyama, and Evelyn Viohl.

2 |     The following documents may be relevant to the foregoing:  Leahy Depo,
3 | Cloonan Depo, Kaye Depo, De Anda Depo, Driskill Depo, Nordquist Depo, Marlow
4 | Depo, Pratt Depo Mattel's Responses and Supplemental Responses to Defendants'
5 | Interrogatories, Mattel's Internal Investigative Files regarding its investigations into
6 | Carter Bryant, MGA, or Isaac Larian, all Mattel worldwide consumer research reports
7 | produced by Mattel, internal marketing documents analyzing the performance of
8 | Bratz in the marketplace, M0001654-55, M0074397-74402, and M0074307-0074396.

9 |     O.    *De Minimus* Use

10 |     MGA Defendants deny that Mattel owns any copyright interest in the alleged
11 | works, but even if Mattel could craft a claim that the Bratz dolls incorporate an aspect
12 | of a Mattel copyrighted work, such use would be *de minimus* and noninfringing.  The
13 | original concepts contributed by Bryant to the creation of the Bratz dolls represent
14 | only one of the many factors that combined to make Bratz one of the most successful
15 | fashion dolls on the market.  The contributions made by MGA to the Bratz dolls far
16 | outweigh any contributions made by Bryant prior to October 21, 2000 in terms of the
17 | overall factors that contributed to the commercial success of Bratz.  Mattel played no
18 | role in MGA's improvements, enhancements and changes to the Bratz dolls and/or the
19 | Bratz concept.  Mattel played no role in the creation and/or selection of the Bratz
20 | slogan, "The Girls with a Passion for Fashion!" or the brand name "Bratz."  Mattel
21 | played no role in the development of the Bratz line of dolls' innovative and trend-
22 | setting packaging, the importance of which is demonstrated in part by Mattel's having
23 | copied such packaging.  Mattel played no role in MGA's development of and
24 | selection of the fashions for the Bratz dolls.  Mattel played no role in the development
25 | of other MGA Bratz spinoff, sub-brands, and other successful additions to the Bratz
26 | doll family, including, but not limited to, Bratz Boyz, Bratz Kidz, Bratz Big Kidz,
27 | Bratz Babyz, Bratz Babyz Boyz, Bratz Babyz Ponyz, Lil' Bratz, Lil' Bratz Boyz,
28 | Bratz Petz, Bratz Lil' Angelz, Itsy Bitsy Bratz, Itsy Bitsy Bratz Petz, Micro Bratz, Be-

EXHIBIT 25
PAGE 851

1 Bratz, and Funky Fashion Makeover Heads. Mattel played no role in the
2 development of the myriad of accessories for the Bratz dolls. Mattel played no role in
3 MGA's and/or Klasky Csupo, Inc.'s creation and/or development of two-dimensional
4 Bratz character art utilized on, for example, product packaging and licensed products.
5 Mattel played no role in the development of the successful themes that have enhanced
6 the popularity of the Bratz dolls. Mattel played no role in the development of the
7 Bratz animated TV series, Bratz TV commercials, or Bratz the movie. Mattel played
8 no role in the development of the myriad of Bratz licensed products. Mattel played no
9 role in the development of the Bratz brand. Mattel played no role in the development
10 of the storylines and personas associated with each of the Bratz dolls.

11    Additionally, neither the first generation of Bratz dolls nor any subsequent
12 Bratz products were based on any Carter Bryant designs created on or before October
13 19, 2000. MGA further contends that the first generation of Bratz dolls (and
14 subsequent Bratz products) were "conceived of" and "reduced to practice" for
15 purposes of design patent law, and first expressed in a tangible medium for purposes
16 of copyright law, after October 20, 2000, as a result of original, creative efforts of
17 artists employed by, or working on behalf of, MGA. All first-generation Bratz dolls
18 and subsequent Bratz products are not substantially similar to, are not a copy of, and
19 are not derivative of, any Carter Bryant designs completed on or before October 19,
20 2000.

**EXHIBIT 25**
**PAGE 852**

21    To the extent that Mattel argues that the shapes of characters in Carter Bryant's
22 drawings that he called "Bratz" (including, but not limited to, those drawings
23 identified by Carter Bryant in Exhibit 5 of his deposition as being sketched in August
24 1998) represented a conception of what could have later become a three-dimensional
25 object that could have been the subject of a design patent, MGA contends as follows:
26    Carter Bryant was not a sculptor, and any effort to translate his pre-1999 two-
27 dimensional flat art into a three-dimensional form for use as a fashion doll sculpt
28 would have produced shapes that were different from the actual shape of the final

1 three-dimensional Bratz sculpt used in manufacturing the first generation of Bratz
2 dolls released on the market by MGA in or about June 2001. Also, different sculpt
3 artists would have created different sculpts – Bryant's two-dimensional drawings did
4 not dictate a specific three-dimensional object. The shapes of the characters in
5 Bryant's drawings bear little resemblance to the final shape of the actual Bratz dolls.
6 Differences between the drawings and the final shape of the actual Bratz dolls
7 include, but are not limited to, the following: posture; hip-to-waist ratio; feet size
8 (dolls' feet are not as exaggerated as characters' feet in the drawings); head size
9 (dolls' heads are proportionally smaller than characters' heads in the drawings); eyes
10 (dolls' eyes are more open than characters' eyes in the drawings); other facial features
11 including lips, cheek bones, chin and forehead.

12 Moreover, the final physical shape of the first generation of Bratz dolls,
13 released on the market by MGA in or about June 2001, was conceived of by Margaret
14 Leahy, working on behalf of MGA, along with other MGA agents and employees
15 such as employees in Hong Kong and Mercedeh Ward. The conception of this
16 physical shape was completed on or after October 20, 2000, and reduced to practice
17 no earlier than December 19, 2000.

EXHIBIT 25
PAGE 853

18 Copyright infringement analysis under Ninth Circuit law requires that
19 "objective" or "extrinsic" elements that are "scènes-à-faire" in the public domain, or
20 public domain materials that Bryant was aware of and that directly or indirectly
21 influenced him in developing his concept for a new line of fashion dolls, be filtered
22 out of the subject works, and, thereafter, that the remaining "subjective" or "intrinsic"
23 elements be evaluated for substantial similarity. Carter Bryant's 1998 drawings
24 contain many elements that must be filtered out, including but not limited to the
25 oversized head, eyes, lips, and feet of the figures in Bryant's drawings and the stock
26 model and/or doll poses. A non-exhaustive list of examples of prior existing works
27 that incorporate such elements includes the following: sources of inspiration
28 specifically identified by Carter Bryant, including Steve Madden advertisements and

67

1 Paris Blues advertisements, which were highly visible in 1998 (various Steve Madden
2 advertisements also served as a key inspiration for Mattel's own "Toon Teens" dolls);
3 Blythe dolls; Lisa Frank designs; Takara's Jenny, Licca, and Barbie dolls; Mattel's
4 Liddle Kiddles; Margaret Keane artwork; Betty Boop; Little Miss No Name; Hello
5 Kitty; Coca-Cola advertisements; anime, including, e.g., Sailor Moon; and manga.
6       Once all of the materials that directly or indirectly influenced Bryant and all
7 "scène-à-faire" features are eliminated from the analysis, the first generation Bratz
8 dolls (and all subsequent Bratz products) are readily seen as not substantially similar
9 to Carter Bryant's 1998 drawings. The differences between the drawings and the first
10 generation Bratz dolls include, but are not limited to, the following:

11       • Posture
12       • Hip-to-waist ratio
13       • Feet size (dolls' feet are not as exaggerated as characters' feet in the
14         drawings)
15       • Head size (dolls' heads are proportionally smaller than characters' heads
16         in the drawings)
17       • Eyes (dolls' eyes are more open than characters' eyes in the drawings)
18       • Eye to lips ratio (lips of characters in drawings are proportionally larger
19         relative to eyes than are lips of dolls)
20       • Hair (characters in drawings have much edgier hairstyles than the dolls
21         do)
22       • Shapes of eyes and eye design
23       • Shapes of lips
24       • Overall look and feel (dolls are overall softer, less extreme than
25         drawings)

**EXHIBIT 25**
**PAGE 854**

26       That the dolls and the drawings are not substantially similar also is consistent
27 with the fact that Carter Bryant was not a sculptor, and, as discussed above, any effort
28 to translate his pre-1999 two-dimensional flat art into a three-dimensional form for

68

1 | use as a fashion doll sculpt would have produced shapes that were different from the
2 | actual shape of the final three-dimensional Bratz sculpt used in manufacturing the first
3 | generation of Bratz dolls released on the market by MGA in or about June 2001.
4 | Indeed, a team of highly-skilled artists (including several that had been used by
5 | Mattel) spent months developing the Bratz first-generation dolls—valuable time and
6 | original creative effort that would not have been necessary if said first-generation
7 | Bratz dolls were simply a copy of Bryant's designs.

8 | The absence of substantial similarity is further shown in the close correlation
9 | between Bryant's drawings and the inspiration he points to, including but not limited
10 | to the Steve Madden and Paris Blues advertisements in the August 1998 issue of
11 | *Seventeen Magazine,* as well as other advertisements in that issue, such as the Coca
12 | Cola advertisement.

13 | Mattel's own My Scene Barbie line of dolls provides further proof that the first
14 | generation of Bratz dolls was not substantially similar to the Bryant drawings, in that
15 | (i) Mattel asserts that the My Scene Barbie dolls are independent works of art, not
16 | copied from Bratz, yet (ii) said dolls are far closer in appearance to Bratz dolls than
17 | are Bryant's two-dimensional drawings.

18 | Additional details regarding such differences will be the subject of expert
19 | disclosures and will be provided in accordance with the Court's schedule for expert
20 | discovery.

**EXHIBIT 25**
**PAGE 855**

21 | With respect to any Carter Bryant contribution to the first generation Bratz
22 | product after October 4, 2000 and before October 21, 2000, MGA notes that any such
23 | contribution was far outweighed by the original and/or creative input of other artists
24 | working for or on behalf of MGA on the Bratz concept, which was owned by MGA as
25 | a consequence of the transfer of rights from Bryant to MGA.

26 | With respect to Bratz two-dimensional character art utilized on, for example,
27 | Bratz product packaging and licensed products, while the initial Bratz character art
28 | was derivative of Bryant's initial sketches from 1998, by no later than August, 2003,

69

1 the Bratz character art had changed sufficiently such that it was no longer derivative
2 of Bryant's sketches.

3      The following persons have knowledge of facts and circumstances surrounding
4 the foregoing: Isaac Larian; Carter Bryant; Margaret Leahy; Veronica Marlow;
5 Mercedeh Ward; Sarah Halpern; Paula Garcia; Steve Tarmichael; Rebecca Harris;
6 Tina Tomiyama; Cecilia Kwok; David Dees; Jesse Ramirez; Samuel Wong; Lily
7 Martinez; Ei Akiko Fong; John Steven Baulch; Aileen Storer; Debora Middleton;
8 Ronan Spelman; Charlotte Broussard.

9      The following documents may be relevant to the foregoing:  all documents
10 that refer to or evidence the work performed by MGA employees and freelancers
11 toward the reduction to practice of the first generation of Bratz dolls during the period
12 after October 20, 2000 through June 1, 2001, including but not limited to:  Carter
13 Bryant's drawings; documents and tangible things produced by Margaret Leahy;
14 tangible things produced by Veronica Marlow; invoices submitted by employees
15 and/or freelance artists working for MGA for work performed on the Bratz project; all
16 documents that constitute samples of the following items in the public domain in
17 1998: Blythe dolls; Lisa Frank designs; Takara's Jenny, Licca, and Barbie dolls;
18 Mattel's Liddle Kiddles; Margaret Keane artwork; Betty Boop; Little Miss No Name;
19 Hello Kitty; anime, including, <u>e.g.</u>, Sailor Moon; manga; Coca-Cola advertisements;
20 Steve Madden advertisements; and Paris Blues advertisements; Bratz prototypes,
21 samples, sculpts, and rotocasts found in Hong Kong and produced to Mattel.  The
22 documents evidencing this work are too numerous to identify individually.

23     P.   <u>Joint Authorship</u>     **EXHIBIT 25**
                                     **PAGE 856**

24      MGA Defendants deny that Mattel owns any copyright interest in the alleged
25 works, but even if it did, any liability would be eliminated or greatly diminished by
26 the doctrine of joint authorship. The original concepts contributed by Bryant to the
27 creation of the Bratz dolls represent only one of the many factors that combined to
28 make Bratz one of the most successful fashion dolls on the market. The contributions

1 made by MGA to the Bratz dolls far outweigh any contributions made by Bryant prior
2 to October 21, 2000 in terms of the overall factors that contributed to the commercial
3 success of Bratz. Mattel played no role in MGA's improvements, enhancements and
4 changes to the Bratz dolls and/or the Bratz concept. Mattel played no role in the
5 creation and/or selection of the Bratz slogan, "The Girls with a Passion for Fashion!"
6 or the brand name "Bratz." Mattel played no role in the development of the Bratz line
7 of dolls' innovative and trend-setting packaging, the importance of which is
8 demonstrated in part by Mattel's having copied such packaging. Mattel played no
9 role in MGA's development of and selection of the fashions for the Bratz dolls.
10 Mattel played no role in the development of other MGA Bratz spinoff, sub-brands,
11 and other successful additions to the Bratz doll family, including, but not limited to,
12 Bratz Boyz, Bratz Kidz, Bratz Big Kidz, Bratz Babyz, Bratz Babyz Boyz, Bratz
13 Babyz Ponyz, Lil' Bratz, Lil' Bratz Boyz, Bratz Petz, Bratz Lil' Angelz, Itsy Bitsy
14 Bratz, Itsy Bitsy Bratz Petz, Micro Bratz, Be-Bratz, and Funky Fashion Makeover
15 Heads. Mattel played no role in the development of the myriad of accessories for the
16 Bratz dolls. Mattel played no role in MGA's and/or Klasky Csupo, Inc.'s creation
17 and/or development of two-dimensional Bratz character art utilized on, for example,
18 product packaging and licensed products. Mattel played no role in the development
19 of the successful themes that have enhanced the popularity of the Bratz dolls. Mattel
20 played no role in the development of the Bratz animated TV series, Bratz TV
21 commercials, or Bratz the movie. Mattel played no role in the development of the
22 myriad of Bratz licensed products. Mattel played no role in the development of the
23 Bratz brand. Mattel played no role in the development of the storylines and personas
24 associated with each of the Bratz dolls.

**EXHIBIT 25**
**PAGE 857**

25       Additionally, neither the first generation of Bratz dolls nor any subsequent
26 Bratz products were based on any Carter Bryant designs created on or before October
27 19, 2000. MGA further contends that the first generation of Bratz dolls (and
28 subsequent Bratz products) were "conceived of" and "reduced to practice" for

71

1 purposes of design patent law, and first expressed in a tangible medium for purposes
2 of copyright law, after October 20, 2000, as a result of original, creative efforts of
3 artists employed by, or working on behalf of, MGA. All first-generation Bratz dolls
4 and subsequent Bratz products are not substantially similar to, are not a copy of, and
5 are not derivative of, any Carter Bryant designs completed on or before October 19,
6 2000.

7      To the extent that Mattel argues that the shapes of characters in Carter Bryant's
8 drawings that he called "Bratz" (including, but not limited to, those drawings
9 identified by Carter Bryant in Exhibit 5 of his deposition as being sketched in August
10 1998) represented a conception of what could have later become a three-dimensional
11 object that could have been the subject of a design patent, MGA contends as follows:

12      Carter Bryant was not a sculptor, and any effort to translate his pre-1999 two-
13 dimensional flat art into a three-dimensional form for use as a fashion doll sculpt
14 would have produced shapes that were different from the actual shape of the final
15 three-dimensional Bratz sculpt used in manufacturing the first generation of Bratz
16 dolls released on the market by MGA in or about June 2001. Also, different sculpt
17 artists would have created different sculpts – Bryant's two-dimensional drawings did
18 not dictate a specific three-dimensional object. The shapes of the characters in
19 Bryant's drawings bear little resemblance to the final shape of the actual Bratz dolls.
20 Differences between the drawings and the final shape of the actual Bratz dolls
21 include, but are not limited to, the following: posture; hip-to-waist ratio; feet size
22 (dolls' feet are not as exaggerated as characters' feet in the drawings); head size
23 (dolls' heads are proportionally smaller than characters' heads in the drawings); eyes
24 (dolls' eyes are more open than characters' eyes in the drawings); other facial features
25 including lips, cheek bones, chin and forehead.

**EXHIBIT 25**
**PAGE 858**

26      Moreover, the final physical shape of the first generation of Bratz dolls,
27 released on the market by MGA in or about June 2001, was conceived of by Margaret
28 Leahy, working on behalf of MGA, along with other MGA agents and employees

72

1  such as employees in Hong Kong and Mercedeh Ward. The conception of this
2  physical shape was completed on or after October 20, 2000, and reduced to practice
3  no earlier than December 19, 2000.

4  Copyright infringement analysis under Ninth Circuit law requires that
5  "objective" or "extrinsic" elements that are "scènes-à-faire" in the public domain, or
6  public domain materials that Bryant was aware of and that directly or indirectly
7  influenced him in developing his concept for a new line of fashion dolls, be filtered
8  out of the subject works, and, thereafter, that the remaining "subjective" or "intrinsic"
9  elements be evaluated for substantial similarity. Carter Bryant's 1998 drawings
10  contain many elements that must be filtered out, including but not limited to the
11  oversized head, eyes, lips, and feet of the figures in Bryant's drawings and the stock
12  model and/or doll poses. A non-exhaustive list of examples of prior existing works
13  that incorporate such elements includes the following: sources of inspiration
14  specifically identified by Carter Bryant, including Steve Madden advertisements and
15  Paris Blues advertisements, which were highly visible in 1998 (various Steve Madden
16  advertisements also served as a key inspiration for Mattel's own "Toon Teens" dolls);
17  Blythe dolls; Lisa Frank designs; Takara's Jenny, Licca, and Barbie dolls; Mattel's
18  Liddle Kiddles; Margaret Keane artwork; Betty Boop; Little Miss No Name; Hello
19  Kitty; Coca-Cola advertisements; anime, including, e.g., Sailor Moon; and manga.

20  Once all of the materials that directly or indirectly influenced Bryant and all
21  "scène-à-faire" features are eliminated from the analysis, the first generation Bratz
22  dolls (and all subsequent Bratz products) are readily seen as not substantially similar
23  to Carter Bryant's 1998 drawings. The differences between the drawings and the first
24  generation Bratz dolls include, but are not limited to, the following:

25  • Posture

26  • Hip-to-waist ratio

27  • Feet size (dolls' feet are not as exaggerated as characters' feet in the
28  drawings)

EXHIBIT 25
PAGE 859

73

1     •   Head size (dolls' heads are proportionally smaller than characters' heads
2         in the drawings)
3     •   Eyes (dolls' eyes are more open than characters' eyes in the drawings)
4     •   Eye to lips ratio (lips of characters in drawings are proportionally larger
5         relative to eyes than are lips of dolls)
6     •   Hair (characters in drawings have much edgier hairstyles than the dolls
7         do)
8     •   Shapes of eyes and eye design
9     •   Shapes of lips
10     •   Overall look and feel (dolls are overall softer, less extreme than
11         drawings)

12       That the dolls and the drawings are not substantially similar also is consistent
13 with the fact that Carter Bryant was not a sculptor, and, as discussed above, any effort
14 to translate his pre-1999 two-dimensional flat art into a three-dimensional form for
15 use as a fashion doll sculpt would have produced shapes that were different from the
16 actual shape of the final three-dimensional Bratz sculpt used in manufacturing the first
17 generation of Bratz dolls released on the market by MGA in or about June 2001.
18 Indeed, a team of highly-skilled artists (including several that had been used by
19 Mattel) spent months developing the Bratz first-generation dolls—valuable time and
20 original creative effort that would not have been necessary if said first-generation
21 Bratz dolls were simply a copy of Bryant's designs.

22       The absence of substantial similarity is further shown in the close correlation
23 between Bryant's drawings and the inspiration he points to, including but not limited
24 to the Steve Madden and Paris Blues advertisements in the August 1998 issue of
25 *Seventeen Magazine,* as well as other advertisements in that issue, such as the Coca
26 Cola advertisement.

**EXHIBIT 25**
**PAGE 860**

27       Mattel's own My Scene Barbie line of dolls provides further proof that the first
28 generation of Bratz dolls was not substantially similar to the Bryant drawings, in that

1 (i) Mattel asserts that the My Scene Barbie dolls are independent works of art, not
2 copied from Bratz, yet (ii) said dolls are far closer in appearance to Bratz dolls than
3 are Bryant's two-dimensional drawings.

4      Additional details regarding such differences will be the subject of expert
5 disclosures and will be provided in accordance with the Court's schedule for expert
6 discovery.

7      With respect to any Carter Bryant contribution to the first generation Bratz
8 product after October 4, 2000 and before October 21, 2000, MGA notes that any such
9 contribution was far outweighed by the original and/or creative input of other artists
10 working for or on behalf of MGA on the Bratz concept, which was owned by MGA as
11 a consequence of the transfer of rights from Bryant to MGA.

12      With respect to Bratz two-dimensional character art utilized on, for example,
13 Bratz product packaging and licensed products, while the initial Bratz character art
14 was derivative of Bryant's initial sketches from 1998, by no later than August, 2003,
15 the Bratz character art had changed sufficiently such that it was no longer derivative
16 of Bryant's sketches.

17      The following persons have knowledge of facts and circumstances surrounding
18 the foregoing: Isaac Larian; Carter Bryant; Margaret Leahy; Veronica Marlow;
19 Mercedeh Ward; Sarah Halpern; Paula Garcia; Steve Tarmichael; Rebecca Harris;
20 Tina Tomiyama; Cecilia Kwok; David Dees; Jesse Ramirez; Samuel Wong; Lily
21 Martinez; Ei Akiko Fong; John Steven Baulch; Aileen Storer; Debora Middleton;
22 Ronan Spelman; Charlotte Broussard.

**EXHIBIT 25
PAGE 861**

23      The following documents may be relevant to the foregoing: all documents that
24 refer to or evidence the work performed by MGA employees and freelancers toward
25 the reduction to practice of the first generation of Bratz dolls during the period after
26 October 20, 2000 through June 1, 2001, including but not limited to: Carter Bryant's
27 drawings; documents and tangible things produced by Margaret Leahy; tangible
28 things produced by Veronica Marlow; invoices submitted by employees and/or

1 freelance artists working for MGA for work performed on the Bratz project; all
2 documents that constitute samples of the following items in the public domain in
3 1998: Blythe dolls; Lisa Frank designs; Takara's Jenny, Licca, and Barbie dolls;
4 Mattel's Liddle Kiddles; Margaret Keane artwork; Betty Boop; Little Miss No Name;
5 Hello Kitty; anime, including, e.g., Sailor Moon; manga; Coca-Cola advertisements;
6 Steve Madden advertisements; and Paris Blues advertisements; Bratz prototypes,
7 samples, sculpts, and rotocasts found in Hong Kong and produced to Mattel. The
8 documents evidencing this work are too numerous to identify individually.

9       Q.    Competition Privilege/Justification

10      Mattel's counterclaims are barred in whole or in part on the grounds that the
11 acts of the MGA Defendants were lawful competition or justified. MGA's
12 development and marketing of toys, including its Bratz fashion dolls and other
13 products constitutes lawful competition.

14      Discovery is ongoing and the MGA Defendants reserve the right to supplement
15 this response and, consistent with its obligations under Federal Rule of Civil
16 Procedure 26(e), the MGA Defendants will supplement this response if they receive
17 additional responsive information.

**EXHIBIT 25**
**PAGE 862**

18      R.    Good Faith

19      Mattel's counterclaims are barred in whole or in part because the MGA
20 Defendants acted in good faith. MGA acted in good faith when Bryant transferred
21 and MGA acquired all rights to the Bratz concept, because of the following facts of
22 which MGA was aware in the September to October 2000 time period: (i) Bryant had
23 an idea in August or September of 1998, when he was not employed by Mattel, for a
24 series of characters that he named Bratz that could be used to create a line of fashion
25 dolls; (ii) at the same time, Bryant sketched a series of drawings to illustrate his
26 conception; (iii) Bryant was the rightful owner of the concepts reflected in his
27 drawings and other representations of his ideas and of his drawings; (iv) Bryant and
28 his counsel, who MGA understood to have conducted an investigation, represented

76

1  and warranted to MGA that Bryant was the exclusive originator and owner of his
2  Bratz ideas and drawing and that no third party had any interest or rights in the
3  drawings or the ideas reflected in the drawings; (v) Bryant came recommended by
4  Veronica Marlow, a trusted freelancer who had worked for MGA in the past; (vi)
5  immediately upon entering into a written freelance agreement with Bryant, Isaac
6  Larian, the CEO of MGA, instructed Bryant to immediately resign from Mattel (and
7  to the extent that anyone at MGA knew or had reason to know that Bryant had given
8  two-weeks' notice at Mattel, his continuing presence at Mattel during that notice
9  period had nothing to do with MGA's efforts to invest in and develop a line of dolls
10  based on Bryant's concepts); (vii) assuming some part of the Bratz concept was a
11  feature that could have been protected by a design patent, any such invention was not
12  "conceived of" or "reduced to practice" prior to October 21, 2000, and such
13  conception and reduction to practice were effectuated by Margaret Leahy, working on
14  behalf of MGA, after October 20, 2000 and before June 1, 2001, along with other
15  MGA agents and employees such as employees in Hong Kong and Mercedeh Ward;
16  and (viii) MGA perceived (correctly) that Bryant's concept for a new line of dolls was
17  one that needed considerable original, creative contributions and development by
18  skilled artists who would be retained by MGA. MGA also perceived (correctly) while
19  Bryant's idea provided a starting point, a significant amount of time, skill, resources,
20  and original creative effort would be required to create a line of dolls that would have
21  a chance of succeeding in the highly competitive fashion doll market, historically
22  dominated by Mattel's Barbie. MGA thus retained for that purpose skilled artists,
23  including Margaret Leahy, who worked for MGA as a sculptor throughout the
24  relevant time period, and face painter Anna Rhee. Considerable contributions to the
25  development of this product were also made by, among others, Paula Garcia, who was
26  responsible for the overall supervision of the project, Isaac Larian, Mercedeh Ward,
27  Veronica Marlow, and those involved in package design. This major investment by
28  MGA, and the risks it faced, confirms MGA's good faith.       **EXHIBIT 25**
                                                                 **PAGE 863**

1  Discovery is ongoing and the MGA Defendants reserve the right to supplement
2  this response and, consistent with its obligations under Federal Rule of Civil
3  Procedure 26(e), the MGA Defendants will supplement this response if they receive
4  additional responsive information.

5  The following persons have knowledge of facts and circumstances regarding
6  the foregoing:  Carter Bryant; Bryant's mother, Janet Bryant; Bryant's father, Thomas
7  Bryant; Isaac Larian; Jeanne Galvano; Richard Irmen; Elise Cloonan; Ramona Prince;
8  Margaret Leahy; Veronica Marlow; Mercedeh Ward; Sarah Halpern; Paula Garcia;
9  Steve Tarmichael; Rebecca Harris; Cecilia Kwok; David Dees; Jesse Ramirez;
10  Samuel Wong; Edmond Lee; Steven Lee; Aileen Storer; Eric Yip; Leon Djiguerian;
11  Steffen Smith; Rachel Harris; Maggie Siu; Ben Ton; Sam Wong; Ray Wong; Ann
12  Wang; David Rosenbaum.

13  The following documents are relevant to the foregoing: Carter Bryant's
14  August and September 1998 drawings that he called "Bratz" (including, but not
15  limited to, those drawings identified by Carter Bryant in Exhibit 5 of his deposition as
16  being sketched in August 1998); publicly available materials that Bryant identified in
17  his deposition testimony as inspiring his conception of a line of dolls in August or
18  September of 1998, including but not limited to the August 1998 issue of *Seventeen*
19  *Magazine*; all of Carter Bryant's sketches and/or modifications of sketches relating to
20  Bratz concepts which were made by him after January 4, 1999 and prior to October
21  21, 2000; each and every document, prototype, and sample produced by Margaret
22  Leahy, including documents and items marked as exhibits at her deposition and those
23  not marked as exhibits at her deposition; castings produced by Veronica Marlow at
24  her deposition, including photographs of such castings marked as exhibits at her
25  deposition; invoices submitted from Carter Bryant, Veronica Marlow, Anna Rhee,
26  Victoria O'Connor, and other invoices submitted by freelancers for work performed
27  on the Bratz project; documents relating to the work performed by MGA employees
28  and freelancers toward the reduction to practice of the first generation of Bratz dolls

78

1 | during the period after October 19, 2000 through June 1, 2001, including but not
2 | limited to: documents showing the development of the first generation of Bratz dolls;
3 | documents showing exchanges with the Hong Kong factory regarding the
4 | development of the first generation of Bratz dolls; documents showing the timing of
5 | the development of packaging, fashion, and accessories for the first generation of
6 | Bratz dolls; documents related to the January 2001 Hong Kong toy fair; documents
7 | related to the February 2001 New York toy fair; polyurethane samples of prototypes;
8 | rotocasts and sculpts in Hong Kong; all prototypes, samples, and tangible items
9 | produced by Margaret Leahy and Veronica Marlow, including items marked as
10 | exhibits at their depositions and those not marked as exhibits at their depositions;
11 | invoices submitted from Carter Bryant, Veronica Marlow, Anna Rhee, Victoria
12 | O'Connor, and other invoices submitted by freelancers for work performed on the
13 | Bratz project; Carter Bryant's August and September 1998 drawings that he called
14 | "Bratz" (including, but not limited to, those drawings identified by Carter Bryant in
15 | Exhibit 5 of his deposition as being sketched in August 1998); and all of Carter
16 | Bryant's sketches and/or modifications of sketches relating to Bratz concepts which
17 | were made by him after January 4, 1999 and prior to October 21, 2000; Carter
18 | Bryant's August and September 1998 drawings that he called "Bratz" (including, but
19 | not limited to, those drawings identified by Carter Bryant in Exhibit 5 of his
20 | deposition as being sketched in August 1998); publicly available materials that Bryant
21 | identified in his deposition testimony as inspiring his conception of a line of dolls in
22 | August or September of 1998, including but not limited to the August 1998 issue of
23 | *Seventeen Magazine*; Mattel's Brand Directional Outlines; analyses and assessments
24 | of Mattel's marketing strategies prepared and/or produced by Young and Rubicam
25 | Brands and Peterson Milla Hooks; Mattel's Marketing Department assessments of
26 | Mattel's advertising and branding strategies; Mattel's Creative Briefs; documents
27 | generated by Mattel Worldwide Consumer Research relating to any aspect of the
28 | market for fashion dolls, including without limitation Bratz, My Scene, and Barbie;

EXHIBIT 25
PAGE 865

1 | each and every document, prototype, and sample produced by Margaret Leahy,
2 | including documents and items marked as exhibits at her deposition and those not
3 | marked as exhibits at her deposition; castings produced by Veronica Marlow at her
4 | deposition, including photographs of such castings marked at her deposition; invoices
5 | submitted from Carter Bryant, Veronica Marlow, Anna Rhee, Victoria O'Connor, and
6 | other invoices submitted by freelancers for work performed on the Bratz project; all of
7 | Carter Bryant's sketches and/or modifications of sketches relating to Bratz concepts
8 | which were made by him after January 4, 1999 and prior to October 21, 2000.

9 | S.    Lack of Authority

10 | Mattel's counterclaims are barred in whole or in part on the grounds that to the
11 | extent any person committed an unlawful or tortious act, the person lacked authority
12 | to commit such act on behalf of the MGA Defendants.

13 | Discovery is ongoing and the MGA Defendants reserve the right to supplement
14 | this response and, consistent with its obligations under Federal Rule of Civil
15 | Procedure 26(e), the MGA Defendants will supplement this response if they receive
16 | additional responsive information.

**EXHIBIT 25**
**PAGE 866**

17 | T.    Lack of Standing

18 | Mattel's counterclaims are barred in whole or in part by its lack of standing
19 | because does not have any ownership interest in Bratz. Carter Bryant conceived of
20 | the idea for a new line of fashion dolls that he called "Bratz" in August/September
21 | 1998, a time when he was not employed by Mattel. There was neither a conception
22 | nor a reduction to practice of Bryant's idea for Bratz, as those terms are used in patent
23 | law and/or in the Employee Confidential Information and Inventions Agreement
24 | produced in this action by Mattel as M0001596 ("Employee Agreement"), during the
25 | period of Bryant's employment Mattel. Any work that Bryant performed relating to
26 | his Bratz ideas during the time period that he was still employed by Mattel constituted
27 | lawful steps by Bryant to prepare to embark upon a new career. Consequently, the
28 | Employee Agreement, which by its express terms is limited to inventions conceived

MGA'S RESPONSE TO MATTEL'S AMEND. SUPP. ROG RE AFFIRM. DEFENSES          NO. CV 04-9049 SGL (RNBx)

1  or reduced to practice during Bryant's term of employment with Mattel, does not
2  apply to Bryant's Bratz idea, and Bryant was the rightful and sole owner of his Bratz
3  idea and the concepts reflected in his illustrative drawings of his idea at the time he
4  transferred rights to Bratz to MGA.

5       While the Inventions Agreement covers utility patents, the concept of fashion
6  dolls was already in the public domain and could not and cannot be protected by a
7  utility patent. The Inventions Agreement does not apply to design patents in that said
8  Agreement did not include any reference to the statutory definition of a design patent.
9  35 U.S.C. §171 extends design patent protection for "any new, original and
10  ornamental design for an article of manufacture." Even if the Inventions Agreement
11  did cover design patents, no conception nor reduction to practice of an original
12  ornamental design for an article of manufacture related to Bratz occurred during
13  Carter Bryant's employment at Mattel. From a design patent law perspective, the
14  conception and reduction to practice of the Bratz dolls was accomplished on or after
15  October 21, 2001 by an artist, Margaret Leahy, working for MGA, and other Mattel
16  employees and agents, and not by Carter Bryant.

17       The Inventions Agreement does not cover copyright subject matter. In contrast
18  to earlier versions of the Inventions Agreement signed by Mattel employees as a
19  condition of their employment status, and other Mattel documents, the Agreement
20  signed by Carter Bryant specifically omitted a reference to "copyright subject matter."
21  Nor does the Inventions Agreement apply to Bryant's conception of a line of fashion
22  dolls.                                                    **EXHIBIT 25**
                                                              **PAGE 867**
23       To the extent that Mattel alleges that Bryant's concept for a new line of fashion
24  dolls, or the name "Bratz," are trade secrets of Mattel's, they are not covered by the
25  Inventions Agreement because they were conceived of by Bryant prior to his re-
26  employment by Mattel. In addition, even if they had been conceived of during
27  Bryant's second tenure at Mattel, they would not fall within the scope of the
28  Inventions Agreement because they were not concepts that were developed "as a

1 result of [Carter Bryant's] employment with the company." Bryant's job
2 responsibilities in his position that began on January 4, 1999 (in the Barbie
3 Collectibles group at Mattel) was to design fashions, hairstyles, and face appearances
4 using the standard Barbie sculpt for dolls that were marketed by Mattel as "Barbie".
5 In addition, the Inventions Agreement signed by Bryant on January 4, 1999,
6 specifically omitted references to Mattel's ownership of employee ideas, whereas
7 earlier and later versions of the Inventions Agreement and other similar documents,
8 including but not limited to the Mattel Proprietary Information Checkout Form signed
9 by Carter Bryant in October 2000, included employee "ideas" within their scope.
10 The Mattel Proprietary Information Checkout Form, to the extent it attempted to
11 impose new obligations and restrictions on Bryant on his last day at Mattel, would be
12 unenforceable for lack of consideration and fraud.

13     None of Mattel's employment-related forms signed by Carter Bryant required
14 him to disclose pre-existing concepts that he had created. However, prior and
15 subsequent employment forms utilized by Mattel did impose such a requirement on
16 new Mattel employees.

17     All of Mattel's employment-related form agreements are contracts of adhesion
18 under California law. Ambiguous contracts are to be construed strictly against the
19 drafter under California law. See Calif. Civil Code § 1654; Carsten's v. U.S. Shoe
20 Corp.'s Long-Term Benefits Disability Plan, 2007 WL 3236353 (N.D. Cal. October
21 31, 2007); Mayhew v. Benninghoff, 53 Cal. App. 4th 1365 (Cal. Ct. App. 1997). This
22 is particularly true in the case of a contract of adhesion. See generally Goddard v.
23 South Bay Union High Sch. Dist., 79 Cal. App. 3d 98 (Cal. Ct. App. 1978); Gray v.
24 Zurich Ins. Co., 65 Cal. 2d 263 (1966). All ambiguities in the "INVENTIONS
25 AGREEMENT" must therefore be resolved against Mattel.

**EXHIBIT 25**
**PAGE 868**

26     Discovery is ongoing and the MGA Defendants reserve the right to supplement
27 this response and, consistent with its obligations under Federal Rule of Civil
28 Procedure 26(e), the MGA Defendants will supplement this response if they receive

1 additional responsive information.

2     The following persons have knowledge of facts and circumstances relating to
3 the foregoing: Carter Bryant; Bryant's mother, Janet Bryant; Bryant's father, Thomas
4 Bryant; Jeanne Galvano; Richard Irmen, Elise Cloonan; Ramona Price; Margaret
5 Leahy; Veronica Marlow; Anna Rhee; Mercedeh Ward; Sarah Halpern; Paula
6 Treantafelles (Garcia); Steve Tarmichael; Rebecca Harris, Cecilia Kwok; David Dees;
7 Jesse Ramirez; Samuel Wong; Edmond Lee; Steven Lee; Aileen Storer; Eric Yip;
8 Leon Djiguerian; Rachel Harris; Maggie Siu; Ben Ton; Sam Wong; Ray Wong;
9 Sandy Yonemoto; Alan Kaye; Lissa Freed; Richard De Anda; Elise Cloonan; Ann
10 Driskill; Ron Longsdorf; Tina Tomiyama; Cassidy Park; Mattel's in-house legal staff,
11 including Michael Moore; Mattel's outside counsel, including "outside attorneys"
12 referred to by Richard De Anda in an undated email written by De Anda and sent to
13 Alan Kaye (M 0074400); Matt Bousquette; Ivy Ross; Adrienne Fontanella.

14     The following documents may be relevant to these facts:  the sketches drawn, in
15 whole or in part, by Bryant in or about August 1998, including those bearing the bates
16 numbers BRYANT 175, 176, 177, 178, 179, 180, 181, 182, 183, 186, 189, 190, 192,
17 193, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204, 205, 206, 207, 208, 209,
18 210, 211, 212, 213, 214, 215, 216, 217, 218, 219, 220, 277, 300, 301, 302, 303, 1003,
19 1243, 1977, 1993 and Exhibits 1, 2, and 3 to his deposition; publicly available
20 materials that Bryant identified in his deposition testimony as inspiring his conception
21 of a line of dolls in or about August 1998, including but not limited to the August
22 1998 issue of Seventeen Magazine; other documents shown to Bryant at his
23 November 2004 deposition and marked as exhibits thereto relating to the development
24 of his idea for Bratz; Transcript of the Deposition of Carter Bryant, the various
25 versions of Mattel's form of "Employee Confidential Information and Inventions
26 Agreement," including but not limited to the documents produced in this litigation
27 bearing bates numbers M0079358; M0079344-45; M0079342-43; M0079340-41;
28 M0079346-50; M0079352-57; M0096936-37; M0096983-84; all versions and/or

MGA'S RESPONSE TO MATTEL'S AMEND. SUPP. ROG RE AFFIRM. DEFENSES          NO. CV 04-9049 SGL (RNBx)

EXHIBIT 25
PAGE 869

1 iterations of the Mattel Conflict of Interest Policy and/or Conflict of Interest

2 Questionnaire, including the version signed by Carter Bryant in January 1999 (M

3 0001621), and any versions used by Mattel that preceded or followed the one signed

4 by Bryant in January 1999; all versions and/or iterations of the Mattel Proprietary

5 Information Checkout Form, including the version signed by Carter Bryant in October

6 2000 (M 0001604), and any versions used by Mattel that preceded or followed the

7 one signed by Bryant in January 1999.

8          U.       Joinder in Defenses of Co-Defendants

9          MGA Defendants hereby adopt and incorporate by reference any and all other

10 affirmative defenses that have been or will be asserted by any other defendant

11 (including Bryant) in this litigation to the extent that defendants may share in such

12 affirmative defenses.

13          Discovery is ongoing and the MGA Defendants reserve the right to supplement

14 this response and, consistent with its obligations under Federal Rule of Civil

15 Procedure 26(e), the MGA Defendants will supplement this response if they receive

16 additional responsive information.

17          V.       Undiscovered Defenses

18          The MGA Defendants have insufficient knowledge or information upon which

19 to form a belief as to whether additional defenses are available. Throughout this case,

20 Mattel has failed to comply with its discovery obligation and abused the discovery

21 process by, among other things, destroying evidence, unilaterally canceling scheduled

22 depositions, asserting meritless objections, and causing delay after delay. The MGA

23 Defendants continue their factual investigation and currently await Mattel's

24 compliance with multiple Court Orders compelling discovery. The MGA Defendants

25 / / /

26 / / /

27 / / /

28 / / /

EXHIBIT 25
PAGE 870

84

1 also have pending motions to compel against Mattel. The MGA Defendants reserve

2 the right to assert any further or additional defenses upon receiving more complete

3 information regarding the matters alleged in the Counterclaims, through discovery or

4 otherwise.

5

6 DATED:  January 7, 2008

7                                             SKADDEN, ARPS, SLATE, MEAGHER &
                                              FLOM LLP
8

9                                             By: _____
                                                      Thomas J. Nolan
10                                            Attorneys for Counter-Defendants, MGA
                                              ENTERTAINMENT, INC., ISAAC LARIAN,
11                                            MGA ENTERTAINMENT (HK) Ltd., and MGAE
                                              de MEXICO S.R.L. de C.V.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                                                    **EXHIBIT 25**
                                                                      **PAGE 871**

85

MGA'S RESPONSE TO MATTEL'S AMEND. SUPP. ROG RE AFFIRM. DEFENSES          NO. CV 04-9049 SGL (RNBx)

**EXHIBIT 26**

1  KEKER & VAN NEST, LLP
   JOHN W. KEKER - #49092
2  jkeker@kvn.com
   MICHAEL H. PAGE - #154913
3  mpage@kvn.com
   CHRISTA M. ANDERSON - #184325
4  canderson@kvn.com
   MATTHEW M. WERDEGAR - #200470
5  mwerdegar@kvn.com
   JOHN E. TRINIDAD - #250468
6  jtrinidad@kvn.com
   AUDREY WALTON-HADLOCK- #250574
7  awaltonhadlock@kvn.com
   710 Sansome Street
8  San Francisco, CA  94111-1704
   Telephone: (415) 391-5400
9  Facsimile: (415) 397-7188

10 Attorneys for Plaintiff
   CARTER BRYANT

11

12                    UNITED STATES DISTRICT COURT

13          CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

14

15

16 CARTER BRYANT, an individual,        Case No. CV 04-09049 SGL (RNBx)
                                        (consolidated with CV 04-9059 & 05-
17                    Plaintiff,        2727

18     v.                               CARTER BRYANT'S RESPONSES
                                        TO MATTEL, INC.'S AMENDED
19 MATTEL, INC. a Delaware              SUPPLEMENTAL
   Corporation,                         INTERROGATORY REGARDING
20                                      DEFENDANTS' AFFIRMATIVE
                      Defendant.        DEFENSES
21
   CONSOLIDATED WITH MATTEL,            CONFIDENTIAL --
22 INC., v. BRYANT and MGA              ATTORNEYS' EYES ONLY
   ENTERTAINMENT, INC. v.
23 MATTEL, INC.                         Judge:   Hon. Stephen G. Larson
                                        Discovery Cut-Off: Jan. 28, 2008
24

25

26    PROPOUNDING PARTY:    MATTEL, INC.

27    RESPONDING PARTY:     CARTER BRYANT

28    SET NO.:              SUPPLEMENTAL (AMENDED)

                              1-7

408830.01      CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S AMENDED SUPPLEMENTAL INTERROGATORY
                         CASE NO. CV 04-09049 SGL (RNB EXHIBIT

                                                  PAGE_____

                                                              EXHIBIT 26
                                                              PAGE 872

1  Pursuant to Federal Rules of Civil Procedure 33, and the Court's December

2  3, 2007 Order, Carter Bryant responds and answers Mattel Inc.'s Amended

3  Supplemental Interrogatory Regarding Defendants' Affirmative Defenses as

4  follows:

5  **Preliminary Statement**

6  1.     This preliminary statement applies to all responses Bryant provides

7  below to Mattel's Amended Supplements Interrogatory Regarding Defendants'

8  Affirmative Defenses.  Bryant's responses are made without waiving, or intending

9  to waive but, on the contrary, expressly reserving:  (a) the right to object, on the

10  grounds of competency, privilege, relevancy or materiality, or any other proper

11  grounds, to the use of the responses, for any purpose in whole or in part, in any

12  subsequent step or proceeding in this action or any other action; (b) the right to

13  object on any and all grounds, at any time, to other interrogatories or other

14  discovery procedures; and (c) the right at any time to revise, correct, add to, or

15  clarify any of the responses propounded herein.  Bryant's responses are made for

16  the purposes of this action only.

17  2.     Bryant's responses herein are to the best of Bryant's present

18  knowledge, information and belief.  Bryant's responses are at all times subject to

19  such additional or different information that discovery or further investigation may

20  disclose and, while based on the present state of Bryant's recollection and

21  knowledge, are subject to such refreshing of recollection, and such additional

22  knowledge of facts, as may result from further discovery or investigation.  Bryant

23  also anticipates that further discovery, investigation, and legal research and

24  analysis, as well as expert analysis, will reveal new facts or new significance of

25  known facts, which may lead Bryant to discover other information responsive to

26  this Interrogatory.  Also, as detailed more fully in particular responses, Mattel has

27  strenuously resisted and obstructed complete discovery on some of the affirmative

28  defenses at issue in these responses.  Although Mattel has now been ordered to

408830.01

1

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S AMENDED SUPPLEMENTAL INTERROGATORY
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT 26
PAGE 873

PAGE_____

EXHIBIT_____

1   provide full discovery on many of the relevant issues, other issues remain pending

2   before the Discovery Master and the Court. Mattel's stalling of this discovery, as

3   well as other pending discovery, has limited Bryant's ability to respond fully here.

4   Bryant reserves the right to amend or supplement his objections and responses in

5   light of any future discovery, investigation or analysis, and to use any such

6   information at any hearing or at trial. Bryant also expressly reserves the right to

7   make any use of, or to introduce at any hearing or at trial, information that is

8   responsive to Mattel's interrogatories, but discovered subsequent to Bryant's

9   responses herein, or omitted from this response through any mistake or oversight.

10   3. Bryant's responses are based on his understanding and interpretation

11   of the interrogatory. Bryant reserves the right to supplement his objections and

12   responses should Mattel subsequently put forth an interpretation of any part of the

13   interrogatory that differs from that of Bryant.

14   4. The responses below shall not be construed as an admission as to the

15   relevance or admissibility of any statement or characterization contained in any

16   interrogatory. Bryant reserves all objections, including without limitation

17   objections as to competency, relevance, materiality, privilege, authenticity, or

18   admissibility. Bryant also reserves all other rights with respect to these responses,

19   including all rights to challenge on appeal the Court's December 3, 2007 Order

20   requiring Bryant to answer this interrogatory "without objection."

21   5. Bryant reserves the right to object on any ground at any time to such

22   other or supplemental discovery requests as Mattel may propound involving or

23   relating to the same subject matter of these interrogatories.

24   6. Bryant does not intend to disclose here any information that was

25   prepared in anticipation of litigation, constitutes attorney work product, discloses

26   mental impressions, conclusions, opinions or legal theories of any attorney for or

27   other representative of Bryant, contains privileged attorney-client communications

28   or is otherwise protected from disclosure by any other privileges, laws, or rules.

408830.01

2

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S AMENDED SUPPLEMENTAL INTERROGATORY
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT

PAGE____

EXHIBIT 26
PAGE 874

1   Any disclosure of such protected or privileged information is inadvertent and shall
2   not be construed as a waiver of those privileges or protections.  Bryant reserves the
3   right to correct the record as to any such disclosure, as provided for in the
4   Protective Order governing this case.

5       7.      As previously mentioned, discovery has yet to be completed in this
6   case.  By responding and objecting to these interrogatories, Bryant does not intend
7   to, and does not, limit the evidence he may rely to support his contentions and
8   defenses at trial, or to rebut or impeach contentions, assertions, and evidence
9   presented by Mattel.

10      8.      Bryant does not hereby admit, adopt or acquiesce in any factual or
11  legal contention, assertion or characterization contained in the Interrogatory or any
12  particular request therein.

13      9.      No incidental or implied admissions are intended by this Response.
14  These responses should not be taken as an admission that Bryant accepts or admits
15  the existence of any facts set forth or assumed by any instruction, definition or
16  interrogatory.

17                          **Responses**

18  **Supplemental Interrogatory:**

19      State the facts upon which YOU intend to rely at trial to support YOUR
20  affirmative defenses, and IDENTIFY all PERSONS with knowledge of those facts
21  and all DOCUMENTS that REFER OR RELATE TO those facts.

22  **Responses to Supplemental Interrogatory:**

23  **A.    First Affirmative Defense (Unclean Hands)**

24      Mattel's counterclaims, and each claim for relief, are barred by the equitable
25  doctrine of unclean hands.  Mattel's conduct towards Bryant and MGA regarding
26  the matters at issue in this litigation has been unfair, and Mattel is undeserving of
27  any relief against Bryant.  In particular, Mattel believed from the time that Bryant
28  left Mattel's employ that he was going to perform work for a Mattel competitor,

408830.01

3

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S AMENDED SUPPLEMENTAL INTERROGATORY
CASE NO. CV 04-09049 SGL (RNBx)   EXHIBIT

PAGE____

**EXHIBIT 26**
**PAGE 875**

1  and Mattel shortly thereafter began investigating what it suspected to be

2  wrongdoing in connection with the Bratz dolls.  Yet, Mattel waited and said

3  nothing while the dolls were successfully (and at great cost) developed,

4  manufactured and sold, and only filed suit years later.  Also, Mattel has attempted

5  to undermine and "kill" Bratz.

6       Mattel's counterclaims are barred by the equitable doctrine of unclean hands

7  because, among other things, Mattel intentionally delayed taking legal action

8  against MGA or Carter Bryant for several years after the launch of Bratz in the

9  belief that Mattel would be able to drive Bratz (and as a result, drive MGA) out of

10 the market for fashion dolls and/or the belief that Mattel did not have any rights

11 under the "Inventions Agreement" as against Bryant, based on its own

12 interpretations of the "Inventions Agreement," and on the advice that Mattel

13 received from in-house and outside counsel.  Mattel also waited to file suit until

14 after it had secured Bryant's assistance in an unrelated legal action against another

15 Mattel competitor, namely the litigation known as *Gunther-Wahl Productions v.*

16 *Mattel, Inc.*, Case No. BC195819 filed on or about August 12, 1998 in the Superior

17 Court of the State of California, County of Los Angeles, and subsequent appeals.

18 Mattel only took legal action after it no longer needed Bryant's assistance, and

19 well after MGA and Bryant had invested substantial amounts of capital and

20 creative and innovative human effort in the Bratz line of dolls and had experienced

21 enormous success in the market place.

22       A report from Bryant's exit interview at Mattel shows that Bryant told

23 Mattel's human resources representative he was leaving because an "[o]pportunity

24 arose; had to take it."  Mattel has acknowledged that employees leaving under

25 similar circumstances to work for an unnamed competitor have "caused Mattel to

26 begin investigating their activities."

27       Furthermore, numerous Mattel employees knew and/or believed in the fall

28 of 2001 that Carter Bryant was involved in the development and introduction of the

4

408830.01

EXHIBIT ____

PAGE ____

**EXHIBIT 26**
**PAGE 876**

1   Bratz line. This knowledge and/or these beliefs by Mattel employees went well

2   beyond mere "rumor and innuendo," as has been suggested by Mattel. In its

3   interrogatory responses, Mattel also asserts that Bryant used several "other Mattel

4   employees" to work on the Bratz dolls so that they "had been designed and were

5   far along in development during the time that Bryant was employed by Mattel."

6          Shortly after Bratz dolls were in retail stores in or about September 2001,

7   Mattel knew or was on notice that Carter Bryant was involved in the development

8   of that line. Mattel now asserts in this lawsuit that the idea for Bratz was a

9   violation of rights that Mattel had in a proposed flanker brand called "Toon

10  Teens," which Mattel was developing in the summer of 1999, but never introduced

11  to market. In this connection, during 2001, Toon Teens samples were taken out of

12  storage by Mattel employees and delivered to Mattel's legal department for

13  analysis of possible copyright infringement and other claims against Bryant and

14  MGA.

15         Mattel knew Bryant's role in Bratz and was investigating possible claims *at*

16  *least as early as summer 2001*, when Bratz came out. Margaret Leahy, the third-

17  party sculptor of Bratz, testified that in the summer of 2001 a friend from Mattel

18  was "grilling" her, "like somebody put her up to it," about whether "Carter [was]

19  the designer on the doll or what was [MGA employee and former Mattel

20  employee] Paula [Garcia's] involvement" in Bratz. Leahy testified that she told the

21  Mattel employee that "Carter initially came up with a design and Paula carried it

22  out."

23         Mattel actively investigated Bryant's role in creating Bratz in 2001 and

24  2002. Mattel's internal investigative files confirm that Mattel commenced an

25  official investigation into whether Bryant stole the Bratz idea in March 2002.

26  Mattel admitted that in 2002 it investigated "rumor and innuendo that Bryant may

27  be working with MGA on Bratz," including whether "Bryant … plagiarized

28  [Mattel product] 'Toon Teens' and created Bratz dolls for MGA" and whether

5

408830.01   CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S AMENDED SUPPLEMENTAL INTERROGATORY
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT __
PAGE __

EXHIBIT 26
PAGE 877

1  Bryant helped MGA create Bratz "[w]hile he was working with Mattel." Mattel's
2  CEO Robert Eckert received an "anonymous letter" on or about August 5, 2002
3  that alleged that Bryant helped MGA create Bratz while working for Mattel. As
4  part of an official investigation requested by Mattel CEO Robert Eckert in August
5  2002 as to whether Bryant helped MGA create Bratz "[w]hile he was working with
6  Mattel," Mattel's head of security, Richard De Anda, wrote that he had been
7  "aware of this situation and … working on it for several months" but it was in the
8  hands of Mattel's attorneys. Testimony from former Mattel employee Elise
9  Cloonan confirms that by at least late 2001, Mattel's lawyers were conducting an
10 investigation involving Bryant's work on Bratz in the design department.

11     On March 15, 2002, Mattel opened an investigative file on MGA and Isaac
12 Larian after receiving information from Evelyn Viohl and Ivy Ross that MGA had
13 recently hired a number of former Mattel employees and was reportedly
14 manufacturing products that appeared to be Mattel designs.

15     Mattel has also forfeited any right it may have had to enforce Paragraph 3-a
16 of the "Inventions Agreement" against Carter Bryant as a result of laches, estoppel,
17 consent, and waiver. It was common knowledge at Mattel that many Mattel
18 employees employed in the Mattel design center worked on a freelance basis for
19 third parties, including Mattel competitors, and/or on their own projects with the
20 anticipation that such projects eventually would be offered for sale to third parties,
21 including Mattel competitors. Indeed, Ms. Cloonan testified that the practice was
22 so widespread that there was even a name for it at Mattel: a "G-Job". Mattel
23 employees performed non-Mattel work while employed by Mattel and Mattel
24 consented to this moonlighting. For example, Margaret Leahy testified that her
25 Mattel supervisor, Michael Hebden, suggested to her that she seek out
26 moonlighting work. Robert Best developed a fashion line while employed at
27 Mattel. Best disclosed this to Mattel and was not terminated. Joni Pratt created
28 volleyball and basketball books for her daughter's high school outside of work,

408830.01

6
CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S AMENDED SUPPLEMENTAL INTERROGATORY
CASE NO. CV 04-09049 SGL (RNBx)  EXHIBIT ___

EXHIBIT 26
PAGE 878
PAGE ___

1  along with invitation and wrapping paper. Pratt testified that she showed these
2  works to her supervisor at Mattel so there could be no misunderstanding that it was
3  not related to her work at Mattel. Pratt has not disclosed everything she has drawn
4  outside of work and testified that she does not feel she has an obligation to show
5  her supervisors everything she has drawn outside of work. Lori Sipos, a designer
6  at Mattel, created puppets as a hobby while she worked at Mattel. Sipos told Jill
7  Nordquist about her hobby when showing her one of her puppets, but she was not
8  telling Nordquist about the puppets in an effort to "report" her work. Nordquist
9  testified that she was informed about the designs other people created outside of
10 work in the course of sharing hobbies and not as part of an effort to report their
11 works. Veronica Marlow helped Dianne Gavin develop a line of handbags while
12 both were employed at Mattel. At her deposition, Veronica Marlow testified that
13 Isabel Cabrera, Beatrice Morales, and Maria Elena Salazar worked with her on
14 fashions for Bratz while they were employed by Mattel. Some of Mattel's sample
15 makers made wedding gowns and did nails on the weekends and evenings and
16 some of Mattel's hair rooters worked in hair salons on weekends. Indeed, Richard
17 De Anda, Mattel's head of security, testified at his deposition that he also
18 moonlighted as an expert witness and consultant while working for Mattel. De
19 Anda further testified that he does not believe that Mattel owns or has a claim on
20 the work he does for himself. Despite knowledge of this activity, Mattel rarely, if
21 ever, enforced any rights it may have had to prohibit such moonlighting.

22      Issues concerning this Defense are currently the subject of outstanding
23 discovery requests. In particular, Mattel has staunchly refused to provide
24 discovery that would address when, in fact, Mattel first had reason to suspect
25 Bryant's involvement in Bratz, his alleged breach of contract, his work for MGA,
26 and Mattel's alleged "true owner[ship] of Bratz," in spite of numerous interrogatory
27 requests, document requests, requests for admission, and deposition notices.
28 Defendants' concerns regarding Mattel's discovery abuses have recently been

7

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S AMENDED SUPPLEMENTAL INTERROGATORY
CASE NO. CV 04-09049 SGL (RNBx) EXHIBIT ___

PAGE ___

EXHIBIT 26
PAGE 879

1   addressed in multiple motions to compel both before Judge Infante and Judge
2   Larson. Indeed, on January 3, 2008, Judge Infante overruled all of Mattel's
3   objections and compelled discovery relevant to Defendants' statute of limitations
4   and laches defenses. However, Mattel has yet to provide the ordered discovery.
5           Mattel's counterclaims are also barred in whole or in part by Mattel's
6   unclean hands and wrongful acts based, in part, on Mattel's efforts to undermine
7   MGA's business and to "kill" Bratz at any cost. This includes, but is not limited
8   to, Mattel's efforts to infringe and dilute MGA's trade dress, copy MGA's
9   products, packaging, themes, and advertising, and engage in other acts of unfair
10  competition against MGA. Since the Bratz dolls were launched in 2001, Mattel
11  has serially imitated and copied many of MGA's products, trade dress, trademarks,
12  themes, ideas, advertising and product packaging, including, but not limited, to:

13      •   Mattel imitated and copied the disproportionately large heads,
14          distinctive faces with artfully made-up, heavy-lidded, sultry, almond-
15          shaped large eyes and large, overly-lined and lipsticked lips, trendy,
16          hip clothes and hair styles, and oversized feet of MGA's Bratz female
17          fashion dolls with Mattel's My Scene fashion dolls. Further, Mattel
18          has systematically proceeded to modify the faces of the My Scene
19          fashion dolls since their original release to copy and imitate the
20          distinctive faces of the Bratz fashion dolls more and more over time as
21          detailed and illustrated with photographs in pages 10-17 of MGA's
22          Complaint.

23      •   Mattel imitated and copied the distinctive packaging and overall look
24          and total image of Bratz fashion dolls, including the transparent and
25          open style of the Bratz fashion doll packaging, the *tout ensemble*-style
26          of the Bratz fashion doll packaging, and the "flying banner" ribbon-
27          style slogan running across the middle of the box of the Bratz fashion
28          dolls. Further, as detailed in pages 17-19 of MGA's complaint, Mattel

8

EXHIBIT 26
PAGE____          PAGE 880

1  has systematically proceeded to change its "My Scene" packaging to

2  copy and imitate the Bratz doll packaging more and more over time.

3  • In September 2004, MGA was informed by a Wal-Mart Mexico buyer

4  that Mattel is packing its closed out Flava dolls in a trapezoid-shaped

5  packaging that is confusingly-similar to Bratz fashion doll packaging.

6  • Mattel copied and imitated the "Wintertime Wonderland" theme and

7  concept for Brat" fashion dolls with the "Chillin' Out!" theme for

8  "My Scene" fashion dolls, which are dressed in trendy winter clothes

9  and are packaged with winter sport accessories.

10 • Mattel copied and imitated the "Formal Funk" theme and concept for

11 Bratz fashion dolls with the "Night on the Town" theme for My Scene

12 fashion dolls, which are dressed in trendy formal wear or evening

13 gowns.

14 • Mattel copied and imitated the "Sun-Kissed Summer" theme, concept

15 and packaging for Bratz fashion dolls with the "Jammin' in Jamaica"

16 theme for "My Scene" fashion dolls, which are dressed in trendy

17 bathing suits and are packaged with beach gear and water sport

18 accessories.

19 • Mattel copied and imitated the "Forever Diamondz" theme and

20 concept for Bratz fashion dolls with the "My Bling Bling" theme for

21 "My Scene" fashion dolls, which are packaged real diamond jewelry

22 that can be worn by girls.

23 • Mattel copied and imitated Bratz television commercials for its My

24 Scene commercials. The elements of these Bratz commercials copied

25 and imitated by Mattel include the combination of live-action footage

26 with cartoon or animated figures of the dolls featured in the

27 commercial, the use of multi-ethnic, "tween"-aged female actresses to

28 portray each of the dolls in the multi-ethnic line, "hip"- sounding

9

408830.01   CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S AMENDED SUPPLEMENTAL INTERROGATORY
CASE NO. CV 04-09049 SGL (RNBx)   EXHIBIT _____

EXHIBIT 26
PAGE _____   PAGE 881

theme songs or jingles repeating the name of the doll line being advertised and similar camera angles and techniques, including sweeping in to a close-up of the doll as the doll turns or twists and its hair flips in a dramatic fashion. Mattel copied and imitated these features in several "My Scene" advertisements, including those featuring the "My Scene" "Stylin' Head", the "My Scene" "My Bling Bling" theme and the "My Scene" "RollerGirls" theme.

- In April 2002, Margo Eldridge informed Isaac Larian that Mattel was intentionally trying to book the same actresses who portrayed the Bratz girls in MGA's commercials in order to interfere with MGA's ability to shoot its own commercials. Further, in June 2003, Margo Eldridge informed Isaac Larian that Mattel was contacting and attempting to hire the same essential crew members used by MGA for Mattel's commercials.

- Mattel hired at least one of the actresses who has appeared in several Bratz commercials. This actress now appears in "My Scene" commercials, including being featured prominently in the commercial for "My Scene" "My Bling Bling".

- Mattel filmed a Polly Pocket commercial in the same mall and featuring the same escalator as appeared in a previous Bratz commercial.

- Mattel copied and imitated the distinctive trapezoidal-shaped packaging for MGA's "Bratz Formal Funk Super Stylin' Runway Disco" play set with its trapezoidal-shaped packaging for its "My Scene Sound Lounge" play set.

- Mattel copied and imitated MGA's "Bratz Funky Fashion Makeover" heads with its "My Scene Stylin' Heads," which have distinctive faces

10
408830.01      CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S AMENDED SUPPLEMENTAL INTERROGATORY
CASE NO. CV 04-09049 SGL (RNBx) EXHIBIT

EXHIBIT 26
PAGE 882

1   with artfully made-up, heavy-lidded, almond-shaped large eyes, and

2   large, overly-lined and lipsticked lips.

3   • Mattel copied and imitated a portion of the Bratz dolls famous

4   trademarked tag line "The Girls with a Passion for Fashion" on its

5   website for its Diva Starz dolls by asking users: "Do you have a

6   passion for fashion?"

7   • Mattel copied and imitated MGA's "Bratz Petz" plush toys (including,

8   but not limited to, "Bratz Dogz") with its "My Scene" plush pets,

9   which have large, human-like, made-up eyes with long eye lashes and

10   wearing trendy human clothing.

11   • Mattel copied and imitated MGA's packaging for "Bratz Petz" with

12   its packaging for "My Scene" plush pets, which consists of an open

13   box with no top and with partial side panels that slope from a narrow

14   front panel to a higher back panel.

15   • Mattel copied and imitated MGA's "4-Ever Best Friends" doll line

16   with its "Wee 3 Friends" doll line, which is a line of "little girl"

17   fashion dolls with a number in the name of the doll line, packaged

18   together as "friends" with themed accessories and mix-and-match

19   outfits.

20   • Mattel copied and imitated MGA's packaging for the "4-Ever Best

21   Friends" doll line with its packaging for the "Wee 3 Friends" doll line,

22   which has the same pink and teal color schemes, rounded heart-like

23   shape and serves as a display/carrying case.

24   • Mattel copied and imitated MGA's "Mommy's Little..." doll line with

25   its "Little Mommy..." doll line, which is a line of baby or toddler-like

26   dolls with the words "Little" and "Mommy" in the title and which are

27   sold with themed-accessories.

28

EXHIBIT __     **EXHIBIT 26**
               **PAGE 883**

PAGE

408830.01     CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S AMENDED SUPPLEMENTAL INTERROGATORY
              CASE NO. CV 04-09049 SGL (RNBx)

1    • Mattel copied and imitated the strong, extreme, battle-like theme of
2    "Alien Racers" toy racing vehicles with its revamped and renamed
3    "AcceleRacerS" toy racing vehicles.

4    • Mattel copied and imitated the "Alien Racers" logo with its
5    "AcceleRacerS" logo, which accentuates the "A," "R," and "S" in
6    compressed block lettering.  Mattel copied and imitated MGA's
7    "other-worldly" themed television commercials for "Alien Racers"
8    with television commercials for "AcceleRacerS."  In these
9    "AcceleRacerS" commercials, the product competes against alien-like
10   Cyborgs in a "race to save the world," which copies and imitates
11   MGA's alien theme and commercials in which "Alien Racers" are in
12   engaged in a "race to save the universe."

13   Mattel's confusingly-similar products, packaging and commercials have
14   confused consumers, retailers, and members of the press:

15   • In November 2002, confused consumers emailed MGA's customer
16   service department, seeking information about where to buy a
17   "Madison Bratz doll."  These emails were produced to Mattel.

18   • On March 17, 2004, a reporter for an Oregon newspaper mistakenly
19   identified a "My Scene Stylin' Head" as a Bratz hair and makeup doll
20   head."

21   • On October 6, 2004, a BBC News Online Business Reporter listed
22   Bratz fashion dolls as the first of the "10 top-selling toys this
23   Christmas," but mistakenly included "My Scene Masquerade" fashion
24   dolls (instead of Bratz fashion dolls) in the photograph illustrating the
25   top-selling toys.

26   • In or around April 2005, retailers in a Target store in Atlanta, Georgia
27   mistakenly merchandized "My Scene" pets in the middle of the "Bratz
28   Petz" product display.

EXHIBIT ____

**EXHIBIT 26**
**PAGE 884**

PAGE ____

12

- In or around November 2006, the main AOL shopping website (shop.aol.ca) reported one of the "Top Picks by Toys 'R Us" is "Barbie Diamondz by MGA".

- In December 2006, a Kansas second-grade student asked for a "My Scene Bling Bling Bratz Head" in a letter to Santa posted on the Northeast USD 246 website.

- In an eBay posting, dated February 2, 2006, a parent asked for a "Bratz 'Madison'" doll - "preferably in mint condition. It's for my daughter of the same name. I think the company stopped making them. Or changed the name."

- In or around January 2007, on the website "La Papa," a seller advertises a "Bratz Chelsea" doll (when the pictured item is a "My Scene Chelsea" doll).

- In or around January 2007, an eBay seller repeatedly refers to the pictured "Bratz Play Sportz Yasmin" doll as the "Barbie Bratz Doll Yasmin."

- In or around January 2007, an eBay seller describes the "My Scene Convertible" that it is attempting to sell as a "Bratz My Scene Black Convertible."

- A "Customer Review" for the "My Scene Hudson" doll, dated May 26, 2003, on Amazon.com provides: "I got a Hudson for my 11th birthday and he was so nice. I thought it was a Bratz...."

- During a visit to a Toys 'R Us store in Livingston, New Jersey in or around May 2006, Dan Cooney witnessed a woman buy a "My Scene Madison" doll that she mistakenly believed was a "Bratz Sasha" doll.

- Many of Mattel's own focus group studies and consumer research analyses have revealed consumer confusion between Bratz products and My Scene products.

EXHIBIT ___
PAGE ___

**EXHIBIT 26**
**PAGE 885**

13

In a further attempt to harm MGA's business, Mattel has threatened, manipulated, improperly influenced, and intimidated many people and companies (including, but not limited to, freelancers, employees, licensees, retailers, distributors, manufacturers, raw good suppliers, and industry bodies) to prevent them from working with MGA. For example, Mattel has disseminated false information to retailers and others about MGA in order persuade retailers not to purchase MGA products and manipulate the retail market.

- Mattel falsely told Toys 'R Us that MGA was giving another major United States retailer below-market pricing.

- In August 2004, Barb Lubestine of Wal-Mart told Isaac Larian that Mattel representatives told her that Bratz is "dying" at Target and Toys 'R Us, which was false.

- In May 2004, Lin Sherlock of Woolworths U.K. informed Isaac Larian that Mattel falsely informed her that two major U.S. retailers were delisting MGA's "4-Ever Best Friends" and that Mattel's copycat product ("Wee 3 Friends") was outselling "4-Ever Best Friends."

- In February 2005, Margo Eldridge informed Isaac Larian that Bob Moehl (creative head of Fisher Price advertising at FCB) told her that, at Toy Fair in February 2005, Mattel falsely told retailers that Bratz sales were off by 14% and that "Barbie" sales were up by 3%.

- In February 2005, Rosana Ferrer (a distributor and licensee of Bratz in Puerto Rico) informed Isaac Larian that Mattel sent an email to one of her customers, falsely stating that MGA had a big decline in sales worldwide and that Mattel was the # 1 brand worldwide.

- In or around June 2005, Mattel told Dean Gianoukas, an analyst at J.P. Morgan, that Mattel was gaining share and that Bratz was slowing, even though Bratz had grown by 17%. EXHIBIT

**EXHIBIT 26**
**PAGE 886**

14

1       •   In February 2006, Neil Friedman falsely reported to the press that

2            more than 51 million people visit the Barbie.com website per month

3            when the number is much lower.

4      Mattel has also threatened and pressured distributors and retailers not to

5 distribute Bratz products.

6       •   In February 2002, "Michael D" of JNH informed Martin Hitch of

7            MGA that Mattel (specifically Adrienne Fontanella and Matt

8            Bousquette) were very upset that MGA used Bandai as distributors

9            and thus would not allow Banda representatives into the "Barbie

10            Gallery."

11       •   In June 2003, Jose Antonio of Bandai Spain informed Isaac Larian

12            that Mattel was threatening retailers.

13       •   Mattel has a relationship with Jumbo, the largest retailer in Greece.

14            Jumbo refuses to sell MGA products, which MGA believes is due to

15            Mattel's improper influence and pressure.  Moreover, in February

16            2006, Berte Dario, Managing Director of Giochi Preziosi, informed

17            Isaac Larian that Fontini Karageorgi said that Mattel was blacklisting

18            retailers in Greece that sold Bratz.

19      Mattel's manipulation of the retail market also included Mattel's efforts to

20 tamper with retail displays and disseminate false information about the retail

21 market.  Mattel merchandisers have tampered with MGA's retail displays to

22 replace favorably-placed MGA merchandise with Mattel merchandise.

23       •   In July 2006, Heather Hocut of Wal-Mart informed Isaac Larian that

24            Mattel merchandisers moved Bratz modulars from the front of a Wal-

25            Mart store to the back and replaced the modulars in the front of the

26            store with Barbie products.  Ms. Hocut warned Erica Ashbrook that if

27            she ever caught them doing this again Mattel merchandisers would not

28

**EXHIBIT 26**
**PAGE 887**

15

'408830.01

1    be allowed at Wal-Mart.  Ms. Hocut also said that Ms. Ashbrook

2    notified Connie Hibbert (or Hebert) about this issue.

3    • Mattel altered retails displays at Toys 'R Us by moving its products

4    into shelves reserved for MGA products.  In August 2003, Yuval

5    Caspi visited a Toys 'R Us store in Van Nuys, California and saw

6    Mattel's Flava dolls set up between the Bratz dolls in the section

7    reserved for Bratz.  Mattel's in-store merchandisers tampered with

8    MGA shelf space at Toys 'R Us in Santa Monica, California in or

9    around March or April 2004.

10   • In October 2002, Robin Hogel of Zellers (a Canadian retail chain)

11   informed Mark Robinson of MGA that Mattel was pressuring Zellers

12   to give Bratz less desirable aisle and shelf space.

13   Mattel has also intimidated former Mattel employees who have gone to

14   work for MGA by sending threatening letters to them warning them not to disclose

15   publicly-available information about Mattel.

16   • On December 20, 2004, Mattel sent a letter to MGA regarding Dawn

17   Whitaker, warning MGA that Ms. Whitaker had signed an Employee

18   Confidential Information and Inventions ("ECII") Agreement with

19   Mattel requiring that Ms. Whitaker maintain the secrecy of personnel

20   information, forecasts, financial data, business strategies, product

21   plans, marketing plans, and inventions, among other information.

22   Mattel further warned MGA that Mattel "vigorously enforces" such

23   agreements, including by seeking all available remedies, and that Ms.

24   Whitaker had been so informed.

25   • On February 18, 2005, Mattel sent a letter to MGA regarding Alice

26   Kao, warning MGA that Ms. Kao had signed an ECII Agreement with

27   Mattel requiring that Ms. Kao maintain the secrecy of personnel

28   information, forecasts, financial data, business strategies, product

16

408830.01

EXHIBIT ___

PAGE ___

**EXHIBIT 26
PAGE 888**

1    plans, marketing plans, and inventions, among other information.

2    Mattel further warned MGA that Mattel "vigorously enforces" such

3    agreements, including by seeking all available remedies, and that Ms.

4    Kao had been so informed.

5    • On March 7, 2005, Mattel sent a letter to MGA regarding Joyce Kim,

6    warning MGA that Ms. Kim had signed an ECII Agreement with

7    Mattel requiring that Ms. Kim maintain the secrecy of personnel

8    information, forecasts, financial data, business strategies, product

9    plans, marketing plans, and inventions, among other information.

10   Mattel further warned MGA that Mattel "vigorously enforces" such

11   agreements, including by seeking all available remedies, and that Ms.

12   Kim had been so informed.

13   • On March 10, 2005, Mattel sent a letter to MGA regarding Janet Han,

14   warning MGA that Ms. Han had signed an ECII Agreement with

15   Mattel requiring that Ms. Han maintain the secrecy of personnel

16   information, forecasts, financial data, business strategies, product

17   plans, marketing plans, and inventions, among other information.

18   Mattel further warned MGA that Mattel "vigorously enforces" such

19   agreements, including by seeking all available remedies, and that Ms.

20   Han had been so informed.

21   • On May 20, 2005, Mattel sent a letter to MGA regarding Jim Huntley,

22   warning MGA that Mr. Huntley had signed an ECII Agreement with

23   Mattel requiring that Mr. Huntley maintain the secrecy of personnel

24   information, forecasts, financial data, business strategies, product

25   plans, marketing plans, and inventions, among other information.

26   Mattel further warned MGA that Mattel "vigorously enforces" such

27   agreements, including by seeking all available remedies, and that Mr.

28   Huntley had been so informed.

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S AMENDED SUPPLEMENTAL INTERROGATORY
CASE NO. CV 04-09049 SGL (RNBx)   EXHIBIT __

PAGE ____

**EXHIBIT 26**
**PAGE 889**

1        •   On June 13 and July 5, 2005, Mattel sent a letter to MGA regarding

2             Michael Hinh, warning MGA that Mattel had advised Mr. Hinh that

3             he had ongoing confidentiality and fiduciary duties to Mattel and that

4             Mattel would pursue all available remedies against Mr. Hinh and

5             MGA if those duties were violated.  Mattel further warned MGA that

6             Mr. Hinh had signed an ECII Agreement with Mattel, requiring that

7             Mr. Hinh maintain the secrecy of personnel information, forecasts,

8             financial data, business strategies, product plans, marketing plans, and

9             inventions, among other information, and that Mattel "vigorously

10           enforces" such agreements, including by seeking all available

11           remedies.

12        •   On August 1, 2005, Mattel sent a letter to MGA regarding Harvey

13           Scott, warning MGA that Mr. Scott had signed an ECII Agreement

14           with Mattel requiring that Mr. Scott maintain the secrecy of personnel

15           information, forecasts, financial data, business strategies, product

16           plans, marketing plans, and inventions, among other information.

17           Mattel further warned MGA that Mattel "vigorously enforces" such

18           agreements, including by seeking all available remedies, and that Mr.

19           Scott had been so informed.

20        •   On August 16, 2005, Mattel sent a letter to MGA regarding Jier Su,

21           warning MGA that Mr. Su had signed an ECII Agreement with Mattel

22           requiring that Mr. Su maintain the secrecy of personnel information,

23           forecasts, financial data, business strategies, product plans, marketing

24           plans, and inventions, among other information.  Mattel further

25           warned MGA that Mattel "vigorously enforces" such agreements,

26           including by seeking all available remedies, and that Mr. Su had been

27           so informed.

28

408830.01

EXHIBIT 26
PAGE 890

1
2
3
4
5
6
7
8

- On March 27, 2006, Mattel sent a letter to MGA regarding Jorge Castilla, warning MGA that Mr. Castilla had signed an ECII Agreement with Mattel requiring that Mr. Castilla maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Mr. Castilla had been so informed.

9
10
11
12
13
14
15
16

- On May 15, 2006, Mattel sent a letter to MGA regarding Daniel Cooney, warning MGA that Mr. Cooney had signed an ECII Agreement with Mattel requiring that Mr. Cooney maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Mr. Cooney had been so informed.

17
18
19
20
21
22
23
24
25
26

- On August 21, 2006, Mattel sent a letter to MGA regarding John Bloodworth, warning MGA that Mr. Bloodworth had signed a Confidentiality and No Conflict Agreement and a Confidentiality and Non-Disclosure Agreement with Mattel requiring that Mr. Bloodworth maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Mr. Bloodworth had been so informed.

27
28

- On September 5, 2006, Mattel sent a letter to MGA regarding Jill Hatch, warning MGA that Ms. Hatch had signed an ECII Agreement

19

EXHIBIT 26
PAGE 891

with Mattel requiring that Ms. Hatch maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Ms. Hatch had been so informed.

- On September 29, 2005, Mattel sent a letter to MGA regarding Janine Brisbois, warning MGA that Ms. Brisbois had signed a proprietary rights agreement with Mattel requiring that Ms. Brisbois maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Ms. Brisbois had been so informed.

- On November 27, 2006, Mattel sent a letter to MGA and Leland Ratleff, warning that Mr. Ratleff had signed an Employee Patent and Confidence Agreement with Mattel requiring that Mr. Ratleff maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Mr. Ratleff had been so informed.

- On December 21, 2006, Mattel sent a letter to MGA regarding Jill Larson, warning MGA that Ms. Larson had signed a Employee Patent and Confidence Agreement with Mattel requiring that Ms. Larson maintain the secrecy of personnel information, forecasts, financial data, business strategies, product plans, marketing plans, and

408830.01

PAGE____

**EXHIBIT 26**
**PAGE 892**

inventions, among other information. Mattel further warned MGA that Mattel "vigorously enforces" such agreements, including by seeking all available remedies, and that Ms. Larson had been so informed.

Mattel has threatened and warned a number of companies not to license MGA properties or risk retribution in that Mattel would cease relations with the company or decline to renew its licensing agreements.

- In September 2002, Morten Geschwendtner of Kidz Entertainment informed Sandrine de Raspide that Euromic was under tremendous pressure from Mattel not to sign an agreement for "Bratz."

- Neils Bucholst of Euromic sent a letter, dated December 4, 2002, to Mitchell Kamarck, then-General Counsel of MGA. The letter stated that, on or around May 28, 2002, a regional manager of Mattel told Mr. Bucholst that she was upset about rumors indicating that Euromic had signed up with MGA/Kidz Entertainment on Bratz and told him "point blank" that Mattel would discontinue relations with Euromic if Euromic did not stop dealing with MGA/Kidz Entertainment. Mr. Bucholst told her that Euromic had no intention of stopping its co-operation with MGA/Kidz Entertainment. Mattel continued to urge Euromic to stop its dealings with MGA/Kidz Entertainment, but Euromic "stood firm." In the fall of 2002, the regional manager of Mattel informed Euromic, without explanation, that its contract with Mattel would not be prolonged.

- In September 2003, Stephen Graham of Character Licensing and Marketing informed Sandrine de Raspide that Mattel was "absolutely adamant that [CLM was] not to take on Bratz." Mr. Graham stated that Mattel is "obviously extremely threatened by Bratz and they said

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S AMENDED SUPPLEMENTAL INTERROGATORY
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT 26
PAGE 893

1    that if any Barbie licensees sign on for Bratz they will take away

2    Barbie."

3  •  In June 2002, Hayley Sussman of Endemol U.K. plc informed

4    Sandrine de Raspide that a number of companies, including Smith &

5    Brooks (apparel manufacturer), Zeon (watch manufacturer) and

6    Gemma International (greeting card licensee), were uncomfortable

7    about proceeding with a "Bratz" license because they are concerned

8    about losing their "Barbie" licenses.

9  •  In or around September 2002, Hayley Sussman informed MGA that

10   Smith & Brooks (an apparel manufacturer) would love to manufacture

11   "Bratz" apparel but were "too scared to take the risk" of losing its

12   license from Mattel, which constitutes 50% of its business.

13  •  In September 2002, Morten Geschwendtner informed MGA that

14   Mattel threatened or tried to pressure Egmont, Euromic, MV Sports,

15   and Hart Concepts not to license "Bratz."

16  •  In October, 2002, Muki Agami, the managing director of JNH Israel

17   (a licensee of "Barbie"), visited MGA's showroom in Hong Kong and

18   advised MGA that he had received a call from the President of Sea

19   Port (the licensing agent for "Barbie" in Europe), warning Mr. Agami

20   that he will lose the "Barbie" license if he takes the "Bratz" license.

21  •  In November 2002, Kate Kilmo of Random House told MGA that

22   Egmont told her that Mattel threatened to terminate its license if it

23   licensed "Bratz."

24  •  In January 2006, Melvin Thomas of The Licensing Company

25   informed MGA that Egmont had told him that it did not want to move

26   forward with publishing rights to "Bratz" because it would affect

27   Egmont's relationship with Mattel.

**EXHIBIT 26**
**PAGE 894**

22

406830.01

- In May 2006, Morten Geschwendtner informed MGA that Egmont did not want to move forward with "Bratz" publishing rights in the United Kingdom and Germany, because Egmont does huge business with Mattel in over 15 countries.

- In January 2007, Frank Knau of Egmont in Germany denied a request by MGA to start a "Bratz" magazine in Germany on the grounds that, "we have a long term business relation with Mattel re Barbie. Mattel considers Bratz as a direct competitor to Barbie and hence we would not like to irritate our good relation with Mattel by publishing a Bratz magazine in competition to our Barbie magazine."

- In May 2005, Larry Rosen, CEO of Rose Art Industries, Inc., informed MGA that Mattel had cancelled all foreign and "Fun-Dough" agreements due to "Bratz."

- In February 2005, Peter Carrero (an employee of ITC in Brazil) informed MGA about Candide, an electronics company that was interested in developing its own line of "Bratz" toys as well as importing "Bratz" products from MGA. Candide also had a "Barbie" licensing program. Susana Kuemmerle indicated that Candide wanted to do electronics only, that MGA's pricing did not work for Candide, and that Candide was not interested in MGA's toy line. In the same email Ms. Kuemmerle also mentioned that she was informed that the order from Mattel was "do whatever is necessary, no matter the cost, but do not let Bratz penetrate the market."

On information and belief, Mattel has threatened and warned raw good suppliers and toy manufacturers not to supply goods to MGA or to make MGA products or they would lose business from Mattel.

- On information and belief, in 2001, Mattel pressured Saran, a Japanese doll hair supplier, not to supply doll hair to MGA.

---

23

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S AMENDED SUPPLEMENTAL INTERROGATORY
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT 26
PAGE 895

PAGE____

1       •    In June or July 2003, Mattel informed Francis Choi of Early Light of

2              its new policy, namely that Mattel will not assign products for Early

3              Light to manufacture if Early Light makes "Bratz" products or

4              products from other customers that compete directly with similar

5              Mattel products.

6       In February 2004, MGA was informed by Cory Schwartz of

7 ConsumerQuest, a market research firm, that Mattel asked him not to work with

8 MGA. In March 2005, Nick Austin of Vivid Entertainment, Inc., a U.K. "Bratz"

9 distributor, informed MGA of aggressive pricing by Mattel in Europe, stating that

10 "Our spies tell us that El Segundo has authorized Mattel UK to 'burry us' and that

11 this blitz of heavy TV coupled with 25% off is just the start!" In addition, Mr.

12 Austin informed MGA that Vivid was taking out a full page advertisement in the

13 trade press to "shout about our 56.6% share because the trade mags will not cover

14 in editorial because Mattel has frightened the[m] off with threats of cutting their ad

15 spend in the magazines."

16       Mattel also engaged in unfair practices relating to NPD as well as consumer

17 organizations, including TIA and CARU. NPD is the leading supplier of sales

18 statistics and data in the toy industry, which are vital for efficient product-line

19 management by toy manufacturers. Without these statistics and data, it is difficult

20 for toy companies to assess and measure the relative success of their products in

21 key categories. NPD is a subscription service and places restrictions on the use of

22 its information and statistics by subscribers. Both Mattel and MGA subscribe to

23 NPD's services. Mattel has more influence on NPD than does MGA because it

24 generates substantially more subscription revenue for NPD due to the fact that it

25 sells a broader range of toy products. Mattel has improperly influenced NPD to

26 employ a double standard and not enforce the same rules against Mattel that NPD

27 enforces against MGA. In September 2003, Mattel pressured NPD to terminate

28 MGA's subscription when MGA allegedly violated the terms of its NPD

<div align="center">24</div>

EXHIBIT 26<br>PAGE 896

1  agreement by improperly referring to Mattel when publicly disclosing NPD data in
2  a press release.  Mattel publicly disclosed NPD information on Mattel's
3  comparative standing relative to other companies in an earnings conference call
4  and in a press release in September of 2004, but NPD did not take similar action
5  against Mattel.

6      Mattel also pressured NPD into changing product classifications in order to
7  manipulate the data and artificially preserve Mattel's market share rankings in the
8  fashion doll category, thus lowering MGA's ranking and harming MGA's sales.  In
9  February 2004, NPD announced proposed changes to doll categories, combining
10  Mini Dolls and Mini Doll Accessories into one category and placing fashion dolls
11  packaged with an accessory in the Accessory category provided that the accessory
12  is of greater or equal value within the set.  In early 2005, Mattel lobbied NPD to
13  get "Bratz Babyz" placed out of the fashion doll category.  In May 2006, NPD
14  announced category changes, which would place larger dolls such as Mattel's
15  "American Girls" dolls in the fashion doll category.

16      MGA believes that Mattel has improperly used its influence to induce
17  CARU to place onerous restrictions on MGA advertisements and require MGA to
18  amend aspects of its commercials that have gone unchallenged in other parties'
19  commercials.  CARU is the toy industry's independent self-regulatory body in
20  charge of maintaining standards in advertising.  CARU's approval is considered
21  critical within the toy industry to avoid regulatory action by the Federal Trade
22  Commission.  Mattel is a major contributor to CARU's budget and thus has
23  influence over CARU.  Mattel has influenced CARU to initiate (or has initiated on
24  its own) proceedings against MGA for techniques used in MGA's commercials
25  that have also been employed in Mattel's own commercials for "Barbie" and other
26  products, such as alleged insufficient use of hands to manipulate and move the
27  dolls, use of a human hand and arm to manipulate the doll that was allegedly
28  improperly camouflaged by a person wearing a dark sleeve against a dark

25

EXHIBIT ___

**EXHIBIT 26**
**PAGE 897**

PAGE ___

1  background, use of computer graphics in which it was allegedly impossible for a
2  child to discern what was reality and what was computer-generated fantasy, and
3  allegedly showing dolls holding items when in reality dolls could not hold any
4  items without adhesives. To MGA's knowledge, CARU has never initiated
5  proceedings or undertaken an informal inquiry against Mattel for Mattel's use of
6  these same or similar techniques. While MGA was able to defeat many of Mattel's
7  baseless allegations, CARU found against MGA on the following issues: (1)
8  CARU recommended that MGA disclose that the "Bratz" dolls could not actually
9  hold items in its "Rock Angelz" commercial; (2) CARU found that MGA used
10 improper computer graphics in its "Big Bratz Babyz" commercial; and (3) CARU
11 found against MGA on the claims of insufficient hand usage for certain scenes in
12 its "Genie Magic" and "Big Bratz Babyz" commercials. As a result, MGA has
13 been forced to incur unnecessary costs for reshooting, reproducing and reediting its
14 commercials.

15      Further, in the Spring of 2005, CARU issued an inquiry about MGA's
16 Bratz.com website to comply with COPPA and instructed MGA to respond to
17 make changes to its website in excess of restrictions imposed on Mattel and others.
18 In March 2002, Margo Eldridge informed Isaac Larian that CARU has questioned
19 MGA's "Mermaid" commercial, and as it was the first time that CARU had every
20 questioned any commercial Ms. Eldridge had done since 1978, she believes the
21 inquiry was due to Mattel's improper influence. In addition, CARU has drafted
22 press releases regarding the outcome of Mattel's challenges against MGA, which
23 exhibit a negative bias towards MGA and a positive bias toward Mattel. In May
24 2006, CARU drafted press releases regarding the "Big Bratz Babyz" and "Ponyz"
25 decisions, which created the misimpression that CARU found for Mattel on the
26 majority of Mattel's challenges, when in reality, CARU had rejected most of
27 Mattel's challenges. Further, in June 2006, CARU drafted a press release
28

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S AMENDED SUPPLEMENTAL INTERROGATORY
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT 26
PAGE 898

1   regarding Mattel's challenges against the packaging for MGA's "Bratz Campfire"

2   dolls, which put a negative slant on the decision.

3       Mattel also engaged in unfair business practices in connection with the TIA

4   Toy-of-the-Year awards. Each year since 2000, the TIA presents the Toy-of-the-

5   Year awards, which generate substantial goodwill with retailers, distributors,

6   licensees, and customers for the winning toys. For the first three years of the

7   awards (2000, 2001, and 2002), the Toy-of-the-Year award was chosen by

8   consumer vote. MGA's "Bratz" dolls won the 2001 and 2002 Toy-of-the-Year

9   awards. However, beginning with the 2003 Toy-of-the-Year award, the TIA

10  changed the rules to have the award selected by members of the industry (rather

11  than by consumers). MGA believes that Mattel orchestrated this change, as it is

12  the largest, and accordingly, most influential member of TIA, and the Chairman of

13  TIA at the time was Neil Friedman, who was also the President of Fisher Price (a

14  subsidiary of Mattel). Under the new voting rules, Fisher Price's "Hokey Pokey

15  Elmo" won the 2003 Toy-of-the-Year award, beating out MGA's "Bratz Super

16  Stylin' Runway Disco." MGA asked TIA to substantiate the vote count for the

17  2003 Toy-of-the-Year award in order to ensure that the voting process was

18  impartial, but the TIA refused.

19      Other examples of Mattel's unfair competition and unclean hands include:

20  Mattel's efforts to create negative publicity or press about MGA, MGA products,

21  Bryant, Larian, or MGA employees; Mattel's efforts to fund or commission market

22  research or studies that portray Bratz or MGA products negatively; Mattel's efforts

23  to interfere with MGA's acquisition of or invest in Zapf Creation AG; Mattel's

24  efforts to include negative references to MGA or Bratz on Mattel's "We Believe in

25  Girls" website; Mattel's efforts or intent to interfere with business dealings or

26  contractual relations between MGA and Smoby Group; Mattel's influencing

27  Nickelodeon to reject MGA advertisements or to limit time slot for advertisements;

28  assisting parties in lawsuits against MGA; Mattel's monitoring, "spying on" or

EXHIBIT

PAGE

EXHIBIT 26
PAGE 899

1    gaining knowledge of MGA's trade secrets, non-public information, non-public

2    activities, unreleased products, and product development; gaining access, or

3    attempts to gain access, to MGA showrooms, Plan-o-Grams, merchandising

4    displays, Toy Fair displays on false pretenses; Mattel's wrongfully obtaining

5    MGA's costs and sales information through Mattel-employed category managers at

6    retailers; Mattel's inducing non-party customers to breach confidentiality

7    agreements with MGA and divulge non-public information about MGA's

8    unreleased products; Mattel's covertly investigating MGA, its officers and

9    employees, and their family members; Mattel's contacting persons under false

10    pretense in order to interrogate them about Bratz and this litigation; Mattel's

11    coercing its employees to accept restrictive covenants (right before a massive

12    layoff) and non-compete clauses and other efforts to prevent prospective MGA

13    employees from accepting offers of employment; and Mattel's falsely inflating its

14    Barbie sales figures in an effort to mislead the public and retailers.

15       Discovery is ongoing and many third party subpoenas served by the MGA

16    Defendants are currently outstanding and the subject of meet-and-confers.  Bryant

17    reserves the right to supplement this response and, consistent with his obligations

18    under Federal Rule of Civil Procedure 26(e), Bryant will supplement this response

19    if he receives additional responsive information.

20       The following persons have knowledge of facts and circumstances

21    surrounding the foregoing: Carter Bryant; Richard De Anda; Robert Eckert; Alan

22    Kaye; Michele McShane; Robert Normile; Margaret Leahy; Elise Cloonan;

23    Veronica Marlow; Ilana Raynes; Michael Hebden; Frederick Jackson; Ray Moore;

24    Joe Benet; Carolyn Oros; Hung Lee; Diana Troup; Cynthia Young; Margo

25    Michelle; Kitty Black-Perkins; Janet Unalp; Debbie Meyer; Carol Spencer;

26    Jennifer Kiernan; Bill Kelly; Steve McAdam; Howie Jesser, Ken Smith; Bob

27    Tomamora; Tom Hodges; Julie Ashe Nobles; Morris Batay; Bruce Ryniker; Larry

28    Wood; Eric Ostendorf; Steve Ryniker; Melody Hansen; Carter Bryant; Anna Rhee;

408830.01

EXHIBIT 26
PAGE 900

1   Joe Feldman; Janet Blaser; Bill Greening; Roxanna Powell; Ken O'Leary; Lily

2   Martinez; Cassidy Park; Ivy Ross; Joe Franke; Ann Driskill; Robert Best; Anne

3   Olson; Dennis Soai; Kislap Ongchango; Nick Patean; Jerry Richardson; Spencer

4   Davis; Bill Martinez; Barbara Meyer; Larry Clayton; Elon Dancer; Maury Kessel;

5   Chris McAdam; Michael Norgren; Chris Sesto; Paul Sesto; Michael Hastey;

6   Sullivan Hastey; Mark Rigger; Jeff Fuller; Tim Lewis; Tim Correa; Doc O'Connor;

7   Myziue Hamilton; Joan Gaynor; Patty Gaynor; Mina Mirkazemi; Mercedeh Ward;

8   Tony Yao; Aldo Fazilli; Isabel Cabrera; Beatrice Morales; Pedro Salazar; Maria

9   Elena Salazar; Roger Simoneau, Jill Nordquist, Joni Pratt, Tina Tomiyama, and

10   Evelyn Viohl; various current and former employees and contractors of MGA and

11   its affiliates, including, without limitation, Carter Bryant Isaac Larian, Veronica

12   Marlow, Susana Kuemmerle, Sandrine de Raspide, Stephen Lee, Bruno Carlson,

13   Paula Garcia, Shirin Salemnia, Margo Eldridge, Gustavo Machado Gomez,

14   Edmund Lee, Chuck Scothon, Jaime Cygielman, Thomas Debrowski, Dave

15   Malacrida, Thomas Pfau, Yuval Caspi, Jim Huntley, and Dan Cooney; various

16   current or former employees and contractors of Mattel, including, without

17   limitation, Matt Bousquette, Erica Ashbrook, Lily Martinez, Ron Brawer,

18   Adrienne Fontanella, Tim Kiplin, Neil Friedman, Bob Eckert, Richard De Anda,

19   Tina Patel, Ivy Ross, and Connie Hibbert (or Hebert); current or former employees

20   of Kidz Entertainment, including, without limitation, Morten Geschwendtner,

21   Steffen Kragh, and Anna-Lisa McBride; current or former employees of The

22   Licensing Company, including, without limitation, Melvin Thomas; current or

23   former employees of Euromic, including, without limitation, Niels Buchholst;

24   current or former employees of Character Licensing and Marketing, including,

25   without limitation, Graham Stephen; current or former employees of Egmont,

26   including, without limitation, Frank Knau; current or former employees of Saran;

27   current or former employees of Endemol U.K. plc, including, without limitation,

28   Hayley Sussman; current and former employees of ConsumerQuest, including,

408830.01

EXHIBIT 26
PAGE 901

1  without limitation, Cory Schwartz; current or former employees of Smith &

2  Brooks; current or former employees of Zeon; current or former employees of

3  Gemma International; current or former employees of Hart Concepts; current or

4  former employees of MV Sports; current or former employees of JNH Israel,

5  including, without limitation, Muki Agami; current or former employees of Sea

6  Port; current or former employees of Random House, including, without limitation,

7  Kate Kilmo; current or former employees of Vivid Entertainment, Inc., including,

8  without limitation, Nick Austin; current or former employees of Early Light,

9  including, without limitation, Francis Choi; current or former employees of ITC,

10  including, without limitation, Peter Carrero; current or former employees of

11  Candide; current or former employees of Rose Art Industries, Inc., including,

12  without limitation, Larry Rosen; anyone who is familiar with MGA's and Mattel's

13  products, including, without limitation, consumers, retailers, licensees, distributors,

14  and the trade press; various current or former employees and contractors of Wal-

15  Mart, including, without limitation, Heather Hocut and Barb Lubestine; various

16  current or former employees of Toys 'R Us, including, without limitation, Manny

17  Francione; current or former employees of Zellers, including, without limitation,

18  Robin Hogels; current or former employees of Woolworth UK, including, without

19  limitation, Lin Sherlock; current or former employees of J.P. Morgan, including,

20  without limitation, Dean Gianoukis; Margo Eldridge; Michael D of JNH; Rosana

21  Ferrer; Berte Dario; Fontini Karageorgi; Jose Antonio; current and former

22  employees of Vivid U.K., including, but not limited to, Nick Austin and Emma

23  Sherski; current or former employees of NPD, including, but not limited to, Kelly

24  Falco, Esther Han, Karyn Shonbart, and Frederique Tutt; current or former

25  employees and contractors of Mattel; Ketchum, Young & Rubicam Brands,

26  Peterson Milla Hooks, Brian Hooks, Ogilvy & Mather Worldwide; MTV Networks

27  / Nickelodeon.

28       The following documents may be relevant to the foregoing: The following

408830.01

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S AMENDED SUPPLEMENTAL INTERROGATORY
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT 26
PAGE 902

1   documents may be relevant to the foregoing: Transcript from the Deposition of
2   Carter Bryant; Transcript from the Deposition of Margaret Leahy, Transcript from
3   the Deposition of Elise Cloonan, Transcript from the Deposition of Alan Kaye,
4   Transcript from the Deposition of Richard De Anda, Transcript from the
5   Deposition of Ann Driskill, Transcript from the Deposition of Jill Nordquist,
6   Transcript from the Deposition of Veronica Marlow, Transcript from the
7   Deposition of Joni Pratt, Mattel's Responses and Supplemental Responses to
8   Defendants' Interrogatories, Mattel's Internal Investigative Files regarding its
9   investigations into Carter Bryant, MGA, or Isaac Larian, including, but not limited
10  to, M 0074307-0074430, all Mattel worldwide consumer research reports produced
11  by Mattel, internal marketing documents analyzing the performance of Bratz in the
12  marketplace, documents relating to Carter Bryant's involvement in the litigation
13  known as *Gunther-Wahl Productions v. Mattel, Inc.*, Case No. BC195819 filed on
14  or about August 12, 1998 in the Superior Court of the State of California, County
15  of Los Angeles, and subsequent appeals, M0001654-55, M0074397-74402,
16  M0074307-0074396, and M 0013842.; the products, trade dress, trademarks,
17  themes, ideas, advertising and product packaging identified above; letters and
18  emails to MGA from Euromic, Character Licensing and Marketing, Egmont,
19  ConsumerQuest, Endemol, Kidz-Entertainment, Endemol U.K. plc, The Licensing
20  Company, Rose Art Industries, ITC, Early Light, and Vivid Imagination; mails
21  from consumers to MGA or Internet postings by consumers evidencing confusion
22  between "Bratz" and "My Scene," articles in the press evidencing confusion
23  between "Bratz" and "My Scene"; copies of web pages from eBay, La Papa, and
24  Amazon; and a photograph of display of "Bratz" products at Target, which
25  includes "My Scene" plush pet; emails to MGA from Toys 'R Us, Zellers,
26  Woolworth UK, Margo Eldridge, JNH, Rosanna Ferrer, and J.P. Morgan; and press
27  releases and articles with false information reported by Mattel; emails from Kelly
28  Falco of NPD to MGA; emails from Nick Austin of Vivid U.K. to MGA; Mattel's

31

EXHIBIT 2

**EXHIBIT 26
PAGE 903**

1  press releases and communications with retailers and financial investors that

2  improperly contain NPD data; Mattel's focus group studies and consumer research

3  campaigns for MyScene products; documents regarding TIA's rules for the Toy-

4  of-the-Year awards; correspondence between MGA's representatives and TIA; and

5  correspondence between CARU and MGA representatives; documents produced

6  by TIA in response to subpoena (TIA00001-00400); documents produced by

7  CARU in response to subpoena; documents produced by NPD (NPD00001-00496)

8  **B.    Second Affirmative Defense (Waiver)**

9        Mattel's counterclaims, and each claim for relief, are barred by the equitable

10  doctrine of waiver. In particular, Mattel believed from the time that Bryant left

11  Mattel's employ that he was going to perform work for a Mattel competitor, and

12  Mattel shortly thereafter began investigating what it suspected to be wrongdoing in

13  connection with the Bratz dolls. Yet, Mattel waited and said nothing while the

14  dolls were successfully (and at great cost) developed, manufactured and sold, and

15  only filed suit years later. Mattel was aware of the relevant facts regarding Mr.

16  Bryant's work for MGA, but intentionally waived and chose to forgo asserting any

17  rights over the Bratz dolls until years later. Mattel has also tolerated conduct by

18  other employees similar to the alleged conduct by Bryant on which Mattel now

19  bases its contract and related claims.

20        Mattel's counterclaims are barred because, among other things, Mattel

21  intentionally delayed taking legal action against MGA or Carter Bryant for several

22  years after the launch of Bratz in the belief that Mattel would be able to drive Bratz

23  (and as a result, drive MGA) out of the market for fashion dolls and/or the belief

24  that Mattel did not have any rights under the "Inventions Agreement" as against

25  Bryant, based on its own interpretations of the "Inventions Agreement," and on the

26  advice that Mattel received from in-house and outside counsel. Mattel also waited

27  to file suit until after it had secured Bryant's assistance in an unrelated legal action

28  against another Mattel competitor, namely the litigation known as *Gunther-Wahl*

**EXHIBIT 26**
**PAGE 904**

1   *Productions v. Mattel, Inc.*, Case No. BC195819 filed on or about August 12, 1998

2   in the Superior Court of the State of California, County of Los Angeles, and

3   subsequent appeals. Mattel only took legal action after it no longer needed

4   Bryant's assistance, and well after MGA and Bryant had invested substantial

5   amounts of capital and creative and innovative human effort in the Bratz line of

6   dolls and had experienced enormous success in the market place.

7       A report from Bryant's exit interview at Mattel shows that Bryant told

8   Mattel's human resources representative he was leaving because an "[o]pportunity

9   arose; had to take it." Mattel has acknowledged that employees leaving under

10   similar circumstances to work for an unnamed competitor have "caused Mattel to

11   begin investigating their activities."

12       Furthermore, numerous Mattel employees knew and/or believed in the fall

13   of 2001 that Carter Bryant was involved in the development and introduction of the

14   Bratz line. This knowledge and/or these beliefs by Mattel employees went well

15   beyond mere "rumor and innuendo," as has been suggested by Mattel. In its

16   interrogatory responses, Mattel also asserts that Bryant used several "other Mattel

17   employees" to work on the Bratz dolls so that they "had been designed and were

18   far along in development during the time that Bryant was employed by Mattel."

19       Shortly after Bratz dolls were in retail stores in or about September 2001,

20   Mattel knew or was on notice that Carter Bryant was involved in the development

21   of that line. Mattel now asserts in this lawsuit that the idea for Bratz was a

22   violation of rights that Mattel had in a proposed flanker brand called "Toon

23   Teens," which Mattel was developing in the summer of 1999, but never introduced

24   to market. In this connection, during 2001, Toon Teens samples were taken out of

25   storage by Mattel employees and delivered to Mattel's legal department for

26   analysis of possible copyright infringement and other claims against Bryant and

27   MGA.

28

**EXHIBIT 26**
**PAGE 905**

1    Mattel knew Bryant's role in Bratz and was investigating possible claims *at*

2  *least as early as summer 2001*, when Bratz came out.  Margaret Leahy, the third-

3  party sculptor of Bratz, testified that in the summer of 2001 a friend from Mattel

4  was "grilling" her, "like somebody put her up to it," about whether "Carter [was]

5  the designer on the doll or what was [MGA employee and former Mattel

6  employee] Paula [Garcia's] involvement" in Bratz.  Leahy testified that she told the

7  Mattel employee that "Carter initially came up with a design and Paula carried it

8  out."

9    Mattel actively investigated Bryant's role in creating Bratz in 2001 and

10  2002.  Mattel's internal investigative files confirm that Mattel commenced an

11  official investigation into whether Bryant stole the Bratz idea in March 2002.

12  Mattel admitted that in 2002 it investigated "rumor and innuendo that Bryant may

13  be working with MGA on Bratz," including whether "Bryant … plagiarized

14  [Mattel product] 'Toon Teens' and created Bratz dolls for MGA" and whether

15  Bryant helped MGA create Bratz "[w]hile he was working with Mattel."  Mattel's

16  CEO Robert Eckert received an "anonymous letter" on or about August 5, 2002

17  that alleged that Bryant helped MGA create Bratz while working for Mattel.  As

18  part of an official investigation requested by Mattel CEO Robert Eckert in August

19  2002 as to whether Bryant helped MGA create Bratz "[w]hile he was working with

20  Mattel," Mattel's head of security, Richard De Anda, wrote that he had been

21  "aware of this situation and … working on it for several months" but it was in the

22  hands of Mattel's attorneys.  Testimony from former Mattel employee Elise

23  Cloonan confirms that by at least late 2001, Mattel's lawyers were conducting an

24  investigation involving Bryant's work on Bratz in the design department.

25    On March 15, 2002, Mattel opened an investigative file on MGA and Isaac

26  Larian after receiving information from Evelyn Viohl and Ivy Ross that MGA had

27  recently hired a number of former Mattel employees and was reportedly

28  manufacturing products that appeared to be Mattel designs.

34

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S AMENDED SUPPLEMENTAL INTERROGATORY
CASE NO. CV 04-09049 SGL (RNBx)

1    Mattel has also forfeited any right it may have had to enforce Paragraph 3-a
2  of the "Inventions Agreement" against Carter Bryant as a result of laches, estoppel,
3  consent, and waiver. It was common knowledge at Mattel that many Mattel
4  employees employed in the Mattel design center worked on a freelance basis for
5  third parties, including Mattel competitors, and/or on their own projects with the
6  anticipation that such projects eventually would be offered for sale to third parties,
7  including Mattel competitors. Indeed, Ms. Cloonan testified that the practice was
8  so widespread that there was even a name for it at Mattel: a "G-Job". Mattel
9  employees performed non-Mattel work while employed by Mattel and Mattel
10  consented to this moonlighting. For example, Margaret Leahy testified that her
11  Mattel supervisor, Michael Hebden, suggested to her that she seek out
12  moonlighting work. Robert Best developed a fashion line while employed at
13  Mattel. Best disclosed this to Mattel and was not terminated. Joni Pratt created
14  volleyball and basketball books for her daughter's high school outside of work,
15  along with invitation and wrapping paper. Pratt testified that she showed these
16  works to her supervisor at Mattel so there could be no misunderstanding that it was
17  not related to her work at Mattel. Pratt has not disclosed everything she has drawn
18  outside of work and testified that she does not feel she has an obligation to show
19  her supervisors everything she has drawn outside of work. Lori Sipos, a designer
20  at Mattel, created puppets as a hobby while she worked at Mattel. Sipos told Jill
21  Nordquist about her hobby when showing her one of her puppets, but she was not
22  telling Nordquist about the puppets in an effort to "report" her work. Nordquist
23  testified that she was informed about the designs other people created outside of
24  work in the course of sharing hobbies and not as part of an effort to report their
25  works. Veronica Marlow helped Dianne Gavin develop a line of handbags while
26  both were employed at Mattel. At her deposition, Veronica Marlow testified that
27  Isabel Cabrera, Beatrice Morales, and Maria Elena Salazar worked with her on
28  fashions for Bratz while they were employed by Mattel. Some of Mattel's sample

35

EXHIBIT 26
PAGE 907

1   makers made wedding gowns and did nails on the weekends and evenings and

2   some of Mattel's hair rooters worked in hair salons on weekends. Indeed, Richard

3   De Anda, Mattel's head of security, testified at his deposition that he also

4   moonlighted as an expert witness and consultant while working for Mattel. De

5   Anda further testified that he does not believe that Mattel owns or has a claim on

6   the work he does for himself. Despite knowledge of this activity, Mattel rarely, if

7   ever, enforced any rights it may have had to prohibit such moonlighting.

8         Issues concerning this Defense are currently the subject of outstanding

9   discovery requests. In particular, Mattel has staunchly refused to provide

10  discovery that would address when, in fact, Mattel first had reason to suspect

11  Bryant's involvement in Bratz, his alleged breach of contract, his work for MGA,

12  and Mattel's alleged "true owner[ship] of Bratz," in spite of numerous interrogatory

13  requests, document requests, requests for admission, and deposition notices.

14  Defendants' concerns regarding Mattel's discovery abuses have recently been

15  addressed in multiple motions to compel both before Judge Infante and Judge

16  Larson. Indeed, on January 3, 2008, Judge Infante overruled all of Mattel's

17  objections and compelled discovery relevant to Defendants' statute of limitations

18  and laches defenses. However, Mattel has yet to provide the ordered discovery.

19  Factual investigation and discovery is ongoing and Bryant reserves the right to

20  supplement this response and, consistent with his obligations under Federal Rule of

21  Civil Procedure 26(e), Bryant will supplement this response if he receives

22  additional responsive information.

23        The following persons have knowledge of facts and circumstances

24  regarding the foregoing: Carter Bryant; Richard De Anda; Robert Eckert; Alan

25  Kaye; Michele McShane; Robert Normile; Margaret Leahy; Elise Cloonan;

26  Veronica Marlow; Ilana Raynes; Michael Hebden; Frederick Jackson; Ray Moore;

27  Joe Benet; Carolyn Oros; Hung Lee; Diana Troup; Cynthia Young; Margo

28  Michelle; Kitty Black-Perkins; Janet Unalp; Debbie Meyer; Carol Spencer;

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S AMENDED SUPPLEMENTAL INTERROGATORY
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT 26
PAGE 908

1  Jennifer Kiernan; Bill Kelly; Steve McAdam; Howie Jesser, Ken Smith; Bob
2  Tomamora; Tom Hodges; Julie Ashe Nobles; Morris Batay; Bruce Ryniker; Larry
3  Wood; Eric Ostendorf; Steve Ryniker; Melody Hansen; Carter Bryant; Anna Rhee;
4  Joe Feldman; Janet Blaser; Bill Greening; Roxanna Powell; Ken O'Leary; Lily
5  Martinez; Cassidy Park; Ivy Ross; Joe Franke; Ann Driskill; Robert Best; Anne
6  Olson; Dennis Soai; Kislap Ongchango; Nick Patean; Jerry Richardson; Spencer
7  Davis; Bill Martinez; Barbara Meyer; Larry Clayton; Elon Dancer; Maury Kessel;
8  Chris McAdam; Michael Norgren; Chris Sesto; Paul Sesto; Michael Hastey;
9  Sullivan Hastey; Mark Rigger; Jeff Fuller; Tim Lewis; Tim Correa; Doc O'Connor;
10  Myziue Hamilton; Joan Gaynor; Patty Gaynor; Mina Mirkazemi; Mercedeh Ward;
11  Tony Yao; Aldo Fazilli; Isabel Cabrera; Beatrice Morales; Pedro Salazar; Maria
12  Elena Salazar; Roger Simoneau, Jill Nordquist, Joni Pratt, Tina Tomiyama, and
13  Evelyn Viohl.

14       The following documents may be relevant to the foregoing: Transcript from
15  the Deposition of Carter Bryant; Transcript from the Deposition of Margaret
16  Leahy, Transcript from the Deposition of Elise Cloonan, Transcript from the
17  Deposition of Alan Kaye, Transcript from the Deposition of Richard De Anda,
18  Transcript from the Deposition of Ann Driskill, Transcript from the Deposition of
19  Jill Nordquist, Transcript from the Deposition of Veronica Marlow, Transcript
20  from the Deposition of Joni Pratt, Mattel's Responses and Supplemental Responses
21  to Defendants' Interrogatories, Mattel's Internal Investigative Files regarding its
22  investigations into Carter Bryant, MGA, or Isaac Larian, including, but not limited
23  to, M 0074307-0074430, all Mattel worldwide consumer research reports produced
24  by Mattel, internal marketing documents analyzing the performance of Bratz in the
25  marketplace, documents relating to Carter Bryant's involvement in the litigation
26  known as *Gunther-Wahl Productions v. Mattel, Inc.*, Case No. BC195819 filed on
27  or about August 12, 1998 in the Superior Court of the State of California, County
28  of Los Angeles, and subsequent appeals, M0001654-55, M0074397-74402,

37

408830.01

EXHIBIT 26
PAGE 909

1    M0074307-0074396, and M 0013842.

2    **C.**    **Third Affirmative Defense (Estoppel)**

3        Mattel's counterclaims, and each claim for relief, are barred by the equitable

4 doctrine of estoppel. In particular, Mattel believed from the time that Bryant left

5 Mattel's employ that he was going to perform work for a Mattel competitor, Mattel

6 shortly thereafter began investigating what it suspected to be wrongdoing in

7 connection with the Bratz dolls, and was thus apprised of the relevant facts. Yet,

8 Mattel waited and said nothing while the dolls were successfully (and at great cost)

9 developed, manufactured and sold, and only filed suit years later. Mattel either

10 intended that its conduct would be acted upon by Bryant to continue working for a

11 competitor, or Mattel acted in such a way that Bryant had a right to believe it was

12 so intended. Bryant was unaware that Mattel asserted any right over the Bratz

13 dolls or that Mattel would claim that his work for MGA was improper. Should

14 Mattel prevail in this litigation, Bryant would have relied on Mattel's conduct to

15 his detriment. Accordingly, Mattel should be estopped from belatedly raising its

16 claims.

17        Mattel's counterclaims, and each claim for relief, are barred by the equitable

18 doctrine of waiver. In particular, Mattel believed from the time that Bryant left

19 Mattel's employ that he was going to perform work for a Mattel competitor, and

20 Mattel shortly thereafter began investigating what it suspected to be wrongdoing in

21 connection with the Bratz dolls. Yet, Mattel waited and said nothing while the

22 dolls were successfully (and at great cost) developed, manufactured and sold, and

23 only filed suit years later. Mattel was aware of the relevant facts regarding Mr.

24 Bryant's work for MGA, but intentionally waived and chose to forgo asserting any

25 rights over the Bratz dolls until years later. Mattel has also tolerated conduct by

26 other employees similar to the alleged conduct by Bryant on which Mattel now

27 bases its contract and related claims.

28        Mattel's counterclaims are barred because, among other things, Mattel

408830.01

EXHIBIT 26
PAGE 910

1   intentionally delayed taking legal action against MGA or Carter Bryant for several

2   years after the launch of Bratz in the belief that Mattel would be able to drive Bratz

3   (and as a result, drive MGA) out of the market for fashion dolls and/or the belief

4   that Mattel did not have any rights under the "Inventions Agreement" as against

5   Bryant, based on its own interpretations of the "Inventions Agreement," and on the

6   advice that Mattel received from in-house and outside counsel. Mattel also waited

7   to file suit until after it had secured Bryant's assistance in an unrelated legal action

8   against another Mattel competitor, namely the litigation known as *Gunther-Wahl*

9   *Productions v. Mattel, Inc.*, Case No. BC195819 filed on or about August 12, 1998

10  in the Superior Court of the State of California, County of Los Angeles, and

11  subsequent appeals. Mattel only took legal action after it no longer needed

12  Bryant's assistance, and well after MGA and Bryant had invested substantial

13  amounts of capital and creative and innovative human effort in the Bratz line of

14  dolls and had experienced enormous success in the market place.

15          A report from Bryant's exit interview at Mattel shows that Bryant told

16  Mattel's human resources representative he was leaving because an "[o]pportunity

17  arose; had to take it." Mattel has acknowledged that employees leaving under

18  similar circumstances to work for an unnamed competitor have "caused Mattel to

19  begin investigating their activities."

20          Furthermore, numerous Mattel employees knew and/or believed in the fall

21  of 2001 that Carter Bryant was involved in the development and introduction of the

22  Bratz line. This knowledge and/or these beliefs by Mattel employees went well

23  beyond mere "rumor and innuendo," as has been suggested by Mattel. In its

24  interrogatory responses, Mattel also asserts that Bryant used several "other Mattel

25  employees" to work on the Bratz dolls so that they "had been designed and were

26  far along in development during the time that Bryant was employed by Mattel."

27          Shortly after Bratz dolls were in retail stores in or about September 2001,

28  Mattel knew or was on notice that Carter Bryant was involved in the development

39

408830.01

**EXHIBIT 26**
**PAGE 911**

1  of that line. Mattel now asserts in this lawsuit that the idea for Bratz was a

2  violation of rights that Mattel had in a proposed flanker brand called "Toon

3  Teens," which Mattel was developing in the summer of 1999, but never introduced

4  to market. In this connection, during 2001, Toon Teens samples were taken out of

5  storage by Mattel employees and delivered to Mattel's legal department for

6  analysis of possible copyright infringement and other claims against Bryant and

7  MGA.

8       Mattel knew Bryant's role in Bratz and was investigating possible claims *at*

9  *least as early as summer 2001*, when Bratz came out. Margaret Leahy, the third-

10  party sculptor of Bratz, testified that in the summer of 2001 a friend from Mattel

11  was "grilling" her, "like somebody put her up to it," about whether "Carter [was]

12  the designer on the doll or what was [MGA employee and former Mattel

13  employee] Paula [Garcia's] involvement" in Bratz. Leahy testified that she told the

14  Mattel employee that "Carter initially came up with a design and Paula carried it

15  out."

16       Mattel actively investigated Bryant's role in creating Bratz in 2001 and

17  2002. Mattel's internal investigative files confirm that Mattel commenced an

18  official investigation into whether Bryant stole the Bratz idea in March 2002.

19  Mattel admitted that in 2002 it investigated "rumor and innuendo that Bryant may

20  be working with MGA on Bratz," including whether "Bryant ... plagiarized

21  [Mattel product] 'Toon Teens' and created Bratz dolls for MGA" and whether

22  Bryant helped MGA create Bratz "[w]hile he was working with Mattel." Mattel's

23  CEO Robert Eckert received an "anonymous letter" on or about August 5, 2002

24  that alleged that Bryant helped MGA create Bratz while working for Mattel. As

25  part of an official investigation requested by Mattel CEO Robert Eckert in August

26  2002 as to whether Bryant helped MGA create Bratz "[w]hile he was working with

27  Mattel," Mattel's head of security, Richard De Anda, wrote that he had been

28  "aware of this situation and ... working on it for several months" but it was in the

40

1   hands of Mattel's attorneys.  Testimony from former Mattel employee Elise

2   Cloonan confirms that by at least late 2001, Mattel's lawyers were conducting an

3   investigation involving Bryant's work on Bratz in the design department.

4        On March 15, 2002, Mattel opened an investigative file on MGA and Isaac

5   Larian after receiving information from Evelyn Viohl and Ivy Ross that MGA had

6   recently hired a number of former Mattel employees and was reportedly

7   manufacturing products that appeared to be Mattel designs.

8        Mattel has also forfeited any right it may have had to enforce Paragraph 3-a

9   of the "Inventions Agreement" against Carter Bryant as a result of laches, estoppel,

10  consent, and waiver.  It was common knowledge at Mattel that many Mattel

11  employees employed in the Mattel design center worked on a freelance basis for

12  third parties, including Mattel competitors, and/or on their own projects with the

13  anticipation that such projects eventually would be offered for sale to third parties,

14  including Mattel competitors.  Indeed, Ms. Cloonan testified that the practice was

15  so widespread that there was even a name for it at Mattel: a "G-Job".  Mattel

16  employees performed non-Mattel work while employed by Mattel and Mattel

17  consented to this moonlighting.  For example, Margaret Leahy testified that her

18  Mattel supervisor, Michael Hebden, suggested to her that she seek out

19  moonlighting work.  Robert Best developed a fashion line while employed at

20  Mattel.  Best disclosed this to Mattel and was not terminated.  Joni Pratt created

21  volleyball and basketball books for her daughter's high school outside of work,

22  along with invitation and wrapping paper.  Pratt testified that she showed these

23  works to her supervisor at Mattel so there could be no misunderstanding that it was

24  not related to her work at Mattel.  Pratt has not disclosed everything she has drawn

25  outside of work and testified that she does not feel she has an obligation to show

26  her supervisors everything she has drawn outside of work.  Lori Sipos, a designer

27  at Mattel, created puppets as a hobby while she worked at Mattel.  Sipos told Jill

28  Nordquist about her hobby when showing her one of her puppets, but she was not

41

408830.01

EXHIBIT 26
PAGE 913

1  telling Nordquist about the puppets in an effort to "report" her work. Nordquist
2  testified that she was informed about the designs other people created outside of
3  work in the course of sharing hobbies and not as part of an effort to report their
4  works. Veronica Marlow helped Dianne Gavin develop a line of handbags while
5  both were employed at Mattel. At her deposition, Veronica Marlow testified that
6  Isabel Cabrera, Beatrice Morales, and Maria Elena Salazar worked with her on
7  fashions for Bratz while they were employed by Mattel. Some of Mattel's sample
8  makers made wedding gowns and did nails on the weekends and evenings and
9  some of Mattel's hair rooters worked in hair salons on weekends. Indeed, Richard
10  De Anda, Mattel's head of security, testified at his deposition that he also
11  moonlighted as an expert witness and consultant while working for Mattel. De
12  Anda further testified that he does not believe that Mattel owns or has a claim on
13  the work he does for himself. Despite knowledge of this activity, Mattel rarely, if
14  ever, enforced any rights it may have had to prohibit such moonlighting.

15      Issues concerning this Defense are currently the subject of outstanding
16  discovery requests. In particular, Mattel has staunchly refused to provide
17  discovery that would address when, in fact, Mattel first had reason to suspect
18  Bryant's involvement in Bratz, his alleged breach of contract, his work for MGA,
19  and Mattel's alleged "true owner[ship] of Bratz," in spite of numerous interrogatory
20  requests, document requests, requests for admission, and deposition notices.
21  Defendants' concerns regarding Mattel's discovery abuses have recently been
22  addressed in multiple motions to compel both before Judge Infante and Judge
23  Larson. Indeed, on January 3, 2008, Judge Infante overruled all of Mattel's
24  objections and compelled discovery relevant to Defendants' statute of limitations
25  and laches defenses. However, Mattel has yet to provide the ordered discovery.
26  Factual investigation and discovery is ongoing and Bryant reserves the right to
27  supplement this response and, consistent with his obligations under Federal Rule of
28

EXHIBIT 26
PAGE 914

42

1  Civil Procedure 26(e), Bryant will supplement this response if he receives

2  additional responsive information.

3      The following persons have knowledge of facts and circumstances

4  regarding the foregoing:  Carter Bryant; Richard De Anda; Robert Eckert; Alan

5  Kaye; Michele McShane; Robert Normile; Margaret Leahy; Elise Cloonan;

6  Veronica Marlow; Ilana Raynes; Michael Hebden; Frederick Jackson; Ray Moore;

7  Joe Benet; Carolyn Oros; Hung Lee; Diana Troup; Cynthia Young; Margo

8  Michelle; Kitty Black-Perkins; Janet Unalp; Debbie Meyer; Carol Spencer;

9  Jennifer Kiernan; Bill Kelly; Steve McAdam; Howie Jesser, Ken Smith; Bob

10  Tomamora; Tom Hodges; Julie Ashe Nobles; Morris Batay; Bruce Ryniker; Larry

11  Wood; Eric Ostendorf; Steve Ryniker; Melody Hansen; Carter Bryant; Anna Rhee;

12  Joe Feldman; Janet Blaser; Bill Greening; Roxanna Powell; Ken O'Leary; Lily

13  Martinez; Cassidy Park; Ivy Ross; Joe Franke; Ann Driskill; Robert Best; Anne

14  Olson; Dennis Soai; Kislap Ongchango; Nick Patean; Jerry Richardson; Spencer

15  Davis; Bill Martinez; Barbara Meyer; Larry Clayton; Elon Dancer; Maury Kessel;

16  Chris McAdam; Michael Norgren; Chris Sesto; Paul Sesto; Michael Hastey;

17  Sullivan Hastey; Mark Rigger; Jeff Fuller; Tim Lewis; Tim Correa; Doc O'Connor;

18  Myziue Hamilton; Joan Gaynor; Patty Gaynor; Mina Mirkazemi; Mercedeh Ward;

19  Tony Yao; Aldo Fazilli; Isabel Cabrera; Beatrice Morales; Pedro Salazar; Maria

20  Elena Salazar; Roger Simoneau, Jill Nordquist, Joni Pratt, Tina Tomiyama, and

21  Evelyn Viohl.

22      The following documents may be relevant to the foregoing: Transcript from

23  the Deposition of Carter Bryant; Transcript from the Deposition of Margaret

24  Leahy, Transcript from the Deposition of Elise Cloonan, Transcript from the

25  Deposition of Alan Kaye, Transcript from the Deposition of Richard De Anda,

26  Transcript from the Deposition of Ann Driskill, Transcript from the Deposition of

27  Jill Nordquist, Transcript from the Deposition of Veronica Marlow, Transcript

28  from the Deposition of Joni Pratt, Mattel's Responses and Supplemental Responses

408830.01

EXHIBIT 26
PAGE 915

1   to Defendants' Interrogatories, Mattel's Internal Investigative Files regarding its

2   investigations into Carter Bryant, MGA, or Isaac Larian, including, but not limited

3   to, M 0074307-0074430, all Mattel worldwide consumer research reports produced

4   by Mattel, internal marketing documents analyzing the performance of Bratz in the

5   marketplace, documents relating to Carter Bryant's involvement in the litigation

6   known as *Gunther-Wahl Productions v. Mattel, Inc.*, Case No. BC195819 filed on

7   or about August 12, 1998 in the Superior Court of the State of California, County

8   of Los Angeles, and subsequent appeals, M0001654-55, M0074397-74402,

9   M0074307-0074396, and M 0013842.

10  **D.    Fourth Affirmative Defense (Laches)**

11       Mattel's counterclaims, and each claim for relief, are barred by the equitable

12  doctrine of laches. In particular, Mattel believed from the time that Bryant left

13  Mattel's employ that he was going to perform work for a Mattel competitor, and

14  Mattel shortly thereafter began investigating what it suspected to be wrongdoing in

15  connection with the Bratz dolls. Mattel thus was apprised of the relevant facts.

16  Yet, Mattel waited and said nothing while the dolls were successfully (and at great

17  cost) developed, manufactured and sold, and only filed suit years later.

18  Accordingly, laches should bar Mattel from belatedly raising its claims.

19       Mattel's counterclaims, and each claim for relief, are barred by the equitable

20  doctrine of waiver. In particular, Mattel believed from the time that Bryant left

21  Mattel's employ that he was going to perform work for a Mattel competitor, and

22  Mattel shortly thereafter began investigating what it suspected to be wrongdoing in

23  connection with the Bratz dolls. Yet, Mattel waited and said nothing while the

24  dolls were successfully (and at great cost) developed, manufactured and sold, and

25  only filed suit years later. Mattel was aware of the relevant facts regarding Mr.

26  Bryant's work for MGA, but intentionally waived and chose to forgo asserting any

27  rights over the Bratz dolls until years later. Mattel has also tolerated conduct by

28  other employees similar to the alleged conduct by Bryant on which Mattel now

44

**EXHIBIT 26**
**PAGE 916**


1    Shortly after Bratz dolls were in retail stores in or about September 2001,

2  Mattel knew or was on notice that Carter Bryant was involved in the development

3  of that line. Mattel now asserts in this lawsuit that the idea for Bratz was a

4  violation of rights that Mattel had in a proposed flanker brand called "Toon

5  Teens," which Mattel was developing in the summer of 1999, but never introduced

6  to market. In this connection, during 2001, Toon Teens samples were taken out of

7  storage by Mattel employees and delivered to Mattel's legal department for

8  analysis of possible copyright infringement and other claims against Bryant and

9  MGA.

10    Mattel knew Bryant's role in Bratz and was investigating possible claims *at*

11  *least as early as summer 2001*, when Bratz came out. Margaret Leahy, the third-

12  party sculptor of Bratz, testified that in the summer of 2001 a friend from Mattel

13  was "grilling" her, "like somebody put her up to it," about whether "Carter [was]

14  the designer on the doll or what was [MGA employee and former Mattel

15  employee] Paula [Garcia's] involvement" in Bratz. Leahy testified that she told the

16  Mattel employee that "Carter initially came up with a design and Paula carried it

17  out."

18    Mattel actively investigated Bryant's role in creating Bratz in 2001 and

19  2002. Mattel's internal investigative files confirm that Mattel commenced an

20  official investigation into whether Bryant stole the Bratz idea in March 2002.

21  Mattel admitted that in 2002 it investigated "rumor and innuendo that Bryant may

22  be working with MGA on Bratz," including whether "Bryant ... plagiarized

23  [Mattel product] 'Toon Teens' and created Bratz dolls for MGA" and whether

24  Bryant helped MGA create Bratz "[w]hile he was working with Mattel." Mattel's

25  CEO Robert Eckert received an "anonymous letter" on or about August 5, 2002

26  that alleged that Bryant helped MGA create Bratz while working for Mattel. As

27  part of an official investigation requested by Mattel CEO Robert Eckert in August

28  2002 as to whether Bryant helped MGA create Bratz "[w]hile he was working with

46

EXHIBIT 26
PAGE 918