Expert Report of Paul K. Meyer

23.    I understand that Robert Tonner and Glenn Vilppu have provided opinions regarding the creative elements of the Bratz doll design.  Individuals may provide additional opinions regarding the creative elements of the Bratz doll design and/or the percentage of the "doll design" category that relates to the accused copyrighted property.

24.    In my initial Report, I described potential refinements to my apportionment percentages.  For example, I wrote, "I do not attempt to split the category 'design of the doll' between the various functions that contribute to doll design, including the accused copyrighted property, new drawings, sculpt, face paint and hair, as examples.  If such a split were performed, it would reduce the apportionment percentages...related to the accused copyrighted property."[14]  An apportionment percentage related to doll design ranges between 14.3% to 18.6%, as addressed below.

25.    Thus, if the evidence shows or it is determined that the accused copyrighted property represents 50% of the "doll design," then the apportionment percentages would be reduced by 50% (i.e., the apportionment range identified above of 14.3% to 18.6% would become 7.2% to 9.3%).  If it is determined that the accused copyrighted property represents 25% of the "doll design," the apportionment percentages would be reduced by 75% (i.e., the apportionment range identified above of 14.3% to 18.6% would become 3.6% to 4.7%).  If it is determined that the accused

---

[14] Expert Report of Paul K. Meyer, February 11, 2008, p. 11.

10

EXHIBIT 59
PAGE 1995

REDACTED

Expert Report of Paul K. Meyer

copyrighted property represents 10% of the "doll design," the apportionment percentages would be reduced by 90% (i.e., the apportionment range identified above of 14.3% to 18.6% would become 1.4% to 1.9%).

26. Later in this Report I address other adjustments that could be made to the apportionment approaches. For example, Mr. Kidder has determined that royalties paid to Mr. Bryant on the first generation of Bratz fashion dolls, $911,922, represents "the maximum outside bound on the profits to Mr. Bryant attributable to such allegedly copyrighted material."[15]  This amount represents 3.9% of royalties paid to Mr. Bryant.[16]  If it is determined that the accused copyrighted property represents 3.9% of royalties paid to Mr. Bryant, the apportionment percentages would be reduced by 96.1% (i.e., the apportionment range based on Mr. Bryant royalties of 15.0% to 25.0% would become 0.6% to 1.0%).

27. I have also addressed Mr. Wagner's valuation of Bratz and stock held by the Larian Trusts. Mr. Wagner's inputs into his valuation based on an income approach are flawed in the following areas: (1) deductible costs, (2) revenue growth, (3) discount rate, (4) working capital, and (5) failure to apportion Bratz profits.  Without apportionment, the use of an income approach assumes that the entire value of Bratz is related to the accused copyrighted property. For illustrative purposes, using Mr. Wagner's model with more appropriate inputs, I have determined

28. In addition, Mr. Wagner's market valuation approaches based on comparable companies and comparable transactions are flawed, and should not be relied upon.  Mr. Wagner is attempting to value the Bratz product line, and not a diversified, competitive toy company.  Furthermore, although the Bratz property is unique and realized significant success between 2001 and 2006,

---

[15] Expert Report of Douglas Kidder, March 17, 2008, p. 7.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

11

EXHIBIT 59
PAGE 1996

REDACTED

Expert Report of Paul K. Meyer

product sales declined in 2007 and are projected to decline in 2008. Bratz's future is uncertain, given emerging competition and forecasted downturns in the industry. Mr. Wagner has also failed to consider an adjustment to the value of MGA stock owned by Mr. Larian and/or his trusts related to a lack of liquidity. My analysis of Mr. Wagner's valuation opinions indicate that they are not reliable for purposes of determining damages related to alleged copyright infringement, and other causes of action alleged by Mattel.

29.   To the extent Mr. Wagner presents a claim related to "MGA's distributions to Mr. Larian in excess of his tax obligations associated with his proportion of MGA's income,"[18] such a claim would be duplicative of any claim by Mattel related to MGA historical profits from the accused copyrighted property.

## III.   DETAILED OPINIONS

30.   In this Section, I provide rebuttal opinions related to Mr. Wagner's analysis of costs,[19] apportionment issues and Mr. Wagner's "opinions regarding profits that may be recovered from MGA Entertainment, Inc., and MGA Entertainment (HK) Limited, Isaac Larian and Carter Bryant."[20]

### A.   Determination of Profits

31.   Overall, profits are calculated by deducting costs ("deductible costs") from accused revenue. Costs that increase and/or contribute to the accused sales should be deducted. Copyright infringement damages are measured by profits of the infringing products after apportionment for profits attributable to factors other than the accused copyrighted property. I address apportionment in a later section of this Rebuttal Report.[21]

32.   Throughout this Rebuttal Report, I reference the Litigation Services Handbook, a publication co-edited by Mr. Wagner and identified in his list of publications submitted in connection with his

---

[18] Expert Report of Michael J. Wagner, February 11, 2008, p. 11.
[19] It is unclear whether Mr. Wagner is opining that the costs that he identifies in Tab B1, Schedule 1.1 are appropriate for purposes of determining deductible costs in a copyright infringement claim. Mr. Wagner states in his Report, "I have been asked to make these calculations irrespective of whether all of the items I have included as costs will, in fact, be deducted at trial." Expert Report of Michael J. Wagner, February 11, 2007, p. 7.
[20] Expert Report of Michael J. Wagner, February 11, 2008, p. 1.
[21] I understand at this point in time that Mattel and/or its experts have not presented positions on the profits that may be apportioned to the accused copyrighted property.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                                              12

**EXHIBIT 59**
**PAGE 1997**

Expert Report of Paul K. Meyer

Report.[22]   The Litigation Services Handbook contains a number of topics addressed by Mr. Wagner in his Report, including damages in copyright cases, determination of deductible costs, cost estimation, statistical methods, valuations, discount rates and other issues related to determining an alleged infringer's profits in copyright infringement matters.[23]

### 1. Accused Revenues And Identification Of Accused Products

33.   Mr. Wagner's book recognizes that it is the burden of the plaintiff to prove the infringer's gross revenues.[24]   In his Report, Mr. Wagner does not identify MGA's revenues that are alleged to infringe Mattel's copyrighted property.   Mr. Wagner states, "I have calculated actual Bratz revenues, costs, profits and distributions to shareholders for income taxes attributable to Bratz."[25]

Mr. Wagner describes the summarized sales and revenues as follows: "all of the gross sales for each Bratz profit center" and "revenues for Bratz from licensing agreements, DVD and TV syndication, Distribution agreements, Music sales and Theatrical productions."[26]   Mr. Wagner's summary of Bratz revenues is broad, including revenues and product sales of dolls allegedly inspired by the original Mr. Bryant drawings, as well as all subsequent Bratz doll themes, other products and non-doll accessories; other MGA brands, including, as examples, Baby Bratz, Lil' Bratz, Bratz Kidz and Bratz Boyz; licensing revenue; and entertainment revenue.

34.   Carol A. Scott, retained on behalf of Mattel in this matter, intended to justify the inclusion of non-Core Bratz fashion dolls within the definition of Bratz.   However, Dr. Scott has not demonstrated a causal link between the alleged infringement and any revenue derived from Bratz sales.   She states in her "Expert Report" dated February 11, 2008 that "MGA's Bratz lines of accessories and other follow-on Bratz products are driven by the success and sale of the Bratz dolls themselves.   The sale of accessories and other merchandise sold as part of the Bratz product line or as Bratz licensed goods are directly dependent on, and derive their value from, the success

---

[22] "Litigation Services Handbook, Role Of The Financial Expert, Third Edition;" Weil, Roman L.; Wagner, Michael J.; Frank, Peter B.
[23] See, for example, Chapter 7, "Cost Estimation" and Chapter 22, "Calculating Damages in Copyright Infringement Matters," "Litigation Services Handbook, Role Of The Financial Expert, Third Edition."
[24] "Litigation Services Handbook, The Role Of The Financial Expert, Third Edition," p. 22.5.
[25] Expert Report of Michael J. Wagner, February 11, 2008, p. 7.
[26] Expert Report of Michael J. Wagner, February 11, 2008, p. 8.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                   13

**EXHIBIT 59**
**PAGE 1998**

REDACTED

Expert Report of Paul K. Meyer

of the Bratz dolls."[27]  Dr. Scott does not offer an opinion regarding whether the accused copyrighted property contributed to sales of any Bratz products or licensed goods, nor does she identify which Bratz products infringe the accused copyrighted property.

35.  Erich A. Joachimsthaler, an expert retained on behalf of MGA, states, "There are serious limitations in [Dr. Scott's] analysis and the report fails to identify the key drivers of the relationship between the success of the Bratz dolls and the sales of other accessories and merchandise sold as part of the Bratz product line or as Bratz licensed goods manufactured by other companies."[28]  He also opines that Dr. Scott "does not establish a causal relationship, yet she concludes that there is a causal relationship that goes from dolls to accessories, merchandising and other products.  Clearly this conclusion is inappropriate factually and logically."[29]

36.  My discussion of the accused revenues below covers the three types of accused revenues addressed in Mr. Wagner's report: (1) product SKUs, (2) licensing, and (3) entertainment.

a.  Product SKUs

37.  Mr. Wagner states that he uses a document addressed by Lisa Tonnu, MGA's VP of Taxation, as the basis for determining Bratz gross sales.[30]  Ms. Tonnu confirmed in her deposition that the document relied upon by Mr. Wagner includes all Bratz-branded products that MGA sold from 2001 to 2006.[31]  Ms. Tonnu testified, "My understanding is this report that was generated included everything in the Bratz brand."[32]  I understand that this document wasn't prepared in connection with this matter and that Ms. Tonnu was not questioned specifically about whether the products and sales revenues related solely to the accused copyrighted property.[33]

38.  For this Rebuttal Report, and with the purpose of summarizing MGA profits apportioned to the accused copyrighted property, I have analyzed and considered Mr. Wagner's revenues, which are presented in Tab B1, Schedule 1.1 of his Report.  I understand that it is MGA's position that its

---

[27] Expert Report of Carol A. Scott, February 11, 2008, p. 2.
[28] Expert Report of Erich A. Joachimsthaler, March 17, 2008, p. 3.
[29] Expert Report of Erich A. Joachimsthaler, March 17, 2008, p. 6.
[30] Expert Report of Michael J. Wagner, February 11, 2008, p. 8; Deposition of Lisa Tonnu, July 19, 2007, p. 9.  Mr. Wagner uses the terms "Bratz Gross Sales" to describe sales of product SKUs, "Bratz Other Revenues" to describe licensing and entertainment revenues, and "Total Bratz Gross Revenue" to describe the sum of "Bratz Gross Sales" and "Bratz Other Revenues."
[31] Deposition of Lisa Tonnu, September 24, 2007, p. 381-383, 398.
[32] Deposition of Lisa Tonnu, September 24, 2007, p. 398.
[33] Deposition of Lisa Tonnu, September 25, 2007, p. 624-625.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

14

EXHIBIT 59
PAGE 1999

Bratz products do not infringe the accused copyrighted property. For purposes of presenting my rebuttal opinions, I use two product groupings as the basis for revenues to determine accused profits. The first is the Bryant Bratz Core fashion dolls; the second is the Bratz Core fashion dolls. For illustrative purposes, I have also presented the results of an analysis using Mr. Wagner's claimed scope of Bratz revenues in **ATTACHMENT 4**. The breadth of the products included in my analysis may change depending on discovery, further information, subsequent events, instruction from counsel, and/or direction by the Court.

### b. Licensing Revenues

39. I understand that it is MGA's position that revenues derived from licensing do not infringe the accused copyrighted property. In the event that the Court determines licensing revenues to be infringing, I have analyzed and calculated revenues, deductible costs, profits and apportioned profits associated with licensing. This calculation is summarized in **ATTACHMENT 4**.

### c. Entertainment Revenues

40. I understand that it is MGA's position that revenues derived from entertainment sources, including DVD, music, television and theatrical, do not infringe the accused copyrighted property. In the event that the Court determines licensing revenues to be infringing, I have analyzed and calculated revenues, deductible costs, profits and apportioned profits associated with MGA entertainment revenues. This calculation is summarized in **ATTACHMENT 4**.

### 2. Deductible Costs From Alleged Infringing Revenues

41. With respect to copyright claims and non-patent intellectual property claims, Mr. Wagner's book recognizes: (a) judgment is involved in determining an infringer's profits; (b) the appropriateness of deducting costs from infringing revenue; (c) the appropriateness of deducting overhead costs as a component of deductible costs; (d) cost approaches based on "percentage, or fully allocated" methods, (e) approaches used in determining deductible costs include deducting all common costs shared by an infringing work and other works, and (f) approaches which deduct any costs that contribute to the manufacture and sale of the alleged infringing product.

### a. Deductible Costs As Addressed In The Book Edited By Mr. Wagner

42. The purpose of a "deductible expense" analysis performed in the context of determining copyright infringement damages is to identify the costs and expenses that should be deducted from accused sales revenues to determine alleged infringing profits. Mr. Wagner's book

**EXHIBIT 59**
**PAGE 2000**

Expert Report of Paul K. Meyer

addresses deductible costs related to determining an alleged infringer's profits in copyright matters.[34]

43.    First, Mr. Wagner's book recognizes that in determining an infringer's profits, deduction of costs is appropriate:

"(b)…Thus, one could also measure damages as the seller's (infringer's) revenues less the costs it incurred to realize those sales…"[35]

44.    Second, Mr. Wagner's book provides additional insight into approaches available to determine deductible costs, including deducting all common shared costs in determining the infringer's profits.

"(b)…(iv) *Burden of Proof for Costs*…Generally speaking, the expert can use two approaches to deciding which costs to deduct. The first approach deducts all common costs shared by an infringing work and other works of the infringer, reasoning that the infringing work is only one of many items that the infringer produces and carries its share of all costs."[36] (emphasis added)

45.    Finally, the book Mr. Wagner edited includes a chapter dedicated to "Damages Issues: Non-Patent Intellectual Property." The chapter recognizes cost approaches that are acceptable for determining a defendant's profits, including "percentage-basis" or "fully allocated" cost approaches. Additionally, the chapter recognizes that "this approach deducts any costs that contribute to the manufacture and sale of the alleged infringing product."[37]

"(iii) *Deduction of Costs*…*At least* two general approaches—incremental and percentage, or fully allocated—appear acceptable in certain situations, as well as a number of hybrids."[38] (emphasis added)

\* \* \*

---

[34] "Litigation Services Handbook, The Role Of The Financial Expert, Third Edition." Chapter 22, "Calculating Damages In Copyright Infringement Matters," specifically addresses these topics.
[35] "Litigation Services Handbook, The Role Of The Financial Expert, Third Edition," p. 22.5.
[36] "Litigation Services Handbook, The Role Of The Financial Expert, Third Edition," p. 22.5-22.6. Mr. Wagner's book also states, "The infringed party typically advances the opposing philosophy that computation should only deduct incremental costs. Eliminating the shared portion of overhead costs increases the profit of the infringing work. The advocates argue that the infringing work adds incrementally to the infringer's profits and one should evaluate costs in like fashion when evaluating the infringer's profits."
[37] "Litigation Services Handbook, The Role Of The Financial Expert, Third Edition," p. 21.18.
[38] "Litigation Services Handbook, The Role Of The Financial Expert, Third Edition," p. 21.18.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                                16

EXHIBIT 59
PAGE 2001

Expert Report of Paul K. Meyer

"The defendant using a percentage-basis (also known as *fully allocated* or *full absorption*) approach may deduct most or all of its costs of doing business, whether such costs increase incrementally at the relevant level of sales or not. Experts often allocate expenses between infringing and noninfringing sales, where necessary, by applying a common expense percentage. Such percentages could equal the ratio of total expense to total sales, but could also use ratios of units produced or percent of labor hours."[39] (emphasis added)

\* \* \*

"One relatively common hybrid approach in both Lanham Act and copyright cases is the *contribution theory* or *direct assistance rule* espoused by the *Restatement of Torts*...This approach deducts any costs that contribute to the manufacture and sale of the alleged infringing product. This approach will deduct an expense, such as salaries for marketing department executives, even though it does not vary incrementally at the relevant level of sales to the extent those executives devoted some portion of their time and effort to sales of the product at issue. A contributory approach will not deduct expenses such as audit fees, legal fees, and property or excise taxes, unless evidence shows that they supported the manufacture and sale of the relevant product."[40] (emphasis added)

### b. Analytical Approach And Steps To Determining Deductible Costs

46. In performing my analysis of deductible costs and assessing the propriety of Mr. Wagner's analysis of deductible costs, I performed a variety of qualitative and quantitative analyses, including the following:

- Interviewed MGA personnel to determine the nature and behavior of MGA costs;

- Analyzed MGA methods used to allocate costs and determine product profitability;

- Assessed the magnitude of Bratz revenues to total MGA revenues and its impact on MGA's costs;

- Considered trend analysis comparing costs to revenues, and examining the change in revenues and costs and their relationship over time;

- Analyzed MGA from a financial perspective before and after the release of Bratz;

---

[39] "Litigation Services Handbook, The Role Of The Financial Expert, Third Edition," p. 21.18.
[40] "Litigation Services Handbook, The Role Of The Financial Expert, Third Edition," p. 21.18.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

**EXHIBIT 59**
**PAGE 2002**

- Performed statistical regression analysis to predict the relationship between sales and costs;

- Studied increases in MGA's headcount between 2001 and 2006; and

- Reviewed Mr. Wagner's approach related to calculating deductible costs.

The objective of these analyses, fact finding and inquiries was to determine the appropriate deductible costs to deduct in these circumstances.

47.   Mr. Wagner summarizes MGA's "direct expenses" and "calculated expenses" for Bratz in Tab B1, Schedule 1.1 of his Report.  Mr. Wagner also presents profit margins as a percentage of gross revenue of 22.72% before shareholder taxes, and 19.44% after taxes paid by shareholders.[41][42]   Additionally, in his Report Mr. Wagner states, "I have been asked to make these calculations irrespective of whether all of the items I have included as costs will, in fact, be deducted at trial."[43]

48.   Assuming that Mr. Wagner's costs and expenses summarized in Tab B1, Schedule 1.1 reflect Mattel's position on deductible costs in this matter, I have determined that the results of Mr. Wagner's costs and expenses analysis are understated and should not be used as a basis for deductible costs.   In addition, I have performed a separate analysis of deductible costs for purposes of determining MGA profits from Bratz before apportionment (see ATTACHMENT 4).

### c.   Critique Of, And Adjustments To, Mr. Wagner's "Direct Expenses"

49.   Mr. Wagner's "Direct Expenses" include cost of sales, returns, entertainment production, ad media and ad production, royalty, and mold depreciation expenses.   According to Mr. Wagner, these "direct expenses [were] incurred by MGA for the production and sale of Bratz products."[44]   In the remainder of this section, I address each "Direct Expense" that should be deducted from sales of products containing the accused copyrighted property.

---

[41] MGA is an S Corporation.  In accordance with Subchapter S of the Internal Revenue Code, the company is not subject to federal income taxes at the corporate level.  Taxable income or loss of a company is allocated to the shareholders based on their respective ownership interests.  Taxes are deductible expenses.  Mr. Wagner has summarized the distributions to shareholders to pay taxes of approximately $101 million, or 3.28% of Bratz's gross revenue in Tab B1, Schedule 1.1 of his Report.
[42] Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 1.1.
[43] Expert Report of Michael J. Wagner, February 11, 2008, p. 7.
[44] Expert Report of Michael J. Wagner, February 11, 2008, p. 9.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                    18

EXHIBIT 59
PAGE 2003

Expert Report of Paul K. Meyer

### i.   Cost of Sales

50.   Cost of sales data is contained in MGA's primary accounting systems, Great Plains (through 2005) or Axapta (2006-present).  The Axapta and Great Plains accounting systems are used by MGA for purposes of financial reporting and preparation of its audited financials.  The Axapta and Great Plains accounting systems contain overall information regarding cost of sales, but do not break down cost of sales at the product or SKU level.  Detailed records identifying cost of sales are contained in MGA's Targit database, which tracks sales, costs of goods sold and returns of products shipped to MGA's customers.

51.   Mr. Wagner determined MGA's cost of sales based on an MGA schedule titled "Bratz Sales, 2001-2006."[45]  Based on my analysis, I have determined that the source data for this schedule is the Targit database.  In my opinion, use of Targit data is an appropriate starting point to compute cost of sales.  However, adjustments to this data are necessary to properly calculate MGA's cost of sales.

52.   First, the Targit data contains a small number of monthly data points containing sales and no corresponding cost of sales.  I have estimated the cost of sales for these periods based on the cost of sales for the same SKU in another month.  When SKU cost of sales data for another month was unavailable, I applied a percentage of cost of sales to sales based on MGA's total sales and cost of sales.

53.   Second, the Targit data does not include accounting adjustments to cost of sales.  These adjustments are made in MGA's Axapta and Great Plains accounting systems to reflect actual costs, and are not tracked at a product or SKU level.[46]  To account for these adjustments, I have compared cost of sales from the Targit data to cost of sales contained in the Axapta and Great Plains accounting systems, and developed a factor to match cost of sales contained in the Targit data to cost of sales recorded in the Axapta and Great Plains accounting systems.

### ii.   Returns

54.   I have made a similar adjustment for returns as described above for cost of sales.  I have compared returns from the Targit data to returns contained in the Axapta and Great Plains

---

[45] Expert Report of Michael J. Wagner, February 11, 2008, p. 9.
[46] Discussions with MGA personnel.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                                                     19

EXHIBIT 59
PAGE 2004

**Expert Report of Paul K. Meyer**

accounting systems, and developed a factor to match returns contained in the Targit data to returns recorded in the Axapta and Great Plains accounting systems.

### iii. Entertainment Production Costs

55.   Mr. Wagner has identified entertainment production costs related to MGA sources of entertainment revenues including DVDs, television and music. The production costs for these entertainment revenues can be tracked directly to each entertainment project. I have not made any adjustments to Mr. Wagner's approach to determining production costs.

### iv. Ad Media and Ad Production Expenses

56.   In his calculations for ad media and ad production expenses related to Bratz, Mr. Wagner relies upon an MGA log of advertising expenditures for the years 2006 and 2007.[47] This log identifies a brand, and in some cases a sub-brand, associated with each ad media and ad production expenditure. For 2006 and 2007, Mr. Wagner calculated the portion of ad media and ad production expenses related to Bratz.[48] MGA does not have records prior to 2006 identifying this brand and sub-brand information for each ad media and ad production expenditure. To estimate Bratz related ad media and ad production expenses in prior years, Mr. Wagner uses the relationship of Bratz to non-Bratz ad media and ad production expenditures for 2006 and 2007, and applies this relationship to ad media and ad production expenditures in prior years (2001-2005).[49]

57.   I have not made any adjustments to Mr. Wagner's overall approach. However, I have adjusted Mr. Wagner's calculations to properly reflect the ad media and ad production expenditures related to Bratz. The 2006 and 2007 log of advertising expenditures contains significant advertising expenditures for which no brand and sub-brand have been specified. Based on Mr. Wagner's calculation, he assumes that these expenses are unrelated to Bratz. Mr. Wagner's assumption is incorrect. Ms. Evans at MGA has confirmed that these expenses are related to Bratz, and would therefore need to be deducted from Bratz revenues.

### v. Royalty Expense

---

[47] Expert Report of Michael J. Wagner, February 11, 2008, p. 9, Tab B1, Schedules 3.2 and 3.3.
[48] Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedules 3.2 and 3.3.
[49] Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedules 3.2 and 3.3.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                        20

EXHIBIT 59
PAGE 2005

Expert Report of Paul K. Meyer

58.   Between January 2001 and July 2007 MGA has incurred royalty expenses totaling approximately $56 million.[50]  Royalty expenses are comprised of royalties paid to Mr. Bryant totaling approximately $35 million as well as royalties paid to other parties including Lovins and Parinchy.[51]  I have not made any adjustments to Mr. Wagner's approach in determining the amount of royalty expenses.

### vi. Mold Depreciation

59.   Between January 2001 and July 2007, MGA incurred mold depreciation expenses totaling approximately $65 million.[52]  Mold depreciation expenses include the annual depreciation related to the acquisition of product molds.  The majority of these expenses, $46 million, can be tracked by SKU based on records maintained at MGA in Hong Kong.  The remaining amount is related to mold depreciation expenses incurred by MGA in the United States and is not tracked by SKU.  I understand that between 2001 and 2007, MGA made substantial investments in molding for Bratz products.  I understand that these mold depreciation expenses incurred by MGA in the United States are related to Bratz products.  Mr. Wagner improperly assumes that mold depreciation expenses incurred in the United States that are not tracked by SKU are unrelated to Bratz.

60.   For determining mold depreciation expenses that are tracked by product, I have not adjusted Mr. Wagner's approach.  For mold depreciation expenses that are not tracked by SKU, I have adjusted Mr. Wagner's approach to account for additional mold depreciation expenses related to Bratz products.[53]

### d. Critique Of, And Adjustments To, Mr. Wagner's "Calculated Expenses"

61.   Mr. Wagner defines "calculated expenses" as "all expenses that are not tracked by product or product line by MGA," including "Other Sales and Marketing Expense, Product Development Expenses, Travel and Entertainment Expense, Salaries and Related Expenses, Premises Related

---

[50] Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 4.2.
[51] Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedules 7.2, 7.3 and 7.4.
[52] Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 4.2.
[53] My adjustment to Mr. Wagner's calculation of mold depreciation expense is similar to an adjustment made by Mr. Wagner to determine ad production and ad media expenses, which is addressed in more detail earlier in this Rebuttal Report. In that adjustment, Mr. Wagner used MGA detailed expenditures for ad production and ad media in the United States as the basis to prorate ad production and ad media expenses attributable to Bratz in all countries.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                            21

EXHIBIT 59
PAGE 2006

Expert Report of Paul K. Meyer

Expenses, Supplies, Postage and Delivery Expense and Other Depreciation and Amortization," among others.[54] Mr. Wagner computes "calculated expenses" based on two methods.

62. First, for sales discounts and allowances and other cost of sales, Mr. Wagner allocates these costs based on MGA revenues using a full-allocation method (e.g., costs are fully allocated based on revenues).[55] I have not adjusted Mr. Wagner's approach.

63. Second, Mr. Wagner performs a statistical analysis to determine the "incremental" portion of costs attributable to the production and sale of Bratz products.[56] These costs primarily represent operating costs of MGA.[57] Mr. Wagner adjusts the results of his statistical analysis by $126.3 million after determining his statistical analysis did not identify all costs attributable to Bratz products.[58] The remainder of this section addresses Mr. Wagner's approach to calculating operating costs and more appropriate approaches for determining operating costs.

i. Analyses and Determination of Deductible Operating Costs.

64. I performed an analysis of MGA operating costs that contributed to the development, production, marketing, selling and administration of Bratz products. Since these expenses are not specifically tracked by Bratz products or product lines, these expenses need to be analyzed to determine their nature and whether they increase and/or relate to Bratz product sales. My analysis and determination of deductible operating costs is based on (a) interviews with MGA personnel, (b) analysis of MGA records containing methods used by MGA to allocate operating costs, (c) the magnitude of Bratz revenues to total MGA revenues, (d) study of sales and cost trends, (e) analysis of MGA financials before and after the release of Bratz, (f) changes in MGA headcount between 2001 and 2006, (g) performing a statistical regression analysis, and (h) review of Mr. Wagner's approach and the publication which he edited.

---

[54] Expert Report of Michael J. Wagner, February 11, 2008, p. 9-10.
[55] Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 1.2.
[56] Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 1.2.
[57] Mr. Wagner also uses his "calculated expenses" method to determine (a) other depreciation and amortization costs and (b) other income and expense. These expenses are not classified as operating costs, however, my discussion of operating costs applies to these costs as well.
[58] Mr. Wagner states in his Report, "In addition, since regression analysis determines additional costs associated with a $1 increase in sales and the incremental sales to MGA for the Bratz products is a substantial percentage of their total revenue, I analyzed the remaining costs that were not incremental costs associated with Bratz products as a result of my regression analysis to determine whether any of these remaining costs are attributable to Bratz products as a result of the large proportion of Bratz products to total MGA sales. Based on this additional analysis, I determined that an additional $126.3 million of costs are attributable to Bratz products." Expert Report of Michael J. Wagner, February 11, 2008, p. 9-10.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                          22

EXHIBIT 59
PAGE 2007

Expert Report of Paul K. Meyer

65.     In summary, quantitative analysis of MGA operating expenses and consideration of the nature and growth of those expenses, indicate that between 2001 and 2007, the majority of those costs have been incurred to support the Bratz product line. The scope of my analysis over a six-year period indicates that these costs are largely attributable to sales of Bratz products. On an overall basis, the results of my qualitative analysis also indicate that MGA's operating expenses between 2001 and 2007 are attributable to the growth in Bratz product sales. Based on these results indicating that MGA operating expenses vary over time with increases in MGA and Bratz sales, the nature of costs over longer time periods, and the fact that the vast majority of MGA sales are Bratz-related sales, I have concluded that it is appropriate to allocate MGA operating expenses to Bratz based on sales. The resulting allocated operating expenses can then be deducted from alleged infringing revenues related to the accused copyrighted property.

66.     According to Mr. Wagner's book, "When identifying costs as fixed or variable, one must establish a corresponding time frame. Over a long enough time period, all costs vary. Over short time periods, nearly all costs remain fixed. In measuring fixed and variable costs, the scope of the analysis drives the time frame."[59] The scope of my analysis is over a six-year period for a company that has experience significant and unprecedented growth in sales and operating costs. The cost growth in MGA operating costs is attributable to the growth in Bratz sales.

### ii. MGA Methods to Allocate Operating Costs

67.     As discussed above, MGA's substantial increase in operating costs between 2000 and 2006 is attributable to sales of Bratz products. The increase in MGA operating costs supported the development, production, sales and marketing of Bratz products. For 2006 and 2007, MGA prepared internal analyses to study the profitability of its product lines. These studies contained an allocation of operating costs based on MGA sales and further confirm my opinions regarding operating costs.[60] My discussion with MGA personnel and MGA's studies of product line profitability are consistent with my approach to allocate MGA operating costs based on MGA sales.

### iii. Analysis of MGA Financial Records

---

[59] "Litigation Services Handbook, The Role Of The Financial Expert, Third Edition," p. 7.5.
[60] This cost approach allocates operating costs based on MGA sales. This would be a percentage-based approach.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                                      23

EXHIBIT 59
PAGE 2008

Expert Report of Paul K. Meyer

68.     The release and subsequent sales of Bratz products changed the entire MGA company infrastructure.  The Bratz product line caused MGA to significantly expand its central office resources to manage, support and administer the increasing Bratz sales.  As described earlier and

69.     I have compared the MGA sales growth for the period 2003 through 2006 to MGA's growth in operating expenses for that same period.  The results of this comparison indicate that, although MGA's sales increased over 35% during this period, its operating expenses increased by over 100%.  This indicates significant cost variability for the MGA operating expense accounts.[61] CHART I below demonstrates MGA sales and cost growth.

---

[61] Mr. Wagner's Tab B1, Schedule 2.3, "MGA Annual Common-Size Income Statement," indicates total operating expenses for 2001-2006 is 22.05% of gross revenue.  Additionally, MGA's operating expenses were 22.25% in 2002, 22.50% in 2005, and 24.53% in 2006.  The operating expense ratio dropped in 2003 as Bratz sales increased.  This data indicates that operating expenses vary with MGA sales.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                                 24

EXHIBIT 59
PAGE 2009

REDACTED

*Expert Report of Paul K. Meyer*

70.  Without Bratz sales, MGA would be an entirely different business.  MGA would avoid the majority of its operating expenses if it did not have the Bratz product line.  MGA would have significantly reduced infrastructure and associated costs.[62]  MGA's operating expense levels would be consistent with the company's operating expense history prior to 2001 but for the Bratz product line.  To support these increased sales levels, MGA had to expand many central, corporate office functions.  **TABLE III** below demonstrates significant increases in MGA operating expenses between 2000 and 2006.

---

[62] Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 4.2.
[63] Discussions with MGA personnel.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                    25

EXHIBIT 59
PAGE 2010

REDACTED

**Expert Report of Paul K. Meyer**

During this same time period, MGA's operating expenses increased from under $30 million in 2000 to over $200 million in 2006, representing an increase of almost 700%. The largest expense categories, including sales and marketing, product development and salaries increased between 300% and 1,200% during the time period 2000 through 2006.

72.   In **TABLE IV** below, I have compared non-Bratz sales levels from 1999 and 2000 to non-Bratz sales in 2004 to highlight that MGA's operating cost growth is due to Bratz sales. Even though non-Bratz sales increased by 27% between 2000 and 2004, total operating expenses increased by over 400%. For each operating expense category, MGA has experienced a significant increase

---

[64] Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 4.2. These costs are generally categorized by MGA as "operating expenses."
[65] Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 1.1
[66] Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 1.5.
[67] TABLE I – Bratz And Non-Bratz Gross Revenues, 2000-2006 (In Millions).

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                                    26

**EXHIBIT 59**
**PAGE 2011**

REDACTED

Expert Report of Paul K. Meyer

between 2000 and 2004. In comparison, MGA experienced more modest increases in operating expenses between 1999 and 2000, before the release of Bratz.

73.   Based on my analysis of MGA financials, MGA's significant increase in operating costs is attributable to the sales of Bratz products. Conversely, without Bratz, MGA would have avoided the majority of its operating costs and would have experienced operating costs similar to its level of operating costs prior to the release of Bratz. This analysis supports my opinion that allocating operating costs based on MGA sales is appropriate for determining the amount of MGA operating costs attributable to sales of Bratz products.

---

[68] Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 4.2.
[69] Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 1.1.
[70] Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 1.5.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                              27

EXHIBIT 59
PAGE 2012

REDACTED

Expert Report of Paul K. Meyer

#### iv. MGA Headcount

74.     Between 2001 and 2006, MGA's employee headcount increased from 135 employees to over 837 employees, an increase of over 500%. As demonstrated in TABLE V below, each year MGA's employee headcount increased by at least 20% annually. According to MGA personnel, during this time period MGA hired employees to expand its global operations and infrastructure to support the significant growth in Bratz sales. The increases in headcount resulted in higher operating costs. Therefore, changes in MGA's headcount during this 6-year period support my opinion that significant increases in MGA's operating costs are attributable to sales of Bratz products.

TABLE V – MGA Headcount, 2001-2006[71]

|  | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|
| MGA Headcount (Excluding Little Tikes) | 135 | 212 | 345 | 505 | 610 | 837 |
| % Change | n/a | 57% | 63% | 46% | 21% | 37% |

#### v. Regression Analysis

75.     Mr. Wagner states, "For all expenses that are not tracked by product or product line by MGA, I calculated incremental costs based on a regression analysis of monthly costs for various cost categories to gross revenues provided by MGA to determine the incremental costs associated with sales."[72] After performing his regression analysis, Mr. Wagner, "analyzed the remaining costs that were not incremental costs associated with Bratz products as a result of [his] regression analysis to determine whether any of these remaining costs are attributable to Bratz products <u>as a result of the large proportion of Bratz products to MGA sales</u>."[73]  (emphasis added)  It is my opinion that "incremental" costs do not necessarily reflect all costs attributable to the sales of Bratz products.

76.     Mr. Wagner uses MGA sales and cost data on a monthly basis to perform a regression analysis to determine whether a relationship exists between MGA sales and costs. The regression analysis is used by Mr. Wagner to compute the impact that changes in sales have on changes in costs.

---

[71] Discussions with MGA personnel.
[72] Expert Report of Michael J. Wagner, February 11, 2008, p. 9.
[73] Expert Report of Michael J. Wagner, February 11, 2008, p. 9-10.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                                28

EXHIBIT 59
PAGE 2013

Expert Report of Paul K. Meyer

Mr. Wagner performs his regression analysis for 22 categories of MGA costs, comparing each cost category to sales. The results of Mr. Wagner's regression analysis are summarized in Tab B1, Schedule 5.2 to his Report. Of the 22 cost categories, Mr. Wagner analyzes 12 categories related to "calculated expenses," as summarized in **TABLE VI** below. The remaining 10 cost categories are "direct" (as discussed previously) or are allocated based on another method discussed elsewhere in this Report.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT 59
PAGE 2014

Expert Report of Paul K. Meyer

TABLE VI – Selected Results Of Mr. Wagner's Regression Analysis[74]

| | Cost Category | Mr. Wagner Determines His Results Are "Statistically Significant"[75] | Mr. Wagner Adjusts His Regression Results[76] | Mr. Wagner Determines Expense Is Not Attributable to Bratz[77] |
|---|---|---|---|---|
| 1. | Other Sales & Marketing Expenses, Excluding Ad Production & Ad Media Expenses | √ | √ | |
| 2. | Product Development Expenses | √ | √ | |
| 3. | Travel & Entertainment Expenses | √ | √ | |
| 4. | Salaries & Related Expenses | √ | √ | |
| 5. | Professional Fees | | √ | |
| 6. | Premises Related Expenses | √ | √ | |
| 7. | Equipment Related Expenses | | | √ |
| 8. | Supplies, Postage & Delivery Expenses | √ | | |
| 9. | Other Expenses | | √ | |
| 10. | Distribution Expenses | | | √ |
| 11. | Other Depreciation & Amortization Expenses, Excluding Mold Depreciation | √ | √ | |
| 12. | Other (Income) Expense | | | √ |

77.     For certain cost categories, Mr. Wagner concludes the results of his regression analysis are statistically significant (i.e., the results of the regression analysis are valid and can be used to predict the level of expenses that are attributable to Bratz products), and for other cost categories he concludes the results of the regression analysis are statistically insignificant. If his results are statistically significant, Mr. Wagner applies the results of his regression model to determine the level of expenses attributable to Bratz products. Mr. Wagner then makes adjustments to his regression analysis to quantify other costs that may be attributable to Bratz. TABLE VI above demonstrates that Mr. Wagner made adjustments to all of his regression results where he

---

[74] These costs are generally categorized by MGA as "operating expenses."
[75] Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 5.2.
[76] Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 1.1.
[77] Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 1.1.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                                    30

EXHIBIT 59
PAGE 2015

**Expert Report of Paul K. Meyer**

determined the results were statistically significant, with the exception of one operating cost category, supplies, postage and delivery expenses.

78. While the use of regression analysis to study the relationship of sales and costs is not improper, the underlying assumptions used to construct a regression analysis may lead to results that are not meaningful. According to Mr. Wagner's book, "Many naïve users of regression make the mistake of simply plugging data into a program and using the results. This can lead to nonsense results. Acknowledged or not, an underlying model and assumptions always exist. The careful analyst recognizes this and makes sure that the model describes the intended type of cost relation."[78]

79. In addition, Mr. Wagner's book states, "The analyst needs to confirm any cost estimate, statistically or otherwise, as reasonable. The reasonableness tests include the following:

- Compare the results of applying more that one estimating method. If the results are reasonable, the methods should yield approximately the same results, or one should have good reasons for a discrepancy.

- Compare the result to reality. For example, compare estimated costs at historical volumes to historical costs. Compare results at an assumed but-for volume with historical results (at some other date) at roughly the same volume. The results need not be the same, but differences should be reconcilable...

- Finally, apply a test called *interocular inspection*. This is a tongue-in-cheek name for a real test, in which you stare at the results until the meaning hits you between the eyes. In other words, consider whether your results make sense."[79] (emphasis original)

80. As described in the following paragraphs, the results of Mr. Wagner's regression analysis are not reasonable. I have identified flaws with key underlying assumptions in Mr. Wagner's approach and made adjustments to correct for these flaws. After making these adjustments, the results from the regression model are more reasonable for purposes of understanding and predicting the relationship between MGA sales and costs. In the following paragraphs, I describe the flaws with Mr. Wagner's approach and the results of my analysis which corrects for these flaws (see **ATTACHMENT 6**).

---

[78] "Litigation Services Handbook, The Role Of The Financial Expert, Third Edition," p. 7.12.
[79] "Litigation Services Handbook, The Role Of The Financial Expert, Third Edition," p. 7.24.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

31

**EXHIBIT 59**
**PAGE 2016**

81.     Mr. Wagner performs a regression analysis based on monthly MGA sales and cost data.[80] Because MGA's sales are seasonal and its major customers are large toy retailers, the use of monthly data to perform a regression analysis does not fully capture the relationship between sales and costs. For example, during the peak sales months of August, September and October, sales at MGA increase significantly. During these peak sales months, many of MGA's operating expenses, such as salaries and rent, remain constant, as they represent pro rata annual salary or pro rata annual lease costs. On an annual basis, however, most of MGA's operating expenses have increased between 2001 and 2006 on a year over year basis as sales have increased year over year between 2001 and 2006. Many costs have increased in a "step function" as additional resources are needed to support Bratz sales growth. As a result of using monthly sales and cost data, Mr. Wagner's analysis does not account for the seasonality in MGA's sales and understates the variability of operating expenses with respect to sales growth.

82.     Additionally, costs such as product development and sales and marketing, contribute to sales growth in future periods. Mr. Wagner's regression model assumes product development and sales and marketing costs incurred in a single month are only related to sales in that same month. I understand that product development and sales and marketing costs are drivers of sales of Bratz products, and that these efforts can benefit sales for many months into the future. Mr. Wagner's regression model does not accurately capture the relationship between product sales and costs such as product development and sales and marketing because his model does not account for a sales lag.

83.     Mr. Wagner's regression analysis also demonstrates a large portion of MGA's "fixed" costs also vary with sales. As demonstrated in **CHART II** below and in **ATTACHMENT 6**, his calculation shows MGA's "fixed" costs increase year over year between 2001 and 2006. As the name implies, fixed costs do not change over time. By definition, all costs are variable over time and MGA's so-called fixed costs became largely variable with respect to Bratz sales growth. Increases in "fixed" costs year over year demonstrate the flaw with Mr. Wagner's regression analysis, as these costs vary with Bratz sales.

---

[80] Mr. Wagner used monthly data for 2002, 2003, 2006 and January through July 2007.

EXHIBIT 59
PAGE 2017

Expert Report of Paul K. Meyer

84.    Mr. Wagner recognizes in his Report that the results of his statistical analysis (i.e., regression

analysis) have understated the calculated expenses related to Bratz. Mr. Wagner states:

> "In addition, since regression analysis determines additional costs
> associated with a $1 increase in sales and the incremental sales to MGA
> for the Bratz products is a substantial percentage of their total revenue, I
> analyzed the remaining costs that were not incremental costs associated
> with Bratz products as a result of my regression analysis to determine
> whether any of these remaining costs are attributable to Bratz products as
> a result of the large proportion of Bratz products to total MGA sales.
> Based on this additional analysis, I determined that an additional $126.3
> million of costs are attributable to Bratz products."[82]  (emphasis added)

Mr. Wagner adjusts upward the costs of certain "calculated expense" accounts. In his report, Mr.

Wagner did not explain why the results of his regression were not reasonable for calculating

---

[81] Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 1.5; ATTACHMENT 6.
[82] Expert Report of Michael J. Wagner, February 11, 2008, p. 9-10.

CONFIDENTIAL -- ATTORNEYS' EYES ONLY

33

EXHIBIT 59
PAGE 2018

REDACTED

"incremental" costs. Nevertheless, the overall "calculated expenses" identified by Mr. Wagner are understated for purposes of determining deductions from alleged infringing revenue.

85.    I have adjusted Mr. Wagner's regression model using annual MGA sales and cost data instead of the monthly sales and cost data used by Mr. Wagner. This adjustment helps to correct for the seasonality and sales lag issues described above. Accordingly, the results of my regression model are significantly better than the results of Mr. Wagner's regression model. According to Mr. Wagner's book, "One advantage of regression is that it not only provides estimates of the costs and other parameters but also measures the accuracy of those estimates."[83] One of the accuracy measures relates to "how well the model as a whole fits the data," which is indicated by an "important measure" called adjusted R-squared.[84] "A high value of $R^2$ leads us to say that the regression equation explains a large portion of the variation in the dependent variable."[85]

86.    The difference between the adjusted R-squared Mr. Wagner has computed to the adjusted R-squared I have calculated is significant. For every cost category in which Mr. Wagner applied his regression analysis, the adjusted R-squared I have computed is significantly higher than Mr. Wagner's adjusted R-squared. A higher adjusted R-squared results in a predictive model that as a whole better fits the data and results in more accurate estimates of costs. In addition, my results are also statistically significant based on the definition of statistical significance identified by Mr. Wagner.[36] The results of my regression analysis and a comparison to Mr. Wagner's results are summarized in **ATTACHMENT 6**.

87.    The results of my regression model also demonstrate that the 12 cost categories identified above are attributable to changes in sales. I also combined the 12 cost categories into one annual cost to perform an alternative regression model. This analysis also confirmed that MGA operating costs are attributable to changes in MGA sales. The overall results of the statistical analyses support my opinion that changes in MGA's operating costs are attributable to sales of MGA and more specifically, sales of Bratz products.

---

[83] "Litigation Services Handbook, The Role Of The Financial Expert, Third Edition," p. 7.18.
[84] "Litigation Services Handbook, The Role Of The Financial Expert, Third Edition," p. 7.18.
[85] "Litigation Services Handbook, The Role Of The Financial Expert, Third Edition," p. 7.18.
[86] Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 5.1.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

**EXHIBIT 59
PAGE 2019**

Expert Report of Paul K. Meyer

### e. Taxes

88. This section addresses the deductibility and amounts of MGA shareholder taxes. Since MGA is an S Corporation, taxable income or loss is allocated to the shareholders based on their respective ownership interests; shareholders then pay taxes on their respective share of income. Shareholders of Subchapter S corporations are taxed directly on the net income of the corporation. The corporation is not taxed separately from the individual shareholders. The shareholders of Subchapter S corporations pay taxes based on applicable individual tax rates.

89. I understand that S Corporations may make distributions to their shareholders for purposes of paying taxes on their respective share of the company's income.

taxes paid by shareholders on their share of MGA income that is related to Bratz is a deductible expense for the purposes of determining copyright infringement damages in this matter.

90. In his Report, Mr. Wagner states that he uses the amount of distributions paid to shareholders for the payment of taxes as a proxy for the amount of taxes that should be considered deductible expenses. Specifically, Mr. Wagner uses a "shareholders' distribution report for the period of 2001 through 2005" and allocates the distributions paid to shareholders for purposes of taxes based on MGA's income before taxes.[87] Mr. Wagner then reduces MGA's profits by these

---

[87] Expert Report of Michael J. Wagner, February 11, 2008, p. 10.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT 59
PAGE 2020

REDACTED

Expert Report of Paul K. Meyer

### B.   Profit Apportionment

92.   Mr. Wagner states in his Report, "I have not addressed the issue of apportionment of the profits from Bratz as I understand that MGA has the burden of proof on that issue. I will comment upon MGA's apportionment of the profits from Bratz, if they make such a calculation, at the appropriate time."[89] This reference in Mr. Wagner's Report is vague and does not state that it is related to any particular cause of action, including alleged copyright infringement. Mr. Wagner's summary of the "Profitability of Bratz" in Tab B1, Schedule 1.1 does not indicate the profits that MGA made from use of the accused copyrighted property, nor does it associate any of those profits with any specific cause of action in this matter. Additionally, Mr. Wagner does not define "apportionment" or how he would apply apportionment analyses. Without apportionment, it would not be appropriate to rely upon Mr. Wagner's opinions related to Bratz profits and his summary at Tab B1, Schedule 1.1 of his Report.

93.   As stated in Paragraph 13 of my initial Report dated February 11, 2008, I understand that when measuring the defendant's profits from any infringing products, the copyright statute provides that, "...the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work."[90] (emphasis added) Determining the elements of profit attributable to factors other than the copyrighted work is referred to as apportionment of profit.

94.   Mr. Wagner's book recognizes that apportioning infringing sales is a subjective exercise where a variety of techniques can be enlisted.

> "Courts have typically found apportioning sales value a subjective exercise, usually based on expert testimony. Experts may find mathematical estimating techniques (such as regression) helpful, particularly if the infringer sold the work with and without the infringing element under relatively constant conditions. Other factors could affect the profitability of the with-and-without versions: the condition of the overall economy, the amount of advertising used, demand for the work's market segment, the work's age, and competing products. Alternatively, the results of similar products or works, without the infringing element,

---

[89] Expert Report of Michael J. Wagner, February 11, 2008, p. 24.
[90] 17 U.S.C. § 504(b).

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

36

**EXHIBIT 59
PAGE 2021**

Expert Report of Paul K. Meyer

might give additional guidance as to the overall contribution of the infringed element."[91]   (emphasis added)

### 1. Apportionment Factors and Considerations

95.   In my initial Report, I discussed seven apportionment factors that contributed to the success of the Bratz fashion dolls, including: (1) the design of the doll; (2) the development of the characters associated with the doll line; (3) the themes associated with the dolls; (4) the development of fashions sold with the dolls; (5) the development of accessories sold as part of the doll line; (6) the packaging in which the dolls are sold; and (7) MGA's branding, marketing and advertising efforts.[92]

### a.   Design Of The Doll

96.   I understand that a variety of design steps are critical in the development of a Bratz doll and contribute to generation of Bratz sales and profits. The "design of the doll" refers to a variety of developmental steps, each of which involves substantial creative contributions.   These steps include: (a) Carter Bryant's drawings, both before and after his departure from Mattel, (b) the sculpts for the Bratz dolls created by Margaret Leahy, (c) the engineering concepts that allowed for production of the doll, (d) the face painting of the dolls by Anna Rhee, and (e) the Bratz dolls hair rooting and hairstyling by Steve Tarmichael.   All of these doll development steps were overseen by Paula Garcia.[93]

97.   In his declaration, Mr. Tonner addresses creative elements, other than Mr. Bryant's drawings, that were part of the design of the Bratz doll. Mr. Tonner addresses the following:

- Proportion – "From my observation, Mr. Bryant's sketch is not a technical drawing—if it was, the hip joint shape and placement as well as the leg shape would have been different on the doll... Ms. Leahy knew pleasing proportions (it's the landmark that all sculptors use).   Using her own judgment, Ms. Leahy was able to hit the landmarks."[94]

- Face Design – "Mr. Bryant's original sketches show the characters with very trendy, edgy, all most (sic) 'punk'-like styles.   The dolls arrived on

---

[91] "Litigation Services Handbook, The Role Of The Financial Expert, Third Edition," p. 22.2.
[92] Paula Garcia and Robert Tonner concurred that these seven factors were the major factors contributing to Bratz's sales and profits.
[93] In his initial Expert Report, Mr. Tonner stated, "Ms. Treantafelles [Garcia] was perhaps the most important person in the development of the project.  She took an idea from an untested, unknown clothing designer (who was not a doll designer) and worked with an extremely talented staff to develop a market changing doll."  Expert Witness Report by Robert Tonner, February 8, 2008, p. 16.
[94] Declaration of Robert Tonner, March 13, 2008, p. 1.

**EXHIBIT 59**
**PAGE 2022**

the store shelves with nothing of the sort. The Bratz doll products all had long, pretty normal hair and the hair styles have virtually remained that way since."[95]

- Face Sculpt – "The face painter for the Bratz doll was highly skilled and certainly brought his/her own 'look' and identity of design into the project, i.e. artistic contributions not found in Bryant's sketches."[96] (emphasis original)

98.   Similarly, Mr. Vilppu addresses creative elements of the doll design stating, "Mr. Bryant's sketches are really best interpreted as his 'visual thinking.' They first and foremost conveyed an idea to MGA which allowed the sculptor(s) and face painter(s) involved in the Bratz design significant freedom in executing the dolls, and the particular skills and improvements that the sculptor(s) and face painter(s) brought to the project are evident in the many differences between Mr. Bryant's concept sketches and the completed dolls."[97]

### b.   Themes Associated With The Dolls

99.   I understand that fashion dolls are marketed with various themes. For example, Barbie themes have included "California Girl," "Princess World," "Fairy World," "Kelly World," "Happy Family," "Pop" and "Essentials."[98]   Bratz themes have included "Sun-Kissed Summer," "Wintertime Wonderland" and "Formal Funk," as examples.[99]   The themes associated with fashion dolls play a large role in MGA's generation of Bratz sales and profits. Sales of themed Bratz products vary significantly, demonstrating that theme selection plays an important role in the success of a Bratz fashion doll.

### c.   Fashions Sold With The Dolls

100.   I understand that fashions and softgoods are important to MGA's generation of Bratz sales and profits. Bratz and Barbie are fashion dolls, which means that girls play with them in part by changing the dolls' fashions. Thus, the dolls' fashions are significant contributors to the dolls' success. I understand the Bratz doll rotocast and body have generally not changed since introduction to the market, yet the Bratz fashions have continued evolving, keeping up with

---

[95] Declaration of Robert Tonner, March 13, 2008, p. 3.
[96] Declaration of Robert Tonner, March 13, 2008, p. 5.
[97] Expert Report of Glenn V. Vilppu, March 14, 2008, p. 3.
[98] "Barbie 2004 Marketing Plan," October 28, 2003 [M0284970-96 at 85].
[99] MGA's Complaint, April 13, 2005, p. 19.

Expert Report of Paul K. Meyer

current and popular fashion trends.[100]   Bratz fashions reflect at least three different creative elements: (a) swatch selection, (b) pattern development and (c) graphic print application.

### d.  Accessories Sold With The Dolls

101.  As part of its theme and concept development, MGA expends significant creative resources to develop accessories.  Accessories included with Bratz dolls vary from shoes and purses to musical instruments and sporting equipment.  The accessories play an important role in emphasizing the theme and contribute to Bratz generation of sales and profits.[101]

### e.  Characters Associated With The Doll Line

102.  Characters and character development are important to MGA's generation of Bratz sales and profits. MGA has introduced numerous Bratz doll characters since 2001 which are designed to emphasize different personalities, interests and ethnic backgrounds.[102,103]  Offering a variety of characters allows MGA's target consumers to identify with certain Bratz doll personalities and diversities.

### f.  Packaging In Which The Dolls Are Sold

103.  I understand that packaging is important to MGA, and MGA devotes significant resources to developing and producing packaging for Bratz dolls.  I further understand that packaging consists of two primary creative processes: (a) package design consisting of the package shape, graphics and product placement, and (b) copy that conveys attributes of the product.[104]  MGA has developed award-winning, innovative packaging designs for the Bratz products.  Certain of the Bratz packaging included handles, which also served as items for the consumer, and incorporate the Bratz logo, copy for the Bratz products and the "Passion for Fashion" tag line.

### g.  MGA's Branding, Marketing And Advertising Efforts

104.  I understand that MGA devoted significant resources toward advertising and marketing, and that advertising and marketing strategies were important to MGA's generation of Bratz sales and

---

[100] Discussions with Paula Garcia.
[101] Discussions with Paula Garcia.
[102] Discussions with Paula Garcia and review of MGA sales data.
[103] Based on discussions with Paula Garcia, I understand that Charles O'Connor was responsible for writing the copy on the initial Bratz packaging, including developing and expanding the characters' personalities.
[104] Discussions with MGA personnel.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

**EXHIBIT 59**
**PAGE 2024**

Expert Report of Paul K. Meyer

profits. I also understand from Erich Joachimsthaler, Ph.D., another expert retained on behalf of MGA, that MGA's Bratz branding efforts were important to the success of Bratz dolls.

### h.   Deposition Testimony of Ms. Joyce Ng

105.   Subsequent to the filing of my initial Report, I reviewed deposition testimony from Joyce Ng, a market research consultant, who ran focus groups for MGA and was also a former Senior Product Manager at Mattel.[105] In her deposition, Ms. Ng confirmed that fashions, accessories, characters, themes, packaging and branding contribute to the success of a doll line. Ms. Ng's testimony is consistent with the importance of the apportionment factors described above. Excerpts from Ms. Ng's deposition testimony are summarized in **TABLE VIII** below.

---

[105] Deposition of Joyce Ng, February 15, 2008, p. 8, 15, 67.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                           40

**EXHIBIT 59**
**PAGE 2025**

Expert Report of Paul K. Meyer

TABLE VIII – Selected Excerpts From Ms. Ng's Deposition

| | |
|---|---|
| Fashions & Accessories | "…Those kinds of things help further a girl or the consumer's ability to play with the dolls. Fashion play and dress-up and role-playing are all, you know, key ways girls play with these types of dolls, so having a lot of fashion helps further that fantasy and those play patterns. And they, also, are great additional ways to build sales…So you're only going to need, usually, so many dolls, but you can keep getting a girl to buy more and more fashions, and they're more storable, and you can mix and match or trade them off to your girlfriends and give them as birthday presents. But after some point, a girl would become more saturated more quickly with the actual dolls."[106] |
| Themes | "…Whether in reality or in perception, they [Mattel] felt that it was very important to have good themes to keep the line fresh and to have something to tell to retailers and to girls."[107] |
| Characters | "[Characters are] something that the girls can project, a personality and a life and a fantasy play life around."[108] |
| Packaging | "You want to have good packaging instead of bad packaging. Depending on the packaging, sometimes packaging can be so good that by itself it can draw attention to a product that, otherwise, would be bypassed in the store. If it's mediocre, you know—it [packaging] can either do a lot, or it can do nothing."[109] |
| Advertising & Branding | "If the advertising is well-done as in the creative, certainly, in toys, it can be highly effective."[110]<br><br>* * *<br><br>"If you are able to build a strong brand, you can, also, tend to have higher margins."[111] |

### 2. Apportionment Approaches

106.    I presented seven approaches to determine apportionment percentages in my inital Report dated February 11, 2008.[112,113] I have updated the results of one of these approaches based on Mr.

[106] Deposition of Joyce Ng, February 15, 2008, p. 194-195.
[107] Deposition of Joyce Ng, February 15, 2008, p. 197.
[108] Deposition of Joyce Ng, February 15, 2008, p. 199.
[109] Deposition of Joyce Ng, February 15, 2008, p. 203-204.
[110] Deposition of Joyce Ng, February 15, 2008, p. 205.
[111] Deposition of Joyce Ng, February 15, 2008, p. 207.
[112] I understand that Mattel has produced licensing deals with royalty rates redacted. Without this Mattel information, I have not been able to perform analysis in this area. If Mattel produces unredacted licensing agreements, I may analyze those agreements in conjunction with relevant industry licensing information, if any, to determine whether this information would be instructive in the context of developing an apportionment percentage under the facts and circumstances of this case related to the accused copyrighted property.
[113] I understand that it is the position of MGA management that it could have introduced an "alternative substitute product" that would have been developed without reference to the accused copyrighted property. The period to develop and release

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                                                  41

EXHIBIT 59
PAGE 2026

Expert Report of Paul K. Meyer

Wagner's report and have identified additional apportionment approaches and considerations based on The Brandware Group, Inc's research report, "Bratz Doll Purchasing Influence Study," dated March 5, 2008, Robert Tonner's declaration dated March 13, 2008 and Douglas Kidder's Expert Report dated March 17, 2008. Below is a discussion of these additional apportionment approaches and considerations. The results of all the apportionment approaches are summarized later in this section.

### a. Apportionment Based on Sales Variation Among Bratz Products

107. For six of these seven approaches identified in my February 11, 2008 Report, I determined separate apportionment percentages. For the seventh apportionment approach, identified as "Sales variation among Bratz products," I did not identify a specific apportionment percentage, but indicated that I would do so upon Mattel identifying the accused MGA products in this case. Mr. Wagner and Dr. Scott have not explicitly identified accused Bratz products, but Mr. Wagner has summarized all alleged Bratz revenues in Tab B1, Schedule 1.1. As no specific products were identified for Mattel's copyright claims, I performed a broad theme-based product analysis to determine apportionment percentages for this approach by analyzing the levels of sales achieved for 77 separate Bratz themes included in Mr. Wagner's analysis of Bratz sales.[114]

108. In my initial Report, I described an apportionment calculation based on sales variation among Bratz dolls as follows:

> "Since 2001, MGA has introduced hundreds of Bratz dolls, each with generally the same doll design (rotocast and body). Although each of these dolls may contain the same accused copyrighted property, they do not collectively contain the same themes, fashions, packaging and characters. Therefore, variation in sales revenue levels among the different Bratz doll SKUs containing the same doll design (rotocast and body) can be attributed to factors other than the accused copyrighted property. Bratz doll sales over time can be segregated by SKU, by themes and by characters. Within a particular sales segregation, comparisons can be made between higher and lower sales revenue SKUs. This sales data may indicate an apportionment percentage for the accused copyrighted property by examining the sales patterns and levels between product SKUs

---

this product would not have been significant and would not have impacted MGA's ability to achieve the actual level of sales realized by Bratz. As MGA had an available "alternative substitute product" option, this would limit the value of the accused copyrighted property, and eliminate any alleged future damages related to the copyright claims.
[114] The 77 MGA Bratz themes include all Bratz themes other than the theme called "Other."

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

42

EXHIBIT 59
PAGE 2027

in a particular segregation (e.g., May 2005 release and by theme) as compared against the segregation's overall sales statistics."[115]

109. ATTACHMENT 7 contains a list of 77 Bratz Core fashion doll themes released by MGA between 2001 and 2007 sorted in ascending order of sales. This attachment demonstrates large variation in sales among themes, ranging from approximately             . The dolls within each of these themes contain the same accused copyrighted property, demonstrating that factors other than the accused copyrighted property drive variation in sales. The lowest selling theme, Bratz Hairplay, contains the accused copyrighted property, as do the remaining 76 themes. This theme could be used as a baseline to determine the maximum apportionment percentage attributable to the accused property.[117] The baseline should be based on a theme for which MGA is not continuing to make sales. Because the first sales of Bratz Hairplay occurred between August 2007 and October 2007, indicating that MGA may continue to make sales of this theme, Bratz Hairplay would not serve as an appropriate baseline. The third lowest selling theme, Bratz Sweetz, was not sold between August 2007 and October 2007, indicating that MGA may no longer be making sales of this theme, and would serve as a more appropriate baseline. An apportionment factor based on Bratz Sweetz as a baseline results in an apportionment percentage of 1.19%. This percentage is computed by comparing sales of the Bratz Sweetz theme to sales of the remaining 74 themes.

110. I have tested the sensitivity of my analysis using different themes as a baseline. I have identified three themes with total sales of less than             occurring between August 2007 and October 2007. The maximum apportionment percentage based on sales of these themes is 5.38%. I have also identified two themes with sales between             and no sales occurring between August 2007 and October 2007. The maximum apportionment percentage based on sales for these themes is 16.65%. The baseline theme that results in the 16.65% maximum apportionment percentage is Bratz Midnight Dance. Sales for twenty other Bratz Core fashion doll themes were lower than sales for Bratz Midnight Dance.

---

[115] Expert Report of Paul K. Meyer, February 11, 2008, p. 52.
[116] ATTACHMENT 7.
[117] The Bratz Hairplay themed doll includes creative elements beyond the scope of the accused copyrighted property, including fashions, packaging and accessories.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2028

Expert Report of Paul K. Meyer

        **b. Apportionment Based on the Brandware Group's "Bratz Doll Purchasing Influence Study"**

111.    The Brandware Group ("Brandware") performed a study dated March 5, 2008, to "measure the purchasing influence of the design of the Bratz doll itself relative to other aspects of the product and brand features."[118]  I understand the accused copyrighted property relates primarily to the design of the Bratz doll.  Studying purchasing influences related to the design of Bratz dolls relative to other aspects of the product presents another method to apportion MGA profits attributable to the accused copyrighted property.[119]

112.    To perform its study, Brandware conducted a survey of 325 mothers and daughters to determine the relative purchase influence among eight categories of purchasing considerations, including the design of the doll.[120]  Each respondent was asked to allocate 100 points among eight considerations that influenced the most recent purchase of a Bratz doll.[121]  The results of the survey are summarized in **TABLE IX** below.

---

[118] "Research Report: Bratz Doll Purchasing Influence Study," The Brandware Group, Inc., March 5, 2008, p. 2, 22.
[119] I do not attempt to split the category "design of the doll" between the various functions that contribute to doll design, including the accused copyrighted property, new drawings, sculpt, face paint and hair, as examples.  If such a split were performed, it would reduce the apportionment percentages related to the accused copyrighted property.
[120] "Research Report: Bratz Doll Purchasing Influence Study," The Brandware Group, Inc., March 5, 2008, p. 2, 22.
[121] "Research Report: Bratz Doll Purchasing Influence Study," The Brandware Group, Inc., March 5, 2008, p. 22.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                  44

**EXHIBIT 59**
**PAGE 2029**

Expert Report of Paul K. Meyer

TABLE IX – Summary Of Brandware Study[122]

| Purchase Consideration | Relative Importance |
|---|---|
| 1.  Appeal of the product packaging that contained the purchased Bratz doll | 5.6% |
| 2.  Appeal of having a genuine Bratz product | 9.4% |
| 3.  Quality of the Bratz doll itself | 11.2% |
| 4.  "Personality" of the purchased Bratz doll | 12.2% |
| 5.  The "play theme" associated with the purchased Bratz doll | 14.0% |
| 6.  Accessories included with the purchased Bratz doll | 14.2% |
| 7.  Outfits included with the purchased Bratz doll | 14.8% |
| 8.  Appearance of the Bratz doll itself | 18.6% |
| Total | 100.0% |

113.   In summary, the survey results indicate that the appearance of the Bratz doll itself plays a role in the purchase decision of a Bratz doll, but it is not the only decision upon which a purchase is made.  The relative importance of the appearance of the Bratz doll itself of 18.6% is instructive to apportioning MGA's profits to the accused property.

c.   Summary of Apportionment Approaches

114.   TABLE X below provides a summary of the apportionment methods in my initial Report and includes additional apportionment approaches.[123]  After reducing the revenues summarized by Mr. Wagner for deductible costs, I adjust the resulting profit amounts by the apportionment percentages that result from the eight apportionment approaches below.  In the next section, I describe potential adjustments that would significantly reduce the apportionment percentages presented in the table below.

---

[122] "Research Report: Bratz Doll Purchasing Influence Study," The Brandware Group, Inc., March 5, 2008, p. 22.
[123] Expert Report of Paul K. Meyer, February 11, 2008, p. 55.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                            45

EXHIBIT 59
PAGE 2030

Expert Report of Paul K. Meyer

TABLE X – Summary Of Apportionment Approaches And Percentages

| Apportionment Approach | Profit Apportionment Percentage |
|---|---|
| 1.  Mattel's studies of "Key Fashion Doll Attributes" in conjunction with the creative elements to develop a fashion doll | 15.4% |
| 2.  Royalties paid by MGA to Mr. Bryant for his contributions to the Bratz doll line | Approx. 15.0%[124] (3.0% of net sales) |
| 3.  Work tasks to develop the original Bratz doll | 22.3% |
| 4.  MGA's Bratz product development contributions | 14.3% |
| 5.  MGA's "licensing in" and "licensing out" royalty rates | 25.0% |
| 6.  MGA's investments in the Bratz product line | 24.3% |
| 7.  Sales variation among Bratz products [125] | 16.7% |
| 8.  The Brandware Group's "Bratz Doll Purchasing Influence Study" | 18.6% |
| Range | 14.3% – 25.0% |

**d.  Adjustments to Apportionment Approaches Related to "Doll Design"**

115.    Three of the eight apportionment approaches summarized in **TABLE X** relate to apportionment based on "doll design" including: (1) Mattel's studies of "Key Fashion Doll Attributes" in conjunction with the creative elements to develop a fashion doll, (4) MGA's Bratz product development contributions, and (8) The Brandware Group's "Bratz Doll Purchasing Influence Study."  The apportionment percentages for these three approaches range between 14.3% and 18.6%.  As described earlier in this Report, the profit apportionment rates for "doll design" may be split among the various functions that contribute to "doll design" including the accused copyrighted property, new drawings, sculpt, face paint and hair, as examples.  For example, if the evidence shows or it is determined that the accused copyrighted property represents 50% of the "doll design," then the apportionment percentages would be reduced by 50% (i.e., the apportionment range identified above of 14.3% to 18.6% would become 7.2% to 9.3%).  If it is

---

[124] For illustrative purposes, assuming a MGA profit margin of 20.0% would yield an apportionment percentage of 15.0%.
[125] As Mattel had not identified the accused products in this case at the time of my initial Report, I did not calculate an apportionment percentage for this factor.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                          46

EXHIBIT 59
PAGE 2031

determined that the accused copyrighted property represents 25% of the "doll design," the apportionment percentages would be reduced by 75% (i.e., the apportionment range identified above of 14.3% to 18.6% would become 3.6% to 4.7%). If it is determined that the accused copyrighted property represents 10% of the "doll design," the apportionment percentages would be reduced by 90% (i.e., the apportionment range identified above of 14.3% to 18.6% would become 1.4% to 1.9%).

116. Mr. Tonner has provided opinions regarding the creative elements of the Bratz "doll design." He states, "Carter Bryant provided a new idea for a fashion doll, and sketches illustrating his concept to help convey the ideas. Mr. Bryant also stayed involved, but he was neither a sculptor, nor a face painter, nor a design engineer. Others were responsible for the sculpt, the face paint, the initial packaging, and other necessary skills and contributions in the development process, as well as team leadership."[126] His opinion indicates that the accused copyrighted property is only one component of the doll design.

### e. Adjustments to Apportionment Approaches Related to Mr. Bryant's Royalty Rate And Royalties Paid

117. In addition, three of the eight apportionment approaches summarized in **TABLE X**, relate to apportionment based on royalties paid to Mr. Bryant including: (2) Royalties paid by MGA to Mr. Bryant for his contributions to the Bratz doll line, (5) MGA's "licensing in" and "licensing out" royalty rates, and (6) MGA's investments in the Bratz product line. The apportionment percentages for these three approaches range between 15.0% and 25.0%. In my first Report, I described potential refinements to a royalty based apportionment approach:

> "Since the accused copyrighted property only represents a portion of the contributions provided by Mr. Bryant, the 3.0% royalty Mr. Bryant receives would represent the maximum value of the accused copyrighted property, prior to splitting the royalty payments between the accused copyrighted property and other contributions provided by Mr. Bryant."[127]

118. I understand Mr. Kidder opines that royalties paid to Mr. Bryant on the first generation of Bratz fashion dolls, $911,922, represents "the maximum outside bound on the profits to Mr. Bryant attributable to such allegedly copyrighted material."[128] According to Mr. Kidder, "if Carter

---

[126] Declaration of Robert Tonner, March 13, 2008, p. 9.
[127] Expert Report of Paul K. Meyer, February 11, 2008, p. 47-48.
[128] Expert Report of Douglas Kidder, March 17, 2008, p. 7.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2032

Bryant had not worked on any further doll lines beyond the first generation of Bratz dolls, he would not have received his 3% royalty on those products."[129] Mr. Kidder also states, "Indeed, if all Carter Bryant had done was assign the sketches and the idea to MGA and stop working, he would have received no more than the royalties from the first generation of Bratz dolls launched."[130]  As I stated in my initial Report, the 3.0% royalty rate paid to Mr. Bryant represents a maximum royalty. Mr. Kidder has split the royalty payments between the accused copyrighted property and other contributions provided by Mr. Bryant.

119.   Through September 30, 2007, Mr. Bryant received $23,170,790 of royalties for Bratz Core fashion doll SKUs. Of this amount, Mr. Kidder has determined that $911,922 is attributable to the accused copyrighted property. Based on Mr. Kidder's approach, 3.9% of royalties paid to Mr. Bryant for Bratz Core fashion dolls is attributable to the copyrighted property.[131]  This percentage would allow for a split between the accused copyrighted property and other contributions by Mr. Bryant. If the accused copyrighted property represents 3.9% of royalties paid to Mr. Bryant, the apportionment percentages would be reduced by 96.1%. (i.e., the apportionment range identified above of 15.0% to 25.0% would become 0.6% to 1.0%).

   f.   Adjustment to Apportionment Approach Based on Work Tasks To Develop The Original Bratz Dolls

120.   The third apportionment approach summarized in TABLE X, Work tasks to develop the original Bratz dolls, is based on the time Mr. Bryant spent on the original Bratz dolls relative to the creative efforts of others to develop the original Bratz dolls. The apportionment percentage for this approach is 22.3%. In my initial Report, I described the efforts of Mr. Bryant:

> "Mr. Bryant's time contributing to creative elements of the Bratz dolls during this development period totals approximately 21 weeks. Mr. Bryant's work efforts also include the initial two weeks he testified it took to develop the accused copyrighted property. As addressed elsewhere, Mr. Bryant's efforts were related to both the accused copyrighted property and other contributions to the Bratz dolls."[132]

121.   Of the total time Mr. Bryant spent on the initial Bratz development effort (23 weeks), Mr. Kidder assumes that Mr. Bryant spent two weeks to develop the initial sketches that are subject to the

---

[129] Expert Report of Douglas Kidder, March 17, 2008, p. 11.
[130] Expert Report of Douglas Kidder, March 17, 2008, p. 11.
[131] Mr. Kidder's value of the accused property ($911,922) divided by total royalties paid to Mr. Bryant for Bratz Core fashion dolls ($23,170,790) equals 3.9%.
[132] Expert Report of Paul K. Meyer, February 11, 2008, p. 49.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                    48

EXHIBIT 59
PAGE 2033

( ( 

**Expert Report of Paul K. Meyer**

copyright claim (2 weeks). Using this information, Mr. Kidder provides an opinion regarding the split between Mr. Bryant's time spent developing the accused copyrighted property and time spent for all of Mr. Bryant's contributions of 2/23 (or 8.7%).[133]  If 8.7% of Mr. Bryant's time related to development of the accused copyrighted property, the apportionment percentage would be reduced by 91.3% (i.e., the apportionment percentage identified above of 22.3% would become 1.9%).

C.   Opinions Related To Mr. Wagner's Alleged Determination Of "The Fair Value Of MGA Stock Attributable To The Bratz Products" (Analysis Of Future Bratz-Related Profits And Valuation)

122.   In his Report, Mr. Wagner states that "Isaac Larian's benefit from sales of Bratz products is determined to be Mr. Larian's percentage of the value of Bratz plus MGA's distributions to Mr. Larian in excess of his tax obligations associated with his proportion of MGA's income."[134]  Mr. Wagner further states, "In order to calculate the benefit to Isaac Larian as a result of the sales and licensing of Bratz products, I determined the Bratz contribution to the fair value of the stock currently held by the Larian Trusts."[135,136]  Mr. Wagner does not associate his opinions and analyses regarding Mr. Larian's alleged benefit from sales of Bratz products with any specific cause of action in this matter. As it relates to the copyright infringement cause of action, any analysis of the future value of Bratz would be improper unless apportioned to the accused copyrighted property, which Mr. Wagner has not done. I understand that it is not appropriate to simply present the "value of Bratz,"[137] as contrasted to the value of the accused copyrighted property, which by definition is a subset of the overall value of the Bratz product line.

123.   To the extent Mr. Wagner presents a claim related to "MGA's distributions to Mr. Larian in excess of his tax obligations associated with his proportion of MGA's income,"[138] such a claim would be duplicative with any claim by Mattel related to MGA historical profits from the accused copyrighted work.

---

[133] Expert Report of Douglas Kidder, March 17, 2008, p. 12.
[134] Expert Report of Michael J. Wagner, February 11, 2008, p. 11.
[135] "Since MGA is not a publicly traded company, there is no readily available stock price to value Isaac Larian's interest in MGA." Expert Report of Michael J. Wagner, February 11, 2008, p. 11.
[136] Mr. Wagner has not defined the term "benefit" and the relevance of calculating "benefits" to Mr. Larian.
[137] Expert Report of Michael J. Wagner, February 11, 2008, p. 11.
[138] Expert Report of Michael J. Wagner, February 11, 2008, p. 11.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                              49

EXHIBIT 59
PAGE 2034

124.  Additionally, Mr. Wagner states in his Report, "I have not provided an opinion regarding the future damages that will be incurred by Mattel in the event that the court does not grant an injunction against MGA with regards to the copyrights in this case."[139] However, Mr. Wagner's value of MGA's stock reflects future cash flows from MGA's operations into perpetuity. Therefore, the stock valuation represents a measure of MGA's future profits. Assuming a finding of liability, I understand that it would not be appropriate for Mattel to be awarded a claim for future Bratz profits related to the accused copyrighted work unless MGA is provided with rights to use such copyrighted works in the future (i.e., if the Court determined that MGA could not use the accused copyrighted property in the future, no award for future profits should be allowed).[140] As stated earlier, nowhere in his Report does Mr. Wagner address Mattel's damages for its copyright infringement cause of action.

125.  Mr. Wagner presents three valuation approaches—one income approach and two market approaches. He then calculates a weighted average value by assigning a weighting of 70% to the income approach value and 20% and 10% respectively to the two market approach values.[141] The result is a "100% Equity Valuation of Bratz."[142] In this section, I identify the flaws in Mr. Wagner's method and its application that render his results and conclusions unreliable. For illustrative purposes, I adjust Mr. Wagner's model for more appropriate inputs and demonstrate the impact of those adjustments.

### 1.  Income Approach

126.  To determine the amount of "the Bratz contribution to the value of MGA stock" based on the income approach, Mr. Wagner uses a discounted cash flow analysis in which he projects MGA's cash flows from Bratz products for the years 2008, 2009 and 2010, as well as a terminal value for Bratz as of December 31, 2010.[143,144] Mr. Wagner then discounts these projected cash flows and

---

[139] Expert Report of Michael J. Wagner, February 11, 2008, p. 24.
[140] I have determined a royalty rate to apply to future MGA Bratz Core fashion doll revenues under the assumption that there is a finding of liability under Mattel's copyright infringement claim. Payment of such a royalty would provide compensation to Mattel for MGA's future use of the accused copyrighted property. I have determined a royalty rate of 2-3%, based on comparing the apportioned profits to the revenues of Bratz Core fashion dolls between 2001 and October 2007.
[141] Expert Report of Michael J. Wagner, February 11, 2008, p. 12.
[142] Expert Report of Michael J. Wagner, February 11, 2008, Tab B2, Schedule 1.0. Mr. Wagner also states that a third approach, the Cost Approach, is another valuation method that he considered "to determine the fair value of the MGA stock attributable to the Bratz products on December 31, 2007." However, he states he "did not find it to be an appropriate measure of value of MGA's on-going business." Expert Report of Michael J. Wagner, February 11, 2008, p. 12.
[143] Expert Report of Michael J. Wagner, February 11, 2008, p. 13.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2035

terminal value to December 31, 2007 using a discount rate of 11%.[145]  As discussed below in more detail, Mr. Wagner's analysis is flawed and the results of his analysis are unreliable.  In general, he has adopted unrealistic assumptions about future cash flows from Bratz products which cause his analysis to overstate both the Bratz valuation related to MGA stock and, therefore, the value of the accused copyrighted property.

### a. Sales Growth Rate

127.  Mr. Wagner includes sales for all Bratz-related products, licensing revenue and entertainment revenue in his "Total Bratz Gross Revenue," which he uses as a basis for his discounted cash flow analysis.[146]  Specifically, Mr. Wagner uses actual 2006 "Total Bratz Gross Revenue" of ⬛ to estimate 2007 "Total Bratz Gross Revenue," since he "was only provided with 10 months of data for 2007."[147]  Mr. Wagner compares Bratz sales for the period January 2006 through October 2006 to Bratz sales for the period January 2007 through October 2007.  This comparison reflects a decline of approximately 18% between 2006 and 2007.[148]  Mr. Wagner then estimates 2007 "Total Bratz Gross Revenue" by reducing 2006 Bratz product revenues by approximately 18%, resulting in gross revenue for 2007 of approximately ⬛ million.[149]

128.  I have not adjusted the scope of sales revenues included in Mr. Wagner's valuation.  However, based on a narrower definition of accused revenues, referred to as Bryant Bratz Core fashion dolls, Mr. Wagner's valuation would be reduced by approximately 70%.  Mr. Wagner's valuation would be reduced by 60% using the Bratz Core fashion doll revenue base.[150]

129.  As discussed above, Mr. Wagner estimates 2007 "Total Bratz Gross Revenue" to be approximately ⬛.  As part of his discounted cash flow analysis, Mr. Wagner then projects growth of these sales at the rate of 2% per year into perpetuity.[151]  In his report, Mr.

---

[144] Mr. Wagner presents the value of MGA stock owned by the Larian Trusts on page 12 of his Report.  (Percentage ownership of MGA stock indicated at 81.82%.)

[145] Expert Report of Michael J. Wagner, February 11, 2008, p. 13.

[146] Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 3.1.

[147] Expert Report of Michael J. Wagner, February 11, 2008, p.14, Tab B2, Schedule 2.1.

[148] Expert Report of Michael J. Wagner, February 11, 2008, Tab B2, Schedule 2.7.

[149] Expert Report of Michael J. Wagner, February 11, 2008, Tab B2, Schedule 2.1.

[150] Sales of Bryant Bratz Core fashion dolls are $900 million (see ATTACHMENT 4), or approximately 30%, of Mr. Wagner's calculation of "Bratz Gross Revenue" of $3.1 billion.  Sales of Bratz Core fashion dolls are $1.2 billion (see ATTACHMENT 4), or approximately 40%, of Mr. Wagner's calculation of "Bratz Gross Revenue" of $3.1 billion.  Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 1.1.

[151] Expert Report of Michael J. Wagner, February 11, 2008, p. 15.

EXHIBIT 59
PAGE 2036

REDACTED

Wagner states that 2% is "reasonable given the historic growth rate in Bratz and per review of the historical and projected growth rates of other companies in the industry."[152]  Mr. Wagner's assumption that Bratz revenues will grow by 2% into perpetuity is speculative.

130.  First, Mr. Wagner has not properly considered that sales of Bratz products have been declining since 2006, and are projected to decline into the future.[153]  As discussed above, Mr. Wagner acknowledges that sales in the first 10 months of 2007 declined by approximately 18% from the same period in 2006, yet he projects 2% annual growth for Bratz sales into perpetuity.  The Bratz product line is currently experiencing significant challenges.  Bratz sales declined significantly between 2006 and 2007; Mr. Wagner's analysis indicates a decline of approximately 18%.  MGA's 2008 forecasts indicate a 15% decline in sales of all products from 2007 to 2008 [154]  Bratz sales in 2008 were not specifically identified in MGA's forecasts, but accounted for a large portion of the forecasted decline.  Additionally, MGA's net operating income as a percentage of gross sales has dropped from the 2003-2004 time period, when it was approximately 25%, to approximately 21% in 2005 and approximately 17% in 2006.[155]  MGA management has recognized reasons Bratz has experienced a downturn, including:  Bratz doll themes losing their individualism, age compression of buyers, emerging competition (e.g., "Hannah Montana" doll and "High School Musical" dolls) and lead paint issues impacting toy demand.[156]

131.  Second, Mr. Wagner has not properly considered the decline of sales in the toy industry in general.  According to an IBISWorld Industry Report dated February 18, 2008, titled "Doll, Toy and Game Manufacturing in the US: 33993," total industry revenue has declined every year, except one, since 1998.[157]  The same report projects that "the industry's revenues will decline at an average annualized rate of 3% over the next five years."[158]

132.  Finally, Mr. Wagner has not considered product-specific factors that will impact future Bratz sales.  Based on discussions with MGA personnel, it is my understanding that the popularity of the "Hannah Montana" doll and the "High School Musical" dolls during the 2007 holiday season

---

[152] Expert Report of Michael J. Wagner, February 11, 2008, p. 14-15.
[153] Discussions with MGA personnel.
[154] Discussions with MGA personnel.
[155] Net Operating Income/Gross Revenue.  Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 4.2.
[156] Discussions with MGA personnel.
[157] "Doll, Toy and Game Manufacturing in the US: 33993," IBISWorld, February 18, 2008, p. 40.
[158] "Doll, Toy and Game Manufacturing in the US: 33993," IBISWorld, February 18, 2008, p. 43.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2037

REDACTED

contributed significantly to decreased sales of Bratz dolls as compared to 2006.[159]   Additionally, the "Bratz International A&U" study, dated November 2007, confirms that "even though Bratz is a favorite, there is increased competition for purchases this year. The introduction of High School Musical and Hannah Montana will likely have a big impact on purchases of Bratz. Both moms and girls agree that their purchases are going to shift."[160] Other factors mentioned above negatively impacting Bratz sales include age compression of target consumers and increasing popularity of video games.[161]   These and other factors indicate that Mr. Wagner's 2% annual growth into perpetuity is unreasonable.

133.   When adjusting Mr. Wagner's model for illustrative purposes, I use a -10% growth rate from 2007 to 2008 and a -3% annual growth rate from 2008 to 2010 based on discussions with MGA personnel, recent MGA sales trends and projections and industry data.

### b.   Operating Expenses

134.   Mr. Wagner estimates operating expenses for 2008 through 2010 at 19.56% of Bratz sales by averaging his calculated operating expenses incurred in 2005 and 2006. Based on my analysis of deductible costs described above and Mr. Wagner's summary of MGA operating expenses,[162] I have determined that operating costs incurred in 2005 and 2006 as a percentage of MGA's sales are 23.51%.[163] I have applied this percentage to determine operating expenses for the years 2008 through 2010 in my illustrative calculations.

### c.   Discount Rate

135.   Mr. Wagner uses the Capital Asset Pricing Model ("CAPM") to determine the discount rate at which he discounts Bratz's future cash flows and terminal value. Mr. Wagner states in his Report, "The CAPM is a common rate used in valuation to determine the equity rate of return. Since MGA has no debt attributable to Bratz, the equity rate is the discount rate."[164] Mr. Wagner

---

[159] Discussions with MGA personnel.
[160] "Bratz International A&U, US, UK, & Canada," C&R Research Services, Inc., November 2007, [MGA3823970-4075 at 3976.] "A&U" refers to Attitude & Usage, see MGA3823970-4075 at 3972.
[161] Discussions with MGA personnel.
[162] Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 4.2.
[163] ATTACHMENT 5.2.
[164] Expert Report of Michael J. Wagner, February 11, 2008, p. 15.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                                                53

EXHIBIT 59
PAGE 2038

Expert Report of Paul K. Meyer

determines that an 11% discount rate is appropriate for discounting future cash flows from Bratz.[165]

136.   Mr. Wagner's discount rate is understated for several reasons.  First, Mr. Wagner fails to take into account that he is valuing a single product line, not an entire company.  As discussed below, Bratz is not an independent business enterprise.  Unlike Bratz, business enterprises have the ability to introduce new branded products, diversify and respond to market changes, thereby maintaining corporate life into perpetuity.  This ability to diversify reduces risk, resulting in a lower cost of capital.  As a single product line, Bratz does not have these abilities.  Bratz has been extremely successful but is now experiencing industry growth challenges and new competition, like the "Hannah Montana" doll and the "High School Musical" dolls.  Therefore, I have determined a specific risk premium associated with the risk of a single product line.

137.   Second, Mr. Wagner uses a size premium of 1.67%, which he selects from a table in the Morningstar Stocks, Bonds, Bills, and Inflation ("SBBI") 2007 Yearbook.[166]  A size premium is normally used to reflect the additional risk associated with a smaller company.  Mr. Wagner chose a size premium of 1.67%, which is associated with companies with market capitalizations between approximately $1.4 billion and $1.9 billion.[167]  Mr. Wagner has not provided any basis for his determination.  The size premium associated with companies with market capitalizations between approximately $625 million and $975 million is up to 2.28%.[168]  These market capitalizations are more reflective of the value of Bratz.

138.   Third, Mr. Wagner erroneously uses an unlevered beta of 0.79, which he states is the "SIC Composite" unlevered beta for SIC Code 394 – "Dolls, Toys, Games and Sporting and Athletic Goods."[169,170]  The correct unlevered beta for this "SIC Composite" is 0.98.[171]

139.   Adjusting Mr. Wagner's discount rate for (a) a specific risk premium that is associated with the risk of a single product line, (b) a size risk premium and (c) the correct unlevered beta results in a discount rate of 15%.

---

[165] Expert Report of Michael J. Wagner, February 11, 2008, p. 15.
[166] Expert Report of Michael J. Wagner, February 11, 2008, Tab B2, Schedule 3.0.
[167] Morningstar SBBI 2007 Yearbook, p. 131, 137.
[168] Morningstar SBBI 2007 Yearbook, p. 131, 137.
[169] Expert Report of Michael J. Wagner, February 11, 2008, Tab B2, Schedule 3.0.
[170] "SIC Composite" refers to all companies in the SIC Code. Morningstar Cost of Capital 2007 Yearbook.
[171] Morningstar Cost of Capital 2007 Yearbook.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

54

EXHIBIT 59
PAGE 2039

### d. Working Capital

140.   Based on MGA's working capital in 2005 and 2006, Mr. Wagner estimates working capital requirements for the Bratz product line in 2008 and beyond. Mr. Wagner calculates the difference between MGA's working capital in 2006 to his calculation of working capital requirements for the Bratz product line in 2008. He assumes the difference is a decrease in the Bratz product line working capital which results in an increase in Bratz product line free cash flow. As described below, Mr. Wagner's calculations are flawed for two reasons.

141.   First, Mr. Wagner compares working capital for <u>MGA</u> to working capital for the <u>Bratz product line</u>. The working capital for MGA includes working capital needs to support Bratz operations as well as working capital needs to support MGA's non-Bratz operations. According to Mr. Wagner's report, over 40% of MGA's sales are non-Bratz sales in 2007.[172] This indicates that a reasonable amount of MGA's working capital would be devoted to non-Bratz operations. Mr. Wagner's working capital calculation is flawed and his cash flow forecast is overstated because he compares the working capital of an entire company to the working capital needs of one product line.

142.   Second, Mr. Wagner improperly ignores working capital requirements for the Bratz product line in 2007. Mr. Wagner compares 2006 working capital to 2008 working capital. By ignoring working capital in 2007, Mr. Wagner's calculation overstates the change in working capital and overstates free cash flow associated with the Bratz product line. There is no basis to assume working capital requirements of the Bratz product line would change significantly between 2007 and 2008. The unreasonableness of this calculation is illustrated on Mr. Wagner's Tab B2, Schedule 2.3, which indicates that an increase in sales of approximately $ would be accompanied by a decrease in working capital of approximately .        (or -585% of the change in sales).[173] For 2009 and 2010, Mr. Wagner projects increases in investment in working capital of approximately        approximately 15% of the change in sales).[174] A more appropriate methodology for determining the investment in working capital would be to assume a change in the investment in working capital from 2006 to 2007 and no changes

---

[172] Expert Report of Michael J. Wagner, February 11, 2008, Tab B2, Schedule 2.1.
[173] Expert Report of Michael J. Wagner, February 11, 2008, Tab B2, Schedule 2.3.
[174] Expert Report of Michael J. Wagner, February 11, 2008, Tab B2, Schedule 2.3.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT 59
PAGE 2040

REDACTED

**Expert Report of Paul K. Meyer**

thereafter. Correcting for Mr. Wagner's flaws results in an approximately $60 million decrease in Mr. Wagner's valuation of Bratz.

### e.  Adjusting Mr. Wagner's Model For More Appropriate Inputs And Apportionment To The Accused Copyrighted Property

143.  Mr. Wagner does not apportion his valuation of Bratz to reflect the value attributable to the accused copyrighted property. Without apportioning, the entire value of Bratz is assigned to the accused copyrighted property. This is not appropriate.

144.  For illustrative purposes, I have made adjustments to Mr. Wagner's model, which he uses to determine his Bratz valuation based on future cash flows. These adjustments, which are explained above, include: (1) adjusting Bratz deductible costs to 23.51% of total Bratz revenues, (2) adjusting Bratz revenue growth to -10% for 2008 and -3% per year thereafter, (3) adjusting the discount rate to 15%, and (4) assuming no change in working capital requirements. Using these more appropriate inputs to Mr. Wagner's model results in a future Bratz valuation of approximately                     Applying the apportionment percentages to this adjusted amount yields values of the accused copyrighted property of between

Approximately 30% of this valuation relates to Bryant Bratz Core fashion dolls, or approximately                     , and approximately 40% of this valuation relates to Bratz Core fashion dolls, or approximately

145.  Mr. Wagner alleges that "Isaac Larian's benefit from sales of Bratz products is determined to be Mr. Larian's percentage of the value of Bratz plus MGA's distributions to Mr. Larian."[177] Applying the Larian Trusts' ownership percentage in MGA of :

---

[175] ATTACHMENT 5.

[177] Expert Report of Michael J. Wagner, February 11, 2008, p. 11.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

56

EXHIBIT 59
PAGE 2041

REDACTED

Expert Report of Paul K. Meyer

TABLE XI – Adjustments To Mr. Wagner's Model

|  | Enterprise Value Based On 14.3% Apportionment Percentage (Doll Design Only) | Enterprise Value Based On 25.0% Apportionment Percentage (Doll Design Only) |
|---|---|---|
| Mr. Wagner's Bratz Enterprise Value | | |
| Adjusted Bratz Value | | |
| Apportionment Percentage | | |
| Apportioned Adjusted Bratz Value | | |
| Mr. Larian's Ownership In MGA | | |
| Mr. Larian's Alleged Benefit From Sales Of Bratz Products After Apportionment | | |

146.   Mr. Wagner alleges distributions paid by MGA to Mr. Larian or the Larian Trusts are approximately                in excess of tax payments.[178]  Any claim including distributions to Mr. Larian prior to December 2007 would be duplicative with Mr. Wagner's calculations of Bratz profits. I understand that, to the extent relevant, MGA will address this issue at trial.  Mr. Wagner's summary of distributions paid to Mr. Larian does not include any tax-related distributions made in 2006.   Other adjustments may also be relevant to this summary of shareholder distributions.

2.   Market Approaches

a.   Mr. Wagner's Use Of The "Market Approach" Is Improper

147.   Addressed in the following section are various reasons why Mr. Wagner's use of market approaches to perform a Bratz valuation under these circumstances is not appropriate.   The results of Mr. Wagner's market approaches should not be relied upon.

i.   Bratz Is Not A Diversified Company

148.   In his use of the market approach to determine the value of Bratz, Mr. Wagner relies on the values of a number of companies that he believes are comparable to MGA.  However, the market

---

[178] Expert Report of Michael J. Wagner, February 11, 2008, Tab B2, Schedule 6.0.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                                   57

EXHIBIT 59
PAGE 2042

REDACTED

**Expert Report of Paul K. Meyer**

approach is not appropriate in this case because Bratz is a product line and not an overall business enterprise like the "comparable" companies identified by Mr. Wagner. As business enterprises, these companies have the ability to introduce entirely new products or product lines, diversify and respond more broadly to market changes, thereby improving the ability to maintain corporate life in perpetuity. Bratz, as a product line, does not have all of these capabilities. Like most products, it has a finite economic life that is determined by such things as consumer preferences, fashions and substitute products. As mentioned earlier, the Bratz product line experienced a significant sales decline in 2007.

149.   In its Form 10-K for the period ended December 31, 2007, Mattel acknowledges the transitory nature of products in the toy industry and how, as a company, it must be able to respond to market changes to avoid negative results:

> "If Mattel does not successfully satisfy consumer preferences, enhance existing products, develop and introduce new products and achieve consumer acceptance of those products, Mattel's results of operations may be adversely affected."[179]

* * *

> "Consumer preferences, particularly among end users of Mattel's products–children–are continuously changing. Significant, sudden shifts in demand are caused by "hit" toys and trends, which are often unpredictable. Mattel offers a diverse range of products for children of all ages and families that includes, among others, toys for infants and preschoolers, girls' toys, boys' toys, youth electronics, hand-held and other games, puzzles, educational toys, media-driven products and fashion-related toys... <u>Mattel's ability to maintain its current product sales, and increase its product sales or establish product sales with new, innovative toys, will depend on Mattel's ability to satisfy play preferences, enhance existing products, develop and introduce new products, and</u> achieve market acceptance of these products. <u>Competition is intensifying due to recent trends towards shorter life cycles for individual toy products, the phenomenon of children outgrowing toys at younger ages and an increasing use of more sophisticated technology in toys.</u>"[180] (emphasis added)

* * *

---

[179] Mattel Form 10-K for the period ended December 31, 2007, p. 15.
[180] Mattel Form 10-K for the period ended December 31, 2007, p. 15-16.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                              58

EXHIBIT 59
PAGE 2043

Expert Report of Paul K. Meyer

> "Mattel's business is susceptible to changes in popular culture, media, fashion, and technology. Misperceptions of trends in popular culture, media and movies, fashion, or technology can negatively affect Mattel's sales."[181]  (emphasis added)

150.   Business valuation theory emphasizes that the economic life of an asset is one of the fundamental components of its value.  This theory addresses the importance of product life cycles.  "In order to value intangible assets or intellectual property, it is absolutely necessary to address the question of economic life."[182]  Mr. Wagner has failed to address this important aspect of the Bratz product line, instead assuming that it will have a perpetual life, like the companies used in his market approach analysis.  Bratz sales have declined since 2006 and are projected to decline in the future.[183]

151.   The value of the "comparable" companies is influenced by the strength and diversity of their product offerings.   TABLE XII below sets forth the multiple product lines at three of the "comparable" companies identified by Mr. Wagner, as well as the date the company was founded.  Each company is at least 60 years old.

---

[181] Mattel Form 10-K for the period ended December 31, 2007, p. 16.
[182] Smith, Gordon; Parr, Russell, *Valuation of Intellectual Property and Intangible Assets*, Third Edition, p. 257-258, 262-263, 283-306 at p. 306.
[183] Discussions with MGA personnel.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT 59
PAGE 2044

Expert Report of Paul K. Meyer

**TABLE XII – Product Lines Of Mr. Wagner's "Comparable" Companies**

| Mattel – incorporated in 1948[184] |
| --- |
| *Mattel Girls & Boys Brands*—including Barbie® fashion dolls and accessories ("Barbie®"), Polly Pocket®, Little Mommy®, Disney Classics, Pixel Chix®, and High School Musical (collectively "Other Girls Brands"), Hot Wheels®, Matchbox®, and Tyco® R/C vehicles and playsets (collectively "Wheels"), and CARS™, Radica® products, and games and puzzles (collectively "Entertainment"). |
| *Fisher-Price Brands*—including Fisher-Price®, Little People®, BabyGear™, and View-Master® (collectively "Core Fisher-Price®"), Sesame Street®, Dora the Explorer™, Winnie the Pooh, Go-Diego-Go!™, and See 'N Say® (collectively "Fisher-Price® Friends"), and Power Wheels®. |
| *American Girl Brands*—including Just Like You®, the historical collection and Bitty Baby®. American Girl Brands products are sold directly to consumers, and its children's publications are also sold to certain retailers. |

| Marvel – founded in 1939[185] |
| --- |
| Proprietary library of over 5,000 characters. The library of characters is one of the oldest and most recognizable collections of characters in the entertainment industry, and includes Spider-Man, Iron Man, The Incredible Hulk, Captain America, Thor, Ghost Rider, The Fantastic Four, X-Men, Blade, Daredevil, The Punisher, Namor the Submariner, Nick Fury, The Avengers, Silver Surfer and Ant-Man. |

| Hasbro – founded in 1926[186] |
| --- |
| Core game brands include MONOPOLY, BATTLESHIP, GAME OF LIFE, SCRABBLE, CHUTES AND LADDERS, CANDY LAND, TROUBLE, MOUSETRAP, OPERATION, HUNGRY HUNGRY HIPPOS, CONNECT FOUR, TWISTER, YAHTZEE, JENGA, SIMON, CLUE, SORRY!, RISK, BOGGLE and TRIVIAL PURSUIT, as well as a line of jigsaw puzzles |
| Boys' toys include a wide range of core brands such as G.I. JOE and TRANSFORMERS action figures and accessories as well as entertainment-based licensed products based on popular movie and television characters, such as STAR WARS and MARVEL toys and accessories. |
| The girls' toys category, seeks to provide a traditional and wholesome play experience. Girls' toys include LITTLEST PET SHOP, MY LITTLE PONY, FURREAL FRIENDS and BABY ALIVE brands. |
| Preschool toys category encompasses a range of products for infants and preschoolers and include a portfolio of core brands marketed primarily under the PLAYSKOOL trademark. The PLAYSKOOL line includes such well-known products as MR. POTATO HEAD, WEEBLES, SIT 'N SPIN and GLOWORM. |
| The tweens toys category generally markets products under the TIGER ELECTRONICS and NERF brands and seeks to target those children who have outgrown traditional toys. |

ii. **Mr. Wagner's Forecasted Growth For Bratz Is Inconsistent With Forecasted Growth For The "Comparable" Companies**

152.   In his use of the income approach to determine the value of Bratz, Mr. Wagner forecasts that Bratz revenues and profits will grow at an annual rate of 2%.[187]   In contrast, the companies

---

[184] Mattel Form 10-K for the period ended December 31, 2007, p. 3.
[185] Marvel Form 10-K for the period ended December 31, 2007, p. 1; http://www.worldcollectorsnet.com/comics/marvel-comics.html.
[186] Hasbro Form 10-K for the period ended December 31, 2007, p. 1-2.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                                                60

EXHIBIT 59
PAGE 2045

identified by Mr. Wagner in his "Comparable Companies" analysis under the market approach have forecasted growth rates much greater than 2%.[188]

153.    TABLE XIII below compares expected growth rates from analyst reports for the "comparable" companies to Mr. Wagner's growth projection for Bratz.

**TABLE XIII – Comparison Of "Comparable" Company Growth Rates**

| Company | Growth Rate | Description |
|---|---|---|
| Mattel | 10% | 3-5 year EPS growth[189] |
| Hasbro | 3-5% | Company's long-term total [sales] growth target[190] |
| Jakks Pacific | 10-12% | Earnings growth over next several years[191] |
| RC2 | 11% | 3-5 year EPS growth[192] |
| Marvel | 11.9% | 5-year forward EPS[193] |
| **Bratz** | **2%** | **Mr. Wagner's Projection** |

154.    Expected growth of revenues, profits and free cash flows is a key driver of value. The fact that the "comparable" companies identified by Mr. Wagner have forecasted growth rates that range from 50% to 500% higher than his forecasted growth rate for Bratz (and even higher when compared to MGA's actual forecasts that project sales declines) demonstrates that these companies are not comparable to Bratz and should not be used in a market approach to determine the value of Bratz.

    b. **Other Flaws in Mr. Wagner's Market Approach**

        i. **Failure to Reflect 2007 Results**

155.    Mr. Wagner applies the comparable company and transaction multiples to Bratz 2006 results, deriving a "market approach" value as of 2006. Mr. Wagner's approach significantly overstates

---

[187] Expert Report of Michael J. Wagner, February 11, 2008, p. 14.
[188] In fact, Bratz sales declined 18% from 2006 to 2007 and are forecasted to decline in 2008.
[189] "MAT: Slightly Decreasing Q4 2007/2008 EPS Est's and Val. Range, MAT's retail sell-through appears lower than expected in Q4," Wachovia, January 7, 2008.
[190] "HAS: Initiating With a HOLD Rating. Challenging Toy Environment & Tough Comparisons in 2008 Warrant Patience, but Cash Flow Should Drive Stock Higher Over Time," Needham, November 29, 2007.
[191] "JAKKS Pacific (JAKK) Assuming Coverage with HOLD Rating and $29 Price Target; Increased Holiday Sales Visibility Makes Us More Positive," Wedbush Morgan Securities, December 12, 2007.
[192] "RCRC: Initiating Coverage With An Outperform Rating, 2007 'PerfectStorm' Year – 2008 Recovery & Share Repo Story," Wachovia, November 13, 2007
[193] Marvel Entertainment, "Raising Estimates on Increased Confidence in 'Iron Man' Prospects," Cowen and Company, February 22, 2008, p.1.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

**EXHIBIT 59
PAGE 2046**

Expert Report of Paul K. Meyer

the current value of Bratz for two reasons. First, the valuation multiples of the comparable companies have declined substantially since 2006. As shown in **TABLE XIV** below, the median multiple declined by over 30% between 2006 and 2007, which would result in an over 30% decline in Mr. Wagner's valuation. Second, Bratz revenues and profits have declined substantially from 2006 to 2007.

**TABLE XIV – Comparison Of EBITDA Multiples Based On 2006 And 2007 Metrics**

| Mr. Wagner's "Comparable" Company | EBITDA Multiples | |
| --- | --- | --- |
| | 2006 (Mr. Wagner)[194] | 2007 (Analyst)[195] |
| Mattel | 10.50 | 7.80 |
| Hasbro | 9.20 | 5.40 |
| Jakks | 5.05 | 5.50 |
| RC2 | 8.91 | 6.90 |
| Marvel[196] | 17.90 | 8.10 |
| Median Multiple | 9.20 | 6.90 |
| Average Multiple | 10.31 | 6.74 |

**ii. Failure to Apply a Discount for Lack of Liquidity**

156.   Mr. Wagner's calculation of the value of Bratz using comparable companies assumes a marketable, controlling interest.[197]   However, Mr. Larian's 81.82% interest in a product line owned by a privately held company is less liquid than the value of the public companies used in the comparable company approach.   Liquidity discounts are relevant to valuation of closely-held businesses:

> "If the analysis of the value of a controlling ownership interest in a privately owned business is based on market prices for the acquisitions of publicly traded companies, these data suggest that some amount of valuation adjustment is applicable... Empirical data clearly suggest that a

[194] Expert Report of Michael J. Wagner, February 11, 2008, Tab B2, Schedule 4.0.
[195] RC2 Corp, "Highlights from Wedbush Morgan California Dreamin' MAC: Management Access Conference: Reiterating Q4 Estimates and BUY Rating," Wedbush Morgan Securities, December 13, 2007, p. 3; Marvel Entertainment, "Q4 Earnings Solid from Higher Spider-Man Licensing Revenue; Delay of One Film Out of 2009 Pressuring Shares," Wedbush Morgan Securities, February 20, 2008, p. 3.
[196] The majority of Marvel's revenue is derived from its licensing and publishing segments. These Marvel segments have substantially higher profit margins than its toy segment.  Marvel Form 10-K for the period ended December 31, 2007, p. 9, 26, 30-31.
[197] Expert Report of Michael J. Wagner, February 11, 2008, Tab B2, Schedule 4.0.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*                                                                 62

EXHIBIT 59
PAGE 2047

valuation discount is appropriate for controlling ownership interests (and, for that matter, for 100 percent ownership interests) in closely held businesses.   This illiquidity discount applies—although to varying degrees—regardless of whether the subject business is valued by reference to discounted or capitalized economic income analyses, to guideline publicly traded companies, to consummated guideline acquisitions, or to an asset-based valuation method."[198]  (emphasis added)

157.   Mr. Wagner should have applied a discount for lack of liquidity to his calculated value, which would have significantly reduced that value.

### iii.   Mr. Wagner Acknowledges The Deficiencies Of His Market Approaches, Including His "Comparable" Transactions Approach

158.   In his Report, Mr. Wagner acknowledges the challenges with his market approach in the form of "comparable" transactions to value the stock of MGA. Mr. Wagner states:

"In my opinion, the income approach best represents the value of the on-going business as it allows for full consideration of circumstances unique to MGA.   At the same time, the market approach in the form of comparable transaction analysis is least relevant because the degree of similarity between MGA and comparable acquisitions is hard to gauge, as every company's financial and business environment is unique."[199] (emphasis added)

Mr. Wagner gives the results from his "comparable" transaction valuation a 10% weighting in his determination of the "100% Equity Valuation of Bratz."[200]

159.   Mr. Wagner's collection of 18 alleged "comparable" transactions includes a wide array of properties, further indicating the speculative nature of this approach under these circumstances. For example, some of Mr. Wagner's "comparable" transactions relate to the sale of property including: animated robots; collectibles, confectionary, trading cards and sticker album collections; electronic games; educational products and programs; model trains; playground equipment; infant toys; video games; and playing cards, amongst others.[201]

160.   As demonstrated above, use of the market approach to value the stock of MGA is not appropriate in these circumstances.   Additionally, Mr. Wagner's value calculated under the "comparable" companies approach is twice the value he calculates under the income approach, further

[198] *Valuing a Business*, Fourth Edition, Pratt, Shannon P., et al, p. 411-421 at 416.
[199] Expert Report of Michael J. Wagner, February 11, 2008, p. 12.
[200] Expert Report of Michael J. Wagner, February 11, 2008, p. 12.
[201] Expert Report of Michael J. Wagner, February 11, 2008, Tab B2, Schedule 8.0.

EXHIBIT 59
PAGE 2048

Expert Report of Paul K. Meyer

indicating the unreasonable results yielded by the market approach.[202]  Nonetheless, Mr. Wagner relies on his valuation based on "comparable" companies and includes the results in his value conclusion.[203]

### D.   Net Worth Of Isaac Larian

161.   Mr. Wagner addresses a calculation of the net worth of Isaac Larian, stating, "I have not been provided with adequate information to form an opinion regarding this value."[204]  Yet, in the "Net Worth of Isaac Larian" section of his Report, without explanation, he cites to a document titled, "Isaac and Angela Larian, List of Assets, 2007" but doesn't provide any opinion regarding this document.[205]

### E.   Net Worth Of MGA

162.   In his Report, Mr. Wagner addresses his calculation of the net worth of MGA and does not reference any cause of action.  Mr. Wagner begins his analysis with the book shareholders' equity of MGA as of December 31, 2006.  Mr. Wagner presents no analysis related to whether the book values are consistent with current and/or market values for assets and/or liabilities.  Nor does Mr. Wagner apportion the book net worth of MGA and/or the distributions.

### F.   Other Causes of Action

163.   As stated earlier, Mr. Wagner does not state anywhere in his Report that he computed Mattel damages, nor has Mr. Wagner associated his calculations with any specific Mattel causes of action.  I understand the calculations performed by Mr. Wagner are not appropriate measures of damages for Mattel's aiding and abetting breach of duty of loyalty or aiding and abetting breach of fiduciary duty claims.

164.   Douglas Kidder, an expert retained on behalf of Mr. Bryant, is addressing damages associated with Mattel's causes of action against Mr. Bryant.  I understand these amounts calculated by Mr. Kidder represent the maximum amount of damages under Mattel's aiding and abetting breach of duty of loyalty and breach of fiduciary duty claims against MGA.

---

[202] Expert Report of Michael J. Wagner, February 11, 2008, p. 12.

Expert Report of Michael J. Wagner, February 11, 2008, p. 23.
[203] Expert Report of Michael J. Wagner, February 11, 2008, p. 23.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

EXHIBIT 59
PAGE 2049

REDACTED

Expert Report of Paul K. Meyer

165. With respect to the intentional interference with contract claim, Mr. Kidder opines that damages are "minimal" as against Carter Bryant because "I have seen no evidence that Mattel would ever have developed the Bratz doll line from Carter Bryant's initial sketches and ideas."[206] He concludes that, "had Carter Bryant assigned all his Bratz-related ideas and drawings to Mattel, doing so would have resulted in no profits to Mattel—hence resulting in no damages for breach of contract."[207]

166. I understand that Mattel could have asserted that, as a result of MGA's alleged interference with its contract with Carter Bryant, that Mattel was deprived of the opportunity to market the Bratz doll line or deprived of the opportunity to deny MGA the opportunity to market the Bratz doll line. Under these theories, I understand Mattel would be required to offer an actual damages or lost profits analysis. Mr. Wagner has offered neither.

167. With respect to the other remaining claims asserted by Mattel (i.e., conversion and unfair competition), I understand that any recovery available under such claims would be limited to the amounts discussed above (e.g., the value of the allegedly converted property, or restitution of the amount allegedly taken from Mattel).

### G.   Interest

168. If directed, I will be prepared to address issues of prejudgment interest at trial based on statutory interest rates, interest rates provided by the Court and/or short-term borrowing rates. Any calculation(s) would be performed on profits following application of an appropriate apportionment analysis and would be compounded on an annual basis.

---

[206] Expert Report of Douglas Kidder, March 17, 2008, p. 15-16.
[207] Expert Report of Douglas Kidder, March 17, 2008, p. 17.

*CONFIDENTIAL -- ATTORNEYS' EYES ONLY*                                           65

EXHIBIT 59
PAGE 2050

ATTACHMENT 1



## Paul K. Meyer, CPA, CFE, CPA-ABV

Paul K. Meyer
Managing Director

Navigant Consulting
One Market Street,
Spear Street Tower – 12th Floor
San Francisco, CA 94105
Tel: 415-399-2107
Fax: 415-399-2187

pmeyer@navigantconsulting.com

**Professional History**
- Navigant Consulting – 2004 to present
- TUCKER ALAN INC. – 1994 to 2004
- Peterson Consulting L.P. & Peterson & Co. – 1981 and 1994
- Arthur Andersen LLP – 1979 to 1981

**Education**
- Bachelor of Science, Commerce; McIntire School of Commerce, University of Virginia, 1979

**Professional Associations and Certifications**
- Consulting Professor at Stanford University, Department of Civil Engineering, School of Engineering (1994 – Present)
- Member of Advisory Board, McIntire School of Commerce, University of Virginia
- Certified Public Accountant licensed in Virginia and California
- Certified Fraud Examiner (CFE)
- Accredited in Business Valuation (CPA – ABV)
- Member of Licensing Executive Society and INTA

**Honors and Fellowships**
- Recipient of "2003 Alumnus of the Year" Award, McIntire School of Commerce

Mr. Meyer is a Managing Director with Navigant Consulting and co-leader of the national intellectual property practice. Mr. Meyer was previously the President and co-founder of Tucker Alan. He is a Certified Public Accountant and Certified Fraud Examiner, as well as Accredited in Business Valuation (CPA-ABV). As a Consulting Professor, Mr. Meyer teaches a graduate course at Stanford University's School of Engineering, Additionally, he frequently lectures on damages issues, including presentations at conferences for the Licensing Executives Society (LES), the Practicing Law Institute (PLI), Law Seminars International (LSI), USC Intellectual Property Institute, Santa Clara University Law School and the Sedona Patent Conference. Mr. Meyer has over 25 years of experience consulting on financial, accounting, economic and damages matters, as well as significant testimony experience. He has testified in over 200 depositions and approximately 60 trials and major arbitrations, including over 30 jury trials.

### Professional Experience

**Intellectual Property Consulting, including Patent Infringement**

Analyzed the impacts due to alleged intellectual property infringements and misappropriation, including patents, trademarks, copyrights, trade secrets, trade dress and confidential information.

Analyzed lost profits related to lost sales, price erosion and convoyed sales. Evaluated and analyzed markets and potential, market share, historical and projected sales, ability to achieve projected sales, company and product profitability, revenue sources and trends, nature of costs and cost allocations, product pricing issues and cost of capital considerations.

Analyzed sales and profits, product features and other factors, production capacity, sales and distribution capacity, capital expenditures and resources required to bring products to market.

Analyzed and investigated licensing and royalty disputes. Investigated sales reported, guaranteed minimums, deductions from revenue such as returns and volume discounts, and compliance with contractual limitations.

Analyzed and determined reasonable royalties. Determined reasonable royalties using a hypothetical negotiation approach. Considered cost savings and enhanced earnings related to licensing technology, licensing history and other license agreements, design-around considerations, head start advantages and avoided product development costs. Mr. Meyer has experience in the analysis of the Georgia-Pacific factors to determine reasonable royalties in

Page 1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2051



numerous industries. Mr. Meyer has analyzed hundreds of license arrangements, bringing a broad perspective to determining reasonable royalty damages.

Analyzed the value of intellectual property related to its transfer and disposition. Valuation of technology transferred between holding companies and subsidiaries. Analyzed technology sharing agreements, including joint product development agreements and software development projects. Mr. Meyer has been in charge of valuation projects related to patents. Mr. Meyer has participated in licensing negotiations.

Analyses related to intellectual property have related to a variety of industries, including high technology products including computer hardware and software, file and data systems, integrated circuits, consumer goods, eye care, pharmaceuticals, medical devices, cosmetics, apparel, office products, frozen foods, dental technology, spinal implants, utility partitioning software, e-commerce networking technology, telecommunications equipment, web-conferencing, light emitting diodes (LEDS), liquid crystal displays, optical networking, biotechnology, computer maintenance and servicing, hospitality, cellular communications, energy, aircraft, flash memory, disc drives, CD-ROM controllers, nutritional supplements, software, video games, resettable fuses, knee braces, professional sports merchandise, laser measuring devices, PDA's, sporting goods, VCR's, architectural plans, risk microprocessors, toys and games, and automotive diagnostic equipment, as examples. Analysis of pharmaceutical drug sales and market issues. Analysis of computer sales, cost and financial issues related to Apple MAC clones and related manufacturing and supply issues.

Significant experience in matters involving software, including operating systems, human resource and time and reporting enterprise applications, business to business software solutions, database applications, search engines, customer management solutions, business analytics software, retail software packages, video games and emulation software, application management solutions, mainframe tools, diagnostic service contracts and support, e-commerce, and ETL software, as examples.

Significant experience in pharmaceutical and medical devices matters addressing market competitors, market shares, sales, profits and the costs of development. Technology includes drug-eluting stents, spinal implants, surgical devices, generic cyclosporine and urinary drugs, as examples. Analyses and determination of damages.

Analysis of a variety of technology found in PC's and notebook computers including CPU's, memory devices, inverter controllers, hard drive partitioning, keyboard, graphic and audio acceleration, and computer locking devices, as examples.

Related to PC and notebook game play, analysis of financial, economic and royalty rate issues to graphic accelerators and audio acceleration technology. Technology addressed on chip data memory utilization to accomplish acceleration, as an example. Analyses of market issues, product refreshening, development costs, incremental margins earned and reasonable royalty rates.

Related to video games, analysis of intellectual property damage issues related to emulator software allowing Playstation games to be played on MAC and Windows' platforms. Analyses of

Page 2

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2052

NΛVIGANT
C O N S U L T I N G

sales, costs, market and other issues.  Analysis of video game sales on various platforms.  Analysis of MAC emulator software allowing for Windows' utility software to be used on MAC platforms.

Analyzed patent damages related to the U.S. government's use of Boeing patents in servicing the International Space Station with the Space Shuttle.  Analysis and determination of reasonable royalties. Testimony in the Court of Claims.

Mr. Meyer has analyzed the financial and economic impacts of alleged trade secret misappropriation. He has determined the cost of the development of proprietary technologies and analyzed and valued the economic impact of trade secret misappropriation in a variety of industries.  Mr. Meyer has analyzed revenues, apportionment issues and deductible costs in copyright and trade secret matters.  Industries include software, semiconductor, mainframe computer, credit card, web conferencing, video games and book publishing, as examples.

Analyzed trademark value and alleged diminution in trademark value in matters involving consumer goods, entertainment, food, semiconductor and other high technology, as examples. Analyzed corrective advertising issues, including the nature and amount of advertising, marketing, and selling expenditures, customer data, distribution and sales channels, and geographic considerations.

Economic, Financial Condition, Damage and Valuation Analyses

Analyzed the financial condition of corporations, partnerships and individuals under a variety of circumstances including lost profits claims, business interruption, business valuation, reduced profitability, troubled loan and bankruptcy, insolvency, reorganization, business failures and various fraudulent activities.

Analyzed numerous lost profits and "loss of use" claims including economic analyses of past sales, future projections, costs of goods sold, relevant cost allocations, interest rates, and discount rates.

Business analysis and business valuation in a variety of circumstances, including business interruption, lender liability, consumer class action, and other disputes.  Industries include: seafood, ship repair, high technology, aquaculture, biotechnology, oil, automotive repair, wine, automotive sales, computer resellers, restaurants, service, e-commerce, and retail, as examples. Such valuations have involved extensive analysis of past operating results, future projections, comparable companies, capitalization multiples and market risk.

Analyzed the variable costs, indirect and overhead costs, and revenues of companies alleging loss of market share and revenue impact.  Analyses of product pricing and discount issues including high technology, biotechnology, sporting goods, superstores, and insurance.  Financial analyses of companies in industries including pharmaceutical, computer and equipment leasing, semiconductor, retail, maritime, automotive, service, agriculture, e-commerce, e-procurement, manufacturing, and high technology, as examples. Analyses of hotel and resort property financial operations and profitability.

Analysis of damages and other financial and economic issues in various class action matters.

Prepared asset, economic benefit and business valuations, including the following:

- Electric and Gas Utility Asset Transfers, Including Intellectual Property

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2053



Research and analyses related to sales, markets, and damages related to videogames, video chips and underlying alleged proprietary technology. Issues related to the accused products of a market leader in the supply of performance 3D graphics processors for enhanced PC game performance, as an example. Study of distribution channels including board suppliers, OEM sales and retail sales. Consideration of products features. Analysis of economic and financial issues related to Creative's Soundblaster Live!™ audio card.

Analyses of athletic footwear market and sales issues related to a raw material supplier dispute and midsole shoe technology. Issues included the consideration of alternate design technology, athletic footwear market trends, and the specific cost structure and facilities of the supplier.

Analysis of concessions and merchandise operations and contracts at Sears Point Raceway. Analyses of sales, costs and profits related to events such as Kragen 350 NASCAR Winston Cup and NHRA FRAM/Autolite National drag races, as examples.

Analyses related to major motion picture merchandising tie-in deals. Analysis of licensing agreements related to the movie Godzilla for toy distribution. Dispute related to scope of exclusivity arrangements and Classic Godzilla property.

Analyses related to design mark issues concerning a major entertainment company and an internet search engine. Dispute related to Disney's Go Network.

Analysis related to board game property owned by Whiz Kids/The Topps Company concerning alleged use of a patented game dial. Analysis of licensing agreements related to "licensing in" property to incorporate into game board themes (e.g., Marvel characters, Major League Baseball, etc.)

Analysis related to interactive toys for children. Patent dispute asserted against a former market leader. Study of Leap Pad sales, profits and licensing history. Analysis of technology-based educational product market, including major competitors.

Analysis of hundreds of talent contracts in a major class action related to seven Major Motion Picture Studios. Analysis of consideration paid to talent.

As part of special purpose assignment, analysis of advertising expenditures related to a large pizza franchise operation. Study of costs of producing ad campaign, including TV, radio and print campaigns, and in-store displays and giveaways. Analysis of production costs including talent contracts. Review of media placement costs and media placement. Review of Ad Fund collections and reserves related to franchisee contributions.

**Financial Institution, Bankruptcy, Workout, Alter Ego, General Management and Accounting Consulting**

Performed general consulting on accounting, economic, financial, management and business operations matters. Analyzed accounting issues and treatment under a variety of consulting circumstances. Analysis of revenue recognition and accounting for long-term projects. Experience in accounting issues related to high technology companies, including software sales, installation and support revenue recognition.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2054



Performed compliance reviews, and determined the propriety of financial summaries and reports based upon the investigation of the underlying source documentation for a variety of industries and companies, including insurance, financial institutions, and Fortune 500 companies.

Performed detailed reviews of the "sources" and "uses" of cash and funds flow, which uncovered and documented check kiting, various investor "ponzi-type" schemes, fraudulent invoices, and other activities involving the misuse of an entity's assets.  Assisted in financial statement audits of banks and other financial institutions.

Consulted to banks and federal government agencies on management procedures and controls, lender liability matters, troubled loan analyses, bankruptcy issues, compliance with policies and procedures, funds flow reviews and assessment of allegations of impropriety such as check kiting.

Significant experience in bankruptcy matters involving solvency analysis, review of reorganization and liquidation plans, reviews for preference items and fraudulent transfers, and analysis of claims.

Assisted corporations and other entities on management reviews of corporate departments and functions, merger and acquisition matters, cost determination studies, financial statement analyses, ability to pay analyses, avoiding or reducing the impact of disputes, cost competitiveness, financial statement disclosure and contract administration issues.

Significant experience in the analysis of the relationship and operations of companies addressing alter ego issues and single entity theory.

Reviews and analyses related to special purpose studies including the verification of account activity, transactions and licensing arrangements.

Consulting to companies on a variety of issues including profitability analysis, transfer pricing, accounting systems, internal controls, account segregation and affiliate issues, as examples.

Experience in the review and analysis of licenses, related business documents and records involving the licensing of intellectual property.  This experience includes a variety of industries including athletic wear, consumer goods, household products, sports merchandising and memorabilia, high technology, biotechnology, telecommunications and entertainment, as examples.

Review and analysis of hundreds of talent contracts for actors, producers, directors and providers of rights in motion picture deals.  Review and analysis of business and financial data in a variety of matters involving consumer issues and alleged unfair business practices.

Experience in the review and analysis of compensation arrangements including contingent and commission structure consideration.   Experience includes distributors and salespersons in industries such as high technology, oil and gas, retail, entertainment and financial services.

Teach accounting and financial issues at Stanford University in the School of Engineering (over 15 years).

Securities and Related Analyses

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2055



Performed a variety of analyses in securities and securities-related matters including: forensic accounting in connection with criminal investigations and litigation; review and assessment of joint venture activities; analysis of complex related party transactions piercing the corporate veil; study of alleged departures from generally accepted accounting principles; funds tracing; asset valuation analyses; debt service analyses; real estate portfolio analyses; special reviews to assess insolvency and related issues; investigation of preference transactions and/or fraudulent conveyances in bankruptcy matters; evaluation of disclosures in financial statements and SEC filings; analysis of restitution damages and forensic analyses of why entities have not met planned and/or projected results.

Performed analyses of mutual fund trading activities in a variety of funds over an extended period of time. Documented and analyzed timing and nature of trades. Considered specific mutual fund investing objectives and investor prospectus.

### Antitrust

Experience on antitrust matters related to monopolization, tying arrangements, price maintenance and below cost pricing. Analyses of damages as well as studies of costs related to product pricing. Cost determination including the review of direct, indirect and overhead costs. Analysis of product and competitors' revenues, market shares, market issues, prices, costs and profits. Experience in various industries including computer hardware, software, diagnostics, spare parts, and documentation. Additional experience in wine, motion picture, sporting goods, insurance, oil and gas, pharmaceutical, construction, electronics and retail industries, as examples. Experience in class action matters requiring detailed forensic analysis of prices, price changes and costs.

### Forensic And Record Reconstruction

Significant experience in tracing and in financial and cost record reconstruction engagements. Analyses have included detailed reconstruction and record reconciliation in a variety of industries under different circumstances, including: bank trust accounts, gas well production and mineral rights, general liability insurance policies (dating back to the mid 1930's), incurred cost history of Nuclear Power plants, and intellectual property disputes involving audits of historical royalties due. These assignments have required various analyses and comparisons of historical production, trends, asset valuations and detailed transaction reviews. In some instances, third party information has been relied upon in efforts to gain an understanding of missing data, e.g. various third party disclosures, annual financial filings with regulators, insurance brokers files, beneficiaries portfolio listings, published industry data, and the like.

Significant experience in fraud and transactions reviews related to check kiting schemes, other asset transfers, fraudulent invoice schemes and alter ego analyses. Testimony given in Federal Court on the results of tracing and reconstruction. Northern California engagement required six days of trial testimony (Judge Illston, Northern District Court of California, San Francisco).

### Certified Fraud Examiner

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2056

NAVIGANT
C O N S U L T I N G

### Testimony And Alternative Dispute Resolution Experience

**Testimony Experience**

Testimony in arbitration, state court, federal court, federal bankruptcy court, Court of Federal Claims and International Trade Commission.

Testimony has covered intellectual property, licensing and royalty determination, lost profits, business interruption, business value, employee compensation, increased costs, cost allocations, the nature of costs, insurance coverage, the cost of capital and the financial operations and relationship of companies.

Presentation of damage analysis in mediation.

Served as an arbitrator on damage issues.

Testimony, depositions and declarations in civil court and arbitration, as follows:

The United States District Courts for:

- The Northern District Of California
- The District Of Delaware
- The Eastern District Of Texas
- The Eastern District Of Massachusetts
- The Eastern District Of Virginia
- The District Of Colorado
- The Eastern District Of California
- The Central District Of California
- The District Of Montana
- The Northern District Of Illinois
- The Central District Of Illinois
- The Southern District Of Texas
- The Territory Of Guam
- The Eastern District Of Wisconsin

Superior Courts for The State of California in the City and Counties of:

- San Francisco
- San Mateo
- Santa Clara
- Sacramento
- Sonoma
- Alameda
- Napa
- Stanislaus
- Tulare
- Contra Costa
- Sutter
- Santa Cruz
- Martinez
- Monterey
- San Luis Obispo
- Los Angeles
- Orange
- Ventura

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXHIBIT 59
PAGE 2057**

NAVIGANT
CONSULTING

Testimony, depositions and declarations in civil court and arbitration, (*continued*):

Federal Bankruptcy Court:

* Mississippi
* California

Arbitration:

* California
* Hawaii

International Trade Commission (Washington D.C.)

Court of Federal Claims (Washington, D.C.)

**Alternative Dispute Resolution Experience**

Consulted to companies and law firms on techniques to avoid disputes and to minimize the impact of existing disputes.

Participated in numerous mediations and settlement negotiations presenting accounting, economic and business operations analyses, and assisting in developing alternative methods to resolve disputes.

Selected by mediators to assist in mediating financial issues between the parties in dispute.

Performed ability to pay analyses in the context of mediations and settlement discussions by analyzing financial statements, cash flows and other accounting and business records.

## Representative Topics Covered In Lectures And Speaking Assignments

Accounting theory and application; finance and economics; financial statement analysis; construction accounting issues; analysis of construction claims and long term contract claims; preparation and analysis of financial and economic damage claims; alternative dispute resolution / intellectual property; technology valuation and reasonable royalty determination; trademark valuation; intellectual property damages and economics; cost of capital; insurance coverage; antitrust economic and financial issues; and employee compensation, including stock options.

## Selected Speaking Assignments

Stanford University Construction Executive Program (1984-1986)

Western Council of Construction Consumers

Stanford in Business / Economics and Damages

Hastings College of the Law/Economic Damages (1988, 1989, 1992)

Stanford University, Graduate Program of Construction Management

Public Contract Section of American Bar Association Trial Advocacy Program (1983-1985)

Page 9

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2058

NAVIGANT
CONSULTING

San Francisco Chapter of Casualty Insurance Adjusters

Fidelity and Surety Claims Association of Northern California

Institute of Management Accountants (formerly, National Association of Accountants) – Diablo Valley Chapter

Construction SuperConference (New York City, 1992)

Intellectual Property Section of the State Bar of California -- Valuation of Business Technology Trademark Valuation (Los Angeles, 1993)

Intellectual Property Section of the State Bar of California -- 19th Annual Intellectual Property Law Institute (Palm Springs, California, 1994)

San Francisco Barristers Group, Intellectual Property Damages (1994)

Intellectual Property Section of the State Bar of Arizona (1995)

American Bar Association Corporate Counsel Committee Workshop (1995)

Intellectual Property Section of the Washington, D.C. Bar, Intellectual Property Damages (1995)

University of California at Berkeley, Graduate School of Engineering, Damages and Case Study (1995, 1996)

Computer Software and Semiconductor Chip Infringement Cases, Computer Litigation Section of the American Bar Association, Damage Theories and Approaches (San Francisco, California, 1995)

Continuing Legal Education, Economic, Financial and Damage Topics, various law firms (1993, 1994, 1995, 1996, 1997, 1998, 1999, 2001, 2002, 2003)

Intellectual Property Section of the State Bar of California -- 21st Annual Intellectual Property Law Institute (San Jose, California, 1996)

Alternative Dispute Resolution SuperConference -- Intellectual Property Alternative Dispute Resolution (Washington, DC, 1997)

Sacramento Intellectual Property Section (Sacramento, California, 1999)

Intellectual Property Section of the State Bar of California – 24th Annual Intellectual Property Law Institute (Santa Monica, California, 1999)

Bar Association of Colorado, Denver Securities Litigation Subcommittee, Analyses Related To Securities Litigation (Denver, Colorado, 2001)

Practicing Law Institute, Protecting Your Intellectual Property Assets, Valuing Intellectual Property (Palo Alto, California, 2001)

Licensing Executive Society – 2001 Annual Meeting, Patent Infringement Damages (Palm Springs, California, 2001)

Page 10

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2059

NAVIGANT
C O N S U L T I N G

Manatt, Phelps & Phillips, LLP — "Strategies For Using Intellectual Property Risk Management As Leverage, Valuing Intellectual Property," (Palo Alto, California, 2002)

International Trademark Association's 124th Annual Meeting — "Point / Counterpoint:   Global Trademark Valuation Issues," (Washington, DC, 2002)

Practicing Law Institute, Protecting Your Intellectual Property Assets, Valuing Intellectual Property (Palo Alto, California, 2002)

Law Seminars International — "Calculating and Proving Intellectual Property Damages," (San Francisco, California, January 2003)

Law Seminars International — "Calculating And Proving Intellectual Property Damages: Determining Reasonable And Nondiscriminatory Royalties," (McLean, Virginia, July 2003)

Stanford University, Center for Professional Development – "Analysis of Business Performance – Key Concepts And Analyses," (Palo Alto, California, 2003)

Abbott Laboratories, "Valuation of Patent Damages", (Abbott Park, Illinois, September 2003)

Kraft Foods – "Valuation of Trademark Damages", (Northfield, Illinois, September 2003)

Sun Microsystems – "Patent Valuation and Damages Issues", (Menlo Park, CA, March 2004)

Stanford University, Center for Professional Development – "Analysis of Business Performance – Key Concepts And Analyses," (Palo Alto, California, 2005)

Sedona Conference On Patent Litigation – Faculty Member, (Sedona, AZ, October 2005)

Foley & Lardner LLP, "Recent Developments in Patent Damages", (Palo Alto, CA, January 2006)

Santa Clara University, "Recent Developments In Patent Damages", (Santa Clara, CA, March 2006 and March 2007)

American Bar Association ("ABA") Section of Litigation Annual Conference, (Los Angeles, CA, April 2006)

McDermott Will & Emery LLP, "Recent Developments in Patent Damages", (Palo Alto, CA, May 2006)

Sedona Conference On Patent Litigation – Faculty Member, (Sedona, AZ, October 2006)

USC Gould School of Law, Intellectual Property Institute, (Los Angeles, CA, March 2007)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2060

PAUL K. MEYER                                      ATTACHMENT 2
TESTIMONY IN LAST FOUR YEARS (2004 – PRESENT)

Does v. Reddy,  In the United States District Court for the Northern District of California in and for the Division of San Francisco (Deposition), 2004

Dataquill Limited v Handspring, Inc.  In the United States District Court for the Northern District of Illinois (Deposition), 2004

Miller v. Bank of America, In the Superior Court of the State of California in and for County of San Francisco (Deposition, Trial), 2004

Medtronic Sofamore Danek, Inc. v. Gary K. Michelson, M.D. and Karlin Technology, Inc., In the United States District Court for the Western District of Tennessee, Western Division (Deposition), 2004

Acco Brands, Inc., d/b/a/ Kensington Technology Group v. ABA Locks Manufacturer Co., Ltd., and Belkin Components, In the United States District Court for the Eastern District of Texas, Marshall Division, (Deposition), 2003,  (Trial), 2004

Compuware Corporation v. International Business Machines Corporation (IBM), In the Eastern District of Michigan, Southern Division (Deposition), 2004

Intel Corporation v. Intell Management & Investment Co., In the United States District Court for the Northern District of California in and for the Division of San Francisco (Deposition), 2004

Pixion, Inc. v. Placeware, Inc. (Microsoft)., In the United States District Court for the Northern District of California in and for the Division of San Francisco (Deposition, Trial), 2005

Samsung Electronics Co. v Inventec Corporation, et al., In the United States District Court for the Southern District of Texas, Houston Division (Deposition), 2005

---

NAVIGANT CONSULTING, INC.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2061

TESTIMONY IN LAST FOUR YEARS (2004 – PRESENT)                    ATTACHMENT 2
Page 2

Storage Technologies Corporations v. Cisco Systems Inc., In the United States District Court for the Northern District of California in and for the Division of San Francisco (Deposition), 2002  (Trial), 2005

Auerbach Acquisition Associates, Inc. v. Greg Daily, etc., In the Superior Court of the State of California in and for County of Los Angeles (Deposition), 2005

02 Micro International Limited v. Monolithic Power Systems, Inc., In the United States District Court for the Northern District of California, Oakland Division (Deposition, Trial), 2005

Waltrip, et al. v. Kimberlin, et al., In the Superior Court of the State of California in and for County of San Francisco (Deposition, Trial), 2005

SEC v. Gary D. Kennedy, In the United States District Court for the District of Utah, Central Division (Deposition), 2005

Acco Brands, Inc., d/b/a/ Kensington Technology Group v. ABA Locks Manufacturer Co., Ltd., and Belkin Components, In the United States District Court for the Eastern District of Texas, Marshall Division (Deposition, Trial), 2005

Samsung Electronics, Inc. v. Quanta Computer, Inc, In the United States District Court for the Northern District of California, San Francisco Division (Deposition), 2006

Samsung Electronics, Inc. v. Compal Electronics, Inc., In the United States District Court for the Northern District of California, San Francisco Division (Deposition, Trial), 2006

In The Matter Of:  Certain Baseband Processor Chips and Chipsets, Transmitter And Receiver (Radio) Chips, Power Control Chips And Products Containing Same, Including Cellular Telephone Handsets (Kyocera Wireless Corporation), United States International Trade Commission Investigation Number 337-TA-543, Washington D.C., (Deposition, Trial), 2006

NAVIGANT CONSULTING, INC.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2062

TESTIMONY IN LAST FOUR YEARS (2004 – PRESENT)
Page 3

Certain High-Brightness Light Emitting Diodes and Products Containing Same (Lumileds Lighting U.S., L.L.C.), United States International Trade Commission Investigation Number 337-TA-556, Washington D.C., (Deposition), 2006

CGI-AMS Inc. v. Fireman's Fund Insurance Company, American Arbitration Association (Deposition), 2006

New World TMT Ltd. v. Prediwave Corporation, et al., In the Superior Court of the State of California in and for County of Santa Clara (Deposition), 2006

LG.Philips LCD CO., LTD. v. Tatung Co. Of America, Tatung Company And Chunghwa Picture Tubes, LTD., In the United States District Court for the Central District of California, Western Division Los Angeles (Deposition, Trial), 2006

Sputtered Films, Inc. v. Sergey Mishin, Agilent Technologies, Inc., Avago Technologies, Inc., et al., In the Superior Court of the State of California in and for the County of Santa Barbara, Anacapa Division (Deposition), 2006

Mylan v. Proctor & Gamble Pharmaceuticals; In the Superior Court of the State of California in and for County of San Francisco (Deposition), 2006

Lexmark International v. Static Control Components, Inc., In the United States District Court for the Eastern District of Kentucky, Lexington Division (Deposition), 2006

Informatica Corporation v. Business Objects Data Integration, Inc., In The United States District Court for the Northern District of California, San Francisco Division (Deposition), 2006; (Trial), 2007

The Boeing Company v. The United States, In The United States Court of Federal Claims, Washington D.C. (Deposition, Trial), 2007

Funai Electric Company, Ltd. v. Daewoo Electronics Corporation, et al., In The United States District Court for the Northern District of California, San Francisco Division (Deposition), 2007; (Trial), 2008

NAVIGANT CONSULTING, INC.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2063

TESTIMONY IN LAST FOUR YEARS (2004 – PRESENT)                    ATTACHMENT 2
Page 4

Boston Scientific Corporation, et al. v. Johnson & Johnson And Cordis Corporation, In The United States District Court for the Northern District of California, San Francisco Division (Deposition, Trial), 2007

Tinkers & Chance v. LeapFrog Enterprises, Inc. In The United States District Court for the Northern District of California, San Francisco Division (Deposition), 2007

First National Mortgage Company v. Federal Realty Investment Trust, In The United States District Court for the Northern District of California, San Jose Division (Deposition), 2008

NAVIGANT CONSULTING, INC.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2064

Additional Information Considered                    ATTACHMENT 3

| Court Documents and Depositions | Date |
|---|---|
| Carter Bryant's Notice of Motion and Motion for Partial Summary Judgment; Memorandum of Points and Authorities in Support Thereof | 03/07/08 |
| Mattel, Inc.'s Notice of Motion and Motion for Partial Summary Judgment; and Memorandum of Points and Authorities | 03/07/08 |
| MGA Parties' Notice of Motion for Partial Summary Judgment, Motion and Memorandum of Points and Authorities in Support Thereof | 03/07/08 |
| Deposition of Joyce Ng | 02/15/08 |
| Deposition of Lisa Tonnu | 01/17/08 |
| Expert Report of Carol A. Scott | 02/11/08 |
| Expert Report of Michael J. Wagner and Attachments | 02/11/08 |
| Expert Report of Douglas Kidder | 03/17/08 |
| Expert Report of Glenn V. Vilppu | 03/14/08 |
| Expert Report of Debora Middleton | 02/11/08 |
| Declaration of Robert Tonner In Opposition To Mattel's Motion For Partial Summary Judgment | 03/13/08 |
| Expert Report of Erich A. Joachimsthaler | 03/17/08 |
| Stipulation Re: Expert Discovery For Phase I | 02/25/08 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2065

Additional Information Considered

| Other | Date |
|---|---|
| "Research Report: Bratz Doll Purchasing Influence Study," The Brandware Group | 03/05/08 |
| Mattel, Inc. Form 10-K for the period ended December 31, 2007 | 12/31/07 |
| Hasbro, Inc. Form 10-K for the period ended December 30, 2007 | 12/30/07 |
| Marvel Entertainment, Inc. Form 10-K for the period ended December 31, 2007 | 12/31/07 |
| "Doll, Toy and Game Manufacturing in the US: 33993," IBISWorld Industry Report | 02/18/08 |
| "Litigation Services Handbook, The Role of the Financial Expert, Third Edition," Weil, Roman L.; Wagner, Michael J.; Frank, Peter B. | 2001 |
| "Report On: The Transamerica Pyramid; Brand Equity and Rental Premiums," Carol A. Scott (in conjunction with Prophet) | January 2002 |
| 17 U.S.C. § 504(b) | n/a |
| "Valuing a Business, Fourth Edition," Pratt, Shannon P., et al | 2000 |
| "Valuation of Intellectual Property and Intangible Assets, Third Edition," Smith, Gordon; Parr, Russell | 2000 |
| www.worldcollectorsnet.com | |
| Marvel Entertainment, "Q4 Earnings Solid from Higher Spider-Man Licensing Revenue; Delay of One Film Out of 2009 Pressuring Shares," Wedbush Morgan Securities | 02/20/08 |
| Marvel Entertainment, "Raising Estimates on Increased Confidence in 'Iron Man' Prospects," Cowen and Company | 02/22/08 |
| shareholder transactions.xls (MGA3865982-6029) | |

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2066

ATTACHMENT 4.1

## Bratz Core Fashion Dolls - Mr. Bryant Royalty SKUs

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | Jan - Jul 2007 | Aug - Oct 2007 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Gross Revenue | | | | | | | | | |
| Returns | | | | | | | | | |
| Sales Discounts and Allowances | | | | | | | | | |
| Net Sales | | | | | | | | | |
| Cost of Goods Sold | | | | | | | | | |
| Gross Profit on Sales | | | | | | | | | |
| Other Cost of Sales | | | | | | | | | |
| Royalty Expense | | | | | | | | | |
| **Operating Expenses** | | | | | | | | | |
| Ad Production Expense | (11,088,289) | (5,185,215) | (11,688,795) | (3,565,562) | (1,311,628) | (1,161,119) | (353,866) | (104,545) | (58,189,512) |
| Ad Media Expense | (2,280,181) | (3,130,658) | (7,399,833) | (9,016,821) | (6,997,283) | (6,439,457) | (1,243,566) | (2,585,638) | (49,507,078) |
| Other Sales and Marketing | (3,360,207) | (3,360,207) | (4,652,827) | (5,292,675) | (4,667,297) | (4,191,519) | (1,602,721) | (1,043,760) | (25,460,031) |
| Product Development | (641,042) | (363,357) | (763,908) | (3,347,597) | (3,001,607) | (2,234,652) | (1,026,827) | (664,560) | (17,381,224) |
| Travel and Entertainment | (68,309) | | | (511,009) | (445,638) | (456,494) | (239,204) | (123,102) | (2,471,021) |
| Salaries and Related Expenses | (1,051,305) | (4,970,056) | (6,606,110) | (13,111,553) | (10,373,325) | (9,526,783) | (4,123,926) | (3,030,337) | (51,295,404) |
| Professional Fees | (312,435) | (2,360,421) | (2,118,035) | (3,981,937) | (1,297,444) | (1,348,334) | (637,335) | (617,638) | (12,513,580) |
| Premises Related Expenses | (220,592) | (937,570) | (1,561,234) | (3,092,005) | (2,312,976) | (1,893,711) | (356,388) | (450,874) | (11,425,408) |
| Equipment Related Expenses | (72,474) | (28,981) | (76,617) | (311,376) | (95,331) | (73,191) | (45,654) | (21,964) | (666,089) |
| Supplies, Postage, Delivery | (96,216) | (350,621) | (669,522) | (684,877) | (502,290) | (358,879) | (162,537) | (104,337) | (2,863,978) |
| Other Expenses | (624,135) | (1,460,627) | (2,761,847) | (803,644) | (757,456) | (378,235) | (51,927) | (39,521) | (6,877,393) |
| Distribution Expense | | | | | | | | | |
| **Total Operating Expense** | | | | | | | | | |
| Net Operating Income | ($57,623,347) | $38,757,630 | $71,180,672 | $48,372,591 | $29,064,991 | $18,499,731 | ($1,308,332) | ($5,922,728) | $176,611,208 |
| Mold Depreciation | (14,460) | (125,770) | (740,005) | (1,220,080) | (1,533,462) | (961,208) | (178,619) | (576,447) | ($4,769,820) |
| Other Depreciation | | | (210,667) | (408,452) | (429,636) | (556,285) | (262,441) | (133,237) | (2,252,948) |
| Other (Income)/Expense | | | | | | | | | |
| Distribution Revenue | | | | | | | | | |
| Net Income Before Taxes | | | | | | | | | |
| MGA Taxes | | | | | | | | | |
| Shareholder Taxes | | | | | | | | | |
| Net Income | | | | | | | | | |

Bratz Core Fashion Dolls - Mr. Bryant Royalty SKUs

Page 4 of 4

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2067

REDACTED

ATTACHMENT 4.2

## Bratz Core Fashion Dolls - All SKUs

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | Jan - Jul 2007 | Aug - Oct 2007 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Gross Revenue | | | | | | | | | |
| Returns | | | | | | | | | |
| Sales Discounts and Allowances | | | | | | | | | |
| Net Sales | | | | | | | | | |
| Cost of Goods Sold | | | | | | | | | |
| Gross Profits on Sales | | | | | | | | | |
| Other Cost of Sales | ($786,221) | ($1,351,468) | ($6,946,158) | ($4,932,472) | ($12,670,480) | ($12,565,412) | ($5,339,888) | ($5,719,078) | ($51,309,198) |
| Royalty Expense | ($637,479) | ($2,907,560) | ($5,210,105) | ($5,198,973) | ($4,255,231) | ($3,620,235) | ($2,204,131) | | ($24,042,714) |
| **Operating Expenses** | | | | | | | | | |
| Ad Production Expense | | ($1,688,795) | ($7,399,833) | ($3,692,804) | ($1,897,531) | ($2,310,524) | ($1,071,294) | ($316,647) | ($10,978,096) |
| Ad Media Expense | (13,934,519) | (5,274,946) | (7,399,833) | (9,374,769) | (9,544,282) | (12,394,578) | (3,766,548) | (7,834,483) | (69,523,958) |
| Other Sales and Marketing | (2,365,676) | (3,186,835) | (3,251,215) | (5,478,479) | (6,752,174) | (8,326,411) | (4,854,345) | (3,161,372) | (37,854,346) |
| Product Development | (805,589) | (2,403,086) | (6,052,827) | (3,463,076) | (4,342,422) | (4,538,437) | (3,110,083) | (2,012,675) | (24,730,195) |
| Travel and Entertainment | (85,843) | (267,915) | (363,908) | (528,948) | (644,703) | (906,820) | (724,508) | (272,856) | (3,895,501) |
| Salaries and Related Expenses | (1,321,167) | (5,056,064) | (6,606,118) | (13,571,846) | (15,007,080) | (18,924,857) | (12,496,725) | (6,149,544) | (79,133,400) |
| Professional Fees | (392,634) | (2,340,231) | (2,118,035) | (4,121,727) | (1,877,011) | (2,678,451) | (1,930,379) | (1,567,836) | (17,026,305) |
| Premises Related Expenses | (277,215) | (933,755) | (1,561,234) | (3,200,553) | (3,346,180) | (3,960,605) | (2,593,852) | (1,365,619) | (17,259,052) |
| Equipment Related Expenses | (15,676) | (29,482) | (76,617) | (322,823) | (131,915) | (143,594) | (138,279) | (66,526) | (932,714) |
| Supplies, Postage, Delivery | (120,916) | (356,485) | (604,522) | (708,920) | (726,663) | (712,909) | (490,296) | (315,715) | (4,036,424) |
| Other Expense | (784,343) | (1,483,504) | (2,761,342) | (831,856) | (1,095,812) | (751,260) | (197,277) | (119,703) | (7,988,102) |
| Distribution Expense | | | | | | (55,430) | (674,049) | | (729,478) |
| Total Operating Expense | ($20,603,375) | ($21,352,742) | ($30,464,050) | ($45,297,803) | ($46,571,774) | ($55,705,775) | ($32,010,104) | ($23,282,971) | ($274,089,369) |
| Net Operating Income | | | | | | | | | |
| Mold Depreciation | | | | | | | | | |
| Other Depreciation | (18,172) | (132,016) | (230,667) | (515,951) | (631,554) | (1,101,081) | (794,889) | (403,551) | (3,817,880) |
| Other (Income)/Expense | | | | | | | | | |
| Distribution Revenue | | 16,824 | 33,713 | 904,779 | 750,228 | 1,817,564 | 772,833 | | 4,365,939 |
| Net Income Before Taxes | | | | | | | | | |
| MGA Taxes | | | | | | | | | |
| Shareholder Taxes | | | | | | | | | |
| Net Income | | | | | | | | | |
| Bratz Core Fashion Dolls - All SKU | | | | | | | | | |

EXHIBIT 59
PAGE 2068

REDACTED

ATTACHMENT 13

### Adjustments To Mr. Wagner's Profitability of Bratz Analysis [1]

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | Jan - Jul 2007 | Aug - Oct 2007 | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Gross Revenue** | | | | | | | | | |
| Product Revenue | $ 19,586,623 | $ 105,458,859 | $ 264,122,197 | $ 265,706,096 | $ 272,646,479 | $ 300,964,498 | $ 139,437,580 | $ 108,644,561 | $ 1,482,160,709 |
| Entertainment Revenue | | | | | | | | | |
| Licensing Revenue | | | | | | | | | |
| **Total Gross Revenue** | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| Returns | $ (832,532) | $ (2,565,460) | $ (16,664,604) | $ (1,896,656) | $ (263,897) | $ (6,289,669) | $ (3,121,070) | $ (1,956,299) | $ (12,144,718) |
| Sales Discounts and Allowances | $ (663,532) | $ (3,925,572) | $ (6,782,462) | $ (13,995,318) | $ (32,111,339) | $ (31,225,900) | $ (14,074,769) | $ (12,696,568) | $ (121,232,708) |
| Net Sales | $ | $ (765,531) | $ (1,460,742) | $ (5,516,253) | $ (6,947,583) | $ (7,744,478) | $ (4,256,502) | $ | $ (54,644,614) |
| Cost of Goods Sold | $ | $ | $ (1,417,304) | $ | $ (5,563,771) | $ (5,603,360) | $ (2,589,564) | $ (616,413) | $ (39,141,690) |
| **Gross Profit on Sales** | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| **Production Costs** | | | | | | | | | |
| Other COS, Excluding Production and Royalty Expenses | $ (4,754,809) | $ (10,806,643) | $ (4,051,606) | $ (3,238,269) | $ (4,809,375) | $ (5,754,125) | $ (4,379,423) | $ (702,909) | $ (25,927,687) |
| Royalty Expense | $ (3,004,284) | $ (6,840,346) | $ (7,752,021) | $ (20,874,144) | $ (24,189,287) | $ (30,660,438) | $ (4,261,877) | $ (13,292,840) | $ (144,210,077) |
| Licensing Related Costs | $ (853,015) | $ (4,558,138) | $ (7,722,064) | $ (12,411,354) | $ (27,310,345) | $ (34,764,079) | $ (10,276,916) | $ (7,018,365) | $ (84,602,720) |
| **Operating Expenses** | $ (51,231) | $ (513,674) | $ (7,723,183) | $ (7,225,334) | $ (11,005,596) | $ (11,302,877) | $ (6,904,495) | $ (4,465,313) | $ (84,238,005) |
| Ad Production Expense | $ (3,404,107) | $ (3,694,000) | $ (877,809) | $ (1,342,716) | $ (1,756,459) | $ (2,458,477) | $ (1,889,517) | $ (953,868) | $ (5,796,853) |
| Ad Media Expense | $ (407,282) | $ (4,468,338) | $ (26,281,149) | $ (32,394,691) | $ (48,885,943) | $ (53,397,125) | $ (53,079,996) | $ (13,763,373) | $ (199,840,590) |
| Sales & Marketing Expense | $ (294,413) | $ (2,816,773) | $ (6,255,649) | $ (9,838,646) | $ (6,315,814) | $ (7,261,543) | $ (4,984,495) | $ (4,023,997) | $ (11,332,993) |
| Product Development Expense | $ (14,660) | $ (56,528) | $ (169,015) | $ (7,569,428) | $ (9,114,482) | $ (10,207,353) | $ (4,607,362) | $ (3,504,918) | $ (34,651,504) |
| Travel & Entertainment Expense | $ (326,594) | $ (693,489) | $ (2,491,434) | $ (770,864) | $ (175,743) | $ (84,376) | $ (354,590) | $ (170,742) | $ (3,252,484) |
| Salaries & Related Expenses | $ (303,582) | $ (2,840,927) | $ (6,853,837) | $ (1,692,349) | $ (1,970,753) | $ (3,692,765) | $ (1,263,524) | $ (810,312) | $ (9,932,134) |
| Professional Fees | | | | $ (1,585,624) | $ (2,985,479) | $ (4,037,010) | $ (403,607) | $ (307,230) | $ (14,215,554) |
| Promotion Related Expenses | | | | | | $ (316,043) | $ (1,476,413) | | $ (1,634,456) |
| **Total Operating Expenses** | $ (71,063,139) | $ (40,714,771) | $ (74,067,342) | $ (104,646,025) | $ (119,330,011) | $ (144,924,883) | $ (77,604,599) | $ (53,140,035) | $ (508,324,552) |
| Net Operating Income | | | | | | | | | |
| Mold Depreciation | | | | | | | | | |
| Other Depreciation & Amortization | | | | | | | | | |
| Other (Income) & Expense | | | | | | | | | |
| Distribution Revenue | | | | | | | | | |
| Net Income Before Taxes | | | | | | | | | |
| MGA Taxes | | | | | | | | | |
| Net Income Before Shareholder Tax | | | | | | | | | |
| Shareholder Taxes | | | | | | | | | |
| Net Income | | | | | | | | | |

Notes: (1) Applying apportionment percentages ranging from 14.5% to 25.0% to profits of Bratz through October 2007.
(2) Amount includes royalty expense for August through October 2007.

Page 1 of 1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2069

REDACTED

ATTACHMENT 5

## Adjustments To Mr. Wagner's Calculation Of Enterprise Value
### For Illustrative Purposes

**Inputs**

| | |
|---|---|
| Growth Rate: | -3.00% |
| Discounted To: | 12/31/2007 |
| Terminal Value Date: | 12/31/2010 |
| Discount Rate[1]: | 15.00% |

| | 2008 | 2009 | 2010 | Terminal Value |
|---|---|---|---|---|
| A | Cash Flow [2] | | | |
| B | Terminal Value [3] | | | |
| C | Period | | | |
| $D = 1/(1+\text{Discount Rate})^C$ | Discount Factor | | | |
| $E = A * D$ | Present Value | | | |
| F | Enterprise Value | | | |

Notes: (1) ATTACHMENT 5.4.
(2) ATTACHMENT 5.1.
(3) Terminal Value = [(2010 Cash Flow) * (1 + Growth Rate)] / [(Discount Rate) - (Growth Rate)].

Page 1 of 1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2070

REDACTED

ATTACHMENT 5.2

Adjustments To Mr. Wagner's Calculation Of Future Bratz Cash Flow, 2008-2010
For Illustrative Purposes

**Adjustments**

| | |
|---|---|
| Bratz Gross Revenue Growth Rate From 2006-2007 [1]: | -18.10% |
| Projected Bratz Gross Revenue Growth Rate From 2007-2008: | -10.00% |
| Projected Bratz Gross Revenue Annual Growth Rate From 2008-2010: | -3.00% |
| 2005-2006 Average Operating Expenses [2]: | 23.51% |
| Working Capital:  No change in Working Capital | |

| | | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| A | Total Bratz Gross Revenue | | | | | |
| | *Growth* | | | | | |
| B | Gross Margin (40.94% Of Gross Revenue) [7] | | | | | |
| | *Percentage* | | | | | |
| C | Operating Expenses (23.51% Of Gross Revenue) [8] | | | | | |
| D | Depreciation [9] | | | | | |
| E | Taxes (1.77% Of Gross Revenue) [10] | | | | | |
| F = B - C - D - E | Income | | | | | |
| | *Percentage* | | | | | |
| G | Distributions To Shareholders For Taxes (34.37% Of Income) [11] | | | | | |
| H = F - G | Net Income | | | | | |
| | *Percentage* | | | | | |
| I | Depreciation/Amortization [9] | | | | | |
| J = H + I | Operating Cash Flow | | | | | |
| K | Investment In Working Capital | | | | | |
| L | Capital Expenditure (1.57% Of Gross Revenue) [9] | | | | | |
| M = J - K - L | Free Cash Flow | | | | | |

Page 1 of 2

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2071

REDACTED

ATTACHMENT 5.1

Adjustments To Mr. Wagner's Calculation Of Future Bratz Cash Flow, 2008-2010

For Illustrative Purposes

Notes:
(1) Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 2.7.
(2) ATTACHMENT 5.2.
(3) Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 1.1.
(4) [2007 Total Bratz Gross Revenue = [2006 Total Bratz Gross Revenue * (1 + Bratz Revenue Growth Rate From 2006-2007)].
(5) [2008 Total Bratz Gross Revenue = [2007 Total Bratz Gross Revenue * (1 + Projected Bratz Gross Revenue Growth Rate From 2007-2008)].
(6) [2009-2010 Total Bratz Gross Revenue = [Prior Year Total Bratz Gross Revenue * (1 + Projected Bratz Gross Revenue Annual Growth Rate From 2008-2010)].
(7) Expert Report of Michael J. Wagner, February 11, 2008, Tab B2, Schedule 2.1.
2008-2010 Gross Margin = Total Bratz Gross Revenue * 40.94%.   40.94% is the 2005-2006 average Gross Margin.
(8) ATTACHMENT 5.2.
(9) ATTACHMENT 5.3.
(10) Expert Report of Michael J. Wagner, February 11, 2008, Tab B2, Schedule 2.1.
2008-2010 Taxes = Total Bratz Sales * 1.77%.  1.77% is the 2005-2006 average Taxes as a percentage of Sales.
(11) Expert Report of Michael J. Wagner, February 11, 2008, Tab B2, Schedule 2.1.       ⱡ MGA's 2002-2004 effective tax rate.
2008-2010 Distributions To Shareholders For Taxes = Income"

Page 2 of 2

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2072

REDACTED

ATTACHMENT 5.2

## Calculation Of MGA Operating Expenses As A Percentage Of Sales
### For Illustrative Purposes

| | 2005 | 2006 | Average |
|---|---|---|---|
| A | MGA Gross Revenue [1] | | |
| B | MGA Total Operating Expenses [1] | | |
| $C = B / A$ | *Percentage* | | |

Notes:
(1) Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedule 4.2.

Page 1 of 1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2073

REDACTED

ATTACHMENT 5.3

Adjustments To Mr. Wagner's Projected Bratz Depreciation And Capital Expenditure Projections, 2008-2010
For Illustrative Purposes

| | 2008 | 2009 | 2010 |
|---|---|---|---|

MGA Sales [1]

Capital Expenditures [2]

*Capital Expenditures As A Percentage of MGA Sales*

Depreciation/Amortization [3]

*Depreciation As A Percentage of Capital Expenditures*

Notes:   (1) ATTACHMENT 5.1.
(2) Per the Expert Report of Michael J. Wagner, February 11, 2008, Tab B2, Schedule 2.2,
"Capital expenditures are projected to continue as the average CapEx as a percentage of sales
rate over the 2001-2006 period." 2.57% is the 2001-2006 average of Capital Expenditures to Sales.
(3) Per the Expert Report of Michael J. Wagner, February 11, 2008, Tab B2, Schedule 2.2,
"Depreciation is projected to increase to 100% of capital expenditures."

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 1 of 1

EXHIBIT 59
PAGE 2074

REDACTED

ATTACHMENT 5.4

## Adjustments To Mr. Wagner's Discount Rate
### For Illustrative Purposes

| | | |
|---|---|---|
| A | Risk Free Rate [1] | 4.50% |
| | | |
| B | Unlevered Beta [2] | 0.98 |
| | | |
| C | Equity Risk Premium [3] | 7.10% |
| D | Mr. Wagner's Adjustment To Equity Risk Premium [1] | 1.25% |
| E = C - D | Adjusted Equity Risk Premium | 5.85% |
| | | |
| F | Size Premium [3] | 2.28% |
| | | |
| G | Specific Risk Premium | 2.49% |
| | | |
| H = A + (B * E) + F + G | Discount Rate | 15.00% |

Notes:  (1) Expert Report of Michael J. Wagner, February 11, 2008, Tab B2, Schedule 3.0.
(2) Morningstar Cost of Capital 2007 Yearbook, Statistics For SIC Code 394, SIC Composite, p. 3-74.
(3) Morningstar Stocks, Bills, Bonds, and Inflation 2007 Yearbook, Valuation Edition, Table 7-2, 8th Decile, p. 131;
Table 7-5, 8th Decile Size Premium, p. 137.

Page 1 of 1

CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT 59
PAGE 2075

ATTACHMENT 6

## Comparison of Regression Results Based on Annual Data to Mr. Wagner's Regression Results Based on Monthly Data

| Count | Dependent | Independent | Regression Results Based on Annual Data (1997 - 2006) [1] | | | | | | Mr. Wagner's Regression Results Based on Monthly Data | | | | | | Difference Adj. RSQ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Coefficient | T-Value | P-Value | Significant | RSQ | Adj. RSQ | Coefficient | T-Value | P-Value | Significant | RSQ | Adj. RSQ | |
| 1 | Other Revenue [1] | Intercept | | -1.19706 | 29.74% | No | | | | 1.37817 | 17.56% | No | | | 62.59% |
| | | MGA_Sales | | 3.68911 | 2.11% | Yes | 77.27% | 71.58% | | 2.26946 | 2.86% | Yes | 11.16% | 8.99% | |
| 2 | Sales Returns [1] | Intercept | | 0.15645 | 88.71% | No | | | | 1.98613 | 6.64% | No | | | 17.71% |
| | | MGA_Sales | | 1.31353 | 28.07% | No | 36.48% | 15.35% | | 0.12000 | 90.51% | No | 0.04% | -2.40% | |
| 3 | Sales Discount & Allowances | Intercept | | 0.27528 | 79.01% | No | | | | -0.57771 | 56.70% | No | | | 27.50% |
| | | MGA_Sales [2] | | 11.58068 | 0.00% | Yes | 94.37% | 93.67% | | 9.11835 | 0.00% | Yes | 66.97% | 66.17% | |
| 4 | Cost of Goods Sold | Intercept | | 1.80755 | 9.58% | No | | | | 1.51394 | 13.77% | No | | | 18.51% |
| | | MGA_Sales [3] | | 73.36090 | 0.00% | Yes | 99.85% | 99.83% | | 13.55922 | 0.00% | Yes | 81.77% | 81.32% | |
| 5 | Production Costs | Intercept | | -0.50287 | 64.97% | No | | | | -0.83130 | 41.73% | No | | | -11.47% |
| | | Other_Rev | | 1.91389 | 15.15% | No | 54.83% | 39.97% | | 4.47939 | 0.03% | Yes | 54.13% | 51.44% | |
| 6 | Other COS, Excluding Production and Royalty | Intercept | | -0.61574 | 55.52% | No | | | | 0.00989 | 99.61% | No | | | 30.07% |
| | | MGA_Sales [5] | | 5.76649 | 0.04% | Yes | 80.72% | 78.35% | | 6.26188 | 0.00% | Yes | 48.68% | 47.64% | |
| 7 | Royalty Expense | Intercept | | 1.44992 | 13.76% | No | | | | -0.71561 | 47.83% | No | | | 28.35% |
| | | MGA_Sales [6] | | 3.76330 | 0.55% | Yes | 63.90% | 59.39% | | 4.46129 | 0.01% | Yes | 32.68% | 31.04% | |
| 8 | Sales Marketing / Ad Production Exp. [4] | Intercept | | 0.66862 | 52.26% | No | | | | 4.70472 | 0.01% | Yes | | | 95.31% |
| | | Gross_Rev | | 13.05783 | 0.00% | Yes | 95.52% | 94.96% | | -0.94767 | 35.14% | No | 3.11% | -0.35% | |
| 9 | Ad Media Expense [4] | Intercept | | | | | | | | 1.41003 | 16.61% | No | | | 50.02% |
| | | Gross_Rev | | | | | | | | 1.78379 | 8.19% | No | 7.20% | 4.94% | |
| 10 | Other Sales & Marketing Expense [4] | Intercept | | | | | | | | 1.17153 | 24.81% | No | | | 77.86% |
| | | Gross_Rev | | | | | | | | 3.10876 | 0.34% | Yes | 19.08% | 17.10% | |
| 11 | Product Development Expense | Intercept | | 1.60189 | 10.92% | No | | | | 3.60312 | 0.05% | Yes | | | 74.41% |
| | | MGA_Sales [6] | | 13.66555 | 0.00% | Yes | 95.50% | 93.39% | | 3.29225 | 0.21% | Yes | 20.93% | 18.98% | |
| 12 | Travel & Entertainment Expense | Intercept | | 0.36691 | 72.32% | No | | | | 1.73364 | 8.70% | No | | | 59.60% |
| | | Gross_Rev | | 6.13301 | 0.03% | Yes | 82.46% | 80.27% | | 3.63639 | 0.34% | Yes | 22.36% | 20.47% | |
| 13 | Salary Expense | Intercept | | -0.42178 | 68.45% | No | | | | 2.01460 | 5.05% | No | | | 62.53% |
| | | Gross_Rev | | 7.22934 | 0.01% | Yes | 86.22% | 85.07% | | 3.63550 | 0.08% | Yes | 24.38% | 22.93% | |
| 14 | Professional Fees | Intercept | | 0.00067 | 99.79% | No | | | | 0.67016 | 50.46% | No | | | 80.57% |
| | | Gross_Rev | | 6.80506 | 0.01% | Yes | 85.27% | 83.43% | | 1.69470 | 14.26% | No | 5.17% | 2.85% | |
| 15 | Premises Related Expenses | Intercept | | -0.35544 | 59.61% | No | | | | 1.77197 | 8.38% | No | | | 67.69% |
| | | Gross_Rev | | 8.08922 | 0.00% | Yes | 89.11% | 87.74% | | 3.59674 | 0.15% | Yes | 21.96% | 20.06% | |
| 16 | Equipment Related Expenses | Intercept | | -0.51729 | 73.51% | No | | | | 1.08137 | 28.59% | No | | | 58.88% |
| | | Gross_Rev | | 4.53628 | 0.29% | Yes | 69.17% | 65.31% | | 1.97145 | 5.54% | No | 8.66% | 6.43% | |
| 17 | Supplies, Postage & Delivery Expenses | Intercept | | 3.57766 | 0.67% | Yes | | | | 2.86989 | 0.61% | Yes | | | 69.89% |
| | | Gross_Rev | | 17.55772 | 0.00% | Yes | 97.67% | 97.15% | | 4.09174 | 0.02% | Yes | 28.99% | 27.26% | |

Page 1 of 2

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2076

REDACTED

ATTACHMENT 6

## Comparison of Regression Results Based on Annual Data to Mr. Wagner's Regression Results Based on Monthly Data

| Count | Dependent | Independent | Regression Results Based on Annual Data (1997 - 2006)[1] | | | | | | Mr. Wagner's Regression Results Based on Monthly Data | | | | | | Difference Adj. RSQ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Coefficient | T-Value | P-Value | Significant | RSQ | Adj. RSQ | Coefficient | T-Value | P-Value | Significant | RSQ | Adj. RSQ | |
| 18 | Other Expenses | Intercept | | 0.90474 | 39.30% | No | 56.66% | 51.24% | | 1.91707 | 6.22% | No | 0.92% | -1.50% | 52.74% |
| | | Gross_Rev | | 3.23393 | 1.20% | Yes | | | | 2.61672 | 54.08% | No | | | |
| 19 | Distribution Expenses[9] | Intercept | | N/A | N/A | N/A | | | | 5.26710 | 79.26% | No | 3.54% | -2.14% | N/A |
| | | Gross_Rev | | N/A | N/A | N/A | | | | 0.79895 | 44.05% | No | | | |
| 20 | Mold Depreciation | Intercept | | -0.34503 | 73.90% | No | 90.49% | 89.30% | | 0.18598 | 85.34% | No | 24.61% | 22.77% | 66.53% |
| | | Gross_Rev | | 8.73546 | 0.00% | Yes | | | | 3.65874 | 0.07% | Yes | | | |
| 21 | Other Depreciation & Amortization | Intercept | | -0.85123 | 41.94% | No | 74.76% | 71.61% | | 1.04658 | 30.14% | No | 21.39% | 19.47% | 52.13% |
| | | Gross_Rev | | 4.86809 | 0.12% | Yes | | | | 3.34010 | 0.16% | Yes | | | |
| 22 | Other (Income) & Expenses | Intercept | | 0.33870 | 74.36% | No | 19.82% | 9.80% | | 0.77795 | 44.11% | No | 2.12% | -0.26% | 10.06% |
| | | Gross_Rev | | -1.40635 | 19.73% | No | | | | 0.94296 | 35.12% | No | | | |
| 23 | Taxes | Intercept | | -1.60819 | 10.83% | No | 92.74% | 91.83% | | 1.23535 | 21.65% | No | 28.21% | 26.46% | 65.37% |
| | | Gross_Rev | | 10.10814 | 0.00% | Yes | | | | 4.01411 | 0.02% | Yes | | | |
| 24 | Combined Cost (8-18) | Intercept | | 0.22492 | 82.77% | No | 93.65% | 92.85% | | 2.42710 | 1.97% | Yes | 23.84% | 21.98% | 70.87% |
| | | Gross_Rev | | 10.85994 | 0.00% | Yes | | | | 3.58231 | 0.09% | Yes | | | |
| 25 | Combined Cost (11-18) | Intercept | | 0.00492 | 99.62% | No | 91.95% | 90.94% | | 2.10416 | 4.15% | Yes | 18.28% | 16.23% | 74.66% |
| | | Gross_Rev | | 9.55906 | 0.00% | Yes | | | | 3.02815 | 0.42% | Yes | | | |
| 26 | Combined Cost (8-18, 21) | Intercept | | 0.18900 | 85.48% | No | 93.46% | 92.65% | | 2.40757 | 2.16% | Yes | 24.01% | 22.15% | 70.49% |
| | | Gross_Rev | | 10.69569 | 0.00% | Yes | | | | 3.59900 | 0.09% | Yes | | | |
| 27 | Combined Cost (11-18, 21) | Intercept | | -0.03723 | 97.12% | No | 91.66% | 90.62% | | 2.06821 | 4.55% | Yes | 18.57% | 16.59% | 74.01% |
| | | Gross_Rev | | 9.37582 | 0.00% | Yes | | | | 3.05811 | 0.39% | Yes | | | |

Notes:
(1) Source: Expert Report of Michael J. Wagner, February 11, 2008, Tab B1, Schedules 15 and 4.2.
(2) Incomplete data between 1997 and 2000 for the dependent variable.
(3) Gross Revenue is substituted for MGA Sales between 1997 and 2000.
(6) Ad Production Exp (8), Ad Media Expense (9), and Other Sales & Marketing Expense (10) are aggregated into one category because detailed data for each category is unavailable between 1997 and 2000.
(9) Distribution Expense data available for 2006 only; therefore, no annual regression has been performed.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2077

REDACTED

ATTACHMENT 7

## Apportionment Based on Sales Variation Among Bratz Themes

| Theme Description [1] | Theme Number | Total Target Sales Between 2001 and YTD Oct-07 | Target Sales During Aug-07, Sep-07 & Oct-07 [2] | Percentage of Total Sales During Aug-07, Sep-07 & Oct-07 [2] | Number of Remaining Themes (Excluding Base) | Base Theme Sales | Sum of Sales of All Remaining Themes (Excluding Base) | Apportionment Percentage of All Themes | Apportionment Percentage for Themes With No Sales During Aug-07, Sep-07 & Oct-07 |
|---|---|---|---|---|---|---|---|---|---|
| | | A | B | C = B/A | D | E = A x D | F | G = E/F | G + E/F |
| 1. Bratz Hairplay | 122 | | | 100% | 76 | | | 0.55% | |
| 2. Bratz Magic Fashion Nails | 117 | | | 100% | 75 | | | 0.71% | |
| 3. Bratz Sweetz | 101 | | | 0% | 74 | | | 1.19% | 1.19% |
| 4. Bratz Life. Style. | 76 | | | 0% | 73 | | | 1.39% | 1.39% |
| 5. Bratz Fashion Runway | 139 | | | 100% | 72 | | | 1.49% | |
| 6. Bratz Ice Hockey | 75 | | | 24% | 71 | | | 1.57% | |
| 7. Bratz Learning Fashion Design | 120 | | | 100% | 70 | | | 3.16% | |
| 8. Bratz Behind The Scenes | 49 | | | 42% | 69 | | | 3.59% | |
| 9. Bratz Multi Theme | 42 | | | 29% | 68 | | | 3.72% | |
| 10. Bratz Designed By You | 10 | | | 37% | 67 | | | 3.95% | |
| 11. Bratz Spiderman | 16 | | | 6% | 66 | | | 4.33% | |
| 12. Bratz Shock | 15 | | | 1% | 65 | | | 4.94% | |
| 13. Bratz Wanted | 106 | | | 0% | 64 | | | 5.38% | 5.38% |
| 14. Bratz Winter Glitz | 110 | | | 46% | 63 | | | 7.79% | |
| 15. Bratz Winter Collection | 13 | | | 82% | 62 | | | 8.20% | |
| 16. Bratz Stylin | 7 | | | 95% | 61 | | | 9.61% | |
| 17. Bratz Spring Break | 94 | | | 0% | 60 | | | 13.37% | 13.37% |
| 18. Bratz Gold Medal Gymnasts | 23 | | | 36% | 59 | | | 14.26% | |
| 19. Bratz Hot Summer Dayz | 4 | | | 7% | 58 | | | 16.04% | |
| 20. Bratz Girlfriendz | 68 | | | 56% | 57 | | | 15.83% | |
| 21. Bratz Midnight Dance | 80 | | | 0% | 56 | | | 16.65% | 16.65% |
| 22. Bratz X-Treme Skateboarding | 29 | | | 32% | 55 | | | 18.01% | |
| 23. Bratz Sweetheart | 6 | | | 14% | 54 | | | 22.25% | |

Page 1 of 4

CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT 59
PAGE 2078

REDACTED

ATTACHMENT 7

## Apportionment Based on Sales Variation Among Bratz Themes

| Theme Description [1] | Theme Number | Total Targt Sales Between 2001 and YTD Oct-07 | Targt Sales During Aug-07, Sep-07 & Oct-07 [2] | Percentage of Total Sales During Aug-07, Sep-07 & Oct-07 [2] | Number of Remaining Themes (Excluding Base) | Base Theme Sales | Sum of Sales of All Remaining Themes (Excluding Base) | Apportionment Percentage of All Themes | Apportionment Percentage for Themes With No Sales During Aug-07, Sep-07 & Oct-07 |
|---|---|---|---|---|---|---|---|---|---|
| | | A | B | C = B/A | D | E = A x D | F | G = E/F | G = E/F |
| 47. Bratz Be-Bratz | 25 | | | | | | | | |
| 48. Bratz Campfire | 55 | | | | | | | | |
| 49. Bratz Princess | 20 | | | | | | | | |
| 50. Bratz Pampered Pupz | 26 | | | | | | | | |
| 51. Bratz Flashback Fever | 61 | | | | | | | | |
| 52. Bratz Treasure | 105 | | | | | | | | |
| 53. Bratz Sleepover | 5 | | | | | | | | |
| 54. Bratz Wild Wild West | 109 | | | | | | | | |
| 55. Bratz Ice Champions | 74 | | | | | | | | |
| 56. Bratz Wild Life Safari | 108 | | | | | | | | |
| 57. Bratz Step Out | 96 | | | | | | | | |
| 58. Bratz Magic Hair | 27 | | | | | | | | |
| 59. Bratz Girls Night Out | 69 | | | | | | | | |
| 60. Bratz Sun-Kissed Summer | 99 | | | | | | | | |
| 61. Bratz Nighty-Nite | 82 | | | | | | | | |
| 62. Bratz Birthday | 11 | | | | | | | | |
| 63. Bratz The Movie | 24 | | | | | | | | |
| 64. Bratz Funk N' Glow | 64 | | | | | | | | |
| 65. Bratz Genie Magic | 67 | | | | | | | | |
| 66. Bratz Tokyo-A-Go-Go | 103 | | | | | | | | |
| 67. Bratz Passion For Fashion | 12 | | | | | | | | |
| 68. Bratz Holiday | 3 | | | | | | | | |
| 69. Bratz Formal Funk | 62 | | | | | | | | |

Page 3 of 4

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2080

REDACTED

ATTACHMENT 7

## Apportionment Based on Sales Variation Among Bratz Themes

| Theme Description (1) | Theme Number | Total Bratz Sales Between 2001 and YTD-Oct-07 | Bratz Sales During Aug-07, Sep-07 & Oct-07 (2) | Percentage of Total Sales During Aug-07, Sep-07 & Oct-07 (2) | Number of Remaining Themes (Excluding Base) | Bratz Theme Sales | Sum of Sales of All Remaining Themes (Excluding Base) | Apportionment Percentage of All Themes | Apportionment Percentage for Themes With No Sales During Aug-07, Sep-07 & Oct-07 |
|---|---|---|---|---|---|---|---|---|---|
| | | A | B | C = B/A | D | E = A x D | F | G = E/F | G + E/F |
| 24. Bratz The Fashion Show | 8 | | | 28% | 53 | | | 24.63% | |
| 25. Bratz Flower Girlz | 19 | | | | | | | | |
| 26. Bratz Feelin' Pretty | 60 | | | | | | | | |
| 27. Bratz Star Singerz | 21 | | | | | | | | |
| 28. Bratz Fashion Stylistz | 18 | | | | | | | | |
| 29. Bratz Adventure Girlz | 17 | | | | | | | | |
| 30. Bratz Fabulous | 59 | | | | | | | | |
| 31. Bratz Sweet Dreamz | 100 | | | | | | | | |
| 32. Bratz Live In Concert | 79 | | | | | | | | |
| 33. Bratz Magic Make-Up | 28 | | | | | | | | |
| 34. Bratz School | 14 | | | | | | | | |
| 35. Bratz Rodeo | 90 | | | | | | | | |
| 36. Bratz I-Candy | 73 | | | | | | | | |
| 37. Bratz Pretty 'N' Punk | 86 | | | | | | | | |
| 38. Bratz Head Gamez | 70 | | | | | | | | |
| 39. Bratz Dynamite | 58 | | | | | | | | |
| 40. Bratz Ooh La La | 83 | | | | | | | | |
| 41. Bratz Beach Party | 46 | | | | | | | | |
| 42. Bratz Talking | 102 | | | | | | | | |
| 43. Bratz Fashion Pixiez | 22 | | | | | | | | |
| 44. Bratz Hollywood | 71 | | | | | | | | |
| 45. Bratz Secret Date | 91 | | | | | | | | |
| 46. Bratz Birthday Bash | 50 | | | | | | | | |

Page 2 of 4

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2079

REDACTED

ATTACHMENT 7

Apportionment Based on Sales Variation Among Bratz Themes

| Theme Description (1) | Theme Number | Total Target Sales Between 2001 and YTD Oct-07 | Target Sales During Aug-07, Sep-07 & Oct-07 (2) | Percentage of Total Sales During Aug-07, Sep-07 & Oct-07 (2) | Number of Remaining Themes (Excluding Base) | Base Theme Sales | Sum of Sales of All Remaining Themes (Excluding Base) | Apportionment Percentage of All Themes | Apportionment Percentage for Themes With No Sales During Aug-07, Sep-07 & Oct-07 |
|---|---|---|---|---|---|---|---|---|---|
| | | A | B | C = B / A | D | E = A / x D | F | G = E / F | G = E / F |
| 70. Bratz Slumber Party | 92 | | | | | | | | |
| 71. Bratz Funk Out | 65 | | | | | | | | |
| 72. Bratz Rock Angelz | 87 | | | | | | | | |
| 73. Bratz Diamondz | 55 | | | | | | | | |
| 74. Bratz Sky 11t | 98 | | | | | | | | |
| 75. Bratz Strut It | 97 | | | | | | | | |
| 76. Bratz Winterfest Wonderland | 111 | | | | | | | | |
| 77. Bratz Play Sportz | 1 | | | | | | | | |

Notes
(1) Excludes themes identified as "Other".
(2) Sales at MGA historically peak during August, September, and October.

Page 4 of 4

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 59
PAGE 2081

REDACTED

**EXHIBIT 60**

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an Individual,<br><br>Plaintiff,<br><br>v.<br><br>MATTEL, Inc., a Delaware corporation,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS | **HIGHLY CONFIDENTIAL –<br>ATTORNEY'S EYES ONLY**<br><br>CASE NO. CV 04-9049 SGL (RNBx)<br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV OS-02727<br><br>**EXPERT REPORT OF<br>DOUGLAS KIDDER**<br>*March 17, 2008* |

EXHIBIT 60
PAGE 2082

Highly Confidential – Attorney's Eyes Only

## Table of Contents

Section                                                                                    Page

1.  Scope of Work.................................................................................................1
2.  Qualifications................................................................................................1
3.  Background...................................................................................................2
    3.1   Case Background.....................................................................................2
    3.2   Mattel....................................................................................................2
    3.3   MGA & Bratz..........................................................................................5
4.  Opinions.......................................................................................................6
    4.1   Summary of Opinions...............................................................................6
    4.2   Mr. Wagner's Opinion Is Devoid Of Information Necessary To Fully Evaluate
    Damages Claims In This Case.........................................................................8
    4.3   Further Assessment of Apportionment Commenced In Mr. Meyer's Report.....10
    4.4   Maximum Amounts Recoverable Under Mattel's Different Damages' Claims. 12
5.  Signature.....................................................................................................19

EXHIBIT 60
PAGE 2083

Highly Confidential – Attorney's Eyes Only

## 1. SCOPE OF WORK

1. I have been retained by Carter Bryant to opine on the damages opinions submitted by Michael Wagner and Paul Meyer in this matter. In forming my opinion, I have relied on the expert reports of Robert Tonner and Erich Joachimsthaler. I expect to update my report should additional information become available.

## 2. QUALIFICATIONS

2. My name is Douglas Kidder. I am a Managing Partner with OSKR, LLC a firm that provides expert services primarily in the areas of intellectual property and antitrust. I am also a member of the Licensing Executives Society and a Director of i-cap Partners – a venture capital fund investing in technology companies.

3. I hold a B.A. in Mathematics and English with Honors from Amherst College (1983) and a Masters in Science from the University of California at Berkeley (1986). While at Berkeley, I was a lecturer in the Computer Science department.

4. I have been performing business analyses and valuations for over twenty years, both as a consultant and as a manager. I have published and spoken on business and valuation issues mostly related to intellectual property. I co-authored an article on the application of Black-Scholes option pricing models to patent valuation.

5. A copy of my resume is attached as **Exhibit 1**. A list of documents reviewed in connection with this Report is attached as **Exhibit 2**. I am being compensated at an hourly rate of $475 per hour, plus reimbursement of expenses. I have been assisted in this matter by OSKR staff, working under my supervision and control. I have no financial interest in the outcome of this matter.

6. I understand that discovery in this case is still ongoing on matters relevant to this report, and that additional expert reports are due to be served today by the other parties to this case. I reserve the right to supplement my report in light of that additional information.

1

**EXHIBIT 60**
**PAGE 2084**

## 3.  BACKGROUND

### 3.1  CASE BACKGROUND

7.  I understand that Mattel has alleged a variety of claims against Carter
Bryant and MGA Entertainment, Inc. ("MGA").  The claims that I understand to have
been alleged against Carter Bryant are:

- Breach of the duty of loyalty,

- Breach of contract,

- Breach of fiduciary duty,

- Conversion,

- Unfair competition under Cal. Bus. & Prof. Code § 17200, and

- Copyright infringement.

8.  I further understand that Mattel's claims are generally based on its
allegations that Carter Bryant conceived of and reduced to practice the Bratz doll line
while he was employed by Mattel as a doll designer in 1999 and 2000.[1]  As a result,
Mattel alleges (and the Defendants dispute) that it owns intellectual property related to
Bratz, that the Bratz doll line infringes on Mattel's copyrights, and that Mr. Bryant
breached certain duties to Mattel in failing to assign Bratz-related ideas and sketches to
Mattel.

### 3.2  MATTEL

9.  Mattel is a leader in the design, manufacture, and marketing of toy and
family products.[2]  Some of its best selling product lines include "Barbie, Hot Wheels,
Matchbox, Tyco, American Girl, and Fisher Price brands."[3,4]  Mattel was founded in

---

[1]  See, for example, Mattel, Inc.'s Objections and Second Supplemental Responses to Defendant's First
    Set of Interrogatories.
[2]  http://www.shareholder.com/mattel/default.cfm.
[3]  http://www.shareholder.com/mattel/default.cfm.
[4]  Throughout this report I have used many names that I understand to be registered trademarks.  My use
    of those marks without an attendant symbol is not intended to convey a disregard for the registration.

2

EXHIBIT 60
PAGE 2085

Highly Confidential – Attorney's Eyes Only

1945 and incorporated in 1948.[5] The company's headquarters are located in El Segundo, California.[6]

10. Mattel began advertising its toys in 1955 through the "Mickey Mouse Club" television show.[7] In 1959, Mattel unveiled its "Barbie" product line which catapulted Mattel to being a leading toy manufacturer.[8] Mattel became publicly owned in the subsequent year.

11. Much of Mattel's success is attributed to the Barbie product line. However, starting in 1998 sales for the Barbie product line declined with a 14% drop in gross sales.[9] More recently, Barbie's worldwide gross sales decreased 13% in 2005 from 2004, while domestic Barbie gross sales decreased 21%.[10] Mattel recovered somewhat in 2006, with a 3% increase in domestic Barbie gross sales.[11]

12. Reviving Barbie's past success was the chief goal for management in Mattel's 2006 Annual Report:

> The first goal is to enhance innovation in order to reinvigorate the Barbie® brand, while maintaining growth in other core brands by continuing to develop popular toys.[12]

13. Mattel has increasingly made an effort to couple the Barbie franchise with storytelling through movies, books, magazines, and music.[13] This strategy, known as the "Worlds Of" approach includes "worlds" such as "Fairytopia, Happy Family, and Cali Girl."[14]

> In 2004, the Barbie® world will come to life through storytelling. This fresh approach is the result of the brand's new leadership and foresight to turn the toy industry's traditional toy manufacturing model on its head by

---

5   http://www.mattel.com/about_us/history/default.asp.
6   Mattel, Inc., Form 10-K, For the fiscal year ended December 31, 2007, p. 3.
7   http://www.mattel.com/about_us/history/default.asp.
8   http://www.mattel.com/about_us/history/default.asp.
9   Mattel, Inc. 1998 Annual Report, p. 27.
10  Mattel, Inc. 2006 Annual Report, pp. 31-32.
11  Mattel, Inc. 2006 Annual Report, p. 27.
12  Mattel, Inc. 2006 Annual Report, p. 26.
13  Mattel, Inc. 2003 Annual Report, Letter to Shareholders.
14  Mattel, Inc. 2003 Annual Report, p. 4.

EXHIBIT 60
PAGE 2086

Highly Confidential -- Attorney's Eyes Only

writing the stories first, and then creating dolls and toys to play out the stories.... For older girls, Barbie® takes a more visual approach with a 44-minute DVD, a funky magazine, CDs and partnerships with hip fashion retailers like Sephora and Levi's. For younger girls, the stories come to life with pop-up books and rich story "maps." Each of these value-added content components will be included in the toy packages to encourage cross-selling and deeper purchase.[15]

14.  In an apparent effort to pursue other avenues of growth and counterassault MGA's Bratz dolls' success, Mattel launched "Flava" dolls in July 2003. Flava is described as

The first reality-based fashion doll brand that celebrates today's teen culture through authentic style, attitude and values, Mattel has created a hot hip-hop themed line that allows girls to express their own personal flava.[16]

15.  The Flava product line did not meet sales expectations in 2003 and was discontinued for 2004.[17] It is my understanding that this attempt at a multiethnic line of fashion dolls failed as a result of poor execution and an unattractive appearance to the dolls.[18]

16.  Mattel also apparently sought to compete with the Bratz doll line by introducing "My Scene" dolls in 2002, dubbed by Mattel as "the exciting new Barbie segment" and created specifically for the "tween" girl.[19] The My Scene Barbie line was an attempt by Mattel "to stop girls from growing out of Barbie too fast and too soon — and from defecting to Bratz."[20]

17.  The My Scene dolls have kept Barbie's shape although the heads are bigger than traditional Barbies. I understand that while the My Scene dolls may be

---

[15] "New Look, New Approach, New Product Lines Reinforce Barbie® Doll's Reign As The #1 Girls Brand in the World," Mattel Press Release, February 5, 2004.

[16] "Category-Busting Flavas Dolls Are Hip-Hop Happening And Promote Fearless Self Expression in Girls Ages 8-10," Mattel Press Release, July 20, 2003.

[17] Mattel, Inc. 2003 Annual Report, p. 19.

[18] Expert Report of Robert Tonner, February 11, 2008, p. 17.

[19] Mattel, Inc. 2002 Annual Report, p. 4; "My Scene and Limited Too Team up for the Ultimate Tween Power Play," Mattel Press Release, June 10, 2003.

[20] Anne D'Innocenzio, "Barbie gets hipper, trendier to fight the competition," The Associated Press, November 22, 2002.

4

EXHIBIT 60
PAGE 2087

Highly Confidential -- Attorney's Eyes Only

reminiscent of the Bratz dolls, they are not as new looking as Bratz and have had trouble competing.[21]

### 3.3   MGA & BRATZ

18.   Founded in 1979, MGA is a consumer entertainment company specializing in the manufacturing of proprietary and licensed children's toys.[22] MGA's headquarters are located in Van Nuys, California.[23] MGA was first incorporated in 1982 as ABC International Traders, Inc. to import and distribute name-brand consumer electronics.[24] The company later received the exclusive rights to sell Nintendo hand-held LCD games in the United States starting in 1987.[25] This initial success led to MGA acquiring licenses including "The World Wrestling Federation, Power Rangers, DragonBall Z, Rugrats, NFL, Sailor Moon, Monster Rancher, Bear in the Big Blue House and Crazy Bones."[26]

19.   Some of MGA's proprietary successes include "Singing Bouncy Baby" which won the 1997 Doll of the Year honors at the sixth annual TOY Awards from Family Fun Magazine and "Virtual Car Racing," a handheld game which was honored as part of Dr. Toy's 100 Best Children's Products for 1999.[27] MGA was awarded the Girl Vendor of the Year Award in 2003 by Toys R Us.[28]

20.   The Bratz doll line was the first fashion doll line introduced by MGA. The original four Bratz dolls (Sasha, Cloe, Yasmin and Jade) first appeared on the shelves in June 2001 and the Bratz product line has since become a world premiere toy

---

[21]   *Expert Report of Paul K. Meyer*, February 11, 2008, p. 14, 37-38; *Expert Report of Robert Tonner*, February 11, 2008, p. 17.

[22]   MGA Entertainment complaint against Mattel, filed April 13, 2005; MGA Press Release, February 11, 2004; (http://www.mgae.com/downloads/pressreleases/NYTF%202004%20Release.pdf).

[23]   http://www.mgae.com/international.asp

[24]   http://web.archive.org/web/20000229132238/www.mgae.com/about.htm.

[25]   http://web.archive.org/web/20000229132238/www.mgae.com/about.htm.

[26]   http://web.archive.org/web/20000229132238/www.mgae.com/about.htm.

[27]   http://web.archive.org/web/20000229132238/www.mgae.com/about.htm.

[28]   MGA Press Release, February 17, 2003; http://www.mgae.com/downloads/pressreleases/NYTF%202004%20Release.pdf.

EXHIBIT 60
PAGE 2088

brand, winning Family Fun magazine's Toy of the Year Award three years in a row and the Toy Industry Association's (TIA) Toy of the Year in 2002 and 2003.[29]

> That hot product (Bratz) propelled MGA from a small hand-held videogame firm into a toy industry powerhouse.[30]

21. By 2003, Bratz dolls garnered 32% of doll sales, with revenues of $1 billion, while becoming the top seller in the fashion doll category.[31] Bratz currently offers numerous product types and categories: Bratz, Bratz Babyz, Bratz Kidz, Activies, Home Décor, Electronics, Bratz Sports, Games and Bratzlife.[32] The product line concept was also used to inspire a movie, "Bratz: The Movie" which was released in August of 2007.[33]

## 4.   OPINIONS

### 4.1   SUMMARY OF OPINIONS

22. While purportedly a damages opinion, Mr. Wagner's report does not offer sufficient information to evaluate the forms of damages that I understand Mattel has sought in this case. Instead, his report appears to simply be a calculation of the amounts earned by or paid to MGA Entertainment, Inc. ("MGA"), Isaac Larian and Carter Bryant from the sales of the entire line of Bratz-related products, along with net worth calculations. Mr. Wagner has not provided any information tying these calculations to the claims against Carter Bryant in this case.

23. In particular, Mr. Wagner fails to address calculations that are relevant to the form of recovery available for the specific claims that Mattel has brought against

---

[29]   MGA Press Release, February 11, 2004;
http://www.mgae.com/downloads/pressreleases/MGA%20Fastest%20Growing%20rel.pdf.

[30]   Abigail Goldman, "Bratz Dolls' Little Sisters to Challenge Barbie," Los Angeles Times, December 4, 2003.

[31]   Ruth La Ferla, "Underdressed and Hot: Dolls Moms Don't Love," NY Times, October 26, 2003;
Abigail Goldman, "Bratz Maker Has the Holidays Wrapped Up; Upstart MGA Entertainment has created a sensation, but can it endure?" Los Angeles Times, December 25, 2003.

[32]   http://www.bratz.com/.

[33]   MGA Press Release, January 9, 2007;
http://www.mgae.com/downloads/pressreleases/Bratz%20the%20Move%20%20Paula%20Abdul.pdf.

6

EXHIBIT 60
PAGE 2089

Highly Confidential – Attorney's Eyes Only

Carter Bryant. For example, it is my understanding that, were Mattel to be successful in pursuing a claim for breach of duty of loyalty against Carter Bryant, Mattel may be seeking damages equal either to the amount Mattel was harmed during the period of the alleged disloyalty or to the amount Carter Bryant benefited during the alleged period of disloyalty. Yet nowhere does Mr. Wagner's report attempt to put a number on these potential forms of damages.

24. Below are two tables that summarize my opinions on the maximum amount of recovery available to Mattel under different potential damages theories, and then relates them to the actual claims asserted by Mattel against Carter Bryant. It is my understanding that all of Mattel's claims, and all claims for damages potentially associated with those claims, are disputed by Mr. Bryant, and I render no opinion on the viability of any of Mattel's claims, nor on the form of recovery permitted by the law for any of these claims.

**Table 1: Damages Elements**

| Element | Description | Amount |
|---------|-------------|--------|
| A | Maximum value of Carter Bryant's payments from MGA prior to his departure from Mattel. | $6,693.61 |
| B | Maximum value of Carter Bryant's payments from Mattel during the period when Mattel alleges he was working with MGA. | $25,000 |
| C | Maximum outside bound of the value of minimal Mattel resources allegedly used by Carter Bryant in working on the Bratz dolls. | $2,000[34] |
| D | Carter Bryant's total royalties from the first generation of Bratz dolls, which also represents the maximum outside bound on the value of Mr. Bryant's original Bratz ideas, sketches and allegedly copyrighted material, and the maximum outside bound on the profits to Mr. Bryant attributable to such allegedly copyrighted material. | $911,922 |
| E | Allocated value of Mr. Bryant's original Bratz ideas, sketches and allegedly copyrighted material, and value of the profits to Mr. Bryant attributable to such allegedly copyrighted material | $79,337 |

---

[34] As noted below, this amount is far in excess of the likely actual value of the resources allegedly used by Carter Bryant. The number provided is simply a conservative placeholder as Mr. Wagner failed to place any value on these resources.

7

EXHIBIT 60
PAGE 2090

Highly Confidential – Attorney's Eyes Only

Table 2: Relationship of Above Damages Elements to Claims Mattel Has Asserted[35]

| Claim | Damages Elements | Amount |
|---|---|---|
| Breach of the duty of loyalty | A, B, C, D, and/or E | $2,000-$911,922 |
| Breach of contract | B, C, D, and/or E | $2,000-$911,922 |
| Breach of fiduciary duty | A, B, C, D, and/or E | $2,000-$911,922 |
| Conversion | C | $2,000 |
| Unfair competition under Cal. Bus. & Prof. Code § 17200 | B, C, D, and/or E | $2,000-$911,922 |
| Copyright infringement. | D or E | $79,337-$911,922 |

Because I understand that Mattel would not be entitled to recover any of the above forms

of damage more than once, the maximum outer bound on the damages recoverable in this

case for all claims against Carter Bryant (were Mattel to win on each such claim) is a

total of elements A, B, C and D identified above ($945,615.61).

25.   I discuss each of these opinions in more detail in the following sections.

## 4.2   MR. WAGNER'S OPINION IS DEVOID OF INFORMATION NECESSARY TO FULLY EVALUATE DAMAGES CLAIMS IN THIS CASE

26.   It is my opinion that Mr. Wagner has not provided information that is

sufficient to determine the damages to which Mattel might be entitled were it to prevail

on its claims against Carter Bryant for breach of contract, breach of fiduciary duty,

breach of the duty of loyalty, conversion, unfair competition, and/or copyright

infringement.[36] In particular, Mr. Wagner not only fails to assess the factors that go

into determining profits (he merely tallies the amount of money that Carter Bryant was

---

[35]   Again, this chart is not intended to create a legal opinion on the forms of recovery available under any particular claim. Instead, it is intended to attempt to match Mattel's asserted claims with the kinds of damages Mattel appears to be seeking based on its interrogatory responses.

[36]   It is my understanding that unjust enrichment is not being legally claimed, although Mattel at some point has attempted to assert it as such.

8

EXHIBIT 60
PAGE 2091

Highly Confidential – Attorney's Eyes Only

paid by MGA[37]), but he also fails to differentiate between Carter Bryant's profits

resulting from alleged acts of wrongdoing as opposed to other acts and factors.

27.  Mr. Wagner's opinion is so limited with respect to Carter Bryant that I can

reproduce it in its entirety here:

**C. Carter Bryant's benefit resulting from payments received from MGA in connection with Bratz is $35,825,449.**

The calculation of the benefit to Carter Bryant as a result of Bratz is entirely related to the compensation he received as a consultant on Bratz products. As discussed above, Carter Bryant had a consulting agreement with MGA for his work on Bratz. I totaled all payments received by Carter Bryant as a result of the Bratz consulting agreement with MGA. The total payments received by Carter Bryant beginning in 2000 through the fourth quarter of 2007 were $35,825,449.[38]

28.  Mr. Wagner provides no information as to how the payments made to Mr.

Bryant relate to the allegedly wrongful acts asserted by Mattel against Carter Bryant in

the complaint, and fails to take into account the fact that Carter Bryant's contract with

MGA extended far beyond simply providing Mr. Bryant's initial ideas and sketches.  In

fact, Carter Bryant's consulting contract with MGA stated that he agreed to provide:

...services to consult with MGA and advise MGA on the design and development by MGA of a line of dolls presently known as "Bratz"...

MGA shall pay to Bryant a royalty of three percent (3%) of the Net Sales Receipts from the sales by MGA of any of the MGA Products developed by MGA on which Bryant provided his consulting services.[39]

29.  It is not surprising to me that MGA would strike a deal with Carter Bryant

that paid him based on his ongoing contribution to MGA and the Bratz dolls. The

amounts paid to Carter Bryant by MGA included compensation for consulting services

on products that were not simply the original Bratz dolls and were performed long after

---

[37]  I note that Mr. Wagner has not acknowledged the difference between totaling the payments to Carter Bryant and determining the profits made by Carter Bryant from those payments. I have not quantified Carter Bryant's expenses that would be relevant to determining profits, but expect they may be substantial if tallied over the years of Mr. Bryant's work with MGA.

[38]  *Expert Report of Michael J. Wagner February 11, 2008*, p. 21.

[39]  BRYANT 00794 - 95.

9

**EXHIBIT 60**
**PAGE 2092**

Highly Confidential – Attorney's Eyes Only

Mr. Bryant left Mattel. Yet Mr. Wagner does not attempt to apportion the monies received by Carter Bryant between such doll lines or draw any connection between particular damages suffered as a result of particular alleged misconduct by Mr. Bryant. Nor does Mr. Wagner opine that Carter Bryant's earnings represent a form of economic harm to Mattel in the form of lost profits. He simply totals the amount paid to Carter Bryant from his consulting contract with MGA.

### 4.3 FURTHER ASSESSMENT OF APPORTIONMENT COMMENCED IN MR. MEYER'S REPORT

30. In his expert report dated February 11, 2008, Paul Meyer performs a lengthy analysis of various apportionment factors. Specifically, he assesses the percentage of profits attributable to factors other than the copyrighted work. However, as Mr. Meyer acknowledges in his report, he does not complete the analysis to fully apportion profits between those attributable to the copyrighted works allegedly infringed, and those profits earned from other acts or services. Mr. Meyer recognizes that the 3% royalty paid to Carter Bryant is an arm's length transaction that represents an absolute maximum value for profits attributable to the copyrighted works or the value of the copyrighted property. However, he states that he has not completed his analysis by apportioning that maximum value between the accused copyrighted property and the rest of the services Carter Bryant provided MGA in order to obtain that value.

31. In his report, Mr. Meyer opines that:

Since the accused copyrighted property only represents a portion of the contributions provided by Carter Bryant, the 3.0% royalty Carter Bryant receives would represent the maximum value of the accused copyrighted property, prior to splitting the royalty payments between the accused copyrighted property and other contributions provided by Carter Bryant. ... For illustrative purposes, assuming a MGA profit margin of 20% would yield an apportionment percentage of 15.0%.[40]

---

[40] *Expert Report of Paul K. Meyer*, February 11, 2008, p. 48.

10

EXHIBIT 60
PAGE 2093

Highly Confidential – Attorney's Eyes Only

32.  There has only been one transaction that directly concerned the actual
transfer of the ideas or copyrighted materials to which Mattel claims ownership. That
transaction was the original contract between MGA and Carter Bryant. In exchange for
a payment of 3% of net sales for product lines worked on by Carter Bryant, MGA
received the rights to the initial sketches and ideas – the accused copyrighted property –
and received the services of Carter Bryant in the form of a great many more sketches
and ideas over time. Indeed, if all Carter Bryant had done was assign the sketches and
the idea to MGA and stop working, he would have received no more than the royalties
from the first generation of Bratz dolls launched. Thus, the total payments to Carter
Bryant by MGA are compensation for a great deal more than just the original Bratz
sketches constituting the allegedly infringed copyrighted property.

33.  I have calculated the total royalties paid to Carter Bryant by MGA for the
original four Bratz dolls. The royalty statements from MGA specifically call out the
total sales of products, by SKU, that Carter Bryant worked on. Thus, if Carter Bryant
had not worked on any further doll lines beyond the first generation Bratz dolls, he
would not have received his 3% royalty on those later products. The total amount Mr.
Bryant received for the initial four Bratz dolls was $911,922.[41] *See* Exhibit 3 for more
detail.

34.  All of the other payments to Carter Bryant were for Carter Bryant's work
designing fashions and soft goods for other products – products that I understand to
have been developed well after Carter Bryant's departure from Mattel. And, under the

---

[41]  In regard to the SKUs that concern sales of the first generation of Bratz dolls, it is my understanding
that SKU 248521 originally concerned Bratz Cloe dolls and later was assigned to a different nature of
product for the Fall '02 line. It is not my current understanding that the amounts paid to Mr. Bryant
from 2002 forward for this SKU line concerned the first generation Bratz doll and hence I have not
included them in this total. However, in the event that all royalties paid under this SKU number were
to be included as sales for the first generation Bratz dolls, then I would amend my report as follows:
(1) in each place where I have reflected the number $911,922, that number would be changed to be
$2,397,251; (2) in each place where I have reflected the number $79,337, that number would be
changed to $208,561; and (3) the apportionment percentage reflected at the end of my report
(paragraph 52) would change to a range of .58% to 6.7%. See Exhibits 3 and 3.1.

11

EXHIBIT 60
PAGE 2094

Highly Confidential – Attorney's Eyes Only

contract, these later payments could not have been payment for transfer of ownership of Mr. Bryant's original Bratz ideas and sketches (and any copyrights they contained) because that transfer happened at the signing of the contract with MGA. In other words, the license for such ideas or copyrights was paid in full through payment of the 3% royalties on the first line of Bratz dolls he worked on. Accordingly, the profits to Carter Bryant attributable to the original Bratz idea, sketches and allegedly copyrighted works at issue cannot exceed $911,922.

35. Mr. Meyer also notes that in the initial development effort, Carter Bryant spent a total of approximately 21 weeks on the development of the initial Bratz dolls and an additional 2 weeks developing the initial sketches that are the subject of Mattel's copyright claim.[42] Assuming that Mr. Meyer's estimates of the time spent by Carter Bryant are correct, this allocation of time can serve as the basis for a further apportionment. Specifically, 2/23 (or 8.7%) of the monies paid to Carter Bryant would be profits attributable to work that Carter Bryant performed on the accused copyrighted property prior to the date he left Mattel's employment. This would place the profits Carter Bryant received from the allegedly infringed copyrighted property at 8.7% of $911,922 or $79,337. Thus the proper range of profits attributable to the allegedly infringed copyrighted works is no more than $911,922 (the maximum value of the works at issue) and is more properly $79,337.

## 4.4  MAXIMUM AMOUNTS RECOVERABLE UNDER MATTEL'S DIFFERENT DAMAGES' CLAIMS.

36. Mattel generally asserts the following alleged misconduct as its basis for claims against Carter Bryant:[43]

---

[42] *Expert Report of Paul K. Meyer*, February 11, 2008, p. 49.

[43] See, e.g., Mattel's Objections and Second Supplemental Responses to Bryant's First Set of Interrogatories., No. 3, p. 89-128. Mattel also has vaguely asserted that Mr. Bryant may have "borrowed" from some Mattel product ideas in developing the Bratz idea. However, Mattel has asserted no claims against Mr. Bryant for trade secret misappropriation or copyright infringement with

12

EXHIBIT 60
PAGE 2095

Highly Confidential – Attorney's Eyes Only

- Pitching and ultimately assigning the Bratz idea to MGA while employed by Mattel;

- Using Mattel personnel and resources to make a "dummy" to assist him during the pitch of the Bratz idea;

- Obtaining, through his employment at Mattel, the identity of a Mattel hair vendor that Bryant then contacted to assist in the development of the Bratz doll line;

- Identifying individuals that he knew as a consequence of his Mattel employment to MGA and enlisting those individuals to work on Bratz;

- Working on a "test project" for MGA during the term of his employment for Mattel;

- Using Mattel resources (i.e., a fax machine or telephones) in connection with his agreement with MGA;

- Receiving monetary payments and other benefits from MGA while employed by Mattel.

37.   It is my understanding that, as a result of these acts, Mattel is seeking damages pursuant to the following claims:

- Breach of the duty of loyalty,

- Breach of contract,

- Breach of fiduciary duty,

- Conversion,

- Unfair competition under Cal. Bus. & Prof. Code § 17200, and

- Copyright infringement.

38.   For Mattel's claim for breach of duty of loyalty, I understand that one measure of damages for such a claim is a measure of the profits gained by Carter

---

respect to such ideas or products, and hence does not appear to place a value on any such vague allegation.

13

**EXHIBIT 60**
**PAGE 2096**

Highly Confidential – Attorney's Eyes Only

Bryant during the time that his employment with Mattel overlapped with the period he
allegedly worked with MGA. A review of the interrogatory responses from Carter
Bryant in this case reveals that the only payments Carter Bryant received from MGA
during the time that he was employed by Mattel were in the amounts of $162.38,
$1,031.23 and $5,500.00. The interrogatory responses also state that only the $162.38
amount constituted payment for work or services relating to dolls or toys that Bryant
performed for MGA during his employment with Mattel.[44] However, because his
contract with MGA was dated[45] September 18, 2000[46] granting him $5,500 per month
for the first six months and because he didn't leave Mattel until October 19, 2000,[47]
Mattel may be arguing that the $5,500 was for work done while Carter Bryant was still
employed by Mattel. Therefore, I have used all amounts paid by MGA to Carter Bryant
prior to his departure from Mattel as damages should Carter Bryant be found to have
breached his duty of loyalty. This amounts to $6,693.61.

39.  To the extent that Mattel is seeking damages for breach of duty of loyalty
on the basis of salary paid by Mattel to Carter Bryant during a time period that he was
allegedly working with MGA, that amount by definition cannot exceed his salary of
approximately $25,000 for that period (see discussion below). Further, to the extent
that Mattel is seeking damages for breach of duty of loyalty on the basis of Mr.
Bryant's allegedly wrongful "taking" from Mattel of the original Bratz idea or sketches
and assigning them to MGA, the value of that harm cannot exceed $79,337 to $911,922
for the reasons set forth above in paragraphs 32-35.

40.  For the breach of contract claim, I understand that Mattel is entitled to
seek recovery of the amount that would compensate Mattel for any harm directly
caused by the alleged breach, i.e., an amount that would place Mattel in the same

---

[44]  Bryant's Supplemental Responses to Mattel's First Set of Interrogatories., No. 1, p. 6.
[45]  I understand that the contract was not signed until October 4, 2000. Deposition of Carter Bryant, Nov.
4, 2004, p. 190.
[46]  BRYANT 00794 – 99.
[47]  M 0001604.

14

**EXHIBIT 60
PAGE 2097**

Highly Confidential – Attorney's Eyes Only

position it would have been in had Carter Bryant fully performed his obligations. It is also my understanding that these damages must be reasonably foreseeable and cannot exceed the benefit Mattel would have received had the contract been performed.

41. In this case, Mattel claims that Carter Bryant breached the Employment Agreement by:

- Failing to assign to Mattel (and instead assigning to MGA) his Bratz-related ideas and drawings;

- Spending an undefined amount of time working on his Bratz-related ideas while employed by Mattel; and

- Using certain Mattel resources (including a doll head used in the construction of the pitch "dummy," some small amount of time by a Mattel face painter and hair rooter who assisted in the construction of the dummy, information concerning the identity of a Mattel hair vendor, the use of Mattel's fax machine to send an executed agreement to MGA, and the identities of several individuals that Carter Bryant knew through his Mattel employment who were enlisted to work on the Bratz project) while empoyed by Mattel in order to pursue his Bratz-related ideas.

42. Even assuming that all of these breaches occurred (which, again, I understand is disputed), the damages to Mattel would be minimal. This is because the Bratz doll line was not simply the inevitable outgrowth of the original sketches developed by Carter Bryant – it was the product of a team of people working together to create a set of three-dimensional dolls inspired by two-dimensional sketches and then imbuing those dolls with personality, story, packaging and branding. While I have no experience developing a new doll product, I do have experience with creating new

15

EXHIBIT 60
PAGE 2098

Highly Confidential – Attorney's Eyes Only

products. In my personal experience, it takes numerous factors[48] (many discussed in the report submitted by Robert Tonner), including a well-functioning, complete team to create a saleable product from an initial idea.

43. More importantly, however, I have seen no evidence that Mattel would ever have developed the Bratz doll line from Carter Bryant's initial sketches and ideas. To the contrary, there is ample evidence that the Bratz line would never have flourished at Mattel.[49] Indeed, some of the most compelling evidence to me is the lack of success at Mattel with the Flava dolls. These dolls, apparently intended by Mattel to compete with Bratz in the market for a multiethnic doll line were unable to compete with Bratz and ultimately failed as a result of Mattel's inability to combine the right elements of style, marketing, branding and appearance that was needed to capture the energy and imagination of the consumers.

44. The lack of success with the Flava dolls appears to be symptomatic of other constraints at Mattel. There is evidence that at the time of Carter Bryant's departure, the Barbie franchise was aggressively protected by Mattel and Mattel would not have sought to introduce a new fashion doll that could "knock Barbie off her pedestal."[50] I also note that Mr. Tonner's report discusses the fact that the Harry Potter dolls were not successful at Mattel, but were successful at his company. This is further

---

[48] In the economics literature, these are known as "complementary assets." See, Teece, D., *Profiting from technological innovation: Implications for integration, collaboration, licensing and public policy*, Research Policy 15 (1986), pp. 285-305.

[49] Decl. of Jason D. Russell in Support of MGA Parties' Motion for Partial Summary Judgment, Ex. 38 (March 5, 2001 e-mail from Mateo Romano of Mattel to Martin Hitch, MGA's VP of International Sales, declining to license BRATZ); "Dolled Up To Lure Older Girls Mattel Brings In Flip-Hop Crowd," The Wall Street Journal, July 18, 2003 (observing that Mattel has strict quotas for marketing "flanker brands," i.e. dolls lines that compete with Barbie); *Expert Report of Robert Tonner*, February · 11, 2008, p. 16.

[50] Decl. of Jason D. Russell in Support of MGA Parties' Motion for Partial Summary Judgment, Ex. 38 (March 6, 2001 e-mail from Mateo Romano of Mattel to Martin Hitch, MGA's VP of International Sales, declining to license BRATZ); "Dolled Up To Lure Older Girls Mattel Brings In Flip-Hop Crowd," The Wall Street Journal, July 18, 2003 (observing that Mattel has strict quotas for marketing "flanker brands," i.e. dolls lines that compete with Barbie and quoting Mattel executive as acknowledging that Mattel had put Barbie "on a pedestal"); Expert Report of Robert Tonner, February 11, 2008, p. 16.

16

EXHIBIT 60
PAGE 2099

Highly Confidential – Attorney's Eyes Only

illustration of the fact that a successful doll requires far more than just an idea or even a fully developed character.

45. Thus, had Carter Bryant assigned all his Bratz-related ideas and drawings to Mattel, doing so would likely have resulted in no profits to Mattel – hence resulting in no damages for breach of contract. Moreover, even if one assumes, contrary to the evidence in the case, that Mattel would itself have developed the successful Bratz doll line as a result of the assignment of Carter Bryant's original idea and sketches to Mattel, the value of that assigned property at the time of assignment would only be $79,337 (or a maximum of $911,922) as discussed above.

46. As for the other alleged breaches of contract, Mattel seems to be arguing that Carter Bryant was somehow working less than he should have for Mattel during the last few months of employment when the Bratz idea was being pitched and then pursued by MGA. Yet Mattel and Mr. Wagner have identified no damages (in the form of unearned salary payments) resulting from alleged but unidentified work responsibilities that Carter Bryant should have but didn't perform during the time period that he was in contact with MGA prior to leaving Mattel.

47. In this case there is contradictory testimony about the date that Carter Bryant first started doing work for MGA. Those dates range from June of 2000[51] to October 4, 2000.[52] For the purposes of this calculation only, I am assuming that Carter Bryant began working with MGA on the date claimed by Mattel, i.e., June 1, 2000, and terminated his employment with Mattel on October 19, 2000.[53]

48. Even assuming for sake of argument (again, this is a disputed allegation) that Carter Bryant did not perform any of his Mattel work responsibilities for the entire period from June 1 through October 19, 2000, Mattel only lost out on the

---

[51]  Mattel, Inc's Objections and Second Supplemental Responses to Defendant's First Set of Interrogatories, Numbers 1-14, p. 12.
[52]  Deposition of Carter Bryant, November 4, 2004, p. 43.
[53]  M 0001604.

17

EXHIBIT 60
PAGE 2100

Highly Confidential – Attorney's Eyes Only

approximately five months of work that Carter Bryant allegedly did not perform –
totaling approximately $25,000 in salary.[54]

49.   Furthermore, the minimal value of the items that Mattel claims that Carter
Bryant allegedly used in contradiction of his employment contract (e.g., a doll head in a
trash bin, a small amount of time of other Mattel employees allegedly used to prepare
the pitch "dummy," the use of a fax machine, etc.) is *de minimis* and in any event is far
less than a placeholder amount of $2,000.[55]

50.   Accordingly, in total, damages for breach of contract cannot exceed a
range of $2,000 to $911,922. This calculated amount overstates Mattel's true damages
for the reasons stated above, as well as because:

- it uses Mattel's alleged start date of Mr. Bryant's work with MGA;
- it assumes that Carter Bryant simply failed to perform any of his work
  responsibilities for Mattel during this time;
- it is overly generous to Mattel in assigning value to the Mattel resources
  allegedly used by Mr. Bryant; and
- it assumes, contrary to evidence, that the Bratz idea and sketches would
  have had some value to Mattel.

51.   As for the fiduciary duty claim, it is my understanding that the law only
permits damages that would compensate Mattel for harm caused, or for the benefit
Mattel would have received had the breach not occurred, but Mattel cannot be placed in
a better position than it would have been had there been no breach. Therefore, in this
case the analysis of the maximum value of potential forms of recovery under this claim
is the same as for the claim for breach of contract. The analysis is therefore
incorporated here by reference instead of repeating it in total here.

---

[54]   M 0001613 – 14.
[55]   I reserve the right to update this value should Mattel provide actual valuations of the allegedly misused
Mattel resources.

18

EXHIBIT 60
PAGE 2101

Highly Confidential – Attorney's Eyes Only

52. As for the claim for copyright infringement, I understand that Mattel's damages claim against Carter Bryant would be limited to Mr. Bryant's profits (as Mattel has put forth no damages claim based on Mattel's actual damages), and that any damages claim based on profits must be apportioned so as to deduct elements of profit attributable to factors other than the copyrighted work. As discussed above, that amount is no greater than the range of $79,337 to $911,922 (equivalent to an apportionment percentage of .22% to 2.5% of the amounts paid to Mr. Bryant).

53. As for the other remaining claims asserted by Mattel (i.e., conversion and unfair competition), it is my understanding that any recovery available under such claims would be limited to the forms of relief discussed above (e.g., the value of the allegedly converted property, or restitution of the amount allegedly taken from Mattel). Pursuant to the above analysis, those amounts cannot exceed $2,000 to $911,922. .

5. **SIGNATURE**

54. I certify that, to the best of my knowledge and belief:

- The statements of fact in this report are true and correct.
- The reported analyses, opinions and conclusions are limited only by the reported assumptions and are my personal, unbiased and professional analyses, opinions and conclusions.
- I have no personal interest or bias with respect to the parties involved.
- My compensation is not contingent on an action or event resulting from the analyses, conclusions or opinions of this report.

Douglas G. Kidder                                     March 17, 2008

19

EXHIBIT 60
PAGE 2102

# EXHIBIT 1

**EXHIBIT 60**
**PAGE 2103**

Exhibit 1

# Douglas G. Kidder

510.923.0623 (office)
510.558.0325 (home)
dkidder@oskr.com

CURRENT EMPLOYMENT

| | | |
|---|---|---|
| 2008- Present | **Managing Partner** | **OSKR, LLC.** |

Co-founder of a consulting firm focused on intellectual property (IP) and antitrust complex damages issues.

| | | |
|---|---|---|
| 2001 - 2007 | **Principal** | **LECG, LLC.** |
| 1997 – 1999 | | |

Consulted for clients on intellectual property (IP) and complex damages issues with a particular focus on technology companies. Significant experience with semiconductor and software technologies. Assignments included:

- Consulting expert for a biotechnology company to determine reasonable license structures for various microarray patent licenses. (Multiple assignments.)
- Consulting expert for a venture capital firm on possible antitrust violations leading to the failure of a portfolio company.
- Testifying at arbitration on the value of an ATM patent, trademark and copyright portfolio.
- Advising a technology company on the value of patents and an appropriate royalty rate for an IP holding company.
- Valuing a portfolio of VCSEL patents for W.L. Gore & Associates for donation to the University of California.
- Determining the value of a most-favored-licensee provision in a biotechnology patent license.
- Reviewing a proposed PC software protocol license for reasonableness for the Department of Justice.
- Consulting with a technology (hardware) manufacturer on an appropriate structure for a patent license under "Reasonable and Non Discriminatory" (RAND) terms.
- Consulting expert for Cadence in the Cadence v. Avant! theft of trade secrets matter.

| | | | |
|---|---|---|---|
| 2005 | **Office Director** | **LECG** | **Emeryville, CA** |

Responsible for the operations of a 90-person office including reviews, hiring, firing, promotions, morale and general administration.

| | | | |
|---|---|---|---|
| 2001 - 2008 | **Special Assistant to the Chairman, Strategy** | **LECG** | |

Advised the Chairman on corporate acquisitions and general strategic direction.

| | | | |
|---|---|---|---|
| 2001 - Present | **President** | **MAAS BOAT COMPANY** | **Richmond, CA** |

Own and manage a company that manufactures and sells open water rowing shells in the U.S. and around the world. Primary responsibilities are marketing, finance and product design, www.maasboats.com

| | | | |
|---|---|---|---|
| 2004 – Present | **President** | **KIDDER RACING** | **Richmond, CA** |

Developed design brief for an innovative single-handed sailing skiff. Recruited design team, founded company and have responsibility for final design, strategy, marketing and finance. Extensive product testing is also involved. Expected product launch in Summer 2008.

| | | | |
|---|---|---|---|
| 2004 – Present | **Director** | **I-CAP PARTNERS** | **Emeryville, CA** |

US director of this New Zealand based venture capital fund. Review potential technology investments on an *ad hoc* basis.

1

**EXHIBIT 60
PAGE 2104**

Exhibit 1

**Prior Experience**

| 2000 – 2001 | Managing Director | SCIENT | San Francisco, CA |
|---|---|---|---|
| | Joined corporate strategy group to help design and implement a turn-around for this Internet consulting firm. Responsible for company organizational transition. | | |
| 1999 – 2000 | VP Operations | KENAMEA | San Francisco, CA |
| | Helped develop strategy and business plan for an Internet software startup. Managed all operations of the company as we grew from 4 to 25 people. | | |
| 1996 – 1997 | Principal | MANAGEMENT RESOURCES | Berkeley, CA |
| | Independent consultant performing due diligence and analyses of startup business opportunities. | | |
| 1995 – 1996 | Vice President Business Development | WALT DISNEY IMAGINEERING | Glendale, CA |
| | Evaluated new business ideas for WDI including creative concepts and technology initiatives. | | |
| 1993 – 1995 | Director | VALSPAR | Chicago, IL |
| | Managed the production planning, distribution and I/T functions for the $200 million Consumer Paint Division. | | |
| 1987 – 1993 | Senior Associate Associate Analyst | BOOZ, ALLEN | San Francisco, CA |
| 1984 – 1986 | Lecturer | UC BERKELEY | Berkeley, CA |
| 1986 | Chief Engineer | WINDWARD YACHTS | Oakland, CA |

**EDUCATION**

| 1986 | M.Sc. Naval Architecture, University of California at Berkeley |
|---|---|
| 1983 | B.A. with Honors in Mathematics and English, Amherst College |

| **PUBLICATIONS & PRESENTATIONS** | Kidder, D. (coauthor), "Are Patents Really Options?", *les Nouvelles Journal of the Licensing Executives Society*, V. 38(4), December 2003. "Most Favored Licensee Clauses: Draining the Swamp" presentation at *Advanced Topics in IP Valuation* to the Intellectual Property Society, July 2004. |
|---|---|
| **BOARD POSITIONS** | Skyflow Inc. (former), NextWindow, Hero Arts (Advisory Board), Trade New Zealand (Advisory Board, former), Berkeley Rowing Club (former) |
| **OTHER** | Member of the Licensing Executives Society |
| | Booz, Allen & Hamilton Professional Excellence Award |
| | Outstanding Graduate Student Instructor Award |
| | Significant experience with investment valuation for technology companies. |

EXHIBIT 60
PAGE 2105

Exhibit I

**Litigation Experience**

Ossur Holdings Inc. and Generation II USA, Inc., v. Bellacure, Inc., Shane Sterling and Maurice Cannon. Before United States District Court, Western District of Washington at Seattle. Civil Action No: 05-CV-01552-CMP; retained by counsel for plaintiffs, re: lost profits and unjust enrichment due to alleged theft of trade secrets in the medical device industry (osteoarthritis knee braces).

Comcast Cable Communications Corporations, LLC v. Finisar Corporation. Before United States District Court, Northern District of California, San Francisco Division. Civil Action No: C 06-04206-WHA; retained by counsel for plaintiffs re: reasonable royalty due to alleged patent infringement in cable television.

3

EXHIBIT 60
PAGE 2106

# EXHIBIT 2

**EXHIBIT 60**
**PAGE 2107**

Expert Report of Douglas Kidder
March 17, 2008

## Exhibit 2: Documents Considered

| LEGAL: | DATE |
|---|---|
| Amended Answer and Affirmative Defenses of MGA, MGA (HK), and MGA De Mexico S.R.L. De C.V. to Mattel's Second Amended Answers and Counterclaims. | September 19, 2007 |
| Bryant's Objections and Responses to Mattel's Supplemental Interrogatories. | February 8, 2008 |
| Bryant's Responses to Mattel's Amended Supplemental Interrogatory re Affirmative Defenses. | January 7, 2008 |
| Bryant's Second Amended Reply to Mattel's Counterclaims. | October 16, 2007 |
| Bryant's Second Supplemental Responses to Mattel's Fifth Set of Interrogatories. | January 28, 2008 |
| Bryant's Second Supplemental Responses to Mattel's Revised Fourth Set of Interrogatories. | January 28, 2008 |
| Bryant's Second Supplemental Responses to Mattel's Revised Third Set of Interrogatories. | January 28, 2008 |
| Bryant's Second Supplemental Responses to Mattel's Sixth Set of Interrogatories. | January 28, 2008 |
| Bryant's Supplemental Responses to Mattel's First Set of Interrogatories. | January 28, 2008 |
| Bryant's Supplemental Responses to Mattel's Second Set of Interrogatories. | January 28, 2008 |
| Bryant's Supplemental Responses to Mattel's Seventh Set of Interrogatories. | December 17, 2007 |
| Declaration of Jason D. Russell in Support of MGA Parties' Motion for Partial Summary Judgement. | March 7, 2008 |
| Mattel's Second Amended Answers and Counterclaims. | July 12, 2007 |
| Mattel's Objections and Second Supplemental Responses to Defendants First Set of Interrogatories, Nos. 1-14. | December 14, 2007 |
| Mattel's Supplemental Responses to Bryant's Second Set Interrogatories. | March 4, 2008 |
| Mattel's Supplemental Responses to MGA's First Set of Interrogatories. | December 7, 2007 |
| MGA's Complaint Against Mattel. | April 13, 2005 |
| MGA De Mexico S.R.L. De C.V.'s Fourth Supplemental Reponses to Mattel's Amended Fourth Set of Interrogatories, Nos. 43-44. | March 3, 2008 |
| MGA De Mexico S.R.L. De C.V.'s Fourth Supplemental Reponses to Mattel's Revised Third Set of Interrogatories, Nos. 38, 40, and 41. | March 3, 2008 |
| MGA De Mexico S.R.L. De C.V.'s Objections and Responses to Mattel's Seventh set of Interrogatories. | November 26, 2007 |
| MGA De Mexico S.R.L. De C.V.'s Objections and Responses to Mattel's Sixth set of Interrogatories. | November 26, 2007 |
| MGA De Mexico S.R.L. De C.V.'s Supplemental Reponses to Mattel's Fifth Set of Interrogatories, No. 47. | March 3, 2008 |
| MGA's (HK) Fourth Supplemental Responses to Mattel's Amended Fourth Set of Interrogatories, Nos. 43-44. | March 3, 2008 |
| MGA's (HK) Supplemental Responses to Mattel's Fifth Set of Interrogatories, No. 47. | March 3, 2008 |
| MGA's (HK) Fourth Supplemental Responses to Mattel's Revised Third Set of Interrogatories, Nos. 38, 40, and 41. | March 3, 2008 |
| MGA's (HK) Objections and Responses to Mattel's Seventh Set of Interrogatories. | November 26, 2007 |
| MGA's (HK) Objections and Responses to Mattel's Sixth Set of Interrogatories. | November 26, 2007 |
| MGA's Fourth Supplemental Responses to Mattel's First Set of Interrogatories re Unfair Competition, No. 1. | July 31, 2007 |
| MGA's Fourth Supplemental Responses to Mattel's Revised Third Set of Interrogatories, Nos. 38, 40, and 41. | March 3, 2008 |
| MGA's Fourth Supplemental Responses to Mattel's Second Set of Interrogatories. | November 30, 2007 |
| MGA's Objections and Responses to Mattel's Sixth Set of Interrogatories. | November 26, 2007 |
| MGA's Objections and Responses to Mattel's Supplemental Set of Interrogatories. | November 19, 2007 |
| MGA's Response to Mattel's Amended Supplemental Interrogatory re Defs' Affirmative Defenses. | January 7, 2008 |
| MGA's Responses to Mattel's First Set of Interrogatories. | January 27, 2005 |
| MGA's Supplemental Responses to Mattel's Fifth Set of Interrogatories, No. 47 | March 3, 2008 |
| MGA's Supplemental Responses to Mattel's Seventh Set of Interrogatories. | November 30, 2007 |
| MGA's Third Supplemental Responses to Mattel's Revised Third Set of Interrogatories . | January 28, 2008 |
| Stipulation Re: Expert Discovery for Phase 1. | February 25, 2008 |

| DEPOSITIONS | DATE |
|---|---|
| Anna Rhee | February 3, 2005 |
| Anne Wang | January 28, 2004 |
| Carter Bryant - Volume 4 | January 23, 2008 |
| Carter Bryant - Volume 5 | January 24, 2008 |
| Carter Bryant with Exhibits - Volume 1 | November 4, 2004 |
| Carter Bryant with Exhibits - Volume 2 | November 5, 2004 |
| Carter Bryant with Exhibits - Volume 3 | November 8, 2004 |
| David Rosenbaum | January 25, 2003 |
| Isaac Larian | July 18, 2006 |

| EXPERT REPORTS | DATE |
|---|---|
| Expert Report of Bruce L. Stein | February 11, 2008 |
| Expert Report of Carol A. Scott with Exhibits | February 11, 2008 |
| Expert Report of Debora Middleton with Exhibits | February 8, 2008 |
| Expert Report of Dr. Erich Joachimsthaler | February 11, 2008 |
| Expert Report of Lee Loetz with Exhibits | February 11, 2008 |
| Expert Report of Mary Bergstein with Exhibits | February 11, 2008 |
| Expert Report of Michael J. Wagner with Exhibits | February 11, 2008 |
| Expert Report of Paul K. Meyer | February 11, 2008 |
| Expert Report of Peter S. Menell with Exhibits | February 10, 2008 |
| Expert Report of Robert Tonner | February 11, 2008 |

Highly Confidential - Attorney's Eyes Only

1

**EXHIBIT 60
PAGE 2108**

#### WEBSITES

http://www.mattel.com/about_us/history/default.asp
http://www.mgae.com/international.asp
http://web.archive.org/web/20000408153741/mgae.com/about.htm
http://web.archive.org/web/20000229132238/www.mgae.com/about.htm
http://www.bratz.com/
http://www.shareholder.com/mattel/default.cfm.
http://www.shareholder.com/mattel/news/20030729-115032.cfm

#### FINANCIAL FILINGS AND REPORTS

Mattel, Inc., Form 10-K, For the fiscal year ended December 31, 2007
Mattel, Inc. 1998 Annual Report
Mattel, Inc. 2002 Annual Report
Mattel, Inc. 2003 Annual Report
Mattel, Inc. 2006 Annual Report

#### PRESS RELEASES AND ARTICLES

Abigail Goldman, "Bratz Dolls' Little Sisters to Challenge Barbie," Los Angeles Times, December 4, 2003.
Abigail Goldman, "Bratz Maker Has the Holidays Wrapped Up; Upstart MGA Entertainment has created a sensation, but can it endure?" Los Angeles Times, December 25, 2003.
Anne D'Innocenzio, "Barbie gets hipper, trendier to fight the competition," The Associated Press, November 22, 2002.
Mattel Press Release, July 29, 2003.
Maureen Tkacik, "Dolled Up: To Lure Older Girls, Mattel Brings in Hip-Hop Crowd," Wall Street Journal, July 18, 2002.
MGA Press Release, January 7, 2004.
MGA Press Release, February 11, 2004.
MGA Press Release, February 17, 2003.
MGA Press Release, January 9, 2007.
"My Scene and Limited Too Team up for the Ultimate Tween Power Play," Mattel Press Release, June 10, 2003.
"New Look, New Approach, New Product Lines Reinforce Barbie® Doll's Reign As The #1 Girls Brand in the World," Mattel Press Release, February 5, 2004.
Ruth La Ferla, "Underdressed and Hot: Dolls Moms Don't Love," NY Times, October 26, 2003.

#### OTHER

Royalty statements produced by Carter Bryant, including those in Exhibit A of the Second Supplemental Decl. of John Trinidad in Support of Bryant's Motion to Quash Mattel Inc.'s Subpoena Issued to Peoples Bank of the Ozarks or in the Alternative for Protective Order.
Teece, David, Profiting from technological innovation: Implications for integration, collaboration, licensing and public policy , Research Policy 15 (1986).

Highly Confidential - Attorney's Eyes Only

2

EXHIBIT 60
PAGE 2109

# EXHIBIT 3

**EXHIBIT 60**
**PAGE 2110**

Expert Report of Douglas Kidder
March 17, 2008

## Exhibit 3

| SKU | C | Bratz Product | 6/30/2001 | 9/30/2001 | 12/31/2001 | 3/31/2002 | 6/30/2002 | 9/30/2002 | 12/31/2002 | 3/31/2003 | 6/30/2003 | 9/30/2003 | 12/31/2003 | 3/31/2004 | 6/30/2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 248521 | | Cloe | 15,237.63 | 2,511.96 | 6,252.62 | 48,419.88 | -196.67 | -5.56 | 5.35 | 66.74 | | | | | |
| 248538 | | Cloe | 6,498.26 | 97,721.48 | 165,397.70 | 12,273.90 | -65.45 | 0.54 | 4.65 | -1.01 | -0.69 | -3.03 | -1.71 | | 0.41 |
| 248545 | | Jade | 8,307.38 | 35,826.05 | 62,067.37 | 4,670.70 | -108.36 | 0.77 | 6.12 | 38.86 | | | | | |
| 248552 | | Sasha | 8,920.24 | 22,023.69 | 39,743.93 | 25,110.57 | -93.89 | 1.11 | 14.19 | 0.36 | | | | | |
| 248559 | | Yasmin | | 52,088.46 | 98,205.44 | | 33,467.45 | 87,169.86 | 55,962.03 | 19,219.23 | 6.16 | -0.04 | 0.15 | | |
| 249115 | | Bratz Fashion Pack Asst. | | | | | | | | | | | | | |
| | | **TOTAL** | $38,964 | $116,678 | $371,777 | $90,475 | $33,223 | $87,158 | $55,971 | $19,325 | $5 | -$1 | -$2 | $0 | $0 |

| SKU | C | Bratz Product | 9/30/2004 | 12/31/2004 | 3/31/2005 | 6/30/2005 | 9/30/2005 | 12/31/2005 | 3/31/2006 | 6/30/2006 | 9/30/2006 | 12/31/2006 | 3/31/2007 | 6/30/2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 248521 | | Cloe | | -0.30 | | 1.80 | 0.17 | | | 44.23 | | | | 2.33 |
| 248538 | | Cloe | | | | 0.30 | | | | | 0.53 | | | |
| 248545 | | Jade | | | | | | 265.34 | | 25.94 | 0.59 | | | 1.37 |
| 248552 | | Sasha | | | | | | | | | 0.13 | | | |
| 248559 | | Yasmin | | | | | | 123.60 | | | | | | |
| 249115 | | Bratz Fashion Pack Asst. | 0.07 | 144.03 | | 2,845.34 | 4.96 | 89.91 | | | | | | |
| | | **TOTAL** | $0 | $144 | $0 | $2,848 | $5 | $480 | $0 | $70 | $1 | $0 | $0 | $4 |

| SKU | Bratz Product | TOTAL |
|---|---|---|
| 248521 | Cloe | 9,074.58 |
| 248538 | Cloe | 326,693.87 |
| 248545 | Jade | 117,671.70 |
| 248552 | Sasha | 74,715.47 |
| 248559 | Yasmin | 184,469.92 |
| 249115 | Bratz Fashion Pack Asst. | 190,058.21 |
| | | **$911,921.75** |

Notes: SKU for Sasha in 12/31/02 is 248552. I assume this to be 248552.
SKU 248521 includes Cloe only.
Royalty Statements for quarter ending 3/31/2003 was not provided.

Sources: BRYANT 009877; BRYANT3 001944; BRYANT3 002712; BRYANT3 002731; BRYANT3 002716; BRYANT3 002741; BRYANT3 003496; BRYANT3 003506; BRYANT3 003516; BRYANT3 003624; BRYANT3 003637; BRYANT3 003640; BRYANT3 003441; BRYANT3 003445; BRYANT3 003461; BRYANT 003441; BRYANT 12042; BRYANT 12041; BRYANT 12015; BRYANT3 12045; BRYANT3 12057; BRYANT3 12116; BRYANT3 12117; BRYANT3 11124.

Highly Confidential - Attorney's Eyes Only

EXHIBIT 60
PAGE 2111

Expert Report of Douglas Kidder
March 17, 2006

## Exhibit 3.1

| SKU[1] | Bratz Product | 6/30/2001 | 9/30/2001 | 12/31/2001 | 3/31/2002 | 6/30/2002 | 9/30/2002 | 12/31/2002 | 3/31/2003 | 6/30/2003 | 9/30/2003 | 12/31/2003 | 3/31/2004 | 6/30/2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 248521 | Cloe / Bratz 02 Fall Asst. | 15,237.63 | 2,811.96 | 6,292.62 | 48,419.88 | 186,923.18 | 567,652.28 | 547,093.00 | 167,289.43 | 16,480.24 | | | | |
| 248538 | Cloe | | 97,721.48 | 165,397.70 | 72,273.90 | -196.67 | -5.56 | 5.35 | 68.74 | | -0.69 | -0.60 | | |
| 248545 | Jade | 6,488.26 | 35,856.05 | 63,067.37 | -4,670.73 | -65.45 | 0.54 | 4.65 | -1.01 | | -1.03 | -1.71 | | |
| 248552 | Sasha | 8,307.24 | 22,022.69 | 39,743.91 | 25,110.57 | -109.86 | 0.77 | 6.12 | 38.86 | | | | | |
| 248569 | Yasmin | 8,250.34 | 52,083.46 | 98,305.44 | | -93.89 | 1.11 | 14.19 | | -0.69 | -0.04 | 0.15 | | |
| 249115 | Bratz Fashion Pack Asst. | | | | | 33,687.45 | 87,160.56 | 55,940.65 | 15,218.22 | 6.16 | | | 0.41 | |
| **TOTAL** | | $38,564 | $210,476 | $372,777 | $90,475 | $220,047 | $654,810 | $605,054 | $186,613 | $16,486 | -$1 | -$2 | $0 | $0 |

| SKU | Bratz Product | 9/30/2004 | 12/31/2004 | 3/31/2005[2] | 6/30/2005 | 9/30/2005 | 12/31/2005 | 3/31/2006 | 6/30/2006 | 9/30/2006 | 12/31/2006 | 3/31/2007 | 6/30/2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 248521 | Cloe / Bratz 02 Fall Asst. | | | | | | | | | | | | |
| 248538 | Cloe | | -0.30 | | 1.80 | 0.17 | 266.34 | | 44.23 | 0.58 | | | 2.33 |
| 248545 | Jade | | | | 0.30 | | | | 25.94 | 0.59 | | | 1.57 |
| 248552 | Sasha | | | | | | 123.60 | | | 0.13 | | | |
| 248569 | Yasmin | 0.07 | | | 0.30 | | 89.91 | | | | | | |
| 249115 | Bratz Fashion Pack Asst. | | 144.08 | | 2,845.24 | 4.96 | | | | | | | |
| **TOTAL** | | $0 | $144 | $0 | $2,849 | $5 | $480 | $0 | $70 | $1 | $0 | $0 | $4 |

| SKU | Bratz Product | TOTAL |
|---|---|---|
| 248521 | Cloe / Bratz 02 Fall Asst. | 1,494,403.31 |
| 248538 | Cloe | 336,691.87 |
| 248545 | Jade | 117,871.70 |
| 248552 | Sasha | 74,715.47 |
| 248569 | Yasmin | 184,469.92 |
| 249115 | Bratz Fashion Pack Asst. | 199,098.21 |
| **TOTAL** | | **$2,397,250.08** |

Notes:
[1] SKU for Sasha in 12/31/01 is 248552. I assume this to be 248552.
SKU 248551 included both Cloe and Sasha 02 Fall Asst.
[2] Royalty Statement for quarter ending 3/31/2003 was not provided.

Sources: BRYANT 003879, BRYANT 003896, BRYANT 003771, BRYANT 003736, BRYANT 003761, BRYANT 003766, BRYANT 003440, BRYANT 03450, BRYANT 03454, BRYANT 03465, BRYANT 03440; BRYANT 00949, BRYANT 00051, BRYANT 00061, BRYANT 00951, BRYANT 03959, BRYANT 00296, BRYANT 03040, BRYANT 13040, BRYANT 12116, BRYANT 11323, BRYANT 11323, BRYANT 12214.

Highly Confidential – Attorney's Eyes Only

EXHIBIT 60
PAGE 2112

**EXHIBIT 61**



CALENDARED
RECEIVED

FEB 1 3 2008

1   KEKER & VAN NEST, LLP
    JOHN W. KEKER - #49092
2   jkeker@kvn.com
    MICHAEL H. PAGE - #154913
3   mpage@kvn.com
    CHRISTA M. ANDERSON - #184325
4   canderson@kvn.com
    MATTHEW M. WERDEGAR - #200470
5   mwerdegar@kvn.com
    JOHN E. TRINIDAD - #250468
6   jtrinidad@kvn.com
    AUDREY WALTON-HADLOCK- #250574
7   awaltonhadlock@kvn.com
    710 Sansome Street
8   San Francisco, CA 94111-1704
    Telephone: (415) 391-5400
9   Facsimile: (415) 397-7188

10  Attorneys for Plaintiff
    CARTER BRYANT

11

12              UNITED STATES DISTRICT COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14                    EASTERN DIVISION

15

16  CARTER BRYANT, an individual,        Case No. CV 04-09049 SGL (RNBx)
                                         (consolidated with CV 04-9059 & 05-
17                  Plaintiff,           2727

18      v.                               CARTER BRYANT'S NOTICE OF
                                         EXPERT DISCLOSURES
19  MATTEL, INC. a Delaware              PURSUANT TO FED. R. CIV. P. 26
    Corporation,
20

21                  Defendant.

22  CONSOLIDATED WITH MATTEL,            Date Comp. Filed: April 13, 2005
    INC., v. BRYANT and MGA
23  ENTERTAINMENT, INC. v.               Discovery Cut-Off: Jan. 28, 2008
    MATTEL, INC.                         Pre-Trial Conference: May 5, 2008
24                                       Trial Date: May 27, 2008

25

26

27

28
                        2-11-08
            CARTER BRYANT'S NOTICE OF EXPERT DISCLOSURES
                 PURSUANT TO FED. R. CIV. P. 26
410489.02        CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT 61
PAGE 2113

1    Pursuant to Rule 26 of the Federal Rules of Civil Procedure, Carter Bryant

2  hereby discloses the following expert witnesses, as Bryant may offer these expert

3  witnesses at trial to present evidence under Federal Rules of Evidence 702, 703,

4  and/or 705.

5

6      Professor Mary Bergstein, Ph.D.
       Division of Liberal Arts
7      Rhode Island School of Design

8
       D. Jan Duffy
9      Management Practices Group

10
       Erich Joachimsthaler, Ph.D.
11     Vivaldi Partners

12
       Professor Peter Menell
13     Professor of Law
14     U.C. Berkeley - Boalt Hall School of Law

15     Paul K. Meyer
16     Navigant Consulting

17     Debora Middleton
       Director of Creative Development
18     MGA Entertainment, Inc.

19
       Christina Tomiyama
20

21     Robert Tonner
       Tonner Doll Co.
22

23     The initial written reports of each of the foregoing expert witnesses

24  accompanying this disclosure are being concurrently served on Mattel's counsel by

25  MGA Entertainment, Inc.

26     Carter Bryant reserves the right to present evidence at trial through any

27  expert disclosed by any other party, without waiving any objections thereto. Mr.

28  Bryant also reserves the right to name additional rebuttal experts. Additionally,

1

410489.02

**EXHIBIT 61
PAGE 2114**

1 | should other parties be permitted to identify any additional experts, Mr. Bryant

2 | further reserves the right to notice further experts for the purpose of rebutting the

3 | evidence presented by said additional experts. Finally, Mr. Bryant reserves the

4 | right to identify additional experts as permitted by the Court.

5

6 | Dated: February 11, 2008                    KEKER & VAN NEST, LLP

7

8                                         By: _____

9                                              MATTHEW M. WERDEGAR
                                               Attorneys for Plaintiff
10                                             CARTER BRYANT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

410489.02

EXHIBIT 61
PAGE 2115

1

PROOF OF SERVICE

2

3   I am employed in the City and County of San Francisco, State of California in the office of a member of the bar of this court at whose direction the following service was made. I am over the age of eighteen years and not a party to the within action. My business address is Keker & Van Nest, LLP, 710 Sansome Street, San Francisco, California 94111.

4

5

6   On February 11, 2008, I served the following document(s):

7

**CARTER BRYANT'S NOTICE OF EXPERT DISCLOSURES PURSUANT TO FED. R. CIV. P. 26**

8

9   by **E-MAIL VIA PDF FILE**, by transmitting on this date via e-mail a true and correct copy scanned into an electronic file in Adobe "pdf" format. The transmission was reported as complete and without error.

10

11

12   John B. Quinn                        Thomas J. Nolan
13   Michael T. Zeller                    Skadden Arps Slate Meagher & Flom
     Quinn Emanuel Urquhart Oliver &      300 South Grand Avenue, Suite 3400
14   Hedges, LLP                          Los Angeles, CA 90071-3144
15   865 South Figueroa Street, 10th Floor   Tel:   213/687-5000
     Los Angeles, CA  90017-2543          Fax:   213/687-5600
16   Tel:   213/443-3000                  tnolan@skadden.com
17   Fax:   213/443-3100
     johnquinn@quinnemanuel.com
18   michaelzeller@quinnemanuel.com

19

20   Alexander H. Cote
     Overland Borenstein Scheper & Kim LLP
21   300 S. Grand Avenue, Suite 2750
     Los Angeles, California 90071
22   Tel:   213/613-4660
23   Fax:   213/613-4656
     acote@obsklaw.com
24

25   Executed on February 11, 2008, at San Francisco, California.

26   I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

27

28                                        _Julie Selby_
                                          JULIE A: SELBY

PROOF OF SERVICE
CASE NO. CV 04-09049 SGL (RNBx)

410578.01

**EXHIBIT 61**
**PAGE 2116**

PROOF OF SERVICE

I am employed in the City and County of San Francisco, State of California in the office of a member of the bar of this court at whose direction the following service was made. I am over the age of eighteen years and not a party to the within action. My business address is Keker & Van Nest, LLP, 710 Sansome Street, San Francisco, California 94111.

On February 12, 2008, I served the following document(s):

**CARTER BRYANT'S NOTICE OF EXPERT DISCLOSURES PURSUANT TO FED. R. CIV. P. 26**

by **COURIER**, by placing a true and correct copy in a sealed envelope addressed as shown below, and dispatching a messenger from Nationwide Legal, Inc. whose address is 316 W. Second Street, Suite 705, Los Angeles, CA 90012, with instructions to hand-carry the above and make delivery to the following during normal business hours, by leaving the package with the person whose name is shown or the person authorized to accept courier deliveries on behalf of the addressee.

| | |
|---|---|
| John B. Quinn<br>Michael T. Zeller<br>Quinn Emanuel Urquhart Oliver &<br>Hedges, LLP<br>865 South Figueroa Street, 10th Floor<br>Los Angeles, CA 90017-2543<br>Tel:  213/443-3000<br>Fax:  213/443-3100<br>johnquinn@quinnemanuel.com<br>michaelzeller@quinnemanuel.com | Thomas J. Nolan  (via Fed Ex)<br>Skadden Arps Slate Meagher & Flom<br>300 South Grand Avenue, Suite 3400<br>Los Angeles, CA 90071-3144<br>Tel:  213/687-5000<br>Fax:  213/687-5600<br>tnolan@skadden.com |

Alexander H. Cote  (via Fed Ex)
Overland Borenstein Scheper & Kim LLP
300 S. Grand Avenue, Suite 2750
Los Angeles, California 90071
Tel:  213/613-4660
Fax:  213/613-4656
acote@obsklaw.com

Executed on February 12, 2008, at San Francisco, California.

PROOF OF SERVICE<br>CASE NO. CV 04-09049 SGL (RNBx)

410578.01

**EXHIBIT 61**<br>**PAGE 2117**

1   I declare under penalty of perjury under the laws of the State of California
2   that the above is true and correct.

3                                          JULIE A. SELBY

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

410578.01

PROOF OF SERVICE
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT 61
PAGE 2118

**EXHIBIT 62**

**BRYANT V. MATTEL and Consolidated Actions**
**CASE NO. CV 04-9049 SGL (RNBx)**

Expert Report of Thomas S. Gruca

March 17, 2008

CONFIDENTIAL

EXHIBIT 62
PAGE 2119

## EXPERT REPORT OF THOMAS S. GRUCA

### I. INTRODUCTION

#### A. Qualifications

1. I am the Henry B. Tippie Research Professor of Marketing at the University of Iowa. Currently, I teach courses in marketing management and marketing research at the graduate level. I hold a Ph.D. in Business Administration with a concentration in Decision and Information Sciences and an MBA in Management Information Systems. I earned both degrees from the University of Illinois at Urbana-Champaign. I have attached a copy of my curriculum vitae to this Report as **Exhibit A.**

2. Additionally, I am Director of Analytics at Brandware Research, a marketing research consultancy. Brandware Research specializes in custom research designed to help its clients evaluate, position, test, extend, and track the success of brands or brand families.

3. Previously, I was on the faculty of the University of Massachusetts at Amherst, where I taught marketing research and buyer behavior, product management, and marketing models.

4. My marketing-related research has been published in the *Journal of Marketing*, *Journal of Marketing Research*, *Marketing Science*, *International Journal of Research in Marketing*, *Journal of the Academy of Marketing Science*, *European Journal of Operational Research*, *Journal of Interactive Marketing*, *Journal of Service Research*, and *Psychology and Marketing*. A complete list of publications I have authored may be found in **Exhibit A.**

#### B. Scope of Assignment

1

CONFIDENTIAL

EXHIBIT 62
PAGE 2120

5.      I have been retained by counsel for MGA Entertainment, who asked me to form an opinion regarding statements made by Carol A. Scott in paragraph 12 of her expert report, dated February 11, 2008 regarding the role of doll design in the success of the Bratz doll.

6.      More specifically, MGA's counsel asked Brandware Research to measure the relative influence of the appearance of the Bratz doll on purchasing decisions compared to other product and brand attributes. These other attributes included outfits purchased with the Bratz doll; accessories included with the Bratz doll; the "play theme" associated with the Bratz doll; the quality of the Bratz doll; the appeal of having a genuine Bratz product; the "personality" of the Bratz doll; and the packaging that contained the Bratz doll. A full discussion of the scope of the study is set forth in a presentation, which is attached to my Report as **Exhibit B.**

## II.     STATEMENT OF OPINIONS & BASES FOR OPINIONS

### A.     Survey & Methodology

7.      My conclusions are based primarily on market research conducted by Brandware Research. Between February 28 and March 2, 2008, Brandware Research conducted an online survey of 325 U.S. mothers who a) have daughters ages 4 to 12 and b) have purchased a Bratz doll during the previous 12 months.

8.      The survey used the "self-explicated" approach to measure the relative influence of product and brand attributes. This methodology has been broadly accepted in the marketing research community for many years (Wilke and Pessemier 1973). In a comprehensive analysis of empirical studies, the self-explicated approach has been shown to have at least as strong predictive validity as conjoint measurement (Sattler & Hensel-Borner, 2003).

2

CONFIDENTIAL

EXHIBIT 62
PAGE 2121