1  property's] illicit use while stolen" and these "remedies are not per se preempted by

2  the Copyright Act.").[228]

3  **B.    The Copyright Act Does Not Preempt Mattel's Claim for**

4  **Intentional Interference with Contract**

5  Because Mattel's intentional interference claim contains an extra element—

6  inducement of Bryant to improperly use Mattel's property and to betray his

7  obligations of confidentiality and loyalty to Mattel—the Copyright Act does not

8  preempt it.  In arguing to the contrary, MGA ignores a body of controlling case law

9  holding that contract-interference claims contain an "extra element" not present in

10  copyright.[229]  See, e.g., Altera Corp. v. Clear Logic, 424 F.3d 1079, 1089 (9th Cir.

11  2005) (rejecting claim that interference with software license agreement by copying

12  software files to attract new customers is preempted and holding that "[t]he right at

13  issue is not the reproduction of the software . . . but is more appropriately

14  characterized as the use of the bitstream," which provided the "extra element'

15  necessary to defeat preemption") (citing Nat'l Car Rental Sys., Inc. v. Computer

16  Assocs. Int'l, 991 F.2d 426, 432 (8th Cir. 1993); Summit Machine Tool

17  Manufacturing Corp. v. Victor CNC Systems, Inc., 7 F.3d 1434, 1442 (9th Cir.

18

19  [228]   MGA's authorities are inapposite.  Dielsi v. Falk, 916 F. Supp. 985, 992 (C.D. Cal. 1996) involved intangible property subject to copyright protection.  Because ideas are not copyrightable, Dielsi is distinguishable.  Likewise, Harper & Row Publrs. v. Nation

20  Enters., 723 F.2d 195, (2d Cir. 1983) involved only a temporary and minimal deprivation of property rights.  See id. at 201 ("[m]erely removing one of a number of copies of a

21  manuscript . . . for a short time, copying parts of it, and returning it undamaged, constitutes far too insubstantial an interference with property rights to demonstrate conversion.").

22  Here, defendants' misappropriation of Bratz made it impossible for Mattel to capitalize on that property.  Finally, in Worth v. Universal Pictures, Inc., 5 F.Supp.2d 816 (C.D. Cal.

23  1997), the plaintiffs sought damages for the "unauthorized reproduction and distribution" of a movie.  Id. at 822.  However, their conversion claim was predicated upon the

24  submission of a variety of protected works of authorship, see id., whereas, the predicate ideas/concepts in this case receive no such copyright protection.  Additionally, unlike the

25  plaintiffs in Worth, Mattel claims a "physical deprivation," id., thereby further distinguishing its claim from copyright.

26  [229]   MGA cites only non-binding cases from outside this circuit, see MGA Motion at 37-38 (citing Harper & Row (2d Cir.) and Gemcraft Homes, Inc. v. Sumurdy, 688 F.

27  Supp. 289, 295-96 (E.D. Tex. 1988), or cases involving reproduction of intangible intellectual property subject to copyright protection.  See id. (citing Motown Record v.

28  George A. Hormel & Co., 657 F. Supp. 1236, 1240 (C.D. Cal. 1987), and Idema v. Dreamworks, Inc., 162 F.Supp.2d 1129, 1193 (C.D. Cal. 2001)).

-76-

EXHIBIT
PAGE

**EXHIBIT 68
PAGE 2372**

1   1993) (interference claim that defendant appropriated property that plaintiff had the

2   exclusive right to "includes the requisite extra element and therefore is not

3   preempted by federal law.")[230]

4        So too here.   Mattel's interference claim rests on MGA's inducement of

5   Bryant improperly to use Mattel's property—conduct entirely different from the

6   reproduction and distribution of the property itself.   Moreover, the Inventions

7   Agreement created a contractual duty as well as a fiduciary duty, see Mattel Motion

8   at 31-33, and MGA's inducement of Bryant to breach such duties involves "extra

9   elements" absent from copyright law.  See Nimmer On Copyright, § 1.01[B][1][b] at

10  1-28 ("breach of trust requires the existence of a trust relationship which is of course

11  not a prerequisite to a copyright infringement action. The same additional ingredient

12  applies to an action for breach of fiduciary duty in as much as no such duty attends a

13  copyrighted work.").[231]

14       Finally, insofar as Mattel's interference claim is premised on MGA's

15  inducement of Bryant improperly to use trade secret materials in violation of the

16  Inventions Agreement, it is not preempted because "a status of secrecy [is] not

17  required for copyright ...."  Nimmer, supra § 1.01[B][1][h] & n.357 (citing cases).

18       **C.    Mattel's Unfair Competition Claim Is Not Preempted.**

19       MGA's contention that Mattel's UCL claims are preempted because the

20  Complaint "specifically incorporates allegations made earlier in its complaint,"

---

21  [230]   Unisys Corp. v. Varilease Technology Group, Inc., 1999 WL 34782848, at *2 (D.
22  Ariz. 1999) (no preemption because "intentional interference claim includes additional or
    extra elements ...; specifically, breach of an alleged fiduciary duty and intentional
23  misconduct); PMC, Inc. v. Saban Entertainment, Inc., 45 Cal. App. 4th 579, 594 n.8 (1996)
    (allegation defendant prevented plaintiff from "finalizing a deal ... is qualitatively
    different from conduct charged as an infringer"); Celestial Mechanix, 2005 WL at * 11
24  (wrongfully inducing defendant to breach a contract is "qualitatively different from a
    copyright claim, and it is not preempted"); See also Silicon Image, Inc. v. Analogix
25  Semiconductor, Inc., 2007 WL 1455903, at *9 (N.D. Cal. 207) (the allegation of "the use
    of Silicon Image's software in a matter that is in violation of the Software License
26  Agreement ... provides the 'extra element' necessary to avoid preemption.").
    [231]   Further, to the extent that Mattel's claim involves ideas/concepts unprotected by
27  copyright, its interference claim, like its conversion claim, does not fall within the "subject
    matter" of the Copyright Act, and is therefore not preempted for this additional reason..
28  See supra at VII.A.1 (discussing cases).

EXHIBIT ___
PAGE ___

**EXHIBIT 68**
**PAGE 2373**

1    MGA Motion at 40, is specious.  And its contention that the claims merely replicate

2    copyright claims is similarly unpersuasive.

3          That Mattel followed the customary pleading practice of incorporating all of

4    its prior allegations in its Complaint says nothing about whether its UCL claims are

5    preempted.  Were MGA's view the law, courts would not engage in a fact-specific

6    preemption analysis (as they do under well-settled precedent), but would simply

7    skim a complaint to see if it incorporated prior allegations involving copyright, and

8    if so, summarily find preemption.

9          Kodadek v. MTV Networks, 152 F.3d 1209 (9th Cir. 1998), does not support

10   MGA's position.  Kodadek found preemption because the incorporated "paragraphs

11   *of consequence*," id., at 1212 (emphasis added), involved the unauthorized

12   reproduction, preparation and distribution of works of authorship—conduct covered

13   by Section 106 of the Copyright Act.  It did not hold that any incorporation of prior

14   allegations, irrespective of the specific nature of the claim, automatically triggers

15   preemption.  Such a "kitchen sink" approach would ignore the important legal

16   distinction courts have drawn between UCL claims that merely replicate copyright

17   protection and those premised on conduct involving "extra elements," such as

18   "breach of fiduciary duty, breach of confidentiality or improper revelation of a trade

19   secret," which are not preempted.  See Balboa Ins. Co. v. Trans Global Equities,

20   218 Cal. App. 3d 1327, 1351 (1990).

21         Mattel's claims are clearly not preempted by the Copyright Act because they

22   are premised in part on "MGA's commercial bribery of Bryant in violation of Calif

23   Penal Code § 641.3, misappropriation of trade secrets in violation of 18 U.S.C.

24   § 1832(a)," Complaint ¶ 165, at 74, and MGA's and Larian's disparagement of and

25   misrepresentations regarding Mattel's products.  See id.[232]  The "extra elements" in

26   these claims are analogous to other claims courts have found not preempted.  See,

27

28   _____
     [232] Some of these claims pertain to Phase II.

-78-

EXHIBIT 68
PAGE 2374

1  e.g., Firoozye v. Earthlink Network, 153 F.Supp.2d 1115, 1131 (N.D. Cal. 2001)

2  (UCL claim premised on misrepresentation and misappropriation of trade secrets not

3  preempted) (quoting Trandes Corp. v. Guy F. Atkinson Co., 996 F.2d 655, 660 (4th

4  Cir. 1993); Lattie v. Murdach, 1997 WL 33803 at *5 (no preemption of fraudulent

5  misrepresentation allegations in UCL claim); Vigilante.com, Inc. v. Argus

6  Test.com, Inc., 2005 WL 2218405, at * 13 n. 12 (D. Or. 2005) (no preemption of

7  unfair competition claim involving breach of confidentiality of information and use

8  of infringing materials to steal customers, distributors, and employees).

9      In Educational Testing Service v. Simon, 95 F.Supp.2d 108, 1091 (C.D. Cal.

10  1999), the court rejected an argument that the Copyright Act preempted a UCL

11  claim involving the defendants' use of reconstructed test questions created by ETS

12  to prepare future test-takers.  The court held that the conduct violated a separate

13  statute, Section 123 of the California Business and Professions Code, and thus,

14  involved an "extra element" that was qualitatively different from copyright. See id.

15  Notably, the court found no preemption despite plaintiffs' coterminous copyright

16  infringement claims for unauthorized reproduction of the test questions. See id. at

17  1090. ETS thus establishes that UCL claims and copyright claims can coexist.[233]

18

19                           **Conclusion**

20      For the foregoing reasons, the Court should deny defendants' motions for

21  partial summary judgment.

22

23

24

25

26  _____

    [233] Moreover, the legislative history of the Copyright Act evinces a clear intent to
    permit state law unfair competition claims provided, as here, they "'contain elements such
    as an invasion of personal rights or a breach of trust or confidentiality.'" See id. at n.28

27  (quoting Warrington Associates, Inc. v. Real-Time Engineering Systems, Inc., 522 F.
    Supp. 367, 369 (N.D. Ill. 1981) (quoting H. Rep. No. 9401476, 94th Con., 2d Sess. 132

28  (1976), reprinted in 5 U.S. Code Cong. & Admin. News at 5659, 5746-5747 (1976))).

JOINT OPPOSITION

EXHIBIT __

PAGE ____

**EXHIBIT 68**
**PAGE 2375**

1  DATED: March 24, 2008          QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

2

3                                  By_John Quinn (BP)_

4                                  John B. Quinn
                                   Attorneys for Mattel, Inc.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-80-

EXHIBIT

PAGE

EXHIBIT 68
PAGE 2376

**EXHIBIT 69**

# MGA Entertainment, Inc. v. Mattel, Inc., et al.

Case No. CV 05-02727

Expert Report of Peter S. Menell

February 11, 2008

CONFIDENTIAL – ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2377

*Confidential*

### EXPERT REPORT OF PROFESSOR PETER S. MENELL

**Introduction**

1. My name is Peter S. Menell. I am a Professor of Law at the University of California at Berkeley School of Law. I also serve as Executive Director of the Berkeley Center for Law and Technology. This section of the Report summarizes my academic training, professional experience, scholarly writings, and professional activities relating to the issues for which my analysis and opinions have been requested in this matter. My qualifications are more fully set forth in my curriculum vitae, which is attached as Appendix A to this Report.

2. *Academic Training.* My educational training includes an S.B. from the Massachusetts Institute of Technology, a J.D. from Harvard Law School, and a Ph.D. (Economics) from Stanford University. I developed a strong interest in intellectual property while in law school. I wrote my third year paper, a requirement for graduation from Harvard Law School, under the guidance of then Judge, now Supreme Court Justice, Stephen G. Breyer on intellectual property protection for computer software. That paper, "Tailoring Legal Protection for Computer Software," was awarded first prize for Harvard Law School in the Nathan Burkan Memorial Competition, a leading competition for copyright scholarship. The paper was later published in the *Stanford Law Review,* a leading scholarly publication.

3. *Professional Experience.* Following law school, I spent a year clerking for the Honorable Jon O. Newman of the U.S. Court of Appeals for the Second Circuit. Judge Newman is particularly noted for his intellectual property jurisprudence and I had the opportunity to work on several important copyright and trademark matters during that year. See, e.g., *Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir. 1987); *Stormy Clime Ltd. v. ProGroup, Inc.*, 809 F.2d 971 (2d Cir. 1987). Fifteen years after the clerkship, I had the privilege to contribute an article honoring Judge Newman's copyright jurisprudence for a symposium celebrating his first 30 years on the federal bench. See Peter S. Menell, Envisioning Copyright Law's Digital Future, 46 *New York Law School Law Review* 63 (2003).

4. Following my clerkship, I went directly into legal academia, where I have remained throughout my career. I joined the faculty at the University of California at Berkeley School of Law in 1990 and was promoted to full professor in 1994. Apart from a year-long visit to teach at Stanford Law School, a Winter term visit to teach at Harvard Law School, and several shorter visits elsewhere (Swiss Federal Institute of Technology (ETH) (annual visits to lecture on U.S. intellectual property law since 1997) and University of Toronto (Distinguished Visiting Professor to teach an intensive course on U.S. intellectual property law)), I have been based at the UC-Berkeley School of Law, where my principal activities have been legal scholarship (focusing principally on intellectual property law and policy), teaching (focusing principally in the areas of intellectual property law and entertainment law over the past decade), and developing the Berkeley Center for Law and Technology (an intellectual property-focused

-1-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2378

research and public policy institute). I have also devoted substantial time and energy to educating judges about intellectual property law, worked directly on public policy relating to intellectual property, lectured widely on intellectual property law issues, and consulted on a wide variety of intellectual property matters.

5. *Legal Scholarship.* Much of my academic career has focused on the study of intellectual property law and policy. I have authored or co-authored more than two dozen articles on many aspects of the field. I have written nearly 20 articles relating to copyright law. I wrote the chapter of Nimmer on Copyright relating to bankruptcy treatment of copyrights. In addition, I am co-author of two leading texts on intellectual property law: Intellectual Property in the New Technological Age (Aspen Law & Business, 1st ed. 1997, 2nd ed. 2000, 3rd ed. 2003, 4th ed. 2006, 4th rev. ed., 2007) and Software and Internet Law (Aspen Law & Business, 1st ed. 2000, 2nd ed. 2003, 3rd ed. 2006). Both of these volumes have been the best selling texts in their field since their first edition. I am currently under contract to write or edit four additional books in the fields of intellectual property and entertainment law. In conjunction with the Federal Judicial Center, I am also co-authoring a manual for judges on patent case management. In addition, I founded and have supervised publication of the Annual Review of Law & Technology, a compendium of student-authored comments on the leading developments in intellectual property, antitrust, and cyberlaw published by the *Berkeley Technology Law Journal.* The 11th edition of the Annual Review of Law & Technology is scheduled for publication in May 2008.

6. *Intellectual Property Teaching at UC-Berkeley School of Law.* For the past decade, I have taught an annual survey course on intellectual property law, a writing workshop on law and technology (that results in the Annual Review of Law & Technology), and a course on intellectual property in the entertainment industries. I have also organized a workshop on Intellectual Property Scholarship.

7. *Other Intellectual Property Teaching.* For the past decade, I have taught annual intensive courses on U.S. intellectual property law at the ETH Zürich (Eidgenössische Technische Hochschule Zürich; also known as the Swiss Federal Institute of Technology), one of the leading European technology universities. I have also lectured frequently at Congresses for the European Intellectual Property Institutes Network (EIPIN), Seoul National University's Center for Law & Technology, and Tel Aviv University. I have also organized most of the Federal Judicial Center's intellectual property programs since 1997, including an annual three-day intensive program held at UC-Berkeley in the spring. I discuss these courses in more detail below in the section on "Judicial Education."

8. *Berkeley Center for Law and Technology.* Upon arriving at the University of California at Berkeley in 1990, I began developing an institute for the study of intellectual property law. That vision came to life in 1995 with the founding of the Berkeley Center for Law & Technology (BCLT). BCLT's mission is "to foster the beneficial and ethical advancement of technology by promoting the understanding and guiding the development of intellectual property and related fields of law and policy as they intersect with business, science, and technology." I have served as one of BCLT's directors since its founding and also managed the daily operations of BCLT as

-2-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2379

Executive Director from 2000-05. BCLT has developed a wide range of research, education, and public policy programs. It has built an unparalleled academic program on intellectual property, enabling UC-Berkeley to garner U.S. News & World Reports' top ranking for intellectual property programs for the past decade. BCLT has sponsored leading conferences on salient public policy issues at the intersection of law and technology, including software innovation, new business models for transacting intellectual property on the Internet, digital rights management, electronic commerce, the intersection of intellectual property and antitrust, and patent reform. BCLT has also established affiliations with other intellectual property and technology institutes around the world.

9. *Judicial Education.* In 1997, I was invited by the Federal Judicial Center to organize a three day conference for 40 federal judges entitled "The Landscape of Intellectual Property Law." The program was among the highest rated educational programs ever offered by the FJC. I have since organized more than two dozen educational programs on intellectual property attended by more than 800 federal jurists. The FJC has made the BCLT/FJC three day program one of its annual activities. The 10th Annual Conference – now entitled "Intellectual Property in the New Technological Age" – is scheduled for May 2008. I am currently working on a patent case management judicial guide that the Federal Judicial Center will be publishing in 2008. David Nimmer and I are in the formative stages of developing an analogous judicial guide for copyright case management.

10. *Public Policy.* Throughout the past two decades, I have worked to guide jurists and policy makers in developing and applying intellectual property law. I served as an adviser to the Office of Technology Assessment, a research arm of Congress, on two important studies: Copyright and Home Copying: Technology Challenges Law (Oct. 1989) and Finding a Balance: Computer Software, Intellectual Property and the Challenge of Technological Change (1992). I have also co-authored amicus briefs in several leading copyright cases. See Karjala & Menell, Applying Fundamental Copyright Principles in Lotus Development Corp. v. Borland International Inc., 10 *High Technology Law Journal* 177 (1995); Sega Enterprises Ltd. v. Accolade, Inc., Civil Action No. 92-15655 (N.D. Cal.), reprinted in 33 *Jurimetrics* 147 (Fall 1992); Indirect Copyright Liability: A Re-examination of Sony's Staple Article of Commerce Doctrine, 20 *Berkeley Technology Law Journal* 511 (2005). I have advised the federal and several state governments on various intellectual property matters. I serve as a consultant to the State governments on intellectual property and antitrust issues in the ongoing litigation between the U.S. Department of Justice and various states against Microsoft Corporation. I served as an expert witness for the Internal Revenue Service in Microsoft Corporation v. Commissioner, Dkt. No. 16878-96, in which I was qualified by the U.S. Tax Court as an expert in intellectual property law. I have also consulted on intellectual property matters for the U.S. Patent and Trademark Office, the Federal Trade Commission, Federal Judicial Center, and various district courts.

11. *Public Speaking.* Over the years, I have given more than 100 lectures on intellectual property issues – including keynote and principal addresses for the American Intellectual Property Law Association, the U.S. Copyright Office (in its Copyright Office Comes to

-3-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2380

California series), the Copyright Society, the USC Entertainment Law and Business conference (the leading annual entertainment law conference in the United States), and the European Intellectual Property Institutes Network (EIPIN) annual series of conferences.

12. *Consulting and Expert Witness Work.* I have consulted on a wide range of intellectual property matters over the past decade. I have also served as an expert witness in approximately half a dozen intellectual property-related matters over that same time period.

13. I have conducted the copyright tutorial and prepared this report on behalf of MGA at my current billing rate of $700 per hour.

### Scope of Report

14. Through its counsel (Skadden, Arps, Slate, Meagher & Flom LLP), MGA has asked me to address several matters relating to its ongoing litigation against Mattel, Inc. These tasks fall into three areas: (1) copyright tutorial – provide an understanding of the copyright doctrines relating to protection and infringement; (2) copyright infringement analysis – assess whether the Bratz dolls and related packaging art would infringe copyright in any of Carter Bryant's sketches if in fact they were owned by Mattel; and (3) employee agreements – interpret the scope of the 1999 Mattel "EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT" signed by Carter Bryant.

15. *Summary of Analysis and Conclusions.*
A. Copyright Infringement Analysis. From the standpoint of copyright protection, Carter Bryant's sketches lie in the upper regions of the abstractions pyramid. His concepts do not attract copyright protection. His sketches reflect a mix of relatively detailed soft goods elements (clothing and accessory) and largely rudimentary hard goods elements. Thus, the doll features attract relatively modest protection. When the sketches are subjected to successive filters of copyright law's limiting doctrines (originality, merger, scènes à faire, functionality), many of the hard goods elements of Carter Bryant's fall away entirely or fade in significance. The anatomical aspects of the sketches, the standard poses, the aspects of the art based on human features, well-known techniques, and prior art that was widely available and to which Carter Bryant acknowledges he was exposed leaves a rather modest residue of copyright protection in the basic doll design. The strongest claim to copyright lies in the compilation of elements. But since the individual elements themselves attract relatively modest (if any) protection, the compilation itself only enjoys protection against "bodily appropriation" or "virtual identity." As the comparisons show, MGA's Bratz blank and face paint do not reflect anywhere near that level of similarity. The elements differ quite significantly from the Bryant sketches. And the compilation itself reflects many prior art aspects (other fashion dolls, the Spice Girls) and scènes à faire. Based on these considerations, I do not believe that MGA's Bratz dolls infringe copyright in the Carter Bryant doll sketches.
B. Given its standard form nature, Mattel's strong relative bargaining power vis á vis its employees, and the take-it-or-leave-it basis on which it offered its 1999 "EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT," the agreement

-4-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2381

constitutes a contract of adhesion. Therefore, any ambiguity is interpreted against the drafter. With respect to the trade secret provision, I concluded that the agreement was ambiguous at best with regard to Carter Bryant's obligations to treat the Bratz concept as a Mattel trade secret (if, in fact, it was conceived while he was in Mattel's employ). As a result, I concluded that it should be interpreted narrowly (i.e., in Carter Bryant's favor). With regard to the invention assignment provision, I concluded that the text of the provision limited the assignment obligation to technological inventions and therefore did not cover Carter Bryant's artistic concept and purely aesthetic sketches. This interpretation was reinforced by the nature of Mattel's business, its patenting activities, and changes that it made to the scope of the invention assignment provisions in 2004.

## I. Copyright Tutorial for MGA's Doll and Face Painting Experts

16. *Rationale for the Copyright Tutorial.* Based upon more than two decades teaching and researching copyright law, I have come to believe that subject matter experts (such as artists, musicologists, and computer scientists) cannot properly perform their functions in copyright trials unless they appreciate several key aspects of copyright law – mainly the thresholds, limiting doctrines, and scope of copyright protection, the standard for infringement, and, in some cases, the defenses to copyright infringement. In cases involving well-trodden areas of creativity, copyright law demands experts, judges, and juries to engage in a particularly subtle form of analysis. Take, for example, a music copyright case. The plaintiff wrote and recorded a song in a particular genre – such as rhythm and blues. The defendant wrote and recorded a song that sounds similar – it may have familiar background rhythm, instrumentation, use of bridges and choruses, and a lyrical phrase or two. A jury might conclude upon a quick listen that the two compositions are similar – maybe even substantially similar. But the test for copyright is more nuanced than that. The jury must filter out the unprotected elements from the plaintiff's work in making the comparison. Basic rhythm patterns, common instrumentation, standard uses of bridges and choruses, and short phrases are not protectable, nor are standard compilations of such elements. This can be a challenge in that few people have the ability to conduct such filtering in real time. As the Second Circuit has noted,

> The "substantial similarity" that supports an inference of copying sufficient to establish infringement of a copyright is not a concept familiar to the public at large. It is a term to be used in a courtroom to strike a delicate balance between the protection to which authors are entitled under an act of Congress and the freedom that exists for all others to create their works outside the area protected by infringement.

See *Warner Brothers v. American Broadcasting Cos.*, 720 F.2d 231, 245 (2d Cir.1983). Furthermore, subject matter experts who are not versed in the subtleties of copyright law can easily confuse the issues. The problem is exacerbated by the adversary system. To the extent that art, literary, computer software, or music experts are exposed to copyright law, it is often by the lawyers who have hired them. Such lawyers have an obligation to represent their clients zealously. In my experience, this duty can impinge upon the comprehensiveness and balance of

-5-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2382

the presentation of copyright principles. Hence, there is a constructive role for a detached copyright expert to play in explaining the applicable concepts to subject matter experts.

17. I had the opportunity to play such a role in a software copyright case last year that was resolved through a JAMS arbitration. I worked closely with a leading computer software professor who later served as a technical expert to the three arbitrator tribunal. In this way, he did not learn about copyright law from advocates but rather someone who teaches copyright law to students and judges on a regular basis. I based my presentation to him on the same materials that I have developed for teaching federal judges. The three arbitrator panel permitted both of us to testify. The computer software expert could focus on the application of the legal concepts that he had learned from me and the opposing counsel could cross-examine me regarding what I presented to the subject matter expert. In my view (and apparently the view of the arbitrators given their ultimate determinations), this process enhanced the objectivity of the subject matter expert while providing opposing counsel with a fair opportunity to probe the basis for the subject matter expert's understanding of copyright concepts. It also provided the tribunal with the benefit of someone who has a wide range of experience studying and working on copyright matters.

18. The MGA attorneys asked me to perform the same roles in this case. They asked me to use the materials that I use in Federal Judicial Center programs and my other teaching to instruct Robert Tonner, MGA's doll expert, and Tina Tomiyama, MGA's face painting expert, about copyright infringement analysis. We held this session on the afternoon of Thursday, January 3rd, at the law offices of Skadden, Arps, Slate, Meagher & Flom LLP in Los Angeles. I conducted the session in much the same manner that I teach copyright law to a wide range of audiences. I used the same powerpoint slides as the basis for an interactive lecture. I explained the concepts, used illustrations, and engaged the audience in questions and discussion. The formal presentation lasted about two and a half hours. I also met with Robert Tonner the next morning and early afternoon as we examined various sculpts and other materials relating to the creation of the Bratz line of dolls.

19. In the remainder of this section of the report, I will for completeness purposes summarize the presentation that I made to Mr. Tonner and Ms. Tomiyama. (For purposes of trial testimony, I would focus on the issues of most pertinence in this case.) I drew upon the materials that I have developed over the past decade for teaching copyright law. Those slides are included in Appendix B to this report. I should note that the main infringement analysis chart (Slides [B2], [B4], and [B25]) was developed in conjunction with David Nimmer, author of the leading copyright treatise, and Lon Sobel, a professor at Southwestern Law School and the editor of the Entertainment Law Reporter. David often co-teaches the FJC copyright programs with me. Lon has also participated in several of these programs. In addition, the three of us have lectured together to a wide range of audiences throughout the country.

20. *Introduction.* As suggested above, the challenge in teaching copyright's infringement test is that most people's naive assumption about copyright protection is that it is really just a plagiarism test – if one work looks like a prior work, then there is infringement. And in some

CONFIDENTIAL – ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2383

cases, that test will achieve the correct answer. If someone were to a publish a book that was identical or nearly identical to J.K. Rowling's "Harry Potter and the Philosopher's Stone," it would almost certainly be a copyright infringement. Similarly, if someone were to produce a comic strip with nearly identical likenesses of Charlie Brown, Lucy, and Snoopy, it would also almost certainly be a copyright infringement. But as we move away from the realm of complex and highly imaginative works of authorship into more crowded fields of creativity (such as popular music), more limited ranges of creativity (such as still art drawing, conceptual or minimalist graphic art, map-making, and anatomically-based toys), or more artistically constrained mediums of expression (such as computer programs that will run on particular communication platforms), then the plagiarism approach diverges from copyright law's multi-layered framework for separating the protectable from the unprotectable and systematic analysis of infringement.

21. One of the copyright questions posed by this litigation – and the one of most relevance to Mr. Tonner's and Ms. Tomiyama's analysis – is whether MGA's Bratz dolls infringe the drawings that Carter Bryant sketched prior to October 19, 2000. Since Mr. Tonner and Ms. Tomiyama will play a role in explicating the applicability of several of copyright law's limiting doctrines, I sought to provide them with both a clear understanding of the overarching copyright infringement framework as well as illustrations of the most pertinent limiting doctrines.

22. *Infringement Analysis.* As reflected in the main infringement Slide [B2], the basic test for copyright infringement involves three principal overarching elements: (1) actual copying of (2) copyright protected expression resulting in (3) substantial similarity.

23. *Actual Copying.* Copyright protects authors and artists against copying, not merely similarity. Thus, a defendant can successfully defend a claim of copyright infringement by establishing that he or she independently created an identical work to the plaintiff's work. While this is rare in the context of complex works in which there is a wide range of artistic choice, it can occur in more constrained areas of expression. The plaintiff bears the burden of proving copying by direct evidence and/or circumstantial evidence (access and probative similarity).

24. *Copyright Protected Material.* Factual copying alone does not violate copyright law as the copyist may merely be reproducing elements that were not protected or making such modest use as to fall below the "substantial similarity" threshold for infringement. Copying as a legal matter requires proof that the defendant's work is substantially similar to original protected expression of the copyright owner. The analysis proceeds in three stages, often referred to as Abstraction, Filtration, and Comparison. See generally *Computer Associates Intern., Inc. v. Altai, Inc.*, 982 F.2d 693, 706-12 (2d Cir. 1992); see also *Nichols v. Universal Pictures Co.*, 45 F.2d 119 (2d Cir.1930) (L. Hand, J.), *cert. denied*, 282 U.S. 902 (1931); Nimmer on Copyright §13.03. First, the copyrighted work must be dissected into its constituent elements. In the case of a graphic such as the Bryant sketches, that would involve examining the individual characters, the character features, and the compilation of elements. In the second stage of the analysis, each element (and compilation) would then be evaluated to determine whether they reflected original protectable expression. Elements lacking in originality (e.g., derived from prior art) or lying

-7-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2384

outside the scope of copyright protection (such as ideas, scènes à faire, elements serving functional purposes) would be filtered out of the work for purposes of the infringement analysis, leaving only the protected expression (which can include original compilations of elements). In stage 3 of the analysis, the allegedly infringing work is compared with the protected expression embodied in the plaintiff's work to determine whether there is substantial similarity of the protected expression.

25. This analytic framework traces back to Judge Learned Hand's seminal explication in *Nichols v. Universal Pictures Co.*, 45 F.2d 119 (2d Cir.1930). This case reflects the challenge of comparing a later work (a film) that has various thematic similarities to and may well have been inspired by a successful play, but yet is not infringing under a proper application of copyright principles. I have long used this case to illustrate the nature of the abstraction and filtration stages of infringement analysis. The case dates back to the 1920s and relates to the controversies over intermarriage and prejudice among religious communities in the great melting pot that was New York City (and America) at the time (and in many respects, still today).

26. Nichols v. Universal Pictures Co.: *The Plaintiff's Work* ("Abie's Irish Rose"). The plaintiff, Anne Nichols, had scripted "Abie's Irish Rose," a poignant story about the son of a widowed Orthodox Jew (Abraham or "Abie" Levy) who had fallen in love with an Irish Catholic girl (Rose Murphy) while serving in the army in France. They both knew of Abie's father's deep objections to marrying outside of the Jewish faith. Nonetheless, they secretly wed and then introduced the bride to Abie's father as an Orthodox Jew in the hopes that he would be enchanted. Abie's father falls for the ruse and arranges for his rabbi to perform a Jewish marriage ceremony. But just as the ceremony is completed, Rose's widowed, devoutly Catholic father arrives from his home in California with a priest. When the ruse is uncovered, the fathers lose their composure and the scene turns ugly. Meanwhile, the rabbi and the priest, who happened to be old friends, try to reconcile the families but without success. The fathers disown their children and vow to dissolve the marriage. But after a year, they learn that the children have brought a child into the world. In the final scene, both fathers coincidentally arrive bearing gifts on Christmas for their grandchild. In fact, the couple had given birth to an adorable set of twins; one of whom is placed in each of the grandfather's arms by the rabbi and the priest, who had arrived to aid in the reconciliation. The play ends on a hopeful note, with the grandson named for Rose's father and the granddaughter named for Abie's deceased mother. The play reflects both the raging social tension of the time (especially in New York City, the hub of European immigration) and the hope for religious, racial, and ethnic harmony. It enjoyed great commercial success on Broadway, running for over 2,000 performances between 1922 and 1927. See Slides [B5] and [B6].

27. Nichols v. Universal Pictures Co.: *The Allegedly Infringed Work* ("The Cohens and the Kellys"). Following the success of Abie's Irish Rose, Universal Pictures released "The Cohens and the Kellys" in 1926, set in New York City and revolving around the same theme of intermarriage between Jewish and Irish immigrant families. In this work, the daughter (Nannie) of a Jewish clothing merchant (Nathan Cohen) falls in love with Terry Kelly, the son of an Irish policeman, who lives across the hall in an East Side tenement. The families have long feuded

-8-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2385

and both families vehemently oppose the relationship. As the plot unfolds, Nathan averts bankruptcy by an unexpected inheritance of $2,000,000 from a distant relative that is communicated to him by a strange lawyer. The Cohens move to a fashionable neighborhood, partially in the hope that Nannie's attraction to Terry will subside. But while Nathan is on a trip to Florida, Nannie and Terry secretly wed and give birth to a child. Upon his return, Nathan shuns Terry, accusing him of marrying Nannie for their fortune. After recriminations, Nannie leaves with the baby to live with Terry's family. Nathan is despondent, at which point the lawyer returns and informs Nathan that he has just discovered that the $2,000,000 which Cohen received rightfully belonged to Kelly, who was the nearest relative of Sadie Greenbaum. The lawyer offers to keep this information secret if Cohen agrees to split the fortune with him. Cohen's sense of honor is awakened and he refuses, instead running to Kelly's flat to explain the mistake. There he finds his family and young grandchild. He confesses that he has been a "stubborn old fool." As he is about to depart, Kelly reminds him of the grandchild and, through the pacifying influence of their respective wives, offers to share the inheritance and enter into partnership. The film ends happily with reconciliation. See Slides [B5] and [B6].

28. Although there was no literal copying of any of the dialogue from "Abie's Irish Rose," Nichols identified numerous similarities as the basis for her claim: motivating idea, emotional themes, basic characters, arc of plot development, and the clash of interactive forces. Given the success of Nichols' play, audiences for "The Cohens and the Kellys" would understandably perceive similarity to "Abie's Irish Rose." Yet, since copyright protection does not extend to ideas but rather is limited to the expressions of ideas, to conclude that "The Cohens and the Kellys" infringed "Abie's Irish Rose" would greatly hamper the freedom of future authors, artists, and filmmakers to work in the shadow of original works.

29. Nichols v. Universal Pictures Co.: *Judge Learned Hand's Resolution*. While recognizing that copyright protection extends beyond the literal text of a work, Judge Hand nonetheless offered a powerful principle for dealing with those "troublesome" cases where a subsequent creator takes thematic elements from a copyrighted work:

> Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended. Nobody has ever been able to fix that boundary, and nobody ever can.

45 F.2d 119, 121 (citation omitted). As reflected in Slide [B7], this framework can usefully be presented as a pyramid of abstractions. At the top of the pyramid lies the main idea of the work -- the highest level of abstraction. As we descend, greater granularity can be discerned -- the general plot outline, subplots, general characters and scenes, specific character elements, and finality, the actual text of the play (or artistic choices in a graphic work). As Judge Hand

-9-

CONFIDENTIAL --
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2386

emphasizes, protection does not apply to abstract ideas and the precise line of demarcation depends on case-by-case analysis.  In the *Nichols* case, Judge Hand found that the stories were in fact "quite different," with

> [t]he only matter common to the two [being] a quarrel between a Jewish and an Irish father, the marriage of their children, the birth of grandchildren and a reconciliation.
>
>   If the defendant took so much from the plaintiff, it may well have been because her amazing success seemed to prove that this was a subject of enduring popularity. Even so, granting that the plaintiff's play was wholly original, and assuming that novelty is not essential to a copyright, there is no monopoly in such a background. Though the plaintiff discovered the vein, she could not keep it to herself; so defined, the theme was too generalized an abstraction from what she wrote. It was only a part of her "ideas."
>
>   Nor does she fare better as to her characters. It is indeed scarcely credible that she should not have been aware of those stock figures, the low comedy Jew and Irishman. The defendant has not taken from her more than their prototypes have contained for many decades. If so, obviously so to generalize her copyright, would allow her to cover what was not original with her. But we need not hold this as matter of fact, much as we might be justified. Even though we take it that she devised her figures out of her brain de novo, still the defendant was within its rights.

Id. at 122.  Slide [B8] traces out several of the limiting doctrines reflected in Judge Hand's analysis – the idea-expression dichotomy (articulated in the Supreme Court's *Baker v. Selden* decision and codified in section 102(b) of the Copyright Act of 1976), the merger doctrine (denying copyright protection for expression when there is only one or but a few ways of expressing an idea), and the scènes à faire doctrine (derived from French for "scenes to be done").  Slide [B9] fleshes out the scènes à faire doctrine  – "incidents, characters or settings which are as a practical matter indispensable, or at least standard in the treatment of a given topic." *Atari, Inc. v. North American Phillips Consumer Electronics*, 672 F.2d 607, 616 (7th Cir. 1982)).  Slide [B10] illustrates the principle, noting that without this doctrine, the creators of Hill Street Blues, the first modern police drama revolving around the activities of a busy urban police station, might have been able to block production of NYPD Blue and Law and Order, both of which draw upon similar incidents, characters, and settings.

30.  Judge Hand's framework has proven critical to the delicate balance between competition and the recognition of property rights in authorship to promote creativity.  Each generation anew has revisited the themes that Anne Nichols so poignantly explored.  We see this basic thematic structure in the successful 1972-73 CBS television series Bridget Loves Bernie, in which a struggling young Jewish cab driver/aspiring playwright Bernie Steinberg, whose parents ran a modest family delicatessen, fell in love with Bridget Fitzgerald, the Irish Catholic daughter of wealthy parents.  The couple eloped to the disappointment of both sets of parents and the show revolves around the ongoing tensions.  (Notwithstanding the show's popularity (ranked fifth for

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2387

the season), CBS cancelled it after one season as a result of hate mail objecting to the inter-religious theme.) A few decades later, the theme reemerged in ABC's hit series (1997-2002), Dharma and Greg, in which Greg's wealthy, blue blood Episcopalian Republican parents object to their son's marriage to Dharma, the Jewish daughter of hippie parents. One can discern the basic plot elements from "Abie's Irish Rose" yet again in "Meet the Fockers," a 2004 film revolving around a Jewish-Catholic marriage.

31. *Further Illustrations.* These same concepts apply as well to other settings. Slide [B11] illustrates the works at issue in *Satava v. Lowry*, 323 F.3d 805 (9th Cir. 2003), in which the first artist to encase a jellyfish in a clear glass sculpture sought to prevent others from using this basic idea (encapsulating a jelly fish in an oval vessel). As that court noted,

> Our case law suggests, and we hold today, that a combination of unprotectable elements is eligible for copyright protection only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship. See Metcalf, 294 F.3d at 1074; Apple Computer, Inc., 35 F.3d at 1446. See also Feist, 499 U.S. at 358 ("[T]he principal focus should be on whether the selection, coordination, and arrangement are sufficiently original to merit protection.").

Id. at 811. Slide [B12] is based on a French case in which the publisher of a cartoon book about a clownfish (Pierrot) brought suit against Pixar for alleged infringement of the Pierrot graphic work in the film "Finding Nemo." Pixar's successful defense was that its work was derived from something found in nature – namely, the clownfish. Even if Pixar had seen Pierrot, the scope of protection for that work would be extremely limited given its inspiration.

32. *Originality.* The clownfish example also brings the requirement of originality into play. To the extent that an artist bases his work on things found in nature or in prior art, then those aspects lack originality and are excluded from copyright protection. Slides [B13]-[B19] illustrate this copyright limitation. Slide [B13] traces the originality requirement to court decisions reading the use of the word "Authors" in the Intellectual Property Clause of the Constitution as a limitation on congressional power. Copyrights may only be accorded those who originate. In the Feist decision, the Supreme Court characterized the originality requirement as "the *sine qua non*" of copyright protection. See *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). As reflected on Slide [B14], Congress codified this requirement in the Copyright Act of 1976, incorporating the two pronged test reflected in jurisprudence – that a work reflect both independent creation and a "modicum" of creativity. As indicated in the House Report, the threshold is relatively low – not requiring novelty, ingenuity, or esthetic merit. See H.R. Rep. 94-1476 p. 51 (1976). Slides [B15] and [B16] motivate three important corollaries of the originality requirement: (1) that facts are not protectable (since they exist and are merely discovered); (2) that theories derived from facts are not protectable; and (3) that research is not protectable. Slide [B15] illustrates *A. A. Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972 (2d Cir.), *cert. denied*, 449 U.S. 841 (1980), in which the court denied copyright protection for a historian's extensive research supporting a theory for the destruction of the Hindenburg – that a

-11-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2388

"rigger" on the Hindenburg crew sabotaged the Hindenburg to please his lady friend, a suspected communist dedicated to exploding the myth of Nazi invincibility. Thus, Universal Studios violated no copyright interest in Hoehling's book "Who Destroyed the Hindenburg?" when it produced a film based on this theory. The court explains that:

> the hypothesis that Eric Spehl destroyed the Hindenburg is based entirely on the interpretation of historical facts, including Spehl's life, his girlfriend's anti-Nazi connections, the explosion's origin in Gas Cell 4, Spehl's duty station, discovery of a dry-cell battery among the wreckage, and rumors about Spehl's involvement dating from a 1938 Gestapo investigation. Such an historical interpretation, whether or not it originated with Mr. Hoehling, is not protected by his copyright and can be freely used by subsequent authors.

Id. at 978-79. The court goes on to note that "[t]he same reasoning governs Hoehling's claim that a number of specific facts, ascertained through his personal research, were copied by appellees." Id. at 979. Slide [B16] illustrates *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365 (5th Cir. 1981), in which the author of a novel detailing a sensational kidnapping in which the victim was buried alive in an underground casket equipped with life support equipment for 83 hours alleged that a made-for-television movie dramatizing the events infringed copyright in the book. The court overturned a verdict finding infringement because the jury was erroneously instructed that the labor or research by an author is protected by copyright law. Slide [B17] presents two other originality-based doctrines: (1) that rhythm is typically not protected and (2) that words and short phrases are denied copyright protection. Slides [B18]-[B19] present the Supreme Court's *Feist* case, which holds that compilations of facts, even if the result of tremendous effort, are not protectable unless they are sufficiently original. Thus, a massive phone directory organized alphabetically is not copyrightable whereas my own list of the top twenty restaurants in Berkeley would be. But others would be free to develop their own restaurant lists. Slide [B20] introduces the useful article doctrine, which allows protection for elements of two and three dimensional works only to the extent that the expressive aspects are separable from the functional or useful characteristics. It also notes the exclusion of typefaces from copyright protection. Slide [B21] uses the metaphor of a radiating target to illustrate the contours of copyright protection. At the target's bull's-eye lies highly expressive creativity in which the author or artist has broad range of expressive parameters to choose from. The scope of copyright protection diminishes as authors and artists move away from that core. Completely outside of copyright protection are facts, scènes à faire, and theories.

33. With that background in place, we are ready to move on to the next step in the analysis of "copyright protected expression." Slide [B22] illustrates that both "Abie's Irish Rose" and "The Cohens and the Kellys" can be broken down into the various levels of abstraction alluded to by Judge Hand. On the bottom left side of the slide, the structure of "Abie's Irish Rose" is represented by blue shaded elements. On the bottom right side of the slide, the structure of "The Cohens and the Kellys" is superimposed over the top of "Abie's Irish Rose" with the differences reflected in pink. As can be seen, there is quite a bit of similarity at the higher, more abstract levels of abstraction and relatively little overlap (similarity) at the lower levels. The challenge is

-12-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2389

deciding whether there is "substantial similarity of copyright protected expression." To do so first requires filtration of the unprotected elements.

34. *Filtration.* Slides [B23] and [B24] illustrate metaphorically the filtration process. In essence, the court must sift the Plaintiff's work though a colander that is specially designed to catch the unprotected elements: unoriginal aspects, expression of ideas that are severely limited in terms of the number of ways in which they can be expressed, scènes à faire, facts, historical events, and ideas. Slide [B24] reflects the result of that process in the *Nichols* case. The colander has removed the ideas and unoriginal aspects (e.g., religious clash, religious ceremonies). What is left in the bowl below are copyright protected elements, as reflected in the pyramid format. Note that the top and significant portions of the middle layers of the pyramid have been filtered out, whereas much of the granular text remains. But even at the bottom level, there may be gaps, due to unoriginal text and stage direction (such as the religious traditions and prayers in the marriage ceremonies). I like to refer to this resulting image as resembling the dental structure of hockey players, with many of the top teeth and one or two bottom teeth missing.

35. *Comparison: "Substantial Similarity"* – After filtration comes the comparison stage of the analysis. The case with which the substantial similarity framework can be applied varies across factual scenarios. It is easiest to apply in contexts in which the copyrighted work at issue involved substantial unconstrained or only minimally constrained creative effort and the defendants have reproduced the entirety of the work or a significant expressive element (literal similarity). The substantial similarity doctrine is much more difficult to apply where the plaintiff's work can best be characterized as "thin" (due to relatively modest creativity coupled with limiting doctrines constraining the scope of protection) or where the defendant's work only weakly imitates the plaintiff's work. The courts have used sliding scale approaches to balancing these competing considerations – the robustness of the plaintiff's copyright protection on the one hand and the extent of copying on the other. Where copyright protection is robust, then substantial similarity will suffice to establish infringement. But where copyright protection is thin – for example, because the range of artistic creativity is tightly constrained by prior art or functional limitations – then courts require a high degree of similarity. The last column of Slide [B25] summarizes these principles. Slide [B26] illustrates the sliding scale concept, with works that have a broad effective range of creativity – such as the authoring of novels and unconstrained artistic painting – subject to the "substantial similarity" standard and highly constrained works – such as functional works, works that imitate things found in nature, or works in which choice is limited – analyzed under the "virtual identity" standard.

36. *Compilations of Unprotected Elements: Virtual Identity.* Slide [B27] illustrates the works at issue in the *Harper House v. Thomas Nelson*, 889 F.2d 197 (9th Cir. 1989). The plaintiff sought to assert copyright in the organization of its "Day Runner"® organizer – a series of calendars, forms, charts, and related materials for recording and organizing information. While accepting the district court's finding that copyright subsisted in this compilation of materials, the court emphasized that "compilations that consist largely of uncopyrightable elements receive only limited protection. As with factual compilations, copyright infringement of compilations

-13-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2390

consisting largely of uncopyrightable elements should not be found in the absence of 'bodily appropriation of expression.'" (citing *Worth v. Selchow & Righter Co.*, 827 F.2d 569, 573 (9th Cir.1987)). See Slide [B28]. Slide [B29] highlights the ways in which use of the term "copying" can obfuscate copyright infringement analysis. In its closing argument, Harper House's counsel "exploited the negative connotation to copying, urging the jury to use their basic sense that when given a homework assignment at school, one should not copy the work of another student – 'change a word here, change a word there, put it on a different size paper and hand it in as your own." The court's admonition highlights the concern that I emphasized at the outset of this section of the report, see paragraph 16, with equating plagiarism with copyright infringement. Copyright law allows use of unprotected elements as well as fair use. The court notes that "given the negative connotations to 'copying,' there was an obvious risk of an improper verdict for plaintiffs, and a need for further instructions to protect legitimate activity and avoid the suffocation of competition." 889 F.2d at 207.

37. *Application of the Substantial Similarity Framework to the* Nichols *Case*. Slide [B30] characterizes the nature of the final comparison in the *Nichols* case. Note that what is compared is not the entirety of "Abie's Irish Rose," but rather only the protectable elements. It is easier to see in this format that "The Cohens and the Kellys" is only modestly similar to protected elements of "Abie's Irish Rose." The regions of blue in "The Cohens and the Kellys" pyramid (i.e., the areas of similarity with "Abie's Irish Rose") are largely unprotected (white in the filtered "Abie's Irish Rose" pyramid). This representation helps to visualize the conceptual and subtle framework that Judge Hand endorsed and applied.

38. *Illustrations*. Slides [B31] - [B54] illustrate the application of this framework to various familiar and challenging contexts. I use these slides to provide the audience the opportunity to test out their understanding of the copyright infringement framework. In my experience, this is the best way of developing analytical intuition for copyright infringement analysis. Slides [B31] - [B32] relate to the controversy that erupted over Alice Randall's novel, "The Wind Done Gone," which tells the story of Margaret Mitchell's classic novel, "Gone With the Wind," from the perspective of slaves on the plantation. Slide [B33] provides the backdrop for discussing the British copyright infringement case brought against Dan Brown, author of the 2003 blockbuster novel, "The Da Vinci Code," by two of the authors of the 1982 novel, "The Holy Blood and the Holy Grail." Slides [B34] - [B37] explore the application of the infringement framework to graphic works. Slides [B36] - [B37] concern a controversial and provocative August 1991 Vanity Fair cover photograph in which the actress Demi Moore appears nude and nearly nine months pregnant. Paramount Pictures spoofed the photograph by superimposing Leslie Neilsen's head on a similarly proportioned and posed model for an advertising poster for its 1994 film Naked Gun 33½: The Final Insult, which prompted a copyright infringement lawsuit. In assessing the third statutory factor – "the amount and substantiality of the portion used in relation to the copyrighted work as a whole" – of the fair use defense (17 U.S.C. §107), the court conducted a filtering analysis because the statute focuses on the "protected elements" of the plaintiff's work. See *Leibovitz v. Paramount Pictures*, 137 F.3d 109 (2d Cir. 1998). In so doing, Judge Newman noted that the key elements of the pose were derived from prior paintings and sculptural works – dating back to " 'Venus' of Willendorf," circa 25,000-20,000 B.C." and

-14-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2391

Botticelli ("Birth of Venus") – depicting nude and pregnant women in a "gesture of modesty"
pose.  See *id.* at 111, 115-16.  Slides [B38]-[B39] illustrate the challenge of filtration and
comparison in the context of musical compositions.  They require the audience to compare
musical compositions while at the same time ignoring features – such as rhythm, short phrases,
and unoriginal progressions.  Slide [B40] examines three-dimensional works.  Slides [B41]-
[B54] illustrate how infringement analysis applies to the context of computer software, a
particularly constrained medium of expression.

## II. Copyright Infringement Analysis – Whether the Bratz Dolls Infringe Copyright in Carter Bryant's Sketches

39. *Application of these Concepts to the Present Case.*  In this section, I apply the principles set
forth in Section I to the present dispute.  In order to avoid the factual disputes relating to the time
period in which Carter Bryant came up with and drew the Bratz sketches and whether Margaret
Leahy and other MGA sculptors and artists "copied" from Carter Bryant's sketches, I base the
analysis of this section of the report on the express assumptions that copyrights in the sketches
are owned by someone other than MGA and that MGA's artists saw Carter Bryant's sketches
before conducting their own work.  I will be skipping over the "factual copying" element of the
copyright infringement framework and focus my analysis of whether MGA's Bratz dolls are
"substantially similar" to copyright-protected expression in Carter Bryant's sketches.  As with
Section I of this report, my analysis is illustrated through a series of slides, reproduced in
Appendix C.

40. *Basis for the Analysis.*  In preparing this analysis, I have drawn upon the following sources:
(1) Carter Bryant Sketches; (2) Carter Bryant's Deposition Testimony; (3) MGA's Bratz dolls;
(4) the blank form for MGA's Bratz dolls; (5) sculpts leading up to the final Bratz doll blank; (6)
Draft Report of Mary Bergstein, Art/Popular Culture Historian; (7) Draft Report of Robert
Tonner, Fashion Doll Designer, Sculptor, and History Expert; (8) Draft Report of Christina
(Tina) Tomiyama, Fashion Doll Face Painting Expert, Fashion Doll Industry Expert, and Doll
Product Manager; (9) Slide Presentation by Robert Tonner (presented to MGA Experts on
January 3, 2008 at Skadden, Arps, Slate, Meagher & Flom LLP's Los Angeles office); (10) Prior
Art and Popular Culture Material (Seventeen Magazine (August 1998 edition)); image searches
on the Internet; on-line resources about specific artists, dolls, and popular culture; and (11) my
own knowledge of popular culture.

41. *Avoiding the Plagiarism Trap.*  As discussed in Section I of the report, copyright protection
does not track the moral intuition relating to plagiarism.  Rather, copyright analysis requires a
systematic process to avoid hampering the freedom of expression and competition.  See
Paragraphs 16 and 36.  Slide [C1] shows Carter Bryant's sketches of the Jade character on the
left and MGA's Jade doll on the right.  Copyright law does not protect a name.  Nor does it
protect many aspects of Carter Bryant's sketches.  Yet, without careful instruction, a jury may
naturally be led to think that the Jade doll "copies" Bryant's sketches.  Such a conclusion would,
in my opinion, overlook what is in fact protected in the sketches and to what extent those
elements or compilations of elements are substantially similar or possibly virtually identical to

-15-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2392

the Jade doll.

42. *The Abstraction Framework.* Slide [C2] begins the analysis with Judge Learned Hand's classic statement of the copyright infringement framework. Drawing upon Mary Bergstein's model of the process of developing visual and sculptural art, Slide [C3] presents the levels of abstraction applicable in the context of fashion dolls. The top of the pyramid – the highest level of abstraction – contains the concepts animating the work. These ideas are excluded from copyright protection. At the next level lies sketches of the concept(s). Mary Bergstein refers to them as "'notes' on paper." They lack significant detail or expression. The next level of the abstractions waterfall consists of studies. Here, the artist is engaged in more detailed illustration, typically observing the concepts from multiple vantage points. They are still rather inchoate and copyright protection is typically judged thin at this level. Next come drawings, which are detailed expressions of the concepts. Drawings provide the basis for models and finally, in the case of fashion dolls, three-dimensional sculpts with face paint. As Robert Tonner explained during our meeting, even fully detailed drawings provided to different sculptors can result in quite different dolls. In his report, he notes that:

> Many companies produce dolls made to represent the same characters. One of the most popular characters is Scarlett O'Hara from the movie Gone with the Wind. World Doll in the 1980's, Mattel, the Franklin Mint and Tonner Doll have all done portraits of the actress, Vivian Leigh, who portrayed Scarlett in the Movie. Each of the dolls look markedly different although they are all supposed to portray the same person. The point being, that each sculptor brings his/her personal style to a project – even one as specific as Scarlett O'Hara.

At the bottom of the pyramid – where a detailed fashion doll has been sculpted and painted – copyright protection can be significantly more robust, depending, of course, on the extent to which the sculptor and face painter have departed from prior art sources.

43. *Levels of Abstraction: Carter Bryant's Sketches.* As Mary Bergstein and Tina Tomiyama have expressed, Carter Bryant's illustrations prior to October 19, 2000 of the Bratz doll can best be characterized as sketches, at least with regard to the doll features (body, face, and hair). (Tina Tomiyama notes that the illustrations of the "soft goods" – the fashions being worn by the dolls (Carter Bryant's area of expertise and passion) – are more detailed, and could be characterized as drawings. But as I understand the dispute, there is not any serious disagreement about infringement of particular fashions. In any case, such fashions changed periodically.) Slide [C4] shows that the doll features (as opposed to "soft goods") of Carter Bryant's illustrations sit quite high in the pyramid of abstractions. Carter Bryant's conception reflected three principal elements: (1) attitude: sassy, bratty fashion dolls (2) ethnic/racial orientation: an ensemble of four friends reflecting different racial and ethnic backgrounds; and (3) doll features: a disproportionately large head (relative to human dimensions and some (but not all) fashion dolls) with large eyes and particularly large feet. Apart from the clothing fashions, the illustrations were rather rudimentary. The sketches provided only a frontal (or slightly angled) view. Therefore, the depth of facial features cannot be perceived. The facial elements are particularly

-16-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2393

inchoate and stylized.  Tina Tomiyama notes that the sketches were not "instructional," but rather conceptual.  She sees them more as carrying forward the idea of sassy, multi-racial girls, not a detailed expression.  Furthermore, she does not consider the sketches to have been realistic in terms of the constraints of fashion doll manufacturing and functionality.  Robert Tonner noted that the sketches did not provide much guidance to a sculptor.  They were not schematic in nature, but rather high concept.  He did not feel that they would provide much constraint on a sculptor.  Rather, the sculptor would need to bring a lot of their own creativity to the job of building a doll.

44. *Filtration.*  With the abstraction stage complete, Slide [C5] begins the analysis of filtration. The abstraction pyramid has been lowered into the filtration colander.  In this stage of the analysis, I explore the various limiting doctrines aimed at determining the copyright-protected elements of Carter Bryant's illustration.  As a preliminary observation, I will note that the illustrations are near the top of the pyramid.  Copyright protection is quite thin at that altitude. Nonetheless, there may be enough expression for copyright to subsist, at least against slavish copying.  Slides [C6]-[C19] provide a basis for assessing the principal limiting doctrines that come into play in the filtration stage of the analysis: originality, merger, scènes à faire, unprotectability of functional features (including inseparable expressive features of useful articles).

45. As developed in his deposition testimony, Carter Bryant has spent much of his life studying fashion illustration, fashion design, and fashion dolls.  From a young age, he competed with his mother to read the latest fashion magazines.  Growing up in the 1970s and 1980s, he was exposed to the various waves of popular culture from television, magazines, and formal study of fashion design.  He studied fashion illustration following high school.  He worked in the fashion doll industry through the 1990s.  Thus, he was exposed to a wide range of influences.  From a copyright standpoint, he was not operating in a "clean room" when he made the Bratz sketches. Rather, he acknowledges his interest in reflecting cultural trends as well as the profound influence of those who came before him.  He was not interested in creating extra terrestrial beings.  Rather, he sought to create a fashion doll that would appeal to girls and provide a substrate for him to pursue his interest in fashion design.

46. *Prior Widely-Known Character Illustration.*  Drawing upon Robert Tonner's historical look at character art, Slides [C6]-[C7] contain several of the more influential sources for cartoon illustrators of Carter Bryant's generation.  Marvin Fleischer created the Betty Boop character in a series of films released by Paramount Pictures in the early 1930s.  At the time, her overt sexual appeal created quite a stir and attracted large audiences.  The character was modeled after Helen Kane, a popular singer in the 1920s and actress for Paramount Pictures.  As illustrated in Slide [C6], Betty Boop's features were exaggerated – disproportionately large head, large round eyes with distinct eye lashes, hour-glass figure, long legs.  Slide [C7] contains examples of break-through Japanese anime art that became popular in the United States.  The "Speed Racer" cartoon series derives from Tatsu Yoshida's "Mach GoGoGo" series developed in Japan in the 1960s.  Yoshida based the character on the U.S. films "Viva Las Vegas" and the James Bond film, "Goldfinger."  Trans-Lux acquired the U.S. rights, recorded voice-overs, and licensed the

-17-

CONFIDENTIAL – ATTORNEYS EYES ONLY

**EXHIBIT 69**
**PAGE 2394**

cartoon series for broadcast in the United States. Its mix of fiendish conspiracies, action, fast cars, and sparkling eyes captivated American youth. I have emphasized the eye illustration, as it provided inspiration for many later animators and illustrators. The other half of Slide [C7] reflects another anime series that successfully crossed the Pacific Ocean, this time in the mid 1990s. Sailor Moon featured a collection of characters. It builds around an imaginative story of a middle school girl who, led by a talking cat, takes on a plot by the Dark Kingdom to destroy the Earth. Sailor Moon is joined by several friends in her adventures.

47. *Prior Fashion Dolls*. Carter Bryant was deeply influenced by prior fashion dolls. Slides [C8] and [C9] illustrate several fashion dolls that enjoyed commercial success in the 1980s and 1990s. Bryant was free to use the unprotected elements of such dolls, and he did so liberally in his drawings. Doll shapes and facial elements are entitled to rather thin protection due to the anatomical basis for their design (all artists are free to represent the human form), social views of attractiveness (aesthetic functionality), and some basic doll designs being in the public domain. As reflected in Mattel's litigation against Radio City Music Hall and the Goldberger Doll Manufacturing Company, copyright protection in a crowded field like fashion dolls is quite limited. "[I]f the facial features of two dolls were similar not only to each other, but also to those of numerous other dolls available on the market, the similarity would be relatively unlikely to support the inference that the defendant copied from the plaintiff. The defendant might equally have copied from any of the other similar dolls. Alternatively, an observation that features of a work are ubiquitous within an industry might lead a court to doubt that those features are original to the plaintiff." See *Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133, 135 (2d Cir. 2004). Bryant's sketches of the torso, arms, legs, and some facial elements undoubtedly draw from this prior work.

48. *Doll Illustration Art*. Robert Tonner and Mary Bergstein both point to the great influence that Margaret Keane had upon doll illustrators. Her 1981 work, "Ladies in Waiting" (Slide [C10]) brought new sensibilities to face illustration: the bulbous, mesmerizing eyes, disproportionate head. Some of her earlier drawings were the inspiration for Allison Katzman's "Blythe" line of dolls, featuring eyes that changed color with the pull of a string attached to the back of the head. See Slide [C11]. These dolls, manufactured by Kenner, were quite popular in the 1970s and continue to attract collector attention. See Slide [C12].

49. *Fashion Illustration*. As Robert Tonner and Tina Tomiyama explained at our January 3, 2008 meeting, Carter Bryant used fairly standard poses in his sketches of the Bratz dolls. Given his training, love of fashion model runway poses, and experience, Bryant did not innovate the poses reflected in his illustrations. Rather, he used well-worn poses. Slide [C13] captures the highly constrained aspects of fashion illustration and some of that prior art. The left side of the slide shows that fashion drawing is largely about human anatomy and common body, leg, foot, and hand positions, all constrained by the human form. I have included on the right side of the slide fashion illustrations from magazines from the 1930s. One can see aspects of these images (and their stock nature) in Carter Bryant's sketches. As Tina Tomiyama emphasized, Carter Bryant innovated in the fashions, not the poses or the body details.

-18-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2395

50. *Popular Culture circa 1998.*  Slides [C14]-[C19] provide a sense of the broader cultural influences in the 1998-2001 time frame – when Carter Bryant developed the sketches and MGA designed the first generation of the Bratz line of dolls. Bryant specifically acknowledges drawing on some of these materials. Mary Bergstein, Tina Tomiyama, and Robert Tonner all see fashion and doll designers as being heavily influenced by trends in popular culture. They specifically see these influences in Carter Bryant's work. Slide [C14] shows the coming of age of strong, female friend-based television series in the mid to later 1990s. The three female lead characters in the hit television series Friends emphasized female bonding. As Mary Bergstein explains, Ally McBeal was almost a live fashion doll that could appeal to adults and young girls alike. She was also closely associated with sassy female supporting actresses. Sex and the City brought the female bond to a new level. It also revealed an assertiveness and sexuality never before seen in television history. In the music field, the Spice Girls were a major new influence. See Slide [C15]. They brought the multi-racial element, as well as assertiveness. They were not the first female-driven ensemble group (e.g., the Go-Go's came before), but they specifically appealed to a younger audience and fashion played a big role in their image and marketing. The Spice Girls also arose in the merchandising age – with the role of MTV, movie spinoffs, and, of course, a line of dolls brought out by Galoob Toys (later bought by Hasbro). See Slide [C16]. These dolls were a large hit in the 1997 and 1998 Christmas holiday seasons. Slides [C17]-[C18] show several of the advertisements from the August 1998 issue of Seventeen Magazine, which Carter Bryant specifically recalls as an inspiration for his Bratz sketches. Several of the images in that issue bear a close resemblance to the concepts and even some of the rudimentary details in Bryant's sketches. The Steve Madden advertisement on Slide [C17] captures the attitude, large feet, and out-thrust hips. The Kristi ad also uses an upward camera angle to similar effect. The character in the Paris Blues ad – large, anime-like eyes, body language, body proportions, large feet, sassy fashion sense – could almost join Bryant's sketch of the Bratz ensemble without much change.  The Coca Cola ad reflects the attitude and cartoon-like head and body features of Bryant's illustrations. And the Cover Girl ad shows a multi-racial ensemble reminiscent of Carter Bryant's conception. Slide [C18] takes the ensemble concept further: the Dixie Chicks' "Chicks with Attitude" slogan; the cool, self-confident, defiant girls on the left and lower right; and the fashion illustrations on the upper right. These concepts and images were clearly in the public consciousness (and in the places that fashion and doll designers would be looking) in the 1998-2000 period.

51. *Lara Croft and Angelina Jolie.*  Another salient female image of this period was the fashion model as action hero, reflected in the Lara Croft computer game series (introduced in 1996), comic books, novels, and films. See Slide [C19]. Lara is an intelligent, athletic, and risk-taking woman who, somewhat like Indiana Jones, travels the world in pursuit of priceless archeological artifacts. She was famously portrayed in the comic book-like 2001 film by Angelina Jolie, who came to represent the new face of beauty. Even before her portrayal in this film, Jolie's large, penetrating eyes, swollen lips, and multi-ethnic features defined a new ideal at this time, which has followed the same trajectory of the Bratz doll line.

52. *Filtration Factors.*  Slide [C20] shows metaphorically the filtration process. The colander catches the concepts underlying Carter Bryant's sketches – an ensemble of sassy, multi-cultural

-19-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2396

dolls with disproportionately large heads, eyes, and feet, and voluptuous lips. Thus the top level of the pyramid is filtered out and much of the sketches as well. The sketch art is not particularly detailed in many of the elements – the body pose, many aspects of the body dimensions, an ensemble of multi-racial dolls, and the individual facial features. Furthermore, few of these elements are original to Carter Bryant. The colander collects Steve Madden's large feet, standard fashion poses, the Spice Girls (and their multi-racial fashion doll line), Margaret Keane's influential facial illustration, the Speed Racer and Paris Blues anime eye shape, Betty Boop's large head and big eyes, and Angelina Jolie's piercing eyes and protruding lips. Moreover, functional constraints, scènes à faire, and the merger doctrine exclude protection for many aspects of Bryant's sketches. At best, there is only modest protection for a few details and perhaps the compilation of elements, but these would be protected only against "bodily appropriation" – what the Ninth Circuit call "virtual identity." As reflected in the "bowl" of protectable expression, there is a veneer of protection for the sketch-level body art. To illustrate the effects of the filter, I have air brushed out much of the facial and body features. What protectable expression exists in Carter Bryant's sketches relates significantly to the fashions, which are quite detailed. Thus, unlike many of the doll elements, they significantly survive the filter, as does the spiky hair style for one version of Jade.

53. *Comparison.* The next series of slides undertakes a detailed comparison of Carter Bryant's sketches to the first generation Bratz doll. (All versions of Bratz dolls are based on the same sculpt. Face painting and body tones enable one doll shape to provide the basis for four distinctive looks.) Slide [C21] illustrates the nature of the comparison. As explained in Section I of the report, the purpose of the filtration step is to prevent an author or artist from being able to assert control over unprotectable aspects of a work. Thus, the appropriate comparison is not between the plaintiff's work (in this case, the Carter Bryant sketches) and the defendant's work (in this case, the Bratz dolls), but rather the protected elements of the plaintiff's work (the air brushed out image) and the defendant's work. As reflected in the pyramid on the right, there is overlap between Carter Bryant's Jade sketch and MGA's Jade doll at some of the higher levels of the pyramid. But much of that similarity is filtered out, leaving rather modest similarity of *protected* expression. The slides that follow illustrate this point. Furthermore, the sketches simply do not provide anywhere near the detailed body and facial features of MGA's Bratz doll.

54. *Body Elements.* Slide [C22] compares the two principal Carter Bryant body sketches with comparable views of the MGA Bratz blank sculpt. It is important to recognize that the rudimentary detail of Bryant's sketches and the fact that much of what Bryant does reflect in this sketch should be filtered out based on prior art (fashion dolls, fashion illustration, human body), scènes à faire (fashion doll characteristics), and functionality (joint characteristics). Nonetheless, there are significant differences between the sketches and the blank sculpt. Slide [C23] illustrates several of the differences. The two-dimensional width of the waist on the sketch is approximately half of the width of the waist on the sculpt (compare the mid-section red and blue lines). The separation between the thighs (red) is about one-third the separation of the sculpt. The left leg angle of the sketch is set at a significant angle (red line) whereas the angle of the sculpt is nearly vertical (blue line). Slide [C24] compares a partial profile angle. The two look quite different for several reasons. First the sculpt simply does not bend in the way shown

-20-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2397

on the sketch. Thus, the sculpt cannot accommodate thrust-forward hips or a turned waist. Second, the legs of the sculpt are symmetrical and therefore cannot resemble the pose of the sketch. The sculpt arms are significantly longer.

55. *Feet.* Slide [C25] focuses on the foot size and shape of the sketch and sculpt. Even though the sketch appears to be wearing shoes, the sculpt foot size is much smaller than suggested by the sketch. In addition the shape of the sculpt foot is much more slender. As reflected by the red line, the ankle width on the sketch is much narrower than the sculpt.

56. *Legs.* Slide [C26] compares the leg dimensions. The sketch positions the knee cap substantially higher up the leg than reflected in the sculpt. This reflects the oversized foot concept that inspired the drawings. In its design, however, MGA chose a less exaggerated foot and lower leg. The sketch depicts a more adult-shaped leg, with a wider upper thigh region, whereas the sculpt comes closer to more common and youthful leg dimensions.

57. *Arms.* Slide [C27] compares the arm dimensions. The arms of the sculpt are considerably longer in relationship to other body dimensions. Whereas the tips of the fingers in sketch reach just below the hip region, the hands of the sculpt extend nearly to the knee. The elbow bends are also different. The sculpt has a much longer bicep region.

58. *Hands.* Slide [C28] shows the hands and wrist angles to be significantly different. The sketch has bent wrists with the thumb separated from the fingers. The sculpt reflects a nearly flat wrist, thumb and fingers in parallel, and less separation between the thumb and forefinger.

59. *Torso.* Slides [C29]-[C30] compare the torso regions. Slide [C29] shows that the sculpt has a a significantly more pronounced chest region and rounded abdomen. Slide [C30] shows that whereas the sketch features a triangular crotch region, the sculpt has a rectangular shape. It also shows quite a different ratio of shoulder width to hip width. The sculpt has broader shoulders.

60. *Head Shape.* Slide [C31] compares the major contours of the head region. The dimensions are quite different, as reflected in the width between the eyes (narrower on the sculpt), distance from the middle of the mouth to the ear (much longer on the sculpt), and size of the forehead (much larger on the sculpt). More generally, the Bryant sketch suggests a more mature face, whereas the sculpt is baby-faced and more full-cheeked. The sketch provides little indication of the depth of the facial features. The sculpt reveals significant three-dimensionality – especially in the eye cavities, cheek region, and chin shape.

61. *Facial Features: Eye.* Slide [C32] provides a study of the face painted eye. The right side of the slide contains the sculpt eye. The left side of the slide provides different eye images drawn from Carter Bryant's sketch (third from the top), prior art (first image – Japanese anime (Speed Racer); second image – (Paris Blues ad)), and an actual eye (belonging to Angelina Jolie). The purpose of this exercise is to make several points. First, the Carter Bryant sketch must be substantially discounted by the influence of prior art. Second, the depiction of the sketched eye owes much to the human form, also limiting the degree of protectable expression. And third,

-21-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2398

that the Bratz Jade eye is more closely similar, or least as similar, to the Paris Blues and Angelina eyes as it is to the Carter Bryant sketch.

62. *Facial Features: Eyes.* Slides [C33]-[C34] reveal substantial differences between the sketched eyes and the eyes on the finished doll. The sketch has no lower lashes, different eye height, different relationship between the eye brow and the inside corner of the eye. In many respects, the Bratz doll eyes are more like Angelina Jolie's eyes than the eyes in the Bryant sketch. Slide [C34] highlights four regions of the Bratz doll eye that bear no similarity to the Bryant sketch. Region a shows lower brow lashes (or eye liner) on the Bratz doll, whereas the Bryant sketch has no corresponding lashes. Region b shows a wide, rounded left eye and pupil on the Bratz doll, whereas Bryant sketched a more angular, narrower opening. Region c shows the positioning and coloration of the eye brow. The left edge of the right brow in Bryant's sketch is directly above the inner corner of the eye, whereas it is set toward the middle of the eye on the MGA doll. Furthermore, Bryant uses black coloring; the doll uses brown. Region d shows a different lash effect. Whereas the sketch has thicker, more concentrated lashes on the outer rim of the eye, the doll shows lashes toward the middle. These are just a few of the many differences. The point is that the MGA face painters did not follow the Bryant sketches but rather made their own artistic choices.

63. *Facial Feature: Lips.* Slide [C35] compares MGA's Jade doll lips with Carter Bryant's sketch (middle), the lips of the character depicted in the Paris Blues advertisement, and a photograph of Angelina Jolie's lips. The Jade doll lips differ significantly from the Bryant sketch in terms of shape (ratio of top lip to bottom lip, no opening on the doll, curvature at the top of the lips (rounded in the sketch versus indented on the doll), color shading). In many respects, the Bratz doll mouth is closer to the photograph of Angelina Jolie's plump lips than to Carter Bryant's rather basic illustration.

64. *Facial Features: Concept.* When the entire face of the set of dolls is considered, it appears that MGA's creative artists evolved the concept away from the more clearly distinctive racial appearance toward an inter-racial mixture. All of the dolls have a more ambiguous multi-cultural sensibility. Mary Bergstein explains this point more fully.

65. *Compilation of Elements.* Although the individual elements do not in my opinion reflect significant (and certainly not substantial) similarity to copyright protected elements of Carter Bryant's sketches, there remains the question of whether the compilation of elements in the sketches has been improperly appropriated. But here again, many aspects of a compilation claim fail to survive filtration. Fashion dolls, multi-racial collections of fashion dolls (Spice Girls), large head/large eyes/large feet (Margaret Keane, Blythe, Speed Racer, Steve Madden, Paris Blues), piercing eyes and large lips (Lara Croft, Angelina Jolie) can all be found in various permutations. As explained in Section I of the report, compilations of largely unprotected elements are subject to a much higher threshold for similarity – "bodily appropriation" or virtual identity. I do not believe that the similarities between the overall compilation of elements in MGA's individual Bratz dolls reflect even substantial similarity to any protected compilation in Bryant's sketches. In any case, they do not rise to the level of bodily appropriation.

-22-

CONFIDENTIAL – ATTORNEYS EYES ONLY

EXHIBIT 69 PAGE 2399

66. *Summary of AFC Analysis.* I assumed for purposes of this analysis that MGA's creative artists worked from Carter Bryant's concepts. Some members of the creative team saw Carter Bryant's sketches and worked with his input. Yet, these materials were conceptual and abstract. They did not provide the type of detailed "blueprints" or instructional direction that significantly constrained their expression of Bryant's concepts. Furthermore, as Mary Bergstein explains, the concepts evolved in the production process. The idea of multi-racial/ethnic dolls morphed through MGA's creative process into inter-racial/ethnic dolls. The highly exaggerated feet and body language transformed into prettier, more naturally proportioned bodies. Carter Bryant's emphasis on fashions remained, but they do not find expression in the scultps and face paint. From the standpoint of copyright protection, Carter Bryant's sketches lie in the upper regions of the abstractions pyramid. His concepts do not attract copyright protection. His sketches reflect a mix of relatively detailed soft goods elements (clothing and accessory) and largely rudimentary hard goods elements. Thus, the doll features attract relatively modest protection. When the sketches are subjected to successive filters of copyright law's limiting doctrines (originality, merger, scènes à faire, functionality), many of the hard goods elements of Carter Bryant's fall away entirely or fade in significance. The anatomical aspects of the sketches, the standard poses, the aspects of the art based on human features, well-known techniques), and prior art that was widely available and to which Carter Bryant acknowledges he was exposed leaves a rather modest residue of copyright protection in the basic doll design. The strongest claim to copyright lies in the compilation of elements. But since the individual elements themselves attract relatively modest (if any) protection, the compilation itself only enjoys protection against "bodily appropriation" or "virtual identity." As the comparisons show, MGA's Bratz blank and face paint do not reflect anywhere near that level of similarity. The elements differ quite significantly from the Bryant sketches. And the compilation itself reflects many prior art aspects (other fashion dolls, the Spice Girls) and scènes à faire. Based on these considerations, I do not believe that MGA's Bratz dolls infringe copyright in the Carter Bryant doll sketches.

### III. Analysis of the 1999 Mattel "EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT" Signed by Carter Bryant

67. It is my understanding that the parties dispute whether Carter Bryant prepared the "Bratz Sketches" in 1998, prior to his rejoining Mattel in early 1999, or while employed by Mattel after January 4, 1999. MGA has asked to me to provide my opinion on two questions: (1) whether Mattel's "EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT" (hereinafter "1999 Agreement"), which Carter Bryant signed on January 4, 1999, would provide for Mattel to own a trade secret for the Bratz line of fashion dolls if Bryant conceived the idea between January 4, 1999 and his departure from Mattel on October 19, 2000; and (2) whether the 1999 Agreement would provide for Mattel to own copyright (or any other intellectual property rights) in the Bratz sketches if they were in fact created between January 4, 1999 and his departure from Mattel on October 19, 2000.

68. *General Basis for Opinion.* Over the course of my career, I have analyzed a wide range of employment and licensing agreements in the entertainment and technology industries. This has included teaching about assignment agreements in courses on entertainment law and intellectual

-23-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2400

property law, examining hundreds of intellectual property licensing agreements in the course of consulting and expert work, and studying cases, treatises, and industry form books on employment, licensing, trade secrets, and assignment agreements for scholarship on the termination of transfers provisions of the Copyright Act, a casebook comprising a series of case files on entertainment law, and articles on the intersection of intellectual property and bankruptcy law.

69. *Specific Basis for Opinion.* In conducting this analysis, I have drawn upon the following sources: (1) 1999 Mattel agreement; (2) other Mattel employment agreements; (3) deposition testimony of Carter Bryant, Tim Kilpin, Alan Kaye, Ann Driskill, Anna Rhee, Sandy Yonemoto, Lissa Freed, Veronica Marlow, Adrian Fontanella, Ivy Ross, Maureen Tafoya, Teresa Newcomb; (4) Expert Report of Christina Tomiyama; (5) treatises and cases on California contract law and the interpretation of employment agreements; (6) U.S. Patent and Trademark Office records relating to Mattel's patents; and (7) general intellectual property, entertainment law, and IP licensing books, treatises, and form books.

70. *Legal Standard.* In interpreting written employment agreements (as well as written contracts generally), California courts look to the objective manifestations of the parties' intent, including the words used in their agreement as well as extrinsic evidence, including: the circumstances surrounding the formation of the agreement; the nature, purpose, and subject matter of the contract; and the parties' subsequent conduct.[1] See *People v. Shelton,* 37 Cal. 4th 759, 767, 37 Cal. Rptr. 3d 354 (2006); *Wolf v. Superior Court,* 114 CA4th 1343, 1356, 8 CR3d 649 (2004); *De Anza Enters. v Johnson,* 104 CA4th 1307, 1315, 128 CR2d 749 (2002); see generally George W. Kuney and Donna C. Looper, California Law of Contracts §5.1 (2007). Where the terms of a contract are uncertain, California Civil Code §1654 provides, following the doctrine of *contra preferentem* (interpreting ambiguous agreements against the drafter), that "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." See *Powerine Oil Co., Inc. v Superior Court,* 37 C4th 377, 33 CR3d 562 (2005). This rule applies with particular force in the context of "contracts of adhesion" – in which a party with strong bargaining power drafts and offers a standardized contract on a "take-it-or-leave-it" basis. See *Badie v Bank of America,* 67 CA4th 779, 79 CR2d 273 (1998); *Neal v. State Farm Ins. Cos.,*188 CA2d 690, 695, 10 CR 781 (1961); see generally George W. Kuney and Donna C. Looper, California Law of Contracts §5.73 (2007). Even beyond this interpretive convention, California courts impose two further limitations on contracts of adhesion. First, a provision that "does not fall within the reasonable expectations of the weaker or 'adhering' party will not be enforced against him." Second, under principles of equity, unduly oppressive or "unconscionable" provisions are not enforceable. See *Cubic Corporation v. Marty,* 185

---

[1] California courts construe the parol evidence rule narrowly. Extrinsic evidence is admissible to explain the meaning of a written contract as long as it is "relevant to prove a meaning to which the language of the instrument is reasonably susceptible," even if no ambiguity is apparent on the face of the document. See *PG&E v G.W. Thomas Drayage & Rigging Co., Inc.,* 69 C2d 33, 37, 69 CR 561 (1968).

-24-

CONFIDENTIAL – ATTORNEYS EYES ONLY

EXHIBIT 69 PAGE 2401

Cal.App.3d 438, 229 Cal.Rptr. 828, 1 U.S.P.Q.2d 1709 (Cal. Ct. App. 1986).

71. *Formation of the 1999 Agreement.* As a threshold matter, it is my opinion that the 1999 Agreement is a contract of adhesion. Under California law, a "contract of adhesion" is a standardized contract that is drafted and presented by a party having superior bargaining power to another on a take-it-or-leave-it basis. The 1999 Agreement is a pre-printed form contract specifying terms. It does not include spaces for filling in or altering the specified terms. The only area for writing contains two signature lines, one for the employee and one for the company representative. Carter Bryant stated that he was not given an opportunity to read the agreement. In his words, "[w]e were basically just instructed to sign the paperwork to begin work." See Deposition of Carter Bryant, 30:21-31:25. Teresa Newcomb signed Bryant's 1999 Agreement on behalf of Mattel on January 4, 1999. At the time of her deposition in this matter (in 2008), she was a Senior Recruiter at Mattel. She testified that it was her understanding that the confidentiality and inventions agreement was not negotiable. See Deposition of Teresa Newcomb, 110:13-113:12. Lissa Freed, a Director of Human Resources at Mattel since 2001 testified that the "Employee Confidential Information and Inventions Agreement" is a standard form that new Mattel employees sign. See Deposition of Lissa Freed, 18:10-24:21.

72. *Summary of the 1999 Agreement.* The 1999 Agreement begins with a preamble summarizing the principal obligations. Section 1 sets forth the "Trade Secret" provisions. Section 2 contains the "Ownership of Inventions" provisions. Section 3 addresses "Conflicts with Other Activities." Section 4 includes various provisions relating to: modification, termination, and waiver; severability; remedies; and choice of law.

73. *The Trade Secret Provisions.* Section 1 of the 1999 Agreement is entitled "Provisions Related to Trade Secrets." For purposes of determining whether Mattel might have owned a trade secret for the Bratz line of fashion dolls (under the assumption that Bryant conceived the idea during the term of the agreement), the pertinent language provides:

    (a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

    (b) As used in the Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors, and other persons and entities with whom the Company does business.

    (c) I will not disclose or use at any time either during or after my employment

-25-

CONFIDENTIAL --
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2402

with the Company, any Proprietary information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary information.

(d)   Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable, and other materials (including all copies) in my possession, custody or under my control containing or disclosing Proprietary information.

74. *Analysis of the Trade Secret Provisions of the 1999 Agreement.*  Subsection (a) contains an acknowledgment that "Proprietary information" includes "information" that an employee may develop or discover "as a result of" employment with Mattel.  Subsection (b) defines "Proprietary Information" to mean "any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors, and other persons and entities with whom the Company does business."  This definition tracks the definition of a "trade secret" in the Uniform Trade Secrets Act.

75. *Application of Trade Secret Provisions of the 1999 Agreement to Carter Bryant's Bratz Fashion Doll Idea.*  Under the assumption that Carter Bryant came up with the Bratz idea between January 4, 1999 and October 19, 2000, the question arises whether this idea falls within the general definition of "Proprietary Information" and whether he developed it "as a result of" his employment with Mattel.  If so, then he may not "disclose or use [it] at any time either during or after [his] employment with the Company . . . except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing."  See Subsection (1)(c).  Furthermore, he would be obliged to "deliver to the Company all tangible, written, graphical, machine readable, and other materials (including all copies) in [his] possession, custody or under my control containing or disclosing [such] information" upon his termination.  See Subsection (1)(d).

76. *Interpretation of "As a Result of My Employment with the Company" in the 1999 Agreement.*  A critical threshold question in evaluating whether or not Carter Bryant had any trade secret obligations vis à vis Mattel with regard to his Bratz idea is understanding what is meant by the phrase "as a result of my employment with the Company" in subsection 1a of the 1999 Agreement.  California Civil Code §1644 requires contract language to be given its ordinary common meaning unless it is clear that the parties intended a special or technical meaning. There is no reason to believe that this phrase was intended to be given special or technical meaning.  In my opinion, the ordinary meaning of "as a result of my employment with the company" is at best ambiguous as applied to Bryant's development of the Bratz concept.  "As a result of my employment with the Company" would certainly cover ideas or projects that fell

-26-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2403

directly within an employee's job responsibilities. Thus, had Bryant been a doll designer working in a flanker brand division, then he would have not been at liberty to develop a new doll line on his own. But as Tina Tomiyama, who worked with Carter Bryant at Mattel during the time period in question, reports, the Bratz "sketches were entirely unrelated to the work Carter was asked to do in the Barbie® Collectibles group." Expert Report of Christina (Tina) Tomiyama. Furthermore, Carter Bryant was a "soft goods" designer, not a doll designer. Tomiyama further notes that many of Mattel's creative employees in the Design Center pursued personal artistic projects and developed their art portfolio in their spare time.

77. *Interpretation of Ambiguous Terms.* California Civil Code §1654 provides that "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." This rule applies with special force in the case of contracts of adhesion. Therefore, it is my opinion that the phrase "as a result of my employment with the Company" would be construed narrowly if Bryant's conception of the Bratz idea were determined to have occurred during the term of the 1999 Agreement.

78. *The Inventions Ownership Provision.* Section 2 of the 1999 Agreement is entitled "Ownership of Inventions." For purposes of determining ownership of intellectual property in the Bratz sketches (under the assumption that they were prepared during the term of the agreement), the pertinent language provides:

> (a) I agree to communicate to the Company as promptly and fully as practicable all inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents, and copyrights for all such inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

> (b) As used in this Agreement, the term "inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data, computer programs and formulae, whether patentable or unpatentable.

I believe that both ordinary and technical meaning suggest that this "inventions" ownership provision does not cover expressive artistic drawings but rather technological works.

79. *Analysis of Inventions Ownership Provisions of the 1999 Agreement: Ordinary Meaning.* Section 2(a) refers to "inventions," which section 2(b) defines as including, "but not limited to, all discoveries, improvements, processes, developments, designs, know-how, data, computer programs and formulae, whether patentable or unpatentable." California courts typically consult a dictionary to determine ordinary meaning. See *People ex rel Lockyer v. R.J. Reynolds Tobacco*

-27-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2404

*Co.*, 116 CA4th 1253, 1263, 11 CR3d 317 (2004).   Standard dictionary definitions refer to: "a device, contrivance, or process originated after study and experiment," *Merriam-Webster Dictionary* (on-line edition); and "a new device, method, or process developed from study and experimentation: the phonograph, an invention attributed to Thomas Edison," *American Heritage Dictionary* (on-line edition).  Thus, the ordinary meaning of the word "invention" in the context of the 1999 Agreement relates to technological innovation.  This interpretation is reinforced by the list of topics covered in section 2(b), all of which relate to technological creativity.  By contrast, if this agreement was intended to cover artistic creativity of the types that Carter Bryant and other fashion illustrators would recognize, it would refer to pictorial or graphic works, artistic creativity, and/or works of authorship.

80. *Analysis of Inventions Ownership Provisions of the 1999 Agreement: Technical Meaning.*
Civil Code §1645 provides that: "[t]echnical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense."[2]  Viewing the terms in Sections 2(a) and (b) of the Mattel Inventions Agreement from a technical perspective, they cover the general subject matter of the Patent Act, as opposed to expressive graphic works that fall more squarely within copyright law's domain (with a caveat for designs and computer programs, which I address below).  Beginning with the U.S. Constitution, the Intellectual Property Clause distinguishes between "Writings" and "Discoveries," the former relating to copyright subject matter and the latter corresponding to patent subject matter.  See U.S. Constitution, Art. I, Sec. 8, Cl. 8.  In delineating the permissible subject matter of the Patent Act, Section 101 states "[w]hoever *invents* or *discovers* any new and useful *process*, machine, manufacture, or composition of matter, or any new and useful *improvement* thereof." (Emphasis added).  This provision thus covers four of the terms listed in Section 2(b): "inventions," "discoveries," "processes," and "improvements."  The term "developments" is closely related to "improvements."  It also arises in the context of "research and *development*," a term associated with technological innovation.  The term "know-how" is synonymous with tacit trade secret knowledge, which has specialized meaning in technology industries.  "Data," "computer programs," and "formulae" all have strong technological associations.  The last remaining term, "designs," is somewhat more ambiguous, being associated with both technological (structural design, machine design) and artistic (fashion, art) activities.  Taking all of the terms listed in subsection 2(b) together, however, reinforces the technological interpretation of "design."  In my experience, with the exception of "design," these terms are not commonly used in art-oriented workplaces or agreements – such as advertising, animation, film, theatrical, or literary fields.  Subsection 2(a) bolsters this patent-oriented,

---

[2] See *Denver D. Darling, Inc. v. Controlled Env'ts Constr., Inc.*, 89 CA4th 1221, 1236, 108 CR2d 213 (2001) (allowing admission of parol evidence to explain when, in the context of a building contract, the concrete surfaces in a cold-storage facility would be required to meet a high degree of flatness); *Rosen v State Farm Gen. Ins. Co.*, 30 C4th 1070, 135 CR2d 361 (2003) (holding that a homeowner's insurance policy that defined the term "collapse" to mean "actually fallen down or fallen into pieces" did not provide coverage for the imminent collapse of two decks).

-28-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2405

technological meaning through the reference to "all inventions *conceived and reduced to practice.*" The terms "conception" and "reduction to practice" derive clearly from Section 102(g) of the Patent Act. Such technical terms of art are used in determining who was the first to invent in a priority battle for ownership of utility patents. By contrast, the Copyright Act does not talk in terms of "inventions" but rather of "authorship." Section 102(b) of the Copyright Act expressly excludes any "idea, procedure, process, system, method of operation, concept, principle, or discovery" from copyright protection.

81. *"whether patentable or unpatentable."* The final clause of the definition of subsection 2(b) – "whether patentable or unpatentable" – reinforces the technological focus of the invention ownership provision. The first part of the clause is clear – "patentable." Utility patents fall on the technology side of the technology/art divide. One could quibble that the availability of "design patents" reaches into the more artistic domain. Having done an exhaustive review of all 1,225 patents held by Mattel, I can say with confidence that Mattel has not pursued design patents on the types of expressive art reflected in Carter Bryant's Bratz sketches. To the contrary, the overwhelming majority of the design patents are toy or device related. Mattel has not used design patents to protect its core fashion design franchises. The second part of the final clause – unpatentable – can be interpreted in one of two ways: (1) like patentable things but not necessarily meeting the technical requirements for patentability (i.e., not novel, obvious); or (2) any creativity, whether or not like patentable things. The latter interpretation would mean that the entire clause was superfluous. By stating "whether patentable or unpatentable," the clause most plausibly indicates that the definition of "invention" is not limited to things that meet the requirement of the Patent Act, although it is limited to the technologically-oriented terms set forth.

82. *Understanding the reference to "copyrights" and "copyright applications" in subsection 2(a).* The reference to "copyrights" and "copyright applications" in subsection 2(a) creates some tension with the "technology" limitation on inventions. In my view, however, that tension is removed by recognizing that computer programs are eligible for both patent and copyright protection. And Mattel had in fact entered markets for computer-related games and toys by the mid-1990s.

83. *Circumstantial evidence of the meaning of "inventions": Mattel's business and patenting activity.* California courts will consider a wide range of evidence bearing on the meaning of a contract term. If Mattel was limited to the "Barbie" and fashion dolls, then the "technological" interpretation of "invention" might seem odd. It is important to recognize that Mattel is a broad-based toy company, with many technologically oriented divisions. It is common for legal departments in large enterprises to standardize invention assignment agreements and to have all employees in the enterprise sign the form, if it bears little connection to the work of that employee. The University of California has all professors – whether in hard sciences, law, or English – assign their "inventions" made within the scope of their employment over to the University. Yet this clause does not extend to copyrightable works. A review of Mattel's extensive patent portfolio (1,226 patents) reveal a wide range of patenting acitivity, although little related to fashion dolls. Those relatively rare patents that even mention "fashion dolls"

-29-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2406

(including a rare design patent) do not relate to the "soft goods"-type of work that Carter Bryant was engaged in. The fashion doll-related patents principally relate to mechanical features of the dolls, and not their visual or artistic characteristics.

84. *Circumstantial evidence of the meaning of "inventions": Subsequent Changes to Mattel's Standard Form Inventions Agreement.* California courts will consider parties' subsequent behavior in interpreting contractual terms. In March 2004, Mattel substantially rewrote its "Employee Confidentiality and Inventions Agreement" to cover:

> (b) Disclosure of Inventions; Ownership and Assignment of My Mattel Inventions.
>> (i) Disclosure of All Inventions. I will promptly disclose in confidence to Mattel all inventions, discoveries, improvements, developments, designs, works, original works of authorship, ideas, know-how, formulas, processes, methods, software programs, databases, mask works, and trade secrets, whether or not patentable, copyrightable, or protectable as trade secrets (collectively, "Inventions") . . .

> (c) Assignment of Mattel's Proprietary Rights. In addition to the assignment of My Mattel Inventions to Mattel set forth in Section 2(b)(ii), I agree to assign to Mattel, and do hereby irrevocably assign to Mattel, in perpetuity and without any limitation or reservation of rights, all of my right, title, and interest in and to (i) all worldwide patent rights, copyrights, trade mark rights, good will, mask work rights, trade secret rights, and other intellectual property rights in and to My Mattel Inventions, and (ii) all Moral Rights in and to all of the foregoing (all of the foregoing, "Mattel's Proprietary Rights"). . . .

Note that the new definition of "inventions" specifically encompasses "original works of authorship" and expands the final clause to state "whether or not patentable, copyrightable, or protectable as trade secrets." This agreement specifically refers to assignment of "copyrights." These changes imply that the prior definition either did not cover copyrightable expression or, at a minimum, that the prior language was ambiguous with regard to ownership of expressive works.

85. *Ambiguous Terms.* As explained above, I consider the 1999 Agreement invention assignment clause to exclude the Bratz sketches even if they were done by Carter Bryant during the period he was employed at Mattel. At a minimum, the scope of the inventions clause is ambiguous as it relates to such works. California Civil Code §1654 provides that "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." This rule applies with special force in the case of contracts of adhesion. Therefore, it is my opinion that the 1999 Agreement does not extend to the Bratz sketches. Furthermore, I do not believe that such a broad interpretation of the inventions assignment provision would "fall

-30-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2407

within the reasonable expectations of the weaker or 'adhering' party." See *Cubic Corporation v. Marty*, 185 Cal.App.3d 438, 229 Cal.Rptr. 828, 1 U.S.P.Q.2d 1709 (Cal. Ct. App. 1986).

86. *Ineligibility of Bryant's Bratz Concept or Sketches for Utility Patent Protection circa 2000.* Based on my understanding of patent law, I do not believe that the concept or sketches for the Bratz dolls could have received a utility patent. It is doubtful that the Patent Office would seriously consider a patent application for fashion dolls apart from any mechanical or other technological features. Utility patents are not available for purely aesthetic features of articles of manufacture. There were no technological features in the Bratz concept or sketches.

87. I continue to review materials relating to this matter and reserve the right supplement my report as appropriate.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of February, 2008, at Berkeley, California.

_____
Peter S. Menell

-31-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2408

A

EXHIBIT 69
PAGE 2409

Expert Report of Professor Peter Menell                                          Appendix A

**Peter S. Menell**
Professor of Law
Director, Berkeley Center for Law & Technology
Boalt Hall School of Law
University of California at Berkeley
Berkeley, California 94720
(510) 642-5489; (510) 643-1328 (FAX)
pmenell@law.berkeley.edu

## PROFESSIONAL EXPERIENCE

**University of California at Berkeley School of Law (Boalt Hall)**           7/90 - present
    **Professor of Law** (since 1994) - principal areas: Intellectual Property and New Technology;
    Property Law; Entertainment Law; Environmental Law and Policy; Law and Economics.
    **Co-Founder** (1995), **Director** (1995-present), **and Executive Director** (2000-05), **Berkeley**
    **Center for Law and Technology** http://www.law.berkeley.edu/bclt

    **Visiting Professor of Law** - Swiss Federal Institute of Technology (ETH) (1987-present)
    (one week course on U.S. intellectual property law); Studienzentrum Gerzensee, Switzerland
    (2005, 2001) (one week course on Intellectual Property in the New Technological Age);
    Seoul National University College of Law (2007) (two week course on Intellectual Property
    in the Digital Age); Tel Aviv University (2005, 2006, 2007) (two week course on Intellectual
    Property in the Digital Age); University of Toronto (Distinguished Visiting Professor, Fall
    2002); Stanford Law School (Fall 1992), Harvard Law School (Winter 1990); **Associate**
    **Professor of Law** - Georgetown University Law Center (1987 - 90)

    **Hon. Jon O. Newman, U.S. Court of Appeals, Second Circuit**               9/86 - 7/87
    **Law Clerk**

## EDUCATION

**Harvard Law School** J.D., cum laude, 1986
    *Honors and Awards*: Harvard Law Review, vols. 98 & 99 (Articles Editor); Olin Fellow;
    John M. Olin Prize; Nathan Burkan Memorial Competition, First Prize

**Stanford University** Ph.D. (economics) 1986, M.A. 1982
    *Doctoral Dissertation*: "Essays on the Implications of Transaction Costs for the Design
    of Legal Rules and Institutions"

**Massachusetts Institute of Technology** S.B. (economics), Phi Beta Kappa, 1980

-1-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2410

## PUBLICATIONS

### Books

Intellectual Property in the New Technological Age (with R. Merges and M. Lemley)  (Aspen Law& Business, 1st ed. 1997, 2nd ed. 2000, 3rd ed. 2003, 4th ed. 2006, 4th ed. revised, 2007) (with Case and Statutory Supplement and Teacher's Manual)

Software and Internet Law (with M. Lemley, R. Merges, and P. Samuelson) (Aspen Law & Business 2000, 2nd ed. 2003, 3rd ed. 2006) (with Teacher's Manual)

Environmental Law (International Library of Essays in Law and Legal Theory  (Second Series),  Ashgate Publishing) (2002)

Governance of Resources: A Comparative Institutional Approach to Property (with W. Pritchett) (Foundation Press, forthcoming 2008) (with Teacher's Manual)

Property Law and Policy: A Comparative Institutional Perspective (with J. Dwyer) (Foundation Press, 1998) (with Teacher's Manual)

Environmental Law and Policy (with R. Stewart) (Aspen Law & Business (formerly Little, Brown & Co.), 1994)

Intellectual Property in the Entertainment Industries (with L. Sobel and J. Stern) (Foundation Press) (forthcoming)

Intellectual Property (with N. Netanel and A. Reese) (Foundation Press) (forthcoming)

Patent Case Management Judicial Guide (in process) (with Matthew Powers, Lynn Pasahow, and James Pooley)

### Special Journals (Founder and Supervising Professor)

Annual Review of Law and Technology, Berkeley Technology Law Journal (1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005 (two volumes), 2006, 2007)

Annual Review of Environmental and Natural Resource Law, Ecology Law Quarterly (1999, 2000, 2001, 2002)

-2-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2411

### Articles, Book Chapters, and Encyclopedia Entries

Property as a Triadic Relation (in process)

The Evolution of Legal Protection for Computer Software (in process)

Defusing the Termination of Transfers Time Bomb (in process) (with D. Nimmer)

Accessibility without Piracy: Reinvigorating Copyright's Deposit and Catalog Functions in the Digital Age (in process)

Are Software Patents ". . . anything under the sun made by man . . ."? (in process)

Copyright's Experimental Use Doctrine (in process)

Intellectual Property and the Law of Land, 30, Regulation No. 4, p. 64 (Winter 2008)

Intellectual Property and the Property Rights Movement, 30 Regulation No. 3, p. 36 (Fall 2007)

Knowledge Access and Preservation Policy in the Digital Age, 44 Houston Law Review 1013 (2007)

Intellectual Property and the Property Rights Movement, 30 Regulation No. 3, p. 36 (Fall 2007)

Intellectual Property Law, chapter in Handbook of Law and Economics, edited by A. Mitchell Polinsky and Steven Shavell ( 2007) (with S. Scotchmer)

Legal Realism in Action: Indirect Copyright Liability's Continuing Tort Framework and Sony's *de facto* Demise, 55 UCLA L. Rev. 143 (2007) (with D. Nimmer)

The Property Rights Movement's Embrace of Intellectual Property: True Love or Doomed Relationship?, 34 Ecology Law Quarterly 713(2007)

Unwinding Sony, 95 California Law Review 941 (2007) (with D. Nimmer)

Bankruptcy Treatment of Intellectual Property Assets: An Economic Analysis, 22 Berkeley Technology Law Journal 733 (2007)

A Method for Reforming the Patent System, 13 Michigan Telecommunications and Technology Law Review 487 (2007)

Economic Aspects of Intellectual Property, in Encyclopedia of Law and Society: American

-3-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2412

and Global Perspectives, Sage Publications (2007)

An Economic Assessment of Market-Based Approaches to Regulating the Municipal Solid Waste Stream, in Jody Freeman and Charles Kolstad (Eds), Moving to Markets in Environmental Regulation: Lessons from Twenty Years of Experience (Oxford University Press, New York, 2006).

Copyright's "Staple Article of Commerce Doctrine": Patently Misguided, 53 Journal of the Copyright Society 365 (2006) (with D. Nimmer).

Regulating Spyware: The Limitations of State "Laboratories" and the Case for Federal Preemption of State Unfair Competition Laws, 20 Berkeley Technology Law Journal 1363 (2005)

Indirect Copyright Liability: A Re-examination of Sony's Staple Article of Commerce Doctrine, 20 Berkeley Technology Law Journal 511 (2005) (Amicus Curiae brief submitted in Metro-Goldwyn-Mayer Studios Inc., et al., v. Grokster, Ltd., et al. (U.S. Supreme Court));

Bankruptcy Treatment of Copyrights, Chapter 19A of Nimmer on Copyright (2005)

The Rise of Internet Interest Group Politics, 19 Berkeley Technology Law Journal 1 (2004) (with A. Burstein and W. DeVries)

Pre-existing Confusion in Copyright's Work-for-Hire Doctrine, 50 Journal of the Copyright Society 399 (2003) (with D. Nimmer & D. McGimsey).

Envisioning Copyright Law's Digital Future, 46 New York Law School Law Review 63 (2002- 03). Reprinted in National Association of College and University Attorneys, Copyright Issues in Higher Education: A Legal Compendium (2006).

Reunifying Property, 46 St. Louis University Law Review 599 (2002)  (with J. Dwyer).

Sound Recordings, Works for Hire, and the Termination-of-Transfers Time Bomb, 49 J. Copyright Society 387 (with D. Nimmer) (2001).

Intellectual Property, in N. J. Smelser and Paul B. Baltes  (editors) 2001  International Encyclopedia of the Social & Behavioral Sciences.  Pergamon, Oxford.

Property, in N. J. Smelser and Paul B. Baltes  (editors) 2001  International Encyclopedia of the Social & Behavioral Sciences.  Pergamon, Oxford.

Foreword, Annual Review of Environmental and Natural Resource Law, 28 Ecology Law Quarterly 225 (2001) (with J. Brax).

-4-

CONFIDENTIAL --
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2413

Foreword, Annual Review of Law & Technology, 16 Berkeley Technology Law Journal 1 (2001) (with C. Cretsinger)

Foreword, Annual Review of Environmental and Natural Resource Law, 27 Ecology Law Quarterly 541 (2000).

Economic Implications of State Sovereign Immunity from Infringement of Federal Intellectual Property Rights, 33 Loyola of Los Angeles Law Review 1399 (2000).

Intellectual Property: General Theories, Encyclopedia of Law & Economics: Volume II (2000) (Boudewijn Bouckaert and Gerrit de Geest (eds)) Edward Elgar: Cheltenham, UK.

Foreword, Annual Review of Environmental and Natural Resource Law, 26 Ecology Law Quarterly 679 (1999).

An Epitaph for Traditional Copyright Protection of Network Features of Computer Software, 43 Antitrust Bulletin 651 (Fall-Winter 1998)

Regulation of Toxic Substances, The New Palgrave Dictionary of Economics and the Law, (1998).

Educating Consumers about the Environment: Labels versus Prices, in Law and Economics of the Environment (Roger van den Bergh and Erling Eide (eds), Centre for Advanced Study, The Norwegian Academy of Science and Letters) (Juridisk Forlag Publisher) (1996).

The Uneasy Case for Ecolabelling, 4 Review of European Community and International Environmental Law (RECIEL) 304 (1995).

Applying Fundamental Copyright Principles in *Lotus Development Corp. v. Borland International Inc.*, 10 High Technology Law Journal 177 (with Dennis Karjala) (1995).

Structuring a Federal Market-Oriented Eco-Information Policy, 54 Maryland Law Review 1435 (1995).

The Basic Issue in *Lotus v. Borland*, in J. Strauss (ed.) Current Issues in Intellectual Property (International Association for the Advancement of Teaching and Research in Intellectual Property (ATRIP), Ljubljana Proceedings) (Slovenian Intellectual Property Office, 1995) (with Dennis Karjala).

The Challenges of Reforming Intellectual Property Protection for Computer Software, 94 Columbia Law Review 2644 (1994).

Eco-Information Policy: A Comparative Institutional Perspective, Stanford Law and Economics Working Paper Series, April 1993.

-5-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2414

Using Economic Incentives to Regulate the Municipal Solid Waste Stream, 17 Geneva Papers on Risk and Insurance 485 (1992).

Institutional Fantasylands: From Scientific Management to Free Market Environmentalism, 15 Harvard Journal of Law and Public Policy 489 (1992). (Reprinted in Robert Fischman, Maxine Lipeles, and Mark Squillace, An Environmental Law Anthology (1995)).

The Limitations of Legal Institutions for Addressing Environmental Risks, 5 Journal of Economic Perspectives 93 (1991).

Optimal Multi-Tier Regulation: An Application to Municipal Solid Waste (ENRP Project 88/Round II Project Report 91-03, Center for Science and International Affairs, Environment and Natural Resources Program, Kennedy School of Government, Harvard University).

Legal Advising on Corporate Structure in the New Era of Environmental Liability, 1990-3 Columbia Business Law Review 399 (1991).

Beyond the Throwaway Society: An Incentive Approach to Regulating Municipal Solid Waste, 17 Ecology Law Quarterly 655 (1990). Selected as one of the best environmental law articles published in 1990-91. Reprinted in 23 Land Use and Environment Law Review (1992).

An Analysis of the Scope of Copyright Protection for Application Programs, 41 Stanford Law Review 1045 (1989). Selected by the editors of Intellectual Property Law Review as one of the best intellectual property articles published in 1989.

Tailoring Legal Protection for Computer Software, 39 Stanford Law Review 1329 (1987). Selected by the editors of Intellectual Property Law Review as one of the best intellectual property articles published in 1987.

Liability of Parent Corporations for Hazardous Waste Cleanup and Damages, 99 Harvard Law Review 986 (1986).

A Note on Private versus Social Incentives to Sue in a Costly Legal System, 12 Journal of Legal Studies 41 (1983).

Economic Implications of ERISA, in Bodie, Z. & Shoven, J. (eds.) Financial Aspects of the United States Pension System 37 (U. Chi. Press, 1983) (with J. Bulow & M. Scholes).

**Teaching Materials**

IPPresentations - Presentation technology for teaching intellectual property law.

United States v. RETEP Chemical Corp. et al.: An Interactive Exercise for Teaching Hazardous Waste Law, (1985 & updates) (has been used at Albany, Berkeley, Georgetown,

CONFIDENTIAL – ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2415

Harvard, Hastings, Nebraska, New York Law School, New York University, Northeastern, Stanford, University of Chicago, and Williamette).

## PRESENTATIONS

Knowledge Accessibility and Preservation Policy for the Digital Age, Chicago IP Colloquium, Chicago, January 2008

United States Patent Law (a two day course), Swiss Federal Institute of Technology (ETH), Zurich, Switzerland, December 2007

The Relationship Between Substantive Law and Enforcement in Intellectual Property, at conference on "Enforcement Framework and Civil Enforcement," European Intellectual Property Institutes Network (EIPIN), Gerzensee, Switzerland, November-December 2007

Knowledge Accessibility and Preservation Policy for the Digital Age, IP Scholarship Conference, Berkeley, November 2007

Keynote Presentation, Cutting Edge Issues in IP Litigation, Cornerstone Research Conference, Hawaii, November 2007

Copyright and Content Governance in Web 2.0, USC Entertainment Law and Business Conference, Los Angeles, California, October 2007

Educating the Judiciary about Intellectual Property Law and Case Management, presentation to members of the Indian Judiciary, October 2007

BCLT/U.S. Patent & Trademark Office Roundtable, Berkeley, September 2007

Intellectual Property Protection for Computer Software, for delegation of Chinese judges and government officials, Haas School of Business, Berkeley, September 2007

Accessibility without Piracy: Reinvigorating Copyright's Deposit and Catalog Functions in the Digital Age, Conference on Copyright in Context, University of Houston Law Center's Institute for Intellectual Property & Information Law, Santa Fe, New Mexico, June 2007

Conference Organizer and Presenter (sessions on Patent Basics, Copyright Basics, Copyright Infringement, Trade Dress, and Digital Copyright Issues), Intellectual Property in the New Technological Age, a three day conference sponsored by the Berkeley Center for Law & Technology and the Federal Judicial Center (attended by 40 federal judges), Berkeley, California, May - June 2007.

Managing IP, (a week long course), Swiss Federal Institute of Technology (ETH), Zurich, Switzerland, May 2007

-7-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2416

Panelist, Future of Copyright, USC Annenberg Center, May 2007

Legal Realism in Action: Indirect Copyright Liability's Continuing Tort Framework and Sony's *de facto* Demise Intellectual Property Scholarship: IP History and Historiography Workshop, UCLA School of Law, March 2007

Panel Chairperson, Conference on Copyright, DRM Technologies, and Consumer Protection, Berkeley Center for Law & Technology, Berkeley, California, March 2007

Pros and Cons of Open Source Business Models, European Intellectual Property Institutes Network (EIPIN), Gerzensee, Switzerland, February 2007

The Grokster Case, European Intellectual Property Institutes Network (EIPIN), Gerzensee, Switzerland, February 2007

Panel Chairperson, The DRM v. Collecting Societies Debate, European Intellectual Property Institutes Network (EIPIN), Gerzensee, Switzerland, February 2007

United States Copyright Law (a two day course), Swiss Federal Institute of Technology (ETH), Zurich, Switzerland, January 2007

A Method for Reforming the Patent System, Fourth Annual Conference on Telecommunications & IP: US & Korean Perspectives, co-hosted by Seoul National University's Center for Law & Technology and BCLT, Hawaii, January 2007

United States Patent Law (a two day course), Swiss Federal Institute of Technology (ETH), Zurich, Switzerland, December 2007

Copyright: From Traditional Concepts to the Digital Age (2 day conference), Mealey's Conference/Lexis-Nexis, San Francisco, December 2006

Economic and Cultural Aspects: A Law and Economics Perspective, at conference on "The Flow of Information in the Digital Millennium, Technological," European Intellectual Property Institutes Network (EIPIN), Munich, Germany, December 2006

Are Software Patents ". . . anything under the sun made by man . . .", Conference on "Software Patents: A Time for a Change?", Boston University, November 2006

Computer Hardware and Software Law, Program on the Law of the New Economy, University of St. Gallen's Executive Master of European and International Business Law Program, Austin, Texas, November 2006

True Love or Marriage of Convenience: The Property Rights Movement's Embrace of

-8-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2417

Intellectual Property, Conference on Litigating Taking and Other Legal Challenges to Land Use and Environmental Regulation, Boalt Hall School of Law, Berkeley, October 2006

Intellectual Property in the Digital Age, Workshop for Judges of the Seventh Circuit, Lake Geneva, Wisconsin, October 2006

Promoting Expressive Creativity: Technology, IP, and Business Models, for delegation of Chinese judges and government officials, Haas School of Business, Berkeley, October 2006

The Role of Intellectual Property in Business Formation, for delegation of Chinese judges and government officials, Haas School of Business, Berkeley, October 2006

Cost-Benefit Analysis of Software Patents, Conference on Patents and Diversity, University of Michigan Law School, Ann Arbor, Michigan, September 2006

Intellectual Property in the New Technological Age, for law students from Osaka University, Japan, (lecture in Berkeley, California), September 2006

Unwinding Sony, IP Scholarship Seminar, University of California at Berkeley School of Law, Berkeley, California, September 2006

Accessibility without Piracy: Reinvigorating Copyright's Deposit and Catalog Functions in the Digital Age, Intellectual Property Scholars Conference, Berkeley, California, August 2006

Conference Organizer and Presenter (sessions on Patent Basics, Copyright Basics, Copyright Infringement, Trade Dress, and Digital Copyright Issues), Intellectual Property in the New Technological Age, a three day conference sponsored by the Berkeley Center for Law & Technology and the Federal Judicial Center (attended by 40 federal judges), Berkeley, California, June 2006.

Managing IP, (a week long course), Swiss Federal Institute of Technology (ETH), Zurich, Switzerland, May 2006

Political Economy of Intellectual Property Law, Patent Reform Conference, Berkeley Center for Law & Technology, Berkeley, California May 2006

Unwinding Sony, Boston College, Boston, Massachusetts, April 2006

Patent Law and Patent Case Management, National Workshop for Federal Magistrate Judges, Federal Judicial Center, April 2006

IP and the Music Industry, Boalt Hall Alumni Association, Orange County Section, March 2006

Panelist, The Google Library Project: Fair Use or Foul? Copyright Office Comes to California,

-9-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2418

February 2006

A Direct Analysis of Indirect Copyright Liability, Keynote Address, American Intellectual Property Law Association Mid-Winter Meetings, Palm Springs, California, February 2006

A Direct Analysis of Indirect Copyright Liability, Third Annual Conference on Telecommunications & IP: US & Korean Perspectives, co-hosted by Seoul National University's Center for Law & Technology and BCLT, Hawaii, February 2006

United States Copyright Law (a two day course), Swiss Federal Institute of Technology (ETH), Zurich, Switzerland, January 2006

Distributive Justice in Copyright Law: Termination of Transfers?, IDC, Herzliya, Israel, December 2005

United States Patent Law (a three day course), Swiss Federal Institute of Technology (ETH), Zurich, Switzerland, December 2005

Law and Economics of Intellectual Property in the Digital Age, European Intellectual Property Institutes Network (EIPIN), Gerzensee, Switzerland, December 2005

Patently Misguided: A Direct Analysis of Indirect Copyright Liability, European Intellectual Property Institutes Network (EIPIN), Gerzensee, Switzerland, December 2005

Computer Hardware and Software Law, Program on the Law of the New Economy, University of St. Gallen's Executive Master of European and International Business Law Program, Austin, Texas, November 2005

Copyright: From Traditional Concepts to the Digital Age (2 day conference), Mealey's Conference/Lexis-Nexis, New York, November 2005

A Direct Analysis of Indirect Copyright Liability, Boalt Hall School of Law, Berkeley, California November 2005

Developments in Patent, Copyright, and Trademark Law, National Workshop for District Judges, Federal Judicial Center, Houston, Texas, October 2005

Intellectual Property in the New Technological Age, for law students from Osaka University, Japan, (lecture in Berkeley, California), September 2005

Regulating Spyware: The Limitations of State "Laboratories" and the Case for Federal Preemption, Intellectual Property Scholars Conference, New York, August 2005

Framing the P2P/Copyright Policy Debate, presented at panel on "Strange Bedfellows: What Is

-10-

CONFIDENTIAL – ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2419

the Future for Copyright and Peer-to-Peer, Together?", Annual Meeting of the Copyright Society of the U.S.A., Bolton Landing, New York, June 2005

Conference Organizer and Presenter (sessions on Patent Basics, Copyright Basics, Copyright Infringement, Trade Dress, and Digital Copyright Issues), Intellectual Property in the New Technological Age, a three day conference sponsored by the Berkeley Center for Law & Technology and the Federal Judicial Center (attended by 40 federal judges), Berkeley, California, May 2005

Regulating Spyware: The Limitations of State "Laboratories" and the Case for Federal Preemption, presented at panel on Regulatory Challenges, Conference on Spyware: The Latest Cyber-Regulatory Challenge, Berkeley, California, May 2005

Indirect Copyright Liability: From Betamax to Grokster and Beyond, Copyright Society, Northern California Chapter, San Francisco, California, April 2005

Keynote Speaker, Training Lawyers and Guiding Law in the New Technological Age, presented at Osaka University, March 2005

Co-organizer, Perspectives on Patent Law and Innovation, co-sponsored by BCLT and the Federal Circuit Bar Association, Berkeley, California, February 2005

Indirect Copyright Liability: From Betamax to Grokster, Second Annual Conference on Telecommunications & IP: US & Korean Perspectives, co-hosted by Seoul National University's Center for Law & Technology and BCLT, Hawaii, January 2005

United States Patent Law (a week long course), Swiss Federal Institute of Technology (ETH), Zurich, Switzerland, January 2005

Framing the P2P/Copyright Policy Debate, Peer-to-Peer File-Sharing Technology: Consumer Protection and Competition Issues, Federal Trade Commission, Washington, D.C., December 2004

Computer Hardware and Software Law, Program on the Law of the New Economy, University of St. Gallen's Executive Master of European and International Business Law Program, Austin, Texas, November 2004

A Functional Analysis of the "Music Industry," Cardozo School of Law, New York, October 2004

Developments in Patent, Copyright, and Trademark Law, National Workshop for District Judges, Federal Judicial Center, Seattle, September 2004

Intellectual Property in the New Technological Age, for law students from Osaka University,

-11-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2420

Japan, (lecture in Berkeley, California), September 2004

Bankruptcy Treatment of Intellectual Property Assets, National Workshop for Bankruptcy Judges, Federal Judicial Center, Seattle, August 2004

Property as a Triadic Relation, Disciplinary Approaches to Teaching Property Panel, Association of American Law Schools' Conference on Teaching Property Law for the 21st Century, Portland, Oregon, June 2004

Organizer and Presenter, IP and Entrepreneurship Symposium, Berkeley, June 2004

Developments in Patent, Copyright, and Trademark Law, National Workshop for District Judges, Federal Judicial Center, Chicago, June 2004

The Music Business Enters the Digital Age: New Distribution Models, DRM, and Enforcement, 2004 Annual Computer and Technology Law Institute, Austin, May 2004

Co-organizer and Presenter, "Ideas Into Action: Implementing Reform of the Patent System," Berkeley, April 2004

Developments in Patent, Copyright, and Trademark Law, National Workshop for District Judges, Federal Judicial Center, Philadelphia, April 2004

Envisioning Copyright's Digital Future, Arizona State University School of Law, March 2004

Defusing the Termination of Transfer Time Bomb, Arizona State University School of Law, March 2004

Economic Analysis of Intellectual Property, Conference on the Handbook of Law and Economics, Stanford Law School, March 2004

Intellectual Property in the Digital Age, Berkeley Executive Program, Haas School of Business, Berkeley, California, February 2004

Keynote Speaker, Toward a Theory of Copyright in the Digital Age, The Digital Challenge to Copyright Law, Santa Clara University School of Law, February 2004

Envisioning Copyright's Digital Future, Telecommunications & IP: US & Korean Perspectives, co-hosted by Seoul National University's Center for Law & Technology and BCLT, Honolulu, Hawaii, January 2004

United States Patent Law (a week long course), Swiss Federal Institute of Technology (ETH), Zurich, Switzerland, January 2004

-12-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2421

Computer Hardware and Software Law, Program on the Law of the New Economy, University of St. Gallen's Executive Master of European and International Business Law Program, Austin, Texas, November 2003

The Policy Challenges: Intellectual Property, Antitrust, Regulation, 2003 Businessweek CEO Leadership Forum: Jump-Starting the Upturn, Haas School of Business, Berkeley, California, October 2003

Cutting Edge Issues in Intellectual Property, Workshop for Judges of the Seventh Circuit, Lake Geneva, Wisconsin, October 2003

The Municipal Solid Waste "Crisis" in Retrospect: The Role of Market-Based Mechanisms, Georgetown University Law Center, October 2003

Intellectual Property in the Digital Age, Berkeley Executive Program, Haas School of Business, Berkeley, California, October 2003

Property as a Triadic Relation, University of British Columbia Faculty of Law, Vancouver, British Columbia, September 2003

The Municipal Solid Waste "Crisis" in Retrospect: A Success Story for Market-Based Mechanisms, Twenty Years of Market-based Instruments for Environmental Protection: Has the Promise Been Realized?, Bren School of Environmental Science & Management, University of California, Santa Barbara, August 2003

Top-Down versus Bottom-Up Approaches to Climate Change, presented at Can Technology Spare the Earth?, sponsored by the Foundation for the Research in Economics and the Environment, Gallatin Gateway, Montana, June 2003

Conference Organizer and Presenter (sessions on Patent Basics, Copyright Basics, Copyright Infringement, Trade Dress, and Digital Copyright Issues), Intellectual Property in the New Technological Age, a three day conference sponsored by the Berkeley Center for Law & Technology and the Federal Judicial Center (attended by 35 federal judges), Berkeley, California, May 2003

Apple v. Franklin: 20 Years Later, Temple University James E. Beasley School of Law, March 2003

"Fair Use in the 21st Century," The Copyright Office Comes to California, San Francisco, California, March 2003

"Fair Use in the 21st Century," The Copyright Office Comes to California, Los Angeles, California, March 2003

-13-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2422

United States Patent Law (a week long course), Swiss Federal Institute of Technology (ETH), Zurich, Switzerland, January 2003

Computer Hardware and Software Law, Program on the Law of the New Economy, University of St. Gallen's Executive Master of European and International Business Law Program, Austin, Texas, November 2002

Session Organizer and Presenter, Law and Technology, National Symposium for United States Court of Appeals Judges, Washington, D.C., October 2002

Intellectual Property in the New Information Age, MCM St. Gallen Advanced Management Program, Haas School of Business, October 2002

Reunifying Property, Faculty Workshop, University of Toronto, October 2002

Intellectual Property in the Digital Age (intensive two week course), University of Toronto, September - October 2002

Envisioning Copyright Law's Digital Future, Law and Economics Workshop, University of Toronto, September 2002

Defusing the Termination of Transfers Time Bomb, Second Annual Intellectual Property Scholars Conference, Cardozo School of Law, New York, August 2002

Conference Organizer and Presenter (sessions on Patent Basics, Copyright Basics, Copyright Infringement, Trade Dress, and Digital Copyright Issues), Intellectual Property in the New Technological Age, a three day conference sponsored by the Berkeley Center for Law & Technology and the Federal Judicial Center (attended by 30 federal judges), Berkeley, California, June 2002

Session Organizer and Presenter, Second Annual Information, Networks, and Technology Law Institute, Peer-to-Peer Networks and Digital Content, San Jose, California, June 2002

Moderator, Peer to Peer and Copyright, 12th Conference on Computers, Freedom, and Privacy, San Francisco, April 2002

Program Organizer and Moderator, Digital Content Roundtable: Filesharing in Napster's Wake Berkeley, April 2002

Guest Lecturer, Sound Recordings and the Termination of Transfers Time Bomb, UCLA School of Law, March 2002

Program Organizer and Presenter, Developments in Intellectual Property Law: National Workshop for Federal District Judges (sessions on patent, copyright, and trademark law),

-14-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2423

sponsored by the Federal Judicial Center, New Orleans, Louisiana, February 2002

United States Patent Law (a week long course), Swiss Federal Institute of Technology (ETH), Zurich, Switzerland, February 2002

Program Organizer, Second Annual Roundtable on the Future of Television, UC-Berkeley School of Law, February 2002

Intellectual Property in the Information Economy, Top-Down Law, Haas School of Business, February 2002

The Digital Transformation of Copyright Law, A Symposium Honoring Judge Jon O. Newman's Thirty Years on the Bench, New York, January 2002

Filesharing in Napster's Wake: Challenges for Copyright Law, Munger, Tolles & Olson, Los Angeles, California, January 2002

Intellectual Property in the Information Age, St. Gallen Advanced Management Program, Haas School of Business, University of California at Berkeley, December 2001

Program organizer and presenter, Developments in Intellectual Property Law: National Workshop for Federal District Judges (sessions on patent, copyright, and trademark law), sponsored by the Federal Judicial Center, San Diego, California, (December 2001)

Educating Consumers about the Environment: the 3R's, Labels, and Prices, presented at Innovations in Environmental Economics and Policy Analysis: A Seminar for Law Professors, sponsored by the Foundation for the Research in Economics and the Environment, Gallatin Gateway, Montana, July 2001

Toward a Comparative Institutional Framework for Property, Resources, and the Environment, presented at Innovations in Environmental Economics and Policy Analysis: A Seminar for Law Professors, sponsored by the Foundation for the Research in Economics and the Environment, Gallatin Gateway, Montana, July 2001

Intellectual Property in the New Technological Age, week-long course for European doctoral students held at Studienzentrum Gerzensee, Switzerland, June-July 2001

Conference Organizer and Presenter (sessions on Patent Basics, Copyright Basics, Copyright Infringement, and Digital Copyright Issues), Intellectual Property in the New Technological Age, a three day conference sponsored by the Berkeley Center for Law & Technology and the Federal Judicial Center (attended by 50 federal judges), Berkeley, California, June 2001.

The Future of Intellectual Property, Silicon Valley Intellectual Property Law Association, Palo Alto, California, May 2001

-15-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2424

Conference co-organizer and presenter, Copyright: From Traditional Concepts to the Digital Age, a series of two-conferences sponsored by Law Lectures Institute (with David Nimmer and Lon Sobel) in Washington, D.C. (March 2001), Los Angeles (March 2001), San Francisco (April 2001), and New York (April-May 2001)

Intellectual Property: Case Study on Online Music, PwC FAS Noah's Ark E-Business Training Program @ UCLA, Anderson School of Business, April 2001

Conference Organizer and Moderator, Digital Music, UC-Berkeley Haas School of Business, April 2001

Conference organizer and presenter, U.S. Patent Law, a day long program for Heller Ehrman White & McAuliffe LLP, Berkeley, California, March 2001

Conference Organizer and Moderator, The Present and Future of Television, UC-Berkeley Haas School of Business, March 2001

The Institutional Architecture of Innovation and Competition Law and Policy, presented at Beyond Microsoft: Antitrust, Technology, and Intellectual Property, sponsored by the Berkeley Center for Law & Technology, March 2001

United States Patent Law (a week long course), Swiss Federal Institute of Technology (ETH), Zurich, Switzerland, February 2001

Napster and the Music Industry, Federalist Society Luncheon at the American Association of Law Schools Annual Meeting, San Francisco, California, January 2001

Intellectual Property in the Information Economy, Top-Down Law, Haas School of Business, January 2001.

Copyright Protection for Computer Software, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, P.C., San Francisco, California, November 2000

Conference Organizer and Moderator, Washington Technology Briefing, Boalt Hall School of Law, November 2000

The Centrality of Law in the Information Economy, Management of Technology Program, Haas School of Business, November 2000

Cyberlaw, Workshop for Judges of the 2nd and DC Circuits, Cooperstown, New York, November 2000

Antitrust and IP in the Information Age, Workshop for Judges of the 2nd and DC Circuits, Cooperstown, New York, November 2000.

-16-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2425

Cyberlaw, Workshop for Judges of the 8th and 10th Circuits, Colorado Springs, Colorado, October 2000

Panelist, Bay Area Meeting on the Commission on Macroeconomics and Health, Berkeley, California August 2000

Intellectual Property Concerns for E-Commerce Companies, St. Gallen Advanced Management Program, Haas School of Business, University of California at Berkeley, August 2000

Panelist, U.S. Patent and Trademark Office, Roundtable on Business Method Patents, Crystal City, Virginia, August 2000

Intellectual Property Concerns for E-Commerce Companies, PwC FAS Conference, Dallas, Texas, July 2000

Digital Music: Napster, the New Economy, and Copyright, Heller, Ehrman, White & McAuliffe, July 2000

Conference Organizer and Presenter (sessions on Software and Business Method Patents, Copyright -- Software Protection, and Digital Copyright Issues), Intellectual Property in the New Technological Age, a three-day conference sponsored by the Berkeley Center for Law & Technology and the Federal Judicial Center (attended by 40 federal judges), Berkeley, California, June 2000

Conference Organizer and Presenter, Music to Whose Ears? The Debate Over Digital Music, School of Law, University of California at Berkeley, April 2000

Panelist, U.S. Patent and Trademark Office, Study Group on State Sovereign Immunity and Intellectual Property, Washington, DC, March 2000

Intellectual Property Concerns for E-Commerce Companies, PwC FAS Noah's Ark E-Business Training Program @ UCLA, Anderson School of Business, March 2000, May 2000

United States Patent Law (a week long course), Swiss Federal Institute of Technology (ETH), Zurich, Switzerland, February 2000

Economic Implications of *Florida Prepaid Postsecondary Education Exprense Board v. College Savings Bank*, Symposium on Recent Developments in Federalism, Loyola Law School, February 2000

Intellectual Property Concerns for E-Commerce Companies, Center for Executive Development, Haas School of Business, University of California at Berkeley, February 2000

Conference Organizer and Presenter, Intellectual Property in the New Technological Age,

-17-

CONFIDENTIAL -- ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2426

Workshop for Judges of the Ninth Circuit, sponsored by the Federal Judicial Center and the Berkeley Center for Law and Technology, San Diego, California, January 2000

Using Powerpoint to Teach Property Law, American Association of Law Schools Washington, D.C., January 2000

Panelist, Intellectual Property Rights Research Workshop, National Academies' Science, Technology and Economic Policy Board (STEP), Berkeley, California, October 1999

Intellectual Property Issues, Federal Bar Association Conference on Federal Law and the Internet: Is Cyberspace a Different Place?, Sacramento, California, September 1999

Survey of Intellectual Property Law, Telecommunications Policy Research Conference, Arlington, Virginia, September 1999

Session Organizer and Presenter, Intellectual Property and the Challenges Posed by New Technology, presented at National Workshop for Federal District Judges organized by the Federal Judicial Center, (June (San Francisco, California), August (Baltimore, Maryland), and September (Chicago, Illinois) 1999) (attended by 600 federal judges)

United States Patent Law (a week long course), Swiss Federal Institute of Technology (ETH), Zurich, Switzerland, February 1999

Conference Organizer and Presenter, The Landscape of Intellectual Property Law, a three day conference sponsored by the Berkeley Center for Law & Technology and the Federal Judicial Center (attended by 40 federal judges), Berkeley, California, June 1998

Moderator, Panel on The Emerging Law for Intellectual Property and High Technology in a Global Age, Conference on Boalt in the Global Age, Berkeley, California, California, April 1998

The Evolution of Environmental Governance, Panel on Regulation of Pollutants: Federal, State, and Local, Conference on Power, Politics, and Place: Who Holds the Reins of Environmental Regulation? Berkeley, California, February 1998

Moderator, Panel on Consumer Products, Conference on Science, Law, Information and the Global Marketplace, sponsored by Prop 65 News, San Francisco, California, February 1998

United States Patent Law (a week long course), Swiss Federal Institute of Technology (ETH), Zurich, Switzerland, February 1998

Session Organizer, Intellectual Property and New Technology, American Law and Economics Association, Toronto, Ontario, Canada, May 1997

Session Organizer, Property and Environmental Institutions, American Law and Economics

-18-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2427

Association, Toronto, Ontario, Canada, May 1997

Discussant, "Rulemaking Processes in Cyberspace," Conference on International Economic Regulation, Georgetown University Law Center, April 1997

Moderator, Technical Protection for Digital Content: Electronic Rights Management Systems, Conference on Digital Content: New Products and Business Models, Center for Law & Technology, University of California at Berkeley, November 1996

"Comparative Institutional Analysis of Risk Regulation," Conference on Law, Risk, and Risk Management, University of California at Berkeley School of Law, October 1996

Berkeley Roundtable on Software Innovation, Center for Law & Technology, University of California at Berkeley School of Law, April 1996

."Structuring a Federal Market-Oriented Eco-Information Policy," Conference on Environmental Federalism, University of Maryland School of Law, April 1995

Discussant, Conference on the Law and Economics of Litigation Reform, Georgetown University Law Center, October 1994

Panelist, "Economic and Public Policy Analysis," 1994 CERCLA Reauthorization and Amendments Legislation, San Francisco Bar Association, October 1994

Discussant, Conference entitled "Towards a Third Intellectual Property Paradigm," Columbia University School of Law, April 1994

"Eco-Information Policy: A Comparative Institutional Perspective," Georgetown University Law Center, February 1994

Chairperson, Panel on "Market Responses to Product Labeling," American Economic Association/Association of Environmental and Resource Economists Annual Meetings, and Presenter, "Eco-Information Policy: A Comparative Institutional Perspective," Boston, Massachusetts, January 1994

Discussant, Panel on the Costs and Benefits of Superfund Cleanups, Conference on Superfund Reauthorization and Empirical Issues, NYU School of Law, December 1993

"Policy Implications of Product Life Cycle Assessment," Keeping California Industry Competitive and Green: A Workshop to Define Critical Research, Education, and Technology Transfer Issues, Department of Engineering, University of California at Berkeley, May 1993

"Eco-Information Policy: A Comparative Institutional Perspective," Faculty Workshop, Stanford Law School, March 1993

-19-

CONFIDENTIAL – ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2428

Workshop on Digital Libraries, National Science Foundation, XEROX Palo Alto Research Center, December 1992

"The Limitations of Legal Institutions for Addressing Environmental Risks," presented at Institute for Law and Economics Roundtable on Managing Hazardous Waste, University of Pennsylvania School of Law, November 1992

"An Analysis of Government Policies to Stimulate Recycling Markets," presented at session on "Implementing a New Framework for Environmental Policy," Association for Public Policy Analysis and Management Annual Meeting, Denver, Colorado, October 1992

"The Design of Environmental Liability Regimes to Encourage Environmentally Responsible Foreign Investment," presented to the Russian Ministry on Property, Moscow, Russia, October 1992

Conference on Law, Economics and International Patent Reform, Columbia University School of Law, June 1992

"Toward a Coherent Eco-Information Policy," presented at U.S./European Communities Conference on Environmental Policy, Berkeley, California,  April 1992

Conference on Constitutional Law and Economics, Panel Chairperson, Stanford Law School, Stanford, California, October 1991

"Beyond the Throwaway Society: An Incentive Approach to Regulating Municipal Solid Waste," presented at Conference on "Engineering Our Way Out of the Dump," sponsored by the National Academy of Engineering, National Academy of Sciences Conference Center, Woods Hole, Massachusetts, July 1991

"Optimal Multi-Tier Regulation: An Application to Municipal Solid Waste," presented at Resources for the Future, Washington, D.C., May 1991

"Does the Current Scheme of Intellectual Property Protection Create Sufficient Economic Incentives for Software Innovation?" presented at Conference on "Computer Software-Intellectual Property Climate for Innovation in the 1990s: A Public Policy Forum," sponsored by the Annenberg Washington Program, Washington, D.C., May 1991

"Market Mechanisms to Encourage Recycling," presented at "Conference on Incentive-Based Strategies for Environmental Protection," sponsored by Senators Timothy Wirth and the late John Heinz and the Kennedy School of Government, Harvard University, Cambridge, Massachusetts, May 1991

Conference on Auto Insurance Reform and New Ways of Paying for the Costs of Driving, Moderator, University of California at Berkeley School of Law, April 1991

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2429

"The Limits of Free Market Environmentalism: A Comparative Institutional Perspective," presented at Conference on "Free Market Environmentalism: The Role of the Market in Environmental Protection," Northwestern School of Law, Lewis and Clark College, Portland, Oregon, April 1991

"Optimal Multi-Tier Regulation: An Application to Municipal Solid Waste," presented at Conference on "The Law and Economics of Environmental Policy," sponsored by the European Association of Law and Economics and the Geneva Association for the Study of Risk and Insurance, Paris France, April 1991

"Optimal Multi-Tier Regulation: An Application to Municipal Solid Waste," presented at the Kennedy School of Government, Harvard University, Cambridge, Massachusetts, March 1991

"Beyond the Throwaway Society: An Incentive Approach to Regulating Municipal Solid Waste," presented at the Law and Economics Workshop, University of Toronto School of Law, Toronto, Ontario, Canada, December 1990

"Using Economic Incentives to Regulate the Municipal Solid Waste Stream," presented at Conference on "Integrated Waste Management Systems." Foundation for Research in Economics and the Environment, Seattle, Washington, November 1990

"The Power of the Purse: Financial Incentives as Regulatory Instruments," Rapporteur, Conference sponsored by Law Reform Commission of Canada, Calgary, Alberta, Canada. October 1990

"The Limitations of Legal Institutions for Addressing Environmental Risks," presented at Conference on the Economics of Liability, Stanford Law School, May 1990

"Beyond the Throwaway Society: An Incentive Approach to Regulating Municipal Solid Waste," presented in the Law and Economics Seminar, Harvard Law School, February 1990

"Legal Advising on Corporate Structure in the New Era of Environmental Liability," presented at Conference on Environmental Concerns in Business Transactions, Columbia University School of Law, February 1990

"Beyond the Throwaway Society: An Incentive Approach to Regulating Municipal Solid Waste," presented in the Law and Economics Seminar, Georgetown University Law Center, April 1990

"An Analysis of the Scope of Copyright Protection for Application Programs," presented in the Law, Economics, and Organization Seminar, Yale Law School, October 1989

"Tailoring Legal Protection for Computer Software," presented in the Law and Economics Seminar, Harvard Law School, March 1987

-21-

CONFIDENTIAL – ATTORNEYS EYES ONLY

EXHIBIT 69 PAGE 2430

## PROFESSIONAL ACTIVITIES

Green Hills Software (Munger, Tolles & Olson LLP) (copyright protection for computer software)
**Expert Witness** (August 2006-July 2007)

Cogent Systems (Hennigan, Bennett & Dorman LLP) (trade secret)
**Consultant and Expert Witness** (August 2006-present)

Yahoo!
**Consultant** (May 2006)

Lucasfilm and LucasArts
**Consultant** (May 2006)

Maxim Integrated Products Inc./McDermott, Will & Emery (patent law)
**Consultant and Expert Witness** (January 2006 - April 2006)

GlaxoSmithKline(GSK)/Arnold & Porter
**Consultant** (October 2005 - April 2006)

Fairchild Semiconductor Inc./McDermott, Will & Emery (patent law)
**Consultant and Expert Witness** (August 2005 - October 2005)

Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., U.S. Supreme Court
**Counsel of Record**, Amicus Brief (filed January 2005)

HoMedics, Inc./Brooks Kushman Intellectual Property Law
**Consultant**, copyright case (Jan 2004 - March 2004)

UC Berkeley - United Nations Industrial Development Organization
**Member**, Faculty Advisory Board

California State Attorney General
**Member**, Microsoft Judgment Advisory Panel (advise California and other state Attorney General offices about Microsoft's compliance with the antitrust consent decree) . (August 2003 - present)

Davis, Polk & Wardell/Wilkie Farr & Gallagher (trade secrets in securitization of royalties)
**Expert Witness and Consultant** (May-June 2003)

ACE Insurance and Casualty Company (patent, trademark, unfair competition, false advertising, and antitrust law)
**Expert Witness** (August 2002 - 2005)

-22-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2431

Cooley, Godward/Keker and van Nest (copyright law)
> **Consultant and Expert** (malpractice case concerning MP3.com) (February 2002 - June 2002)

Finisar Corp. (Digital fiberoptics company)/Milbank, Tweed; Gray, Cary
> **Consultant** (licensing of intellectual property rights) (January 2002 - March 2002)

Gator.com/Claria Corp. (Internet advertising company)/Cooley, Godward
> **Consultant** (intellectual property issues) (October 2001 - December 2001; Sept 2003-present)

OSNR, Inc. (Internet Music Start-up)
> **Consultant** (intellectual property and content licensing) (October 2001 - February 2002)

ACCPAC (software company)/Howard, Rice, Nemerovski, Canaday, Falk & Rabin
> **Consultant** (intellectual property) (November 2000)

U.S. Patent and Trademark Office, Roundtable: Business Method Patents
> **Panelist** (August 2000)

U.S. Patent and Trademark Office, Study Group on State Sovereign Immunity and Intellectual Property (March 2000)
> **Panelist**

Sun Microsystems/Day, Casebeer, Madrid, Winters & Batchelder
> **Consultant** (Intellectual Property and Licensing Issues) (1999)

Oracle (Barbados) Foreign Sales Corporation v. Commissioner, Internal Revenue Service (Docket Nos. 13298-98, 13299-98, 13300-98, 13301-98)
> **Expert Witness on Behalf of the IRS**

Microsoft Corporation v. Commissioner, Internal Revenue Service (Docket No. 16878-96)
> **Expert Witness on Behalf of the IRS**

United States of America, State of New York, et al. v. Microsoft Corporation (Civil Action No. 98-1232, 98-1233, U.S. District Court, District of Columbia)
> **Consultant to States' Attorneys General**

Workshop on Liability and Redress Issues Arising in Relation to the Draft Biosafety Protocol, European Commission Directorate-General XI (Environment, Nuclear Safety and Civil Protection), London England, July 1998.
> **Participant**

Legal Scholarship Network, Environmental Law and Policy Abstracts

CONFIDENTIAL –
ATTORNEYS EYES ONLY

**EXHIBIT 69
PAGE 2432**

**Co-Chairperson, Advisory Board**

Berkeley Center for Law and Technology
    **Co-Founder, Director** (1995 - present), **and Executive Director** (since 2000)

Environmental Health and Safety Committee, University of California at Berkeley
    **Member** (1997-present)

Environmental Sciences Curriculum Planning Committee, University of California at Berkeley
    **Member** (1996-97)

Lotus Development Corporation v. Borland International, Inc., No. 94-2003 (December 1995)
    **Counsel of Record** (Co-authored with Dennis Karjala), Amicus Brief filed in the U.S. Supreme Court

Animal Care and Use Committee, University of California at Berkeley (August 1995 -1999)
    **Member**

Comment of U.S. Copyright Law Professors on the Copyright Office Term of Protection Study, Signatory (published in 12 European Intellectual Property Review 531 (1994)).

Lotus Development Corporation v. Borland International, Inc., Civil Action No. 90-11662-K (D. Mass.)
    **Co-author** (with Dennis Karjala), Amicus Brief to First Circuit Court of Appeals

Harvard Institute for International Development Newly Independent States (NIS) Environment Program
    **Member, Advisory Panel** (November 1993 - present)

Environmental Insurance Issues Task Force, California Insurance Commission
    **Member** (April 1993 - January 1994)

Berkeley Technology Law Journal
    **Faculty Adviser** (1993 - present) and **Advisory Board** (2000-present)

Association of American Law Schools -- Intellectual Property Section
    **Treasurer** (1993-94)

American Association of Universities (AAU) Research Libraries Task Force on Intellectual Property Rights in an Electronic Environment
    **Member** (November 1992 - March 1994) -- Developing proposals for university policies governing intellectual property ownership and rights in an electronic environment.

Western Governors' Association Environmental Policy Council

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2433

> **Member** (October 1992 - present) -- Advising the Western Governors' Association on the choice and design of incentive-based environmental policy initiatives.

Harvard Institute for International Development/U.S. Agency for International Development
> **Russian Environmental Liability Task Force** (October 1992) -- Advising the Russian Ministry of Property and the U.S. Government regarding environmental concerns associated with foreign investment in Russia.

Lester Center for Entrepreneurship and Innovation, Haas School of Business, University of California at Berkeley
> **Faculty Advisory Board** (May 1992 - present)

Sega Enterprises Ltd. v. Accolade, Inc., Civil Action No. 92-15655 (N.D. Cal.)
> Amicus brief on behalf of intellectual property professors.  Reprinted in 33 Jurimetrics 147 (Fall 1992).

Ecology Law Quarterly
> **Faculty Advisory Board** (March 1992 - present)

Environmental Auditing Certificate Program, UC Berkeley Extension Programs in Environmental Hazard Management
> **Advisory Committee** (January 1992 - June 1993)

U.S. Congress, Office of Technology Assessment, Finding a Balance: Computer Software, Intellectual Property and the Challenge of Technological Change (May 1992).
> **External Reviewer**

Lotus Development Corporation v. Borland International, Inc., Civil Action No. 90-11662-K (D. Mass.)
> Amicus brief on behalf of intellectual property professors.

U.S. Environmental Protection Agency, Office of Exploratory Research, Socioeconomic Peer Review Panel (June 1991, June 1992, June 1994).
> **Member** - reviewed research proposals from social scientists and legal scholars.

Center for the Study of Law, Science and Technology, Interdisciplinary Project to Create a Legal Research Agenda for Issues Arising Out of the Human Genome Initiative (Spring 1991).
> **Member, "Legal" Working Group** - conference brought together members of the scientific, medical, legal, and social science communities to establish an agenda for the myriad complex legal issues that may arise from the human genome initiative and related advances in the biological sciences.  Conference Report is published in 32 Jurimetrics (Winter 1992).

Project 88 - Round II, Harnessing Market Forces to Protect Our Environment (sponsored by

-25-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2434

Senators Timothy Wirth and John Heinz) (Summer 1990 - Spring 1991).

**Staff Member and White Paper Author ("Using Economic Incentives to Regulate Municipal Solid Waste")** - project brought together academic, public interest, industry, and government economists and lawyers to propose economic incentive systems for protecting the environment.  The final study is published in Project 88 -- Round II; Incentives for Action: Designing Market-Based Environmental Strategies (May 1991).

U.S. Congress, Office of Technology Assessment, Staying on Top: The Challenges of Technological Change and Global Competition in Protecting Intellectual Property.

**Workshop Participant** (August 1990 - October 1990) - established to study the role of intellectual property policies in encouraging software innovations and fostering the competitiveness of U.S. software and allied industries.

U.S. Congress, Office of Technology Assessment, Copyright and Home Copying.

**Member, Advisory Panel** (April 1988 - October 1989) - established to study the extent of home copying of copyrighted material and the implications of such behavior for the efficacy of the intellectual property system.  The findings of this study are reported in OTA, Copyright and Home Copying: Technology Challenges Law (Oct. 1989).

Center for the Study of Law, Science and Technology, Conference on Computer Software Copyright Protection (February 1989).

**Member, Steering Committee** (July 1988 - June 1989) - conference brought together intellectual property scholars for the purpose of identifying areas of consensus concerning the proper scope of copyright protection for computer software.  Conference Report is published in 30 Jurimetrics (Fall 1989).

**Member**, California Bar Association, U.S. Supreme Court Bar (admitted to practice), American Intellectual Property Association, Copyright Society, American Economic Association, American Law and Economics Association, ATRIP (International Association for the Advancement of Teaching and Research in Intellectual Property), various environmental organizations.

-26-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2435

B

EXHIBIT 69
PAGE 2436





CONFIDENTIAL –
ATTORNEYS EYES ONLY

1

EXHIBIT 69
PAGE 2437





CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2438





CONFIDENTIAL --
ATTORNEYS EYES ONLY

3

EXHIBIT 69
PAGE 2439

## LEVELS OF ABSTRACTION

Upon any work . . . a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his "ideas," to which, apart from their expression, his property is never extended. Nobody has ever been able to fix that boundary, and nobody ever can.

*Nichols v. Universal Pictures Corp.*
45 F.2d 119 (2nd Cir. 1930)

Story - Main Idea

Plot Outline

Subplots

General Characters and Scenes

Specific Character Elements

Text

Slide B7

---

### Idea/Expression Dichotomy



§102(b) In no case does copyright protection . . . extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

Related Doctrines:

• *Baker v. Selden*
• Blank Forms Doctrine
• merger
• *scènes à faire*

Slide B8

CONFIDENTIAL --
ATTORNEYS EYES ONLY

4

EXHIBIT 69
PAGE 2440

| scènes à faire |
| --- |

**Copyright does not extend to the "incidents, characters or settings which are as a practical matter indispensable, or at least standard in the treatment of a given topic."**

*Atari, Inc. v. North American Phillips Consumer Electronics,*
*672 F.2d 607, 616 (7ᵗʰ Cir. 1982).*

**"Elements such as drunks, prostitutes, vermin and derelict cars would appear in any realistic work about the work of policemen in the South Bronx."**

*Walker v. Time Life Films, 784 F.2d 44, 50 (2d Cir. 1986).*

Slide B9



Slide B10

CONFIDENTIAL –
ATTORNEYS EYES ONLY

5

EXHIBIT 69
PAGE 2441





CONFIDENTIAL –
ATTORNEYS EYES ONLY

6

EXHIBIT 69
PAGE 2442



### Originality Requirement

The "originality" requirement entered copyright law not through statute but by judicial interpretation of the intellectual property clause.

**U.S. Constitution**

Article I §8, cl. 8

Congress shall have power

To Promote the Progress of Science and the useful Arts, by securing for limited Times, to Authors the exclusive Right to their respective Writings and Discoveries.

An author is "the beginner . . . or first mover of anything . . . creator, originator."

*Remick Music Corp. v. Interstate Hotel Corp. of Neb.* 58 F.Supp. 523 (D. Neb. 1944), *aff'd.* 157 F.2d 744 (8th Cir. 1946)

"The *sine qua non* of copyright is originality."
*Feist*, 499 U.S. 340 (1990)

Slide B13

---

### Originality Requirement 

**§ 102(a) Copyright protection subsists . . . in original works of authorship . . .**

Elements:   1. Independent Creation
            2. Modicum of Creativity

H.R. Rep. 94-1476 51 (1976)

The phrase "original works of authorship," which is purposely left undefined, is intended to incorporate without change the standard of originality established by the courts under the 1909 Act. This standard does not include requirements of novelty, ingenuity, or esthetic merit, and there is no intention to enlarge the standard of copyright protection to require them.

Slide B14

CONFIDENTIAL --
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2443





CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2444



**Modicum of Creativity**
*de minimis* Limitation

**Rhythm typically not protectable.**

"[W]ords and short phrases such as names, titles, and slogans are not copyrightable." Copyright Office, 37 CFR §202.1

"Everything You Always Wanted to Know About Sex But Were Afraid to Ask"

SCENE

The Unbearable Lightness of Being

... Priceless
There are some things money can't buy ...
For everything else, there's

Practice Tip | Trademark Protection, Unfair Competition (passing off)
Slide B17

---

499 U.S. 340, 113 L.Ed.2d 358

1310FEIST PUBLICATIONS, INC., Petitioner

v.

RURAL TELEPHONE SERVICE COMPANY, INC.

No. 89-1909.

Argued Jan. 9, 1991.

Decided March 27, 1991.

Rural Telephone Service

Alphabetical listing of names, towns, and telephone numbers

§101. A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship.

• facts are not copyrightable
• but original compilations of facts are

Slide B18

CONFIDENTIAL –
ATTORNEYS EYES ONLY

9

EXHIBIT 69
PAGE 2445



499 U.S. 340, 113 L.Ed.2d 358

₁₃₄₆FEIST PUBLICATIONS, INC., Petitioner

v.

RURAL TELEPHONE SERVICE COMPANY, INC.

No. 89-1909

Argued Jan. The *sine qua non* of copyright is originality. To qualify for copyright protection, a work must be original to the author.

collection and assembling of preex... ...te...s or of data that are selected, coo... arranged in such a way that the ... or ... a whole constitutes an original wo... ...or...

* facts are not copyrightable
* but original compilations of facts are

Slide B19

---

## Limiting Doctrines

### Idea/Expression Dichotomy



§102(b) In no case does copyright protection . . . extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

### Design of Useful Articles

### Typefaces



Slide B20

CONFIDENTIAL –
ATTORNEYS EYES ONLY

10

EXHIBIT 69
PAGE 2446





CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2447





CONFIDENTIAL – ATTORNEYS EYES ONLY

EXHIBIT 69
PAGE 2448





CONFIDENTIAL –
ATTORNEYS EYES ONLY

13

EXHIBIT 69
PAGE 2449



**HARPER HOUSE, INC. v. THOMAS NELSON, INC.**
Cite as 889 F.2d 197 (9th Cir. 1989)

Slide B27

---

**HARPER HOUSE, INC. v. THOMAS NELSON, INC.**
Cite as 889 F.2d 197 (9th Cir. 1989)

Even if an organizer is copyrightable as a compilation, however, it warrants only extremely limited copyright protection. A *factual* compilation receives only limited copyright protection. *See Worth v. Selchow & Righter Co.*, 827 F.2d 569, 573 (9th Cir.1987); *Cooling Systems & Flexibles, Inc. v. Stuart Radiator, Inc.*, 777 F.2d 485, 492 (9th Cir.1985). Similarly, compilations that consist largely of uncopyrightable elements receive only limited protection. As with factual compilations, copyright infringement of compilations consisting largely of uncopyrightable elements should not be found in the absence of "bodily appropriation of expression." strict court involving similar items. *Baldwin Cooke,*

*Edwin K. Williams & Co.,* and *Cash Dividend Check Corp.,* each involved "bodily appropriation"—copying or unauthorized use of substantially the entire item. In *Baldwin Cooke,* the defendant included exactly the same forms as found in plaintiff's planner, and advertised its planner as meeting demands for a product such as plaintiff's planner. Both planners were 140 pages long, and the layout, organization, artwork and lists were identical. 383 F.Supp. at 656. In *Edwin K. Williams & Co.,* the defendant was a corporation related to plaintiff which used plaintiff's entire work in an unauthorized manner. 542 F.2d at 1055–59.

Slide B28

CONFIDENTIAL --
ATTORNEYS EYES ONLY

14

EXHIBIT 69
PAGE 2450

[7] We reject Harper House's claim that Instruction Nos. 6 and 8 adequately cautioned the jury to limit its review to protectable material.  Instruction Nos. 6 and 8 both required that Harper House make a showing of "substantial similarity" between *protectable expressions* in the organizers.  Though the instructions cautioned that the jury limit its review to protectable material, this caution was of little value bec... not adequately given the negative connotations to "copying," there was an obvious risk of an improper verdict for plaintiffs, and a need for further instructions to protect legitimate activity and avoid the suffocation of competition.[6]

6. In closing argument, Harper House's counsel fully exploited the negative connotation to copying, urging the jury to use their basic sense that when given a homework assignment at school, one should not copy the work of another student—"change a word here, change a word there, put it on a different size paper and hand it in as your own."

Slide B29



Slide B30

CONFIDENTIAL – ATTORNEYS EYES ONLY

15

EXHIBIT 69
PAGE 2451





CONFIDENTIAL –
ATTORNEYS EYES ONLY

16

EXHIBIT 69
PAGE 2452