**EXHIBIT 1**

COPY

ORIGINAL FILED

AUG 2 5 2003

LOS ANGELES
SUPERIOR COURT

1  HOWARTH & SMITH
   DON HOWARTH (State Bar No. 53783)
2  SUZELLE M. SMITH (State Bar No. 113992)
   BRIAN D. BUBB (State Bar No. 137408)
3  ROBERT D. BRAIN (State Bar No. 98815)
   800 Wilshire Blvd., Suite 750
4  Los Angeles, California 90017

5  (213) 955-9400

6  Attorneys for Plaintiff
   FARHAD LARIAN

7

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                FOR THE COUNTY OF LOS ANGELES

10

11  FARHAD LARIAN,                        CASE NO.    BC301371

12        Plaintiff,                      VERIFIED COMPLAINT FOR:

13    vs.                                 1)   FRAUD & DECEIT IN THE
                                               INDUCEMENT OF
14  ISAAC LARIAN and DOES 1 through            ARBITRATION
    50, inclusive,                             AGREEMENT;
15
         Defendants.                      2)   BREACH OF FIDUCIARY
16                                             DUTIES;

17                                        3)   FRAUD & DECEIT IN THE
                                               CONDUCT OF
18                                             ARBITRATION PROCESS;

19                                        4)   BREACH OF IMPLIED
                                               COVENANT OF GOOD
20                                             FAITH AND FAIR DEALING;

21                                        5)   VIOLATION OF
                                               CALIFORNIA
22                                             CORPORATIONS CODE §§
                                               25401 AND 25501;
23
                                          6)   VIOLATION OF
24                                             CALIFORNIA
                                               CORPORATIONS CODE §§
25                                             25402 AND 25502;

26                                        7)   FRAUD & DECEIT RE
                                               DECEMBER 2000
27                                             AGREEMENT;

28

FL 6465                                   VERIFIED COMPLAINT

03:P391001.618

EXHIBIT ____1____

PAGE ____19____

8)   NEGLIGENT MISREPRESENTATION;

9)   UNFAIR COMPETITION, IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200; and

10)  RESCISSION BASED ON MISTAKE

DEMAND FOR JURY TRIAL

Plaintiff, FARHAD LARIAN ("Plaintiff" or "Fred") alleges as follows:

### COMMON ALLEGATIONS

Parties and Venue

1.    Plaintiff Farhad Larian, also known as "Fred" Larian, is now, and at all times herein mentioned was, a resident of the State of California.  He is currently residing in Los Angeles County, California.

2.    Defendant Isaac Larian ("Isaac") is now, and at all time herein mentioned was, a resident of Los Angeles County, California.

3.    Plaintiff is unaware of the true names and capacities of Defendant DOES 1 through 50, inclusive, and therefore sues such Defendants by fictitious names.  Plaintiff will amend this complaint to show the true names and capacities of, and to make specific allegations against, these Defendants if and when additional information against them is ascertained.  Plaintiff is informed and believes and thereon alleges that each of the Defendants, including each fictitiously named Defendant, is liable in some manner for the events referred to in this complaint.

4.    At all times mentioned herein, each Defendant was the agent of each of the other Defendants, and was acting within the course and scope of said agency in performing the acts described herein.

5.    Venue is proper in Los Angeles County under California Code of Civil Procedure § 395 because Defendant Isaac Larian resides in Los Angeles County.

2

FL 6466

VERIFIED COMPLAINT

EXHIBIT 1
PAGE 70

General Background

6.      In or about 1979, two brothers, Plaintiff Fred Larian and Defendant Isaac Larian formed an equal partnership to import and distribute name brand consumer products, splitting the profits and losses 50/50.

7.      In or about 1982 the partnership was incorporated as ABC International Traders, Inc. ("ABC"), a closely-held, not publicly traded company, with each brother owning an equal 50 percent of the corporation. Upon incorporation, the brothers continued as before to divide the work and to split equally the profits in running the business. In or about 2002, the name of ABC was changed to MGA Entertainment, Inc. ("MGA).

8.      In or about 1985 or 1986, Fred's and Isaac's shares were diluted when ABC sold stock to their brother-in-law, Jahangir "Eli" Makabi. Such sale left Fred and Isaac each with an equal 45 percent share of the ownership of ABC. After the sale of the stock to Mr. Makabi, the brothers continued as partners and joint venturers in operating the Company, both continued to divide the work at ABC, and each sharing equally 45 percent of its profits.

9.      In or about 1994, Fred and Isaac also became equal 45 percent shareholders (with 10 percent going to Mr. Makabi) in MGA Hong Kong, Limited (together with MGA and ABC, "the Company"), and operated part of their business through such entity. At all times referenced herein, Isaac has served as the President of the Company. More recently, Isaac also acquired the additional title of CEO.

10.     Starting as far back as 1993, disputes arose between the brothers over the operation of the Company. In part, this was because, as Isaac put it, they were "equal partners in the Company" yet had different ideas on how best to make the Company prosper. Over the years, Fred and Isaac discussed various ways to resolve these disputes.

///

///

///

3

FL 6467

VERIFIED COMPLAINT

EXHIBIT 1

PAGE 21

11.     One method the brothers' discussed was having one brother buy out the other's equity interest.  Over the years, various such purchases were discussed and on one occasion an outside appraisal of the Company, performed at the specific request of Isaac, valued the Company at $35 million to $40 million.

12.     By 1999, Isaac, as President, had assumed control of sales, product development and financial matters.  At Isaac's direction, Fred assumed responsibility for major projects such as customs regulations, facilities management and warehouse distribution control, and was not as involved in the day-to-day sales or financial control of the Company.  For his role, Isaac took a significantly greater salary.

### Defendant's Concealment of the Bratz Doll Line

13.     Plaintiff is informed and believes that beginning in or about late 1999 and early 2000, Isaac became aware of a potential new product line that had tremendous potential for the Company.  The new product line involved the "Bratz" dolls and related products.  Bratz dolls are "hipper" and more "edgy" than Barbie and Barbie-type dolls, and are aimed at the post-adolescent, pre-teen and early teen market, i.e., a market where the allure of playing with Barbie-type dolls wanes.

14.     Plaintiff is informed and believes that during this same time period, Isaac devised a plan to keep this business opportunity secret from Fred and to gain control of the Company by buying Fred's shares at a value which did not include this new business opportunity.  Isaac concealed from Plaintiff, his brother and partner and stockholder, knowledge he had, as well as his intentions and actions undertaken, regarding the Bratz product line.

15.     In or about early 2000, Isaac called a meeting to discuss the new Bratz product line with selected individuals in the Company.  Plaintiff is informed and believes that those present at the meeting spoke enthusiastically of the tremendous opportunity the Bratz line presented for the Company as, *inter alia*, it captured a vacant market niche.

///

EXHIBIT ___1___

PAGE ___22___

FL 6468

1  Fred was not present for this meeting.  Upon information and belief, Isaac took steps to

2  conceal the results of the meeting from Fred.

3      16.    Also in or about February 2000, Isaac tried to dissuade Fred from attending

4  the New York Toy Fair, even though Fred had routinely and regularly attended such toy

5  fairs in the past.  The New York Toy Fair is an important venue for discussing and

6  researching the market potential of new product lines.  Isaac was furious when he

7  discovered that Plaintiff was traveling to New York for the fair.  Plaintiff was expelled by

8  Isaac from meetings he tried to attend and was excluded from any discussions Isaac may

9  have had relating to the Bratz line of products at the fair.

10     17. .  In early March 2000, while continuing to conceal from Fred the Company's

11  plans for the Bratz line, Isaac offered to purchase all of Plaintiff's 45 percent interest in

12  the Company for $9 million.  The offer was based on a total value of the Company of $20

13  million.  Upon information and belief, Isaac knew at the time he made the offer of the

14  Company's plans already in place, and actions already undertaken, regarding the Bratz

15  line, and that such plans made the Company worth well in excess of $20 million.

16     18.    As set forth herein, the two brothers divided responsibilities with Isaac,

17  assuming control of sales, product development and financial matters, and Fred assuming

18  responsibility for major projects.  Financial information was handled by Isaac and the

19  Controller, Dennis Medici.  Throughout 2000 Isaac repeatedly and routinely shared with

20  Fred any financial information that showed the Company was performing poorly, while

21  withholding any positive financial information about the Company, including the plans

22  for the Bratz line.  Indeed, in May 2000 Isaac told the Company's the Controller, Dennis

23  Medici, that he was to no longer give Fred any information regarding the financial

24  operation of the Company. During this period, Isaac gave Fred only bleak financial news

25  about the Company and continued to conceal the Company's plans and actions

26  undertaken regarding Bratz.

27     19.    On or about September 18, 2000, Isaac caused the Company to enter into a

28  worldwide licensing agreement for the Bratz dolls and related items.  The existence of

5

FL 6469

VERIFIED COMPLAINT

03.P391001.618

1   this license was concealed from Fred.  Upon information and belief, these important and

2   valuable rights are already generating revenues of in excess of $500 million a year and

3   are expected to exceed $3 billion in the next few years.

4

5   <u>Fraud Regarding the Arbitration Agreement</u>

6       20.    In or about September 2000, Isaac resumed his efforts to buy Fred's interest

7   in the Company.  Isaac kept the Bratz opportunity and other information about the true

8   financial condition of the Company hidden from Fred in an effort to secure Fred's

9   agreement to a proposed arbitration process with their Uncle Morad Zarabi.  Isaac agreed,

10  and induced Fred to agree, to the arbitration process without disclosing that during the

11  arbitration he would conceal the Company's plans and actions undertaken regarding the

12  Bratz line, and other financial information about the Company so that such information

13  would not be included in Mr. Zarabi's valuation of the Company.   In or about September

14  2000, Isaac and Fred executed the "Agreement to Arbitrate and Selection of Arbitrator"

15  ("Arbitration Agreement") attached hereto as Exhibit A.

16      21.    At all times before and up through his execution of the Arbitration

17  Agreement and for some considerable time thereafter, Fred was unaware of the true facts

18  regarding the new business opportunities and Bratz line of products, was unaware of the

19  true financial condition of the Company, and was unaware of the intention of Isaac to

20  conceal such material facts from the arbitrator and from him during the arbitration

21  process.  Had Fred been aware of the new business opportunities, the Bratz line of

22  products, the true financial condition of the Company, and/or the plans of Isaac to

23  conceal such material information from him and from the arbitrator, he would not have

24  agreed to enter into the arbitration process for the sale of his interest in the Company;

25  would not have agreed to the Arbitration Agreement; would not have agreed to have Mr.

26  Zarabi serve as arbitrator; and, would have placed greater restrictions and obligations on

27  the powers of any arbitrator, including without limitation a written requirement that the

28  Company be valued by an independent appraiser outside the family and that such

6

EXHIBIT

PAGE ___

24

1  appraisal be distributed to the parties for comment before any decision in the arbitration

2  was reached.

3      22.    In or about, December 2000, as a result of the Arbitration Agreement, Fred

4  and Isaac entered into a settlement and resolution of their differences with Fred agreeing

5  to sell his shares to Isaac.  Fred and Isaac executed a written "Agreement for Sale of

6  Stock," dated as of December 4, 2000, ("December 2000 Agreement") attached hereto as

7  Exhibit B.  One of the factors in causing Fred to enter into the Agreement for Sale of

8  Stock was the fact that he had been fraudulently induced into entering into the Arbitration

9  Agreement.

10      23.    At the time Isaac agreed to have Mr. Zarabi arbitrate the value of the

11  Company and other issues, and at all relevant times thereafter, Isaac knew that he would

12  continue to conceal the existence of his and the Company's plans for the Bratz line from

13  Mr. Zarabi and Fred during the arbitration, and other financial information about the

14  Company, the result of which, Isaac knew and intended, would be a fraudulently

15  diminished value of Fred's shares from what they would be worth if all pertinent

16  financial information about the Company and its plans for the Bratz product line were

17  disclosed.  Isaac entered into the arbitration with the intent to induce Fred to rely on his

18  presenting Mr. Zarabi with all material information about the Company and its finances

19  so as to allow Mr. Zarabi to determine a fair value for the Company.  Fred did, in fact,

20  actually and reasonably rely on Isaac disclosing such material information in agreeing to

21  have Mr. Zarabi decide the value of the shares and other matters, and in executing the

22  "Arbitration Agreement".

23

24  <u>**Fraud in the Conduct of the Ongoing Arbitration**</u>

25      24.    Mr. Zarabi held various hearings and received financial and other

26  information about the Company in his role as arbitrator beginning in the Fall of 2000.

27  Isaac did not disclose to Fred the license the Company had obtained in September 2000

28  for the Bratz line, the plans the Company had to develop and distribute, or any other

7

EXHIBIT

PAGE

25

1  actions the Company had already undertaken regarding, the Bratz product line and other

2  business opportunities, the true financial condition of the Company, or the other matters

3  alleged heretofore.  Upon information and belief, during this period, Isaac did not

4  disclose to Mr. Zarabi the license the Company had obtained in September 2000 for the

5  Bratz line, the plans the Company had to develop and distribute, or any other actions the

6  Company had already undertaken regarding, the Bratz product line and other business

7  opportunities, the true financial condition of the Company, or the other matters alleged

8  heretofore.

9      25.    At the time Isaac agreed to have Mr. Zarabi arbitrate the value of the

10  Company and other issues, and at all relevant times thereafter, Isaac knew that he would

11  continue to conceal the existence of his and the Company's plans for the Bratz line from

12  Mr. Zarabi and Fred during the arbitration, and other financial information about the

13  Company, the result of which, Isaac knew and intended, would be a fraudulently

14  diminished value of Fred's shares from what they would be worth if all pertinent

15  financial information about the Company and its plans for the Bratz product line were

16  disclosed.  Isaac entered into the arbitration with the intent to induce Fred to rely on his

17  presenting Mr. Zarabi with all material information about the Company and its finances

18  so as to allow Mr. Zarabi to determine a fair value for the Company.  Fred did, in fact,

19  actually and reasonably rely on Isaac disclosing such material information in agreeing to

20  have Mr. Zarabi decide the value of the shares and other matters, and in agreeing to the

21  arbitration process.

22      26.    In or about, December 2000, as a result of the arbitration process,

23  Fred and Isaac entered into a settlement and resolution of their differences with Fred

24  agreeing to sell his shares to Isaac.  Fred and Isaac executed a written "Agreement for

25  Sale of Stock," dated as of December 4, 2000, ("December 2000 Agreement") attached

26  hereto as Exhibit B.  One of the factors in causing Fred to enter into the Agreement for

27  Sale of Stock was the fraud and facts set forth heretofore.

28  ///

PAGE ___    EXHIBIT ___    7-6

03:P391001.618                    FL 6472

VERIFIED COMPLAINT

<u>Fraud In the Agreement for Sale of Stock</u>

27.     At all relevant times herein and during the negotiation of the December 2000 Agreement, Isaac continued his fraudulent concealment and nondisclosure as set forth herein of the Company's plans, assets and steps undertaken, regarding the Bratz product line as well as other financial information regarding the Company. But for the fraud, and had Plaintiff known of the true facts regarding the Company's plans, assets and steps undertaken regarding the Bratz product line, the true financial information about the Company and the other matters alleged heretofore, he would not have agreed to sell his shares to Isaac under the terms of the December 2000 Agreement.

<u>Discovery of Fraud</u>

28.     In or about late spring and summer 2002, Plaintiff first became aware of the true scope of the Company's extraordinary plans, efforts and history regarding the Bratz product line and other financial information about the Company that had been concealed from him by Isaac, as the license had been concealed from him. In or about the spring and summer 2002, Isaac asked Fred to audit payments that were due to the Company. In that audit, Fred discovered information, for the first time, that the Company had been receiving or was expecting significant revenues based on the Bratz product line.

29.     Fred then asked Mr. Zarabi whether Isaac had disclosed that information to Mr. Zarabi and/or any appraiser involved with the arbitration. Plaintiff was told by Mr. Zarabi that Isaac had not provided him with such information. Plaintiff made a demand that Mr. Zarabi rectify the situation, but to date nothing has been done. Thereafter, Plaintiff made a demand that Isaac pay the fair market value of Plaintiff's share of the company, but Isaac has failed and refused to do so.

///
///
///
///

03:P391001.618   FL 6473   VERIFIED COMPLAINT

### FIRST CAUSE OF ACTION

(Fraud & Deceit in the Inducement of Arbitration Agreement)

30.     Plaintiff hereby reasserts and realleges Paragraphs 1 through 29 inclusive, as though set forth in full herein.

31.     In entering into the Arbitration Agreement, agreeing to participate in the arbitration process contemplated thereby, and offering to purchase Plaintiff's shares in the Company, Defendant knowingly made false representations of material fact to Plaintiff and/or concealed and/or failed to disclose material facts known to Defendant which he was under a duty to disclose to Plaintiff. Such facts specifically include, without limitation, his intentions regarding the information he was planning to conceal from the arbitrator, otherwise fail to disclose during the course of the arbitration process, and/or had already concealed from Plaintiff, concerning the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line.

32.     Plaintiff actually, reasonably, and justifiably relied upon the false statements, concealments, and omissions of Defendant described above in agreeing to execute the Arbitration Agreement, participate in the arbitration process contemplated thereby, and sell his shares in the Company. Had Plaintiff known of the true facts, specifically including the true facts concerning Defendant's intentions regarding, without limitation, the information he was planning to conceal from arbitrator, otherwise fail to disclose during the arbitration process and/or already had concealed from Plaintiff concerning the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line, Plaintiff would not have entered into the Arbitration Agreement, would not have agreed to participate in the arbitration process contemplated thereby, and would not have agreed to sell his shares of the Company.

33.     Defendant made the false representations, concealments and omissions alleged above with the intent to defraud Plaintiff and/or in reckless disregard of the truth

10

EXHIBIT ___ PAGE ___

1  for purposes of inducing Plaintiff to execute the Arbitration Agreement, agree to

2  participate in the arbitration process contemplated thereby, and sell his shares in the

3  Company at a below fair market price.

4       34.   At all material times, Plaintiff was unaware of the falsity of the

5  representations and disclosures of Defendant as alleged above and believed them to be

6  true.  At all material times, Plaintiff was unaware of the material omissions, concealments

7  and misstatements of material facts by Defendant, and could not, in the exercise of

8  reasonable care, made himself aware of the falsity of such misrepresentations and

9  nondisclosures, or the existence of such omissions or concealments.

10       35.   As a direct and proximate result of the fraudulent conduct alleged above,

11  Plaintiff has been damaged, without limitation, in that he was fraudulently induced to

12  enter the Arbitration Agreement, participate in the arbitration process contemplated

13  thereby, sell his shares of the Company to Defendant at a below fair market price of less

14  than $9 million, and enter into the December 2000 sale agreement.  Plaintiff is entitled to

15  rescission of the September agreement to arbitrate, rescission of the December 2000 stock

16  sale agreement and restitution of his shares in the Company.  In the alternative, Plaintiff

17  is entitled to damages, the amount of such damage is not presently ascertainable, but will

18  be proven at trial.

19       36.   The conduct of Defendant as alleged above, was fraudulent, malicious,

20  oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious

21  disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an

22  award of punitive damages against Defendant.

23

24           **SECOND CAUSE OF ACTION**

25           **(Breach of Fiduciary Duties)**

26       37.   Plaintiff hereby reasserts and realleges Paragraphs 1 through 36 inclusive,

27  as though set forth in full herein.

28  ///

03:P391001.618               FL 6475        VERIFIED COMPLAINT

38.     As alleged herein, as an officer, manager and major shareholder of the Company in which Plaintiff was a shareholder, and as Plaintiff's partner and joint venturer in the management and operation of the Company, and otherwise due to their family relationship, Defendant owed Plaintiff fiduciary duties of loyalty, honesty, care and fair dealing in all matters concerning the Company.

39.     At all times alleged herein, Plaintiff actually and reasonably reposed the highest trust and confidence in Defendant's loyalty, honesty, care, and fair dealing in all matters concerning the Company.

40.     Defendant repeatedly breached and violated such fiduciary duties owed Plaintiff by, among other things, failing to inform Plaintiff, without limitation, of the true and accurate financial condition of the Company, its financial prospects, its business opportunities, the Company's plans and actions already undertaken concerning the Bratz product line, and/or his intentions regarding the information he was planning to conceal from the arbitrator and others in the course of the arbitration process stemming from the Arbitration Agreement.

41.     Said breaches of fiduciary duties by Defendant have caused Plaintiff damage, including but not limited to damages resulting from the sale of his shares of the Company to Defendant at a below fair market price, in an amount not presently ascertainable, but which will be proven at the time of trial.

42.     The conduct of Defendant, as alleged above, was fraudulent, malicious, oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an award of punitive damages against Defendant.

## THIRD CAUSE OF ACTION

### (Fraud & Deceit in the Conduct of the Arbitration Process)

43.     Plaintiff hereby reasserts and realleges paragraphs 1 through 42, inclusive, as though set forth in full herein.

12

FL 6476

VERIFIED COMPLAINT

03:P391001.618

44.     In participating in the arbitration process contemplated by the Arbitration Agreement, Defendant knowingly made false representations of material fact and/or concealed and/or failed to disclose material facts known to Defendant which he was under a duty to disclose to the arbitrator and otherwise during the arbitration. Such facts specifically included, without limitation, information as to the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line.

45.     Plaintiff actually, reasonably, and justifiably relied upon the false statements, concealments, and omissions of Defendant described above in participating in the arbitration process contemplated by the Arbitration Agreement. Had Plaintiff known of the true facts, specifically including, without limitation, the scope of the information Defendant concealed from the arbitrator and otherwise not disclosed in the course of the arbitration process regarding the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line, Plaintiff would not have participated in the arbitration process or agreed to sell his shares of the Company.

46.     Defendant made the false representations, concealments and omissions alleged above with the intent to defraud Plaintiff and/or in reckless disregard of the truth for purposes of inducing Plaintiff to participate in the arbitration process contemplated by the Arbitration Agreement and to sell his shares of the Company to Defendant at a below market price.

47.     At all material times, Plaintiff was unaware of the falsity of the representations and disclosures of Defendant as alleged above and believed them to be true. At all material times, Plaintiff was also unaware of the material omissions, concealments and misstatements of material facts by Defendant, and could not, in the exercise of reasonable care, made himself aware of the falsity of such misrepresentations and nondisclosures, or the existence of such omissions or concealments.

///

13

PAGE ___

EXHIBIT ___

3I

1   48.   As a direct and proximate result of the fraudulent conduct alleged above,

2   Plaintiff has been damaged in that he was fraudulently induced to participate in the

3   arbitration contemplated by the Arbitration Agreement and sell his shares of the Company

4   to Defendant at a below fair market price. Plaintiff is entitled to rescission of the

5   December 2000 stock sale agreement and restitution of his shares in the Company. In the

6   alternative, Plaintiff is entitled to damages, the amount of such damage is not presently

7   ascertainable, but will be proven at trial.

8   49.   The conduct of Defendant, as alleged above was fraudulent, malicious,

9   oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious

10  disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an

11  award of punitive damages against Defendant.

12

13              **FOURTH CAUSE OF ACTION**

14      **(Breach of Implied Covenant of Good Faith and Fair Dealing in
        the Arbitration Agreement)**

15

16  50.   Plaintiff hereby reasserts and realleges paragraphs 1 through 49, inclusive,

17  as though set forth in full herein.

18  51.   The Arbitration Agreement contract executed by Plaintiff and Defendant

19  contained an implied covenant of good faith and fair dealing which imposed the

20  following, among others duties on Defendant: (a) a duty to act with honesty in fact in his

21  performance under the agreement; (b) a duty of fair, open and honest disclosure to

22  Plaintiff; (c) a duty to refrain from realizing secret gains at the expense of Plaintiff by

23  connivance, deceit, suppression of facts, or other improper means; and (d) a duty to

24  refrain from taking any action which would unfairly injure the rights of the Plaintiff or

25  interfere in his ability to recognize his reasonable expectations under, and benefits of, the

26  Agreement.

27  52.   By engaging in the conduct described above, specifically including, without

28  limitation, concealing from the arbitrator and otherwise failing to disclose material facts

14

03:P391001.618

FL 6478

VERIFIED COMPLAINT

PAGE ___ EXHIBIT ___ 30

1  in the course of the arbitration process information regarding the true and accurate

2  financial condition of the Company, its financial prospects, its business opportunities,

3  and/or the Company's plans and actions already undertaken concerning the Bratz product

4  line, Defendant has breached his duties of good faith and fair dealing set forth above.

5      53.     At all times herein relevant, Plaintiff has performed and discharged all

6  covenants, conditions, and duties required of him under the Arbitration Agreement,

7  including all duties imposed by the covenant of good faith and fair dealing, except those

8  obligations, if any, which have been prevented by Defendant, those obligations Defendant

9  has waived by his words and/or conduct, or those obligations which Defendant is

10 estopped from asserting that Plaintiff has not performed as a result of Defendant's

11 conduct alleged herein.

12     54.     As a direct and proximate result of Defendant's actions and breaches as

13 alleged herein, Plaintiff has suffered, and continues to suffer damages in an amount as yet

14 unascertained but which will be established at trial.

15     55.     The conduct of Defendant, as alleged above, was fraudulent, malicious,

16 oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious

17 disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an

18 award of punitive damages against Defendant.

19

20                     **FIFTH CAUSE OF ACTION**

21          **(Violation of California Corporations Code §§ 25401 and 25501)**

22     56.     Plaintiff hereby reasserts and realleges paragraphs 1 through 55, inclusive,

23 as though set forth in full herein.

24     57.     In committing the acts, omissions, and concealments alleged herein,

25 Defendant has violated California Corporations Code, Section 25401 by, among other

26 things, offering to purchase a security in this State: (a) by means of written and/or oral

27 communications containing untrue statements of material facts, specifically including

28 untrue facts regarding the true and accurate financial condition of the Company, its

15

FL 6479          VERIFIED COMPLAINT

EXHIBIT

PAGE 33

1  financial prospects, its business opportunities, and/or the Company's plans and actions

2  already undertaken concerning the Bratz product line; and/or (b) omitting to state material

3  facts necessary in order to make statements made, in light of the circumstances when they

4  were first made, not misleading, specifically regarding the true and accurate financial

5  condition of the Company, its financial prospects, its business opportunities, and/or the

6  Company's plans and actions already undertaken concerning the Bratz product line.

7      58.    As a direct and proximate result of the acts and conduct of Defendant,

8  Plaintiff is entitled to rescission of the sale and restitution of his shares of the Company

9  or damages under California Corporations Code § 25501, in an amount as yet

10  unascertained but which will be established at trial, plus such other relief as pled herein.

11

12                  **SIXTH CAUSE OF ACTION**

13        (Violation of California Corporations Code §§ 25402 and 25502)

14      59.    Plaintiff hereby reasserts and realleges paragraphs 1 through 58 inclusive,

15  as though set forth in full herein.

16      60.    At all times alleged herein, Defendant was an officer of the Company, a

17  director of the Company, a controlling person of the Company, and/or a person whose

18  relationship with the Company provided him access, directly and indirectly, to material

19  information about the Company, within the meaning of California Corporations Code §

20  25402.

21      61.    At all times alleged, Defendant had access to, and had information about,

22  the Company not generally available to the public or to Plaintiff, which would

23  significantly affect the value, and fair market price of the shares, of the Company,

24  specifically including, without limitation, information regarding the true and accurate

25  financial condition of the Company, its financial prospects, its business opportunities,

26  and/or the Company's plans and actions already undertaken concerning the Bratz product

27  line.

28  ///

03:P391001.618                                          FL 6480                        VERIFIED COMPLAINT

EXHIBIT

PAGE

34

62.   At all times herein alleged, Defendant knew such information regarding, without limitation, the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line, was not generally available to the public or to Plaintiff, and was not intended to be available to the public or to Plaintiff.

63.   In committing the acts, omissions, and concealments alleged herein, Defendant has violated California Corporations Code, Section 25402 by, among other things, purchasing and offering to purchase from Plaintiff his shares of the Company at a time when he knew of material, non-public, undisclosed information about the Company gained from his status as an officer, director, controlling person, and individual with access to such information regarding, without limitation, the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line.

64.   As a direct and proximate result of the acts and conduct of Defendant, Plaintiff is entitled to rescission of the sale and restitution of his shares of the Company or damages pursuant to California Corporations Code § 25502 in an amount as yet unascertained but which will be established at trial, plus such other relief as pled herein.

## SEVENTH CAUSE OF ACTION

### (Fraud & Deceit Regarding the December 2000 Agreement)

65.   Plaintiff hereby reasserts and realleges paragraphs 1 through 64 inclusive, as though set forth in full herein.

66.   Prior to Plaintiff's entering into the December 2000 Agreement to sell Plaintiff's stock in the Company to Defendant, Defendant knowingly made false representations of material fact and/or concealed and/or failed to disclose material facts known to Defendant which he was under a duty to disclose to Plaintiff. Such facts specifically included, without limitation, the true and accurate financial condition of the

///

17

FL 6481

1   Company, its financial prospects, its business opportunities, and/or the Company's plans
2   and actions already undertaken concerning the Bratz product line.

3        67.    Plaintiff actually, reasonably, and justifiably relied upon the false
4   statements, concealments, and omissions of Defendant described above in executing the
5   December 2000 Agreement and agreeing to sell his shares to Defendant. Had Plaintiff
6   known of the true facts, specifically including, without limitation, the facts concerning
7   true and accurate financial condition of the Company, its financial prospects, its business
8   opportunities, and/or the Company's plans and actions already undertaken concerning the
9   Bratz product line, Plaintiff would not have entered into the December 2000 Agreement,
10  or otherwise agreed to sell his shares in the Company at that time.

11       68.    Defendant made the false representations, concealments and omissions
12  alleged above with the intent to defraud Plaintiff and/or in reckless disregard of the truth
13  for purposes of inducing Plaintiff to execute the December 2000 Agreement and to sell
14  his shares in the Company to the Defendant at a below fair market price.

15       69.    At all material times, Plaintiff was unaware of the falsity of the
16  representations and disclosures of Defendant as alleged above and believed them to be
17  true. At all material times, Plaintiff was also unaware of the material omissions,
18  concealments and misstatements of material facts by Defendant, and could not, in the
19  exercise of reasonable care, made himself aware of the falsity of such misrepresentations
20  and nondisclosures, or the existence of such omissions or concealments.

21       70.    As a direct and proximate result of the fraudulent conduct alleged above,
22  Plaintiff has been damaged in that he was fraudulently induced to enter the December
23  2000 Agreement calling for the sale of his shares of the Company at a below fair market
24  price. The amount of such damage is not presently ascertainable, but will be proven at
25  trial.

26  / / /
27  / / /
28  / / /

                                    18

03:P391001.618                                      FL 6482            VERIFIED COMPLAINT

71.     The conduct of Defendant, as alleged above, was fraudulent, malicious, oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an award of punitive damages against Defendant.

## EIGHTH CAUSE OF ACTION

### (Negligent Misrepresentation)

72.     Plaintiff hereby reasserts and realleges paragraphs 1 through 70 inclusive, as though set forth in full herein.

73.     Prior to Plaintiff's entering into the December 2000 Agreement to sell Plaintiff's stock in the Company, Defendant owed Plaintiff a duty of reasonable care regarding, without limitation, the accuracy and honesty of the statements made regarding the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line.

74.     Defendant breached his duty to Plaintiff by making misrepresentations of material facts, and by omitting and failing to disclose material facts, which he knew, or in the exercise of reasonable care, should have known were inaccurate and which he was under a duty to disclose to Plaintiff, specifically including, without limitation, information concerning the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line.

75.     Defendant made such misrepresentations and omissions concerning, without limitation, the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line with the intent to induce Plaintiff into executing the December 2000 Agreement and selling his shares to Defendant at below fair market value price.

19

03:P391001.618                          FL 6483                          VERIFIED COMPLAINT

1    76.    Plaintiff actually, reasonably, and justifiably relied upon the false

2    statements and omissions of Defendant described above in deciding to execute the

3    December 2000 Agreement and sell his shares in the Company to Defendant. Had

4    Plaintiff known of the true facts, specifically including, without limitation, the true and

5    accurate financial condition of the Company, its financial prospects, its business

6    opportunities, and/or the Company's plans and actions already undertaken concerning the

7    Bratz product line, Plaintiff would not have entered into the December 2000 Agreement,

8    or otherwise agreed to sell his shares in the Company at that time.

9    77.    As a direct and proximate result of the negligent conduct alleged above,

10   Plaintiff has been damaged in that he was improperly induced to enter the December

11   2000 Agreement and sold his shares of the Company at a below fair market price. The

12   amount of such damage is not presently ascertainable, but will be proven at trial.

13

14                          **NINTH CAUSE OF ACTION**

15                   (Unfair Competition in Violation of California
                     Business & Professions Code §§ 17200 et seq.)

16

17   78.    Plaintiff hereby reasserts and realleges paragraphs 1 through 77 inclusive,

18   as though set forth in full herein.

19   79.    California Business and Professions Code §§ 17200 et seq. proscribes, in

20   part, "any unlawful, unfair, or fraudulent business practice."

21   80.    By virtue of the conduct alleged above, Defendant has committed unlawful,

22   unfair, and/or fraudulent business practices with regard to his dealings with Plaintiff.

23   81.    As a direct and proximate result of Defendant's violations Business and

24   Professions Code §17200 et seq. alleged above, Plaintiff has been harmed and is entitled

25   to restitution of the amounts to which he has been unjustly harmed, and Defendant

26   unjustly enriched, and other relief as pled herein.

27   ///

28   ///

03:739J001.618                              FL 6484              VERIFIED COMPLAINT

# TENTH CAUSE OF ACTION

## (Rescission Based on Mistake)

82. Plaintiff hereby reasserts and realleges paragraphs 1 through 81, inclusive, as though set forth in full herein.

83. In entering into both the Arbitration Agreement and the December 2000 Agreement, Plaintiff was mistaken in his belief that Defendant planned to inform the arbitrator, and otherwise to disclose during the course of the arbitration proceeding, and/or had already had disclosed to Plaintiff, without limitation true and accurate information concerning the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line.

84. The disclosure of true and accurate information to Plaintiff and to the arbitrator concerning, without limitation, the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line was a basic assumption on which the Arbitration Agreement and/or the December 2000 Agreement rested.

85. Defendant's failure to accurately disclose true and accurate information to Plaintiff and to the arbitrator regarding, without limitation, the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line had a such material effect on the Arbitration Agreement and/or the December 2000 Agreement that enforcement of either agreement against Plaintiff would be unfair and unconscionable.

86. Defendant both knew about, and was the cause of, Plaintiff's mistake in believing Defendant would accurately disclose to Plaintiff and to the arbitrator, without limitation, true and accurate information regarding the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line at the time Plaintiff executed those agreements.

EXHIBIT

PAGE ___

39

21

FL 6485

VERIFIED COMPLAINT

03-P391001.618

87.   Plaintiff did not bear the risk of Defendant's entering into the Arbitration Agreement and/or the December 2000 Agreement without disclosing to Plaintiff and to the arbitrator, without limitation, true and accurate information regarding the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

### ON THE FIRST AND SECOND CAUSES OF ACTION

1.   For rescission of the Arbitration Agreement;

2.   For rescission of Plaintiff's sale of his shares in the Company;

3.   For restitution of Plaintiff's shares in the Company;

4.   In the alternative of rescission of the sale of shares and restitution, for damages according to proof;

5.   For punitive damages in an amount necessary to punish the Defendant, to the extent permitted by law.

6.   For attorneys fees and cost of suit.

7.   For interest at the maximum rate allowed by law.

8.   For such other and further relief the Court may deem just, equitable, and/or proper.

### ON THE THIRD AND SEVENTH CAUSES OF ACTION

1.   For rescission of Plaintiff's sale of his shares in the Company;

2.   For restitution of Plaintiff's shares in the Company;

3.   In the alternative of rescission of the sale of shares and restitution, for damages according to proof;

4.   For punitive damages in an amount necessary to punish the Defendant, to the extent permitted by law.

FL 6486

VERIFIED COMPLAINT

03:P391001.618

1       5.    For attorneys fees and cost of suit.

2       6.    For interest at the maximum rate allowed by law.

3       7.    For such other and further relief the Court may deem just, equitable, and/or

4   proper.

5

6              **ON THE FOURTH AND EIGHTH CAUSES OF ACTION**

7       1.    For damages according to proof;

8       2.    For attorneys fees and cost of suit.

9       3.    For interest at the maximum rate allowed by law.

10      4.    For such other and further relief the Court may deem just, equitable, and/or

11  proper.

12

13             **ON THE FIFTH AND SIXTH CAUSES OF ACTION**

14      1.    For rescission of Plaintiff's sale of his shares in the Company;

15      2.    For restitution of Plaintiff's shares in the Company;

16      3.    In the alternative of rescission of the sale of shares and restitution, for

17  damages according to proof;

18      4.    For attorneys fees and cost of suit.

19      5.    For interest at the maximum rate allowed by law.

20      6.    For such other and further relief the Court may deem just, equitable, and/or

21  proper.

22

23             **ON THE NINTH CAUSE OF ACTION**

24      1.    For restitution in an amount necessary to restore to Plaintiff the amount by

25  which Defendant has been unjustly enriched by means of the unlawful, unfair, and

26  fraudulent acts alleged above.

27      2.    For attorneys fees and cost of suit.

28      3.    For interest at the maximum rate allowed by law.

03:P391001.618        FL 6487        VERIFIED COMPLAINT

EXHIBIT 4

1      4.    For such other and further relief the Court may deem just, equitable, and/or

2 proper.

3

4                      <u>ON THE TENTH CAUSE OF ACTION</u>

5      1.    For rescission of Plaintiff's sale of his shares in the Company;

6      2.    For restitution of Plaintiff's shares in the Company;

7      3.    For attorneys fees and cost of suit.

8      4.    For interest at the maximum rate allowed by law.

9      5.    For such other and further relief the Court may deem just, equitable, and/or

10 proper.

11

12                       <u>DEMAND FOR JURY TRIAL</u>

13    Plaintiff hereby demands a trial by jury herein on all causes of action so triable.

14

15 DATED: August _25_, 2003         HOWARTH & SMITH
                                DON HOWARTH

16                           SUZELLE M. SMITH
                           BRIAN D. BUBB

17                           ROBERT D. BRAIN

18

19                     By: _Don Howarth_
                             Don Howarth

20

21                     Attorneys for Plaintiff
                     Farhad Larian

22

23

24

25

26

27

28

24

03:P391001.618                            FL 6488       VERIFIED COMPLAINT

### VERIFICATION

1

2      I, Farhad Larian, declare:

3      I am a party to this action, and I certify and declare that I have read the foregoing

4   **VERIFIED COMPLAINT** and know its contents thereof. The same is true of my own

5   knowledge, except as to those matters which are therein alleged on information and

6   belief, and as to those matters, I believe them to be true.

7      I declare under penalty of perjury under the laws of the State of California that this

8   Verification was executed on August 22, 2003, at Los Angeles, California and that the

9   foregoing is true and correct.

10

11                                              Farhad Larian

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT PAGE 43

03:F390001.618                                                          VERIFICATION

FL 6489

EXHIBIT  A

EXHIBIT _____ 1

PAGE _____ 44

FL 6490

## AGREEMENT TO ARBITRATE AND SELECTION OF ARBITRATOR

This Agreement is made between Isaac Larian ("Isaac"), Farhad Larian ("Farhad") and Morad Zarabi ("Morad") pursuant to the following recitals, terms and conditions.

A.    Isaac and Farhad each own a 45% shareholder interest in ABC Int'l Traders Inc., a California corporation ("Corporation").

B.    Disputes have arisen between Isaac and Farhad concerning the continuing operation of the Corporation and other matters such as partnerships. Isaac and Farhad have been unable to resolve their disputes and desire to conclude their disputes in an economical and timely manner, outside of the formal judicial process.

C.    Both Isaac and Farhad have great confidence in the business and personal judgment of Morad and desire to utilize the services of Morad as a binding arbitrator of the disputes between Isaac and Farhad.

D.    As an accommodation to Isaac and Farhad, Morad agrees to undertake the position as arbitrator.

Now Therefore, the parties agree as follows:

1.    Isaac and Farhad irrevocably appoint Morad to arbitrate their disputes with respect to the Corporation, its operation and their shareholder interests in the Corporation, and other disputes.

2.    Upon execution of this Agreement, Isaac and Farhad shall deliver their irrevocable shareholder proxy and share certificates to Morad so that Morad may vote their shares of Corporation as Morad so determines, including the voting for positions on the Board of Directors.

3.    Upon execution of this Agreement, Isaac and Farhad shall each deliver to Morad their personal check in the amount of $500,000.00 payable to the other, to be utilized as a down payment of the purchase price as determined in Section 5 of this Agreement for the Sale of either Isaac's or Farhad's shares of the Corporation to the other.

4.    Isaac and Farhad shall present their arguments and concerns to Morad in a manner as determined by Morad. Evidence may be admitted or excluded in the sole discretion of Morad. Morad shall then render his decisions with respect to the disputes and said decisions shall be binding and conclusive upon Isaac and Farhad.

5.    In rendering his decisions, Morad has the right and power to determine, among other issues, whether either Isaac or Farhad will have to sell his shares of Corporation to the other and the purchase price and terms of payment for said shares; setting the salaries of Isaac and Farhad; and the continuation of employment by the Corporation of either Isaac or Farhad.

EXHIBIT 1

PAGE 45

FL 6491

6. Isaac and Farhad agree to be bound by the terms of Morad's decisions and to implement the terms of Morad's decisions in the time parameters as established by Morad.

7. Isaac and Farhad acknowledge that Morad has agreed to perform such services as arbitrator as an accommodation to Isaac and Farhad. Isaac and Farhad agree to hold Morad harmless and to indemnify Morad from any cost, liability, suit, claim, damage or judgment, including court costs and reasonable attorneys' fees arising out of or relating to this Agreement and the decisions made by Morad pursuant to the terms of this Agreement.

8. Isaac and Farhad agree to pay equally the costs and expenses of Morad incurred by him, including his attorneys' fees, in drafting and implementing the terms of this Agreement and performing his responsibilities herein.

9. Isaac and Farhad agree and intend hereby that Morad's decisions will constitute a full and final resolution of all disputes, past or present, between Isaac and Farhad concerning the Corporation, its operation their shareholder interests in Corporation, and other disputes.

10. Any judgment or award rendered by Morad may be entered in any Court having jurisdiction over the disputes between Isaac and Farhad.

11. To the extent not otherwise provided by this Agreement or determined by Morad, the rules governing the arbitration and enforcement of the arbitration award shall be governed by the California Arbitration Act, California Code of Civil Procedure, Section 1280 et seq.

Dated: _____, 2000

_____        _____        _____
ISAAC LARIAN                     FARHAD LARIAN                     MORAD ZARABI

EXHIBIT ____

PAGE ____ 46

FL 6492

EXHIBIT B

FL 6493

EXHIBIT _____ 1

PAGE _____ 47

AGREEMENT FOR SALE OF STOCK

This Agreement, made this 4th day of December, 2000, by and between Farhad Larian ("SELLER"), and Isaac Larian ("BUYER").

Whereas, the SELLER is the owner of 10,000,000 shares of common stock of ABC International Traders Inc., a California corporation and 450 shares of MGA Entertainment Hong Kong Limited, a Hong Kong Corporation (collectively "CORPORATION"), with offices at 16730 Schoenborn Street, North Hills, California 91343-6122, and desires to sell to the BUYER, and the BUYER desires to purchase from the SELLER, these 10,000,000 and 450 shares of common stock of CORPORATION.

Now, therefore, in consideration of the promises and of the mutual covenants and agreements herein contained, the parties hereto hereby agree as follows:

1.  At Closing, as defined hereinafter, SELLER shall sell, transfer and convey to BUYER and BUYER shall purchase from SELLER, SELLER'S 10,000,000 and 450 shares of common stock of CORPORATION.

2.  The purchase price for said shares shall be the sum of Eight Million Seven Hundred Seventy Five Thousand Dollars ($8,775,000.00), payable as follows:

    a.  The sum of $500,000.00 at Closing, as defined hereinafter; plus

    b.  The sum of $8,275,000.00 evidenced by BUYER'S promissory note made payable to SELLER, in the form as attached hereto as Exhibit "A" and incorporated herein by reference.  Said promissory note shall provide for a principal payment in the amount of $2,000,000.00, with interest at nine and one-half percent on or before April 15, 2001 and the remainder of the principal balance amortized in equal monthly payments of principal and interest over 120 months at an annual interest rate of nine and one-half percent commencing June

1

EXHIBIT 1
PAGE 48

FL 6494

1, 2001. The promissory note shall also provide that, in the event of default, BUYER agrees that SELLER'S personal residence located at 237 North Carolwood Drive, Los Angeles, CA shall be exempt from lien or attachment.

    3.   BUYER agrees to secure his promissory note obligation to SELLER as follows:

        BUYER shall execute a Pledge Agreement in favor of SELLER in the form as attached hereto as Exhibit "B" and incorporated herein by reference. Said Pledge Agreement shall be for the purposes of securing BUYER'S total shareholder interest in CORPORATION in favor of SELLER until such time as BUYER'S obligations pursuant to his promissory note in favor of SELLER has been paid in full. Said Pledge Agreement shall have restrictions imposed upon BUYER with respect to the amount of compensation paid to BUYER from CORPORATION during the period of time that BUYER'S promissory note in favor of SELLER remains outstanding.

    4.  In addition to the purchase price as above stated, BUYER shall cause ABC International Traders Inc. to enter into a Consultation Agreement with BUYER in the form as attached hereto as Exhibit "C" and incorporated herein by reference.

    5.  SELLER warrants and represents to the BUYER the following:

        a.   That CORPORATION is a corporation duly organized, validly existing, and in good standing under the laws of California or Hong Kong, respectively, has all necessary corporate powers to own its properties and carry on its business as now owned and operated by it.

        b.   That SELLER is the owner of and has the good and marketable title to the 10,000,000 shares and 450 shares, respectively, of stock agreed to be sold herein, representing 45% of the issued and outstanding shares of CORPORATION, and each of them, free of all encumbrances, liens and security interests.

2

EXHIBIT _____1_____

PAGE _____49_____

c. That the authorized capital stock of CORPORATION consists of 100,000,000 shares and 1,000 shares respectively of common stock no or nominal par value, of which 22,200,000 shares of ABC International Traders Inc. are presently issued and outstanding and 1,000 shares of MGA Entertainment Hong Kong Limited are presently issued and outstanding.

d. That any right of first refusal, stock option or any other agreement wherein SELLER has the right to purchase shares of CORPORATION is hereby terminated.

6. BUYER acknowledges that he is a current shareholder of CORPORATION, has been the President and a Director of CORPORATION; and an employee of CORPORATION for at least 18 years for ABC International Traders Inc. and at least 7 years for MGA Entertainment Hong Kong Limited, since the inception of CORPORATION. BUYER is thoroughly familiar with the operations of CORPORATION and purchases the shares of CORPORATION from SELLER with full knowledge of the business, prospects, liabilities, obligations, nature and salability of inventory, collectability of accounts receivable, condition of furniture, fixtures and equipment, and financial condition of CORPORATION. SELLER makes no warranty, either express or implied as to the business of CORPORATION, its prospects, liabilities, obligations, nature and salability of inventory, collectability of accounts receivable, condition of furniture, fixtures and equipment, or financial condition.

7. The consummation of the transaction contemplated by this Agreement ("Closing") shall take place at the offices of the CORPORATION on the 2nd day of January 2001, at 10:00 a.m., or such other time and place as the parties may agree. The sale shall be effective as of the close of business on December 31, 2000, the end of the calendar and fiscal year of CORPORATION. At the Closing the

3

EXHIBIT ___1___

PAGE ___50___

FL 6496

following documents and instruments shall be exchanged between the parties:

    a.   SELLER shall deliver to BUYER:

       (i).  CORPORATION'S share certificate number 3 issued in favor of SELLER representing 10,000,000 shares of ABC International Traders Inc.; and share certificated number 2 issued in favor of SELLER representing 450 shares of MGA Entertainment Hong Kong Limited, duly endorsed by SELLER in favor of BUYER.

       (ii).  The resignation of SELLER as a Director and employee of CORPORATION.

       (iii).  Any and all records of CORPORATION in the possession of SELLER.

       (iv).  A Pledge Agreement executed by SELLER as the secured party in the form as attached hereto as Exhibit "B".

       (v).  A Consultation Agreement executed by SELLER in the form as attached hereto as Exhibit "C".

       (vi).  A Mutual Release executed by SELLER in the form as attached hereto as Exhibit "D".

    b.   BUYER shall deliver to SELLER:

       (i).  Cash in the sum of $500,000.00 in the form of a cashier's check, certified check or wired funds.

       (ii).  BUYER'S Promissory Note in the amount of $8,275,000.00 made payable to SELLER in the form as attached hereto as Exhibit "A".

       (iii).  A Pledge Agreement executed by BUYER as the securing party in the form as attached hereto as Exhibit "B".

       (iv).  A Consultation Agreement executed by ABC International Traders Inc. in the form as attached hereto as Exhibit "C".

       (vi).  A Mutual Release executed by BUYER in the form as attached

4

EXHIBIT \_\_\_\_1_____

PAGE \_\_\_51_____

FL 6497

hereto as Exhibit "D".

8.    The parties acknowledge that differences have arisen between them concerning the continued management and operation of CORPORATION, to the extent that the continued successful operation of CORPORATION is threatened unless one of the parties purchases the other party's shareholder interest.  The parties have each sought the assistance of Morad Zarabi ("Morad") as an "arbitrator" to determine the seller and buyer between the parties, the purchase price and the terms of the purchase.  The parties previously executed an Agreement To Arbitrate And Selection of Arbitrator setting forth their agreement in this regard.  Morad has determined the purchase price and terms of payment from consultations with each of the parties and by undertaking his own outside independent research as to the value of CORPORATION.  Morad shall not charge a fee for his services rendered herein.  The costs and expenses of Morad, including appraisal costs and attorneys' fees incurred by Morad in drafting this Agreement, the various Exhibits attached hereto and the Agreement To Arbitrate And Selection of Arbitrator shall be paid by the CORPORATION at time of closing.  The parties acknowledge that Morad agreed to undertake his duties as arbitrator as an accommodation to the parties.  Each of the parties agrees to indemnify Morad, his associates, employees, consultants, lawyers, family members and all other persons employed or consulted by Morad in connection with the consummation of this Agreement or the Agreements or other documents attached as Exhibits hereto, and hold him and them harmless from any suit, claim, liability, loss, expense or damage, including court costs and reasonable attorneys' fees, as a result Morad's actions as arbitrator or any other actions concerning the drafting or implementation of this Agreement or the Agreements or other documents attached as Exhibits hereto.

5

EXHIBIT _____ 1 _____

PAGE _____ 52 _____

FL 6498

9. Except as otherwise provided in this Agreement, any controversy between the parties arising out of this Agreement or the Agreements contained in the Exhibits attached hereto shall be submitted to Morad who shall serve as sole arbitrator with respect to said disputes. The decision of Morad shall be final and binding upon both parties. In the event Morad is unavailable to so act, then Kambiz Zarabi shall serve as arbitrator. Any arbitrator may appoint another person or entity to arbitrate, either currently or prospectively, in the event that both named arbitrators herein are unable to so act.

10. The parties acknowledge that this Agreement, the Agreements attached hereto as Exhibits, and the Agreement To Arbitrate And Selection Of Arbitrator were drafted at the request of and on behalf of Morad by his attorneys, Stern & Goldberg. The parties each acknowledge that Stern & Goldberg does not represent either party to this Agreement. The parties have each been advised to seek legal counsel of their choice to represent their respective interests prior to entering into this Agreement and the Agreements attached hereto as Exhibits. Each party shall have three business days from the date of signing this Agreement to consult with legal counsel of his choice concerning the terms and conditions of this Agreement. Either party may terminate this Agreement without any further liability thereon, except to the extent such liability arises under the Agreement To Arbitrate And Selection of Arbitrator previously signed by the parties, in the event he notifies Morad and the other party in writing of his intent to do so within three business days from the signing of this Agreement. In the event no such written notification has been given, it shall be assumed that each party has chosen either to have this Agreement reviewed by legal counsel of his choice and no objections to the form and content of this Agreement has been made; or said party has decided, in its unilateral discretion despite repeated warnings by

6

EXHIBIT 1
PAGE 53

FL 6499

Morad and his attorney to seek such independent legal review, not to seek such legal advice. The parties have initialed this section hereinafter indicating their knowledge of the provisions of this Section.

11. The parties agree that, to the extent required, the transfer of shares as contemplated by this Agreement will have been qualified with the California Commissioner of Corporations in accordance with the California Corporate Securities Law and the Commissioner's Rules and Regulations; and the appropriate Hong Kong governmental authorities, respectively. The parties agree to utilize their best efforts and timely file any applications, consents or notices to secure the Commissioner's and/or Hong Kong authorities consent to the transfer of shares as contemplated herein.

12. Each party represents and warrants that it has dealt with no broker or finder in connection with any transaction contemplated by this Agreement, and as far as it knows, no broker or other person is entitled to any commission or finder's fee in connection with any of these transactions. Each party will indemnify and hold one another harmless against any loss, liability, damage, cost, claim, or expense incurred by reason of any brokerage commission or finder's fee alleged to be payable because of any act, omission, or statement of the indemnifying party.

13. The parties intend that this Agreement and the parties timely compliance with the terms hereof shall resolve and settle all of the claims of either party against the other, including any claim one party may have against the other or CORPORATION for any prior monetary discrepancy whatsoever. The parties shall execute a Mutual Release in the form as attached hereto as Exhibit

7

EXHIBIT _____ 1

PAGE _____ 54

FL 6500

"D".

14. BUYER agrees that, during the time that any portion of the promissory note from BUYER payable to SELLER as provided herein remains outstanding, BUYER, shall cause CORPORATION to name Morad as a member of the Board of Directors of CORPORATION.

15. This Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained herein and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties. No supplement, modification, or amendment to this Agreement shall be binding unless executed in writing by the parties. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

16. This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

17. This Agreement shall be binding on and shall inure to the benefit of the parties to it, and their respective heirs, legal representatives, successors and assigns; provided, however, no assignment by BUYER shall relieve BUYER of any of his obligations or duties under this Agreement.

18. If any action or other proceeding is commenced to enforce the terms of this Agreement, the prevailing party, in addition to all other relief as appropriate under California law, shall be entitled to the recovery of court costs and reasonable attorneys fees.

19. This Agreement shall be construed in accordance with and be governed

8

EXHIBIT ____1____

PAGE ____55____

FL 6501

by the laws of the State of California.

IN WITNESS WHEREOF, the parties to this Agreement have duly executed it effective the day and year first above written.

BUYER:                                    SELLER:

_____        _____
ISAAC LARIAN                              FARHAD LARIAN

EXHIBIT ____1____

PAGE ____50____

FL 6502

SPOUSAL CONSENT

The undersigned is the spouse of Farhad Larian.  To the extent that the undersigned now has a community property interest in the shares of ABC International Traders Inc. registered in the name of her husband, the undersigned hereby acknowledges that she has read this Agreement For Sale Of Stock, understands its contents and agrees that her community property interest in the shares of said corporation registered in the name of her husband shall be bound by and subject to the terms of this Agreement.

Dated:  _____, 2000        _____

10

FL 6503

PROMISSORY NOTE

$8,275,000.00     Los Angeles, California,   January ___ 2001

 In installments as herein stated, for value received, the undersigned promises to pay to Farhad Larian, or order, at Los Angeles, California, the sum of Eight Million Two Hundred Seventy Five Thousand Dollars, with interest from date of making on unpaid principal, at the rate of nine and one-half percent per annum, payable in installments of principal and interest (amortized on $6,275,000.00 portion of note) of $83,798.90 or more on the first day of each successive month, commencing June 1, 2001. Principal and accrued interest on the above portion of the note shall be all due and payable on June 1, 2004. The undersigned shall have a ten (10) day grace period from and after the due date of any payment prior to being in default of his obligation herein. In addition thereto, the undersigned shall make a principal payment of $2,000,000.00, with interest thereon, on or before April 15, 2001.

 Should default be made in payment of any installment of principal or interest when due the whole sum of principal and interest shall become immediately due at the option of the holder of this note. Principal and interest payable in lawful money of the United States. If action be instituted on this note the undersigned promises to pay such sum as the Court may fix as attorney's fees.

 This Promissory Note is secured by a Pledge Agreement of even date executed by the undersigned and beneficiary herein.

 In the event of default, the principal residence of the undersigned, located at 237 North Carolwood Drive, Los Angeles, California 90077 shall not be subject to lien, attachment or seizure.

ISAAC LARIAN

EXHIBIT ____ 1

PAGE ____ 58

FL 6504

01-31-01    17:13    From-Stern & Goldberg               +310 276 9521              -755   P.003/007   F-722

## AMENDMENT TO PROMISSORY NOTE

On December 4, 2000, Farhad Larian ("Farhad"), Isaac Larian ("Isaac"), ABC International Traders Inc., a California corporation ("ABC") and/or Morad Zarabi ("Morad") entered into an Agreement For Sale of Stock, which included an $8,275,000.00 Promissory Note ("Note") executed by Isaac in favor of Farhad. The Note provided, in part, for a principal payment of $2,000,000.00 with interest thereon, on or before April 15, 2001.

Isaac and Farhad agree that the payment date for said $2,000,000.00 installment, plus interest, at the request of Isaac, be and is hereby extended to "on or before June 3, 2001".

All other terms of the Note shall remain in full force and effect.

Dated: 2/1/2001

_____                          _____
Farhad Larian                                     Isaac Larian

1

EXHIBIT ____1____

PAGE ____59____

FL 6505

```
------------------------------------------------------------------------
                                       12-04-2000  17:59:53 Pg  1
------------------------------------------------------------------------

Compounding interval:  Monthly

Annual percentage rate......:  9.500%
Effective annual rate.......:  9.925%
Rate per compounding period.:  0.7917%
Equivalent daily rate.......:  0.02603%

Valuation date: 01-01-2001    Value: $ 6,275,000.00

CASH FLOW DATA
------------------------------------------------------------------------
First date   Payment amount  -#- Interval   Last date
------------------------------------------------------------------------
06-01-2001   $    83,798.90   35 Monthly     04-01-2004
05-01-2004   $ 5,211,001.13    1
```

AMORTIZATION SCHEDULE  -  Normal amortization

| Pmt | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| | | | Balance at 01-01-2001 | | 6,275,000.00 |
| 1 | 06-01-2001 | 83,798.90 | 252,349.44 | 168,550.54- | 6,443,550.54 |
| 2 | 07-01-2001 | 83,798.90 | 51,011.44 | 32,787.46 | 6,410,763.08 |
| 3 | 08-01-2001 | 83,798.90 | 50,751.87 | 33,047.03 | 6,377,716.05 |
| 4 | 09-01-2001 | 83,798.90 | 50,490.25 | 33,308.65 | 6,344,407.40 |
| 5 | 10-01-2001 | 83,798.90 | 50,226.56 | 33,572.34 | 6,310,835.06 |
| 6 | 11-01-2001 | 83,798.90 | 49,960.78 | 33,838.12 | 6,276,996.94 |
| 7 | 12-01-2001 | 83,798.90 | 49,692.89 | 34,106.01 | 6,242,890.93 |
| 2001 totals | | 586,592.30 | 554,483.23 | 32,109.07 | |
| 8 | 01-01-2002 | 83,798.90 | 49,422.89 | 34,376.01 | 6,208,514.92 |
| 9 | 02-01-2002 | 83,798.90 | 49,150.74 | 34,648.16 | 6,173,866.76 |
| 10 | 03-01-2002 | 83,798.90 | 48,876.45 | 34,922.45 | 6,138,944.31 |
| 11 | 04-01-2002 | 83,798.90 | 48,599.98 | 35,198.92 | 6,103,745.39 |
| 12 | 05-01-2002 | 83,798.90 | 48,321.32 | 35,477.58 | 6,068,267.81 |
| 13 | 06-01-2002 | 83,798.90 | 48,040.45 | 35,758.45 | 6,032,509.36 |
| 14 | 07-01-2002 | 83,798.90 | 47,757.37 | 36,041.53 | 5,996,467.83 |
| 15 | 08-01-2002 | 83,798.90 | 47,472.04 | 36,326.86 | 5,960,140.97 |
| 16 | 09-01-2002 | 83,798.90 | 47,184.45 | 36,614.45 | 5,923,526.52 |
| 17 | 10-01-2002 | 83,798.90 | 46,894.58 | 36,904.32 | 5,886,622.20 |
| 18 | 11-01-2002 | 83,798.90 | 46,602.43 | 37,196.47 | 5,849,425.73 |
| 19 | 12-01-2002 | 83,798.90 | 46,307.95 | 37,490.95 | 5,811,934.78 |
| 2002 totals | | 1,005,586.80 | 574,630.65 | 430,956.15 | |
| 20 | 01-01-2003 | 83,798.90 | 46,011.15 | 37,787.75 | 5,774,147.03 |
| 21 | 02-01-2003 | 83,798.90 | 45,712.00 | 38,086.90 | 5,736,060.13 |

ATTACHMENT

EXHIBIT ___1___

PAGE ___60___

FL 6506

```
                                                   12-04-2000  17:59:53 Pg   2
```

| Pmt | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 22 | 03-01-2003 | 83,798.90 | 45,410.48 | 38,388.42 | 5,697,671.71 |
| 23 | 04-01-2003 | 83,798.90 | 45,106.57 | 38,692.33 | 5,658,979.38 |
| 24 | 05-01-2003 | 83,798.90 | 44,800.25 | 38,998.65 | 5,619,980.73 |
| 25 | 06-01-2003 | 83,798.90 | 44,491.51 | 39,307.39 | 5,580,673.34 |
| 26 | 07-01-2003 | 83,798.90 | 44,180.33 | 39,618.57 | 5,541,054.77 |
| 27 | 08-01-2003 | 83,798.90 | 43,866.68 | 39,932.22 | 5,501,122.55 |
| 28 | 09-01-2003 | 83,798.90 | 43,550.55 | 40,248.35 | 5,460,874.20 |
| 29 | 10-01-2003 | 83,798.90 | 43,231.92 | 40,566.98 | 5,420,307.22 |
| 30 | 11-01-2003 | 83,798.90 | 42,910.77 | 40,888.13 | 5,379,419.09 |
| 31 | 12-01-2003 | 83,798.90 | 42,587.07 | 41,211.83 | 5,338,207.26 |
| 2003 totals | | 1,005,586.80 | 531,859.28 | 473,727.52 | |
| 32 | 01-01-2004 | 83,798.90 | 42,260.81 | 41,538.09 | 5,296,669.17 |
| 33 | 02-01-2004 | 83,798.90 | 41,931.96 | 41,866.94 | 5,254,802.23 |
| 34 | 03-01-2004 | 83,798.90 | 41,600.52 | 42,198.38 | 5,212,603.85 |
| 35 | 04-01-2004 | 83,798.90 | 41,266.45 | 42,532.45 | 5,170,071.40 |
| 36 | 05-01-2004 | 5,211,001.13 | 40,929.73 | 5,170,071.40 | 0.00 |
| 2004 totals | | 5,546,196.73 | 207,989.47 | 5,338,207.26 | |
| Grand totals | | 8,143,962.63 | 1,868,962.63 | 6,275,000.00 | |

EXHIBIT _____ 1

PAGE _____ 61

FL 6507

PLEDGE AGREEMENT

THIS PLEDGE AGREEMENT made this _17th_ day of _DEC._, 2001, by and
between Isaac Larian hereinafter referred to as "Pledgor"; and Farhad Larian
hereinafter referred to as "Pledgee"; and Morad Zarabi hereinafter referred to
as "Trustee".

W I T N E S S E T H

Pledgor, as security for the performance of his obligations under and
pursuant to a promissory note payable to Pledgee of even date herewith in the
principal amount of $8,275,000.00, as well as the performance of all other
obligations contemplated hereby and pursuant to the terms of the Agreement For
Sale Of Stock dated December __, 2000 between Pledgor and Pledgee, pledges,
assigns and delivers to Trustee for the benefit of Pledgee the hereinafter
described shares of stock of ABC International Traders Inc., a California
corporation, and MGA Entertainment Hong Kong Limited, a Hong Kong corporation,
hereinafter collectively referred to as "Company", subject to the terms and
conditions hereinafter set forth.

NOW, THEREFORE, it is mutually agreed by the parties as follows:

1)      PLEDGE

(a)  Pledgor hereby delivers to Trustee certificates of stock in
ABC International Traders Inc. numbered 1 and 3 representing a total of
20,000,000 shares of common stock of ABC International Traders Inc.; and
certificates of stock in MGA Entertainment Hong Kong Limited numbered 1 and 2
representing a total of 900 shares of common stock of MGA Entertainment Hong

1

EXHIBIT ___1___

PAGE ___62___

FL 6508

Kong Limited issued in the name of Pledgor, together with an assignment separate from certificate executed by Pledgor in favor of Pledgee assigning said shares of common stock in Company to Pledgee, said stock certificates and assignment to be held by Trustee as security for the payment of Pledgor's promissory note and other obligations referred to above.

(b)   Pledgor warrants and represents that he owns said stock free and clear of any liens or encumbrances except this Pledge Agreement; and agrees not to encumber, transfer or otherwise hypothecate said stock during the term of the Pledge Agreement.

(c)   In the event that during the term of this Pledge Agreement any stock dividend, reclassification, readjustment, or other change is declared or made in the capital stock of the Company which affects the pledged shares, or any subscription, warrant, or other option is exercised with reference to the pledged stock, all the new, substituted or additional shares, or other securities issued pursuant to any such change or option shall be delivered to Trustee by Pledgor and shall be held by Trustee under the terms of this Pledge Agreement in the same manner as the stock originally pledged hereunder.  Trustee shall have no duty or obligation to compel Pledgor to deliver such new, substituted or additional shares, or other securities so issued to Trustee.

2)   <u>VOTING RIGHTS, DIVIDENDS AND OTHER RESTRICTIONS ON DISTRIBUTIONS</u>:

(a)   Pledgor shall have the right to vote the stock pledged as herein and to receive all cash dividends, as limited hereinafter, if any, declared on said stock, so long as the Pledgor is not in default in the performance of any of the terms of this Pledge Agreement, the Agreement For Sale Of Stock or in the payment of the promissory note secured hereby during

2

EXHIBIT ___1___

PAGE ___63___

FL 6509

the term of this Pledge Agreement.  In the event Pledgee notifies the Trustee that Pledgor is in default hereunder, Pledgee shall be entitled to vote the shares for which payment is in default.  For voting purposes, Trustee shall be entitled to rely upon the written representations of Pledgee concerning a default relative to shares held by Trustee, and Trustee shall have no obligation to make any such determination unless Pledgee sends to Trustee a letter by certified mail specifying a default as set forth in Paragraph 4 below.

(b)  During the term of this Pledge Agreement, Pledgor and his immediate family members shall be limited in the aggregate annual amount of distributions from ABC International Traders Inc., whether as salary, dividends, perquisites or any other form to an amount no greater than the sum of the annual principal and interest payments payable to Pledgee under the promissory note plus the sum of $500,000.00 plus the amount of any federal and state taxes payable by Pledgor on said amounts.  Notwithstanding the above, this distribution limitation shall not apply with respect to any distributions to family members of Pledgor who are presently employed at Company.

3)  RETURN OF COLLATERAL:  At such time as Pledgor has presented to Trustee evidence satisfactory to Trustee of full payment of Pledgor's promissory note to Pledgee, and the complete performance of any other obligation imposed on Pledgor pursuant to the terms of the Agreement For Sale Of Stock above mentioned, Trustee shall deliver to Pledgor all of the stock held hereunder together with the assignment executed by Pledgor.

4)  DEFAULT:  An event of default by Pledgor as used in this Pledge Agreement shall be any and all of the following, provided, however, that the default shall not be deemed to occur until the Pledgee shall have notified the

3

EXHIBIT _____

PAGE _____

FL 6510

Pledgor in writing specifying the nature of the default, and until the time for curing the same, if any, following Pledgor's receipt of notice from Pledgee, has expired:

(a)  The failure of Pledgor to pay the indebtedness evidenced by the promissory note in favor of Pledgee in accordance with the terms thereof, should Pledgor fail to make such payment within thirty (30) days from the due date of any payment thereunder.

(b)  The failure of Pledgor to observe, keep or perform within ninety (90) days any covenant, agreement or condition required in this instrument or the Agreement For Sale Of Stock or the Promissory Note in favor of Pledgee herewith to be observed, kept or performed for the benefit of Pledgee.

(c)  If Pledgor is adjudicated a bankrupt, or requests, either by way of petition or answer, that Pledgor be adjudicated a bankrupt, or if any involuntary petition in bankruptcy be filed against Pledgor and the same shall not have been determined in favor of Pledgor or dismissed within ninety (90) days from the date thereof.

5)  RIGHTS ON DEFAULT:

(a)  Upon the happening of any of the events specified in Paragraph 4, Pledgee may, at Pledgee's election and upon proper notice and after the appropriate curative periods set forth in Paragraph 4, declare any and all obligations of the Pledgor in default secured hereby immediately all due and payable, and Pledgee is given the full power and authority to take possession of all stock pledged hereunder by the Pledgor in default from Trustee, and, at Pledgee's option, to sell and deliver the whole or any part of the herein described stock held by Trustee, or any substitutions or

4

EXHIBIT _____

PAGE _____ 65

additions thereto, at one or more private or public sales, with notice, as
Pledgee shall determine.

(b)  Upon any such sale, Pledgee may become the purchaser of the
whole, or any part, of such stock, discharged from any right of redemption,
and after deducting all costs and expenses of collection, sale and delivery,
including reasonable attorney's fees, may apply the residue of the proceeds of
such collection, sale or sales, to the payment of the obligations secured
hereby.  Any overage of the residue of the proceeds of such sales shall be
forthwith returned to Pledgor.

(c)  In the event of any public sale of the stock hereunder, if
any law or regulation of the Securities and Exchange Commission or the
California Commissioner of Corporations, or any other Federal or state body
having jurisdiction, shall require that the Company whose stock is pledged
hereunder or Pledgee or Pledgor should take any action prior to the sale of
said stock, each of the parties hereto shall use his or its respective best
efforts to comply with all of the said requirements.  Pledgee agrees to
indemnify and hold Pledgor and Company harmless against any liabilities
incurred by either of them by virtue of Pledgee's sale of the stock in
violation of any such law or regulation.

6)    LIENS:  Pledgor agrees to pay prior to delinquency all taxes,
charges, liens and assessments against the stock pledged hereunder.

7)    CAPTIONS:  The paragraph captions are inserted in this Pledge
Agreement merely for convenience and are not to be construed as a part of this
Pledge Agreement, or in any way limiting or affecting the language of any
paragraph in this Pledge Agreement.

8)    PLEDGE CONSENT:  Where the consent of the Pledgee is required in

5

EXHIBIT _____ 1
PAGE _____ 66

this Agreement, in connection with actions proposed to be taken by Pledgor,
such consent shall not be withheld or delayed unreasonably.  Consent shall be
deemed to have been given to any specific action by Pledgor if Pledgee has not
responded to written request for such consent within fifteen (15) days after
receipt of notice in accordance with paragraph 12 of this Agreement.

9)   GENDER:  In this Agreement, whenever the context so requires, the
masculine gender herein written shall include the feminine or the neuter and
the singular number shall include the plural.

10)   TRUSTEE:

(a)   Trustee, by its signature hereto, consents to act as Trustee
hereunder upon the express understanding that it shall be solely responsible
for the physical holding of the shares described herein, and shall deliver
said shares of stock to Pledgee in the event of default as hereinabove
provided, together with the attached assignment; or to Pledgor upon full
satisfaction of the promissory note and obligations pursuant to the Agreement
For Sale Of Stock, both above described.

(b)   It is expressly understood that the duties and obligations of
the Trustee are to be strictly limited to the foregoing, and the parties
acknowledge that they do hereby hold Trustee free and harmless from any and
all liability, costs, and expenses, including attorney's fees, by reason
hereof, and that said parties shall and do hereby indemnify Trustee therefrom.
Pledgor does hereby acknowledge that the stock being deposited with Trustee
hereunder is deposited upon the joint risk of Pledgor and Pledgee.  Any fees
of Trustee for acting as Trustee shall be paid by Pledgor.

(c)   Trustee shall have the power to appoint, currently or
prospectively, a successor Trustee to so serve under the terms of this Pledge

6

EXHIBIT    1
PAGE    67

FL 6513

Agreement in the event Trustee is unable or unavailable to so act.

11)   SUCCESSORS AND ASSIGNS:  This Pledge Agreement shall be binding upon the parties hereto, and upon their respective heirs, personal representatives, successors and assigns.

12)   NOTICES:  Any and all notices to be served on or given to either Pledgor or Pledgee hereto, shall be in writing and shall be deemed duly served and given when personally delivered to either of the parties or in lieu of such personal service, when deposited in the United States mail, first-class, postage prepaid, addressed to Pledgor at 237 North Carolwood Drive, Los Angeles, California 90077, or to Pledgee at 2142 Century Park Lane, #6108, Los Angeles, CA 90067.  Any and all notices to be served on or given to Trustee shall be in writing and shall be deemed duly served and given upon receipt by Trustee.

13)   GOVERNING LAW:  This Agreement shall be governed and interpreted in accordance with the laws of the State of California.


IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.


PLEDGEE:                                      PLEDGOR:


_____                    _____
FARHAD LARIAN                                 ISAAC LARIAN


                      TRUSTEE:


                   _____
                   MORAD ZARABI


                              7


EXHIBIT _____1_____

PAGE _____68_____

FL 6514

<u>CONSULTING AGREEMENT</u>

This Consulting Agreement is entered into this <u>1</u> day of <u>JAN</u> , 2001, by and between ABC International Traders Inc., a California corporation ("Company") and Farhad Larian ("Consultant").

WHEREAS, CONSULTANT was a former shareholder, Director and employee of COMPANY.

WHEREAS, COMPANY desires to have CONSULTANT perform certain services on behalf of COMPANY as an Independent Contractor.

NOW, THEREFORE, for valuable consideration, it is hereby agreed by the parties hereto as follows:

1.    <u>TERM</u>

The term of this Agreement shall be for a period of five years, commencing January 1, 2001 and terminating December 31, 2005, unless earlier terminated as provided hereinafter.

2.    <u>SERVICES</u>

(a)   CONSULTANT agrees to provide and make himself available to perform general administrative services, at the request of COMPANY, and/or otherwise make himself available to COMPANY for consultation by telephone, for a total period of time not more than ten hours per month, during the normal

1

EXHIBIT 1

PAGE 69

FL 6515

business hours of COMPANY.

(b)   COMPANY hereby acknowledges that during the term of this Agreement, CONSULTANT may engage in any other business or professional activity provided that such activity does not directly compete with the business of COMPANY within Los Angeles County, California, and the performance of such activity does not interfere with his present work as a consultant for COMPANY.

(c)   CONSULTANT hereby acknowledges that he is being employed as an Independent Contractor to render the services described herein and that CONSULTANT shall be solely responsible for any Federal and State Income Tax withholding or Estimated Tax Payments that CONSULTANT may be required to file and/or pay.

3.   COMPENSATION

For all services rendered by CONSULTANT under this Agreement, COMPANY shall pay to CONSULTANT the sum of $7,500.00 per month payable on the first day of each month of the term hereof.

4.   TERMINATION

This Agreement may be terminated by either party for cause or for breach by the other party of any provision contained in this Agreement. COMPANY may not terminate CONSULTANT for a breach of this Agreement until COMPANY has furnished CONSULTANT with written notice of the breach contended by COMPANY and CONSULTANT fails to cure said breach within ten (10) days of receipt of said notice.

After five years from the date hereof but not before, this Agreement may be terminated by COMPANY upon payment in full of the promissory note given by Isaac Larian to CONSULTANT as part of the purchase of CONSULTANT'S shares of COMPANY.

2.

EXHIBIT ____1____

PAGE ____70.____

This Agreement may be terminated by CONSULTANT, at any time, without cause, upon giving COMPANY thirty (30) days prior written notice.

5.   TRADE SECRETS

CONSULTANT acknowledges and represents that the sources of COMPANY's services, techniques, methods, products, manufacturing techniques, manufacturing requirements, pricing, customer lists and vendor lists are a trade secret and the property of COMPANY.   It is agreed that all such data is confidential and that it shall not be disclosed, directly or indirectly, or used by CONSULTANT in any way, except on behalf of COMPANY, either during the term of this Agreement or at any time thereafter.

6.   NOTICES

Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if sent by registered mail to the principal office of COMPANY or personal residence of CONSULTANT.

7.   COUNTERPARTS

The within Agreement may be executed in duplicate counterparts and each such signed duplicate counterpart shall be deemed to be an original.

8.   TITLES AND CONSTRUCTION

The titles of the paragraphs in this Agreement are set forth for convenience only.  This Agreement shall not be construed or interpreted for or against either of the parties hereto by reason of its draftsmanship by either party.

9.   ASSIGNMENT

The rights, benefits, duties and obligations of COMPANY and CONSULTANT under this Agreement may not be assigned without the express written permission of the other.

3

EXHIBIT ___1___

PAGE ___71___

FL 6517

10.  ARBITRATION

Any controversy between the parties arising out of this Agreement shall be submitted to Morad Zarabi who shall serve as sole arbitrator with respect to said disputes.  If Morad Zarabi is unable to so act, Kambiz Zarabi is appointed arbitrator.  Either arbitrator can select another person or entity to serve as arbitrator, either currently or prospectively, if neither of the above two named arbitrators are available to so serve.  The decision of the arbitrator shall be final and binding upon both parties.

11.  ATTORNEYS' FEES

If any action or any other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which they may be entitled.

12.  ENTIRE AGREEMENT

(a)  This Agreement constitutes the entire Agreement between the parties and contains all of the agreement between the parties with respect to the subject matter hereof; this Agreement supersedes any and all other agreements, either oral or in writing, between parties hereto with respect to the subject matter hereof.

(b)  No change or modification of this Agreement shall be valid unless the same be in writing and signed by the person or party to be charged.

13.  GOVERNING LAW

This Agreement shall be subject to and governed by the laws of the State of California.

.4.

EXHIBIT ____1____

PAGE ____72____

FL 6518

DATED: _JAN 1_____, 2001

COMPANY:                           CONSULTANT:

ABC INTERNATIONAL TRADERS INC.

_Farhad Lero_

By: _____          FARHAD LARIAN
     Isaac Larian, President

5

EXHIBIT ____1____

PAGE ____73____

FL 6519

## MUTUAL RELEASE

For valuable consideration, receipt of which is hereby acknowledged:

1.   Isaac Larian, an individual, and ABC International Traders Inc., a California corporation, and each of them, on behalf of themselves, their associates, owners, stockholders, predecessors, successors, heirs, assigns, directors, officers, partners, employees, representatives, and all other persons acting by, through, under, or in concert with them, or any of them, do hereby acquit, release and forever discharge Farhad Larian, an individual, and his spouse, associates, successors, heirs, assigns, agents, representatives, and all other persons acting by, through, under, or in concert with him or any of them, of and from any and all cause or causes of action, suits, claims, demands, obligations, liabilities, damages, liens, contracts, agreements, promises, losses, costs, or expenses of any nature whatsoever, known or unknown, fixed or in equity, from the beginning of time to the date hereof with the exception of those obligations imposed under the terms of the Agreement For Sale Of Stock between Isaac Larian and Farhad Larian for the sale by Farhad Larian of his shareholder interest in ABC International Traders Inc. to Isaac Larian and the agreements attached as Exhibits to the Agreement For Sale Of Stock.

2.   Farhad Larian, an individual, on behalf of himself, his spouse, associates, successors, heirs, assigns, agents, representatives, and all other persons acting by, through, under, or in concert with him or any of them, do hereby acquit, release and forever discharge Isaac Larian, an individual, and ABC International Traders Inc., a California corporation, and each of them, their respective associates, owners, stockholders, predecessors, successors, heirs, assigns, directors, officers, partners, employees, representatives, and all other persons acting by, through, under, or in concert with them, or any of them, of and from any and all cause or causes of action, suits, claims, demands, obligations, liabilities, damages, liens, contracts, agreements, promises, losses, costs, or expenses of any nature whatsoever, known or unknown, fixed or in equity, from the beginning of time to the date hereof with the exception of those obligations imposed under the terms of the Agreement For Sale Of Stock between Isaac Larian and Farhad Larian for the sale by Farhad Larian of his shareholder interest in ABC International Traders Inc. to Isaac Larian and the agreements attached as Exhibits to the Agreement For Sale Of Stock.

3.   The foregoing release is and shall be a release of all claims, whether known or unknown, and each of the undersigned parties waives all rights reserved to him, it or them, by Section 1542 of the Civil Code of the State of California, which provided, as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the Release which if known by him must have materially affected his settlement with the debtor."

4.   This Release shall be binding on, and shall inure to the benefit of, the parties to it and their respective heirs, legal representatives, successors and assigns.

Exhibit "D"

EXHIBIT _____

PAGE ___ 74

FL 6520

5.   Each of the undersigned individuals represents that he signs this Release with the express authority of the party on whose behalf he signs.

IN WITNESS WHEREOF, the parties hereto have executed this Release on the 4TH day of DECEMBER , 2000 6)

_____          _____
ISAAC LARIAN                      FARHAD LARIAN


ABC INTERNATIONAL TRADERS INC.

By: _____
    Isaac Larian, President

EXHIBIT ____1____

PAGE ____75____

AMENDMENT TO AGREEMENTS

On December 4, 2000, Farhad Larian ("Farhad"), Isaac Larian ("Isaac"), ABC International Traders Inc., a California corporation ("ABC") and/or Morad Zarabi ("Morad") entered into one or more of the following agreements concerning or relating to the sale by Farhad to Isaac of Farhad's shareholder interest in ABC and MGA Entertainment Hong Kong Limited, a Hong Kong corporation:

      A. Agreement For Sale of Stock.
      B. Promissory Note.
      C. Pledge Agreement.
      D. Consulting Agreement.
      E. Mutual Release.

The parties desire to amend the agreements as specifically provided herein, and in all other respects, ratify and confirm said agreements.

1. Agreement For Sale of Stock.

    a. There should be inserted as a second paragraph at section 12 on page 7 to read as follows:

"BUYER shall, and shall additionally cause CORPORATION to, indemnify and hold SELLER harmless from and against any claim, suit, liability, cause of action or damages arising from or related to SELLER's employment by CORPORATION, ownership of the stock in CORPORATION and/or any personal guarantees given by SELLER in his capacity as a shareholder, officer or employee of CORPORATION, to the greatest extent permitted by law. The provisions of this paragraph shall survive any termination of this Agreement. In addition thereto, BUYER shall, and shall additionally cause CORPORATION to, utilize all commercially reasonable efforts to have SELLER removed as a guarantor of any of the obligations of CORPORATION. Notwithstanding the above, SELLER shall remain personally liable on the SBA guarantee concerning the real property located at 16730 Schoenborn Street, North Hills, CA 91343".

    b. There should be inserted at the end of section 14 on page 8 the following additional sentence:

"BUYER shall execute in favor of Morad or any successor pledgeholder under the Pledge Agreement a limited proxy to vote his shares of CORPORATION for the purpose of electing Morad or any successor pledgeholder as a member of the board of directors of CORPORATION, so that Morad or the successor pledgeholder will serve in such capacity until such time as the promissory note issued by BUYER in favor of SELLER has been paid in full."

1

EXHIBIT _____1_____

PAGE _____76_____

FL 6522

2. Promissory Note.

 a. The date of making for purposes of interest accruals shall be January 1, 2001.

 b. There shall be added as Exhibit "1" to the Promissory Note the amortization schedule for the $6,275,000.00 principal as attached hereto.

 c. There shall be inserted the following additional paragraph between the first and second paragraphs:
  "In the case of a sale of at least a majority of the shares of ABC International Traders Inc. ("ABC") by the maker hereof in a single transaction or in a series of related transactions; or the sale of at least a majority of ABC's assets in a single transaction or a series of related transactions, then, in any such case and notwithstanding anything to the contrary contained in this promissory note, all or a portion of the remaining unpaid principal and then accrued interest thereon shall then become due and payable in the same fractional proportion as determined by a fraction the numerator of which is the sale proceeds received and the denominator of which is the total value of ABC shares or assets, as the case may be. In the event of an exchange by the maker of shares of ABC for shares in another corporation, Morad Zarabi, designated arbitrator under the Agreement For Sale Of Stock between maker and beneficiary herein, shall determine, in his sole discretion, whether some or all of the newly acquired shares shall be transferred to beneficiary herein in payment of a portion of the promissory note; or whether said newly acquired shares shall instead be substituted for ABC shares under the Pledge Agreement executed between the maker, beneficiary and Morad Zarabi."

 d. There shall be added the following additional paragraph to the Promissory Note:
  "Notwithstanding any other provision of this Promissory Note, any controversy between the parties concerning or arising from the Promissory Note shall be submitted to Morad Zarabi who shall serve as sole arbitrator with respect to said disputes. The decision of Morad shall be final and binding upon both parties. In the event Morad is unavailable to so act, then Kambiz Zarabi shall serve as arbitrator. Any arbitrator may appoint another person or entity to arbitrate, either currently or prospectively, in the event that both named arbitrators herein are unable to so act."

3. Pledge Agreement.

 a. There shall be added an additional section 14, as follows:
  "14) ARBITRATION:  Any controversy between the parties concerning or

2

EXHIBIT     1

PAGE     77

FL 6523

arising from this Pledge Agreement shall be submitted to Morad Zarabi who shall serve as sole arbitrator with respect to said disputes. The decision of Morad shall be final and binding upon all parties. In the event Morad is unavailable to so act, then Kambiz Zarabi shall serve as arbitrator. Any arbitrator may appoint another person or entity to arbitrate, either currently or prospectively, in the event that both named arbitrators herein are unable to so act."

    4. Consulting Agreement.

        a. There shall be added an additional section 14, as follows:
        "14. INDEMNIFICATION
                To the maximum extent provided by law, COMPANY shall indemnify and hold CONSULTANT harmless from and against any claim, suit, liability, cause of action or damages arising from or related to CONSULTANT's services under the terms of this agreement or the past services of CONSULTANT as an employee of COMPANY. The provisions of this paragraph shall survive any termination of this Agreement."

        In Witness Whereof, the parties execute this Amendment To Agreements on the 31 day of December, 2000.


_____          _____
Farhad Larian                                              Isaac Larian


ABC International Traders Inc.

By: _____      _____
    Isaac Larian, President                              Morad Zarabi


3

EXHIBIT _____

PAGE _____ 78

FL 6524

**EXHIBIT 2**

*ABC Chemical?*
*MGA → general?*

Farhad Larian
ABC International Traders, Inc.
March 30, 2000
Page 1

Isaac Larian
MGA Entertainment
16730 Schoenborn Street
North Hills, California 91343-6122
Tel. (818) 894-2525    Fax (818) 894-8094


March 30, 2000


Farhad Larian
ABC International Traders, Inc.
7277 Hayvenhurst Avenue, No. B7
Van Nuys, California 91406


Re:    Agreement Concerning Purchase of Shares in ABC
International Traders, Inc.

Dear Fred:

The purpose of this letter is to set forth our agreement (AAgreement@) concerning my purchase of all of your shares in ABC International Traders, Inc., a California company, (the ACompany@). Our Agreement is as follows:

1.    You currently own shares of the common stock of the Company which equals forty five percent (45%) of all of the currently issued and outstanding shares of the Company (your 45% interest is herein referred to as the AShares@) of the Company. Upon execution of this Agreement, I will purchase all of your Shares, for the total purchase price of nine million ($9,000,000) dollars, payable as set forth in this letter.

2.    I have previously paid you the sum of
This amount shall, for all purposes of this Agreement, be deemed a deposit for, and payment for the Shares.

CONFIDENTIAL-ATTORNEY'S
EYES ONLY PURSUANT TO
PROTECTIVE ORDER

KS05908

REDACTED

EXHIBIT _____ 2 _____

PAGE _____ 79 _____

Farhad Larian
ABC International Traders, Inc.
March 30, 2000
Page 2

4.     It is understood and acknowledged that the Company is indebted to you in the amount of approximately one million four hundred thousand ($1,400,000) dollars, which indebtedness is represented by subordinated notes in your favor, executed by the Company.  The Company hereby agrees, that to the extent permitted by law, it will repay the actual amount of said obligation, on the date which is eighteen (18) months after your execution of this Agreement. I further agree to take all actions necessary to allow the Company to meet this obligation.

5.     In consideration of the mutual promises herein contained, each of us, Isaac Larian, on the one hand, and Farhad (AFred@) Larian on the other hand, on behalf of ourselves and our predecessors, agents, heirs, successors and assigns, do hereby forever release, discharge, and acquit each other and each of our respective predecessors, agents, heirs, successors and assigns from any and all claims, demands, liens, agreements, contracts, covenants, actions, suits, causes of action, obligations, controversies, costs, expenses, damages, judgments, orders and liability of whatever kind or nature in law, equity, or otherwise, whether now known or unknown, suspected or unsuspected and whether or not concealed or hidden, which have existed or may have existed, or which do
exist, or which hereinafter can, shall or may exist by reason or any matter, cause or thing done, omitted or occurring at any time on or before the effective date of this Agreement, including, but not limited to, all claims, rights and causes of action arising out of, relating to or connected with the Company, or with either of our relationship as an officer, director, shareholder, or creditor of the Company.

Each of us agree that this mutual general release shall remain fully effective and binding as to each of us, even if the facts turn out to be different from

CONFIDENTIAL-ATTORNEY'S
EYES ONLY PURSUANT TO
PROTECTIVE ORDER

KS05909

EXHIBIT _____ 2 _____

PAGE _____ 80 _____

Farhad Larian
ABC International Traders, Inc.
March 30, 2000
Page 3

what we now believe them to be.  In addition, each of us hereby waives, to the extent permitted by law, the benefits of any law which may provide that a release does not apply to unknown claims.

We each warrant and represent that prior to the effective date of this Agreement, each of us has not assigned or transferred, or purported to assign or transfer, voluntarily, involuntarily or by operation of law, any claims, causes of action or rights of any nature whatsoever which either of us may have against one another.

We each waive application of ' 1542 of the California Civil Code as to any claims which relate to, or might have arisen, or may arise, from either of our involvement in connection with the Company.  Civil Code ' 1542 reads:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

6.     We both agree that the Company is currently involved in litigation entitled MGA vs. Lucas and MGA vs. Fireman, Alpine and Alliance Insurance Company.  At your option, you can elect, in writing, upon execution of this Agreement, to participate and be entitled to forty five percent (45%) of the net recovery from said litigation (i.e., the proceeds received minus all expenses and costs incurred in connection with said litigation), by agreeing to pay forty five percent (45%) of all fees and costs incurred in the litigation, as and when such fees and costs become payable, commencing on the date of execution of this Agreement.  This is your election; if you do not wish to participate in the recovery, you will not be obligated to pay such expenses and costs.

7.     Immediately upon execution of this Agreement, you will transfer to me, one or more share certificates, evidencing all of the Shares in the Company, free and clear of any and all encumbrances, duly endorsed in blank or accompanied by stock powers or other instruments of transfer, duly executed in blank, along with your resignation as a director and/or officer of the Company.

8.     The stock certificates, stock powers and/or endorsements, assignments and other instruments, which will be delivered by you in connection with the Shares, will be your valid and binding obligations, enforceable in accordance with the respective terms, and will vest in me and

EXHIBIT ___2___

PAGE ___81___

CONFIDENTIAL-ATTORNEY'S
EYES ONLY PURSUANT TO
PROTECTIVE ORDER

KS05910

Farhad Larian
ABC International Traders, Inc.
March 30, 2000
Page 4

entitle me to all of the Shares, free and clear of any and all encumbrances, except restrictions on
transfer imposed by any federal or state securities laws.

     9.    This Agreement shall constitute the full and entire understanding of both
of

us with respect to the subject matter hereof, and any prior agreement, understanding or

representation concerning the same is hereby terminated and canceled in its entirety
and is of no further force and effect. Furthermore, each of us acknowledges that neither
of us, and no other person, has made any promises or representations or warranties
whatsoever, expressed implied or statutory, which are not contained herein concerning
the subject matter hereof to induce either of us, to execute this Agreement, and each of
us

acknowledge that we have not executed this Agreement in reliance of any promise,
representation or warranty not contained herein.

     10.    This Agreement shall be construed and interpreted under and according to
the laws of the State of California . In the event of any dispute in connection with this
Agreement, the prevailing party shall be entitled to reimbursement of all attorney and accountant
fees and costs.

     11.    Each of us acknowledges that we have read and understood this Agreement
and in entering into this Agreement, have had the opportunity to be advised by independent
attorneys of our own choice.

                        Very truly yours,

                        ISAAC LARIAN

IL:eg

I accept to the terms of this letter and hereby acknowledge my acceptance of these
terms.

CONFIDENTIAL-ATTORNEY'S
EYES ONLY PURSUANT TO
PROTECTIVE ORDER

KS05911

EXHIBIT _____2_____

PAGE _____82_____

Farhad Larian
ABC International Traders, Inc.
March 30, 2000
Page 5

_____

Isaac Larian                                    Date

_____

Farhad Larian                                   Date

CONFIDENTIAL-ATTORNEY'S
EYES ONLY PURSUANT TO
PROTECTIVE ORDER

KS05912

EXHIBIT _____ 2 _____

PAGE _____ 83 _____

**EXHIBIT 3**

## DECLARATION OF FARHAD "FRED" LARIAN

I, FARHAD LARIAN declare as follows:

1.      I am over the age of 18 and have personal knowledge of the facts herein and could and would competently testify thereto.

2.      By 1999, I had been business partners with my brother, Defendant Isaac Larian ("Isaac"), for over 20 years.  Our company ABC International Traders, Inc. (subsequently renamed by Isaac MGA Entertainment, Inc.) designs, licenses, imports and distributes toys worldwide.

3.      Some time before September 2000, Isaac came upon a very lucrative business opportunity for the company – becoming the exclusive distributor of a new line of dolls called "Bratz."  Isaac secretly negotiated for and on September 18, 2000, secretly finalized and obtained a worldwide license agreement making Isaac and the company the exclusive worldwide distributor of Bratz dolls and related products. (Attached hereto as Exhibit A is a true and correct copy of the Carter Bryant License Agreement.  The signed version is in the possession of Isaac Larian.)

4.      Just ten days later, on September 28, 2000, Isaac fraudulently induced me into signing the Arbitration Agreement that is the subject of the First Cause of Action, without disclosing the Bratz opportunity and license.  Based on newspaper articles, the Bratz product line has already generated several hundred million dollars in revenues for the company and is expected soon to earn more than $1 billion annually for the company.

5.      At the time Isaac sought my consent to the arbitration agreement, Isaac had managed to conceal from me his obtaining the Bratz license and other material information about the Company, and also hid from me his intention to continue to conceal such information during the arbitration.

6.      Isaac's goal was to use the arbitration process to award him my equity interest in the Company at a severely undervalued price.  Believing that Isaac had already disclosed to me, and would continue to disclose during the arbitration, all material financial information about the Company, and that there was nothing unknown to me that would affect the price of my stock, I

///

05P427001.616                                OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION

EXHIBIT ____3____

PAGE ____84____

signed a written "Agreement to Arbitrate" dated September 28, 2000, ("Arbitration Agreement"), which, *inter alia*, appointed our Uncle, Mr. Morad Zarabi, as the arbitrator.

7.     During the course of the few meetings that were held pursuant to the Arbitration Agreement, Isaac continued to keep from me, and kept from Mr. Zarabi, the information he knew about the execution of the Bratz license agreement, and other vital material and financial information affecting the Company. This claim is set out in my Fourth Cause of Action for Fraud and Deceit in the Conduct of the Arbitration process.

8.     During the course of the arbitration hearings, which were halted without an award being issued, Isaac and I negotiated a resolution of our differences, which resulted in my selling my shares to Isaac under a written "Agreement for Sale of Stock" dated December 4, 2000, ("Stock Sales Agreement").

9.     I uncovered the truth about Isaac's fraud in the middle of 2002, and thereafter brought this suit.

10.     On August 25, 2003, I filed a Verified Complaint alleging ten common law and statutory causes of action. The 10 causes of action alleged in the Verified Complaint are: (1) Fraud and Deceit in the Inducement of the Arbitration Agreement; (2) Beach of Fiduciary Duties; (3) Fraud and Deceit in the Conduct of the Arbitration process; (4) Breach of the Implied Covenant of Good Faith and Fair Dealing; (5) Violation of Corporations Code §§ 25401, 25501; (6) Violation of Corporations Code §§ 25402, 25502; (7) Fraud and Deceit in the Inducement of the December 2000 Agreement; (8) Negligent Misrepresentation; (9) Violation of Business and Professions Code § 17200 et seq.; and (10) Rescission based on Mistake. I hereby reaffirm and incorporate by reference as though set out in full herein each and every statement therein.

11.     The principal allegation of the pending suit, set forth in the First Cause of Action, is that I was fraudulently induced by Isaac into executing the Arbitration Agreement. That is, Isaac tricked me into agreeing to arbitration, knowing that he had already concealed, and would continue to conceal during the arbitration process, the company's license for the Bratz product line and other material financial information about the company, thereby misrepresenting to me the value of Arbitration Agreement among other things. Had I known of this concealed    AA 155

2

EXHIBIT ___3___

PAGE ___85___

16.     Isaac misrepresents my claim when he states: "Here, plaintiff's allegations do not that plaintiff's consent to have his disputes decided by arbitration was induced by fraud." exactly what I allege in my First Cause of Action, entitled "Fraud & Deceit in the ment of Arbitration Agreement" (Verified Complaint p. 10). The allegations of the Complaint make it plain that my principal contention in the First Cause of Action is that fraudulently obtained my consent to the Arbitration Agreement by concealing and holding of material financial information about the company. (Verified Complaint ¶¶ 19-20)

17.     There was never _any_ award by _any_ arbitrator. Isaac suggests that I "submitted fraud claims to the arbitrator for decision on January 26, 2003" and that this court should send it to arbitration. I never asked for any arbitrator to decide my claim that _I was_ _fraudulently induced into entering into the Arbitration Agreement and therefore the Arbitration_ _ement should be set aside._ Nowhere do I allege in my Verified Complaint that I submitted issue of whether I was fraudulently induced into the Arbitration Agreement to an arbitrator. demurrer, Isaac suggests that because I asked Morad to "rectify the situation" that the plaint supports Isaac's assertion that the fraud-in-the-inducement of the Arbitration ement has been submitted to arbitration. (Verified Complaint ¶. 29) I have not.

18.     In the motion to compel arbitration, Isaac states there was a "one-day hearing" and mitted a list of issues to the arbitrator. In fact, the so-called one-day hearing, was about an r two discussion. I _never_ asked Uncle Morad to decide the issue of whether I had been duiently induced by Isaac into entering the Arbitration Agreement and whether it should be aside.

19.     Isaac suggests that the following written statement forms the basis to find that all d claims were submitted to the arbitrator:

> "The December 2000 appraisal of MGA, which the arbitrator relied upon to
> establish the value of MGA, was substantially understated as a result of Isaac
> Larian's concealment of the Bratz doll license agreement. That license agreement
> was material to the value of MGA but was not considered in setting MGA's value
> because of the concealment from the arbitrator." Motion To Compel Ex. C.     AA 157

4
OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION

EXHIBIT ___3___

PAGE ___86___

20.     The request submitted to Mr. Zarabi dealt only with Isaac's failure to come forward with information *as part of the arbitration process*, and <u>not</u> whether there was fraudulent inducement in September 2000 of my consent to the Arbitration Agreement.  When I found out that Isaac had failed to disclose material information to the arbitrator, the first thing I did was to find out if such information had been disclosed and then told the arbitrator.   Absolutely nothing in that statement suggests that I had asked the arbitrator to <u>*set aside the Arbitration Agreement altogether because it had been induced by fraud.*</u>  And certainly, it does not say that all fraud claims are to be submitted to arbitration.

        I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

        Executed this 1st day of November, 2003 at Los Angeles, California.

                                        FARHAD LARIAN

                                                                        AA 158

5

EXHIBIT _____3_____

PAGE _____87_____

**EXHIBIT 4**

## DECLARATION OF MORAD ZARABI

I, Morad Zarabi, hereby declare:

1.      I am the uncle of Plaintiff Farhad Larian and Defendant Isaac Larian. I served as their arbitrator from 2000 to the present. The facts set forth in this Declaration are of my own personal knowledge, and if called as a witness, I could and would testify competently thereto.

2.      This Declaration is filed in opposition to Plaintiff Farhad Larian's Motion to Compel Production of Documents of Ernest Dutcher.

3.      In September, 2000, I was selected as the arbitrator to arbitrate a dispute which had arisen between Farhad and Isaac concerning their joint ownership in ABC International Traders, Inc. ("ABC" herein). I was expressly authorized to determine whether either Farhad or Isaac was to sell his shares to the other and the purchase price and terms of payment for the shares.

4.      Beginning in Fall of 2000, I gathered financial and other information and held hearings in my role as arbitrator. I engaged the services of National Business Appraisers, LLC ("National Business" herein) for the purpose of providing me with a valuation of ABC.

5.      In December, 2000, I rendered my decision which was embodied in a written Agreement for Sale of Stock dated December 4, 2000. As reflected in the Sale Agreement, Farhad was to be seller and Isaac was to be buyer, the price was to be $8,775,000.00, payable $500,000.00 at the closing, with a promissory note in the amount of $8,275,000.00.

6.      In Summer of 2002, Farhad alleged that Isaac concealed from Farhad and myself certain facts pertaining to a product line of ABC called the "Bratz doll," which allegedly was of great value and would have justified a substantially higher price for Farhad's shares.

7.      Thereafter, I began gathering financial and other information from Farhad and Isaac. In early 2003, I again engaged the services of National Business for the purpose of providing me, for my consideration and review in connection with my duties as arbitrator, with a valuation of ABC based upon information that I gathered in 2002.

8.      On or about February 7, 2003, I met with Farhad and Isaac to discuss the issues. I heard arguments from both sides and took the matter under submission. Prior to me rendering my decision, Farhad filed this instant action with the Court. I remain willing and able to

C:\Data\Farhad Larian\International Trader - Litigation\Opposition.wpd                9

HS 01285

EXHIBIT _____4_____

PAGE _____88_____



Sep-15-2004  12:35pm   From-HOWARTH
From-IBERS & Goldberg                          8197593848        T-371  P.013/013  F-923
                                                                 T-248  P.003/003  F-888

1  continue with my duties as arbitrator should the Court ultimately decide that the dispute be

2  arbitrated.

3      I declare under penalty of perjury, pursuant to the State of California, that the foregoing

4  is true and correct, and that this Declaration was executed on this _14_ day of September, 2004,

5  at Encino, California.

6

7

8                                          MORAD ZARABI

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

C:\Docs\Follies Litigation\International Trustee - Litigation\Opposition.wpd          10

OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

HS 01286

EXHIBIT ____4____

PAGE ____89____

**EXHIBIT  5**

TRANSCRIPT OF AUDIOTAPED MEETING WITH

ERNEST DUTCHER, APPRAISER

**CERTIFIED COPY**

Reported by:

JOHANNA M. BENNETT

CSR No. 5263

JOB No. 888989

ESQUIRE DEPOSITION SERVICES
(323) 938-2461

EXHIBIT ___5___

PAGE ___90___

KRANE 0039

```
1
2
3
4
5
6
7
8
9
10
11        Transcript of Audiotaped Meeting with
12    Ernest Dutcher, transcribed in Temple City,
13    California, on Wednesday, September 10, 2003,
14    by JOHANNA M. BENNETT, Certified Shorthand
15    Reporter No. 5263.
16
17
18
19
20
21
22
23
24
25
                                                      2
```

EXHIBIT ___5___

PAGE ___91___

KRANE 0040

```
1   KNOWN APPEARANCES:

2

3

4        MORAD ZARABI

5        A MALE VOICE

6        ERNEST DUTCHER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                           3
```

ESQUIRE DEPOSITION SERVICES
(323) 938-2461

EXHIBIT ___5___

PAGE ___92___

KRANE 0041

```
 1                *        *         *
 2
 3          MR. ZARABI:  Today is February 7.  I have a
 4   meeting with Mr. Ernest.
 5          MR. DUTCHER:  Ernest Dutcher.
 6          MR. ZARABI:  Ernest, and -- today is February
 7   7.  I have a meeting with Mr. Ernest and the gentleman,
 8   he appraised ABC or MGA International and he allow me to
 9   tape this conversation for the future if use it, if we
10   need it, even in the court.
11          Will you please say your name and everything,
12   please.
13          MR. DUTCHER:  My name is Ernest E. Dutcher.  My
14   designation is master certified business appraiser, and
15   my office is in Encino, California.
16          I received the instruction to provide a limited
17   letter report which means that the -- valuation was
18   conducted in a manner that would be required for an
19   eventual full narrative report.
20          And at the time -- at the time of the appraisal
21   of December 31, 1999, I relied on information given to
22   me by management, and we provided the report and we've
23   come -- we've used three methodologies in trying to
24   determine or estimate the value of the company.
25          MR. ZARABI:  Mr. Ernest, I have a question for
```

                                                              4

EXHIBIT _____5_____

PAGE _____93_____

KRANE 0042

```
 1    you.
 2              MR. DUTCHER:  Uh-huh.
 3              MR. ZARABI:  Have you appraised any toys
 4    company before?
 5              MR. DUTCHER:  I would have to research that
 6    because I've been in this business for approximately 25
 7    years, and I worked for some major companies and I'm
 8    sure that during that time that that type of company
 9    probably was one of the thing we did.
10              I can't say for sure, but I will say this, that
11    almost every company that is appraised is done almost
12    the same way.  It typically has many methodologies that
13    are available to the appraisers such as:  The income
14    approach, the market approach and the excess earnings
15    approach is three of them.  And that's the three I used
16    in doing this particular report.
17              And the reason that we can do it that way
18    instead of like one methodology -- one -- almost every
19    company that's appraised is appraised based on its
20    future earning potential.
21              And the fact that it's a toy company or a
22    manufacturer of doors and windows, it doesn't matter
23    because the basic bookkeeping, the basic financial
24    statements and so forth all resemble one another.
25              And based on that fact that we go through the
```

5

EXHIBIT 5
PAGE 94

KRANE 0043

```
 1   potential of the company, we review the industry, which

 2   in this case was rather, as I remember, rather volitile

 3   at the time and probably still is, it's kind of a

 4   volitile industry, up and down.

 5        And so we felt and I still believe that we are

 6   eminently qualified to do the job.

 7        MR. ZARABI:  Okay.  My second question is:

 8   Are you either, ah, licensee in this company?  Are you

 9   base your appraisal is -- my (inaudible) there is the

10   (inaudible), if you see the licensee or you didn't see

11   the licensee affecting the appraisal or not?

12        MR. DUTCHER:  The licensee is a method to keep

13   the revenues rolling into the company.  We assume that

14   the licensee -- the license, which, by the way, can be

15   valued individually, with individual effort.  It would

16   not give the answers that you are looking for in this

17   appraisal.  You needed the overall value of the company

18   to determine what the buyout value of a 40 -- 45-percent

19   interest was.

20        It would serve no purpose to have a value of

21   each of the licenses.  And One other thing, licenses in

22   the toy industry, because of the fact that each toy

23   that's been designed has a quite a short life and there

24   has to be probably a lot of different licenses, so it

25   actually would be beyond the scope of what we were doing
```

                                                          6

EXHIBIT _____ 5 _____

PAGE _____ 95 _____

KRANE 0044

```
 1    to try to evaluate each individual license.
 2              MR. ZARABI:  All right.  I'm sure.
 3              A MALE VOICE:  I'm sorry.  (Inaudible) Jerard.
 4    I'm going to ask you a few questions myself.
 5              MR. DUTCHER:  Sure.
 6              A MALE VOICE:  You said that the valuation was
 7    done December 31, 1999 or was that --
 8              MR. DUTCHER:  Date of value.
 9              A MALE VOICE:  In '99 you valued, end of '99
10    you valued or August or September of 2000?
11              MR. DUTCHER:  No.  That wasn't when I
12    valued it.  Somewhere probably in the mid -- I think
13    perhaps in July or August I probably received the
14    order.  I'd have to pull more of the file.  I didn't
15    have time to pull it all.
16              MR. ZARABI:  November -- the very first year
17    appraisal --
18              A MALE VOICE:  The appraisal is dated November
19    7, 2000, so your -- your --
20              MR. DUTCHER:  Let me see that.  I might be
21    looking at a different one.  I was looking at the first
22    one.  November 7, 2000.
23              A MALE VOICE:  So you --
24              MR. DUTCHER:  No, no, no, no.  The date of
25    valuation is December 31, 1999.  I have no right to use
```

7

EXHIBIT ___5___

PAGE ___96___

KRANE 0045

1   anything that happened after that date.   Unless we move

2   this date up to December 31, 2000, I couldn't consider

3   anything that happened subsequent to this date.

4           A MALE VOICE:   Okay.   So that's when the

5   valuation was done?

6           MR. DUTCHER:   That's the date --

7           A MALE VOICE:   And you met with who for this

8   valuation?

9           MR. DUTCHER:   I met with Morad and I met with

10  the two shareholders.

11          A MALE VOICE:   The two main shareholders?

12          MR. DUTCHER:   Yes.

13          A MALE VOICE:   Isaac and Farhad?

14          MR. DUTCHER:   Right.

15          A MALE VOICE:   You met with both of them?

16          MR. DUTCHER:   With both of them one time, as I

17  recall.

18          A MALE VOICE:   At the same time, meeting in the

19  same meeting?

20          MR. DUTCHER:   Yes.

21          A MALE VOICE:   So you never had a separate

22  meeting with Farhad or Isaac, separately --

23          MR. DUTCHER:   I don't think so.   I do recall

24  it's back a ways, but I don't remember having any

25  separate valuations -- separate meetings.

8

EXHIBIT _____ 5 _____

PAGE _____ 97 _____

KRANE 0046

1          A MALE VOICE:  And you had it sitting with both

2    of them?

3          MR. DUTCHER:  At the same time and I think

4    Morad was present?

5          A MALE VOICE:  Were you present at that

6    meeting?

7          MR. ZARABI:  I don't remember.  I don't recall.

8          A MALE VOICE:  So you --

9          MR. ZARABI:  I don't remember, when you say --

10          A MALE VOICE:  But you didn't have a separate

11   meeting with Isaac?

12          MR. DUTCHER:  I don't -- no, I don't think so.

13          A MALE VOICE:  Okay.  And --

14          MR. ZARABI:  Have you had a meeting with the

15   controller?

16          A MALE VOICE:  Did you have meetings with the

17   accounting people?

18          MR. DUTCHER:  Was it a lady?

19          MR. ZARABI:  A lady or a guy.

20          MR. DUTCHER:  Just to give them the information

21   I needed to provide the report.

22          A MALE VOICE:  Okay.  What information, may I

23   ask, you asked them to give you?

24          MR. DUTCHER:  The financial data is for five

25   years.  I believe --

9

EXHIBIT _____ 5 _____

PAGE _____ 98 _____

KRANE 0047

```
1              A MALE VOICE:  Last five years?
2         MR. DUTCHER:  The prior five years --
3         A MALE VOICE:  Right.
4         MR. DUTCHER:  -- ending December 31, 1999.
5         A MALE VOICE:  Okay.
6         MR. DUTCHER:  And then kind of a tour of the
7    facilities and general description of what the business
8    was and the fact I was not providing a full narrative
9    report, the actual detailed description of the market
10   and so forth was not included with the report.  We have
11   what we call a phase 1 and a phase 2 in our appraisals.
12            The phase 1 covers a letter report which is not
13   a full narrative report.  The letter report is
14   restricted -- is restricted to providing the financial
15   data only.
16        A MALE VOICE:  Uh-huh.
17        MR. DUTCHER:  -- with this minimal description
18   of the data and that is typically enough for a
19   friendly --
20        A MALE VOICE:  Break up.
21        MR. DUTCHER:  Yeah.  -- for a friendly break
22   up.
23        A MALE VOICE:  So phase 1 would be for a
24   friendly buyout?
25        MR. DUTCHER:  Yes.
```

                                                          10

EXHIBIT _____ 5 _____

PAGE _____ 99 _____

KRANE 0048

```
 1          A MALE VOICE:  And phase 2 would be?

 2          MR. DUTCHER:  Phase 2 would be in case any

 3   litigation was needed, and so forth, phase 2 had to be

 4   created and it can be done at any time.

 5          A MALE VOICE:  So for this purpose you only did

 6   a phase 1?

 7          MR. DUTCHER:  Phase 1, correct.

 8          A MALE VOICE:  Okay.  So --

 9          MR. ZARABI:  Let me ask a question.  The time

10   for the having meeting with Isaac, Farhad and his

11   controller or anybody in the MGA or ABC Corporation, did

12   they cooperate completely with you or not?

13          MR. DUTCHER:  They seemed to.  They seemed to

14   describe the business and so forth.  I had no reason to

15   believe that there was any problem between them and it's

16   not our --

17          MR. ZARABI:  Did you feel that anything they're

18   hiding for you something?

19          MR. DUTCHER:  I didn't get any -- any such

20   feeling, no.

21          MR. ZARABI:  No?

22          MR. DUTCHER:  I felt that everything was above

23   board.

24          A MALE VOICE:  I have further questions.

25          When you determined your future -- the
```

11

EXHIBIT _____ 5 _____

PAGE _____ 100 _____

KRANE 0049

1   future -- I mean, how did you determine the cost -- I

2   mean, did they give you any projections for the future

3   of the sales of this company?

4           MR. DUTCHER:  Typically I ask for their opinion

5   of what the future can be, and I just don't remember.

6   I'd have to go back and research the file completely,

7   and -- and if I didn't ask for them, it would be

8   unusual.

9           MR. ZARABI:  So you must have asked for them

10  and you would have kept --

11          MR. DUTCHER:  My guess, my best guess would be

12  that I would have asked what they thought the future was

13  because my -- again, as I repeat, in appraising is

14  not -- the value of the company doesn't lie on what it

15  has done.  It lies in what the future holds for that

16  company.

17          MR. ZARABI:  As well, yes.

18          MR. DUTCHER:  So very few people would invest

19  in Enron right now because it was a wonderful company in

20  the past.

21          MR. ZARABI:  Right.

22          MR. DUTCHER:  Right now it has zero value.  So

23  we try our best to get a forecast from the responsible

24  people, marketing, so forth, try to get a feel for what

25  they think that the future holds for the business.

12

EXHIBIT ____5____

PAGE ____101____

KRANE 0050

1    In addition, we check to see what the market
2  is, like our market approach consists of looking into
3  various public companies that are involved in the same
4  business such as Mattel and so forth.  We have a number
5  of them listed in the report.
6    We can get a feel for the -- actually, the toy
7  market or that type of market in general from that --
8  from that.  From -- from these sources, we then come up
9  with a conclusion of value based on our experience and
10  estimating what the likelihood of the continuation of
11  the company and whether it has any value related to the
12  future.  And the income approach and the other
13  approaches provide that for me.
14    A MALE VOICE:  I just have a couple of
15  questions.              Number one, you said that you
16  met with both of them.  Would you have written that in
17  your paperwork if you had met with both of them?
18    MR. DUTCHER:  Probably.  If I -- I could go
19  back and research that because I usually keep track for
20  my time.
21    A MALE VOICE:  I would like you, please, to do
22  that, doublecheck and make sure in that meeting when you
23  sat and gave them -- you wanted to sit down and discuss
24  with them, I want to make sure that both of them were
25  there or not, whether Fahrad's there or not.  I just --

13

EXHIBIT ___5___

PAGE ___102___

KRANE 0051

1       MR. DUTCHER:  Yes.

2       A MALE VOICE:  Are you sure?

3       MR. DUTCHER:  I'm positive they are both there

4   because Morad took me over to the location, which is

5   over behind the airport somewhere.

6       A MALE VOICE:  Right.

7       MR. DUTCHER:  And I remember going in and

8   meeting both of them at the time.

9       A MALE VOICE:  And sitting in the same meeting

10  with both of them present, when they were giving you

11  projections for the future?

12      MR. DUTCHER:  I think it all happened in the

13  same meeting.  I don't think there was more than one

14  meeting on gathering the information directly from the

15  people.

16      A MALE VOICE:  So, then, basically they both

17  sat there and gave you --

18      MR. ZARABI:  All the information.

19      A MALE VOICE:  -- all the information of what

20  they thought?

21      MR. DUTCHER:  That's my -- that's my

22  recollection of it, yes.

23      A MALE VOICE:  If you could go back and

24  doublecheck, we appreciate --

25      MR. DUTCHER:  I'll check the company notes on

                                                    14

EXHIBIT __5__

PAGE __103__

KRANE 0052

```
1    it, yes.
2              A MALE VOICE:  -- if you can send a letter on
3    that.
4              And secondly, again, going back to that same
5    meeting, report of the potential future sales, you think
6    both of them gave you that or was one of them more vocal
7    than the other one?
8              MR. DUTCHER:  No, I don't remember any -- I
9    don't remember any outstanding big shining potential
10   that they brought out other than --
11             LEFT2:  (Inaudible.)
12             MR. DUTCHER:  -- doing in a normal course of
13   business.
14             A MALE VOICE:  So you just basically took the
15   normal increases on a yearly basis and that's what you
16   did?
17             MR. DUTCHER:  Yes.  Yes.
18             MR. ZARABI:  Let me ask a question.
19             MR. DUTCHER:  Uh-huh.
20             MR. ZARABI:  Even the time you -- first of all,
21   how long you have experience for the appraising the
22   business, completely?  10 years?  20 years?
23             MR. DUTCHER:  I have 20, 25 years.
24             MR. ZARABI:  20 years.
25             MR. DUTCHER:  I've owned my own businesses and
```

                                                           15

EXHIBIT ___5___

PAGE ___104___

KRANE 0053

1    I've --

2         MR. ZARABI:  And you -- because of your

3    conversation you say every court of law accept your

4    appraisal, right?

5         MR. DUTCHER:  I've never found one that didn't.

6         MR. ZARABI:  Okay.

7         MR. DUTCHER:  I've never been denied a position

8    of expertise.

9         MR. ZARABI:  My final question is:  If the

10   contract came to the table by September 18, year 2000 --

11        A MALE VOICE:  This was a license of September

12   18, 2000.

13        MR. DUTCHER:  Okay.

14        MR. ZARABI:  If you have on the table --

15        MR. DUTCHER:  Uh-huh.

16        MR. ZARABI:  -- with the other licensees, it

17   was affecting the price or no?

18        MR. DUTCHER:  It could have, but I'd have to

19   have a lot more information.  I can't say it wouldn't.

20        A MALE VOICE:  (Inaudible) check each license.

21        MR. ZARABI:  You never check any license?

22        A MALE VOICE:  He never checked any license.

23        MR. DUTCHER:  However, if there was one that

24   was really, really outstanding.

25        A MALE VOICE:  Did you check each license?

· 16

EXHIBIT _____5_____

PAGE _____105_____

KRANE 0054

1              MR. DUTCHER:  No.

2              A MALE VOICE:  No, you didn't.

3              MR. DUTCHER:  No.

4              A MALE VOICE:  And none of them were furnished

5      to you?

6              MR. DUTCHER:  Another thing, to answer that

7      probably better, we know that through the period of the

8      company, let's take a look at the --

9              MR. ZARABI:  The (inaudible) --

10             MR. DUTCHER:  -- history.  Let's go back here

11     five years.  In 1995, we had 64 million in revenues.  In

12     1996 it dropped to 46 million in revenues.

13             In 1997 it recovers somewhat to 55 million in

14     revenues but dropped to 40 million, you know, that's a

15     big drop, by 1998.  Then it jumped in 1999 to 66 million

16     which told me this:  That at times they had a hot

17     product.  A hot product here, and they probably had a

18     hot product here --

19             A MALE VOICE:  In '97.

20             MR. DUTCHER:  -- another hot product here --

21             A MALE VOICE:  In --

22             MR. DUTCHER:  -- which we picked up here, and

23     then for the future it says, "These hot products will

24     come and go because the toy business is that way."

25             I don't say that because I know the toy

                                                          17

EXHIBIT _____5_____

PAGE _____106_____

KRANE 0055

1    business itself.

2              A MALE VOICE:  Uh-huh.

3              MR. DUTCHER:  But I do know when you see an

4    industry, there is such volatility --

5              A MALE VOICE:  Volatility in the sales.

6              MR. DUTCHER:  -- that tells the appraiser, that

7    you better be careful on how much growth you are

8    forecasting into the future because that is the basis of

9    your value.

10             A MALE VOICE:  How much growth did you --

11             MR. DUTCHER:  And I think the growth was

12   probably estimated at 5 percent.  Yes.

13             A MALE VOICE:  Yes.

14             MR. DUTCHER:  We forecast a growth of 5 percent

15   a year because you know with that much -- a big jump and

16   a big drop and a big jump, there is no one on earth that

17   can forecast with any degree of accuracy of what's

18   really going to happen.

19             MR. ZARABI:  With your experience, there is any

20   way you can imagine this sale after two years instead of

21   5 percent jump to 25 percent?

22             MR. DUTCHER:  Well, I would say that --

23             A MALE VOICE:  Possible because --

24             MR. ZARABI:  (Inaudible.)

25             MR. DUTCHER:  -- might do that, but I recognize

                                                          18

ESQUIRE DEPOSITION SERVICES
(323) 938-2461

EXHIBIT ___5___

PAGE ___107___

KRANE 0056

```
 1   that, that it did do that.  It jumped from 40 to 60.
 2   That's a huge jump and then it dropped back to 40.  No,
 3   and that --
 4           MR. ZARABI:  It was not established company the
 5   way you see it?
 6           MR. DUTCHER:  Pardon?
 7           MR. ZARABI:  It was not established number
 8   company.
 9           MR. DUTCHER:  Well, the only thing I see is a
10   begun of of hot products that came along, hot products
11   that boosted it temporarily, but it didn't have a long
12   life.
13           A MALE VOICE:  I have another question for
14   you.  And this is I think that I would like to ask you
15   somewhat of your experience not relating to this.
16           What happens when you value a company and then
17   the company goes drastically lower in sales?  So let's
18   say they were doing an average of 60 and 70, went down
19   to 20?  What happens to them?
20           MR. DUTCHER:  What happens to them is not
21   important at the time I do the appraisal because we
22   don't know what's going to happen to them.
23           We only can say based on history that the trend
24   has been up, but how can you forecast anything when the
25   trend is up and down and up and down.
```

                                                                    19

EXHIBIT ____5____

PAGE ____108____

KRANE 0057

```
1        You could -- I could -- even if I knew the
2   company went bankrupt the next year, I would still have
3   to put the valuation based on what I could see if I was
4   there on December 31, 1999.
5        A MALE VOICE:  Right.
6        MR. DUTCHER:  I could not change my opinion
7   based on a subsequent event.
8        A MALE VOICE:  Who gave you the authorization
9   to go up to December 31, 1999?
10       MR. DUTCHER:  I think it was --
11       A MALE VOICE:  Morad?
12       MR. DUTCHER:  I think you had said --
13       A MALE VOICE:  Morad said to him that the
14  valuation has to be as of December 31 --
15       MR. ZARABI:  December 31, 1999.
16       A MALE VOICE:  I think (inaudible) I have a
17  question, from whatever happens?
18       MR. ZARABI:  I didn't have the experience to
19  say to --
20       A MALE VOICE:  (Inaudible.)
21       MR. ZARABI:  -- 1999, but I don't remember but
22  you said based on your experience, you go to the 1999,
23  correct?
24       MR. DUTCHER:  Well --
25       MR. ZARABI:  Because I don't remember --
```

20

ESQUIRE DEPOSITION SERVICES
(323) 938-2461

EXHIBIT 5
PAGE 109

KRANE 0058

```
 1          MR. DUTCHER:  -- because 1999 was a full year.
 2   December 31st was a full year.
 3          A MALE VOICE:  Yes.
 4          MR. DUTCHER:  And had we done a midyear which
 5   we could do --
 6          MR. ZARABI:  Uh-huh.
 7          MR. DUTCHER:  -- I would do one as of the date
 8   of that appraisal.
 9          MR. ZARABI:  Because of the full year you had
10   the financial --
11          MR. DUTCHER:  Of course.
12          MR. ZARABI:  -- for 1999 --
13          MR. DUTCHER:  Of course.
14          MR. ZARABI:  -- you base it as of 1999?
15          MR. DUTCHER:  That is correct.
16          MR. ZARABI:  Even --
17          A MALE VOICE:  That was the record that they
18   could furnish him.  They couldn't furnish him -- if he
19   went there in September or October, he couldn't have
20   gotten information of what has happened in that -- in
21   that year because they wouldn't know because there would
22   be no physical audited information.  The only audited
23   information was end of '99.
24          MR. DUTCHER:  Plus the fact usually toward the
25   end of the year, there's year-end adjustments and things
```

                                                         21

EXHIBIT _____ 5 _____

PAGE _____ 110 _____

KRANE 0059

1    of that sort that happen.

2         So we have had -- we can do appraisals due at

3    the  midyear, but we put lower weight on that simply

4    because it's speculation.

5         A MALE VOICE:  Not (inaudible).

6         MR. ZARABI:  Robert says after (inaudible) base

7    of the company going down instead of 50 million

8    business, comes to the $20 million which is the

9    (inaudible) assets.  Now I'm --

10        A MALE VOICE:  That's the valuation --

11        MR. DUTCHER:  If it went down the following

12   year, it would not change the valuation because I would

13   have to change the date of value.

14        A MALE VOICE: Okay.  And then would any court

15   be able to cancel the contract because of that reason?

16        MR. DUTCHER:  If there were -- if the event,

17   the sale took place based on the appraisal and the

18   appraisal date was December 31, 1999, I could see no way

19   that they can rule any other way accept to state that

20   what happened in 1999, December 31, then prior to that

21   was the only thing that we can use.

22        A MALE VOICE:  But don't you think that if --

23   if there was things going on in December or even

24   January, but you had -- but in fact you had your

25   appraisal done six months to eight months later --

22

EXHIBIT _____ 5 _____

PAGE _____ lll _____

KRANE 0060

1        MR. DUTCHER:  Uh-huh.

2        A MALE VOICE:  -- the fact still remains that

3   they would have known the trend for the following year,

4   and they would have been able to tell you that in their

5   meeting, wouldn't you -- they?

6        MR. DUTCHER:  Well, I would think so.  It -- if

7   there was something on the horizon that was unusual, I

8   would think they would have brought it out at that

9   meeting.  I don't remember that.

10        A MALE VOICE:  Let's take it --

11        MR. ZARABI:  Opposite way.

12        A MALE VOICE:  -- the opposite way, okay?

13        MR. ZARABI:  Say, the dates are to which date

14   is this affecting.

15        A MALE VOICE:  The question is this:  In the

16   year 2000, let's take it the other way now, instead of

17   it going to 60 average million in sales it suddenly

18   jumped to 90 or 80 or 90 and probably jumps the year

19   after to a hundred and the following year jumps to

20   200,000 -- $200 million.

21        MR. DUTCHER:  Well, in other words, we can only

22   base our judgment on what has historically happened in

23   the past.  Typically, if we were to give an estimate out

24   in the future that it was going to grow at some

25   astronomical rate, we'd have to put a heavy discount

23

EXHIBIT    5
PAGE    112

KRANE 0061

1   rate on that, on the probability or possibility it may

2   not happen.

3       So we used a discount rate here of 20.75

4   percent which was probably based on the fact it was --

5   even this number was -- had some risk in reaching it.

6   In other words, that discount rate is a --

7       MR. ZARABI:  But the final question is:  You

8   appraise this company based on fairness, based on your

9   experience.

10      There is any influence from either party, me --

11  I'm Morad, Isaac, Farhad, (inaudible), anything that is

12  affecting your appraisal or no?

13      MR. DUTCHER:  I would say that there was not

14  iota of pressure put on me one way or the other by

15  either yourself or the other two parties to have a

16  higher or lower number.

17      This is precisely my opinion of value at that

18  time and was not influenced by anyone else's input

19  except for the financial part of it.

20      MR. ZARABI:  Okay.  I thank you very much.  I

21  really appreciate it for you coming over here.

22      A MALE VOICE:  We might need you --

23      MR. ZARABI:  We might meet again.  Maybe we ask

24  you for the subpoena in the court of law, and I hope we

25  expecting to your cooperation.

24

EXHIBIT 5
PAGE 113

KRANE 0062

```
1          MR. DUTCHER:  There's no question.  It's part
2     of my job.
3          MR. ZARABI:  Thank you very much and thanks
4     again.
5          MR. DUTCHER:  Okay.
6                    *         *         *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                    25
```

ESQUIRE DEPOSITION SERVICES
(323) 938-2461

EXHIBIT ___5___

PAGE ___114___

KRANE 0063

1

2

3

4

5        I, the undersigned, a Certified Shorthand

6   Reporter of the State of California, do hereby certify:

7        That the foregoing audiotaped proceedings

8   were listened to and taken down by me using machine

9   shorthand which was thereafter transcribed under my

10  direction; further, that the foregoing is an accurate

11  transcription thereof.

12       I further certify that I am neither

13  financially interested in the action nor a relative or

14  employee of any attorney of any of the parties.

15       IN WITNESS WHEREOF, I have this date

16  subscribed my name.

17

18  Dated:_____ SEP 1 1 2003

19

20

21

            JOHANNA M. BENNETT
22          CSR No. 5263

23

24

25

EXHIBIT ____5____

PAGE ____115____

KRANE 0064

**EXHIBIT  6**

DECLARATION OF ERNEST DUTCHER

I, Ernest Dutcher, hereby declare as follows:

1.    I am the owner of National Business Appraisers, LLC. I make this declaration from personal knowledge and I could and would competently testify to its contents.

2.    In or around October 2000, I was retained to perform an appraisal of the current value of ABC International Traders, Inc. ("ABC") by Ellis Stern for Morad Zarabi for the purpose of a sale of a shareholder's interest. This was the first time I did any work for either Mr. Stern or Mr. Zarabi.

3.    After being retained, I spoke with Mr. Zarabi about the appraisal. He advised me that Farhad Larian was selling his interest in ABC. He said that Farhad was not very involved in ABC and was not doing much work for ABC, and that his shares were to be sold to Isaac Larian.

4.    During October and early November 2000, I performed the appraisal of ABC utilizing documentation provided to me by Mr. Zarabi and /or Mr. Stern. While performing this appraisal, I was not given any information about the Bratz product line, nor was I told of ABC's plans for the Bratz product line. Thus, I

1

000006

1  knew nothing about any activity by ABC involving the Bratz

2  product line. For performing this appraisal I was not asked to

3  appraise a Hong Kong company called MGA Entertainment Hong Kong,

4  Limited ("MGAEHK"). Until September 2004, I was unaware shares

5  of this company were part of the sale transaction.

6

7      5.   On or about October 31, 2000 I met with and provided a

8  draft appraisal to Mr. Zarabi which valued ABC as of December

9  31, 1999 at $26,942,000 and valued a 45% shareholder's interest

10 at $12,123,900. A true and correct copy of the draft appraisal

11 from my computer files is attached as Exhibit A. Upon review of

12 the draft appraisal, Mr. Zarabi instructed me to decrease the

13 valuation to get close to $20,000,000. As a result of the

14 meeting and following Mr. Zarabi's instructions, I did the

15 following: lowered the overall growth rates used on Table E;

16 changed the weighing on table C; rounded down the calculated

17 value on Table J; and changed the "Price Trend Factors" on Table

18 H. These changes were made in order to reduce ABC's appraised

19 value from $26,942,000 to $21,600,000 which lowered the value of

20 a 45% shareholder's interest from $12,123,900 to $9,720,000. On

21 or about November 7, 2000 I issued my valuation report for the

22 period ending December 31, 1999 based on the lowered numbers. A

23 true and correct copy of the November 7, 2000 appraisal is

24 attached as Exhibit B.

25

2

000007

$2 - ED$

EXHIBIT ____ V

PAGE ____ 117

6.   At all times during October and November 2000 Mr. Zarabi was fully aware the valuation was being done as of December 31, 1999. In performing the November 7, 2000 appraisal I followed Mr. Zarabi's instructions. At no time in 2000, after receiving the draft appraisal did Mr. Zarabi tell me I should also value MGAEHK, should value ABC as of a date other than December 31, 1999, or that I had not followed his instructions. At no time after receiving the November 7, 2000 appraisal did Mr. Zarabi tell me that by lowering the appraised value I had not followed his instructions.

7.   Shortly after issuing the November 7, 2000 report, Mr. Stern requested that I send him all of my files concerning the appraisal of ABC. I complied with his request. Among the items I sent to Mr. Stern was the draft appraisal dated October 31, 2000 which is attached to this declaration as Exhibit A.

8.   On February 5, 2003 I was advised by Mr. Stern that the selling shareholder of ABC was complaining about the appraisal dated November 2000 (December 31, 1999 valuation date) because of an undisclosed contract which I later learned is called Bratz. Mr. Stern requested that I look at the issue. Subsequently I met with Mr. Zarabi and his son Robert Zarabi on February 7, 2003 to discuss the appraisal. Morad Zarabi asked me to perform another appraisal of ABC to value it as of December

3

3-20

EXHIBIT ___ Q ___

PAGE ___ 118 ___

1   31, 2000. He did not ask me to include the Bratz contract in my

2   valuation approaches and I was not provided with any information

3   or documentation about revenues and profits generated from the

4   Bratz line, ABC's plans for this line, or the growth potential

5   ABC anticipated from Bratz. I performed the appraisal based on

6   information in my computer file and the 2000-2001 financial

7   statement for ABC provided to me by Mr. Zarabi. I determined a

8   value of $33,805,000 for ABC as of December 31, 2000 and the

9   value of a 45% interest in shareholder equity as $15,212,000.

10

11      9.   Subsequently Mr. Zarabi discussed the 2003 appraisal

12  (December 31, 2000 valuation date) with me. Mr. Zarabi asked me

13  to apply a minority shareholder discount to the valuation

14  determined by the 2003 appraisal to lower the appraised value.

15  As a result I applied a 25% minority shareholder discount which

16  reduced the 45% shareholder interest from $15,212,000 to

17  $11,409,000. However, I advised Mr. Zarabi in my report that the

18  minority discount was not applicable. A true and correct copy of

19  the 2003 appraisal from my computer files is attached as Exhibit

20  C.

21

22      10.   I now believe that the appraisal report dated November

23  7, 2000 which valued ABC as of December 31, 1999 and which

24  contained the value lowered from the draft appraisal is not a

25  supportable opinion.

4

EXHIBIT ___6___

PAGE ___119___

11.   Because I did not receive complete information in 2003 which should have been available and should have been provided to me (such as ABC's 2002 sales and profits, ABC's forecasts for 2003 and beyond, and other pertinent and requisite data), I now believe the valuation report dated February 13, 2003 valuing ABC as of December 31, 2000 is also an unsupportable opinion.

12.   At no time when performing appraisals of ABC, was I informed of an extraordinary event in 1998 when Toys R Us stopped buying from MGA for that year. Disclosure of such extraordinary event would have materially increased the appraised values as of December 31, 1999 and December 31, 2000.

13.   On or about April 12, 2004 Mr. Zarabi retained me to perform another appraisal of ABC (renamed MGA Entertainment, Inc.) based on a December 31, 2001 valuation date. From discussions with Mr. Zarabi I understood that his purpose in commissioning this appraisal was to obtain a valuation lower than the 2003 appraisal (Exhibit C - valuation date December 31, 2000). For performing this appraisal, Mr. Zarabi told me the Hallmark deferrals which I had accounted for in my valuation dated February 13, 2003 were no longer applicable. Mr. Zarabi instructed me to exclude and ignore the Hallmark deferrals. Inclusion of such deferrals would have materially increased the

5

5- ED

EXHIBIT _____ Q _____

PAGE _____ 120 _____

1  valuation in the appraisal prepared in 2004. Subsequently I
2  prepared a draft appraisal with a December 31, 2001 valuation
3  date which I submitted to Mr. Zarabi in early May 2004. A true
4  and correct copy of that appraisal dated May 1, 2004 is attached
5  as Exhibit D. As of April 29, 2004 I had discussed this
6  appraisal with Mr. Ellis Stern. As of April 29, 2004 Mr. Ellis
7  Stern was aware that this appraisal (Exhibit D) had been
8  prepared and existed.
9
10      14.  In early 2004 I was subpoenaed by Farhad Larian to
11  produce my records in a lawsuit against Isaac Larian. I had
12  previously turned over my records of the appraisals to Mr. Ellis
13  Stern. On or about May 17, 2004 I met with Mr. Stern who
14  informed me that my records of the 2000 appraisal were being
15  turned over to Farhad Larian, but that data relating to the
16  subsequent appraisals were going to be withheld.  He also asked
17  that I provide him with my electronic files relating to all
18  appraisals of ABC. I complied and on May 18, 2004 provided Mr.
19  Stern with a computer disk containing the electronic files. On
20  May 18, 2004 I also met with Mr. Morad Zarabi.
21
22      15.  Subsequently, from discussions with Mr. Ellis Stern, I
23  learned that the initial draft appraisal of ABC prepared in 2000
24  - which Mr. Stern had a copy of (Exhibit A) - had not been
25  produced to Farhad Larian. From discussions with both Mr. Ellis

EXHIBIT ___ Q

PAGE ___ 121

1  Stern and Mr. Morad Zarabi I understood that they wanted the
2  draft appraisal concealed. I believe the reason for wanting this
3  draft concealed was the fact that in preparing the appraisal
4  report dated November 7, 2000 (Exhibit B), Mr. Zarabi had
5  instructed me to modify the draft appraisal and to decrease the
6  appraised value to get close to $20,000,000. Some time in 2004
7  Mr. Ellis Stern advised me to erase all draft appraisal reports
8  from my computer files. I attempted to erase all draft appraisal
9  reports from my computer files. However, one file copy of the
10 draft appraisal remained on a separate disk.
11
12     16. On September 1, 2004 Mr. Stern emailed me about his
13 telephone conversation earlier that day with Farhad's attorneys.
14 Mr. Stern reported that in reference to my electronic records of
15 ABC's appraisals, he had told Farhad's attorneys that I "no
16 longer maintain such electronic records". Mr. Stern's statement
17 to Farhad's attorney was untrue. I had provided Mr. Stern copies
18 of my electronic records of ABC's appraisals on May 18,2004.
19
20     17.   In September 2004, Mr. Stern advised me he will
21 represent me along with Mr. Zarabi in connection with the
22 disputes between ABC's shareholders and I agreed.
23
24     18.  Subsequent to first being engaged by Mr. Stern and Mr.
25 Zarabi in October 2000, in addition to the three appraisals of

7
000012

EXHIBIT  6
PAGE  122

1  ABC and MGA, I have performed two appraisals for Mr. Zarabi of
2  his own company - Piege Co., DBA Felina Lingerie. I have also
3  performed two other appraisals for Mr. Stern. For the first
4  appraisal of ABC my base fee was $8,500. For the first appraisal
5  of Piege Co., my base fee was $7,500.
6
7       I declare under penalty of perjury under the laws of the
8  State of California and the United States of America that the
9  foregoing facts are true and correct, executed this 7th day of
10 January 2005 at Los Angeles County, California.

                                      Ernest Dutcher

000013

8-2W

EXHIBIT  6
PAGE  123

CONFIDENTIAL DRAFT
ABC

**TABLE A**
**FIVE YEAR COMPARATIVE BALANCE SHEET**
FYY End December 31
($000)

Job No. 1118ABCV
Appr Date 31-Dec-99
Run Date 12/14/04

| ASSETS | FYE 8/31 1995* | % | 1996 | % | 1997 | % | 1998 | % | 1999 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| Current assets | | | | | | | | | | |
| Cash & equivalents | $16 | 0.1 | $438 | 2.5 | $797 | 3.8 | $860 | 5.1 | ($379) | -0.4 |
| Accounts Receivable-Trade | 11,729 | 40.9 | 3,760 | 21.8 | 10,067 | 47.7 | 7,614 | 44.8 | 11,154 | 63.5 |
| Inventories | 14,534 | 50.7 | 11,677 | 67.7 | 8,563 | 41.0 | 7,400 | 43.6 | 5,834 | 33.2 |
| Due from affiliate | 417 | 1.5 | 143 | 0.8 | 171 | 0.8 | - | - | (320) | -1.8 |
| Prepaid Expenses & Other | 1,112 | 3.9 | 786 | 4.6 | 768 | 3.6 | 379 | 2.2 | 373 | 2.1 |
| Total Current | $27,808 | 97.0 | $16,804 | 97.4 | $20,466 | 96.9 | $16,253 | 95.7 | $16,962 | 96.6 |
| Property & Equipment | | | | | | | | | | |
| Machinery & Equipment | 1,687 | 5.9 | 1,759 | 10.2 | 2,369 | 11.2 | 3,621 | 21.3 | 1,409 | 8.0 |
| Leasehold Improvements | 86 | | 86 | | 86 | | 86 | | 86 | |
| Less Accum. Depr. | (899) | -3.1 | (1,399) | -8.1 | (1,800) | -8.5 | (2,977) | -17.5 | (900) | -5.1 |
| Net Fixed Assets | $874 | 3.0 | $446 | 2.6 | $655 | 3.1 | $730 | 4.3 | $595 | 3.4 |
| Deposits & other | | 0.0 | | 0.0 | | 0.0 | | 0.0 | | 0.0 |
| TOTAL ASSETS | $28,682 | 100.0 | $17,250 | 100.0 | $21,121 | 100.0 | $16,983 | 100.0 | $17,557 | 100.0 |

* Changed from a fiscal year ending of 8/31 to calendar year ending of 12/31. This information is from the fiscal year of 9/1/94 to 8/31/95.

000014

Exhibit A
Page 1 of 15

EXHIBIT  6
PAGE  124

CONFIDENTIAL DRAFT

TABLE A-1
FIVE YEAR COMPARATIVE BALANCE SHEET
F/Y End December 31
($000)

Job No. 1118ABCV
Appr Date 12/31/99
Run Date 12/14/04

### LIABILITIES & SHAREHOLDERS EQUITY

| | 1995 | % | 1996 | % | 1997 | % | 1998 | % | 1999 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| **Current Liabilities** | | | | | | | | | | |
| Accounts Payable & Accrued | $ 5,588 | 12.5 | $ 7,222 | 41.9 | $ 11,134 | 52.7 | $ 6,904 | 40.7 | $ 6,611 | 37.7 |
| Bank Line-Revolving | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Current Port. L T Debt | | 0.0 | 36 | 0.2 | 38 | 0.2 | 38 | 0.2 | 0 | 0.0 |
| Other current | 11,486 | 40.0 | 3 | 0.0 | 45 | 0.2 | 131 | 0.8 | 0 | 0.0 |
| Total current liabilities | $ 15,074 | 52.6 | $ 7,261 | 42.1 | $ 11,217 | 53.1 | $ 7,073 | 41.6 | $ 6,611 | 37.7 |
| **Long Term Liabilities** | | | | | | | | | | |
| Notes payable to bank | $ - | 0.0 | $ 5,950 | 34.5 | $ 3,175 | 15.0 | $ 5,231 | 30.8 | $ 2,129 | 12.1 |
| Long term debt, less current | 1,305 | 4.5 | | 0.0 | | 0.0 | | 0.0 | 0 | 0.0 |
| Subordinated notes payable & other | 3,728 | 13.0 | 2,718 | 15.8 | 3,028 | 14.3 | 3,247 | 19.1 | 3,255 | 18.5 |
| Total long term liabilities | $ 5,033 | 17.5 | $ 8,668 | 50.2 | $ 6,203 | 29.4 | $ 8,478 | 49.9 | $ 5,384 | 30.7 |
| Total Liabilities | $ 20,107 | 70.1 | $ 15,929 | 92.3 | $ 17,420 | 82.5 | $ 15,551 | 91.6 | $ 11,995 | 68.3 |
| Shareholders Equity | $ 8,575 | 29.9 | $ 1,321 | 7.7 | $ 3,701 | 17.5 | $ 1,432 | 8.4 | $ 5,562 | 31.7 |
| Total Liabilities & Shareholders Equity | $ 28,682 | 100.0 | $ 17,250 | 100.0 | $ 21,121 | 100.0 | $ 16,983 | 100.0 | $ 17,557 | 100.0 |
| Current Ratio | 1.84 | | 2.31 | | 1.82 | | 2.30 | | 2.57 | |
| Quick Ratio | 0.78 | | 0.58 | | 0.97 | | 1.20 | | 1.68 | |
| L T Debt / Net Worth | 0.59 | | 6.56 | | 1.68 | | 5.92 | | 0.97 | |
| Working Capital | $ 12,734 | 44.4 | $ 9,543 | 55.3 | $ 9,249 | 43.8 | $ 9,180 | 54.1 | $ 10,351 | 59.0 |

IMPLIED WORKING CAPITAL          Included in Business Enterprise Value

| | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|
| Net Revenues | $ 64,141 | $ 46,980 | $ 55,315 | $ 40,732 | $ 66,350 |
| WC as a percent of revenues * | 14.29% | 14.29% | 14.29% | 14.29% | 14.29% |
| Implied working capital | $ 9,163 | $ 6,711 | $ 7,902 | $ 5,819 | $ 9,479 |

* Robert Morris Associates SIC #2944, Games, Toys etc.

000015

Exhibit A
Page 2 of 15

EXHIBIT 6
PAGE 125

CONFIDENTIAL DRAFT

**TABLE B**

**FIVE YEAR COMPARATIVE INCOME STATEMENT**

ABC INTERNATIONAL TRADERS, INC.

F/Y End December 31 ($000)

Job No  1318ABCV
Appr Date  31-Dec-99
Run Date  12/14/04

| | (1) 1995 | % | 1996 | % | 1997 | % | 1998 | % | 1999 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUES - NET** | $ 64,141 | 100.0 | $ 46,980 | 100.0 | $ 55,315 | 100.0 | $ 40,732 | 100.0 | $ 66,350 | 100.0 |
| Less cost of sales | 46,011 | 71.7 | 36,834 | 78.4 | 40,032 | 72.4 | 26,093 | 64.1 | 43,724 | 65.9 |
| **GROSS PROFIT** | $ 18,130 | 28.3 | $ 10,146 | 21.6 | $ 15,283 | 27.6 | $ 14,639 | 35.9 | $ 22,626 | 34.1 |
| Other income (loss) | 714 | 1.1 | (738) | -1.6 | 28 | 0.1 | (253) | -0.6 | 350 | 0.5 |
| **TOTAL INCOME** | $ 18,844 | 29.4 | $ 9,408 | 20.0 | $ 15,311 | 27.7 | $ 14,386 | 35.3 | $ 22,976 | 34.6 |
| **EXPENSES** | | | | | | | | | | |
| Advertising & promotion | $ 1,896 | 3.0 | $ 2,936 | 6.2 | $ 2,992 | 5.4 | $ 3,898 | 9.6 | $ 4,347 | 6.6 |
| Automobile expense | 49 | 0.1 | 74 | 0.2 | 47 | 0.1 | 64 | 0.2 | 67 | 0.1 |
| Bad debts | 488 | 0.8 | 289 | 0.6 | (6) | 0.0 | | 0.0 | 30 | 0.0 |
| Bank charges | 205 | 0.3 | 312 | 0.7 | 294 | 0.5 | 181 | 0.4 | 196 | 0.3 |
| Commissions | 1,925 | 3.0 | 1,912 | 4.1 | 2,535 | 4.6 | 2,168 | 5.3 | 2,487 | 3.7 |
| Data processing & supplies | 66 | 0.1 | 22 | 0.0 | 27 | 0.0 | 64 | 0.2 | 66 | 0.1 |
| Depreciation | 228 | 0.4 | 732 | 1.6 | 585 | 1.1 | 589 | 1.4 | 540 | 0.8 |
| Delivery, postage | 72 | 0.1 | 130 | 0.3 | 242 | 0.4 | 191 | 0.5 | 323 | 0.5 |
| Insurance | 348 | 0.5 | 329 | 0.7 | 227 | 0.4 | 305 | 0.7 | 386 | 0.6 |
| Interest Expense | 917 | 1.4 | 663 | 1.4 | 390 | 0.7 | 552 | 1.4 | 842 | 1.3 |
| Legal, professional & accounting | 575 | 0.9 | 343 | 0.7 | 1,225 | 2.2 | 1,681 | 4.1 | 1,199 | 1.8 |
| Miscellaneous other | 111 | 0.2 | 187 | 0.4 | 105 | 0.2 | 379 | 0.9 | 62 | 0.1 |
| Molds | 9 | 0.0 | 6 | 0.0 | 0 | 0.0 | 0 | 0.0 | 508 | 0.8 |
| Office Expenses | 53 | 0.1 | 77 | 0.2 | 61 | 0.1 | 71 | 0.2 | 132 | 0.2 |
| Product development | 911 | 1.4 | 1,028 | 2.2 | 463 | 0.8 | 1,048 | 2.5 | 1,711 | 2.6 |
| Rents | 637 | 1.0 | 467 | 1.0 | 346 | 0.6 | 382 | 0.9 | 455 | 0.7 |
| Repairs & maintenance | 15 | 0.0 | 11 | 0.0 | 11 | 0.0 | 22 | 0.1 | | 0.0 |
| Salaries, officers | 1,394 | 2.2 | 696 | 1.5 | 704 | 1.3 | 1,104 | 2.7 | 1,194 | 1.8 |
| Salaries & wages | 2,316 | 3.6 | 2,509 | 4.3 | 2,284 | 4.1 | 2,223 | 5.5 | 3,179 | 4.8 |
| Taxes & licenses | 51 | 0.1 | 27 | 0.1 | 217 | 0.4 | 39 | 0.1 | 61 | 0.1 |
| Taxes, payroll | 121 | 0.2 | 220 | 0.5 | 176 | 0.3 | 219 | 0.5 | 254 | 0.4 |
| Telephone | 160 | 0.2 | 219 | 0.5 | 188 | 0.3 | 166 | 0.4 | 214 | 0.3 |
| Travel & entertainment | 251 | 0.4 | 341 | 0.7 | 226 | 0.4 | 277 | 0.7 | 399 | 0.6 |
| Utilities | 36 | 0.1 | 36 | 0.1 | 32 | 0.1 | 30 | 0.1 | 35 | 0.1 |
| **TOTAL EXPENSES** | $ 12,823 | 20.0 | $ 13,060 | 27.8 | $ 13,371 | 24.2 | $ 15,613 | 38.3 | $ 18,707 | 28.2 |
| **PRETAX INCOME** | $ 6,021 | 9.4 | $ (3,652) | -7.8 | $ 1,940 | 3.5 | $ (1,227) | -3.0 | $ 4,269 | 6.4 |
| Add Depreciation/Amort | 228 | 0.4 | 732 | 1.6 | 585 | 1.1 | 589 | 1.4 | 540 | 0.8 |
| **PRETAX CASH FLOW (2)** | $ 6,249 | 9.7 | $ (2,920) | -6.2 | $ 2,525 | 4.6 | $ (638) | -1.6 | $ 4,809 | 7.2 |
| Add Interest Charges | 917 | 1.4 | 663 | 1.4 | 390 | 0.7 | 552 | 1.4 | 842 | 1.3 |
| **EBDIT (3)** | $ 7,166 | 11.2 | $ (2,257) | -4.8 | $ 2,915 | 5.3 | $ (86) | -0.2 | $ 5,651 | 8.5 |

(1) Changed from a fiscal year ending of 8/31 to calendar year ending of 12/31. This information is from the fiscal year of 9/1/94 to 8/31/95.
(2) Pretax income plus depreciation.
(3) Pretax cash flow plus interest charges.

000016

Exhibit A
Page 3 of 15

EXHIBIT ___ U

PAGE ___ 126

CONFIDENTIAL DRAFT

**TABLE C**
**INCOME STATEMENT ADJUSTMENTS**
ABC INTERNATIONAL TRADERS, INC.
Y/E End December 31
($000)

Job No. 1118ADCV
Appr Date 12/31/1999
Run Date 12/1/00

| | Y/E Ending 8/31/1995 | % | 1996 | % | 1997 | % | 1998 | % | 1999 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| REVENUES - NET | $ 64,141 | 100.0 | $ 46,980 | 100.0 | $ 53,313 | 100.0 | $ 40,752 | 100.0 | $ 66,520 | 100.0 |
| OPERATING INCOME (EBDIT) | $ 7,166 | 11.2 | $ (2,257) | (4.8) | $ 2,915 | 5.3 | $ (86) | (0.2) | $ 5,651 | 8.5 |
| ADJUSTMENTS TO INCOME | | | | | | | | | | |
| Legal, professional & accounting | 575 | 0.9 | 343 | 0.7 | 1,235 | 2.2 | 1,681 | 4.1 | 1,199 | 1.8 |
| Meals (50% capitalized) | 0 | - | 0 | - | 0 | - | 0 | - | 508 | 0.8 |
| Salaries, Officers | 1,394 | 2.2 | 696 | 1.5 | 704 | 1.3 | 1,104 | 2.7 | 1,194 | 1.8 |
| Traveling Expenses | 251 | 0.4 | 341 | 0.7 | 226 | 0.4 | 277 | 0.7 | 399 | 0.6 |
| TOTAL ADJUSTMENTS TO INCOME | $ 2,220 | 3.5 | $ 1,380 | 2.9 | $ 2,165 | 3.9 | $ 3,062 | 7.5 | $ 3,300 | 5.0 |
| SUBTOTAL | $ 9,386 | 14.6 | $ (877) | (1.9) | $ 5,070 | 9.3 | $ 2,976 | 7.3 | $ 8,951 | 13.5 |
| LESS REASONABLE EXPENSES | | | | | | | | | | |
| Legal, professional & accounting | 0.75% | 481 | 0.8 | 352 | 0.8 | 413 | 0.8 | 305 | 0.8 | 498 | 0.8 |
| Meals (50% capitalized) | | 0 | - | 0 | - | 0 | - | 0 | - | | |
| Salaries, Officers | 1.50% | 942 | 1.5 | 705 | 1.5 | 830 | 1.5 | 611 | 1.5 | 943 | 1.5 |
| Traveling Expenses | 0.60% | 385 | 0.6 | 282 | 0.6 | 332 | 0.6 | 244 | 0.6 | 398 | 0.6 |
| ADJUSTED PRETAX INCOME | $ 7,943 | 12.3 | $ (1,934) | (4.1) | $ 3,825 | 6.9 | $ 2,060 | 5.1 | $ 7,358 | 11.1 |
| Add Back Depreciation | 228 | 0.4 | 732 | 1.6 | 345 | 1.1 | 389 | 1.4 | 540 | 0.8 |
| ADJUSTED PRETAX CASH FLOW | $ 8,171 | 12.7 | $ (1,202) | (2.6) | $ 4,410 | 8.0 | $ 2,649 | 6.5 | $ 7,898 | 12.1 |
| Add Back Interest Expense | 917 | 1.4 | 663 | 1.4 | 390 | 0.7 | 551 | 1.4 | 842 | 1.2 |
| ADJUSTED EBDIT (1) | $ 9,088 | 14.2 | $ (539) | (1.1) | $ 4,800 | 8.7 | $ 3,200 | 7.9 | $ 8,840 | 13.3 |
| EBDIT AS % OF SALES | 14.2 | | (1.1) | | 8.7 | | 7.9 | | 13.3 | |
| Weighting | | | | | | | | | | |
| Product - 1 Column | 93 | | | | | | | | | |
| Divisor - Sum of Weights | 10 | | | | | | | | | |
| WEIGHTED AVERAGE EBDIT | 9.3 | | 14.2 | | 34.7 | | 31.4 | | 36.6 | |

EXHIBIT __6__
PAGE __127__

CONFIDENTIAL DRAFT

TABLE D-1
ADJUSTED BOOK VALUE
F/Y End December 31
(S000)

1118ABCV
05/15/00

| ABC | Book 31-Dec-99 | % | Adjustments 31-Dec-99 | % | Adjusted 31-Dec-99 | % |
|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | |
| Cash & equivalents | (79) | -0.5 | $79 | NM | $0 | 0.0 |
| Accounts Receivable-Trade | 11,154 | 65.8 | (11,154) | NM | 0 | 0.0 |
| Inventories | 5,834 | 34.4 | (5,834) | NM | 0 | 0.0 |
| Due from affiliate | (320) | | | | | |
| Prepaid Expenses & Other | 373 | 2.2 | (373) | | | |
| Implied Working Capital | - | 0.0 | 9,480 | NM | 9,480 | 30.1 |
| Total Current Assets | 16,962 | 100.0 | (S7,802) | NM | S9,480 | 30.1 |
| **Fixed Assets as Appraised** | | | | | | |
| Automotive Equipment | 0 | 0.0 | 15 | | 15 | 0.0 |
| Computer Equipment | 0 | 0.0 | 205 | | 205 | 0.7 |
| Furniture & Fixtures | 0 | 0.0 | 28 | | 28 | 0.1 |
| Leasehold Equipment | 0 | 0.0 | 31 | | 31 | 0.1 |
| Machinery & Equipment | 0 | 0.0 | 5 | | 5 | 0.0 |
| Molds & Tooling | 0 | 0.0 | 1,380 | | 1,381 | 4.4 |
| Office Equipment | 0 | 0.0 | 6 | | | |
| Net Fixed Assets | (0) | 0.0 | 0 | | 1,666 | 5.3 |
| INTANGIBLE ASSETS | - | 0.0 | $20,309 | NM | 20,309 | 64.6 |
| BUSINESS ENTERPRISE VALUE | 16,962 | 100.0 | | NM | 31,455 | 100.0 |

The right hand column represents the assets included in "Business Enterprise Value"(BEV). This represents the value of the assets required for normal business operations. To convert this number to Total Asset Value, subtract the Implied Working Capital. This will yield "Basic Business Value", or the value of the fixed, intangible and other assets only.  See Table D-2 for calculations of Adjusted Book Value.

000018

EXHIBIT ___ U

PAGE ___ 128

**TABLE D-2**
**ADJUSTED BOOK VALUE**
F/Y End December 31

| | 1118ABCV 12/31/99 |
|---|---|
| **MARKET VALUE OF BUSINESS ENTERPRISE** | |
| Less Implied Working Capital | $ 31,455 |
| | (9,480) |
| **BASIC BUSINESS VALUE**          Fixed Plus Intangibles | $ 21,975 |
| Less Fixed Assets as Appraised | (1,666) |
| **MARKET VALUE OF INTANGIBLES (GOODWILL)** | $ 20,309 |
| Add Fixed & Other Assets as Appraised (Table H) | 1,666 |
| Add Current Assets at 12/31/99 (Table A) | 16,962 |
| **ADJUSTED TOTAL ASSET VALUE** | $ 38,937 |
| Less Total Liabilities at 12/31/99 (Table A-1) | (11,995) |
| **ADJUSTED SHAREHOLDER EQUITY** | $ 26,942 |

See Table J for final conclusion.

Exhibit A
Page 6 of 15

000019

EXHIBIT ___6___
PAGE ___129___

CONFIDENTIAL DRAFT
ABC

**TABLE E**
**INCOME APPROACH**
FY Ending Sept 30
($000)

Job No. 1118ABCV
Appr Date  31-Dec-99
Run Date  12/14/04

| | 2000 | 2001 | 2002 | 2003 | 2004 | Reversion |
|---|---|---|---|---|---|---|
| FORECAST REVENUE GROWTH | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% |
| FORECAST OF REVENUE | $69,668 | $73,151 | $76,808 | $80,649 | $84,681 | |
| EBDIT as % of Revenues * | 9.3% | 9.3% | 9.3% | 9.3% | 9.3% | |
| EBDIT * | $6,464 | $6,788 | $7,127 | $7,483 | $7,858 | |
| Less Capital Equipment Reserve | (464) | (488) | (512) | (538) | (564) | |
| Less Working Capital (1) | (9,480) | (498) | (523) | (549) | (576) | |
| DISTRIBUTABLE CASH FLOW | ($3,480) | $5,803 | $6,093 | $6,397 | $6,717 | $6,885 |
| REVERSIONARY VALUE | | | | Factor (3) | 8.750 | $60,244 |
| Discount Rate (Table F) | 20.75% | 20.75% | 20.75% | 20.75% | 20.75% | 20.75% |
| Period Factor | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | 5.00 |
| Multiplier | 0.910 | 0.754 | 0.624 | 0.517 | 0.428 | 0.390 |
| NPV OF DIST. CASH FLOWS | ($3,167) | $4,373 | $3,803 | $3,307 | $2,875 | $23,468 |

| | |
|---|---|
| NPV OF DISTRIBUTABLE CASH FLOW FOR FIRST FIVE YEARS | $11,191 |
| NPV OF REVERSIONARY VALUE | 23,468 |
| | $34,659 |
| MARKET VALUE OF ENTERPRISE BY THE INCOME APPROACH          Rounded | $34,650 |

(1) Estimated percent of annual revenue growth required for working capital---> Reference - RJ          14.29%
Annual Statement Studies.

(2) Income to be capped at end of 5th year was calculated by estimating 6th year's income considering a future growth of 5%, and averaging with the 5th year. This adjusts the fifth year from mid-year to the expected end-of-year-revenues.

(3) Calculated with the following formula: Cap Rate = (1+G)/(R-G), where G = estimated future growth rate (5%)
R = wtd avg cost of capital (20.5%). (1+.05) / (.205 -.05) or 1.05/.15  =          8.750          or          11.43%

* Earnings Before Depreciation & Amortization, Interest and Taxes.  (See Table C).

000020

Exhibit A
Page 7 of 15

EXHIBIT _____ 6

PAGE _____ 130

CONFIDENTIAL DRAFT        TABLE F        Job No. 1118ABCV
CAPITAL ASSET PRICING MODEL    Appr Date   31-Dec-99
(CAPM)             Run Date   12/14/04

ABC INTERNATIONAL TRADERS, INC.
--------------------------------------------------

**KEY ASSUMPTIONS**

| | | |
|---|---|---|
| Cost of debt - pretax (1) | | 11.00% |
| Federal tax rate (2) | Pretax Basis | 0.00% |
| State tax rate | | 0.00% |
| Combined marginal tax rate | Pretax Basis | 0.00% |
| Long-term treasury bond rate | | 6.00% |
| Market average beta | * | 0.92 |
| Market average percent of equity | * | 72.00% |
| Market average percent of debt | * | 28.00% |

**WEIGHTED AVG COST OF CAPITAL**      20.72%    Rounded    20.75%
Formula: $(1-T)*(Kd)(D)+(Ke)(E)$

| | |
|---|---|
| T = Tax rate | 0.00% |
| Kd = Cost of debt | 11.00% |
| D = Proportion of debt in total capital | 28.00% |
| Ke = Cost of equity | 24.50% |
| E = Proportion of equity | 72.00% |

**COST OF EQUITY CAPITAL**      24.57%    Rounded    24.50%
Formula: $Ke = ((B*Rp)+Rs)+Rt$

| | |
|---|---|
| Rf = Rate of return on risk-free security (3) | 5.00% |
| Rp = Risk premium (Rm - Rf) | 12.10% |
| Rs = Company-specific risk premium (4) | 7.50% |
| Rt = Current return on 30 Year treasury bills | 6.00% |
| B = Industry beta (5) | 0.92 |
| Rm = Market return (6) | 17.10% |

*Ibbotson Industry Studies for SIC Code 3944, Games, Toys, and Children's Vehicles

(1) Company's estimated cost of interest-bearing debt.
(2) Valuation based upon after tax income streams.
(3) Ibbotson & Associates Report 1926-1999, "Arithmetic Mean of Annual Returns for Long-Term U.S. Treasury Bonds" (riskless).
(4) Additional risk factor to adjust for specific risks of the subject company and industry.
(5) A measure of risk (variability) of common stocks in the industry. (Ibbotson Industry Studies for SIC Code 3944, Games, Toys, and Children's Vehicles)
(6) Ibbotson & Associates Report 1926-1997, "Arithmetic Mean of Annual Returns for The Common Stock of Small Companies".

000021

Exhibit A
Page 8 of 15



EXHIBIT _____ 6

PAGE _____ 131

CONFIDENTIAL DRAFT        TABLE G                    Job No. 1118ABCV
                    EXCESS EARNINGS APPROACH .  Appr Date 31-Dec-99
                              ($000)                Run Date  14-Dec-04
ABC
EARNINGS BEFORE CAPITAL CHARGES                                    56,464

| CAPITAL CHARGES Economic Depreciation | Appraised Value | Est Life | | Return Of | |
|---|---|---|---|---|---|
| Automotive Equipment | $ 15 | 10 | Yrs | 2 | |
| Computer Equipment | 205 | 5 | Yrs | 41 | |
| Furniture & Fixtures | 28 | 15 | Yrs | 2 | |
| Leasehold Equipment | 31 | 10 | Yrs | 3 | |
| Machinery & Equipment | 5 | 10 | Yrs | 1 | |
| Molds & Tooling | 1,380 | 3 | Yrs | 460 | |
| Office Equipment | 6 | 10 | Yrs | 1 | |
| Fixed Assets at Cost | $ 1,672 | 3.6 | | $464 | $  (464) |

| Economic Return | Adjusted Book | % | Return On | |
|---|---|---|---|---|
| Working Capital | $ 9,480 | 11.0% | $ 1,043 | |
| Automotive Equipment | 15 | 15.0% | 2 | |
| Computer Equipment | 205 | 20.0% | 41 | |
| Furniture & Fixtures | 28 | 15.0% | 4 | |
| Leasehold Equipment | 31 | 20.0% | 6 | |
| Machinery & Equipment | 5 | 12.5% | 1 | |
| Molds & Tooling | 1,380 | 15.0% | 207 | |
| Office Equipment | 6 | 15.0% | 1 | |
| Adj. Tangible Net W. | $ 11,152 | | $ 1,305 | $  (1,305) |

TOTAL EXCESS EARNINGS                                              $   4,695

Excess Earnings Cap Rate                    19.5% *              $ 24,077
Add Tangible Assets                                                11,152

BUSINESS ENTERPRISE VALUE BY EXCESS EARNINGS METHOD  $ 35,228

                                            Rounded            $ 35,250

*Equity Discount Rate minus future growth rate.

000022                                              Exhibit A
                                                   Page 9 of 15

AJC INTERNATIONAL TRADERS, INC.
16739 Schoenborn Street
North Hills, CA 91343-6122

**TABLE II**
**FIXED ASSET APPRAISAL**
**PROnt DEPRECIATION SCHEDULES**

Appraisal Date 12/31/99
Original Cost $1,417
Depreciated Replacement Cost New $1,672

| Owned / Leased | Entry Item Order No. | DESCRIPTION | Qty | Valuation Date | Orig Cost* ($) | Est Term Life | Yrs In Use | Rem Econ Life | Price Trend Factor | Repl Cost New | Est'd Remng Life | Fair Market Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OWNED | 12 | TRUCK | 1 | AE | 01-Aug-93 | 35,931 | 10.0 | 10.0 | 3.6 | 1.202 | 43,215 | 36% | 15,474 |
| OWNED | 17 | COMPUTER | 1 | CE | 15-Dec-93 | 1,120 | 5.0 | 6.2 | (1.2) | 1.300 | 336 | -24% | 0 |
| OWNED | 18 | COMPUTER | 1 | CE | 15-Jul-94 | 750 | 5.0 | 5.3 | (0.3) | 1.400 | 300 | -9% | 0 |
| OWNED | 27 | COMPUTER | 1 | CE | 01-Oct-94 | 3,727 | 5.0 | 5.3 | (0.3) | 1.400 | 2,291 | -5% | 0 |
| OWNED | 59 | COMPUTER | 1 | CE | 01-Oct-94 | 1,476 | 5.0 | 5.3 | (0.3) | 1.400 | 399 | -5% | 0 |
| OWNED | 28 | COMPUTER | 1 | CE | 01-Dec-94 | 20,393 | 5.0 | 5.1 | (0.1) | 1.500 | 8,157 | -2% | 0 |
| OWNED | 29 | COMPUTER | 1 | CG | 01-Mar-95 | 22,714 | 5.0 | 4.8 | 0.2 | 1.500 | 11,357 | 3% | 367 |
| OWNED | 30 | COMPUTER | 1 | CG | 01-Mar-95 | 18,174 | 5.0 | 4.8 | 0.4 | 1.500 | 9,087 | 8% | 752 |
| OWNED | 31 | COMPUTER | 1 | CG | 15-Aug-95 | 16,48 | 5.0 | 4.4 | 0.8 | 1.500 | 5,224 | 16% | 822 |
| OWNED | 32 | COMPUTER | 1 | CG | 15-Nov-95 | 15,360 | 5.0 | 4.2 | 0.9 | 1.500 | 7,680 | 17% | 1,338 |
| OWNED | 33 | COMPUTER | 1 | CG | 15-Dec-95 | 4,923 | 5.0 | 4.0 | 1.0 | 1.500 | 2,462 | 19% | 469 |
| OWNED | 34 | COMPUTER | 1 | CG | 15-Dec-95 | 9,975 | 5.0 | 4.0 | 1.0 | 1.500 | 4,988 | 19% | 953 |
| OWNED | 60 | COMPUTER | 1 | CG | 01-Jul-96 | 8,445 | 5.0 | 3.5 | 1.5 | 1.500 | 5,063 | 29% | 1,519 |
| OWNED | 61 | COMPUTER | 1 | CG | 01-Jul-96 | 211,403 | 5.0 | 3.5 | 1.5 | 1.600 | 126,841 | 29% | 38,036 |
| OWNED | 62 | COMPUTER | 1 | CG | 01-Jan-97 | 1,309 | 5.0 | 3.0 | 2.0 | 1.600 | 785 | 39% | 305 |
| OWNED | 63 | COMPUTER | 1 | CE | 01-Jul-97 | 2,762 | 5.0 | 2.5 | 2.5 | 1.700 | 1,933 | 50% | 966 |
| OWNED | 64 | COMPUTER | 1 | CE | 01-Jul-97 | 27,935 | 5.0 | 2.5 | 2.5 | 1.700 | 19,254 | 50% | 9,421 |
| OWNED | 45 | COMPUTER | 1 | CE | 01-Jan-99 | 39,397 | 5.0 | 1.0 | 3.4 | 0.800 | 31,678 | 68% | 21,445 |
| OWNED | 46 | COMPUTER | 1 | CE | 01-Jul-08 | 36,468 | 5.0 | 1.0 | 4.0 | 0.800 | 29,334 | 70% | 20,536 |
| OWNED | 47 | COMPUTER | 1 | CE | 01-Jan-99 | 91,565 | 5.0 | 0.9 | 4.2 | 0.900 | 82,467 | 83% | 68,972 |
| OWNED | 48 | COMPUTER | 1 | CE | 01-Mar-99 | 11,243 | 5.0 | 0.8 | 4.2 | 0.900 | 10,119 | 83% | 8,472 |
| OWNED | 49 | COMPUTER | 1 | CE | 01-Mar-99 | 4,000 | 5.0 | 0.8 | 4.2 | 0.900 | 3,600 | 83% | 3,092 |
| OWNED | 50 | COMPUTER | 1 | CE | 01-Mar-99 | 4,125 | 5.0 | 0.8 | 4.2 | 0.900 | 3,713 | 83% | 3,098 |
| OWNED | 51 | COMPUTER | 1 | CE | 01-Apr-99 | 3,005 | 5.0 | 0.7 | 4.3 | 0.900 | 2,705 | 83% | 2,702 |
| OWNED | 52 | COMPUTER | 1 | CE | 01-Apr-99 | 2,733 | 5.0 | 0.7 | 4.4 | 0.900 | 2,460 | 83% | 2,049 |
| OWNED | 53 | COMPUTER | 1 | CE | 01-Aug-99 | 20,684 | 5.0 | 0.4 | 4.6 | 0.900 | 18,616 | 85% | 16,443 |
| OWNED | 54 | COMPUTER | 1 | CE | 01-Nov-99 | 1,557 | 5.0 | 0.2 | 4.7 | 0.900 | 1,401 | 92% | 1,285 |
| OWNED | 55 | COMPUTER | 1 | CE | 01-Nov-99 | 1,683 | 5.0 | 0.3 | 5.2 | 0.900 | 9,251 | 92% | 1,418 |
| OWNED | 4 | FURNITURE & FIXTURES | 1 | FF | 01-Sep-89 | 6,957 | 15.0 | 10.2 | 5.7 | 1.330 | 19,734 | 38% | 6,372 |
| OWNED | 5 | FURNITURE & FIXTURES | 1 | FF | 01-Jan-01 | 13,000 | 15.0 | 5.0 | 5.3 | 1.330 | 9,051 | 37% | 3,417 |
| OWNED | 6 | FURNITURE & FIXTURES | 1 | FF | 15-Apr-94 | 1,474 | 15.0 | 5.7 | 9.3 | 1.172 | 1,643 | 62% | 1,019 |
| OWNED | 16 | EXHIBIT BOOTH, FURN & FIX | 1 | FF | 15-Dec-94 | 226 | 15.0 | 5.0 | 10.0 | 1.146 | 475 | 71% | 392 |
| OWNED | 24 | FURNITURE & FIXTURES | 1 | FF | 01-Aug-93 | | 15.0 | | | | | | |

EXHIBIT U

PAGE 133

ABC INTERNATIONAL TRADERS, INC.
15720 Schoenborn Street
North Hills, CA 91343-6112

**TABLE II**
**FIXED ASSET APPRAISAL**
**FROM DEPRECIATION SCHEDULES**

Appraisal Date 12/31/99
Original Cost $2,417
$1,673

| Owned /Leased | Entry Order No. | DESCRIPTION | Qty | Valuation Date | Orig Cost ($) | Est Econ Life | Yrs In Use | Item Rem Life | Price Trend Factor | Repl Cost New | Est'd Rem Rating Life | Fair Market Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OWNED | 25 | FURNITURE & FIXTURES | FF | 01-Aug-95 | 299 | 15.0 | 4.6 | 10.6 | 1.146 | 343 | 71% | 242 |
| OWNED | 26 | FURNITURE & FIXTURES | FF | 01-Aug-95 | 1,069 | 15.0 | 4.4 | 10.6 | 1.146 | 1,225 | 71% | 864 |
| OWNED | 34 | FURNITURE & FIXTURES | FF | 15-Sep-95 | 1,235 | 15.0 | 4.3 | 10.7 | 1.146 | 1,444 | 72% | 1,050 |
| OWNED | 35 | FURNITURE & FIXTURES | FF | 12-Nov-95 | 1,200 | 15.0 | 4.1 | 10.9 | 1.146 | 1,146 | 72% | 831 |
| OWNED | 43 | FURNITURE & FIXTURES | FF | 01-Mar-98 | 1,659 | 15.0 | 1.8 | 13.2 | 1.065 | 465 | 91% | 631 |
| OWNED | 44 | FURNITURE & FIXTURES | FF | 01-Aug-98 | 643 | 15.0 | 1.6 | 13.6 | 1.065 | 685 | 91% | 620 |
| OWNED | 57 | FURNITURE & FIXTURES | FF | 01-May-99 | 2,660 | 15.0 | 0.7 | 14.3 | 1.045 | 3,736 | 96% | 3,588 |
| OWNED | 57 | FURNITURE & FIXTURES | FF | 01-Dec-99 | 1,115 | 15.0 | 0.1 | 14.9 | 1.045 | 1,164 | 99% | 1,157 |
| OWNED | 6 | LEASEHOLD IMPROVEMENTS | LI | 01-Dec-90 | 2,789 | 15.0 | 9.3 | 0.7 | 1.320 | 3,681 | 7% | 274 |
| OWNED | 7 | LEASEHOLD IMPROVEMENTS | LI | 01-Feb-91 | 2,303 | 15.0 | 8.9 | 1.1 | 1.274 | 2,921 | 11% | 315 |
| OWNED | 21 | LEASEHOLD IMPROVEMENTS | LI | 15-Jan-94 | 17,200 | 15.0 | 5.9 | 3.7 | 1.202 | 20,795 | 37% | 7,523 |
| OWNED | 19 | LEASEHOLD IMPROVEMENTS | LI | 01-Nov-94 | 8,453 | 15.0 | 5.2 | 4.0 | 1.172 | 10,111 | 40% | 4,086 |
| OWNED | 20 | LEASEHOLD IMPROVEMENTS | LI | 01-Nov-94 | 28,062 | 15.0 | 5.2 | 4.8 | 1.172 | 33,848 | 48% | 16,248 |
| OWNED | 36 | LEASEHOLD IMPROVEMENTS | LI | 15-Oct-95 | 2,814 | 15.0 | 4.2 | 5.8 | 1.146 | 3,225 | 51% | 1,646 |
| OWNED | 13 | MACHINERY & EQUIPMENT | ME | 15-Mar-94 | 1,000 | 10.0 | 6.0 | 4.0 | 1.172 | 1,177 | 40% | 475 |
| OWNED | 12 | MACHINERY & EQUIPMENT | ME | 15-Apr-94 | 1,111 | 10.0 | 5.7 | 4.3 | 1.172 | 1,302 | 43% | 558 |
| OWNED | 22 | MACHINERY & EQUIPMENT | ME | 01-Dec-94 | 2,444 | 10.0 | 5.1 | 4.9 | 1.172 | 2,864 | 49% | 1,408 |
| OWNED | 39 | MACHINERY & EQUIPMENT | ME | 01-Jul-97 | 628 | 10.0 | 7.5 | 2.5 | 1.088 | 683 | 75% | 512 |
| OWNED | 40 | MACHINERY & EQUIPMENT | ME | 01-Jul-97 | 2,936 | 10.0 | 2.5 | 7.5 | 1.088 | 3,194 | 75% | 2,395 |
| OWNED | 3 | MOLDS & TOOLING | MT | 01-Sep-80 | 3,229 | 3.0 | (4.3) | 1.320 | 4,263 | -47% | 0 | |
| OWNED | 42 | MOLDS & TOOLING | MT | 01-Jul-98 | 877,864 | 3.0 | 0.5 | 1.065 | 935,035 | 79% | 664,191 | |
| OWNED | 56 | MOLDS & TOOLING | MT | 01-Jul-99 | 733,751 | 3.0 | 0.5 | 2.5 | 1.045 | 767,022 | 90% | 724,009 |
| OWNED | 5 | EQUIPMENT | OE | 01-Sep-91 | 1,100 | 10.0 | 8.2 | 1.8 | 1.274 | 1,452 | 18% | 96 |
| OWNED | 9 | TELEPHONE SYSTEM | OE | 01-Sep-91 | 15,087 | 10.0 | 8.2 | 1.8 | 1.274 | 19,221 | 18% | 3,518 |
| OWNED | 8 | MAIL MACHINE | OE | 01-Dec-91 | 1,997 | 10.0 | 8.1 | 1.9 | 1.274 | 2,544 | 19% | 487 |
| OWNED | 10 | WATER PURIFIER | OE | 01-Jun-91 | 147 | 10.0 | 7.6 | 2.4 | 1.232 | 181 | 24% | 44 |
| OWNED | 18 | WATER PUMP | OE | 01-Feb-93 | 1,748 | 10.0 | 7.1 | 2.9 | 1.146 | 2,003 | 29% | 1,019 |
| OWNED | 23 | CELLULAR PHONE | OE | 01-Aug-92 | 781 | 5.0 | 7.4 | (2.4) | 1.320 | 392 | -48% | 0 |
| OWNED | 15 | TELECOM EQUIPMENT | OE | 15-Jul-94 | 2,426 | 5.0 | 5.5 | 4.5 | 1.172 | 2,843 | 45% | 1,287 |

($000) $2,417    PMV $1,673

Exhibit A
Page 11 of 15

EXHIBIT 6
PAGE 134

TABLE H-1

FIXED ASSET APPRAISAL

From Depreciation Schedules

($000)

| SUMMARY BY ASSET CATEGORY | | Original Cost | Estimated Econ. Life | FMV |
|---|---|---|---|---|
| Automotive Equipment | AE | $    36 | 10.0 | $    15 |
| Computer Equipment | CE | 585 | 5.0 | 205 |
| Furniture & Fixtures | FF | 47 | 15.0 | 28 |
| Leasehold Equipment | LE | 63 | 10.0 | 31 |
| Machinery & Equipment | ME | 8 | 10.0 | 5 |
| Molds & Tooling | MT | 1,655 | 5.0 | 1,380 |
| Office Equipment | OE | 23 | 10.0 | 6 |
| TOTALS | | $ 2,417 | | $ 1,672 |

Extracted from the detailed appraisal in Table H.

Exhibit A
Page 12 of 15

EXHIBIT _____ 6

PAGE _____ 135

**TABLE I**
**MARKET INFORMATION**
**23-Oct-00**

| COMPANY | Symbol | Shares Out (000) | Market Cap* ($000) | Annual Sales ($000) | Mkt Cap/ Sales (0) | Beta (0) |
|---|---|---|---|---|---|---|
| JAKKS PACIFIC | JAKK | 19,441 | 162,818 | 183,685 | 0.886 | 1.00 |
| HASBRO,INC | HAS | 172,309 | 1,744,629 | 4,232,263 | 0.412 | 1.00 |
| MATTEL | MAT | 426,371 | 5,036,507 | 5,514,950 | 0.913 | 0.38 |
| RADICA GAMES | RADA | 17,640 | 39,690 | 118,733 | 0.334 | 1.28 |
| TOYMAX INTERNATIONAL | TMAX | 10,598 | 22,521 | 138,985 | 0.162 | NA |
| AVERAGES | | 129,272 | 1,401,233 | 2,037,723 | 0.412 | 0.92 |

*Minority value. Should be converted to control value to use for valuation under the market approach.

000026

EXHIBIT ____ 6 ____

PAGE ____ 136 ____

| CONFIDENTIAL DRAFT | TABLE I-1 MARKET APPROACH ($000) | | Job No. 1118ABCV Appr Date 31-Dec-99 Run Date 14-Dec-04 |
|---|---|---|---|
| GROSS REVENUES | | | $ 66,350 |
| AVERAGE REVENUE/MARKET CAPITALIZATION RATIO | | | 0.412 |
| MARKET VALUE OF EQUITY ON A MINORITY BASIS | | | $ 27,351 |
| Less Public/Private discount for relative size | | 23.1% | (6,312) |
| MINORITY VALUE OF EQUITY - SMALL, PRIVATE COMPANY | | | $ 21,039 |
| Add Control Premium | | 35% | 7,364 |
| MARKET VALUE OF EQUITY ON A CONTROL BASIS | | Rounded | $ 28,400 |
| Add Imputed Working Capital | | | 9,480 |
| MARKET VALUE OF BUSINESS ENTERPRISE ON A CONTROL BASIS | | | $ 37,880 |

000027

Exhibit A
Page 14 of 15

EXHIBIT ___ 6
PAGE ___ 137

**CONFIDENTIAL DRAFT**

**TABLE J**
**CONCLUSION OF MARKET VALUE**
**($000)**

Job No. 1118ADCV
Appr Date 31-Dec-99
Run Date 14-Dec-04

**ABC INTERNATIONAL TRADERS, INC.**

| | Conclusion | Weight | Product |
|---|---|---|---|
| INCOME APPROACH (Table E) | $ 34,650 | 0.50 | $ 17,325 |
| MARKET APPROACH (Table I-1) | $ 37,880 | 0.00 | - |
| EXCESS EARNINGS APPROACH (Table G) | $ 35,250 | 0.50 | 17,625 |
| FMV OF BUSINESS ENTERPRISE (includes working capital) | | | $ 34,950 |
| Less Discount for Lack of Liquidity | | 10% | $ (3,495) |
| MARKET VALUE OF BUSINESS ENTERPRISE | | | $ 31,455 |
| Less Implied Working Capital | | | $ (9,480) |
| BASIC BUSINESS VALUE | | | $ 21,975 |
| Add Current Assets (Table A) | | | 16,962 |
| FMV OF TOTAL ASSETS | | | $ 38,937 |
| Less Total Liabilities (Table A-1) | | | $ (11,995) |
| FMV OF SHAREHOLDERS EQUITY ON A CONTROL BASIS | | | $ 26,942 |
| FMV OF SHAREHOLDER INTEREST | | 45% | $ 12,123.90 |
| (Dollars) | | | or $12,123,900 |

Exhibit A
Page 15 of 15

EXHIBIT ___6___

PAGE ___138___

NATIONAL BUSINESS APPRAISERS, LLC
8383 Wilshire Boulevard, Suite 1060
Beverly Hills, California 90211,
Phone (323) 655-5623      Fax (323) 658-7096
Email DUTCH7898@AOL.COM      www.bizappraisers.com

November 7, 2000

Mr. Morad Zarabi, Arbitrator
**ABC INTERNATIONAL TRADERS, INC.**
20120 Plummer St.
Chatsworth, CA  91211-5448

Dear Mr. Zarabi:

At your request, we are appraising the shareholders equity of ABC International Traders, Inc (ABC).  We were asked to express our opinion of the market value, on a control basis, of a 45 percent interest in the shareholders equity.

It is our understanding that this opinion will be used for establishing a value for a buy-out of the Subject interest, and may be invalid if used for any other purpose.

ABC develops, produces and markets toys and related products. The company's products are action figures and accessories featuring licensed characters, and mini dolls. Purchasers of the company's products include discount retail chain stores, department stores, toy specialty stores and wholesalers. The company licenses numerous trademarks, corporate, trade and brand names and logos from third parties.

This report covers only Phase I of a full narrative report, therefore we issue only a brief letter report.  All of the financial tables that are normally included in a full-narrative report are presented in the Addenda.

Based upon the information and analyses presented in the Addenda, it is our opinion that as of date of value of December 31, 1999, the market value of the shareholder's equity of ABC International Traders, Inc, on a control basis, as summarized in Table J, of Addenda, was:

<u>$21,600,000</u>

000029

Exhibit B
Page 1 of 28

EXHIBIT ____ 6

PAGE ____ 139

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

November 7, 2000
Page 2

It is also our opinion that as of December 31, 1999, the market value of a 45 percent interest in the shareholder's equity of ABC International Traders, Inc., on a control basis, as summarized in Table J, of the Addenda, was:

**$9,720,000**

It is our opinion that a minority discount does not apply to the 45% interest as the other major shareholder holds an equal 45% interest.

Table J, in the Addenda presents our conclusions of market value under the income, market and excess earnings approach, and sets forth the calculations of the various appraised interests as of December 31, 1999.

In conjunction with our work, ABC provided us with audited and unaudited financial information and prospective financial and operational data. We accepted the historical data as fairly reflecting its operations, trends and financial position. We have not independently investigated the accuracy or completeness of the historical data provided to us and we express no opinion or other form of assurance regarding the accuracy or completeness of the data. The conclusions of value presented herein are based on numerous assumptions pertaining to prospective economic and operating conditions. Unanticipated events and circumstances may occur and actual results achieved during the period covered by our prospective financial analysis will vary from our estimates. The variations may be material. In accordance with ethical principles of the Institute of Business Appraisers, neither National Business Appraisers, LLC, nor any of its employees or subcontractors has any present or contemplated future interest in the business interests or assets herein appraised. Neither our employment nor our compensation is in any way contingent upon the values presented in this report. A copy of this report and the working papers from which it was prepared will be kept in our files for eight years.

Respectfully submitted,

NATIONAL BUSINESS APPRAISERS, LLC

By:_____
Ernest E. Dutcher, MCBA
Managing Member
Senior Valuation Counselor

Attachments: Professional Qualifications; Statement of Facts and Limiting Conditions; Addenda

1087ABCV

2-

NATIONAL BUSINESS APPRAISERS, LLC

000030

Exhibit B
Page 2 of 28

EXHIBIT _____ U
PAGE _____ 140

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

November 7, 2000
Page 3

## CERTIFICATION

We certify that, to the best of our knowledge and belief:

* The statements of fact contained in this report are true and correct.

* The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and is our personal, unbiased professional analyses, opinions, and conclusions.

* We have no present or prospective interest in the property that is the subject of this report, and we have no personal interest or bias with respect to the parties involved.

* Our compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in, or the use of, this report.

* Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

* No significant professional assistance was provided to the undersigned in connection with this assignment.

Appraiser_____
           Ernest E. Dutcher, MCBA

3-ED

NATIONAL BUSINESS APPRAISERS, LLC
000031

Exhibit B
Page 3 of 28

EXHIBIT _____ 6

PAGE _____ 141

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

November 7, 2000
Page 4

## PROFESSIONAL QUALIFICATIONS

For

### ERNEST E. DUTCHER, MCBA

Designations

of

Certified Business Appraiser
Master Certified Business Appraiser

Awarded by

THE INSTITUTE OF BUSINESS APPRAISERS

http://www.instbusapp.org

*The oldest business appraisal society in the nation.*

NATIONAL BUSINESS APPRAISERS, LLC
8383 Wilshire Blvd., Suite 1060
Beverly Hills, CA 90211

Phone (323) 655-5623     E-mail: dutch7895@aol.com     Fax (323) 658-7096

NATIONAL BUSINESS APPRAISERS, LLC
000032

Exhibit B
Page 4 of 28

EXHIBIT _____ 6

PAGE _____ 142

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

November 7, 2000
Page 5

ERNEST E. DUTCHER, MCBA

Professional Qualifications

Experience: Mr. Dutcher's full time appraisal experience began in 1975. He has been involved in the analysis and valuation of a broad variety of business enterprises in many industries, including electric power generation, healthcare, equipment leasing & rental, distribution, transportation, manufacturers in the communications, computer, electronics, rubber & chemical industries, shipping, engineering, oil & gas, and many others. He has consulted in marketing, manufacturing and management. He was CEO of an electronic equipment manufacturing company and has held executive positions in other manufacturing, distribution and sales companies.

Employment: Managing Member and Senior Valuation Counselor for National Business Appraisers, LLC. Was Senior Valuation Counselor for Valuation Counselors Group, Inc. for four years, following five years with Marshall and Stevens Incorporated. Previously, he was SW. Manager of Acquisitions for a public company; Business Opportunities Sales for Coldwell Banker; President and General Manager of an elevated work platform manufacturer; Vice President and Controller for an equipment sales and rental company; Vice President of Manufacturing and Division Manager of companies producing specialized heating devices and electronic heat controllers; President and CEO of a high technology public company in the electronics industry; and President and sole stockholder of an exclusive area distributor of Magnavox consumer electronics components and accessories.

Education: Mr. Dutcher attended Yale University, majoring in Communications; USAF Military Schools, attaining the rank of Captain, Radar and Communications. He also attended RCA Institute, UCLA Extension Division and Santa Monica City College in public relations, plus many seminars and home study courses in finance, taxation, computer courses in business related software etc. He has held California real estate and insurance licenses and is a licensed pilot.

Professional Societies: Mr. Dutcher is a senior member in the Institute of Business Appraisers (IBA), the premier professional society of business appraisers, with over 3,400 members. He has also served on the select Qualifications Review Committee. As of March 31, 1999, only about 250 IBA members were designated as Certified Business Appraisers (CBAs). *As of that date, Mr. Dutcher was one of only 15 Master Certified Business Appraisers (MCBAs), a designation requiring over 10 years of providing business appraisals on a full time basis as a CBA.*

Court Testimony: Mr. Dutcher has qualified and testified as an expert witness before Federal Tax Courts in Los Angeles and San Francisco California, and California Superior Courts of Los Angeles, Orange, and San Diego Counties. He has served as a consultant in valuation matters to numerous attorneys during the litigation process.

NATIONAL BUSINESS APPRAISERS, LLC
000033

Exhibit B
Page 5 of 28

EXHIBIT _____ (0

PAGE _____ 143

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

November 7, 2000
Page 6

## STATEMENT OF FACTS AND LIMITING CONDITIONS

National Business Appraisers, LLC (NBA), strives to clearly and accurately disclose the assumptions and limiting conditions that directly affect a valuation analysis, opinion or conclusion. In order to assist the reader in interpreting this report, such assumptions are set forth as follows:

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of the original assignment. If the need for subsequent services related to a valuation assignment (e.g., testimony, updates, conferences, reprint, or copy services) is contemplated, special arrangements acceptable to NBA must be made in advance. NBA, reserves the right to make adjustments to the analysis, opinion and conclusion set forth in the report as we deem necessary if the facts presented by ABC prove to be inaccurate or have been misinterpreted.

It is assumed that: no opinion is intended in matters that require legal, engineering or other professional advice which has been or will be obtained from professional sources; the valuation report will not be used for guidance in professional matters exclusive of the appraisal and valuation discipline; there are no regulations of any government entity to control or restrict the use of the property unless specifically referred to in the report; and the property will not operate in violation of any applicable government regulations, codes, ordinances or statutes.

Information furnished by others is presumed to be reliable, and where so specified in the report, has been verified; however, no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain. All facts and data set forth in the report are true and accurate to the best of NBA's knowledge and belief. No single item of information was completely relied upon to the exclusion of other information.

Financial data, operating histories and other data relating to income and expenses attributed to the business have been provided by management or it's representatives have been accepted without further verification except as specifically stated in the report.

Valuation reports may contain prospective financial information, estimates or opinions that represent the appraiser's view of reasonable expectations at a particular point in time, but such information, estimates or opinions are not offered as predictions or as assurances that a particular level of income or profit will be achieved, that events will occur or that a particular price will be offered or accepted. All opinions as to value are presented as NBA's considered opinion based on the facts and data obtained during the investigation and set forth in the report. Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material. It should be specifically noted that the valuation assumes the

NATIONAL BUSINESS APPRAISERS, LLC

000034

Exhibit B
Page 6 of 28

EXHIBIT _____ 6

PAGE _____ 144

**ABC INTERNATIONAL TRADERS, INC.**
North Hills, California

November 7, 2000
Page 7

property will be competently managed and maintained by financially sound owners over the expected period of ownership. This appraisal engagement does not entail an evaluation of man-agement's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

No effort has been made to determine the impact of possible energy shortages or the effect on this project of future federal, state or local legislation, including any environmental or ecological matters or interpretations thereof.

Neither the report nor any portions thereof, especially any conclusions as to value, the identity of the appraiser(s) or NBA, shall be disseminated to the public through public relations media, news media, sales media or any other public means of communications without the prior written consent and approval of NBA. The date(s) of the valuation to which the value estimate conclusions apply is set forth in the letter of transmittal and within the body of the report. The value is based on the purchasing power of the United States dollar as of that date. Unless otherwise noted, NBA assumes that there will be no changes in tax regulations.

No significant change is assumed in the supply and demand patterns indicated in the report. The valuation assumes market conditions observed as of the current date of our market research stated in the letter of transmittal. These market conditions are be-lieved to be correct; however, the appraisers assume no liability should market conditions materially change because of unusual or unforeseen circumstances.

The report and the final estimate of value and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed, solely for the purposes stated, and should not be relied upon for any other purpose. Any allocation of total price between tangible assets and various classes of intangible assets, if shown, is invalidated if used separately or in conjunction with any other report. Neither the appraisal report nor its contents nor any reference to the appraiser(s) or NBA, may be referred to or quoted in any registration statement, prospectus, offering memorandum, sales brochure, other appraisal, loan or other agreement or document given to third parties excepting governmental agencies or the extent required by law without our prior written consent. Permission will be granted only upon meeting certain conditions.

A copy of this report and the working papers from which it was prepared will be kept in our files for eight years.

NATIONAL BUSINESS APPRAISERS, LLC

000035

Exhibit B
Page 7 of 28

EXHIBIT 6

PAGE 145

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

November 7, 2000
Page 8

---

**ADDENDA**

NATIONAL BUSINESS APPRAISERS, LLC

000036

Exhibit B
Page 8 of 28

EXHIBIT _____ U

PAGE _____ 146

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

November 7, 2000
Page 9

## INDEX OF FINANCIAL TABLES

TABLE A       FIVE YEAR COMPARATIVE BALANCE SHEET – ASSETS

TABLE A-1   FIVE YEAR COMPARATIVE BALANCE SHEET – LIABILITIES

TABLE B       COMPARATIVE INCOME STATEMENT - 5 YEARS

TABLE C       INCOME STATEMENT ADJUSTMENTS

TABLE D-1   ADUSTED BOOK VALUE – PAGE 1

TABLE D-2   ADUSTED BOOK VALUE – PAGE 2

TABLE E       INCOME APPROACH METHOD OF VALUATION

TABLE F       CAPITAL ASSET PRICING MODEL

TABLE H       FIXED ASSET APPRAISAL -- DETAIL

TABLE H-1   FIXED ASSET APPRAISAL - SUMMARY

TABLE I         MARKET COMPARABLES - PUBLIC COMPANIES

TABLE I-1    MARKET APPROACH

TABLE J       CONCLUSIONS OF MARKET VALUE

NATIONAL BUSINESS APPRAISERS, LLC
000037

Exhibit B
Page 9 of 28

EXHIBIT ___6___

PAGE ___147___

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

November 7, 2000
Page 10

## DESCRIPTION OF FINANCIAL SCHEDULES USED IN VALUATION

### TABLE A: Comparative Balance Sheet - Assets

This historical comparative balance sheet presents the changes in the asset items over the 5-year period. The dominant change is in inventories that dropped by $8.7 million over the period.

### TABLE A-1: Comparative Balance Sheet - Liabilities

This historical comparative balance sheet presents the changes in the liability items over the 5-year period. The dominant change is in current liabilities that dropped by $8.46 million. This table also reflects the calculations of "Implied Working Capital", calculated as a percentage of revenues, which was substituted to minimize the dynamic nature of current assets and current liabilities that typically change on a daily basis. This allows the conclusions of value to remain valid over a longer period of time without material changes in value.

### TABLE B: Comparative Income Statement

This historical comparative income statement presents the book figures over the 5-year period. The information contained in this table provides the foundation, after the adjustments described in Table C, for the valuation approaches used in this appraisal. The most recent year's performance as presented in Column 5, represents the year-end book figures. To the concluded Pretax Income, we have added back depreciation and amortization to obtain "Pretax Cash Flow". Interest expense is added back to Cash Flow as this appraisal assumes a debt-free basis to yield "Operating Margin, or "Earnings Before Depreciation Interest, Taxes and Amortization" (EBDITA).

A study of this table indicated that ABC follows the somewhat erratic performance of the industry.

### TABLE C: Adjustments to Comparative Income Statement

This statement reflects certain essential income statement items extracted from **Table B** that is subject to adjustments to remove extraordinary income or expense items that would not be necessary for normal business operations. Following the Adjusted Net Income, Cash Flow and Operating Margin, we calculate the weighted average net income utilizing the 1997, 1998, and 1999 EBDITA as a percentage of sales. This results in

NATIONAL BUSINESS APPRAISERS, LLC
000038

*10-90*

Exhibit B
Page 10 of 28

EXHIBIT _____ *C*

PAGE _____ *148*

ABC INTERNATIONAL TRADERS, INC.                         November 7, 2000
North Hills, California                                         Page 11

adjusted Pretax Income, Net Income, Cash Flow and Operating Margin (EBDITA) expenses. The resulting "Adjusted Operating Margin (EBDITA)" is the key income stream upon which the "Income Approach" (Table E) and the "Excess Earnings Approach" (Table G) is based.

The result is used in Table E to calculate the EBDITA for each year of the forecast 5-year period. The most recent year (1999) was weighted only minimally as the EBDITA appears unreasonably high based upon the prior two years

### TABLE D-1: Adjusted Book Value

In this table, all current asset items are reversed out in the second column. We have substituted "Implied Working Capital" as explained in the description of Table A-1. The calculations of market value for the fixed assets (Table H-1) appear in the right hand column. The conclusion of market value for the intangible assets, as calculated in Table D-2, is also added to yield "Business Enterprise Value".

### TABLE D-1: Adjusted Book Value

This table presents the calculations of Total Asset Value and Adjusted Shareholder Equity based upon the Business Enterprise Value shown in Table J.

### TABLE E: Income Approach

Based upon historical growth rates and estimates of future performance a five-year forecast is made for net revenues. The value of the reversionary period following the 5-year forecast period would be a capitalization of the average of the fifth and sixth year, discounted to present value. The After Tax Earnings as Percent of Revenues was calculated in Table C, and is used to estimate the operating profit for each forecast year in Table E. Adding back the Depreciation yields the After Tax Cash Flow. Capital expenditures and changes in working capital are subtracted from this figure to produce the "Distributable Cash Flow". Applying the appropriate discount rate (calculated in Table F) returns these cash flow streams to present value. The total of the five discounted cash flows plus the discounted reversionary value represents the Business Enterprise Value under the Income Approach. The capitalization rate for the reversionary period is calculated using the formula shown in the notes following the schedule.

### TABLE F: Capital Asset Pricing Model

NATIONAL BUSINESS APPRAISERS, LLC

000039

Exhibit B
Page 11 of 28

EXHIBIT ___ U

PAGE ___ 149

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

November 7, 2000
Page 12

Widely used method of determining the discount rates that are used in **Table E**. The "Weighted Average Cost of Capital" represents the blending of the Company's estimated cost of borrowing (the lowest rate) and the "cost of equity capital". The blending is based upon the market average percent of equity and of debt as taken from the public market as shown in Table G-1 under the assumption that the selected public companies could be buyers for the Subject company, which would then reflect the capital structure of the buyer. Borrowed capital is generally the lowest risk due to the security normally provided to the lender. Equity capital, on the other hand, carries the greatest risk, as it does not share the security available to lenders. The blending of these two rates yields the weighted average cost of capital, or discount rate. The notes following **Table F** adds further insight.

TABLE G: Capitalization of Excess Earnings

This represents one of three significant valuation approaches for small privately held companies. The original simplified "formula method" had the disadvantage of ignoring the value of the individual asset categories with differing economic lives. In **Table G**, the "Earnings Before Capital Charges" is the estimated EBDITA for the year 2000, as calculated in Table E. From these earnings, we subtract the return of the capital investment represented by the "Economic Depreciation", and the return on the assets in use as listed under the heading "Economic Return on Capital", yielding the "Total Excess Earnings" of ABC. The "Net Excess Earnings", is then capitalized using the equity multiple as developed in Table F. The value of the capitalized excess earnings is then added to the "Total Assets in Use" to reflect the market value under the Excess Earnings Approach on a control basis.

TABLE H

The method for appraising fixed assets as herein described is known as the "Depreciated Replacement Cost New Approach" (DRCN). This presents the appraised value of each of the items of fixed assets, based upon the depreciation schedule of the income tax return for 1999. As noted, each item is listed as to description, date of purchase, original cost, estimated economic life, years in use, remaining economic life, price trend factor based upon the consumer price index, replacement cost new, estimated remaining economic life and fair market value. Items beyond their estimated economic life are valued at zero.

TABLE H-1

This table summarizes the market value of each group of assets, and is used in Table D and Table G.

NATIONAL BUSINESS APPRAISERS, LLC

000040

*IL-ED*

Exhibit B
Page 12 of 28

EXHIBIT     6

PAGE     190

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

November 7, 2000
Page 13

TABLE I:  Market Comparable Companies from public marketplace.

The operating results of the listed public companies present various indicators that are useful in determining the market value of ABC.  Listed are the Company's shares outstanding, market capitalization, annual sales, market capitalization/sales ratio, and Beta.  We use the median of the market-cap/sales ratios of the Public companies in our Market Approach that follows in Table I-1.  We use the average of the Betas and the capital structures of the public companies for our calculations of the discount rates in Table F.  These comparables are all involved in the same industry as ABC.

TABLE I-1:  Market Approach Valuation

Gross revenues in 1999 for ABC is multiplied by the median revenue/market cap ratio to obtain the indicated market value on a minority basis.  A discount[1] that is the reciprocal of the public premium for relative size of the public vs. private companies is applied to adjust for the differences in size of the public companies as compared with ABC.  This yields the market value of the equity on a minority basis.  To adjust the minority value to a control value we add the premium for control for comparison with the other approaches, which yields the market value of the equity on a control basis.  To convert this value to the business enterprise value, we must add back the implied working capital to yield Business enterprise value on a control basis.  This value is now comparable to the results of the other two approaches as reflected in Table J.

TABLE I: Final Correlation

Each of the individual market values developed in the various approaches are listed, and weighted. The income approach is generally granted the greatest weight, as the driving force for the average investor is the anticipation of future benefits, however in this report we believe it appropriate to grant equal weight to the excess earnings approach as it too is a very valid approach for use with small business valuations. The market approach is granted no weight in the report due to the volatile nature of the industry and the stock market in general.

---

[1] Mergerstat Review 1999

NATIONAL BUSINESS APPRAISERS, LLC

000041

13 - 80

Exhibit B
Page 13 of 28

EXHIBIT _____ 6

PAGE _____ 181

CONFIDENTIAL
ABC

TABLE A
FIVE YEAR COMPARATIVE BALANCE SHEET
F/Y End December 31
($000)

Job No. 1087ABCV
Appr Date 31-Dec-99
Run Date 10/19/04

| ASSETS | FYE 8/31 1995* | % | 1996 | % | 1997 | % | 1998 | % | 1999 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| Current assets | | | | | | | | | | |
| Cash & equivalents | $16 | 0.1 | $438 | 2.5 | $797 | 3.8 | $860 | 5.1 | ($379) | -0.4 |
| Accounts Receivable-Trade | 11,729 | 40.9 | 3,760 | 21.8 | 10,067 | 47.7 | 7,614 | 44.8 | 11,154 | 63.5 |
| Inventories | 14,534 | 50.7 | 11,677 | 67.7 | 8,663 | 41.0 | 7,400 | 43.6 | 5,834 | 33.2 |
| Due from affiliate | 417 | 1.5 | 143 | 0.8 | 171 | 0.8 | - | 0.0 | (320) | -1.8 |
| Prepaid Expenses & Other | 1,112 | 3.9 | 786 | 4.6 | 768 | 3.6 | 379 | 2.2 | 373 | 2.1 |
| Total Current | $27,808 | 97.0 | $16,804 | 97.4 | $20,466 | 96.9 | $16,253 | 95.7 | $16,962 | 96.6 |
| Property & Equipment | | | | | | | | | | |
| Machinery & Equipment | 1,687 | 5.9 | 1,759 | 10.2 | 2,369 | 11.2 | 3,621 | 21.3 | 1,409 | 8.0 |
| Leasehold Improvements | 86 | | 86 | | 86 | | 86 | | 86 | |
| Less Accum. Depr. | (899) | -3.1 | (1,399) | -8.1 | (1,800) | -8.5 | (2,977) | -17.5 | (900) | -5.1 |
| Net Fixed Assets | $874 | 3.0 | $446 | 2.6 | $655 | 3.1 | $730 | 4.3 | $595 | 3.4 |
| Deposits & other | | 0.0 | | 0.0 | | 0.0 | | 0.0 | | 0.0 |
| TOTAL ASSETS | $28,682 | 100.0 | $17,250 | 100.0 | $21,121 | 100.0 | $16,983 | 100.0 | $17,557 | 100.0 |

* Changed from a fiscal year ending of 8/31 to calendar year ending of 12/31. This information is from the fiscal year of 9/1/94 to 8/31/95.

Exhibit B
Page 14 of 28

000042

EXHIBIT ___6___

PAGE ___132___

CONFIDENTIAL

TABLE A-1

FIVE YEAR COMPARATIVE BALANCE SHEET
F/Y End December 31
($000)

Job No. 1087ABCV
Appr Date   12/31/99
Run Date   10/19/04

LIABILITIES & SHAREHOLDERS EQUITY

| | 1995 | % | 1996 | % | 1997 | % | 1998 | % | 1999 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| **Current Liabilities** | | | | | | | | | | |
| Accounts Payable & Accrued | $ 3,588 | 12.5 | $ 7,222 | 41.9 | $ 11,134 | 52.7 | $ 6,904 | 40.7 | $ 6,611 | 37.7 |
| Bank Line-Revolving | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Current Port. L T Debt | | 0.0 | 36 | 0.2 | 38 | 0.2 | 38 | 0.2 | 0 | 0.0 |
| Other current | 11,486 | 40.0 | 3 | 0.0 | 45 | 0.2 | 131 | 0.8 | 0 | 0.0 |
| Total current liabilities | $ 15,074 | 52.6 | $ 7,261 | 42.1 | $ 11,217 | 53.1 | $ 7,073 | 41.6 | $ 6,611 | 37.7 |
| **Long Term Liabilities** | | | | | | | | | | |
| Notes payable to bank | $  - | 0.0 | $ 5,950 | 34.5 | $ 3,175 | 15.0 | $ 5,231 | 30.8 | $ 2,129 | 12.1 |
| Long term debt, less current | 1,305 | 4.5 | | 0.0 | | 0.6 | | 0.0 | 0 | 0.0 |
| Subordinated notes payable & other | 3,728 | 13.0 | 2,718 | 15.8 | 3,028 | 14.3 | 3,247 | 19.1 | 3,255 | 18.5 |
| Total long term liabilities | $ 5,033 | 17.5 | $ 8,668 | 50.2 | $ 6,203 | 29.4 | $ 8,478 | 49.9 | $ 5,384 | 30.7 |
| **Total Liabilities** | $ 20,107 | 70.1 | $ 15,929 | 92.3 | $ 17,420 | 82.5 | $ 15,551 | 91.6 | $ 11,995 | 68.3 |
| **Shareholders Equity** | $ 8,575 | 29.9 | $ 1,321 | 7.7 | $ 3,701 | 17.5 | $ 1,432 | 8.4 | $ 5,562 | 31.7 |
| **Total Liabilities & Shareholders Equity** | $ 28,682 | 100.0 | $ 17,250 | 100.0 | $ 21,121 | 100.0 | $ 16,983 | 100.0 | $ 17,557 | 100.0 |
| Current Ratio | 1.84 | | 2.31 | | 1.82 | | 2.30 | | 2.57 | |
| Quick Ratio | 0.78 | | 0.58 | | 0.97 | | 1.20 | | 1.68 | |
| L T Debt / Net Worth | 0.59 | | 6.56 | | 1.68 | | 5.92 | | 0.97 | |
| Working Capital | $ 12,734 | 44.4 | $ 9,543 | 55.3 | $ 9,249 | 43.8 | $ 9,180 | 54.1 | $ 10,351 | 59.0 |

IMPLIED WORKING CAPITAL         Included in Business Enterprise Value

| | | | | | |
|---|---|---|---|---|---|
| Net Revenues | $ 64,141 | $ 46,980 | $ 55,315 | $ 40,732 | $ 66,350 |
| W/C as a percent of revenues * | 13.50% | 13.50% | 13.50% | 13.50% | 13.50% |
| Implied working capital | $ 8,659 | $ 6,342 | $ 7,468 | $ 5,499 | $ 8,957 |

* Robert Morris Associates SIC #3944, Games, Toys etc.

Exhibit B
Page 15 of 28

15-80

EXHIBIT ___ 6

PAGE ___ 103

CONFIDENTIAL

**TABLE B**
**FIVE YEAR COMPARATIVE INCOME STATEMENT**
F/Y End December 31
($000)

ABC INTERNATIONAL TRADERS, INC.

Job No. 1087ABCV
Appr Date 31-Dec-99
Run Date 10/19/04

| | (1) 1995 | % | 1996 | % | 1997 | % | 1998 | % | 1999 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| REVENUES - NET | $ 64,141 | 100.0 | $ 46,980 | 100.0 | $ 55,315 | 100.0 | $ 40,732 | 100.0 | $ 66,350 | 100.0 |
| Less cost of sales | 46,011 | 71.7 | 36,834 | 78.4 | 40,032 | 72.4 | 26,093 | 64.1 | 43,724 | 65.9 |
| GROSS PROFIT | $ 18,130 | 28.3 | $ 10,146 | 21.6 | $ 15,283 | 27.6 | $ 14,639 | 35.9 | $ 22,626 | 34.1 |
| Other income (loss) | 714 | 1.1 | (738) | -1.6 | 28 | 0.1 | (253) | -0.6 | 350 | 0.5 |
| TOTAL INCOME | $ 18,844 | 29.4 | $ 9,408 | 20.0 | $ 15,311 | 27.7 | $ 14,386 | 35.3 | $ 22,976 | 34.6 |
| EXPENSES | | | | | | | | | | |
| Advertising & promotion | $ 1,896 | 3.0 | $ 2,936 | 6.2 | $ 2,992 | 5.4 | $ 3,898 | 9.6 | $ 4,367 | 6.6 |
| Automobile expense | 49 | 0.1 | 74 | 0.2 | 47 | 0.1 | 64 | 0.2 | 67 | 0.1 |
| Bad debts | 488 | 0.8 | 289 | 0.6 | (6) | 0.0 | | 0.0 | 30 | 0.0 |
| Bank charges | 205 | 0.3 | 312 | 0.7 | 294 | 0.5 | 181 | 0.4 | 196 | 0.3 |
| Commissions | 1,925 | 3.0 | 1,912 | 4.1 | 2,535 | 4.6 | 2,168 | 5.3 | 2,487 | 3.7 |
| Data processing & supplies | 66 | 0.1 | 22 | 0.0 | 27 | 0.0 | 64 | 0.2 | 66 | 0.1 |
| Depreciation | 228 | 0.4 | 732 | 1.6 | 585 | 1.1 | 589 | 1.4 | 540 | 0.8 |
| Delivery, postage | 72 | 0.1 | 130 | 0.3 | 242 | 0.4 | 191 | 0.5 | 323 | 0.5 |
| Insurance | 346 | 0.5 | 329 | 0.7 | 227 | 0.4 | 305 | 0.7 | 386 | 0.6 |
| Interest Expense | 917 | 1.4 | 663 | 1.4 | 390 | 0.7 | 552 | 1.4 | 842 | 1.3 |
| Legal, professional & accounting | 575 | 0.9 | 343 | 0.7 | 1,225 | 2.2 | 1,681 | 4.1 | 1,199 | 1.8 |
| Miscellaneous other | 111 | 0.2 | 187 | 0.4 | 105 | 0.2 | 379 | 0.9 | 62 | 0.1 |
| Molds | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 508 | 0.8 |
| Office Expenses | 53 | 0.1 | 77 | 0.2 | 61 | 0.1 | 71 | 0.2 | 132 | 0.2 |
| Product development | 911 | 1.4 | 1,028 | 2.2 | 463 | 0.8 | 1,008 | 2.5 | 1,711 | 2.6 |
| Rents | 637 | 1.0 | 467 | 1.0 | 346 | 0.6 | 382 | 0.9 | 455 | 0.7 |
| Repairs & maintenance | 15 | 0.0 | 11 | 0.0 | 11 | 0.0 | 22 | 0.1 | | 0.0 |
| Salaries, offices | 1,394 | 2.2 | 696 | 1.5 | 704 | 1.3 | 1,104 | 2.7 | 1,194 | 1.8 |
| Salaries & wages | 2,316 | 3.6 | 2,009 | 4.3 | 2,284 | 4.1 | 2,223 | 5.5 | 3,179 | 4.8 |
| Taxes & licenses | 51 | 0.1 | 27 | 0.1 | 217 | 0.4 | 39 | 0.1 | 61 | 0.1 |
| Taxes, payroll | 121 | 0.2 | 220 | 0.5 | 176 | 0.3 | 219 | 0.5 | 254 | 0.4 |
| Telephone | 160 | 0.2 | 219 | 0.5 | 188 | 0.3 | 166 | 0.4 | 214 | 0.3 |
| Travel & entertainment | 251 | 0.4 | 341 | 0.7 | 226 | 0.4 | 277 | 0.7 | 399 | 0.6 |
| Utilities | 36 | 0.1 | 36 | 0.1 | 32 | 0.1 | 30 | 0.1 | 35 | 0.1 |
| TOTAL EXPENSES | $ 12,823 | 20.0 | $ 13,060 | 27.8 | $ 13,371 | 24.2 | $ 15,613 | 38.3 | $ 18,707 | 28.2 |
| PRETAX INCOME | $ 6,021 | 9.4 | $ (3,652) | -7.8 | $ 1,940 | 3.5 | $ (1,227) | -3.0 | $ 4,269 | 6.4 |
| Add Depreciation/Amort | 228 | 0.4 | 732 | 1.6 | 585 | 1.1 | 589 | 1.4 | 540 | 0.8 |
| PRETAX CASH FLOW (2) | $ 6,249 | 9.7 | $ (2,920) | -6.2 | $ 2,525 | 4.6 | $ (638) | -1.6 | $ 4,809 | 7.2 |
| Add Interest Charges | 917 | 1.4 | 663 | 1.4 | 390 | 0.7 | 552 | 1.4 | 842 | 1.3 |
| EBDITA (3) | $ 7,166 | 11.2 | $ (2,257) | -4.8 | $ 2,915 | 5.3 | $ (86) | -0.2 | $ 5,651 | 8.5 |

(1) Changed from a fiscal year ending of 8/31 to calendar year ending of 12/31. This information is from the fiscal year of 9/1/94 to 8/31/95.
(2) Pretax income plus depreciation & amortization.
(3) Pretax cash flow plus interest charges.

000044

16-90

Exhibit B
Page 16 of 21

EXHIBIT    6

PAGE    154

CONFIDENTIAL

ABC INTERNATIONAL TRADERS, INC.

**TABLE C**
**INCOME STATEMENT ADJUSTMENTS**
F/Y End December 31
($000)

Job No. 1007ABCV
Appr Date: 12/31/1999
Run Date: 10/19/04

| | | F/Y Ending 8/31/1995 | % | 1996 | % | 1997 | % | 1998 | % | 1999 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| REVENUES - NET | | $ 64,141 | 100.0 | $ 46,980 | 100.0 | $ 55,315 | 100.0 | $ 40,732 | 100.0 | $ 66,330 | 100.0 |
| OPERATING INCOME (EBDIT) | | $ 7,166 | 11.2 | $ (2,257) | (4.8) | $ 2,915 | 5.3 | $ (86) | (0.2) | $ 5,651 | 8.5 |
| ADJUSTMENTS TO INCOME | | | | | | | | | | | |
| Legal, professional & accounting | | 575 | 0.9 | 343 | 0.7 | 1,223 | 2.2 | 1,681 | 4.1 | 1,199 | 1.8 |
| Molds (s/b capitalized) | | 0 | - | 0 | - | 0 | - | 0 | - | 508 | 0.8 |
| Salaries, Officers | | 1,394 | 2.2 | 696 | 1.5 | 704 | 1.3 | 1,104 | 2.7 | 1,194 | 1.8 |
| Traveling Expenses | | 251 | 0.4 | 341 | 0.7 | 226 | 0.4 | 277 | 0.7 | 399 | 0.6 |
| TOTAL ADJUSTMENTS TO INCOME | | $ 2,220 | 3.5 | $ 1,380 | 2.9 | $ 2,155 | 3.9 | $ 3,062 | 7.5 | $ 3,300 | 5.0 |
| SUBTOTAL | | $ 9,386 | 14.6 | $ (877) | (1.9) | $ 5,070 | 9.2 | $ 2,976 | 7.3 | $ 8,951 | 13.5 |
| LESS REASONABLE EXPENSES | | | | | | | | | | | |
| Legal, professional & accounting | 0.75% | 481 | 0.8 | 352 | 0.8 | 415 | 0.8 | 305 | 0.8 | 498 | 0.8 |
| Molds (s/b capitalized) | | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - |
| Salaries, Officers | 1.50% | 562 | 1.5 | 705 | 1.5 | 830 | 1.5 | 611 | 1.5 | 995 | 1.5 |
| Traveling Expenses | 0.60% | 385 | 0.6 | 282 | 0.6 | 332 | 0.6 | 244 | 0.6 | 398 | 0.6 |
| ADJUSTED PRETAX INCOME | | $ 7,943 | 12.4 | $ (1,934) | (4.1) | $ 3,825 | 6.9 | $ 2,060 | 5.1 | $ 7,458 | 11.2 |
| Add Back Depreciation | | 228 | 0.4 | 732 | 1.6 | 585 | 1.1 | 589 | 1.4 | 540 | 0.8 |
| ADJUSTED PRETAX CASH FLOW | | $ 8,171 | 12.7 | $ (1,202) | (2.6) | $ 4,410 | 8.0 | $ 2,649 | 6.5 | $ 7,998 | 12.1 |
| Add Back Interest Expense | | 917 | 1.4 | 663 | 1.4 | 390 | 0.7 | 552 | 1.4 | 842 | 1.3 |
| ADJUSTED EBDITA (1) | | $ 9,088 | 14.2 | $ (539) | (1.1) | $ 4,800 | 8.7 | $ 3,201 | 7.9 | $ 8,840 | 13.3 |
| EBDITA AS % OF SALES | | | 14.2 | | (1.1) | | 8.7 | | 7.9 | | 13.3 |
| Weighting (used average) | | | 1.0 | | 1.0 | | 1.0 | | 1.0 | | 1.0 |
| Product - $ Columns | | | 43 | | | | | | | | | |
| Divisor - Sum of Weights | | | 5 | | | | | | | | | |
| AVERAGE EBDITA | | 8.6 | Percent (Used in Table E) | | | | | | | | |

000045

17-22

EXHIBIT  6

PAGE  195

| CONFIDENTIAL | | | | | | t087ABCV 05/15/00 | |
|---|---|---|---|---|---|---|---|
| | TABLE D-1 ADJUSTED BOOK VALUE F/Y End December 31 ($000) | | | | | | |
| ABC | Book 31-Dec-99 | % | Adjustments 31-Dec-99 | % | | Adjusted 31-Dec-99 | % |
| **Current Assets** | | | | | | | |
| Cash & equivalents | (79) | -0.5 | $79 | NM | | $0 | 0.0 |
| Accounts Receivable-Trade | 11,154 | 65.8 | (11,154) | NM | | 0 | 0.0 |
| Inventories | 5,834 | 34.4 | (5,834) | NM | | 0 | 0.0 |
| Due from affiliate | (320) | | | | | | |
| Prepaid Expenses & Other | 373 | 2.2 | (373) | | | | |
| Implied Working Capital | - | 0.0 | 8,960 | NM | | 8,960 | 35.0 |
| Total Current Assets | 16,962 | 100.0 | ($8,322) | NM | | $8,960 | 35.0 |
| **Fixed Assets as Appraised** | | | | | | | |
| Automotive Equipment | 0 | 0.0 | 13 | | | 13 | 0.1 |
| Computer Equipment | 0 | 0.0 | 263 | | | 264 | 1.0 |
| Furniture & Fixtures | 0 | 0.0 | 23 | | | 23 | 0.1 |
| Leasehold Equipment | 0 | 0.0 | 26 | | | 26 | 0.1 |
| Machinery & Equipment | 0 | 0.0 | 5 | | | 5 | 0.0 |
| Molds & Tooling | 0 | 0.0 | 1,310 | | | 1,311 | 5.1 |
| Office Equipment | 0 | 0.0 | 5 | | | | |
| Net Fixed Assets | (0) | 0.0 | 0 | | | 1,641 | 6.4 |
| INTANGIBLE ASSETS | - | 0.0 | $15,004 | NM | | 15,004 | 58.6 |
| BUSINESS ENTERPRISE VALUE | 16,962 | 100.0 | | NM | | 25,605 | 100.0 |

The right hand column represents the assets included in "Business Enterprise Value"(BEV). This represents the value of the assets required for normal business operations. To convert this number to Total Asset Value, subtract the Implied Working Capital. This will yield "Basic Business Value", or the value of the fixed, intangible and other assets only. See Table J for calculations of BEV, and Table D-2 for calculations of shareholders' equity.

18-

Exhibit B
Page 18 of 28

EXHIBIT _____ 6

PAGE _____ 156

**TABLE D-2**

**ADJUSTED BOOK VALUE**

F/Y End December 31

| | | | |
|---|---|---|---|
| | Job No. | 1087ABCV | |
| | Val Date | 31-Dec-99 | |
| | Run Date | 8-Nov-00 | |

| | | |
|---|---|---|
| MARKET VALUE OF BUSINESS ENTERPRISE (Table J) | $ | 25,605 |
| Less Implied Working Capital | | (8,960) |
| **BASIC BUSINESS VALUE**                    Fixed Plus Intangibles | $ | 16,645 |
| Less Fixed Assets as Appraised (Table H-1) | | (1,641) |
| MARKET VALUE OF INTANGIBLES (GOODWILL) | $ | 15,004 |
| Add Fixed & Other Assets as Appraised (Table H-1) | | 1,641 |
| Add Current Assets at 12/31/99 (Table A) | | 16,962 |
| ADJUSTED TOTAL ASSET VALUE | $ | 33,607 |
| Less Total Liabilities at 12/31/99 (Table A-1) | | (11,995) |
| | | 21,612 |
| ADJUSTED SHAREHOLDER EQUITY                    Rounded | $ | 21,600 |

000047

19-2D

Exhibit B
Page 19 of 28

EXHIBIT    ψ

PAGE    157

CONFIDENTIAL
ABC

**TABLE E**
**INCOME APPROACH**
FY Ending Sept 30
($000)

Job No. 1087ABCV
Val Date 31-Dec-99
Run Date  8-Nov-00

| | 2000 | 2001 | 2002 | 2003 | 2004 | Reversion |
|---|---|---|---|---|---|---|
| FORECAST REVENUE GROWTH | 6.00% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% |
| FORECAST OF REVENUE | $70,331 | $72,793 | $75,340 | $77,977 | $80,706 | |
| EBDITA as % of Revenues * | 8.6% | 8.6% | 8.6% | 8.6% | 8.6% | |
| EBDITA * | $6,032 | $6,243 | $6,461 | $6,687 | $6,921 | |
| Less Capital Equipment Reserve | (440) | (456) | (472) | (488) | (505) | |
| Less Working Capital (1) | (8,960) | (332) | (344) | (356) | (368) | |
| DISTRIBUTABLE CASH FLOW | ($3,369) | $5,455 | $5,646 | $5,843 | $6,048 | $6,153 |
| REVERSIONARY VALUE | | | | Factor (3) | 7.667 | $47,177 |
| Discount Rate (Table F) | 20.75% | 20.75% | 20.75% | 20.75% | 20.75% | 20.75% |
| Period Factor | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | 5.00 |
| Multiplier | 0.910 | 0.754 | 0.624 | 0.517 | 0.428 | 0.390 |
| NPV OF DIST. CASH FLOWS | ($3,066) | $4,111 | $3,524 | $3,020 | $2,589 | $18,378 |

NPV OF DISTRIBUTABLE CASH FLOW FOR FIRST FIVE YEARS      $10,178
NPV OF REVERSIONARY VALUE      18,378

$28,556

MARKET VALUE OF ENTERPRISE BY THE INCOME APPROACH      Rounded   $28,550

(1) Estimated percent of annual revenue growth required for working capital---> Reference - RP  13.50%
Annual Statement Studies.

(2) Income to be capped at end of 5th year was calculated by estimating 6th year's income considering a future growth of 3.5%, and averaging with the 5th year. This adjusts the fifth year from mid-year to the expected end-of-year-revenues.

(3) Calculated with the following formula: Cap Rate = (1+G)/(R-G), where G = estimated future growth rate.
R = wtd avg cost of capital. (1+.035) / (.2075 -.05) or 1.035/.1525  =  7.667   or   13.04%

* Earnings Before Depreciation & Amortization, Interest and Taxes.  (See Table C).

000048

CONFIDENTIAL                    **TABLE F**                    Job No: 1087ABCV
                    CAPITAL ASSET PRICING MODEL          Val Date  31-Dec-99
                              (CAPM)                     Run Date   8-Nov-00

ABC INTERNATIONAL TRADERS, INC.
--------------------------------------------

**KEY ASSUMPTIONS**

| | | |
|---|---|---|
| Cost of debt - pretax (1) | | 11.00% |
| Federal tax rate (2) | Pretax Basis | 0.00% |
| State tax rate | | 0.00% |
| Combined marginal tax rate | Pretax Basis | 0.00% |
| Long-term treasury bond rate | | 6.00% |
| Market average beta | * | 0.92 |
| Market average percent of equity | * | 72.00% |
| Market average percent of debt | * | 28.00% |

| WEIGHTED AVG COST OF CAPITAL | 20.72% | Rounded | 20.75% |
|---|---|---|---|
| Formula: (1-T)*(Kd)(D)+(Ke)(E) | | | |
| T = Tax rate | | | 0.00% |
| Kd = Cost of debt | | | 11.00% |
| D = Proportion of debt in total capital | | | 28.00% |
| Ke = Cost of equity | | | 24.50% |
| E = Proportion of equity | | | 72.00% |

| COST OF EQUITY CAPITAL | 24.57% | Rounded | 24.50% |
|---|---|---|---|
| Formula: Ke = ((B*Rp)+Rs)+Rt | | | |
| Rf = Rate of return on risk-free security (3) | | | 5.00% |
| Rp = Risk premium (Rm - Rf) | | | 12.10% |
| Rs = Company-specific risk premium (4) | | | 7.50% |
| Rt = Current return on 30 Year treasury bills | | | 6.00% |
| B  = Industry beta (5) | | | 0.92 |
| Rm = Market return (6) | | | 17.10% |

*Ibbotson Industry Studies for SIC Code 3944, Games, Toys, and Children's Vehicles

(1) Company's estimated cost of interest-bearing debt.
(2) Valuation based upon after tax income streams.
(3) Ibbotson & Associates Report 1926-1999, "Arithmetic Mean of Annual Returns for Long-Term U.S. Treasury Bonds" (riskless).
(4) Additional risk factor to adjust for specific risks of the subject company and industry.
(5) A measure of risk (variability) of common stocks in the industry. (Ibbotson Industry Studies for SIC Code 3944, Games, Toys, and Children's Vehicles)
(6) Ibbotson & Associates Report 1926-1997, "Arithmetic Mean of Annual Returns for The Common Stock of Small Companies".

000049

Exhibit B
Page 21 of 28

EXHIBIT ___4___
PAGE ___159___

**CONFIDENTIAL**

**TABLE G**
**EXCESS EARNINGS APPROACH**
**($000)**

Job No. 1087ABCV
Val Date 31-Dec-99
Run Date  8-Nov-00

ABC

| EARNINGS BEFORE CAPITAL CHARGES (EBDITA for 2000) | | | | | $6,032 | |
|---|---|---|---|---|---|---|

| **CAPITAL CHARGES**<br>Economic Depreciation | Appraised<br>Value | Est<br>Life | | Return<br>Of | | |
|---|---|---|---|---|---|---|
| Automotive Equipment | $    13 | 10 | Yrs | 1 | | |
| Computer Equipment | 263 | 5 | Yrs | 53 | | |
| Furniture & Fixtures | 23 | 15 | Yrs | 2 | | |
| Leasehold Equipment | 26 | 10 | Yrs | 3 | | |
| Machinery & Equipment | 5 | 10 | Yrs | 0 | | |
| Molds & Tooling | 1,310 | 3 | Yrs | 437 | | |
| Office Equipment | 5 | 10 | Yrs | 1 | | |
| Fixed Assets at Cost | $  1,646 | 3.7 | | $440 | $ | (440) |

| **Economic Return** | Adjusted<br>Book | % | Return<br>On | | |
|---|---|---|---|---|---|
| Working Capital | $  8,960 | 11.0% | $    986 | | |
| Automotive Equipment | 13 | 15.0% | 2 | | |
| Computer Equipment | 263 | 20.0% | 53 | | |
| Furniture & Fixtures | 23 | 15.0% | 4 | | |
| Leasehold Equipment | 26 | 20.0% | 5 | | |
| Machinery & Equipment | 5 | 12.5% | 1 | | |
| Molds & Tooling | 1,310 | 15.0% | 197 | | |
| Office Equipment | 5 | 15.0% | 1 | | |
| Adjusted Tangible Assets | $ 10,606 | | $  1,247 | $ | (1,247) |

| TOTAL EXCESS EARNINGS | | | | $ | 4,344 |
|---|---|---|---|---|---|
| Excess Earnings Cap Rate | | 24.5% * | | $ | 17,732 |
| Add Adjusted Tangible Assets | | | | | 10,606 |
| BUSINESS ENTERPRISE VALUE BY EXCESS EARNINGS METHOD | | | | $ | 28,338 |
| | | Rounded | | $ | 28,350 |

*Equity Discount Rate

Exhibit B
Page 22 of 28

EXHIBIT ___4___

PAGE ___100___

**ABC INTERNATIONAL TRADERS, INC.**
16700 Schoenborn Street
North Hills, CA 91343-6122

**TABLE H**
**FIXED ASSET APPRAISAL**
**FROM DEPRECIATION SCHEDULES**

Valuation Date 12/31/99
Original Cost $2,417
Depreciated Replacement Cost New $1,646

| Owned Leased | Entry Order | Item No. | DESCRIPTION | Qty | | Valuation Date | Orig Cost ($) | Yrs in Use | Est Econ Life | Rem Econ Life | Price Trend Factor | Repl Cost New | Est'd Rmng Life | 12/31/99 Fair Market Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OWNED | 12 | | 1 TRUCK | | AE | 01-Aug-93 | 35,951 | 6.4 | 10.0 | 3.6 | 1.000 | 35,951 | 56% | 12,873 |
| OWNED | 17 | | 1 COMPUTER | | CE | 15-Dec-93 | 1,120 | 6.2 | 5.0 | (1.2) | 1.000 | 1,120 | -24% | 0 |
| OWNED | 18 | | 1 COMPUTER | | CE | 15-Jul-94 | 750 | 5.5 | 5.0 | (0.5) | 1.000 | 750 | -9% | 0 |
| OWNED | 27 | | 1 COMPUTER | | CE | 01-Oct-94 | 5,727 | 5.3 | 5.0 | (0.3) | 1.000 | 5,727 | -5% | 0 |
| OWNED | 59 | | 1 COMPUTER | | CE | 01-Oct-94 | 1,476 | 5.3 | 5.0 | (0.3) | 1.000 | 1,476 | -5% | 0 |
| OWNED | 28 | | 1 COMPUTER | | CE | 01-Dec-94 | 20,393 | 5.1 | 5.0 | (0.1) | 1.000 | 20,393 | -2% | 0 |
| OWNED | 29 | | 1 COMPUTER | | CE | 01-Mar-95 | 22,714 | 4.8 | 5.0 | 0.2 | 1.000 | 22,714 | 3% | 734 |
| OWNED | 30 | | 1 COMPUTER | | CE | 01-Jun-95 | 18,174 | 4.6 | 5.0 | 0.4 | 1.000 | 18,174 | 8% | 1,504 |
| OWNED | 31 | | 1 COMPUTER | | CE | 15-Oct-95 | 10,448 | 4.2 | 5.0 | 0.8 | 1.000 | 10,448 | 16% | 1,643 |
| OWNED | 32 | | 1 COMPUTER | | CE | 15-Nov-95 | 15,360 | 4.1 | 5.0 | 0.9 | 1.000 | 15,360 | 17% | 2,676 |
| OWNED | 33 | | 1 COMPUTER | | CE | 15-Dec-95 | 4,923 | 4.0 | 5.0 | 1.0 | 1.000 | 4,923 | 19% | 939 |
| OWNED | 37 | | 1 COMPUTER | | CE | 15-Dec-95 | 9,975 | 4.0 | 5.0 | 1.0 | 1.000 | 9,975 | 19% | 1,902 |
| OWNED | 38 | | 1 COMPUTER | | CE | 01-Jul-96 | 8,445 | 3.5 | 5.0 | 1.5 | 1.000 | 8,445 | 30% | 2,531 |
| OWNED | 60 | | 1 COMPUTER | | CE | 01-Jul-96 | 211,405 | 3.5 | 5.0 | 1.5 | 1.000 | 211,405 | 30% | 63,364 |
| OWNED | 41 | | 1 COMPUTER | | CE | 01-Jul-97 | 1,309 | 2.5 | 5.0 | 2.5 | 1.000 | 1,309 | 50% | 392 |
| OWNED | 63 | | 1 COMPUTER | | CE | 01-Jul-97 | 27,505 | 2.5 | 5.0 | 2.5 | 1.000 | 27,505 | 50% | 13,745 |
| OWNED | 45 | | 1 COMPUTER | | CE | 01-Jan-98 | 2,762 | 1.6 | 5.0 | 3.4 | 1.000 | 2,762 | 68% | 1,230 |
| OWNED | 46 | | 1 COMPUTER | | CE | 01-Jan-98 | 39,597 | 1.6 | 5.0 | 3.4 | 1.000 | 39,597 | 68% | 27,056 |
| OWNED | 47 | | 1 COMPUTER | | CE | 04-Jul-98 | 36,668 | 1.5 | 5.0 | 3.5 | 1.000 | 36,668 | 70% | 25,558 |
| OWNED | 49 | | 1 COMPUTER | | CE | 01-Mar-99 | 91,565 | 1.0 | 5.0 | 4.0 | 1.000 | 91,565 | 82% | 73,292 |
| OWNED | 50 | | 1 COMPUTER | | CE | 01-Feb-99 | 11,243 | 0.9 | 5.0 | 4.1 | 1.000 | 11,243 | 82% | 9,192 |
| OWNED | 51 | | 1 COMPUTER | | CE | 01-Mar-99 | 4,000 | 0.8 | 5.0 | 4.2 | 1.000 | 4,000 | 83% | 3,333 |
| OWNED | 52 | | 1 COMPUTER | | CE | 01-Mar-99 | 4,135 | 0.8 | 5.0 | 4.2 | 1.000 | 4,135 | 83% | 3,436 |
| OWNED | 53 | | 1 COMPUTER | | CE | 01-Mar-99 | 3,605 | 0.8 | 5.0 | 4.2 | 1.000 | 3,605 | 83% | 3,003 |
| OWNED | 54 | | 1 COMPUTER | | CB | 01-Apr-99 | 2,733 | 0.8 | 5.0 | 4.2 | 1.000 | 2,733 | 83% | 2,276 |
| OWNED | 55 | | 1 COMPUTER | | CB | 01-Jun-99 | 4,702 | 0.6 | 5.0 | 4.4 | 1.000 | 4,702 | 85% | 3,996 |
| OWNED | 55 | | 1 COMPUTER | | CB | 01-Jun-99 | 20,684 | 0.6 | 5.0 | 4.4 | 1.000 | 20,684 | 88% | 18,270 |
| OWNED | 1 | | 1 EXHIBIT BOOTH - FURN & FIX | | FF | 01-Sep-99 | 1,557 | 0.3 | 5.0 | 4.7 | 1.000 | 1,557 | 92% | 1,427 |
| OWNED | 2 | | 1 FURNITURE & FIXTURES | | FF | 01-Nov-99 | 1,687 | 0.2 | 5.0 | 4.8 | 1.000 | 1,687 | 93% | 1,575 |
| OWNED | 4 | | 1 FURNITURE & FIXTURES | | FF | 01-Sep-90 | 14,443 | 10.3 | 15.0 | 4.7 | 1.000 | 14,443 | 32% | 4,651 |
| OWNED | 16 | | 1 FURNITURE & FIXTURES | | FF | 01-Jul-91 | 6,857 | 9.5 | 15.0 | 5.5 | 1.000 | 6,857 | 38% | 2,589 |
| OWNED | 24 | | 1 FURNITURE & FIXTURES | | FF | 15-Apr-94 | 13,606 | 6.5 | 15.0 | 8.7 | 1.000 | 13,606 | 43% | 5,890 |
| OWNED | 24 | | 1 FURNITURE & FIXTURES | | FF | 01-Aug-95 | 238 | 5.7 | 15.0 | 9.3 | 1.000 | 238 | 62% | 869 |
| | | | | | | | | 4.4 | 15.0 | 10.6 | 1.000 | | 71% | 168 |

000051

EXHIBIT ____ 6
PAGE ____ 161