ABC INTERNATIONAL TRADERS, INC.
16730 Schoenborn Street
North Hills, CA 91343-6122

**TABLE II**
**FIXED ASSET APPRAISAL**
**FROM DEPRECIATION SCHEDULES**

Valuation Date 12/31/99
Original Cost $2,417
Fair Market Value $1,646

Depreciated Replacement Cost New

| Owned / Leased | Entry Item Order No. | DESCRIPTION | Qtr | Valuation Date | Orig Cost* ($) | Est Econ Life | Yrs In Use | Rem Econ Life | Price Trend Factor | Repl Cost New | Estd Rmng Life | Fair Market Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OWNED | 25 | FURNITURE & FIXTURES | FF | 01-Aug-95 | 299 | 15.0 | 4.4 | 10.6 | 1.000 | 299 | 71% | 211 |
| OWNED | 26 | FURNITURE & FIXTURES | FF | 01-Aug-95 | 1,069 | 15.0 | 4.4 | 10.6 | 1.000 | 1,069 | 71% | 754 |
| OWNED | 34 | FURNITURE & FIXTURES | FF | 15-Sep-95 | 1,295 | 15.0 | 4.3 | 10.7 | 1.000 | 1,295 | 71% | 924 |
| OWNED | 35 | FURNITURE & FIXTURES | FF | 15-Nov-95 | 1,000 | 15.0 | 4.1 | 10.9 | 1.000 | 1,000 | 72% | 725 |
| OWNED | 43 | FURNITURE & FIXTURES | FF | 01-Mar-98 | 1,659 | 15.0 | 1.8 | 13.2 | 1.000 | 1,659 | 88% | 1,456 |
| OWNED | 44 | FURNITURE & FIXTURES | FF | 01-Aug-98 | 643 | 15.0 | 1.4 | 13.6 | 1.000 | 643 | 91% | 582 |
| OWNED | 57 | FURNITURE & FIXTURES | FF | 01-May-99 | 3,601 | 15.0 | 0.7 | 14.3 | 1.000 | 3,601 | 96% | 3,441 |
| OWNED | 58 | FURNITURE & FIXTURES | FF | 01-Oct-90 | 1,115 | 15.0 | 0.1 | 14.9 | 1.000 | 1,115 | 99% | 1,109 |
| OWNED | 6 | LEASEHOLD IMPROVEMENTS | LI | 01-Oct-90 | 2,789 | 10.0 | 9.3 | 0.7 | 1.000 | 2,789 | 7% | 208 |
| OWNED | 7 | LEASEHOLD IMPROVEMENTS | LI | 01-Feb-91 | 2,293 | 10.0 | 8.9 | 1.1 | 1.000 | 2,293 | 11% | 248 |
| OWNED | 21 | LEASEHOLD IMPROVEMENTS | LI | 01-Sep-93 | 17,300 | 10.0 | 6.3 | 3.7 | 1.000 | 17,300 | 37% | 6,342 |
| OWNED | 19 | LEASEHOLD IMPROVEMENTS | LI | 15-Jan-94 | 8,633 | 10.0 | 6.0 | 4.0 | 1.000 | 8,633 | 40% | 3,486 |
| OWNED | 20 | LEASEHOLD IMPROVEMENTS | LI | 01-Nov-94 | 28,862 | 10.0 | 5.2 | 4.8 | 1.000 | 28,862 | 48% | 13,949 |
| OWNED | 36 | LEASEHOLD IMPROVEMENTS | LI | 15-Oct-95 | 2,814 | 10.0 | 4.2 | 5.8 | 1.000 | 2,814 | 58% | 1,628 |
| OWNED | 13 | MACHINERY & EQUIPMENT | ME | 15-Jan-94 | 1,004 | 10.0 | 6.0 | 4.0 | 1.000 | 1,004 | 40% | 405 |
| OWNED | 14 | MACHINERY & EQUIPMENT | ME | 15-Apr-94 | 1,111 | 10.0 | 5.7 | 4.3 | 1.000 | 1,111 | 43% | 476 |
| OWNED | 39 | MACHINERY & EQUIPMENT | ME | 01-Dec-94 | 2,444 | 10.0 | 5.1 | 4.9 | 1.000 | 2,444 | 49% | 1,201 |
| OWNED | 40 | MACHINERY & EQUIPMENT | ME | 01-Jul-97 | 628 | 10.0 | 2.5 | 7.5 | 1.000 | 628 | 75% | 471 |
| OWNED | 3 | MOLDS & TOOLING | MT | 01-Sep-90 | 2,936 | 5.0 | 9.3 | (4.3) | 1.000 | 2,936 | -87% | 0 |
| OWNED | 56 | MOLDS & TOOLING | MT | 01-Jul-98 | 3,239 | 5.0 | 1.5 | 3.5 | 1.000 | 3,239 | 70% | 2,232 |
| OWNED | 2 | MOLDS & TOOLING | MT | 01-Jun-98 | 877,864 | 5.0 | 1.5 | 3.5 | 1.000 | 877,864 | 70% | 614,264 |
| OWNED | 5 | EQUIPMENT | OE | 01-Sep-99 | 773,751 | 5.0 | 0.5 | 4.5 | 1.000 | 773,751 | 90% | 696,164 |
| OWNED | 8 | TELEPHONE SYSTEM | OE | 01-Nov-90 | 1,100 | 10.0 | 9.3 | 0.7 | 1.000 | 1,100 | 7% | 73 |
| OWNED | 9 | MAIL MACHINE | OE | 01-Dec-91 | 15,087 | 10.0 | 8.2 | 1.8 | 1.000 | 15,087 | 18% | 2,761 |
| OWNED | 10 | WATER PURIFIER | OE | 01-Jan-92 | 1,997 | 10.0 | 8.1 | 1.9 | 1.000 | 1,997 | 19% | 382 |
| OWNED | 23 | WATER PUMP | OE | 01-Feb-95 | 147 | 10.0 | 4.9 | 5.1 | 1.000 | 147 | 24% | 35 |
| OWNED | 11 | CELLULAR PHONE | OE | 01-Aug-92 | 1,748 | 5.0 | 7.4 | (2.0) | 1.000 | 1,748 | 51% | 889 |
| OWNED | 15 | TELECOM EQUIPMENT | OE | 15-Jul-94 | 2,426 | 10.0 | 5.5 | 4.5 | 1.000 | 2,426 | 45% | 1,100 |
| | | | | ($000) | $2,417 | | | | | | | $1,646 |

000052

Exhibit B
Page 24 of 28

EXHIBIT 6
PAGE 162

**TABLE H-1**
**FIXED ASSET APPRAISAL**
From Depreciation Schedules
($000)

Job No. 1087/ABCV
Val Date 31-Dec-99
Run Date 8-Nov-00

| SUMMARY BY ASSET CATEGORY | | Original Cost | Est Econ Life | FMV |
|---|---|---|---|---|
| Automotive Equipment | AE | $    36 | 10.0 | $      13 |
| Computer Equipment | CE | 585 | 5.0 | 263 |
| Furniture & Fixtures | FF | 47 | 15.0 | 23 |
| Leasehold Equipment | LE | 63 | 10.0 | 26 |
| Machinery & Equipment | ME | 8 | 10.0 | 5 |
| Molds & Tooling | MT | 1,655 | 5.0 | 1,310 |
| Office Equipment | OE | 23 | 10.0 | 5 |
| **TOTALS** | | **$ 2,417** | | **$   1,646** |

Extracted from the detailed appraisal in Table H.

25 ·

000053

EXHIBIT ___6___
PAGE ___163___

**TABLE I**
**MARKET INFORMATION**
23-Oct-00

Job No. 1087ABCV
Val Date 31-Dec-99
Run Date 8-Nov-00

| COMPANY | Symbol | Shares Out (000) | Market Cap* ($000) | Annual Sales ($000) | Mkt Cap/ Sales (0) | Beta (0) |
|---|---|---|---|---|---|---|
| JAKKS PACIFIC | JAKK | 19,441 | 162,818 | 183,685 | 0.886 | 1.00 |
| HASBRO,INC | HAS | 172,309 | 1,744,629 | 4,232,263 | 0.412 | 1.00 |
| MATTEL | MAT | 426,371 | 5,036,507 | 5,514,950 | 0.913 | 0.38 |
| RADICA GAMES | RADA | 17,640 | 39,690 | 118,733 | 0.334 | 1.28 |
| TOYMAX INTERNATIONAL | TMAX | 10,598 | 22,521 | 138,985 | 0.162 | NA |
| SELECTED | | 129,272 | 1,401,233 | 2,037,723 | 0.334 | 0.92 |

*Minority value of shareholder equity. Converted to control value in Table I-I to compare with other control value appproaches as reflected in Table I. We selected the Radica Games ratio as most representitive to compare with the Subject company.

000054

EXHIBIT ____ U
PAGE ____ 164

CONFIDENTIAL

**TABLE 1-1**
**MARKET APPROACH**
($000)

Job No. 1087ABCV
Val Date 31-Dec-99
Run Date 8-Nov-00

| | | |
|---|---|---|
| GROSS REVENUES | | $ 66,350 |
| AVERAGE REVENUE/MARKET CAPITALIZATION RATIO (Table 1) | | 0.334 |
| MARKET VALUE OF EQUITY ON A MINORITY BASIS | | $ 22,179 |
| Less Public/Private discount for relative size | 23.1% | (5,118) |
| MINORITY VALUE OF EQUITY - SMALL PRIVATE COMPANY | | $ 17,061 |
| Add Control Premium | 35% | 5,971 |
| MARKET VALUE OF EQUITY ON A CONTROL BASIS | Rounded | $ 23,000 |
| Add implied working Capital | | 8,960 |
| MARKET VALUE OF BUSINESS ENTERPRISE ON A CONTROL BASIS | | $ 31,960 |

27-

000055

EXHIBIT ____ 6

PAGE ____ 105

CONFIDENTIAL

**TABLE J**
**CONCLUSION OF MARKET VALUE**
**($000)**

Job No.  1087ABCV
Val Date  31-Dec-99
Run Date  8-Nov-00

**ABC INTERNATIONAL TRADERS, INC.**

| | | Conclusion | Weight | | Product |
|---|---|---|---|---|---|
| INCOME APPROACH (Table E) | $ | 28,550 | 0.50 | $ | 14,275 |
| MARKET APPROACH (Table I-1) | $ | 31,960 | 0.00 | | - |
| EXCESS EARNINGS APPROACH (Table G) | $ | 28,350 | 0.50 | | 14,175 |
| **FMV OF BUSINESS ENTERPRISE (Includes working capital)** | | | | $ | 28,450 |
| Less Discount for Lack of Liquidity | | | 10% | $ | (2,845) |
| **MARKET VALUE OF BUSINESS ENTERPRISE** | | | | $ | 25,605 |
| Less Implied Working Capital | | | | | (8,960) |
| **BASIC BUSINESS VALUE** | | | | $ | 16,645 |
| Add Current Assets (Table A) | | | | | 16,962 |
| **FMV OF TOTAL ASSETS** | | | | $ | 33,607 |
| Less Total Liabilities (Table A-1) | | | | | (11,995) |
| **FMV OF SHAREHOLDERS EQUITY ON A CONTROL BASIS** | | | | $ | 21,612 |
| | | | Rounded | $ | 21,600 |
| **FMV OF SHAREHOLDER INTEREST** | | | 45% | $ | 9,720.00 |
| | | | | | or |
| | | | (Dollars) | | $9,720,000 |

Adjusted book value not included as it is used only to summarize the above values.

000056

25-

EXHIBIT ____ 6
PAGE ____ 106

**NATIONAL BUSINESS APPRAISERS, LLC**
16055 Ventura Boulevard, Suite 1200
Encino, California 914360211
Phone (818) 528-2013      Fax (818) 528-2014
Email dutch7895@sbcglobal.net   www.bizappraisers.com

February 13, 2003

Mr. Morad Zarabi, Arbitrator
**ABC INTERNATIONAL TRADERS, INC.**
20120 Plummer St.
Chatsworth, CA 91211-5448

Dear Mr. Zarabi:

At your request after receipt of additional relevant information, we are reappraising the shareholders equity of ABC International Traders, Inc (ABC).  We were asked to express our opinion of the market value, on a control basis, of a 45 percent interest in the shareholders equity.

It is our understanding that this opinion will be used for establishing a value for a buy-out of the Subject interest, and may be invalid if used for any other purpose.

ABC develops, produces and markets toys and related products. The company's products are action figures and accessories featuring licensed characters, and mini dolls. Purchasers of the company's products include discount retail chain stores, department stores, toy specialty stores and wholesalers. The company licenses numerous trademarks, corporate, trade and brand names and logos from third parties.

This report covers only Phase I of a full narrative report, therefore we issue only a brief letter report.  All of the financial tables that are normally included in a full-narrative report are presented in the Addenda.

Based upon the information and analyses presented in the Addenda, it is our opinion that as of date of value of December 31, 2000, the market value of the shareholder's equity of ABC International Traders, Inc, on a control basis, as summarized in Table J, of Addenda, was:

$33,805,000

000057

Exhibit C
Page I of 28

EXHIBIT _____6_____
PAGE _____167_____

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

February 13, 2003
Page 2

It is also our opinion that as of December 31, 2000, the market value of a 45 percent interest in the shareholder's equity of ABC International Traders, Inc., on a control basis, as summarized in Table J, of the Addenda, was:

**$15,212,000**

It is our opinion that a minority discount does not apply to the 45% interest as the other major shareholder holds an equal 45% interest.

Table J, in the Addenda presents our conclusions of market value under the income, market and excess earnings approach, and sets forth the calculations of the various appraised interests as of December 31, 2000.

In conjunction with our work, ABC provided us with audited and unaudited financial information and prospective financial and operational data. We accepted the historical data as fairly reflecting its operations, trends and financial position. We have not independently investigated the accuracy or completeness of the historical data provided to us and we express no opinion or other form of assurance regarding the accuracy or completeness of the data. The conclusions of value presented herein are based on numerous assumptions pertaining to prospective economic and operating conditions. Unanticipated events and circumstances may occur and actual results achieved during the period covered by our prospective financial analysis will vary from our estimates. The variations may be material. In accordance with ethical principles of the Institute of Business Appraisers, neither National Business Appraisers, LLC, nor any of its employees or subcontractors has any present or contemplated future interest in the business interests or assets herein appraised. Neither our employment nor our compensation is in any way contingent upon the values presented in this report. A copy of this report and the working papers from which it was prepared will be kept in our files for eight years.

Respectfully submitted,

NATIONAL BUSINESS APPRAISERS, LLC

By:_____
Ernest E. Dutcher, MCBA
Managing Member
Senior Valuation Counselor

Attachments: Professional Qualifications; Statement of Facts and Limiting Conditions; Addenda

111&ABCV

2.℘⟋

NATIONAL BUSINESS APPRAISERS, LLC

000058

Exhibit C
Page 2 of 28

EXHIBIT ____ C

PAGE ____ 168

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

February 13, 2003
Page 3

## CERTIFICATION

We certify that, to the best of our knowledge and belief:

*   The statements of fact contained in this report are true and correct.

*   The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and is our personal, unbiased professional analyses, opinions, and conclusions.

*   We have no present or prospective interest in the property that is the subject of this report, and we have no personal interest or bias with respect to the parties involved.

*   Our compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in, or the use of, this report.

*   Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

*   No significant professional assistance was provided to the undersigned in connection with this assignment.

Appraiser_____
        Ernest E. Dutcher, MCBA

EXHIBIT _____6_____

PAGE _____169_____

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

February 13, 2003
Page 4

## PROFESSIONAL QUALIFICATIONS

For

## ERNEST E. DUTCHER, MCBA

Designations

of

**Certified Business Appraiser**
**Master Certified Business Appraiser**

Awarded by

### THE INSTITUTE OF BUSINESS APPRAISERS

http://www.instbusapp.org

*The oldest business appraisal society in the nation.*

NATIONAL BUSINESS APPRAISERS, LLC
**000060**

Exhibit C
Page 4 of 28

EXHIBIT ____6____
PAGE ____170____

Case 2:04-cv-09049-DOC-RNB   Document 4061-3   Filed 07/01/08   Page 10 of 128   Page ID #:98628

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

February 13, 2003
Page 5

___

**ERNEST E. DUTCHER, MCBA**

<u>Professional Qualifications</u>

**Experience:** Mr. Dutcher's full time appraisal experience began in 1975. He has been involved in the analysis and valuation of a broad variety of business enterprises in many industries, including electric power generation, healthcare, equipment leasing & rental, distribution, transportation, manufacturers in the communications, computer, electronics, rubber & chemical industries, shipping, engineering, oil & gas, and many others. He has consulted in marketing, manufacturing and management. He was CEO of an electronic equipment manufacturing company and has held executive positions in other manufacturing, distribution and sales companies.

**Employment:** Managing Member and Senior Valuation Counselor for National Business Appraisers, LLC. Was Senior Valuation Counselor for Valuation Counselors Group, Inc. for four years, following five years with Marshall and Stevens Incorporated. Previously, he was SW. Manager of Acquisitions for a public company; Business Opportunities Sales for Coldwell Banker; President and General Manager of an elevated work platform manufacturer; Vice President and Controller for an equipment sales and rental company; Vice President of Manufacturing and Division Manager of companies producing specialized heating devices and electronic heat controllers; President and CEO of a high technology public company in the electronics industry; and President and sole stockholder of an exclusive area distributor of Magnavox consumer electronics components and accessories.

**Education:** Mr. Dutcher attended Yale University, majoring in Communications; USAF Military Schools, attaining the rank of Captain, Radar and Communications. He also attended RCA Institute, UCLA Extension Division and Santa Monica City College in public relations, plus many seminars and home study courses in finance, taxation, computer courses in business related software etc. He has held California real estate and insurance licenses and is a licensed pilot.

**Professional Societies:** Mr. Dutcher is a senior member in the Institute of Business Appraisers (IBA), the premier professional society of business appraisers, with over 3,400 members. He has also served on the select Qualifications Review Committee. As of March 31, 1999, only about 250 IBA members were designated as Certified Business Appraisers (CBAs). *As of that date, Mr. Dutcher was one of only 15 Master Certified Business Appraisers (MCBAs), a designation requiring over 10 years of providing business appraisals on a full time basis as a CBA.*

**Court Testimony:** Mr. Dutcher has qualified and testified as an expert witness before Federal Tax Courts in Los Angeles and San Francisco California, and California Superior Courts of Los Angeles, Orange, and San Diego Counties. He has served as a consultant in valuation matters to numerous attorneys during the litigation process.

EXHIBIT _____ 6

PAGE _____ 171

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

February 13, 2003
Page 6

## STATEMENT OF FACTS AND LIMITING CONDITIONS

National Business Appraisers, LLC (NBA), strives to clearly and accurately disclose the assumptions and limiting conditions that directly affect a valuation analysis, opinion or conclusion. In order to assist the reader in interpreting this report, such assumptions are set forth as follows:

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of the original assignment. If the need for subsequent services related to a valuation assignment (e.g., testimony, updates, conferences, reprint, or copy services) is contemplated, special arrangements acceptable to NBA must be made in advance. NBA, reserves the right to make adjustments to the analysis, opinion and conclusion set forth in the report as we deem necessary if the facts presented by ABC prove to be inaccurate or have been misinterpreted.

It is assumed that: no opinion is intended in matters that require legal, engineering or other professional advice which has been or will be obtained from professional sources; the valuation report will not be used for guidance in professional matters exclusive of the appraisal and valuation discipline; there are no regulations of any government entity to control or restrict the use of the property unless specifically referred to in the report; and the property will not operate in violation of any applicable government regulations, codes, ordinances or statutes.

Information furnished by others is presumed to be reliable, and where so specified in the report, has been verified; however, no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain. All facts and data set forth in the report are true and accurate to the best of NBA's knowledge and belief. No single item of information was completely relied upon to the exclusion of other information.

Financial data, operating histories and other data relating to income and expenses attributed to the business have been provided by management or it's representatives have been accepted without further verification except as specifically stated in the report.

Valuation reports may contain prospective financial information, estimates or opinions that represent the appraiser's view of reasonable expectations at a particular point in time, but such information, estimates or opinions are not offered as predictions or as assurances that a particular level of income or profit will be achieved, that events will occur or that a particular price will be offered or accepted. All opinions as to value are presented as NBA's considered opinion based on the facts and data obtained during the investigation and set forth in the report. Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material. It should be specifically noted that the valuation assumes the

NATIONAL BUSINESS APPRAISERS, LLC
000062

Exhibit C
Page 6 of 28

EXHIBIT ___6___

PAGE ___172___

**ABC INTERNATIONAL TRADERS, INC.**
North Hills, California

February 13, 2003
Page 7

property will be competently managed and maintained by financially sound owners over the expected period of ownership. This appraisal engagement does not entail an evaluation of man-agement's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

No effort has been made to determine the impact of possible energy shortages or the effect on this project of future federal, state or local legislation, including any environmental or ecological matters or interpretations thereof.

Neither the report nor any portions thereof, especially any conclusions as to value, the identity of the appraiser(s) or NBA, shall be disseminated to the public through public relations media, news media, sales media or any other public means of communications without the prior written consent and approval of NBA. The date(s) of the valuation to which the value estimate conclusions apply is set forth in the letter of transmittal and within the body of the report. The value is based on the purchasing power of the United States dollar as of that date. Unless otherwise noted, NBA assumes that there will be no changes in tax regulations.

No significant change is assumed in the supply and demand patterns indicated in the report. The valuation assumes market conditions observed as of the current date of our market research stated in the letter of transmittal. These market conditions are be-lieved to be correct; however, the appraisers assume no liability should market conditions materially change because of unusual or unforeseen circumstances.

The report and the final estimate of value and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed, solely for the purposes stated, and should not be relied upon for any other purpose. Any allocation of total price between tangible assets and various classes of intangible assets, if shown, is invalidated if used separately or in conjunction with any other report. Neither the appraisal report nor its contents nor any reference to the appraiser(s) or NBA, may be referred to or quoted in any registration statement, prospectus, offering memorandum, sales brochure, other appraisal, loan or other agreement or document given to third parties excepting governmental agencies or the extent required by law without our prior written consent. Permission will be granted only upon meeting certain conditions.

A copy of this report and the working papers from which it was prepared will be kept in our files for eight years.

NATIONAL BUSINESS APPRAISERS, LLC

Exhibit C
Page 7 of 28

000063

7.80

EXHIBIT ____6____
PAGE ____173____

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

February 13, 2003
Page 8

ADDENDA

NATIONAL BUSINESS APPRAISERS, LLC
000054

Exhibit C
Page 8 of 28

EXHIBIT _____ 6

PAGE _____ 174

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

February 13, 2003
Page 9

## INDEX OF FINANCIAL TABLES

TABLE A      FIVE YEAR COMPARATIVE BALANCE SHEET – ASSETS

TABLE A-1   FIVE YEAR COMPARATIVE BALANCE SHEET – LIABILITIES

TABLE B      COMPARATIVE INCOME STATEMENT - 5 YEARS

TABLE C      INCOME STATEMENT ADJUSTMENTS

TABLE D-1   ADUSTED BOOK VALUE – PAGE 1

TABLE D-2   ADUSTED BOOK VALUE – PAGE 2

TABLE E      INCOME APPROACH  METHOD OF VALUATION

TABLE F      CAPITAL ASSET PRICING MODEL

TABLE H      FIXED ASSET APPRAISAL – DETAIL

TABLE  H-1  FIXED ASSET APPRAISAL - SUMMARY

TABLE I       MARKET COMPARABLES - PUBLIC COMPANIES

TABLE I-1    MARKET APPROACH

TABLE J      CONCLUSIONS OF MARKET VALUE

9.90

NATIONAL BUSINESS APPRAISERS, LLC

Exhibit C
Page 9 of 28

000065

EXHIBIT ___6___

PAGE ___175___

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

February 13, 2003
Page 10

## DESCRIPTION OF FINANCIAL SCHEDULES USED IN VALUATION

### TABLE A: Comparative Balance Sheet - Assets

This historical comparative balance sheet presents the changes in the asset items over the 5-year period. The dominant change is in current assets.

### TABLE A-1: Comparative Balance Sheet - Liabilities

This historical comparative balance sheet presents the changes in the liability items over the 5-year period. The dominant change is in current liabilities that increased to $24.223 million. This table also reflects the calculations of "Implied Working Capital", calculated as a percentage of revenues, which was substituted to minimize the dynamic nature of current assets and current liabilities that typically change on a daily basis. This allows the conclusions of value to remain valid over a longer period of time without material changes in value.

### TABLE B: Comparative Income Statement

This historical comparative income statement presents the book figures over the 5-year period. The information contained in this table provides the foundation, after the adjustments described in **Table C**, for the valuation approaches used in this appraisal. The most recent year's performance as presented in Column 5, represents the year-end book figures. To the concluded Pretax Income, we have added back depreciation and amortization to obtain "Pretax Cash Flow". Interest expense is added back to Cash Flow as this appraisal assumes a debt-free basis to yield "Operating Margin, or "Earnings Before Depreciation Interest, Taxes and Amortization" (EBDITA).

A study of this table indicated that ABC follows the somewhat erratic performance of the industry.

### TABLE C: Adjustments to Comparative Income Statement

This statement reflects certain essential income statement items extracted from **Table B** that is subject to adjustments to remove extraordinary income or expense items that would not be necessary for normal business operations. Following the Adjusted Net Income, Cash Flow and Operating Margin, we calculate the weighted average net income utilizing the 1997, 1998, 1999 and 2000 EBDITA as a percentage of sales. This results in adjusted Pretax Income, Net Income, Cash Flow and Operating Margin (EBDITA)

NATIONAL BUSINESS APPRAISERS, LLC

Exhibit C
Page 10 of 28

000066

EXHIBIT ___6___

PAGE ___17b___

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

February 13, 2003
Page 11

expenses. The resulting "Adjusted Operating Margin (EBDITA) is the key income stream upon which the "Income Approach" (Table E) and the "Excess Earnings Approach" (Table G) is based.

The result is used in Table E to calculate the EBDITA for each year of the forecast 5-year period.

### TABLE D-1: Adjusted Book Value

In this table, all current asset items are reversed out in the second column. We have substituted "Implied Working Capital" as explained in the description of Table A-1. The calculations of market value for the fixed assets (Table H-1) appear in the right hand column. The conclusion of market value for the intangible assets, as calculated in Table D-2, is also added to yield "Business Enterprise Value".

### TABLE D-1: Adjusted Book Value

This table presents the calculations of Total Asset Value and Adjusted Shareholder Equity based upon the Business Enterprise Value shown in Table J.

### TABLE E: Income Approach

Based upon historical growth rates and estimates of future performance a five-year forecast is made for net revenues. The value of the reversionary period following the 5-year forecast period would be a capitalization of the average of the fifth and sixth year, discounted to present value. The After Tax Earnings as Percent of Revenues was calculated in Table C, and is used to estimate the operating profit for each forecast year in Table E. Adding back the Depreciation yields the After Tax Cash Flow. Capital expenditures and changes in working capital are subtracted from this figure to produce the "Distributable Cash Flow". Applying the appropriate discount rate (calculated in Table F) returns these cash flow streams to present value. The total of the five discounted cash flows plus the discounted reversionary value represents the Business Enterprise Value under the Income Approach. The capitalization rate for the reversionary period is calculated using the formula shown in the notes following the schedule.

### TABLE F: Capital Asset Pricing Model

Widely used method of determining the discount rates that are used in Table E. The "Weighted Average Cost of Capital" represents the blending of the Company's estimated

NATIONAL BUSINESS APPRAISERS, LLC

Exhibit C
Page 11 of 28

EXHIBIT _____

PAGE _____ 177

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

February 13, 2003
Page 12

cost of borrowing (the lowest rate) and the "cost of equity capital". The blending is based upon the market average percent of equity and of debt as taken from the public market as shown in Table G-1 under the assumption that the selected public companies could be buyers for the Subject company, which would then reflect the capital structure of the buyer. Borrowed capital is generally the lowest risk due to the security normally provided to the lender. Equity capital, on the other hand, carries the greatest risk, as it does not share the security available to lenders. The blending of these two rates yields the weighted average cost of capital, or discount rate. The notes following Table F adds further insight.

TABLE G: Capitalization of Excess Earnings

This represents one of three significant valuation approaches for small privately held companies. The original simplified "formula method" had the disadvantage of ignoring the value of the individual asset categories with differing economic lives. In **Table G,** the "Earnings Before Capital Charges" is the estimated EBDITA for the year 2000, as calculated in Table E. From these earnings, we subtract the return of the capital investment represented by the "Economic Depreciation", and the return on the assets in use as listed under the heading "Economic Return on Capital", yielding the "Total Excess Earnings" of ABC. The "Net Excess Earnings", is then capitalized using the equity multiple as developed in Table F. The value of the capitalized excess earnings is then added to the "Total Assets in Use" to reflect the market value under the Excess Earnings Approach on a control basis.

TABLE H

The method for appraising fixed assets as herein described is known as the "Depreciated Replacement Cost New Approach" (DRCN). This presents the appraised value of each of the items of fixed assets, based upon the depreciation schedule of the income tax return for 1999. As noted, each item is listed as to description, date of purchase, original cost, estimated economic life, years in use, remaining economic life, price trend factor based upon the consumer price index, replacement cost new, estimated remaining economic life and fair market value. Items beyond their estimated economic life are valued at zero.

TABLE H-1

This table summarizes the market value of each group of assets, and is used in Table D and Table G.

EXHIBIT _____ψ_____

PAGE _____178_____

ABC INTERNATIONAL TRADERS, INC.
North Hills, California

February 13, 2003
Page 13

**TABLE I:** Market Comparable Companies from public marketplace.

The operating results of the listed public companies present various indicators that are useful in determining the market value of ABC.  Listed are the Company's shares outstanding, market capitalization, annual sales, market capitalization/sales ratio, and Beta.  We use the median of the market cap/sales ratios of the Public companies in our Market Approach that follows in Table I-1.  We use the average of the Betas and the capital structures of the public companies for our calculations of the discount rates in Table F.  These comparables are all involved in the same industry as ABC.

**TABLE I-1:** Market Approach Valuation

Gross revenues in 2000 for ABC is multiplied by the median revenue/market cap ratio to obtain the indicated market value on a minority basis.  A discount[1] is applied to adjust for the differences in size of the public companies as compared with ABC.  This yields the market value of the equity on a minority basis.  To adjust the minority value to a control value we add the premium for control for comparison with the other approaches, which yields the market value of the equity on a control basis.  To convert this value to the business enterprise value, we must add back the implied working capital to yield Business enterprise value on a control basis.  This value is now comparable to the results of the other two approaches as reflected in Table J.

**TABLE I: Final Correlation**

Each of the individual market values developed in the various approaches are listed, and weighted. The income approach is generally granted the greatest weight, as the driving force for the average investor is the anticipation of future benefits, however in this report we believe it appropriate to grant meaningful weight to both the excess earnings approach and the market approach as both are valid approaches for use with medium sized business valuations.

---

[1] Mergerstat Review 1999

EXHIBIT 6

PAGE 179

REVISED REPORT
ABC

**TABLE A**
**FIVE YEAR COMPARATIVE BALANCE SHEET**
F/Y End December 31
($000)

Job No. I118ABCV   Appr Date 12/31/2000   Run Date 03/26/04

| ASSETS | 1996 | % | 1997 | % | 1998 | % | 1999 | % | 2000 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | | | | | |
| Cash & equivalents | $438 | 2.5 | $797 | 3.8 | $860 | 5.1 | ($379) | -0.4 | $1,144 | 4.5 |
| Accounts Receivable-Trade | 3,760 | 21.8 | 10,067 | 47.7 | 7,614 | 44.8 | 11,154 | 63.5 | 8,744 | 34.3 |
| Inventories | 11,677 | 67.7 | 8,663 | 41.0 | 7,400 | 43.6 | 5,834 | 33.2 | 14,278 | 56.0 |
| Due from affiliate | 143 | 0.8 | 171 | 0.8 | | 0.0 | (320) | -1.8 | 209 | 0.8 |
| Prepaid Expenses & Other | 786 | 4.6 | 768 | 3.6 | 379 | 2.2 | 373 | 2.1 | 190 | 0.7 |
| **Total Current** | $16,804 | 97.4 | $20,466 | 96.9 | $16,253 | 95.7 | $16,962 | 96.6 | $24,365 | 96.4 |
| **Property & Equipment** | | | | | | | | | | |
| Machinery & Equipment | $1,759 | 10.2 | $2,366 | 11.2 | $3,621 | 21.3 | $1,409 | 8.0 | $2,231 | 8.8 |
| Leasehold Improvements | 86 | | 86 | | 86 | | 86 | | 215 | |
| Less Accum. Depr. | (1,399) | -8.1 | (1,806) | -8.5 | (2,977) | -17.5 | (900) | -5.1 | (1,554) | -6.0 |
| **Net Fixed Assets** | $446 | 2.6 | $655 | 3.1 | $730 | 4.3 | $595 | 3.4 | $912 | 3.6 |
| Deposits & other | | 0.0 | | 0.0 | | 0.0 | | 0.0 | | 0.0 |
| **TOTAL ASSETS** | $17,250 | 100.0 | $21,121 | 100.0 | $16,983 | 100.0 | $17,557 | 100.0 | $25,477 | 100.0 |

This information is from the fiscal year of 1996 to 2000.

Exhibit C
Page 14 of 28

000070

14.60

EXHIBIT 6
PAGE 180

REVISED REPORT

### TABLE A-1
### FIVE YEAR COMPARATIVE BALANCE SHEET
F/Y End December 31

(\$000)

Job No. 1118ABCV
Appv Date 12/31/2000
Run Date 15-Dec-00

#### LIABILITIES & SHAREHOLDERS EQUITY

| | 1996 | % | 1997 | % | 1998 | % | 1999 | % | 2000 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| **Current Liabilities** | | | | | | | | | | |
| Accounts Payable & Accrued | \$ 7,222 | 41.9 | \$ 11,134 | 52.7 | \$ 6,904 | 40.7 | \$ 6,611 | 37.7 | \$ 12,951 | 50.8 |
| Bank Line-Revolving | 0 | 0.0 | 0 | 0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Current Port. L.T Debt | 36 | 0.2 | 38 | 0.2 | 38 | 0.2 | 0 | 0.0 | 0 | 0.0 |
| Other current | 3 | 0.0 | 45 | 0.2 | 131 | 0.8 | 0 | 0.0 | 11,272 | 44.2 |
| Total current liabilities | \$ 7,261 | 42.1 | \$ 11,217 | 53.1 | \$ 7,073 | 41.6 | \$ 6,611 | 37.7 | \$ 24,223 | 95.1 |
| **Long Term Liabilities** | | | | | | | | | | |
| Notes payable to bank | \$ 5,950 | 34.5 | \$ 3,175 | 15.0 | \$ 5,231 | 30.8 | \$ 2,129 | 12.1 | \$ 1,147 | 4.5 |
| Long term debt, less current | | 0.0 | | 0.0 | | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Subordinated notes payable & other | 2,718 | 15.8 | 3,028 | 14.3 | 3,247 | 19.1 | 3,255 | 18.5 | 3,590 | 14.1 |
| Total long term liabilities | \$ 8,668 | 50.2 | \$ 6,203 | 29.4 | \$ 8,478 | 49.9 | \$ 5,384 | 30.7 | \$ 4,733 | 18.6 |
| **Total Liabilities** | \$ 15,929 | 92.3 | \$ 17,420 | 82.5 | \$ 15,551 | 91.6 | \$ 11,995 | 68.3 | \$ 28,960 | 113.7 |
| **Shareholders Equity** | \$ 1,321 | 7.7 | \$ 3,701 | 17.5 | \$ 1,432 | 8.4 | \$ 5,562 | 31.7 | \$ (3,483) | -13.7 |
| **Total Liabilities & Shareholders Equity** | \$ 17,250 | 100.0 | \$ 21,121 | 100.0 | \$ 16,983 | 100.0 | \$ 17,557 | 100.0 | \$ 25,477 | 100.0 |
| Current Ratio | 2.31 | | 1.83 | | 2.30 | | 2.57 | | 1.01 | |
| Quick Ratio | 0.98 | | | | | | | | | |
| L.T Debt / Net Worth | 0.56 | | 0.97 | | 1.20 | | 1.68 | | 0.41 | |
| Working Capital | \$ 9,543 | 55.3 | 1.68 | | 5.02 | | 0.97 | | -1.36 | |
| | | | \$ 9,249 | 43.8 | \$ 9,180 | 54.1 | \$ 10,351 | 59.0 | \$ 342 | 1.3 |
| **IMPLIED WORKING CAPITAL** | | | | | | | | | | |
| Net Revenues | \$ 46,980 | | \$ 55,313 | | \$ 40,732 | | \$ 66,350 | | \$ 77,489 | |
| W/C as a percent of revenues * | 12.23% | | 12.23% | | 12.23% | | 12.23% | | 12.23% | |
| Implied working capital | \$ 5,747 | | \$ 6,766 | | \$ 4,982 | | \$ 8,116 | | \$ 9,479 | |
| * Robert Morris Associates SIC #3944, Games, Toys etc. | | | | | | | | | \$ 9,508 | |

Exhibit C
Page 15 of 28

000071

15.8(i)

EXHIBIT 6
PAGE 181

| REVISED REPORT | | TABLE B | | | | | Job No. | 1118ABCV | |
|---|---|---|---|---|---|---|---|---|---|
| | | FIVE YEAR COMPARATIVE INCOME STATEMENT | | | | | Appr Date | 12/01/2000 | |
| ABC INTERNATIONAL TRADERS, INC. | | F/Y End December 31 | | | | | Run Date | 25-Mar-04 | |
| | | ($000) | | | | | | | |
| | 1996 | % | 1997 | % | 1998 | % | 1999 | % | (1) 2000 | % |
| REVENUES - NET | $ 46,980 | 100.0 | $ 55,315 | 100.0 | $ 40,732 | 100.0 | $ 66,350 | 100.0 | $ 77,489 | 100.0 |
| Less cost of sales | 36,834 | 78.4 | 40,052 | 72.4 | 26,093 | 64.1 | 43,724 | 65.9 | 51,300 | 66.8 |
| GROSS PROFIT | $ 10,146 | 21.6 | $ 15,283 | 27.6 | $ 14,639 | 35.9 | $ 22,626 | 34.1 | $ 24,189 | 31.2 |
| Other income (loss) | (738) | -1.6 | 28 | 0.1 | (253) | -0.6 | 350 | 0.5 | 5,000 | 6.5 |
| TOTAL INCOME | $ 9,408 | 20.0 | $ 15,311 | 27.7 | $ 14,386 | 35.3 | $ 22,976 | 34.6 | $ 29,189 | 37.7 |
| EXPENSES | | | | | | | | | | |
| Advertising & promotion | $ 2,936 | 6.2 | $ 2,993 | 5.4 | $ 3,898 | 9.6 | $ 4,367 | 6.6 | $ 7,680 | 9.9 |
| Automobile expense | 74 | 0.2 | 47 | 0.1 | 64 | 0.2 | 67 | 0.1 | 70 | 0.1 |
| Bad debts | 289 | 0.6 | (6) | 0.0 | | 0.0 | 30 | 0.0 | | 0.0 |
| Bank charges | 312 | 0.7 | 294 | 0.5 | 181 | 0.4 | 196 | 0.3 | 200 | 0.3 |
| Commissions | 1,912 | 4.1 | 2,535 | 4.6 | 2,368 | 5.3 | 2,487 | 3.7 | 3,000 | 3.9 |
| Data processing & supplies | 22 | 0.0 | 27 | 0.0 | 64 | 0.2 | 66 | 0.1 | 70 | 0.1 |
| Depreciation | 732 | 1.6 | 585 | 1.1 | 589 | 1.4 | 540 | 0.8 | 634 | 0.8 |
| Delivery, postage | 130 | 0.3 | 242 | 0.4 | 191 | 0.5 | 323 | 0.5 | 375 | 0.5 |
| Insurance | 329 | 0.7 | 227 | 0.4 | 305 | 0.7 | 386 | 0.6 | 400 | 0.5 |
| Interest Expense | 663 | 1.4 | 390 | 0.7 | 552 | 1.4 | 842 | 1.3 | 1,179 | 1.5 |
| Legal, professional & accounting | 343 | 0.7 | 1,225 | 2.2 | 1,681 | 4.1 | 1,199 | 1.8 | 1,250 | 1.6 |
| Miscellaneous other | 187 | 0.4 | 105 | 0.2 | 379 | 0.9 | 62 | 0.1 | 4,910 | 6.3 |
| Molds | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 504 | 0.8 | 750 | 1.0 |
| Office Expenses | 77 | 0.2 | 61 | 0.1 | 71 | 0.2 | 132 | 0.2 | 150 | 0.2 |
| Product development | 1,028 | 2.2 | 463 | 0.8 | 1,008 | 2.5 | 1,711 | 2.6 | 2,000 | 2.6 |
| Rents | 467 | 1.0 | 346 | 0.6 | 382 | 0.9 | 455 | 0.7 | 431 | 0.6 |
| Repairs & maintenance | 11 | 0.0 | 11 | 0.0 | 22 | 0.1 | | 0.0 | | 0.0 |
| Salaries, officers | 696 | 1.5 | 704 | 1.3 | 1,104 | 2.7 | 1,193 | 1.8 | 1,200 | 1.5 |
| Salaries & wages | 2,009 | 4.3 | 2,284 | 4.1 | 2,223 | 5.5 | 3,179 | 4.8 | 3,874 | 5.0 |
| Taxes & licenses | 27 | 0.1 | 211 | 0.4 | 39 | 0.1 | 61 | 0.1 | 75 | 0.1 |
| Taxes, payroll | 220 | 0.5 | 176 | 0.3 | 219 | 0.5 | 254 | 0.4 | 260 | 0.3 |
| Telephone | 219 | 0.5 | 185 | 0.3 | 166 | 0.4 | 214 | 0.3 | 225 | 0.3 |
| Travel & entertainment | 341 | 0.7 | 226 | 0.4 | 277 | 0.7 | 399 | 0.6 | 450 | 0.6 |
| Utilities | 36 | 0.1 | 32 | 0.1 | 30 | 0.1 | 35 | 0.1 | 40 | 0.1 |
| TOTAL EXPENSES | $ 13,060 | 27.8 | $ 13,371 | 24.2 | $ 15,613 | 38.3 | $ 18,707 | 28.2 | $ 29,223 | 37.7 |
| PRETAX INCOME | $ (3,652) | -7.8 | $ 1,940 | 3.5 | $ (1,227) | -3.0 | $ 4,269 | 6.4 | $ (34) | 0.0 |
| Add Depreciation/Amort | 732 | 1.6 | 585 | 1.1 | 589 | 1.4 | 540 | 0.8 | 634 | 0.8 |
| PRETAX CASH FLOW (2) | $ (2,920) | -6.2 | $ 2,525 | 4.6 | $ (638) | -1.6 | $ 4,809 | 7.2 | $ 600 | 0.8 |
| Add Interest Charges | 663 | 1.4 | 390 | 0.7 | 552 | 1.4 | 842 | 1.3 | 1,179 | 1.5 |
| EBDIT (3) | $ (2,257) | -1.8 | $ 2,915 | 5.3 | $ (86) | -0.2 | $ 5,651 | 8.5 | $ 1,779 | 2.3 |

(1) Basic data from Deloitte & Touche audited report.
(2) Pretax income plus depreciation.
(3) Pretax cash flow plus interest charges

Exhibit C
Page 16 of 28

000072

16. 8D

EXHIBIT ____6____

PAGE ____182____

Case 2:04-cv-09049-DOC-RNB   Document 4061-3   Filed 07/01/08   Page 22 of 128   Page ID #:98640

REVISED REPORT

**ABC INTERNATIONAL TRADERS, INC.**

TABLE C
INCOME STATEMENT ADJUSTMENTS
FY End December 31
($000)

Job No LITERACY
Oper Date 12/31/2000
Run Date 23-Apr-04

| | 1996 | % | 1997 | % | 1998 | % | 1999 | % | 2000 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| REVENUES - NET | $ 46,980 | 100.0 | $ 55,315 | 100.0 | $ 40,732 | 100.0 | $ 66,350 | 100.0 | $ 77,489 | 100.0 |
| OPERATING INCOME (CREDIT) | $ (2,357) | (4.8) | $ 2,915 | 5.3 | $ (66) | (0.2) | $ 5,651 | 8.3 | $ 1,779 | 2.3 |
| ADJUSTMENTS TO INCOME | | | | | | | | | | |
| Legal, professional & accounting | 345 | 0.7 | 1,225 | 2.2 | 1,681 | 4.1 | 1,199 | 1.8 | 7,350 | 7.0 |
| Mailroom | 0 | | 0 | | 0 | | | | 5,000 | 6.3 |
| Salaries, Officers | 695 | 1.5 | 704 | 1.3 | 1,104 | 2.7 | 1,194 | 1.8 | 1,200 | 1.5 |
| Traveling Expenses | 341 | 0.7 | 226 | 0.4 | 277 | 0.7 | 399 | 0.6 | 439 | 0.6 |
| TOTAL ADJUSTMENTS TO INCOME | $ 1,380 | 2.9 | $ 2,155 | 3.9 | $ 3,062 | 7.5 | $ 2,792 | 4.2 | $ 7,900 | 10.2 |
| SUBTOTAL | $ (977) | (1.9) | $ 5,070 | 9.1 | $ 2,996 | 7.3 | $ 8,443 | 12.7 | $ 9,679 | 12.5 |
| LESS REASONABLE EXPENSES | | | | | | | | | | |
| Legal, professional & accounting  0.73% | (353) | (0.6) | (415) | (0.8) | (305) | (0.3) | (493) | (0.8) | (581) | (0.8) |
| Salaries, Officers  1.50% | (705) | (1.5) | (830) | (1.5) | (611) | (1.5) | (955) | (1.5) | (1,162) | (1.5) |
| Traveling Expenses  0.60% | (282) | (0.6) | (332) | (0.6) | (240) | (0.6) | (398) | (0.6) | (465) | (0.6) |
| ADJUSTED PRETAX INCOME | $ (2,216) | (4.7) | $ 3,494 | 6.3 | $ 1,815 | 4.5 | $ 6,552 | 9.9 | $ 7,470 | 9.6 |
| Add Back Depreciation | 732 | 1.6 | 385 | | 589 | 1.4 | 580 | 0.8 | 634 | 0.8 |
| ADJUSTED PRETAX CASH FLOW | $ (1,484) | (3.2) | $ 4,079 | 7.4 | $ 2,404 | 5.9 | $ 7,092 | 10.7 | $ 8,104 | 10.5 |
| Add Back Interest Expense | 663 | 1.4 | 390 | 0.7 | 552 | 1.4 | 842 | 1.4 | 1,179 | 1.5 |
| ADJUSTED EBDIT (1) | $ (821) | (1.7) | $ 4,469 | 8.1 | $ 2,956 | 7.3 | $ 7,934 | 12.0 | $ 9,283 | 12.0 |
| EBDIT AS % OF SALES | (1.7) | | 8.1 | | 7.3 | | 12.0 | | 12.0 | |
| Weighting | | | | | | | | | | |
| Product - 3 Columns | 8 | | | | 2 | | 2 | | 2 | |
| Divisor - Sum of Weights | 29 | | 16.2 | | 14.5 | | 23.9 | | 24.0 | |
| WEIGHTED AVERAGE EBDIT | 9.8 | Percent (Used in Table E) | | | | | | | | |

Exhibit C
Page 17 of 28

000073

11.8D

EXHIBIT    6
PAGE    183

REVISED REPORT

**TABLE D-1**
**ADJUSTED BOOK VALUE**
F/Y End December 31
($000)

Job No.   1118ABCV
Appr Date   12/31/2000
Run Date   25-Mar-04

| ABC | Book 31-Dec-00 | % | Adjustments 31-Dec-00 | % | Adjusted 31-Dec-00 | % |
|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | |
| Cash & equivalents | 1,144 | 4.7 | ($1,144) | NM | $0 | 0.0 |
| Accounts Receivable-Trade | 8,744 | 35.6 | (8,744) | NM | 0 | 0.0 |
| Inventories | 14,278 | 58.1 | (14,278) | NM | 0 | 0.0 |
| Due from affilliate | 209 | | (209) | NM | 0 | 0.0 |
| Prepaid Expenses & Other | 190 | 0.8 | (190) | NM | 0 | 0.0 |
| Implied Working Capital | 0 | | 9,500 | NM | 9,500 | 19.9 |
| Total Current Assets | 24,565 | 100.0 | ($15,065) | NM | $9,500 | 19.9 |
| **Fixed Assets as Appraised** | | | | | | |
| Automotive Equipment | 0 | 0.0 | 11 | | 11 | 0.0 |
| Computer Equipment | 0 | 0.0 | 131 | | 131 | 0.3 |
| Furniture & Fixtures | 0 | 0.0 | 24 | | 24 | 0.1 |
| Leasehold Equipment | 0 | 0.0 | 23 | | 23 | 0.0 |
| Machinery & Equipment | 0 | 0.0 | 4 | | 4 | 0.0 |
| Molds & Tooling * | 0 | 0.0 | 1,031 | | 1,031 | 2.2 |
| Office Equipment | 0 | 0.0 | 4 | | | |
| Net Fixed Assets | (1) | 0.0 | 0 | | 1,225 | 2.6 |
| **INTANGIBLE ASSETS** | - | 0.0 | $36,975 | NM | 36,975 | 77.5 |
| **BUSINESS ENTERPRISE VALUE** | 24,564 | 100.0 | | NM | 47,700 | 100.0 |

The right hand column represents the assets included in "Business Enterprise Value"(BEV). This represents the value of the assets required for normal business operations. To convert this number to Total Asset Value, subtract the Implied Working Capital. This will yield "Basic Business Value", or the value of the fixed, intangible and other assets only. See Table D-2 for calculations of Adusted Book Value.

Exhibit C
Page 18 of 28

000074

18. 8P

EXHIBIT _____ 6

PAGE _____ 184

TABLE D-2
ADJUSTED BOOK VALUE
F/Y End December 31

| | Job No. | 1118ABCV |
|---|---|---|
| | Appr Date | 12/31/2000 |
| | Run Date | 25-Mar-04 |

**MARKET VALUE OF BUSINESS ENTERPRISE**

Less Implied Working Capital — $ 47,700

(9,500)

**BASIC BUSINESS VALUE**       Fixed Plus Intangibles — $ 38,200

Less Fixed Assets as Appraised — (1,225)

**MARKET VALUE OF INTANGIBLES (GOODWILL)** — $ 36,975

Add Fixed & Other Assets as Appraised (Table H) — 1,225

Add Current Assets at 12/31/00 (Table A) — 24,565

**ADJUSTED TOTAL ASSET VALUE** — $ 62,765

Less Total Liabilities at 12/31/00 (Table A-1) — (28,960)

**ADJUSTED SHAREHOLDER EQUITY** — $ 33,805

See Table J for final conclusion.

Exhibit C
Page 19 of 28

19 AD

EXHIBIT ___6___

PAGE ___185___

REVISED REPORT
ABC

**TABLE E**
**INCOME APPROACH**
FY Ending Sept 30
($000)

Job No.  111EABCV
Appr Date  12/31/2000
Run Date  25-Mar-04

| | 2001 | 2002 | 2003 | 2004 | 2005 | Reversion |
|---|---|---|---|---|---|---|
| FORECAST REVENUE GROWTH | 25.00% | 10.00% | 5.00% | 5.00% | 5.00% | 5.00% |
| FORECAST OF REVENUE | $96,861 | $106,547 | $111,875 | $117,468 | $123,342 | |
| EBDIT as % of Revenues * | 9.8% | 9.8% | 9.8% | 9.8% | 9.8% | |
| EBDIT * | $9,510 | $10,461 | $10,984 | $11,534 | $12,110 | $10,919 (Table G) |
| Less Capital Equipment Reserve | (347) | (381) | (401) | (421) | (442) | |
| Less Working Capital (1) | (9,500) | (1,185) | (652) | (684) | (718) | |
| DISTRIBUTABLE CASH FLOW | ($337) | $8,895 | $9,932 | $10,429 | $10,950 | $11,224 |
| REVERSIONARY VALUE | | | | Factor (3) | 6.885 | $77,280 |
| Discount Rate (Table F) | 19.25% | 19.25% | 19.25% | 19.25% | 19.25% | 19.25% |
| Period Factor | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | 5.00 |
| Multiplier | 0.916 | 0.768 | 0.644 | 0.540 | 0.453 | 0.415 |
| NPV OF DIST. CASH FLOWS | ($308) | $6,831 | $6,396 | $5,632 | $4,959 | $32,046 |

NPV OF DISTRIBUTABLE CASH FLOW FOR FIRST FIVE YEARS ............ $23,508
NPV OF REVERSIONARY VALUE ............ 32,046

$55,554

MARKET VALUE OF ENTERPRISE BY THE INCOME APPROACH      Rounded      $55,550

(1) Estimated percent of annual revenue and revenue growth required for working capit   -->   12.23%
Reference - RMA Annual Statement Studies.

(2) Income to be capped at end of 5th year was calculated by estimating 6th year's income considering a future growth of 5%, and averaging with the 5th year. This adjusts the fifth year from mid-year to the expected end-of-year-revenues.

(3) Calculated with the following formula: Cap Rate = (1+G)/(R-G), where G = estimated future growth rate.  R = wtd avg cost of capital.  (1+.05) / (.2025 - .05) or 1.05/.1525  =    6.885    or    14.52%

* Earnings Before Depreciation & Amortization, Interest and Taxes.  (See Table C).

Exhibit C
Page 20 of 28

000076

2a 8P

EXHIBIT _____ 6

PAGE _____ 186

REVISED REPORT

**TABLE F**
**CAPITAL ASSET PRICING MODEL**
**(CAPM)**

| | Job No. | 1318ABCV |
| --- | --- | --- |
| | Appr Date | 12/31/2000 |
| | Run Date | 15-Dec-04 |

ABC INTERNATIONAL TRADERS, INC.

**KEY ASSUMPTIONS**

| | | |
| --- | --- | --- |
| Cost of debt - pretax (1) | | 10.00% |
| Federal tax rate (2) | Pretax Basis | 0.00% |
| State tax rate | | 0.00% |
| Combined marginal tax rate | Pretax Basis | 0.00% |
| Long-term treasury bond rate | | 6.00% |
| Market average beta | * | 1.00 |
| Market average percent of equity | * | 72.00% |
| Market average percent of debt | * | 28.00% |

**WEIGHTED AVG COST OF CAPITAL**          19.36%     Rounded     19.25%

Formula: (1-T)*(Kd)(D)+(Ke)(E)

| | |
| --- | --- |
| T = Tax rate | 0.00% |
| Kd = Cost of debt | 10.00% |
| D = Proportion of debt in total capital | 28.00% |
| Ke = Cost of equity | 23.00% |
| E = Proportion of equity | 72.00% |

**COST OF EQUITY CAPITAL**          23.10%     Rounded     23.00%

Formula: Ke = ((B*Rp)+Rs)+Rf

| | |
| --- | --- |
| Rf = Rate of return on risk-free security (3) | 5.00% |
| Rp = Risk premium (Rm - Rf) | 12.10% |
| Rs = Company-specific risk premium (4) | 5.00% |
| Rt = Current return on 30 Year treasury bills | 6.00% |
| B = Industry beta (5) | 1.00 |
| Rm = Market return (6) | 17.10% |

*Ibbotson Industry Studies for SIC Code 3944, Games, Toys, and Children's Vehicles

(1) Company's estimated cost of interest-bearing debt.

(2) Valuation based upon after tax income streams.

(3) Ibbotson & Associates Report 1926-1999, "Arithmetic Mean of Annual Returns for Long-Term U.S. Treasury Bonds" (riskless).

(4) Additional risk factor to adjust for specific risks of the subject company and industry.

(5) A measure of risk (variability) of common stocks in the industry. (Ibbotson Industry Studies for SIC Code 3944, Games, Toys, and Children's Vehicles)

(6) Ibbotson & Associates Report 1926-1997, "Arithmetic Mean of Annual Returns for The Common Stock of Small Companies".

Exhibit C
Page 21 of 28

21. 80

EXHIBIT ____4____

PAGE ____187____

REVISED REPORT

**TABLE G**

**EXCESS EARNINGS APPROACH**

($000)

ABC

| | | | Job No. | 1118ABCV |
|---|---|---|---|---|
| | | | Appr Date | 12/31/2000 |
| | | | Run Date | 25-Mar-04 |

**EARNINGS BEFORE CAPITAL CHARGES (Table E)**                                    $10,919

| CAPITAL CHARGES Economic Depreciation | Appraised Value | Est Life | | Return Of | |
|---|---|---|---|---|---|
| Automotive Equipment | $   11 | 10 | Yrs | 1 | |
| Computer Equipment | 131 | 5 | Yrs | 26 | |
| Furniture & Fixtures | 24 | 15 | Yrs | 2 | |
| Leasehold Equipment | 23 | 10 | Yrs | 2 | |
| Machinery & Equipment | 4 | 10 | Yrs | 0 | |
| Molds & Tooling * | 1,031 | 3 | Yrs | 344 | |
| Office Equipment | 4 | 10 | Yrs | 0 | |
| Fixed Assets at Cost | $  1,229 | 3.5 | | $347 | $   (347) |

| Economic Return | Adjusted Book | % | Return On | |
|---|---|---|---|---|
| Working Capital | $  9,500 | 10.0% | $   950 | |
| Automotive Equipment | 11 | 15.0% | 2 | |
| Computer Equipment | 131 | 20.0% | 26 | |
| Furniture & Fixtures | 24 | 15.0% | 4 | |
| Leasehold Equipment | 23 | 20.0% | 5 | |
| Machinery & Equipment | 4 | 12.5% | 1 | |
| Molds & Tooling * | 1,031 | 15.0% | 155 | |
| Office Equipment | 4 | 15.0% | 1 | |
| Adj. Tangible Net W. | $ 10,729 | | $  1,142 | $  (1,142) |

| | | | | |
|---|---|---|---|---|
| TOTAL EXCESS EARNINGS | | | | $   9,430 |
| Excess Earnings Cap Rate | | 23.0%  ** | | $  41,001 |
| Add Tangible Assets | | | | 10,729 |
| BUSINESS ENTERPRISE VALUE BY EXCESS EARNINGS METHOD | | | | $  51,730 |

* Includes Fixed Assets added in 2000.            Rounded       $  51,750

**Equity Discount Rate

Exhibit C
Page 22 of 28

000078

EXHIBIT ___6___

PAGE ___188___

ABC INTERNATIONAL TRADERS, INC.
16730 Schoenborn Street
North Hills, CA 91343-6122

Appraisal Date 12/31/00
Original Cost $2,417
Depreciated Replacement Cost New $2,229

TABLE II
FIXED ASSET APPRAISAL
FROM DEPRECIATION SCHEDULES

| Owned Leased | Entry Item Order No. | DESCRIPTION | Qty | | Valuation Date | Orig Cost* ($) | Est Econ Life | Yrs In Use | Rem Econ Life | Price Trend Factor | Repl Cost New | Ext'd Rem Life | Fair Market Value 12/31/00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OWNED | 12 | TRUCK | 1 | AE | 01-Aug-93 | 35,951 | 10.0 | 7.4 | 2.6 | 1.202 | 43,213 | 26% | 11,141 |
| OWNED | 17 | COMPUTER | 1 | CE | 15-Oct-93 | 1,120 | 5.0 | 7.2 | (2.2) | - | - | -44% | 0 |
| OWNED | 18 | COMPUTER | 1 | CB | 15-Jul-94 | 750 | 5.0 | 6.5 | (1.5) | - | - | -29% | 0 |
| OWNED | 27 | COMPUTER | 1 | CB | 01-Oct-94 | 5,727 | 5.0 | 6.5 | (1.5) | - | - | -25% | 0 |
| OWNED | 59 | COMPUTER | 1 | CB | 01-Oct-94 | 1,476 | 5.0 | 6.3 | (1.3) | - | - | -25% | 0 |
| OWNED | 35 | COMPUTER | 1 | CE | 01-Dec-94 | 20,393 | 5.0 | 6.1 | (1.1) | - | - | -23% | 0 |
| OWNED | 29 | COMPUTER | 1 | CH | 01-May-95 | 22,714 | 5.0 | 5.8 | (0.8) | - | - | -17% | 0 |
| OWNED | 30 | COMPUTER | 1 | CH | 01-Jun-95 | 18,174 | 5.0 | 5.6 | (0.6) | - | - | -12% | 0 |
| OWNED | 31 | COMPUTER | 1 | CH | 15-Oct-95 | 10,448 | 5.0 | 5.2 | (0.2) | - | - | -4% | 0 |
| OWNED | 33 | COMPUTER | 1 | CH | 15-Nov-95 | 15,360 | 5.0 | 5.1 | (0.1) | - | - | -3% | 0 |
| OWNED | 32 | COMPUTER | 1 | CH | 15-Dec-95 | 4,923 | 5.0 | 5.0 | (0.0) | - | - | -1% | 0 |
| OWNED | 37 | COMPUTER | 1 | CH | 15-Dec-95 | 9,975 | 5.0 | 5.0 | (0.0) | - | - | -1% | 0 |
| OWNED | 38 | COMPUTER | 1 | CE | 01-Jul-96 | 8,445 | 5.0 | 4.5 | 0.5 | 0.600 | 5,067 | 10% | 503 |
| OWNED | 60 | COMPUTER | 1 | CE | 01-Jul-96 | 211,405 | 5.0 | 4.5 | 0.5 | 0.600 | 126,843 | 10% | 12,580 |
| OWNED | 61 | COMPUTER | 1 | CE | 01-Jul-96 | 1,309 | 5.0 | 4.5 | 0.5 | 0.600 | 785 | 10% | 78 |
| OWNED | 62 | COMPUTER | 1 | CE | 01-Jul-97 | 27,505 | 5.0 | 3.5 | 1.5 | 0.700 | 19,254 | 30% | 5,760 |
| OWNED | 63 | COMPUTER | 1 | CE | 01-Jul-97 | 2,762 | 5.0 | 3.5 | 1.5 | 0.700 | 1,933 | 30% | 578 |
| OWNED | 45 | COMPUTER | 1 | CE | 01-Jan-98 | 39,597 | 5.0 | 2.6 | 2.4 | 0.800 | 31,678 | 48% | 15,232 |
| OWNED | 46 | COMPUTER | 1 | CB | 01-Jul-98 | 36,668 | 5.0 | 2.5 | 2.5 | 0.800 | 29,334 | 50% | 14,643 |
| OWNED | 47 | COMPUTER | 1 | CB | 01-Jul-98 | 91,565 | 5.0 | 2.5 | 2.5 | 0.900 | 82,469 | 60% | 49,445 |
| OWNED | 48 | COMPUTER | 1 | CB | 01-Feb-99 | 11,243 | 5.0 | 1.9 | 3.1 | 0.900 | 10,119 | 62% | 6,243 |
| OWNED | 49 | COMPUTER | 1 | CB | 01-Mar-99 | 4,000 | 5.0 | 1.8 | 3.2 | 0.900 | 3,600 | 63% | 2,276 |
| OWNED | 50 | COMPUTER | 1 | CB | 01-Mar-99 | 4,125 | 5.0 | 1.8 | 3.2 | 0.900 | 3,713 | 63% | 2,348 |
| OWNED | 51 | COMPUTER | 1 | CB | 01-May-99 | 3,605 | 5.0 | 1.8 | 3.2 | 0.900 | 3,245 | 63% | 2,052 |
| OWNED | 52 | COMPUTER | 1 | CB | 01-May-99 | 2,735 | 5.0 | 1.8 | 3.2 | 0.900 | 2,460 | 63% | 1,555 |
| OWNED | 53 | COMPUTER | 1 | CB | 01-May-99 | 4,702 | 5.0 | 1.7 | 3.3 | 0.900 | 4,232 | 65% | 2,748 |
| OWNED | 54 | COMPUTER | 1 | CB | 01-Jun-99 | 20,684 | 5.0 | 1.4 | 3.6 | 0.900 | 18,616 | 68% | 12,710 |
| OWNED | 55 | COMPUTER | 1 | CB | 01-Aug-99 | 1,557 | 5.0 | 1.3 | 3.7 | 0.900 | 1,401 | 72% | 1,004 |
| OWNED | | COMPUTER | 1 | CB | 01-Sep-99 | 1,687 | 5.0 | 1.3 | 3.7 | 0.900 | 1,518 | 73% | 1,113 |
| OWNED | 1 | EXHIBIT BOOTH - FURN & FIX | 1 | FF | 01-Nov-89 | 14,443 | 15.0 | 11.2 | 3.8 | 1.368 | 19,758 | 26% | 5,041 |
| OWNED | 2 | FURNITURE & FIXTURES | 1 | FF | 01-Sep-90 | 6,857 | 15.0 | 10.3 | 4.7 | 1.320 | 9,051 | 31% | 2,811 |
| OWNED | 16 | FURNITURE & FIXTURES | 1 | FF | 01-Jul-91 | 13,606 | 15.0 | 9.5 | 5.5 | 1.274 | 17,334 | 37% | 6,345 |
| OWNED | 26 | FURNITURE & FIXTURES | 1 | FF | 15-Apr-94 | 1,404 | 15.0 | 6.7 | 8.3 | 1.172 | 1,645 | 55% | 909 |
| OWNED | 34 | FURNITURE & FIXTURES | 1 | FF | 01-Aug-95 | 238 | 15.0 | 5.4 | 9.6 | 1.146 | 273 | 64% | 174 |

23.90

EXHIBIT U
PAGE 189

ABC INTERNATIONAL TRADERS, INC.
16730 Schoenborn Street
North Hills, CA 91343-6122

Appraisal Date 12/31/00
Original Cost $2,417
$1,229

**TABLE II**
**FIXED ASSET APPRAISAL**
**FROM DEPRECIATION SCHEDULES**

Depreciated Replacement Cost New

| Owned Leased | Entry Order No. | DESCRIPTION | Qty | Valuation Date | Orig Cost* (D) | Est Econ Life | Yrs In Use | Rem Econ Life | Price Trend Factor | Repl Cost New | Est'd Rmng Life | Fair Market Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OWNED | 25 | FURNITURE & FIXTURES | FF | 01-Aug-95 | 299 | 15.0 | 5.4 | 9.6 | 1.146 | 343 | 64% | 210 |
| OWNED | 26 | FURNITURE & FIXTURES | FF | 01-Aug-95 | 1,069 | 15.0 | 5.4 | 9.6 | 1.146 | 1,225 | 64% | 782 |
| OWNED | 24 | FURNITURE & FIXTURES | FF | 15-Sep-95 | 1,235 | 15.0 | 5.3 | 9.7 | 1.146 | 1,484 | 65% | 960 |
| OWNED | 35 | FURNITURE & FIXTURES | FF | 15-Nov-95 | 1,000 | 15.0 | 5.1 | 9.9 | 1.146 | 1,146 | 66% | 754 |
| OWNED | 43 | FURNITURE & FIXTURES | FF | 01-Mar-98 | 1,659 | 15.0 | 2.8 | 12.2 | 1.065 | 1,767 | 81% | 1,433 |
| OWNED | 44 | FURNITURE & FIXTURES | FF | 01-Aug-98 | 643 | 15.0 | 2.4 | 12.6 | 1.065 | 685 | 84% | 574 |
| OWNED | 57 | FURNITURE & FIXTURES | FF | 01-May-99 | 3,601 | 15.0 | 1.7 | 13.3 | 1.043 | 3,756 | 89% | 3,337 |
| OWNED | 58 | FURNITURE & FIXTURES | FF | 01-Dec-99 | 1,113 | 15.0 | 1.1 | 13.9 | 1.043 | 1,163 | 93% | 1,079 |
| OWNED | 6 | LEASEHOLD IMPROVEMENTS | LI | 01-Oct-90 | 2,789 | 10.0 | 10.3 | (0.3) | 1.274 | 2,921 | -3% | 0 |
| OWNED | 7 | LEASEHOLD IMPROVEMENTS | LI | 01-Feb-91 | 2,293 | 10.0 | 9.9 | 0.1 | 1.274 | 2,921 | 1% | 23 |
| OWNED | 21 | LEASEHOLD IMPROVEMENTS | LI | 01-Sep-93 | 17,200 | 10.0 | 7.3 | 2.7 | 1.202 | 20,795 | 27% | 5,538 |
| OWNED | 19 | LEASEHOLD IMPROVEMENTS | LI | 15-Jan-94 | 8,633 | 10.0 | 7.0 | 3.0 | 1.172 | 10,118 | 30% | 3,071 |
| OWNED | 20 | LEASEHOLD IMPROVEMENTS | LI | 01-Nov-94 | 28,862 | 10.0 | 6.2 | 3.8 | 1.172 | 33,826 | 38% | 12,956 |
| OWNED | 36 | LEASEHOLD IMPROVEMENTS | LI | 15-Oct-95 | 2,814 | 10.0 | 5.2 | 4.8 | 1.146 | 3,225 | 48% | 1,543 |
| OWNED | 13 | MACHINERY & EQUIPMENT | ME | 15-Jan-94 | 1,004 | 10.0 | 7.0 | 3.0 | 1.172 | 1,177 | 30% | 357 |
| OWNED | 14 | MACHINERY & EQUIPMENT | ME | 15-Jan-94 | 1,111 | 10.0 | 6.7 | 3.3 | 1.172 | 1,302 | 33% | 427 |
| OWNED | 22 | MACHINERY & EQUIPMENT | ME | 01-Jul-94 | 2,444 | 10.0 | 6.1 | 3.9 | 1.172 | 2,864 | 39% | 1,121 |
| OWNED | 39 | MACHINERY & EQUIPMENT | ME | 01-Jul-97 | 628 | 10.0 | 3.5 | 6.5 | 1.088 | 683 | 65% | 444 |
| OWNED | 40 | MACHINERY & EQUIPMENT | ME | 01-Sep-90 | 2,956 | 10.0 | 10.3 | (5.3) | 1.088 | 3,194 | 63% | 2,075 |
| OWNED | 3 | MOLDS & TOOLING | MT | 01-Jul-08 | 3,220 | 5.0 | 2.5 | 2.5 | 1.065 | - | -107% | 0 |
| OWNED | 42 | MOLDS & TOOLING | MT | 01-Jul-99 | 877,854 | 5.0 | 1.5 | 3.5 | 1.043 | 934,925 | 50% | 466,694 |
| OWNED | 56 | MOLDS & TOOLING | MT | 01-Sep-99 | 773,751 | 5.0 | 1.3 | 3.7 | 1.043 | 807,022 | 70% | 564,252 |
| OWNED | 8 | EQUIPMENT | OE | 01-Nov-91 | 1,100 | 5.0 | 9.2 | (4.2) | 1.274 | - | -3% | 0 |
| OWNED | 5 | TELEPHONE SYSTEM | OE | 01-Dec-91 | 15,087 | 5.0 | 9.1 | (4.1) | 1.274 | 19,221 | 8% | 1,590 |
| OWNED | 10 | MAIL MACHINE | OE | 01-Jun-92 | 1,997 | 10.0 | 8.6 | 1.4 | 1.274 | 2,544 | 9% | 231 |
| OWNED | 23 | WATER PURIFIER | OE | 01-Jun-92 | 147 | 10.0 | 5.9 | 4.1 | 1.232 | 181 | 41% | 26 |
| OWNED | 11 | WATER PUMP | OE | 01-Feb-93 | 1,748 | 10.0 | 8.4 | 1.6 | 1.146 | 2,003 | 41% | 818 |
| OWNED | 15 | CELLULAR PHONE | OE | 01-Aug-92 | 784 | 5.0 | 8.4 | (3.4) | 0.500 | 392 | -68% | 0 |
| OWNED | | TELECOM EQUIPMENT | OE | 15-Jul-94 | 2,436 | 5.0 | 6.5 | (1.5) | 1.172 | 2,843 | 35% | 1,004 |
| OWNED | | MOLDS & TOOLING | OE | 30-Jun-00 | 822 | 5.0 | 0.5 | 4.5 | 1.172 | 963 | 90% | 866 |
| | | | | ($000) | $2,417 | | | | | FMV | | $1,229 |

000080

Exhibit C
Page 24 of 28

24. EW

EXHIBIT _____ 6

PAGE _____ 190

**TABLE H-1**
**FIXED ASSET APPRAISAL**
From Depreciation Schedules
($000)

Job No. 1118ABCV
Appr Date 12/31/2000
Run Date 25-Mar-04

| SUMMARY BY ASSET CATEGORY | | Original Cost | Estimated Econ. Life | FMV |
|---|---|---|---|---|
| Automotive Equipment | AE | $ 36 | 10.0 | $ 11 |
| Computer Equipment | CE | 585 | 5.0 | 131 |
| Furniture & Fixtures | FF | 47 | 15.0 | 24 |
| Leasehold Equipment | LE | 63 | 10.0 | 23 |
| Machinery & Equipment | ME | 8 | 10.0 | 4 |
| Molds & Tooling * | MT | 2,477 | 5.0 | 1,031 |
| Office Equipment | OE | 23 | 10.0 | 4 |
| **TOTALS** | | **$ 3,239** | | **$ 1,229** |

Extracted from the detailed appraisal in Table H.

000081

Exhibit C
Page 25 of 28

25.2D

EXHIBIT ____ 6
PAGE ____ 191

TABLE I
MARKET INFORMATION
23-Oct-00

| COMPANY | Symbol | Shares Out (000) | Market Cap* ($000) | Annual Sales ($000) | Mkt Cap/ Sales (0) | Beta (0) |
|---|---|---|---|---|---|---|
| | | | | | Job No. | 1118ABCV |
| | | | | | Appr Date | 12/31/2000 |
| | | | | | Run Date | 25-Mar-04 |
| JAKKS PACIFIC | JAKK | 19,441 | 162,818 | 183,685 | 0.886 | 1.00 |
| HASBRO,INC | HAS | 172,309 | 1,744,629 | 4,232,263 | 0.412 | 1.00 |
| MATTEL | MAT | 426,371 | 5,036,507 | 5,514,950 | 0.913 | 0.38 |
| RADICA GAMES | RADA | 17,640 | 39,690 | 118,733 | 0.334 | 1.28 |
| TOYMAX INTERNATIONAL | TMAX | 10,598 | 22,521 | 138,985 | 0.162 | NA |
| AVERAGES (Beta is Median) | | 129,272 | 1,401,233 | 2,037,723 | 0.542 | 1.00 |
| AVERAGES OF SMALLER COMPANIES | | | | | 0.334 | 1.093 |

*Minority value. Should be converted to control value to use for valuation under the market approach.

Exhibit C
Page 26 of 28

000082

26.80

EXHIBIT 6

PAGE 192

REVISED REPORT

**TABLE I-1**
**MARKET APPROACH**
**($000)**

| | Job No. | 1118ABCV |
|---|---|---|
| | Appr Date | 12/31/2000 |
| | Run Date | 25-Mar-04 |

| | | |
|---|---|---|
| GROSS REVENUES | | $ 96,861 |
| AVERAGE SMALL COMPANY REVENUE/MARKET CAP RATIO | | 0.334 |
| MARKET VALUE OF EQUITY ON A MINORITY BASIS | | $ 32,379 |
| Less Public/Private discount for relative size | 10.0% | (3,238) |
| MINORITY VALUE OF EQUITY - SMALL PRIVATE COMPANY | | $ 29,141 |
| Add Control Premium | 35% | 10,199 |
| EQUITY MARKET VALUE ON A CONTOL BASIS | Rounded | $ 39,300 |
| Add Implied Working Capital | | 9,500 |
| ADJUSTED EQUITY MARKET VALUE ON A CONTROL BASIS | | $ 48,800 |
| | Rounded | $ 48,800 |

Exhibit C
Page 27 of 28

000083

21.90

EXHIBIT ___6___

PAGE ___193___

REVISED REPORT

**TABLE J**

**CONCLUSION OF MARKET VALUE**

($000)

| | Conclusion | Weight | Product |
|---|---|---|---|
| | | Job No. | 1118ABCV |
| | | Appr Date | 12/31/2000 |
| | | Run Date | 25-Mar-04 |
| ABC INTERNATIONAL TRADERS, INC. | | | |
| INCOME APPROACH (Table E) | $ 55,550 | 0.50 | $ 27,775 |
| MARKET APPROACH (Table F-1) | $ 48,800 | 0.25 | 12,200 |
| EXCESS EARNINGS APPROACH (Table G) | $ 51,750 | 0.25 | 12,938 |
| FMV OF BUSINESS ENTERPRISE (includes working capital) | | Rounded | $ 53,000 |
| Less Discount for Lack of Liquidity | | 10% | (5,300) |
| MARKET VALUE OF BUSINESS ENTERPRISE | | | $ 47,700 |
| Less Implied Working Capital | | | (9,500) |
| BASIC BUSINESS VALUE | | | $ 38,200 |
| Add Current Assets (Table A) | | | 24,565 |
| FMV OF TOTAL ASSETS | | | $ 62,765 |
| Less Total Liabilities (Table A-1) | | | (28,960) |
| FMV OF SHAREHOLDERS EQUITY ON A CONTROL BASIS | | | $ 33,805 |
| FMV OF SHAREHOLDER INTEREST ON A CONTROL BASIS | | 45% | $ 15,212 |
| Less Minority Discount | | 25% | (3,803) |
| FMV OF SHAREHOLDER INTEREST ON A MINORITY BASIS | | | $ 11,409 |

Exhibit C
Page 28 of 28

28.8D

000084

EXHIBIT ____6____
PAGE ____194____

**NATIONAL BUSINESS APPRAISERS, LLC**
16055 Ventura Boulevard, Suite 1200
Encino, California 914360211.
Phone (818) 528-2013      Fax (818) 528-2014
Email dutch7895@sbcglobal.net

DRAFT – FOR DISCUSSION PURPOSES ONLY

May 1, 2004

Mr. Morad Zarabi, Arbitrator
MGA ENTERTAINMENT, INC.
20120 Plummer St.
Chatsworth, CA  91211-5448

Dear Mr. Zarabi:

At your request after receipt of additional relevant information, we are reappraising the shareholders equity of MGA Entertainment, Inc. (MGA), formerly known as MGA International Traders, Inc (MGA).  We were asked to express our opinion of the market value on a control basis of a 45 percent interest in the shareholders equity of MGA.  Two of the shareholders hold an equal 45% interest with a third shareholder holding the 10% balance.

It is our understanding that this opinion will be used for supporting a value for a buy-out of the Subject interest, and may be invalid if used for any other purpose.

MGA develops, produces and markets toys and related products. The company's products are action figures and accessories featuring licensed characters, and mini dolls.

Purchasers of the company's products include discount retail chain stores, department stores, toy specialty stores and wholesalers.  The company licenses numerous trademarks, corporate, trade and brand names and logos from third parties.

According to the Toy Industry Association the size of the U.S. Toy industry, excluding video games, was $19.8 billion for 1999, $20.4 billion for 2000, and $20.5 billion for 2001.  U. S. imports of toy products from China was $10.7 billion in 2000, and 10.4 billion in 2001. It is further estimated that the average child in the U.S. receives over $400 (retail) worth of toys per year.  The industry, in spite of a relatively flat growth rate, appears to be healthy and not seriously affected by the recession as is the case with so many other U.S. industries.

This report covers only Phase I of a full narrative report therefore we issue only a brief letter report.  All of the financial tables that are normally included in a full-narrative report are presented in the Addenda, along with individual explanations for each table.

000085    1.

Exhibit D
Page I of 34

EXHIBIT ____ 6
PAGE ____ 195

MGM ENTERTAINMENT, INC.                                      May 1, 2004
North Hills, California          *DRAFT REPORT*               Page 2

Table J, in the Addenda presents our conclusions of market value under the income, market and excess earnings approach, and sets forth the calculations of the various appraised interests as of December 31, 2001.

Based upon the information and analyses presented in the Addenda, it is our opinion that as of the valuation date of December 31, 2001, the market value of the shareholder's equity of MGA International Traders, Inc, on a control basis, as summarized in Table J, of Addenda, was:

**$24,430,000**

It is also our opinion that as of December 31, 2001, the market value of a 45 percent interest in the shareholder's equity of MGA International Traders, Inc., on a control basis, as summarized in Table J, of the Addenda, was:

**$11,000,000**

It is our opinion that a minority discount does not apply to the 45% interest as the other major shareholder holds an equal 45% interest, and under California Corporations Code Section 2000 (the California corporate dissolution statute) the case law is generally interpreted to mean that a minority interest is valued as if it were a proportional share of a control value.[1]

In conjunction with our work, MGA provided us with audited and unaudited financial information and prospective financial and operational data. We accepted the historical data as fairly reflecting its operations, trends and financial position.

We have not independently investigated the accuracy or completeness of the historical data provided to us and we express no opinion or other form of assurance regarding the accuracy or completeness of the data.

Neither our employment nor our compensation is in any way contingent upon the values presented in this report.

---

[1] See, for example, *Roland v. 4-C's Electronic Packaging,* 168 Cal.App.3rd 290 (1985) and *Brown v. Allied Corrugated Box Co.,* 91 Cal.App.3rd 477 (1979)

2.

NATIONAL BUSINESS APPRAISERS, LLC                Exhibit D
000086                                           Page 2 of 34

EXHIBIT ____ 6

PAGE ____ 196

MGM ENTERTAINMENT, INC.
North Hills, California          *DRAFT REPORT*

May 1, 2004
Page 3

A copy of this report and the working papers from which it was prepared will be kept in our files for eight years.

Respectfully submitted,

NATIONAL BUSINESS APPRAISERS, LLC

By: _____
Ernest E. Dutcher, MCBA
Managing Member
Senior Valuation Counselor

Attachments: Professional Qualifications; Statement of Facts and Limiting Conditions; Addenda
J131MGAV

3. *Ed*

NATIONAL BUSINESS APPRAISERS, LLC

000087

Exhibit D
Page 3 of 34

EXHIBIT ___ 6

PAGE ___ 197

MGM ENTERTAINMENT, INC.
North Hills, California          *DRAFT REPORT*

May 1, 2004
Page 4

## CERTIFICATION

We certify that, to the best of our knowledge and belief:

*    The statements of fact contained in this report are true and correct.

*    The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and is our personal, unbiased professional analyses, opinions, and conclusions.

*    We have no present or prospective interest in the property that is the subject of this report, and we have no personal interest or bias with respect to the parties involved.

*    Our compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in, or the use of, this report.

*    Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

*    No significant professional assistance was provided to the undersigned in connection with this assignment.

Appraiser_____
          Ernest E. Dutcher, MCBA

NATIONAL BUSINESS APPRAISERS, LLC
000088

Exhibit D
Page 4 of 34

EXHIBIT ____ *U*

PAGE ____ *198*

MGM ENTERTAINMENT, INC.
North Hills, California          *DRAFT REPORT*

May 1, 2004
Page 5

---

PROFESSIONAL QUALIFICATIONS

For

ERNEST E. DUTCHER, MCBA

Designations

of

**Certified Business Appraiser**
**Master Certified Business Appraiser**

Awarded by

THE INSTITUTE OF BUSINESS APPRAISERS

*The oldest business appraisal society in the nation.*

**NATIONAL BUSINESS APPRAISERS, LLC**
16055 Ventura Blvd., Suite 1200
Encino, CA 91436

Phone (818) 528-2013      E-mail: dutch7895@sbcglobal.net      Fax (818) 528-2014

5.

NATIONAL BUSINESS APPRAISERS, LLC
000089

Exhibit D
Page 5 of 34

EXHIBIT        6

PAGE        199

MGM ENTERTAINMENT, INC.                                        May 1, 2004
North Hills, California          *DRAFT REPORT*                Page 6

## *Master Certified Business Appraiser Accreditation*

The <u>Master Certified Business Appraiser</u> is the highest professional designation awarded in the business valuation industry, and recognizes the extraordinary competence of a few highly skilled and experienced individuals whose work has been widely accepted by clients and acknowledged by their most senior professional colleagues. It is a designation not commonly available except to the best-of-the-best professional appraisers, and is intended to indicate to users of appraisal services that the holder has achieved a high distinction of competence in his/her profession.

*Requirements for Accreditation as a Master Certified Business Appraiser*

1. <u>Education</u>: Applicant must possess a 4-year college degree and a 2-year post-graduate degree or equivalent and provide proof of this to the IBA in the form specified by the Executive Director.

2. <u>Appraisal Experience and Tenure:</u> Applicant must have held the Certified Business Appraiser designation for not less than ten years, and must have fifteen-years full-time experience as a business appraiser. Applicants experience must include valuation of a variety of business types and appraisals for a variety of purposes. Proof in support of an applicants appraisal experience and tenure shall be provided in the form specified by the Executive Director.

3. <u>Recognition by Other Professional Societies</u>: Applicant must hold a journeyman level professional designation awarded by one or more compeer professional business appraisal societies. Acceptable professional designations include those issued by the American Society of Appraisers (Accredited Senior Appraiser - Business Valuation), the National Association of Certified Valuation Analysts (Certified Valuation Analyst), and the American Institute of Certified Public Accountants (Accredited in Business Valuation).

4. <u>References</u>: Applicant must provide satisfactory references from three individuals who have known the applicant for not less than five years, who hold the profess-sional designation Master Certified Business Appraiser, and who, <u>based on their extensive personal knowledge and comprehensive review of the applicant's work-product</u>, will vouch for 1) the excellence of his analytical skills and appraisal work-product, 2) his/her professional and ethical character, and 3) his/her contribution to the betterment of the profession of business valuation.

5. <u>Membership in IBA</u>: Applicant must be a member-in-good-standing of the Institute of Business Appraisers.

NATIONAL BUSINESS APPRAISERS, LLC          Exhibit D
000090                                     Page 6 of 34

EXHIBIT     6
PAGE        200

MGM ENTERTAINMENT, INC.
North Hills, California        *DRAFT REPORT*

May 1, 2004
Page 7

**ERNEST E. DUTCHER, MCBA - <u>Professional Qualifications</u>**

**Experience:** Mr. Dutcher's appraisal experience began in 1975. He has been involved in the analysis and valuation of a broad variety of business enterprises in many industries, including electric power generation, healthcare, equipment leasing & rental, distribution, transportation, manufacturers in the communications, computer, electronics, rubber & chemical industries, shipping, engineering, oil & gas, and many others. He has consulted in marketing, manufacturing and management. He was CEO of an electronic equipment manufacturing company and has held executive positions in other manufacturing, distribution and sales companies.

**Employment:** Managing Member and Senior Valuation Counselor for National Business Appraisers, LLC. Was Senior Valuation Counselor for Valuation Counselors Group, Inc. for four years, following five years with Marshall and Stevens Incorporated. Previously, he was SW. Manager of Acquisitions for a public company; Business Opportunities Sales for Coldwell Banker; President and General Manager of an elevated work platform manufacturer; Vice President and Controller for an equipment sales and rental company; Vice President of Manufacturing and Division Manager of companies producing specialized heating devices and electronic heat controllers; President and CEO of a high technology public company in the electronics industry; and President and sole stockholder of an exclusive area distributor of Magnavox consumer electronics components and accessories.

**Education:** Mr. Dutcher attended Yale University, majoring in Communications; USAF Military Schools, attaining the rank of Captain, Radar and Communications. He also attended RCA Institute, UCLA Extension Division and Santa Monica City College in public relations, plus many seminars and home study courses in finance, taxation, computer courses in business related software etc. He has held California real estate and insurance licenses and is a licensed pilot.

**Professional Societies:** Mr. Dutcher is a senior member in the Institute of Business Appraisers (IBA), the premier professional society of business appraisers, with over 3,500 members. He has also served on the select Qualifications Review Committee. As of December 31, 2004, only about 350 IBA members had earned the professional designation of Certified Business Appraiser (CBA). *At that date, Mr. Dutcher was one of only 42 Master Certified Business Appraisers (MCBAs), a designation requiring over 10 years of providing business appraisals on a full-time basis as a CBA.*

**Court Testimony:** Mr. Dutcher has qualified and testified as an expert witness before Federal Tax Courts in Los Angeles and San Francisco California, and California Superior Courts of Los Angeles, Orange, and San Diego Counties. He has served as a consultant in valuation matters to numerous attorneys during the litigation process.

NATIONAL BUSINESS APPRAISERS, LLC
000091

Exhibit D
Page 7 of 34

EXHIBIT 6
PAGE 201

**MGM ENTERTAINMENT, INC.**
North Hills, California          *DRAFT REPORT*

May 1, 2004
Page 8

## EXPERT WITNESS QUALIFICATIONS

### LITIGATION SUPPORT

Working closely with attorneys and Clients to develop and refine strategies in litigation. Includes the preparation of business valuations and assisting the attorney in preparation for court action for a variety of purposes, such as U.S. Government challenges involving healthcare fraud & abuse issues, divorce proceedings; eminent domain litigation involving loss of business goodwill in condemnation or inverse condemnation actions, defending or supporting IRS actions against partnership interests in energy projects and medical groups, and other commercial litigation.

Assisting the attorney in the preparation of court documents and exhibits to support testimony. Review and critique of opposing appraisal reports and preparing questions there from for cross-examination. Providing expert witness testimony in court actions.

### CLIENT EXAMPLES

- **Van Duzer v. Commissioner** – San Francisco Federal Tax Court
  Prepared valuation of "Windfarms" and expert testimony in support of opinions for Petitioner's defense attorneys to prove that the purchase price paid by Petitioner for two electric power-generating facilities was not in excess of their fair market value. **Resulted in favorable opinion from the Tax Court. (T.C. Memo. 1991-249) (Tax Court Docket No. 25802-88)**

- **Ahadpour v. Commissioner** – Los Angeles Federal Tax Court
  Prepared valuation and expert testimony in support of opinions of market value of a marine salvage business in Iran that was lost during the Iran-Iraqi war, and subsequently claimed as a deduction from Federal taxes by Client. **(Tax Court Docket No. 4843-96)**

- **Contra Costa County v. Kenetech Corporation** – Contra Costa County Superior Court
  Prepared valuation of wind turbines condemned for road purposes. Gave deposition in support of concluded values. Assisted defense attorney in preparation for court. Case settled in Mandatory Settlement Conference.

- **T & W Converters, Inc. v. City of Glendale** – Los Angeles Superior Court (Jury Trial)
  Prepared valuation of "Loss of Business Goodwill resulting from Inverse Condemnation of the Company's premises, forcing move to less favorable location. Provided attorney with support in preparing court exhibits. Prepared questions for cross-examination of opposing appraisal report. Provided deposition and direct testimony. **Verdict rendered in Client's favor.**

*8. GW*

EXHIBIT _____ 6
PAGE _____ 702

MGM ENTERTAINMENT, INC.
North Hills, California          *DRAFT REPORT*

May 1, 2004
Page 9

• <u>Friendly Hills Medical Group v Commissioner</u> – Settled before trial.
    Provided financial appraisals used in the sale of the group to Loma Linda Medical Center, and to defend against IRS and OIG challenges to the inclusion of business goodwill in the sale of medical practices.

This became a landmark case in which the Service eventually accepted our position. The IRS's internal agent guidelines for proper methodologies for use in the determination of intangibles in appraisals of medical groups and practices are based upon this appraisal.

Numerous other business appraisals have resulted in favorable settlements prior to trial.

Over the past 20 years many other valuations have been prepared by this appraiser encompassing a wide variety of industries, including: resorts, clubs and hotels; restaurant chains, marine; agriculture; contracting; construction; manufacturing; communications; computer hardware and software; wholesaling; retailing; financing and services. Purposes included estate planning, mergers & acquisitions, litigation support, tax planning, partnership buy-outs, employee stock option plans, subsidiary spin-offs, etc.

## REFERENCES

| | | |
|---|---|---|
| Brian D. Newnan, Estate Trustee | (800) 800-1651 | Estate Tax Planning |
| Bradford S. Lovette, Principal | (561) 833-7029 | Healthcare Entities |
| Jerome L. Doff, Attorney | (310) 966-0031 | Patents & Intellectual Property |
| William J. Kellogg, Pres. LaJolla Beach & T/C | (858) 454-7126 | Estate Tax Planning |
| Ellis Stern, Attorney | (818) 458-3940 | Estate Tax Planning. |
| Mark Cahn – Esq. - Wilmer, Cutler & Pick. | (202) 663-6249 | FMV, Physician Contracts Etc. |
| Rosemary Wilson – Adm., Arkansas Urology | (501) 664-0530 | Healthcare Valuations |
| Steve Mopsick, Attorney at Law | (916) 558-6111 | IRS – Taxation Defenses |

NATIONAL BUSINESS APPRAISERS, LLC
000093

Exhibit D
Page 9 of 34

EXHIBIT   U

PAGE   703

**MGM ENTERTAINMENT, INC.**
North Hills, California          *DRAFT REPORT*

May 1, 2004
Page 10

## STATEMENT OF FACTS AND LIMITING CONDITIONS

National Business Appraisers, LLC (NBA), strives to clearly and accurately disclose the assumptions and limiting conditions that directly affect a valuation analysis, opinion or conclusion. In order to assist the reader in interpreting this report, such assumptions are set forth as follows:

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of the original assignment. If the need for subsequent services related to a valuation assignment (e.g., testimony, updates, conferences, reprint, or copy services) is contemplated, special arrangements acceptable to NBA must be made in advance. NBA, reserves the right to make adjustments to the analysis, opinion and conclusion set forth in the report as we deem necessary if the facts presented by MGA prove to be inaccurate or have been misinterpreted.

It is assumed that: no opinion is intended in matters that require legal, engineering or other professional advice which has been or will be obtained from professional sources; the valuation report will not be used for guidance in professional matters exclusive of the appraisal and valuation discipline; there are no regulations of any government entity to control or restrict the use of the property unless specifically referred to in the report; and the property will not operate in violation of any applicable government regulations, codes, ordinances or statutes.

Information furnished by others is presumed to be reliable, and where so specified in the report, has been verified; however, no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain. All facts and data set forth in the report are true and accurate to the best of NBA's knowledge and belief. No single item of information was completely relied upon to the exclusion of other information.  Management has provided financial data, operating histories and other data relating to income and expenses attributed to the business or its representatives have been accepted without further verification except as specifically stated in the report.

Valuation reports may contain prospective financial information, estimates or opinions that represent the appraiser's view of reasonable expectations at a particular point in time, but such information, estimates or opinions are not offered as predictions or as assurances that a particular level of income or profit will be achieved, that events will occur or that a particular price will be offered or accepted. All opinions as to value are presented as NBA's considered opinion based on the facts and data obtained during the investigation and set forth in the report. Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material. It should be specifically noted that the valuation assumes the property will be competently managed and maintained by financially sound owners over the expected period of ownership. This appraisal engagement does not entail an

NATIONAL BUSINESS APPRAISERS, LLC
000094

*10. RW*

Exhibit D
Page 10 of 34

EXHIBIT ____6____

PAGE ____704____

MGM ENTERTAINMENT, INC.
North Hills, California          *DRAFT REPORT*

May 1, 2004
Page 11

evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

The conclusions of value presented herein are based on numerous assumptions pertaining to prospective economic and operating conditions. Unanticipated events and circumstances may occur and actual results achieved during the period covered by our prospective financial analysis will vary from our estimates. The variations may be material.

No effort has been made to determine the impact of possible energy shortages or the effect on this project of future federal, state or local legislation, including any environmental or ecological matters or interpretations thereof.

Neither the report nor any portions thereof, especially any conclusions as to value, the identity of the appraiser(s) or NBA, shall be disseminated to the public through public relations media, news media, sales media or any other public means of communications without the prior written consent and approval of NBA. The date(s) of the valuation to which the value estimate conclusions apply is set forth in the letter of transmittal and within the body of the report. The value is based on the purchasing power of the United States dollar as of that date. Unless otherwise noted, NBA assumes that there will be no changes in tax regulations. No significant change is assumed in the supply and demand patterns indicated in the report. The valuation assumes market conditions observed as of the current date of our market research stated in the letter of transmittal. These market conditions are be-lieved to be correct; however, the appraisers assume no liability should market conditions materially change because of unusual or unforeseen circumstances.

The report and the final estimate of value and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed, solely for the purposes stated, and should not be relied upon for any other purpose. Any allocation of total price between tangible assets and various classes of intangible assets, if shown, is invalidated if used separately or in conjunction with any other report. Neither the appraisal report nor its contents nor any reference to the appraiser(s) or NBA, may be referred to or quoted in any registration statement, prospectus, offering memorandum, sales brochure, other appraisal, loan or other agreement or document given to third parties excepting governmental agencies or the extent required by law without our prior written consent. Permission will be granted only upon meeting certain conditions.

A copy of this report and the working papers from which it was prepared will be kept in our files for eight years.

NATIONAL BUSINESS APPRAISERS, LLC
000095

Exhibit D
Page 11 of 34

EXHIBIT 4
PAGE 903

MGM ENTERTAINMENT, INC.
North Hills, California          *DRAFT REPORT*

May 1, 2004
Page 12

ADDENDA

NATIONAL BUSINESS APPRAISERS, LLC
000096

Exhibit D
Page 12 of 34

EXHIBIT ___ 6
PAGE ___ 206

MGM ENTERTAINMENT, INC.
North Hills, California          *DRAFT REPORT*

May 1, 2004
Page 13

## INDEX OF FINANCIAL TABLES

TABLE A       FIVE YEAR COMPARATIVE BALANCE SHEET – ASSETS

TABLE A-1   FIVE YEAR COMPARATIVE BALANCE SHEET – LIABILITIES

TABLE B       COMPARATIVE INCOME STATEMENT - 5 YEARS

TABLE C       INCOME STATEMENT ADJUSTMENTS

TABLE D-1   ADUSTED BOOK VALUE – PAGE 1

TABLE D-2   ADUSTED BOOK VALUE – PAGE 2

TABLE E       INCOME APPROACH METHOD OF VALUATION

TABLE F       CAPITAL ASSET PRICING MODEL

TABLE H       FIXED ASSET APPRAISAL – DETAIL

TABLE H-1   FIXED ASSET APPRAISAL - SUMMARY

TABLE I        MARKET COMPARABLES - PUBLIC COMPANIES

TABLE I-1     MARKET APPROACH

TABLE J       CONCLUSIONS OF MARKET VALUE

13. ED

Exhibit D
Page 13 of 34

EXHIBIT ___6___

PAGE ___707___

MGM ENTERTAINMENT, INC.
North Hills, California          *DRAFT REPORT*

May 1, 2004
Page 14

## DESCRIPTION OF FINANCIAL SCHEDULES USED IN VALUATION

**TABLE A: Comparative Balance Sheet – Assets**

This historical comparative balance sheet presents the changes in the asset items over the 5-year period. The dominant changes appear in current assets for the years 2000 and 2001 caused mainly by increases in accounts receivable and inventories. Total assets changed from a low of about $17.6 million at 12/31/2000 to $30.6 million by 12/31/2001.

**TABLE A-1: Comparative Balance Sheet - Liabilities**

This historical comparative balance sheet presents the changes in the liability items over the 5-year period. The dominant change is in current liabilities that increased from a low of $6.6 million at 12/31/1999 to $31.3 million at 12/31/2001. Total liabilities moved from $12 million at 12/31/1999 to $35 million by 12/31/2001. Shareholder equity dropped from a high of $5.6 million at 12/31/1999 to $(4.5) million at 12/31/2001. This table also reflects the calculations of "Implied Working Capital" as a percentage of revenues, which was substituted to minimize the dynamic nature of current assets and current liabilities that typically change on a daily basis. This allows the conclusions of value to remain valid over a longer period of time without material changes in value.

**TABLE B: Comparative Income Statement**

This historical comparative income statement presents the book figures over the 5-year period. The information contained in this table provides the foundation, after the adjustments described in Table C, for the valuation approaches used in this appraisal. The most recent year's performance as presented in Column 5, represents the year-end book figures. To the concluded Pretax Income, we have added back depreciation and amortization to obtain "Pretax Cash Flow". Interest expense is added back to Cash Flow as this appraisal assumes a debt-free basis to yield "Operating Margin, or "Earnings Before Depreciation Interest, Taxes and Amortization" (EBITDA).

A study of this table indicated that MGA showed steady growth in revenues over the 5-year period, but pretax income follows the somewhat erratic performance of the industry.

**TABLE C: Adjustments to Comparative Income Statement**

This statement reflects certain essential income statement items extracted from **Table B** that is subject to adjustments to remove extraordinary income or expense items that

NATIONAL BUSINESS APPRAISERS, LLC
000098

*14. [signature]*

Exhibit D
Page 14 of 34

MGM ENTERTAINMENT, INC.                                May 1, 2004
North Hills, California          *DRAFT REPORT*                Page 15

would not be necessary for normal business operations. Following the Adjusted Net
Income, Cash Flow and Operating Margin, we calculate the weighted average net income
utilizing the 1997, 1998, 1999 2000 and 2001 EBITDA as a percentage of sales. This
results in adjusted Pretax Income, Net Income, Cash Flow and Operating Margin
(EBITDA) expenses. The resulting "Adjusted Operating Margin (EBITDA) is the key
income stream upon which the "Income Approach" (Table E) and the "Excess Earnings
Approach" (**Table G**) is based.

### TABLE D-1: Adjusted Book Value

In this table, all current asset items are reversed out in the second column. We have
substituted "Implied Working Capital" as explained in the description of Table A-1. The
calculations of market value for the fixed assets (Table H-1) appear in the right hand
column. The conclusion of market value for the intangible assets, as calculated in Table
D-2, is also added to yield "Business Enterprise Value".

### TABLE E: Income Approach

Based upon historical growth rates and estimates of future performance a five-year
forecast is made for net revenues. The value of the reversionary period following the 5-
year forecast period would be a capitalization of the average of the fifth and sixth year,
discounted to present value. The After Tax Earnings as Percent of Revenues was
calculated in **Table C**, and is used to estimate the operating profit for each forecast year
in **Table E**. Adding back the Depreciation yields the After Tax Cash Flow. Capital
expenditures and changes in working capital are subtracted from this figure to produce
the "Distributable Cash Flow". Applying the appropriate discount rate (calculated in
**Table F**) returns these cash flow streams to present value. The total of the five discounted
cash flows plus the discounted reversionary value represents the Business Enterprise
Value under the Income Approach. The capitalization rate for the reversionary period is
calculated using the formula shown in the notes following the schedule.

### TABLE F: Capital Asset Pricing Model

Widely used method of determining the discount rates that are used in **Table E**. The
"Weighted Average Cost of Capital" represents the blending of the Company's estimated
cost of borrowing (the lowest rate) and the "cost of equity capital". The blending is based
upon the market average percent of equity and of debt as taken from the public market as
shown in Table G-1 under the assumption that the selected public companies could be
buyers for the Subject company, which would then reflect the capital structure of the
buyer. Borrowed capital is generally the lowest risk due to the security normally provided.

NATIONAL BUSINESS APPRAISERS, LLC

*15. 9W.*
Exhibit D
Page 15 of 34

EXHIBIT _6_

PAGE _709_

MGM ENTERTAINMENT, INC.                                              May 1, 2004
North Hills, California          *DRAFT REPORT*                          Page 16

to the lender. Equity capital, on the other hand, carries the greatest risk, as it does not
share the security available to lenders. The blending of these two rates yields the weighted
average cost of capital, or discount rate. The notes following **Table F** adds further insight.

### TABLE G: Capitalization of Excess Earnings

This represents one of three significant valuation approaches for small privately held
companies. The original simplified "formula method" had the disadvantage of ignoring
the value of the individual asset categories with differing economic lives. In **Table G,** the
"Earnings Before Capital Charges" is the estimated EBITDA for the year 2000, as
calculated in Table E. From these earnings, we subtract the return of the capital
investment represented by the "Economic Depreciation", and the return on the assets in
use as listed under the heading "Economic Return on Capital", yielding the "Total Excess
Earnings" of MGA. The "Net Excess Earnings", is then capitalized using the equity
multiple as developed in Table F. The value of the capitalized excess earnings is then
added to the "Total Assets in Use" to reflect the market value under the Excess Earnings
Approach on a control basis.

### TABLE H

The method for appraising fixed assets as herein described is known as the "Depreciated
Replacement Cost New Approach" (DRCN). This presents the appraised value of each of
the items of fixed assets, based upon the depreciation schedule of the income tax return
for 1999. As noted, each item is listed as to description, date of purchase, original cost,
estimated economic life, years in use, remaining economic life, price trend factor based
upon the consumer price index, replacement cost new, estimated remaining economic life
and fair market value. Items beyond their estimated economic life are valued at zero.

### TABLE H-1

This table summarizes the market value of each group of assets, and is used in Table D
and Table G.

### TABLE I: Market Comparable Companies from public marketplace.

The operating results of the listed public companies present various indicators that are
useful in determining the market value of MGA. Listed are the Company's shares
outstanding, market capitalization, annual sales, market capitalization/sales ratio, and

*16. $\mathcal{GN}$*

Exhibit D
Page 16 of 34

EXHIBIT _____ $\mathcal{U}$

PAGE _____ *710*

MGM ENTERTAINMENT, INC.
North Hills, California          *DRAFT REPORT*

May 1, 2004
Page 17

Beta. We use the median of the market cap/sales ratios of the Public companies in our Market Approach that follows in **Table I-1**. We use the average of the Betas and the capital structures of the public companies for our calculations of the discount rates in **Table F**. These comparables are all involved in the same industry as MGA.

### TABLE I-1: Market Approach Valuation

Gross revenues in 2001 for MGA is multiplied by the median revenue/market cap ratio to obtain the indicated market value on a minority basis. A discount[1] is applied to adjust for the differences in size of the public companies as compared with MGA. This yields the market value of the equity on a minority basis. To adjust the minority value to a control value we add the premium for control for comparison with the other approaches, which yields the market value of the equity on a control basis. This value may now be compared to the results of the other two approaches as reflected in Table J

### TABLE J: Final Correlation

Each of the individual market values developed in the various approaches are listed, and weighted. The income approach is generally granted the greatest weight, as the driving force for the average investor is the anticipation of future benefits, however in this report we believe it appropriate to also grant meaningful weight the excess earnings approach as it also is a valid approach for use with medium sized business valuations. **Due to the growing instability in the public marketplace, we are not granting any weight to the market approach, but using it as a "sanity check" only.**

---

[1] Mergerstat Review 1999

NATIONAL BUSINESS APPRAISERS, LLC

000101

Exhibit D
Page 17 of 34

EXHIBIT ___ 6

PAGE ___ 211

DRAFT REPORT
MGM ENTERTAINMENT, INC.

**TABLE A**
**FIVE YEAR COMPARATIVE BALANCE SHEET**
F/Y End December 31
($000)

Job No. 1131ABCV
Appr Date 12/31/2001
Run Date 10/19/04

| ASSETS | 1997 | % | 1998 | % | 1999 | % | 2000 | % | 2001 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| **Current assets** | | | | | | | | | | |
| Cash & equivalents | $797 | 3.8 | $860 | 5.1 | ($579) | -0.3 | $1,134 | 4.5 | $556 | 1.8 |
| Accounts Receivable-Trade | 10,067 | 47.7 | 7,614 | 44.8 | 11,154 | 63.5 | 8,744 | 34.3 | 15,058 | 49.2 |
| Inventories | 8,663 | 41.0 | 7,400 | 43.6 | 5,834 | 33.2 | 14,278 | 56.0 | 13,893 | 45.4 |
| Due from affiliate | 171 | 0.8 | - | 0.0 | (320) | -1.8 | 209 | 0.8 | 71 | 0.2 |
| Prepaid Expenses & Other | 768 | 3.6 | 379 | 2.2 | 373 | 2.1 | 189 | 0.7 | 314 | 1.0 |
| Total Current | $20,466 | 96.9 | $16,253 | 95.7 | $16,962 | 96.6 | $24,564 | 96.4 | $29,902 | 97.7 |
| **Property & Equipment** | | | | | | | | | | |
| Machinery & Equipment | $2,369 | 11.2 | $3,621 | 21.3 | $1,409 | 8.0 | $2,231 | 8.8 | $2,317 | 7.6 |
| Leasehold Improvements | 86 | | 86 | | 86 | | 215 | | 225 | |
| Less Accum. Depr. | (1,800) | -8.5 | (2,977) | -17.5 | (900) | -5.1 | (1,534) | -6.0 | (1,841) | -6.0 |
| Net Fixed Assets | $655 | 3.1 | $730 | 4.3 | $595 | 3.4 | $912 | 3.6 | $701 | 2.3 |
| Deposits & other | | 0.0 | | 0.0 | | 0.0 | | 0.0 | | 0.0 |
| TOTAL ASSETS | $21,121 | 100.0 | $16,983 | 100.0 | $17,557 | 100.0 | $25,476 | 100.0 | $30,603 | 100.0 |
| | | | | | | | (634) | | (307) | |

* This information is from the fiscal year of 1997 to 2001.

Exhibit D
Page 18 of 34

EXHIBIT ____ 6
PAGE ____ 212

| DRAFT REPORT | | TABLE A-1 | | | | | | Job No: 1131ABCV | |
| MGM ENTERTAINMENT, INC. | | FIVE YEAR COMPARATIVE BALANCE SHEET | | | | | | Appr Date: 12/31/2001 | |
| | | F/Y End December 31 | | | | | | Run Date: 19-Oct-04 | |
| | | ($000) | | | | | | | |
| | | | | | | | | | |
| | | **LIABILITIES & SHAREHOLDERS EQUITY** | | | | | | | |
| | | | | | | | | | |
| | 1997 | % | 1998 | % | 1999 | % | 2000 | % | 2001 | % |
| **Current Liabilities** | | | | | | | | | |
| Accounts Payable & Accrued | $ 11,134 | 52.7 | $ 6,904 | 40.7 | $ 6,611 | 37.7 | $ 12,951 | 50.8 | $ 14,479 | 47.3 |
| Bank Line-Revolving | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Current Port. L T Debt | 38 | 0.2 | 38 | 0.2 | 0 | 0.0 | 11,272 | 44.2 | 16,784 | 54.8 |
| Other current | 45 | 0.2 | 131 | 0.8 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Total current liabilities | $ 11,217 | 53.1 | $ 7,073 | 41.6 | $ 6,611 | 37.7 | $ 24,223 | 95.1 | $ 31,263 | 102.2 |
| **Long Term Liabilities** | | | | | | | | | |
| Notes payable to bank | $ 3,175 | 15.0 | $ 5,231 | 30.8 | $ 2,129 | 12.1 | $ 1,147 | 4.5 | $ 1,125 | 3.7 |
| Long term debt, less current | | 0.0 | | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Subordinated notes payable & other | 3,028 | 14.3 | 3,247 | 19.1 | 3,255 | 18.5 | 3,590 | 14.1 | 2,683 | 8.8 |
| Total long term liabilities | $ 6,203 | 29.4 | $ 8,478 | 49.9 | $ 5,384 | 30.7 | $ 4,737 | 18.6 | $ 3,808 | 12.4 |
| Total Liabilities | $ 17,420 | 82.5 | $ 15,551 | 91.6 | $ 11,995 | 68.3 | $ 28,960 | 113.7 | $ 35,071 | 114.6 |
| Shareholders Equity | $ 3,701 | 17.5 | $ 1,432 | 8.4 | $ 5,562 | 31.7 | $ (3,484) | -13.7 | $ (4,468) | -14.6 |
| Total Liabilities & Shareholders Equity | $ 21,121 | 100.0 | $ 16,983 | 100.0 | $ 17,557 | 100.0 | $ 25,476 | 100.0 | $ 30,603 | 100.0 |
| Current Ratio | 1.82 | | 2.30 | | 2.57 | | 1.01 | | 0.96 | |
| Quick Ratio | 0.97 | | 1.20 | | 1.68 | | 0.41 | | 0.50 | |
| L T Debt / Net Worth | 1.68 | | 5.92 | | 0.97 | | -1.36 | | -0.85 | |
| Working Capital | $ 9,249 | 43.8 | $ 9,180 | 54.1 | $ 10,351 | 59.0 | $ 341 | 1.3 | $ (1,361) | -4.4 |
| **IMPLIED WORKING CAPITAL** | | | | | | | | | |
| Net Revenues | $ 55,315 | | $ 40,732 | | $ 66,350 | | $ 77,489 | | $ 96,370 | |
| W/C as a percent of revenues * | 12.23% | | 12.23% | | 12.23% | | 12.23% | | 12.23% | |
| Implied working capital | $ 6,766 | | $ 4,982 | | $ 8,116 | | $ 9,479 | | $ 11,788 | |
| * Robert Morris Associates SIC #3944, Games, Toys etc. | | | | | | | | Rounded | $ 13,800 |

Exhibit D
Page 19 of 34

19. ℰℒ

EXHIBIT ____ 6

PAGE ____ 413

| DRAFT REPORT | | TABLE B | | | | | | Job No. 1131ABCV | |
|---|---|---|---|---|---|---|---|---|---|
| | FIVE YEAR COMPARATIVE INCOME STATEMENT | | | | | | | Appr Date 12/17/2001 | |
| | | F/Y End December 31 | | | | | | Run Date 19-Oct-04 | |
| MGM ENTERTAINMENT, INC. | | ($000) | | | | | | | |
| | | | | | | | | (1) | |
| | 1997 | % | 1998 | % | 1999 | % | 2000 | % | 2001 | % |
| REVENUES - NET | $ 55,315 | 100.0 | $ 40,732 | 100.0 | $ 66,250 | 100.0 | $ 77,489 | 100.0 | $ 96,370 | 100.0 |
| Less cost of sales | 40,032 | 72.4 | 26,093 | 64.1 | 43,724 | 65.9 | 53,300 | 68.8 | 64,663 | 67.1 |
| GROSS PROFIT | $ 15,283 | 27.6 | $ 14,639 | 35.9 | $ 22,626 | 34.1 | $ 24,189 | 31.2 | $ 31,707 | 32.9 |
| Other income (loss) | 28 | 0.1 | (253) | -0.6 | 350 | 0.5 | | 0.0 | | 0.0 |
| TOTAL INCOME | $ 15,311 | 27.7 | $ 14,386 | 35.3 | $ 22,976 | 34.6 | $ 24,189 | 31.2 | $ 31,707 | 32.9 |
| EXPENSES | | | | | | | | | | |
| Advertising & promotion | $ 2,992 | 5.4 | $ 3,898 | 9.6 | $ 4,367 | 6.6 | $ 7,680 | 9.9 | $ 9,442 | 9.3 |
| Automobile expense | 47 | 0.1 | 64 | 0.2 | 67 | 0.1 | 70 | 0.1 | | 0.0 |
| Bad debts | (6) | 0.0 | | | 30 | 0.0 | | | | 0.0 |
| Bank charges | 294 | 0.5 | 181 | 0.4 | 196 | 0.3 | 200 | 0.3 | | 0.0 |
| Commissions | 2,535 | 4.6 | 2,168 | 5.3 | 2,487 | 3.7 | 3,000 | 3.9 | | 0.0 |
| Data processing & supplies | 27 | 0.0 | 64 | 0.2 | 66 | 0.1 | 70 | 0.1 | | 0.0 |
| Depreciation | 585 | 1.1 | 589 | 1.4 | 540 | 0.8 | 2,531 | 3.3 | 2,609 | 2.7 |
| Delivery, postage | 242 | 0.4 | 191 | 0.5 | 323 | 0.5 | 375 | 0.5 | | 0.0 |
| Insurance | 227 | 0.4 | 305 | 0.7 | 386 | 0.6 | 400 | 0.5 | | 0.0 |
| Interest Expense | 390 | 0.7 | 552 | 1.4 | 842 | 1.3 | 1,180 | 1.5 | 1,690 | 1.8 |
| Legal, professional & accounting | 1,225 | 2.2 | 1,681 | 4.1 | 1,399 | 1.8 | 1,250 | 1.6 | 1,250 | 1.3 |
| Miscellaneous other | 105 | 0.2 | 379 | 0.9 | 62 | 0.1 | | 0.0 | | 0.0 |
| Molds | 0 | 0.0 | 0 | 0.0 | 508 | 0.8 | 750 | 1.0 | | 0.0 |
| Office Expenses | 61 | 0.1 | 71 | 0.2 | 132 | 0.2 | 150 | 0.2 | | 0.0 |
| Product development | 463 | 0.8 | 1,004 | 2.5 | 1,711 | 2.6 | 2,000 | 2.6 | | 0.0 |
| Rents | 366 | 0.6 | 382 | 0.9 | 455 | 0.7 | 431 | 0.6 | 630 | 0.7 |
| Repairs & maintenance | 11 | 0.0 | 22 | 0.1 | | 0.0 | 3,012 | 3.9 | | 0.0 |
| Salaries, officers | 704 | 1.3 | 1,104 | 2.7 | 1,194 | 1.8 | 1,200 | 1.5 | 1,200 | 1.2 |
| Salaries & wages | 2,284 | 4.1 | 2,223 | 5.5 | 3,179 | 4.8 | 3,873 | 5.0 | | 0.0 |
| Taxes & licenses | 217 | 0.4 | 39 | 0.1 | 61 | 0.1 | 75 | 0.1 | | 0.0 |
| Taxes, payroll | 176 | 0.3 | 219 | 0.5 | 254 | 0.4 | 260 | 0.3 | | 0.0 |
| Telephone | 188 | 0.3 | 166 | 0.4 | 214 | 0.3 | 225 | 0.3 | | 0.0 |
| Travel & entertainment | 236 | 0.4 | 377 | 0.7 | 399 | 0.6 | 450 | 0.6 | | 0.0 |
| Utilities | 32 | 0.1 | 30 | 0.1 | 35 | 0.1 | 40 | 0.1 | | 0.0 |
| Sales & Marketing | | | | | | | | | 11,075 | |
| General & Administrative | | | | | | | | | 2,864 | |
| TOTAL EXPENSES | $ 13,371 | 24.2 | $ 15,613 | 38.3 | $ 18,707 | 28.2 | $ 29,222 | 37.7 | $ 30,800 | 32.0 |
| PRETAX INCOME | $ 1,940 | 3.5 | $ (1,227) | -3.0 | $ 4,269 | 6.4 | $ (5,033) | -6.5 | $ 907 | 0.9 |
| Add Depreciation/Amort | 585 | 1.1 | 589 | 1.4 | 540 | 0.8 | 2,531 | 3.3 | 2,609 | 2.7 |
| PRETAX CASH FLOW (2) | $ 2,525 | 4.6 | $ (638) | -1.6 | $ 4,809 | 7.2 | $ (2,502) | -3.2 | $ 3,516 | 3.6 |
| Add Interest Charges | 390 | 0.7 | 552 | 1.4 | 842 | 1.3 | 1,180 | 1.5 | 1,690 | 1.8 |
| EBITDA (3) | $ 2,915 | 5.3 | $ (86) | -0.2 | $ 5,651 | 8.5 | $ (1,322) | -1.7 | $ 5,206 | 5.4 |

(1) Basic data from Deloitte & Touche audited report. Certain expense detail exist missing, but does not alter value opinions.
(2) Pretax income plus depreciation & amortization.
(3) Pretax cash flow plus interest charges. Earnings Before Interest, Taxes, Depreciation and Amortization.

Exhibit D
Page 20 of 34

20. Eb

EXHIBIT 6
PAGE 214

[DRAFT REPORT]

**MGM ENTERTAINMENT, INC.**

**TABLE C**
**INCOME STATEMENT ADJUSTMENTS**
F/Y End December 31
($000)

Job No. 1037ADCP
App Date 12/31/2000
Run Date 19-Oct-04

| | 1997 | % | 1998 | % | 1999 | % | 2000 | % | 2001 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| REVENUES - NET | $ 55,315 | 100.0 | $ 40,732 | 100.0 | $ 66,350 | 100.0 | $ 77,489 | 100.0 | $ 96,370 | 100.0 |
| OPERATING INCOME (EBITDA) | $ 2,915 | 5.3 | $ (86) | (0.2) | $ 5,651 | 8.5 | $ (7,322) | (1.7) | $ 5,206 | 5.4 |
| ADJUSTMENTS TO INCOME | | | | | | | | | | |
| Legal, professional & accounting | 1,225 | 2.2 | 1,681 | 4.1 | 1,199 | 1.8 | 1,250 | 1.6 | 1,230 | 1.3 |
| Salaries, Officers | 704 | 1.3 | 1,104 | 2.7 | 1,194 | 1.8 | 1,200 | 1.5 | 1,200 | 1.2 |
| Consulting fees - former stockholder | 0 | | 0 | | 0 | | 620 | | 96 | 0.1 |
| U.S/Customs reserve | | | | | | | | | | |
| TOTAL ADJUSTMENTS TO INCOME | $ 1,929 | 3.5 | $ 2,785 | 6.8 | $ 2,393 | 3.6 | $ 3,070 | 4.0 | $ 2,440 | 2.6 |
| SUBTOTAL | $ 4,844 | 8.8 | $ 2,699 | 6.6 | $ 8,044 | 12.1 | $ 1,748 | 2.3 | $ 7,746 | 8.0 |
| LESS REASONABLE EXPENSES | | | | | | | | | | |
| Legal, professional & accounting 0.75% | (415) | (0.8) | (305) | (0.8) | (498) | (0.8) | (581) | (0.8) | (723) | (0.8) |
| Salaries, Officers 1.50% | (830) | (1.5) | (611) | (1.5) | (995) | (1.5) | (1,162) | (1.5) | (1,446) | (1.5) |
| ADJUSTED PRETAX INCOME | $ 3,599 | 6.5 | $ 1,783 | 4.4 | $ 6,551 | 9.9 | $ 4 | 0.0 | $ 5,578 | 5.8 |
| Add Back Depreciation | 585 | 1.1 | 389 | 1.4 | 540 | 1.4 | 2,351 | 3.3 | 2,609 | 2.7 |
| ADJUSTED PRETAX CASH FLOW | $ 4,184 | 7.6 | $ 2,272 | 5.6 | $ 7,095 | 10.7 | $ 5,355 | 3.3 | $ 8,187 | 8.5 |
| Add Back Interest Expense | 390 | 0.7 | 352 | 0.7 | 841 | 1.3 | 1,180 | 1.3 | 1,699 | 1.8 |
| ADJUSTED EBITDA (1) | $ 4,574 | 8.3 | $ 2,624 | 7.2 | $ 7,933 | 12.0 | $ 3,715 | 4.8 | $ 9,877 | 10.2 |
| EBITDA AS % OF SALES | | 8.3 | | 7.2 | | 12.0 | | 4.8 | | 10.2 |
| Weighting | | 1 | | 2 | | 2 | | 2 | | 3 |
| Product - 3 Columns | | 79 | | 14.4 | | 23.9 | | 9.6 | | 30.7 |
| Divisor - Sum of Weights | | 10 | | | | | | | | |
| WEIGHTED AVERAGE EBITDA | | 7.9 | Percent (Used in Table 6) | | | | | | | |

(1) Earnings Before Interest, Taxes, Depreciation and Amortization

Exhibit D
Page 21 of 34

000105

21. ED

EXHIBIT     6
PAGE     215

| DRAFT REPORT | | | TABLE D-1 | | | Job No. | 1131ABCV | |
| MGM ENTERTAINMENT, INC. | | | ADJUSTED BOOK VALUE | | | Appr Date | 12/31/2001 | |
| | | | F/Y End December 31 | | | Run Date | 19-Oct-04 | |
| | | | ($000) | | | | | |

| | Book 31-Dec-01 | % | Adjustments 31-Dec-01 | % | Adjusted 31-Dec-01 | % |
|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | |
| Cash & equivalents | 556 | 1.8 | ($556) | NM | $0 | 0.0 |
| Accounts Receivable-Trade | 15,068 | 49.2 | (15,068) | NM | 0 | 0.0 |
| Inventories | 13,893 | 45.4 | (13,893) | NM | 0 | 0.0 |
| Due from affiliate | 71 | | (71) | NM | 0 | 0.0 |
| Prepaid Expenses & Other | 314 | 1.0 | (314) | NM | 0 | 0.0 |
| Implied Working Capital | 0 | | 11,800 | NM | 11,800 | 28.5 |
| Total Current Assets | 29,902 | 97.7 | ($18,102) | NM | $11,800 | 28.5 |
| **Fixed Assets as Appraised** | 701 | | | | | |
| Automotive Equipment | 0 | 0.0 | 7 | | 7 | 0.0 |
| Computer Equipment | 0 | 0.0 | 23 | | 23 | 0.1 |
| Furniture & Fixtures | 0 | 0.0 | 21 | | 21 | 0.0 |
| Leasehold Equipment * | 0 | 0.0 | 126 | | 126 | 0.3 |
| Machinery & Equipment | 0 | 0.0 | 4 | | 4 | 0.0 |
| Molds & Tooling * | (0) | 0.0 | 690 | | 690 | 1.7 |
| Office Equipment | 0 | 0.0 | 1 | | | - |
| Net Fixed Assets | 701 | 2.3 | | | 870 | 2.1 |
| **INTANGIBLE ASSETS** | - | 0.0 | $28,730 | NM | 28,730 | 69.4 |
| **BUSINESS ENTERPRISE VALUE** | 30,603 | 100.0 | | NM | 41,400 | 100.0 |

The right hand column represents the assets included in "Business Enterprise Value"(BEV). This represents the value of the assets required for normal business operations. To convert this number to Total Asset Value, subtract the Implied Working Capital. This will yield "Basic Business Value", or the value of the fixed, intangible and other assets only. Then add book current assets. See Table D-2 for calculations.

Exhibit D
Page 22 of 34

000106

22, 8W

EXHIBIT ___ 6

PAGE ___ 216

**TABLE D-2**

**MGM ENTERTAINMENT, INC.**

**ADJUSTED BOOK VALUE**

F/Y End December 31

| | Job No. | 1131ABCV |
|---|---|---|
| | Appr Date | 12/31/2001 |
| | Run Date | 19-Oct-04 |

| | | |
|---|---|---|
| **MARKET VALUE OF BUSINESS ENTERPRISE** | | $ 41,400 |
| Less Implied Working Capital | | (11,800) |
| | | |
| **BASIC BUSINESS VALUE**   Fixed Plus Intangibles | | $ 29,600 |
| Less Fixed Assets as Appraised | | (870) |
| | | |
| **MARKET VALUE OF INTANGIBLES (GOODWILL)** | | $ 28,730 |
| Add Fixed & Other Assets as Appraised (Table H) | | 870 |
| Add Current Assets at 12/31/01 (Table A) | | 29,900 |
| | | |
| **ADJUSTED TOTAL ASSET VALUE** | | $ 59,500 |
| Less Total Liabilities at 12/31/01 (Table A-1) | | (35,070) |
| | | |
| **ADJUSTED SHAREHOLDER EQUITY** | | $ 24,430 |

See Table J for weighting of approaches and final conclusion.

Exhibit D
Page 23 of 34

000107

27. ED

EXHIBIT 6

PAGE 217

| DRAFT REPORT<br>MGM ENTERTAINMENT, INC. | | TABLE E<br>INCOME APPROACH<br>FY Ending Sept 30<br>($000) | | | | Job No.   1131ABCV<br>Appr Date   12/31/2001<br>Run Date   19-Oct-04 | |
|---|---|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006** | **Reversion** |
| **FORECAST REVENUE GROWTH** | 10.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% |
| **FORECAST OF REVENUE** | $106,007 | $111,307 | $116,873 | $122,716 | $128,852 | |
| **EBITDA as % of Revenues *** | 7.9% | 7.9% | 7.9% | 7.9% | 7.9% | |
| **EBITDA *** | $8,333 | $8,749 | $9,187 | $9,646 | $10,128 | $9,208<br>(Table G) |
| Less Capital Equipment Reserve | 0 | 0 | 0 | 0 | 0 | |
| Less Working Capital (1) | (11,800) | (648) | (681) | (715) | (751) | |
| **DISTRIBUTABLE CASH FLOW** | ($3,467) | $8,101 | $8,506 | $8,931 | $9,378 | $9,612 |
| **REVERSIONARY VALUE** | | | | | Factor (3)   6.885 | $66,184 |
| Discount Rate (Table F) | 18.50% | 18.50% | 18.50% | 18.50% | 18.50% | 18.50% |
| Period Factor | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | 5.00 |
| Multiplier | 0.919 | 0.775 | 0.654 | 0.552 | 0.466 | 0.428 |
| **NPV OF DIST. CASH FLOWS** | ($3,185) | $6,280 | $5,565 | $4,931 | $4,369 | $28,325 |

| NPV OF DISTRIBUTABLE CASH FLOW FOR FIRST FIVE YEARS | $17,959 |
|---|---|
| NPV OF REVERSIONARY VALUE | 28,325 |
| | $46,284 |

| MARKET VALUE OF ENTERPRISE BY THE INCOME APPROACH | Rounded | $46,300 |
|---|---|---|

(1) Estimated percent of annual revenue and revenue growth required for working capit   -->   12.23%
Reference - RMA Annual Statement Studies.

(2) Income to be capped at end of 5th year was calculated by estimating 6th year's income considering
a future growth of 5%, and averaging with the 5th year. This adjusts the fifth year from mid-year to the
expected end-of-year-revenues.

(3) Calculated with the following formula: Cap Rate ≈ (1+G)/(R-G), where G ≈ estimated future growth
rate.  R ≈ wtd avg cost of capital.  (1+.05) / (.2025 -.05) or 1.05/.1525 ≈   6.885   or   14.52%

* Earnings Before Interest, Taxes, Depreciation & Amortization. (See Table C).

Exhibit D
Page 24 of 34

24. EO

EXHIBIT ___ 6

PAGE ___ 218

| DRAFT REPORT | TABLE F | Job No. | 1131ABCV |
|---|---|---|---|
| | CAPITAL ASSET PRICING MODEL | Appr Date | 12/31/2001 |
| | (CAPM) | Run Date | 19-Oct-04 |

**MGM ENTERTAINMENT, INC.**

**KEY ASSUMPTIONS**

| | | |
|---|---|---|
| Cost of debt - pretax (1) | | 10.00% |
| Federal tax rate (2) | Pretax Basis | 0.00% |
| State tax rate | | 0.00% |
| Combined marginal tax rate | Pretax Basis | 0.00% |
| Long-term treasury bond rate | | 6.00% |
| Market average beta | * | 1.34 |
| Market average percent of equity | * | 60% |
| Market average percent of debt | * | 40% |

| **WEIGHTED AVG COST OF CAPITAL** | 18.44% | Rounded | **18.50%** |
|---|---|---|---|
| Formula: (1-T)*(Kd)(D)+(Ke)(E) | | | |
| T  = Tax rate | | | 0.00% |
| Kd = Cost of debt | | | 10.00% |
| D  = Proportion of debt in total capital | | | 39.70% |
| Ke = Cost of equity | | | 24.00% |
| E  = Proportion of equity | | | 60.30% |

| **COST OF EQUITY CAPITAL** | 24.21% | Rounded | **24.00%** |
|---|---|---|---|
| Formula: Ke = ((B*Rp)+Rs)+Rt | | | |
| Rf = Rate of return on risk-free security (3) | | | 5.00% |
| Rp = Risk premium (Rm - Rf) | | | 12.10% |
| Rs = Company-specific risk premium (4) | | | 2.00% |
| Rt = Current return on 30 Year treasury bills | | | 6.00% |
| B  = Industry beta (5) | | | 1.34 |
| Rm = Market return (6) | | | 17.10% |

*Ibbotson Industry Studies for SIC Code 3944, Games, Toys, and Children's Vehicles

(1) Company's estimated cost of interest-bearing debt.

(2) Valuation based upon pretax income streams.

(3) Ibbotson & Associates Report 1926-1999, "Arithmetic Mean of Annual Returns for Long-Term U.S. Treasury Bonds" (riskless).

(4) Additional risk factor to adjust for specific risks of the subject company and industry.

(5) A measure of risk (variability) of common stocks in the industry. (Ibbotson Industry Studies for SIC Code 3944, Games, Toys, and Children's Vehicles)

(6) Ibbotson & Associates Report 1926-1997, "Arithmetic Mean of Annual Returns for The Common Stock of Small Companies".

Exhibit D
Page 25 of 34

25. ED

EXHIBIT ___ U
PAGE ___ 219

| | | | |
|---|---|---|---|
| RADICA GAMES | EQUITY | 62,052 | 68% |
| | DEBT | 28,777 | 32% |
| | | 90,829 | 100.00% |
| ZINDART | EQUITY | 77,268 | 55% |
| | DEBT | 62,936 | 45% |
| | | ###### | 100.00% |
| | AVERAGE | 69,660 | 60% |
| | | 45,857 | 40% |
| | | ###### | 100.00% |

Exhibit D
Page 26 of 34

000110

24. QD

EXHIBIT 

PAGE _____ 220

**DRAFT REPORT**

**TABLE G**

**EXCESS EARNINGS APPROACH**

**MGM ENTERTAINMENT, INC.**

($000)

Job No. 1131ABCV
Appr Date 12/31/2001
Run Date 19-Oct-04

**EARNINGS BEFORE CAPITAL CHARGES (Table E)**                    $9,208

| CAPITAL CHARGES Economic Depreciation | Appraised Value | Est Life | | Return Of | | |
|---|---|---|---|---|---|---|
| Automotive Equipment | $    7 | 10 | Yrs | 1 | | |
| Computer Equipment | 23 | 5 | Yrs | 5 | | |
| Furniture & Fixtures | 21 | 15 | Yrs | 1 | | |
| Leasehold Equipment * | 126 | 10 | Yrs | 13 | | |
| Machinery & Equipment | 4 | 10 | Yrs | 0 | | |
| Molds & Tooling * | 690 | 3 | Yrs | 230 | | |
| Office Equipment | 1 | 7 | Yrs | 0 | | |
| Fixed Assets Total | $   871 | 3.6 | | $243 | $ | (243) |

| Economic Return | Adjusted Book | % | | Return On | | |
|---|---|---|---|---|---|---|
| Working Capital | $ 11,800 | 10.0% | | $ 1,180 | | |
| Automotive Equipment | 7 | 15.0% | | 1 | | |
| Computer Equipment | 23 | 20.0% | | 5 | | |
| Furniture & Fixtures | 21 | 15.0% | | 3 | | |
| Leasehold Equipment * | 126 | 20.0% | | 25 | | |
| Machinery & Equipment | 4 | 12.5% | | 0 | | |
| Molds & Tooling * | 690 | 15.0% | | 104 | | |
| Office Equipment | 1 | 15.0% | | 0 | | |
| Adjusted Tangible Assets | $ 12,671 | | | $ 1,318 | $ | (1,318) |

| TOTAL EXCESS EARNINGS | | | | | $ | 7,646 |
|---|---|---|---|---|---|---|
| Excess Earnings Cap Rate | | 24.0% ** | | | $ | 31,860 |
| Add Tangible Assets | | | | | | 12,671 |
| **BUSINESS ENTERPRISE VALUE BY EXCESS EARNINGS METHOD** | | | | | $ | 44,531 |

* Includes Fixed Assets added in 2000 and 2001          Rounded          $ 44,550

**Equity Discount Rate

Exhibit D
Page 27 of 34

000111

21. ED

EXHIBIT ___4___

PAGE ___221___

**MGM ENTERTAINMENT, INC.**
16730 Schoenborn Street
North Hills, CA 91343-6122

**TABLE H**
**FIXED ASSET APPRAISAL**
**FROM DEPRECIATION SCHEDULES & FINANCIALS**

Appraisal Date 12/31/01
Original Cost $2,541
Depreciated Replacement Cost New $871

| Owned Leased | Entry Item Order No. | DESCRIPTION | Qty | Valuation Date | Orig Cost* (1) | Est Econ Life | Yrs In Use | Rem Econ Life | Price Trend Factor | Repl Cost New | Est'd Rem Life | Fair Market Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OWNED | 12 | TRUCK | AE | 01-Aug-93 | 35,951 | 10.0 | 8.4 | 1.6 | 1.208 | 43,429 | 16% | 6,855 |
| OWNED | 17 | COMPUTER | CE | 15-Oct-93 | 1,120 | 5.0 | 8.2 | (3.2) | | - | -64% | 0 |
| OWNED | 18 | COMPUTER | CE | 15-Jul-94 | 750 | 5.0 | 7.5 | (2.5) | | - | -49% | 0 |
| OWNED | 27 | COMPUTER | CE | 01-Oct-94 | 5,727 | 5.0 | 7.3 | (2.3) | | - | -45% | 0 |
| OWNED | 59 | COMPUTER | CE | 01-Oct-94 | 1,476 | 5.0 | 7.3 | (2.3) | | - | -45% | 0 |
| OWNED | 28 | COMPUTER | CE | 01-Dec-94 | 20,393 | 5.0 | 7.1 | (2.1) | | - | -43% | 0 |
| OWNED | 29 | COMPUTER | CE | 01-Mar-95 | 22,714 | 5.0 | 6.8 | (1.8) | | - | -37% | 0 |
| OWNED | 30 | COMPUTER | CE | 01-Jun-95 | 18,174 | 5.0 | 6.6 | (1.6) | | - | -32% | 0 |
| OWNED | 31 | COMPUTER | CE | 15-Jun-95 | 10,448 | 5.0 | 6.2 | (1.2) | | - | -24% | 0 |
| OWNED | 32 | COMPUTER | CE | 15-Oct-95 | 15,360 | 5.0 | 6.1 | (1.1) | | - | -23% | 0 |
| OWNED | 33 | COMPUTER | CE | 15-Nov-95 | 4,923 | 5.0 | 6.0 | (1.0) | | - | -21% | 0 |
| OWNED | 37 | COMPUTER | CE | 15-Dec-95 | 9,975 | 5.0 | 6.0 | (1.0) | | - | -21% | 0 |
| OWNED | 38 | COMPUTER | CE | 15-Dec-95 | 8,445 | 5.0 | 6.0 | (1.0) | | - | -21% | 0 |
| OWNED | 60 | COMPUTER | CE | 01-Jul-96 | 211,405 | 5.0 | 5.5 | (0.5) | | - | -10% | 0 |
| OWNED | 61 | COMPUTER | CE | 01-Jul-96 | 1,309 | 5.0 | 5.5 | (0.5) | | - | -10% | 0 |
| OWNED | 41 | COMPUTER | CE | 01-Jul-97 | 27,505 | 5.0 | 4.5 | 0.5 | 0.075 | 2,063 | 10% | 205 |
| OWNED | 62 | COMPUTER | CE | 01-Jul-97 | 2,762 | 5.0 | 4.5 | 0.5 | 0.075 | 207 | 10% | 20 |
| OWNED | 63 | COMPUTER | CE | 01-Jun-98 | 39,597 | 5.0 | 3.6 | 1.4 | 0.800 | 31,678 | 28% | 8,955 |
| OWNED | 45 | COMPUTER | CE | 01-Jul-98 | 36,668 | 5.0 | 3.5 | 1.5 | 0.800 | 29,334 | 30% | 8,775 |
| OWNED | 46 | COMPUTER | CE | 01-Jul-99 | 91,565 | 5.0 | 3.0 | 2.0 | 0.085 | 7,783 | 40% | 3,115 |
| OWNED | 47 | COMPUTER | CG | 01-Feb-99 | 11,743 | 5.0 | 2.9 | 2.1 | 0.085 | 956 | 42% | 400 |
| OWNED | 48 | COMPUTER | CG | 01-Mar-99 | 4,000 | 5.0 | 2.9 | 2.1 | 0.085 | 340 | 43% | 145 |
| OWNED | 49 | COMPUTER | CG | 01-Mar-99 | 4,125 | 5.0 | 2.8 | 2.2 | 0.085 | 351 | 43% | 150 |
| OWNED | 50 | COMPUTER | CG | 01-Mar-99 | 3,605 | 5.0 | 2.8 | 2.2 | 0.085 | 306 | 43% | 130 |
| OWNED | 51 | COMPUTER | CG | 01-Mar-99 | 2,733 | 5.0 | 2.8 | 2.2 | 0.085 | 232 | 43% | 100 |
| OWNED | 52 | COMPUTER | CG | 01-Mar-99 | 4,702 | 5.0 | 2.8 | 2.2 | 0.085 | 400 | 45% | 180 |
| OWNED | 53 | COMPUTER | CG | 01-Apr-99 | 20,684 | 5.0 | 2.6 | 2.4 | 0.085 | 1,758 | 48% | 850 |
| OWNED | 54 | COMPUTER | CG | 01-Jun-99 | 1,557 | 5.0 | 2.4 | 2.6 | 0.085 | 132 | 52% | 70 |
| OWNED | 55 | COMPUTER | CG | 01-Sep-99 | 1,687 | 5.0 | 2.3 | 2.7 | 0.085 | 143 | 53% | 75 |
| OWNED | 4 | EXHIBIT BOOTH + FURN & FIX | FF | 01-Nov-89 | 14,443 | 15.0 | 12.2 | 2.8 | 1.382 | 19,960 | 19% | 3,760 |
| OWNED | 1 | FURNITURE & FIXTURES | FF | 01-Sep-90 | 6,857 | 15.0 | 11.3 | 3.7 | 1.334 | 9,147 | 24% | 2,230 |
| OWNED | 2 | FURNITURE & FIXTURES | FF | 01-Apr-91 | 13,606 | 15.0 | 10.5 | 4.5 | 1.280 | 17,416 | 30% | 5,215 |
| OWNED | 16 | FURNITURE & FIXTURES | FF | 15-Apr-94 | 1,464 | 15.0 | 7.7 | 7.3 | 1.178 | 1,654 | 49% | 805 |
| OWNED | 24 | FURNITURE & FIXTURES | FF | 01-Aug-95 | 238 | 15.0 | 6.4 | 8.6 | 1.178 | 280 | 57% | 160 |

000112

Exhibit D
Page 28 of 34

EXHIBIT ____ 6
PAGE ____ 222

MGM ENTERTAINMENT, INC.
16730 Schoenborn Street
North Hills, CA 91343-6122

**TABLE II**
**FIXED ASSET APPRAISAL**
**FROM DEPRECIATION SCHEDULES & FINANCIALS**

Appraisal Date 12/31/01
Original Cost $3,541
Depreciated Replacement Cost New $871

| Owned / Leased | Entry Item Order No. | DESCRIPTION | Qty | Valuation Date | Orig Cost* ($) | Est Econ Life | Yrs In Use | Rem Econ Life | Price Trend Factor | Repl Cost New | Eff'd Rmng Life | Fair Market Value 12/31/01 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OWNED | 25 | FURNITURE & FIXTURES | 1 | 01-Aug-95 | 299 | 15.0 | 6.4 | 8.6 | 1.178 | 352 | 57% | 200 |
| OWNED | 26 | FURNITURE & FIXTURES | 1 | 01-Aug-95 | 1,069 | 15.0 | 6.4 | 8.6 | 1.178 | 1,259 | 57% | 720 |
| OWNED | 34 | FURNITURE & FIXTURES | 1 | 15-Sep-95 | 1,295 | 15.0 | 6.3 | 8.7 | 1.178 | 1,526 | 58% | 885 |
| OWNED | 35 | FURNITURE & FIXTURES | 1 | 15-Nov-95 | 1,000 | 15.0 | 6.1 | 8.9 | 1.178 | 1,178 | 59% | 695 |
| OWNED | 43 | FURNITURE & FIXTURES | 1 | 01-Mar-98 | 1,659 | 15.0 | 3.8 | 11.2 | 1.072 | 1,778 | 74% | 1,325 |
| OWNED | 44 | FURNITURE & FIXTURES | 1 | 01-Aug-98 | 643 | 15.0 | 3.4 | 11.6 | 1.072 | 689 | 77% | 530 |
| OWNED | 57 | FURNITURE & FIXTURES | 1 | 01-May-99 | 3,601 | 15.0 | 2.7 | 12.3 | 1.056 | 3,803 | 82% | 3,125 |
| OWNED | 58 | FURNITURE & FIXTURES | 1 | 01-Dec-99 | 1,115 | 15.0 | 2.1 | 12.9 | 1.056 | 1,177 | 86% | 1,015 |
| OWNED | 6 | LEASEHOLD IMPROVEMENTS | 1 | 01-Oct-90 | 2,239 | 10.0 | 11.3 | (1.3) | | | -13% | 0 |
| OWNED | 7 | LEASEHOLD IMPROVEMENTS | 1 | 01-Feb-91 | 2,293 | 10.0 | 10.9 | (0.9) | | | -9% | 0 |
| OWNED | 21 | LEASEHOLD IMPROVEMENTS | 1 | 01-Sep-91 | 17,300 | 10.0 | 8.3 | 1.7 | 1.208 | 20,898 | 17% | 3,475 |
| OWNED | 19 | LEASEHOLD IMPROVEMENTS | 1 | 15-Jan-94 | 8,633 | 10.0 | 8.0 | 2.0 | 1.178 | 10,170 | 20% | 2,070 |
| OWNED | 20 | LEASEHOLD IMPROVEMENTS | 1 | 01-Nov-94 | 28,862 | 10.0 | 7.2 | 2.8 | 1.178 | 33,999 | 28% | 9,620 |
| OWNED | 36 | LEASEHOLD IMPROVEMENTS | 1 | 15-Oct-95 | 2,814 | 10.0 | 6.2 | 3.8 | 1.152 | 3,242 | 38% | 1,225 |
| OWNED | | LEASEHOLD IMPROVEMENTS | 1 | 30-Jun-00 | 114,000 | 10.0 | 1.5 | 8.5 | 1.034 | 117,876 | 85% | 100,145 |
| OWNED | | LEASEHOLD IMPROVEMENTS | 1 | 30-Jun-01 | 9,572 | 10.0 | 0.5 | 9.5 | 1.000 | 9,572 | 95% | 9,090 |
| OWNED | 13 | MACHINERY & EQUIPMENT | 1 | 15-Jan-94 | 1,004 | 10.0 | 8.0 | 2.0 | 1.178 | 1,183 | 20% | 240 |
| OWNED | 14 | MACHINERY & EQUIPMENT | 1 | 15-Apr-94 | 1,111 | 10.0 | 7.7 | 2.3 | 1.178 | 1,309 | 23% | 300 |
| OWNED | 22 | MACHINERY & EQUIPMENT | 1 | 01-Dec-94 | 2,444 | 10.0 | 7.1 | 2.9 | 1.178 | 2,879 | 29% | 840 |
| OWNED | 39 | MACHINERY & EQUIPMENT | 1 | 01-Jul-97 | 628 | 10.0 | 4.5 | 5.5 | 1.085 | 688 | 55% | 380 |
| OWNED | 40 | MACHINERY & EQUIPMENT | 1 | 01-Jul-97 | 2,936 | 10.0 | 4.5 | 5.5 | 1.097 | 3,221 | 55% | 1,770 |
| OWNED | 3 | MOLDS & TOOLING | 1 | 01-Sep-98 | 877,864 | 5.0 | 3.5 | 1.5 | 1.072 | 941,070 | 30% | 281,550 |
| OWNED | 42 | MOLDS & TOOLING | 1 | 01-Jul-99 | 773,751 | 5.0 | 2.5 | 2.5 | 1.056 | 817,081 | 50% | 407,870 |
| OWNED | 56 | MOLDS & TOOLING | 1 | 30-Jun-00 | 822 | 5.0 | 1.5 | 3.5 | 1.034 | 850 | 70% | 595 |
| OWNED | 11 | CELLULAR PHONE | 1 | 01-Aug-92 | 784 | 10.0 | 9.4 | (4.4) | | | -44% | 0 |
| OWNED | 9 | EQUIPMENT | 1 | 01-Sep-99 | 1,100 | 10.0 | 11.3 | (0.1) | | | -1% | 0 |
| OWNED | 5 | MAIL MACHINE | 1 | 01-Dec-91 | 1,997 | 10.0 | 10.1 | (0.1) | | | -1% | 0 |
| OWNED | 15 | TELECOM EQUIPMENT | 1 | 15-Jul-94 | 2,426 | 10.0 | 7.5 | 2.5 | 1.178 | 2,858 | 25% | 725 |
| OWNED | 8 | TELEPHONE SYSTEM | 1 | 01-Nov-91 | 15,087 | 10.0 | 10.2 | (0.2) | | | -2% | 0 |
| OWNED | 23 | WATER PUMP | 1 | 01-Feb-95 | 1,748 | 10.0 | 6.9 | 3.1 | 1.152 | 2,014 | 31% | 620 |
| OWNED | 10 | WATER PURIFIER | 1 | 01-Jun-92 | 147 | 10.0 | 9.6 | 0.4 | 1.238 | 182 | 4% | 5 |

Total at Cost   3,541   ($000)

FMV   871   ($000)

Exhibit D
Page 29 of 34

000113

29. ℮D

EXHIBIT ____ U

PAGE ____ 223

MGM ENTERTAINMENT, INC.
16730 Schoenborn Street
North Hills, CA 91343-6122

**TABLE II**
**FIXED ASSET APPRAISAL**
**FROM DEPRECIATION SCHEDULES & FINANCIALS**

Appraisal Date 12/31/01
Original Cost \$2,541
Depreciated Replacement Cost New \$871

| Owned Leased | Entry Item Order No. | DESCRIPTION | Qty | Valuation Date | Orig Cost* (\$) | Est Econ Life | Yrs In Use | Rem Econ Life | Price Trend Factor | Repl Cost New | Est'd Rem'g Life | Fair Market Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

**TABLE H-1**
FIXED ASSET APPRAISAL
MGM ENTERTAINMENT, INC.
($000)

| | | | | | | Job No. | 1131ABCV |
| | | | | | | Appr Date | 12/31/2001 |
| | | | | | | Run Date | 19-Oct-04 |

| From Depreciation Schedules & Financial | | | Original Cost | Estimated Econ. Life | FMV |
|---|---|---|---|---|---|
| Automotive Equipment | AE | $ | 36 | 10.0 | $ 7 |
| Computer Equipment | CE | | 585 | 5.0 | 23 |
| Furniture & Fixtures | FF | | 47 | 15.0 | 21 |
| Leasehold Equipment * | LE | | 186 | 10.0 | 126 |
| Machinery & Equipment | ME | | 8 | 10.0 | 4 |
| Molds & Tooling * | MT | | 1,656 | 10.0 | 690 |
| Office Equipment | OE | | 23 | 7.0 | 1 |
| **TOTALS** | | $ | 2,541 | | $ |

Extracted from the detailed appraisal in Table H.

EXHIBIT ____ U
PAGE ____ 225

## TABLE I
## MARKET INFORMATION
### 31-Dec-01

|  | | | | | | Job No. | 1131ABCV | |
|  | | | | | | Appr Date | 12/31/2001 | |
|  | | | | | | Run Date | 19-Oct-04 | |

| COMPANY | Symbol | Price | Shares Out (000) | Market Cap* ($000) | Annual Sales ($000) | Mkt Cap/ Sales (0) | Beta (0) |
|---|---|---|---|---|---|---|---|
| JAKKS PACIFIC | JAKK | 18.95 | 19,556 | 370,580 | 284,309 | 1.303 | 1.00 |
| HASBRO, INC | HAS | 16.23 | 172,309 | 2,796,575 | 2,856,339 | 0.979 | 1.00 |
| MATTEL | MAT | 17.20 | 426,371 | 7,333,581 | 4,804,062 | 1.527 | 0.38 |
| RADICA GAMES | RADA | 4.14 | 17,640 | 73,030 | 98,554 | 0.741 | 1.28 |
| ZINDART LTD | ZND | 1.75 | 30,601 | 53,551 | 136,083 | 0.394 | 1.40 |
| | | | | | | | |
| AVERAGES (Beta is Median) | | | 133,295 | 2,125,463 | 1,635,869 | 0.989 | 1.00 |
| AVERAGES OF SMALLER COMPANIES | | | | | 117,319 | 0.567 | |

*Minority value. Should be converted to control value to use for valuation under the market approach.

Exhibit D
Page 32 of 34

000116

EXHIBIT ___6___

PAGE ___221___

**EXHIBIT 7**

MEMO TO FILE/ANG                        RE:  FELINA - INTERNATIONAL TRADERS

On October 19, 2004, I met with Ernie Dutcher. Initially, he advised me that his hourly rate for straight time is $250.00 per hour and $375.00 per hour for depositions and court appearances. He advised me that he has been deposed a couple of dozen times. He advised that the appraisals he did took into account the bratz style doll which is the issue in this lawsuit. He said he also relied on audited financial statements.

Ernie advised me that Morad was trying to be super fair and he did not apply a minority discount. However, Section 2000 does not allow the minority discount.

Ernie said his final appraisal is an ongoing project so it is not finished. He said he can put everything on a 3 1/2 inch disk and he would provide it to me. He said he thinks he has most of the information and he would look for the rest.

On October 19, 2004, I received a telephone call from Ernie Dutcher. He advised me that his files would not fit on a floppy disk so he put the information on a zip disk and could have it delivered to my office.

ANG:ms

EXHIBIT ___7___

PAGE ___227___

FL 10453

C:\wpdocs\MEMOS\ANG.63

**EXHIBIT 8**



Wachovia Corporation
Legal Division
NC0630
One Wachovia Center
301 South College Street
Charlotte, NC 28288

Tel 704 374-6611

Fenita M. Shepard
Vice President
Assistant General Counsel
Direct Dial 704-383-4448
Fax 704-383-0649
fenita.shepard@wachovia.com

**WACHOVIA**

November 15, 2005

**VIA FAX AND US MAIL**
Robert G. Wilson, Esq.
Cotkin, Collins, & Ginsburg
300 South Grand Avenue, 24th Floor
Los Angeles, CA 90071-3134

      RE:   LARIAN V. LARIAN ARBITRATION

Dear Mr. Wilson:

      Not only do I concur with Mr. Feldman's position, but also there is absolutely no way that I can produce the documents to you by tomorrow. There are three (3) boxes of loan documents that need to be reviewed for responsiveness and privilege. Only after such a review, can these documents be made available.

      Also, Mr. Laugton will be on vacation from November 21, 2005 through November 28, 2005. Please let me know if you are agreeable to a stipulation as to the authenticity of the documents so that Mr. Laughton will not have to appear. Otherwise, please let me know when, this week, you will need Mr. Laughton to testify.

      Very truly yours,

      *Fenita M. Shepard*
      Fenita M. Shepard

Cc:   Richard L. Kellner, Esq.
       Robert M. Turner, Esq.

**CC 00570**

EXHIBIT _____ 8 _____

PAGE _____ 248 _____

Wachovia Corporation
Legal Division
NC0630
One Wachovia Center
301 South College Street
Charlotte, NC 28288

Tel 704 374-6611

Fe·   M. Shepard
Vic. . resident
Assistant General Counsel
Direct Dial 704-383-4448
Fax 704-383-0649
fenita.shepard@wachovia.com



**WACHOVIA**

November 15, 2005

<u>VIA FAX AND US MAIL</u>
Robert G. Wilson, Esq.
Cotkin, Collins, & Ginsburg
300 South Grand Avenue, 24th Floor
Los Angeles, CA 90071-3134

     RE:   LARIAN v. LARIAN ARBITRATION

Dear Mr. Wilson:

     It is my understanding that the Defendants in the above referenced matter have filed a Motion to Quash ("Motion") seeking to quash the third party subpoena (duces tecum) served on Bruce Laughton, an employee of Wachovia Bank, N.A.  Without waiving any objections it may have to the third party subpoena, Wachovia Bank, N.A. will await a ruling from the Arbitration panel on Defendant's Motion before it responds to the subpoena.  Should you wish to discuss this further, please feel free to contact me.

     Very truly yours,

     *Fenita M. Shepard*
     Fenita M. Shepard

Cc:   Richard L. Kellner, Esq.
       Robert M. Turner, Esq.

CC 00571

EXHIBIT _____ 8

PAGE _____ 229

**EXHIBIT 9**

RightFAX                8/30/2007 2:34    PAGE 002/006   Fax Server

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority _____    Send _____
Entered _____    Closed _____
JS-5/JS-6 _____   JS-2/JS-3 _____
Scan Only _____   Docketed on CM _____
_____ THIS CONSTITUTES NOTICE OF
ENTRY AS REQUIRED BY FRCP 77(d)

8/29/07

EASTERN DIVISION
BY _____ DEPUTY

# PRIORITY SEND
### & ENTERED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Date:  August 27, 2007

Case No.    CV 04-09049 SGL (RNBx)

Title:    CARTER BRYANT -v- MATTEL, INC.
          AND CONSOLIDATED ACTIONS

==================================================================

PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

Gina L. Guzman                      Theresa Lanza
Courtroom Deputy Clerk              Court Reporter

ATTORNEYS PRESENT FOR CARTER        ATTORNEYS PRESENT FOR MATTEL:
BRYANT:

John W. Keker, Esq.                 John B. Quinn, Esq.
(morning session only)              Michael T. Zeller, Esq.
                                    Jon D. Corey, Esq.

ATTORNEYS PRESENT FOR MGA:

Patricia Glaser, Esq.
Diana M. Torres, Esq.

PROCEEDINGS:    **ORDER DENYING MOTION FOR TERMINATING SANCTIONS;
                ORDER DENYING REQUEST FOR INTERLOCUTORY
                APPEAL; ORDER REQUIRING FILING OF AFFIDAVITS RE
                EVIDENCE PRESERVATION**

This matter is before the Court on MGA's and Carter Bryant's Motion for Terminating Sanctions, filed on July 24, 2007 (docket #889). This matter was heard on August 27, 2007, at which time it was taken under submission. The Court has considered the moving, opposition, and reply briefs, as well as the many declarations and other evidence presented by the parties. The

MINUTES FORM 90                             Initials of Deputy Clerk _ glg
CIVIL -- GEN                                Time: 02/52
                              1             Docket No. 895

EXHIBIT       9

PAGE          230

Court has also considered the arguments presented at the August 27 hearing and the sworn testimony given by Michael C. Moore, in-house counsel for Mattel. Although at the hearing the Court indicated it would defer ruling on the present motion pending further filings by all parties regarding their efforts to preserve evidence, upon further reflection the Court sees no reason to delay ruling on the current motion.[1]  As set forth below, the Court **DENIES** the motion.

Based on their inherent power to sanction for "abusive litigation practices," district courts may impose sanctions against a party who destroys evidence, including the ultimate sanction of dismissal. Leon v. IDX Systems Corp., 464 F.3d 951, 958 (9th Cir. 2006). Dismissal is a harsh sanction, which may nonetheless be imposed upon those parties who have "engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings." Anheuser-Busch, Inc. v. Natural Beverage Distributors, 69 F.3d 337, 348 (9th Cir. 1995). However, before imposing the ultimate sanction of dismissal, district courts should consider five factors: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." Id. Nevertheless, district courts need not make explicit findings regarding each of these factors and, in any event, "a finding of willfulness, fault, or bad faith is required for dismissal to be proper." Leon, 464 F.3d 951, 958 (9th Cir. 2006) (internal quotation marks and citation omitted).

"A party's destruction of evidence qualifies as willful spoliation if the party has 'some notice that the documents were potentially relevant to the litigation before they were destroyed.'" Id. at 959 (quoting United States v. Kitsap Physicians Serv., 314 F.3d 995, 1001 (9th Cir. 2002) (finding no willful spoliation where documents were destroyed in the routine course of business)). Neither Leon nor Kitsap elaborate on when a party has the "notice" necessary to trigger the duty to preserve evidence. However, in In re Napster, Inc. Copyright Litigation, 462 F.Supp.2d 1060, 1068 (N.D. Cal. 2006), the district court presented a persuasive discussion of the standard, first rejecting an argument that the duty to preserve evidence arises only when litigation is "imminent," and then setting forth a lesser standard. Specifically, the Napster court noted that the duty arose "when a party should have known that the evidence may be relevant to future litigation," and that any such "future litigation" must be "probable," and not merely "possibl[e]." (Internal quotation marks and citation omitted).

Keeping in mind these standards, the Court turns to the categories of evidence MGA and Bryant allege that Mattel has despoiled. As articulated by the Court at the hearing on this matter, those categories are (1) Mattel employees' emails, (2) documents maintained on the Zeus document storage system, (3) the delay in producing certain Rule 30(b)(6) witnesses, (4) Carter

---

[1]  By the same token, upon further reflection, the Court sees no reason to delay ruling on MGA's request for interlocutory appeal of the present order.  See 28 U.S.C. § 1292(b) (stating that certifications for interlocutory appeal should be set forth in the order to be appealed).  The Court's ruling on that matter appears infra.

MINUTES FORM 90
CIVIL – GEN

2

Initials of Deputy Clerk __gjo_____
Time: 02/52
Docket No. 895

EXHIBIT _____ 9

PAGE _____

Bryant's missing phone records, and (5) Carter Bryant's missing time records.

In considering the arguments of the parties regarding when Mattel's duty to begin to preserve evidence arose, the Court determines that November 24, 2003, marks the date when litigation between Mattel and Bryant became more than merely speculative and in fact became probable. On this date, in-house counsel for Mattel received in discovery in an unrelated action a copy of a contract between MGA and Bryant that pre-dated Bryant's resignation from Mattel. This contract appeared to Mattel to violate certain employment agreements executed by Bryant and Mattel, thus giving rise to one of the current consolidated actions. Although prior to this date an internal investigation may have raised a <u>suspicion</u> on Mattel's part that litigation might arise, there was no evidence presented to the Court that Mattel should have known it had a viable claim against Bryant before November 2003. Cf. Fed. R. Civ. P. 11(b)(3) ("By presenting to the court . . . a pleading . . . , an attorney
. . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .").

The Court heard testimony from Michael C. Moore, in-house counsel for Mattel, regarding the efforts to preserve email communications and other evidence. Counsel for MGA and Bryant cross-examined Mr. Moore at the hearing on this matter. The Court credits his testimony. The efforts Mr. Moore described regarding the preservation of emails is reasonable, and certainly does not amount to spoliation. Moore described communications with specific individuals identified by Mattel as those most likely to have information relevant to the litigation and efforts made to preserve any evidence those individuals had in their custody or control. Emails not otherwise archived from the relevant time period – mostly September and October, 2000 – had already been deleted from Mattel's email servers in accordance with its email retention policies. Mattel cannot be faulted for deleting these emails in the regular course of business before it had notice of its claims against Bryant.

In April, 2005, the current litigation took a dramatic turn, when MGA filed suit against Mattel. At that time, <u>all</u> Mattel employees were instructed to maintain any evidence potentially relevant to the litigation. When that suit was filed, Mattel took action to preserve all of its emails, capturing emails that date back to December, 2004. They retain these backup tapes to this day. MGA and Bryant make much of Mattel's failure to suspend its 90-day auto-delete policy regarding emails, but fail to address two key points: First, Mattel altered only the storage mechanism for its emails, it did not actually delete any emails; and second, Mattel, a number of years ago, informed MGA that it was not planning on suspending its 90-day auto-delete policy, and MGA did not at that time object.

As for the Zeus tapes, there is simply no evidence of spoliation. First and foremost, as the system has been described to the Court, the system is a cumulative file system that continues to accumulate. The system is still in operation, does not have an auto-delete function, and

MINUTES FORM 90
CIVIL – GEN

3

Initials of Deputy Clerk __glg_____
Time: 02/52
Docket No. 895

EXHIBIT ____9____

PAGE ____231____

information dating back to all relevant time period in this case may be accessed from it. Additionally, Mattel's in-house counsel testified as to the existence of several backup tapes that it can make available to MGA and Bryant. Finally, outside of pure speculation, there is no evidence that anyone has deleted anything from the Zeus system. Although production issues may still remain with respect to these data, preservation of this data, in the Court's view, is simply not an issue based on the record before the Court.

The delay in producing certain Rule 30(b)(6) witnesses is not a proper basis for terminating sanctions in this case. No motions to compel were brought to compel these witnesses's depositions at earlier times, and MGA and Bryant's accusations that the delay in producing them for deposition is part of a cover-up of the destruction of evidence is mere unfounded speculation. Moreover, the Court is mindful that MGA has been found by the discovery master to be guilty of the very same unexcused delay of which it accuses Mattel. See August 14, 2007, J. Infante Order, at 8 and 9 (attached to the Supplemental Proctor Decl. as Ex. 1).

Although Mattel is at a loss to explain the missing phone records from the critical month of October, 2000, there is no evidence that the records were destroyed. Moreover, other evidence presented by Mattel, especially phone records produced by Bryant that show he was in contact with MGA during that time period, suggest that the missing records would not assist Bryant.

The "missing" time records were either never created or were deleted. There is no evidence that the latter occurred. In fact, the only evidence on this point, from Mattel's Rule 30(b)(6) witness, is that although deletion of time records is possible, he was unaware of any instances of that occurring. Artavia Depo. 116, 170-71.

In sum, MGA and Bryant have failed to present any evidence regarding the "willfulness, fault, or bad faith" required to justify the imposition of terminating sanctions. Leon, 464 F.3d at 958. Many of MGA and Bryant's allegations, especially those raised in connection with Mattel's failure to suspend its auto-delete policy (portrayed as a wholesale failure to preserve emails less than 90-days old) and the availability of data from the Zeus system, are nothing more than rhetoric laced with hyperbole. Other allegations, such as Mattel's motive for delaying certain Rule 30(b)(6) depositions, and the destruction of Bryant's October, 2000, phone records and time records, are nothing more than sheer speculation, unsupported by evidence. Although counsel impressed upon the Court MGA's conviction of the righteousness of its cause, such overzealous conviction as witnessed by the Court at the hearing is no substitute for proof.

Accordingly, the Court DENIES MGA's and Bryant's Motion for Terminating Sanctions.

At the hearing, counsel for MGA and Bryant requested the Court certify the present order for interlocutory appeal. That request is DENIED. Permissive interlocutory appeals are governed by 28 U.S.C. § 1292(b):

When a district judge, in making in a civil action an order not otherwise

MINUTES FORM 90
CIVIL – GEN

4

Initials of Deputy Clerk ___plg_____
Time: 02/52
Docket No. 895

EXHIBIT _____9_____

PAGE _____232_____

RightFAX                    8/30/2007 2:34   PAGE 008/008   Fax Server

appealable under this section, shall be of the opinion that such order involves a
controlling question of law as to which there is substantial ground for difference of
opinion and that an immediate appeal from the order may materially advance the
ultimate termination of the litigation, he shall so state in writing in such order.

Id. Here, there is no "controlling question of law" in controversy. The law is quite settled.
Accordingly, certification for interlocutory appeal of the present order is unwarranted.

As stated at the hearing, the Court **ORDERS** all parties to set forth, in affidavit form, their
preservation efforts and policies with respect to the present litigation on or before September 10,
2007.

**IT IS SO ORDERED.**

MINUTES FORM 90
CIVIL – GEN

5

Initials of Deputy Clerk ___glg___
Time: 02/52
**Docket No. 895**

EXHIBIT ___9___

PAGE ___733___

RightFAX                8/30/2007 2:34    PAGE 001/006    Fax Server

**From:**   Name:        United States District Court
                         312 North Spring Street
                         Los Angeles, CA 90012
            Voice Phone: (213) 894-5474

**To:**     Name:        Michael Zeller
            Company:

                         865 S Figueroa St, 10th Floor,
            City/State:  Los Angeles, CA 90017-2543
            Fax Number:  213-443-3100



**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

## Automated Document Delivery Service

*Notice pursuant to Rule 77(d) FRCiv.P
The attached copy is hereby served upon you pursuant to Federal Rule of Civil Procedure 77(d).*

Fax Notes:

Case 2:04-CV-09049 : CARTER BRYANT V. MATTEL INC

*Pursuant to General Order 06-07, Section F, the following documents shall be submitted in the traditional manner: Pen Registers, Search Warrants, Seizure Warrants, Wire Taps, Bond Related Documents, Under Seal and In-Camera Documents, and All Charging Documents (Complaints, Informations, Indictments, and Superseding Charging Documents). All other documents filed in cases unassigned to a judge shall be filed electronically with a copy e-mailed to the criminal intake mailbox for the appropriate division. The proper e-mail address for each division is as follows:*

*Western Division: CrimIntakeCourtDocs-LA@cacd.uscourts.gov
Southern Division: CrimIntakeCourtDocs-SA@cacd.uscourts.gov
Eastern Division: CrimIntakeCourtDocs-RS@cacd.uscourts.gov*

*For additional information and assistance, please refer to the CM/ECF page on the Court website at www.cacd.uscourts.gov.*

**Switch to e-mail delivery and get these documents sooner!
To switch, complete and submit
Optical Scanning Enrollment / Update form G-76.
Call 213-894-5474 for help and free technical support.**

*If you received this document in error because the attorney with whom this document is directed is no longer the attorney on the case, a Notice of Change of Attorney Information, form G-6, must be filed. If there are other cases which you've received documents for which you are no longer the attorney, separate notices must be filed for each case. Failure to do so will result in the continued sending of documents to you. Form G-6 is available on the court's website at www.cacd.uscourts.gov or at the Clerk's Office.*

Date and time of transmission:        **Thursday, August 30, 2007 2:34:04 PM**
Number of pages including this cover sheet:  **06**

EXHIBIT _____ 9

PAGE _____ 234

**EXHIBIT 10**

# quinn emanuel trial lawyers

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | PALM SPRINGS | SAN DIEGO

WRITER'S DIRECT DIAL NO.
**(213) 443-3675**

WRITER'S INTERNET ADDRESS
**taniakrebs@quinnemanuel.com**

November 28, 2005

Robert Wilson
Cotkin Collins & Ginsburg
300 South Grand Avenue, 24th Floor
Los Angeles, CA 90071

Dear Bob:

As you know, this firm represents Mattel in ongoing litigation against Carter Bryant and MGA that involves, at least in part, events pertaining to Bratz dolls, including the conception, design, development and marketing of Bratz dolls.

We are aware that your client is in possession of documents that fall into the following general categories, among others: (1) internal MGA emails dating from the mid-1990s through 2005; (2) emails between MGA employees and individuals outside MGA dating from the mid-1990s through 2005; (3) emails between your client and various individuals regarding the timing of Bratz development in 2000; and (4) other emails between your client and Isaac Larian.

Documents that we are aware are in your client's possession, custody and control which are relevant to Mattel's litigation include -- but are in no way limited to -- the following:

- An internal MGA email dated November 16, 2000 that summarizes "last week's meeting" with K-Mart and references Bratz.

- An email from Fred Larian to Isaac Larian dated November 22, 2000 mentioning prices for a "Bratz Fashion Pack."

- A November 22, 2000 chart describing changes to the Bratz Doll Assortment and Bratz Holiday doll.

**quinn emanuel urquhart oliver & hedges, llp**

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-624-7707 FAX 213-624-0643
805 Third Avenue, 11th Floor, New York, New York 10022 | TEL 212-702-8100 FAX 212-702-8200
201 Sansome Street, 6th Floor, San Francisco, California 94104 | TEL 415-986-5700 FAX 415-986-5707
555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-620-4500 FAX 650-620-4555
45-025 Manitou Drive, Suite 8, Indian Wells, California 92210 | TEL 760-345-4757 FAX 760-345-2414
4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-3107 FAX 858-812-3336

EXHIBIT ____10____

PAGE ____235____

- An August 19, 2005 Fred Larian email to Scott Bachrach (at scottbac@aol.com) inquiring about the first contact between Mr. Bachrach and MGA concerning Bratz, as well associated communications.

- An August 22, 2005 Fred Larian email to Colleen O'Higgins (colleenohiggins@msn.com) asking about Carter Bryant and Bratz licensees, as well as associated communications.

- Communications with Bin Ton regarding Bratz, including without limitation those relating to actual and/or draft Bin Ton declaration(s) regarding Bratz.

- Communications with Michael Lingg regarding Bratz, including without limitation those relating to actual and/or draft Lingg declaration(s) regarding Bratz.

- Communications with Jennifer Maurus regarding Bratz, including without limitation those relating to actual and/or draft Maurus declarations regarding Bratz.

- A December 21, 2000 email from Isaac Larian to Paul Warner, with copies to Dennis Medici and Fred Larian, that mentions TRU purchases for products including Bratz.

- An August 1, 2005 email from Fred Larian to Victoria O'Connor regarding Bratz licensees, as well as associated communications.

- An August 1, 2005 email chain between Fred Larian and employees at dng.com asking about Bratz, as well as associated communications.

- An August 7, 2005 email from Mark Fragel answering questions regarding Bratz materials shown to Paulette Prim in November 2000.

- A document entitled "Analysis of Design, Packaging & Mock-Up Expense for 6 Months Ending 6/30/99 and 6/30/00" attached to an August 11, 2000 email from Dennis Medici to Isaac Larian and Fred Larian.

- A May 24, 2000 Fred Larian email to Isaac Larian which asserts that Isaac had instructed Fred to withhold the originals of documents that had been located in connection with the Fireman's Fund case and "to tell him [an MGA attorney] we could not find the originals."

- An August 14, 2000 Isaac Larian email to Medici, Warner and Fred Larian that references cost tracking software used by Mattel that Isaac Larian says he learned about from interviewing Mattel employees.

- Emails between Isaac Larian and Jahangir Makabi requesting that Mr. Makabi sign an affidavit that he lost his original stock certificates despite Makabi's protestation that he never had any such certificates, as well as associated communications.

- A January 31, 2001 email from Isaac Larian to All in Marketing and Product Development, Medici and Didi Brown asserting that he (Isaac Larian) had been

EXHIBIT _____ 10 _____          2

PAGE _____ 236 _____

diagnosed with "Alzheimer's" and denying in substance that he ever said anything that cannot be confirmed by a writing.

- A November 15, 2000 Paula Treantafelles email to Fred Larian that says MGA will be selling a Bratz backpack and states that a design for it is attached.

As you also are aware, the MGA/Bryant litigation is currently stayed pending an interlocutory appeal to the Ninth Circuit on jurisdictional issues. When discovery resumes, we plan to serve your client with a subpoena for the production of documents that include without limitation the documents listed above as well as such other documents in his possession, custody or control that refer or relate to the design, development, marketing, sale and/or any other activities regarding Bratz prior to June 30, 2001. You and your client are obligated to ensure that your client preserves all such documents in the interim. Moreover, you and your client have an obligation to retain all electronic copies or versions of such documents that he has in his possession, custody or control and their associated metadata.

If you disagree with our view on the preservation obligations that you and your client have, or if your client has taken or intends to take any steps to dispose of or to otherwise dispossess himself of such documents, please let me know immediately so that we can seek Court intervention on the matter. Thank you in advance for your anticipated cooperation.

Very truly yours,

Tania M. Krebs

EXHIBIT 10

PAGE 237

3

**EXHIBIT 11**

RECEIVED

FEB 0 4 2008

1  THOMAS J. NOLAN (Bar No. 66992)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2  300 South Grand Avenue
   Los Angeles, California 90071-3144
3  Telephone: (213) 687-5000
   Facsimile: (213) 687-5600
4  E-mail:    tnolan@skadden.com

5  RAOUL D. KENNEDY (Bar No. 40892)
   TIMOTHY A. MILLER (Bar No. 154744)
6  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   Four Embarcadero Center, 38th Floor
7  San Francisco, California 94111-5974
   Telephone: (415) 984-6400
8  Facsimile: (415) 984-2698
   E-mail:    rkennedy@skadden.com
9  E-mail:    tmiller@skadden.com

10 Attorneys for Cross-Defendants
   MGA Entertainment, Inc., MGA Entertainment (HK) Limited,
11 MGAE De Mexico, S.R.L. De C.V., and ISAAC LARIAN

12            UNITED STATES DISTRICT COURT

13            CENTRAL DISTRICT OF CALIFORNIA

14                  EASTERN DIVISION

15 CARTER BRYANT, an individual          ) CASE NO. CV 04-9049 SGL (RNBx)
                                         ) Consolidated with Case No. 04-9059
16            Plaintiff,                  ) and Case No. 05-2727
                                         )
17      v.                                ) DISCOVERY MATTER
                                         )
18 MATTEL, INC., a Delaware              ) [To be heard by Discovery Master Hon.
   corporation                           ) Edward A. Infante (Ret.)]
19                                        )
              Defendant.                  ) MGA ENTERTAINMENT, INC.'S
20                                        ) OBJECTIONS AND RESPONSES TO
                                         ) MATTEL'S "FIRST" SET OF
21 Consolidated with MATTEL, INC. v.     ) REQUESTS FOR ADMISSION TO
   BRYANT and MGA                        ) MGA ENTERTAINMENT, INC.;
22 ENTERTAINMENT, INC. v.                ) CARTER BRYANT; MGA
   MATTEL, INC.                          ) ENTERTAINMENT (HK) LIMITED;
23                                        ) AND ISAAC LARIAN
   CONFIDENTIAL – ATTORNEYS'             )
24 EYES ONLY                             ) Phase 1:
                                         ) Discovery Cut-Off:   January 28, 2008
25                                        ) Pre-Trial Conference: May 5, 2008
                                         ) Trial Date:          May 27, 2008
26

27

28
                              2-4-08
   ────────────────────────────────────────────────────────────────
   MGA'S RESPONSE TO MATTEL'S 1ST SET OF RFA TO BRYANT, MGA, MGA HK AND LARIAN

   EXHIBIT ____11____

   PAGE ____238____

1 | **PROPOUNDING PARTY:**    MATTEL, INC. ("Mattel")

2 | **RESPONDING PARTIES:**   MGA ENTERTAINMENT, INC.

3 | **SET NUMBER:**           ONE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MGA'S RESPONSE TO MATTEL'S 1ST SET OF RFA TO BRYANT, MGA, MGA HK AND LARIAN

EXHIBIT _____ 11

PAGE _____ 231

Pursuant to Federal Rule of Civil procedure 36, MGA Entertainment, Inc. ("MGA") submits its objections and responses (the "Response"), for reasons stated below, to Mattel's "First" Set of Requests for Admission to MGA Entertainment, Inc.; Carter Bryant; MGA Entertainment (HK) Limited; and Isaac Larian.

### GENERAL RESPONSE

The General Response set forth herein applies to all responses MGA is providing in response to these requests for admission (the "Request") or may in the future provide in response to any discovery request in this action. The Response is made without waiving or intending to waive but, on the contrary, expressly reserving: (a) the right to object, on the grounds of competency, privilege, relevancy or materiality, or any other proper grounds, to the use of the Response, for any purpose in whole or in part, in any subsequent step or proceeding in this action or any other action; (b) the right to object on any and all grounds, at any time, to other requests for admissions or other discovery procedures; and (c) the right at any time to revise, correct, add to, or clarify any of the responses propounded herein.

The Responses reflect only the present state of MGA's discovery regarding the information Mattel seeks. Discovery for Phase Two and other investigation or research concerning this litigation are continuing. It is anticipated that further discovery, independent investigation, and legal research and analysis will supply additional facts and meaning to the known facts, as well as establish entirely new factual conclusions, all of which may lead MGA to discover other information responsive to this Request. MGA therefore reserves the right to amend or supplement this Response at any time in light of future investigation, research or analysis, and also expressly reserves the right to rely on, at any time, including trial, subsequently discovered information omitted from this Response as a result of mistake, error, oversight or inadvertence. MGA does not hereby admit, adopt or

MGA'S RESPONSE TO MATTEL'S 1ST SET OF RFA TO BRYANT, MGA, MGA HK AND LARIAN

EXHIBIT _____ 11

PAGE _____ 740

1   acquiesce in any factual or legal contention, assertion or characterization contained

2   in the Request or any particular request therein, even where MGA has not otherwise

3   objected to a particular request, or has agreed to provide information responsive to a

4   particular request.

5           No incidental or implied admissions are intended by this Response.

6   These responses should not be taken as an admission that MGA accepts or admits the

7   existence of any facts set forth or assumed by any instruction, definition or request.

8                                   **GENERAL OBJECTIONS**

9           MGA incorporates the following General Objections, as well as the

10  General Response, into its Specific Objections and Responses to each and every

11  Request.  The assertion of same, similar, or additional objections to the individual

12  requests does not waive any of MGA's general objections as set forth below:

13          1.      MGA objects to the Request insofar as it seeks disclosure of

14  information that is not required to be disclosed under any applicable privilege,

15  doctrine or immunity, including without limitation the attorney-client privilege, the

16  work product doctrine, the right of privacy, the joint defense privilege, the common

17  interest privilege, and all other privileges recognized under the constitutional,

18  statutory or decisional law of the United States of America, the State of California or

19  any other applicable jurisdiction.

20          2.      MGA objects to the Request to the extent it seeks information not

21  relevant to the claims or defenses of any party to this action and is not reasonably

22  calculated to lead to the discovery of admissible evidence.

23          3.      MGA objects to the Request insofar as it seeks information that

24  is, by reason of public filing or otherwise, already in Mattel's possession or is readily

25  accessible to Mattel.

26          4.      MGA objects to the Request insofar as it (1) seeks information

27  not within MGA's possession, custody or control; (2) seeks information that MGA

28

                                          2

EXHIBIT _____ 11 _____

PAGE _____ 241 _____

1  cannot locate after a reasonably diligent search; or (3) refers to persons, entities, or

2  events not known to MGA.

3        5.    MGA objects to the Request insofar it seeks confidential

4  information, trade secrets or other proprietary information.

5        6.    MGA objects to the Request to the extent it is unduly burdensome

6  and oppressive.

7        7.    To the extent the Request asks MGA to provide information

8  concerning the legal basis of its defense of this matter, MGA objects on the grounds

9  that the Request impermissibly call for mental impressions, conclusions, opinions

10  and/or legal theories of MGA's attorneys.

11        8.    In responding to the Request, MGA has not and will not comply

12  with any instructions or definitions that seek to impose requirements in addition to

13  those imposed by the Federal Rules of Civil Procedure or any applicable local rule.

14        9.    MGA objects to the Request to the extent that it may unfairly

15  seek to restrict the facts on which MGA may rely at trial.  Discovery has not been

16  completed and MGA is not yet necessarily in possession of all the facts and

17  documents upon which MGA intends to rely.  All of the responses submitted

18  herewith are tendered to Mattel with the reservation that the responses are submitted

19  without limiting the evidence on which MGA may rely to support the contentions

20  and defenses that MGA may assert at the trial of this action and to rebut or impeach

21  the contentions, assertions and evidence that Mattel may present.  MGA reserves the

22  right to supplement or amend these responses at a future date.

23        10.    MGA objects to the Request to the extent it seeks information

24  that will be the subject of expert witness testimony and that is therefore premature.

25  MGA further objects to the Request to the extent that it seeks to circumvent the

26  expert disclosure provisions of the <u>Federal</u> and <u>Local Rules</u>.

27        11.    MGA reserves the right to object on any ground at any time to

28  such other and supplemental discovery requests as Mattel may propound involving

3

MGA'S RESPONSE TO MATTEL'S 1ST SET OF RFA TO BRYANT, MGA, MGA HK AND LARIAN

EXHIBIT _____ 11

PAGE _____ 242

1  or relating to the same subject matter of the Request.

2      12.   MGA objects to the definitions and instructions to the extent such

3  definitions and instructions purport to enlarge, expand, or alter in any way the plain

4  meaning and scope of any specific term or specific requests on the grounds that such

5  enlargement, expansion or alteration renders such term or request vague, ambiguous,

6  unintelligible, overly broad, unduly burdensome or uncertain.

7      13.   MGA objects to the defined terms "YOU," "MGA," "MGA HK,"

8  "DEFENDANT," "DEFENDANTS," "AFFILIATES," "DESIGN" or "DESIGNS,"

9  "BASED ON," "BRATZ," "BRATZ WORK," "BRATZ DOLLS," "BRYANT'S

10  BRATZ DESIGNS," "BRYANT'S BRATZ IDEAS," "BRYANT'S PITCH

11  MATERIALS," "MATTEL," "CREATED," "RELATING TO" or "REFER OR

12  RELATE TO," and "COMMUNICATION" in the Request on the grounds that these

13  terms use defined terms that distort the commonly used and understood meanings of

14  terms, including legal terms of art, by sweeping in concepts not properly associated

15  with them and render the Request overly broad, unduly burdensome, vague and

16  ambiguous, including, by way of example and without limitation, as follows:

17      (a)   MGA objects to the definition of the term "BRATZ"

18  (Definitions ¶ 11) as vague, ambiguous, overly broad and unduly burdensome, and

19  designed to mislead and confuse the trier of fact. The definition includes "any

20  project, product, doll or DESIGN ever known by [the Bratz] name (whether in whole

21  or in part and regardless of what such project, product or doll is or has been also,

22  previously or subsequently called) and any product, doll or DESIGN or any portion

23  thereof that is now or has ever been known as, or sold or marketed under, the name

24  or term 'Bratz' (whether in whole or in part and regardless of what such product, doll

25  or DESIGN or portion thereof is or has been also, previously or subsequently called)

26  or that is now or has ever been sold or marketed as part of the 'Bratz' line, and each

27  version or iteration of such product, doll or DESIGN or any portion thereof," and it

28  goes on. By incorporating the definition of "DESIGN," the overly broad definition

4

EXHIBIT ___11___

PAGE ___243___

1  of "BRATZ" includes two-dimensional and three-dimensional representations,

2  including "works, design, artwork, sketches, drawings, illustrations, representations,

3  depictions, blueprints, schematics, diagrams, images, sculptures, prototypes, models,

4  samples, rotocasts, reductions to practice, developments, inventions and/or

5  improvements . . . ." (Definitions ¶ 9.)  (See objection to term "DESIGN" below)

6  These convoluted and multi-part definitions combine to render the Requests vague,

7  ambiguous and overly broad, and to include within the term "BRATZ" things that do

8  not fairly represent the Bratz line of dolls, accessories and related products that are

9  the subject of this case.  In responding to the Request, MGA will interpret the term

10  "BRATZ" to mean the line of dolls introduced by MGA to the market for sale in

11  May or June of 2001 and subsequent dolls, accessories and other products known as

12  Bratz or associated by MGA with the Bratz line of dolls;

13              (b)    MGA objects to the definition of the term "BRATZ

14  DOLLS" (Definitions ¶ 13) as vague, ambiguous, overly broad and unduly

15  burdensome, and designed to mislead and confuse the trier of fact.  The definition

16  includes any doll that "REFERS OR RELATES to BRATZ."  Mattel's definition of

17  the terms "BRATZ" and "REFERS OR RELATES" renders the definition of

18  "BRATZ DOLL" unintelligible because MGA cannot know, by way of example,

19  what dolls may "deal with, comment on, respond to, . . . or in any way pertain"

20  (Definitions ¶ 22) to "BRATZ," which is already defined to include any "doll . . . that

21  is now or has ever been known as, or sold or marketed under, the name or term

22  'Bratz' . . . or that is now or has ever been sold or marketed as part of the 'Bratz' line,

23  and each version or iteration of such . . . doll . . . ."  In responding to the Request,

24  MGA will interpret the term "BRATZ DOLL" to mean the line of dolls introduced

25  by MGA to the market for sale in May or June of 2001 and subsequent dolls known

26  as Bratz;

27              (c)    MGA objects to the definition of the term "BRATZ

28  WORK" (Definitions ¶ 12) as vague, ambiguous, overly broad and unduly

5

EXHIBIT _____ 11

PAGE _____ 244

1  burdensome, and designed to mislead and confuse the trier of fact. The definition

2  contains separate component parts ("any representation . . . whether in whole or in

3  part, whether two-dimensional or three-dimensional, and whether in tangible, digital,

4  electronic or other form, including . . . any DESIGN . . .as well as all other items,

5  things and DOCUMENTS in which any of the foregoing are or have been expressed,

6  embodied, contained, fixed or reflected in any manner . . . ."). The incorporation of

7  the defined term "DESIGN" adds at least another 21 elements ("all works, designs,

8  artwork, sketches, drawings, illustrations, representations, depictions, blueprints,

9  schematics, diagrams, images, sculptures, prototypes, models, samples, rotocasts,

10  reductions to practice, developments, inventions and/or improvements"). The

11  inclusion of these disparate concepts in the term "work" improperly conflates distinct

12  issues of patent law, copyright protection, trade secret law and the common law

13  protecting original ideas;

14                    (d)    MGA objects to the definition of the term "BASED ON"

15  (Definitions ¶ 10) as vague, ambiguous, overly broad and unduly burdensome, and

16  designed to mislead and confuse the trier of fact. The definitions strays far from the

17  English meaning of "based on" by including terms loaded with legal significance in

18  intellectual property law, such as "substantially similar to," or "derivative of." In

19  responding to these requests, MGA will not interpret the term "BASED ON," but

20  rather will respond using "based on" as it is commonly used and understood;

21                    (e)    MGA objects to the term "CREATED" (Definitions ¶ 19)

22  as vague, ambiguous, overly broad and unduly burdensome, and designed to mislead

23  and confuse the trier of fact. The definition strays far from the English meaning of

24  the term "created" by including concepts such as "improved," "altered," "conceived

25  of," and "reduced to practice." Thus, by way of example, under Mattel's definition of

26  "CREATED," the jury could be misled into believing that a person "CREATED" a

27  particular thing when that person did not, but only slightly altered or improved the

28  thing. In responding to the Request, MGA will not interpret the term "CREATED"

6

EXHIBIT _____ 11

PAGE _____ 245

1  according to Mattel's definition, but rather will respond using "created" in its normal,

2  accepted meaning;

3          (f)    MGA objects to the term "DESIGN" (Definitions ¶ 9) as

4  vague, ambiguous, overly broad and unduly burdensome, and designed to mislead

5  and confuse the trier of fact.  The definition combines at least three or four disparate

6  intellectual property concepts.  In addition to invoking copyright principles

7  ("artwork, sketches, drawings, illustrations, . . . depictions, blueprints, schematics,

8  diagrams, images, sculptures, . . . models . . . fixed . . ."), *see* 17 U.S.C. § 101, the

9  definition also includes patent law terms, such as "design," "reductions to practice"

10  and "improvements."  *See* 35 U.S.C. § 102(g); 35 U.S.C. § 171; 1-GLOS *Chisum on*

11  *Patents* (2007).  In addition, the definition makes no distinction between design and

12  utility patents.  *See* 1-23 *Chisum on Patents* § 23.01 (highlighting the distinctions

13  between the two).  Moreover, under Mattel's definition, a "DESIGN" could also be a

14  trade secret under California's Uniform Trade Secrets Act.  *See* Cal. Civ. Code §

15  3426.1 (defining "Trade secret" as "information, including a formula, pattern,

16  compilation, program, device, method, technique, or process that: (1) Derives

17  independent economic value, actual or potential, from not being generally known to

18  the public . . .").  MGA will interpret the term "DESIGN" as it is commonly used and

19  understood;

20          (g)    MGA objects to the terms "RELATING TO" and "REFER

21  OR RELATE TO" on the grounds and to the extent that they are overly broad,

22  unduly burdensome, and/or are vague and ambiguous in the context of the

23  interrogatories as written and as those interrogatories would be plainly understood

24  absent Mattel's definitions;

25          (h)    MGA objects to the term "BRYANT'S BRATZ DESIGNS"

26  (Definitions ¶ 15) as vague, ambiguous, overly broad and unduly burdensome, and

27  designed to mislead and confuse the trier of fact.  The definition includes the defined

28  term "CREATED," (Definitions ¶ 19) which strays far from the English meaning of

EXHIBIT _____ 11

PAGE _____ 246

1  TO" Bratz.

2         Subject to and without waiving the foregoing general and specific

3  objections, MGA responds as follows to the request:

4         DENIED as stated. MGA denies that MGA conducted any formal focus

5  group testing of Bratz dolls prior to March 2001 and specifically denies that MGA

6  conducted any focus group testing (formal or informal) during that time period that

7  involved a three-dimensional depiction of a Bratz doll. MGA admits that, prior to

8  March 2001 and possibly as early as December 2000, MGA informally assembled a

9  group of children to solicit, possibly with the aid of drawings provided by Carter

10  Bryant, their opinions on the idea of a line of dolls that would be called "Bratz" and

11  with respect to certain features of such a potential doll line that were depicted in

12  those drawings, including, for example, a removable hair mechanism. It is also

13  possible that prior to March 2001, the opinions of one or more children and MGA

14  employees were solicited on one or more aspects of what later became the Bratz line

15  of dolls that was introduced to market in May or June of 2001, but MGA specifically

16  denies that any such informal discussions involved any three-dimensional depiction

17  of a Bratz doll.

18

19  **REQUEST FOR ADMISSION NO. 37:**

20         Admit that MGA did conduct focus group testing RELATING TO

21  BRATZ prior to March 2001.

22  **RESPONSE TO REQUEST FOR ADMISSION NO. 37:**

23         MGA incorporates by reference its General Response and General

24  Objections above, as though fully set forth herein and specifically incorporates

25  General Objection Nos. 12-13 (regarding Definitions), including but not limited to its

26  objections to the definition of the terms "MGA," "RELATING TO" and "BRATZ."

27  MGA objects that the definition is "Bratz" is overly broad so as to render the request

28  vague and ambiguous. In responding to this request, MGA interprets the term

MGA'S RESPONSE TO MATTEL'S 1ST SET OF RFA TO BRYANT, MGA, MGA HK AND LARIAN

EXHIBIT _____ 11

PAGE _____ 247

1  "BRATZ" to mean the line of dolls introduced by MGA to the market for sale in

2  May or June of 2001 and subsequent dolls, accessories and other products known as

3  Bratz or associated by MGA with the Bratz line of dolls.  MGA further objects on

4  the grounds that the undefined term "focus group" is vague and ambiguous.  In

5  responding to this request, MGA interprets the term "focus group" to mean "a small

6  group selected from a wider population and sampled, as by open discussion, for its

7  members' opinions about or emotional response to a particular subject or area, used

8  especially in market research or political analysis." *American Heritage Dictionary of*

9  *the English Language,* 4th edition (2000).  MGA further objects that the request is

10  vague, ambiguous and overly broad in that it refers to focus groups "RELATING

11  TO" Bratz.

12         Subject to and without waiving the foregoing general and specific

13  objections, MGA responds as follows to the request:

14         DENIED as stated.  MGA denies that MGA conducted any formal focus

15  group testing of Bratz dolls prior to March 2001 and specifically denies that MGA

16  conducted any focus group testing (formal or informal) during that time period that

17  involved a three-dimensional depiction of a Bratz doll.  MGA admits that, prior to

18  March 2001 and possibly as early as December 2000, MGA informally assembled a

19  group of children to solicit, possibly with the aid of drawings provided by Carter

20  Bryant, their opinions on the idea of a line of dolls that would be called "Bratz" and

21  with respect to certain features of such a potential doll line that were depicted in

22  those drawings, including, for example, a removable hair mechanism.  It is also

23  possible that prior to March 2001, the opinions of one or more children and MGA

24  employees were solicited on one or more aspects of what later became the Bratz line

25  of dolls that was introduced to market in May or June of 2001, but MGA specifically

26  denies that any such informal discussions involved any three-dimensional depiction

27  of a Bratz doll.

28

40

MGA'S RESPONSE TO MATTEL'S 1ST SET OF RFA TO BRYANT, MGA, MGA HK AND LARIAN

1 | **REQUEST FOR ADMISSION NO. 38:**

2 |        Admit that MGA did not conduct any focus group testing RELATING

3 | TO BRATZ in the year 2000.

4 | **RESPONSE TO REQUEST FOR ADMISSION NO. 38:**

5 |        MGA incorporates by reference its General Response and General

6 | Objections above, as though fully set forth herein and specifically incorporates

7 | General Objection Nos. 12-13 (regarding Definitions), including but not limited to its

8 | objections to the definition of the terms "MGA," "RELATING TO" and "BRATZ."

9 | MGA objects that the definition is "Bratz" is overly broad so as to render the request

10 | vague and ambiguous.  In responding to this request, MGA interprets the term

11 | "BRATZ" to mean the line of dolls introduced by MGA to the market for sale in

12 | May or June of 2001 and subsequent dolls, accessories and other products known as

13 | Bratz or associated by MGA with the Bratz line of dolls.  MGA further objects on

14 | the grounds that the undefined term "focus group" is vague and ambiguous.  In

15 | responding to this request, MGA interprets the term "focus group" to mean "a small

16 | group selected from a wider population and sampled, as by open discussion, for its

17 | members' opinions about or emotional response to a particular subject or area, used

18 | especially in market research or political analysis." *American Heritage Dictionary of*

19 | *the English Language,* 4th edition (2000).  MGA further objects that the request is

20 | vague, ambiguous and overly broad in that it refers to focus groups "RELATING

21 | TO" Bratz.

22 |        Subject to and without waiving the foregoing general and specific

23 | objections, MGA responds as follows to the request:

24 |        DENIED as stated.  MGA denies that MGA conducted any formal focus

25 | group testing of Bratz dolls in the year 2000 and specifically denies that MGA

26 | conducted any focus group testing (formal or informal) during that time period that

27 | involved a three-dimensional depiction of a Bratz doll.  MGA admits that, prior to

28 | March 2001 and possibly as early as December 2000, MGA informally assembled a

EXHIBIT ___11___

PAGE ___249___

1 group of children to solicit, possibly with the aid of drawings provided by Carter
2 Bryant, their opinions on the idea of a line of dolls that would be called "Bratz" and
3 with respect to certain features of such a potential doll line that were depicted in
4 those drawings, including, for example, a removable hair mechanism. It is also
5 possible that in the year 2000, the opinions of one or more children and MGA
6 employees were solicited on one or more aspects of what later became the Bratz line
7 of dolls that was introduced to market in May or June of 2001, but MGA specifically
8 denies that any such informal discussions involved any three-dimensional depiction
9 of a Bratz doll.

10

11 **REQUEST FOR ADMISSION NO. 39:**

12        Admit that MGA did conduct focus group testing RELATING TO
13 BRATZ in the year 2000.

14 **RESPONSE TO REQUEST FOR ADMISSION NO. 39:**

15        MGA incorporates by reference its General Response and General
16 Objections above, as though fully set forth herein and specifically incorporates
17 General Objection Nos. 12-13 (regarding Definitions), including but not limited to its
18 objections to the definition of the terms "MGA," "RELATING TO" and "BRATZ."
19 MGA objects that the definition is "Bratz" is overly broad so as to render the request
20 vague and ambiguous. In responding to this request, MGA interprets the term
21 "BRATZ" to mean the line of dolls introduced by MGA to the market for sale in
22 May or June of 2001 and subsequent dolls, accessories and other products known as
23 Bratz or associated by MGA with the Bratz line of dolls. MGA further objects on
24 the grounds that the undefined term "focus group" is vague and ambiguous. In
25 responding to this request, MGA interprets the term "focus group" to mean "a small
26 group selected from a wider population and sampled, as by open discussion, for its
27 members' opinions about or emotional response to a particular subject or area, used
28 especially in market research or political analysis." *American Heritage Dictionary of*

42

MGA'S RESPONSE TO MATTEL'S 1ST SET OF RFA TO BRYANT, MGA, MGA HK AND LARIAN

EXHIBIT    11

PAGE    750

1

2  DATED:  February 04, 2008

3                                     SKADDEN, ARPS, SLATE, MEAGHER &
                                      FLOM, LLP
4
                                      By: _____
5                                          Timothy A. Miller
                                      Attorneys for Counter-Defendants, MGA
6                                      ENTERTAINMENT, INC., ISAAC LARIAN,
                                      MGA ENTERTAINMENT (HK) LIMITED,
7                                      AND MGAE de MEXICO S.R.L. de C.V.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                         76
   MGA'S RESPONSE TO MATTEL'S 1ST SET OF RFA TO BRYANT, MGA, MGA HK AND LARIAN
   202634-San Francisco Server 1A - MSW

EXHIBIT _____ 11 _____

PAGE _____ 251 _____

**EXHIBIT 12**

**RECEIVED**

SEP 1 0 2007

1   DALE M. CENDALI (admitted *pro hac vice*)
    dcendali@omm.com
2   DIANA M. TORRES (S.B. #162284)
    dtorres@omm.com
3   JAMES P. JENAL (S.B. # 180190)
    jjenal@omm.com
4   O'MELVENY & MYERS LLP
    400 South Hope Street
5   Los Angeles, CA  90071-2899
    Telephone:  (213) 430-6000
6   Facsimile:  (213) 430-6407

7   PATRICIA GLASER (S.B. #55668)
    CHRISTENSEN, GLASER, FINK,
8   JACOBS, WEIL & SHAPIRO, LLP
    10250 Constellation Boulevard, 19th Floor
9   Los Angeles, CA 90067
    Telephone:  (310) 553-3000
10  Facsimile:  (310) 557-9815

11  Attorneys for MGA Entertainment, Inc.

12              UNITED STATES DISTRICT COURT

13             CENTRAL DISTRICT OF CALIFORNIA

14

15  CARTER BRYANT, an individual,        Case No.  CV 04-09049 SGL (RNBx)
                                         (consolidated with CV 04-9059 & 05-
16              Plaintiff,               2727)

17      v.

18  MATTEL, INC., a Delaware            **DECLARATION OF DAPHNE
    Corporation,                        GRONICH IN RESPONSE TO
19                                      COURT'S REQUEST FOR
                Defendant.              INFORMATION REGARDING
20                                      DOCUMENT PRESERVATION**

21

22                                      Discovery Cut-off:  March 3, 2008
                                        Pre-trial Conference:  June 2, 2008
23                                      Trial Date:  July 1, 2008

24                                      Judge:  Hon. Stephen G. Larson

25

26

27

28

LA2:841480.1

EXHIBIT _12_

PAGE _252_

GRONICH DECL
CV 04-09049 SGL (RNBX)

I, Daphne Gronich, declare and state as follows:

1.     I am General Counsel for MGA Entertainment, Inc. ("MGA") and a resident of the state of California.  All of the facts set forth herein are known to me personally, except for those stated on information and belief and if called as a witness, I could and would testify competently thereto.

**Document Preservation Communications**

2.     I have been MGA's General Counsel since December, 2003, and have had oversight responsibility for MGA's legal response to this litigation since its inception.   Shortly after Mattel sued Carter Bryant in April 2004, even though MGA had not been named as a defendant in that suit, I communicated to MGA employees that Mattel had filed suit against Carter Bryant alleging that he had breached his employment agreement with Mattel.  I advised MGA's employees that MGA might at some point become involved in the litigation, and that it would be prudent for MGA to preserve all documents that might be potentially relevant to the claims at issue in the litigation.  In addition to these initial communications, both I and my colleague, Rich Daniels, one of MGA's other in-house attorneys, repeated that advisement at numerous one-on-one and group meetings (including those held in Isaac Larian's office at MGA's former location on Schoenborn Avenue in North Hills) involving senior executives, creative staff members, sales and administration staff and others including IT personnel. These communications took place throughout the late-Spring and Summer of 2004.

3.     In addition to those communications, the legal department began locating and collecting documents and materials that might be relevant to the lawsuit against Mr. Bryant.  In that regard we were aided by the company's previous efforts to collect certain documents and materials related to the origin and initial development of "Bratz," due to MGA's involvement in prior, unrelated litigation (that did not challenge MGA's ownership of "Bratz").  As a result, we

LA2:841480.1                                    - 1 -                            GRONICH DECL
CV 04-09049 SGL (RNBX)

EXHIBIT ___12___

PAGE ___253___

1    were able to preserve potentially relevant documents and materials from MGA's

2    employees in California and its related company in Hong Kong, including Isaac

3    Larian, Paula Treantafelles (now Garcia), Dave Malacrida, Victoria O'Connor,

4    Becky Harris, Charles O'Connor, Aileen Storer, Mercedeh Ward, Marcy George,

5    Shirin Salemnia, Edmond Lee, Dennis Soai, Stephen Lee, Samuel Wong, Cecilia

6    Kwok and Franki Tsang.

7              4.      In addition to the communications described above, in the weeks

8    following the filing of Mattel's lawsuit against Carter Bryant, both I and Rich

9    Daniels and/or our outside counsel, spoke with and/or confirmed that MGA had the

10   documents of key potential witnesses, including Isaac Larian, Paula Garcia,

11   Victoria O'Connor, Charles O'Connor, Aileen Storer, Mercedeh Ward, Marcy

12   George, Dennis Soai, Shirin Salemnia, and Dave Malacrida.   During those

13   conversations, we again personally directed MGA's potential witnesses to preserve

14   their potentially relevant documents.

15             5.      As a result of those discussions, MGA's potential witnesses

16   were given express direction by myself, Mr. Daniels, or MGA's outside counsel to

17   preserve their relevant paper documents and to assist, as necessary, MGA's IT

18   department in preserving their emails and electronic documents.   We also directed

19   the IT department to segregate and preserve emails from MGA employees who had

20   since left the company, which former employees included some who had also been

21   previously employed by Mattel prior to working for MGA.

22             6.      In the years since the litigation began, I have sent out reminder

23   emails to MGA's employees reminding them of their continuing obligation to

24   preserve documents potentially relevant to this litigation, including reminder emails

25   that I sent to all MGA employees on April 14, 2005, December 5, 2006, and July 5,

26   2007. In addition, other members of the legal department routinely advise the staff

27   members with whom they work to retain relevant documents. For example, Sam

28   Khare, an MGA in-house lawyer who works closely with the product design teams,

LA2:841480.1                          - 2 -                      GRONICH DECL
                                                          CV 04-09049 SGL (RNBX)

EXHIBIT _____ 12
PAGE _____ 254

1  routinely reminds people in the design groups to retain documents.

2         7.     After we became aware of Mattel's claims against MGA, on

3  December 5, 2006 I sent an email to all MGA employees reminding them of their

4  ongoing obligations regarding Mattel's suit against Carter Bryant and informing

5  them of the nature of the new claims against MGA, including the allegation of trade

6  secret theft. I reminded MGA's employees of MGA's policy that its employees

7  must not bring with them to MGA the property or confidential or proprietary

8  information of their former employers, and instructed them to preserve all

9  documents and materials relevant to these new claims as well.

10         8.     In addition to that communication, we also began collecting and

11  segregating the documents of all former Mattel employees, including those who

12  were no longer employed by MGA.

13         9.     While MGA is ready and willing to produce its communications

14  for the Court's review, I have been informed by MGA's outside counsel that Mattel

15  has taken the position that "it cannot agree" that MGA's production of those

16  communications would not constitute a waiver of the attorney-client privilege.

17  Attached hereto as **Exhibit 1** is a true and correct copy of a letter from Mattel's

18  counsel, Jon Corey, to MGA's outside counsel, Bill Charron, asserting that

19  position. If the Court wishes to see such communications and agrees with MGA

20  that such production would not constitute a waiver of the attorney-client privilege,

21  MGA will produce its communications within 24 hours of receiving the Court's

22  guidance.

23

24  **Paper Document Preservation**

25         10.    MGA does not now, and never has had a policy to routinely

26  destroy paper documents. In particular, since this litigation began, MGA has

27  expressly retained paper files in the Creative Departments, character art files,

28  vendor files, executive files and others.

LA2:841480.1

- 3 -

GRONICH DECL
CV 04-09049 SGL (RNBX)

EXHIBIT _____ 12
PAGE _____ 255

**Email Preservation**

11.     Since before 2004, MGA has used Microsoft's Exchange email system and the Outlook email client to provide email support to the company. MGA does not have, and never has had, a policy to auto-delete emails; to the contrary, employees are advised to retain work-related emails.  I am informed by our IT staff that employees may, and often do, create email storage files (known as "pst" files) to which they can move emails from their mailbox on the Exchange server.  MGA's practice is to preserve those pst files, and it has done so.

12.     MGA's process for preserving those emails has become more automated over time as our IT department has grown in its sophistication to meet the needs of the company, particularly as MGA itself has grown and expanded.  I am informed that in January of 2000, MGA only had around eighty employees, whereas by January of 2004 that number had grown to 196 and by January of 2007 it was approximately 900 domestically and 670 internationally, including subsidiaries.

13.     In 2004, when an employee would leave the company, the IT department copied the pst files from the employee's computer and burned them onto CDs that were then retained by the IT department.  I am informed that in September 2005, the system was improved so that instead of having to copy those pst files onto CDs, the IT department was then able to preserve those pst files on a network server.

14.     Emails in the departing employee's mailbox on our Exchange server are retained on the Exchange server.  The IT department's network administrators change the access permissions on that employee's mailbox so that only the administrators can access it.  In that way, those emails are retained and can be accessed when necessary with proper authorization.

15.     In the past year, an even more automated process was put in place to preserve and manage email.  In January 2007, the IT department began

LA2:841480.1

- 4 -

GRONICH DECL
CV 04-09049 SGL (RNBX)

EXHIBIT _____ 12
PAGE _____ 256

1  using a system known as "Archive One" which I am informed automatically

2  archives emails older than 90 days once a user's mailbox exceeds a set size

3  threshold. In this way, access to older emails is retained, but the size of the user's

4  mailbox files on our Exchange server is controlled.

5       16.   MGA's Exchange email server is also backed up on a nightly

6  basis as a means of disaster recovery. Historically those backup tapes had been

7  rotated on a 90-day cycle. However, because we have no policy of auto-deleting

8  emails and because we preserve the mailboxes (and pst files) of former employees,

9  unless an employee violates MGA's policies, and the legal department's express

10  and repeated directives to preserve email, no email would be lost by recycling those

11  backup tapes.

12

13  **Other Electronic Document Preservation**

14       17.   Employees are encouraged to store other electronic documents

15  (such as Word documents or Excel spreadsheets) on a shared network file server.

16  Some employees may also save electronic documents in the "My Documents"

17  folder on their computer. As was the case for emails saved to local pst files, going

18  back to 2004, if an employee left the company the contents of the My Documents

19  folder was also copied onto CDs and preserved. Again, when the system evolved in

20  September of 2005, the My Documents folder was preserved onto a network server.

21  Since March of this year, the entire hard drive itself is preserved by the IT

22  department.

23       18.   In addition to those preservation methods when an employee

24  would leave the company, files saved to the shared network file server would be

25  retained indefinitely and protected by nightly backups. I am informed that since

26  this litigation began in April 2004, MGA has not suffered any server failures that

27  resulted in the loss of data.

28       19.   In April of this year, another automated capability was brought

EXHIBIT    12

PAGE    257

1   online.   MGA has now installed an automated process that daily copies the

2   contents of the My Documents folder and any pst files that are saved in the user's

3   "Exchange" folder to a network file server.

4        20.    Within days of learning of Mattel's intent to bring claims

5   against MGA, MGA made, and retains to this day, a complete backup of all of its

6   servers.

7

8   **Preservation of Data from Isaac Larian's Computer**

9        21.    I am informed by our IT department that there are always two

10  laptop computers assigned to Mr. Larian – the computer that he is actively using,

11  and a second, "mirrored" spare computer.  Whenever Mr. Larian docks his

12  computer into the MGA network, any changes that have been made to the files on

13  his computer are automatically "mirrored" or copied to the spare.  In that way, any

14  potential data loss is minimized.

15       22.    I am also informed by our IT department that when Mr. Larian

16  needs to replace his laptop, the IT department starts with the mirrored spare.  If the

17  hard drive on Mr. Larian's old laptop is still operable, they make sure that the files

18  on the mirrored spare contain the most up-to-date information that can be read from

19  the old hard drive.  When all of that data has been copied onto the spare, it is

20  provided to Mr. Larian and a new laptop becomes the mirrored spare.

21       23.    Personal computers at MGA frequently contain a great deal of

22  MGA's confidential and trade secret information – and this is especially true for

23  Mr. Larian's laptop.  I am informed by our IT department that prior to instituting

24  the present policy of retaining computer hard drives, whenever a computer that Mr.

25  Larian had been using was to be retired from his use – whether due to damage or

26  simply the need to provide newer technology – the hard drive was backed up to one

27  of the IT department's archive servers so as to preserve the data that was on the

28  hard drive in a secure location.  Once the data had been safely preserved, the IT

LA2:841480.1                          - 6 -                    GRONICH DECL
                                                      CV 04-09049 SGL (RNBX)

EXHIBIT _____ 12 _____

PAGE _____ 258 _____

1  department then reformatted the hard drive in such a way that the confidential and

2  trade secret data was no longer present on the hard drive. Thus, although the hard

3  drive had been "wiped" before being put back into service or disposed of, none of

4  the data had been lost to MGA as it remained preserved on one of the IT

5  department's archive servers. Today, we would simply retain the hard drive from

6  Mr. Larian.

7

8  **Other Corporate Data Preservation**

9       24.   In 2004, MGA used an enterprise accounting package known as

10  Great Plains. In January 2006, MGA converted to a newer system known as

11  Axapta and after that time, all new business transactions were processed on the

12  Axapta system. However, MGA has retained the Great Plains system and I am

13  informed that no data was lost in the conversion. Accordingly, MGA is able to

14  retrieve transaction data as needed going back to at least 1998.

15

16       I declare under penalty of perjury under the laws of the United States

17  that the foregoing is true and correct.

18       Executed this 10th day of September, 2007, at Van Nuys, California.

19

20                                      Daphne Gronich

21

22

23

24

25

26

27

28

LA2:841480.1                          - 7 -                    GRONICH DECL
                                                              CV 04-09049 SGL (RNBX)

EXHIBIT _____ 12 _____

PAGE _____ 259 _____

**EXHIBIT 13**

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 090378)
2    johnquinn@quinnemanuel.com
     Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
     Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
     Timothy L. Alger (Bar No. 160303)
5    (timalger@quinnemanuel.com)
     865 South Figueroa Street, 10th Floor
6  Los Angeles, California  90017-2543
     Telephone:   (213) 443-3000
7  Facsimile:   (213) 443-3100

8  Attorneys for Mattel, Inc.

9

10                 UNITED STATES DISTRICT COURT

11                CENTRAL DISTRICT OF CALIFORNIA

12                       EASTERN DIVISION

13  CARTER BRYANT, an individual,        CASE NO. CV 04-9049 SGL (RNBx)
                                         Consolidated with
14              Plaintiff,               Case Nos. CV 04-09059 & CV 05-2727

15       vs.                             Hon. Stephen G. Larson

16  MATTEL, INC., a Delaware             MATTEL, INC.'S CORRECTED
    corporation,                         PHASE ONE WITNESS LIST
17
                Defendant.               **Phase 1:**
18                                       Discovery Cut-Off:     January 28, 2008
                                         Pre-Trial Conference: May 5, 2008
19  AND CONSOLIDATED ACTIONS             Trial Date:           May 27, 2008

20

21

22

23

24

25

26

27

28

EXHIBIT 2
PAGE 700

07209/2441845.7

-1-

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Mattel, Inc. ("Mattel") hereby identifies the following witnesses that it intends at this time to call at trial, other than those witnesses contemplated for impeachment or rebuttal. Mattel reserves the right to present these witnesses' testimony through prior deposition or other testimony to the extent a witness is unavailable to provide live testimony at trial or such testimony is otherwise admissible. Mattel reserves the right to call any witnesses included in the witness lists of other parties to this action and any amendments thereto, including any expert witnesses. Mattel reserves the right to supplement or amend its designation of witnesses and their testimony.

### Witnesses Mattel Intends to Call In Its Case In Chief

1. Nana Ashong
2. Kerri Brode
3. Carter Bryant
4. Ana Isabel Cabrera
5. Beatriz Morales
6. Elise Cloonan
7. Mel Woods
8. Robert Eckert
9. Lissa Freed
10. Rachel Harris
11. Andreas Koch
12. Farhad Larian
13. Isaac Larian
14. Steven Linker
15. Maria Veronica de Souza Marlow
16. Liliana Martinez

EXHIBIT 13
PAGE 201

07209/2441845.7

-2-

| | | |
|---|---|---|
| 1 | 17. | Jennifer Maurus |
| 2 | 18. | Carl Meyer |
| 3 | 19. | Victoria O'Connor |
| 4 | 20. | Sarah Odom |
| 5 | 21. | Denise O'Neal |
| 6 | 22. | Jeff Weiss |
| 7 | 23. | Jacqueline Ramona Prince |
| 8 | 24. | Anna Rhee |
| 9 | 25. | David Rosenbaum |
| 10 | 26. | Maria Elena Salazar |
| 11 | 27. | Maureen Tkacik |
| 12 | 28. | Lisa Tonnu |
| 13 | 29. | Paula Dianthe Treantafelles (Garcia) |
| 14 | 30. | Anne Wang |
| 15 | 31. | Sandy Yonemoto |
| 16 | 32. | Kitty Hammons |
| 17 | 33. | Ivy Ross |
| 18 | 34. | Cassidy Park |
| 19 | 35. | Bryan Armstrong |
| 20 | 36. | Margaret Hatch-Leahy |
| 21 | 37. | Samir Khare |
| 22 | 38. | Sheila Kyaw |
| 23 | 39. | Edmond Lee |
| 24 | 40. | Mark Menz |
| 25 | 41. | Valery Aginsky |
| 26 | 42. | Lloyd Cunningham |
| 27 | 43. | William Flynn |
| 28 | 44. | Frank Keiser |

EXHIBIT ___

PAGE ___

-3-

MATTEL, INC.'S PHASE ONE WITNESS LIST

| | | |
|---|---|---|
| 1 | 45. | Lee Loetz |
| 2 | 46. | Ralph Oman |
| 3 | 47. | Walter Rantanen |
| 4 | 48. | Carol Scott |
| 5 | 49. | Michael Wagner |
| 6 | 50. | John Alex |
| 7 | 51. | Bruce Stein |
| 8 | 52. | Kenneth Hollander |
| 9 | 53. | Angel Gomez |
| 10 | 54. | Robert C. Lind |
| 11 | 55. | Heather McComb |
| 12 | 56. | Nicholas Mirzoeff |
| 13 | 57. | Denise Van Patten |
| 14 | 58. | Ginger McRae |
| 15 | 59. | Christopher Palmeri |
| 16 | 60. | Jill Nordquist |
| 17 | 61. | Arnold Artavia |

<u>**Witnesses Mattel May Call In Its Case In Chief**</u>

| | | |
|---|---|---|
| 19 | 62. | Joan Gaynor |
| 20 | 63. | Rene Pasko |
| 21 | 64. | Pedro Salazar |
| 22 | 65. | Rodney Palmer |
| 23 | 66. | Richard De Anda |
| 24 | 67. | Kami Gillmore-Bryant |
| 25 | 68. | Robert Hudnut |
| 26 | 69. | Cynthia Pierce |
| 27 | 70. | David Dees |
| 28 | 71. | Wendy Feinburg |

EXHIBIT 13

PAGE 703

| | | |
|---|---|---|
| 1 | 72. | Schuyler Bacon |
| 2 | 73. | Robert Best |
| 3 | 74. | Sandra Bilotto |
| 4 | 75. | Ann Driskill |
| 5 | 76. | Brooke Gilbert |
| 6 | 77. | Daphne Gronich |
| 7 | 78. | Sarah Halpern |
| 8 | 79. | Rebecca Harris |
| 9 | 80. | Martin Hitch |
| 10 | 81. | Hoi Hoffman-Briggs |
| 11 | 82. | Don Howarth |
| 12 | 83. | Julia Jensen |
| 13 | 84. | Fred Kawashima |
| 14 | 85. | Cecelia Kwok |
| 15 | 86. | Steven Lee |
| 16 | 87. | Victor Lee |
| 17 | 88. | David Malacrida |
| 18 | 89. | Dennis Medici |
| 19 | 90. | Amy Myers |
| 20 | 91. | Joyce Ng |
| 21 | 92. | Charles O'Connor |
| 22 | 93. | Kislap Ongchango |
| 23 | 94. | Joni Pratte |
| 24 | 95. | William Ragsdale |
| 25 | 96. | Wendy Ragsdale |
| 26 | 97. | Lon P. Ross |
| 27 | 98. | Ellis Stern |
| 28 | 99. | Maureen Tafoya |

EXHIBIT 13

PAGE 204

| | | |
|---|---|---|
| 1 | 100. | Frankie Tsang |
| 2 | 101. | Morad Zarabi |
| 3 | 102. | Chris Sesto |
| 4 | 103. | Patrica Glaser |
| 5 | 104. | Scott Gizer |
| 6 | 105. | Alisa Morganthaler-Lever |
| 7 | 106. | Douglas Wickham |
| 8 | 107. | Keith Jacoby |
| 9 | 108. | Kenneth Lockhart |
| 10 | 109. | Carmen Monteagudo |
| 11 | 110. | Jessie Ramirez |
| 12 | 111. | Neil Friedman |
| 13 | 112. | Lucy Arant |
| 14 | 113. | Michael Moore |
| 15 | 114. | Debora Middleton |
| 16 | 115. | Ernest Dutcher |
| 17 | 116. | Robert G. Wilson |
| 18 | 117. | Alan N. Goldgberg |
| 19 | 118. | William Conkle |
| 20 | 119. | Mark Kremer |
| 21 | 120. | Bryant Delgadillo |
| 22 | 121. | Larry Feldman |
| 23 | 122. | Robert Turner |
| 24 | 123. | Richard Kellner |
| 25 | 124. | Ronald Brawer |
| 26 | 125. | Carlos Gustavo Machado |
| 27 | 126. | Nick Armando Contreras |
| 28 | 127. | Mariana Trueba Almada |

EXHIBIT
PAGE
505 | 17

07209/2441845.7

-6-

| | | |
|---|---|---|
| 1 | 128. | Janine Brisbois |
| 2 | 129. | Daniel Cooney |
| 3 | 130. | Susana Kuemmerle |
| 4 | 131. | Jean Gomez |
| 5 | 132. | Janet Bryant |
| 6 | 133. | Thomas Bryant |
| 7 | 134. | Jeanne Galvano |
| 8 | 135. | Richard Irmen |
| 9 | 136. | Charnayne Brooks |
| 10 | 137. | Sarah Choi |
| 11 | 138. | Mei Wah (Sarah) Chui |
| 12 | 139. | Larry Clayton |
| 13 | 140. | Adrienne Fontenella |
| 14 | 141. | Mitchell Kamarck |
| 15 | 142. | Yim Chong Lo |
| 16 | 143. | Ron Longsdorf |
| 17 | 144. | Eli Makabi |
| 18 | 145. | Susan G. McBride |
| 19 | 146. | Colleen O'Higgins |
| 20 | 147. | Kumi Croom |
| 21 | 148. | Julia Marine |
| 22 | 149. | Shirin Salemnia |
| 23 | 150. | Richard Sandham |
| 24 | 151. | Aileen Storer |
| 25 | 152. | Stephen Tarmichael |
| 26 | 153. | Ben Ton |
| 27 | 154. | Evelyn Viohl |
| 28 | 155. | Spencer Woodman |

EXHIBIT 13

PAGE 266

MATTEL, INC.'S PHASE ONE WITNESS LIST

| | |
|---|---|
| 1 | 156. Milton Zablow |
| 2 | 157. Joe Franke |
| 3 | 158. Larry McFarland |
| 4 | 159. Maureen Mullen Chianese |
| 5 | 160. Tina Patel |
| 6 | 161. Matt Bousquette |
| 7 | 162. Joe Tiongco |
| 8 | 163. Mercedeh Ward |
| 9 | 164. Alan Kaye |
| 10 | 165. Theresa Newcomb |
| 11 | 166. Paul Warner |
| 12 | 167. Helene Bartels |
| 13 | 168. Traci Feldman |
| 14 | 169. Michael Hebden |

DATED: April 1, 2008

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By: Jon D. Corey JB

Jon D. Corey
Attorneys for Plaintiff Mattel, Inc.

EXHIBIT ⑬
PAGE 107

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017.

On April 1, 2008, I served true copies of the following documents described as: **MATTEL, INC.'S CORRECTED PHASE ONE WITNESS LIST** on the parties in this action as follows:

Thomas J. Nolan, Esq.
**Skadden, Arps, Slate, Meagher & Flom LLP**
300 South Grand Avenue, Suite 3400
Los Angeles, CA  90071
'tnolan@skadden.com'

Mark E. Overland, Esq.
David C. Scheper, Esq.
Alexander H. Cote, Esq.
**Overland Borenstein Scheper & Kim, LLP**
300 South Grand Avenue, Suite 2750
Los Angeles, CA 90071

'moverland@obsklaw.com'

John W. Keker, Esq.
Michael H. Page, Esq.
Christa M. Anderson, Esq.
**Keker & Van Nest, LLP**
710 Sansome Street
San Francisco, CA 94111

'MWerdegar@kvn.com'

**[X]  BY ELECTRONIC MAIL TRANSMISSION:** By electronic mail transmission from monicaascarrunz@quinnemanuel.com on April 1, 2008, by transmitting a PDF format copy of such document(s) to each such person at the e-mail address listed below their address(es).  The document(s) was/were transmitted by electronic transmission and such transmission was reported as complete and without error.

Executed on April 1, 2008, at Los Angeles, California.

Tamar Buchakjian

EXHIBIT ____ 13
PAGE ____ 208

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is NOW Messenger Service, 1301 West Second Street, Suite 206, Los Angeles, California 90026.

On April 1, 2008, I served true copies of the following documents described as: **MATTEL, INC.'S CORRECTED PHASE ONE WITNESS LIST** on the parties in this action as follows:

Thomas J. Nolan, Esq.
**Skadden, Arps, Slate,
Meagher & Flom LLP**
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071

[X]   **PERSONAL**: By personally delivering the document listed above to the person(s) at the address(es) set forth above.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made

Executed on April 1, 2008, at Los Angeles, California.

_BRIAN SHORE_

Case No. CV 04-9049 SGL (RNBx)

PROOF OF SERVICE

07209/2456597.176189/24
47320.2

**EXHIBIT 14**

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  johnquinn@quinnemanuel.com
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
  Timothy L. Alger (Bar No. 160303)
  (timalger@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 SGL (RNBx)<br><br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>Hon. Stephen G. Larson<br><br>**MATTEL'S PROPOSED JURY INSTRUCTIONS**<br><br>**Phase 1:**<br><br>Discovery Cut-Off:  January 28, 2008<br>Pre-Trial Conference:  May 5, 2008<br>Trial Date:  May 27, 2008 |

04-08-08

09/2463941.1

EXHIBIT _____ 14 _____

PAGE _____ 270 _____

1       Plaintiff Mattel, Inc. ("Mattel") hereby proposes the following jury

2   instructions for Phases 1(a) and 1(b) of the trial in this matter.  Mattel requests and

3   reserves the right to amend, modify, withdraw and/or supplement the following

4   instructions before or during the trial of this matter.  Mattel intends to submit

5   further proposed jury instructions depending upon and based upon rulings issued in

6   connection with the parties' pending motions for partial summary judgment, any

7   motions in limine or other pre-trial or trial motions, and the evidence and theories

8   proffered by the parties during the course of the trial.  See Fed. R. Civ. P. 51(a).

9   DATED:  April __, 2008            QUINN EMANUEL URQUHART OLIVER &
10                                      HEDGES, LLP

11

12                                      By_____
                                          Jon D. Corey
13                                        Attorneys for Mattel, Inc.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

09/2463941.1

-1-
MATTEL'S PROPOSED JURY INSTRUCTIONS

EXHIBIT ____14____

PAGE ____271____

# MATTEL'S SPECIAL JURY INSTRUCTION NO. ___

## EVIDENCE OF SPOLIATION

During the trial, the plaintiff, Mattel, intends to introduce evidence that the defendants, including Carter Bryant, MGA, MGA's CEO Isaac Larian and/or MGA Hong Kong, did not preserve evidence relevant to this case. In certain circumstances, you may assume that such evidence is or would have been favorable to Mattel and adverse to the defendants. At the end of the trial, I will instruct you on the law in this regard.

**Authority:** *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir.1993); *Akonia v. United States*, 938 F.2d 158, 161 (9th Cir.1991), *cert. denied*, 503 U.S. 962 (1992); *Housing Rights Center v. Sterling*, 2005 WL 3320739, *8 (C.D. Cal. 2005); *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 110 (2d Cir.2002); *Rogers v. T.J. Samson Community Hosp.*, 276 F.3d 228, 232-33 (6th Cir.2002). This instruction will appropriately explain to the jury, at the start of trial, why evidence will be presented regarding the defendants' spoliation of evidence. Without any foundational instruction, the jury may be confused by the presentation of spoliation evidence. This instruction lays an appropriate foundation for the presentation of such evidence.

09/2463941.1

EXHIBIT ___14___

PAGE ___272___

## MATTEL'S SPECIAL JURY INSTRUCTION NO. ____

### ADVERSE INFERENCE FROM SPOLIATION

The plaintiff, Mattel, contends that the defendants, including Carter Bryant, MGA, Isaac Larian and MGA Hong Kong, did not take appropriate steps to preserve relevant evidence and destroyed such evidence. The defendants deny that contention.

If you find that relevant evidence that was within the defendants' control is missing or has been destroyed and that the evidence is missing because of the defendants' bad faith or negligent, unjustified or careless actions or inaction, you may infer that such evidence, if available now, would have been favorable to Mattel and adverse to the defendants.

Defendants' destruction of evidence was negligent, unjustified or careless if they had notice that the evidence might be relevant to this litigation when they destroyed the evidence or made the evidence unavailable. A person is under a duty to preserve evidence that he or she knows, or reasonably should know, could be relevant to a case.

**Authority:** *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993)("[A] trial court also has the broad discretionary power to permit a jury to draw an adverse inference from the destruction or spoliation against the party or witness responsible for that behavior."); *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991) ("Generally, a trier of fact may draw an adverse inference from the destruction of evidence relevant to a case."); *Advantacare Health Partners v. Access IV*, 2004 WL 1837997, * 6 (N.D. Cal. 2004) ("In the Ninth Circuit, spoliation of evidence raises a presumption that the destroyed evidence goes to the merits of the case, and further, that such evidence was adverse to the party that destroyed it.") (citations omitted). Importantly, "a finding of 'bad faith' is *not* a prerequisite to this corrective procedure. *See, e.g., Glover*, 6 F.3d at 1330; *see Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 109 (2d Cir. 2001) (culpable state of mind for an imposition of an adverse inference includes negligence). A litigant has a freestanding duty "to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." *Housing Rights Center v. Sterling*, 2005 WL 3320739, *3 (C.D. Cal. 2005).

09/2463941.1

-53-

EXHIBIT ___14___

PAGE ___273___



1        An adverse inference jury instruction should be given where "[s]ufficient
2   evidence exists to permit a jury to determine the factual predicate" underlying a
    claim of spoliation. *Rogers v. T.J. Samson Community Hosp.*, 276 F.3d 228,
3   234 (6th Cir. 2002). "When a genuine question exists as to whether a party's loss
    or destruction of evidence was negligent (or worse), it is appropriate to defer that
4   question to the jury, by instructing jurors that if they find that the spoliation of
    evidence was at least negligent, they may infer that the missing evidence would
5   favor the non-spoliating party." *One Beacon Ins. Co. v. Broadcast Development*
    *Group, Inc.*, 2005 WL 2077499, *5 (6th Cir. 2005).

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

09/2463941.1

-54-

MATTEL'S PROPOSED JURY INSTRUCTIONS

EXHIBIT __14__

PAGE __274__

1       Plaintiff Mattel, Inc. ("Mattel") hereby proposes the following jury

2   instructions for Phases 1(a) and 1(b) of the trial in this matter.  Mattel requests and

3   reserves the right to amend, modify, withdraw and/or supplement the following

4   instructions before or during the trial of this matter.  Mattel intends to submit

5   further proposed jury instructions depending upon and based upon rulings issued in

6   connection with the parties' pending motions for partial summary judgment, any

7   motions in limine or other pre-trial or trial motions, and the evidence and theories

8   proffered by the parties during the course of the trial.  <u>See</u> <u>Fed. R. Civ. P.</u> 51(a).

9   DATED:  April __, 2008         QUINN EMANUEL URQUHART OLIVER &

10                                HEDGES, LLP

11

12                      By_____

13                        Jon D. Corey
                     Attorneys for Mattel, Inc.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

09/2463941.1

EXHIBIT _____ 14

PAGE _____ 275

**EXHIBIT 15**

● ORIGINAL ●

William C. Conkle (SB# 076103)
Mark D. Kremer (SB# 100978)
Eric S. Engel (SB# 105656), members of
CONKLE & OLESTEN
Professional Law Corporation
3130 Wilshire Boulevard, Suite 500
Santa Monica, California 90403-2403

Telephone: (310) 998-9100

Attorneys for Plaintiff Farhad Larian

**FILED**
LOS ANGELES SUPERIOR COURT

FEB 2 8 2005

JOHN A. CLARKE, EXECUTIVE OFFICER/CLERK

BY_____
J. SUNGA, DEPUTY

Case assigned to,
judge Paul Gutman
D24

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| FARHAD LARIAN, | CASE NO. BC329501 |
| Plaintiff, | VERIFIED COMPLAINT FOR: |
| v. | 1) FRAUD |
| MORAD ZARABI, ISAAC LARIAN AND KAMBIZ ZARABI AND DOES 1 through 5, INCLUSIVE | 2) NEGLIGENT MISREPRESENTATION |
| Defendants. | 3) CONSPIRACY |
| | 4) DECLARATORY RELIEF |
| | 5) CONSTRUCTIVE TRUST |
| | 6) INJUNCTIVE RELIEF |

Plaintiff alleges as follows:

1. Plaintiff, Farhad Larian also known as Fred Larian ("FRED") is now and at all times relevant to this Complaint was a resident of Los Angeles County California.

2. Defendant, Morad Zarabi ("MORAD") is now and at all times relevant to this Complaint was a resident of Los Angeles County California.

2221.002\9929

Complaint

EXHIBIT 15

PAGE 276

3.  Defendant, Isaac Larian ("ISAAC") is now and at all times relevant to this Complaint was a resident of Los Angeles County California.

4.  Defendant Kambiz Robert Zarabi ("KAMBIZ") is now and at all times relevant to this Complaint was a resident of Los Angeles County California.

5.  Plaintiff is unaware of the true names and capacities of Does 1 through 5 and therefore sues such defendants by such fictitious names. Plaintiff will amend this Complaint to identify the true names and capacities of these defendants if and when additional information against them is ascertained. Plaintiff is informed and believes that each of the doe defendants is liable in some manner for the acts and omissions and the injuries and damages alleged in this Complaint.

6.  At all times relevant to this Complaint, each defendant was the agent or employee of each of the other defendants as the case may have been, and was acting within the course of the scope of such agency or employment in performing the acts alleged in this Complaint.

7.  FRED and ISAAC are brothers who for over 20 years engaged in business as partners through equal ownership of several businesses and ventures they co-founded. They shared profits and losses on an equal basis.

8.  The businesses they co-founded included the companies known as ABC International Traders, Inc. ("ABC") and MGA Entertainment Hong Kong Ltd. ("MGAEHK"). ABC and MGAEHK collectively are referred to as "MGA". At all times relevant to this Complaint FRED and ISAAC each owned 45% of the outstanding stock, while their brother in law Jangahir Makabi ("MAKABI") owned 10% of MGA. FRED's 45% interest amounted to 10,000,000 shares of common stock in ABC and

EXHIBIT  15

PAGE  277

1  450 shares of common stock in MGAEHK (collectively "FRED's Stock"). Over time

2  FRED and ISAAC divided responsibilities in MGA's business:  ISAAC, as CEO

3  assumed responsibility for finance, sales, marketing and product development while

4  FRED, as Executive Vice President was responsible for operations, including customs,

5  warehousing, distribution and facilities.

6

7      9.      MORAD is the uncle of ISAAC and FRED.

8

9      10.     In the spring of 2000 ISAAC offered to buy FRED's 45% interest in MGA

10  for $9,000,000 valuing MGA at $20,000,000.  FRED responded that he wanted an

11  appraisal of MGA to consider selling his interest.  Consequently, ISAAC and FRED

12  continued to negotiate a buy-sell agreement for ISAAC to buy FRED's Stock. ISAAC

13  told FRED that he only wanted to appraise MGA as of December 31, 1999.  FRED

14  demanded a current appraisal.  To avoid an appraisal ISAAC suggested using a process

15  by which he or FRED would make an offer to buy the other's interest which if not

16  accepted would require the refusing party to purchase the offeror's interest for the same

17  price. FRED rejected the method telling ISAAC that FRED did not want to be a buyer.

18  Ultimately ISAAC refused to go through with a buy-sell agreement that required three

19  appraisals of MGA.

20

21      11.     From the inception of their partnership, FRED and ISAAC had agreed that

22  their salaries and other compensation from MGA would always be equal.  They had

23  followed this agreement for more than twenty years, taking equal raises and pay-cuts

24  at the same time.  In early 2000, however, while he was attempting to buy FRED out

25  of MGA, ISAAC secretly gave himself a $100,000 raise to about $325,000. ISAAC

26  later demanded that the MGA Board of Directors raise his salary to $500,000, ratify

27  $750,000 as a bonus for 1999, authorize a $1,500,000 bonus for 2000, and give him a

28  4% royalty on items he "personally develops for MGA's 2001 line or products".

2221.002\9929                       -3-
                              Complaint

EXHIBIT    15
PAGE       278

1   Subsequently, Isaac's two brothers in-law purporting to act as MGA directors increased
2   ISAAC's salary to always be three times that of FRED's salary and authorized an
3   additional bonus of up to 50% of ISAAC's tripled salary.   FRED is informed and
4   believes that ISAAC engineered the compensation increase to put additional pressure
5   on FRED to sell out his interests in MGA.  FRED is further informed and believes that
6   in exchange for MAKABI's vote, ISAAC promised MAKABI some portion of FRED's
7   Stock if FRED agreed to sell it to ISAAC.
8
9        12.    In or around the summer of 2000, following ISAAC's refusal to proceed
10   with the buy-sell agreement, MORAD contacted FRED and urged him to let MORAD
11   arbitrate the impasse between ISAAC and FRED over the stock sale.  MORAD told
12   FRED that FRED should not wait any longer to resolve his disputes with ISAAC as
13   ISAAC was attempting to "take over the company" by the enormous raise in
14   compensation which MORAD said was "just a part of ISAAC's plans to oust FRED".
15   MORAD suggested that he determine which brother should sell his interest in MGA
16   and at what price.  FRED responded that he did not want to be a buyer and required for
17   any arbitration, that the price of his stock be determined by an appraisal of the current
18   value of MGA, as ISAAC had control of the financial and business information. FRED
19   also told MORAD he required a resolution of certain other partnership accounts.  In
20   response MORAD promised FRED that the price of FRED's interest in MGA would
21   be determined by a current and accurate appraisal of MGA that MORAD would obtain.
22   MORAD called the appraisal "the central piece of the arbitration".  MORAD also
23   promised to resolve the accounting of the other partnership accounts.
24
25        13.    In several communications with FRED, MORAD stressed his unique
26   position to serve as an arbitrator.  MORAD held out his familial relationship to the
27   brothers as assuring his impartiality and trustworthiness.  MORAD promised to treat
28   each brother "as one of his eyes", an expression meaning that MORAD would allow

2221.002\9929                               -4-
                                        Complaint

EXHIBIT ___15___

PAGE ___279___