1   no harm to come to either of them.  MORAD claimed that his business experience
2   would assure the accuracy of the appraisal and the accounting  and that he would hire
3   a CPA, Mike Shenassafar, to assist him.  MORAD said that he would serve as an
4   arbitrator free of charge, requiring reimbursement only for expenses, such as fees for
5   the appraisal and the CPA. MORAD told FRED that he could trust MORAD to resolve
6   the brothers' dispute, ending the unhappiness it was causing their family.

7

8       14.    MORAD presented FRED with an Agreement for Arbitration and
9   Selection of Arbitrator ("Arbitration Agreement"), a copy of which is attached as
10  Exhibit 1 to this Complaint. FRED is informed and believes that MORAD's attorney
11  Ellis Stern drafted it.  MORAD told FRED that he should not hire an attorney to advise
12  him about the Arbitration Agreement because "attorneys are in it for themselves and
13  would never allow this to end until they got all of the money for themselves".
14  MORAD reiterated to FRED that he could trust MORAD.

15

16      15.    In reliance on the representations of MORAD, on or about September 28,
17  2000 FRED signed the Arbitration Agreement without the advice of counsel and did
18  not hire counsel to represent him in the arbitration.

19

20      16.    Plaintiff is informed and believes that the representations of MORAD
21  were false when made in and around the summer of 2000 prior to FRED's execution
22  of the Arbitration Agreement.   MORAD engaged in misrepresentations and
23  concealments to induce FRED's agreement to allow MORAD to arbitrate the
24  controversy with ISAAC so that MORAD could fix the sale price without an appraisal.
25  MORAD never intended to engage in any neutral arbitration using an accurate and
26  current appraisal of MGA and never intended to use a CPA to assist him with the
27  appraisal. MORAD intended to trick FRED to sell his interest in MGA to ISAAC and
28  settle the other partnership accounts by making FRED believe the price for FRED's

2221.002\9929                        -5-
                                   Complaint

EXHIBIT __15__

PAGE __280__

1   Stock had been established by an accurate appraisal and accounting, but in fact was
2   pre-determined by MORAD.  In furtherance of his plan, MORAD concealed from
3   FRED MORAD's inability to competently read and write English.

4

5   17.   Plaintiff is informed and believes that MORAD made his false
6   representations pursuant to an agreement and plan formed between MORAD and
7   ISAAC to induce FRED to give MORAD authority to determine a value for MGA and
8   trick FRED into selling his interests in MGA at a price pre-determined by ISAAC
9   without an appraisal.  Under the plan and agreement with ISAAC, MORAD agreed to
10  induce FRED's consent to the Arbitration Agreement, by promising FRED an accurate
11  and complete appraisal, but would fix the price for which FRED would sell his Stock
12  to ISAAC and settle the partnership accounts, at or below the $9,000,000 ISAAC had
13  previously offered to pay for FRED's Stock, irrespective of the true appraised value
14  of MGA.

15

16  18.   Following execution of the Arbitration Agreement, MORAD took steps
17  in accordance with his intent and the plan to defraud FRED into accepting a price for
18  his interests not determined by an appraisal including the following:

19      18.1   Consistent with ISAAC's earlier proposal to avoid an appraisal,
20  prior to commissioning the appraisal MORAD induced FRED to give him a written
21  offer to purchase ISAAC's 45% interest in MGA based upon a value of $17,500,000.
22  FRED withdrew the offer the same day.

23      18.2   MORAD hired National Business Appraisers ("NBA") to perform
24  an appraisal of ABC, and in order to lower the appraised value of ABC, allowed NBA
25  to restrict the valuation period to the end of December 1999 thereby eliminating year
26  2000 financial and business information from the appraisal, including information
27  relating to the "Bratz" product line.

28

2221.002\9929                          -6-
                                      Complaint

EXHIBIT  15

PAGE  781

1          18.3   MORAD allowed NBA to value only ABC and omit valuation of

2  MGAEHK.

3          18.4   Upon receiving the initial draft of NBA's appraisal of ABC with a

4  value of $26,942,000 as of December 31, 1999, MORAD instructed NBA to reduce the

5  valuation to get close to $20,000,000 which would yield a price of $9,000,000 for

6  FRED's interest.

7          18.5   MORAD subsequently concealed from FRED that the final reduced

8  appraisal of ABC was at $21,600,000 and represented that the appraisal found the value

9  of MGA to be $17,500,000.

10         18.6   On information and belief MORAD never involved the CPA in the

11  appraisal process, never showed the appraisal to the CPA, nor allowed him to review

12  it for accuracy.

13

14       19.   In or around late November or early December 2000, MORAD came to

15  FRED with a proposed price of $8,775,000 for sale of FRED's Stock to ISAAC

16  calculated on 45% of a combined valuation of $19,500,000 for MGA and the other

17  partnership accounts. MORAD represented to FRED that the appraisal placed the value

18  of MGA at $17,500,000.  MORAD said  the $2,000,000 difference between  the

19  appraisal of $17,500,000 and the $19,500,000 was to satisfy the amount due from

20  ISAAC to FRED for the other partnership accounts. Believing in his uncle's integrity,

21  FRED trusted MORAD's representation of the value found by the appraisal.  In

22  reliance on MORAD's representations, FRED agreed to settle his disputes with ISAAC

23  by selling his interest at the price MORAD represented was determined by the appraisal

24  of MGA and the partnership accounts.

25

26       20.   MORAD's personal attorney Ellis Stern drew up agreements for the sale

27  and settlement of FRED's interest in MGA to ISAAC and the partnership accounts

28  including an Agreement for Sale of Stock, Pledge Agreement, Promissory Note, Mutual

2221.002\9929

-7-

Complaint

EXHIBIT 15

PAGE 282

1  Release and Consulting Agreement (collectively "December 2000 Agreement"). FRED

2  asked MORAD if FRED should have an attorney to advise him about the transaction.

3  MORAD said no. MORAD said that he would make sure the agreements accurately

4  reflected the transaction and protected both FRED and ISAAC. Based on MORAD's

5  representation, FRED did not have counsel advise him with respect to the transaction

6  and signed the December 2000 Agreement.

7

8      21.    In inducing FRED's agreement to sell FRED's Stock to ISAAC, MORAD

9  continued to conceal his fraud and deceit from FRED. MORAD assured FRED that the

10  sale price based on a combined valuation of $19,500,000 for MGA and the partnership

11  accounts was determined by the appraisal and accounting. MORAD convinced FRED

12  to agree to resolve any disputes with ISAAC over the December 2000 Agreement by

13  arbitrating them before MORAD or if MORAD was unavailable before his son

14  KAMBIZ. MORAD repeated to FRED that he should keep resolution of such matters

15  in the family and FRED could trust both MORAD and KAMBIZ. MORAD also

16  claimed that as a director of MGA and as the arbitrator, he would be in a position to

17  protect FRED's interest. In reliance on MORAD's representations including that the

18  appraised value of MGA had been $17,500,000 upon which the sale price for his

19  interest in MGA was based, FRED agreed to the provisions for resolving any disputes

20  over the December 2000 Agreement by arbitrating before MORAD (and if MORAD

21  was unavailable to serve, MORAD's son KAMBIZ) ("December Arbitration

22  Provisions").

23

24      22.    MORAD's representations to FRED that FRED should trust him to

25  continue to act as an impartial and honest arbitrator of disputes that might arise under

26  the December 2000 Agreement were false and were made to conceal MORAD's fraud

27  and deceit in the appraisal and valuation of MGA and to induce FRED's agreement to

28  the December Arbitration Provisions so to allow MORAD to hide his wrongful acts and

2221.002\9929

-8-<br>Complaint

EXHIBIT ___15___

PAGE ___283___

1  omissions and/or conspiracy with ISAAC.  MORAD had not honestly and impartially
2  acted as an arbitrator in the past and had no intent to arbitrate or otherwise act
3  impartially and honestly to resolve any disputes that might arise under the December
4  2000 Agreement.  MORAD intended only to use his position as arbitrator to continue
5  to conceal his fraud and deceit and other wrongful acts and omissions toward FRED.

7      23.    Under the December 2000 Agreement, MORAD became a director of
8  MGA and took possession of the share certificates for FRED's Stock as Trustee to be
9  held as collateral for ISAAC's payment of the full purchase price to FRED.

11      24.    Following the execution of the December 2000 Agreement, MORAD
12  requested FRED to "return the favor" for what MORAD called his "pro-bono
13  arbitration work" in 2000.  MORAD requested $10,000.00 from FRED for MORAD's
14  relative.  MORAD told FRED that ISAAC had already paid an identical amount.
15  FRED paid the money MORAD requested.  In June 2004 FRED's attorneys asked
16  MORAD to disclose and produce evidence of these payments. MORAD, through his
17  attorney Ellis Stern, refused.  In or around June 2004, in relation to FRED's inquiry
18  about these payments, MORAD publicly threatened that he "will destroy FRED and
19  make him equal to dirt".  On information and belief MORAD sought and obtained a
20  larger payment from ISAAC for MORAD's "pro-bono arbitration work" and for that
21  reason refused to disclose such payments.

23      25.    In 2001, ISAAC was unable to make the payment under the promissory
24  note given FRED as part of the December 2000 Agreement.  MORAD induced FRED
25  to extend the due date of the note and advanced money on behalf of ISAAC to FRED
26  for payments on the promissory note.

2221.002\9929

-9-

Complaint

EXHIBIT 15

PAGE 784

26.    In or around the summer of 2002, FRED became aware of facts that suggested the valuation of MGA in 2000 represented by MORAD may have been inaccurate and that the actual valuation of MGA was significantly higher because of a license and plans for a product line called "Bratz" which were undisclosed to FRED. FRED requested a copy of the appraisal of MGA performed in 2000. MORAD refused, maintaining that he was legally not allowed to disclose it.  FRED did not suspect MORAD of any wrong doing at this time, believing instead that ISAAC had withheld the Bratz information from both FRED and MORAD without MORAD's knowledge or consent.

27.    Subsequently FRED submitted to MORAD his claim that FRED had been defrauded by ISAAC.

28.    A few months after FRED's submission of his claim to MORAD for the fraud in the sale of FRED's Stock, MORAD called a meeting at his offices on January 26, 2003.  He advised FRED that no lawyers would be allowed and that no evidence would be presented as this  was an informal meeting.  MORAD tape recorded the meeting which lasted less than two hours. After ISAAC left the meeting, he called MORAD and MORAD reported to FRED that ISAAC said "figure out a way to pay FRED something and get rid of him".  On or about September 14, 2004 MORAD declared under oath that the meeting occurred on a different day and was an "arbitration hearing" upon which he "took the matter under submission"!

29.    After the January meeting in several communications, MORAD and KAMBIZ  advised FRED ways to settle the claim against ISAAC including buying back a portion of FRED's Stock, which MORAD said he had convinced ISAAC to allow.

2221.002\9929                                -10-
                                          Complaint

EXHIBIT ___15___

PAGE ___285___

30.     In 2003, FRED learned that sometime after the January 26, 2003 meeting MORAD had commissioned another appraisal of MGA ("2003 Appraisal"). MORAD told FRED he had commissioned the 2003 Appraisal but did not show it to him. In December 2004 FRED learned that the valuation date of the 2003 Appraisal was as of December 31, 2000 (the effective date under the December 2000 Agreement) and that it found the value of ABC to be $33,805,000. In December 2004 FRED also learned that in or about April 2004, MORAD had commissioned yet another appraisal of MGA based on a valuation date ending December 31, 2001 ("2004 Appraisal").

31.     Throughout 2003, FRED again asked MORAD and also KAMBIZ to provide FRED a copy of the appraisals. They initially refused to disclose any of the documentation for the appraisals. FRED filed suit in August 2003 against ISAAC for fraud arising from the non-disclosure of the Bratz line (The "Bratz Action"). In September 2003, MORAD promised to give FRED all documents and records relating to the 2000 and 2003 appraisals in exchange for payment of $15,000. MORAD's attorney, Ellis Stern corroborated MORAD's promise to give FRED all of the documents and records related to the appraisal. FRED paid MORAD the $15,000 but then MORAD refused to provide all of the records to FRED. MORAD said instead he had turned over his records and files to his attorney Stern who refused to produce copies to FRED.

32.     When FRED continued to press for production of MORAD's entire file concerning the 2000 and 2003 appraisals, ISAAC opposed production and demanded that no records from the appraisal be produced. Finally after the Court in the Bratz Action ordered discovery, MORAD's attorneys produced certain of the documents related to the 2000 appraisal but refused to produce documents related to the 2003 Appraisal. MORAD's attorney Stern represented to have produced all of the 2000 appraisal documentation and provided a privilege log which he later filed in Court. No

EXHIBIT      15

PAGE      786

1  draft appraisals were produced to FRED by MORAD personally or by his attorneys.
2  The draft of the 2000 appraisal, the 2004 Appraisal, and some correspondence from
3  NBA relating to the 2000 appraisals were neither produced nor listed on the privilege
4  log Stern had submitted to FRED and the Court. FRED pursued discovery of NBA and
5  the appraiser but both ISAAC and MORAD opposed it.  Ultimately it was not until
6  FRED went to NBA directly in December 2004 that he discovered the extent and nature
7  of MORAD's wrongful acts.  The documents and information provided by NBA also
8  revealed that MORAD's attorney, Stern had submitted a false privilege log to FRED
9  and to the Court.

10

11      33.    In or around April to July 2004 FRED learned of translations that
12  MORAD had ordered including translations related to a January 30, 2003 letter
13  MORAD had received from FRED's attorney, and of MORAD's need to use translators
14  in the contemplated arbitration of FRED's claims against ISAAC.  These facts and
15  documents were suppressed from FRED by MORAD and his attorney.

16

17      34.    In or around January 2004, FRED demanded of MORAD that FRED's
18  Stock held by MORAD as trustee pursuant to the December 2000 Agreement be
19  maintained pending resolution of FRED's claims against ISAAC. Through his attorney
20  Stern, MORAD agreed. In or around December 2004, FRED demanded that MORAD
21  show FRED the stock certificates.  MORAD refused.

22

23      35.    In or around December 2004, FRED obtained documentation and
24  information directly from NBA disclosing that:

25          35.1  NBA had never provided MORAD with an appraisal valuing ABC
26  or MGA at $17,500,000 as MORAD had represented to FRED;

27          35.2  In or around October 2000 NBA transmitted to MORAD an initial
28  draft appraisal valuing ABC at $26,942,000. MORAD then instructed NBA to decrease

2221.002\9929                    -12-
                             Complaint

EXHIBIT 15
PAGE 287

1  the value to get close to $20,000,000 and allowed the valuation date to be as of

2  December 31, 1999;

3      35.3  NBA's final reduced appraisal in November 2000 was

4  $21,600,000.00 for the period ending December 31, 1999 and excluded MGAEHK

5  from the valuation;

6      35.4  Commencing in February 2003, NBA met with MORAD and

7  KAMBIZ concerning the November 2000 appraisal because of FRED's claim against

8  ISAAC for fraud;

9      35.5  In February 2003, MORAD commissioned the appraisal of MGA

10  as of December 31, 2000 (2003 Appraisal) without consideration of the Bratz License

11  and product line. This appraisal found the value to be $33,805,000.00;

12      35.6  MORAD subsequently requested NBA to reduce the 2003 Appraisal

13  by applying a minority shareholder discount.

14      35.7  In 2000, NBA had given the draft 2000 appraisal to MORAD and

15  his attorneys.

16      35.8  In 2004, MORAD's attorneys advised NBA to destroy any drafts

17  of the 2000 appraisal.

18      35.9  In 2004 MORAD commissioned the appraisal of ABC as of

19  December 31, 2001 (2004 Appraisal) to obtain a valuation lower than the 2003

20  Appraisal.  The 2004 Appraisal, the draft 2000 appraisal, and some correspondence

21  from NBA relating to the 2000 appraisals had been suppressed from FRED and omitted

22  from the privilege log Stern submitted to both FRED and the Court.

23

24      36.    FRED is informed and believes that MORAD's suppression of the

25  appraisals, his attempts to destroy and prevent discovery of evidence, and his lies to

26  FRED were calculated to conceal his fraud in the inducement of the Arbitration

27  Agreement and December Arbitration Provisions, his corruption of the appraisal in

28

2221.002\9929                    -13-
                            Complaint

EXHIBIT __15__

PAGE __288__

1  2000, and/or in furtherance of the conspiracy with ISAAC to trick FRED into selling

2  Fred's Stock at a price pre-determined by ISAAC and/or MORAD.

3

4        **FIRST CAUSE OF ACTION FOR PROMISSORY FRAUD INDUCING**

5          **CONSENT TO THE ARBITRATION AGREEMENT**

6              **AGAINST MORAD ZARABI**

7      37.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

8

9      38.    MORAD's representations to Plaintiff concerning MORAD's intention

10  to neutrally, honestly, completely and accurately appraise the current value of MGA,

11  and account for the other partnership matters, to resolve Plaintiff's disputes with

12  ISAAC were false and known by MORAD to be false when he made them.  The

13  misrepresentations and omissions were material and made to induce Plaintiff to consent

14  to the Arbitration Agreement and selection of MORAD as arbitrator.  The true facts

15  were that MORAD never intended to engage in an accurate, complete and current

16  appraisal of MGA or accounting of the other partnership matters, but rather to set a

17  pre-determined price for the sale of FRED's Stock to ISAAC.  In furtherance of this

18  intent, MORAD concealed his disability in reading and writing English.

19

20      39.    Reasonably relying on MORAD's representation of what MORAD

21  intended to do as an arbitrator and that Plaintiff could trust him, Plaintiff was induced

22  to sign the Arbitration Agreement and selection of MORAD as the arbitrator.  Had

23  Plaintiff known MORAD's true intentions, Plaintiff would not have signed the

24  Arbitration Agreement, and would not have agreed to the December Arbitration

25  Provisions.

26

27      40.    As a result of the fraud and deceit alleged herein, Plaintiff is entitled to

28  rescission of the Arbitration Agreement and the December Arbitration Provisions

2221.002\9929             -14-

                       Complaint

**EXHIBIT** 15

**PAGE** 209

proximately caused by it as well as restitution of all sums obtained by MORAD from Plaintiff because of them.

## SECOND CAUSE OF ACTION FOR NEGLIGENT
## MISREPRESENTATIONS INDUCING CONSENT
## TO THE ARBITRATION AGREEMENT
## AGAINST MORAD ZARABI

41.   Plaintiff realleges paragraphs 1 through 36 of this Complaint.

42.   MORAD owed a duty of reasonable care in making representations and statements to Plaintiff regarding MORAD's ability and intentions with respect to the appraisal of MGA and the accounting of the other partnership matters.

43.   MORAD breached his duty to Plaintiff by making misrepresentations of material facts and by omitting and failing to disclose material facts which he knew or in the exercise of reasonable care should have known were untrue or inaccurate and which he was under a duty to disclose to Plaintiff, including without limitation, his inability to competently read and write English, his intent to set a pre-determined price for Fred's Stock and the value of the other partnership accounts.

44.   MORAD made the misrepresentations and omissions with the intent to induce Plaintiff to agree to the Arbitration Agreement consenting to arbitrate before MORAD as the arbitrator of the disputes between Plaintiff and ISAAC over MGA and the other partnership matters.

45.   Plaintiff actually, reasonably and justifiably relied upon the false statements and omissions of MORAD and consented to the Arbitration Agreement. Had Plaintiff known the true facts, Plaintiff would not have entered into the Arbitration

2221.002\9929                          -15-
                                    Complaint

EXHIBIT ___15___

PAGE ___290___

1    Agreement and selection of MORAD as the arbitrator, and would not have given
2    MORAD authority as arbitrator to determine the price at which Plaintiff would sell his
3    interest in MGA and the other partnership accounts.

4

5        46.    As a result of the misrepresentation alleged herein, FRED is entitled to
6    rescission of the Arbitration Agreement and the December Arbitration Provisions
7    proximately caused by it and restitution of all sums obtained by MORAD from Plaintiff
8    because of them.

9

10              **THIRD CAUSE OF ACTION FOR CONSPIRACY TO COMMIT**
11               **PROMISSORY FRAUD INDUCING CONSENT TO THE**
12                         **ARBITRATION AGREEMENT**
13               **AGAINST MORAD ZARABI AND ISAAC LARIAN**
14        47.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

15

16        48.    Plaintiff is informed and believes that commencing in or around the
17    summer and fall of 2000, ISAAC and MORAD conspired and agreed together to induce
18    FRED to give MORAD power and authority as an arbitrator to set a price
19    pre-determined by ISAAC and/or MORAD, at which ISAAC would purchase FRED's
20    shares in MGA.

21

22        49.    In furtherance of the conspiracy, MORAD made the misrepresentations
23    and omissions of material facts alleged in this Complaint to induce FRED to consent
24    to arbitration before MORAD and to execute the Arbitration Agreement. MORAD's
25    representations were false and known by MORAD and ISAAC to be false when made.

26

27        50.    In reasonable reliance on the representations of MORAD, Plaintiff
28    executed the Arbitration Agreement.

2221.002\9929                          -16-
                                      Complaint

EXHIBIT ___15___

PAGE ___21___

51.    Plaintiff is entitled to rescission of the Arbitration Agreement and the December Arbitration Provisions proximately caused by it and restitution of all sums obtained by MORAD from Plaintiff because of them.

## FOURTH CAUSE OF ACTION FOR DECLARATORY RELIEF
## OVER VALIDITY OF THE ARBITRATION AGREEMENT
## AND THE DECEMBER ARBITRATION PROVISIONS
## AGAINST MORAD ZARABI AND ISAAC LARIAN

52.    Plaintiff realleges paragraphs 1 though 36 of this Complaint.

53.    An actual justiciable controversy exists between Plaintiff on the one hand, and Defendants MORAD and ISAAC on the other hand in that Plaintiff contends that the Arbitration Agreement was void ab initio due to the fraud and deceit of MORAD and/or ISAAC inducing Plaintiff's consent to it; and that the December Arbitration Provisions are likewise void because they were proximately caused by Plaintiff's consent to the Arbitration Agreement.    Plaintiff is informed and believes that Defendants MORAD and ISAAC contend that the Arbitration Agreement is valid and enforceable and that there is no basis for invalidating or voiding the Arbitration Agreement or the December Arbitration Provisions.

54.    Plaintiff has no accurate remedy at law and the parties require a judicial declaration of their legal rights and obligations with respect to the Arbitration Agreement and the December Arbitration Provisions.

2221.002\9929

-17-

Complaint

EXHIBIT ___15___

PAGE ___292___

# FIFTH CAUSE OF ACTION FOR FRAUD IN THE INDUCEMENT
## OF THE DECEMBER ARBITRATION PROVISIONS
### AGAINST MORAD ZARABI

55.   Plaintiff realleges paragraphs 1 through 36 of this Complaint.

56.   MORAD's representations to FRED in or around the end of November or the beginning of December 2000 concerning the accuracy of the appraisal of MGA, the appraised value being $17,500,000, and MORAD's honesty and trustworthiness were false when made and known by MORAD to be false when made. The true facts were that MORAD concealed the appraisal showing the value of MGA to be significantly greater than the representation to Plaintiff, and concealed the fact that he had corrupted and acted to distort the appraisal of MGA by ordering the appraiser to reduce the value to close to $20,000,000. In making the misrepresentations and omissions, MORAD intended to induce Plaintiff to agree to resolve any disputes arising from the December 2000 Agreement by arbitration before MORAD and/or KAMBIZ, so that MORAD could continue to conceal his fraud and deceit and his wrongful acts and omissions.

57.   The misrepresentations and omissions to Plaintiff were material and Plaintiff reasonably relied on them to his detriment and by them was induced to enter into the December Arbitration Provisions.

58.   As the result of MORAD's fraud and deceit, Plaintiff is entitled to rescission of the December Arbitration Provisions and restitution of all sums obtained by MORAD from Plaintiff because of them.

EXHIBIT   5

PAGE   793

### SIXTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION INDUCING CONSENT TO THE DECEMBER ARBITRATION PROVISIONS AGAINST MORAD ZARABI

59.   Plaintiff realleges paragraphs 1 through 36 of this Complaint.

60.   MORAD owed a duty of reasonable care in making representations and statements to Plaintiff regarding the appraised value of MGA and the accounting of the other partnership matters.

61.   MORAD breached his duty to Plaintiff by making misrepresentations of material facts and by omitting and failing to disclose material facts which he knew or in the exercise of reasonable care should have known were inaccurate and which he was under a duty to disclose to Plaintiff, including without limitation, the true and correct valuation of MGA found by NBA's appraisal.

62.   MORAD made the misrepresentations and omissions with the intent to induce Plaintiff to consent to the December Arbitration Provisions selecting MORAD and his son KAMBIZ as the arbitrators with sole authority to determine disputes between Plaintiff and ISAAC arising from the December 2000 Agreement.

63.   Plaintiff actually, reasonably and justifiably relied upon the false statements and omissions of MORAD.  Had Plaintiff known the true facts, Plaintiff would not have entered into the December Arbitration Provisions which selected MORAD and his son KAMBIZ as the arbitrators.

EXHIBIT __15__

PAGE __214__

64.   As a result of MORAD's misrepresentations Plaintiff is entitled to rescission of the December Arbitration Provision and restitution of all sums obtained by MORAD from Plaintiff because of them.

## SEVENTH CAUSE OF ACTION FOR CONSPIRACY TO FRAUDULENTLY INDUCE EXECUTION OF THE DECEMBER ARBITRATION PROVISIONS AGAINST MORAD ZARABI AND ISAAC LARIAN

65.   Plaintiff realleges paragraphs 1 through 36 of this Complaint.

66.   Plaintiff is informed and believes that the misrepresentations and omissions by MORAD in late November to December 2000 were carried out pursuant to a conspiracy and agreement between MORAD and ISAAC to induce FRED to agree to arbitrate all disputes before MORAD and KAMBIZ so they could continue to conceal MORAD's and ISAAC's fraud and conspiracy.

67.   In furtherance of the conspiracy, MORAD committed the acts alleged in this Complaint, including without limitation manipulating and corrupting the appraisal, lying to FRED about the appraised value of MGA and inducing FRED to resolve all disputes arising out of the agreement by arbitration before MORAD or KAMBIZ in order to conceal the conspiracy.

68.   As the result of the misrepresentations by MORAD pursuant to the conspiracy of ISAAC and MORAD which induced FRED's consent to the December Arbitration Provisions, Plaintiff is entitled to rescission of the December Arbitration Provisions and restitution of all sums obtained by MORAD from Plaintiff because of them.

EXHIBIT ___15___

PAGE ___215___

## EIGHTH CAUSE OF ACTION FOR DECLARATORY RELIEF
## OVER VALIDITY OF THE DECEMBER ARBITRATION PROVISIONS
## AGAINST ISAAC LARIAN

69.    Plaintiff realleges paragraphs 1 though 36 of this Complaint.

70.    An actual justiciable controversy exists between Plaintiff on the one hand and ISAAC on the other hand in that Plaintiff contends that the December Arbitration Provisions were void ab initio due to the fraud and deceit of MORAD and/or ISAAC inducing Plaintiff's consent to them while Plaintiff is informed and believes that ISAAC contends that the December Arbitration Provisions are valid and enforceable and that there is no basis for invalidating or voiding them, in whole or part.

71.    Plaintiff has no adequate remedy at law and the parties require a judicial declaration of their legal rights and obligations with respect to the December Arbitration Provisions.

## NINTH CAUSE OF ACTION FOR DECLARATORY JUDGMENT
## OVER THE DISQUALIFICATION OF MORAD ZARABI
## AND KAMBIZ ROBERT ZARABI FROM SERVING AS ARBITRATORS
## AGAINST ISAAC LARIAN, MORAD ZARABI
## AND KAMBIZ ROBERT ZARABI

72.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

73.    An actual justiciable controversy exists between Plaintiff on the one hand and Defendants on the other hand in that Plaintiff contends that as a result of the position, facts and circumstances concerning MORAD and KAMBIZ alleged in this Complaint, they are disqualified under California law from exercising any power or authority as an arbitrator of any disputes between Plaintiff and Defendant ISAAC

2221.002\9929                           -21-
                                     Complaint

EXHIBIT ___15___

PAGE ___296___

1   LARIAN; while Plaintiff is informed and believes that Defendants and each of them
2   contend that MORAD and KAMBIZ are not so disqualified.
3
4       74.    Plaintiff has no adequate remedy at law and the parties require a judicial
5   declaration of their legal rights and obligations with respect to the ability of MORAD
6   and KAMBIZ to exercise power and authority as arbitrators under the December 2000
7   Agreement.
8
9          **TENTH CAUSE OF ACTION  FOR DECLARATORY JUDGMENT**
10          **OVER ENFORCEABILITY OF ARBITRATION AGREEMENTS**
11                      **AGAINST ISAAC LARIAN**
12      75.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.
13
14      76.    An actual justiciable controversy exists between Plaintiff on the one hand
15   and Defendant ISAAC LARIAN on the other hand in that Plaintiff contends that the
16   Arbitration Agreement and the December Arbitration Provisions are unenforceable in
17   that they are agreements to arbitrate solely before MORAD ZARABI and in the case
18   of the December Arbitration Provisions, KAMBIZ ZARABI if MORAD is unavailable
19   or such arbitrators as either of them might appoint if MORAD and KAMBIZ are both
20   unavailable.  Because MORAD and KAMBIZ are disqualified under California law,
21   neither may serve as arbitrator or appoint arbitrators.  Plaintiff is informed and believes
22   that Defendant ISAAC LARIAN disputes the disqualification of MORAD and
23   KAMBIZ ZARABI and that notwithstanding any disqualification of MORAD and
24   KAMBIZ, contends the arbitration agreements are legally enforceable.
25
26      77.    Plaintiff has no adequate remedy at law and the parties require judicial
27   declaration of their rights and obligations with respect to the Arbitration Agreement
28   and the December Arbitration Provisions and their enforceability.

2221.002\9929                    -22-
                                Complaint

EXHIBIT ___15___

PAGE ___77___

## ELEVENTH CAUSE OF ACTION FOR RESCISSION
## OF THE DECEMBER 2000 AGREEMENT BASED ON PROMISSORY
## FRAUD INDUCING CONSENT TO ARBITRATION AGREEMENT
## AGAINST MORAD ZARABI AND ISAAC LARIAN

78.   Plaintiff realleges paragraphs 1 through 36 of this Complaint.

79.   The fraud and deceit of MORAD and/or conspiracy of MORAD and ISAAC to deceive and defraud, inducing Plaintiff to consent to the Arbitration Agreement proximately caused Plaintiff's consent to the December 2000 Agreement. As a consequence of Plaintiff's entitlement to rescission of the Arbitration Agreement, Plaintiff is also entitled to rescission of the December 2000 Agreement, including the Pledge Agreement and restitution of his stock in MGA subject to any accounting required by law.

80.   As a proximate result of Defendants wrongful conduct, Plaintiff has been damaged in an amount and of a nature according to proof at trial.

81.   MORAD's wrongful acts were conducted maliciously, oppressively and fraudulently with the intent to injure Plaintiff. Plaintiff is therefore entitled to an award of punitive damages sufficient to punish MORAD and deter such conduct in the future.

## TWELFTH CAUSE OF ACTION FOR RESCISSION
## OF THE DECEMBER 2000 AGREEMENT
## AGAINST MORAD ZARABI AND ISAAC LARIAN

82.   Plaintiff realleges paragraphs 1 through 36 of this Complaint.

83.   MORAD's fraud and deceit and/or the conspiracy of MORAD and ISAAC, to defraud and deceive, inducing Plaintiff into believing that MORAD had carried out

2221.002\9929                          -23-
                                      Complaint

EXHIBIT ____15____

PAGE ____298____

1   an accurate, complete, and current appraisal of MGA which purportedly had
2   determined the value of MGA to be $17,500,000 proximately caused Plaintiff to
3   consent to the December 2000 Agreement and consequently Plaintiff is entitled to
4   rescission of it, including the Pledge Agreement and restitution of his stock in MGA
5   subject to any accounting required by law.

6

7       84.    As a proximate result of Defendants wrongful conduct, Plaintiff has been
8   damaged in an amount and of a nature according to proof at trial.

9

10      85.    MORAD's wrongful acts were conducted maliciously, oppressively and
11  fraudulently with the intent to injure Plaintiff. Plaintiff is therefore entitled to an award
12  of punitive damages sufficient to punish MORAD and deter such conduct in the future.

13

14          **THIRTEENTH CAUSE OF ACTION FOR RESCISSION BASED ON**
15              **NEGLIGENT MISREPRESENTATIONS INDUCING**
16                  **THE DECEMBER 2000 AGREEMENT**
17                      **AGAINST MORAD ZARABI**
18      86.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

19

20      87.    MORAD owed a duty of reasonable care in making representations and
21  statements to Plaintiff regarding a) his purported intention to impartially arbitrate the
22  sale of Plaintiff's interest in MGA by an accurate, complete, and current appraisal and
23  b) the true and correct appraised value of MGA and the accounting of the other
24  partnership matters.

25

26      88.    MORAD breached his duty to Plaintiff by making misrepresentations of
27  material facts and by omitting and failing to disclose material facts which he knew or
28  in the exercise of reasonable care should have known were inaccurate and which he

2221.002\9929                        -24-
                                    Complaint

EXHIBIT ___15___

PAGE ___217___

1  was under a duty to disclose to Plaintiff, including without limitation, MORAD's true

2  intentions regarding setting the price for Plaintiff's stock and the true and correct

3  valuation of MGA found by NBA's appraisal.

4

5      89.    MORAD's misrepresentations induced Plaintiff's execution of the

6  December 2000 Agreement and Plaintiff is entitled to rescission of it, including the

7  Pledge Agreement and to restitution of his stock in MGA subject to an accounting

8  required by law.

9

10      90.    As a proximate result of Defendants wrongful conduct, Plaintiff has been

11  damaged in an amount and of a nature according to proof at trial.

12

13          **FOURTEENTH CAUSE OF ACTION FOR DECLARATORY**

14      **RELIEF OVER VALIDITY OF THE DECEMBER 2000 AGREEMENT**

15          **AGAINST ISAAC LARIAN**

16      91.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

17

18      92.    An actual justiciable controversy exists between Plaintiff on the one hand

19  and Defendant ISAAC on the other hand  in that Plaintiff contends that the December

20  2000 Agreement was void ab initio due to the fraud and deceit of MORAD and/or

21  ISAAC inducing Plaintiff's consent to it while Plaintiff is informed and believes that

22  ISAAC contends the December 2000 Agreement is valid, enforceable and that there is

23  no basis for invalidating or voiding it.

24

25      93.    Plaintiff has no accurate remedy at law and the parties require a judicial

26  declaration of their legal rights and obligations with respect to the December 2000

27  Agreement.

28

2221.002\9929

-25-

Complaint

EXHIBIT 15

PAGE 300

# FIFTEENTH CAUSE OF ACTION FOR CONSTRUCTIVE TRUST, PRELIMINARY INJUNCTION AND ACCOUNTING AGAINST MORAD ZARABI AND ISAAC LARIAN

94.     Plaintiff realleges paragraphs 1 through 36 of this Complaint.

95.     The share certificates for FRED's Stock were held in trust by MORAD pursuant to a pledge agreement made by ISAAC in connection with the December 2000 Agreement. Plaintiff has made demand on MORAD to show him the share certificates, but MORAD has failed and refused to do so. Plaintiff is informed and believes that MORAD has turned over the stock certificates or other instruments affecting the stock certificates to ISAAC.

96.     By virtue of their fraudulent acts, Plaintiff is entitled to rescission of the December 2000 Agreement and to restitution of his stock in MGA subject to an accounting by the Court of any amount of the consideration Plaintiff received for his stock that must be returned to Isaac, which Plaintiff hereby offers to restore. Defendants and each of them hold FRED's Stock as a constructive trustee for Plaintiff's benefit. Plaintiff is informed and believes that the stock certificates may be voided, lost or destroyed and Plaintiff's stock interest diluted or altered to Plaintiff's detriment unless Defendants and each of them are enjoined and restrained from taking any acts of any nature with respect to Plaintiff's stock certificates and stock interest.

97.     Plaintiff does not know what amounts, if any have accrued or been distributed on account of Plaintiff's MGA stock and an accounting is therefore necessary to determine what amounts, if any are due Plaintiff on account of his MGA stock.

2221.002\9929                          -26-
                                     Complaint

EXHIBIT __15__

PAGE ___301___

WHEREFORE, Plaintiff prays for judgment as follows:

1.      That the September 28, 2000 Agreement to Arbitrate and Selection of Arbitrator is declared void ab initio or is rescinded;

2.      That the December Arbitration Provisions are declared void ab initio or are rescinded;

3.      That MORAD ZARABI is judicially declared as disqualified from serving as an arbitrator of any disputes between Plaintiff and Defendant ISAAC LARIAN;

4.      That KAMBIZ ROBERT ZARABI is judicially declared as disqualified from serving as an arbitrator of any disputes between Plaintiff and Defendant ISAAC LARIAN;

5.      That Defendants and each of them and their agents and employees hold Plaintiff's MGA Stock as constructive trustees for Plaintiff's benefit;

6.      That Defendants and each of them, their agents, employees and all those in active concert and participation with them are preliminarily and permanently enjoining from transferring, disposing of, or altering FRED's Stock certificates or interest in MGA;

7.      That the December 2000 Agreement (including all related agreements) is declared void ab initio or is rescinded;

8.      That Plaintiff's stock in MGA be restored to him;

9.      For an accounting of all monies accruing to or distributed on account of Plaintiff's stock in MGA;

10.     For damages as allowed by law and according to proof at trial;

11.     For reasonable attorneys fees;

12.     For costs as allowed by law;

13.     For punitive damages as allowed by law and according to proof at trial; and

EXHIBIT 15

PAGE 302



1    14.    For such other relief as the Court deems just and proper.

2

3    Dated:  February 24, 2005                    William C. Conkle
                                                  Mark D. Kremer
4                                                 Eric S. Engel, members of
                                                  CONKLE & OLESTEN
5                                                 Professional Law Corporation

6

7                                      By: _____

8                                                 Mark D. Kremer
                                                  Attorneys for Plaintiff
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2221.002\9929                          -28-
                                       Complaint

EXHIBIT ___15___

PAGE ___303___

## VERIFICATION

I have read the foregoing **Verified Complaint** and know its contents.

☒    I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐    I am _____ of _____, a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason.

☐    I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

☒    The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐    I am one of the attorneys for _____, a party to this action. Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on February 25, 2005.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Farhad Larian
_____
Print Name of Signator

_____
Signature

Verification to Complaint

EXHIBIT __15__

PAGE __304__

**ORIGINAL**

CM-010

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):*<br>Mark D. Kremer<br>Conkle & Olesten, Professional Law Corporation<br>3130 Wilshire Blvd., Suite 500<br>Santa Monica, CA 90403<br>TELEPHONE NO. 310-998-9100   FAX NO. 310-998-9109<br>ATTORNEY FOR *(Name):* Plaintiff | **FOR COURT USE ONLY**<br><br>**FILED**<br>LOS ANGELES SUPERIOR COURT<br><br>FEB 2 8 2005<br><br>JOHN A. CLARKE, EXECUTIVE OFFICER/CLERK<br>BY<br>J. SUNGA, DEPUTY |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012-3014
BRANCH NAME: Central District

CASE NAME: Farhad Larian v. Morad Zarabi, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: BC 329501 |
|---|---|---|---|---|
| [X] Unlimited<br>(Amount demanded exceeds $25,000) | [ ] Limited<br>(Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 1811) | | JUDGE:<br>DEPT: |

*All five (5) items below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | (Cal. Rules of Court, rules 1800–1812) |
| [ ] Uninsured motorist (46) | [ ] Collections (09) | [ ] Antitrust/Trade regulation (03) |
| **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort** | [ ] Insurance coverage (18) | [ ] Construction defect (10) |
| [ ] Asbestos (04) | [X] Other contract (37) | [ ] Mass tort (40) |
| [ ] Product liability (24) | **Real Property** | [ ] Securities litigation (28) |
| [ ] Medical malpractice (45) | [ ] Eminent domain/Inverse condemnation (14) | [ ] Environmental/Toxic tort (30) |
| [ ] Other PI/PD/WD (23) | [ ] Wrongful eviction (33) | [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41) |
| **Non-PI/PD/WD (Other) Tort** | [ ] Other real property (26) | **Enforcement of Judgment** |
| [ ] Business tort/unfair business practice (07) | **Unlawful Detainer** | [ ] Enforcement of judgment (20) |
| [ ] Civil rights (08) | [ ] Commercial (31) | **Miscellaneous Civil Complaint** |
| [ ] Defamation (13) | [ ] Residential (32) | [ ] RICO (27) |
| [ ] Fraud (16) | [ ] Drugs (38) | [ ] Other complaint *(not specified above)* (42) |
| [ ] Intellectual property (19) | **Judicial Review** | **Miscellaneous Civil Petition** |
| [ ] Professional negligence (25) | [ ] Asset forfeiture (05) | [ ] Partnership and corporate governance (21) |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Petition re: arbitration award (11) | [ ] Other petition *(not specified above)* (43) |
| **Employment** | [ ] Writ of mandate (02) | |
| [ ] Wrongful termination (36) | [ ] Other judicial review (39) | |
| [ ] Other employment (15) | | |

2. This case [ ] is  [X] is not  complex under rule 1800 of the California Rules of Court. If case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties   d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel   e. [ ] Coordination with related actions pending in one or more courts issues that will be time-consuming to resolve       in other counties, states or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence   f. [ ] Substantial post-judgment judicial supervision

3. Type of remedies sought *(check all that apply):*
   a. [X] monetary   b. [X] nonmonetary; declaratory or injunctive relief   c. [X] punitive

4. Number of causes of action *(specify):* 15

5. This case [ ] is  [X] is not  a class action suit.

Date: February 24, 2005

Mark D. Kremer
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate, Family, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a complex case, this cover sheet shall be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2003]

**CIVIL CASE COVER SHEET**

Legal Solutions Plus

Cal. Rules of Court, rules 201.8, 1800–1812,
Standards of Judicial Administration, § 19

EXHIBIT 15

PAGE 305

# ORIGINAL

| SHORT TITLE | Farhad Larian v. Morad Zarabi, et al. | CASE NUMBER | BC329501 |
|---|---|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

This form is required pursuant to LASC Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.

Item I. Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? [X] YES  CLASS ACTION? [ ] YES  LIMITED CASE? [ ] YES  TIME ESTIMATED FOR TRIAL 7___ HOURS/ [X] DAYS.

Item II. Select the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III. Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column A, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column B below which best describes the nature of this case.

**Step 3:** In Column C, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Los Angeles Superior Court Local Rule 2.0.

| Applicable Reasons for Choosing Courthouse Location (See Column C below) |
|---|

1. Class Actions must be filed in the County Courthouse, Central District.
2. May be filed in Central (Other county, or no Bodily Injury/Property Damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.

**Step 4:** Fill in the information requested on page 4 in Item IV. Sign the declaration.

| | A Civil Case Cover Sheet Category No. | B Type of Action (Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | [ ] A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | [ ] A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/Property Damage/Wrongful Death Tort** | Asbestos (04) | [ ] A6070  Asbestos Property Damage | 2. |
| | | [ ] A7221  Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | [ ] A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | [ ] A7210  Medical Malpractice - Physicians & Surgeons | 1., 2., 4. |
| | | [ ] A7240  Other Professional Health Care Malpractice | 1., 2., 4. |
| | Other Personal Injury Property Damage Wrongful Death (23) | [ ] A7250  Premises Liability (e.g., slip and fall) | 1., 2., 4. |
| | | [ ] A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 2., 4. |
| | | [ ] A7270  Intentional Infliction of Emotional Distress | 1., 2., 3. |
| | | [ ] A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | [ ] A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., 3. |
| | Civil Rights (08) | [ ] A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | [ ] A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | [ ] A6013  Fraud (no contract) | 1., 2., 3. |
| | Intellectual Property (19) | [ ] A6016  Intellectual Property | 2., 3. |

CIV 109 03-04
LASC Approved

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 1 of 4
LA-481

EXHIBIT ___15___

PAGE ___306___

SHORT TITLE: Farhad Larian v. Morad Zarabi, et al.    CASE NUMBER

| A<br>Civil Case Cover<br>Sheet Category No. | | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons<br>- See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/Property Damage/Wrongful Death Tort (Cont'd.)** Professional Negligence (25) | ☐ | A6017  Legal Malpractice | 1., 2., 3. |
| | ☐ | A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| Other (35) | ☐ | A6025  Other Non-Personal Injury/Property Damage tort | 2., 3. |
| **Employment** Wrongful Termination (36) | ☐ | A6037  Wrongful Termination | 1., 2., 3. |
| Other Employment (15) | ☐ | A6024  Other Employment Complaint Case | 1., 2., 3. |
| | ☐ | A6109  Labor Commissioner Appeals | 10. |
| **Contract** Breach of Contract/ Warranty (06) (not insurance) | ☐ | A6004  Breach of Rental/Lease Contract (not Unlawful Detainer or wrongful eviction) | 2., 5. |
| | ☐ | A6008  Contract/Warranty Breach-Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | ☐ | A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | ☐ | A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| Collections (09) | ☐ | A6002  Collections Case-Seller Plaintiff | 2., 5., 6. |
| | ☐ | A6012  Other Promissory Note/Collections Case | 2., 5. |
| Insurance Coverage (18) | ☐ | A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| Other Contract (37) | ☒ | A6009  Contractual Fraud | 1., ②, 3., 5. |
| | ☐ | A6031  Tortious Interference | 1., 2., 3., 5. |
| | ☐ | A6027  Other Contract Dispute (not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Real Property** Eminent Domain/Inverse Condemnation (14) | ☐ | A7300  Eminent Domain/Condemnation   Number of parcels _____ | 2. |
| Wrongful Eviction (33) | ☐ | A6023  Wrongful Eviction Case | 2., 6. |
| Other Real Property (26) | ☐ | A6018  Mortgage Foreclosure | 2., 6. |
| | ☐ | A6032  Quiet Title | 2., 6. |
| | ☐ | A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer** Unlawful Detainer - Commercial (31) | ☐ | A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| Unlawful Detainer - Residential (32) | ☐ | A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| Unlawful Detainer - Drugs (38) | ☐ | A6022  Unlawful Detainer-Drugs | 2., 6. |
| **Judicial Review** Asset Forfeiture (05) | ☐ | A6108  Asset Forfeiture Case | 2., 6. |
| Petition re Arbitration (11) | ☐ | A6115  Petition to Compel/Confirm/ Vacate Arbitration | 2., 5. |

CIV 109 03-04
LASC Approved

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 2 of 4

EXHIBIT ___15___

PAGE ___307___

| | SHORT TITLE: Farhad Larian v. Morad Zarabi, et al. | CASE NUMBER | |
|---|---|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review (Cont'd.)** | Writ of Mandate<br>(02) | ☐ A6151  Writ - Administrative Mandamus<br>☐ A6152  Writ - Mandamus on Limited Court Case Matter<br>☐ A6153  Writ - Other Limited Court Case Review | 2., 8.<br>2.<br>2. |
| | Other Judicial Review (39) | ☐ A6150  Other Writ / Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007  Construction defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement of Judgment<br>(20) | ☐ A6141  Sister State Judgment<br>☐ A6160  Abstract of Judgment<br>☐ A6107  Confession of Judgment (non-domestic relations)<br>☐ A6140  Administrative Agency Award (not unpaid taxes)<br>☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax<br>☐ A6112  Other Enforcement of Judgment Case | 2., 9.<br>2., 6.<br>2., 9.<br>2., 8.<br>2., 8.<br>2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints (Not Specified Above)<br>(42) | ☐ A6030  Declaratory Relief Only<br>☐ A6040  Injunctive Relief Only (not domestic/harassment)<br>☐ A6011  Other Commercial Complaint Case (non-tort/non-complex)<br>☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8.<br>2., 8.<br>1., 2., 8.<br>1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership/Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions (Not Specified Above)<br>(43) | ☐ A6121  Civil Harassment<br>☐ A6123  Workplace Harassment<br>☐ A6124  Elder/Dependent Adult Abuse Case<br>☐ A6190  Election Contest<br>☐ A6110  Petition for Change of Name<br>☐ A6170  Petition for Relief from Late Claim Law<br>☐ A6100  Other Civil Petition | 2., 3., 9.<br>2., 3., 9.<br>2., 3., 9.<br>2.<br>2., 7.<br>2., 3., 4., 8.<br>2., 9. |

CIV 109 03-04
LASC Approved

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 3 of 4

EXHIBIT ___15___

PAGE ___308___

| SHORT TITLE Farhad Larian v. Morad Zarabi, et al. | CASE NUMBER |
|---|---|

**Item III.** Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3** on Page 1, as the proper reason for filing in the court location you selected.

| REASON: CHECK THE NUMBER UNDER COLUMN C WHICH APPLIES IN THIS CASE | ADDRESS. |
|---|---|
| ☐1. ☒2. ☐3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | 20120 Plummer Street |

| CITY: Chatsworth | STATE. CA | ZIP CODE: 91311 |
|---|---|---|

**Item IV.** *Declaration of Assignment:* I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the <u>Stanley Mosk</u> _____ courthouse in the <u>Central</u>_____ District of the Los Angeles Superior Court (Code of Civ. Proc., § 392 et seq., and LASC Local Rule 2.0, subds. (b), (c) and (d)).

Dated: <u>February 24, 2005</u>

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

---

### PLEASE HAVE THE FOLLOWING DOCUMENTS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet form JC 982.2(b)(1).
4. Complete Addendum to Civil Case Cover Sheet form CIV 109 _____ (eff. Date).
5. Payment in full of the filing fee, unless fees have been waived.
6. Signed order appointing the Guardian ad Litem, JC form 982(a)(27), if the plaintiff or petitioner is a minor under 18 years of age, or if required by Court.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

CIV 109 03-04
LASC Approved

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 4 of 4

EXHIBIT ___15___

PAGE ___309___

**EXHIBIT 16**

Westlaw.

123 Cal.App.4th 751                                                                  Page 1

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004
Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

**H**
Larian v. Larian
Cal.App. 2 Dist.,2004.

Court of Appeal, Second District, Division 5,
California.
Farhad LARIAN, Plaintiff and Respondent,
v.
Isaac LARIAN, Defendant and Appellant.
No. B171891.

Oct. 28, 2004.
As Modified on Denial of Rehearing Nov. 16, 2004.

**Background:** Shareholder in family corporation
sued president of corporation, alleging, inter alia,
fraud in arbitration process leading to shareholder's
sale of shares at below market value. President
moved to compel arbitration pursuant to parties'
agreement to arbitrate. The Superior Court, Los
Angeles County, No. BC301371,Rodney E. Nelson,
J., denied motion, and president appealed.

**Holding:** The Court of Appeal, Turner, P.J., held
that there was no evidence of fraud in inception or
execution of arbitration agreement, and thus
shareholder's claim that president's fraud was
sufficient to warrant nonenforcement of arbitration
agreement was to be resolved in arbitral forum.

Reversed with directions.

Mosk, J., filed an opinion concurring in the result.
West Headnotes
**[1] Alternative Dispute Resolution 25T ☞117**

25T Alternative Dispute Resolution
  25TII Arbitration

25TII(A) Nature and Form of Proceeding
    25Tk117 k. Preemption. Most Cited Cases
(Formerly 33k2.2 Arbitration)

**States 360 ☞18.15**

360 States
  360I Political Status and Relations
    360I(B) Federal Supremacy; Preemption
      360k18.15 k. Particular Cases, Preemption
or Supersession. Most Cited Cases
(Formerly 33k2.2 Arbitration)
The United States Arbitration Act was inapplicable
to judicial resolution of arbitration agreement that
provided that California law applied. 9 U.S.C.A. § 1
et seq.

**[2] Alternative Dispute Resolution 25T ☞113**

25T Alternative Dispute Resolution
  25TII Arbitration
    25TII(A) Nature and Form of Proceeding
      25Tk113 k. Arbitration Favored; Public
Policy. Most Cited Cases
(Formerly 33k1.2 Arbitration)
California law favors enforcement of arbitration
agreements.

**[3] Alternative Dispute Resolution 25T ☞139**

25T Alternative Dispute Resolution
  25TII Arbitration
    25TII(B) Agreements to Arbitrate
      25Tk136 Construction
        25Tk139 k. Construction in Favor of
Arbitration. Most Cited Cases
(Formerly 33k7.1 Arbitration)
Any doubts as to whether an arbitration clause
applies to a particular dispute should be resolved in
favor of requiring the parties to arbitrate.

**[4] Alternative Dispute Resolution 25T ☞112**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT _____ 16
PAGE _____ 310

123 Cal.App.4th 751                                                                                              Page 2

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(A) Nature and Form of Proceeding
            25Tk112 k. Contractual or Consensual Basis. Most Cited Cases
        (Formerly 33k2.2 Arbitration)

**Alternative Dispute Resolution 25T ☞134(1)**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk131 Requisites and Validity
                25Tk134 Validity
                    25Tk134(1) k. In General. Most Cited Cases
        (Formerly 33k6.2 Arbitration)
The right to compel arbitration depends upon the existence of a valid agreement to arbitrate between the parties, and this question is determined by reference to the law applicable to contracts generally.

**[5] Alternative Dispute Resolution 25T ☞112**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(A) Nature and Form of Proceeding
            25Tk112 k. Contractual or Consensual Basis. Most Cited Cases
        (Formerly 33k1.1 Arbitration)
Although California has a strong public policy in favor of arbitration, there is no preference for the arbitral forum when the parties have not agreed to arbitrate.

**[6] Alternative Dispute Resolution 25T ☞210**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(D) Performance, Breach, Enforcement, and Contest
            25Tk204 Remedies and Proceedings for Enforcement in General
                25Tk210 k. Evidence. Most Cited Cases
        (Formerly 33k23.10 Arbitration)
Before a party may be compelled to arbitrate a

claim, the petitioning party has the burden of proving the existence of a valid arbitration clause and the dispute is covered by the agreement.

**[7] Alternative Dispute Resolution 25T ☞210**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(D) Performance, Breach, Enforcement, and Contest
            25Tk204 Remedies and Proceedings for Enforcement in General
                25Tk210 k. Evidence. Most Cited Cases
        (Formerly 33k23.10 Arbitration)
If a party moving to compel arbitration meets its burden of proving the existence of a valid arbitration clause and the dispute is covered by the agreement, the opponent of arbitration has to prove by a preponderance of the evidence any defense to the petition or motion to compel the dispute to be arbitrated.

**[8] Alternative Dispute Resolution 25T ☞134(3)**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk131 Requisites and Validity
                25Tk134 Validity
                    25Tk134(3) k. Validity of Assent. Most Cited Cases
        (Formerly 33k6.2 Arbitration)
There was no evidence of fraud in inception or execution of agreement to arbitrate between shareholder and president of family corporation, and thus shareholder's claim that president's fraud in arbitration process, leading to shareholder's sale of shares at below market value, was sufficient to warrant nonenforcement of arbitration agreement was to be resolved in arbitral forum; shareholder's evidence indicated only fraud in inducement, which was not sufficient to render agreement unenforceable.
*See 6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, §§ 501, 502; Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2003) ¶ 5:112 et*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT _____14_____

PAGE _____311_____

123 Cal.App.4th 751

Page 3

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

seq. (CAADR Ch. 5-D); Cal. Jur. 3d, Arbitration and Award, § 36; Cal. Civil Practice (Thomson/West 2003) Procedure, § 26:49.

**917 Kaye Scholer LLP, Larry R. Feldman, Robert M. Turner, and J. Andrew Sjoblom, Los Angeles, for Defendant and Appellant.

Howarth & Smith, Don Howarth, Suzelle M. Smith, Brian D. Bubb, and Robert D. Brain, Los Angeles, for Plaintiff and Respondent.TURNER, P.J.

*754 I. INTRODUCTION

Defendant, Isaac Larian, appeals from an order denying his motion to compel arbitration. The lawsuit containing numerous causes of action was filed by plaintiff, Farhad Larian. Plaintiff and defendant are brothers. We conclude there is no evidence the parties signed the September 28, or December 4, 2000, arbitration agreements because of any fraud in the inception or execution as defined by the California Supreme Court in *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 415-416, 58 Cal.Rptr.2d 875, 926 P.2d 1061. In the absence of evidence of fraud in the inception or execution of the September 28 or December 4, 2000, arbitration agreements, the trial court was required to grant defendant's motion to compel the parties to arbitrate their dispute. We reverse the order denying the motion to compel arbitration.

II. BACKGROUND

A. The Complaint

The complaint, containing 10 causes of action, was filed on August 25, 2003. It alleges plaintiff and defendant formed an equal partnership in 1979 to import and distribute name brand consumer products. In 1982, the partnership was incorporated as a closely held corporation, ABC International Traders, Inc. In 1985 or 1986, plaintiff and defendant sold 10 percent of their stock to their brother-in-law. After the sale, plaintiff and defendant each owned 45 percent of the stock of the

company. In 1994, plaintiff and defendant became equal 45 percent shareholders in MGA Hong Kong, Limited and operated part of ABC International Traders, Inc. through this entity. In 2002, the name of ABC International Traders, Inc. was changed to MGA Entertainment, Inc. In 1993, plaintiff and defendant began having disputes over the operation of the company. Plaintiff and defendant discussed having one brother buy out the other's equity interest. An outside appraisal of the company valued the company at $35 million to $40 million.

**918 By 1999, defendant, as president, assumed control of sales, product development, and financial matters. Plaintiff was less involved in the day-to-day sales and financial control of the company. In late 1999 or early 2000, *755 defendant became aware of "Bratz" dolls, a new product line which had a tremendous potential. The complaint alleges that, after learning of the product line, defendant devised a plan to keep the business opportunity, the Bratz doll product line, secret from plaintiff and to gain control of the company. The complaint alleged that defendant intended to gain control of MGA Entertainment, Inc. by buying plaintiff's shares at a depressed value. The buyout would not include the potential business opportunity involving the new doll line.

In "early" 2000, defendant called a meeting to discuss the new Bratz product line with selected members of the company. Defendant concealed the meeting and discussion about the proposed new product line from plaintiff. In February 2000, defendant tried to dissuade plaintiff from attending the New York Toy Fair. Plaintiff had routinely attended the New York Toy Fair in the past. Defendant was furious with plaintiff for attending the toy fair, where discussions and research for market potential and new product lines take place. Defendant expelled plaintiff from meetings plaintiff tried to attend. Plaintiff was excluded from any discussions defendant may have had relating to the Bratz product line at the fair.

In early March 2000, defendant offered to purchase all of plaintiff's 45 percent interest in the company, MGA Entertainment, Inc., for $9 million. The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __14__

PAGE __312__

Page 4

123 Cal.App.4th 751

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

offer was based on a total value of the company at $20 million. This did not include plans and actions already taken regarding the Bratz product line, which allegedly would bring $3 billion in sales in the next few years. The financial information at the company was handled by defendant and its controller, Dennis Medici.

The complaint further alleged that throughout 2000, defendant repeatedly and routinely shared with plaintiff misleading financial information showing the company was performing poorly. In May 2000, defendant instructed Mr. Medici not to share any information about the financial operation of MGA Entertainment, Inc. with plaintiff. Defendant continued to conceal the company's plans and actions regarding the new doll line.

It is alleged that, on September 18, 2000, defendant caused the company to enter into a worldwide licensing agreement of the Bratz dolls and related items. Defendant concealed the existence of the licensing agreement from plaintiff. During September 2000, defendant continued to seek to buy plaintiff's interest in MGA Entertainment, Inc. The complaint alleges: "[Defendant] kept the Bratz opportunity and other information about the true financial *756 condition of the Company hidden from [plaintiff] in an effort to secure [plaintiff's] agreement to a proposed arbitration process with their uncle, Morad Zarabi. [Defendant] agreed, and induced [plaintiff] to agree, to the arbitration process without disclosing that during the arbitration he would conceal the Company's plans and actions undertaken regarding the Bratz line, and other financial information about the Company so that such information would not be included in Mr. Zarabi's valuation of the Company."

On September 28, 2000, plaintiff and defendant executed an "Agreement to Arbitrate and Selection of Arbitrator." Plaintiff alleges he was unaware of the true facts before executing the arbitration agreement; had he known the true facts, he would not have entered into the agreement to arbitrate and would not have **919 agreed to sell his shares; he would have placed greater restrictions and obligations on the powers of any arbitrator

including a requirement that the company be valued by an independent appraiser outside of the family; and defendant fraudulently concealed the true facts from plaintiff and the arbitrator during the arbitration process.

On December 4, 2000, as a result of the September 28, 2000, agreement to arbitrate the sale of the stock, the parties entered into a settlement and resolution of their differences, whereby plaintiff agreed to sell his shares to defendant at a below fair market price of less than $9 million. Plaintiff discovered the true facts in spring or summer 2002. Plaintiff requested rescission and damages based on the following theories: fraud and deceit in the inducement of the arbitration agreement (first); fiduciary duties breach (second); fraud and deceit in the arbitration process (third); breach of the implied covenant of good faith and fair dealing in the arbitration agreement (fourth); violation of California Corporations Code (fifth and sixth); fraud and deceit regarding the December 4, 2000 agreement (seventh); negligent misrepresentation (eighth); unfair competition in violation of Business and Professions Code section 17200 et seq. (ninth); and rescission based on mistake (10th).

B. The Motion to Compel Arbitration

On October 24, 2003, defendant moved to compel arbitration of the action on the grounds the parties entered into a broad arbitration agreement which covers the disputes alleged in the complaint; by executing the September 28, 2000, agreement, plaintiff agreed to submit the fraud claim asserted in the complaint to the arbitrator; and the arbitrator must decide the fraud claims as a matter of law. In support of the motion, defendant attached a copy of the *757 September 28, 2000, arbitration agreement. Paragraph 5 of the September 28, 2000, arbitration agreement gave an uncle, Morad Zarabi, the power to arbitrate the disputes between the brothers.

Defendant declared that the parties participated in the arbitration. The arbitrator, Mr. Zarabi, retained an appraiser, an accountant, and attorneys. Mr.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ___ 14
PAGE ___ 313

Page 5

123 Cal.App.4th 751

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004
Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

Zarabi also gathered information and conducted hearings. In December 2000, Mr. Zarabi, the arbitrator, issued his award. The December 4, 2000, agreement required defendant to purchase plaintiff's stock. According to defendant, "[The award] was embodied in the Agreement for Sale of Stock drafted by the arbitrator's attorneys, Stern & Goldberg." Under the terms of the December 4, 2000, agreement, plaintiff was to receive $8,775,000 for his stock. For the stock, defendant was to pay. plaintiff $500,000 at the closing of escrow. Defendant was also obligated to execute a promissory note for the balance. Under the terms of the promissory note, defendant was required to pay plaintiff $2 million by April 15, 2001. . Moreover, defendant was obligated to pay plaintiff $83,798.90 commencing the first of each month commencing June 1, 2001. Interest was to accrue at the rate of 9.5 percent per annum on unpaid sums. Paragraph 9 of the December 4, 2000, sales agreement contains the following arbitration clause: "[A]ny controversy between the parties arising out of this Agreement or the Agreements contained in the Exhibits attached hereto shall be submitted to [Mr. Zarabi] who shall serve as sole arbitrator with respect to said disputes. The decision of [Mr. Zarabi] shall be final and binding upon both parties."

On January 26, 2003, plaintiff submitted a list of claims to the arbitrator, Mr. Zarabi. Plaintiff asserted these claims were subject to arbitration. The list included: "The December 2000 appraisal of MGA, **920 which the arbitrator relied upon to establish the value of MGA, was substantially understated as a result of [defendant's] concealment of the Bratz doll license agreement. That license agreement was material to the value of MGA but was not considered in setting MGA's value because of [defendant's] concealment from the arbitrator."

Plaintiff opposed the motion to compel arbitration on the grounds that the court, not the arbitrator, must decide whether a party was fraudulently induced to consent to an arbitration agreement; fraud in the inducement of the arbitration agreement was not submitted to any arbitrator; and the court should resolve the fraud in the inducement claim because

the arbitration proceedings could be void. Plaintiff declared that on September 18, 2000, defendant secretly finalized and obtained a worldwide license agreement for *758 the Bratz dolls. The September 18, 2000, agreement provided that defendant and MGA Entertainment, Inc. were the exclusive worldwide distributors of Bratz dolls and related products. Ten days later, on September 28, 2000, defendant induced plaintiff to sign the arbitration agreement without disclosing the Bratz opportunity and licenses. The Bratz product line has . generated several hundred million dollars in revenues for MGA Entertainment, Inc. and is expected to earn more than $1 billion annually for the company. Further, according to plaintiff, Mr. Zarabi never returned an award. Rather, the December 4, 2000, stock sale agreement was the result . of negotiations between plaintiff and defendant.

In reply to the opposition, defendant argued plaintiff did not dispute the critical facts which required arbitration of the dispute. Those facts included that the parties agreed to arbitrate the sale of the stock in September 2000. Mr. Zarabi, the arbitrator, decided which party should sell his stock to the other and the price. On December 4, 2000, the brothers signed the sales agreement incorporating the price and terms as determined by the arbitrator, Mr. Zarabi. The parties have fully performed the sales transaction. Defendant contended plaintiff submitted the fraud issue to the arbitrator in January 2003. Defendant further argued that the complaint only alleges fraud during the events leading up to the agreements; it does not allege facts showing fraud in the inducement or execution of the arbitration clauses. According to defendant, the issue of whether he fraudulently withheld information during the arbitration process must be decided by the arbitrator.

The trial court denied the motion to compel concluding that the allegation of fraud in the execution of the arbitration agreement as alleged in the complaint must be decided by the court. In denying the motion, the court cited Code of Civil Procedure section 1281 [FN1]; *Rosenthal v. Great Western Fin. Securities Corp.*, supra, 14 Cal.4th at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ____ 14

PAGE ____ 314

123 Cal.App.4th 751

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

Page 6

page 419, 58 Cal.Rptr.2d 875, 926 P.2d 1061; and *Bolter v. Superior Court* (2001) 87 Cal.App.4th 900, 906, 104 Cal.Rptr.2d 888. The trial court ruled that the complaint adequately alleged that had plaintiff known about the pending Bratz product line, he would not have: signed the arbitration agreement, agreed to participate in the arbitration, and agreed to sell his shares in MGA Entertainment, Inc. The trial court further ruled: "It is true ... that there are references to the arbitration process in the [f]irst [c]ause of [a]ction. The concealment of the Bratz line from the arbitrator was a **921 ... piece of the process. That is, plaintiff would have no complaint if the full facts had been revealed in the arbitration. Both those references do not eliminate the allegations that he would not have entered into the arbitration agreement but for the alleged fraud."

FN1. All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

*759 III. Discussion

A. Overview

[1][2][3][4][5] The outcome of this appeal is controlled by the provisions of the California Arbitration Act. The September 28, 2000, arbitration agreement explicitly provides it is subject to the California Arbitration Act. Further, the December 4, 2000, agreement provides it is to be applied pursuant to California law. Hence, the United States Arbitration Act, title 9 United States Code section 1 et seq., is inapplicable to this appeal. (*Volt Information Sciences, Inc. v. Board of Trustees of Leland* (1989) 489 U.S. 468, 470, 109 S.Ct. 1248, 103 L.Ed.2d 488; accord, *Mount Diablo Medical Center v. Health Net of California, Inc.* (2002) 101 Cal.App.4th 711, 714-726, 124 Cal.Rptr.2d 607.) California law favors enforcement of arbitration agreements. (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 97, 99 Cal.Rptr.2d 745, 6 P.3d 669; *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9, 10 Cal.Rptr.2d 183,

832 P.2d 899.)Section 1281 provides: "A written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." The trial court has authority to compel arbitration pursuant to section 1281.2, which provides in part: "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, unless it determines that ... [¶] (b) Grounds exist for the revocation of the agreement." Plaintiff argues that he was fraudulently induced to enter into the September 28, 2000, arbitration agreement. It is this fraud that plaintiff argues warrants revocation, or to be more precise, nonenforcement of the September 28, 2000, arbitration agreement. Any doubts as to whether an arbitration clause applies to a particular dispute should be resolved in favor of requiring the parties to arbitrate. (*Vianna v. Doctors' Management Co.* (1994) 27 Cal.App.4th 1186, 1189, 33 Cal.Rptr.2d 188; *United Transportation Union v. Southern Cal. Rapid Transit Dist.* (1992) 7 Cal.App.4th 804, 808, 9 Cal.Rptr.2d 702.) However, the right to compel arbitration depends upon the existence of a valid agreement to arbitrate between the parties. (*County of Contra Costa v. Kaiser Foundation Health Plan, Inc.* (1996) 47 Cal.App.4th 237, 245, 54 Cal.Rptr.2d 628; *Marsch v. Williams* (1994) 23 Cal.App.4th 250, 255, 28 Cal.Rptr.2d 398.) The question of whether a valid agreement to arbitrate exists is determined by reference to the law applicable to contracts generally.*760 *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 971-973, 64 Cal.Rptr.2d 843, 938 P.2d 903; *Kinney v. United HealthCare Services, Inc.* (1999) 70 Cal.App.4th 1322, 1327-1328, 83 Cal.Rptr.2d 348.) Although, as noted, California has a strong public policy in favor of arbitration, there is no preference for the arbitral forum when the parties have not agreed to arbitrate. (*Freeman v. State Farm Mut. Auto. Ins. Co.* (1975) 14 Cal.3d 473, 481, 121 Cal.Rptr. 477, 535 P.2d 341; *Cione v. Foresters Equity Services, Inc.* (1997) 58

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ___14___

PAGE ___315___

123 Cal.App.4th 751

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

Cal.App.4th 625, 634, 68 Cal.Rptr.2d 167.)

**922 [6][7] Before a party may be compelled to arbitrate a claim, the petitioning party has the burden of proving the existence of a valid arbitration clause and the dispute is covered by the agreement. (*Engalla v. Permanente Medical Group, Inc., supra,* 15 Cal.4th at p. 972, 64 Cal.Rptr.2d 843, 938 P.2d 903; *Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at pp. 413-414, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) If the moving party meets its burden, the opponent of arbitration has to prove by a preponderance of the evidence any defense to the petition or motion to compel the dispute to be arbitrated. (*Engalla v. Permanente Medical Group, Inc., supra,* 15 Cal.4th at p. 972, 64 Cal.Rptr.2d 843, 938 P.2d 903; *Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 413, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) Each case must be decided on its own facts. (*King v. Larsen Realty, Inc.* (1981) 121 Cal.App.3d 349, 357, 175 Cal.Rptr. 226; *Williams Constr. Co. v. Standard-Pacific Corp.* (1967) 254 Cal.App.2d 442, 454, 61 Cal.Rptr. 912.)

B. Supreme Court Authority

Three Supreme Court decisions define the limited scope of judicial review of a claim that fraud prevents enforcement of an arbitration clause. In *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 315, 197 Cal.Rptr. 581, 673 P.2d 251, a lease contained an arbitration clause. A dispute arose about the air conditioning in the premises and the tenant, a law firm, filed suit. The tenant argued it was fraudulently induced to enter into the lease which contained the arbitration clause. The trial court accepted the tenant's fraudulent inducement defense to the arbitration clause contention. The trial court entered an order denying the lessor's motion to compel arbitration.

The Supreme Court held that claims of fraud in the inducement must be resolved by the arbitrator: " Therefore, in the absence of indication of contrary intent, and where the arbitration clause is.

reasonably susceptible of such an interpretation, claims of fraud in the inducement of the contract (as distinguished from claims of fraud directed to the arbitration clause itself) *761 will be deemed subject to arbitration." (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street, supra,* 35 Cal.3d at p. 323, 197 Cal.Rptr. 581, 673 P.2d 251.) Associate Justice Joseph R. Grodin then explained that the trial court's order denying the motion to compel the parties to arbitrate because of the fraudulent representations which induced the tenant to execute the lease which contained the arbitration clause was in error: " Indeed, the claim of substantive breach-that the air conditioning did not perform properly-is totally embraced within the claim of fraud-that the lessor knew, at the time of the lease, that the air conditioning would not perform. Thus, if the trial court were to proceed to determine the fraud claim it would almost certainly have to decide the claim of substantive breach as well, and the original expectations of the parties-that such questions would be determined through arbitration-would be totally defeated. However the fraud claim were determined, there would be virtually nothing left for the arbitrator to decide. We conclude that the arbitration clause is broad enough to include this claim of fraud in the inducement." (*Id.* at p. 324, 197 Cal.Rptr. 581, 673 P.2d 251.)

In *Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at page 415, 58 Cal.Rptr.2d 875, 926 P.2d 1061, the Supreme Court explained the distinction between arbitrable and nonarbitrable fraud claims which are asserted as grounds for voiding an arbitration clause: **923 " California law distinguishes between fraud in the ' execution' or 'inception' of a contract and fraud in the 'inducement' of a contract. In brief, in the former case " 'the fraud goes to the inception or execution of the agreement, so that the promisor is deceived as to the nature of his act, and actually does not· know what he is signing, or does not intend to enter into a contract at all, mutual assent is lacking, and [the contract] is *void.* In such a case it may be disregarded without the necessity of rescission.' "(*Ford v. Shearson Lehman American Express, Inc.* (1986) 180 Cal.App.3d 1011, 1028

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT _____ 14
PAGE _____ 316

Page 8

123 Cal.App.4th 751

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

[225 Cal.Rptr. 895].) Fraud in the inducement, by contrast, occurs when " 'the promisor knows what he is signing but his consent is *induced* by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is *voidable*. In order to escape from its obligations the aggrieved party must *rescind....* ' " (*Ibid.*)"(*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 415, 58 Cal.Rptr.2d 875, 926 P.2d 1061; see *Pacific State Bank v. Greene* (2003) 110 Cal.App.4th 375, 389, fn. 7, 1 Cal.Rptr.3d 739.)

The Supreme Court then explained that when fraud in the inception or execution of the *arbitration clause* is present (the first of the two types of fraud identified in the immediately preceding citation), the dispute is not arbitrable: "[C]laims of fraud in the execution of the entire agreement are not arbitrable under either state or federal law. If the entire contract is void *ab initio* because of fraud, the parties have not agreed to arbitrate any controversy . ... [¶] [By contrast,] fraud in the inducement relating to other *762 contractual terms does not render the arbitration agreement unenforceable, even when it might justify rescission of the contract as a whole. By entering into the arbitration agreement, the parties established their intent that disputes coming within the agreement's scope be determined by an arbitrator rather than a court; this contractual intent must be respected even with regard to claims of fraud in the inducement of the contract generally." (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 416, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) The Supreme Court summarized its analysis thusly: "Claims that a party has employed fraud in inducing consent specifically to the arbitration agreement (e.g., by actively concealing its existence or misrepresenting its meaning or value) are, under *Prima Paint* [ *v. Flood & Conklin* (1967) 388 U.S. 395, 404, 87 S.Ct. 1801], to be decided by the court, because they go to the valid making of the arbitration clause itself. Claims that, due to fraud in the execution of the agreement as a whole, the parties reached no contract containing an arbitration clause, are also to be decided by the court. But claims that the contract as a whole was obtained through fraud in the inducement are, in the absence of evidence of

the parties' contrary intent, arbitrable under *Prima Paint.* Included in this rule of arbitrability are claims of a 'grand scheme' of fraud, or fraud ' permeating' the transaction." (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 419, 58 Cal.Rptr.2d 875, 926 P.2d 1061.)

In *Rosenthal,* when defining fraud in the inception or execution as it relates to an arbitration clause, the Supreme Court adverted directly to section 163 of the Restatement Second of Contracts including comments a and c, at pages 443-444. (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 420, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) Section 163 of the Restatement Second of Contracts which is part of the discussion of misrepresentation states, "If a misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears**924 to be a manifestation of assent by one who neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract, his conduct is not effective as a manifestation of assent." Comment a to section 163 of the Restatement Second of Contracts which is cited in *Rosenthal* states in part: "*Rationale.* Under the general principle stated in § 19(2), a party's conduct is not effective as a manifestation of his assent unless he knows or has reason to know that the other party may infer from it that he assents. This Section involves an application of that principle where a misrepresentation goes to what is sometimes called the 'factum' or the 'execution' rather than merely the 'inducement.' If, because of a misrepresentation as to the character or essential terms of a proposed contract, a party does not know or have reasonable opportunity to know of its character or essential terms, then he neither knows nor has reason to know that the other party may infer from his conduct that he assents to that contract." Comment c to section 163 of the Restatement Second of *763 Contracts which is cited in *Rosenthal* part merely indicates that an agreement described in this provision is a "void contract."

In *Rosenthal,* the Supreme Court reviewed the evidence presented by the different plaintiffs in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ___16___

PAGE ___317___

123 Cal.App.4th 751                                                                    Page 9

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004
Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

order to determine whether there was fraud in the inception or execution of the arbitration agreement. The fraud in the inception or execution evidence as it related to the arbitration clauses in *Rosenthal* differed amongst the plaintiffs. For varying reasons, some plaintiffs had not read the agreements containing the arbitration clauses. The Supreme Court adopted the following test for evaluating the fraud in the inception or execution claims of the plaintiffs which were asserted as a basis for voiding the arbitration clauses: "California law, like the Restatement, requires that the plaintiff, in failing to acquaint himself or herself with the contents of a written agreement before signing it, not have acted in an objectively unreasonable manner. One party's misrepresentations as to the nature or character of the writing do not negate the other party's apparent manifestation of assent, if the second party had ' reasonable opportunity to know of the character or essential terms of the proposed contract.' (Rest.2d Contracts, § 163, p. 443.) If a party, with such reasonable opportunity, fails to learn the nature of the document he or she signs, such 'negligence' precludes a finding the contract is void for fraud in the execution. (*C.I.T. Corporation v. Panac* [ (1944) ] 25 Cal.2d [547,] 549 [154 P.2d 710].)[¶] It follows that one party's *unreasonable* reliance on the other's misrepresentations, resulting in a failure to read a written agreement before signing it, is an insufficient basis, under the doctrine of fraud in the execution, for permitting that party to avoid an arbitration agreement contained in the contract." ( *Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 423, 58 Cal.Rptr.2d 875, 926 P.2d 1061; see *Lovejoy v. A T & T Corp.* (2004) 119 Cal.App.4th 151, 161, 14 Cal.Rptr.3d 117; *Pacific State Bank v. Greene, supra,* 110 Cal.App.4th at p. 393, 1 Cal.Rptr.3d 739.) Based on this legal premise concerning the scope of fraud in the inception or execution, the Supreme Court concluded some of the plaintiffs acted unreasonably in not reading the arbitration clauses. As to these plaintiffs, the trial court was not authorized to pass on their fraud defenses posited in response to the motion to compel arbitration. (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at pp. 425-426, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) But the Supreme Court noted that other plaintiffs

who executed investment contracts containing**925 arbitration clauses, some of whom had very limited understandings of English, were blind, or suffered from Alzheimer's disease, could reasonably rely on defendants' agents' representations as to the contents of the agreements including the arbitration clauses. This latter group of plaintiffs were entitled to have the trial judge evaluate their fraud defenses to the arbitration clauses. (*Id.* at pp. 427-428, 58 Cal.Rptr.2d 875, 926 P.2d 1061; *Jones v. Adams Financial Services* (1999) 71 Cal.App.4th 831, 837, 84 Cal.Rptr.2d 151 [legally blind signatory to agreement suffering from dementia entitled to void arbitration clause on fraud in execution grounds].)

*764 It bears emphasis that *Rosenthal* merely held that a fraud in the inception or execution defense to an arbitration demand was to be decided by a judge. A party is still entitled to argue a fraud defense before an arbitrator as a ground for invalidating the arbitration clause. The Supreme Court cautioned, " Whether a fraud claim that is insufficient as a defense to an arbitration demand may, if proven, nonetheless form the basis for equitable or other relief in the arbitral forum, is a separate issue, with which we have no concern in this case." (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 423, 58 Cal.Rptr.2d 875, 926 P.2d 1061.)

The third Supreme Court case to hold that courts evaluate fraud in the inception or execution defense to an arbitration demand was *Engalla v. Permanente Medical Group, Inc., supra,* 15 Cal.4th at pages 973-984, 64 Cal.Rptr.2d 843, 938 P.2d 903. In *Engalla,* the plaintiffs presented evidence that defendant, a medical group, made misrepresentations concerning its arbitration clause. The relevant portion of the health care plan made the following representations as to the promised speed of the arbitration process provided by the medical group: " 'Within 30 days after initial service on a Respondent, Claimant and Respondent each shall designate an arbitrator and give written notice of such designation to the other, and Claimant shall forward $150, made payable to Kaiser Foundation [¶] Health Plan Arbitration Account, to Kaiser Foundation Health Plan.... This

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ___16___

PAGE ___318___

Page 10

123 Cal.App.4th 751

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

$150 will be deposited with Respondent's $150 in a special account maintained by Bank of America National Trust and Savings Association [and will] ... provide the initial funds to pay the fees of the neutral arbitrator and expenses of arbitration as approved by him or her.... Within 30 days after these notices have been given and payments made, the two arbitrators so selected shall select a neutral arbitrator and give notice of the selection to Claimant and all Respondents served, and the three arbitrators shall hold a hearing within a reasonable time thereafter ...."(*Id.* p. 962, fn. 3, 64 Cal.Rptr.2d 843, 938 P.2d 903.)There was evidence that in fact the arbitration process provided by the health care group took years to complete. The plaintiffs also presented evidence the medical group knew its agents would not timely appoint arbitrators nor move towards and arbitration hearing. (*Id.* at pp. 974-976, 64 Cal.Rptr.2d 843, 938 P.2d 903.) The Supreme Court concluded: "In sum, we conclude there is evidence to support the [plaintiffs'] claims that [the defendant] fraudulently induced [the plaintiffs] to enter the arbitration agreement in that it misrepresented the speed of its arbitration program, a misrepresentation on which [the plaintiffs'] employer relied by selecting [the defendant's] health plan for its employees, and that the [plaintiffs] suffered delay in the resolution of its malpractice dispute as a result of that reliance, despite [the plaintiffs'] own reasonable diligence. The trial court, on remand, must resolve conflicting factual evidence in order to properly adjudicate **926 [the defendant's] petition to compel arbitration." (*Engalla v. Permanente Medical Group, Inc., supra,* 15 Cal.4th at pp. 981-982, 64 Cal.Rptr.2d 843, 938 P.2d 903, fns. omitted.) It bears emphasis that the misrepresentations constituting fraud in *765 the inception or execution related to whether the extraordinarily dilatory arbitral method at issue was really consistent with the promised arbitration process. In other words, in *Engalla,* there was evidence that the arbitral forum the defendant provided was far different from the promised manner in which arbitration hearings are normally conducted. (Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2003) ¶ 5:116.1, pp. 5-59-5-60 (rev.# 1, 2002).)

[8] In this case, there is no evidence of fraud in the inception or execution of the agreement as it relates to the arbitration clause. There is no evidence that plaintiff, to paraphrase section 163 of the Restatement Second of Contracts, as cited in *Rosenthal,*"neither kn[ew] nor ha[d a] reasonable opportunity to know of the character or essential terms of the" September 28 or December 4, 2000, arbitration agreements. Rather, the only evidence adduced by plaintiff indicates he was induced to enter into the September 28 arbitration and December 4, 2000, stock sale agreements because of defendant's misrepresentations concerning the prospective Bratz doll venture and the financial status of MGA Entertainment, Inc. which is fraud in the inducement. There is no evidence, as in *Engalla,* that the arbitration before Mr. Zarabi resulting from the September 28, 2000, arbitration agreement was other than as promised or reasonably expected. Further, there is no evidence of any false representations concerning any contemplated arbitral proceedings that will result from the arbitration clause in the December 4, 2000, stock sale agreement. Whether the alleged fraud concerning the concealment of the value and business prospects of MGA Entertainment, Inc. is legally or equitably sufficient to warrant nonenforcement of the September 28 or December 4, 2000, arbitration agreements is to be resolved in the arbitral forum. (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 423, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) Hence, the trial court was required to grant the motion to compel arbitration.

Given our resolution of the fraud in the inception or execution issues, we need not address the parties' remaining contentions. Further, our resolution of the fraud in the inception or execution issues renders all of defendant's judicial notice and additional evidence requests moot. They are denied on that basis. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1058, fn. 6, 60 Cal.Rptr.2d 225, 929 P.2d 544 [judicial notice]; *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 89, fn. 26, 118 Cal.Rptr. 34, 529 P.2d 66 [new evidence on appeal].)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 16

PAGE 319

123 Cal.App.4th 751

Page 11

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004
Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

### IV. DISPOSITION

The order denying the petition to compel arbitration is reversed. Upon issuance of the remittitur, the trial court is to grant the motion to compel *766 arbitration and stay civil proceedings. Defendant, Isaac Larian, is awarded his costs on appeal from plaintiff, Farhad Larian.

I concur: GRIGNON, J.MOSK, J., Concurring.
I concur in the result.

There was an arbitration pursuant to the September 28, 2000 Agreement to Arbitrate and Selection of Arbitrator. The arbitrator issued an award. Thus, because the arbitration had already taken place, there was no need to compel arbitration **927 under that agreement. The parties entered into a new agreement on December 4, 2000, and pursuant to that agreement signed mutual general releases. Therefore, the only existing agreement between the parties was the December 4, 2000 agreement. That agreement contained an arbitration provision. I believe that arbitration should be compelled on the basis of that arbitration provision.

The December 4, 2000 agreement that contains the operative arbitration provisions includes the following choice-of-law clause. "This agreement shall be construed in accordance with and be governed by the laws of the State of California." The majority conclude that this clause renders the Federal Arbitration Act, title 9, United States Code section 1, et seq. (FAA) "inapplicable."

I am not so certain that the choice-of-law clause does exclude the application of the FAA. The issue is whether the applicable choice-of-law clause manifests an intention to be governed by California procedural rules applicable to arbitrations. (See *Mount Diablo Medical Center v. Health Net of California, Inc.* (2002) 101 Cal.App.4th 711, 722, 124 Cal.Rptr.2d 607.) In *Mastrobuono v. Shearson Lehman Hutton, Inc.* (1995) 514 U.S. 52, 58-59, 115 S.Ct. 1212, 131 L.Ed.2d 76, the United States Supreme Court concluded that a choice-of-law clause dealing with a clause specifying that the agreement "shall be governed by the laws of the State of New York" did not preclude the applicability of the FAA. In *Blue Cross of California v. Superior Court* (1998) 67 Cal.App.4th 42, 62-63, fn. 8, 78 Cal.Rptr.2d 779, we said that *Volt Information Sciences, Inc. v. Board of Trustees* (1989) 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488"does not stand for the proposition a general choice of law provision evidences in all cases an express intent to incorporate a state's arbitration rules into an arbitration agreement."

*767 If we did apply federal law, the result would be the same. Both federal and California state law have adopted the principle of separability by which the arbitrator is given the power to determine the validity of the contract without calling into question the validity of the arbitration clause from which he or she derives his or her power. (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 315, 197 Cal.Rptr. 581, 673 P.2d 251; *Prima Paint Corp. v. Flood & Conklin Mfg. Co.* (1967) 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270; 1 Domke on Commercial Arbitration (3d ed.2003) § 11.2, pp. 11.6-11.10.)

Accordingly, I agree with the conclusion of the majority.

Cal.App. 2 Dist.,2004.
Larian v. Larian
123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ___14___

PAGE ___320___

**EXHIBIT 17**

Morad Zarabi
20120 Plummer Street
Chatsworth, CA 91311

February 8, 2005

Facsimile Letter

Dear Gentlemen:

Please be advised that I am unavailable to act as an arbitrator regarding any disputes between Farhad Larian and Isaac Larian concerning the controversies that are the subject of my selection as arbitrator. For your reference, Kambiz Zarabi is also unavailable.

Accordingly, pursuant to paragraph 9 of the Sale Agreement, I am appointing Judicial Arbitration and Mediation Services, Inc. ("JAMS") as my successor arbitrator. The parties are instructed to select and hire one of the panel members with business dispute experience. If you are unable to agree upon an arbitrator within twenty (20) days after delivery of this letter, then JAMS is authorized to select the arbitrator for you in its discretion. Upon your advising me of the identity of the new arbitrator, I will forward all my files, including the original stock certificate evidencing the sale, to the new arbitrator. JAMS can be contacted at 213-620-1133.

Should you have any questions, please feel free to contact me in writing only.

Thank you and good luck,

Morad Zarabi

Cc:
By email:    Mr. Fred Larian
By email     Mr. Isaac Larian
             Mr. Ellis Stern
             Mr. Robert Turner Esq. – Attorney for Isaac Larian
             Mr. Mark D. Kremer – Attorney for Fred Larian

Exhibit 42
Page 1 of 1

EXHIBIT 17

PAGE 321

**EXHIBIT 18**

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 05/04/05

DEPT. 46

HONORABLE RODNEY E. NELSON          JUDGE   E. LOPEZ          DEPUTY CLERK

HONORABLE                           JUDGE PRO TEM          ELECTRONIC RECORDING MONITOR

C. VAUGHN/CTRM ASST   Deputy Sheriff   NONE          Reporter

| 8:30 am | BC301371 | | |
|---------|----------|---|---|
| | FARHAD LARIAN | Plaintiff Counsel | NO APPEARANCES |
| | VS | | |
| | ISAAC LARIAN ET AL | Defendant Counsel | |

NATURE OF PROCEEDINGS:

COURT ORDER

The Court is in receipt of Defendant's notice that the
parties are unable to agree to an arbitrator.

The Court hereby selects Retired Judge Alan B. Haber
as Arbitrator.

Counsel are to contact the Arbitrator and ensure that
proceedings are realized.

Clerk to give notice.

CLERK'S CERTIFICATE OF MAILING/
NOTICE OF ENTRY OF ORDER

I, the below named Executive Officer/Clerk of the
above-entitled court, do hereby certify that I am not
a party to the cause herein, and that this date I
served Notice of Entry of the above minute order of
05/04/2005 upon each party or counsel named below by
depositing in the United States mail at the courthouse
in Los Angeles, California, one copy of the
original entered herein in a separate sealed envelope
for each, addressed as shown below with the postage
thereon fully prepaid.

Date: May 4, 2005>

                    Page    1 of  2    DEPT. 46

MINUTES ENTERED
05/04/05
COUNTY CLERK

EXHIBIT     18

PAGE     322

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | | |
|---|---|---|---|
| DATE: 05/04/05 | | | DEPT. 46 |
| HONORABLE RODNEY E. NELSON | JUDGE | E. LOPEZ | DEPUTY CLERK |
| HONORABLE | JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| C. VAUGHN/CTRM ASST | Deputy Sheriff | NONE | Reporter |

8:30 am BC301371

FARHAD LARIAN
VS
ISAAC LARIAN ET AL

Plaintiff
Counsel        NO APPEARANCES

Defendant
Counsel

NATURE OF PROCEEDINGS:

John A. Clarke, Executive Officer/Clerk

By: _____
        E. Lopez, Deputy Clerk


CONKLE & OLSTEN
ERIC ENGEL
3130 WILSHIRE BLVD., STE. 500
SANTA MONICA, CA 90403


KAY SCHOLER
LARRY FELDMAN
1999 AVENUE OF THE STARS, STE. 1700
LOS ANGELES, CA 90067


                    Page   2 of 2    DEPT. 46

MINUTES ENTERED
05/04/05
COUNTY CLERK

EXHIBIT 18

PAGE 323

**EXHIBIT 19**

NOV 28 2005 12:36PM   HP LASERJET 3200                                    p.2

1   Honorable Alan B. Haber
    ADR SERVICES, INC
2   1900 Avenue of the Stars, Suite 250
    Los Angeles, California 90067-4303
3   (310) 201-0010 PH
    (310) 201-0016 FAX
4

5

6                    IN THE MATTER OF THE ARBITRATION BETWEEN

7

8

9
    FARHAD LARIAN                           )
10                                          )
                    Claimant                )    ADR Case No. 05-2096-ABH
11                                          )
                                            )
12  vs.                                     )    LASC Case No. BC 301371
    ISAAC LARIAN                            )
13                                          )    FINAL ARBITRATION AWARD
                                            )
14                  Respondent              )    DISMISSAL OF ALL CLAIMS WITH
                                            )               PREJUDICE
15                                          )
16

17

18

19

20

21

22

23

24
25  CHRONOLOGY OF EVENTS:

26        This Binding Arbitration between the above-named claimant and respondent commenced

27  on November 16, 2005, at the ADR offices, Suite 250, 1900 Avenue of the Stars, Los Angeles,

28  90067.  This Arbitration was scheduled for hearings on November 16, 17, 18, 21,22, 23 and

29  December 5, 2005.  Claimant Farhad was represented by Mr. Robert G. Wilson of the law firm

                                            1

Received  Nov-28-2005  12:38pm    From-                    To-COTKIN COLLINS AND G   Page  002

CC 00546

EXHIBIT ___19___

PAGE ___324___

1  of Cotkin, Collins and Ginsburg and Mr. Richard Kellner of the law firm of Kabateck, Brown

2  and Kellner.   Respondent Isaac Larian was represented by Mr. Larry Feldman and Mr. Robert

3  Turner, both of the Kaye Scholer LLP law firm.  Also in attendance was Ms. Daphne Gronich,

4  counsel for third-party intervenor, MGA Entertainment, Inc.

5       On November 17, 2005, the second day of the Arbitration proceedings, towards the end

6  of the full-day session, following the testimony of a witness called by claimant, claimant's

7  counsel called claimant Farhad Larian to testify as a witness.  Upon taking his place at the

8  witness chair, claimant Farhad Larian requested that he be permitted to address me, and the

9  assemblage of counsel, and announced that he wishes to "go off the record".  I then requested that

10 claimant Larian consult privately with both of his counsel.  Claimant Farhad Larian declined my

11 request that he consult with his attorneys.  Both of his attorneys appeared ready to leave the

12 hearing room and consult with claimant Farhad Larian.      However, claimant Farhad Larian

13 continued to insist that he be permitted to address me and the assemblage of attorneys. I again

14 suggested that claimant Farhad Larian meet with his attorneys.  For a second time he insisted

15 that he be allowed to address me and the assemblage, and refused my second suggestion that it

16 would be advisable for him to speak to his attorneys.   I informed him that any remarks or

17 statements that he made would have to be "on the record"(at all times during the Arbitration

18 proceeding, a Certified Court Reporter was recording the proceedings).  Claimant Farhad Larian

19 then addressed the assemblage and explained that certain evidence presented thus far in the

20 proceedings caused him to conclude that his claims against respondent Isaac Larian were

21 unfounded and that it was his request that the proceedings be brought to a conclusion.

22 Thereupon, one of claimant's attorneys, Mr. Robert G. Wilson announced that he was resigning

23 as claimant's counsel.   In essence, and unquestionably, claimant Farhad Larian conceded that

24 his claims against Isaac Larian for breach of fiduciary duty, fraud, and unilateral mistake and

25 requests for monetary damages and recission should be "dropped", and the arbitration should be

26 terminated.  I suggested that a recess would be appropriate.  Claimant and his counsel, Mr.

27 Richard Kellner then retired to a different room: I then left the hearing room and briefly spoke

28 with Mr. Kellner and claimant Farhad Larian and with Mr. Kellner's permission explained that if

29 his true intentions were to terminate the proceedings, that he and Mr. Kellner would have to

2

CC 00547

EXHIBIT ___19___

PAGE ___325___

1  return to the hearing room and agree "on the record" to dismiss all of the Arbitration claims.

2  and acknowledge that a dismissal with prejudice would mean that he would not be able to renew

3  or refile his claims in the future.  Claimant Farhad then acknowledge on the record that he

4  understood the consequences of a dismissal of his Arbitration claims, and that he wished for a

5  dismissal with prejudice of the claims.

6

7  THE ARBITRATION AWARD:

8       Based on my satisfaction that claimant Farhad Larian knowingly and voluntarily wished

9  for all of his Arbitration claims in this proceeding against respondent Isaac Larian be dismissed

10  with prejudice, and his acknowledgment that there was no merit to any of his claims in this

11  proceeding, I am ordering that all of the claims made by claimant Farhad Larian in this

12  proceeding be forthwith dismissed with prejudice, and issue an award in favor of respondent

13  Isaac Larian.

14

15  DATED: November 18, 2005

16

Hon. Alan B. Haber(ret.), Arbitrator

17

18

19

20

21

22

23

24

25

26

27

28

29

3

CC 00548

EXHIBIT ___19___

PAGE ___320___

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is ADR Services, Inc., 1900 Avenue of the Stars, Suite 250 Los Angeles, California 90067.

On November 28, 2005, I served the foregoing document described as the **FINAL ARBITRATION AWARD** on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

Richard Kellner, Esq.
Michael R. Brown, Esq.
KABATECK BROWN & KELLNER LLP
350 South Grand Avenue, 39th Floor
Los Angeles, California 90071

Robert G. Wilson, Esq.                    Larry R. Feldman, Esq.
COTKIN COLLINS & GINSBURG                 KAYE SCHOLER
300 South Grand Avenue, 24th Floor        1999 Avenue of the Stars, Suite 1600
Los Angeles, California 90071             Los Angeles, California 90067

____X____   **BY U.S. MAIL**, I caused such envelope with postage thereon to be placed in the United States mail at Los Angeles, California.

____X____   **BY FACSIMILE**, I caused such to be faxed to the attorneys on November 28, 2005.

_____   **BY PERSONAL SERVICE** I caused such envelope to be delivered by hand to:

____X____   **STATE** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

_____   **FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on November 28, 2005 at Los Angeles, California.

_____
Terry Shea

E:\I word\PROOF OF SERVICE.doc

Received   Nov-28-2005  12:38pm   From-                    To-COTKIN COLLINS AND G   Page  005

**CC 00549**

EXHIBIT _____19_____

PAGE _____327_____

**EXHIBIT 20**



1-28-06

1  KABATECK BROWN KELLNER LLP
   Richard L. Kellner, SBN 171416
2  Alfredo Torrijos, SBN 222458
   350 South Grand Avenue, 39th Floor
3  Los Angeles, California 90071
   Telephone: (213) 217-5000
4  Facsimile: (213) 217-5010

5  COTKIN, COLLINS & GINSBURG
   A PROFESSIONAL CORPORATION
6  Robert G. Wilson, SBN 58653
   300 South Grand Avenue, 24th Floor
7  Los Angeles, California 90071
   Telephone: (213) 688-9350
8  Facsimile: (213) 688-9351

9  Attorneys for Claimant
   Farhad Larian

10

11

12              ARBITRATION BEFORE ADR SERVICES, INC.

13  FARHAD LARIAN,                     ADRS CASE. NO. 05-2096-ABH

14          Claimant,                  THE HONORABLE ALAN HABER

15      v.                             DECLARATION OF CLAIMANT
                                       FARHAD LARIAN IN SUPPORT OF HIS
16  ISAAC LARIAN,                      OPPOSITION TO RESPONDENT ISAAC
                                       LARIAN'S MOTION FOR ATTORNEYS'
17          Respondent.                FEES

18

19                                     [Filed concurrently with Claimant Farhad
                                       Larian's Opposition to Respondent Isaac
20                                     Larian's Motion for Attorneys' Fees; and
                                       Declaration of Richard L. Kellner in Support
21                                     of Claimant Farhad Larian's Opposition to
                                       Respondent Isaac Larian's Motion for
22                                     Attorneys' Fees]

23

24

25

26  ///

27  ///

28  ///

    DECLARATION OF CLAIMANT FARHAD LARIAN IN SUPPORT OF HIS OPPOSITION TO
        RESPONDENT ISAAC LARIAN'S MOTION FOR ATTORNEYS' FEES

                                                        CC 00694

EXHIBIT _____ 20

PAGE _____ 328

### DECLARATION OF FARHAD LARIAN

I, FARHAD LARIAN, do hereby declare as follows:

1.      I am the Claimant in this action.  I have personal knowledge of the facts contained herein and if called to testify to the matters set forth herein, I could competently testify thereto.

2.      This case has not been easy for me.  I am an extremely emotional person and I have struggled greatly with the impact that this case has had on my family.  Despite our differences, Isaac and I are still brothers.  We spent many years working hard trying to make MGA Entertainment, Inc. what it is today.   Some of those years were good, some were bad, but we were working together and we were family.

3.      I do not (and never have) begrudge the fact that my brother has become very wealthy by virtue of his full ownership of MGA Entertainment, Inc.  He deserves it.  My brother is an extremely talented business person; I have never doubted or denied that.

4.      I brought this action because I had real and genuine doubts as to whether I received a fair price for the December 2000 sale of my stock in ABC International Traders, Inc. and MGA Entertainment Hong Kong Limited (later collectively known as, "MGA Entertainment, Inc.").  I genuinely believed that my brother Isaac had a responsibility for making up the difference in price between what my stock was actually worth (based on a valuation of December 2000) and what I was paid for that stock.  This differential would only represent a fraction of the gains that Isaac has subsequently earned due to his purchase of my stock.

5.      A few weeks before the arbitration, I was at Santa Monica beach with my family.  On that day, my wife Lisa and I lost our four year old daughter.  Fortunately, after one terrible hour, we found our daughter at the police station.  The whole ordeal was agonizing, but it reminded me that there are more important things in life than this case -- that there are things that I would rather do than spend my time trying to prove that my brother had engaged in wrongful conduct against me.

6.      During the arbitration, sitting in the same room as my brother and his wife was difficult, much more difficult than I could have ever imagined.  As each hour of the arbitration progressed, I could not help but feel -- physically feel -- the hatred that Isaac had for me.  Right

— 2 —

CC 00695

EXHIBIT     20

PAGE     329

then, I made a decision to abandon my claims in the arbitration and issue a public apology, hoping (perhaps in vain) that one day my brother and I could reconcile.

7.      My brother was so moved by my public recant that he subsequently offered to pay me the difference between the appraised value of my stock in 2000 and the amount that I was paid for the stock. Attached hereto as Exhibit "A" is a true and correct copy of a print-out of the email that I received from my brother on November 29, 2005 and my responding email of December 1, 2005.

8.      I am not a wealthy man. I simply could not have made the generous gesture of publicly abandoning my claims, if had known that Isaac's lawyers would come after me for their attorneys' fees.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ day of January 2006 at Los Angeles, California.

FARHAD LARIAN

— 3 —

DECLARATION OF CLAIMANT FARHAD LARIAN IN SUPPORT OF HIS OPPOSITION TO
RESPONDENT ISAAC LARIAN'S MOTION FOR ATTORNEYS' FEES

CC 00696

EXHIBIT ___20___

PAGE ___330___

**EXHIBIT A**

CC 00697

EXHIBIT _20_

PAGE _331_

**From:** Fred Larian [mailto:fredlarian@sbcglobal.net]
**Sent:** Thursday, December 01, 2005 4:11 PM
**To:** 'Isaac Larian (President / CEO)'
**Subject:** RE: I am traveling

I did not call Shamsi. She called me and said she had suggested the new appraisal to you (and later to me).  I told her Isaac and I are supposed to talk directly.  When are you back in town?

**From:** Isaac Larian (President / CEO) [mailto:LarianI1@mgae.com]
**Sent:** Tuesday, November 29, 2005 6:37 PM
**To:** fredlarian@sbcglobal.net
**Subject:** I am traveling

Fred,

I am traveling.

I got a call from Shamsi saying that you want a new appraisal, as of year end 2000?

I thought we decided to talk directly?

I don't mind doing this if you want this and indeed have been asking for it.  But , on one condition: A written contract that if the appraisal was less than what you got paid, you will pay the difference.

I am not going through this again.

I want me and my family to go on with our lives.

Let me know.

Isaac Larian
CEO

 MGA Entertainment, Inc.
16388 Roscoe Blvd. Suite 200
Van Nuys, California 91406
Tel: 818-894-3150

CC 00698

EXHIBIT ___20___

PAGE ___332___

email: iarianl1@mgae.com
fax: 818-894-1267

WWW. BRATZ.COM
www.mgae.com
www.allenracers.com

CC 00699

EXHIBIT _____ 80

PAGE _____ 333

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 350 South Grand Avenue, 39th Floor, Los Angeles, CA 90071.

On January 20, 2006, I caused the foregoing document described as **CLAIMANT FARHAD LARIAN'S OPPOSITION TO RESPONDENT ISAAC LARIAN'S MOTION FOR ATTORNEYS' FEES** on the interested parties in this action as follows:

Larry R. Feldman, Esq.
Kaye Scholer LLP
1999 Avenue of the Stars, Suite 1700
Los Angeles, CA 90067
FAX NO: 310-788-1200

Robert Wilson, Esq.
Cotkin Collins & Ginsburg
300 South Grand Avenue, 24th Floor
Los Angeles, CA 90071

[X]  **VIA OVERNIGHT EXPRESS** – I am readily familiar with the firm's practice of collection and processing for overnight delivery. Under that practice it would be deposited in a box or other facility regularly maintained by Overnight Express, or delivered to an authorized courier or driver authorized by Overnight Express to receive documents, in an envelope or package designated by Overnight Express with delivery fees paid or provided for, addressed to the person on whom it is to be served, at the office address as last given by that person on any document filed in the cause and served on the party making service; otherwise at that party's place of residence.

[]  **VIA U.S. MAIL** - I deposited such envelope(s) with the United States Postal Service, enclosed in a sealed envelope, for collection and mailing with the United States Postal Service where it would be deposited for first class delivery, postage fully prepared, in the United States Postal Service that same day in the ordinary course of business. I am readily familiar with my employer's business practice for collection and processing of correspondence for mailing with the United States Postal Service.

Executed on **January 20, 2006**, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

IRMA DELEON

**PROOF OF SERVICE**

**CC 00700**

EXHIBIT _____ 20

PAGE _____ 334

**EXHIBIT 21**

FEB 03 2006 5:12PM    HP LASERJET 3200                                        P.2

1  Honorable Alan B. Haber(Ret.)
   ADR SERVICES, INC.
2  1900 Avenue of the Stars, Suite 250
   Los Angeles, California 90067-4303
3  (310) 201-0010 PH
   (310) 201-0016 FAX
4

5

6

7

8                    IN THE MATTER OF THE ARBITRATION BETWEEN

9

10  FARHAD LARIAN,                    )        LASC CASE No. BC301371
                                      )
11              Claimant,             )        ADR CASE No. 05-2096-ABH
                                      )
12      Vs.                           )
                                      )
13  ISAAC LARIAN,                     )        FINAL ARBITRATION AMENDMENT
                                      )        FOR RESPONDENT'S MOTION FOR
14              Respondent,           )        PREVAILING PARTY ATTORNEY'S
                                      )        FEES
15                                    )
                                      )
16

17

18       On November 28, 2005, my Arbitration Award was filed and served on counsel for the

19  claimant and respondent. The Award entered a dismissal with prejudice of all claims in this

20  arbitration proceeding.    This dismissal was requested by claimant on the second day of the

21  Arbitration proceedings.   Respondent filed a Motion for Attorneys Fees, requesting fees and

22  costs incurred by respondent during the course of this litigation.   I have considered the

23  respondent's moving papers, and declaration, and have considered the respondent's opposition

24  papers and the two declarations attached to the opposition papers.   The parties agreed to a

25  telephonic conference call for oral argument in connection with this motion.   On February 1, this

26  matter was argued by the parties by way of a telephonic conference call. Present during the call

27  for Claimant was Mr. Richard Kellner of the law firm of Kabateck Brown Kellner LLP, and

28  present during the conference call for Respondent was Mr. Larry Feldman of the law firm of

29  Kaye Scholer LLP.

                                             1

CC 00518

EXHIBIT ____21____

PAGE ____335____

1   FINDINGS RE: THE JURISDICTION ISSUE
2          Claimant's counsel alleged (1) that as the Arbitrator I had no jurisdiction to issue an
3   Arbitration Award and therefore there was no prevailing party; (2) that I should use my
4   discretion and not award attorney's fees to the respondent Isaac Larian, and (3) attorneys fees
5   and costs should not be awarded because the respondent's application for fees and costs is not
6   adequate.  I find that the claimant's claim of lack of jurisdiction is not well-taken.  Judge Nelson
7   appointed me as the arbitrator in this matter on May 4, 2005, following his having made a
8   finding that the parties were unable to agree on an arbitrator.  Judge Nelson's ruling followed a
9   remittitur from the Second District Court of Appeal, ordering that a prior ruling denying the
10  respondent's request to arbitrate this matter be vacated, and that an arbitration go forward
11  pursuant to Section 1281.6 of the California Code of Civil Procedure. The chronology of events
12  leading up to my appointment as arbitrator establishes the hypocrisy of the claimant's claim that
13  that my selection as arbitrator was improper.
14         On March 2, 2005(following the Court of Appeal's mandate to grant an order compelling
15  arbitration) Judge Nelson ordered each party to submit a list of at least five(5) nominees to serve
16  as the arbitrator.  Judge Nelson informed counsel that he would then select five(5) names for the
17  two submitted lists, indicating that in the event the parties could not agree from his list, that he
18  would select the arbitrator, in accordance with Section 1281.6 of the Code of Civil Procedure.
19  Respondent provided five(5) names; my name was not on the list.  Claimant provided five names
20  and my name was on the list.(Interestingly, claimant in their submission of five names, objected
21  to Judge Nelson's procedure, and asserted that a principal term of the arbitration agreement
22  provided that the arbitrator serve without charging a fee).  Finding a retired Judge to serve as a
23  neutral arbitrator without monetary compensation in a case where a claimant(as in this case) is
24  seeking six million dollars in monetary damages($600,000,000.) is probably more difficult than
25  trying to locate Judge Crater.
26         On March 24, 2005, Judge Nelson selected retired Judge Robert Altman to serve as the
27  arbitrator in this matter.  On April 4, 2005, Judge Nelson, having learned that Judge Altman
28  withdrew as arbitrator, informed counsel that he would be sending a new list of five(5) arbitrator
29  nominees. My name was on that list of five(5).  On April 15, claimant's counsel wrote to Judge

2

CC 00519

EXHIBIT _____ 21
PAGE _____ 336

1  Nelson listing claimant's nominees; once again my name was on claimant's list, and made

2  reference to the names of four of respondent's nominees. My name was not on the respondent's

3  list. Once again, the parties could not agree on Judge Nelson's list of five. On May 4, 2005,

4  Judge Nelson appointed me as the arbitrator pursuant to Section 1281.6 of the Code of Civil

5  Procedure.

6        The legal principles of estoppel and waiver have application to the claimant's claim of my

7  lacking jurisdiction to serve as the arbitrator. At no time from the receipt of Judge Nelson's

8  minute order transmitted to me on May 4, 2005 and through and including my involvement in

9  pre-Arbitration proceedings, and the Arbitration, had claimant ever asserted to me that I lacked

10  jurisdiction to serve as the arbitrator in this matter. The first time that I learned of the lack of

11  jurisdiction claim was upon receiving claimant's counsel's opposition brief to the respondent's

12  Motion for attorneys fees and costs. I find that Judge Nelson's appointment of me as arbitrator is

13  the law of the case.

14

15  FINDINGS RE: ATTORNEYS FEES AND COSTS REQUESTS

16        As previously discussed, I find that the respondent is the prevailing party in this litigation.

17  The Stock Purchase Agreement provided that the prevailing party can recover attorneys fees and

18  costs. I have considered and read respondent's moving papers and have reviewed all 97 exhibits

19  attached to respondent's declaration. This case involved a claim for $600,000,000. in monetary

20  damages and was intensely litigated over an approximately two-year period. The nature of this

21  case demanded skilled and experienced attorneys. Claimant retained serially, three different law

22  firms to represent him over the period of this case, as did respondent in hiring two attorneys who

23  have more than 60 combined years of heavy litigation experience and are highly skilled in their

24  profession. Considering the nature of this case, I am satisfied that the records of hours kept by

25  claimant's counsel, and their hourly rates for counsel and paralegals was justified; that the hours

26  for which the claimant was billed were spent. A review of the 97 exhibits provided by

27  respondent demonstrates the nature of the litigation pre-Arbitration; the extensive motions that

28  were litigated, the appellate matters and the time spent for preparation of the arbitration

29  proceedings. I find that the fees charged by counsel for the respondents was reasonable.

3

CC 00520

EXHIBIT _____ 21

PAGE _____ 337

1    THE ATTORNEYS FEES AWARD:

2      The attorneys fees award is the sum of $1,180,481.05. Judgment for respondent Isaac

3    Larian in the sum of $1,180,481.05 against respondent Farhad Larian.

4

5    DATED: February 3, 2006

6

7

8                           Arbitrator, Judge Alan B. Haber(ret.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

CC 00521

EXHIBIT ___21___

PAGE ___338___

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is ADR Services, Inc., 1900 Avenue of the Stars, Suite 250 Los Angeles, California 90067.

On February 3, 2006, I served the foregoing document described as the **FINAL ARBITRATION AMENDMENT FOR RESPONDENT'S MOTION FOR PREVAILING PARTY ATTORNEY'S FEES** on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

Richard Kellner, Esq.
Michael R. Brown, Esq.
KABATECK BROWN & KELLNER
350 South Grand Avenue, 39th Floor
Los Angeles, California 90071

Robert G. Wilson, Esq.                      Larry R. Feldman, Esq.
COTKIN COLLINS & GINSBURG                   Robert Turner, Esq.
300 South Grand Avenue, 24th Floor          KAYE SCHOLER
Los Angeles, California 90071               1999 Avenue of the Stars, Suite 1600
                                            Los Angeles, California 90067

| | |
|---|---|
| **X** | **BY U.S. MAIL,** I caused such envelope with postage thereon to be placed in the United States mail at Los Angeles, California. |
| **X** | **BY FACSIMILE,** I caused such to be faxed to the attorneys on February 3, 2006. |
| | **BY PERSONAL SERVICE** I caused such envelope to be delivered by hand to: |
| **X** | **STATE** I declare under penalty of perjury under the laws of the State of California that the above is true and correct. |
| | **FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. |

Executed on February 3, 2006 at Los Angeles, California.

Terry Shon

CC 00522

EXHIBIT ___21___

PAGE ___339___

**EXHIBIT 22**

**From:**       Fred Larian
**To:**         Isaac Larian
**CC:**
**BCC:**
**Sent Date:**      2004-05-04 20:38:52:000
**Received Date:**  2004-05-04 20:37:32:828
**Subject:**
**Attachments:**

I saw the Mattel suit against Carter Bryant. Please let me know if there is anything I can do to help.

The original message has been archived. Click the following link to retrieve it

http://mgavs.mgae.com/AOneSearch?ID=99A8A838-F43F-11DA-88CE-000423BD2771_Ex%20Employees

EXHIBIT _____ 22

PAGE _____ 340

ighly Confidential - Restricted Attorney's Eyes Only

MGA 4007280

**EXHIBIT 23**



Corporate Office:

16380 Roscoe Boulevard
Van Nuys, CA 91406
Phone: 818/894-2525, ext. 6711
Fax    818/895-0771

August 19, 2005

**VIA FACSIMILE**
Mark D. Kremer, Esq.
Conkle & Olesten,
Professional Law Corporation
3130 Wilshire Boulevard, Suite 500
Santa Monica, California 90403-2351

Dear Mr. Kremer:

It has come to our attention that your client, Fred Larian, has been using a confidential list of home telephone numbers that he obtained while at MGA to call current and former MGA employees at their homes and question them about MGA's early development of its "Bratz" line of dolls and to secure contact information of others – presumably to seek the same information.

As a preliminary matter, MGA's employee home contact list is MGA's property for use, if necessary, by its current employees. Mr. Larian had no right to take that list with him or to use it after he left MGA, and certainly not in the context in which it is being used. Quite a few of MGA's current and former employees, some of whom have been called and contacted by Mr. Larian multiple times, have complained about his continuing calls and efforts to contact them, including, in some cases, after they have asked him not to contact them and/or have intentionally not returned his calls.

As Mr. Larian should know, MGA considers many aspects of the development of its products, including the identity of its specialized personnel, independent contractors and suppliers, to be proprietary, trade secret information, and vigorously protects that information from disclosure to third parties. In keeping with those efforts, MGA's employees – both current and former – are obligated by contract to maintain the confidentiality of its trade secret information and are further obligated to refer all requests for information sought in the context of litigation, whether against the company or against third parties, to the Legal Department.

Any attempt by Mr. Larian to obtain trade secret information concerning the development of the "Bratz" dolls from MGA's current or former employees or to obtain other proprietary information from such persons without MGA's consent, is an attempt to induce them to breach their obligations to MGA, not to mention a breach of his own obligations, as a former employee and officer of MGA. Employees and former employees of MGA have an obligation to only use proprietary and confidential information obtained during the course of their employment by the company only for the purpose of conducting the company's business, and such information

EXHIBIT __23__

PAGE __341__

CONFIDENTIAL – ATTORNEYS' EYES ONLY

MGA 3866369

2

may not be used, discussed or disclosed except as specifically authorized by MGA. In this regard, MGA has not authorized these discussions or disclosures, and has not waived its right to assert that they are unauthorized and that they must cease. As Mr. Larian also knows, MGA is in litigation concerning these rights and, thus, all communications with MGA personnel or MGA representatives about such matters, including its current and former outside counsel as well as third parties involved in the creation, development, production, distribution and sale of its proprietary materials, must be conducted through MGA's counsel to ensure that the rights of the company and its handling of discovery in connection with such litigation are not compromised. Mr. Larian's efforts in contacting certain current and former counsel of MGA to attempt to secure the release of information, is similarly improper and will not be tolerated. Any such information and files are the property of MGA and Mr. Larian can in no way suggest that he is entitled to such information or files, including as a result of having formerly been an officer of MGA f/k/a ABC International Traders, Inc.). MGA has not waived and will not waive any privileges that attach to such materials and must also insist that Mr. Larian cease all contacts and attempted contacts with MGA's counsel.

In conclusion, MGA requests that Mr. Larian cease all attempts to solicit information from MGA's former and current employees, independent contractors and outside counsel concerning MGA's proprietary and trade secret information, as well as information protected by the attorney-client privilege and attorney work product doctrine, and that he return to MGA all documents in his possession he took from MGA without consent, including all copies of home contact lists, as well as any materials that he may have obtained or compiled through his efforts.

At this time, MGA will give Mr. Larian the benefit of the doubt that he did not realize that his actions were interfering with existing contractual relations between MGA and others, or interfering with its legitimate efforts to maintain the confidentiality of proprietary or privileged information or that they were precluded by his on-going confidentiality obligations towards the company. Should he refuse to comply with the foregoing requests, however, MGA will be forced to view Mr. Larian's conduct as willful and reserves its rights to seek to protect its rights through the courts. MGA sincerely hopes that the parties can resolve this matter, now that you have been apprized of its concerns.

Please respond by noon on Tuesday, August 23, 2005. Thank you.

Sincerely,

Daphne Gronich
General Counsel

cc:   Diana Torres, Esq.

EXHIBIT 23
PAGE 342

CONFIDENTIAL – ATTORNEYS' EYES ONLY                    MGA 3866370

**EXHIBIT 24**

# _FAX TRANSMITTAL_

**CONFIDENTIAL**

## Conkle & Olesten

William C. Conkle
Christina Olesten
John A. Conkle
Mark D. Kremer
Eric S. Engel
Scott A. Hampton

**Professional Law Corporation**
**3130 Wilshire Boulevard, Suite 500**
**Santa Monica, California 90403**
**(310) 998-9100**
**FAX: (310) 998-9109**
Direct E-Mail: Attorney's Initials *@conklelaw.com*
Internet Homepage: *http://www.conklelaw.com*

DATE: September 7, 2005     TOTAL PAGES: 3 (Including Cover)

FROM: Mark D. Kremer

CLIENT/MATTER NAME: Larian v. Larian

CLIENT/MATTER NUMBER: 2221.002

DOCUMENT NUMBER (IF APPLICABLE): 9787

DELIVER TO: Daphne Gronich

FAX NUMBER: 818-895-0771

THIS FAX _x_ WILL __ WILL NOT BE FORWARDED UNDER SEPARATE COVER

MESSAGE:

## IN CASE OF TRANSMISSION PROBLEMS, CALL (310) 998-9100

The information transmitted in this fax message, including any attachments, is intended only for the addressee. The information may be confidential and legally privileged under attorney-client, attorney work product, or other applicable privileges. Unauthorized access to this message may violate federal and state civil and criminal laws. If you have received this message, but are not the addressee, you are advised that any use, copying, disclosure or distribution of the information in this message is prohibited. Please call 310 998-9100 and destroy all copies of this fax message. Thank you.

FL 0274

EXHIBIT 24

PAGE 343

CONFIDENTIAL

## CONKLE & OLESTEN
PROFESSIONAL LAW CORPORATION

WILLIAM C. CONKLE
CHRISTINA OLESTEN
JOHN A. CONKLE
MARK D. KREMER
ERIC S. ENGEL
SCOTT A. HAMPTON

3130 WILSHIRE BOULEVARD, SUITE 500
SANTA MONICA, CALIFORNIA 90403-2304
TELEPHONE: (310) 998-9100

DIRECT E-MAIL: Attorney's Initials@conklelaw.com
INTERNET HOMEPAGE: http://www.conklelaw.com

TELECOPIER
(310) 998-9109

TAXPAYER ID #
95-3774554

September 7, 2005

Via Facsimile
and U.S. Mail

Daphne Gronich
16360 Roscoe Blvd.
Van Nuys, CA 91406

Re:   Farhad Larian/Isaac Larian and MGA Entertainment, Inc.
Our File No. 2221.002

Dear Ms Gronich:

Thank you for your letter of August 19, 2005.  This shall constitute Farhad ("Fred") Larian's substance to response.

1.      Fred did not obtain while at MGA and does not have a confidential list of home telephone numbers of MGA's current or former employees.

2.      We are unaware of any current or former employee complaints about Fred's efforts to contact them.  We are aware of persons reporting that they have been threatened by you and other lawyers acting on behalf of MGA with litigation in an effort to block disclosure of information.   These activities raise ethical, not legal concerns and we suggest you look with some circumspection on them.

3.      Because of the generalizations you use to identify MGA's "trade secrets" we are unable to intelligently evaluate your claim that any are involved here, but we look with skepticism upon it.  It is certainly not clear what, if any, information concerning development of the Bratz Dolls is a "trade secret".  Isaac has made numerous public statements about the subject. Much of the information is so old that

2221.002\9787

FL 0275

EXHIBIT ___24___
PAGE ___344___

CONKLE & OLESTEN
PROFESSIONAL LAW CORPORATION

Daphne Gronich
September 7, 2005
Page 2

CONFIDENTIAL

it cannot possibly have any commercial value from being "secret" assuming that it ever did. Fred is not a competitor of MGA and has no use for any information which would impair its commercial value to MGA. Fred's interest in the information is for use in the arbitration over Isaac's concealment of it in 2000 when it should have been disclosed to Fred and the appraisal. And in any event, MGA may not use a claim of "trade secret" privilege to assist Isaac in perpetrating a fraud.

4.      We cannot agree that Fred is attempting to induce any person to break a contract. We are not aware of any contractual provision that would be violated by Fred's request for information and as indicated earlier we are skeptical of the claim that any of the information Fred wants would qualify as a trade secret. Please send us a copy of the contact provisions upon which MGA relies so we may evaluate it.

Please call me to have a full airing of MGA's and Fred's concerns.

Very truly yours,

Mark D. Kremer

MDK/pi

2221.002\9787

EXHIBIT ___24___

PAGE ___345___

FL 0276

**EXHIBIT 25**

RDB copy

HOWARTH & SMITH
ATTORNEYS AT LAW
800 WILSHIRE BOULEVARD
SUITE 750
LOS ANGELES, CALIFORNIA 90017
TELEPHONE: (213) 955-9400
FAX: (213) 622-0791
www.howarth-smith.com

DON HOWARTH

April 6, 2004

DHowarth@howarth-smith.com
Direct Line: (213) 955-9400 Ext. 109

**VIA FACSIMILE AND U.S. MAIL**
Larry R. Feldman, Esq.
Kaye Scholer LLP
1999 Avenue of the Stars
Suite 1700
Los Angeles, California 90067

Re: *Larian v. Larian*

Dear Larry:

This letter is to follow up on our meeting at your office on February 26, 2004, and our conversation by phone more recently. Since then I have also received a letter from you dated March 29, 2004 asking about our progress in getting back to you. I trust you received my message that I was out of the office in Hawaii last week and that I would get back to you with a written response upon my return. This letter is the promised written response.

The facts of which we are presently aware clearly show that it is not correct, as you stated in our meeting, that at the end of 2000, Isaac believed Bratz was just another doll, or that Fred knew everything that Isaac knew. Indeed, even the limited evidence immediately available without discovery having yet occurred demonstrates just the reverse. For example:

- The July 18, 2003, Wall Street Journal reports that sometime in 1999 Isaac had a conversation with a buyer from Wal-Mart in which the idea for a Bratz-type doll germinated. The article quotes Isaac as saying that "he was motivated by a challenge from a Wal-Mart Stores, Inc. buyer to 'give me something that can compete with Barbie.'" Isaac kept this conversation secret from Fred, and Fred found out about it for the first time when he read the published article.

04 L181001 086

**HS 03235**

EXHIBIT 25
PAGE 346

Larry R. Feldman, Esq.
April 6, 2004
Page 2

- By late 1999, Isaac had decided that MGA's challenger to Barbie should be a fashion-type doll. MGA had previously distributed other types of dolls, but never a fashion doll, as the WSJ article confirms. For the first time ever, Isaac conducted a contest to select a design for the doll, and selected Carter Bryant's Bratz doll line as the winner of the contest. It is plain that Isaac did not consider Bratz to be just another doll for MGA. The existence of this contest was concealed from Fred, and, in fact, Fred was never told that the Company was looking for a fashion-type doll to compete with Barbie or that the Bratz line was being developed by Isaac and MGA during 1999 and 2000, despite Fred's position as Isaac's partner and a co-founder of MGA.

- In late 1999, and continuing at least through the spring of 2000, Isaac ordered MGA employees to stop sharing financial information with Fred. Isaac threatened at least one employee's job if the employee did not follow Isaac's instructions and cut Fred out of the information loop. In addition, Isaac instructed an employee to stop sending Fred daily sales reports that up to that point, Fred had routinely received. The result of this concerted concealment effort was that Fred did not, and could not, know the complete financial picture of the Company.

- In February 2000, Isaac tried to keep Fred from attending the N.Y. Toy Fair, the venue in which information about new, upcoming products is reviewed.

- Beginning in early 2000, Isaac began systematically portraying Fred, both internally and to the outside world, as someone who had no role in the management and decision making of the Company; and that Isaac alone controlled the strategic moves for MGA. In or about February 2000, Isaac had Fred's name removed from the Company profile, and changed the document (and history) to list only Isaac as the founder of MGA. When Fred raised this issue with Isaac, he was told that "there is . . . a lot more to come."

- In the Spring of 2000, before the Agreement to Arbitrate was signed and before Isaac had announced his plans for Bratz either publicly or to Fred, Isaac took steps to personally profit from the Bratz program. On April 11,

04:L181001.086

HS 03236

EXHIBIT _____ 25

PAGE _____ 347

Larry R. Feldman, Esq.
April 6, 2004
Page 3

2000, Isaac sought the following from the Company's Board of Directors:
(1) an increase in his annual salary from $221,000 to $500,000; (2) a bonus
of $750,000 for 1999; (3) a bonus of $1.5 million in 2000 if EBITA for the
year reached $8 million; and (4) a separate bonus of a 4% royalty on any
new toy idea he personally developed in MGA's 2001 line. Paying Isaac a
royalty for anything that he "personally developed" was an absolute first for
the Company, and the target figures in (3) and (4) plainly indicate an
unannounced, but real plan to exploit the Bratz market beginning in 2001.
A successful Bratz roll-out in 2001 would allow Isaac personally to profit
(at the expense of his fiduciary Fred) from the Bratz opportunity.

- In or about July or August 2000, Isaac called internal meetings with top
management at MGA about Bratz and his plans for seizing the opportunity
presented by the doll line. Isaac expressed optimism in these meetings that
the Bratz line could directly compete with Barbie, would appeal to an even
wider range of girls than did Barbie, and presented an opportunity he had
been looking to find for years. Fred, a 45% shareholder and officer of
MGA, was intentionally excluded from those meetings, and from the
special handling of Bratz.

- Roughly contemporaneously with these internal meetings, Isaac began
negotiating with Carter Bryant and eventually obtained from him the
worldwide licensing rights to Bratz. The license was unique in several
important respects. For the first time in the Company's history, the Bratz
license made Isaac and MGA the licensor of the product, allowing MGA to
control the licensing in an unlimited number of product categories
worldwide. In previous deals, MGA was just a distributor/licensee of a
product. The difference between being a licensee and a licensor is
enormous and becoming a licensor is something Isaac had wanted for a very
long time. Further, the Bratz deal was unique because MGA paid more for
that license of that doll than it ever had paid for a license of any other doll
in the Company's history. Fred was not told anything about the
unprecedented scope of the Bratz license prior to signing the Agreement to
Arbitrate, or the Stock Sales Agreement in December 2000.

04.LI81901.086

**HS 03237**

EXHIBIT ___25___

PAGE ___348___

Larry R. Feldman, Esq.
April 6, 2004
Page 4

- In the fall of 2000, Isaac began to develop the Bratz product line, including
  ordering prototypes and filing additional trademarks. Fred was intentionally
  kept unaware of the scope of Isaac's plans to develop and market Bratz at
  that time.

- During this time, including in the fall of 2000, Isaac followed a practice of
  passing along to Fred only negative financial news about the Company,
  such as a $2 million loss from cancelled Toys-R-Us orders, thus making the
  Company seem worth much less than it actually was. Isaac did not disclose
  to Fred news which would have a positive financial effect on the value of
  the Company, such as his plans for Bratz or other potential revenue streams
  for the Company.

- On December 11, 2000 MGA filed, and Isaac personally signed,
  applications for five new trademarks, including one for each of the names
  of the Bratz dolls. Isaac's personally signing such applications facilitated a
  plan to keep knowledge about the scope of the Bratz program tightly
  controlled.

- Then, in February 2001, with Fred out of the picture after his execution of
  the December Stock Sale Agreement, Isaac went public about the scope and
  significance of Bratz. He introduced the dolls at the February 2001 N.Y.
  Toy Fair with the public assertion that it was now "a Bratz world."

- Isaac's view of Bratz was further documented in June 2001, confirming that
  Bratz was MGA's "first intellectual property" and his belief that it was
  "sure to revolutionize the world of fashion dolls."

All of this and other evidence strongly indicates that Isaac made a concerted effort
to get Fred out of the company so that he could exploit the unique Bratz opportunity
without sharing the benefits with Fred.

When we met, you provided us with three e-mails which you claimed
demonstrated that Fred knew all of what Isaac knew about Bratz when he signed the
Agreement to Arbitrate. They do not. The e-mails – dated November 15, 2000,
November 22, 2000, and April 30, 2001 – were all sent *after* execution of the September

04 L181001.086

HS 03238

EXHIBIT _____ 25

PAGE _____ 349

Larry R. Feldman, Esq.
April 6, 2004
Page 5

2000 Agreement to Arbitrate. Further, none of them give any indication of anything unusual about Bratz that would alert Fred to its impact on the valuation of the Company.

You also asserted that the e-mails illustrate Fred's awareness of the Bratz program earlier than the time alleged in the complaint on file in the action. Again that is not correct. Paragraph 28 of the Complaint alleges that in late spring or summer 2002, Fred first became aware of the "true scope of the Company's extraordinary plans, efforts and history regarding the Bratz product line and other financial information about the Company that had been concealed from him by Isaac, as the license had been concealed from him." Nothing in the three e-mails is inconsistent with this allegation.

Additional evidence that Isaac attempted to defraud Fred into signing the Agreement to Arbitrate and to pay him less than the true value of his shares comes from Mr. Dutcher's appraisal. As may have been reported to you from the hearing on our motion to take Mr. Dutcher's deposition, the Court recognized the significance of this information, saying that, "[t]his information is directly relevant as it goes to whether [plaintiff] was defrauded because information about this new product was withheld from him." From what we can tell from the November 7, 2000, appraisal we have (and have given to you), it seems apparent that Isaac did not provide Mr. Dutcher with information about the Company's plans for Bratz or projections of its revenue potential for 2000, 2001 and beyond. We are advised that Isaac engaged in regular financial modeling for the Company and that in those forecasts, revenue streams were projected for each item the Company sold or was planning to sell. There is nothing in the appraisal itself indicating that Mr. Dutcher received such 2000 or 2001 projections, either for the Company as a whole or for Bratz. Further, it does not appear that the value of MGA Entertainment, HK was included in the appraisal at all, and Fred's shares in that company were certainly part of what was covered in the Agreement to Arbitrate. In any event, we will know more about the information provided to Mr. Dutcher and how he proceeded when we get Mr. Dutcher's files and take his deposition now that our motion has been granted.

You indicated to me that the Company actually lost money for 2000 after realizing a profit in 1999, and thus using the 1999 figures in the appraisal worked in Fred's favor in valuing the Company. First, it is not apparent to us that the Company lost money in 2000, as Isaac has not provided to Fred the tax returns or necessary financial information to verify that claim. From what we know, both sales and profits were expected to be much greater in 2000 than they were in 1999. If there was a loss in 2000, it certainly could have been the result of any number of things which would be largely irrelevant to a valuation

04 L181001 086

HS 03239

EXHIBIT _____ 25
PAGE _____ 350

Larry R. Feldman, Esq.
April 6, 2004
Page 6

of the Company – things such as one time writeoffs for non-repeating events, deferring revenue and profit recognition into the future (perhaps as to Hallmark?), payment of large bonuses to management, shifting profits into subsidiaries; etc. We do not yet know what reserves were taken that may have reduced profits and we do not know what revenues were attributed to or held by MGA Hong Kong. Until we are provided with the financial information that will enable us to analyze the Company's P/L statement, cash statement, cash flow analysis, and the like, and to have things fully audited, it is not helpful to be advised there was a stated loss, especially on rising revenues.

We do note that in the November 7, 2000 valuation, Mr. Dutcher states that "The most recent year (1999) was weighted only minimally as the EBDITA appears unreasonably high based on the two prior years." Mr. Dutcher was looking at EBDITA of $2,915,000 for 1997; EBDITA of a loss of $86,000 for 1998; and EBDITA of $5,651,000 for 1999. Looking at just those numbers, one can see why he might assume that the 1999 numbers were "high" based on a 1998 loss of $86,000. However, as Isaac knew, the 1999 revenues were not at all "unreasonably high" compared to the prior years because in 1998 there was a one-time loss of approximately $10 million in revenues and $4.5 million in profits due to a Toys-R-Us sanction of refusing to do business for 1 year. Further, the actual numbers for 2000 were consistent with the Company's strong growth, and had Mr. Dutcher had those numbers, he would have seen that the 1999 numbers were not unreasonably high. When we have complete information accounted for, it appears there was a strong progression of $2.9 million for 1997, $4.5 million for 1998 and $5.6 million for 1999.

Because they are not as subject to management and accounting choices - which we will need to examine - sales are important in looking at company valuation. It appears that sales were about $40,732,000 in 1998, $66,350,000 in 1999 (from tax returns which Dutcher used), and we believe they were much higher in 2000. However, Dutcher used $70,331,000 as revenues for 2000 (a pro forma 6% increase over 1999). We have now seen documents suggesting that revenues were already higher than this in 2000, perhaps as high as $90,000,000 or more.

Further evidence of how far off Mr. Dutcher was led by what Isaac gave him and withheld from him is apparent when one looks at his 2003 projected revenues of $72,793,000 (3.5% pro forma over 2002). The Wall Street Journal article reports

04 L181001 086

HS 03240

EXHIBIT ___25___

PAGE ___351___

Larry R. Feldman, Esq.
April 6, 2004
Page 7

expected sales of $800 million for 2003, 65% of which is accounted for by Bratz. The appraisal without the information on Bratz was thus more than 10 times lower in its projection for 2003 than it should have been.

When Isaac chose not to share key pieces of information about the scope of the Bratz project with Fred, and to selectively provide him and the appraiser with other financial information about the Company during 1999 and 2000 and projections for the future, there is no doubt that he violated California law requiring him as a fiduciary to disclose all such information to his partner and co-venturer, Fred. Being a fiduciary means that each owes the other the "duty of highest loyalty and utmost good faith, being charged not to take any unfair advantage or secret profit." *Universal Sales Corp. v. California Press Mfg. Co.*, 20 Cal. 2d 751, 772 (1942); BAJI 12.36. A fiduciary has a duty to make a full and fair disclosure of all facts which materially affect the rights and interest of the person to whom the duty is owed. A fiduciary must give priority to the best interest of the persons to whom the duty is owed. When there is a "fiduciary relationship any transaction by which one of the co-adventurers secures an advantage over the other or others is presumptively fraudulent and casts a burden on such party gaining advantage to show fairness and good faith in all respects." *Boyd v. Bevilacqua*, 247 Cal. App. 2d 272, 291 (1966).

It is also a well-settled and fundamental precept that a fiduciary such as Isaac may not usurp business opportunities such as Bratz for himself at the expense of Fred as his co-fiduciary. In *MacIsaac v. Pozzo*, 81 Cal. App. 2d 278 (1947), the parties entered into a partnership to do business together and had agreed to split profits equally. However, plaintiff went out on its own and improperly made a deal with a customer, Utah Fuel Co., and got the defendant to agree to take only 15% of the profit. When the proceeds from the Utah Fuel deal came in, a declaratory judgment action was instigated by the plaintiff and Pozzo defended on the ground that the agreement to split the profits 85/15 was procured by fraud. In agreeing with Pozzo, the court held the following:

> [I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself. And, if in

04 L181001 086

HS 03241

EXHIBIT ___85___

PAGE ___352___

Larry R. Feldman, Esq.
April 6, 2004
Page 8

such circumstances, the interests of the corporation are betrayed, the corporation may elect to claim all the benefits for itself, and the law will impose a trust in favor of the corporation upon the property, interests and profits so acquired.

The facts bring the case within the stated rule. While it has been applied so generally in corporation cases to have become known as the doctrine of corporate opportunity, <u>it is founded in the doctrine of loyalty in business which applies in all situations in which trust is reposed.</u> *The fiduciary is held to the utmost measure of loyalty and accordingly he may not use a trust opportunity for personal advantage.* "The policy of the law is to put fiduciaries beyond the reach of temptation by making it unprofitable for them to yield to it."

The primary duty of the parties was to take no advantage of each other within their fiduciary relationship by means of <u>the slightest concealment</u>, misrepresentation, or adverse pressure. Defendant was entitled to a complete disclosure as to the negotiations with Utah Fuel Co., and an equal opportunity to take advantage of them. Plaintiff contrived to appropriate for itself the major share of the profits with the result that the firm, when it took the contract and assumed the responsibility, stood committed to an unequal division. Defendant could not be deprived of its rights in this matter.

The judgment properly awarded defendant the amount by which plaintiff profited through breach of duty. Whether it be regarded as damages presumed to have been suffered through deprivation of a business opportunity or as profits unjustly received by a plaintiff is immaterial.

*Id.* at 284-85 (emphasis supplied; extensive internal citations omitted). *See also, e.g.,* Witkin, 9 Summary of California Law § 20, p. 419 (9th ed. 1990) ("The fiduciary relationship . . . obviously makes applicable the rule which, in corporation law, is known as the doctrine of 'corporate opportunities'"); *Air Purification v. Carle,* 99 Cal. App. 2d 258, 265 (1950) (holding ("[In] a trust relationship . . . one of the parties will not be allowed to deal with the subject matter of the association for his own advantage.").

04:L181001 086

HS 03242

EXHIBIT 25

PAGE 353

Larry R. Feldman, Esq.
April 6, 2004
Page 9

Based on just what we know without discovery it is clear that Isaac has ignored the requirement that he not engage in "the slightest concealment." When Isaac put together the licensing deal for Bratz without informing Fred of his plans or sharing with Fred the financial expectations and rewards deriving therefrom, Isaac violated his duties as a fiduciary, and he will have to account to Fred.

In addition to Isaac's duties to disclose to Fred all material information relating to the Company, and to refrain from usurping a business opportunity – both of which arose from his fiduciary relationship with Fred – Isaac's actions in isolating the Bratz and other financial information from Fred also created an independent duty of disclosure. As Witkin notes, "The duty to disclose may arise without any confidential relationship where the defendant alone has knowledge of material facts which are not accessible to the plaintiff." Bernard E. Witkin, 5 Summary of California Law, § 700, p. 801 (9th ed. 1990; citations omitted). Here, as recited above – from holding secret meetings to instructing Company employees not to give Fred information – Isaac went to great lengths to make sure the material facts about the Bratz doll project were "not accessible" to Fred, when he had a duty to inform him of the scope of the Bratz program before entering into the Agreement to Arbitrate and Stock Purchase Agreement. It was impermissible for Isaac to keep his plans for the scope of the Bratz program secret. Also, note that ¶ 6 of the buy/sell agreement itself makes clear that it is Isaac, not Fred, who has "full knowledge of business prospects."

Isaac has indicated to Fred a willingness to address the merits and provide us with documents in his possession and control, including those held by the companies. Our outstanding discovery requests are a good listing of what we need, but in summary, we certainly need each of the following:

1. All documents that relate to Bratz from 1999 through 2003, including trademarks, license agreement negotiations with Carter Bryant, notes or agendas of meetings re: Bratz, prototypes, designs, correspondence with attorneys re: the license agreement or trademarks, and financial documents, including sales and revenue projections, audited and unaudited;

2. All documents that relate to the value, revenues and costs of MGA, ABC and MGA Hong Kong from 1999 through the present, including all internal materials, projections and tax returns, all reserves, write downs and supporting documentation;

04 L181001 086

HS 03243

EXHIBIT _____ 25

PAGE _____ 354

Larry R. Feldman, Esq.
April 6, 2004
Page 10

3. All information that Isaac and/or the companies provided to Morad and/or Mr. Dutcher;

4. All corporate minutes, shareholder resolutions, stock options grants or proposals and related documentation, and general ledgers for ABC, MGA and MGA Hong Kong.

In addition to this documentation from Isaac, we also need his reconfirmed agreement to allow Morad to release his file. We also need written confirmation by Isaac that he wants full and honest disclosure by any person who is a witness to the events herein; that he will not directly or indirectly retaliate against any person based on what they disclose; and that he is encouraging and requesting them to give Fred a candid, honest, and complete response to any questions Fred may have of them. In exchange for such complete disclosure, Fred is also willing to produce his records now.

Once we have received the above, and do our homework in connection with what we find, we will be in a position to make a recommendation as to proceeding with a binding reference of this matter to a retired judge, and what the order of reference would provide. We also have some candidates to put forward in this regard. If in the meantime you are interested in a non-binding mediation, we are prepared to support that immediately, and without further discovery beyond production of the materials indicated. We have some thoughts as to who might be able to get this sorted out between these brothers, so that the matter can be closed. Please let me know if this is an option.

Very truly yours,

Don Howarth

04.L181001.086

**HS 03244**

EXHIBIT ___25___

PAGE ___355___

Larry R. Feldman, Esq.
April 6, 2004
Page 11

bcc:   Mr. Farhad Larian (via U.S. Mail)

04-L181001.086

EXHIBIT_____25_____

PAGE _____356_____

HS 03245

## Howarth & Smith
ATTORNEYS AT LAW
800 Wilshire Boulevard
Suite 750
Los Angeles, California 90017
(213) 955-9400
Fax: (213) 622-0791

# FAX COVER SHEET

*The information contained in this facsimile message is information protected by attorney-client and/or the attorney/work product privilege. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by facsimile. If the person actually receiving this facsimile or any other reader of the facsimile is not the named recipient or the employee or agent responsible to deliver it to the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address via U.S. Postal Service.*

FAX NUMBER TRANSMITTED TO: (310) 788-1200

To:             Larry R. Feldman, Esq.

From:           Brian D. Bubb, Esq.

Number of pages including this page: 11

*        IF YOU DO NOT RECEIVE <u>ALL</u> PAGES, PLEASE TELEPHONE US IMMEDIATELY AT (213) 955-9400.

Sent by:        Jason Sickler

Date: April 6, 2004

Re:    Larian v. Larian

COMMENTS:

**HS 03246**

EXHIBIT _____ 25

PAGE _____ 357

Confirmation Report—Memory Send

```
                                    Time      : Apr-05-2004  11:37pm
                                    Tel line 1 :
                                    Tel line 2 :
                                    Name      : HOWARTH
```

| | | |
|---|---|---|
| Job number | : | 375 |
| Date | : | Apr-05 11:33pm |
| To | : | 53084498#001#13107881200# |
| Document Pages | : | 011 |
| Start time | : | Apr-05 11:33pm |
| End time | : | Apr-05 11:37pm |
| Pages sent | : | 011 |
| Status | : | OK |

Job number    : 375            *** SEND SUCCESSFUL ***

**Howarth & Smith**
ATTORNEYS AT LAW
800 Wilshire Boulevard
Suite 750
Los Angeles, California 90017
(213) 955-9400
Fax (213) 622-0791

# FAX COVER SHEET

*The information contained in this facsimile message is information protected by attorney-client and/or the attorney/work product privilege. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by facsimile. If the person actually receiving this facsimile or any other reader of the facsimile is not the named recipient or the employee or agent responsible to deliver it to the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address via U.S. Postal Service*

FAX NUMBER TRANSMITTED TO: (310) 788-1200

To:              Larry R. Feldman, Esq.

From:            Brian D. Bubb, Esq.

Number of pages including this page: 11

-        IF YOU DO NOT RECEIVE ALL PAGES, PLEASE TELEPHONE US IMMEDIATELY AT (213) 955-9400

Sent by:         Jason Sickler                                    Date: April 6, 2004

Re:    Larian v. Larian

COMMENTS:

HS 03247

EXHIBIT _____ 25

PAGE _____ 358

BLUEBIRD (888) 477-0700
OFFICE SUPPLIES   www.bluebirdofs.com

**EXHIBIT 26**

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 90378)
2    (johnquinn@quinnemanuel.com)
     Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
     Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
     865 South Figueroa Street, 10th Floor
5    Los Angeles, California 90017-2543
     Telephone:  (213) 443-3000
6    Facsimile:   (213) 443-3100

7  Attorneys for Mattel, Inc.

8                    UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10                        EASTERN DIVISION

11  CARTER BRYANT, an individual,        CASE NO. CV 04-9049 SGL (RNBx)

12              Plaintiff,               Consolidated with
                                         Case No. CV 04-09059
13        vs.                            Case No. CV 05-02727

14  MATTEL, INC., a Delaware             MATTEL, INC.'S [CORRECTED]
    corporation,                         SEPARATE STATEMENT OF
15                                       UNCONTESTED FACTS AND
                Defendant.               CONCLUSIONS OF LAW IN SUPPORT
16                                       OF MATTEL, INC.'S MOTION FOR
                                         PARTIAL SUMMARY JUDGMENT
17  AND CONSOLIDATED ACTIONS
                                         Date:    April 23, 2008
18                                       Time:    10:00 a.m.
                                         Place:   Courtroom 1
19
                                         **Phase 1**
20                                       Discovery Cut-Off:      Jan. 28, 2008
                                         Pre-Trial Conference:   May 5, 2008
21                                       Trial Date:             May 27, 2008

22               **CONFIDENTIAL -- FILED UNDER SEAL**

23               **PURSUANT TO PROTECTIVE ORDER**

24

25

26

27

28

EXHIBIT 26
PAGE 357

07209/2428907.1

3/11



1    Pursuant to Rule 56 of the <u>Federal Rules of Civil Procedure</u> and <u>Local</u>
2    <u>Rule</u> 56-1, defendant Mattel, Inc. ("Mattel") submits the following Separate
3    Statement of Uncontested Facts and Conclusions of Law in support of its Motion for
4    Partial Summary Judgment in Mattel's favor on the following issues:
5        **(1)** the Employee Confidential Information and Inventions Agreement
6    ("Inventions Agreement") executed by Bryant and Mattel on January 4, 1999 is
7    enforceable;
8        **(2)** under the Inventions Agreement (a) Mattel owns all Bratz-related
9    "inventions" Bryant conceived, created, made, or reduced to practice while he was
10   employed by Mattel, (b) the term "inventions" covers designs, improvements, ideas,
11   concepts, and copyrightable subject matter, such that if Mattel proves at trial that
12   any such items were conceived, created, made, or reduced to practice by Bryant
13   during his Mattel tenure, Mattel will be entitled to a judgment that it owns those
14   inventions, and (c) there is no factual dispute that certain such inventions, including
15   several drawings (Exs. 716-19, 721-22, 724-25, drawing Bates-numbered SL00044)
16   and a dummy model, were conceived, created, made, or reduced to practice during
17   Bryant's Mattel tenure, and hence are owned by Mattel;
18       **(3)** the first-generation Bratz dolls released to the public in the summer
19   of 2001, Copyright Registration Nos. VA 1-090-287, VA 1-090-288, VA 1-090-
20   289, VA 1-090-290 and VA 1-148-305, are substantially similar to seventeen
21   drawings (Ex. 10) and a doll sculpt drawing or blueprint (SL00044) created by
22   Bryant, which are original, protectable works of expression;
23       **(4)** Although damages and the full scope of Bryant's wrongdoing may
24   involve disputed facts which need to be decided by the jury, on the undisputed facts
25   Bryant is liable for breach of both the Inventions Agreement and the Conflict of
26   Interest Questionnaire, breach of the duty of loyalty, and breach of fiduciary duty;
27       **(5)** Although damages and the full scope of their wrongdoing may
28   involve disputed facts which need to be decided by the jury, on the undisputed facts

EXHIBIT ____

PAGE ____

360

07209/2428907.1

-1-

1    MGA and Larian are liable for aiding and abetting Bryant's breaches of the duty of

2    loyalty and fiduciary duty; and

3            **(6)** The affirmative defenses of MGA, Larian and MGA Hong Kong of

4    (a) 17 U.S.C. § 205, (b) bona fide purchaser for value, (c) good faith, (d)

5    acquiescence, (e) abandonment, (f) acts and omissions of others; and the affirmative

6    defenses of MGA, Larian, MGA Hong Kong and Bryant of (a) statute of limitations,

7    (b) laches, (c) waiver, (d) failure to mitigate damages, and (e) estoppel; and the

8    affirmative defense of Bryant of (a) unclean hands and (b) consent, all fail as to

9    Mattel's Phase 1 claims.

10

11                 **STATEMENT OF UNCONTESTED FACTS**

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| 1.     Mattel's business as of 2000 was to "desig[n], manufactur[e], and marke[t] a broad vareity of toy products on a worldwide basis through both sales to retailers [i.e. "customers"] and direct to consumers...[and] to create new brands..." | 1.     Mattel Inc. 2000 Annual Report at 18, attached as Exhibit 1 to the Declaration of B. Dylan Proctor ("Proctor. Dec."), dated March 7, 2008 and filed concurrently herewith. |
| 2.     Bryant withdrew "his Ninth, Tenth, and Eleventh affirmative defenses of 'failure of contract,' 'duress/ unconscionability' and 'alleged duties contrary to law[.]'" | 2.     Stipulation and Order Regarding Carter Bryant's Amended Reply to Mattel's Counterclaims, dated October 5, 2007, at 1:18-22, Proctor Dec., Exh. 3. |
| 3.     The Court has already ruled that that Mattel's Confidential Information and Inventions Agreement signed by Bryant (1) is not an unlawful restraint of | 3.     Court's Order Granting Motions to Dismiss, dated July 18, 2006 at 13, 14, 15-16, Proctor Dec., Exh. 2. |

28

EXHIBIT ____ $26$

PAGE ____ 301

07209/2428907.1

| | Uncontroverted Facts: | Evidentiary Support |
|---|---|---|
| 1 | | |
| 2 | trade in violation of Section 16600 of the | |
| 3 | Business and Professions Code (July 17, | |
| 4 | 2006 Order at 10-11),[1] (2) does not | |
| 5 | violate Sections 96(k), 98.6 or 2699 of | |
| 6 | the Labor Code (id. at 11-12), (3) does | |
| 7 | not violate Section 2870 of the Labor | |
| 8 | Code (id. at 12-13), (4) is not | |
| 9 | substantively unconscionable (Order at | |
| 10 | 13-14), (5) does not violate Sections 232 | |
| 11 | or 232.5 of the Labor Code (id. at 14), (6) | |
| 12 | was not obtained through fraud or | |
| 13 | fraudulently concealed facts (id. at 14- | |
| 14 | 15), and (7) was not obtained through | |
| 15 | duress (id. at 16-17). | |
| 16 | 4.    "[T]he model maker would be the | 4.    Deposition Transcript of Carter |
| 17 | one who would kind of come up with the | Bryant, Vol. 3 ("Bryant Tr. Vol. 3"), |
| 18 | very preliminary mechanics of -- of the | dated November 8, 2004, at 545:24-25, |
| 19 | toy[.]" | attached as Exhibit 3 to the Declaration of |
| 20 | | Jon D. Corey ("Corey Dec."), dated |
| 21 | | March 7, 2008 and filed concurrently |
| 22 | | herewith. |
| 23 | 5.    Toy design involves "[coming] up | 5.    Deposition Transcript of Ana Elise |
| 24 | with concepts for dolls and toys[.]" | Cloonan, Vol. 1 ("Cloonan Tr. Vol. 1") |
| 25 | | dated December 14, 2007, at 98:23-24, |
| 26 | | Corey Dec., Exh. 6; see also Deposition |
| 27 | | |
| 28 | [1]  UF 3 (July 17, 2006 Order at 10-11). | |

EXHIBIT 24
PAGE 302

07209/2428907.1

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
|  | Transcript of Christina Tomiyama, Vol. 1 ("Tomiyama Tr. Vol. 1"), dated February 27, 2008, at 38:3-39:8 (noting that the role of a designer like Bryant was to design products), Corey Dec., Exh. 7. |
| 6.     Bryant admitted creating a Bratz "dummy" or model using Mattel resources and that he paid at least one Mattel employee for her work on Bratz. | 6.     Bryant Tr. Vol. 3 at 666:5-667:9, Corey Dec., Exh. 3; Deposition Transcript of Carter Bryant, Vol. 1 ("Bryant Tr. Vol. 1"), dated November 4, 2004, at 166:10-170:15 (describing his recruitment of two Mattel employees to make his "dummy"), Corey Dec., Exh. 1; Id. at 165:6-8 ("there was a bin of heads or something that I had seen in the office and I just used one of those heads"); Deposition Transcript of Carter Bryant, Vol. 4 ("Bryant Tr. Vol. 4"), dated January 23, 2008, at 817:8-19 (where Bryant admits paying Sheila Kyaw for her work on the dummy), Corey Dec., Exh. 4; see also Deposition Transcript of Sheila Kyaw ("Kyaw Tr."), dated January 24, 2008, at 169:23-170:21, 173:24-176:8, 251:3-4, 251:24-252:1, Corey Dec., Exh. 8. |
| 7.     Bryant acknowledged that he "learned about the existence of [hair | 7.     Bryant Tr. Vol. 1 at 133:9-15, Corey Dec., Exh. 1; see also id. at |

EXHIBIT 24
PAGE 303

07209/2428907.1

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| vendor] Universal in connection with [his] Mattel employment[.]" | 135:25-136:1 ("I may have asked -- I may have asked the manager of the hair department, Jennifer Shaw [for the phone number]"). |
| 8.    Bryant placed dozens of phone calls to MGA from his extension at Mattel. | 8.    M 0001820-24 (Mattel phone records showing that Bryant called MGA's main line on 9/11/00, 9/12/00, 9/13/00, 9/14/00, 9/15/00, 9/18/00, 9/19/00, 9/20/00, 9/21/00, 9/25/00, 9/26/00, and 9/27/00, and that he called Isaac Larian on 9/27/00), attached as Exhibit 1 to the Declaration of Rodney Palmer, Jr. ("Palmer Dec."), dated March 6, 2008 and filed concurrently herewith. |
| 9.    The Inventions Agreement reads, "the term 'inventions' includes, but is not limited to, all discoveries, improvements, processes, designs, know-how, data computer programs and formulae, whether patentable or unpatentable." | 9.    Mattel's Employee Confidential Information and Inventions Agreement ("Inventions Agreement") at ¶ 2(b), Proctor Dec., Exh. 5. |
| 10.    The Inventions Agreement assigns to Mattel "all [Bryant's] right, title and interest" in Bryant's inventions to the extent they were "conceived or reduced to practice by [Bryant] (alone or jointly by others) at any time during [Bryant's] employment by the Company." and also | 10.    Inventions Agreement at ¶ 2(a), Proctor Dec., Exh. 5. |

EXHIBIT ___  PAGE ___

-5-

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| his "right title and interest in any patents, copyrights, patent applications or copyright applications based thereon."<br><br>The Inventions Agreement further states that even if no copyright application has yet been filed, Bryant must assist Mattel "at any time" "to obtain for [Mattel's] own benefit, patents and copyrights for all such inventions anywhere in the world…" | |
| 11.   Bryant admitted that "toy inventing" is equivalent to "designing toys." | 11.   Deposition Transcript of Carter Bryant, Vol. 4 ("Bryant Tr. Vol. 4"), dated January 23, 2008, at 861:4-13, Corey Dec., Exh. 4. |
| 12.   "[I]mprovement" is "an alteration or addition to an existing subject of invention or discovery that does not destroy its identity or essential character but accomplishes greater efficiency or economy[.]" | 12.   See WEBSTER'S THIRD NEW INT'L DICTIONARY (1993) at 1138, Proctor Dec., Exh. 6. |
| 13.   "[D]esign" is "a preliminary sketch or outline (as a drawing on paper or a modeling in clay) showing the main features of something to be executed[.]" | 13.   See WEBSTER'S THIRD NEW INT'L DICTIONARY (1993) at 611, Proctor Dec., Exh. 6. |
| 14.   The Proprietary Information Check Out form that Bryant signed at the end of | 14.   Proprietary Information Checkout, Proctor Dec., Exh. 7. |

EXHIBIT ___ 24
PAGE ___ 305

07209/2428907.1

| | Uncontroverted Facts: | Evidentiary Support |
|---|---|---|
| 1 | | |
| 2 | his Mattel tenure describes the Inventions | |
| 3 | Agreement as covering "any and all | |
| 4 | inventions, improvements and ideas | |
| 5 | (whether or not patentable) which I have | |
| 6 | made or conceived ... during the period | |
| 7 | of my employment with the Company." | |
| 8 | | |
| 9 | The Check Out form also certified that | |
| 10 | "[a]ll documents ... and other items | |
| 11 | including, but not limited to, ... sketches | |
| 12 | ... relating to the business of the | |
| 13 | Company, made or obtained by me while | |
| 14 | employed by the Company shall be the | |
| 15 | exclusive property of the Company and | |
| 16 | shall be delivered by me to the Company | |
| 17 | on termination of my employment or at | |
| 18 | any time as requested by the Company." | |
| 19 | 15.    Bryant's counsel represented to the | 15.    Transcript of Hearing Regarding |
| 20 | Court with respect to the Inventions | Mattel's Motion to Dismiss Bryant's |
| 21 | Agreement that, "The nature of the | Counter-claims, dated June 26, 2006, at |
| 22 | assignment here is that it is a broad based | 12:23-25, Proctor Dec., Exh. 8. |
| 23 | assignment of all inventions during their | |
| 24 | employment; all things that were | |
| 25 | conceived and practiced." | |
| 26 | 16.    Defendants' expert D. Jan Duffy | 16.    Expert Report of D. Jan Duffy, |
| 27 | described Mattel's and other employers' | dated February 11, 2008, at 7, Proctor |
| 28 | "procedures and practices involving | Dec., Exh. 9. |

EXHIBIT ___ PAGE ___

3696    26

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| employer/employee rights to ideas and inventions." | |
| 17.   Bryant has sharply restricted his defense of unclean hands. | 17.   Werdeger letter to Proctor, dated February 27, 2008, Proctor Dec., Exh. 120. |
| 18.   MGA, MGA Entertainment (HK) Limited, and Isaac Larian have withdrawn enitrely their defense of unclean hands to Mattel's Phase I claims. | 18.   MGA's Notice of Withdrawal of Unclean Hands Affirmative Defense as it Pertains to Phase 1, dated February 15, 2008, Proctor Dec., Exh. 121. |
| 19.   Bryant admitted creating drawings of the Bratz characters wearing evening fashion designs in or about July 2000. | 19.   See Drawing Bates-numbered BRYANT 00273 and a photograph of BRYANT 00273 marked as Exhibit 717 in this action, Proctor Dec., Exh. 12; Bryant Tr. Vol. 2 at 340:21-23, Corey Dec., Exh. 2; BRYANT 00228 and a photograph of BRYANT 00228 marked as Exhibit 719 in this action, Proctor Dec., Exh. 12; Bryant Tr. Vol. 2 at 301:25-302:3, Corey Dec., Exh. 2; BRYANT 00221 and a photograph of BRYANT 00221 marked as Exhibit 722 in this action, Proctor Dec., Exh. 12; Bryant Tr. Vol. 2 at 340:2-4, Corey Dec., Exh. 2; BRYANT 00297 and a photograph of BRYANT 00297 marked as Exhibit 725 in this action, Proctor Dec., Exh. 12; Bryant Tr. Vol. 2 at 358:2- |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | 358:4, Corey Dec., Exh. 2; see also Bryant Tr. Vol. 1 at 229:14-230:5, Corey Dec., Exh. 1; Bryant Tr. Vol. 2 at 302:4-19, Corey Dec., Exh. 2; Bryant's Responses to Mattel, Inc.'s Third Set of Requests for Admission Propounded to All Defendants at Response Nos. 9-12; Proctor Dec., Exh. 88. |
| 20.   When MGA and MGA Hong Kong sought to enforce MGA's copyrights in the courts of Hong Kong, the former director of MGA Hong Kong swore in an affirmation that Bryant created 17 drawings as the "initial concept and design drawings of the Bratz dolls" "in the year 2000 pursuant to the [Bryant-MGA] Agreement." | 20.   Affirmation of Lee Shiu Cheung, dated June 18, 2002, at ¶ 7, Proctor Dec., Exh. 13; Exhibit LSC-3 to the Affirmation of Lee Shiu Cheung, Proctor Dec., Exh. 14. |
| 21.   Bryant testified that he drew a key sculptural drawing to give to the sculptor of Bratz to "restart" her sculpt.  Bratz program manager Paula Garcia testified that the same drawing was completed between October 4, 2000 and October 19, 2000. | 21.   Bryant Tr. Vol. 2 at 350:16-25, Corey Dec., Exh. 2.  Sculptural drawing Bates-numbered BRYANT 00278, Proctor Dec., Exh. 15;  Deposition Transcript of Paula Garcia, Vol. 2, dated May 25, 2007, at 589:25-592:7 (Garcia testifies that she thinks the drawing was created in between October 4, 2000 and October 19, 2000, and that it was given to Margaret Leahy), Corey Dec., Exh. 20. |

EXHIBIT

PAGE

308

07209/2428907.1

-9-

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| 22.   A third-party vendor testified that he received the same key sculptural drawing that Bryant created for the sculptor as part of a packet of materials from Bryant and MGA while Bryant was still employed by Mattel.  The witness decribed the drawing as "an engineering drawing or a call-out of what the doll size is, the size of the doll, basically, and sort of like specs on what the body was going to be made of -- or not made of but how it was going to look." | 22.   See Collection of drawings marked as Exhibit 323 in this action at SL00044, Proctor Dec., Exh. 16; see also Deposition Transcript of Steven Linker ("Linker Tr."), dated September 13, 2006 at 77:11-13 (describing Ex. 323, Bates-numbered SL00013-63, as "this was the package that was provided to me at the October 19th meeting at MGA, excluding SL 00015."), Corey Dec., Exh. 9; id. at 89:11-21 ("This is just I guess like…So it was the actual size reference, so it gave us an idea how to build around this size with all the fashions and everything and the packaging size.  Again, we were doing packaging, so we needed to know the actual size of the doll, and this was a good call-out on that size reference."). |
| 23.   MGA has registered Bratz drawings created by Bryant with the U.S. Copyright Office. | 23.   See the copyright registration marked as Exhibit 505 in this action, Proctor Dec., Exh. 17; the copyright registration marked as Exhibit 507 in this action, Proctor Dec., Exh. 18; the copyright registration marked as Exhibit 509 in this action, Proctor Dec., Exh. 19; the copyright registration marked as Exhibit 511 in this action, Proctor Dec., |

EXHIBIT

PAGE

309 26

07209/2428907.1

-10-

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | Exh. 20; the copyright registration marked as Exhibit 513 in this action, Proctor Dec., Exh. 21. |
| 24.    Mattel has registered the same Bratz drawings with the U.S. Copyright Office that MGA has registered as well as other Bratz drawings created by Bryant during Bryant's Mattel employment. | 24.    See the copyright registration Bates-numbered M 0059601-2, Proctor Dec., Exh. 22; the copyright application Bates-numbered M 0059734-7, Proctor Dec., Exh. 23; the copyright registration Bates-numbered M 0059585-6, Proctor Dec., Exh. 24; the copyright application Bates-numbered M 0059702-5, Proctor Dec., Exh. 25; the copyright registration Bates-numbered M 0059589-90, Proctor Dec., Exh. 26; the copyright application Bates-numbered M 0059710-3, Proctor Dec., Exh. 27; the copyright registration Bates-numbered M 0059591-2, Proctor Dec., Exh. 28; the copyright application Bates-numbered M 0059714-7, Proctor Dec., Exh. 29; the copyright registration Bates-numbered M 0059587-8, Proctor Dec., Exh. 30; the copyright application Bates-numbered M 0059706-9, Proctor Dec., Exh. 31; the copyright registration Bates-numbered M 0059609-10, Proctor Dec., Exh. 32; the copyright application Bates-numbered M 0059750-3, Proctor |

07209/2428907.1

EXHIBIT 26

PAGE 310

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | Dec., Exh. 33; the copyright registration Bates-numbered M 0059583-4, Proctor Dec., Exh. 34; the copyright application Bates-numbered M 0059698-701, Proctor Dec., Exh. 35; the copyright registration Bates-numbered M 0059593-4, Proctor Dec., Exh. 36; the copyright application Bates-numbered M 0059718-21, Proctor Dec., Exh. 37; the copyright registration Bates-numbered M 0059595-6, Proctor Dec., Exh. 38; the copyright application Bates-numbered M 0059722-5, Proctor Dec., Exh. 39; the copyright registration Bates-numbered M 0059597-8, Proctor Dec., Exh. 40; the copyright application Bates-numbered M 0059726-9, Proctor Dec., Exh. 41; the copyright registration Bates-numbered M 0059599-600, Proctor Dec., Exh. 42; the copyright application Bates-numbered M 0059730-3, Proctor Dec., Exh. 43; the copyright registration Bates-numbered M 0059603-4, Proctor Dec., Exh. 44; the copyright application Bates-numbered M 0059738-41, Proctor Dec., Exh. 45; the copyright registration Bates-numbered M 0059605-6, Proctor Dec., Exh. 46; the copyright application |

EXHIBIT

PAGE

371

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | Bates-numbered M 0059742-5, Proctor Dec., Exh. 47; the copyright registration Bates-numbered M 0059607-8, Proctor Dec., Exh. 48; the copyright application Bates-numbered M 0059746-9, Proctor Dec., Exh. 49; the copyright registration Bates-numbered M 0059581-2, Proctor Dec., Exh. 50; the copyright application Bates-numbered M 0059758-61, Proctor Dec., Exh. 51; the copyright registration Bates-numbered M 0059579-80, Proctor Dec., Exh. 52; the copyright application Bates-numbered M 0059754-7, Proctor Dec., Exh. 53. |
| 25.    Bryant testified that he intended his Bratz drawings to serve as guides for creation of the Bratz dolls. | 25.    Bryant Tr. Vol. 2 at 387:17-25, Corey Dec., Exh. 2; Bryant Tr. Vol. 3 at 528:3-20, Corey Dec., Exh. 3;  Bryant Tr. Vol. 5 at 901:7-902:3, Corey Dec., Exh. 5. |
| 26.    Defendant Larian testified in another matter that the first Bratz dolls were exhibited in November 2000.  MGA Rule 30(b)(6) designee Rebecca Harris confirmed that Larian was referring to the exhibition of Bryant's drawings. | 26.    See Affidavit of Isaac Larian in Cityworld at ¶13, ("Larian's Cityworld Affidavit") Bates-numbered M 0883396-407 (Larian stating "The Bratz dolls were first exhibited in the USA in November 2000."), Proctor Dec., Exh. 54; Deposition Transcript of Spencer Woodman ("Woodman Tr."), dated |

EXHIBIT 26

PAGE 372

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | October 9, 2007, at 170:22, Corey Dec., Exh. 17; see also Deposition Transcript of Rebecca Harris, Vol. 2 ("Rebecca Harris Tr. Vol. 2"), dated January 22, 2008, at 476:18-25, Corey Dec., Exh. 10 (when asked about Larian's statement at ¶13 in Larian's Cityworld Affidavit, Harris responds, "They were the boards. . . . the boards were sketches of the dolls."); see also Bryant sketches marked as Exhibits 1107-10 in this action, Proctor Dec., Exh. 55; Deposition Transcript of Paula Garcia, Vol. 4 ("Garcia Tr. Vol. 4"), at 1021:14, 1024:21, 1025:19 & 1026:12, Corey Dec., Exh. 18; see also Rebecca Harris Tr. Vol. 2 at 367:2-6, Corey Dec., Exh. 10 (confirming "MGA made presentations to retailers, in connection with Bratz, specifically to Wal-Mart, Kmart, Walgreens, and Target, in November 2000."); id. at 376:25-377:15 (noting that MGA presented character art boards to the retailers previously listed "because that's all that we had available to show them."); id. at 485:20-489:19 (describing pictures of boards attached to an e-mail as some of the boards presented |

EXHIBIT 26
PAGE 373

07209/2428907.1

-14-

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | to the retailers); e-mail and attachments Bates-numbered MGA 0050733-36, Proctor Dec., Exh. 56; Deposition Transcript of Sarah Chui ("Chui Tr."), dated September 28, 2007, at 94:4, Corey Dec., Exh. 19; Rebecca Harris Tr. Vol. 2 at 497:23-500:3 (describing Bryant's sketches as some of the figures which were on the boards presented to the retailers), Corey Dec., Exh. 10; Collection of drawings marked as Exhibit 302 in this action, Proctor Dec., Exh. 57; Deposition Transcript of Paula Garcia, Vol. 2, ("Garcia Tr. Vol. 2"), dated May 25, 2007, at 622:9-11, Corey Dec., Exh. 20. |
| 27.    In a side-by-side comparison of a picture of a first wave Bratz doll unclothed next to a sculpt drawing done by Bryant, all the major anatomical landmarks -- including chins, shoulders, waists, crotch, knees, and ankles -- line up on a horizontal plane.  The alignments are too numerous to be coincidental. | 27.    See Exhibit 37 and Paragraph 12 to the Declaration of Lee Loetz ("Loetz Dec."), dated March 7, 2008 and filed concurrently herewith. |
| 28.    A side-by-side comparison of a picture of a first wave Bratz doll unclothed next to a sculpt drawing done | 28.    Loetz Dec., Exh. 2 & ¶ 13. |

EXHIBIT 26

PAGE 374

| | Uncontroverted Facts: | Evidentiary Support |
|---|---|---|
| 1 | | |
| 2 | by Bryant from a three quarter view | |
| 3 | shows that the dolls and drawings are | |
| 4 | highly similar, and demonstrates that the | |
| 5 | doll closely followed the curves of the | |
| 6 | drawing. | |
| 7 | 29.    In Bryant's drawings, the | 29.    Loetz Dec., Exhs. 4, 5, 7, 9 & 16 & |
| 8 | characters have an angular waist pose | ¶ 15. |
| 9 | with knock-knees, pigeon toes, and hands | |
| 10 | upturned at the wrist.  The final dolls | |
| 11 | match to a remarkable degree the poses in | |
| 12 | Carter Bryant's concept sketches. | |
| 13 | Similarly, the upturned hands at the | |
| 14 | wrists evident in Bryant's drawings were | |
| 15 | faithfully executed in the three | |
| 16 | dimensional Bratz dolls. | |
| 17 | 30.    The proportional placement of the | 30.    Loetz Dec., Exhs. 6, 17, 19, 21 & |
| 18 | eyes, hair and lips, which define the | 24 & ¶¶ 16-18. |
| 19 | signature "sultry look" of the Bratz dolls, | |
| 20 | match nearly identically as between the | |
| 21 | drawings and the dolls.  From a three | |
| 22 | quarter view, the eyes are a similar | |
| 23 | distance apart, as are the eyebrows.  The | |
| 24 | cheek color application is in the same | |
| 25 | place.  The faces have a similar shape, | |
| 26 | from the brow down to indenture of the | |
| 27 | eye socket, to the outward curve of the | |
| 28 | cheek.  Even the moles are in the same | |

EXHIBIT __ 26
PAGE __ 375

07209/2428907.1

-16-

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| location on the face. | |
| 31.    Bryant's drawings include oversized almond shaped-eyes, with heavy lids, outlined with makeup lines. The Bratz dolls' eyes share this almond shape, which is angled upward at its outside edge.  The pupils are also placed in a similar location on the horizontal as well as vertical plane.  And the eyebrows share the same distance from the eye, the same angular shape, and cover fifty percent of the pupils; Loetz deems this fact especially notable. | 31.    Loetz Dec., Exhs. 18, 20, 22 & ¶¶ 19-20. |
| 32.    The makeup on the eyes in Bryant's drawings was meticulously executed on the doll.  In the dolls and in the drawings, the characters' eyes have three eyelashes.  There are similarities in placement and design of the eye makeup. The eyeliner design is similar in its painterly thickness and sweeping upward curves.  The eye makeup style and design is exceptional in correlation from drawing to doll. The various colors of makeup and the placement, size and shape of the makeup applications gives the look of a girl who has on too much | 32.    Loetz Dec., Exhs. 20, 22, 24 & ¶ 21. |

EXHIBIT 26
PAGE 376

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| eye makeup . | |
| 33.    The lips are essentially the same in Bryant's drawings and the dolls.  Both have large over-inflated lips with the widest portion being in the middle of the lips.  There is also a correlation in makeup style on the lips.  The glossy lips with a dark distinctive outline are apparent on both doll and drawing. | 33.    Loetz Dec., Exhs. 8, 18, 20, 22, 24 & ¶ 22. |
| 34.    The dolls and the drawings share similar braided hairstyles on a dark-haired character, and pig-tailed hairstyles with the same length bangs on a dark haired character. | 34.    Loetz Dec., Exhs. 17, 19, 23 & ¶ 23. |
| 35.    The dolls and drawings share similar urban fashions of short skirts, layered tops, and high heeled shoes. Where pants are worn, both doll and drawing share the same flared style with wide cuffs and striped details.  The denim skirts are also similar.  The dolls and drawings feature a similar floral pattern shirt, with similar style and length denim skirt.   The dolls and drawings also share a similar knit hat style, similar striped shirts, and similarly layered and cropped shirts. | 35.    Loetz Dec., Exhs. 4, 5, 10, 25, 26, 28, 29, 30 & ¶ 26. |

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

EXHIBIT 26
PAGE 377

07209/2428907.1

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| 36.    The Bratz accessories are youthful and funky in style, especially in the use of colorful backpacks and bags.  Both dolls and drawings share the same graphic motif, such as a kitten on a cropped t-shirt, and a bunny on a backpack. | 36.    Loetz Dec., Exhs. 7, 13, 16, 27 & ¶¶ 27-28. |
| 37.    There are extensive similarities in the shoe design, including in the execution of sneaker style and design, high heels, open toes, and belt straps.  Shoes in both the drawings and on the dolls are oversized. | 37.    Loetz Dec., Exhs. 3, 9-12, 14, 15 & ¶¶ 29-30. |
| 38.    There is a visual consistency from Bryant's sketches, to the first wave of dolls, up through the later waves of Bratz dolls. | 38.    Loetz Dec., ¶ 31. |
| 39.·   MGA registered with the U.S. Copyright Office the original four Bratz dolls released to market in or about June 2001 and registered the Bratz sculpt in or about March 2002.  MGA's initial copyright registrations for those dolls and the Bratz sculpt list their dates of creation as 2000. | 39.    See MGA copyright registration produced in this action and Bates-numbered M 0110155-9, Proctor Dec., Exh. 58; MGA copyright registration produced in this action and Bates-numbered M 0110160-4, Proctor Dec., Exh. 59; MGA copyright registration produced in this action and Bates-numbered M 0110165-9, Proctor Dec., Exh. 60; MGA copyright registration |

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

07209/2428907.1

EXHIBIT 26

PAGE 378

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | produced in this action and Bates-numbered M 0110639-42, Proctor Dec., Exh. 61; MGA copyright registration produced in this action and Bates-numbered M 0110174-8, Proctor Dec., Exh. 62. |
| 40.     After Mattel filed this lawsuit, MGA "corrected" the registrations for the original dolls and the sculpt to state that the dolls were created in 2001. | 40.     See Form CA produced in this action and Bates-numbered M 0110217-8, Proctor Dec., Exh. 63; Form CA produced in this action and Bates-numbered M 0110219-20, Proctor Dec., Exh. 64; Form CA produced in this action and Bates-numbered M 0110221-2, Proctor Dec., Exh. 65; Form CA produced in this action and Bates-numbered M 0110223-4, Proctor Dec., Exh. 66; Form CA produced in this action and Bates-numbered M 0110225-6, Proctor Dec., Exh. 67. |
| 41.     When defendant Isaac Larian sought to enforce MGA's copyrights in the courts of Hong Kong, he swore in an affidavit that the defendant's dolls "have infringed the two dimensional drawings which are artistic works in which copyright subsists." | 41.     Larian CityWorld Affidavit at ¶ 12, Proctor Dec., Exh. 54. |
| 42.     Daphne Gronich, MGA's former | 42.     See, e.g., Affidavit of Daphne |

EXHIBIT   86

PAGE   379

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| general counsel, repeatedly identified fifteen Bryant drawings as the "artistic works" upon which the three dimensional Bratz dolls are modeled. | Gronich at ¶¶ 5-6 in Hunglam Toys Company Limited et al., Proctor Dec., Exh. 68; Woodman Tr. Vol. 1 at 235:6-7, Corey Dec., Exh. 17; see also Affidavit of Daphne Gronich in MGA Entertainment, Inc. v. Double Grand Corp. Ltd., at ¶¶ 6-7, Proctor Dec., Exh. 122. |
| 43.   Both MGA Hong Kong's Lee Shiu Cheung and MGA Hong Kong's outside counsel have separately declared under oath that "[t]he designs of the Bratz dolls are all original drawings created by Mr. Bryant using his own independent labour, skill and judgement [sic]." | 43.   Affirmation of Lee Shiu Cheung in MGA Entertainment, Inc. v. Double Grand Corp. Ltd. at ¶ 8, Proctor Dec., Exh. 69; Woodman Tr. Vol. 1 at 281:7-14, Corey Dec., Exh. 17;  see also Affirmation of Wai Lim Fan at ¶ 5(2) in MGA Entertainment, Inc. v. Hunglam Toys Co. Ltd., dated July 24, 2003, Proctor Dec., Exh. 123. |
| 44.   Bryant admitted in this action that the drawings at issue are original works of authorship within the meaning of the Copyright Act. | 44.   Carter Bryant's Responses to Mattel's Sixth Set of Requests for Admission at Response Nos. 18, 19, 92, 93, 145, 146, 177, 178, 262, 263, 644, 645, 655, 656, 666, 667, 677, 678, Proctor Dec., Exh. 70. |
| 45.   Bryant admitted that he failed to disclose his Bratz inventions to Mattel. | 45.   Bryant Tr. Vol. 4 at 885:3-18, Corey Dec., Exh. 4. |
| 46.   Bryant signed a contract dated as of September 18, 2000 assigning to MGA all "Bryant Work Product," which | 46.   Agreement between Carter Bryant and MGA ("Bryant-MGA Agreement") at ¶3(a), Bates-numbered BRYANT 00794- |

07209/2428907.1

EXHIBIT

PAGE

380

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| included copyrights to "all results and proceeds of services provided during the term of this Agreement . . . ." | 799, Proctor Dec., Exh. 71. |
| 47.    The Bryant-MGA Agreement obligated Bryant to provide his services to MGA on a "top priority basis" while Bryant was still a Mattel employee. | 47.    Bryant-MGA Agreement at ¶ 1, Proctor Dec., Exh. 71. |
| 48.    In 2004, Bryant signed a "Modification and Clarification" of his MGA contract, which "confirms" that "it is the continuing intent, and has always been the intent of the parties from the beginning of their contractual relationship, that MGA shall own all Intellectual Property Rights subsisting in all Services and Materials created and worked on by Bryant." | 48.    2004 Modification and Clarification of 2000 Agreement ("Modification of 2000 Agreement") at § 2, Bates-numbered MGA000429-434, Proctor Dec., Exh. 72. |
| 49.    The Modification of the 2000 Agreement defines "Services" to include "all creative and productions services and materials used to develop, create, design, render, produce or deliver the Projects," and defining "Projects" as "any and all projects worked on by Bryant with respect to the Bratz Property". | 49.    Modification of 2000 Agreement at §§ 1.1, 1.4, Proctor Dec., Exh. 72. |
| 50.    The Inventions Agreement prohibits Bryant from "without the | 50.    Inventions Agreement at ¶ 3(a), Proctor Dec., Exh. 5. |

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

07209/2428907.1

EXHIBIT ___

PAGE ___ 391

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| Company's express written consent, engag[ing] in any employment or business other than for the Company, or invest[ing] in or assist[ing] (in any manner) any business competitive with the business or future business plans of the Company." | |
| 51.    In the Inventions Agreement, Bryant specifically acknowledged: "The Company depends on me to maintain that confidentiality, and I accept that position of trust." | 51.    Inventions Agreement at ¶ 1(a), Proctor Dec., Exh. 5. |
| 52.    The Inventions Agreement also required Bryant to maintain Mattel's proprietary information in strict confidence. | 52.    See Inventions Agreement at ¶ 1(a)-(d), Proctor Dec., Exh. 5. |
| 53.    Bryant testified that, while at Mattel, he had extensive access to and exposure to confidential and proprietary information, including not only the designs for the Barbie line, but other proposed lines of dolls and toys; that he had confidential knowledge relating to design, marketing, production, sales; that his access to the creative resources and concepts at the core of Mattel's business put him in a position where he was | 53.    Bryant Tr. Vol. 1 at 17:5-6, Corey Dec., Exh. 1 ("I suppose that my understanding was to keep the work that was being done at Mattel secret, yes."); id. at 14:20-16:8 (admitting that he had access to confidential information and stating "[b]asically we had access to knowledge of the products that we were working on."); Bryant Tr. Vol. 4 at 822:1-826:20, Corey Dec., Exh. 4 (discussing his attendance at meetings regarding |

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

07209/2428907.1

EXHIBIT 26
PAGE 382

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| clearly in a position of trust within the company. | products and products in development); id. at 828:11-830:15 (acknowledging the openness of the Mattel design center and the possibility that "somebody could walk by and see what a doll designer sitting in the cubicle was doing"); Bryant Tr. Vol. 5 at 1095:15- 1097:4, Corey Dec., Exh. 5 (admitting that he attended brainstorming sessions and that he "[threw] in ideas."). |
| 54.    Bryant worked on his Bratz drawings while employed by Mattel. | 54.    See, e.g., UF 17-19; see also collection of Bratz drawings marked as Exhibit 2 in this action, Proctor Dec., Exh. 73; Bryant Tr. Vol. 2 at 296:4-297:12 (Bryant admits to coloring the drawings collectively marked as Exhibit 2 in this action in 1999, and that, to his best recollection, he put them together to form a packet in 1999), Corey Dec., Exh. 2. |
| 55.    Bryant showed his Bratz drawings to MGA while employed by Mattel. | 55.    E-mail reminder regarding meeting in Larian's office with attendees Paula Treantafelles & Victoria O'Connor re Carter Bryant on 9/1/00 ("E-mail Reminder"), Bates-numbered MGA001473, Proctor Dec., Exh. 74; Deposition Transcript of Isaac Larian ("Larian Tr. Vol. 1"), dated July 18, 2006, at 198:19-198:24, Corey Dec., Exh. 13; |

07209/2428907.1

-24-

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | collection of Bryant drawings marked as Exhibit 302 in this action, Proctor Dec., Exh. 57; Bryant Tr. Vol. 1 at 9:25-11:17, Corey Dec., Exh. 1 (Bryant discusses his first meeting with MGA that took place at the end of August 2000 and in which he showed his drawings); Deposition Transcript of Veronica Marlow ("Marlow Tr. Vol. 1"), dated December 28, 2007, at 135:20-136:9, Corey Dec., Exh. 11 (Marlow testifies that Ex. 302 contains the drawings Bryant showed Garcia at the first meeting); id. at 206:18-211:17 (Marlow discusses the September 1, 2000 meeting and mentions the fact that Larian and his daughter commented on Bryant's drawings); Deposition Transcript of Paula Garcia, Vol. 1 ("Garcia Tr. Vol. 1"), dated May 24, 2007, at 265:11-268:20 (Garcia testifies to the prototype and drawings that Bryant presented), Corey Dec., Exh. 12; Larian Tr. Vol. 1 at 77:14-78:10 (Larian comments on his first encounter with Bryant and how Bryant showed him some drawings), Corey Dec., Exh. 13 ; Deposition Transcript of Victoria O'Connor |

EXHIBIT 26

PAGE 384

-25-

07209/2428907.1

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | Confidential ("O'Connor Tr. Conf."), dated December 6, 2004, at 55:12-56:2, Corey Dec., Exh. 14 (O'Connor states that Bryant presented a prototype and a drawing at the first meeting with MGA at which she was present); Id. at 56:20-59:12 (O'Connor describes in more detail the prototype and the drawings that Bryant brought with him); Deposition Transcript of Samir Khare, Vol. 3 ("Khare Tr. Vol. 3"), dated January 25, 2008, at 752:24- 753:12, Corey Dec., Exh. 15 (Khare discusses the first meeting where Bryant showed his sketches to Garcia and Marlow); id. at 766:17- 767:11 (Khare testifies about Bryant showing his drawings at the first meeting with MGA); Deposition Transcript of Rachel Harris ("Rachel Harris Tr."), dated February 26, 2008, at 17:11-19, 30:24-32:17, Corey Dec., Exh. 16 (Harris testified that MGA set up a meeting for Bryant to present his drawings to MGA in October of 2000). |
| 56.   Bryant has admitted working for MGA on a "separate" doll called "Angel" while employed by Mattel and was paid | 56.   See Bryant Tr. Vol. 1 at 178:3 - 178:18, Corey Dec., Exh. 1; see also Bryant's Angel sketches, Bates-numbered |

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

07209/2428907.1

| | Uncontroverted Facts: | Evidentiary Support |
|---|---|---|
| 1 | | |
| 2 | by MGA for that work. | BRYANT 00173-174, Proctor Dec., Exh. |
| 3 | | 75; Garcia Tr. Vol. 2 at 321:22-322:6, |
| 4 | | Corey Dec., Exh. 20; Bryant invoice, |
| 5 | | Bates-numbered MGA 001294-96, |
| 6 | | Proctor Dec., Exh. 76; Deposition |
| 7 | | Transcript of Kerri Brode, Percipient, |
| 8 | | ("Brode Percipient Tr."), dated August |
| 9 | | 15, 2007, at 117:18-24, Corey Dec., Exh. |
| 10 | | 21. |
| 11 | 57.    Bryant targeted Mattel vendors and | 57.    Facsimile from Bryant to Universal |
| 12 | engaged them to start their work on Bratz | Commerce Corp., Bates-numbered |
| 13 | before he left Mattel. | BRYANT 01200-03, Proctor Dec., Exh. |
| 14 | | 77; Bryant Tr. Vol. 3 at 680:13-21, Corey |
| 15 | | Dec., Exh. 3; Marlow's invoices for 169 |
| 16 | | hours of work on Bratz beginning as early |
| 17 | | as September 29, 2000, Bates-numbered |
| 18 | | MGA 0072161-167, Proctor Dec., Exh. |
| 19 | | 78; Garcia Tr. Vol. 4 at 1276:16-21, |
| 20 | | Corey Dec., Exh. 18;  Bryant Tr. Vol. 2 at |
| 21 | | 341:18-342:11, Corey Dec., Exh. 2 |
| 22 | | (testifying about the drawing he gave to |
| 23 | | Margaret Leahy while he was still at |
| 24 | | Mattel for her to begin her sculpting work |
| 25 | | on Bratz); October 12, 2000 e-mail from |
| 26 | | Liz Hogan to Paula Treantafelles and |
| 27 | | Carter Bryant, copy to Steve Linker, |
| 28 | | Bates-numbered SL00001, Proctor Dec., |

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

07209/2428907.1

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | Exh. 79; Linker Tr. Vol. 1 at 57:7-21, Corey Dec. Exh. 9; October 14, 2000 e-mail from Hogan to Treantafelles copying Linker, Bates-numbered SL00005-7, Proctor Dec., Exh. 80; Linker Tr. Vol. 1 at 66:16-67:9, Corey Dec., Exh. 9; Bryant Tr. Vol. 1 at 221:21-222:11, Corey Dec., Exh. 1 (noting that before he signed his contract with MGA, he and Garcia met with Steve Linker regarding packaging designs for Bratz). |
| 58.    Bryant created Bratz designs that bore March and April 2000 fax header dates -- six to seven months before his last day at Mattel. | 58.    Bratz designs with March and April 2000 fax headers, Bates-numbered KMW-M 01647-8, MGA HK 0001928, MGA HK 0001935, KMW-M 007726, KMW-M 007729, KMW-M 007734 & BRYANT 00167, Proctor Dec., Exh. 81; see also Bryant Tr. Vol. 2 at 317:17-23, Corey Dec., Exh. 2. |
| 59.    Paula Treantafelles, the project manager on Bratz, stated in an e-mail dated October 10, 2000 that Bryant worked for MGA for at least 4 hours per day starting weeks before he left Mattel. | 59.    E-mail correspondence between Larian, O'Connor, Dennis Medici and Treantafelles, dated October 10, 2000, Bates-numbered MGA 004717, Proctor Dec., Exh. 82; Deposition Transcript of Paula Garcia, Vol. 3 ("Garcia Tr. Vol. 3"), dated October 9, 2007 at 873:25-875:4, Corey Dec., Exh. 22. |

EXHIBIT 26

PAGE 387

07209/2428907.1