| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| 60.  MGA produced an internal MGA e-mail message stating that the first Bratz dolls were created in September 2000. | 60.  E-mail from Nana Ashong to O'Connor, Treantafelles and Martin Hitch, copy to Jackie Bielke, dated September 6, 2001, Bates-numbered MGA0069426-7, Proctor Dec., Exh. 83; Deposition Transcript of Nana Ashong Vol. 1 ("Ashong Tr. Vol. 1"), dated January 28, 2008, at 215:23-216:16, Corey Dec., Exh. 23. |
| 61.  Anna Rhee, the face painter of Bratz, testified that invoices dated as early as June 12, 2000 were for work she performed on Bratz for MGA under the "code name" of "Angel." | 61.  Rhee's 2000-2001 invoices to MGA, Bates-numbered AR 0001-0058, Proctor Dec., Exh. 84; Deposition Transcript of Anna Rhee Non-Confidential ("Rhee Non-Conf. Tr."), dated February 3, 2005 at 23:13-24:8, Corey Dec., Exh. 24; Deposition Transcript of Anna Rhee Confidential ("Rhee Conf. Tr."), dated February 3, 2005, at 107:16-110:6 (Rhee testifies about AR 0001 and says that the invoice reflects Bratz work she performed for Bryant), Corey Dec., Exh. 25. |
| 62.  Bryant testified that he informed Isaac Larian and Paula Garcia, MGA's CEO and Product Managaer respectively, that he was a Mattel employee at his initial meeting with MGA.  Larian, | 62.  Bryant Tr. Vol. 1 at 88:12-13, Corey Dec., Exh. 1 ("I believe that I told Paula that I was employed by Mattel at my first meeting with her."); Id. at 88:21-89:1 (Bryant testifying that he told Larian |

07209/2428907.1

EXHIBIT 26
PAGE 388

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| O'Connor and Rachel Harris have each confirmed that they knew he was a Mattel employee when each first met with him. | he was an employee of Mattel at the September 1, 2000 meeting);  Larian Tr. Vol. 1 at 77:17-18, Corey Dec., Exh. 13 (Larian testifies that "[Bryant] said he works at Mattel.");  Isaac Larian's testimony in Art Attacks at MGA 0868922, Proctor Dec., Exh. 85; O'Connor Tr. at 71:8-17, Corey Dec., Exh. 14 (O'Connor testifies that Bryant mentioned he was employed by Mattel and that he was a designer for Barbie Collectibles). |
| 63.     Bryant testified that he told Larian that he was a Mattel employee the first time that he met Larian.  In addition, MGA's Rachel Harris testified that MGA knew Bryant was a Mattel employee at the time Bryant presented his drawings to MGA. | 63.     Bryant Tr. Vol. 1 at 88:21-89:3, Corey Dec., Exh. 1; Rachel Harris Tr. Vol. 1 at 41:10-42:10, 166:1-168:8, Corey Dec., Exh. 16. |
| 64.     Bryant told MGA's counsel that he had signed a confidentiality agreement with Mattel. | 64.     Facsimile from Bryant to David Rosenbaum, Bates-numbered MGA007337-40, Proctor Dec., Exh. 86; Bryant Tr. Vol. 4 at 772:18-773:15, Corey Dec., Exh. 4; Bryant Tr. Vol. 3 at 585:17 - 587:17 (Bryant testifying that he had informed MGA that he had signed a confidentiality agreement), Corey Dec., |

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

07209/2428907.1

EXHIBIT

PAGE

389

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | Exh. 3. |
| 65.    MGA specifically paid Bryant for work performed and expenses that he incurred on behalf of MGA while Bryant was still working for Mattel. | 65.    See, e.g., Bryant's invoice dated August 31, 2000 and marked as Exhibit 593 in this action, Proctor Dec., Exh. 76; Brode Percipient Tr. at 117:10-118:6, Corey Dec., Exh. 21; internal MGA e-mail regarding setting Bryant up as a vendor, Bates-numbered MGA 001291, Proctor Dec., Exh 89; Deposition Transcript of MGA Designee Kerri Brode ("Brode Designee Tr.") dated January 19, 2007, at 53:6-14, Corey Dec., Exh. 26; Bryant's actual expense report, receipts, and MGA's payment to Bryant for his Bratz expenses, Bates-numbered MGA 3786749-60, Proctor Dec., Exh. 111. |
| 66.    Bratz has been a very successful product for MGA and Larian. | 66.    Deposition Transcript of Lisa Tonnu, Vol. 2 ("Tonnu Vol. 2"), dated September 24, 2007, at 380:21-381:19, Corey Dec., Exh. 27; Bratz Sales from 2001-2006 spreadsheet, Bates-numbered MGA 0868723-865, marked as Exhibit 660 in this action, Proctor Dec., Exh. 4. |
| 67.    The Inventions Agreement states at the outset that the agreement "is designed to make clear that … inventions that I create will be owned by the Company," | 67.    Inventions Agreement, Proctor Dec., Exh. 5. |

EXHIBIT 24 PAGE 390

| | Uncontroverted Facts: | Evidentiary Support |
|---|---|---|
| 1 | | |
| 2 | and concluding with the capitalized, | |
| 3 | bold-faced statement that "**THIS** | |
| 4 | **AGREEMENT CREATES** | |
| 5 | **IMPORTANT OBLIGATIONS OF** | |
| 6 | **TRUST AND AFFECTS THE** | |
| 7 | **EMPLOYEE'S RIGHT TO** | |
| 8 | **INVENTIONS THE EMPLOYEE** | |
| 9 | **MAY MAKE DURING HIS OR HER** | |
| 10 | **EMPLOYMENT.**" | |
| 11 | 68.    The Bratz project manager at | 68.    See E-mail interview of Paula |
| 12 | MGA admitted that the Bratz dolls are | Treantafelles for "Dolls Magazine", dated |
| 13 | based on Bryant's drawings.  An MGA | April 25, 2001 and May 1, 2001, Bates- |
| 14 | Rule 30(b)(6) designee likewise admitted | numbered MGA 0051255-7, at MGA |
| 15 | that the drawing started the "concept" | 0051256 ("The four girls were already |
| 16 | from which the dolls "evolved[.]" | concepted [sic] when presented by the |
| 17 | | inventor during our first meeting.  I |
| 18 | | thought they were incredible and I tried to |
| 19 | | stay true [to] this inventor/creator's |
| 20 | | vision."), Proctor Dec., Exh. 110; see also |
| 21 | | Rebecca Harris Vol. 2 at 490:15-17 ("His |
| 22 | | drawings start a concept, you know, and |
| 23 | | from the concept they evolved into what |
| 24 | | they are."), Corey Dec., Exh. 10. |
| 25 | 69.    Bryant departed from Mattel on | 69.    Proprietary Information Checkout, |
| 26 | October 19, 2000. | Proctor Dec., Exh. 7; Mattel Exit |
| 27 | | Interview Form, Proctor Dec., Exh. 90. |
| 28 | 70.    On April 27, 2004, Mattel filed its | 70.    Mattel's Complaint in Mattel, Inc. |

EXHIBIT
PAGE

26
391

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| original complaint in California state court against Bryant in <u>Mattel, Inc. v. Bryant</u>, Case No. BC314398. Mattel brought claims for breach of contract and breach of duty of loyalty. | <u>v. Bryant</u>, Case No. BC314398 at 5-9, Proctor Dec., Exh. 91. |
| 71.     On May 13, 2005, Mattel filed its answer to MGA's complaint in <u>MGA Entertainment, Inc. v. Mattel, Inc.</u>, Case No. CV 05-2727 SGL (RNBx). | 71.     Mattel's answer to MGA's complaint in <u>MGA Entertainment, Inc. v. Mattel, Inc.</u>, Case No. CV 05-2727 SGL (RNBx), dated May 13, 2005, Proctor Dec., Exh. 92. |
| 72.     On November 20, 2006, Mattel moved to amend its complaint against MGA and Bryant. Mattel added a claim for copyright infringement against Bryant when it moved to amend. | 72.     Mattel's Notice of Motion and Motion for Leave to File Amended Complaint at 1-3, 14, filed November 20, 2006, Proctor Dec., Exh. 93. |
| 73.     The Court has previously ruled that, "November 24, 2003[] marks the date when litigation between Mattel and Bryant became more than merely speculative and in fact became probable. On this date, in-house counsel for Mattel received in discovery in an unrelated action a copy of a contract between MGA and Bryant that pre-dated Bryant's resignation from Mattel.  This contract appeared to Mattel to violate certain employment agreements executed by | 73.     Court's Order Denying MGA's Motion for Terminating Sanctions, dated August 27, 2007, at 3, Proctor Dec., Exh. 94. |

EXHIBIT ___

PAGE ___

372

07209/2428907.1

-33-

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| Bryant and Mattel, thus giving rise to one of the current consolidated actions. Although prior to this date an internal investigation may have raised a <u>suspicion</u> on Mattel's part that litigation might arise, there was no evidence presented to the Court that Mattel should have known it had a viable claim against Bryant before November 2003." | |
| 74.   The Court ruled that Mattel could file its Amended Complaint in Case No. 04-9059 as an Amended Answer in Case No. 05-2727 instead. | 74.   <u>See</u> Court's Order Regarding Mattel's Motion for Leave to Amend, dated January 11, 2007, at 22:13-15, Proctor Dec., Exh. 95. |
| 75.   The Court previously found that, "By MGA's own admission Mattel's copyright claim arises out of the same conduct or transaction contained in the original complaint filed in April, 2004 …" | 75.   <u>Id.</u> at 13. |
| 76.   Bryant alleged in an Interrogatory Response that Mattel knew "he was going to perform work for a Mattel competitor," but "waited and said nothing while the [Bratz] dolls were successfully (and at great cost) developed, manufactured and sold, and only filed suit years later." | 76.   Carter Bryant's Responses to Mattel, Inc's Amended Supplemental Interrogatory Regarding Defendants' Affirmative Defenses ("Bryant's Responses") at §§ B, E, Proctor Dec., Exh. 96. |

EXHIBIT 96
PAGE 393

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

07209/2428907.1

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| 77.    In the Inventions Agreement, Bryant acknowledged that his "obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company." | 77.    Inventions Agreement at ¶ 4(a), Proctor Dec., Exh. 5. |
| 78.    During his exit interview, Bryant claimed that he was leaving to start his own freelancing business and work for himself doing design and development. | 78.    Bryant Tr. Vol. 1. at 208:22-24, Corey Dec., Exh. 1. |
| 79.    Had Mattel been aware that Bryant was going to a competitor, it would have followed its policy of expelling that employee the same day of his announced resignation. | 79.    Deposition Transcript of Sandra Yonemoto, Confidential ("Yonemoto Conf. Tr. Vol. 1"), dated May 30, 2007, at 67:16-19, Corey Dec., Exh. 28. |
| 80.    On January 4, 1999, Bryant executed a Conflict of Interest Questionnaire ("Conflict Questionnaire"), in which he certified that, other than as disclosed, he had not worked for any competitor of Mattel in the prior twelve months and had not engaged in any business venture or transaction involving a Mattel competitor that could be construed as a conflict of interest. | 80.    Mattel's Complaint at Exh. B, Proctor Dec., Exh. 91. |
| 81.    Bryant did not notify Mattel that he was working on Bratz. | 81.    Bryant Tr. Vol. 4 at 885:3-18, Corey Dec., Exh. 4. |

EXHIBIT ___
PAGE ___

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| 82.   In an e-mail dated March 12, 2002, from Isaac Larian to MGA personnel, regarding inquiries about Bratz, Larian stated that:"[t]here must be no mention about Mattel or any of their properties, Carter, any MGA Bratz arts, etc." | 82.   E-mail from Isaac Larian dated March 12, 2002 instructing MGA personnel, Bates-numbered MGA 3801819-22, Proctor Dec., Exh. 97. |
| 83.   In response to an e-mail from Larian proposing development of a collectible Bratz doll, Dee Dee Valencia proposed creating a limited edition model that would create a marketing "frenzy." However, she raised the question: "Signed by....????? I know we want to keep Carter under wraps." | 83.   E-mail from Isaac Larian to Dee Dee Valencia dated February 6, 2003, Bates-numbered MGA 3801558-9, Proctor Dec., Exh. 98. |
| 84.   Lee Loetz is a toy designer with more than ten years of experience in the toy industry.  He has worked with companies throughout the industry and has prepared artwork and designs that have been implemented in numerous toys and children's products. | 84.   Loetz Dec., Exh. 1.¶ |
| 85.   In public statements, Larian identified himself, not Bryant, as the creator of Bratz. | 85.   See Affidavit of Isaac Larian in MGA v. Metson at p. 2, ¶ 8, Bates-numbered MGA 0868039-91 (Larian claiming he "was the inspiration behind the Bratz dolls."), Proctor Dec., Exh. 99; Woodman Tr. Vol. 1 at 218:1-21, Corey |

07209/2428907.1

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

EXHIBIT ___
PAGE ___
395

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | Dec., Exh. 17; Business Week article discussing Mattel and Bratz, Bates-numbered M 0074054-6, ("[Larian] got the idea for Bratz after seeing his own kids run around in navel-baring tops and hip-huggers."), Proctor Dec., Exh. 100; San Fernando Valley Business Journal article discussing Larian, (Larian states "It was Jason's idea for Bratz."), Proctor Dec., Exh. 100.  Similarly, Larian represented to the U.S. Patent and Trademark Office that he had created the Bratz feet and packaging:  U.S. patent application for Bratz feet marked as Exhibit 500 in this action, Proctor Dec., Exh. 101; Amendment to U.S. patent application for Bratz feet marked as Exhibit 548 in this action, Proctor Dec., Exh. 102; Patent for trapezoidal packaging marked as Exhibit 552 in this action, Proctor Dec., Exh. 103; Patent application for trapezoidal packaging marked as Exhibit 615 in this action, Proctor Dec., Exh. 104.  See also e-mail from Isaac Larian dated March 12, 2002 instructing MGA personnel, Bates-numbered MGA 3801819-22 (Larian |

EXHIBIT ___
PAGE ___

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | demanded that a Bratz website make no reference to Mattel), Proctor Dec., Exh. 97. |
| 86.   The Inventions Agreement provides "Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach." | 86.   Inventions Agreement at ¶ 4(a), Proctor Dec., Exh. 5. |
| 87.   Paragraph 1(c) of the Inventions Agreement required Bryant to "not disclose or use at any time either during or after my employment with the Company any Proprietary information except for the exclusive benefit of the Company." | 87.   Inventions Agreement at 1(c), Proctor Dec., Exh. 5. |
| 88.   Paragraph 3(a) of the Inventions Agreement states "I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company." | 88.   Inventions Agreement at 3(a), Proctor Dec., Exh. 5. |
| 89.   Assuming Mattel employees were moonlighting as defendants suggest, such work, based on defendants' <u>own</u> | 89.   <u>See, e.g.,</u> Bryant's Responses at 35 (Joni Pratte's volleyball and basketball books; Lori Sipos' puppets; Veronica |

EXHIBIT

PAGE

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| description, was completely unrelated to Mattel's core line of business. | Marlow's handbags; other employees' weekend nail and hair salon work), Proctor Dec., Exh. 96. |
| 90.   The MGA Defendants' Answer and Affirmative Defenses state simply, "Mattel has abandoned any interest it may have had in the alleged copyrighted works." | 90.   Amended Answer and Affirmative Defenses of MGA Entertainment, Inc. MGA Entertainment (HK) Limited, and MGAE De Mexico S.R.L. De C.V. To Mattel, Inc's Second Amended Answer and Counterclaims ("MGA's Answer"), dated September 19, 2007 at 24, Proctor Dec., Exh. 105. |
| 91.   MGA's Answer argues that MGA allegedly "acted with a good faith belief that Bryant owned the rights to his original Bratz drawings and that his assignment of such rights to MGA Defendants was valid and permissible." | 91.   MGA's Answer at 22:12-15, Proctor Dec., Exh. 105. |
| 92.   MGA admitted that it did not record its copyright assignment. | 92.   See MGA's Responses to Mattel's Third Set of Requests for Admission Nos. 241-44, 249-52, Proctor Dec., Exh. 106. |
| 93.   MGA's complaint in MGA Entertainment, Inc. v. Mattel, Inc., Case No. CV 05-2727 SGL (RNBx), emphasizes the uniqueness of Bratz: "At approximately 9.5 to 10 inches tall, the 'BRATZ' dolls were intentionally shorter than 'Barbie' dolls and looked like no | 93.   MGA's complaint in MGA Entertainment, Inc. v. Mattel, Inc., Case No. CV 05-2727 SGL (RNBx), Proctor Dec., Exh. 107. |

EXHIBIT ____ 200

PAGE ____ 3118

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| other, with disproportionately large heads, big, dramatic eyes and lips, small, thin bodies, oversized feet (to emphasize shoe fashion and to stand on their own, unlike 'Barbie' which requires a stand), and up-to-date fashions." | |
| 94.   The sum total of MGA's attorney David Rosenbaum's investigation of Mattel's preexisting rights to Bratz was a brief telephone conversation with Bryant's attorney, Anne Wang.  Wang purportedly said that Bryant created Bratz before commencing employment at Mattel.  Rosenbaum asked no questions about what investigation Wang had done to reach that conclusion.  He did not ask any specific questions about the time, manner or place Bryant allegedly developed the concept, whether it was expressed then in any tangible form, or whether Bryant could otherwise document ownership. | 94.   Deposition Transcript of David Rosenbaum ("Rosenbaum Tr."), dated January 25, 2008, at 78:21-88:18 & 218:18-220:3, Corey Dec., Exh. 29. |
| 95.   On September 14, 2000, Rosenbaum received a fax from Bryant, from the fax machine at Barbie Collectibles -- stating that Bryant could not look into his agreements with Mattel | 95.   Facsimile from Bryant to David Rosenbaum, Bates-numbered MGA007337-40, Proctor Dec., Exh. 86. |

EXHIBIT  26
PAGE  394

07209/2428907.1

-40-

| | Uncontroverted Facts: | Evidentiary Support |
|---|---|---|
| 1 | | |
| 2 | further without risking suspicion. | |
| 3 | 96.    Rosenbaum testified based on his | 96.    Rosenbaum Tr. at 88:19-90:24, |
| 4 | knowledge of "customary practice" in the | Corey Dec., Exh. 29; see also Mercedeh |
| 5 | industry, "[h]is assumption was that as an | Ward's Inventions Agreement with MGA, |
| 6 | employee of Mattel, the work that | Bates-numbered MGA001470-2, Proctor |
| 7 | [Bryant] did for Mattel as an employee of | Dec., Exh. 87. |
| 8 | Mattel would be owned by Mattel." | |
| 9 | MGA itself used Inventions Agreement | |
| 10 | substantially similar to Mattel's. | |
| 11 | 97.    The Bryant-MGA Agreement | 97.    Bryant-MGA Agreement at ¶ 2, |
| 12 | drafted by MGA prohibits Bryant from | Proctor Dec., Exh. 71. |
| 13 | providing services "to any person, firm or | |
| 14 | corporation engaged in the design, | |
| 15 | development and manufacture and sale of | |
| 16 | dolls or similar products" during the term | |
| 17 | of the Agreement. | |
| 18 | 98.    The Bryant-MGA Agreement | 98.    Bryant-MGA Agreement at ¶ 3(a), |
| 19 | drafted by MGA assigns "[a]ll results and | Proctor Dec., Exh. 71. |
| 20 | proceeds of the services provided by | |
| 21 | Bryant" under the Agreement, "including | |
| 22 | without limitation, any inventions, and | |
| 23 | any documentation related thereto, and | |
| 24 | any other material, whether written or | |
| 25 | oral" to MGA "exclusively, throughout | |
| 26 | the world, and in perpetuity[.]" | |
| 27 | 99.    Paragraph 3.2 of Bryant and | 99.    Modification of 2000 Agreement at |
| 28 | MGA's Modification of 2000 Agreement | § 3.2, Bates-numbered MGA000429-434, |

07209/2428907.1

EXHIBIT ___ 26

PAGE ___ 401

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| "confirms" assignment of "all work done by Bryant prior to September 18, 2000, which became known as the Bratz property, including without limitation the drawings which are the subject of Copyright Registration Nos. VA 1-218-487, VA 1-218-488, VA 1-218-489, VA 1-218-490 and VA 1-218-491 (and the characters that are now referred to as CLOE, JADE, SASHA and YASMIN)[.]" | Proctor Dec., Exh. 72. |
| 100.   Bryant testified that he had seen only the Steve Madden and Paris Blues ads before creating the Bratz drawings. | 100.   Bryant Tr. Vol. 1 at 140:21-141:6, Corey Dec., Exh. 1. Compare Expert Report of Peter S. Menell, dated February 11, 2008, at 17-20, Proctor Dec., Exh. 108; (Spice Girls dolls, Japanese anime-style cartoons, the "Blythe" line of dolls, Margaret Keene's "Ladies in Waiting" illustrations, the Lara Croft character, print advertisements by Steve Madden, Cover Girl, Paris Blue and Coca Cola). |
| 101.   When Bryant left Mattel's employ in October 2000, he lied about where he was going, telling Mattel employees that he was not going to work for a freelancer. | 101.   Bryant Tr. Vol. 1 at 209:16-17, Corey Dec., Exh. 1 ("I did tell Mattel people what I was going to do, which was to go create my own business and be a freelance designer."); Deposition Transcript of Jill Nordquist ("Nordquist |

EXHIBIT ___ 26

PAGE ___ 40 of ___

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | Tr."), dated July 31, 2007, at 145:1-9 (Nordquist testified that "[I asked] him if he was going to a competitor -- competitive doll company, to which he responded no"), Corey Dec., Exh. 30; id. at 127:22-128:9 (when asked whether Bryant was going to a competitive doll company, Bryant responded "I'm not saying."); Deposition Transcript of Ivy Ross ("Ross Tr."), dated January 17, 2008, at 87:5-23 ("He told me he was going to have more time on his hands, be able to sit at home and with his dog on his side and do drawings and spend more quality time at home, and it's just something he felt he really needed to do at this point in his life, and I asked if he was going to a competitor, and he said no, it was not a competitor. . . ."), Corey Dec., Exh. 31; id. at 88:17-19 (noting what Bryant described "felt like it was some free-lance-type-situation or part-time job"); id. at 220:5-12 (Ross explains that Ron Longsdorf suggested "[Bryant] had gotten a great opportunity where he was going to be doing something that gave him a lot of freedom and a different |

EXHIBIT 26
PAGE 402

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
|  | lifestyle and it appeared that he couldn't be convinced otherwise"). |
| 102.   Larian directed a subordinate to conceal a fax header from Bryant's signed contract signature page before sending the page to Particia Glaser, Larian's attorney.  The concealed fax header would have shown that the page was faxed from "Barbie Collectibles." | 102.   O'Connor Conf. Tr. at 18:13-18, Corey Dec., Exh. 14. |
| 103.   Farhad Larian, a former MGA executive and Isaac Larian's brother, has stated in court pleadings that Bryant brought Bratz to MGA by February 2000 -- and that they attempted to conceal it. | 103.   [Proposed] First Amended VerifiedComplaint in Larian v. Larian at ¶16, Bates-numbered FL 10569-621, Proctor Dec., Exh. 109. |
| 104.   Both MGA and Larian admitted they knew Bryant was a Mattel employee at the time Bryant presented his drawings to MGA. | 104.   Response to Request for Admission No. 140 in MGA's Responses to Mattel's Third Set of Requests for Admission to MGA; Proctor Dec., Exh. 106; Rachel Harris Tr. Vol. 1 at 41:10-42:10, 166:1-168:8, Corey Dec., Exh. 16. |
| 105.   Bryant told MGA that he had signed a confidentiality agreement with Mattel. | 105.   Bryant Tr. Vol. 3 at 585:17 - 587:17, Corey Dec., Exh. 3; facsimile from Bryant to David Rosenbaum, Bates-numbered MGA007337-40, Proctor Dec., Exh. 86. |
| 106.   MGA itself requires strict | 106.   Mercedeh Ward's Inventions |

EXHIBIT ___

PAGE ___

403   26

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| confidentiality from its own employees in jobs such as Bryant's. | Agreement with MGA, Bates-number MGA 001470-2, Proctor Dec., Exh. 87. |
| 107.   MGA has produced a document that shows Bryant's end date at Mattel and start date at MGA as "don't ask." | 107.   MGA spreadsheet listing former Mattel employees, Bates-numbered MGA 1134723-30, at 26, Proctor Dec., Exh. 112. |
| 108.   MGA admits that no public statement even recognizing Bryant as Bratz's creator was issued until July 18, 2003, when the Wall Street Journal published an article with that information. | 108.   MGA Entertainment, Inc.'s Supplemental and Amended Responses to Mattel, Inc.'s Third Set of Requests for Admission to MGA Entertainment, Inc., Proctor Dec., Exh. 113. |
| 109.   Defendants have not and cannot present any evidence that Mattel had notice of its claims against Bryant before April 27, 2001. | 109.   Defendants have no evidence genuinely disputing this fact. |
| 110.   Defendants can proffer no evidence that Mattel consented to their employees' moonlighting activity. | 110.   Defendants have no evidence genuinely disputing this fact. |
| 111.   Defendants cannot present any evidence that suggests Mattel intended or acted in a manner that would allow its employees to believe they could violate their legal obligations with impunity. | 111.   Defendants have no evidence genuinely disputing this fact. |
| 112.   Defendants have not presented any evidence to show that they would have behaved differently had Mattel filed suit | 112.   Defendants have no evidence genuinely disputing this fact. |

EXHIBIT ___ 26

PAGE ___ 404

07209/2428907.1

-45-

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| earlier, as they have continued manufacturing the infringing dolls both before and after Mattel's filing of this action. | |
| 113. In its Eighth Affirmative Defense, MGA contends that "Mattel's damages, if any, were not caused by MGA Defendants and are not attributable to any acts or omissions of MGA defendants." | 113. MGA's Answer at 23:5-6, Proctor Dec., Exh. 105. |
| 114. MGA defendants have asserted the following affirmative defenses that fall under the rubric of good faith: bona fide purchaser for value, 17 U.S.C. § 205(d), lawful competition, and good faith. | 114. MGA's Answer at 22, 25, Proctor Dec., Exh. 105. |
| 115. Bryant initially asserted a good faith defense, but withdrew it in his amended answer. | 115. Bryant's Amended Reply to Mattel's Counterclaims, dated September 12, 2007, Proctor Dec., Exh. 114. |
| 116. Bryant did not seek reconsideration of the August 27, 2007 Court's Order Denying MGA's Motion for Terminating Sanctions. | 116. There is no evidence genuinely disputing this fact. |
| 117. The Court ruled in the January 11, 2007 Order that the relation back principle applies to MGA even though it was not named a defendant in Mattel's complaint. | 117. Court's Order Regarding Mattel's Motion for Leave to Amend, dated January 11, 2007, at 12-15, Proctor Dec., Exh. 95. |
| 118. The Court noted, "Again, the | 118. Court's Order Regarding Mattel's |

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

07209/2428907.1

EXHIBIT ___
PAGE ___
405

| | Uncontroverted Facts: | Evidentiary Support |
|---|---|---|
| 1 | | |
| 2 | relations back principle would seem to | Motion for Leave to Amend, dated |
| 3 | render [Mattel's] claim timely if it were | January 11, 2007, at 15, 22, Proctor Dec., |
| 4 | filed as an amended answer . . . in the 05- | Exh. 95. |
| 5 | 2727 case.") | |
| 6 | 119.   The nature of the underlying claim | 119.   Mattel's Second Amended Answer |
| 7 | is to establish that Defendants have no | in Case No. 05-2727, dated July 12, 2007, |
| 8 | interest in Bratz. | at ¶ 169 , Proctor Dec., Exh. 115. |
| 9 | 120.   Defendants were not prejudiced | 120.   Tonnu Vol. 2 at 380:21-381:19, |
| 10 | because they did not rely on Mattel's | Corey Dec., Exh. 27; Bratz Sales from |
| 11 | alleged delay; rather, they proceeded with | 2001-2006 spreadsheet, Bates-numbered |
| 12 | developing and producing Bratz dolls | MGA 0868723-865, marked as Exhibit |
| 13 | both before and after Mattel brought suit. | 660 in this action, Proctor Dec., Exh. 4. |
| 14 | 121.   No authorized Mattel executive | 121.   Defendants have no evidence |
| 15 | ever provided Bryant with written | genuinely disputing this fact. |
| 16 | consent to this assignment of Bratz to | |
| 17 | MGA, or permitted him to work for | |
| 18 | MGA while in Mattel's employ. | |
| 19 | 122.   Bryant asserts that "Mattel | 122.   Bryant's Responses at 32, Proctor |
| 20 | believed from the time that Bryant left | Dec., Exh. 96. |
| 21 | Mattel's employ that he was going to | |
| 22 | perform work for a Mattel competitor." | |
| 23 | 123.   Defendants assert that waiver | 123.   Bryant's Responses at 32, Proctor |
| 24 | applies because Mattel "tolerated conduct | Dec., Exh. 96. |
| 25 | by other employees similar to the alleged | |
| 26 | conduct by Bryant." | |
| 27 | 124.   As shown, Mattel did not "know | 124.   Defendants have no evidence |
| 28 | the facts" regarding defendants' waiver | genuinely disputing this fact. |

EXHIBIT _____ 26

PAGE _____ 406

07209/2428907.1

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| and consent defenses. | |
| 125.   "Designs," as that term is well understood in the toy industry, undoubtedly include drawings. | 125.   Rebecca Harris Vol. 2 at 490:15-17 ("His drawings start a concept, you know, and from the concept they evolved into what they are."), Corey Dec., Exh. 10; Paula Garcia Vol. 2 at 318:19-320:13 (discussing need for "I-designs" for Prayer Angels and receiving drawings from Bryant), Corey Dec., Exh. 20. |
| 126.   Mattel's in-house counsel learned on November 24, 2003 through discovery in another action that Bryant had entered a contract with MGA while still employed by Mattel. | 126.   Deposition Transcript of Michael Moore, dated March 7, 2008, at ¶ 3, Exh. 1. |
| 127.   The Court has previously held "None of the substantive concerns raised by MGA and Bryant to the present amended complaint, *e.g.*, statutes of limitations, would appear to be affected if the new claims and defendants were brought as defenses and counterclaims in the 05-2727 case as opposed to the 04-9059 one." | 127.   Court's Order Regarding Mattel's Motion for Leave to Amend at 22, Proctor Dec., Exh. 95. |
| 128.   Mattel recorded Bryant's Inventions Agreement with the U.S. Copyright Office on November 6, 2006. | 128.   Certificates of Recordation recorded by Mattel with the Copyright Office, Proctor Dec., Exhs. 116-118. |
| 129.   A Hong Kong court found on | 129.   Judgment of Deputy High Court of |

EXHIBIT
PAGE ____
407

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| summary judgment that three-dimensional dolls and products infringed MGA's copyright in Bryant's initial concept drawings. "The substantial similarity between the plaintiff's drawings and the dolls produced from them, and the defendant's dolls are obvious on inspection." | the Hong Kong Special Administrative Region in <u>MGA Entertainment, Inc. v. Double Grand Corp. Ltd.</u>, Action No. 1883 of 2003, dated February 24, 2006 at ¶ 11, attached as Exhibit A to Request for Judicial Notice, dated March 7, 2008 and filed concurrently herewith. |
| 130.   The Questionnaire required Bryant to notify Mattel if he became engaged in any business venture with a Mattel competitor that could be construed as a conflict of interest. | 130.   Mattel's Complaint in <u>Mattel, Inc. v. Bryant</u>, Case No. BC314398 at Exh. B, Proctor Dec., Exh. 91. |

## STATEMENT OF UNCONTESTED CONCLUSIONS OF LAW

1.     Partial summary adjudication enables a district court to make rulings on individual issues even where summary judgment is not appropriate as to all of the claims advanced by the complaint. <u>See</u> <u>Fed. R. Civ. P.</u> 56(d) (district court "shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted"); <u>First Nat'l Ins. Co. v. Federal Deposit Ins. Co.</u>, 977 F. Supp. 1051, 1055 (S.D. Cal. 1997) ("Even if First National will not prevail on one of its causes of action, the Court may still grant summary adjudication as to specific issues if it will narrow the issues for trial.").

2.     The standard for granting partial summary adjudication echoes that for granting summary judgment. <u>See</u> <u>Humanitarian Law Project v. Mukasey</u>, 509 F.3d 1122, 1130 (9th Cir. 2007). The Court must determine "what material facts are not genuinely" disputed and whether the moving party is entitled to a ruling on the issue as

EXHIBIT __26__

PAGE __408__

07209/2428907.1

1   a matter of law. Fed. R. Civ. P. 56(d). In making that determination, the Court

2   "view[s] the evidence in the light most favorable to the nonmoving party."

3   Humanitarian Law Project, 509 F.3d at 1130.

4       3.      Among the issues susceptible to partial summary adjudication are liability

5   on a cause of action where a factual dispute remains only on damages, see Fed. R. Civ.

6   P. 56(d)(2), and the availability of an affirmative defense, see Vernon v. Heckler, 811

7   F.2d 1274, 1278 (9th Cir. 1987) ("The affirmative defense of statute of limitations ...

8   may be tested on summary judgment ....").

9       4.      Section 2870 of the Labor Code prohibits contractual provisions that

10  assign the employee's "rights in an invention ... that the employee developed entirely

11  on his or her own time without using the employer's equipment, supplies, facilities, or

12  trade secret information ...." Cal. Labor Code § 2870. The statute's prohibition does

13  not apply if the invention (1) relates to the employer's business "at the time of

14  conception or reduction to practice" or (2) if the invention results from any work

15  performed by the employee for the employer. Id. Thus, an invention lawfully may be

16  assigned in three independent circumstances: "(1) The invention was developed using

17  the employer's time or resources; or (2) The invention relates to the employer's

18  business or actual or demonstrably anticipated research or development; or (3) The

19  invention resulted from work performed by the employee for the employer." Cadence

20  Design Sys., Inc. v. Bhandari, 2007 WL 3343085, at *5 n.4 (N.D. Cal. Nov. 8, 2007).

21      5.      Bryant bears the burden of establishing his inventions are within Section

22  2870's scope. See Cal. Labor Code § 2872 ("In any suit or action arising thereunder,

23  the burden of proof shall be on the employee claiming the benefits of its provisions.")

24      6.      "Courts interpreting employee assignment agreements in the context of

25  section 2870 have construed the 'related to' phrase broadly." Cadence, 2007 WL

26  3343085, at *5. Thus, in Cadence, the court granted summary judgment to an

27  employer, finding that the employee's invention "related to" the employer's business

28  even though the employer did not yet have the invention in its product line and the

PAGE ___ EXHIBIT ___ 409

1   invention merely improved the employer's existing products. Id.; see also Cubic Corp.

2   v. Marty, 229 Cal. Rptr. 828, 834-36 (1986) (finding that employee's invention fell

3   within the scope of company's actual or demonstrated research and development

4   because it would enhance the company's product capabilities).

5       7.    The Court can determine the scope of the Inventions Agreement on partial

6   summary judgment because interpretation of the plain language of the agreement is a

7   pure legal question. See, e.g., Cal. Civ. Code § 1639 ("When a contract is reduced to

8   writing, the intention of the parties is to be ascertained from the writing alone, if

9   possible ...."); In re Bennett, 298 F.3d 1059, 1064 (9th Cir. 2002) ("'If contractual

10  language is clear and explicit, it governs.'") (quoting Bank of the West v. Superior

11  Court, 2 Cal.4th 1254, 1264 (1992)); Am. President Lines, Ltd. v. Zolin, 38 Cal. App.

12  4th 910, 923 (1995) (interpretation of a written instrument is essentially a judicial

13  function); Sheet Metal Workers, Int'l Ass'n Local Union No. 24 v. Architectural Metal

14  Works, Inc., 259 F.3d 418, 426 (6th Cir. 2001) (interpretation of a contract is an issue

15  of law and may be resolved by summary adjudication).

16      8.    To prove copyright infringement, a plaintiff must show (1) ownership of a

17  valid copyright, (2) access to the original, and (3) substantial similarity of the works.

18  Brown Bag Software Corp. v. Symantec, 960 F.2d 1465, 1472 (9th Cir. 1992).

19      9.    "Access is proven when the plaintiff shows that the defendant had an

20  opportunity to view or to copy the plaintiff's work.." Meta-Film Assoc., Inc. v. MCA,

21  Inc., 586 F. Supp. 1346, 1355 (C.D. Cal. 1984) (quoting Sid & Marty Krofft Television

22  Prods., Inc. v. McDonalds Corp., 562 F.2d 1157, 1172 (9th Cir. 1977)).

23      10.   Substantial similarity is often resolved at the summary-judgment stage.

24  See, e.g., JCW Invs., Inc. v. Novelty, Inc., 289 F.Supp.2d 1023 (N.D. Ill. 2003)

25  (granting summary judgment to plaintiff on copyright infringement claim involving

26  copying of toys), aff'd 482 F.3d 910 (7th Cir. 2007); Educ. Testing Serv. v. Simon, 95

27  F. Supp. 2d 1081 (C.D. Cal. 1999) (testing materials).

28

EXHIBIT
PAGE ___ 410

07209/2428907.1

-51-

1    11.    Access lowers the plaintiff's quantum of proof with respect to substantial
2  similarity.  See, e.g., Three Boys Music Corp. v. Bolton, 212 F.3d 477, 485 (9th Cir.
3  2000) ("Under our case law, substantial similarity is inextricably linked to the issue of
4  access.  In what is known as the 'inverse ratio rule,' we require a lower standard of
5  proof of substantial similarity when a high degree of access is shown.") (quotation
6  marks and citation omitted); Krofft, 562 F.2d at 1172 (high "degree of access justifies a
7  lower standard of proof to show substantial similarity").

8         The Ninth Circuit uses the extrinsic test and the intrinsic test to
9  determine substantial similarity.  Under the extrinsic test, the plaintiff must establish
10  that specific expressive elements of the works at issue are similar.  The intrinsic test,
11  on the other hand, looks at the overall similarity of expression in the two works from
12  the perspective of an ordinary observer.  The plaintiff must satisfy both tests to
13  prevail on a claim of copyright infringement.  See, e.g., Krofft, 562 F.2d at 1164
14  (9th Cir. 1977); Litchfield v. Spielberg, 736 F.2d 1352, 1356 (9th Cir. 1984).  The
15  works at issue satisfy both tests.

16    12.    As part of the extrinsic test, the court engages in "analytic dissection" to
17  determine what is protected and what is not.  See, e.g., Dr. Seuss Enters., L.P. v.
18  Penguin Books USA, Inc., 109 F.3d 1394, 1398 (9th Cir. 1997).  This involves
19  breaking works into their components to determine whether similarities between the
20  works are attributable to unprotected elements, if any.  Id.  The unprotected similarities
21  are filtered out.  Id.

22    13.    Because the intrinsic test focuses on a reasonable observer's overall
23  impression, analytic dissection is not employed.  See Olson v. Nat'l Broad. Co., 855
24  F.2d 1446, 1449 (9th Cir. 1988).  The intrinsic test ascertains the visceral reaction of
25  the lay observer, and as such is "virtually devoid of analysis."  Shaw v. Lindheim, 919
26  F.2d 1353, 1357 (9th Cir. 1990).

27    14.    "As Judge Learned Hand cogently remarked, 'no plagiarist can excuse the
28  wrong by showing how much of his work he did not pirate.'"  Harper & Row

EXHIBIT ___

PAGE ___

4 ||

1  Publishers, Inc. v. Nation Enters., 471 U.S. 539, 565 (1985) (quoting Sheldon v. Metro-

2  Goldwyn Pictures Corp., 81 F.2d 49, 56 (2d Cir. 1936)).

3      15.   In the context of toys, courts often find similarities substantial.   For

4  example, in Fisher-Price Toys v. My-Toy Co., 385 F. Supp. 218 (S.D.N.Y. 1974), the

5  court entered judgment for the plaintiff-copyright owner where the accused dolls and

6  the copyrighted dolls had similar shapes, facial features and proportion, eye shape and

7  color, and clothes.  Likewise, in Gund v. Russ Berrie & Co., 701 F. Supp. 1013, 1019

8  (S.D.N.Y. 1988), the court issued an injunction because the infringing baby ostrich

9  dolls and the copyrighted dolls had similarly curved necks, beaks, colored bodies, and

10  "stubby" tails.

11     16.   Courts uniformly hold that a two-dimensional drawing may be infringed

12  by a three-dimensional toy.  See King Features Syndicate v. Fleisher, 299 F. 533 (2d

13  Cir. 1924) (copyrighted comic book character infringed by dolls); Fleisher Studios v.

14  Ralph A. Freundlich, Inc., 73 F.2d 276, 278 (2d Cir. 1934) (drawing of Betty Boop

15  character infringed by a substantially similar doll).

16     17.   "[A] taking is considered de minimis only if it is so meager and

17  fragmentary that the average audience would not recognize the appropriation." Fisher

18  v. Dees, 794 F.2d 432, 434 n.2 (9th Cir. 1986).

19     18.   The Copyright Act protects "original works of authorship." 17 U.S.C. §

20  102.

21     19.   A copyright registration obtained within five years of the work's

22  publication "shall constitute prima facie evidence of the validity of the copyright and of

23  the facts stated in the certificate." 17 U.S.C. § 410(c); see also Transgo, Inc. v. Ajac

24  Transmission Parts Corp., 768 F.2d 1001, 1019 (9th Cir. 1985) ("[R]egistration by the

25  Copyright Office is prima facie evidence of copyrightability. This presumption shifts

26  the burden of proof to the challenging party to demonstrate why the item in question is

27  not copyrightable."); NIMMER ON COPYRIGHT §12.11[B][1] at 12-201 (same).

28

EXHIBIT

PAGE

2б

4/2

07209/2428907.1

-53-

20.     Courts consistently "invoke[] judicial estoppel not only to prevent a party from gaining an advantage by taking inconsistent positions, but also because of 'general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings,' and to 'protect against a litigant playing fast and loose with the courts.'" Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 782 (9th Cir. 2001) (quoting Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir. 1990)). "Inconsistency is the basic element that runs through both judicial reliance and more open-ended 'fast-and-loose' theories of judicial estoppel." CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE, § 4477 at 587 (3d ed. 2002). With the latter theory, "[t]he focus is not so much on a court's reliance as on the perceived unseemliness of a litigant's conduct." Id.

21.     In Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340 (1991), the Supreme Court held that the originality requirement in copyright law requires "only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." Id. at 345. Distinguishing the originality requirement of copyright law from the novelty requirement of patent law, the Court emphasized that "the requisite level of creativity is extremely low; even a slight amount will suffice," and "[t]he vast majority of works make the grade quite easily." Id. (quotation and citation omitted). The Ninth Circuit similarly has explained that originality means "little more than a prohibition of actual copying" and requires only that the author contribute "something more than a 'merely trivial' variation." Three Boys, 212 F.3d at 489 (quoting North Coast Indus. v. Jason Maxwell, Inc., 972 F.2d 1031, 1033 (9th Cir. 1992)).

22.     The existence of prior similar works is irrelevant to the issue of originality without "evidence that [the work's author] copied from such works." NIMMER § 12.11[B][1] at 12-202; R. Dakin & Co. v. A & L Novelty Co., Inc., 444 F. Supp. 1080, 1084 (E.D.N.Y. 1978). "Absent such evidence, works such as these, having copyright registration certificates, are entitled to a presumption of originality." Id.

EXHIBIT

PAGE

23.     Given the low bar of originality, courts have uniformly rejected arguments that a work that purportedly draws on pre-existing material is not entitled to full protection under the Copyright Act. In Kamar International, the Ninth Circuit rejected the defendant's argument that the plaintiff's toys were not sufficiently original "because stuffed toy animals are widely available to manufacturers ..., and that because [the plaintiff's] concepts of toy animals were taken from the public domain, [its] stuffed animals are not copyrightable." 657 F.2d at 1061.  The court held that "[a]nyone can copyright anything [including realistic depictions of animals], if he adds something original to its expression." Id. (emphasis added).

24.     In Mattel, Inc. v. Goldberger Doll Mfg. Co., 365 F.3d 133 (2d Cir. 2004), the district court had held that copyright protection did not extend to such purportedly common features of a BARBIE doll as the widely spaced eyes, pert nose, and slim figure.  The Second Circuit reversed, holding:

> Mattel's copyright in a doll visage with an upturned nose, bow lips, and widely spaced eyes will not prevent a competitor from making dolls with upturned noses, bow lips, and widely spaced eyes, even if the competitor has taken the idea from Mattel's example, so long as the competitor has not copied Mattel's particularized expression.

Id. at 135-36.  The court emphasized that virtually imperceptible variations on common facial features may be extremely valuable.  "One artist's version of a doll face with upturned nose, bow lips, and widely spaced eyes will be irresistible to an eight-year-old collector.  Another artist's version, which to a grownup may look very like the first, will be a dud to the eight-year-old. . . . We can surmise that in the highly competitive, billion-dollar doll industry, getting the doll's face and expression exactly right is crucial to success." Id. at 136 (emphasis added).  See also, e.g., JCW Investments, Inc. v. Novelty, Inc., 482 F.3d 910 (7th Cir. 2007) (a

EXHIBIT ___

PAGE ___ 4/4

1    doll that "represent[ed] a combination of elements that were in the public domain or

2    were *scènes à faire*" was sufficiently original because "the very combination of

3    these elements as well as the expression that is [the doll] himself are creative")

4       25.    Every California employee owes a duty of undivided loyalty to his

5    employer and may not take any action that is adverse to his employer. See Stokes v.

6    Dole Nut Co., 41 Cal. App. 4th 285, 295 (1995); Fowler v. Varian Assocs. Inc., 196

7    Cal. App. 3d 34, 41 (1987); J. C. Peacock, Inc. v. Hasko, 196 Cal. App. 2d 353, 357

8    (1961); 4 KIRBY WILCOX AND ERICA GRUBB, CALIFORNIA EMPLOYMENT LAW § 70.04

9    (2003). The duty of loyalty is also codified in the Labor Code, which obligates every

10    employee to comply with his employer's directions, to assign to the employer

11    everything (except compensation) the employee acquires by virtue of his employment,

12    and to give preference to the business of the employer over his own similar interests.

13    Cal. Labor Code §§ 2856, 2860, 2863.

14       26.    Thus, "[w]here a person is employed to design improvements to the

15    product of his employer, or to design new products for his employer, and he does so, he

16    may not use the results of such work for his own use and benefit and particularly not to

17    the detriment of his employer." Daniel Orifice Fitting Co. v. Whalen, 198 Cal. App. 2d

18    791, 797-98 (1962) (stating that such a job does not contemplate a right to pitch designs

19    to competitors) (citations omitted). The Restatement (Second) of Agency explains an

20    employee who breaches his duty of loyalty is entitled to no compensation and indeed

21    provides that the employee must disgorge anything received as a result of his violation

22    of the duty. See Restatement (Second) of Agency §§ 393, 403, 429, 469 (1958).

23       27.    Confidentiality provisions may create a fiduciary duty under California

24    law. See GAB Bus. Svcs. Inc. v. Lindsey & Newsom Claim Servs., Inc., 83 Cal. App.

25    4th 409, 417 (2000), overruled on other grounds, Reeves v. Hanlon, 33 Cal. 4th 1140

26    (2004).

27       28.    An employee owes his employer a fiduciary duty if the employer entrusts

28    him with highly confidential information. See Stevens v. Marco, 147 Cal. App. 2d 357

EXHIBIT _____ PAGE _____

07209/2428907.1

1 (1956) (fiduciary relationship existed because one party confidentially entrusted
2 another with "a new and valuable idea"); <u>Michelson v. Hamada</u>, 29 Cal. App. 4th 1566,
3 1581 (1994) ("Confidential and fiduciary relations are, in law, synonymous, and may
4 be said to exist whenever trust and confidence is reposed by one person in the integrity
5 and fidelity of another.") (citations and quotation omitted).

6     29.   A broad variety of conduct can breach an employee's duty of loyalty and
7 fiduciary duty. As the Court recognized in <u>Bancroft-Whitney Co. v. Glen</u>, 64 Cal. 2d
8 327, 346 (1966), "No ironclad rules as to the type of conduct which is permissible can
9 be stated, since the spectrum of activities in this regard is as broad as the ingenuity of
10 man itself."

11     30.   "[I]n the absence of authority, express or implied, [an agent] cannot
12 transfer his principal's property, and such authority will not be presumed." <u>Palo Alto</u>
13 <u>Mut. Bldg. & Loan Ass'n v. First Nat'l Bank</u>, 33 Cal. App. 214, 221 (1917) (quotation
14 and citation omitted).

15     31.   For a "preparation to compete" defense to apply, the employee must
16 disclose his plans to his employer. <u>See Daniel Orifice Fitting Co.</u>, 198 Cal. App. 2d at
17 800-01 (employee liable where he did not make a "full disclosure of acts undertaken in
18 preparation for entering into competition" with the employer) (quotation and citation
19 omitted); <u>Sequoia Vacuum Sys. v. Stransky</u>, 229 Cal. App. 2d 281, 287 (1964)
20 ("Appellant argues that all his activities were within the permissible scope of seeking
21 other employment . . . But the protection of the principal's interest requires a full
22 disclosure of acts undertaken in preparation of entering into competition").

23     32.   Courts have consistently recognized that employers have a right to expect
24 loyalty from their employees, and that employees have a legally enforceable duty to
25 provide it. "There can be no doubt that [the defendant] breached his duties.... He was
26 an officer in charge of an important part of the respondent's business and at the same
27 time he was creating improvements to the respondent's product, he was concealing
28 such improvements and stealthily doing all that was necessary to set up a competing

EXHIBIT

PAGE

416

07209/2428907.1

1   business." Daniel Orifice Fitting Company, 198 Cal. App. 2d at 800; see also Stokes,

2   41 Cal. App. 4th at 296 (employees breached the duty of loyalty by working toward

3   establishing a competing business); Fowler, 196 Cal. App. 3d at 37, 42 (marketing

4   manager's communications with third parties about a new competing business venture

5   were a breach of his duty of loyalty); J. C. Peacock, Inc., 196 Cal. App. 2d at 358-59

6   (finding breach of the duty of loyalty where employees entered into business

7   transactions that presented a conflict of interest).

8        33.    A defendant aids and abets the commission of an intentional tort if he (1)

9   knows the other's conduct constitutes a breach of duty, and (2) gives substantial

10  assistance or encouragement to the other so to act. See, e.g., Neilson v. Union Bank of

11  Calif., 290 F. Supp. 2d 1101, 1119 (C.D. Cal. 2003); River Colony Estates Gen. P'ship

12  v. Bayview Fin. Trading Group, Inc., 287 F. Supp. 2d 1213, 1225-26 (S.D.Cal. 2003);

13  Casey v. U.S. Bank Nat'l Assoc., 127 Cal. App. 4th 1138, 1144 (2005).

14       34.    Aiding and abetting requires actual knowledge of the underlying breach,

15  Neilson, 290 F. Supp. 2d at 1118-19, but does not require a defendant to agree to join

16  the wrongful conduct in the way one joins a conspiracy. Berg & Berg Enters., LLC v.

17  Sherwood Partners, Inc., 131 Cal. App. 4th 802, 823 n. 10 (2005). For instance, even

18  "ordinary business transactions" that a bank performs for a customer can satisfy the

19  substantial assistance element. Casey, 127 Cal. App. 4th at 1145.

20       35.    Although financial gain and self-interested profit are not elements of an

21  aiding and abetting claim, they corroborate the two elements of the claim. Neilson v.

22  Union Bank of Calif., 290 F. Supp. 2d 1101, 1127-28 (C.D. Cal. 2003). In other words,

23  if the aider/abetter is an active participant in the breach of a fiduciary duty and reaped

24  the benefit, he cannot disclaim the burden of liability for the breach. Id. (citing

25  Heckmann v. Ahmanson, 168 Cal. App. 3d 119, 127 (1985); Bancroft-Whitney Co., 64

26  Cal.2d at 353.

27       36.    Good faith is not a valid defense to copyright infringement. "[E]ven

28  where the defendant believes in good faith that he is not infringing a copyright, he may

07209/2428907.1

EXHIBIT ___ PAGE ___ 417

1  be found liable." <u>Pye v. Mitchell</u>, 574 F.2d 476, 481 (9th Cir. 1978) (<u>citing</u> <u>County of</u>

2  <u>Ventura v. Blackburn</u>, 362 F.2d 515 (9th Cir. 1966)); <u>see also</u> <u>L.A. News Serv. v.</u>

3  <u>Conus Commc'n Co.</u>, 969 F. Supp. 579, 584 (C.D. Cal. 1997) ("Direct infringement

4  does not require intent or any particular state of mind").

5      37.   17 U.S.C. § 205(d) states that where there are competing transfers of

6  copyright, a prior transferee prevails unless the later purported transferee took in good

7  faith without notice of the earlier transfer <u>and</u> recorded first. <u>See</u> 17 U.S.C. § 205(d)

8  ("[T]he later transfer prevails <u>if recorded first</u> . . . and if taken in good faith . . . and

9  without notice of the earlier transfer") (emphasis added).

10      38.   Good faith is not a viable defense to claims for unfair competition and

11  conversion because these are strict-liability offenses for which intent is not even an

12  element. <u>See, e.g.</u>, <u>Community Assisting Recovery, Inc. v. Aegis Ins. Co.</u>, 92 Cal. App.

13  4th 886, 891 (2001) ("The [unfair competition] statute imposes strict liability. It is not

14  necessary to show that the defendant intended to injure anyone."); <u>Virtanen v.</u>

15  <u>O'Connell</u>, 140 Cal. App. 4th 688, 707 (2006) ("Conversion is a species of strict

16  liability in which questions of good faith, lack of knowledge and motive are ordinarily

17  immaterial.") (quotation and citation omitted).

18      39.   "A defense which demonstrates that plaintiff has not met its burden of

19  proof [as to an element] is not an affirmative defense." <u>Zivkovic v. Southern California</u>

20  <u>Edison Co.</u>, 302 F.3d 1080, 1088 (9th Cir. 2002); <u>see also</u> <u>Bank of the Sierra v. Kallis</u>,

21  2006 WL 3513568, *10 (E.D. Cal. Dec. 6 2006) (granting summary judgment on an

22  affirmative defense where defendant was merely "challenging an element of the

23  [plaintiff's] cause of action" because "mere negation of a required element of a cause

24  of action is not an affirmative defense.").

25      40.   Claims for aiding and abetting a breach of loyalty or a breach of fiduciary

26  duty and for interference with contract clearly fall within this category. <u>See, e.g.</u>,

27  <u>CRST Van Expedited, Inc. v. Werner Enters., Inc.</u>, 479 F.3d 1099, 1105 (9th Cir. 2007)

28  (interference with contract); <u>PMC, Inc. v. Kadisha</u>, 78 Cal. App. 4th 1368, 1382 (2000)

EXHIBIT

PAGE

418

1  (misappropriation of trade secrets); <u>Casey v. U.S. Bank Nat'l Ass'n</u>, 127 Cal. App. 4th

2  1138, 1144 (2005) (aiding and abetting).

3      41.   The applicable limitations periods and accrual rules are:

4          We begin by identifying each claim's limitations period.

| Claim | Statute of Limitations | Accrual |
|---|---|---|
| Copyright Infringement (MGA and Bryant) | rolling 3 years (17 U.S.C. § 507(b)) | upon discovery (see <u>Roley v. New World Pictures, Ltd.</u>, 19 F.3d 479, 481 (9th Cir. 1994)) |
| Misappropriation of Trade Secrets (MGA and Bryant) | 3 years (Cal. Code Civ. Pro. § 3426.6) | upon discovery (see Cal. Code Civ. Pro. § 3426.6) |
| Breach of Contract (Bryant) | 4 years (Cal. Code Civ. Pro. § 337(1)) | upon discovery where there is concealment (see <u>April Enters., Inc. v. KTTV</u>, 147 Cal. App. 3d 805, 831 (1983)) |
| Interference with Contract (MGA) | 2 years (Cal. Code Civ. Pro. § 339(1)) | upon discovery (see <u>Korea Supply Co. v. Lockheed Martin Corp.</u>, 109 Cal.Rptr. 2d 417, 428-9 (2001), <u>rev'd on other grounds</u>, 29 Cal.4th 1134 (2003)) |
| Breach of Fiduciary Duty (Bryant) | 4 years if gravamen of claim is not fraud (Cal. Code Civ. Pro. § 343) | upon discovery (see <u>April Enters.</u>, 147 Cal. App. 3d at 827) |
| Aiding and Abetting Breach of Fiduciary Duty (MGA) | 2 years (see <u>Rambus Inc. v. Samsung Electronics Co.</u>, 2007 WL 39374, at *3 n.4 (N.D. Cal. 2007)) | upon discovery (see <u>April Enters.</u>, 147 Cal. App. 3d at 827) |
| Breach of Duty of Loyalty (Bryant) | 3 years (by analogy to breach of fiduciary duty) | upon discovery (by analogy to breach of fiduciary duty) |
| Aiding and Abetting Breach of Duty of Loyalty (MGA) | 2 years (by analogy to aiding and abetting breach of fiduciary duty) | upon discovery (by analogy to aiding and abetting breach of fiduciary duty) |
| Conversion | 3 years (Cal. Code Civ. Pro. § 338(c)) | upon act of wrongfully taking property (see <u>Bono v. Clark</u>, 103 Cal. App. 4th 1409, 1433 (2003)), but the discovery rule applies in cases where "a fiduciary has concealed the material facts giving rise to the cause of action." <u>Id.</u> |
| Unfair Competition | 2 years if based on common law (Cal. Code Civ. Pro. | upon discovery (see, e.g., Mass. Mutual Life Ins. Co. v. |

EXHIBIT ___ PAGE ___ 4/19

-60-

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

| | § 339(1)); 4 years if based on statute (Cal. Bus. & Prof. Code § 17208) | Superior Court, 97 Cal. App.4th 1282, 1295 (2002)) |
|---|---|---|
| Declaratory Relief | period applicable to underlying claim (see Howard Jarvis Taxpayers Ass'n v. City of La Habra, 25 Cal.4th 809, 821 (2001)) | accrual applicable to underlying claim (see Howard Jarvis Taxpayers Ass'n, 25 Cal.4th at 821) |

42.   It is well-established that a claim accrues when the plaintiff could have discovered the specific wrongful acts alleged in the complaint, not when the plaintiff merely had cause to suspect some wrongdoing.   See, e.g., Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797 (2005).  In Fox, a patient filed a medical malpractice action against her surgeon.   After learning in discovery about a potential surgical equipment malfunction, she amended her complaint to include a product liability claim against the equipment manufacturer.   The California Supreme Court held that the plaintiff's product liability claim was timely because "if a plaintiff's reasonable and diligent investigation discloses only one kind of wrongdoing when the injury was actually caused by tortious conduct of a wholly different sort, the discovery rule postpones accrual of the statute of limitations on the newly discovered claim." Id. at 813 (emphasis added).  See also Snow v. A.H. Robins Co., 165 Cal. App. 3d 120, 124 (1985) (plaintiff's fraud claim based upon the manufacturer's concealment of product defect rates accrued upon her discovery of the misrepresentation, not when she learned that the product failed); Westinghouse Elec. Corp. v. General Circuit Breaker & Elec. Supply Inc., 106 F.3d 894, 899 (9th Cir. 1997) (citing Hobson v. Wilson, 737 F.2d 1, 35 (D.C. Cir. 1984), cert. denied, 470 U.S. 1084 (1985)) (the party asserting the time bar must prove that the opposing party knew of facts giving it notice of the specific cause of action at issue, not just any cause of action).   Thus, the pertinent question for accrual is when the plaintiff discovered the specific misconduct for which it has sued.

43.   A plaintiff is "on notice" of a claim only when he has "an awareness of sufficient facts to identify a particular cause of action, be it a tort, a constitutional

EXHIBIT ___
PAGE ___
420

1  violation or a claim of fraud. [It does] not mean the kind of notice—based on hints,
2  suspicions, hunches or rumors—that requires a plaintiff to make inquiries in the
3  exercise of due diligence, but not to file suit." Garamendi v. SDI Vendome S.A., 276
4  F. Supp. 2d 1030, 1043 (C.D. Cal. 2003) (quoting Hobson, 737 F.2d at 35).

5        44.    "[A] claim relates back if it "arose out of the conduct, transaction, or
6  occurrence set out — or attempted to be set out — in the original pleading." Fed. R.
7  Civ. P. 15(c)(1)(B); see also Martel v. Trilogy Ltd., 872 F.2d 322, 327 (9th Cir. 1989)
8  (new claim related back because it arose from the same transaction and occurrence as
9  original claim); Grudt v. City of Los Angeles, 2 Cal. 3d 575, 583-84 (1970) (holding
10 that amended complaint related back to filing of original complaint where new claim
11 added new theory of recovery based on same acts and same injury alleged in original
12 pleading); cf. Cummings v. U.S., 704 F.2d 437 (9th Cir. 1983) (claimant's insurer's
13 complaint in intervention seeking to enforce its right of subrogation related back to
14 filing of claimant's original complaint); DePinto v. Provident Sec. Life Ins. Co., 323
15 F.2d 826, 831-32 (9th Cir. 1963) (intervention of a party plaintiff that shared interests
16 with the original plaintiff related back for statute of limitations purposes)

17       45.    Under Rule 15(c), the state relation back rules apply if state law provides
18 "the applicable statute of limitations." See also Wm. Moore, MOORE'S FEDERAL
19 PRACTICE 3d, § 15.20[3] at 15-126.   ("When a state relation-back rule is more
20 generous than the federal relation-back rule, the more generous state rule should
21 apply.").  California favors "liberality in the amendment of pleadings to encourage
22 litigating causes on their merits." Myers v. Phillip Morris, Inc., 2003 WL 21756086 at
23 *4 (E.D. Cal. 2003) (quoting Marasco v. Wadsworth, 21 Cal. 3d 82, 89 (1978)). Under
24 California relation-back doctrine, the claims against new defendants, who were
25 previously sued as Does, relate back to the date of the original complaint, as long as
26 they are based on the same general set of facts. See, e.g., Smeltzley v. Nicholson Mfg.
27 Co., 18 Cal. 3d 932 (1977); Austin v. Mass. Bonding & Ins. Co., 56 Cal. 2d 596, 600
28 (1961).

EXHIBIT ___
PAGE ___ 421

07209/2428907.1

-62-

46.   "Laches is not available as a defense to an action at law." <u>Abbott v. City of Los Angeles</u>, 50 Cal.2d 438, 462 (1958); <u>see also</u> 11 B.E. WITKIN, SUMMARY OF CALIFORNIA LAW, EQUITY § 14(a)(2) (9th ed. 1987) ("Laches can be asserted only in a suit in equity; an action at law may be brought at any time within the period of the statute of limitations."). "The equitable doctrine of laches has a legal equivalent in the statute of limitations. To allow a laches defense in a legal action would be to override a time limit mandated by the Legislature." <u>Unilogic, Inc. v. Burroughs Corp.</u>, 10 Cal. App. 4th 612, 619 (1992).

47.   The declaratory relief claim is considered a claim at law (not equity) because the nature of the underlying claim resembles an action at law for money damages. <u>See Wells Fargo Bank v. Bank of America</u>, 32 Cal. App. 4th 424, 439 (1995) ("Although declaratory relief is an equitable proceeding, whether laches is available in a declaratory relief proceeding depends upon the nature of the underlying claim."). Thus, in <u>Wells Fargo</u>, the court held that laches was inapplicable to a declaratory relief claim because it was "essentially also a dispute regarding money." <u>Id.</u>; <u>see also</u> <u>Mandracio v. Bartenders Union, Local 41</u>, 41 Cal.2d 81, 84-85 (1953) (laches inapplicable to declaratory relief action that amounted to an action for money damages).

48.   Only in the rarest of circumstances can a claim that satisfies the statute of limitations be barred as untimely by laches. <u>See, e.g.</u>, <u>Jarrow Formulas, Inc. v. Nutrition Now, Inc.</u>, 304 F.3d 829, 835-36 (9th Cir. 2002) ("[A] laches determination is made with reference to the limitations period for the analogous action at law. If the plaintiff filed suit within the analogous limitations period, the strong presumption is that laches is inapplicable."); <u>Kling v. Hallmark Cards Inc.</u>, 225 F.3d 1030, 1041, n.8 (9th Cir. 2000) ("When a limitation on the period for bringing suit has been set by statute, laches will generally not be invoked to shorten the statutory period.") (quoting <u>Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.</u>, 988 F.2d 1157, 1161 (Fed. Cir. 1993));

49.    To establish laches, defendant must show "both an unreasonable delay . . . and prejudice to itself." Kling, 225 F.3d at 1036 (quotation omitted).  Continuing the same challenged conduct militates against a finding of laches.  See, e.g, Russell v. Price, 612 F.2d 1123, 1125-26 (9th Cir. 1979) ("Defendants at no time changed their film distribution activities in reliance on [plaintiff's] conduct."); Danjaq, LLC v. Sony Corp., 263 F.3d 942, 955 (9th Cir. 2001) ("A defendant may also demonstrate prejudice by showing that it took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly.").

50.    Existence of nonwaiver clauses is "important fact[]" militating against finding of waiver. Securities and Exchange Commission v. Lincoln Thrift Ass'n, 557 F.2d 1274, 1278 (9th Cir. 1977).

51.    "Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it." U. S. v. King Features Entm't, Inc., 843 F.2d 394, 399 (9th Cir. 1988) (citation omitted).  Waiver of copyright "occurs only if there is an intent by the copyright proprietor to surrender rights in his work." A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1026  (9th Cir. 2001) (quoting 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT ¶ 13.06 (2000)). Because the burden is on the party claiming a waiver of a right to prove it by clear and convincing evidence, doubtful cases will be decided against a waiver. See City of Ukiah v. Fones, 64 Cal. 2d 104, 107-08 (1966).

52.    Inaction by itself is not an intentional relinquishment. Novell Inv. v. Weird Stuff, Inc., No. C92-20467 JW/EAI, 1994 WL 16458729 (N.D. Cal. 1993), is on point.  In Novell, plaintiffs brought an action for copyright infringement, trademark infringement, and false designation of origin against defendants as a result of the unauthorized sale of approximately 1700 Novell NetWare 3.11 serialized "system" disks which were retrieved from a dumpster by defendants and sold to another party. Defendants argued that Novell had waived its right to claim infringement because it had knowledge of "dumpster divers" -- persons who comb through dumpsters for material -

EXHIBIT
PAGE

26
423

07209/2428907.1

-64-

1  - for several years and failed to take action to deter such activity. The court rejected

2  this claim, and held that "there was no evidence that Novell was aware of 'dumpster

3  divers' for years and failed to take action to deter such activity." Id. at *13.

4  "Moreover, even if Novell failed to take preventive measures to stop "dumpster

5  diving," a failure to act, without more, is insufficient evidence" to support a waiver

6  claim. Id. Accordingly, the court denied defendants' waiver defense and granted

7  summary judgment to Novell. See also id. at *17 (applying same analysis to copyright

8  claim).

9      53.    The law is clear that litigants need not choose between pursuing all

10  offenders or none. See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 518 F.

11  Supp. 2d 1197, 1225 (9th Cir. 2007) ("The Court knows of no rule in copyright, and

12  StreamCast has cited no authority for the proposition, that a copyright holder is bound

13  to pursue either all infringers or none at all."); Emerson Electric Co. v. Rogers, 418

14  F.3d 841, 845 (8th Cir. 2005) ("While [employer] may not have exercised its rights

15  under the covenant on every occasion, there is no credible evidence that [its] failure to

16  do so rose to a waiver of its right to enforce the agreement as to [the defendant

17  employee] or that its failure to enforce the agreement as to other employees makes it

18  any less likely that [defendant] could use information gained during his relationship

19  with [the employer] to unfairly compete against it."); Deal v. Consumer Programs, Inc.,

20  458 F. Supp. 2d 970, 978 n 5 (E.D. Mo. 2005) (employer's alleged non-enforcement of

21  a contractual provision against one executive does not operate as a waiver of that

22  provision against another); Pochopien v. Marshall, O'Toole, Gerstein, Murray &

23  Borun, 315 Ill. App. 3d 329, 339 (Ill. App. 2000) ("The non-enforcement of a provision

24  as to previous employees in different situations is insufficient to constitute waiver as to

25  a subsequent employee.").

26      54.    To establish the defense of consent, there cannot be fraud or mistake on

27  the part of the plaintiff. 2 SCHWING § 32:3 at 197 ("To be a defense, the consent given

28  must have been to the very act or circumstances that caused the harm giving rise to the

EXHIBIT ___
PAGE ___
424

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

07209/2428907.1

1 action.") (citation omitted); <u>Greenawalt v. Rogers</u>, 151 Cal. 630, 635 (1907) ("An

2 apparent consent is not real or free when obtained through … fraud [or] mistake.").

3     55.    Like waiver, "[a]bandonment also requires intent to surrender rights." <u>Bell</u>

4 <u>Atlantic Business Systems Services, Inc. v. Hitachi Data Systems Corp.</u>, 1995 WL

5 836331 * 11 (1995) (<u>citing</u> <u>Hampton v. Paramount Pictures Corp.</u>, 279 F.2d 100, 103

6 (9th Cir.), and <u>Lopez v. Electrical Rebuilders, Inc.</u>, 416 F. Supp. 1133, 1135 (C.D. Cal.

7 1976)). Thus, abandonment "must be manifested by some overt act indicative of a

8 purpose to surrender the rights and allow the public to copy." <u>Hampton</u>, 279 F.2d at

9 104; <u>see also</u> <u>Micro Star v. Formgen Inc.</u>, 154 F.3d 1107, 1114 (9th Cir. 1998).

10     56.    A vague and conclusory allegation cannot sustain an abandonment claim.

11 <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986) ("a party opposing a

12 properly supported motion for summary judgment 'may not rest upon the mere

13 allegations or denials of his pleading but … must set forth specific facts showing there

14 is a genuine issue for trial'" (<u>quoting</u> <u>Fed. R. Civ. P.</u> 56(e)).

15     57.    For estoppel to apply, the party sought to be estopped (1) "must know the

16 facts; (2) he must intend that his conduct shall be acted on or must so act that the party

17 asserting the estoppel has a right to believe it is so intended; (3) the latter must be

18 ignorant of the true facts; and (4) he must rely on the former's conduct to his injury."

19 <u>Metro-Goldwyn-Mayer</u>, 518 F. Supp. 2d at 1225; <u>see also</u> <u>Bell Atlantic Bus. Sys.</u>

20 <u>Servs., Inc. v. Hitachi Data Sys. Corp</u>, 1995 WL 836331 (1995) (<u>citing</u> <u>U. S. v. King</u>

21 <u>Features Entm't</u>, 843 F.2d 394, 399 (9th Cir. 1988)). "'Where any one of the elements

22 of equitable estoppel is absent, the claim must fail.'" <u>Am. Cas. Co. of Reading Pa. v.</u>

23 <u>Baker</u>, 22 F.3d 880, 891, 892 (9th Cir. 1994) (citation omitted). Where, as here, only

24 one inference can be drawn from the evidence, the question of estoppel is one of law.

25 <u>See</u> <u>Sawyer v. Sonoma County</u>, 719 F.2d 1001, 1006 n.12 (9th Cir. 1983) (<u>citing</u>

26 <u>Driscoll v. City of L.A.</u>, 67 Cal.2d 297, 305 (1967)).

27     58.    "Acquiescence constitutes a ground for denial of relief only upon a finding

28 of conduct on the plaintiff's part that amounted to an assurance to the defendant,

1  express or implied, that plaintiff would not assert ..." his rights against the defendant.

2  Novell, 1994 WL 16458729 at * 13; see id. at *17 (applying standard to copyright

3  infringement).

4      59.   "The doctrine of unclean hands demands that a plaintiff act fairly in the

5  matter for which he seeks a remedy.... The determination of the unclean hands defense

6  cannot be distorted into a proceeding to try the general morals of the parties." Kendall-

7  Jackson Winery Ltd v. Superior Court, 76 Cal. App.4th 970, 978 (1999). "It is

8  fundamental to the operation of the doctrine that the alleged misconduct by the plaintiff

9  related directly to the transactions concerning which the complaint is made." Dollar

10  Systems, Inv. v. Avcar Leasing Systems, Inc., 890 F.2d 165, 173 (9th Cir. 1989)

11  (quoting Arthur v. Davis, 126 Cal. App. 3d 684, 693-94 (1981). See also

12  Magnesystems, Inc.v. Nikken, Inc., 933 F. Supp. 944, 953 (C.D.Cal. 1996) (rejecting

13  unclean hand defense based on plaintiffs' alleged patent infringement in a patent

14  infringement case against defendants, finding that "[p]laintiff's alleged misconduct

15  ha[d] no direct relationship to the [patent-in-suit] or [p]laintiff's conduct in obtaining

16  the patent-in-suit.").

17      60.   Courts routinely dispose of the affirmative defense of failure to mitigate on

18  summary judgment. See, e.g., U.S. v. Union Pacific R. Co., 2008 WL 413765

19  (E.D.Cal. 2008). Lack of such evidence is fatal to a mitigation of damages defense.

20  See, e.g., Classic Concepts, Inc. v. Linen Source, Inc., 2006 WL 4756377, *8 (C.D.

21  Cal. Apr. 27 2006) (granting summary judgment on a defense of mitigation of damages

22  where defendant failed to introduce any evidence supporting the defense).

23

24  DATED: March 7, 2008        QUINN EMANUEL URQUHART OLIVER &

25                            HEDGES, LLP

26

27                        By _____

                          John B. Quinn

28                          Attorneys for Mattel, Inc.

EXHIBIT ___ PAGE ___ 426

07209/2420289.3

**EXHIBIT 27**

CALENDARED

RECEIVED
MAR 1 0 2008

1  THOMAS J. NOLAN (Bar No. 66992)
   (tnolan@skadden.com)
2  JASON D. RUSSELL (Bar No. 169219)
   (jrussell@skadden.com)
3  MARINA V. BOGORAD (Bar No. 217524)
   (mbogorad@skadden.com)
4  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   300 South Grand Avenue
5  Los Angeles, CA 90071-3144
   Tel.: (213) 687-5000 / Fax: (213) 687-5600
6
7  KENNETH PLEVAN (admitted *pro hac vice*)
   (kplevan@skadden.com)
8  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   Four Times Square, New York, NY 10046
   Tel.: (212) 735-3000 / Fax: (212) 735-2000
9
10 Attorneys for MGA Entertainment, Inc., MGA Entertainment (HK) Limited,
   MGAE de Mexico, S.R.L. de C.V., and Isaac Larian

11                  UNITED STATED DISTRICT COURT

12                 CENTRAL DISTRICT OF CALIFORNIA

13                        EASTERN DIVISION

14 CARTER BRYANT, an individual,        ) CASE NO. CV 04-9049 SGL (RNBx)
                                        ) Consolidated with Case No. 04-9059
15                      Plaintiff,      ) and Case No. 05-2727
                                        )
16          v.                          ) Honorable Stephen G. Larson
                                        )
17 MATTEL,    INC.,   a   Delaware      ) MGA PARTIES' CORRECTED
   corporation,                         ) NOTICE OF MOTION FOR PARTIAL
18                                      ) SUMMARY JUDGMENT, MOTION
                        Defendant.      ) AND MEMORANDUM OF POINTS
19                                      ) AND AUTHORITIES IN SUPPORT
                                        ) THEREOF;
20 AND CONSOLIDATED ACTIONS            )
                                        ) PREVIOUSLY SUBMITTED UNDER
21                                        SEPARATE COVER:
                                          1.  [PROPOSED] STATEMENT OF
22                                            UNCONTROVERTED FACTS
                                              AND CONCLUSIONS OF LAW;
23 **FILED UNDER SEAL PURSUANT**         2.  REQUEST FOR JUDICIAL
   **TO PROTECTIVE ORDER**                   NOTICE;
24                                        3.  DECLARATION OF JASON D.
                                              RUSSELL;
25                                        4.  DECLARATION OF ISAAC
                                              LARIAN;
26                                        5.  [PROPOSED] ORDER; and
                                          6.  PROOF OF SERVICE.
27
                                        Hearing Date: April 23, 2008
28                                      Time: 10:00 a.m.

                                2 | 10
─────────────────────────────────────────────────────
MGA Parties' Motion for Partial Summary Judgment - Case No. CV 04-9049 SGL (RNBx)

EXHIBIT _____27_____

PAGE _____427_____

1  information at Mattel to benefit MGA. Indeed, it is undisputed that Bryant's creation of the
2  BRATZ concept was something that was <u>not</u> done during the normal course and scope of
3  his employment at Mattel or at the direction of Mattel.

**D.    Mattel's Common Law Unfair Competition Claims Also Fail**

5  "The common law tort of unfair competition is generally thought to be synonymous
6  with the act of 'passing off' one's goods as those of another." <u>Bank of the W.</u>, 2 Cal. 4th at
7  1263.   Here, Mattel's claim does not allege a claim resembling one for "passing off."
8  Mattel never alleges that MGA or Larian sold Mattel's products as their own.  Mattel's
9  claims also fail to satisfy the basic elements of such a claim, which requires that: "(1) the
10  [counterclaimant] has invested substantial time and money in development of its ...
11  'property'; (2) the [counterclaim] defendant has appropriated the [property] at little or no
12  cost; and (3) the [counterclaimant] has been injured by the [counterclaim] defendant's
13  conduct." <u>Smith & Hawken, Ltd. v. Gardendance, Inc.</u>, 2004 WL 2496163, at **6-7 (N.D.
14  Cal. Nov. 5, 2004).

15  First, Mattel does not allege that it invested "substantial time and money in
16  development of its property."  Mattel seeks to destroy BRATZ, not take possession of it,
17  indicating that Mattel does not value the BRATZ because of some prior effort or pecuniary
18  investment. (Ex. 21 (Brawer) at 232:19-233:22 and SAA p. 76, ¶ 4 (Mattel seeks an order
19  impounding BRATZ).)  Moreover, it is undisputed that Mattel neither knew about nor put
20  effort into developing BRATZ on its own.   Furthermore, MGA and Larian have not
21  appropriated the drawings, let alone "at little or not cost." <u>Smith & Hawken</u>, 2004 WL
22  2496163, at **6-7.  MGA and Larian were repeatedly assured that Bryant's title to his
23  drawings was free and clear of Mattel's grasp, and indeed MGA poured literally millions of
24  dollars into developing BRATZ in reliance on Bryant's representations. (UF ¶¶ 15, 20-23.)

**IV.   MATTEL CANNOT ESTABLISH THAT LARIAN
AND MGA INTENTIONALLY INTERFERED WITH
BRYANT'S AT-WILL CONTRACT WITH MATTEL**

27  In its Sixth Counterclaim, Mattel alleges that Larian and MGA intentionally
28  "encouraged, aided and financed Bryant to develop BRATZ, knowing full well that Bryant

EXHIBIT ____27____

PAGE ____428____

1   was still employed by Mattel" in order to "obtain[] a valuable fashion doll line" even though
2   in developing the line for MGA, Bryant would be in breach of his contractual obligations to
3   Mattel. (SAA ¶ 33.) While it is unclear which "contract" Mattel is referring to, Larian and
4   MGA assume for this motion that Mattel is referring to the Inventions Agreement Bryant
5   signed with Mattel in January 1999. (Id. ¶ 22.) Here, Bryant's offer letter from Mattel
6   states "your employment is at-will[.]" (UF ¶ 1.)

7       To establish a claim for intentional interference with contractual relations, Mattel
8   must show: (1) a valid contract between Mattel and Carter Bryant; (2) MGA and Larian's
9   knowledge of the contract; (3) MGA and Larian's intentional acts designed to induce a
10  breach or disruption of the contractual relationship; (4) actual breach or disruption of the
11  contractual relationship; and (5) resulting damage. See Family Home & Fin. Ctr., Inc. v.
12  Fed. Home Loan Mortg. Corp., 461 F. Supp. 2d 1188, 1193 (C.D. Cal. 2006) (summary
13  judgment granted where plaintiff failed to show defendant induced breach). Even if Mattel
14  could establish breach or disruption of a contract, it must also prove that MGA and Larian
15  caused that disruption. See id. As shown below, Mattel cannot establish any of these
16  elements on the undisputed record.

17      "California courts have consistently declared ... an expression of public policy to
18  ensure that every citizen shall retain the right to pursue any lawful employment and
19  enterprise of their choice." Metro Traffic Control, Inc. v. Shadow Traffic Network, 22 Cal.
20  App. 4th 853, 859 (1994). This policy dictates that "[t]he interests of the employee in his
21  own mobility and betterment are deemed paramount to the competitive business interests of
22  the employers[.]" Diodes, Inc. v. Franzen, 260 Cal. App. 2d 244, 255 (1968). Thus,
23  California "public policy generally supports a competitor's right to offer more pay or better
24  terms to another's employee, so long as the employee is free to leave.... [I]f the law were to
25  the contrary, the result 'would be intolerable, both to such employers as could use the
26  employe[e] more effectively and to such employe[e]s as might receive added pay. It would
27  put an end to any kind of competition.'" Reeves, 33 Cal. 4th at 1151 (quoting Judge
28  Learned Hand in Triangle Film Corp. v. Artcraft Pictures Corp., 250 F. 981, 982 (2d Cir.

EXHIBIT ___27___

PAGE ___429___

1918)).[46]

These policy concerns spawned the principle that where, as here, the contract at issue is an at-will employment contract, "no actionable wrong is committed by a competitor who solicits his competitor's employees or who hires away one or more of his competitor's employees who are not under contract, so long as the inducement to leave is not accompanied by unlawful action." Diodes, 260 Cal. App. 2d at 255. Later courts interpreted "the qualification of Diodes regarding 'employees who are not under contract' to mean an employment contract other than employment at will."[47]

## A. Bryant did not breach or disrupt his contract with Mattel

As shown in Bryant's summary judgment brief, Bryant did not breach his Employment Agreement with Mattel because any BRATZ-related drawings or models allegedly created by Bryant before his departure from Mattel do not fall within the scope of the Inventions Agreement. (Bryant Br. at III.B.)

## B. MGA and Larian lacked the intent to induce Bryant to breach his contract

To prove that MGA and Larian intended to interfere with Bryant's Employment Agreement by contracting with Bryant for the ownership rights to the BRATZ concept and drawings, Mattel must show that MGA and Larian knew that "the interference is certain or

---

[46]   See also VL Sys., Inc. v. Unisen, Inc., 152 Cal. App. 4th 708, 713, 715 (2007) (quoting Diodes, finding no unlawful solicitation of employee where the employee initiated the new agreement with the defendant and "chose to seek the job with" the defendant); Reeves v. Hanlon, 33 Cal. 4th 1140, 1145 (2004) (requiring a demonstration of an unlawful act on the part of the competitor employer "will promote the public policies supporting the right of at-will employees to pursue opportunities for economic betterment and the right of employers to compete for talented workers"); Continental Car-Na-Var Corp. v. Moseley, 24 Cal. 2d 104, 110 (1944) ("A former employee has the right to engage in a competitive business for himself and to enter into competition with his former employer, even for the business of ... his former employer, provided such competition is fairly and legally conducted."); accord Interloc Solutions, Inc. v. Technology Assocs. Int'l Corp.   2007 WL 2429715, at *2 (E.D. Cal. Aug. 24, 2007) ("employees are not precluded from seeking new employment on their own initiative").

[47]   Metro Traffic, 22 Cal. App. 4th at 860; Reeves, 33 Cal. 4th at 1145 ("defendant is not subject to liability for intentional interference if the interference consists merely of extending a job offer that induces an employee to terminate his or her at-will employment"). The California Supreme Court refined this standard, holding that "to recover for a defendant's interference with an at-will employment relation, a plaintiff must plead and prove that the defendant engaged in an independently wrongful act – i.e., an act 'proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard' that induced an at-will employee to leave the plaintiff." Reeves, 33 Cal. 4th at 1152-53.

EXHIBIT _____ 27

PAGE _____ 430

1  substantially certain to occur as a result of his action. The rule applies, in other words, to an
2  interference that is incidental to the actor's independent purpose and desire but known to
3  him to be a necessary consequence of his action." Tuchscher Dev. Enters., Inc. v. San
4  Diego Unified Port Dist., 106 Cal. App. 4th 1219, 1239 (2003) (emphasis added). There is
5  no intent to interfere where the defendant knows or believes its agreement with a third party
6  will not infringe the rights of the plaintiff.

7      1-800 Contacts, Inc. v. Steinberg, 107 Cal. App. 4th 568 (2003), although arising in
8  an anti-SLAPP motion, is instructive. The court found plaintiff (a discount contact lens
9  seller) would be unlikely to prevail on its intentional interference with contract claims
10 against defendant (a representative of optometrist associations) where plaintiff's former
11 legal counsel contacted defendant and offered his services to groups of optometrists, which
12 were direct competitors of plaintiff's as contact lens sellers and were seeking laws
13 regulating the activities of businesses like plaintiff's. Id. at 573. Because the former
14 employee repeatedly reiterated to defendant that he would not disclose confidential
15 information learned from his previous employer, "stated and restated his contractual
16 obligation not to work for a defined class of competitors, and obtained assurances that
17 neither [defendant] Steinberg nor the optometric associations were within that class[,]" the
18 court concluded that, regardless of whether the former employee actually breached the
19 contract, "the evidence did not show or substantiate that Steinberg – either in agreeing to
20 work with [the former employee] on a subject of mutual concern or in inviting or arranging
21 for others interested to meet with them – acted with knowledge that any such breach would
22 thereby be caused." Id. at 586 (emphasis added). The undisputed facts here show that
23 Larian and MGA took steps to verify that by contracting with Bryant for the ownership of
24 BRATZ, they would not infringe any potential rights of Mattel, and thus the intent element
25 cannot be met. MGA and Larian indisputably did not know the specific requirements of
26 Bryant's Employment Agreement; Bryant was unable to provide a copy at their request,
27 because he did not have one in his possession. (UF ¶ 19.) MGA and Larian specifically
28 sought assurances from Bryant and his patent attorney that Bryant's developing of the

EXHIBIT ___ 27

PAGE ___ 431

BRATZ concept fell outside the scope of Bryant's employment with Mattel (UF ¶¶ 14, 20), and were told by Bryant and his attorney that he "had created the doll at a time period separate from his employment and that it was his own separate creation." (UF ¶¶ 15, 21.) MGA and Larian had no reason to doubt these assurances, especially as a patent attorney familiar with the precise ownership issues in question represented that she was "satisfied" the Employment Agreement was not implicated. (UF ¶¶ 20-22.)

Finally, and most importantly, MGA and Larian asked for and received a warranty from Bryant that, inter alia, his signing of the agreement with MGA did not breach any existing contract with a third party, that the BRATZ concept and drawings were "original" and were the exclusive property of MGA, and indemnifying MGA from third party claims to ownership of the BRATZ concept or drawings. (UF ¶ 23.) Given this evidence, there is no question that MGA and Larian were far from "certain" that any interference with Mattel's rights was likely to occur—indeed, the opposite is true, as the undisputed facts show that, as a result of repeated inquiries by MGA and Larian and assurances from Bryant and his attorney, MGA and Larian were rightfully secure in the knowledge that they were <u>not</u> interfering with <u>any</u> party's contractual rights. Thus, there is no triable issue of fact as to MGA and Larian's lack of intent to interfere with Bryant's Employment Agreement.

### C. MGA and Larian did not induce Bryant to leave Mattel and therefore could not be the cause of his alleged breach

It is settled that a contracting party is not liable for intentional interference with contract where the breaching party initiates the contact with him. See Restatement (Second) of Torts § 766, cmt. n (2007).[48] See also DeVoto v. Pacific Fidelity Life Ins. Co., 618 F.2d 1340, 1348 (9th Cir. 1980) (noting that "where a contract has been abrogated, competitors may thereafter offer to deal with the party who repudiated the contract without incurring liability in tort: there is no act of inducement, and once the contract is abrogated there is no

---

[48] "One does not induce another to commit a breach of contract with a third person under the rule stated in this Section when he merely enters into an agreement with the other with knowledge that the other cannot perform both it and his contract with the third person. .... For instance, B is under contract to sell certain goods to C. He offers to sell them to A, who knows of the contract. A accepts the offer and receives the goods. A has not induced the breach and is not subject to liability under the rule stated in this Section."

EXHIBIT _____ 27

PAGE _____ 432

1  advantage to appropriate") (citing Restatement (Second) of Torts § 766, cmt. n); Bauer v.

2  Interpublic Group of Companies, Inc., 255 F. Supp. 2d 1086, 1093, 1095 (N.D. Cal.

3  2003).[49]

4      Assuming Bryant somehow breached his Employment Agreement with Mattel in

5  selling the BRATZ concept to MGA, the undisputed evidence shows that there was no

6  inducement on the part of MGA and Larian for him to do so. Here, the record is undisputed

7  that Bryant was the one searching for a company to develop his BRATZ line and he was the

8  initiating party.[50] It is undisputed that Bryant had no contact with MGA until he arrived at

9  MGA headquarters for his first pitch meeting – arranged by Marlow, who was not an MGA

10 employee – in August of 2000. (UF ¶¶ 3, 7-10.) Mattel has no evidence to suggest that

11 MGA approached or solicited Bryant to leave his position at Mattel.    Given these

12 undisputed facts, MGA and Larian did not intentionally induce or cause Bryant to breach

13 his Employment Agreement.

14 **V.    AS BRYANT DID NOT OWE A FIDUCIARY DUTY TO
        MATTEL, THERE CAN BE NO AIDING AND ABETTING LIABILITY**

15     Mattel's 8th Counterclaim alleges that MGA and Larian are liable for aiding and

16 abetting Bryant's breach of fiduciary duty owed to Mattel because they "encouraged, aided

17

18  [49]  1-800 Contacts, Inc., 107 Cal. App. 4th at 586 (where breaching party approached defendant, defendant agreed to work with and set up meetings for others to work with breaching party not

19  enough to show inducement); American Mortg. Network v. LoanCity.com, 2006 WL 3199291, at *17 (Cal. C24t. App. Nov. 7, 2006) (judgment notwithstanding a verdict granted where

20  "dissatisfied" employee "putting himself in the market" contacted and was hired by competitor after receiving competitor's name as recommendation from third party); Xtracash ATM, Inc. v.

21  Karsh, 2002 WL 31053855, at *9 (Cal. Ct. App. Sept. 16, 2002) (granting summary judgment on intentional interference with contract claims against provider of ATM services, finding no

22  inducement where "very dissatisfied" merchants contacted and contracted with defendant to provide alternate service and undisputed facts showed defendant "did not approach merchants to

23  change their service and did not induce them to breach their contracts with [plaintiff]"); Fogel v. UNUM Corp., 2001 WL 1359112, at *4 (Cal. Ct. App. Nov. 6, 2001) (no inducement where, inter

24  alia, alleged inducing party did not approach breaching party but instead was solicited by breaching party).

25  [50]  UF ¶ 5; Ex. 1 (Bryant) at 8:15-9:4, 157:19-158:2 ("Q. Can you tell us the context in which Ms. Marlow first spoke to you about MGA in July of 2000? A. I spoke with her. I told her that I

26  had a project that I was interested in possibly doing something with, and I spoke to her and asked her if she could possibly – or if she had any leads or if she could possibly help me pitch this idea.

27  Q. So you contacted her?  A. Yes.  Q. And in response to that query what did she say?  A. She told me that she had been working for a company called MGA and that they, in fact, were looking for

28  new doll projects.  Q. And is it true that you had never heard of MGA before?  A. I had not.").

EXHIBIT _____ 27

PAGE _____ 433

1    and financed Bryant to develop BRATZ," knowing Bryant was employed by Mattel and

2    that Mattel is the "true owner of BRATZ designs and works." (SAA ¶¶ 33, 34; see also id.

3    ¶¶ 26-27, 136-37, 139-41.) Bryant's concurrently filed summary judgment motion, in which

4    MGA and Larian join, demonstrates that, as a matter of law, Bryant did not owe a fiduciary

5    duty. (Bryant Br. at III.A.) Absent such a duty, a claim for aiding and abetting necessarily

6    fails. See Richard B. LeVine, Inc. v. Higashi, 131 Cal. App. 4th 566, 574 (2005) (granting

7    summary judgment on aiding and abetting breach of fiduciary duty where plaintiff failed to

8    establish breach); see also MJT Securities v. Toronto Dominion Bank, 2007 WL 1725421,

9    at **7-8 (N.D. Cal. June 14, 2007). As Bryant owed no fiduciary duty to Mattel, Mattel's

10   claim against MGA and Larian likewise fails as a matter of law.

## CONCLUSION

11

12        For the foregoing reasons, MGA and Isaac Larian respectfully request an order

13   granting partial summary judgment and dismissing Mattel's Phase I claims against them.

14   DATED: March 7, 2008

15                                   SKADDEN, ARPS, SLATE, MEAGHER &
                                     FLOM, LLP

16                                   By: _____
                                              Thomas J. Nolan
17                                   Attorneys for MGA Entertainment, Inc., MGA
                                     Entertainment (HK) Limited, MGAE de Mexico,
18                                   S.R.L. de C.V., and Isaac Larian

19

20

21

22

23

24

25

26

27

28

EXHIBIT ____27____

PAGE ____434____

**EXHIBIT 28**

## D. JAN DUFFY REBUTTAL OF REPORT OF BRUCE L. STEIN

### RE: IN THE MATTER OF CARTER BRYANT v. MGA ENTERTAINMENT, INC. AND CONSOLIDATED CASES

**Case No. CV 04-9059**

United States District Court
Central District of California
Eastern Division

**OPINIONS:**

Mattel, Inc. (hereinafter "Mattel") has designated Bruce L. Stein, a former Worldwide President, Chief Operating Officer and Board member of Mattel, as its expert on "commonly understood and accepted employment practices in the toy industry." Whatever Mr. Stein's service as an executive at Mattel or other toy companies, however, neither Mr. Stein's education nor his prior work experience would seem to equip him to offer expert opinion about "commonly understood and accepted employment practices" in the toy or any other industry. According to his biography, Mr. Stein's academic training is a bachelor's degree in psychology/biology and an MBA with concentrations in marketing and finance. His work experience prior to serving as President and COO at Mattel appears to include corporate marketing, advertising, and executive positions with other organizations. Mr. Stein apparently currently serves in a CEO position as well as on the Boards of several companies.

Thus, while Mr. Stein's executive level experience has been in organizations that employ professionals in Human Resources, employment law, and employment practices, Mr. Stein's own personal background would not appear to have included the relevant law or the practice of designing, implementing, administering or enforcing "commonly understood and accepted employment practices," that is, the policies, procedures, processes, or systems relating to managing employees or to Human Resources. His personal background would also not appear to have included the relevant law or the practice of designing, implementing, administering or enforcing agreements, policies, procedures, processes, or systems relating to protection of intellectual property. Moreover, even Mr. Stein's own experience of agreeing to and signing intellectual property agreements with Mattel would likely have been quite different from that of a rank and file employee such as Carter Bryant. For example, not only would he doubtless have had the resources to seek an attorney's assistance in comprehending any agreements Mattel was seeking to obtain from him, but he or his attorney may have had an opportunity, unlike Carter Bryant, to negotiate the terms of such agreements.

**Mr. Stein's Opinion 1:**
Mr. Stein nevertheless appears in his Report to offer several opinions on "accepted employment practices" in the toy industry. First, he opines that "[a]lthough some design group employees inside the toy companies envy the lifestyle and individual fortunes made by the small group of successful inventors....most [designers] choose not to [go the

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT _____28_____

PAGE _____435_____

independent route]." He states that this is because of "individual risk tolerance and lifestyle preferences," that cause them to opt for the "many benefits" such as a "regular salary, performance bonuses, stock options, health insurance, vacation pay...etc." offered to regular employees. "In exchange for these pay and benefit packages," Mr. Stein concludes, "it is industry practice for a toy company to require these design group employees to execute contracts that assign their work product solely to the company."

In one sense, Mr. Stein is correct: it is the norm in any industry in which research and design are important, not just the toy industry, to ask employees to enter into agreements intended to protect the company's proprietary information and other intellectual property. In fact, most current intellectual property protection programs have their modern roots in the technology industry, but many other industries from defense contracting to biotech and pharmaceuticals to fashion, seek agreements with employees concerning proprietary information, confidentiality, and inventions assignments.

Mr. Stein is not correct, however, in his assumption or conclusion that Mattel's intellectual property protection practices or the agreements that Carter Bryant was required to sign in connection with his employment and termination from Mattel conformed to the norms of similarly situated employers' agreements or employment practices concerning them. Mr. Stein seems to opine somewhat sweepingly, that "The universality of this type of invention assignment is reflected in the Bryant/Mattel and Bryant/MGA agreements, as well as the other employment and consulting contracts used by both Mattel and MGA that "were provided for [his] review." As with the confidentiality provisions...the invention assignment clauses in those contracts appear by their terms to extend beyond patentable inventions to other types of protectable intellectual property. Based on [his] experience, the scope of these provisions is consistent with predominant industry practice..."

First, at no point in his report does Mr. Stein reference any specific language in the documents Mr. Bryant signed while at Mattel to support his conclusions regarding their scope and "consistenc[y] with predominant industry practice." Moreover, as I concluded in my extensive analysis and opinions concerning Mattel's intellectual property protection program and related employment practices, (Expert Report of D. Jan Duffy, February 11, 2008), the language of the 1995 and 1999 Confidentiality and Inventions Assignments agreements signed by Mr. Bryant, as well as the Proprietary Information Checkout he signed during his exit interview, constituted significant departures from the usual and reasonable management practice of similar employers regarding such agreements. In brief, I concluded in my Report and continue to be of the opinion, that all of the agreements Mattel required Mr. Bryant to sign were unclear, overly legalistic, ambiguously worded, difficult to read or comprehend, inconsistent, and hardly capable of effectively communicating their import to design employees such as Mr. Bryant.

Even more important, Mr. Stein completely ignored the manner and circumstances in which, during Mr. Bryant's tenure, Mattel imposed its agreements upon employees. Aside from outlining the defects associated with the language in the agreements themselves, my Report contained significant analysis of the extreme deficiencies in Mattel's relevant employment practices. These serious departures from reasonable practice included, but are not limited to: the failure of Mattel to offer employees a

meaningful opportunity to review the agreements in question; Mattel's insistence that all employees sign such agreements in the course of a brief employee orientation session in which numerous other matters were addressed; failure of Mattel's top leadership to evince awareness of or knowledgeable commitment to the agreements or even Mattel's intellectual property protection program in general; Mattel's failure to educate human resources staff who were administering the agreements and related policies and procedures; and Mattel's failure to provide other knowledgeable or competent advisors to assist employees, or to meaningfully alert employees of the potential need to seek knowledgeable counsel on their own.

Additionally, Mr. Stein makes a significant error in asserting that "it is industry practice for a toy company to require these design group employees to execute contracts that assign their work product **solely** to the company." [Emphasis supplied.] As I discussed in my Report, it is anything but usual or reasonable practice in California for an employer to demand that **any and all** of an employee's inventions or ideas be assigned to the employer. Rather, given California's strong public policy protections of employees' privacy and other rights, California employers must, and ordinarily do, take care to exclude, and to communicate to employees the exclusion of, certain inventions belonging to the employee, rather than the employer. In fact, as also discussed in my Report, I am of the opinion that Mattel's failure to include the requisite exclusion plainly and conspicuously in the agreements it required Carter Bryant to sign at his orientation was a major deficiency in Mattel's employment related practices. Also seriously deficient is the extreme case of the "Proprietary Information Checkout" document that Mattel required Mr. Bryant to sign upon his resignation. As described, that agreement failed to include mention of the requisite exclusion at all and even actively misrepresented the nature of Mr. Bryant's previously signed agreements.

Even Mattel seems to have recognized, at least to some degree, that its agreements and the manner in which it imposed them upon employees failed to conform to "commonly understood and accepted employment practices in the toy [or other] industry." First, for example, at some point, it dropped the egregiously improper and misleading "Proprietary Information Checkout" form it had Mr. Bryant sign in 2000, ultimately replacing it in 2006 with the more appropriate and usual "Confidentiality Obligations" form. Mattel also amended its Employee Confidential Information and Inventions Agreement after Mr. Bryant's departure, making it at least marginally more comprehensible and user-friendly. Finally, although Mattel's executive leadership, including Executive Vice President of Human Resources, Alan Kaye, were too uninformed or unmindful of the program to provide details, it appears that Mattel made some effort to conduct employee meetings to explain the purport of its new confidentiality and inventions agreement before requesting employees to sign them.

In short, contrary to Mr. Stein's opinion, for the above reasons, I remain of the opinion that Mattel's intellectual property-related employment practices represent anything but "commonly understood and accepted employment practices" in the toy or any other industry. Rather, both in their language and in the manner in which they were imposed upon employees like Carter Bryant, they were a significant departure from usual and reasonable management practices of similar employers.

3

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT ___28___

PAGE ___437___

## Mr. Stein's Opinion 2

Related to his first opinion, Mr. Stein also opines that design jobs inside toy companies are "coveted by many creative types" because, he reasons, it is a place for "a creative designer to do their most creative work, have a company ready to bring their ideas to market, and have a lucrative set of benefits that remove the everyday worries of finances, health care, and the like from the joy they experience in being creative. In the end, in my experience, for most designers, the contracts they sign that give a toy company the rights to their work product are more liberating than restrictive." Regardless of whether "creative types" at other toy companies would consider the benefits they received to be particularly "lucrative" and the security of employment inside a toy company to guaranty them the "joy of being creative," many employees at Mattel, specifically, clearly did not consider Mattel to offer them the joy of job security of any kind.

First, Mattel's, in this case, quite clear, conspicuous and consistent policy language directly informs employees that they are "at will" and thus can be terminated at any time. In addition, Mattel has a history of layoffs that would clearly remind them that there was no job security whatsoever for them at Mattel. Moreover, perhaps because the high compensation and benefits such as stock options they obtained at Mattel created a cushion that would make them less mindful of the employees laid off during their tenure, Mattel executives such as Bob Eckert, Adrienne Fontanella, and Ivy Ross were unable to remember specific information or numbers about Mattel's layoffs when asked during their depositions.

The impact of Mattel's layoffs upon rank and file employees was, unsurprisingly, significant, however. For example, as Amy Myers, a former Mattel designer who was laid off, testified in her deposition, when it happened to her, she "just knew" she was going to be laid off because there was a "giant layoff" and "everybody knew there was going to be a big layoff." (Myers, 206: 3-4 and 207: 1-2.) Asked to characterize how often layoffs occurred at Mattel during her tenure she stated: "I really can't recall. I mean I know they had- every once in a while they would have a big layoff. It might not be in – in our group. It might be in a different group. It's – it happened a lot there." (Myers, 209: 6-9)

Elise Cloonan, a former Mattel designer and roommate of Carter Bryant, was also asked at her deposition about layoffs at Mattel:

Q: During the period of time you were at Mattel, was there, from time to time, layoffs of a number of individual employees?
A: Constantly
Q: "Constantly" meaning once every year? Once every two years?
A: About once every – Yeah, once every two years
Q: And did that engender a – sort of a feeling that you never knew when you would be gone?
The Deponent: The faster they happened, the more morale plunged. If they were spread out like over two, three years, it kind of – it went away. But when they were like every – when they were happening every year and we were constantly getting over – our leadership overhead was changing, absolutely.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT ____ 28

PAGE ____ 438

Q: What period of time was that that we're talking about when it happened more frequently?
A: It seemed—
Q: If I could finish, -- more frequently and there was a morale problem?
The Deponent: In my opinion, it – it seemed to increase more towards when –
I call it the old regime left. After Jill Barad and all her people left, and Ivy Ross came on board, it increased a lot, because there was a huge turnover.
[Lawyers' colloquy omitted.]

Thus, in accord with Mr. Stein's opinion that "creative types" seek secure employment inside companies, given Mattel's lay-off history, it is hardly surprising that some Mattel employees at least would seek safer employment elsewhere even while they were still employed at Mattel.

At any rate, Mr. Stein's opinion notwithstanding, nothing in the law, policy, usual practice or even logic would prohibit at least some "creative types" from taking the plunge into "risky" entrepreneurial pursuits or free-lance ventures rather than employment with a company. In fact, given California's public policy and general support for entrepreneurial enterprise, nothing even prohibits employees from undertaking "preparations to compete" with their current employer while they remain employed.

**Mr. Stein's Opinion 3:**
Mr. Stein also offers the opinion that "independent inventing....is a very challenging road that most inventors barely earn a living at. Most product ideas are rejected, and even if accepted it often takes years for an idea to make it to market and begin generating royalty income for the inventor. Also, for many independent inventors, the absence of a broad group of talented peers and the team process negatively impacts the quality of their ideas, their productivity and their enjoyment of their work."

In one sense, Mr. Stein is correct: the road employees like Carter Bryant elected to take is a dangerous one, fraught with delay, uncertainty and potential, and even likely, failure. What Mr. Stein, an executive with significant personal resources in the form of high compensation, stock options, and the "lucrative benefits" he extols, seems to miss is how the danger of the entrepreneurial or even freelance route affects rank and file employees like Carter Bryant. Lacking the resources of a Bruce Stein, it is not at all uncommon for rank and file employees to keep even a search for alternative employment quiet from an existing employer. In fact, as a result, most job application forms have a question that asks: "May we contact your current employer?" Knowing that the answer is understandably likely to be "no," a negative answer is seldom a bar to new employment. It is also not at all uncommon for an employee in search of a new position to slip away at lunch hour or on a free day to a job interview. Moreover, despite the chagrin that many employers feel at the practice, it is also hardly uncommon for employees searching for a new job to utilize their current employer's internet access, fax machine, or telephone line to help them obtain a new position. In fact, Mattel Human Resources employee Theresa Newcomb acknowledged in her deposition that Mattel had no policy against calling employees Mattel was recruiting at their places of employment and that it had likely happened in her experience at Mattel.

5
CONFIDENTIAL -
ATTORNEYS' EYES ONLY

EXHIBIT _____ 28

PAGE _____ 439

Given how easily they can fail, employees like Carter Bryant who are taking the particular risks of pitching an idea in exchange for future royalties rather than another job, in particular, often exhibit these above-described common behaviors. Moreover, given the relatively small size of the toy industry, members of the toy industry design community are perhaps particularly unlikely to burn bridges with an existing employer by announcing prematurely or staging a "noisy withdrawal" that they are leaving to follow a risky entrepreneurial endeavor.

In short, Mattel's own expert Bruce Stein unwittingly seems to validate rather than undermine the position that Carter Bryant and MGA take in this litigation. That is, among other things, that given the failure of Mattel to guide employees like Carter Bryant differently than it did, through clear, comprehensible, fair, legal and appropriate policies, procedures, practices and agreements; given the normal behavior of employees under the uncertain circumstances to which they were subject in their employment with Mattel including its substantial history of layoffs; and given the natural reluctance of rank and file employees who choose the uncertain road of pitching an idea or seeking employment outside of their existing employer's organization to burn bridges, it is unreasonable for Mattel to believe that employees like Carter Bryant would have acted differently than they did. Rather, it is Mattel that departs from usual and reasonable practice by its significant failure to provide clear and meaningful guidance as to its expectations of employee conduct; its unwillingness or inability to invest the resources necessary to create fair and reasonable agreements with rank and file employees; and its failure to provide a working environment that would foster the benefits described by Mattel's former COO Bruce Stein and attract and retain talented designers such as Carter Bryant.

_3/17/08_
Date

D. Jan Duffy

6

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT ____ 28

PAGE ____ 440

Given how easily they can fail, employees like Carter Bryant who are taking the particular risks of pitching an idea in exchange for future royalties rather than another job, in particular, often exhibit these above-described common behaviors. Moreover, given the relatively small size of the toy industry, members of the toy industry design community are perhaps particularly unlikely to burn bridges with an existing employer by announcing prematurely or staging a "noisy withdrawal" that they are leaving to follow a risky entrepreneurial endeavor.

In short, Mattel's own expert Bruce Stein unwittingly seems to validate rather than undermine the position that Carter Bryant and MGA take in this litigation. That is, among other things, that given the failure of Mattel to guide employees like Carter Bryant differently than it did, through clear, comprehensible, fair, legal and appropriate policies, procedures, practices and agreements; given the normal behavior of employees under the uncertain circumstances to which they were subject in their employment with Mattel including its substantial history of layoffs; and given the natural reluctance of rank and file employees who choose the uncertain road of pitching an idea or seeking employment outside of their existing employer's organization to burn bridges, it is unreasonable for Mattel to believe that employees like Carter Bryant would have acted differently than they did. Rather, it is Mattel that departs from usual and reasonable practice by its significant failure to provide clear and meaningful guidance as to its expectations of employee conduct; its unwillingness or inability to invest the resources necessary to create fair and reasonable agreements with rank and file employees; and its failure to provide a working environment that would foster the benefits described by Mattel's former COO Bruce Stein and attract and retain talented designers such as Carter Bryant.

3/17/08
Date

D. Jan Duffy

6

CONFIDENTIAL -
ATTORNEYS' EYES ONLY

EXHIBIT 28

PAGE 440

**EXHIBIT 29**

## CONFIDENTIALITY AND INVENTIONS ASSIGNMENT AGREEMENT

This Confidentiality and Inventions Agreement is executed by and between ABC Int' Traders, Inc. ("Company") and _____Kathi Gilmore_____("Employee").

During the course of his/her employment at the Company, Employee will have access to, wil acquire, and will become acquainted with trade secrets, confidential information and property related to the Company and its customers' and vendors' businesses. The Company's trade secrets include, but are not limited to, such information as customer names, addresses, phone numbers names, specific characteristics of suppliers and customers and their respective employees with whom the Company has dealings (whether or not such information is contained on a Rolodex computer printout, customer list, or is orally communicated to any Company employee in the course of their duties) and the history of purchases, along with terms and conditions of credi offered to each customer; names, addresses, telephone numbers and specific characteristics o prospective customers and contacts; information regarding particular customer produc peculiarities, manners of doing business, needs and requirements; product specifications and performance needs for each customer; and the prices charged to each customer; customer information reports, pricing information (such as price lists, quotation guides, previous or outstanding quotations, equipment prices or billing information), mailing labels, mailing plans and programs, sales report forms, pending projects or proposals, techniques used in approaches or results of any market research, advertising sources, employee salaries, contracts and wage information, names and addresses of the vendors, manufacturers, and other suppliers of Company products, the products they supply, the applicable prices and discounts, and the applicable product specifications; new products or inventions developed or under development by the Company; formulas, patterns, compilations, programs, devises, methods, techniques, processes, pictures, contracts, files, methods or production (including quality control and packaging), proposals, business plans and projections, budgets, financial information, software, hardware, any patent application or the contents thereof; and all other material relating in any manner whatsoever to the customers products, vendors, and suppliers of Company, including matters which should reasonably be considered trade secrets even if not expressly described herein.

All information obtained in the course of Employee's employment is to be used only for the purpose of conducting the Company's business. Employee agrees to never discuss or disclose such trade secrets, confidential information or property, either directly or indirectly, with or in the presence of persons outside the Company, either during employment, or at any time thereafter, except as required by Employee's supervisor. Employee further agrees that information in any form, including but not limited to documents, tapes, lists, computer printouts, studies, reports, drafts, pictures, charts, maps, drawings, programs, equipment, scrap, blueprints, vendor lists, customer lists, client billing information, all financial reports, payroll information, records, files and other materials pertaining to the Company, its customers and vendors, may not be removed from the facilities without the advance written permission of Employee's supervisor.

Employee acknowledges that all such trade secrets or confidential information, or any copies of summaries thereof, whether prepared by Employee, by the Company, or provided to Employee by the Company, is the exclusive property of the Company. On demand or termination of employment for any reason, Employee agrees to return to the Company all papers, records, electronic copies, and documents in Employee's possession or obtained during the course of Employee's employment with the Company and Employee further agrees that he/she will not retain

EXHIBIT ___2 1/___

any copies, nor permit anyone to retain any copies thereof, except that those who have successfully completed their 90 day introductory period may keep their Franklin Planner.

Employee acknowledges and agrees that the trade secrets described herein have independent economic value in that they are not generally known within the trade they represent many years of research and development and give the Company substantial competitive advantages.

As a condition of employment, Employee agrees that he/she (1) will regard and preserve the confidential information as highly confidential and as the trade secrets of the Company; (2) will not, at any time during or within twelve months after the termination of his/her employment with the Company, reveal, disclose, permit to be disclosed, or make known to any person, firm or corporation, any confidential information which was disclosed to Employee or of which he/she became aware during his/her employment, regardless of whether developed, prepared or created in whole or in part by Employee's efforts, except to the extent that such disclosure is necessary and is authorized in writing by the Company to carry out Employee's duties of employment; (3) will retain all confidential information in trust for the sole benefit of the Company and will not disclose to or use any confidential information in an independent business related to the scope of the Company's business (designer, manufacturer and distributor of toy); (4) will not photocopy or duplicate, and will not permit any person to photocopy or duplicate, any of the confidential information without the Company's written consent and approval; (5) will not make any use of confidential information for his/her own benefit or the benefit of any person or entity other than the Company; (6) will return all confidential information (including but not limited to customer lists, books maintained by Employee, and source lists) to the Company immediately upon request for same. Employee agrees that if he/she has any questions about whether a matter is a trade secret, to seek a determination by the Company before he/she uses any such information.

Employee agrees to maintain the same level of confidentiality regarding co workers, employee relations matters," and Company operations. Employee agrees, by accepting employment or continued employment with the Company, to comply with these rules and to maintain confidentiality of the Company's trade secrets.

Employee understands and acknowledges that the trade secrets and confidential information of the Company are not known to the general public and are the subject of reasonable efforts to maintain its secrecy. They are of a special, unique and extraordinary character, which gives them a particular value, the loss of which cannot be reasonably compensated in damages in an action at law. Employee further understands and agrees that in addition to any other rights or remedies which the Company may have, the Company shall be entitled to immediate injunctive and other equitable relief to prevent a breach of this Confidentiality and Inventions Agreement. If any legal proceeding arises under this Confidentiality and Inventions Agreement, the prevailing party shall be entitled to recover all costs and expenses, including reasonable attorney's fees and costs. California law shall apply to this agreement as to contracts wholly performed within the state.

Employee and the Company agree that this Confidentiality and Inventions Agreement shall not apply to information that Employee was aware of prior to his/her employment with the Company, or that is otherwise publicly known.

EXHIBIT _____ 29 _____

PAGE _____ 442 _____

Confidential - Attorney's Eyes Only

MGA 0875723

Employee further agrees that during his/her employment and for a period of twelve months after termination, Employee will not solicit the purchase of any products or services from any supplier or vendor who supplies products or services to the Company.

INVENTIONS ASSIGNMENT:

1. ASSIGNMENT OF INTEREST: Employee agrees to assign, and does hereby assign, to Company all interest which employee may have in all patentable and/or not-patentable ideas and/or inventions made or conceived by Employee solely or jointly with others during Employee's employment with Company. This assignment shall not apply to any idea or invention developed by Employee entirely on Employee's own time without equipment, supplies, facilities, or trade secret information of Company, unless such invention or idea: (1) relates to the business of company or to Company's actual or anticipated research or development, or (2) results from any work performed by Employee for Company. THIS AGREEMENT DOES NOT APPLY TO ANY INVENTION WHICH QUALIFIES FULLY UNDER THE PROVISIONS OF CALIFORNIA LABOR CODE SECTION 2870.

2. DISCLOSURE OF IDEAS OR INVENTIONS: Employee agrees to promptly disclose in writing to Fred Larian all inventions developed solely or jointly with others during Employee's employment with Employer, whether such inventions are patentable, not-patentable or assignable under this Agreement. Employer agrees to maintain such disclosure in confidence.

3. WRITTEN DISCLOSURE OF PRIOR INVENTIONS: Employee agrees to provide a complete list of all patented or not-patended ideas and inventions conceived by Employee or anyone else jointly with Employee, prior to the date Employee has signed this Agreement. The failure of Employee to provide Company with a written disclosure of ideas or inventions shall be deemed to constitute an affirmative acknowledgment by Employee that no such ideas or inventions exist.

If any provision of this Confidentiality and Inventions Agreement is held to be invalid or unenforceable, in whole or in part, the remaining portions of this Agreement shall continue to be valid and will be performed, construed and enforced to the fullest extent permitted by law. The invalid or unenforceable provision shall be deemed amended and limited in accordance with the intent of the parties, as determined from the face of this Agreement, to the extent necessary to permit the maximum enforceability or validation of the provision.

| 5/24/99 | _Kami Gillman_ | _Kami Gillman_ |
|---|---|---|
| Date | Employee Signature | Employee Name (printed) |

| 5/24/99 | | _F. Sarne Larian_ |
|---|---|---|
| Date | Employer Signature | Name (printed) |

EXHIBIT _24_

PAGE **443**

MGA 0875724

**EXHIBIT 30**

## Employee Confidential Information
## and Inventions Agreement

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates, I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment by the Company and other good and valuable consideration, I agree that:

1. **Provisions Related to Trade Secrets.**

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in this Agreement, "Proprietary Information" means any information (including any formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information of the Company, its customers, suppliers, joint venturers, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time, either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

2. **Ownership of Inventions.**

(a) I agree to communicate to the Company as promptly and fully as practicable all Inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such Inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time and in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such Inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data, computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this Agreement requiring me to assign my rights in any Invention does not apply to an Invention which qualifies under the provisions of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an Invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit no. 1228
Date: 12/28/07
Marlow  P. Pyburn

M 0255145

1228.1

EXHIBIT 30

PAGE 44

3.  *Conflicts with Other Activities.*

(a)  My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or the future business plans of the Company.

(b)  My employment with the Company and my compliance with this Agreement do not and will not breach any agreement to keep in confidence information acquired by me prior to or outside of my employment with the Company. I have not brought and will not bring with me to the Company any materials, documents or information of a former employer or any third party that are not generally available to the public unless I have obtained express written authorization from the owner for their possession and use by or for the Company. I have not entered into, and will not enter into, any agreement, either oral or written, in conflict with this Agreement.

4.  *Miscellaneous.*

(a)  My obligations under this Agreement may not be modified or terminated, in whole or in part, except in a writing signed by a Vice-President of the Company. Any waiver by the Company of a breach of any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b)  Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body, by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c)  My obligations under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will inure to the benefit of and be binding upon the successors and assigns of the Company.

(d)  I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

(e)  Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f)  This Agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g)  This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

_Maria Veronica B. Marlow_
Employee Signature

MATTEL, INC.

By: _Teresa Newcomb_

Maria Veronica Brandon Marlow
Employee Name  (print)

_TERESA NEWCOMB_
Name of Witness  (print)

6-27-96
Date

CONFIDENTIAL - ATTORNEYS' EYES ONLY

M 0255146

EXHIBIT 30
PAGE 445

1228.2

BLUEBIRD OFFICE SUPPLIES (888) 477-0750 www.bluebirdbiz.com

**EXHIBIT 31**

Employee Confidential Information
and Inventions Agreement

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates, I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment by the Company and other good and valuable consideration, I agree that:

1.  *Provisions Related to Trade Secrets.*

(a)  I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b)  As used in this Agreement, "Proprietary Information" means any information (including any formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information of the Company, its customers, suppliers, joint venturers, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c)  I will not disclose or use at any time, either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d)  Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

2.  *Ownership of Inventions.*

(a)  I agree to communicate to the Company as promptly and fully as practicable all Inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such Inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time and in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such Inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b)  As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data, computer programs and formulae, whether patentable or unpatentable.

(c)  Any provision in this Agreement requiring me to assign my rights in any Invention does not apply to an Invention which qualifies under the provisions of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an Invention qualifies under Section 2870.

(d)  I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT ___31___

PAGE ___446___

M 0255129

3. *Conflicts with Other Activities.*

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or the future business plans of the Company.

(b) My employment with the Company and my compliance with this Agreement do not and will not breach any agreement to keep in confidence information acquired by me prior to or outside of my employment with the Company. I have not brought and will not bring with me to the Company for use in the performance of my duties at the Company any materials, documents or information of a former employer or any third party that are not generally available to the public unless I have obtained express written authorization from the owner for their possession and use by or for the Company. I have not entered into, and will not enter into, any agreement, either oral or written, in conflict with this Agreement.

4. *Miscellaneous.*

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in a writing signed by a Vice-President of the Company. Any waiver by the Company of a breach of any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligations under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will inure to the benefit of and be binding upon the successors and assigns of the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f) This Agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.

_____
Employee Signature

MARGARET LEAHY
Employee Name (print)

06-19-95
Date

MATTEL, INC.
By: _____

Lian A. Kiashner
Name of Witness (print)

EXHIBIT 31
PAGE 447

CONFIDENTIAL - ATTORNEYS' EYES ONLY

M 0255130

**EXHIBIT 32**



# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; (v) I will not improperly use or disclose any confidential or trade secret information of any third party in connection with the services I provide to the Company; and (vi) when and if my employment with the Company terminates, I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment by the Company and other good and valuable consideration, I agree that:

## 1. Provisions Related to Trade Secrets

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in this Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information of the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time, either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession, custody or under my control containing or disclosing Proprietary Information.

## 2. Ownership of Inventions

(a) I agree to communicate to the Company as promptly and fully as practicable all Inventions (as defined below) conceived or reduced to practice by me alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such Inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such Inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data, computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this Agreement requiring me to assign my rights in any Invention does not apply to an Invention which qualifies under the provisions of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an Invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those Inventions that either (1) relate at the time of conception or reduction to practice of the Invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an Invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute any document and to file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

## 3. Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

EXHIBIT 2185 TREKOKSLIM

CONFIDENTIAL - ATTORNEYS' EYES ONLY

M 0896949

EXHIBIT _____

PAGE _____

(b)  I represent and warrant that during my employment I shall not use or incorporate into any Company invention any confidential information or trade secrets of any former employer, any person or entity for whom I provided services, or any other person or entity, unless I have obtained all consents, licenses or other rights necessary to allow me to provide the Company with the appropriate assignments and licenses.

(c)  I represent and warrant that during my employment I shall not improperly use or disclose any confidential or trade secret information, if any, of any former employer or any other person or entity to whom I have an obligation of confidentiality, and I will not bring onto the premises of the Company any unpublished documents or any property belonging to any former employer or any other person or entity to whom I have an obligation of confidentiality, unless expressly consented to in writing by that former employer, person or entity.

4.  Miscellaneous

(a)  My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach of any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b)  Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c)  My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will inure to the benefit of and be binding upon the successors and assigns of the Company.

(d)  I understand that the provisions of this Agreement are a material condition to my employment with the Company and, therefore, my failure to comply with any such provision will result in disciplinary action, up to and including immediate termination. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

(e)  I acknowledge that, depending on the circumstances, violation of this Agreement could subject me to both civil and criminal prosecution. I further acknowledge that any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f)  This Agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g)  This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS
THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.

Employee Signature                                 MATTEL, INC.
                                                   By

Employee Name (print)

DANIEL J. COONEY JR.                               Ana López
Date                                               Name of Witness (print)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 32

PAGE 449

M 0896950

**EXHIBIT 33**

**EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT**

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that: (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

**1. Provisions Related to Trade Secrets**

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including Information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in this Agreement, "Proprietary Information" means any Information including formula, pattern, compilation, device, method, technique or process that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes Information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

**2. Ownership of Inventions**

(a) I agree to communicate to the Company as promptly and fully as practicable all Inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such Inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such Inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this agreement requiring me to assign my rights in any Invention does not apply to an Invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an Invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those Inventions that either (1) relate at the time of conception or reduction to practice of the Invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an Invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

**3. Conflicts with Other Activities**

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

**4. Miscellaneous**

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will inure to the benefit of and be binding upon the successors and assigns of the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f) This agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

_Jorge R Castilla_
Employee Signature

JORGE R. CASTILLA
Employee Name (print)

10/29/99
Date

MATTEL, INC.

By: _____
Signature

_____
Name of Witness (print)

EXHIBIT 33

PAGE 451

CONFIDENTIAL

M 0098205

**EXHIBIT 34**

### Employee Confidential Information
### and Inventions Agreement

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that (i) I will maintain the confidentiality of the Company's trade secrets (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates, I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment by the Company and other good and valuable consideration, I agree that:

1.  *Provisions Related to Trade Secrets*

    (a)  I acknowledge that the Company possess and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

    (b)  As used in the Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information of the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

    (c)  I will not disclose or use at any time, either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

    (d)  Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

2.  *Ownership of Inventions*

    (a)  I agree to communicate to the Company as promptly and fully as practicable all Inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the company. I hereby assign to the Company and/or its nominees all my right, title and interest in such inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

    (b)  As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data, computer programs and formulae, whether patentable or unpatentable.

    (c)  Any provision in this Agreement requiring me to assign my rights in any invention does not apply to an invention which qualifies under the provisions of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer. I understand that I bear the burden of proving that an invention qualifies under Section 2870.

    (d)  I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

Exhibit 1116

Garcia

10/10/07  7  pages

J'ana Siegers, CSR 10845

EXHIBIT 34

PAGE 451

CONFIDENTIAL - ATTORNEYS' EYES ONLY

M 0079201

3. *Conflicts with Other Activities*

(a)  My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

4.  *Miscellaneous*

(a)  My obligations under this Agreement may not be modified or terminated, in whole or in part, except in a writing signed by a Vice-President of the Company.  Any waiver by the Company or a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b)  Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. .If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c)  My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination.  This Agreement will inure to the benefit of and be binding upon the successors and assigns of the Company.

(d)  I understand that the provisions of this Agreement are a material condition to my employment with the Company.  I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

(e)  Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company.  Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f)  This Agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g)  This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings.  This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.

_____          MATTEL, INC.
Employee Signature                       By: _____

_____          _____
Paula Treantafeles                       Faith Scelick
Employee Name (print)                    Name of Witness (print)

07/04/97
Date

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT _____ 34

PAGE _____ 452

M 0079202

EXHIBIT 35



# Application For Employment

**IMPORTANT NOTICE:**

This is a very significant document. You should be careful as you complete it. Answer each item accurately and completely. Failure to do so may result in your not being considered for the position or in your termination if inaccurate or omitted information is discovered after your employment has begun.

All applicants will be considered for employment without regard to sex, race, color, religion, national origin, ancestry, age, marital status, sexual orientation, medical condition, veteran status or physical or mental disability, or any other legally protected classification, except as may be permitted by law. MGA Entertainment also provides reasonable accommodations to qualified individuals with disabilities, in accordance with the Americans With Disabilities Act and applicable state and local laws.

MGA Entertainment promotes a drug free work place. It is MGA Entertainment's practice to maintain a safe, healthy and efficient work environment for our employees. Therefore, MGA Entertainment reserves the right to request applicants to submit to a controlled substance and/or alcohol pre-employment test. Further consideration in the hiring process is contingent upon negative test results.



### Application must be completed even if supplemented by a resume.

APPLICANT NAME - PLEASE PRINT   _Maria Elena    Salazar_

HOME ADDRESS   _11064 Amigo  N._          HOME PHONE ( _818_ ) _832-1220_

CITY AND STATE (INCLUDING ZIP CODE)   _Northridge   CA  91326_          WORK PHONE

SOCIAL SECURITY NUMBER   _603. 36. 1537_

| TYPE OF EMPLOYMENT ◯ TEMPORARY | DAYS/HOURS AVAILABLE | LOCATION DESIRED | APPLIED AT (Location) |
|---|---|---|---|
| ⊘ FULL-TIME   ◯ PART-TIME | | | |

SPECIFY POSITION DESIRED   _Pattees & Sample Maker_          SALARY DESIRED _$20.00_

HAVE YOU APPLIED TO MGA ENTERTAINMENT PREVIOUSLY?   ◯ YES   ⊘ NO

HAVE YOU WORKED FOR MGA ENTERTAINMENT AS A TEMP?   ◯ YES   ⊘ NO   DATE _____   POSITION _____

DO YOU HAVE RELATIVES EMPLOYED BY MGA ENTERTAINMENT?   ◯ YES   ⊘ NO   IF YES, NAME, RELATIONSHIP AND POSITION

HOW WERE YOU REFERRED TO MGA ENTERTAINMENT?   _Denny's_

MGA-01 (10/02)

Confidential - Attorney's Eyes Only

EXHIBIT ___35___

PAGE ___463___

MGA 0886442

APPLICANT NAME _Maria Ele. A Salazar_   POSITION _Patters "Imple Maker_   DATE _03-06-03_

## EMPLOYMENT HISTORY

Please account for all periods of time regardless how spent during the last ten (10) years.  Identify previous employers in Sections 1 through 3 SEQUENTIALLY starting with your most recent employer.  If additional space is needed, please use Section 4 or attach an additional list. Use Section 4 to account for periods of time during which you were not employed.

MAY WE CONTACT YOUR PRESENT EMPLOYER? ☑ YES   ○ NO   (If left blank, we will check)

| | | |
|---|---|---|
| **FROM. MO/YR** 2001. **TO: MO/YR** 2003. | **NAME OF COMPANY** Veronicas Marlow | |
| **ADDRESS OF COMPANY** | **CITY** | **STATE** | **ZIP CODE** | **IMMEDIATE SUPERVISOR** | **TELEPHONE NO** ( ) |

**Section 1**
YOUR POSITION OR TITLE: "Patters & Imple Maker"
SALARY/RATE START $25.00   ENDING $23.00
DUTIES: First Patterns for Bent doll and Release
REASON FOR LEAVING: She had Vacation too

| **FROM MO/YR** 1996. **TO: MO/YR** 2001. | **NAME OF COMPANY** Mattel Toys. |
| **ADDRESS OF COMPANY** 333 Continental. | **CITY** El Segundo | **ZIP CODE** 90245 | **IMMEDIATE SUPERVISOR** Marillo Chavez | **TELEPHONE NO** (310) 252-2756 |

**Section 2**
YOUR POSITION OR TITLE: Sample Maker Specialist.
SALARY/RATE START $16.00   ENDING $20.00
DUTIES: Saw the first Sample for Rezense Production Construction by hand embroidered cross Thread.
REASON FOR LEAVING: DPT. Moved. MALASIA

| **FROM MO/YR** 1992. **TO: MO/YR** 1993. | **NAME OF COMPANY** Josef fashion |
| **ADDRESS OF COMPANY** | **CITY** New York | **STATE** | **ZIP CODE** | **IMMEDIATE SUPERVISOR** | **TELEPHONE NO** ( ) |

**Section 3**
YOUR POSITION OR TITLE: Sample Maker.
SALARY/RATE START $18.00   ENDING $20.00
DUTIES: First Sample for Production
REASON FOR LEAVING: They Closed.

Condense other previous employment or periods you were not employed and the reason(s).

| **FROM-TO (MO/YR)** | **NAME OF COMPANY OR EXPLANATION OF HOW TIME WAS SPENT** |
|---|---|
| **4** | |
| | |
| | |
| | |
| | |

Confidential - Attorney's Eyes Only

EXHIBIT __35__
PAGE __454__

MGA 0886443

APPLICANT NAME _Maria Elena Salazar_ POSITION _Pattees & / patt Maker_ DATE _05.06.0?_

## REFERENCES

Please list three persons best qualified to comment on your work-related experience and/or educational background. Please include direct supervisors or managers. Do not include relatives.

| NAME | 1. Veronica Marlow | 2. ~~Carter Bryant~~ | 3. Katiana |
|---|---|---|---|
| TITLE | | Designer | Jimenez |
| COMPANY | Veronica Marlow | MGA | |
| ADDRESS | | Carter Bryant | Mattel Toys |
| BUSINESS TELEPHONE | (818) 360·9158 | (47) 725-7916 | (310)255-3408 |

## EDUCATION/TRAINING

List below your educational background and/or training, including high school, all colleges, trade and military service schools:

| Indicate last level of education completed: | HIGH SCHOOL ☐9 ☐10 ☐11 ☐12 ☐GED | TRADE SCHOOL ☐1 ☐2 ☐3 ☐4 | COLLEGE/UNIVERSITY ☐1 ☐2 ☐3 ☐4 | POST GRADUATE EDUCATION ☐1 ☐2 ☐3 ☐4 |
|---|---|---|---|---|
| NAME OF SCHOOL (High School or University) | LOCATION (City & State) | MAJOR/AREA OF STUDY | DIPLOMA/DEGREE/ CERTIFICATE | |
| Lima - Peru | | | | |
| Trade Tech | Los Angeles. | sketching fashion | | |
| '' '' | '' '' | Patters | | |

Additional Educational, Vocational and/or Professional Information: _West Valley Occupational Center - Designing ('98)_

Additional information or special qualifications you wish to add, i.e., public speaking, public relations, research or special skills:

Other studies completed, such as extension courses:

If your work or school records are listed under other names, please specify:

Do you have any commitment to another entity, business, or person that might affect your employment with our company? ☐ YES ☒ NO
Explain fully:

## SKILLS

Typing _____ wpm          ☐ Adding Machine 10 Key.          PC: _____ Apple, IBM, Macintosh, etc.
Shorthand _____ wpm          ☐ Sight _____ Touch _____          ☐ Software _____
☐ Switchboard          ☐ Word Processing. _____
☐ Windows. _____

Indicate any additional skills, licenses or certifications you have.

What foreign languages do you speak fluently? _Spanish's_ Read? _Spanish's_ Write? _Spanish's._

Can you travel if a job requires it? ☐ YES ☐ NO  Can you relocate if necessary? ☒ YES ☐ NO  Are you willing to work overtime as necessary? ☒ YES ☐ NO

Are you over eighteen years of age? ☒ YES ☐ NO  Are you able to perform the tasks of the position for which you have applied, with or without an accommodation? ☐ Yes ☐ No  If you require an accommodation, how would you perform the tasks and with what accommodations?

Is there any reason why you would not be able to fully conform to all attendance requirements? ☐ YES ☐ NO  Describe Fully:

If you are hired, will you be able to provide documentation to verify that you are authorized to work on a full-time basis for all employers in the United States? ☐YES ☒NO

Are you subject to any nondisclosure agreement, covenant not to compete or solicit customers or employees, or any other agreement which could restrict or interfere with your duties for MGA ENTERTAINMENT? ☐ YES ☒ NO  If yes, please explain:

EXHIBIT __35__

PAGE __455__

Confidential - Attorney's Eyes Only

MGA 0886444

APPLICANT NAME _Farina Elena, Falcaar_ POSITION _Letters & Leftmaker_ DATE _03.06.08_

Have you been convicted of the following crimes in the past 7 years (excluding any conviction for which the record has been judicially sealed, expunged, eradicated or reversed on appeal)? Conviction of a felony or misdemeanor does not necessarily preclude employment by MGA Entertainment.

a. Felony ☐ YES ☒ NO  b. Misdemeanor (other than a marijuana conviction greater than two years old) ☐ YES ☐ NO

If YES, please describe the nature of the crime(s), the dates of the conviction(s), the jurisdiction, rehabilitation efforts and any other pertinent details relative to the crime(s)

Do you have a valid Drivers License? ☒ YES ☐ NO   Drivers License number _A7644305_

Do you have any automobile liability insurance? ☒ YES ☐ NO   State _____ Number _____ Insurer _____

| PREVIOUS ADDRESS IN U.S. DURING LAST SEVEN YEARS (Street Address, City, State & ZIP Code) | FROM | TO |
|---|---|---|
| 14915 Simonds St. CA 91345 | 200 1 | 200 8 |
| 11054 Amigo Av Northridge CA 91326 | 90 8 | 200 9 |
| | | |
| | | |
| | | |
| | | |

| PERSON TO NOTIFY IN CASE OF EMERGENCY | RELATIONSHIP |
|---|---|
| Haydee Martinez | Sister in Law |
| ADDRESS (State, City & ZIP Code) | EMERGENCY TELEPHONE NO. |
| 14915 Simond St. Mission Hills | (818) 838-1585 |

## CONDITIONS OF EMPLOYMENT

I hereby authorize investigation of all statements contained in this application and any resume submitted herewith, including verification of employment (including the amount of compensation, reasons for termination of my employment, work performance, abilities and other qualities pertinent to my qualifications for employment), education, personal history and conviction records. I hereby release MGA Entertainment and those individuals or companies providing such information from any liability or damages, except where such release is prohibited by statute or regulation.

I understand that verification of educational accomplishments and employment history; receipt of satisfactory references; review of criminal records; motor vehicle records; and verification of negative drug results; and my execution of an arbitration agreement are all required as a condition of hire. I further understand that, if I am hired, all of the foregoing also may be required as a condition of my continued employment, and that any failure to submit to or cooperate in any of the foregoing may result in disciplinary action up to and including termination of employment. I also understand that, if I am hired, additional personal information may be required for determining benefit eligibility and for other statistical purposes.

I hereby authorize MGA Entertainment to obtain a consumer report from an outside vendor. I will be given a separate Notice and Disclosure document regarding the consumer report. I understand that this consumer report shall be used in MGA Entertainment's evaluation of my application for employment. I understand that the consumer report has information on my motor vehicle records; felony/misdemeanor records; verifications of educational accomplishments; and verifications of employment history. I hereby release those individuals or companies providing such information from any liability or damages, except where such release is prohibited by statute or regulation.

If I am hired, I agree to comply with all MGA Entertainment employment policies. I understand that employment at MGA Entertainment is at the consent of MGA Entertainment and the employee, and that either may terminate the employment relationship at any time, with or without cause and with or without notice. I understand that MGA Entertainment has the right to adjust compensation and demote and discipline employees with or without cause. I also understand that no person, except the Chief Executive Officer of MGA Entertainment has any authority to enter into any agreement for employment or to make an agreement contrary to the foregoing, and that any such agreement must be in writing and signed by the Chief Executive Officer of MGA Entertainment. No manager or representative of MGA Entertainment has made any statement or agreement contrary to the foregoing, and there are no agreements, express or implied, contrary to the foregoing. _A_ [initials]

I understand that MGA Entertainment has a 90 day introductory employment period, during which the company and I have the opportunity to assess my suitability for the position. Upon achievement of a successful 90 day period, my employment status will change from introductory to regular.

I agree that at the time of any separation, voluntary or involuntary, I will participate in an exit interview. _A_ [initials]

I understand that, if hired, I may not hold other employment, nor engage in other activities that create a conflict of interest with my position with the company unless given permission in writing by the company. _A_ [initials]

I hereby agree to submit all disputes and claims arising out of the submission of this application to final and binding arbitration. In the event that I am hired by the company, as further consideration for such employment with the company, I agree that the exclusive remedy for resolving any dispute arising out of and/or related in any way to my employment with the company that cannot be resolved by informal internal resolution shall be to submit such claim to binding arbitration. This includes, but is not limited to any statutory claim that may arise under federal or state law. Such arbitration shall be handled in accordance with the rules then in effect for the American Arbitration Association. The arbitrator shall not be authorized to award myself or the company extra contractual damages, such as compensatory or punitive damages. Any decisions by the arbitrator shall be final and binding on myself and the company. The cost of such arbitration, including but not limited to arbitration fees and court reporting fees, shall be paid by the losing party. Each party shall be responsible for their own attorney fees. In entering into this agreement, myself and the company knowingly waive our respective rights to a jury trial and/or to have any such dispute brought before a federal and/or state court or agency. This application contains the entire agreement between myself and the company with regard to dispute resolution, and there are no other agreements as to dispute resolution, either oral or written. _A_ [initials]

I hereby certify that I have read and I understand this application are true and complete to the best of my knowledge. I understand and agree to the terms of the foregoing, and that all statements and comments set forth in this application are true and complete to the best of my knowledge. I understand that misrepresentation, falsification or omission of material facts may result in denial or termination of employment.

Date _03 06 08_   Applicant's Signature _Faria Elena Falcan_

Confidential - Attorney's Eyes Only

EXHIBIT _35_

PAGE _456_

MGA 0886445

## NOTICE AND DISCLOSURE

Please be advised that MGA Entertainment may obtain investigation reports about you in connection with your application for employment and/or at any time during your employment with MGA Entertainment if you are hired or if you are a current employee, for employment purposes including, but not limited to, reassignment, promotion, retention, and rehiring.

Such investigation reports may include information concerning your character, general reputation, personal characteristics, and/or mode of living. This information may be obtained from personal interviews with your professional and personal acquaintances. You have the right to request in writing, within a reasonable period of time, a complete disclosure of the nature and scope of an investigation involving such personal interviews. Examples of investigation reports may include, but are not limited to, criminal background reports, motor vehicle driving records, credit histories, reference checks, verification of education or past employment, and investigations into theft, fraud, harassment and workplace violence.

Your signature below acknowledges that you have read and understand the above disclosure.

_Maria Elena Salazar_
[Printed Name of Employee]

_03 . 06 . 05_
[Date]

_Maria Elena Salazar_
[Signature of Employee]

EXHIBIT ___35___

PAGE ___457___

Confidential - Attorney's Eyes Only

MGA 0886446

## AUTHORIZATION TO OBTAIN INVESTIGATION REPORTS

I, _Maria Elena Salazar_ , hereby authorize MGA Entertainment to obtain any investigation reports
[Name]

on me in connection with my application for employment and/or at any time during my employment with MGA Entertainment

if I am hired or if I am a current employee, for employment purposes including, but not limited to, reassignment, promotion,

retention, and rehiring.


I have received and read a Notice and Disclosure explaining that such investigation reports may include information

concerning my character, general reputation, personal characteristics, and/or mode of living.  This information may be

obtained from personal interviews with my professional and personal acquaintances.


I understand that MGA Entertainment and its agents are not responsible for the accuracy or completeness of the information

contained in any such reports.  I release MGA Entertainment and its agents from all liability, claims, and lawsuits with

respect to the information obtained from any or all of the sources used by MGA Entertainment.


I understand that this authorization is not an offer for employment by MGA Entertainment and that any false or misleading

information I have provided to MGA Entertainment may result in a refusal to hire, promote, reassign, or continue employment.


I also understand that this authorization is a continuing authorization and will remain valid until such time as I inform MGA

Entertainment, in writing, that I wish to revoke this authorization.


Date of Birth: _07 - 04 - 60_

I want a copy of my background report:    Yes _✓_    No _____

(Please check one box - California only.)


_Maria Elena Salazar ._                     _03 - 06 - 03 ._
[Typed Name of Applicant]                         [Date]

_Maria Elena Salazar_
[Signature of Applicant]


Confidential - Attorney's Eyes Only

EXHIBIT __35__

PAGE __458__

MGA 0886447

**Eve Johnson**

*March 31, 8:30am*
*Start date:*

| | |
|---|---|
| **From:** | Isaac Larian |
| **Sent:** | Monday, March 17, 2003 3:05 PM |
| **To:** | Eve Johnson |
| **Subject:** | Re: Maria Salazar - Background Check |

48k per year   *= $23 per hour.*
---------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Eve Johnson <EJohnson@mgae.com>
To: Isaac Larian <ilarian@mgae.com>
Sent: Mon Mar 17 23:01:38 2003
Subject: RE: Maria Salazar - Background Check

$30 per hour is 62,400 a year and $20 an hour is 41,600 a year.

-----Original Message-----
From: Isaac Larian
Sent: Monday, March 17, 2003 2:59 PM
To: Eve Johnson
Subject: Re: Maria Salazar - Background Check


What is it per year
---------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Eve Johnson <EJohnson@mgae.com>
To: Paula Treantafelles <PTreantafelles@mgae.com>; Isaac Larian <ilarian@mgae.com>
Sent: Mon Mar 17 22:55:36 2003
Subject: Maria Salazar - Background Check

The background check for Maria Salazar, Seamstress applicant, has cleared.  She is eligible for hire.  Her last salary was $30 per hour, she stated desired salary of $20 per hour.

Let me know how to proceed.

Thanks.

Eve

1

Confidential - Attorney's Eyes Only

EXHIBIT   35

PAGE   459

MGA 0886448

**EXHIBIT 36**

1  THOMAS J. NOLAN (Bar No. 66992)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2  300 South Grand Avenue
   Los Angeles, California 90071-3144
3  Telephone: (213) 687-5000
   Facsimile: (213) 687-5600
4  E-mail: tnolan@skadden.com

5  RAOUL D. KENNEDY (Bar No. 40892)
   TIMOTHY A. MILLER (Bar No. 154744)
6  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   Four Embarcadero Center, 38th Floor
7  San Francisco, California 94111-5974
   Telephone: (415) 984-6400
8  Facsimile: (415) 984-2698
   E-mail: rkennedy@skadden.com

9
   Attorneys for Cross-Defendants
10 MGA Entertainment, Inc., MGA Entertainment (HK) Limited,
   MGAE De Mexico, S.R.L. De C.V., and ISAAC LARIAN

11                UNITED STATES DISTRICT COURT

12               CENTRAL DISTRICT OF CALIFORNIA

13                      EASTERN DIVISION

14
   CARTER BRYANT, an individual          ) CASE NO. CV 04-9049 SGL (RNBx)
15                                        )
              Plaintiff,                  ) Consolidated with Case No. 04-9059
16                                        ) and Case No. 05-2727
        v.                                )
17                                        ) **DISCOVERY MATTER**
   MATTEL, INC., a Delaware              )
18 corporation                           ) **MGA ENTERTAINMENT (HK)**
                                          ) **LTD.'S THIRD SUPPLEMENTAL**
19            Defendant.                  ) **RESPONSES TO MATTEL, INC.'S**
                                          ) **AMENDED FOURTH SET OF**
20 ─────────────────────────────         ) **INTERROGATORIES**
   Consolidated with MATTEL, INC. v.     )
21 BRYANT and MGA                         )
   ENTERTAINMENT, INC. v.                )
22 MATTEL, INC.                          ) **Phase 1:**
                                          ) Discovery Cut-Off:   January 28, 2008
23                                        ) Pre-Trial Conference: May 5, 2008
   **CONFIDENTIAL – ATTORNEYS'**         ) Trial Date:          May 27, 2008
24 **EYES ONLY**                          )
                                          )
25

26 **PROPOUNDING PARTY:**   **MATTEL, INC. ("MATTEL")**

27 **RESPONDING PARTY:**    **MGA ENTERTAINMENT (HK) LTD**

28 **SET NUMBER:**          **AMENDED FOURTH**

─────────────────────────────────────────────────────────────
MGA HK'S 3RD SUPP'L RESPONSE TO MATTEL'S AMENDED 4TH SET OF INTERROGATORIES

## PRELIMINARY STATEMENT

The General Response set forth herein applies to all responses that MGA Entertainment (HK) Ltd. ("MGA (HK)") is providing in response to these interrogatories (the "Interrogatories") or may in the future provide in response to any discovery request in this action. The Response is made without waiving, or intending to waive but, on the contrary, expressly reserving: (a) the right to object, on the grounds of competency, privilege, relevancy or materiality, or any other proper grounds, to the use of the Response, for any purpose in whole or in part, in any subsequent step or proceeding in this action or any other action; (b) the right to object on any and all grounds, at any time, to other interrogatories or other discovery procedures; and (c) the right at any time to revise, correct, add to, or clarify any of the responses propounded herein.

The Response reflects only the present state of MGA (HK)'s discovery regarding the information that Mattel seeks. Discovery for Phase Two and other investigation or research concerning this litigation are continuing. It is anticipated that further discovery, independent investigation, and legal research and analysis will supply additional facts and meaning to the known facts, as well as establish entirely new factual conclusions, all of which may lead MGA (HK) to discover other information responsive to these Interrogatories. MGA (HK) therefore reserves the right to amend or supplement this Response at any time in light of future investigation, research or analysis, and also expressly reserves the right to rely on, at any time, including trial, subsequently discovered information omitted from this Response as a result of mistake, error, oversight or inadvertence. MGA (HK) does not hereby admit, adopt or acquiesce in any factual or legal contention, assertion or characterization contained in the Interrogatories or any particular request therein, even where MGA (HK) has not otherwise objected to a particular interrogatory, or has agreed to provide information responsive to a particular interrogatory.

No incidental, or implied admissions are intended by this Response.

1

EXHIBIT ____36____

PAGE ____461____

1 These responses should not be taken as an admission that MGA (HK) accepts or

2 admits the existence of any facts set forth or assumed by any instruction, definition

3 or interrogatory.

## GENERAL OBJECTIONS

5       MGA (HK) responds to these Interrogatories subject to the following

6 general objections and limitations, each of which is incorporated into each and every

7 response as though fully set forth therein:

8       1.    MGA (HK) objects to these Interrogatories to the extent they seek

9 information that is not subject to disclosure under any applicable privilege, doctrine

10 or immunity, including without limitation the attorney-client privilege, the work

11 product doctrine, the right of privacy, and all other privileges recognized under the

12 constitutional, statutory or decisional law of the United States of America, the State

13 of California or any other applicable jurisdiction. MGA (HK) shall not produce such

14 information in response to Mattel's interrogatories. Any disclosure of such protected

15 or privileged information is inadvertent and shall not be construed as a waiver of

16 those privileges or protections. MGA (HK) reserves the right to correct the record

17 with regard to any such inadvertent disclosure, as provided for in the Protective

18 Order governing this case.

19       2.    MGA (HK) objects to these Interrogatories to the extent they seek

20 information not relevant to the claims or defenses of any party to this action and not

21 reasonably calculated to lead to the discovery of admissible evidence.

22       3.    MGA (HK) objects to these Interrogatories to the extent they seek

23 information which by reason of public filing or otherwise is already in Mattel's

24 possession or is readily accessible to Mattel.

25       4.    MGA (HK) objects to these Interrogatories to the extent they seek

26 the disclosure of information (1) not within its possession, custody or control; (2)

27 that MGA (HK) cannot locate after a reasonably diligent search; or (3) that refer to

28 persons, entities, or events not known to MGA (HK). Such instructions, definitions,

EXHIBIT ___36___

PAGE ___402___

1 or requests are objectionable where they seek to require more of MGA (HK) than

2 any obligation imposed by the Federal Rules of Civil Procedure; subject MGA (HK)

3 to unreasonable and undue annoyance, oppression, burden, and expense; and/or seek

4 to impose upon MGA (HK) an obligation to investigate or discover information or

5 materials from sources equally accessible to Mattel.

6      5.    MGA (HK) objects to these Interrogatories to the extent they are

7 overbroad and unduly burdensome.

8      6.    MGA (HK) objects to the definitions and instructions to the

9 extent such definitions and instructions purport to enlarge, expand, or alter in any

10 way the plain meaning and scope of any specific term or specific interrogatories on

11 the ground that such enlargement, expansion, or alteration renders such a term or

12 request vague, ambiguous, unintelligible, overly broad, unduly burdensome, and/or

13 uncertain.

14      7.    MGA (HK) objects to the terms YOU, YOUR, BRYANT,

15 LARIAN, MGA, MATTEL, AFFILIATES, PERSON, PERSONS, DESIGN,

16 DESIGNS, BRATZ, SOLD, SELL, SALE, BRATZ DOLL, BRATZ PRODUCT,

17 BRATZ MOVIE, BRATZ TELEVISION SHOW, BASED ON, and REFER OR

18 RELATE TO on the grounds that these terms render the interrogatories overbroad,

19 unduly burdensome, vague and ambiguous and to the extent that they could be read

20 to call for legal conclusions in responding to the interrogatories, including, by way of

21 example and without limitation, as follows:

22      (a)    MGA (HK) objects to the definition of the term "BRATZ"

23 (Definitions ¶ 9) as vague, ambiguous, overly broad and unduly burdensome, and

24 designed to mislead and confuse the trier of fact. The definition includes "any

25 project, product, doll or DESIGN ever known by [the Bratz] name (whether in whole

26 or in part and regardless of what such project, product or doll is or has been also,

27 previously or subsequently called) and any product, doll or DESIGN or any portion

28 thereof that is now or has ever been known as, or sold or marketed under, the name

3

EXHIBIT ___36___

PAGE ___463___

1   or term 'Bratz' (whether in whole or in part and regardless of what such product, doll

2   or DESIGN or portion thereof is or has been also, previously or subsequently called)

3   or that is now or has ever been sold or marketed as part of the 'Bratz' line, and each

4   version or iteration of such product, doll or DESIGN or any portion thereof," and it

5   goes on. By incorporating the definition of DESIGN, the overly broad definition of

6   BRATZ includes two-dimensional and three-dimensional representations, including

7   "works, designs, artwork, sketches, drawings, illustrations, representations,

8   depictions, blueprints, schematics, diagrams, images, sculptures, prototypes, models,

9   samples, rotocasts, reductions to practice, developments, inventions and/or

10   improvements ...." (Definitions ¶ 8.) These convoluted and multi-part definitions

11   combine to render the interrogatories vague, ambiguous and overly broad, and to

12   include within the term BRATZ things that do not fairly represent the Bratz line of

13   dolls, accessories and related products that are the subject of this case. In responding

14   to these interrogatories, MGA (HK) will interpret the term "BRATZ" to mean the

15   line of dolls introduced by MGA to the market for sale in May or June of 2001 and

16   subsequent dolls, accessories and other products known as Bratz or associated by

17   MGA (HK) with the Bratz line of dolls;

18         (b)    MGA (HK) objects to the definition of the term "BRATZ

19   DOLL" (Definitions ¶ 12) as vague, ambiguous, overly broad and unduly

20   burdensome, and designed to mislead and confuse the trier of fact. The definition

21   includes any doll that "REFERS OR RELATES TO BRATZ." Mattel's definition of

22   the terms "BRATZ" and "REFERS OR RELATES" renders the definition of

23   "BRATZ DOLL" unintelligible because MGA (HK) cannot know, by way of

24   example, what dolls may "deal with, comment on, respond to,... or pertain"

25   (Definitions ¶ 17) to "BRATZ." In responding to these interrogatories, MGA (HK)

26   will interpret the term "BRATZ DOLL" to mean the line of dolls introduced by

27   MGA to the market for sale in May or June of 2001 and subsequent dolls known as

28   Bratz;

EXHIBIT _____36_____

PAGE _____404_____

1    (c)   MGA (HK) objects to the definition of the term "BASED

2  ON" as vague, ambiguous, overly broad and unduly burdensome, and designed to

3  mislead and confuse the trier of fact. The definition strays far from the English

4  meaning of "based on" by including terms loaded with legal significance in

5  intellectual property law, such as "substantially similar to," or "a derivative of." In

6  responding to these interrogatories, MGA (HK) will not interpret the term "BASED

7  ON," but rather will respond using "based on" in its normal accepted meaning.

8    (d)   MGA (HK) objects to the terms "IDENTIFY" or

9  "IDENTITY" as overbroad, unduly burdensome, vague, ambiguous, and oppressive.

10  Mattel's definition of these terms inherently call for answers to multiple discrete

11  questions or subparts to questions. For example, when those terms are used to

12  reference any BRATZ PRODUCT, the use of those terms requests at least 6 different

13  and distinct facts: (a) the full name of the product; (b) the number of the product; (c)

14  the SKU of the number; (d) any other applicable designation of the product useful

15  for identification; (e) the period of time during which the product was, has been, or

16  will be sold; and (f) the identity of each person who has licensed from YOU the right

17  to sell such BRATZ PRODUCT. Therefore, any interrogatory that includes or

18  incorporates the terms IDENTIFY or IDENTITY are necessarily compound and

19  should be posed as separate interrogatories.

20    (e)   MGA (HK) objects to the term "any" and "REFER OR

21  RELATE TO" on the grounds and to the extent that they are overbroad, unduly

22  burdensome, and/or are vague and ambiguous in the context of the interrogatories as

23  written and as those interrogatories would be plainly understood absent Mattel's

24  definitions.

25    8.   MGA (HK) objects to these interrogatories to the extent that they

26  may unfairly seek to restrict the facts on which MGA (HK) may rely at trial.

27  Discovery has not been completed and MGA (HK) is not yet necessarily in

28  possession of all the facts and documents upon which MGA (HK) intends to rely. All

5

EXHIBIT ___36___

PAGE ___405___

1  of the responses submitted herewith are tendered to Mattel with the reservation that

2  the responses are submitted without limiting the evidence on which MGA (HK) may

3  rely to support the contentions and defenses that MGA (HK) may assert at the trial of

4  this action and to rebut or impeach the contentions, assertions and evidence that

5  Mattel may present. MGA (HK) reserves the right to supplement or amend these

6  responses at a future date.

7       9.     MGA (HK) objects to each interrogatory to the extent that it

8  seeks information that will be the subject of expert witness testimony and that is

9  therefore premature.

10      10.    In responding to these interrogatories, MGA (HK) has not and

11 will not comply with any instructions or definitions that seek to impose requirements

12 in addition to those imposed by the Federal Rules of Civil Procedure and any

13 applicable local rule, any orders entered by the Court in this Action, or other

14 applicable law.

15      11.    Consistent with Rule 33(d) of the Federal Rules of Civil

16 Procedure, MGA (HK) objects to providing responses to interrogatories that can be

17 derived from documents that have been or will be produced (when requested in

18 compliance with Rule 26) and where the burden to derive such information is

19 substantially the same for Mattel as it is for MGA (HK).

20      12.    MGA (HK) objects to each interrogatory to the extent that it

21 seeks the disclosure of confidential, proprietary, or trade-secret information.

22      13.    MGA (HK) objects to each interrogatory to the extent that it calls

23 for a legal conclusion.

24      14.    MGA (HK) objects to several of those interrogatories that appear

25 to be directed at other parties to the litigation and not to MGA (HK), given the nature

26 of the claims asserted against MGA (HK) in this case.

27      15.    MGA (HK) reserves the right to object on any ground at any time

28 to such other or supplemental discovery requests as Mattel may propound involving

EXHIBIT ___32___

PAGE ___466___

1  or relating to the same subject matter of these interrogatories.

2        16.    To the extent MGA (HK) responds to an interrogatory, it does so

3  without waiving or intending to waive but rather, on the contrary, preserving and

4  intending to preserve, its contention that anything Mr. Bryant did on weekends,

5  evenings, vacation and any other time outside ordinary business hours was not done

6  while he was working for Mattel. MGA (HK)'s response may not be taken as an

7  admission that the information it provides in its response in any way reflects or

8  evidences work performed by Mr. Bryant while he was working for Mattel or that

9  MGA (HK) adopts or agrees with any fact or legal conclusion assumed, presumed or

10  contained in Mattel's interrogatory.

11        17.    MGA (HK) objects to each of Mattel's interrogatories because

12  Mattel has propounded more than 50 interrogatories, including discrete subparts.

13  Under Judge Larson's order of February 22, 2007, "Interrogatories are limited to 50

14  for each side for both [Case Nos. CV 04-04049-SGL and CV 05-02727]."

15        18.    MGA (HK)'s responses are made based on its understanding and

16  interpretation of each interrogatory. MGA (HK) reserves the right to supplement its

17  objections and responses should Mattel subsequently put forth an interpretation of

18  any interrogatory that differs from those of MGA (HK).

19  **OBJECTIONS AND RESPONSES TO SPECIFIC INTERROGATORIES**

20        Without waiving or departing from its General Response and General

21  Objections, and specifically incorporating them in its response to each Interrogatory

22  below, MGA (HK) makes the following additional objections and responses to

23  specific Interrogatories:

24  **INTERROGATORY NO. 42:**

25        State all facts that support YOUR contention, if YOU so contend, that

26  any BRATZ DOLLS are not BASED ON BRATZ DESIGNS created by BRYANT

27  on or before October 19, 2000, and IDENTIFY all PERSONS with knowledge of

28  such facts and all DOCUMENTS that REFER OR RELATE TO such facts.

**RESPONSE TO INTERROGATORY NO. 42:**

MGA (HK) incorporates by reference its General Response and General Objections above, as though fully set forth herein and specifically incorporates General Objection No. 7 (regarding Definitions), including without limitation MGA (HK)'s objection to the definition of the terms BASED ON, BRATZ DOLLS, BRATZ, DESIGN, IDENTIFY and REFER OR RELATE TO, and further objects to this interrogatory on the ground that it is overbroad, unduly burdensome, vague and ambiguous.

MGA (HK) also objects to this interrogatory to the extent it seeks information that is not subject to disclosure under any applicable privilege, doctrine or immunity, including without limitation the attorney-client privilege, the work product doctrine, the right of privacy, and all other privileges recognized under the constitutional, statutory or decisional law of the United States of America, the State of California or any other applicable jurisdiction. MGA (HK) objects to this interrogatory to the extent it calls for a legal conclusion.

MGA (HK) further objects to this interrogatory on the ground that it is premature because the invention, creation, conception, or reduction to practice of Bratz (and other legal concepts that may be relevant) will be the subject of expert testimony at trial. MGA (HK) objects to this interrogatory to the extent it seeks to limit the expert testimony that MGA (HK) may seek to introduce at trial. MGA (HK) will identify its experts and make related disclosures in accordance with the Court's orders and applicable rules.

MGA (HK) further objects to this interrogatory on the grounds that it seeks information that is not relevant to the claims or defenses of any party to the action and is not reasonably calculated to lead to the discovery of admissible evidence because the INVENTIONS AGREEMENT executed by Carter Bryant in or around January 1999, purports to state that any inventions conceived or reduced to practice by him during his employment with Mattel would be owned by Mattel. The

EXHIBIT 26

PAGE 468

1 | references to the conception and reduction to practice of an invention are terms of art

2 | in patent law. Accordingly, copyright law principles of substantial similarity,

3 | copying, and derivative works are not relevant to the INVENTIONS AGREEMENT

4 | which, by its terms, involves only principles of patent law.

5 |      MGA (HK) further objects on the ground that this interrogatory is an

6 | overbroad and unduly burdensome contention interrogatory to the extent it asks for

7 | "all facts" which supports the denial of a statement or allegation. *See e.g., Safeco of*

8 | *Am. v. Rawstron*, 181 F.R.D. 441,447-48 (CD. Cal. 1998) (rejecting discovery

9 | requests seeking "all facts, documents, and witnesses that support the denial of a

10 | statement or allegation of fact" because the "universe of potentially responsive

11 | information is almost endless").

12 |      MGA (HK) further objects to the extent that this interrogatory seeks

13 | information that is outside MGA (HK)'s knowledge and is not in MGA (HK)'s

14 | possession, custody, or control. In particular, MGA (HK) objects to this interrogatory

15 | to the extent that it requests that MGA (HK) "state *all* facts ... and IDENTIFY *all*

16 | PERSONS... and *all* DOCUMENTS" (emphasis added).

17 |      MGA (HK) further objects to this interrogatory because Mattel has

18 | propounded more than 50 interrogatories. Under Judge Larson's order of February

19 | 22, 2007, "Interrogatories are limited to 50 for each side for both [Case Nos. CV 04-

20 | 04049-SGL and CV 05-02727]."

21 | **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 42:**

22 |      MGA (HK) incorporates by reference its General Response and General

23 | Objections above, as though fully set forth herein and specifically incorporates

24 | General Objection No. 7 (regarding Definitions), including without limitation MGA

25 | (HK)'s objection to the definition of the terms BASED ON, BRATZ DOLLS,

26 | BRATZ, DESIGN, IDENTIFY and REFER OR RELATE TO, and further objects to

27 | this interrogatory on the ground that it is overbroad, unduly burdensome, vague and

28 | ambiguous.

1          MGA (HK) also objects to this interrogatory to the extent it seeks

2   information that is not subject to disclosure under any applicable privilege, doctrine

3   or immunity, including without limitation the attorney-client privilege, the work

4   product doctrine, the right of privacy, and all other privileges recognized under the

5   constitutional, statutory or decisional law of the United States of America, the State

6   of California or any other applicable jurisdiction. MGA (HK) objects to this

7   interrogatory to the extent it calls for a legal conclusion.

8          MGA (HK) further objects to this interrogatory on the ground that it is

9   premature because the invention, creation, conception, or reduction to practice of

10  Bratz (and other legal concepts that may be relevant) will be the subject of expert

11  testimony at trial. MGA (HK) objects to this interrogatory to the extent it seeks to

12  limit the expert testimony that MGA (HK) may seek to introduce at trial. MGA (HK)

13  will identify its experts and make related disclosures in accordance with the Court's

14  orders and applicable rules.

15         MGA (HK) further objects to this interrogatory on the grounds that it

16  seeks information that is not relevant to the claims or defenses of any party to the

17  action and is not reasonably calculated to lead to the discovery of admissible

18  evidence because the INVENTIONS AGREEMENT executed by Carter Bryant in or

19  around January 1999, purports to state that any inventions conceived or reduced to

20  practice by him during his employment with Mattel would be owned by Mattel. The

21  references to the conception and reduction to practice of an invention are terms of art

22  in patent law. Accordingly, copyright law principles of substantial similarity,

23  copying, and derivative works are not relevant to the INVENTIONS AGREEMENT

24  which, by its terms, involves only principles of patent law.

25         MGA (HK) further objects on the ground that this interrogatory is an

26  overbroad and unduly burdensome contention interrogatory to the extent it asks for

27  "all facts" which supports the denial of a statement or allegation. *See e.g., Safeco of*

28  *Am. v. Rawstron,* 181 F.R.D. 441,447-48 (CD. Cal. 1998) (rejecting discovery


EXHIBIT _____ 3<u>l0</u>

PAGE _____ 4<u>70</u>

1  requests seeking "all facts, documents, and witnesses that support the denial of a

2  statement or allegation of fact" because the "universe of potentially responsive

3  information is almost endless").

4       MGA (HK) further objects to the extent that this interrogatory seeks

5  information that is outside MGA (HK)'s knowledge and is not in MGA (HK)'s

6  possession, custody, or control. In particular, MGA (HK) objects to this interrogatory

7  to the extent that it requests that MGA (HK) "state *all* facts ... and IDENTIFY *all*

8  PERSONS... and *all* DOCUMENTS" (emphasis added).

9       Subject to and without waiving the foregoing objections, MGA (HK)

10 responds as follows:

11      Should there be a finding that any intellectual property rights associated

12 with the drawings completed by Carter Bryant in August or September, 1998, and/or

13 subsequent drawings, sketches, and/or representations that Bryant created prior to

14 October 4, 2000, are owned by Mattel, it is MGA (HK)'s position that the first

15 generation of Bratz dolls, first "reduced to practice," and first expressed in a tangible

16 medium, after October 20, 2000, and all subsequent Bratz dolls, are not substantially

17 similar to, are not a copy of, and are not derivative of Carter Bryant's aforementioned

18 works.

19      MGA (HK) further responds that said first generation of Bratz dolls

20 differ markedly and significantly from the drawings or designs completed by Carter

21 Bryant prior to October 19, 2000. First, with respect to the three-dimensional

22 "dummy" to which Bryant referred at his deposition, it had no material resemblance

23 to the first generation of Bratz dolls. Second, with respect to Carter Bryant's

24 drawings, MGA (HK) points out that two-dimensional drawings do not translate into

25 three-dimensional dolls without original, creative effort. Third, there are

26 recognizable and material differences in the total overall look and feel of the first

27 generation Bratz dolls compared to Carter Bryant's drawings completed prior to

28 October 21, 2000. Fourth, there are recognizable and material differences in

EXHIBIT 26

PAGE 471

1  individual elements of the first generation Bratz dolls compared to Carter Bryant's

2  drawings completed prior to October 21, 2000, including, but not limited to, with

3  respect to the following: hair styles; hair colors; facial expression; depiction of

4  noses; eye art; extent of detail of eye art; lip art; eyebrow art; proportions of the

5  bodies; posture; spatial arrangement of hands; wrists and arms; and proportions and

6  spatial arrangements of the eyes, noses, and mouths. Additional details regarding

7  such differences will be the subject of expert disclosures and will be provided at a

8  later time.

9         With respect to any design relating to the Bratz concept that Carter

10  Bryant may have contributed after October 4, 2000 and before October 21, 2000, *i.e.*,

11  during a period that he was performing such services for MGA pursuant to a

12  freelance contract, MGA (HK) notes that any such design would have incorporated

13  the original and/or creative input of other artists working for or on behalf of MGA on

14  the Bratz concept, which was owned by MGA as a consequence of the October 4,

15  2000 transfer of rights from Bryant to MGA. In addition, the first generation of Bratz

16  dolls, and all subsequent Bratz dolls, are not substantially similar to, derivative of,

17  and/or a copy of any work performed or created by Carter Bryant from October 4-

18  October 20, 2000.

19         The following persons have knowledge of said facts: Isaac Larian;

20  Carter Bryant; Margaret Leahy; Veronica Marlow; Anna Rhee; Mercedeh Ward;

21  Sarah Halpern; Paula Treantafelles (Garcia); Steve Tarmichael; Rebecca Harris;

22  Cecilia Kwok; David Dees; Jesse Ramirez; and Samuel Wong.

23         The following documents may be relevant to these facts: all

24  DOCUMENTS that refer to or evidence the work performed by MGA employees

25  and freelancers toward the reduction to practice of the first generation of Bratz dolls

26  during the period after October 20, 2000 through June 1, 2001, including but not

27  limited to: Carter Bryant's drawings; the Bratz dolls; My Scene dolls;

28  DOCUMENTS evidencing the development of the first generation of Bratz dolls by

EXHIBIT  ___36___

PAGE  ___472___

1  employees and freelance artists working for MGA; and invoices submitted by
2  freelancers for work performed on the Bratz Project. The documents evidencing this
3  work are too numerous to identify individually.

4  **SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 42:**

5       MGA (HK) incorporates by reference its General Response and General
6  Objections above, as though fully set forth herein and specifically incorporates
7  General Objection No. 7 (regarding Definitions), including without limitation MGA
8  (HK)'s objection to the definition of the terms BASED ON, BRATZ DOLLS,
9  BRATZ, DESIGN, IDENTIFY and REFER OR RELATE TO, and further objects to
10 this interrogatory on the ground that it is overbroad, unduly burdensome, vague and
11 ambiguous.

12      MGA (HK) also objects to this interrogatory to the extent it seeks
13 information that is not subject to disclosure under any applicable privilege, doctrine
14 or immunity, including without limitation the attorney-client privilege, the work
15 product doctrine, the right of privacy, and all other privileges recognized under the
16 constitutional, statutory or decisional law of the United States of America, the State
17 of California or any other applicable jurisdiction. MGA (HK) objects to this
18 interrogatory to the extent it calls for a legal conclusion.

19      MGA (HK) further objects to this interrogatory on the ground that it is
20 premature because the invention, creation, conception, or reduction to practice of
21 Bratz (and other legal concepts that may be relevant) will be the subject of expert
22 testimony at trial. MGA (HK) objects to this interrogatory to the extent it seeks to
23 limit the expert testimony that MGA (HK) may seek to introduce at trial. MGA (HK)
24 will identify its experts and make related disclosures in accordance with the Court's
25 orders and applicable rules.

26      MGA (HK) further objects to this interrogatory on the grounds that it
27 seeks information that is not relevant to the claims or defenses of any party to the
28 action and is not reasonably calculated to lead to the discovery of admissible

EXHIBIT _____36_____

PAGE _____473_____

1  evidence because the INVENTIONS AGREEMENT executed by Carter Bryant in or
2  around January 1999, purports to state that any inventions conceived or reduced to
3  practice by him during his employment with Mattel would be owned by Mattel. The
4  references to the conception and reduction to practice of an invention are terms of art
5  in patent law. Accordingly, copyright law principles of substantial similarity,
6  copying, and derivative works are not relevant to the INVENTIONS AGREEMENT
7  which, by its terms, involves only principles of patent law.
8           MGA (HK) further objects on the ground that this interrogatory is an
9  overbroad and unduly burdensome contention interrogatory to the extent it asks for
10  "all facts" which supports the denial of a statement or allegation. *See e.g., Safeco of*
11  *Am. v. Rawstron*, 181 F.R.D. 441,447-48 (CD. Cal. 1998) (rejecting discovery
12  requests seeking "all facts, documents, and witnesses that support the denial of a
13  statement or allegation of fact" because the "universe of potentially responsive
14  information is almost endless").
15           MGA (HK) further objects to the extent that this interrogatory seeks
16  information that is outside MGA (HK)'s knowledge and is not in MGA (HK)'s
17  possession, custody, or control. In particular, MGA (HK) objects to this interrogatory
18  to the extent that it requests that MGA (HK) "state *all* facts ... and IDENTIFY *all*
19  PERSONS... and *all* DOCUMENTS" (emphasis added).
20           MGA (HK) objects to the interrogatory on the ground that it is
21  compound and therefore Mattel has propounded more than 50 interrogatories,
22  including discrete subparts, in violation of Judge Larson's order of February 22,
23  2007, that "Interrogatories are limited to 50 for each side for both [Case Nos. CV 04-
24  04049-SGL and CV 05-02727]." In its supplemental response to this interrogatory,
25  MGA (HK) did not refuse to answer the interrogatory based on the 50-interrogatory
26  limit, but rather refused to use the compound and misleading defined terms that
27  permeate Mattel's interrogatories. The interrogatories attempt to use misleading and
28  unfair definitions to create jury confusion or to circumvent 50-interrogatory limit.

14
MGA HK'S 3RD SUPP'L RESPONSE TO MATTEL'S AMENDED 4TH SET OF INTERROGATORIES

EXHIBIT _____ 36

PAGE _____ 474