1   means that these claims must be treated as having been filed on November 24, 2005,
2   almost a year before Mattel sought leave to amend them on November 20, 2006.
3   Given that Mattel had notice of its claims against Bryant only as of November 24,
4   2003,[131] and of its claims against the MGA defendants and Larian only as of
5   November 4, 2004,[132] the claims with two-year statutes of limitations
6   (aiding/abetting breach of fiduciary duty and duty of loyalty and interference with
7   contract) are timely—those claims had to be filed on or before November 4, 2006,
8   and here they are treated as having been filed on November 24, 2005. *A fortiori* the
9   other claims, which have statutes of limitations longer than two years, are also
10  timely.

11      **C.    As The Court Correctly Held, Mattel's Phase One Claims Added**
12              **In 2006 Relate Back To The 2004 Complaint And Are Timely.**

13      On several occasions, defendants have challenged the timeliness of Mattel's
14  amended claims.  The Court rejected those challenges before, and MGA offers no
15  reason why it should not do so again.

16      Mattel filed its original complaint against Bryant and ten Doe defendants on
17  April 27, 2004 (the "'04 Action").  It alleged state-law claims for breach of contract,
18  breach of fiduciary duty, breach of duty of loyalty, unjust enrichment, and
19  conversion.  Mattel based those claims on the allegations that Bryant "had secretly
20  aided, assisted, and worked for a Mattel competitor, including without limitation by
21  entering into the agreement with the competitor, during the time Bryant was
22  employed by Mattel ... and was being paid by Mattel as a product designer."[133]
23  Mattel further alleged that "Bryant and other defendants converted, misappropriated
24  and misused Mattel property ...."[134]

25

26      [131]  MGA AMF # 127.
27      [132]  MGA MF # 13.
        [133]  Complaint, ¶ 3, 4, 12, Proctor Dec., Exh. 91.
28      [134]  Complaint, ¶ 12. Proctor Dec., Exh. 91.

JOINT OPPOSITION

EXHIBIT    77

PAGE    616

On December 7, 2004, MGA Entertainment, Inc. ("MGA") intervened as a defendant because it claimed to have "a significant protectable interest relating to the subject matter of the action."[135]   On the same day, MGA answered the complaint, denying most of its substantive allegations and asserting a litany of affirmative defenses.[136]   MGA also contended that Mattel's original conversion claim was really "a copyright claim under federal law" and described this case as a "copyright action."[137]   MGA has been an active participant in the litigation since then.

On November 20, 2006, Mattel sought leave to file an amended complaint that added, inter alia, (a) claims of copyright infringement and other related state law claims against the existing parties to the action, Bryant and MGA; and (b) the same claims against new parties, MGA Hong Kong, and Isaac Larian, substituting them for the Doe defendants named in Mattel's original complaint.   Defendants opposed the amendment, arguing that Mattel's copyright infringement and contract-interference claims were time-barred, and that its substitution of MGA Hong Kong and Larian was improper because Mattel previously knew their identities.

Although the Court considered and rejected both of these arguments, defendants seek to resuscitate them now.   In its Order dated January 12, 2007, the Court found that both the copyright infringement claims and contract-interference claims arise from the same general set of facts as Mattel's original 2004 complaint, and therefore relate back to that complaint. (Order, at 13:27-28 (the copyright claim relates back to "the same conduct or transaction contained in the original complaint, filed in April 2004")); (id., at 14:16-17, 15:1 ("through Rule 15(c) Mattel's intentional interference claim would relate back to when it filed its original complaint in April 2004, well before the statute of limitations expired")).

---

[135]   Stipulation Permitting MGA to Intervene as a Party to this Action, 1:5-9, Zeller Dec., Exh. 122.
[136]   MGA's Answer in Case No. CV 04-9059, Zeller Dec., Exh. 123.
[137]   Id.

JOINT OPPOSITION

EXHIBIT __7__
PAGE __817__

1  Defendants themselves recognized that the new claims arose from the same set of
2  facts as the original claims.[138]  Moreover, the Court noted that MGA and Bryant
3  could hardly claim to be prejudiced by the amendment: "it is readily apparent . . .
4  that both [MGA and Bryant] have been aware for some time of the factual
5  predicates now underlying Mattel's copyright claims and intentional interference
6  claim." (Order, at 9:11-13).  The Court also found that substitution of the Doe
7  defendants was proper because "[a]s made clear by Mattel, California law allows a
8  plaintiff to substitute in a defendant for a 'Doe' if the plaintiff was ignorant of that
9  defendant's . . . basis for liability at the time the [original] complaint was filed."
10 (Order, at 15 fn. 5).

11      In the interest of orderly scheduling, the Court directed that Mattel's new
12 claims should be asserted as counterclaims to MGA's complaint against Mattel, filed
13 in April 2005, rather than added to Mattel's 2004 complaint.  However, the Court
14 made clear that it had not intended that Mattel was to be prejudiced thereby.  It
15 stated: "None of the substantive concerns raised by MGA and Bryant to the present
16 amended complaint, e.g., statutes of limitations, would appear to be affected if the
17 new claims and defendants were brought as defenses and counterclaims in the 05-
18 2727 case as opposed to the 04-9059 one." (Order on Motion to Amend, p. 22:8-
19 12.).

20      Defendants concede that Mattel's claims "survive . . . if they relate back to the
21 '04 Complaint," MGA Mot., 29:21-22, which this Court has already held they do.

22

23

24

25 ———— [138]   In its unsuccessful opposition to Mattel's motion to amend, MGA contended that
   the allegations in Mattel's original Complaint "underlie the copyright infringement and
26 intentional interference contract claims Mattel now seeks to allege against MGA, Mr.
   Larian and Bryant" and that "Mattel's present theory of copyright infringement is not new
27 at all." (MGA Opp. to Mtn. to Amend, at 12:7-9, 9:2-4).  MGA also conceded that the
   interference claim arises out of the same operative events set forth in Mattel's original
28 Complaint. (Id. at 12:7-9).

JOINT OPPOSITION

EXHIBIT ____ 77

PAGE ____ 818

The Court should revisit this decision only if defendants can show new material facts or new controlling law. See Local Rule 7-18. They cannot.[139]

### 1.   **Mattel's Amended Claims Against Bryant Relate Back to the April 2004 Complaint.**

California's rules on relation back govern Mattel's amended state law claims. See Advisory Committee Notes to 1991 Amendment ("if the controlling body of limitations law . . . affords a more forgiving principle of relation back than the one provided in . . . rule [15(c)], it should be available to save the claim"); Motley v. Parks, 198 F.R.D. 532, 534 (C.D. Cal. 2000) ("Because California law regarding the relation back of claims is more liberal than the standard set forth in Rule 15(c)(3), Rule 15(c)(1) applies."). California favors "liberality in the amendment of pleadings to encourage litigating causes on their merits." Myers v. Phillip Morris, Inc., 2003 WL 21756086 at *4 (E.D. Cal. 2003) (citation omitted).

California's "relation-back doctrine requires that the amended complaint must (1) rest on the same general set of facts, (2) involve the same injury, and (3) refer to the same instrumentality, as the original one." Norgart v. Upjohn Co., 21 Cal. 4th 383, 408-09 (1999) (citations and emphasis omitted); see also Fed. R. Civ. P. 15(c)(1)(B) (claim relates back if it "arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading").

---

[139]   This Court also addressed the issue of the date of accrual in its order on defendants' unsuccessful motion for terminating sanctions. There, defendants argued that Mattel was on notice of its claims by 2002. Court's Order dated August 27, 2007, Proctor Dec., Exh. 94. As it had before, the Court rejected this contention, holding:

> [T]he Court determines that November 24, 2003, marks the date when litigation between Mattel and Bryant became more than merely speculative and in fact became probable. . . . *[T]here was no evidence presented to the Court that Mattel should have known it had a viable claim against Bryant before November 2003.*

Court's Order dated August 27, 2007, Proctor Dec., Exh. 94. This is the standard that applies now. Unless Mattel should have known it had a viable claim, its claims could not have accrued.

-34-

EXHIBIT 77
PAGE 814

Here, all the Phase One claims against Bryant relate back to the filing date of the original complaint because they arise from the same common transaction or occurrence as Mattel's other claims—namely, Bryant's clandestine work on Bratz for MGA while employed by Mattel. Ample precedent supports this conclusion. See, e.g., Martel v. Trilogy Ltd., 872 F.2d 322, 327 (9th Cir. 1989) (new claim related back because it arose from the same transaction and occurrence as original claim); Grudt v. City of Los Angeles, 2 Cal. 3d 575, 583-84 (1970) (amended complaint related back to filing of original complaint where new claim added new theory of recovery based on same acts and same injury alleged in original pleading); Lamont v. Wolfe, 142 Cal.App.3d 375, 379 (1983) (similar). Bryant says nothing about this precedent.

### 2.    Mattel's Phase One Claims Against MGA Relate Back to the April 2004 Complaint.

The analysis is the same for Mattel's Phase One claims against MGA. Because MGA intervened in the '04 Action as a defendant, it became a party to that action for all purposes.

On December 7, 2004, MGA intervened as a defendant pursuant to Fed. R. Civ. P. 24(a)(2), claiming to have a "significantly protectable interest relating to the subject matter of the action."[140] The same day, MGA answered Mattel's complaint.[141] From the outset, MGA participated in all phases of the litigation including discovery, briefing, and motion practice, and attended all court hearings. It acted in all respects as a full party to this action. It never once claimed to seek conditions from the court on its intervention. Now, it claims it intervened purely as a

EXHIBIT  77

PAGE  02D

---

[140]    See Stipulation to Intervene filed Dec. 7, 2004; Defendants' Supplemental Brief in Opposition to Plaintiff Mattel's Motion to Remand dated Jan 10, 2005 7-8; Bryant and MGA's Brief in Response to Court's Questions Regarding Rules 24 and 19B) in Connection with Plaintiff Mattel's Motion to Remand, dated Feb 7, 2005 at 1-8.
[141]    MGA's Answer, Zeller Dec., Exh. 123.

JOINT OPPOSITION

1  procedural matter and that Mattel's claims against it therefore cannot relate back to

2  the April 2004 Complaint.

3      MGA's argument is specious.  It is well-settled that, once a party intervenes

4  under Fed. R. Civ. P. 24(a)(2), it takes on the status of a full party to the action.  See

5  U. S. v. Oregon, 657 F.2d 1009, 1014 (9th Cir. 1981) (intervenors under Fed. R.

6  Civ. P. 24(a)(2), enter the suit with the status of original parties and are fully bound

7  by all court orders); see also Northeast Clackamas Co. Elec. Coop., Inc. v

8  Continental Gas Co., 221 F2d 329, 332-33 (9th Cir. 1955) (intervenor has the right

9  to conduct discovery, assert counterclaims against the original parties, participate at

10  trial, and appeal); Brown v. Demco Inc., 792 F.2d 478, 480 (5th Cir. 1986) (if a

11  motion to intervene is granted, the intervenor is treated as if it were an original party

12  and has equal standing with the original parties).  With rights come

13  responsibilities.  By successfully intervening, MGA has made itself subject to

14  complete adjudication of all issues in the litigation between itself and Mattel. Id.

15      Mattel's Phase One claims against MGA, like its claims against Bryant

16  himself, therefore relate back to the April 2004 complaint.  Because all the claims

17  against MGA arise out of the same underlying misconduct (Bryant's work on Bratz

18  during his Mattel tenure) as do Mattel's original claims against Bryant, they fully

19  satisfy the "transactional" requirements of both federal and state law governing

20  relation back.[142]

21          **3.    Mattel's Phase One Claims Against the Other Defendants**

22                **Also Relate Back to the April 2004 Complaint.**

23      Under California's relation back doctrine, the claims against the Doe

24  defendants relate back to the date of the original complaint, as long as (1) they are

25

26  [142] At the very least, the claims against MGA relate back to the date of MGA's intervention, December 7, 2004.  Since, as shown above, Mattel lacked inquiry notice prior

27  to November 24, 2003, even those claims with two-year statutes of limitations are timely because they needed to be filed only before November 24, 2005.

28

EXHIBIT 77
PAGE 821

based on the same general set of facts as the original claims, and (2) Mattel's failure to name the Doe defendant by name was the result of Mattel's ignorance as to the basis for the defendants' liability at the time the lawsuit was originally filed.  See, e.g., Smeltzley v. Nicholson Mfg. Co., 18 Cal. 3d 932, 939-40 (1977); Austin v. Mass. Bonding and Ins. Co., 56 Cal. 2d 596, 600 (1961).  Relation back in this context means that, if a defendant was named as a Doe, the original complaint is treated as the filing date and it does not matter if the statute of limitations expired before the plaintiff substituted a named party for that Doe.   See Sobeck & Assocs., Inc. v. B & R Investments, 215 Cal. App. 3d 861, 869-70 (1989).[143]

Here, the Court held—and defendants cannot credibly dispute—that Mattel's counterclaims against MGA Hong Kong and Larian arise from the same general set of facts as the claims against Bryant.[144]  The original complaint alleged that Doe defendants assisted Bryant in violating his contractual, common law, and fiduciary obligations to Mattel by working for a Mattel competitor while remaining a Mattel employee, and misappropriating Mattel's property.  (Complaint ¶¶ 3, 4, 12).  The amended claims allege additional facts showing that the MGA defendants were complicit in that misconduct.  The amended and supplemental Phase One claims are based on the same general set of facts as the original claims.

Defendants assert that relation back is nonetheless improper because "there was no mistake in identity of either MGA or Larian at the time Mattel filed its '04 Complaint nor was there lack of notice as to their involvement in the development of Bratz . . ." (MGA Mem. at 33:3-5).  This is the same argument that MGA made

---

[143]   Doe defendants must be named and served within three years of commencement of the action.  Cal. Code Civ. Proc. § 583.210(a).  Here, Mattel moved to amend in November 2006, less than three years after the commencement of the 2004 action.

[144]   As set forth above, MGA intervened to become a defendant in the '04 Action almost two years before Mattel moved to amend the complaint.  Therefore, it was not a true "Doe" when Mattel moved to amend.  Mattel uses the term "MGA defendants" for the Court's convenience.  Whether considered as a defendant in its own name or a Doe defendant, MGA has no basis to argue that it was unfairly prejudiced, or not on notice, as to the claims against it, all of which are timely.

-37-

EXHIBIT 11
PAGE 822

1  in its opposition to Mattel's motion to amend. (See MGA Opp., 20:17-22:17)

2  (arguing leave to amend should be denied because "Mattel [cannot] credibly claim

3  that it was unaware of the alleged wrongdoing of which it accuses MGA and

4  Mr. Larian now"). The Court already considered and rejected this argument.[145]

5      As discussed above, mere knowledge of MGA's "involvement in the

6  development of Bratz" is wholly irrelevant. There is no evidence, and certainly no

7  undisputed evidence, that Mattel <u>knew</u> on April 27, 2004 that the MGA defendants

8  had actively participated in Bryant's wrongdoing. As recognized in <u>General Motors</u>

9  <u>Corp. v. Superior Court</u>, 48 Cal. App. 4th  80, 593-94 (1996), even where the

10  plaintiff knows the existence and identity of the defendant, "the plaintiff is 'ignorant'

11  within the meaning of the statute if he lacks knowledge of that person's connection

12  with the case or with his injuries." See also <u>Fuller v. Tucker</u>, 84 Cal. App. 4th 1163,

13  1170 (2000) ("The [Doe statute's] phrase 'ignorant of the name of a defendant' is

14  broadly interpreted to mean not only ignorant of the defendant's identity, but also

15  ignorant of the facts giving rise to a cause of action against that defendant.").

16  Where, as here, "a lawsuit is initiated within the applicable period of limitations . . .

17  and the plaintiff has complied with section 474 by alleging the existence of

18  unknown additional defendants, the relevant inquiry is *what facts the plaintiff*

19

[145] As the Court held:

> MGA also argues that Mattel's effort to substitute MGA and its CEO, Isaac Larian, for the "Doe" defendants listed in its original complaint is improper because Mattel knew of their identity when it filed the original complain. The argument is misplaced.  As made clear by Mattel, California law allows to substitute in a defendant for a "Doe" if the plaintiff was ignorant of that defendant's . . . basis for liability at the time the complaint was filed. [citation] . . . MGA notes that the original complaint spoke of Bryant working for one of Mattel's competitors and of that employee's theft of Mattel's intellectual property before leaving to work for that competitor.  At most, all this shows is that Mattel knew that Bryant went to work for MGA, not that MGA or Mr. Larian encouraged Bryant's alleged unlawful behavior recited in the original complaint.

Order 15-16. Nothing has changed now.

-38-

EXHIBIT 11
PAGE 823

1   *actually knew* at the time the original complaint was filed." <u>General Motors</u>, 48 Cal.

2   App. at 588 (emphasis in original).  The answer here is that Mattel did not *know* of

3   the MGA defendants' knowing involvement in Bryant's wrongdoing in April

4   2004.[146]  Accordingly, as the Court ruled previously, all of Mattel's Phase One state-

5   law claims relate back to the original Complaint, and are timely.

      **4.**   **Defendants' Assertion That Mattel's Claims Relate Back to the '05 Action Misstates the Court's Order.**

8       Defendants concede that the Court held that "Mattel's claims against MGA

9   and Larian could relate back to the '04 Complaint . . . as arising 'out of the same

10  conduct or transaction' contained in the '04 Complaint."  MGA Mot, at 16:17-18.

11  They also acknowledge that the Court directed the amendment to proceed as

12  counterclaims in the '05 Action only because doing so served "judicial economy

13  considerations."  (<u>Id.</u> at 16:14).  Nonetheless, defendants assert that Mattel's claims

14  relate back to MGA's complaint or Mattel's answer in the '05 Action, and not

15  Mattel's complaint in the '04 Action.  (<u>See</u>, <u>e.g.</u>, <u>id.</u> at 27:28; 28:28).  Defendants are

16  incorrect.

17      First, there is no evidence that, by instructing Mattel to amend in the form of

18  counterclaims in the '05 action, the Court intended to deprive Mattel of eleven

19  months of time to file its claims.  To the contrary, the Court expressly contemplated

20  relation back to the '04 Action.[147]   (Order at 13:26-14:1) ("By MGA's own

21  admission Mattel's copyright claim arises out of the same conduct or transaction

22  *contained in the original complaint filed in April, 2004*, well within the applicable

23  limitations period.") (emphasis added).  The Court allowed amendment in the

24  context of the '05 Action because it was presented with an "amended complaint

---

25      [146]   Defendants bear the burden of proof on the issue of actual knowledge.  <u>See</u>

26  <u>Breceda v. Gamsby</u>, 267 Cal. App. 2d 167, 179 (1968) ("No evidence was produced to prove or from which any reasonable inference could be drawn that plaintiff was aware

27  earlier of facts not pleaded and not disclosed. Gamsby had the burden of proving such awareness if it existed.").

28      [147]   Order, dated Jan. 11, 2007 at 13:21-14:1, Proctor Dec., Exh. 95.

JOINT OPPOSITION

EXHIBIT 11

PAGE 524

1  [that] adds five more defendants and nine new legal claims, alleging a wide range of

2  commercial disputes between rival doll makers that spans three countries." (Order,

3  4:8-10).   These additional claims and defendants pertain largely to Phase Two.

4  Defendants' assertion that Mattel's Phase One claims relate to pleadings in the '05

5  Action is inconsistent with the Court's stated intent to streamline the litigation

6  without sacrificing the parties' substantive rights.

7          Second, amended Phase One claims logically relate back to the '04 Complaint

8  rather than any pleading in the '05 Action.  The amended Phase One claims share a

9  common nucleus of facts with the '04 Action (which addresses issues relating to the

10  ownership of Bratz based upon Bryant's work on Bratz during his Mattel tenure),

11  not MGA's claims or Mattel's answer in the '05 Action.   Not surprisingly, the

12  suggestion (by Bryant) that led to this Court's direction to file the claims as

13  counterclaims in the '05 Action extended only to the proposed additional Phase Two

14  claims of RICO violations and trade secret theft.   Neither Bryant nor the MGA

15  defendants asked that Mattel's aiding and abetting, copyright infringement, or

16  contract-interference claims be alleged as counterclaims in the '05 Action.[148]

17          Finally, an interpretation of the Court's order that would deprive Mattel of at

18  least eleven months for statute of limitations purposes would violate the Rules

19  Enabling Act.  As noted, the Court's decision to allow amendment in the form of

20  counterclaims, rather than amendment of the Mattel v. Bryant complaint, was based

21  solely on case management concerns. The Court's discretion to manage its docket in

22  the most efficient manner arises from Fed. R. Civ. P. 16, which provides a

23  procedural mechanism for case management by the district courts.   The Rules

24  Enabling Act, however, states that rules of procedure "shall not abridge, enlarge or

25

26  [148]   Defendants' attempted distinction between the '04 and 05 Actions with respect to relation back is also contrary to the Court's consolidation order. The Court had previously

27  ordered that Case No. "05-02727 [i.e., the '05 Action] be CLOSED by the clerk," consolidated that with the earlier filed action, and that "that all further documents and

28  proceedings occur under Bryant v. Mattel, 04-09049 SGL." See June 19, 2006 Order.

EXHIBIT  17

PAGE  825

1   modify any substantive right."   28 U.S.C. § 2072(b);  cf. Stacey v. Charles J.

2   Rogers, Inc., 756 F.2d 440, 442 (6th Cir. 1985) (consolidation is "a matter of

3   convenience and economy in administration, but does not . . . change the rights of

4   the parties").  Whether the statute of limitations bars Mattel's claims indisputably

5   implicates Mattel's fundamental substantive rights.  See, e.g., Guaranty Trust Co. of

6   N.Y. v. York, 326 U.S. 99, 109-12 (1945) (applicability of state's statute of

7   limitations implicated matters of substance, not procedure).    Accordingly, the

8   Court's decision to permit Mattel's amended claims to proceed as counterclaims in

9   the '05 Action cannot prejudice Mattel's substantive right to pursue these claims.

10        **D.    Mattel's Claims Are Timely.**

11        Defendants include a claim by claim analysis purporting to show the

12   untimeliness of Mattel's claims.  The analysis is erroneous.

13             **1.    The Intentional Interference Claim Is Timely.**

14        Defendants argue that that claims for intentional interference with contract

15   accrue upon breach of the contract.  MGA Mot. at 20-21.  But this principle is

16   inoperative where, as here, the plaintiff, as a result of defendants' fraudulent

17   concealment, hid both the evidence of the breach and of the interference.  See

18   Gryczman v. 4550 Pico Partners, Ltd., 107 Cal. App. 4th 1, 5-6 (2003) (discovery

19   rule applied to contract claim brought four years after defendant secretly conveyed

20   certain real property).

21        Moreover, because Mattel's interference claim arises from the same nucleus

22   of facts alleged in Mattel's April 2004 complaint, it relates back to that complaint,

23   wherein defendants were named as Does. Because the '04 Action was filed less than

24   two years after Mattel's discovery of defendants' legal wrongdoing, the interference

25   claim is timely.   Indeed, the Court already held "through Rule 15(c) Mattel's

26   intentional interference claim would relate to when it filed its original complaint in

27   April 2004, well before the limitations period expired."

28

EXHIBIT 11

PAGE  826

-41-

### 2.   The Aiding and Abetting Claims Are Timely.

As set forth above, Mattel's aiding and abetting claims against the MGA defendants relate back to its April 2004 complaint. Assuming that a two-year statute of limitations applies, the claims are timely because Mattel did not learn of the MGA defendants' wrongdoing until well after April 2002. Even if Mattel's aiding and abetting claims relate back only to the '05 Action, the claims are timely because less than a year passed between Bryant's November 2004 deposition, where Mattel learned of actionable misconduct involving MGA and Larian, and Mattel's May 2005 answer in the '05 Action.

### 3.   The Conversion Claim Is Timely.[149]

Defendants assert that the "discovery rule does not apply to a claim for conversion." (MGA Mem. 26:8-9 (citing AmerUS Life Ins. Co. v. Bank of Am., N.A., 143 Cal. App. 4th 631, 639 (2006) (emphasis in original)). The case defendants themselves cite for this proposition defeats their argument. "[W]hen the defendant in a conversion action fraudulently conceals the relevant facts or where the defendant fails to disclose such facts in violation of his or her fiduciary duty to the plaintiff," the discovery rule applies. AmerUS Life Ins. Co., 143 Cal. App. 4th at 639; see also Orkin v. Taylor, 487 F.3d 734, 741-42 (9th Cir. 2007) (same). Such concealment clearly occurred here — at the very least, disputed issues of fact are present that preclude summary judgment.

### 4.   The Unfair Competition Claim Is Timely.

Defendants argue that the limitations period applicable to Mattel's claim for statutory unfair competition expired in October 2004, four years after Bryant left Mattel, because the discovery rule does not apply to such claims. MGA Mot. at 27. California courts are divided on this point. Compare Mass. Mut. Life Ins. Co. v.

---

[149] Defendants contend that the limitation periods for Mattel's copyright infringement and conversion claims apply to its claim for declaratory relief. As explained in text, Mattel's claims for copyright infringement and conversion are timely. Accordingly, under defendants' own logic, the declaratory relief claim is timely as well.

-42-

EXHIBIT 11 PAGE 827

1   Superior Court, 97 Cal. App. 4th 1282, 1295 (2002) (citations omitted) (statute "will

2   probably run from the time a reasonable person would have discovered the basis for

3   a claim") with Snapp & Assocs. Ins. Svcs. v. Robertson, 96 Cal. App. 4th 884, 890-

4   91 (2002) (discovery rule does not apply).  But the Court need not address this issue

5   because Mattel filed suit against Bryant in April 2004, less than four years after he

6   left Mattel.  As the Court already held, Mattel's claims against MGA and Larian

7   relate back to its original complaint against Bryant and are thus timely.[150]

8       MGA advances a number of subsidiary arguments, none of which is

9   persuasive.  First, MGA contends that the claim is based on an at-will employment

10  contract, and thus requires an independent wrong.  But Bryant's at-will relationship

11  has no bearing on his breaches of the Inventions Agreement or other unfair

12  practices.  See infra, at V.A.  Second, defendants incorporate, without elaboration,

13  Bryant's unsubstantiated contention that he did not breach the Inventions

14  Agreement.  As shown above, this argument is meritless.  Third, defendants assert

15  they lacked the requisite knowledge or intent to induce Bryant to breach his

16  contract—a claim that is clearly subject to factual dispute.  Finally, defendants argue

17  that, despite dangling large sums of money, and an opportunity to develop a doll line

18  of his own, they did not cause Bryant to breach the Inventions Agreement.  But their

19  conduct proves otherwise, and at the very least, creates a genuine issue for trial, as

20  discussed in further detail below.

21

22

23

24

25

26  [150] The Court does not need to resolve whether a claim of common law unfair
27  competition is governed by a three or four year statute of limitations.  Because Mattel's
    claim of common law unfair competition did not accrue until well after April 2002, and
28  relates back to Mattel's April 2004 complaint, it is timely under either limitations period.

-43-

EXHIBIT  11
PAGE  828

**III.    MATTEL'S FEDERAL COPYRIGHT CLAIM IS TIMELY.**

    **A.    Mattel Asserted Its Copyright Claim Within Three Years of Accrual.**

        **1.    The Standard for Accrual of Copyright Infringement Claims.**

The copyright infringement claim is timely as to all defendants because Mattel asserted it within three years of accrual, the applicable statute of limitations under 17 U.S.C. § 507(b).    Copyright claims accrue "when [the plaintiff] has knowledge of a violation or is chargeable with such knowledge." Roley v. New World Pictures, Ltd., 19 F.3d 479, 481 (9th Cir. 1994)).    Thus, "if the copyright plaintiff was unaware of the infringement, and that lack of knowledge was reasonable under the circumstances," the infringement does not start the limitations clock. Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 706 (9th Cir. 2004).

        **2.    Mattel's Copyright Claim Could Not Have Accrued Prior to November 24, 2003.**

MGA cannot establish that, prior to November 24, 2003, Mattel either actually knew of the infringement or "is chargeable with such knowledge." Allegations of ownership and substantial similarity are essential to a copyright infringement claim. See Kling v. Hallmark Cards, Inc., 225 F.3d 1030, 1037-38 (9th Cir. 2000). Mattel could not have alleged in either element in February 2001, or in fact any time prior to 2003. Prior to November 24, 2003, Mattel *had not even obtained Bryant's drawings*.[151] Without Bryant's drawings—the copyrighted works Mattel claims were infringed—Mattel could not perform a substantial similarity analysis.    Accordingly, prior to 2003, Mattel could not have brought suit for copyright infringement because it did not know that it owned Bratz, let alone that defendants were infringing its rights in Bratz. Cf. Kling, 225 F.3d at 1036 ("there can be no laches in failing to assert rights of which a party is wholly ignorant, and

---

[151]    MGA AMF # 127.

EXHIBIT  17
PAGE  079

whose existence he had no reason to apprehend") (quoting Halstead v. Grinnan, 152 U.S. 412, 417 (1894)).

In Kling, the plaintiff filed suit thirteen years after the defendants' written refusal to compensate him for the cartoon scripts at issue, but within three years of coming across the allegedly infringing cartoons in a video store. The Ninth Circuit reversed the district court's grant of summary judgment to the defendant on the basis of laches, holding that "the period of delay for laches for a copyright infringement claims runs only from the time that the plaintiff knew or should have known about an actual or impending infringement, *not an adverse claim of ownership*." Id. at 1032 (emphasis added). The court explained that the plaintiff cannot sue based upon a bare claim of adverse ownership, because a showing of infringement is required as an element of the claim. Id. at 1037-38. The Ninth Circuit recognized, "[t]o require every owner whose right was not 'obviously' established to sue for a declaration of ownership whenever a dispute arises or to forfeit his right to seek relief against possible infringements in the future, could engender much needless litigation." Id. at 1038.

MGA's principal authority for its claim that "attendance at trade show [is] sufficient 'discovery' to start the statute of limitations on copyright infringement claim" (MGA Mem. 19) is Polar Bear, 384 F.3d at 707. That aspect of Polar Bear is readily distinguished. In that case, the defendant there displayed at a trade show footage of plaintiff's "copyrighted film" without authorization; because the plaintiff had made the film, it clearly knew it owned the copyright and that this copyright was being infringed by the exhibition. Id. at 703. Here, Mattel had markedly less knowledge at the time of the trade show referenced by MGA. Mattel did not know then that Bryant created Bratz works at Mattel, let alone what they looked like or

EXHIBIT 17
PAGE 830

-45-

1   that they were substantially similar to the dolls released by MGA.[152]  Any notice of

2   these crucial facts came only in late 2003.

3       **3.    The Stay In the Action Tolled the Statute of Limitations on**

4           **the Copyright Claim.**

5       As explained above, the limitation periods on Mattel's claims were tolled due

6   to the stay related to the interlocutory appeal of an Order removing the case to

7   federal court.  The proceedings in this case were stayed for nearly a year (May 20,

8   2005 until May, 16, 2006).  Id.  Mattel's copyright claim is timely regardless of the

9   stay; this further shows its timeliness.  The Court should exclude the period of the

10  stay in performing its statute of limitations analysis.

11      **B.    The Copyright Infringement Claim Against Bryant and MGA**

12          **Relates Back to the '04 Complaint.**

13          **1.    Mattel's Copyright Infringement Claim Against Bryant and**

14              **MGA is Timely.**

15      Whether the Court applies state or federal relation back rules with respect to

16  the copyright infringement claims against Bryant and MGA, the result is the same:

17  the claims are timely.  When Mattel filed its motion to amend, both Bryant and, as

18  explained above, MGA, were parties to the '04 Action.  Therefore, the copyright

19  claim against them relates back to the '04 Complaint as long as it arises from the

20  "conduct, transaction, or occurrence" alleged therein.  Fed. R. Civ. P. 15(c)(1)(B).  It

21  does.  The complaint in the '04 Action alleged that "Bryant and other defendants

22  converted, misappropriated and misused Mattel property . . ."[153]  The amended

23  complaint expands upon this allegation by asserting that defendants infringed

24  Mattel's copyrights in Bratz, i.e., its property.  Indeed, the Court already held that

25  ───────────

26  [152]  Watermark Publishers V. High Tech. Sys., Inc., 1997 WL 717677, 44 U.S.P.Q.2d 1578 (S.D. Cal. 1997), is also inapposite.  In that case, the plaintiff "immediately identified" the disputed map "as infringing upon viewing it for the first time in 1991," id.

27  at 1583, and then informed her attorney.  See id.  Such known acts of infringement were not present here until Mattel saw Bryant's drawings in 2003.

28      [153]  Complaint, ¶ 12, Proctor Dec., Exh. 72.

-46-

EXHIBIT 77

PAGE 831

1   the copyright claim relates back to "the same conduct or transaction contained in the

2   original complaint, filed in April 2004."   Order, at 13:27-28.   Because Mattel's

3   copyright claim against Bryant and MGA relates back to the complaint in the '04

4   Action, it is indisputably timely.

5         2.   **The Timing Of Mattel's Registration Of Its Copyrights Does**

6              **Not Affect the Viability of Its Claims.**

7         MGA contends that Mattel's claim for copyright infringement "may not relate

8   back to any pleading filed prior to October 30, 2006, when Mattel obtained

9   registrations of its alleged copyright in BRATZ . . . because copyright registration is

10  a jurisdictional prerequisite . . . and 'relation-back' rules cannot supplant

11  jurisdictional standing."   MGA Mot. at 24.   MGA does not cite any applicable

12  precedent to support this argument.   It is contrary to settled law.

13        "[C]ourts have allowed the plaintiff's subsequent compliance with the

14  registration . . . requirements to relate back to the date the lawsuit was filed, thus

15  preserving claims that might otherwise have been barred by the statute of

16  limitations."   PAUL GOLDSTEIN, GOLDSTEIN ON COPYRIGHT, § 15.2 at p. 15:11

17  (citations omitted); see also Co-Opportunities Inc. v. National Broad. Co., 510 F.

18  Supp. 43, 49 (N.D. Cal. 1981) ("the subsequent recordation [of the copyright

19  assignment] will be allowed to relate back so that the assignee acquires a right to sue

20  as of the date of filing the action"); Ruskin v. Sunrise Mgmt., Inc., 506 F. Supp.

21  1284, 1289 (D. Colo. 1981) ("Upon amendment [to allege recordation of copyright

22  transfer], the copyright claim would relate back, for statute of limitation purposes, to

23  the original filing date of the complaint."); Villeroy & Boch, S.a.r.l. v. THC Sys.,

24  Inc., 1989 WL 8936, at * 2 (S.D.N.Y. Jan. 30 1989) (denying defendant's motion for

25  summary judgment that argued the Court lacked subject matter jurisdiction because

26  the plaintiff did not record his copyright transfer, and granting leave to amend

27

28

EXHIBIT 77

PAGE 832

-47-

JOINT OPPOSITION

1  complaint so that "supplemental complaint relates back to the filing date of the

2  initial complaint for statute of limitations purposes.").[154]

3      The slim authority that MGA cites is inapposite.  The cases cited in footnote

4  33 of MGA's brief hold simply that copyright registration is a prerequisite of an

5  infringement claim.  But it is undisputed that Mattel registered copyrights in Bratz

6  drawings; the question, which the above-cited cases address, is what effect the

7  timing of recordation/registration has on relation-back principles.  It has none.

8  Miguel v. Country Funding Corp., 309 F. 3d 1161, 1165 (9th Cir. 2002), is also

9  distinguishable.  Miguel concerned an action under the Truth in Lending Act, not

10  the Copyright Act.  It did not address or alter the body of authority permitting

11  relation back of copyright claims when registration or recordation occurs after suit is

12  filed.

13  **C.    The Rolling Statute of Limitations Applies to Mattel's Copyright**

14  **Claims Against All Defendants.**

15      In cases of copyright infringement, the three year limitations period is rolling,

16  i.e., it allows recovery for all infringing acts committed within three years prior to

17  the filing of suit, even if infringement commenced more than three years prior.  As

18  the Ninth Circuit has held: "Section 507(b) is clear on its face. 'It does not provide

19  for a waiver of infringing acts within the limitation period if earlier infringements

20  were discovered and not sued upon, nor does it provide for any reach back if an act

21  of infringement occurs within the statutory period." Roley, 19 F.3d at 481 (citing

22  Hoey v. Dexel Systems Corp., 716 F. Supp 222, 223 (E.D. Va. 1989)).  Thus, in

23  Roley, the Court reasoned that "in a case of continuing copyright infringements, an

24  action may be brought for all acts that accrued within the three years preceding the

25  filing of suit." Id.

26

27  _____

[154]    It is irrelevant that these cases address recordation of a transfer of copyright, not registration of copyright, because both recordation and registration are jurisdictional pre-

28  requisites to an infringement action.  See 17 U.S.C. §§ 205(d); 411(a).

EXHIBIT 77

PAGE 833

1    Accordingly, even if the Court were to find that Mattel discovered its rights to
2  Bratz before November 24, 2003, and that relation back does not apply, the
3  copyright claim is still timely as to acts of infringement occurring within three years
4  before Mattel amended its complaint in November 2006. Such acts are plentiful and
5  recurring. Defendants' infringement of Bratz continues today, as each new model of
6  a Bratz doll constitutes a new, and independently actionable, act of infringement.

7    Seeking to avoid the effect of the rolling statute of limitations, MGA claims
8  that Mattel's copyright infringement claim is "essentially a claim for copyright
9  ownership," and that Mattel's claims are therefore time-barred. (MGA's Motion at
10  23 (quoting Welles v. Turner Enter. Co., 503 F.3d 728, 734 (9th Cir. 2007)). MGA
11  asserts that it expressly repudiated Mattel's ownership in Bratz "as soon as the dolls
12  entered the market." (Id.)

13    The argument fails because Mattel asserted "a cause of action for
14  infringement that is separate and distinct from [its] ownership claim." Specifically,
15  Mattel alleges that it owns certain copyright registrations. (Counterclaims, ¶ 83).
16  Mattel further alleges that "[c]ounter-defendants have reproduced, created derivative
17  works from and otherwise infringed upon the exclusive rights of Mattel in its
18  protected works without Mattel's authorization." (Id., ¶ 84). This is a copyright
19  infringement claim, pure and simple, even though Mattel's complaint additionally
20  includes allegations of ownership of Bratz. Indeed, defendants strongly dispute that
21  the Bratz dolls are substantially similar to Bryant's drawings,[155] and both parties
22  have retained experts on this issue.

23    MGA's authorities are also inapposite, involving situations where the
24  copyright owner was aware of his rights. See Zuill v. Shanahan, 80 F.3d 1366,
25  1367-68 (9th Cir. 1996) (defendant expressly repudiated the plaintiff's "claims to
26  ownership" of music that the plaintiff created more than three years before filing of
27
28

---

[155]  Defendants' Responses to Mattel's Revised Fourth Set of Interrogatories at No. 42, Zeller Dec., Exhs. 29, 109, 110.

-49-

EXHIBIT 77

PAGE 834

suit);[156] <u>Big East Entm't, Inc. v. Zomba Enters., Inc.</u>, 453 F. Supp. 2d 788, 795 (S.D.N.Y. 2006) ("Although Allen asserted an ownership claim on behalf of Rock Candy at various times after 1991... he failed to act within the three-year statute of limitations."); <u>Barksdale v. Robinson</u>, 211 F.R.D. 240, 244-45 (S.D.N.Y. 2002) (the statute of limitations on plaintiff's copyright ownership claim began to run when the plaintiff sent a cease-and-desist letter claiming ownership of works); <u>Minder Music Ltd., v. Mellow Smoke Music Co.</u>, 1999 WL 820575, * 2 (S.D.N.Y. 1999) ("Plaintiff knew that defendants were asserting a right to 50% ownership from the moment that plaintiff acquired its rights, because defendants' interest was noted in plaintiff's 1990 purchase agreement [eight years before filing suit]."); <u>Netzer v Continuity Graphic Assocs.</u>, 963 F. Supp. 1308, 1315-16 (S.D.N.Y. 1997) (plaintiff received a copy of a comic book with a copyright notice that did not recognize his contribution in 1984, nine years before plaintiff brought suit for co-ownership of copyright). Since Mattel was not aware that Bryant had created Bratz drawings at Mattel or that it owned copyrights in Bryant's drawings prior to 2003 at the earliest, these cases are inapplicable. Further, as explained above, ownership of Bratz is only one element of Mattel's infringement claim.

Moreover, MGA ignores authority that contradicts its position.  For instance, in <u>Carrell v. Shubert Org.</u>, 104 F. Supp. 2d 236 (S.D.N.Y. 2000), the plaintiff brought both a declaratory relief claim concerning ownership of certain make-up designs for the Broadway show "Cats" and a copyright claim for the infringement of the designs. The court found that, although the ownership claims were time-barred, the plaintiff could pursue an infringement claim since "[a] plaintiff's right to sue as a copyright owner is not a remedy that flows from a declaration of ownership." <u>Id.</u> at

---

[156]   Importantly, <u>Zuill</u> did not address the issue whether an infringement action is time barred if the co-ownership claim was untimely.  80 F.3d at 1369 ("We conclude that claims of co-ownership, <u>as distinct from claims of infringement</u>, accrue when plain and express repudiation of co-ownership is communicated to the claimant, and are barred three years from the time of repudiation.") (emphasis added).

EXHIBIT 77
PAGE 835

1   252-53. The court denied a motion to dismiss because "plaintiff has sufficiently

2   articulated a cause of action for infringement that is separate and distinct from her

3   ownership claim." Id. at 254. The same is true here.

4   **D.   Defendants' Fraudulent Concealment Tolls the Limitations Period.**

5       As with Mattel's state law claims, defendants' fraudulent concealment of the

6   fact that Bryant created Bratz tolls the statute of limitations on Mattel's claim of

7   copyright infringement. See Wood v. Santa Barbara Chamber of Commerce, Inc.,

8   705 F.2d 1515, 1521 (9th Cir. 1983) ("A fraudulent concealment defense requires a

9   showing both that the defendant used fraudulent means to keep the plaintiff unaware

10  of his cause of action, and also that the plaintiff was, in fact, ignorant of the

11  existence of his cause of action.") (citation omitted).  Here, as shown above in

12  connection with the state law claims, defendants intentionally, persistently, and

13  fraudulently sought to conceal the true facts of Bratz' origin.  These efforts made it

14  impossible for Mattel to discover that Bryant created Bratz during his Mattel tenure,

15  and that Mattel therefore owns Bratz pursuant to the Inventions Agreement.

16  Defendants cannot use their own misconduct to defeat Mattel's copyright claim on

17  statute of limitations grounds.

18  **IV.   BRYANT BREACHED HIS FIDUCIARY DUTY TO MATTEL, AND**

19          **THE MGA DEFENDANTS HELPED HIM.**

20      **A.   Bryant Owed Mattel a Fiduciary Duty.**

21      Bryant contends that he entered into a "straightforward employment

22  relationship" with Mattel (Bryant Mot. at 10), and that such a relationship is

23  insufficient to establish a fiduciary relationship as a matter of law. Id. But, as noted

24  by Bryant, a fiduciary duty may be imposed by law *or* undertaken by agreement, see

25  GAB Bus. Svcs. Inc. v. Lindsey & Newsom Claim Servs., Inc., 83 Cal. App. 4th

26  409, 417 (2000), overruled on other grounds, Reeves v. Hanlon, 33 Cal. 4th 1140

27  (2004). Here, the undisputed facts show that Bryant undertook his fiduciary duty to

28

EXHIBIT 11
PAGE 836

-51-

1  Mattel by agreement.[157]    In the Inventions Agreement, Bryant specifically

2  acknowledged: "The Company depends on me to maintain that confidentiality, and

3  I accept that position of trust."[158]    The Agreement required Bryant to maintain

4  Mattel's proprietary information in strict confidence.[159]    Immediately above the

5  signature line, the Agreement emphasizes: "**CAUTION: THIS AGREEMENT**

6  **CREATES IMPORTANT OBLIGATIONS OF TRUST** . . ."[160]    These

7  provisions create a fiduciary duty under California law.    See, e.g., GAB Bus.

8  Svcs, Inc., 83 Cal. App. 4th at 417.[161]

9       Even absent these contractual provisions, Bryant owed Mattel a fiduciary duty

10  because Mattel entrusted him with highly confidential information. See Stevens v.

11  Marco, 147 Cal. App. 2d 357, 373 (1956) (fiduciary relationship existed because

12  one party confidentially entrusted another with "a new and valuable idea");

13  Michelson v. Hamada, 29 Cal. App. 4th 1566, 1581 (1994) ("Confidential and

14  fiduciary relations are, in law, synonymous, and may be said to exist whenever trust

15  and confidence is reposed by one person in the integrity and fidelity of another.")

16  (citations and quotation omitted).  It is undisputed that, while at Mattel, Bryant had

17  extensive access to confidential information (including designs for BARBIE and

18  _____

19  [157]    Bryant contends that his employment offer letter makes no mention of a fiduciary relationship.  (Bryant Mot. at 15.)  But the December 9, 1998 offer letter from Mattel to

20  Bryant clearly reflects that "this offer is contingent upon . . . the signing of a Confidential Information and Inventions Agreement." Ex. 10 (BRYANT 001198-001199). CB AMF #

96.
21  [158]    CB AMF 113, (Inventions Agreement ¶ 1(a)).
    [159]    CB AMF 110, (Inventions Agreement ¶ 1(a)-(d)).
22  [160]    Thus, the plain language of the Inventions Agreement contradicts Bryant's claim that the document did not apprise him that he had a fiduciary duty to Mattel and that

23  Mattel never informed him that the company wanted to "saddle him with such a duty." (Bryant Memo at 15).

24  [161]    Bryant's reliance on City Solutions, Inc v. Clear Channel Commn's, Inc., 201 F.Supp.2d 1048 (N.D. Cal. 2002) for the proposition that the Inventions Agreement did not

25  create a fiduciary duty is misplaced. In that case, the confidentiality agreement signed by the parties specifically stated that it did not create any agency, partnership or joint venture

26  agreement.  Id. 1050.  Here, there is no similar statement disclaiming a fiduciary relationship in the Inventions Agreement. Instead, there is language overtly reposing trust

27  and confidence in a party, Bryant, who accepted that placement of trust. Moreover, City Solutions left open the possibility of finding a breach of fiduciary duty on the

28  confidentiality agreement at issue if that breach had been more tailored to subject matter of the agreement on which it was based, as is the case here.

JOINT OPPOSITION

EXHIBIT   11
PAGE   837

1  e.g., Firoozye v. Earthlink Network, 153 F.Supp.2d 1115, 1131 (N.D. Cal. 2001)

2  (UCL claim premised on misrepresentation and misappropriation of trade secrets not

3  preempted) (quoting Trandes Corp. v. Guy F. Atkinson Co., 996 F.2d 655, 660 (4th

4  Cir. 1993); Lattie v. Murdach, 1997 WL 33803 at *5 (no preemption of fraudulent

5  misrepresentation allegations in UCL claim); Vigilante.com, Inc. v. Argus

6  Test.com, Inc., 2005 WL 2218405, at * 13 n. 12 (D. Or. 2005) (no preemption of

7  unfair competition claim involving breach of confidentiality of information and use

8  of infringing materials to steal customers, distributors, and employees).

9      In Educational Testing Service v. Simon, 95 F.Supp.2d 108, 1091 (C.D. Cal.

10  1999), the court rejected an argument that the Copyright Act preempted a UCL

11  claim involving the defendants' use of reconstructed test questions created by ETS

12  to prepare future test-takers.   The court held that the conduct violated a separate

13  statute, Section 123 of the California Business and Professions Code, and thus,

14  involved an "extra element" that was qualitatively different from copyright. See id.

15  Notably, the court found no preemption despite plaintiff's coterminous copyright

16  infringement claims for unauthorized reproduction of the test questions. See id. at

17  1090. ETS thus establishes that UCL claims and copyright claims can coexist.[233]

18

19  ### Conclusion

20      For the foregoing reasons, the Court should deny defendants' motions for

21  partial summary judgment.

22

23

24

25

26

27

28

---

[233] Moreover, the legislative history of the Copyright Act evinces a clear intent to permit state law unfair competition claims provided, as here, they "'contain elements such as an invasion of personal rights or a breach of trust or confidentiality.'"  See id. at n.28 (quoting Warrington Associates, Inc. v. Real-Time Engineering Systems, Inc., 522 F. Supp. 367, 369 (N.D. Ill. 1981) (quoting H. Rep. No. 9401476, 94th Con., 2d Sess. 132 (1976), reprinted in 5 U.S. Code Cong. & Admin. News at 5659, 5746-5747 (1976)).

PAGE 838     EXHIBIT 11

1   DATED:  March 24, 2008          QUINN EMANUEL URQUHART OLIVER &
                                    HEDGES, LLP

2

3                                   By_____
                                       John B. Quinn
4                                      Attorneys for Mattel, Inc.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 77
PAGE 839

-80-

**EXHIBIT 78**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CARTER BRYANT, | **CASE NUMBER** |
| PLAINTIFF(S), | CV 04-09049 SGL (RNBx) |
| v. | |
| MATTEL, INC., et al., | **NOTICE OF CLERICAL ERROR** |
| DEFENDANT(S), | |

TO:   U. S. District Judge(s)
      U. S. Magistrate Judge(s)
      Counsel of Record

You are hereby notified that due to a clerical error ☐ documents associated with the filing of the new action ☐ the following scanned document ☑ docket entry   have/has been corrected as indicated below.

Title of Scanned Document:   Minute Order of 4-25-08, Granting in part, Denying in part, and Deferring in Part the Parties' MSJ

Filed Date: 4-25-08                                Document Number: 3285

☐   Incorrect case number _____ was assigned to this ☐ action ☐ document.

☐   Case number has been corrected. The correct case number is _____

☐   Incorrect judge's initials were indicated on this ☐ action ☐ document. The correct judge's initials are _____

☐   Incorrect magistrate judge's initials were indicated on this ☐ action ☐ document. The correct magistrate judge's initials
      are _____.

☐   Case has been reassigned from ☐ Judge ☐ Magistrate Judge _____ to

      ☐ Judge ☐ Magistrate Judge _____. The initials of the new judge(s) are _____

☐   Case was assigned to ☐ Western ☐ Southern ☐ Eastern division. Pursuant to General Order ☐ 349, ☐ 98-3 ☐ 02-06,

      the case has been reassigned to the ☐ Western ☐ Southern ☐ Eastern division. The former case number _____
      has been reassigned to new case number _____

☐   Subsequent documents must be filed at the ☐ Western ☐ Southern ☐ Eastern division. Failure to file at the proper location
      will result in your documents being returned to you.

☐   Case title is corrected from _____ to _____

☐   Document has been re-numbered as document number _____

☐   Incorrect ☐ Filed Date ☐ Date of Document ☐ ENTERED Date ☐ DATE ENTERED ON CM/ICMS was stamped on
      document. The correct date is _____

☑   Document is missing page number(s):  7 and 8 _____

☐   To ensure proper routing of documents, all documents filed with the court must reflect the following case number and judge's
      initials: _____

☑   Other: a complete copy with missing pages are re-scanned for service on the parties.

CLERK, U.S. DISTRICT COURT

Date 4-25-08                                By: _____ Jim Holmes, CRD
                                                      Deputy Clerk

*cc: Intake Supervisor / Deputy In Charge*

PAGE ___ EXHIBIT ___ 840 18

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.      CV 04-09049 SGL(RNBx)                          Date:  April 25, 2008
Title:        CARTER BRYANT -v- MATTEL, INC.

Consolidated With Related Actions:
CASE NO. CV 04-09059 SGL(RNBx):  MATTEL, INC.,  v. CARTER BRYANT,
CASE NO. CV 05-02727 SGL (RNBx): MGA ENTERTAINMENT, INC., v. MATTEL, INC.,
========================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

          Jim Holmes
          Courtroom Deputy Clerk

ATTORNEYS PRESENT FOR CARTER BRYANT:      ATTORNEYS PRESENT FOR MATTEL:

None Present                               None Present

ATTORNEYS PRESENT FOR MGA AND
ISAAC LARIAN:

None Present

PROCEEDINGS:      ORDER GRANTING IN PART, DENYING IN PART, AND DEFERRING IN
                  PART THE PARTIES' MOTIONS FOR PARTIAL SUMMARY JUDGMENT
                  (IN CHAMBERS)

          This matter is before the Court on the parties' motions for partial summary judgment.  The
motions were heard on April 22, 2008, and the Court has set the motions for further hearing on
May 19, 2008, at 1:30 p.m.  As set forth below, the Court rules on a number of issues presented
by the motions for partial summary judgment and reserves ruling on other issues until after further
hearing on the motions for partial summary judgment and, in the case of MGA's affirmative
defenses, until after the Phase 1 trial.

          The parties have made hundreds of objections to evidence offered in support of and in
opposition to the motions for partial summary judgment.  Although counsel for Bryant requested

MINUTES FORM 90                                                    Initials of Deputy Clerk: jh
CIVIL -- GEN                        Page 1

EXHIBIT 78
PAGE 841

explicit rulings on the objections raised by Bryant, the Court declines to do so.  To the extent that this Order necessarily relies on evidence subject to any party's objections, the objections are implicitly overruled.

## PREEMPTION

MGA and Bryant seek summary judgment in their favor as to Mattel's claims for intentional interference with contractual relations, conversion, and unfair competition, arguing that these claims are preempted by the Copyright Act.  They are partially correct.

A state law is preempted by the Copyright Act where (1) the work at issue comes within the subject matter of copyright, and (2) the state law rights are "equivalent to rights within the general scope of copyright[.]"  Del Madera Properties v. Rhodes and Gardner, Inc., 820 F.2d 973, 977 (9th Cir.1987).  "If a state law claim includes an 'extra element' that makes the right asserted qualitatively different from those protected under the Copyright Act, the state law claim is not preempted by the Copyright Act."  Altera Corp. v. Clear Logic, Inc.,  424 F.3d 1079, 1089 (9th Cir. 2005).  Generally the Copyright Act does not preempt the enforcement of contractual rights.  Id.

As to the first element, the intentional interference with contractual relations claim addresses generally an issue within the subject matter of copyright -- the underlying wrong upon which the claim is premised is Mattel's deprivation of rights to intellectual property.

As to the second element, it is clear that the tort of intentional interference with contractual relations is neither categorically preempted or categorically saved from preemption; rather, the Court must engage in a determination of whether the substance of the tort claim differs qualitatively from the copyright claim at issue.  Compare Altera, 424 F.3d at 1089 (holding that a intentional interference claim was not preempted because it was based not on copyrights but on a contractual provision) with Laws v. Sony Music Entertainment, Inc., 448 F.3d 1134, 1144 (9th Cir. 2006) (holding preempted a singer's voice misappropriation claim was not qualitatively different from her copyright claim).

Here, to the extent that the tortious interference is premised upon MGA's alleged interference with any copyrights that Mattel may have under the Inventions Agreement, it is preempted.  Such a claim is not qualitatively different from Mattel's copyright claim.  However, to the extent that the claim is based on MGA's acts that may be found to have aided and abetted the breach or induced the breach of Bryant's fiduciary duty, the claim is not preempted.  That claim is qualitatively different from Mattel's copyright claim.

Therefore, the tortious interference with contractual relations is preempted to the extent that it is based on Mattel's rights to Bratz.  It is not preempted as to Mattel's claims for breach of fiduciary duty.

The parties' arguments regarding the conversion claim address two distinct issues: Conversion of ideas and conversion of tangible things.  The Court addresses each in turn.

MINUTES FORM 90
CIVIL -- GEN                                    Page 2                          Initials of Deputy Clerk: jh

EXHIBIT    78

PAGE    842

Both sides acknowledge, as this Court certainly agrees, that one cannot copyright an idea. Thus, it would seem, a claim for conversion of ideas is not subject to preemption because it is not "within the subject matter of copyright." Del Madera, 820 F.2d at 977. MGA argues that ideas are not subject to a claim of conversion, to which Mattel responds that such rights in ideas may be created by contract. Mattel relies on Desny v. Wilder, 46 Cal.2d 715, 733 (1956) which, remarkably, so holds. However, that case does not support the proposition that a breach of such rights may be remedied by the tort claim of conversion rather than a breach of contract claim. The law in California regarding the tort of conversion's applicability to ideas remains the same today as in 1956: "The tort of conversion does not apply to ideas." Melchior v. New Line Productions, Inc., 106 Cal.App.4th 779 (2003). Therefore, although this claim is not preempted, it is not actionable as a tort claim. Accordingly, summary judgment in favor of MGA and Bryant is granted as to this particular claim.

Mattel also argues that its conversion claim is not preempted to the extent that it seeks the return of tangible things, most notably the original Bratz drawings. This claim is "within the subject matter of copyright," but the state rights go beyond the rights protected by the Copyright Act by allowing for the return of property.

At oral argument, counsel for MGA argued that Mattel seeks the rights that the drawings represent, not the "paper and ink" of which those drawings are comprised. Mattel disagreed with that interpretation, noting that it seeks the return of the original drawings and certain sculpts to which it may have rights under the Inventions Agreement.

The items to which Mattel lays claim are not like the manuscript at issue in Dielsi v. Falk, 916 F.Supp. 985, 992 (C.D. Cal. 1996), or the government documents at issue in Idema v. Dreamworks, Inc., 162 F.Supp.2d 1129, 1192-93 (C.D. Cal. 2001), both of which had value merely for their ability to hold and convey their contents. Rather, the materials Mattel seeks are works of art that may have value apart from the copyrights they represent or the "paper and ink" and other materials of which they are comprised. Given the role of the drawings and sculpts in developing a new, commercially successful line of fashion dolls, and given the role of these items in the present litigation, the Court discerns a possible inherent value to the materials themselves.

MGA and Bryant also pressed at oral argument that Mattel had not advanced such a claim for return of tangible items. The Court disagrees. Citing to its Complaint at ¶ 157, Mattel contends it has long sought the return of tangible items.[1] An examination of Mattel's claim for conversion reveals that it encompasses such a claim. Therefore, the conversion claim seeking the return of tangible items is not preempted. MGA and Bryant's motions for summary judgment on this issue are therefore denied.

To the extent that Mattel's statutory unfair competition claim, discussed more fully below, is

---

[1] From a review of the record, it is clear to the Court that Mattel intended to cite ¶ 157 of its Amended Answer and Counterclaims, not its Complaint.

EXHIBIT __78__

PAGE __843__

Case 2:04-cv-09049-DOC-RNB   Document 4061-9   Filed 07/01/08   Page 30 of 123   Page ID
#:99362
Case 2:04-cv-09049-SGL-RNB   Document 3286   Filed 04/25/2008   Page 5 of 11

based on copyright infringement, it is preempted, and the Court grants summary judgment in favor
of MGA on this issue.

## STATUTE OF LIMITATIONS

The Court heard argument at length on the statute of limitations issue.  Although it is not
entirely clear, it appears to the Court from the hearing and from MGA's Rule 56(f) affidavit, that
there remain outstanding discovery matters that may have the potential, if resolved in MGA's
favor, to factor into the inquiry into the determination of the date of the accrual of any claims
against Bryant and/or MGA.  Accordingly, the Court defers ruling on the issue of statute of
limitations at this time.

## INVENTIONS AGREEMENT

The Court addressed many issues of the enforceability of the Employee Confidentiality and
Inventions Agreement in its July 17, 2006, Order.  The Court finds no good reason to revisit or
revise that Order.

Bryant argues that the Inventions Agreement is ambiguous on the issue of whether it
covered anything other than "inventions" as that term is used in patent law.  Here, Bryant was a
fashion designer.  He signed an agreement that assigned his "inventions" to Mattel.  "Inventions"
is defined by the agreement to include "designs," which was undeniably the focus of Bryant's
employment with Mattel.  In addition to assigning all rights to Bryant's "inventions" (i.e., "designs")
to Mattel, the agreement also assigned to Mattel "all [Bryant's] right, title, and interest in any . . .
copyrights . . . and copyright applications based [on those inventions]".

In order to conclude that the Inventions Agreement is ambiguous on the issue of whether it
would include any copyrightable drawings or doll designs developed by an employee, the Court
would have to read out of the agreement explicit terms assigning to the employer the rights to
"designs," "copyrights," and "copyright applications."  The Court is required to read the contract as
a whole and, where possible, give effect to all its terms.  Cal. Civ. Code § 1641 ("The whole of a
contract is to be taken together, so as to give effect to every part, if reasonably practicable, each
clause helping to interpret the other.").  To accept the interpretation advanced by Bryant, the Court
would have to disregard this bedrock principle of contract construction by ignoring an explicit
assignment by the employee to the employer of copyrights.  The interpretation advanced by
Bryant is therefore not reasonable, and the Court finds that the Inventions Agreement is not
ambiguous on the issue of its scope with respect to copyrightable materials.

The Inventions Agreement explicitly conveys to Mattel an employee's interest in any
copyrights or copyright applications.  Assuming copyrightability and the resolution of certain (as
yet unresolved) issues of timing of creation and/or alteration in Mattel's favor, the original Bratz
drawings clearly fall within the scope of the Inventions Agreement.

Moreover, the Inventions Agreement incorporates, and therefore does not violate, Cal.

EXHIBIT    78

PAGE    844

Labor Code § 2870. Pursuant to that statute (and its incorporation in the Inventions Agreement), because the subject matter at issue -- the Bratz dolls -- relate to Mattel's business of marketing fashion dolls, the factual question of whether Bryant worked on them on his own time, rather during his working hours at Mattel, is not relevant.

MGA argues that contracts of adhesion are unenforceable if they are either outside the scope of the parties' expectations or they are substantively unconscionable. The Court previously determined that the Inventions Agreement was not substantively unconscionable, and now determines that it is not outside the scope of the parties' expectations. As noted above, Bryant was a designer, and the plain language of the Inventions Agreement assigns his "designs" to his employer. Objectively, therefore, it would not be surprising that Mattel would lay claim to Bryant's rights to any doll or doll fashions he designed during the period of his employment with Mattel. Moreover, undisputed evidence establishes that Bryant's subjective understanding of the contract was that it transferred at least some of his rights to Mattel.

Bryant also argues that his actions went no further than lawful preparations to compete with his employer. The undisputed facts, however, tell a different story: Bryant directly competed with Mattel by entering into a contract with its competitor to produce a competing product while still employed by Mattel.

The Court grants summary judgment in favor of Mattel on the issue of the enforceability of the Inventions Agreement and the issue of applicability of the Inventions Agreement to any Bratz-related "inventions" (including any designs, improvements, ideas, concepts, and copyrightable subject matter) that he is found to have created during the period of his employment with Mattel.

## DUTY OF LOYALTY AND FIDUCIARY DUTY

Carter Bryant, like all other California employees, owed a duty of loyalty to Mattel while employed there. See Cal. Labor Code § 2863. The undisputed facts establish that he breached this duty by entering into a contract with Mattel's competitor, while still employed by Mattel, to produce a line of fashion dolls to be marketed in direct competition with Mattel's products. See Huong Que, Inc. v. Luu, 150 Cal.App.4th 400, 414 (2007) ("The duty of loyalty is breached, and the breach may give rise to a cause of action in the employer, when the employee takes action which is inimical to the best interests of the employer.") (internal quotation marks and citation omitted).

Bryant also owed a fiduciary duty to Mattel by virtue of the language set forth in ¶ 1(a) of the Inventions Agreement. Id. ("The value of the Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust."). Under California law, a confidential relationship that gives rise to a fiduciary duty is created "where a confidence is reposed by one person in the integrity of another, and . . . the party in whom the confidence is reposed . . . voluntarily accepts or assumes to accept the confidence . . . ." City Solutions, Inc. v. Clear Channel Communications, Inc., 201 F.Supp.2d 1048, 1050-51 (N.D. Cal. 2002). The Inventions Agreement imposed such a duty on Bryant.

EXHIBIT ___78___

PAGE ___045___

At the hearing on this matter, counsel contended that a required element for imposing a fiduciary duty -- that the party with the duty be in a superior position to the party to whom the duty is owed -- was missing. That element is described as follows: "[T]he essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party." City Solutions, Inc. v. Clear Channel Communications, Inc., 201 F.Supp.2d 1048, 1050 (N.D. Cal. 2002) (internal quotation marks and citation omitted). The "superior position" to which California courts refer in this context is not superior bargaining power -- a position on which Mattel would apparently have the edge -- but rather it refers to a superior position vis-à-vis the duty imposed. Here, because the duty imposed upon Bryant was essentially to police his own actions by maintaining Mattel's confidentiality and communicating his own "inventions" to Mattel, Bryant was "in a superior position to exert unique influence over" Mattel because he was in the best position, arguably the only one in a position, to know of and police his actions.

As with the duty of loyalty, the undisputed facts establish that Bryant breached his fiduciary duty to communicate his inventions to Mattel when, rather than doing so, he secretly entered into a contract with Mattel's competitor, while still employed by Mattel, to produce a line of fashion dolls to be marketed in direct competition with Mattel's products.

Accordingly, the Court grants Mattel's motion for summary judgment on the issues of the existence and breach of the duty of loyalty. The Court grants Mattel's motion for summary judgment and denies Bryant's motion for summary judgment on the issue of the existence and breach of a fiduciary duty.

In its motion, MGA argued that there can be no liability for aiding and abetting a breach of fiduciary duty in the absence of a fiduciary duty. Because the Court has rejected this argument, the Court denies MGA's motion for summary judgment on this issue.

### INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

MGA moved for summary judgment as to Mattel's claim for intentional interference with contractual relations.

The elements of a claim for intentional interference with contractual relations are stated as (1) a valid contract between a plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. Family Home & Finance Center, Inc. v. Federal Home Loan Mortg. Corp., 461 F.Supp.2d 1188, 1193 (C.D. Cal. 2006) (citing Pac. Gas & Elec. Co. v. Bear Stearns Co., 50 Cal.3d 1118, 1126 (1990)).

The undisputed facts show that the first, third, and fifth elements are met. Mattel has raised a triable issue of fact as to the second. The fourth element may be resolved after the

EXHIBIT _____78_____

PAGE _____846_____

Case 2:04-cv-09049-DOC-RNB   Document 4061-9   Filed 07/01/08   Page 33 of 123   Page ID
#:99365
Case 2:04-cv-09049-SGE-RNB   Document 3286   Filed 04/25/2008   Page 8 of 11

Court's further hearing on the motions for partial summary judgment. The Court therefore defers ruling on this issue.

## UNFAIR COMPETITION

MGA and Bryant's motions are granted in part and denied in part as to Mattel's unfair competition claims.

Mattel's statutory unfair competition claim, brought pursuant to Cal. Bus. & Profs. Code § 17200, survives summary judgment because Mattel has raised a triable issue of fact as to whether MGA tortiously interfered with Bryant and Mattel's contractual relationship and whether MGA engaged in commercial bribery.

However, two bases for this claim are foreclosed at this time. To the extent that the § 17200 claim is based on copyright infringement, it is preempted. To the extent that it is based on unfair conduct, summary judgment in favor of MGA is granted because the articulated unfair conduct does not approximate an antitrust violation that threatens competition. See Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal.4th 163, 186-87 (1999).

As to Mattel's common law unfair competition claim, summary judgment in favor of MGA and Bryant is granted. This claim is not, as it must be, based on the act of passing off another's goods as one's own. See Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1153 (9th Cir. 2008) (citing Bank of the W. v. Superior Court, 2 Cal.4th 1254 (1992)).

## UNJUST ENRICHMENT

Because Mattel failed to oppose this portion of Bryant's motion, the Court grants Bryant's motion for partial summary judgment on the issue of unjust enrichment.

## AFFIRMATIVE DEFENSES

Mattel seeks summary judgment as to many of the affirmative defenses asserted by the MGA entities and Carter Bryant. Most of these defenses are essentially equitable in nature, and therefore the Court **DEFERS RULING** on them until after trial. Specifically, the Court **DEFERS RULING** on the affirmative defenses of abandonment, acts and omissions of others, acquiescence, consent, estoppel, failure to mitigate, laches, unclean hands, and waiver until after trial.

For the reason set forth above in a separate section, the Court defers ruling on Mattel's motion as to the statute of limitations defense.

The final affirmative defense is based on 17 U.S.C. § 205(d). With this affirmative defense, MGA essentially contends that it is a bona fide purchaser for value of the Bratz copyrights which

EXHIBIT _____ 7B
PAGE _____ 847

Case 2:04-cv-09049-DOC-RNB   Document 4061-9   Filed 07/01/08   Page 34 of 123   Page ID
#:99366
Case 2:04-cv-09049-SGL-RNB      Document 3286      Filed 04/25/2008   Page 9 of 11

took the rights in good faith and without notice of any prior transfer of the rights therein to Mattel. As the issue is argued by the parties, the Court would be required to determine the legal issue of whether MGA's registration of the copyrights as an "assignment" constitutes "constructive notice" in the manner required to give MGA the protection of 17 U.S.C. § 205(d).  In the Court's view, this is a complex legal issue that is not thoroughly addressed by the parties' briefs.  Moreover, the Court notes that a trial on the merits is likely to resolve the less complex factual issue of whether MGA acted in good faith and without notice of an earlier assignment of rights.  Accordingly, the Court **DEFERS RULING** on this issue until after the Phase 1 trial.

* * * *

The Court will consider a number of remaining issues at the further hearing on these motions, set for May 19, 2008.  Specifically, referencing the parties' Notices of Motion, the Court will consider the following issues:

Mattel's motion:  Issue (2)(c), whether there is a factual dispute regarding the timing of certain drawings and a dummy model; issue (3), whether the first-generation Bratz dolls are substantially similar to seventeen drawings and a doll sculpt drawing or blueprint created by Bryant and whether those are original, protectable works of expression; issue (5), whether MGA and Larian are liable for aiding and abetting Bryant's breaches of the duty of loyalty and fiduciary duty; and issue (6)(a) whether Mattel is entitled to summary judgment as to the affirmative defense of statute of limitations.

Bryant's motion:  Whether Bryant is entitled to summary judgment as to Mattel's claim for copyright infringement; whether Bryant is entitled to summary judgment as to Mattel's breach of contract claim; and whether Bryant is entitled to summary judgment on any portion of his claim for declaratory relief.

MGA's motion:  Whether Mattel's claims are time barred; and whether the fourth element of intentional interference with contractual relations -- actual breach or disruption of the contractual relationship -- can be resolved on summary judgment.

Except for any updates from any party regarding the outstanding discovery matters that may be relevant to the statute of limitations, these issues are considered by the Court to be fully briefed.  Any supplemental briefs by the parties on any issue other than the statute of limitations will be stricken by the Court.  Any supplemental filings regarding the statute of limitations issue shall be limited to addressing the status of outstanding discovery issues and/or recently produced evidence.

**IT IS SO ORDERED.**

EXHIBIT _7B_

PAGE _B48_

Case 2:04-cv-09049-DOC-RNB    Document 4061-9    Filed 07/01/08    Page 35 of 123    Page ID
#:99367
Case 2:04-cv-09049-SGL-RNB    Document 3286    Filed 04/25/2008    Page 10 of 11

# NOTICE PARTY SERVICE LIST

**Case No.**  CV 04-09049 SGL(RNBx)     **Case Title** Carter Bryant v. Mattel, Inc.

**Title of Document**  Minute Order of April 25, 2008

| | |
|---|---|
| | Atty Sttlmnt Officer Panel Coordinator |
| | BAP (Bankruptcy Appellate Panel) |
| | Beck, Michael J (Clerk, MDL Panel) |
| | BOP (Bureau of Prisons) |
| | CA St Pub Defender (Calif. State PD) |
| | CAAG (California Attorney General's Office - Keith H. Borjon, L.A. Death Penalty Coordinator) |
| | Case Asgmt Admin (Case Assignment Administrator) |
| | Catterson, Cathy (9th Circuit Court of Appeal) |
| | Chief Deputy Admin |
| | Chief Deputy Ops |
| | Clerk of Court |
| | Death Penalty H/C (Law Clerks) |
| | Dep In Chg E Div |
| | Dep In Chg So  Div |
| | Federal Public Defender |
| | Fiscal Section |
| | Intake Section, Criminal LA |
| | Intake Section, Criminal SA |
| | Intake Supervisor, Civil |
| | PIA Clerk - Los Angeles (PIALA) |
| | PIA Clerk - Riverside (PIAED) |
| | PIA Clerk - Santa Ana (PIASA) |
| | PSA - Los Angeles (PSALA) |
| | PSA - Riverside (PSAED) |
| | PSA - Santa Ana (PSASA) |
| | Schnack, Randall (CJA Supervising Attorney) |
| | Statistics Clerk |

| | |
|---|---|
| | US Attorneys Office - Civil Division -L.A. |
| | US Attorneys Office - Civil Division - S.A. |
| | US Attorneys Office - Criminal Division -L.A. |
| | US Attorneys Office - Criminal Division -S.A. |
| | US Bankruptcy Court |
| | US Marshal Service - Los Angeles (USMLA) |
| | US Marshal Service -  Riverside (USMED) |
| | US Marshal Service -Santa Ana (USMSA) |
| | US Probation Office (USPO) |
| | US Trustee's Office |
| | Warden, San Quentin State Prison, CA |

| ✓ | ADD NEW NOTICE PARTY (if sending by fax, mailing address must also be provided) |
|---|---|
| Name: Ambassador Pierre-Richard Prosper | |
| Firm: | |
| Address (include suite or floor): P.O. Box 581103 | |
| Salt Lake City, UT   84158 | |
| *E-mail: Prosper.Pierre@Arentfox.com | |
| *Fax No.: | |

\* For CIVIL cases only

| JUDGE / MAGISTRATE JUDGE (list below): |
|---|
| |
| |
| |

**Initials of Deputy Clerk** jh

EXHIBIT _____ 78

PAGE _____ 849

# NOTICE PARTY SERVICE LIST

**Case No.**  CV 04-09049 SGL(RNBx)    **Case Title**  Carter Bryant v. Mattel, Inc.

**Title of Document**  Minute Order of April 25, 2008

| | |
|---|---|
| | Atty Sttlmnt Officer Panel Coordinator |
| | BAP (Bankruptcy Appellate Panel) |
| | Beck, Michael J (Clerk, MDL Panel) |
| | BOP (Bureau of Prisons) |
| | CA St Pub Defender (Calif. State PD) |
| | CAAG (California Attorney General's Office - Keith H. Borjon, L.A. Death Penalty Coordinator) |
| | Case Asgmt Admin (Case Assignment Administrator) |
| | Catterson, Cathy (9th Circuit Court of Appeal) |
| | Chief Deputy Admin |
| | Chief Deputy Ops |
| | Clerk of Court |
| | Death Penalty H/C (Law Clerks) |
| | Dep In Chg E Div |
| | Dep In Chg So Div |
| | Federal Public Defender |
| | Fiscal Section |
| | Intake Section, Criminal LA |
| | Intake Section, Criminal SA |
| | Intake Supervisor, Civil |
| | PIA Clerk - Los Angeles (PIALA) |
| | PIA Clerk - Riverside (PIAED) |
| | PIA Clerk - Santa Ana (PIASA) |
| | PSA - Los Angeles (PSALA) |
| | PSA - Riverside (PSAED) |
| | PSA - Santa Ana (PSASA) |
| | Schnack, Randall (CJA Supervising Attorney) |
| | Statistics Clerk |

| | |
|---|---|
| | US Attorneys Office - Civil Division -L.A. |
| | US Attorneys Office - Civil Division - S.A. |
| | US Attorneys Office - Criminal Division -L.A. |
| | US Attorneys Office - Criminal Division -S.A. |
| | US Bankruptcy Court |
| | US Marshal Service - Los Angeles (USMLA) |
| | US Marshal Service - Riverside (USMED) |
| | US Marshal Service -Santa Ana (USMSA) |
| | US Probation Office (USPO) |
| | US Trustee's Office |
| | Warden, San Quentin State Prison, CA |

✓ **ADD NEW NOTICE PARTY**
**(if sending by fax, mailing address must also be provided)**

Name: Hon. Edward A. Infante (Ret.)

Firm:

Address (*include suite or floor*):  Two Embarcadero
Center, Suite 1500, San Francisco, CA  94111

*E-mail:

*Fax No.:

* For CIVIL cases only

**JUDGE / MAGISTRATE JUDGE (list below):**

**Initials of Deputy Clerk** jh

EXHIBIT  78

PAGE  850

**EXHIBIT 79**



1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
    John B. Quinn (Bar No. 090378)
2    johnquinn@quinnemanuel.com
    Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
    Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
    865 South Figueroa Street, 10th Floor
5  Los Angeles, California 90017-2543
    Telephone: (213) 443-3000
6  Facsimile:  (213) 443-3100

7  Attorneys for Mattel, Inc.

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                  EASTERN DIVISION

11  CARTER BRYANT, an individual,     CASE NO. CV 04-9049 SGL (RNBx)
                                      Consolidated with
12              Plaintiff,            Case No. CV 04-09059
                                      Case No. CV 05-02727
13        vs.

14  MATTEL, INC., a Delaware          EXPERT REPORT OF RALPH OMAN
    corporation,
15                                    **Phase 1**
              Defendant.              Discovery Cut-Off:     January 28, 2008
16                                    Pre-Trial Conference:  May 5, 2008
    _____        Trial Date:            May 27, 2008
17  AND CONSOLIDATED ACTIONS

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT ___

PAGE ___

                                      EXPERT REPORT RALPH OMAN

# EXPERT REPORT OF RALPH OMAN

I have been retained by attorneys for Mattel, Inc. ("Mattel"). This report is submitted pursuant to Fed. R. Civ. P. 26 (a)(2). I reserve the right to supplement or amend this report pursuant to Fed. R. Civ. P. 26 (e) if additional information affecting my opinion becomes available.

## QUALIFICATIONS

Currently I am Practitioner-in-Residence at the George Washington University Law School in Washington, D.C. I have 32 years experience in domestic and international copyright administration. My qualifications, which are set forth in my *curriculum vitae* attached as Exhibit A, include my education, training, and experience in the area of U.S. Copyright Office practice and procedure.

From 1985 through 1993, I served as the Register of Copyrights of the United States. As the Register of Copyrights, I was the chief government official responsible for administering the U.S. copyright system. Among other responsibilities, the Register of Copyrights supervises the work of the corps of examiners and rules on the copyrightability of works. I am familiar with the U.S. copyright law and U.S. Copyright Office rules, regulations, practices, and procedures, including those that relate to the registration of pictorial, graphic, and sculptural works. During my tenure, I supervised the revision of the *Compendium of Copyright Office Practices*, which is a manual of practices and procedures that is primarily intended for the use of the Copyright Office's staff. I supervised the 1990 revision of Circular 40, which is an official publication that summarizes the registration and deposit procedures for works of the visual arts, including drawings, prints, sculptural works, and dolls and other 3-dimensional works based on 2-dimensional designs. This publication is intended for use by the general public.

As the Register of Copyrights, I acted as principal advisor to the U.S. Congress on copyright legislation, and served as principal advisor to the U.S.

EXPERT REPORT RALPH OMAN

EXHIBIT 79
PAGE 892

Department of State on international copyright matters, including drafting, negotiating and implementing international copyright treaties. During my tenure as Register, I testified more than 40 times before Congress on proposed copyright legislation, and I helped move the United States into the Berne Convention for the Protection of Literary and Artistic Works.

Before becoming Register, I served in other government positions, including Chief Counsel of the U.S. Senate Subcommittee on Patents, Copyrights, and Trademarks, and Chief Counsel of the Senate Subcommittee on Criminal Law. I also served as Chief Minority Counsel on the Senate Subcommittee on Patents, Trademarks and Copyrights from 1975 to 1977. In that capacity, I participated in the final drafting and negotiations that led to passage of the landmark U.S. Copyright Revision Act of 1976, the current statute.

I am a graduate of Hamilton College (A.B., 1962) and Georgetown University Law Center (J.D., 1973). I am a member of the bar for the District of Columbia. I am a Past President of the Giles S. Rich American Inn of Court (which is the intellectual property Inn for Washington, D.C.), a former Trustee of the Copyright Society of the United States of America, and the American Bar Association's Liaison to the Committee on Copyright at the World Intellectual Property Organization in Geneva. In 2002, I received the Jefferson Medal from the New Jersey Intellectual Property Law Association, in recognition of my life-long commitment to the protection of intellectual property.

EXPERT REPORT RALPH OMAN

EXHIBIT 79

PAGE 863

At the George Washington University Law School I teach U.S. copyright law, including Copyright Office registration procedures and the registration of works of the Visual Arts. I have written numerous articles and delivered many speeches addressing copyright and related rights, and I have testified as an expert in the area of copyright law in a number of judicial proceedings. A list of the articles and major policy speeches I have authored in the past ten years on subjects relating to copyright law is attached as Exhibit B. My prior testimony is listed in the attached Exhibit C. I am also the author of a book entitled <u>Copyright: Engine of Development</u>, published by UNESCO. In 1993, I received the International Book Award from the International Publishers Association.

## COMPENSATION

My work on this case is being billed at my standard rate of $350 per hour. My payment is not contingent upon the outcome of the case.

## MATERIALS REVIEWED

In the preparation of this report and for the expert testimony that I may be called upon to provide, I reviewed the Plaintiff's Complaint in case number CV05-02727 and the Defendant's Second Amended Answer and Counterclaims in case number 05-2727, along with the exhibits thereto. I reviewed the copyright registration certificates and the supplementary registrations for the works involved in this litigation, along with the deposit material, and I reviewed the affidavit of Isaac Larian in a 2002 Hong Kong case, <u>ABC International Traders, Inc. doing</u>

EXHIBIT 7a
PAGE 894

EXPERT REPORT RALPH OMAN

business as MGA Entertainment v. Toys & Trends (Hong Kong) Limited. And I also reviewed both volumes of the deposition of Bryan Armstrong in this case, the deposition of Samir Kumar Khare, the six (6) Affidavits of Daphne Gronich, Esquire, General Counsel of MGA, the three (3) affirmations of Lee Shiu Cheung, Managing Director of MGA Hong Kong, the Affirmation of Wai Lim Fan, MGA's Hong Kong Solicitor, and a portion of MGA's Response to Mattel's Amended Supplemental Interrogatory Regarding Defendant's Affirmative Defenses. Finally, I have examined certain Bratz dolls.

## EXPERT OPINION

A.    Summary

Based on my experience as the Register of Copyrights, I would like to explain the nature of the registration system in the U.S. Copyright Office and the significance of registration certificates. In the context of that discussion, I will also offer comments on the significance of supplementary registrations that seek to correct or amplify the facts that were stated in the original applications. And, last, I will comment on the registration of a two-dimensional artwork and its relationship to a three-dimensional work that derives from it, and the nature of the copyright deposit that is required by Copyright Office regulations when filing the original registration application.

At the outset, it is important to keep in mind that the copyright system is very different than the patent system. For patents, the U.S. Patent and Trademark

EXPERT REPORT RALPH OMAN

EXHIBIT 74

PAGE 855

1  Office actually grants patents.  Either the Office issues the patent, or it doesn't.  If it
2  doesn't grant the patent, you don't have one.  For copyrights, the Copyright Office
3
4  registers a "claim" to copyright.  It doesn't grant the copyright.  Only a court can
5  deem a copyright enforceable.

6      **B.**    **The Practices and Procedures of the U.S. Copyright Office**
7             **Regarding the Registration of Pictorial, Graphic, and Sculptural**
8             **Works**
9             The Copyright Act defines "pictorial, graphic and sculptural works" as
10
11  "two-dimensional and three-dimensional works of fine, graphic, and applied art…."
12  17 U.S.C. § 101.  In order to register a two- or three-dimensional work, the owner of
13  that work must comply with the practices and procedures described in the Copyright
14
15  Act, the Code of Federal Regulations, and Circulars 40 and 40A (*Copyright*
16  *Registration for Works of the Visual Arts, Deposit Requirements in Visual Arts*
17  *Material*).  I will explain these practices and procedures from my vantage point as
18
19  the former U.S. Register of Copyrights.

20      **1.**    **Application Requirements.**
21             In order to register a claim to copyright in a work with the Copyright
22  Office, the applicant must complete the relevant application form, which varies
23
24  depending upon the nature of the work.  In the case of a drawing or doll, the
25  applicant typically uses uses "Form VA," which stands for "visual arts."
26
27
28

PAGE ___ 856

EXHIBIT ___ 7a

EXPERT REPORT RALPH OMAN

(a)    **Title of the Work.**

In order to complete Form VA, the applicant should identify the title of the work on line 1 of the application.

(b)    **Nature of the Work.**

The applicant should also identify the nature of the work on line 1 of the application. The nature of work space was added to form VA, because this form "cover[s] a number of different categories of works, and it was believed the additional information would clarify the general character or the type or category of the work being registered." Copyright Office, *Registration of Claims to Copyright*, 65 Fed. Reg. 41,508 (Jul 5, 2000). Although the "nature of authorship" statement on line 2 is the "primary source" for identifying the nature of the applicant's claim (as modified by the "derivative works" statements on lines 6(a) and 6(b) (if any)), the nature of work statement usually provides "a supplementary description augmenting the statement of authorship." *See id.* For instance, if the applicant submitted a photograph of an empty room, checked the "2 Dimensional Artwork" box on line 2, and wrote "wallpaper" in the nature of work space, the examiner would assume that the applicant intended to register the wallpaper design that is shown in the photograph, rather than the photograph itself. Together, these statements put the world on notice concerning the nature of the work that the applicant has created, and the nature of the authorship that appears in that work. However, they do not define the specific metes and bounds of the copyright in that

EXPERT REPORT RALPH OMAN

work. The metes and bounds of the copyright are defined by the deposited work itself, and by judicial interpretation.

### (c)   Name of the Author.

The applicant must provide the name of the person who created the work on line 2.

### (d)   Nature of Authorship.

The applicant must describe the Nature of Authorship on line 2. The applicant does not have to describe the nature of his or her authorship in any detail. The applicant is only required to check the boxes that are printed on line 2 that correspond to the type of authorship that the author has created (e.g., "2 Dimensional Artwork" for a fabric design, "3 Dimensional Sculpture" for a garden gnome, "Jewelry Design" for a bracelet, etc.).

### (e)   Date of Publication.

Next, the applicant must identify the year in which the work was created (line 3(a)), and the specific date and nation where the work was first published (line 3(b)). If the work has never been published, the applicant should leave line 3(b) blank. "Publication" has a very specific meaning. It is "...the distribution of copies...of a work to the public by sale or other transfer of ownership.... The offering to distribute copies...to a group of persons for purposes of further distribution...constitutes publication." 17 U.S.C. Section 101.

EXPERT REPORT RALPH OMAN

EXHIBIT A
PAGE 858

**(f)** **Copyright Ownership.**

The applicant must provide the name and address of the copyright claimant on line 4. The copyright claimant is the person who owns the copyright in the work that the applicant has sought to register. In most cases, the author and the copyright claimant will be the same person. However, if they are different, the applicant must explain how the copyright claimant obtained his or her ownership of the copyright on line 4. The Copyright Office will normally accept a general "transfer of ownership" statement, such as "by assignment," "by will," "by contract," and the like.

**(g)** **Previous Registrations.**

If the work or a prior version of that work were previously registered with the Copyright Office, the applicant should disclose that information on line 5 of the application form. If so, the applicant must provide the previous registration number, and must explain why he or she seeks another registration.

**(h)** **Derivative Works.**

If the work is based upon or contains a substantial amount of, for example, previously registered or public domain material, the applicant should identify that preexisting work or material on line 6(a) of the application. This is known as a "derivative work statement." In addition, the applicant should identify the new and original material that the author has added to that preexisting material by describing that new material on line 6(b) of the application. This is known as the

EXPERT REPORT RALPH OMAN

PAGE    EXHIBIT

"material added" statement. The material added statement "generally delineates the extent of the claim" in the new material that the author has created above and beyond the preexisting material that the applicant has identified on line 6(a).

*Compendium II* § 325.02.

The applicant does not have to describe each aspect of the preexisting material that appears in the work, or each aspect of the new material that he or she has created. Instead, the applicant may provide a brief, general statement sufficient to identify the preexisting material, such as "previous version," and, if necessary, a brief, general statement sufficient to identify the new material that the author has added to the work, such as "revised version," "artistic revisions," "additional material," or the like. In this respect, as mentioned above, the examination process at the U.S. Copyright Office is more informal than the examinations that are conducted at the U.S. Patent and Trademark Office. When an applicant files a patent application, the applicant must submit a list of "claims" describing each aspect of the invention in great detail. If, after review, the examiner determines that the applicant's invention is truly new and non-obvious, the Patent and Trademark Office will issue a patent for the invention. By contrast, Copyright Office examiners are not expected to make, and do not make, these types of evaluations. The examiner will accept a general statement concerning the preexisting material that may appear in the work, and a general statement concerning the new material that has been added to that work. As a general rule, the examiner will not compare

EXHIBIT
PAGE

860

EXPERT REPORT RALPH OMAN

1   the new work that has been submitted with works that have been registered in the

2   past to determine if these statements are correct, or to determine if the new material

3
4   qualifies quantitatively and qualitatively for copyright registration.[1]

5       Let me expand a bit on this point, because it is very important in the

6
7   context of this case. This difference between the patent examination system and the

8   copyright examination system has an important consequence. For a patent, the

9   inventor must fully disclose all of the technical particulars of the invention so that

10  others can understand the invention completely, reproduce it, refine it, build on it,

11
12  invent around it. That full disclosure is a vital part of the patent bargain. In

13  exchange of that disclosure the inventor gets 20 years of exclusivity to exploit the

14  invention.

15
16      For a copyright, on the other hand, the registration serves a vastly

17  different purpose. The creator is frequently permitted to deposit a photograph of a

18  3-dimensional work or a drawing of the work, because the purpose of the deposit is

19
20  not to enable the reconstruction of the work at a later date, but for three other

21  purposes: (1) to enrich the collections of the Library of Congress, (2) to let the

22

23  _____
    [1]   When I served as Register of Copyrights, the Turner Broadcasting Company
24  sought to register colorized versions of black and white films that were either in the
    public domain or owned by TBS. I insisted that TBS submit a pristine copy of the
25  black and white version of each film so that the examiner could determine if the
    colorization process added any new material to those preexisting works. I note,
26  however, that this procedure was the exception to the general rule. In most cases,
    the examiner makes this determination based solely on the statements that appear in
27  lines 6(a) and (b).
28

PAGE ___ EXHIBIT ___

1  examiner confirm that the work contains at least a minimal level of creativity to

2  satisfy the (admittedly low) standard for registration, and (3) for identification

3
4  purposes in case of litigation.  For many works, including toys and dolls, the Library

5  has no interest, so a deposit of the actual work itself is not  required.  For example,

6  the Library normally having no interest in unpublished databases, Copyright Office
7
8  regulations permit the creator of an unpublished database to mask out large portions

9  of the work if it contains trade secrets or other sensitive information.  Similarly, a

10  computer programmer can block out large portions of the program's source code to
11
12  protect proprietary information or valuable code.  In some cases, the programmer

13  can refuse to supply any source code at all, and supply instead a sample of the object

14  code, which is indecipherable.  Moreover, a remitter can request special relief from
15
16  the deposit requirement entirely, based on undue burden, cost, or hardship.  None of

17  these exemptions to full disclosure would be permitted in a patent application.

18
19          For these reasons, Samir Khare is incorrect to say in his deposition on

20  page 258 that the two-dimensional drawings of the dolls cannot have been intended

21  to register the dolls themselves.  Confusing patents and copyright, he says that it is

22  "...impossible [to] go from a 2-D flat drawing to a 3-D doll.  You simply can't....
23
24  [The 2-D drawing] doesn't give you any dimensions at all....  You simply don't

25  capture enough detail."  Without dimensions, technical specification, and

26  manufacturing techniques, he suggests, one cannot reconstruct the dolls.  His
27
28  analysis misconstrues the basic rationale of the copyright registration system and the

EXHIBIT 79

PAGE 862

EXPERT REPORT RALPH OMAN

1  purpose of the deposit requirement.  The drawings of the dolls fulfill the deposit

2  requirements of the Copyright Office.  They show the sufficiency of authorship for

3
4  registration purposes, and they permit the identification of the works for which

5  protection is claimed.  The drawings therefore are the proper deposit for the dolls.

6
   **(i)   Certification.**
7
8      Finally, the applicant must provide the name of a person who the

9  Copyright Office should contact if the examiner has any questions concerning the

10 application (line 7), and the applicant must sign a certification on line 8 confirming
11
12 that the statements in the application are correct to the best of the applicant's

13 knowledge.  Any person who knowingly makes a false representation of a material

14
15 fact in the application, or in a written statement filed in connection with that

16 application, may be fined up to $2,500.  (*See* 17 U.S.C. § 506(e).)  Normally, in a

17 case involving a willful false representation, the Copyright Office would also cancel

18
19 the registration.

20     Generally speaking, the Copyright Office insists on accuracy in

21 copyright applications.  If the Copyright Office registers the claim, or refuses to

22
23 register the claim, the court can draw conclusions from that office action.  But if the

24 applicant deliberately manipulates the process and thereby short-circuits an

25 informed assessment by the Copyright Office, then that purpose is thwarted.  For

26 that reason, the consequences of misrepresentation could be serious.  If an applicant
27
28 makes a material misrepresentation or a material omission in the application forms

EXHIBIT 7A

PAGE 8163

1  or deposit materials, and if that misrepresentation or omission would have otherwise

2  prompted the examiner to reject the application, the registration could be invalidated

3
4  for committing fraud on the Copyright Office.

5      2.    **Deposit Requirements**

6          To register a pictorial, graphic, or sculptural work in the Copyright

7  Office, the applicant must provide the Office with a representation of that work.

8
9  Normally, as discussed above, the applicant will submit a photograph or a drawing

10  that is sufficient to identify the work that the applicant seeks to register. In many

11  cases, the Copyright Office prefers not to accept physical samples of these works

12
13  because of spatial constraints and because the Library of Congress has no interest in

14  adding dolls and other ephemera to the collection of the national library.

15      3.    **Filing Fee**

16          In order to register a pictorial, graphic, or sculptural work, the applicant

17
18  must pay the usual non-refundable fee of $45.00 for each application, which is

19  intended to recapture a portion of the cost of processing all of the paperwork.

20      4.    **The Examination Process**

21          When the Copyright Office receives an application, the Receiving and

22
23  Processing Division stamps the application form to indicate the date that the

24  application, the fee, and deposit were filed with the Copyright Office and sends the

25  $45.00 filing fee to the U.S. Treasury. If the Copyright Office subsequently issues a

26

27

28

EXHIBIT 7a
PAGE 864

EXPERT REPORT RALPH OMAN

1  registration certificate for the application, the filing date becomes the effective date

2  of the registration.

3

4         Next, the Copyright Office Receiving and Processing Division sends

5  the application and deposit to the Examining Division where the file is assigned to

6  an examiner.  The examiner will review the application and deposit material to

7

8  determine whether or not they are complete, and whether or not the work constitutes

9  copyrightable subject matter.  Over the past 20 years, this process has become

10  increasingly streamlined and automated – a modernization that began during my

11

12  tenure as Register– due to the large number of applications that the Copyright

13  Office receives each year, and the great pressure to reduce costs and downsize the

14  staff of the Office.  In fact, in most cases the examiner will review each routine

15

16  application for roughly 1 to 5 minutes, and then will move on to the next application

17  in the stack.

18

19         As discussed above, the examination process at the U.S. Copyright

20  Office is very different than the examinations that are conducted at the U.S. Patent

21  and Trademark Office.  Some would say that it is less rigorous, but that would

22

23  confuse the purpose of the two examinations.  For instance, the Copyright Office

24  examiner will not conduct an independent investigation to determine if the work for

25  which registration is sought were created by the person who has been identified on

26  line 2 of the application.  Likewise, the examiner will not second-guess the date of

27

28  publication specified on line 3, or compare the applicant's work with an earlier

EXHIBIT 7a
PAGE _____ 865

EXPERT REPORT RALPH OMAN

similar work to determine if the new work contains enough new material to merit a

new copyright registration – even if the applicant has provided a "derivative work"

statement on lines 6(a) and 6(b).  Instead, the examiner will normally rely solely on

the information that the applicant provided in the application form, along with the

certification on line 8 which states that this information is correct.  Of course, if an

author submits a work that is known to be in the public domain, such as "The Star-

Spangled Banner" or "The Lord's Prayer," the examiner would question the

application.

   In examining an application, the examiner will determine if any portion

of the work can reasonably be construed to contain copyrightable authorship.  If the

nature of work statement or the material added statement mentions material that

both falls within, and does not fall within, the subject matter of copyright – such as

"artwork and layout" for a book – the examiner normally will annotate the

application to indicate that the presumptions that attach to the registration only cover

the author's material that is copyrightable – such as "artwork" (with "layout" not

eligible for protection).  If the nature of work or the material added statement

contains claims that are unacceptable as a matter of law – e.g., "ideas," "process," or

"concepts" – the examiner will contact the person identified on line 7 by telephone,

email, or letter to make certain that the claim to copyright actually comprises

copyrightable subject matter.

EXPERT REPORT RALPH OMAN

EXHIBIT __19__

PAGE __0606__

1    If the examiner finds that the work likely satisfies at least one of the

2    statutory registration requirements, he or she will approve the work for registration,

3
4    create an online record, and send the package to the unit that generates the

5    registration certificate.  If the work has been published, the Copyright Office will

6    assign a registration number beginning with the letters "VA," which, as already

7
8    mentioned, stand for "visual arts."  If the work is unpublished, the Office will assign

9    a registration number beginning with the letters "VAu."  If the examiner determines

10   that the work fails to satisfy the statutory registration requirements, he or she will

11
12   issue a formal refusal, and will explain the basis for the refusal in writing.

13   Rejections are infrequent.

14       **5.    Supplementary Registrations**

15       If a registration certificate contains an error or omission, the registrant

16
17   can correct that mistake with a "supplementary registration."  A supplementary

18   registration does not replace the original – or "basic" – registration certificate, but it

19   can be used to correct or to amplify some of the information that appears in that

20
21   certificate.  For example, if the applicant failed to identify his or her work as a work

22   made for hire, he or she can ask the Copyright Office to issue a supplementary

23   registration to correct that mistake.  Likewise, if the basic registration mentions only

24
25   one author and one copyright claimant, the Copyright Office will accept an

26   application for a supplementary registration from other authors who would like the

27

28

EXPERT REPORT RALPH OMAN

EXHIBIT 79
PAGE 0167

1   record to reflect their claim to authorship and/or ownership in the work that was

2   registered with the Copyright Office.

3

4          In order to obtain a supplementary registration, the registrant must

5   complete Form CA, which stands for "Correction/Amplification," and must pay a

6   filing fee of $115.00. If the Copyright Office decides to issue a supplementary

7   registration, the basic registration still remains in effect. As the Copyright Office's

8

9   information circular explains, "The basic registration will not be expunged or

10  cancelled, and the two registrations will both stand in the Copyright Office records."

11

12  *Circular 8, Supplementary Copyright Registrations* at p. 3. The supplementary

13  registration simply directs the public's attention to a possible error or omission in

14  the basic registration, and places what purports to be the correct information or the

15

16  missing information in the official record.

17

18          C.      **The Copyright Registrations**

19                  1.      **The Importance of the Registration Certificates**

20                  It is well established that the Copyright Office will register claims to

21  copyright in three-dimensional embodiments of two-dimensional drawings of a doll.

22

23  As long as the underlying drawings of the dolls qualify for copyright protection,

24  those registrations of the drawings protect not only the drawings but the dolls

25  themselves. The protectable elements of the drawings, when incorporated into the

26

27  form and appearance of the three-dimensional dolls, must of course be authorized by

28

EXHIBIT ___ 79

PAGE ___ 808

**EXPERT REPORT RALPH OMAN**

1  the copyright owner of the drawings, or they will be infringing.  As Professor

2  Nimmer states in his treatise: "[C]ourts have correctly held three-dimensional dolls

3
4  copied from the copyrighted cartoon illustrations of 'Spark Plug, The Horse' and

5  'Betty Boop' to constitute infringement."  Nimmer on Copyright, 2.18 [H][1]

6
7  (footnotes omitted).  By way of illustration, the Disney company has the right to

8  create three-dimensional Mickey Mouse dolls based on the two-dimensional

9  drawings of the famous cartoon character.

10        Isaac Larian, when he sought to enforce MGA's claimed rights against

11
12  an accused infringer in the courts of Hong Kong, made the same point in his

13  affidavit to the court.  He correctly noted, after consultation with his lawyers, that

14
15  the creation of the original drawings of the dolls serve as the legal basis for claiming

16  copyright in the dolls themselves, and that he could sue the Hong Kong

17  manufacturer of the alleged knock-offs because they infringed the original drawings.

18
19  His actual words were as follow: "[T]he 3 dimensional Funky Tweenz dolls have

20  infringed the 2 dimensional drawings which are artistic works in which copyright

21  subsists."  Larian Affidavit at para. 12.

22        By way of amplification, I also note that, in her affidavits for the Hong

23
24  Kong litigation in 2002, Ms. Gronich repeatedly identifies the 15 drawings as the

25  "artistic works" upon which the 3 dimensional dolls are modeled.  Gronich Affidavit

26  at para. 4 and para. 5.  Lee Shiu Cheung also makes clear that [t]he designs of the

27
28  Bratz dolls are all original drawings created by Mr. Bryant using his own

EXHIBIT ___ 14

PAGE ___ 969

**EXPERT REPORT RALPH OMAN**

1  independent labour, skill and judgement [sic]," and the "17 initial concept drawings

2  of the first 4 Bratz dolls [were] designed by Mr. Bryant...." Lee Affirmation at

3
4  para. 8-9.

5         I also note that MGA's registration of Carter Bryant's drawings is itself

6  significant. In MGA's Response to Mattel's Supplemental Interrogatory, MGA

7
8  suggests that there were a number of prior works underlying Mr. Bryant's Bratz

9  drawings, and that the drawings are therefore largely non-original. However, MGA

10  itself registered those drawings and did not list any pre-existing works on which the

11
12  Bryant drawings were purportedly based. The Copyright office expects applicants

13  to identify previously registered or public domain materials on which the works are

14  based when they seek registration of those works. That MGA did not do so suggests

15
16  that it thought that Mr. Bryant's Bratz drawings were wholly original when it

17  registered them. Indeed, it is common sense that because the drawings were

18  registered as "original" works of art, MGA's registrations of the drawings reflect

19
20  that MGA believes that the drawings are original.

21         2.    **The Significance of the Supplementary Registrations**

22         The Copyright Office prides itself on the completeness and accuracy of

23  its public records. As the repository of vital copyright information, it helps authors

24
25  protect their rights, and it promotes trade and commerce in copyrighted materials.

26  For that reason, the Office encourages authors to correct that public record if they

27  discover errors or inaccuracies. That being said, the Copyright Office also

28

EXHIBIT 9
PAGE 870

EXPERT REPORT RALPH OMAN

discourages corrections of the record if the motivations are suspect. It is one thing to correct a mistake, but another thing to attempt to manipulate the record to gain some legal or competitive advantage. In this case, plaintiff has submitted a series of supplementary applications that purport to correct various dates of creation and dates of publication, and the status of various works as a derivative works, among other things. I note that in my experience sophisticated companies such as MGA generally do not make mistakes in their copyright applications. When asked about the discrepancy between an original publication date on an MGA copyright registration form and the "corrected" date on the CA Form, Mr. Khare confesses that in "[a]ll honesty, I don't know. Because I can tell you, at the time that this [original] Form VA was filled out, [MGA] had better information relating to when this particular drawing may or may not have been—may have been published." Khare Deposition at 253. The forms are typically filled out by well-trained staff professionals who appreciate the importance of an accurate filing. It is a felony to deliberately falsify a government document. When the Copyright Office sees a flurry of CAs in contemplation of litigation, or after litigation has already commenced, the Office will normally view them as self-serving and irrelevant. But the Copyright Office doesn't challenge them because it knows that at that point the matter is in the hands of the court.

EXPERT REPORT RALPH OMAN

## D.   **Anomalies**

Mr. Armstrong, at pages 268-69 in Volume 1 of his deposition, claims that in registering the Bryant drawings MGA was simply intending to register the packaging for the Bratz dolls. I have long experience with the registration process, and I have never encountered a similar contention—where a sophisticated company first registers a display box with graphics rather than registering the underlying work itself. (The fact that MGA, or its agent, maintains a deposit account at the Copyright Office suggests to me a frequent use of the registration system, and a sophisticated understanding of the registration process.) Nor have I encountered a situation where a sophisticated company contends that it registered the original drawings of doll designs in the Copyright Office for the purpose of registering, not the unique physical characteristics of the dolls, but their packaging materials. And, finally, I have also never encountered a situation where a sophisticated company claims to be registering packaging materials and, as the deposit, submits drawings of the item that is supposed to go in the packaging. Occasionally, the Office will accept a substitute deposit in place of the actual item being registered, as long as the substitute contains a clear and complete representation of all of the graphic authorship claimed in the application. But the Office will do so only when the item for which registration is sought is no longer available. The Office has some discretion in this regard under its Special Relief authority 37 CFR 202.20(d). That being said, during my tenure as Register, the Office would not accept a drawing or

EXHIBIT ____ A

PAGE ____ 872

photograph of, for example, a doll, for a claim to copyright in the packaging, with its various original graphics and artwork. Since the examiner would know that the packaging itself was readily available, he or she would insist that the remitter submit the actual packaging, or photographs of the packaging, as the only proper deposit.

Also anomalous is the series of supplementary registrations recently made by MGA. All of the corrections/amplifications seem to be an attempt to rewrite the timeline of the creation of the dolls. For the Hong Kong litigation MGA sought to establish that all of the creative acts that culminated with the sale of the Bratz dolls happened very early in the chronology. In the current litigation, we see an effort to create the impression that the various creative steps took place much later, that the whole process should ratchet forward to make it seem that events were much more recent than they actually were.

DATED: February 11, 2008

Ralph Oman

EXHIBIT A
PAGE 873

EXHIBIT 7a

PAGE 074

# EXHIBIT A

# RALPH OMAN

**Current Position**
Practitioner-in-Residence, The George Washington University Law School, 20th and H Streets NW, Washington, D.C. 20006

**Professional Experience**
Counsel, Dechert LLP, 1775 I Street, N.W., Washington, D.C. 20006-2401. 1995-2008

Of Counsel, Mudge Rose Guthrie Alexander and Ferdon, 1994-1995

Register of Copyrights of the United States, 1985-1993

> The Register of Copyrights is the chief government official charged with administering the national copyright law. The Register supervises the work of 550 Copyright Office employees, rules on the copyrightability of works, acts as a principal advisor to Congress on copyright legislation and, during my tenure, to the Department of State on international copyright matters, drafting, negotiating, and implementing international copyright agreements.

Pravel Professorial Lecturer in Intellectual Property and Patent Law, The George Washington University Law School, 1993 - present.

Chief Counsel, Subcommittee on Patents, Copyrights, and Trademarks, Committee on the Judiciary, U.S. Senate, 1983-1985

Staff Director, then Chief Counsel, Subcommittee on Criminal Law, Committee on the Judiciary, U.S. Senate, 1981-1983

Legislative Counsel to Senator Charles McC. Mathias (R-Maryland), 1977-1981

Counsel to Senator Hugh Scott (R-Pennsylvania), Subcommittee on Patents, Trademarks, and Copyrights, Committee on the Judiciary, U.S. Senate, 1975-1977

Attorney, Antitrust Division, U.S. Department of Justice, 1974-1975

Law Clerk, Judge C. Stanley Blair, U.S. District Court for the District of Maryland, 1973-1974

U.S. Naval Flight Officer, 1965-1970, (Retired from the U.S. Naval Reserve with the rank of Captain, 1992)

Foreign Service Officer, U.S. Department of State, Dhahran and Jidda, Saudi Arabia, 1962-1964

EXHIBIT _____ A _____

PAGE _____ 24 _____

EXHIBIT 7a
PAGE 075

| | |
|---|---|
| **Education** | Georgetown University Law Center, J.D., 1973, Executive Editor, *Law and Policy in International Business* |
| | Hamilton College, A.B., 1962 |
| | Sorbonne, Paris, France, 1960-1961 |
| **Honors and Affiliations** | 1990 Exemplary Public Service Award of the New York State Bar Association Arts, Sports and Entertainment Law Section |
| | 1993 International Book Award from the International Publishers Association |
| | 1993 Lifetime Achievement Medal, Foundation for a Creative America |
| | Federal Bar Association, President, Capitol Hill Chapter 1993-1994 |
| | 2002, The Jefferson Medal, awarded by the New Jersey Intellectual Property Law Association, in recognition of long professional commitment to strong intellectual property protection |
| | Member, International Association for the Advancement of Teaching and Researching in Intellectual Property; ABA's Section on Intellectual Property Law, former chair of six of the eight copyright committees |
| | Former Trustee, Copyright Society of the United States of America |
| | Master of the Court, and Past President, Giles S. Rich Inn of Court, Washington, D.C. |
| | Admitted to practice in District of Columbia and before the U.S. Supreme Court and the Fourth Circuit Court of Appeals |
| | <u>Who's Who in America</u> |
| | <u>Who's Who in American Law</u> |
| **Personal** | Married, three children |
| **Miscellaneous** | Fluent French, conversational Arabic, private pilot's license, qualified sailing instructor |

EXHIBIT _____ A
PAGE _____ 25

EXHIBIT _____ A
PAGE _____ 070

EXHIBIT

PAGE

877

# EXHIBIT B

## Exhibit B

ARTICLES AND MAJOR POLICY SPEECHES BY RALPH OMAN (1997 - PRESENT)

(Authored or Co-Authored)

1. "Copyright on the Global Internet: Trust Everybody - But Cut the Cards"  Delivered at Copyright on the Internet Seminar, Washington, D.C., November 8, 1996.

2. "Copyright on the Global Internet: Two New Treaties" IP WorldWide, 1997.

3. "Copyright on the Internet"  Delivered at National CLE Conference, Vail, Colorado, January 16, 1997.

4. "Copyright and Software: A Tour d'Horizon"  Delivered at Association of Corporate Patent Counsel, Palm Beach, Florida, January 27, 1997.

5. "Copyright Protection for Software and Databases"  Delivered at SmithKline Beechem, IP Workshop, Upper Marion, PA., January 30, 1997.

6. "New Global Treaties Protect Copyright Online" article for ABA IPL Newsletter, Winter 1997.

7. "The World Intellectual Property Organization: A United Nations Success Story"  Gerald Mossinghoff and Ralph Oman, *World Affairs*, Fall 1997.

8. "The Shape of Things to Come"  Remarks prepared for the International Council of the National Academy of Television Arts and Sciences, New York, March 6, 1997.

9. "Performing Rights in the Digital Age: The International Perspective" Fordham Law School's International Intellectual Property Law and Policy, Spring 1997

10. "Copyright Protection for Software"  Delivered at Franklin Pierce Law Center, Concord, NH, April 12,1997.

11. "Copyright Liability on the Internet"  Delivered at American University, May 2, 1997.

12. "From Scourge to Savior: How Digital Technology Will Save Authorship in the Age of the Internet" Delivered at W.I.P.O. International Forum, Seville, Spain, May 14, 1997.

13. "Copyright in the Middle East: A Survey"  W.I.P.O. Arab Regional Symposium on the Agreement on Trade-Related Aspects of IP Rights, Amman, Jordan, June 17-19, 1997.

14. "Folkloric Treasures: The Next Copyright Frontier?"  Published in the ABA - IPL Section Newsletter, July 9, 1997.

PAGE ___ 878   EXHIBIT ___

EXHIBIT _____ B

PAGE _____ 26

15. "Current Developments in Copyright: International Trends"  Delivered at George Washington Law School, Summer Intellectual Training Program, July 10, 1997.

16. "Marketing Software, Databases, and Entertainment Media on the Internet: New Rules for the Digital Age"  Delivered at All Ohio Annual Institute on Intellectual Property, September 11-12, 1997.

17. "The Need for Shared Liability on the Internet"  Published in the *Federal Bar Association Journal*, Winter 1997.

18. "Copyright Basics"  Delivered at ASAE, Capitol Hilton, Washington, D.C., October 6, 1997.

19. "Making the Internet Safe for the Songwriter: Copyright in the Digital Age"  Delivered at the Copyright Society of the South, Nashville, October 13, 1997

20. "The Current State of International CopyrightLaw"  Delivered at International Law Institute, Washington, D.C., October 16, 1997.

21. "The Current State of International Copyright Law"  Delivered at the World Bank, Washington, D.C., March 3,1997. (also presented at the Bulgarian Intellectual Property Rights Group, The International Law Institute, Nov. 12, 1997)

22. "VideoWars - Copyright in the Digital Age"  Seattle, Washington, January 1998.

23. "Strong Intellectual Property Protection: The Key to Sri Lanka's Economic Growth"  Delivered in Colombo, Sri Lanka, January 1998.

24. "Copyright in the Digital Age"  Delivered at Video Wars Seminar in Seattle, Washington, February 12-13, 1998.

25. "Making the Internet Safe for Authors and Composers: Copyright in the Digital Age"  John Marshall Law School, Chicago, February 27, 1998.

26. "The Way to Net Infringers" *Legal Times*, March 23, 1998.

27. "Congress Civilizes the Internet"  University of Akron School of Law, March 16, 1998.

28. "The Internet and the Law of Intellectual Property,"  Washington, D.C. Bar, April 4, 1998.

29. "Report on Copyright In China for the Standing Committee on Copyright Reform," Beijing/Shanghai/Tianjin, July 1-11, 1998.

30. "The Growing International Consensus on Computer Software Protection"  ABA Annual Meeting, Toronto, August 1, 1998.

31. "The Digital Millennium Copyright Act of 1998: Congress Civilizes the Internet" Washington, D.C. Bar, August 31, 1998.

EXHIBIT ___B___

PAGE ___27___

2

32. "Folkloric Treasures: The Next Copyright Frontier" ATRIP, Mexico City, August 24, 1998.

33. "Congress Civilizes the Internet" NJIPLA, New Brunswick, New Jersey, October, 8, 1998.

34. "Copyright in Cyberspace" Georgetown Law School, Washington, D.C., October 23, 1998.

35. "Digital TV - Copyright in the Age of Digital Television" The Fourth Digital Television Forum, Los Angeles, December 1, 1998.

36. "Creative Compromise" *Corporate Counsel Magazine,* December 1998.

37. "The Digital Millennium Copyright Act: Congress Civilizes the Internet" D.C. Bar Association, Washington, D.C., December 11, 1998.

38. "Congress Civilizes the Internet" *IP WorldWide,* January 1999.

39. "The Cultural and Economic Importance of Copyright and Related Rights" U.S. Copyright Office, Library of Congress, March 18, 1999.

40. "The Bazaar New World of E-commerce" *Corporate Counsel Magazine*, July 1999.

41. "The Contours of International Copyright" Seminar sponsored by World Trade Organization and Organization of American States, Washington D.C., July 2, 1999.

42. "The Contours of International Copyright" American Bar Association Young Lawyers Division, Atlanta, Georgia, August 9, 1999.

43. "Database Protection in the Digital Age" National Institute of Health, Technology Transfer Office, Bethesda, Maryland, September 23, 1999.

44. "The New Organum: Copyright in the Digital Age" International Judges Conference, Washington D.C., October 17, 1999, Published in the May 2000 issue of the Federal Circuit Bar Journal.

45. "Copyright in the Digital Age" The Greater Richmond Intellectual Property Law Association, November 11, 1999

46. "Collective Management in the Digital Age: A Report from the Republic of Technology" Spanish Society of Authors and Editors, Madrid, Spain, November 4, 1999.

47. "Present at the Creation: Copyright in the Digital Age" Literary and Artistic Association for the Defense of the Rights of Authors, Alicante, Spain, November 8, 1999.

48. "Copyright in the 20th Century: A Charter for a Living People" *Corporate Counsel Magazine*, December 1999.

49. "Folkloric Treasures: The Next Copyright Frontier?" John Marshall Law School, January 4, 2000.

EXHIBIT 1a

PAGE 888

EXHIBIT ___B___

PAGE ___28___

3

50. "Music in the Digital Age: An Overview" New York County Lawyers' Association, March 10, 2000

51. "Database Protection in the Digital Age", Intellectual Property Seminar, Dechert Price & Rhoads, May 8, 2000.

52. "Music in the Digital Age: An Overview", American Intellectual Property Law Association, h, PA, May 17, 2000.

53. "Congress Acts To Make The World Safe For E-Commerce" District of Columbia Bar Association, Washington, D.C., Continuing Legal Education "Taming the Wild Wild Web," August 31, 2000

54. "Present at the Creation: Copyright in the Digital Age" University of Guadalajara, Organization of American States, December 5, 2000

55. "The Digital Millenium Copyright Act: An Assessment" District of Columbia Bar Association, Washington, D.C., December 8, 2000

56. "Folkloric Treasures: The Next Copyright Frontier?", published in The John Marshall Law School, Winter 2000 edition, Vol. II, No. 1.

57. "Speech to Experts from Lebanon ", Washington, D.C., October 2001

58. "'Copyright and the 107[th] Congress", delivered at the New Jersey Intellectual Property Law Association, February 8, 2001, Metropark, N.J.

59. "The Role of Service and Access Providers in Digital Transmissions and their Responsibility Regarding Copyright," UNESCO Forum, April 12, 2001.

60. "Copyright and the 107[th] Congress," District of Columbia Bar Association, Washington, D.C.., April 30, 2001.

61. "Liability and Copyright in the Age of the Internet," Stockholm, Sweden, July 6, 2001.

62. Lebanon Speech (October 2001)

63. "Congress Wrestles with State Liability for Intellectual Property Violations: What Will Pass Constitutional Muster?", Intellectual Property & Technology Law Journal, Vol. 13, Number 12, December 2001.

64. "New Developments in Copyright Litigation," National CLE Conference in Steamboat Springs, Colorado, January 7, 2002.

65. "Copyright for Engineers", American Society of Mechanical Engineers, The Hilton, Alexandria, VA., May 6, 2002.

66. "Jefferson Medal Speech", presented at the NJ Intellectual Property Law Association

EXHIBIT _____ B

PAGE _____ 29

PAGE    EXHIBIT    881 | 9

4

67. "Copyright for Architects", American Bar Association, Section of Intellectual Property Law, Philadelphia, PA, June 28, 2002.

68. "Copymart: Harnessing the Power of Digital Technology," Copymart Symposium, Japanisch-Deutsches Zentrum, Berlin, Germany, September 6, 2002.

69. "International Copyright: Engine of Progress," Georgetown University Law Center, November 18, 2002.

70. "Copyright in the Digital Age," Delivered at the International Intellectual Property Week, Amman, Jordan, August 11, 2003.

71. Public Administration of Copyrights, Amman, Jordan, August 13, 2003.

72. "Copyright In Palestine," Delivered to the Ramallah, Palestine International Copyright Delegation, Ramallah Palestine, August 13-20, 2003.

73. "Protection of Folklore: The Next Copyright Treaty," Delivered at the International Intellectual Property Week, Amman, Jordan, August 14, 2003.

74. "Copyright and Developing Countries," "Enforcement of Copyright," and "Copyright Basics," Ramallah, Palestine, August 17-19, 2003.

75. "The Protection of Actors Rights: The U.S. Perspective", Budapest, Hungary, September 17, 2003

76. "Marketing Music Online," CIP Forum, Gütenborg, Sweden, October 6, 2003.

77. "Annual Update of Copyright Law," AIPLA Annual Meeting, Washington, D.C., November 1, 2003.

78. "The Role of the Private Sector in the International Harmonization of Copyright", Federalist Society's National Lawyers Convention, Washington, D.C., November 14, 2003

79. "Going Back to First Principles", Santa Clara Computer & High Technology Law Journal Symposium, Santa Clara, CA, February 6, 2004

80. "Panel on the Intellectual Property Legislative Process in European Union and United States", Fordham University School of Law, New York, NY, April 16, , 2004

81. "Folklore, Broadcaster's Treaty, Audiovisual Performers Treaty," LAIPLA, Santa Barbara, CA, May 14-16, 2004

82. "Curbing the Companies That Abet Online Piracy," The Boston Globe, August 9, 2004

83. "Congress and the Courts Tackle the Digital Agenda . . . Again." The Annual Meeting of the American Intellectual Property Law Association, Washington, D.C., October 16, 2004

84. "Liability on the Internet: A Comparative Study of Europe and the United States," VII SGAE International Seminar, Madrid, 1 and 2 December 2004

PAGE ___ EXHIBIT ___ 19

882

EXHIBIT _____ B

PAGE _____ 30

5

85.  "The Securities Industry and Intellectual Property," New York, January 12, 2005

86.  "GAME [ALMOST] OVER," University of Akron School of Law, Akron , Ohio, March 7, 2005

87.  "The China Report," U.S.-Asia Foundation Sponsors. March 20 - March 30, 2005.

88.  "Which File Swappers Are Vulnerable?" USA Today, June 28, 2005

89.  "The Continuing Search for Copyright Balance on the Internet:  The U.S. Supreme Court Bridles in Peer-to-Peer File-Sharing." WIPO Seminar on Collective Management of Copyright and Related Rights in the Digital era, New Delhi, India (September 13, 2005)

90.  "Emerging Digital Technologies:  Prospects and Opportunities for Creating New Business Models." WIPO Seminar on Collective Management of Copyright and Related Rights in the Digital era, New Delhi, India (September 14, 2005)

91.  Introduction of Charlotte (January 24, 2006)

92.  Tribute to Marybeth Peters–Commemorating 40 years of service. Library of Congress, Washington, D.C. (February 14, 2006)

93.  Collective Management of Copyright in the Digital Age; delivered at The World Intellectual Property Organization - Geneva, Switzerland.  (April 2006)

94.  The Evolution of U.S. Copyright from Developing Country to World Leaders, by Ralph Oman given at the Georgetown University Law School Seminar, Nancy Linck's Class, on April 12, 2006.

95.  Piracy in China and Russia, World Piracy Prevention Conference, Los Angles, CA. (Conf. was cancelled.) April 24-25, 2006.

96.  How Digital Rights Management Will Save Authorship in the Age of the Internet; (May 22-23, 2006) (Denver)

97.  "Copyright Piracy in China" delivered at The John Marshall School; Chicago, May 25-26, 2006.

98.  "Copyright and the Arab Renaissance" delivered at the Judicial Workshop on Intellectual Property Rights , European Patent Office, Munich, Germany, September 11-13, 2006.

99.  Tribute to Irwin Karp – Irwin Karp Memorial Service, Columbia Law School, New York, NY, October 20, 2006.

100.  The Role of the U.S. Copyright Office in the Administration of the U.S. Copyright System, given at Michigan State Law School, November 15, 2006 [Doc. No. 13191159/bus].

101.  Congress and Copyright:  Going Back to First Principles, The Denver Chapter of the Copyright Society of the U.S.A., Denver, Colorado, March 27, 2007.

102.  Congress and Copyright: New Directions with a New Majority, The Rocky Mountain Chapter of the Copyright Society of the U.S.A., Denver, Colorado, March 27, 2007.

103.  Speech presented at Breakfast given for His Excellency Ambassador Yang and distinguished guests on April 27, 2007.

104.  "Lebanon: On the Threshold of a New Day," delivered at The Phoenicia Hotel in Beirut, Lebanon on July 30, 2007.

105.  Presentation by Ralph Oman given to the American Bar Association's IPL Section in San Francisco on August 9-13, 2007.

106.  Legislative Report on the 110th Congress, by Ralph Oman given at the IABM Conference in Atlanta, GA on October 5, 2007.

107.  Speech presented at Suffolk University Law School on November 7, 2007.

EXHIBIT __D__
PAGE __884__

EXHIBIT __B__

PAGE __32__

7

EXHIBIT \_\_\_ 7a

PAGE \_\_\_ 885

# EXHIBIT C

EXPERT REPORTS, DECLARATIONS, DEPOSITION TESTIMONY,
AND TRIAL TESTIMONY (2003 - 2007)

| CASE CAPTION | PLEADING |
|---|---|
| *Karen Knauer, et al. v. Kaiser Permanente International, Inc., et al.,* Case No. C 02-05172 DLJ (N.D. Cal.) | EXPERT REPORT OF RALPH OMAN, ESQUIRE (October 3, 2003), DECLARATION OF RALPH OMAN, ESQUIRE (October 31, 2003), REBUTTAL EXPERT REPORT OF RALPH OMAN, ESQUIRE (November 14, 2003) (On behalf of defendant Kaiser Permanente)<br><br>On November 13, 2003 I was deposed by the plaintiff in my capacity as an expert on behalf of the defendants. |
| *Core Group PC v. Sprint PCS,* CASE NO. C 02-05172 DLJ (American Arbitration Association) | EXPERT REPORT OF RALPH OMAN, ESQUIRE (November 17, 2003) (On behalf of petitioner, Core Group PC)<br><br>On February 13, 2004 I testified before a panel of the American Arbitration Association in my capacity as an expert on behalf of the plaintiff. |
| *S&R Design, Inc. v. BH Multi Com Corp.* CASE NO. 04 CV 00223 (LTS) (S.D.N.Y.) | DECLARATION OF RALPH OMAN (on behalf of BH Multi Com Corp.) (April 22, 2004) |
| Société du troit de reproduction des auteurs, compositeurs et editeurs au Canada (SODRAC) (Tariff Proceedings Before the Copyright Board of Canada) | EXPERT REPORT OF RALPH OMAN, ESQUIRE (May 20, 2004) (On behalf of SODRAC)<br><br>My report was included as part of the record for this proceeding. |

EXHIBIT

PAGE

EXHIBIT ___C___

PAGE ___33___

13980821.1.BUSINESS

| | |
|---|---|
| *New York Mercantile Exchange v. Intercontinental Exchange, Inc.* Case No. 02-CV 9277 (JGK) (DF) | EXPERT REPORT OF RALPH OMAN, ESQUIRE (August 12, 2004) (On behalf of plaintiff NYMEX)<br><br>On October 12, 2004 I was deposed by the plaintiff in my capacity as an expert on behalf of NYMEX. |
| *eScholar LLC v. Otis Educational Systems, Inc.,* Case No. 04 CIV. 4051 (SCR) (SDNY) | EXPERT REPORT OF RALPH OMAN, ESQUIRE (December 21, 2004) (On behalf of defendant Otis Educational Systems, Inc.)<br><br>On January 28, 2005 and February 9, 2005 I was deposed by the plaintiff in my capacity as an expert on behalf of Otis Educational Systems. |
| *Team Play Inc. et al. v. Boyer d/b/a Skyboy Productions,* Case No. 03 C 7240 (N.D. Ill.) | EXPERT REPORT OF RALPH OMAN (on behalf of plaintiff Team Play) (February 25, 2005) |
| *Express LLC v. Fetish Group Inc.*, Civil Action No. CV05-2931 (JTLx) (C.D. Cal.) | DECLARATION OF RALPH OMAN (September 9, 2005); SUPPLEMENTAL DECLARATION OF RALPH OMAN (September 16, 2005) (on behalf of plaintiff Fetish Group Inc.) |
| *Universal Furniture International, Inc. v. Collezione Europa USA, Inc.,* Case No. 1:04CV00977 (M.D.N.C.) | EXPERT REPORT OF RALPH OMAN, ESQUIRE (March 9, 2006) (on behalf of defendant Collezione Europa)<br><br>On June 2, 2006 I was deposed by the plaintiff in my capacity as an expert on behalf of Collezione Europa. |

PAGE 1807   EXHIBIT D

13980821.1.BUSINESS

EXHIBIT ___C___

PAGE ___34___

| | |
|---|---|
| *Richard K. Niemi et al. v. American Axle Manufacturing & Holding Inc., et al*, Case No. 05-74210 (E.D. Mich.) | EXPERT REPORT OF RALPH OMAN, ESQUIRE (July 28, 2006) (on behalf of defendants American Axle Manufacturing & Holding et al.) |
| *Jaime Feliciano Caceres d/b/a JF & Assoc. et al. v. LandFill Technologies Corp., et al.*, Case No. 02-2697 (PG) (D.P.R.) | EXPERT OF RALPH OMAN, ESQUIRE (December 8, 2006) and SUPPLEMENTAL EXPERT REPORT OF RALPH OMAN, ESQUIRE (October 11, 2007) (on behalf of plaintiffs Jaime Feliciano Caceres, et al.) |
| *Bird Brain v. CVS Corp.*, Case No. 06-12799 (E.D. Mich.) | EXPERT OF RALPH OMAN, ESQUIRE (March 6, 2007) (on behalf of plaintiff Bird Brain)<br><br>SUPPLEMENTAL EXPERT OF RALPH OMAN, ESQUIRE (March 22, 2007) (on behalf of plaintiff Bird Brain) |
| *Van Cleef & Arpels v. Frank Pollak and Sons,* | DECLARATION OF RALPH OMAN, ESQUIRE (May 2007) (on behalf of plaintiff Van Cleef & Arpels) |

PAGE 888    EXHIBIT 19

13980821.1.BUSINESS

EXHIBIT ___C___

PAGE ___35___

EXHIBIT 80

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, an individual,                     CASE NO. CV 04-9049 SGL (RNBx)

      Plaintiff,                                       Consolidated with

                                      Case Nos. CV 04-09059 & CV 05-2727

      vs.

                                        Hon. Stephen G. Larson

MATTEL, INC., a Delaware corporation

      Defendant.

AND CONSOLIDATED ACTIONS

## REPORT OF JOHN L. ALEX PURSUANT TO RULE 26 (a) (2) (B), FEDERAL RULES OF CIVIL PROCEDURE

I, John L. Alex, have been retained by Mattel, Inc. ("Mattel") as an expert consultant to Quinn Emanuel Urquart Oliver and Hedges, LLP ("QEOU&H") and to serve as a possible testifying expert witness in the above-identified case.  This is my written report concerning issues relating to U.S. Serial No. 10/373,602 (the '602 application), entitled "Doll with Aesthetic Changeable Footwear," naming Isaac Larian as the sole inventor therein and to duty of candor and inventorship issues pertinent to the filing and prosecution of that patent application

This report is based on information made available to me to date.  I understand, however, that preparation for trial continues and that I will have the right to supplement or amend this report or any further report in the event additional information pertinent to my opinions becomes known to me.  I further understand that I may be asked at trial to express opinions in rebuttal of matters that are raised at trial.

EXHIBIT   80

PAGE   889

Confidential – Attorney's Eyes Only

## I.   QUALIFICATIONS

I am a shareholder in and president of the firm of Cook, Alex, McFarron, Manzo, Cummings & Mehler, Ltd. Located in Chicago, Illinois. I graduated from the Northwestern University Technology Institute (now the McCormick School of Engineering and Applied Sciences) in 1959 with a Bachelor of Science degree in chemical engineering. Following my graduation from engineering school, I attended the Northwestern University School of Law, from which I graduated in 1962 with a Juris Doctor degree.

Prior to commencing my career as an attorney, I worked for approximately two years performing various engineering duties at Sinclair Refining Company in East Chicago, Indiana as a co-op student during alternate quarters from 1955 through March 1959. After graduating from engineering school, I worked during the summers of 1959 and 1960 as a chemical engineer with Allis-Chalmers Company in Milwaukee, Wisconsin.

My first legal employment was as a law clerk with the firm of Hill, Sherman, Meroni, Gross & Simpson during the summer of 1961. After my graduation from law school in June of 1962, I was employed as an associate by that firm, and remained there until mid-1963. Upon leaving the employ of the Hill, Sherman firm, I was associated for approximately one year with the firm of Dawson, Tilton, Fallon, Lungmus & Alexander. Thereafter, I joined the firm of Greist, Lockwood, Greenawalt & Dewey as an associate. I became a partner in that firm in 1968 and remained with that firm and its successors until 1999 when lawyers of my firm and of the firm of Cook, McFarron & Manzo formed my present firm.

Throughout my tenure with the firms noted above, I have spent the bulk of my time in the practice of law dealing with patent related matters at all levels. During the early years of my practice, I personally prepared, filed and prosecuted a significant number of patent applications

EXHIBIT ___80___

PAGE ___890___

2

with the United States Patent and Trademark Office. More recently, I have continued my patent prosecution practice by supervising and assisting other attorneys in my firm in patent application preparation and prosecution before the United States Patent and Trademark Office.

A substantial portion of my legal career has been devoted to providing opinions on patent infringement and validity issues, and representing clients (both patent owners and accused infringers) in patent litigation matters. I have represented and continue to represent a number of clients in patent-related matters involving the mechanical and chemical arts. During my career, I have studied, analyzed and given opinions on the prosecution of hundreds of patents. Most recently, I have accepted engagements as a patent expert in a number of cases involving the mechanical and chemical arts.

Among the professional associations of which I am a member are the Intellectual Property Law Association of Chicago and the American Bar Association.

A more detailed synopsis of my career is contained in my curriculum vitae which is attached to this report as Attachment A. My vitae also lists those cases in which I have testified as an expert witness during the last four years, by deposition and, where applicable, at trial.


## II.    COMPENSATION

I am being compensated for consulting and expert services provided in connection with this litigation at the rate of $460 per hour.


## III.   STATEMENT OF OPINIONS TO BE EXPRESSED

If called to testify at the trial of this case, I expect to generally testify about the nature and purpose of patents and patent applications. I will describe the steps involved in the filing and

EXHIBIT __80__                    3

PAGE ____891____

prosecution of the '602 application and explain the significance of its file history. I expect to
also explain the parts of a patent application and the function each part must play, including the
function of the claims. I expect to explain that a claim in a patent application is the definition
identifying the scope of a claimed invention. I also expect to explain why it is important that the
actual inventor(s) of the subject matter of each patent claim be properly identified and the
importance of the duty of candor and good faith in dealing with the Patent Office imposed on
each individual associated with the filing and prosecution of a patent application.

## IV.    INFORMATION REVIEWED

In preparing to render my opinion as set forth in this report, I have to-date reviewed the
following:

(1)    Exhibits 1, 3, 5, 499, 500, 501, 502, 503, 504, 546, 547, 548 and 549;

(2)    Declaration, Power of Attorney and Petition filed with the '602 patent application
(MGA 3765285-6);

(3)    Collection of documents, 9 pages (Bryant 12577-85);

(4)    Transcript of deposition of Carter Bryant, 3 volumes, pp. 1-727;

(5)    Transcript of deposition of Bryan Armstrong, pp. 223-253, 305-309 and 333-343;

(6)    Transcript of deposition of Samir Khare, pp. 97-104, 109-175 and 245-249.

## V.    STATEMENT OF OPINIONS TO BE EXPRESSED AND REASONS THEREFOR

### 1.    General Testimony

As background, it may be helpful to provide a brief description of certain aspects of the
patent application process.

EXHIBIT _____ 80

PAGE _____ 892

4

The Patent Application Process.  An inventor/applicant must go through a detailed procedure in the U.S. Patent and Trademark Office ("PTO") in order to seek a patent.  This procedure requires, among other things, that the person named in the application as the "inventor" provide a sworn statement that he is the original, first and a sole or a joint inventor of the subject matter claimed and for which a patent is sought.

Old or Obvious Inventions Are Not Patentable.  It should be understood that not every invention is patentable.  First of all, an invention has to be new.  That is, the PTO will not give the inventor a patent if the claimed invention turns out to have been previously known or in the public domain.  Therefore, the PTO patent examiner, in deciding whether to grant a patent, makes a search to see if there are any prior patents or publications, or instances of prior public knowledge or use (all of which we sometimes call the "prior art") that substantially show or describe the invention.  If there is such a reference in the prior art, the PTO examiner rejects the invention as "old" or "lacking novelty."

But just being "new" is not enough to qualify an invention for a patent.  If the invention, despite being technically novel, is so close to the prior art that it can be said to have been an obvious invention, the PTO will not grant a patent.  The test for obviousness is whether a person of ordinary skill in the art would have found the invention obvious at the time it was made.

Patent Claims and the Negotiation Process.  So in order to get a patent on an invention, the inventor/applicant has to tell how to make and use it, and also has to overcome any PTO objections that the invention was old or obvious.  Usually this requires some additional discussion between the inventor and the PTO.  This negotiation process is called "prosecution" of a patent application.  When the application is filed with the PTO, it contains one or more short numbered paragraphs at the end of the application which are called "claims."  The remainder of

5

EXHIBIT 80

PAGE 893

the "specification" contains the detailed written description of the invention (sometimes drawings are also used to help explain the invention).

Patent claims are important because they are the only way the public has of knowing exactly what the result was of the prosecution process that took place between the inventor/applicant and the PTO. Claims give the PTO examiner something that he or she can work with the see whether the invention was new and nonobvious, and if the patent is issued, tell the public exactly what it is that constitutes an infringement of the patent. For these reasons, 35 U.S.C. § 112 also requires, as a condition for patentability, that the claims particularly point out and distinctly claim the subject matter that the applicant regards as his or her invention.

The Duty of Honesty to the PTO. Although most of the PTO's business is in writing, it is important to understand that the public does not have a lawyer to represent it in the bargaining process with the inventor—only the inventor is represented by counsel. For this reason, the courts and the PTO have been very strict in requiring that the inventor and the lawyer disclose every bit of information that a reasonable patent examiner might consider important. Applicants, their lawyers and those persons associated with the filing and prosecution of a patent application also must be completely honest in what they tell the PTO; they cannot submit an affidavit, or declaration or other statement that is false or misleading or only partially true. In this case, the named inventor attempted to mislead the PTO both as to inventorship and failed to inform the PTO of the public disclosure of the "BRATZ" dolls more than one year before the filing date of the '602 application. This concealment was later compounded when Mr. Carter Bryant later submitted a sworn declaration which was false and misleading.

EXHIBIT 80

PAGE 894

6

## 2.   The "Changeable Footgear" Patent Application

On February 24, 2003 an application for patent entitled "Doll With Aesthetic Changeable Footgear" was filed in the U.S. Patent and Trademark Office naming Isaac Larian as the sole inventor. That application was accompanied by a sworn statement entitled "Declaration, Power of Attorney and Petition" wherein Mr. Larian affirmatively stated that he believed he was the original, first and sole inventor of the subject matter claimed in that patent application and further stated that he reviewed and understood the contents of the specification, including the claims and acknowledged his duty to disclose information material to the examination of that application in accordance with 37 C.F.R. § 1.56(a). That application, as filed, contained 17 claims, four of which were in independent form. Claim 1 which, for purposes of this report can be regarded as being representative of the independent claims, is reproduced below:

> 1.   A doll with changeable footgear comprising:
> a torso having a body and legs, said legs having a predetermined skin color and texture;
> a pair of foot/shoe assemblies, each including an open shoe with straps, with the shoe being open to expose at least part of the foot, the foot having substantially the same predetermined skin color and texture;
> each said assembly being removable secured to one of said legs at the lower leg or ankle of said doll at a separation point;
> each said assembly and lower legs having a snap-together joint with a protuberance on one part and a mating recess on the other part; and
> a simulated strap forming part of said shoe extending around said assembly at said separation point.

The application was acted on by Patent Examiner Ali Abdelwahed who issued an office action on May 12, 2003 wherein, among other things, he rejected all of the claims as being anticipated by the "BRATZ™ dolls reference" which he indicated "clearly discloses all of the structural limitations recited in claims 1-17."[1] Shortly thereafter, Mr. Larian's attorney, Alan C. Rose, contacted Examiner Abdelwahed requesting the references supporting that rejection. That

---

[1] This rejection under 35 U.S.C. § 102 (b) was expressly recited to include on-sale activities in a subsequent office action finally rejecting these claims.

7

EXHIBIT ___80___

PAGE ___895___

documentary support was provided and indicated that the so-called Bratz dolls had been

launched in June 2001 by MGA Entertainment, the company headed by Mr. Larian.

In preparing to respond to Examiner Abdelwahed's rejection of claims 1-17 based on the

Bratz prior art, Mr. Rose communicated with Mr. Carter Bryant and on August 11, 2003 sent him

a Declaration for his signature noting in the body of his cover letter, that "[o]ur patent application

was filed on February 24, 2003, so a release back in 2001 would be anticipatory, while a release

in the fall of 2002 would be within the one year grace period." Accordingly, Mr. Rose fully

apprized Mr. Bryant of the materiality of the Bratz prior art. The Declaration was signed by Mr.

Bryant and stated that he was familiar with the Bratz dolls project of MGA Entertainment and

that he had worked with Isaac Larian, president of MGA Entertainment on the Bratz doll project.

It then made the following representation:

> 4. "I was actively involved with the release of the Bratz dolls of the
> configuration as set for in paragraph 3, and this release did not occur until the fall
> of the year 2002."

Mr. Rose, in his Amendment filed on August 12, 2003 made a following statement:

> Regarding the 35 USC 102 rejection of all claims, attention is respectfully
> directed to the attached Declaration of Carter Bryant, a Freelance Designer who
> worked with the inventor on the Bratz doll project; and who confirms that the
> release date for the dolls as claimed in this patent application, did not occur until
> the fall of 2002. Of course, this is only a few months prior to the February 24,
> 2003 filing date of the present application. Accordingly, it is respectfully
> requested that the rejection based on the Bratz article be withdrawn.

I understand that the evidence will clearly show that the introduction of the Bratz dolls

occurred well prior to the one-year critical date. Accordingly, the declaration of Carter Bryant,

after having been advised of the materiality of the timing of the Bratz doll launch, in my opinion

can be viewed as a knowing effort to mislead the PTO by a willful false statement made under

oath in violation of 18 U.S.C. § 1001.

8

EXHIBIT ___80___

PAGE ___B96___

If called, I further expect to testify that the inventorship identified in the '602 application is incorrect and, in my opinion, constitutes a knowing effort to mislead the PTO. Inventorship in patent law is determined on claim-by-claim basis. Accordingly, if the claims as presented initially and as later amended in the patent application identify subject matter that can only be attributed to a person other than the named inventor (in this case, Mr. Bryant), the failure to identify him as a named inventor, in my opinion can be construed to be a knowing and willful misrepresentation as to inventorship.

Mr. Bryant, while still an employee of Mattel, Inc., presented representatives of MGA Entertainment with drawings of dolls that squarely fall within the scope of the clams of the '602 application in September 2000 more than two years prior to the filing of the '602 application. I further understand that the evidence will show that the Mr. Bryant has stated under oath he conceived the idea of detachable feet, as shown in a drawing contained in Exhibit 1, prior to his meeting with Mr. Larian. The claims in the '602 patent application specifically recite that the foot/shoe assemblies are removably secured to the lower leg or ankle of the doll by a "snap-together joint with a protuberance on one part and a mating recess on the other part. . . ." As such, these claims literally read on the Bryant drawings included in Exhibit 1 and the drawings from the '602 patent application which were attached to the Bryant Declaration. In fact, the specification of this application expressly stated both configurations were within the scope of the invention. The precise language in the specification reads as follows:

> "Thus, by way of example and not of limitation instead of having the protuberance 26 on the leg 16 and the recess 28 on the shoe/foot assemblies, this configuration may be reversed, with the protuberance on the shoe/foot assembly, and the recess on the doll legs."

EXHIBIT ____ 80

PAGE ____ 897

9

I am not aware of anything in the record showing that Isaac Larian conceived the idea of a doll having detachable feet before he was provided Exhibit 1 in a September 2000 meeting with Mr. Bryant.

In view of the foregoing, it is my opinion that the '602 patent application naming Isaac Larian as the sole inventor, as recited in his Declaration, contains material false statements, which could be construed to be in violation of 18 U.S.C. § 1001. The materiality of such a misrepresentation is important to the PTO for a number of reasons, one of which being it can be significant in determining when an invention was actually made.

After submission of the Bryant Declaration and accompanying Amendment, Examiner Abdelwahed finally rejected the claims in the '602 application on October 28, 2003. A document which I understand came from the files of MGA Entertainment identified as Exhibit 499, shows that this application was abandoned on November 26, 2003. If this is in fact the case, it appears that there was an affirmative abandonment by those prosecuting the '602 application prior to its normal date for abandonment which would have occurred six months from the date of that final rejection.

## VI.   **EXHIBITS**

I have not yet determined what exhibits I might use at trial of this action if I am called to testify. Such exhibits will be promptly identified to all concerned parties if and when I am so called.

Date: February 11, 2008

John L. Alex

EXHIBIT ____80____

PAGE ____898____

10

# CURRICULUM VITAE OF JOHN L. ALEX

<u>Business</u>

Cook, Alex, McFarron, Manzo, Cummings & Mehler, Ltd.
200 West Adams Street, Suite 2850
Chicago, Illinois 60606
(312) 236-8500

<u>Personal Data</u>

| | |
|---|---|
| Born: | July 25, 1936, Chicago, Illinois |
| Marital Status: | Married, three children |
| Residence: | Clarendon Hills, Illinois |

<u>Education</u>

| | |
|---|---|
| Law School:<br>1959-1962 | Northwestern University School of Law<br>Chicago, Illinois<br>Juris Doctor |
| Undergraduate:<br>1954-1959 | Northwestern University<br>Evanston, Illinois<br>Bachelor of Science, Chemical Engineering |

<u>Bar Admissions</u>

State of Illinois
Supreme Court of the United States
U.S. Courts of Appeals for the Federal, First, Seventh and Eighth Circuit
U.S. District Court, Northern District of Illinois (Trial Bar)
U.S. Patent and Trademark Office

<u>Professional Experience</u>

| | |
|---|---|
| 1999-Present | Cook, Alex, McFarron, Manzo, Cummings & Mehler, Ltd.<br>Chicago, Illinois |
| 1964-1999 | Lockwood, Alex, FitzGibbon & Cummings<br>Chicago, Illinois |
| 1963-1964 | Dawson, Tilton, Fallon, Lungmus &Alexander<br>Chicago, Illinois |
| 1962-1963 | Hill, Sherman, Meroni, Gross and Simpson<br>Chicago, Illinois |

EXHIBIT ___80___

PAGE ___899___

Attachment A
Page 2 of 2

<u>Professional Activities</u>

American Bar Association
American Intellectual Property Law Association
Intellectual Property Law Association of Chicago
The Lawyers Club of Chicago

<u>Practice</u>

Primary litigation responsibility (at trial and appellate level) in patent, trademark, copyright and related litigation;

Expert witness engagements in patent infringement litigation;

Patent, trademark and copyright licensing;

Validity and infringement evaluations and opinions;

Patent interferences;

Patent and trademark application preparation and prosecution;

Counseling in intellectual property matters.

<u>Cases Wherein I Have Testified As An Expert Witness at Trial or By Deposition Within the Preceding Four Years</u>

Ecolab v. Paraclipse, D. Nebraska (Deposition and Trial)

Lakewood Engineering and Manufacturing Co. v. Lasko Metal Products, Inc., N.D. IL (Deposition and Trial)

Caterpillar, Inc. v. Deere & Company, N.D. IL (Deposition)

Paymaster Technologies, Inc. v. The United States, U.S. Court of Claims (Deposition and Trial)

The Coca-Cola Company v. Pepsico, Inc. et al., N.D. GA (Atlanta Div.) (Deposition and Trial)

Novartis Corporation v. Teva Pharmaceuticals USA, Inc., D. NJ (Deposition)

Marine Polymer Technologies, Inc. v. HemCon, Inc., D. NH (Deposition)

EXHIBIT _____ BD

PAGE _____ 900

Attachment A
Page 2 of 2

**EXHIBIT 81**

Copyright Office fees are subject to change
yright Office
as the Copy-

**Form CA**
For Supplementary Registration
UNITED STATES COPYRIGHT OFFICE

VA 1—391—530

EFFECTIVE DATE OF SUPPLEMENTARY REGISTRATION

March 28 2005
Month   Day   Year

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**A**
Title of Work ▼
Sasha Drawing

Registration Number of the Basic Registration ▼
VA 1-218-488

Year of Basic Registration ▼
2003

Name(s) of Author(s) ▼
Carter Bryant

Name(s) of Copyright Claimant(s) ▼
MGA Entertainment, Inc

**B**
Location and Nature of Incorrect Information in Basic Registration ▼
Line Number ____3b____   Line Heading or Description Date of Publication

Incorrect Information as It Appears in Basic Registration ▼
February 12, 2001

Corrected Information ▼
at least as early as May 21, 2001

Explanation of Correction ▼

**C**
Location and Nature of Information in Basic Registration to be Amplified ▼
Line Number _____   Line Heading or Description _____
Amplified Information and Explanation of Information ▼



Δπ EXHIBIT 508
Deponent ARMSTRONG
Date 7/18/07 Rptr ACC
WWW.DEPOBOOK.COM

MORE ON BACK ▶  • Complete all applicable spaces (D-G) on the reverse side of this page   • Sign the form at Space F
DO NOT WRITE HERE
Page 1 of ___ pages

EXHIBIT ___81___

PAGE ___901___

M 0110211

FORM CA RECEIVED

**MAR 28 2005**

FUNDS RECEIVED DATE

EXAMINED BY

CORRESPONDENCE ☒

REFERENCE TO THIS REGISTRATION ADDED TO
BASIC REGISTRATION ☒ YES ☐ NO

FORM CA

FOR
COPYRIGHT
OFFICE
USE
ONLY

**D**

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET

Continuation of ☐ Part B or ☐ Part C

**Correspondence** Give name and address to which correspondence about this application should be sent
Carol A. Witschel
White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Phone (212) 819-8200          Fax (212) 354-8113          Email cwitschel@whitecase.com

**Deposit Account** If the registration fee is to be charged to a Deposit Account established in the Copyright Office give name and number of Account
Name _____
Account Number _____

**Certification*** I, the undersigned, hereby certify that I am the (Check only one)
☐ author     ☐ owner of exclusive rights)
☐ other copyright claimant   ☒ duly authorized agent of   MGA Entertainment Inc.
                                    Name of author or other copyright claimant, or owner of exclusive rights) ▲
of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name ▼ Carol A. Witschel          Date ▼ March 24, 2005

Handwritten signature (X) ▼   *Carol A Witschel*

**Certificate will be mailed in window envelope to this address**

Name ▼
Carol A. Witschel – White & Case LLP
Number/Street/Apt ▼
1155 Avenue of the Americas
City/State/ZIP ▼
New York, New York 10036

**G**

EXHIBIT ___81___

PAGE ___902___

M 0110212

**EXHIBIT 82**

6 -18 -3

HCA No. 1883/2003

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

CIVIL ACTION NO. 1883 OF 2003

***************

BETWEEN

MGA ENTERTAINMENT INC.                    1st Plaintiff

MGA ENTERTAINMENT (H.K.) LIMITED          2nd Plaintiff

And

DOUBLE GRAND CORPORATION LIMITED    Defendant

**********************

**AFFIRMATION OF LEE SHIU CHEUNG**

**********************

I, Lee Shiu Cheung of Room 1001, Empire Centre, 68 Mody Road, Tsimshatsui

East, Kowloon, Hong Kong do solemnly, sincerely and truly affirm and say as follows:-

1.  I am the Managing Director of MGA (H.K.) Entertainment Limited (hereinafter referred to as "MGA HK"), the 2nd Plaintiff herein, which is an affiliate of MGA Entertainment Inc., the 1st Plaintiff herein (hereinafter referred to as "MGA US"). I am duly authorised by MGA US and MGA HK to make this affirmation on their behalf. Unless otherwise stated, the facts and matters contained herein are true and they are either within my own personal knowledge or gleaned from books and records of MGA US or MGAHK to which I have free access. Insofar as facts and matters that do

EXHIBIT

PAGE

A03   82

1

not fall within the aforesaid category, they are related to me by the respective sources stated hereinafter and are true to the best of my information and belief.

2. MGA US was originally founded in 1979 as a consumer electronics business. In 1987, MGA US obtained exclusive rights to sell Nintendo hand held LCD games (Game Boy) in the USA and naturally, Game Boy was an instant success worldwide. This event paved way for MGA US to create innovative products for other best selling licenses, including Hello Kitty and Power Rangers. In 2002, MGA US added Spider-Man: The Movie and in 2003 MGA US added The Hulk to its already existing collection of licenses. MGA US is thus a successful and reputable company in the toy business. MGA US holds other licenses including licences from Marvel Characters, Inc., Atari Corporation and BVS Merchandising, Inc. (Disney). Now produced and shown to me marked exhibit "LSC-1" is a copy of the corporate profile of MGA US downloaded from its website.

3. Since 1987 MGA US has primarily concentrated and focused its efforts in the toy industry and as at the date hereof, MGA US has 8 product categories and they are smart toys, interactive dolls, handheld games, fashion dolls, youth electronics, music, licensed products and small dolls. In the years 2001 and 2002, MGA US's revenue exceeded US$98 million and US$225 million respectively. The projected revenue for the year 2003 is over US$650 million due to the success of a range of dolls known as BRATZ which is the subject matter of this action and will be dealt with in detail hereinafter. For the year 2002, the sale of BRATZ dolls and, accessories accounted for 69% of the total revenue of approximately US$225 million. MGA US forecasts that the sale of BRATZ dolls, and accessories for the year 2003 will account for 72%

EXHIBIT
PAGE
82
704

2

of the revenue of this year.

4.  Toys designed and marketed by MGA US have been the subject of numerous awards and prizes.  However, the most successful toy designed and marketed by MGA US must be BRATZ dolls.  For two consecutive years, MGA has won the toy industry's most prestigious award, The People's Choice Toy of the Year for Bratz-related toys.  It has also won two consecutive Family Fun Toy of the Year award for Bratz-related toys.  Additionally, in 2001 and 2002, Bratz-related toys won Today's toy tests.

5.  The BRATZ dolls come in 2 sizes.  The full version stands at 10 inches tall and the mini version stands at 4 and a half inches tall.  The mini version has been marketed under the names "Micro Bratz" and "Lil' Bratz" but will be referred to herein as "mini Bratz"

6.  MGA HK has become a manufacturing licensee of MGA as of 1st January 2003.

**Copyright Works**

7.  On 18th September 2000, MGA entered into an agreement with Mr. Carter Bryant (hereinafter referred to as "Mr. Bryant") whereby Mr. Bryant designed and developed a line of dolls known as BRATZ (hereinafter referred to as "the Bryant Agreement").  Mr. Bryant was a graduate of Ottis College in fashion and toy design.  Although BRATZ is a misspelling of the word "brats", the former was coined by MGA US not to denote naughty or spoilt children by to denote hip and cool young adolescent or

3

EXHIBIT 82

PAGE 405

teenage girls. This idea of hip and cool is born out in the design of the BRATZ dolls.

8. Now produced and shown to me marked "LSC-2" is a copy of the Bryant Agreement. I crave leave to draw this Court's attention to clause 3 of the Bryant Agreement whereby all intellectual property rights including copyright subsisting in the works generated by Mr. Bryant shall be owned by MGA US. Pursuant and prior to the Bryant Agreement and commission, Mr. Bryant initially designed a range of 4 girls and subsequently extended the range by adding 1 more girl and 2 boys. The designs of the BRATZ dolls are all original drawings created by Mr. Bryant using his own independant labour, skill and judgement. At all material times, Mr. Bryant is a resident of and domiciled in the USA.

9. Now produced and shown to me marked "LSC-3 " are copies of 17 initial concept drawings of the first 4 BRATZ dolls designed by Mr. Bryant pursuant to the Bryant Agreement. Now produced and shown to me marked "LSC-4" is a copy of a sheet of paper setting out the initial concept and idea of the BRATZ dolls by Mr. Bryant. The girls represent best friends in high school who love to trade clothes, shoes and hairdos. Since these accessories are interchangeable, the dolls can look different every day. The success of the BRATZ dolls ensured a lucrative business of supplying accessories to the owners of BRATZ dolls creating a steady stream of revenue.

PAGE 900    EXHIBIT 82

4

Confidential - Attorney's Eyes Only                MGA 0993023

10. The first 4 BRATZ dolls were given a name and a different ethnic origin so they could appeal to everyone in the targeted age group of girls between 5 and 14 years old. Cloe is Caucasian, Sasha is Black, Yasmin is Hispanic and Jade is Asian. Meygan the 5th female doll that was subsequently added to the range is a red-head.

11. After making the design drawings exhibited as "LSC-3", wax models of the sculpting of the head, body parts and shoes of the BRATZ dolls were made by Margaret Leheay who is a freelance sculptor in or about winter 2000-2001. These wax models were created by Margaret Leheay using her own independent skill, labour and judgement. Margaret Leheay was commissioned by MGA US to make the said wax models for valuable consideration. At all material times, Margaret Leheay was a resident of and domiciled in the United States of America. It was the understanding and agreement between Margaret Leheay and MGA US that all intellectual property rights including copyright subsisting in the wax models shall belong to MGA US. Now produced and shown to me marked exhibit "LSC-5" being a copy assignment of copyright executed by Margaret Leheay in favour of MGA US.

12. The wax models were then used to make silicon rubber moulds of the head, body parts and shoes of the BRATZ dolls. The silicon rubber moulds were made under commission by Jessie Ramirez under valuable consideration in or about winter 2000-2001. These silicon rubber moulds were created by Jessie Ramirez using her own independent skill, labour and judgement. At all material times, Jessie Ramirez is a resident of and domiciled in the United States of America. It was the understanding and agreement between Jessie Ramirez and MGA US that all intellectual property rights including copyright subsisting in the silicon rubber moulds shall belong to MGA

5

Confidential - Attorney's Eyes Only

PAGE ___ 909

EXHIBIT ___ 82

MGA 0883924

US. During the process of making the silicon rubber moulds the wax models were destroyed.

13. Polyurethane samples were produced from the silicon rubber moulds. The silicon rubber moulds have also been destroyed after the polyurethane samples were made. These samples were necessary for the making of production moulds of the dolls. There are now produced and shown to me marked "LSC-5" the polyurethane samples of the head sculpt and some body parts and shoes of the full version BRATZ dolls. It was the understanding and agreement between Jesse Ramirez and MGA US that all intellectual property rights including copyright subsisting in the polyurethane samples shall belong to MGA US. Now produced and shown to me marked "LSC-6" is the copy assignment of copyright executed by Jesse Ramirez in favour of MGA US.

14. As regards the mini Bratz, the design process is more or less the same as the full sized version. Margaret Leheay was again commissioned to produce wax models of the miniature version of the Bratz dolls. The wax models were used by Jessie Ramirez to produce silicon rubber moulds and from the silicon rubber moulds, polyurethane samples of the head and body parts were produced. Now produced and shown to me marked as "LSC-7 " are polyurethane samples of the head and body parts of the mini Bratz. Again, the wax models and the silicon rubber moulds were destroyed during the process only leaving behind the polyurethane samples behind. Similar to the full sized version, copyright subsisting in the mini version of the wax model, silicon rubber moulds and polyurethane samples belong to MGA US and are covered by the assignment exhibited as "LSC-6".

6

Confidential – Attorney's Eyes Only

MGA 0883925

EXHIBIT 82
PAGE 708

15. The facial decorations and features of the BRATZ dolls are unique and much time, effort and monetary resources have been expended in perfecting them. MGA US commissioned one Anna Rhee to design the facial decoration of the BRATZ dolls with the understanding and agreement that all intellectual property rights including copyright shall belong to MGA US. At all material times, Anna Rhee is a resident of and domiciled in the United States of America.

16. Based on and originated from the initial concept drawings of Mr. Bryant, Anna Rhee drew some decoration directions for the facial decorations for different series of dolls. She then created the original deco masters which are hand-painted facial decorations on a rubber head sculpt of a doll. With the input of Mr. Bryant, Ms. Rhee revised the deco masters a number of times until they are perfected being the final version that were used to serve as the benchmark and template from which the original four different Bratz dolls' individual facial decorations are mass produced by spray masking. Now produced and shown to me marked "LSC-8" is the pile of decoration directions (inclusive those on the 2001 Fall series), "LSC-9a to d" are the deco masters for the 2001 Fall Series and "LSC-10" is a bundle of documents setting out the various changes during the design process made by Anna Rhee from the initial concept drawings of Mr. Bryant.

17. The full size versions of the first 4 BRATZ dolls were first published in the United States of America in November 2001 (2001 Fall Series) when they were offered for

7

Confidential – Attorney's Eyes Only

MGA 0883926

EXHIBIT ___ 82

PAGE ___ 909

sale to the general public. The mini versions of the first 4 BRATZ dolls were first published in the United States of America in or about March 2002 when they were offered for sale to the general public. Both versions of the BRATZ dolls were available for sale in Hong Kong since December 2002. Now produced and shown to me marked "LSC-11a to d" are samples of the first 4 full sized version BRATZ dolls in their packaging and "LSC-12" is a sample of Cloe in the mini version and her packaging.

18. The Bratz dolls are unique in a variety of ways including their oversized heads and individual facial decoration. One thing that has contributed to the success of Bratz and mini-Bratz is the oversized eyes and mouth that are capable of being decorated with makeup and the diminished size of the nose that serves no decoratative purposes. Thus, the elements of the face that can be made-up, the eyes and mouth, are exaggerated while the elements of the face that cannot be made-up, the nose, is reduced. In addition, Bratz make-up is multi-colored and the eyelashes are exaggerated in size but limited in number of eyelashes. The lipstick is also two-toned in order to draw attention to the lips.

19. A prominent feature of Bratz and Mini-Bratz is the snap on shoes. Carter Bryant originally designed the snap on shoes so that shoes could be an important part of the play value of Bratz. By employing snap on shoes, girls are able to easily change the dolls footwear and it allows many different varieties of footwear to be worn by the dolls.

20. Insofar as this action is concerned, the Defendant has copied the facial decoration of

PAGE _____ 010

EXHIBIT _____ 82

8

Confidential – Attorney's Eyes Only

MGA 0883927

the full and mini versions of Cloe and the head, body parts and shoes of the mini version of Cloe. I crave leave to refer to "LSC-11a" and "LSC-12".

21. The current average FOB sales value of the full and mini version of the BRATZ dolls are respectively US$10.66 and US$4.73.

22. The BRATZ dolls and their accessories (which are not the subject matter of this action) are marketed and sold in more than 52 countries and places including the European Union, the Americas, the Balkans, the Baltics, Norway, Switzerland, Russia, Ukraine, Poland, Hungary, Czech Republic, Lebanon, UAE, Saudi Arabia, Egypt, Syria, Israel, South Africa, Australia, New Zealand, Philippines, Indonesia, Taiwan, Thailand, Singapore, South Korea, Japan and Hong Kong.

23. The BRATZ dolls have their own website at www.bratzpack.com. The site provides some games, e-greetings and Mix N Match Mall of Bratz' fashion and hairdos. The site also maintains a fan club known as BRATZ pack and maintains a list of its members. The aim of this fan club is to notify its members of new fashion trends that the BRATZ dolls will wear themselves and the launch and marketing thereof. Now produced and shown to me marked "LSC-13" are downloaded copies from the said web-site.

23. So far MGA US has spent a total of over US$22 million in advertising and promotion expenses worldwide in relation to the Bratz brand.

PAGE ___ 9||   EXHIBIT 82

9

Confidential - Attorney's Eyes Only

MGA 0883928

24. As mentioned hereinbefore, the BRATZ dolls have become an instant success and they have become collectibles. Considerable media coverage have been given to these dolls and now produced and shown to me marked "LSC-14" is a selection of press cuttings and celebrity photos of the BRATZ pack.

25. Another major source of revenue generated by the BRATZ dolls is income derived from merchandising rights by granting non-exclusive licenses to other companies worldwide. So far, 120 merchandise licence agreements have been granted in respect of a wide range of products including paper napkins, girls clothing, jewelry, bedding, home furnishing, stationery, toiletries, video games, footwear and electrical appliances etc. Pursuant to these licenses, Bratz branded goods are sold in Spain, Portugal, Australia, New Zealand, Finland, Germany, Austria, Switzerland, France, Belgium, Luxembourg, Mexico, Italy, UK, Ireland, Eire, Greece, Norway, Channel Islands, Brazil, Columbia, Greece, Cyprus, Denmark, Iceland, Sweden, Columbia, Venezuela, Turkey, Peru, Israel, all Central America countries, all Carribean Island countries, Dominican Republic, Ecuador, Venezuela, Bolivia, Paraguay, Chile, UAE, Saudi Arabia, Kuwait, Iran, Lebanon, Syria, Jordan, Egypt, Qatar, Oman, Behrain, Yemen and Hong Kong. MGA projects annual licensing revenue of $12 million per year by year-end 2004.

26. Furthermore, MGA US has granted exclusive distribution rights of the BRATZ dolls and accessories to Bandai Inc. for a term of 3 years starting from 1st April 2001 in France, Belgium, Germany, Austria, Switzerland, Spain, UK, Portugal, Ireland,

EXHIBIT 82

PAGE 712

10

Confidential – Attorney's Eyes Only

MGA 088 3929

Luxembourg and Netherlands.

**The Defendant and its Infringing Activities**

27. BY reason of the success of the BRATZ dolls many knock offs have appeared in the market. In order to save guard the business interests and exclusivity of the BRATZ dolls, the Plaintiff had obtained interim injunctions in Hong Kong against Toys & Trends (Hong Kong) Limited and Cityworld Limited. The Plaintiff has also taken action in the UK against LB Group Limited and David Halsall International Limited who settled the Plaintiff's claims and paid significant amounts of damages.

28. Now produced and shown to me marked "LSC-15" is a copy of the latest annual return of the Defendant. It was filed on 18th July 2002. The Defendant has a paid up capital of HK$10,000 of which 1 share with a nominal value of HK$1.00 is held by Peter Leung. Peter Leung and Leung Wai Hung are directors of the Defendant.

29. I crave leave to refer to the Affidavit of Ray Black dated 13th June 2003 and filed on behalf of the Plaintiffs which sets out the full background that brought to light the infringing activities of the Defendant.

30. On 6th March 2003, Mr. Ray Dorrity of Bandai, UK ("Dorrity"), the distributor of BRATZ dolls in the UK had discovered the sale of "Mini Trendy Teenz" by one Fareham Toys in Fareham, the UK. Dorrity then purchased two samples of the Mini Trendy Teenz

11

Confidential – Attorney's Eyes Only

MGA 0883930

EXHIBIT 82

PAGE 913

and had referred the matter to Mr. Ray Black of SJ Berwin, the UK lawyers of MGA US together with the samples. Now produced and shown to me marked "LSC-16" is a sample of the infringing Mini Trendy Teenz obtained by Dorrity.

31. SJ Berwin had obtained 4 full sized versions Trendy Teenz from Toy Depot UK on 25th March 2003 and sent a sample to Messrs. William W. L. Fan & Co. in end March 2003. Now produced and shown to me marked exhibit "LSC-17" is the said sample.

32. In the meantime, private investigators were instructed to conduct enquiries into the Defendant's infringing activities. I crave leave to refer to the Affirmation of Lam Yuen Chak of Kroll Fact Finders Limited dated 16th June 2003 and filed on behalf of the Plaintiffs.

33. On 4th April 2003, Mr. Erik Siersema of Hasbro, UK, the distributor of BRATZ dolls in Holland, wrote to Sandrine Raspide of MGA US disclosing to MGA US that they had encountered a "L'il Bratz knock off" called Designer Girls / Mini Trendy Teens with the name Toy Depot (Far East) Company in HK on the packaging and enquired about the "Bratz Knock Off products / protection". Now produced and shown to me marked "LSC-18" is a copy of the said e-mail and "LSC-19" is a sample of Mini Trendy Teenz provided by Hasbro UK, the back of the packing bears two companies names, namely one "Kingsley Paige Plc" and one "Toy Depot (Far East) Company".

34. In reliance of what Mr. Connolly had said to Mr. Ray Black that he was able to procure undertakings from the Defendant and/or its directors, the Plaintiffs' solicitors in Hong Kong wrote to the Defendant on 6 May 2003 requesting a suitable undertaking from

12

Confidential - Attorney's Eyes Only

MGA 0883931

EXHIBIT 82

PAGE 914

the Defendant. Now produced and shown to me in a bundle marked "LSC-20" is a copy of the said letter. The Defendant's solicitors replied on 12 May 2003 requesting more time to take instructions. The said letter is exhibited as "LSC-21". Correspondence was exchanged between the 2 firms, copies of which are all exhibited as "LSC-22". The end result of this series of correspondence was that the Defendant might have been alerted of an impending civil claim and refused to supply samples to the investigators. Accordingly, a writ was issued against the Defendant on 26 May 2003. However, if Mr. Connolly did not misrepresent that the Defendant was willing to give suitable undertakings, the writ would be issued against the Defendant sooner. The misrepresentation of Mr. Connolly lured the Plaintiff into a false sense of security.

35. However, the investigations do show that the Defendant was still dealing in mini version of the Trendy Teenz which is a slavish copy of the mini version of Cloe down to the shoes and its snap on function. However, due to time constraints the Plaintiff has been unable to locate the copyright works relating to the shoes. The facial decoration of the doll head design on the Bobble pen and Rocker Headz Bobbing Fashion doll is also a reproduction of the facial decoration of Cloe. I crave leave to refer to paragraph 9 of the Affirmation of Lam Yuen Chak on the Defendant's quotations.

36. We have visited the Defendant's website again at www.doublegrand.com on 26th May 2003. The front page displayed some photographs of the Defendant's products including the Rocker Headz Bobblehead Fashion Dolls. Now produced and shown

13

Confidential – Attorney's Eyes Only

MGA 0883932

to me marked "LSC-23" is the print-out of the web-site.

## BALANCE OF CONVENIENCE

37. As already adverted to hereinabove, one of the main revenue streams of the BRATZ
dolls are license fees. The demand and price of BRATZ licenses depend on the
exclusivity and popularity of the product.

(i) The FOB value of Mini Trendy Teenz was US$0.86 each only, while the mini
Bratz is sold at US$4.73. The quotations from the Defendant on the Mini
Trendy Teenz, RockerHeadz Bobblehead Fashion Dolls and RockerHeadz
Fashion Doll Bobble Pen also reflected that the infringing articles are cheap
imitations of the Bratz dolls.

(ii) Bratz is popular because of its unique funky and sassy image. I also refer to
paragraph 18 hereinbefore explaining the unique facial features of the dolls.
The Trendy Teenz, RockerHeadz Bobblehead Fashion Dolls and RockerHeadz
Fashion Doll Bobble Pen have copied BRATZ' image in particular the eyes and
lips and will dilute the exclusivity and affect the image of the BRATZ dolls.

The continual sale of the cheap imitations will no doubt affect the demand of licenses
and the prices that MGA US can command. Any dilution in exclusivity and diminution
in value of license fee is a potential loss which can not be adequately compensated
by damages. It is impossible to calculate the monetary loss in this regard.

(iii) Furthermore, Bandai UK, MGA US' licensee in the UK and Hasbro, MGA US'
distributor in Holland have already lodged complaints to MGA US concerning
the appearance of the infringing dolls on the markets. Now produced and

14

Confidential - Attorney's Eyes Only

MGA 088 3933

PAGE ____ 916      EXHIBIT ____ 82

shown to me marked "LSC-24" is an e-mail from Mr. Dorrity to Mr. Ray Black of SJ Berwin of 2nd June 2003.  As shown in Dorrity's said e-mail, the continual sale of the cheap imitations would no doubt adversely affect the sales of BRATZ.

38.   From the aforesaid e-mail from Mr. Dorrity of Bandai to Mr. Ray Black and from the e-mail from Mr. Erik Siersema of Hasbro as referred to above ("LSC-18"), the licensee and distributor of Bratz have expressed their deep concern about the status of Bratz knock off products protection.  Thus, the appearance of the infringing Trendy Teenz dolls have already caused concern and if the Defendant is not stopped, MGA US's future bargaining power with Bandai UK and Hasbro would be affected.  Bandai Inc. is one of the largest toy companies in the world and MGA US cannot afford to maintain a lesser bargaining position by reason of the appearance of cheap imitations.  The will affect the terms of the distributorship when it comes up for renewal next year.  Cheap imitations also affect the value of licence fees and such loss is irreparable and unquantifiable.

39.   The targeted consumers of BRATZ dolls are girls aged between 4 and 14 years old.  They may not all be savvy or mature enough to notice the Mini Trendy Teenz, full version trendy Teenz dolls, RockerHeadz Bobblehead Fashion Dolls and RockerHeadz Fashion Doll Bobble Pen are not of MGA US' manufacture.  Many customers may have mistakenly thought this is an addition to the line of BRATZ dolls especially the Mini Trendy Teenz is of the same size as Little Bratz.  Even without taking the aforesaid into account, it would be entirely a matter of guesswork to know how many sales of BRATZ dolls would have been made were it not for the

15

Confidential – Attorney's Eyes Only

MGA 0883934

PAGE _____ EXHIBIT 82

917

Defendant's unlawful activities. It would be difficult, if not impossible, for MGA US to show any diminution in projected sales was attributable to infringing copies on the market.

40. Since toy safety laws in the USA are very stringent, MGA HK had to conduct many safety, reliability and drop tests on the BRATZ dolls. There is no evidence that the Defendant did any of these tests to comply with US legislation. There is also no evidence to show that Mini Trendy Teenz, full version trendy Teenz dolls, RockerHeadz Bobblehead Fashion Dolls and RockerHeadz Fashion Doll Bobble Pen are available for sale in USA at retail level. However, this does not stop North American customers from purchasing these infringements through the web. Due to the apparent similarity between the toys, any accident caused by defective manufacture in USA or elsewhere e.g. maybe falsely attributed to BRATZ dolls and the Plaintiffs. Again this damage to reputation, especially to a new product is unquantifiable and irreparable.

41. Since Toy Depot Ltd., the exclusive distributor of Trendy Teenz dolls in the UK, has agreed not to deal with the infringing dolls anymore and the Defendant has only just embarked on its unlawful activities, the balance of convenience would favour the grant of an injunction for any loss would be easily quantifiable by mould costs and limited advertising expenses incurred unlike on the other hand, the Plaintiffs' BRATZ dolls have appeared in the market for longer than the Defendant's dolls.

42. As shown by the Defendant's annual return herein, it is an insubstantial company and its ability to pay damages is in doubt. On the other hand, as shown hereinabove

16

EXHIBIT 82

PAGE 918

Confidential – Attorney's Eyes Only

MGA 08B3935

MGA US is a company doing business in a substantial way and it is able and willing to give a cross-undertaking on damages.

Affirmed at *Messrs. C.L. Chow &* )
*Mackson Chan, Solicitors,* )
*Rooms 501-2, Hang Seng Building,* )
*77 Des Voeux Road Central, H.k.* )
this **14day** of June 2003.    )

Before me,

*Chan Yin Chun*
Chan Yin Chun
Solicitor Hong Kong SAR
Solicitor & Mackson Chan, Solicitors

This affirmation is filed for and on behalf of the 1st and 2nd Plaintiffs.

EXHIBIT 82
PAGE 919

17

Confidential – Attorney's Eyes Only

MGA 0883936

**EXHIBIT 83**

# ABC International Traders, Inc.

March 2001

Business Plan Copy Number [1]

This document contains confidential and proprietary information
belonging exclusively to ABC International Traders, Inc.

Isaac Larian
Chief Executive Officer
16730 Schoenborn Street
North Hills, California 91343
818-894-2525

*This is a business plan. It does not imply an offering of Securities.*

EXHIBIT ___83___

PAGE ___920___

Confidential - For Attorney's Eyes Only

MGA 4033288

# Table of Contents

Vision and Mission ............................................................................................ 4

   Present Situation ........................................................................................ 4

   Vision and Mission .................................................................................... 6

   Goals ........................................................................................................ 7

   Objectives ................................................................................................ 7

Company Overview .......................................................................................... 10

   Legal Business Description ...................................................................... 10

   Management Team .................................................................................. 11

   Strategic Alliances .................................................................................. 13

Market Analysis ............................................................................................... 15

   Market Definition .................................................................................... 15

   Risk ........................................................................................................ 18

Marketing Plan ................................................................................................ 19

   Sales Strategy ........................................................................................ 19

   Distribution Channels ............................................................................. 20

   Advertising and Promotion ..................................................................... 21

   Public Relations ...................................................................................... 23

Line List .......................................................................................................... 24

Financial Plan (TLP) ........................................................................................ 25

Media Plan ...................................................................................................... 26

2.

EXHIBIT ____ 03 ____

PAGE ____ 921 ____

Confidential - For Attorney's Eyes Only

MGA 4033289

# Vision/Mission

## Present Situation

Barbie dominates the $655 million (per NPD TRSTS) Fashion Doll category. Out of the top 25 selling items in the category for YTD 2000, only four were not some variation of the Barbie brand. This leaves very little room to maneuver for other companies and brands hoping to break into the category. In fact, the picture gets bleaker with the realization that of the four items in the top 25 that are not part of the Barbie brand, all are licensed.

The operating environment was similarly hostile to attempted entry in 1998 and 1999. Only three of the top 25 items and two of the top 25 items respectively were not Barbie branded. Those items that were not Barbie branded, were licensed. The entire category, therefore, has a history of complete domination by Mattel, with minimal shelf space for one or two very successful licenses.

For YTD 2000, TRSTS data indicates that over 90% of all sales in the category were Mattel manufactured products. Play Along received 3.3% from its Britney Spears dolls. Kid Kore managed to grab 1.5% of the market based on its marginally successful line of non-licensed fashion dolls.

The Fashion Doll category declined −1%, 2000 vs. 1999. The #1 Fashion Doll in 2000 was Celebration Barbie with $38M in sales as compared to Barbie Millennium with $49M in sales in 1999. Celebration Barbie finished the year as the #7 ranked traditional toy. Another successful item for Mattel was the Barbie Wizard of Oz Asst., ranking #13 among all traditional toys in 2000. Barbie Wizard of Oz actually sold more individual units (1.9M units) than Celebration Barbie (1.3M units) as Barbie Wizard of Oz retailed for $15 compared to Celebration Barbie at $29 (NPD Group TRSTS, 2001)

In 2000, the top 5 Dolls were all introduced by Mattel, and all ranked among the top 25 traditional toys. These dolls include Celebration Barbie, Barbie Wizard of Oz Asst., Diva Starz Doll Asst., Barbie & Krissy Mermaids and Dancin Debbie.

ABC International Traders, Inc. is launching its own line of fashion dolls in Fall 2001, Bratz™. The Bratz are four unique fully-articulated dolls which include Cloe, Sash, Yasmin and Jade. If ABC were to achieve a moderate success in the confines of the category, it would be considered a major sales victory because of the sales dollars generated. For example, if ABC had produced the #15 selling fashion doll in 1999, that would project out to sales for ABC of $16 million or 24% of the 1999 total sales. So although manufacturing a #15 selling item carries little prestige, the success of the item in this case is unquestionable.

3

Confidential - For Attorney's Eyes Only

EXHIBIT ____83____

PAGE ____922____

MGA 4033290

## Company

ABC International Traders, Inc. was founded in 1979 and is presently in its growth stage. ABC International Traders, Inc. can best be described as currently being in the business of manufacturing consumer electronic toys. In recent times our key strengths have been state-of-the-art technology and innovative marketing.

## Management

Most of our management team is in place, however, we require a Chief Operating Officer and a Vice President of Product Development to complete our team by April, 2001. Also, we are currently hiring three employees to handle product development and marketing.

## Products and Services

At present, Bratz™ is in the production stage and will be on the shelves of mass market, mid-tier and drug retailers in June 2001. Each Bratz will have an MSRP of $14.99. ABC will also offer three fashion packs including Pajama Power, Study Hall Style and Dynamite Dance for an MSRP of $7.99.

Our current product line is in need of a brand extension for Spring 2002 which will consist of new fashions for the four Bratz. This new line of Bratz will also include a new hairplay feature whereby the consumer can remove the current hairpiece and replace it with another. The hairplay feature included in the doll packs will be supported by a hairpack SKU with an MSRP of $7.99. In order to be price sensitive for Spring, also offered will be a $9.99 Character Pack which will include one doll without the mix 'n match feature. In Spring, the Bratz will have new fashions and a bevy of hairstyles from which to choose.

In Fall 2002, the Bratz will become interactive. Using infared technology, they will be able to communicate with one another on various topics. ABC will still offer Cloe, Sasha, Yasmin and Jade (in new, funky fashions) but will introduce a new character as well. The interactive Bratz will have an MSRP of $24.99. Sold separately will be a BratzPack (MSRP $12.99) in which the consumer can now carry her Bratz fashion dolls and accessories. One of those accessories will include a choice of three modes of transportation all at an MSRP of $29.99; a scooter, a Vespa or a pink convertible (again using infared technology). Another introduction will be a large Bratz head where the consumer can use makeup play pattern to pretty up their Bratz. Included will be lipstick, eyeshadow, glitter, hairgels and blush for an MSRP of $19.99. As hair styles change with the seasons so too will the Bratz Hairpacks for Fall (MSRP of $7.99). Lastly, fashion packs for Fall will be refreshed (MSRP $4.99).

4

Confidential - For Attorney's Eyes Only

EXHIBIT _____ 83

PAGE _____ 923

MGA 4033291

## Market Environment

The fashion doll marketplace has been stagnant for 30 years. We are now poised to introduce a fashion doll that Mattel does not understand.   Barbie's target demographic is girls 4-6 years old.

In August 2000, Mattel introduced an electronic mini-doll line, Diva Starz.  In 2000, Diva Starz sold over $21M (NPD TSRTS) at an average selling price of $27.37 per doll.  Diva Starz' target demographic is girls 5-7 years old.

ABC's Bratz combine the classic play pattern of Barbie and the extreme, contemporary play of Diva Starz.  It is in this offering, ABC can create a new category.  ABC's core target market is girls 7-11 years old.  Bratz creates a niche that appeals to girls that Barbie does not understand and Diva Starz simply does not appeal to.

## Customers

Current customers who have ordered Bratz include, but are not limited to, Wal-Mart, Target, Kmart, Toys 'R Us, K*B Toys, Rite Aid and Walgreens.

## Distribution

We have worldwide distribution and sell to more than 33,000 storefronts in the United States alone.  ABC International Traders, Inc. has over 200 sales people working out of 10 offices.

## Vision and Mission

### Vision

By 2002 ABC International Traders, Inc. will be a highly visible company known as a leader in the fashion doll industry. We will have developed four unique dolls and marketed these products in the mass market channels.  Sales will exceed ABC International Traders, Inc. will actively be promoting the Bratz™ through television advertising, print advertising, web site, end caps, POP and FSI.  We are also looking to secure a promotional partner by September 1, 2001.

5

Confidential - For Attorney's Eyes Only

EXHIBIT _____ 83

PAGE _____ 924

MGA 4033292

REDACTED

**Mission Statement**

In order to achieve our Vision, ABC International Traders, Inc. commits to the following:

ABC International Traders, Inc.'s Mission is to seize and sustain 3% market share in the fashion doll and ancillary categories.  In carrying out our day-to- day business we strive to:

1.   Treat our employees with respect.

2.   Follow the philosophy that our customers are our priority.

3.   Be considered as a leader in our toy community.

Through a long-term commitment to this mission, we will be known as a company that offered consumers an alternative to Barbie in the 21st century. Our customers, vendors, and employees see ABC International Traders, Inc. as offering innovative products at an affordable price point.

## Goals & Objectives

1.   Initiate the launch strategy of Bratz
     - Production start date of April 28, 2001
     - Website will be live by June 1, 2001 (budget of $75k)
       - ➢ Obtain freelance developed by March 12, 2001
       - ➢ Finalize creative pitch from vendor by March 21, 2001
     - Television commercial spot will air by October 1, 2001 ($150k to shoot - $2.5M in media budget)
       - ➢ Delivered to networks by September 15, 2001
       - ➢ Commercial production to begin end of second quarter 2001
       - ➢ Storyboards due by April 15, 2001
       - ➢ Bids from production companies due by April 15, 2001
       - ➢ Selection of production company by April 30, 2001
     - Retailer advertising campaigns underway
       [insert info from Pat]
       - ➢ Senior Product Manager to bring product samples from Hong Kong by March 21, 2001
       - ➢ Shoot product for ad slicks the week of March 26, 2001
       - ➢ Finalize strategy with Sales Department on April 3-4, 2001
         - ♦ End caps
         - ♦ FSI
         - ♦ Floor minders
         - ♦ POP

2.   Secure $250k in Advances and/or Guarantees by December 30, 2001 through licensing of the Bratz brand.

6

Confidential - For Attorney's Eyes Only

EXHIBIT ___83___

PAGE ___925___

MGA 4033293

Since the Bratz™ have a passion for fashion, product roll-out will begin with apparel for Fall 2002. ABC International Traders will become a licensor to a host of apparel licensees. The Bratz™ apparel will be launched at the MAGIC Show in Las Vegas, February 2002. Categories will include apparel, t-shirts, innerwear, sleepwear, outerwear and hosiery.

Also launching in Fall 2002 in time for Back-to-School will be stationery, calendars and diaries. ABC has already received interest from Shaw Creations, Inc. (licensee of Warner Bros. and Disney) to create Bratz™ raincoats and umbrellas.

In order for ABC International Traders, Inc. to attain its vision in the manner described in our mission statement, the following primary strategic goals need to be achieved:

- Create collateral press kit to distribute to prospective licensees (mini-disc)
- Kit components to include:
  - ➤ Flash animation/website/ad slicks
  - ➤ Media Charts/Promo plans/distribution profile
  - ➤ Press Release
  - ➤ Corporate Backgrounder
  - ➤ Clips (print, tv)
  - ➤ Character profiles and Background
  - ➤ Prospective Licensee Form
  - ➤ Digital photos
  - ➤ Mini-disc completed by May 1, 2001
  - ➤ Style guide for licensees completed by June 12, 2001
- Bids from vendors due by March 20, 2001
- Exhibit Bratz at the International Licensing Show (10x20 booth) at the Jacob Javits Convention Center, June 12-14, 2001
- Facilitate Bratz RoadShow to major retailers (Wal-Mart, Kmart, Target, Toys 'R Us, K*B Toys) to begin in May 2001
- Place one Full-page ad in *License! Magazine* for May, June, July 2001 ($13,500)

3. Obtain 20M impressions by December 1, 2001
- Place full-page ads in consumer and trade publications (*License!, Jump, Cosmo Girl, Teen*)
- Launch Bratz at FAO Schwartz September 1, 2001
- Participate in PlayDate in New York, October 2001

4. Exceed break-even of 800,000 units of Bratz™ fashion dolls (goal is to ship 3.5M units by December 31, 2001). Current forecast:
- Toys 'R Us          200K pcs
- Wal-Mart          150K pcs

7

Confidential - For Attorney's Eyes Only

EXHIBIT _____ 83

PAGE _____ 926

MGA 4033294

- Target            60K pcs
- Kmart             80K pcs
- K*B Toys          36K pcs
- International      250K pcs
- Others            100K pcs

- Marketing department to present sales with a kit by March 12, 2001 to include:
  - Line list
  - Frequently Asked Questions (FAQs)
  - Media & Promotional Plans
  - PowerPoint Presentation
  - Press clippings (TV, print)
- Facilitate bi-weekly Bratz meeting with Sales department

5.  Complete Bratz Television Series Pitch Pack by July 1, 2001
- ABC has received interest from Kids WB, Fox Kids and Sony in developing an animated series based on the Bratz
- ABC has received interest from Bandai Entertainment in producing the animation for the Bratz series
- Zeke Kamm (writer of The Powerpuff Girls and Dexter's Lab) will create the Bratz Mini-Bible
- Focus group research will be conducted at LA Focus on March 22, 2001 and March 23, 2001
- ABC will meet with Zeke on March 26, 2001 to discuss target audience and strategy for the series
- Mini-Bible will be completed by May 15, 2001
- Meetings with networks will be conducted the week of May 21, 2001

6.  Secure Promotional Partner by September 1, 2001
- Possible QSR with McDonald's, Tricon, or Shell
- Possible promotion with Coca-Cola, Kellogg's, Quaker Oats
- Pitch pack/press kit completed by May 1, 2001
- Three-Five Premium concepts will be presented
  - Mini-Bratz
  - Bratz candy
  - Home video
  - Tatoos
  - Female sports drink

8

EXHIBIT _____ 83

Confidential - For Attorney's Eyes Only

PAGE _____ 927

MGA 4033295

# Company Overview

## Legal Business Description

### Company Name

ABC International Traders, Inc. is the legal name of our Company but we dba MGA Entertainment.

### Legal Form of Business

The legal form of ABC International Traders is Subchapter S-Corporation.

### *Business Location*

The corporate headquarters of ABC International Traders, Inc. is 16730 Schoenborn Street, North Hills, California, 91343. Satellite locations include MGA Entertainment (HK) Ltd., Room 1001 10/F, Empire Centre, 68 Mody Road, Tsimshatsui East, Kowloon, Hong Kong; 200 5th Avenue, Suite 1212, New York, NY, 10010; 175 Paramount Drive, 3rd Floor, Mailbox 13, Raynham, MA 02767; Dallas Market Center, 2100 Stemmons Freeway, Suite 8850, Dallas, TX 75207; 336 Hazelwood Avenue, San Francisco, CA 94127; 1012 Linden Street, Innisfil, Ontario, Canada L9S 1W4;

### *Government Regulations*

Because ABC International Traders, Inc. is operating in the toy industry we are under the regulation of the FCC, FTC and FDA.

The manufacture and sale of toys is regulated by both federal and state authorities. ABC International Traders, Inc. has obtained all required federal and state permits, licenses, and bonds to operate its facilities. There can be no assurance that ABC International Traders, Inc.'s operation and profitability will not be subject to more restrictive regulation or that the ABC International Traders, Inc.'s operations and profitability will not be subject to more restrictive regulation or increased taxation by federal, state, or local agencies.

9

EXHIBIT _____ 83

PAGE _____ 928

Confidential - For Attorney's Eyes Only

MGA 4033296

## Management Team

**Officers and Key Employees**

Isaac Larian, President

Fred Larian, Executive Vice President

Eli Makabi, Executive Vice President

Patrick Williams, Senior Vice President of Sales

Paul Warner, Vice President of Sales

Martin Hitch, Vice President of International Sales

Dennis Medici, Chief Financial Officer

Stephen Lee, General Manager of Hong Kong Office

Lon Ross, Director of Marketing

Paula Treantafelles, Senior Product Manager

Of the ten people who make up the corporate staff, there are three founders who hold the following positions:

*Isaac Larian, President*

*Fred Larian, Executive Vice President*

*Eli Makabi, Executive Vice President*

Responsibilities & Management Team Backgrounds

**Isaac Larian, President/CEO**
Isaac Larian oversees all divisions of the company, including product development, sales, marketing, overseas operations, production and distribution. With the pioneering spirit of the MGA family and the creative minds and insights of his own children, Mr. Larian is a major contributor to the development of new products and vision behind ABC International Traders, Inc.

Under Mr. Larian's leadership, ABC International Traders, Inc. has experienced outstanding growth, with 2000 sales of more than                an increase of 43 percent. Mr. Larian founded MGA Entertainment in 1979, under the name *SURPRISE GIFT WAGON*, to import and distribute name brand consumer electronics. The company was

10

Confidential - For Attorney's Eyes Only

EXHIBIT ___83___

PAGE ___929___

MGA 4033297

**REDACTED**

incorporated under the same name in 1982, and in 1987, Mr. Larian made a strategic move to enter the world of consumer entertainment, brokering a deal with Nintendo that made ABC the first official distributor of Nintendo and CD products in the United States. In 1993, under the new name MGA Entertainment, he successfully led the company in its formal transition from a consumer electronics company to a consumer entertainment company.   Mr. Larian has a Bachelor of Science degree in Engineering.

### Fred Larian, Executive Vice President
Should he be included?

### Eli Makabi, Executive Vice President
Eli Makabi oversees warehouse operations, purchasing, logistics and distribution.

### Patrick Williams, Senior Vice President of Sales
Mr. Williams brings over 20 years of sales experience including working for Mattel and Hasbro.  At ABC, he directs staffing, training and performance evaluations to develop and control sales program. Mr. Williams manages worldwide sales distribution by establishing sales territories, quotas, and goals and advises dealers and distributors concerning sales and advertising techniques. Additionally, he analyzes sales statistics to formulate policy and to assist dealers in promoting sales.  Mr. Williams manages sales office activities including customer/product/service.

### Paul Warner, Vice President of Sales
Before joining ABC International Traders, Inc., Mr. Warner spent 10 years with Ritvik Toys Inc. (Mega Bloks).  Before joining Child World, he worked as a buyer for Fay's Drug Co., Inc.  Between 1977 and 1978, Paul was the sales representative for Supermarket Distributors, Inc.  At ABC, Paul forecasts and plans sales for all east coast accounts including Toys 'R Us and Kmart and supervises independent sales representatives.  He also oversees ABC's Canadian market sales.

### Martin Hitch, Vice President of International Sales
Martin Hitch brings over 11 years of international and domestic sales experience while working for Mattel and Hasbro.  He oversees over 40 distributors throughout the world including Tomy Japan, Tomy U.K., Vivid Imaginations (UK), Bandai Spain, Bandai Germany, and Bandai France.

### Dennis Medici, Chief Financial Officer
Dennis Medici's 18 year tenure in finance and accounting includes five years with Upper Deck. Currently, he manages working capital including receivables, inventory, cash and marketable securities. Performs financial forecasting including capital budget, cash budget, pro forma financial statements, external financing requirements, financial condition requirements.

11

Confidential - For Attorney's Eyes Only

EXHIBIT ___83___

PAGE ___930___

MGA 4033296

**Stephen Lee, General Manager - Hong Kong**
Mr. Lee brings over 20 years of overseas operations knowledge to ABC. He previously
worked for Atari, JTS and Radofin.

**Lon Ross, Director of Marketing**
Lon Ross has held positions in entertainment/media marketing and brand management
with firms that include Mattel, United Pet Group, MuchMusic USA, Cablevision
Systems, and Twentieth Century Fox. While employed within the toy industry, Mr. Ross
was responsible for managing and developing licensed products representing nearly $500
million in revenues. Mr. Ross has managed toy brands and licenses ranging from Disney
Entertainment properties, Winnie the Pooh, Nickelodeon properties, the National
Basketball Association (NBA), Barbie, and Matchbox/Hot Wheels. Lon Ross is
responsible for a wide range of initiative ranging from brand direction and planning,
promotions, advertising, and product development strategy. Mr. Ross holds an MBA
from the Weatherhead School of Management at Case Western Reserve University and a
BS in marketing from Babson College.

**Paula Treantafelles, Senior Product Manager**
Paula Treantafelles graduated from Univeristy of Southern California with her Bachelor
of Science, Business Administration degree. After graduation, Paula worked in the Sales
Research and Design and Development teams for the Large and Small Doll brand groups
at Mattel, Inc. At ABC, Ms. Treantafelles is responsible the product development, brand
management and marketing of the Bratz™ line.

The leadership and alignment characteristics of ABC International Traders, Inc.'s
management team have resulted in the establishment of broad and flexible goals designed
to meet the ever-changing demands of the quickly moving marketplace requiring our
products. This is evident when the team responds to situations requiring new and
innovative capabilities.

## Staffing

ABC International Traders, Inc. development team recognizes that additional staff is
required to properly support marketing, sales, research, and support functions. We are
currently seeking a Chief Operating Officer, Vice President of Product Development and
an Associate Product Manager.

## Strategic Alliances

ABC International Traders, Inc. has formed some very important relationships with major
companies in the entertainment industry. The following is a list of existing relationships:

12

Confidential - For Attorney's Eyes Only

EXHIBIT ___83___

PAGE ___931___

MGA 4033299

**Licensing Efforts**

ABC International Traders, Inc. has been involved in the entertainment licensing industry for 14 years beginning with Nintendo in 1987.  ABC is a member of the International Licensing Industry Merchandisers' Association (LIMA).

Character and entertainment licensing has enjoyed enormous success in the past decade, generating billions of dollars in revenues each year. It is one of the most profitable types of licensing. It is difficult to measure the precise revenue from character licensing accurately, however, due to two recent trends in the industry: a trend towards long-term relationship agreements between the licensor and the licensee, and a trend towards structuring of partial payment in terms of equity in licensee operations. Although the predominance of character and entertainment licensing in the merchandising industry continues to erode as a lot of other properties have emerged and are now available for licensing, there is little question that this segment still continues to dominate the market. This property type is also the most concentrated with just a few large players dominating the licensing activity. The major players in character and entertainment licensing are the big movie studios and broadcasting companies. Names such as Disney, Warner Bros., Nickelodeon, and Fox come to mind immediately, and these companies are launching some of the most successful licensing programs, such as the famous old (comic) book characters X-Men, Spider-Man, or Batman, TV-based properties as Looney Tunes, The Simpsons and Sesame Street or properties based on movies such as Star Wars, one of the most successful licensing programs ever. New entertainment licensing properties also stem from the videogame section such as Nintendo and Pokémon.

ABC International Traders, Inc. currently has the following Merchandise License Agreements in place:

| Property | Licensor | Length of Contract (years) |
|---|---|---|
| Got Milk? | California Milk Board | 3 |
| Monster Rancher | BKN Entertainment | 2.5 |
| Bear in the Big Blue House | Jim Henson Company | 2.5 |
| Asteroids | Infogrames | 6 |
| Centipede | Infogrames | 6 |
| Missile Command | Infogrames | 6 |
| Super Breakout | Infogrames | 6 |
| Pac-Man/Ms. Pac-Man | Namco | 8 |
| Mrs. Fields Famous Brands | Mrs. Fields | 3.5 |
| National Hot Rod Association | NHRA Properties | 3 |
| National Football League | NFL Properties | 3 |
| Power Rangers | Saban Entertainment | 8 |
| Hello Kitty | Sanrio Inc. | 3 |
| Deer Avenger 1 & 2 | Simon & Schuster | 3 |
| Crazy Bones | Toy Craze, Inc. | 2 |
| WWF | WWFE, Inc. | 4 |

13

Confidential - For Attorney's Eyes Only

EXHIBIT _____83_____

PAGE _____932_____

MGA 4033300