# Market Analysis

## Market Definition

The target audience for the Bratz are tween girls from 7-11 years old. Tweens consist of three markets in one; the *primary* market - spending money on their own wants and needs, the *influence* market – directing the spending of their parents' money on their want and needs and the *future* market – for all goods and services who have all their purchases ahead of them. All three markets combined, tweens have more market potential than any other demographic group.

Girls lead the tween market and are gender specific. Tweens want a product uniquely made for them. They do not want adults to infiltrate into their world. Tweens aspire to be like "big girls" and are fashion conscious. At this age, girls are also making the transition from play to reality and becoming self-reliant.

## Industry Analysis

The Barbie brand is unquestionably dominant in the Fashion Doll category. This means that all things being equal, a consumer will choose the Barbie doll over all others. That being the case, Mattel does not have to compete based on a targeted price point. They can, and do, price their most successful Barbie offerings at every price point from $5.00 to $20.00. It is an inefficient scattering of offerings, but Mattel manages to collect revenues at all possible price point triggers – not just one.

For those items that are not Barbie related, the price point target has to be more strategic. The market seems to have focused in on the $15.00 price point. For YTD 2000, of the top 11 selling non-Barbie branded fashion dolls, nine were priced within a dollar or two of $15.00. It appears to be a collective decision that is more than arbitrary. In a sample of 11 products selected from among the midrange sellers, only three had a price point very close to $15.00. Among the bottom dwellers of the category, these are nearly none with a price point close to $15.00. Those should not be interpreted as a casual relationship that exists between this particular price point and sales success. There is no basis on which to draw that conclusion definitively. It is, however, a noteworthy point and an indicator of where pricing attention could best be focused.

The fashion doll category market is stagnant. The market for these products amounted to $1.1 billion in 2000--representing a 1% decline from 1999.

Referenced sources agree that the major trend is for funky, edgy fashion or small dolls. The trend has been toward the development of such products (Diva Starz, Bratz™).

The overall fashion doll market for the toy industry is projected to be $1.3 billion by the end of 2001. The overall market potential for Bratz™ is estimated to be $30 million by the end of 2001.

14

EXHIBIT ___83___

PAGE ___933___

Confidential · For Attorney's Eyes Only

MGA 4033301

Brands and licenses are so pervasive in the Fashion Doll category it would be appropriate to say that they define the category. For YTD 2000, retailers sold $324MM of branded/licensed product in the category. That accounts for 89% of all sales of fashion dolls. In fact, a review of the top brands/licenses in the category reveals a domino effect where the licenses drive fashion and the fashion drives the doll category.

| Brand/License | Sales $ | Sales Units |
|---|---|---|
| Barbie | $298,254,562 | 24,469,979 |
| Britney Spears | $13,362,740 | 885,119 |
| Spice Girls | $1,695,582 | 284,903 |
| Toy Story | $1,508,963 | 114,857 |
| Star Wars | $1,392,632 | 133,115 |
| Christina Aguilera | $1,344,720 | 74,182 |
| S Club 7 | $409,829 | 26,040 |
| Aladdin | $344,028 | 22,783 |
| Tarzan | $311,886 | 27,991 |
| Charlie's Angels | $181,374 | 12,116 |

Category success without licensing or very strong branding are few and far between. The market is apparently looking for fashion leadership, and that leadership must have a name. Primarily, leadership is provided by Barbie. Barbie is still viewed as the ideal female figure and as an infinitely versatile model of modern fashion. It is not surprising that Barbie is a clear leader. Media images are secondary sources for fashion leadership. Category consumers are drawn to images or major fashion and lifestyle leaders like Britney Spears which is why Bratz will be successful. They are the girls with a "passion for fashion".

## Strengths

In terms of product strength, Bratz™ has several distinct advantages over the competition. First is its marked advancement in the physical appearance of the dolls. The Bratz™ are unique in many ways; their eyes are big with a hint of animé style; their lips are more pronounced, their feet and heads are oversized. There is no fashion doll on the market that bears the resemblance to the Bratz™. Additionally, the fashions exemplified mirror those worn by today's tween. Chunky shoes, tube tops and their hair accessories demonstrate the urban girl for the 21st century.

In marketing, our most powerful assets are distribution and image of the brand. ABC will launch an aggressive $2.5 million dollar television campaign for fourth quarter 2001. Print advertising in popular tween magazines such as *Cosmo Girl*, *Teen* and *Jump* will further enhance our product positioning.

The Bratz™ will be offered to retailers at a price point close to that of Barbie's. ABC is confident that girls will purchase the Bratz™ over Barbie because they are not defined by race or ethnicity. This was a conscious decision so the consumer can choose the doll that reflects their own fashion style or appearance.

15

EXHIBIT __B3__

PAGE __934__

Confidential - For Attorney's Eyes Only

MGA 4033302

**Weaknesses**

There is one handicap inherent in ABC venturing into the Fashion Doll category. The only notable marketplace disadvantage is that ABC is competing with the number one toy company in the world, Mattel.

This category is monopolized by Mattel with Barbie. By year-end 2001 we will have positioned ourselves by capturing 3% of the market share and thereby reduce this weakness considerably. We do not wish to dominate this category but instead grow our Bratz™ business steadily one year at a time.

Corporate weaknesses, at this time, consist only of staffing. However, we are taking steps to secure a Chief Operating Officer, Vice President of Product Development and an Associate Product Manager which we feel should alleviate this problem.

**Opportunities**

The upside potential for Bratz™ is to double our market share in the fashion doll category and being considered as a contender for Mattel.

Based on ABC's plan to continually refresh the brand each season with new product offerings, as introduced in the Mission section, it is apparent that we can achieve a steady growth in market share.

**Unexploited Opportunities**

An altogether new application for this product would be tapping into licensing the property.

ABC can effectively leverage the Bratz™ brand by introducing not only apparel but accessories such as handbags, bookbags, footwear, eyewear, headwear, jewelry, watches and luggage, to name a few. This opportunity will be exploited further at the Licensing Show in June.

The cost to begin licensing is minimal. Costs will primarily be centered around marketing the brand to the trade to create awareness. It is imperative that this introduction is done simultaneously with the release of the dolls on shelf. This will generate more interest in the brand. The only risk involved is that the Bratz™ dolls do not sell-thru at retail. However, preliminary research with young girls indicates this will not be the case.

16

Confidential - For Attorney's Eyes Only

EXHIBIT ___83___

PAGE ___935___

MGA 4033303

## Risk

### Business Risk

*Competition*

ABC International Traders, Inc. competes with Mattel, who is the largest toy company in the world.  Mattel has greater sales, and financial, production, distribution, and marketing resources than ABC International Traders, Inc.  There can be no assurance that competition in the future will not increase from other toy manufacturers, many of which, like ABC International Traders, Inc., have recently debuted their line of fashion dolls for Fall 2001.  Competitors will try to offer knock off dolls with better features and lower price points.

### Elements of Risk

Since this the initial introduction of ABC International Traders, Inc. into the Fashion Doll market, ABC runs the risk of failure from trade acceptance by retailers.  This is being overcome already by the orders placed from the top five major retailers.  Additionally, ABC's Sales Department has been provided with the necessary tools and information to combat any resistance.

ABC can also fail if not receiving consumer acceptance.  Initial research disproves such a theory.  However, additional research will be conducted on March 22 and 23, 2001 with girls from ages 5.5 – 13 years old.

Lastly, licensing a property no one has yet heard of can prove to be quite a challenge.  If the fashion dolls to not sell-thru well at retail, this can cause a backlash with licensees who have already spent monies in advances and product development.  Promoting the brand through advertising and trade show events will counteract this risk.

17

EXHIBIT ____83____

Confidential - For Attorney's Eyes Only

PAGE ____936____

MGA 4033304

# Marketing Plan

ABC International Traders, Inc.'s marketing strategy is to enhance, promote and support the fact that Bratz™ offers urban streetwear fashions coupled with extreme looks into the Fashion Doll category with which Mattel cannot compete.

The overall marketing plan for our product is based on the following fundamentals:

- Entering the Fashion Doll category in Fall 2001

- Reach the tween market (girls 7-12) who are no longer interested in Barbie

- Place the Bratz™ in mass market retailers for Fall 2001

- Secure 3% market share in the Fashion Doll category by year-end 2001

## Sales Strategy

The Bratz™ should be treated as a long-term brand with future line extensions.

As such, the target market segments to focus on tweens. Because of the Bratz™ special market characteristics, our in-store sales strategy includes:

- Securing end-caps
- Free-standing inserts
- Floor minders
- Point of Purchase displays

## Positioning

Our Bratz™ is seen by the consumer as innovative and hip.  Its unique advantages can be exploited to arrive at a winning position in the consumer's mind.

In terms of market segmentation advantages, we can use middle class consumers and ethnic appeal to arrive at a winning position here.

To be effective, other licensed products depend on the presence of our Bratz™ .

## Pricing

18

Confidential - For Attorney's Eyes Only

EXHIBIT _____ 83 _____

PAGE _____ 937 _____

MGA 4033305

The Bratz™ price (MSRP $14.99) is competitive with Barbie. There is a higher perceived value in Bratz™ because each doll comes with five accessories pieces so each doll has two complete outfits.

The prices for our products are determined first and foremost by costs. It is important to know that competitive pricing is essential to our market profile.

Examples of competitive pricing include:

| Rank | Item | Manufacturer | Intro Date | Average Price |
|------|------|-------------|-----------|---------------|
| 1 | Celebration Barbie | Mattel | June 2000 | $33.27 |
| 2 | Barbie Wizard of Oz | Mattel | February 2000 | $14.87 |
| 3 | Mary Kate & Ashley | Mattel | March 2000 | $15.03 |
| 4 | Superslide Kelly | Mattel | December 1999 | $15.27 |

## Distribution Channels

ABC International Traders, Inc.'s marketing department plans to sell our Bratz™ through several channels. In addition to selling the product to mass marketers, it will be sold at mid-tier department stores, toy specialty stores and through e-commerce. Key competition uses the same distribution channels.

A partial list of ABC International Traders, Inc.'s major current customer include:

- Wal-Mart
- Kmart
- Target
- Toys 'R Us
- K*B Toys
- RadioShack

## Direct Sales

The majority of ABC International Traders, Inc. sales will be handled internally through direct sales by our staff.

ABC International Traders, Inc. anticipates hiring two additional National Account Sales Managers for Kmart and Target.

We have chosen to use a direct sales force because our products require considerable customer education and post-sales support—directly from the company. Our price point, pricing structure and profits are such that our costs of sales warrants "person-to-person" selling strategy.

## International Distributors

One of the key elements designed into the ABC International Traders, Inc. marketing

19

EXHIBIT ___83___

Confidential - For Attorney's Eyes Only

PAGE ___938___

MGA 4033306

plan is the targeting of our distributors. We will select distribution channels already in existence and staffed with professionals possessing appropriate backgrounds and clientele.

ABC International Traders, Inc. products are very pertinent to the nature of distributor's business and to the well-being of their customer base.

This strategic marketing approach takes full advantage of the fact that these professionals are already involved with parallel products and services. They already have a track record of experience.

By operating within these distribution channels in this manner, we can maintain control of our market. In addition, we can generate growth at a reasonable pace and obtain excellent sales results.

Bratz™ fresh look and attitude is especially appreciated internationally. Overseas, fashion-forward couture is ahead of the American designers. The United Kingdom, Australian and Italy already see the fashion trends demonstrated in Bratz™ and have committed to developing the brand in their markets.

## Advertising and Promotion

ABC International Traders, Inc. recognizes the key to success at this time requires extensive promotion. This must be done aggressively on a wide scale. ABC International Traders, Inc. plans to advertise in major trade and consumer magazines such as *Teen, Jump, Cosmo Girl* and *License!*. Co-op advertising will also be placed with mass market retailers.

### Objectives

- Position ABC International Traders, Inc. as a leader in the fashion doll market.

- Increase company awareness and brand name recognition among retailers, buyers, and customers.

- Develop, through market research, significant information to create immediate and long-term marketing plans.

- Coordinate sales literature and promotional collateral in order to secure licensees and promotional partners.

### Media Objectives

- Gain awareness of company among industry groups, buyers, and customers.

20

Confidential - For Attorney's Eyes Only

EXHIBIT ___ 83 ___

PAGE ___ 939 ___

MGA 4033307

- Establish an image of ABC International Traders, Inc. as a organization that is professional, completely reliable, and highly positioned in the market.

- Maximize efficiency in selection and scheduling of published ads in publications to cover tween and trade markets.

## Media Strategy

- Select primary business publications with high specific market penetration.

- Schedule adequate frequency of ads to impact market with corporate image and product messages.

- Where possible, position advertising in or near product reviews and appropriate editorials.

- Take advantage of special high-interest issues of major publications when possible (Discount Store News' Wal-Mart issue).

- To get the most out of our promotional budget, our media coverage will be to focus on a tween audience.

We will develop an advertising campaign built around product innovation, beginning with a "who we are" statement and supporting it with ads that reinforce individuality of each girl. Additionally, we will develop a consistent reach and frequency throughout the year.

## Advertising Campaign

The best way to reach our potential customers is to develop an intense advertising campaign promoting the Bratz™ basic premise--"The Girls with a Passion for Fashion". This will also be conveyed through the interactive website www.bratzpack.com. Over the course of the campaign, 92% of all girls 4-9 years old will see our ads an average of 15 times.

To establish the Bratz™ image, the delivery and tone of our statements will be urban glamour.

Ads will convey the look and feel of a youthful company.

Because Bratz™ is so unique, it is important to develop a promotional campaign that is consistent and easy to understand.

21

EXHIBIT ___83___

PAGE ___940___

Confidential - For Attorney's Eyes Only

MGA 4033308

**Preliminary Media Schedule**

Television advertising will air for 12 weeks beginning October 1st through December 23, 2001. Cable television will air on Nickelodeon, Fox Family and Cartoon Network. Network television will air on ABC (see Appendix for media chart).

Additional publications will include *Disney Adventures, Nickelodeon Magazine,* and *Girls Life*. Editorial will run in the June issue of *License!*

**Sales Support Collateral Materials**

ABC International Traders, Inc. has developed a variety of collateral materials to support our sales efforts. These items include sell sheets, FAQs, line list, media and promotional plans.

**Advertising Budget**

For the next nine months, advertising and promotion will require $3,000,000 million dollars. On an ongoing basis we will budget our advertising investment as 15% of total sales.

## Public Relations

**Publicity Strategy**

During 2001 ABC International Traders, Inc. will focus on the following publicity strategies:

- Develop a sustained public relations effort, with ongoing contact between key editors and top-level personnel.

- Develop a regular and consistent product update program for the major target media, keeping key editors abreast of Bratz™ enhancements and new product introductions.

- Develop an internal newsletter that can cover key sales successes, significant marketing and manufacturing events, technical support and product development stories. Internally, the newsletter would be targeted at all company personnel and sales representatives; externally the piece would be targeted at key customers and prospects.

- Establish contact with editorial staff for the purpose of being included in product "round-ups"--product comparisons in publications such as Consumer Reports, where

22

Confidential - For Attorney's Eyes Only

EXHIBIT __θ3__

PAGE __941__

MGA 4033309

competing products are compared. This exposure builds credibility and market acceptance.

- Produce a complete company backgrounder on ABC International Traders, Inc. to be used as the primary public relations tool for all target media editorial contact. This will also be effective for inclusion in press kits and sales packages. The backgrounder would include sections on the following broad subjects:

  ➢ Overview of the Market: size; characteristics.

  ➢ The Market in 2000, present and future.

  ➢ The Company
  ➢ History
  ➢ Management Philosophy
  ➢ Brief sketches of Top Executives

  ➢ The Products
  ➢ Market Niches

**Press Release**

ABC International Traders, Inc. will develop a series of press releases on the entire Bratz™ line. Prepare press releases for each new product introduction, and participation in a trade shows.

**Trade Show**

ABC International Traders, Inc. will participate in several trade shows in 2001: 1) International Licensing Show in June, 2) Hong Kong Pre-Toy Fair in July and 3) New York Pre-Toy Fair in September and Dallas Pre-Toy Fair in November.

In 2001, ABC International Traders, Inc. will concentrate on promoting the Bratz™ for licensing. In deciding on the ABC International Traders, Inc. plan for the International Licensing Show, the following factors have been taken into consideration:

Target audience of the show—securing at least seven licensees

Geographic location—New York is also host to many international companies who may be interested in licensing Bratz™ in their markets

Time frame—in securing apparel and accessories licensees after June, there will be ample time for each manufacturer to debut their Bratz™ collection at the MAGIC show in February 2002.

23

EXHIBIT _____B3_____

PAGE _____942_____

Confidential - For Attorney's Eyes Only

MGA 4033310

**EXHIBIT 84**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 SGL (RNBx)<br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>Hon. Stephen G. Larson<br><br>EXPERT REBUTTAL REPORT OF<br>ROBERT C. LIND |

EXHIBIT 84

PAGE 943

## REBUTTAL TO EXPERT REPORT OF PETER S. MENELL
## BY ROBERT C. LIND

At the request of counsel for Mattel, Inc. ("Mattel"), I submit this rebuttal expert report pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. This report sets forth the opinions, and the basis thereof, about which I may be called to testify at trial at the request of counsel for Mattel. Specifically, this report is directed to testimony that I may be asked to provide in view of the expected testimony of Peter S. Menell, as embodied in his expert report ("the Menell report") on behalf of MGA Entertainment, Inc. ("MGA"). The Menell report is directed toward the copyrightability of drawings created by Carter Bryant, the subsequent assignment of the copyrights in those drawings to Mattel and the alleged infringement of those copyrights by MGA and its employees.

Matters raised by the Plaintiff and/or the Defendant subsequent to this report, that are within the scope of my expert representation and that are subject to contradiction and/or rebuttal may be addressed in subsequent reports. It may become necessary to refine and supplement this and subsequent reports as additional information becomes available.

I also reserve the right to add to or to modify this report in the event that inaccuracies or omissions are discovered. My testimony at trial will take into account the evidence all parties produce, including the testimony of other expert witnesses.

## QUALIFICATIONS, COMPENSATION, PRIOR TESTIMONY

I am currently a Professor of Law at Southwestern Law School in Los Angeles, California, where I teach copyright law, entertainment law, entertainment and dignitary rights, and advanced entertainment law. I have been a member of the Southwestern faculty for more than 26 years. In addition, I have taught at Loyola Law School (Los Angeles), George Washington Law School and Marymount College of Virginia. My qualifications are set forth in my curriculum vitae that is attached as Appendix A to the Rebuttal Report.

I began my study of copyright law under the tutelage of Professor Waldo Moore in January of 1978, while earning my juris doctor degree from The National Law Center of the George Washington University. I stayed at George Washington as a graduate student, teaching and completing my course work in furtherance of a Master of Laws degree. In 1981, I was hired by Southwestern University School of Law to teach copyright law and to assist students interested in the field of entertainment law. Since that time, I have taught more than 50 sections of the copyright law course and six sections of the advanced copyright law seminar. I have taught copyright law to more than 2,500 students.

I am the author or co-author of six books:

- Entertainment Law: Legal Concepts and Business Practices (2d ed. 1992 & 2008 Supp.) (Co-Author), a five volume treatise published by Thomson West. I am currently writing a third edition of this work.
- Newsgathering and the Law (3d ed. 2005 & 2007 Supp.) (Co-Author), published by

1

EXHIBIT __84__

PAGE __944__

LexisNexis Publishing.
- Copyright Law (3d ed. 2006), a substantive outline published by Carolina Academic Press.
- Trademark Law (3d ed. 2006), a substantive outline published by Carolina Academic Press.
- Entertainment Law (3d ed. 2003 & 1999 Document Supp.) (Co-Author), a casebook published by LexisNexis Publishing.
- Art and Museum Law: Cases and Materials (Co-Author) (2002), a casebook published by Carolina Academic Press.

I have published more than thirty articles and chapters and have given more than 100 lectures and presentations, the majority of which have been on the topic of copyright law. I have made copyright presentations to law firms and legal departments of motion picture studios and music publishers. I am recognized and quoted as an expert in the subjects of intellectual property, entertainment, art, museum and media law by The New York Times, The Los Angeles Times, and The Los Angeles Daily Journal among other newspapers, magazines, television and radio stations.

I am outside copyright counsel for Warner/Chappell Music Publishing and outside intellectual property counsel for Lions Gate Entertainment for whom I provide analysis and advice concerning transactional, clearance, preventative and litigation matters. In addition, I consult with several attorneys, governmental entities, nonprofit organizations and companies regarding various intellectual property, media, First Amendment and entertainment issues.

I am paid $300 per hour for my study and testimony in this case. I have not testified as an expert at trial or by deposition in any case during the past four years.

## INFORMATION CONSIDERED

In addition to the case law and materials cited in this report, I have reviewed and relied on the following documents in preparing this report:

- Copyright registration certificates, supplementary registrations and deposit material, for the works involved in this litigation.
- Expert Report of Lee Loetz
- Expert Report of Kenneth Hollander
- Deposition of Rebecca Harris
- Employee Confidential Information and Inventions Agreement
- Expert Report of Peter S. Menell
- Bratz dolls

2

EXHIBIT ___ 84

PAGE ___ 945

EXPECTED TESTIMONY AND OPINIONS

## SUMMARY

This case involves the infringement of drawings made by Carter Bryant, the copyrights to which were assigned to Mattel. Employee Confidential Information and Inventions Agreement ("Inventions Agreement") ¶ 2(a). These drawings were made available to MGA and its employees when Bryant began working for MGA to develop a line of dolls. Both the Bryant drawings and the dolls were intended to be marketed to children. Access to the Bryant drawings has been admitted and there is evidence of direct copying by MGA. The Report by Professor Menell attempts to defend the actions of MGA by attacking the scope of copyright protection afforded the Bryant drawings, arguing that the individual elements contained in the drawings deserve little copyright protection and any claim of infringement of Mattel's compilation copyright must fail because MGA has not made an identical copy of those compilations.

These arguments are made without regard to Ninth Circuit legal precedent concerning intermediate copying, direct evidence of copying, the inverse ratio rule, the extrinsic test, the intrinsic test and the special rules of substantial similarity that are to accompany an analysis of works marketed to children. The legal framework and analysis provided by Professor Menell is heavily influenced by the law of the Second Circuit Court of Appeals. This is surprising, given that this action is pending in the United States District Court for the Central District of California, Eastern Division, which must apply the law of the Ninth Circuit Court of Appeals. The law of these two circuits often diverge, particularly regarding copyright infringement, the main focus of the Menell report.

There exist several significant differences between the Second Circuit law of copyright infringement and the law of the Ninth Circuit. One commentator has referred to these differences as a "chasm" between the two circuits. See William F. Patry, Patry on Copyright § 9:235 (2007). Several assertions made by Professor Menell in his report are at odds with the law enunciated by the Ninth Circuit. His inattention to Ninth Circuit precedent bypasses several Ninth Circuit rules regarding copyright infringement that are relevant to this litigation.

It is my opinion that the drawings created by Carter Bryant and assigned to Mattel meet the requirements for copyright protection, that it is likely that these drawings were directly copied by MGA during the development and marketing of the Bratz dolls and that many of the elements of the Bratz dolls are, at the very least, substantially similar to the Bryant drawings. Applying the current Ninth Circuit *Krofft* test, I have concluded that the ideas and expression found in the Bratz dolls are substantially similar to the ideas and expression of the Bryant drawings, satisfying the requirements of the extrinsic test for copyright infringement. A finder of fact would likely find that MGA's Bratz dolls took the total concept and feel of the Bryant drawings, satisfying the requirements of the intrinsic test for copyright infringement, particularly in light of their intended audience of young children. Finally, it is my view the facial, body and design elements of the Bryant drawings are protected as artistic works, and not just as compilations.

3

EXHIBIT _____ 84

PAGE _____ 946

## INAPPLICABILITY OF THE ABSTRACTION, FILTRATION, COMPARISON TEST

Professor Menell spends much time describing and applying the abstraction, filtration, comparison test set forth by the Second Circuit in *Computer Associates Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992). Menell report at 16-22. This test is not applicable to this case for several reasons. First, this case has not been filed in the Second Circuit, but in the Ninth Circuit which has its own tests for determining claims of copyright infringement. In the Ninth Circuit it is not only permissible to compare the ideas in the defendant's work to the ideas in the plaintiff's work, but it is reversible error for a trial court to fail to do so. See *Jada Toys, Inc. v. Mattel, Inc.*, 2008 WL 450891, \*6 (9th Cir. 2008) (district court's granting of summary judgment reversed because district court did not conduct an objective test of comparing both ideas and expression as required under the extrinsic test). Second, the *Computer Associates* test is not appropriate in cases, such as the case at bar, where the issue is primarily dealing with the alleged infringement of literal elements, rather than nonliteral elements. See *Lotus Development Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 814-15 (1st Cir. 1995) (while the *Altai* test may provide useful framework for assessing alleged nonliteral copying, it is of little help in assessing literal copying, where it may actually be misleading). Third, the dissection required by the test and the hypercritical analysis of the filtration step has been rightfully criticized when used in cases involving the visual arts because it improperly biases infringement decisions against copyright owners such as Mattel. This concern has been raised by Professor Paul Goldstein:

> Unlike literary or musical works, visual works can always be compared simultaneously, side-by-side, by judge or jury. Unlike literary and musical works, visual depictions are completely and graphically bounded by the artist's intentions. A picture is not only worth a thousand words; it also conveys its message in a single unambiguous image. As a consequence, the danger exists that, in dissecting the plaintiff's work to determine whether the defendant has appropriated any of its protected expression, courts will emphasize specific differences between works rather than their more substantial similarities.

II Paul Goldstein, *Goldstein on Copyright* § 10.2 (3d ed. 2007). With its copyright infringement tests, the Ninth Circuit has addressed this concern to a greater extent than has the Second Circuit.

Professor Menell spends several pages in his report itemizing the "wide range of influences" to which Carter Bryant is said to be exposed. See Menell report at 17-20. Apart from the August 1998 issue of Seventeen Magazine, Professor Menell does not indicate that Bryant ever saw the examples given and certainly provides no evidence that they were the source of his initial drawings of the Bratz dolls. The itemized list of alleged influences, including cultural trends, draft report of an art/popular culture historian, Betty Boop, *Speed Racer*, Sailor Moon, Margaret Keane, *Friends*, Ally McBeal, *Sex and the City*, the Spice Girls, Lara Croft, Angelina Jolie, additional prior art, popular culture material, Internet image searches, doll illustration art, fashion illustration and the August 1998 issue of Seventeen Magazine, would ordinarily form the basis of an attempt at an independent creation defense. However, such a defense was made impossible by Carter Bryant's involvement in the development of both the

4

EXHIBIT ____84____

PAGE ____947____

drawings and the Bratz dolls.

## NINTH CIRCUIT INFRINGEMENT ANALYSIS

Rather than react to the attempted importation of the copyright infringement rules of the Second Circuit, my analysis is principally based on the law of copyright infringement applied in the Ninth Circuit. In order for a plaintiff to prevail in an action for copyright infringement in the Ninth Circuit, two elements must be established: Ownership of a valid copyright and the alleged infringer's violation of one or more of the exclusive rights granted to copyright holders under section 106 of the Copyright Act. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159 (9th Cir. 2007). Where the alleged infringement is of the reproduction right, the plaintiff must prove that the infringer copied the plaintiff's work either through evidence of direct copying, or circumstantial evidence of copying, i.e. access and substantial similarity. *Murray Hill Publications, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 316 (9th Cir. 2004). The registration of the copyrights in the drawings with the Copyright Office, once by MGA and a second time by Mattel, creates a presumption that the drawings are protected by copyright. See *Smith v. Jackson*, 84 F.3d 1213, 1219 (9th Cir. 1996).

### Intermediate Copying

Professor Menell's report focuses largely on the MGA Bratz blank sculpt and the final version of the first generation Bratz dolls when analyzing the similarities between Bryant's drawings and MGA's allegedly infringing works. See Menell report at ¶¶ 53 & 54. In the Ninth Circuit, a broad view is taken of the rights protected by section 106(1) of the Copyright Act, the reproduction right. Ninth Circuit case law protects the copyright owner not only against the final product that is marketed commercially, but also against all prepatory items that may have led to the final revised copy. See *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 518 (9th Cir. 1993); *Walker v. University Books, Inc.*, 602 F.2d 859, 864 (9th Cir. 1979) ("'[T]he fact that an allegedly infringing work may itself be only an inchoate representation of some final product to be marketed commercially does not in itself negate the possibility of infringement."); *Walt Disney Productions v. Filmation Associates*, 628 F. Supp. 871, 875 (C.D. Cal. 1986).

Professor Menell assumes for purposes of his analysis that MGA's artists saw Carter Bryant's drawings, "worked from Carter Bryant's concepts" and that "[s]ome members of the creative team saw Carter Bryant's sketches and worked with his input." See Mennel report at ¶¶ 39 & 66. Professor Mennel does not specify how MGA employees "worked from" or "worked with" the drawings, but it appears that such activity encompassed reproduction of the drawings. There has been testimony that MGA prepared and used character art boards, also referred to as concept boards, created by Carter Bryant, that depicted drawings of the yet to be produced Bratz dolls, to buyers of several retailers such as Wal-Mart, Toys "R" Us, Kmart and Walgreens. Such material was also used at the Hong Kong Toy Fair. Deposition of Rebecca Harris, Volume 2 at 365-77 & 476-78 (Jan. 22, 2008). MGA's submission of deposit copies as

5

EXHIBIT ____84____

PAGE ____948____

part of its copyright registration applications of the Bryant drawings also constituted an unauthorized reproduction. Such a use of identical or substantially similar prepatory material in the product development stage or marketing stage is actionable infringement.

According to the Ninth Circuit, the Copyright Act proscribes unauthorized intermediate copying. *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1518 (9th Cir. 1993) ("[T]he Copyright Act does not distinguish between unauthorized copies of a copyrighted work on the basis of what stage of the alleged infringer's work the unauthorized copies represent."). This is so, regardless of whether the end product of the copying also infringes the exclusive rights of the copyright owner. See *Sega*, 977 F.2d at 1519.

The application of this rule that is analogous to the present case occurred in *Walt Disney Productions v. Filmation Associates*, 628 F. Supp. 871 (C.D. Cal. 1986). In that case, the owner of the copyrights in classic feature-length animated motion pictures such as *Snow White and the Seven Dwarfs* and *Pinocchio* sued another animation studio, Filmation Associates, for copyright infringement. Disney claimed that Filmation was producing feature-length animated films based on the same public domain stories, such as *Pinocchio*, but had copied Disney's motion picture, series of designs and drawings of characters in the drawings, story boards, working model and advertising material Filmation had created for its *New Adventures of Pinocchio* motion picture that was being developed. *Disney*, 628 F. Supp. at 875.

Filmation defended its actions claiming that the materials it had created were only transitory steps en route to a fixed product, that it had yet to complete and distribute its motion picture and could not be said to have infringed Disney's copyrights until Filmation's motion picture was finished. *Disney*, 628 F. Supp. at 875-76. The United States District Court for the Central District of California rejected that argument, holding that any unauthorized reproduction of protected Disney material constituted copyright infringement, even though the preliminary works created in the production of Filmation's motion picture were merely part of the process by which Filmation planned to produce an ultimate product that would not be substantially similar to Disney's classic films. The court found that to constitute an actionable copy, Filmation's expression needed only to be a material object permanently cast in some intelligible form. The court deemed that Filmation's script, story board, story reel and promotional trailer constituted actionable copies, even though they may have been prepared only for the use of Filmation's animators. Copying of a work by a competitor is actionable, even though the copying is intended as part of a process to create a noninfringing work. "It is thus irrelevant that Filmation has not concluded or 'realized' what it considers to be a final motion picture: the Act prohibits the creation of copies, even if the creator considers those copies mere interim steps toward some final goal." *Disney*, 628 F. Supp. at 875.

The copying of the Bryant drawings by MGA, such as for use in sales pitches to retail stores, for use at a toy fair and to create deposit copies for the Copyright Office, all constitute actionable unauthorized reproductions.

EXHIBIT ____ 84

PAGE ____ 949

## Direct Evidence of Copying in the Ninth Circuit

In most copyright infringement actions, direct evidence of copying is not available. See *Swirsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004); *Broderbund Software, Inc. v. Unison World, Inc.*, 648 F. Supp. 1127, 1135 (N.D. Cal. 1986). Therefore, a plaintiff often attempts to establish the defendant's copying through circumstantial evidence by showing that the infringer had access to the work and that the two works are substantially similar. *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1110 (9th Cir. 1970). In his report, Professor Menell forthrightly admits to "skipping over the 'factual copying' element of the copyright infringement framework. . . ." Menell Report ¶ 39. This is in light of apparently direct evidence that MGA employees copied the Bryant drawings. MGA registered the same drawings of Jade (M 0110183), Sasha (M 0110187), Cloe (M 0110197), Yasmin (M 0110202) and Bratz Group (M 0110192), that have been registered with the Copyright Office by Mattel: Doll No. 2 (M 0059704), Group Drawing (M 0059708), Doll No. 3 (M 0059712), Doll No. 4 (M 0059716) and Doll No. 9 (M 0059736).

Professor Menell fails to address the implications of such evidence in the Ninth Circuit. Such unquestioned copying has significant ramifications under Ninth Circuit precedent. Where there is evidence of direct copying, there is no need to analyze the similarities of the plaintiff's and defendant's works. Compare *Funky Films, Inc. v. Time Warner Entertainment Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (absent evidence of direct copying, proof of infringement involves demonstration of access and substantial similarity), with *Norse v. Henry Holt and Co.*, 991 F.2d 563, 566 (9th Cir. 1993) (substantial similarity analysis is inapposite to the copying issue where the defendant has admitted copying). Even if similarity is analyzed, the traditional rigor of the substantial similarity standard is eased both by the inverse ratio rule of the Ninth Circuit and by the fact that the intended audience for the works is young children.

## Proof of Access in the Ninth Circuit

In copyright infringement cases where copying must be proven through circumstantial evidence, access is shown through evidence that the infringer had actually read or heard plaintiff's work, or had a reasonable opportunity to view or hear the plaintiff's work. *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1163 (9th Cir. 1977); *Jason v. Fonda*, 698 F.2d 966, 967 (9th Cir. 1983) ("bare possibility" that the producers and broadcasters of the motion picture had access to the author's book was insufficient to prove access). Professor Menell states in his report that he bases his copyright infringement analysis "on the express assumptions that copyright in the sketches are owned by someone other than MGA and that MGA's artists saw Carter Bryant's sketches before conducting their own work." Menell Report at ¶ 39. When an employee of the copyright owner subsequently is employed by the defendant accused of copyright infringement, the connection provided by the employee is proof of defendant's access to the copyright owner's work. See *Johnson Controls, Inc. v. Phoenix Control Systems, Inc.*, 886 F.2d 1173, 1176 (9th Cir. 1989).

There can be no more direct access than a situation where both the protected work and the

EXHIBIT ____84____

PAGE ____950____

infringing work have been produced by the same person. When the creator of a copyrighted work, without the authority to do so, reproduces the copyrighted work or creates a derivative work based upon that copyrighted work, copying and infringement are proven.

This case is reminiscent of the classic "Cherry Ripe" case, *Gross v. Seligman*, 212 F. 930 (2d Cir. 1914). There, the creator of a photograph was found to have infringed its copyright by later creating a photograph of a substantially similar image. In that case an artist posed a model in the nude and fixed the image in a photograph titled *Grace of Youth*. The artist subsequently assigned his copyright in the photograph to a third party. Two years later the artist photographed the same model in an identical pose, now smiling with a cherry stem held in her teeth. This photograph was titled *Cherry Ripe*. The court found that the artist had copied his earlier work, either from memory or with the use of a copy of the earlier photograph. "Whether the model in the second case was posed, and light and shade, etc., arranged with a copy of the first photograph physically present before the artist's eyes, or whether his mental reproduction of the exact combination he had already once effected was so clear and vivid that he did not need the physical reproduction of it, seems to us immaterial. The one thing, viz., the exercise of artistic talent, which made the first photographic picture a subject of copyright, has been used not to produce another picture, but to duplicate the original." *Gross*, 212 F. at 931. In spite of changes made to the background, slight differences in the model's figure, and the addition of a smile and the holding of a cherry stem between the model's teeth, the Court of Appeals affirmed the district court's finding of an infringement of the copyright in the initial photograph. *Gross*, F. at 931.

Similarly to the facts in *Gross*, Carter Bryant created the copyrighted drawings, assigned away his copyrights in those works, and subsequently assisted in recreating the original works without the permission of their copyright owner.

The holding of the Second Circuit in *Gross* is instructive in considering the hypercritical nature of Professor Menell's analysis of whether Carter Bryant's drawings have been infringed by Carter Bryant's Bratz dolls. The court in *Gross* concluded:

> The eye of an artist or a connoisseur will, no doubt, find differences between these two photographs. The backgrounds are not identical, the model in one case is sedate, in the other smiling; moreover the young woman was two years older when the later photograph was taken, and some slight changes in the contours of her figure are discoverable. But the identities are much greater than the differences, and it seems to us that the artist was careful to introduce only enough differences to argue about, while undertaking to make what would seem to be a copy to the ordinary purchaser who did not have both photographs before him at the same time. In this undertaking we think he succeeded.

212 F. 930, 931-32 (1914).

8

EXHIBIT ___84___

PAGE ___951___

*The Inverse Ratio Rule*

Having conceded access by MGA's employees, Professor Menell fails to address the impact this strong proof of access to Mattel's works by MGA's employees has on the amount of similarity that must be proven by Mattel pursuant to Ninth Circuit precedent. In the Ninth Circuit, when a high degree of access is shown, a lower standard of proof of substantial similarity is required. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000); *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1178 (9th Cir. 2003). Where a high degree of access has been conceded, as Professor Menell has done in his report, the copyright owner's burden of proof of substantial similarity is commensurately lowered. See *Swirsky v. Carey*, 376 F.3d 841, 844-45 (9th Cir. 2004); *Metcalf v. Bochco*, 294 F.3d 1069, 1075 (9th Cir. 2002) ("If the trier of fact were to believe that [defendants] actually read [plaintiffs'] scripts . . . it could easily infer that the many similarities between plaintiffs' scripts and defendants' work were the result of copying, not mere coincidence.").

<u>Substantial Similarity</u>

As indicated above in the discussion regarding the Ninth Circuit's inverse ratio rule, substantial similarity is inextricably linked to the issue of access. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000). The quantum of similarity required in this case is decreased as a result. The Ninth Circuit has traditionally employed a two-part test to determine whether two works are substantially similar. In *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977), the Ninth Circuit adopted a bifurcated test to determine whether a defendant was to be held liable for the unauthorized reproduction of the plaintiff's work. Under this approach, after access has been proven, a court in a copyright infringement action alleging the infringement of the reproduction right of 17 U.S.C. § 106(1) is to apply an extrinsic test and an intrinsic test. *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994).

*The Extrinsic Test*

As originally adopted in *Krofft*, the extrinsic test focused on the similarity of ideas between the plaintiff's work and the defendant's work. *Krofft*, 562 F.2d at 1164. The similarity of ideas was determined by external criteria, with analytic dissection and expert testimony permitted. *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994). The extrinsic test is an objective test that "depends not on the responses of the trier of fact, but on specific criteria which can be listed and analyzed." *Krofft*, 562 F.2d at 1164; *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002) ("'extrinsic test' is an objective comparison of specific expressive elements"). If the plaintiff satisfies the extrinsic test, the case is to go to trial where the trier of fact will apply both the extrinsic and intrinsic tests to determine whether the defendant has infringed the plaintiff's copyright. See *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th

9

EXHIBIT ___84___
PAGE ___952___

Cir. 1996).

The extrinsic test is to utilize specific criteria that can be listed and analyzed. *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 900 (9th Cir. 1987). When analyzing these objective details, courts have found the evidence to fail the extrinsic test where there have been substantial differences between the plaintiffs and the defendant's works. See *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994). Subjective assessments of similarity in appearance between the plaintiff's work and the defendant's work are deemed best suited to the trier of fact as part of the intrinsic test. See *Shaw v. Lindheim*, 919 F.2d 1353, 1361 (9th Cir. 1990); *Cavalier v. Random House, Inc.*, 297 F.3d 815, 826 (9th Cir. 2002).

The extrinsic test has evolved into an objective consideration of "whether there are substantial similarities in *both* ideas and expression". *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994) (emphasis in original). See *Shaw v. Lindheim*, 919 F.2d 1353, 1355 (9th Cir. 1990); *Johnson Controls, Inc. v. Phoenix Control Systems, Inc.*, 886 F.2d 1173, 1176 (9th Cir. 1989). This focus on both ideas and expression continues to be required by the Ninth Circuit. See *Cavalier v. Random House, Inc.*, 297 F.3d 815, 827 (9th Cir. 2002) ("Although the concept of a built-in night light is not protectible under copyright law, the choice of a smiling moon or star face with pinkish cheeks surrounded by stars in a specific configuration, and situated above an encircled star 'on' button, constitutes protectible expression.").

In the recent case of *Jada Toys, Inc. v. Mattel, Inc.*, 2008 WL 450891 (9th Cir. 2008), the district court had granted summary judgment in a case where Mattel claimed that a competitor's flame logo infringed Mattel's logo used on its HOT WHEELS line of toy vehicles. "[T]he district court concluded that because the logos at issue were not similar, the extrinsic test was not met. It also found that since the logos were not similar, no reasonable person could believe that they conveyed a similar expression and, therefore, the intrinsic test had not been satisfied." *Jada Toys, Inc. v. Mattel, Inc.*, 2008 WL 450891, *6 (9th Cir. 2008). The Ninth Circuit reversed the district court's granting of summary judgment because the district court did not conduct an objective test as to both ideas and expression as required under the extrinsic test. *Id.*

Professor Menell's admonition that the filtration step of the *Computer Associates* test must filter out all ideas by draining them through his colander, leaving only protected expression to compare to the defendant's work, is contrary to the analysis required by the Ninth Circuit in *Jada Toys*.

When analyzing artworks under the extrinsic test, a court looks to the similarity of the objective details in appearance. See *Cavalier v. Random House, Inc.*, 297 F.3d 815, 826 (9th Cir. 2002) ("the precise factors evaluated for literary works do not readily apply to art works."). These objective details include type of artwork involved, materials used, subject matter, setting for the subject, shapes, colors, and the arrangement of the representations. See *Cavalier v. Random House, Inc.*, 297 F.3d 815, 826 (9th Cir. 2002); *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977). The cases that apply the *Krofft* test to artworks have identified several objective details that form the basis for analysis under the extrinsic test. These include the following:

10

EXHIBIT ___84___

PAGE ___953___

### Type of artwork involved

Although the two-dimensional Carter Bryant drawings are a different type of artwork than
the three-dimensional works of sculpture known as the Bratz dolls, they are integrally related to
the origins and development of the Bratz product line. Drawings are traditionally the initial
depictions of a new doll and constitute an important part of the process by which the doll is
created. As confirmed by other expert reports on which I am relying, in this case the dolls appear
to have been closely modeled on the drawings created by Carter Bryant. Furthermore, there is
evidence that the three-dimensional sculpt for Bratz was based on Bryant's drawings and that
Bryant himself made further contributions to the appearance of the sculpt.

### Materials used

A difference in media does not excuse copying or the making of unauthorized derivatives.
The Bryant drawings constituted a fundamental step in the development of the Bratz dolls. The
Bryant drawings were created with sufficient specificity to effectively aid in the translation of the
images from two-dimensional to three-dimensional. In *Walt Disney Productions v. Filmation
Associates*, 628 F. Supp. 871 (C.D. Cal. 1986), Filmation argued that its drawings which
incorporated elements from Disney motion pictures, constituted a different media from the
celluloid motion pictures produced by Disney. The court determined that the fact that the
infringing copies were made in a medium different than that of the protected work was not a
defense to copying. *Walt Disney Productions v. Filmation Associates*, 628 F. Supp. 871, 876
(C.D. Cal. 1986). See *Walker v. University Books, Inc.*, 602 F.2d 859, 864 (9th Cir. 1979).

### Subject matter

Both the Bryant drawings and the Bratz dolls depict the same subject matter: dolls to be
marketed to young girls that have sultry looking faces and a funky urban fashion style with large
heads, wide eyes, full lips, very small noses, short curvy torsos and large oversized feet that can
be detached and replaced with interchangeable feet in different style shoes. This similarity of
both ideas and expressions is sufficient to satisfy the extrinsic test. In *Aliotti v. R. Dakin & Co.*,
831 F.2d 898, 900-01 (9th Cir. 1987), the fact that the product lines of both plaintiffs and
defendant depicted the same subject matter, stuffed dinosaur toys, was found to be sufficient to
satisfy the extrinsic test.

Professor Menell argues that doll shapes and facial elements are entitled to only thin
protection because their designs are based on the human anatomy and all artists are free to
represent the human form. Menell report ¶ 47. This is not correct even under Second Circuit
law. As the court in *Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133 (2d Cir. 2004),
points out, it would be the ubiquitous use of certain facial features in dolls that would raise doubt
as to the originality of those features. 365 F.3d at 135 n.2. Courts protect specific features of
dolls even though they are based on human physical attributes. See *Mattel, Inc. v. Azrak-*

11

EXHIBIT _____ 84

PAGE _____ 954

*Hamway Int'l, Inc.*, 724 F.2d 357, 360 (2d Cir. 1983) (per curiam) (accentuation of certain muscle groups relative to others constituted protectible expression in Mattel's He-Man doll). The creative choices that are available when designing a doll are so numerous, the fact that they represent one or more of the many varieties of the human form will not preclude or limit the copyright protection offered to original works of art. In upholding the copyright protection for the expressive features of a Barbie doll, the Second Circuit stated:

> There are innumerable ways of making upturned noses, bow lips, and widely spaced eyes. Even if the record had shown that many dolls possess upturned noses, bow lips, and wide-spread eyes, it would not follow that each such doll – assuming it was independently created and not copied from others – would not enjoy protection from copying. We have often affirmed entitlement to copyright protection so long as the work was in fact created by its author, notwithstanding "lack of creativity," "lack of artistic merit" and absence of anything "strikingly unique or novel."

*Mattel, Inc. v. Goldberger Doll Manufacturing Co.*, 365 F.3d 133, 135 (2d Cir. 2004) (citations omitted).

It is the particularized expression in the Bryant drawings that are protected by copyright and which MGA is not permitted to copy. *Mattel, Inc. v. Goldberger Doll Manufacturing Co.*, 365 F.3d 133, 136 (2d Cir. 2004) (citations omitted). It must be emphasized that to merit protection from copying, a fixed work need only have been independently created by its author and possess "some minimal degree of creativity," the requisite level of which "is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." *Feist Publications, Inc. v. Rural Telephone Serv. Co.*, 499 U.S. 340, 345 (1991).

### Setting for the subject

Both the Bryant drawings and the Bratz dolls focus on multi-ethnic young images with an interest in fashion that denotes a knowing, urban, hip attitude.

### Shapes

As set forth in the expert report of Lee Loetz, both the Bryant drawings and the Bratz dolls are constructed of large heads, wide eyes, full lips, very small noses, short torsos, long thin legs and large feet that can be detached and replaced with interchangeable feet in different style shoes. The proportionately large head is placed on a smaller body. The shape of the faces is similar and are of similar width and length. The large inflated shape of the lips is similar. Professor Menell opines that the Jade doll lips differ significantly from the Bryant drawing used for comparison. However, the lips on the Jade doll are very similar to the drawings numbered M

12

EXHIBIT ___84___
PAGE ___955___

0110202 and M0110192, where the drawing depicts open lips of equal ratio with indented curvature at the top.

Professor Menell argues that there are significant differences between the drawings and the blank sculpt he uses to compare, rather than a completed Bratz doll. Menell report ¶ 54. However, the comparison at times is unfair, such as comparing the eyes even though there are no details in the eye sockets of the blank sculpt. At another point, Professor Menell points to the difference in the size of the feet depicted in the drawings and the bare feet depicted in the blank sculpt. Menell report ¶ 55. The fact that the drawing depicts the doll wearing large shoes accounts for the size differential. This comparison is particularly questionable in light of the fact that the Bratz dolls are popular for their shoes. Bates stamp MGA 0883400, ¶ 17.

As reflected in the Loetz Expert Report, each of the works of the parties, the almond shaped, upwardly angled, heavily lidded eye, as well as the placement of the pupil in the drawings also appear in the dolls. Although Professor Menell provides several examples of eyes to compare with the style of eyes included in the drawings, none of the examples, except for the sculpt eye, share the half-closed eyelid, nor the upturned almond shape of the eye depicted in the Bryant drawing. See *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 901 (9th Cir. 1987) (eye style of stuffed dinosaurs was not dictated by the idea of stuffed dinosaur dolls and thus constituted protectable expression).

Professor Menell states that even if the Bryant drawings are protected by copyright, such protection is "thin" or "modest" due to the limiting doctrines of originality, merger, scenes a faire and functionality that are applied at the filtration stage of his analysis. The numerous creative choices available to a doll designer almost ensures sufficient originality for copyright protection where the doll has not been slavishly copied from another source. See *Mattel, Inc. v. Goldberger Doll Manufacturing Co.*, 365 F.3d 133, 135 (2d Cir. 2004). His report identifies several examples of dolls or images that depict a sassy, bratty attitude, an ensemble of four female friends, multi-racial or multi-ethnic elements, large head, large eyes, large feet, long legs. At no point does he indicate how these depictions have merged into an idea or how they are as a practical matter indispensable when designing a fashion doll.

As for functionality, Professor Menell parenthetically mentions "joint characteristics" without describing how those characteristics limit copyright protection. Menell report ¶ 54. He also makes a parenthetical reference to "aesthetic functionality" as a limiting factor due to social views of attractiveness. Menell report at ¶ 47. Although it may be conceded that dolls tend to incorporate attractive features (though images based on *Shrek* may belie that notion) Professor Menell makes no attempt to define the narrow confines of what he would consider socially acceptable attractiveness.

In essence, Professor Menell would have the reader of his report believe that although Carter Bryant was reportedly paid a large sum of money by MGA for the drawings, MGA found the drawings sufficiently original and developed to form the basis of its own copyright infringement action in Hong Kong and the Bratz doll line has been extremely successful, the drawings are merely commonplace and have only a "modest residue of copyright protection." Menell report ¶ 15.

13

EXHIBIT ___ 84
PAGE ___ 756

*Colors*

Professor Menell points out that one of the Bryant drawings uses black coloring for the eyebrow while one of the Bratz dolls uses brown. Menell report ¶ 62. However, this may be due to the different skin color used on the two compared works.

### *Arrangement of the representations*

The body proportions of the Bryant drawings and dolls are largely identical. This is demonstrated by the alignments of the major anatomical landmarks of chins, shoulders, chests, waists, elbows, crotch, wrists, knees and ankles. The placements of the eyes, nose and lips on the dolls are also aligned in the same manner as they appear in the drawings. The eyes are equidistant in the dolls and the drawings, as are the eyebrows. A mole appears on the left eye in the dolls and the drawings. This strong similarity of body landmarks constitutes evidence that the drawings were a direct reference used to complete the dolls.

The similarities set forth above are sufficient to meet the requirements of the extrinsic test. Once that test is met, the trier of fact is to compare the total concept and feel of the competing works, without the assistance of expert witnesses and analytic dissection.

### *The Intrinsic Test*

The intrinsic test focuses on the similarity of expression. It is a subjective test that examines an ordinary person's subjective impressions of the similarities between the two works and is exclusively the province of the trier of fact. *Funky Films, Inc. v. Time Warner Entertainment Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006). This subjective test does not permit expert testimony, nor does it allow analytic dissection. *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994); *Olson v. National Broadcasting Co.*, 855 F.2d 1446, 1449 (9th Cir. 1988); *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977). The trier of fact is not to analyze the works or examine external criteria. *Krofft*, 652 F.2d at 1164. Under the intrinsic test, the finder of fact must decide as an ordinary observer "whether the 'total concept and feel of the two works is substantially similar." *Berkic v. Crichton*, 761 F.2d at 1292. At this point the works are to be compared as a whole. "The two works . . . should be considered and tested, not hypercritically or with meticulous scrutiny, but by the observations and impressions of the average reasonable reader and spectator." *Twentieth Century-Fox Film Corp. v. Stonesifer*, 140 F.2d 579, 582 (9th Cir. 1944).

The similarities between the Bratz dolls and the Bryant drawings are much closer than the works at issue in *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir. 1977), which were found to be infringing.

14

EXHIBIT ___84___

PAGE ___957___

### The Intended Audience

In determining whether the defendant has taken the total concept and feel of the plaintiff's work, the Ninth Circuit uses the standard of the "reasonable person in the intended audience." See *Johnson Controls, Inc. v. Phoenix Control Systems, Inc.*, 886 F.2d 1173, 1176 n.4 (9th Cir. 1989). Professor Menell has disregarded the special consideration given to the intended audience of the works at issue. Where works are to be used by children, their relative lack of sophistication is taken into account when a comparison of similarities is made. In *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1166 (9th Cir. 1977), the Ninth Circuit noted: "The present case demands an even more intrinsic determination because both the plaintiffs' and defendants' works are directed to an audience of children. This raises the particular factual issue of the impact of the respective works upon the minds and imaginations of young people." *Krofft*, 562 F.2d at 1166. See also *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 902 (9th Cir. 1987) ("Because children are the intended market for the dolls, we must filter the intrinsic inquiry through the perception of children.").

This special consideration has also been adopted by the Second Circuit. See *Williams v. Crichton*, 84 F.3d 581, 589 (2d Cir. 1996) ("Consideration of the total concept and feel of a work, rather than specific inquiry into plot and character development, is especially appropriate in an infringement action involving children's works, because children's works are often less complex than those aimed at an adult audience."); *Well-Made Toy Mfg. Corp. v. Goffa Intern. Corp.*, 210 F. Supp. 2d 147, 161-62 (E.D.N.Y. 2002), aff'd, 354 F.3d 112, (2d Cir. 2003) ("some juvenilization of a judge's appreciation of what is important in dolls is tolerable").

And this is particularly so in the instant case where the basic consumer appeal is to youngsters. In applying the test of the average lay observer, they are not to be excluded-indeed they are the 'far-flung faithful . . . audience.' The television advertising campaign of plaintiff was directed toward acquainting these youngsters with Tammy and Pepper, its new teenage and pre-teen dolls. The impression of the faces and general appearance of the dolls was upon them. The plaintiff's and defendant's dolls are so substantially similar that the Randy doll, for example, would readily be mistaken for the Tammy doll. Both are slim, twelve-inch, not fully developed teenage female figures; both have full faces, large widely spaced eyes, pupils positioned to look to the left, long eyelashes, high eyebrows, pert upturned noses, bow lips, and puffed checks; both have movable heads, arms and legs, and both invite the child to acquire an accompanying wardrobe. In sum, the dolls create the same impression, both with respect to their appearances and the play-uses for which they are suited. It is the youngsters who, on the basis of this impression, go to the stores with their parents or at home make their wishes known for the dolls they desire after television has made its impact upon on them. In their enthusiasm to acquire Tammy or Pepper they certainly are not bent upon 'detecting disparities' or even readily observing upon inspection such fine details as the point at which the necks are molded.

15

EXHIBIT ___84___

PAGE ___958___

*Ideal Toy Corp. v. Fab-Lu Ltd.*, 261 F. Supp. 238, 241-42 (S.D.N.Y. 1966), aff'd, 360 F.2d 1021 (2d Cir. 1966).

The intended audience for the Bratz dolls is young girls. These girls will not be familiar with the August 1998 issue of Seventeen Magazine or the litany of additional prior art provided by Professor Menell. Neither will these young consumers focus on the hypercritical comparative analysis of body elements and facial features presented in the Menell report.

## PROTECTION OF BRYANT DRAWINGS AS ALLEGED COMPILATIONS

The elements that make up the image of the drawings do not constitute a mere grouping of random similarities that led to a finding of noninfringement in *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994). Furthermore, under Ninth Circuit law, the standard of infringement for a compilation of creative elements is substantial similarity, not the identical or near identical standard argued for by Professor Menell. See *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1446-47 (9th Cir. 1994); *McCulloch v. Albert E. Price, Inc.*, 823 F.2d 316, 321 (9th Cir. 1987).

Professor Menell relies on *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197 (9th Cir. 1989), for the proposition that the protection of compilations should be limited to proof of virtual identity. The Bryant drawings are clearly artistic works and do not consist of the blank forms, useful articles and common property such as standard calendars, rulers and area code/time zone maps, the elements that comprised the organizer at issue in *Harper House*. As artistic works, the Bryant drawings deserve the broader, more traditional protection of the substantial similarity infringement standard because of the endless variation of expression that was available to Carter Bryant when he created the drawings. See *McCulloch v. Albert E. Price, Inc.*, 823 F.2d 316, 321 (9th Cir. 1987). Such works are to be considered as a whole, including any elements that may not be independently copyrightable apart from the work. See *McCulloch*, 823 F.2d at 321; *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1109 (9th Cir. 1970).

## CONCLUSION

In my opinion, the analysis provided by Professor Menell in his report is not based on the law relevant to this case. In light of the law applied by the Ninth Circuit, the evidence of direct copying makes any the exercise of substantial similarity analysis unnecessary. Even assuming that direct copying cannot be proven in the case of the final version of the Bratz dolls, the strong showing of admitted access requires that the amount of similarity required to be proven by Mattel is reduced pursuant to the inverse ratio rule. The degree of similarity must also be lowered in light of the fact that the intended audience for these works are children. Comparing both the ideas and expression found in the Bryant drawings and the Bratz dolls, it is clear that there exists substantial similarity under the extrinsic test. As a result, the trier of fact, viewing the works through the eyes of their intended audience, will likely find that MGA's dolls took the total

16

EXHIBIT ____84____

PAGE ____959____

concept and feel of the Mattel drawings, satisfying the requirements of the intrinsic test. I reserve the right to supplement my testimony in light of any additional testimony by Professor Menell or assertions or evidence proffered by MGA's experts or fact witnesses at trial.

Date: 3 -17 -08                    By: Robert c. 7

Robert C. Lind

17

EXHIBIT ___84___

PAGE ___960___

# APPENDIX A

EXHIBIT _____ B4

PAGE _____ 961

March 4, 2008

## CURRICULUM VITAE

### OF

### ROBERT C. LIND

Office:

Southwestern Law School
675 S. Westmoreland Ave.
Los Angeles, CA 90005
(213) 738-6785
E-Mail: rlind@swlaw.edu

Home:

10217 Hadley Avenue
Northridge, California 91324-1118
Telephone: (818) 831-1156
Fax: (818) 360-4966
E-Mail: rlind@socal.rr.com

Education:

LL.M., 1983, The National Law Center, George Washington University, Washington, D.C. (Concentration in First Amendment Studies; University Fellow in Law; Graduation with Highest Honors; Thesis: "The Tort of Emotional Distress and the First Amendment Protection of Expression").

J.D., 1979, The National Law Center, George Washington University, Washington, D.C. (National Semi-Finalist in Giles Sutherland Rich Intellectual Property Moot Court Competition).

Bachelor of Elected Studies, 1976, University of Minnesota, Minneapolis, Minnesota. (Concentration in Legal and Intellectual History; Summa Cum Laude; Phi Beta Kappa; Phi Kappa Phi).

A.A., 1973, Anoka-Ramsey State Community College, Coon Rapids, Minnesota.

Educational Employment Experience:

1985-Present        SOUTHWESTERN UNIVERSITY SCHOOL OF LAW,
                    Los Angeles, California

                    Professor of Law, teaching courses in copyright; trademark; entertainment; torts and
                    mass communications law; as well as seminars on defamation, privacy and emotional
                    distress; museum and art law; advanced copyright law; advanced entertainment law

1

EXHIBIT ___ B4

PAGE ___ 962

and television production law.

| | |
|---|---|
| 1981-1985 | SOUTHWESTERN UNIVERSITY SCHOOL OF LAW,<br>     Los Angeles, California |

Associate Professor of Law, teaching courses in torts, copyright, and mass communication law.

| | |
|---|---|
| 1980 | MARYMOUNT COLLEGE OF VIRGINIA,<br>     Arlington, Virginia |

Visiting Lecturer in Business, teaching a course in labor-management relations.

| | |
|---|---|
| 1979-1981 | THE NATIONAL LAW CENTER, GEORGE WASHINGTON UNIVERSITY,<br>     Washington, D.C. |

Lecturer in Law, teaching a first year course in legal research, writing and professional responsibility.

Practice Experience:

    Employment

Consultant to a number of law firms and businesses on copyright, trademark, entertainment, defamation, right of publicity and privacy law matters.

Expert witness in cases dealing with intellectual property, entertainment and media issues.

Arbitrator, Screen Actors Guild Arbitration (1989).

Arbitrator, Los Angeles County Bar Association Arbitration (1985).

AMERICAN ASSOCIATION OF MUSEUMS, Washington, D.C. (1980-81). Legal Consultant on museum law.

AMERICAN LAW INSTITUTE-AMERICAN BAR ASSOCIATION COMMITTEE ON CONTINUING PROFESSIONAL EDUCATION (1977-81). Researcher in the areas of conflicts of interest and nonprofit organizations.

REICHELT, NUSSBAUM, BROWN & TOPF, Mt. Ranier, Maryland (1977-78). Duties consisted of research and writing in various areas of law.

2

EXHIBIT   84

PAGE   963

Admissions to Practice:

District of Columbia, 1980
United States District Court for the District of Columbia, 1980
United States Court of Appeals for the District of Columbia, 1980
California, 1981
United States District Court for the Central District of California, 1983
United States Court of Appeals for the Ninth Circuit, 1983
United States Court of Appeals for the Federal Circuit, 1986
Supreme Court of the United States, 2003

Professional Activities:

Honors

Excellence in Teaching Award, Upper Division Professor (2006).

Paul E. Treusch Professor of Law (2005-2006).

Copyright Fellow, The Center for Computer-Assisted Legal Instruction (2004-2005).

Trademark Fellow, The Center for Computer-Assisted Legal Instruction (2003-2004).

Irving D. and Florence Rosenberg Professor of Law (2001-2002).

Professional Associations

American Bar Association, Member of Committees on Communications Law, Entertainment and Sports Industry, Legal Education, Patent, Trademark and Copyright Law.

District of Columbia Bar Association.

California Bar Association, Member of the Intellectual Property Section.

Los Angeles County Bar Association, Member of the Intellectual Property & Entertainment Law Section.

Beverly Hills Bar Association

American Intellectual Property Law Association.

American Association of Museums.

3

EXHIBIT ___84___

PAGE ___964___

Los Angeles Copyright Society

Governmental Activities

Member of the Mayor's Advisory Committee Regarding The Robert F. Kennedy Assassination Investigation Materials, Los Angeles, California, 1986-1987.

Member of the Robert F. Kennedy Assassination Investigation Materials Special Advisory Committee to the California State Archives, Sacramento, California, 1987-1989.

Lectures and Presentations

"The Commodification of Lectures and the Teacher Exception to the Work-Made-For-Hire Rules of Copyright Ownership," Southwestern Law School, Los Angeles, California, September 26, 2007.

"The Demise of Record Companies?," Keynote Speech at the 2006 Music Law Conference presented by the University of Florida, Levin College of Law, Gainesville, Florida, February 4, 2006.

"Copyright Protection for Digitized Analog Sound Recordings," Music Law Committee, Intellectual Property and Entertainment Law Section of the Los Angeles County Bar Association, Los Angeles, California, September 30, 2003.

"The Actor as Palette: The Intersection of Copyright, Actor Attributes and the Right of Publicity," Southwestern University School of Law, Los Angeles, California, March 19, 2003.

"Year In Review - Trademarks," 2001 Spring Seminar, Orange County Patent Law Association /San Diego Intellectual Property Law Association, Long Beach, California, March 18, 2001.

"Fundamentals of Copyright Law," Law Art Seminars, Los Angeles, California, November 18, 2000.

"Fundamentals of Trademark Law," Law Art Seminars, Los Angeles, California, November 19, 2000.

"Recent Developments in Trademark Law," 25th Annual Intellectual Property Institute, Intellectual Property Law Section of the State Bar of California, San Jose, California, November 10, 2000.

"Copyright Practice," Half Moon Seminars, Newport Beach, California, June 16, 2000.

4

EXHIBIT _____ 84

PAGE _____ 965

"Copyright Responses to Digital Technology," Southwestern University School of Law, Los Angeles, California, January 27, 2000.

"Trademark Law Basics," Law Art Seminars, San Francisco and Los Angeles, California, November 13, 1999.

"Copyright Law Basics," Law Art Seminars, San Francisco and Los Angeles, California, November 12, 1999.

"The Digital Millennium Copyright Act & The Copyright Extension Act," Association of Clearance and Research Professionals, Los Angeles, California, May 19, 1999.

"Intellectual Property Concerns of Libraries and Museums," Riverside Local History Resource Center, Riverside, California, May 12, 1999.

"Digital Millennium Copyright Act," Copyright and Trademark Subcommittee of the Intellectual Property and Entertainment Section of the Los Angeles County Bar Association, Los Angeles, California, January 11, 1999.

"Trademark Law Basics," Law Art Seminars, San Francisco and Los Angeles, California, November 14, 1998.

"Copyright Law Basics," Law Art Seminars, San Francisco and Los Angeles, California, November 13, 1998.

"Copyright Term Extension Act," Copyright and Trademark Subcommittee of the Intellectual Property and Entertainment Section of the Los Angeles County Bar Association, Los Angeles, California, November 19, 1998.

"Copyright Duration & Reversion," Warner/Chappell Music Publishing, Los Angeles, California, February 4, 1998.

"Trademark Law Basics," Law Art Seminars, San Francisco and Los Angeles, California, October 24 & November 6, 1997.

"Copyright Law Basics," Law Art Seminars, San Francisco and Los Angeles, California, October 25 & November 7, 1997.

"Copyright Protection for Creations of Nonhumans: Celestial Beings, Chimpanzees and Computers," Los Angeles Copyright Society, Los Angeles, California, April 2, 1997.

"Museums, Artwork and Electronic Rights," California Western School of Law, San Diego, California, December 5, 1996.

"Comprehensive Copyright Law," Law Art Seminars, Los Angeles, California, November

5

EXHIBIT _____ 84

PAGE _____ 966

14, 1996.

"Copyright Law Basics," Law Art Seminars, San Francisco and Los Angeles, California, October 26 & November 2, 1995.

"Employment in the Entertainment Industry," Southwestern University School of Law, Los Angeles, California, October 11, 1995.

"Copyright Law Basics," Law Art Seminars, Los Angeles, California, April 22, 1995.

"Opportunities in Entertainment Law," Southwestern University School of Law, Los Angeles, California, September 28, 1994.

"Copyright Law Basics," Law Art Seminars, San Francisco and Los Angeles, California, November 1 & 11, 1994.

"Defamation and Journalistic Ethics," Filipino American Press Club of Los Angeles, Los Angeles, California, September 16, 1994.

"Copyright Law Basics," Law Art Seminars, Palo Alto and Los Angeles, California, April 22 & 29, 1994.

"Defamation and Privacy Law," Twentieth Century Fox, Los Angeles, California, June 10, 1993.

"Copyright Law Basics," Law Art Seminars, Los Angeles, California, May 8, 1993.

"Copyright Infringement Issues in Computer Software," Customs Law Committee of the Los Angeles County Bar Association, Los Angeles, California, December 19, 1991.

"Hate Speech," Southwestern University School of Law, Los Angeles, California, September 13, 1990.

"Copyright Made Simple," American Law Institute-American Bar Association Committee on Continuing Professional Education, St. Louis, Missouri, March 24, 1988.

"Media Law," California Intercollegiate Press Association, Santa Monica, California, March 10, 1984.

"Emotional Distress and the First Amendment: Of and Concerning Nazis, Gap Tooth Pornographers and other Meaningful Exercises in Bad Taste," Southwestern University School of Law, Los Angeles, California, November 22, 1983.

6

EXHIBIT ___84___

PAGE ___967___

Made various presentations to law firms and legal departments of motion picture studios and music publishers.

Recognized and quoted as an expert in the subjects of intellectual property, entertainment, art, museum and media law by The New York Times, The Los Angeles Times, and The Los Angeles Daily Journal among other newspapers, magazines, television and radio stations.

Panel and Program Participation

"Law Student Note Sharing – Websites, Copyright and Learning Styles," Legal Education and IT: Mirage or Oasis?, 17th Annual Conference for Law School Computing, Center for Computer-Assisted Legal Instruction, Las Vegas, Nevada, June 19, 2007.

"Law of Podcasts," Legal Education and IT: Mirage or Oasis?, 17th Annual Conference for Law School Computing, Center for Computer-Assisted Legal Instruction, Las Vegas, Nevada, June 18, 2007.

"Antitrust Analysis and the Special Nature of Copyright Protection," Antitrust and Intellectual Property in Global Context: A Symposium in Celebration of the Work of Lawrence A. Sullivan, Southwestern Law School, Los Angeles, California, February 23, 2007.

"Hollywood and Technology," The U.S. District Court of California, 1966-2006: Text and Context, Southwestern Law School, Los Angeles, California, October 27, 2006.

"The Legal Battle Lines Surrounding Digital Libraries," It's a Wrap: Cutting Edge Issues in Entertainment Litigation, Women Lawyers Association of Los Angeles, Los Angeles, California, January 28, 2006.

"Nuts and Bolts of Intellectual Property Law," Continuing Education of the Bar, Anaheim, California, January 27, 2006.

"To Clear or Not to Clear: Product Uses in Film and Television," Brave New World: Representing Clients in an Evolving and Regulated Environment, Donald E. Biederman Entertainment & Media Law Institute and the Media Law Resource Center, Los Angeles, California, January 26, 2006.

"Nuts and Bolts of Intellectual Property Law," Continuing Education of the Bar, San Diego, California, January 20, 2006.

"Nuts and Bolts of Intellectual Property Law," Continuing Education of the Bar, Los Angeles, California, January 13, 2006.

7

EXHIBIT _____ 84

PAGE _____ 968

"Defenses to Third-Party Liability," Third-Party Liability in Intellectual Property, Santa Clara University, Santa Clara, California, October 7, 2005.

"When Imitation Isn't Flattering: Dealing with Idea Submission Claims," I'm a Lawyer, Help Me Out Here!: Key Issues in Entertainment & Media Law, Donald E. Biederman Entertainment & Media Law Institute and the Media Law Resource Center, Los Angeles, California, January 27, 2005.

"Pitching Your Ideas," Film and Media Business Seminar, California Lawyers for the Arts, Los Angeles, California, October 30, 2004.

"The Dastar Case, Defining the Boundaries Between Copyright and Trademark Law," Intellectual Property Section of the Conejo Valley Bar Association, Westlake Village, California, July 1, 2004.

"Why Every Faculty Member Should Author a CALI Lesson," 14th Annual Conference for Law School Computing, Center for Computer-Assisted Legal Instruction, Seattle, Washington, June 17, 2004.

"What's Hot in the Right of Publicity Arena?," Intellectual Property Law, Internet & New Media Section of the Beverly Hills Bar Association, Beverly Hills, California, May 27, 2004.

"Play: The Revolution Arrives," Sony v. Universal: The Betamax Decision Twenty Years Hence, Southwestern University School of Law, Los Angeles, California, March 11, 2004.

"Hot Issues in Entertainment," The American Bar Association Forum on Communications Law, 9th Annual Conference, Boca Raton, Florida, January 23-24, 2004.

"Reflections on the Term Extension Case:  What's Wrong with the U.S. Intellectual Property System," Southwestern University School of Law, Los Angeles, California, April 23, 2003.

"Trademark Year in Review," 27th Annual Intellectual Property Institute, Intellectual Property Law Section of the State Bar of California, Santa Barbara, California, November 9, 2002.

"Foreign Infringing Websites:  Which Battleground Should You Choose?," Intellectual Property and Technology Law section of the Orange County Bar Association, Irvine,

EXHIBIT ___84___

PAGE ___969___

California, October 15, 2002.

"New Business in Show Business:  The Latest Developments in Music Law," Music Lowdown 2002, Denver, Colorado, June 8, 2002.

"Copyright Wars," Association of Independent Music Publishers, Los Angeles, California, April 25, 2002.

"Entertainment and the Internet (Industry Perspective)," Entertainment Law in an Information Economy, William Mitchell College of Law, St. Paul, Minnesota, April 5, 2002.

"Legal Ethics:  Confidentiality Issues," Legal Problems of Museum Administration, American Law Institute-American Bar Association Committee on Continuing Professional Education, Los Angeles, California, March 21, 2002.

"Trademark Law Update," 26th Annual Intellectual Property Institute, Intellectual Property Law Section of the State Bar of California, Anaheim, California, November 17, 2001.

"The Law of the Internet in California," National Business Institute, Los Angeles, California, July 31, 2001.

"Digital Copyright Issues," Judges of the Central District of California United States District Court, Los Angeles, California, June 1, 2001.

"Copyright, Copy Wrong: Copyright Issues in a Digital World," Metropolitan Cooperative Library System, Torrance, California, April 25, 2001.

"Intellectual Property Law Year in Review: Practical Implications of Recent Decisions," First Annual Symposium, Intellectual Property, Internet & New Media Section, Beverly Hills Bar Association, Beverly Hills, California, April 21, 2001.

"California Streamin' <2>: Riding the Wave of Success in Internet Content Delivery," Subscreen (for Television, Film, and the Internet) Subsection of the Intellectual Property and Entertainment Law Section of the Los Angeles County Bar Association, Los Angeles, California, April 18, 2001.

9

EXHIBIT ___84___

PAGE ___970___

"Update on Entertainment and Copyright Cases," 2001 Spring Copyright Conference, Los Angeles Copyright Society, Indian Wells, California, March 24, 2001.

"Capitalism & Art – Intellectual Property Protection and Free Expression in the Digital Age," 11th Annual Entertainment Industry Labor & Employment Law Conference, Labor & Entertainment Law Section of the Los Angeles County Bar Association, Santa Monica, California, December 15, 2000.

"Everything You Ever Wanted To Know About The Copyright Office," Association of Independent Music Publishers, Los Angeles, California, June 22, 2000.

"Protecting Trademarks, Copyrights, and Publicity Rights in Entertainment Media," University of California at Los Angeles, Los Angeles, California, May 6, 2000.

"Hot Issues in Newsgathering," The American Bar Association Forum on Communications Law, San Diego, California, February 18, 2000.

"'It's the Story, Stupid' Airtight Acquisitions, A Roundtable Discussion," Film & Television Subcommittee of the Intellectual Property and Entertainment Section of the Los Angeles County Bar Association, Los Angeles, California, February 16, 2000.

"Copyright Issues for the New Millennium," Intellectual Property Issues for the New Millennium, Thomson & Thomson, Los Angeles, California, September 28, 1999.

"Protecting Trademarks, Copyrights, and Publicity Rights in Entertainment Media," University of California at Los Angeles, Los Angeles, California, May 15, 1999.

"Software Protection From a Patent and Copyright Perspective," Kelley Drye & Warren, Los Angeles, California, October 14, 1997.

"Art and Literature on the Internet," 3rd Annual Entertainment Law Conference, California Western School of Law, San Diego, California, March 29, 1997.

"The Piracy of Intellectual Property in an International Arena," 3rd Annual Entertainment Law Conference, California Western School of Law, San Diego, California, March 29, 1997.

10

EXHIBIT ___84___

PAGE ___91___

"Intellectual Property on the Internet: Copyright and Trademark," Friends of the UCLA Library, Los Angeles, California, January 30, 1997.

"Download This!  Indecency, the Internet, and the V-Chip: Implications for the Americas & Beyond," Southwestern Journal of Law and Trade in the Americas Symposium on Mass Media and Censorship in the Americas, Los Angeles, California, January 24, 1997.

"Copyright Workshop," Registrars Committee, Western Region, Western Museums Association, Salt Lake City, Utah, October 16, 1996.

"Media and the Courts," National Judicial College, Reno, Nevada, May 29-31, 1996.

"Photography and the Law: Surviving the End of the 20th Century," Artists & the Law Committee, Los Angeles County Bar Association, Los Angeles, California, May 18, 1996.

"Introduction to Patent, Trademark and Copyright Law Practice," California Continuing Education of the Bar, various locations in California, September 7-18, 1995.

"Introduction to Patent, Trademark and Copyright Law Practice," California Continuing Education of the Bar, various locations in California, January 13-25, 1993.

"Ethics:  Progress Report on the American Association of Museums' Draft Code of Ethics," Legal Problems of Museum Administration, American Law Institute-American Bar Association Committee on Continuing Professional Education, Los Angeles, California, March 21, 1991.

"Providing Expert Opinions and Authentications:  How Dangerous Can It Be?," Legal Problems of Museum Administration, American Law Institute-American Bar Association Committee on Continuing Professional Education, Los Angeles, California, March 20, 1991.

"Privacy & Emotional Distress:  The Latest Libel Battleground," Orange County Press Club, Newport Beach, California, April 30, 1988.

"Some Common Tort Claims that Museum Visitors Have Asserted," Legal Problems of Museum Administration, American Law Institute-American Bar Association Committee on Continuing Professional Education, St. Louis, Missouri, March 24, 1988.

11

EXHIBIT ___ B4

PAGE ___ 972

"Responding to Copyright Claims by Others: Fair Use and Other Defenses," Legal Problems of Museum Administration, American Law Institute-American Bar Association Committee on Continuing Professional Education, St. Louis, Missouri, March 24, 1988.

"What Ethical Limits Apply when Museums Compete for Collections, Contributions, and Staff?," Legal Problems of Museum Administration, American Law Institute-American Bar Association Committee on Continuing Professional Education, Boston, Massachusetts, March 19, 1987.

"Museum and Professional Codes of Conduct: Are These Beginning to Acquire the Force of Law?," Legal Problems of Museum Administration, American Law Institute-American Bar Association Committee on Continuing Professional Education, Boston, Massachusetts, March 19, 1987.

"Legalizing Media Ethics," Association for Education in Journalism and Mass Communication, Memphis, Tennessee, August 6, 1985.

"Can Copyright Survive New Technology?," Association for Education in Journalism and Mass Communication, Corvallis, Oregon, August 8, 1983.

Law School Governance:

Present

Faculty Recruitment Committee; Externship Committee; Faculty Advisor to the Entertainment Law Society; Faculty Advisor for the Entertainment Law Externship Program.

Past

Tenure Committee; Library Committee; Sabbatical Committee; Faculty Development Committee; Student Faculty Relations Committee; Ad Hoc Committee on Enhancement of Student Life; Scholastic Standards Committee; 75th Anniversary Committee; Budget Committee; Ad Hoc Committee on Law Review and Moot Court; Torts Curriculum Committee; Law Review Advisor; Faculty Advisor to various moot court teams.

12

EXHIBIT 84

PAGE 973

Publications:

Published Books and Chapters

ENTERTAINMENT LAW: LEGAL CONCEPTS AND BUSINESS PRACTICES (3d ed. 2007) (Volumes 1 & 2) (Co-Author).

TRADEMARK LAW (3d ed. 2006).

COPYRIGHT LAW (3d ed. 2006).

NEWSGATHERING AND THE LAW (3d ed. 2005 & 2007 Supp.) (Co-Author).

ENTERTAINMENT LAW: LEGAL CONCEPTS AND BUSINESS PRACTICES (2d ed. 1992 & 2008 Supp.) (Co-Author).

ENTERTAINMENT LAW (3d ed. 2003 & 1999 Document Supp.) (Co-Author).

ART AND MUSEUM LAW: CASES AND MATERIALS (Co-Author) (2002).

COPYRIGHT LAW: STUDENT STUDY GUIDE (2d ed. 2002).

TRADEMARK LAW: STUDENT STUDY GUIDE (2d ed. 2002).

*Copyright Law Basics, in* COPYRIGHT BASICS: OUTLINE AND MATERIALS 1 (8th ed. 2000).

*Trademark Law Basics, in* TRADEMARK BASICS: OUTLINE AND MATERIALS 1 (4th ed. 2000).

*A Copyright Law Compendium of Current Developments, Basic Concepts and Selected Statutes, in* INTRODUCTION TO PATENT, TRADEMARK, AND COPYRIGHT LAW PRACTICE vii (1995) (Co-author).

*Artworks in the Digital Era, in* THE VISUAL ARTIST'S BUSINESS AND LEGAL GUIDE 230 (Gregory Victoroff ed. 1994).

13

EXHIBIT _____ 84

PAGE _____ 974

*The Visual Artist and the Law of Privacy, in* THE VISUAL ARTIST'S BUSINESS AND LEGAL GUIDE 299 (Gregory Victoroff ed. 1994).

Published Articles

"Use of Loan-Out Corporations in the Entertainment Industry," ANDREWS ENTERTAINMENT INDUSTRY LITIGATION REPORTER, January 11, 2006, at 2 (Co-Author).

"Has Celebrity Been Federalized?: Section 43(a) of the Lanham Act as a Substitute for the Right of Publicity," MEDIA LAW RESOURCE CENTER BULLETIN, January 13, 2004, at 21 (Co-Author).

"Attorney-Client Privilege in the Museum Context," ALI-ABA COURSE OF STUDY: LEGAL PROBLEMS OF MUSEUM ADMINISTRATION 223 (2002) (Co-Author).

"The Constitutionality of the Driver's Privacy Protection Act," 17 COMM. LAW. 18 (Summer 1999) (Co-Author).

"Right of Publicity Concerns of Museums," WEST MUSE 9 (Fall 1998).

"Institutional Trademarks," WEST MUSE 8 (Fall 1997).

"Licensing and Use of Digital Reproductions of Museum Collections," Western Museums Association (1996) (Co-Author), *reprinted in* REGISTRARS' QUARTERLY 2 (Winter 1997).

"Gifts, Ethics, and Conflicts of Interest," WESTERN MUSEUMS ASSOCIATION NEWSLETTER (2 part series published Summer & Fall 1996) (Co-Author).

"Museum Concerns About Going Digital," WESTERN MUSEUMS ASSOCIATION NEWSLETTER (3 part series published Summer, Fall, Winter 1995) (Co-Author).

"The Visual Artist and the Law of Defamation," 2 UCLA ENT. L. REV. 63 (1995).

"Defender of the Faith in the Midst of the Simpson Circus," 24 SW. U. L. REV. 1215 (1995) (reviewing REX S. HEINKE, MEDIA LAW (1994)).

14

EXHIBIT ____ B4

PAGE ____ 975

"Ownership of Copyrighted Works," WESTERN MUSEUMS CONFERENCE NEWSLETTER 5 (Fall 1993).

"Institutional Regulation of Employee Expression: Writing as a Conflict of Interest Within Museums and Related Nonprofit Institutions," 32 SANTA CLARA LAW REVIEW 427 (1992) (Co-Author).

"Critical Opinions: You Have the Right to Remain Silent," 71 MUSEUM NEWS 86 (January/February 1992) (Co-Author).

"Legal Risks Associated With Providing Expert Opinions and Authentications," ALI-ABA COURSE OF STUDY: LEGAL PROBLEMS OF MUSEUM ADMINISTRATION 191 (1991).

"Personal Collecting: Proceed With Caution," 69 MUSEUM NEWS 33 (September/October 1990) (Co-Author).

"Consider the Potential Liability of Failing to Conserve Collections," 68 MUSEUM NEWS 32 (January/February 1989) (Co-Author).

Book Review of "Board Liability: Guide for Nonprofit Directors," 19 JOURNAL OF ARTS MANAGEMENT AND LAW 77 (1989) (Co-Author).

"The Falwell Decision: Analysis of the Conflict Between the Tort of Intentional Infliction of Emotional Distress and the First Amendment," 11 LOS ANGELES LAWYER 14 (July/August 1988).

"Copyright Made Simple," ALI-ABA COURSE OF STUDY: LEGAL PROBLEMS OF MUSEUM ADMINISTRATION 609 (1988).

"Responding to Copyright Claims by Others: The Fair Use Defense," ALI-ABA COURSE OF STUDY: LEGAL PROBLEMS OF MUSEUM ADMINISTRATION 597 (1988).

Book Review of "Art Law: Rights and Liabilities of Creators and Collectors," 67 MUSEUM NEWS 97 (January /February 1988).

"Museum and Professional Codes of Conduct: Are These Beginning to Acquire the Force of

15

EXHIBIT ___B4___

PAGE ___976___

Law," 11 ALI-ABA COURSE MATERIALS JOURNAL 63 (June 1987) (Co-Author).

"What Legal Limits Apply When Museums Compete for Staff," ALI-ABA COURSE OF STUDY: LEGAL PROBLEMS OF MUSEUM ADMINISTRATION 321 (1987).

"Justice Rehnquist: First Amendment Speech in the Labor Context," 8 HASTINGS CONSTITUTIONAL LAW QUARTERLY 93 (1980).

"No Fool as a Client," 58 MUSEUM NEWS 37 (September/October 1979) (Co-Author).

"Liabilities of Museum Trustees," SOUTHEASTERN MUSEUM CONFERENCE JOURNAL 14 (November 1978) (Co-Author).

16

EXHIBIT _____ 84
PAGE _____ 977

1                                **PROOF OF SERVICE**

2

3         I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543.

4

5         On **March 17, 2008**, I served true copies of the following document described as: **Expert Rebuttal Report of Robert C. Lind** on the parties in this action as follows:

6       Mike Werdegar                              Carl Roth
        **Keker & Van Nest, LLP**               **Skadden, Arps, Slate, Meageher & Flom**

7       710 Sansome Street                         **LLP**
      San Francisco, CA 94111                300 South Grand Ave.,

8       *mwerdegar@kvn.com*                       Suite 3400
                                            Los Angeles, CA 90071

9                                            *carl.roth@skadden.com*

10

11       Mark E. Overland
      **Overland Borenstein Scheper & Kim LLP**
      300 South Grand Ave.

12       Suite 2750
      Los Angeles, CA 90071

13       *moverland@obsklaw.com*

14

15 **BY ELECTRONIC MAIL TRANSMISSION:** By electronic mail transmission per stipulation from the parties on March 17, 2008, by transmitting a PDF format copy of such document(s) to each such person at the e-mail address listed below their address(es). The document(s) was/were

16 transmitted by electronic transmission and such transmission was reported as complete and without error.

17

18         I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

19

20

21       Executed on March 17, 2008, at Los Angeles, California.

22

23                                       _Andrea Hoeven_

24                                       Andrea Hoeven

25

26

27

28

07975/2338347.1                        -2-                  Case No. CV 04-9049 SGL (RNBx)

EXHIBIT ___84___                               PROOF OF SERVICE

PAGE ___978___

**EXHIBIT 85**

RECEIVED

MAR 2 6 2008

1  THOMAS J. NOLAN (Bar No. 66992)
   (tnolan@skadden.com)
2  JASON D. RUSSELL (Bar No. 169219)
   (jrussell@skadden.com)
3  MARINA V. BOGORAD (Bar No. 217524)
   (mbogorad@skadden.com)
4  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   300 South Grand Avenue, Los Angeles, CA 90071-3144
5  Tel.: (213) 687-5000 / Fax: (213) 687-5600

6  KENNETH PLEVAN (admitted *pro hac vice*)
   (kplevan@skadden.com)
7  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   Four Times Square, New York, NY 10046
8  Tel.: (212) 735-3000 / Fax: (212) 735-2000

9  Attorneys for MGA Entertainment, Inc., MGA Entertainment (HK) Limited,
   MGAE de Mexico, S.R.L. de C.V., and Isaac Larian
10
                 UNITED STATES DISTRICT COURT
11
                 CENTRAL DISTRICT OF CALIFORNIA
12
                      EASTERN DIVISION
13
14 CARTER BRYANT, an individual,     )  CASE NO. CV 04-9049 SGL (RNBx)
                                      )  Consolidated with Case No. 04-9059
15                Plaintiff,          )  and Case No. 05-2727
                                      )
16       v.                           )  Honorable Stephen G. Larson
                                      )
17 MATTEL, INC., a Delaware           )  MGA PARTIES' MEM. OF POINTS AND
   corporation,                       )  AUTHORITIES IN OPPOSITION TO
18                                    )  MATTEL, INC.'S MOTION FOR PARTIAL
                  Defendant.          )  SUMMARY JUDGMENT
19 _____)
   AND CONSOLIDATED ACTIONS          )  **FILED UNDER SEPARATE COVER:**
20                                    )  (1) MGA PARTIES' OPP'N TO MATTEL,
                                      )      INC.'S [CORRECTED] SEP. STMT. OF
21                                         UNCONTESTED FACTS AND
                                           CONCLUSIONS OF LAW;
22 **FILED UNDER SEAL PURSUANT**       (2) DECLARATIONS OF THOMAS J.
   **TO PROTECTIVE ORDER**                NOLAN, ROBERT TONNER, CARTER
23                                         BRYANT, PETER S. MENELL, GLENN
                                           V. VILPPU and PAULA GARCIA;
24                                      (3) MGA PARTIES' OPP'N TO MATTEL,
                                           INC.'S REQ. FOR JUDICIAL NOTICE;
25                                      (4) MGA PARTIES' REQ. FOR JUDICIAL
                                           NOTICE;
26                                      (5) MGA PARTIES' OBJECTIONS TO
                                           MATTEL, INC.'S EVIDENCE;
27                                      (6) [PROPOSED] ORDER; and
                                        (7) PROOF OF SERVICE.
28                                      Hearing Date: April 22, 2008; Time: 10:00 a.m.

3-24

MGA Parties' Opposition to Mattel's Motion for Partial Summary Judgment - Case No. CV 04-9049 SGL (RNBx)

EXHIBIT __05__

PAGE __979__

## **PRELIMINARY STATEMENT**

1
2      The MGA Parties highlighted in their summary judgment motion that Mattel had
3  embarked on a campaign to "litigate MGA to death" and engaged in a pattern of
4  overreaching in litigation to carry out that goal. Mattel's summary judgment motion merely
5  confirms this approach. Under the guise of "streamlining the issues," Mattel seeks summary
6  judgment on its copyright, contract, and tort claims and to do away with <u>all</u> of the MGA
7  Parties' affirmative defenses. However, Mattel's overreaching motion shows neither that
8  Mattel is entitled to judgment as a matter of law nor that the undisputed facts support its
9  contentions. If anything, the MGA Parties are entitled to summary judgment on every issue.
10      <u>First</u>, MGA joins Carter Bryant's Memorandum of Points and Authorities in
11  Opposition to Mattel, Inc.'s Motion for Partial Summary Judgment ("Bryant Opp'n"), which
12  shows that Mattel's contractual arguments fail. The plain language of the Inventions
13  Agreement shows it does not convey the rights that Mattel claims. Even if one could
14  construct an interpretation supporting Mattel, Bryant offers a more plausible construction
15  that Mattel has no rights under that agreement. Because the agreement is a purported
16  transfer of copyright interests (and a contract of adhesion), Section 204 of the Copyright Act
17  and basic contract law compel that if the contract is ambiguous (and it is), then Mattel loses,
18  as such rights cannot be transferred unless done so clearly and unambiguously.
19      <u>Second</u>, Mattel's request for partial summary judgment on infringement (based on its
20  assumption that it owns certain of Bryant's BRATZ drawings created or colored while
21  employed at Mattel) is built upon faulty statements of the law and improper analysis of the
22  works. Mattel proposes a standard that the Ninth Circuit has squarely rejected and then
23  purports to apply it to the facts by ignoring the record and MGA Parties' expert reports. As
24  Mattel well knows, having had summary judgment <u>reversed</u> on this very issue, summary
25  judgment on the factually intense issue of "substantial similarity" is strongly disfavored.
26  <u>Jada Toys, Inc. v. Mattel, Inc.</u>, ___ F.3d ___, 2008 WL 450891, at *6 (9th Cir. 2008). Not
27  only is Mattel unable to prove that it owns a copyright interest in any of the BRATZ
28  drawings (at best, there is a genuine issue under the contract), but also cannot prove as a

EXHIBIT _____ 85

PAGE _____ 980

1  both the extrinsic and intrinsic tests to determine whether the defendant has infringed").)[2]

2  Mattel's request for summary judgment on infringement should be denied as it is

3  based on disputed facts and an erroneous recitation and application of the legal standards.

4  Although Mattel concedes the propriety of the two-part "extrinsic/intrinsic" test for

5  copyright infringement, it does not properly apply either part of that test. The "extrinsic"

6  prong of the test requires that the Court eliminate elements of the allegedly infringed work

7  that are not protected by copyright law and limit the inquiry to whether the "protectable

8  elements" in the copyrighted and accused works, standing alone, are "substantially similar."

9  Mattel makes no effort whatsoever to parse the allegedly protectable elements in Bryant's

10 sketches from those that are unprotected (see, e.g., uncopyrightable "ideas," "scenes à

11 faire," etc.). This fundamental failure alone dooms Mattel's motion.

12 MGA Parties' experts show that when Bryant's sketches are filtered of their

13 unprotectable elements, little original expression remains and that expression is not

14 duplicated in the BRATZ dolls.   They also show that the sketches and dolls are not

15 "substantially similar" under the extrinsic part of the infringement test. They also show that

16 Bryant's sketches are only entitled to "thin" copyright protection and that the subjective,

17 "intrinsic" part of the infringement test should be conducted under a "virtually identical

18 standard," not the "substantially similar" standard cited by Mattel. Copyright infringement

19 for works that are only entitled to "thin" protection exists only if the protectable elements in

20 the sketches were essentially directly copied in the dolls.   That is plainly not the case here.

21 Mattel relies on its expert's (Loetz) opinion that the "first generation" BRATZ dolls

22 are "substantially similar" to "a set of Bryant drawings provided by Bryant to MGA." But

23 Loetz failed to "filter" protectable and unprotectable elements. And MGA Parties' expert,

24 Vilppu (Loetz's former teacher, who Loetz recognizes as one of the "top experts in the

---

[2]   Accord Cavalier v. Random House, Inc., 297 F.3d 815, 824 (9th Cir. 2002) (same); Zella v.
E.W. Scripps Co., 529 F. Supp. 2d 1124, 1133 n.8 (C.D. Cal. 2007) ("Only extrinsic test is
assessed prior to a jury trial … because 'intrinsic test, which examines an ordinary person's
subjective impressions of the similarities between two works, is exclusively the province of the
jury.'"); Identity Arts v. Best Buy Enter. Serv., Inc., 2007 WL 1149155, at *8 (C.D. Cal. Apr. 18,
2007); Sony Pictures Entm't. v. Fireworks Entm't, 156 F. Supp. 2d 1148, 1157 (C.D. Cal. 2001).

EXHIBIT ___85___

PAGE ___981___

1 | then did so only as a means of "litigating MGA to death." (MGA MSJ at 1-4, 12.) If Mattel

2 | had legitimate claims, it does not, its failure to act on them promptly is a failure to mitigate.

3 | **V.    IF THE COURT HAS ANY DOUBTS, THEN THE MGA PARTIES ARE ENTITLED TO 56(F) RELIEF TO OBTAIN PENDING DISCOVERY**

4 | "[S]ummary judgment is disfavored where relevant evidence remains to be

5 | discovered," and can be granted only where such discovery would be "fruitless." Jones v.

6 | Blanas, 393 F.3d 918, 930, 935 (9th Cir. 2004). Although the MGA Parties believe there is

7 | ample evidence to deny Mattel's motion, if the Court has any doubts on the MGA Parties'

8 | affirmative defenses of statute of limitations, laches, waiver, estoppel, acquiescence,

9 | consent, abandonment, or mitigation, then Rule 56(f) relief is plainly warranted.[38]

10 | Indeed, Mattel is withholding vital evidence on: (i) the timing of its knowledge that

11 | Bryant created BRATZ and took that creation to MGA; (ii) prior and subsequent alterations

12 | in the Inventions Agreements that show that Mattel knew that its agreements did not convey

13 | the interests that Mattel now claims; (iii) Mattel's efforts to enforce, discuss or negotiate

14 | agreements with its employees between 1995 and 2005, including specifically its

15 | knowledge that employees were "moonlighting" and earning monies while employed at

16 | Mattel for engaging in creative and inventive work for competitors; and (iv) its decision

17 | whether to sue MGA and Larian. (Nolan Decl. ¶¶ 2-6.) These items are subject to pending

18 | motions to compel that will not be resolved until summary judgment briefing is complete.

19 | **CONCLUSION**

20 | For the foregoing reasons, Mattel's partial summary judgment motion should be denied.

21 | DATED: March 24, 2008        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

22 |

23 | By: _____

24 | Marina V. Bogorad
    Attorneys for the MGA Parties

25 |

26 | [38]   Orlando Residence, Ltd. v. GP Credit Co., LLC, 2006 WL 2849866, at *11 (E.D. Wis. Sept.
27 | 29, 2006) (continuing summary judgment motion under Rule 56(f) until pending motions to compel discovery relating to statute of limitations issues were resolved to allow plaintiff to
28 | "conduct [further] discovery ... regarding the accrual of its causes of action ... [and] any tolling of the statute(s) of limitations" and "supplement its summary judgment response" accordingly).

EXHIBIT   85

PAGE   982

**EXHIBIT 86**

# DECLARATION OF RALPH OMAN

I, Ralph Oman, declare as follows:

1.      I am the former Register of Copyrights of the United States and a professor of copyright law at the George Washington Law School.  I make this declaration of personal, firsthand knowledge, and if called and sworn as a witness, I could and would testify competently thereto.

2.      From 1985 to 1993 I served as the U.S. Register of Copyrights, the chief government official responsible for administering the U.S. copyright system, and acted as the principal advisor to the United States Department of State on international copyright matters, including drafting, negotiating and implementing international copyright treaties.  As part of my responsibilities, I worked closely with the Hong Kong member of the British delegation to the frequent meetings of governmental copyright experts at the World Intellectual Property Organization in Geneva, Switzerland and became familiar with Hong Kong copyright law.

3.      I have subsequently given lectures in Hong Kong and in neighboring Shenzhen regarding Hong Kong copyright law.  I have also worked with several of my foreign students on papers regarding comparative analysis of Hong Kong and U.S. copyright law, and I regularly read and review literature involving issues of Hong Kong copyright law.

4.      It is a prerequisite under both Hong Kong and U.S. copyright law that a work must be "original" to be protectible, and courts in both countries apply substantially the same standards in determining whether or not a work is "original."  Hong Kong courts accept U.S. copyright registration certificates as valuable evidence of a work's presumptive originality and ownership in copyright infringement suits.  Further, Hong Kong law allows suits for copyright infringement

EXHIBIT ___80___

PAGE ___983___                        -i-

DECLARATION OF RALPH OMAN

1  of three-dimensional objects, such as dolls, based on U.S. registration certificates for

2  two-dimensional drawings.

3        I declare under penalty of perjury under the laws of the United States of

4  America that the foregoing is true and correct.

5

6        Executed on April 25, 2008, at Washington, District of Columbia.

7

8                                  Ralph Oman

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT    86

PAGE    984

DECLARATION OF RALPH OMAN

**EXHIBIT 87**

RECEIVED

MAR 1 8 2008

KEKER & VAN NEST, LLP
JOHN W. KEKER - #49092
jkeker@kvn.com
MICHAEL H. PAGE - #154913
mpage@kvn.com
CHRISTA M. ANDERSON - #184325
canderson@kvn.com
MATTHEW M. WERDEGAR - #200470
mwerdegar@kvn.com
JOHN E. TRINIDAD - #250468
jtrinidad@kvn.com
AUDREY WALTON-HADLOCK- #250574
awaltonhadlock@kvn.com
710 Sansome Street
San Francisco, CA  94111-1704
Telephone:  (415) 391-5400
Facsimile:  (415) 397-7188

Attorneys for Plaintiff
CARTER BRYANT

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, <br><br> Plaintiff, <br><br> v. <br><br> MATTEL, INC. a Delaware Corporation, <br><br> Defendant. <br><br> CONSOLIDATED WITH MATTEL, INC. v. BRYANT and MGA ENTERTAINMENT, INC. v. MATTEL, INC. | Case No. CV 04-09049 SGL (RNBx) (consolidated with CV 04-9059 & 05-2727 <br><br> **EXPERT REPORT OF GARY FUNCK** <br><br> Dept:  Courtroom 1 <br> Judge:  Hon. Stephen G. Larson <br><br> Date Comp. Filed: April 13, 2005 <br><br> Discovery Cut-Off: Jan. 28, 2008 <br> Pre-Trial Conference: May 5, 2008 <br> Trial Date: May 27, 2008 |

3/17

413334.01

EXHIBIT ___B7___

PAGE ___985___

1    As described in this Microsoft support page,

2    http://support.microsoft.com/kb/314866, this registry key is listed as a "run key", and as

3    the reference states:

4         "Run keys cause programs to automatically run each time that a user logs on."

5

6    EE adds a sub-key named "Evidence Eliminator" to the run key with a string value:

7         C:\PROGRAM FILES\EVIDENCE ELIMINATOR\ee.exe /m

8    This will direct Windows to run EE every time a user logs in. The "/m" switch will

9    cause EE to run minimized in the system tray (ref: EE help file). The "system tray" is the

10   small area that is typically in the lower right corner of a Windows screen, where there are

11   various icons that can be used as a quick way to cause various programs to perform

12   various tasks. Upon startup, after the user logs in, that is all Evidence Eliminator does:  it

13   places an icon in the system tray, and "wakes up" only when the user clicks on that icon

14   and makes a selection from its menu, or when the user enters a hot-key sequence or right-

15   clicks on a file/folder and selects an EE operation.

16

17   Based upon both our review of product documentation and our research into

18   Evidence Eliminator's behavior we conclude that EE performs its functions only when

19   the user explicitly issues command to the program. Unlike a virus scanning program for

20   example, EE will not silently perform file cleaning and deletion programs in the

21   background.

22

23

24

25

26

27

28

EXPERT REPORT OF GARY FUNCK
CASE NO. CV 04-09049 SGL (RNBx)

413334.01

EXHIBIT _____ 87

PAGE _____ 986

1

2         I found one such backup of the Windows registry files, under the directory

3  _RESTORE\ARCHIVE (Exhibit J). The file is named RG1081300092.CAB, and is

4  dated April 6, 2004. I was able to extract a copy of USER.DAT also dated April 6, 2004

5  and was able to read the contents of this copy of this registry file.

6

7

8  Dated:  March 17, 2008

*Gary Funck*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31

**EXPERT REPORT OF GARY FUNCK**
**CASE NO. CV 04-09049 SGL (RNBx)**

413334.01

EXHIBIT _____ 87

PAGE _____ 907

**EXHIBIT 88**



1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2    John B. Quinn (Bar No. 090378)
     (johnquinn@quinnemanuel.com)
3    Michael T. Zeller (Bar No. 196417)
     (michaelzeller@quinnemanuel.com)
4    Jon D. Corey (Bar No. 185066)
     (joncorey@quinnemanuel.com)
5    Timothy L. Alger (Bar No. 160303)
     (timalger@quinnemanuel.com)
6  865 South Figueroa Street, 10th Floor
   Los Angeles, California 90017–2543
7  Telephone: (213) 443–3000
   Facsimile: (213) 443–3100

8  Attorneys for Mattel, Inc.

9                    UNITED STATES DISTRICT COURT

10               CENTRAL DISTRICT OF CALIFORNIA

11                         EASTERN DIVISION

12  CARTER BRYANT, an individual,        CASE NO. CV 04–9049 SGL (RNBx)

13                     Plaintiff,         Consolidated with
14                                        Case No. CV 04–09059
                                          Case No. CV 05–02727
15
                                          **DISCOVERY MATTER**
16  MATTEL, INC., a Delaware
17  corporation,                          **[To Be Heard By Discovery Master
                                          Hon. Edward Infante (Ret.) Pursuant
18                     Defendant.          To The Court's Order Of December
                                          6, 2006]**

19  ───────────────────────────           SUPPLEMENTAL DECLARATION OF
                                          MELISSA GRANT IN SUPPORT OF
20  AND CONSOLIDATED ACTIONS              MOTION OF MATTEL, INC. FOR AN
                                          ORDER ENFORCING COURT'S
21                                        JANUARY 25, 2007 ORDER
                                          COMPELLING BRYANT TO
22                                        PRODUCE COMPUTER HARD
                                          DRIVES AND FOR SANCTIONS
23
                                          Hearing Date: TBA
24                                        Time: TBA
                                          Place: TBA
25
                                          **Phase I**
26                                        Discovery Cut–off: January 28, 2008
                                          Pre–trial Conference: May 5, 2008
27                                        Trial Date: May 27, 2008

28                          **CONFIDENTIAL**
           **FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

07209/2391265.1

SUPPLEMENTAL DECLARATION OF MELISSA GRANT

EXHIBIT ___88___
PAGE ___988___

COPY

## DECLARATION OF MELISSA GRANT

I, Melissa Grant, declare as follows:

1.      I am a member of the bars of the State of California and an associate at Quinn Emanuel Urquhart Oliver & Hedges, LLP, attorneys for plaintiff and counter-defendant, Mattel, Inc. ("Mattel"). I make this declaration of personal, firsthand knowledge and, if called and sworn as a witness, I could and would testify competently thereto.

2.      Attached as Exhibit 1 is a true and correct copy of Mattel's Notice of Motion and Motion to Compel Production of Documents by Carter Bryant, filed on January 4, 2007.

3.      Attached as Exhibit 2 is a true and correct copy of Mattel's Proprietary Information Checkout, signed by Carter Bryant on October 19, 2000.

4.      Attached as Exhibit 3 is a true and correct copy of the Forensic Analysis Report 1 by Mark J. Menz, dated February 10, 2008.

5.      Attached as Exhibit 4 is a true and correct copy of the Forensic Analysis Report 2 by Mark J. Menz, dated February 10, 2008.

6.      Attached as Exhibit 5 is a true and correct copy of a Detailed Screen Image of Bryant's "My Documents" Folder from his Desktop. I cross-referenced the information on the Detailed Screen Image with the information on screen image attached as Exhibit O to the Declaration of Michael H. Page in Support of Carter Bryant's Opposition to Mattel, Inc.'s Motion for an Order to Enforce the January 25, 2007 Compelling Bryant to Produce Hard Drives and for Sanctions. I determined that of the 143 filenames and/or folders listed on Exhibit O only one was created in 2000 and only eight were created in 2001.

7.      A review of Carter Bryant's document productions reveals that Bryant has produced only a handful of e-mail messages relating to Bratz from the crucial period of 2000 to 2001, and even fewer from equally crucial period of 2002 to 2005. Attached as Exhibit 6 are true and correct copies of those e-mail messages.

-2-
SUPPLEMENTAL DECLARATION OF MELISSA GRANT

89

PAGE _____ 989

1      8.     MGA and various third parties have produced to Mattel e-mail

2  messages that Bryant exchanged with them.  Bryant, however, has not produced

3  those e-mail messages in any form.  Attached as Exhibit 7 are true and correct

4  copies of a selection of those e-mail messages produced by MGA and third parties

5  witnesses to Mattel dated from 2000 through 2001.

6      9.     Attached as Exhibit 8 is a true and correct copy of excerpts of the

7  deposition of Brooke Gilbert, taken on July 24, 2007.

8      10.    Attached as Exhibit 9 is a true and correct copy the Minute Order

9  Granting in Part and Denying in Part Mattel's Motion for Leave to Take Additional

10  Discovery, entered on January 7, 2008.

11      11.    Attached as Exhibit 10 is a true and correct copy of the Order

12  Granting in Part and Denying in Part Mattel's Motion to Compel Production of

13  Documents by Isaac Larian; Denying Request for Sanctions, entered December 31,

14  2007.

15      I declare under penalty of perjury under the laws of the United States of

16  America that the foregoing is true and correct.

17

18      Executed this 15th day of February, 2008, at Los Angeles, California.

19

20

21  Melissa Grant

22

23

24

25

26

27

28

07209/2391265.1

-3-

EXHIBIT ___88___

PAGE ___990___

# Exhibit 6

EXHIBIT 88

PAGE 991

through chat rooms between characters or characters and you.. we can get their girls of al ages to describe the perfect BRATS boyfriend. This way we get it just right.

Ken is a dork. I agree and I do not think he is any reason or benchmark to including our excluding the introduction of our own boyfriend.

NEW STRATEGY:
OK I have have had extended conversation with VP of Sales (a new guy from Mattel...so good and so supportive). I have also been reading recaps from retailers since at this very moments these retailers are committing and commenting on the line.

They are asking about the possibility of introducing a new lower price point (like 9.99) for doll packs. It makes sense and it represents the retailers. willingness to offer more shelf space to BRATS. I was thinking that the only way to support this price point is to offer a doll no extra fashion or shoes. We can also save money by scaling down the size of the package ...which by the way is costing me almost a dollar! What do you think?

BRATZPACKS:
In truth there is Sales and retail concern that it maybe to early for the bratzpack and may better fit in Fall since:
*    the dolls will at least then be in distribution for one year ...
allowing an average consumer to have collected enough dolls to warrant a carrying case.
*    fall is back to school and a bratzpack is a perfect concept for back to school

I agree with the arguments above.. but I am not yet totally ready to abandon this sku...but I do think that we should only offer one design.

4 styles will only be cherry picked and I am constantly being reminded of "limited shelf space". So if we do one braxtpack it needs then to be big enough for a couple of dolls, tons of fashion/shoes and a couple hairstyles.

What do you think?

This is how I see it:

SPRING:
*    14.99 BRATZ doll packs with hair feature and refreshed fashion
*    12.99 BRATZpack??
*    9.99 BRATZ doll pack
*    4.99 prom fashion pack

FALL:
*    24.99/29.99 price point TBD
*    19.99 BRATZ big head (focus on hair and makeup play)
*    14.99 BRATZ doll packs with refreshed fashion
*    14.99 new BRATZ character with hair and fashion-boyfriend?
*    12.99 bratzpack
*    4.99 refresh fashion packs (carry over 2 and add 2 new fashions)

BRYANT 07889

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT ___88___

PAGE ___993___

CompuServe Mail on the Web: Message                                    Page 1 of 3




On CS:  Try CompuServe 6.0    : Send an E-Card
        CompuServe.com        : Send a Gift
        Instant Messaging      : White Pages

**New Mail:** message      **Old Mail**      **Sent Mail**          <u>Help</u> | <u>Sign Off</u>

**Get Mail  Create Mail** | **Reply  Reply All  Forward  Delete  Keep As New**

**Subject:** BRATZ update
**Date:** Thu, 1 Mar 2001 13:19:55 -0800                    « Previous | Next »
**From:** PTreantafelles@mgae.com
**To:** bryant598@cs.com

Carter-

I am sorry for this back and forth.  I dont mean to constantly change strategy on you so many times but I am finally getting real retailer feedback in this last week and I am trying to learn and respond so that we are positioned correctly in spring.  I can hear your frustration in your email.  I apologize.  Please be patient with me.

Do you think that in the future I should do my strategy discussions with sales and retail first and then discuss with you.  ...so I protect your sanity.  I just want you and I to work close.. side by side ...but this change in strategy is in evitable.  I am trying to manage it the best way I know how.

OK here it is...

DOLLPACKS:
I agree with you.  We need a fresh new fashions for spring doll packs.

We need to re-design the fashions since we are going to add extra hair. Therefore we need  outfits that are less expensive so that we can compensate for the cost of this new hair.

We need new fashion I am just concerned that I am going to overwhelm you.  I dont want you to be frustrated.

Do you agree that hair feature with fresh new fashion is big enough news to support spring launch?  I think it is perfect.

BOYFRIEND:
In no way do I expect never to launch a boyfriend... because we WILL launch a boyfriend but I dont think that this is the right launch to introduce him. It has to be perfect timing and perfect reason for introduction.

I think that the current characters are strong enough to stand on their own for at least one year.  We need time to strongly profile them before we crowd them with another character.  Through the website that we are going to develop (we had Ayzenbeg re-pitch their concept last night)  ...  this a whole different discussion I want to share with you... but I learned that

http://csmail07.compuserve.com/webmail/br/msgview.tmpl?folder=SU5CT1g=&uid=1167237   3/1/2001

CONFIDENTIAL
ATTORNEY'S EYES ONLY                              BRYANT 07888

EXHIBIT _____88_____

PAGE _____994_____

**CompuServe Mail on the Web: Message**                                              **Page 2 of 3**

through chat rooms between characters or characters and you... we can get their girls of al ages to describe the perfect BRATZ boyfriend. This way we get it just right.

Ken is a dork. I agree and I do not think he is any reason or benchmark to including our excluding the introduction of our own boyfriend.

NEW STRATEGY:
OK I have have had extended conversation with VP of Sales (a new guy from Mattel...so good and so supportive). I have also been reading recaps from retailers since at this very moments these retailers are committing and commenting on the line.

They are asking about the possibility of introducing a new lower price point (like 9.99) for doll packs. It makes sense and it represents the retailers willingness to offer more shelf space to BRATZ. I was thinking that the only way to support this price point is to offer a doll no extra fashion or shoes. We can also save money by scaling down the size of the package ...which by the way is costing me almost a dollar! What do you think?

BRATZPACKS:
In truth there is Sales and retail concern that it maybe to early for the bratzpack and may better fit in Fall since:
* the dolls will at least then be in distribution for one year ... allowing an average consumer to have collected enough dolls to warrant a carrying case.
* fall is back to school and a bratzpack is a perfect concept for back to school

I agree with the arguments above.. but I am not yet totally ready to abandon this sku...but I do think that we should only offer one design.

4 styles will only be cherry picked and I am constantly being reminded of "limited shelf space". So if we do one bratzpack it needs then to be big enough for a couple of dolls, tons of fashion/shoes and a couple hairstyles.

What do you think?

This is how I see it:

SPRING:
* 14.99 BRATZ doll packs with hair feature and refreshed fashion
* 12.99 BRATZpack??
* 9.99 BRATZ doll pack
* 4.99 prom fashion pack

FALL:
* 24.99/29.99 price point TBD
* 19.99 BRATZ big head (focus on hair and makeup play)
* 14.99 BRATZ doll packs with refreshed fashion
* 14.99 new BRATZ character with hair and fashion-boyfriend?
* 12.99 bratzpack
* 4.99 refresh fashion packs (carry over 2 and add 2 new fashions)

**BRYANT 07889**

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT ___ 88

PAGE ___ 195

Subj:    RE: RE:SP colors
Date:    12/1/2001 7:35:16 AM Pacific Standard Time
From:    NPembleton@mgae.com (Ninette Pembleton)
To:    bryant596@cs.com (Carter Bryant)

12/1
Carter
I hope you have enjoyed your vacation.

Dianne is the Director of Design (Packaging).

I realize Isaac used the term "lively" but I am not sure this is correct.
The set is quite lively (except for ground color). Perhaps too lively.

Veronica had some incredible insight as to what we need to change to make
the set more yummy looking. I had received a bag from Clare's Boutique that
Paula passed to me a couple of weeks ago, but I wasn't clear what is was
for. After speaking with Veronica, it makes sense now.

Veronica had purchased items to reflect the color and paint technique she
wanted applied to the Tropical Punch set.

What I really need from the two of you now is to give very specific
instruction as to where the color reference she purchased needs to be
applied. As you know, Hong Kong thinks literally, and works best when they
are told exactly what to paint (& how) where. If our original paint master
from Anna had shown them the direction Veronica intended, I think we would
have ended up a bit closer to the desired effects. No problem, we can
straighten it out now.

My suggestion would be to take digitals of the set I received from HK and
enlarge them. Apply the color match reference (e.g. hair barettes, etc) to
the digital and draw call out lines where you want that color and technique
applied throughout the set.

You will be back on Wednesday, but this new set needs to travel to Toys R Us
appointment. The set will leave the office on Friday, 12/7 and not be back
until 12/17. I will follow the spt to New Jersey on 12/11-12/14.

Can we make a date now to turn the set over to you on 12/18 and then get it
back to me by 12/21 in time to return to Hong Kong before the holiday?

The Frozen Candy set is in and ready for Anna to paint. I will provide it
to you on Thursday, 12/6 so you can work with Anna on direction. If
possible, I would like Anna to paint the set in the desired end technique so
Hong Kong has literal reference to follow. Maybe Veronica has some
accessories she can give to Anna & then HK for reference?

Phew! Long E Mail -
Ninette


——Original Message——
From: bryant596@cs.com
To: NPembleton@mgae.com
Sent: 11/30/2001 6:08 PM

BRYANT 08665

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT ___ 88

PAGE ___ 996



BRYANT 08666

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT  88
PAGE  997



BRYANT 08667

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT 88

PAGE 998

Subj:   RE: RE:SP colors
Date:   12/1/2001 7:35:16 AM Pacific Standard Time
From:   NPembleton@mgae.com (Ninette Pembleton)
To:     bryant598@cs.com (Carter Bryant)

12/1
Carter
I hope you have enjoyed your vacation.

Dianna is the Director of Design (Packaging).

I realize Isaac used the term "lively" but I am not sure this is correct.
The set is quite lively (except for ground color).  Perhaps too lively.

Veronica had some incredible insight as to what we need to change to make
the set more yummy looking.  I had received a bag from Clare's Boutique that
Paula passed to me a couple of weeks ago, but I wasn't clear what is was
for.  After speaking with Veronica, it makes sense now.

Veronica had purchased items to reflect the color and paint technique she
wanted applied to the Tropical Punch set.

What I really need from the two of you now is to give very specific
instruction as to where the color reference she purchased needs to be
applied.  As you know, Hong Kong thinks literally, and works best when they
are told exactly what to paint (& how) where.  If our original paint master
from Anna had shown them the direction Veronica intended, I think we would
have ended up a bit closer to the desired effects. No problem, we can
straighten it out now.

My suggestion would be to take digitals of the set I received from HK and
enlarge them.  Apply the color match reference (e.g. hair barettes, etc) to
the digital and draw call out lines where you want that color and technique
applied throughout the set.

You will be back on Wednesday, but this new set needs to travel to Toys R Us
appointment.  The set will leave the office on Friday, 12/7 and not be back
until 12/17.  I will follow the set to New Jersey on 12/11-12/14.

Can we make a date now to turn the set over to you on 12/18 and then get it
back to me by 12/21 in time to return to Hong Kong before the holiday?

The Frozen Candy set is in and ready for Anna to paint.  I will provide it
to you on Thursday, 12/6 so you can work with Anna on direction.  If
possible, I would like Anna to paint the set in the desired end technique so
Hong Kong has literal reference to follow. Maybe Veronica has some
accessories she can give to Anna & then HK for reference?

Phew!  Long E Mail -
Ninette

----Original Message----
From: bryant598@cs.com
To: NPembleton@mgae.com
Sent: 11/30/2001 6:08 PM

**BRYANT 08665**

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT   88
PAGE   999



BRYANT 08666

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT ____ 88

PAGE ____ 1000



BRYANT 08667

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88

PAGE _____ 1001

Subj:   Bratz funk n glow accessories matrix
Date:   12/18/2001 9:16:09 PM Pacific Standard Time
From:   Bryant596
To:   CKwok@mgae.com
CC: PTreantafelles@mgae.com

Hi Cecilia and Paula,

below is an accessory matrix for TF samples. We may move some of these accessories around after we have samples of them and have a chance to really examine the dolls and place the accessories where they look the best.

For now I think this will work for TF.

**CLOE**
*cuff bracelet (looks like many) v/m gold; worn with coral top outfit
*wavy bangle bracelets (3) v/m silver; worn with black top outfit
*large hair clip, gold glitter, not worn, show as a packout item
*v/m gold stud earrings (no hoops); worn with coral top
*v/m silver hoop earrings; worn with black top
*necklace 1 gold glitter; worn with coral
*beach party unframed glasses, coral color; worn with coral top
*black glitter headband, not worn, show as packout item

**JADE**
*purse 2 silver v/m; wear with fringe pants outfit
*translucent bangle bracelets (3), pink/peach; wear with peach top outfit
*v/m silver stud earrings, wear with peach outfit
*v/m silver square earrings, wear with fringe outfit
*wavy v/m silver bracelets (3), wear with fringe outfit
*pair 5 sunglasses, red; wear with fringe outfit
*necklace 1, pink glitter; not worn, show as packout item
*star hair clip, silver glitter, not worn, show as packout item
*peach glitter headband, not worn, show as packout item

**NEW GIRL**
*purse 1 v/m silver wear with coat outfit
*translucent bangle bracelets (3) periwinkle and burgundy, not worn, show as packout items
*wavy bracelets (3) v/m silver, wear with short skirt outfit
*beach party framed glasses, black grape color; wear with either outfit
*star hairclip, periwinkle glitter, not worn, show as packout item
*round earrings v/m silver; worn with coat
*fan earrings v/m silver, worn with short skirt
*necklace 4, lavender glitter, worn with short skirt
*silver glitter headband, not worn, show as packout item

**SASHA**
*purse 3 v/m gold; worn with jeans outfit
*cuff bracelet v/m gold worn with black top
*square bracelets (3) v/m gold worn with jeans outfit
*pair 4 sunglasses, pumpkin color, worn with jeans
*large hair clip, fucshia glitter, not worn, show as packout item
*v/m gold hoop earrings; wear with black top outfit
*v/m gold square earrings; wear with jeans
*necklace 2, light blue glitter; wear with jeans
*gold glitter headband, not worn, show as packout item

**YASMIN**

BRYANT 05314

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88
PAGE _____ 1002

*purse 3 v/m silver; wear with pants outfit
*v/m copper band bracelets; wear with short skirt outfit
*wavy cuff bracelet (looks like many) v/m; wear with pants
*pair 3 sunglasses, aqua, wear with jeans
*heart hair clip; not worn, copper glitter. show as packout item
*v/m silver stud earrings; wear with jeans outfit
*v/m copper hoop earrings; wear with short skirt
*necklace 3 silver glitter
*aqua glitter headband, not worn, show as packout item

If there are items listed here that are not ready, please use a similar substitute.

Thanks.
Carter

BRYANT 05315

Tuesday, December 18, 2001    CompuServe: Bryant888    Page: 2

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88

PAGE _____ 1003

Subj:   Funk N Grow Final Accessories Matrix 1/4
Date:   1/5/2002 6:42:49 PM Pacific Standard Time
From:   CKwok@mgae.com (Cecilia Kwok)
To:   PTreantafelles@mgae.com (Paula Treantafelles), Bryant599@cs.com (Carter)
CC: DSarrow@mgae.com (DeDe Sarrow), SWONG@mgae.com (Samuel WONG)

File:  CUFF.jpg (63389 bytes)
DL Time (53333 bps): < 1 minute

Dear all,

Listed the accessories matrix for the Funk N Glow below.  Please re-view &
confirm in order to prevent any confusion between.
Remarks:
1. Since the cuff bracelet with 3 holes on it was dropped, we only have one
cuff bracelet design, and enclosed is the photo of the sample for your quick
reference. <<CUFF.jpg>>
2. please advise the PMS for the colors except the vm gold and silver.  That
is we required the PMS for the colors marked coral, pink, etc.
3. please advise if we have any hair piece included for this item, since
this was included in the accessories ref sample but not included on the list
below. *Yes, can EL concept something?*

CLOE
*cuff bracelet vm gold x 1 pc
*squiggle bracelets vm silver x 3 pcs
*large hair clip, gold glitter x 1 pc
*vm gold fan shape earrings x 1 pair
*vm silver hoop earrings x 1 pair
*necklace 1 gold glitter x 1 pc
*beach party unframed glasses, coral color x 1 pc   *198 ∪*
*black glitter headband x 1 pc

JADE
*purse 2 silver vm x 1 pc
*translucent bangle bracelets pink/peach x 3 pcs   *198 ∪ /162 ∪*
*vm silver stud earrings - we did not have the silver studs earring, are we
replace this by hoop or fan shape earrings? *hoop*
*vm silver square earrings x 1 pair
*squiggle vm silver bracelets x 3 pcs
*pair 5 sunglasses x 1 pc   *1795 ∪*
*necklace 1, pink glitter x 1 pc *( 198)*
*large hair clip, silver glitter x 1 pc
*peach glitter headband x 1 pc   *(162)*

NEW GIRL
*purse 1 vm silver x 1 pc
*translucent bangle bracelets periwinkle and burgundy x 3 pcs   *2716*  *220/195*
*squiggle bracelets vm silver x 3 pcs
*pair 5 glasses, black grape color x 1 pc *2627*
*large hairclip, periwinkle glitter x 1 pc *(2716)*
*round earrings vm silver x 1 pair
*fan earrings vm silver x 1 pair
*necklace 4, lavender glitter x 1 pc *(2635)*
*silver glitter headband x 1 pc

SASHA

**BRYANT 05312**

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88
PAGE _____ 1004

*purse 3 vm gold x 1 pc
*cuff bracelet vm gold x 1 pc
*square bracelets vm gold x 3 pcs
*pair 4 sunglasses, pumpkin color x 1 pc   7K
*heart hair clip, fucshia glitter x 1 pc   233
*vm gold hoop earrings x 1 pair
*vm gold square earrings x 1 pair
*necklace 2, light blue glitter x 1 pc   277
*gold glitter headband x 1 pc

YASMIN
*purse 3 vm silver x 1 pc
*vm copper band bracelets x 1 pc
*squiggle bracelet vm - please advise vm gold or silver?  silver
*pair 3 sunglasses, aqua x 1 pc   304
*heart hair clip copper glitter x 1 pc
*vm silver stud earrings - we did not have the silver studs earring, are we
replace this by hoop or fan shape earrings?  fan
*vm copper hoop earrings x 1 pair
*necklace 3 silver glitter x 1 pc
*aqua glitter headband x 1 pc  ( 304)

Regards,
Cecilia

——————— Headers ———————
Return-Path: <CKwok@mgae.com>
Received: from  rly-xa05.mx.aol.com (rly-xa05.mail.aol.com [172.20.105.74]) by air-xa03.mail.aol.com (v62.22) with ESMTP id
MAILINXA36-0105214249; Sat, 05 Jan 2002 21:42:49 -0500
Received: from  hiserver2.mgae.com (page088126.nabigator.com [203.198.201.126]) by rly-xa05.mx.aol.com (v83.26) with
ESMTP id MAILRELAYIN0A510-0105214219; Sat, 05 Jan 2002 21:42:19 1900
Received: by HKSERVER2 with Internet Mail Service (5.5.2653.19)
    id <CM3F7BGB>; Sun, 6 Jan 2002 10:41:49 +0800
Message-ID: <ACC6628EE967D4116D0100D0B73C397757F260@HKSERVER2>
From: Cecilia Kwok <CKwok@mgae.com>
To: Paula Treantafelles <PTreantafelles@mgae.com>, Carter
    <Bryant996@cs.com>
Cc: DeDe Sarrow <DSarrow@mgae.com>, Samuel WONG <SWONG@mgae.com>
Subject: Funk N Grow Final Accessories Matrix 1/6
Date: Sun, 6 Jan 2002 10:41:43 +0800
MIME-Version: 1.0
X-Mailer: Internet Mail Service (5.5.2653.19)
Content-Type: multipart/mixed;
    boundary="—_=_NextPart_000_01C19658.ACEC9260"

BRYANT 05313

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT 

PAGE 1005

Subj:     **Slumber Party strategy**
Date:     1/30/2002 9:54:09 PM Pacific Standard Time
From:     PTreantafelles@mgae.com (Paula Treantafelles)
To:       KBaker@mgae.com (Kirsten Baker), ilarian@mgae.com (Isaac Larian), bryant598@cs.com (Carter Bryant), pmarlow@yahoo.com (Peter Marlow)

Please note our initial strategy for Slumber Party assortment.

This strategy will be reviewed on 2/16. We will be prepared with tear sheets, concept board and actual sketches representing piece count and design by price point

This concept is going to be considered the themed assortment for spring 2003 (much like beach party was the themed assortment for spring 2003).

Discussed retail price was 16.99.
Strategy was to offer 2 mix and match pj fashion plush tons of injection molded accessories appropriate for slumber party

The packout will include (please note that this is preliminary):
*   pajama outfit (2 pieces)
*   shorts pj outfit (2 pieces)
*   stuffed funky animal to match size appropriate for BRATZ
*   fuzzy removable slippers
*   robe
*   overnite bag
*   tooth paste
*   tooth brush
*   rollers
*   face wash
*   face mask
*   eye mask
*   nail polish
*   pillow
*   snacks (like popcorn bowl, soda cans, etc)
*   fuzzy dairies with fuzzy pen
*   8 ball to tell fortune

Veronica and Carter
Please note that Isaac asked me to add speaking/interactive feature to this assortment so that the girls can speak back and forth with one another like real little girls do at slumber parties. ...lets discuss.

——————— Headers ———————
Return-Path: <PTreantafelles@mgae.com>
Received: from  rly-xd05.mx.aol.com (rly-xd05.mail.aol.com [172.20.105.170]) by slr-xd02.mail.aol.com (v82.22) with ESMTP id MAILINXD29-0131005409; Thu, 31 Jan 2002 00:54:09 -0500
Received: from  mgaemail.mgae.com (adsl-gte-la-216-86-192-202.mminternet.com [216.86.192.202]) by rly-xd05.mx.aol.com (v83.35) with ESMTP id MAILRELAYINXD56-0131005356; Thu, 31 Jan 2002 00:53:56 -0500
Received: by MGAEMAIL with Internet Mail Service (5.5.2653.19)
     id <CCV23666>; Wed, 30 Jan 2002 21:52:24 -0600
Message-ID: <A5F04B33477DD511A81200506BE739BF4B3C61@MGAEMAIL>
From: Paula Treantafelles <PTreantafelles@mgae.com>
To: Kirsten Baker <KBaker@mgae.com>, Isaac Larian <ilarian@mgae.com>,

**BRYANT 06676**

**CONFIDENTIAL
ATTORNEY'S EYES ONLY**

EXHIBIT _____ 88

PAGE _____ 1006

Subj:   **slumber party accessory drawings**
Date:   5/20/2002 4:22:52 PM Central Daylight Time
From:   Bryant598
To:     PTreantafelles@mgae.com
CC:     DSoal@mgae.com

File:  CLOESL~1.ZIP (1380372 bytes)
DL Time (26400 bps): < 14 minutes

Hi Paula and Dennis. Here are the slumber party drawings. Paula, I know you already forwarded some drawings to HK, so I am not sure you actually even need these, but I wanted to do them so that everything would be clear.

Also, I am including a matrix here for accessories (old and new) that could be included for each character.

OK, I hope you are all doing good.
take care and talk to you soon.

Carter

**SLUMBER PARTY ACCESSORY MATRIX**

**Common Accessories: (accessories that each character will get; all new designs. See drawings included.)**
*toothpaste
*toothbrush
*hair rollers
*bobble pins
*nail polish & applicator

**Meygan Accessories:**
*common accessories
new designs:
*nail buffer
*2 individually designed nail polishes
*six pack of soda
*lotion bottle
*sasha's rotary phone (will have fabric covering)
Existing accessories:
*large compact
*2 funk and glow headbands
*emory board

**Yasmin Accessories:**
*common accessories
New designs:
*powder puff and case with 'princess' logo on top
*lipstick (2)
*mascara
*popcorn
*princess phone (will have fabric covering)
Existing accessories:
*large compact
*small compact
*Princess mirror
*large funk and glow hair clip
*small funk and glow hair clip
*spa makeup brush

BRYANT 06677

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88
PAGE _____ 1007

Jade Accessories:
*common accessories
New designs:
*cradle phone (will have some fabric covering)
* chip art magazines (3) with artwork
Existing Accessories:
*large funk and glow hair clip
*small funk and glow hair clip
*2 headbands
*spa hairbrush
*spa comb
*spa hairdryer
*spa curling iron
*large compact
*spa squirt bottle
*spring 2002 hairclip (2, the ones Cloe had)

Sasha Accessories:
*common accessories
New designs:
*boombox
*3 "CD's" with jewel cases
*magic eye or "8" ball fortune telling ball
*rotary phone (will have fabric covering)
Existing Accessories:
*large funk and glow hair clip
*star funk and glow hair clip

Cloe Accessories:
*common accessories
New designs:
*small "candle"
*large "candle"
* 2 oval "soaps"
* square "soap"
*bubble bath bottle
* chip art board game
*Yasmin's princess phone (will have fabric covering)
Existing accessories:
*star funk and glow hair clip
*large funk and glow hair clip
*spa star perfume bottle
*spa round/star perfume bottle

BRYANT 06678

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 08

PAGE _____ 1008



BRYANT 06679

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88

PAGE _____ 1009



BRYANT 06680

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88
PAGE _____ 1010



BRYANT 06681

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88

PAGE _____ 1011



BRYANT 06682

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT ___ 88 ___

PAGE ___ 1012 ___



BRYANT 06683

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88 _____

PAGE _____ 1013 _____

Subj: Slumber party-accessories
Date: 6/10/2002 1:34:34 PM Central Daylight Time
From: DSoei@mgae.com (Dennis Soei)
To: bryant598@cs.com (Carter Bryant)

Okay, will have one pair of shoe. We need # of color callouts for cost purpose as Vendor need to give the quotes to Isaac when he's there on 6/17. Here the break down of the accessories besides the SG fashions:
(with SG fashions, total pieces is 26 to 27 per doll)

**CLOE**
1 pair slippers with fabric/flocking  290 C
1 diary – *mold in white*
1 pen - *light blu w/glitter*  290 C
1 toothpaste  290 c white top
1 toothbrush  *white bristles*  187 c
1 nail polish/applicator  187 c w/silver top
1 curling iron  182 c
1 phone(princess) 1895 c  *1365 flame*  290 w/1365 flame
2 candles white w/~~1465~~ 1365 flame
2 soap bars  290 + 1625
1 bubble bath bottle  182 c
1 game board
1 round perfume bottle  clear
1 large hairclip  ~~18~~ #2767 C
1 hairbrush  2767 c

**YASMIN**
1 pair slippers with fabric/flocking  250 c
1 diary  mold in white
1 pen  *lavender w/glitter* 264 c
1 toothpaste  2717 c white top
1 toothbrush  white bristles/264 c handle
1 nail polish/applicator  272 c w/white app. top
1 curling iron  272 c
1 phone (princess)  2706 c w/pearl
1 powder puff w/ case  217 c w/pearl
1 mascara  272 c w/silver applicator top
1 popcorn cup  2655 c/white stripes  with  1215 c popcorn
1 large makeup compact  white with 2717/272 c makeup colors
3 lipsticks  272 c w/lipstick of 204c    white w/lipstick of 197c   2717c with lipstick of 1955
1 hand mirror (princess) white w/pearl
1 makeup brush  2706
1 hairbrush  2717

**JADE**
1 pair slippers with fabric/flocking  169 C
1 diary - mold in  white
1 pen  -  M1w/the 2717
1 toothpaste  318 c white top
1 toothbrush  183 c white bristles
1 nail polish/applicator  318 c w/silver top
1 curling iron  623 c
1 phone (cradle)  183 w white dial & silver handle on handset
3 magazines  mold in white
1 hairbrush  #1625
1 hair dryer 1345

*FINAL*
*MATRIX*
*6/10/02*

**BRYANT 06684**

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT ___88___

PAGE ___104___

1 small hairclip *1625*
1 star hairclip *183 c*
1 head band *318 c*

**MEYGAN**
1 pair slippers with fabric/flocking *light blue - 543 c*
1 diary - *mold in white*
1 pen *543 c*
1 toothpaste - *white bristles/red handle* *193 C* *light blue toothpaste 543 C w/white cap*
1 toothbrush *white*
1 nail polish/applicator *bottle in 193 c w/silver applicator top*
1 curling iron *white w/pearl*
1 phone (rotary) *127 c with white rotary dial*
1 nail puller *white*
2 nail polish bottles *183 c w/white applicator top* ~~193 c with~~ *543c w/white applicator top*
1 6-pack soda cans *543c/193 c silver*
1 lotion bottle *183 c w/white drop*
1 large makeup compact *543 C with inside of 183c /193 c*
1 hand mirror - oval *543c with holographic sticker for 'mirror'*
1 emory board *195c*
1 hairbrush *183 c*


**SASHA**
1 pair slippers with fabric/flocking *162 C*
1 diary - *mold in white*
1 pen *170 c w/glitter*
1 toothpaste *2975 c w/white top*
1 toothbrush *white bristles* *1485 c handle*
1 nail polish/applicator *170 c w/white applicator*
1 curling iron *silver w/pearl*
1 phone (rotary) *2975 c w/white rotary*
1 boom box *170 c w/silver speakers*
1 3 cd's with jewel case *holographic*
1 magic eye/8 ball *black with white graphic*
1 comb *white w/pearl*
1 large hairclip ~~=~~ *1345 c*
1 head band *2975 c*
1 hairbrush *1345 c*


----Original Message----
From: Bryant598@cs.com [mailto:Bryant598@cs.com]
Sent: Monday, June 10, 2002 10:42 AM
To: DSoal@mgae.com
Subject: Re: Slumber party-accessories

Hi Dennis,

I can't open XLS files, so please just email me the accessory callouts w/out

the attachment.

**BRYANT 06685**

Also, we are only doing ONE pair of slippers per girl as per my
understanding. That's why the prototypes only included one pair of slippers.

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88
PAGE _____ 1015

I think it's redundant to give them each 2 pairs of slippers. Let's break our

normal pattern of 2 pairs of shoes for this segment and do one fabulous pair

of slippers with fabric/flocking and skip the painted ones. Perhaps that way

we can include more accessories...??

Your interest callout is correct. Cloe, relax, candles, etc. Yasmin makeup, Jade, hair, Meygan, nails, Sasha, music and/or fortune......

I have June 28 as date for color callouts on my schedule from Dede. Do you have to have the callouts today?

Carter

──────── Headers ────────
Return-Path: <DSoal@mgae.com>
Received: from rly-xi04.mx.aol.com (rly-xi04.mail.aol.com [172.20.116.9]) by air-xi02.mail.aol.com (v88.11) with ESMTP id MAILINX21-0810143434; Mon, 10 Jun 2002 14:34:34 2000
Received: from mgaemail.mgae.com (adsl-gte-la-216-86-192-202.mminternet.com [216.86.192.202]) by rly-xi04.mx.aol.com (v85_r1.12) with ESMTP id MAILRELAYIND945-0810143421; Mon, 10 Jun 2002 14:34:21 -0400
Received: by MGAEMAIL with Internet Mail Service (5.5.2653.19)
     id <L2Q452X6>; Mon, 10 Jun 2002 11:32:11 -0700
Message-ID: <A5F04B33477DD511A81200508BE739BF7AEF93@MGAEMAIL>
From: Dennis Soal <DSoal@mgae.com>
To: Carter Bryant <bryant598@cs.com>
Subject: Slumber party-accessories
Date: Mon, 10 Jun 2002 11:31:32 -0700
MIME-Version: 1.0
X-Mailer: Internet Mail Service (5.5.2653.19)
Content-Type: text/plain;
     charset="iso-8859-1"

BRYANT 06686

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT ____88____

PAGE ____1016____

# Pajama Party — Jade



Pink spaghetti strap

eye mask

Green Robe w/ coral pink trim (piping)

dinosaur

Capri Pants (mid-calf)

Green plush bag backing

CONFIDENTIAL
ATTORNEY'S EYES ONLY

Slippers (Bottom)

Slippers (top)

BRYANT 06687

EXHIBIT ___88___

PAGE ___1017___

# Pajama Party - Cloe



tank top

eye mask

Full Pajama set

Boxer shorts

Pig

CONFIDENTIAL
ATTORNEY'S EYES ONLY

RoBe

SlIPPERS        SlIPPERS

BRYANT 06688

EXHIBIT _____ 88 _____

PAGE _____ 10|8 _____



SOFT "MASK" THAT CLINGS TO FACE OF DOLL

TOOTHPASTE & TOOTHBRUSH

ROLLERS & BOBBY PINS

NAIL POLISH

"FUZZY" PEN

"FUZZY" PHONE

COMPACT & POWDER PUFF

BRYANT 06689

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT ____ 88

PAGE ____ 1019



SASHA

- SEVERAL PIECES OF TWISTED HAIR TIED
TOWARD BACK OF HEAD. MAKE THE TWISTS
SORT OF 'IMPERFECT.'

312/441 BLEND

BRYANT 06690

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88

PAGE _____ 1020



BRYANT 06691

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT ___88___

PAGE ___1021___



CONFIDENTIAL
ATTORNEY'S EYES ONLY

BRYANT 06692

EXHIBIT _____

PAGE _____ 1022



MEYGAN

-CAN WE DO A LOWERED FOREHEAD
ON HER LIKE WE DO FOR CLOE?

446

BRYANT 06693

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____

PAGE _____ 1023




YASMIN

522/736 BLEND

**BRYANT 06694**

**CONFIDENTIAL**
**ATTORNEY'S EYES ONLY**

EXHIBIT _____ 88

PAGE _____ 1024

SASHA



- APPX ACTUAL SIZE

- SEE EXAMPLE LOGO

- CREATE THIS DESIGN VERY CLOSE TO
  ORIGINAL DESIGN.

- AQUA = 2975 C
- MED. BLUE = 299 C w/GLITTER

- NO BLACK LINES

**BRYANT 06695**

**CONFIDENTIAL**
**ATTORNEY'S EYES ONLY**

EXHIBIT ____ 88

PAGE ____ 1025

*MEYGAN*





CHERRIES

ACTUAL SIZE

PINK = 1895 C
RED = 200 C
STEMS/LEAF = 383 C

MONKEY

ACTUAL SIZE

FACE = 726 C
LIGHT BROWN = 4645 C
(ALL LINES ON FACE SHOULD BE DONE IN LIGHT BROWN; ONLY THE EYES ARE BLACK.)

LEAF

ACTUAL SIZE

(WHITE AREAS IN LEAF SHOULD BE CLEAR.)

291 C

BRYANT 06696

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88

PAGE _____ 1026

CLOE



- SILVER STARS
- ACTUAL SIZES
- LARGE STAR = APX ½" × ½"
- SMALL STAR = APX ¼" × ¼"

BRYANT 06697

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88
PAGE _____ 1027

Heat transfers

Cloe
1/2" star: pink top, makeup bag, slippers (2)(if possible)
1/4" star: night blinders

Meygan
1/2" x 1/2" cherries
monkey for bag 1 1/2" x 1 1/2"
leaf design for makeup bag

Jade
-use kitty from print of shorts & add light blue color to it -
-also, let's change grand color of this print to be more turquoisey (?)
- asian girl - modify design to ~~include~~ ~~use~~ look more like original

Yasmin
no heat transfers

Sasha
"idream" team emblem for bag
re-use "00" from fashion pack Just do P.E. for white/grey Tshirt
create heat transfer of ducky for makeup bag

BRYANT 06698

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT ___88___

PAGE ___1028___



BRYANT 06699

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88
PAGE _____ 1029



BRYANT 06700


CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88
PAGE _____ 1030





**BRYANT 06701**

**CONFIDENTIAL**
**ATTORNEY'S EYES ONLY**

EXHIBIT _____ 88 _____

PAGE _____ 1031 _____





BRYANT 06702

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88
PAGE _____ 1032









BRYANT 06703

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88 _____

PAGE _____ 1033 _____



BRYANT 06704

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88 _____

PAGE _____ 1034 _____



Sasha - music / 8 ball
Yasmin - makeup / popcorn
Kayla - manicure / soda
Cloe - candles / perfume / game " Tv
Jade - hair / ? magazines

BRYANT 06705

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88

PAGE _____ 1035



BRYANT 06706

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT ___ 08 ___

PAGE ___ 1036 ___

<u>Sasha</u>
star hair clip
small hair clip
boombox
3 CD's in Jewel Cases
"8"ball          plus common accessories

<u>Sasha soft goods</u>
eye mask
animal
fuzzy diary
fuzzy slippers
outfits
overnite bag
pillow?

<u>Yasmin</u>
large hair clip
heart hair clip
makeup - lipsticks (2)
          mascara
          eyeshadows (in compact)
mirror    blush (in compact)

box of popcorn    plus common accessories

<u>Yasmin soft goods</u>
eye mask
animal
fuzzy diary
fuzzy slippers
outfits
overnte bag
pillow

<u>Kayla</u>
headband
star hair clip
manicure - nail polish (2)
          (so she will have 3 total)
          emory board
          buffer
          tube of lotion    plus common accessories
6 pack of soda

Kayla soft goods
eye mask
animal
blah blah

<u>Jade</u>
blow dryer
comb
brush              plus common accessories
curling iron
bobby pins
small hair clip
headband
magazines (3)

<u>CLOE</u>
3 soaps    bubble bath
3 candles
3 perfume bottles
large hair clip
star hairclip
board game or small TV        plus common accessories

BRYANT 06707

CONFIDENTIAL
ATTORNEY'S EYES ONLY

1037



CLOE SLUMBER PARTY

- NEW DESIGNS

- 2 CANDLES
- 3 SOAPS (2 OF OVAL, ONE SQUARE)
- 'BUBBLE' BATH BOTTLE
- CHIP ART BOARD GAME

BRYANT 06708

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88

PAGE _____ 1038



- pale skin  redhead
- soft, creamy whites of eyes
- off black lashes

**BRYANT 06709**

**CONFIDENTIAL**
**ATTORNEY'S EYES ONLY**

EXHIBIT _____

PAGE _____ 1039



- tan skin
- cool blush
- soft whites of eyes

BRYANT 06710

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88
PAGE _____ 1040



- Pale skin, blonde.
- cool pinks
- dark brown, not black lashes (off black)
- soft whites of eyes

BRYANT 06711

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88
PAGE _____ 1041



- pale skin
- asian look
- coraly pinks
- eyes dark brown with some blueish green
- soft whites of eyes

BRYANT 06712

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88
PAGE _____ 1042





JADE

-LETS DO 2 HEADS - CAN YOU
TRY ONE WITH LONG PONYTAILS
AND ONE WITHOUT THEM;
JUST THE LITTLE SHORTY
PONYTAILS.

312/9601 BLEND

CLOE

- CAN WE GIVE HER A
SLIGHTLY LOWERED HAIRLINE
SO SHE HAS A SMALLER
FOREHEAD.

519/588 BLEND

BRYANT 06713

CONFIDENTIAL
ATTORNEY'S EYES ONLY

CANISTER _____

PAGE _____ 1043



- SASHA SLUMBER PARTY.

- NEW DESIGNS

- BOOMBOX WITH CLEAR, EMBOSSED
  "CD" PLAYER
  (COULD POSSIBLY REALLY OPEN ?)

- CD'S (3 or 4 IN PACKOUT): CLEAR JEWEL CASES

- "MAGIC EYE" OR "8" BALL
  FORTUNE TELLING TOY

- ROTARY PHONE (WILL HAVE A FABRIC
                       COVERING)

BRYANT 06714

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT ___ 88
PAGE ___ 1044



- BRATZ SLUMBER PARTY
- COMMON ACCESSORIES
- NEW DESIGNS

* TOOTHPASTE
* TOOTHBRUSH
* HAIR ROLLERS (4 EACH DOLL)
* BOBBIE PINS (4 EACH DOLL)
* NAIL 'POLISH' & APPLICATOR

BRYANT 06715

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT ____ 88
PAGE ____ 1045



- JADE SLUMBER PARTY

- NEW DESIGNS

- CRADLE PHONE (WILL HAVE
             FABRIC AROUND
             BASE OF PHONE)

- CHIP ART MAGAZINES
  (3 TOTAL, ALL WITH DIFFERENT COVERS)

BRYANT 06716

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT ____ 88
PAGE ____ 1046



- YASMIN SLUMBER PARTY

- NEW DESIGNS

- POWDER PUFF & CASE WITH
  "PRINCESS LOGO" ON TOP

- LIPSTICK
- MASCARA
- POPCORN
- PRINCESS PHONE (WILL HAVE FABRIC
                  COVERING)

BRYANT 06717

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT ___88___

PAGE ___1047___



- MEYGAN SLUMBER PARTY

- NEW DESIGNS

- NAIL BUFFER

- 2 INDIVIDUAL DESIGNED NAIL 'POLISHES'

- SIX-PACK OF SODA

- 'LOTION' BOTTLE

- MEYGAN GETS SASHA ROTARY PHONE WITH DIFFERENT FABRIC COVERING

**BRYANT 06718**

**CONFIDENTIAL
ATTORNEY'S EYES ONLY**

EXHIBIT _____ 88 _____

PAGE _____ 1048 _____



beauty style

Da Balm

1. Wait 'til ya got a whiff of this: Smith's Strawberry Salve smells—and tastes—like it's still attached to the berry patch. ($5.95; 800-793-LIFE]

2. LUSH's Lite Lip Balm's loaded with Marshmallow (yup, the same goo that makes Rice Krispies treats yummy!) to protect your pout from drying out. [$5.25; www.lushcanada.com]

3. Survival in a tin: Badger Lip Balm has the superpower to stop the damaging effects of the sun, wind, earth and water. In four drool-worthy flavors, your friends will be "badgering" you for another fingerful [$4; www.badgerbalm.com].

4. Appease your eclectic side and moisturize your mouth at the same time.

Perfumeria Gal's lip balm, which is available in eight can-we-say scrumptious scents (like this one in Violet), is a pretty addition to any purse. [$5; 800-249-3393]

5. Your grandma probably wore the famous Smith's Rosebud Salve when she first smiled at your grandpa. This 108-year-old lip balm is the desert lizard choice of the famous. [$4.95; 800-793-LIFE]

6. What's all the buzz about? Burt's Beeswax Lip Balm, of course. The healing potion—and the minty flavor—promises a smooth kiss. [In a tube or tin, $2.50 each; www.burtsbees.com]

7. You don't have to be dirty to drench your lips in Dirty Girl's Forbidden Fruit Lip Luster. [$12; 888-454-7570 or at Urban Outfitters]

8. Quench your thirsty lips—or cuticles, elbows, heels or any other parched place on your body—with Mad Gab's Elephant Lube. These pots are hand-packed with moisturizing shea butter and taste like they're cooked in your mum's kitchen. [$6; www.madgabs.com]

CONFIDENTIAL
ATTORNEY'S EYES ONLY

BRYANT 06719

EXHIBIT
88
PAGE
1049




## Flushed or Blushed?

That is the question. If it's tough to tell, it must be Too Faced Cosmetics Flushed Blush. These cool compacts couple silky matte and shimmery shades (like Who's Your Daddy? shown) for a just-jogged flush. Too Faced fans Mandy Moore and Madonna would love the line's newcomers. ($18.50, www.toofaced.com)

## Cool Inventions

While we dream of beauty, she creates it. Gelit Strugano, 24, started girlActik with a little cash and a big idea: a line of sparkle makeup that actually stays put (like the pink glitter, below). (Glitter and sticky base, $20; www.girlactik.com)

## Fresh Air

Fresh, Boston's bath and body boutique, and its delish-scented stuff have become the rite of passage for celebs. Our pick: the Cherry Cranberry Soap, shown. ($7; www.fresh.com)

## Bitter Pink

There's nothing sour about Tarte's Cheek Stain. On the contrary, these simple glide-on-and-smudge sticks are infused with a sugar-sweet scent (like this one in peach) that give your skin super-sheer color. Plus, the packaging is to die for. ($23; www.beauty.com)

## Lava Lips

There's lip gloss. And then there's Cover Girl's Lava Lip Gloss. This pout potion and its lava-like formula gives new meaning to the word "fun." Plus, it comes in yummy flavors (like Cherry Bomb, shown). ($4.85; at drugstores)

## Win! $25 of you can use CG's Lava Lip Gloss. [illegible fine print]

—Danielle Gillis 37

CONFIDENTIAL
ATTORNEY'S EYES ONLY

BRYANT 06720

EXHIBIT 88

PAGE 1050



Free Style.

BRYANT 06721

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88
PAGE _____ 1031



CONFIDENTIAL
ATTORNEY'S EYES ONLY

BRYANT 06722

EXHIBIT 88

PAGE 1052



CONFIDENTIAL.
ATTORNEY'S EYES ONLY

BRYANT 06723



CONFIDENTIAL
ATTORNEY'S EYES ONLY

BRYANT 06724

EXHIBIT _____ 88

PAGE _____ 1054



CONFIDENTIAL
ATTORNEY'S EYES ONLY

BRYANT 06725

EXHIBIT ___88___

PAGE ___1055___



# INTRODUCING

**Shine Control**
**MATTIFYING**
**MAKEUP**



Breakthrough shine-controlling complex to absorb oil.

Clarifying botanical extract that minimizes pores.

Lightweight water-based formula lets skin breathe.

Natural, fresh finish lasts all day. www.revlon.com



# REVLON

IT'S FABULOUS BEING A WOMAN.

CONFIDENTIAL
ATTORNEY'S EYES ONLY

BRYANT 06726

EXHIBIT _____ 88

PAGE _____ 105b



**gloss is boss** Sheen and shine go all over! Here, eyes and lips go slick, but you can also gloss over your cheeks, shoulders, and collarbone, just don't over do it. To gloss up your lids use a shiny shadow, like Eye Gloss by Makeup! Bobbe Joy or Maybelline Expert Eyes Shadow Gloss. Want more eye emphasis? Use fake lashes: Don't go for a strip of lashes, though. Use individual lashes instead so you can put 'em where you need 'em; like on the outer edge of your lashes or a few in the center of your lashes, which will help make your eyes look larger. Put color on your lips, then shine 'em up with a supershiny lip gloss. Be sure to tote some gloss to the prom 'cuz it won't last all night. Wanna add shine to your shoulders? Petroleum jelly'll do the trick. Necklace by slitherageonline.com.

CONFIDENTIAL
ATTORNEY'S EYES ONLY

BRYANT 06727

EXHIBIT _____ 88

PAGE _____ 1057



**be bronzed** New for now, a healthy bronzed look, says Gillian. Give your skin a sunkissed, dewy look by using a tint-ed moisturizer, such as Cover Girl CG Smoothers Tinted Moisturizer. Go for a flush of color on your cheeks, using a gel or cream blush for an oh-so-natural look. To keep that bronzy look going, use a brick colored blush and put it high on your cheekbones, blending out toward your temples. Keep eyes neutral with a light shadow on your browbone and beige shadow over your lid. For fun: Try a gold eyeliner! On your lips, use a lipstain in a color similar to your blush shade, or slick your lips with a light beige, frosty lip color.
Flower pin from Capelli New York.

CONFIDENTIAL
ATTORNEY'S EYES ONLY

BRYANT 06728

EXHIBIT __88__

PAGE __1058__

Page 1 of 1

| Subj: | GNO Cloe accessory callout |
|---|---|
| Date: | 6/26/2003 4:32:02 PM Central Daylight Time |
| From: | CBE1068 |
| To: | DSoal@mgae.com |
| File: | GNO Cloe additional accessories.JPG (256158 bytes) DL Time (26400 bps): < 3 minutes |

Hi Dennis

here are the accessories for Cloe GNO. Let me know if you have any questions on the items listed.

*hoop earrings (see attachment)
*pointed drop earrings (see attachment)
*large drop earrings (see attachment)
*3 round band bracelets (see attachment)
*3 squiggle bracelets (see attachment)
*pointed drop necklace (see attachment)
*2 large butterfly hairclips (see attachment)
*2 "rhinestone" style bobby pins (from S02 Sweetheart Meygan)
*rhinestone embellished cell phone
*square compact (from Runway playset, see attachment)
*lipstick
*makeup brush (from Runway playset, see attachment)
*star perfume bottle (from FF)

*we will also include false eyelashes for the consumer. We will design a container for them based on Cloe's icon. This will then be downsized for the an additional accessory for the doll).

**BRYANT 07162**

**CONFIDENTIAL**
**ATTORNEY'S EYES ONLY**

Thursday, June 26, 2003 CompuServe: CBE1068

EXHIBIT _____ 88

PAGE _____ 1059



BRYANT 07163

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88

PAGE _____ 1060



CLOE

BRYANT 07164

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88
PAGE _____ 1061

Subj:     FW: BratzBoys
Date:     7/22/2002 1:29:21 PM Central Daylight Time
From:     PTreantafelles@mgae.com (Paula Treantafelles)
To:       bryant596@cs.com (Carter Bryant), FChonavel@mgae.com (Fabienne Chonavel), DSanrow@mgae.com (Dede Sanrow)

Ok cool feedback for Boyz.  This is for new coming deisgns.  PS  we sold
5,000 in first week at Target alone
——Original Message——
From: Bill Howard On Behalf Of MGA - Customer Service
Sent: Monday, July 22, 2002 11:01 AM
To: Isaac Larian; Paula Treantafelles; Fabienne Chonavel; Maggie Bermudas
Subject: FW: BratzBoys


Some Bratz Boyz feedback........

——Original Message——
From: SKOT Sacred Knight Of Tomorrow [mailto:skot777@msn.com]
Sent: Sunday, July 21, 2002 8:16 AM
To: customerservice@mgae.com
Subject: BratzBoys

These are the coolest boy dolls ever!
you have the most amazing dolls!
i was hoping to suggest some clothing ideas for them:
-Surf set (for both, with bare feet-both colors, surf boards, and swim
trunks)
This can also be two different sets, for each boy, and include Volleyball
and frisbees.
-Skateboard set (Skateboard, skate shoes, and new duds)
-Rave-hoppin' (shinny clothes for going to the rave)
-Snowboarding set (snowboard, warmclothes, and boots)

And playsets would rock, like
a cruising car, or     _boy car_
a music/coffee shop, or
a club-houze.

An Asian guy-friend would be cool too!


The clothes y'all make for them is EXTREMELY current, and is what all the
teens here wear...at least all the cool teens! Barbie is so out of style!
her clothes look like they are made for adult collectors that shop at Kohl's
or some other old-person store, or they are just to kiddie, with pink and
sparkles....NO ONE DRESSES LIKE BARBIE! EVERYONE WANTS TO DRESS LIKE THE
BRATZ!
I got both Dylan and Cameron at Target, ... are clothes going to be made
available for them? are there any exclusives of any of the Bratz dolls at
any non-dept store? (i buy them at WalMArt, Target, and K-Mart, and
occassionally at K*B, like in the beginning, when some were hard to get). I
got my first 3 of the original 4 at Toys R Us, i didn't like the blonde
girl.


——————— Headers ———————
Return-Path: <PTreantafelles@mgae.com>

BRYANT 11581

Monday, July 22, 2002   CompuServe: Bryant596          Page 1

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88
PAGE _____ 1062

Received: from  rly-xj01.mx.aol.com (rly-xj01.mail.aol.com [172.20.116.38]) by air-xj02.mail.aol.com (v66_r1.16) with ESMTP id MAILINXJ21-0722142921; Mon, 22 Jul 2002 14:29:21 -0400
Received: from  mgaemail.mgae.com (adsl-gte-la-216-86-192-202.mmintemet.com [216.86.192.202]) by rly-xj01.mx.aol.com (v66_r1.15) with ESMTP id MAILRELAYINXJ12-0722142905; Mon, 22 Jul 2002 14:29:05 -0400
Received: by MGAEMAIL with Internet Mail Service (5.5.2653.19)
   id <38KZ4J8Q>; Mon, 22 Jul 2002 11:26:43 -0700
Message-ID: <A5F04B33477DD511A61200506BE730BFA2FECE@MGAEMAIL>
From: Paula Treantafelles <PTreantafelles@mgae.com>
To: Carter Bryant <bryant596@cs.com>, Fabienne Chonavel
   <FChonavel@mgae.com>,
   Dede Sanrow <DSanrow@mgae.com>
Subject: FW: BratzBoys
Date: Mon, 22 Jul 2002 11:26:39 -0700
MIME-Version: 1.0
X-Mailer: Internet Mail Service (5.5.2653.19)
Content-Type: text/plain;
   charset="iso-8859-1"

BRYANT 11582

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT __88__

PAGE __1063__

| Subj: | Fwd: FNG/Slumber party hair |
|---|---|
| Date: | 1/7/2003 11:10:27 PM Central Standard Time |
| From: | Bryant598 |
| To: | ECheung@mgae.com |
| CC: | DSosi@mgae.com |

Hi Emila,

I'm responding to this to help out Dennis who is so so busy right now. Please see the attached below for new hair colors for Funk and Glow refresh and Slumber Party refresh.

curl sizes will be available later.

thanks.
Carter

———
Forwarded Message:

| Subj: | FNG/Slumber party hair |
|---|---|
| Date: | 1/6/2003 3:43:05 PM Central Standard Time |
| From: | Bryant598 |
| To: | DSosi@mgae.com |

Hi Dennis,

here is hair color info for all characters except for Meygan. Please let me know if we will replace Meygan with Dana or if we will continue to use Meygan in these segments.

**FNGLOW F03**

**CLOE: 519**
**YASMIN: SLUMBER PARTY YASMIN HAIRCOLORS**
**JADE: 312/9601 BLEND**
**SASHA: 312 WITH STREAKS IN 561**
**DANA: 441 WITH STREAKS IN 446**

**SLUMBER PARTY F03**

**CLOE: 529/736 BLEND**
**YASMIN: YASMIN S03 DOLLPACK HAIRCOLORS**
**JADE: 9601/441 BLEND**
**SASHA: 9601 WITH STREAKS IN 623**
**DANA: SASHA DOLLPACK S03 HAIRCOLORS**

BRYANT 05374

Thursday, January 09, 2003 CompuServe: Bryant598

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88

PAGE _____ 1064

| | |
|---|---|
| Subj: | RE: style it hair colors |
| Date: | 1/9/2003 4:45:24 PM Central Standard Time |
| From: | DSoal@mgae.com (Dennis Soal) |
| To: | bryant598@cs.com (Carter Bryant) |

Here is hair color of styf It.
Dana = 441 with 623 streaks.
Cloe = 538/736 blend.
Sasha = 9601/433 blend
Yasmin = 443/441 blend
Jade = 9601 with 433 streaks.

-----Original Message-----
From: Bryant598@cs.com [mailto:Bryant598@cs.com]
Sent: Thursday, January 09, 2003 12:58 PM
To: DSoal@mgae.com
Subject: style it hair colors

Hi Dennis,

can you send me the final colors we selected for styl it segment for my records.

thanks,

Carter

----------------- Headers -----------------
Return-Path: <DSoal@mgae.com>
Received: from rly-xf05.mx.aol.com (rly-xf05.mail.aol.com [172.20.105.229]) by air-xf03.mail.aol.com (v90.10) with ESMTP id MAILINXF34-0109174524; Thu, 09 Jan 2003 17:45:24 1900
Received: from mgaemail.mgae.com (adsl-gte-ia-216-86-192-202.mminternet.com [216.86.192.202]) by rly-xf05.mx.aol.com (v90_r1.1) with ESMTP id MAILRELAYINXF52-0109174517; Thu, 09 Jan 2003 17:45:17 -0500
Received: by MGAEMAIL with Internet Mail Service (5.5.2653.19)
    id <ZTLDXK8F>; Thu, 9 Jan 2003 14:42:02 -0800
Message-ID: <A5F04B33477DD511A81200506BE739BF013DF934@MGAEMAIL>
From: Dennis Soal <DSoal@mgae.com>
To: Carter Bryant <bryant598@cs.com>
Subject: RE: style it hair colors
Date: Thu, 9 Jan 2003 14:40:55 -0800
MIME-Version: 1.0
X-Mailer: Internet Mail Service (5.5.2653.19)
Content-Type: text/plain;
    charset="iso-8859-1"

Thursday, January 09, 2003 CompuServe: Bryant598

BRYANT 07546

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88

____ 1065

| Subj: | final boyz dollpack accessories |
|---|---|
| Date: | 1/12/2003 4:36:22 PM Central Standard Time |
| From: | Bryant598 |
| To: | DScott@mgae.com |
| File: | Koby F03 dollpack shoe 2.ZIP (128429 bytes) DL Time (26400 bps): < 1 minute |

Hi Dennis,

OK here is the updated and hopefully final accessory matrix and color callout for boyz dollpack F03. Shoe color callouts and matrix also attached.

Let's use existing accessories on the boyz for now since we actually have a good selection of them and we can create more accessories in future segments as necessary.

CAMERON:
blue sweater outfit: bead bracelet (from Dylan S03 dollpack) in existing colors. Also, create stud artwork for belt if necessary. Create new buckle design that reflects sewn sample if necessary.
red sweater outfit: lock necklace in silver, silver 'flame' glasses with lenses in 655 (glasses from Dylan S03 dollpack)

see attachment for shoe styles and color callouts

KOBY:
stripe shirt outfit: watch from S03 dollpack boyz in silver with face in 277C. Bead bracelet from Dylan S03 dollpack, silver with center accents in 497C. Both watch and bracelet should be worn together on same arm. Silver sunglasses from Cameron S03 dollpack, with lenses in 139C.

vest outfit: shell bracelet from Cameron S03 dollpack in ivory with centers in 497C. Bead bracelet in 497C with center accents in silver. Both should be worn on same arm.

see attachment for shoe color callouts.

DYLAN:
jacket outfit: silver glasses from Cameron S03 dollpack. Silver frames with lenses in 131C.

sweater outfit: watch from boyz dollpack S03. Silver with face in 139C. Also, please create new belt buckle that reflects 3d sample.

see attachment for shoes.

EITAN:
flame shirt outfit: wraparound flame glasses from Cameron F2001 dollpack. Black with lenses and flames in 138C. Cuff bracelet with studs from Cameron F2001 dollpack; use existing colors (black with silver studs), bead necklace from Dylan F2001 dollpack, silver.

beige shirt/jeans outfit: bead bracelet and nunchuck necklace from Dylan S03 dollpack, both silver with black centers.

Please also create stud artwork for belt if necessary as well as new buckle design if necessary.

see attachment for shoes.

BRYANT 11537

Sunday, January 12, 2003 CompuServe: Bryant598

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT 88

PAGE 1066

| Subj: | FNG REFRESH ACCESSORIES YASMIN AND CLOE |
|---|---|
| Date: | 1/23/2003 9:52:15 PM Central Standard Time |
| From: | Bryant598 |
| To: | DSaal@mgae.com |

Hi Dennis,

OK here is the revised matrix for FNG refresh; I think this will make life easier for all! All accessories and shoes are from FNG 2002.

This email covers Yasmin and Cloe only. Will send the other characters seperately.

Let me know if you have any questions on anything.

YASMIN:

SHOES: 1. Candie's platform shoes; 324 C tops, gold soles and studs, black bottom; wears with aqua top and jean skirt
   2. strappy sandals; 189C straps and sole, gold studs and bottom of shoe; wears with coral top and jeans
ACCESSORIES: use YASMIN FNG 2002 ACCESSORIES; NOTE COLOR CHANGES TO THE FOLLOWING ITEMS:
   1. necklace; change color to 189C
   2. heart hairclip; change color to 189C
   3. sunglasses; change color to 189C

CLOE:

SHOES: 1. Candie's platform from Jade FNG 2002; USE AS-IS; wears with coral top and fringe jeans
   2. strappy sandal; straps and sole, 680C, silver studs and bottom of shoe; wears with sparkle halter top and sparkle jeans
ACCESSORIES: USE MEYGAN FNG 2002 ACCESSORIES. NOTE COLOR CHANGES TO THE FOLLOWING ITEMS:
   1. hairband; change color to 184C

BRYANT 05370

Thursday, January 23, 2003 CompuServe: Bryant598

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT 88
PAGE 1067

| Subj: | **FNG REFRESH ACCESSORY MATRIX** |
| Date: | 1/23/2003 9:57:35 PM Central Standard Time |
| From: | Bryant598 |
| To: | DSosi@mgae.com |

Hi Dennis

here is the matrix for Sasha

SHOES: 1. strappy sandal; straps in 258C, gold sole and studs, black bottom of shoe. Wears with grey jeans, lavender top, white fur vest

    2. Candle's platform; gold top, 154C soles, black studs and bottom of shoe. Wears with gold fringe top and gold printed jeans.

ACCESSORIES: USE ACCESSORIES FROM SASHA FNG 2002. NOTE CHANGES TO COLOR IN THE FOLLOWING ITEMS:

    1. large hairclip; change color to 252C
    2. necklace; change color to 258C
    3. sunglasses; change color to 252C

**BRYANT 05371**

Thursday, January 23, 2003 CompuServe: Bryant598

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT 88

PAGE 1068

| Subj: | FNG REFRESH DANA AND JADE |
|-------|---------------------------|
| Date: | 1/23/2003 10:06:55 PM Central Standard Time |
| From: | Bryant598 |
| To: | DSosl@mgae.com |

Hi Dennis,

here is the matrix for FNG DANA and FNG JADE REFRESH.

DANA:

SHOES: 1. strappy sandal; black straps, gold studs and sole, black bottom of shoe. Wears with pink skirt/black top outfit
      2. Candie's platform; gold top with black sole and studs; wears with gold top, jeans, boa outfit

ACCESSORIES:USE ACCESSORIES FROM CLOE FNG 2002. NOTE CHANGES TO COLOR IN THE FOLLOWING ITEMS:
      1. hoop earrings; change to gold vum
      2. squiggle bracelets; change to gold vum
      3. sunglasses; change to 233C

JADE:

SHOES: 1. Candie's platform; 170C top, silver sole and studs, black bottom; wears with peach top and flame jeans
      2. FNG boot; silver, black sole and chain; wears with black top and burgundy skirt

ACCESSORIES: USE ACCESSORIES FROM JADE FNG 2002. NOTE CHANGES TO COLOR IN THE FOLLOWING ITEMS:
      1. necklace; change color to black.

BRYANT 05372

Thursday, January 23, 2003 CompuServe: Bryant598

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88

PAGE _____ 1069

Page 1 of 1

| | |
|---|---|
| Subj: | RE: beach bash girls accessories |
| Date: | 6/4/2003 1:19:07 PM Central Daylight Time |
| From: | DSoal@mgae.com (Dennis Soal) |
| To: | CBE1068@cs.com ('CBE1068@cs.com') |
| File: | newaccessoriesBB.zip (1164063 bytes) DL Time (26400 bps): < 12 minutes |

Carter, Thank you for the list of existing accessories. what about the new accessories & shoes for each doll? below is the new accessories mockups based on the 3D reference you sent earlier. necklace 3 & 4 are very similiar in style. I think we should just pick & use one style out of the two.
Also include is the final wax from Margaret. She does not know which are for Boyz & which for Girlz. Since I don't have any reference samples to compare, I like you to identify them for clarification. I have concern about the shoes that I believe for the Boyz. They look narrow & elongated. I want to send back to Margaret to fix it for more proportion. What do you think & have you seen these in 3D form?

-----Original Message-----
From: CBE1068@cs.com [mailto:CBE1068@cs.com]
Sent: Monday, June 02, 2003 7:02 PM
To: DSoal@mgae.com
Subject: beach bash girls accessories

Hi Dennis

here are the accessories that will be 'common' to each girl. Please also see the sketch of how we might do the 'thing to bring' accessories.

I will call out individual 'thing to bring' accessories seperately. For the common accessories, let's do:

water bottle: clear with label
lotion bottle: 2 colors, perhaps with new 'suntan' label
lipstick: 3 colors
nail polish: 2 colors
sunglasses: one color
squirt bottle: 3 colors

thanks.
Carter

-------- Headers --------
Return-Path: <DSoal@mgae.com>
Received: from rly-xn04.mx.aol.com (rly-xn04.mail.aol.com [172.20.83.137]) by air-xn04.mail.aol.com (v93.12) with ESMTP id MAILINXN41-81c73ede3815171; Wed, 04 Jun 2003 14:19:02 -0400
Received: from mgaemail.mgae.com (adsl-gte-la-216-86-192-202.mminternet.com [216.86.192.202]) by rly-xn04.mx.aol.com (v93.12) with ESMTP id MAILRELAYINXN43-6433ede37982e3; Wed, 04 Jun 2003 14:17:02 -0400
Received: by MGAEMAIL with Internet Mail Service (5.5.2653.19)
    id <L62G3G9F>; Wed, 4 Jun 2003 11:12:58 -0700
Message-ID: <A5F04B33477DD511A81200508BE7398F013E0151@MGAEMAIL>
From: Dennis Soal <DSoal@mgae.com>
To: "CBE1068@cs.com" <CBE1068@cs.com>
Subject: RE: beach bash girls accessories
Date: Wed, 4 Jun 2003 11:11:55 -0700
MIME-Version: 1.0
X-Mailer: Internet Mail Service (5.5.2653.19)
Content-Type: multipart/mixed;
    boundary="----_=_NextPart_000_01C32AC4.C80986D0"

BRYANT 11133

Wednesday, June 04, 2003 CompuServe: CBE1068

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT ___88___

PAGE ___1070___

| Subj: | **Accessory Callouts** |
| Date: | 7/10/2003 6:28:29 PM Central Daylight Time |
| From: | LDomingo@mgae.com (Lui Domingo) |
| To: | cbe1068@cs.com ('cbe1068@cs.com') |

Hi Carter -

I was not sure if I sent you the right files earlier.  Maybe this is what you want.

Cade: racer style glasses (see attachment), silver bracelet from Dylan Formal Funk, ochre colored necklace from Koby Formal Funk (please note that some of the colors mentioned here may be changed in the final color callout.)

Cameron: wrap glasses, (see attachment) ochre colored necklace from Koby Formal Funk, silver bracelet from Dylan Formal Funk

Eitan: racer glasses, studded bracelet (see attachment), dragon necklace from Dylan Formal Funk

Koby: old 'flame' glasses, beaded bracelet, lock necklace (see attachment)

Dylan: wrap glasses, watch, shell necklace (see attachment)

――――――――――  Headers ――――――――――
Return-Path: <LDomingo@mgae.com>
Received: from  rly-xi03.mx.aol.com (rly-xi03.mail.aol.com [172.20.116.8]) by air-xi04.mail.aol.com (v94.1) with ESMTP id MAILINXI44-213a3f0e12bd1ee; Thu, 10 Jul 2003 21:28:29 -0400
Received: from  mgaemail.mgae.com (adsl-gte-la-216-86-192-202.mminternet.com [216.86.192.202]) by rly-xi03.mx.aol.com (v94.27) with ESMTP id MAILRELAYINXI38-4d63f0e129e330; Thu, 10 Jul 2003 21:28:06 -0400
Received: by MGAEMAIL with Internet Mail Service (5.5.2653.19)
    id <3K5H7BMJ>; Thu, 10 Jul 2003 18:23:49 -0700
Message-ID: <A5F04B33477DD511A81200508BE739BF0257A684@MGAEMAIL>
From: Lui Domingo <LDomingo@mgae.com>
To: "'cbe1068@cs.com'" <cbe1068@cs.com>
Subject: Accessory Callouts
Date: Thu, 10 Jul 2003 18:22:46 -0700
MIME-Version: 1.0
X-Mailer: Internet Mail Service (5.5.2653.19)
Content-Type: text/plain;
    charset="iso-8859-1"
X-AOL-IP: 172.20.116.8

Saturday, July 12, 2003 CompuServe: CBE1068

BRYANT 11769

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88

PAGE _____ 1071

Page 1 of 1

| Subj: | boyz dollpack refresh accessory colors |
|-------|----------------------------------------|
| Date: | 7/15/2003 3:31:25 PM Central Daylight Time |
| From: | CBE1068 |
| To: | DSoai@mgae.com |
| CC: | LDomingo@mgae.com |

Hi Dennis and Lui

here are the accessory color callouts for boyz dollpack refresh S04.

let me know if you have questions.

Cade:
racer style sunglasses: brown frames, PMS 161C, lenses in 7407C
bracelet, silver
necklace, brown, PMS 161C, silver 'links'

Cameron:
wrap sunglasses, navy frames, PMS 539C, yellow lenses, PMS 7403C
necklace, brown, PMS 464C, silver 'links'
bracelet, silver

Dylan:
wrap sunglasses, brown frames, PMS 161C, orange lenses, PMS 158C
watch, silver with orange face, PMS 158C
necklace, white shells, brown 'links', PMS 161C

Eitan:
racer sunglasses, black frames, red lenses, PMS 200C
studded bracelet, black with silver studs
dragon necklace, silver

Koby:
sunglasses, silver frames, red lenses, PMS 200C
bracelet, black
lock necklace, silver

Tuesday, July 15, 2003 CompuServe: CBE1068

BRYANT 11768

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88

PAGE _____ 1072

CompuServe Mail - Message View

CompuServe
mail on the web

On CS: Try CompuServe 6.0
CompuServe.com
Instant Messaging

Send an E-Card
Send a Gift
White Pages

Your last name: [_____]          Ancestry.com

Help | Sign Off

New Mail: Message      Old Mail      Sent Mail

Get        Create      Address      | Reply    Reply    Forward    Keep      Delete
Mail       Mail        Book         |          All               As New

« Previous  |  Next »

**Subject:** FW: Lipstixx Doll
**Date:** Tue, 16 Dec 2003 14:24 EST
**From:** Paula Treantafelles <PTreantafelles@mgae.com>
**To:** Elaine Yip <Elyip@mgae.com>, Carter Bryant
<cbe1068@cs.com>, Aileen Storer <AStorer@mgae.com>,
Steffen Smith <SSmith@mgae.com>, Dennis Soal
<DSoal@mgae.com>

Ok guys....same here..

Can we possibly drop:

* some of the fashion pieces
* some of the details (studs, silkscreens..etc)
* package size?
* package materials (silkscreens on acetates or holographic prints)

Carter and Dennis can you guys pls brainstorm... I need some help.
-----Original Message-----
From: Connie Chau [mailto:conniechau@wahshing.com]
Sent: Thursday, December 11, 2003 5:27 PM
To: Paula Treantafelles; Elaine Yip
Subject: Lipstixx Doll


Dear Paula/Elaine,

Recap yesterday discussion, please find below a list of those features that
can·consider to re-design to obtain a better cost saving.


Kitty
- too many outfits
- total 10 pcs
- they are: headband, neck belt, vest, top, skirt, skirt belt, tights, back
\pack, pillow and boots
- 16 studs on skirt belt
- 4C silk screen on back pack

**BRYANT 09526**

Element
- 8 pcs outfits: coat, top, neck belt, dress, dress belt, tights, bag and
boots
- too many location print

*[handwritten: drop   skirt   skirt]*

http://csmail.compuserve.com/msgview.adp?folder=SU5CT1g=&uid=8535187

12/16/2003

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ *88*

PAGE _____ *1073*

CompuServe Mail - Message View

- 4C silk screen on 2 die cuts for boots
- 4C silk screen on 1 die cut for top
- 4C silk screen on 2 die cuts for bag
- 64 studs on bag — PRINT
- 20 studs on dress belt — PRINT
- ~~10 studs on neck belt~~ DROP

Heaven
- Glitter print on pant — expensive
- pant's fabric material — expensive
- 7 pcs outfits: hedband, jacket, top pant, backpack, arm warmers and boots

Baby Doll
- 1C silk screen for top
- 14 studs on skirt belt, 4 studs on jacket and 20 studs on boots
- expensive sewing labour for starbag (many die cuts)
- 7 pcs outfits: jacket, top, skirt, skirt belt, tights, star bag and boots

Best regards,
Connie

‹ Previous | Next ›

| Get Mail | Create Mail | Address Book | | Reply | Reply All | Forward | Keep As New | Delete |

©Copyright 2003 CompuServe Interactive Services, Inc.
Legal Notices | Privacy Policy

Help | Sign Off

BRYANT 09527

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT _____ 88

PAGE _____ 1074

CompuServe Mail - Message View                                    Page 1 of 8



**On CS:** Try CompuServe 6.0    Send an E-Card
CompuServe.com    Send a Gift
Instant Messaging    White Pages

AMERIQUEST.COM   Mortgage rates are STILL LOW!
The time to refinance is NOW!
**Click Here**

New Mail    Old Mail    **Sent Mail: Message**                Help | Sign Off

Get Mail    Create Mail    Address Book    | Reply    Reply All    Forward    Delete

**Subject:** Boyz RF accessory callout                        ‹ Previous | Next »
**Date:** Fri, 14 Nov 2003 18:46 EST
**From:** CBE1068
**To:** DSoai@mgae.com
**Attachments:** boyz stomp boot.JPG, boyz stripe sneaker.JPG

HI Dennis
here are the accessory callouts for RF boyz.
Let me know if you have questions.

PS Happy Birthday!!!!!!!! I didn't even know! which one was it??
well, hope it is a great one for you!!


R/F Boyz Accessory callout

Roller Disco
existing:
wrist cuff ~~headband~~ *silver w/ black studs*
hand watch #1 *silver w/ black face*

new:
sunglasses - *silver vum w/ grey lenses cool grey 9 c*
whistle necklace *silver*
rainbow necklace *black w/rings in 200 c, hov yellow, hov green, 286 c*
rubber bracelets *black*
star bracelet (from 80's boy) *black w/ silver stars*

shoes:
new sneaker skates 1&2

MOD
no existing accessories

new:
zipper bracelet *black w/silver 'zipper'*
rubber bracelets (black and white) *b & w*
rubber bracelets (silver) *silver*
multi band stud bracelet *black w/silver studs*
b/w shell necklace *white shells w/black beads*
new bead and link necklace *silver beads, black links*
sunglasses *black lenses, silver frames*

shoes:
new MOD shoe styles 1&2 *boot - black - shoe*

BRYANT 09758

CONFIDENTIAL
ATTORNEY'S EYES ONLY

http://csmail.compuserve.com/msgview.adp?folder=T1VUQk9Y&uid=8228121          11/14/2003

EXHIBIT ___88___

PAGE ___1075___

CompuServe Mail - Message View                                          Page 2 of 8

DISCO
existing:
hand watch #2 *gold w/black face*
chain link bracelet *gold*

new:
sunglasses *lenses 364C, arms in black*
medallion necklace *gold rim*
rainbow necklace (from R/D..will do in black/gold) *black w/gold rings*
leather bracelet (from 70's boy) *black w/gold grommets*
star/link bracelet *black w/gold stars*

shoes:
original boyz stomp shoe (see attachment) *black*
slip on shoe (from boyz Formal Funk) *black*

80s
existing:
bead necklace *black*
necklace #6 ~~metro~~ *white w/black links*

new:
sunglasses *black frames, red 200c lenses*
leather/chain cuff bracelet *black w/silver chain*
bead bracelet *silver*
star bracelet *black w/silver stars*
rubber bracelets *black*

shoes:
new converse style sneakers from boyz Tokyo
creepers (from boyz Formal Funk)

70s
existing:
peace necklace *462 C*
necklace #6 *451S w/silver links*
shell bracelet *468c w/462c centers*
bead bracelet *462 c w/silver centers*

new:
sunglasses *frames in 462, lenses in 151S C*
leather bracelet *463 w/silver grommets*
peace bracelet *silver*

shoes:
new walabee style (from boyz dollpack f03)
stripe sneaker (see attachment)

BRYANT 09759

CONFIDENTIAL
ATTORNEY'S EYES ONLY

EXHIBIT ___ 88 ___

PAGE ___ 1076 ___



**Subject:** sports accessory color callouts
**Date:** Mon, 28 Jun 2004 15:57 EST
**From:** CBE1068
**To:** DRonquillo@mgae.com
**Cc:** DSoail@mgae.com
**Attachments:** sports soccer shoe color callout.JPG, sports cheer shoe color callout.JPG, sports cheer megaphone color callout.JPG, sports kickboxing shoe color callout.JPG

Hi Desiree

here are the accessory color callouts for sports, by sport. Let me know if you ha

Bowling (Cloe)
shoes: black, white and 1915C; follow 3d
ball and pins: ball, leopard print; 7501C, black and 7505C; pins, 1915C hi gloss
water bottle: as-is existing

Soccer (Sasha)
ball: white with black
shoes: see sketch
water bottle: as-is existing
video camera (from Tokyo): silver, black

Golf (Jade)
clubs: silver vum
ball and tee: white
shoes: black hi gloss
water bottle: existing

Karate: (Yasmin)
nun chucks: 200C
water bottle: existing
spa shoe: black
hair accessory (from Kimono dolls)200c, black, 3135C
flip phone (from Tokyo) silver, black

Cheer: (Dana)
megaphone: see sketch
shoes: see sketch
water bottle: as is
video camera silver, black

Kickboxing (alternate)

**BRYANT 10831**

**CONFIDENTIAL**
**ATTORNEY'S EYES ONLY**

EXHIBIT ___ 68
PAGE ___ 1077

CompuServe Mail - Message View                                    Page 1 of 2





New Mail     Old Mail     Sent Mail: Message                    Help | Sign Off

| Get Mail | Create Mail | Address Book | | Reply | Reply All | Forward | Delete |

**Subject:** babyz bags and blankets                          ‹ Previous | Next ›
**Date:** Mon, 16 May 2005 14:56 EST
**From:** CBE1068
**To:** LDjiguerian@mgae.com

Hi Leon

here are the color callouts for the babyz blankets and bags. All colors listed
are PMS colors.

Cloe:
white bage with piping in PMS 1505
blanket in PMS 191 with trim in PMS 1505

Dana:
bag in 701 with piping in 100
blanket in 701 with trim in 522

Fianna:
bag in 1645 with white piping
blanket in 563 with trim in 1645

Jade:
bag in 1915 with white trim
blanket in 1505 with trim in 1915

Meygan:
bag in 318 with white trim
blanket in white with trim in 191

Roxxi:
bag in black with trim in 3105
blanket in 185 with trim in 3105

Sasha:
bag in 312 with trim in 182
blanket in 182 with trim in 312

Yasmin:
bag in black with trim in 100
blanket in 100 with trim in white

**CONFIDENTIAL**
**ATTORNEY'S EYES ONLY**

**BRYANT 13572**

http://csmail.compuserve.com/msgview.adp?folder=T1VUQk9Y&uid=11974691          5/16/2005

EXHIBIT ___88___

PAGE ___1078___



CONFIDENTIAL
ATTORNEY'S EYES ONLY          BRYANT 13573

EXHIBIT ___88___

PAGE ___1079___



Sasha

CONFIDENTIAL
ATTORNEY'S EYES ONLY          BRYANT 13574

EXHIBIT    88

PAGE    1080



Roxxi

CONFIDENTIAL
ATTORNEY'S EYES ONLY

BRYANT 13575

EXHIBIT ___ 88 ___

PAGE ___ 1081 ___