The burden is on Mattel to show by a preponderance of evidence the similarity of each element in the sketches you determine to be protectible. In considering the extrinsic test, you may take into account the testimony of experts called by each party.

Now comparing the items in the BRATZ dolls that you find to be similar to the protected elements of expression in a particular Bryant sketch owned by Mattel, you should determine whether Mattel has shown by a preponderance of the evidence that the two works are substantially similar. If you do not so find, then you must find for MGA and Bryant on the claim of copyright infringement.

If you do find substantial similarity under the extrinsic test, then you turn to the next step of the analysis, the "intrinsic" test.

BROAD OR THIN PROTECTION

Before proceeding to apply the "intrinsic" test, you must make an important preliminary determination: the correct standard to apply. The appropriate standard for the intrinsic test depends on the scope of copyright protection in a work. In this case, you must determine the scope of copyright protection in each of Mr. Bryant's sketches asserted by Mattel against MGA.

The analytic dissection and filtration you previously performed in connection with the extrinsic test also allows you to determine whether the sketches are entitled to "broad" or "thin" copyright protection. The sketches will be entitled to "broad" protection if you find that they are highly original and reflect a high degree of artistic judgment in a medium offering a broad range of creative choice. The threshold for infringement in such works is substantial similarity of original protected expression.

On the other hand, if you find that the sketches include only a few protectible elements, or are in a medium in which the effective range of creative expression is limited, then the sketches are only entitled to "thin" protection. In that case, you can find infringement only if the dolls are virtually identical to original protected expression in any protected sketch examined as a whole. [Satava v. Lowry, 323 F.3d 805, 812 (9th Cir. 2003); Cosmos Jewelry Ltd. v. Po Sun Hon Co., 470 F. Supp. 2d 1072, 1084 (C.D. Cal. 2006) (citing Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435, 1439 (9th Cir. 1994)).]

16

EXHIBIT ___9/___

PAGE ___1196___

The burden of proving that the Bryant sketches are entitled to broad protection is on Mattel.

INTRINSIC TEST

The second step of the infringement analysis, the "intrinsic" test, involves a subjective comparison of the protectible aspects of the "works as a whole." [Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435, 1443 (9th Cir. 1994).]

In this evaluation, you should not consider the unprotectible elements that you filtered out as part of the extrinsic test analysis. [Cavalier v. Random House, Inc., 297 F.3d 815, 822 (9th Cir. 2002); Robert C. Lind, Copyright Law (3d ed. 2006) at 173.]

The intrinsic test is determined from the perspective of an ordinary, reasonable observer. [Smith v. Jackson, 84 F.3d 1213, 1218 (9th Cir. 1996).] Because girls of the age 8-12 are the core intended market for the BRATZ dolls, you should consider such consumers as the ordinary, reasonable observers. [Aliotti v. R. Dakin & Co., 831 F.2d 898, 902 (9th Cir. 1987).] In other words, you should perform the intrinsic test through the eyes of a discerning 8-12 year old girl who would be a likely user of BRATZ dolls.

The testimony of experts is not to be considered in your evaluation of the intrinsic test.

The appropriate standard for the intrinsic test depends on the scope of copyright protection in a work. If you determine that the Bryant sketches are highly original and are entitled to "broad" copyright protection, infringement under the "intrinsic" test may be found if the ordinary, reasonable person (the 8-12 year old girl) would find the "total concept and feel" of the two separate works to be substantially similar, bearing in mind that ideas, concepts, and style are not protectible. However, if you determine that the Bryant sketches are entitled only to "thin" copyright protection because a large amount of expression has been filtered out as a result of the application of the extrinsic test, MGA may only be found liable for infringement if you determine that the sketches and dolls are "virtually identical" to original protected expression of any protected sketch viewed as a whole. [Satava v. Lowry, 323 F.3d 805, 812 (9th Cir. 2003).]

17

EXHIBIT _____ 91

PAGE _____ 1197

Mattel bears the burden of proving by a preponderance of the evidence that the Bryant sketches are entitled to broad protection under the intrinsic test. If Mattel should fail to meet that burden, you must apply the "virtual identity" test for "thinly protected" works. The "virtual identity" test means just what it says: the BRATZ dolls must be virtually identical with respect to any elements that you find to be protectible in a particular Bryant sketch for there to be infringement under the intrinsic test.

Then, applying one of these two tests – substantial similarity for broad works, or virtual identity for thin works – you will determine if Mattel has met its burden of proving infringement under the "intrinsic" test. If Mattel has not met its burden under the intrinsic test, then you must find for the defendants on the copyright infringement claims.

Authority:  Swirsky v. Carey, 376 F.3d 841, 845 (9th Cir. 2004); Apple Computer, Inc. v. Microsoft Corporation, 35 F.3d 1435, 1447 (9th Cir. 1994); Frybarger v. Int'l Bus. Machines Corp., 812 F.2d 525, 530 (9th Cir. 1987); Thomas v. The Walt Disney Co., 2008 U.S. Dist. LEXIS 14643 (N.D. Cal. Feb. 14, 2008); Idema v. Dreamworks, Inc., 162 F. Supp.2d 1129, 1176 (C.D. Cal. 2001).

18

EXHIBIT _____ 9|

PAGE _____ 1198

**INSTRUCTION NO. 10C**

COPYRIGHT INFRINGEMENT – COMPARING TWO DIMENSIONAL
WORK WITH A THREE DIMENSIONAL WORK

The Bryant sketches are 2-dimensional works, while the BRATZ dolls are 3-dimensional works. While those facts may complicate your analysis under the extrinsic and intrinsic tests, the copyright in a 2-dimensional work can be infringed by a 3-dimensional work. However, the copyright in a 2-dimensional work only covers what is shown on the face of the work. For example, if a Bryant sketch only shows the front view of a figure, the copyright does not cover the rear or side view of that figure, or anything else that is not specifically visible in that particular sketch. Whether in this case the BRATZ dolls (3-dimensional works) infringe the Bryant sketches (2-dimensional works), is for you to decide, using the two-part analyses already described.

Authority: 1-2 Nimmer on Copyright § 2.08(C)(2).

EXHIBIT _____ 91

PAGE _____ 1199

**INSTRUCTIONS NO. 11C**

COPYRIGHT INFRINGEMENT – INDEPENDENT CREATION

Even if Mattel proves that MGA had access to the 16 Bryant sketches and that particular Bratz dolls are substantially similar to certain of these sketches, this only creates a presumption of illegal copying. MGA may rebut that presumption with evidence that the Bratz dolls are the product of independent creation, and were not copied from the 16 Bryant sketches. If MGA presents evidence of independent creation, then you should weigh all of the evidence bearing in mind that Mattel bears the burden of proving that MGA copied the 16 Bryant sketches.

Authority: Moore v. Kulicke & Soffa Industries, Inc. 318 F.3d 561 (3d Cir. 2003); Keeler v. Brass Co. v. Continental Brass Co., 862 F.2d 1063 (4th Cir. 1988); Don Post Studios, inc. v. Cinema Secrets, Inc., 124 F. Supp. 2d 311 (E.D. Pa. 2000).

EXHIBIT ___91___

PAGE ___1200___

**INSTRUCTION NO. 12C**

<u>COPYRIGHT INFRINGEMENT – MULTIPLE COPYRIGHT
REGISTRATIONS</u>

Mattel has based its copyright claims on 16 separate copyright registrations, each one registering a different Carter Bryant sketch. Each of these sketches is only entitled to copyright protection for the original expression contained in the particular sketch. Mattel cannot extend or enhance its rights by treating two or more of the sketches as a compilation or as a unified work. In other words, Mattel cannot pick and choose characteristics from more than one of these sketches to search for alleged similarities with a single BRATZ doll. Each individual sketch must be judged based on its own protectible content in a comparison with a particular one of the allegedly infringing BRATZ dolls.

This means that in determining whether Mattel has met its burden of proving infringement, you must separately analyze each of the 16 sketches covered by a Mattel copyright under both the extrinsic and intrinsic tests. As an example, you may not combine the design of facial features from one Bryant sketch with the body proportions from another Bryant sketch, and then evaluate whether the BRATZ dolls are substantially similar to this combination.

Authority: <u>Idema v. Dreamworks, Inc.</u>, 162 F. Supp. 2d 1129, 1144 n.31 (C.D. Cal. 2001); <u>see also</u> <u>Green v. Schwarzenegger</u>, 1995 U.S. Dist. LEXIS 14031 at ** 61-62 (C.D. Cal. July 17, 1995) (unpublished) ("Plaintiff cannot pick and choose characteristics from any number of characters in his work to search for alleged similarities with a single character in defendants' work."); 9 <u>Patry on Copyright</u> § 9:66 (2008).

EXHIBIT _____ 91
PAGE _____ 1201

**INSTRUCTION NO. 13C**

DERIVATIVE LIABILITY: VICARIOUS INFRINGEMENT

If you find that MGA or MGA Hong Kong infringed Mattel's copyrights in the Bryant sketches, you may consider Mattel's claims that Isaac Larian and Carter Bryant vicariously infringed those copyrights. Mattel has the burden of proving each of the following by a preponderance of the evidence with respect to each of them:

      1.    That Mr. Larian or Mr. Bryant profited directly from the infringing activity of MGA or MGA Hong Kong;

      2.    That Mr. Larian or Mr. Bryant had the right and ability to supervise the infringing activities of MGA and MGA Hong Kong; and

      3.    That Mr. Larian or Mr. Bryant failed to exercise that right and ability.

If you find that Mattel proved each of these elements, your verdict should be for Mattel as to the individual defendant if you also find that MGA or MGA Hong Kong infringed Mattel's copyright. If, on the other hand, Mattel has failed to prove any of these elements with respect to Isaac Larian or with respect to Carter Bryant, your verdict should be for Mr. Larian or Mr. Bryant, or both of them.

Authority: Ninth Circuit Manual of Model Jury Instructions 17.20 (2007).

22

EXHIBIT _____ 9 )

PAGE _____ 1202

**INSTRUCTION NO. 14C**

<u>DERIVATIVE LIABILITY: CONTRIBUTORY INFRINGEMENT</u>

A defendant may be liable for copyright infringement engaged in by another if he knew or had reason to know of the infringing activity and intentionally induces that infringing activity.

If you find that MGA or MGA Hong Kong infringed Mattel's copyrights in the Bryant sketches, you may proceed to consider Mattel's claims that Isaac Larian and Carter Bryant contributorily infringed those copyrights. To prove contributory copyright infringement, Mattel must prove both of the following elements by a preponderance of the evidence with respect to <u>each</u> of them:

     1.    That Mr. Larian or Mr. Bryant knew or had reason to know of the infringing activity of MGA or MGA Hong Kong; and

     2.    That Mr. Larian or Mr. Bryant intentionally induced MGA or MGA Hong Kong's infringing activity

If you find that MGA or MGA Hong Kong infringed Mattel's copyright, and you also find that Mattel has proved both of these elements as to the individual defendant, your verdict should be for the Mattel. If, on the other hand, Mattel has failed to prove either of these elements, your verdict should be for Mr. Larian or Mr. Bryant, or both of them.

Authority: Ninth Circuit Manual of Model Jury Instructions 17.21 (2007).

23

EXHIBIT 9 |

PAGE 1203

**EXHIBIT 92**

Expert Witness Report
By Denise Van Patten
March 10, 2008
Confidential – For Attorney's Eyes Only

Quinn Emanuel Urquhart Oliver & Hedges, LLP contacted me regarding a
lawsuit between Mattel and MGA. I have been an expert witness in only one
other case for Mattel and I have been paid as an expert in this case at $300
per hour. I have known and met various people from Mattel and MGA over
the years in my capacity as the Guide to Doll Collecting at About.com, and
written about the dolls from both companies on my About.com site for the
past 9 years. I also am a dealer of collectible Barbie dolls.

1.    My Experience

I live and work in Chico, California, where I own a doll and toy shop called
Katherine's Cottage. I have been the Guide to Doll Collecting at About.com
since early 1999, and I am the author of *"The Official Price Guide to Dolls,"*
published by House of Collectibles (Random House Books) in 2005. My
work is completely within the doll and toy industry, and has been for 9 years
full time, and part-time for several years before that. I have bought and sold
hundreds of thousands of dollars worth of dolls for my personal collection as
well. I have owned and operated my full-time doll and toy shop since
September 10, 2001 and an online and by-appointment doll business for 5
years prior to that.

As Guide to Doll Collecting at About.com I write and report exclusively and
extensively on dolls, doll collecting and the doll industry. In that capacity, I
write several articles about dolls each month, and have done so since 1999.
About.com is currently owned by The New York Times Company.  The
URL of my web site is www.collectdolls.about.com. Through this site, I stay
very up to date on dolls on the market, doll trends, and doll companies and
artists. I have attended New York Toy Fair each year since 2000, and I have
also attended countless other doll shows, doll conventions, and doll events. I
have given seminars and lectures about dolls and doll history at many
events, including seminars about Barbie dolls and fashion doll history,
including at many national United Federation of Doll Clubs ("UFDC")

EXHIBIT _____ 92

PAGE _____ 1204

conventions from 1997 through 2006, as well as at various IDEX doll shows in San Francisco, Orlando, Florida, and Las Vegas, and other doll events.

My book, *The Official Price Guide to Dolls*," is 600 pages long, and it includes price information, information on doll trends, doll history, and much more plus an extensive bibliography. The book is a leading reference for doll pricing and identification.

My shop sells many types of dolls currently available. Dolls that are carried include Barbie dolls, Tonner dolls, Madame Alexander dolls, Adora dolls, Lee Middleton dolls, the American Ball Jointed dolls, Marie Osmond dolls, Only Heart Club dolls, Ginny dolls, Madi the Magical Fairy, Corolla dolls, Groovy Girls, Ty Girlz, and many others.

I have also personally collected dolls for my entire life, and in earnest since 1990. My personal collection consists of several hundred dolls. One of the main focuses of my doll collection is fashion dolls, and I own fashion dolls and fashion doll clothing and accessories going back to the 1860s, and fashion dolls and fashion doll clothing and accessories from every decade from the 1950s through to today, including an extensive vintage Barbie doll collection.

## 2.    Review of Documents

I have reviewed certain documents in Mattel, Inc. v. Carter Bryant, and Carter Bryant v. Mattel, Inc and MGA Entertainment, Inc. v. Mattel, Inc, and MGA Entertainment, Inc. v. Mattel, Inc. with a case number of CV-04-9049, consolidated with Case No. 04-9059 and Case No. 05-2727 and other various filings, including Mattel's Second Amended Answer and Counterclaims and reports in conjunction with these lawsuits, including expert reports by Robert Tonner and Mary Bergstein for MGA and Carter Bryant, and by Lee Loetz and Kenneth Hollander for Mattel. I have also reviewed Mattel catalogs, articles and photos of dolls, my own site at About.com, and my book, the *"Official Price Guide to Dolls."*

## 3.    Bases for This Report

The bases for this report are the documents I have reviewed listed in section 2 above, as well as the research I have done for the hundreds of articles I've written for About.com and other publications and for my book, as well as

2

EXHIBIT _____ 92

PAGE _____ 1205

my experience in the doll industry. I have also based part of this report on the research I have done for lectures and seminars that I have given to the members of the UFDC and attendees at IDEX and at doll clubs throughout the years; my topics have included "Barbie: The Doll That Changed a Generation" and "The History of Fashion Dolls."

## 4.   A (Very) Brief History of the Fashion Doll – The Beginning of the Fashion Doll

Bratz are fashion dolls—dolls with a teenage or adult look and body that have in-scale wardrobes and accessories available for the dolls. The original fashion dolls were made in the 1860s, mostly by French companies. These were dolls with bisque heads and often kid leather or wood bodies that were shaped and dressed like a woman and which had an entire cottage industry in France that helped dress and accessorize them to look just like the fashionable ladies of their day [Exhibit 1]. French Fashion Dolls had everything available for them—day dresses, evening wear, church outfits, hats, shoes, underwear, lawn bowling sets, sewing sets, opera glasses, even bibles and crosses—that a refined lady of the late 1800s would need. The dolls were intended to teach little girls of their time how to be a lady. Made by companies including Bru, Jumeau, and Gaultier, the French Fashion dolls reigned as the most popular dolls of their day until they were quite thoroughly dethroned by dolls representing little girls [Exhibit 2]—first also produced by the same French companies and later by German dollmaking companies just as Simon and Halbig and Kestner. By 1900, French Fashion Dolls were a distant memory, and fashion dolls in general were not truly seen again in large numbers until the 1950s.

## 5.   Dolls During the First Half of the 20th Century and the Re-Birth of the Fashion Doll

During the first half of the 1900s, most dolls that were manufactured and played with represented babies and young children. Dolls that were important (and representative of many other dolls in their genres) throughout this period of doll history include the By-Lo Baby, mama dolls (an entire genre of composition toddler dolls that could walk and cry "mama"), Effanbee's Patsy and Patsyette, Ginny, Betsy Wetsy and Shirley Temple [Exhibit 3].

EXHIBIT 9 0

PAGE 1206

3

In 1955, Madame Alexander introduced Cissy [Exhibit 4], a 21" fashion doll with a (somewhat) womanly figure including a small bust and feet molded in a position for high-heeled shoes. She had high-fashion outfits and accessories (gowns, day dresses, hats, jewelry, and high-heels) available separately. Although available only to well-off families due to her cost, she was the first true fashion doll of the 20th Century, and spawned in the last half of the 1950s many similar dolls including Miss Revlon, Little Miss Revlon (by Ideal), Jill (by Vogue) Cissette (a smaller 10" fashion doll by Madame Alexander), and many others [Exhibit 5].

### 6.    Barbie: A Landmark Fashion Doll

The first Barbie doll burst into this scene in 1959 [Exhibit 6]. Barbie was truly a landmark doll. Although she had some similarities to her fashion doll predecessors in the 1950s, those predecessors only hinted at what Barbie would be. The earlier 1950s dolls had lovely wardrobes and accessories, but the Barbie doll had more—she was the perfect, handheld, miniaturized size for play, and she had an extremely extensive, detailed wardrobe. And, of course, the Barbie doll had an over-exaggerated womanly body (large breasts, tiny waist and perfect, slim hips) to show off the doll's clothing and to help project the child, through play, into her future as a teen and adult woman.

The Barbie doll was hugely successful, and it changed the way dolls were played with and the types of dolls that were made, not only for an entire generation of girls, but throughout the remainder of the 20th Century and into the 21st.

### 7.    Barbie: A Controversial Doll

The thing to note about a landmark doll is that it presents a big change from dolls that come immediately before, and often will stir up controversy. The womanly shape of the first Barbie dolls made them quite controversial with some mothers in the 1960s (much in the same way that Bratz is controversial today, but more about that later). Some mothers were scandalized by Barbie's large breasts and refused to buy Barbie for their little girls (often the mothers would buy Tammy [Exhibit 7], Ideal's answer to Barbie who was much flatter in build). Barbie also started out with harsh, adult-looking make-up that existed in the #1 and #2 versions of the first Ponytail Barbie doll, but Mattel quickly reacted to parental objections and toned down the

4

EXHIBIT ____ 92

PAGE ____ 1207

facial makeup within the first year of production by making changes to the doll's make-up and releasing what collectors refer to today as Ponytail Barbie #3 (this took place within the first year of release of the doll) [Exhibit 8].

In fact, for some people, Barbie dolls remain controversial today. Commentators delight in pointing out how unnatural the dolls' dimensions would be in a real-life woman (according to the National Organization for Women, if Barbie were 5 ft 6 inches, her measurements would be 39-21-33, and the chances of a real woman having those measurements are 1 in 100,000), and that if her dimensions were real, she would topple over off her teeny tiny un-proportional feet.

## 8.    The Wardrobe of Early Barbie

The first Barbie was sold in a bathing suit, albeit a modest one-piece, but 2-piece bathing suits followed by the mid 1960s with the "Twist and Turn" Barbie dolls. Some mothers found the bathing suits immodest, but the dolls were not sold in bathing suits to be racy—they were sold in bathing suits to keep the cost of the doll down, much the same way that French Fashion Dolls were sold in their underwear in the 1860s-1880s. Fashion dolls are sold to dress, and by selling a "basic" doll in underwear (or, in Barbie's case, a bathing suit), the doll was accessible to more people due to a lower price point. The cost of a couture French Fashion Doll dress could easily exceed the cost of a French Fashion Doll, just as the cost of an elaborate 1960s Barbie evening dress could easily equal or exceed the cost of a Barbie doll.

The original Barbie's wardrobe [Exhibit 9] consisted not of cutting-edge fashions, but the type of fashions you would see on teens and women of the era—beautiful business suits, dresses for shopping, nursing uniforms, evening and bridal gowns. Mothers who objected to the original Barbie doll were objecting to the doll's figure (especially the ample bosom) and generally not her classic wardrobe. It is this wardrobe and the way it was sold and played with that made Barbie a truly classic fashion doll. Just as the French Fashion Dolls of the 1800s helped girls imagine and practice life as an adult, the first Barbie dolls provided the same type of projection-play for little girls in the 1960s.

EXHIBIT _____ 92

PAGE _____ 1208

**9.**   **A Brief History of Barbie's Competitors:**

Thanks to Barbie's popularity, a host of fashion doll competitors sprung up in the 1960s. These included Tammy (as mentioned above, she had flatter body proportions, aimed at those mothers who felt Barbie was a bit too womanly-looking), the Littlechaps, Tressy, and many others. Some were called "Barbie clones" for their obvious similarity to Barbie dolls (Mitzi, Genevieve, Peggy Ann, etc.) Although the Barbie doll's popularity waned a bit in the early 1970s, it soon recovered and has become the best-known and best-selling doll of all time. From the 1960s through the 1970s, many other fashion dolls made for play were competitors [Exhibit 10], including Dawn Dolls, Crissy Dolls, Tiffany Taylor, Darci and many, many others, and most of those competitors are no longer in production.

**10.**   **Bratz Dolls Were a Departure From Traditional Play Dolls For Children**

There were many types of play dolls available for children on the market when Bratz was launched. A look at my *"Hot Holiday Dolls for Children"* feature on About.com from 1999 and 2000 shows some of the most popular and some of the most innovative play dolls during the period from 1998 to 2000, which included:

a. Celebration Barbie (by Mattel)
b. Angelina Ballerina (mouse doll with a series of books by Pleasant Company)
c. Holiday Brandy (Celebrity fashion doll by Mattel)
d. Amazing Ally (talking little girl doll by Playmates Toys)
e. Amazing Babies (talking baby dolls by Playmates Toys)
f. Sailor Moon (cartoon-inspired fashion doll by Irwin)
g. Barbie Holiday Sisters Gift Set (by Mattel)
h. Eloise (Literary character, by Madame Alexander)
i. Bitty Baby (Baby Doll by Pleasant Co.)
j. Madeline (Literary character by Eden LLC)
k. Ann Estelle (Mary Engelbreit character by Tonner Doll Company)

As one can see from this list, most of the play dolls available at the time were traditional fashion dolls (dolls in the Barbie line, celebrity fashion dolls

EXHIBIT ____92____

6

PAGE ____1209____

such as Brandy), baby dolls (Amazing Babies, Bitty Baby), child dolls and dolls from literature and art (Angelina Ballerina, Madeline, Ann Estelle).

Sailor Moon was a bit of a departure—she was based on a children's series, but Sailor Moon made my Hot Holiday Doll list for her innovative qualities—she wasn't really widely available at usual play toy outlets but instead at specialty outlets like Sun Coast Videos.

By 2002, Bratz was on my *"Hot Holiday Dolls"* list (2001 Hot Holiday Dolls did not appear due to the 9/11 attacks).

## 11.    Bratz: A Landmark Fashion Doll for the 21st Century

Bratz dolls [Exhibit 11], much like the first Barbie doll in 1959, was a landmark doll--a doll that changed how children play and the types of dolls that are made, a controversial doll, and a doll that broke with the look and feel of other dolls that were contemporaneously on the market.

Bratz, to my mind as an observer of and participant in the doll industry, has several defining characteristics, the combination of which made them a landmark doll:

a. Very Large Heads
b. Large, oversized eyes and lips & minimized nose
c. Tiny Torso
d. Long Legs
e. Large, snap-off feet
f. Multi-ethnicity
g. Attitude
h. Flashy lifestyle
i. Urban, trendy, edgy clothing

Some of these particular traits have been seen in prior dolls that had been on the market. For instance, the Blythe doll [Exhibit 12] of 1972 had an overly large head, giant eyes and long, skinny legs (but that doll, although highly sought-after by collectors today, was a failure in the marketplace and was only released for 1 year). Betty Spaghetty [Exhibit 13] didn't only have removable, snap-off feet but other snap-off parts as well.  Diva Starz [Exhibit 14] had huge eyes and a huge head (produced by Mattel and introduced to the public in 2000 before Bratz) but Diva Starz as released to

7

EXHIBIT _____ 92

PAGE _____ 1210

market lack the attitude and fashion sense of the Bratz and have tiny lips. Many dolls have been produced with multi-ethnic variations.

Just as some Barbie dolls took a few cues from cultural influences and dolls on the market that came before, but put them together in a totally new way, Bratz did the same. Bratz had a unique look and concept in the toy marketplace in 2001, when it was introduced.

The unique look and concept of Bratz clearly can be seen in the Carter Bryant drawings shown in Exhibit 15. The drawing, to my eyes as a doll industry commentator and observer, clearly seem to be drawings of Bratz. In fact, as the Expert Rebuttal Report of Kenneth Hollander dated March 2008 shows, most of the girls between the ages of 8 and 13 (Bratz target audience) who were surveyed clearly share my opinion that the Carter Bryant drawings are drawings of the Bratz dolls. It's an overall impression— the facial features, the proportion of the dolls bodies and heads, the huge feet, the attitude. I disagree with Mary Bergstein's position in her Expert Report dated February 11, 2008, that Carter Bryant's drawing was only one of the many inspirations for Bratz. That the drawing was the direct instrument of their creation can be seen in the unusual attitude of the drawing and the dolls—an attitude that was not seen in mass market dolls available for play from 1998 through 2001.

## 12.    Bratz – They've Got Attitude!

Traditionally, play dolls reflect the mainstream fashion of the times they are produced in (such as the French Fashion Dolls did in the 1800s and certain of the Barbie dolls did in the 1960s). Not edgy fashion, not fashion-on-the-fringe, but the fashions that many in the culture are familiar with. Typical play baby dolls wear clothing just like that of most actual babies and children of their era. Typical play fashion dolls wear clothing like mainstream clothing for teenagers and adults, with an emphasis on adult and classic fashions (gowns, casual dresses, bridal dresses, equestrian outfits, everyday outfits). These types of outfits for fashion dolls made it easier for girls to do "projection play" into their own futures as grown women, and made it easier for moms to part with their money to buy the dolls. As mentioned, the whole point of fashion dolls in the 1860s was to teach girls how to be ladies; the dolls had the dresses, the accessories that any grown lady of culture and taste would have. Many Barbie dolls in the early 1960s did much the same thing.

8

EXHIBIT ___92___

PAGE ___1211___

Bratz, however, are dolls with an attitude. The attitude can be seen in the physical appearance and edgy clothing styles of the dolls as produced and it is clearly shown in Carter Bryant's drawing.

Bratz have always proudly worn their attitude, they have a "passion for fashion" (catch phrase used to sell the dolls) and an urban sassy, edgy look and feel (some would say sexy instead of sassy, but not officially as it is pretty hard to sell a sexy doll to a mom for their little girls). Bratz dolls (especially in the first few years of their production) had midriff-baring fashions, often short skirts, and other edgy adult-themed wear. Due to the cutting-edge attitudes, fashions, and lifestyles of the Bratz mixed with their unique look (their heavy-lidded eyes, their bee-stung large lips) Bratz have garnered some unfortunate nick-names. The following unfortunate nicknames are among those that I found while researching Bratz on the Internet for this report: "Prosti-tots", "My Little Stripper," and "Skank" dolls. These are the words of other commentators, not mine, and I am not using them here to be disparaging about the Bratz dolls (which I have covered extensively and mostly positively on my About.com site) but to show through these severe reactions to Bratz that the dolls are a landmark doll, a departure from dolls in the marketplace that came before them, and that they garner controversy and critics just as the first Barbie doll did.

One of my favorite quotes regarding Bratz is the following one from Newsweek Magazine: "Bratz, after all, are the dolls you can't take to school because they don't meet the dress code". (Newsweek, Dec 11, 2006, article by Ramin Setoodeh)

## 13. Barbie: Many Different Face Sculpts, Body Sculpts, Materials and Countless Incarnations

There have been hundreds of different types of Barbie dolls released. I'm going to point out only a few which highlight some of the different body features and styles of Barbie dolls throughout the years.

The very first Barbie dolls, the Ponytail Barbie dolls (1959-1965) [Exhibit 6], as well as the "Bubblecut" Barbie dolls that followed immediately after (1961-1966) showed off early 1960s outfits and styles. These dolls had jointing only at the neck, shoulders and hips (for the legs). By 1965, glamour was all the rage thanks to Jackie Onassis, and the American Girl Barbie dolls

9

EXHIBIT _____ 92

PAGE _____ 1212

[Exhibit 17] were introduced (1965-1966). These dolls had bendable knees, and a shoulder-length classic Page Boy hair style which looked beautiful with the mid-1960s Barbie outfits. Between the Ponytail Barbie dolls and the American Girl Barbie dolls, several other Barbie dolls were introduced with unique features. One was the Fashion Queen Barbie Doll (1963-1964) [Exhibit 18], which came with molded hair and three wigs. Another was Miss Barbie (1964) [Exhibit 18]—the only Barbie doll that has ever sported a hard-plastic head (as opposed to vinyl) and sleep eyes that opened and closed.

Many of these Barbie dolls had, basically, the same facial sculpt. By the mid to late 1960s, the mod and groovy era of history arrived, and Barbie dolls changed. The first Twist and Turn Barbie dolls (1966-1971) [Exhibit 19] were introduced. Twist and Turn Barbie dolls had swivel waists (so the dolls could be posed in "mod" stances), rooted eyelashes for the first time, and long hair to the mid-back. The face of the doll was also re-sculpted with a more youthful appearance.

By the late 1960s, several talking versions of Barbie dolls were introduced (Mattel took the pull-string technology that had worked so well on Chatty Cathy and other talking dolls and toys, and put it into Barbie). Other notable Barbie variations of the late 1960s and early 1970s included Malibu Barbie (tanned, surfer-girl persona), Living Barbie (rotating waist, bendable at wrists and ankles), and Color Magic Barbie (actually 1966; you could change her hair color with chemicals).

During the early 1970s, the face-sculpt used on many Barbie dolls didn't change very much, but Barbie dolls were no longer sold only in basic bathing suits. Barbie dolls began increasingly to be sold in themed versions—ballet, gymnastics, and horse-back riding were some of the 1970s themes.

In 1977, the Barbie doll was re-invented again with a new face and body sculpt that collectors refer to as the "Superstar" Barbie [Exhibit 20], named for the first doll that bore this sculpt. This new Barbie doll had a big smile, bright, larger eyes and arms permanently bent at the elbows. This was the face of the Barbie in the 1980s, and the Superstar Barbie doll became synonymous with Barbie throughout the 1980s. Many of the dolls with the Superstar Barbie sculpt wore big, sparkly gowns and would have been right

10

EXHIBIT ___92___

PAGE ___12\3___

at home in an episode of the television program Dynasty from the mid
1980s.

Although not meant for play, it bears mentioning that Barbie has been
released in several porcelain versions for collectors, starting with Blue
Rhapsody Barbie in 1986 [Exhibit 21].

By the 1990s, several new face and body sculpts were created, including a
more sophisticated close-mouth sculpt (used on dolls such as Bead Blast
Barbie (1997-1998) [Exhibit 22], and some slimmer and less curvy body
sculpts. Since the 1990s, several versions of a 38-inch tall Barbie have been
produced, called "My Size Barbie." By the end of the 1990s and into the
21st century, fantasy Barbie dolls were very popular (princesses and fairy
tale themes) and Barbie starred in several motion pictures including The
Nutcracker and The Twelve Dancing Princesses. Barbie also began to meld
with technology in the 1990s, with computer versions that could be dressed
like Barbie dolls. Barbie has been sold in the shape of an MP3 player
[Exhibit 23], which enables girls to also play with their Barbie dolls online
in the virtual Barbie Girls world. On www.barbiegirls.com, girls can dress
their virtual Barbie dolls, style their hair, decorate their houses and interact
with other girls and their virtual Barbie dolls.

Although also not a play doll, Silkstone Barbie (also known as the Fashion
Model Barbie) [Exhibit 24] was introduced to collectors in 2000—this is a
Barbie with a different, hard, porcelain-type of vinyl, a slimmer body, and a
retro-looking face sculpt and face painting.

My Scene [Exhibit 16] Barbie dolls were introduced in 2002. They do have
the "lollipop" look (larger, non-proportional head) which has become
common in dolls in the 21st century. They also tend to wear edgier fashion
(although, overall, not as edgy as the Bratz dolls clothing). However, the
dolls are still clearly recognizable as Barbie dolls. They are taller than the
Bratz, they have a Barbie body, they actually have feet, and their heads
aren't nearly as large as the heads on the Bratz dolls.

Along the way, Barbie has also had over 100 careers (including nurse,
teacher, president, airline hostess, doctor, pet doctor, soccer coach, swim
coach etc.). She has been produced in Asian, Hispanic and African
American versions and too many hair colors to count, she's run for President
and even had a tattoo (of a butterfly; 1999 Butterfly Tattoo Barbie). My

11

EXHIBIT ____9̲2̲____

PAGE ____1̲2̲\4̲____

Scene Barbie dolls are just one of the many, many incarnations that Barbie
doll have taken over its nearly 50 year history.

*Denise Van Patten*          3-17-08

**Denise Van Patten**        **Date**

12

EXHIBIT ____ 92

PAGE ____ 1215

**EXHIBIT 93**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 SGL (RNBx)<br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>Hon. Stephen G. Larson<br><br>EXPERT REBUTTAL REPORT OF<br>HEATHER MCCOMB |

**CONFIDENTIAL -- ATTORNEY'S EYES ONLY**

EXHIBIT 93

PAGE 1216

## EXPERT REPORT OF HEATHER MCCOMB

### I.    QUALIFICATIONS

I have been a design professional for 44 years in both the Advertising and Toy Manufacturing businesses.  In addition to being a working board designer, my experience includes positions as Vice President of product design and development at 2 of the 3 largest U.S. toy companies, with responsibilities for very broad product lines in the range of $500-800 million in sales.  Additional work for smaller specialized toy companies and companies engaged in product categories such as juvenile products and collectible dolls rounds out my experience.

During this span of time, I have worked for, collaborated with, managed and mentored well over 200 artists and designers in nearly every area of design expertise.  On the technical side, I have a strong record of fruitful collaboration with engineering, Far East manufacturing and other scientific and technical disciplines.

My executive expertise includes management of global product development, including resource management, planning, client relations, inventor relations, cross functional design teams, 30 plus person in-house departments, scheduling and budgets in excess of $4 million.  I have special expertise in management of large complex projects and projects that are new arenas for a company.

**Companies / Positions**

Tyco Toys, Inc. / Vice President Research & Development

Hasbro, Inc. / Vice President Design, First Fun Division

Crayola, Inc. / Manager Product Design

Blue Ridge Juvenile Products / Vice President Product Development

The Family Company / Vice President Design & Development

Contemporary Marketing / Associate Creative Director

Edmund Scientific Co. / Art Director

Heather McComb / Design Consultant

EXHIBIT ___92___

PAGE ___12\7___

**Toy Product Categories**

Large Dolls / Feature Dolls

Small Dolls/ Collectibles

Fashion Dolls

Activities / Food

Plush

Preschool

Action Figures

Licensed Brands

Draw & Design

**Media Expertise**

Injection molding & tooling

Rotational molding

Mechanisms

Soft Goods, including plush

Illustration

Technical drawing

Landscape design

Food & cosmetic chemistry

All printing media

Simple electronics

Space design & construction

Packaging, signage, exhibits

Art direction - print and video

A copy of my resume is attached as Exhibit 1 to this report.

I am being compensated at the rate of $250 per hour for my time in this matter.

I have not testified as an expert witness at trial or in deposition in the preceding four years and have not authored any publications within the preceding 10 years.

**II.   MATERIALS REVIEWED**

In addition to the items referred to below, the materials I have reviewed in connection with this report are listed in Exhibit 2.

**III.   ISSUES ON WHICH I WILL GIVE AN OPINION**

I have been asked by counsel for Mattel to address certain portions of the Expert Reports of Robert Tonner and Mary Bergstein both of which are dated February 11, 2008. Specifically, I have been asked to opine about the role and contribution of Carter Bryant and certain other individuals in the design and development of the Bratz dolls and the role and quality of Carter Bryant's Bratz design drawings.

07209/2435521.1

EXHIBIT _____ 93

PAGE _____ 1218

2

## IV.   SUMMARY OF OPINIONS

1.      Regardless of how Carter Bryant's Bratz design drawings might be classified in
the practice of art history and museum connoisseurship, in the practice of promotional toy design
and development, they are fully developed, high quality design drawings on which the Bratz
dolls were based.

2.      With mass-market promotional fashion dolls like Bratz, the use of sculptors, face
painters, hair rooters, engineers and other specialists is typical and part of the routine, expected
development process.  These individuals typically apply their skills to faithfully execute the
original expression captured in the creator's design drawings, not to create something new or
different.  That was the case with Bratz, with the end result being a doll that is a highly faithful
execution of Carter Bryant's original design drawings.[1]

## V.   OPINIONS

In the toy industry, designers conceive their vision and concept and then apply their
talents to translate the essence of the vision and concept into a physical material expression,
typically design drawings that can be seen and evaluated by others.[2]  In my experience in the toy
industry, a designer's design drawings are not merely "notes on paper" or a source of inspiration
that others use to create something new or different.  Toy professionals make judgments and
decisions based on the design drawings as presented to them.  For example, they assess the
design presented in the drawings for its quality and suitability as a particular toy.  In addition,
they look to see if it embodies and expresses the very desired quality sometimes referred to as
"Toy Magic"--something commonly known and hard to describe, but very recognizable when
you see it.  It is this magic, captured and communicated in the original expression as presented in

---

[1]   This conclusion is confirmed by the results of a survey conducted by Kenneth
Hollander, which finds that more than 90% of girls aged 8-13 recognize Bryant's drawings as the
Bratz dolls.  Hollander Expert Report at ¶ 8.

[2]   Marlow, Vol. 1 at 182:8-12  *"When you draw something, what are you trying to do?
Communicate an idea that you have in your mind, a concept that you create; that's how you
show it to people, that's a language, is a way to communicate;"* Bryant, Vol. 4 at 812:7-12
"Q: *How would you (Bryant) convey to them what the idea was?... A: For me it would probably
be through a drawing."*

EXHIBIT ____93____

PAGE ____121____

3

the designer's drawings, that generates enough excitement and enthusiasm to impel business professionals into a commitment of necessary resources to take the toy to market.

With respect to Bratz, Carter Bryant's drawings were fully developed design drawings that expressed an original creative concept that captured MGA.[3] These drawings were recognized as a doll with the right "look" and "attitude."[4] The dolls shown in Bryant's drawings were described as "fresh," "nothing like it," "exciting," "spunky," "fun," "contemporary" and "exuded the attitude and expression [MGA] wanted."[5] According to one participant in what has been referred to as Bryant's 'pitch meeting' with MGA, "We were just looking at the picture, everybody was excited about the picture."[6] And Bryant's impression of the reaction to the drawings presented in his pitch? "It seemed like the room was buzzing."[7]

The significance of Bryant's drawings is further demonstrated by the actions that, according to MGA, they took upon seeing them, including the following:

---

[3]   Email from Paula Garcia to Robert Haynes-Peterson dated May 5, 2001 ("*The four girls were already concepted when presented by the inventor during our first meeting. I thought they were incredible and I tried to stay true (to) this inventor/creator's vision.*"). MGA 0051255-57.

[4]   Bryant testimony from Art Attacks at 80:10-13 "*After I started doing my drawings, it just kind of - when I looked at them, it just hit me. I just thought these girls have, you know, tons of spunk and attitude and, you know, they love fashion.*;" Bryant, Vol. II at 404:11-12 "*I think I was just trying to convey to her some idea of the look I was after, yes;* Bryant, Vol. III at 715:13-15 "*I just began sketching. I wanted to have poses that had a lot of attitude and energy;*" Garcia, Vol. I at 270:18-20 "*I remember them to be 2-D references for a style or an attitude that could potentially be dolls.*"

[5]   Marlow, Vol. 1 at 212:25-213:17 "*I really recall how fun the dolls are...because...you have never seen something like that...It was very cool...You get pretty excited about that because you hadn't seen anything like it...the attitude of the dolls...how cute;*" Marlow, Vol. 1 at 211:14-17 "*Yeah, (Isaac) loved the whole concept of it, those four dolls together and, you know, he thought it was really fresh and real contemporary and fun, and he liked the concept.*" Garcia, Vol. 2 at Ex. 40: M 0073820.  Article by David Rowan quotes Garcia who felt that Carter Bryant's initial drawings "*exuded the attitude and expression we wanted.*"

[6]   .Marlow, Vol. 1 at 208:22-209:5 "*We were just looking at the picture, everybody was excited about the picture.*"

[7]   Carter testimony from Art Attacks at 85:15-16 "Q: *What was your impression of the reaction to your pitch?*  A: *It seemed like the room was buzzing.*"

EXHIBIT _____ 93

PAGE _____ 1220

4

1.  MGA reversed its earlier reluctance to enter the fashion doll category.[8]

2.  According to MGA, it almost immediately (2 weeks +/-) made a substantial financial commitment to the doll.

3.  Assuming it started development when it claims, MGA moved forward with extraordinary speed and force to assemble and dedicate the resources to take Bratz to market.

4.  MGA engaged Carter Bryant, as the creator of the drawings, to work for it during the development process to ensure the continuity of his vision as expressed in his drawings.

That the drawings are the foundation images of the dolls is further confirmed by the words and actions of MGA employees and others who worked on the Bratz dolls. They all clearly understood Bryant's drawings to be drawings of the Bratz dolls and that the dolls were based on the drawings. For example:

- **Bryant, Vol. 1 at 224:13-15** "Q The face design was - for the Bratz was based on your drawings? A Yes."

- **Bryant, Vol. 1 at 228:15-229:7** "Q All right. I mean, for example, you said the size of the eyes and the lips you thought were distinctive. ...A Yes. Q And that was reflected in the drawings you did in '98? A Yes, I think so....Q And the drawing that you gave to Margaret- A Yes. Q Did that reflect these distinctive features, also? A I think it did."

---

[8] Marlow, Vol. 1 at 153:6-154:5 *"No. At that conversation she(Paula) had seen many other concepts on fashion dolls, but she didn't like any of them, and therefore I guess she was discouraged about it...well, like I said, she said that she had seen these (sic) stuff, she didn't like it and also Isaac wasn't too interested because Barbie has been in the market for so long, and everybody who attempted to do fashion dolls have failed. So he was - I guess he wasn't sure that, you know, he should get in the business of fashion dolls;* Marlow, Vol. 1 at 210:19-211:5 discussed at the pitch meeting *"That Isaac had said what Paula had stated before, that he was concerned about get(sic) into the fashion doll industry because Barbie had been the - leading the fashion doll for 40 years and nobody, you know, succeeded in competing with Barbie and he wasn't sure that he want to get into these, even though he liked the concept, he thought that the dolls look really good and they were really cute. And - but he - you know, he wasn't sure, he was going to think about it."*

EXHIBIT _____93____

PAGE _____121____

5

- **Bryant, Vol. 1 at 75:22-76:3** "A She showed me something very preliminary. Q What was it? A sculpt? A It was a clay - it was a clay model, yes. Q All right. Of what? A It was a model based on my 1998 drawings. Q A model of the Bratz dolls? A A very preliminary model, yes."

- **Garcia, Vol. 3 at 939:20-940:6** "When you say 'It's possible,' it's your best recollection that a sketch was provided to Margaret Hatch-Leahy to give her direction and guidance as to how that very first Bratz sculpt should look, correct?...A: Yes. Q: And that was a sketch or drawing that Carter Bryant prepared? A: Yes, I believe so."

- **Linker, Vol. 1 at 62:5-10** "At this meeting we were shown the concept of Bratz, the dolls. Q What were you shown? A We were shown art boards, illustrations of dolls and their features as far as what the dolls do and what they represent."

- **Harris, Vol. 1 at 216:16-21** "He (Larian) showed us some drawings. Q These were drawings of Bratz? A They were the designs, yes, that were brought in. Q Designs for the Bratz dolls? A Correct."

- **Brode, Vol. 1 at 176:6-8** "SL25 is the next page. Do you recognize this as a drawing or rendering of a Bratz doll? A Yes."

- **Lee, Vol. 1 at 113:14-20** "These character arts represents four different dolls. Q And the ones you are referring to are the ones that say Cloe, Yasmin, Sasha, and Jade; is that correct? A Yes."

In my experience, once the magic and excitement of the original drawing is recognized, as it was with Bryant's Bratz drawings, they become the basis for and guide the development of the actual product which goes forward with the express goal of not losing what it was that so excited everyone in the first place. In mass-market promotional fashion doll development, toy professionals know that a team of sculptors, face painters, hair rooters, engineers and other specialists will be assembled as part of the routine, expected development process. This team is engaged, not to change the designer's original design as they may see fit, but rather to apply their particular skills as necessary in order to faithfully execute the designer's 2–dimensional design

EXHIBIT _____ 93

PAGE _____ 1222

6

into a 3-dimensional doll. These individuals apply their skills *in service to the designer's original expression* of the toy, in the role of a translator rather than the author of a new work. And this, in my opinion, is exactly what occurred with the Bratz dolls.

A general explanation of the Toy Development Process will help to explain this conclusion. For a doll line such as Bratz the toy process can be divided for clarity into 5 general phases: Ideation & Concept, Design, Development, Engineering & Tooling, Production & Shipping.

**Ideation & Concept.** This consists of preliminary thinking and studying the existing toys on the market, especially in the relevant category: in this case, fashion dolls. The designers will brainstorm and ideas will flow. At this point the designer often begins sketching. This thinking-sketching becomes the process of editing and shaping the raw ideas into a real toy concept. It's the first phase of turning a raw idea, an inspiration, into a physical thing: initial concept sketches.

**Design.** The purpose of this phase is to specifically create and define (ie. to design) what the toy is, what it looks like, how it functions, who the consumer will be and what the toy's strong emotional appeal is to this consumer. All of this is communicated by the designer in a design drawing or a series of design drawings.

The goal of this phase is to define and express the toy so clearly and so completely that you can 'sell' it. The designer needs to 'sell' the toy, that is, to get approval from a toy company's senior management to proceed to Development, which means a serious commitment of company resources – both dollars and personnel. In my experience, if the decision makers (cold-eyed business persons all) don't fully see and understand the toy as expressed in the design drawings, they will not take out their checkbooks.

This is precisely the place in the toy development process where the Bratz dolls stood after Carter Bryant's pitch meeting to MGA and MGA's commitment to the dolls. The fact that MGA did not re-do Bryant's design drawings, and instead (according to MGA) focused on development starting no later than September 2000, shows that Bryant's drawings were the final design drawings.

At the end of the Design phase, with senior management's commitment to the toy in hand, many companies will do focus group testing. (A focus group test is a series of round table question/answer/discussion sessions with the targeted consumers led by a professional test

EXHIBIT ___93___

PAGE ___1223___

7

moderator.) The report from this test provides a company with a certain amount of consumer validation of the toy's appeal prior to spending big money. At this early stage of the process, these focus groups may be done using the design drawings.

In the context of this timeline we must consider Pre-Toyfair. Pre-Toyfair is typically an early preview, for the retailers, of the new toy 'coming attractions.' This occurs in the fall of the year before the actual product year – in 2000 that typically would have been around September or October. For the major customers (Wal-Mart, Target, Toys R Us) this often means a special trip to their home office to present your newest stuff. Since development of the Bratz dolls was, according to MGA, started at a date right around Pre-Toyfair, the only things available to take to their Pre-Toyfair customer meetings (at least according to MGA) would have been Bryant's design drawings. If so, that would further show that the dolls were based on the drawings.

**Development** is the phase when the approved toy design gets translated into 3D. There is much to be done at this stage. However, it is all aimed at faithfully executing the designer's vision as approved in the final design drawings – here, Carter Bryant's drawings.

When translating the design drawings into final 3D form during the development phase, some changes from the original concept are usually required for various reasons such as function, safety or cost. The job of the project manager, such as Paula Garcia in the case of Bratz, is to guide the concept while maintaining the designer's originality and vision. It is clear that Ms. Garcia worked closely with Bryant to keep true to his Bratz concept by doing things like going shopping for fashions for the Bratz dolls together. Carter Bryant was clearly relied upon, as the creator of Bratz , to see it through the development process intact.

The value of Carter Bryant is no more evident than in his work with the sculptor of the original Bratz doll. Carter Bryant picked who the sculptor would be. He provided her with his design drawings. He then met with her and provided comments. This is standard procedure in the toy industry. The person closest to the concept, in this case the inventor, approves the sculpt. The sculpt is "wrong" until the chosen creative person proclaims it "correct".

Mr. Tonner stated in his report that "If Mr. Bryant had given the project to any other sculptor (even one from Mattel) there is no way that it would have looked the same and, therefore, may or may not have been successful." This statement is inconsistent with my experience.

07209/2435521.1

EXHIBIT ___93___

PAGE ___1224___

8

A toy company does not give a job to a sculptor, and just hope for a good outcome based on that sculptor's reputation. The sculptor is carefully guided, and given direction through the process. While there may be small variations from sculptor to sculptor if you give them the same concept drawings, those variations would be "corrected" by the original designer in a "sculpt review". This is what happened with Bratz. As stated in his deposition, Carter Bryant reviewed and corrected what he thought were mistakes in the first sculpts.

Also at this point in the process, a more complete focus group consumer test is frequently conducted, typically using handmade samples of the dolls. I understand that MGA has stated there was no formal focus group conducted until March 2001. It would be unusual, in my experience, not to do such testing earlier.

**Engineering & Tooling** is the phase which finalizes the doll engineering. The project transfers to the manufacturing vendor and steel molds are made (these are used to produce the high volume of plastic parts). This is done in China and is a technologically precise and fairly long phase. Specialized components like hair or fabric are ordered far in advance to be available in the factory in time for the start of production. The goal and purpose of this phase is to enable the production of large volumes of accurate replications of the doll.

**Manufacturing & Shipping.** The actual manufacturing and shipping of the product is the final phase of toy development. This involves mass production of the approved dolls. Depending on the number of units involved, this manufacturing phase can require an extensive amount of time.

This development process may seem rather complex to a lay person. However, it is, in fact, everyday normal to professionals in the toy business. When executed skillfully, this process shepherds the aesthetic appeal of the designer's original toy vision as expressed in his drawings through the interfaces of many and varied media and materials, *without fundamentally changing it.*

EXHIBIT _____ 93_____

PAGE _____ 1225_____

9

In the case of Bratz, my opinion is that MGA used Carter Bryant's drawings as the actual design drawings. They were guided by their expression and the vision embodied in the drawings and the process resulted in a manufactured Bratz doll that is strikingly similar to Mr. Bryant's original Bratz drawings, complete with the drawings' "freshness", "excitement", "expression", "look", "style", "attitude" and distinctive aesthetic signature clearly still there.

DATED: March 17, 2008

_Heather McComb_   3.17. 2008

_____

Heather McComb

07209/2435521.1

EXHIBIT ___93___

PAGE ___1226___

10

# EXHIBIT 1

EXHIBIT _____ 93

PAGE _____ 1227

## Heather McComb

*1805 Cloverleaf Street, Bethlehem, PA 18017 / heather547@msn.com / cel 610.865.0368*

### SUMMARY

*Acknowledged expert in strategising, leading and organizing complex design projects as well as top creative and technical staff. A clear, analytical, problem solving thinker with a special facility for communicating with designers, non-creative and technical persons. Comprehensive experience as a Designer and Design Team Leader in the fields of Product Design, Graphic Design and Advertising. Areas of expertise includes:*

- *Global product development*
- *Cross-functional design teams*
- *Expansion into new product areas*
- *Corporate Planning, Scheduling, Estimating*

- *3D and 2D design*
- *Integrating art, technology and marketing*
- *Coaching and Developing creative staff*
- *Licensed product*

### PROFESSIONAL EXPERIENCE

**INDEPENDENT CONSULTANT**  (2006-present)

**CRAYOLA, Llc. Division of Hallmark, Inc.,** Easton, PA  (2004-2006)
**Manager, Product Design**

- Organized first Product Design department at Binney. Hired first fulltime experienced Product Designer beyond myself. Developed Advanced Concepts function and more effective use of key design consultants which has resulted in better, more focused concepts and better, more refined product.

- Concepted and developed, in the context of the toy team, the spring 06 Outdoor line which spearheaded a new selling season and retail location. Developed a distinctive form language to support the breakthrough nature of this line. It has been sold-in to all 3 major retailers, becoming a TV-promoted line along the way. Early number are excellent

- Clarified and defined role of Design in product development for other departments in the company which has resulted in the beginning foundation of a true integrated team product development function. Developed and nurtured particularly good relationship with the Engineering team.

- Initiated toy team's improvements to front end of development process and milestone definition. The resulting structure and discipline has improved product launch timing by 2 months for 06 line and is on the cusp of another 2 month improvement for 07 line, which is the corporate goal. This early work also resulted in a corporate level 'Kaisen Event' to analyze and define the 'toy' process from Line List to Production Start, including the Hallmark Hong Kong team. This process is now being considered for corporate-wide rollout.

- Spearheaded the drive to establish internal cost estimating function. Contacted and recommended experienced toy cost engineer who is currently consulting. The addition of this functional expertise has resulted in shorter management decision time, more focused product development producing better product and decreased HK quotations by 80%.

**UNIVERSITY OF RHODE ISLAND,** Providence, RI  (2003-2004)
**Full-Time Student,  Biotechnology Manufacturing Program**

**HASBRO, INC.,** Pawtucket, RI  (2000- 2002)
**Vice President, R & D**
**Preschool, Creative Play, Girls Toys**

- Charged with re-organizing and revitalizing the Division R&D department to create fresh, innovative product lines. Results: 2000 was division's first profitable year in 10 years. 2001 division was the most profitable in the entire corporate sector. 2002 exceeded budget and was reforecast up 2X. 2003 declared by head buyer of #1 major retailer "the best (division) line I've ever seen".
- Reduced model costs by 22%. Reduced overall development $$ by 43%
- Led design team that created lines which increased sales 66% in three years
- Coached key Design Directors with career issues to "star" status and promotions in 2 years

**BLUE RIDGE INTERNATIONAL PRODUCTS,** Freeport, FL  (1998-2000)
**Vice President, Product Development**
- Launched first comprehensive Juvenile Auto Safety Line, including Marketing, Packaging, Product Development, Engineering, QC, and far east Production start-up. Increased distribution 300%.
- Revitalized existing Home Products line with upgraded new product. Pioneered an entirely new segment, making the line a year-round business instead of just seasonal.
- Recruited and hired young design talent which has become the foundation of the company's Product Design.

EXHIBIT _____ 93

PAGE _____ 1228

*Heather McComb*   page two

**THE FAMILY COMPANY,** Moorestown, NJ  (1997-1998)
**Vice President, Design / Development / Operations**
- Concepted and managed into production first two product lines for this start-up company. Included several trips to Hong Kong/China for sourcing and production start.


**TYCO TOYS, INC.,** Mt. Laurel, NJ  (1987-1997)
(acquired by Mattel, Inc. 1997)
**Vice President, Research & Development**  (1995-1997)
**Senior Director, Product Development**  (1992-1995)
**Director, Product Development**  (1989-1992)
**Manager, Product Development**  (1987-1989)

- Managed product design primarily in new expansion where the company had no experience. Entering and competing successfully in this broad range of new areas was the most significant factor in the company's rise from #8 to #3 in the industry, $844MM in sales.

- Collaborated with the V.P. of *Engineering* to perfect the working systems now called "Team Design" and Concurrent Engineering". This resulted in the shortest, most efficient product-to-market schedules of any major company in the industry.

- Identified the single largest problem between the *Marketing* and Product Development Departments (samples!) and solved it. With the design of a system and the hiring of the right staff, the problem was eliminated resulting in a smoother, more collaborative relationship between the departments.

- Instituted design process milestones to establish earlier collaboration between Product Design and *Structural Packaging*. This resulted in a less linear development time line and earlier identification of potential packaging de-bug issues.

- Prodded, persuaded and strategized company into addressing long standing *Finance* planning problem which encompassed virtually every department and every product. The system developed would enable all departments to work in real time with a full Toy Line Projection reflecting current data.

- Highly regarded by *Licensors and Inventors* for skill in developing their properties without losing the original concept. This strengthened company's position when seeking licenses and concepts.

- Developed large, varied network of outside design, engineering and specialty vendors particularly in new areas where this network did not exist. Efficiently moved into new product categories and cope with extremely rapid growth only adding new staff sparingly.

- Created Soft Goods Engineering position to address technical, sourcing and costing problems. This resulted in a 50% reduction in development time for solving soft goods technical problems, higher quality in finished product, six weeks shorter sourcing time, and 20% more accurate costing.

- Initiated planning to create a custom R&D Purchase Requisition system. This resulted in maintaining fast turnaround and appropriate approvals in spite of rapid, exponential department growth. Also resulted in a database for faster, more accurate cost control and product development budget estimating.

- Traveled to Far East sourcing and manufacturing centers as final decision maker. Maintained production start deadlines on key "fast track" projects.

- Addressed critical design, sourcing development, manufacturing and QC problems in food and cosmetic toy chemistry. As a result, sourcing, costing and QC certification was resolved eight weeks earlier in the development cycle, virtually eliminating late production starts due to "chemistry" items.

- Created Girls Toy Category Product Development Department. Category grew from zero to $130MM, comprising 45% of company's total sales volume.

- Invented the LV Memorial Parking Space Lottery which resulted in a 22% increase in laughs, helping to diffuse a department morale-breaking situation.

**CONTEMPORARY MARKETING, INC.,** Bala Cynwyd, PA  (1979-1986)
(Advertising Agency)
**Associate Creative Director**  (1983-1986)
**Senior Art Director**  (1981-1983)
**Art Director**  (1979-1981)

EXHIBIT _____ 93

PAGE _____ 1229

## Heather McComb
*1805 Cloverleaf Street, Bethlehem, PA 18017 / heather547@msn.com / cel 610.865.0368*

# ADDENDUM

## MEDIA EXPERTISE

- Injection molding & tooling
- Soft goods, including plush
- All printing media
- Roto molding

- Food and cosmetic chemistry
- Art direction - print and video
- Mechanisms
- Simple electronics

- Space design & construction
- Illustration
- Packaging, signage, exhibits
- Landscape design

## PRODUCT

**Toys**

| | |
|---|---|
| Preschool: | PlaySkool Line, Transformers Jr. Line, Magna Doodle Magic School Bus, Ideal Sesame Street |
| Plush: | Bob the Builder, Doodle Bear, Fast Talkin' Bubba, Baggie Bunny Line, Zooballs, Farm Babies, Kitty Kitty Kittens |
| Food: | Easy Bake Oven, Queasy Bake line, Dr. Dreadful, Ice Cream Maker, Candy Maker |
| Activities: | Crayola Outdoor Line, Play Doh, E-Kara, Tinker Toys, Koosh, Tyco Super Blocks, Fashion Magic Line, Princess Potions |
| Large Dolls: | Baby Wiggles and Giggles, Oopsie Daisy, Baby Shivers, My Pretty Ballerina, Magic Bottle Baby, All Ideal Nursery Dolls, Talking Ed Grimley, Rub A Dub Doggie, California Roller Baby, It's Me! Collectible Doll Line |
| Small Dolls/ Collectibles | Shoezies, Quints, Dixie's Diner, Real Charmers, Bitsy Bears, Liddle Kiddles, Fabulous Hair Friends, Skate City |
| Fashion Dolls: | Ariel, The Little Mermaid, Blossom, Swan Princess |
| Games: | Sling Shot Duel, Travel Rock'em Sock'em, Dunk Shot Pickin Chickens |
| Draw & Design: | Magna Doodle, Lite Brite, Spirograph, Super Sketch Projector, 3-D Big Draw |

**Other**

| | |
|---|---|
| Juvenile Products: | SafeFit Brand automotive safety products |
| General Consumer: | Edmund Scientific Co. science products, general catalog and multi-media theatre, Draft Dodger brand products, Girard Bank, P & I Weight Loss Centers new program, Radisson Mark Plaza Hotel business markets. |
| Business-to-Business: | Dana Corporation, Bethlehem Steel new mill, Bait, Inc. oil rig emergency release system, Parker Hannifin Corp. automotive parts. Red Devil paint accessories, CMI corporate headquarters space design, Sonic Instruments worldwide products information, Loctite Corp. |

## EDUCATION
BioChemistry/Genetics, University of New Hampshire, Durham, NH

## PERSONAL
Interests include travel, house renovation and architecture, reading, science, mountaineering and other outdoor pursuits. Dining, landscaping and garden, woodworking, small British cars, running and interesting, stimulating conversation.

EXHIBIT _____ 93

PAGE _____ 1230

# EXHIBIT 2

EXHIBIT _____ 93

PAGE _____ 123)

**Materials Reviewed**

Mattel's Second Amended Answer and Counterclaims in <u>MGA Entertainment, Inc. v. Mattel, Inc.</u>

Color photographs of Bryant's Bratz drawings

Color copies of Bryant's Bratz drawings

The four first generation Bratz dolls, released to market in 2001

Color photographs of the four first generation Bratz dolls, released to market in 2001

MGA 0051255-7

MGA 0065339-42

Depositions with exhibits of the following:
- Carter Bryant, Vols. 1-5
- Paula Garcia, Vols. 1-4
- Veronica Marlow, Vol. 1
- Stephen Linker, Vol. 1
- Margaret Hatch Leahy, Vol. 1
- Elise Cloonan, Vol. 1
- Anna Rhee, Vol. 1
- Kerri Brode, Percipient Witness, Vol. 1 (excerpts only)
- Rachel Harris, Vol. 1
- Edmond Lee, Vol. 1 (excerpts only)

Carter Bryant's Testimony from <u>Art Attacks Inc., LLC v. MGA Entertainment, Inc.</u>, Case No. 04-1035-J (BLM)

Expert Reports of
- Mary Bergstein
- Paul K. Meyer
- Debora Middleton
- Robert Tonner
- Kenneth Hollander
- Lee Loetz

EXHIBIT ___93___

PAGE ___1232___

1

## PROOF OF SERVICE

2

3    I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543.

4

5    On **March 17, 2008,** I served true copies of the following document described as: **Expert Rebuttal Report of Heather McComb** on the parties in this action as follows:

6    Mike Werdegar                                    Carl Roth
     **Keker & Van Nest, LLP**                         **Skadden, Arps, Slate, Meageher & Flom**
7    710 Sansome Street                                **LLP**
     San Francisco, CA 94111                           300 South Grand Ave.,
8    *mwerdegar@kvn.com*                               Suite 3400
                                                       Los Angeles, CA 90071
9                                                      *carl.roth@skadden.com*

10
     Mark E. Overland
11   **Overland Borenstein Scheper & Kim LLP**
     300 South Grand Ave.
12   Suite 2750
     Los Angeles, CA 90071
13   *moverland@obsklaw.com*

14

15   **BY ELECTRONIC MAIL TRANSMISSION:** By electronic mail transmission per stipulation from the parties on March 17, 2008, by transmitting a PDF format copy of such document(s) to each such person at the e-mail address listed below their address(es). The document(s) was/were

16   transmitted by electronic transmission and such transmission was reported as complete and without error.

17

18   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

19

20

21   Executed on March 17, 2008, at Los Angeles, California.

22

23                                              Andrea Hoeven

24

25

26

27                                              EXHIBIT _____ 93

28                                              PAGE _____ 1233

     07975/2338347.1                    -2-

     Case No. CV 04-9049 SGL (RNBx)
     PROOF OF SERVICE

BLUEBIRD

EXHIBIT 94

# EXPERT REBUTTAL REPORT OF
# KENNETH HOLLANDER

**March, 2008**

**Kenneth Hollander Associates**

**45431 Greenling Circle Mendocino, CA 95460**

**(707) 962-1648   www.kharesearch.com**

EXHIBIT _____ 94

PAGE _____ 1234

# TABLE OF CONTENTS

Rule 26(a)(2)(B) Disclosure ........................................................... 1

Purpose .................................................................................. 2

Findings ................................................................................. 3

Design Principles and Standards ................................................... 4

Proper Universe ....................................................................... 5

Sample of Respondents .............................................................. 6

Protocol.................................................................................. 8

Screener and Questionnaire ........................................................ 9

Period of Interviewing ............................................................. 13

"Double Blind" Procedures ....................................................... 13

Recapitulation of Survey Neutrality ............................................ 14

Detailed Findings.................................................................... 15

Appendices

A:  Resume of Kenneth A. Hollander

B:  Questionnaires and Images

C:  Computer Tabular Output

EXHIBIT    94
PAGE    1235

## RULE 26(A)(2)(B) DISCLOSURE

1. Pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, this report states opinions Kenneth Hollander will express in the matter of CARTER BRYANT v. MATTEL, INC. Case # CV 04-9049 SGL (RNBx).

2. The sources considered by Kenneth Hollander in forming these opinions include the information contained in the Complaint for False Designation of Origin, Affiliation, Association, or Sponsorship, Unfair Competition, Dilution, and Unjust Enrichment; Mattel, Inc.'s Second Amended Answer in Case No, 05-2727 and Counterclaims; the Reference Manual on Scientific Evidence, Second Edition; The Manual for Complex Litigation, Third Edition; and the results of the interviews, which are the basis for this report.

3. Mr. Hollander's qualifications are found in Appendix A. I have not authored any publications in the past ten years. Although all invoices for cost components of the study reported herein have not yet been received, it is estimated that the total cost for the conduct of this study will be approximately $59,200. His fee for testimony is $450 an hour.

4. These fees are not contingent upon the outcome of either this study or of the litigation.

EXHIBIT    _au_

PAGE    _1236_

---

## PURPOSE

5.  Mattel's outside attorneys, Quinn Emanuel Urquhart Oliver & Hedges, LLP, asked the firm of Kenneth Hollander Associates to respond to certain portions of the expert reports of Robert Tonner and Mary Bergstein dated February 11, 2008, regarding purported differences between certain Carter Bryant drawings and Bratz dolls.

6.  Specifically Kenneth Hollander Associates was asked to conduct survey research to determine the extent to which, if any, girls aged 8-13 recognize certain Carter Bryant drawings as looking like Bratz dolls.

7.  The results of this survey are discussed in detail on the following pages where, it will be noted, every effort was made to be objective by recognizing potential, albeit inadvertent, biases and accounting for each of them beforehand.

EXHIBIT       94
PAGE       1237



8.  The results of this survey are that a net nine out of ten respondents (91.1%) identified the Bryant drawings as Bratz dolls.

9.  These results were obtained under neutral conditions: (a) neither the respondents nor the interviewers knew the purpose of the survey; (b) only non-leading questions were asked; (c) there was neither stimulus bias nor question bias; and (d) experimental controls were used to account for any anomalous influences.

10. The basis for my opining about these findings are my qualifications and experience, which include conducting or critiquing more than 100 intellectual property surveys.

_____
**Kenneth A. Hollander**

3·17·08
**Date**

EXHIBIT    94
PAGE    1238

## DESIGN PRINCIPLES AND STANDARDS

11. The present survey was designed and conducted in accordance with the principles and standards delineated in the <u>Manual for Complex Litigation,Third Edition</u>, 1995, prepared for the Federal Judicial Center. These principles provide the best assurance that the data collected are valid and can be relied upon to draw conclusions regarding consumers' opinions. The principles provide that:

- The proper universe(s) be identified and examined.

- A representative sample be drawn from each such universe.

- The plan for selecting the samples be prepared in accordance with generally accepted standards of procedure in the field.

- The questionnaire for gathering this relevant information be prepared in accordance with generally accepted standards of procedure.

- The persons designing and conducting the investigation be qualified to perform their tasks.

- The interviewers be well trained and have no knowledge of the pending litigation or purposes for which the data would be used.

- The interviewing be conducted in accordance with generally accepted standards of procedure in the field.

- The questioning of respondents be correct and unbiased.

- Once gathered, the data be accurately analyzed and reported.

EXHIBIT ____94____

PAGE ____1239____

## PROPER UNIVERSE

12. The <u>Reference Manual on Complex Litigation, Second Edition</u>, West Group, St. Paul, MN, 2000, prepared for the Federal Judicial Center, states on page 239, "One of the first steps in designing a survey or in deciding whether an existing survey is relevant is to identify the target population (or universe). The target population consists of all elements (i.e., objects, individuals, or other social units) whose characteristics or perceptions the survey is intended to represent."

13. With respect to this issue, we understand that an intended audience for Bratz dolls is females aged 8-13.

14. Accordingly, we have defined the proper universe for this survey as follows:

    A. Females aged 8-13,

    B. Residing in the United States,

    C. Who have had a Bratz doll (among others) bought for them within the past 12 months.

    D. And, to avoid their knowledge base and opinions being influenced, no member of their immediate household works for:

        (1) A marketing or marketing research firm

        (2) An advertising or public relations agency

        (3) A law firm

        (4) A newspaper, radio or TV station

        (5) A manufacturer, distributor, or retailer of children's dolls

EXHIBIT __94__

PAGE __1240__

**SAMPLE OF RESPONDENTS**

15. The <u>Reference Manual</u> also states on page 240 that "The surveyor's job generally is easier if a complete list of every eligible member of the population is available...so that the sampling frame lists the identity of all members of the target population." A sample drawn at random from such a list would be a true probability sample.

16. A complete list of all members of this proper universe was not available, which means that a true probability sample was not possible. Therefore, a non-probability sample was used for this investigation.

17. Non-probability samples are and have been used to make consequential academic and business decisions and are also accepted into evidence in Federal Courts throughout the country.

18. In this case, the Internet was used as the preferred interviewing medium, not only because it has fewer drawbacks than the alternatives but also because it has significant advantages, such that it is fast becoming the preferred medium whenever appropriate. In fact, according to the leading marketing research publication, "Inside Research," one-third of all survey research in 2006 was conducted via the Internet and this percentage will continue to increase.

19. Given such widespread adoption, the use of the Internet as an interviewing medium affords the opportunity to (a) locate and interview a representative sample of the proper universe in a timely and efficient manner, (b) eliminate any potential

EXHIBIT ___ 94

PAGE ___ 1241

interviewer biases, (c) expose the exact same stimuli to specific respondents in exactly the same manner, and (d) allow respondents to complete a survey at a time and place of their choosing and, thus, to do so in a more thoughtful manner than if it were a time and place of the researcher's choosing.

20. With these considerations in mind, the sample for this survey comprised females aged 8-13 living in households recruited by the Internet interviewing firm of Greenfield Online; all met the screening requirements previously discussed.

21. Greenfield Online is America's largest exclusive Internet interviewing company, is widely respected, and has been used before by Kenneth Hollander Associates.

22. We therefore assert that the beliefs of the Greenfield Online respondents meeting this survey's screening requirements are reasonably representative of all USA respondents meeting these same requirements.

23. The protocol for this survey was to recruit and interview 410 female respondents aged 8-13: 203 were exposed to certain Bryant drawings and another 207 were exposed to certain uncontested drawings.

24. The rationale for this survey design is explained in the following section of the report headed, "Protocol."

EXHIBIT _____ 94

PAGE _____ 1242

---

## PROTOCOL

25. This survey employed a Test and Control protocol in order to account for what survey researchers refer to as "noise," that is, any exogenous and unmeasureable respondent issues such as going-in knowledge and/or preconceived opinions. The way around these potentially confounding influences is to use a control group.

26. The Test Group saw two different screens of Bryant drawings: one screen displayed a different drawing in each quadrant of the screen (the "Quadrant" screen); the second screen displayed a group drawing (the "Group" screen). The Control Group saw two analogous screens except the Quadrant and Group screens were non-contested "Cherry Merry Muffin" drawings.

27. Respondents were assigned either to the Test Group or the Control Group on an every-other-interview basis. The respondents in both the Test Group and the Control Group were asked identical questions in an identical order.

28. This protocol ensures that if there are different "Bratz" answers for the Test and Control Groups, they are not caused by "noise," or by differences between the respondents themselves, or by the questions asked of these respondents.

EXHIBIT _____ 94

PAGE _____ 1243

## SCREENER AND QUESTIONNAIRE

29. The "screening" questionnaire established that: no one in the household worked for a prohibited firm (Question A); there was a girl aged 8-13 living in the household (Questions B and C); a Bratz doll had been bought in the past 12 months for a girl aged 8-13 living in the household (Questions D and E); and a girl aged 8-13 for whom a doll had been bought in the past 12 months was available to take the survey (Questions F1 and F2).

### SCREENER [COMPLETED BY THE ADULT PANEL MEMBER]

A. Do you yourself or does any member of your immediate household work for....

|  | Yes | No |  |
|---|---|---|---|
| A manufacturer of children's apparel | O | O | |
| A marketing or marketing research firm | O | O | IF "YES" TERMINATE |
| An advertising or public relations agency | O | O | IF "YES" TERMINATE |
| A law firm | O | O | IF "YES" TERMINATE |
| A newspaper, radio or TV station | O | O | IF "YES" TERMINATE |
| A manufacturer, distributor, or retailer of children's dolls | O | O | IF "YES" TERMINATE |
| A manufacturer, distributor, or retailer of children's toys or games | O | O | |

B. Do you currently have children living in your home?

  O  Yes  [CONTINUE]
  O  No  [TERMINATE]

EXHIBIT ___9U___

PAGE ___1244___

C. *How many of the children currently living in your home are:*

| Girls | 0 | 1 | 2 | 3 or more |
|---|---|---|---|---|
| Under 8 yrs. old | O | O | O | O |
| 8-13 yrs. old | O | O | O | O |
| 14-18 yrs. old | O | O | O | O |
| **Boys** | 0 | 1 | 2 | 3 or more |
| Under 8 yrs. old | O | O | O | O |
| 8-13 yrs. old | O | O | O | O |
| 14-18 yrs. old | O | O | O | O |

**[TERMINATE IF GIRLS 8-13 YRS. OLD IS '0']**

D. *In the past 12 months, which of the following items (if any) have you or anyone in your immediate household bought for an 8-13 year-old girl currently living in your home? (please select all that apply) [ROTATE LIST ITEMS]*

- ☐ *A doll [TERMINATE IF NOT SELECTED]*
- ☐ *A dress*
- ☐ *Shoes*
- ☐ *Athletic equipment*
- ☐ *An electronic game*
- ☐ *None of the above*

E. *In the past 12 months, what brand or brands of dolls were bought for an 8-13 year-old girl currently living in your home?*

*[QT=OE]*
*[FIVE OPEN END TEXT BOXES; RESPONDENT CAN ONLY CONTINUE IF ONE OF THE QUALIFYING VARIATIONS OF "BRATZ SPELLING" IS INCLUDED]*

*Qualifying variations of BRATZ DOLL (not case sensitive):*
- *Bratz*
- *Brats*
- *Brat*
- *Braz*
- *Bras*
- *Bratt*
- *Brattz*
- *Bratts*
- *Brazz*
- *Brass*

EXHIBIT _____ 94

PAGE _____ 1245

- *Bratz Doll*
- *Brats Doll*
- *Brat Doll*
- *Braz Doll*
- *Bras Doll*
- *Bratt Doll*
- *Brattz Doll*
- *Bratts Doll*
- *Brazz Doll*
- *Brass Doll*

*F1. Is the 8-13 year old girl for whom a doll was purchased available to participate in the study?*

     O  *Yes [SHOW INFO NODE G2]*
     O  *No [TERMINATE]*

*F2. Please invite the 8-13 year old girl for whom a doll was purchased to join you at the computer and have __her__ answer the following questions. [CONTINUE TO MAIN QUESTIONNAIRE]*

**30. The girl aged 8-13 completed the Main Questionnaire:**

<u>*MAIN QUESTIONNAIRE*</u>

*Hello!*

*Thank you for participating in our study.*

*How old are you?*
     O  *Age 8*
     O  *Age 9*
     O  *Age 10*
     O  *Age 11*
     O  *Age 12*
     O  *Age 13*

*As soon as you are ready to begin, click the >> button.*

**[ON AN EVERY-OTHER BASIS, ASSIGN RESPONDENT TO ONE OF THE FOLLOWING CELLS]**

O  *Cell M*
O  *Cell N*

EXHIBIT _____ 94

PAGE _____ 1246

---

Kenneth Hollander Associates       Page 11       March 17, 2008

*H1. We're going to show you some drawings and ask you a few questions about them. If you don't know an answer, it's okay. There are no right or wrong answers, so you won't need to guess.*

*H2. Please look at the drawings on the following two screens. Take as much time as you wish looking at each. When you're finished looking at each screen, click the "NEXT" button.*

**IMAGE 1**
*IF CELL=M, IMAGE = m1.jpg*
*IF CELL=N, IMAGE = n1.jpg*

**IMAGE 2**
*IF CELL=M, IMAGE = m2.jpg*
*IF CELL=N, IMAGE = n2.jpg*

*You just saw two screens of drawings. What, if anything, do these drawings look like to you?*

- ☐ *Angie dolls*
- ☐ *Barbie dolls*
- ☐ *Bratz dolls*
- ☐ *Cabbage Patch dolls*
- ☐ *Cherry Merry Muffin dolls*
- ☐ *Madam Alexander dolls*
- ☐ *Strawberry Shortcake dolls*
- ☐ *None of the above*
- ☐ *Don't know*

*[1. ROTATE 1ST 7 RESPONSES (Angie - Strawberry Shortcake dolls)*
*2. ANCHOR LAST 2 RESPONSES ("None of the above"& "Don't know")*
*3. ALLOW MULTIPLE RESPONSES (EXCEPT "None of the above" and "Don't know")]*

EXHIBIT _____ 9U

PAGE _____ 1247



## PERIOD OF INTERVIEWING

31. Interviewing was conducted from March 4 to March 7, 2008. Given the nature of Internet interviewing, respondents completed their interview at a time and place convenient to them, which means that they had no constraints of either time or place to interfere with their giving considered answers to the questions.

## DOUBLE BLIND PROCEDURES

32. Because of the way the questions were crafted, neither the survey programmer nor the respondents knew the purpose of this survey.  That is, no question suggested the survey's sponsor or purpose.

33. Thus, neither the programmer nor the respondents could either advertently or inadvertently influence the results.

EXHIBIT _____ 94

PAGE _____ 1248

## RECAPITULATION OF SURVEY NEUTRALITY

34. All nine of the Design Principles and Standards delineated in Paragraph 11 were observed in this survey and have been referenced in the discussion of each applicable issue. Furthermore, the following additional five safeguards were observed:

   A. Respondents were told that it was permissible to have no opinion about a subject, and thus that they shouldn't feel the need to guess at an answer.

   B. The Test and Control protocol accounted for any unknown and, therefore, unmeasureable "noise" factors.

   C. Answers that included names were rotated on an every-other-interview basis to eliminate position bias.

   D. Adults who themselves had potentially atypical knowledge because of their profession, or who had family members with such atypical knowledge, were excluded from the survey.

   E. Finally, neither the survey company nor the respondents knew the sponsor or the purpose of the study; thus, neither could attempt to influence the results.

EXHIBIT ___ 9U

PAGE ___ 1249

---

## DETAILED FINDINGS

35. The table below shows that a net of 91.1% identified the Bryant drawings as Bratz dolls. Statistically, this result could occur by chance only once in 100 occurrences; that is, the result is "statistically significant" at the 99% confidence level.

### Drawings Look Like...

|  | Test Group | Control Group |
|---|---|---|
| Base=Total in Each Group.......... | (200) | (200) |
|  | % | % |
| Angie dolls only | 0.0 | 0.0 |
| Barbie dolls only | 0.5 | 0.0 |
| **Bratz dolls only** | 92.1↑ | 1.0 |
| Cabbage Patch dolls only | 0.0 | 1.9 |
| Cherry Merry Muffin dolls only | 0.0 | 9.2 |
| Madam Alexander dolls only | 0.5 | 1.0 |
| Strawberry Shortcake dolls only | 0.0 | 55.6 |
| More than one doll | 4.4 | 26.6 |
| None of the above | 2.0 | 2.4 |
| Don't know | 0.5 | 2.4 |
|  | 100.0 | 100.0 |

*Q. What, if anything, do these drawings look like to you?*

↑Significantly higher than Control Group at 99% confidence level

EXHIBIT _____ 94

PAGE _____ 1250

**APPENDIX A**
Resume of Kenneth A. Hollander

EXHIBIT _____ 94

PAGE _____ 1251

# BIOGRAPHICAL MATERIAL

*-Kenneth A. Hollander-*

**CAREER**
- *Procter & Gamble, Cincinnati*
  - **Research Brand Manager**

- *Hallmark Cards, Kansas City*
  - **Associate Research Director**

- *Young & Rubicam, Chicago*
  - **Research Director**

- *Interpublic Group of Companies, Atlanta*
  - **Vice President, Director of Communications Planning Group**

- *Kenneth Hollander Associates*
  - **Chief Executive Officer**

**ACADEMIC INVOLVEMENT**
- *University of Georgia Graduate School of Business*
  - **Lecturer**
  - **Chairman, Board of Advisors, Masters of Marketing Research Program**
  - **Distinguished Practitioner, Department of Marketing**

- *Emory University Graduate School of Business*
  - **Lecturer**

- *Stanford University Graduate School of Business*
  - **Lecturer**

**PUBLICATION**
- **Contributing Editor, <u>Advertising</u>, McGraw Hill**

**SPEAKER**
- *American Marketing Association*
- *Association of National Advertisers*
- *Advertising Research Foundation*
- *Marketing Research Association*

**EDUCATION**
- *B.S.*     *The Ohio State University*
- *MBA*     *The University of Missouri*

EXHIBIT _____ 94

PAGE _____ 1252

**Kenneth Hollander Deposition and/or Trial Testimony: 2003-2007**

<u>2003</u>
US District Court of Nevada. Hartl Crushek LLP v. Erin Systems, Hartl Anlagerbau GmbH. CV:S-02-0379-LDG-LRL

US District Court of South Florida. Nitro Leisure Products v. Acushnet Company. CV:02-14008-CIV Middlebrooks/Lynch

US District Court Southern District of Texas—Houston Division. TXU v. Encore Bank. CV:H-02-3463

US District Court of South Florida—Miami Division. Doral Golf Resort & Spa v. International Doral Miami, CV:01-23425

<u>2004</u>
US District Court Southern District of Florida—Fort Lauderdale Division. Bank of America v. Nations Mortgage and Investments, Inc. 03-62037 CIV-ZLOCH

<u>2005</u>
US District Court of Nevada. R&R Partners v. Dorothy Tovar. CV-N-04-0145-LRH-VPC

US District Court Southern District of California. Votivo v. Archieligo. CV03-230L

<u>2006</u>
US District Court for Western District of Washington. Richard Bach and Russell v. Forever Living Products U.S., Inc., C05-0970P

US District Court Central District of California, Southern Division, Lamoon, Inc. v. Lamour Nail Products, Inc., SAV05-191 AHS (ANx).

US District Court of South Florida, Miami Division. Manpower Software v. Manpower, Inc., 04-22997.

US District Court of Nevada. Hansen Beverage v. Rockstar, Inc.  CV 2:06-cv-00733

U.S. District Court for the Eastern District of North Carolina Western Division. Georgia-Pacific Corporation v. Von Drehle Corporation, 5-05-CV-478-BO(1)

<u>2007</u>
U. S. District Court for Central District of California Western Division. Nissan Motor Co. Ltd. and Nissan North America, Inc. v. Nissan Computer Corporation and The Internet Center, Inc., CV 99-12980 DDP (Mcx).

U.S. District Court District of New Jersey. IDT Telecom Inc. and Union Telecard Alliance, LLC v. CVT Prepaid Solutions, Inc. CV 07-1076

U.S. District Court Central District of California. TrafficSchool.Com, Inc. v. Edriver, Inc. CV06-7561 PA (Cwx)

U.S. District Court Southern District of California. Brighton Collectibles, Inc. v. Renaissance Group International and Ralph's Grocery Company, CV-06-1115 H POR

U.S. District Court Northern District of Illinois Eastern Division, Luster Products v. Intimate Beauty Corporation and V. Secret Catalogue, Inc, CV05C-4527

EXHIBIT _____ 94

PAGE _____ 1253

**APPENDIX B**
**Questionnaires & Images**

EXHIBIT _____ 94

PAGE _____ 1254

## GIRLS DOLL STUDY

SCREENER (TO BE COMPLETED BY THE PARENT)

A. Do you yourself or does any member of your immediate household work for....

|  | Yes | No |  |
|---|---|---|---|
| A manufacturer of children's apparel | O | O |  |
| A marketing or marketing research firm | O | O | IF "YES" T&T |
| An advertising or public relations agency | O | O | IF "YES" T&T |
| A law firm | O | O | IF "YES" T&T |
| A newspaper, radio or TV station | O | O | IF "YES" T&T |
| A manufacturer, distributor, or retailer of children's dolls | O | O | IF "YES" T&T |
| A manufacturer, distributor, or retailer of children's toys or games | O | O |  |

B. Do you currently have children living in your home?

    O  Yes [CONTINUE]
    O  No  [T&T]

C. How many of the children currently living in your home are:

| Girls | 0 | 1 | 2 | 3 or more |
|---|---|---|---|---|
| Under 8 yrs. old | O | O | O | O |
| 8-13 yrs. old | O | O | O | O |
| 14-18 yrs. old | O | O | O | O |

| Boys | 0 | 1 | 2 | 3 or more |
|---|---|---|---|---|
| Under 8 yrs. old | O | O | O | O |
| 8-13 yrs. old | O | O | O | O |
| 14-18 yrs. old | O | O | O | O |

[IF GIRLS 8-13 YRS. OLD IS '0' T&T]

D. In the past 12 months, which of the following items (if any) have you or anyone in your immediate household bought for an 8-13 year-old girl currently living in your home? (please select all that apply) [ROTATE LIST ITEMS]

    □  A doll [IF NOT SELECTED, T&T]
    □  A dress
    □  Shoes
    □  Athletic equipment
    □  An electronic game
    □  None of the above

EXHIBIT ____ 24

PAGE ____ 1255

E.  In the past 12 months, what brand or brands of dolls were bought <u>for an 8-13 year-old girl</u> currently living in your home?

[QT=OE]
[include 5 open end text boxes; respondent can only continue if one of the qualifying variations of "Bratz spelling" is included]

       Qualifying variations of BRATZ DOLL (not case sensitive):
- Bratz
- Brats
- Brat
- Braz
- Bras
- Bratt
- Brattz
- Bratts
- Brazz
- Brass
- Bratz Doll
- Brats Doll
- Brat Doll
- Braz Doll
- Bras Doll
- Bratt Doll
- Brattz Doll
- Bratts Doll
- Brazz Doll
- Brass Doll

F1. Is the 8-13 year old girl for whom a doll was purchased available to participate in the study?

     O  Yes [show info node G2]
     O  No [TERMINATE]

F2. Please invite the 8-13 year old girl for whom a doll was purchased to join you at the computer and have **_her_** answer the following questions. [continue to main questionnaire]

**[PAGE BREAK]**

Hello!

Thank you for participating in our study.

EXHIBIT _____ 94
PAGE _____ 1256

How old are you?

O   Age 8
O   Age 9
O   Age 10
O   Age 11
O   Age 12
O   Age 13

As soon as you are ready to begin, click the >> button.

EXHIBIT _____ 94

PAGE _____ 1257

MAIN QUESTIONNAIRE

ON AN EVERY-OTHER BASIS, ASSIGN RESPONDENT TO ONE OF THE FOLLOWING CELLS

O  Cell M
O  Cell N

H1. We're going to show you some drawings and ask you a few questions about them. If you don't know an answer, it's okay. There are no right or wrong answers, so you won't need to guess.

H2. Please look at the drawings on the following two screens. Take as much time as you wish looking at each. When you're finished looking at each screen, click the "NEXT" button.

**IMAGE 1**
IF CELL=M, IMAGE = m1.jpg
IF CELL=N, IMAGE = n1.jpg

**IMAGE 2**
IF CELL=M, IMAGE = m2.jpg
IF CELL=N, IMAGE = n2.jpg

You just saw two screens of drawings. What, if anything, do these drawings look like to you?

- ☐ Angie dolls
- ☐ Barbie dolls
- ☐ Bratz dolls
- ☐ Cabbage Patch dolls
- ☐ Cherry Merry Muffin dolls
- ☐ Madam Alexander dolls
- ☐ Strawberry Shortcake dolls
- ☐ None of the above
- ☐ Don't know

[1.  ROTATE 1ST 7 RESPONSES (Angie - Strawberry Shortcake dolls)
 2.  ANCHOR LAST 2 RESPONSES ("None of the above"& "Don't know")
 3.  ALLOW MULTIPLE RESPONSES (EXCEPT "None of the above" and "Don't know")]

EXHIBIT ___ 94

PAGE ___ 1258

# Test Group Images
# (Cell M)

EXHIBIT _____ 94

PAGE _____ 1259



EXHIBIT 94

PAGE 1260



EXHIBIT ___94___

PAGE ___1261___

# Control Group Images
## (Cell N)

EXHIBIT _____ 94

PAGE _____ 1262



EXHIBIT ___94___

PAGE ___1263___



EXHIBIT _____ 94
PAGE _____ 1264

# APPENDIX C
## Computer Tabular Output

EXHIBIT ____ 94

PAGE ____ 1265

| Base=Total in Each | Test Group | Control Group |
|---|---|---|
| Group.......... | 203 | 207 |
| Angie dolls only | 0.0 | 0.0 |
| Barbie dolls only | 0.5 | 0.0 |
| Bratz dolls only | 92.1 | 1.0 |
| Cabbage Patch dolls only | 0.0 | 1.9 |
| Cherry Merry Muffin dolls only | 0.0 | 9.2 |
| Madam Alexander dolls only | 0.5 | 1.0 |
| Strawberry Shortcake dolls only | 0.0 | 55.6 |
| More than one doll | 4.4 | 26.6 |
| None of the above | 2.0 | 2.4 |
| Don't know | 0.5 | 2.4 |
|  | 100.0 | 100.0 |

EXHIBIT _____ 94

PAGE _____ 1266

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is Now Legal Service, 1301 W. 2nd Street, Suite 206, Los Angeles, CA 90026.

On March 17, 2008, I served true copies of the following document(s) described as **EXPERT REBUTTAL REPORT OF KENNETH HOLLANDER** on the parties in this action as follows:

| | |
|---|---|
| Mark E. Overland, Esq.<br>David C. Scheper, Esq.<br>Alexander H. Cote<br>**Overland Borenstein Scheper**<br>**& Kim LLP**<br>300 South Grand Avenue<br>Suite 2750<br>Los Angeles, CA 90071-3144 | John W. Keker, Esq.<br>Michael H. Page, Esq.<br>Christina M. Anderson, Esq.<br>**Keker & Van Nest LLP**<br>710 Sansome Street<br>San Francisco, CA 94111 |

Thomas J. Nolan, Esq.
Carl Roth, Esq.
**Skadden, Arps, Slate, Meagher &**
**Flom LLP**
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071

**BY PERSONAL SERVICE:** I delivered such envelope(s) by hand to the office of the person(s) being served.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on March 17, 2008, at Los Angeles, California.

_____
NOW LEGAL -- Dave Quintana

EXHIBIT _____ 94

PAGE _____ 1267

**EXHIBIT 95**

Copyright Office fees are subject to change.
For current fees, check the Copyright Office
website at *www.copyright.gov*, write the Copy-
right Office, or call (202) 707-3000.

**Form VA**
For a Work of the Visual Arts
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

VA                    VAU

EFFECTIVE DATE OF REGISTRATION

Month          Day          Year

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**1**
Title of This Work ▼

drawing of Doll No. 1

NATURE OF THIS WORK ▼ See instructions

drawing

Previous or Alternative Titles ▼

Publication as a Contribution If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared. Title of Collective Work ▼

If published in a periodical or serial give: Volume ▼          Number ▼          Issue Date ▼          On Pages ▼

**2**
**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**a**
NAME OF AUTHOR ▼

Carter Bryant

DATES OF BIRTH AND DEATH
Year Born ▼          Year Died ▼
1968

Was this contribution to the work a "work made for hire"?
☐ Yes
☑ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of _____ USA
Domiciled in _____

Was This Author's Contribution to the Work
Anonymous?   ☐ Yes   ☑ No
Pseudonymous?   ☐ Yes   ☑ No
If the answer to either of these questions is "Yes," see detailed instructions.

Nature of Authorship Check appropriate box(es). See Instructions
☐ 3-Dimensional sculpture        ☐ Map                ☐ Technical drawing
☑ 2-Dimensional artwork          ☐ Photograph         ☐ Text
☐ Reproduction of work of art    ☐ Jewelry design     ☐ Architectural work

**b**
Name of Author ▼

Dates of Birth and Death
Year Born ▼          Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of _____
Domiciled in _____

Was This Author's Contribution to the Work
Anonymous?   ☐ Yes   ☐ No
Pseudonymous?   ☐ Yes   ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

Nature of Authorship Check appropriate box(es). See Instructions
☐ 3-Dimensional sculpture        ☐ Map                ☐ Technical drawing
☐ 2-Dimensional artwork          ☐ Photograph         ☐ Text
☐ Reproduction of work of art    ☐ Jewelry design     ☐ Architectural work

**3**
**a** Year in Which Creation of This Work Was
Completed   2000
This information must be given
Year in all cases.

**b** Date and Nation of First Publication of This Particular Work
Complete this information ONLY if this work has been published.
Month   Early 2001, USA   Day _____   Year _____
Nation

**4**
See instructions before completing this space.

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼

Mattel, Inc.
333 Continental Blvd.
El Segundo, CA 90245 - 5012

Transfer If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

Assignment

APPLICATION RECEIVED

ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED

FUNDS RECEIVED

DO NOT WRITE HERE
OFFICE USE ONLY

MORE ON BACK ▶
• Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.
• Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of _____ pages

07209/1985444.1

EXHIBIT _____ 95 _____

PAGE _____ 1268 _____

M 0059698

<table>
<tr><td>EXAMINED BY</td><td>FORM VA</td></tr>
<tr><td>CHECKED BY</td><td></td></tr>
<tr><td>☐ CORRESPONDENCE<br>Yes</td><td>FOR<br>COPYRIGHT<br>OFFICE<br>USE<br>ONLY</td></tr>
</table>

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office? **5**
☐ Yes  ☐ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼
a. ☐ This is the first published edition of a work previously registered in unpublished form.
b. ☐ This is the first application submitted by this author as copyright claimant.
c. ☐ This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give: Previous Registration Number ▼          Year of Registration ▼

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation. **6**
a. **Preexisting Material** Identify any preexisting work or works that this work is based on or incorporates. ▼          **a**

See instructions before completing this space.

b. **Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼          **b**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account. **7**
Name ▼                          Account Number ▼          **a**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/Zip ▼          **b**
Robert D. Walsh
Mattel, Inc. MI-1220
333 Continental Blvd.
El Segundo, CA 90245 - 5012

Area code and daytime telephone number  ( 310 ) 252-6650          Fax number  ( 310 ) 252-4991
Email

**CERTIFICATION*** I, the undersigned, hereby certify that I am the **8**
check only one ▶
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☑ authorized agent of   Mattel, Inc.
          Name of author or other copyright claimant, or owner of exclusive right(s) ▲
of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.
Robert D. Walsh                                    Date  October 27, 2006

Handwritten signature (X) ▼
X _Robert D. Walsh_

**Certificate will be mailed in window envelope to this address:** **9**
Name ▼
Robert D. Walsh  Mattel, Inc.  MI -1220
Number/Street/Apt ▼
333 Continental Blvd.
City/State/ZIP ▼
El Segundo, CA 90245 -5012

• Complete all necessary spaces
• Sign your application in space 8

1. Application form
2. Nonrefundable filing fee in check or money order payable to Register of Copyrights
3. Deposit material

Library of Congress
Copyright Office
101 Independence Avenue SE
Washington, DC 20559-6000

*17 USC section: Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Form VA   Rec   07/09/1995447.1      Printed on recycled paper                    U.S. Government Printing Office: 2004-380-482-60,126

EXHIBIT _____ 95
PAGE _____ 1269

M 0059699



EXHIBIT 95

PAGE 120

M 0059700



EXHIBIT 45

PAGE 1271

M 0059701

Date: 22/001/08
Time: 16:03:34
Production Number: M 0059702-1-4

EXHIBIT ___95___

PAGE ___1272___

Copyright Office fees are subject to change. For current fees, check the Copyright Office website at *www.copyright.gov*, write the Copyright Office, or call (202) 707-3000.

**Form VA**
For a Work of the Visual Arts
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

|  | VA | VAU |
|---|---|---|

EFFECTIVE DATE OF REGISTRATION

| Month | Day | Year |
|---|---|---|

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

## 1

**Title of This Work ▼**

drawing of Doll No. 2

**NATURE OF THIS WORK ▼ See Instructions**

drawing

**Previous or Alternative Titles ▼**

**Publication as a Contribution** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared. Title of Collective Work ▼

If published in a periodical or serial give: Volume ▼          Number ▼          Issue Date ▼          On Pages ▼

## 2

### a
**NAME OF AUTHOR ▼**

Carter Bryant

**DATES OF BIRTH AND DEATH**
Year Born ▼          Year Died ▼
1968

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

Was this contribution to the work a "work made for hire"?
☐ Yes
☑ No

**Author's Nationality or Domicile**
Name of Country
OR { Citizen of _____ USA
Domiciled in _____

**Was this Author's Contribution to the Work**
Anonymous?        ☐ Yes  ☑ No
Pseudonymous?   ☐ Yes  ☑ No
If the answer to either of these questions is "Yes," see detailed instructions.

**Nature of Authorship** Check appropriate box(es). **See Instructions**
☐ 3-Dimensional sculpture        ☐ Map                  ☐ Technical drawing
☑ 2-Dimensional artwork          ☐ Photograph        ☐ Text
☐ Reproduction of work of art    ☐ Jewelry design   ☐ Architectural work

### b
**Name of Author ▼**

**Dates of Birth and Death**
Year Born ▼          Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**Author's Nationality or Domicile**
Name of Country
OR { Citizen of _____
Domiciled in _____

**Was This Author's Contribution to the Work**
Anonymous?        ☐ Yes  ☐ No
Pseudonymous?   ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**Nature of Authorship** Check appropriate box(es). **See Instructions**
☐ 3-Dimensional sculpture        ☐ Map                  ☐ Technical drawing
☐ 2-Dimensional artwork          ☐ Photograph        ☐ Text
☐ Reproduction of work of art    ☐ Jewelry design   ☐ Architectural work

## 3

### a
**Year in Which Creation of This Work Was Completed** This information must be given in all cases.
2000

**Date and Nation of First Publication of This Particular Work** Complete this information ONLY if this work has been published.
### b
Month Early 2001, USA          Day _____          Year _____          Nation

## 4

See instructions before completing this space.

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼

Mattel, Inc.
333 Continental Blvd.
El Segundo, CA 90245 - 5012

**Transfer** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

Assignment

APPLICATION RECEIVED

ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED

FUNDS RECEIVED

DO NOT WRITE HERE OFFICE USE ONLY

**MORE ON BACK ▶**
- Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
- See detailed instructions.
- Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of _____ pages

07209/1985444.1

EXHIBIT _____ 95

PAGE _____ 1273                    M 0059702

| EXAMINED BY | FORM VA |
|---|---|
| CHECKED BY | |
| ☐ CORRESPONDENCE<br>Yes | FOR<br>COPYRIGHT<br>OFFICE<br>USE<br>ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes  ☑ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: Previous Registration Number ▼          Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.

a. **Preexisting Material** Identify any preexisting work or works that this work is based on or incorporates. ▼

b. **Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**6**

a

b

See instructions
before completing
this space

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.

Name ▼          Account Number ▼

**7**

a

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/Zip ▼

Robert D. Walsh
Mattel, Inc. MI-1220
333 Continental Blvd.
El Segundo, CA 90245 - 5012

b

Area code and daytime telephone number    ( 310 ) 252-6650          Fax number    ( 310 ) 252-4991

Email

**CERTIFICATION\*** I, the undersigned, hereby certify that I am the

check only one ▶

☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☑ authorized agent of **Mattel, Inc.**

Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Robert D. Walsh          Date  October 27, 2006

Handwritten signature (X) ▼

x _____Robert D. Walsh_____

| Certificate will be mailed in window envelope to this address: | Name ▼<br>Robert D. Walsh  Mattel, Inc.  MI -1220<br>Number/Street/Apt ▼<br>333 Continental Blvd.<br>City/State/ZIP ▼<br>El Segundo, CA 90245 -5012 | • Complete all necessary spaces<br>• Sign your application in space 8.<br>1. Application form<br>2. Nonrefundable filing fee in check or money order payable to Register of Copyrights<br>3. Deposit material<br>Library of Congress<br>Copyright Office<br>101 Independence Avenue SE<br>Washington, DC 20559-6000 |
|---|---|---|

**9**

\*17 U.S.C. §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Form VA  Rev: 07/2006  Print: 07/2006  20,000    Printed on recycled paper          U.S. Government Printing Office: 2004-302-604/30,191

EXHIBIT _____ 95

PAGE _____ 1274

M 0059703



EXHIBIT ___95___

PAGE ___1275___

M 0059704



EXHIBIT _____ 95

PAGE _____ 1276

M 0059705

EXHIBIT _____ 95 _____

PAGE _____ 1277 _____

Production Number: M 0059706-1-4
Time: 16:03:34
Date: 22/01/08

Copyright Office fees are subject to change.
For current fees, check the Copyright Office
website at *www.copyright.gov*, write the Copy-
right Office, or call (202) 707-3000.

**Form VA**
For a Work of the Visual Arts
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

VA          VAU

EFFECTIVE DATE OF REGISTRATION

Month          Day          Year

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1**

Title of This Work ▼
group drawing of dolls

NATURE OF THIS WORK ▼ See Instructions
drawing

Previous or Alternative Titles ▼

Publication as a Contribution If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared. Title of Collective Work ▼

If published in a periodical or serial give: Volume ▼          Number ▼          Issue Date ▼          On Pages ▼

**2**

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**a**
NAME OF AUTHOR ▼
Carter Bryant

DATES OF BIRTH AND DEATH
Year Born ▼          Year Died ▼
1968

Was this contribution to the work a "work made for hire"?
☐ Yes
☑ No

Author's Nationality or Domicile
Name of Country
OR {
Citizen of _____ USA
Domiciled in _____

Was This Author's Contribution to the Work
Anonymous?          ☐ Yes   ☑ No
Pseudonymous?      ☐ Yes   ☑ No
If the answer to either of these questions is "Yes," see detailed instructions.

Nature of Authorship Check appropriate box(es). See Instructions
☐ 3-Dimensional sculpture      ☐ Map            ☐ Technical drawing
☑ 2-Dimensional artwork        ☐ Photograph     ☐ Text
☐ Reproduction of work of art  ☐ Jewelry design ☐ Architectural work

**b**
Name of Author ▼

Dates of Birth and Death
Year Born ▼          Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR {
Citizen of _____
Domiciled in _____

Was This Author's Contribution to the Work
Anonymous?          ☐ Yes   ☐ No
Pseudonymous?      ☐ Yes   ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

Nature of Authorship Check appropriate box(es). See Instructions
☐ 3-Dimensional sculpture      ☐ Map            ☐ Technical drawing
☐ 2-Dimensional artwork        ☐ Photograph     ☐ Text
☐ Reproduction of work of art  ☐ Jewelry design ☐ Architectural work

**3**

**a**
Year in Which Creation of This Work Was
Completed
2009
Year ◀ This information must be given in all cases.

**b**
Date and Nation of First Publication of This Particular Work
Complete this information ONLY if this work has been published.
Month Early 2001, USA      Day _____      Year _____          Nation

**4**
See instructions before completing this space.

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼
Mattel, Inc.
333 Continental Blvd.
El Segundo, CA 90245 - 5012

Transfer If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼
Assignment

APPLICATION RECEIVED

ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED

FUNDS RECEIVED

DO NOT WRITE HERE OFFICE USE ONLY

**MORE ON BACK ▶** • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.      • See detailed instructions.          • Sign the form at line 8.

DO NOT WRITE HERE

07209/1985444.1

Page 1 of _____ pages

EXHIBIT _____ 95

PAGE _____ 1278

M 0059706

| EXAMINED BY | | FORM VA |
|---|---|---|
| CHECKED BY | | |
| ☐ CORRESPONDENCE Yes | | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes  ☐ No   If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: Previous Registration Number ▼          Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.

a. **Preexisting Material** Identify any preexisting work or works that this work is based on or incorporates. ▼

**6**

**a**

See instructions before completing this space.

b. **Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**b**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.

Name ▼                          Account Number ▼

**7**

**a**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/Zip ▼

Robert D. Walsh
Mattel, Inc, MI-1220
333 Continental Blvd.
El Segundo, CA 90245 -5012

**b**

Area code and daytime telephone number   ( 310 ) 252-6650            Fax number   ( 310 ) 252-4991

Email

**CERTIFICATION** I, the undersigned, hereby certify that I am the

check only one ▶
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☑ authorized agent of   Mattel, Inc.

Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Robert D. Walsh                                    Date   October 27, 2006

Handwritten signature (X) ▼

X   _Robert D. Walsh_

**9**

| Certificate will be mailed in window envelope to this address: | Name ▼ Robert D. Walsh  Mattel, Inc. MI-1220 | • Complete all necessary spaces • Sign your application in space 8 |
|---|---|---|
| | Number/Street/Apt ▼ 333 Continental Blvd. | SEND ALL 3 ELEMENTS IN THE SAME PACKAGE: 1. Application form 2. Nonrefundable filing fee in check or money order payable to Register of Copyrights 3. Deposit material |
| | City/State/ZIP ▼ El Segundo, CA 90245 -5012 | Library of Congress Copyright Office 101 Independence Avenue SE Washington, DC 20559-6000 |

*17 USC §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Form VA   Rev: 07/2006   Print: 07/2006—30,000   Printed on recycled paper                                         U.S. Government Printing Office: 2004-330-955/60,136

EXHIBIT _____ 95 _____

PAGE _____ 1279 _____

M 0059707



EXHIBIT ___95___

PAGE ___1280___

M 0059708



EXHIBIT ___95___

PAGE ___1281___

M 0059709

Date: 23/01/08
Time: 16:03:34
Production Number: M 0059714-1-4

EXHIBIT ___95___

PAGE ___1202___

Copyright Office fees are subject to change. For current fees, check the Copyright Office website at *www.copyright.gov*, write the Copyright Office, or call (202) 707-3000.

**Form VA**
**For a Work of the Visual Arts**
**UNITED STATES COPYRIGHT OFFICE**

REGISTRATION NUMBER

| | VA | VAU |
|---|---|---|

EFFECTIVE DATE OF REGISTRATION

| Month | Day | Year |
|---|---|---|

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1**

Title of This Work ▼

drawing of Doll No. 4

NATURE OF THIS WORK ▼ See instructions

drawing

Previous or Alternative Titles ▼

Publication as a Contribution If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared. Title of Collective Work ▼

If published in a periodical or serial give: Volume ▼    Number ▼    Issue Date ▼    On Pages ▼

**2**

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**a** NAME OF AUTHOR ▼

Carter Bryant

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼
1968

Was this contribution to the work a "work made for hire"?
☐ Yes
☑ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of _____ USA
Domiciled in _____

Was This Author's Contribution to the Work
Anonymous?    ☐ Yes  ☑ No
Pseudonymous?   ☐ Yes  ☑ No
If the answer to either of these questions is "Yes," see detailed instructions.

Nature of Authorship Check appropriate box(es). See Instructions
☐ 3-Dimensional sculpture    ☐ Map    ☐ Technical drawing
☑ 2-Dimensional artwork    ☐ Photograph    ☐ Text
☐ Reproduction of work of art    ☐ Jewelry design    ☐ Architectural work

**b** Name of Author ▼

Dates of Birth and Death
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of _____
Domiciled in _____

Was This Author's Contribution to the Work
Anonymous?    ☐ Yes  ☐ No
Pseudonymous?   ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

Nature of Authorship Check appropriate box(es). See Instructions
☐ 3-Dimensional sculpture    ☐ Map    ☐ Technical drawing
☐ 2-Dimensional artwork    ☐ Photograph    ☐ Text
☐ Reproduction of work of art    ☐ Jewelry design    ☐ Architectural work

**3**

**a** Year in Which Creation of This Work Was Completed
2000
This information must be given Year in all cases.

**b** Date and Nation of First Publication of This Particular Work
Complete this information Month _____ Day _____ Year _____
ONLY if this work has been published.
Early 2001, USA
Nation

**4**

See instructions before completing this space.

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼

Mattel, Inc.
333 Continental Blvd.
El Segundo, CA 90245 - 5012

Transfer If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

Assignment

APPLICATION RECEIVED

ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED

FUNDS RECEIVED

DO NOT WRITE HERE OFFICE USE ONLY

**MORE ON BACK ▶**   • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.    • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of _____ pages

07209/1985444.1

EXHIBIT _____ 95

PAGE _____ 1283

**M 0059714**

| EXAMINED BY | FORM VA |
|---|---|
| CHECKED BY | |
| CORRESPONDENCE ☐ Yes | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**5** PREVIOUS REGISTRATION Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☐ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼
a. ☐ This is the first published edition of a work previously registered in unpublished form.
b. ☐ This is the first application submitted by this author as copyright claimant.
c. ☐ This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give: Previous Registration Number ▼     Year of Registration ▼

**6** DERIVATIVE WORK OR COMPILATION Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.
a. Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼
**a**
See instructions before completing this space.
b. Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼
**b**

**7** DEPOSIT ACCOUNT If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼     Account Number ▼
**a**
CORRESPONDENCE Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/Zip ▼
**b**
Robert D. Walsh
Mattel, Inc. MI-1220
333 Continental Blvd.
El Segundo, CA 90245 - 5012
Area code and daytime telephone number  ( 310 ) 252-6650     Fax number  ( 310 ) 252-4991
Email

**8** CERTIFICATION* I, the undersigned, hereby certify that I am the
check only one ▶
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☑ authorized agent of  Mattel, Inc.
Name of author or other copyright claimant, or owner of exclusive right(s) ▲
of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.
Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.
Robert D. Walsh     Date October 27, 2006
Handwritten signature (X) ▼
X _Robert D. Walsh_

**9** Certificate will be mailed in window envelope to this address:
Name ▼
Robert D. Walsh Mattel, Inc. MI-1220
Number/Street/Apt ▼
333 Continental Blvd.
City/State/ZIP ▼
El Segundo, CA 90245 -5012

*17 USC §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.
Form VA   Rev: 07/2006   Print: 07/2006—30,000   Printed on recycled paper     U.S. Government Printing Office: 2004-320-945/60,125

EXHIBIT ___95___
PAGE ___1284___

M 0059715



EXHIBIT 95

PAGE 1285

M 0059716



EXHIBIT ___95___

PAGE ___1286___

M 0059717

Date: 22/03/08
Time: 16:03:35
Production Number: M 0059738-1-4

EXHIBIT _____95_____
PAGE ___1287___

Copyright Office fees are subject to change.
For current fees, check the Copyright Office
website at *www.copyright.gov*, write the Copy-
right Office, or call (202) 707-3000.

**Form VA**
For a Work of the Visual Arts
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

|  | VA | VAU |
|---|---|---|

EFFECTIVE DATE OF REGISTRATION

| Month | Day | Year |
|---|---|---|

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**1** Title of This Work ▼
drawing of Doll No. 10

NATURE OF THIS WORK ▼ See Instructions
drawing

Previous or Alternative Titles ▼

Publication as a Contribution If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared. Title of Collective Work ▼

If published in a periodical or serial give: Volume ▼    Number ▼    Issue Date ▼    On Pages ▼

**2**
**a**
NAME OF AUTHOR ▼
Carter Bryant

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼
1968

Was this contribution to the work a "work made for hire"?
☐ Yes
☑ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of ___ USA
      Domiciled in ___

Was This Author's Contribution to the Work
Anonymous?     ☐ Yes  ☑ No
Pseudonymous?  ☐ Yes  ☑ No
If the answer to either of these questions is "Yes," see detailed instructions.

Nature of Authorship  Check appropriate box(es). See Instructions
☐ 3-Dimensional sculpture     ☐ Map            ☐ Technical drawing
☑ 2-Dimensional artwork       ☐ Photograph     ☐ Text
☐ Reproduction of work of art ☐ Jewelry design ☐ Architectural work

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b**
Name of Author ▼

Dates of Birth and Death
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of ___
      Domiciled in ___

Was This Author's Contribution to the Work
Anonymous?     ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

Nature of Authorship  Check appropriate box(es). See Instructions
☐ 3-Dimensional sculpture     ☐ Map            ☐ Technical drawing
☐ 2-Dimensional artwork       ☐ Photograph     ☐ Text
☐ Reproduction of work of art ☐ Jewelry design ☐ Architectural work

**3**
**a**
Year in Which Creation of This Work Was Completed
2000
This information must be given in all cases.

**b**
Date and Nation of First Publication of This Particular Work
Complete this information ONLY if this work has been published.
Month Early 2001, USA    Day ___    Year ___    Nation

**4**
See Instructions before completing this space.
COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼

Mattel, Inc.
333 Continental Blvd.
El Segundo, CA 90245 - 5012

Transfer If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼
Assignment

APPLICATION RECEIVED
ONE DEPOSIT RECEIVED
TWO DEPOSITS RECEIVED
FUNDS RECEIVED

DO NOT WRITE HERE OFFICE USE ONLY

MORE ON BACK ▶
• Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.
• Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of ___ pages

07209/1985444.1

EXHIBIT ___ 95

PAGE ___ 1288

**M 0059738**

| EXAMINED BY | FORM VA |
|---|---|
| CHECKED BY | |
| ☐ CORRESPONDENCE ·Yes | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes  ☑ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: Previous Registration Number ▼        Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.

a. **Preexisting Material** Identify any preexisting work or works that this work is based on or incorporates. ▼

**6**

a

See instructions before completing this space.

b. **Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

b

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.

Name ▼        Account Number ▼

**7**

a

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/Zip ▼

Robert D. Walsh
Mattel, Inc. MI-1220
333 Continental Blvd.
El Segundo, CA 90245 - 5012

b

Area code and daytime telephone number  ( 310 ) 252-6650        Fax number   ( 310 ) 252-4991

Email

**CERTIFICATION*** I, the undersigned, hereby certify that I am the

check only one ▶
{
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☑ authorized agent of   Mattel, Inc.
}

Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Robert D. Walsh        Date  October 27, 2006

Handwritten signature (X) ▼

x _Robert D. Walsh_

| Certificate will be mailed in window envelope to this address: | Name ▼ Robert D. Walsh  Mattel, Inc.  MI -1220 | • Complete all necessary spaces • Sign your application in space 8 |
|---|---|---|
| | Number/Street/Apt ▼ 333 Continental Blvd. | 1. Application form 2. Nonrefundable filing fee in check or money order payable to Register of Copyrights 3. Deposit material |
| | City/State/ZIP ▼ El Segundo, CA 90245 -5012 | Library of Congress Copyright Office 101 Independence Avenue SE Washington, DC 20559-6000 |

**9**

*17 U.S.C. §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Form VA   Rev: 07/2006   Print: 07/2006—30,000   Printed on recycled paper        U.S. Government Printing Office: 2004-630-960/60,129

07209/1985447.1

EXHIBIT _95_

PAGE _1289_

M 0059739



EXHIBIT 95

PAGE 1290

M 0059740



EXHIBIT ___95___

PAGE ___1291___

M 0059741