### D.    Publications

7.    I have published six drawing manuals and thirty teaching DVDs. I have a highly
regarded general drawing manual that has a strong emphasis on basic procedures, fundamentals
of anatomy, 2D and 3D observations. I also publish specific drawing manuals for different
aspects of human anatomy, such as heads, feet, and hands.  My Sketch Book is on the list of
recommended reading in the field of human and animal figures at Walt Disney Feature
Animation. My drawing manual is used for reference at the Getty Museum educational museum,
and numerous art schools and university programs use my drawing manual as a text book.

### E.    Gallery Experience

8.    I was a part owner of the "Seventh Street Gallery" from 1975-1980. I have had at least
14 one-man shows, including at the Long Beach Museum, Paideia Gallery, Los Angeles, and
Orange Coast College Costa Mesa, numerous two man and group shows, and invitationals
throughout the United States and Canada. My work is included in  collections throughout the
U.S., Canada, and Europe, and I continue to create oil paintings, watercolors, drawings, prints
and computer graphics.

## II.    EXPERT EXPERIENCE AND COMPENSATION

9.    I have not testified as an expert at trial or in a deposition. I am being compensated at my
standard rate of $100 per hour, with a minimum of $600 per day.

## III.    MATERIALS REVIEWED AND EXHIBITS

10.    For this report, I have reviewed the following (1) the "Expert Report Of Lee Loetz"
submitted by Mattel, Inc. in this case; (2) sketches prepared by Carter Bryant; (3) certain Bratz
dolls (MGA-TI-000475; MGA-TI-000480; MGA-TI-000483; MGA-TI-000488), and a
"Yasmin" doll that was out of the packaging; (4) pages from a Seventeen Magazine referenced in
this report; (5) certain reference books I own; and, (6) a report by Debbie Middleton submitted
by MGA in this case.

11.    As an artist, I draw regularly and frequently use illustrations to explain points as part of
my teaching and otherwise. I have prepared some sketches to illustrate certain of my opinions in
connection with this report. If called to testify in this case, I may use additional illustrations in
connection with my testimony.

12.    I continue to review materials relating to this matter and reserve the right to supplement
my report as appropriate.

## IV.    SUMMARY OF MY OPINIONS

13.    Through its counsel, MGA has asked me to address two topics that I understand are in
dispute in this case and that have been addressed by Mattel experts. The first is whether it is
common for employed artists to develop ideas or projects on their own time or to perform

EXHIBIT _____ 98

PAGE _____ 131

CONFIDENTIAL

freelance work and the propriety of such work. As discussed below, based on my over 45 years of industry experience, it is well-known that artists commonly work on their own projects in their free time and also undertake freelance work and such work is appropriate and an accepted part of the industry. I do not believe that the artist's employer would have a right to claim ownership of these efforts.

14.     I have also been asked to address the opinions rendered by Mr. Loetz in connection with his report and declaration. As detailed below, I disagree with Mr. Loetz's opinion that Mr. Bryant's sketches "are in essence" the Bratz dolls "in two dimensional form," and his opinion that the Bratz dolls "are a faithful execution" of Mr. Bryant's sketches. In my opinion, there are many significant differences between Mr. Bryant's sketches and the Bratz dolls. My specific disagreements with Mr. Loetz's opinions are detailed below, but, in summary, if the sketches were mine, and the goal of the project was to recreate the sketches in the dolls, I would consider the project a failure. In industry terminology, the dolls are "off model" and I would have rejected the dolls as not being a faithful execution of the sketches.

15.     I agree with Mr. Loetz that the sketches illustrate a "concept" and it is my understanding that the sketches were used by MGA as an inspiration in connection with development of the dolls. However, the sketches do not provide anything close to the level of detail or "control" that would be needed to construct the dolls, and what few details there are in the sketches were not faithfully carried over into the dolls. For example, the sketches are inconsistent as to body proportions and as to other features and they do not provide the level of consistency and detail that would allow a sculptor to faithfully recreate the sketches as dolls.

16.     Based on my review of Mr. Bryant's sketches, it does not appear that he had the skill set needed to provide the detailed "turn-around" control drawings necessary for a faithful reproduction of the drawings in a doll. Mr. Bryant appears to have been more interested in illustrating the overall concept than in providing the type of specific detail needed to execute the actual dolls. This concept represents Mr. Bryant's contribution to the Bratz dolls. Mr. Bryant's sketches are really best interpreted as his "visual thinking". They first and foremost conveyed an idea to MGA which allowed the sculptor(s) and face painter(s) involved in the Bratz design significant freedom in executing the dolls, and the particular skills and improvements that the sculptor(s) and face painter(s) brought to the project are evident in the many differences between Mr. Bryant's concept sketches and the completed dolls.

17.     I also have been informed that at some point after Mr. Bryant first drew his original sketches, he added color to them. In my opinion, the addition of color does not change the basic nature of the sketch as an expression of an idea. All that colorization would be useful for is to facilitate the presentation of that idea.

18.     Many of the similarities noted by Mr. Loetz are not actually similar. Other similarities he notes, such as the lining up of various body landmarks, are as much the result of standard human proportions or standard animation proportioning techniques as anything else, and Mr. Loetz overlooks notable differences in the body and face proportions between the sketches and the dolls. Mr. Loetz also included with his report art that was used in connection with the packaging of the dolls and comparisons of this art with Mr. Bryant's sketches. I have reviewed these

3     EXHIBIT _____ 98

PAGE _____ 1372

CONFIDENTIAL

comparisons and in my opinion the art used with the packaging differs significantly from Mr. Bryant's sketches. I have also reviewed the materials included with Ms. Middleton's report and believe that later package art used by MGA differed even more significantly from Mr. Bryant's sketches.

## V.    **MY OPINIONS**

### A.    **Artists Moonlighting**

19.    I am informed that a Mattel expert has opined that under common industry practice, designers and other creative personnel who are employed by a company and sign employment agreements are required to forgo freelance work and to assign all of their work product solely to the company. This is contrary to my experience.

20.    When I worked at Disney and other studios, I did not believe that the studios owned what I did in my own time (even though the studios always required that I sign an employment agreement), because it was not related to the work the studio had hired and paid me to do. When I worked at Disney, I was always painting at lunch and at night, which was different from what I was doing for the studios even though my work for the studios involved art.

21.    In the animation business it is very common for people to try to develop their own characters on the side. In my opinion, based on over 45 years in the industry, artists developing ideas on their free time or doing freelance work for other studios while working at one studio was tolerated because people in that field tend to move around quite a bit – it was just the nature of the business. Due to the general freelance nature of the industry, there was the motto "Don't Explain, Don't Complain, and Don't Be Late," meaning that as long as you got your work done, and didn't flaunt your other jobs, your employer would turn a blind eye to your freelance work. For example, I developed my own cartoon concept called the "Little People Who Lived Under the Roses," which began as a bedtime story for my children. I developed characters and a story line. While I did not try to use this commercially, I always felt that I had a right to do so. In my view, the studio did not own that idea or any of my related drawings. I can't remember where I worked when I developed this idea; it may have been Disney, Marvel, or Warner Brothers. Another specific example of that I can recall is that when I worked at Disney, I also did freelance story boards for Depatie-Freeling Studio. Also, in the animation industry, studios will often farm out work all over the world to freelancers as independent contractors and studios for hire.

22.    One of the side effects of any animated film is the creation of dolls, so often the doll is a by-product of an animated film. Dolls have also been used as a primary source of animated films. It would therefore not be surprising for people working in the doll and toy industries to also work concurrently on animation projects on their own.

23.    The Animation Guild often sponsors a "pitch night" where artists come in and pitch their ideas for animation films. Many of the artists making the pitch are probably working for other studios. The pitches often involve ideas the studios would not be interested in.

**B.    General Opinions Concerning Mr. Loetz's Report**

24.    Mr. Loetz concludes in his report that the "drawings are in essence the dolls in two dimensional form and the dolls are based on Carter Bryant's drawings." As an initial matter, it is my understanding that there is no dispute in this lawsuit that the sculptor and face painter for MGA used Mr. Bryant's sketches as a starting point and discussed the dolls with Mr. Bryant. Although the sketches may have been an inspiration for the dolls, in fact, the dolls differ significantly and substantially from the sketches to the extent that, in my opinion, the sketches cannot be considered to be "the dolls in two dimensional form." This could be for a number of reasons, such as the creative freedom of the sculptor and face painter, or artistic direction from them, or even guidance from Mr. Bryant that differed from his initial concept. Whatever the reason, it is clear that there was a dramatic evolution that occurred in between the initial sketches and the dolls. If the sketches were mine, and if the intent were to recreate my sketches in the dolls, I would reject the dolls as a faithful reproduction of the sketches because they are "off model."

25.    Without being critical of the sketches, in my opinion, one of the reasons that may underlie the differences between the sketches and the dolls is that Carter Bryant does not appear to have the skill set necessary to create three dimensional "control" drawings that a sculptor would need in order to faithfully execute the drawings in a doll. If an artist wanted control over a final doll product, he or she would have to be able to draw a "turn around" of the proposed doll that would show the doll from all angles. This type of drawing in three dimensions is a different realm than drawing in two dimensions and I have not seen any drawings indicating that Mr. Bryant was trained in that realm of drawing. Again, without being critical, one of my first impressions of Mr. Bryant's sketches was that they appear to have been drawn more like sketches for pitching a cartoon series instead a design for dolls. As mentioned in my qualifications section, in 1996, I worked at Rhythm & Hues Studios. While there, I worked on a project that involved preparing drawings for a sculpture of an anatomical figure. As part of that project, I drew many detailed three dimensional drawings for the sculptor from a variety of angles. Even though my drawings were much more detailed than those of Mr. Bryant's, the sculptor and I still had to go through several rounds of revisions before the sculptor was able to recreate my drawings the way I wanted. Since the sculptor in that instance was not able to initially recreate my detailed drawings, it is not surprising that a sculptor working off of Mr. Bryant's drawings would come up with a doll that is very different from the drawings.

26.    Since Mr. Bryant's sketches lack three dimensional information, I believe that if they were given to four different sculptors, it is likely that they would each develop significantly different dolls. In the process of making a doll from sketches like Mr. Bryant's, it would be necessary to change the sketches using an artistic process where the sculptor would add his or her own skill and changes. Even assuming a sculptor could execute these sketches, given the lack of continuity in proportions across Mr. Bryant's sketches (for example, the figures in the group shot are 3 heads high while the individual sketches are 4 ½ head high), as well as the lack of necessary three dimensional information, different sculptors working off the sketches would most likely come up with significantly different dolls. In my opinion, the people designing the sculpt for the doll in this instance were traditional doll makers who made the changes to the drawing proportions to make them "stock" doll proportions for the dolls.

EXHIBIT    *98*    **CONFIDENTIAL**

PAGE    1374

27.     Even if Mr. Bryant's sketches served as an inspiration for the doll sculptors and face painters, that fact alone does not mean that the dolls are "copies" of the sketches or that the sketches "are in essence" the dolls. In my opinion, artists are constantly absorbing what they see and they are inspired by a variety of sources even if they are not conscious of that inspiration. Almost all art is some form of "copying" other art because artists are constantly looking at the current influences, their surroundings, and studying art. In general, working from imagination, we are influenced by our experiences and the culture we are part of. This is often a subconscious rather than purposeful adaptation of theme and images we have experienced. Here, I am informed that Mr. Bryant has identified various influences for his sketches, including the Seventeen Magazine pages that I have reviewed. These influences are apparent in the sketches.

28.     Mr. Loetz compares Mr. Bryant's sketches with the dolls in the areas of proportion, posing, face design, and style. As discussed in more detail below, I disagree with Mr. Loetz's conclusions in each of these areas. Regarding the proportions, although there are some similarities that are generic human proportions or standard animation proportioning techniques, there are also notable differences in the body and face proportions. In terms of the poses, although I do not know what Mr. Loetz means by a "knowing urban, hip, attitude," it is my opinion that the dolls stripped of their clothes and the packaging have no attitude and they do not replicate the poses seen in Mr. Bryant's sketches. They are just basic dolls. In the area of face design, there are many differences between the eyes, lips, hair, and skin that make the faces on the dolls very different than those on the sketches. Here again, I am not sure what Mr. Loetz means by "urban funky styling" and "funky youthful freshness," but, in my opinion, the styles seen in the sketches and the dolls are simply what kids were wearing. That said, the differences between the clothes and accessories in the sketches and the dolls are significant and numerous enough to make me conclude that the dolls are not a faithful execution of the sketches.

## C.     Mr. Loetz's "Proportion" Opinions

29.     Mr. Loetz states in his report that "the measurements of body proportions is a key factor in distinguishing one design from another" and "the body proportions of Carter Bryant's sketches are virtually identical to the dolls." Although there are some similarities between the body proportions, which are necessary to make the dolls look human, there are also significant differences between the sketches and the dolls which I will discuss in detail below in connection with the specific exhibits used by Mr. Loetz. (All references in my report to "Exhibits" refer to the exhibits used by Mr. Loetz.) In my opinion, the alignments noted by Mr. Loetz are not a factor showing copying – most are standard human proportions and not simply the result of the sculptor "accurately executing" the sketches. For example, if the sculptor had in fact accurately followed the sketches, the dolls would have looked deformed due to the unnaturally shrunken rib cage, short arms, the lower legs being out of proportion lengthwise, etc. Important changes from the sketches were necessary to avoid this.

30.     Most of the similarities in the proportions noted by Mr. Loetz are well-known standard proportions that have long been used in the industry because they are either natural human proportions or because they are common animation techniques. For example, standard illustration terminology describes characters by how many "heads high" the character is. For example, as shown by the following chart from my text book "The Vilppu Drawing Manual" and

6

98

CONFIDENTIAL

Stephen Rogers Peck's "Atlas of Human Anatomy for the Artist" (1951), the basic artistic convention is that a human is drawn around 7 ½ or 8 heads high, whereas a baby is about 4 ½ heads high, and a teenager would be around 6 heads high.



The standard Barbie doll is about 7 ½ heads high, and thus suggests a relatively mature character.

31.      As also shown by these drawings, regardless of the actual height of a human being, there are some standard proportions that are the same across individuals.  For example, in humans, what Mr. Loetz terms the "crotch" – what is more properly termed the "pubic arch" – is located at about one-half of the human's height, and the wrist generally is at the same level as the pubic arch.  Further, the bottom of the knees is about half way between the trochanter (essentially the top of the femur) and the bottom of foot.

7

EXHIBIT ___98___          CONFIDENTIAL

PAGE ___1376___

32.    The human face also has standard proportions.  For example, the nose is located about half-way between the eye brow and the chin.  The distance between the nose and the pit of neck is the same as the distance between the nose and the top of head.  Human eyes are typically one eye distance apart, and the head is typically five eyes wide.  The following illustrations from my book "Head Drawing and Anatomy" shows the accepted norms for head and facial proportions:



Varying these standards will result in an abnormal, non-human looking head.

33.    In addition to standard human proportions, there are also common animation techniques that can been seen in Mr. Bryant's sketches.  For example, in animation, it is not uncommon to draw a 3 or 4 head high human.  A specific example is the following 3 head animation of Ralph Kramden gesturing to a 4 head Alice.

8

CONFIDENTIAL



34.     It is also well-known that you can easily vary the overall impression of a drawing by varying the head and eye size. Making the head and eyes larger makes the character appear more child-like, cuter, and generally more appealing. In contrast, making the head smaller gives the character a sense of power. For this reason, Michelangelo tended to make the heads in his figures smaller to give an impression of power.

35.     The use of enlarged feet is also a normal animation technique. An example of this is the well-known R. Crumb character:



The Steve Madden and Paris Blues ads used for inspiration by Mr. Bryant presented more contemporary versions of the use of large feet, here in the fashion context:

 

36.     The Bratz dolls are cartoon versions of teenagers. As can been seen in Mr. Bryant's sketches, he used standard animation proportions. For example, in the group sketches the figures are about 3 heads high, while the individual doll sketches are more in the range of 4 ½ heads high. Mr. Bryant also used an oversized head and oversized eyes, which again is common in animation. Because animation is so common and pervasive in our culture, the cartoon aspects of the doll are appealing to the Bratz audience. However, this appealing look does not necessarily give it attitude. As discussed below, it is the clothes and the packaging that give the dolls any attitude.

37.     As Mr. Loetz notes, small changes in features can make big differences in overall appearance. The reason for this is because the human eye quickly picks up deviations from the norm. This is well-illustrated by a proper comparison of the sketches and the dolls. The specific differences will be discussed below, but among other things the dolls have an overall different look and feel – simply stated, the dolls are much cuter and sweeter than the figures in the sketches.

10      EXHIBIT     *98*      CONFIDENTIAL

PAGE     1379

### 1.    Exhibit 37



38.    As an initial matter, it is my understanding that the Bryant sketch shown on the left side of Exhibit 37 was a drawing that Mr. Bryant did of a preliminary sculpt that had been prepared by a sculptor retained by MGA. It is thus not surprising that the drawing and the doll have some similarities. It is also my understanding, which is confirmed by a comparison of this drawing to the doll, that the preliminary sculpt was considerably altered before the doll design was finalized for the first generation Bratz dolls. Based on the overall differences, I would have been very disappointed if the doll shown in Exhibit 37 was presented to me as an embodiment of the drawing if the drawing were mine, and I would have rejected the doll based on the significant differences between the drawing and the doll.

39.    As discussed above, there are standard human proportions and if a doll or drawing does not have those proportions, they would look wrong. For example, there is nothing special about the fact that the sketches and dolls have the pubic arch in the standard half-height position. The wrists also fall at the standard location. The position of the knee is also in the standard position relative to the legs.

40.    In terms of proportions, the sketches and dolls have relatively large animation type heads. Although these heads are larger than normal adult proportions, they are fairly standard cartoon sized heads, so there is nothing particularly unique about the fact that the heads are large. As a result of the larger head, and to keep the pubic arch in its "normal" half-height location, the upper torso is compressed by necessity. However, within the torso the proportions are normal.

EXHIBIT _____ _____                    **CONFIDENTIAL**

PAGE _____ 1380

41.     In the drawing, the lower part of the leg is longer than the upper leg, whereas the legs on the doll are closer to normal proportions. This is a significant difference. The doll's natural proportions were probably favored by the sculpt maker so that the leg would look more natural when it bends. I note that Mr. Loetz has drawn the "bottom" line at the bottom of the shoe, whereas the more appropriate location would be the bottom of the foot.

42.     In terms of facial proportions, the sketches are generally faithful to the standard proportions for eye width and spacing. In contrast the dolls have significantly oversized eyes and deviate from this standard. Because the dolls eyes are oversized, there is an abnormally smaller space between the eyes on the doll than on the drawing. The drawing included in Exhibit 37 is closer to "normal" than doll.

43.     The following is a list of additional specific differences between the drawing and the doll: (i) the dolls legs are longer; (ii) the doll has a more "adult" profile; (iii) the doll's legs are straight up and down, while the legs in the drawing are not and have thicker thighs; (iv) the doll has a wider waist and rib cage relative to the hips and rib cage; (v) the doll has broader shoulders relative to the hips. None of these differences are noted by Mr. Loetz.

EXHIBIT    98

CONFIDENTIAL

PAGE    1381

2.    **Exhibit 2**



44.    Contrary to Mr. Loetz's opinion, I do not believe that this Exhibit shows that the dolls and sketches have an "identical nature." In my opinion, it is obvious that the drawing and doll are totally different and at best, the doll is a clumsy variation of the drawing. The doll simply does not follow the curves of the drawing.

45.    As a preliminary issue, in my opinion the "doll" shown in Exhibit 2 is not a photograph of a doll as Mr. Loetz states. It appears that Mr. Loetz "ghosted out" a photograph of a doll and drew a line around it. This ghosting out appears to mask some of the differences between the drawing and an actual doll and thus is inappropriate for use as a comparison. Also, this example is not a true illustration of what the doll looks like. The doll was manipulated to make it look like it does in this exhibit. For example, the doll as sold does not have "pigeon toes" as shown in this Exhibit.

46.    Beginning with a comparison of the upper torso, it is clear that the upper torsos are not "identical." The torso in the drawing is smaller in proportion to the doll's torso. Also, the torso of the doll is straight up whereas the torso of the drawing is tilted. Similarly, the neck of the doll is straight up whereas the neck of the drawing is tilted forward, which is more human-like. The shoulders also have the following differences: (i) the right shoulder is higher than the left in drawing, but the same height in sculpt; (ii) the shoulders on the drawing are smaller; (iii) the "shoulder to body proportions" are different; and (iv) the "shoulder to neck proportions" are different. Further, in the drawings, the width of the rib cage area is about one half of the size of the hips area, whereas in the doll, the width of the rib cage area and hips area are roughly the same size.

13    EXHIBIT ___98___    CONFIDENTIAL

PAGE ___1382___

47.     There are also significant differences in the arms, wrists and hands. In particular, the doll's arm has been rotated out and the action of the wrist has been turned up rather than down as is the case with the drawing. Also, the arms on the doll are longer. It is also clear that the doll's wrist is moving in the opposite direction to the wrist in the drawing. The hands are totally different, in that the angle of the right hand is exactly opposite in the doll and the drawing. Also, in the drawing the hand is angled down with fingers spread. In the sculpt, it is angled forward with fingers more together. In addition, the left hand in the drawing has the fingers spread, but this was changed in the doll. Basically, the doll is void of any gesture that Mr. Bryant drew in his sketch. I believe that that the only thing similar about the arms is that they are going out, but there is nothing unusual about that.

48.     The hips are different both in terms of size and thrust. The shoes are also different (the drawing has much bigger shoes).

49.     The pubic arch area also has the following differences: (i) the sculpt has a larger space between the thighs relative to the drawing; (ii) the drawing shows a more natural slope from the rib cage to the pelvis. These differences are masked by the misleading representation of the doll in this exhibit.

50.     In my opinion, the legs of the drawing have more character. Further the legs are in different proportions, in particular the lower leg in the drawing is longer than the upper leg. In terms of the calves, the doll's right calf appears backwards (high on the inside), whereas the drawing has calves that are more naturally proportioned. In addition, the drawing has thicker thighs and the knees are together, whereas the doll's legs are straight up and down like "telephone pole" legs. These are obviously not the same legs and I believe that ghosting the doll photograph hides some of the differences in the shape of the legs. The drawing's legs are just more shapely, though out of proportion.

51.     These changes give the drawing and doll different overall "feels." The figure in the drawing is pulling back, which throws the shoulders off and the various differences in the curves of the drawing versus the doll give them different "feels. The drawing has more "flow" and a more natural pose than the doll.

52.     To the extent there are similarities, they are mostly due to natural proportioning or the use of standard animation techniques. For example, the doll "roughly" follows the curves of the drawing, but only "very roughly." Both have "pigeon toes," but very different types of "pigeon toes" – in the drawing, the knees are touching and then the legs are out and the toes in whereas, in contrast, in the doll, the knees are apart and the legs are straighter with just the shoes turned in.

### D.    Mr. Loetz's "Posing" Opinions

53.      According to Mr. Loetz, "in Carter Bryant's sketches, the Bratz figures are posed in an unusual way, which denoted their knowing urban, hip, attitude." I am not sure what this means. Is Mr. Loetz referring to kids in New York, Los Angeles, or Tokyo? The phrase he uses does not mean anything to me. Although I'm not exactly sure what Mr. Loetz means by "knowing, urban, hip attitude," in my opinion the numerous differences between the sketches and the dolls results in a different overall impression in that the dolls are much sweeter in appearance than the sketches.

54.      Although the style differences between the sketches and the dolls will be discussed in more detail later, I would comment here that, in my opinion, the clothes and poses in the sketches simply represent what kids were wearing at the time. It looks like Mr. Bryant was just "copying" what he saw kids wearing. Also, whatever "attitude" is conveyed in Mr. Bryant's sketches, it is not represented in the dolls. Although the clothes and packaging provide the dolls with some attitude, the unclothed dolls do not have any attitude. I believe the clothes and packaging are factors in selling these dolls, which are the work of packaging and illustration professionals and are loosely based on the sketches. For example, I do not think anyone would actually look at the packaging design and think that they look like the dolls, except in a very general sense. The marketing and advertising is what provides the attitude. This involves a separate area of specialty of creative talent that was used to bring the dolls to market. The concept sketch is only the first of many steps to the cash register.

55.      Mr. Loetz admits that there are differences between the sketches and the dolls, which he attributes to the fact that the dolls are designed to have their clothes removed. He nonetheless states that the dolls match the poses in Mr. Bryant's sketches "to a remarkable degree." In my opinion, the poses in the sketches are significantly different from the poses of the dolls. If the sketches had been mine, and the task was to accurately reproduce the sketches in the dolls, I would have rejected the dolls as not faithfully executing the poses in my sketches based on the specific differences discussed below. In industry terms, the dolls would be considered "off-model." But, I would not expect that the dolls would actually reproduce accurately my conceptual drawing because in creating something you are looking for a flavor and the sculptor is focused on a different set of issues such as making a doll that can be played with. Designing a concept and making a doll are two different disciplines: one is the inspiration while the other is the actualization of what would work. While coming up with a concept is an individual effort, the creation of a doll is the product of a team effort.

56.      I also disagree with Mr. Loetz's use of the term "pigeon toes." I do not believe it is used accurately in his report. The term "pigeon toes" simply means that the toes point in, not that the knees and toes point in. In the sketches, the knees and feet both point in, which is simply an imitation of a gesture that girls sometimes make. I do not believe that Mr. Bryant intended for his sketches to be turned into "pigeon toed" dolls.

EXHIBIT ___98___    **CONFIDENTIAL**

PAGE ___1384___

57.     The dolls as packaged and sold do not have "pigeon toes" and I don't believe that the ability of the toes to point in or out amounts to a reproduction of the sketches.

1.     **Exhibit 5**



58.     In my opinion this doll does not "match the attitude and look of the concept" drawing because the doll simply is not a representation of the drawing.

59.     For example, the particular pose of the drawing has more attitude and gesture than the doll. That said, relative to other of Mr. Bryant's sketches, this drawing does not have much attitude. The drawing appears to be more of a stock drawing to show off the clothes. The face in the drawing does not have any expression. The doll has even less attitude, with fewer curves.

60.     There are significant differences in the posing of the body. In particular, the head in the drawing is tilted, whereas the doll's head is not. The drawing's head appears to be "pasted on." The left shoulder in the drawing is angled back and down, while the doll's shoulders are not. The upper torso in the drawing is considerably smaller than the pelvic area, which is not carried through in the doll. The pubic arch on the drawing is higher than that on the doll (the doll's is in the common one-half height position) and the drawing has hips that are slightly thrust to the right. However, even with the hips slightly thrust, in my opinion, there is no particular attitude in the hips on either the drawing or the doll. The other differences in general anatomy discussed with Exhibit 37 and, in particular, Exhibit 2 are also present here.

16     EXHIBIT ___98___     **CONFIDENTIAL**

PAGE ___1385___

61.     The facial features will be discussed in more detail in the "Face Design" section of my report, but there are many differences. One of the biggest differences is the hair. The drawing has spiky short hair with a barrette while the doll has long pulled-back hair with basic, not spiky bangs. I also note that the eyes are obviously larger on the doll with a particularly larger pupil-to-iris ratio on the doll. The doll has a high, wide-open pupil, whereas the drawing has a small pupil and larger iris. These are significant differences. A concept drawing is not a doll.

17   EXHIBIT _____ 9B

PAGE _____ 1386

CONFIDENTIAL

2.    **Exhibit 4**



62.    Because of the significant differences discussed below, I do not believe that the doll is a "faithful" execution of the drawing. If this were my drawing and someone gave me the doll as a proposed representation of that drawing, I would reject it based on the differences discussed below.

63.    Specific differences in the poses include the following: (i) the doll is posed in a standard or "stock" doll pose that is used with dolls that involve a change of clothes; (ii) the angle of the head is different and the chin is tilted under in the drawing; (iii) the neck is thinner in the drawing; (iv) there is nothing "knock-kneed" about the doll; (v) the hip thrust is different. Although both are shown with their toes pointed in, that is not particularly interesting, especially since the doll's shoes are made so that they can also point out in the opposite direction of the drawing. The packaging and promotional materials do not follow through with this idea. Again, in my opinion, Mr. Bryant probably did not intend for his sketches to be the starting point for "pigeon toed" dolls as Mr. Loetz suggests.

64.    In addition, the hands on the doll are angled up while the hands in the drawing are angled down, which, in my opinion, is a significant difference in the poses. Again, I believe that the angle of the arms and hands in the doll is common for dolls that are made to have wardrobe changes.

65.    In terms of other differences between the drawing and the dolls, I find that the shoulders are wider on the doll and a different proportion relative to the head.

18

EXHIBIT ___98___

PAGE ___1387___

**CONFIDENTIAL**

66.     I will discuss the differences in the facial features more in the "Face Design" section of my report, but I wanted to point out the following differences in facial features that can be seen in this exhibit: (i) the doll's eyes are larger; (ii) in the drawing, the eyes are more slanted; (iv) the ears are different (the drawing has more realistic ears and the ears are lower on the drawing); (v) the lips are different shapes.  The hair is also totally different in that: (i) it is a different color, (ii) the bangs are lower on doll, (iii) there is a much larger space between the eye brows and bangs in the drawing, (iv) the hair ties are different colors, (iv) the hair in the drawing comes down in front of the ears.

67.     The clothes here are very different.  They are tighter fitting in the drawing, in different colors, there is no mid-riff showing in the drawing and the shoes are also different.

19

EXHIBIT _____ 98

PAGE _____ 1388

CONFIDENTIAL

3.    **Exhibit 10**



68.    I strongly disagree with Mr. Loetz's opinion that "the particular upturned hands at the wrists evident in Carter Bryant's sketches was faithfully executed in the three dimensional Bratz dolls." As is obvious from Exhibit 10, the sculptor angled the hands in the opposite direction from the direction shown in the sketches. The doll hands are angled up while the drawing depicts hands that are angled down.

20

EXHIBIT ____ 98

PAGE ___ 1389

CONFIDENTIAL

4.    **Exhibit 7**



69.    The anatomical differences here are the same as already discussed.  Also, the poses are quite different (the arms, the hips, the legs), with many of the differences partially obscured by the clothes.

70.    The fashion differences are discussed in more detail in the "Style" section of my report but I wanted to mention here that the costuming on these is totally different.  For example, they have different hats; the drawing has a puffy vest over a stripped shirt, while the doll has a shirt with just an orange bodice; the doll has a convertible skirt, that has lower, orange accented side pockets.  The backpacks are also different in terms of style, color, and the number of legs on the "rabbit," which is placed high on the drawing backpack and low on the doll.  The "rabbit" on the drawing only has two feet while the rabbit shown with the doll has four.

21    EXHIBIT _98_

    PAGE_ 1390

CONFIDENTIAL

5.   **Exhibit 9**



71.   There are no similarities between the sketch in this exhibit and the doll other than both appear to include removable shoes.  This exhibit also shows that Mr. Bryant's concept included the ability to remove the back of the doll's head, and this suggestion was not followed through in the dolls.

72.   The clothing differences in this exhibit will be discussed in more detail in the "Style" section of my report, but I wanted to point out here that this exhibit illustrates that the denim skirt on this doll can convert from a long skirt to a miniskirt.  To my knowledge, none of Mr. Bryant's sketches depict a convertible skirt, and the doll was clearly and significantly changed from the sketches.

22

EXHIBIT _98_

PAGE _1391_

CONFIDENTIAL

6.     **Exhibit 16**



73.     The poses in Exhibit 16 are very different and there are no pose similarities of note. Basically, the sketches have more character and flow, while the dolls are just basic dolls.

74.     The fashion differences, which will be discussed more in the "Style" section of my report, are remarkable. For example, in my opinion the doll maker was smart to remove what appears to be some sort of devil creature drawn on the shirt in the sketch. Also, the clothing on the doll is much more "frilly."

EXHIBIT     *98*

**CONFIDENTIAL**

PAGE     *1392*

### E. Mr. Loetz's "Face Design" Opinions

75.     I disagree with Mr. Loetz's opinion that the dolls are a "faithful execution" of the face design in Carter Bryant's sketches. I agree with Mr. Loetz that changes to the facial features change the character. For example, if you move a nose off center on a face, it will change the character of that face. This is not, however, a justification for saying that the face design in the drawing and the doll are the same. If anything, the importance of facial features makes the significant differences between the facial features shown in the sketches and the dolls' facial features more remarkable. In my opinion, the facial features simply are not the same. The dolls themselves do not have "attitude." The attitude comes from the clothes, the art on the packaging, and other things.

76.     As to Mr. Loetz's comments on the proportional sizing of the face and feature placement on the face, it appears that Mr. Bryant simply used similar proportions of a baby's head to make it cute. As discussed above, this is a common and normal technique. That's just what illustrators do.

77.     I agree with Mr. Loetz that the distance between the eyes is the same. I must point out, however, that this distance had better be the same, since it is the same in all humans and changing this space will make the character look abnormal. As noted, it is well-known that the normal distance between human eyes is about one eye distance. Here, although the distance between the eyes in the sketches and dolls are about the same, the eyes on the dolls are significantly wider than the eyes in the drawing which results in the space between the eyes on the dolls actually being less than the normal one eye distance.

78.     There are other similarities in face proportions, but again these are normal. The human face has many consistent proportions and the fact that these are similar is due to the fact that they are both trying to represent a human face. As to face similarities, I think the shape is very generic and that many dolls would have a similar face shape.

EXHIBIT _____ 98 _____ **CONFIDENTIAL**

PAGE _____ 1393

1.    **Exhibit 6**



79.    I specifically disagree with Mr. Loetz's opinion that this "side-by-side comparison"
shows that the features "fall on the same horizontal plane." Among other things, the lips, ears,
eye lashes, and the bottom of eye brow (and other aspects of the eye brow) do not line up.
However, even if they did line up, as discussed, the general lining up of facial features is normal
and natural. For example, if there were significant differences in how high the nose was on the
face, then the human eye would quickly detect that something was "wrong." The differences
that do exist give the doll more of a sweet look, not the "urban" or "hip" look suggested by Mr.
Loetz (whatever that means).

80.    This exhibit also clearly shows that there are big differences between the eyes. For
example, the doll's eyes are considerably larger than those on the drawing. Further, the doll's
iris is considerably larger than the iris shown in the drawing, and the doll's iris is considerably
larger in proportion to the pupil. The "highlight" put in the pupil is larger in the drawing than in
the doll and it is also in a different location. The doll's eyes are also a different shape and lack
the tear duct shown on the drawing. The eye lashes in the drawing are thicker and closer
together. The drawing also has a strong band of dark eye shadow near the upper eye crease,
whereas in the doll this is just a line.

81.    The eyebrow shape and spacing is also different. In the drawing, the inner corner of the
eyebrow comes down lower towards the nose than in the drawing. The arch of the eyebrow has
a more angular peak on the drawing.

82.    The ears are a totally different design and they are in different locations.

83.    The lips are more real on the doll and very different than those in the drawing. Among
other things, the drawing does not have the "dip" in the upper lip that is present on the doll. The
drawing has a wider, fuller, more rounded lower lip. The upper lip in the drawing is

CONFIDENTIAL

proportionally larger than in the doll, and the upper lip line on the drawing is therefore wider relative to the lower lip whereas they are more equal on the doll.

EXHIBIT _____ 918

CONFIDENTIAL

PAGE ___ 1395

2.    **Exhibits 8 & 21**



84.    In my opinion the differences in facial features shown in these exhibits are so significant that the doll is simply not the same character as the drawing. In particular, the skin tone is different and the blushing is different. Regarding Mr. Loetz's comment concerning the placement of the rouge, it is just common to put rouge on cheeks, so that is not unusual. The hair is also very different, with dreadlocks on the drawing and straight hair on the doll.

85.    The difference between the eyes, eyebrows and lips are numerous and will be discussed in detail in my discussion of Exhibit 22 below.

86.    It is difficult for me to see what Mr. Loetz is trying to convey with the green lines. There is nothing particular that stands out to me with those lines, which do not match the faces very well and tend to mask differences between the drawing and the doll.

EXHIBIT _____98_____          **CONFIDENTIAL**

PAGE _____1396_____

3.　　**Exhibits 17 & 18**





87.　　The drawing and doll shown in these exhibits are not at all alike and I do not see them as being the same doll.   I agree with Mr. Loetz that both the drawing and doll have "moles,"

28   EXHIBIT ___98___

CONFIDENTIAL

PAGE ___1397___

4. **Exhibits 23 and 24**



Hairstyle:
Side parted hair with side swept long bangs



Face Shape

3 Eyelashes
&
Eyeliner Application

Eye Shape

Eye Angle

Lip Shape

Exhibit 24

30 EXHIBIT 98

CONFIDENTIAL

PAGE 1399

95.     In an overall impression, I feel that the drawing has more "spark" and "life" to it, whereas the doll is more generic looking.  I think the drawing is better and more appealing.

96.     I also believe that the hair is a significant part of this design and there are major differences here.  Although, they both have blond hair in "updos," the hair styles have very different feels.  It is my understanding from looking at a sample of a Bratz doll in packaging, that the doll's hair, as sold, goes straight down the doll's back, which is different from what is shown here with the doll's hair in an "updo."  The doll's updo was apparently the result of a re-styling in an attempt to match the hairstyle in the drawing.  However, the drawing has hair that is looser and more flowing.  The doll's hair is pulled tighter.  The doll has a part, while the drawing has an "overlap" (I am not sure how this "overlap" would actually be implemented).  The drawing has a tiara.  The drawing has loose curls coming down on both sides.  The drawing has hair that comes down closer to the eye brow.  The curls on top of the drawing are "looser."

97.     There are also big differences between the eyebrows: (i) the drawing's eyebrows go up to a "corner" in the center, whereas the doll's eyebrows are more rounded; (ii) the drawing has a thicker brow toward the inner edge and goes narrow, but the doll's eyebrows are more equal.

98.     The eye lashes are also different in that the lashes on the drawing are heavier and on the doll they are more refined.  Although both include three top lashes, the look is different in terms of the thickness, angle, and spacing of the three clumps.  The three eye lash design in the drawing was not followed through in the doll, which changed the look.  Also, Mr. Loetz did not draw a green line on the lower lashes, which are very different: (i) the drawing has two lower lashes and the doll has three; (ii) the three lower lashes on the doll are positioned closer to and touch the top lashes at the edge of the eye while there is a gap between the top and bottom lashes on the drawing.

99.     The eye make-up and eye liner is also different.  The eyeliner on the drawing is thinner on the inner part and gets thicker towards the outer edge.  The eyeliner on the doll is more equal in thickness.

100.    The eyes themselves include a number of significant differences: (i) the eyes in the sketches have a more rounded shape and the eyes on the doll are larger; (ii) there is more white under the iris on the doll; (iii) the pupils are larger on the doll; (iv) the eye color is different.

101.    The lips are very dissimilar: (i) the doll's lips are just a completely different kind of lip; (ii) the drawing lips have an opening between the lips; (iii) the drawing lips have a more square shaped bottom lip: (iv) the drawing lips have more of a dip in the middle of the top lip.

102.    Also, the neck is thinner in the drawing.

103.    The accessories that were drawn by Mr. Bryant, including the tiara, earrings and a necklace, are not represented at all in the doll.

EXHIBIT _____   CONFIDENTIAL

PAGE ____1400

5.    **Exhibit 19**



Hair Bangs

Face Shape

Distance Between Eyebrows

Distance Between Eyes

Cheek Color Application

Width & Height

Exhibit 19

104.    Here again, I think that the doll is much sweeter looking than the drawing.  Directly contrary to Mr. Loetz's opinion, I would have "rejected" the doll as a "faithful execution" of the drawing.

105.    Although Mr. Loetz states that this Exhibit illustrates the similarities in hair styles between the sketches and the dolls, there are a number of significant hair differences: (i) the bangs on the doll are lower relative to the brows, not the "same length"; (ii) the bangs are choppier in the drawing; (iii) the hair colors are different.

106.    The overall shape of the face is different in that the face of the doll is fuller.

107.    In my opinion, the eyes are dramatically different: (i) they are different colors; (ii) they are different shapes; (iii) the drawing has a tear duct; (iv) the eyes are more slanted in the drawing, which tend to give a different ethnic look; (v) the eye liner is very different both in color and in shape; (vi) the eyes are larger on doll.

108.    The eye lashes are also different.  The doll has two lower lashes while the drawing does not have any.  The upper lashes are spaced differently and are different lengths on the doll.  On the drawing all of the top lashes are close to the outer part of the eye, but the doll has one short top lash near the middle of the eye and larger lashes towards the outside.

32    EXHIBIT    98    **CONFIDENTIAL**

PAGE    1401

109.    The lips are also very different.  The shape of the lips is different (the lower lip on the drawing is smaller relative to the upper lip).  The lips are different colors.  The drawing has lips that are more square across the bottom and the doll has more curved bottom lip.

110.    There are also differences in the cheek color and application.  On the drawing it looks like Mr. Bryant just used tone to create a sense of volume, which also can be viewed as rouge. The rouge on the drawing is much darker and there is very little rouge on the doll.

111.    The ears are also different.  The ear is higher on doll (on the drawing the ear is at the bottom of the nose).  The ears are smaller on the drawing.

33

EXHIBIT    _98_

PAGE    _1402_

CONFIDENTIAL

6.   **Exhibits 20 & 22**



112.   As an initial impression, clearly the skin tones are very different between the sketches and the dolls.

113.   The eye brow of the doll in Exhibit 20 is hidden in the bangs, but not on the drawing. The general thickness of the eyebrow in the drawing starts with a squarish end near the nose while the doll has more of a tapered starting line.  The big difference is not top of eyelid to brow, but distance from bottom of upper eyelid to the bottom of lower eyelid; the opening of the eye on the doll is considerably larger.

114.   I also see big differences in the eyes.  As to Mr. Loetz's comment concerning the "almond shaped" eyes, I believe that an almond shape eye is a generic means of portraying ethnicity, but here the sketches and dolls do not have the same shape eyes.  The slant is nothing original, but just a normal slant to the eye.  Additional differences in the eyes include: (i) the pupils in doll eyes are bigger; (ii) there is white in the iris under the doll's eye in Exhibit 22; (iii) the eyes are not the same "almond shape" – the eye in the drawing is narrower and smaller and the doll eye shape is more rounded; (iv) the drawing has a tear duct, but there is no tear duct on

EXHIBIT    98

**CONFIDENTIAL**

PAGE    1403

the doll. Although the eye makeup is on the eyes in both the sketches and the dolls, I believe this placement is normal for eye makeup.

115.  The eye lashes are also different. In the drawing they go from thinner on the inner edge to thicker; the doll's lash is a more consistent thickness. Here again the doll has two lower lashes while the drawing does not have any. The upper lashes are spaced differently and are different lengths on the doll. On the drawing all of the top lashes are close to the outer part of the eye, but the doll has one short top lash near the middle of the eye and larger lashes towards the outside.

116.  The lips are also different:  (i) the drawing's lips have an opening between the lips; (ii) the drawing's lips have a more square shaped bottom lip; (iii) the drawing's lips have more of a dip in the middle of the top (although it appears on Exhibit 22 that the green line is hiding the dip in the upper lip); (iv) they have different lipstick and the doll's lips are glossy not matte; and (v) the doll does not have the strong flare at the ends of the lips that are present on the drawing.

117.  You can also see how much lower the bangs come down on the doll in Exhibit 20 to actually cover the eye brow.

118.  In the drawing, the eye makeup is more extreme than on the doll and almost linear. The eye shadow is softer on the doll. In the doll you have white added to the upper lid, which is not present in the drawing.

EXHIBIT 98
PAGE 1404
CONFIDENTIAL

F.     **Mr. Loetz's "Style" Opinions**

119.    Mr. Loetz admits that he believes that the clothes in Mr. Bryant's sketches "were more colorful, more flared, more decorative in patterns, and more revealing." However, he incorrectly states that the doll fashion and style were "faithfully executed from Carter Bryant's concept sketches <u>in detail</u>" because both the doll and the sketches have an "attitude of funky urban freshness." Although I am not exactly sure what Mr. Loetz means by "funky urban freshness," I believe that the fashion similarities claimed by Mr. Loetz are simply the type of styles being worn by kids at that time. In addition to differences noted elsewhere in my report, the following section discusses certain of the specific differences between the sketches and the dolls and illustrates significant differences between the clothes and accessories seen in Mr. Bryant's sketches and the doll clothes and accessories.

1.     **Exhibit 16**



120.    I do not see any similarities between the graphics on the shirts. The graphic on the doll's shirt looks like a kitten, while the graphic on the shirt in the drawing is clearly not a kitten as Mr. Loetz opines. To me, the graphic in the drawing looks like some type of fanciful "devil" creature. The only "similarity" is that both shirts include something with eyes. I also note that, unlike the doll's shirt, the shirt in the drawing is not a cropped shirt. The doll also has a two pieced long sleeved layered shirt.

36

EXHIBIT   98
PAGE   1405
CONFIDENTIAL

2.   **Exhibit 13**



121.   Other than the fact that both include the word "angel," there are no similarities whatsoever between these designs. The shirt design on the dolls looks like a "generational shift," meaning that as the doll went through the various stages with various inputs, the graphic was probably changed by different people to "see what works." I also note that the doll shirt has a halo, the script of the lettering is different, and the wings were incorporated into the script.

EXHIBIT            98            CONFIDENTIAL

PAGE            1406

3.    **Exhibit 27**



122.    I consider these items to be simply types of children's backpacks.  Specific differences I note in the top pair include: (i) different logo placement, (ii) the drawing has two side pockets and there are none on doll backpack; (iii) the front pocket on drawing looks like it has two compartments; (iv) different colors; (v) the rabbits are different.

123.    Specific differences I see on the middle pair include:  (i) different patterns; (ii) the doll bag looks like a thicker "padded" fabric; (iii) they are "just basically what you would find in a clothing store."

EXHIBIT _____ 98 _____        **CONFIDENTIAL**

PAGE _____ 1407 _____

124.    I think that the bottom pair have no similarity at all. There is no logo on the doll bag. There are no stars on the doll bag. The doll bag has a more sophisticated look. In my opinion, no one would think these are similar.

EXHIBIT 9B
PAGE 1408
CONFIDENTIAL

4.     **Exhibit 25**



125.    These designs are nothing alike.  If you saw these on a hanger in a store, you would not consider them to be the same skirt.  For example, there is a "ruffle" added to the bottom of the doll skirt.  There are also numerous differences between the fabric "strips" used in the two designs: (i) the skirt in the drawing has the strip of fabric at the bottom and it is on the top of the doll skirt; (ii) the drawing shows a floral print and the doll has a paisley print; (iii) the colors used for the two prints are different – the drawing is mainly yellow with some red and green, but the doll is purples, blues, and pinks; (iv) the strip height is not the same as can be seen by Loetz's green lines.

126.    Other differences include the following: (i) the doll does not show a bare midriff; (ii) the drawing shows a zipper at the top of the skirt, but the doll's skirt is more of an elastic closure; (iii) the drawing has more of a look of Levi's cut off with fabric added to bottom; (iv) the denim color is different; (v) the waist on the drawing is narrower and more feminine.

5.    **Exhibit 28**



Hat Design

127.    Contrary to Mr. Loetz's opinion, the hats have a different look and are a totally different design: (i) the drawing hat is more of a Tibetan style with the hat covering the ears; (ii) the hats are different colors; (iii) the pompons are different colors and different sizes; (iv) the hat in the drawing has stripes at top and bottom, but there are no stripes on doll hat; (v) the doll hat does not have pompons by the ears; (vi) the doll's hat is basically just a pull-on hat. If I had designed the hat in the drawing and then was shown the hat on the dolls my reaction would have been: "Hey! What happened!"

EXHIBIT    98

PAGE    1410

CONFIDENTIAL

6.    **Exhibit 30**



Striped Shirt Design & Colors

128.    I see numerous significant differences between the sketch and doll in this exhibit, including that: (i) the drawing does not show a bare mid-riff; (ii) the drawing has a puffy vest over a sweater, whereas the doll has a one-piece orange sweater with stripped sleeves; (iii) the stripes are different.

42

EXHIBIT 98

PAGE 1411

CONFIDENTIAL

7.    **Exhibit 29**



Denim Skirt Style

129.    Contrary to Mr. Loetz's opinion, the skirts are very different: (i) the skirt on the doll is convertible into a mini-skirt; (ii) the skirt on the doll has large side pockets down low, but the skirt in drawing has smaller side pockets up high; (iii) the pockets on the doll skirt have orange accents; (iv) the doll skirt has orange stitching.  Although overlooked by Mr. Loetz, conversion of the doll's skirt is shown in his Exhibit 9 set forth above.

EXHIBIT    *98*        **CONFIDENTIAL**

PAGE    *1412*

8.    **Exhibit 4**



130.    Regarding the fashion similarities claimed by Mr. Loetz, in my view these were simply the styles that kids were wearing.  Also, as to this exhibit, I do not think the clothes are at all similar.

CONFIDENTIAL

9.    **Exhibits 5, 15 and 26**

EXHIBIT _____

PAGE _____

CONFIDENTIAL



131.    Specific differences in connection with the shoes include different colors, different design, different style, and the laces are actually tied on the doll. As a father of five children, I would find the untied laces to be more normal. Differences between the pants include different colors, different stripes, and the doll pants do not have the same "leg warmer" type look with the fabric changing at the bottom on the pants.

46      EXHIBIT _____98_____      **CONFIDENTIAL**

PAGE _____1415_____

**10.** **Exhibit 9**



132.    This exhibit involves very different kinds of shoes:  (i) the shoes in the drawing are clunky hiking boots, but the shoes on the doll are tennis shoes (the middle doll shoe looks much like the shoes in the Paris Blues ad discussed above); (ii) the shoes in the drawing are larger; (iii) different colored shoes; (iv) the laces are undone in the drawing.  The shoe differences provide for a "completely different tone."

133.    I also note that the shoes and clothes are different (as discussed previously) and that the dolls do not have removable hair (as also discussed previously).

EXHIBIT _____ 98

PAGE _____ 1416

CONFIDENTIAL

11.    **Exhibit 3**



134.    Mr. Loctz states that Exhibit 3 shows the "oversized proportional nature of the shoes/feet are closely followed from the drawings to the dolls." As an initial matter, there is nothing unique about "oversized shoes/feet." As shown previously, this was part of the style at the time and many people were using oversize shoes. They have also been used many times in the past. Also, the shoes in the drawing on the left are not nearly as large relative to the body as those in the drawing on the right.

135.    As previously stated, the proportions of the human body are just "generic" and I believe that it is inappropriate to draw conclusions based on the similar proportions in the drawing and doll.

136.    Finally, I note the following differences: (i) the drawing on the right has a triangle shaped hip region, while the doll has a box shaped hip region; (ii) the doll's right arm can not do the same pose as the drawing – the doll's arm is rotated up and the drawing arm is rotated down.

EXHIBIT _____ 98 _____ **CONFIDENTIAL**

PAGE _____ 1417

### G.      The Group Sketches

#### 1.      Exhibit 32



137.    I believe that the drawing used with the packaging of the first generation dolls, which is shown above in the drawing on the left, is significantly different than Mr. Bryant's group sketch, shown above in the drawing on the right. Among other things: (i) the packaging drawing shows all of the dolls with very long hair, which is nothing like Mr. Bryant's drawing; (ii) the packaging drawing shows dolls that are very skinny, which is also unlike Mr. Bryant's drawing; (iii) the head size on the packaging drawing is bigger than Mr. Bryant's drawing in proportion to body – in Mr. Bryant's drawing the figures are all four head figures, whereas the packaging art figures are all three head figures, which is a significant difference.  None of these sketches includes the "pigeon toe" look that was discussed by Mr. Loetz as being important.  Aside from some similarity in poses, the packaging and sketches involve very different characters.

138.    These differences are also shown in Exhibits 31 and Exhibits 33 through 36.  In the following sections I will note additional significant differences between the specific characters in Mr. Bryant's drawing and in the packaging drawing.

EXHIBIT   98   **CONFIDENTIAL**

PAGE   1418

2.    **Exhibit 33**



139.    As a preliminary matter, it is important to note that the feet shown in these sketches are not "pigeon toed." Rather, as shown by Exhibit 32, they are feet from two different dolls.

140.    Basically these are clearly just different sketches, and the overall look on the packaging (left) is sweeter. In addition to the differences discussed above, the following differences can be seen here: (i) they have very different costumes; (ii) there is a dramatic difference of hair; (iii) the packaging shows a unique hat that does not appear in any of Mr. Bryant's sketches relied upon by Mr. Loetz; (iv) the eyes are just much nicer on the packaging; (v) the lips are different on the packaging, in particular the upper lip is different and you see less of the teeth on the packaging; (vi) the actual tilt of the head appears to be different.

EXHIBIT 98

PAGE 149

**CONFIDENTIAL**

3.    **Exhibit 34**



141.    A few of the differences here include: (i) different hats; (ii) the hair is very different in terms of shape and mass; (iii) the facial features such as eyes, lips, and skin tone are different; (iv) Mr. Bryant's drawing has a hand in pocket, as opposed to both arms up; (v) the drawing shows a puffy vest over a stripped shirt while the package has a mid-riff showing orange top; (vi) the skirt is a different color and style; and (vii) the shoes are a totally different style.

4.    **Exhibit 35**



142.    I would view these as two models having the same pose, but being completely different people. The differences here include: (i) totally different concept of the heads; (ii) the packaging has a hair band (iii) different hair colors and styles; (iv) the packaging drawing has considerably larger lips and eyes; (v) the packaging drawing shows a very skinny right arm, while Mr. Bryant's drawing has more volume and a sweater; (vi) completely different pants and top.

EXHIBIT _____ 98_____    **CONFIDENTIAL**

PAGE _____ 1421_____

5.   **Exhibit 36**



In my opinion, you would never look at these as the same character. They have completely different hair colors and styles, and the packaging has a head covering. The facial features are clearly different. Additionally, the clothes are not similar at all. Mr. Bryant's drawing has a jacket, an ornamental "dog tag" and baggy pants while the packaging has a tube top and bell bottoms. The shoes are completely different styles and colors. Again, these are just not the same character.

7.   **Later Packaging Art**

As noted, I reviewed the drawings that were attached as exhibits to Debbie Middleton's Expert Report. In my opinion, the later packaging art used by MGA was even more different from Mr. Bryant's sketches than the first generation art included with Mr. Loetz's report. Everything about the later drawings is different, and they appear to be more rendered, finished, presentation type drawings. These drawings also incorporate a background, which is a significant difference.

Date:  March 14, 2008

By: _Glenn V. Vilppu_

53

EXHIBIT ___98___   **CONFIDENTIAL**

PAGE ___1422___

**EXHIBIT 99**

# MGA Entertainment, Inc. v. Mattel, Inc., et al.

Case No. CV 05-02727

Expert Report of Peter S. Menell

February 11, 2008

CONFIDENTIAL – ATTORNEYS EYES ONLY

EXHIBIT _____ 99

PAGE _____ 1423

*Confidential*

# EXPERT REPORT OF PROFESSOR PETER S. MENELL

## Introduction

1. My name is Peter S. Menell. I am a Professor of Law at the University of California at Berkeley School of Law. I also serve as Executive Director of the Berkeley Center for Law and Technology. This section of the Report summarizes my academic training, professional experience, scholarly writings, and professional activities relating to the issues for which my analysis and opinions have been requested in this matter. My qualifications are more fully set forth in my curriculum vitae, which is attached as Appendix A to this Report.

2. *Academic Training.* My educational training includes an S.B. from the Massachusetts Institute of Technology, a J.D. from Harvard Law School, and a Ph.D. (Economics) from Stanford University. I developed a strong interest in intellectual property while in law school. I wrote my third year paper, a requirement for graduation from Harvard Law School, under the guidance of then Judge, now Supreme Court Justice, Stephen G. Breyer on intellectual property protection for computer software. That paper, "Tailoring Legal Protection for Computer Software," was awarded first prize for Harvard Law School in the Nathan Burkan Memorial Competition, a leading competition for copyright scholarship. The paper was later published in the *Stanford Law Review*, a leading scholarly publication.

3. *Professional Experience.* Following law school, I spent a year clerking for the Honorable Jon O. Newman of the U.S. Court of Appeals for the Second Circuit. Judge Newman is particularly noted for his intellectual property jurisprudence and I had the opportunity to work on several important copyright and trademark matters during that year. See, e.g., *Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir. 1987); *Stormy Clime Ltd. v. ProGroup, Inc.*, 809 F.2d 971 (2d Cir. 1987). Fifteen years after the clerkship, I had the privilege to contribute an article honoring Judge Newman's copyright jurisprudence for a symposium celebrating his first 30 years on the federal bench. See Peter S. Menell, Envisioning Copyright Law's Digital Future, 46 *New York Law School Law Review* 63 (2003).

4. Following my clerkship, I went directly into legal academia, where I have remained throughout my career. I joined the faculty at the University of California at Berkeley School of Law in 1990 and was promoted to full professor in 1994. Apart from a year-long visit to teach at Stanford Law School, a Winter term visit to teach at Harvard Law School, and several shorter visits elsewhere (Swiss Federal Institute of Technology (ETH) (annual visits to lecture on U.S. intellectual property law since 1997) and University of Toronto (Distinguished Visiting Professor to teach an intensive course on U.S. intellectual property law)), I have been based at the UC-Berkeley School of Law, where my principal activities have been legal scholarship (focusing principally on intellectual property law and policy), teaching (focusing principally in the areas of intellectual property law and entertainment law over the past decade), and developing the Berkeley Center for Law and Technology (an intellectual property-focused

-1-

EXHIBIT 99
PAGE 1424

CONFIDENTIAL –
ATTORNEYS EYES ONLY

research and public policy institute). I have also devoted substantial time and energy to educating judges about intellectual property law, worked directly on public policy relating to intellectual property, lectured widely on intellectual property law issues, and consulted on a wide variety of intellectual property matters.

5. *Legal Scholarship.* Much of my academic career has focused on the study of intellectual property law and policy. I have authored or co-authored more than two dozen articles on many aspects of the field. I have written nearly 20 articles relating to copyright law. I wrote the chapter of Nimmer on Copyright relating to bankruptcy treatment of copyrights. In addition, I am co-author of two leading texts on intellectual property law: Intellectual Property in the New Technological Age (Aspen Law & Business, 1st ed. 1997, 2nd ed. 2000, 3rd ed. 2003, 4th ed. 2006, 4th rev. ed., 2007) and Software and Internet Law (Aspen Law & Business, 1st ed. 2000, 2nd ed. 2003, 3rd ed. 2006). Both of these volumes have been the best selling texts in their field since their first edition. I am currently under contract to write or edit four additional books in the fields of intellectual property and entertainment law. In conjunction with the Federal Judicial Center, I am also co-authoring a manual for judges on patent case management. In addition, I founded and have supervised publication of the Annual Review of Law & Technology, a compendium of student-authored comments on the leading developments in intellectual property, antitrust, and cyberlaw published by the *Berkeley Technology Law Journal.* The 11th edition of the Annual Review of Law & Technology is scheduled for publication in May 2008.

6. *Intellectual Property Teaching at UC-Berkeley School of Law.* For the past decade, I have taught an annual survey course on intellectual property law, a writing workshop on law and technology (that results in the Annual Review of Law & Technology), and a course on intellectual property in the entertainment industries. I have also organized a workshop on Intellectual Property Scholarship.

7. *Other Intellectual Property Teaching.* For the past decade, I have taught annual intensive courses on U.S. intellectual property law at the ETH Zürich (Eidgenössische Technische Hochschule Zürich; also known as the Swiss Federal Institute of Technology), one of the leading European technology universities. I have also lectured frequently at Congresses for the European Intellectual Property Institutes Network (EIPIN), Seoul National University's Center for Law & Technology, and Tel Aviv University. I have also organized most of the Federal Judicial Center's intellectual property programs since 1997, including an annual three-day intensive program held at UC-Berkeley in the spring. I discuss these courses in more detail below in the section on "Judicial Education."

8. *Berkeley Center for Law and Technology.* Upon arriving at the University of California at Berkeley in 1990, I began developing an institute for the study of intellectual property law. That vision came to life in 1995 with the founding of the Berkeley Center for Law & Technology (BCLT). BCLT's mission is "to foster the beneficial and ethical advancement of technology by promoting the understanding and guiding the development of intellectual property and related fields of law and policy as they intersect with business, science, and technology." I have served as one of BCLT's directors since its founding and also managed the daily operations of BCLT as

-2-

EXHIBIT ___99___

PAGE ___1425___

CONFIDENTIAL –
ATTORNEYS EYES ONLY

Executive Director from 2000-05. BCLT has developed a wide range of research, education, and public policy programs. It has built an unparalleled academic program on intellectual property, enabling UC-Berkeley to garner U.S. News & World Reports' top ranking for intellectual property programs for the past decade. BCLT has sponsored leading conferences on salient public policy issues at the intersection of law and technology, including software innovation, new business models for transacting intellectual property on the Internet, digital rights management, electronic commerce, the intersection of intellectual property and antitrust, and patent reform. BCLT has also established affiliations with other intellectual property and technology institutes around the world.

9. *Judicial Education.* In 1997, I was invited by the Federal Judicial Center to organize a three day conference for 40 federal judges entitled "The Landscape of Intellectual Property Law." The program was among the highest rated educational programs ever offered by the FJC. I have since organized more than two dozen educational programs on intellectual property attended by more than 800 federal jurists. The FJC has made the BCLT/FJC three day program one of its annual activities. The 10th Annual Conference – now entitled "Intellectual Property in the New Technological Age" – is scheduled for May 2008. I am currently working on a patent case management judicial guide that the Federal Judicial Center will be publishing in 2008. David Nimmer and I are in the formative stages of developing an analogous judicial guide for copyright case management.

10. *Public Policy.* Throughout the past two decades, I have worked to guide jurists and policy makers in developing and applying intellectual property law. I served as an adviser to the Office of Technology Assessment, a research arm of Congress, on two important studies: Copyright and Home Copying: Technology Challenges Law (Oct. 1989) and Finding a Balance: Computer Software, Intellectual Property and the Challenge of Technological Change (1992). I have also co-authored amicus briefs in several leading copyright cases. See Karjala & Menell, Applying Fundamental Copyright Principles in Lotus Development Corp. v. Borland International Inc., 10 *High Technology Law Journal* 177 (1995); Sega Enterprises Ltd. v. Accolade, Inc., Civil Action No. 92-15655 (N.D. Cal.), reprinted in 33 *Jurimetrics* 147 (Fall 1992); Indirect Copyright Liability: A Re-examination of Sony's Staple Article of Commerce Doctrine, 20 *Berkeley Technology Law Journal* 511 (2005). I have advised the federal and several state governments on various intellectual property matters. I serve as a consultant to the State governments on intellectual property and antitrust issues in the ongoing litigation between the U.S. Department of Justice and various states against Microsoft Corporation. I served as an expert witness for the Internal Revenue Service in Microsoft Corporation v. Commissioner, Dkt. No. 16878-96, in which I was qualified by the U.S. Tax Court as an expert in intellectual property law. I have also consulted on intellectual property matters for the U.S. Patent and Trademark Office, the Federal Trade Commission, Federal Judicial Center, and various district courts.

11. *Public Speaking.* Over the years, I have given more than 100 lectures on intellectual property issues – including keynote and principal addresses for the American Intellectual Property Law Association, the U.S. Copyright Office (in its Copyright Office Comes to

EXHIBIT ___ *99*

PAGE ___ *1426*

CONFIDENTIAL –
ATTORNEYS EYES ONLY

California series), the Copyright Society, the USC Entertainment Law and Business conference (the leading annual entertainment law conference in the United States), and the European Intellectual Property Institutes Network (EIPIN) annual series of conferences.

12. *Consulting and Expert Witness Work*. I have consulted on a wide range of intellectual property matters over the past decade. I have also served as an expert witness in approximately half a dozen intellectual property-related matters over that same time period.

13. I have conducted the copyright tutorial and prepared this report on behalf of MGA at my current billing rate of $700 per hour.

## Scope of Report

14. Through its counsel (Skadden, Arps, Slate, Meagher & Flom LLP), MGA has asked me to address several matters relating to its ongoing litigation against Mattel, Inc. These tasks fall into three areas: (1) copyright tutorial – provide its doll and face painting experts with an understanding of the copyright doctrines relating to protection and infringement; (2) copyright infringement analysis – assess whether the Bratz dolls and related packaging art would infringe copyright in any of Carter Bryant's sketches if in fact they were owned by Mattel; and (3) employee agreements – interpret the scope of the 1999 Mattel "EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT" signed by Carter Bryant.

15. *Summary of Analysis and Conclusions*.
A. Copyright Infringement Analysis. From the standpoint of copyright protection, Carter Bryant's sketches lie in the upper regions of the abstractions pyramid. His concepts do not attract copyright protection. His sketches reflect a mix of relatively detailed soft goods elements (clothing and accessory) and largely rudimentary hard goods elements. Thus, the doll features attract relatively modest protection. When the sketches are subjected to successive filters of copyright law's limiting doctrines (originality, merger, scènes à faire, functionality), many of the hard goods elements of Carter Bryant's fall away entirely or fade in significance. The anatomical aspects of the sketches, the standard poses, the aspects of the art based on human features, well-known techniques), and prior art that was widely available and to which Carter Bryant acknowledges he was exposed leaves a rather modest residue of copyright protection in the basic doll design. The strongest claim to copyright lies in the compilation of elements. But since the individual elements themselves attract relatively modest (if any) protection, the compilation itself only enjoys protection against "bodily appropriation" or "virtual identity." As the comparisons show, MGA's Bratz blank and face paint do not reflect anywhere near that level of similarity. The elements differ quite significantly from the Bryant sketches. And the compilation itself reflects many prior art aspects (other fashion dolls, the Spice Girls) and scènes à faire. Based on these considerations, I do not believe that MGA's Bratz dolls infringe copyright in the Carter Bryant doll sketches.
B. Given its standard form nature, Mattel's strong relative bargaining power vis á vis its employees, and the take-it-or-leave-it basis on which it offered its 1999 "EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT," the agreement

-4-

EXHIBIT _____ 99

PAGE _____ 1427

CONFIDENTIAL –
ATTORNEYS EYES ONLY

constitutes a contract of adhesion. Therefore, any ambiguity is interpreted against the drafter. With respect to the trade secret provision, I concluded that the agreement was ambiguous at best with regard to Carter Bryant's obligations to treat the Bratz concept as a Mattel trade secret (if, in fact, it was conceived while he was in Mattel's employ). As a result, I concluded that it should be interpreted narrowly (i.e., in Carter Bryant's favor). With regard to the invention assignment provision, I concluded that the text of the provision limited the assignment obligation to technological inventions and therefore did not cover Carter Bryant's artistic concept and purely aesthetic sketches. This interpretation was reinforced by the nature of Mattel's business, its patenting activities, and changes that it made to the scope of the invention assignment provisions in 2004.

## I. Copyright Tutorial for MGA's Doll and Face Painting Experts

16. *Rationale for the Copyright Tutorial.* Based upon more than two decades teaching and researching copyright law, I have come to believe that subject matter experts (such as artists, musicologists, and computer scientists) cannot properly perform their functions in copyright trials unless they appreciate several key aspects of copyright law -- mainly the thresholds, limiting doctrines, and scope of copyright protection, the standard for infringement, and, in some cases, the defenses to copyright infringement. In cases involving well-trodden areas of creativity, copyright law demands experts, judges, and juries to engage in a particularly subtle form of analysis. Take, for example, a music copyright case. The plaintiff wrote and recorded a song in a particular genre – such as rhythm and blues. The defendant wrote and recorded a song that sounds similar – it may have familiar background rhythm, instrumentation, use of bridges and choruses, and a lyrical phrase or two. A jury might conclude upon a quick listen that the two compositions are similar – maybe even substantially similar. But the test for copyright is more nuanced than that. The jury must filter out the unprotected elements from the plaintiff's work in making the comparison. Basic rhythm patterns, common instrumentation, standard uses of bridges and choruses, and short phrases are not protectable, nor are standard compilations of such elements. This can be a challenge in that few people have the ability to conduct such filtering in real time. As the Second Circuit has noted,

> The "substantial similarity" that supports an inference of copying sufficient to establish infringement of a copyright is not a concept familiar to the public at large. It is a term to be used in a courtroom to strike a delicate balance between the protection to which authors are entitled under an act of Congress and the freedom that exists for all others to create their works outside the area protected by infringement.

See *Warner Brothers v. American Broadcasting Cos.*, 720 F.2d 231, 245 (2d Cir. 1983). Furthermore, subject matter experts who are not versed in the subtleties of copyright law can easily confuse the issues. The problem is exacerbated by the adversary system. To the extent that art, literary, computer software, or music experts are exposed to copyright law, it is often by the lawyers who have hired them. Such lawyers have an obligation to represent their clients zealously. In my experience, this duty can impinge upon the comprehensiveness and balance of

-5-



EXHIBIT _____99_____

PAGE _____1428_____

CONFIDENTIAL –
ATTORNEYS EYES ONLY

the presentation of copyright principles. Hence, there is a constructive role for a detached copyright expert to play in explaining the applicable concepts to subject matter experts.

17. I had the opportunity to play such a role in a software copyright case last year that was resolved through a JAMS arbitration. I worked closely with a leading computer software professor who later served as a technical expert to the three arbitrator tribunal. In this way, he did not learn about copyright law from advocates but rather someone who teaches copyright law to students and judges on a regular basis. I based my presentation to him on the same materials that I have developed for teaching federal judges. The three arbitrator panel permitted both of us to testify. The computer software expert could focus on the application of the legal concepts that he had learned from me and the opposing counsel could cross-examine me regarding what I presented to the subject matter expert. In my view (and apparently the view of the arbitrators given their ultimate determinations), this process enhanced the objectivity of the subject matter expert while providing opposing counsel with a fair opportunity to probe the basis for the subject matter expert's understanding of copyright concepts. It also provided the tribunal with the benefit of someone who has a wide range of experience studying and working on copyright matters.

18. The MGA attorneys asked me to perform the same roles in this case. They asked me to use the materials that I use in Federal Judicial Center programs and my other teaching to instruct Robert Tonner, MGA's doll expert, and Tina Tomiyama, MGA's face painting expert, about copyright infringement analysis. We held this session on the afternoon of Thursday, January 3rd, at the law offices of Skadden, Arps, Slate, Meagher & Flom LLP in Los Angeles. I conducted the session in much the same manner that I teach copyright law to a wide range of audiences. I used the same powerpoint slides as the basis for an interactive lecture. I explained the concepts, used illustrations, and engaged the audience in questions and discussion. The formal presentation lasted about two and a half hours. I also met with Robert Tonner the next morning and early afternoon as we examined various sculpts and other materials relating to the creation of the Bratz line of dolls.

19. In the remainder of this section of the report, I will for completeness purposes summarize the presentation that I made to Mr. Tonner and Ms. Tomiyama. (For purposes of trial testimony, I would focus on the issues of most pertinence in this case.) I drew upon the materials that I have developed over the past decade for teaching copyright law. Those slides are included in Appendix B to this report. I should note that the main infringement analysis chart (Slides [B2], [B4], and [B25]) was developed in conjunction with David Nimmer, author of the leading copyright treatise, and Lon Sobel, a professor at Southwestern Law School and the editor of the Entertainment Law Reporter. David often co-teaches the FJC copyright programs with me. Lon has also participated in several of these programs. In addition, the three of us have lectured together to a wide range of audiences throughout the country.

20. *Introduction.* As suggested above, the challenge in teaching copyright's infringement test is that most people's naive assumption about copyright protection is that it is really just a plagiarism test – if one work looks like a prior work, then there is infringement. And in some

EXHIBIT _____ 99

PAGE _____ 1429

CONFIDENTIAL –
ATTORNEYS EYES ONLY

cases, that test will achieve the correct answer. If someone were to a publish a book that was identical or nearly identical to J.K. Rowling's "Harry Potter and the Philosopher's Stone," it would almost certainly be a copyright infringement. Similarly, if someone were to produce a comic strip with nearly identical likenesses of Charlie Brown, Lucy, and Snoopy, it would also almost certainly be a copyright infringement. But as we move away from the realm of complex and highly imaginative works of authorship into more crowded fields of creativity (such as popular music), more limited ranges of creativity (such as still art drawing, conceptual or minimalist graphic art, map-making, and anatomically-based toys), or more artistically constrained mediums of expression (such as computer programs that will run on particular communication platforms), then the plagiarism approach diverges from copyright law's multi-layered framework for separating the protectable from the unprotectable and systematic analysis of infringement.

21. One of the copyright questions posed by this litigation – and the one of most relevance to Mr. Tonner's and Ms. Tomiyama's analysis – is whether MGA's Bratz dolls infringe the drawings that Carter Bryant sketched prior to October 19, 2000. Since Mr. Tonner and Ms. Tomiyama will play a role in explicating the applicability of several of copyright law's limiting doctrines, I sought to provide them with both a clear understanding of the overarching copyright infringement framework as well as illustrations of the most pertinent limiting doctrines.

22. *Infringement Analysis.* As reflected in the main infringement Slide [B2], the basic test for copyright infringement involves three principal overarching elements: (1) actual copying of (2) copyright protected expression resulting in (3) substantial similarity.

23. *Actual Copying.* Copyright protects authors and artists against copying, not merely similarity. Thus, a defendant can successfully defend a claim of copyright infringement by establishing that he or she independently created an identical work to the plaintiff's work. While this is rare in the context of complex works in which there is a wide range of artistic choice, it can occur in more constrained areas of expression. The plaintiff bears the burden of proving copying by direct evidence and/or circumstantial evidence (access and probative similarity).

24. *Copyright Protected Material.* Factual copying alone does not violate copyright law as the copyist may merely be reproducing elements that were not protected or making such modest use as to fall below the "substantial similarity" threshold for infringement. Copying as a legal matter requires proof that the defendant's work is substantially similar to original protected expression of the copyright owner. The analysis proceeds in three stages, often referred to as Abstraction, Filtration, and Comparison. See generally *Computer Associates Intern., Inc. v. Altai, Inc.*, 982 F.2d 693, 706-12 (2d Cir. 1992); see also *Nichols v. Universal Pictures Co.*, 45 F.2d 119 (2d Cir.1930) (L. Hand, J.), *cert. denied*, 282 U.S. 902 (1931); Nimmer on Copyright §13.03. First, the copyrighted work must be dissected into its constituent elements. In the case of a graphic such as the Bryant sketches, that would involve examining the individual characters, the character features, and the compilation of elements. In the second stage of the analysis, each element (and compilation) would then be evaluated to determine whether they reflected original protectable expression. Elements lacking in originality (e.g., derived from prior art) or lying

-7-

EXHIBIT _____ 99

PAGE _____ 1430

CONFIDENTIAL –
ATTORNEYS EYES ONLY

outside the scope of copyright protection (such as ideas, scènes à faire, elements serving functional purposes) would be filtered out of the work for purposes of the infringement analysis, leaving only the protected expression (which can include original compilations of elements). In stage 3 of the analysis, the allegedly infringing work is compared with the protected expression embodied in the plaintiff's work to determine whether there is substantial similarity of the protected expression.

25. This analytic framework traces back to Judge Learned Hand's seminal explication in *Nichols v. Universal Pictures Co.*, 45 F.2d 119 (2d Cir.1930). This case reflects the challenge of comparing a later work (a film) that has various thematic similarities to and may well have been inspired by a successful play, but yet is not infringing under a proper application of copyright principles. I have long used this case to illustrate the nature of the abstraction and filtration stages of infringement analysis. The case dates back to the 1920s and relates to the controversies over intermarriage and prejudice among religious communities in the great melting pot that was New York City (and America) at the time (and in many respects, still today).

26. Nichols v. Universal Pictures Co.: *The Plaintiff's Work* ("Abie's Irish Rose"). The plaintiff, Anne Nichols, had scripted "Abie's Irish Rose," a poignant story about the son of a widowed Orthodox Jew (Abraham or "Abie" Levy) who had fallen in love with an Irish Catholic girl (Rose Murphy) while serving in the army in France. They both knew of Abie's father's deep objections to marrying outside of the Jewish faith. Nonetheless, they secretly wed and then introduced the bride to Abie's father as an Orthodox Jew in the hopes that he would be enchanted. Abie's father falls for the ruse and arranges for his rabbi to perform a Jewish marriage ceremony. But just as the ceremony is completed, Rose's widowed, devoutly Catholic father arrives from his home in California with a priest. When the ruse is uncovered, the fathers lose their composure and the scene turns ugly. Meanwhile, the rabbi and the priest, who happened to be old friends, try to reconcile the families but without success. The fathers disown their children and vow to dissolve the marriage. But after a year, they learn that the children have brought a child into the world. In the final scene, both fathers coincidentally arrive bearing gifts on Christmas for their grandchild. In fact, the couple had given birth to an adorable set of twins; one of whom is placed in each of the grandfather's arms by the rabbi and the priest, who had arrived to aid in the reconciliation. The play ends on a hopeful note, with the grandson named for Rose's father and the granddaughter named for Abie's deceased mother. The play reflects both the raging social tension of the time (especially in New York City, the hub of European immigration) and the hope for religious, racial, and ethnic harmony. It enjoyed great commercial success on Broadway, running for over 2,000 performances between 1922 and 1927. See Slides [B5] and [B6].

27. Nichols v. Universal Pictures Co.: *The Allegedly Infringed Work* ("The Cohens and the Kellys"). Following the success of Abie's Irish Rose, Universal Pictures released "The Cohens and the Kellys" in 1926, set in New York City and revolving around the same theme of intermarriage between Jewish and Irish immigrant families. In this work, the daughter (Nannie) of a Jewish clothing merchant (Nathan Cohen) falls in love with Terry Kelly, the son of an Irish policeman, who lives across the hall in an East Side tenement. The families have long feuded

-8-

EXHIBIT _____ 99

PAGE _____ 1431

CONFIDENTIAL –
ATTORNEYS EYES ONLY

and both families vehemently oppose the relationship. As the plot unfolds, Nathan averts bankruptcy by an unexpected inheritance of $2,000,000 from a distant relative that is communicated to him by a strange lawyer. The Cohens move to a fashionable neighborhood, partially in the hope that Nannie's attraction to Terry will subside. But while Nathan is on a trip to Florida, Nannie and Terry secretly wed and give birth to a child. Upon his return, Nathan shuns Terry, accusing him of marrying Nannie for their fortune. After recriminations, Nannie leaves with the baby to live with Terry's family. Nathan is despondent, at which point the lawyer returns and informs Nathan that he has just discovered that the $2,000,000 which Cohen received rightfully belonged to Kelly, who was the nearest relative of Sadie Greenbaum. The lawyer offers to keep this information secret if Cohen agrees to split the fortune with him. Cohen's sense of honor is awakened and he refuses, instead running to Kelly's flat to explain the mistake. There he finds his family and young grandchild. He confesses that he has been a "stubborn old fool." As he is about to depart, Kelly reminds him of the grandchild and, through the pacifying influence of their respective wives, offers to share the inheritance and enter into partnership. The film ends happily with reconciliation. See Slides [B5] and [B6].

28. Although there was no literal copying of any of the dialogue from "Abie's Irish Rose," Nichols identified numerous similarities as the basis for her claim: motivating idea, emotional themes, basic characters, arc of plot development, and the clash of interactive forces. Given the success of Nichols' play, audiences for "The Cohens and the Kellys" would understandably perceive similarity to "Abie's Irish Rose." Yet, since copyright protection does not extend to ideas but rather is limited to the expressions of ideas, to conclude that "The Cohens and the Kellys" infringed "Abie's Irish Rose" would greatly hamper the freedom of future authors, artists, and filmmakers to work in the shadow of original works.

29. Nichols v. Universal Pictures Co.: *Judge Learned Hand's Resolution.* While recognizing that copyright protection extends beyond the literal text of a work, Judge Hand nonetheless offered a powerful principle for dealing with those "troublesome" cases where a subsequent creator takes thematic elements from a copyrighted work:

> Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended. Nobody has ever been able to fix that boundary, and nobody ever can.

45 F.2d 119, 121 (citation omitted). As reflected in Slide [B7], this framework can usefully be presented as a pyramid of abstractions. At the top of the pyramid lies the main idea of the work – the highest level of abstraction. As we descend, greater granularity can be discerned – the general plot outline, subplots, general characters and scenes, specific character elements, and finality, the actual text of the play (or artistic choices in a graphic work). As Judge Hand

-9-

EXHIBIT 99

PAGE 1432

CONFIDENTIAL –
ATTORNEYS EYES ONLY

emphasizes, protection does not apply to abstract ideas and the precise line of demarcation depends on case-by-case analysis. In the *Nichols* case, Judge Hand found that the stories were in fact "quite different," with

> [t]he only matter common to the two [being] a quarrel between a Jewish and an Irish father, the marriage of their children, the birth of grandchildren and a reconciliation.
>
> If the defendant took so much from the plaintiff, it may well have been because her amazing success seemed to prove that this was a subject of enduring popularity. Even so, granting that the plaintiff's play was wholly original, and assuming that novelty is not essential to a copyright, there is no monopoly in such a background. Though the plaintiff discovered the vein, she could not keep it to herself; so defined, the theme was too generalized an abstraction from what she wrote. It was only a part of her "ideas."
>
> Nor does she fare better as to her characters. It is indeed scarcely credible that she should not have been aware of those stock figures, the low comedy Jew and Irishman. The defendant has not taken from her more than their prototypes have contained for many decades. If so, obviously so to generalize her copyright, would allow her to cover what was not original with her. But we need not hold this as matter of fact, much as we might be justified. Even though we take it that she devised her figures out of her brain de novo, still the defendant was within its rights.

Id. at 122. Slide [B8] traces out several of the limiting doctrines reflected in Judge Hand's analysis – the idea-expression dichotomy (articulated in the Supreme Court's *Baker v. Selden* decision and codified in section 102(b) of the Copyright Act of 1976), the merger doctrine (denying copyright protection for expression when there is only one or but a few ways of expressing an idea), and the scènes à faire doctrine (derived from French for "scenes to be done"). Slide [B9] fleshes out the scènes à faire doctrine – "incidents, characters or settings which are as a practical matter indispensable, or at least standard in the treatment of a given topic." *Atari, Inc. v. North American Phillips Consumer Electronics*, 672 F.2d 607, 616 (7th Cir. 1982)). Slide [B10] illustrates the principle, noting that without this doctrine, the creators of Hill Street Blues, the first modern police drama revolving around the activities of a busy urban police station, might have been able to block production of NYPD Blue and Law and Order, both of which draw upon similar incidents, characters, and settings.

30. Judge Hand's framework has proven critical to the delicate balance between competition and the recognition of property rights in authorship to promote creativity. Each generation anew has revisited the themes that Anne Nichols so poignantly explored. We see this basic thematic structure in the successful 1972-73 CBS television series Bridget Loves Bernie, in which a struggling young Jewish cab driver/aspiring playwright Bernie Steinberg, whose parents ran a modest family delicatessen, fell in love with Bridget Fitzgerald, the Irish Catholic daughter of wealthy parents. The couple eloped to the disappointment of both sets of parents and the show revolves around the ongoing tensions. (Notwithstanding the show's popularity (ranked fifth for

-10-

EXHIBIT _____99_____

PAGE _____1433_____

CONFIDENTIAL –
ATTORNEYS EYES ONLY

the season), CBS cancelled it after one season as a result of hate mail objecting to the inter-religious theme.) A few decades later, the theme reemerged in ABC's hit series (1997-2002), Dharma and Greg, in which Greg's wealthy, blue blood Episcopalian Republican parents object to their son's marriage to Dharma, the Jewish daughter of hippie parents. One can discern the basic plot elements from "Abie's Irish Rose" yet again in "Meet the Fockers," a 2004 film revolving around a Jewish-Catholic marriage.

31. *Further Illustrations.* These same concepts apply as well to other settings. Slide [B11] illustrates the works at issue in *Satava v. Lowry*, 323 F.3d 805 (9th Cir. 2003), in which the first artist to encase a jellyfish in a clear glass sculpture sought to prevent others from using this basic idea (encapsulating a jelly fish in an oval vessel). As that court noted,

> Our case law suggests, and we hold today, that a combination of unprotectable elements is eligible for copyright protection only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship. See Metcalf, 294 F.3d at 1074; Apple Computer, Inc., 35 F.3d at 1446. See also Feist, 499 U.S. at 358 ("[T]he principal focus should be on whether the selection, coordination, and arrangement are sufficiently original to merit protection.").

Id. at 811. Slide [B12] is based on a French case in which the publisher of a cartoon book about a clownfish (Pierrot) brought suit against Pixar for alleged infringement of the Pierrot graphic work in the film "Finding Nemo." Pixar's successful defense was that its work was derived from something found in nature – namely, the clownfish. Even if Pixar had seen Pierrot, the scope of protection for that work would be extremely limited given its inspiration.

32. *Originality.* The clownfish example also brings the requirement of originality into play. To the extent that an artist bases his work on things found in nature or in prior art, then those aspects lack originality and are excluded from copyright protection. Slides [B13]-[B19] illustrate this copyright limitation. Slide [B13] traces the originality requirement to court decisions reading the use of the word "Authors" in the Intellectual Property Clause of the Constitution as a limitation on congressional power. Copyrights may only be accorded those who originate. In the Feist decision, the Supreme Court characterized the originality requirement as "the *sine qua non*" of copyright protection. See *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). As reflected on Slide [B14], Congress codified this requirement in the Copyright Act of 1976, incorporating the two pronged test reflected in jurisprudence – that a work reflect both independent creation and a "modicum" of creativity. As indicated in the House Report, the threshold is relatively low – not requiring novelty, ingenuity, or esthetic merit. See H.R. Rep. 94-1476 p. 51 (1976). Slides [B15] and [B16] motivate three important corollaries of the originality requirement: (1) that facts are not protectable (since they exist and are merely discovered); (2) that theories derived from facts are not protectable; and (3) that research is not protectable. Slide [B15] illustrates *A. A. Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972 (2d Cir.), *cert. denied*, 449 U.S. 841 (1980), in which the court denied copyright protection for a historian's extensive research supporting a theory for the destruction of the Hindenburg – that a

-11-

EXHIBIT 99
PAGE 1434

CONFIDENTIAL –
ATTORNEYS EYES ONLY

"rigger" on the Hindenburg crew sabotaged the Hindenburg to please his lady friend, a suspected communist dedicated to exploding the myth of Nazi invincibility. Thus, Universal Studios violated no copyright interest in Hoehling's book "Who Destroyed the Hindenburg?" when it produced a film based on this theory. The court explains that:

> the hypothesis that Eric Spehl destroyed the Hindenburg is based entirely on the interpretation of historical facts, including Spehl's life, his girlfriend's anti-Nazi connections, the explosion's origin in Gas Cell 4, Spehl's duty station, discovery of a dry-cell battery among the wreckage, and rumors about Spehl's involvement dating from a 1938 Gestapo investigation. Such an historical interpretation, whether or not it originated with Mr. Hoehling, is not protected by his copyright and can be freely used by subsequent authors.

Id. at 978-79. The court goes on to note that "[t]he same reasoning governs Hoehling's claim that a number of specific facts, ascertained through his personal research, were copied by appellees." Id. at 979. Slide [B16] illustrates *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365 (5th Cir. 1981), in which the author of a novel detailing a sensational kidnapping in which the victim was buried alive in an underground casket equipped with life support equipment for 83 hours alleged that a made-for-television movie dramatizing the events infringed copyright in the book. The court overturned a verdict finding infringement because the jury was erroneously instructed that the labor or research by an author is protected by copyright law. Slide [B17] presents two other originality-based doctrines: (1) that rhythm is typically not protected and (2) that words and short phrases are denied copyright protection. Slides [B18]-[B19] present the Supreme Court's *Feist* case, which holds that compilations of facts, even if the result of tremendous effort, are not protectable unless they are sufficiently original. Thus, a massive phone directory organized alphabetically is not copyrightable whereas my own list of the top twenty restaurants in Berkeley would be. But others would be free to develop their own restaurant lists. Slide [B20] introduces the useful article doctrine, which allows protection for elements of two and three dimensional works only to the extent that the expressive aspects are separable from the functional or useful characteristics. It also notes the exclusion of typefaces from copyright protection. Slide [B21] uses the metaphor of a radiating target to illustrate the contours of copyright protection. At the target's bull's-eye lies highly expressive creativity in which the author or artist has broad range of expressive parameters to choose from. The scope of copyright protection diminishes as authors and artists move away from that core. Completely outside of copyright protection are facts, scènes à faire, and theories.

33. With that background in place, we are ready to move on to the next step in the analysis of "copyright protected expression." Slide [B22] illustrates that both "Abie's Irish Rose" and "The Cohens and the Kellys" can be broken down into the various levels of abstraction alluded to by Judge Hand. On the bottom left side of the slide, the structure of "Abie's Irish Rose" is represented by blue shaded elements. On the bottom right side of the slide, the structure of "The Cohens and the Kellys" is superimposed over the top of "Abie's Irish Rose" with the differences reflected in pink. As can be seen, there is quite a bit of similarity at the higher, more abstract levels of abstraction and relatively little overlap (similarity) at the lower levels. The challenge is

EXHIBIT _____ 99

PAGE _____ 1435

CONFIDENTIAL –
ATTORNEYS EYES ONLY