deciding whether there is "substantial similarity of copyright protected expression." To do so first requires filtration of the unprotected elements.

34. *Filtration.* Slides [B23] and [B24] illustrate metaphorically the filtration process. In essence, the court must sift the Plaintiff's work though a colander that is specially designed to catch the unprotected elements: unoriginal aspects, expression of ideas that are severely limited in terms of the number of ways in which they can be expressed, scènes à faire, facts, historical events, and ideas. Slide [B24] reflects the result of that process in the *Nichols* case. The colander has removed the ideas and unoriginal aspects (e.g., religious clash, religious ceremonies). What is left in the bowl below are copyright protected elements, as reflected in the pyramid format. Note that the top and significant portions of the middle layers of the pyramid have been filtered out, whereas much of the granular text remains. But even at the bottom level, there may be gaps, due to unoriginal text and stage direction (such as the religious traditions and prayers in the marriage ceremonies). I like to refer to this resulting image as resembling the dental structure of hockey players, with many of the top teeth and one or two bottom teeth missing.

35. *Comparison: "Substantial Similarity"* – After filtration comes the comparison stage of the analysis. The ease with which the substantial similarity framework can be applied varies across factual scenarios. It is easiest to apply in contexts in which the copyrighted work at issue involved substantial unconstrained or only minimally constrained creative effort and the defendants have reproduced the entirety of the work or a significant expressive element (literal similarity). The substantial similarity doctrine is much more difficult to apply where the plaintiff's work can best be characterized as "thin" (due to relatively modest creativity coupled with limiting doctrines constraining the scope of protection) or where the defendant's work only weakly imitates the plaintiff's work. The courts have used sliding scale approaches to balancing these competing considerations – the robustness of the plaintiff's copyright protection on the one hand and the extent of copying on the other. Where copyright protection is robust, then substantial similarity will suffice to establish infringement. But where copyright protection is thin – for example, because the range of artistic creativity is tightly constrained by prior art or functional limitations – then courts require a high degree of similarity. The last column of Slide [B25] summarizes these principles. Slide [B26] illustrates the sliding scale concept, with works that have a broad effective range of creativity – such as the authoring of novels and unconstrained artistic painting – subject to the "substantial similarity" standard and highly constrained works – such as functional works, works that imitate things found in nature, or works in which choice is limited – analyzed under the "virtual identity" standard.

36. *Compilations of Unprotected Elements: Virtual Identity.* Slide [B27] illustrates the works at issue in the *Harper House v. Thomas Nelson*, 889 F.2d 197 (9th Cir. 1989). The plaintiff sought to assert copyright in the organization of its "Day Runner"® organizer – a series of calendars, forms, charts, and related materials for recording and organizing information. While accepting the district court's finding that copyright subsisted in this compilation of materials, the court emphasized that "compilations that consist largely of uncopyrightable elements receive only limited protection. As with factual compilations, copyright infringement of compilations

-13-

EXHIBIT     99

PAGE     1436

CONFIDENTIAL –
ATTORNEYS EYES ONLY

consisting largely of uncopyrightable elements should not be found in the absence of 'bodily appropriation of expression.'" (citing *Worth v. Selchow & Righter Co.*, 827 F.2d 569, 573 (9th Cir.1987)). See Slide [B28]. Slide [B29] highlights the ways in which use of the term "copying" can obfuscate copyright infringement analysis. In its closing argument, Harper House's counsel "exploited the negative connotation to copying, urging the jury to use their basic sense that when given a homework assignment at school, one should not copy the work of another student – 'change a word here, change a word there, put it on a different size paper and hand it in as your own." The court's admonition highlights the concern that I emphasized at the outset of this section of the report, see paragraph 16, with equating plagiarism with copyright infringement. Copyright law allows use of unprotected elements as well as fair use. The court notes that "given the negative connotations to 'copying,' there was an obvious risk of an improper verdict for plaintiffs, and a need for further instructions to protect legitimate activity and avoid the suffocation of competition." 889 F.2d at 207.

37. *Application of the Substantial Similarity Framework to the* Nichols *Case.* Slide [B30] characterizes the nature of the final comparison in the *Nichols* case. Note that what is compared is not the entirety of "Abie's Irish Rose," but rather only the protectable elements. It is easier to see in this format that "The Cohens and the Kellys" is only modestly similar to protected elements of "Abie's Irish Rose." The regions of blue in "The Cohens and the Kellys" pyramid (i.e., the areas of similarity with "Abie's Irish Rose") are largely unprotected (white in the filtered "Abie's Irish Rose" pyramid). This representation helps to visualize the conceptual and subtle framework that Judge Hand endorsed and applied.

38. *Illustrations.* Slides [B31] - [B54] illustrate the application of this framework to various familiar and challenging contexts. I use these slides to provide the audience the opportunity to test out their understanding of the copyright infringement framework. In my experience, this is the best way of developing analytical intuition for copyright infringement analysis. Slides [B31] - [B32] relate to the controversy that erupted over Alice Randall's novel, "The Wind Done Gone," which tells the story of Margaret Mitchell's classic novel, "Gone With the Wind," from the perspective of slaves on the plantation. Slide [B33] provides the backdrop for discussing the British copyright infringement case brought against Dan Brown, author of the 2003 blockbuster novel, "The Da Vinci Code," by two of the authors of the 1982 novel, "The Holy Blood and the Holy Grail." Slides [B34] - [B37] explore the application of the infringement framework to graphic works. Slides [B36] - [B37] concern a controversial and provocative August 1991 Vanity Fair cover photograph in which the actress Demi Moore appears nude and nearly nine months pregnant. Paramount Pictures spoofed the photograph by superimposing Leslie Neilsen's head on a similarly proportioned and posed model for an advertising poster for its 1994 film Naked Gun 33⅓: The Final Insult, which prompted a copyright infringement lawsuit. In assessing the third statutory factor – "the amount and substantiality of the portion used in relation to the copyrighted work as a whole" – of the fair use defense (17 U.S.C. §107), the court conducted a filtering analysis because the statute focuses on the "protected elements" of the plaintiff's work. See *Leibovitz v. Paramount Pictures*, 137 F.3d 109 (2d Cir. 1998). In so doing, Judge Newman noted that the key elements of the pose were derived from prior paintings and sculptural works – dating back to " 'Venus' of Willendorf," circa 25,000-20,000 B.C." and

-14-

EXHIBIT 99

PAGE 1437

CONFIDENTIAL –
ATTORNEYS EYES ONLY

Botticelli ("Birth of Venus") – depicting nude and pregnant women in a "gesture of modesty" pose. See *id.* at 111, 115-16. Slides [B38]-[B39] illustrate the challenge of filtration and comparison in the context of musical compositions. They require the audience to compare musical compositions while at the same time ignoring features – such as rhythm, short phrases, and unoriginal progressions. Slide [B40] examines three-dimensional works. Slides [B41]-[B54] illustrate how infringement analysis applies to the context of computer software, a particularly constrained medium of expression.

## II. Copyright Infringement Analysis – Whether the Bratz Dolls Infringe Copyright in Carter Bryant's Sketches

39. *Application of these Concepts to the Present Case.* In this section, I apply the principles set forth in Section I to the present dispute. In order to avoid the factual disputes relating to the time period in which Carter Bryant came up with and drew the Bratz sketches and whether Margaret Leahy and other MGA sculptors and artists "copied" from Carter Bryant's sketches, I base the analysis of this section of the report on the express assumptions that copyrights in the sketches are owned by someone other than MGA and that MGA's artists saw Carter Bryant's sketches before conducting their own work. I will be skipping over the "factual copying" element of the copyright infringement framework and focus my analysis of whether MGA's Bratz dolls are "substantially similar" to copyright-protected expression in Carter Bryant's sketches. As with Section I of this report, my analysis is illustrated through a series of slides, reproduced in Appendix C.

40. *Basis for the Analysis.* In preparing this analysis, I have drawn upon the following sources: (1) Carter Bryant Sketches; (2) Carter Bryant's Deposition Testimony; (3) MGA's Bratz dolls; (4) the blank form for MGA's Bratz dolls; (5) sculpts leading up to the final Bratz doll blank; (6) Draft Report of Mary Bergstein, Art/Popular Culture Historian; (7) Draft Report of Robert Tonner, Fashion Doll Designer, Sculptor, and History Expert; (8) Draft Report of Christina (Tina) Tomiyama, Fashion Doll Face Painting Expert, Fashion Doll Industry Expert, and Doll Product Manager; (9) Slide Presentation by Robert Tonner (presented to MGA Experts on January 3, 2008 at Skadden, Arps, Slate, Meagher & Flom LLP's Los Angeles office); (10) Prior Art and Popular Culture Material (Seventeen Magazine (August 1998 edition)); image searches on the Internet; on-line resources about specific artists, dolls, and popular culture); and (11) my own knowledge of popular culture.

41. *Avoiding the Plagiarism Trap.* As discussed in Section I of the report, copyright protection does not track the moral intuition relating to plagiarism. Rather, copyright analysis requires a systematic process to avoid hampering the freedom of expression and competition. See Paragraphs 16 and 36. Slide [C1] shows Carter Bryant's sketches of the Jade character on the left and MGA's Jade doll on the right. Copyright law does not protect a name. Nor does it protect many aspects of Carter Bryant's sketches. Yet, without careful instruction, a jury may naturally be led to think that the Jade doll "copies" Bryant's sketches. Such a conclusion would, in my opinion, overlook what is in fact protected in the sketches and to what extent those elements or compilations of elements are substantially similar or possibly virtually identical to

-15-

EXHIBIT _____ 99

PAGE _____ 1438

CONFIDENTIAL –
ATTORNEYS EYES ONLY

the Jade doll.

42. *The Abstraction Framework.* Slide [C2] begins the analysis with Judge Learned Hand's classic statement of the copyright infringement framework. Drawing upon Mary Bergstein's model of the process of developing visual and sculptural art, Slide [C3] presents the levels of abstraction applicable in the context of fashion dolls. The top of the pyramid – the highest level of abstraction – contains the concepts animating the work. These ideas are excluded from copyright protection. At the next level lies sketches of the concept(s). Mary Bergstein refers to them as "'notes' on paper." They lack significant detail or expression. The next level of the abstractions waterfall consists of studies. Here, the artist is engaged in more detailed illustration, typically observing the concepts from multiple vantage points. They are still rather inchoate and copyright protection is typically judged thin at this level. Next come drawings, which are detailed expressions of the concepts. Drawings provide the basis for models and finally, in the case of fashion dolls, three-dimensional sculpts with face paint. As Robert Tonner explained during our meeting, even fully detailed drawings provided to different sculptors can result in quite different dolls. In his report, he notes that:

> Many companies produce dolls made to represent the same characters. One of the most popular characters is Scarlett O'Hara from the movie Gone with the Wind. World Doll in the 1980's, Mattel, the Franklin Mint and Tonner Doll have all done portraits of the actress, Vivian Leigh, who portrayed Scarlett in the Movie. Each of the dolls look markedly different although they are all supposed to portray the same person. The point being, that each sculptor brings his/her personal style to a project – even one as specific as Scarlett O'Hara.

At the bottom of the pyramid – where a detailed fashion doll has been sculpted and painted – copyright protection can be significantly more robust, depending, of course, on the extent to which the sculptor and face painter have departed from prior art sources.

43. *Levels of Abstraction: Carter Bryant's Sketches.* As Mary Bergstein and Tina Tomiyama have expressed, Carter Bryant's illustrations prior to October 19, 2000 of the Bratz doll can best be characterized as sketches, at least with regard to the doll features (body, face, and hair). (Tina Tomiyama notes that the illustrations of the "soft goods" – the fashions being worn by the dolls (Carter Bryant's area of expertise and passion) – are more detailed, and could be characterized as drawings. But as I understand the dispute, there is not any serious disagreement about infringement of particular fashions. In any case, such fashions changed periodically.) Slide [C4] shows that the doll features (as opposed to "soft goods") of Carter Bryant's illustrations sit quite high in the pyramid of abstractions. Carter Bryant's conception reflected three principal elements: (1) attitude: sassy, bratty fashion dolls (2) ethnic/racial orientation: an ensemble of four friends reflecting different racial and ethnic backgrounds; and (3) doll features: a disproportionately large head (relative to human dimensions and some (but not all) fashion dolls) with large eyes and particularly large feet. Apart from the clothing fashions, the illustrations were rather rudimentary. The sketches provided only a frontal (or slightly angled) view. Therefore, the depth of facial features cannot be perceived. The facial elements are particularly

-16-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

inchoate and stylized. Tina Tomiyama notes that the sketches were not "instructional," but rather conceptual. She sees them more as carrying forward the idea of sassy, multi-racial girls, not a detailed expression. Furthermore, she does not consider the sketches to have been realistic in terms of the constraints of fashion doll manufacturing and functionality. Robert Tonner noted that the sketches did not provide much guidance to a sculptor. They were not schematic in nature, but rather high concept. He did not feel that they would provide much constraint on a sculptor. Rather, the sculptor would need to bring a lot of their own creativity to the job of building a doll.

44. *Filtration.* With the abstraction stage complete, Slide [C5] begins the analysis of filtration. The abstraction pyramid has been lowered into the filtration colander. In this stage of the analysis, I explore the various limiting doctrines aimed at determining the copyright-protected elements of Carter Bryant's illustration. As a preliminary observation, I will note that the illustrations are near the top of the pyramid. Copyright protection is quite thin at that altitude. Nonetheless, there may be enough expression for copyright to subsist, at least against slavish copying. Slides [C6]-[C19] provide a basis for assessing the principal limiting doctrines that come into play in the filtration stage of the analysis: originality, merger, scènes à faire, unprotectability of functional features (including inseparable expressive features of useful articles).

45. As developed in his deposition testimony, Carter Bryant has spent much of his life studying fashion illustration, fashion design, and fashion dolls. From a young age, he competed with his mother to read the latest fashion magazines. Growing up in the 1970s and 1980s, he was exposed to the various waves of popular culture from television, magazines, and formal study of fashion design. He studied fashion illustration following high school. He worked in the fashion doll industry through the 1990s. Thus, he was exposed to a wide range of influences. From a copyright standpoint, he was not operating in a "clean room" when he made the Bratz sketches. Rather, he acknowledges his interest in reflecting cultural trends as well as the profound influence of those who came before him. He was not interested in creating extra terrestrial beings. Rather, he sought to create a fashion doll that would appeal to girls and provide a substrate for him to pursue his interest in fashion design.

46. *Prior Widely-Known Character Illustration.* Drawing upon Robert Tonner's historical look at character art, Slides [C6]-[C7] contain several of the more influential sources for cartoon illustrators of Carter Bryant's generation. Marvin Fleischer created the Betty Boop character in a series of films released by Paramount Pictures in the early 1930s. At the time, her overt sexual appeal created quite a stir and attracted large audiences. The character was modeled after Helen Kane, a popular singer in the 1920s and actress for Paramount Pictures. As illustrated in Slide [C6], Betty Boop's features were exaggerated -- disproportionately large head, large round eyes with distinct eye lashes, hour-glass figure, long legs. Slide [C7] contains examples of breakthrough Japanese anime art that became popular in the United States. The "Speed Racer" cartoon series derives from Tatsu Yoshida's "Mach GoGoGo" series developed in Japan in the 1960s. Yoshida based the character on the U.S. films "Viva Las Vegas" and the James Bond film, "Goldfinger." Trans-Lux acquired the U.S. rights, recorded voice-overs, and licensed the

EXHIBIT ___99___

PAGE ___1440___

CONFIDENTIAL --
ATTORNEYS EYES ONLY

cartoon series for broadcast in the United States. Its mix of fiendish conspiracies, action, fast cars, and sparkling eyes captivated American youth. I have emphasized the eye illustration, as it provided inspiration for many later animators and illustrators. The other half of Slide [C7] reflects another anime series that successfully crossed the Pacific Ocean, this time in the mid 1990s. Sailor Moon featured a collection of characters. It builds around an imaginative story of a middle school girl who, led by a talking cat, takes on a plot by the Dark Kingdom to destroy the Earth. Sailor Moon is joined by several friends in her adventures.

47. *Prior Fashion Dolls*. Carter Bryant was deeply influenced by prior fashion dolls. Slides [C8] and [C9] illustrate several fashion dolls that enjoyed commercial success in the 1980s and 1990s. Bryant was free to use the unprotected elements of such dolls, and he did so liberally in his drawings. Doll shapes and facial elements are entitled to rather thin protection due to the anatomical basis for their design (all artists are free to represent the human form), social views of attractiveness (aesthetic functionality), and some basic doll designs being in the public domain. As reflected in Mattel's litigation against Radio City Music Hall and the Goldberger Doll Manufacturing Company, copyright protection in a crowded field like fashion dolls is quite limited. "[I]f the facial features of two dolls were similar not only to each other, but also to those of numerous other dolls available on the market, the similarity would be relatively unlikely to support the inference that the defendant copied from the plaintiff. The defendant might equally have copied from any of the other similar dolls. Alternatively, an observation that features of a work are ubiquitous within an industry might lead a court to doubt that those features are original to the plaintiff." See *Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133, 135 (2d Cir. 2004). Bryant's sketches of the torso, arms, legs, and some facial elements undoubtedly draw from this prior work.

48. *Doll Illustration Art*. Robert Tonner and Mary Bergstein both point to the great influence that Margaret Keane had upon doll illustrators. Her 1981 work, "Ladies in Waiting" (Slide [C10]) brought new sensibilities to face illustration: the bulbous, mesmerizing eyes, disproportionate head. Some of her earlier drawings were the inspiration for Allison Katzman's "Blythe" line of dolls, featuring eyes that changed color with the pull of a string attached to the back of the head. See Slide [C11]. These dolls, manufactured by Kenner, were quite popular in the 1970s and continue to attract collector attention. See Slide [C12].

49. *Fashion Illustration*. As Robert Tonner and Tina Tomiyama explained at our January 3, 2008 meeting, Carter Bryant used fairly standard poses in his sketches of the Bratz dolls. Given his training, love of fashion model runway poses, and experience, Bryant did not innovate the poses reflected in his illustrations. Rather, he used well-worn poses. Slide [C13] captures the highly constrained aspects of fashion illustration and some of that prior art. The left side of the slide shows that fashion drawing is largely about human anatomy and common body, leg, foot, and hand positions, all constrained by the human form. I have included on the right side of the slide fashion illustrations from magazines from the 1930s. One can see aspects of these images (and their stock nature) in Carter Bryant's sketches. As Tina Tomiyama emphasized, Carter Bryant innovated in the fashions, not the poses or the body details.

-18-

EXHIBIT _____ 99

PAGE _____ 1441

CONFIDENTIAL –
ATTORNEYS EYES ONLY

50. *Popular Culture circa 1998*. Slides [C14]-[C19] provide a sense of the broader cultural influences in the 1998-2001 time frame – when Carter Bryant developed the sketches and MGA designed the first generation of the Bratz line of dolls. Bryant specifically acknowledges drawing on some of these materials. Mary Bergstein, Tina Tomiyama, and Robert Tonner all see fashion and doll designers as being heavily influenced by trends in popular culture. They specifically see these influences in Carter Bryant's work. Slide [C14] shows the coming of age of strong, female friend-based television series in the mid to later 1990s. The three female lead characters in the hit television series Friends emphasized female bonding. As Mary Bergstein explains, Ally McBeal was almost a live fashion doll that could appeal to adults and young girls alike. She was also closely associated with sassy female supporting actresses. Sex and the City brought the female bond to a new level. It also revealed an assertiveness and sexuality never before seen in television history. In the music field, the Spice Girls were a major new influence. See Slide [C15]. They brought the multi-racial element, as well as assertiveness. They were not the first female-driven ensemble group (e.g., the Go-Go's came before), but they specifically appealed to a younger audience and fashion played a big role in their image and marketing. The Spice Girls also arose in the merchandising age – with the role of MTV, movie spinoffs, and, of course, a line of dolls brought out by Galoob Toys (later bought by Hasbro). See Slide [C16]. These dolls were a large hit in the 1997 and 1998 Christmas holiday seasons. Slides [C17]-[C18] show several of the advertisements from the August 1998 issue of Seventeen Magazine, which Carter Bryant specifically recalls as an inspiration for his Bratz sketches. Several of the images in that issue bear a close resemblance to the concepts and even some of the rudimentary details in Bryant's sketches. The Steve Madden advertisement on Slide [C17] captures the attitude, large feet, and out-thrust hips. The Kristi ad also uses an upward camera angle to similar effect. The character in the Paris Blues ad – large, anime-like eyes, body language, body proportions, large feet, sassy fashion sense – could almost join Bryant's sketch of the Bratz ensemble without much change. The Coca Cola ad reflects the attitude and cartoon-like head and body features of Bryant's illustrations. And the Cover Girl ad shows a multi-racial ensemble reminiscent of Carter Bryant's conception. Slide [C18] takes the ensemble concept further: the Dixie Chicks' "Chicks with Attitude" slogan; the cool, self-confident, defiant girls on the left and lower right; and the fashion illustrations on the upper right. These concepts and images were clearly in the public consciousness (and in the places that fashion and doll designers would be looking) in the 1998-2000 period.

51. *Lara Croft and Angelina Jolie*. Another salient female image of this period was the fashion model as action hero, reflected in the Lara Croft computer game series (introduced in 1996), comic books, novels, and films. See Slide [C19]. Lara is an intelligent, athletic, and risk-taking woman who, somewhat like Indiana Jones, travels the world in pursuit of priceless archeological artifacts. She was famously portrayed in the comic book-like 2001 film by Angelina Jolie, who came to represent the new face of beauty. Even before her portrayal in this film, Jolie's large, penetrating eyes, swollen lips, and multi-ethnic features defined a new ideal at this time, which has followed the same trajectory of the Bratz doll line.

52. *Filtration Factors*. Slide [C20] shows metaphorically the filtration process. The colander catches the concepts underlying Carter Bryant's sketches – an ensemble of sassy, multi-cultural

EXHIBIT _____ 9C9_____

PAGE _____ 1442_____

CONFIDENTIAL –
ATTORNEYS EYES ONLY

dolls with disproportionately large heads, eyes, and feet, and voluptuous lips. Thus the top level of the pyramid is filtered out and much of the sketches as well. The sketch art is not particularly detailed in many of the elements – the body pose, many aspects of the body dimensions, an ensemble of multi-racial dolls, and the individual facial features. Furthermore, few of these elements are original to Carter Bryant. The colander collects Steve Madden's large feet, standard fashion poses, the Spice Girls (and their multi-racial fashion doll line), Margaret Keane's influential facial illustration, the Speed Racer and Paris Blues anime eye shape, Betty Boop's large head and big eyes, and Angelina Jolie's piercing eyes and protruding lips. Moreover, functional constraints, scènes à faire, and the merger doctrine exclude protection for many aspects of Bryant's sketches. At best, there is only modest protection for a few details and perhaps the compilation of elements, but these would be protected only against "bodily appropriation" – what the Ninth Circuit call "virtual identity." As reflected in the "bowl" of protectable expression, there is a veneer of protection for the sketch-level body art. To illustrate the effects of the filter, I have air brushed out much of the facial and body features. What protectable expression exists in Carter Bryant's sketches relates significantly to the fashions, which are quite detailed. Thus, unlike many of the doll elements, they significantly survive the filter, as does the spiky hair style for one version of Jade.

53. *Comparison.* The next series of slides undertakes a detailed comparison of Carter Bryant's sketches to the first generation Bratz doll. (All versions of Bratz dolls are based on the same sculpt. Face painting and body tones enable one doll shape to provide the basis for four distinctive looks.) Slide [C21] illustrates the nature of the comparison. As explained in Section I of the report, the purpose of the filtration step is to prevent an author or artist from being able to assert control over unprotectable aspects of a work. Thus, the appropriate comparison is not between the plaintiff's work (in this case, the Carter Bryant sketches) and the defendant's work (in this case, the Bratz dolls), but rather the protected elements of the plaintiff's work (the air brushed out image) and the defendant's work. As reflected in the pyramid on the right, there is overlap between Carter Bryant's Jade sketch and MGA's Jade doll at some of the higher levels of the pyramid. But much of that similarity is filtered out, leaving rather modest similarity of *protected* expression. The slides that follow illustrate this point. Furthermore, the sketches simply do not provide anywhere near the detailed body and facial features of MGA's Bratz doll.

54. *Body Elements.* Slide [C22] compares the two principal Carter Bryant body sketches with comparable views of the MGA Bratz blank sculpt. It is important to recognize that the rudimentary detail of Bryant's sketches and the fact that much of what Bryant does reflect in this sketch should be filtered out based on prior art (fashion dolls, fashion illustration, human body), scènes à faire (fashion doll characteristics), and functionality (joint characteristics). Nonetheless, there are significant differences between the sketches and the blank sculpt. Slide [C23] illustrates several of the differences. The two-dimensional width of the waist on the sketch is approximately half of the width of the waist on the sculpt (compare the mid-section red and blue lines). The separation between the thighs (red) is about one-third the separation of the sculpt. The left leg angle of the sketch is set at a significant angle (red line) whereas the angle of the sculpt is nearly vertical (blue line). Slide [C24] compares a partial profile angle. The two look quite different for several reasons. First the sculpt simply does not bend in the way shown

-20-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT ___99___

PAGE ___1443___

on the sketch. Thus, the sculpt cannot accommodate thrust-forward hips or a turned waist. Second, the legs of the sculpt are symmetrical and therefore cannot resemble the pose of the sketch. The sculpt arms are significantly longer.

55. *Feet.* Slide [C25] focuses on the foot size and shape of the sketch and sculpt. Even though the sketch appears to be wearing shoes, the sculpt foot size is much smaller than suggested by the sketch. In addition the shape of the sculpt foot is much more slender. As reflected by the red line, the ankle width on the sketch is much narrower than the sculpt.

56. *Legs.* Slide [C26] compares the leg dimensions. The sketch positions the knee cap substantially higher up the leg than reflected in the sculpt. This reflects the oversized foot concept that inspired the drawings. In its design, however, MGA chose a less exaggerated foot and lower leg. The sketch depicts a more adult-shaped leg, with a wider upper thigh region, whereas the sculpt comes closer to more common and youthful leg dimensions.

57. *Arms.* Slide [C27] compares the arm dimensions. The arms of the sculpt are considerably longer in relationship to other body dimensions. Whereas the tips of the fingers in sketch reach just below the hip region, the hands of the sculpt extend nearly to the knee. The elbow bends are also different. The sculpt has a much longer bicep region.

58. *Hands.* Slide [C28] shows the hands and wrist angles to be significantly different. The sketch has bent wrists with the thumb separated from the fingers. The sculpt reflects a nearly flat wrist, thumb and fingers in parallel, and less separation between the thumb and forefinger.

59. *Torso.* Slides [C29]-[C30] compare the torso regions. Slide [C29] shows that the sculpt has a a significantly more pronounced chest region and rounded abdomen. Slide [C30] shows that whereas the sketch features a triangular crotch region, the sculpt has a rectangular shape. It also shows quite a different ratio of shoulder width to hip width. The sculpt has broader shoulders.

60. *Head Shape.* Slide [C31] compares the major contours of the head region. The dimensions are quite different, as reflected in the width between the eyes (narrower on the sculpt), distance from the middle of the mouth to the ear (much longer on the sculpt), and size of the forehead (much larger on the sculpt). More generally, the Bryant sketch suggests a more mature face, whereas the sculpt is baby-faced and more full-cheeked. The sketch provides little indication of the depth of the facial features. The sculpt reveals significant three-dimensionality -- especially in the eye cavities, cheek region, and chin shape.

61. *Facial Features: Eye.* Slide [C32] provides a study of the face painted eye. The right side of the slide contains the sculpt eye. The left side of the slide provides different eye images drawn from Carter Bryant's sketch (third from the top), prior art (first image -- Japanese anime (Speed Racer); second image -- (Paris Blues ad)), and an actual eye (belonging to Angelina Jolie). The purpose of this exercise is to make several points. First, the Carter Bryant sketch must be substantially discounted by the influence of prior art. Second, the depiction of the sketched eye owes much to the human form, also limiting the degree of protectable expression. And third,

EXHIBIT ____99____

PAGE ____1444____

CONFIDENTIAL --
ATTORNEYS EYES ONLY

that the Bratz Jade eye is more closely similar, or least as similar, to the Paris Blues and Angelina eyes as it is to the Carter Bryant sketch.

62. *Facial Features: Eyes.* Slides [C33]-[C34] reveal substantial differences between the sketched eyes and the eyes on the finished doll. The sketch has no lower lashes, different eye height, different relationship between the eye brow and the inside corner of the eye. In many respects, the Bratz doll eyes are more like Angelina Jolie's eyes than the eyes in the Bryant sketch. Slide [C34] highlights four regions of the Bratz doll eye that bear no similarity to the Bryant sketch. Region a shows lower brow lashes (or eye liner) on the Bratz doll, whereas the Bryant sketch has no corresponding lashes. Region b shows a wide, rounded left eye and pupil on the Bratz doll, whereas Bryant sketched a more angular, narrower opening. Region c shows the positioning and coloration of the eye brow. The left edge of the right brow in Bryant's sketch is directly above the inner corner of the eye, whereas it is set toward the middle of the eye on the MGA doll. Furthermore, Bryant uses black coloring; the doll uses brown. Region d shows a different lash effect. Whereas the sketch has thicker, more concentrated lashes on the outer rim of the eye, the doll shows lashes toward the middle. These are just a few of the many differences. The point is that the MGA face painters did not follow the Bryant sketches but rather made their own artistic choices.

63. *Facial Feature: Lips.* Slide [C35] compares MGA's Jade doll lips with Carter Bryant's sketch (middle), the lips of the character depicted in the Paris Blues advertisement, and a photograph of Angelina Jolie's lips. The Jade doll lips differ significantly from the Bryant sketch in terms of shape (ratio of top lip to bottom lip, no opening on the doll, curvature at the top of the lips (rounded in the sketch versus indented on the doll), color shading. In many respects, the Bratz doll mouth is closer to the photograph of Angelina Jolie's plump lips than to Carter Bryant's rather basic illustration.

64. *Facial Features: Concept.* When the entire face of the set of dolls is considered, it appears that MGA's creative artists evolved the concept away from the more clearly distinctive racial appearance toward an inter-racial mixture. All of the dolls have a more ambiguous multi-cultural sensibility. Mary Bergstein explains this point more fully.

65. *Compilation of Elements.* Although the individual elements do not in my opinion reflect significant (and certainly not substantial) similarity to copyright protected elements of Carter Bryant's sketches, there remains the question of whether the compilation of elements in the sketches has been improperly appropriated. But here again, many aspects of a compilation claim fail to survive filtration. Fashion dolls, multi-racial collections of fashion dolls (Spice Girls), large head/large eyes/large feet (Margaret Keane, Blythe, Speed Racer, Steve Madden, Paris Blues), piercing eyes and large lips (Lara Croft, Angelina Jolie) can all be found in various permutations. As explained in Section I of the report, compilations of largely unprotected elements are subject to a much higher threshold for similarity -- "bodily appropriation" or virtual identity. I do not believe that the similarities between the overall compilation of elements in MGA's individual Bratz dolls reflect even substantial similarity to any protected compilation in Bryant's sketches. In any case, they do not rise to the level of bodily appropriation.

-22-

EXHIBIT _____ 99

PAGE _____ 1445

CONFIDENTIAL --
ATTORNEYS EYES ONLY

66. *Summary of AFC Analysis.*  I assumed for purposes of this analysis that MGA's creative artists worked from Carter Bryant's concepts. Some members of the creative team saw Carter Bryant's sketches and worked with his input. Yet, these materials were conceptual and abstract. They did not provide the type of detailed "blueprints" or instructional direction that significantly constrained their expression of Bryant's concepts. Furthermore, as Mary Bergstein explains, the concepts evolved in the production process. The idea of multi-racial/ethnic dolls morphed through MGA's creative process into inter-racial/ethnic dolls. The highly exaggerated feet and body language transformed into prettier, more naturally proportioned bodies. Carter Bryant's emphasis on fashions remained, but they do not find expression in the sculpts and face paint. From the standpoint of copyright protection, Carter Bryant's sketches lie in the upper regions of the abstractions pyramid. His concepts do not attract copyright protection. His sketches reflect a mix of relatively detailed soft goods elements (clothing and accessory) and largely rudimentary hard goods elements. Thus, the doll features attract relatively modest protection. When the sketches are subjected to successive filters of copyright law's limiting doctrines (originality, merger, scènes à faire, functionality), many of the hard goods elements of Carter Bryant's fall away entirely or fade in significance. The anatomical aspects of the sketches, the standard poses, the aspects of the art based on human features, well-known techniques), and prior art that was widely available and to which Carter Bryant acknowledges he was exposed leaves a rather modest residue of copyright protection in the basic doll design. The strongest claim to copyright lies in the compilation of elements. But since the individual elements themselves attract relatively modest (if any) protection, the compilation itself only enjoys protection against "bodily appropriation" or "virtual identity." As the comparisons show, MGA's Bratz blank and face paint do not reflect anywhere near that level of similarity. The elements differ quite significantly from the Bryant sketches. And the compilation itself reflects many prior art aspects (other fashion dolls, the Spice Girls) and scènes à faire. Based on these considerations, I do not believe that MGA's Bratz dolls infringe copyright in the Carter Bryant doll sketches.

## III. Analysis of the 1999 Mattel "EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT" Signed by Carter Bryant

67. It is my understanding that the parties dispute whether Carter Bryant prepared the "Bratz Sketches" in 1998, prior to his rejoining Mattel in early 1999, or while employed by Mattel after January 4, 1999.  MGA has asked to me to provide my opinion on two questions: (1) whether Mattel's "EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT" (hereinafter "1999 Agreement"), which Carter Bryant signed on January 4, 1999, would provide for Mattel to own a trade secret for the Bratz line of fashion dolls if Bryant conceived the idea between January 4, 1999 and his departure from Mattel on October 19, 2000; and (2) whether the 1999 Agreement would provide for Mattel to own copyright (or any other intellectual property rights) in the Bratz sketches if they were in fact created between January 4, 1999 and his departure from Mattel on October 19, 2000.

68. *General Basis for Opinion.*  Over the course of my career, I have analyzed a wide range of employment and licensing agreements in the entertainment and technology industries. This has included teaching about assignment agreements in courses on entertainment law and intellectual

-23-

*CP1*

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT _____

PAGE _____ *1446*

property law, examining hundreds of intellectual property licensing agreements in the course of consulting and expert work, and studying cases, treatises, and industry form books on employment, licensing, trade secrets, and assignment agreements for scholarship on the termination of transfers provisions of the Copyright Act, a casebook comprising a series of case files on entertainment law, and articles on the intersection of intellectual property and bankruptcy law.

69. *Specific Basis for Opinion.*  In conducting this analysis, I have drawn upon the following sources: (1) 1999 Mattel agreement; (2) other Mattel employment agreements; (3) deposition testimony of Carter Bryant, Tim Kilpin, Alan Kaye, Ann Driskill, Anna Rhee, Sandy Yonemoto, Lissa Freed, Veronica Marlow, Adrian Fontanella, Ivy Ross, Maureen Tafoya, Teresa Newcomb; (4) Expert Report of Christina Tomiyama; (5) treatises and cases on California contract law and the interpretation of employment agreements; (6) U.S. Patent and Trademark Office records relating to Mattel's patents; and (7) general intellectual property, entertainment law, and IP licensing books, treatises, and form books.

70. *Legal Standard.*  In interpreting written employment agreements (as well as written contracts generally), California courts look to the objective manifestations of the parties' intent, including the words used in their agreement as well as extrinsic evidence, including: the circumstances surrounding the formation of the agreement; the nature, purpose, and subject matter of the contract; and the parties' subsequent conduct.[1]  See *People v. Shelton*, 37 Cal. 4th 759, 767, 37 Cal. Rptr. 3d 354 (2006); *Wolf v. Superior Court*, 114 CA4th 1343, 1356, 8 CR2d 649 (2004); *De Anza Enters. v Johnson*, 104 CA4th 1307, 1315, 128 CR2d 749 (2002); see generally George W. Kuney and Donna C. Looper, California Law of Contracts §5.1 (2007).  Where the terms of a contract are uncertain, California Civil Code §1654 provides, following the doctrine of *contra preferentem* (interpreting ambiguous agreements against the drafter), that "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist."  See *Powerine Oil Co., Inc. v Superior Court*, 37 C4th 377, 33 CR3d 562 (2005).  This rule applies with particular force in the context of  "contracts of adhesion" -- in which a party with strong bargaining power drafts and offers a standardized contract on a "take-it-or-leave-it" basis.  See *Badie v Bank of America*, 67 CA4th 779, 79 CR2d 273 (1998); *Neal v. State Farm Ins. Cos.*, 188 CA2d 690, 695, 10 CR 781 (1961); see generally George W. Kuney and Donna C. Looper, California Law of Contracts §5.73 (2007).  Even beyond this interpretive convention, California courts impose two further limitations on contracts of adhesion.  First, a provision that "does not fall within the reasonable expectations of the weaker or 'adhering' party will not be enforced against him."  Second, under principles of equity, unduly oppressive or "unconscionable" provisions are not enforceable.  See *Cubic Corporation v. Marty*, 185

---

[1] California courts construe the parol evidence rule narrowly.  Extrinsic evidence is admissible to explain the meaning of a written contract as long as it is "relevant to prove a meaning to which the language of the instrument is reasonably susceptible," even if no ambiguity is apparent on the face of the document.  See *PG&E v G.W. Thomas Drayage & Rigging Co., Inc.*, 69 C2d 33, 37, 69 CR 561 (1968).

EXHIBIT _____ 99

PAGE _____ 1447

CONFIDENTIAL --
ATTORNEYS EYES ONLY

Cal.App.3d 438, 229 Cal.Rptr. 828, 1 U.S.P.Q.2d 1709 (Cal. Ct. App. 1986).

71. *Formation of the 1999 Agreement.* As a threshold matter, it is my opinion that the 1999 Agreement is a contract of adhesion. Under California law, a "contract of adhesion" is a standardized contract that is drafted and presented by a party having superior bargaining power to another on a take-it-or-leave-it basis. The 1999 Agreement is a pre-printed form contract specifying terms. It does not include spaces for filling in or altering the specified terms. The only area for writing contains two signature lines, one for the employee and one for the company representative. Carter Bryant stated that he was not given an opportunity to read the agreement. In his words, "[w]e were basically just instructed to sign the paperwork to begin work." See Deposition of Carter Bryant, 30:21-31:25. Teresa Newcomb signed Bryant's 1999 Agreement on behalf of Mattel on January 4, 1999. At the time of her deposition in this matter (in 2008), she was a Senior Recruiter at Mattel. She testified that it was her understanding that the confidentiality and inventions agreement was not negotiable. See Deposition of Teresa Newcomb, 110:13-113:12. Lissa Freed, a Director of Human Resources at Mattel since 2001 testified that the "Employee Confidential Information and Inventions Agreement" is a standard form that new Mattel employees sign. See Deposition of Lissa Freed, 18:10-24:21.

72. *Summary of the 1999 Agreement.* The 1999 Agreement begins with a preamble summarizing the principal obligations. Section 1 sets forth the "Trade Secret" provisions. Section 2 contains the "Ownership of Inventions" provisions. Section 3 addresses "Conflicts with Other Activities." Section 4 includes various provisions relating to: modification, termination, and waiver; severability; remedies; and choice of law.

73. *The Trade Secret Provisions.* Section 1 of the 1999 Agreement is entitled "Provisions Related to Trade Secrets." For purposes of determining whether Mattel might have owned a trade secret for the Bratz line of fashion dolls (under the assumption that Bryant conceived the idea during the term of the agreement), the pertinent language provides:

> (a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.
>
> (b) As used in the Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors, and other persons and entities with whom the Company does business.
>
> (c) I will not disclose or use at any time either during or after my employment

-25-

EXHIBIT _____ 99

PAGE _____ 1448

CONFIDENTIAL –
ATTORNEYS EYES ONLY

with the Company, any Proprietary information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary information.

(d)   Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable, and other materials (including all copies) in my possession, custody or under my control containing or disclosing Proprietary information.

74. *Analysis of the Trade Secret Provisions of the 1999 Agreement.* Subsection (a) contains an acknowledgment that "Proprietary information" includes "information" that an employee may develop or discover "as a result of" employment with Mattel. Subsection (b) defines "Proprietary Information" to mean "any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors, and other persons and entities with whom the Company does business." This definition tracks the definition of a "trade secret" in the Uniform Trade Secrets Act.

75. *Application of Trade Secret Provisions of the 1999 Agreement to Carter Bryant's Bratz Fashion Doll Idea.* Under the assumption that Carter Bryant came up with the Bratz idea between January 4, 1999 and October 19, 2000, the question arises whether this idea falls within the general definition of "Proprietary Information" and whether he developed it "as a result of" his employment with Mattel. If so, then he may not "disclose or use [it] at any time either during or after [his] employment with the Company . . . except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing." See Subsection (1)(c). Furthermore, he would be obliged to "deliver to the Company all tangible, written, graphical, machine readable, and other materials (including all copies) in [his] possession, custody or under my control containing or disclosing [such] information" upon his termination. See Subsection (1)(d).

76. *Interpretation of "As a Result of My Employment with the Company" in the 1999 Agreement.* A critical threshold question in evaluating whether or not Carter Bryant had any trade secret obligations vis à vis Mattel with regard to his Bratz idea is understanding what is meant by the phrase "as a result of my employment with the Company" in subsection 1(a) of the 1999 Agreement. California Civil Code §1644 requires contract language to be given its ordinary common meaning unless it is clear that the parties intended a special or technical meaning. There is no reason to believe that this phrase was intended to be given special or technical meaning. In my opinion, the ordinary meaning of "as a result of my employment with the company" is at best ambiguous as applied to Bryant's development of the Bratz concept. "As a result of my employment with the Company" would certainly cover ideas or projects that fell

-26-

CONFIDENTIAL –
ATTORNEYS EYES ONLY

EXHIBIT _____ 99 _____

PAGE _____ 1449 _____

directly within an employee's job responsibilities. Thus, had Bryant been a doll designer working in a flanker brand division, then he would have not been at liberty to develop a new doll line on his own. But as Tina Tomiyama, who worked with Carter Bryant at Mattel during the time period in question, reports, the Bratz "sketches were entirely unrelated to the work Carter was asked to do in the Barbie® Collectibles group." Expert Report of Christina (Tina) Tomiyama. Furthermore, Carter Bryant was a "soft goods" designer, not a doll designer. Tomiyama further notes that many of Mattel's creative employees in the Design Center pursued personal artistic projects and developed their art portfolio in their spare time.

77. *Interpretation of Ambiguous Terms.* California Civil Code §1654 provides that "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." This rule applies with special force in the case of contracts of adhesion. Therefore, it is my opinion that the phrase "as a result of my employment with the Company" would be construed narrowly if Bryant's conception of the Bratz idea were determined to have occurred during the term of the 1999 Agreement.

78. *The Inventions Ownership Provision.* Section 2 of the 1999 Agreement is entitled "Ownership of Inventions." For purposes of determining ownership of intellectual property in the Bratz sketches (under the assumption that they were prepared during the term of the agreement), the pertinent language provides:

> (a) I agree to communicate to the Company as promptly and fully as practicable all inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents, and copyrights for all such inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

> (b) As used in this Agreement, the term "inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data, computer programs and formulae, whether patentable or unpatentable.

I believe that both ordinary and technical meaning suggest that this "inventions" ownership provision does not cover expressive artistic drawings but rather technological works.

79. *Analysis of Inventions Ownership Provisions of the 1999 Agreement: Ordinary Meaning.* Section 2(a) refers to "inventions," which section 2(b) defines as including, "but not limited to, all discoveries, improvements, processes, developments, designs, know-how, data, computer programs and formulae, whether patentable or unpatentable." California courts typically consult a dictionary to determine ordinary meaning. See *People ex rel Lockyer v. R.J. Reynolds Tobacco*

-27-

EXHIBIT 99

PAGE 1450

CONFIDENTIAL –
ATTORNEYS EYES ONLY

*Co.*, 116 CA4th 1253, 1263, 11 CR3d 317 (2004). Standard dictionary definitions refer to: "a device, contrivance, or process originated after study and experiment," *Merriam-Webster Dictionary* (on-line edition); and "a new device, method, or process developed from study and experimentation: the phonograph, an invention attributed to Thomas Edison," *American Heritage Dictionary* (on-line edition). Thus, the ordinary meaning of the word "invention" in the context of the 1999 Agreement relates to technological innovation. This interpretation is reinforced by the list of topics covered in section 2(b), all of which relate to technological creativity. By contrast, if this agreement was intended to cover artistic creativity of the types that Carter Bryant and other fashion illustrators would recognize, it would refer to pictorial or graphic works, artistic creativity, and/or works of authorship.

80. *Analysis of Inventions Ownership Provisions of the 1999 Agreement: Technical Meaning.* Civil Code §1645 provides that: "[t]echnical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense."[2] Viewing the terms in Sections 2(a) and (b) of the Mattel Inventions Agreement from a technical perspective, they cover the general subject matter of the Patent Act, as opposed to expressive graphic works that fall more squarely within copyright law's domain (with a caveat for designs and computer programs, which I address below). Beginning with the U.S. Constitution, the Intellectual Property Clause distinguishes between "Writings" and "Discoveries," the former relating to copyright subject matter and the latter corresponding to patent subject matter. See U.S. Constitution, Art. I, Sec. 8, Cl. 8. In delineating the permissible subject matter of the Patent Act, Section 101 states "[w]hoever *invents* or *discovers* any new and useful *process*, machine, manufacture, or composition of matter, or any new and useful *improvement* thereof." (Emphasis added). This provision thus covers four of the terms listed in Section 2(b): "inventions," "discoveries," "processes," and "improvements." The term "developments" is closely related to "improvements." It also arises in the context of "research and *development*," a term associated with technological innovation. The term "know-how" is synonymous with tacit trade secret knowledge, which has specialized meaning in technology industries. "Data," "computer programs," and "formulae" all have strong technological associations. The last remaining term, "designs," is somewhat more ambiguous, being associated with both technological (structural design, machine design) and artistic (fashion, art) activities. Taking all of the terms listed in subsection 2(b) together, however, reinforces the technological interpretation of "design." In my experience, with the exception of "design," these terms are not commonly used in art-oriented workplaces or agreements – such as advertising, animation, film, theatrical, or literary fields. Subsection 2(a) bolsters this patent-oriented,

---

[2] See *Denver D. Darling, Inc. v. Controlled Env'ts Constr., Inc.*, 89 CA4th 1221, 1236, 108 CR2d 213 (2001) (allowing admission of parol evidence to explain when, in the context of a building contract, the concrete surfaces in a cold-storage facility would be required to meet a high degree of flatness); *Rosen v State Farm Gen. Ins. Co.*, 30 C4th 1070, 135 CR2d 361 (2003) (holding that a homeowner's insurance policy that defined the term "collapse" to mean "actually fallen down or fallen into pieces" did not provide coverage for the imminent collapse of two decks).

-28-

EXHIBIT _____99_____

PAGE _____1451_____

CONFIDENTIAL –
ATTORNEYS EYES ONLY

technological meaning through the reference to "all inventions *conceived and reduced to practice.*" The terms "conception" and "reduction to practice" derive clearly from Section 102(g) of the Patent Act. Such technical terms of art are used in determining who was the first to invent in a priority battle for ownership of utility patents. By contrast, the Copyright Act does not talk in terms of "inventions" but rather of "authorship." Section 102(b) of the Copyright Act expressly excludes any "idea, procedure, process, system, method of operation, concept, principle, or discovery" from copyright protection.

81. *"whether patentable or unpatentable."* The final clause of the definition of subsection 2(b) – "whether patentable or unpatentable" – reinforces the technological focus of the invention ownership provision. The first part of the clause is clear – "patentable." Utility patents fall on the technology side of the technology/art divide. One could quibble that the availability of "design patents" reaches into the more artistic domain. Having done an exhaustive review of all 1,225 patents held by Mattel, I can say with confidence that Mattel has not pursued design patents on the types of expressive art reflected in Carter Bryant's Bratz sketches. To the contrary, the overwhelming majority of the design patents are toy or device related. Mattel has not used design patents to protect its core fashion design franchises. The second part of the final clause -- unpatentable – can be interpreted in one of two ways: (1) like patentable things but not necessarily meeting the technical requirements for patentability (i.e., not novel, obvious); or (2) any creativity, whether or not like patentable things. The latter interpretation would mean that the entire clause was superfluous. By stating "whether patentable or unpatentable," the clause most plausibly indicates that the definition of "invention" is not limited to things that meet the requirement of the Patent Act, although it is limited to the technologically-oriented terms set forth.

82. *Understanding the reference to "copyrights" and "copyright applications" in subsection 2(a).* The reference to "copyrights" and "copyright applications" in subsection 2(a) creates some tension with the "technology" limitation on inventions. In my view, however, that tension is removed by recognizing that computer programs are eligible for both patent and copyright protection. And Mattel had in fact entered markets for computer-related games and toys by the mid-1990s.

83. *Circumstantial evidence of the meaning of "inventions": Mattel's business and patenting activity.* California courts will consider a wide range of evidence bearing on the meaning of a contract term. If Mattel was limited to the "Barbie" and fashion dolls, then the "technological" interpretation of "invention" might seem odd. It is important to recognize that Mattel is a broad-based toy company, with many technologically oriented divisions. It is common for legal departments in large enterprises to standardize invention assignment agreements and to have all employees in the enterprise sign the form, if it bears little connection to the work of that employee. The University of California has all professors – whether in hard sciences, law, or English – assign their "inventions" made within the scope of their employment over to the University. Yet this clause does not extend to copyrightable works. A review of Mattel's extensive patent portfolio (1,226 patents) reveal a wide range of patenting acitivity, although little related to fashion dolls. Those relatively rare patents that even mention "fashion dolls"

-29-

EXHIBIT 99
PAGE 1452

CONFIDENTIAL – ATTORNEYS EYES ONLY

(including a rare design patent) do not relate to the "soft goods"-type of work that Carter Bryant was engaged in. The fashion doll-related patents principally relate to mechanical features of the dolls, and not their visual or artistic characteristics.

84. *Circumstantial evidence of the meaning of "inventions": Subsequent Changes to Mattel's Standard Form Inventions Agreement.* California courts will consider parties' subsequent behavior in interpreting contractual terms. In March 2004, Mattel substantially rewrote its "Employee Confidentiality and Inventions Agreement" to cover:

> (b)   Disclosure of Inventions; Ownership and Assignment of My Mattel Inventions.
>> (i)   Disclosure of All Inventions. I will promptly disclose in confidence to Mattel all inventions, discoveries, improvements, developments, designs, works, original works of authorship, ideas, know-how, formulas, processes, methods, software programs, databases, mask works, and trade secrets, whether or not patentable, copyrightable, or protectable as trade secrets (collectively, "Inventions") . . .
>
> (c)   Assignment of Mattel's Proprietary Rights. In addition to the assignment of My Mattel Inventions to Mattel set forth in Section 2(b)(ii), I agree to assign to Mattel, and do hereby irrevocably assign to Mattel, in perpetuity and without any limitation or reservation of rights, all of my right, title, and interest in and to (i) all worldwide patent rights, copyrights, trade mark rights, good will, mask work rights, trade secret rights, and other intellectual property rights in and to My Mattel Inventions, and (ii) all Moral Rights in and to all of the foregoing (all of the foregoing, "Mattel's Proprietary Rights"). . . .

Note that the new definition of "inventions" specifically encompasses "original works of authorship" and expands the final clause to state "whether or not patentable, copyrightable, or protectable as trade secrets." This agreement specifically refers to assignment of "copyrights." These changes imply that the prior definition either did not cover copyrightable expression or, at a minimum, that the prior language was ambiguous with regard to ownership of expressive works.

85. *Ambiguous Terms.* As explained above, I consider the 1999 Agreement invention assignment clause to exclude the Bratz sketches even if they were done by Carter Bryant during the period he was employed at Mattel. At a minimum, the scope of the inventions clause is ambiguous as it relates to such works. California Civil Code §1654 provides that "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." This rule applies with special force in the case of contracts of adhesion. Therefore, it is my opinion that the 1999 Agreement does not extend to the Bratz sketches. Furthermore, I do not believe that such a broad interpretation of the inventions assignment provision would "fall

EXHIBIT _____ 99

PAGE _____ 1453

CONFIDENTIAL – ATTORNEYS EYES ONLY

within the reasonable expectations of the weaker or 'adhering' party." See *Cubic Corporation v. Marty*, 185 Cal.App.3d 438, 229 Cal.Rptr. 828, 1 U.S.P.Q.2d 1709 (Cal. Ct. App. 1986).

86. *Ineligibility of Bryant's Bratz Concept or Sketches for Utility Patent Protection circa 2000.* Based on my understanding of patent law, I do not believe that the concept or sketches for the Bratz dolls could have received a utility patent. It is doubtful that the Patent Office would seriously consider a patent application for fashion dolls apart from any mechanical or other technological features. Utility patents are not available for purely aesthetic features of articles of manufacture. There were no technological features in the Bratz concept or sketches.

87. I continue to review materials relating to this matter and reserve the right supplement my report as appropriate.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of February, 2008, at Berkeley, California.

Peter S. Menell

-31-

EXHIBIT 99

PAGE 1454

CONFIDENTIAL –
ATTORNEYS EYES ONLY

**EXHIBIT 100**

IN THE HIGH COURT OF THE                    HCA 2687/2003
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
CIVIL ACTION NO. 2687 OF 2003

BETWEEN

MGA ENTERTAINMENT INC.                    Plaintiff

and

(1)    HUNGLAM TOYS COMPANY LIMITED
(2)    CHOY KAM YING, CANDY
(3)    KWOK YIN KWAN, MAY
(4)    KWOK CHIN HUNG                    Defendants

## AFFIDAVIT OF DAPHNE GRONICH

I, Daphne GRONICH of 16380 Roscoe Boulevard, Van Nuys, California 91406, the United States of America, hereby make oath and say as follows:-

1.    I am the General Counsel of MGA Entertainment, Inc. formerly known as ABC International Traders, Inc. trading as MGA Entertainment, the Plaintiff herein (hereinafter referred to as "MGA Inc."). MGA Inc. is a company incorporated and existing under the laws of the State of California in the U.S.A. I am duly authorized by MGA Inc. to make this affidavit for and on its behalf pursuant to Section 121 of the Copyright Ordinance, Cap. 528. Unless otherwise stated, the facts and matters contained herein are true to the best of my knowledge and belief and they either are within my own personal knowledge or gleaned from books and records of MGA Inc.

EXHIBIT ___6B___

PAGE ___481___

EXHIBIT ___100___

PAGE ___1455___

(49 pgs)

Exhibit no. ___949___
Date: ___10/9/07___
Woodman  P. Pyburn

Confidential - Attorney's Eyes Only

MGA 0883230

949-1

to which I have access.  Insofar as facts and matters that do not fall within the aforesaid category, they are related to me by the respective sources stated hereunder and are true to the best of my knowledge and belief.

2.   MGA Inc. is a successful and reputable company in the toy business internationally. Since 1987, it has concentrated and focused its efforts primarily in the toy industry.

3.   The toys designed and marketed by MGA Inc. have won international acclaim and were made the subject of numerous awards and prizes.  However, the most successful toys designed and marketed by MGA Inc. must be the BRATZ dolls.

4.   MGA Inc. is and was at all material times the owner of copyright in the following artistic works relating to the BRATZ dolls ("the Copyright Works").

### Particulars of the Copyright Works

5.   (a)   15 design drawings of various BRATZ fashion dolls ("the Design Drawings"); now produced and shown to me marked as "DG-1" are true copies of the Design Drawings.

(b)   1 drawing of a body sketch of the BRATZ fashion dolls ("the Body Sketch"); now produced and shown to me marked as "DG-2" is a true copy of the Body Sketch.

EXHIBIT _____ 68

PAGE _____ 488

2

Confidential - Attorney's Eyes Only

EXHIBIT _____ 100

PAGE _____ 1456

MGA 0883231

919-2



(c)   wax models of the head, body and shoes of the BRATZ fashion dolls ("the Wax Models").

(d)   silicon rubber moulds of the head, body and shoes of the BRATZ fashion dolls made from the Wax Models ("the Silicon Rubber Moulds").

(e)   polyurethane samples of the head, body and shoes of the BRATZ fashion dolls made from the Silicon Rubber Moulds ("the PU Samples"); now produced and shown to me marked as "DG-3" is the photograph of the PU Samples being true copies of the same.

(f)   4 drawings of the facial decoration of the BRATZ fashion dolls ("the Decoration Directions"); now produced and shown to me marked as "DG-4" are true copies of the Decoration Directions.

(g)   8 drawings 4 of which are pantone colour guides of the facial decorations of the BRATZ fashion dolls ("the Pantone Colour Guides"); now produced and shown to me marked as "DG-5" are true copies of the Pantone Colour Guides.

(h)   4 hand-painted décor-masters on 4 rubber head sculpts of the BRATZ fashion dolls ("the Décor-Masters"); now produced and shown to me marked as

3

EXHIBIT __lol8__

PAGE __489__

Confidential - Attorney's Eyes Only

EXHIBIT __lol0__

PAGE __1457__

MGA 0883232

949-3

"DG-6" is the photograph of the Décor-Masters being true copies of the same.

## Particulars of Subsistence and Ownership of the Copyright Works

6. (a) Carter Bryant (hereinafter referred to as "**Mr. Bryant**") made the Design Drawings, the Body Sketch, the Decoration Directions and the Pantone Colour Guides referred to in paragraph 5(a), (b), (f) and (g) hereinabove wherein copyright subsist.

(b) Mr. Bryant made the aforesaid copyright works at the following times and place:-

| The Copyright Works | Time of creation | Place of Creation |
|---|---|---|
| Design Drawings | Between 1998 and prior to 18th September 2000 | Missouri and California |
| Body Sketch | Around November 2000 | California |
| Decoration Directions | Between late 2000 and 2001 | California |
| Pantone Colour Guides | Between late 2000 and 2001 | California |

(c) (i) Pursuant to an agreement dated 18th September 2000 ("the Bryant 2000 Agreement"), Mr. Bryant assigned all rights including the copyright subsisting in the Design Drawings to MGA Inc. Now produced and shown to me marked as "DG-7" is a true copy of the Bryant 2000 Agreement.

EXHIBIT 68

PAGE 490

4

Confidential - Attorney's Eyes Only

EXHIBIT 106

PAGE 1458

MGA 0883233

949.6

(ii)   As for the Body Sketch, Decoration Directions and Pantone Colour Guides, they were made by Mr. Bryant subsequent and pursuant to the Bryant 2000 Agreement which provides, inter alia, that copyright subsisting in the works should vest in MGA Inc.

(iii)   MGA Inc. and Mr. Bryant had further entered into a "Modification and Clarification of the Agreement dated September 18, 2000" in May 2004 making modifications to and/or clarification of the Bryant 2000 Agreement. Now produced and shown to me marked as **"DG-8"** is a true copy of the said Agreement.

(iv)   By virtue of the aforesaid, MGA Inc. is the owner of the Design Drawings, the Body Sketch, Decoration Directions and Pantone Colour Guides and the copyright subsisting therein.

(d)   At the time when the aforesaid copyright works were created, Mr. Bryant was a resident of the USA and was domiciled in the States of Missouri and California in the USA. As at the date hereof, Mr. Bryant's residence and domicile are unchanged.

7.   (a)   Margaret Leahy (hereinafter referred to as **"Ms. Leahy"**) made the Wax Models referred to in paragraph 5(c) hereinabove wherein copyright subsist.

(b)   Ms. Leahy made the Wax Models between the Years 2000 and 2001 in the

5

EXHIBIT ___68___

PAGE ___491___

Confidential - Attorney's Eyes Only

EXHIBIT ___100___

PAGE ___1459___

MGA 0883234

949.15

State of California in the United States of America.

(e)   (i)    Ms. Leahy was commissioned by MGA Inc. to make the Wax Models. At all material times, it was the understanding and agreement between MGA Inc. and Ms. Leahy that copyright subsisting in the Wax Models should vest in MGA Inc.

(ii)    Pursuant to the understanding and agreement under the preceding sub-paragraph, Ms. Leahy entered into a confirmatory assignment in June 2003, which has been superseded by a re-confirmatory assignment entered into between MGA Inc. and Ms. Leahy in February 2004 ("the Leahy 2004 Assignment"). Now produced and shown to me marked as "DG-9" is a true copy of the Leahy 2004 Assignment.

(iii)    By virtue of the aforesaid, MGA Inc. is the owner of the Wax Models and the copyright subsisting therein.

(d)    At the time when the aforesaid copyright works were created, Ms Leahy was a resident of the USA and was domiciled in the state of California in the USA. As at the date hereof, Ms. Leahy's residence and domicile are unchanged.

(e)    The Wax Models were destroyed during the making of the Silicon Rubber Moulds. The Silicon Rubber Moulds being the negative of the Wax Models, however, evidence the existence of the Wax Models.

EXHIBIT _68_

PAGE _492_

6

Confidential - Attorney's Eyes Only

EXHIBIT _100_

PAGE _1460_

MGA 0883235

Q.a 1

8.  (a)  Jessie Ramirez ("hereinafter referred to as "**Mr. Ramirez**") made the Silicon Rubber Moulds and the PU Samples referred to in paragraph 5(d) & (e) hereinabove wherein copyright subsist.

(b)  Mr. Ramirez made the Silicon Rubber Moulds and the PU Samples between the Years 2000 and 2001 in the State of California in the United States of America.

(c)  (i)  Mr. Ramirez was commissioned by MGA Inc. to make the Silicon Rubber Moulds and the PU Samples. At all material times, it was the understanding and agreement between MGA Inc. and Mr. Ramirez that copyright subsisting in the Silicon Rubber Moulds and the PU Samples should vest in MGA Inc.

(ii)  Pursuant to the understanding and agreement under the preceding sub-paragraph, Mr. Ramirez had entered into a confirmatory assignment on 16th June 2003. Now produced and shown to me marked as "**DG-10**" is a true copy of the said confirmatory assignment.

(iii)  By virtue of the aforesaid, MGA Inc. is the owner of the Silicon Rubber Moulds and the PU Samples and the copyright subsisting therein.

EXHIBIT 698
PAGE 493

7

Confidential - Attorney's Eyes Only

EXHIBIT 100
PAGE 1461

MGA 0883236

94a 2

(d)   At the time when the aforesaid copyright works were created, Mr. Ramirez was a resident of the USA and is domiciled in the State of California in the USA.   As at the date hereof, Mr. Ramirez's residence and domicile are unchanged.

(e)   The Silicon Rubber Moulds were destroyed during the making of the PU Samples.  The PU Samples being the negative of the Silicon Rubber Moulds, however, evidence the existence of the Silicon Rubber Moulds and constitute true copies thereof.

9.   (a)   Anna Rhee (hereinafter referred to as "Ms. Rhee") made the Décor-Masters referred to in paragraph 5(h) hereinabove wherein copyright subsist.

(b)   Ms. Rhee made the Décor-Masters between the Years 2000 and 2001 and in the state of California in the United States of America.

(c)   (i)   Ms. Rhee was commissioned by MGA Inc. to make the Décor-Masters. At all material times, it was the understanding and agreement between MGA Inc. and Ms. Rhee that copyright subsisting in the Décor-Masters should vest in MGA Inc.

(ii)   Pursuant to the understanding and agreement under the preceding sub-paragraph, Ms. Rhee had entered into a confirmatory assignment on

EXHIBIT ___68___

PAGE ___494___

8

Confidential - Attorney's Eyes Only

EXHIBIT ___100___

PAGE ___1462___

MGA 0883237

969.0



12th June 2003 which has been superseded by a re-confirmatory assignment made between MGA Inc. and Ms. Rhee on 27th January 2004 ("**the Rhee 2004 Assignment**"). Now produced and shown to me marked as "**DG-11**" is a true copy of the Rhee 2004 Assignment.

(iii)     By virtue of the aforesaid, MGA Inc. is the owner of the Décor-Masters and the copyright subsisting therein.

(d)     At the time when the aforesaid copyright works were created, Ms. Rhee was a resident of the USA and is domiciled in the State of California in the USA. As at the date hereof, Ms. Rhee's residence and domicile are unchanged.

### Design Process of BRATZ dolls

10.     (a)     As regards the BRATZ dolls, after making the Design Drawings exhibited hereto as "DG-1", which were created by Mr. Bryant using his own independent labour, skill and judgment, the Wax Models of the sculpting of the head, body parts and shoes of the BRATZ dolls were made by Ms. Leahy. The Wax Models were created by Ms. Leahy using her own independent skill and labour. The Wax Models were then used to make the Silicon Rubber Moulds of the head, body parts and shoes of the BRATZ dolls. The PU Samples were then made from the Silicon Rubber Moulds. The Silicon Rubber Moulds and the PU Samples were created by Mr. Ramirez using his own independent skill and labour.

9

EXHIBIT  68
PAGE  495

Confidential - Attorney's Eyes Only

EXHIBIT  100
PAGE  1463

MGA 0883238

949-7



(b)    Ms. Rhee was commissioned to design the facial decorations of the BRATZ

dolls. Based on the Pantone Colour Guides, she created the original Décor-

Masters which are hand-painted facial decorations on a rubber head sculpt of a

doll that were used to serve as the benchmark and template from which the

original several different BRATZ dolls' individual facial decorations are mass

produced by spray masking.

10

EXHIBIT 68

PAGE 496

Confidential - Attorney's Eyes Only

EXHIBIT 100

PAGE 1464

MGA 0883239

949.11

11.    The artistic works referred to in paragraph 5(a) to (h) hereinabove were first published

in the USA in or about June 2001 when the BRATZ fashion dolls were first exhibited

and offered for sale.  Alternatively, the said artistic works are unpublished.

Sworn at 16360 Roscoe Boulevard)
Van Nuys, California USA               )
                                       )
                                       )
this   6ᵀ    day of December 2005.     )

Before me,



Notary Public

This affidavit is filed for and on behalf of the Plaintiff.

11

EXHIBIT   68

PAGE   497

Confidential - Attorney's Eyes Only

EXHIBIT   100

PAGE   1465

MGA 0883240

G19  11

**EXHIBIT 101**

8-17-03

HCA 2687/2003

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

ACTION NO. 2687 OF 2003

———————

BETWEEN

MGA ENTERTAINMENT INC.                                        Plaintiff

                                and

HUNGLAM TOYS COMPANY LIMITED                        Defendant

———————

AFFIRMATION OF LEE SHIU CHEUNG

     I, Lee Shiu Cheung of Room 1001, Empire Centre, 68 Mody Road, Tsimshatsui East, Kowloon, Hong Kong do solemnly, sincerely and truly affirm and say as follows:-

1.     I am the Managing Director of MGA (H.K.) Entertainment Limited (hereinafter "MGAHK"), which is an affiliate and manufacturing licensee of MGA Entertainment Inc., the Plaintiff herein.  I am duly authorised by the Plaintiff to make this affirmation on its behalf.  Unless otherwise stated, the facts and matters contained herein are true to the best of my knowledge and belief and they either are within my

1

EXHIBIT ___10___

PAGE ___1466___

Confidential - Attorney's Eyes Only

MGA 0885915

own personal knowledge or gleaned from books and records of the Plaintiff to which I

have free access. Insofar as facts and matters that do not fall within the aforesaid

category, they are related to me by the respective sources stated hereinunder and are

true to the best of my knowledge and belief.

2.    The Plaintiff was originally founded in 1979 as a consumer electronics business. In

1987, the Plaintiff obtained exclusive rights to sell Nintendo handheld LCD game

players called Game Boy in the United States of America ("USA") and Game Boy

was an instant success worldwide. This event paved way for the Plaintiff to create

innovative products for other best selling licences, including Hello Kitty and Power

Rangers. In 2002, the Plaintiff added "Spider-Man: The Movie" and in 2003, "The

Hulk" to its already existing collection of licences. The Plaintiff is thus a successful

and reputable company in the toy business internationally. The Plaintiff holds other

licences including licences from Marvel Characters, Inc., Atari Corporation and BVS

Merchandising, Inc. (Disney). Now produced and shown to me marked "LSC-1" is a

copy of the corporate profile of the Plaintiff downloaded from its website.

3.    Since 1987 the Plaintiff has primarily concentrated and focused its efforts in the toy

industry and as at the date hereof, the Plaintiff has 8 product categories and they are

smart toys, interactive dolls, handheld games, fashion dolls, youth electronics, music,

licensed products and small dolls. In the years 2001 and 2002, the Plaintiff's revenue

exceeded US$98 million and exceeded US$225 million respectively. The projected

revenue for the year 2003 is over US$650 million due to the success of a range of

dolls known as BRATZ which is the subject matter of this action and will be dealt

2

EXHIBIT ___10_

PAGE ___1467_

Confidential - Attorney's Eyes Only

MGA 0885916

with in detail hereinafter. For the year 2002, the sale of BRATZ dolls and, accessories accounted for 69% of the total revenue of the Plaintiff. The Plaintiff forecasts that the sale of BRATZ dolls, and accessories for the year 2003 will account for 72% of the revenue of this year.

4.  Toys designed and marketed by the Plaintiff have been the subject of numerous awards and prizes. However, the most successful toy designed and marketed by the Plaintiff must be the BRATZ dolls. For two consecutive years in 2001 and 2002, the Plaintiff won the toy industry's most prestigious award, The People's Choice Toy of the Year for BRATZ-related toys. It has also won two consecutive Family Fun Toy of the Year award for BRATZ-related toys in 2001 and 2002. Additionally, in 2001 and 2002, BRATZ-related toys won Today's toy tests.

5.  The BRATZ dolls come in 2 sizes. The full version stands at 10 inches tall and the mini version stands at 4 and a half inches tall. This application only concerns the full version dolls.

**Subsistence and Ownership of Copyright Works**

6.  On or about 18th September 2000, the Plaintiff entered into an agreement with Mr. Carter Bryant ("Mr. Bryant") under which Mr. Bryant designed and developed a line of dolls known as BRATZ ("the Bryant Agreement"). Mr. Bryant was a graduate of Ottis College in fashion and toy design. Although BRATZ is a variation of the word "brats", the former was coined by the Plaintiff not to denote naughty or spoilt children but to denote hip and cool young adolescent or teenage girls. This idea of hip and

3

EXHIBIT __10__

PAGE __1468__

Confidential - Attorney's Eyes Only

MGA 0885917

cool is born out in the design of the BRATZ dolls.

7.   Now produced and shown to me marked "LSC-2" is a copy of the Bryant Agreement. I crave leave to refer to clause 3 of the Bryant Agreement whereby all intellectual property rights including copyright subsisting in the works generated by Mr. Bryant shall be owned by the Plaintiff. Pursuant and prior to the Bryant Agreement and commission, Mr. Bryant initially designed a range of 4 girls and subsequently extended the range by adding 1 more girl and 4 boys. The designs of the BRATZ dolls are all original drawings created by Mr. Bryant using his own independent labour, skill and judgement and wherein copyright subsist. At all material times, Mr. Bryant is a resident of and domiciled in USA.

8.   Now produced and shown to me marked "LSC-3" are true copies of 18 initial concept drawings of the first 4 BRATZ dolls designed by Mr. Bryant pursuant and prior to the Bryant Agreement. These drawings were made by Mr. Bryant on divers dates between 1998 and 2000 in the USA. Now produced and shown to me marked "LSC-4" is a true copy of a sheet of paper setting out the initial concept and idea of the BRATZ dolls by Mr. Bryant. The girls represent best friends in high school who love to trade clothes, shoes and hairdos. Since these accessories are interchangeable, the dolls can look different everyday. The success of the BRATZ dolls ensured a lucrative business of supplying accessories to the owners of the BRATZ dolls creating a steady stream of revenue.

9.   The first 4 BRATZ dolls were each given a name and a different ethnic origin so they

4

EXHIBIT ____ 10

PAGE ____ 1469

Confidential - Attorney's Eyes Only

MGA 0885918

could appeal to everyone in the targeted age group of girls between 5 and 14 years old. Cloe is Caucasian, Sasha is Black, Yasmin is Hispanic and Jade is Asian. Meygan is the fifth female doll that has been subsequently added to the range and is red-headed.

10.     After making the design drawings exhibited as "LSC-3", wax models of the sculpting of the head, body parts and shoes of the BRATZ dolls were made by Margaret Leahy who was a freelance sculptor in or about winter 2000-2001. These wax models were created by Margaret Leahy using her own independent skill, labour and judgement wherein copyright subsisted. Margaret Leahy was commissioned by the Plaintiff to make the said wax models for valuable consideration. At all material times, Margaret Leahy was a resident of and domiciled in USA. It was the understanding and agreement between Margaret Leahy and the Plaintiff that all intellectual property rights including copyright subsisting in the wax models shall belong to the Plaintiff. Now produced and shown to me marked "LSC-5" is a copy assignment of copyright executed by Margaret Leahy in favour of the Plaintiff.

11.     The wax models were then used to make silicon rubber moulds of the head, body parts and shoes of the BRATZ dolls. The silicon rubber moulds were made under commission by Jessie Ramirez under valuable consideration in or about winter 2000-2001. These silicon rubber moulds were created by Jessie Ramirez using her own independent skill, labour and judgement wherein copyright subsisted. At all material times, Jessie Ramirez is a resident of and domiciled in USA. It was the understanding and agreement between Jessie Ramirez and the Plaintiff that all intellectual property rights including copyright subsisting in the silicon rubber moulds shall belong to the

5

EXHIBIT ____ 101
PAGE ____ 1470

Confidential - Attorney's Eyes Only

MGA 0885919

Plaintiff. During the process of making the silicon rubber moulds the wax models were destroyed.

12. Polyurethane samples were produced from the silicon rubber moulds. The silicon rubber moulds have also been destroyed after the polyurethane samples were made. These samples were necessary for the making of production moulds of the dolls. There are now produced and shown to me marked "LSC-6" the polyurethane samples of the head sculpt and some body parts and shoes of BRATZ dolls. It was the understanding and agreement between Jesse Ramirez and the Plaintiff that all intellectual property rights including copyright subsisting in the polyurethane samples shall belong to the Plaintiff. Now produced and shown to me marked "LSC-7" is a copy assignment of copyright executed by Jesse Ramirez in favour of the Plaintiff.

13. The facial decorations and features of the BRATZ dolls are unique and much time, effort and monetary resources have been expended in creating and perfecting them. The Plaintiff commissioned one Anne Rhee to design the facial decoration of the BRATZ dolls with the understanding and agreement that all intellectual property rights including copyright shall belong to the Plaintiff. At all material times, Anne Rhee is a resident of and domiciled in USA.

14. Based on and originated from the initial concept drawings of Mr. Bryant, Anna Rhee drew some decoration directions for the facial decorations for different series of dolls. She then created the original deco or paint masters which are hand-painted facial decorations on a rubber head sculpt of a doll. With the input of Mr. Bryant, Ms Rhee

6

EXHIBIT ___ 1O1

PAGE ___ 1471

MGA 0885920

revised the deco masters a number of times until they were perfected being the final version that were used to serve as the benchmark and template from which the original four different BRATZ dolls' individual facial decorations were mass produced by spray masking. Now produced and shown to marked "**LSC-8**" is the pile of decoration directions (inclusive those on the 2001 Fall series) made by Anna Rhee from the initial concept drawings of Mr. Bryant in Winter 2000-2001, "**LSC-9a-d**" are the deco masters hand-painted by Anna Rhee for the 2001 Fall Series in about Winter 2000 - 2001 and "**LSC-10**" is a bundle of documents setting out the various changes during the design process made by Mr. Bryant. There is now produced and shown to me marked "**LSC-11**" a copy of the assignment of copyright executed by Anne Rhee in favour of the Plaintiff. Copyright subsisting in the above deco masters and decoration directions made by Anne Rhee belong to the Plaintiff and are covered by the assignment exhibited as "**LSC-11**" and the copyright subsisting in "**LSC-10**" is covered by "**LSC-2**".

15.     The Plaintiff has also registered the design of the first 4 BRATZ in the United Kingdom ("UK") in July 2001. There is now produced and shown to me marked "**LSC-12**" copy certificates of the design registration dated 27th July 2001.

16.     The first 4 BRATZ dolls were first published in the USA in June 2001 (2001 Fall Series) when they were offered for sale to the general public. The BRATZ dolls were available for sale in Hong Kong since December 2002. Now produced and shown to me marked "**LSC-13a-d**" are samples of the first 4 BRATZ dolls in their packaging.

7

EXHIBIT ___101___

PAGE ___1472___

Confidential - Attorney's Eyes Only                    MGA 0885921

17.   The BRATZ dolls are unique in a variety of ways including their oversized heads and individual facial decoration.  One thing that has contributed to the success of BRATZ is the oversized eyes and the protrusive mouth that are capable of being decorated with makeup and the diminished size of the nose that serves no decorative purposes. Thus, the elements of the face that can be made-up, the eyes and mouth, are exaggerated while the elements of the face that cannot be made-up, the nose, is reduced.   In addition, BRATZ make-up is multi-coloured and the eyelashes are exaggerated in size but limited in number of eyelashes.  The lipstick is also two-toned in order to draw attention to the lips.

18.   A prominent feature of BRATZ is the snap-on shoes.  Mr. Bryant's design of the snap-on shoes can be shown in the concept drawing with 2 identical girls standing in the same posture with four hands demonstrating the interchangeable hairdos and snap on shoes for the BRATZ dolls, the drawing titled "Basic Doll Piece Count" which narrates different interchangeable pieces of BRATZ dolls, inclusive "Pop On / Off Sneakers" and "Pop On / Off Mary Janes" (plat-formed sandals) and the body sketch all exhibited in "LSC-3" hereinabove.  The interchangeable shoes are an important part of the play value of BRATZ.  By employing snap-on shoes, girls are able to easily change the dolls footwear and it allows many different varieties of footwear to be worn by the dolls.

19.   The current average FOB sales value of the BRATZ dolls is US$10.66.

20.   The BRATZ dolls and their accessories are marketed and sold in more than 52

8

EXHIBIT ____ 10

PAGE ____ 1473

Confidential - Attorney's Only

MGA 0885922

countries and places including the European Union, the Americas, the Balkans, the Baltics, Norway, Switzerland, Russia, Ukraine, Poland, Hungary, Czech Republic, Lebanon, UAE, Saudi Arabia, Egypt, Syria, Israel, South Africa, Australia, New Zealand, Philippines, Indonesia, Taiwan, Thailand, Singapore, South Korea, Japan and Hong Kong.

21.   The BRATZ dolls have their own website at "www.bratzpack.com".   The site provides some games, e-greetings and Mix N Match Mall of BRATZ' fashion and hairdos.  The site also maintains a fan club known as BRATZ pack and maintain a list of its members.  The aim of this fan club is to notify its members of new fashion trends that the BRATZ dolls will wear themselves and launch and marketing thereof. Now produced and shown to me marked "LSC-14" are downloaded copies from the said website.

22.   So far the Plaintiff has spent a total of over US$22 million in advertising and on promotion expenses worldwide in relation to BRATZ.

23.   As mentioned hereinbefore, the BRATZ dolls have become an instant success and they have become collectibles.   Considerable media coverage have been given to these dolls and now produced and shown to me marked "LSC-15" is a selection of press cuttings and celebrity photos of the BRATZ pack including Singtao Daily dated 13th December 2002 and South China Morning Post dated 19th January 2003 which reported the official launch of BRATZ dolls in Hong Kong since December 2002.

9

EXHIBIT _____ 10 |

PAGE _____ 1474

Confidential - Attorney's Eyes Only

MGA 0885923

24. Another major source of revenue generated by the BRATZ dolls is income derived from merchandising rights by granting non-exclusive licences to other companies worldwide. So far, 120 merchandise licence agreements have been granted in respect of a wide range of products including paper napkins, girls clothing, jewelry, bedding, home furnishing, stationery, toiletries, video games, footwear and electrical appliances etc. Pursuant to these licenses, BRATZ branded goods are sold in Spain, Portugal, Australia, New Zealand, Finland, Germany, Austria, Switzerland, France, Belgium, Luxembourg, Mexico, Italy, UK, Ireland, Eire, Greece, Norway, Channel Islands, Brazil, Columbia, Greece, Cyprus, Denmark, Iceland, Sweden, Columbia, Venezuela, Turkey, Peru, Israel, all Central America countries, all Carribean Island countries, Dominican Republic, Ecuador, Venezuela, Bolivia, Paraguay, Chile, UAE, Saudi Arabia, Kuwait, Iran, Lebanon, Syria, Jordan, Egypt, Qatar, Oman, Behrain, Yemen and Hong Kong. The Plaintiff projects an annual licensing revenue of US$12 million per year by year end 2004.

25. Furthermore, the Plaintiff has granted exclusive distribution rights of the BRATZ dolls to, inter alia, Bandai UK Ltd. in the UK and Ireland since 1st April 2001 and to Hasbro S.A. in Belgium, the Netherlands and Luxembourg.

**The Defendant's Infringing Activities**

26. This is now produced and shown to me marked "LSC-16" being a copy advertisement on SCAMPZ Dolls which resemble the BRATZ dolls in Vol. 1 of 2003 Part 2 issue of the Hong Kong Toys magazine at p.615. There is now further produced and shown to me marked "LSC-17" copy latest annual return and business registration certificate of

10

EXHIBIT ___10___

PAGE ___1475___

Confidential - Attorney's Eyes Only

MGA 0885924

the Defendant.  The said advertisement was discovered by the Plaintiff's Solicitors Messrs. William W. L. Fan & Co. in or about early April 2003.

27.  Looking at the information of the Defendant, the Plaintiff noted that the Defendant had previously been involved in dealing with dolls infringing copyright of the Plaintiff in the BRATZ dolls called SCAMPZ at the Nuremberg Toy Fair 2003 in Germany.   However, on that occasion, the Defendant traded under the name "Hunglam International Co.".  I crave leave to refer to the business registration exhibited as "LSC-17", it shows that the Defendant traded also under the name "Hunglam International Co.".  In any event, the placing of the aforesaid advertisement was the first time the Plaintiff learnt of the Defendant's dealing with the SCAMPZ dolls in Hong Kong under either of its name.

28.  At the Nuremberg Toy Fair, it was the Plaintiff's distributor, Bandai Inc. in Germany who on or about 30th January 2003 discovered that, amongst others, one Hunglam International operated by the Defendant was exhibiting and selling the SCAMPZ dolls at its booth and made complaints to the Plaintiff about it.  The Plaintiff immediately warned the Defendant through its legal representative, Messrs. Neuhof Rechtsanwälte and demanded that the SCAMPZ dolls be removed from its booth.  At first the Defendant refused to do so but later changed its position on or about 2nd February 2003 and voluntarily removed the SCAMPZ dolls after consultation with their lawyer.

29.  At the time when the Defendant was found to have placed advertisement in the Hong Kong Toy magazine the Plaintiff was not aware of other occasions on which the

11

EXHIBIT _____ 101
PAGE _____ 1476

Confidential - Attorney's Eyes Only                                      MGA 0885925

Defendant had dealt with the SCAMPZ dolls other than at the Nuremberg Toy Fair. The aforesaid advertisement was apparently placed before the Defendant was warned at the Nuremberg Toy Fair and as the Defendant was being cooperative, it was not expected that subsequently there would be dealing with the SCAMPZ dolls by the Defendant. Nevertheless, considering that the advertisement was placed in Hong Kong, the Plaintiff decided that it would be prudent to issue a cease and desist letter to the Defendant in Hong Kong. It was expected that the Defendant would be cooperative as well as it did previously. That was the reason why in the cease and desist letter, the incident at the Nuremberg Toy Fair was particularly referred to. There is now produced and shown to me marked "LSC-18" copy letter dated 15th April 2003 the Plaintiff and MGAHK instructed Messrs. William W. L. Fan & Co. to issue to the Defendant. Shortly afterwards, a reply was received from the Defendant's solicitors herein asking for more time to conduct investigation and enquiring about the potential damages. There is now produced and shown to me marked "LSC-19" copy of the said letter.

30.    Despite the Plaintiff's being optimistic in the beginning about the Defendant's cooperation, as correspondence were exchanged between the parties, the Defendant seemed not to be willing to give any definite answer. Further produced and shown to me marked "LSC-20" are the other correspondences between the Plaintiff's and the Defendant's solicitors. In the letter dated 15th May 2003, the Defendant asked for more time and it is the last letter in the correspondences.

31.    In the meantime, Hasbro B.V., the Plaintiff's exclusive distributor of the BRATZ dolls

12

EXHIBIT ___10___

PAGE ___1477___

Confidential - Attorney's Eyes Only                                        MGA 0885926

in the Netherlands complained to the Plaintiff that a company called Toi-Toys B.V. ("Toi-Toys") was selling the SCAMPZ dolls in late May 2003. Hasbro B.V. immediately instructed its attorneys Messrs. Clifford Chance LLP to issue a cease and desist letter against Toi-Toys on 27th May 2003 and Toi-Toys replied by fax on or about 28th May 2003 that they were prepared to stop selling any infringing dolls and would want to sort out which of them infringed the Plaintiff's rights. In the course of corresponding with Toi-Toys during June 2003, Hasbro B.V. was informed by Toi-Toys that their supplier of the SCAMPZ dolls was the Defendant.

32.    Notwithstanding Hasbro B.V. had not taken further action against Toi-Toys, the Plaintiff had continued to instruct Hasbro B.V.'s attorneys to claim against Toi-Toys and had eventually settled the matter with Toi-Toys in August. Toi-Toys has acknowledged the Plaintiff's copyright in the Bratz dolls and confirmed that it will pay damages to the Plaintiff. Now produced and shown to me marked exhibit "LSC-21" being the copy letter from Hasbro B.V. to the Plaintiff dated 11th August 2003.

33.    Messrs. Clifford Chance LLP had in mid June 2003 sent to Messrs. William W. L. Fan & Co. a sample SCAMPZ doll Hasbro S.A. purchased from Toi-Toys B.V. in end May 2003. Now produced and shown to me marked exhibit "LSC-22" being the said doll bearing the name "SCAMPZ" on her boots.

34.    With this new information about the Defendant and lack of further reply from the Defendant, it became clear that the Defendant had been just employing delaying tactics with the Plaintiff. The Plaintiff decided not to further correspond with the

13

EXHIBIT        101

PAGE        1478

Confidential - Attorney's Eyes Only                MGA 0885927

Defendant but to proceed on conducting investigation on the Defendant. On or about 20th June 2003, the Plaintiff instructed Kroll Fact Finders Ltd. to investigate on infringing activities of the Defendant. In or about mid-July 2003, Fact Finders reported that the Defendant was indeed involved in the selling and trading of the SCAMPZ dolls in Hong Kong. I have read the Affirmation of Lam Yuen Chak from Fact Finders and verily believe the contents thereof to be true. I crave leave to refer to the same for the Defendant's infringing activities which shows that not only is the Defendant selling SCAMPZ, the manufacturing thereof is directed or authorized or at least closely connected with the Defendant.

35.   Apart from Toi-Toys, the Plaintiff received complaints in or about June 2003 from Bandai UK Ltd. that SCAMPZ was available at an Irish wholesaler. The Plaintiff had no information in regard to the source of SCAMPZ to the Irish wholesaler. Considering the close connection of the Defendant with the manufacturing of SCAMPZ, it is likely that the Defendant was involved one way or the other. Now produced and shown to me marked exhibit "LSC-23" being the copy letter from Bandai UK Ltd. to the Plaintiff dated 8th August 2003.

36.   In light of the above evidence, the Plaintiff decided to take legal action against the Defendant for copyright infringement. On 22nd July 2003, a writ against the Defendant was issued.

37.   Shortly after the writ has been issued, the Plaintiff had on 23rd July 2003 discovered that the Defendant exhibited and offered for sale and/or sold the SCAMPZ dolls at the

14

EXHIBIT _____ |D|

PAGE _____ /477

Confidential - Attorney's Eyes Only                                                    MGA 0885928

HK Houseware Fair and HK Gifts & Premium Fair 2003 ("the Hong Kong Fair").

The Plaintiff immediately instructed Messrs. William W. L. Fan & Co. to deal with

this matter. However, there was a typhoon coming to Hong Kong that day and

Typhoon Signal No.3 was hoisted the whole day with the expectation that Signal No.8

be hoisted later that day. Because of the typhoon, a complaint to the organizer, the

Trade Development Council ("the TDC") against the Defendant was made on 24th

July 2003. There is now produced and shown to me marked "LSC-24" copy

complaint letter (without enclosures) from Messrs. William W. L. Fan & Co. to the

TDC with IPR Form A in support of the Plaintiff's complaint. Although the TDC

accepted our complaint, due to substantial numbers of complaints at the Hong Kong

Fair, they took action and warned the Defendant only towards the end of that day.

Despite the TDC's warning, the Defendant refused to remove the SCAMPZ from it

booth. There is now produced and shown to me marked "LSC-25" copy IPR Form

B2 for the Defendant's refusal to the TDC. There is now produced and shown to me

marked "LSC-26" copy photograph taken by the TDC staff showing the SCAMPZ

dolls on display at the Hong Kong Fair.

38.   In the evening of 25th July 2003, Messrs. William W.L. Fan & Co. learnt from the

TDC that the Defendant claimed to be the registered owner of the designs in relation

to the SCAMPZ dolls. We were astonished to hear that and it was the first time the

Plaintiff knew of such registration despite our previous correspondence. There is now

produced and shown to me marked "LSC-27" copy of the certified true copy of the

entry in the Register of Designs relating to Design Registration No. 0310011.8 of

SCAMPZ dolls.

15

EXHIBIT ___ 101

PAGE ___ 1480

Confidential - Attorney's Eyes Only

MGA 0885929

**Serions Issue to be Tried**

39.    The first thing I noticed about SCAMPZ is its name which is similar in style and meaning with BRATZ.  Firstly, they both are variation of an actual word.  BRATZ derived from the word "brats" and the SCAMPZ obviously from the word "scamps" which both have similar meanings.  I have explained hereinabove why the Plaintiff varied the spelling of the word "brats" by replacing the letter "s" with a "z" in the end. Coincidentally, there is a "z" used instead of "s" in the name SCAMPZ.

40.    I have examined the SCAMPZ dolls as exhibited hereinabove and in Lam Yuen Chak's Affirmation and find that they are obviously slavish copy of the BRATZ dolls and is a clear infringement of the Plaintiff's copyright in BRATZ. The full sized BRATZ dolls each is about 10 inches tall, the SCAMPZ dolls each is of a bigger size which is about 17 inches tall.  However, apart from the size, it is really obvious that the SCAMPZ dolls are virtually the same as the BRATZ dolls in all material aspects.

41.    I crave leave to refer to ,the exhibit "**LSC-6**" the polyurethane samples of the head sculpt of BRATZ.  I would like to draw to this Honourable Court's attention of the shape and configuration of the head and face of SCAMPZ, all the prominent features of the BRATZ dolls are present in the SCAMPZ dolls including in particular the oversized head, eyes and lips and the diminished sized nose.

42.    The similarity between the BRATZ and SCAMPZ dolls is even more obvious when one looks at them including the facial decoration or makeup on each of the dolls' face.

16

EXHIBIT ___ |O |

PAGE ___ |4θ|

Confidential - Attorney's Eyes Only

MGA 0885930

I crave leave to refer to the exhibit "LSC-9a-d" the deco masters and "LSC-8" the decoration directions. The pattern, style and combination and layers of different colours of the multi-coloured facial decoration or makeup on the SCAMPZ dolls are substantially similar to that of the BRATZ dolls. Even the exaggerated eyelashes and two-tone lips in BRATZ are present in SCAMPZ.

43. All of above suggest a strong case of direct copying of the BRATZ dolls by the SCAMPZ dolls. In short, the Defendant has copied the head sculpt and the facial decoration of the Bratz dolls.

44. I have also looked at the registered design papers on SCAMPZ dolls exhibited as "LSC-27". The registration is for only shape and configuration of the head of the doll. The drawings attached to the certificate again show substantial similarities as described hereinabove with BRATZ especially when compared with exhibit "LSC-6".

45. I would draw to this Honourable Court's attention that the date of registration of the Defendant's design is 6th January 2003 which is clearly after the publication of the BRATZ dolls in the USA and Hong Kong hence not novel. I am also advised by the Plaintiff's legal advisors and verily believe that the Defendant's registered design is not an article by definition registrable under the Registered Designs Ordinance. In short, the Defendant's registered design in invalid. The Plaintiff will issue an Originating Motion for revocation under section 45 of the Registered Designs Ordinance for revocation of the Defendant's registration on grounds including lack of novelty and being non-registrable by definition. According to section 47 of the

17

EXHIBIT ___ 101

PAGE ___ 1482

Confidential - Attorney's Eyes Only

MGA 0885931

Registered Designs Ordinance, a revoked registration will be rectified and deemed never to have been made in the Register.

46. The Plaintiff could not register its design of the BRATZ in Hong Kong because it had been previously published. It must be wrong for the Defendant to be allowed to keep a registration of a design not new and not of their own and not registrable, it would further be wrong for the Defendant to take advantage of the Plaintiff's designs and have a free ride on the success of BRATZ.

47. Despite the previous warnings by the Plaintiff in Germany and in Hong Kong, the Defendant never disclosed that it held a registration of the designs in SCAMPZ in Hong Kong. The Defendant obviously did not want to alert the Plaintiff of its registration fearing actions be taken against it.

48. The similarities between BRATZ and SCAMPZ and the infringing acts of the Defendant have raised much more than a triable issue for copyright infringement as well as revocation of the Defendant's registered design. In any event, the Defendant's registration covered only shape and configuration of the head of the SCAMPZ dolls but the Plaintiff's claim copyright over their facial decoration as well which is something not covered by the said registration.

**Balance of Convenience**

49. By reason of the success of BRATZ many knock offs have appeared in the market. In order to saveguard the business interests and exclusivity of the BRATZ dolls, the

18

EXHIBIT 10
PAGE 1483

Confidential - Attorney's Eyes Only

MGA 0885932

Plaintiff had obtained interim injunctions in Hong Kong against Toys & Trends (Hong Kong) Limited, Cityworld Limited and Double Grand Corporation Limited. The Plaintiff has also taken action in the UK against LB Group Limited and David Halsall International Limited who settled the Plaintiff's claims and paid significant amounts of damages.

50.     As already adverted to hereinabove, one of the main revenue streams of the BRATZ dolls are licence fees.  The demand and price of BRATZ licences depend on the exclusivity and popularity of the product.

51.     The FOB Hong Kong value of SCAMPZ with accessories was US$6.40 each only, it could be as cheap as US$3.25 without accessories while BRATZ is sold at US$10.66. The quotations from the Defendant reflected that the infringing articles are cheap imitations of the BRATZ dolls.

52.     BRATZ is popular because of its unique funky and sassy image. I have explained the unique facial of the dolls. The SCAMPZ have copied BRATZ' image in particular the eyes and lips and this will dilute the exclusivity and affect the image of the BRATZ dolls.

53.     The continual sale of the cheap imitations will no doubt affect the demand of licences and the prices that the Plaintiff can command.  Any dilution in exclusivity and diminution in value of licence fee is a potential loss which is not measurable and cannot be adequately compensated by damages.  It is impossible to calculate the

19

EXHIBIT _____ 106

PAGE _____ 1484

Confidential - Attorney's Eyes Only

MGA 0885933

monetary loss in this regard.

54.     There have already been complaints to the Plaintiff from its exclusive distributors concerning the appearance of the infringing dolls on the markets. I crave leave to refer to "LSC-21" and "LSC-23" as referred to hereinabove. As shown therein, the continual sale of the cheap imitations would no doubt adversely affect the sales of BRATZ. It can be seen that the distributors of BRATZ are strongly concerned about the status of BRATZ knock off products protection. Thus, the appearance of the infringing SCAMPZ dolls have already caused concern and if the Defendant is not stopped, the Plaintiff's future bargaining power with Bandai group companies and Hasbro group companies would be affected. Bandai and Hasbro are two groups of the largest toy companies in the world and the Plaintiff cannot afford to maintain a lesser bargaining position with them by reason of the appearance of cheap imitations. This will affect the terms of the distributorships when they come up for renewal. Cheap imitations also affect the value of licence fees and such loss is irreparable and unquantifiable.

55.     In this particular case, the Defendant holds a registration of the designs of SCAMPZ albeit invalid. If the Defendant is not stopped as soon as possible, buyers and consumers might be misled into believing that the Defendant actually had the rights in SCAMPZ which is an imitation of BRATZ. Not only would this facilitate the distribution of SCAMPZ at a faster speed by the Defendant, it would also seriously undermine the faith of others in the Plaintiffs' intellectual property rights in BRATZ which would directly affect the position of the Plaintiff in dealing with its licensees.

20

EXHIBIT _____ 10 ]

PAGE _____ 1485

Confidential - Attorney's Eyes Only

MGA 0885934

56.    The targeted consumers of BRATZ dolls are girls aged between 4 and 14 years old. They may not all be savvy or mature enough to notice the SCAMPZ are not of the Plaintiff's manufacture.   Many customers may have mistakenly thought this is an addition to the line of BRATZ dolls.  Even without taking the aforesaid into account, it would be entirely a matter of guesswork to know how many sales of BRATZ dolls would have been made were it not for the Defendant's unlawful activities.  It would be difficult, if not impossible, for the Plaintiff to show any diminution in projected sales attributable to infringing copies on the market.

57.    Since toy safety laws in USA are very stringent, MGAHK has to conduct many safety, reliability and drop tests on the BRATZ dolls.   There is no evidence that the Defendant did any of these tests to comply with US legislation.  Although there is at present no evidence to show that SCAMPZ are available for sale in USA at retail level, this does not stop North American customers form purchasing them through the internet.  Due to the apparent similarity between the dolls, any accident caused by defective manufacture in USA or elsewhere e.g. may falsely be attributed to BRATZ dolls and the Plaintiffs.  Again this damage to reputation, especially to a new product is unquantifiable and irreparable.

58.    I crave leave to refer to exhibit "LSC-17" the latest annual return of the Defendant. The Defendant has a paid up capital of HK$20,000.  As shown by the Defendant's annual return herein, it is an insubstantial company and its ability to pay damages is in doubt.  On the other hand, as shown hereinabove the Plaintiff is a company doing

21

EXHIBIT ____ 10|

PAGE ____ 1486

Confidential - Attorney's Eyes Only

MGA 0885935

business in a substantial way and it is able and willing to give a cross-undertaking on damages.

59.     One of the customers of the Defendant was Toi-Toys, since Toi-Toy has already agreed with the Plaintiff not to deal with the SCAMPZ dolls any longer and has settled with the Plaintiff, the cessation of orders from Toi-Toys is not relevant in considering the effect of the Plaintiffs' present application against the Defendant.

60.     As mentioned in paragraph 17 of the Affirmation of Lam Yuen Chak, Candy of the Defendant stated that the SCAMPZ dolls have only been around since the end of last year. Messrs. William W. L. Fan & Co. have also visited the websites of the Defendant at www.hunglamtoys.com.hk recently on 23rd June 2003 and www.scampz.com on 8th August 2003, there were only blank pages indicating that it would be coming soon. Apparently, the SCAMPZ dolls are still in it early stage in marketing, an injunction against would cause only minimal impact on its sales. There is now produced and shown to me marked "LSC-28" copy pages downloaded from the Defendant's websites.

61.     After the aforesaid complaints from Bandai UK that there was SCAMPZ dolls available at one Irish wholesaler and pressure was put by them on the Plaintiff to cope with the situation. The Plaintiff instructed SJ Berwin to determine whether the SCAMPZ had hit the UK market but despite calling 100 retailers, it showed no evidence that the doll had hit the UK market. There is now produced and shown to me marked "LSC-29" copy e-mail from Paul Cox of SJ Berwin to Mitchell Kamarck

22

EXHIBIT ____ [0]

PAGE ____ /487

Confidential - Attorney's Eyes Only

MGA 0885936

of the Plaintiff dated 13th June 2003.  It is important that a stop be put on the spreading of SCAMPZ as experience and common sense tells me, only at initial stage can spreading of infringing products be effectively be controlled or stopped.

62.  It is essential that this Honourable Court grants an interim injunction against the Defendant as soon as possible because the month of August is considered critical in the sale of toys in general.  The month of August is the beginning of summer vacation for students, sale figures of toys are naturally high being one of the peak seasons for toy industry.  What is more important is that orders for Christmas which is the major peak season for toy industry are normally placed around this time.  Further, the Fair has just ended.  According to my experience, most of the orders generated from such fair come within the first 1 to 2 months immediately after.  I hereby humbly ask that this Honourable Court grants the relief as asked for in the summons.

Affirmed at Messrs. Chow, Griffiths    )
4chan of Rm 1902-4. Hang    )
Hang Building. 77 des Voeux    )
Road Central. H.K    )
    )
this 11 day of August 2003.    )

Before me,

NG TEE LOK
Solicitor, Hong Kong SAR
Chow, Griffiths & Chan

Solicitor, Hong Kong SAR

This affirmation is filed for and on behalf of the Plaintiff.

23

Confidential - Attorney's Eyes Only

EXHIBIT ___101___

PAGE ___1480___

MGA 0885937

HCA NO. 2687/2003

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

ACTION NO. 2687 OF 2003

---

BETWEEN

MGA ENTERTAINMENT INC.                    Plaintiff

and

HUNGLAM TOYS CO. LTD.                     Defendant

---

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**AFFIRMATION OF LEE SHIU CHEUNG**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Filed on the 12th day of August 2003.

**William W. L. Fan & Co.**
Solicitors

Room 507, Hang Seng Building,
77 Des Voeux Road Central,
Hong Kong.
Tel: 2110 2128       Fax: 2111 9336
Ref: WF-2015-RC

EXHIBIT _____ 10

PAGE _____ 1489

Confidential - Attorney's Eyes Only

MGA 0885938

HCA 2687/2003

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

ACTION NO. 2687 OF 2003

_____

BETWEEN

MGA ENTERTAINMENT INC.                    Plaintiff

and

HUNGLAM TOYS COMPANY LIMITED              Defendant

**********************************

This is the marked exhibit referred to in the Affirmation of Lee Shiu Cheung dated the 12th day of August 2003.

| Exhibit Ref | Date | Description | Page No. |
|---|---|---|---|
| LSC-1 | 03.06.2003 (downloading date) | Copy of the corporate profile of the Plaintiff | 1 |

Before me,

NG LEE LOK
Solicitor, Hong Kong SAR
Solicitors, Woo, Kwan, Lee & Lo

EXHIBIT ___101___

PAGE ___1496___

MGA 0885939

Confidential - Attorney's Eyes Only



**MGA Entertainment**
**A Consumer Products Entertainment Company**

Leading a revolution in family and children's entertainment, MGA Entertainment develops a broad range of proprietary and licensed products by using innovative designs and new technologies applied to its products. The company's diverse product line features Award-Winning fashion dolls and accessories, remote control action vehicles, special feature plush, interactive dolls, electronic handheld and virtual reality games, girl's lifestyle products, smart toys, and consumer electronics.

2002 marks the most productive year in MGA Entertainment's history, with continued success of its proprietary fashion doll line, Bratz, first launched in June of 2001. The company has gained recognition from a number of toy experts, and has received multiple Industry awards between 1998 and 2001, including The National Parenting Seal of Approval, Dr. Toy's Top 10 Best Children's Products, and two time winner of Herb Weisbaum's NBC Today Show Annual Toy Test. This year is no exception, winning the Toy Industry's most prestigious award, The People's Choice Toy of the Year for Bratz in February, followed by a second consecutive Family Fun Toy of the Year award for Bratz, this time for their newly introduced Salon N Spa play set.

MGA Entertainment was originally founded as a consumer electronics business in 1979. In 1987, the company gained entrée into the toy business by obtaining exclusive rights to sell Nintendo handheld LCD games in the United States. This event paved the way for MGA Entertainment to create innovative products for other hot licenses, including Hello Kitty and Power Rangers. This year, MGA Entertainment added Spider-Man:The Movie to its already exciting collection of licenses, with The Hulk to follow in 2003.

MGA Entertainment has also taken on the role as licensor for Bratz. Bratz licensed product debuted in spring 2002 with tween targeted apparel and footwear. Brand extensions in stationery, school supplies, video games, board games, puzzles, Halloween costumes and party goods, to name a few, will follow throughout the year and into 2003. Also, the first direct-to-video animated episode starring the Bratz has commenced production and will debut in the second half of 2003, as well.

Available in more storefronts than any other toy manufacturer, MGA Entertainment's quality family entertainment products are available in a wide variety of retail outlets, including toy, mass merchandiser, specialty, drug and grocery stores, as well as online at most popular retailer, or "e"-tailer websites.

MGA Entertainment's corporate offices are located in North Hills, California, a suburb of Los Angeles, with affiliate offices in Hong Kong and New York.

EXHIBIT ___3/6/03___ 101

PAGE ___1491___

Confidential - Attorney's Eyes Only

MGA 0885940

**EXHIBIT 102**



M 0914772

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT __102__

PAGE __1492__



EXHIBIT 102
PAGE 1493

M 0914773

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXHIBIT 103**

M 0914776

EXHIBIT _____ 1494

PAGE _____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

M 0914777

EXHIBIT 1495

PAGE 102

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXHIBIT 104**

1  LARRY W. MCFARLAND (State Bar No. 129668)
   DAVID K. CAPLAN (State Bar No. 181174)
2  ELLIE SCHWIMMER (State Bar No. 221522)
   KEATS MCFARLAND & WILSON LLP
3  9720 Wilshire Boulevard
   Penthouse Suite
4  Beverly Hills, California 90212
   Tel: (310) 248-3830
5  Fax: (310) 860-0363
6  Attorneys for Plaintiff
   MGA ENTERTAINMENT, INC.
7
8
9
10              UNITED STATES DISTRICT COURT
11             CENTRAL DISTRICT OF CALIFORNIA
12                  WESTERN DIVISION
13  MGA ENTERTAINMENT, INC.,        CV04-2524 CBM (CWx)

14              Plaintiff,          **UNDER SEAL**

15       v.                         Civil Action No.:

16  MULTITOY, INC., YUAN-LAN LIU,   COMPLAINT FOR:
    an individual, JEFF WU, an individual
17  and dba IMC TOYS, ALL TOYS      1. FEDERAL COPYRIGHT
18  IMPORTS, INC., SUSAN LIU, an       INFRINGEMENT (17 U.S.C. §§ 501
    individual, TOYSDIVISION, INC.,    et seq.);
19  TOM LIU, an individual, and DOES 1-  2. FEDERAL TRADEMARK
20  20,                                COUNTERFEITING (15 U.S.C.
                                        § 1114);
21              Defendants.         3. FALSE DESIGNATION OF ORIGIN
                                       AND FALSE DESCRIPTION (15
22                                     U.S.C. § 1125(a));
                                    4. TRADE DRESS INFRINGEMENT-
23                                     PRODUCT PACKAGING (15 U.S.C.
                                       §§ 1125 et seq.);
24                                  5. TRADE DRESS INFRINGEMENT-
                                       PRODUCT CONFIGURATION
25                                     (15 U.S.C. §§ 1125 et seq.);
                                    6. STATE STATUTORY UNFAIR
26                                     COMPETITION;
                                    7. STATE COMMON LAW
27                                     TRADEMARK INFRINGEMENT
                                       AND UNFAIR COMPETITION; and
28                                  8. CONSTRUCTIVE TRUST

I:\IP\10306\00009\pleadings\Complaint4 - downtown.doc

FILED
CLERK, U.S. DISTRICT COURT
APR 1 2 2004
CENTRAL DISTRICT OF CALIFORNIA
BY                      DEPUTY

DOCKETED ON CM
APR 1 6 2004
BY              019

EXHIBIT 104
PAGE 1496
M 0078522

1   Plaintiff MGA Entertainment, Inc. ("Plaintiff") for its Complaint alleges and

2   avers as follows:

3   ## JURISDICTION AND VENUE

4   1.   This Court has jurisdiction over this matter pursuant to 17 U.S.C. § 501

5   et seq.; 15 U.S.C. § 1121; 28 U.S.C. § 1331, and § 1338(a) and (b); and 28 U.S.C. §

6   1367.  Venue in this district is proper pursuant to 28 U.S.C. § 1391 (b) and (c) and

7   § 1400(a).

8   ## PLAINTIFF AND ITS RIGHTS.

9   2.   Plaintiff MGA Entertainment, Inc. is a corporation organized pursuant to

10  the laws of the State of California, with its principal place of business in this judicial

11  district.  Plaintiff is a manufacturer and distributor of a wide variety of popular toys,

12  including dolls, plush animals and radio controlled vehicles.

13  3.   Plaintiff is the exclusive owner of all rights in and to the internationally

14  famous BRATZ characters, which include, but are not limited to, "Cloe," "Jade,"

15  "Sasha," "Yasmin," "Meygan," "Dana," "Fianna," "Nevra," "Cameron," "Dylan,"

16  "Eitan," "Koby," "Cade," "Ailani," "Nazalia," "Talia," "Zada," "Mikko," "Colin,"

17  "Deavon" and "Lakin" (including all of the different dolls and authorized versions of

18  these characters).  These characters are hereinafter referred to as the "BRATZ

19  Characters." True and correct copies of exemplars of depictions of the BRATZ

20  Characters, in the form of selected pages from Plaintiff's copyrighted BRATZ Purse

21  Style Guide, are attached hereto as **Exhibit 1.**

22  4.   The BRATZ Characters, the associated images, accessories, designs, and

23  all other forms of intellectual property associated with the BRATZ Characters,

24  including the distinctive trapezoidal packaging therefor, are extremely valuable to

25  Plaintiff.

26  5.   In 2001, Plaintiff introduced a new line of fashion dolls known as the

27  "BRATZ" or, alternatively, the "BRATZPACK" which are three-dimensional

28  depictions of the BRATZ Characters (hereinafter the "BRATZ Dolls").  When first

I:\IP\10300\0009\pleadings\Complaint4 - downtown.doc                    -1-

EXHIBIT ___104___

PAGE ___1497___

M 0078523

1  introduced, the BRATZ Dolls only included "Cloe," "Jade," "Sasha" and "Yasmin."

2  Dolls based on the additional characters listed in paragraph 3 have been introduced

3  since that time.

4      6.    Plaintiff's rights in and to the internationally famous BRATZ Characters

5  and the BRATZ Dolls include all intellectual and industrial property rights associated

6  therewith, including, without limitation, all copyrights, patents, trademarks, industrial

7  designs, trade secrets, contract and licensing rights, design rights, moral rights and

8  trade dress rights in and to the BRATZ Characters, the BRATZ Dolls and the BRATZ

9  Packaging Trade Dress (as defined in paragraph 54 below), consisting of the

10  distinctive packaging in which such dolls, playsets and accessories are sold, as well as

11  the BRATZ Product Configuration Trade Dress (as defined in paragraph 65 below), in

12  any country of the world (collectively referred to as the "BRATZ Property").

13      7.    Plaintiff has obtained numerous federal copyright registrations for the

14  BRATZ Characters and the BRATZ Dolls (the "BRATZ Copyrights"). Plaintiff has

15  complied with all applicable copyright laws. The BRATZ Copyrights are valid,

16  subsisting and in full force and effect. True and correct photocopies of representative

17  copyright registrations, including copyright registrations for Plaintiff's BRATZ Dolls,

18  are attached hereto as **Exhibit 2**.

19      8.    More than 50 million BRATZ Dolls have been sold to date on a

20  worldwide basis, of which over 35 million have been sold in the United States.  In

21  addition, more than 25 million packages of accessories for such BRATZ Dolls have

22  been sold worldwide, including over 15 million sold in the United States.

23      9.    For two consecutive years in 2001 and 2002, Plaintiff won the toy

24  industry's most prestigious award, the People's Choice Toy of the Year Award, for its

25  BRATZ Dolls.  In 2003, Plaintiff won the Toy Industry Association, Inc. ("TIA")

26  Property Toy of the Year Award, the TIA Girl Toy of the Year Award, the Family Fun

27  Toy of the Year, Toy Wishes Magazine Hot Dozen, MSNBC Hottest Toy of the Year

28  2003, MSN.com Top Holiday Toy 2003, NBC Today Show Toy Test Winner 2003,

EXHIBIT   104

PAGE   1498

M 0078524

1   Toys R. Us/Amazon.com, eBay, and KB Toys Host Lists for 2003, and CNN Money

2   Top 10 Holiday Toys for Girls 2003.

3       10.    Plaintiff operates a web site to promote the BRATZ Dolls and BRATZ

4   Products (as defined below in paragraph 12) at www.bratzpack.com. This web site

5   provides games, e-greetings and the Mix 'N Match Mall of BRATZ fashion and hair

6   designs. The web site also offers visitors the opportunity to join the "Bratz" fan club.

7   Over 250,000 BRATZ fans have signed up and have asked to be notified of new

8   fashion trends that the BRATZ Dolls will wear, as well as the launch and marketing of

9   those new fashions and new dolls.

10      11.    Plaintiff has spent millions of dollars to develop, build and promote the

11  BRATZ Property including, without limitation, the placement of advertisements in all

12  media, including print ads, television spots and radio spots.

13      12.    A significant portion of Plaintiff's business since 2001 has been devoted

14  to the creation and commercial exploitation of the BRATZ Property.  Plaintiff licenses

15  the right to use the BRATZ Characters in a wide range of products such as apparel,

16  back-to-school products, home decor, jewelry and beauty products.  Plaintiff

17  manufactures a wide range of merchandise, including the BRATZ Dolls, and has also

18  produced an upcoming direct-to-video production entitled "BRATZ: The Video,

19  Starrin' 'N' Stylin'!" which will be released in the third quarter of 2004 (these

20  products are hereinafter referred to as the "BRATZ Products").  Plaintiff has

21  numerous active merchandise and promotional licenses, and the number of licenses is

22  continuing to grow. In order to maintain its reputation as well as the value of its

23  licenses, Plaintiff carefully selects each licensee to ensure the quality of its licensed

24  products and has subjected each licensee to a strict quality review and approval

25  program.  Plaintiff currently has over 200 licensees worldwide for BRATZ Products.

26      13.    In keeping with the importance of the BRATZ Property, Plaintiff and/or

27  its licensees have expended tens of millions of dollars in advertising the BRATZ

28  Products and promoting the use of the BRATZ Characters on original licensed

1  products, which include apparel and other items. Items bearing the BRATZ Characters

2  and/or the BRATZ name and mark have proven to be in great demand.

3       14.    The BRATZ Characters are extremely valuable and successful.  The

4  licensing of rights to the BRATZ Characters and sale of BRATZ Products has

5  generated tens of millions of dollars in revenue.  In 2003, such sales and licenses

6  generated in excess of $500 million in revenue.

7       15.    The BRATZ Characters are extremely popular with the public, and the

8  BRATZ Dolls and BRATZ Characters have received enormous amounts of

9  unsolicited publicity, through various magazine and newspaper articles discussing the

10  BRATZ Dolls and Characters.

11       16.    Through Plaintiff's extensive sales and promotional efforts, as well as its

12  strict adherence to the highest standards of quality for its licensed and manufactured

13  products, Plaintiff and its BRATZ Property are associated in the public mind with

14  high-quality dolls, playsets and accessories, and the BRATZ Property has

15  considerable value to Plaintiff.

16       17.    As a result of the foregoing, Plaintiff has developed strong trademark

17  rights in various elements associated with the sale and marketing of the BRATZ

18  Property (hereinafter the "BRATZ Trademarks"). The BRATZ Trademarks are

19  renowned nationwide as identifiers of quality dolls and related products.  These

20  trademarks include, but are not limited to, the following:  BRATZ, the names and

21  designs of the individual BRATZ Characters as well as of the BRATZPACK, the

22  design of the packaging for the BRATZ Dolls, and various taglines and other word

23  marks associated with the sale and marketing of the BRATZ Products including, but

24  not limited to, the mark "THE GIRLS WITH A PASSION FOR FASHION." Plaintiff

25  has also obtained numerous federal trademark registrations for the BRATZ

26  Trademarks.  Among these registrations are registrations for the BRATZ and BRATZ

27  PACK marks, the names of several of the BRATZ Characters, and for the mark THE

28  GIRLS WITH A PASSION FOR FASHION in Class 28 for dolls and dolls'

EXHIBIT ___104

PAGE ___1500

M 0078526

1   accessories (hereinafter the "PASSION FOR FASHION Trademark"). True and

2   correct photocopies of representative trademark registrations are attached hereto as

3   **Exhibit 3**.

4        18.    Plaintiff has used the BRATZ Trademarks continuously on and in

5   connection with the BRATZ Products since the inception of each of the various

6   BRATZ Products, and these BRATZ Trademarks have never been abandoned. The

7   BRATZ Trademarks are valid, subsisting and in full force and effect.

8        19.    Based on the extensive sales and promotion of the BRATZ Products and

9   the wide popularity of such products including Plaintiff's promotion of its BRATZ

10  Products in media outlets and on its website www.bratzpack.com, the BRATZ

11  Trademarks have developed secondary meaning and significance in the minds of the

12  public, and the services and products utilizing and/or bearing such marks are

13  immediately identified by the purchasing public with Plaintiff.

14  **DEFENDANTS AND THEIR INFRINGING ACTS.**

15       20.    Upon information and belief, defendant Multitoy, Inc. ("Multitoy") is a

16  California corporation, having its principal place of business at 309 East 4th Street,

17  Los Angeles, California 90013. Defendant Multitoy is selling and offering for sale

18  infringing dolls which bear infringements of trademarks and copyrights owned by

19  Plaintiff, and that infringe upon Plaintiff's trade dress rights. Defendant Multitoy is

20  subject to the jurisdiction of this Court and is importing, advertising, manufacturing

21  (or causing to be manufactured), distributing, selling, offering for sale and/or

22  otherwise exploiting merchandise that infringes the BRATZ Property in this judicial

23  district.

24       21.    Upon information and belief, defendant YUAN-LAN LIU is an

25  individual residing in Los Angeles County in the State of California and doing

26  business as Multitoy, located at 309 East 4th Street, Los Angeles, California 90013.

27  Upon information and belief, YUAN-LAN LIU is importing, advertising,

28  manufacturing (or causing to be manufactured), distributing, selling, offering for sale

I:\IP\10300\00009\pleadings\Complaint4 - downtown.doc                    -5-

EXHIBIT ___ 104

PAGE ___ 1501

M 0078527

1  and/or otherwise exploiting merchandise that infringes the BRATZ Property, and is an

2  active, conscious, and dominant force behind the wrongful acts of Multitoy.

3      22.    Upon information and belief, defendant JEFF WU ("WU") is an

4  individual residing in Los Angeles County in the State of California and doing

5  business as IMC Toys, located at 406 East 4th Street, Los Angeles, California 90013.

6  Defendant WU is selling and offering for sale infringing dolls which bear

7  infringements of trademarks and copyrights owned by Plaintiff, and that infringe upon

8  Plaintiff's trade dress rights.  Defendant JEFF WU is subject to the jurisdiction of this

9  Court and is importing, advertising, manufacturing (or causing to be manufactured),

10  distributing, selling, offering for sale and/or otherwise exploiting merchandise that

11  infringes the BRATZ Property in this judicial district.

12      23.    Upon information and belief, defendant All Toys Imports, Inc. ("All

13  Toys") is a California corporation, having its principal place of business at 330 South

14  Wall Street, Unit 9, Los Angeles, California 90013.  Defendant All Toys is selling and

15  offering for sale infringing dolls which bear infringements of trademarks and

16  copyrights owned by Plaintiff, and that infringe upon Plaintiff's trade dress rights.

17  Defendant All Toys is subject to the jurisdiction of this Court and is importing,

18  advertising, manufacturing (or causing to be manufactured), distributing, selling,

19  offering for sale and/or otherwise exploiting merchandise that infringes the BRATZ

20  Property in this judicial district.

21      24.    Upon information and belief, defendant SUSAN LIU is an individual

22  residing in Los Angeles County in the State of California and doing business as All

23  Toys, located at 330 South Wall Street, Unit 9, Los Angeles, California 90013.  Upon

24  information and belief, SUSAN LIU is importing, advertising, manufacturing (or

25  causing to be manufactured), distributing, selling, offering for sale and/or otherwise

26  exploiting merchandise that infringes the BRATZ Property, and is an active,

27  conscious, and dominant force behind the wrongful acts of All Toys.

28

EXHIBIT .104

PAGE 1502

M 0078528

1    25.    Upon information and belief, defendant Toys Division, Inc. ("Toys

2  Division") is a California corporation, having its principal places of business at 1440

3  Boyd Street, Los Angeles, California 90033 and on its Web site located at

4  <www.toysdivision.com>. Defendant Toys Division is selling and offering for sale

5  infringing dolls which bear infringements of trademarks and copyrights owned by

6  Plaintiff, and that infringe upon Plaintiff's trade dress rights.  Defendant Toys Division

7  is subject to the jurisdiction of this Court and is importing, advertising, manufacturing

8  (or causing to be manufactured), distributing, selling, offering for sale and/or

9  otherwise exploiting merchandise that infringes the BRATZ Property in this judicial

10  district.

11    26.    Upon information and belief, defendant TOM LIU is an individual

12  residing in Los Angeles County in the State of California and doing business as Toys

13  Division, located at 1440 Boyd Street, Los Angeles, California 90033 and on the Web

14  site located at <www.toysdivision.com>.  Upon information and belief, TOM LIU is

15  importing, advertising, manufacturing (or causing to be manufactured), distributing,

16  selling, offering for sale and/or otherwise exploiting merchandise that infringes the

17  BRATZ Property, and is an active, conscious, and dominant force behind the

18  wrongful acts of Toys Division.

19    27.    Upon information and belief, various Does 1 through 20 are either

20  entities or individuals who are residents of, or are present in, this judicial district, are

21  transacting business in this judicial district, are subject to the jurisdiction of this Court,

22  and are individuals who are principals or supervisory employees of the respective

23  named defendants, or are suppliers to the respective named defendants, and/or are

24  other entities or individuals who are importing, advertising, manufacturing (or causing

25  to be manufactured), distributing, selling, offering for sale and/or otherwise exploiting

26  merchandise in Los Angeles, California, which infringes upon some or all of the

27  BRATZ Property in this judicial district.  The identities of the various Does are

28  unknown to Plaintiff at this time.  This Complaint will be amended to include the

I:\IP\10306\00009\pleadings\Complaint4 - downtown.doc                    -7-

EXHIBIT _____ 04

PAGE _____ 1503                                      M 0078529

1  names of such individuals when identified to Plaintiff. The named defendants and
2  Does 1 through 20 are hereinafter collectively referred to as "Defendants."

3      28.    Defendants, without any authorization from Plaintiff, have been
4  importing, advertising, manufacturing (or causing to be manufactured), distributing,
5  selling, offering for sale and/or otherwise exploiting merchandise incorporating the
6  BRATZ Property, for which Plaintiff has the exclusive rights. The result of
7  Defendants' activities has been that Defendants have profited, and continue to profit,
8  from their infringement of Plaintiff's rights.

9      29.    Upon information and belief, long after Plaintiff's adoption and use of
10 the BRATZ Property on a diverse range of goods, and after Plaintiff obtained federal
11 copyright and trademark registrations, Defendants have adopted and used likenesses
12 of the BRATZ Property without Plaintiff's consent, by importing, advertising,
13 manufacturing (or causing to be manufactured), distributing, selling, offering for sale
14 and/or otherwise exploiting counterfeit and/or infringing products bearing likenesses
15 of the BRATZ Property (hereinafter "Counterfeit and/or Infringing Products"), and
16 have caused said Counterfeit and/or Infringing Products to enter into commerce and/or
17 to be transported or used in commerce. Defendants' products are not licensed by
18 Plaintiff and, at all relevant times, Defendants were not authorized by Plaintiff, or any
19 authorized agent of Plaintiff, to import, advertise, manufacture (or cause to be
20 manufactured), distribute, sell, offer for sale or otherwise exploit such Counterfeit
21 and/or Infringing Products. Defendants are currently engaged in such use and unless
22 enjoined by this Court will continue such use.

23     30.    By engaging in this conduct, Defendants have acted in willful disregard
24 of the laws protecting Plaintiff's goodwill, copyrights, trademarks and trade dress
25 rights, and have confused and deceived, or threaten to confuse and deceive, the
26 consuming public as to the source or sponsorship of the products. By their wrongful
27 conduct, Defendants have blatantly traded upon and diminished Plaintiff's goodwill
28 and infringed Plaintiff's rights.

I:\IP\10306\00007\pleadings\Complaint4 - downtown.doc                    -8-



EXHIBIT ___104___

PAGE ___1504___

M 0078530

### FIRST CLAIM FOR RELIEF

**(Federal Copyright Infringement)**

**[17 U.S.C. § 501]**

**(Applicable to All Defendants)**

31.     Plaintiff repeats and realleges all of the allegations contained in the preceding paragraphs of this Complaint as though the same were fully set forth herein.

32.     At all relevant times, Plaintiff has owned all right, title, and interest in and to the BRATZ Copyrights as delineated herein.

33.     Plaintiff has complied in all respects with Title 17 of the United States Code, secured the exclusive rights and privileges in and to the above-referenced copyrights, and in compliance with the law has received from the Registrar of Copyrights the appropriate certificates of registration, which constitute prima facie evidence of the validity of the copyrights and of the facts stated in the certificates.

34.     After the date that Plaintiff obtained federal copyright registrations and continuing to date, Defendants have infringed the BRATZ Copyrights by importing, advertising, manufacturing (or causing to be manufactured), distributing, selling, offering for sale, or otherwise exploiting without Plaintiff's consent, the Counterfeit and/or Infringing Products which are copies of or bear a substantial similarity to the BRATZ Copyrights.

35.     Upon information and belief, Defendants' conduct was and is willfully done with knowledge of Plaintiff's rights in and to the BRATZ Copyrights.

36.     Plaintiff has no adequate remedy at law and has suffered and continues to suffer irreparable harm and damage as a result of Defendants' acts as aforesaid in an amount not thus far determined, but which will be established at trial.

37.     Defendants' wrongful conduct will continue unless enjoined by this Court.

///

///

EXHIBIT _____ 104

PAGE _____ 1505

**M 0078531**

## SECOND CLAIM FOR RELIEF

### (Trademark Counterfeiting)

### [15 U.S.C. § 1114]

### (Applicable only to Defendant All Toys)

38.     Plaintiff repeats and realleges the allegations contained in paragraphs 1-30 of this Complaint as though the same were fully set forth herein.

39.     Defendant All Toys has used spurious designations that are identical with, or substantially indistinguishable from, the PASSION FOR FASHION Trademark on goods covered by the registration for the PASSION FOR FASHION Trademark.

40.     Upon information and belief, Defendant All Toys has intentionally and willfully used these spurious designations, knowing they are counterfeit, in connection with importing, advertising, manufacturing (or causing to be manufactured), distributing, selling, offering for sale and/or otherwise exploiting goods for its own personal financial gain, and such intentional and willful conduct by defendant All Toys makes this an exceptional case.

41.     Defendant All Toys' conduct in importing, advertising, manufacturing (or causing to be manufactured), distributing, selling, offering for sale and/or otherwise exploiting products bearing the PASSION FOR FASHION Trademark was and is without Plaintiff's consent.

42.     Defendant All Toys' unauthorized use of the PASSION FOR FASHION Trademark on and in connection with importing, advertising, manufacturing (or causing to be manufactured), distributing, selling, offering for sale and/or otherwise exploiting the Counterfeit Products constitutes use of the PASSION FOR FASHION Trademark in commerce.

43.     Defendant All Toys' unauthorized use of the PASSION FOR FASHION Trademark as set forth above is likely to:

(a)     cause confusion, mistake and deception;

I:\HP\10306\00009\pleadings\Complaint4 - downtown.doc

-10-

EXHIBIT ___104___

PAGE ___1506___

M 0078532

1    (b)    cause the public to believe that defendant All Toys' Counterfeit Products
2           are authorized, sponsored or approved by Plaintiff or that defendant All
3           Toys is affiliated, connected or associated with or in some way related to
4           Plaintiff; and
5    (c)    result in defendant All Toys unfairly benefiting from Plaintiff's goodwill
6           and reputation, to the substantial and irreparable injury of the public,
7           Plaintiff, the PASSION FOR FASHION Trademark, and the substantial
8           goodwill represented thereby.
9       44.    Defendant All Toys' acts as recited herein constitute trademark
10   counterfeiting in violation of Section 32 of the Lanham Act, 15 U.S.C. §§ 1114, 1116.
11      45.    Plaintiff has no adequate remedy at law and has suffered and continues to
12   suffer irreparable harm and damage as a result of defendant All Toys' acts in an
13   amount not thus far determined, but which will be established at trial.
14      46.    The conduct of Defendant All Toys described above has caused and, if
15   not enjoined, will continue to cause irreparable damage to the rights of Plaintiff in the
16   BRATZ Property, and to Plaintiff's business, reputation, and goodwill.  Defendant All
17   Toys' wrongful conduct will continue unless enjoined by this Court.

18                     **THIRD CLAIM FOR RELIEF**
19          **(False Designation of Origin and False Description)**
20                       **[15 U.S.C. § 1125(a)]**
21                   **(Applicable to All Defendants)**

22      47.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-
23   30 and 39-46 of this Complaint as though the same were fully set forth herein.
24      48.    The BRATZ Trademarks, including all of the images and designs
25   embodied in the BRATZ Property, as set forth in the preceding paragraphs hereof, are
26   distinctive, have been used throughout the United States and worldwide, and are well
27   known to the trade and members of the purchasing public.  The public generally
28   associates and identifies the BRATZ Trademarks with Plaintiff.

EXHIBIT _____104_____

PAGE _____1507_____                    **M 0078533**

1    49.    Defendants' conduct in importing, advertising, manufacturing (or causing

2    to be manufactured), distributing, selling, offering for sale and/or otherwise exploiting

3    products bearing one or more of the BRATZ Trademarks constitutes false designation

4    of origin or sponsorship of said products and tends falsely to represent that products

5    bearing the BRATZ Trademarks originate with Defendants or that said products and

6    Defendants have been sponsored, approved, or licensed by Plaintiff or are in some

7    way affiliated or connected with Plaintiff.  Such conduct of Defendants is likely to

8    confuse, mislead, and deceive Defendants' customers, purchasers and members of the

9    public as to the origin of said products, or cause said persons to believe that those

10   products and/or Defendants have been sponsored, approved, authorized or licensed by

11   Plaintiff or are in some way affiliated or connected with Plaintiff, all in violation of 15

12   U.S.C. § 1125(a).

13   50.    Upon information and belief, Defendants' actions were done willfully

14   with full knowledge of the falsity of such designations of origin and false descriptions

15   or representations, and with the express intent to cause confusion, and to mislead and

16   deceive the purchasing public.

17   51.    Plaintiff has no adequate remedy at law and has suffered and continues to

18   suffer irreparable harm and damage as a result of Defendants' acts in an amount not

19   thus far determined, but which will be established at trial.

20   52.    The conduct of Defendants described above has caused and, if not

21   enjoined, will continue to cause irreparable damage to the rights of Plaintiff in the

22   BRATZ Property, and to Plaintiff's business, reputation, and goodwill.  Defendants'

23   wrongful conduct will continue unless enjoined by this Court.

24   ///

25   ///

26   ///

27   ///

28   ///

F:\EP\1030\0009\pleadings\Complaint4 - downtown.doc                    -12-

EXHIBIT ____ 104

PAGE ____ 1508

M 0078534

## FOURTH CLAIM FOR RELIEF

### (Trade Dress Infringement- Product Packaging)

### [15 U.S.C. § 1125(a)]

### (Applicable to All Defendants)

53.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-30, 39-46 and 48-52 of this Complaint as though the same were fully set forth herein.

54.    The unique trade dress of Plaintiff's packaging for the BRATZ Dolls includes, but is not limited to, the unique non-functional shape of the trapezoidal display packaging encasing Plaintiff's BRATZ Products, the arrangement and placement of images of the BRATZ Characters and the BRATZ Trademarks on the product packaging, the type-style, colors, color printing style, and the display of the accessories for Defendants' goods in the packaging for the BRATZ Dolls (hereinafter referred to as the "BRATZ Packaging Trade Dress").

55.    The BRATZ Packaging Trade Dress is non-functional and inherently distinctive.

56.    The BRATZ Packaging Trade Dress has also developed secondary meaning associating such Trade Dress in the mind of the consuming public with a single source.

57.    Defendants have competed unfairly with Plaintiff and have misappropriated and traded upon Plaintiff's goodwill and business reputation symbolized by the BRATZ Packaging Trade Dress.

58.    Defendants have used, in connection with importing, advertising, manufacturing (or causing to be manufactured), distributing, selling, offering for sale and/or otherwise exploiting of products and the packaging for such products, one or more of the elements of the BRATZ Packaging Trade Dress. Defendants have additionally caused goods bearing such misleading packaging to enter into interstate commerce. Defendants' use of the BRATZ Packaging Trade Dress, or a colorable

-13-

EXHIBIT    104

PAGE    1509

M 0078535

1    imitation thereof, is a false description and representation that the goods are made by,

2    sponsored by or affiliated with Plaintiff, in violation of 15 U.S.C. § 1125(a).

3         59.    Plaintiff is likely to be damaged by such false descriptions or

4    representations by reason of the likelihood that purchasers will be confused as to the

5    true source, sponsorship or affiliation of said goods of Defendants.

6         60.    As a direct and proximate result of the foregoing acts, Defendants have

7    made substantial profits to which they are not entitled.

8         61.    As a result of the foregoing, Defendants have unfairly competed with

9    Plaintiff in violation of 15 U.S.C. § 1125(a).

10        62.    Plaintiff has no adequate remedy at law and has suffered and continues to

11   suffer irreparable harm and damage as a result of Defendants' acts as aforesaid in an

12   amount not thus far determined, but which will be established at trial.

13        63.    The conduct of Defendants described above has caused and, if not

14   enjoined, will continue to cause irreparable damage to the rights of Plaintiff in the

15   BRATZ Property, and to Plaintiff's business, reputation and goodwill.  Defendants'

16   wrongful conduct will continue unless enjoined by this Court.

### FIFTH CLAIM FOR RELIEF

### (Trade Dress Infringement-Product Configuration)

### [15 U.S.C. § 1125(a)]

### (Applicable To All Defendants)

21        64.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-

22   30, 39-46, 48-52 and 54-63 of this Complaint as though the same were fully set forth

23   herein.

24        65.    The unique elements of the BRATZ Dolls include, but are not limited to,

25   oversized heads with prominent jawbones; almond-shaped eyes with multi-colored

26   eye makeup; stylable hair; full lips with lipstick; noses that are reduced in size; slender

27   bodies that bend at the waists; slim arms; noticeable (but not oversized) chests; long

28   slim legs that move forward and backward and that flex at the knee, but do not move

F:\P\10308\00009\pleadings\Complaint4 - downtown.doc

-14-

EXHIBIT    104

PAGE    1510

M 0078536

1 | side to side; and oversized, removable feet with shoes (hereinafter referred to as the
2 | "BRATZ Product Configuration Trade Dress").

3 |     66.    The BRATZ Product Configuration Trade Dress is non-functional.

4 |     67.    Based on Plaintiff's extensive advertising and sales, as well as the wide
5 | popularity of Plaintiff's products, the BRATZ Product Configuration Trade Dress has
6 | acquired secondary meaning so that any product or advertisement bearing such trade
7 | dress is immediately associated by purchasers and the public as being a product of,
8 | and affiliated with, a single source – namely, Plaintiff.

9 |     68.    Defendants have competed unfairly with Plaintiff and have
10 | misappropriated and traded upon Plaintiff's goodwill and business reputation
11 | symbolized by the unique BRATZ Product Configuration Trade Dress.

12 |     69.    Defendants have used, in connection with importing, advertising,
13 | manufacturing (or causing to be manufactured), distributing, selling, offering for sale
14 | and/or otherwise exploiting products, one or more of the elements of the BRATZ
15 | Product Configuration Trade Dress, and have caused such misleading products to
16 | enter into interstate commerce.  Defendants' use of the BRATZ Product Configuration
17 | Trade Dress, or a colorable imitation thereof, is a false description and representation
18 | that the goods are made by, sponsored by or affiliated with Plaintiff, in violation of 15
19 | U.S.C. § 1125(a).

20 |     70.    Plaintiff is likely to be damaged by Defendants' false descriptions or
21 | representations by reason of the likelihood that purchasers will be confused as to the
22 | true source, sponsorship, or affiliation of Defendants' goods.

23 |     71.    In engaging in the foregoing conduct, Defendants have made substantial
24 | profits to which they are not entitled.

25 |     72.    As a result of the foregoing, Defendants have unfairly competed with
26 | Plaintiff in violation of 15 U.S.C. § 1125(a).

27

28

EXHIBIT _____ 104

PAGE _____ 1511

M 0078537

73.     Plaintiff has no adequate remedy at law and has suffered and continues to suffer irreparable harm and damage as a result of Defendants' acts as aforesaid in an amount not thus far determined, but which will be established at trial.

74.     The conduct of Defendants described above has caused and, if not enjoined, will continue to cause irreparable damage to the rights of Plaintiff in the BRATZ Property, and to Plaintiff's business, reputation and goodwill.  Defendants' wrongful conduct will continue unless enjoined by this Court.

## SIXTH CLAIM FOR RELIEF

### (State Statutory Unfair Competition)

### [Cal. Bus. & Prof. Code § 17200 et seq.]

### (Applicable To All Defendants)

75.     Plaintiff repeats and realleges the allegations contained in paragraphs 1-30, 39-46, 48-52, 54-63 and 65-74 of this Complaint as though the same were fully set forth herein.

76.     This claim arises under California Business and Professions Code §17200 et seq.  This Court has jurisdiction over the subject matter of this claim pursuant to the provisions of 28 U.S.C. § 1338(b), this being a claim of unfair competition joined with a substantial and related claim under the Lanham Act, and under 28 U.S.C. § 1367.

77.     Plaintiff owns all rights, title and interest in and to the distinctive trade names, trademarks, designs, symbols and logos used by Plaintiff by virtue of its extensive manufacture, distribution, promotion, advertising, licensing, offering for sale and sale of a wide variety of goods bearing such trade names, trademarks, designs, symbols, and logos (collectively the "Common Law Trademarks"), as set forth in preceding paragraphs of this Complaint.

78.     None of the Defendants have any rights to Plaintiff's Common Law Trademarks.

EXHIBIT _104_

PAGE _1512_

M 0078538

79.    Products bearing Plaintiff's Common Law Trademarks have been imported, advertised, manufactured (or caused to be manufactured), distributed, sold, offered for sale and/or otherwise exploited and are being continuously imported, advertised, manufactured (or caused to be manufactured), distributed, sold, offered for sale and/or otherwise exploited in California to this day by Defendants.  In such marketing and sales activity, Defendants' Counterfeit and/or Infringing Products bear infringing copies of Plaintiff's Common Law Trademarks, and are confusingly similar to Plaintiff's own products.  Such unauthorized use by Defendants of Plaintiff's Common Law Trademarks, or confusingly similar imitations thereof, is likely to cause confusion and mistake in the minds of the trade and the purchasing public and to deceive them as to the source of origin, authorization or sponsorship of the Counterfeit and/or Infringing Products and, therefore, to cause purchasers to buy such products in the erroneous belief that they are authentic.

80.    Upon information and belief, Defendants have intentionally appropriated one or more of Plaintiff's Common Law Trademarks with the intent of causing confusion, mistake and deception as to the source of their goods and with the intent to palm off their goods as those of Plaintiff and to place others in the position to palm off their goods as those of Plaintiff.

81.    Plaintiff states, upon information and belief, and thereupon alleges, that the acts of Defendants have violated the unfair competition laws of the State of California and specifically California Business and Professions Code §17200 et seq.

82.    By such actions in infringing Plaintiff's Common Law Trademarks, Defendants are improperly trading upon the enviable reputation and goodwill of Plaintiff and are impairing Plaintiff's valuable rights in and to such Common Law Trademarks.

83.    Plaintiff has no adequate remedy at law and has suffered and continues to suffer irreparable harm and damage as a result of Defendants' acts as aforesaid in an amount not thus far determined, but which will be established at trial.

EXHIBIT ___104___

PAGE ___153___

M 0078539

84.   The conduct of Defendants described above has caused and, if not enjoined, will continue to cause irreparable damage to the rights of Plaintiff in the BRATZ Property, and to Plaintiff's business, reputation and goodwill. Defendants' wrongful conduct will continue unless enjoined by this Court.

## SEVENTH CLAIM FOR RELIEF

### (State Common Law Trademark Infringement and Unfair Competition)
### (Applicable To All Defendants)

85.   Plaintiff repeats and realleges the allegations contained in paragraphs 1-30, 39-46, 48-52, 54-63, 65-74 and 76-84 of this Complaint, as though the same were fully set forth herein.

86.   This claim arises under the common law of California. This Court has jurisdiction over the subject matter of this claim pursuant to the provisions of 28 U.S.C. § 1338(b), this being a claim of unfair competition joined with a substantial and related claim under the Lanham Act, and under 28 U.S.C. § 1367.

87.   Plaintiff owns all rights, title, and interest in and to Plaintiff's distinctive Common Law Trademarks, as set forth in paragraph 77 of this Complaint.

88.   The Counterfeit and/or Infringing Products incorporate matter constituting replicas and imitations of Plaintiff's Common Law Trademarks. Such unauthorized use by Defendants of Plaintiff's Common Law Trademarks constitutes trademark infringement and unfair competition, and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of the products, and to cause purchasers to believe such products are authentic products of Plaintiff when, in fact, they are not.

89.   Upon information and belief, Defendants have intentionally appropriated one or more of Plaintiff's Common Law Trademarks with the intent of causing confusion, mistake and deception as to the source of their goods and with the intent to palm off their goods as those of the Plaintiff and to place others in the position to palm

I:\VP\10509\00009\pleadings\Complaint4 - downtown.doc

EXHIBIT  104

PAGE  1514

M 0078540

1    off their goods as those of Plaintiff and, as such, Defendants have committed

2    trademark infringement and unfair competition under the common law.

3        90.    By such actions in infringing Plaintiff's Common Law Trademarks,

4    Defendants are improperly trading upon the enviable reputation and goodwill of

5    Plaintiff and are impairing Plaintiff's valuable rights in and to such trademarks.

6        91.    As set forth above, upon information and belief, the activities of

7    Defendants complained of herein constitute willful and intentional acts of

8    infringement of Plaintiff's Common Law Trademarks and unfair competition.

9        92.    Plaintiff has no adequate remedy at law and has suffered and continues to

10   suffer irreparable harm and damage as a result of Defendants' acts as aforesaid in an

11   amount not thus far determined, but which will be established at trial.

12       93.    The conduct of Defendants described above has caused and, if not

13   enjoined, will continue to cause irreparable damage to the rights of Plaintiff in the

14   BRATZ Property, and to Plaintiff's business, reputation, and goodwill.  Defendants'

15   wrongful conduct will continue unless enjoined by this Court.

16                    **EIGHTH CLAIM FOR RELIEF**

17                       **(Constructive Trust)**

18                      **[Cal. Civ. Code § 2224]**

19                   **[Applicable to all Defendants]**

20       94.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-

21   30, 32-37, 39-46, 48-52, 54-63, 65-74, 76-84 and 86-93 of this Complaint as though

22   the same were fully set forth herein.

23       95.    This claim arises under California Civil Code section 2224 and the

24   common law of the State of California.  This Court has jurisdiction over the subject

25   matter of this claim pursuant to the provisions of 28 U.S.C. § 1338(b), this being a

26   claim of constructive trust joined with a substantial and related claim under the

27   Copyright and Trademark Laws of the United States, and under 28 U.S.C. § 1367.

28

EXHIBIT ___104___

PAGE ___1515___

M 0078541

96. Plaintiff states, upon information and belief and thereupon alleges, that Defendants own and/or possess tangible real and/or personal properties and assets including, but not limited to, bank, savings, and/or other financial accounts, consisting of and/or obtained by profit derived from Defendants' unauthorized manufacture, distribution and/or sale of the Counterfeit and/or Infringing Products.

97. Plaintiff is entitled to the profits Defendants have derived from the infringement of the BRATZ Property under 17 U.S.C. § 504(b), 15 U.S.C. § 1117, and California Business and Professions Code § 14340.

98. Plaintiff has no adequate remedy at law and has suffered irreparable harm and damage as a result of Defendants' acts, as aforementioned. Defendants hold those tangible real and/or personal properties and assets consisting of and/or obtained by profit derived from Defendants' infringing activities as constructive trustees for the benefit of Plaintiff, in an amount thus far not determined.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands:

A. That the Court order that Defendants, their agents, servants, employees, representatives, successors and assigns, and all persons, entities, firms or corporations in active concert or participation with any of them, be immediately enjoined from:

(1) directly or indirectly infringing the BRATZ Property including, but not limited to, the BRATZ Characters, the BRATZ Dolls, the BRATZ Copyrights, the BRATZ Trademarks, the Common Law Trademarks, the BRATZ Product Configuration Trade Dress and the BRATZ Packaging Trade Dress, as described above, in any manner, including generally, but not limited to, manufacturing (or causing to be manufactured), importing, copying, distributing, advertising, selling, offering for sale and/or otherwise exploiting any merchandise which infringes said BRATZ Property and, specifically, manufacturing, importing, copying, distributing,

-20-

EXHIBIT 104

PAGE 1516

M 0078542

1          advertising, selling, offering for sale and/or otherwise exploiting

2          the Counterfeit and/or Infringing Products or any other

3          unauthorized products that picture, reproduce or utilize the

4          likenesses of or which copy or bear a substantial similarity to the

5          BRATZ Property;

6     (2)     engaging in any conduct that tends falsely to represent, or is likely

7          to confuse, mislead, or deceive purchasers, Defendants' customers

8          and/or members of the public into believing, that the actions of

9          Defendants, the products sold by Defendants or Defendants

10          themselves are connected with Plaintiff, are sponsored, approved

11          or licensed by Plaintiff, or are in some way connected or affiliated

12          with Plaintiff;

13     (3)     affixing, applying, annexing or using in connection with the

14          importation, manufacture, distribution, advertising, sale and/or

15          offering for sale of any goods or services, a false description or

16          representation, including words or other symbols tending to falsely

17          describe or represent such goods as being those of Plaintiff;

18     (4)     otherwise competing unfairly with Plaintiff in any manner;

19     (5)     infringing the aforementioned BRATZ Copyrights, BRATZ

20          Trademarks including, but not limited to, the BRATZ, BRATZ

21          PACK and PASSION FOR FASHION trademarks, as well as the

22          Common Law Trademarks, BRATZ Packaging Trade Dress and

23          BRATZ Product Configuration Trade Dress, and damaging

24          Plaintiff's goodwill, reputation, and business;

25     (6)     during the pendency of this action, destroying or otherwise

26          disposing of:

27        (a)     merchandise falsely bearing the BRATZ Property, or

28            infringements or counterfeits thereof;

EXHIBIT 104
PAGE 1517

M 0078543

(b)   any other products which reproduce, copy, counterfeit, imitate or bear the BRATZ Property including, but not limited to, the BRATZ Characters, the BRATZ Dolls, the BRATZ Copyrights, the BRATZ Trademarks, the Common Law Trademarks, the BRATZ Product Configuration Trade Dress and the BRATZ Packaging Trade Dress, trade names, logos or designs, or which picture, reproduce or utilize the likenesses of or copy or bear a substantial similarity to the BRATZ Property including, without limitation, the BRATZ Characters and the BRATZ Dolls;

(c)   any promotional and advertising material labels, packages, wrappers, containers and any other unauthorized items which reproduce, copy, counterfeit, imitate or bear the BRATZ Property including, but not limited to, the BRATZ Characters, the BRATZ Dolls, the BRATZ Copyrights, the BRATZ Trademarks, the Common Law Trademarks, the BRATZ Product Configuration Trade Dress and the BRATZ Packaging Trade Dress, trade names, logos or designs, or which picture, reproduce or utilize the likenesses of or copy or bear a substantial similarity to the BRATZ Property;

(d)   any molds, screens, patterns, plates, disks, negatives or other items used specifically for making or manufacturing products bearing the BRATZ Property including, but not limited to, the BRATZ Characters, the BRATZ Dolls, the BRATZ Copyrights, the BRATZ Trademarks, the Common Law Trademarks, the BRATZ Product Configuration Trade Dress and the BRATZ Packaging Trade Dress, trade names, logos, or designs, or which picture, reproduce or utilize the

EXHIBIT ___104___

PAGE ___1518___                M 0078544

1  likenesses of or copy or bear a substantial similarity to the

2  BRATZ Property; and

3  (e)  any sales and supplier or customer journals, ledgers,

4  invoices, purchase orders, inventory control documents,

5  bank records, catalogues, recordings of any type whatsoever,

6  and all other business records and documents believed to

7  concern the importation, manufacture, reproduction,

8  purchase, advertising, sale or offering for sale of such

9  Counterfeit and/or Infringing Products;

10  (7)  during the pendency of this action, destroying any documents,

11  electronic files or business records that pertain to the importation,

12  manufacture, reproduction, advertisement, offer for sale or sale of

13  the Counterfeit and/or Infringing Products or any other items

14  which infringe the rights of Plaintiff in the BRATZ Property,

15  including any correspondence (including but not limited to

16  electronic mail), importation documents, manufacturing

17  specifications, shipping orders, phone records, phone logs, sales

18  and supplier or customer journals, ledgers, invoices, purchase

19  orders, product catalogs, web site order logs, inventory control

20  documents, bank records, catalogues, recordings of any type

21  whatsoever, and all other business records and documents believed

22  to concern the importation, manufacture, reproduction, purchase,

23  advertising, sale or offering for sale of such Counterfeit and/or

24  Infringing Products; and

25  (8)  effecting assignments or transfers of money, real or personal

26  property, business licenses, forming new entities or associations or

27  utilizing any other device for the purpose of circumventing or

28

I:\IP\10306\00009\pleadings\Complaint4 - downtown.doc

-23-

EXHIBIT  104

PAGE  519

M 0078545

1          otherwise avoiding the prohibitions or restrictions set forth in

2          subparagraphs (1) - (7) above;

3      B.   That the Court issue an order directing the United States Marshal for this

4  District, one or more of the Marshal's deputies, on-duty law enforcement officers or

5  off-duty law enforcement officers, assisted by one or more attorneys or agents of

6  Plaintiff, to enter Defendants' premises as listed above, and that Plaintiff and/or their

7  designees be authorized to seize the following items which are in the possession,

8  custody or control of any of Defendants:

9          (a)    all unauthorized products bearing the BRATZ Property including,

10                 but not limited to, the BRATZ Characters, the BRATZ Dolls, the

11                 BRATZ Copyrights, the BRATZ Trademarks, the Common Law

12                 Trademarks, the BRATZ Product Configuration Trade Dress and

13                 the distinctive BRATZ Packaging Trade Dress, or infringement,

14                 counterfeits or likenesses thereof, or that are substantially similar

15                 thereto;

16         (b)    any other unauthorized products which picture, reproduce or utilize

17                 the likenesses of or copy or bear a substantial similarity to the

18                 BRATZ Property or any elements thereof;

19         (c)    any unauthorized promotional and advertising material, labels,

20                 packages, wrappers, containers and any other items which picture,

21                 reproduce or utilize the likenesses of or copy or bear a substantial

22                 similarity to the BRATZ Property or any elements thereof;

23         (d)    any plates, molds, matrices, masters, tapes, film negatives, disks

24                 and other articles by means of which such Counterfeit and/or

25                 Infringing Products, or unauthorized items which picture,

26                 reproduce or utilize the likenesses of or copy or bear a substantial

27                 similarity to the BRATZ Property or any elements thereof, may be

28                 reproduced;

EXHIBIT ___104___

PAGE ___1520___

M 0078546

(e)   any other matter or material in any media embodying any unauthorized copies of the BRATZ Property or that are substantially similar thereto or any other evidence of infringement, including, but not limited to, hard disks, tapes, electronic mail, documents, product catalogs or software;

(f)   with respect to those defendants who have committed trademark counterfeiting, any correspondence (including but not limited to electronic mail), phone records, phone logs, importation documents, manufacturing specifications, shipping orders, sales journals, supplier journals, customer journals, ledgers, invoices, purchase orders, shipping logs, inventory control documents, bank records, catalogues, product lists, computer files, computers, recordings of any type whatsoever and all other business records and documents believed to concern the manufacture, distribution, purchase, advertising, sale or offering for sale of infringing merchandise; and

(g)   with respect to those defendants who have committed trademark counterfeiting, all computers and computer storage media, including without limitation, hard drives, floppies, CDs, DVDs, removable media (such as Zip/Jazz disks and Syquest), data cartridges and backup media, believed to concern the manufacture, importation, distribution, purchase, advertising, sale or offering for sale of any products bearing any labels, tags, logos, decals, emblems or other markings and/or any products which reproduce, copy, counterfeit, imitate, or bear any of the BRATZ Property that are identical with or substantially indistinguishable therefrom. Instead of seizing the items set forth in this paragraph (g), at Plaintiff's election, Plaintiff may make copies of the items set forth

EXHIBIT ___104___

PAGE ___152___

M 0078547

in this paragraph at the site of the seizure.  If Plaintiff seizes the items set forth in this paragraph, Plaintiff may make copies of all such computer storage media and shall return such seized items to Defendants no later than five (5) business days after such seizure;

C.    That the Court issue an order allowing Plaintiff (or its designees) to be allowed to accompany the United States Marshal or other law enforcement officers, including off-duty officers, and to assist in the seizure;

D.    That the Court issue an Order permitting accelerated pre-trial discovery within two (2) business days in order to ensure that other available evidence in this case -- which includes evidence that is transitory, portable and easily destroyed -- is available for a hearing on a preliminary injunction and preserved for trial;

E.    That the Court issue an order requiring Defendants to show cause why, pending a trial on the merits, it should not issue a Preliminary Injunction Order in accordance with Prayer For Relief A;

F.    That the Court issue a Preliminary Injunction in accordance with the order requested in Prayer For Relief A;

G.    That the Court issue a Permanent Injunction making permanent the orders requested in Prayer For Relief A1-6, 8;

H.    That Plaintiff be awarded damages for Defendants' copyright infringement in the form of either: (i) actual damages in an amount to be determined at trial, together with Defendants' profits derived from their unlawful infringement of the BRATZ Copyrights or (ii) statutory damages for each act of infringement in an amount provided by law, including enhanced damages for willful infringement, as set forth in 17 U.S.C. §504, at Plaintiff's election before the entry of a final judgment, together with pre-judgment and post-judgment interest;

I.    That Plaintiffs be awarded treble damages in an amount to be determined at trial for Defendants' willful trademark infringement pursuant to 15 U.S.C. § 1117(a), together with pre-judgment and post-judgment interest;

EXHIBIT ___104___

PAGE ___1522___                M 0078548

1    J.    That Plaintiff be awarded damages for Defendant All Toys' trademark

2  counterfeiting in the form of either: (i) treble damages in an amount to be determined

3  at trial, or (ii) statutory damages for each counterfeit mark per type of goods or

4  services sold, offered for sale or distributed in an amount provided by law, as set forth

5  in 15 U.S.C. §1117(c), together with pre-judgment and post-judgment interest;

6    K.    That Defendants account for and pay over to Plaintiff all damages

7  sustained by Plaintiff and profits realized by Defendants by reason of Defendants'

8  unlawful acts herein alleged, and that those profits be increased as provided and

9  allowed by law;

10    L.    That Defendants hold, as constructive trustees for the benefit of Plaintiff,

11  any and all personal and/or real properties and assets consisting of and/or obtained by

12  profits derived from Defendants' infringing activities, and that Plaintiff be granted

13  possession of or trustee rights over these properties;

14    M.    That the Court issue an order requiring Defendants to deliver to Plaintiff

15  or, at Plaintiff's option, destroy, at Defendants' cost, all infringing copies of the

16  BRATZ Property at the conclusion of the present matter;

17    N.    That the Court award Plaintiff its reasonable attorneys' fees pursuant to

18  17 U.S.C. § 505 and 15 U.S.C. § 1117(a);

19    O.    That the Court award Plaintiff its costs of suit incurred herein; and

20    P.    That the Court grant Plaintiff such other and further relief as it deems just

21  and equitable.

22

23  DATED: April ___, 2004        Respectfully submitted,

24                          KEATS MCFARLAND & WILSON LLP

25

26

27                          Larry W. McFarland

28                          Attorneys for Plaintiff
                                   MGA Entertainment, Inc.

EXHIBIT 104

PAGE 1523

M 0078549

EXHIBIT 3

EXHIBIT ____104____

PAGE ____1524____

M 0078573

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Form VA**
For a Work of the Visual Arts

VA 1-233-273

EFFECTIVE DATE OF REGISTRATION

MAR 01 2004

---

**DO NOT WRITE ABOVE THIS LINE  IF YOU NEED MORE SPACE  USE A SEPARATE CONTINUATION SHEET**

**1**

Title of This Work ▼

BRATZ Purse Style Guide

NATURE OF THIS WORK ▼ See instructions

Text  Illustrations

Previous or Alternative Titles ▼

Publication as a Contribution If this work was published as a contribution to a periodical serial or collection give information about the collective work in which the contribution appeared Title of Collective Work ▼

If published in a periodical or serial give  Volume ▼        Number ▼         Issue Date ▼        On Pages ▼

---

**2**

**NOTE**

Under the law the author of a work made for hire is generally the employer not the employee (see instructions) For any part of this work that was made for hire check Yes in the space provided give the employer (or other person for whom the work was prepared) as Author of that part and leave the space for dates of birth and death blank

NAME OF AUTHOR ▼

**a**  MGA Entertainment Inc

DATES OF BIRTH AND DEATH
Year Born ▼        Year Died ▼

Was this contribution to the work a work made for hire?
☑ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of ____
Domiciled in  USA

Was This Author's Contribution to the Work
Anonymous  ☐ Yes  ☑ No
Pseudonymous ☐ Yes ☑ No
If the answer to either of these questions is Yes see detailed instructions

Nature of Authorship Check appropriate box(es) See instructions
☐ 3 Dimensional sculpture       ☐ Map            ☐ Technical drawing
☑ 2 Dimensional artwork         ☐ Photograph     ☑ Text
☐ Reproduction of work of art   ☐ Jewelry design ☐ Architectural work

Name of Author ▼

**b**

Dates of Birth and Death
Year Born ▼        Year Died ▼

Was this contribution to the work a work made for hire?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of ____
Domiciled in ____

Was This Author's Contribution to the Work
Anonymous  ☐ Yes  ☐ No
Pseudonymous ☐ Yes ☐ No
If the answer to either of these questions is Yes see detailed instructions

Nature of Authorship  Check appropriate box(es) See instructions
☐ 3 Dimensional sculpture       ☐ Map            ☐ Technical drawing
☐ 2 Dimensional artwork         ☐ Photograph     ☐ Text
☐ Reproduction of work of art   ☐ Jewelry design ☐ Architectural work

---

**3**

**a**  Year in Which Creation of This Work Was Completed  2002
This information must be given Year in all cases

**b**  Date and Nation of First Publication of This Particular Work  at least as early as
Complete this information Month  October  Day 14,  Year 2002
ONLY if this work has been published  United States of America  Nation

---

**4**

See instructions before completing this space

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2 ▼

MGA Entertainment Inc
16730 Schoenborn Street North Hills California 91343

Transfer If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2 give a brief statement of how the claimant(s) obtained ownership of the copyright ▼

APPLICATION RECEIVED
MAR - 1 2004
ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED
MAR - 1 2004
FUNDS RECEIVED

---

**MORE ON BACK ▶**  Complete all applicable spaces (numbers 5 9) on the reverse side of this page
See detailed instructions  Sign the form at line 8

Page 1 of ___ pages

EXHIBIT  3
PAGE  50

EXHIBIT  64
PAGE  1525

M 0078574

| EXAMINED BY | | FORM VA |
|---|---|---|
| CHECKED BY | | |
| ☐ CORRESPONDENCE   Yes | | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET**

**PREVIOUS REGISTRATION** Has registration for this work or for an earlier version of this work already been made in the Copyright Office?
☐ **Yes**  ☐ **No**  If your answer is Yes, why is another registration being sought? (Check appropriate box.) ▼
a. ☐ This is the first published edition of a work previously registered in unpublished form.
b. ☐ This is the first application submitted by this author as copyright claimant.
c. ☐ This is a changed version of the work, as shown by space 6 on this application.
If your answer is Yes, give: Previous Registration Number ▼         Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.
a. **Preexisting Material** Identify any preexisting work or works that this work is based on or incorporate. ▼

Preexisting artwork including Reg Nos VA 1 218-487 VA 1 218 488 VA 1 218 489 VA 1 218-490 VA 1 218
491 VA 1 090 287 VA 1 090 288 VA 1 090 289 and VA 1 090 290 and other prior character artwork

**6**

a

See instructions before completing this space

b. **Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

New illustrations and text

b

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼                                         Account Number ▼

**7**

a

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/ZIP ▼

Larry W McFarland Keats McFarland & Wilson LLP
9720 Wilshire Boulevard Penthouse Suite
Beverly Hills California 90212

b

Area code and daytime telephone number   ( 310 ) 248 3830                Fax number   ( 310 ) 860 0363
Email  lmcfarland@kmwlaw com

**CERTIFICATION*** I, the undersigned, hereby certify that I am the

check only one ▶
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☑ authorized agent of   MGA Entertainment Inc
_____
Name of author or other copyright claimant, or owner of exclusive right(s) ▲

**8**

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.
Larry W McFarland                                                    Date February 27 2004

Handwritten signature (X) ▼
X _____

| Certificate will be mailed in window envelope to this address | Name ▼ Larry W McFarland Keats McFarland & Wilson LLP | **9** |
|---|---|---|
| | Number/Street/Apt ▼ 9720 Wilshire Boulevard Penthouse Suite | |
| | City/State/ZIP ▼ Beverly Hills California 90212 | |

*17 U S C § 506(e) Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409 or in any written statement filed in connection with the application shall be fined not more than $2 500.

Rev August 2003—30 000   Web Rev June 2002   ⊕ Printed on recycled paper                    U S Government Printing Office 2003-496 605/60 029

EXHIBIT  104

PAGE  1526

M 0078575

Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**FORM VA**
For a Work of the Visual Arts
~~UNITED STATES COPYRIGHT OFFICE~~

VA 1-218-489

EFFECTIVE DATE OF REGISTRATION

DEC 22 2003
Month      Day      Year

---

DO NOT WRITE ABOVE THIS LINE  IF YOU NEED MORE SPACE  USE A SEPARATE CONTINUATION SHEET

**1**

Title of This Work ▼

BRATZ Group Drawing

NATURE OF THIS WORK ▼ See Instructions

color drawing

Previous or Alternative Titles ▼

Publication as a Contribution If this work was published as a contribution to a periodical  serial  or collection  give information about the collective work in which the contribution appeared  Title of Collective Work ▼

If published in a periodical or serial give  Volume ▼        Number ▼        Issue Date ▼        On Pages ▼

---

**2**

**NOTE**

Under the law the author of a work made for hire is generally the employer not the employee (see instructions) For any part of this work that was made for hire check Yes in the space provided give the employer (or other person for whom the work was prepared) as Author of that part and leave the space for dates of birth and death blank

**a**  NAME OF AUTHOR ▼

Carter Bryant

DATES OF BIRTH AND DEATH
Year Born ▼        Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☑ No

Author s Nationality or Domicile
Name of Country
OR { Citizen of   U S A
      Domiciled in

Was This Author s Contribution to the Work
Anonymous?    ☐ Yes  ☑ No
Pseudonymous?  ☐ Yes  ☑ No
If the answer to either of these questions is "Yes" see detailed instructions

Nature of Authorship  Check appropriate box(es) See Instructions
☐ 3 Dimensional sculpture    ☐ Map              ☐ Technical drawing
☑ 2 Dimensional artwork      ☐ Photograph       ☐ Text
☐ Reproduction of work of art  ☐ Jewelry design  ☐ Architectural work

**b**  Name of Author ▼

Dates of Birth and Death
Year Born ▼        Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

Author s Nationality or Domicile
Name of Country
OR { Citizen of
      Domiciled in

Was This Author s Contribution to the Work
Anonymous?    ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes" see detailed instructions

Nature of Authorship  Check appropriate box(es) See Instructions
☐ 3 Dimensional sculpture    ☐ Map              ☐ Technical drawing
☐ 2 Dimensional artwork      ☐ Photograph       ☐ Text
☐ Reproduction of work of art  ☐ Jewelry design  ☐ Architectural work

---

**3**

**a**  Year in Which Creation of This Work Was Completed
1998
This information must be given
Year in all cases

**b**  Date and Nation of First Publication of This Particular Work
Complete this information  Month February  Day 12  Year 2001
ONLY if this work has been published    U S A                          Nation

---

**4**

See Instructions before completing this space

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2 ▼

MGA Entertainment Inc  16730 Schoenborn Street
North Hills CA  91343 6122

Transfer If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2  give a brief statement of how the claimant(s) obtained ownership of the copyright ▼

Assignment

APPLICATION RECEIVED
ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED
DEC 22 2003
FUNDS RECEIVED

DO NOT WRITE HERE
OFFICE USE ONLY

---

MORE ON BACK ▶   Complete all applicable spaces (numbers 5-9) on the reverse side of this page
See detailed instructions      Sign the form at line 8

DO NOT WRITE HERE
Page 1 of ___ pages

EXHIBIT 3
PAGE 52

EXHIBIT 109

PAGE 1527

M 0078576

| EXAMINED BY | | FORM VA |
|---|---|---|
| CHECKED BY | | |

| ☐ CORRESPONDENCE Yes | FOR COPYRIGHT OFFICE USE ONLY |
|---|---|

**DO NOT WRITE ABOVE THIS LINE  IF YOU NEED MORE SPACE  USE A SEPARATE CONTINUATION SHEET**

**PREVIOUS REGISTRATION** Has registration for this work  or for an earlier version of this work  already been made in the Copyright Office?

☐ Yes  ☑ No  If your answer is  Yes  why is another registration being sought? (Check appropriate box ) ▼

a  ☐ This is the first published edition of a work previously registered in unpublished form

b  ☐ This is the first application submitted by this author as copyright claimant

c  ☐ This is a changed version of the work  as shown by space 6 on this application

If your answer is  Yes  give  Previous Registration Number ▼           Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work  complete only 6b for a compilation

a  Preexisting Material  Identify any preexisting work or works that this work is based on or incorporates ▼

b  Material Added to This Work  Give a brief  general statement of the material that has been added to this work and in which copyright is claimed ▼

**6**

a  See instructions before completing this space

b

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office  give name and number of Account

Name ▼           Account Number ▼

**7**

a

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent  Name/Address/Apt/City/State/ZIP ▼

Larry W  McFarland  Keats McFarland & Wilson  LLP
9720 Wilshire Boulevard  Penthouse Suite
Beverly Hills  California  90212

b

Area code and daytime telephone number   ( 310 ) 248 3830           Fax number   ( 310 ) 860 0363

Email  lmcfarland@kmwlaw com

**CERTIFICATION**  I  the undersigned  hereby certify that I am the

check only one ▶

☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☑ authorized agent of  MGA Entertainment  Inc
           Name of author or other copyright claimant  or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3  do not sign and submit it before that date

Larry W  McFarland           Date  December 16  2003

Handwritten signature (X) ▼

X

| Certificate will be mailed in window envelope to this address | Name ▼
Larry W  McFarland  Keats McFarland & Wilson  LLP
Number/Street/Apt ▼
9720 Wilshire Boulevard  Penthouse Suite
City/State/ZIP ▼
Beverly Hills  California  90212 |
|---|---|

**9**

17 U S C  § 506(e)  Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409  or in any written statement filed in connection with the application  shall be fined not more than $2 500

Rev June 2002—20 000   Web Rev June 2002   ⊕ Printed on recycled paper           US Government Printing Office  2000 461 113/20 021

EXHIBIT  3

PAGE  53

EXHIBIT  104

PAGE  1528

M 0078577



8/1998

EXHIBIT __3__
PAGE __54__

EXHIBIT __104__

PAGE __1529__

M 0078578