

BARBIE

TeResa

CONFIDENTIAL

EXHIBIT 110

PAGE 1607

M0012573







EXHIBIT 110

PAGE 1608

CONFIDENTIAL

M0012574



CONFIDENTIAL

M0012575

EXHIBIT ___110___

PAGE ___1609___





EXHIBIT _____ 110

PAGE _____ 1610

CONFIDENTIAL

M0012576





Barbie decal
Roller blade
1999

CONFIDENTIAL

M0012577

EXHIBIT ___110___
PAGE ___1611___

BLUEBIRD OFFICE SUPPLIES (888) 477-0716 www.bluebirdoffice.c

**EXHIBIT 111**

FROM : Link67          FAX NO. : 310 395 1205          Ju... 5 1999 01:18PM  P1



EXHIBIT _____111_____

CONFIDENTIAL - ATTORNEY'S EYES ONLY   PAGE _____1612_____          M 0016504

**EXHIBIT 112**



EXHIBIT 112

CONFIDENTIAL - ATTORNEY'S EYES ONLY    PAGE 1613

M 0016474



EXHIBIT ___11૨___

PAGE ___1૦14___

CONFIDENTIAL - ATTORNEY'S EYES ONLY

M 0016475



AFRO GIRL

#1A

EXHIBIT ___112___

PAGE ___1415___

CONFIDENTIAL - ATTORNEY'S EYES ONLY

M 0016476



EXHIBIT ___11 2___

PAGE ___1 6 1 6___

CONFIDENTIAL - ATTORNEY'S EYES ONLY

M 0016477






Chat Girls - Cool, Hip And Talkin'

EXHIBIT ___112___

CONFIDENTIAL - ATTORNEY'S EYES ONLY    PAGE ___1617___    M 0016501

**EXHIBIT 113**



EXHIBIT ___113___

PAGE ___1618___

CONFIDENTIAL - ATTORNEY'S EYES ONLY

M 0016495



CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT ___113___

PAGE ___1619___

M 0016496

**EXHIBIT 114**



CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT ___114___

PAGE ___1020___

M 0016816











CONFIDENTIAL - ATTORNEY'S EYES ONLY

M 0016817

EXHIBIT ___114___

PAGE ___1021___









CONFIDENTIAL - ATTORNEY'S EYES ONLY          M 0016818

EXHIBIT _114_

PAGE _11022_





EXHIBIT ___ 114 ___

PAGE ___ 1623 ___

CONFIDENTIAL - ATTORNEY'S EYES ONLY

M 0016819





EXHIBIT ___114___

PAGE ___1624___

CONFIDENTIAL - ATTORNEY'S EYES ONLY

M 0016820





M 0016821

CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT __114__

__1025__





**CONFIDENTIAL - ATTORNEY'S EYES ONLY**

**M 0016822**

EXHIBIT ___11 4___

PAGE ___1626___





CONFIDENTIAL - ATTORNEY'S EYES ONLY

M 0016823

EXHIBIT _____ 114
PAGE _____ 1627







CONFIDENTIAL - ATTORNEY'S EYES ONLY

M 0016824

EXHIBIT _____ 114
PAGE _____ 1628

EXHIBIT 115



CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT _____ 115

PAGE _____ 1029

TP 0012



CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT ____ 115 ____

PAGE ____ 1630 ____

TP 0013



EXHIBIT ___115___

PAGE ___1631___

CONFIDENTIAL - ATTORNEY'S EYES ONLY

TP 0014



EXHIBIT ___115___

PAGE ___1032___

CONFIDENTIAL - ATTORNEY'S EYES ONLY

TP 0015



EXHIBIT __115__

PAGE __1633__

CONFIDENTIAL - ATTORNEY'S EYES ONLY

TP 0016



EXHIBIT ___115___

PAGE ___1634___

CONFIDENTIAL - ATTORNEY'S EYES ONLY

TP 0017

EXHIBIT 116



MINI
DIVASTARZ
ASIAN 2

CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT ___114___

PAGE ___1635___

TP 0109

MINI
DIVA STARZ
ASIAN 1.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT ___ 110

PAGE ___ 1636

TP 0110



MiNi
DIVASTARZ
ASIAN 3

CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT _____ 116

PAGE _____ 1037

TP 0111



MINI
DIVASTARZ
INDIAN 2

CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT ___ 116
PAGE ___ 1638

TP 0112



MiNi
DIVASTARZ

INDIAN 1

CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT ___ 116

PAGE ___ 1639

TP 0113



CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT ___116___

PAGE ___1640___

TP 0114



CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT ____116____

PAGE ____1641____

TP 0115



CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT 116

PAGE 1642

TP 0116



CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT ___110___

PAGE ___1643___

TP 0117

APR-11-2000 11:46 AM                                          P.01



CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT _____ 116 _____

PAGE _____ 1644 _____

TP 0118

**EXHIBIT 117**

**From:**     Liz Hogan

**To:**       Pratte, Joni; sue davis;

**CC:**       Steve Linker;

**Subject:**  Re: names

**Date:**     Friday, January 07, 2000 4:16:51 AM

**Attachments:**

---

joni and sue,
here are names and tag lines from steve and i.
liz


### CHAT GIRL name alternatives:

CH@T GRRLS- Full of attitude and chat-i-tude!

-Plenty of @ttitude and ch@titude!

CH@T CHICS

@girls
@chics

@dolls
@brats
@gals
interCH@T Girls -Where it's at!

MallCH@TS
MallBRATS
MallRATS
MallGirls

iKNOW


CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT ____17____

PAGE ____1645____

M 0016585

iGALS
iGIRLS- iNTERACTIVE &iNTELLIGENT!
iREACT
iCHAT GIRLS
iCHAT
iCHICS
   -iNTELLIGENT! iNTERACTIVE! iNTO HAVING FUN!

-Trend Talkin' Teenagers!
-Trend Setting Teens
-The Edge of Trend!
-The Edge of Style!

PC Girls

YEAH GALS
GO-GALS
TRONIC CHICS - Hi Tech Talkers
CHATRONIchics
TRONI-CHICS- Electronic Intelligence
Electro-chat  - Chics with something to say!
   -Chics that don't chit-chat!

VIRTUAL G
V-GALS
NuGIRLs

HIPsters
HIPstars

Chit Chat Girls
Poppies
Chat Nana's
Chat Na Na's
Mai Girls
Cha Cha Chat
Mushi Mushi Girls

CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT 117
PAGE 1646

M 0016586

Hello Girls
gigi GAB
mojo juju's - keep on talkin'
talki-talki  girls
411girls
queens of stlye- hip, talkin teens!

CONFIDENTIAL - ATTORNEY'S EYES ONLY    EXHIBIT ___11 7___    M 0016586.001

PAGE ___1047___

**EXHIBIT 118**



CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT ___118___

PAGE ___1648___

M 0016806



CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT 118

PAGE 1649

M 0016807



CONFIDENTIAL - ATTORNEY'S EYES ONLY   EXHIBIT _____ 118

PAGE   1650

M 0016808



CONFIDENTIAL - ATTORNEY'S EYES        M 0016809

EXHIBIT ___118___
PAGE ___1051___











CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT 118

PAGE 1652

M 0016810



**CONFIDENTIAL - ATTORNEY'S EYES ONLY**      M 0016811

EXHIBIT ___118___

PAGE ___1653___

**EXHIBIT 119**



CONFIDENTIAL - ATTORNEY'S EYES ONLY

TP 0008

EXHIBIT 119
PAGE 1054



EXHIBIT 1109

PAGE 1655

CONFIDENTIAL - ATTORNEY'S EYES ONLY

TP 0009



CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT ____119____

PAGE ____1656____

TP 0010



**CONFIDENTIAL - ATTORNEY'S EYES ONLY**

TP 0011

EXHIBIT 119
PAGE 1657

**EXHIBIT 120**

























CONFIDENTIAL - ATTORNEY'S EYES ONLY

EXHIBIT ___120___

PAGE ___1658___

M 0016482

BLUEBIRD OFFICE SUPPLIES (888) 477-0 www.bluebir...

**EXHIBIT 121**

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT 122**

# Carter H. Bryant

1-A Sycamore Drive
Kimberling City, MO 65686
(417)739-1338office (417)739-2248FAX

## Professional Objective

To utilize and expand on the training and experience I have gained thus far in a creative and
challenging manner. To provide my employer with the best possible in creative ideas, designs
and/or illustrations which will hopefully enhance the overall quality of their product line.

## Education

Otis college of Art and Design, Los Angeles, CA
1994
Fashion Design/Illustration Major

## Professional Experience

### Most Recent Position

September 1995-April 1998
Mattel, Inc.
333 Continental Blvd.
El Segundo, CA 90245
Title: **Designer, Barbie Mainline Fashion Dolls**
Responsibilities:
Developing doll/toy concepts from initial idea to the pre-production development stage. This
included the full range of design, from the design of the fashions and accessories, which included
shoes/hats/bags, etc. to the design of the hairstyle/hair color, face design, which included
designing of the dolls' "makeup" and the conceptual design of the "feature" (or 'play pattern') of
the toy which usually included any accessory that was to be included with the doll, such as a
skateboard or a horse or a bicycle, etc. Concepts were first presented in illustration form, using
sketches/illustrations and concept boards, and, upon approval, translated to the 3-Dimensional
prototype stage.

### Special Accomplishments

Designer of the "Teen Skipper" dolls, marketed in 1997. The Teen Skipper dolls became Mattel's
best selling doll in the Barbie doll line for the first half of 1997, outselling all advertised dolls in
the Barbie Line. (The Skipper dolls were *un*-advertised during the first half of 1997.)

Designer of the "new" Barbie body which will be introduced this year. The new body received
media attention in the *Wall Street Journal*, as well as *Good Morning America*, and was also
covered in various news programs around the country. Was also instrumental in bringing in a new
face design/sculpt for the 1998 Barbie line after 20 years of Mattel's use of the same sculpt.

My original fashion illustrations for the "Teen Skipper" dolls were reproduced to appear in a
cover-story article on the Teen Skipper dolls for the *'Barbie Bazaar'* magazine's July/August

CONFIDENTIAL-
ATTORNEYS' EYES ONLY

M 0001615

EXHIBIT _____ 22 _____

PAGE _____ 1680 _____


DEPOSITION
EXHIBIT
20

1997 issue. This article included a report on how I was involved in the design of the Teen Skipper dolls. "*Barbie Bazaar*" is an internationally distributed magazine.

### Toys Currently on the Market

Several of my toy designs are currently on the market and are visible in the "Barbie Aisle" and adjacent aisles of most large toy stores. (See photos included)

**1998 Barbie doll line**
*Cool Blue Barbie/Extreme Green Teen Skipper/Perfect Pink Teresa/Purple Panic Christie
These dolls were introduced in May of 1998 and are currently among Mattel's *top 3 selling dolls.*

**1997 Barbie doll line**
*Teen Skipper/Teen Courtney/Teen Nikki. See comments under *special accomplishments.* Also see tear sheets included from magazine article.
* Bicyclin' Stacie/Whitney/Janet
* Flower Fun Barbie. A low priced Barbie doll.
* "Clueless" dolls, Cher, Amber and Dionne. I designed a second Cher doll which was  approved by Mattel and the TV shows' producers, but due to the shows' cancellation, was never put into production. This toy concept was very well received, however, within the toy industry of Mattel's customers/retailers.

**Upcoming**
As mentioned earlier, the "new" Barbie body should be introduced later this year on a product with a yet-to-be-determined name. The working name of this line was "Really Rad", and included the characters Barbie/Christie/Teresa and Kira.

CONFIDENTIAL-
ATTORNEYS' EYES ONLY

M 0001616

EXHIBIT ___122___

PAGE ___1681___

**EXHIBIT 123**

**From:** Isaac Larian
**Sent:** Thursday, November 02, 2000 8:39 AM
**To:** Mercedeh Ward; Paula Treantafelles
**Subject:** FW: Bratz Design

Please print and see me on this.

-----Original Message-----
**From:** Samuel Wong
**Sent:** Wednesday, November 01, 2000 11:00 PM
**To:** Mercedeh Ward; Paula Treantafelles
**Cc:** Isaac Larian; Stephen Lee; Victor Lee; Franki Tsang; Disraeli Chan; Judy Rich; Cecilia Kwok; Alex Fan
**Subject:** RE: Bratz Design

Mercedeh,

So far, there is no misunderstanding here. As stated in Cecilia's previous e-mail, HK can make the armatures according to the shape of the sculpture of the Bratz, this is correct and this is usually prefer by the factory. By doing so, factory can make sure the armature are fit within the sculpture and perform the function that we required before they proceed to tooling stage. Of course, HK will review the prototype and send it to LA for final approval before we let the factory to proceed toolings. The armature design is very common and widely use for the doll that need articulated functions, so it should not have any problem to handle here.

Right now, we have already clear about the movement of the head, arms, legs and hips. Therefore, we prefer LA just to send us the final sculpture with sketches of armatures (for ref. only) to HK and we will mock up the armature samples to fit within the doll and test it here and then send to LA for final review and approval.

Both nylon and celcon are all OK for use on armature. However, we usually use celcon for armature because it is more easy to control in molding process. We will prepare samples using celcon and nylon for your evaluation when we have test shot and you can make final decision from there.

Regarding the % of wax pattern, HK definitely need 8% larger wax pattern for tooling. If LA can only provide 6% larger size, we will enlarge the size to 8% before we go to toolings as we mentioned before that the wax material that using by LA cannot be use for toolings. Since the head is small, therefore, the loss of definition is minimal. Don't worry. (If you still worry about the loss of definition, you can make the definition of your wax pattern more sharply to overcome the loss of definition). So far, we don't have any problem on all our current doll with using 8% larger wax pattern that supply by LA.

Confirm we will use injection PVC for the shoes. The connection can be done properly.

thanks & best regards

Samuel (11/2/00)
-----Original Message-----
**From:** Mercedeh Ward
**Sent:** Thursday, November 02, 2000 2:22 AM
**To:** Samuel Wong; Paula Treantafelles
**Cc:** Isaac Larian; Stephen Lee; Victor Lee; Franki Tsang; Disraeli Chan; Judy Rich; Cecilia Kwok
**Subject:** RE: Bratz Design

Samuel;

Please see my comments below.

Regards;

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MGA 0009407

EXHIBIT 123

PAGE 1682

MGA0009407 B

*Mercedeh Ward*
Sr. Product Design/Engineer Manager
MGA Entertainment
(818) 894-2525 X105
http:\\www.mgae.com

‑‑‑‑Original Message‑‑‑‑
From:      Samuel Wong
Sent:      Tuesday, October 31, 2000 12:01 AM
To:        Mercedeh Ward; Paula Treantafelles
Cc:        Isaac Larian; Stephen Lee; Victor Lee; Franki Tsang; Disraeli Chan; Judy Rich; Cecilia Kwok
Subject:   RE: Bratz Design

Mercedeh,

- Regarding the armature, noted LA will provide armature for us to use for tooling. Usually, we can
  make armature ourselves here to fit in your sculpture, therefore, we previously advised that LA
  can just simply send us the sculpture and HK can make armature here in order to speed up the
  process and may save cost. However, if you prefer to make armature in LA, this is also welcome.
  Please make sure the armatures that LA provide us for tooling fit inside the patterns and fulfill
  your requirements. Samuel, We are having a misunderstanding here. I will not be
  sending armatures for you to use for tooling. I asked Cecilia to help me with sculpting
  armatures. I realized later that it would be easier for me to have them done here. We
  have to sculpt around the arm and hip joints we can not just send sculpting to you with
  out the proper fit of arms and legs.
  What I can provide is guidance on how the armatures should be finalized for production.
  If you would prefer we can do the engineering drawings here. Let em know if that is what
  you prefer.
- noted the construction of the doll movable head will be same as the "skipper" doll. Yes

- noted the arms of the doll will be moved like "skipper" doll. Yes
  Please confirm our following understanding is correct or not :
  There is only armature inside the doll's arms (ie : the arms cannot bend like the legs). The
  arms will not bend like the Skippers legs. The arms will have the full function of Skippers
  arms. Rotate fully and away from the body.

- Noted the hip joint will be same as the "skipper" doll. Noted the sculpture that we received is a
  very rough sculpture. Please make sure the design on the hip joint of the final sculpture of Bratz
  matches with the hip joint design of the "skipper" doll. FYI : per your rough sculpture that we
  recevied, the hip joint right now is using the ball joint design. The final sculpting will have
  two disks one in the hip and one on the leg (both legs). The disks will be place in the
  correct place for you to finalize you tooling from. We will not have a ball joint in our doll.
  After reviewing the rough wax it was agreed in LA that it was not as attractive for our
  purposes and the doll's hips did not provide enough space for the ball joint to work.

- Noted the knee will be bended like the "skipper" doll. Yes. I had suggested Nylon to be

CONFIDENTIAL ‑
ATTORNEYS' EYES ONLY

MGA 0009408

EXHIBIT _____ 103

PAGE _____ 1083

MGA0009408 B

used for armature please let me know if you are using a different material for production. The knee joint is critical in function.

- Next time, we would appreciate if LA can make all the sculptures that used for roto casting 8% larger than the actual size that LA expected. As explained by Cecilia before, the wax material that LA is using cannot go directly to tooling stage. Would it make it easier from now on we send the final tooling of the roto head to HK. I think if we are going to produce small dolls it is critical we can work off of 6% sculpting. I feel we are going to lose to much definition if we use a 8% sculpting to start from. I will discuss with our sculptor to see if she can work with 8% for next project. We need to talk about this matter again for other projects.

We have to duplicate another wax (using HK wax material) sculpture before we can go to tooling stage. During this duplication, there will have 2% shrinkage occur on the wax sculpture, therefore, we request LA to make all the wax sculpture 8% larger in order to overcome this 2% shrinkage, otherwise, HK has to enlarge the size of the LA wax pattern upon receipt by 2 % before we can go to tooling stage ( this will require about 7-10days leadtime). If we don't do that, we can never get the correct skin size for production. Please note. Doing this process must have some effect on the look of the sculpture??

- Noted the head and feet of our doll will not be in proportion.
Pls advise if the final sculpture still on schedule ( release to HK on 11/27)? Please also confirm will the armatures send out at the same time LA release the final sculpture? As I said we will not be providing armature to HK. We are working on final sculpting to the 11/27 date.

- Please confirm if the shoes are injection PVC or not ( we think it should be injection PVC)? The shoes will have paint ups. We can use PVC if the connection can be done properly for the shoes(foot) to connect to the legs.
Thanks & best regards
Samuel / Cecilia (10/31/00)
-----Original Message-----
**From:**      Mercedeh Ward
**Sent:**      Tuesday, October 31, 2000 1:58 AM
**To:** Cecilia Kwok; Paula Treantafelles
**Cc:** Isaac Larian; Stephen Lee; Victor Lee; Franki Tsang; Disraeli Chan; Samuel Wong; Judy Rich
**Subject:**      RE: Bratz Design

Cecilia;

Please slow down a bit. We are still defining the product and you are miles a head of use. I am going to comment on the sculpting and the doll's body at this point because I have to see the fabric swatches that were sent to you before I can make comment.

The doll's body:

- I worked it out with the sculptor we will make our sculpting armatures here in US. I thought you misunderstood me when I asked for the armatures I was only talking about sculpting armatures and not production doll armatures. We

CONFIDENTIAL -
ATTORNEYS' EYES ONLY

MGA 0009409

EXHIBIT ____123____

PAGE ____1684____

MGA0009409 B

decided to make the armatures so there are no confusion.
- The doll has a movable head like the "skipper" doll.
- The arms will move like the "skipper" doll.
- The hip joints are just like the "skipper" doll and NOT BALL joints. The sculpting that you received is very ROUGH.
- the knee will bent and the "Skipper" doll.
- The head sculpting will be at the 6% up.
- The head and feet of our dolls will not be in proportion to dolls that you have seen before. The Rough sculpting is correct in the foot and head size difference to the doll body.

Best Regards;

*Mercedeh Ward*
Sr. Product Design/Engineer Manager
MGA Entertainment
(818) 894-2525 X105
http:\\www.mgae.com

----Original Message----
From:
Sent:          Cecilia Kwok
To:            Monday, October 30, 2000 1:53 AM
Cc:            Paula Treantafelles; Mercedeh Ward
               Isaac Larian; Stephen Lee; Victor Lee; Franki TSANG; Disraeli Chan; Samuel
               WONG; Judy Rich
Subject:       Bratz Design

Dear All,

HK just received the packages for the Bratz Fashion & rough wax today (10/30).
Here are the photo of the fashion information & HK's comment:

Re: Doll Packs
1. Bratz Doll 1
- Fashion Fabric « File: Doll1a.JPG » « File: doll1b.JPG »
- Fashion Pattern Drawing « File: doll1fs.bmp »

Re: Bratz Doll 2
- Fashion Fabric « File: Doll2a.JPG » « File: doll2b.JPG »
- Fashion Pattern Drawing « File: doll2fs.bmp »

Re: Bratz Doll 3
- Fashion Fabric « File: doll3a.JPG » « File: doll3b.JPG » « File: doll3c.JPG »
- Fashion Pattern Drawing « File: doll3fs.bmp »

Re: Bratz Doll 4
- Fashion Fabric « File: doll4a.JPG » « File: doll4b.JPG »
- Fashion Pattern Drawing « File: doll4fs.bmp »

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MGA 0009410

EXHIBIT _____ 173

PAGE _____ 1685

MGA0009410 B

HK's comment :

1. Accessories such as belt, hats, head kerchief were added which did not mention in the PDF.  All the vendors quoting did not include these.  There will be cost impact for the accessories.

2. DChan quickly reviewed the fabric matrix and found some of the fabric material are expensive than TWILL.  There will be cost impact and listed out as follows for your quick reference:

Doll 1 : Leopard print fuzz fabric for the shirt, Light weight dark denim w/ fine silver sparkle for the jacket, Light weight dark denim w/ coarse silver sparkle for the pants, Aqua panne velvet w. iredes cent film for the belt, Aqua & light brown vinyl snakeskin print for the hat, Vinyl lined w/ silver fabric & tricot for the backpack

Doll 2 : Hombred from gold to fushia metal mesh for the Halter top, Light gray double knit w/ silver sparkle, Gray reflective fabric (good weight) for the backpack, Dark blue reflective vinyl (light weight) for the backpack

Doll 3 : Deep periwinkle 15D tricot w. silver sparkle for the top sleeves, Iredescen denin in lighter weight for the skirt, M/C knit w/ glitter dots for the skirt trim, Lavender moire stretch velvet for the top, M/C mesh for the head kerchief

Doll 4 : Cranberry red crebe knit w/ purple glitter for the top, Oliver green stretch poly satin with texture for the pants, Crimsom velboa for the skirt trim, Multi-color stripes satin knit for the Beannie

Anyway, we will get vendors quote based on your fabric matrix.  Our current quotes already over the target price USS2.75 and we need cost reduction.  However, the fabric proposed are adding cost.

3. For the Doll 1's belt, a tooling for the belt buckle is required.

4. Please advise the target age grading for this item.  LA provided to use some glitter dots on the fabric and are easily come off.  There may be safety issues.


Re: Fashion Pack 1
- Fashion Fabric  ‹‹ File: fashion1.JPG ››
- Fashion Pattern Drawing  ‹‹ File: fashion1fs.bmp ››
HK's comment :

1. There are totally 3 fashion pack.  HK only received one fashion pack design & fabric and still awaiting for the other 2.

2. DChan quickly reviewed the fabric matrix and found some of the fabric material are expensive than TWILL.  There will be cost impact and listed out for your quick reference: Fuzzy novelty knit in rasberry for the halter top, Crushed panne veluet in chartreuse for the pants.


Re: Carrying Case (for Child)
- Fabric information  ‹‹ File: Case1.JPG ››  ‹‹ File: case2.JPG ››  ‹‹ File: case3.JPG ››

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MGA 0009411

EXHIBIT _____ 123

PAGE _____ 1686

MGA0009411 B

HK's comment : per separate mail, HK commented the Carrying case design and waiting for LA reply.

<< Message: Bratz Backpack design inquiry >>

Re: Hair Pack
HK's comment : Did not receive the Hair pack.  Please advise the curl size of each hair styles for getting quote. (FYI : curl hair is more expensive than straight hair)

Re: Rough Wax
HK received the rough wax body today.  HK downsized the head by 6% by the computer and attached to the 1:1 body.  This reflected the final size/ outlook of the wax. Enclosed is the photo for your reference: << File: waxfinalsize.jpg >>
HK's comment : The head & legs/ feet seem are not in proportion.  LA please advise if this is the actual size that you expected for future production.  HK also received the reference body showing the joint & armature required.
<< File: MVC-003F.JPG >>
HK's comment :
1. Please confirm the type of joint request by return.  << File: Joints.jpg >>
2. Per separate email, HK already commented the armature mock up request and waiting for LA reply.

Please advise.
Regards,
Cecilia

CONFIDENTIAL -
ATTORNEYS' EYES ONLY

MGA 0009412

EXHIBIT _____ 123
PAGE _____ 1687

MGA0009412 B

**EXHIBIT 124**

**From:**            Paula Treantafelles
**Sent:**           Wednesday, September 27, 2000 12:34 PM
**To:**              Franki Tsang; Judy Rich
**Subject:**       BRATZ

Franki
Please note that I sent to you today a binder describing the new small doll line called BRATZ.

This is a small doll line made up of 4 characters. The position of this line is hair and dress play.
Dolls are sold with 1 hair style and 1 outfit for a "day time" look and another outfit and hair style for a "night time" look.

**The consumer has the ability to:**
• change dolls clothes
• snap in different hair styles (illustrated in the binder)
• snap in different pairs of shoes (illustrated in the binder)

I need you to help me get an idea of what a dress pack would cost. I need to make sure that pieces I am expecting to include support our retail price.

The second to last page of this binder reflects the doll pack piece count
• 2 hair styles
• 1 purse
• 4 piece fashion set
• 2 pairs of shoes

The very last page of this binder indicates:
• preferred hair vendor (contact name, address and phone number)
• approximate amount/weight of hair

I also sent to you physical samples of:
• body
• outfit pieces
• purse
• shoes
These pieces represent approximate size or amount of softgoods material expected for these mentioned pieces.

I am hoping that this information will help you ..help me get an idea of how much these components will cost.

I am going to send you a PDF by end of next week. Please call me if you have any questions. I would love to put a development schedule together as soon as I get Isaac to buy off on the line I mentioned above.

Sorry for this.

EXHIBIT ____124____

PAGE ____1688____

ATTORNEY'S EYES ONLY

MGA000422

**EXHIBIT 125**

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that: (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

## 1. Provisions Related to Trade Secrets

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in this Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of any Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

## 2. Ownership of Inventions

(a) I agree to communicate to the Company as promptly and fully as practicable all inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this agreement requiring me to assign my rights in any invention does not apply to an invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

## 3. Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

## 4. Miscellaneous

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will insure to the benefit of and be binding upon the successors and assigns of the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f) This agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

Employee Signature _Carter Bryant_

Employee Name (print) CARTER H. BRYANT

Date 01/04/99

MATTEL INC.

By _Teresa Newcomb_
Signature

Name of Witness (print) TERESA NEWCOMB

EXHIBIT ___125___

PAGE ___1689___

M 0001622

**EXHIBIT 126**

| | |
|---|---|
| **From:** | Mercedeh Ward |
| **To:** | |
| **CC:** | |
| **BCC:** | |
| **Sent Date:** | 2000-10-30 17:58:12:468 |
| **Received Date:** | 2000-10-30 17:59:09:203 |
| **Subject:** | RE: Bratz Design |
| **Attachments:** | |

Cecilia;

Please slow down a bit. We are still defining the product and you are miles a head of use. I am going to comment on the sculpting and the doll's body at this point because I have to see the fabric swatches that were sent to you before I can make comment.

The doll's body:

- I worked it out with the sculptor we will **make our sculpting armatures here in US**. I thought you misunderstood me when I asked for the armatures I was only talking about sculpting armatures and not production doll armatures. We decided to make the armatures so there are no confusion.
- The doll has a movable head like the "skipper" doll.
- The arms will move like the "skipper" doll.
- The hip joints are just like the "skipper" doll and NOT BALL joints. The sculpting that you received is very ROUGH.
- the knee will bent and the "Skipper" doll.
- The head sculpting will be at the 6% up.
- The head and feet of our dolls will not be in proportion to dolls that you have seen before. The Rough sculpting is correct in the foot and head size difference to the doll body.

Best Regards;

*Mercedeh Ward*
Sr. Product Design/Engineer Manager
MGA Entertainment
(818) 894-2525 X105
http:\\www.mgae.com

-----Original Message-----
From:  Cecilia Kwok
Sent:  Monday, October 30, 2000 1:53 AM
To:  Paula Treantafelles; Mercedeh Ward
Cc:  Isaac Larian; Stephen Lee; Victor Lee; Franki TSANG; Disraeli Chan; Samuel WONG; Judy Rich
Subject:  Bratz Design

Dear All,

EXHIBIT _____124_____

PAGE _____1690_____

Confidential - For Attorney's Eyes Only

MGA 4504698

HK just received the packages for the Bratz Fashion & rough wax today (10/30).
Here are the photo of the fashion information & HK's comment:

Re: Doll Packs
1. Bratz Doll 1
- Fashion Fabric ≪ File: Doll1a.JPG ≫ ≪ File: doll1b.JPG ≫
- Fashion Pattern Drawing ≪ File: doll1fs.bmp ≫

Re: Bratz Doll 2
- Fashion Fabric ≪ File: Doll2a.JPG ≫ ≪ File: doll2b.JPG ≫
- Fashion Pattern Drawing ≪ File: doll2fs.bmp ≫

Re: Bratz Doll 3
- Fashion Fabric ≪ File: doll3a.JPG ≫ ≪ File: doll3b.JPG ≫ ≪ File: doll3c.JPG ≫
- Fashion Pattern Drawing ≪ File: doll3fs.bmp ≫

Re: Bratz Doll 4
- Fashion Fabric ≪ File: doll4a.JPG ≫ ≪ File: doll4b.JPG ≫
- Fashion Pattern Drawing ≪ File: doll4fs.bmp ≫

HK's comment :
1. Accessories such as belt, hats, head kerchief were added which did not mention in the PDF. All the vendors quoting did not include these. There will be cost impact for the accessories.

2. DChan quickly reviewed the fabric matrix and found some of the fabric material are expensive than TWILL. There will be cost impact and listed out as follows for your quick reference:

Doll 1 : Leopard print fuzz fabric for the shirt, Light weight dark denim w/ fine silver sparkle for the jacket, Light weight dark denim w/ coarse silver sparkle for the pants, Aqua panne velvet w. iredes cent film for the belt, Aqua & light brown vinyl snakeskin print for the hat, Vinyl lined w/ silver fabric & tricot for the backpack

Doll 2 : Hombred from gold to fushia metal mesh for the Halter top, Light gray double knit w/ silver sparkle, Gray reflective fabric (good weight) for the backpack, Dark blue reflective vinyl (light weight) for the backpack

Doll 3 : Deep periwinkle 15D tricot w. silver sparkle for the top sleeves, Iredescen denin in lighter weight for the skirt, M/C knit w/ glitter dots for the skirt trim, Lavender moire stretch velvet for the top, M/C mesh for the head kerchief

Doll 4 : Cranberry red crebe knit w/ purple glitter for the top, Oliver green stretch poly satin with texture for the pants, Crimsom velboa for the skirt trim, Multi-color stripes satin knit for the Beannie

Anyway, we will get vendors quote based on your fabric matrix. Our current quotes already over the target price US$2.75 and we need cost reduction. However, the fabric proposed are

EXHIBIT ___1740___
PAGE ___1691___

Confidential - For Attorney's Eyes Only

MGA 4504699

adding cost.

3. For the Doll 1's belt, a tooling for the belt buckle is required.
4. Please advise the target age grading for this item.  LA provided to use some glitter dots on the fabric and are easily come off.  There may be safety issues.

Re: Fashion Pack 1
- Fashion Fabric  << File: fashion1.JPG >>
- Fashion Pattern Drawing  << File: fashion1fs.bmp >>
HK's comment :
1. There are totally 3 fashion pack.  HK only received one fashion pack design & fabric and still awaiting for the other 2.

2. DChan quickly reviewed the fabric matrix and found some of the fabric material are expensive than TWILL.  There will be cost impact and listed out for your quick reference:
Fuzzy novelty knit in rasberry for the halter top, Crushed panne veluet in chartreuse for the pants.

Re: Carrying Case (for Child)
- Fabric information  << File: Case1.JPG >>  << File: case2.JPG >>  << File: case3.JPG >>
HK's comment : per separate mail, HK commented the Carrying case design and waiting for LA reply.

<< Message: Bratz Backpack design inquiry >>

Re: Hair Pack
HK's comment : Did not receive the Hair pack.  Please advise the curl size of each hair styles for getting quote.  (FYI : curl hair is more expensive than straight hair)

Re: Rough Wax
HK received the rough wax body today.  HK downsized the head by 6% by the computer and attached to the 1:1 body.  This reflected the final size/ outlook of the wax.  Enclosed is the photo for your reference:  << File: waxfinalsize.jpg >>

HK's comment : The head & legs/ feet seem are not in proportion.  LA please advise if this is the actual size that you expected for future production.

HK also received the reference body showing the joint & armature required.  << File: MVC-003F.JPG >>
HK's comment :
1. Please confirm the type of joint request by return.  << File: Joints.jpg >>
2. Per separate email, HK already commented the armature mock up request and waiting for LA reply.

Please advise.
Regards,
Cecilia

EXHIBIT _____ 124

Confidential - For Attorney's Eyes Only

PAGE _____ 1692

MGA 4504700

**EXHIBIT 127**



# Mattel

**PROPRIETARY INFORMATION CHECKOUT**      MAT-4125-B

Each terminating employee should be aware that, in his Employee's Agreement, he has agreed to transfer all inventions made or conceived during the period of his employment to Mattel and to do all acts necessary to secure patent protection for such inventions for Mattel.

Each employee should also be aware that he has agreed to protect the proprietary information of Mattel. More particularly, he has agreed essentially as follows:

"In consideration of my employment by MATTEL, INC., or any of its subsidiaries or affiliated companies now or hereafter existing (hereinafter referred to individually and collectively as 'MATTEL'), I hereby covenant and agree that:

My interest in (a) any and all inventions, improvements and ideas (whether or not patentable) which I have made or conceived, or may make or conceive at any time during the period of my employment with the Company, either solely or jointly with others and in (b) any suggestions, designs, trademarks, copyright subject matter, literary or artistic works which I have made or conceived, or may make or conceive at any time during the period of my employment which relate or are applicable directly or indirectly to any phase of the Company's business shall be the exclusive property of the Company, its successors, assignees or nominees. (The items defined in (a) and (b) above will hereinafter be referred to collectively as 'Proprietary Subject Matter'.)

I shall make full and prompt disclosure in writing to an officer or official of the Company, or to anyone designated for that purpose by the Company, of all Proprietary Subject Matter made or conceived during the term of my employment. I agree, at the request of Mattel's Patent counsel, to provide additional information to more fully define the specific structure of the disclosed subject matter and to present support documents evidencing my conception and development of the subject matter.

Since the work for which I am employed upon which I shall be engaged will include Company knowledge and information of a private, confidential, or secret nature, I shall not, except as required in the conduct of the Company's business or as authorized in writing by the Company, during the course of my employment or thereafter, publish, disclose, or make use of, or authorize anyone else to publish, disclose or otherwise make use of any such knowledge or information, of a confidential nature to and the secret property of the Company or the design, construction, manufacture or sale of the Company's products or services. This obligation shall apply even to Company information created by me.

All documents, written information and other items including, but not limited to, notes, sketches, manuals, blueprints, notebooks, products, tools, fixtures, records and information relating to the business of the Company, made or obtained by me while employed by the Company shall be the exclusive property of the Company and shall be delivered by me to the Company on termination of my employment or at any time as requested by the Company".

Please acknowledge the above by signing and dating in the spaces provided below.

*after Empy R.##*

| SIGNATURE | DATE | 10/19/00 |
| --- | --- | --- |
| WITNESS | DATE | 10/19/00 |

EXHIBIT ___127___

PAGE ___1093___

M 0001604

**EXHIBIT 128**

1   Hon. Edward A. Infante (Ret.)
    JAMS
2   Two Embarcadero Center
    Suite 1500
3   San Francisco, California  94111
    Telephone:    (415) 774-2611
4   Facsimile:     (415) 982-5287

5

6

7

8                        UNITED STATES DISTRICT COURT

9                        CENTRAL DISTRICT OF CALIFORNIA

10                              EASTERN DIVISION

11

12   CARTER BRYANT, an individual,          CASE NO. CV 04-09049 SGL (RNBx)
                                            JAMS Reference No. 1100049530
13                  Plaintiff,

14         v.                               Consolidated with
                                            Case No. CV 04-09059
15   MATTEL, INC., a Delaware corporation,  Case No. CV 05-2727

16                  Defendant.              **ORDER DENYING MGA'S MOTION
                                            TO COMPEL DISCOVERY AS TO
17                                          ISSUES AS TO WHICH MATTEL HAS
                                            PURPORTEDLY WAIVED THE
18                                          ATTORNEY-CLIENT AND WORK
                                            PRODUCT PRIVILEGES BY CLAIM
19                                          ASSERTION**

20   CONSOLIDATED WITH
     MATTEL, INC. v. BRYANT and
21   MGA ENTERTAINMENT, INC. v. MATTEL,
     INC.
22

23

24                          I. INTRODUCTION

25         On January 18, 2008, MGA Entertainment, Inc., ("MGA") submitted a "Motion to

26   Compel Discovery as to Issues as to Which Mattel has Waived the Attorney-Client and Work

27   Product Privileges by Claims Assertion."  At issue is whether, under the standards set forth in

28   Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)

     EXHIBIT _____128_____

     PAGE _____1694_____

                                                                                    1

1  Hearn v. Hearn v. Rhay, 68 F.R.D. 574 (E.D. Wash. 1975), Mattel has impliedly waived the

2  attorney-client privilege and work product doctrine concerning what it knew or had reason to

3  suspect, prior to November 2003, regarding (a) Carter Bryant's involvement in Bratz, (b) his

4  alleged breach of contract, (c) his work for MGA, and/or (d) Mattel's alleged ownership of Bratz.

5  On January 31, 2008, Mattel, Inc. ("Mattel") submitted an opposition, and on February 5, 2008,

6  Mattel submitted a reply.  On April 7, 2008, MGA submitted a twenty-one page supplemental

7  memorandum of points and authorities, the declaration of Lance Etcheverry and the second

8  supplemental declaration of Marcus Mumford.  On April 11, 2008, Mattel submitted the

9  declaration of Dylan Proctor.  The matter was heard on April 11, 2008.

## II. BACKGROUND

10
11       In July of 2007, Mattel filed counterclaims alleging, inter alia, that it was the "true owner

12  of Bratz" pursuant to agreements it had with Carter Bryant ("Bryant"), and that Bryant

13  "conceived, created or reduced to practice" Bratz designs and worked for MGA while employed

14  at Mattel.  Mumford Decl., Ex. 1, Second Amended Counterclaim, ¶¶23-27, 29, 34.  Mattel

15  alleged that "Bryant and MGA deliberately and intentionally concealed facts sufficient for Mattel

16  to suspect or to know that it was the true owner of Bratz . . . .  includ[ing] . . . the fact that Bryant

17  conceived, created, designed and developed Bratz while employed by Mattel, . . . the fact that

18  Bryant worked with and assisted MGA during the time Bryant was employed by Mattel, . . . [and]

    concealing Bryant's role in Bratz."  Id. at ¶35.  Further, Mattel alleged that:

19           [b]ecause of Bryant's and MGA's acts of concealment. . . Mattel had no reason to
             suspect that Bryant had worked with MGA, or assisted MGA, while he [sic] still
20           employed by Mattel until approximately November 24, 2003, when Mattel
             received, through an unrelated legal action, a copy of Bryant's agreement with
21           MGA, which showed that the date of Bryant's agreement with MGA predated
             Bryant's departure from Mattel.  It was then, as a result, that Mattel learned for the
22           first time that Bryant had secretly aided, assisted and worked for and with MGA .
             . . in violation of his Mattel Employment Agreement.
23
    Id. at ¶¶35-36.  Based on the above, Mattel asserted numerous claims against MGA and Bryant,
24
    including, inter alia, copyright infringement, civil RICO violations, conspiracy to violate RICO,
25
    breach of contract, intentional interference with contract, breach of fiduciary duty, aiding and
26
    abetting breach of fiduciary duty, breach of duty of loyalty, aiding and abetting breach of duty of
27
    loyalty, conversion, unfair competition, and declaratory relief.
28
    Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)

                            EXHIBIT _____ 128

                            PAGE _____ 1095

                                                                                            2

1    MGA and Bryant denied the allegations in Mattel's counterclaims and pleaded several

2   affirmative defenses, including statute of limitations and laches. MGA and Bryant sought and

3   received discovery relating to these two defenses. More specifically, MGA and Bryant obtained

4   interrogatory responses, documents, admissions, and deposition testimony directed to when, in

5   fact, Mattel first had reason to suspect Bryant's involvement in Bratz, his alleged breach of

6   contract, his work for MGA, and Mattel's alleged true ownership of Bratz.

7    In response to an interrogatory, Mattel provided the following information relating to

8   when and how Mattel first learned that Bryant performed work for MGA:

9    > To Mattel's knowledge, Bryant was first confirmed as the Bratz designer in the
   > July 18, 2003 *Wall Street Journal* article, in which Isaac Larian also indicated that
   > Bryant had been involved in some manner with MGA in or about "late 1999."

10

11   > Subsequently, in November 2003, Mattel obtained a copy of a contract between
   > defendant Carter Bryant and defendant MGA . . . . Through this agreement,
12   > Mattel concluded that Bryant . . . worked as a designer for a Mattel competitor,
   > MGA.

13

14   Mumford Decl., Ex. 17. Mattel later supplemented its response to state: "[a]fter Bryant left

15   Mattel, but prior to the July 18, 2003 [*Wall Street Journal*] article, there was rumor and innuendo

16   that Bryant may be working with MGA on Bratz." Id., Ex. 3. Mattel's supplemental interrogatory

17   response also includes an assertion that Bryant used several Mattel employees to work on the

18   Bratz dolls so that the Bratz dolls "had been designed and were far along in development during

19   the time that Bryant was employed by Mattel." Id., Ex. 4.

20    In the instant motion, MGA contends that Mattel has impliedly waived the attorney-client

21   and work product privileges concerning what Mattel knew or had reason to suspect, prior to

22   November 2003, regarding (a) Bryant's involvement in Bratz, (b) his alleged breach of contract,

23   (c) his work for MGA, and/or (d) Mattel's alleged true ownership of Bratz. MGA reasons that in

24   order to avoid the statute of limitations and laches doctrine, Mattel affirmatively injected into this

25   litigation the issue of what it knew or had reason to suspect prior to November 2003 regarding

26   these subjects, and that Mattel has denied MGA access to information vital to its defenses by

27   asserting the attorney-client privilege and work product doctrine. MGA contends that fairness

28   dictates that MGA be given access to all evidence that might show what Mattel knew or had

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT ____128____

PAGE ____1696____

3

1   reason to suspect concerning these subjects, including attorney-client communications and work

2   product. MGA further contends that, based upon the discovery it has received to date, there is

3   good reason to believe that at least as early as the summer of 2001, when Bratz was first released,

4   Mattel suspected or had reason to suspect that Bryant was involved in Bratz and that he also

5   worked for MGA while a Mattel employee. See MGA's Motion at pp. 2-5. MGA seeks an order

6   (1) finding that Mattel has waived the attorney-client privilege and work product doctrine

7   concerning what Mattel knew or had reason to suspect prior to November 2003 regarding Bryant's

8   involvement in Bratz, his alleged breach of contract, his work for MGA, and/or Mattel's alleged

9   true ownership of Bratz, and (2) compelling Mattel to supplement its pertinent discovery

10  responses and document productions accordingly.

11          Mattel contends that there is no basis for finding a waiver because Mattel has not

12  affirmatively placed its privileged communications at issue. Mattel draws a clear distinction

13  between pleading fraudulent concealment and relying on privileged information to support that

14  pleading. Mattel contends that under Ninth Circuit precedent, merely pleading fraudulent

15  concealment does not place privileged information at issue, and therefore cannot support a finding

16  of waiver. Mattel reasons that if this were the rule, the privilege would be waived any time a

17  party asserts fraudulent concealment simply because privileged information may be probative of

    what a party knew.

18          In Mattel's view, the Ninth Circuit has only found that a party affirmatively put privileged

19  information at issue in two situations: (1) where a party relies on privileged information to

20  support a claim or defense, and (2) where the only evidence available to assess the truthfulness of

21  a party's claim or defense consists of privileged information. Mattel contends neither situation is

22  present here. Mattel contends that it has not relied upon any privileged information to support its

23  fraudulent concealment allegation, and that the evidence related to its fraudulent concealment

24  allegations is not solely privileged. Mattel also denies shielding any of the facts of when and how

25  it learned that Bryant allegedly worked for MGA while he was employed by Mattel.

26  Furthermore, Mattel contends that in view of the substantial non-privileged information that exists

27  and has been produced, MGA cannot show that Mattel's claims of privilege have denied MGA

28
    Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)

    EXHIBIT ____128____

    PAGE ____1697____

                                                                                              4

1   information critical to its defenses.

2   <center>III. DISCUSSION</center>

3   In Hearn v. Rhay, 68 F.R.D. 574 (E.D. Wash. 1975), the court established a three-part test

4   for determining whether a party has impliedly waived the attorney-client privilege and work

5   product privileges as to subject matter the party has placed at issue. The Hearn test for finding an

6   implied waiver requires that:

7   > (1) assertion of the privilege was a result of some affirmative act, such as filing
    > suit, by the asserting party; (2) through this affirmative act, the asserting party put
    > the protected information at issue by making it relevant to the case; and (3)
    > application of the privilege would have denied the opposing party access to
    > information vital to his defense.

8

9

10  Hearn, 68 F.R.D. at 581, see also Home Indem. Co v. Lane Powell Moss and Miller, 43 F.3d

11  1322, 1326 (9th Cir. 1995) (adopting the Hearn test in the Ninth Circuit); United States v. Amlani,

12  169 F.3d 1189, 1195 (9th Cir. 1999). In the instant case, the second and third element of the

13  Hearn test are not satisfied, and therefore a finding of implied waiver is unwarranted.

14  Because the parties dispute the meaning of the second element of the Hearn test, the facts

15  in Hearn require careful scrutiny. In Hearn, an inmate brought a civil rights action against prison

16  officials complaining of his confinement at a state penitentiary and sought discovery of

17  information to negate the defense that the prison officials acted in good faith and were therefore

18  immune from suit for damages. The Hearn court found that defendants had impliedly waived the

19  attorney-client privilege. With respect to the second element, the court reasoned that defendants

20  had placed privileged information at issue, "for the legal advice they received is germane to the

21  qualified immunity defense they raised." Hearn, 68 F.R.D. at 851. Despite the court's use of the

22  term "germane," it is apparent later in the decision that the court's holding was based upon a

23  finding that the privileged information was more than merely "germane" to the defense raised.

24  The court stated that defendants' communications with their attorney were "inextricably merged

25  with the elements of plaintiff's case and defendants' affirmative defense." Id. at 582. The court

26  also emphasized that "[t]hese communications are not incidental to the case; they inhere in the

27  controversy itself, and to deny access to them would preclude the court from a fair and just

28  determination of the issues." Id.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT ___128___

PAGE ___1698___

5

1    Other cases applying Hearn make clear that it is not enough that the privileged

2  information be merely germane or relevant to an issue asserted in the case in order to satisfy the

3  second element of the Hearn test. See U.S. v. Amlani, 169 F.3d 1189, 1195 (9th Cir. 1999)

4  ("[p]rivileged communications do not become discoverable simply because they are related to

5  issues raised in the litigation").  Rather, courts have found that a party affirmatively puts at issue

6  privileged information when that party relies on privileged communications or work product in

7  support of its claims or defenses. See e.g. Chevron Corp. v. Pennzoil Co., 974 F.2d 1156 (9th Cir.

8  1992) (finding implied waiver where defendant asserted advice of counsel defense).

9  Alternatively, courts have found that a party affirmatively puts at issue privileged information

10 when the only evidence available to assess a party's claim or defenses consists of privileged

11 information. See e.g. U.S. v. Amlani, 169 F.3d 1189, 1195 (9th Cir. 1999) (finding implied

12 waiver where the only evidence of an essential element of plaintiff's attorney disparagement claim

13 was privileged communications); Holmgren v. Sate Farm Mutual Automobile Ins. Co., 976 F.2d

14 573, 577 (9th Cir. 1992) (in an action for bad faith claim settlement practices, finding implied

15 waiver of work product regarding insurer's counsel's handling of a claim).

16    Indeed, two of the cases cited by MGA in support of waiver were predicated upon a party

17 putting at issue privileged information by relying on such information to defeat a statute of

18 limitations defense.  For example, in In re Imperial Corp. of Amer., 179 F.R.D. 286 (S.D. Cal.

19 1998), the court found implied waiver where the plaintiff contended that it learned it had a claim

20 for legal malpractice by means of counsel's investigation.  The plaintiff in that case testified "that

21 he relied on his attorney's advice and investigation regarding overcoming [defendant's] statute of

22 limitations defense." Id. at 288.  Similarly, in Titan Corp. v. M/A-Com, Inc., 1994 WL

23 16001739, at *1 (S.D. Cal. 1994), the plaintiff indicated in discovery and elsewhere that it had no

24 actual knowledge of any alleged fraud by defendant until an investigation was conducted by its

25 counsel.  The Titan court held that the "plaintiff put the alleged protected information in issue by

26 relying on its counsel's investigation in order to overcome the statute of limitations bar." Id. at *2.

27    A third case relied upon by MGA, Aloe Vera of America, Inc. v. United States, No. CV

28 99-1794 PHX JAT, 2003 WL 22429082 (D. Ariz. 2003), did not involve direct reliance on

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT _____128_____

PAGE _____1699_____

6