| | F | G |
|---|---|---|
| 1 | Vendor Name | Purchases Account Number |
| 2 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 3 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 4 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 5 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 6 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 7 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 8 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 9 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 10 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 11 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 12 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 13 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 14 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 15 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 16 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 17 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 18 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 19 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 20 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 21 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 22 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 23 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 24 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 25 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 26 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 27 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 28 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 29 | LARIAN, ISAAC (INTEREST) | 2702-000 - SUB DEBT INTEREST |
| 30 | LARIAN, ISAAC (INTEREST) | 2700-000 NOTES PAYABLE - OFFICERS |
| 31 | LARIAN, ISAAC (INTEREST) | 3600-000 DISTRIBUTION |
| 32 | LARIAN, ISAAC (INTEREST) | 3600-000 DISTRIBUTION |
| 33 | LARIAN, ISAAC (INTEREST) | 3600-000 DISTRIBUTION |
| 34 | LARIAN, ISAAC (INTEREST) | 2700-000 NOTES PAYABLE - OFFICERS |
| 35 | LARIAN, ISAAC (INTEREST) | 1560-000 NOTES RECEIVALBLE - OFFICERS |
| 36 | LARIAN, ISAAC (INTEREST) | 3600-000 DISTRIBUTION |
| 37 | LARIAN, ISAAC (INTEREST) | 3600-000 DISTRIBUTION |
| 38 | LARIAN, ISAAC (INTEREST) | 3600-000 DISTRIBUTION |
| 39 | LARIAN, ISAAC (INTEREST) | 3600-000 DISTRIBUTION |
| 40 | LARIAN, ISAAC (INTEREST) | 3600-000 DISTRIBUTION |
| 41 | LARIAN, ISAAC (INTEREST) | 3600-000 DISTRIBUTION |
| 42 | LARIAN, ISAAC (INTEREST) | 3600-000 DISTRIBUTION |
| 43 | LARIAN, ISAAC (INTEREST) | 3600-000 DISTRIBUTION |
| 44 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 45 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 46 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 47 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 48 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 49 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 50 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 51 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 52 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 53 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 54 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 55 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 56 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 57 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 58 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 59 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 60 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 61 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 62 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 63 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |

Exhibit 12
Page 221
MGA 3787417

CONFIDENTIAL – ATTORNEYS' EYES ONLY



|  | A |
|---|---|
| 64 | Invoice |
| 65 | Invoice |
| 66 | Invoice |
| 67 | Invoice |
| 68 | Invoice |
| 69 | Invoice |
| 70 | Invoice |
| 71 | Invoice |
| 72 | Invoice |
| 73 | Invoice |
| 74 | Invoice |
| 75 | Invoice |
| 76 | Invoice |
| 77 | Invoice |
| 78 | Invoice |
| 79 | Invoice |
| 80 | Invoice |
| 81 | Invoice |
| 82 | Invoice |
| 83 | Invoice |
| 84 | Invoice |
| 85 | Invoice |
| 86 | Invoice |
| 87 | Invoice |
| 88 | Invoice |
| 89 | Invoice |
| 90 | Invoice |
| 91 | Invoice |
| 92 | Invoice |
| 93 | Invoice |
| 94 | Invoice |
| 95 | Invoice |
| 96 | Invoice |
| 97 | Invoice |
| 98 | Invoice |
| 99 | Invoice |
| 100 | Invoice |
| 101 | Invoice |
| 102 | Invoice |
| 103 | Invoice |
| 104 | Invoice |
| 105 | Invoice |
| 106 | Invoice |
| 107 | Invoice |
| 108 | Invoice |
| 109 | Invoice |
| 110 | Invoice |
| 111 | Invoice |
| 112 | Invoice |
| 113 | Invoice |
| 114 | Invoice |
| 115 | Invoice |
| 116 | |
| 117 | |
| 118 | |
| 119 | |
| 120 | |
| 121 | |
| 122 | |
| 123 | THE REMAINDER OF INVOICES WERE PAID OUT OF THE DISBURSEMENT ACCOUNT |

CONFIDENTIAL -- ATTORNEYS' EYES ONLY

Exhibit 12
Page 222
MGA 3787418



| | B | C | D | E |
|---|---|---|---|---|
| 64 | 4160 | | 9/12/2001 EXP 7/17/01-8/16/01 | |
| 65 | 4160 | | 10/11/2001 EXP 09/26-10/10/01 | |
| 66 | 4160 | | 10/19/2001 EXP 10/19/01 | |
| 67 | 4160 | | 12/3/2001 EXP 12/01/01 | |
| 68 | 4160 | | 2/15/2002 EXP 12/08-02/10/02 | |
| 69 | 4160 | | 3/14/2002 EXP 01/11-03/09/02 | |
| 70 | 4160 | | 4/15/2002 2001 TAXES | |
| 71 | 4160 | | 5/10/2002 EXP 04/02-05/01/02 | |
| 72 | 4160 | | 5/24/2002 EXP 05/06-05/10/02 | |
| 73 | 4160 | | 6/10/2002 2002-TAXES 06/17/02 | |
| 74 | 4160 | | 6/13/2002 EXP 05/10-05/15/02 | |
| 75 | 4160 | | 6/21/2002 EXP 06/10-06/13/02 | |
| 76 | 4160 | | 8/15/2002 EXP 07/11-08/01/02 | |
| 77 | 4160 | | 9/11/2002 2002 TAXES 09/16/02 | |
| 78 | 4160 | | 9/19/2002 EXP 05/10-06/13/02 | |
| 79 | 4160 | | 12/31/2002 123102 EST TAX | |
| 80 | 4160 | | 1/16/2003 EXP RPT 1/6/03 | |
| 81 | 4160 | | 2/19/2003 EXP 2/2-2/5/03 | |
| 82 | 4160 | | 1/31/2003 EXP JAN 03 | |
| 83 | 4160 | | 3/19/2003 EXP 2/14-2/18/03 | |
| 84 | 4160 | | 4/15/2003 EXP 1/12-2/18/03 | |
| 85 | 4160 | | 8/11/2003 EXP 7/14/03 | |
| 86 | 4160 | | 11/1/2003 EXP 11/8/03 | |
| 87 | 4160 | | 12/29/2005 WIRE 12/29/05 | |
| 88 | ILARIAN | | 5/24/2007 INTEREST 5/23/07 | |
| 89 | ILARIAN | | 4/4/2007 EXP 4/3/07 | |
| 90 | ILARIAN | | 5/31/2007 INTEREST 05/07 | |
| 91 | ILARIAN | | 5/31/2007 05/07 INTEREST | |
| 92 | ILARIAN | | 6/29/2007 JUNE 07 INTEREST | |
| 93 | ILARIAN | | 6/28/2007 INTEREST JUNE 07 | |
| 94 | ILARIAN | | 7/23/2007 INTEREST JUL 07 | |
| 95 | ILARIAN | | 7/23/2007 JUL 07 INTEREST | |
| 96 | ILARIAN | | 9/18/2007 08/07 INT PYMNT | |
| 97 | ILARIAN | | 9/18/2007 INT PYMNT 08/07 | |
| 98 | ILARIAN | | 9/18/2007 08 08/07 PYMNT | |
| 99 | ILARIAN | | 9/30/2007 INT PMNT 9/07.1 | |
| 100 | ILARIAN | | 9/30/2007 INT PMNT 9/07.2 | |
| 101 | ILARIAN | | 9/30/2007 INT PMNT 9/07.3 | |
| 102 | ILARIAN | | 10/31/2007 OCT INT PYMNT.1 | |
| 103 | ILARIAN | | 10/31/2007 OCT INT PYMNT.2 | |
| 104 | ILARIAN | | 10/31/2007 OCT INT PYMNT.3 | |
| 105 | ILARIAN | | 11/30/2007 NOV 07 INST PMT 4.1M | |
| 106 | ILARIAN | | 12/7/2007 NOV 07 INST PYMT.2 | |
| 107 | ILARIAN | | 12/7/2007 NOV 07 INST PYMT.3 | |
| 108 | ILARIAN | | 12/31/2007 DEC 07 INT PMT 4.1M | |
| 109 | ILARIAN | | 12/31/2007 DEC 07 INT PMT 7M | |
| 110 | ILARIAN | | 12/31/2007 DEC 07 INT PMT 8.18M | |
| 111 | ISAAC LARIAN | | 3/7/2006 WIRE 3/7/06 | |
| 112 | ISAAC LARIAN | | 11/29/2006 WIRE 11/29/06 | |
| 113 | ISAAC/ANGELA | | 2/8/2006 WIRE 2/8/06 | |
| 114 | ISAAC/ANGELA | | 6/5/2006 WIRE 5/8/06 | |
| 115 | ISAAC/ANGELA | | 10/12/2006 WIRE 10/12/06 | |
| 116 | | | | |
| 117 | | | | |
| 118 | | | | |
| 119 | | | | |
| 120 | | | | |
| 121 | PAID OUT OF THE CONCENTRATION ACCOUNT | | | |
| 122 | | | | |
| 123 | | | | |

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Exhibit 12
Page 223
MGA 3787419

REDACTED

| | F | G |
|---|---|---|
| 64 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 65 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 66 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 67 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 68 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 69 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 70 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 71 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 72 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 73 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 74 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 75 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 76 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 77 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 78 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 79 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 80 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 81 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 82 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 83 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 84 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 85 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 86 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 87 | LARIAN, ISAAC-EMPLOYEE | REIMBURSEMENTS |
| 88 | ISAAC LARIAN | 27200 - Interest Payable |
| 89 | ISAAC LARIAN | 81000-1950 - TRAVEL/AIR |
| 90 | ISAAC LARIAN | 93550-1950 - Interest Expense - Officers |
| 91 | ISAAC LARIAN | 93550-1950 - Interest Expense - Officers |
| 92 | ISAAC LARIAN | 93550-1950 - Interest Expense - Officers |
| 93 | ISAAC LARIAN | 93550-1950 - Interest Expense - Officers |
| 94 | ISAAC LARIAN | 93550-1950 - Interest Expense - Officers |
| 95 | ISAAC LARIAN | 93550-1950 - Interest Expense - Officers |
| 96 | ISAAC LARIAN | 93550-1950 - Interest Expense - Officers |
| 97 | ISAAC LARIAN | 93550-1950 - Interest Expense - Officers |
| 98 | ISAAC LARIAN | 93550-1950 - Interest Expense - Officers |
| 99 | ISAAC LARIAN | 93550-1950 - Interest Expense - Officers |
| 100 | ISAAC LARIAN | 93550-1950 - Interest Expense - Officers |
| 101 | ISAAC LARIAN | 93550-1950 - Interest Expense - Officers |
| 102 | ISAAC LARIAN | 93550-1950 - Interest Expense - Officers |
| 103 | ISAAC LARIAN | 93550-1950 - Interest Expense - Officers |
| 104 | ISAAC LARIAN | 93550-1950 - Interest Expense - Officers |
| 105 | ISAAC LARIAN | 93550-1950 - Interest Expense - Officers |
| 106 | ISAAC LARIAN | 93550-1950 - Interest Expense - Officers |
| 107 | ISAAC LARIAN | 93550-1950 - Interest Expense - Officers |
| 108 | ISAAC LARIAN | 93550-1950 - Interest Expense - Officers |
| 109 | ISAAC LARIAN | 93550-1950 - Interest Expense - Officers |
| 110 | ISAAC LARIAN | 93550-1950 - Interest Expense - Officers |
| 111 | ISAAC LARIAN | 36100 - Distribution-Isaac Larian GRAT |
| 112 | ISAAC LARIAN | 36100 - Distribution-Isaac Larian GRAT |
| 113 | ISAAC AND ANGELA LARIAN FOUNDATION | 88460-1950 - DONATIONS |
| 114 | ISAAC AND ANGELA LARIAN FOUNDATION | 88460-1950 - DONATIONS |
| 115 | ISAAC AND ANGELA LARIAN FOUNDATION | 88460-1950 - DONATIONS |
| 116 | | |
| 117 | | |
| 118 | | |
| 119 | | |
| 120 | | |
| 121 | | |
| 122 | | |
| 123 | | |

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Exhibit 12
Page 224
MGA 3787420

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | Document Type | Vendor ID | Posting Date | Document Number | Document Amount |
| 2 | Invoice | J LARIAN | 9/1/2006 | PROF. FEES 9/1/06 | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | PAID OUT OF THE DISBURSEMENT ACCOUNT | | | | |

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Exhibit 12
Page 225
MGA 3787421

REDACTED

| | A | B | C | D |
|---|---|---|---|---|
| 1 | Document Type | Vendor ID | Posting Date | Document Number |
| 2 | Invoice | JASMINE | 6/14/2007 | P/R CK REISSUE 06/07 |
| 3 | | | | |
| 4 | | | | |
| 5 | PAID OUT OF THE DISBURSEMENT ACCOUNT | | | |

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Exhibit 12
Page 227
MGA 3787423

| E | F | G |
|---|---|---|
| Document Amount | Vendor Name | Purchases Account Number |
| 1 | | |
| 2 | 198.03 JASMINE LARIAN | 71400-7435 - TEMPORARY HELP |
| 3 | | |
| 4 | | |
| 5 | | |

CONFIDENTIAL -- ATTORNEYS' EYES ONLY

Exhibit 12
Page 228
MGA 3787424

| | F | G |
|---|---|---|
| 1 | Vendor Name | Purchases Account Number |
| 2 | LARIAN LIVING TRUST | 15611 - Due To/From Larian Family Trust |
| 3 | | |
| 4 | | |
| 9 | | |

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Exhibit 12
Page 230
MGA 3787426

**Exhibit 13**

Doll wars | The San Diego Union-Tribune                      http://www.signonsandiego.com/uniontrib/20050605/news_1c05doll.html

**SignOnSanDiego.com**
BY THE UNION-TRIBUNE

**Sunday**
»Next Story»
News
Local News
Insight
Business
Sports
Sunday Currents
Arts
Travel
Homes
Homescape
Books
Passages
**The Last Week**
Sunday
Monday
Tuesday
Wednesday
Thursday
Friday
Saturday
**Weekly Sections**
Books | UT-Books
Family
Food
Health
Home
Homescape
Dialog
InStyle
Night & Day
Sunday Arts
Travel
Quest
Wheels

**Subscribe to the UT**
Union-Tribune

### The San Diego Union-Tribune.

SAVE THIS   EMAIL THIS   PRINT THIS   MOST POPULAR

## Doll wars

### Makers of Barbie and rival Bratz not playing nice in battle for supremacy

**By Norma Meyer**
COPLEY NEWS SERVICE

**June 5, 2005**

LOS ANGELES – Inside the security-guarded Bratz think tank, a hairstylist uses teensy rollers to coif dozens of decapitated doll heads staring back with made-up faces. Skewered onto sticks, they look like Bratz-kabobs. At another desk, an artist delicately paints more Lilliputian test noggins with dramatically shadowed bedroom eyes, lip-lined pouts and occasional beauty marks.

The bustling Bratz design center seems like it's all for child's play. But this is base camp for one side in the adult-driven vicious Doll Wars.

The edgy hipster hit Bratz doll and cultural icon Barbie are tearing out each other's hair – which apparently can be in demand. MGA Entertainment, the makers of Bratz, claim in court papers that Barbie parent Mattel once bought up all the doll hair from the two main suppliers in hopes the Bratz would go bald.

That's just for starters. Later on, even Hokey Pokey Elmo figures into the Barbie/Bratz brawl.

The toyland tussle began in mid-2001, when the sassy, big-headed Bratz fashionistas– with their multiethnic urban look, Angelina Jolie bee-stung lips and Britney Spears bare midriffs -- debuted for 'tweens and suddenly threatened to push the perennial plastic princess off her pink perch.

As Bratz sales soared, Barbie, who at 46 has been everything from an Army medic in Desert Storm to a presidential candidate, was not about to take her ball, let alone her 43 pets, Vespa scooter and Bob Mackie gowns, and go home.

After all, 'tweens account for billions in spending. They're the wannabe teens who are into MTV as much as toys with bendable arms. No wonder



CAROL KRON / Copley News Service
Rivals Bratz (left) and My Scene Barbie are duking it out in the playroom and in court. The edgy fashion dolls with wowing wardrobes are aimed at 'tweens.

Exhibit 13
Page 231



the two doll makers aren't playing around.

First, in a high-stakes ongoing case, Mattel sued Bratz creator Carter Bryant, a former Barbie designer, claiming he was a traitor who got the Bratz idea when he was on Barbie's payroll. Bryant counter-sued, arguing the world's largest toy company is trying to hijack his "brainchild anyway it can." Then, hard-driving Business Executive Barbie slapped a lawsuit on a high-level manager who defected to MGA allegedly with "trade secrets" (a judge booted that case in January).

Now, the Bratz have put down their mini cappuccino cups to battle back. In a biting, recently filed, multimillion-dollar federal lawsuit, MGA accuses Barbie of being "the playground bully" and Mattel of "serial copycatting." MGA contends the desperate, vindictive toy titan made a knockoff of Bratz, the My Scene Barbie, to confuse consumers and "muscle MGA out of business."

"It's a rip-off," says MGA founder Isaac Larian, surrounded in his Van Nuys office by his 10-inch babes, such as Pretty 'N' Punk Jade, in skintight leather pants and jet-black hair streaked with neon blue.

Sultry Bratz was once the anti-Barbie. Now, Larian says, "The pictures speak 1,000 words."

He is referring to side-by-side photos in the lawsuit, which purport to show how the "stale" traditional busty blonde, Barbie Millicent Roberts from Willows, Wis., had an extreme makeover into My Scene Barbie in fall 2002 – with oversized head and feet and almond-shaped eyes like Bratz – and underwent touch-up surgery last year to become more of a Bratz clone with thickly lined heavy eyelids, similar packaging and themes.

Barbie's handlers won't comment on specifics of MGA's lawsuit. But in a written statement, El Segundo-based Mattel said MGA got involved in Bryant's case because "its interest in the Bratz doll line could be at risk. In our opinion, MGA's recently filed suit against Mattel is part of its overall litigation strategy in relation to Mattel's suit against Mr. Bryant.

"Apparently MGA has become concerned enough that it feels compelled to make an offensive strike against Mattel."

The accessorized, long-haired dueling divas, aimed at 8-to 11-year-olds, have this in common: 'tude, primping, skimpy clothes, shop-til-you-drop and guys. (They also have plenty of parent critics, who've bashed them as everything from "all sluts" to "hookers-in-training.")

The 10 Bratz Pack girls, who include Yasmin, Sasha and Cloe, party with the five Bratz Boyz, among them Koby, whose nickname is " 'The Panther' –because I'm always on the prowl!" They cavort in the Flashback Fever Party Bus with the real working Jacuzzi, and the revolving Tokyo A Go-Go Sushi Lounge with the sliced sashimi and karaoke stage. The celebrity architectural firm that did homes for Eddie Murphy and Rod Stewart designed their chic, three-story Bratz Pad ($229.99 on toysRus.com).

My Scene's "tribe" includes 11 1/2-inch tall Barbie, whose hangout, according to her blog, is the "day spa," and whose "fave" pastime is "chatting with cuties!" Gal pal Madison's fave pastime is "getting manis and pedis," and her perfect date is "dinner and dancing with a hottie!" One hottie for retail sale is Hudson, who likes "fun, flirty" girls. This summer, they'll kick it with "Mean Girls" star Lindsay Lohan (shrunk as a My Scene doll).

Exhibit 13
Page 232

Larian, an Iranian immigrant, used to pass by the old Mattel
headquarters in Hawthorne on his way to work as a dishwasher at a
Spire's coffee shop. "I came here at the age of 17 with $350 and a blanket
and a one-way ticket," the 51-year-old CEO recalls.

He says he later sold mail-order brass giftware, got a civil engineering
degree from California State University Los Angeles, and started a
consumer electronics business by buying a Nintendo license for
hand-held computer games.

That company turned into MGA, which bills itself as the world's largest
privately owned toy company, with about 65 percent of its business
Bratz. MGA employs some 600 people worldwide, half of whom work in
the San Fernando Valley headquarters, where the motto "Fortune Favors
the Bold" is plastered on interior doors.

Larian says 80 million Bratz have been sold in 65 countries; in Britain
and Australia, it's the No. 1 fashion doll. MGA won't reveal its income,
but an industry magazine reported the Bratz brand last year raked in $1.1
billion worldwide.

Publicly traded Mattel, with more than 20,000 global employees, insists
the tiny-waisted queen is still the world's reigning doll. More than a
billion Barbies have been sold since her birth in 1959, says Mattel, and if
put head to toe, she and her friends would circle Earth seven times.

The Barbie brand is a $3-billion-a-year biz. Still, Barbie's had the blues –
sales worldwide fell 15 percent for the first quarter of 2005.

"Oh my God! Barbie is so here to stay!" exclaims Russell Arons, Barbie's
v.p. of marketing.

True, the golden girl isn't relinquishing her crown. But "Bratz represents
a level of competition that Barbie has never seen before," observes Sean
McGowan, a toy-industry analyst with the investment firm Harris
Nesbitt.

Mattel co-founder Ruth Handler named Barbie after her daughter.
Larian named the first Bratz doll, Yasmin, after his daughter. He says the
breathing, preteen Yasmin was at his office when she saw Bryant's
drawings that inspired Bratz and thought they were cool.

In its lawsuit, Mattel alleges that Bryant, while their employee, stole
ideas and "secretly aided, assisted and worked for" a competitor, MGA.
But Bryant, who designed the 2001 collector-edition prim-and-proper
Grand Entrance Barbie in the taffeta ball gown, says in his countersuit he
was between stints at Mattel and home in Missouri when the Bratz bulb
blinked. Driving back from his job at an Old Navy clothing store, he
passed a high school, noticed the "bratty" attitude and trendy outfits and
"had a 'eureka' moment."

Barbie's 43-year beau Ken was a pawn in the doll dust-up, according to
Bryant's suit. (Bryant declined an interview through MGA.) Barbie
allegedly "dumped" Ken last year in a "publicity stunt to revive Barbie in
the face of the Bratz success."

"That was something I had been wanting to do for years," counters
Mattel's Arons. "Let's be honest. Ken was a goon. It was time."

"And he had commitment issues," chimes in David Stamper, a Mattel
spokesman.

Exhibit 13
Page 233

Obviously, it's a doll-eat-doll world.

"The industry is very cutthroat," says Bradley Justice, a longtime Barbie collector and North Carolina-based regional director of the United Federation of Doll Clubs. "There are spies everywhere. It's almost like an espionage novel."

In fact, MGA's lawsuit alleges "monkey-see monkey-do" Mattel also copied the funky-looking plush Bratz Petz and other toys. The suit contends Mattel threatened its licensees with retribution if they bought Bratz, and tampered with Bratz displays at stores, relocating Barbie's nemesis to the back shelves.

"Barbie does not 'play nice' with others (particularly her competitors)," MGA's suit charges.

MGA also claims Mattel strong-armed trade organizations, including the Toy Industry Association, which gave the People's Choice Toy of the Year Award -- sort of like toy town's Oscar -- to Bratz for 2001 and 2002 by consumer vote. But then an executive of Fisher-Price, a Mattel subsidiary, orchestrated a rule change in 2003 so the award was chosen by industry members and "not surprisingly," the lawsuit complains, Hokey Pokey Elmo by Fisher-Price beat out Bratz Formal Funk Super Stylin' Runway Disco.

The toy association declined comment on the alleged "fix."

With all the subterfuge, its no wonder paranoid people inhabit Barbie's Dream House. Court papers in Mattel's failed lawsuit against former exec Ron Brawer, who left for MGA, include "Mattel's Code of Conduct." Employees were not to discuss confidential info in public places "such as planes, restaurants and elevators" in case operatives lurked.

Litigious Barbie has dragged her own alleged copycatters into court. Hasbro had to give its European Sindy doll a face-lift in 1992 after Mattel claimed it looked like Barbie's twin. The same year, Mattel forced Kenner Products to alter two of its Miss America doll heads.

There are more than skull molds involved this go-around. MGA has offshoots like Bratz Babyz and a slew of related merchandise, such as the Bratz Electric Funk Chill-Out Fridge for a girl's room. Mattel is coming out with a My Scene Nokia cell phone. Twentieth Century Fox is producing a Bratz live-action feature film; Barbie stars in an upcoming animated DVD, "My Scene Goes Hollywood."

Babs collector Justice, 35, says My Scene was "definitely inspired by the Bratz doll." And no, he's not upset that the onetime pediatrician, police officer, paleontologist and astronaut is now a party girl. Barbie has always reflected our culture.

"Look at Paris Hilton," Justice emphasizes. "Do you think she wants to be an astronaut?"

Barbie morphed because market research indicates 8-year-olds are influenced by movies and TV, want to drive a car and long to be a teen, Arons says. That's why there's American Idol Barbie and tanned Cali Barbie, whose boy-toy is surfer-dude Blaine.

And there's also Halle Berry Catwoman Barbie, whose claws are surely sharpened for the cat fight with Bratz.

»Next Story»

Exhibit 13
Page 234

Contact Us | Site Index | About Us | Advertise on SignOnSanDiego | Make us your homepage
Frequently Asked Questions | UTads.com | About the Union-Tribune | Contact the Union-Tribune
© Copyright 2005 Union-Tribune Publishing Co.

Exhibit 13
Page 235

**Exhibit  14**

## MGA Banks Identified In Production To Date

| Company | Bank Name | Account # | Bates Numbers of Documents Identifying Bank Account (No Actual Bank Records Included) |
|---|---|---|---|
| MGA USA | Bank of America | | |
| MGA USA | Beal Bank | | MGA 4045069-5178 |
| MGA USA | HSBC | | MGA 4009299-9300, MGA 4009303-04 |
| MGA USA | UBOC | | MGA 3708312-MGA 3708424 (redacted check at 3708424) |
| MGA USA | State Street Bank International | | MGA 3850336 |
| MGA USA | State Street Bank International & LA | REDACTED | MGA 3765665-3765747 |
| MGA USA | State Street LA | | MGA 1728809 |
| MGA USA | UBOC | | |
| MGA USA | Union Bank (UBOC) | | MGA 0433431-MGA 0433432; MGA 3765665-3765747 |
| MGA USA | Union Bank (UBOC) | | MGA 1710906- MGA 1710909 |
| MGA USA | UBOC | | |
| MGA USA | UBOC | | MGA 3765665-3765747 |
| MGA USA | UBOC | | MGA 3765665-3765747 |
| MGA USA | UBOC | | MGA 3765665-3765747 |
| MGA USA | | | MGA 3765665-3765747 |
| MGA USA | Wells Fargo | | MGA 1475167-MGA 1475184 |
| MGA USA | Wells Fargo | | MGA 1513313-MGA 1513314 |
| MGA USA | Wells Fargo | | MGA 1513313 |
| MGA USA | Wells Fargo | | MGA 0869730 |
| MGA USA | Wells Fargo | | MGA 0878534- MGA 0878535; MGA 0878553-MGA 0878562 |

Page 1 of 5

Attorney's Eyes Only

Exhibit 14
Page 236

## MGA Banks Identified In Production To Date

| Company | Bank Name | Account # | Bates Numbers of Documents Identifying Bank Account (No Actual Bank Records Included) |
|---|---|---|---|
| Banco Nossa Caixa-Brazil | | | MGA 1728809 |
| MGA HK | Bank of America | | MGA 4006024 |
| MGA HK | Bank of America | | MGA 1699085 |
| MGA HK | State Street Bank & Trust company | | MGA 4029646-48 |
| | | | MGA 1639686- MGA 1639697 |
| MGA HK | HSBC | | MGA 1513312-1513314 |
| MGA HK | Hong Kong Bank | | |
| MGA HK | HSBC- Hong Kong Shanghai Banking Corporation | | MGA 2684333-MGA 2684339 |
| MGA HK | N/A | REDACTED | MGA 3862019-20; MGA 3862021-2026; |
| | | | MGA 3848826-8827 |
| | | | MGA 3708298-MGA 3708311. |
| MGA HK | Standard Chartered Bank Hong Kong | | MGA 2100446- MGA 2100451 |
| MGA EU | N/A | | |
| MGA Canada | Wells Fargo | | MGA 1115431 |
| MGA Mexico | N/A | | |
| MGA Mexico | N/A | | |
| MGA Mexico | N/A | | MGA 1693228-MGA 1693235 |
| MGA Mexico | Banamex | | MGA 1534924-MGA 1534925 |
| MGA Mexico | Banamex | | MGA 1534924-MGA 1534925 |
| MGA Mexico | Dept. of Treasury Reporting Banamex Accounts | | MGA 1535083- MGA 1535086 |

Page 2 of 5

Attorney's Eyes Only

Exhibit 14
Page 237

**MGA Banks Identified In Production To Date**

| Company | Bank Name | Account # | Bates Numbers of Documents Identifying Bank Account (No Actual Bank Records Included) |
|---|---|---|---|
| MGA Entertainment Mauritius Limited | Mauritius -HSBC Deposit Account | | MGA 1513313-MGA 1513314 |
| MGA Entertainment Mauritius Limited | Wells Fargo-SF - Wells Capital Management | | MGA 1513313-MGA 1513314 |
| MGA Entertainment Mauritius Limited | "Mauritian Offshore Banks" | REDACTED | MGA 3708298-MGA 3708311, MGA 3848828- MGA 3848833 |
| MGA Entertainment Mauritius Limited | "Mauritian Offshore Banks" | | MGA 1480182, MGA 3848828- MGA 3848833 |
| MGA Entertainment Mauritius Limited | Mauritian Offshore Banks | | MGA 2089380, MGA 3848828- MGA 3848833 |
| | "Mauritian Offshore Banks" | | MGA 2089381, MGA 3848828- MGA 3848833 |
| MGA Entertainment Mauritius Limited | Mauritian Offshore Banks | | MGA 2089384 |
| MGA Entertainment Mauritius Limited | Mauritian Offshore Banks | | MGA 2802963; MGA 3396397-6405, MGA 3848828- MGA 3848833 |
| MGA Entertainment Mauritius Limited | Transfer of $90 million to Mauritius | | MGA 3473566, MGA 3848822- MGA 3848825, MGA 3473567-MGA 3473579 |
| | Mauritian Offshore Banks | | MGA 3473567-MGA 3473579 |
| | Mauritian Offshore Banks | | MGA 3848822- MGA 3848825 |
| MGA Entertainment Mauritius Limited | Mauritian Offshore Banks | | MGA 3848826-MGA 3848827, MGA 3848828- MGA 3848833 |

Attorney's Eyes Only

Page 3 of 5

Exhibit 14
Page 238.

## MGA Banks Identified In Production To Date

| Company | Bank Name | Account # | Bates Numbers of Documents Identifying Bank Account (No Actual Bank Records Included) |
|---|---|---|---|
| Mga Entertainment Mauritius Limited, FAX to Stephen S. C. Lee from wincy Wong December 6, 2000 | Mauritian Offshore Banks | | MGA 3848828- MGA 3848833 |
| MGA Entertainment Mauritius Limited | Mauritian Offshore Banks | REDACTED | MGA 3848822- MGA 3848825 |
| MGA Entertainment Mauritius Limited | Mauritian Offshore Banks | | MGA 3848766- MGA 3848771 |
| | | | |
| MGA International Holding Company (Netherlands) | N/A | | MGA 1639026-1639027 & MGA 1639028-1639030 |
| | | | |
| | | | |
| FLOTIS Bank (Netherlands; Wells Fargo | | | MGA 3710760-MGA 3710775 |
| And other banks for MGA Affiliates | | | MGA 3710760-MGA 3710775 |
| | | | MGA 3787447 |
| | | | MGA 3787427 |

Attorney's Eyes Only

Exhibit 14
Page 239

**MGA Banks Identified In Production To Date**

| Company | Bank Name | Account # | Bates Numbers of Documents Identifying Bank Account (No Actual Bank Records Included) |
|---------|-----------|-----------|----------------------------------------------|
| US Bank Corp Reference Email | US Bank Corp advised MGA that MGA's value as of 3/12/2002, (date of the email) that the current minimum value of the company is $350 MM, based on company projected profits. | REDACTED | MGA 0142904 |
| US Bank Corp Reference Email | | | MGA 1002883 |
| Wells Fargo HSBC trade Bank | See also 2004 projections, "assuming conservation $850 MM in sales" - appears email is re investors. | | MGA 1729141 |

Attorney's Eyes Only

Page 5 of 5

Exhibit 14
Page 240

# Exhibit 15

| From: | Isaac Larian |
| To: | Abe Mirza; Gary Thomson |
| CC: | |
| BCC: | |
| Sent Date: | 2002-03-12 00:32:17:912 |
| Received Date: | 2002-03-12 00:32:17:912 |
| Subject: | Draft-Bandai-CONFIDENTIAL-LET ME KNOW YOUR COMMENTS AND OTHER WISHES BEFORE I SEND. |

Attachments:

Dear Masa,

The investment banker group we have hired (US Bank corp.) has advised us that the current minimum value of the company is                    . This is based on company-projected profits.

I would like to make an appointment to come and see you in Paris and show you the detail and discuss this further. Please advise when are you available?

Please also advise what are the agenda items (your wish list) that Bandai wants to get from the deal?

From our side, beside the initial minority investment by Bandai, we would like to get the following from Bandai relationship:

- Autonomy to run and grow MGA's business as we have done in the past.

- Creative input in MGA's future product lunches.
- Bandai to distribute and promote MGA's products in as many markets as Bandai is strong.
- Bandai to distribute MGA products such as Bratz in Japan as soon as it no longer has a conflict with Mattel.
- MGA to have the first right to license secondary Bandai property products that Bandai will not produce ( e.g. Gundum Wing Walkie Talkie, etc).

Confidential - For Attorney's Eyes Only

MGA 0142904

Exhibit 15
Page 241

REDACTED

| | |
|---|---|
| From: | Isaac Larian |
| To: | US Bancorp Piper Jaffray - David Dandel; US Bancorp Piper Jaffray - John Jacobs; US Bancorp Piper Jaffray - Philip Collins |
| CC: | Lois Ungar; Michael Bernstein; Gary Thomson |
| BCC: | |
| Sent Date: | 2002-09-08 22:52:53:890 |
| Received Date: | 2002-09-08 22:52:53:890 |
| Subject: | MGA value |
| Attachments: | |

It was good to see you last week.

MGA's valuation should be revisted based on the following

1-MGA's sales and EBITDA.

2-Licensing incon:

We estimate that            n of Bratz licensed products will be sold by end 2003. We get a net royalty of 10-12% which goes directly to the bottom line here.

Please review and advise.

Isaac Larian
*Isaac Larian*
CEO
*M G A* Entertainment
16730 Schoenborn Street
North Hills, California 91343
Tel: 818-894-3150
Fax:818-894-1267
e-mail: llarian@MGAE.COM
*Please Visit*
www.MGAE.com
*And the beautiful BRATZ at*
www.Bratzpack.com
*Hey! It's MGA!*

Confidential - For Attorney's Eyes Only

MGA 1002558

Exhibit 15
Page 242

**REDACTED**

| From: | Isaac Larian |
|-------|--------------|
| To: | Lois Ungar |
| CC: | |
| BCC: | |
| Sent Date: | 2002-09-09 23:38:19;906 |
| Received Date: | 2002-09-09 23:38:19;906 |
| Subject: | FW: MGA value |
| Attachments: | |

FYI

-----Original Message-----
From: Jacobs, John [mailto:JJacobs@pjc.com]
Sent: Monday, September 09, 2002 4:33 PM
To: 'Isaac Larian'
Subject: RE: MGA value

Isaac:

This all sounds great and it will definitely go into the overall valuation.
We are anxious to work with you and Lois to finalize the financial model for
the next several years. Everyone at the meeting was impressed and looking
forward to working together. We have a conference call scheduled with Lois
on Wednesday to go over the schedule and time line. We will all spend a lot
of time on the model and then it is our job collectively to present it in
the best light to potential investors/acquirers.

Best regards,

John

-----Original Message-----
From: Isaac Larian [mailto:llarian@mgae.com]
Sent: Sunday, September 08, 2002 3:53 PM
To: US Bancorp Piper Jaffray - David Dandel; US Bancorp Piper Jaffray -
John Jacobs; US Bancorp Piper Jaffray- Philip Collins
Cc: Lois Ungar; Michael Bernstein; Gary Thomson
Subject: MGA value

It was good to see you last week.

MGA's valuation should be revisited based on the following

1-MGA's sales and EBITDA.

2-Licensing income;

Confidential - For Attorney's Eyes Only

We estimate that _____ f Bratz licensed products will be sold by end 2003. We get a net royalty of 10-12% which goes directly to the bottom line here.

Please review and advise.

Isaac Larian
Isaac Larian
CEO
M G A Entertainment
16730 Schoenborn Street
North Hills, California 91343
Tel: 818-894-3150
Fax:818-894-1267
e-mail: ilarian@MGAE.COM
Please Visit
www.MGAE.com
And the beautiful BRATZ at
www.Bratzpack.com
Hey! Its MGA!

U.S. Bancorp Piper Jaffray – Guides for the journey.®

We have been guiding clients through all types of market conditions for more than 100 years. No matter where you're headed, we recommend you take a guide.

Find out more at http://www.piperjaffray.com

Investment products purchased from or through U.S. Bancorp Piper Jaffray:

\* Not FDIC-insured \* No bank guarantee \* May lose value \*

For additional disclosure information see
http://www.pjc.com/sub_global/usbpj_disclosure.html

Confidential - For Attorney's Eyes Only

Exhibit 15
Page 244

REDACTED

| From: | Isaac Larian (President / CEO) |
|-------|-------------------------------|
| To: | Brian Wing |
| CC: | |
| BCC: | |
| Sent Date: | 2005-03-23 02:39:11:156 |
| Received Date: | 2005-03-23 02:39:11:156 |
| Subject: | FW: Daily Consolidated Cash Report - 3/21/05 |
| Attachments: | MGA Consolidated Cash Report 0305.xls |

What are we doing with this money to invest it???

Isaac Larian
CEO
MGA Entertainment, Inc.
16380 Roscoe Blvd. Suite 200
Van Nuys, California 91406
Tel: 818-894-3150
email: larian1@mgae.com
fax: 818-894-1267
www.mgae.com
www.bratzpack.com
www.alienracers.com

-----Original Message-----
From: Mondana Hamzavi
Sent: Tuesday, March 22, 2005 2:44 PM
To: Isaac Larian (President / CEO); Mel Woods; Valerie Grant
Subject: Daily Consolidated Cash Report - 3/21/05

Consolidated Cash Balance as of 3/21/05 is                    . Please see the attached cash report.

Mondana

Confidential - For Attorney's Eyes Only

MGA 1513312

Exhibit 15
Page 245

REDACTED

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | MGA Entertainment, Inc. | | | | | | | |
| 2 | Daily Cash Report as at 3/21/05 | | | | | | | |
| 3 | | | | | | | | |
| 4 | | | | | | | US Balance | HK Balance |
| 5 | | | | | | | US$ | US$ |
| 6 | | | | | | | | (000) |
| 7 | | | USA | | | | | |
| 8 | Union Bank | | | | | | | |
| 9 | | Disbursement Account | (303-0153854) | | | | | |
| 10 | | Deposit Account | (070-0478280) | | | | | |
| 11 | | | | | | | | |
| 12 | Wells Fargo | | | | | | | |
| 13 | | Disbursement Account | (4945080034) | | | | | |
| 14 | | Deposit Account | (4945080042) | | | | | |
| 15 | | | | | | | | |
| 16 | Wells Fargo Overnight Investment A/C | | | | | | | |
| 17 | | | | | | | | |
| 18 | | | HONG KONG | | | | | |
| 19 | Bank of America | | | | | | | |
| 20 | | | | | | | | |
| 21 | | H.K.Dollars-Current Account (6055-57033-019) | | | | | | |
| 22 | | U.S.Dollars-Current Account (6055-57033-035) | | | | | | |
| 23 | | U.S.Dollars-Saving Account (6055-57033-027) | | | | | | |
| 24 | | | | | | | | |
| 25 | | Overnight deposit | | | | | | |
| 26 | | From A/C #6055-57033-027 | | | | | | |
| 27 | | From A/C 6055-57033-027 | | | | | | |
| 28 | | From A/C #6055-57033-027 | | | | | | |
| 29 | | From A/C #6055-57033-027 | | | | | | |
| 30 | HSBC | | | | | | | |
| 31 | | | | | | | | |
| 32 | | Multi Currency Statement Saving A/C (502-249352) | | | | | | |
| 33 | | | | | | | | |
| 34 | | Overnight deposit | | | | | | |
| 35 | | From A/C #502-249352 | | | | | | |
| 36 | | From A/C #502-249352 | | | | | | |
| 37 | | | | | | | | |
| 38 | | | | | | | | |
| 39 | | | MAURITIUS | | | | | |
| 40 | HSBC | | | | | | | |
| 41 | | Deposit Account (080-075930-020 ) | | | | | | |
| 42 | | | | | | | | |
| 43 | Wells Fargo  - SF | | | | | | | |
| 44 | | Wells Capital Mgmnt #4068000769 /  (Mauritius a/c 14836401) | | | | | | |
| 45 | | Wells Capital Mgmnt #4068000769 /  (Mauritius a/c 14836401) | | | | | | |
| 46 | | Wells Capital Mgmnt #4068000769 /  (Mauritius a/c 14836401) | | | | | | |
| 47 | | Interest 2-28-05 | | | | | | |
| 48 | CASH BOOK BALANCE | | | | | | | |
| 49 | | | | | | | | |
| 50 | | | | | | | | |
| 51 | Remarks | | | | | | | |
| 52 | | | | | | | | |

Confidential - For Attorney's Eyes Only

MGA 1513313

Exhibit 15
Page 246

| | I |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | Mauritius Balance |
| 5 | US$ |
| 6 | (000) |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |
| 29 | |
| 30 | |
| 31 | |
| 32 | |
| 33 | |
| 34 | |
| 35 | |
| 36 | |
| 37 | |
| 38 | |
| 39 | |
| 40 | |
| 41 | |
| 42 | |
| 43 | |
| 44 | |
| 45 | |
| 46 | |
| 47 | |
| 48 | |
| 49 | |
| 50 | |
| 51 | |
| 52 | |

Confidential - For Attorney's Eyes Only

MGA 1513314

Exhibit 15
Page 247

**Exhibit  16**

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

**Exhibit 17**

CONFORMED COPY
LODGED                         FILED

2007 MAY 16  PM 1: 59   2007 MAY 16  PM 2: 00

CLERK U.S. DISTRICT COURT   CLERK U.S. DISTRICT COURT
  CENTRAL DIST. OF CALIF.     CENTRAL DIST. OF CALIF.
        RIVERSIDE                    RIVERSIDE

BY _____      BY _____

1  Hon. Edward A. Infante (Ret.)
   JAMS
2  Two Embarcadero Center
   Suite 1500
3  San Francisco, California 94111
   Telephone:    (415) 774-2611
4  Facsimile:    (415) 982-5287

5

6

7                    UNITED STATES DISTRICT COURT

8                   CENTRAL DISTRICT OF CALIFORNIA

9                          EASTERN DIVISION

10

11  CARTER BRYANT, an individual,        CASE NO. C 04-09049 SGL (RNBx)
                                         JAMS Reference No. 1100049530
12           Plaintiff,

13        v.                             Consolidated with
                                         Case No. CV 04-09059
14  MATTEL, INC., a Delaware corporation, Case No. CV 05-2727

15           Defendant.                  **ORDER GRANTING MATTEL'S**
                                         **MOTION TO COMPEL PRODUCTION**
16                                       **OF DOCUMENTS AND**
                                         **INTERROGATORY RESPONSES BY**
17  CONSOLIDATED WITH                    **MGA**
    MATTEL, INC. v. BRYANT and
18  MGA ENTERTAINMENT, INC. v. MATTEL,
    INC.
19

20                          I. INTRODUCTION

21        On February 2, 2007, Mattel, Inc. ("Mattel") submitted its Motion To Compel Production

22  of Documents and Interrogatory Answers by MGA Entertainment, Inc. ("MGA"). On February

23  20, 2007, MGA submitted its opposition brief, and on February 26, 2007, Mattel submitted a

24  reply brief. The matter was heard on March 5, 2007. Thereafter the motion was taken under

25  submission pending the parties' submission of a proposed protective order, which was received

26

27

28
    Bryant v. Mattel, Inc.,                                                    1
    CV-04-09049 SGL (RNBx)

Exhibit 17
Page 254

1   on April 23, 2007.  Having considered the motion papers and comments of counsel at the hearing,

2   Mattel's motion to compel is granted.

3   ## II.  BACKGROUND

4   A. Requests for Documents

5   In June of 2004, two months after Mattel filed suit against Bryant, and before MGA

6   became a party to the action, Mattel served MGA with an eight-page subpoena for twenty-one

7   categories of documents, to be produced in ten days.  MGA filed a motion to quash, which the

8   court granted because of the short amount of time provided for compliance with the subpoena.

9   The parties met and conferred in July of 2004, and reached an agreement to limit the scope of

10  some of Mattel's requests.  In particular, the parties agreed to limit production to the "first

11  generation" Bratz dolls.  On August 12, 2004, MGA produced documents.

12  In 2005, the parties stipulated to supplementing their document productions on May 16,

13  2005.  Mattel agreed to continue limiting its discovery requests to "first generation" Bratz dolls.

14  In September of 2006, MGA made a supplemental production of documents.  On February

15  5, 2007, MGA produced about 2,300 pages of documents to replace earlier produced documents

16  with legibility problems.  On February 20, 2007, MGA produced an additional 224 pages of

17  documents to replace earlier produced documents with legibility problems.

18  Mattel now moves to compel MGA to produce documents responsive to its requests.  As a

19  preliminary matter, Mattel contends that MGA's production is deficient because it contains

20  redactions and cut-off text.  Further, Mattel contends that MGA's production is incomplete with

21  respect to essentially five categories of documents.  First, Mattel contends that MGA is

22  withholding documents relating to the origins of Bratz and Bryant's work for MGA.  Mattel

23  believes that MGA's production is incomplete based upon its review of documents that have been

24  produced by third party Steven Linker.  According to Mattel, Linker's documents from October

25  of 2000 show that Bratz was much farther along before Bryant left Mattel than MGA or Bryant

26  previously represented.  Mattel also contends that MGA's responses to the document requests

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

2

Exhibit 17
Page 255

1   contain inappropriate limitations, such as MGA's statement that it will produce "relevant and

2   responsive non-objectionable documents" or only that it will produce documents "sufficient" to

3   show when certain dates relating to Bratz occurred. Mattel contends that these "carve outs

4   purport to allow MGA to cherry-pick what it will and will not produce to Mattel." Mattel's

5   Separate Statement at 17:11-13. Mattel also contends that the carve-outs fail to provide notice of

6   what is or is not being withheld. Mattel also contends that MGA's objections based upon its

7   confidentiality concerns or the privacy rights of third parties are unwarranted in light of the

8   protective order in place. In addition, Mattel contends that MGA's objection to producing

9   documents relating to activities or conduct in foreign countries is wholly improper because those

10   documents may contain information relevant to Mattel's claims.

11       Second, Mattel seeks documents relating to the origins of Bratz, regardless of whether

12   such documents relate to the "first generation" Bratz dolls. Mattel argues that whether the work

13   ultimately resulted in Bratz dolls that were released at a particular time does not matter for

14   discovery purposes. Mattel contends that the works created by Bryant during his Mattel

15   employment are highly relevant because Mattel owns them, regardless of whether they resulted in

16   a Bratz doll released at a particular time.[1]

17       Mattel next contends that MGA is improperly withholding documents about designs

18   Bryant created on Bratz dolls that were released after June 2001, even though such designs may

19   be derivative of work he did when employed by Mattel. Mattel contends that it is entitled to

20   explore whether such works and the profits from Bratz dolls other than the "first generation"

21   Bratz dolls were derived from works owned by Mattel both for purposes of establishing liability

22   and damages. Furthermore, Mattel asserts that the "first generation" limitation on discovery is

23   improper in light of Bryant's continuing duty not to use Mattel's confidential and proprietary

24   information as well as MGA's unfair competition claims.

25   _____

26   [1]  Mattel also reiterates many of the arguments it made previously in connection with its earlier filed motion
to compel Bryant to produce documents.

27

28   Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)                                                                    3

Exhibit 17
Page 256

1    Mattel also asserts that MGA is improperly withholding documents relating to products,

2    services and matters other than those relating to "dolls." According to Mattel, it has evidence that

3    Bryant conceived of marketing and advertising ideas for the Bratz line while he was employed by

4    Mattel. Mattel contends that any such ideas or contributions may belong to it pursuant to the

5    Inventions Agreement.

6    Third, Mattel seeks documents relating to all of MGA's payments to Bryant, and not just

7    payments for the "first generation" Bratz dolls. Mattel asserts that such information is relevant

8    because (1) Mattel seeks all benefits Bryant received as a result of violating his duties to Mattel;

9    (2) under the Copyright Act, Mattel is entitled to all profits from infringement as well as actual

10   damages; and (3) payments may show when and what trade secret information Bryant and other

11   defendants allegedly misappropriated from Mattel.

12   Fourth, Mattel seeks documents relating to MGA's agreements with Bryant. Mattel

13   contends that all agreements between Bryant and MGA are relevant, not just the original

14   September 18, 2000 agreement. In particular, Mattel contends that it is entitled to discover all

15   documents relating to MGA and Bryant's alleged joint defense agreement because such

16   information would be relevant to demonstrate bias and lack of credibility.

17   Fifth, Mattel seeks production of all declarations, affidavits and other sworn written

18   statements from other cases that refer or relate to Bratz or Angel. Mattel contends that such

19   information may reveal relevant information about the date of creation of Bryant's Bratz

20   drawings.

21   In response, MGA denies withholding responsive documents and asserts that it has

22   produced volumes of documents responsive to Mattel's requests. In particular, MGA represents

23   that it has produced all responsive and relevant documents that it was able to locate in response to

24   request nos. 6, 7, 9, 26, 27, 32, 33, 34, 35, 36, 55, 69, and 70. Further, MGA asserts that even

25   before the motion was filed, it had agreed to address the vast majority of the issues raised in this

26   motion. In particular, MGA represents that it is diligently working to produce documents related

27

28
     Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)                                                          4

Exhibit 17
Page 257

1   to Bratz other than "first generation" Bratz in response to request nos. 1, 2, 8, 10, 11, 43, 45, 46,

2   49, 50, 51, 53, 57, 59, 61, 63, 64, 66, 96, 97, 98, 99 and 100.  MGA represents that it informed

3   Mattel that it would produce documents pertaining to subsequent generations of Bratz dolls that

4   have been released on the market.  In addition, MGA represents that it has agreed to produce

5   documents relevant to Bratz or Prayer Angels that it received from Union Bank.  More

6   specifically, MGA represents that it agreed to review and produce documents provided to it by

7   Union Bank for the years 1999 – 2001 concerning payments that it could identify as being for

8   Bratz or Prayer Angels.  MGA also represents that it has agreed to produce royalty statements.

9   Therefore, MGA views the motion as unnecessary.

10        MGA next contends that Mattel's motion should be denied for the following additional

11   reasons.  First, MGA contends that Mattel is not entitled to MGA's product design documents for

12   unreleased products.  MGA asserts that its product design documents for its unreleased toy

13   concepts are among its most highly valuable trade secrets.  Furthermore, MGA contends that

14   designs and drawings for products currently under development, over six years after Bryant first

15   created his original Bratz drawings, have no relevance to any of Mattel's claims.  In the event that

16   documents relating to unreleased products are ordered produced, MGA requests a protective order

17   under Rule 26(c), Fed.R.Civ.P., that limits the dissemination of its documents more drastically

18   than the current protective order provides.  In the alternative, MGA requests that any order

19   compelling production of documents relating to unreleased products should essentially be stayed

20   until after MGA's products are publicly released.

21        Second, MGA contends that Mattel is not entitled to information concerning Bryant's

22   attorneys' fees because the information is privileged.  Furthermore, MGA contends that the

23   information is not relevant to demonstrate bias because "there is no dispute that Bryant's interests

24

25

26

27

28
Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

5

Exhibit 17
Page 258

1 | in this case are aligned with those of MGA, and that Bryant is 'biased' in that sense." MGA's
2 | Opposition at 24:9-12.[2]

3 |      Third, MGA asserts that Mattel is not entitled to review all non-public witness statements
4 | and litigation documents concerning Bratz for a variety of reasons, including because Mattel has
5 | refused to produce similar types of documents. More significantly, MGA contends that Mattel's
6 | requests for non-public witness statements are "a blatant attempt to avoid the discovery
7 | limitations imposed by both the Federal Rules of Civil Procedure and those additional limitations
8 | imposed by this Court." MGA's Opposition at 25:6-7. MGA explains its position as follows.
9 | MGA is involved in litigation against a number of counterfeiters and infringers in Asia. In 2003,
10 | Mattel allegedly began feeding documents concerning "Toon Teens" to those defendants in an
11 | attempt to prove that Bryant created Bratz while working at Mattel, even though Mattel
12 | abandoned its claims based upon "Toon Teens" in this court. Thereafter, those defendants took
13 | the position that MGA did not own, and therefore could not enforce, the rights to Bratz. MGA
14 | was thus forced to litigate the issue of ownership. MGA contends that "[i]n effect, by prompting
15 | foreign counterfeiters to espouse a theory that Mattel now admits has no merit, Mattel has created
16 | a situation in which MGA has been forced to give testimony and provide evidence related to
17 | issues in this case that Mattel now seeks to obtain wholesale." MGA's Opposition at 25:5-24.

18 |      Fourth, MGA contends that Mattel is not entitled to documents concerning a family
19 | dispute between MGA's chief executive officer and his brother because such documents are in no
20 | way relevant to this lawsuit. MGA explains that the brothers were involved in an arbitration
21 | proceeding relating to MGA's CEO's purchase of his brother's interest in MGA. Moreover,
22 | MGA contends that the brothers were bound by a protective order prohibiting the use of any
23 | documents or testimony for any purpose other than the arbitration.

24 |
25 |
26 |     [2]  Nevertheless, MGA represents that it has produced the only non-privileged document responsive to the request.
27 |
28 |

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

6

Exhibit 17
Page 259

1    Fifth, MGA contends that Mattel is not entitled to its chief executive officer's personnel

2  files because they contain confidential information and are not relevant to the lawsuit. Sixth,

3  MGA contends that Mattel is not entitled to obtain documents from MGA that belong to, and are

4  in the possession, custody and control of, its indirect foreign subsidiary, MGA HK Ltd. Lastly,

5  MGA objects to producing documents relating to any testing performed to determine the date that

6  Bratz documents were created. MGA contends that such discovery is premature and should not

7  proceed until experts are designated.

8    B. Interrogatories

9    On April 28, 2005, Mattel served its Second Set of Interrogatories. On May 20, 2005,

10  however, the district court stayed the action. On May 17, 2006, the district court lifted the stay.

11  On May 30, 2006, MGA responded to the interrogatories.

12    Mattel contends that MGA's responses to the interrogatories were untimely. Further,

13  Mattel contends that the interrogatory responses to numbers five through eleven are deficient

14  because they lack substantive information and consist almost entirely of objections. MGA

15  responds that the motion is moot because it is prepared to provide supplemental responses to its

16  interrogatories. MGA does not otherwise assert any additional grounds for opposing Mattel's

17  motion to compel responses to interrogatories.

18                    III. DISCUSSION

19    A. Rule 26 of the Federal Rules of Civil Procedure

20    Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain

21  discovery regarding any matter, not privileged, that is relevant to the claim or defense of any

22  party." Fed.R.Civ.P. 26(b)(1). "Relevant information need not be admissible at trial if the

23  discovery appears reasonably calculated to lead to the discovery of admissible evidence." Id.

24  Discovery shall, however, be limited by the court if it determines that: "(i) the discovery sought is

25  unreasonably cumulative or duplicative, or is obtainable from some other source that is more

26  convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample

27

28
Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

7

Exhibit 17
Page 260

1  opportunity by discovery in the action to obtain the information sought; or (iii) the burden or

2  expense of the proposed discovery outweighs its likely benefit, taking into account the needs of

3  the case, the amount in controversy, the parties' resources, the importance of the issues at stake in

4  the litigation, and the importance of the proposed discovery in resolving the issues." Fed.R.Civ.P.

5  26(b)(2).

6     B. Document Requests

7        1. Requests re Origins of Bratz and Bryant's Work for MGA (Nos. 6, 26, 27, 32, 33,

8           34, 35, 51, 53, 55, 64, 69, 96, 97, 98, 99, 100

9     The requests above seek discoverable information regarding the origins of Bratz and

10  Bryant's work for MGA.  MGA represents that it has produced all responsive documents in

11  response to request nos. 6, 26, 27, 32, 33, 34, 35, 55,and 69 (MGA's Opposition at 13:4-5), and is

12  "diligently working to produce documents in response to" request nos. 51, 53, 64, 96, 97, 98, 99,

13  and 100, including documents related to Bratz other than "first generation" (MGA's Opposition at

14  14:1-4 and note 39).  MGA does, however, object to producing design documents for unreleased

15  products and documents from MGA Hong Kong.

16     As a threshold matter, MGA's responses are inadequate to the extent MGA has restricted

17  its production to "relevant and responsive non-objectionable documents" or documents

18  "sufficient" to show when events relating to Bratz occurred.  These restrictions suggest that MGA

19  might be excluding documents that are responsive to the request based upon its unilateral

20  determination of what is "relevant" or "sufficient."  Mattel shall provide the responses to

21  document requests ordered herein without these restrictions.

22                    Design Documents for Unreleased Products

23     MGA's design documents for unreleased products are relevant to Mattel's claims and

24  defenses and must be produced.  See Order Modifying Protective Order.  On April 23, 2007, the

25  parties submitted a stipulation to modify the existing protective order to limit the disclosure of

26  design documents for unreleased products that constitute trade secret information.  See Stipulation

27

28
   Bryant v. Mattel, Inc.,
   CV-04-09049 SGL (RNBx)                                                    8

Exhibit 17
Page 261

1   to Modify Protective Order; And Proposed Order Thereon ("stipulation"). The parties' stipulation
2   has been approved and entered as an order of the court. MGA is ordered to produce design
3   documents for unreleased products that are responsive to Mattel's document requests in
4   accordance with the terms of the stipulation and order.

5                           <u>Documents from MGA Hong Kong</u>

6          Documents relating to activities or conduct in foreign countries are relevant and
7   discoverable because Mattel has evidence indicating that MGA Hong Kong was involved with
8   Bratz. Nevertheless, MGA objects to producing documents from Hong Kong unless Mattel
9   provides reciprocal discovery from its subsidiaries.

10         Whether MGA is entitled to discovery from Mattel's subsidiaries has not been briefed in
11  the context of this motion, and therefore is not addressed herein. MGA is ordered to produce
12  documents from MGA Hong Kong.

13         Mattel's motion is granted with respect to request nos. 6, 26, 27, 32, 33, 34, 35, 51, 53, 55,
14  64, 69, 96, 97, 98, 99, 100.

15         2. <u>Additional Requests re Origins of Bratz (Nos. 7, 8, 9, 10, 11, 12, 13, 36, 46, 57, 59,</u>
16              <u>61, 63, 66, 67, 70, 88, 90, 91</u>

17         Mattel contends that MGA is improperly limiting its document production to the "first
18  generation" Bratz dolls. MGA represents, however, that it has agreed to produce subsequent
19  generations of Bratz products (MGA's Opposition at 9:20-25, 13:6-14:1), except design
20  documents for yet unreleased products.

21         As stated previously, design documents for yet unreleased products are relevant and
22  discoverable. <u>See</u> Order Modifying Protective Order. Accordingly, MGA is ordered to produce
23  all non-privileged documents that are responsive to request nos. 7, 8, 9, 10, 11, 12, 13, 36, 46, 57,
24  59, 61, 63, 66, 67, 70, 88, 90, and 91.

25         //

26         //

27

28
    Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)                                                    9

Exhibit 17
Page 262

### 3. MGA's Payments to Bryant (Nos.43, 45)

MGA represents that it has already agreed to produce documents related to Bratz, without limiting its production to "first generation" Bratz. MGA's motion at 13:7-14:3. Nevertheless, Mattel is entitled to an order compelling production of such documents by a date certain. Mattel's motion is granted with respect to request nos. 43 and 45.

### 4. MGA's Agreements with Bryant (Nos. 1, 2, 49, 50)

MGA represents that it has already agreed to produce non-privileged documents responsive to request nos. 1, 2, 49, and 50, even though it believes that such documents are not relevant (MGA's motion at 13:7-14:3). These requests seek documents relating to fee or indemnity agreements between MGA and Bryant .

Fee or indemnity agreements are relevant to demonstrate bias and lack of credibility. Accordingly, Mattel's motion is granted with respect to request nos. 1, 2, 49, and 50. Any responsive documents withheld on the basis of a privilege must be properly identified in a privilege log.

### 5. Declarations, Affidavits & Other Sworn Written Statements (Nos. 37, 38, 39, 40, 41,

In request nos. 37, 38, 390, 40, and 41, Mattel seeks production of declarations, affidavits, and other sworn written statements from cases that refer or relate to Bratz or Angel. Mattel anticipates that these documents could provide evidence relating to the conception date for Bratz.

Request nos. 37, 38, 39, 40, and 41 seek relevant information regarding the conception date for Bratz. MGA admits in its opposition brief that this issue was litigated in its suits against alleged counterfeiters and infringers.[3] The issue also appears to have been raised in the arbitration proceedings between MGA's chief executive officer, Isaac Larian, and his brother Farhad Larian. In those proceedings, Farhad Larian alleged that Isaac Larian concealed from him

---

[3] Although MGA questions the propriety of Mattel providing assistance to the alleged counterfeiters and infringers in raising ownership of Bratz as a defense against MGA's claims, MGA has not cited to any legal authority that prohibits Mattel's conduct.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

10

Exhibit 17
Page 263

1  that MGA was developing Bratz by early 2000.  Nevertheless, MGA objects to producing

2  documents from the Larians' arbitration on the grounds that the arbitration was governed by a

3  protective order that prohibits the use of any documents or testimony for any purpose other than

4  the arbitration.  MGA, however, has not provided any evidence of the protective order.

5  Accordingly, Mattel's motion to compel is granted as to request nos. 37, 38, 39, 40 and 41.[4]

6          6. Documents Regarding Date-Testing (Request No. 92)

7       Mattel's request no. 92 seeks documents that refer or relate to "any testing of or sampling

8  from any documents that refer or relate to Bratz or Bryant, including without limitation any such

9  testing or sampling in connection with ink, paper or chemical analysis to date any such documents

10  and including without limitation all results and reports relating thereto."  MGA contends that the

11  request is premature, and should proceed in the course of expert discovery.

12       The request calls for relevant discovery and there is no basis for delaying production of

13  responsive documents, other than expert reports.  The timing of expert reports is governed by

14  Rule 26(a)(2)(C), Fed.R.Civ.P.  Accordingly, Mattel's motion is granted as to request no. 92.

15       C. Interrogatories

16       Mattel contends that MGA's responses to interrogatories were untimely, and therefore

17  MGA has waived its objections to the interrogatories.  Pursuant to Rule 33(b)(3), Fed.R.Civ.P.,

18  responses to interrogatories are due thirty days after service.  In this case, Mattel served its

19  interrogatories on April 28, 2005, and responses were initially due May 31, 2005.  The district

20  court, however, issued a stay on May 20, 2005, twenty-two days after the interrogatories were

21  served.  The district court lifted the stay on May 17, 2006.

22

23

24

25      [4]  In its discussion of the arbitration proceedings, MGA raises an objection to producing Isaac Larian's

26  personnel file based upon privacy grounds.  The personnel file may have documents relevant to Bratz, and therefore should be produced.  The protective order is sufficient to alleviate Mr. Isaac Larian's privacy concerns.

27

28    Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)

11

Exhibit 17
Page 264

1      Neither party has cited to any caselaw governing the calculation of the 30-day period

2  when there is an intervening stay in discovery. In the absence of any caselaw, MGA's responses

3  will be treated as timely in order to preserve any valid objections MGA may have asserted.

4      Interrogatory No. 5 seeks the identity of each and every person who was involved in the

5  conception, origin, creation, design, development, sculpting, engineering, reduction to practice,

6  tooling or painting of, or who otherwise produced or contributed to any embodiment of Bratz

7  before December 31, 2001, including a description of each person's role and the start and end

8  dates of each person's involvement. In response, MGA asserted numerous objections, but did

9  provide the names of five individuals.

10      The interrogatory clearly seeks information relevant to the claims at issue. MGA's

11  objections are without merit. The interrogatory is not vague, ambiguous, compound or overbroad.

12  Nor has MGA carried its burden of establishing that the interrogatory is unduly burdensome, calls

13  for confidential, proprietary or commercially sensitive information, or seeks information

14  protected by the attorney-client privilege. Furthermore, MGA's response is incomplete insofar as

15  it fails to provide the description of each person's role and the start and end dates of each person's

16  involvement. Accordingly, MGA is ordered to provide a complete response to Interrogatory No.

17  5 and identify documents in compliance with Rule 33(d), Fed.R.Civ.P.

18      Interrogatory No. 6 seeks the same information as Interrogatory No. 5 with respect to any

19  embodiment of Angel. MGA is ordered to provide a complete response to Interrogatory No. 6 for

20  the reasons previously discussed in connection with Interrogatory No. 5.

21      Interrogatory No. 7 asks MGA to identify each and every embodiment of Bratz prior to

22  December 31, 2001. In response, MGA asserted numerous objections and did not provide any

23  substantive information.

24      MGA's objections are without merit. The interrogatory clearly seeks information relevant

25  to establishing when Bryant first conceived Bratz. The interrogatory is not vague, ambiguous,

26  compound or overbroad. Nor has MGA carried its burden of establishing that the interrogatory is

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

12

Exhibit 17
Page 265

1  unduly burdensome, calls for confidential, proprietary or commercially sensitive information, or

2  seeks information protected by the attorney-client privilege.  Accordingly, MG is ordered to

3  provide a complete response to Interrogatory No. 7.

4      Interrogatory No.8 asks MGA to identify each and every embodiment of Angel.  MGA is

5  ordered to provide a complete response to Interrogatory No. 8 for the reasons previously

6  discussed in connection with Interrogatory No. 7.

7      Interrogatory No. 9 requires MGA to identify each and every sworn statement that refers

8  or relates to the conception, origin, creation, design, development, sculpting, engineering, tooling

9  or painting of Bratz.  In response, MGA asserted numerous objections and did not provide any

10  substantive information.

11      The interrogatory seeks information relevant to establishing when Bryant first conceived

12  Bratz.  Furthermore, MGA's boiler-plate objections are unsubstantiated.  Accordingly, MGA is

13  ordered to provide a complete response to Interrogatory No. 9.

14      Interrogatory No. 10 requires MGA to identify each and every instance in which Bratz

15  was shown, displayed, or exhibited prior to June 1, 2001, including by stating the date(s) on

16  which each such instance occurred, the location of each show or exhibit, and the identity of

17  persons with knowledge of the shows or exhibits.  In response, MGA asserted numerous

18  objections and provided the following information:  Hong Kong Toy Fair in Hong Kong in or

19  about January 2001 and New York Toy Fair, New York, in or about February 2001.

20      Once again, MGA's boiler-plate objections are unsubstantiated.  The information is

21  potentially relevant to establish when Bryant conceived Bratz.  Further, the response is

22  incomplete insofar as it fails to identify any persons with knowledge.  Therefore, MGA is ordered

23  to provide a complete response to Interrogatory No. 10.

24      Interrogatory No. 11 requires MGA to state the "number for each and every telephone,

25  including without limitation each office, home and cell phone number, in the name of, for the

26  benefit of or for the account of Isaac Larian and any other telephone that Isaac Larian used from

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

13

Exhibit 17
Page 266

1    January 1, 1998 through the present, and IDENTIFY each and every carrier (including without

2    limitation any long-distance carrier) for each such number. In response, MGA asserted numerous

3    boiler-plate objections.

4         Once again, MGA has failed to substantiate any of its objections with supporting

5    declarations or legal authorities. Accordingly, all objections are overruled and MGA is ordered to

6    provide a full response to Interrogatory No. 11.

7                                    IV. CONCLUSION

8         For the reasons set forth above, Mattel's motion to compel production of documents is

9    granted. MGA shall produce all non-privileged documents that are responsive to the requests

10   identified in this Order. Further, MGA shall produce all documents in un-redacted form, except

11   for redactions that are justified by the attorney-client privilege or work product doctrine. Mattel's

12   motion to compel interrogatory answers is also granted. MGA shall produce documents and

13   provide responses to interrogatories consistent with this Order, and produce a privilege log in

14   compliance with Rule 26(b)(5), Fed.R.Civ.P., no later than May 31, 2007. Mattel's request for

15   sanctions is denied.

16        Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery

17   Master, Mattel shall file this Order with the Clerk of Court forthwith.

18

19

20

21   Dated: May /5/, 2007

22                                              HON. EDWARD A. INFANTE (Ret.)
                                                        Discovery Master
23

24

25

26

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                    14

Exhibit 17
Page 267

## PROOF OF SERVICE BY E-MAIL

I, Anthony Sales, not a party to the within action, hereby declare that on May 15, 2007, I served the attached ORDER GRANTING MATTEL'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND INTERROGATORY RESPONSES BY MGA in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| Robert Millman Esq. | Littler Mendelson | rfmillman@littler.com |
| Douglas Wickham Esq. | Littler Mendelson | dwickham@littler.com |
| Keith Jacoby Esq. | Littler Mendelson | kjacoby@littler.com |
| Dominic Messiha Esq | Littler Mendelson | dmessiha@littler.com |
| Diba Rastegar Esq. | Littler Mendelson | drastegar@littler.com |
| Michelle Park Esq. | Littler Mendelson | mpark@littler.com |
| Alaya B. Meyers, Esq. | Littler Mendelson | ameyers@littler.com |
| Brady Mitchell, Esq. | Littler Mendelson | bmitchell@littler.com |
| Carol Miller, Esq. | Littler Mendelson | cmiller@littler.com |
| Ryan P. Eskin, Esq. | Littler Mendelson | reskin@littler.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | jbq@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Morris Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgetmorris@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Dale Cendali Esq. | O'Melveny & Myers LLP | dcendali@omm.com |
| Diana Torres Esq. | O'Melveny & Myers LLP | dtorres@omm.com |
| James Jenal Esq. | O'Melveny & Myers LLP | jjenal@omm.com |
| Alicia Meyer Esq. | O'Melveny & Myers LLP | ameyer@omm.com |
| Jennifer Glad Esq. | O'Melveny & Myers LLP | jglad@omm.com |
| David Hurwitz, Esq. | O'Melveny & Myers LLP | dhurwitz@omm.com |
| Johanna Schmitt Esq. | O'Melveny & Myers LLP | jschmitt@omm.com |
| Patricia Glaser Esq. | Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP | pglaser@chrisglase.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on May 15, 2007, at San Francisco, California.

Anthony Sales

Exhibit 17
Page 268

Exhibit 18

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

**Exhibit 19**

# MGA Entertainment, Inc. v. Mattel, Inc., et al.

Case No. CV 05-2727

Expert Report of Paul K. Meyer

February 11, 2008

_____
Paul K. Meyer

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Exhibit 19
Page 278

### B.    Apportionment Factors And Considerations

29.    I understand that copyright law allows the accused party to identify elements of profit attributable to factors other than the copyrighted work.  I have analyzed, researched and summarized other creative elements and factors related to the success of the Bratz product line. This study has included review of MGA and Mattel documents, review of deposition testimony, discussions with MGA personnel, research, and discussions with other experts retained by MGA. Mattel's documents corroborate inputs I received from MGA personnel identifying important factors it believes contributed to Bratz success.    The results of my study to identify apportionment factors and considerations are summarized in this section of my Report.

30.    The purpose of this Section B is not to provide independent expert opinion on underlying issues and characteristics of the specifically identified apportionment factors, but to identify the important factors contributing to the generation of Bratz success and profits.  I then use these results in the next section of this Report (Section C), which addresses apportionment approaches and resulting percentages.

31.    One of the factors identified as important to the success of Bratz is the "design of the doll."  I understand that other experts retained on behalf of MGA will address substantial differences between the Bratz doll and the drawings included in the accused copyrighted property, as alleged.  In this Report, I do not attempt to split the category "design of the doll" between the various functions that contribute to doll design, including the accused copyrighted property, new drawings, sculpt, face paint and hair, as examples.  If such a split were performed, it would reduce the apportionment percentages summarized in Section C related to the accused copyrighted property.[27, 28]

---

[27] I understand that Peter Menell, Ph.D., a professor of law at UC Berkeley and an expert for MGA, will testify that MGA's Bratz dolls do not infringe copyright in the Carter Bryant doll sketches.  In his expert report dated February 10, 2008, Dr. Menell states, "His [Mr. Bryant's] concepts do not attract copyright protection. His sketches reflect a mix of relatively detailed soft goods elements (clothing and accessory) and largely rudimentary hard goods elements. Thus, the doll features attract relatively modest protection. When the sketches are subjected to successive filters of copyright law's limiting doctrines (originality, merger, scènes à faire, functionality), many of the hard goods elements of Carter Bryant's fall away entirely or fade in significance...But since the individual elements themselves attract relatively modest (if any) protection, the compilation itself only enjoys protection against 'bodily appropriation' or 'virtual identity.'  As the comparisons show, MGA's Bratz blank and face paint do not reflect anywhere near that level of similarity.  The elements differ quite significantly from the Bryant sketches...Based on these considerations, I do not believe that MGA's Bratz dolls infringe copyright in the Carter Bryant doll sketches...I do not believe that the similarities between the overall compilation of elements in MGA's individual Bratz dolls reflect even substantial similarity to any protected compilation in Bryant's sketches. In any case, they do not rise to the level of bodily appropriation."  Expert Report of Professor Peter S. Menell,

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Exhibit 19
Page 279

### *Many People From MGA Contributed To Bratz Sales And Profits*

32. The success of the Bratz product line is attributable to significant contributions made by MGA in the development, launch and growth of the Bratz product line. The development of the Bratz product line was a collaborative effort involving contributions from numerous people working on various aspects of product development.[29, 30]

33. For example, Veronica Marlow, a pattern maker and seamstress, worked to develop the Bratz fashions. As Ms. Marlow explained in her deposition, "the final product ended up being a product of many people working on the project...the [final] doll turn[ed] out to be different than his [Mr. Bryant's] original idea, because a lot of people had input on the doll."[31] Likewise, Margaret Leahy, the sculptor who developed the first Bratz-related sculpts, testified that "Carter [Bryant] initially came up with a design, and Paula [Garcia] carried it out...She was responsible for the final product and the way it looked on the shelves...You can have a good sculpt, but if you have a paint, bad hair, bad fashions, bad pack out and bad marketing, it won't go anywhere. Paula was the mastermind behind making Bratz what it is and putting it all together."[32] Similarly, Isaac Larian confirmed that the development of the Bratz doll "was a collaboration."[33]

February 10, 2008, p. 4, 22. To the extent the Court accepts certain positions of Dr. Menell, this may put downward pressure on the apportionment percentages summarized in Section C.

[28] I understand that Robert Tonner, Tina Tomiyama and others will testify on behalf of MGA that the Bratz doll as actually designed and developed includes significant differences and enhancements over the accused copyrighted property. Expert Reports of Robert Tonner and Tina Tomiyama. In his expert report, Mr. Tonner states that "the importance of the sculptor and what he/she brings to a doll cannot be over emphasized. The idea or concept of a new doll is crucial, so is the ability and sensibility of the sculptor....the tone of the doll was changed during sculpting. In comparing Mr. Bryant's original sketches with the final sculpt, I see important differences. The shape of the head is the most drastic change. Although the sculptor achieved a stylized sculpt that superficially resembles the illustration, the sculpt has a more childlike quality." In addition, Mr. Tonner states, "I believe a good face painter can enhance a doll, but a great face painter can turn an ordinary doll into a spectacular doll. The combination of a great face painter with a great sculpt can create doll magic. The artist [Anna Rhee] who designed the Bratz way used his/her own artistry to create a very new look for Bratz." Expert Witness Report by Robert Tonner, February 8, 2008, p. 12-14. In her expert report, Ms. Tomiyama comments that the Bratz sculpt was "a very fine piece of work," and that it allowed the face painter "considerable freedom to create faces with different configurations, different eye shapes, different lip fullness, etc. Thus, each of the Bratz characters can be differentiated via the face paint, even though all four initial characters used the same sculpt." Ms. Tomiyama also states, "Certainly to the face designer, the face paint is the key component of the appeal of the doll...most of the 'personality' of the doll is conveyed by the face paint." Expert Report of Tina Tomiyama, February 8, 2008, p. 7-8. To the extent the Court accepts positions of Mr. Tonner and Ms. Tomiyama on these issues, this may put downward pressure on the apportionment percentages summarized in Section C.

[29] Discussions with Paula Garcia and Aileen Storer.

[30] Mr. Tonner concludes in his expert report, "Whereas the importance of a new idea cannot be denied, the same idea, without the help of a very talented staff, could have been a flop. I believe that the original idea for Bratz was only one part of what made a very successful doll program." Expert Witness Report by Robert Tonner, February 8, 2008, p. 19.

[31] Deposition of Veronica Marlow, December 28, 2007, p. 177.

[32] Deposition of Margaret Leahy, December 12, 2007, p. 205-206.

[33] Deposition of Isaac Larian, July 18, 2006, p. 127-128.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

Exhibit 19
Page 280

**Expert Report of Paul K. Meyer**

Mr. Larian testified that Carter Bryant, Veronica Marlow, Paula Garcia and "the Hong Kong team" were all involved in the development of the fashions for the Bratz dolls. Carter Bryant also testified that Mercedeh Ward, Paula Garcia, Veronica Marlow, Anna Rhee and Steve Tarmichael worked on the development of the Bratz project.[34]

34.   Based on my review of this and other deposition testimony, production schedules produced in this matter and discussions with Paula Garcia, I understand that at least twelve people provided creative contributions into the initial Bratz doll. These individuals include Carter Bryant, Margaret Leahy, Veronica Marlow, Mercedeh Ward, Anna Rhee, Aileen Storer, Paula Garcia, Charles O'Connor, Sarah Halpern, Steve Tarmichael, David Dees and Rachel Harris. These people and their roles in the development of the initial Bratz dolls are summarized on **ATTACHMENT 6**.

35.   Subsequent to the initial Bratz dolls, MGA has continued to create new Bratz characters, themes, fashions and packaging. Consequently, MGA has continued to devote substantial resources to create new Bratz products and expand the Bratz product line. These efforts have involved continuing creative contributions from these and other individuals.[35]

   ***Many Factors Contributed To Bratz Sales And Profits***

36.   Bratz's success derives from a combination of numerous aspects beyond the scope of the accused copyrighted property. Mattel, which analyzed the success of the Bratz doll line, has attributed Bratz's success to a variety of factors. For example, a presentation included in Mattel's documents entitled, "My City, My Style, My Scene: Competitive Analysis" dated August 2003, identifies factors that contributed to the success of the Bratz product line. Under the heading, "Why Is Bratz Successful?," the following reasons were listed:

> - "Brand name is easy for girls to pronounce and they understand meaning
> - Appeals to older girls who have outgrown Barbie
> - Hip, cool, fun, trendy image
> - Color scheme is appealing and creates presence
> - Fashions and accessories are 'over the top' hip

---

[34] Deposition of Carter Bryant, November 5, 2004, p. 278. See also Deposition of Carter Bryant, November 5, 2004, p. 281-282.

[35] Discussions with Paula Garcia.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY*

Exhibit 19
Page 281

# Exhibit 20

CERTIFIED COPY

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL,   )
                        PLAINTIFF,   )
                V.   )
MATTEL, INC., A DELAWARE   )
CORPORATION,   )
                DEFENDANTS.   )
                        )
AND CONSOLIDATED ACTION (S).   )

CASE NO.
CV 04-9040 SGL (RNBX)

CONSOLIDATED WITH
CASE NO. 04-9059

CASE NO. 05-2727

## C O N F I D E N T I A L

(ATTORNEYS' EYES ONLY)

## DEPOSITION OF FARHAD LARIAN

## VOLUME I

## FEBRUARY 4, 2008



REPORTED BY:
PAULA PYBURN
CSR NO. 7304
JOB NO. 08AE084-PP

515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

Exhibit 20
Page 282

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, AN INDIVIDUAL, | ) )  ) CASE NO. |
| PLAINTIFF, | ) CV 04-9049 SGL(RNBX) )  |
| V. | ) CONSOLIDATED WITH ) CASE NO. 04-9059 |
| MATTEL, INC., A DELAWARE CORPORATION, | ) AND ) CASE NO. 05-2727 )  |
| DEFENDANT. | )  ) |
| AND CONSOLIDATED ACTION(S) | )  )  ) |

CONFIDENTIAL ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF FARHAD
LARIAN, VOLUME I, TAKEN ON BEHALF OF
MATTEL, INC., AT 10250 CONSTELLATION
BOULEVARD, 20TH FLOOR, LOS ANGELES,
CALIFORNIA, COMMENCING AT 9:39 A.M.,
MONDAY, FEBRUARY 4, 2008, BEFORE
PAULA A. PYBURN, C.S.R. 7304,
R.P.R., C.L.R.

1  Exhibit 20
Page 283

```
 1   APPEARANCES OF COUNSEL:
 2   FOR M.G.A. ENTERTAINMENT, INC.:
 3   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
     BY:  JOSE R. ALLEN, ESQ.
 4   FOUR EMBARCADERO CENTER
     SAN FRANCISCO, CALIFORNIA 94111
 5   (415) 984-6400
     JRALLEN@SKADDEN.COM
 6
 7   FOR DEFENDANT MATTEL, INC.:
 8   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     BY:  MICHAEL T. ZELLER, ESQ.
 9            AND
     BY:  BRIDGET A. HAULER, ESQ.
10   865 SOUTH FIGUEROA STREET
     10TH FLOOR
11   LOS ANGELES, CALIFORNIA 90017
     (213) 443-3000
12   MICHAELZELLER@QUINNEMMANUEL.COM
     BRIDGETHAULER@QUINNEMMANUEL.COM
13
14   FOR CARTER BRYANT:
15   KEKER & VAN NEST LLP
     BY:  CHRISTA MARTINE ANDERSON, ESQ.
16       (WHERE INDICATED)
     710 SANSOME STREET
17   SAN FRANCISCO, CALIFORNIA 94111
     (415) 391-5400
18   CANDERSON@KVN.COM
19
20
21
22
23
24
25
```

```
1    APPEARANCES OF COUNSEL:   (CONTINUED)
2    FOR THE WITNESS:
3    CHRISTENSEN, GLASER, FINK, JACOBS,
     WEIL & SHAPIRO, LLP
4    BY:  PATRICIA GLASER, ESQ.
          (WHERE INDICATED)
5              AND
     BY:  ALISA MORGENTHALER LEVER, ESQ.
6              AND
     BY:  JIM SCHREIR, ESQ.
7         (WHERE INDICATED)
8    10250 CONSTELLATION BOULEVARD
     NINETEENTH FLOOR
     LOS ANGELES, CALIFORNIA 90067
9    (310) 553-3000
10
     ALSO PRESENT:
11
     RICHARD DANIELS,
12        IN-HOUSE COUNSEL, M.G.A. ENTERTAINMENT, INC.
     JOSH SHAPIRO
13        M.G.A. ENTERTAINMENT, INC. (WHERE INDICATED)
     STEVEN TOGAMI,
14        J.T.V. LITIGATIONS SERVICES, INC.
15
16
17
18
19
20
21
22
23
24
25
```

1
                        **I N D E X**

2

3   WITNESS:           EXAMINED BY:                        PAGE:

4   FARHAD LARIAN

5                       MR. ZELLER                      7

6                       AFTERNOON SESSION           128

7

8   EXHIBITS FOR IDENTIFICATION:   (BOUND SEPARATELY)

9   NUMBER:

10   4226 -   11/28/05 LETTER FROM TANIA KREBS   101
             TO ROBERT WILSON, 3 PAGES

11

12   4227 -   VERIFIED COMPLAINT, FL 6526 -   155
             FL 6593, 68 PAGES

13   4228 -   EMAIL CHAIN, KS 05926 - KS 05948,   192
             23 PAGES

14

15   4229 -   12/9/04 LETTER FROM FARHAD LARIAN   213
             TO MORAD ZARABI, KBK 01183 -
             KBK 01185, 3 PAGES

16

17   4230 -   PROPOSED FIRST AMENDED VERIFIED   227
             COMPLAINT, FL 10569 - FL 10621,
             53 PAGES

18

19   4231 -   2/7/01 EMAIL FROM ADMINISTRATOR   252
             TO FRED LARIAN, MGA 3850281 -
             MGA 3850285, 5 PAGES

20

21   4232 -   EMAIL CHAIN, KBK 01304 -   284
             KBK 01305, 2 PAGES

22   4233 -   EMAIL CHAIN, KBK 01294 - KBK   297
             01295, 2 PAGES

23

24   4234 -   5/4/04 EMAIL FROM FRED LARIAN TO   300
             ISAAC LARIAN, MGA 4007280, 1 PAGE

25

4 Exhibit 20
Page 286

```
 1    EXHIBITS FOR IDENTIFICATION:   (BOUND SEPARATELY)
 2    NUMBER:
 3    4235 -   SUBPOENA, WITH ATTACHMENTS, 11      301
                PAGES

 4
      4236     7/5/07 LETTER FROM PATRICIA          308
 5              GLASER TO JOHN QUINN, 4 PAGES
 6
 7
      QUESTIONS UNANSWERED BY WITNESS:
 8
 9                    PAGE      LINE
10                     86        20
                       94        17
11                     95        14
                       96         4
12                    112        21
                      113         3
13                    275         4
                      275        22
14                    276         9
                      276        19
15                    277        24
                      278        18
16                    279         7
                      279        18
17                    280        11
                      308        23
18
19
20
21
22
23
24
25
```

5 Exhibit 20
Page 287

1        LOS ANGELES, CALIFORNIA; MONDAY, FEBRUARY 4, 2008

2               9:39 A.M.

3

4        THE VIDEO TECHNICIAN:  GOOD MORNING.  WE

5 ARE ON THE RECORD AT 9:39 A.M.  TODAY'S DATE IS       09:39:35

6 FEBRUARY 4TH, 2008.  MY NAME IS STEVEN TOGAMI, I'M

7 THE VIDEO TECHNICIAN EMPLOYED BY J.T.V. LITIGATION

8 SERVICES, INC., LOCATED IN LOS ANGELES, CALIFORNIA.

9 WE ARE TAPING THESE PROCEEDINGS AT 10250

10 CONSTELLATION BOULEVARD, LOS ANGELES, CALIFORNIA,    09:39:58

11 90067.

12        THIS IS TAPE NO. 1 FOR THE VIDEOTAPED

13 DEPOSITION OF FARHAD LARIAN IN THE ACTION ENTITLED

14 "CARTER BRYANT VS. MATTEL, INC.," AND CONSOLIDATED

15 CASES.  THIS DEPOSITION IS BEING TAKEN ON BEHALF OF   09:40:15

16 THE DEFENDANT.  THE CASE NUMBER IS CV 04-9049 SGL.

17        MAY WE PLEASE HAVE INTRODUCTIONS FOR THE

18 RECORD, BEGINNING WITH THE WITNESS.

19        THE WITNESS:  FARHAD LARIAN.

20        MS. MORGENTHALER LEVER:  ALISA MORGENTHALER   09:40:32

21 LEVER OF CHRISTENSEN GLASER.

22        MR. SCHREIER:  JIM SCHREIER OF CHRISTENSEN

23 GLASER.

24        MR. ALLEN:  JOSE ALLEN, SKADDEN, ARPS FOR

25 THE M.G.A. PARTIES AND ISAAC LARIAN.            09:40:42

6 Exhibit 20
Page 288

1    QUESTION.  "AT THAT TIME" REFERS TO 2003 --

2           MR. ZELLER:  YES.

3           MS. GLASER:  -- WHEN THIS WAS WRITTEN?

4           MR. ZELLER:  RIGHT, WHEN -- WHEN HE HAD

5    THIS EXCHANGE WITH -- WITH ISAAC BACK IN 2003.          02:37:57

6           MS. GLASER:  SO HE'S ASKING YOU IF YOU KNEW

7    IN -- I GUESS IF YOU KNEW IN 2003 WHETHER THE

8    COMPANY LOST MONEY IN 2000 IN THE MAGNITUDE THAT'S

9    REFERENCED HERE.

10          THE WITNESS:  I DON'T RECALL.  I WOULD HAVE      02:38:13

11   TO LOOK AT THE TAX RETURNS AND SEE IF IN FACT IT

12

13   BY MR. ZELLER:

14      Q.  WELL, LET ME TRY IT THIS WAY, THEN.  YOU

15   WERE WITH THE COMPANY IN 2000?                          02:38:25

16      A.  YES.

17      Q.  DO YOU RECALL IT LOSING           DURING

18   2000?

19      A.  I DON'T THINK SO.

20      Q.  AS YOU SIT HERE TODAY DO YOU THINK THE          02:38:31

21   COMPANY LOST           IN 2000?

22          MS. GLASER:  I'M GOING TO OBJECT TO THE

23   QUESTION.  NO FOUNDATION.  I THINK THE RECORDS SPEAK

24   FOR THEMSELVES BUT --

25          THE WITNESS:  I GUESS YOU CAN LOOK UP THE       02:38:51

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

**REDACTED**

```
 1    FINANCIAL STATEMENTS AND TAX RETURNS, AND WHATEVER
 2    IT SAYS IT SAYS.  I -- THIS IS SEVEN YEARS AGO.
 3    BY MR. ZELLER:
 4        Q.   WELL, PART -- THAT'S PART OF WHAT TIME
 5    TRYING TO FIND OUT IS, IS AT ANY POINT DID YOU EVER    02:38:59
 6    SEE ANY RECORDS THAT WOULD INDICATE TO YOU WHETHER
 7    OR NOT THE STATEMENT THAT THE COMPANY LOST
 8              WAS TRUE OR UNTRUE?
 9        A.   I DON'T RECALL A         A LOSS.
10        Q.   DIRECTING YOUR ATTENTION TO PAGE 13 OF THIS  02:39:16
11    EXHIBIT, WHICH IS KS 05938 --
12        A.   YES.
13        Q.   -- YOU'LL SEE THAT THERE IS A PARAGRAPH
14    NEAR THE BOTTOM WHERE IT SAYS, "I DID NOT COME TO
15    AMERICA WITH NOTHING," AND CONTINUES ON.              02:39:47
16             DO YOU SEE THAT?
17        A.   YES.
18        Q.   AND WHAT I WOULD LIKE TO FOCUS ON IS THIS
19    PORTION WHERE IT SAYS, "NOT TO TAKE ANYTHING AWAY
20    FROM OUR PARENTS' FINANCIAL AND MORAL SUPPORT, SEE    02:39:56
21    ATTACHED CHECK EXAMPLES."
22             DO YOU SEE THAT?
23        A.   YES.
24        Q.   WHAT WAS THAT REFERRING TO?
25             MS. GLASER:  COULD YOU READ THE WHOLE        02:40:04
```

202 Exhibit 20
Page 290

REDACTED

```
 1    PART -- PORTION.

 2              THE WITNESS:  OKAY.

 3              WHAT WAS IT REFERRING TO?  IT WAS REFERRING

 4    TO THE CAPITAL THAT MY PARENTS PROVIDED FOR US TO DO

 5    THE BUSINESS.                                          02:40:21

 6    BY MR. ZELLER:

 7         Q.   AND THE CAPITAL THAT THEY PROVIDED WAS

 8    FOR -- FOR M.G.A.; IS THAT RIGHT?

 9         A.   YES.

10         Q.   AND IT SAYS, "SEE ATTACHED CHECK EXAMPLES."   02:40:28

11    AT ONE TIME DID YOU HAVE CHECKS FROM YOUR PARENTS

12    THAT SHOWED THAT CAPITAL THAT THEY HAD CONTRIBUTED

13    TO START UP M.G.A.?

14         A.   I HAVE CHECKS SHOWING THE MONEY THAT CAME

15    FROM IRAN.                                             02:40:51

16         Q.   AND THE -- THE MONEY THAT THAT WAS USED FOR

17    WAS TO -- WAS TO START UP M.G.A.?

18              MR. ALLEN:  OBJECTION.

19              MS. GLASER:  NO FOUNDATION, ASSUMES FACTS

20    NOT IN EVIDENCE.                                       02:41:04

21              THE WITNESS:  ISAAC HAS A DIFFERENT VERSION

22    OF IT.  HE BELIEVES HIS PERSONAL SAVINGS IN AMERICA

23    WAS THE -- THE -- WHAT DO YOU CALL IT?

24    BY MR. ZELLER:

25         Q.   SEED MONEY?                                  02:41:19
```

203 Exhibit 20
Page 291

1      A.   THE SEED MONEY, THAT THEN HELPED US BRING

2    MY PARENTS' MONEY OUT.   I DISAGREE WITH HIM.

3      Q.   MAYBE WE -- STEP BACK FOR A MOMENT.

4      A.   OKAY.

5      Q.   YOU WERE -- YOU WERE A FOUNDER OF M.G.A.?      02:41:33

6      A.   YES.

7      Q.   YOU FOUNDED IT WITH ISAAC?

8      A.   YES.

9      Q.   YOU WERE THERE WHEN YOU AND ISAAC FOUNDED

10   THE COMPANY?                                        02:41:40

11     A.   YES.

12     Q.   AND IT'S -- IT'S YOUR RECOLLECTION THAT THE

13   SEED MONEY, THE CAPITAL THAT WAS USED TO START UP

14   M.G.A. WAS MONEY THAT YOUR PARENTS PROVIDED; RIGHT?

15          MS. GLASER:   I OBJECT TO THE QUESTION;       02:41:50

16   ASSUMES FACTS NOT IN EVIDENCE, NO FOUNDATION, AND IT

17   ALSO IS CONTRARY TO HIS TESTIMONY.

18          THE WITNESS:   MY BELIEF IS THAT THE -- OUR

19   PARENTS' MONEY IS WHAT STARTED THIS.

20   BY MR. ZELLER:                                       02:42:07

21     Q.   AND WHEN YOU SAY YOUR -- IT'S YOUR BELIEF,

22   IT'S ALSO YOUR RECOLLECTION?

23     A.   YES.

24     Q.   DIRECTING YOUR ATTENTION TO PAGE 15 OF THIS

25   EXHIBIT, WHICH IS KS 05940 --                        02:42:27

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

```
 1      A.   YES.

 2      Q.   -- YOU WILL SEE THAT THERE ARE VARIOUS

 3   BULLET POINTS AT THE VERY TOP OF THIS PAGE.

 4      A.   YES.

 5      Q.   ABOUT HALFWAY DOWN IT SAYS (READING):        02:42:35

 6           RISKING MY LIFE TO SMUGGLE OUR

 7           PARENTS' MONEY OUT OF IRAN TO START

 8           THE BUSINESS WITH.

 9           DO YOU --

10      A.   YES.                                         02:42:44

11      Q.   -- SEE THAT?   THE BUSINESS THAT YOU'RE

12   REFERRING TO HERE WAS M.G.A.?

13      A.   YES.

14      Q.   AND THIS IS ANOTHER --

15           MS. GLASER:   WHEN YOU SAY "M.G.A.," I'M --   02:42:50

16   JUST FOR THE RECORD, ARE YOU TALKING ABOUT ITS

17   PREDECESSOR?

18           MR. ZELLER:   WELL, WE TALKED ABOUT WHAT

19   M.G.A. MEANS AT THE BEGINNING.

20           MS. GLASER:   I'M SORRY.                      02:42:58

21           MR. ZELLER:   I'M NOT SURE IF YOU WERE HERE

22   YET AT THAT POINT.

23           MS. GLASER:   NO PROBLEM.

24           MR. ZELLER:   IT INCLUDES -- IT INCLUDES

25   WHEN IT WAS CALLED A.B.C. --                          02:43:04
```

205 Exhibit 20
Page 293

1   STATE OF CALIFORNIA      )

2   COUNTY OF RIVERSIDE      )  SS.

3

4       I, PAULA A. PYBURN, CSR NO. 7304, R.P.R., C.L.R., IN

5   AND FOR THE STATE OF CALIFORNIA, DO HEREBY CERTIFY:

6       I AM THE DEPOSITION OFFICER THAT STENOGRAPHICALLY

7   RECORDED THE TESTIMONY IN THE FOREGOING DEPOSITION;

8       PRIOR TO BEING EXAMINED THE DEPONENT WAS FIRST DULY

9   SWORN BY ME;

10      THE FOREGOING TRANSCRIPT IS A TRUE RECORD OF THE

11  TESTIMONY GIVEN.

12      BEFORE COMPLETION OF THE DEPOSITION, REVIEW OF THE

13  TRANSCRIPT [X] WAS [ ] WAS NOT REQUESTED.  IF REQUESTED,

14  ANY CHANGES MADE BY THE DEPONENT (AND PROVIDED TO THE

15  REPORTER) DURING THE PERIOD ALLOWED ARE APPENDED HERETO.

16

17  DATED *February 8, 2008* .

18

19

20  PAULA A. PYBURN

21  C.S.R. NO. 7304, R.P.R.
    CERTIFIED LIVENOTE REPORTER

22

23

24

25

Exhibit 20
Page 294

**Exhibit 21**

CONFORMED COPY

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2     John B. Quinn (Bar No. 90378)
      (johnquinn@quinnemanuel.com)
3     Michael T. Zeller (Bar No. 196417)
      (michaelzeller@quinnemanuel.com)
      Jon D. Corey (Bar No. 185066)
4     (joncorey@quinnemanuel.com)
      Duane R. Lyons (Bar No. 125091)
5     (duanelyons@quinnemanuel.com)
      865 South Figueroa Street, 10th Floor
6   Los Angeles, California  90017-2543
    Telephone: (213) 443-3000
7   Facsimile: (213) 443-3100

8   Attorneys for Mattel, Inc.

FILED
2007 JUL 12  PM 3: 02

9                UNITED STATES DISTRICT COURT

10               CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 11   CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| 12               Plaintiff, | Consolidated With Case No. 04-9059 and Case No. 05-2727 |
| 13        v. | MATTEL, INC.'S SECOND AMENDED ANSWER IN CASE NO. 05-2727 AND COUNTERCLAIMS FOR: |
| 14   MATTEL, INC., a Delaware corporation, | 1.   COPYRIGHT INFRINGEMENT; |
| 15               Defendant. | 2.   VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT; |
| 16 | 3.   CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT; |
| 17 | |
| 18   MGA ENTERTAINMENT, INC. a California corporation, | 4.   MISAPPROPRIATION OF TRADE SECRETS; |
| 19 | 5.   BREACH OF CONTRACT; |
| 20               Plaintiff, | 6.   INTENTIONAL INTERFERENCE WITH CONTRACT; |
| 21        v. | 7.   BREACH OF FIDUCIARY DUTY; |
| 22   MATTEL, INC., a Delaware corporation, and DOES 1-10, | 8.   AIDING AND ABETTING BREACH OF FIDUCIARY DUTY; |
| 23               Defendants. | 9.   BREACH OF DUTY OF LOYALTY; |
| 24 | |
| 25 | |
| 26 | **PUBLIC REDACTED VERSION** |
| 27 | **Volume I** |
| 28 | |

Exhibit 21
Page 295
C7 .12 c

| | |
|---|---|
| 1 | MATTEL, INC., a Delaware corporation, |
| 2 | |
| 3 | Counter-claimant, |
| 4 | v. |
| 5 | MGA ENTERTAINMENT, INC., a California corporation; ISAAC LARIAN, an individual; CARTER |
| 6 | BRYANT, an individual; MGA ENTERTAINMENT (HK) LIMITED, |
| 7 | a Hong Kong Special Administrative Region business entity; MGAE DE |
| 8 | MÉXICO, S.R.L. DE C.V., a Mexico business entity; CARLOS |
| 9 | GUSTAVO MACHADO GOMEZ, an individual; and DOES 4 through 10, |
| 10 | |
| 11 | Counter-defendants. |
| 12 | AND CONSOLIDATED CASES |

10. AIDING AND ABETTING BREACH OF DUTY OF LOYALTY;
11. CONVERSION;
12. UNFAIR COMPETITION; AND
13. DECLARATORY RELIEF

DEMAND FOR JURY TRIAL

Exhibit 21
Page 296

-2-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

1

## SECOND AMENDED ANSWER

2        Pursuant to the Court's Orders of January 12, 2007 and June 27, 2007,

3   Defendant Mattel, Inc. ("Mattel") answers the Complaint of MGA Entertainment,

4   Inc. ("Complaint") as follows:

5                              Preliminary Statement

6        The Complaint in this case contravenes Rule 8(a) of the Federal Rules

7   of Civil Procedure in multiple respects. For example, in many places, the Complaint

8   improperly mixes factual averments with argumentative rhetoric. The Complaint

9   also includes a selective recitation of alleged historical facts and "rumor," much of

10  which is both irrelevant and inflammatory in tone and content. In addition, many of

11  the allegations of the Complaint are overly broad, vague or conclusory and include

12  terms which are undefined and which are susceptible to different meanings.

13  Accordingly, by way of a general response, all allegations are denied unless

14  specifically admitted, and any factual averment admitted is admitted only as to the

15  specific facts and not as to any conclusions, characterizations, implications or

16  speculations which are contained in the averment or in the Complaint as a whole.

17  These comments and objections are incorporated, to the extent appropriate, into

18  each numbered paragraph of this Second Amended Answer.

19        Mattel further submits that the use of the headings throughout the

20  Complaint is improper, and therefore no response to them is required. In the event

21  that a response is required, Mattel denies those allegations.

22        The Complaint also contains many purported photographs of various

23  items, and it uses one or more headings purporting to describe, either individually or

24  in groups, these various photographs. The images of these photographs contained in

25  the Complaint are all relatively small and some are of less than optimal quality,

26  making it difficult to evaluate the adequacy of the photographs or their fairness and

27  accuracy in depicting what they purport to represent. The Complaint also does not

28  describe the circumstances or time frame in which these photographs were taken Exhibit 21

2154363.2

-3-

1 | and in many cases does not identify, or does not sufficiently or properly identify, the
2 | item depicted in the photographs. All of these factors, as well as the use of these
3 | photographs and headings out of context, or with an insufficient context, impair the
4 | ability of Mattel to fully respond to these photographs and headings, or to any
5 | purported allegations involving, or relying upon, the use of such photographs and
6 | accompanying headings. By way of a general response, Mattel therefore does not
7 | admit the authenticity of any photograph, or the accuracy or adequacy of any
8 | heading, nor does it admit any allegation or inference that is based on, or purports to
9 | be based on, any photograph or accompanying heading in the Complaint. Mattel
10 | reserves the right to challenge the authenticity of any photograph and the accuracy
11 | or adequacy of any heading (either as included in the Complaint or in the context of
12 | additional material not included). Further, with reference to all photographs and
13 | accompanying headings, or any averments based on the Complaint's use of such
14 | photographs and headings, which might be offered into evidence, Mattel specifically
15 | reserves its right to object to any use of such photographs, headings, and averments,
16 | or the Complaint as a whole or in part, in evidence for any purpose whatsoever.

17 |        To the extent that Mattel has endeavored to answer any particular
18 | allegation containing any such photographs and headings, any admission concerning
19 | the item purported to be depicted in such photograph, or described in such headings,
20 | shall not constitute an admission that the photograph is authentic, adequate, or
21 | admissible, nor that any heading is accurate, adequate, or admissible. All such items
22 | purportedly depicted in such photographs, and described in such headings, "speak
23 | for themselves". Accordingly, to the extent that any such referenced materials are
24 | deemed allegations against Mattel, they are denied.

25 | Responses

26 |      1.    Answering paragraph 1 of the Complaint, Mattel admits that
27 | plaintiff MGA Entertainment, Inc. ("plaintiff" or "MGA") is a California
28 | corporation with a principal place of business in Van Nuys, California.

Exhibit 21
Page 298

2154363.2

-4-

1    2.    Answering paragraph 2 of the Complaint, Mattel admits that
2  Mattel is a Delaware corporation with a principal place of business in El Segundo,
3  California.

4    3.    Answering paragraph 3 of the Complaint, Mattel denies that
5  there has been wrongful conduct on its part and states that it is without knowledge
6  or information sufficient to form a belief as to the truth or falsity of the remaining
7  allegations set forth therein and, on that basis, denies them.

8    4.    Answering paragraph 4 of the Complaint, Mattel admits that
9  plaintiff purports to assert claims under the Lanham Act, 15 U.S.C. §§ 1125(a) and
10  (c), California Business and Professions Code §§ 17200 et seq., California Business
11  and Professions Code § 14330 and California common law, denies that plaintiff is
12  entitled to any relief thereunder and denies the truth of the remaining allegations set
13  forth in paragraph 4.

14    5.    Answering paragraph 5 of the Complaint, Mattel admits that it is
15  subject to personal jurisdiction in this District and denies the truth of the remaining
16  allegations set forth in paragraph 5.

17    6.    Answering paragraph 6 of the Complaint, Mattel admits that
18  venue is proper in this District and denies the truth of the remaining allegations set
19  forth in paragraph 6.

20    7.    Answering paragraph 7 of the Complaint, Mattel admits that
21  MGA has filed the instant lawsuit and denies the truth of the remaining allegations
22  set forth in paragraph 7.

23    8.    Answering paragraph 8 of the Complaint, Mattel states that it is
24  without knowledge or information sufficient to form a belief as to the truth or falsity
25  of the allegations regarding MGA's history set forth therein and, on that basis,
26  denies them, states that MGA has made conflicting representations, including in
27  sworn statements, that are at odds with the allegations of the Complaint and denies
28  the truth of the remaining allegations set forth in paragraph 8.

Exhibit 21
Page 299

2154363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1    9.    Answering paragraph 9 of the Complaint, Mattel admits that
2  MGA filed this action, states that Mattel's web site and corporate governance
3  policies speak for themselves and denies the truth of the remaining allegations set
4  forth in paragraph 9.

5    10.    Answering paragraph 10 of the Complaint, Mattel admits that it
6  is the world's most successful toy company, states that the first doll in its BARBIE
7  line was publicly introduced in 1959 and that BARBIE-branded dolls have been the
8  world's best-selling toys, states that Mattel's sales and stock price speak for
9  themselves, and denies the truth of the remaining allegations set forth in paragraph
10  10.

11    11.    Answering paragraph 11 of the Complaint, Mattel admits that
12  Adrienne Fontanella is the former president for girls' toys at Mattel, states that it is
13  without knowledge or information sufficient to form a belief as to the truth or falsity
14  of the allegations regarding an alleged statement by Ms. Fontanella, and denies the
15  truth of the remaining allegations set forth in paragraph 11.

16    12.    Answering paragraph 12 of the Complaint, Mattel is without
17  knowledge or information sufficient to form a belief as to the truth or falsity of the
18  allegations regarding alleged statements by unidentified "analysts," states that
19  Mattel's sales and stock price speak for themselves, and denies the truth of the
20  remaining allegations set forth in paragraph 12.

21    13.    Answering paragraph 13 of the Complaint, Mattel admits that Jill
22  Barad became President and Chief Executive Officer of Mattel in January 1997, that
23  Mattel acquired Tyco Industries, Inc. ("Tyco") in March 1997, that Mattel acquired
24  Pleasant Company in 1998, Mattel acquired the Learning Company in May 1999,
25  that Mattel acquired Purple Moon in 1999, that the MATCHBOX brand was owned
26  by Tyco, that the AMERICAN GIRL line of dolls was made by Pleasant Company
27  at the time of that entity's acquisition, and denies the truth of the remaining
28  allegations set forth in paragraph 13.

Exhibit 21
Page 300

14. Answering paragraph 14 of the Complaint, Mattel states that its public announcements speak for themselves, and denies the truth of the remaining allegations set forth therein.

15. Answering paragraph 15 of the Complaint, Mattel states that its stock price and its public announcements speak for themselves, and denies the truth of the remaining allegations set forth therein.

16. Answering paragraph 16 of the Complaint, Mattel states that its stock price speaks for itself, states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding the alleged views of unnamed "analysts" and "[i]nvestors," and denies the truth of the remaining allegations set forth therein.

17. Answering paragraph 17 of the Complaint, Mattel admits that Ms. Barad resigned in February 2000.

18. Answering paragraph 18 of the Complaint, Mattel admits that Robert Eckert became Chairman and Chief Executive Officer of Mattel in May 2000 and that Mr. Eckert previously was employed at Kraft Foods, Inc. for 23 years, is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding the views of unnamed "[i]nvestors" and others, and denies the truth of the remaining allegations set forth in paragraph 18.

19. Answering paragraph 19 of the Complaint, Mattel admits that the *Wall Street Journal* published an article on August 10, 2000 the content of which speaks for itself, and denies the truth of the remaining allegations set forth therein.

20. Answering paragraph 20 of the Complaint, Mattel admits that it disposed of the Learning Company in October 2000, states that its sales and revenues speak for themselves, states that the remainder of the allegations contained therein are characterizations, not factual assertions, and therefore no response is necessary under Fed. R. Civ. P. 8(b) and, to the extent any further response is required, denies the truth of any remaining allegations set forth in paragraph 20.

1         21.    Answering paragraph 21 of the Complaint, Mattel admits that

2  products in plaintiff's "Bratz" line compete with products in Mattel's BARBIE and

3  other product lines and states that the remainder of the allegation contained

4  therein—consisting of a sentence fragment—is unintelligible and on that basis

5  denies the truth of any such remaining allegation set forth therein.

6         22.    Answering paragraph 22 of the Complaint, Mattel admits that

7  products in plaintiff's "Bratz" line compete with Mattel products, states that the

8  remainder of the allegations contained therein are characterizations, not factual

9  assertions, and that therefore no response is necessary under Fed. R. Civ. P. 8(b)

10  and, to the extent any further response is required, denies the truth of any remaining

11  allegations set forth therein.

12         23.    Answering paragraph 23 of the Complaint, Mattel states that

13  MGA has made conflicting statements, including in sworn statements, that are

14  inconsistent with the allegations set forth in paragraph 23 of the Complaint and

15  states that it is therefore without knowledge or information sufficient to form a

16  belief as to the truth or falsity of the allegations set forth therein and, on that basis,

17  denies them.

18         24.    Answering paragraph 24 of the Complaint, Mattel states that the

19  "look" of the referenced dolls speak for themselves and denies the truth of the

20  remaining allegations set forth therein.  By way of further answer, Mattel states that

21  the photographs and their accompanying caption on page 7 of the Complaint are

22  false and misleading to the extent they are intended to suggest that MGA has

23  produced or used a consistent packaging shape or look or that it has protectible

24  rights in the matters depicted in the photographs.

25         25.    Answering paragraph 25 of the Complaint, Mattel admits that

26  Bratz dolls are between approximately 9.5 to 10 inches in height, states that the

27  appearances of the dolls speak for themselves, denies that "Bratz" dolls are or "were

28  intentionally shorter" than dolls in Mattel's BARBIE line, denies that the "Bratz"

Exhibit 21
Page 302

1 | dolls "looked like no other" and denies the truth of the remaining allegations set

2 | forth in paragraph 25.

3 |       26. Answering paragraph 26 of the Complaint, Mattel states that the

4 | use of the term "classic" is unintelligible, since Mattel has designed and sold

5 | different dolls using different heads and with different fashions and themes over the

6 | years, and denies the truth of any remaining allegations. By way of further answer,

7 | Mattel states that the image encaptioned "Mattel's 'Barbie'" on page 8 of the

8 | Complaint is misleading in that it depicts one of the doll heads that have been used

9 | as part of the BARBIE line for many years, and therefore ignores that Mattel has

10 | long designed and sold an array of different BARBIE line dolls that use different

11 | doll heads, including doll heads which depict different ethnicities, and that are

12 | dressed in different clothing and fashion styles.

13 |       27. Answering paragraph 27 of the Complaint, Mattel admits that

14 | MGA has used the line "The Girls With a Passion for Fashion" in some contexts,

15 | denies that MGA originated or otherwise has rights to that phrase, admits that one

16 | audience for products in the "Bratz" line has been "tweens" and denies the truth of

17 | the remaining allegations set forth in paragraph 27.

18 |       28. Answering paragraph 28 of the Complaint, Mattel admits that

19 | certain "Bratz" dolls have won certain awards, the terms of which speak for

20 | themselves, states that it is without knowledge or information sufficient to form a

21 | belief as to the truth or falsity of the allegations regarding the "awards" MGA claims

22 | and, on that basis, denies them, denies that plaintiff has protectible rights and denies

23 | the truth of any remaining allegations set forth in paragraph 28.

24 |       29. Answering paragraph 29 of the Complaint, Mattel admits that

25 | dolls in the "Bratz" line compete with dolls in Mattel product lines, denies that

26 | Mattel has or has ever had a "stranglehold" on any market, states that the market

27 | allegations contained in paragraph 29 are vague and ambiguous, including without

28 | limitation in that the allegations fail to specify what products among the parties

Exhibit 21
Page 303

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1   respective lines are being referred to and what time period is being referred to, and

2   denies the truth of any remaining allegations set forth in paragraph 29.

3         30.   Answering paragraph 30 of the Complaint, Mattel admits that

4   MGA has been a licensee of Mattel, states that the market allegations are vague and

5   ambiguous, including without limitation in that the allegations fail to specify what

6   products are being referred to and what time periods or points in time are being

7   referred to, and states that the remainder of the allegations contained therein are

8   characterizations, not factual assertions, and therefore no response is necessary

9   under Fed. R. Civ. P. 8(b) and, to the extent any further response is required, denies

10   the truth of any remaining allegations set forth in paragraph 30.

11         31.   Answering paragraph 31 of the Complaint, Mattel states that the

12   allegations contained therein are characterizations, not factual assertions, and

13   therefore no response is necessary under Fed. R. Civ. P. 8(b) and, to the extent any

14   further response is required, denies the truth of the allegations set forth in paragraph

15   31.

16         32.   Answering paragraph 32 of the Complaint, Mattel denies the

17   truth of the allegations set forth therein.

18         33.   Answering paragraph 33 of the Complaint, Mattel denies the

19   truth of the allegations set forth therein.

20         34.   Answering paragraph 34 of the Complaint, Mattel states that it

21   has released various MY SCENE dolls, including MY SCENE dolls named

22   "Madison", "Chelsea" and "Barbie," states that the appearance of the Bratz and MY

23   SCENE dolls speak for themselves, denies that Mattel designed its MY SCENE

24   dolls to "evoke" or resemble the alleged "look" of "Bratz" dolls, denies that plaintiff

25   has protectible rights, states that MGA has made conflicting representations that are

26   at odds with the allegations of the Complaint and that it is therefore without

27   knowledge or information sufficient to form a belief as to the truth or falsity of the

28   allegations regarding the "launch" of Bratz dolls set forth therein and, on that basis

2154363.2

-10-

Exhibit 21
Page 304

1  denies them, and denies the truth of the remaining allegations set forth therein.  By

2  way of further answer, Mattel states that the photographs and their accompanying

3  captions on page 10 of the Complaint are misleading and false to the extent they are

4  intended to suggest that a particular Mattel doll has been changed over time as

5  purportedly depicted.  Among other things, Mattel has long designed and sold an

6  array of different BARBIE line dolls using different doll heads, and the photographs

7  encaptioned "Mattel's Traditional 'Barbie'" is one of the doll heads that has been

8  used, and continues to be used, as part of the BARBIE line.  In addition, the

9  photographs encaptioned MY SCENE doll "circa 2002" is, in fact, a Mattel doll

10 character called BARBIE that continues to be sold and/or marketed with that head,

11 and the photographs encaptioned MY SCENE doll "circa 2004" depict a MY

12 SCENE doll character separate and apart from the one depicted in the "circa 2002"

13 image (and is not a revised character as plaintiff apparently attempts to imply).

14        35.    Answering paragraph 35 of the Complaint, Mattel admits that

15 Mattel released a product line called FLAVAS, states that the appearance of the

16 FLAVAS dolls speaks for themselves, states that it is without knowledge or

17 information sufficient to form a belief as to the truth or falsity of the allegations

18 regarding the "rumor" relied upon by plaintiff and the undefined "media"

19 purportedly quoting Isaac Larian and, on that basis, denies them, denies that Mattel

20 has abandoned the FLAVAS line, and denies the truth of the remaining allegations

21 set forth in paragraph 35.

22        36.    Answering paragraph 36 of the Complaint, Mattel denies the

23 truth of the allegations set forth therein.

24        37.    Answering paragraph 37 of the Complaint, Mattel denies the

25 truth of the allegations set forth therein.  By way of further answer, Mattel states that

26 the unnumbered photographs and their accompanying captions on pages 11 through

27 16 of the Complaint -- which apparently were included to purportedly support the

28 allegation that MY SCENE dolls "became 'Bratz,'" which allegation Mattel

1  specifically denies -- are false and misleading.  Among other things, the heads
2  depicted are among an array of different doll heads that Mattel has used, and
3  continues to use, over the course of many years.  Moreover, the images purport to
4  compare different Mattel doll lines to show alleged changes in appearance even
5  though, in fact, each of the heads are currently sold and/or marketed to the public.
6  The "Blonde" series of photographs encaptioned "original" and "recent" MY
7  SCENE is further and specifically misleading in that it purports to compare two
8  differently named and outfitted dolls in the MY SCENE doll line, both of which
9  continue to be sold and/or marketed.

10       38.     Answering paragraph 38 of the Complaint, Mattel states that the
11 phrase "the 'BRATZ' eye" is unintelligible, denies that MGA has rights therein,
12 denies that MGA was the originator of or the first to use the eye shape or makeup
13 depicted as purportedly constituting "the 'BRATZ' eye," denies that Mattel has
14 copied the "the 'BRATZ' eye" and denies the truth of the remaining allegations
15 contained in paragraph 38.  By way of further answer, Mattel states that the
16 unnumbered photographs and accompanying caption on page 13 of the Complaint
17 are false and misleading.  Among other things, the purported "Original Mattel 'My
18 Scene' Eye" is one of the eye and makeup designs that Mattel has used over the
19 course of many years, and Mattel continues to sell and/or market dolls using the eye
20 and makeup design depicted therein.

21       39.     Answering paragraph 39 of the Complaint, Mattel states that the
22 phrase "the 'BRATZ' eye" is unintelligible, denies that MGA has rights therein,
23 denies that MGA was the originator of or the first to use the eye shape or makeup
24 purportedly described as constituting "the 'BRATZ' eye," denies that Mattel has
25 copied "the 'BRATZ' eye," states that the relevant dolls speak for themselves and
26 denies the truth of the remaining allegations contained in paragraph 39.  By way of
27 further answer, Mattel states that the unnumbered photographs and accompanying
28 captions on page 14 of the Complaint are false and misleading.  Among other things

1 the purported "New Mattel 'My Scene' Eye" is one of the eye and makeup designs
2 that Mattel has used over the course of many years, and Mattel continues to sell
3 and/or market dolls using the eye and makeup design depicted on page 14 of the
4 Complaint.

5       40.    Answering paragraph 40 of the Complaint, Mattel denies the
6 truth of the allegations therein. By way of further answer, Mattel states that the
7 unnumbered photographs and their accompanying captions on pages 15 to 16 are
8 false and misleading. Among other things, the heads depicted are among an array of
9 different doll heads that Mattel has used, and continues to use, over the course of
10 many years. Moreover, the photographs purport to compare different Mattel doll
11 lines to show alleged changes in appearance even though, in fact, each of the heads
12 are currently sold and/or marketed to the public. The "Blonde" series of
13 photographs encaptioned "original" and "recent" MY SCENE is further and
14 specifically misleading in that it purports to compare two differently named and
15 outfitted dolls in the MY SCENE doll line, both of which continue to be sold and/or
16 marketed.

17       41.    Answering paragraph 41 of the Complaint, Mattel denies the
18 truth of the allegations set forth therein.

19       42.    Answering paragraph 42 of the Complaint, Mattel admits that the
20 photographs purport to depict two packages that were, among others, part of the MY
21 SCENE line, state that the packages speak for themselves and denies the truth of any
22 remaining allegations set forth therein.

23       43.    Answering paragraph 43 of the Complaint, Mattel admits that the
24 photograph purports to depict one of the packages that were, among others, part of
25 the MY SCENE line, states that the parties' packages speak for themselves, states
26 that MGA has failed to establish that it originated, or has protectible rights in, an
27 "open and transparent style" for packaging and denies the truth of the remaining
28 allegations set forth therein.

Exhibit 21
Page 307

3154363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1    44.    Answering paragraph 44 of the Complaint, Mattel admits that
2  one photograph purports to depict one of the packages that were, among others, part
3  of the MY SCENE line, admits that the other photograph purports to depict one of
4  the packages that were, among others, used as part of the Bratz line, states that the
5  parties' packages speak for themselves, denies that MGA originated, or has
6  protectible rights in, "the 'BRATZ' packaging" or in the packaging depicted in the
7  Complaint and denies the truth of any remaining allegations set forth therein.

8    45.    Answering paragraph 45 of the Complaint, Mattel admits that
9  one photograph purports to depict one of the packages that were, among others, part
10  of the MY SCENE line, admits that the other photograph purports to depict one of
11  the packages that were, among others, used as part of the Bratz line, states that the
12  parties' packages speak for themselves, denies that MGA originated, or has
13  protectible rights in, the packaging depicted in the Complaint and denies the truth of
14  any remaining allegations set forth therein.

15    46.    Answering paragraph 46 of the Complaint, Mattel states that it
16  has utilized a wide variety of packaging styles and shapes over the years, states that
17  the relevant packaging speaks for itself, states that MGA lacks protectible rights in
18  "non-rectangular shaped box" packaging or in the other elements MGA claims in
19  paragraph 46, and denies the truth of the remaining allegations set forth therein.

20    47.    Answering paragraph 47 of the Complaint, Mattel denies that
21  any alleged "theme" is "MGA's theme," denies that MGA originated or has rights to
22  any theme and denies the truth of the remaining allegations set forth therein.

23    48.    Answering paragraph 48 of the Complaint, Mattel admits that it
24  released a doll called "Chillin Out!", states that it has released such themed dolls
25  over the course of many years, admits MGA released a "Wintertime Wonderland"
26  themed doll, denies that MGA originated or has rights to such theme, states that the
27  relevant products speak for themselves and denies the truth of the remaining
28  allegations set forth therein.

Exhibit 21
Page 308

2154363.2

-14-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1        49.    Answering paragraph 49 of the Complaint, Mattel admits that it

2  released a doll called "Night on the Town", states that it has released such themed

3  dolls over the course of many years, admits MGA released a "Formal Funk" themed

4  doll, denies that MGA originated or has rights to such theme, states that the relevant

5  products speak for themselves and denies the truth of the remaining allegations set

6  forth therein.

7        50.    Answering paragraph 50 of the Complaint, Mattel admits that it

8  released a doll called "Jammin' in Jamaica" and a playset called "Guava Gulch Tiki

9  Lounge", states that it has released such themed dolls and products over the course

10  of many years, admits that MGA released a "Sun-Kissed Summer" themed doll and

11  playset, denies that MGA originated or has rights to such theme, states that the

12  relevant products speak for themselves and denies the truth of the remaining

13  allegations set forth therein.

14        51.    Answering paragraph 51 of the Complaint, Mattel admits that it

15  has aired television commercials for its MY SCENE line, states that such

16  commercials speak for themselves, denies the truth of the remaining allegations set

17  forth therein and specifically denies that MGA was the originator of or has rights to

18  commercials "combining live action with animated sequences" set to "pop music

19  and lyrics".

20        52.    Answering paragraph 52 of the Complaint, Mattel denies the

21  truth of the allegations set forth therein.

22        53.    Answering paragraph 53 of the Complaint, Mattel admits that it

23  released a MY SCENE "Sound Lounge", admits that MGA released a product called

24  "Runway Disco", states that the relevant products speak for themselves, denies that

25  it "imitated MGA's trapezoidal box," denies that MGA has rights thereto, and

26  denies the truth of the remaining allegations set forth therein.

27        54.    Answering paragraph 54 of the Complaint, Mattel denies the

28  truth of the allegations set forth therein.

Exhibit 21
Page 309

1    55.    Answering paragraph 55 of the Complaint, Mattel admits that,
2  among the styling heads it has produced and sold over the course of many years, it
3  released a MY SCENE styling head, admits that MGA released a styling head called
4  "Funky Fashion Makeover Head", states that the relevant products speak for
5  themselves, denies that MGA has protectible rights and denies the truth of the
6  remaining allegations set forth in paragraph 55.

7    56.    Answering paragraph 56 of the Complaint, Mattel is without
8  knowledge or information sufficient to form a belief as to the truth or falsity of the
9  allegations set forth therein because plaintiff fails to identify the alleged instances of
10 confusion, including the source of the unidentified picture titled "Hairstyle practice",
11 and on that basis, denies them, and denies the truth of any remaining allegations set
12 forth in paragraph 56.

13    57.    Answering paragraph 57 of the Complaint, Mattel admits that it
14 has aired television commercials for its MY SCENE line, states that such
15 commercials speak for themselves and denies the truth of the remaining allegations
16 set forth therein.

17    58.    Answering paragraph 58 of the Complaint, Mattel admits that
18 MGA has used the line "The Girls With a Passion for Fashion" in some contexts,
19 denies that MGA originated that phrase or otherwise has rights to it, states that
20 Mattel's web site speaks for itself and denies the truth of the remaining allegations
21 set forth therein.

22    59.    Answering paragraph 59 of the Complaint, Mattel admits that,
23 among the plush products that it has produced and sold over the course of many
24 years, it has released plush dogs as part of its MY SCENE "Miami Getaway"
25 themed product line, states that Mattel has for many years sold plush pets of the type
26 used with its MY SCENE dog, admits that MGA has released various Bratz pets,
27 states that MGA was not the originator of and has no rights to the features and other

28

1 │ elements described therein, states that the relevant products speak for themselves

2 │ and denies the truth of the remaining allegations set forth therein.

3 │       60.    Answering paragraph 60 of the Complaint, Mattel admits that,

4 │ among the plush toys that it has released over the course of many years, its MY

5 │ SCENE dog has been sold in packaging depicted (in part) on page 22 of the

6 │ Complaint, states that Mattel has for many years sold plush pets and other plush

7 │ products in packaging of the type used with its MY SCENE dog, admits that MGA

8 │ has released a "Bratz" dog, states that MGA was not the originator of and has no

9 │ rights to the packaging described therein, states that the relevant packages speak for

10 │ themselves and denies the truth of the remaining allegations set forth therein.

11 │       61.    Answering paragraph 61 of the Complaint, Mattel denies that it

12 │ has intended to cause any consumer confusion and states that it is without

13 │ knowledge or information sufficient to form a belief as to the truth or falsity of the

14 │ allegations set forth therein concerning unnamed retailers, customers and others

15 │ because plaintiff fails to identify any source for the matters alleged and, on that

16 │ basis, denies them and denies the truth of any remaining allegations set forth therein.

17 │       62.    Answering paragraph 62 of the Complaint, Mattel denies that it

18 │ has intended to cause any confusion and states that it is without knowledge or

19 │ information sufficient to form a belief as to the truth or falsity of the allegations set

20 │ forth therein concerning alleged comments and conversations because plaintiff fails

21 │ to identify any source for the alleged comments and conversations and, on that

22 │ basis, denies them, and denies the truth of any remaining allegations set forth

23 │ therein.

24 │       63.    Answering paragraph 63 of the Complaint, Mattel denies that it

25 │ has intended to cause any confusion and states that it is without knowledge or

26 │ information sufficient to form a belief as to the truth or falsity of the allegations set

27 │ forth therein because plaintiff fails to identify any source for the alleged comments

28 │

Exhibit 21
Page 311

2154363.2

-17-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1  and conversations and, on that basis, denies them, and denies the truth of any

2  remaining allegations set forth therein.

3       64.    Answering paragraph 64 of the Complaint, Mattel denies that it

4  has intended to cause any confusion and states that it is without knowledge or

5  information sufficient to form a belief as to the truth or falsity of the allegations set

6  forth therein because plaintiff fails to identify any source for the alleged comments

7  and conversations and, on that basis, denies them, and denies the truth of any

8  remaining allegations set forth therein.

9       65.    Answering paragraph 65 of the Complaint, Mattel denies the

10 truth of the allegations set forth therein.

11      66.    Answering paragraph 66 of the Complaint, Mattel admits that it

12 sued a competitor in the German courts for unfair competition for copying various

13 Mattel BARBIE line products, states that such claims exclusively arose under and

14 were the subject of German law, states that since that time the Federal Supreme

15 Court has rejected the contention made by MGA in paragraph 66 that

16 "systematically copying and borrowing elements" from competing dolls supports a

17 claim for unfair competition, and denies the truth of the remaining allegations set

18 forth therein.

19      67.    Answering paragraph 67 of the Complaint, Mattel denies the

20 truth of the allegations set forth therein.

21      68.    Answering paragraph 68 of the Complaint, Mattel admits that it

22 has released dolls called "Wee 3 Friends," admits that MGA has released dolls

23 called "4-Ever Best Friends," states that the relevant products speak for themselves,

24 denies that MGA's packaging is distinctive, denies that MGA has protectible rights

25 thereto and denies the truth of the remaining allegations set forth in paragraph 68.

26      69.    Answering paragraph 69 of the Complaint, Mattel admits that its

27 Fisher Price division has released, among other dolls called "Little Mommy," the

28 "Little Mommy Potty Training Baby Doll," admits that MGA has released a

Exhibit 21
Page 312

-18-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1  "Mommy's Little Patient" doll and denies the truth of the remaining allegations set
2  forth therein.

3      70.   Answering paragraph 70 of the Complaint, Mattel admits that it
4  has released die-cast cars and other products called "Acceleracers" as part of its
5  HOT WHEELS line, admits that MGA has released products called "AlienRacers,"
6  denies that MGA was the originator of or has rights to the elements and matters
7  described in paragraph 70, states that the relevant products speak for themselves and
8  denies the truth of the remaining allegations set forth therein.

9      71.   Answering paragraph 71 of the Complaint, Mattel admits that it
10  has aired commercials relating to "Acceleracers," states that such commercials
11  speak for themselves, denies the truth of the remaining allegations set forth therein
12  and specifically denies that MGA originated or has rights to commercials and other
13  matters described therein.

14      72.   Answering paragraph 72 of the Complaint, Mattel states that its
15  web site speaks for itself, denies the truth of the remaining allegations contained in
16  paragraph 72 and specifically denies that Mattel intended to create confusion in the
17  marketplace.

18      73.   Answering paragraph 73 of the Complaint, Mattel denies the
19  truth of the allegations set forth therein.

20      74.   Answering paragraph 74 of the Complaint, Mattel denies the
21  truth of the allegations set forth therein.

22      75.   Answering paragraph 75 of the Complaint, Mattel admits that it
23  has reminded certain former employees who became employed by MGA by letter of
24  their contractual and fiduciary obligation to maintain the secrecy of all Mattel
25  confidential and proprietary business information, states that such letters were
26  prepared and sent to their recipients in good faith contemplation of litigation, admits
27  that it filed a complaint for declaratory relief against Ronald Brawer in Los Angeles
28  Superior Court, entitled <u>Mattel, Inc. v. Brawer</u>, Case No. BC323381, on October 2

Exhibit 21
Page 313

1 | 2004, states that pursuant to the Court's Order of August 25, 2005 it need not
2 | respond to the allegations in paragraph 75 relating to that action, and denies the truth
3 | of the remaining allegations set forth in paragraph 75.

4 |         76.   Answering paragraph 76 of the Complaint, Mattel states that
5 | MGA cannot establish subject matter jurisdiction regarding extra-territorial acts,
6 | including such acts that are lawful in foreign nations, and denies the truth of
7 | allegations set forth therein.

8 |         77.   Answering paragraph 77 of the Complaint, Mattel states that
9 | MGA cannot establish subject matter jurisdiction regarding extra-territorial acts,
10 | including such acts that are lawful in foreign nations, and denies the truth of the
11 | allegations set forth therein.

12 |         78.   Answering paragraph 78 of the Complaint, Mattel states that it is
13 | without knowledge or information sufficient to form a belief as to the truth or falsity
14 | of the allegations regarding MGA's claimed "shortage of doll hair" and, on that
15 | basis, denies them and denies the truth of the remaining allegations set forth therein.

16 |         79.   Answering paragraph 79 of the Complaint, Mattel states that
17 | MGA cannot establish subject matter jurisdiction regarding extra-territorial acts,
18 | including such acts that are lawful in foreign nations, and denies the truth of
19 | allegations set forth therein.

20 |         80.   Answering paragraph 80 of the Complaint, Mattel denies the
21 | truth of the allegations set forth therein.

22 |         81.   Answering paragraph 81 of the Complaint, Mattel admits that
23 | NPD Funworld ("NPD") supplies sales statistics in *inter alia* the toy, PC games and
24 | video games industries, admits that to Mattel's knowledge NPD restricts the use of
25 | its subscriber information, states that MGA was sued by NPD and states that it is
26 | without knowledge or information sufficient to form a belief as to the truth or falsity
27 | of the allegations regarding the need of unspecified "toy companies" for NPD
28 |

Exhibit 21
Page 314

2154363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1 | statistics and, on that basis, denies them and denies the truth of any remaining
2 | allegations set forth therein.

3 |     82.    Answering paragraph 82 of the Complaint, Mattel denies the
4 | truth of the allegations set forth therein.

5 |     83.    Answering paragraph 83 of the Complaint, Mattel states that it is
6 | without knowledge or information sufficient to form a belief as to the truth or falsity
7 | of the allegations set forth therein because MGA fails to quantify its annual
8 | subscription fees and, on that basis, denies them.

9 |     84.    Answering paragraph 84 of the Complaint, Mattel states that it is
10 | without knowledge or information sufficient to form a belief as to the truth or falsity
11 | of the allegations set forth therein and, on that basis, denies them.

12 |     85.    Answering paragraph 85 of the Complaint, Mattel states that
13 | MGA was sued by NPD, states that it is without knowledge or information sufficient
14 | to form a belief as to such nature and grounds for such litigation (to which Mattel
15 | was not a party) and, on that basis, denies the allegations relating thereto, and denies
16 | the truth of the remaining allegations set forth therein.

17 |     86.    Answering paragraph 86 of the Complaint, Mattel denies the
18 | truth of the allegations set forth therein.

19 |     87.    Answering paragraph 87 of the Complaint, Mattel admits that the
20 | Children's Advertising Review Unit ("CARU") is the children's arm of the
21 | advertising industry's self-regulation program, states that compliance with CARU's
22 | Privacy Program can provide FTC-approved Safe Harbor under the Children's
23 | Online Privacy Protection Act ("COPPA"), and denies the truth of the remaining
24 | allegations set forth therein.

25 |     88.    Answering paragraph 88 of the Complaint, Mattel admits that it
26 | is one of dozens of CARU Supporters and denies the truth of the remaining
27 | allegations set forth therein.

28 |

Exhibit 21
Page 315

2154363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1   89.   Answering paragraph 89 of the Complaint, Mattel denies the
2   truth of the allegations set forth therein.

3   90.   Answering paragraph 90 of the Complaint, Mattel states that it is
4   without knowledge or information sufficient to form a belief as to the truth or falsity
5   of the allegations as to the consequences to MGA of MGA's violations of CARU
6   standards and, on that basis, denies them.

7   91.   Answering paragraph 91 of the Complaint, Mattel states that it is
8   without knowledge or information sufficient to form a belief as to the truth or falsity
9   of the allegations as to the consequences to MGA of MGA violation of CARU
10  standards and, on that basis, denies them.

11  92.   Answering paragraph 92 of the Complaint, Mattel admits that the
12  Toy Industry Association, Inc. ("TIA") is a toy industry trade association, admits
13  that at certain times TIA has given awards called the People's Choice Toy of The
14  Year or the Toy of The Year Award, denies that Mattel wrongfully influenced TIA
15  and states that it is without knowledge or information sufficient to form a belief as
16  to the truth or falsity of the remaining allegations set forth therein and, on that basis,
17  denies them.

18  93.   Answering paragraph 93 of the Complaint, Mattel states that the
19  allegations set forth therein are vague and ambiguous, including in that they fail to
20  properly identify the years in which the referenced awards were given and/or the
21  particular product which won such awards, and accordingly lacks knowledge or
22  information sufficient to form a belief as to the truth or falsity of the allegations set
23  forth therein and, on that basis, denies them.

24  94.   Answering paragraph 94 of the Complaint, Mattel admits that
25  Neil Freidman was the chairman of TIA from approximately May 2002 to May
26  2004, states that Fischer Price is a division of Mattel and denies the truth of the
27  remaining allegations set forth therein.

28

Exhibit 21
Page 316
-22-

2154363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1      95.    Answering paragraph 95 of the Complaint, Mattel admits that

2 Hokey Pokey Elmo won the Toy of the Year Award and denies the truth of the

3 remaining allegations set forth therein.

4      96.    Answering paragraph 96 of the Complaint, Mattel states that it is

5 without knowledge or information sufficient to form a belief as to the truth or falsity

6 of the allegations set forth therein and, on that basis, denies them.

7      97.    Answering paragraph 97 of the Complaint, Mattel denies the

8 truth of the allegations set forth therein.

9      98.    Answering paragraph 98 of the Complaint, Mattel denies the

10 truth of the allegations set forth therein.

11      99.    Answering paragraph 99 of the Complaint, Mattel denies the

12 truth of the allegations set forth therein.

13      100.   Answering paragraph 100 of the Complaint, Mattel denies the

14 truth of the allegations set forth therein.

15      101.   Answering paragraph 101 of the Complaint, Mattel repeats its

16 responses contained in paragraphs 1 through 100 of this Second Amended Answer

17 and incorporates them by reference as though fully and completely set forth herein.

18      102.   Answering paragraph 102 of the Complaint, Mattel denies the

19 truth of the allegations set forth therein and specifically denies that MGA's alleged

20 trade dress is distinctive.

21      103.   Answering paragraph 103 of the Complaint, Mattel denies the

22 truth of the allegations set forth therein and specifically denies that MGA's alleged

23 trade dress is distinctive.

24      104.   Answering paragraph 104 of the Complaint, Mattel denies the

25 truth of the allegations set forth therein.

26      105.   Answering paragraph 105 of the Complaint, Mattel denies the

27 truth of the allegations set forth therein.

28

Exhibit 21
Page 317

2154363.2

-23-

1          106.   Answering paragraph 106 of the Complaint, Mattel denies the

2  truth of the allegations set forth therein.

3          107.   Answering paragraph 107 of the Complaint, Mattel denies the

4  truth of the allegations set forth therein.

5          108.   Answering paragraph 108 of the Complaint, Mattel denies the

6  truth of the allegations set forth therein and specifically denies that plaintiff is

7  entitled to injunctive relief.

8          109.   Answering paragraph 109 of the Complaint, Mattel repeats its

9  responses contained in paragraphs 1 through 108 of this Second Amended Answer

10  and incorporates them by reference as though fully and completely set forth herein.

11          110.   Answering paragraph 110 of the Complaint, Mattel denies the

12  truth of the allegations set forth therein.

13          111.   Answering paragraph 111 of the Complaint, Mattel denies the

14  truth of the allegations set forth therein.

15          112.   Answering paragraph 112 of the Complaint, Mattel denies the

16  truth of the allegations set forth therein.

17          113.   Answering paragraph 113 of the Complaint, Mattel denies the

18  truth of the allegations set forth therein.

19          114.   Answering paragraph 114 of the Complaint, Mattel denies the

20  truth of the allegations set forth therein.

21          115.   Answering paragraph 115 of the Complaint, Mattel denies the

22  truth of the allegations set forth therein.

23          116.   Answering paragraph 116 of the Complaint, Mattel denies the

24  truth of the allegations set forth therein.

25          117.   Answering paragraph 117 of the Complaint, Mattel denies the

26  truth of the allegations set forth therein and specifically denies that plaintiff is

27  entitled to injunctive relief.

28

Exhibit 21
Page 318
-24-

2154363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

118. Answering paragraph 118 of the Complaint, Mattel denies the truth of the allegations set forth therein.

119. Answering paragraph 119 of the Complaint, Mattel repeats its responses contained in paragraphs 1 through 118 of this Second Amended Answer and incorporates them by reference as though fully and completely set forth herein.

120. Answering paragraph 120 of the Complaint, Mattel denies the truth of the allegations set forth therein.

121. Answering paragraph 121 of the Complaint, Mattel denies the truth of the allegations set forth therein.

122. Answering paragraph 122 of the Complaint, Mattel denies the truth of the allegations set forth therein.

123. Answering paragraph 123 of the Complaint, Mattel denies the truth of the allegations set forth therein and specifically denies that plaintiff is entitled to injunctive relief.

124. Answering paragraph 124 of the Complaint, Mattel repeats its responses contained in paragraphs 1 through 123 of this Second Amended Answer and incorporates them by reference as though fully and completely set forth herein.

125. Answering paragraph 125 of the Complaint, Mattel denies the truth of the allegations set forth therein.

## General Denial

Unless specifically admitted herein, Mattel denies the truth of each and every allegation set forth in plaintiff's Complaint and specifically denies that plaintiff is entitled to any relief against Mattel.

2154363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

Exhibit 21
Page 319

## Affirmative Defenses

By alleging the Affirmative Defenses set forth below, Mattel does not agree or concede that it bears the burden of proof or the burden of persuasion on any of these issues, whether in whole or in part.

## First Affirmative Defense

Plaintiff's Complaint fails to state a claim upon which relief can be granted.

## Second Affirmative Defense

Plaintiff has no valid, enforceable or protectible rights or interest in the alleged trade dress or other matters asserted, including without limitation in that plaintiff has failed to establish that its alleged trade dress is distinctive as to plaintiff.

## Third Affirmative Defense

Plaintiff's claims, including without limitation plaintiff's claims based upon alleged extra-territorial acts, are barred in whole or in part by lack of subject matter jurisdiction.

## Fourth Affirmative Defense

Plaintiff's claims are barred in whole or in part by plaintiff's unclean hands.

## Fifth Affirmative Defense

Plaintiff's claims are barred in whole or in part by virtue of Mattel's prior-creation of the elements and other matters asserted in the Complaint.

Sixth Affirmative Defense

Plaintiff's claims are barred in whole or in part by its lack of standing.

Seventh Affirmative Defense

Plaintiff's claims are barred in whole or in part by the applicable statutes of limitation and the doctrine of laches.

Eighth Affirmative Defense

Plaintiff's claims are barred in whole or in part by the doctrines of waiver, estoppel and acquiescence.

Ninth Affirmative Defense

Plaintiff's claims are barred in whole or in part by Mattel's constitutional rights of free speech, petitioning and association, including without limitation by the litigation privilege as protected by and/or codified in *inter alia* Section 47(b) of the California Civil Code, the *Noerr-Pennington* doctrine, the common interest privilege and by other privileges.

Tenth Affirmative Defense

Plaintiff's claims are barred in whole or in part by Mattel's federal and state constitutional rights of free speech, including without limitation under the First Amendment of the United States Constitution.

Eleventh Affirmative Defense

Plaintiff's claims are barred in whole or in part by the competitor privilege.

1        ## Twelfth Affirmative Defense

2            Plaintiff's claims are in whole or in part preempted by the Copyright

3    Act and barred by the *Sears-Compco* doctrine.

4

5        ## Thirteenth Affirmative Defense

6            Plaintiff's requested relief, including plaintiff's requests for punitive

7    and/or enhanced damages, are barred in whole or in part because all of Mattel's

8    actions were in good faith.

9

10       ## Fourteenth Affirmative Defense

11           Plaintiff's damages, if any, were not caused by Mattel and are not

12   attributable to the acts or omissions of Mattel.

13

14       ## Fifteenth Affirmative Defense

15           Plaintiff has failed to mitigate its damages, if any.

16

17       ## Additional Defenses

18           Mattel has insufficient knowledge or information upon which to form a

19   belief as to whether additional defenses are available.  Mattel reserves the right to

20   amend this Second Amended Answer to add, delete, or modify additional defenses

21   based on legal theories which may or will be divulged through clarification of the

22   Complaint, through discovery, through change or clarification of the governing law

23   or through further legal analysis of plaintiff's positions in this litigation.

24

25       ## Prayer for Relief

26

27           WHEREFORE, Mattel prays for relief as follows:

28

1.      That the Complaint be dismissed with prejudice;

2.      That plaintiff take nothing by reason of the Complaint against Mattel and that judgment be entered in Mattel's favor;

3.      That Mattel recover its costs and attorneys' fees; and

4.      That this Court award such other and further relief as it deems just and proper.

## COUNTERCLAIMS

Pursuant to the Court's Orders of January 12, 2007 and June 27, 2007, and incorporating its [Proposed] Amended Complaint dated November 19, 2006, Mattel, Inc. alleges as follows:

### Preliminary Statement

1.      For years MGA Entertainment, Inc. has engaged in a pattern of stealing and using Mattel, Inc.'s property and trade secrets. MGA's use of the stolen property and trade secrets caused and continues to cause significant harm to Mattel. MGA first stole "Bratz," a fashion doll, from Mattel, and then continued stealing Mattel's confidential and proprietary information to fuel MGA's growth.

2.      Carter Bryant conceived, created and developed Bratz designs while he was employed by Mattel as a doll designer. He concealed his Bratz work from Mattel and wrongfully sold Bratz to MGA while he was a Mattel employee. As MGA knows, Mattel owns the Bratz designs that Bryant made. As the rightful owner of those Bratz designs, Mattel has registered copyrights for them and seeks damages arising from MGA's repeated infringement of those copyrights.

3.      Emboldened by the success of its illegal conduct, MGA has repeated—and even expanded—its pattern of theft on numerous occasions. For example, in or about 2004, MGA decided to expand into Mexico. To do so, and operating from its Southern California offices, MGA hired away three key Mattel employees in Mexico, who, on their way out, stole virtually every category of

2154363.2

-29-

1 | Mattel's sensitive and trade secret business plans and information for the Mexican
2 | market, as well as a significant quantity of sensitive and trade secret information
3 | for Mattel's U.S. and worldwide businesses, and took them to MGA. Armed with
4 | Mattel's confidential business plans and methods, MGA claimed to have increased
5 | its market share in Mexico alone by 90% in a single year.

6 |     4. In 2005, MGA needed help in Canada. So MGA, again
7 | operating from its Southern California headquarters, hired Janine Brisbois from
8 | Mattel. At that time, Ms. Brisbois was responsible for Mattel's account with Toys
9 | 'R Us ("TRU") and Wal-Mart. MGA gave her responsibility for those same
10 | accounts, and she took from Mattel documents containing proprietary advertising,
11 | project, sales, customer and strategy information for not only Canada, but for the
12 | United States. Eliminating any doubt that MGA then proceeded to use those stolen
13 | materials, Brisbois subsequently accessed and modified certain of those Mattel
14 | documents while employed by MGA.

15 |     5. These are not the only instances of such misconduct, which
16 | MGA orchestrated and carried out from its headquarters in this District. Counter-
17 | defendants have engaged in an ongoing, widespread pattern of illegal acts,
18 | consisting of inducing Mattel employees to steal Mattel's confidential information
19 | or other property and take it with them to MGA to further MGA's business interests
20 | and to harm Mattel.

21 | **Jurisdiction**

22 |     6. This Court has federal question jurisdiction over this action
23 | pursuant to 28 U.S.C. §§ 1331, 17 U.S.C. §§ 101 *et seq.*, and 18 U.S.C. § 1964(c).
24 | This Court has supplemental jurisdiction over Mattel's state law claims pursuant to
25 | 28 U.S.C. § 1367.

26 | **Venue**

27 |     7. Venue is proper in this District pursuant to 28 U.S.C.
28 | §§ 1391(b)-(d), 1391(f) and 1400(a) and 18 U.S.C. § 1965.

Exhibit 21
Page 324

2154363.2

-30-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1                                                  **Parties**

2           8.    Mattel is a corporation organized and existing under the laws of

3 the State of Delaware, with its principal place of business in El Segundo,

4 California.

5          9.    Counter-defendant MGA Entertainment, Inc. ("MGA") is a

6 corporation organized and existing under the laws of the State of California, with

7 its principal place of business in Van Nuys, California.  Mattel is informed and

8 believes, and on that basis alleges, that ABC International Traders, Inc. is a

9 predecessor corporation to MGA and that until September 16, 2002, MGA was

10 incorporated and known as ABC International Traders, Inc.  Upon the filing of the

11 Complaint, Mattel, being ignorant of the nature, extent and scope of MGA

12 Entertainment, Inc.'s involvement and complicity in the conduct alleged therein and

13 having designated MGA Entertainment, Inc. in the Complaint as Doe 1 and having

14 discovered its involvement and complicity, Mattel hereby amends its Complaint by

15 substituting MGA Entertainment, Inc. for the fictitious Doe name Doe 1.

16         10.    Counter-defendant Carter Bryant ("Bryant") is an individual who

17 formerly was employed by Mattel and has worked for and continues to work as a

18 contactor for MGA.  Mr. Bryant currently resides in the State of Missouri.

19         11.    Counter-defendant MGA Entertainment (HK) Limited is a

20 business entity organized and existing under the laws of the Hong Kong Special

21 Administrative Region, with its principal place of business in Hong Kong.  Upon

22 the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope

23 of involvement and complicity of MGA Entertainment (HK) Limited in the conduct

24 alleged therein and having designated MGA Entertainment (HK) Limited in the

25 Complaint as Doe 2 and having discovered its involvement and complicity, Mattel

26 hereby amends its Complaint by substituting MGA Entertainment (HK) Limited for

27 the fictitious Doe name Doe 2.

28

Exhibit 21
Page 325

2154363.2

-31-

1    12.    Counter-defendant MGAE de Mexico, S.R.L. de C.V. ("MGA

2    de Mexico") is a business entity organized and existing under the laws of Mexico,

3    with its principal place of business in Mexico City, Mexico.

4        13.    Mattel is informed and believes, and on that basis alleges, that

5    Counter-defendant Larian is the President and CEO of MGA and an individual

6    residing in the County of Los Angeles.  Upon the filing of the Complaint, Mattel,

7    being ignorant of the nature, extent and scope of involvement and complicity of

8    Larian in the conduct alleged therein and having designated Larian in the

9    Complaint as Doe 3 and having discovered his involvement and complicity, Mattel

10   hereby amends its Complaint by substituting Larian for the fictitious Doe name

11   Doe 3.

12       14.    Counter-defendant Carlos Gustavo Machado Gomez is an

13   individual who is employed by Counter-defendant MGA and who, on information

14   and belief, currently resides in the County of Los Angeles.

15       15.    The true names and capacities of Counter-defendants sued herein

16   as DOES 4 through 10, inclusive, are unknown to Mattel, which therefore sues said

17   Counter-defendants by such fictitious names.  Mattel will amend its pleadings to

18   allege their true names and capacities when the same are ascertained.

19                        **Factual Background**

20   **I.    MATTEL**

21       16.    Mattel manufactures and markets toys, games, dolls and other

22   consumer products.  Harold Mattson and Eliot and Ruth Handler founded Mattel in

23   1945.  The name of the company was created by incorporating the names of two of

24   its founders, "MATT-son" and "EL-liot."  Originating from the Handlers' garage in

25   Southern California, the company greatly expanded its operations following World

26   War II.  During the next several decades, Mattel became famous for producing

27   high-quality products at reasonable prices.

28

Exhibit 21
Page 326

2154363.2

-32-

1        17.   Critical to Mattel's success is its ability to design and develop

2   new products. Mattel invests millions of dollars in product design and

3   development and introduces hundreds of new products each year. Mattel maintains

4   a 180,000 square-foot design center in El Segundo, California, that houses

5   hundreds of designers, sculptors, painters and other artists, who work exclusively to

6   create the products on which Mattel's business depends.

7        18.   Mattel also has invested substantial amounts over many years to

8   develop its business methods and practices, including, without limitation, its

9   marketing and advertising research, plans, methods and processes; its business

10   research and forecasts; its costs, budgets, pricing, credit terms, deal terms and

11   finances; its manufacturing, distribution, and sales methods and processes; and its

12   inventory methods and processes. These represent a material part of the intellectual

13   infrastructure of Mattel and are highly valuable.

14   **II.   MGA ENTERTAINMENT**

15        19.   MGA is also a toy manufacturer. MGA began as a consumer

16   electronics business, but expanded into the toy business with licenses to sell

17   handheld electronic games. By approximately late 1999 or early 2000, MGA

18   developed a strategy to expand its business and compete directly with Mattel by

19   launching a fashion doll line, so it stole a fashion doll that was owned by Mattel –

20   "Bratz."

21        20.   MGA intentionally stole not just specific Mattel property, such

22   as Bratz designs, prototypes and related materials, but also a vast array of trade

23   secrets and other confidential information that comprise Mattel's intellectual

24   infrastructure. MGA's rapid growth was not organic, but rather was based upon its

25   theft of Bratz. As a result, MGA lacked an appropriate intellectual infrastructure

26   for a company of its size and it became increasingly difficult to manage. To deal

27   with these problems, as detailed below, time and time again MGA simply stole

28   Mattel's proprietary business methods, practices and information. This not only

Exhibit 21
Page 327

2154363.2

-33-

1   allowed MGA to avoid expending time, money and effort necessary to build a

2   legitimate business, but also allowed MGA to unfairly compete against Mattel by

3   taking Mattel's playbook.

4   **III.  MGA STEALS A NEW LINE OF FASHION DOLLS FROM MATTEL**

5      21. Carter Bryant is a former Mattel employee.  Bryant joined Mattel

6   in September 1995, where he worked in Mattel's Design Center as a BARBIE

7   product designer.  In or about April 1998, Bryant resigned his position with Mattel

8   and moved to Missouri to live with his parents.  Late in 1998, Bryant applied to

9   Mattel to be rehired.  On January 4, 1999, he began working at Mattel in Mattel's

10  Design Center, again as a product designer, for Mattel's BARBIE collectibles line.

11     22. Upon his return to Mattel in January 1999, Bryant executed an

12  Employee Confidential Information and Inventions Agreement (the "Employment

13  Agreement"), a true and correct copy of which is attached hereto as Exhibit A.

14     23. Pursuant to his Employment Agreement and as a condition of

15  and in consideration for his employment, Bryant agreed, among other things, that

16  he held a position of trust with Mattel, that the designs and inventions he created

17  during his Mattel employment (with certain exceptions not relevant here) were

18  owned by Mattel, and that he would be loyal to the company by agreeing not to

19  assist or work for any competitor of Mattel while he was employed by Mattel.

20     24. On January 4, 1999, Bryant also executed Mattel's Conflict of

21  Interest Questionnaire (the "Conflict Questionnaire").  Among other things, Bryant

22  certified in the Conflict Questionnaire that, other than as disclosed, he had not

23  worked for any competitor of Mattel in the prior twelve months and had not

24  engaged in any business venture or transaction involving a Mattel competitor that

25  could be construed as a conflict of interest.  Bryant understood what the Conflict

26  Questionnaire required because, among other things, he disclosed on it the

27  freelance work he had performed while in Missouri for Ashton-Drake, which is

28

1   unrelated to the conduct alleged herein.  A true and correct copy of the Conflict

2   Questionnaire executed by Bryant is attached hereto as Exhibit B.

3        25.   Pursuant to the Conflict Questionnaire, Bryant also agreed that

4   he would immediately notify his supervisor of any change in his situation that

5   would cause him to change any of the foregoing certifications.  Despite this

6   obligation, at no time did Bryant disclose to Mattel that he was engaging in any

7   business venture or transaction with MGA or any other Mattel competitor.

8        26.   More specifically, while Bryant was employed by Mattel, Bryant

9   and other Counter-defendants misappropriated and misused Mattel property and

10   Mattel resources for the benefit of Bryant and MGA.  Such acts included, but are

11   not limited to, the following:

12        a.   using his exposure to Mattel development programs to

13   create the concept, design and name of Bratz;

14        b.   using Mattel resources, and while employed by Mattel,

15   Bryant worked by himself and with other Mattel employees and contractors to

16   design and develop Bratz, including without limitation by creating drawings and

17   three-dimensional models of Bratz dolls, and fashion designs for the dolls'

18   associated clothing and accessories; and

19        c.   using Mattel resources, and while employed by Mattel,

20   Bryant took steps to assist MGA to produce Bratz dolls.

21        27.   During the time that he was employed by Mattel and thereafter,

22   Bryant concealed these actions from Mattel, including by failing to notify his

23   supervisor of the conflict of interest he created when he began working on MGA's

24   behalf and when he began receiving payments from MGA.  Bryant additionally

25   enlisted other Mattel employees to perform work on Bratz during the time he was

26   employed by Mattel and, by all indications, in at least some cases led them to

27   believe that they were performing work on a project for Mattel.

28

Exhibit 21
Page 329

2154363.2

-35-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1           28.   Bryant also made affirmative misrepresentations to Mattel

2 management and employees immediately before his departure from Mattel on

3 October 20, 2000. For example, during his last few weeks at Mattel, Bryant told

4 his co-workers and supervisors that he was going to leave Mattel for "non-

5 competitive" pursuits. Bryant's representations to his supervisors and his co-

6 workers were false. Bryant knew at the time that those representations were false

7 and made those false statements to conceal from Mattel the fact that he was already

8 working with MGA and that he had contracted with MGA to assign Bratz works to

9 MGA and to provide design and development services to MGA, a Mattel

10 competitor.

11           29.   As a result of the efforts of Bryant and other Mattel employees

12 working on Bratz (which were done without Mattel's knowledge), the Bratz dolls

13 had been designed and were far along in development during the time that Bryant

14 was employed by Mattel and prior to the time that Bryant left Mattel on

15 October 20, 2000. Not only did Bryant create and develop designs for the dolls as

16 well as other aspects of the products such as their fashion accessories during the

17 time he was employed by Mattel, but MGA showed Bratz prototypes and/or

18 product to both focus groups and retailers in November 2000, less than three weeks

19 after Bryant left Mattel. Bryant, Larian and others at MGA arranged these

20 meetings while Bryant was still employed by Mattel.

21           30.   Bryant and MGA employees also repeatedly and continuously

22 communicated with employees of MGA Entertainment (HK) Limited on subjects

23 such as design and manufacturing of Bratz. On information and belief, at all

24 material times, MGA Entertainment (HK) Limited has maintained regular and

25 continuous contacts with persons in the County of Los Angeles; it regularly has

26 shipped products that it manufactures, or that are manufactured for it, to the County

27 of Los Angeles; and such products have been distributed to retailers and sold to

28 consumers in the County of Los Angeles.

1    31.   Bratz also were shown to retailers at the Hong Kong Toy Fair in

2    January 2001. By early 2001, only a few months after Bryant resigned from

3    Mattel, MGA began having the Bratz fashion doll line and accessories

4    manufactured and then, shortly thereafter, began selling them at retail.

5    32.   Since 2001, MGA has distributed and sold Bratz and Bratz-

6    related products throughout the world. Mattel is informed and believes that MGA

7    also licenses Bratz to third parties. Mattel is also informed and believes that MGA

8    derives annual revenue from its sales and licenses of Bratz in excess of $500

9    million. Mattel is further informed and believes that MGA and Bryant claim

10   current ownership of Bratz, and all copyrights and copyright registrations attendant

11   thereto. MGA continues to market, sell and license Bratz and has expressed an

12   intention to continue to do so.

13   33.   Mattel is informed and believes that MGA and Larian

14   encouraged, aided and financed Bryant to develop Bratz, knowing full well that

15   Bryant was still employed by Mattel at the time and that by performing such work,

16   including design-related work, for his own benefit and/or the benefit of MGA,

17   Bryant would be, and was, in breach of his contractual, statutory and common law

18   duties to Mattel. Mattel is also informed and believes that MGA proceeded to aid

19   and encourage Bryant to develop Bratz with the goal of obtaining a valuable

20   fashion doll line that would be commercially successful in the competitive, multi-

21   billion dollar market for fashion dolls.

22   34.   Pursuant to Bryant's contract with Mattel, among other things,

23   Mattel is the true owner of Bratz designs and works, including those specifically

24   that were conceived, created or reduced to practice during Bryant's Mattel

25   employment as well as all designs and works that are or have been derived

26   therefrom. Counter-defendants' continued use, sale, distribution and licensing of

27   Bratz thus infringes upon Mattel's rights, injures Mattel and unlawfully enriches the

28   Counter-defendants.

Exhibit 21
Page 331

2154362.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1        35.   Bryant and MGA deliberately and intentionally concealed facts

2  sufficient for Mattel to suspect or to know that it was the true owner of Bratz.

3  Their acts of concealment include, but are not limited to, concealing the fact that

4  Bryant conceived, created, designed and developed Bratz while employed by

5  Mattel, including by tampering with and defacing documents which showed that, in

6  fact, Bryant was a Mattel employee while he was working for and with MGA;

7  concealing the fact that Bryant worked with and assisted MGA during the time

8  Bryant was employed by Mattel and was compensated for that assistance;

9  concealing that Bryant was providing consulting services to MGA; concealing

10  Bryant's role in Bratz by falsely claiming that Larian and others were the creators

11  of Bratz; and concealing the fact that Mattel was the true owner of Bratz by, among

12  other things, filing fraudulent registrations and/or amendments to registrations with

13  the United States Copyright Office claiming MGA as the author of Bratz as a work

14  for hire and altering relevant dates on such documents to further obscure the true

15  facts of when the works were created.

16        36.   Because of Bryant's and MGA's acts of concealment and Bryant's

17  misrepresentations to Mattel, Mattel had no reason to suspect that Bryant had

18  worked with MGA, or assisted MGA, while he still employed by Mattel until

19  approximately November 24, 2003, when Mattel received, through an unrelated

20  legal action, a copy of Bryant's agreement with MGA which showed that the date

21  of Bryant's agreement with MGA predated Bryant's departure from Mattel. It was

22  then, as a result, that Mattel learned for the first time that Bryant had secretly aided,

23  assisted and worked for and with MGA while employed at Mattel and in violation

24  of his Mattel Employment Agreement. Specifically, Bryant's agreement with

25  MGA obligated Bryant to provide product design services to MGA on a "top

26  priority" basis. Bryant's agreement with MGA also provided that Bryant would

27  receive royalties and other consideration for sales of products on which Bryant

28  provided aid or assistance; that all works and services furnished by Bryant under

Exhibit 21
Page 332

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1 the agreement, including those he purportedly provided while still a Mattel
2 employee, purportedly would be considered "works for hire" of MGA; and that all
3 intellectual property rights to preexisting works by Bryant, including Bratz designs,
4 purportedly were assigned to MGA.

5 **IV. MGA STEALS MATTEL TRADE SECRETS IN MEXICO**

6       37. On information and belief, in or about late 2003 or early 2004,
7 MGA decided to open business operations in Mexico. Faced with the difficult task
8 of developing an overall strategy for expanding into a market in which it had only a
9 nominal presence and no operations, MGA elected to steal Mattel's plans, strategy
10 and business information for the Mexican market and materials related to Mattel's
11 worldwide business strategies. As detailed below, MGA and Larian approached
12 three employees of Mattel's Mexican subsidiary ("Mattel Mexico"), enticed them to
13 steal Mattel's most sensitive business planning materials, and then hired them to
14 assist in establishing and running MGA's new Mexican subsidiary.

15     **A.**    **MGA Hires Three Senior Mattel Employees in Mexico**

16       38. Carlos Gustavo Machado Gomez ("Machado") was the Senior
17 Marketing Manager, Boys Division, for Mattel Mexico, a position of trust and
18 confidence. He was employed at Mattel Mexico from April 1, 1997 until April 19,
19 2004. His duties included short, medium and long-term marketing planning,
20 generating product sales projections, and assisting in creation of the media plan. In
21 his position, Machado had access to highly confidential and sensitive marketing
22 and product development information. Machado had an employment agreement
23 with Mattel in which he agreed to maintain the confidentiality of Mattel's protected
24 information. Mattel's policies also required Machado to protect Mattel's
25 proprietary information and not to disclose it to competitors.

26       39. Mariana Trueba Almada ("Trueba") was the Senior Marketing
27 Manager, Girls Division, for Mattel Mexico, a position of trust and confidence.
28 She was employed at Mattel Mexico from November 3, 1997 until April 19, 2004.

Exhibit 21
Page 333

2154363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1  Like Machado, her duties included short, medium and long-term marketing
2  planning, generating product sales projections, and assisting in creation of the
3  media plan. In her position, Trueba had access to highly confidential and sensitive
4  marketing and product development information. Trueba had an employment
5  agreement with Mattel in which she agreed to maintain the confidentiality of
6  Mattel's protected information. Mattel's policies also required Trueba to protect
7  Mattel's proprietary information and not to disclose it to competitors.

8       40.   Pablo Vargas San Jose ("Vargas") was a Senior Trade Marketing
9  Manager with Mattel Mexico, a position of trust and confidence. He was employed
10  at Mattel Mexico from March 29, 2001 until April 19, 2004. Vargas was
11  responsible for ensuring that point-of-sale promotions were carried out, analyzing
12  the results of such promotions, negotiating promotion budgets, and generally
13  managing promotional activities. Vargas also had access to highly confidential and
14  sensitive marketing and product development information. Vargas had an
15  employment agreement with Mattel in which he agreed to maintain the
16  confidentiality of Mattel's protected information. Mattel's policies also required
17  Vargas to protect Mattel's proprietary information and not to disclose it to
18  competitors.

19       41.   Beginning in late 2003 or early 2004, Machado, Trueba and
20  Vargas began planning to leave Mattel Mexico to join MGA. In connection with
21  that plan, and with the encouragement of Larian and other MGA officers operating
22  in the United States, they began accessing, copying and collecting proprietary
23  Mattel documents to take with them. On April 19, 2004, Machado, Trueba and
24  Vargas each resigned their positions with Mattel, effective immediately. They
25  stated that they had been hired by a Mattel competitor, but refused to identify that
26  competitor. In fact, they had been offered and accepted employment by MGA to
27  establish and run MGA's new operation in Mexico.
28

2154363.2

Exhibit 21
Page 334

-40-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

**B.     Machado, Trueba and Vargas Stole Dozens of Confidential Trade Secret Marketing and Sales Documents for MGA's Benefit**

42.     Following these resignations, Mattel discovered that Machado, Trueba and Vargas had been in frequent telephonic and e-mail contact with MGA personnel, including Larian, for over three months prior to their resignations. The primary vehicle for these communications in furtherance of their "plot" was an America Online e-mail account with the address <plot04@aol.com>. On information and belief, during this time, Machado, Trueba and Vargas supplied Larian with certain Mattel confidential and proprietary information in order to prove their value to MGA and to improve their negotiating position vis-à-vis their respective employment contracts with MGA.

43.     In March 2004, Machado, Trueba and Vargas were making plans to travel from Mexico to Los Angeles to meet with MGA personnel in person prior to resigning their positions at Mattel. Also, by at least March 3, 2004, Machado, Trueba and Vargas were discussing with MGA personnel, including Larian, specific details regarding setting up MGA offices in Mexico City. On information and belief, prior to their resignations, Larian and others at MGA directed Machado, Trueba and Vargas to steal virtually all Mattel confidential and proprietary information that they could access and bring it with them to MGA. This was reflected in, among things, e-mail messages that Mattel had discovered after Machado, Trueba and Vargas had resigned. For example, on March 22, 2006, approximately one month before they resigned, Machado, Trueba and Vargas wrote an e-mail message from the <plot04@aol.com> e-mail account addressed to Larian, MGA's General Manager Susan Kuemmerle and another MGA officer Thomas Park. In that e-mail message, Machado, Trueba and Vargas sought to prove their value in this endeavor to MGA by writing: "Attached you will find our analysis for future discussion. We will be available during the nights of the week after 16:30 Los Angeles time . . . ." In another e-mail message, showing that the

1   participants intentionally sought to maximize the damage to Mattel from their
2   conduct, Kuemmerle wrote to Larian and Park: "Gustavo, Mariana and Pablo want
3   to resign (all at the same time, and you can believe my smile!) next Wednesday."

4       44.   Beginning on April 12, 2004, a week before his resignation and
5   after numerous communications and meetings with Larian and other MGA
6   personnel, Machado began transferring additional Mattel confidential and
7   proprietary information to a portable USB storage device (also know as a "thumb
8   drive") that he connected to his Mattel computer. On Friday, April 16, 2004, the
9   last business day before he gave notice, Machado copied at least 70 sensitive
10  documents to the portable USB storage device.

11      45.   Starting on April 12, 2004, Vargas also copied a host of
12  confidential and proprietary materials to a portable USB storage device, including
13  sales plans, sales projections and customer profiles.

14      46.   On April 16, 2004, Trueba also copied Mattel confidential and
15  proprietary information to a portable USB storage device connected to her Mattel
16  computer.

17      47.   With full knowledge that she was going to leave Mattel for a
18  competitor, Trueba also took steps to increase further her access to Mattel's
19  confidential information shortly before her resignation. For example, just four days
20  before leaving, Trueba went out of her way to seek to attend a meeting at which
21  Mattel personnel analyzed BARBIE programs for the United States, Canada and
22  South America. Two days before her resignation, she contacted both a Mattel
23  employee located in El Segundo, California and Mattel's advertising agency to
24  request updated confidential information about advertising plans for BARBIE. On
25  information and belief, Trueba acted at the direction of MGA and Larian and did so
26  in order to obtain further information that would allow MGA to obtain unfair
27  competitive advantage over Mattel.

28

Exhibit 21
Page 336

2154363.2

-42-

48.   Machado, Trueba and Vargas stole virtually every type of document a competitor would need to enter the Mexican market and to unlawfully compete with Mattel in Mexico, in the United States, and elsewhere.  They stole global internal future line lists that detailed anticipated future products, production and shipping costs for Mattel products; daily sales data for Mattel products; customer data; sales estimates and projections; marketing projections; documents analyzing changes in sales performance from 2003 to 2004; budgets for advertising and promotional expenses; strategic research reflecting consumer responses to products in development; media plans; consumer comments regarding existing Mattel products customer discounts and terms of sale; customer inventory level data; assessments of promotional campaign success; market size historical data and projections; marketing plans and strategies; merchandising plans; retail pricing and marketing strategies; and other similar materials.

49.   The stolen data was not limited to the Mexican market.  The information stolen would, and did, give MGA an unfair competitive advantage in the United States and around the world.  Further, the stolen information was not located exclusively in Mexico, but included confidential and proprietary information that resided on Mattel computers in Phoenix, Arizona and El Segundo, California, and/or documents which were originally created by personnel in El Segundo.  Included among these stolen documents was one of Mattel's earliest internal global line lists, which included information for BARBIE products for the upcoming year and included, for each product, the expected profit margin, advertising expenditures, expected volume and marketing strategy.  On information and belief, Machado, Trueba or Vargas delivered that internal line list to Larian or another MGA officer during their negotiations with MGA.

50.   MGA has used the information taken from Mattel to obtain an unfair advantage over Mattel, including in both the United States and Mexico.  In fact, MGA later publicized its claim that, in 2005, it had increased its Mexican

Exhibit 21
Page 337

2154363.2

-43-

1 market share by 90 percent over the prior year. This increase came at the expense
2 of Mattel, which lost market share during 2004 in Mexico and was forced to
3 increase its advertising and promotional spending to offset further losses.

4      51.   Machado, Trueba and Vargas attempted to conceal their
5 widespread theft of Mattel's proprietary information. For example, Machado ran a
6 software program on his Mattel personal computer in an attempt to erase
7 information, including information that would reveal the addresses to which he had
8 sent, or from which he had received, e-mail messages. On information and belief,
9 for the same purpose Machado also damaged the hard drive of the personal
10 computer that he used at Mattel.

11      52.   On information and belief, on April 19, 2004, immediately after
12 Machado, Trueba and Vargas simultaneously resigned, they traveled from Mexico
13 to Los Angeles to meet with MGA personnel, including Larian, in person.

14      53.   Mattel notified Mexican authorities about the theft of its trade
15 secret and confidential information. On October 27, 2005, the Mexican Attorney
16 General Office obtained a search warrant from the Mexican Federal Criminal
17 Courts for MGA's facilities in Mexico City. In that search, the Mexican authorities
18 found and seized from MGA's offices both electronic and paper copies of a large
19 number of documents containing Mattel trade secrets, including those that Mattel
20 discovered through its forensic investigations, plus many others that Mattel had not
21 known had been stolen.

22      54.   Based on Machado's "performance" in Mexico, Isaac Larian
23 subsequently promoted Machado and he was transferred to MGA's main office in
24 Van Nuys, California. On information and belief, Machado currently resides in the
25 County of Los Angeles, California.

26
27
28

Exhibit 21
Page 338

2154363.2

-44-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

V.   **MGA HIRES MATTEL'S SENIOR VICE PRESIDENT AND GENERAL MANAGER TO FACILITATE ITS THEFT AND USE OF MATTEL'S HIGHLY VALUABLE BUSINESS METHODS AND PRACTICES**

55.   On October 1, 2004, Mattel's Senior Vice President and General Manager, Ron Brawer, left Mattel and joined MGA. Tyco Toys, Inc. ("Tyco"), a predecessor to Mattel, had hired Brawer on April 22, 1996. The same day, Brawer entered into an Employee Invention & Trade Secret Agreement with Tyco. On April 9, 1997, Brawer became a Marketing Director for Mattel in Mount Laurel, New Jersey, and remained bound by his Employee Invention & Trade Secret Agreement.

56.   In January 2003, while Brawer held a position of trust and confidence at Mattel, Mattel's "Code of Conduct" was circulated to all Mattel employees worldwide. Included in the Code of Conduct were statements that:

> Employees and Directors have an obligation to protect the confidentiality of Mattel's proprietary information. Proprietary information is any information not generally known to the public that is useful to Mattel, that would be useful to its competitors or other third parties or that would be harmful to Mattel or its customers if disclosed. Proprietary information includes trade secrets, revenue and profit information and projections, new product information, marketing plans, design and development efforts, manufacturing processes and any information regarding potential acquisitions, divestitures and investments.
>
> We can protect the security of Mattel's proprietary information by limiting access to it. Confidential information should not be discussed with those who are not obligated to maintain the information in confidence and in public places where the

Exhibit 21
Page 339

21543632

-45-

1    information is not likely to be kept secret, such as planes,

2    restaurants and elevators.  The obligation to preserve confidential

3    information continues even after employment ends.

4  The Code of Conduct applied to Brawer and required that he meet his obligations

5  under the Code of Conduct.

6        57.   By 2003, Brawer had advanced within Mattel to a Senior Vice

7  President position over customer marketing, a position of trust and confidence.  In

8  his executive position, Brawer was provided access to information that was both

9  sensitive and confidential, including, but not limited to, detailed information related

10  to development, manufacture, marketing, pricing, shipping, and performance of

11  Mattel's then-current and anticipated future product lines, and other confidential

12  business plans between Mattel and its most significant retail customers.

13        58.   In December 2003, Alan Kaye, Mattel's Senior Vice President of

14  Human Resources, asked Brawer whether he was discussing potential employment

15  with MGA.  Brawer denied that he had been in contact with MGA and represented

16  that he would not talk to MGA.  Throughout 2004, Mattel reminded and stressed to

17  its employees, including Brawer, the importance of protecting Mattel's confidential

18  and proprietary materials and information.

19        59.   On March 18, 2004, in response to a survey from the President of

20  Mattel Brands, Matt Bousquette, confirming compliance with Mattel's Code of

21  Conduct, Brawer wrote back that he "applaud[ed] the company's vigorous

22  protection of it's [sic] intellectual property," reflecting Brawer's clear

23  understanding that Mattel required its proprietary information to be kept

24  confidential.

25        60.   In April 2004, Mattel promoted Brawer to Senior Vice

26  President/General Manager.  The General Manager position also is an executive

27  position of trust and confidence.  The role of a General Manager is to lead a cross-

28  functional "Customer Business Team."  Each General Manager is accountable for

2154363.2

Exhibit 21
Page 340

1    strategic partnership with a key Mattel retailer, covering all aspects of the business,
2    including both traditional toy sales and retail development of licensed products.

3         61.   In or about late May 2004, Brawer began performing General
4    Manager duties, working with one of Mattel's major retail customer accounts.
5    Thereafter, Brawer began receiving information related not only to the Senior Vice
6    President, Customer Marketing position that he still formally held, but also began
7    receiving detailed information related to his role as General Manager. Brawer
8    began requesting and analyzing detailed information related to Mattel and its four
9    key retail accounts.

10        62.   On September 15, 2004, Brawer left work at noon for observance
11    of Rosh Hashanah. As Brawer left, he carried a large cardboard box with binders
12    and other materials. Several hours after his departure, Brawer instructed his
13    assistant to print Mattel's 2004 Sales Plan for one of Mattel's significant customers
14    and to provide it to him, falsely claiming he needed it for a meeting

15        63.   On September 17, 2004, Brawer returned to Mattel and
16    immediately informed his supervisor that he was leaving Mattel, effective October
17    1, 2004, to work for competitor MGA.

18        64.   On September 20, 2004, Mattel hand-delivered a letter to Brawer
19    reminding him of his continuing obligation to preserve the confidentiality of
20    Mattel's proprietary information and trade secrets not only through October 1,
21    2004, but continuing beyond the termination of his employment.

22        65.   At his exit interview on September 29, 2004, Mattel reminded
23    Brawer that he had ongoing duties of confidentiality to Mattel, even after the
24    termination of his employment. Brawer was given a copy of his Original
25    Confidentiality Agreement, which he had signed on April 22, 1996, and another
26    copy of the Code of Conduct. During the exit interview, however, Brawer noted
27    that he had not signed the Code of Conduct, which he intended and Mattel
28    understood to mean that Brawer believed he was not bound by Mattel's policy

Exhibit 21
Page 341

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

1  because he had not signed it.  Brawer was unwilling to complete or sign the form

2  that sought to confirm that Brawer understood his ongoing obligations under the

3  Code of Conduct, which included the obligation to preserve the confidentiality of

4  Mattel's proprietary and trade secret information.

5       66.  On October 1, 2004, Brawer's final day of employment with

6  Mattel, Mattel hand-delivered to Brawer a letter that, among other things, reminded

7  Brawer of his confidentiality obligations to Mattel under the Code of Conduct.

8       67.  Upon joining MGA, Brawer became its Executive Vice-

9  President of Sales and Marketing.  In that role he was responsible for MGA's sales

10  worldwide.  As part of those responsibilities, Brawer had and continues to have

11  responsibility for MGA's accounts with the same retailers that he worked with

12  while at Mattel.

13       68.  Brawer represented during his Mattel exit interview that he had

14  returned all proprietary information to Mattel.  That representation was false.  On

15  information and belief, Brawer removed proprietary and trade secret information

16  from Mattel that he did not return.  Mattel is informed and believes that Brawer did

17  not return to Mattel, for example, the information contained in his contacts file.

18  The contacts file included contact information for Mattel customers, most notably

19  TRU, and extensive contact information for Mattel employees, including titles, e-

20  mail addresses and telephone numbers.

21       69.  Mattel has recently learned that Brawer has been using that

22  contact information on a regular basis, including within recent months.  Since

23  leaving Mattel, Brawer has had contacts with Mattel employees, both by telephone

24  and by electronic mail.  Based on his knowledge of Mattel's operations and the

25  roles of certain Mattel employees, he has targeted certain Mattel employees who

26  have broad access to Mattel proprietary information in an effort to induce and

27  encourage them to join MGA and to steal or otherwise wrongfully misappropriate

28  Mattel confidential information and trade secrets.  Brawer has done so by

Exhibit 21
Page 342

2154363.2

-48-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1  promising these Mattel employees salaries 25 percent or more higher than they earn
2  at Mattel and stating to them that they should not be concerned by legal action
3  taken by Mattel to protect its trade secrets and its rights because such claims are
4  hard to prove and easy to defeat.

5  **VI.  MGA STEALS MATTEL TRADE SECRETS IN CANADA**

6        70.   In an effort to increase its market share and sales in Canada and
7  elsewhere, MGA stole Mattel trade secrets regarding Mattel's customers, sales,
8  projects, advertising and strategy, not only for Canada, but the United States and
9  the rest of the world.

10       71.   Janine Brisbois was a Director of Sales for the Girls Division in
11 Canada.  Mattel hired her as a National Account Manager in August 1999.  When
12 she was hired as a Mattel employee, Brisbois agreed that she would preserve and
13 would not disclose Mattel's proprietary or confidential information.  For example,
14 Brisbois agreed:

15            You must keep Mattel's Proprietary Information confidential,
16            and you may only use or disclose such information as necessary
17            to perform your job responsibilities in accordance with Mattel
18            policies.  Your obligation to keep Mattel's Proprietary
19            Information confidential will continue even after any termination
20            of your employment with your employer.

21            . . .

22            Mattel takes steps to maintain the secrecy and confidential nature
23            of Mattel's Proprietary Information and, if a competitor
24            discovered Mattel's Proprietary Information, it could
25            significantly damage Mattel and your Employer.

26       72.   While with Mattel, Brisbois had responsibility for Mattel's
27 account with TRU and later had responsibility for Mattel's Wal-Mart account.  In
28 her capacity as Sales Director-Wal-Mart/CTC/Girls Team, Brisbois had access to

1 | Mattel confidential and proprietary information regarding Mattel's future product
2 | lines, advertising and promotional campaigns and product profitability.

3 |        73.  On September 26, 2005, Brisbois resigned from Mattel to take a
4 | position as Vice President of Sales at MGA. Mattel is informed and believes that
5 | in that position Brisbois has responsibility for MGA's accounts with both TRU and
6 | Wal-Mart. During Brisbois' exit interview she was specifically asked whether she
7 | was "taking anything." Brisbois responded, "No." Both during and after her exit
8 | interview, Brisbois was advised by Mattel of her obligations to preserve Mattel's
9 | confidential and proprietary information.

10 |        74.  Mattel is informed and believes that Brisbois spoke with Isaac
11 | Larian, MGA's CEO, on September 22, 2005 at approximately 8:30 p.m., when he
12 | called Ms. Brisbois at her home. Mattel subsequently learned that on the same day
13 | that she spoke with Mr. Larian and four days before she resigned, Brisbois copied
14 | approximately 45 Mattel documents on to a USB or "thumb" drive with the volume
15 | label "BACKPACK." On information and belief, Brisbois removed the thumb
16 | drive from Mattel Canada's office by concealing it in her backpack or gym bag the
17 | last time that she left that office. These documents contained Mattel trade secret
18 | and proprietary information, and included:

19 |       &bull;  a document containing the price, cost, sales plan and quantity of every
20 |           Mattel product ordered by every Mattel customer in 2005 and 2006;
21 |       &bull;  the BARBIE television advertising strategy and information concerning
22 |           sales increases generated by television advertisements;
23 |       &bull;  competitive analysis of Mattel vis-à-vis its competitors in Canada;
24 |       &bull;  an analysis of Mattel's girls business sales beginning in 2003 and
25 |           forecasts through 2006;
26 |       &bull;  profit and loss reviews for Mattel's products being sold in Wal-Mart,
27 |           including margins and profit in not only Canada, but in the United
28 |           States and Mexico; and

Exhibit 21
Page 344

2154363.2

-50-

1     • a document containing the product launch dates and related advertising

2        for all Mattel new products between Fall 2005 and Spring 2006.

3        75.   After Mattel discovered that Brisbois had copied these sensitive

4   documents to a thumb drive, Mattel notified Canadian law enforcement authorities.

5   Canadian law enforcement authorities recovered from Brisbois a thumb drive with

6   the volume label "BACKPACK" containing the documents that Brisbois had

7   copied from Mattel's computer system.  Mattel later learned that while she was

8   working as a Vice President of Sales at MGA, Brisbois accessed and modified

9   documents on that thumb drive.

10       76.   After joining MGA, Brisbois repeatedly traveled to MGA's

11  offices in Van Nuys, California and met with Larian and Brawer.  In February,

12  2006, knowing that Mattel trade secrets had been seized from MGA's Mexico City

13  offices and that at least three MGA employees were under criminal investigation,

14  MGA nonetheless issued a press release trumpeting its 2005 performance, with

15  Larian himself concluding, "Our international teams in Mexico and Canada have

16  done a fantastic job."

17  **VII. MGA PERSUADES OTHER EMPLOYEES LEAVING MATTEL TO**

18  **JOIN MGA TO MISAPPROPRIATE MATTEL TRADE SECRETS**

19  **FOR THE BENEFIT OF MGA**

20       77.   In the past few years, MGA has hired directly from Mattel's

21  United States operations at least 25 employees, from Senior Vice-President level to

22  lower level employees.  On information and belief, many of these employees were

23  specifically targeted and recruited by MGA, including by Larian and Brawer, based

24  on the Mattel confidential and proprietary information they could access.  Many of

25  these employees had access to information that Mattel considers to be highly

26  proprietary and confidential.  Mattel believes that some of those former Mattel

27  employees may be observing their obligations not to misappropriate, disclose or

28  use Mattel's confidential and proprietary information.  Mattel is informed and

!154363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

Exhibit 21
Page 345

1    believes, however, that certain additional employees accessed, copied and took

2    from Mattel confidential and proprietary information, including Mattel's strategic

3    plans; business operations, methods and systems; marketing and advertising

4    strategies and plans; future product lines; product profit margins; and customer

5    requirements. The misappropriated confidential and proprietary information

6    included information that these Mattel employees were not authorized to access.

7    On information and belief, the misappropriated confidential and proprietary

8    information taken from Mattel is being disclosed to and used by MGA for the

9    benefit of MGA and to the detriment of Mattel.

10    **VIII. LARIAN MAKES MISREPRESENTATIONS TO RETAILERS**

11         **ABOUT MATTEL'S PRODUCTS**

12         78.   Counter-defendants have engaged in other illegal practices in

13    their efforts to compete unfairly with Mattel. Larian has a practice of sending e-

14    mail messages to a "Bratz News" distribution list that Larian created or that was

15    created for him. Mattel is informed and believes that the recipients of e-mail

16    messages sent to the "Bratz News" distribution list include members of the media

17    as well as representatives of many of Mattel's most significant customers.

18         79.   On May 12, 2006, Larian sent an e-mail message to the "Bratz

19    News" distribution list that included a reference to Mattel's updated MY SCENE

20    MY BLING BLING product with real gems. Mattel had not publicly announced

21    this product at the time that Larian sent his May 12, 2006 e-mail. In fact, Mattel

22    had guarded the identification of this particular product.

23         80.   Shortly thereafter, Larian engaged in a campaign of calling

24    Mattel's most significant customers, including but not limited to Target and TRU,

25    regarding the MY SCENE MY BLING BLING product with real gems. In an

26    effort to dissuade these retailers from purchasing Mattel's MY SCENE MY BLING

27    BLING product with real gems, Larian knowingly made false factual statements

28    about that product to each retailer. As of the writing of this Second Amended

Exhibit 21
Page 346

2154363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1  Answer and Counterclaims, Mattel is aware that Larian represented to each retailer

2  that each was the only retailer to purchase the product and that Mattel would not be

3  supporting the product with television advertising.  At the time that Larian made

4  these statements, he knew them to be false.  As a result of Larian's

5  misrepresentations, at least one retailer cancelled its order for 75,000 units of the

6  MY SCENE MY BLING BLING product with real gems.  Only after Mattel

7  learned of Larian's misrepresentations and was able to correct them was Mattel able

8  to assure the retailer that Larian's representations were false and to persuade the

9  retailer to reinstate the order.

10        81.   Such conduct is not an isolated incident.  MGA and Larian, in an

11  effort to gain an unfair competitive advantage, repeatedly issued false and

12  misleading press releases.  In these press releases, MGA and Larian have

13  misrepresented Bratz's sales, Bratz's market share, Bratz's position vis-à-vis

14  Mattel's BARBIE products, sales of Mattel's BARBIE products, and the market

15  share of Mattel's BARBIE products.

## CLAIMS FOR RELIEF

### First Counterclaim

### Copyright Infringement

### (Against MGA, MGA Entertainment (HK) Limited,

### Larian, Bryant and Does 4 through 10)

21        82.   Mattel repeats and realleges each and every allegation set forth in

22  paragraphs 1 through 81, above, as though fully set forth at length.

23        83.   Mattel is the owner of copyrights in works that are fixed in

24  tangible media of expression and that are the subject of valid, and subsisting,

25  copyright registrations owned by Mattel.  These include, without limitation, the

26  works that are the subject of Registrations VA 1-378-648, VA 1-378-649, VA 1-

27  378-650, VA 1-378-651, VA 1-378-652, VA 1-378-653, VA 1-378-654, VA 1-

28

Exhibit 21
Page 347
-53-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

1   378-655, VA 1-378-656, VA 1-378-657, VA 1-378-658, VA 1-378-659, VA 1-

2   378-660, VAu 715-270, VAu 715-271 and VAu 715-273.

3       84.   Counter-defendants have reproduced, created derivative works

4   from and otherwise infringed upon the exclusive rights of Mattel in its protected

5   works without Mattel's authorization.  Counter-defendants' acts violate Mattel's

6   exclusive rights under the Copyright Act, including without limitation Mattel's

7   exclusive rights to reproduce its copyrighted works and to create derivative works

8   from its copyrighted works, as set forth in 17 U.S.C. §§ 106 and 501.

9       85.   Counter-defendants' infringement (and substantial contributions

10  to the infringement) of Mattel's copyrighted works is and has been knowingly made

11  without Mattel's consent and for commercial purposes and the direct financial

12  benefit of Counter-defendants.  Counter-defendants, moreover, have deliberately

13  failed to exercise their right and ability to supervise the infringing activities of

14  others within their control to refrain from infringing Mattel's copyrighted works

15  and have failed to do so in order to deliberately further their significant financial

16  interest in the infringement of Mattel's copyrighted works.  Accordingly, Counter-

17  defendants have engaged in direct, contributory and vicarious infringement of

18  Mattel's copyrighted works.

19      86.   By virtue of defendants' infringing acts, Mattel is entitled to

20  recover Mattel's actual damages plus Counter-defendants' profits, Mattel's costs of

21  suit and attorneys' fees, and all other relief permitted under the Copyright Act.

22      87.   Counter-defendants' actions described above have caused and

23  will continue to cause irreparable damage to Mattel, for which Mattel has no

24  remedy at law.  Unless Counter-defendants are restrained by this Court from

25  continuing their infringement of Mattel's copyrights, these injuries will continue to

26  occur in the future.  Mattel is accordingly entitled to injunctive relief restraining

27  Counter-defendants from further infringement.

28

Exhibit 21
Page 348

2154363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

## Second Counterclaim

### Violation of the Racketeer Influenced and Corrupt Organizations Act

### 18 U.S.C. §§ 1962(c) and 1964(c)

### (Against All Counter-defendants)

88.    Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 87, above, as though fully set forth at length.

89.    Beginning at various times from approximately 1999 through the filing of this Second Amended Answer and Counterclaims, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas and Brisbois were employed by and associated-in-fact with an enterprise engaging in, and the activities of which affect, interstate and foreign commerce (the "MGA Criminal Enterprise"). The MGA Criminal Enterprise is made up of the MGA Group (MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, certain of the Doe Counter-defendants and Brawer), the Bryant Group (Bryant and certain of the Doe Counter-defendants), the Mexican Group (Machado, Trueba and Vargas) and the Canadian Group (Brisbois). In addition, beginning at various times from approximately 1999 through the filing of this Second Amended Answer and Counterclaims, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, Larian and Bryant, and certain of the Doe Counter-defendants, were employed by and associated-in-fact with a second enterprise engaging in, and the activities of which affect, interstate and foreign commerce (the "Bratz Criminal Enterprise").

90.    MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois, and the Other Former Employees, and each of them, for the purpose of executing and attempting to execute the scheme to improperly defraud Mattel and steal its trade secret or otherwise confidential and proprietary information, by

Exhibit 21
Page 349

-55-

2154363.2

1  means of tortious, fraudulent and criminal conduct, did and do unlawfully, willfully

2  and knowingly conduct and participate, directly and indirectly, in the conduct of

3  the MGA Criminal Enterprise's affairs and, in the case of MGA, MGA

4  Entertainment (HK) Limited, Larian, Bryant, and certain of the Doe Counter-

5  defendants, the Bratz Criminal Enterprise's affairs, through a pattern of

6  racketeering activity. Their actions include multiple, related acts in violation of:

7  18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1512

8  (tampering with a witness victim, or informant), 18 U.S.C. § 1952 (interstate and

9  foreign travel to aid racketeering), and 18 U.S.C. § 2319(a) and 17 U.S.C. §

10  506(a)(1)(A) (criminal copyright infringement).

11       91.   MGA, MGA Entertainment (HK) Limited, MGA de Mexico,

12  Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas,

13  Brisbois, and the Other Former Employees, and each of them, shared the common

14  purpose of enabling MGA to obtain confidential, proprietary and otherwise

15  valuable Mattel property through improper means in order to assist MGA in

16  illegally competing with Mattel domestically and throughout the world.

17       92.   The MGA Criminal Enterprise and Bratz Criminal Enterprise as

18  described herein are and have been at all relevant times continuing enterprises

19  because, among other reasons, each is designed to and did unlawfully acquire the

20  confidential business information and property of Mattel and incorporated this

21  information and property into MGA's ongoing business, marketing strategies and

22  business methods, practices and processes. The conduct of each enterprise

23  continues through the date of this Second Amended Answer and Counterclaims and

24  is ongoing by virtue of MGA's continuing use of Mattel's information and property,

25  all to the detriment of Mattel.

26       93.   The pattern of racketeering activity, as defined by 18 U.S.C.

27  §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat

28  of continuing criminal activity. This activity consists of multiple acts of

Exhibit 21
Page 350

2154363.2

-56-