UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

CARTER BRYANT, AN                      )
INDIVIDUAL,                            )
                                       ) CASE NO.
       PLAINTIFF,                      ) CV 04-9049 SGL (RNBX)
                                       )
V.                                     ) CONSOLIDATED WITH
                                       ) CASE NO. 04-9059
MATTEL, INC., A DELAWARE               )        AND
CORPORATION,                           ) CASE NO. 05-2727
                                       )
       DEFENDANT.                      )
_____)
                                       )
AND CONSOLIDATED ACTION(S)             )
_____)


CONFIDENTIAL ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF ISAAC
LARIAN, VOLUME II, TAKEN ON BEHALF
OF MATTEL, INC., AT 10250
CONSTELLATION BOULEVARD, 19TH FLOOR,
LOS ANGELES, CALIFORNIA, COMMENCING
AT 9:34 A.M., WEDNESDAY, MARCH 26,
2008, BEFORE PAULA A. PYBURN, C.S.R.
7304, R.P.R., C.L.R.

                                                      261

EXHIBIT ____4____

PAGE ____115____

```
 1   APPEARANCES OF COUNSEL:
 2   FOR M.G.A. ENTERTAINMENT, INC.:
 3   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
     BY:  THOMAS J. NOLAN, ESQ.
 4   300 SOUTH GRAND AVENUE
     LOS ANGELES, CALIFORNIA 90071-3144
 5   (213) 687-5000
     TNOLAN@SKADDEN.COM
 6
 7   FOR DEFENDANT MATTEL, INC.:
 8   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     BY:  MICHAEL T. ZELLER, ESQ.
 9            AND
     BY:  JON COREY, ESQ.
10            AND
     BY:  BRIDGET A. HAULER, ESQ.
11   865 SOUTH FIGUEROA STREET
     10TH FLOOR
12   LOS ANGELES, CALIFORNIA 90024
     (213) 443-3000
13   MICHAELZELLER@QUINNEMMANUEL.COM
     JONCOREY@QUINNEMMANUEL.COM
14   BRIDGETHAULER@QUINNEMMANUEL.COM
15
     FOR CARTER BRYANT:
16
     KEKER & VAN NEST LLP
17   BY:  CHRISTA MARTINE ANDERSON, ESQ.
          (PAGES 276 - 517)
18   710 SANSOME STREET
     SAN FRANCISCO, CALIFORNIA 94111
19   (415) 391-5400
     CANDERSON@KVN.COM
20
21   ALSO PRESENT:
22   STEVEN TOGAMI,
          J.T.V. LITIGATIONS SERVICES, INC.
23   JEANINE PISONI,
          GENERAL COUNSEL, M.G.A. ENTERTAINMENT, INC.
24
25
```

262

EXHIBIT __4__

PAGE __116__

```
 1                    I N D E X
 2
 3    WITNESS:        EXAMINED BY:              PAGE:
 4    ISAAC LARIAN
 5                    MR. ZELLER                265
 6
 7
      EXHIBITS FOR IDENTIFICATION:  (BOUND SEPARATELY)
 8
      NUMBER:
 9
10    4941     EMAIL CHAIN, MGA 3805091, 1 PAGE    270
11    4942     EMAIL CHAIN, MGA 3801558 AND        275
              MGA 3801559, 2 PAGES
12    4943     EMAIL CHAIN, MGA 0143307 - MGA      288
              0143309, 3 PAGES
13
14    4944     EMAIL CHAIN, MGA 0142614 -  MGA     296
              0142616, 3 PAGES
15    4945     MGA PRIVILEGE LOG (REVISED)         477
              JANUARY 23, 2008, 242 PAGES
16
      4946     ISAAC LARIAN TOTAL INCOME PER TAX   498
17             RETURN YEARS 1999-2006,
              MGA 3787278, 1 PAGE
18
      4947     ISAAC AND ANGELA LARIAN NET WORTH   498
19             AS OF MARCH 14, 2005,
              MGA 3787275 - MGA 3787277 AND
20             MGA 3787279, 4 PAGES
21
22    QUESTIONS UNANSWERED BY WITNESS:
23
                      (NONE)
24
25
```

A&B COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT _____ 4 _____

PAGE _____ 117 _____

```
1       LOS ANGELES, CALIFORNIA; MONDAY, JANUARY 28, 2008

2                       9:34 A.M.

3

4               THE VIDEO TECHNICIAN:  GOOD MORNING.  WE

5       ARE BACK ON THE RECORD AT 9:34 A.M.  TODAY'S DATE IS        09:34:09

6       MARCH 26TH, 2008, THIS IS TAPE NO. 1 OF VOLUME II

7       FOR THE CONTINUED DEPOSITION OF ISAAC LARIAN IN THE

8       ACTION ENTITLED "CARTER BRYANT VS. MATTEL, INC.,"

9       AND CONSOLIDATED CASES.

10              MAY WE PLEASE HAVE INTRODUCTIONS FOR THE           09:34:30

11      RECORD, BEGINNING WITH THE WITNESS.

12              THE WITNESS:  ISAAC LARIAN.

13              MR. NOLAN:  TOM NOLAN, SKADDEN ARPS, ON

14      BEHALF OF M.G.A. AND ISAAC LARIAN.

15              MS. PISONI:  JEANINE PISONI, GENERAL             09:34:41

16      COUNSEL FOR M.G.A.

17              MR. ZELLER:  MIKE ZELLER FOR MATTEL.

18              MS. HAULER:  BRIDGET HAULER FOR MATTEL.

19              MR. COREY:  JON COREY ON BEHALF OF MATTEL.

20              THE REPORTER:  RAISE YOUR RIGHT HAND,            09:35:04

21      PLEASE.

22              DO YOU SOLEMNLY AFFIRM THE TESTIMONY YOU

23      ARE ABOUT TO GIVE IN THIS DEPOSITION SHALL BE THE

24      TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH?

25              THE WITNESS:  I DO.                              09:35:05
```

264

EXHIBIT ___4___

PAGE ___118___

1        Q.   PRIOR TO THE TIME THAT M.G.A. HIRED RON

2   BRAWER, HOW LONG HAD MR. BRAWER AND M.G.A. BEEN IN

3   DISCUSSIONS ABOUT HIM POTENTIALLY WORKING FOR

4   M.G.A.?

5        A.   I DON'T RECALL.                              03:09:15

6        Q.   WAS IT MONTHS?

7        A.   COULD BE.

8        Q.   WAS IT MORE THAN A YEAR?

9        A.   I DON'T KNOW.

10       Q.   YOU'RE NOT SURE?                             03:09:22

11       A.   I DON'T KNOW.

12       Q.   MIGHT HAVE BEEN MORE THAN A YEAR, LESS THAN

13   A YEAR, YOU CAN'T TELL ME.  IS THAT TRUE?

14       A.   I DO NOT --

15            MR. NOLAN:  ASKED AND ANSWERED.             03:09:32

16            THE WITNESS:  -- KNOW.

17   BY MR. ZELLER:

18       Q.   WELL, YOU DON'T HAVE ANY ESTIMATE WHETHER

19   IT WAS MONTHS, YEARS, DECADES, HOW LONG YOU WERE

20   TALKING WITH MR. BRAWER?                             03:09:39

21       A.   FOR SURE IT WASN'T DECADES.

22       Q.   CAN YOU NARROW IT DOWN ANY MORE THAN LESS

23   THAN DECADES?

24       A.   MONTH.

25       Q.   YOUR BEST ESTIMATE, IT WAS A NUMBER OF      03:09:51

                                                            497

EXHIBIT ____4____

PAGE ____119____

1    MONTHS; IS THAT TRUE?

2        A.   THAT'S RIGHT.

3            MR. ZELLER:   LET'S PLEASE MARK AS NEXT IN

4    ORDER A ONE-PAGE DOCUMENT BEARING BATES

5    NO. MGA 3787278, WHICH IS ENTITLED "ISAAC LARIAN          03:10:07

6    TOTAL INCOME PER TAX RETURNS."

7            (EXHIBIT 4946 MARKED.)

8            MR. ZELLER:   AND I'M SORRY, WHAT NUMBER WAS

9    THAT?

10           THE REPORTER:   4946.                              03:10:48

11           MR. ZELLER:   AND WHILE WE'RE AT IT, LET'S

12   PLEASE ALSO MARK AS EXHIBIT 4947 A MULTIPAGE

13   DOCUMENT BEARING BATES NUMBERS MGA 3787275 THROUGH

14   -79.

15           (EXHIBIT 4947 MARKED.)                             03:13:56

16           THE WITNESS:   OKAY, GO AHEAD.

17   BY MR. ZELLER:

18       Q.   DIRECTING YOUR ATTENTION TO EXHIBIT 4946,

19   DO YOU RECOGNIZE WHAT THIS IS?

20       A.   I DON'T.   THIS IS THE FIRST TIME I SEE IT.       03:14:02

21       Q.   YOU'VE LOOKED AT THE INFORMATION HERE?

22       A.   I HAVE.

23       Q.   IS THIS CONSISTENT, GENERALLY SPEAKING,

24   WITH YOUR RECOLLECTION AND UNDERSTANDING OF -- OF

25   WHAT'S REFLECTED HERE?                                     03:14:16

                                                        498

EXHIBIT  4

PAGE  120

```
 1        A.   I DON'T KNOW.  WHERE DID YOU GET THAT FROM?

 2        Q.   WELL, YOU'LL SEE THAT IT SAYS -- HAS AN MGA

 3   NUMBER THERE, IT'S VERY SMALL ON THIS PARTICULAR

 4   ONE.

 5        A.   I SEE IT.                                       03:14:25

 6        Q.   YOU SEE IT IN THE LOWER RIGHT-HAND CORNER?

 7        A.   RIGHT.

 8        Q.   SO IT MEANS I GOT IT FROM M.G.A.

 9        A.   OKAY.

10        MR. NOLAN:  I THINK -- MIKE, FOR THE                 03:14:31

11   RECORD, I THINK IT WAS PREPARED IN -- I MAY BE WRONG

12   IN THIS, BUT I THOUGHT THIS WAS INTRODUCED OR

13   DISCUSSED AT LISA TONNU'S DEPOSITION.

14        IS THAT TRUE?

15        MS. HAULER:  I DON'T THINK SO.                       03:14:42

16        MR. COREY:  I DON'T IT WAS.

17        MR. NOLAN:  THIS WAS NOT?  OKAY.  I

18   APOLOGIZE.

19        MR. ZELLER:  I THINK THAT WAS A DIFFERENT

20   DOCUMENT.                                                 03:14:47

21        THE WITNESS:  OKAY.  I DON'T KNOW WHO

22   PREPARED THIS.

23   BY MR. ZELLER:

24        Q.   SO IT'S FAIR TO SAY YOU DON'T KNOW WHETHER

25   THE INFORMATION HERE IN EXHIBIT 4946 IS ACCURATE OR       03:14:52
```

499

EXHIBIT ___4_____

PAGE ___12/_____

1    INACCURATE?

2         MR. NOLAN:   WHEN YOU SAY "ACCURATE," YOU

3    MEAN TO THE PENNY --

4         MR. ZELLER:   WELL, I WAS TRYING TO FIND OUT

5    GENERALLY --                                    03:15:00

6         MR. NOLAN:   -- OR TO THE DOLLAR?   I'M

7    SORRY.

8         MR. ZELLER:   -- SPEAKING WHETHER HE THOUGHT

9    IT WAS ACCURATE, AND I THOUGHT HE WAS SAYING HE

10   DIDN'T KNOW.                                     03:15:08

11        Q.   SO LET ME TRY IT THIS WAY:   LOOKING AT THE

12   INFORMATION HERE IN EXHIBIT 4946, DO YOU THINK THESE

13   NUMBERS THAT ARE REFLECTED HERE ARE GENERALLY

14   ACCURATE?

15        A.   WHAT PORTION OF IT?                    03:15:15

16        MR. NOLAN:   ANY -- ANY AND ALL.

17        MR. ZELLER:   YEAH, EXACTLY.

18        THE WITNESS:   IF IT CAME FROM M.G.A. I HOPE

19   THEY'RE ACCURATE.

20   BY MR. ZELLER:                                   03:15:23

21        Q.   WELL, I'M SURE WE ALL DO.

22        A.   RIGHT.

23        Q.   BUT WHAT I'M TRYING TO FIND OUT IS, IS THAT

24   PRESUMABLY YOU HAVE SOME BALLPARK UNDERSTANDING OF,

25   YOU KNOW, AT LEAST SOME OF THE -- SOME OF THE AMOUNT  03:15:32

                                                        500

EXHIBIT ___4___

PAGE ___122___

1   OF WAGES, FOR EXAMPLE, THAT YOU HAVE GOTTEN OVER THE

2   YEARS.

3        A.   RIGHT.

4        Q.   AND, YOU KNOW, WHAT WAS REFLECTED ON YOUR

5   TAX RETURNS.                                                      03:15:42

6             AND SO MY QUESTION IS, IS -- IS THE

7   INFORMATION IN EXHIBIT 4946 GENERALLY SPEAKING

8   CONSISTENT WITH YOUR UNDERSTANDING AND RECOLLECTION?

9        A.   AGAIN, YOU KNOW, IT'S POSSIBLE.  I JUST GOT

10  TO -- I -- I GOT TO GIVE THIS TO AN ACCOUNTANT FOR           03:15:59

11  THEM TO TELL ME.  I -- I -- I ASSUME THEY'RE

12  ACCURATE, BUT I DON'T KNOW.  I'M -- I'M SURE THEY

13  SAW -- WHOEVER PUT THIS TOGETHER HAD CERTAIN RECORDS

14  TO DO IT.

15       Q.   SO YOU DON'T KNOW WHETHER THE INFORMATION         03:16:16

16  IN HERE IS ACCURATE OR INACCURATE; IS THAT TRUE?

17       A.   NO.  I JUST TOLD YOU THAT I -- I -- I THINK

18  IF THIS CAME FROM M.G.A.  I HOPE IT'S ACCURATE.  I

19  HOPE WHOEVER PUT THIS TOGETHER DID AN ACCURATE JOB.

20       Q.   BUT YOU DON'T KNOW WHO --                          03:16:32

21       A.   TO THE PENNY --

22       Q.   YOU DON'T KNOW WHO PUT IT TOGETHER?

23       A.   PROBABLY LISA TONNU; THAT'S MY BEST GUESS.

24       Q.   DO YOU KNOW WHAT THIS INFORMATION IN

25  EXHIBIT 4946 WAS ACTUALLY BASED ON, OTHER THAN WHAT       03:16:43

501

EXHIBIT ___4___

PAGE ___123___

1    YOU CAN READ HERE?

2        A.    NO, JUST WHAT I CAN READ IN HERE.

3        Q.    DIRECTING YOUR ATTENTION TO EXHIBIT 4947 --

4        A.    RIGHT.

5        Q.    -- DO YOU RECOGNIZE ANY PORTION OF THIS          03:16:54

6    EXHIBIT?

7        A.    WHAT PORTION?   IT SAYS "ISAAC AND ANGELA

8    LARIAN."

9        Q.    WELL, MY QUESTION IS, DO YOU RECOGNIZE --

10       A.    I HAVE NEVER SEEN -- IF YOU ARE ASKING ME        03:17:08

11   IF I HAVE SEEN SOMETHING LIKE THIS BEFORE, I HAVE

12   NOT.

13       Q.    DO YOU KNOW WHO PREPARED EXHIBIT 4947?

14       A.    I CAN JUST ASSUME, MAYBE LISA TONNU.

15       Q.    BUT YOU'RE NOT SURE?                             03:17:19

16       A.    I'M PRETTY SURE SHE -- SHE PREPARED IT.

17   EITHER HER OR BRIAN WING [PHONETIC] OR TOGETHER.

18       Q.    DO YOU HAVE AN UNDERSTANDING AS TO WHY IT

19   WAS PREPARED?

20       A.    FOR THIS LITIGATION.                             03:17:31

21       Q.    DID YOU REVIEW IT AT SOME POINT?

22       A.    NO, NOW THAT I'VE SEEN IT -- I DON'T

23   RECALL.

24       Q.    LET ME TRY IT THIS WAY:   WAS -- DID THERE

25   COME A TIME WHEN YOU ASKED LISA TONNU OR SOMEONE        03:17:40

                                                                    502

EXHIBIT ___4___

PAGE ___124___

1   ELSE WITHIN M.G.A. TO PUT TOGETHER CERTAIN FINANCIAL

2   INFORMATION FOR YOU?

3        A.   THERE HAS BEEN, YES.

4        Q.   AND THAT WAS IN CONNECTION WITH THIS CASE?

5        A.   THAT'S CORRECT.                                03:17:51

6        Q.   AND GENERALLY SPEAKING IT'S YOUR

7   UNDERSTANDING THAT THESE TWO EXHIBITS THAT I MARKED,

8   4946 AND 4947, WERE THE RESULT OF THAT?

9        A.   I -- I ASSUME SO.

10       Q.   BUT YOU'RE NOT SURE?                            03:18:02

11       A.   YEAH.  AGAIN, I DON'T KNOW.  I GOT TO ASK

12   HER.

13       Q.   HAVING LOOKED AT THE INFORMATION IN 4947,

14   CAN YOU TELL ME WHETHER ANY OF IT IS ACCURATE OR

15   NOT?                                                     03:18:15

16            MR. NOLAN:  I'M SORRY, WHETHER ANY OF IT IS

17   ACCURATE?

18            MR. ZELLER:  THAT'S RIGHT.

19            MR. NOLAN:  OR INACCURATE?

20            MR. ZELLER:  OR NOT, RIGHT.                     03:18:20

21            MR. NOLAN:  OR NOT, OKAY.

22            GO THROUGH AND TAKE YOUR TIME.

23            THE WITNESS:  I CAN'T -- I CAN'T.  I DON'T

24   KNOW, FRANK -- FOR EXAMPLE, VALUE, WHERE SHE PUT

25   S-CORP. M.G.A. ENTERTAINMENT, I DON'T KNOW WHERE SHE     03:18:32

                                                      503

EXHIBIT ___4___

PAGE ___125___

1    CAME UP WITH THAT NUMBER.  THAT'S THE ONE THAT

2    STICKS IN MY MIND.

3          THE REST OF IT I ASSUME SHE IS ACCURATE.

4    BY MR. ZELLER:

5      Q.   AND THAT'S ON THE FIRST PAGE OF EXHIBIT      03:18:44

6    4947 YOU'RE REFERRING TO?

7      A.   IN EVERY ONE OF THOSE PAGES WHERE YOU SEE A

8    LINE, AND MAYBE SOME ON THE SECOND PAGE.

9          MR. NOLAN:  KEEP YOUR VOICE UP, ISAAC,

10   PLEASE.                                              03:18:56

11         THE WITNESS:  EXCUSE ME.

12         YEAH.  LIKE I DON'T KNOW HOW SHE PUT THE

13   VALUE ON M.G.A. ENTERTAINMENT.

14   BY MR. ZELLER:

15     Q.   DO YOU HAVE -- DO YOU HAVE A GENERAL          03:19:06

16   UNDERSTANDING OR ESTIMATE OF YOUR NET WORTH TODAY?

17     A.   IN GENERAL, PERSONALLY, OR --

18     Q.   YES.

19     A.   -- TO BRATZ?

20     Q.   WE'LL START WITH PERSONALLY.                  03:19:21

21     A.   GOD, I -- I REALLY GOT TO REFER TO MY

22   ACCOUNTANT HOW THESE ARE SPREAD.

23     Q.   DO YOU HAVE A GENERAL UNDERSTANDING OR

24   ESTIMATE OF THE NET WORTH OF ANY OF THE LARIAN

25   TRUSTS?                                              03:19:38

504 -

EXHIBIT    4

PAGE    126

```
1
2
3
4
5                                                            03:19:47
6        Q.   DO -- DO YOU PERSONALLY TODAY OWN ANY
7    SHARES OF SMOBY?
8        A.   DO I OWN?  THAT'S A GOOD QUESTION.
9        Q.   THAT'S WHY I ASK.
10       A.   THAT'S A VERY GOOD QUESTION.  I DON'T KNOW     03:20:03
11   IF I -- FRANKLY, I DON'T KNOW IF I DO OR NOT
12   LEGALLY.
13       Q.   DO YOU KNOW --
14       A.   BECAUSE --
15       Q.   I'M SORRY, GO AHEAD.                           03:20:12
16       A.   BECAUSE THEY WENT TO LIQUIDATION OR THEY
17   WERE GIVEN TO SIMBA.
18       Q.   DOES M.G.A. OWN ANY SHARES OF SMOBY THAT
19   YOU KNOW OF?
20       A.   AGAIN, THE SAME -- I'M SORRY, WHEN EARLIER.    03:20:22
21   YOU WERE ASKING, DO I PERSONALLY OWN --
22       MR. NOLAN:  RIGHT, THAT WAS HIS FIRST --
23       THE WITNESS:  -- THE ANSWER -- I'M SORRY,
24   I'M SORRY, THE ANSWER TO THAT IS NO, I DON'T.
25       IF M.G.A. OWNS OR NOT, THAT'S A LEGAL             03:20:30
```

505

EXHIBIT _____4_____

PAGE ___127___

REDACTED

1    QUESTION, I HAVE NO IDEA.

2    BY MR. ZELLER:

3         Q.    AND PART OF THAT HAS TO DO WITH THE FACT

4    THAT THAT CASE IS WORKING ITS WAY THROUGH THE FRENCH

5    COURTS?                                                      03:20:43

6         A.    IT IS -- IT'S A FRENCH CONNECTION.

7         Q.    DO YOU KNOW WHETHER ANY OF THE LARIAN

8    TRUSTS OWN ANY SHARES OF SMOBY?

9         A.    THEY DON'T.

10        Q.    DO YOU KNOW IF YOU PERSONALLY OR ANY OF THE     03:20:53

11   LARIAN TRUSTS HAVE -- HAVE EVER OWNED ANY OF THE

12   SHARES OF SMOBY?

13        A.    NO.

14        Q.    THE ANSWER IS THEY HAVE NOT?

15        A.    PERSONALLY OR THE TRUST, NO.                     03:21:08

16        Q.    HAVE YOU PERSONALLY OWNED ANY SHARES OF

17   ZAPF?

18        A.    PERSONALLY, I DON'T THINK SO.  I THINK IT'S

19   THROUGH THE TRUST.

20        Q.    SO IT'S -- IT'S YOUR UNDERSTANDING THAT THE     03:21:24

21   TRUST OWNS SHARES OF ZAPF?

22        A.    THAT'S CORRECT.

23        Q.    AND DO YOU HAVE AN UNDERSTANDING AS TO

24   APPROXIMATELY HOW MUCH OF -- OF ZAPF THE TRUSTS

25   HOLD?                                                       03:21:36

506

EXHIBIT ___4___

PAGE ___128___

```
1        A.    WHAT DO YOU MEAN BY "HOW MUCH"?

2        Q.    WELL, HOWEVER YOU COULD ARTICULATE IT,

3   WHETHER IT WOULD BE A NUMBER OF SHARES, OVERALL

4   VALUE?

5        A.                                              03:21:47

6

7        Q.    DOES M.G.A. OWN ANY -- ANY SHARES OF ZAPF?

8        A.    I DON'T THINK SO.

9        Q.    HAS IT EVER, TO YOUR KNOWLEDGE?

10       A.    I DON'T KNOW.                             03:22:06

11             I DON'T THINK THEY DO.  I DON'T KNOW,  OR

12   MAYBE THEY HAVE ONE OR TWO SHARES, I THINK.  I DON'T

13   REMEMBER EXACTLY.

14       Q.    DO YOU HAVE AN UNDERSTANDING AS TO WHAT THE

15   TRUSTS' MOST SIGNIFICANT OR LARGEST ASSET IS?        03:22:21

16            MR. NOLAN:  WHICH TRUST, MIKE?

17            MR. ZELLER:  WELL, I'M TALKING ABOUT ANY OF

18   THESE TRUSTS THAT -- THAT -- THE LARIAN TRUSTS.

19       Q.    I KNOW THAT THERE ARE A COUPLE OF DIFFERENT

20   NAMES FOR THESE.                                     03:22:33

21       A.    WHAT'S THE MOST SIGNIFICANT ASSETS?  THE

22   MONEY AND THE SECURITIES THAT'S IN THE BANKS.

23       Q.    IN THE YEAR 2007 DID YOU RECEIVE A DIVIDEND

24   FROM M.G.A. FOR ANYTHING OTHER THAN FOR TAXES?

25       A.    I DON'T RECALL.  I DON'T KNOW.             03:22:54
```

507

EXHIBIT _____4_____

PAGE _____129_____

REDACTED

1    Q.   HAVE YOU IN 2008?

2    A.   RECEIVED -- 2008 IS NOT OVER YET.

3    Q.   RIGHT.  I'M TALKING ABOUT TO DATE IN 2008.

4    A.   NO.  WHAT -- SALARY I HAVE RECEIVED.

5    WHAT -- WHAT DID YOU ASK?                                03:23:10

6    Q.   A DIVIDEND FROM M.G.A.?

7    A.   I DON'T THINK SO.  NOT TO THE BEST OF MY

8    KNOWLEDGE.

9        DO YOU KNOW HOW MUCH MORE TIME WE HAVE,

10   GUYS?                                                    03:23:17

11       MS. PISONI:  TWO MINUTES.

12       THE WITNESS:  HOW MUCH?

13       MR. NOLAN:  WE HAVE FOUR MINUTES?

14       THE VIDEO TECHNICIAN:  SIX.

15       MR. NOLAN:  SIX MINUTES.                             03:23:22

16   BY MR. ZELLER:

17

18

19                                                            03:23:35

20

21

22

23

24       SORRY.

25   Q.   DO YOU HAVE AN ESTIMATE AS TO THE TOTAL             03:23:47

508

EXHIBIT ___4___

PAGE ___130___

REDACTED

1    AMOUNT OF MONEY THAT YOU'VE RECEIVED IN CONNECTION

2    WITH BRATZ?

3        A.   IN CONNECTION WITH BRATZ?

4             MR. NOLAN:   OBJECTION; VAGUE AND AMBIGUOUS.

5             THE WITNESS:   NO.                                03:24:01

6    BY MR. ZELLER:

7        Q.   DO YOU HAVE AN UNDERSTANDING OR AN

8    ESTIMATION AS TO THE TOTAL AMOUNT THAT M.G.A. HAS

9    RECEIVED FROM BRATZ?

10       A.   I DON'T.                                          03:24:12

11            MR. NOLAN:   SAME OBJECTION.

12   BY MR. ZELLER:

13       Q.   DO YOU KNOW AN ANNA CABRERA?

14       A.   WHO?

15       Q.   CABRERA?                                          03:24:22

16       A.   NEVER HEARD OF HER.

17       Q.   OR ISABEL CABRERA?

18       A.   NO.

19       Q.   DO YOU KNOW A MARIA SALAZAR?

20       A.   NO.                                               03:24:30

21       Q.   DO YOU KNOW A BEATRICE MORALES?

22       A.   NO.

23       Q.   ARE YOU AWARE OF ANY INSTANCES OF ANY

24   PERSONS WHILE THEY WERE EMPLOYED BY MATTEL WORKING

25   FOR M.G.A.?                                                03:24:49

                                                          509

EXHIBIT ___4___

PAGE ___131___

1    A.   I'M SORRY?

2    Q.   ARE YOU AWARE OF ANY INSTANCES IN WHICH

3    SOMEONE WHO WAS WORKING AS AN EMPLOYEE FOR M.G.A. --

4    WELL, ACTUALLY, STRIKE THAT, LET ME REPHRASE THAT.

5         ARE YOU AWARE OF ANY INSTANCES IN WHICH                    03:25:03

6    ANYONE DID WORK FOR M.G.A. WHILE THAT PERSON WAS A

7    MATTEL EMPLOYEE?

8    A.   NO, EXCEPT THE TWO WEEKS THAT CARTER BRYANT

9    WAS THERE.  I MEAN, IS THAT -- IF YOUR QUESTION IS          03:25:20

10   FROM OCTOBER 4 TO OCTOBER 20TH, WHICH I FOUND OUT

11   AFTER YOU SUED US, THAT CARTER BRYANT STAYED AT

12   MATTEL, NO, I DON'T.

13   Q.   HAS ANYONE EVER -- WELL, LET ME ASK THIS:

14   DOES M.G.A. HAVE A POLICY AGAINST HAVING PERSONS WHO

15   ARE THEN EMPLOYED BY COMPETITORS WORKING FOR M.G.A.         03:25:41

16   AT THE SAME TIME?

17   A.   I'M SORRY, I DON'T UNDERSTAND YOUR

18   QUESTION.

19   Q.   DOES -- DOES M.G.A. HAVE A POLICY AGAINST

20   HAVING MATTEL EMPLOYEES, WHILE THEY'RE STILL              03:25:53

21   EMPLOYEES, WORKING WITH M.G.A.?

22        MR. NOLAN:  OBJECTION; ASSUMES FACTS NOT IN

23   EVIDENCE.  ALSO VAGUE AND AMBIGUOUS AS TO WHAT YOU

24   MEAN BY A "POLICY.."

25        THE WITNESS:  I'M NOT AWARE OF POLICY, OR           03:26:03

510

EXHIBIT ___4___

PAGE ___132___

```
 1   STATE OF CALIFORNIA )

 2   COUNTY OF RIVERSIDE )  SS.

 3

 4        I, PAULA A. PYBURN, CSR NO. 7304, R.P.R.,

 5   C.L.R., IN AND FOR THE STATE OF CALIFORNIA, DO

 6   HEREBY CERTIFY:

 7        I AM THE DEPOSITION OFFICER THAT

 8   STENOGRAPHICALLY RECORDED THE TESTIMONY IN THE

 9   FOREGOING DEPOSITION;

10        PRIOR TO BEING EXAMINED THE DEPONENT WAS FIRST

11   DULY SWORN BY ME;

12        THE FOREGOING TRANSCRIPT IS A TRUE RECORD OF

13   THE TESTIMONY GIVEN.

14        BEFORE COMPLETION OF THE DEPOSITION, REVIEW OF

15   THE TRANSCRIPT [X] WAS [ ] WAS NOT REQUESTED.  IF

16   REQUESTED, ANY CHANGES MADE BY THE DEPONENT (AND

17   PROVIDED TO THE REPORTER) DURING THE PERIOD ALLOWED

18   ARE APPENDED HERETO.

19

20   DATED  March 27, 2008.

21

22

23   PAULA A. PYBURN
     C.S.R. NO. 7304, R.P.R.
24   CERTIFIED LIVENOTE REPORTER

25
```

A & E COURT REPORTERS  (213)955-0070  FAX: (213)955-0077

EXHIBIT  4

PAGE  133

**Exhibit  5**

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL, )
)
PLAINTIFF, )
)
V. )      NO. CV 04-9040 SGL (RNBX)
)
MATTEL, INC., A DELAWARE )
CORPORATION, )
)
DEFENDANTS. )
_____ )
)
AND CONSOLIDATED ACTION (S). )

# C O N F I D E N T I A L

**(PURSUANT TO PROTECTIVE ORDER, THIS TRANSCRIPT HAS BEEN
DESIGNATED CONFIDENTIAL, ATTORNEYS' EYES ONLY)**

# DEPOSITION OF LISA TONNU

# VOLUME IV

# JANUARY 17, 2008



REPORTED BY:
PAULA PYBURN
CSR NO. 7304
JOB NO. 08AB029-PP

COURT REPORTERS
515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

Exhibit 10
Page 166

EXHIBIT ___5___

PAGE ___134___

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, AN INDIVIDUAL, | ) |
| | ) |
| | ) CASE NO. |
| PLAINTIFF, | ) CV 04-9049 SGL(RNBX) |
| | ) |
| V. | ) CONSOLIDATED WITH |
| | ) CASE NO. 04-9059 |
| MATTEL, INC., A DELAWARE | ) AND |
| CORPORATION, | ) CASE NO. 05-2727 |
| | ) |
| DEFENDANT. | ) |
| ——————————————— | ) |
| | ) |
| AND CONSOLIDATED ACTION(S) | ) |
| ——————————————— | ) |

CONFIDENTIAL ATTORNEY'S EYES ONLY
VIDEOTAPED DEPOSITION OF M.G.A.
ENTERTAINMENT, INC., PURSUANT TO
RULE 30(B)(6) (LISA TONNU, VOLUME
IV), TAKEN ON BEHALF OF MATTEL,
INC., AT 865 SOUTH FIGUEROA STREET,
2ND FLOOR, LOS ANGELES, CALIFORNIA,
COMMENCING AT 9:25 A.M., THURSDAY,
JANUARY 17, 2008, BEFORE PAULA A.
PYBURN, C.S.R. 7304, R.P.R., C.L.R.

733

Exhibit 10
Page 167

EXHIBIT 5

PAGE 135

```
 1   APPEARANCES OF COUNSEL:
 2   FOR M.G.A. ENTERTAINMENT, INC.:
 3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
      BY:  CARL ALAN ROTH, ESQ.
 4    BY:  RYAN WEINSTEIN, ESQ.
      300 SOUTH GRAND AVENUE
 5    LOS ANGELES, CALIFORNIA 90071-3144
      (213) 687-5000
 6    CROTH@SKADDEN.COM
      RWEINSTE@SKADDEN.COM
 7
 8   FOR DEFENDANT MATTEL, INC.:
 9    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      BY:  JON D. COREY, ESQ.
10    BY:  DIANE HUTNYAN, ESQ.
          (WHERE INDICATED)
11    865 SOUTH FIGUEROA STREET
      2ND FLOOR
12    LOS ANGELES, CALIFORNIA 90017-2543
      (213) 443-3000
13    JONCOREY@QUINNEMANUEL.COM
      DIANEHUTNYAN@QUINNEMANUEL.COM
14
15   FOR CARTER BRYANT:
16    KEKER & VAN NEST LLP
      BY:  AUDREY WALTON-HADLOCK, ESQ.
17    710 SANSOME STREET
      SAN FRANCISCO, CALIFORNIA 94111-1704
18    (415) 391-5400
      AWALTONHADLOCK@KVN.COM
19
20   ALSO PRESENT:
21    CRAIG HOLDEN, M.G.A. ENTERTAINMENT, INC.
          (WHERE INDICATED)
22    STEVEN TOGAMI, J.T.V. LITIGATION SERVICES, INC.
23
24
25
```

734

Exhibit 10
Page 168

A&B COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT 5
PAGE 136

```
 1                    I N D E X
 2
 3   WITNESS:        EXAMINED BY:              PAGE:
 4   LISA TONNU
 5                   MR. COREY                 739
 6                   AFTERNOON SESSION         852
 7                   MS. HUTNYAN               918
 8
 9   EXHIBITS FOR IDENTIFICATION:   (BOUND SEPARATELY)
10   NUMBER:
11   1350 -   THIRD NOTICE OF DEPOSITION OF    741
             M.G.A. ENTERTAINMENT, INC.,
12           PURSUANT TO FEDERAL RULE OF CIVIL
             PROCEDURE 30(B)(6), 11 PAGES
13
     1351 -   FOURTH DEPOSITION NOTICE OF      743
14           M.G.A. ENTERTAINMENT, INC.,
             PURSUANT TO FEDERAL RULE OF CIVIL
15           PROCEDURE 30(B)(6), 30 PAGES
16   1352 -   PAYMENTS MADE TO MARLOW, MGA     759
             3787447 - MGA 3787464, 18 PAGES
17
     1353 -   BONUS AND MERIT SCHEDULE, MGA    770
18           0218357 - MGA 0218421, 65 PAGES
19   1354 -   PAYMENTS MADE TO OR ON BEHALF OF 786
             ISAAC LARIAN OR FAMILY MEMBERS,
20           MGA 3787372 - MGA 3787397, 26
             PAGES
21
     1355 -   PAYMENTS MADE TO OR ON BEHALF OF 827
22           MAKABI FAMILY MEMBERS, MGA
             3787427 - MGA 3787446, 20 PAGES
23
     1356 -   2006 W-2 AND EARNINGS SUMMARIES, 843
24           MGA 3787315 - MGA 3787321, 7
             PAGES
25
```

735

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

Exhibit 10
Page 169

EXHIBIT ___5___

PAGE ___137___

```
1    EXHIBITS FOR IDENTIFICATION:  (BOUND SEPARATELY)
     (CONTINUED)
2
     NUMBER:
3
     1357 -   2005 W-2 AND EARNINGS SUMMARIES,       843
4              MGA 3787322 - MGA 3787328, 7
               PAGES
5
     1358 -   2004 W-2 AND EARNINGS SUMMARIES,       843
6              MGA 3787329 - MGA 3787334, 6
               PAGES
7
     1359 -   2003 W-2 AND EARNINGS SUMMARIES,       843
8              MGA 3787335 - MGA 3787340, 6
               PAGES
9
     1360 -   2002 W-2 AND EARNINGS SUMMARIES,       843
10             MGA 3787341 - MGA 3787346, 6
               PAGES
11
     1361 -   2001 W-2 AND EARNINGS SUMMARIES,       843
12             MGA 3787347 - MGA 3787353, 7
               PAGES
13
     1362 -   1999 W-2 AND EARNINGS SUMMARIES,       843
14             MGA 3787361 - MGA 3787366, 6
               PAGES
15
     1363 -   2000 W-2 AND EARNINGS SUMMARIES,       843
16             MGA 3787354 - MGA 3787360, 7
               PAGES
17
     1364 -   PAYMENT TO LARIAN FAMILY MEMBERS,      852
18             MGA 3787400 - MGA 3787426, 27
               PAGES
19
     1365 -   M.G.A. WORLDWIDE SALES BY S.K.U.,      871
20             2001, MGA 3718299 - MGA 3718343,
               MGA 3718331 - MGA 3718598, MGA
21             3718600 - MGA 3718684, 398 PAGES
22   1366 -   CONSOLIDATED STATEMENT OF             888
               OPERATIONS, MGA 3709872 - MGA
23             3709924, 53 PAGES
24   1367 -   CONSOLIDATED STATEMENT OF             908
               OPERATIONS, MGA 3710419 - MGA
25             3710429, 11 PAGES
```

736

Exhibit 10
Page 170

EXHIBIT _____5_____

PAGE _____138_____

```
 1    EXHIBITS FOR IDENTIFICATION:   (BOUND SEPARATELY)
      (CONTINUED)
 2
      NUMBER:
 3
      1368 -    HANDWRITTEN NOTES OF 1/16/08        931
 4              MEETING WITH ERICH SPECKIN, MGA
                3787467 AND MGA 3787468, 2 PAGES
 5
 6
 7    QUESTIONS UNANSWERED BY WITNESS:
 8                       (NONE)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

737

EXHIBIT ___5___

PAGE ___139___

```
 1        LOS ANGELES, CALIFORNIA; THURSDAY, JANUARY 17, 2008

 2                          9:25 A.M.

 3

 4             THE VIDEO TECHNICIAN:  GOOD MORNING.  WE

 5     ARE ON THE RECORD AT 9:24 A.M.  TODAY'S DATE IS         09:24:45

 6     JANUARY 17TH, 2008.  MY NAME IS STEVEN TOGAMI.  I'M

 7     THE VIDEO TECHNICIAN EMPLOYED BY J.T.V. LITIGATION

 8     SERVICES, INC., LOCATED IN LOS ANGELES, CALIFORNIA.

 9     WE ARE TAPING THESE PROCEEDINGS AT 865 SOUTH

10     FIGUEROA STREET, LOS ANGELES, CALIFORNIA, 90017.        09:25:06

11             THIS IS TAPE NO. 1 FOR VOLUME IV OF THE

12     DEPOSITION -- VIDEOTAPED DEPOSITION OF LISA TONNU IN

13     THE ACTION ENTITLED "CARTER BRYANT VS. MATTEL, INC."

14     THIS DEPOSITION IS BEING TAKEN ON BEHALF OF THE

15     DEFENDANT.  THE CASE NUMBER IS CV 04-9049 SGL.          09:25:28

16             MAY WE PLEASE HAVE INTRODUCTIONS FOR THE

17     RECORD, BEGINNING WITH THE WITNESS.

18             THE WITNESS:  LISA TONNU.

19             MR. ROTH:  CARL ROTH FROM SKADDEN; ARPS ON

20     BEHALF OF THE WITNESS AND THE M.G.A. DEFENDANTS.        09:25:46

21             MS. WALTON-HADLOCK:  AUDREY WALTON-HADLOCK

22     OF KEKER & VAN NEST ON BEHALF OF CARTER BRYANT.

23             MR. WEINSTEIN:  RON WEINSTEIN FROM SKADDEN,

24     ARPS ON BEHALF OF THE WITNESS AND THE M.G.A.

25     DEFENDANTS.                                             09:25:58
```

738

Exhibit 10
Page 172

EXHIBIT 5

PAGE 140

1        MR. COREY:  JON COREY ON BEHALF OF MATTEL.

2        THE VIDEO TECHNICIAN:  THANK YOU.

3        THE REPORTER:  DO YOU SOLEMNLY AFFIRM THE

4  TESTIMONY YOU ARE ABOUT TO GIVE IN THIS DEPOSITION

5  SHALL BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT

6  THE TRUTH?

7        THE WITNESS:  I DO.

8

9               EXAMINATION

10  BY MR. COREY:                      09:26:10

11     Q.  GOOD MORNING, MS. TONNU.

12     A.  GOOD MORNING.

13     Q.  WE HAVE BEEN THROUGH THIS EXERCISE BEFORE.

14  SINCE THE LAST TIME YOU TESTIFIED HAS YOUR -- HAS

15  YOUR JOB POSITION CHANGED AT ALL?        09:26:24

16     A.  NO.

17     Q.  HAS YOUR COMPENSATION CHANGED AT ALL?

18     A.  NO.

19     Q.  HAVE YOU BEEN REPRIMANDED OR DISCIPLINED IN

20  ANY WAY?                           09:26:33

21     A.  NO.

22     Q.  LET ME PUT IN FRONT OF YOU EXHIBIT -- WHAT

23  HAS BEEN PREVIOUSLY MARKED AS EXHIBIT 452, WHICH YOU

24  HAVE SEEN BEFORE.

25        EXHIBIT 452 IS THE SECOND NOTICE OF    09:26:50

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

Exhibit 10
Page 173

EXHIBIT _____5_____

PAGE _____141_____

1      A.   NO.

2      Q.   ARE THERE ANY OTHER -- TAKE A STEP BACK.

3           OTHER THAN THE WAREHOUSE, THE HEADQUARTER

4   OFFICES AND THE SHOWROOM, IS THERE ANY OTHER REAL

5   ESTATE THAT MR. LARIAN OWNS OR HAS AN INTEREST IN TO          11:12:22

6   WHICH M.G.A. ENTERTAINMENT PAYS RENT?

7      A.   NOT THAT I'M AWARE OF.

8      Q.   DO YOU KNOW IF ANY OF THE SUBSIDIARIES OF

9   M.G.A. ENTERTAINMENT PAY RENT FOR FACILITIES IN

10  WHICH MR. LARIAN OWNS OR HAS AN INTEREST?                     11:12:43

11     A.   NOT THAT I'M AWARE OF.

12     Q.   DO YOU KNOW WHETHER M.G.A. HAS EVER MADE A

13  LOAN TO MR. LARIAN?

14     A.   YES.

15          NO, I'M SORRY, CAN YOU REPEAT THAT                    11:13:12

16  QUESTION?

17     Q.   HAS M.G.A. EVER MADE A LOAN TO MR. LARIAN?

18     A.   NOT THAT I'M AWARE OF.   SORRY.

19     Q.   HAS -- DOES M.G.A. PAY FOR -- AND I DON'T

20  KNOW IF MR. LARIAN HAS THESE OR NOT -- HIS -- HIS             11:13:35

21  PERSONAL -- EITHER PERSONAL ASSISTANTS OR PRIVATE --

22  PRIVATE EMPLOYEES?

23          MR. ROTH:   OBJECTION.

24  BY MR. COREY:

25     Q.   LIKE DRIVERS OR THINGS LIKE THAT?                     11:13:46

807 Exhibit 10
Page 174

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT  5
PAGE  142

1        MR. ROTH:  OBJECTION; VAGUE AND AMBIGUOUS.

2        THE WITNESS:  NOT THAT I'M AWARE OF.

3   BY MR. COREY:

4        Q.   DO YOU KNOW WHETHER M.G.A. PAYS FOR

5   SERVICES THAT ARE PROVIDED SPECIFICALLY FOR          11:14:00

6   MR. LARIAN?

7        MR. ROTH:  OBJECTION; VAGUE AND AMBIGUOUS.

8        THE WITNESS:  CAN YOU BE MORE SPECIFIC?

9   BY MR. COREY:

10       Q.   WELL -- YEAH, I CAN BE MORE SPECIFIC.  I    11:14:09

11   MEAN, YOU'RE AN M.G.A. EMPLOYEE, BUT I UNDERSTAND

12   YOU ASSIST MR. LARIAN WITH HIS PERSONAL TAX RETURNS.

13   IS THAT WHAT YOU TOLD -- IS THAT WHAT YOU TESTIFIED

14   BEFORE?

15       A.   I DO NOT PREPARE THEM, NO.  I JUST GATHER   11:14:21

16   THE INFORMATION.

17       Q.   YOU COLLECT THE INFORMATION AND YOU PROVIDE

18   IT TO -- I THINK MOSS ADAMS IS WHO YOU TOLD ME

19   TOOK --

20       A.   THAT'S CORRECT.                            11:14:31

21       Q.   -- CARE OF THAT.

22        AND SO -- AND THERE GOING TO BE SOME -- AND

23   THERE'S GOING TO BE SOME OVERLAP THERE, AND SO I'M

24   TRYING TO FIND OUT IF M.G.A. PAYS MOSS ADAMS, FOR

25   EXAMPLE, OR DOES MR. LARIAN PAY THAT?               11:14:41

Exhibit 10
Page 175

EXHIBIT _____5_____

PAGE ____143____

1     A.   MR. LARIAN PAYS FOR THE PROFESSIONAL FEES.

2     Q.  OKAY.  DO YOU KNOW WHETHER HE PAYS FOR THE

3  PROFESSIONAL FEES FOR THE LAWYERS HANDLING THIS

4  LITIGATION OR ANY OTHER LITIGATION IN WHICH

5  MR. LARIAN IS INVOLVED PERSONALLY?         11:14:55

6         MR. ROTH:  OBJECTION; FOUNDATION.

7         THE WITNESS:  ARE YOU ASKING IF M.G.A. PAYS

8  FOR THEM?

9  BY MR. COREY:

10     Q.   I'M ASKING YOU IF YOU KNOW WHETHER M.G.A.     11:15:03

11  PAYS -- PAYS THEM?

12     A.   NOT THAT I'M AWARE OF.

13     Q.   AND I THINK YOU TOLD ME BEFORE THAT -- THAT

14  MOSS ADAMS PROVIDES BOTH TAX AND ACCOUNTING

15  SERVICES.  AM I RECALLING THAT CORRECTLY?      11:15:20

16     A.   "ACCOUNTING SERVICES," I DON'T UNDERSTAND

17  WHAT YOU MEAN.

18     Q.   DOES MR. -- DOES MR. LARIAN HAVE A SEPARATE

19  ACCOUNTANT OTHER THAN MOSS ADAMS?

20         MR. ROTH:  OBJECTION; FOUNDATION.        11:15:31

21  BY MR. COREY:

22     Q.   IF YOU KNOW.

23     A.   NOT THAT I'M AWARE OF.

24         AND YOU'RE TALKING ABOUT CURRENTLY;

25  CORRECT?                        11:15:41

809  Exhibit 10
Page 176

EXHIBIT   5

PAGE   144

1  STATE OF CALIFORNIA    )
                          ) SS.
2  COUNTY OF RIVERSIDE    )

3      I, PAULA A. PYBURN, CERTIFIED SHORTHAND

4  REPORTER, CERTIFICATE NUMBER 7304, R.P.R., C.L.R., FOR

5  THE STATE OF CALIFORNIA, HEREBY CERTIFY:

6          THE FOREGOING PROCEEDINGS WERE TAKEN BEFORE ME

7  AT THE TIME AND PLACE THEREIN SET FORTH, AT WHICH TIME

8  THE WITNESS WAS PLACED UNDER OATH BY ME;

9          THE TESTIMONY OF THE WITNESS AND ALL OBJECTIONS

10  MADE AT THE TIME OF THE EXAMINATION WERE RECORDED

11  STENOGRAPHICALLY BY ME AND WERE THEREAFTER TRANSCRIBED;

12          THE FOREGOING TRANSCRIPT IS A TRUE AND CORRECT

13  TRANSCRIPT OF MY SHORTHAND NOTES SO TAKEN;

14          I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR

15  NOR RELATED TO ANY PARTY TO SAID ACTION NOR IN ANY WAY

16  INTERESTED IN THE OUTCOME THEREOF.

17          IN WITNESS WHEREOF, I HAVE HEREUNTO SUBSCRIBED

18  MY NAME THIS 23rd DAY OF JANUARY, 2008.

19

20          Paula A. Pyburn

21

22

23

24

25

81
Exhibit 10
Page 177

A & E COURT REPORTERS   (213) 955-0070   FAX: (213) 955-0077

EXHIBIT        J

PAGE        145

Exhibit  6

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

**Exhibit 7**

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL,    )
                                 )
        PLAINTIFF,               )
                                 )
    V.                           )        NO.  CV 04-9040 SGL (RNBX)
                                 )
MATTEL, INC., A DELAWARE         )
CORPORATION,                     )
                                 )
        DEFENDANTS.              )
_____)
                                 )
AND CONSOLIDATED ACTION (S).     )
_____)

# C O N F I D E N T I A L

### (PURSUANT TO PROTECTIVE ORDER, THIS TRANSCRIPT HAS BEEN DESIGNATED CONFIDENTIAL, ATTORNEYS' EYES ONLY)

## DEPOSITION OF LISA TONNU

## VOLUME IV

## JANUARY 17, 2008



COURT REPORTERS

515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

REPORTED BY:
PAULA PYBURN
CSR NO. 7304
JOB NO. 08AE029-PP

EXHIBIT _____7_____

PAGE _____173_____

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, AN | ) |
| INDIVIDUAL, | ) |
| | ) CASE NO. |
| PLAINTIFF, | ) CV 04-9049 SGL(RNBX) |
| | ) |
| V. | ) CONSOLIDATED WITH |
| | ) CASE NO. 04-9059 |
| MATTEL, INC., A DELAWARE | )         AND |
| CORPORATION, | ) CASE NO. 05-2727 |
| | ) |
| DEFENDANT. | ) |
| _____ | ) |
| | ) |
| AND CONSOLIDATED ACTION(S) | ) |
| _____ | ) |

CONFIDENTIAL ATTORNEY'S EYES ONLY
VIDEOTAPED DEPOSITION OF M.G.A.
ENTERTAINMENT, INC., PURSUANT TO
RULE 30(B)(6) (LISA TONNU, VOLUME
IV), TAKEN ON BEHALF OF MATTEL,
INC., AT 865 SOUTH FIGUEROA STREET,
2ND FLOOR, LOS ANGELES, CALIFORNIA,
COMMENCING AT 9:25 A.M., THURSDAY,
JANUARY 17, 2008, BEFORE PAULA A.
PYBURN, C.S.R. 7304, R.P.R., C.L.R.

733

EXHIBIT _____7_____

PAGE _____174_____

```
 1    APPEARANCES OF COUNSEL:
 2    FOR M.G.A. ENTERTAINMENT, INC.:
 3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
      BY:  CARL ALAN ROTH, ESQ.
 4    BY:  RYAN WEINSTEIN, ESQ.
      300 SOUTH GRAND AVENUE
 5    LOS ANGELES, CALIFORNIA 90071-3144
      (213) 687-5000
 6    CROTH@SKADDEN.COM
      RWEINSTE@SKADDEN.COM
 7
 8    FOR DEFENDANT MATTEL, INC.:
 9    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      BY:  JON D. COREY, ESQ.
10    BY:  DIANE HUTNYAN, ESQ.
           (WHERE INDICATED)
11    865 SOUTH FIGUEROA STREET
      2ND FLOOR
12    LOS ANGELES, CALIFORNIA 90017-2543
      (213) 443-3000
13    JONCOREY@QUINNEMANUEL.COM
      DIANEHUTNYAN@QUINNEMANUEL.COM
14
15    FOR CARTER BRYANT:
16    KEKER & VAN NEST LLP
      BY:  AUDREY WALTON-HADLOCK, ESQ.
17    710 SANSOME STREET
      SAN FRANCISCO, CALIFORNIA 94111-1704
18    (415) 391-5400
      AWALTONHADLOCK@KVN.COM
19
20    ALSO PRESENT:
21    CRAIG HOLDEN, M.G.A. ENTERTAINMENT, INC.
           (WHERE INDICATED)
22    STEVEN TOGAMI, J.T.V. LITIGATION SERVICES, INC.
23
24
25
```

734

EXHIBIT ___7___

PAGE ___175___

```
 1                    I N D E X
 2
 3   WITNESS:          EXAMINED BY:              PAGE:
 4   LISA TONNU
 5                     MR. COREY                 739
 6                     AFTERNOON SESSION         852
 7                     MS. HUTNYAN               918
 8
 9   EXHIBITS FOR IDENTIFICATION:   (BOUND SEPARATELY)
10   NUMBER:
11   1350 -   THIRD NOTICE OF DEPOSITION OF      741
             M.G.A. ENTERTAINMENT, INC.,
12           PURSUANT TO FEDERAL RULE OF CIVIL
             PROCEDURE 30(B)(6), 11 PAGES
13
14   1351 -   FOURTH DEPOSITION NOTICE OF        743
             M.G.A. ENTERTAINMENT, INC.,
15           PURSUANT TO FEDERAL RULE OF CIVIL
             PROCEDURE 30(B)(6), 30 PAGES
16   1352 -   PAYMENTS MADE TO MARLOW, MGA       759
             3787447 - MGA 3787464, 18 PAGES
17
18   1353 -   BONUS AND MERIT SCHEDULE, MGA      770
             0218357 - MGA 0218421, 65 PAGES
19   1354 -   PAYMENTS MADE TO OR ON BEHALF OF   786
             ISAAC LARIAN OR FAMILY MEMBERS,
20           MGA 3787372 - MGA 3787397, 26
             PAGES
21
22   1355 -   PAYMENTS MADE TO OR ON BEHALF OF   827
             MAKABI FAMILY MEMBERS, MGA
23           3787427 - MGA 3787446, 20 PAGES
24   1356 -   2006 W-2 AND EARNINGS SUMMARIES,   843
             MGA 3787315 - MGA 3787321, 7
25           PAGES
```

735

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT  7

PAGE  176

1  EXHIBITS FOR IDENTIFICATION:  (BOUND SEPARATELY)
   (CONTINUED)
2
   NUMBER:
3
4  1357 -  2005 W-2 AND EARNINGS SUMMARIES,    843
           MGA 3787322 - MGA 3787328, 7
5          PAGES

6  1358 -  2004 W-2 AND EARNINGS SUMMARIES,    843
           MGA 3787329 - MGA 3787334, 6
7          PAGES

8  1359 -  2003 W-2 AND EARNINGS SUMMARIES,    843
           MGA 3787335 - MGA 3787340, 6
9          PAGES

10 1360 -  2002 W-2 AND EARNINGS SUMMARIES,    843
           MGA 3787341 - MGA 3787346, 6
11         PAGES

12 1361 -  2001 W-2 AND EARNINGS SUMMARIES,    843
           MGA 3787347 - MGA 3787353, 7
13         PAGES

14 1362 -  1999 W-2 AND EARNINGS SUMMARIES,    843
           MGA 3787361 - MGA 3787366, 6
15         PAGES

16 1363 -  2000 W-2 AND EARNINGS SUMMARIES,    843
           MGA 3787354 - MGA 3787360, 7
17         PAGES

18 1364 -  PAYMENT TO LARIAN FAMILY MEMBERS,    852
           MGA 3787400 - MGA 3787426, 27
19         PAGES

20 1365 -  M.G.A. WORLDWIDE SALES BY S.K.U.,    871
           2001, MGA 3718299 - MGA 3718343,
21         MGA 3718331 - MGA 3718598, MGA
           3718600 - MGA 3718684, 398 PAGES
22 1366 -  CONSOLIDATED STATEMENT OF           888
           OPERATIONS, MGA 3709872 - MGA
23         3709924, 53 PAGES
24 1367 -  CONSOLIDATED STATEMENT OF           908
           OPERATIONS, MGA 3710419 - MGA
25         3710429, 11 PAGES

736

EXHIBIT ___7___

PAGE __/77__

```
1    EXHIBITS FOR IDENTIFICATION:   (BOUND SEPARATELY)
     (CONTINUED)
2
     NUMBER:
3
     1368 -    HANDWRITTEN NOTES OF 1/16/08      931
4              MEETING WITH ERICH SPECKIN, MGA
               3787467 AND MGA 3787468, 2 PAGES
5
6
7    QUESTIONS UNANSWERED BY WITNESS:
8                        (NONE)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

737

EXHIBIT ___7___

PAGE ___178___

1     Q.   OKAY.  HAVE THERE BEEN ANY OTHER LOCATIONS

2  IN THE PAST FOR WHICH M.G.A. HAS PAID MR. LARIAN OR

3  AN ENTITY IN WHICH HE HAS AN INTEREST RENT?

4     A.   I DO NOT KNOW.

5     Q.   YOU'RE NOW GOING BACK TO 2005 WHEN YOU     11:05:55

6  JOINED THE COMPANY?

7     A.   YES.

8     Q.   SINCE 2005 DO YOU KNOW HOW MUCH -- TAKE A

9  STEP BACK.

10       DOES MR. LARIAN OWN THE WAREHOUSE, THE     11:06:11

11  HEADQUARTER OFFICES OR THE SHOWROOM SPACE

12  PERSONALLY?

13       MR. ROTH:  OBJECTION; MISSTATES TESTIMONY.

14       THE WITNESS:  NO.

15  BY MR. COREY:     11:06:25

16     Q.   DOES HE OWN THEM THROUGH A COMPANY OR

17  COMPANIES?

18       MR. ROTH:  OBJECTION; FOUNDATION.

19  BY MR. COREY:

20     Q.   IF YOU KNOW.     11:06:34

21     A.   YES.

22     Q.   DO YOU KNOW WHAT THE NAME OF THOSE

23  COMPANIES ARE, COMPANY OR COMPANIES ARE?

24       MR. ROTH:  SAME OBJECTION.

25       THE WITNESS:  YES.     11:06:40

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT____7____

PAGE_____179_____

BY MR. COREY:

1

2      Q.   WHAT -- WHAT ARE THEY?

3      A.   FOR WHICH ONE?

4      Q.   FOR ALL OF THEM.  WHAT ARE THEY FOR THE

5   WAREHOUSE -- WELL, WHAT'S THE NAME OF THE COMPANY OR          11:06:48

6   COMPANIES FOR THE WAREHOUSE?

7      A.   TOY BOX LLC.

8      Q.   IS THAT THE ONLY ONE?

9      A.   NO.

10     Q.   IS THAT THE ONLY ONE FOR THE WAREHOUSE?              11:07:04

11     A.   YES.

12     Q.   OKAY.  WHAT ABOUT THE HEADQUARTER OFFICES?

13     A.   THE NAME?

14     Q.   THE NAME OF THE COMPANY.

15     A.   IT'S 16300 ROSCOE BOULEVARD LLC.                     11:07:13

16     Q.   IS THAT THE ONLY COMPANY THAT OWNS THE

17  HEADQUARTER OFFICES?

18     A.   YES.

19     Q.   WHAT ABOUT THE SHOWROOM SPACE, WHAT'S THE

20  NAME OF THE COMPANY THAT OWNS THAT?                          11:07:37

21     A.   M.G.A. NORTH LLC.

22     Q.   IS THERE ANY COMPANY THAT OWNS THOSE

23  OFFICES?

24     A.   I'M SORRY, I DON'T UNDERSTAND THE QUESTION.

25          MR. ROTH:  OBJECTION; VAGUE AND AMBIGUOUS.           11:07:56

803

EXHIBIT     7

PAGE        180

BY MR. COREY:

Q.   SURE.   WE'LL DO IT A LITTLE BIT DIFFERENTLY.

IS MR. LARIAN -- DOES MR. LARIAN OWN 100 PERCENT OF THE INTEREST IN TOY BOX LLC?                        11:08:07

MR. ROTH:  OBJECTION; FOUNDATION.

BY MR. COREY:

Q.   IF YOU KNOW.

A.   NO.

Q.   DO YOU KNOW WHO OWNS TOY BOX LLC?                   11:08:14

MR. ROTH:   OBJECTION; FOUNDATION.

THE WITNESS:  YES.

BY MR. COREY:

Q.   HOW DO YOU KNOW THAT?

A.   I RECEIVE K-1S FOR THOSE -- FOR THAT              11:08:27
PARTICULAR ENTITY AS PART OF THE PREPARATION OF
MR. LARIAN'S TAX RETURN.

Q.   WHO OWNS TOY BOX LLC?

A.   THERE ARE VARIOUS TRUSTS THAT OWNS IT.

Q.   CAN YOU IDENTIFY THOSE TRUSTS FOR ME?             11:09:13

A.   YES.

Q.   WHAT ARE THEY?

A.   THE ISAAC LARIAN GRANTOR ANNUITY TRUST, THE
ANGELA LARIAN GRANTOR ANNUITY TRUST, JAHANGIR MAKABI
ANNUITY -- GRANTOR ANNUITY TRUST.                      11:09:36

804

EXHIBIT __7__

PAGE __181__

```
 1        Q.   CAN YOU SPELL MR. MAKABI'S FIRST NAME FOR

 2   THE COURT REPORTER?   SHE WOULD REALLY APPRECIATE

 3   THAT.

 4        A.   J-A-H-A-N-G-I-R.

 5             AND SHIRIN MAKABI GRANTOR ANNUITY TRUST.          11:09:51

 6        Q.   ARE THOSE THE ONLY OWNERS --

 7        A.   YES.

 8        Q.   -- OF TOY BOX LLC?

 9             DO YOU KNOW WHAT THE PROPORTION OF

10   OWNERSHIP IS?                                               11:10:09

11        A.   I DO NOT RECALL.

12        Q.   WHO OWNS 16- -- DO YOU KNOW WHO OWNS 16300

13   ROSCOE BOULEVARD LLC?

14        A.   YES.

15        Q.   HOW DO YOU KNOW THAT?                             11:10:19

16        A.   BECAUSE I RECEIVE THE K-1S FOR THAT COMPANY

17   AS WELL.

18        Q.   WHO OWNS 16300 ROSCOE BOULEVARD LLC?

19        A.   ISAAC LARIAN GRANTOR ANNUITY TRUST, ANGELA

20   LARIAN GRANTOR ANNUITY TRUST, LARIAN FAMILY TRUST,         11:10:41

21   JAHANGIR MAKABI GRANTOR ANNUITY TRUST, SHIRIN MAKABI

22   GRANTOR ANNUITY TRUST, MAKABI FAMILY TRUST.

23        Q.   DO YOU KNOW WHAT THE PROPORTIONS OF

24   OWNERSHIP ARE?

25        A.   I DO NOT RECALL.                                 11:10:59
```

805

EXHIBIT  7

PAGE  182

1  Q. WHO OWNS M.G.A. -- DO YOU KNOW WHO OWNS

2 M.G.A. NORTH LLC?

3  A. I DO NOT RECALL.

4  Q. DO YOU KNOW WHETHER IT'S -- IT'S WHOLLY

5 OWNED BY MR. LARIAN OR ONE OF THE TRUSTS, ONE OF HIS  11:11:13

6 TRUSTS?

7  A. NO, IT'S NOT.

8  Q. DOES MR. MAKABI HAVE AN INTEREST IN M.G.A.

9 NORTH LLC?

10  A. I BELIEVE SO.  11:11:26

11  Q. SINCE YOU JOINED M.G.A., DO YOU KNOW HOW

12 MUCH RENT HAS BEEN PAID TO TOY BOX LLC?

13  MR. ROTH: OBJECTION; VAGUE AND AMBIGUOUS.

14  THE WITNESS: NO.

15 BY MR. COREY:  11:11:39

16  Q. SINCE 2005 DO YOU KNOW HOW MUCH RENT HAS

17 BEEN PAID TO 16300 ROSCOE BOULEVARD LLC?

18  MR. ROTH: SAME OBJECTION.

19  THE WITNESS: NO.

20 BY MR. COREY:  11:11:50

21  Q. SINCE YOU JOINED M.G.A. DO YOU KNOW HOW

22 MUCH RENT HAS BEEN PAID TO M.G.A. NORTH LLC?

23  A. NO.

24  Q. DO YOU KNOW WHAT THE -- THE MONTHLY RENT IS

25 FOR ANY OF THESE FACILITIES?  11:12:00

806

EXHIBIT 7

PAGE 183

```
1       A.   NO.

2       Q.   ARE THERE ANY OTHER -- TAKE A STEP BACK.

3            OTHER THAN THE WAREHOUSE, THE HEADQUARTER

4  OFFICES AND THE SHOWROOM, IS THERE ANY OTHER REAL

5  ESTATE THAT MR. LARIAN OWNS OR HAS AN INTEREST IN TO      11:12:22

6  WHICH M.G.A. ENTERTAINMENT PAYS RENT?

7       A.   NOT THAT I'M AWARE OF.

8       Q.   DO YOU KNOW IF ANY OF THE SUBSIDIARIES OF

9  M.G.A. ENTERTAINMENT PAY RENT FOR FACILITIES IN

10  WHICH MR. LARIAN OWNS OR HAS AN INTEREST?                11:12:43

11       A.   NOT THAT I'M AWARE OF.

12       Q.   DO YOU KNOW WHETHER M.G.A. HAS EVER MADE A

13  LOAN TO MR. LARIAN?

14       A.   YES.

15            NO, I'M SORRY, CAN YOU REPEAT THAT            11:13:12

16  QUESTION?

17       Q.   HAS M.G.A. EVER MADE A LOAN TO MR. LARIAN?

18       A.   NOT THAT I'M AWARE OF.   SORRY.

19       Q.   HAS -- DOES M.G.A. PAY FOR -- AND I DON'T

20  KNOW IF MR. LARIAN HAS THESE OR NOT -- HIS -- HIS        11:13:35

21  PERSONAL -- EITHER PERSONAL ASSISTANTS OR PRIVATE --

22  PRIVATE EMPLOYEES?

23       MR. ROTH:  OBJECTION.

24  BY MR. COREY:

25       Q.   LIKE DRIVERS OR THINGS LIKE THAT?             11:13:46
```

807

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT 7

PAGE 184

```
 1    DISTRIBUTION ACCOUNT?
 2         A.   SOME OF THE TRANSACTIONS IN HERE ARE ON
 3    BEHALF OF, AND SO IT WOULD -- WE TREAT IT AS A
 4    DISTRIBUTION TO THE SHAREHOLDER.
 5         Q.   SO -- SO -- IT'S -- SO THAT THE MONEY IS --        11:22:47
 6    IS GOING TO ISAAC LARIAN'S FATHER BUT THE SOURCE OF
 7    THE MONEY IS EITHER AN ADVANCE -- OR IT'S AN ADVANCE
 8    ON A DISTRIBUTION OR SOMETHING LIKE THAT; IS THAT
 9    RIGHT?
10         A.   IT'S NOT AN ADVANCE; IT'S TREATED AS A            11:23:03
11    DISTRIBUTION.
12         Q.   IT'S A DISTRIBUTION?
13         A.   (WITNESS NODS HEAD UP AND DOWN.)
14         Q.   IF YOU LOOK AT -- IF YOU LOOK AT ISAAC
15    LARIAN'S ENTRY, STARTING ON 22 IT HAS 1999 INCOME         11:23:34
16    TAXES AND 2001 TAXES, BUT THERE'S NO ENTRY FOR 2000
17    TAXES.
18         DO YOU KNOW WHY THAT IS?
19         A.   NO.
20         Q.   AND DO YOU KNOW WHETHER THESE ARE                11:23:52
21    DISTRIBUTIONS TO -- WELL, HELP ME -- HELP ME
22    UNDERSTAND HOW -- HOW THIS -- WELL, LET'S DO IT THIS
23    WAY.
24         AND WE HAD STARTED DOWN THIS ROAD BEFORE,
25    BUT YOU WERE INSTRUCTED NOT TO ANSWER.  CAN YOU          11:24:16
```

814

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT ___7___

PAGE ___185___

```
 1    IDENTIFY FOR ME THE SHAREHOLDERS IN M.G.A.

 2    ENTERTAINMENT, INC.?

 3         A.    CURRENTLY?

 4         Q.    YES.

 5         A.    LARIAN FAMILY TRUST, ISAAC LARIAN GRANTOR        11:24:31

 6    ANNUITY TRUST, ANGELA LARIAN GRANTOR ANNUITY TRUST,

 7    MAKABI FAMILY TRUST, JAHANGIR MAKABI GRANTOR ANNUITY

 8    TRUST, SHIRIN MAKABI GRANTOR ANNUITY TRUST.

 9         Q.    DO YOU KNOW WHAT THE CURRENT PROPORTIONS OF

10    OWNERSHIP ARE?                                             11:25:07

11         A.    NOT SPECIFIC TO EACH TRUST, NO.

12         Q.    DO YOU KNOW BETWEEN MR. MAKABI'S FAMILY AND

13    MR. -- THE MAKABI TRUSTS AND THE LARIAN TRUSTS?

14         A.    CAN YOU BE MORE SPECIFIC?

15         Q.    SURE.  DO YOU KNOW -- DO YOU KNOW THE           11:25:26

16    PROPORTION OF OWNERSHIP IF YOU DIVIDE IT BETWEEN THE

17    MAKABI TRUSTS AND THE LARIAN TRUSTS?

18         A.    WHICH TRUSTS?

19         Q.    YOU SAID YOU DIDN'T -- TAKE A STEP BACK.

20               DO YOU KNOW WHAT PERCENTAGE OF M.G.A.           11:25:36

21    ENTERTAINMENT'S STOCK THE LARIAN FAMILY TRUST OWNS?

22         A.    NO, I DON'T KNOW SPECIFICALLY THE AMOUNT.

23    I CAN'T RECALL.

24         Q.    WHAT'S -- WHAT'S -- YOU CAN'T RECALL

25    CURRENTLY?                                                 11:25:53
```

815

EXHIBIT ___7___

PAGE ___186___

```
 1        A.    RIGHT.

 2        Q.    WHAT'S YOUR BEST ESTIMATE?

 3              MR. ROTH:   OBJECTION; CALLS FOR

 4  SPECULATION.

 5              THE WITNESS:   I DON'T -- I DON'T KNOW THE      11:26:01

 6  EXACT PERCENTAGE.

 7  BY MR. COREY:

 8        Q.    DO YOU KNOW THE PERCENTAGE BETWEEN -- THAT

 9  THE LARIAN FAMILY TRUST, THE ISAAC LARIAN GRANTOR

10  ANNUITY TRUST, AND THE ANGELA LARIAN GRANTOR ANNUITY      11:26:13

11  TRUSTS TOGETHER OWN?

12        A.    YES.

13        Q.    WHAT IS THAT?

14        A.    81.82 PERCENT.

15        Q.    81-POINT --                                    11:26:23

16        A.    -82.

17        Q.    AND THE BALANCE IS OWNED IN SOME PROPORTION

18  BY THE MAKABI FAMILY TRUST, THE MR. MAKABI GRANTOR

19  ANNUITY TRUST AND THE SHIRIN MAKABI GRANTOR ANNUITY

20  TRUST; CORRECT?                                            11:26:46

21        A.    YES.

22        Q.    AND HOW LONG HAS THAT BEEN THE PROPORTION

23  OF OWNERSHIP?

24        A.    SINCE I'VE BEEN WITH THE COMPANY.

25        Q.    SO THE ENTRIES RELATING TO MR. LARIAN ON       11:26:57
```

816

EXHIBIT __7__

PAGE __187__

```
 1      A.   YES.

 2      Q..  WHAT DOES THAT -- HOW DO YOU KNOW THAT?

 3      A.   HOW DO I KNOW THAT?

 4      Q.   UH-HUH.

 5      A.   I BELIEVE I HAD DISCUSSIONS WITH SOME -- IN      11:51:52

 6   THE ACCOUNTING DEPARTMENT, AMY AND SOME OF THE OTHER

 7   PEOPLE WHO ARE -- WHO ARE RESPONSIBLE FOR THIS, FOR

 8   THIS ACCOUNT, ABOUT SOME OF THESE RECLASSES.

 9      Q.   WHAT DOES TO "RECLASS" DISTRIBUTIONS REFER

10   TO?                                                     11:52:12

11      A.   IT BASICALLY MEANS THAT WE BASICALLY TREAT

12   THE AMOUNT THAT WAS FUNDED TO THE SHAREHOLDERS AS

13   ACTUALLY -- INSTEAD OF A LOAN, IT'S ACTUALLY

14   CONSIDERED A DISTRIBUTION.

15      Q.   DO YOU KNOW WHETHER ANY OF THE LOANS TO         11:52:26

16   MR. MAKABI ARE DOCUMENTED, IF THERE ARE AGREEMENTS

17   SIGNED, OR ARE THEY JUST TREATED AS ADVANCES?

18      A.   I'M NOT AWARE OF ANY DOCUMENTATION.

19      Q.   DO YOU KNOW IF THEY'RE TREATED AS ADVANCES,

20   THE NOTES RECEIVABLE?                                   11:52:56

21      A.   I DON'T KNOW.

22      Q.   AND THERE'S -- THERE'S ANOTHER ENTRY, IF

23   YOU LOOK AT NOTES RECEIVABLE OFFICERS ON LINE 22, IT

24   LOOKS LIKE IT SAYS, "RECLASS ISAAC AND SHIRIN LOAN

25   TO N.R."                                                11:53:20
```

1    Q.   IT CAME OUT -- THIS -- THE INFORMATION ON

2    EXHIBIT 1354 CAME OUT OF YOUR OLD ACCOUNTING SYSTEM?

3    A.   YES.

4    Q.   AND THERE'S AN ENTRY FOR -- OR A NUMBER OF

5    ENTRIES FOR FARHAD LARIAN, AND IT LOOKS LIKE, AT          11:57:40

6    LEAST ON THE FIRST PAGE, THERE'S AN ENTRY FOR 1999

7    INCOME TAXES AND THEN SOME PAYMENTS FOR FEBRUARY OF

8    '03 THROUGH DECEMBER OF '03.

9         DO YOU KNOW IF THOSE ARE THE ONLY

10   DISTRIBUTIONS THAT HE RECEIVED FROM THE DISTRIBUTION      11:58:02

11   ACCOUNT DURING THAT TIME PERIOD BETWEEN 1999 AND

12   DECEMBER OF 2003?.

13   A.   I'M NOT SURE.

14   Q.   DID HE -- DO YOU KNOW WHETHER HE RECEIVED

15   ANY DISTRIBUTIONS DUE TO HIS OWNERSHIP OR PART           11:58:27

16   OWNERSHIP OF M.G.A. ENTERTAINMENT IN 1999 OR 2000?

17   A.   REPEAT THAT, PLEASE.

18   Q.   SURE.  DO YOU KNOW WHETHER HE RECEIVED ANY

19   DISTRIBUTIONS FROM M.G.A. ENTERTAINMENT DUE TO HIS

20   OWNERSHIP OR PART OWNERSHIP OF THE COMPANY IN 1999       11:58:45

21   OR 2000?

22   A.   I JUST KNOW WHAT THE DETAILS IS THAT'S

23   STATED IN HERE (INDICATING).  SO IT JUST SHOWS A

24   2000 DISTRIBUTION.

25   Q.   WELL, A -- A 1999 DISTRIBUTION.              11:58:57

EXHIBIT    7

PAGE    /89

```
 1        A.   I -- OTHER THAN THIS, THE INFORMATION HERE,
 2   I'M NOT AWARE OF ANY OTHERS (INDICATING).
 3        Q.   OKAY.  YOU SAID -- YOU SAID 2 -- IT SHOWS A
 4   2000 DISTRIBUTION.  I DON'T THINK YOU MEANT TO SAY
 5   THAT.                                                    11:59:11
 6        A.   BUT THERE IS A 2000 DISTRIBUTION ON HERE.
 7   IT WAS -- THE TRANSACTION DATE WAS IN 2000.
 8        Q.   OH, FOR THE 1999 INCOME TAXES?
 9        A.   RIGHT.
10        Q.   AND THEN GOING BACK, THE -- DO YOU KNOW       11:59:19
11   WHETHER M.G.A. USED THE SAME ACCOUNTING SYSTEM UP
12   THROUGH THE END OF 2005?
13        A.   YES.
14        Q.   OKAY.  ALL RIGHT.  YOU CAN SET THAT ASIDE.
15             NOW, GOING BACK TO 1355, WHAT IS EXHIBIT      11:59:43
16   1355?
17        A.   IT LOOKS LIKE THE PAYMENTS THAT WERE MADE
18   TO MAKABI FAMILY MEMBERS, VARIOUS TYPES OF PAYMENTS.
19        Q.   AND IS THE INFORMATION -- LOOKING AT THE
20   FRONT OF THIS, IT LOOKS LIKE THE INFORMATION ON THE     12:00:19
21   FIRST PAGE IS FROM '05 AND '06, SO IS -- IS EXHIBIT
22   1355 COMPLETE AND UP TO DATE?
23        A.   YES.
24        Q.   NOW, THERE ARE -- IT SAYS ON HERE, "PAID
25   OUT OF THE CONCENTRATION ACCOUNT," SO THESE ARE ALL     12:00:55
```

```
1    WIRE PAYMENTS?
2        A.   YES.
3        Q.   ALL RIGHT.  LET'S JUST START ON THE FIRST
4    PAGE.  IT SAYS THE VENDOR I.D. IS MAKABI.
5             DO YOU KNOW WHAT THAT REFERS TO?                12:01:22
6        A.   I THINK THAT'S JUST THE -- EVERY SINGLE
7    PAYEE HAS AN IDENTIFICATION, AND THAT'S THE
8    IDENTIFICATION FOR THIS PARTICULAR PAYEE.
9        Q.   IS THIS -- DO YOU KNOW IF THIS IS
10   MR. MAKABI?                                              12:01:38
11       A.   NO, I DON'T THINK IT IS.
12       Q.   ACTUALLY, IF YOU TURN THE PAGE, IT LOOKS
13   LIKE IT REFERS TO THE MAKABI LIVING TRUST.
14       A.   OR THE FAMILY TRUST, MAKABI FAMILY TRUST.
15       Q.   AND THEN IT SAYS, "PURCHASES ACCOUNT          12:01:56
16   NUMBER," WHAT DOES THAT REFER TO?
17       A.   THAT'S THE ACTUAL G.L. ACCOUNT THAT IT'S
18   BEING HIT AGAINST OR ACCOUNTED FOR, RECORDED IN.
19       Q.   AND -- AND IS THIS -- IS THIS AN ACCOUNT OF
20   THE 3600 SERIES?                                         12:02:17
21       A.   YES.
22       Q.   SO THIS IS JUST -- THIS IS JUST AN EXAMPLE
23   OF THE DISTRIBUTIONS THAT WERE MADE TO THE MAKABI
24   FAMILY TRUST BY WIRE TRANSFER?
25       A.   YES.                                            12:02:35
```

830

EXHIBIT 7

PAGE 191

1    Q.   AND -- AND -- AND JUST SO I'M CLEAR, BUT IF

2   I -- IF I LOOK -- THERE -- THESE TRANSACTIONS ON THE

3   FIRST TWO PAGES OF EXHIBIT 1355 SHOULD BE REFLECTED

4   IN 1354?

5    A.   FOR THE YEARS THAT 1354 --                        12:02:50

6    Q.   CORRECT.

7    A.   -- HAS INFORMATION.

8    Q.   RIGHT.   OKAY.   IT'S NOT -- 1355 IS NOT

9   INTENDED TO REPRESENT A SEPARATE, DISCRETE CATEGORY

10  OF DISTRIBUTION PAYMENTS TO THE MAKABI FAMILY TRUST?   12:03:01

11   A.   NOT THAT I'M AWARE OF, NO.

12   Q.   OKAY.   NOW, IF YOU TURN THE PAGE TO

13  3787429.

14   A.   UH-HUH.

15   Q.   IT LOOKS LIKE THE VENDOR NAME HERE IS         12:03:17

16  SHIRIN MAKABI, THAT'S ACTUALLY ON PAGE 31, COLUMN F,

17  AND IT LOOKS LIKE MOST OF THE ENTRIES ARE FOR --

18  WELL, STRIKE THAT.

19       WHAT DO YOU UNDERSTAND THESE PAYMENTS TO

20  SHIRIN MAKABI TO BE?                                   12:03:41

21   A.   I BELIEVE COLUMN G HAS DESCRIPTION FOR EACH

22  TRANSACTION.

23   Q.   AND COLUMN G -- COLUMN G SAYS

24  "REIMBURSEMENT AND INCOME TAXES" ON PAGE 31.

25       DO YOU KNOW WHAT'S BEING REIMBURSED?            12:03:58

A&B COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT __7__

PAGE __192__

1      A.   I THINK COLUMN D TELLS YOU IN A LITTLE MORE

2   DETAIL WHAT'S BEING REIMBURSED, EXPENSE ITEMS.

3      Q.   THESE ARE -- THESE ARE EXPENSE REPORT

4   CHECKS?

5      A.   YES.                                      12:04:13

6      Q.   IS SHIRIN MAKABI AN EMPLOYEE OF M.G.A.

7   ENTERTAINMENT?

8      A.   SHE IS.

9      Q.   WHAT IS HER TITLE CURRENTLY?

10     A.   I DON'T KNOW HER EXACT TITLE.             12:04:20

11     Q.   DO YOU KNOW WHAT HER GENERAL RESPONSIBILITY

12   IS?

13     A.   YES.

14          MR. ROTH:   OBJECTION; FOUNDATION.

15   BY MR. COREY:                                    12:04:30

16     Q.   HOW DO YOU KNOW THAT?

17     A.   BECAUSE I'VE USED HER IN HER CAPACITY AS AN

18   EMPLOYEE FOR THE COMPANY.

19     Q.   WHAT DOES SHE DO?

20     A.   SHE HANDLES TRAVEL FOR THE COMPANY.       12:04:39

21     Q.   IF YOU TURN THE PAGE TO 3787433, YOU'LL SEE

22   THAT IN ADDITION TO WHAT I UNDERSTAND TO BE THE

23   EXPENSE REPORT ENTRIES AND THE TAX ENTRIES, THERE

24   ARE SOME OTHER ENTRIES THERE THAT JUST CONTAIN

25   NUMBERS.                                         12:05:33

832

EXHIBIT ___7___

PAGE ___193___

```
 1            FOR EXAMPLE, ON LINE 64, DO YOU SEE THOSE,

 2    UNDER COLUMN D?

 3        A.   UH-HUH, YES.

 4        Q.   DO YOU KNOW WHAT THOSE REFER TO?

 5        A.   THAT'S A DOCUMENT NUMBER, SO IT'S SOME KIND          12:05:49

 6    OF SOURCE DOCUMENT, SOME REFERENCE TO A SOURCE

 7    DOCUMENT.

 8        Q.   BUT TO KNOW WHAT THOSE SPECIFICALLY ARE YOU

 9    WOULD HAVE TO LOOK AT THE SOURCE DOCUMENT?

10        A.   YES.                                                 12:06:11

11        Q.   DO YOU KNOW WHAT OTHER TYPES OF THINGS,

12    OTHER THAN -- THAN EXPENSES IDENTIFIED IN EXPENSE

13    REPORTS MS. MAKABI HAS SOUGHT REIMBURSEMENT FOR?

14            MR. ROTH:   OBJECTION; FOUNDATION.

15            THE WITNESS:   CAN YOU BE MORE SPECIFIC?              12:06:33

16    BY MR. COREY:

17        Q.   NO, ACTUALLY, I CAN'T.   I'M TRYING TO FIND

18    OUT WHAT -- WHAT CATEGORY, WHAT TYPES OF THINGS

19    WOULD FALL WITHIN THE -- THE REIMBURSEMENT FOR THE

20    DOCUMENT NUMBERS IDENTIFIED IN COLUMN B.   I'M JUST          12:06:48

21    NOT SURE -- I'M JUST NOT SURE WHAT THEY WOULD BE.

22    YOU MAY NOT EITHER, BUT -- BUT I CAN'T BE MORE

23    SPECIFIC.

24        A.   OTHER THAN WHAT'S STATED IN THIS

25    DESCRIPTION, "D," COLUMN D, I DON'T KNOW OTHERWISE.          12:06:59
```

833

EXHIBIT ___7___

PAGE ___194___

```
 1        Q.   DO YOU KNOW IF THAT INFORMATION IS

 2   AVAILABLE IN YOUR ACCOUNTING SYSTEM?

 3        A.   I DO NOT KNOW.

 4        Q.   IF YOU LOOK AT 3787442, IT LOOKS LIKE THERE

 5   ARE ENTRIES FOR INTEREST ON THE LAST -- FOR EXAMPLE,     12:07:48

 6   ON LINE 300.  DO YOU KNOW WHAT THOSE REFER TO?

 7        A.   APPEARS TO BE INTEREST PAYMENTS TO SHIRIN

 8   MAKABI.

 9        Q.   AND THOSE -- THOSE LOOK LIKE THOSE ARE

10   PAYMENTS THAT ARE MADE TO HER?                           12:08:15

11        A.   YES.

12        Q.   AND WHY WOULD THE -- DO YOU KNOW WHY M.G.A.

13   ENTERTAINMENT WOULD BE MAKING INTEREST PAYMENTS TO

14   MS. -- MRS. MAKABI?

15            MR. ROTH:  OBJECTION; FOUNDATION.               12:08:27

16            THE WITNESS:  THE -- MS. MAKABI LOANED

17   MONEY TO THE COMPANY.

18   BY MR. COREY:

19        Q.   DO YOU KNOW WHY?

20        A.   NO.                                            12:08:40

21            MR. ROTH:  OBJECTION; FOUNDATION, CALLS FOR

22   SPECULATION.

23   BY MR. COREY:

24        Q.   DO YOU KNOW HOW MUCH?

25        A.   NO.                                            12:08:45
```

834

EXHIBIT   7

PAGE   195

1    Q.   DO YOU KNOW WHEN THE LOAN WAS MADE?

2    A.   NO.

3    Q.   DO YOU HAVE AN ESTIMATE AS TO HOW MUCH IT

4    WOULD BE?

5         MR. ROTH:   OBJECTION; CALLS FOR                    12:08:53

6    SPECULATION, LACKS FOUNDATION.

7         THE WITNESS:   NO.

8    BY MR. COREY:

9    Q.   DO YOU KNOW WHAT THE INTEREST RATE WAS ON

10   THAT LOAN?                                               12:09:08

11        MR. ROTH:   SAME OBJECTIONS.

12        THE WITNESS:   NO.

13   BY MR. COREY:

14   Q.   IF YOU LOOK UP A LITTLE BIT HIGHER, THERE

15   ARE -- FOR EXAMPLE, ON -- I THINK IT'S LINE 295, IT     12:09:21

16   LOOKS LIKE -- WELL, THERE ARE A SERIES OF NEGATIVE

17   NUMBERS ON THE -- WHAT APPEARS TO BE AN EXPENSE

18   REPORT ENTRY, AND I BELIEVE IT'S ON 295, THERE'S A

19   NEGATIVE ENTRY OF $451,887.

20        AND DO YOU KNOW WHY THERE'S A NEGATIVE            12:09:46

21   ENTRY FOR THAT?

22   A.   NO.

23   Q.   DO YOU KNOW WHY THERE WOULD BE A NEGATIVE

24   ENTRY FOR ANY EXPENSE REPORT ENTRY?

25        MR. ROTH:   OBJECTION; VAGUE AND AMBIGUOUS.       12:10:09

835

EXHIBIT   7

PAGE   196

1    Q.   DO YOU KNOW WHEN THE LOAN WAS MADE?

2    A.   NO.

3    Q.   DO YOU HAVE AN ESTIMATE AS TO HOW MUCH IT

4  WOULD BE?

5         MR. ROTH:  OBJECTION; CALLS FOR          12:08:53

6  SPECULATION, LACKS FOUNDATION.

7         THE WITNESS:  NO.

8  BY MR. COREY:

9    Q.   DO YOU KNOW WHAT THE INTEREST RATE WAS ON

10  THAT LOAN?                                      12:09:08

11        MR. ROTH:  SAME OBJECTIONS.

12        THE WITNESS:  NO.

13  BY MR. COREY:

14   Q.   IF YOU LOOK UP A LITTLE BIT HIGHER, THERE

15  ARE -- FOR EXAMPLE, ON -- I THINK IT'S LINE 295, IT   12:09:21

16  LOOKS LIKE -- WELL, THERE ARE A SERIES OF NEGATIVE

17  NUMBERS ON THE -- WHAT APPEARS TO BE AN EXPENSE

18  REPORT ENTRY, AND I BELIEVE IT'S ON 295, THERE'S A

19  NEGATIVE ENTRY OF $451,887.

20        AND DO YOU KNOW WHY THERE'S A NEGATIVE     12:09:46

21  ENTRY FOR THAT?

22   A.   NO.

23   Q.   DO YOU KNOW WHY THERE WOULD BE A NEGATIVE

24  ENTRY FOR ANY EXPENSE REPORT ENTRY?

25        MR. ROTH:  OBJECTION; VAGUE AND AMBIGUOUS.  12:10:09

835

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT ___7___

PAGE ___197___

```
 1              THE WITNESS:  NO.
 2   BY MR. COREY:
 3       Q.   AND DOES IT MAKE SENSE TO YOU AS AN
 4   ACCOUNTANT?
 5              MR. ROTH:  OBJECTION; VAGUE AND AMBIGUOUS.      12:10:18
 6              THE WITNESS:  I DON'T KNOW WHAT IT'S FOR.
 7   BY MR. COREY:
 8       Q.   I DIDN'T ASK YOU WHAT IT WAS FOR; I ASKED
 9   YOU IF IT MADE SENSE TO YOU AS -- AS AN ACCOUNTANT?
10              MR. ROTH:  OBJECTION; ARGUMENTATIVE.            12:10:33
11              THE WITNESS:  AM I TESTIFYING AS MYSELF OR
12   AS M.G.A.?
13   BY MR. COREY:
14       Q.   YOU CAN TESTIFY AS YOURSELF FOR THIS
15   QUESTION.                                                 12:10:44
16              MR. ROTH:  OBJECTION; ARGUMENTATIVE, VAGUE
17   AND AMBIGUOUS.
18              THE WITNESS:  I MEAN, IT COULD BE A MISTAKE
19   THAT'S BEING REVERSED OUT.  SO DOES IT MAKE SENSE TO
20   ME?  POTENTIALLY, IF THERE IS A REASON BEHIND IT.         12:11:02
21   BY MR. COREY:
22       Q.   BUT YOU DON'T KNOW -- YOU DON'T KNOW WHAT
23   THE REASON BEHIND IT WAS?
24       A.   NO.
25       Q.   I MEAN, BECAUSE THE -- THE NUMBERS ARE IN        12:11:13
```

836

EXHIBIT  7

PAGE  198

1   THE HUNDREDS OF THOUSANDS OF DOLLARS FOR -- IF IT'S

2   A REVERSING ENTRY FOR AN EXPENSE REPORT.  DO YOU SEE

3   THAT?

4       A.   (WITNESS NODS HEAD UP AND DOWN.)

5       Q.   AND DO YOU KNOW IF SHE WAS PAID HUNDREDS OF          12:11:23

6   THOUSANDS OF DOLLARS FOR EXPENSES?

7       A.   I DON'T KNOW.

8       Q.   DO YOU KNOW WHAT THE TOTAL AMOUNT PAID TO

9   MS. MAKABI -- MRS. MAKABI OUT OF THE CONCENTRATION

10  ACCOUNT IS?                                                  12:11:52

11          MR. ROTH:  OBJECTION; VAGUE AND AMBIGUOUS,

12  MISSTATES TESTIMONY.

13          THE WITNESS:  NO.

14  BY MR. COREY:

15      Q.   IS SHE PERSONALLY PAYING FOR COMPANY               12:12:31

16  TRAVEL --

17          MR. ROTH:  OBJECTION.

18  BY MR. COREY:

19      Q.   -- AND THEN -- AND THEN SUBMITTING THAT AS

20  AN EXPENSE?                                                  12:12:38

21          MR. ROTH:  OBJECTION; CALLS FOR

22  SPECULATION, LACKS FOUNDATION.

23          THE WITNESS:  I BELIEVE THAT SHE USES A

24  CORPORATE CARD WHEN SHE IS PAYING FOR AND GETTING

25  REIMBURSEMENT.                                               12:12:53

837

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT 7

PAGE 199

BY MR. COREY:

    Q.   SHE USES A CORPORATE CARD THAT SHE PERSONALLY PAYS?

    A.   YES.

    Q.   AND THEN THE COMPANY REIMBURSES HER?          12:12:59

    A.   YES.

    Q.   DO YOU KNOW IF THAT'S WHAT THE -- THE REVERSING ENTRIES ARE HERE FOR?

         MR. ROTH:   OBJECTION; CALLS FOR SPECULATION.          12:13:10

         THE WITNESS:   NO.

BY MR. COREY:

    Q.   IF YOU CAN LOOK AT 3787445, THESE LOOK TO BE MR. MAKABI'S -- PAYMENTS MADE TO MR. MAKABI OUT OF THE CONCENTRATION ACCOUNT.          12:14:01

         DO YOU AGREE WITH THAT?

    A.   YES.

    Q.   AND THEN -- YOU'RE A BETTER ACCOUNTANT THAN I AM.  IF YOU LOOK ON PAGE -- EXCUSE ME -- IF YOU LOOK ON LINE 13, I BELIEVE, THE LOAN OF          12:14:18
$1,195,513.44, THAT'S A LOAN FROM THE COMPANY TO MR. MAKABI; THAT'S NOT A LOAN FROM MR. MAKABI TO THE COMPANY?

    A.   DID YOU SAY LINE 12?

    Q.   I SAID "LINE 13," I MEANT LINE 12.          12:14:48

838

EXHIBIT  7

PAGE  200

1      A.    LINE 12, YES, THAT'S WHAT THE NEXT PAGE

2  INDICATES.

3      Q.    OKAY.  AND 1355 IS, AS FAR AS YOU'RE AWARE,

4  THE PAYMENTS THAT WERE MADE TO THE MAKABI FAMILY BY

5  M.G.A. ENTERTAINMENT?                                    12:15:23

6      A.    THE VARIOUS DIFFERENT PAYMENTS?

7      Q.    CORRECT.

8      A.    THERE'S ALSO PAYROLL AS WELL.

9      Q.    OKAY.  WHICH WE HAVEN'T -- WHICH WE

10  HAVEN'T -- WE HAVEN'T LOOKED AT.  I'M GOING TO          12:15:36

11  ASSUME THAT IT'S IN THE STACK THAT MR. ROTH PROVIDED

12  TO ME.

13      A.    YES.

14      Q.    SO BETWEEN -- BETWEEN EXHIBIT 1355 AND

15  PAYROLL, SETTING ASIDE -- SETTING ASIDE THE RENT,       12:15:47

16  WHICH WE TALKED ABOUT, ARE THERE ANY OTHER PAYMENTS

17  THAT YOU'RE AWARE OF THAT WOULD NOT BE REFLECTED IN

18  1355 OR THE PAYROLL INFORMATION THAT'S BEEN

19  PROVIDED?                                               12:16:05

20      A.    THERE'S ALSO THE 1354 AS WELL.

21      Q.    BUT -- BUT 13- -- I THOUGHT YOU SAID BEFORE

22  THAT 1355 SHOULD COVER ALL OF THE DISTRIBUTIONS AS

23  WELL.  DID I -- DID I MISUNDERSTAND THAT?

24      A.    YES.  BECAUSE 1354 HAS SOME OF THE OTHER

25  YEARS AS WELL ON DISTRIBUTIONS.                         12:16:25

839

EXHIBIT  7

PAGE  261

1      Q.   IS 1355 LIMITED TO '06 AND '07?  I MEAN,

2  I'M CONFUSED NOW. .I'M JUST -- I'M JUST TRYING TO

3  FIGURE OUT WHAT THE UNIVERSE OF -- OF PAYMENTS MAY

4  BE TO -- OR WAS TO MR. MAKABI AND HIS WIFE.

5      A.   1354 PROVIDES ALL DISTRIBUTIONS FROM '99          12:16:47

6  THROUGH '05.

7           1355 PROVIDES FOR ALL OTHER TYPES OF

8  PAYMENTS, INCLUDING SOME DISTRIBUTIONS FOR ALL

9  YEARS, BUT ON THE DISTRIBUTION SIDE IT ONLY HAS SOME

10 OF THE MORE CURRENT YEARS, LIKE, FOR EXAMPLE, IT       12:17:12

11 INCLUDES '06, WHICH -54 DOESN'T INCLUDE.

12     Q.   WHY DOES 1355 ONLY INCLUDE SOME

13 DISTRIBUTIONS?

14     A.   IT DOESN'T INCLUDE --

15          MR. ROTH:  OBJECTION --                         12:17:40

16          THE WITNESS:  SORRY.

17          MR. ROTH:  OBJECTION; VAGUE AND AMBIGUOUS.

18          THE WITNESS:  IT -- IT INCLUDES THE

19 DIVIDEND DISTRIBUTIONS UP TO 2005.

20 BY MR. COREY:                                            12:17:49

21     Q.   1354 PROVIDES DIVIDEND DISTRIBUTIONS UP TO

22 2005?

23     A.   CORRECT.

24     Q.   ALL RIGHT.  AND THEN YOU SAID 1355, AT

25 LEAST WITH RESPECT TO THE MAKABIS, CONTAINS OTHER       12:17:57

840

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

EXHIBIT _7_

PAGE _202_

1    TYPES OF DISTRIBUTION -- OTHER TYPES OF TRANSFERS OF

2    VALUE TO THEM, INCLUDING SOME DISTRIBUTIONS; IS THAT

3    WHAT YOU SAID?

4         A.   RIGHT.

5         Q.   AND BY "SOME DISTRIBUTIONS" YOU MEAN IT HAS          12:18:11

6    2006 AND 2007 DISTRIBUTIONS?

7         A.   I BELIEVE IT'S JUST '06 ON THIS ONE.

8         Q.   SO -- SO THE ONLY ADDITIONAL DISTRIBUTIONS

9    ARE FOR 2006?

10        A.   YES.                                                  12:18:26

11        Q.   OKAY.

12        A.   IT HAS SOME DUPLICATE INFORMATION.  LIKE IT

13   HAS '05 ON HERE TOO, BUT IT'S KIND OF DUPLICATE.

14   BECAUSE I THINK THE TRANSACTION DATE MAY BE A LITTLE

15   BIT LATER IN TIME.                                              12:18:36

16        Q.   BUT -- AND YOU'RE REFERRING SIMPLY TO THE

17   FIRST ENTRY --

18        A.   RIGHT.

19        Q.   -- ON PAGE 3787427, LINE 2?  IS THAT WHAT

20   YOU'RE REFERRING TO?                                           12:18:51

21        A.   YES.

22        Q.   ARE THERE ANY OTHER ENTRIES THAT YOU'RE

23   AWARE OF THAT ARE DUPLICATE?

24        A.   NOT THAT I'M AWARE OF.

25        Q.   DO YOU KNOW WHETHER -- I HAVE TO ASK THIS            12:19:06

841

EXHIBIT __7__

PAGE __203__

```
1      LOS ANGELES, CALIFORNIA; THURSDAY, JANUARY 17, 2008

2                          1:50 P.M.

3                           -oOo-

4

5                        LISA TONNU,

6       HAVING BEEN PREVIOUSLY AFFIRMED, WAS

7           EXAMINED AND TESTIFIED AS FOLLOWS:

8

9               EXAMINATION (RESUMED)

10          THE VIDEO TECHNICIAN:  GOING BACK ON THE          01:50:08

11   RECORD AT 1:50 P.M.

12          MR. COREY:  LET ME GET THIS MARKED AS -64.

13          (EXHIBIT 1364 MARKED.)

14   BY MR. COREY:

15      Q.  MY FIRST QUESTION, MS. TONNU, IS GOING TO        01:50:46

16   BE DO YOU RECOGNIZE EXHIBIT 1364?

17      A.  YES.

18      Q.  WHAT DO YOU RECOGNIZE IT TO BE?

19      A.  IT'S THE REPORT THAT WAS PROVIDED IN

20   REGARDS TO PAYMENTS TO LARIAN OR FAMILY MEMBERS.        01:50:58

21      Q.  SO THIS IS THE COROLLARY TO THE EXHIBIT

22   THAT WE LOOKED AT EARLIER RELATED TO THE MAKABI

23   FAMILY RELATED PAYMENTS?

24      A.  THAT'S CORRECT.

25      Q.  AND IS EXHIBIT 1364 SIMILARLY LIMITED BY         01:51:13
```

852

EXHIBIT __7__

PAGE __204__

```
1    THE TIME PERIOD BETWEEN 199- -- TO THE TIME PERIOD
2    1999 THROUGH 2005?
3        A.   NO.  I THINK THE ONLY ONE THAT WAS LIMITED
4    IN TIME WAS THE -- THE DISTRIBUTION ONE.
5        Q.   OKAY.  YOU'RE RIGHT.  I MISSPOKE.              01:51:39
6             DOES EXHIBIT 1364 HAVE 2006 OR 2007
7    DISTRIBUTION INFORMATION IN IT?
8        A.   I DON'T SEE ANY, NO.  OH.  THERE ARE A FEW.
9        Q.   WHAT PAGE ARE YOU LOOKING AT?
10       A.   3787417.                                       01:52:41
11       Q.   -7417?
12       A.   -417.
13       Q.   OKAY.  GOING BACK TO THE FIRST PAGE, YOU
14   RECALL THAT WITH RESPECT TO EXHIBIT NO. 1355 I HAD
15   ASK YOU QUESTIONS ABOUT THE SIGNIFICANCE OF            01:53:54
16   INFORMATION CONTAINED IN THE VARIOUS COLUMNS.  IS
17   THE INFORMATION IN EXHIBIT 1364 ON A COLUMN BY
18   COLUMN BASIS THE SAME TYPE OF INFORMATION THAT
19   APPEARS IN EXHIBIT 1355?
20       A.   YES.                                           01:54:10
21       Q.   THE FORMAT OF THE REPORTS IS THE SAME?
22       A.   YES.
23       Q.   AND WHO PREPARED EXHIBIT 1364?
24       A.   CHAR BROOKS.
25       Q.   IF YOU LOOKED AT THE FIRST PORTION -- LET      01:54:31
```

853

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

EXHIBIT 7

PAGE 205

```
1    ME TAKE -- LET ME TAKE A STEP BACK.
2              I BELIEVE THAT WE HAVE NOW LOOKED AT ALL OF
3    THE DOCUMENTS THAT HAVE BEEN PROVIDED FOR ME HERE
4    TODAY REFLECTING WHAT YOU'VE COLLECTED -- WHAT
5    YOU'VE RELIED ON TO TESTIFY ABOUT THE PAYMENTS MADE     01:55:02
6    TO ISAAC LARIAN OR MEMBERS OF HIS FAMILY.  IS THAT
7    CORRECT?
8         A.   I BELIEVE SO, YES.
9         Q.   OKAY.  NOW, HAVE YOU GONE THROUGH THESE
10   REPORTS TO DETERMINE A TOTAL AMOUNT PAID TO           01:55:15
11   MR. LARIAN?
12        A.   NO.
13        Q.   HOW WOULD YOU DO THAT?
14             MR. ROTH:  OBJECTION; VAGUE AND AMBIGUOUS.
15             THE WITNESS:  WHAT -- FOR -- CAN YOU BE     01:55:31
16   MORE SPECIFIC?
17   BY MR. COREY:
18        Q.   NO, I'M ACTUALLY -- I WANT TO BE GENERAL, I
19   WANT -- I WANT TO MAKE SURE THAT I UNDERSTAND WHAT'S
20   PRESENTED TO ME.                                      01:55:39
21             AND SO I'M SAYING -- WHAT I'M ASKING YOU IS
22   IF YOU WANTED TO COME UP WITH A TOTAL NUMBER BASED
23   ON THE INFORMATION THAT WE'VE LOOKED AT THIS MORNING
24   OF PAYMENTS TO ISAAC LARIAN, FOR EXAMPLE, WHAT
25   DOCUMENTS WOULD YOU HAVE TO LOOK AT TO MAKE SURE      01:55:52
```

854

EXHIBIT 7

PAGE 206

1    THAT YOU CAPTURED ALL OF THOSE PAYMENTS?

2         DO YOU UNDERSTAND MY QUESTION?

3    A.    YES.

4    Q.    OKAY.

5    A.    I WOULD HAVE TO LOOK IN COMBINATION OF ALL          01:56:02

6    THE DOCUMENTS.

7    Q.    OKAY.  BUT WHAT -- WHAT WOULD YOU -- WHAT

8    WOULD YOU DO SPECIFICALLY?

9    A.    I WOULD LOOK AT, FOR EXAMPLE, HIS PAYROLL

10   INFORMATION FOR SALARY THAT'S PAID TO HIM.  I LOOK        01:56:21

11   AT THE DISTRIBUTION TO SEE WHAT TYPES OF

12   DISTRIBUTIONS WERE MADE TO HIM, AND I WOULD LOOK AT

13   THESE TYPE OF PAYMENT LOGS TO SEE WHAT OTHER -- IF

14   THERE'S ANY EXPENSES PAID TO HIM, OR INTEREST PAID

15   TO HIM.                                                   01:56:38

16   Q.    AND YOU RECALL THAT WHEN WE LOOKED AT

17   EXHIBIT 1354 THERE'S AN ENTRY THERE FOR -- THE TOP

18   ONE IS FOR AGHDAS LARIAN, AND THAT'S AN AMOUNT OF

19   $365,760.40, AND THAT'S GOING FROM A DISTRIBUTION

20   ACCOUNT.                                                  01:57:08

21        DO YOU RECALL THAT ENTRY?

22   A.    YES.

23   Q.    THAT'S CATEGORIZED AS ISAAC'S LOAN TO

24   AGHDAS LARIAN.  DO YOU SEE THAT?

25   A.    YES.                                                01:57:29

855

EXHIBIT 7

PAGE 207

1    Q.    OKAY.  SO THAT -- THAT AMOUNT WOULD BE

2   ATTRIBUTABLE TO MR. LARIAN; IS THAT CORRECT?

3    A.    YES.

4    Q.    YOU WOULD INCLUDE THAT IN YOUR CALCULATION

5   OF -- OF PAYMENTS MADE BY M.G.A. TO MR. LARIAN OR ON          01:57:38

6   HIS BEHALF?

7    A.    YES.

8    Q.    NOW, IF YOU GO DOWN TO 3787376, THERE ARE

9   SOME ENTRIES THERE.

10    A.    THIS IS ON THE 1354?                                  01:58:11

11    Q.    WE'RE STILL ON 1354.

12    A.    OKAY.

13    Q.    LINE 90, FOR EXAMPLE.  IF YOU FOLLOW THAT

14   ACROSS, IT SAYS, "CHECK REQUEST SEPTEMBER RENT."  DO

15   YOU SEE WHAT I'M LOOKING AT?                                 01:58:34

16    A.    YES.

17    Q.    IF YOU FOLLOWED THAT ACROSS, THAT'S IN THE

18   AMOUNT OF $50,000 -- $50,198.23.

19    A.    OKAY.

20    Q.    IF YOU FOLLOW IT ACROSS, IT SAYS, "PAYABLES           01:58:45

21   TRX ENTRY PACIFIC IND," AND THEN "PACIFIC INDUSTRIAL

22   PARTNERS LL."

23       CAN I TELL FROM THIS DOCUMENT ON WHOSE

24   BEHALF THAT DISTRIBUTION WAS MADE?

25    A.    NO.                                                   01:59:07

856

EXHIBIT ____7____

PAGE ____208____

1      A.   WHEN YOU SEE COLUMN E IN THE ACTUAL GENERAL

2   LEDGER ACCOUNT NUMBER, YOU START ON LINE 164, YOU

3   SEE MORE DISTINGUISHING ACCOUNT NUMBERS.

4      Q.   OH.  SO THERE'S -- THEY'RE -- THEY'RE MAJOR

5   ACCOUNT NUMBERS.  THEY'RE MAJOR ACCOUNT NUMBERS          02:01:10

6   WITHIN THE SERIES, THE WAY I UNDERSTAND IT?  WHEN

7   YOU -- WHEN YOU SAY "MAJOR ACCOUNT," DO YOU REFER TO

8   THE 3600 ACCOUNT?

9      A.   THAT'S -- RIGHT.

10      Q.   OKAY.  I MEAN, BECAUSE PEOPLE HAVE --          02:01:19

11   PEOPLE HAVE DIFFERENT PARLANCE.

12           SO -- SO IS THERE -- AND I MEAN, THERE ARE

13   A NUMBER OF ENTRIES LIKE THE ONE I JUST IDENTIFIED

14   TO YOU, WITH THE PAYMENT TO PACIFIC -- EXCUSE ME --

15   PACIFIC INDUSTRIAL PARTNERS, LLC.                       02:01:51

16      A.   WHAT WAS THE PAGE NUMBER AGAIN?

17      Q.   IT WAS 37837- -- OR IT'S 3787379, IS THE

18   ONE THAT IDENTIFIES ON LINE 90 "PACIFIC INDUSTRIAL

19   PARTNERS LL."

20      A.   OKAY.                                           02:02:10

21      Q.   AND DO YOU KNOW WHY THAT PAYMENT WAS MADE?

22      A.   NO.

23      Q.   SO IS THERE ANY WAY TO FIGURE OUT FROM THIS

24   DOCUMENT, EXHIBIT 1354, THE AMOUNT OF DISTRIBUTIONS

25   MADE TO MR. -- ISAAC LARIAN AS OPPOSED TO              02:02:36

858

EXHIBIT   7

PAGE        2 09

```
 1        Q.   DO YOU KNOW WHETHER M.G.A. HAS DISTRIBUTION
 2   ACCOUNTS WITH ANY OTHER BANKS CURRENTLY?
 3        A.   NO, I DON'T KNOW.
 4        Q.   DID YOU ASK EITHER MS. BROOKS OR MS. -- WHO
 5   IS THE OTHER WOMAN YOU SPOKE WITH?                      02:05:21
 6        A.   ON WHICH MATTER?
 7        Q.   IN -- IN PREPARING FOR YOUR DEPOSITION, DID
 8   YOU ASK ANYONE WHETHER ALL OF THE CHECKS THAT WERE
 9   WRITTEN CAME FROM THE SAME DISTRIBUTION ACCOUNT?
10        A.   NO.                                           02:05:42
11        Q.   DO YOU KNOW WHAT -- WHICH BANK HELD THE
12   DISTRIBUTION ACCOUNT PRIOR TO JOINING M.G.A.?
13        A.   NO.
14        Q.   NOW, THE -- WHICH BANK CURRENT- --
15   CURRENTLY HOLDS THE -- THE CONCENTRATION ACCOUNT?      02:06:01
16        A.   WELLS FARGO.
17        Q.   AND DO YOU KNOW HOW LONG THAT'S BEEN THE
18   CASE?
19        A.   NO.
20        Q.   DO YOU KNOW IF M.G.A. JUST HAS ONE           02:06:12
21   CONCENTRATION ACCOUNT?
22        A.   I DON'T KNOW.
23        Q.   DO YOU KNOW WHO WOULD KNOW THAT?
24        A.   NO.
25        Q.   DO YOU KNOW IF ALL OF THE PAYMENTS MADE      02:06:19
```

861

EXHIBIT 7

PAGE 210

1

2
                   DECLARATION OF WITNESS

3    I CERTIFY UNDER PENALTY OF PERJURY UNDER THE LAWS OF

4    THE STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE

5    AND CORRECT.

6

7

8    EXECUTED AT             , ON
                   (PLACE)          (DATE)

9

10

11         (SIGNATURE OF WITNESS)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

984

EXHIBIT __7__

PAGE __2 / 1__

```
 1   STATE OF CALIFORNIA    )
                            )  SS.
 2   COUNTY OF RIVERSIDE    )

 3         I, PAULA A. PYBURN, CERTIFIED SHORTHAND

 4   REPORTER, CERTIFICATE NUMBER 7304, R.P.R., C.L.R., FOR

 5   THE STATE OF CALIFORNIA, HEREBY CERTIFY:

 6         THE FOREGOING PROCEEDINGS WERE TAKEN BEFORE ME

 7   AT THE TIME AND PLACE THEREIN SET FORTH, AT WHICH TIME

 8   THE WITNESS WAS PLACED UNDER OATH BY ME;

 9         THE TESTIMONY OF THE WITNESS AND ALL OBJECTIONS

10   MADE AT THE TIME OF THE EXAMINATION WERE RECORDED

11   STENOGRAPHICALLY BY ME AND WERE THEREAFTER TRANSCRIBED;

12         THE FOREGOING TRANSCRIPT IS A TRUE AND CORRECT

13   TRANSCRIPT OF MY SHORTHAND NOTES SO TAKEN;

14         I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR

15   NOR RELATED TO ANY PARTY TO SAID ACTION NOR IN ANY WAY

16   INTERESTED IN THE OUTCOME THEREOF.

17         IN WITNESS WHEREOF, I HAVE HEREUNTO SUBSCRIBED

18   MY NAME THIS 23rd DAY OF JANUARY , 2008.

19

20

21

22

23

24

25

                                                      81
```

EXHIBIT _7_

PAGE _2/2_

**Exhibit  8**

# ABC International Traders, Inc.

March 2001

Business Plan Copy Number [1]

This document contains confidential and proprietary information
belonging exclusively to ABC International Traders, Inc.

Isaac Larian
Chief Executive Officer
16730 Schoenborn Street
North Hills, California 91343
818-894-2525

*This is a business plan. It does not imply an offering of Securities.*

EXHIBIT ___8___

PAGE ___213___

Confidential - For Attorney's Eyes Only

MGA 0050638

# Table of Contents

Vision and Mission ............................................................................ 4

    Present Situation ....................................................................... 4

    Vision and Mission ..................................................................... 6

    Goals ........................................................................................ 7

    Objectives ................................................................................. 7

Company Overview ........................................................................... 10

    Legal Business Description ........................................................ 10

    Management Team .................................................................... 11

    Strategic Alliances .................................................................... 13

Market Analysis ................................................................................ 15

    Market Definition ..................................................................... 15

    Risk .......................................................................................... 18

Marketing Plan ................................................................................. 19

    Sales Strategy .......................................................................... 19

    Distribution Channels .............................................................. 20

    Advertising and Promotion ...................................................... 21

    Public Relations ....................................................................... 23

Line List ........................................................................................... 24

Financial Plan (TLP) ........................................................................ 25

Media Plan ....................................................................................... 26

2

EXHIBIT ___8___

PAGE ___214___

Confidential - For Attorney's Eyes Only

MGA 0050639

# Vision/Mission

## Present Situation

Barbie dominates the $655 million (per NPD TRSTS) Fashion Doll category. Out of the top 25 selling items in the category for YTD 2000, only four were not some variation of the Barbie brand. This leaves very little room to maneuver for other companies and brands hoping to break into the category. In fact, the picture gets bleaker with the realization that of the four items in the top 25 that are not part of the Barbie brand, all are licensed.

The operating environment was similarly hostile to attempted entry in 1998 and 1999. Only three of the top 25 items and two of the top 25 items respectively were not Barbie branded. Those items that were not Barbie branded, were licensed. The entire category, therefore, has a history of complete domination by Mattel, with minimal shelf space for one or two very successful licenses.

For YTD 2000, TRSTS data indicates that over 90% of all sales in the category were Mattel manufactured products. Play Along received 3.3% from its Britney Spears dolls. Kid Kore managed to grab 1.5% of the market based on its marginally successful line of non-licensed fashion dolls.

The Fashion Doll category declined –1%, 2000 vs. 1999. The #1 Fashion Doll in 2000 was Celebration Barbie with $38M in sales as compared to Barbie Millennium with $49M in sales in 1999. Celebration Barbie finished the year as the #7 ranked traditional toy. Another successful item for Mattel was the Barbie Wizard of Oz Asst., ranking #13 among all traditional toys in 2000. Barbie Wizard of Oz actually sold more individual units (1.9M units) than Celebration Barbie (1.3M units) as Barbie Wizard of Oz retailed for $15 compared to Celebration Barbie at $29 (NPD Group TRSTS, 2001)

In 2000, the top 5 Dolls were all introduced by Mattel, and all ranked among the top 25 traditional toys. These dolls include Celebration Barbie, Barbie Wizard of Oz Asst., Diva Starz Doll Asst., Barbie & Krissy Mermaids and Dancin Debbie.

ABC International Traders, Inc. is launching its own line of fashion dolls in Fall 2001, Bratz™. The Bratz are four unique fully-articulated dolls which include Cloe, Sash, Yasmin and Jade. If ABC were to achieve a moderate success in the confines of the category, it would be considered a major sales victory because of the sales dollars generated. For example, if ABC had produced the #15 selling fashion doll in 1999, that would project out to sales for ABC of $16 million or 24% of the 1999 total sales. So although manufacturing a #15 selling item carries little prestige, the success of the item in this case is unquestionable.

3

EXHIBIT _____ 8

PAGE _____ 215

Confidential - For Attorney's Eyes Only

MGA 0050640

## Company

ABC International Traders, Inc. was founded in 1979 and is presently in its growth stage. ABC International Traders, Inc. can best be described as currently being in the business of manufacturing consumer electronic toys. In recent times our key strengths have been state-of-the-art technology and innovative marketing.

## Management

Most of our management team is in place, however, we require a Chief Operating Officer and a Vice President of Product Development to complete our team by April, 2001. Also, we are currently hiring three employees to handle product development and marketing.

## Products and Services

At present, Bratz™ is in the production stage and will be on the shelves of mass market, mid-tier and drug retailers in June 2001. Each Bratz will have an MSRP of $14.99. ABC will also offer three fashion packs including Pajama Power, Study Hall Style and Dynamite Dance for an MSRP of $7.99.

Our current product line is in need of a brand extension for Spring 2002 which will consist of new fashions for the four Bratz. This new line of Bratz will also include a new hairplay feature whereby the consumer can remove the current hairpiece and replace it with another. The hairplay feature included in the doll packs will be supported by a hairpack SKU with an MSRP of $7.99. In order to be price sensitive for Spring, also offered will be a $9.99 Character Pack which will include one doll without the mix 'n match feature. In Spring, the Bratz will have new fashions and a bevy of hairstyles from which to choose.

In Fall 2002, the Bratz will become interactive. Using infared technology, they will be able to communicate with one another on various topics. ABC will still offer Cloe, Sasha, Yasmin and Jade (in new, funky fashions) but will introduce a new character as well. The interactive Bratz will have an MSRP of $24.99. Sold separately will be a BratzPack (MSRP $12.99) in which the consumer can now carry her Bratz fashion dolls and accessories. One of those accessories will include a choice of three modes of transportation all at an MSRP of $29.99; a scooter, a Vespa or a pink convertible (again using infared technology). Another introduction will be a large Bratz head where the consumer can use makeup play pattern to pretty up their Bratz. Included will be lipstick, eyeshadow, glitter, hairgels and blush for an MSRP of $19.99. As hair styles change with the seasons so too will the Bratz Hairpacks for Fall (MSRP of $7.99). Lastly, fashion packs for Fall will be refreshed (MSRP $4.99).

4

EXHIBIT __8__

PAGE __216__

Confidential - For Attorney's Eyes Only

MGA 0050641

## Market Environment

The fashion doll marketplace has been stagnant for 30 years. We are now poised to introduce a fashion doll that Mattel does not understand.  Barbie's target demographic is girls 4-6 years old.

In August 2000, Mattel introduced an electronic mini-doll line, Diva Starz.  In 2000, Diva Starz sold over $21M (NPD TSRTS) at an average selling price of $27.37 per doll.  Diva Starz' target demographic is girls 5-7 years old.

ABC's Bratz combine the classic play pattern of Barbie and the extreme, contemporary play of Diva Starz.  It is in this offering, ABC can create a new category.  ABC's core target market is girls 7-11 years old.  Bratz creates a niche that appeals to girls that Barbie does not understand and Diva Starz simply does not appeal to.

## Customers

Current customers who have ordered Bratz include, but are not limited to, Wal-Mart, Target, Kmart, Toys 'R Us, K*B Toys, Rite Aid and Walgreens.

## Distribution

We have worldwide distribution and sell to more than 33,000 storefronts in the United States alone.  ABC International Traders, Inc. has over 200 sales people working out of 10 offices.

# Vision and Mission

## Vision

By 2002 ABC International Traders, Inc. will be a highly visible company known as a leader in the fashion doll industry. We will have developed four unique dolls and marketed these products in the mass market channels.  Sales will exceed $30,000,000 and ABC International Traders, Inc. will actively be promoting the Bratz™ through television advertising, print advertising, web site, end caps, POP and FSI.  We are also looking to secure a promotional partner by September 1, 2001.

5

EXHIBIT ___8___

PAGE ___217___

Confidential - For Attorney's Eyes Only

MGA 0050642

**Mission Statement**

In order to achieve our Vision, ABC International Traders, Inc. commits to the following:

ABC International Traders, Inc.'s Mission is to seize and sustain 3% market share in the fashion doll and ancillary categories. In carrying out our day-to-day business we strive to:

1. Treat our employees with respect.

2. Follow the philosophy that our customers are our priority.

3. Be considered as a leader in our toy community.

Through a long-term commitment to this mission, we will be known as a company that offered consumers an alternative to Barbie in the 21st century. Our customers, vendors, and employees see ABC International Traders, Inc. as offering innovative products at an affordable price point.

## Goals & Objectives

1. Initiate the launch strategy of Bratz
   - Production start date of April 28, 2001
   - Website will be live by June 1, 2001 (budget of $75k)
     - Obtain freelance developed by March 12, 2001
     - Finalize creative pitch from vendor by March 21, 2001
   - Television commercial spot will air by October 1, 2001 ($150k to shoot - $2.5M in media budget)
     - Delivered to networks by September 15, 2001
     - Commercial production to begin end of second quarter 2001
     - Storyboards due by April 15, 2001
     - Bids from production companies due by April 15, 2001
     - Selection of production company by April 30, 2001
   - Retailer advertising campaigns underway
     [insert info from Pat]
     - Senior Product Manager to bring product samples from Hong Kong by March 21, 2001
     - Shoot product for ad slicks the week of March 26, 2001
     - Finalize strategy with Sales Department on April 3-4, 2001
       - End caps
       - FSI
       - Floor minders
       - POP

2. Secure $250k in Advances and/or Guarantees by December 30, 2001 through licensing of the Bratz brand.

6

EXHIBIT _____ 8 _____

PAGE _____ 218 _____

Confidential - For Attorney's Eyes Only

MGA 0050643

*Since the Bratz™ have a passion for fashion, product roll-out will begin with apparel for Fall 2002. ABC International Traders will become a licensor to a host of apparel licensees. The Bratz™ apparel will be launched at the MAGIC Show in Las Vegas, February 2002. Categories will include apparel, t-shirts, innerwear, sleepwear, outerwear and hosiery.*

*Also launching in Fall 2002 in time for Back-to-School will be stationery, calendars and diaries. ABC has already received interest from Shaw Creations, Inc. (licensee of Warner Bros. and Disney) to create Bratz™ raincoats and umbrellas.*

*In order for ABC International Traders, Inc. to attain its vision in the manner described in our mission statement, the following primary strategic goals need to be achieved:*

- Create collateral press kit to distribute to prospective licensees (mini-disc)
- Kit components to include:
  - ➢ Flash animation/website/ad slicks
  - ➢ Media Charts/Promo plans/distribution profile
  - ➢ Press Release
  - ➢ Corporate Backgrounder
  - ➢ Clips (print, tv)
  - ➢ Character profiles and Background
  - ➢ Prospective Licensee Form
  - ➢ Digital photos
  - ➢ Mini-disc completed by May 1, 2001
  - ➢ Style guide for licensees completed by June 12, 2001
- Bids from vendors due by March 20, 2001
- Exhibit Bratz at the International Licensing Show (10x20 booth) at the Jacob Javits Convention Center, June 12-14, 2001
- Facilitate Bratz RoadShow to major retailers (Wal-Mart, Kmart, Target, Toys 'R Us, K*B Toys) to begin in May 2001
- Place one Full-page ad in *License! Magazine* for May, June, July 2001 ($13,500)

3. Obtain 20M impressions by December 1, 2001
   - Place full-page ads in consumer and trade publications (*License!, Jump, Cosmo Girl, Teen*)
   - Launch Bratz at FAO Schwartz September 1, 2001
   - Participate in PlayDate in New York, October 2001

4. Exceed break-even of 800,000 units of Bratz™ fashion dolls (goal is to ship 3.5M units by December 31, 2001). Current forecast:
   - Toys 'R Us        200K pcs
   - Wal-Mart          150K pcs

7

EXHIBIT ___8___

PAGE ___219___

Confidential - For Attorney's Eyes Only

MGA 0050644

- Target              60K pcs
- Kmart              80K pcs
- K*B Toys          36K pcs
- International      250K pcs
- Others            100K pcs

- Marketing department to present sales with a kit by March 12, 2001 to include:
  - Line list
  - Frequently Asked Questions (FAQs)
  - Media & Promotional Plans
  - PowerPoint Presentation
  - Press clippings (TV, print)
- Facilitate bi-weekly Bratz meeting with Sales department

5. Complete Bratz Television Series Pitch Pack by July 1, 2001
  - ABC has received interest from Kids WB, Fox Kids and Sony in developing an animated series based on the Bratz
  - ABC has received interest from Bandai Entertainment in producing the animation for the Bratz series
  - Zeke Kamm (writer of The Powerpuff Girls and Dexter's Lab) will create the Bratz Mini-Bible
  - Focus group research will be conducted at LA Focus on March 22, 2001 and March 23, 2001
  - ABC will meet with Zeke on March 26, 2001 to discuss target audience and strategy for the series
  - Mini-Bible will be completed by May 15, 2001
  - Meetings with networks will be conducted the week of May 21, 2001

6. Secure Promotional Partner by September 1, 2001
  - Possible QSR with McDonald's, Tricon, or Shell
  - Possible promotion with Coca-Cola, Kellogg's, Quaker Oats
  - Pitch pack/press kit completed by May 1, 2001
  - Three-Five Premium concepts will be presented
    - Mini-Bratz
    - Bratz candy
    - Home video
    - Tatoos
    - Female sports drink

8

EXHIBIT ___8___

PAGE ___220___

Confidential - For Attorney's Eyes Only

MGA 0050645

# Company Overview

## Legal Business Description

### Company Name

ABC International Traders, Inc. is the legal name of our Company but we dba MGA Entertainment.

### Legal Form of Business

The legal form of ABC International Traders is Subchapter S-Corporation.

### *Business Location*

The corporate headquarters of ABC International Traders, Inc. is 16730 Schoenborn Street, North Hills, California, 91343.  Satellite locations include  MGA Entertainment (HK) Ltd., Room 1001 10/F, Empire Centre, 68 Mody Road, Tsimshatsui East, Kowloon, Hong Kong; 200 5th Avenue, Suite 1212, New York, NY, 10010; 175 Paramount Drive, 3rd Floor, Mailbox 13, Raynham, MA  02767; Dallas Market Center, 2100 Stemmons Freeway, Suite 8850, Dallas, TX  75207; 336 Hazelwood Avenue, San Francisco, CA  94127; 1012 Linden Street, Innisfil, Ontario, Canada L9S 1W4;

### *Government Regulations*

Because ABC International Traders, Inc. is operating in the toy industry we are under the regulation of the FCC, FTC and FDA.

The manufacture and sale of toys is regulated by both federal and state authorities. ABC International Traders, Inc. has obtained all required federal and state permits, licenses, and bonds to operate its facilities. There can be no assurance that ABC International Traders, Inc.'s operation and profitability will not be subject to more restrictive regulation or that the ABC International Traders, Inc.'s operations and profitability will not be subject to more restrictive regulation or increased taxation by federal, state, or local agencies.

9

EXHIBIT ___8___

PAGE ___221___

Confidential - For Attorney's Eyes Only

MGA 0050646

## Management Team

### Officers and Key Employees

Isaac Larian, President

Fred Larian, Executive Vice President

Eli Makabi, Executive Vice President

Patrick Williams, Senior Vice President of Sales

Paul Warner, Vice President of Sales

Martin Hitch, Vice President of International Sales

Dennis Medici, Chief Financial Officer

Stephen Lee, General Manager of Hong Kong Office

Lon Ross, Director of Marketing

Paula Treantafelles, Senior Product Manager

Of the ten people who make up the corporate staff, there are three founders who hold the following positions:

*Isaac Larian, President*

*Fred Larian, Executive Vice President*

*Eli Makabi, Executive Vice President*

Responsibilities & Management Team Backgrounds

### Isaac Larian, President/CEO

Isaac Larian oversees all divisions of the company, including product development, sales, marketing, overseas operations, production and distribution. With the pioneering spirit of the MGA family and the creative minds and insights of his own children, Mr. Larian is a major contributor to the development of new products and vision behind ABC International Traders, Inc.

Under Mr. Larian's leadership, ABC International Traders, Inc. has experienced outstanding growth, with 2000 sales of more than $92 million, an increase of 43 percent. Mr. Larian founded MGA Entertainment in 1979, under the name *SURPRISE GIFT WAGON*, to import and distribute name brand consumer electronics. The company was

10

EXHIBIT 8

PAGE 272

Confidential - For Attorney's Eyes Only

MGA 0050647

incorporated under the same name in 1982, and in 1987, Mr. Larian made a strategic move to enter the world of consumer entertainment, brokering a deal with Nintendo that made ABC the first official distributor of Nintendo and CD products in the United States. In 1993, under the new name MGA Entertainment, he successfully led the company in its formal transition from a consumer electronics company to a consumer entertainment company.   Mr. Larian has a Bachelor of Science degree in Engineering.

**Fred Larian, Executive Vice President**
Should he be included?

**Eli Makabi, Executive Vice President**
Eli Makabi oversees warehouse operations, purchasing, logistics and distribution.

**Patrick Williams, Senior Vice President of Sales**
Mr. Williams brings over 20 years of sales experience including working for Mattel and Hasbro.  At ABC, he directs staffing, training and performance evaluations to develop and control sales program. Mr. Williams manages worldwide sales distribution by establishing sales territories, quotas, and goals and advises dealers and distributors concerning sales and advertising techniques. Additionally, he analyzes sales statistics to formulate policy and to assist dealers in promoting sales.  Mr. Williams manages sales office activities including customer/product/service.

**Paul Warner, Vice President of Sales**
Before joining ABC International Traders, Inc., Mr. Warner spent 10 years with Ritvik Toys Inc. (Mega Bloks).   Before joining Child World, he worked as a buyer for Fay's Drug Co., Inc.  Between 1977 and 1978, Paul was the sales representative for Supermarket Distributors, Inc.  At ABC, Paul forecasts and plans sales for all east coast accounts including Toys 'R Us and Kmart and supervises independent sales representatives.  He also oversees ABC's Canadian market sales.

**Martin Hitch, Vice President of International Sales**
Martin Hitch brings over 11 years of international and domestic sales experience while working for Mattel and Hasbro.  He oversees over 40 distributors throughout the world including Tomy Japan, Tomy U.K., Vivid Imaginations (UK), Bandai Spain, Bandai Germany, and Bandai France.

**Dennis Medici, Chief Financial Officer**
Dennis Medici's 18 year tenure in finance and accounting includes five years with Upper Deck.  Currently, he manages working capital including receivables, inventory, cash and marketable securities. Performs financial forecasting including capital budget, cash budget, pro forma financial statements, external financing requirements, financial condition requirements.

11

EXHIBIT ___8___

PAGE ___223___

Confidential - For Attorney's Eyes Only

MGA 0050648

**Stephen Lee, General Manager - Hong Kong**
Mr. Lee brings over 20 years of overseas operations knowledge to ABC. He previously worked for Atari, JTS and Radofin.

**Lon Ross, Director of Marketing**
Lon Ross has held positions in entertainment/media marketing and brand management with firms that include Mattel, United Pet Group, MuchMusic USA, Cablevision Systems, and Twentieth Century Fox. While employed within the toy industry, Mr. Ross was responsible for managing and developing licensed products representing nearly $500 million in revenues. Mr. Ross has managed toy brands and licenses ranging from Disney Entertainment properties, Winnie the Pooh, Nickelodeon properties, the National Basketball Association (NBA), Barbie, and Matchbox/Hot Wheels. Lon Ross is responsible for a wide range of initiative ranging from brand direction and planning, promotions, advertising, and product development strategy. Mr. Ross holds an MBA from the Weatherhead School of Management at Case Western Reserve University and a BS in marketing from Babson College.

**Paula Treantafelles, Senior Product Manager**
Paula Treantafelles graduated from Univeristy of Southern California with her Bachelor of Science, Business Administration degree. After graduation, Paula worked in the Sales Research and Design and Development teams for the Large and Small Doll brand groups at Mattel. Inc. At ABC, Ms. Treantafelles is responsible the product development, brand management and marketing of the Bratz™ line.

The leadership and alignment characteristics of ABC International Traders, Inc.'s management team have resulted in the establishment of broad and flexible goals designed to meet the ever-changing demands of the quickly moving marketplace requiring our products. This is evident when the team responds to situations requiring new and innovative capabilities.

## Staffing

ABC International Traders, Inc. development team recognizes that additional staff is required to properly support marketing, sales, research, and support functions. We are currently seeking a Chief Operating Officer, Vice President of Product Development and an Associate Product Manager.

## Strategic Alliances

ABC International Traders, Inc. has formed some very important relationships with major companies in the entertainment industry. The following is a list of existing relationships:

12

EXHIBIT ___8___

PAGE ___224___

Confidential - For Attorney's Eyes Only

MGA 0050649

**Licensing Efforts**

ABC International Traders, Inc. has been involved in the entertainment licensing industry for 14 years beginning with Nintendo in 1987. ABC is a member of the International Licensing Industry Merchandisers' Association (LIMA).

Character and entertainment licensing has enjoyed enormous success in the past decade, generating billions of dollars in revenues each year. It is one of the most profitable types of licensing. It is difficult to measure the precise revenue from character licensing accurately, however, due to two recent trends in the industry: a trend towards long-term relationship agreements between the licensor and the licensee, and a trend towards structuring of partial payment in terms of equity in licensee operations. Although the predominance of character and entertainment licensing in the merchandising industry continues to erode as a lot of other properties have emerged and are now available for licensing, there is little question that this segment still continues to dominate the market. This property type is also the most concentrated with just a few large players dominating the licensing activity. The major players in character and entertainment licensing are the big movie studios and broadcasting companies. Names such as Disney, Warner Bros., Nickelodeon, and Fox come to mind immediately, and these companies are launching some of the most successful licensing programs, such as the famous old (comic) book characters X-Men, Spider-Man, or Batman, TV-based properties as Looney Tunes, The Simpsons and Sesame Street or properties based on movies such as Star Wars, one of the most successful licensing programs ever. New entertainment licensing properties also stem from the videogame section such as Nintendo and Pokémon.

ABC International Traders, Inc. currently has the following Merchandise License Agreements in place:

| Property | Licensor | Length of Contract (years) |
|---|---|---|
| Got Milk? | California Milk Board | 3 |
| Monster Rancher | BKN Entertainment | 2.5 |
| Bear in the Big Blue House | Jim Henson Company | 2.5 |
| Asteroids | Infogrames | 6 |
| Centipede | Infogrames | 6 |
| Missile Command | Infogrames | 6 |
| Super Breakout | Infogrames | 6 |
| Pac-Man/Ms. Pac-Man | Namco | 8 |
| Mrs. Fields Famous Brands | Mrs. Fields | 3.5 |
| National Hot Rod Association | NHRA Properties | 3 |
| National Football League | NFL Properties | 3 |
| Power Rangers | Saban Entertainment | 8 |
| Hello Kitty | Sanrio Inc. | 3 |
| Deer Avenger 1 & 2 | Simon & Schuster | 3 |
| Crazy Bones | Toy Craze, Inc. | 2 |
| WWF | WWFE, Inc. | 4 |

13

EXHIBIT ___8___

PAGE ___225___

Confidential - For Attorney's Eyes Only

MGA 0050650

# Market Analysis

### Market Definition

The target audience for the Bratz are tween girls from 7-11 years old. Tweens consist of three markets in one; the *primary* market - spending money on their own wants and needs, the *influence* market – directing the spending of their parents' money on their want and needs and the *future* market – for all goods and services who have all their purchases ahead of them. All three markets combined, tweens have more market potential than any other demographic group.

Girls lead the tween market and are gender specific. Tweens want a product uniquely made for them. They do not want adults to infiltrate into their world. Tweens aspire to be like "big girls" and are fashion conscious. At this age, girls are also making the transition from play to reality and becoming self-reliant.

### Industry Analysis

The Barbie brand is unquestionably dominant in the Fashion Doll category. This means that all things being equal, a consumer will choose the Barbie doll over all others. That being the case, Mattel does not have to compete based on a targeted price point. They can, and do, price their most successful Barbie offerings at every price point from $5.00 to $20.00. It is an inefficient scattering of offerings, but Mattel manages to collect revenues at all possible price point triggers – not just one.

For those items that are not Barbie related, the price point target has to be more strategic. The market seems to have focused in on the $15.00 price point. For YTD 2000, of the top 11 selling non-Barbie branded fashion dolls, nine were priced within a dollar or two of $15.00. It appears to be a collective decision that is more than arbitrary. In a sample of 11 products selected from among the midrange sellers, only three had a price point very close to $15.00. Among the bottom dwellers of the category, these are nearly none with a price point close to $15.00. Those should not be interpreted as a casual relationship that exists between this particular price point and sales success. There is no basis on which to draw that conclusion definitively. It is, however, a noteworthy point and an indicator of where pricing attention could best be focused.

The fashion doll category market is stagnant. The market for these products amounted to $1.1 billion in 2000--representing a 1% decline from 1999.

Referenced sources agree that the major trend is for funky, edgy fashion or small dolls. The trend has been toward the development of such products (Diva Starz, Bratz™).

The overall fashion doll market for the toy industry is projected to be $1.3 billion by the end of 2001. The overall market potential for Bratz™ is estimated to be $30 million by the end of 2001.

14

EXHIBIT ___8___

PAGE ___226___

Confidential - For Attorney's Eyes Only

MGA 0050651

Brands and licenses are so pervasive in the Fashion Doll category it would be appropriate to say that they define the category. For YTD 2000, retailers sold $324MM of branded/licensed product in the category. That accounts for 89% of all sales of fashion dolls. In fact, a review of the top brands/licenses in the category reveals a domino effect where the licenses drive fashion and the fashion drives the doll category.

| Brand/License | Sales $ | Sales Units |
|---|---|---|
| Barbie | $298,254,562 | 24,469,979 |
| Britney Spears | $13,362,740 | 885,119 |
| Spice Girls | $1,695,582 | 284,903 |
| Toy Story | $1,508,963 | 114,857 |
| Star Wars | $1,392,632 | 133,115 |
| Christina Aguilera | $1,344,720 | 74,182 |
| S Club 7 | $409,829 | 26,040 |
| Aladdin | $344,028 | 22,783 |
| Tarzan | $311,886 | 27,991 |
| Charlie's Angels | $181,374 | 12,116 |

Category success without licensing or very strong branding are few and far between. The market is apparently looking for fashion leadership, and that leadership must have a name. Primarily, leadership is provided by Barbie. Barbie is still viewed as the ideal female figure and as an infinitely versatile model of modern fashion. It is not surprising that Barbie is a clear leader. Media images are secondary sources for fashion leadership. Category consumers are drawn to images or major fashion and lifestyle leaders like Britney Spears which is why Bratz will be successful. They are the girls with a "passion for fashion".

### Strengths

In terms of product strength, Bratz™ has several distinct advantages over the competition. First is its marked advancement in the physical appearance of the dolls. The Bratz™ are unique in many ways; their eyes are big with a hint of animé style; their lips are more pronounced, their feet and heads are oversized. There is no fashion doll on the market that bears the resemblance to the Bratz™. Additionally, the fashions exemplified mirror those worn by today's tween. Chunky shoes, tube tops and their hair accessories demonstrate the urban girl for the 21st century.

In marketing, our most powerful assets are distribution and image of the brand. ABC will launch an aggressive $2.5 million dollar television campaign for fourth quarter 2001. Print advertising in popular tween magazines such as *Cosmo Girl*, *Teen* and *Jump* will further enhance our product positioning.

The Bratz™ will be offered to retailers at a price point close to that of Barbie's. ABC is confident that girls will purchase the Bratz™ over Barbie because they are not defined by race or ethnicity. This was a conscious decision so the consumer can choose the doll that reflects their own fashion style or appearance.

15

EXHIBIT ___8___

PAGE ___227___

Confidential - For Attorney's Eyes Only

MGA 0050652

**Weaknesses**

There is one handicap inherent in ABC venturing into the Fashion Doll category. The only notable marketplace disadvantage is that ABC is competing with the number one toy company in the world, Mattel.

This category is monopolized by Mattel with Barbie. By year-end 2001 we will have positioned ourselves by capturing 3% of the market share and thereby reduce this weakness considerably. We do not wish to dominate this category but instead grow our Bratz™ business steadily one year at a time.

Corporate weaknesses, at this time, consist only of staffing. However, we are taking steps to secure a Chief Operating Officer, Vice President of Product Development and an Associate Product Manager which we feel should alleviate this problem.

**Opportunities**

The upside potential for Bratz™ is to double our market share in the fashion doll category and being considered as a contender for Mattel.

Based on ABC's plan to continually refresh the brand each season with new product offerings, as introduced in the Mission section, it is apparent that we can achieve a steady growth in market share.

**Unexploited Opportunities**

An altogether new application for this product would be tapping into licensing the property.

ABC can effectively leverage the Bratz™ brand by introducing not only apparel but accessories such as handbags, bookbags, footwear, eyewear, headwear, jewelry, watches and luggage, to name a few. This opportunity will be exploited further at the Licensing Show in June.

The cost to begin licensing is minimal. Costs will primarily be centered around marketing the brand to the trade to create awareness. It is imperative that this introduction is done simultaneously with the release of the dolls on shelf. This will generate more interest in the brand. The only risk involved is that the Bratz™ dolls do not sell-thru at retail. However, preliminary research with young girls indicates this will not be the case.

16

EXHIBIT ___8___

PAGE ___228___

Confidential - For Attorney's Eyes Only

MGA 0050653

## Risk

### Business Risk

*Competition*

ABC International Traders, Inc. competes with Mattel, who is the largest toy company in the world. Mattel has greater sales, and financial, production, distribution, and marketing resources than ABC International Traders, Inc. There can be no assurance that competition in the future will not increase from other toy manufacturers, many of which, like ABC International Traders, Inc., have recently debuted their line of fashion dolls for Fall 2001. Competitors will try to offer knock off dolls with better features and lower price points.

### Elements of Risk

Since this the initial introduction of ABC International Traders, Inc. into the Fashion Doll market, ABC runs the risk of failure from trade acceptance by retailers. This is being overcome already by the orders placed from the top five major retailers. Additionally, ABC's Sales Department has been provided with the necessary tools and information to combat any resistance.

ABC can also fail if not receiving consumer acceptance. Initial research disproves such a theory. However, additional research will be conducted on March 22 and 23, 2001 with girls from ages 5.5 – 13 years old.

Lastly, licensing a property no one has yet heard of can prove to be quite a challenge. If the fashion dolls to not sell-thru well at retail, this can cause a backlash with licensees who have already spent monies in advances and product development. Promoting the brand through advertising and trade show events will counteract this risk.

17

EXHIBIT ___8___

PAGE ___229___

Confidential - For Attorney's Eyes Only

MGA 0050854

# Marketing Plan

ABC International Traders, Inc.'s marketing strategy is to enhance, promote and support the fact that Bratz™ offers urban streetwear fashions coupled with extreme looks into the Fashion Doll category with which Mattel cannot compete.

The overall marketing plan for our product is based on the following fundamentals:

- Entering the Fashion Doll category in Fall 2001

- Reach the tween market (girls 7-12) who are no longer interested in Barbie

- Place the Bratz™ in mass market retailers for Fall 2001

- Secure 3% market share in the Fashion Doll category by year-end 2001

## Sales Strategy

The Bratz™ should be treated as a long-term brand with future line extensions.

As such, the target market segments to focus on tweens. Because of the Bratz™ special market characteristics, our in-store sales strategy includes:

- Securing end-caps
- Free-standing inserts
- Floor minders
- Point of Purchase displays

## Positioning

Our Bratz™ is seen by the consumer as innovative and hip. Its unique advantages can be exploited to arrive at a winning position in the consumer's mind.

In terms of market segmentation advantages, we can use middle class consumers and ethnic appeal to arrive at a winning position here.

To be effective, other licensed products depend on the presence of our Bratz™.

## Pricing

18

EXHIBIT 8

PAGE 236

Confidential - For Attorney's Eyes Only

MGA 0050655

The Bratz™ price (MSRP $14.99) is competitive with Barbie. There is a higher perceived value in Bratz™ because each doll comes with five accessories pieces so each doll has two complete outfits.

The prices for our products are determined first and foremost by costs. It is important to know that competitive pricing is essential to our market profile.

Examples of competitive pricing include:

| Rank | Item | Manufacturer | Intro Date | Average Price |
|------|------|--------------|-----------|---------------|
| 1 | Celebration Barbie | Mattel | June 2000 | $33.27 |
| 2 | Barbie Wizard of Oz | Mattel | February 2000 | $14.87 |
| 3 | Mary Kate & Ashley | Mattel | March 2000 | $15.03 |
| 4 | Superslide Kelly | Mattel | December 1999 | $15.27 |

## Distribution Channels

ABC International Traders, Inc.'s marketing department plans to sell our Bratz™ through several channels. In addition to selling the product to mass marketers, it will be sold at mid-tier department stores, toy specialty stores and through e-commerce. Key competition uses the same distribution channels.

A partial list of ABC International Traders, Inc.'s major current customer include:

- Wal-Mart
- Kmart
- Target
- Toys 'R Us
- K*B Toys
- RadioShack

### Direct Sales

The majority of ABC International Traders, Inc. sales will be handled internally through direct sales by our staff.

ABC International Traders, Inc. anticipates hiring two additional National Account Sales Managers for Kmart and Target.

We have chosen to use a direct sales force because our products require considerable customer education and post-sales support--directly from the company. Our price point, pricing structure and profits are such that our costs of sales warrants "person-to-person" selling strategy.

### International Distributors

One of the key elements designed into the ABC International Traders, Inc. marketing

19

EXHIBIT _____8_____

PAGE _____231_____

Confidential - For Attorney's Eyes Only

MGA 0050656

plan is the targeting of our distributors. We will select distribution channels already in existence and staffed with professionals possessing appropriate backgrounds and clientele.

ABC International Traders, Inc. products are very pertinent to the nature of distributor's business and to the well-being of their customer base.

This strategic marketing approach takes full advantage of the fact that these professionals are already involved with parallel products and services. They already have a track record of experience.

By operating within these distribution channels in this manner, we can maintain control of our market. In addition, we can generate growth at a reasonable pace and obtain excellent sales results.

Bratz™ fresh look and attitude is especially appreciated internationally. Overseas, fashion-forward couture is ahead of the American designers. The United Kingdom, Australian and Italy already see the fashion trends demonstrated in Bratz™ and have committed to developing the brand in their markets.

## Advertising and Promotion

ABC International Traders, Inc. recognizes the key to success at this time requires extensive promotion. This must be done aggressively on a wide scale. ABC International Traders, Inc. plans to advertise in major trade and consumer magazines such as *Teen*, *Jump*, *Cosmo Girl* and *License!*. Co-op advertising will also be placed with mass market retailers.

### Objectives

- Position ABC International Traders, Inc. as a leader in the fashion doll market.

- Increase company awareness and brand name recognition among retailers, buyers, and customers.

- Develop, through market research, significant information to create immediate and long-term marketing plans.

- Coordinate sales literature and promotional collateral in order to secure licensees and promotional partners.

### Media Objectives

- Gain awareness of company among industry groups, buyers, and customers.

20

EXHIBIT ___8___

PAGE ___232___

Confidential - For Attorney's Eyes Only

MGA 0050657

- Establish an image of ABC International Traders, Inc. as a organization that is professional, completely reliable, and highly positioned in the market.

- Maximize efficiency in selection and scheduling of published ads in publications to cover tween and trade markets.

## Media Strategy

- Select primary business publications with high specific market penetration.

- Schedule adequate frequency of ads to impact market with corporate image and product messages.

- Where possible, position advertising in or near product reviews and appropriate editorials.

- Take advantage of special high-interest issues of major publications when possible (Discount Store News' Wal-Mart issue).

- To get the most out of our promotional budget, our media coverage will be to focus on a tween audience.

We will develop an advertising campaign built around product innovation, beginning with a "who we are" statement and supporting it with ads that reinforce individuality of each girl. Additionally, we will develop a consistent reach and frequency throughout the year.

## Advertising Campaign

The best way to reach our potential customers is to develop an intense advertising campaign promoting the Bratz™ basic premise--"The Girls with a Passion for Fashion". This will also be conveyed through the interactive website www.bratzpack.com. Over the course of the campaign, 92% of all girls 4-9 years old will see our ads an average of 15 times.

To establish the Bratz™ image, the delivery and tone of our statements will be urban glamour.

Ads will convey the look and feel of a youthful company.

Because Bratz™ is so unique, it is important to develop a promotional campaign that is consistent and easy to understand.

21

EXHIBIT _____8_____

PAGE _____233_____

Confidential - For Attorney's Eyes Only

MGA 0050656

**Preliminary Media Schedule**

Television advertising will air for 12 weeks beginning October 1st through December 23, 2001. Cable television will air on Nickelodeon, Fox Family and Cartoon Network. Network television will air on ABC (see Appendix for media chart).

Additional publications will include *Disney Adventures, Nickelodeon Magazine*, and *Girls Life*. Editorial will run in the June issue of *License!*

**Sales Support Collateral Materials**

ABC International Traders, Inc. has developed a variety of collateral materials to support our sales efforts. These items include sell sheets, FAQs, line list, media and promotional plans.

**Advertising Budget**

For the next nine months, advertising and promotion will require $3,000,000 million dollars. On an ongoing basis we will budget our advertising investment as 15% of total sales.

## Public Relations

**Publicity Strategy**

During 2001 ABC International Traders, Inc. will focus on the following publicity strategies:

- Develop a sustained public relations effort, with ongoing contact between key editors and top-level personnel.

- Develop a regular and consistent product update program for the major target media, keeping key editors abreast of Bratz™ enhancements and new product introductions.

- Develop an internal newsletter that can cover key sales successes, significant marketing and manufacturing events, technical support and product development stories. Internally, the newsletter would be targeted at all company personnel and sales representatives; externally the piece would be targeted at key customers and prospects.

- Establish contact with editorial staff for the purpose of being included in product "round-ups"--product comparisons in publications such as Consumer Reports, where

22

EXHIBIT ___8___

PAGE ___234___

Confidential - For Attorney's Eyes Only

MGA 0050659

competing products are compared. This exposure builds credibility and market acceptance.

- Produce a complete company backgrounder on ABC International Traders, Inc. to be used as the primary public relations tool for all target media editorial contact. This will also be effective for inclusion in press kits and sales packages. The backgrounder would include sections on the following broad subjects:

> Overview of the Market: size; characteristics.

> The Market in 2000, present and future.

> The Company
> History
> Management Philosophy
> Brief sketches of Top Executives

> The Products
> Market Niches

**Press Release**

ABC International Traders, Inc. will develop a series of press releases on the entire Bratz™ line. Prepare press releases for each new product introduction, and participation in a trade shows.

**Trade Show**

ABC International Traders, Inc. will participate in several trade shows in 2001: 1) International Licensing Show in June, 2) Hong Kong Pre-Toy Fair in July and 3) New York Pre-Toy Fair in September and Dallas Pre-Toy Fair in November.

In 2001, ABC International Traders, Inc. will concentrate on promoting the Bratz™ for licensing. In deciding on the ABC International Traders, Inc. plan for the International Licensing Show, the following factors have been taken into consideration:

Target audience of the show—securing at least seven licensees

Geographic location—New York is also host to many international companies who may be interested in licensing Bratz™ in their markets

Time frame—in securing apparel and accessories licensees after June, there will be ample time for each manufacturer to debut their Bratz™ collection at the MAGIC show in February 2002.

23

EXHIBIT ___8___

PAGE ___235___

Confidential - For Attorney's Eyes Only

MGA 0050660

# EXHIBIT 9

| | |
|---|---|
| From: | Isaac Larian |
| To: | Saban - Haim Saban |
| CC: | |
| BCC: | |
| Sent Date: | 2003-02-04 02:25:52:187 |
| Received Date: | 2003-02-04 02:25:52:187 |
| Subject: | RE: I need your advise |
| Attachments: | |

Haim,

I am meeting with Oded in NY.

Thanks for the introduction.

Isaac Larian
CEO
MGA ENTERTAINMENT
A Consumer Entertainment Product Company
16730 Schoenborn Street
North Hills, California, 91343-6122
Tel: 818-894-3150
Fax:818-894-1267
Ilarian@mgae.com
www.MGAE.COM
Meet the girls with Passion for Fashion
www.Bratzpack.com

-----Original Message-----
From: Haim Saban [mailto:hsaban@saban.com]
Sent: Thursday, January 30, 2003 8:53 AM
To: Isaac Larian
Cc: Lissa Kereta
Subject: RE: I need your advise

I will talk to him and get back to you. Best.

-----Original Message-----
From: Isaac Larian [mailto:ilarian@mgae.com]
Sent: Thursday, January 30, 2003 8:47 AM
To: Haim Saban
Subject: RE: I need your advise

Haim,

Please make the introduction.

EXHIBIT ___9___

PAGE ___236___

MGA 1008775

Confidential - For Attorney's Eyes Only

Also, I called the guy from Dic two times but he did not call back. I left a message I was referred to him by you. Do you have his e mail.

Thanks so much.

Isaac Larian
CEO
MGA ENTERTAINMENT
A Consumer Entertainment Product Company
16730 Schoenborn Street
North Hills, California, 91343-6122
Tel: 818-894-3150
Fax:818-894-1267
llarian@mgae.com
www.MGAE.COM
Meet the girls with Passion for Fashion
www.Bratzpack.com

-----Original Message-----
From: Haim Saban [mailto:hsaban@saban.com]
Sent: Thursday, January 30, 2003 8:47 AM
To: Isaac Larian
Cc: Lissa Kereta
Subject: RE: I need your advise

The best negociator I have ever seen at work is the guy who advised me on my Disney deal.He was also Steve Ross's deal guy.(Time Warne chrmn)He doesnt come cheap,but worth every penny.
His name is Ed Aboodi.Would be happy to make an introduction.Let me know.

-----Original Message-----
From: Isaac Larian [mailto:ilarian@mgae.com]
Sent: Thursday, January 30, 2003 8:01 AM
To: Haim Saban
Subject: RE: I need your advise

Thanks Haim

Working as hard; Probably not. But, you know it is in my blood to work hard.

2

now.

Return on Investment: They want to be able to make 3 times with an exit strategy.

Banker to advise me: No I don't have one. Can you please recommend a good person to me?

-----Original Message-----

EXHIBIT ____9____

PAGE ____237____

Confidential - For Attorney's Eyes Only

MGA 1008776

**REDACTED**

From: Haim Saban [mailto:hsaban@saban.com]
Sent: Thursday, January 30, 2003 7:36 AM
To: ilarian@mgae.com
Subject: Re: I need your advise

These r all valid but very personal questions.
Do u still want to work hard?how much $ do you have as a safety net for your
family?how well will u get along w/your new partners?what r the covenants
they r asking in return for their investment. And the list goes on and on.
Do you have a good banker advising you?

Sent from my Blackberry

-----Original Message-----
From: Isaac Larian <ilarian@mgae.com>
To: Haim Saban <hsaban@saban.com>
Sent: Thu Jan 30 07:04:13 2003
Subject: I need your advise

Hi Haim,

I need your advise please.

My Bratz line is hot ( like Power Ranger's in 1993)

V                                                    03.

                                                    2003.

But, I know Bratz will not go on for ever. So I want to take some cash out
and put away for my family.

There are two investor groups ( TA and Summit) who want to buy 10% of the
company for about $50 million and I can take the cash out. But they want to
have seat on the board and want to take the company IPO in 2 years or sell
the company.

Do you think I should do this or simply take the cash out of the company
profits and hire consultants to help me set the company up for IPO or sale
down the road?

Please let me know your thoughts.

Thanks.

Isaac Larian
CEO
MGA ENTERTAINMENT

EXHIBIT ___9___

PAGE ___238___

Confidential - For Attorney's Eyes Only

MGA 1006777

REDACTED

A Consumer Entertainment Product Company
16730 Schoenborn Street
North Hills, California, 91343-6122
Tel: 818-894-3150
Fax:818-894-1267
llarian@mgae.com
www.MGAE.COM
Meet the girls with Passion for Fashion
www.Bratzpack.com

EXHIBIT _____ 9 _____

PAGE _____ 239 _____

MGA 1008775

Confidential - For Attorney's Eyes Only

# Exhibit 10

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# Exhibit 11

THIS EXHIBIT IS FILED
UNDER SEAL
PURSUANT TO
PROTECTIVE ORDER

# Exhibit 12

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# Exhibit 13

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# Exhibit 14

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 15

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 16

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 17

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 18

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 19

THIS EXHIBIT IS FILED
UNDER SEAL
PURSUANT TO
PROTECTIVE ORDER

# EXHIBIT 20

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 21

| From: | Jeffrey Hall |
|---|---|
| To: | Valerie Grant |
| CC: | Isaac Larian (President / CEO) |
| BCC: | |
| Sent Date: | 2003-09-04 00:00:23:156 |
| Received Date: | 2003-09-04 00:00:23:390 |
| Subject: | Revised P&L, Balance Sheet and Cash Flow for Remainder of 2003 |
| Attachments: | MGA 2003 Forecast Revised 090303.xls |

Val,

The attached file is a (hopefully) conservative estimate of our operations and Cash Flow o͟          asis for the balance of 2003. September w͟          our tighter͟          n ͟tio          ͟          ͟nd ͟          ͟. Note that another ͟          in estimated tax payments is allocat͟          ͟ion          ͟y distributions are forecast for the remainder of 2003.

Taking the distributions into account, o͟          nce figures to drop to between          ͟by the end of September, i͟          uild back up to          ͟in October and November before dropping slightly to end the year around          ͟after the Decem͟          ated tax payments. This forecast is slightly conservative in that I put in a 15-͟          ͟ent factor for payments related to HK Commercial Invoices. You can see the impact on A/R and Cash duri͟          July caused by HK's delinquent preparation͟          ͟. The total A/R balance grew from          ͟it the end of May to $40 million at the end c͟          t the end of July. The continuec͟          growth in the A/R balance for August, September, and ͟          ͟d to duc to increased sales volumes, our DSO will actually decline slightly as HK invoicing gets and stays more current.

The P&L Forecast includ͟          hopefully a conservative total of $,͟          ross shipments, which equates to Net Sales of͟          after accounting for Returns, Allowances, and the Hallmark Impact (which assumes that we elect the Hallmark Treatment for 2003 as we did in 2002). For purposes of the forecast, I assumed that 70% of our shipments for November and December will be to our Top 5 Customers for whom we elect the Hallmark Treatment (Walmart, Target, TRU, Kmart, Kaybee). Hallmark has no impact on our Cash Flow, other than to defer into the following year the sales and profits and thereby defer the tax liability for Isaac and Shirin. It also creates an increased Inventory Balance and reduced A/R balance, as the Hallmark sales are ͟ot treated as A/R and the cost of sales is carri͟          ͟ ͟Inventory, Licensing Revenues of approximatel͟          ͟ake our total 2003 Net Revenues ͟

I will continue to monitor the forecast, and will update August when actual results are finalized in the next 2 weeks. Feel free to contact me with any questions......

Jeff

EXHIBIT ___21/___

PAGE ___460___

MGA 1506093

Confidential - For Attorney's Eyes Only

REDACTED

# EXHIBIT 22

Confidential -- Attorneys' Eyes Only



# United States District Court

## Central District of California

### Case No. CV 04-9049 SGL (RNBx) Consolidated with Case No. 04-9059 and Case No. 05-2727

CARTER BRYANT, an Individual, Plaintiff,

v.

MATTEL, INC., a Delaware corporation, Defendant

Expert Report of
Michael J. Wagner
February 11, 2008

EXHIBIT _____ ZZ

PAGE _____ 461

Confidential – Attorneys' Eyes Only

**I.    Introduction**

I have been retained on behalf of Mattel, Inc. ("Mattel") to provide opinions regarding profits that may be recovered from MGA Entertainment, Inc. and MGA Entertainment (HK) Limited ("MGA"), Isaac Larian, and Carter Bryant (collectively referred to as "counter-defendants").

My opinions address the following matters:

- MGA's revenues, costs and profits relating to the sale, distribution and licensing of Bratz products.
- Isaac Larian's benefit from the use, sale, distribution and licensing of Bratz products.
- Carter Bryant's benefit from payments received in connection with the consulting agreement for Bratz between Mr. Bryant and MGA.
- The appropriate prejudgment interest rate and method to calculate prejudgment interest, if applicable.
- MGA's, Isaac Larian's, and Carter Bryant's net worth.

**II.    Background**

**A.   MGA**

As described in MGA's complaint against Mattel, "MGA is a privately held company in the San Fernando Valley that began in 1979 as a small consumer electronics business. In 1987, the company made its first foray into the toy business when it secured rights to market handheld LCD games featuring licensed Nintendo® characters. Building on that small success, the company began marketing products for popular licensed properties such as the 'Power Rangers'® and 'Hello Kitty'®."[1] In June 2001, MGA released "BRATZ."[2]

**1.   BRATZ**

Bratz dolls were introduced to the market in June of 2001.[3]   Today, the Bratz product line has grown to include a wide variety of products.  When one clicks on the Products link at Bratz.com website, the following product categories are displayed:  Bratz, Bratz Baby, Bratz Kidz, Activities, Home Décor, Electronics, Bratz Sports, Games, and Bratzlife.

---

[1] MGA complaint against Mattel, filed April 13, 2005 [Tab E97, page 2].
[2] MGA complaint against Mattel, filed April 13, 2005 [Tab E97, page 2].

1

EXHIBIT ___22___

PAGE ___467___

Confidential – Attorneys' Eyes Only

A June 2002 declaration of Lee Shiu Cheung, Managing Director of MGA HK, provides further description of the Bratz dolls and the success that MGA expected upon their release. Within the declaration, the Bratz dolls are described as "hip and cool young adolescent or teenage girls" and "4 best friends from high school who love to trade clothes, shoes and hairdos."[4]  The declaration goes on to say, "there would be a lucrative business of supplying accessories to the owners of BRATZ dolls thus ensuring a steady stream of revenue."[5]  In addition to the sale of dolls and accessories, license revenues are discussed as well.  The declaration states, "another major source of revenue generated by the BRATZ dolls is income derived from merchandising rights by granting non-exclusive licenses to other companies worldwide."[6]

### 2.  Success of MGA's BRATZ

A March 8, 2005 report from CBS News quotes Jim Silver of Adventure Publishing Group as saying, "What Bratz has done is actually unbelievable.  Barbie has owned the market. Nobody's ever done a doll over the last 20 years that's done over $100 million. And Bratz came out of nowhere and a little past four years built up to $600 million."[7]

One need only look to the MGA website (www.mgae.com) and their press releases posted there, to see the tremendous success MGA has enjoyed as a result of the BRATZ products.  A February 11, 2004 MGA press release states, "Bratz, *The Girls with a Passion for Fashion*, were introduced in June 2001, and has since become one of the world's premiere toy lines and girls lifestyle brands."[8]  Following is a summary of some of the headlines of MGA's many press releases regarding the success of BRATZ:[9]

- 1/7/2004 – MGA Entertainment announced today that it remains the fastest growing consumer entertainment company in the world.

- 5/12/2004 – BRATZ Fashion Dolls Become the #1 Best Selling Toy in the United Kingdom!

---

[3] February 11, 2004 MGA Press Release [Tab E88, page 3].
[4] Affirmation of Lee Shiu Cheung, June 18, 2002, page 3 [Tab E89].
[5] Affirmation of Lee Shiu Cheung, June 18, 2002, page 3 [Tab E89].
[6] Affirmation of Lee Shiu Cheung, June 18, 2002, page 5 [Tab E89].
[7] "Battles of Babes in Toyland", CBS News, March 8, 2005 [Tab E91, page 1].
[8] February 11, 2004, MGA Press Release [Tab E88, page 3].
[9] Variety of MGA Press Releases [Tab E92].

2

EXHIBIT  22
PAGE  463

Confidential – Attorneys' Eyes Only

- 1/28/2005 – MGA Entertainment and BRATZ Creating Non-Stop Excitement at Retail

- 3/10/2005 – MGA Entertainment's BRATZ becomes the Number One Fashion Doll Brand in Australia

- 5/4/2005 – BRATZ Nominated for Five International Licensing Excellence Awards...As well as seeing a Q1 Market Share Increase

- 5/24/2005 – BRATZ Fashion Dolls report remarkable market share growth in Canada.

- 5/15/2006 – MGA Entertainment, Avi Arad Productions and Crystal Sky Pictures Announce New Motion Picture Based on the Billion Dollar BRATZ™ Toy Franchise

- 2/5/2007 - BRATZ™ becomes No. 1 in Fashion Themed Dolls and Accessories in the USA

- 4/11/2007 - BRATZ™ Takes the Coveted #1 Fashion Doll Spot in Canada

BRATZ has experienced a great deal of success.  A May 2, 2005 article written for Business Week describes Bratz as a "billion-dollar franchise."[10]

Not only did Bratz increase the profile of MGA, it also had a major impact on the financial success of the company.  Sales of Bratz products grew substantially through 2006,[11] while sales of non-Bratz products grew more moderately as shown in the following chart:

---

[10] "Hair Pulling in the Dollhouse", Business Week, May 2, 2005 [Tab E93,page 1].
[11] There is an increase in sales of Non-Bratz products as a percentage of total sales in late 2006 and 2007 resulting from the MGA 2006 acquisition of Little Tykes.

3

EXHIBIT __22__

PAGE __464__

Confidential — Attorneys' Eyes Only

EXHIBIT _____ 22 _____

PAGE _____ 465 _____

REDACTED

Confidential – Attorneys' Eyes Only

**B.   Isaac Larian, Founder, CEO and Majority Shareholder of MGA**

Isaac Larian is the Founder, CEO and Majority Shareholder of MGA.  As such, he has been the subject of many news articles and TV interviews.  A Business Week article describes him as the, "father, so to speak, of the fabulously successful Bratz dolls."[12]   A profile provided by Business Week for the article mentioned above credits him with creating the "enormously successful Bratz dolls, whose edgy looks and clothing sent Barbie reeling."[13]

---

[12] "Hair-Pulling in the Dollhouse" Business Week, May 2, 2005 [Tab E93, page 1].
[13] Bio of Isaac Larian, Business Week, May 2, 2005 [Tab E94, pg.1].
[14] Lisa Tonnu Deposition on January 17, 2008 [Tab E16, pages 74-76].

5

EXHIBIT ____22____

PAGE ____466____

**REDACTED**

Confidential – Attorneys' Eyes Only

### C. Carter Bryant, Designer and Former Employee of Mattel

Carter Bryant began working for Mattel in September of 1995 as a Barbie product designer. In approximately April of 1998, Mr. Bryant resigned from Mattel and then re-applied to Mattel in late 1998. He began working for Mattel again in January 1999 as a product designer and then terminated his employment again with Mattel on October 20, 2000.[16]   Mattel's counter-claim states, "As a result of the efforts of Bryant and other Mattel employees working on Bratz (which were done without Mattel's knowledge), the Bratz dolls had been designed and were far along in development during the time that Bryant was employed by Mattel and prior to the time that Bryant left Mattel on October 20, 2000."[17]

MGA and Carter Bryant entered into a Consulting Services Agreements dated September 18, 2000. The first section of the agreement states, "MGA retains Bryant to provide his services to consult with MGA and advise MGA on the design and development by MGA of a line of dolls presently know as 'Bratz' (the 'MGA Products')."[18] Mr. Bryant's compensation under this agreement is, "a royalty of three percent (3%) of the Net Sales Receipts from the sales by MGA of any of the MGA Products developed by MGA on which Bryant provided his consulting services."[19] As a result of this agreement and the subsequent sales of certain Bratz products, Carter Bryant has received more than $35 million dollars in royalty payments from MGA from 2001 as of December 31, 2007.[20]

### III.   Bases for Opinions

The following is a discussion of the bases supporting each of my opinions.

---

[16] Mattel Inc.'s Amended Answer in Case No. 05-2727 and Counterclaims, Dated January 12th 2007 [Tab E95, pages 32 and 34].
[17] Mattel Inc.'s Amended Answer in Case No. 05-2727 and Counterclaims, Dated January 12th 2007 [Tab E95, page 34].
[18] Carter Bryant Consulting Services Agreement Dated September 18, 2000 [Tab E90, page 1].
[19] Carter Bryant Consulting Services Agreement Dated September 18, 2000 [Tab E90, page 2].
[20] Tab B1, Schedule 7.2.

6

EXHIBIT ___22___

PAGE ___467___

REDACTED

Confidential – Attorneys' Eyes Only

**A.**  **MGA's Revenue, Costs and Profits Relating to the Sales, Distribution and Licensing of Bratz Products[21]**

I calculated the revenue, costs and profits earned by MGA for the sales and licensing of Bratz products for the period of 2001 through October 2007, the last period of data provided by MGA. I have calculated actual Bratz revenues, costs, profits and distributions to shareholders for income taxes [22] attributable to Bratz. I have been asked to make these calculations irrespective of whether all of the items I have included as costs will, in fact, be deducted at trial. The following chart depicts net revenues, cost of good sold, direct costs and calculated costs for Bratz products from 2001 through October 2007.

7

EXHIBIT  22

PAGE  468

REDACTED

Confidential – Attorneys' Eyes Only

1. **Revenues**

The basis for my calculation of MGA revenues of Bratz product sales is a report produced by MGA titled "Bratz Sales, 2001-2006."[23] According to Lisa Tonnu, MGA VP of Taxation[24], if she were asked to total Bratz revenues, she would use this document.[25] Within the "Bratz Sales, 2001-2006" report, the sales are categorized by profit center and then broken down by year and SKU number. [26] Included in this report are both gross sales as well as cost of sales at standard cost. I have accumulated all of the gross sales for each Bratz profit center from this report in order to determine gross sales from Bratz products for 2001 through 2006. For 2007, I used the October 2007 Sales by SKU report provided by MGA to determine gross sales for Bratz products through October 2007. See gross sales for Bratz products by year in Tab B1, Schedule 2.1.

In addition to gross sales from product sales, MGA earned revenues for Bratz from licensing agreements, DVD and TV syndication, Distribution agreements, Music sales and Theatrical productions. I used a variety of different MGA reports to find the portion of revenue for each of these sources linked to Bratz. See Tab B1, Schedule 3.1 for a summary of revenue by category for each year.

In order to determine net sales, I deducted sales returns and sales discounts and allowances from gross revenues. I used the Sales Returns by SKU reports provided by MGA for the period of 2001 through October 2007 in order to determine the sales returns for Bratz products. MGA does not track sales discounts and allowances by profit center or product line. Therefore, I allocated sales discounts and allowances to the profit centers based on the percentage of total sales discounts and allowances to total gross sales for each year.

2. **Expenses**

---

[22] MGA is a Subchapter S Corporation. As such, taxes on MGA's income are paid by the shareholders. However, since MGA makes distributions to shareholders to cover incomes taxes, those distributions are subtracted in my analysis.
[23] See [Tab E53] through [Tab E67].
[24] January 17, 2008 Deposition of Lisa Tonnu [Tab E16, page 33].
[25] January 17, 2008 Deposition of Lisa Tonnu [Tab E16, pages 28, 140 – 142].
[26] I have identified other MGA documents that list Bratz product categories consistent with the product categories in the document identified by Ms. Tonnu. Following is a sample of those documents: [Tab F3.MGA3765749 – MGA Forecasts 6-1-07.xls]; [Tab F20.MGA3721053 - 2007 Carter Bryant Royalty Statements.xls]; [Tab F36.MGA3720119 – 2006-2007 Ad Production Expense.xls]; and [Tab F37.MGA3719906 – 2006 & 2007 YTD Ad Media Expense.xls].

8

EXHIBIT 22

PAGE 469



Confidential – Attorneys' Eyes Only

### a)   Direct Expenses

For some expense categories, I was provided with adequate information to determine the direct expenses incurred by MGA for the production and sale of Bratz products.   For example, from the Report titled "Bratz Sales, 2001-2006", I accumulated the Cost of Sales at Standard cost for the Bratz products from 2001 through 2006 to deduct from the related Bratz revenue.   According to Lisa Tonnu, the standard costs provided in the sales report reflect the "agreed cost between MGA and the manufacturer."[27]  In addition to Cost of Sales, utilizing reports produced by MGA, I determined the direct costs for Production Costs (DVD, TV, and Music), Royalty Expense, Ad Production Expense, Ad Media Expense, Mold Depreciation and expenses for Tooling and Development that were incurred by MGA for Bratz.

For Ad Media and Ad Production Expense, I was provided with a report that identified direct cost by product line for 2006 and year to date (YTD) 2007. According to Lisa Tonnu, this is the only period in which MGA tracked these expenses by product line.[28]  Therefore, for the years where detail was not provided, I used the average Ad Media and Ad Production Expense for Bratz as a percentage of total U.S. Ad Media (excluding Little Tykes) and Ad Production Expense for 2006 and 2007 and applied it to the related expenses for 2001 through 2005 to estimate Bratz Ad Media and production expense for those years.[29]

### b)   Calculated Expenses

For all expenses that are not tracked by product or product line by MGA, I calculated incremental costs based on a regression analysis of monthly costs for various cost categories to gross revenues provided by MGA to determine the incremental costs associated with sales. Additional costs based on these regression analyses are equal to 9.22%[30] of gross revenues. See summary of regression results at Tab B1, Schedules 5.1 and 5.2.

In addition, since regression analysis determines additional costs associated with a $1 increase in sales and the incremental sales to MGA for the Bratz products is a substantial percentage of their total revenue, I analyzed the remaining costs that were not incremental

---

[27] January 17, 2008 Deposition of Lisa Tonnu, [Tab E16, page 136].
[28] January 24, 2008 Deposition of Lisa Tonnu, [Tab E120, pages 134 to 138].
[29] See Tab B1, Schedules 3.2 and 3.3
[30] These cost categories are: Other Sales and Marketing Expense, Product Development Expenses, Travel and Entertainment Expense, Salaries and Related Expenses, Premises Related Expenses,

9

EXHIBIT __22__

PAGE __470__

Confidential – Attorneys' Eyes Only

costs associated with Bratz products as a result of my regression analysis to determine whether any of these remaining costs are attributable to Bratz products as a result of the large proportion of Bratz products to total MGA sales. Based on this additional analysis, I determined that an additional $126.3 million of costs are attributable to Bratz products. See Tab B1, Schedule 1.6 for analysis.

c)   Distributions to Shareholders for Income Taxes

MGA, like other Subchapter S Corporations, distributes to its shareholders amounts sufficient to allow the shareholders to pay income taxes on their share of MGA income. I have not been given access to underlying documents and have relied on documents which appear to have been prepared for litigation. Mr. Larian's tax returns would contain evidence regarding the taxes due on income from MGA, Mr. Larian's specific tax rate and whether the distributions were, in fact, made for tax purposes. Absent that data, I have used a shareholders' distribution report for the period of 2001 through 2005 provided by MGA to determine the amount of the distributions made to shareholders for the payment of taxes. To determine these amounts, I have calculated the portion of the tax distributions attributable to the income from Bratz products and reduced MGA's profits by such amounts for 2001 through 2005.

---

Supplies, Postage and Delivery Expense and Other Depreciation and Amortization. [Tab B1, Schedule 1.2, footnote (o)]

10

EXHIBIT _____ 22

PAGE _____ 471

REDACTED

Confidential – Attorneys' Eyes Only

Isaac Larian's benefit from sales of Bratz Products is determined to be Mr. Larian's percentage of the value of Bratz plus MGA's distributions to Mr. Larian in excess of his tax obligations associated with his proportion of MGA's income.

As a result of the Bratz products, the value of the stock of MGA has increased significantly since the introduction of Bratz in 2001. In order to calculate the benefit to Isaac Larian as a result of the sales and licensing of Bratz products, I determined the Bratz contribution to the fair value of the stock currently held by the Larian Trusts. Since MGA is not a publicly traded company, there is no readily available stock price to use to value Isaac Larian's interest in MGA. Therefore, I have determined the fair value

---

[31] Tab B2, Schedule 1.0
[32] See Deposition of Lisa Tonnu on January 17, 2008, page 78. [Tab E16]

11

EXHIBIT _22_

PAGE _472_

REDACTED

Confidential -- Attorneys' Eyes Only

of MGA stock attributable to the Bratz products.  Fair value is the price at which an asset could be exchanged in a current transaction between knowledgeable, unrelated willing parties.  Fair value does not include any increment of value resulting from cost savings normally associated with a strategic sale.  I considered three generally accepted approaches to determine the fair value of MGA stock attributable to the Bratz products on December 31, 2007.  These approaches are income, market and cost.  I have assumed no potential cost savings in arriving at my opinion of fair value of Bratz.  I will update this analysis if and when I receive full financial data for the entire year of 2007.

The following figure summarizes the results of my analysis and shows the appropriate weights assigned to each individual approach.

In my opinion, the income approach best represents the value of the on-going business as it allows for full consideration of circumstances unique to MGA.  At the same time, the market approach in the form of comparable transaction analysis is least relevant because the degree of similarity between MGA and comparable acquisitions is hard to gauge, as every company's financial and business environment is unique.  As a result, I have assigned a weight of 70 % to the income approach, 20% to the comparable companies analysis and 10% to the comparable transactions analysis.  I also considered the cost approach but did not find it to be an appropriate measure of value of MGA's on-going business.

12

EXHIBIT _____ 22

PAGE _____ 473

REDACTED

Confidential — Attorneys' Eyes Only

The following section is a discussion of my methodology.

1. Income Approach

a) Summary

I performed a valuation of the Bratz contribution to the value of MGA stock based on the income approach in the form of a discounted cash flow ("DCF") analysis. To determine the Bratz enterprise value as of December 31, 2007, I forecasted MGA's future cash flows from Bratz and then valued these cash flows as of the date of the valuation by applying an appropriate discount rate. I also calculated a terminal value at the end of my forecast period. In my analysis, I relied on MGA's historical and projected financial statements. In addition, I reviewed historical and projected sales growth for other companies in the toy industry to ensure that MGA's forecast appears reasonable in light of the industry.

b) Methodology

In determining the value of the Bratz enterprise using the DCF method, I prepared a DCF model that calculates MGA's three year projected cash flows for Bratz from 2008 through 2010 and the Bratz terminal value at December 31, 2010. These cash flows and terminal value are discounted to the valuation date using a discount rate of 11%[37]. The following is a more detailed description of the methodology and assumptions used in the DCF.

---

[34] [$1,636,380,000/81.82%] = $1,999,975,556
[35] Multiply Total Implied Company Value ($2.0 B) by Percentage Share of Bratz Revenues in 2007 of 57%. [Tab B1, Schedule 2.1].
[36] See Tab B2, Schedule 2.0
[37] See Tab B2, Schedule 3.0 for discount rate.

13

EXHIBIT ___22___

PAGE ___474___

REDACTED

Confidential – Attorneys' Eyes Only

### (1)  Revenue and Expense Projections

The starting point for the revenue projections is Bratz's 2006 actual revenues since I was only provided with 10 months of data for 2007.  I projected the 2007 revenues based on sales decline in Bratz for the 10-months ending October 2007 compared with the 10-months ending October 2006.  I projected Bratz forecasted sales growth at 2% each year.  I consider these revised projections to be reasonable.  I believe the long-term growth rate of Bratz is 2%, as discussed in detail in the Terminal Value section below.

Net income from Bratz – The net income resulting from the sale of Bratz products is based on revenues less incremental expenses associated with Bratz products.  Incremental expenses are generally based on the average of 2005 and 2006 expenses from my analysis of Bratz revenues, expenses and profits, as described above.

I also include distributions to shareholders to derive net income.  The amount is based on the historical tax payments as a percentage of net income for 2002 through 2004.

See Tab B2, Schedule 2.1 for detail.

### (2)  Adjustments to income to calculate free cash flow

Net Income projections described above include non-cash charges incurred by MGA.  It is necessary to adjust for such charges in order to determine "free cash flow," or the cash flow that would be available to the owner of the enterprise.  Free cash flow is calculated by adding depreciation and amortization back to the net income and subtracting capital expenditures and investment in working capital.

Capital expenditures are projected at a constant rate of 2.6% of sales, which is the average level of capital expenditures to revenue over the previous six year period from 2001 through 2006 for MGA.[38]

Depreciation is assumed to remain constant at 100% of capital expenditures.  This is considered reasonable given the rate of depreciation to capital expenditures for 2004 through 2006[39] and that the majority of depreciation expense is related to molds[40] which have a

---

[38] See Tab B2, Schedule 2.2.
[39] See Tab B2, Schedule 2.2.
[40] See Tab B1, Schedule 4.2.

14

EXHIBIT 22
PAGE 475

Confidential – Attorneys' Eyes Only

relatively short depreciable life. Per review of the MGA Tooling Depreciation[41] report, almost all of the molds developed for Bratz products have an assigned depreciable life of 24 months.

Investment in working capital is calculated by assuming that certain key ratios will remain at their average 2005-2006 levels. For instance, inventory turnover ratio, account receivable days outstanding, and account payable days outstanding are projected to remain constant.

### (3) Terminal Value

The terminal value is the value of MGA's cash flows as a result of Bratz revenues beyond 2010 and is determined by capitalizing Bratz's 2010 cash flow. The formula to perform this calculation is:

Terminal Value = [2010 cash flow x (1+ growth rate)] / (discount rate – growth rate)

I estimate an increase in MGA's cash flows as a result of Bratz of 2% per year (growth rate in above formula) in perpetuity. This rate is considered reasonable given the historic growth rate in Bratz and per review of the historical and projected growth rates of other companies in the industry.[42]

### (4) Discount Rate

I used the Capital Asset Pricing Model (CAPM) in order to determine the discount rate to discount future cash flows to the date of valuation. The CAPM is a common rate used in valuation to determine the equity rate of return. Since MGA has no debt attributable to Bratz, the equity rate is the discount rate. In 2006, MGA obtained a $200 million revolving loan of which $150 million was outstanding as of December 31, 2006.[43] This loan was primarily obtained to finance the acquisition of Little Tykes in 2006.[44] Therefore, the loan is not related to the ongoing Bratz business and therefore is not considered in the calculation of the discount rate for cash flows from Bratz. The resulting CAPM of 11% is calculated in Tab B2, Schedule 3.0.

---

[41] MGA Tooling Costs and Depreciation Report [Tab F38.MGA3720189 – Tooling Costs & Depreciation.xls].
[42] See Tab B2, Schedule 12.1.
[43] 2005 and 2006 MGA audited financial statements [Tab E24.MGA0868719].
[44] Lisa Tonnu Deposition, September 24, 2007 [Tab E121, page 102].

15

EXHIBIT ___22___

PAGE ___476___

Confidential – Attorneys' Eyes Only

**(5) Summary of Income Approach**

The following table summarizes the annual cash flows for Bratz from 2008 to 2010 plus the terminal value. These amounts are discounted back to 12/31/2007 to determine Bratz's enterprise value.

**2.   Market Approach**

I have used two market approaches in determining the value of MGA stock attributable to Bratz: the comparable trading company approach and the comparable market transaction approach. While both of these approaches use market information to derive Bratz's value, they use different information as the descriptions suggest. The comparable trading company approach uses multiples derived from trading activity of public companies that most closely resemble MGA. The comparable market transaction approach uses multiples derived from transactions that have occurred in MGA's industry. While no two companies are exactly alike, I have selected companies that I believe to be most similar to MGA. I have seen numerous documents produced by MGA that use a multiples approach to value MGA and various acquisition targets at different times. The multiples used in my analysis described below are comparable to the multiples used throughout the analysis provided in the MGA production. See Tab B1, Schedule 7 for a summary of valuation documents reviewed. The following sections describe the methodologies I used to derive Bratz's value based on market data.

EXHIBIT _____22_____

PAGE _____477_____

REDACTED



Confidential – Attorneys' Eyes Only

### a) Comparable Trading Company Analysis

#### (1) Summary

Based on my analysis of comparable publicly traded companies,

I assign this methodology a weight of 20% in my final determination of value.

#### (2) Methodology

There are no companies that are exactly comparable to MGA and more specifically, the Bratz products in their rapid growth, diversification of products and product lines. At best, there are companies that compete with MGA and the Bratz products or companies that are similar in that they sell toys.

I have made an independent search for companies most closely resembling MGA. Based on my research, among publicly traded companies, there are six that I would consider to be in some respect comparable to MGA.[45] All of the companies used in my analysis except for Marvel are taken from Capital IQ's MGA competitor list and Yahoo Finance's Industry Browser for the Toys & Games Industry[46]. From the list of MGA's public competitors provided by Capital

---

[45] See Tab B2, Schedule 4.0
[46] Source: Yahoo Finance Industry Browser – Toys and Games.
http://biz.yahoo.com/p/315conameu.html [Tab E85]

17

EXHIBIT ___22___

PAGE ___478___

**REDACTED**

Confidential – Attorneys' Eyes Only

IQ and Yahoo! Finance, I excluded companies that did not have adequate current data available or were significantly less profitable than MGA. I have included Marvel in the list of comparables since Marvel's business line closely resembles that of MGA. MGA entered into a license agreement for Marvel's Super Hero products in 2006.[47] Two of the companies used in my analysis, Mattel and Hasbro, were also used by MGA in an MGA document titled, "Toy Industry Comparable Companies Analysis" that calculated an estimated enterprise value for MGA using the trading multiples of Mattel and Hasbro.[48]

For each of the six comparable companies used in my analysis, I gathered multiples of enterprise value to revenues, EBITDA and EBIT. I then applied the median of these multiples to corresponding sales, EBITDA and EBIT for the Bratz products for the last full year of data I have, 2006, as calculated in our incremental analysis in Tab B1, Schedule 1.1.

The value resulting from this analysis is the fair market value of a minority interest, and does not reflect the premium a hypothetical buyer would be willing to pay for the controlling interest. To account for this, I apply a "control premium" of 18.5% based on the premiums to unaffected stock price paid in control transaction for all industries during 2007.[49]

See Tab B2, Schedule 4.0 for detailed analysis.

      b)   **Comparable Transactions Analysis**

      (1)  Summary

The comparable transactions analysis uses publicly available information on acquisitions to derive multiples that are then applied to MGA's Bratz results. As with the comparable company trading approach, I consider Revenues, EBIT and EBITDA multiples to be the most appropriate multiples to use in this type of analysis for the valuation of Bratz. This approach has its limitations as it uses actual transactions in the marketplace. If there is limited activity for comparable companies, this approach results in a valuation based on this limited information. While this limitation typically exists, I find it to be a useful approach despite its limitations. This

---

[47] Source: MGA Entertainment Press Release dated January 31, 2006, "MGA Entertainment Secures Multi-Year License for Die-Cast Vehicles Based Upon Marvel Super Hero Universe." [Tab E122]
[48] MGA Toy Industry Comparable Companies Analysis [Tab E32.MGA0236491-504].
[49] Source: Mergerstat / BVR Control Premium Study, 2007, All Industries, Mergerstat Control Premium Median Value [Tab E27].

18

EXHIBIT _____ 22

PAGE _____ 479

**REDACTED**

Confidential – Attorneys' Eyes Only

described limitations, I assign this methodology a weight of 10% in my final determination of value.

### (2)  Methodology

In summary, the methodology used was to identify relevant transactions that took place between January 1, 2001 and December 31, 2007, to obtain the Revenue, EBITDA and EBIT multiples and apply these multiples to Bratz's corresponding revenue, EBITDA and EBIT for 2006 as calculated in our full allocation analysis at Tab B1, Schedule 1.1.

The list of comparable transactions consists of two sets of M&A transaction searches performed on Capital IQ.  All transaction information on Capital IQ is taken from public filings, trade journals, and press releases.[50]  First, I performed a search on all transactions that closed on or after January 1, 2001 through December 31, 2007 where the acquirer is one of the six MGA public comparable companies identified above in section (i) Comparable Trading Company Analysis.  This search returned 25 M&A transactions.  For the second search, I compiled a list of all M&A transactions that closed on or after January 31, 2001 where the target company's primary SIC code was either 3942 (Dolls and Stuffed Toys) or 3944 (Games, Toys and Children's Vehicles).  This search was further limited to transactions that included data needed for our comparables analysis.  The second search returned an additional 32 transactions over the first search method.  See further discussion of search criteria and results at Tab B2, Schedule 8.0 and Schedule 9.0.  I also performed searches on Thomson Financial Mergers & Acquisitions and Mergerstat for information missing from Capital IQ.

Based on the two searches described above, I have only used transactions in my analysis where the target company's revenues exceed $100 million but were less than $2 billion for the last twelve month period, 100% of the company was purchased, and adequate information was available for my analysis of transaction multiples.  See Tab B2, Schedule 8.0 for description of transactions used in analysis and further discussion of the transactions.

The following table shows the multiples used to calculate Bratz enterprise value.

---

[50] Source: Conversation with Capital IQ Representative

EXHIBIT _____22_____

PAGE _____480_____

Confidential – Attorneys' Eyes Only

c)   Cost Approach

The cost approach is generally not reflective of the value of an on-going business such as MGA and the Bratz products.  Therefore, the cost approach was not used.

3.   Distributions Received in Excess of Tax Payments Due

Per review of the W-2's issued by MGA Entertainment Inc. for the years ending December 31, 2004, 2005 and 2006 ely.[51]  In acquire to his wages for these periods, as the majority shareholders or the corporation, from MGA.  See Tab B2, Schedule 6.0 for detail of distributions made to shareholders.  I have deducted the amount of distributions identified for income taxes from total distributions to determine the distributions made in excess of payments for taxes.  I have further reduced the excess distributions received by Mr. Larian by the amount that the distributions are not related to the profits earned by Bratz.  Mr. Larian's tax returns have not been provided to me.  These tax returns would provide information regarding the taxes due on income from MGA and his specific tax rate.  Absent those documents, I have accumulated the amount of the distributions made by MGA that were related to taxes by using the listing of distributions for 2000 through

---

[51] See MGA W-2's issued to Isaac Larian [Tab E123, MGA3787330, MGA3787323, and MGA3787316].

20

EXHIBIT _____ 22

PAGE _____ 481

REDACTED

Confidential – Attorneys' Eyes Only

2005 provided by Lisa Tonnu at her deposition.[52] This document provides an indication of distributions that were made to shareholders for tax purposes.  See Tab B2, Schedule 6.1 for listing of tax distributions.  I have included the value of $                    $[53] received from MGA in excess of tax payments as an additional component of the benefit to Isaac Larian as a result of Bratz.

Furthermore, I noted that there has been a significant increase in salaries and related expenses in 2007 as compared to 2006.  Sal                                            or a
$            $  for per                                    in her deposition, Lisa Tonnu stated that this was likely due to the increase in the number of entities in the MGA corporate structure, including Little Tykes.[56] However, I noted that salaries and related expenses for Little Tykes equaled approximately $4.7 million[57] in 2006 and $16.1 million[58] in 2007.  Therefore, Little Tykes does not appear to account for all of the rising expense.  I have not been provided with compensation information for Mr. Larian for 2007.  Therefore, I reserve the right to opine on the reasonableness of Mr. Larian's salary for the 2007 time period if presented with additional information.

C.  Carter Bryant's benefit resulting from payments received from MGA in connection with Bratz is $35,825,449.

The calculation of the benefit to Carter Bryant as a result of Bratz is entirely related to the compensation he received as a consultant on Bratz products.  As discussed above, Carter Bryant had a consulting agreement with MGA for his work on Bratz.  I totaled all payments received by Carter Bryant as a result of the Bratz consulting agreement with MGA.  The total payments received by Carter Bryant beginning in 2000 through the fourth quarter of 2007 were $35,825,449.[59]

---

[52] List of Distributions Tab E34.MGA3787372-391].  Per Lisa Tonnu, this list is meant to capture all dividend distribution information. Deposition of Lisa Tonnu on January 17, 2008, pages 52-53 and 78-79. [Tab E16]
[53] Tab B2, Schedule 6.0.
[54] 2006 Consolidated Statement of Operations [Tab F1.MGA3710834 – 2006 Consolidated Statement of Operations.xls].
[55] July 2007 Year to Date Consolidated Statement of Operations [Tab F2.MGA3713507 – 2007 YTD Consolidated Statement of Operations.xls].
[56] January 24, 2008 Deposition of Lisa Tonnu, page 160 [Tab E120].
[57] 2006 Consolidated Statement of Operations [Tab F1.MGA3710834 – 2006 Consolidated Statement of Operations.xls].
[58] July 2007 Year to Date Consolidated Statement of Operations [Tab F2.MGA3713507 – 2007 YTD Consolidated Statement of Operations.xls].
[59] Tab B1, Schedule 7.2.

21

EXHIBIT  22

PAGE  482

REDACTED

Confidential – Attorneys' Eyes Only

**D. Prejudgment Interest on MGA's profits earned on the production, sales and licensing of Bratz:**

The following is the methodology I will use to calculate pre-judgment interest when asked.

1. Interest should be calculated based on MGA's cash flows from its infringing activities.

2. The appropriate prejudgment interest rate to apply to MGA's profits from Bratz is MGA's unsecured borrowing rate. Since MGA does not have any unsecured borrowings,[60] I assume MGA's unsecured borrowing rate is the prime rate.

3. Interest should be compounded monthly.

**E. Prejudgment interest on Isaac Larian's distributions received in excess of tax payments due:**

The following is the methodology I will use to calculate pre-judgment interest when asked.

1. Interest should be calculated based on Isaac Larian's cash flows from his infringing activities.

2. The appropriate prejudgment interest rate to apply to Isaac Larian's distributions received is his unsecured borrowing rate. However, since I have not been provided with Mr. Larian's unsecured borrowing rate, I assume his unsecured borrowing rate is the prime rate.

3. Interest should be compounded monthly.

**F. Prejudgment interest on Carter Bryant's payments received in connection with Bratz:**

The following is the methodology I will use to calculate pre-judgment interest when asked.

1. Interest should be calculated based on Carter Bryant's cash flows from his infringing activities.

---

[60] 2005 and 2006 Year End MGA Financial Statements [Tab E24.MGA0566710 and MGA0868719].

22

EXHIBIT _____22_____

PAGE _____483_____

Confidential -- Attorneys' Eyes Only

2.  The appropriate prejudgment interest rate to apply to Carter Bryant's payments received is his unsecured borrowing rate. However, since I have not been provided with Mr. Bryant's unsecured borrowing rate, I assume his unsecured borrowing rate is the prime rate.

3.  Interest should be compounded monthly.

### G.  Net Worth of MGA

I have been asked by counsel to calculate MGA's Net Worth had it not made the distributions to shareholders in excess of taxes due by shareholders on MGA's profits.  Net worth, adjusting for distributions to shareholders in excess of taxes due by shareholders on

### H.  Net Worth of Isaac Larian

[62] In

I have not been provided

with adequate information to form an opinion regarding this value.

### I.  Net Worth of Carter Bryant

Carter Bryant has testified that his net worth is approximately $23 million.[63]  I have not bee provided with adequate information to form an opinion regarding this value.

## IV.  Documents, Data and Other Information Considered

Volume 1, Tab C contains a complete list of documents I considered in forming my opinions.  In addition, I have also had a discussion with Chuck Scothon, General Manager of Mattel's Girls Division.

## V.  Potential Additional Analyses to Perform

My opinions are based on the information received as of the date of my report.  I plan on updating my analysis with the most current data produced as of the date of my testimony.  I understand that discovery is continuing and I may consider other data produced through discovery to determine whether such other data impact my opinions.  I will consider any

---

[61] See Tab B2, Schedule 13.0
[62] Isaac and Angela Larian, List of Assets, 2007 [E81.MGA3767279].
[63] January 24, 2008 Deposition of Carter Bryant [Tab E96, page 1100].

23

EXHIBIT ___22___

PAGE ___484___

**REDACTED**

Confidential — Attorneys' Eyes Only

criticisms of my opinions or bases for my opinions brought to my attention at my deposition or offered by experts retained by counter-defendants. Any of this additional information or work may cause me to change my opinions.

I have not provided an opinion regarding the future damages that will be incurred by Mattel in the event that the court does not grant an injunction against MGA with regards to the copyrights in this case. If it is determined that I should provide such an analysis, I will supplement this report at the time the court requires this analysis to be relevant.

I have not addressed the issue of apportionment of the profits from Bratz as I understand that MGA has the burden of proof on that issue. I will comment upon MGA's apportionment of the profits from Bratz if they make such a calculation, at the appropriate time.

VI.    Qualifications

Volume 1, Tab D contains my *curriculum vitae* which details my qualifications, including a listing of all my publications and testimony.

VII.    Compensation

My current billing rate is $695 per hour.

VIII.    Signature and Date

Michael J. Wagner
February 11, 2008

24

EXHIBIT    22

PAGE    485

# EXHIBIT 23

EXHIBIT
Wagner
4553
3/24/08

Confidential – Attorney's Eyes Only

United States District Court

Central District of California

Case No. CV 04-9049 SGL (RNBx) Consolidated with Case No. 04-9059

and Case No. 05-2727

CARTER BRYANT, an Individual, Plaintiff,

v.

MATTEL, INC., a Delaware corporation, Defendant

Expert Rebuttal Report of

Michael J. Wagner

March 17, 2008

EXHIBIT _____23_____

PAGE _____486_____

Confidential – Attorney's Eyes Only

## I.    Introduction

I have been retained on behalf of Mattel, Inc. ("Mattel") to provide opinions regarding profits that may be recovered from MGA Entertainment, Inc. and MGA Entertainment (HK) Limited ("MGA"), Isaac Larian, and Carter Bryant (collectively referred to as "counter-defendants) and to provide criticisms with respect to the opinions and analyses of Paul Meyer in his report dated February 11, 2008. The opinions I express in this report are in addition to the opinions expressed in my Expert Report dated February 11, 2008.

My opinions address the following matters:

- My opinions with respect to apportionment of MGA's profits. I have not been asked to consider whether there are legal reasons that would preclude apportioning entirely.
- My disagreements with the opinions or analyses performed by Paul Meyer in his report dated February 11, 2008.

## II.    Bases for Opinions

The following are my opinions and the bases for these opinions.

### A.    My Approach to Apportionment of MGA's Profits

I have reviewed Mr. Meyer's seven apportionment methodologies. While I agree MGA and its employees have made contributions to the success of the Bratz products, I do not believe that Mr. Meyer has provided sufficient evidence to establish that MGA is entitled to anything more than an industry normal profitability.

I apportion MGA's profits to allow MGA to retain profits based on the profitability of other companies in the industry. I then evaluate whether Mr. Meyer has offered any evidence that indicates MGA should receive additional profits above the industry return.

I have analyzed the profitability of other companies in the toy industry, both public and private companies.

I used data from Robert Morris Associates ("RMA") to analyze margins for private companies. RMA is an association of lending and credit risk professionals. RMA prepares Annual Statement Studies ("RMA Studies") that contain composite financial data supplied by RMA member institutions. Since the RMA Studies do not identify any of the companies whose

EXHIBIT _____ 23

PAGE _____ 487

2

Confidential – Attorney's Eyes Only

financials are presented, they are somewhat limiting.[1] Nevertheless, these data are used by financial professionals and worth considering in my analysis. I have summarized data from companies with NAICS code 339932 Manufacturing - Game, Toy, and Children's Vehicle Manufacturing ("Toy Companies"). Using common size statements for companies, broken down by the size of annual net sales, I analyzed gross margins, operating profit margins, and earnings before interest and taxes ("EBIT") margins. These margins were compared to MGA total company, Bratz, and non-Bratz margins.[2] I consider the EBIT margin to be the most relevant for an apportionment analysis since it represents profitability without taking taxes into consideration. The EBIT margin for Toy Companies in the RMA Studies between April 2001 and March 2007 for companies with assets $25 million and over range from 1.8% to 7.3%. The EBIT margin for private companies with assets $25 million and over is lower than Bratz product line EBIT margins and is generally higher than non-Bratz EBIT margins.

In my analysis of public companies, I used profitability data from Capital IQ.[3] I used data on companies with primary SIC codes of 3942, Dolls and Stuffed Toys that reported revenues in 2006. Companies were separated into two groups based on whether the company sells only toys ("Pure Toy Companies") or whether it sells toys and other products ("Toy and Other Product Companies").[4] The Pure Toy Companies group includes Mattel, Hasbro and JAKKS Pacific, Inc. among others. For eleven Pure Toy Companies and seven Toy and Other Product Companies, I examined similar margins as those examined in my private company analysis, i.e. gross profit, earnings before interest, taxes, depreciation and amortization ("EBITDA"), EBIT and net income margins.[5] The median EBIT margins for Pure Toy Companies range from -0.19% to 12.9% during 2002 to 2007. In general, the EBIT margins for Pure Toy Companies are less than Bratz product line EBIT margins and are generally higher than non-Bratz EBIT margins during these same periods.

---

[1] In fact, the RMA Studies caution the users with the following statement: "RMA does not recommend using the Annual Statement Studies: Financial Ratio Benchmarks figures as absolute norms for a given industry. Rather, you should use the figures only as general guidelines and as a supplement to the other methods of financial analysis. RMA makes no claim regarding how representative the figures printed in this book are." [Tab E26,p.10].

[2] See Tab B2, Schedules 3.0 and 3.1.

[3] Capital IQ, a division of Standard and Poors, is a web based research platform that combines proprietary research with select 3rd party content to provide "highly integrated views of public and private companies" [Tab E29].

[4] See Tab B2, Schedule 1.1 for business descriptions of each company and the categorization of "Pure Toy Companies" and "Toy and Other Product Companies".

[5] Tab B2, Schedule 1 series show the analyses on gross profit, EBITDA, EBIT, and net income margins.

3

EXHIBIT _____23_____

PAGE _____488_____

Confidential -- Attorney's Eyes Only

Based on my analyses described above, I have used Mattel, Hasbro, and JAKKS Pacific in my calculation of the industry benchmark return. These are companies that have strong brand recognition for their products, have extensive distribution networks, and spend significant money for advertising and product development. In order to determine an industry benchmark return, I have calculated the average EBIT margin earned by Mattel, Hasbro and JAKKS Pacific. Between 2002 and 2007, the EBIT margin for these companies ranged from 10.7% to 12.9%.[6] Given that MGA is a Subchapter S Corporation and its tax structure differs from these companies, I applied margins before interest and taxes to MGA's net income to obtain the "normal industry" return. The results of this analysis are included in Table 1.[7]

If Mattel is not included in the calculation of the "normal industry" returns above, the as shown in Table 2.

---

[6] See Tab B2, Schedule 1.0 for analysis.
[7] See Tab B1, Schedule 2.0 for analysis. Note that I do not apportion 2000 and 2001 profits because MGA had losses for Bratz products in each of these years.

4

EXHIBIT    23

PAGE    489

REDACTED

Confidential – Attorney's Eyes Only

If one were to use an average EBIT margin for public companies that we identify as Pure Toy companies instead of the industry benchmark returns discussed above, the resulting profits attributable to the infringement of the copyrighted works would be significantly higher. Between 2002 and 2007, the Pure Toy Companies' average EBIT margins ranged from -0.31% to 12.88%.[6]  For all years when the Pure Toy Companies' average EBIT margin was less than zero, I assumed no normal industry profits for Pure Toy Companies'. In other words, MGA is not entitled to profits on the Bratz products since the Pure Toy Companies were unable to earn a margin that year. The results of this calculation are included in Table 3 below.

---

[6] See Tab B1, Schedule 3.0.

5

EXHIBIT __23__

PAGE __496__

**REDACTED**

Confidential – Attorney's Eyes Only

If one were to use MGA's Non-Bratz products EBIT margins instead of the industry benchmark returns, the resulting profits attributable to the infringement of the copyrighted works would be significantly higher. Between 2002 and 2006, the MGA's Non-Bratz EBIT margins ranged from -138.33% to 20.86%, and was negative for 4 out of the 5 years.[9] For all years when the Non-Bratz EBIT margin was less than zero, I assumed no MGA normal returns.  In other words, MGA is not entitled to profits on the Bratz products since it was unable to earn profits on its other products. The results of this calculation are included in Table 4 below.

I next considered whether Mr. Meyer's analysis provided a basis to allocate to MGA a greater than normal industry return. In particular, I evaluated Mr. Meyer's seven factors and seven apportionment approaches. In my opinion, Mr. Meyer's analysis does not establish a basis to conclude that MGA is entitled to profits in excess of the industry benchmark returns.

**B.   My disagreements with the opinions or analyses performed by Paul Meyer in his Expert Report dated February 11, 2008.**

In his Expert Report dated February 11, 2008, Mr. Meyer has provided opinions regarding MGA's deductible expenses and methods to apportion MGA's Bratz profits once those profits are determined.

I have reviewed Mr. Meyer's report and Attachments. The following sections detail my disagreements with Mr. Meyer's opinions and methodologies.

---

[9] See Tab B2, Schedule 1.0 for analysis.

6

EXHIBIT _____23_____

PAGE _____491_____

REDACTED

Confidential – Attorney's Eyes Only

1.  **Opinions regarding methodology proposed by Mr. Meyer for calculating MGA deductible expenses to allocate to Bratz**

In paragraphs 23 through 28 in his report, Mr. Meyer described the methodology he will use to calculate MGA's deductible expenses when the accused products are identified. He also provides Attachments 4 and 5 to identify MGA Costs that he has considered for his analysis. While I will comment on Mr. Meyer's analyses as presented in his Expert Report, I reserve the right to provide additional comments based on Mr. Meyer's deposition testimony and his final analysis which has not yet been provided.

a)  Mr. Meyer does not provide evidence that overhead costs assisted in the production, distribution or sale of the infringing product.

While Mr. Meyer refers to 17 U.S.C. §504(b) in his report,[10] he states that, "In determining deductible costs, I understand that costs that contribute to the development, production, management, marketing, selling and administration of the accused products may be deducted."[11] The statute that Mr. Meyer cites states:

"In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work."[12]

This statute does not further define deductible expenses.

The Ninth Circuit Model Civil Jury Instructions for Copyright damages cites case law which provides examples of "deductible expenses." In *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 886 F.2d 1545, 1548 (9th Cir.1989) "types of defendant expenses deducted from gross profit include direct costs of production." Additionally, *Kamar Int'l, Inc. v. Russ Berrie & Co.*, 752 F.2d 1326, 1332 (9th Cir.1984) states that overhead deduction is "allowable when the infringer can demonstrate that it was of actual assistance in the production, distribution or sale of the infringing product."[13]

---

[10] February 11, 2008 Expert Report of Paul K. Meyer, footnote 4, [Tab E16.5].
[11] February 11, 2008 Expert Report of Paul K. Meyer, paragraph 27, [Tab E16.10].
[12] Title 17, Chapter 5, §504, Remedies for Infringement: Damages and profits [Tab E17].
[13] Ninth Circuit Model Civil Jury Instruction, 19.24 Copyright – Damages – Defendant's Profits (17 U.S.C. § 504 (b)), [Tab E28]

7

EXHIBIT    23

PAGE    492

Confidential – Attorney's Eyes Only

Mr. Meyer does not demonstrate or provide support that overhead expenses assisted in the production, distribution or sale of the infringing product. He merely allocates these types of expenses based on percentage of Bratz revenues to total revenues.

       b)   MGA's profits should not be reduced for income taxes to the extent MGA and its shareholders receive income tax benefits for payment of an award of MGA's profits.

On Attachment 4, page 11, Mr. Meyer says that "Taxes are a deductible expense." However, he provides no explanation regarding why taxes are a deductible expense.

MGA pays 1.5% California Franchise Tax on its taxable income.[14] Since an award of MGA's profits is likely tax deductible to MGA, MGA will get a tax deduction for this payment and therefore, may save taxes in the year payment is made and possibly future years.[15] If these taxes had been deducted in the determination of MGA's profits, MGA would receive a "double benefit," first by lower profits for an award and second by receiving a subsequent tax savings for payment of the award. In order to avoid this "double benefit," these taxes should not be deducted if MGA receives a tax benefit for payment of an award of MGA's profits.

In addition, although MGA does not pay Federal Income Tax, it makes distributions to shareholders to cover these taxes. To the extent the shareholders receive a tax deduction for payment of an award of MGA's profits they may receive a tax refund and/or a reduction in present and future tax liabilities.[16] Likewise, MGA also makes distributions to shareholders to cover their California Franchise Tax liabilities owed as a result of MGA's Subchapter S status. The shareholders may save taxes in the year payment is made and possibly future years.[17] As a result of these tax benefits, MGA's distributions to shareholders will be reduced. Therefore, to avoid this "double benefit," deductions for distributions to shareholders should not be made in the calculation of MGA's profits.

---

[14] In addition, MGA's shareholders pay taxes on MGA's income due to MGA's Subchapter S status. I discuss MGA's shareholders' California Franchise Taxes in the following paragraph and limit the remainder of this discussion to MGA's 1.5% California Franchise Tax. [Tab E32.p.4]

[15] California allows Subchapter S Corporations to apply losses against future income for 10 years [Tab E32.p 45]

[16] Federal tax law allows individuals to carry back losses for 2 years and carry forward losses for 20 years [Tab E34] subject to certain "at risk limitations." [Tab E35]

[17] California allows shareholders to apply operating losses against future income subject to certain "at risk limitations." [Tab E32. p. 37-38]

8

EXHIBIT ___23___

PAGE ___493___

Confidential – Attorney's Eyes Only

c) Even if one were to accept Mr. Meyer's definition of allowable deductions, he does not perform any analyses to show that the costs not tracked by product are attributable to Bratz revenues.

In paragraph 27 of his Expert Report, Mr. Meyer states, "Significant increases in MGA's sales and marketing, product development and general and administrative expenses have accompanied sales growth in the Bratz product line." He continues that "These costs are necessary for MGA to manage and administer the various functions that benefit the Bratz product line. These costs have been relevant to MGA's successful development and sales of Bratz products." Therefore, Mr. Meyer concludes that MGA's cost increases are attributable to Bratz products without any further testing, such as statistical regressions. On the contrary, in my initial report when I studied Equipment Related Expenses, Distribution Expenses, and Other Income and Expenses, I did not find a statistically significant relationship between these expenses and the sale of Bratz products. Additionally, I did not find that these costs increased over time as the sales of Bratz products increased. It is my opinion that Mr. Meyer has not provided adequate evidence to support his opinion that, "these costs are necessary for MGA to manage and administer the various functions that benefit the Bratz product line."[18]

I have reviewed Mr. Meyer's Attachment 4 and have identified costs which he indicates he will allocate to Bratz that are not likely attributable to Bratz products. For example, costs in 2001 for account #64450 LCM Adjustment ($2,572,387) and #64600 Obsolescence ($353,373) on page 2 of 11 of Mr. Meyer's Attachment 4 are not likely attributable to Bratz products. Since sales of Bratz products began in 2001, it is unlikely that these products would have a "lower of cost or market" adjustment or obsolescence adjustment in the year of introduction. I have included a complete list of costs listed in Mr. Meyer's Attachment 4 that I do not consider to be related to the sale of Bratz products in Tab B5, Schedule 1.0. This list includes all of the examples discussed above and additional costs identified in my review. It is my opinion that of the costs listed in Attachment 4 that Mr. Meyer believes should be allocated in some form to Bratz, he has included $10.4 million in expenses (prior to allocation) that do not relate to the sale of Bratz products.

Additionally, footnote 2 on page 11 of Mr. Meyer's Attachment 4 describes that in addition to including royalty expenses identified to a specific product SKU, royalty expenses that have not been identified for a specified SKU will be allocated based on SKU sales. Mr. Meyer does not provide any explanation of what these additional royalty expenses relate to or why they

---

[18] IBID

9

EXHIBIT ___23___

PAGE ___494___

Confidential – Attorney's Eyes Only

should be allocated based on SKU sales. It is my understanding that the only royalties being paid for the Bratz products are to Carter Bryant, Barnham Parinchy and Lovins.[19] The amount of Bryant's royalties of $34,438,434 for 2001 through July 2007[20] added together with approximately $1 million paid to the other two parties through July 2007[21] is equal to $35.4 million royalty expense attributable to Bratz.[22]   Mr. Meyer's approach, as described above, allocates $51,289,176[23] in royalty expense through July 2007 to Bratz, if all Bratz revenues are included. Unless further explanation is provided as to how the additional (unidentified) royalties relate to Bratz, it is my opinion that Mr. Meyer's has over-allocated royalty expenses by approximately $15.9 million.[24]

Similarly, footnote 3 on page 11 of Mr. Meyer's Attachment 4 addresses tooling expenses. Mr. Bryant has not adequately supported his opinion that the tooling costs not specifically identified as Bratz related should be allocated amongst all of the product lines, including Bratz. Unless further explanation is provided, it is my opinion that Mr. Bryant has overstated tooling costs attributable to Bratz. In the analysis of tooling expense included in my report dated February 11, 2008, I calculated that tooling expense attributable to the entire Bratz product line was $38,181,979.[25]   In contrast, using Mr. Meyer's described methodology, I calculate tooling expense for the entire Bratz product line to be $48,960,770[26] an overstatement of $9.8 million.[27]

MGA has provided a detailed analysis of #84110 Ad Production and #84120 Ad Media expenses by product line for 2006 and 2007.[28]  Mr. Meyer does not appear to consider these documents in his analysis. Instead, he indicates that he would allocate these expenses by SKU sales volume. This approach is inconsistent with his approach with respect to similar items where costs are tracked by product.

---

[19] I have been provided with MGA royalty reports to these three parties for royalties on Bratz products or trademarks.
[20] See calculation at Tab B3, Schedule 1.0.
[21] Expert Report of Michael J. Wagner, 2/11/08, Tab B1, Schedule 7.1.
[22] Calculated as $34.4 million plus $1.0 million.
[23] See calculation at Tab B3, Schedule 1.0.
[24] Calculated as $51.3 million less $35.4 million.
[25] Expert Report of Michael J. Wagner, 2/11/08, Tab B1, Schedule 1.1.
[26] Tab B3, Schedule 1.0.
[27] Calculated as $48.0 million less $38.2 million.
[28] MGA US Ad Production Expense, 2006 Full Year, 2007 YTD July [Expert Report of Michael J. Wagner, 2/11/08, Tab E9.MGA3720119-122].  2006-2007YTD July: MGA US Ad Media Expense 2006 Actual & 2007 YTD July [Expert Report of Michael J. Wagner, 2/11/08, Tab E1.MGA3719906-921]

10

EXHIBIT ___23___

PAGE ___495___

Confidential – Attorney's Eyes Only

I have also recently received Mr. Meyer's underlying analyses within his document production,[29] and may have additional comments upon completion of my review of such analyses.

### 2.   Apportionment of MGA's profits.

In my opinion, Mr. Meyer has not adequately established the elements of profit attributable to factors other than infringement of the copyrighted works[30] and certainly has not established that any such elements would warrant that MGA should receive a return above the industry benchmark returns.

In Paragraph 39 of his report, Mr. Meyer, with input from other MGA experts and MGA personnel, lists seven factors that allegedly contribute to the sales of Bratz.  While I do not dispute that some of these factors may contribute to the sales of Bratz, I disagree with the relative importance placed on each of these factors and the uniqueness of each factor. I will discuss each of these factors.

Mr. Meyer then created seven different approaches to apportion MGA's profits. Mr. Meyer does not give a reason for how or why he chose these seven approaches. He also does not discuss other approaches he may have considered but did not ultimately present in his report. Several of the approaches are similar to each other, as will be discussed. There are other approaches that could have been used but were not included. Furthermore, Mr. Meyer provides no opinion regarding which approach best measures each of the seven factors that purportedly contribute to the sales of Bratz products nor does he attempt to reconcile the differences in results amongst the different approaches.

### a)   Factors Contributing to Bratz Sales and Profits

### (1)  Factor 1A – Carter Bryant's Design of the Doll

I have separated Factor 1 Design of the Doll, into two factors for discussion purposes: Factor 1A - Carter Bryant's Design of the Doll and Factor 1B – Creative Contribution of Others in the Design of the Doll.

---

[29] Paul K. Meyer Production PKM 00308 – PKM 04926.
[30] In *Nintendo of America, Inc. v. Dragon Pacific*, Judge O'Scannlan opines, "where infringing and noninfringing elements of a work cannot be readily separated, all of a defendant's profits should be awarded to a plaintiff." [Tab E7.5]

11

EXHIBIT ___23___

PAGE ___496___

Confidential – Attorney's Eyes Only

Mr. Meyer understates the importance of Carter Bryant's design of the Bratz doll by discussing the contributions of others as opposed to Carter Bryant's contribution.

The Bratz doll has been described as unique. According to Robert Tonner, MGA's doll expert in this matter, "Bratz was the first truly new look in the fashion doll world in almost forty years. The quirky proportions did not try to emulate Barbie – they were unique."[31] A March 2001 MGA (formerly known as ABC International Traders) Business Plan states that, "the Bratz are unique in many ways; their eyes are big with a hint of anime style; their lips are more pronounced, their feet and heads are oversized...ABC is confident that girls will purchase the Bratz over Barbie because they are not defined by race or ethnicity. This was a conscious decision so the consumer can choose the doll that reflects their own fashion style or appearance."[32] Some of the words that Veronica Marlow uses in her deposition to describe what Mr. Larian thought of Carter Bryant's drawings were "fresh", "contemporary", "fun", "cool", "trendy" and "young looking."[33] Ms. Garcia states, "the four girls were already concepted when presented by the inventor during our first meeting. I thought they were incredible and I tried to stay true this inventor/creator's vision."[34] As stated in the report of Dr. Carol Scott, Mattel's marketing expert, one of the most basic fundamental factors contributing to the success of Bratz brand was "the design and appearance of the dolls."[35] According to Dr. Scott, a strong core product is essential for a successful brand.[36]

(2) Factor 1B - Creative Contribution of Others in the Design of the Doll

Mr. Meyer describes in detail the alleged contribution of the twelve individuals to the development of the Bratz dolls. However, if these individuals were as valuable as Mr. Meyer suggests, MGA would have made it a priority to keep these individuals working for MGA. On the contrary, there is evidence that shows that MGA did not keep all of these individuals employed as employees or contractors. For example, in her deposition, Veronica Marlow states that MGA gave her an ultimatum that she could either work full-time for MGA or not at all. Apparently MGA was not pleased with the fees that she was charging as a free lance vendor (e.g. they were receiving less value than the money they were paying her) and therefore, wanted to bring her in

---

[31] February 11, 2008 Expert Report of Robert Tonner, [Tab E48 p.15].
[32] ABC International Traders, Inc. March 2001 Business Plan [Tab E6.MGA0050408-430, p.15].
[33] December 28, 2007 Deposition of Veronica Marlow [Tab E31 pp.211-212].
[34] E-mail from Paula Treantafelles dated May 1, 2001 [Tab E8.MGA 0051255-257].
[35] Rebuttal Expert Report of Carol A. Scott dated March 17, 2008 [Tab E46,p. 2]
[36] Expert Report of Carol A. Scott dated February 11, 2008 [Tab E43, ¶8]

12

EXHIBIT ___23___

PAGE ___497___

Confidential – Attorney's Eyes Only

house as a full time employee. Veronica Marlow chose not to become an employee of MGA and has not worked for them since.[37]

I think that Mr. Meyer has over emphasized the contribution of the individuals that participated in the development of the Bratz dolls such as a face painter, sculptor, hair rooting and hairstyling specialist, and project manager of the development process. First, Mr. Meyer has not identified any dolls that have failed as a result of bad hair, face paint, or sculpt. Second, and more importantly, he has not identified any contribution by these individuals that could not have been made by any other competent face painter, sculptor, hair rooting and hairstyling specialist, or project manager; that is, MGA could have hired others to complete the product in a similar manner. This is supported by an interview response provided by Paula Garcia to *Dolls Magazine* during May of 2001. Ms. Garcia states, "the four girls were already concepted when presented by the inventor during our first meeting. I thought they were incredible and I tried to stay true this inventor/creator's vision."[38]

Mr. Meyer did not measure the success of MGA non-Bratz products that nonetheless used MGA's other similar personnel. MGA introduced three other dolls, Scooter Samantha, Toddler Tabitha and Prayer Angels in 2001. Some of the individuals that worked on Bratz also worked on the Prayer Angels dolls.[39] None of these dolls sold anywhere near the volume of Bratz dolls.[40] In 2001, Prayer Angels sold just 14.3% of the sales units Bratz sold. Scooter Samantha and Toddler Tabatha were even lower at 9.43% and 0.39% of Bratz units sold, respectively. In terms of sales dollars, Prayer Angels sold 10.56%, Scooter Samantha sold 23.7% and Toddler Tabitha sold 1.98% of Bratz net sales revenue in 2001.[41] The sales of these three products as a percentage of Bratz sales in units and dollars decreased significantly in the second year, 2002. In following years, from 2003 onwards, no MGA doll product sold more than 5% of total Bratz sales in units or sales dollars in any year.[42] Even if one assumes, therefore, that MGA's face painter and similar contributors were excellent, it is apparent they were not able to drive sales of non-Bratz dolls.

---

[37] December 28, 2007 Deposition of Veronica Marlow [Tab E31 pp.108-111].
[38] E-mail from Paula Treantafelles dated May 1, 2001 [Tab E6.MGA 0051255-257].
[39] Tab B4, Schedule 1.0.
[40] Tab B6, Schedule 1.0.
[41] See Tab B6, Schedule 1.1.
[42] See analysis at Tab B6, Schedule 1.1.

13

EXHIBIT ___23___

PAGE ___499___

Confidential – Attorney's Eyes Only

While MGA may be entitled to a normal return on the work performed by these individuals, there is nothing extraordinary about their contributions that would entitle MGA to profits in excess of the industry benchmark returns.

### (3)  Factor 2:  Themes Associated With The Dolls

Mr. Meyer states that the themes associated with the dolls were a contributing factor to the sales of Bratz. However, the use of themes for fashion dolls is not new or unique to Bratz. For example, Mattel has used themes to refresh its Barbie product for years. Similarly, Hasbro has introduced themes for its My Little Pony products. Mr. Meyer has not established that MGA has done anything extraordinary with regards to themes that would entitle them to earn profits in excess of the industry average. See further discussion of themes in my critique of Mr. Meyer's apportionment approach 7 at II.B.2.b)(7) below.

### (4)  Factor 3:  Fashions Sold With The Dolls

Like themes, there is nothing unique about the use of fashion for fashion dolls. Mr. Meyer has not established whether or to what extent MGA is entitled to profits in excess of the industry benchmark returns for its fashions sold with the Bratz product line.

### (5)  Factor 4:  Accessories Sold With The Dolls

Accessories are not new to fashion dolls. Similar to the discussion above regarding themes and fashions, selling accessories with dolls is not new or unique to Bratz. Mattel has sold accessories with their Barbie products for years. Similarly, Hasbro sells many accessories with their My Little Pony products and other doll and action figure product lines. Mr. Meyer's analysis fails to show whether or to what extent, accessories drive the buying decision of the individuals that purchase Bratz products. While MGA may be entitled to earn a return on their investment in accessories, Mr. Meyer has not shown through his report and analysis that MGA is entitled to profits in excess of the industry benchmark returns for its sale of accessories with the Bratz product line.

### (6)  Factor 5:  Characters Associated With The Doll Line

In paragraph 91, Mr. Meyer states, "the success of the Bratz doll was, in part, due to the ability of MGA to differentiate the dolls' characters from those of more traditional fashion dolls, such as Barbie and My Scene." As I understand it, the credit for this lies substantially, if not entirely, with Carter Bryant. He developed a doll that was entirely unique and different looking

14

EXHIBIT ___23___

PAGE ___500___

Confidential – Attorney's Eyes Only

than any other fashion doll on the market as discussed in section II.B.2.a)(1) above. Therefore, this would support a minimal apportionment of profits attributable to elements other than the infringement of the copyrighted works.

### (7) Factor 6: Packaging In Which The Dolls Are Sold

Mr. Meyer states that packaging is one of the contributing factors to the success of Bratz. The strength of the Bratz product -- absent the packaging -- was confirmed by e-mails written by employees of MGA during early 2001; prior to the introduction of the Bratz product packaging. The e-mails indicate that Bratz was being very well received by the industry and that there was already a significant demand by the resellers for the product,[43] at a time when the packaging was not yet available.[44]

Additionally, the MGA market research using the simulated store method does not contain any reference to the packaging when discussing why people choose to purchase the doll. I have been provided with three different market research reports that were done for MGA using the simulated store method. In reporting on what girls liked about the Bratz product line, among the more than 22 attributes that are ranked regarding why the girls liked the doll, packaging is not listed. The results of these studies suggest that the dolls would have sold well irrespective of their packaging.[45] In fact, Mr. Meyer does not include packaging in 4 of his 7 apportionment approaches. Finally, Mr. Meyer also does not account for the effect of including allegedly infringing images on packaging used to sell the Bratz products.

### (8) Factor 7: MGA's Branding, Marketing and Advertising Efforts

I have read Dr. Eric Joachimsthaler's Expert Report, MGA's marketing expert, in which he concludes that MGA did not do anything unique to brand its product. In his report, Dr. Joachimsthaler concludes, "MGA Entertainment engaged in the classic brand-building activities that I would expect from an entrepreneurial-minded company."[46] Dr. Carol Scott's report is to the same effect. Moreover, in my review of MGA's Bratz sales and marketing expenses as a percentage of Bratz sales in comparison to their competitors, I noted that after the initial launch

---

[43] [Tab E37.MGA4000827-28, MGA4001081, MGA 4001180-81].

[44] MGA's final schedule indicates the photo model of packaging would not be available until March 13, 2001 [Tab E38.MGA000359].

[45] 2002 Bratz Commercial Test & Product Appeals Study [Tab E1.MGA40149334]; Bratz Spring '05 Line Summary of Findings [Tab E49.MGA0296812-15]; Bratz Fall '05 Girls Line Central Location Test [Tab E12.MGA0280745-789, p.23].

[46] Expert Report of Dr. Erich Joachimsthaler, page 47, paragraph 87 [Tab E15].

15

EXHIBIT 23

PAGE 501