Confidential – Attorney's Eyes Only

in 2001, MGA spent a smaller percentage of sales for sales and marketing than its competitors.[47]

In evaluating the impact of MGA's marketing and branding, I note that Bratz experienced significant success and positive feedback before the Bratz dolls were even sold to the general public. There are many e-mails from both MGA employees as well as third parties and other MGA produced documents that express how well Bratz is being received by distributors.[48] Additionally, per review of e-mail's sent to/from MGA prior to television advertising beginning October 1, 2001, MGA is very pleased with the immediate success of Bratz despite the fact that there has been no TV advertising yet.[49] This illustrates the strength of the Bratz product without the help of television advertising.

Additionally, I noted that Bratz earned a very large gross margin from the beginning of its sales, before the Bratz brand could have been affected by the branding efforts identified by Dr. Eric Joachimsthaler.[50] The early premiums earned by MGA in 2001 when the Bratz product was launched could not have been attributable to the strength of the Bratz Brand as opposed to the strength of the product.

Dr. Eric Joachimsthaler states that as a brand grows and strengthens, a company ought to be able to obtain larger margins on their products. Perhaps, but gross margins for Bratz products decreased over time.[51] Neither Mr. Meyer nor Dr. Joachimsthaler explained this apparent contradiction.

Finally, Mr. Meyer does not attempt to value in his apportionment analysis the effect of including allegedly infringing images in advertising and media used to sell the Bratz products.

b) Criticisms of Mr. Meyer's Apportionment Approaches

[47] Tab B2, Schedule 1.0
[48] [Tab E42.MGA4001704-5, MGA4001720-21, MGA4000081-82, MGA4000085, MGA4000100, MGA4000101, MGA4000131, MGA4000139, MGA4000152, MGA4000205-208, MGA4000228-231, MGA4000451, MGA4000458-59, MGA4000462, MGA4000877, MGA4000816, MGA4000622-24, MGA4000611]
[49] [Tab E9. MGA4001765, MGA4001673-74, MGA4001559, MGA4001851, MGA4000139, MGA4000232.]
[50] February 11, 2008 Report of Michael J. Wagner, Tab B1, Schedule 1.1.
[51] IBID.

16

EXHIBIT 23

PAGE 502

Confidential – Attorney's Eyes Only

Mr. Meyer summarizes the results of his seven apportionment approaches on Table VII of his report.[52] His profit apportionment percentage ranges from 14.3% to 25%. The high point of his range is 75% higher than the low point. This is a fairly large range. Three of his results are near the high end of the range (22.3%, 24.3% and 25%) while three of his results are near the low end of the range (14.3%, 15%, and 15.4%). Mr. Meyer did not reach a conclusion on approach seven. Furthermore, Mr. Meyer did not reach a conclusion on which approaches best measure each of the factors that he believes contributes to the sales of the Bratz products.

I have analyzed Mr. Meyer's various apportionment approaches to value the alleged contributing attributes and have found that the results for different attributes can vary significantly. For example, using Mr. Meyer's apportionment Approach 3, 25.6% of profits should be apportioned to packaging; however Approach 6 would apportion just 0.3% of profits to packaging. Similarly, Approach 3 apportions 27.3% of profits to fashions while Approach 4 apportions 14.3% of profits to fashions.[53] The approaches that Mr. Meyer uses do not provide consistent apportionments for all attributes.

I have also reviewed Dr. Scott's Expert Report which has criticisms of Mr. Meyer's approaches. Dr. Scott opines that none of Mr. Meyer's seven approaches, "...tell us how important the appearance and design was to consumers in their decision to purchase a Bratz doll."[54] Dr. Scott reached her conclusions by applying her marketing expertise. As is discussed in detail in the following sections, I reached these same conclusions by applying my analytical, financial and economic expertise.

(1) Approach 1: Mattel's studies of "Key Fashion Doll Attributes" in conjunction with the creative elements to develop a fashion doll.

In this approach, Mr. Meyer matches "Key Fashion Doll Attributes" with what he refers to as apportionment factors based on his discussions with MGA's expert, Robert Tonner. A total of 26 checkmarks were assigned to the seven apportionment factors, except packaging. In Section B of his report, Mr. Meyer described seven apportionment factors, including packaging. However, in this approach, he divided the "Design of the Doll" apportionment factor into two factors – Doll Design (No Hair) and Design/Hair. This split into two factors was not explained by Mr. Meyer. The four checkmarks assigned to Doll Design (No Hair) were divided by the 26 total

---

[52] February 11, 2008, Report of Paul K. Meyer, [Tab E16 p. 55].
[53] Carter Bryant's fashion contribution of 11.2% plus others contribution of 16.1%. [Tab B7, Schedule 1.0]
[54] Rebuttal Expert Report of Carol A. Scott dated March 17, 2008 [Tab E46 p. 10]

EXHIBIT ___23___

PAGE ___503___

Confidential – Attorney's Eyes Only

checkmarks to arrive at 15.4% which represents Mr. Meyer's apportionment percentage of MGA's profits attributable to the infringement of the copyrighted works.[55]

While I have several criticisms of this approach, my major criticism is that Mr. Meyer has not shown the degree to which each attribute or several attributes actually cause the customer to buy the product. Although Mr. Meyer's analysis is based in part on Mattel surveys, these surveys only identify attributes; they do not weight them by importance to customers. For example, if girls liked the Bratz hair and that was the driving force that caused them to buy Bratz, it would not matter how many other attributes existed and how many checkmarks each attribute had. The apportionment percentage would be near 100% no matter how many other checkmarks are assigned. Again, Mr. Meyer's analysis fails to identify and weight the attribute(s) that sell the product and for this reason, his analysis is not an accurate approach to apportionment.

Another criticism of Mr. Meyer's approach is that there is no explanation as to why profits attributable to the infringement of the copyrighted works relates to only the Doll Design (No Hair) apportionment factor. Mr. Bryant's drawings include hair, fashion, accessories and possibly other apportionment factors. Therefore, if this approach is used, additional apportionment factors should be considered in the apportionment percentage.

I also note that Mr. Meyer's approach appears illogical in assigning checkmarks in Table IV which are the basis for his apportionment percentage. For example, the drawings by Carter Bryant include clothes that are described as hip. However, Mr. Meyer does not place a check mark in the doll design column. Therefore, within the apportionment analysis, the copyrighted works are not given credit for including fashions within the drawing. Similarly, the doll design column is not checked for the attribute of "most want to be like" although it would appear that the doll design would be significant with respect to that factor.

(2)  Approach 2:  Royalties paid by MGA to Mr. Bryant for his contributions to the Bratz doll line

This approach is one of several that use Carter Bryant's Consulting Agreement in determination of the apportionment percentage. Under this approach, Mr. Meyer uses the Consulting Agreement as the sole basis of his apportionment factor. He opines that since the Consulting Agreement was negotiated between willing parties and reflects the actual percentage of profit that MGA was willing to pay for the copyrighted works and other

---

[55] Expert Report of Paul K. Meyer, February 11, 2008, ¶ 132, [Tab E16 p.46]

EXHIBIT 23

PAGE 504

Confidential -- Attorney's Eyes Only

contributions made by Mr. Bryant, it is relevant to the apportionment of Bratz profits. This is an incorrect analysis for purposes of apportioning profits. Mr. Meyer is trying to compare the royalty agreement between Carter Bryant and MGA, before any profits were earned, to the retrospective apportionment of profits that have been earned and are known. The negotiation of a royalty agreement between two willing parties is different than apportionment of actual profits earned. The issue for purposes of this report is to determine whether and how to apportion profits retrospectively, profits we know have occurred. We are not in the same position as Carter Bryant and MGA were before the Bratz products were made or sold.

In addition, while Mr. Bryant agreed to this royalty rate, it may have been less risky for him to accept this rate rather than take his drawings elsewhere. Additionally, Mr. Bryant recalled in his deposition that he was, "excited to get into, you know, designing a product a little more independently."[56] His excitement might have also contributed to Mr. Bryant's willingness to accept the terms offered by Mr. Larian. Since Mr. Carter was to be paid $5,500 for the first six months and $5,000 for the next three months which was equal to his compensation at Mattel,[57] he may have been more willing to sign this agreement since he would have had income irrespective of whether the Bratz products were profitable. From the perspective of MGA, it is important to know that MGA never had a profitable doll product prior to Bratz and Isaac Larian had misgivings about getting into the fashion doll industry.[58] Additionally, MGA considered development of the Bratz product risky[59] and knew that even if the Bratz product was unprofitable, MGA would owe Mr. Bryant three percent on sales of an unprofitable product. Since the Consulting Agreement was negotiated in September of 2000 and signed in October 2000, prior to the completion of a Bratz doll, the parties did not have the benefit of positive industry feedback or knowledge of the doll's profitability prior to the execution of the Consulting Agreement.

### (3)  Approach 3:  Work Tasks to Develop the Original Bratz Doll

Mr. Meyer lists twelve people who allegedly provided creative input into the initial Bratz dolls, including Carter Bryant, Margaret Leahy, Veronica Marlow, Mercedeh Ward, Anna Rhee,

---

[56] January 23, 2008 Deposition of Carter Bryant [Tab E39 p.860].

[57] Isaac Larian stated in his deposition that he wanted to pay Carter Bryant the salary he was making at Mattel. (Deposition of Isaac Larian, [Tab E40 p.118]) This is also supported by Mr. Bryant's 1998 employment agreement with Mattel which states that his annual salary will be $50,008. [Tab E41.BRYANT 01198-99].

[58] December 28, 2007 Deposition of Veronica Marlow [Tab E31 pp.210-211].

[59] See e-mail written by Isaac Larian to Victoria O'Conner on September 13, 2000 [Tab E13.MGA 0084571].

19

EXHIBIT ___23___

PAGE ___505___

Confidential – Attorney's Eyes Only

Aileen Storer, Paula Garcia, Charles O'Connor, Sarah Halpern, Steve Tarmichael, David Dees and Rachel Harris.[60]  Mr. Meyer uses an estimate of time spent as his basis for his apportionment factor as shown in Attachment Six to his report.  However, he does not explain why time spent is indicative of value contributed to the overall profitability of the Bratz dolls or why each hour for each person should be given equal weight.  This analysis is inherently flawed.  There are many ways that one could value the contribution of individuals other than their time.  For example, you could look at their compensation, experience, time with the organization, number of direct reports, managerial responsibilities, or how many different tasks they are responsible for.  In any event, valuing the contribution of each individual based on the amount of time they worked is not logical.  To use Mr. Meyer approach in the context of the touring Rolling Stones concert would be like valuing the time of Mick Jagger the same as the time of the person that tunes his guitar.  Or in a hospital, using Mr. Meyer's approach, one would value the time of a world class surgeon the same as a first year resident.  Similarly, within a consulting firm, Mr. Meyer's approach would suggest that a senior partner's time is worth the same as a recent college graduate.  Mr. Meyer's approach does not result in a reasonable apportionment.

In summary, Mr. Meyer's attempt to apportion MGA's Bratz profits using time spent on development is not a reliable measure of the contribution of the copyrighted works for purposes of apportioning the Bratz profits earned by MGA.  All Mr. Meyer has proven is that numerous people worked on Bratz or Bratz related tasks.  This is neither disputed nor helpful with respect to the apportionment of profits or justifying apportioning profits in excess of the industry benchmark returns.

(4)  Approach 4:  MGA Bratz product development contributions

In this approach, Mr. Meyer weights all of the doll development contributions equally.  This is illogical.  For example, MGA could develop really creative and wonderful themes but if they did not have a solid core product, those themes could not sell a sub-par doll.  Additionally, MGA could put out the most entertaining and informative commercials that really reach out to their target market but if there is not a strong product behind that advertising, the advertising alone cannot sell the doll.  As noted earlier, e-mails from early 2001 indicate that the reaction from resellers to the Bratz dolls without any marketing, themes or packaging was exceptional.  Likewise, (1) all of these factors that are averaged together in Mr. Meyer's analysis, except the Bratz drawings by Carter Bryant, are present for other doll products offered by MGA such as

---

[60] Expert Report of Paul K. Meyer, February 11, 2008, ¶ 141. [Tab E16 p.49]

20

EXHIBIT ___23___

PAGE ___566___



Confidential – Attorney's Eyes Only

Storytime Princess Collection, Yummi-Land and Prayer Angels and (2) although a number of the contributors to Bratz also worked on these products, these products were not nearly as successful as Bratz. See section II.B.2.a)(2) above for further discussion of Prayer Angels and October 2006 EBIT Report reporting profitability of Storytime Princess and Yummi-Land.[61] Thus, it would appear that the doll design should outweigh other contributions.

(5)  Approach 5:  MGA's "licensing in" and "licensing out" royalty rates

Mr. Meyer compares the 3% royalty rate that MGA pays to Carter Bryant "licensing in" for the Bratz design to the 10% to 16% royalty rates that it "licenses out" the Bratz likeness to third parties.  Mr. Meyer's approach uses MGA's royalties to Mr. Bryant and MGA's royalties received on Bratz as the only criteria for this apportionment.

This approach fails for the same reasons that Mr. Meyer's second approach fails. As discussed above, the negotiation of a royalty agreement between two willing parties is different than an apportionment of actual profits.  Similarly, the rate paid by licensing parties for varying rights to use Bratz copyrights and trademarks is entirely different from the apportionment of known profits.  Neither of these rates reflects how much the copyrighted works contributed to the profitability of the Bratz products.  Therefore, Mr. Meyer's comparison of these two rates does not answer the question of how much value is attributable to the copyrighted works. This approach fails to determine what MGA's contributions are and furthermore, fails to prove that they should earn a profit in excess of the industry norm. .

(6)  Approach 6:  MGA's investments in Bratz product line

Mr. Meyer compares the costs to acquire the copyrighted works to the total costs MGA incurred for the copyrighted works, product development and marketing.

Every company makes investments. The question that must be answered in this analysis is what kind of return is MGA entitled to earn for the investment they made.  Mr. Meyer has not provided an analysis establishing that MGA is entitled to a return on investment that exceeds the industry norm.

Not all costs are equal. The AICPA Practice Aid 06-1, titled "Calculating Intellectual Property Infringement Damages," states "cost-based apportionment is inappropriate if the cost of some elements may not represent their value.  This is particularly true if valuable elements

---

[61] See MGA Worldwide Segment P&L October 2006 YTD – Active – Sorted by EBIT Margin % [Tab

21

EXHIBIT _23_

PAGE _507_

Confidential -- Attorney's Eyes Only

are obtained at no costs...or if the cost or value of the elements are not easily measured, such as the value of a brand name,"[62]   The value of the other factors that contribute to the Bratz product line is not easy to measure therefore; it is not reasonable to use a cost basis approach to apportioning profits in this case.

Not all dollars spent are equal.  For example, I have seen an e-mail from Isaac Larian in regards to a commercial for which MGA paid an advertising agency $400,000.  Within the e-mail, Larian indicates that the commercial was not worth $400,000.[63]  This illustrates that one cannot always weight the dollars equally.  In addition, advertising costs are a necessary cost to promote products and make sales.  While MGA is entitled to deduct the $76.7 million (per Mr. Meyer's Attachment 8) it spent on advertising between 2001 and 2006, the fact of this expenditure provides no basis for apportioning profit, much less awarding excess profits.

(7)  Approach 7: Sales variation among Bratz products

Mr. Meyer calculates the sales of seven themes introduced in May 2005, and suggests that the sales of the lowest-selling theme as a percentage of sales of the highest-selling theme is a reasonable estimate of the portion of MGA profits attributable to infringement of the copyrighted works[64]  According to Mr. Meyer, the copyrighted works may contribute up to 10% of sales of Bratz Rock Angelz dolls.[65]

Mr. Meyer's methodology in his analysis described in paragraph 153 is flawed because he does not consider how factors other than themes have contributed to the differences in sales among these seven themes.  For example, Midnight Dance, the lowest-selling theme, offers only Fianna, Meygan, and Yasmin dolls while the Rock Angelz theme offers Cloe, Jade, Roxxi, Yasmin, and Sasha dolls.[66] Given that Cloe is a high-selling Bratz character, discussed within a marketing report as, "clearly the top character, with roughly twice the appeal of each Yasmin and Jade,"[67] it is not surprising that Midnight Dance, the only one of the seven themes not to offer a Cloe doll, undersold the other themes.

---

E33,MGA1610366-371].
[62] AICPA Practice Aid 06-1, Calculating Intellectual Property Infringement Damages, [Tab E14 p. 65].
[63] E-mail from Isaac Larian dated 6/26/01 [Tab E44,MGA 4001672]. Another e-mail complaining about the quality of a commercial was written by Isaac Larian on 7/26/01 [Tab E44,MGA4000627-628].
[64] Expert Report of Paul K. Meyer, [Tab E16 pp. 52-53].
[65] Expert Report of Paul K. Meyer, [Tab E16 p. 53].
[66] Tab B6 Schedule 4.0.
[67] January 29, 2002 Consumer Quest Market Research Report [Tab E1.MGA 0149331].

22

EXHIBIT _____23_____

PAGE _____508_____

Confidential – Attorney's Eyes Only

Mr. Meyer's apportionment methodology depends on which themes one chooses to compare. For instance, I used Mr. Meyer's methodology to analyze the four themes introduced in May 2004. Of these four themes, Bratz Secret Date had the lowest sales in the 12 months after introduction, with revenue ▮▮▮▮▮▮▮▮▮▮ Bratz Tokyo-A-Go-Go had the highest sales in the 12-month period, with revenue ▮▮▮▮▮▮▮▮ According to Mr. Meyer's methodology, approximately 34% of the sales of Bratz Tokyo-A-Go-Go dolls may be attributable to infringement of the copyrighted works.[68] This is 3.4 times as high as the 10% Mr. Meyer puts forth in his report as an appropriate estimate of the portion of MGA profits attributable to infringement of the copyrighted works.

Furthermore, Mr. Meyer does not adjust for the fact that some themes have more product offerings than others. For example, the Midnight Dance theme contained only five unique fashion doll base SKUs in 2005 while the Rock Angelz collection had 32 unique fashion doll base SKUs. An analysis of SKUs also suggests that the seven themes are not all carried by the same retailers.[69] A difference in both the number of retailers carrying each theme, and in the retailers themselves, could affect the sales of that theme.

Mr. Meyer also fails to consider that certain themes and product assortments are exclusive to one retailer, which may also impact the sales of a particular theme. Nor does Mr. Meyer take into consideration or control for other factors such as (1) any differences in advertising expenditures between differing themes; (2) the effect of introducing so many different themes at one time; (3) the period he selected included the most number of new themes offered in one time period in comparison to prior time periods.

Based on his Table VI, Mr. Meyer concludes that the difference in sales among the various Winter Wonderland themed dolls "represents sales attributable to factors other than the accused copyrighted property, such as the Bratz doll character and fashions."[70] However, Mr. Meyer has incorrectly calculated the sales of each character by excluding sales of Winter Wonderland 6-piece Assortments from his analysis. Each 6-piece assortment includes two Cloe dolls, two Dana dolls, one Jade doll and one Yasmin doll.[71] When these are taken into consideration, Cloe has the highest sales ▮▮▮▮▮▮▮ while Sasha has the

---

[68] Tab B8 Schedule 1.0.
[69] See September 24, 2007 Deposition of Lisa Tonnu [Tab E45 pp.138-139].
[70] Expert Report of Paul K. Meyer, [Tab E16 pp. 53-54].
[71] "Barb Laubenstein MGA - Fall 2004 Item Line Listing" [Tab E4.MGA1162491]
[72] Tab B9 Schedules 1.0 and 2.0.

EXHIBIT ___23___
23

PAGE ___509___

REDACTED

Confidential – Attorney's Eyes Only

As MGA predicted, Cloe and Dana had approximately twice as many sales as the Jade and Yasmin dolls, and approximately four times as many as the Sasha doll.[73] In December 2000 Paula Garcia (Treantafelles) predicted that the "white" doll, Cloe would sell the most and Isaac Larian apparently agreed.[74] A March, 2001 Focus group analysis provides a reason for why Cloe would be the top selling doll. The report states, "Overall, participants chose their Favorite Bratz doll because the doll most closely resembled them, or because they felt the doll represented certain values they held, such as an interest in sports. Among the 3 groups of younger participants (ages 5 ½ - 8 ¼, the primarily Caucasian participants tended to choose Cloe and Yasmin as their favorite dolls. The few African-American participants were consistent in their preference for Sasha."[75] Within the conclusions for this report, it says, "within the line, Yasmin appears to have the broadest appeal. Sasha should do well with African-American consumers; Cloe skews towards younger girls (5 – 7); Jade may do better among older consumers (age 12-13)."[76] Additionally, a January, 2002 market research study states that, "Chloe is clearly the top character, with roughly twice the appeal of each Yasmin and Jade. Sasha has far less appeal."[77] This analysis supports what MGA's market research predicted that the difference in the sales of different doll characters can be attributed to the buyers' preferences for the ethnicity of the doll, and not individual characters or fashions.

(8)  Inappropriate to use "the 25% rule" in the context of apportionment of MGA's Bratz profits

The 25% Rule is a commonly used starting point in real world patent licensing negotiations where the parties do not know what the profit will be and is also used to construct the outcome of a hypothetical negotiation between a licensor and licensee in a patent litigation. These are entirely different questions than determining the correct apportionment in this case. Mr. Meyer is tasked with taking a retrospective look at how to apportion known profits in a court of law as opposed to constructing a hypothetical negotiation. It is also not appropriate to use this starting point in a context where the assumption is that 100% of the profit should be attributable to the intellectual property as the law requires in the context of this case.

---

[73] Tab B9 Schedule 1.1.
[74] E-mails between Issac Larian and Paula Garcia dated December 26, 2006 [Tab E11.MGA 0005137 B].
[75] BratZ Focus Group Evaluation Topline Analysis[Tab E5.MGA 0050469].
[76] BratZ Focus Group Evaluation Topline Analysis [Tab E5.MGA 0050471].
[77] January 29, 2002 Consumer Quest Market Study [Tab E1.MGA 0149331]

24

EXHIBIT _____23_____

PAGE _____510_____

Confidential – Attorney's Eyes Only

### III.  Documents, Data and Other Information Considered

In addition to the documents listed in Tab C of my initial report dated February 11, 2008, Volume 1, Tab C of this report contains a list of additional documents I considered in forming my opinions.

### IV.  Potential Additional Analyses to Perform

My opinions are based on the information received as of the date of my report. However, on March 11, 2008, I received a CD with Mr. Meyer's underlying analyses.[78] I am in the process of reviewing these 4,619 pages and may have additional comments upon completion of my review.

I plan on updating my criticisms of Mr. Meyer's opinions and methodologies, if necessary, after I have received his rebuttal and/or supplemental report and his deposition. I will consider any criticisms of my opinions or bases for my opinions brought to my attention at my deposition or offered by experts retained by MGA. Any of this additional information or work may cause me to change my opinions.

### V.  Qualifications

Volume 1, Tab D contains my curriculum vitae which details my qualifications, including a listing of all my publications and testimony.

### VI.  Compensation

My current billing rate is $695 per hour.

*Michael J Wagner*

Michael J. Wagner

---

[78] Documents with Bates numbers PKM 00308 through PKM 04926.

25

EXHIBIT ___23___

PAGE ___511___

**Exhibit 24**

Westlaw.

APN: 2761-001-072                                                    Page 1

**REAL PROPERTY TRANSACTION RECORD**

Filings Collected Through:04-17-2008
County Last Updated:04-23-2008
Frequency of Update:WEEKLY
Current Date:04/23/2008
Source: COUNTY
RECORDER
          , LOS ANGELES, CALIFORNIA

OWNER INFORMATION

Owner(s):**MGA NORTH LLC**
Ownership Rights:CORPORATION
Corporate Owner:YES
Additional Owner #1:**MGA NORTH LLC**
Owner Rights:CORPORATION
Property Address:20000 PRAIRIE ST
CHATSWORTH CA 91311-6507
Mailing Address:N/AVAIL

PROPERTY INFORMATION

County:LOS ANGELES
Assessor's Parcel Number:2761-001-072
Property Type:WAREHOUSE
Land Use:WAREHOUSE
Building Square Feet:65689

TRANSACTION INFORMATION

Transaction Date:10/25/2006
Seller Name:LOS ANGELES TIMES COMMUNICATIO
Sale Price:$27,300,000.00
Consideration:SALE PRICE (FULL)
Deed Type:GRANT DEED
Type of Transaction:RESALE
Recording Date:10/31/2006
Document Number:2412751
Title Company:CHICAGO TITLE CO.
Construction Type:RESALE
Purchase Payment:CASH

TAX ASSESSOR RECORD is available for this property. The record contains information from the office of the local real property tax assessor office. In addition to identifying the current owner, the record may include tax assessment information, the legal description, and property characteristics. Additional charges may apply.

EXHIBIT __ 24 _____

PAGE _____ 512

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

APN: 2761-001-072                                                    Page 2

<u>TRANSACTION HISTORY REPORT is available for this property. The report contains details about all available transactions associated with this property. The report may include information about sales, ownership transfers, refinances, construction loans, 2nd mortgages, or equity loans based on recorded deeds. Additional charges may apply.</u>

Call Westlaw CourtExpress at 1-877-DOC-RETR (1-877-362-7387)
to order copies of documents related to this or other matters.
Additional charges apply.

END OF DOCUMENT

EXHIBIT __2Y__

PAGE __513__

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Exhibit 25**



About Us | My Account | ☰ View Cart

Home
Company Profiles
Industry Information
Business Development Resources
Business Management Resources
U.S. Job Search

Browse or Search over 5 million articles »   Enter a keyword   [GO!]

Find Articles by Publication

Home | Industry Information | Business News | Browse by Publication | S | San Fernando Valley Business Journal

# MGA Entertainment buying times property.(Real Estate)

Article, News, Research, Information, Industry & Business News
» View article excerpt

Ads by Google

Ads by Google   MIXI

N.Nieszawer Valuations
Ecole de Paris - Jewish painters Kisling, Soutine, Pascin, Kikoine
www.ecoledeparis.org

Target Designer Gadget
Get The Latest Info On New Fashion, Beauty & Furniture Collections!
www.Target.com

Isaac Isaac Mizrahi
Step Out In Style. Save on Isaac Isaac Mizrahi!
Shopzilla.com/IsaacMizrahi

Affordable Credit Scores
Get Credit Scores & Report From All 3 Bureaus. Free 7 Day Access.
FreeTripleCreditReport.com

Isaac Mizrahi NY
The official home of Isaac Mizrahi. Shop at Isaac's exclusive store!
www.isaacmizrahi.com

Need More Information?

More articles about 'Isaac

N.Nieszawer Valuations Ecole de Paris - Jewish painters Kisling, Soutine, Pascin, Kikoine

Target Designer Gadget Get The Latest Info On New Fashion, Beauty & Furniture Collections!

Isaac Isaac Mizrahi Step Out In Style. Save on Isaac Isaac Mizrahi!

**Read ALL the news from Goliath - Try Goliath Business News - FREE!**
You can view this article PLUS...
- Over 5 million business articles
- Hundreds of the most trusted magazines, newswires, and journals (see list)
- Premium business information that is timely and relevant
- Unlimited Access

**Now for a Limited Time, try Goliath Business News - Free for 7 Days!**



Tell Me More  Terms and Conditions

EXHIBIT ___25___

PAGE ___514___

Publication: San Fernando Valley Business Journal
Publication Date: 25-SEP-06
Delivery: Immediate Online Access
Author: Garcia, Shelly
Full Article:

A deal has been struck to sell the coveted Los Angeles Times property in Chatsworth to MGA Entertainment, makers of Bratz dolls, for an estimated $28 million.

MGA, which is currently located in Van Nuys, beat out a handful of developers who saw in the 26-acre parcel a rare chance for a substantial industrial redevelopment in the center of the San Fernando Valley.

With an industrial vacancy rate of under 4 percent in the Valley, such a development would have met with almost certain success, according to the developers who were involved in the bidding process.

But they added that because a developer would have to factor in redevelopment costs, including rising materials prices, along with the cost of carrying the property through the process, the bids they submitted were not likely to top that of an owner-user like MGA.

larian property purchase'

Start a new search.

MGA is likely to have offered as much as a 15 percent premium over bids from other developers, which included LNR Property Corp., M.W. Ossola and Associates Inc.; Overton Moore Properties, Sheridan Ebbert Real Estate Development and Voit Development Co., according to sources.

MGA officials would not comment on the purchase price for the property, which is being divested by Times' owner The Tribune Co., as part of a consolidation of its printing facilities designed to cut costs.

MGA's move to acquire the property comes as the company has experienced explosive growth and more recently, completed several deals that will expand its business even further.

The company, which currently has about 350 workers at its Van Nuys facility, with some 600 worldwide employees, is hiring an additional 100 staffers locally.

"We are going to make a major headquarters here," said Isaac Larian, CEO of MGA. "Our facility here is very limited and our success is because of our people. We want to have a day care facility, a gym, a lot of things employees would like to have. This land will give us the opportunity to do that."

Privately-held, the family-owned company does not report revenue figures. But MGA's success with Bratz, a line of dolls that mimic the urban hip-hop fashions of today has been well-documented. In a few short years since its introduction in 2001, Bratz bumped the 50-year-old Barbie franchise from Mattel to second place, and the dolls have pushed the company into the entertainment arena with videos and other licensed products.

The company manufactures overseas, but virtually all the other functions, from design and development to accounting and licensing, are handled from its U.S. headquarters, which currently provide just 160,000 square feet of space, about 56 percent less than the building that now sits on the Times site.

Larian said that most of the growth has come from Bratz as well as several other lines, including Rescue Pets and Yummi-Land Creme Soda Pop Girls.

The company just inked a deal to acquire Little Tikes from Newell Rubbermaid Inc., a move that will take MGA into the children's toys and furniture categories.

MGA also recently signed a joint venture agreement under which it will sell Zapf Creation products in North and South America. Zapf makes baby dolls that are designed to mimic some of the same movements and activities as real infants.

Trammell Crow represented the Tribune Co.

Multi-family Sale

A 152-unit apartment building in Northridge has sold to an investment company for $28.6 million.

The property, built in 1973, is located at 10435 Lindley Ave.

The buyer, StarPoint Properties LLC, expects to spend about $1.5 million to renovate the property.

Chris Thompson, a broker with Investment Real Estate Associates, represented the seller, a unit of Pacific Property Co., and the buyer, IREA said.

Industrial Sale

A 47,650-square-foot industrial building in North Hollywood was sold for $3.9 million.

EXHIBIT _____ 25

PAGE _____ 515

The building, at 12222-12228 Sherman Way, will serve as a distribution center for Independent Electrical Supply.

The property is located on a 2.3-acre parcel. Steve Scott, a broker with Lee & Associates-LA North/Ventura, represented the new owner, Ron Snow.

Bruce Simpson, a broker with Delphi Business Properties, represented the private seller.

Simi Sale

A 9,723-square-foot office building in Simi Valley was acquired by a user for $3.3 million.

The building, Alamo Executive Center at 3713 Alamo, will be used for corporate headquarters for Newman & Sons, a concrete and asphalt contractor.

The building's current tenant, Simi Starship, will be relocating to an office condominium, also in Simi Valley.

Mike LaRocque, a broker with GVA DAUM, represented the buyer and DAUM's Chris Sullivan and Mike Foxworthy represented Simi Starship.

Chatsworth Lease

DataDirect Networks has leased a 55,563-square-foot industrial facility in Chatsworth for its headquarters location.

The five year lease, at 9351 Deering Ave. in the Northpark Industrial Center, is valued at $2.3 million.

The company, a developer of storage network and other technologies, is expected to employ 100 people at the site.

Scott Caswell, a broker with Delphi Business Properties, represented the landlord, Northpark Industrial. Bennett Robinson, a broker with CB Richard Ellis, represented the tenant.

Westlake Sale

A 38,764-square-foot parcel in Agoura Hills was sold for $1.2 million.

The property was acquired by Conejo Development Co., which plans to build an 11,600-square foot warehouse on the site.

Chris Richards and Bill Napier of NAI Capital represented the seller, Bijan Zaghi.

The buyer was represented by Patrick Naylon, a broker with BP Realtor.

Senior reporter Shelly Garcia can be reached at (818) 316-3123 or by e-mail at sgarcia@sfvbj.com.

More articles from San Fernando Valley Business Journal
New Year's Eve is last link in factory closing, 24-DEC-07
Hollywood urged to give medium a green message; conference pushes changes in product procedures on sets., 24-DEC-07
Nevada transplant returns to Simi, 24-DEC-07

Looking for additional articles?

EXHIBIT _____ 25 _____

PAGE _____ 516 _____

Click here to search our database of over 3 million articles.

**Looking for more in-depth information on this industry?**
Click here to search our complete database of Industry & Market reports by text, subject, publication name or publication date.

**About Goliath**
Whether you're looking for sales prospects, competitive information, company analysis or best practices in managing your organization, Goliath can help you meet your business needs.

Our extensive business information databases empower business professionals with both the breadth and depth of credible, authoritative information they need to support their business goals. Whether it be strategic planning, sales prospecting, company research or defining management best practices - Goliath is your leading source for accurate information.

Advertising, Privacy Policy, Refund Policy, Contact Us, Site Map, Terms & Conditions, Add to del.icio.us
Customer Service, How to Buy, Frequently Asked Questions
Copyright © 2008, ECNext, Inc., All Rights Reserved

EXHIBIT ___25___

PAGE ___517___

**Exhibit 26**

**From:** Jon Corey
**Sent:** Wednesday, May 21, 2008 1:12 AM
**To:** 'Park, Amy S'
**Cc:** Michael T Zeller
**Subject:** Bryant v. Mattel, Inc.

Ms. Park,

On December 27, 200[7], Judge Infante ordered Mr. Larian to produce documents sufficient to show his net worth and gross income, among other things. We have examined Mr. Larian on the only documents that we have identified that show his net worth or gross income, and he disavowed their accuracy at his most recent deposition. In this circumstance, Mattel will revisit the "compelling need" determination by Judge Infante regarding Mr. Larian's tax returns.

Please let me know whether MGA and Mr. Larian will stipulate to the admission, for all purposes, of his net worth and gross income documents that MGA produced. You identified these documents as in your February 18, 2008 Declaration in Support of MGA Defendants' Reply in Support of their Motion to Quash Mattel, Inc.'s Subpoena to Bank of America, dated February 15, 2008 and the Larian Net Worth Documents (MGA 3787275 – MGA 3787283). Alternatively, please let me know when Mattel can expect to receive Mr. Larian's tax returns. If Mr.Larian does not agree and bring himself into compliance with the December 27, 2008 Order, then Mattel will seek relief from Judge Larson on an expedited basis.

Best regards,

EXHIBIT _26_

PAGE _518_

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2    John B. Quinn (Bar No. 090378)
     johnquinn@quinnemanuel.com
3    Michael T. Zeller (Bar No. 196417)
     (michaelzeller@quinnemanuel.com)
4    Jon D. Corey (Bar No. 185066)
     (joncorey@quinnemanuel.com)
5    Timothy L. Alger (Bar No. 160303)
     timalger@quinnemanuel.com
6  865 South Figueroa Street, 10th Floor
   Los Angeles, California  90017-2543
7  Telephone:  (213) 443-3000
   Facsimile:   (213) 443-3100
8
   Attorneys for Plaintiff and Counter-
9  Defendant Mattel, Inc.

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12                    EASTERN DIVISION

| | |
|---|---|
| 13  CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| 14            Plaintiff, | Consolidated With Case No. 04-9059 and Case No. 05-2727 |
| 15       vs. | Hon. Stephen G. Larson |
| 16  MATTEL, INC., a Delaware corporation, | PROOF OF SERVICE |
| 17            Defendant. | |
| 18  AND CONSOLIDATED ACTIONS. | Date:   TBD  Time:   TBD  Place:  TBD |
| 19 | |
| 20 | **Phase I**  Pre–trial Conference: May 5, 2008  Trial Date: May 27, 2008 |

21

22

23

24

25

26

27

28

COPY

209/2423639.1

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is 1301 West 2nd Street, Suite 206, Los Angeles, California 90026.

On May 21, 2008, I served true copies of the following document(s) described as :

1.       DECLARATION OF MELISSA GRANT IN SUPPORT OF MOTION OF MATTEL, INC. FOR AN ORDER ENFORCING THE COURT'S DECEMBER 27, 2007 ORDER COMPELLING ISAAC LARIAN TO PRODUCE CERTAIN DOCUMENTS;

2.       APPLICATION TO FILE UNDER SEAL EXHIBITS 3-23 AND 26 TO THE DECLARATION OF MELISSA GRANT IN SUPPORT OF MOTION OF MATTEL, INC. FOR AN ORDER ENFORCING THE COURT'S DECEMBER 27, 2007 ORDER COMPELLING ISAAC LARIAN TO PRODUCE CERTAIN DOCUMENTS

3.       [PROPOSED] ORDER RE MATTEL, INC.'S APPLICATION TO FILE UNDER SEAL EXHIBITS 3-23 AND 26 TO THE DECLARATION OF MELISSA GRANT IN SUPPORT OF MOTION OF MATTEL, INC. FOR AN ORDER ENFORCING THE COURT'S DECEMBER 27, 2007 ORDER COMPELLING ISAAC LARIAN TO PRODUCE CERTAIN DOCUMENTS

on the parties in this action as follows:

**SEE ATTACHED LIST**

**BY PERSONAL SERVICE:** I delivered such envelope(s) by hand to the office of the person(s) being served.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 21, 2008, at Los Angeles, California.

_Steve Quintana_
NOW LEGAL -- Dave Quintana

209/2423639.1

- 2 -
PROOF OF SERVICE

1

**SERVICE LIST**

2

Thomas J. Nolan, Esq.
**Skadden, Arps, Slate, Meagher &**
3   **Flom LLP**
300 South Grand Avenue, Suite 3400
4   Los Angeles, CA  90071

John W. Keker, Esq.
Michael H. Page, Esq.
Christa M. Anderson, Esq.
**Keker & Van Nest, LLP**
710 Sansome Street
San Francisco, CA 94111

5

6   Overland Borenstein Scheper &
Kim, LLP
7     Mark E. Overland, Esq.
David C. Scheper, Esq.
8     Alexander H. Cote, Esq.
601 West Fifth Street, Suite 12th Floor
9   Los Angeles, CA 90017

Larry W. McFarland, Esq.
Keats McFarland & Wilson LLP
9720 Wilshire Boulevard, Penthouse
Suite
Beverly Hills, California  90212
Tel: (310) 248-3830
Fax: (310) 860-0363
lmcfarland@kmwlaw.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

209/2423639.1