**Exhibit 28**

THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, an
individual,                         Case No.
                                    CV 04-9049 SGL
          Plaintiff,                (RNBx)
                                    Consolidated with:
     vs.
                                    Case No.
MATTEL, INC., a Delaware            CV 04-09059
corporation,
                                    Case No.
          Defendant.                CV 05-02727

**CERTIFIED COPY**

VIDEOTAPED DEPOSITION OF MRS. SARAH D. ODOM,

produced, sworn, and examined on Monday,

January 28, 2008, at 9:00 a.m. of that day,

at the University Plaza Hotel & Convention

Center, 333 John Q. Hammons Parkway, in the

City of Springfield, County of Greene, and

State of Missouri, before me, LAURA R.

PRATT, RMR, CRR, CCR, in the above-captioned

cause; taken on behalf of the Defendant

Mattel.

JOB No. 81039

EXHIBIT __28__

PAGE __426__

SARAH D. ODOM                                    01/28/08

```
 1              A P P E A R A N C E S
 2    For MGA and          MR. ALLEN L. LANSTRA, JR.
      Lanier:                SKADDEN, ARPS, SLATE,
 3                           MEAGHER & FLOM, LLP
                             300 South Grand Avenue
 4                           Los Angeles, CA 90071-3144
 5    For Mattel:          MR. A. BROOKS GRESHAM
                             QUINN EMANUEL URQUHART
 6                           OLIVER & HEDGES, LLP
                             865 S. Figueroa Street
 7                           10th Floor
                             Los Angeles, CA 90017-2543
 8
 9    Videotaped by:       Mr. Ken Crouch
                           Black Dog Productions
10                         1004 W. 4th Street
                           Joplin, MO 64801
11
12
13                        I N D E X
14    TESTIMONY OF
      MRS. SARAH D. ODOM:
15                                  EXAMINATION
16      BY MR. GRESHAM                   5
17
18
19
20
21
22
23
24
25
```

2

EXHIBIT ____28____

PAGE ____427____

SARAH D. ODOM                01/28/08

| | | |
|---|---|---|
| 09:15:54 | 1 | persons who prepare it to your |
| 09:15:55 | 2 | understanding? |
| 09:15:55 | 3 | A.   To my understanding, yes. |
| 09:15:58 | 4 | Q.   Is this report prepared every year? |
| 09:16:00 | 5 | A.   Yes, it is. |
| 09:16:01 | 6 | Q.   And since 1996, to your understanding, has |
| 09:16:04 | 7 | it been prepared every year? |
| 09:16:06 | 8 | A.   I haven't -- you know, I have no knowledge |
| 09:16:08 | 9 | of days before.  I assume so just because it |
| 09:16:12 | 10 | has been a practice of the district, but I |
| 09:16:14 | 11 | don't remember seeing them in my first days |
| 09:16:16 | 12 | of teaching. |
| 09:16:18 | 13 | Q.   If you would, please, take a look at page 6 |
| 09:16:21 | 14 | of the report. |
| 09:16:23 | 15 | A.   Okay. |
| 09:16:30 | 16 | Q.   And, let's see, page 6?  Yeah, there it is. |
| 09:16:33 | 17 | Looking down at the second grid -- first of |
| 09:16:36 | 18 | all, let me read the title in.  It says |
| 09:16:39 | 19 | "Enrollment by Race and Ethnicity, September |
| 09:16:43 | 20 | 2006 -- September 2007."  Do you see that? |
| 09:16:45 | 21 | A.   Yes, I do. |
| 09:16:46 | 22 | Q.   Then a grid appears, and there's a reference |
| 09:16:48 | 23 | to Kickapoo High School about four lines |
| 09:16:50 | 24 | down.  Do you see that? |
| 09:16:51 | 25 | A.   Yes. |

20

EXHIBIT _____ 28

PAGE _____ 428

SARAH D. ODOM                                    01/28/08

| | | |
|---|---|---|
| 09:16:51 | 1 | Q. And there's a total account for enrollment |
| 09:16:54 | 2 | of 1,766 students.  Do you see that? |
| 09:16:57 | 3 | A. Yes. |
| 09:16:57 | 4 | Q. Is that consistent with your recollection of |
| 09:17:00 | 5 | the enrollment at Kickapoo High School in |
| 09:17:02 | 6 | September of 2006? |
| 09:17:03 | 7 | A. Yes. |
| 09:17:03 | 8 | Q. To the best of your knowledge, that's an |
| 09:17:06 | 9 | accurate number.  Correct? |
| 09:17:07 | 10 | A. Yes, it is. |
| 09:17:07 | 11 | Q. And there's numbers that follow that reflect |
| 09:17:09 | 12 | the racial demographics and enrollment.  Do |
| 09:17:12 | 13 | you see those numbers that follow? |
| 09:17:14 | 14 | A. Yes. |
| 09:17:14 | 15 | Q. To the best of your recollection and |
| 09:17:16 | 16 | understanding, are those numbers correct? |
| 09:17:18 | 17 | A. Yes. |
| 09:17:20 | 18 | Q. There's nothing that appears incorrect about |
| 09:17:22 | 19 | that to you.  Correct? |
| 09:17:23 | 20 | A. No. |
| 09:17:24 | 21 | Q. Looking at page 39, this chart says |
| 09:17:35 | 22 | "September Enrollments," and the reporting |
| 09:17:38 | 23 | period appears to be 1998 to 2007.  Do you |
| 09:17:41 | 24 | see that at the top? |
| 09:17:42 | 25 | A. Yes. |

21

EXHIBIT ____28____

PAGE ____429____

SARAH D. ODOM                    01/28/08

| | | |
|---|---|---|
| 09:17:42 | 1 | Q. All right.  Looking down at the second grid, |
| 09:17:44 | 2 | there's a reference to Kickapoo High |
| 09:17:46 | 3 | School.  Do you see that? |
| 09:17:47 | 4 | A. Um-hmm. |
| 09:17:47 | 5 | Q. And there are some years from '98 to 2007, |
| 09:17:50 | 6 | and it shows enrollment figures, |
| 09:17:52 | 7 | purportedly.  Do you see that? |
| 09:17:53 | 8 | A. Yes. |
| 09:17:53 | 9 | Q. Based on your knowledge as a teacher at |
| 09:17:56 | 10 | Kickapoo High School and as a vice principal |
| 09:17:59 | 11 | currently, does that chart accurately |
| 09:18:01 | 12 | reflect the September enrollment of Kickapoo |
| 09:18:04 | 13 | High School from 1998 to 2007? |
| 09:18:06 | 14 | A. To the best of my knowledge, yes. |
| 09:18:07 | 15 | Q. Is it fair to say that the enrollment |
| 09:18:10 | 16 | figures for Kickapoo High School have stayed |
| 09:18:13 | 17 | fairly static from 1998 to 2007? |
| 09:18:16 | 18 | MR. LANSTRA:  Objection. |
| 09:18:18 | 19 | Q. (By Mr. Gresham)  Is that correct? |
| 09:18:18 | 20 | A. Yes. |
| 09:18:20 | 21 | Q. And has the racial demographic at Kickapoo |
| 09:18:23 | 22 | High School stayed approximately the same, |
| 09:18:24 | 23 | to the best of your recollection, also from |
| 09:18:26 | 24 | 1998 to 2007? |
| 09:18:30 | 25 | MR. LANSTRA:  Same objection. |

22

EXHIBIT ___28___

PAGE ___430___

SARAH D. ODOM                                    01/28/08

| | | |
|---|---|---|
| 09:18:32 | 1 | A.  I would say that there probably has |
| 09:18:38 | 2 | fluctuated a little bit since 1998.  If you |
| 09:18:42 | 3 | would look at the beginning year '98, and |
| 09:18:45 | 4 | you go to 2007, you would probably see some |
| 09:18:47 | 5 | changes. |
| 09:18:47 | 6 | Q.  (By Mr. Gresham)  In what way? |
| 09:18:48 | 7 | A.  I would say more non-White -- non-Caucasian |
| 09:18:55 | 8 | students, probably an increase in Hispanic, |
| 09:19:00 | 9 | Asian, and Black American students. |
| 09:19:03 | 10 | Q.  An increase over time.  Correct? |
| 09:19:05 | 11 | A.  Over time. |
| 09:19:05 | 12 | Q.  So if we were to look back at the years 1997 |
| 09:19:09 | 13 | through 1999, we would find fewer |
| 09:19:12 | 14 | multiethnic students than we would today, |
| 09:19:14 | 15 | currently.  Correct? |
| 09:19:16 | 16 | A.  That's what I would say. |
| 09:19:20 | 17 | Q.  Okay.  And that is based on your |
| 09:19:22 | 18 | recollection from the official duties that |
| 09:19:24 | 19 | you had as a teacher? |
| 09:19:27 | 20 | A.  As a teacher and just walking the halls, you |
| 09:19:30 | 21 | know, seeing the population -- |
| 09:19:31 | 22 | Q.  Okay. |
| 09:19:33 | 23 | A.  -- not any recollection of the report from |
| 09:19:38 | 24 | 1998. |
| 09:19:39 | 25 | Q.  Okay. |

23

EXHIBIT _____ 28

PAGE _____ 431

SARAH D. ODOM                    01/28/08

| | | |
|---|---|---|
| 09:19:43 | 1 | A. Do you need this back, or do I give that to |
| 09:19:45 | 2 | her? |
| 09:19:46 | 3 | Q. You get to keep that one.  Let's move to |
| 09:19:49 | 4 | Topic 2.  There were three attachments to |
| 09:19:53 | 5 | the subpoena that you received, Exhibits 1 |
| 09:19:55 | 6 | through 3? |
| 09:19:56 | 7 | A. Um-hmm. |
| 09:19:56 | 8 | Q. Did you have a chance to look through those |
| 09:19:58 | 9 | documents? |
| 09:19:58 | 10 | A. Yes. |
| 09:19:59 | 11 | Q. And what are those documents? |
| 09:20:00 | 12 | A. They are yearbooks at -- Kickapoo High |
| 09:20:03 | 13 | School yearbooks from the years 1997 through |
| 09:20:06 | 14 | 1999. |
| 09:20:07 | 15 | Q. And how do you know that? |
| 09:20:10 | 16 | A. I had copies of the books.  I've seen them. |
| 09:20:14 | 17 | The students in the books are students that |
| 09:20:17 | 18 | I remember, either through having in class |
| 09:20:19 | 19 | or them being involved in activities and |
| 09:20:22 | 20 | their names just being out front.  I'm in |
| 09:20:24 | 21 | them. |
| 09:20:25 | 22 | Q. And are Exhibits 1, 2, and 3 true and |
| 09:20:28 | 23 | correct copies of the yearbooks that you |
| 09:20:30 | 24 | have seen in your possession from those same |
| 09:20:32 | 25 | years at Kickapoo High School? |

24

EXHIBIT _____ 28 _____

PAGE _____ 432 _____

SARAH D. ODOM                          01/28/08

1

2

3

4

5

6

7

8

9        I, SARAH D. ODOM, do hereby declare

10  under penalty of perjury that I have read the foregoing

11  transcript; that I have made any corrections as appear

12  noted, in ink, initialed by me, or attached hereto;

13  that my testimony as contained herein, as corrected, is

14  true and correct.

15        EXECUTED this _7th_ day of _February_,

16  20_08_, at _Springfield_ , _MO_ .
               (City)         (State)

17

18

19

20                      SARAH D. ODOM

21

22

23

24

25

45

EXHIBIT _____28_____

PAGE _____433_____

1                    REPORTER'S CERTIFICATE

2     STATE OF MISSOURI )
                        )ss
3     COUNTY OF GREENE  )

4              I, LAURA REYNOLDS PRATT, RMR, CRR,
      CCR, do hereby certify the witness was duly
5     sworn by me; that the facts stated by me in
      the caption hereof are true; that the said
6     witness did make the above and foregoing
      answers in response to questions propounded
7     as shown; that I did, in stenotype, report
      said proceedings; and that the above and
8     foregoing typewritten pages contain a full,
      true, and correct transcription of my
9     shorthand notes taken on such occasion.

10             I further certify that I am neither
      attorney for, nor counsel for, nor related
11    to, nor employed by any of the parties to
      the action in which this deposition was
12    taken; and, further, that I am not a
      relative or employee of any attorney or
13    counsel employed by the parties hereto, or
      financially interested in the action.

14

15

16    LAURA REYNOLDS PRATT, RMR, CRR, CCR
      CCR No. 627

17

18

19

20

21

22

23

24

25

EXHIBIT _____ 28

PAGE _____ 434

# Errata Sheet

**Pg/Ln**                                **Correction**

___/___      Change from:_____
             Change to:_____

___/___      Change from:_____
             Change to:_____

___/___      Change from:_____
             Change to:_____

___/___      Change from:_____
             Change to:_____

___/___      Change from:_____
             Change to:_____

___/___      Change from:_____
             Change to:_____

___/___      Change from:_____
             Change to:_____

___/___      Change from:_____
             Change to:_____

___/___      Change from:_____
             Change to:_____

___/___      Change from:_____
             Change to:_____

___/___      Change from:_____
             Change to:_____

___/___      Change from:_____
             Change to:_____

___/___      Change from:_____
             Change to:_____

Signature:_____     Date:_____

EXHIBIT _____ 28

PAGE _____ 435



# ANNUAL REPORT 2006 – 2007

### "HELPING TODAY'S KIDS FILL TOMORROW'S PROMISE"

*"Because our students are our future, they must graduate able to deal with the complexities of a rapidly changing world.*

*The Springfield Public Schools community has shared with us a vision for Education that prepares students for better understanding and skill in technology. This year we will introduce a data warehouse and a Web-based assessment system that puts valuable information at the fingertips of all students and staff. These tools, combined with continued public input and support, will guide the district along the path of continuous improvement.*

*Contained in the following pages of this Annual Report is essential information to keep you informed and to guide us as we strive to improve student achievement and enhance our reputation as a regional, state and national leader in providing quality education for all children ."*

— NORMAN F. RIDDER, ED.D., SUPERINTENDENT OF SCHOOLS

---

Springfield Public Schools
Kraft Administrative Center
940 N. Jefferson Ave.
Springfield, MO 65802
Phone: 417-523-0000
http://www.springfieldpublicschoolsmo.org

This information is compiled as a report to the community on the
status and performance of Springfield Public Schools and its students.

EXHIBIT
Laura R. Pratt, RMR
Alpha Reporting Service
1/28/08

EXHIBIT _____ 28 _____

PAGE _____ 436 _____

# Springfield Public Schools
# Annual Report
# 2006-2007

## Our Mission

Springfield Public School District exists for the academic excellence of all students.

## Our Vision

Springfield Public School District shall be a national leader in academic and student development. In addition to the mastery of basic skills, students shall be engaged in challenging academic programs designed to allow students to reach their highest potential.

## About This Report

The Springfield Public School District is fully committed to open, two-way communication with staff, parents of our students, and all citizens who are concerned about education. Our continuing commitment to meet that goal is the reason for this, and previous annual reports.

In this report, you will find information about many aspects of school life, from the bricks and mortar of individual school buildings to the academic achievements and programs that help every student become productive.

This annual profile of our district has been produced every year since 1986 and was expanded in 1996 to meet state public reporting requirements for all school districts in Missouri. The report includes student enrollment numbers, attendance figures, and high school dropout rates. Also included are data about the amount of state and federal aid received by our district, the number of students who qualified for free and reduced lunches, and the length of the school day and year. In addition, tax information and statistics about teaching and administrative staff, average salaries earned, and percent with advanced degrees are also provided for individual school buildings within the district.

Additional state requirements in 2002 initiated the production of individual report cards for each school building in the district. In 2004, state law transferred the responsibility of publishing report cards to the state. With the change in law, the locally produced report cards became optional for districts. Springfield Public Schools chose to continue producing report cards, which contain much of the data published in the annual report, plus additional information. School report cards are available at each school building, at institutions such as public libraries, and are available on the Web at: http://www.springfieldpublicschoolsmo.org

2

EXHIBIT ___28___

PAGE ___437___

# Springfield Public Schools
# Annual Report Index
# 2006-2007

Introduction and Index ................................................................ 2-4

**Student Information**
Enrollment by Race and Ethnic Origin ......................................... 5-6
Mobility/Stability/Attendance ..................................................... 7-8
Dropout Data ............................................................................. 9
Graduation Rate ......................................................................... 10

**Staffing**
Staffing Ratios ......................................................................... 11-12
Years of Experience................................................................... 13-14
Degree Level ............................................................................. 13-14
Salaries.................................................................................... 13-14
District-State Comparisons......................................................... 15

**Student Achievement**
American College Test (ACT) Results .......................................... 16-19
Missouri Assessment Program (MAP) Results .............................. 20-21
   Information about Spring 2007 MAP Test................................. 20
   Links to MAP and Terra Nova Test Results ............................. 21

**Student Demographics**
Free/Reduced Lunches................................................................ 22-23
Family Setting ........................................................................... 22-23

**Parent-Teacher Conferences and Special Programs** ................... 24-25

**Graduate Follow-up**
Graduate Follow-up Survey 2002-2006........................................ 26
Job Placement for Students Completing Vocational Ed. Programs ....... 27

**Missouri School Improvement Plan (MSIP)**
Standards "Met" and "Not Met" .................................................. 28

**Adequate Yearly Progress (AYP)**
Elementary Schools ................................................................... .29-30
Middle and High Schools ............................................................ 31
District..................................................................................... 32

**Accountability Plan**
2006-2007 Accountability ........................................................... 33-35

EXHIBIT _28_

PAGE _458_

**Financial Data**

Average Per Pupil Expenditure ................................................. 36
Tax Rate ............................................................................. 36
Assessed Valuation ............................................................. 36
Operating Budget ............................................................... 36
Building Reports ................................................................. 37

**Additional Information**

Actual September Enrollment ........................................... 38-39
Enrollment Graph ............................................................... 40
Grade Distribution ............................................................. 41
Report of Disciplinary Actions ........................................ 42-43

4

EXHIBIT __28__

PAGE __439__

## ENROLLMENT BY RACE AND ETHNICITY
## SEPTEMBER 2006-2007

| School | Total Count | Black | % Black | White | % White | Hispanic/ Latino | % Hispanic/ Latino | Asian/ Pacific | % Asian/ Pacific | Native Am. Indian | % Native Am. Indian |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bingham | 392 | 27 | 6.9% | 340 | 86.7% | 19 | 4.8% | 2 | 0.5% | 4 | 1.0% |
| Bissett | 254 | 30 | 11.8% | 210 | 82.7% | 11 | 4.3% | 3 | 1.2% | 0 | 0.0% |
| Bowerman | 245 | 20 | 8.2% | 223 | 91.0% | 2 | 0.8% | 0 | 0.0% | 0 | 0.0% |
| Boyd | 165 | 24 | 14.5% | 130 | 78.8% | 10 | 6.1% | 0 | 0.0% | 1 | 0.6% |
| Campbell | 209 | 31 | 14.8% | 166 | 79.4% | 8 | 3.8% | 1 | 0.5% | 3 | 1.4% |
| Cowden | 247 | 19 | 7.7% | 207 | 83.8% | 11 | 4.5% | 6 | 2.4% | 4 | 1.6% |
| Delaware | 206 | 16 | 7.8% | 181 | 87.9% | 4 | 1.9% | 5 | 2.4% | 0 | 0.0% |
| Disney | 566 | 14 | 2.5% | 529 | 93.5% | 10 | 1.8% | 13 | 2.3% | 0 | 0.0% |
| Field | 344 | 5 | 1.5% | 329 | 95.6% | 3 | 0.9% | 6 | 1.7% | 1 | 0.3% |
| Fremont | 159 | 12 | 7.5% | 136 | 85.5% | 9 | 5.7% | 1 | 0.6% | 1 | 0.6% |
| Gray | 550 | 10 | 1.8% | 499 | 90.7% | 8 | 1.5% | 32 | 5.8% | 1 | 0.2% |
| Hickory Hills | 259 | 2 | 0.8% | 247 | 95.4% | 2 | 0.8% | 6 | 2.3% | 2 | 0.8% |
| Holland | 245 | 32 | 13.1% | 189 | 77.1% | 8 | 3.3% | 14 | 5.7% | 2 | 0.8% |
| Jeffries | 510 | 39 | 7.6% | 451 | 88.4% | 8 | 1.6% | 10 | 2.0% | 2 | 0.4% |
| Mann | 421 | 18 | 4.3% | 367 | 87.2% | 13 | 3.1% | 22 | 5.2% | 1 | 0.2% |
| McBride | 614 | 12 | 2.0% | 569 | 92.7% | 11 | 1.8% | 19 | 3.1% | 3 | 0.5% |
| McGregor | 304 | 31 | 10.2% | 177 | 58.2% | 60 | 19.7% | 35 | 11.5% | 1 | 0.3% |
| Pershing | 163 | 10 | 6.1% | 145 | 89.0% | 0 | 0.0% | 8 | 4.9% | 0 | 0.0% |
| Pittman | 297 | 16 | 5.4% | 268 | 90.2% | 11 | 3.7% | 1 | 0.3% | 1 | 0.3% |
| Pl. View | 244 | 12 | 4.9% | 224 | 91.8% | 4 | 1.6% | 4 | 1.6% | 0 | 0.0% |
| Portland | 223 | 14 | 6.3% | 195 | 87.4% | 11 | 4.9% | 2 | 0.9% | 1 | 0.4% |
| Robberson | 266 | 48 | 18.0% | 203 | 76.3% | 15 | 5.6% | 0 | 0.0% | 0 | 0.0% |
| Rountree | 252 | 16 | 6.3% | 221 | 87.7% | 9 | 3.6% | 4 | 1.6% | 2 | 0.8% |
| Sequiota | 376 | 14 | 3.7% | 342 | 91.0% | 3 | 0.8% | 14 | 3.7% | 3 | 0.8% |
| Sherwood | 298 | 8 | 2.7% | 273 | 91.6% | 10 | 3.4% | 5 | 1.7% | 2 | 0.7% |
| Sunshine | 193 | 20 | 10.4% | 160 | 82.9% | 11 | 5.7% | 1 | 0.5% | 1 | 0.5% |
| Truman | 327 | 11 | 3.4% | 304 | 93.0% | 7 | 2.1% | 3 | 0.9% | 2 | 0.6% |
| Twain | 481 | 31 | 6.4% | 415 | 86.3% | 14 | 2.9% | 17 | 3.5% | 4 | 0.8% |
| Watkins | 268 | 29 | 10.8% | 234 | 87.3% | 4 | 1.5% | 0 | 0.0% | 1 | 0.4% |
| Weaver | 291 | 44 | 15.1% | 235 | 80.8% | 8 | 2.7% | 4 | 1.4% | 0 | 0.0% |
| Weller | 318 | 57 | 17.9% | 229 | 72.0% | 25 | 7.9% | 4 | 1.3% | 3 | 0.9% |
| Westport | 461 | 45 | 9.8% | 385 | 83.5% | 18 | 3.9% | 7 | 1.5% | 6 | 1.3% |
| Wilder | 362 | 11 | 3.0% | 340 | 93.9% | 2 | 0.6% | 7 | 1.9% | 2 | 0.6% |
| Williams | 292 | 45 | 15.4% | 240 | 82.2% | 2 | 0.7% | 2 | 0.7% | 3 | 1.0% |
| Wilson's Creek (5th) | 235 | 7 | 3.0% | 218 | 92.8% | 4 | 1.7% | 6 | 2.6% | 0 | 0.0% |
| York | 194 | 9 | 4.6% | 177 | 91.2% | 7 | 3.6% | 0 | 0.0% | 1 | 0.5% |
| Elem. Totals | 11,231 | 789 | 7.0% | 9,758 | 86.9% | 362 | 3.2% | 264 | 2.4% | 58 | 0.5% |

5

EXHIBIT 28

PAGE 440

## ENROLLMENT BY RACE AND ETHNICITY
### SEPTEMBER 2006-2007

| Middle School | Total Count | Black | % Black | White | % White | Hispanic/ Latino | % Hispanic/ Latino | Asian/ Pacific | % Asian/ Pacific | Native Am. Indian | % Native Am. Indian |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Carver | 711 | 43 | 6.0% | 630 | 88.6% | 22 | 3.1% | 15 | 2.1% | 1 | 0.1% |
| Central MYSP | 119 | 3 | 2.5% | 107 | 89.9% | 0 | 0.0% | 9 | 7.6% | 0 | 0.0% |
| Cherokee | 721 | 17 | 2.4% | 666 | 92.4% | 13 | 1.8% | 23 | 3.2% | 2 | 0.3% |
| Hickory Hills | 470 | 24 | 5.1% | 399 | 84.9% | 27 | 5.7% | 17 | 3.6% | 3 | 0.6% |
| Jarrett | 572 | 59 | 10.3% | 477 | 83.4% | 18 | 3.1% | 14 | 2.4% | 4 | 0.7% |
| Pershing | 783 | 22 | 2.8% | 721 | 92.1% | 16 | 2.0% | 22 | 2.8% | 2 | 0.3% |
| Pipkin | 531 | 91 | 17.1% | 409 | 77.0% | 26 | 4.9% | 3 | 0.6% | 2 | 0.4% |
| Pleasant View | 367 | 21 | 5.7% | 327 | 89.1% | 14 | 3.8% | 2 | 0.5% | 3 | 0.8% |
| Reed | 547 | 67 | 12.2% | 451 | 82.4% | 15 | 2.7% | 5 | 0.9% | 9 | 1.6% |
| Study | 404 | 33 | 8.2% | 342 | 84.7% | 21 | 5.2% | 5 | 1.2% | 3 | 0.7% |
| Wilson's Creek (6th) | 231 | 4 | 1.7% | 206 | 89.2% | 5 | 2.2% | 15 | 6.5% | 1 | 0.4% |
| MS totals | 5,456 | 384 | 7.0% | 4,735 | 86.8% | 177 | 3.2% | 130 | 2.4% | 30 | 0.5% |

| High School | Total Count | Black | % Black | White | % White | Hispanic/ Latino | % Hispanic/ Latino | Asian/ Pacific | % Asian/ Pacific | Native Am. Indian | % Native Am. Indian |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Central | 1,429 | 166 | 11.6% | 1,116 | 78.1% | 75 | 5.2% | 54 | 3.8% | 18 | 1.3% |
| Glendale | 1,537 | 48 | 3.1% | 1,423 | 92.6% | 29 | 1.9% | 34 | 2.2% | 3 | 0.2% |
| Hillcrest | 1,264 | 74 | 5.9% | 1,125 | 89.0% | 37 | 2.9% | 13 | 1.0% | 15 | 1.2% |
| Kickapoo | 1,766 | 35 | 2.0% | 1,642 | 93.0% | 21 | 1.2% | 63 | 3.6% | 5 | 0.3% |
| Parkview | 1,574 | 122 | 7.8% | 1,371 | 87.1% | 53 | 3.4% | 22 | 1.4% | 6 | 0.4% |
| HS Totals | 7,570 | 445 | 5.9% | 6,677 | 88.2% | 215 | 2.5% | 186 | 2.5% | 47 | 0.6% |
| DISTRICT | 24,257 | 1,618 | 6.7% | 21,170 | 87.3% | 754 | 2.4% | 580 | 2.4% | 135 | 0.6% |

EXHIBIT _____ 28 _____

PAGE _____ 441 _____

**MOBILITY / STABILITY/ ATTENDANCE REPORT**
**August 28, 2006 – June 7, 2007**

| Elementary School | September Enrollment | Transfers In | Transfers Out | Stable Enrollment | Mobility* Factor | Stability** Factor | Actual % of Attendance |
|---|---|---|---|---|---|---|---|
| Bingham | 392 | 156 | 186 | 316 | 87.2% | 80.6% | 93.99% |
| Bissett | 254 | 129 | 99 | 212 | 89.8% | 83.5% | 94.61% |
| Bowerman | 245 | 148 | 144 | 194 | 119.2% | 79.2% | 93.54% |
| Boyd | 165 | 109 | 106 | 125 | 130.3% | 75.8% | 94.03% |
| Campbell | 209 | 133 | 153 | 160 | 136.8% | 76.6% | 94.45% |
| Cowden | 247 | 93 | 74 | 226 | 67.6% | 91.5% | 94.74% |
| Delaware | 206 | 68 | 72 | 192 | 68.0% | 93.2% | 93.39% |
| Disney | 566 | 118 | 120 | 521 | 42.0% | 92.0% | 96.05% |
| Field | 344 | 108 | 78 | 304 | 54.1% | 88.4% | 95.31% |
| Fremont | 159 | 41 | 73 | 129 | 71.7% | 81.1% | 95.32% |
| Gray | 550 | 108 | 111 | 502 | 39.8% | 91.3% | 96.44% |
| Hickory Hills | 259 | 74 | 76 | 247 | 57.9% | 95.4% | 96.10% |
| Holland | 245 | 64 | 74 | 219 | 56.3% | 89.4% | 94.71% |
| Jeffries | 510 | 171 | 213 | 423 | 75.3% | 82.9% | 95.02% |
| Mann | 421 | 95 | 136 | 357 | 54.9% | 84.8% | 95.23% |
| McBride | 614 | 112 | 86 | 576 | 32.2% | 93.8% | 96.21% |
| McGregor | 304 | 196 | 230 | 227 | 140.1% | 74.7% | 94.48% |
| Pershing | 163 | 63 | 59 | 142 | 74.8% | 87.1% | 95.77% |
| Pittman | 297 | 101 | 94 | 264 | 65.7% | 88.9% | 94.43% |
| Pleasant View | 244 | 46 | 57 | 225 | 42.2% | 92.2% | 96.49% |
| Portland | 223 | 109 | 113 | 182 | 99.6% | 81.6% | 94.20% |
| Robberson | 266 | 135 | 134 | 214 | 101.1% | 80.5% | 94.16% |
| Rountree | 252 | 140 | 123 | 204 | 104.4% | 81.0% | 94.45% |
| Sequiota | 376 | 74 | 54 | 361 | 34.0% | 96.0% | 96.30% |
| Sherwood | 298 | 128 | 103 | 255 | 77.5% | 85.6% | 96.00% |
| Sunshine | 193 | 67 | 73 | 161 | 72.5% | 83.4% | 94.25% |
| Truman | 327 | 61 | 93 | 287 | 47.1% | 87.8% | 95.59% |
| Twain | 481 | 144 | 163 | 413 | 63.8% | 85.9% | 95.67% |
| Watkins | 268 | 135 | 160 | 206 | 110.1% | 76.9% | 94.71% |
| Weaver | 291 | 141 | 150 | 214 | 100.0% | 73.5% | 94.70% |
| Weller | 318 | 184 | 194 | 234 | 118.9% | 73.6% | 94.77% |
| Westport | 461 | 201 | 242 | 370 | 96.1% | 80.3% | 93.82% |
| Wilder | 362 | 70 | 92 | 330 | 44.8% | 91.2% | 95.48% |
| Williams | 292 | 193 | 227 | 215 | 143.8% | 73.6% | 93.33% |
| York | 194 | 108 | 123 | 153 | 119.1% | 78.9% | 93.95% |
| **Elementary Totals** | **10,996** | **4,023** | **4,285** | **9,360** | **75.6%** | **85.1%** | **95.05%** |

*Mobility = sum of transfers in plus transfers out divided by September enrollment.
**Stability = number of students enrolled all year, divided by September enrollment.

7

EXHIBIT _____28_____

PAGE _____442_____

## MOBILITY / STABILITY / ATTENDANCE REPORT
### August 28, 2006 – June 7, 2007

| Middle School | September Enrollment | Transfers In | Transfers Out | Stable Enrollment | Mobility* Factor | Stability** Factor | Actual % of Attendance |
|---|---|---|---|---|---|---|---|
| Carver | 711 | 145 | 139 | 643 | 39.9% | 90.4% | 95.26% |
| Cherokee | 721 | 97 | 68 | 692 | 22.9% | 96.0% | 95.37% |
| Hickory Hills | 470 | 112 | 129 | 413 | 51.3% | 87.9% | 93.66% |
| Jarrett | 572 | 146 | 179 | 496 | 56.8% | 86.7% | 94.51% |
| Pershing | 783 | 136 | 116 | 728 | 32.2% | 93.0% | 95.49% |
| Pipkin | 531 | 249 | 256 | 415 | 95.1% | 78.2% | 91.85% |
| Pleasant View | 367 | 47 | 51 | 336 | 26.7% | 91.6% | 95.34% |
| Reed | 547 | 199 | 221 | 454 | 76.8% | 83.0% | 92.18% |
| Study | 404 | 21 | 226 | 317 | 108.2% | 78.5% | 93.34% |
| Wilson's Creek | 466 | 88 | 76 | 437 | 35.2% | 93.8% | 96.03% |
| **Middle School Totals** | **5,572** | **1,430** | **1,461** | **4,931** | **51.9%** | **88.5%** | **94.41%** |

| Senior High | September Enrollment | Transfers In | Transfers Out | Stable Enrollment | Mobility* Factor | Stability** Factor | Actual % of Attendance |
|---|---|---|---|---|---|---|---|
| Central | 1,548 | 577 | 569 | 1,223 | 74.0% | 79.0% | 91.01% |
| Glendale | 1,537 | 362 | 319 | 1,368 | 44.3% | 89.0% | 92.85% |
| Hillcrest | 1,264 | 487 | 439 | 1,035 | 73.3% | 81.9% | 90.12% |
| Kickapoo | 1,766 | 442 | 421 | 1,577 | 48.9% | 89.3% | 92.62% |
| Parkview | 1,574 | 656 | 621 | 1,228 | 81.1% | 78.0% | 90.62% |
| **High School Totals** | **7,689** | **2,524** | **2,369** | **6,431** | **63.6%** | **83.6%** | **91.55%** |
| **District Totals** | **24,257** | **7,977** | **8,115** | **20,722** | **66.3%** | **85.4%** | **93.85%** |

*Mobility = sum of transfers in plus transfers out divided by September enrollment.
**Stability = number of students enrolled all year, divided by September enrollment.

8

EXHIBIT ___28___

PAGE ___443___

## REPORT OF STUDENT DROPOUTS
## FOR 2006-2007 SCHOOL YEAR

| School | Gender | | Ethnic Origin | | | | | Grade | | | | Total # of Dropouts |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Male | Female | White | Black | Hispanic | Asian/Pacific | Am. Ind./Alaskan | 9 | 10 | 11 | 12 | |
| Central | 60 | 57 | 94 | 12 | 7 | 3 | 1 | 34 | 35 | 29 | 19 | 117 |
| Glendale | 25 | 22 | 41 | 3 | 2 | 0 | 1 | 9 | 14 | 11 | 13 | 47 |
| Hillcrest | 51 | 36 | 76 | 4 | 7 | 0 | 0 | 32 | 20 | 17 | 18 | 87 |
| Kickapoo | 23 | 25 | 42 | 2 | 1 | 1 | 2 | 7 | 14 | 13 | 14 | 48 |
| Parkview | 72 | 56 | 106 | 12 | 4 | 6 | 0 | 14 | 42 | 37 | 35 | 128 |
| TOTALS | 231 | 196 | 359 | 33 | 21 | 10 | 4 | 96 | 125 | 107 | 99 | 427 |

### BY PERCENTAGE OF STUDENT POPULATION

| School | Gender | | Ethnic Origin | | | | | Grade | | | | Total % of Dropouts |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Male | Female | White | Black | Hispanic | Asian/Pacific | Am Ind/Alaskan | 9 | 10 | 11 | 12 | |
| Central | 4.37 | 4.15 | 6.84 | 0.87 | 0.51 | 0.22 | 0.07 | 2.47 | 2.55 | 2.11 | 1.38 | 8.52 |
| Glendale | 1.63 | 1.43 | 2.67 | 0.20 | 0.13 | 0.00 | 0.07 | 0.59 | 0.91 | 0.72 | 0.85 | 3.06 |
| Hillcrest | 4.10 | 2.89 | 6.11 | 0.32 | 0.56 | 0.00 | 0.00 | 2.57 | 1.61 | 1.37 | 1.45 | 6.99 |
| Kickapoo | 1.31 | 1.43 | 2.40 | 0.11 | 0.06 | 0.06 | 0.11 | 0.40 | 0.80 | 0.74 | 0.80 | 2.74 |
| Parkview | 4.71 | 3.67 | 6.94 | 0.79 | 0.26 | 0.39 | 0.00 | 0.92 | 2.75 | 2.42 | 2.29 | 8.38 |
| TOTALS | 3.11 | 2.64 | 4.83 | 0.44 | 0.28 | 0.13 | 0.05 | 1.29 | 1.68 | 1.44 | 1.33 | 5.74 |

High school dropout rate = Number of dropouts/((September FTE enrollment + Transfers in – Transfers out - Dropouts + Total September enrollment)/2)

EXHIBIT _28_

PAGE _444_

### SPRINGFIELD PUBLIC SCHOOLS
### GRADUATING CLASS OF 2006
### STUDENT GRADUATION PERCENTAGE*

| | Dropouts | | | | Total | 2006 | Graduation |
| HIGH SCHOOL | 9th 02-03 | 10th 03-04 | 11th 04-05 | 12th 05-06 | Dropouts | Graduates | Rate |
|---|---|---|---|---|---|---|---|
| Bailey | 2 | n/a | n/a | n/a | 2 | n/a | n/a |
| Central | 8 | 28 | 35 | 46 | 117 | 233 | 66.6% |
| Glendale | 5 | 9 | 21 | 36 | 71 | 344 | 82.9% |
| Hillcrest | 16 | 16 | 37 | 17 | 86 | 243 | 73.9% |
| Kickapoo | 0 | 8 | 17 | 17 | 42 | 451 | 91.5% |
| Parkview | 6 | 15 | 19 | 59 | 99 | 284 | 74.2% |
| TOTAL | 37 | 76 | 129 | 175 | 417 | 1,555 | 78.9% |

### GRADUATING CLASS OF 2007
### STUDENT GRADUATION PERCENTAGE*

| | Dropouts | | | | Total | 2007 | Graduation |
| HIGH SCHOOL | 9th 03-04 | 10th 04-05 | 11th 05-06 | 12th 06-07 | Dropouts | Graduates | Rate |
|---|---|---|---|---|---|---|---|
| Central | 7 | 32 | 35 | 19 | 93 | 246 | 72.6% |
| Glendale | 4 | 19 | 20 | 13 | 56 | 344 | 86.0% |
| Hillcrest | 17 | 28 | 21 | 18 | 84 | 255 | 75.2% |
| Kickapoo | 2 | 13 | 14 | 14 | 43 | 423 | 90.8% |
| Parkview | 1 | 16 | 58 | 35 | 110 | 295 | 72.8% |
| TOTAL | 31 | 108 | 148 | 99 | 386 | 1,563 | 80.2% |

*Graduation Rate: (Graduates / (9-12 Cohort Dropouts + Graduates)) x 100

10

EXHIBIT ___28___

PAGE ___445___

## STAFFING RATIOS
## 2006-2007

| Elementary School | September Core Data Enrollment | Students to Administrators | Students to All Teachers | Students to Classroom Teachers* |
|---|---|---|---|---|
| Bingham | 392 | 392 | 16 | 22 |
| Bissett | 254 | 254 | 13 | 20 |
| Bowerman | 245 | 245 | 13 | 22 |
| Boyd | 165 | 165 | 12 | 18 |
| Campbell | 209 | 209 | 13 | 19 |
| Cowden | 247 | 247 | 12 | 23 |
| Delaware | 206 | 206 | 9 | 21 |
| Disney | 566 | 377 | 19 | 21 |
| Field | 344 | 344 | 17 | 20 |
| Fremont | 159 | 159 | 11 | 18 |
| Gray | 550 | 367 | 19 | 21 |
| Hickory Hills | 259 | 345 | 18 | 19 |
| Holland | 245 | 245 | 12 | 20 |
| Jeffries | 510 | 340 | 17 | 23 |
| Mann | 421 | 421 | 15 | 20 |
| McBride | 614 | 409 | 21 | 22 |
| McGregor | 304 | 304 | 10 | 15 |
| Pershing | 163 | 326 | 15 | 24 |
| Pittman | 297 | 297 | 13 | 22 |
| Pleasant View | 244 | 325 | 17 | 19 |
| Portland | 223 | 223 | 14 | 21 |
| Robberson | 266 | 266 | 13 | 20 |
| Rountree | 252 | 252 | 17 | 19 |
| Sequiota | 376 | 376 | 18 | 22 |
| Sherwood | 298 | 298 | 17 | 19 |
| Sunshine | 193 | 193 | 15 | 18 |
| Truman | 327 | 327 | 17 | 23 |
| Twain | 481 | 481 | 16 | 20 |
| Watkins | 268 | 268 | 14 | 21 |
| Weaver | 291 | 291 | 15 | 22 |
| Weller | 318 | 318 | 14 | 20 |
| Westport | 461 | 461 | 13 | 24 |
| Wilder | 362 | 362 | 17 | 21 |
| Williams | 292 | 292 | 13 | 19 |
| York | 194 | 194 | 11 | 21 |
| **Elementary Totals** | **10,996** | **n/a** | **n/a** | **n/a** |

*All teachers, excluding special education, remedial reading, Title I, and career-technical education teachers

EXHIBIT ___28___

PAGE ___446___

# STAFFING RATIOS
## 2006-2007

| Middle School | September Core Data Enrollment | Students to Administrators | Students to All Teachers | Students to Classroom Teachers* |
|---|---|---|---|---|
| Carver | 711 | 356 | 16 | 20 |
| Cherokee | 721 | 361 | 18 | 21 |
| Hickory Hills | 470 | 376 | 18 | 21 |
| Jarrett | 572 | 286 | 17 | 19 |
| Pershing | 783 | 522 | 19 | 22 |
| Pipkin | 531 | 266 | 11 | 16 |
| Pleasant View | 367 | 294 | 17 | 20 |
| Reed | 547 | 274 | 13 | 20 |
| Study | 404 | 202 | 13 | 21 |
| Wilson's Creek | 466 | 233 | 19 | 22 |
| Middle School Totals | 5,572 | n/a | n/a | n/a |

| High School | September Core Data Enrollment | Students to Administrators | Students to All Teachers | Students to Classroom Teachers* |
|---|---|---|---|---|
| Central | 1,548 | 387 | 17 | 26 |
| Glendale | 1,537 | 384 | 20 | 26 |
| Hillcrest | 1,264 | 316 | 19 | 26 |
| Kickapoo | 1,766 | 442 | 19 | 25 |
| Parkview | 1,574 | 394 | 19 | 24 |
| High School Totals | 7,689 | n/a | n/a | n/a |
| Springfield District Totals | 24,257 | 255 | 15 | 21 |

*All teachers, excluding special education, remedial reading, Title I, and career-technical education teachers.

12

EXHIBIT ___28___

PAGE ___447___

## STAFF INFORMATION 2006-2007

| Elementary School | % of Faculty With Master's Degree or Above | Average Teacher Salary for Regular Term | Average Total* Teacher Salary | Average Administrator Salary | Average Years of Experience |
|---|---|---|---|---|---|
| Bingham | 59.6% | $40,759 | $40,780 | ** | 14.6 |
| Bissett | 46.6% | $38,342 | $38,679 | ** | 9.9 |
| Bowerman | 65.1% | $38,865 | $39,025 | ** | 10.6 |
| Boyd | 77.2% | $39,985 | $40,310 | ** | 11.3 |
| Campbell | 68.9% | $41,014 | $41,405 | ** | 14.1 |
| Cowden | 62.4% | $41,275 | $41,371 | ** | 17.2 |
| Delaware | 56.4% | $38,134 | $38,134 | ** | 10.4 |
| Disney | 79.7% | $44,555 | $44,555 | ** | 18.6 |
| Field | 65.6% | $40,929 | $40,937 | ** | 13.7 |
| Fremont | 52.7% | $38,123 | $38,340 | ** | 9.9 |
| Gray | 62.9% | $42,270 | $42,387 | ** | 15.2 |
| Hickory Hills | 56.8% | $40,912 | $40,912 | ** | 16.5 |
| Holland | 76.4% | $39,102 | $39,596 | ** | 8.9 |
| Jeffries | 68.5% | $41,989 | $41,998 | ** | 17.6 |
| Mann | 63.9% | $39,332 | $39,486 | ** | 11.7 |
| McBride | 42.2% | $38,212 | $38,324 | ** | 11.4 |
| McGregor | 46.6% | $36,867 | $37,132 | ** | 9.4 |
| Pershing | 63.1% | $41,701 | $41,737 | ** | 17.0 |
| Pittman | 77.7% | $42,186 | $42,269 | ** | 14.5 |
| Pleasant View | 68.1% | $43,028 | $43,591 | ** | 20.1 |
| Portland | 65.8% | $39,746 | $40,022 | ** | 11.0 |
| Robberson | 55.1% | $39,275 | $39,425 | ** | 12.8 |
| Rountree | 49.8% | $40,295 | $40,306 | ** | 14.1 |
| Sequiota | 56.1% | $39,352 | $39,361 | ** | 12.0 |
| Sherwood | 65.1% | $41,304 | $41,304 | ** | 13.9 |
| Sunshine | 67.9% | $41,169 | $41,169 | ** | 13.8 |
| Truman | 67.8% | $43,111 | $43,563 | ** | 15.7 |
| Twain | 59.5% | $40,162 | $40,162 | ** | 14.0 |
| Watkins | 65.6% | $41,661 | $42,137 | ** | 15.0 |
| Weaver | 41.6% | $37,127 | $37,316 | ** | 9.7 |
| Weller | 50.1% | $38,417 | $38,760 | ** | 11.9 |
| Westport | 47.5% | $39,835 | $39,916 | ** | 14.5 |
| Wilder | 60.2% | $42,401 | $42,421 | ** | 17.2 |
| Williams | 55.3% | $39,031 | $39,163 | ** | 11.8 |
| York | 44.8% | $37,741 | $37,916 | ** | 10.9 |

*Includes extended-contract salary and extra-duty pay.
**Data not reported if identifiable to an individual.

EXHIBIT 28

PAGE 448

### STAFF INFORMATION 2006-2007

| Middle School | % of Faculty With Master's Degree or Above | Average Teacher Salary for Regular Term | Average Total* Teacher Salary | Average Administrator Salary | Average Years of Experience |
|---|---|---|---|---|---|
| Carver | 55.9% | $41,643 | $43,275 | ** | 13.6 |
| Cherokee | 63.0% | $41,049 | $42,091 | ** | 13.5 |
| Hickory Hills | 57.8% | $39,591 | $40,823 | ** | 11.7 |
| Jarrett | 51.7% | $40,263 | $41,437 | ** | 13.3 |
| Pershing | 72.0% | $44,116 | $45,209 | ** | 15.3 |
| Pipkin | 66.2% | $37,797 | $38,368 | ** | 8.9 |
| Pleasant View | 67.6% | $45,251 | $47,447 | ** | 16.3 |
| Reed | 50.5% | $38,614 | $39,715 | ** | 10.4 |
| Study | 75.2% | $40,768 | $42,217 | ** | 11.2 |
| Wilson's Creek | 51.1% | $38,666 | $39,267 | ** | 10.7 |

| High School | % of Faculty With Master's Degree or Above | Average Teacher Salary for Regular Term | Average Total* Teacher Salary | Average Administrator Salary | Average Years of Experience |
|---|---|---|---|---|---|
| Bailey | 73.0% | $44,392 | $47,170 | ** | 19.7 |
| Central | 65.8% | $43,196 | $45,851 | $76,550 | 13.7 |
| Glendale | 76.0% | $42,865 | $45,458 | $78,069 | 12.3 |
| Hillcrest | 57.0% | $41,870 | $44,187 | $66,320 | 12.9 |
| Juvenile Justice Center | 26.3% | $35,935 | $35,935 | n/a | 13.4 |
| Kickapoo | 77.0% | $43,189 | $45,256 | $70,209 | 13.6 |
| Parkview | 55.8% | $40,924 | $43,291 | $71,321 | 12.6 |
| Springfield District | 62.3% | $40,985 | $41,980 | $73,902 | 13.2 |

*Includes extended-contract salary and extra-duty pay.
**Data not reported if identifiable to an individual.

EXHIBIT ___28___

PAGE ___449___

## STAFF INFORMATION
## 2006-2007
### DISTRICT – STATE COMPARISONS

|  | District | State |
|---|---|---|
| Average Teacher Salary for a Regular Term | $40,985 | $41,750 |
| Average Total Teacher Salary[1] | $41,980 | $43,524 |
| Average Salary of all Administrators | $73,902 | $77,644 |
| Average Years of Experience of Professional Staff | 13.2 | 12.6 |
| Percent of Faculty with Master's Degree or Higher | 62.3% | 50.6% |
| Percent of all District Teachers with Regular Certification[2] | 98.7% | 97.0% |
| Percent of All District Teachers with Temporary or Special Assignment Certification | 1.1% | 1.9% |
| Percent of all District Teachers with Substitute or No Certificate | 0.2% | 1.0% |
| Percent of Classes Taught by Highly Qualified Teachers[3] | 99.1% | 96.8% |

---

[1] Includes extended-contract and extra-duty pay.

[2] Missouri Life Certificate, PC I, PC II, Continuous Professional Certificate (CPC), or Provisional Certificate, as defined by the State of Missouri.

[3] A highly qualified teacher is an individual who: 1) has at least a Bachelor's Degree; 2) has demonstrated content expertise by passing a state-approved test or has completed an academic major or coursework equivalent to a major; and 3) who holds full certification for his or her current teaching assignment.

15

EXHIBIT __28__

PAGE __450__

## AVERAGE ACT SCORES FOR ALL GRADUATES
## GRADUATING CLASSES OF 1997-1998 to 2006-2007

| Springfield District | | | | | | |
|---|---|---|---|---|---|---|
| | Number | English | Mathematics | Reading | Sci. Reasoning | Composite |
| 1997-1998 | 896 | 21.9 | 21.4 | 22.8 | 22.1 | 22.2 |
| 1998-1999 | 962 | 22.3 | 21.3 | 22.8 | 22.2 | 22.3 |
| 1999-2000 | 977 | 23.1 | 21.5 | 23.4 | 22.7 | 22.8 |
| 2000-2001 | 950 | 21.9 | 21.3 | 23.0 | 22.6 | 22.3 |
| 2001-2002 | 901 | 22.4 | 21.4 | 23.2 | 22.4 | 22.5 |
| 2002-2003 | 953 | 22.1 | 21.3 | 22.9 | 22.2 | 22.3 |
| 2003-2004 | 955 | 22.6 | 21.5 | 23.3 | 22.4 | 22.6 |
| 2004-2005 | 909 | 22.5 | 21.7 | 23.0 | 22.4 | 22.5 |
| 2005-2006 | 924 | 22.6 | 21.7 | 23.2 | 22.4 | 22.6 |
| 2006-2007 | 954 | 22.7 | 21.7 | 23.1 | 22.2 | 22.6 |
| State of Missouri | | | | | | |
| | Number | English | Mathematics | Reading | Sci. Reasoning | Composite |
| 1997-1998 | 38,633 | 21.1 | 21.0 | 21.9 | 21.6 | 21.5 |
| 1998-1999 | 39,663 | 21.3 | 20.9 | 22.0 | 21.5 | 21.5 |
| 1999-2000 | 40,997 | 21.3 | 21.0 | 22.1 | 21.6 | 21.6 |
| 2000-2001 | 42,678 | 21.1 | 20.8 | 21.8 | 21.5 | 21.4 |
| 2001-2002 | 41,316 | 21.1 | 20.9 | 21.9 | 21.5 | 21.5 |
| 2002-2003 | 42,840 | 21.2 | 20.7 | 21.9 | 21.4 | 21.4 |
| 2003-2004 | 42,862 | 21.4 | 20.9 | 22.0 | 21.4 | 21.5 |
| 2004-2005 | 42,705 | 21.4 | 20.9 | 21.9 | 21.5 | 21.6 |
| 2005-2006 | 42,885 | 21.5 | 21.0 | 22.0 | 21.5 | 21.6 |
| 2006-2007 | 45,354 | 21.5 | 21.0 | 22.1 | 21.5 | 21.6 |
| National | | | | | | |
| | Number | English | Mathematics | Reading | Sci. Reasoning | Composite |
| 1997-1998 | 995,039 | 20.4 | 20.8 | 21.4 | 21.1 | 21.0 |
| 1998-1999 | 1,019,053 | 20.5 | 20.7 | 21.4 | 21.0 | 21.0 |
| 1999-2000 | 1,065,138 | 20.5 | 20.7 | 21.4 | 21.0 | 21.0 |
| 2000-2001 | 1,069,772 | 20.5 | 20.7 | 21.3 | 21.0 | 21.0 |
| 2001-2002 | 1,116,082 | 20.2 | 20.6 | 21.1 | 20.8 | 20.8 |
| 2002-2003 | 1,175,059 | 20.3 | 20.6 | 21.2 | 20.8 | 20.8 |
| 2003-2004 | 1,171,460 | 20.4 | 20.7 | 21.3 | 20.9 | 20.9 |
| 2004-2005 | 1,186,251 | 20.4 | 20.7 | 21.3 | 20.9 | 20.9 |
| 2005-2006 | 1,206,455 | 20.6 | 20.8 | 21.4 | 20.9 | 21.1 |
| 2006-2007 | 1,300,599 | 20.7 | 21.0 | 21.5 | 21.0 | 21.2 |

EXHIBIT _____ 28 _____

PAGE _____ 451 _____



2007 ACT Score Comparisons

17

EXHIBIT ___28___

PAGE ___452___

## SPRINGFIELD PUBLIC SCHOOLS ACT SCORES
### 2002-2007 SIX-YEAR COMPARATIVE ANALYSIS

**Springfield**

| Year | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|
| Number of Graduates | 1,464 | 1,633 | 1,621 | 1,493 | 1,555 | 1,563 |
| Number of Graduates scoring at or above the National Average | 604 | 621 | 632 | 606 | 615 | 629 |
| Percent of Graduates scoring at or above the National Average (%) | 41.3% | 38.0% | 39.0% | 40.6% | 39.5% | 40.2% |

**Missouri**

| Year | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|
| Number of Graduates | 54,513 | 56,906 | 57,988 | 57,824 | 58,418 | 60,802 |
| Number of Graduates scoring at or above the National Average | 18,742 | 18,907 | 19,192 | 19,506 | 19,660 | 20,887 |
| Percent of Graduates scoring at or above the National Average (%) | 34.4% | 33.2% | 33.1% | 33.7% | 33.7% | 34.4% |

**Central**

| Year | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|
| Percent of Graduates scoring at or above the National Average (%) | 18.9% | 20.4% | 25.2% | 28.9% | 33.0% | 32.9% |

**Glendale**

| Year | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|
| Percent of Graduates scoring at or above the National Average (%) | 52.3% | 50.5% | 53.3% | 53.2% | 55.2% | 52.9% |

**Hillcrest**

| Year | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|
| Percent of Graduates scoring at or above the National Average (%) | 29.1% | 28.1% | 29.1% | 25.9% | 29.2% | 32.9% |

**Kickapoo**

| Year | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|
| Percent of Graduates scoring at or above the National Average (%) | 54.4% | 50.7% | 46.8% | 55.2% | 43.5% | 47.3% |

**Parkview**

| Year | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|
| Percent of Graduates scoring at or above the National Average (%) | 34.9% | 29.9% | 31.0% | 27.7% | 28.5% | 27.5% |

18

EXHIBIT ___28___

PAGE ___453___

## ACT TEST INFORMATION

| 2003-2004 | Central | Glendale | Hillcrest | Kickapoo | Parkview | District | State | National |
|---|---|---|---|---|---|---|---|---|
| % of Graduates Taking ACT | 38.9% | 73.2% | 52.1% | 70.2% | 47.7% | 58.9% | 70.0% | 39.6% |
| ACT Composite Score | 23.5 | 23.2 | 21.3 | 22.5 | 22.4 | 22.6 | 21.5 | 20.8 |

| 2004-2005 | Central | Glendale | Hillcrest | Kickapoo | Parkview | District | State | National |
|---|---|---|---|---|---|---|---|---|
| % of Graduates Taking ACT | 43.1% | 72.9% | 46.9% | 74.6% | 53.0% | 60.9% | 70.0% | 39.8% |
| ACT Composite Score | 24.0 | 23.2 | 21.4 | 22.8 | 20.9 | 22.5 | 21.6 | 20.9 |

| 2005-2006 | Central | Glendale | Hillcrest | Kickapoo | Parkview | District | State | National |
|---|---|---|---|---|---|---|---|---|
| % of Graduates Taking ACT | 44.2% | 76.5% | 48.6% | 67.4% | 47.9% | 59.4% | 70.0% | 40.0% |
| ACT Composite Score | 23.8 | 23.0 | 21.6 | 22.7 | 21.6 | 22.6 | 21.6 | 21.1 |

| 2006-2007 | Central | Glendale | Hillcrest | Kickapoo | Parkview | District | State | National |
|---|---|---|---|---|---|---|---|---|
| % of Graduates Taking ACT | 51.2% | 73.0% | 49.8% | 71.2% | 49.5% | 61.0% | 70.0% | 42.0% |
| ACT Composite Score | 23.3 | 23.0 | 22.0 | 22.7 | 21.3 | 22.6 | 21.6 | 21.2 |

19

EXHIBIT _____28_____

PAGE _____454_____

# INFORMATION ABOUT THE
# MISSOURI ASSESSMENT PROGRAM (MAP) TEST

Two major changes in the 2005-2006 school year make it a benchmark year for MAP testing. First, more grades levels were required to take the test in 2006 than in previous years. The table below shows the testing requirement changes:

| Required Testing Prior to Spring 2006 | Required Testing Spring 2006 and 2007 |
|---|---|
| 3rd grade Communication Arts | 3rd grade Communication Arts |
| 4th grade Mathematics | 3rd grade Mathematics |
| 7th grade Communication Arts | 4th grade Communication Arts |
| 8th grade Mathematics | 4th grade Mathematics |
| 10th grade Mathematics | 5th grade Communication Arts |
| 11th grade Communication Arts | 5th grade Mathematics |
|  | 6th grade Communication Arts |
|  | 6th grade Mathematics |
|  | 7th grade Communication Arts |
|  | 7th grade Mathematics |
|  | 8th grade Communication Arts |
|  | 8th grade Mathematics |
|  | 10th grade Mathematics |
|  | 11th grade Communication Arts |

The second change in 2005-2006 came with the implementation of four, rather than five, MAP proficiency levels for both communication arts and math.* The four levels recently adopted reflect those used by the National Assessment of Educational Progress (NAEP). The table below shows the proficiency-level changes:

| MAP Achievement Levels Prior to Spring 2006 | MAP Achievement Levels Spring 2006 and 2007 |
|---|---|
| Advanced | Advanced |
| Proficient | Proficient |
| Nearing Proficient | Basic |
| Progressing | Below Basic |
| Step 1 |  |

*Note: The State of Missouri still uses five achievement levels for content areas *other than* communication arts and mathematics. For example, Springfield Public Schools voluntarily tested 10th grade students in the spring of 2006 and 2007 in the content area of science. These scores are still reported at five achievement levels, the same as in the past.

20

EXHIBIT ___28___

PAGE___455___

## 2007 AND HISTORICAL MISSOURI ASSESSMENT PROGRAM (MAP) AND TERRA NOVA TEST RESULTS

Detailed Missouri Assessment Program (MAP) Test results for the Springfield Public School District, and all buildings within the district, are posted on the Web at:

**http://dese.mo.gov/planning/profile/building/bl039141.html**

Statewide MAP results are posted on the Web at:

**http://dese.mo.gov/planning/profile/000000.html**

Second-grade Terra Nova reports are posted on the Web at:

**http://springfieldpublicschoolsmo.org**
(Click the "Assessment" link listed under Quick Links on left)

21

EXHIBIT ___28___

PAGE ___456___

## STUDENT DEMOGRAPHIC DATA - ELEMENTARY
### January 31, 2007

| Elementary School | Enroll-ment 1-31-07 | FREE LUNCH | | REDUCED LUNCH | | FREE/RED. LUNCH | | % Family Setting Students Living with 2 Parents |
|---|---|---|---|---|---|---|---|---|
| | | Number | % | Number | % | Number | % | |
| Bingham | 386.00 | 225.00 | 58.3% | 53.00 | 13.7% | 278.00 | 72.0% | 40.7% |
| Bissett | 251.00 | 164.00 | 65.3% | 29.00 | 11.6% | 193.00 | 76.9% | 48.6% |
| Bowerman | 246.39 | 187.30 | 76.0% | 20.00 | 8.1% | 207.30 | 84.1% | 52.4% |
| Boyd | 169.00 | 115.00 | 68.0% | 23.00 | 13.6% | 138.00 | 81.7% | 42.6% |
| Campbell | 202.50 | 163.50 | 80.7% | 15.00 | 7.4% | 178.50 | 88.1% | 40.0% |
| Cowden | 254.00 | 96.00 | 37.8% | 30.00 | 11.8% | 126.00 | 49.6% | 63.0% |
| Delaware | 215.60 | 96.00 | 44.5% | 26.00 | 12.1% | 122.00 | 56.6% | 54.5% |
| Disney | 545.93 | 61.40 | 11.2% | 32.20 | 5.9% | 93.60 | 17.1% | 74.4% |
| Field | 337.40 | 55.00 | 16.3% | 21.00 | 6.2% | 76.00 | 22.5% | 80.1% |
| Fremont | 146.44 | 81.44 | 55.6% | 20.00 | 13.7% | 101.44 | 69.3% | 46.4% |
| Gray | 545.40 | 55.00 | 10.1% | 26.00 | 4.8% | 81.00 | 14.9% | 85.7% |
| Hickory Hills | 268.83 | 46.00 | 17.1% | 9.00 | 3.3% | 55.00 | 20.5% | 74.7% |
| Holland | 248.00 | 129.00 | 52.0% | 38.00 | 15.3% | 167.00 | 67.3% | 48.4% |
| Jeffries | 501.00 | 171.00 | 34.1% | 37.00 | 7.4% | 208.00 | 41.5% | 61.9% |
| Mann | 410.50 | 87.50 | 21.3% | 39.00 | 9.5% | 126.50 | 30.8% | 63.6% |
| McBride | 611.20 | 57.00 | 9.3% | 41.50 | 6.8% | 98.50 | 16.1% | 79.5% |
| McGregor | 314.00 | 253.00 | 80.6% | 29.00 | 9.2% | 282.00 | 89.8% | 53.8% |
| Pershing | 154.00 | 36.00 | 23.4% | 14.00 | 9.1% | 50.00 | 32.5% | 61.7% |
| Pittman | 297.06 | 117.00 | 39.4% | 45.00 | 15.1% | 162.00 | 54.5% | 58.6% |
| Pl. View | 246.20 | 36.00 | 14.6% | 15.00 | 6.1% | 51.00 | 20.7% | 76.4% |
| Portland | 228.19 | 118.59 | 52.0% | 46.20 | 20.2% | 164.79 | 72.2% | 51.8% |
| Robberson | 264.00 | 189.00 | 71.6% | 40.00 | 15.2% | 229.00 | 86.7% | 47.3% |
| Rountree | 256.00 | 93.00 | 36.3% | 22.50 | 8.8% | 115.50 | 45.1% | 64.5% |
| Sequiota | 373.18 | 54.00 | 14.5% | 18.00 | 4.8% | 72.00 | 19.3% | 75.6% |
| Sherwood | 299.00 | 91.00 | 30.4% | 22.00 | 7.4% | 113.00 | 37.8% | 65.6% |
| Sunshine | 191.20 | 90.00 | 47.1% | 17.00 | 8.9% | 107.00 | 56.0% | 55.5% |
| Truman | 327.26 | 92.20 | 28.2% | 26.00 | 7.9% | 118.20 | 36.1% | 66.9% |
| Twain | 491.27 | 183.00 | 37.3% | 65.00 | 13.2% | 248.00 | 50.5% | 59.1% |
| Watkins | 267.00 | 148.00 | 55.4% | 35.00 | 13.1% | 183.00 | 68.5% | 54.7% |
| Weaver | 281.96 | 218.84 | 77.6% | 36.00 | 12.8% | 254.84 | 90.4% | 50.0% |
| Weller | 314.00 | 225.00 | 71.7% | 44.00 | 14.0% | 269.00 | 85.7% | 48.7% |
| Westport | 436.00 | 296.00 | 67.9% | 62.00 | 14.2% | 358.00 | 82.1% | 51.1% |
| Wilder | 363.58 | 75.00 | 20.6% | 18.00 | 5.0% | 93.00 | 25.6% | 72.8% |
| Williams | 296.46 | 226.46 | 76.4% | 28.00 | 9.4% | 254.46 | 85.8% | 40.8% |
| York | 188.00 | 135.00 | 71.8% | 21.00 | 11.2% | 156.00 | 83.0% | 55.9% |
| Elem. Totals | 10,927.55 | 4,467.23 | 40.9% | 1,063.40 | 9.7% | 5,530.63 | 50.6% | 61.4% |

EXHIBIT ___28___

PAGE ___457___

## STUDENT DEMOGRAPHIC DATA – MIDDLE AND HIGH SCHOOLS
### January 31, 2007

| Middle School | Enroll-ment 1-31-07 | FREE LUNCH | | REDUCED LUNCH | | FREE/RED. LUNCH | | % Family Setting Students Living with 2 Parents |
|---|---|---|---|---|---|---|---|---|
| | | Number | % | Number | % | Number | % | |
| Wilson's Creek | 470.06 | 42.00 | 8.9% | 22.00 | 4.7% | 64.00 | 13.6% | 80.2% |
| **Intermediate Total** | 470.06 | 42.00 | 8.9% | 22.00 | 4.7% | 64.00 | 13.6% | 80.2% |

| Middle School | Enroll-ment 1-31-07 | FREE LUNCH | | REDUCED LUNCH | | FREE/RED. LUNCH | | % Family Setting Students Living with 2 Parents |
|---|---|---|---|---|---|---|---|---|
| | | Number | % | Number | % | Number | % | |
| Carver | 700.56 | 167.00 | 23.8% | 76.00 | 10.8% | 243.00 | 34.7% | 58.6% |
| Cherokee | 724.95 | 73.00 | 10.1% | 27.00 | 3.7% | 100.00 | 13.8% | 79.3% |
| Hickory Hills | 465.90 | 157.58 | 33.8% | 49.00 | 10.5% | 206.58 | 44.3% | 58.0% |
| Jarrett | 566.39 | 209.00 | 36.9% | 87.00 | 15.4% | 296.00 | 52.3% | 53.6% |
| Pershing | 785.62 | 126.22 | 16.1% | 45.00 | 5.7% | 171.22 | 21.8% | 68.4% |
| Pipkin | 530.00 | 361.00 | 68.1% | 65.00 | 12.3% | 426.00 | 80.4% | 47.7% |
| Pleasant View | 363.24 | 79.00 | 21.7% | 40.00 | 11.0% | 119.00 | 32.8% | 67.0% |
| Reed | 551.00 | 356.00 | 64.6% | 81.00 | 14.7% | 437.00 | 79.3% | 40.8% |
| Study | 398.00 | 277.00 | 69.6% | 48.00 | 12.1% | 325.00 | 81.7% | 45.2% |
| **Middle School Totals** | 5,085.66 | 1,805.80 | 35.5% | 518.00 | 10.2% | 2,323.80 | 45.7% | 58.9% |

| High School | Enroll-ment 1-31-07 | FREE LUNCH | | REDUCED LUNCH | | FREE/RED. LUNCH | | % Family Setting Students Living with 2 Parents |
|---|---|---|---|---|---|---|---|---|
| | | Number | % | Number | % | Number | % | |
| Central | 1,476.25 | 602.50 | 40.8% | 155.00 | 10.5% | 757.50 | 51.3% | 51.8% |
| Glendale | 1,484.50 | 190.75 | 12.8% | 80.25 | 5.4% | 271.00 | 18.3% | 64.4% |
| Hillcrest | 1,183.41 | 403.67 | 34.1% | 113.25 | 9.6% | 516.92 | 43.7% | 54.4% |
| Kickapoo | 1,718.25 | 151.25 | 8.8% | 85.75 | 5.0% | 237.00 | 13.8% | 69.3% |
| Parkview | 1,471.63 | 511.79 | 34.8% | 147.90 | 10.1% | 659.69 | 44.8% | 45.7% |
| **High School Totals** | 7,334.04 | 1,859.96 | 25.4% | 582.15 | 7.9% | 2,442.11 | 33.3% | 57.7% |
| **District Totals** | 23,817.31 | 8,174.99 | 34.3% | 2,185.55 | 9.2% | 10,360.54 | 43.5% | 60.1% |

EXHIBIT _28_

PAGE _458_

PARTICIPANTS IN PARENT-TEACHER CONFERENCES AND SPECIAL PROGRAMS 2006-2007

| Elementary School | Percent Participants in Parent-Teacher Conferences | Percent Served in Special Education | Percent Served in Gifted Programs | Early Childhood Special Education | Parents as Teachers Pre-natal to 35 Months | Parents as Teachers 36 Months to Kindergarten |
|---|---|---|---|---|---|---|
| Bingham | 100.0% | 11.4% | 2.9% | | | |
| Bissett | 100.0% | 12.4% | 3.2% | | | |
| Bowerman | 95.1% | 20.1% | 1.2% | | | |
| Boyd | 100.0% | 10.1% | 3.6% | | | |
| Campbell | 98.1% | 15.8% | 2.5% | | | |
| Cowden | 100.0% | 12.2% | 1.2% | | | |
| Delaware | 99.0% | 35.3% | 4.5% | | | |
| Disney | 100.0% | 10.9% | 7.6% | | | |
| Field | 100.0% | 11.0% | 9.6% | | | |
| Fremont | 98.7% | 10.9% | 1.4% | | | |
| Gray | 100.0% | 7.7% | 6.9% | | | |
| Hickory Hills | 100.0% | 6.7% | 4.0% | | | |
| Holland | 100.0% | 16.9% | 4.4% | | | |
| Jeffries | 97.5% | 9.8% | 2.8% | | | |
| Mann | 98.1% | 12.8% | 3.7% | | | |
| McBride | 96.6% | 6.3% | 3.3% | | | |
| McGregor | 100.0% | 11.2% | 1.0% | | | |
| Pershing | 98.2% | 22.1% | 3.9% | | | |
| Pittman | 100.0% | 8.8% | 3.7% | | | |
| Pleasant View | 98.8% | 8.5% | 3.3% | | | |
| Portland | 100.0% | 18.2% | 2.7% | | | |
| Robberson | 100.0% | 16.3% | 0.0% | | | |
| Rountree | 100.0% | 7.0% | 8.2% | | | |
| Sequiota | 100.0% | 10.2% | 7.6% | | | |
| Sherwood | 100.0% | 9.4% | 2.3% | | | |
| Sunshine | 100.0% | 12.0% | 7.4% | | | |
| Truman | 97.9% | 15.6% | 1.2% | | | |
| Twain | 99.0% | 10.7% | 4.2% | | | |
| Watkins | 97.4% | 10.9% | 4.1% | | | |
| Weaver | 100.0% | 11.8% | 1.4% | | | |
| Weller | 100.0% | 13.7% | 1.0% | | | |
| Westport | 100.0% | 14.5% | 3.0% | | | |
| Wilder | 99.7% | 11.0% | 8.7% | | | |
| Williams | 100.0% | 19.7% | 2.7% | | | |
| York | 100.0% | 14.4% | 0.5% | | | |
| Elementary Totals | 99.2% | 12.3% | 3.9% | 454 | 2,229 | 2,133 |

*Total number of families receiving at least one personal visit from Parents as Teachers: 3,221

24

EXHIBIT ___28___

PAGE ___459___

## PARTICIPANTS IN PARENT-TEACHER CONFERENCES AND SPECIAL PROGRAMS 2006-2007

| Middle School | % Participants in Parent-Teacher Conferences | % Served in Special Education | % Served in Gifted Programs |
|---|---|---|---|
| Carver | 71.7% | 10.9% | 1.3% |
| Central Middle Years | Reported with high school | Reported with high school | 100.0% |
| Cherokee | 90.7% | 9.4% | 3.3% |
| Hickory Hills | 61.7% | 6.8% | 2.6% |
| Jarrett | 88.3% | 8.7% | 3.9% |
| Pershing | 96.3% | 8.2% | 1.8% |
| Pipkin | 96.2% | 13.8% | 1.9% |
| Pleasant View | 83.9% | 9.7% | 2.5% |
| Reed | 93.2% | 15.6% | 0.5% |
| Study | 94.6% | 21.1% | 2.5% |
| Wilson's Creek | 100.0% | 7.7% | 6.2% |
| Middle School Totals | 87.8% | 10.9% | 2.5% |

| High School | % Participants in Parent-Teacher Conferences | % Served in Special Education | % Enrolled in Advanced Placement and International Baccalaureate Classes | % Participants in Vocational Education Programs | Scholarship Money |
|---|---|---|---|---|---|
| Bailey | n/a | n/a | n/a | n/a | $2,500 |
| Central | 62.3% | 13.2% | 18.8% | 44.8% | $2,920,375 |
| Glendale | 42.9% | 6.5% | 10.6% | 49.1% | $2,790,974 |
| Hillcrest | 54.7% | 15.0% | 11.8% | 46.8% | $1,683,400 |
| Kickapoo | 76.3% | 6.9% | 12.3% | 53.1% | $3,839,389 |
| Parkview | 79.4% | 11.9% | 7.7% | 51.4% | $1,788,814 |
| High School Totals | 63.9% | 10.4% | 12.3% | 49.3% | $13,025,452 |

| | % Participants in Parent-Teacher Conferences | % Served in Special Education | % Served in Gifted Programs |
|---|---|---|---|
| District Totals | 85.4% | 11.4% | 6.2% |

26

EXHIBIT _____28_____

PAGE _____460_____

## GRADUATE FOLLOW-UP ANALYSIS

| | Class of 2002 | Class of 2003 | Class of 2004 | Class of 2005 | Class of 2006 |
|---|---|---|---|---|---|
| Number of Graduates | 1,464 | 1,633 | 1,621 | 1,492 | 1,555 |
| Percent Entering 4-Year College or University | 45.6% | 39.6% | 40.1% | 39.9% | 41.5% |
| Percent Entering 2-Year College or University | 21.7% | 23.1% | 24.4% | 27.5% | 26.8% |
| Percent Entering Post-Secondary Non-College Institution | 2.5% | 2.8% | 1.9% | 2.1% | 0.8% |
| Percent Entering the Work Force | 20.6% | 19.7% | 22.1% | 15.6% | 13.8% |
| Percent Entering the Military | 2.1% | 3.3% | 2.3% | 2.1% | 3.0% |
| Percent Entering Some Other Field | 5.1% | 5.2% | 5.7% | 8.5% | 9.3% |
| Status Unknown | 2.4% | 6.4% | 3.5% | 4.3% | 4.8% |

EXHIBIT ___28___

PAGE ___461___

### INFORMATION REGARDING JOB PLACEMENT FOR STUDENTS
### WHO COMPLETE INDUSTRIAL EDUCATIONAL PROGRAMS 2006-2007

|  | Central | Glendale | Hillcrest | Kickapoo | Parkview |
|---|---|---|---|---|---|
| # exiting high school program | 36 | 23 | 24 | 33 | 20 |
| # employed in related field | 4 | 3 | 6 | 5 | 6 |
| # employed in unrelated field | 9 | 1 | 6 | 5 | 6 |
| # continuing education in related field | 10 | 10 | 3 | 8 | 3 |
| # continuing education in unrelated field | 3 | 4 | 4 | 9 | 5 |
| # in military in related field | 0 | 0 | 0 | 1 | 0 |
| # in military in unrelated field | 1 | 0 | 0 | 0 | 0 |
| # status unknown | 3 | 3 | 5 | 2 | 0 |
| # not employed | 3 | 1 | 0 | 1 | 0 |
| # not available for employment | 3 | 1 | 0 | 2 | 0 |
| # disadvantaged | 0 | 0 | 1 | 0 | 1 |
| # disabled | 5 | 4 | 4 | 9 | 2 |

EXHIBIT _____28_____

PAGE _____462_____

## MISSOURI SCHOOL IMPROVEMENT PLAN (MSIP)
## WAIVER REVIEW INFORMATION – SPRINGFIELD PUBLIC SCHOOL DISTRICT

During the 2003-2004 school year, the Springfield Public School district received notification from the Missouri Department of Elementary and Secondary Education (DESE) that a waiver of the scheduled 2005 Missouri School Improvement Plan accreditation visit had been granted. The waiver was granted based on the district's accreditation at the highest level as demonstrated by the district's two latest DESE-generated Annual Performance Reports (APRs). The waiver rule establishes the criteria and procedure for annually identifying school districts and/or school buildings eligible for waivers in compliance with applicable state law and regulations. Qualifications include:

    A. The district achieved accreditation in the most recent MSIP review and is accredited at the highest level as defined by MSIP and has no Missouri Assessment Program (MAP) scores at or below the established floor based upon the two (2) latest DESE generated Annual Performance Reports (APRs).
    B. The district is in compliance with all Resource and Process Standards and Indicators listed in the Waiver Checklist.

If a district fails to meet the waiver criteria or the district no longer complies with the specific laws and rules referred to in the Waiver Checklist, the district will be scheduled for an on-site review. For districts' receiving a waiver of its regularly scheduled five year MSIP review, DESE conducts a mini-team review to focus on the areas identified in the MSIP Waiver Plan.

The Springfield Public School District's 2005-2006 MSIP Waiver Review visit was conducted on April 3, 2006 by Dr. Dennis Cooper, DESE area state supervisor. This visit involved a review of evidence of district compliance with state standards, a visit to Kraft Administrative Center, the General Services Center and three randomly selected school sites. Schools visited were; Parkview High School, Study Middle School and Eugene Field Elementary. According to the Missouri School Improvement Program Mini-Review Waiver Plan Checklist (2005-2006), the Springfield R-XII School district met all requirements as outlined in the MSIP Waiver Plan including the following items:

- All MSIP Resource Standards and Indicators (MSIP1.3 and 5.1)
- All MSIP Process Standards and Indicators (MSIP 6.1.1, 8.3.5, 6.2.6, 7.1, 7.3, 7.7, 6.6.1, 6.7, 8.3.4, 8.4.3, 8.5, 8.2, 8.10, 8.6, 8.11, 8.13)

This waiver is renewable for five consecutive years if the District continues to meet the following requirements:

- Identified as *Meets Standards* on Accredited level of APR performance indicators
- Complies with all items on the MSIP Waiver Plan
- Annually reviews the District's Comprehensive School Improvement Plan (CSIP) and submits revisions to DESE.

EXHIBIT ___28___

PAGE ___463___

ADEQUATE YEARLY PROGRESS (AYP) 2005, 2006, and 2007

| Elementary School | 2005 Comm. Arts | 2006 Comm. Arts | 2007 Comm. Arts | 2005 Math | 2006 Math | 2007 Math | 2005 Additional Indicator | 2006 Additional Indicator | 2007 Additional Indicator | Overall Area(s) Not Met in 2007 | Groups or Additional Indicator Area Not Met in 2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bingham* | Met | Met | Not Met | Met | Met | Met | Met | Met | Met | Comm. Arts | F/R Lunch |
| Bissett* | Met | Not Met | Not Met | Met | Met | Met | Met | Met | Met | Comm. Arts | F/R Lunch |
| Bowerman* | Met | Met | Not Met | Met | Met | Met | Met | Met | Met | Comm. Arts | Total, Write, and F/R Lunch |
| Boyd* | Met | Met | Not Met | Met | Met | Met | Met | Met | Met | Comm. Arts | F/R Lunch |
| Campbell* | Met | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Cowden* | Met | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Delaware | Met | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Disney | Met | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Field | Met | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Fremont* | Met | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Gray | Met | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Hickory Hills | Met | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Holland* | Met | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Jeffries | Met | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Mann | Met | Met | Met | Met | Met | Met | Met | Met | Met | | |
| McBride | Met | Met | Met | Met | Met | Met | Met | Met | Met | | |
| McGregor* | Met | Not Met | Not Met | Met | Met | Not Met | Met | Met | Met | Comm. Arts and Math | F/R Lunch in Comm. Arts; Total and F/R Lunch in Math |
| Pershing | Met | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Pittman* | Met | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Pleasant View | Met | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Portland* | Met | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Robberson* | Met | Not Met | Met | Met | Met | Met | Met | Met | Met | | |
| Rountree | Met | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Sequiota | Met | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Sherwood | Met | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Sunshine* | Met | Met | Met | Met | Met | Met | Met | Met | Met | | |

Additional indicator was added in 2006; it is attendance rate for elementary and middle schools and graduation rate for high schools.
*Indicates a Title I school during 2006-2007.

29

EXHIBIT _____ 28

PAGE _____ 464

ADEQUATE YEARLY PROGRESS (AYP) 2005, 2006, and 2007

| Elementary School | 2005 Comm. Arts | 2006 Comm. Arts | 2007 Comm. Arts | 2005 Math | 2006 Math | 2007 Math | 2006 Additional Indicator | 2007 Additional Indicator | Overall Area(s) Not Met in 2007 | Groups or Additional Indicator Area Not Met in 2007 |
|---|---|---|---|---|---|---|---|---|---|---|
| Truman | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Twain* | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Watkins* | Met | Met | Not Met | Met | Met | Met | Met | Met | Comm. Arts | F/R Lunch |
| Weaver* | Not Met | Met | Met | Met | Met | Met | Met | Met | | |
| Weller* | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Westport* | Not Met | Met | Not Met | Met | Met | Met | Met | Met | Comm. Arts | F/R Lunch |
| Wilder | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Williams* | Met | Met | Not Met | Met | Met | Met | Met | Met | Comm. Arts | F/R Lunch |
| York* | Met | Met | Not Met | Met | Met | Met | Met | Met | Comm. Arts | White |

*Additional indicator was added in 2006; it is attendance rate for elementary and middle schools and graduation rate for high schools.*

*Indicates a Title I school during 2006-2007.

EXHIBIT _____ 28

PAGE _____ 465

ADEQUATE YEARLY PROGRESS (AYP) 2005, 2006, and 2007

| Middle or High School | 2005 Comm. Arts | 2006 Comm. Arts | 2007 Comm. Arts | 2005 Math | 2006 Math | 2007 Math | 2006 Additional Indicator | 2007 Additional Indicator | Overall Area(s) Not Met in 2007 | Groups or Additional Indicator Area Not Met in 2007 |
|---|---|---|---|---|---|---|---|---|---|---|
| Carver | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Cherokee | Met | Met | Not Met | Met | Met | Met | Met | Met | Comm. Arts | IEP |
| Hickory Hills | Met | Met | Not Met | Met | Met | Met | Met | Met | Comm. Arts | F/R Lunch |
| Jarrett | Met | Met | Met | Not Met | Met | Met | Met | | | |
| Pershing | Met | Not Met | Not Met | Met | Met | Not Met | Met | Met | Comm. Arts and Math | IEP in Comm. Arts and Math |
| Pipkin* | Not Met | Met | Not Met | Met | Met | Met | Met | Met | Comm. Arts | Black and IEP |
| Pleasant View | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Reed* | Not Met | | Not Met | | Not Met | Not Met | Not Met | Not Met | Comm. Arts, Math, and Additional Indicator | Total, Black, F/R Lunch, and IEP in Comm. Arts; Black and IEP in Math; and Attendance |
| Study* | Met | Met | Not Met | Met | Met | Met | Not Met | Met | Comm. Arts | IEP |
| Wilson's Creek | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Central | Not Met | Met | Met | Not Met | Met | Met | Not Met | Met | | |
| Glendale | Met | Met | Met | Not Met | Met | Met | Not Met | Met | | |
| Hillcrest | Not Met | Met | Not Met | Not Met | Met | Not Met | Not Met | Met | Comm. Arts and Math | F/R Lunch in Comm. Arts and Math |
| Kickapoo | Met | Met | Met | Met | Met | Met | Met | Met | | |
| Parkview | Met | Met | Met | Not Met | Met | Met | Not Met | Not Met | Additional Indicator | Graduation Rate |

Additional indicator was added in 2006; it is attendance rate for elementary and middle schools and graduation rate for high schools.

*Indicates a Title I school during 2006-2007.

31

EXHIBIT ___28___

PAGE ___466___

## ADEQUATE YEARLY PROGRESS (AYP) 2005, 2006, and 2007

| District | 2005 Comm. Arts | 2006 Comm. Arts | 2007 Comm. Arts | 2005 Math | 2006 Math | 2007 Math | 2006 Additional Indicator | 2007 Additional Indicator | Overall Area(s) Not Met in 2007 | Groups or Additional Indicator Area Not Met In 2007 |
|---|---|---|---|---|---|---|---|---|---|---|
| | Not Met | Not Met | Not Met | Met | Met | Not Met | Met Attendance/ Not Met Graduation Rate | Met Attendance/ Met Graduation Rate | Comm. Arts and Math | Black, Hispanic, F/R Lunch, IEP, and LEP in Comm. Arts; Black, IEP, and LEP in Math |

| | 2005 Comm. Arts | 2006 Comm. Arts | 2007 Comm. Arts | 2005 Math | 2006 Math | 2007 Math | 2006 Additional Indicator | 2007 Additional Indicator |
|---|---|---|---|---|---|---|---|---|
| High Schools | Met | Met | Met | Met | Met | Met | Met | Met |
| Middle Schools | 3/5 | 5/5 | 4/5 | 1/5 | 5/5 | 4/5 | 1/5 | 4/5 |
| Elementary Schools | 7/9 | 8/10 | 4/10 | 7/9 | 9/10 | 8/10 | 9/10 | 9/10 |
| | 35/37 | 33/36 | 26/35 | 37/37 | 36/36 | 34/35 | 36/38 | 35/35 |

EXHIBIT _____28_____

PAGE _____467_____

## SPRINGFIELD PUBLIC SCHOOLS
## ACCOUNTABILITY PROCESS

Educational reform efforts, most notably the No Child Left Behind Act (NCLB), highlight the need for public education to produce and showcase quantifiable results on tests and other achievement indicators. A review of research literature indicates that educational performance is heightened when individuals understand what is to be measured and why. Such a process is commonly referred to as "accountability." An accountability process that measures progress is a good thing, but it cannot be an end unto itself.  It must result in improvements. Research indicates customers of educational systems have a direct agenda in terms of educational accountability. They want to know:

- How are our kids doing?
- Are our schools improving and succeeding?
- What works to help our students learn?

The accountability goal of the Springfield Public School District is to systematically set goals, define strategies to reach those goals and monitor progress in achieving goals. The commitment of Springfield Public Schools to continuous improvement will be reflected in the Accountability process. A comprehensive accountability process provides continuous feedback to help school leaders systematically investigate which elements help school professionals and students perform more effectively.

The school district has identified three district system-wide goals:

1. Improve student achievement: All students will demonstrate proficiency or  higher in math, reading, and writing.
2. Improve graduation rate: Students will persist in their effort to complete an educational program.
3. Ensure effective and efficient use of resources: High quality, fiscally responsible services will be provided.

In addition, the district identified performance indicators critical to meeting district goals. These indicators help the district know what it must do to be viewed as being successful by the public it serves. In addition, performance measurements have been established to ensure expectations are met. Measurements will be used to ensure the district commitment to continuous improvement is in place and ongoing.

### Revision to the 2001-2005 District Accountability Plan

Initiated in the fall of 2005, a priority of the process to revise the current district Accountability Plan was to ensure alignment with a systems approach to continuous quality improvement. In January 2006, district leaders provided the following as guidance to what district accountability should include:

- Multiple indicators demonstrating improvement and or successes
- Meaningful measures of students performance
- Opportunity to communicate outcomes to community stakeholders
- Align new accountability process with current practice and processes

EXHIBIT ___28___

PAGE ___468___

**Revision Process**

Revised components of district accountability were developed by the Accountability Planning and Development committee (APDC). This committee served as the "architect" of the revision process and utilized district mission, vision, goals and needs assessment information to design and develop revisions. Meetings of the APDC began in April 2006 and continue to date. This committee is also responsible for coordinating, and facilitating the work of the Accountability Process Advisory Committee (APAC).

The APAC was established to act as a collaborative body created for the purpose of reviewing, reflecting and responding to proposed revisions to the former district accountability process. The first meeting of the APAC was held September 7, 2006, and continued bi-monthly throughout the 2006-2007 school year. Representatives from school constituents, including students, teachers, administrative staff, parents, community members and representatives from local institutions of higher education made up the APAC.

**Accountability Process Guiding Principles**

As recommended by Reeves (2004) in *Accountability in Action: A Blueprint for Learning Organizations*, the Springfield Public Schools' APDC and APAC established the following as guiding principles of the district accountability revision process.

The

| Accountability Process Guiding Principles | |
|---|---|
| Congruence | The Accountability process provides a framework to align and develop consistency among all district programs, plans, documents and systems. It is especially important to ensure that systems for rewards and incentives and employee evaluation are consistent with the Accountability process. |
| Respect for Diversity | The Accountability process establishes high expectations for performance, continuous improvement and equity at all schools. However, there are many differences among schools, programs, learning styles, school culture and many different strategies for achieving and measuring success. |
| Accuracy | The Accountability process must be accurate. This means that the measurements are correct, used appropriately and measure the right thing. |
| Specificity | The Accountability process must be specific and focused on the practice of teachers and leaders, not just test scores. Expectations must be clearly stated and feedback must be specific enough to be helpful. |
| Feedback for Continuous Improvement | The Accountability process must support the frequent delivery of data that is specific, ongoing and timely. Accountability data is used to inform improvement decisions and build capacity within the system. |
| Universality | Consistent with the district mission: "Springfield Public Schools exists for the academic excellence of all students," the principle of accountability must be applied to all stakeholders. |
| Fairness | To be fair, the Accountability process must be clearly communicated, consistently applied, and expectations must be realistic yet challenging. |

revised district accountability process will provide board members, the superintendent, the school

34

EXHIBIT _____ 28
PAGE _____ 469

community and public with a combination of specific system wide and school level performance data, along with school level qualitative and narrative information. Some indicators may be used to report student achievement, while others will be used to track levels of improvement within the system and individual schools.

**Accountability Planning and Development and Accountability Process Advisory Committee –**
**Committee Outcomes**

The work of the APAC enabled the ADPC to identify what accountability information is important to district students, staff, parents and stakeholders. The work of the accountability committees supported the need for and played a vital role in district endeavors to ensure accountability results are readily available for students, staff, parents and community stakeholders. Committee feedback was utilized by district staff to pursue the purchase of a district data warehouse and on-line student assessment program. These two critical software packages will allow each school the ability to easily produce and display an "accountability dashboard" on their school website. The district data warehouse, a data collection repository, will be purchased and implemented during the 2007-2008 school year. The on-line student assessment package will be purchased during the 2007-2008 school with initial implementation beginning as early as spring of 2008.

35

EXHIBIT ___28___

PAGE ___470___

### SPRINGFIELD PUBLIC SCHOOL DISTRICT
### FINANCIAL OVERVIEW 2006-2007

#### *Average per pupil expenditure*

Average per pupil expenditure for the district as a whole is calculated by taking the current expenditure (as defined by Section 163.011 RSMo), divided by the average daily attendance (including summer school) of resident students:

$171,465,071.71 ÷ 22,315.24 = $ 7,683.76 average pupil expenditure (per Financial Services)

#### *Voted Tax Rates* (per Financial Services)

|  | General Fund | Special (Teachers) Fund | Debt | Total |
|---|---|---|---|---|
| Unadjusted tax levy | $1.7299 | $1.3157 | $0.5100 | $3.5556 |
| Adjusted tax levy | $1.7299 | $1.3157 | $0.5100 | $3.5556 |

**District Assessed Valuation** (per Missouri Department of Elementary and Secondary Education)

December 31, 2005   $2,700,473,892
December 31, 2006   $2,802,422,970



**Sources of District Operating Revenue 2006-2007**

Federal 10.6%
Other 0.2%
State 25.1%
Local 62.8%
County 1.3%

#### *District's Operating Revenue for 2006-2007* (per Financial Services)
[without bond, debt, and activity funds]

| Local | $115,891,463 | 62.8% |
|---|---|---|
| County | $2,453,899 | 1.3% |
| State | $46,377,056 | 25.1% |
| Federal | $19,645,545 | 10.6% |
| Other | $279,876 | 0.2% |
| **Total Revenue** | **$184,647,839** | **100.0%** |

36

EXHIBIT ___28___

PAGE ___471___

## AMOUNT OF EXPENDITURE BY AVERAGE DAILY ATTENDANCE
## 2006-2007 SCHOOL YEAR

| Elementary Building | Amount of Expenditure Per Average Daily Attendance | Middle School Building | Amount of Expenditure Per Average Daily Attendance |
|---|---|---|---|
| Bingham Elementary | $7,821.80 | Carver Middle School | $7,496.46 |
| Bissett Elementary | $7,677.42 | Cherokee Middle School | $6,973.07 |
| Bowerman Elementary | $8,959.15 | Hickory Hills Middle School | $7,123.32 |
| Boyd Elementary | $9,455.47 | Jarrett Middle School | $7,784.43 |
| Campbell Elementary | $8,379.77 | Pershing Middle School | $6,887.85 |
| Cowden Elementary | $8,774.78 | Pipkin Middle School | $9,316.96 |
| Delaware Elementary | $13,620.34 | Pleasant View Middle School | $7,240.72 |
| Disney Elementary | $7,210.88 | Reed Middle School | $8,445.39 |
| Field Elementary | $7,687.14 | Study Middle School | $8,809.70 |
| Fremont Elementary | $8,393.66 | Wilson's Creek | $6,965.50 |
| Gray Elementary | $6,754.48 | | |
| Hickory Hills Elementary | $6,901.25 | High School Building | |
| Holland Elementary | $9,229.02 | Central High School | $7,896.12 |
| Jeffries Elementary | $7,471.52 | Glendale High School | $7,022.51 |
| Mann Elementary | $7,889.14 | Hillcrest High School | $8,087.21 |
| McBride Elementary | $6,423.43 | Kickapoo High School | $6,986.05 |
| McGregor Elementary | $8,636.83 | Parkview High School | $7,610.12 |
| Pershing Elementary | $8,208.14 | | |
| Pittman Elementary | $8,586.32 | | |
| Pleasant View Elementary | $7,376.46 | | |
| Portland Elementary | $8,288.31 | | |
| Robberson Elementary | $7,774.46 | | |
| Rountree Elementary | $7,453.32 | | |
| Sequiota Elementary | $7,259.07 | | |
| Sherwood Elementary | $7,044.42 | | |
| Sunshine Elementary | $7,678.07 | | |
| Truman Elementary | $7,700.13 | | |
| Twain Elementary | $7,524.07 | | |
| Watkins Elementary | $7,740.87 | | |
| Weaver Elementary | $7,638.29 | | |
| Weller Elementary | $7,903.05 | | |
| Westport Elementary | $8,116.72 | | |
| Wilder Elementary | $7,274.29 | | |
| Williams Elementary | $8,936.63 | | |
| York Elementary | $7,927.79 | | |

EXHIBIT _____ 28

PAGE _____ 472

## SEPTEMBER ENROLLMENTS
## 1998-2007

| ELEMENTARY | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|
| Bingham | 468 | 403 | 392 | 415 | 356 | 373 | 373 | 370 | 392 | 374 |
| Bissett | 265 | 251 | 248 | 255 | 271 | 234 | 247 | 260 | 254 | 237 |
| Bowerman | 263 | 253 | 259 | 223 | 252 | 235 | 210 | 231 | 245 | 264 |
| Boyd | 207 | 162 | 177 | 165 | 162 | 162 | 141 | 155 | 165 | 174 |
| Campbell | 245 | 229 | 238 | 229 | 253 | 227 | 233 | 218 | 209 | 200 |
| Cowden | 263 | 249 | 284 | 246 | 238 | 244 | 253 | 250 | 247 | 256 |
| Delaware | 254 | 230 | 209 | 221 | 222 | 170 | 197 | 211 | 206 | 218 |
| Disney | 636 | 646 | 636 | 652 | 637 | 580 | 581 | 573 | 566 | 532 |
| Doling | 175 | 164 | 147 | -- | -- | -- | -- | -- | -- | -- |
| Fairbanks | 243 | 257 | 247 | 212 | 176 | 168 | 178 | -- | -- | -- |
| Field | 415 | 392 | 399 | 369 | 341 | 317 | 279 | 326 | 344 | 374 |
| Fremont | 182 | 161 | 165 | 155 | 177 | 170 | 161 | 169 | 159 | 150 |
| Gray | 556 | 559 | 572 | 594 | 591 | 593 | 627 | 576 | 550 | 526 |
| Hickory Hills | 322 | 367 | 322 | 350 | 330 | 267 | 276 | 279 | 259 | 275 |
| Holland | 230 | 247 | 251 | 225 | 234 | 248 | 225 | 242 | 245 | 235 |
| Jeffries | 498 | 481 | 519 | 450 | 461 | 505 | 476 | 487 | 510 | 500 |
| Mann | 519 | 501 | 449 | 432 | 406 | 401 | 439 | 436 | 421 | 432 |
| McBride | 283 | 310 | 369 | 495 | 563 | 613 | 660 | 598 | 614 | 598 |
| McGregor | 261 | 241 | 228 | 176 | 202 | 295 | 302 | 332 | 304 | 347 |
| Pepperdine | 167 | 166 | 160 | 137 | -- | -- | -- | -- | -- | -- |
| Pershing | 160 | 165 | 166 | 163 | 138 | 156 | 137 | 164 | 163 | 151 |
| Pittman | 324 | 306 | 299 | 321 | 306 | 293 | 286 | 306 | 297 | 296 |
| Pleasant View | 271 | 279 | 278 | 260 | 244 | 245 | 255 | 253 | 244 | 238 |
| Portland | 242 | 249 | 237 | 257 | 227 | 225 | 210 | 213 | 223 | 235 |
| Robberson | 193 | 210 | 218 | 200 | 269 | 282 | 282 | 259 | 266 | 277 |
| Rountree | 294 | 283 | 268 | 251 | 266 | 276 | 261 | 256 | 252 | 243 |
| Sequiota | 260 | 265 | 264 | 288 | 287 | 341 | 344 | 375 | 376 | 380 |
| Shady Dell | 184 | 165 | 163 | 156 | 170 | 136 | 153 | 127 | -- | -- |
| Sherwood | 328 | 331 | 307 | 312 | 249 | 246 | 265 | 289 | 298 | 306 |
| Sunshine | 220 | 209 | 200 | 210 | 196 | 194 | 183 | 183 | 193 | 173 |
| Truman | 329 | 333 | 309 | 316 | 269 | 267 | 273 | 312 | 327 | 315 |
| Twain | 521 | 496 | 524 | 505 | 511 | 488 | 510 | 463 | 481 | 464 |
| Watkins | 247 | 248 | 265 | 278 | 284 | 276 | 273 | 260 | 268 | 241 |
| Weaver | 182 | 168 | 165 | 149 | 149 | 143 | 130 | 287 | 291 | 289 |
| Weller | 273 | 252 | 226 | 254 | 237 | 232 | 224 | 211 | 318 | 306 |
| Westport | 583 | 558 | 529 | 556 | 494 | 468 | 450 | 453 | 461 | 442 |
| Wilder | 437 | 459 | 455 | 453 | 476 | 390 | 361 | 338 | 362 | 339 |
| Williams | 252 | 218 | 192 | 294 | 284 | 337 | 291 | 313 | 292 | 290 |
| Wilson's Creek (5th) | -- | -- | -- | -- | -- | -- | -- | 225 | 235 | 249 |
| York | 248 | 242 | 244 | 254 | 254 | 244 | 222 | 204 | 194 | 216 |
| Elementary Total | 11,998 | 11,705 | 11,580 | 11,478 | 11,182 | 11,041 | 10,968 | 11,204 | 11,231 | 11,142 |

38

EXHIBIT ___28___

PAGE ___473___

### SEPTEMBER ENROLLMENTS
### 1998-2007

| MIDDLE SCHOOL | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|
| Carver | 728 | 699 | 684 | 701 | 699 | 761 | 805 | 788 | 711 | 664 |
| Central MYSP | – | – | – | – | 97 | 120 | 119 | 115 | 119 | 117 |
| Cherokee | 821 | 880 | 888 | 919 | 945 | 962 | 954 | 714 | 721 | 644 |
| Hickory Hills | 619 | 601 | 578 | 613 | 603 | 557 | 539 | 476 | 470 | 466 |
| Jarrett | 651 | 648 | 605 | 554 | 588 | 606 | 595 | 584 | 572 | 545 |
| Pershing | 709 | 713 | 691 | 694 | 704 | 776 | 780 | 757 | 783 | 734 |
| Pipkin | 530 | 484 | 490 | 520 | 567 | 555 | 554 | 548 | 531 | 535 |
| Pleasant View | 506 | 514 | 522 | 501 | 468 | 445 | 399 | 377 | 367 | 362 |
| Reed | 555 | 536 | 521 | 544 | 568 | 589 | 619 | 543 | 547 | 498 |
| Study | 589 | 559 | 579 | 582 | 573 | 525 | 473 | 416 | 404 | 379 |
| Wilson's Creek (6th) | – | – | – | – | – | – | – | 221 | 231 | 337 |
| Middle School Total | 5,708 | 5,634 | 5,558 | 5,628 | 5,812 | 5,896 | 5,837 | 5,539 | 5,456 | 5,301 |

| HIGH SCHOOL | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|
| Bailey | – | – | – | – | 78 | 81 | – | – | – | – |
| Central | 1,018 | 1,093 | 1,145 | 1,224 | 1,238 | 1,253 | 1,319 | 1,408 | 1,429 | 1,407 |
| Glendale | 1,498 | 1,508 | 1,516 | 1,525 | 1,532 | 1,483 | 1,517 | 1,549 | 1,537 | 1,445 |
| Hillcrest | 1,306 | 1,370 | 1,330 | 1,272 | 1,249 | 1,233 | 1,250 | 1,204 | 1,264 | 1,219 |
| Kickapoo | 1,783 | 1,731 | 1,793 | 1,750 | 1,752 | 1,773 | 1,714 | 1,760 | 1,766 | 1,719 |
| Parkview | 1,427 | 1,422 | 1,518 | 1,521 | 1,513 | 1,525 | 1,514 | 1,594 | 1,574 | 1,569 |
| High School Total | 7,032 | 7,124 | 7,302 | 7,292 | 7,362 | 7,348 | 7,314 | 7,515 | 7,570 | 7,359 |
| DISTRICT TOTAL | 24,738 | 24,463 | 24,440 | 24,398 | 24,356 | 24,285 | 24,119 | 24,258 | 24,257 | 23,802 |

EXHIBIT  28

PAGE  474



Springfield Public School District
Sepetmber Enrollments

EXHIBIT ___28___

PAGE ___475___

40

## GRADE DISTRIBUTION SUMMARY
## 2006-2007

### MIDDLE SCHOOL DIVISION

| School | Grades | | | | | |
|--------|----|----|----|----|----|---------|
| | A | B | C | D | F | *Passed |
| Carver | 44% | 27% | 14% | 5% | 3% | 7% |
| Cherokee | 48% | 25% | 15% | 7% | 4% | 1% |
| Hickory Hills | 49% | 26% | 14% | 6% | 4% | 0% |
| Jarrett | 42% | 24% | 17% | 9% | 7% | 0% |
| Pershing | 47% | 30% | 15% | 5% | 3% | 0% |
| Pipkin | 25% | 27% | 20% | 13% | 13% | 1% |
| Pleasant View | 50% | 26% | 14% | 6% | 2% | 1% |
| Reed | 33% | 29% | 18% | 8% | 8% | 4% |
| Study | 37% | 27% | 17% | 8% | 7% | 4% |
| Wilson's Creek (6th grade only) | 56% | 28% | 10% | 4% | 2% | 0% |
| Middle School Totals | 42% | 27% | 16% | 7% | 6% | 2% |

*Passed: Middle School Exploratory Classes are graded Pass/Fail

### SENIOR HIGH DIVISION

| School | Grades | | | | | |
|--------|----|----|----|----|----|--------|
| | A | B | C | D | F | Passed |
| Central (includes Central MYSP) | 37% | 24% | 18% | 10% | 11% | n/a |
| Glendale | 50% | 23% | 13% | 7% | 6% | n/a |
| Hillcrest | 41% | 22% | 16% | 11% | 10% | n/a |
| Kickapoo | 49% | 24% | 14% | 7% | 5% | n/a |
| Parkview | 34% | 24% | 20% | 12% | 10% | n/a |
| High School Totals | 43% | 23% | 16% | 9% | 8% | n/a |
| District Totals | 43% | 25% | 16% | 8% | 7% | 1% |

41·

EXHIBIT 28

PAGE 476

## REPORT OF DISCIPLINARY ACTIONS FOR THE 2006-2007 SCHOOL YEAR

| Elementary School | Number of Incidents Resulting in a Suspension | | Number of Students Suspended | | Percentage of Students Not Suspended* | |
|---|---|---|---|---|---|---|
| | In-School | Out-of-School | In-School | Out-of-School | In-School | Out-of-School |
| Bingham | 52 | 41 | 31 | 19 | 94.4% | 96.6% |
| Bissett | 44 | 40 | 20 | 14 | 94.4% | 96.1% |
| Bowerman | 33 | 19 | 18 | 9 | 95.1% | 97.6% |
| Boyd | 23 | 31 | 16 | 15 | 94.2% | 94.5% |
| Campbell | 2 | 1 | 2 | 1 | 99.4% | 99.7% |
| Cowden | 20 | 26 | 11 | 10 | 97.4% | 97.7% |
| Delaware | 0 | 3 | 0 | 2 | 100.0% | 99.4% |
| Disney | 22 | 1 | 14 | 1 | 98.0% | 99.9% |
| Field | 5 | 2 | 5 | 2 | 98.8% | 99.5% |
| Fremont | 41 | 20 | 24 | 13 | 90.0% | 94.6% |
| Gray | 19 | 6 | 11 | 4 | 98.5% | 99.4% |
| Hickory Hills | 12 | 3 | 10 | 2 | 97.3% | 99.5% |
| Holland | 11 | 11 | 8 | 8 | 97.6% | 97.6% |
| Jeffries | 87 | 19 | 40 | 13 | 94.9% | 98.3% |
| Mann | 61 | 9 | 40 | 9 | 93.6% | 98.6% |
| McBride | 14 | 4 | 9 | 4 | 98.8% | 99.5% |
| McGregor | 101 | 26 | 48 | 9 | 91.1% | 98.3% |
| Pershing | 39 | 10 | 24 | 5 | 89.3% | 97.8% |
| Pittman | 38 | 7 | 27 | 4 | 94.4% | 99.2% |
| Pleasant View | 30 | 5 | 16 | 5 | 95.0% | 98.5% |
| Portland | 16 | 13 | 7 | 7 | 98.0% | 98.0% |
| Robberson | 5 | 17 | 5 | 10 | 98.8% | 97.6% |
| Rountree | 39 | 7 | 21 | 6 | 94.6% | 98.5% |
| Sequiota | 5 | 4 | 5 | 4 | 98.9% | 99.2% |
| Sherwood | 4 | 1 | 4 | 1 | 99.0% | 99.8% |
| Sunshine | 13 | 11 | 12 | 7 | 95.7% | 97.5% |
| Truman | 19 | 2 | 16 | 2 | 96.3% | 99.5% |
| Twain | 89 | 32 | 40 | 19 | 94.1% | 97.2% |
| Watkins | 18 | 18 | 15 | 11 | 96.4% | 97.3% |
| Weaver | 23 | 14 | 19 | 8 | 95.4% | 98.1% |
| Weller | 36 | 10 | 22 | 5 | 95.4% | 98.9% |
| Westport | 52 | 61 | 30 | 23 | 95.7% | 96.7% |
| Wilder | 10 | 15 | 9 | 7 | 98.1% | 98.5% |
| Williams | 24 | 18 | 15 | 11 | 96.9% | 97.8% |
| York | 23 | 13 | 17 | 8 | 95.5% | 97.9% |
| Elem. Totals | 1,030 | 520 | 611 | 278 | 96.2% | 98.3% |

*Using 2006-2007 cumulative enrollment figures.

42

EXHIBIT __28__

PAGE __477__

## REPORT OF DISCIPLINARY ACTIONS FOR THE 2006-2007 SCHOOL YEAR

| Middle School | Number of Incidents Resulting in a Suspension | | Number of Students Suspended | | Percentage of Students Not Suspended* | |
|---|---|---|---|---|---|---|
| | In-School | Out-of-School | In-School | Out-of-School | In-School | Out-of-School |
| Carver | 214 | 99 | 106 | 59 | 87.6% | 93.1% |
| Cherokee | 184 | 49 | 86 | 30 | 89.5% | 96.3% |
| Hickory Hills | 462 | 149 | 142 | 77 | 75.6% | 86.8% |
| Jarrett | 382 | 102 | 158 | 64 | 78.6% | 91.4% |
| Pershing | 323 | 209 | 132 | 80 | 85.5% | 91.2% |
| Pipkin | 351 | 464 | 155 | 168 | 79.2% | 78.8% |
| Pleasant View | 248 | 56 | 98 | 31 | 76.4% | 92.5% |
| Reed | 637 | 342 | 172 | 107 | 76.6% | 85.4% |
| Study | 381 | 203 | 158 | 101 | 74.0% | 83.4% |
| Wilson's Creek | 64 | 19 | 32 | 12 | 94.0% | 97.7% |
| Middle School Totals | 3,246 | 1,692 | 1,239 | 719 | 82.2% | 89.6% |

| High School | Number of Incidents Resulting in a Suspension | | Number of Students Suspended | | Percentage of Students Not Suspended* | |
|---|---|---|---|---|---|---|
| | In-School | Out-of-School | In-School | Out-of-School | In-School | Out-of-School |
| Central | 726 | 529 | 339 | 267 | 82.1% | 85.9% |
| Glendale | 1,501 | 234 | 402 | 135 | 76.4% | 92.1% |
| Hillcrest | 1,908 | 513 | 573 | 275 | 62.5% | 82.0% |
| Kickapoo | 1,528 | 529 | 447 | 247 | 78.1% | 87.9% |
| Parkview | 1,600 | 291 | 629 | 205 | 67.6% | 89.5% |
| High School Totals | 7,263 | 2,096 | 2,390 | 1,129 | 73.8% | 87.6% |

| | Number of Incidents Resulting in a Suspension | | Number of Students Suspended | | Percentage of Students Not Suspended* | |
|---|---|---|---|---|---|---|
| | In-School | Out-of-School | In-School | Out-of-School | In-School | Out-of-School |
| DISTRICT TOTALS | 11,539 | 4,308 | 4,240 | 2,126 | 86.8% | 93.4% |

* Using 2006-2007 cumulative enrollment figures.

43

EXHIBIT _____ 28

PAGE _____ 478

**Exhibit 29**

# CONFIDENTIAL

## AND FOR

# ATTORNEYS' EYES ONLY

Alpha Reporting Service
3230-G South National
Springfield, MO 65807
(417) 887-4110
(417) 889-4246
www.alphareportingservice.com

EXHIBIT ___29___

PAGE ___479___

COPY

# Transcript of the Testimony of
# **Janet Bryant, Vol. II**

### **Date:** September 26, 2007

### **Case:** Bryant v. Mattel
### CV-04-9049-SGL (RNBx); USDC

ALPHA REPORTING SERVICE
Phone: 417-887-4110
Fax: 417-889-4246
Email: schedule@alphareportingservice.com
www.alphareportingservice.com

EXHIBIT _____ 29

PAGE ____ 480

CONFIDENTIAL TESTIMONY          9/25/2007          ATTORNEYS' EYES ONLY

1

1          IN THE UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                    EASTERN DIVISION

4

      CARTER BRYANT, an
5     individual,
                                Case No. CV 04-9049
6          Plaintiff,           SGL (RNBx)
                                Consolidated with:
7     vs.
                                Case No.
8     MATTEL, INC., a Delaware   CV 04-09059
      corporation,
9                               Case No.
           Defendant.            CV 05-02727
10

11

      VIDEOTAPED DEPOSITION OF MS. JANET L. BRYANT
12

13    produced, sworn, and examined on Tuesday,

14    September 25, 2007, at 9 a.m. of that day, at

15    the University Plaza Hotel & Convention Center,

16    333 John Q Hammons Parkway, in the City of

17    Springfield, County of Greene, and State of

18    Missouri, before me, KELLY R. HEISDORFFER, RPR,

19    CSR, CCR, in the above-captioned cause; taken on

20    behalf of the Defendant.

21

22

             ALPHA REPORTING SERVICE
23            3230-G South National
           Springfield, Missouri 65807
24             (417) 887-4110

25

EXHIBIT _____ 29

PAGE _____ 481

2

1                 A P P E A R A N C E S

2        For Plaintiff:       MR. MICHAEL H. PAGE
                              KEKER & VAN NEST LLP
3                             710 Sansome Street
                              San Francisco, CA 94111-1704
4

5
         For Defendant:       MR. MICHAEL T. ZELLER
6                             TAMAR BUCHAKJIAN, ESQ.
                              QUINN EMANUEL URQUHART
7                             OLIVER & HEDGES, LLP
                              865 South Figueroa Street,
8                             10th Floor
                              Los Angeles, CA 90017-2543
9

10

11       Videotaped by:       MR. BEN COPELAND
                              SOUTHWEST AUDIO VIDEO
12                            241 South Union
                              Springfield, MO 65802
13

14

15       Also present:        Mr. Michael Moore, Mattel
                              Corporation
16

17

18

19

20

21

22

23

24

25

EXHIBIT _____29_____

PAGE _____482_____

304

1      working with MGA, can you give me a ballpark

2      estimate as -- as to the amount?

3   A   Ballpark 200,000.

4   Q   And then so I guess overall -- and tell me if I'm

5      wrong -- it sounds like you would say that of the

6      money and the things of value that Carter's given

7      you since -- since working on BRATZ has been

8      about half a million?

9   A   Yes.

10  Q   And has that been to -- to you and Tom jointly or

11     have there been separate?

12  A   Jointly.

13  Q   Jointly, okay.  Well, why don't we take two

14     minutes, I just want to check my notes to make

15     sure I don't have any additional questions.

16  A   Okay.

17  Q   But I think that's going to probably be about it.

18         (A break was taken at 10:37 a.m.)

19         (Back on the record at 10:40 a.m.)

20      MR. ZELLER:  We're back on.

21  Q   (By Mr. Zeller) Focusing on that time period when

22     Carter was living with you in Kimberling City,

23     did -- did he take any college courses that you

24     know of?

25  A   Not that I know of.

EXHIBIT ____29____

PAGE ____483____

305

1    Q    You don't -- don't think he took any -- any

2         courses at all that you're aware of during that

3         time period?

4    A    Not that I'm aware of.

5    Q    Have you or anyone in your household -- well,

6         again, let's maybe just focus on that time

7         period, make it a little bit easier.  During that

8         time when Carter was living with you in

9         Kimberling City, did -- did you or anyone in that

10        house have a subscription to Seventeen Magazine?

11   A    I don't recall, he may have, because he looked at

12        those magazines all the time and any fashion

13        magazine that there was, so he may have.

14   Q    Well, let -- let me be more specific then.

15        Did -- did you ever have a subscription to

16        Seventeen Magazine?

17   A    In my life?

18   Q    Yes.

19   A    Yes.

20   Q    And when was that?

21   A    Probably when our daughters were home.

22   Q    And when you -- about what time period was that

23        then?

24   A    Well, 20 years ago.

25   Q    So that would -- approximately 1987?

EXHIBIT _____ 29

PAGE _____ 464

306

```
 1   A    Even before.  I know we started taking

 2        Seventeen Magazine when the girls were pretty

 3        young.

 4   Q    And, I'm sorry, are, -- are your daughters older

 5        or younger than Carter?

 6   A    One is older, one is younger.

 7   Q    So both?

 8   A    Uh-huh.

 9   Q    I know that you mentioned Wade was the -- was the

10        oldest --

11   A    Yes.

12   Q    -- son.  Is he the oldest?

13   A    Yes.

14   Q    And then -- and then in terms of order, who was

15        next?

16   A    Wade is the oldest, then Amber, Annjanette,

17        Carter.

18   Q    So Carter's the youngest?

19   A    Yes.

20   Q    And, so, you -- you were saying that you had a

21        subscription there when -- when your daughters

22        were young, and then -- then once they grew up or

23        moved out that there was no longer that

24        subscription?

25   A    Oh, I don't remember that for certain, we may
```

EXHIBIT ___29___

PAGE ___485___

307

```
 1        have still been getting it, but mainly when they

 2        were home.  They were always around.

 3    Q   Is it fair to say that by the time Carter was

 4        living with you in Kimberling City that you no

 5        longer had a subscription to -- to Seventeen?

 6    A   Personally?

 7    Q   Yes.

 8    A   That's fair to say.  He may have had one, I don't

 9        recall.

10    Q   Right, I understand that part.  I'm just -- I'm

11        just now focusing on whether you had a

12        subscription?

13    A   (Shook head.)

14    Q   And you didn't have a subscription --

15    A   No.

16    Q   -- to Seventeen Magazine --

17    A   Not that I --

18    Q   -- during the time period when Carter was living

19        with you in Kimberling City?

20    A   No.  Sorry.

21            MR. PAGE:  She looks young but not that

22        young.

23    Q   (By Mr. Zeller) I make no assumptions.

24    A   We had magazines everywhere.

25            MR. PAGE:  She's more a Teen Beat girl.
```

EXHIBIT ___29___

___486___

308

1    Q    (By Mr. Zeller) Yesterday we talked a bit about

2         when Richard came and visited you there during

3         Christmas in Kimberling City?

4    A    Yes.

5    Q    And correct me if I'm wrong, I think I understood

6         that you were saying that Richard came and

7         visited that Christmas when Carter was living

8         with you in Kimberling City?

9    A    Yes.

10   Q    Do you remember, was that the occasion in which

11        Richard and Carter then drove back to California

12        and moved back?

13   A    I don't -- no, I don't believe so.

14   Q    So you think it was the prior year then, the

15        prior Christmas?

16   A    I believe so.

17   Q    Do you recall at some point when -- when Carter

18        moved back to California from Kimberling City,

19        him packing up and then -- and going back to

20        California?

21   A    Yes.

22   Q    Do you remember him driving?

23   A    Yes.

24   Q    Was Richard with him on that trip?

25   A    No, I don't believe so, I think he drove alone.

EXHIBIT _____ 29

PAGE _____ 487

314

1                    REPORTER'S CERTIFICATE

2        STATE OF MISSOURI)
                          ) ss
3        COUNTY OF GREENE )

4            I, DAWN A. CHAPMAN, Registered Professional
         Reporter, Certified Shorthand Reporter and
5        Certified Court Reporter, do hereby certify that
         the witness was duly sworn by me; that the facts
6        stated by me in the caption hereof are true; that
         the said witness did make the above and foregoing
7        answers in response to questions propounded as
         shown; that I did, in stenotype, report said
8        proceedings; and that the above and foregoing
         typewritten pages contain a full, true, and
9        correct transcription of my shorthand notes taken
         on such occasion.  That presentment by me to the
10       witness for signature was waived; that the
         deposition will be thereafter by the witness read
11       over, signed, and sworn to on or before the date
         of trial; that said deposition is now herewith
12       returned.

13

14           I further certify that I am neither attorney
         for, nor counsel for, nor related to, nor
15       employed by any of the parties to the action in
         which this deposition was taken; and, further,
16       that I am not a relative or employee of any
         attorney or counsel employed by the parties
17       hereto, or financially interested in the action.

18

19       _____
         DAWN A. CHAPMAN, RPR, CSR, CCR
20                       CCR No. 645

21

22

23            ALPHA REPORTING SERVICE
                3230-G South National
24           Springfield, Missouri 65807
                  (417) 887-4110
25

EXHIBIT ____29____

PAGE ____488____

**Exhibit 30**

Bryant, Carter re Gunther-Wahl v. Mattel

1      SUPERIOR COURT OF THE STATE OF CALIFORNIA

       COUNTY OF LOS ANGELES

2

3

       GUNTHER-WAHL PRODUCTIONS, INC.,  )

4      a corporation; and CANDY WAHL,   )

       an individual,                    )

5                             )

             Plaintiffs,      )

6                             )

          vs.              ) Case No. BC 269746

7                             )

       MATTEL, INC., a corporation;    )

8      and DOES 1 through 10,           )

       inclusive,                       )

9                             )

             Defendants.       )

10

11

12

13      THE VIDEOTAPED DEPOSITION OF CARTER BRYANT,

14

15     produced, sworn, and examined on Tuesday, September 9,

16     2003, at 1:02 p.m. of that day, pursuant to Notice to

17     Take Deposition at the Law Offices of Blackwell,

18     Sanders, Peper & Martin, 901 St. Louis Street, in the

19     City of Springfield, County of Greene, State of

20     Missouri, before Jill L. Paulsen, CSR, RPR, CCR #0432,

21     and Notary Public, in a certain cause now pending in the

22     Superior Court of the State of California, County of Los

23     Angeles, wherein the parties are as above set forth;

24     taken on behalf of the Defendants.

25

                        Unsigned                           Page i

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT _____ 30 _____

PAGE _____ 489 _____          M 0061802

1     APPEARANCES

2

3     For Plaintiffs:    Mr. Scott H. Carr

             Greene, Broillet, Panish & Wheeler

4             100 Wilshire Boulevard

             Twenty-First Floor

5             Post Office Box 2131

             Santa Monica, CA  90407-2131

6

      For Defendants:    Mr. Lawrence Y. Iser

7             Greenberg, Glusker, Fields, Claman,

                Machtinger & Kinsella

8             1900 Avenue Of The Stars

             21st Floor

9             Los Angeles, CA  90067

10    For the Witness:  Mr. Pete Salsich, III

             Blackwell, Sanders, Peper & Martin

11            720 Olive Street, Suite 2400

             St. Louis, MO  63101

12

      Videotaped by:    Mr. David Cron

13            Verbatim Video Services

             1528 East Glenwood

14            Springfield, MO  65804

15

16

17         I N D E X

18

      Witness:  CARTER BRYANT         Page

19

20    Examination by Mr. Iser         4

21    Examination by Mr. Carr         82

22    Further Examination by Mr. Carr        112

23    Reporter's Certificate and Costs       114

24

25    Phonetic spelling:  (ph.)

EXHIBIT ____30____

CONFIDENTIAL - ATTORNEYS EYES ONLY

PAGE____490____         M 0061803

1    Q  And what do they make?

2    A  Oh, they make a range of toys, electronic products,

3       consumer products.

4    Q  Have you done any consulting for Mattel since you

5       left their employ?

6    A  No, I have not.

7    Q  And your reason to leave was your -- voluntarily?

8    A  Yes, it was.

9    Q  When you left Mattel, were you required to sign any

10      confidentiality document?

11   A  I don't recall.

12   Q  Were you given any kind of severance pay at the

13      time you left Mattel?

14   A  No.

15   Q  Have you spoken with Mr. Iser or anyone at his

16      office at any time prior to the deposition

17      beginning today?

18   A  I have not personally, no.

19   Q  Okay.  As of the time the deposition commenced, did

20      you have an understanding as to what the issues

21      were in this case?

22   A  Yes, I did.

23   Q  From where did you obtain that information?

24   A  From the subpoena letter.

25   Q  Anything -- any other source?

Unsigned                  Page 88

EXHIBIT _____ 30

PAGE _____ 441

CONFIDENTIAL - ATTORNEYS EYES ONLY

M 0061889

1    A  No.

2    Q  You also indicated that when you were at Mattel,

3        you had heard about the Gunther-Wahl litigation and

4        that it involved fairies, correct?

5    A  Mm-hmm.  That's correct.

6    Q  Is that a "yes"?  Okay.

7        Do you recall from where you heard that?

8    A  No, I don't.

9    Q  Did you hear anything else or have any other

10       knowledge regarding the litigation other than the

11       fact that it involved fairies?

12   A  No, I did not.

13   Q  At what point in time did you learn of the

14       existence of the litigation?

15   A  I don't remember the exact point in time.

16   Q  Do you recall approximately when?

17   A  It might have been sometime in 2000.

18   Q  It was with your second stint with the company?

19   A  Yes, it was.

20   Q  So that would have been sometime between January

21       of '99 and October of 2000?

22   A  That's correct.

23   Q  Okay.  By the way, during the time that you were

24       away from Mattel, you indicated that -- from 1998

25       till January of 1999, you indicated that you had

EXHIBIT _____ 30

CONFIDENTIAL - ATTORNEYS EYES ONLY

PAGE _____ 492

M 0061890

Bryant, Carter re Gunther-Wahl v. Mattel

1    done some work here in Missouri. What type of work

2    did you do?

3    A  Oh, I think at the time I was just generally

4       doing -- I think I was actually working in a movie

5       theater.

6    Q  Okay. Nothing in the design field?

7    A  No.

8    Q  When did you first begin working on the Fairy of

9       the Garden doll?

10   A  I don't exactly recall what specific period of time

11      it was. It was probably in 1999.

12   Q  Again, it was during your second stint with the

13      company?

14   A  Exactly.

15   Q  Okay. And could the same be said for the other

16      flower dolls that we'd talked about earlier today,

17      they were all done -- they were all commenced

18      during your second stint with the company?

19   A  Yes.

20   Q  So, again, that would be sometime from January

21      of '99 to October of 2000?

22   A  That's correct.

23   Q  Do you have any further -- can you give us any

24      further time frame or tighter time frame as to when

25      you worked on those dolls?

Unsigned

Page 90

EXHIBIT ___30___

PAGE ___493___

CONFIDENTIAL - ATTORNEYS EYES ONLY

M 0061891

1   A   Not without possibly referring back to the document

2       to see if there's any indication.

3   Q   Can you take a look at the document and see if that

4       will refresh your recollection in any respect as to

5       when you worked on any of the four dolls that we've

6       talked about.

7           MR. ISER:  Take a look -- if I might help,

8       take a look at the last four pages of the exhibit.

9           THE WITNESS:  Okay.

10          MR. ISER:  I think we pointed out that

11      they were dated.

12          THE WITNESS:  Yes.

13  A   So looks like it would have been sometime probably

14      around the first of 2000, maybe from January.

15  Q   (By Mr. Carr)  Would that have been the time that

16      you started working on the first, which would be

17      the Rose doll?

18          MR. ISER:  I think he was referring to

19      Fairy of the Garden in the last answer.

20  Q   (By Mr. Carr)  Oh, I'm sorry.  I'm sorry.

21  A   I was referring to Fairy of the Garden.

22  Q   Okay.  Can you give us -- tell us the approximate

23      time frame you began working on the Rose doll?

24          MR. ISER:  I don't think anything was

25      dated.

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT _____ 30

PAGE _____ 494

M 0061892

Bryant, Carter re Gunther-Wahl v. Mattel

1           REPORTER'S CERTIFICATE

2

3     STATE OF MISSOURI   )

                 ) ss.

4     COUNTY OF GREENE   )

5

6        I, Jill L. Paulsen, CSR, RPR, CCR #0432, and

Notary Public within and for the State of Missouri, do

7    hereby certify that on September 9, 2003, pursuant to

Notice, the above witness, CARTER BRYANT, was by me

8    first duly sworn to testify the truth, the whole truth,

and nothing but the truth in the case aforesaid; and

9    that the deposition by him was reduced to writing by me

in stenotype, and thereafter transcribed by me, and is

10   fully and accurately set forth in the preceding pages;

that presentment by me to the witness for signature was

11   waived; and that the deposition will be thereafter by

the witness read, signed, and sworn to on or before the

12   date of trial.

13      I do further certify that I am not related to,

nor attorney for, nor employed by any of the said

14   parties, nor otherwise interested in the event of said

action.

15

      IN WITNESS WHEREOF, I have hereunto set my hand and

16   seal on September 16, 2003.

17           _____

           Jill L. Paulsen, CSR, CCR #0432

18            Registered Professional Reporter

           Notary Public

19

My commission expires July 29, 2006.

20

21

22   Costs: Plaintiffs   $ 167.05

        Defendants   $ 478.26

23

24

25

Unsigned                              Page -

EXHIBIT __30__

CONFIDENTIAL - ATTORNEYS EYES ONLY

PAGE ____495____         M 0061915

**Exhibit 31**

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

MATTEL, INC., a Delaware Corporation,

        Plaintiff,

    vs.           CASE NO. CV 04-9059 NM
                      (RJBx)

CARTER BRYANT, an individual, and
DOES 1 through 10, Inclusive.

        Defendants.
_____

CARTER BRYANT, on behalf of himself,
all present and former employees of
Mattel, Inc., and the general public.

        Cross-Complaint.

    vs.

MATTEL, INC.,
a Delaware corporation.

        Cross-Defendant.
_____

CERTIFIED COPY

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF JACQUELINE RAMONA PRINCE

Tuesday, December 21, 2004

Atlanta, Georgia

Reported by:
Kendra R. Bridges
B-2194 Court Reporter
Court Reporter/Notary Public
JOB NO. 29654

www.sarnoffcourtreporters.com

46 Corporate Park, Suite 100   445 South Figueroa St., Suite 2950
Irvine, CA  92606            Los Angeles, CA  90071

phone  877.955.3855
fax     949.955.3854



SARNOFF
Court Reporters and
Legal Technologies

EXHIBIT 31

PAGE 496

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      IN THE UNITED STATES DISTRICT COURT

2    FOR THE CENTRAL DISTRICT OF CALIFORNIA

4  MATTEL, INC., a Delaware Corporation,

5          Plaintiff,

6      vs.        CASE NO. CV 04-9059 NM
                    (RJBx)

7  CARTER BRYANT, an individual, and
    DOES 1 through 10, Inclusive.

8

9        Defendants.
_____

10  CARTER BRYANT, on behalf of himself,
    all present and former employees of

11  Mattel, Inc., and the general public.

12       Cross-Complaint.

13      vs.

14  MATTEL, INC.,
    a Delaware corporation.

15       Cross-Defendant.

16  _____

17

18      Deposition of JACQUELINE PRINCE, taken by the

19  Defendant, at 999 Peachtree Street, Suite 2300, Atlanta,

20  Georgia, on the 21st day of December, 2004, at 9:40 a.m.,

21  before Kendra R. Bridges, Registered Professional

22  Reporter and Notary Public.

23

24

25

EXHIBIT 31

PAGE 497

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   APPEARANCES OF COUNSEL:

 2

 3   For the Plaintiff and Cross-Defendant:

 4   MR. MICHAEL T. ZELLER, Esq.

 5   Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP

 6   865 South Figueroa Street

 7   Tenth Floor

 8   Los Angeles, California  90017

 9   213-624-7707

10   213-624-0643

11   mtz@quinnemanuel.com

12

13   MICHAEL MOORE, Esq.

14   Mattel, Inc.

15   333 Continental Boulevard

16   El Segundo, California  90245

17   310-252-2000

18   310-252-3861

19   michael.moore@mattel.com

20

21

22

23

24

25
```

EXHIBIT ___31___

PAGE ___498___

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    APPEARANCES OF COUNSEL:  (CONTINUED)

2

3    For the Defendants:

4    LARRY W. MCFARLAND, Esq.

5    KEATS MCFARLAND & WILSON

6    9720 Wilshire Boulevard

7    Penthouse Suite

8    Beverly Hills, California   90212

9    310-777-3750

10   310-860-0363

11   lmcfarland@kmwlaw.com

12

13   DONALD W. BENSON, Esq.

14   LITTLER MEDELSON

15   3348 Peachtree Road, NE

16   Suite 1100

17   Atlanta, Georgia   30326

18   404-233-0330

19   404-233-2361

20   dbenson@littler.com

21

22

23

24

25
```

                                                              4

EXHIBIT  3 1

PAGE   499

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL: (CONTINUED)

 2

 3    For Ms. Prince:

 4    DANIEL J. WARREN, Esq.

 5    Sutherland Asbill & Brennan, LLP

 6    999 Peachtree Street

 7    Suite 2300

 8    Atlanta, Georgia  30309

 9    404-853-8028

10    404-853-8806

11    djwarren@sablaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5

EXHIBIT 31

PAGE 500

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    up, you knew by then he wanted some drawings or other

2    things notarized?

3         A.   I didn't know until he got inside and we sat

4    down in my living room and started talking.

5         Q.   And then that's when he -- it became clear to

6    you at least --

7         A.   Right.

8         Q.   -- what he wanted?

9         A.   Right.

10        Q.   What time of the day or was it in the course of

11   the evening did Mr. Bryant stop by?

12        A.   I don't remember.

13        Q.   You don't remember if it was dark out?

14        A.   It wasn't really dark, but I don't remember what

15   time it was.

16        Q.   Did you go to work on that day?

17        A.   I don't remember.  I don't remember if it was

18   that same day or the weekend; I don't remember.

19        Q.   Well, if I told you that August 26th, 1999 was a

20   Thursday, would that help your recollection at all?

21        A.   No.  I mean, I know the date's there, but I

22   don't really remember the time or the date or anything.

23        Q.   In 1999, on Thursdays, were you typically at

24   work --

25        A.   Yes.

123

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   -- during the day?

2      A.   Uh-huh.

3      Q.   Did you have typical office hours that you kept?

4      A.   8:00 to 5:00.

5      Q.   Every day, during the week?

6      A.   Oh and on -- yeah, except Friday.  Eight to one.

7      Q.   So the record's clear then, your normal office

8   or business hours on Mondays, Tuesdays, Wednesdays, and

9   Thursdays was 8:00 a.m. to about 5:00 p.m.?

10     A.   Right.

11     Q.   And so having talked about that, do you have any

12  better recollection as to the time of day or the evening

13  when Mr. Bryant showed up with his drawings?

14     A.   No.

15     Q.   Was there anyone else in your apartment when he

16  showed up?

17     A.   My two little boys.

18     Q.   Was anyone else around at anytime when you and

19  Mr. Bryant were there?

20     A.   No.

21     Q.   So Mr. Bryant at some point showed up at your

22  apartment and he came in.  If you could please tell me

23  what it is that happened from there.

24     A.   He just said that he had these drawings that he

25  had worked on while he was back home visiting in --

124

EXHIBIT 31

PAGE 502

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    reuniting with his family is what he said.  And that he

2    wanted to somehow have some documentation that he did

3    those before he started working back at Mattel.  And I

4    said, Well, I don't know how to do that.  And he said,

5    Why don't we just notarize it for today.  I could

6    notarize my signature on there, right?  I said, Yeah, we

7    could do that.  So that's what we did.

8        Q.   And so the drawings themselves were actually

9    notarized all on that -- on that same occasion?

10       A.   Right.

11       Q.   In other words he didn't go and get his drawings

12   and come back?

13       A.   No, he had them with him.

14       Q.   Did Mr. Bryant tell you why it is that he wanted

15   to document that he did the drawings before he worked

16   for Mattel?

17       A.   Yes.  Because he said he didn't want anyone to

18   think that he did those while he was at Mattel.

19       Q.   Did he say why he didn't want anyone to think

20   that?

21       A.   No.  He just said that he brainstormed and came

22   up with the ideas while he was back home with his family.

23       Q.   Did you have any understanding as to why

24   Mr. Bryant didn't want anyone to think that he came up

25   with the drawings when he was at Mattel?

SARNOFF COURT REPORTERS & LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT 31

PAGE 703

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   No.

2    Q.   Do you have any expectation or understanding

3  from any source as to why Mr. Bryant wanted that?

4    A.   No. I would just think that he just wanted to

5  make sure that it was understood that he did those when

6  he wasn't there.

7    Q.   And did you have an understanding of what affect

8  that would have?

9    A.   Not really.

10    Q.   Did Mr. Bryant discuss what affect that might

11  have?

12    A.   No.

13    Q.   But it was clear to that you that that's what he

14  was concerned about?

15    A.   Yeah.   He seemed a little concerned.

16    Q.   Did you have an understanding or did Mr. Bryant

17  say what is it that prompted him to be concerned about

18  this?

19    A.   Not really.   I didn't really ask him.

20    Q.   Did you ever obtain from any source any

21  understanding as to why Mr. Bryant was concerned about

22  that?

23    A.   No.

24        MR. MCFARLAND:   I'm just objecting when you

25        keep asking these questions from any source.   I just

126

EXHIBIT   31
PAGE   1304

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    at least your viewpoint that there wasn't a way of

2    documenting through the notary process --

3        A.   No.

4        Q.   -- the creation date or the idea date?

5            MR. MCFARLAND:   Objection; calls for

6        speculation.

7            THE WITNESS:   He didn't seem disappointed.

8        Q.   (By Mr. Zeller)   Didn't seem surprised either,

9    to your mind?

10           MR. MCFARLAND:   Objection; calls for

11       speculation.

12           THE WITNESS:   No.

13       Q.   (By Mr. Zeller)   And who was it -- well, I'll

14   ask it this way:   It's your recollection that then you

15   were the one who suggested that one way of doing -- of

16   documenting the -- that at least the date as of the time

17   you were doing the notarization was you?

18       A.   Yes.

19       Q.   That wasn't something that Mr. Bryant came up

20   with that you recall?

21       A.   No.

22       Q.   Or that Mr. Bryant brought up I should say?

23       A.   No.

24       Q.   And did Mr. Bryant comment on that idea at all?

25       A.   No.

SARNOFF COURT REPORTERS & LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT __3 1__

PAGE __505__

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   He just said --

2    A.   He just said, Well, let's do that.

3    Q.   Had Mr. Bryant pulled out the drawings prior to

4    the time that you had that discussion or any part of that

5    discussion?

6    A.   Yes.

7    Q.   Okay.  Maybe you could tell me the first that

8    you can recall happening during the conversation you had

9    with Mr. Bryant?

10    A.   I just remember that the -- I just remember

11    looking at the drawings.

12    Q.   He came in and he sat down in your living room;

13    right?  Is that correct?

14    A.   Would you repeat that?

15    Q.   Yeah.  Mr. Bryant came into your house --

16    A.   Uh-huh.

17    Q.   -- or excuse me, your apartment, and sat down in

18    your living room; right?

19    A.   Right.

20    Q.   And did he pull out the drawings at that time or

21    did you -- did you chat first?

22    A.   We chatted first.

23    Q.   Was it about the drawings or about the dolls?

24    A.   He was explaining what he wanted, which was

25    to -- that he had worked on some drawings while he was in

138

EXHIBIT ___31___

PAGE ___506___

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Minnesota I think it was, and that he was trying to

2    figure out a way to document that they had been done

3    before he came from Minnesota.

4         And I said, Well, I don't know what to do except

5    we -- I mean, the only thing I can do as far as being a

6    notary is just acknowledge your signature, this date and

7    time.  If you want to do that, put those on there.  He

8    said, Okay, let's do that, and that was that.

9         Q.  Was it actually Missouri instead of Minnesota?

10        A.  I don't know if it was Missouri or Minnesota.  I

11   always forget which one.

12        Q.  If you take a look back at Exhibit 60 in your

13   journal entry, you'll see it has the word Missouri?

14        A.  Oh, okay.  I'm sure it's Missouri.

15        Q.  Does that help your recollection?

16        A.  Yeah.  Oh, yeah.  I'll be -- I still don't

17   remember.

18        Q.  But based on your journal entry, you think

19   it's more likely it was Missouri?

20        A.  Well, yes, that's obviously what he told me at

21   the time.

22        Q.  Well -- but my question is a little bit

23   different in this sense:  Did Mr. Bryant pull out the

24   drawings before he started explaining what they were and

25   what he wanted or did he start explaining first and then

139

EXHIBIT __31__

PAGE ___507___

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    show you the drawings?

2         A.   I don't remember exactly.

3              THE VIDEOGRAPHER:   12:48.  We're off the

4         record.

5              (Whereupon, a recess was taken.)

6              THE VIDEOGRAPHER:   1:17.  We're back on the

7         record.

8              MR. ZELLER:   Let's please mark as Exhibit 61 a

9         one-page document which consists of a letter from

10        Charlotte McCluskey to Jacqueline Ramona Prince,

11        dated July 21st, 2004.

12              (Whereupon, Exhibit 61 was marked for

13              identification.)

14        Q.   (By Mr. Zeller)  For the record this is a letter

15        that was just produced today?

16        A.   Yeah.

17        Q.   And you recognize that as the letter that you

18        were referring to earlier in your testimony --

19        A.   Yes.

20        Q.   -- relating to the original of your notary

21        journal?

22        A.   Yes.

23        Q.   And the stamp as well?

24        A.   Yes.

25        Q.   Now, unfortunately there's only -- why don't you
```

EXHIBIT ___31___

PAGE ___508___

Page 199

1

2   STATE OF GEORGIA:

3   COUNTY OF FULTON:

4   I hereby certify that the foregoing

5   deposition was stenographically recorded by me, as

6   stated in the caption.  The deponent was duly sworn

7   to tell the truth, the whole truth, and nothing but

8   the truth.  The colloquies, statements, questions,

9   and answers thereto were reduced to typewriting

10   under my direction and supervision; that the

11   deposition is a true and correct record of the

12   testimony/evidence given by the deponent.

13   I further certify that I am not a relative,

14   an employee of attorney or counsel of the parties,

15   nor am I financially interested in the action.

16        This, the 21st day of December, 2004

17

18        *Kendra R. Bridges*

19        KENDRA R. BRIDGES

20        Certified Court Reporter

21        (B-2194) and Notary Public

22        My commission expires on the

23        5th day of August 2008.

24

25

KENDRA~1.TIF

EXHIBIT 31

PAGE 509

**Exhibit 32**

www.rileywelch.com

# RILEY WELCH AGINSKY
## &
## FORENSIC DOCUMENT EXAMINATIONS, Inc.

P.O. Box 80225, Lansing, Michigan 48908-0225
Telephone (517) 394-1512  Fax (517) 882-2767

Thomas P. Riley, BS
Forensic Document Examiner *, **

Valery N. Aginsky, Ph.D., Ink Chemist
Gregoire P. Michaud, BA, Latent Print Examiner
Felix Adatsi, Ph.D., Toxicologist

Todd W. Welch, BA
Forensic Document Examiner*

February 8, 2008

Diane Cafferata Hutnyan, Esq.
Quinn Emanuel Urquhart Oliver & Hedges LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3666

    Re:  Bryant v. Mattel

Dear Ms. Hutnyan:

I have examined the following document:

**A-1:**  Official Journal of Notarial Acts comprising handwritten entries dated from 1/15/96
    (pages 1 and 2) to 9/14/99 (pages 11 and 12).[1]

## EXAMINATION TASK

I was asked to determine whether the 8/26/99 notation "From 1998 Missouri" was written
contemporaneously with the rest of the entry dated 8/26/99 on pages 11 and 12 of document A-1
or whether it was written at a later date.

## QUALIFICATIONS

I am a forensic chemist of 27 years' experience. I am currently employed, as a Forensic Chemist
specializing in the field of ink analysis and document dating, with Riley, Welch & Aginsky
Forensic Document Examinations, Inc. (formerly known as Riley, Welch & Associates Forensic
Document Examinations, Inc.) I received my Ph.D. in Analytical Chemistry in 1980. Prior to
joining Riley, Welch & Associates I worked as a senior research chemist with the Forensic

---

[1] Also, I have reviewed the following documents:  the August 30, 2007 Order of Judge Infante;  8 boxes of
original Carter Bryant production documents described in Judge Infante's August 30, 2007 Order;  bates
numbered photocopies, video and photographs of these documents;  the transcripts of Carter Bryant's
depositions taken on 11/4/2004 (Vol. 1), 11/5/2004 (Vol. 2), 11/8/2004 (Vol. 3);  the transcripts of
Jacqueline Prince's deposition taken on 12/21/2004.

*Diplomate of the American Board of Forensic Document Examiners, Inc.
**American Society of Questioned Document Examiners

EXHIBIT _____ 32 _____

PAGE _____ 510 _____



Science Center, Ministry of the Interior, Russia. I am experienced in a wide range of examination techniques, but my particular specialty is the analysis and dating of ink on documents by Thin-Layer Chromatography and Gas Chromatography-Mass Spectrometry. I am the author of more than 20 peer-reviewed articles on ink analysis and dating, including chapters in three books and two encyclopedias.

A copy of my curriculum vitae showing further details of my professional history and a list of my professional publications is attached hereto as Exhibit "VNA-1."

In the past five years I have been deposed in my capacity as an expert fifteen times and have testified at trial and hearings as an expert on thirteen occasions, a list of which is attached hereto as Exhibit "VNA-2." I am being compensated for my work in this case according to my hourly rate, which is outlined in the fee schedule attached hereto as Exhibit "VNA-3."

## REPORT OF LABORATORY EXAMINATION

The addition of extra writing can greatly change the meaning of the wording or the value of a document. Therefore, forensic document examinations are often conducted in order to determine whether two pieces of written text originated from the same pen.

As it is usually preferable not to damage the document, the process of forensic ink comparison always begins with the physical examination of the inks using techniques designed to obtain as much information as possible from the ink (and the document as a whole) by visual examination and other nondestructive means, such as microscopic and infrared absorption examinations.[2] If any of the nondestructive techniques shows that the inks being compared are different, then no additional tests, including more sophisticated chemical tests, are required to prove that the two pieces of the written text did not originate from the same pen.

If the nondestructive techniques cannot discriminate between the inks being compared, then chemical methods are to be used. A few samples of each ink are taken from the paper for their chemical analysis. Chemical methods are more effective for discriminating between inks of the same color than the physical (nondestructive) methods. It is widely accepted in the field of forensic writing ink analysis that a combination of two chemical methods, thin-layer chromatography (TLC) and gas chromatography-mass spectrometry (GC-MS), allows the examiner to retrieve maximum information about the composition of writing ink.

Writing inks are made of colorants (dyes, pigments) and a carrier (vehicle). Oil- and water-based ballpoint ink vehicles consist of two main ingredients – solvents that are used to dissolve or disperse the colorants, and the resins that are used to thicken the inks. TLC analyzes ink colorants (ink colored components) and GC-MS analyzes ink vehicle components (volatile solvents, resins and other noncolored ink components, such as modifiers, lubricants, thickeners, antiseptics, surfactants, by-products, etc.) That is, each of these two chemical methods, TLC and

---

[2] ASTM Standard Guide E1422-05, "Standard Guide for Test Methods for Forensic Writing Ink Comparison." Published January 2006. Originally approved in 1991. Last previous edition approved in 2001 as E 1422 – 01.

EXHIBIT ___32___

PAGE ___511___



GC-MS, can provide only some partial information about the composition of writing ink. In simple terms, TLC can analyze one half of the ink composition (1/2 of the "chemical fingerprint" of an ink), and GC-MS can analyze the other half of the ink composition (the other 1/2 of the "chemical fingerprint" of the ink). Thus, these two methods perfectly complement each other.[3]

The physical and chemical examinations including visual, microscopic, and infrared absorption examinations, TLC, and GC-MS were conducted in the following succession.

## PHYSICAL (NONDESTRUCTIVE OPTICAL) EXAMINATIONS

VISUAL EXAMINATION

As mentioned above, the insertion of a modifying clause or sentence may change the meaning of a document. Visual examination is an accepted method in the field of forensic document examination that is used to detect insertions (interlineations or additions). To determine that an insertion or addition has been made usually involves a study of the document as a whole.

Two most common indications of the insertion of a handwritten sentence are as follows[4]:

1. The inserted sentence and the balance of the document are written with different inks.

2. Some sentence is either (A) inserted between the lines of the initial text (if no sufficient space was available within the initial text) or (B) inserted/added immediately after the last line of the initial text (if no sufficient space is available immediately after the last line of the initial text, then the spacing/distance between the inserted sentence and the last line of the text is usually smaller than the spacing between the lines of this text).

All the pages of document A-1 that contained handwritten entries were examined visually (pages 1 through 12; entries dated 1/15/96 through 9/14/99; see Attachment 3). Among these pages, the only place that showed the insertion of material to the initial text was where the notation "From 1998 Missouri" was added to the entry dated 8/26/99 on page 11.[5] The 4 lines of the text "Original sketches of doll idea -- characters 6-total = Names are: Zoe, Lupe, Hallidae, Jade, 2 males." appear evenly spaced and, without the presence of the 5th line (the notation "From 1998 Missouri"), they appear to fill up the entire cell of the table on page 11. Thus, a person wishing to add further information to this 4-line entry would have to squeeze the new wording in between the last line of the entry and the printed horizontal line of the cell of the table in a way that would prevent the same even spacing as was in the original entry. Because no sufficient space was available immediately after the last line of the initial 4-line entry, there is almost no spacing

---

[3] Aginsky, V.N. "Using TLC and GC-MS to Determine whether Inks Came from the Same Manufacturing Batch," *Journal of the American Society of Questioned Document Examiners*, Vol. 9, No. 1, 2006, pp. 19-27.

[4] Scientific Examination of Questioned Documents / Edited by J.S. Kelly and B.S. Lindblom. – 2nd edition, CRC Press, Taylor & Francis, 2006, pp. 319-335.

[5] There might be other notations on pages 1 through 12 that could have been inserted, but the overall appearance of the other entries on pages 1 through 12 did not suggest later insertion.

EXHIBIT ____32____

PAGE ____512____



between the inserted 5th line (the notation "From 1998 Missouri") and the last line of the initial 4-line entry.

## MICROSCOPY

The eye is in itself a powerful scientific instrument capable of discovering much information from an examination of ink on paper. With the aid of glass lenses for magnifying and focusing or a microscope (that uses visual light for illumination), the appearance of a line written on paper gives the document examiner valuable information that may allow discrimination between inks or may individualize the writing instrument through its performance characteristics.

In this examination, 4X and 10X magnifying glasses and a microscope with magnification up to 140X were used. I noted that the width of the ink lines in the notation "From 1998 Missouri" was slightly larger than the width of the ink lines in the rest of the 8/26/99 entry.

The microscopic study did not detect any significant differences between the inks or writing instruments used to produce the notation "From 1998 Missouri" and the surrounding entries written by the Notary Public on pages 11 and 12 of document A-1. This indicates that these inks are either of the same composition (formulation) or of different compositions that cannot be distinguished by the microscopic examination.

## INFRARED ABSORPTION

Inks of the same color (indistinguishable to the naked eye) may differently absorb/reflect invisible radiation beyond the red portion of the visible spectrum. This may allow discrimination between similar (in color) but not identical (in composition) inks. The infrared absorption examination did not detect any differences between the inks used to produce the notation "From 1998 Missouri" and the surrounding entries written by the Notary Public on pages 11 and 12 of document A-1. This indicates that these inks are either of the same composition (formulation) or of different compositions that cannot be distinguished by the infrared absorption examination method.

## CHEMICAL EXAMINATIONS

### SAMPLING

The sampling procedure involved removing portions of the written lines from the entries to be examined. This was accomplished with a hypodermic needle sized hole punch, which removes hole punches of less than 1 mm in diameter. (The bored out ink samples are removed with a plunger). The ink-on-paper samples were taken from 17 areas on pages 11 and 12 of document A-1. The paper blank samples were taken from two areas of paper (on page 11) that did not contain ink. These 17 sets of ink samples and 2 sets of paper blank samples were then analyzed by TLC and GC-MS (as described below). Prior to their analysis by TLC and GC-MS, the samples were kept in my laboratory at normal environmental conditions.[6]

---

[6] Normal room/office humidity and temperature: 72 degrees Fahrenheit plus/minus up to approximately 15 degrees Fahrenheit (i.e. $22^0$C +/- ca. $8^0$C).

EXHIBIT ___32___

PAGE ___513___



RILEY WELCH AGINSKY
Forensic Document Examinations, Inc.

**Ms. Diane Hutnyan**                    **February 8, 2008**                    **Page 5 of 8**

Black and white copies of pages 11 and 12 from which I took ink samples are attached to this report as Attachments 1 and 2, respectively. On these two attachments, each of the above 17 areas is circled and numbered. The questioned notation "From 1998 Missouri" is numbered as entry "8" (see Attachment 1).

CHROMATOGRAPHY

Chromatography is used to separate mixtures of substances into their components. Chromatography was discovered in 1901 when Michael S. Tswett separated pigments from chlorophyll using self-made chromatographic columns packed with various adsorbents. This fundamental discovery marked a milestone in the development of chromatographic separation techniques that led to Nobel prizes in chemistry. Today, chromatography has become the main analytical method in the pharmaceutical industry, food analysis, petrochemical analysis (crude oil, gasoline, kerosene, etc.), biochemical research, environmental analysis (e.g., pesticides in drinking water), clinical analysis (e.g., therapeutic drug monitoring, metabolism disorders), toxicology, forensic and doping analysis, and in many other areas. Thin-layer chromatography (TLC) and gas chromatography-mass spectrometry (GC-MS) are 2 chromatographic methods that are most widely used in analytical and forensic science laboratories all over the world.

Both methods, TLC and GC-MS, were used in this examination.

THIN-LAYER CHROMATOGRAPHY (TLC)

A TLC plate is a sheet of glass or plastic that is coated with a thin layer of a solid adsorbent (usually silica). A sample of the substance to be analyzed is dissolved in an appropriate solvent, and a small amount of the obtained solution is spotted near the bottom of the TLC plate. The TLC plate is then placed in a shallow pool of a solvent in a developing chamber so that only the very bottom of the plate is in the liquid. This liquid, or the eluent, is the mobile phase, and it slowly rises up the TLC plate by capillary action. The components of the sample become separated from one another because of their different degrees of attachment to the coating material (stationary phase) on the plate. The solvent is then allowed to evaporate, and the separated components of the mixture are visualized. If the separated components are colored, visualization is straightforward. If the colorant of ink is a mixture of different dyes, then these dyes are separated on the TLC plate into spots of different colors. Thus, TLC is a very effective method for discriminating between similarly colored inks (if the colorants of the inks consist of different ink dye components that can be separated on the TLC plate).

In this examination, the TLC analysis of the ink samples was conducted as follows. A subset consisting of 3 samples of ink (microplugs) was isolated from each of the above 17 sets of ink samples. Each subset of microplugs was placed into a small glass vial. To each of the vials 2-3 microliters of dimethylformamide were added. The ink was extracted for 30 minutes. The ink extract (visually colorless) was transferred by a capillary pipette to the TLC plate. This transfer process continued until the entire extract had been transferred to the TLC plate (for each sample to be tested). The TLC plate was allowed to air dry and was then placed in a vertical orientation into a developing tank. The tank was a glass enclosure with a removable lid and contained a few milliliters of solution (ethyl acetate – isopropanol – water – acetic acid = 30:15:10:1). After 10 minutes of development the TLC plate was removed from the tank and viewed in both UV (254

EXHIBIT ___32___

PAGE ___94___



and 365 nm) and white light with the unaided eye. Often similarities and differences in colored (dyes) and non-colored components present and relative proportions of the components are noted resulting in conclusions about the number of different ink formulations within the ink samples examined. In this examination, the TLC analysis of the ink samples showed that none of them contained any extractable ink components that could be seen in the form of separated colored spots on the TLC plate. It indicates that the colorant of the ink(s) within the ink samples examined is either carbon black or another insoluble black pigment. Thus, the TLC analysis did not detect any differences between the inks used to produce the notation "From 1998 Missouri" and the surrounding entries written by the Notary Public on pages 11 and 12 of document A-1. This indicates that these inks are either of the same composition (formulation) or of different compositions that cannot be distinguished by TLC.

GAS CHROMATOGRAPHY-MASS SPECTROMETRY (GC-MS)

GC-MS is a widely accepted analytical method of determining the qualitative composition of multi-component systems. It is routinely used in analytical and forensic science laboratories all over the world.[7] In the field of forensic document examination, GC-MS is used for discriminating between similarly colored inks that have been made using different ink vehicle components (solvents, resins, modifiers, lubricants, thickeners, antiseptics, surfactants, by-products, etc.)

The procedure of the GC-MS analysis involves vaporizing a sample and sweeping it through a column with a moving stream of gas termed the mobile phase or the carrier gas. Compressed gas cylinders commonly supply the gases. The sample is introduced into the injection port. The most common type of analysis involves the injection of approximately 1 microliter of a liquid sample into a heated injection port, which is interfaced to the capillary column where the actual separation takes place. The capillary column's inner walls are coated with a viscous liquid material (it is called the stationary phase). This inner coating will interact with different molecules to different extents. Those components of the mixture, which weakly interact with the stationary phase, pass more quickly through the column than those compounds, which have strong interactions with the stationary phase. For this reason, different components of the mixture exit the column at different times. As each component of the mixture comes off the column, it is detected by the MS detector. The detector sends a signal to the attached computer, which displays each signal as a peak on a chart. The array of peaks (one peak for each component) is called a chromatogram. A chromatogram obtained for a certain material can be considered as a "chemical fingerprint" of the vehicle components of this material. When GC-MS is used for comparing, say, 10 entries written with similarly colored inks, the chromatograms are recorded for each of the 10 inks, and then these "chemical fingerprints" are compared to determine the number of different ink formulations used to produce the entries.

In this examination, the GC-MS analysis of the ink samples was conducted as follows. A subset consisting of 3 to 5 microplugs was isolated from each of the above 17 sets of ink samples. Each subset of microplugs was placed into a small glass vial. (3 microplugs of the paper blanks were placed into another vial). To each of the vials 2 microliters of chloroform were added. The ink

---

[7] For example, GC-MS is used for separating accelerants in fire residue from suspected arson fires and for the analysis of drugs.

EXHIBIT ___32___

PAGE ___5|5___



**RILEY WELCH AGINSKY**
Forensic Document Examiners Inc.

| Ms. Diane Hutnyan | February 8, 2008 | Page 7 of 8 |
|---|---|---|

was extracted for 30 minutes. The extracts were analyzed using an Agilent 6850 gas chromatograph interfaced with an Agilent 5973N mass selective detector and equipped with a split/splitless injection system.

The GC-MS conditions and parameters were as follows:

Column: HP-5MS, 30 m x 0.25 mm ID x 0.25-micrometer film thickness (cross-linked 5%-phenyl-95%-dimethylpolysiloxane)

Carrier: helium (column flow 1 mL/min)

Oven program: isothermal for 1 min at 35ºC, program 15ºC/min to 230ºC and hold for 7 minutes

Injection: 1 microliter, splitless, T=250ºC

Purge on time: 1 minute

GC-MS transfer line: 280ºC

The GC-MS analysis revealed the presence of 2 different inks of black color within the ink samples examined: the ink (*ink 1*) used to produce the notation "From 1998 Missouri" on page 11 of document A-1 and the ink (*ink 2*) used to produce the other examined entries on pages 11 and 12 of document A-1.

The difference between *ink 1* and *ink 2* revealed by the GC-MS test is that *ink 1* contains a vehicle component (alkyl derivative of cyclohexanol) that is absent in *ink 2*. This result of the GC-MS analysis shows that *ink 1* and *ink 2* are of different compositions.

## SUMMARY OF EXAMINATION RESULTS

I.      The black inks of two different compositions were found among the examined entries appearing on pages 11 and 12 of document A-1:

- *Ink 1:* the ink used to produce the notation "From 1998 Missouri" on page 11 of document A-1 (entry 8; see Attachment 1).

- *Ink 2:* the ink used to produce the remainder of the writing made by the Notary Public on pages 11 and 12 of document A-1 (entries 1 through 7 and 9 through 17; see Attachments 1 and 2).

II.     As considered above, in section Visual Examination, the location of the notation "From 1998 Missouri" on page 11 of document A-1 clearly shows that this notation is squeezed in between the last line of the 8/26/99 entry "Original sketches of doll idea – characters 6-total = Names are: Zoe, Lupe, Hallidae, Jade, 2 males." and the printed horizontal line below it.

EXHIBIT ___32___

PAGE ___514___



**RILEY WELCH AGINSKY**
**&**
**FORENSIC DOCUMENT EXAMINATIONS, Inc.**

Ms. Diane Hutnyan                    **February 8, 2008**                    **Page 8 of 8**

## CONCLUSION

Based on the results of this examination and my professional experience, it is my opinion that the notation "From 1998 Missouri" was written on page 11 of document A-1 at a later time compared to the rest of the 8/26/99 entry written on pages 11 and 12 of document A-1.

It is also my opinion that the most probable sequence of the writing of the entries on pages 11 and 12 of document A-1 was as follows:

1. The entry dated 8/26/99
2. The entry dated 9/14/99
3. The second entry dated 9/14/99
4. The notation "From 1998 Missouri"

## DISPOSITION OF EVIDENCE

The evidence was returned to Mr. Daniel J. Warren, Esq. (Sutherland Asbill & Brennan, LLP, 999 Peachtree Street, Suite 2300, Atlanta, GA 30309) on January 31, 2008 via Federal Express, tracking number 8635 6224 9130.

Very truly yours,

RILEY, WELCH & AGINSKY
FORENSIC DOCUMENT EXAMINATIONS, INC.

Valery N. Aginsky, Ph.D.
Forensic Chemist

Attachments:

Attachment 1 – Reduced copy of page 11 of document A-1
Attachment 2 – Reduced copy of page 12 of document A-1
Attachment 3 – Reduced copies of the cover page and pages 1 through 12 of document A-1
Exhibit "VNA-1" – Curriculum Vitae (incl. List of publications)
Exhibit "VNA-2" – Court Cases and Depositions
Exhibit "VNA-3" – RWAFDE Schedule of Fees

EXHIBIT _____ 32

PAGE _____ 517

**Exhibit 33**

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

Exhibit 34

LODGED

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 90378)
  (johnquinn@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for
Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>              Plaintiff,<br><br>vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>              Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 SGL (RNBx)<br>Consolidated with<br>Case Nos. CV 04-09059 & CV 05-2727<br><br>MATTEL, INC.'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION<br><br>(1)  TO STRIKE UNCLEAN HANDS AFFIRMATIVE DEFENSE OF MGA ENTERTAINMENT, INC., MGA ENTERTAINMENT (HK) LIMITED, AND MGAE DE MEXICO S.R.L. DE C.V. UNDER FED. R. CIV. P. 12(F), OR IN THE ALTERNATIVE;<br><br>(2)  FOR PARTIAL SUMMARY JUDGMENT<br><br>Date:   November 19, 2007<br>Time:  10:00 a.m.<br>Place:  Courtroom 1<br><br>**Phase 1**<br>Discovery Cut-Off:  January 14, 2008<br>Pre-Trial Conference: April 7, 2008<br>Trial Date:          April 29, 2008<br><br>**Phase 2**<br>Discovery Cut-Off:  March 3, 2008<br>Pre-Trial Conference: June 2, 2008<br>Trial Date:          July 1, 2008 |

COPY

07209/2248801.2

EXHIBIT 34

PAGE 546

1          Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local

2   Rules 56–1 and 56-4, Mattel sets forth the following Separate Statement of

3   Uncontroverted Facts and Conclusions of Law in support of its Motion to Strike

4   Unclean Hands Defense of MGA Entertainment, Inc., MGA Entertainment (HK)

5   Limited, and MGAE de Mexico S.R.L. de C.V. under <u>Fed. R. Civ. P.</u> 12(f), or in the

6   Alternative, for Partial Summary Judgment.

7

8          **<u>STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO</u>**

9                    **<u>GENUINE ISSUE</u>**

10

| Factual Statement | Evidentiary Support |
|---|---|
| 1.   MGA Entertainment, Inc., MGA Entertainment (HK) Limited, and MGAE de Mexico S.R.L. de C.V. (collectively "MGA") Second Affirmative Defense of unclean hands alleges that Mattel engaged in "efforts to undermine MGA's business and to "kill" Bratz at any cost." | Amended Answer and Affirmative Defenses of MGA Entertainment, Inc., MGA Entertainment (HK) Limited, and MGAE de Mexico S.R.L. de C.V. to Mattel, Inc.'s Second Amended Answer and Counterclaims ("MGA' Amended Answer"), at p. 20; Proctor Dec. Ex. 5. |
| 2.   MGA does not identify any witnesses with knowledge of its allegation that Mattel engaged in "efforts to undermine MGA's business and to "kill" Bratz at any cost" in its initial disclosures. | MGA Entertainment, Inc.'s Supplemental Disclosures and MGA Entertainment (HK) Limited, MGAE de Mexico S.R.L. de C.V., and Larian's Initial Disclosures Under Rule 26(a)(1) ("MGA's Initial Disclosures"), at pp. 1-16; Proctor Dec. Ex. 20. |
| 3.   MGA does not identify any | MGA's Initial Disclosures, at pp. 16-19; |

EXHIBIT **34**

PAGE _____

| | |
|---|---|
| 1   documents supporting its allegation that | Proctor Dec. Ex. 20. |
| 2   Mattel engaged in "efforts to undermine | |
| 3   MGA's business and to "kill" Bratz at | |
| 4   any cost" in its initial disclosures. | |
| 5 | |
| 6   4.    MGA's Second Affirmative | MGA's Amended Answer, at p. 20; |
| 7   Defense of unclean hands alleges that | Proctor Dec. Ex. 5. |
| 8   Mattel engaged in "efforts to create | |
| 9   negative publicity or press about MGA, | |
| 10   MGA products, Bryant, Larian, or MGA | |
| 11   employees." | |
| 12   5.    MGA does not identify any | MGA's Initial Disclosures, at pp. 1-16; |
| 13   witnesses with knowledge of its | Proctor Dec. Ex. 20. |
| 14   allegation that Mattel engaged in "efforts | |
| 15   to create negative publicity or press | |
| 16   about MGA, MGA products, Bryant, | |
| 17   Larian, or MGA employees" in its initial | |
| 18   disclosures. | |
| 19 | |
| 20   6.    MGA does not identify any | MGA's Initial Disclosures, at pp. 16-19; |
| 21   documents supporting its allegation that | Proctor Dec. Ex. 20. |
| 22   Mattel engaged in "efforts to create | |
| 23   negative publicity or press about MGA, | |
| 24   MGA products, Bryant, Larian, or MGA | |
| 25   employees" in its initial disclosures. | |
| 26   7.    MGA's Second Affirmative | MGA's Amended Answer, at p. 20; |
| 27   Defense of unclean hands alleges that | Proctor Dec. Ex. 5. |
| 28 | |

07209/2248801.2

EXHIBIT **34**

PAGE **628**

1  Mattel engaged in "efforts to fund or
2  commission market research or studies
3  that portray Bratz or MGA products
4  negatively."

5
6  8.    MGA does not identify any                MGA's Initial Disclosures, at pp. 1-16;
7  witnesses with knowledge of its                Proctor Dec. Ex. 20.
   allegation that Mattel engaged in "efforts
8  to fund or commission market research
9  or studies that portray Bratz or MGA
10 products negatively" in its initial
11 disclosures.
12

13 9.    MGA does not identify any                MGA's Initial Disclosures, at pp. 16-19;
14 documents supporting its allegation that       Proctor Dec. Ex. 20.
15 Mattel engaged in "efforts to fund or
16 commission market research or studies
17 that portray Bratz or MGA products
18 negatively" in its initial disclosures.

19
20 10.    MGA's Second Affirmative               MGA's Amended Answer, at p. 20;
   Defense of unclean hands alleges that         Proctor Dec. Ex. 5.
21 Mattel engaged in "efforts to interfere
22 with MGA's acquisition of or investment
23 in Zapf Creation AG."
24

25 11.    MGA does not identify any              MGA's Initial Disclosures, at pp. 1-16;
26 witnesses with knowledge of its               Proctor Dec. Ex. 20.
27 allegation that Mattel engaged in "efforts
28

07209/2248801.2

-3-
SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

EXHIBIT __34__

PAGE __519__

| | |
|---|---|
| 1   to interfere with MGA's acquisition of or | |
| 2   investment in Zapf Creation AG" in its | |
| 3   initial disclosures. | |
| 4 | |
| 5   12.    MGA does not identify any | MGA's Initial Disclosures, at pp. 16-19; |
| 6   documents supporting its allegation that | Proctor Dec. Ex. 20. |
| 7   Mattel engaged in "efforts to interfere | |
| 8   with MGA's acquisition of or investment | |
| 9   in Zapf Creation AG" in its initial | |
| 10   disclosures. | |
| 11   13.    The person that acquired an | Lisa Tonnu Vol. I. Deposition Transcript |
| 12   interest in Zapf Creation AG was not | at 61:4-9; Corey Dec. Ex. 1; Lisa Tonnu |
| 13   MGA Entertainment, Inc. or within the | Vol. II. Deposition Transcript at 311:4- |
| 14   MGA Entertainment, Inc. corporate | 312:24; Corey Dec. Ex. 2. |
| 15   structure. | |
| 16   14.    MGA's Second Affirmative | MGA's Amended Answer, at p. 20; |
| 17   Defense of unclean hands alleges that | Proctor Dec. Ex. 5. |
| 18   Mattel engaged in "efforts to include | |
| 19   negative references to MGA or Bratz on | |
| 20   Mattel's 'We Believe in Girls' website." | |
| 21 | |
| 22   15.    MGA does not identify any | MGA's Initial Disclosures, at pp. 1-16; |
| 23   witnesses with knowledge of its | Proctor Dec. Ex. 20. |
| 24   allegation that Mattel engaged in "efforts | |
| 25   to include negative references to MGA | |
| 26   or Bratz on Mattel's 'We Believe in Girls' | |
| 27   website" in its initial disclosures. | |
| 28 | |

07209/2248801.2

-4-

EXHIBIT 34
PAGE 530

| | | |
|---|---|---|
| 1 | 16.   MGA does not identify any | MGA's Initial Disclosures, at pp. 16-19; |
| 2 | documents supporting its allegation that | Proctor Dec. Ex. 20. |
| 3 | Mattel engaged in "efforts to include | |
| 4 | negative references to MGA or Bratz on | |
| 5 | Mattel's 'We Believe in Girls' website" in | |
| 6 | its initial disclosures. | |
| 7 | 17.   MGA's Second Affirmative | MGA's Amended Answer, at p. 20; |
| 8 | Defense of unclean hands alleges that | Proctor Dec. Ex. 5. |
| 9 | Mattel engaged in "efforts or intent to | |
| 10 | interfere with business dealings or | |
| 11 | contractual relations between MGA and | |
| 12 | Smoby Group." | |
| 13 | | |
| 14 | 18.   MGA does not identify any | MGA's Initial Disclosures, at pp. 1-16; |
| 15 | witnesses with knowledge of its | Proctor Dec. Ex. 20. |
| 16 | allegation that Mattel engaged in "efforts | |
| 17 | or intent to interfere with business | |
| 18 | dealings or contractual relations between | |
| 19 | MGA and Smoby Group" in its initial | |
| 20 | disclosures. | |
| 21 | 19.   MGA does not identify any | MGA's Initial Disclosures, at pp. 16-19; |
| 22 | documents supporting its allegation that | Proctor Dec. Ex. 20. |
| 23 | Mattel engaged in "efforts or intent to | |
| 24 | interfere with business dealings or | |
| 25 | contractual relations between MGA and | |
| 26 | Smoby Group" in its initial disclosures. | |
| 27 | | |
| 28 | | |

07209/2248801.2

EXHIBIT  34

PAGE  531

-5-
SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| 1 | 20.    MGA's Second Affirmative Defense of unclean hands alleges that Mattel "assist[ed] parties in lawsuits against MGA." | MGA's Amended Answer, at p. 20; Proctor Dec. Ex. 5. |
| 5 | 21.    MGA does not identify any witnesses with knowledge of its allegation that Mattel "assist[ed] parties in lawsuits against MGA" in its initial disclosures. | MGA's Initial Disclosures, at pp. 1-16; Proctor Dec. Ex. 20. |
| 11 | 22.    MGA does not identify any documents supporting its allegation that Mattel "assist[ed] parties in lawsuits against MGA" in its initial disclosures. | MGA's Initial Disclosures, at pp. 16-19; Proctor Dec. Ex. 20. |
| 15 | 23.    MGA's Second Affirmative Defense of unclean hands alleges that Mattel "monitor[ed], 'spyi[ed] on' or gain[ed] knowledge of MGA's trade secrets, non-public information, non-public activities, unreleased products, and product development." | MGA's Amended Answer, at p. 20; Proctor Dec. Ex. 5. |
| 23 | 24.    MGA does not identify any witnesses with knowledge of its allegation that Mattel "monitor[ed], 'spyi[ed] on' or gain[ed] knowledge of MGA's trade secrets, non-public | MGA's Initial Disclosures, at pp. 1-16; Proctor Dec. Ex. 20. |

EXHIBIT 34

PAGE 532

1   information, non-public activities,

2   unreleased products, and product

3   development" in its initial disclosures.

4   25.   MGA does not identify any               MGA's Initial Disclosures, at pp. 16–19;

5   documents supporting its allegation that       Proctor Dec. Ex. 20.

6   Mattel "monitor[ed], 'spyi[ed] on' or

7   gain[ed] knowledge of MGA's trade

8   secrets, non-public information, non-

9   public activities, unreleased products,

10  and product development" in its initial

11  disclosures.

12

13  26.   MGA's Second Affirmative             MGA's Amended Answer, at p. 20;

14  Defense of unclean hands alleges that       Proctor Dec. Ex. 5.

15  Mattel "gain[ed] access, or attempt[ed]

16  to gain access, to MGA showrooms,

17  Plan-o-Grams, merchandising displays,

18  Toy Fair displays on false pretenses."

19  27.   MGA does not identify any             MGA's Initial Disclosures, at pp. 1-16;

20  witnesses with knowledge of its             Proctor Dec. Ex. 20.

21  allegation that Mattel "gain[ed] access,

22  or attempt[ed] to gain access, to MGA

23  showrooms, Plan-o-Grams,

24  merchandising displays, Toy Fair

25  displays on false pretenses" in its initial

26  disclosures.

27

28

EXHIBIT 34

| | |
|---|---|
| 28. MGA does not identify any documents supporting its allegation that Mattel "gain[ed] access, or attempt[ed] to gain access, to MGA showrooms, Plan-o-Grams, merchandising displays, Toy Fair displays on false pretenses" in its initial disclosures. | MGA's Initial Disclosures, at pp. 16-19; Proctor Dec. Ex. 20. |
| 29. MGA's Second Affirmative Defense of unclean hands alleges that Mattel "wrongfully obtain[ed] MGA's costs and sales information through Mattel-employed category managers at retailers." | MGA's Amended Answer, at p. 20; Proctor Dec. Ex. 5. |
| 30. MGA does not identify any witnesses with knowledge of its allegation that Mattel "wrongfully obtaining MGA's costs and sales information through Mattel-employed category managers at retailers" in its initial disclosures. | MGA's Initial Disclosures, at pp. 1-16; Proctor Dec. Ex. 20. |
| 31. MGA does not identify any documents supporting its allegation that Mattel "wrongfully obtaining MGA's costs and sales information through Mattel-employed category managers at | MGA's Initial Disclosures, at pp. 16-19; Proctor Dec. Ex. 20. |

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

EXHIBIT 34

PAGE 534

| | | |
|---|---|---|
| 1 | retailers" in its initial disclosures. | |
| 2 | | |
| 3 | 32.    MGA's Second Affirmative | MGA's Amended Answer, at p. 20; |
| 4 | Defense of unclean hands alleges that | Proctor Dec. Ex. 5. |
| 5 | Mattel "induc[ed] non-party customers to | |
| 6 | breach confidentiality agreements with | |
| 7 | MGA and divulge non-public | |
| 8 | information about MGA's unreleased | |
| 9 | products." | |
| 10 | 33.    MGA does not identify any | MGA's Initial Disclosures, at pp. 1-16; |
| 11 | witnesses with knowledge of its | Proctor Dec. Ex. 20. |
| 12 | allegation that Mattel "induc[ed] non- | |
| 13 | party customers to breach confidentiality | |
| 14 | agreements with MGA and divulge non- | |
| 15 | public information about MGA's | |
| 16 | unreleased products" in its initial | |
| 17 | disclosures. | |
| 18 | 34.    MGA does not identify any | MGA's Initial Disclosures, at pp. 16-19; |
| 19 | documents supporting its allegation that | Proctor Dec. Ex. 20. |
| 20 | Mattel "induc[ed] non-party customers to | |
| 21 | breach confidentiality agreements with | |
| 22 | MGA and divulge non-public | |
| 23 | information about MGA's unreleased | |
| 24 | products" in its initial disclosures. | |
| 25 | | |
| 26 | 35.    MGA's Second Affirmative | MGA's Amended Answer, at pp. 20-21; |
| 27 | Defense of unclean hands alleges that | Proctor Dec. Ex. 5. |
| 28 | | |

07209/2248801.2

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

EXHIBIT __34__

PAGE __535__

| | |
|---|---|
| 1  Mattel "contact[ed] persons under false | |
| 2  pretense in order to interrogate them | |
| 3  about Bratz and this litigation." | |
| 4 | |
| 5  36.    MGA does not identify any | MGA's Initial Disclosures, at pp. 1-16; |
| 6  witnesses with knowledge of its | Proctor Dec. Ex. 20. |
| 7  allegation that Mattel "contact[ed] | |
| 8  persons under false pretense in order to | |
| 9  interrogate them about Bratz and this | |
| 10  litigation" in its initial disclosures. | |
| 11  37.    MGA does not identify any | MGA's Initial Disclosures, at pp. 16-19; |
| 12  documents supporting its allegation that | Proctor Dec. Ex. 20. |
| 13  Mattel "contact[ed] persons under false | |
| 14  pretense in order to interrogate them | |
| 15  about Bratz and this litigation" in its | |
| 16  initial disclosures. | |
| 17  38.    MGA's Second Affirmative | MGA's Amended Answer, at p. 21; |
| 18  Defense of unclean hands alleges that | Proctor Dec. Ex. 5. |
| 19  Mattel "coerc[ed] its employees to | |
| 20  accept restrictive covenants (right before | |
| 21  massive layoff) and non-compete clauses | |
| 22  and other efforts to prevent prospective | |
| 23  MGA employees from accepting offers | |
| 24  of employment." | |
| 25 | |
| 26  39.    MGA does not identify any | MGA's Initial Disclosures, at pp. 1-16; |
| 27  witnesses with knowledge of its | Proctor Dec. Ex. 20. |
| 28 | |

07209/2248801.2

-10-

EXHIBIT  34

PAGE  536

1  allegation that Mattel "coerc[ed] its
2  employees to accept restrictive
3  covenants (right before massive layoff)
4  and non-compete clauses and other
5  efforts to prevent prospective MGA
6  employees from accepting offers of
7  employment" in its initial disclosures.

8
9  40.    MGA does not identify any                MGA's Initial Disclosures, at pp. 16-19;
10  documents supporting its allegation that        Proctor Dec. Ex. 20.
11  Mattel "coerc[ed] its employees to
12  accept restrictive covenants (right before
13  massive layoff) and non-compete clauses
14  and other efforts to prevent prospective
15  MGA employees from accepting offers
16  of employment" in its initial disclosures.

17  41.    MGA's Second Affirmative             MGA's Amended Answer, at p. 21;
18  Defense of unclean hands alleges that        Proctor Dec. Ex. 5.
19  Mattel "delay[ed] in suing Carter Bryant
20  because, *inter alia*, Mattel wanted Bryant
21  to testify in an unrelated Mattel case."

22  42.    MGA does not identify any            MGA's Initial Disclosures, at pp. 1-16;
23  witnesses with knowledge of its              Proctor Dec. Ex. 20.
24  allegation that Mattel "delay[ed] in suing
25  Carter Bryant because, *inter alia*, Mattel
26  wanted Bryant to testify in an unrelated
27
28

07209/2248801.2

EXHIBIT __34__

PAGE __537__

-11-

1   Mattel case" in its initial disclosures.

2
3   43.   MGA does not identify any          MGA's Initial Disclosures, at pp. 16-19;
4   documents supporting its allegation that   Proctor Dec. Ex. 20.
5   Mattel "delay[ed] in suing Carter Bryant
6   because, *inter alia*, Mattel wanted Bryant
7   to testify in an unrelated Mattel case" in
8   its initial disclosures.

9   44.   MGA's Second Affirmative        MGA's Amended Answer, at p. 21;
10  Defense of unclean hands alleges that   Proctor Dec. Ex. 5.
11  Mattel "falsely inflat[ed] its Barbie sales
12  figures in an effort to mislead the public
13  and retailers."

14
15  45.   MGA does not identify any         MGA's Initial Disclosures, at pp. 1-16;
16  witnesses with knowledge of its        Proctor Dec. Ex. 20.
17  allegation that Mattel "falsely inflat[ed]
18  its Barbie sales figures in an effort to
19  mislead the public and retailers" in its
20  initial disclosures.

21  46.   MGA does not identify any         MGA's Initial Disclosures, at pp. 16-19;
22  documents supporting its allegation that   Proctor Dec. Ex. 20.
23  Mattel "falsely inflat[ed] its Barbie sales
24  figures in an effort to mislead the public
25  and retailers" in its initial disclosures.

26  47.   MGA's Second Affirmative         MGA's Amended Answer, at p. 21;
27  Defense of unclean hands alleges that
28

07209/2248801.2

-12-

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

EXHIBIT 34

PAGE 578

| | |
|---|---|
| 1 Mattel "[took] all measures to conceal its | Proctor Dec. Ex. 5. |
| 2 bad acts, including the willful non- | |
| 3 retention and destruction of documents." | |
| 4 48. MGA does not identify any | MGA's Initial Disclosures, at pp. 1-16; |
| 5 witnesses with knowledge of its | Proctor Dec. Ex. 20. |
| 6 allegation that Mattel "[took] all | |
| 7 measures to conceal its bad acts, | |
| 8 including the willful non-retention and | |
| 9 destruction of documents" in its initial | |
| 10 disclosures. | |
| 11 | |
| 12 49. MGA does not identify any | MGA's Initial Disclosures, at pp. 16-19; |
| 13 documents supporting its allegation that | Proctor Dec. Ex. 20. |
| 14 Mattel "[took] all measures to conceal its | |
| 15 bad acts, including the willful non- | |
| 16 retention and destruction of documents" | |
| 17 in its initial disclosures. | |
| 18 50. MGA's Second Affirmative | MGA's Amended Answer, at p. 21; |
| 19 Defense of unclean hands alleges that: | Proctor Dec. Ex. 5. |
| 20 "Mattel believed from the time that | |
| 21 Carter Bryant left Mattel's employ that | |
| 22 he was going to perform work for a | |
| 23 Mattel competitor. Mattel began | |
| 24 investigating Bryant and MGA | |
| 25 Defendants, including Bryant's role in | |
| 26 the creation and development of Bratz, at | |
| 27 least as early as March 2002. | |
| 28 | |

EXHIBIT 34

637A

1   Nonetheless, Mattel waited years to
2   bring suit, all the while allowing MGA
3   Defendants to spend years developing
4   their business and invest tens of millions
5   of dollars developing the Bratz products
6   and building the Bratz brand."

7
8   51.    MGA does not identify in its          MGA's Initial Disclosures, at pp. 1-16;
9   initial disclosures any witnesses with       Proctor Dec. Ex. 20.
10  knowledge that the conduct alleged in
11  MGA's Second Affirmative Defense was
12  unconscionable, in bad faith, or
13  inequitable."

14  52.    MGA does not identify in its          MGA's Initial Disclosures, at pp. 16-19;
15  initial disclosures any documents            Proctor Dec. Ex. 20.
16  showing that the conduct alleged in
17  MGA's Second Affirmative Defense was
18  unconscionable, in bad faith, or
19  inequitable."

20  53.    MGA does not identify in its          MGA's Initial Disclosures, at pp. 1-16;
21  initial disclosures any witnesses with       Proctor Dec. Ex. 20.
22  knowledge that the conduct alleged in
23  MGA's Second Affirmative Defense is
24  directly related to the transactions
25  concerning which Mattel's counterclaims
26  were made.
27
28

07209/2248801.2

-14-
SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

EXHIBIT 34

| | |
|---|---|
| 54.    MGA does not identify in its initial disclosures any documents showing that the conduct alleged in MGA's Second Affirmative Defense is directly related to the transactions concerning which Mattel's counterclaims were made. | MGA's Initial Disclosures, at pp. 16-19; Proctor Dec. Ex. 20. |
| 55.    MGA's Ninth Affirmative Defense of estoppel alleges that: "Mattel believed from the time that Carter Bryant left Mattel's employ that he was going to perform work for a Mattel competitor. Mattel began investigating Bryant and MGA Defendants, including Bryant's role in the creation and development of Bratz, at least as early as March 2002. Nonetheless, Mattel waited years to bring suit, all the while allowing MGA Defendants to spend years developing their business and invest tens of millions of dollars developing the Bratz products and building the Bratz brand." | MGA's Amended Answer, at p. 23; Proctor Dec. Ex. 5. |
| 56.    MGA does not identify in its initial disclosures any witnesses with knowledge that Mattel was apprised of the facts that form the basis of its Ninth | MGA's Initial Disclosures, at pp. 1-16; Proctor Dec. Ex. 20. |

| | |
|---|---|
| 1 | Affirmative Defense. |
| 2 3 4 5 6 7 | 57.    MGA does not identify in its initial disclosures any documents showing that Mattel was apprised of the facts that form the basis of its Ninth Affirmative Defense. |
| | MGA's Initial Disclosures, at pp. 16-19; Proctor Dec. Ex. 20. |
| 8 9 10 11 12 13 14 | 58.    MGA does not identify in its initial disclosures any witnesses with knowledge that Mattel intended the conduct alleged in the Ninth Affirmative Defense to be acted upon or that MGA had a right to believe that Mattel's alleged conduct was so intended. |
| | MGA's Initial Disclosures, at pp. 1-16; Proctor Dec. Ex. 20. |
| 15 16 17 18 19 20 21 22 | 59.    MGA does not identify in its initial disclosures any documents showing that Mattel intended the conduct alleged in the Ninth Affirmative Defense to be acted upon or that MGA had a right to believe that Mattel's alleged conduct was so intended. |
| | MGA's Initial Disclosures, at pp. 16-19; Proctor Dec. Ex. 20. |
| 23 24 25 26 27 | 60.    MGA does not identify in its initial disclosures any witnesses with knowledge that MGA was ignorant of the true state of facts that form the basis of its Ninth Affirmative Defense. |
| | MGA's Initial Disclosures, at pp. 1-16; Proctor Dec. Ex. 20. |
| 28 | |

| | | |
|---|---|---|
| 1 | 61.    MGA does not identify in its | MGA's Initial Disclosures, at pp. 16-19; |
| 2 | initial disclosures any documents | Proctor Dec. Ex. 20. |
| 3 | showing that MGA was ignorant of the | |
| 4 | true state of facts that form the basis of | |
| 5 | its Ninth Affirmative Defense. | |
| 6 | | |
| 7 | 62.    MGA does not identify in its | MGA's Initial Disclosures, at pp. 1-16; |
| 8 | initial disclosures any witnesses with | Proctor Dec. Ex. 20. |
| 9 | knowledge that MGA relied on Mattel's | |
| 10 | alleged conduct in the Ninth Affirmative | |
| 11 | Defense to its injury. | |
| 12 | 63.    MGA does not identify in its | MGA's Initial Disclosures, at pp. 16-19; |
| 13 | initial disclosures any documents | Proctor Dec. Ex. 20. |
| 14 | showing that MGA relied on Mattel's | |
| 15 | alleged conduct in the Ninth Affirmative | |
| 16 | Defense to its injury. | |
| 17 | 64.    MGA's Thirteenth Affirmative | MGA's Amended Answer, at p. 24; |
| 18 | Defense of waiver alleges that: "Mattel | Proctor Dec. Ex. 5. |
| 19 | believed from the time that Carter Bryant | |
| 20 | left Mattel's employ that he was going to | |
| 21 | perform work for a Mattel competitor. | |
| 22 | Mattel began investigating Bryant and | |
| 23 | MGA Defendants, including Bryant's | |
| 24 | role in the creation and development of | |
| 25 | Bratz, at least as early as March 2002. | |
| 26 | Nonetheless, Mattel waited years to | |
| 27 | bring suit, all the while allowing MGA | |
| 28 | | |

07209/2248801.2

-17-

EXHIBIT 34

PAGE 543

1 | Defendants to spend years developing

2 | their business and invest tens of millions

3 | of dollars developing the Bratz products

4 | and building the Bratz brand."

| | |
|---|---|
| 65.    MGA does not identify in its initial disclosures any witnesses with knowledge that Mattel had knowledge of any right alleged in MGA's Thirteenth Affirmative Defense. | MGA's Initial Disclosures, at pp. 1-16; Proctor Dec. Ex. 20. |
| 66.   MGA does not identify in its initial disclosures any documents showing that Mattel had knowledge of any right alleged in MGA's Thirteenth Affirmative Defense. | MGA's Initial Disclosures, at pp. 16-19; Proctor Dec. Ex. 20. |
| 67.    MGA does not identify in its initial disclosures any witnesses with knowledge that Mattel had the intent to forego any right alleged in MGA's Thirteenth Affirmative Defense. | MGA's Initial Disclosures, at pp. 1-16; Proctor Dec. Ex. 20. |
| 68.    MGA does not identify in its initial disclosures any documents showing that Mattel had the intent to forego any right alleged in MGA's Thirteenth Affirmative Defense. | MGA's Initial Disclosures, at pp. 16-19; Proctor Dec. Ex. 20. |
| 69.    MGA's Tenth Affirmative Defense | MGA's Amended Answer, at p. 23; |

| | | |
|---|---|---|
| 1 | of acquiescence alleges that: "Mattel | Proctor Dec. Ex. 5. |
| 2 | believed from the time that Carter Bryant | |
| 3 | left Mattel's employ that he was going to | |
| 4 | perform work for a Mattel competitor. | |
| 5 | Mattel began investigating Bryant and | |
| 6 | MGA Defendants, including Bryant's | |
| 7 | role in the creation and development of | |
| 8 | Bratz, at least as early as March 2002. | |
| 9 | Nonetheless, Mattel waited years to | |
| 10 | bring suit, all the while allowing MGA | |
| 11 | Defendants to spend years developing | |
| 12 | their business and invest tens of millions | |
| 13 | of dollars developing the Bratz products | |
| 14 | and building the Bratz brand. | |
| 15 | Additionally, Mattel tolerated and | |
| 16 | condoned conduct by other employees | |
| 17 | similar to the alleged conduct by Bryant | |
| 18 | and others on which Mattel bases its | |
| 19 | claims." | |
| 20 | 70.    MGA does not identify in its | MGA's Initial Disclosures, at pp. 1-16; |
| 21 | initial disclosures any witnesses with | Proctor Dec. Ex. 20. |
| 22 | knowledge that Mattel consented to any | |
| 23 | particular misconduct by MGA. | |
| 24 | | |
| 25 | 71.    MGA does not identify in its | MGA's Initial Disclosures, at pp. 16-19; |
| 26 | initial disclosures any documents | Proctor Dec. Ex. 20. |
| 27 | showing that Mattel consented to any | |
| 28 | | |

07209/2248801.2

EXHIBIT ___34

PAGE ___545

-19-

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

1  particular misconduct by MGA.

2

3  72.    MGA does not identify in its         MGA's Initial Disclosures, at pp. 1-16;
       initial disclosures any witnesses with     Proctor Dec. Ex. 20.
4
       knowledge that if Mattel consented to
5
       any particular misconduct by MGA it did
6
       so absent any fraud, duress, undue
7
       influence, or mistake.
8

9  73.    MGA does not identify in its         MGA's Initial Disclosures, at pp. 16-19;
10     initial disclosures any documents         Proctor Dec. Ex. 20.
11     showing that if Mattel consented to any
12     particular misconduct by MGA it did so
13     absent any fraud, duress, undue
14     influence, or mistake.
15
       74.    MGA does not identify in its         MGA's Initial Disclosures, at pp. 1-16;
16
       initial disclosures any witnesses with     Proctor Dec. Ex. 20.
17
       knowledge that if Mattel consented to
18
       any particular misconduct by MGA it
19
       never terminated its purported consent.
20

21  75.    MGA does not identify in its         MGA's Initial Disclosures, at pp. 16-19;
22     initial disclosures any documents         Proctor Dec. Ex. 20.
23     showing that if Mattel consented to any
24     particular misconduct by MGA, it never
25     terminated its purported consent.
26
       76.    MGA's Eighth Affirmative           MGA's Amended Answer, at p. 23;
27     Defense of "acts or omissions of others"
28

EXHIBIT   34
PAGE   544

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| 1 | alleges that "Mattel's damages, if any, | Proctor Dec. Ex. 5. |
| 2 | were not caused by MGA Defendants | |
| 3 | and are not attributable to any acts or | |
| 4 | omissions of MGA Defendants." | |
| 5 | 77.    MGA does not identify in its | MGA's Initial Disclosures, at pp. 1-16; |
| 6 | initial disclosures any witnesses with | Proctor Dec. Ex. 20. |
| 7 | knowledge regarding MGA's Eighth | |
| 8 | Affirmative Defense of "acts or | |
| 9 | omissions of others." | |
| 10 | | |
| 11 | 78.    MGA does not identify in its | MGA's Initial Disclosures, at pp. 16-19; |
| 12 | initial disclosures any documents | Proctor Dec. Ex. 20. |
| 13 | regarding MGA's Eighth Affirmative | |
| 14 | Defense of "acts or omissions of others." | |
| 15 | 79.    MGA's Eleventh Affirmative | MGA's Amended Answer, at p. 24; |
| 16 | Defense of "failure to mitigate" alleges | Proctor Dec. Ex. 5. |
| 17 | that "MGA Defendants deny that Mattel | |
| 18 | suffered any damages, but even if it did, | |
| 19 | Mattel failed to take reasonable steps to | |
| 20 | mitigate those purported damages." | |
| 21 | | |
| 22 | 80.    MGA does not identify in its | MGA's Initial Disclosures, at pp. 1-16; |
| 23 | initial disclosures any witnesses with | Proctor Dec. Ex. 20. |
| 24 | knowledge regarding MGA's Eleventh | |
| 25 | Affirmative Defense of "failure to | |
| 26 | mitigate." | |
| 27 | | |
| 28 | 81.    MGA does not identify in its | MGA's Initial Disclosures, at pp. 16-19; |

EXHIBIT ___ 34

PAGE ___ 547

| | | |
|---|---|---|
| 1 | initial disclosures any documents | Proctor Dec. Ex. 20. |
| 2 | supporting MGA's Eleventh Affirmative | |
| 3 | Defense of "failure to mitigate." | |
| 4 | | |
| 5 | 82.    MGA's Fourteenth Affirmative | MGA's Amended Answer, at p. 24; |
| 6 | Defense of abandonment alleges that | Proctor Dec. Ex. 5. |
| 7 | "Mattel has abandoned any interest it | |
| 8 | may have had in the alleged copyrighted | |
| 9 | works." | |
| 10 | 83.    MGA does not identify in its | MGA's Initial Disclosures, at pp. 1-16; |
| 11 | initial disclosures any witnesses with | Proctor Dec. Ex. 20. |
| 12 | knowledge regarding MGA's Fourteenth | |
| 13 | Affirmative Defense of abandonment. | |
| 14 | | |
| 15 | 84.    MGA does not identify in its | MGA's Initial Disclosures, at pp. 16-19; |
| 16 | initial disclosures any documents | Proctor Dec. Ex. 20. |
| 17 | supporting MGA's Fourteenth | |
| 18 | Affirmative Defense of abandonment. | |
| 19 | 85.    MGA's Sixteenth Affirmative | MGA's Amended Answer, at p. 25; |
| 20 | Defense of "joint authorship" alleges that | Proctor Dec. Ex. 5. |
| 21 | "MGA Defendants deny that Mattel | |
| 22 | owns any copyright interest in the | |
| 23 | alleged works, but even if it did, any | |
| 24 | liability would be eliminated or greatly | |
| 25 | diminished by the doctrine of joint | |
| 26 | authorship." | |
| 27 | | |
| 28 | 86.    MGA does not identify in its | MGA's Initial Disclosures, at pp. -16. |

EXHIBIT 34

PAGE 548

| | |
|---|---|
| 1 initial disclosures any witnesses with | Proctor Dec. Ex. 20. |
| 2 knowledge regarding MGA's Sixteenth | |
| 3 Affirmative Defense of "joint | |
| 4 authority." | |
| 5 87.    MGA does not identify in its | MGA's Initial Disclosures, at pp. 16-19; |
| 6 initial disclosures any documents, | Proctor Dec. Ex. 20. |
| 7 including the allegedly jointly authored | |
| 8 works, regarding MGA's Sixteenth | |
| 9 Affirmative Defense of "joint | |
| 10 authority." | |
| 11 | |
| 12 88.    MGA's Eighteenth Affirmative | MGA's Amended Answer, at p. 25; |
| 13 Defense of "good faith" alleges that | Proctor Dec. Ex. 5. |
| 14 "Mattel's counterclaims are barred in | |
| 15 whole or in part because the MGA | |
| 16 Defendants acted in good faith." | |
| 17 89.    MGA does not identify in its | MGA's Initial Disclosures, at pp. 1-16; |
| 18 initial disclosures any witnesses with | Proctor Dec. Ex. 20. |
| 19 knowledge regarding MGA's Eighteenth | |
| 20 Affirmative Defense of "good faith." | |
| 21 | |
| 22 90.    MGA does not identify in its | MGA's Initial Disclosures, at pp. 16-19; |
| 23 initial disclosures any documents | Proctor Dec. Ex. 20. |
| 24 supporting MGA's Eighteenth | |
| 25 Affirmative Defense of "good faith." | |
| 26 91.    MGA's Nineteenth Affirmative | MGA's Amended Answer, at p. 25; |
| 27 Defense of "lack of authority" alleges | |
| 28 | |

| | |
|---|---|
| 1 that "Mattel's counterclaims are barred in | Proctor Dec. Ex. 5. |
| 2 whole or in part on the grounds that to | |
| 3 the extent any person committed an | |
| 4 unlawful or tortious act, the person | |
| 5 lacked authority to commit such act on | |
| 6 behalf of the MGA Defendants." | |
| 7 | |
| 8  92.    MGA does not identify in its | MGA's Initial Disclosures, at pp. 1-16; |
| 9  initial disclosures any witnesses with | Proctor Dec. Ex. 20. |
| 10 knowledge regarding MGA's Nineteenth | |
| 11 Affirmative Defense of "lack of | |
| 12 authority." | |
| 13  93.    MGA does not identify in its | MGA's Initial Disclosures, at pp. 16-19; |
| 14 initial disclosures any documents | Proctor Dec. Ex. 20. |
| 15 supporting MGA's Nineteenth | |
| 16 Affirmative Defense of "lack of | |
| 17 authority." | |
| 18  94.    MGA's Twentieth Affirmative | MGA's Amended Answer, at p. 25; |
| 19 Defense of "lack of standing" alleges | Proctor Dec. Ex. 5. |
| 20 that "Mattel's counterclaims are barred in | |
| 21 whole or in part by its lack of standing." | |
| 22 | |
| 23  95.    MGA does not identify in its | MGA's Initial Disclosures, at pp. 1-16; |
| 24 initial disclosures any witnesses with | Proctor Dec. Ex. 20. |
| 25 knowledge regarding MGA's Twentieth | |
| 26 Affirmative Defense of "lack of | |
| 27 standing." | |
| 28 | |

EXHIBIT _____ 34

PAGE _____ 550

| | |
|---|---|
| 1    96.    MGA does not identify in its | MGA's Initial Disclosures, at pp. 16-19; |
| 2    initial disclosures any documents | Proctor Dec. Ex. 20. |
| 3    regarding MGA's Twentieth Affirmative | |
| 4    Defense of "lack of standing." | |

## CONCLUSIONS OF LAW

| Conclusion of Law | Authority |
|---|---|
| 1.    A Court may grant partial summary judgment on an affirmative defense pursuant to Rule 56 when there is no "genuine issue as to any material fact and [] the moving party is entitled to judgment as a matter of law." | Fed. R. Civ. P. 56(c). |
| 2.    "The question whether a particular affirmative defense is sufficiently supported by testimony to go to the jury may often be resolved on a motion for summary judgment." | U.S. v. Bailey, 444 U.S. 394, 412 n.9 (1980); Applied Elastometrics, Inc. v. Z-Man Fishing Products, Inc., 2007 WL 2814646, at *6 (N.D. Cal. 2007). |
| 3.    "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." | Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). |

EXHIBIT ____ 34

PAGE ____

| | | |
|---|---|---|
| 1 | 4.    Rule 26(a)(1) requires the | Fed. R. Civ. P. 26(a)(1). |
| 2 | disclosure of witnesses and documents | |
| 3 | relating to "claims and defenses." | |
| 4 | | |
| 5 | 5.    Once a the moving party has | Celotex Corp. v. Catrett, 477 U.S. 317, |
| 6 | demonstrated the absence of evidence | 324 (1986). |
| 7 | supporting the non-moving party's | |
| 8 | defenses, it is the non-moving party's | |
| 9 | burden to "go beyond the pleadings and . | |
| 10 | . . designate 'specific facts showing that | |
| 11 | there is a genuine issue for trial.'" | |
| 12 | | |
| 13 | 6.    It is the non-moving party's | Celotex Corp. v. Catrett, 477 U.S. 317, |
| 14 | burden to come forward with sufficient | 324 (1986); Castaic Lake Water Agency |
| 15 | evidence to create a genuine issue of | v. Whittaker Corp., 272 F. Supp. 2d |
| 16 | material fact on each of its affirmative | 1053, 1080 (C.D. Cal. 2003). |
| 17 | defenses. | |
| 18 | | |
| 19 | 7.    The doctrine of unclean hands | Kendall-Jackson Winery, Ltd. v. |
| 20 | "demands that a plaintiff act fairly in the | Superior Court, 76 Cal. App. 4th 970, |
| 21 | matter for which he seeks a remedy." | 978, 90 Cal. Rptr. 2d 743, 748-49 |
| 22 | | (2000). |
| 23 | | |
| 24 | 8.    "It is fundamental to the operation | Dollar Systems, Inc. v. Avcar Leasing |
| 25 | of the doctrine [of unclean hands] that | Systems, Inc., 890 F.2d 165, 173 (9th |
| 26 | the alleged misconduct by the plaintiffs | Cir. 1989) (citing Arthur v. Davis, 126 |
| 27 | relate directly to the transaction | Cal. App. 3d 684, 693-94, 178 Cal. Rptr. |
| 28 | | |

EXHIBIT 34

PAGE 752

| | | |
|---|---|---|
| 1 | concerning which the complaint is | 920, 925 (1981)). |
| 2 | made." | |
| 3 | | |
| 4 | 9.   "The determination of the unclean | Kendall-Jackson Winery, Ltd. v. |
| 5 | hands defense cannot be distorted into a | Superior Court, 76 Cal. App. 4th 970, |
| 6 | proceeding to try the general morals of | 978, 90 Cal. Rptr. 2d 743, 748-49 |
| 7 | the parties." | (2000). |
| 8 | | |
| 9 | 10.    Unclean hands requires | Fladeboe v. American Isuzu Motors, |
| 10 | "unconscionable, bad faith, or | Inc., 150 Cal. App. 4th 42, 58 Cal. Rptr. |
| 11 | inequitable conduct." | 3d 225, 235-36 (2007). |
| 12 | | |
| 13 | 11.    The First Amendment renders | Unelko Corp. v. Rooney, 912 F.2d 1049, |
| 14 | privileged statements that are not false. | 1057-58 (9th Cir. 1990). |
| 15 | | |
| 16 | 12.    A claim for product disparagement | California Scents v. Surco Products, Inc., |
| 17 | requires a false statement. | 406 F.3d 1102, 1109 (citing 4 J. |
| 18 | | McCarthy, McCarthy on Trademarks & |
| 19 | | Unfair Competition, § 27:99 (4th ed. |
| 20 | | 2004)). |
| 21 | | |
| 22 | 13.    California statutory law makes | Cal. Civ. Code § 47(b); ITT Telecom |
| 23 | privileged statements made "in any . . . . | Products Corp. v. Dooley, 214 Cal. App. |
| 24 | judicial proceeding." | 3d 307, 313-14, 262 Cal. Rptr. 2d 773 |
| 25 | | (1989). |
| 26 | | |
| 27 | 14.    California's litigation privilege "is | ITT Telecom Products Corp. v. Dooley, |
| 28 | | |

07209/2248801.2

EXHIBIT 34

PAGE 553

| | |
|---|---|
| absolute in that it applies regardless of whether a statement was uttered with malice or bad faith." | 214 Cal. App. 3d 307, 313-14, 262 Cal. Rptr. 2d 773 (1989) (quoting Thornton v. Rhoden, 245 Cal. App. 2d 80, 93, 53 Cal. Rptr. 706 (1966)). |
| 15.     Before filing an action, an attorney has a duty to investigate claims to see that they have merit. | Rhinehart v. Stauffer, 638 F.2d 1169, 1171 (9th Cir. 1979). |
| 16.     Unclean hands "applies to conduct between the litigants themselves, not to conduct of a litigant towards a nonparty." | Mesnick v. Caton, 183 Cal. App. 3d 1248, 1263, 228 Cal. Rptr. 779 (1986). |
| 17.     Unclean hands is not a recognized defense to a RICO claim. | In re Nat'l Mortgage Equity Corp. Mortgage Pool Certificates Sec. Litig., 636 F. Supp. 1138, 1156 (C.D. Cal. 1986) (citing Perma Life Mufflers, Inc. v. Int'l Parts Corp., 392 U.S. 134, 139 (1968)); Bieter Co. v. Blomquist, 848 F. Supp. 1446, 1448-50 (D. Minn. 1994). |
| 18.     Unclean hands is "recognized [as a defense to copyright infringement] only rarely, when the plaintiff's transgression is of serious proportions and relates directly to the subject matter of the | Survivor Prod. LLC v. Fox Broadcasting Co., 2001 WL 35829270, at *3 (C.D. Cal. 2001) (quoting 3 M. Nimmer, Nimmer on Copyright, § 13.09[B] at 13-145 (1988)); In re Napster, Inc. |

07209/2248801.2

EXHIBIT 34

PAGE 554

1 | infringement action."

Copyright Litig., 191 F. Supp. 2d 1087, 1102-05 (N.D. Cal. 2002).

19.     The necessary elements of an estoppel defense are: "(1) The party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury."

Skulnick v. Roberts Express, Inc., 2 Cal. App. 4th 884, 890, 3 Cal. Rptr. 2d 597 (1992); see also Heckler v. Community Health Servs., 467 U.S. 51, 59 (1984).

20.     For waiver to apply, "it must be shown that the party had knowledge of the right and the intent to waive or forego it."

Solano Concrete Co. v. Lund Constr. Co., 64 Cal. App. 3d 572, 575, 134 Cal. Rptr. 552 (1976); A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1026 (9th Cir. 2001); Goehring v. Chapman Univ., 121 Cal. App. 4th 353, 386, 17 Cal. Rptr. 3d 39 (2004); United States v. King Features Entm't, Inc., 843 F.2d 394, 399 (9th Cir. 1988).

21.     To establish acquiescence or consent it must be shown that the party consented to the particular misconduct at

2 Schwing California Affirmative Defenses, § 32:3 at 195 (2007); Greenawalt v. Rogers, 151 Cal. 630, 635,

07209/2248801.2

EXHIBIT _34_

PAGE _555_

1  issue; that it did so absent any fraud,
2  duress, undue influence, or mistake; and
3  that it never terminated its purported
4  consent.

91 P. 526 (1907); 2 Schwing <u>California</u> <u>Affirmative Defenses</u>, § 32:5 at 206 (2007).

7  DATED:  October 9, 2007

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By _Jon D. Corey /RBS_____
   Jon D. Corey
   Attorneys for
   Mattel, Inc.

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

EXHIBIT _____34_____

PAGE _____556_____

**Exhibit 35**

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 90378)
2      (johnquinn@quinnemanuel.com)
      Michael T. Zeller (Bar No. 196417)
3      (michaelzeller@quinnemanuel.com)
      Jon D. Corey (Bar No. 185066)
4      (joncorey@quinnemanuel.com)
    865 South Figueroa Street, 10th Floor
5   Los Angeles, California 90017-2543
    Telephone: (213) 443-3000
6   Facsimile: (213) 443-3100

7   Attorneys for Mattel, Inc.

8                   UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10                        EASTERN DIVISION

11  CARTER BRYANT, an individual,       CASE NO. CV 04-9049 SGL (RNBx)
                                         Consolidated with
12                 Plaintiff,            Case Nos. CV 04-09059 & CV 05-2727

13          vs.                          NOTICE OF MOTION AND MOTION
                                         OF MATTEL, INC.:
14  MATTEL, INC., a Delaware
15  corporation,                         (1)    TO STRIKE AFFIRMATIVE
                                         DEFENSES (NOS. 2, 8, 9, 10, 11, 13, 14,
16                                       16, 18, 19 AND 20) OF MGA
                   Defendant.            ENTERTAINMENT, INC., MGA
                                         ENTERTAINMENT (HK) LIMITED,
17                                       AND MGAE DE MEXICO S.R.L. DE
                                         C.V. UNDER FED. R. CIV. P. 12(F), OR
18  AND CONSOLIDATED ACTIONS            IN THE ALTERNATIVE,

19                                       (2)    FOR PARTIAL SUMMARY
                                         JUDGMENT; AND
20
                                         MEMORANDUM OF POINTS AND
21                                       AUTHORITIES

22                                       [Statement Of Uncontroverted Facts And
                                         Conclusions Of Law; and Declarations of
23                                       Jon D. Corey and B. Dylan Proctor Filed
                                         Concurrently]
24
                                         Date:   November 19, 2007
25                                       Time:   10:00 a.m.
                                         Place:  Courtroom 1
26
                                         **Phase 1**
27                                       Discovery Cut-Off:    January 14, 2008
                                         Pre-Trial Conference: April 7, 2008
28                                       Trial Date:           April 29, 2008

07209/2247141.3

────────────────────────────────────────
        MATTEL'S MOTION TO STRIKE MGA'S AFFIRMATIVE DEFENSES

EXHIBIT _____ 35

PAGE _____ 557

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Phase 2**
Discovery Cut-Off:      March 3, 2008
Pre-Trial Conference: June 2, 2008
Trial Date:                July 1, 2008

-1-

MATTEL'S OPPOSITION TO MGA'S OBJECTIONS TO DISCOVERY MASTER'S MAY 16, 2007 ORDER

EXHIBIT _____ 35

PAGE _____ 558

1 TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2     PLEASE TAKE NOTICE that on November 19, 2007, at 10:00 a.m., or as soon

3 thereafter as the matter may be heard, in the courtroom of Honorable Stephen G.

4 Larson, located at 3470 Twelfth Street, Riverside, California, 92501, Mattel, Inc. will,

5 and hereby does, move the Court, pursuant to <u>Federal Rule of Civil Procedure</u> 12(f), for

6 an order striking MGA Entertainment, Inc.'s, MGA Entertainment (HK) Limited's, and

7 MGAE de Mexico S.R.L. de C.V.'s ("Defendants") Affirmative Defense Nos. 2, 8, 9,

8 10, 11, 13, 14, 16, 18, 19 and 20, or, in the alternative, for partial summary judgment

9 pursuant to <u>Federal Rule of Civil Procedure</u> 56, for judgment against Defendants and in

10 favor of Mattel on those Affirmative Defenses.

11     This Motion is made on the grounds that Affirmative Defense Nos. 2, 8, 9, 10,

12 11, 13, 14, 16, 18, 19 and 20 are insufficient as a matter of law. Affirmative Defense

13 No. 2 for unclean hands fails because it is based on allegations that are not directly

14 related to the transactions alleged in Mattel's counterclaims. Unclean hands is also not

15 a recognized defense against Mattel's RICO and copyright claims. Affirmative Defense

16 Nos. 9, 10 and 13 -- for estoppel, acquiescence, and waiver -- fail because they are

17 based on the same allegations as MGA's laches defense and do not include allegations

18 sufficient to support estoppel, waiver or acquiescence. Affirmative Defense Nos. 8, 11,

19 14, 16, 18, 19 and 20 each only consist of a single conclusory sentence and do not

20 provide Mattel with fair notice of the basis for each defense.

21     In the alternative, Mattel seeks partial summary judgment on the grounds that

22 Defendants have no evidence to support the identified affirmative defenses, and the

23 evidence adduced creates no disputed issue of material fact which would preclude entry

24 of partial summary judgment on those defenses.

25     This Motion is based on this Notice of Motion and Motion, the accompanying

26 Memorandum of Points and Authorities, the Declaration of B. Dylan Proctor filed

27 concurrently herewith, the Declaration of Jon D. Corey filed concurrently herewith, all

28 the other pleadings and other papers on file in this action, any matters of which this

07209/2247141.3

EXHIBIT ____ 35

PAGE ____ 559

1    Court may take judicial notice, and such further evidence and argument as may be

2    presented at or before the hearing on this matter.

3                    **Certification of Local Rule 7-3 Compliance**

4              Mattel originally met and conferred with counsel for Defendants regarding the

5    deficiencies in their answer on August 28, 2007, after which Defendants agreed to serve

6    and amended answer, which they did.  As set forth in the accompanying Declaration of

7    B. Dylan Proctor, Mattel attempted to further meet and confer with counsel for the

8    Defendants regarding the deficiencies in their amended answer pursuant to Local Rule

9    7-3, but counsel for the Defendants did not respond to Mattel's requests to do so.

10

11   DATED: October 9, 2007              QUINN EMANUEL URQUHART OLIVER &
                                         HEDGES, LLP
12

13                                       By_____Jon D. Corey /BBS_____

14                                          Jon D. Corey
                                            Attorneys for Plaintiff
15                                          Mattel, Inc.

16

17

18

19

20

21

22

23

24

25

26

27

28

07209/2247141.3

                                         -3-
                 MATTEL'S MOTION TO STRIKE MGA'S AFFIRMATIVE DEFENSES

EXHIBIT _____ 35
PAGE _____ 560

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF ALLEGATIONS ......................................................................... 1

ARGUMENT .............................................................................................................. 5

I.      THE COURT CAN, AND SHOULD, STRIKE LEGALLY
        INSUFFICIENT DEFENSES ........................................................................ 5

II.     THE MGA DEFENDANTS' UNCLEAN HANDS DEFENSE IS NOT
        LEGALLY SUFFICIENT ............................................................................. 6

        A.    The Unclean Hands Defense Is Not Transactionally Related to
              Mattel's Counterclaims .................................................................... 6

        B.    Allegations Regarding Mattel's Purported Efforts to Disparage
              MGA Fail For The Additional Reason That The Alleged
              Conduct Is Protected ....................................................................... 10

        C.    Mattel's Investigation Related To This Case Is Not Unclean
              Hands, But Rather Required By The Federal Rules ......................... 11

        D.    Allegations Regarding Mattel's Alleged Conduct Concerning
              Non-Parties Is Not A Valid Basis For An Unclean Hands
              Defense ............................................................................................ 12

        E.    Unclean Hands Is Not a Valid Defense to Mattel's RICO Claims ....... 13

        F.    MGA Does Not Allege a Valid Unclean Hands Defense to
              Mattel's Copyright Infringement Counterclaim ............................. 14

III.    MGA'S ESTOPPEL, WAIVER, AND ACQUIESCENCE DEFENSES
        ARE INSUFFICIENT AS A MATTER OF LAW ......................................... 15

        A.    MGA's Estoppel Defense Is Insufficient As A Matter Of Law ............ 16

        B.    MGA's Waiver Defense Is Insufficient As A Matter Of Law .............. 17

        C.    MGA's Acquiescence Defense Is Insufficient As A Matter Of
              Law .................................................................................................. 18

IV.     SEVERAL OF MGA'S AFFIRMATIVE DEFENSES DO NOT
        PROVIDE FAIR NOTICE ........................................................................... 19

        A.    Fair Notice Requires More Than A Conclusory Averment Of
              The Affirmative Defense ................................................................. 19

-i-

MATTEL'S MOTION TO STRIKE MGA'S AFFIRMATIVE DEFENSES

EXHIBIT ____35____

PAGE ____561____

1    B.    Several of MGA's Affirmative Defenses Do Not Give Mattel
          Fair Notice.................................................................................. 20

2 V.  MATTEL WILL SUFFER PREJUDICE IF MGA'S AFFIRMATIVE
3      DEFENSES ARE NOT STRICKEN ....................................................... 22

4    A.    Mattel Need Not Show Prejudice ........................................ 22

5    B.    Mattel Will Be Prejudiced If The Defenses Are Not Stricken ............ 23

6 VI. IN THE ALTERNATIVE, THE COURT SHOULD GRANT
7      PARTIAL SUMMARY JUDGMENT ON MGA'S AFFIRMATIVE
       DEFENSES .................................................................................... 23

8 CONCLUSION.................................................................................... 25

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT _____ 35
PAGE _____ 562

# TABLE OF AUTHORITIES

**Page**

### Cases

*In re 2TheMart.com. Inc. Securities Litig.,*
  114 F. Supp. 2d 955 (C.D. Cal. 2000).............................................. 6

*A&M Records, Inc. v. Napster, Inc.,*
  239 F.3d 1004 (9th Cir. 2001)................................................. 17

*Applied Elastometrics, Inc. v. Z-Man Fishing Products, Inc.,*
  2007 WL 2814646 (N.D. Cal. 2007).......................................... 24

*Arthur v. Davis,*
  126 Cal. App. 3d 684, 178 Cal. Rptr. 920 (1981) ............................. 6

*Bianchi v. State Farm Fire & Casualty Co.,*
  120 F. Supp. 2d 837 (C.D. Cal. 2000)........................................ 5

*Bieter Co. v. Blomquist,*
  848 F. Supp. 1446 (D. Minn. 1994) ......................................... 13

*California Scents v. Surco Products, Inc.,*
  406 F.3d 1102 ............................................................. 10

*California v. United States,*
  512 F. Supp. 36 (N.D. Cal. 1981)........................................... 22

*Castaic Lake Water Agency v. Whittaker Corp.,*
  272 F. Supp. 2d 1053 (C.D. Cal. 2003)...................................... 25

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ................................................... 24, 25

*D.S. America (East), Inc. v. Chromagrafx Imaging Systems, Inc.,*
  873 F. Supp. 786 (E.D.N.Y. 1995)........................................... 20

*Dollar Systems, Inc. v. Avcar Leasing Systems, Inc.,*
  890 F.2d 165 (9th Cir. 1989)................................................ 6

*F.T.C. v. Medicor LLC,*
  2001 WL 765628 (C.D. Cal. 2001) ...................................... 17, 18

*Fantasy, Inc. v. Fogerty,*
  984 F.2d 1524 (9th Cir. 1993)......................................... 5, 6, 23

*Federal Deposit Ins. Corp. v. Crosby,*
  774 F. Supp. 584 (W.D. Wash. 1991) ........................................ 5

*Fladeboe v. American Isuzu Motors, Inc.,*
  150 Cal. App. 4th 42, 58 Cal. Rptr. 3d 225 (2007)........................... 11

EXHIBIT ___35___

PAGE ___563___

Freezor v. Wal-Mart Stores, Inc.,
   2006 WL 220152 (S.D. Cal. 2006) ........................................................ 5

Ganley v. County of San Mateo,
   2007 WL 902551 (N.D. Cal. 2007) ....................................................... 22

Goehring v. Chapman Univ.,
   121 Cal. App. 4th 353, 17 Cal. Rptr. 3d 39 (2004) ........................ 17, 18

Greenawalt v. Rogers,
   151 Cal. 630, 91 P. 526 (1907) ............................................................ 19

Heckler v. Community Health Servs.,
   467 U.S. 51 (1984) ............................................................................... 16

Heller Financial, Inc. v. Midwhey Powder Co., Inc.,
   883 F.2d 1286 (7th Cir. 1989) ........................................................ 19, 21

ITT Telecom Products Corp. v. Dooley,
   214 Cal. App. 3d 307, 262 Cal. Rptr. 2d 773 (1989) ......................... 11

Ivanhoe Fin., Inc. v. Highland Banc Corp.,
   2004 WL 2091997 (N.D. Ill. 2004) ...................................................... 21

Kaiser Aluminum, Etc. v. Avondale Shipyards, Inc.,
   677 F.2d 1045 (5th Cir. 1982) ............................................................... 5

Kendall-Jackson Winery, Ltd. v. Superior Court,
   76 Cal. App. 4th 970, 90 Cal. Rptr. 2d 743 (2000) ......................... 6, 10

Lobato v. Ford,
   2007 WL 2593485 (D. Colo. 2007) ...................................................... 25

Los Angeles News Service v. Tullo,
   973 F.2d 791 (9th Cir. 1992) ............................................................... 14

Magnesystems, Inc. v. Nikken, Inc.,
   933 F. Supp. 944 (C.D. Cal. 1996) ..................................................... 7, 8

Merrill Lynch Bus. Fin. Servs., Inc. v. Performance Mach. Sys. U.S.A.,
   2005 WL 975773 (S.D. Fla. 2005) ....................................................... 21

Mesnick v. Caton,
   183 Cal. App. 3d 1248, 228 Cal. Rptr. 779 (1986) ....................... 12, 13

In re Napster, Inc. Copyright Litig.,
   191 F. Supp. 2d 1087 (N.D. Cal. 2002) ............................................... 14

In re Nat'l Mortgage Equity Corp. Mortgage Pool Certificates Sec. Litig.,
   636 F. Supp. 1138 (C.D. Cal. 1986) ..................................................... 13

Orth-O-Vision, Inc. v. Home Box Office,
   474 F. Supp. 672 (S.D.N.Y. 1979) ....................................................... 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MATTEL'S MOTION TO STRIKE MGA'S AFFIRMATIVE DEFENSES

EXHIBIT ___35___

PAGE ___664___

Perma Life Mufflers, Inc. v. Int'l Parts Corp.,
  392 U.S. 134 (1968) ................................................................................. 13

Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,
  324 U.S. 806 (1945) ................................................................................... 7

Qarbon.com Inc. v. eHelp Corp.,
  315 F. Supp. 2d 1046 (N.D. Cal. 2004) ........................................... 19, 20

Renalds v. S.R.G. Restaurant Group,
  119 F. Supp. 2d 800 (N.D. Ill. 2000) ....................................................... 20

Rhinehart v. Stauffer,
  638 F.2d 1169 (9th Cir. 1979) .................................................................. 12

Ross v. CCS Intern. Ltd.,
  2000 WL. 1804103 (S.D.N.Y. 2000) ........................................... 17, 18, 21

S.E.C. v. Brincat,
  2001 WL. 1662099 (N.D. Ill. 2001) .......................................................... 21

Scott v. Federal Life Ins. Co.,
  200 Cal. App. 2d 384, 19 Cal. Rptr. 258 (1962) ...................................... 16

Sidney-Vinstein v. A.H. Robins Co.,
  697 F.2d 880 (9th Cir. 1983) .................................................................... 23

Skulnick v. Roberts Express, Inc.,
  2 Cal. App. 4th 884, 3 Cal. Rptr. 2d 597 (1992) ................................ 16, 17

Smith v. Wal-Mart Stores,
  2006 WL. 2711468 (N.D. Cal. 2006) .................................................. 20, 23

Solano Concrete Co. v. Lund Constr. Co.,
  64 Cal. App. 3d 572, 134 Cal. Rptr. 552 (1976) ................................ 17, 18

Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors,
  786 F.2d 1400 (9th Cir. 1986) .................................................................. 14

Survivor Prod. LLC v. Fox Broadcasting Co.,
  2001 WL. 35829270 (C.D. Cal. 2001) ................................................. 5, 14

Thornton v. Rhoden,
  245 Cal. App. 2d 80, 53 Cal. Rptr. 706 (1966) ....................................... 11

U.S. v. Bailey,
  444 U.S. 394 (1980) ................................................................................. 24

U.S. v. Hempfling,
  2007 WL. 1299262 (E.D. Cal. 2007) ....................................................... 19

Unelko Corp. v. Rooney,
  912 F.2d 1049 (9th Cir. 1990) .................................................................. 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT ____35____

PAGE ____565____

United States v. King Features Entm't, Inc.,
   843 F.2d 394 (9th Cir. 1988) ............................................................. 18

Wyshak v. City Nat'l Bank,
   607 F.2d 824 (9th Cir. 1979) ............................................................. 19

### Statutes

Cal. Civ. Code § 47(b) ....................................................................... 11

Cal. Civ. Code § 3516 ........................................................................ 18

Fed. R. Civ. P. Rule 11 ....................................................................... 12

Fed. R. Civ. P. 12(f) .................................................................. 1, 5, 22

Fed. R. Civ. P. 15(a) ............................................................................ 8

Fed. R. Civ. P. 26(a)(1) .............................................................. 24, 25

Fed. R. Civ. P. 56(c) .......................................................................... 24

Local Rule 7-3 ...................................................................................... 2

### Other Authorities

2 Schwing, California Affirmative Defenses, § 32:1 at 186 (2007) ......................... 19

3 M. Nimmer, Nimmer on Copyright, § 13.09[B] at 13-145 (1988) ....................... 14

4 J. McCarthy, McCarthy on Trademarks & Unfair Competition,
   § 27:99 (4th ed. 2004) ...................................................................... 10

California Practice Guide: Federal Civil Procedure Before Trial § 9:409 ............... 22

Restatement (Second) of Torts § 892A(2) ....................................................... 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

07209/2247141.3

MATTEL'S MOTION TO STRIKE MGA'S AFFIRMATIVE DEFENSES

EXHIBIT _____ 35
PAGE _____ 566