## MEMORANDUM OF POINTS AND AUTHORITIES

### Preliminary Statement

The MGA defendants pleaded an unclean hands defense that lists every supposed Mattel bad act that MGA could conjure. These include, for example, accusations that Mattel interfered with European corporate acquisitions to which MGA was not a party and assisted unidentified parties in other lawsuits against MGA. The Ninth Circuit and this Court have recognized, however, that unclean hands is not a license to list every bad act that comes to mind or to try generally the parties' morals. The unclean hands defense must be directly related to Mattel's counterclaims. Because the acts alleged as establishing unclean hands bear no direct relationship to Mattel's counterclaims, it should be stricken.

With its unclean hands defense MGA tries to introduce collateral allegations— actually disguised claims—without leave of Court to do so. MGA previously attempted to take discovery on some of the same alleged conduct which forms the basis for this affirmative defense. Judge Infante sustained Mattel's objections because the conduct had no bearing on Mattel's counterclaims. The Court should strike the unclean hands defense, rather than reward MGA for attempting to circumvent Judge Infante's prior rulings by attempting to introduce new, unrelated claims without leave of Court.

MGA's affirmative defenses of estoppel, waiver and acquiescence are also insufficient as a matter of law. The same factual allegation—that Mattel allegedly delayed in bringing suit—is the basis for each defense. Delay, without more, is not a sufficient basis for an estoppel, waiver or acquiescence defense.

Many of MGA's affirmative defenses also consist of only a single conclusory sentence invoking the affirmative defense, without providing any hint of a factual basis. These defenses should therefore be stricken for a failure to provide fair notice.

### Statement of Allegations

<u>Mattel's Original Complaint and the Consolidated Cases.</u>  Mattel filed its original complaint on April 27, 2004, alleging that a former employee, Carter Bryant, breached

07209/2247141.3

-1-

EXHIBIT _____ 35
PAGE _____ 567

1  his common law, statutory and contractual duties to Mattel by working with and
2  assisting a Mattel competitor, MGA, while employed by Mattel.[1]  While at Mattel,
3  Bryant worked on the "Bratz" project, a line of fashion dolls, that MGA later marketed.[2]
4  On December 7, 2004, MGA filed an answer in intervention to Mattel's complaint
5  against Bryant claiming that the action put at issue MGA's rights in Bratz .[3]

6        MGA filed a complaint against Mattel on April 13, 2005 alleging that Mattel
7  engaged in "serial copycatting" of the Bratz dolls.[4]  Mattel's complaint and MGA's
8  complaint were later consolidated along with a declaratory relief action filed by Bryant
9  that was later dismissed.[5]

10        Mattel's Amended Complaint and Counterclaims.   On November 19, 2006,
11  Mattel moved for leave to amend its complaint.  The Court granted Mattel's motion,
12  allowing Mattel's new claims to be alleged as counterclaims to MGA's unfair
13  competition complaint.[6]  Mattel filed its Second Amended Answer and Counterclaims
14  on July 12, 2007.   Mattel's claims against MGA Entertainment, Inc., MGA
15  Entertainment (HK) Limited, MGAE de Mexico S.R.L. de C.V. (collectively, "MGA")
16  include claims for copyright infringement, violation of RICO, conspiracy to violate
17  RICO, misappropriation of trade secrets, intentional interference with contract, aiding

18

19

20

21      [1]  Mattel's Complaint in Case No. 04-9059 SGL (RNBx), dated April 27, 2004
22  ("Original Complaint"), attached as Exhibit 8 to the Declaration of B. Dylan
    Proctor, dated October 9, 2007 ("Proctor Dec.").
23      [2]  Id., ¶¶ 12-13.
        [3]  Stipulation Permitting MGA to Intervene as a Party to This Action, dated
24  December 7, 2004, Proctor Dec. Ex. 9.
25      [4]  MGA's Complaint in Case No. 05-02727 CBM (RZx), dated April 13, 2005,
    Proctor Dec. Ex. 10.
26      [5]  Minute Order Re Consolidation dated June 19, 2006, Proctor Dec. Ex. 11.
        [6]  Order Regarding Mattel's Motion for Leave to Amend, dated January 11,
27  2007, Proctor Dec. Ex. 12.

28

EXHIBIT ___35___

PAGE ___568___

1  and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty,

2  conversion and unfair competition.[7]

3      Mattel alleges, among other things, that MGA encouraged, aided and paid Bryant

4  to develop Bratz designs while Bryant was a Mattel employee, knowing that such

5  conduct was a breach of Bryant's contractual duties to Mattel;[8] that MGA and Bryant

6  intentionally concealed these facts from Mattel;[9] that Mattel is the rightful owner of

7  Bratz drawings; and that MGA's infringement of Mattel copyrights in those drawings

8  harmed, and continues to harm, Mattel.

9      Mattel also alleges that MGA approached three senior Mattel employees of

10  Mattel's Mexican subsidiary, enticed them to steal "virtually all Mattel confidential and

11  proprietary information that they could access and bring it with them to MGA," where

12  they were hired to assist in establishing and running MGA's new Mexican subsidiary.[10]

13  The three Mattel employees "stole virtually every type of document a competitor would

14  need to enter the Mexican market and to compete with Mattel in Mexico, in the United

15  States, and elsewhere."[11]

16      Mattel alleges that MGA also enticed Ron Brawer, a Mattel executive, to leave

17  Mattel for MGA and, in the process, to steal Mattel's trade secrets, including files that

18  contained "contact information for Mattel customers, most notably [Toys 'R Us], and

19  extensive contact information for Mattel employees, including titles, e-mail addresses

20  and telephone numbers."[12]  Brawer used that information for the benefit of MGA by

21  targeting "certain Mattel employees who have broad access to Mattel proprietary

22

23    [7]  Mattel's Second Amended Answer in Case No. 05-2727 and Counterclaims,

24  dated July 12, 2007 ("Mattel's Counterclaims"), Proctor Dec. Ex. 13.

25    [8]  Id., ¶ 33.

  [9]  Id., ¶ 35.

26    [10]  Id., ¶ 43.

27    [11]  Id., ¶ 48.

  [12]  Id., ¶ 68.

28

MATTEL'S MOTION TO STRIKE MGA'S AFFIRMATIVE DEFENSES

EXHIBIT 35
PAGE 569

1   information in an effort to induce and encourage them to join MGA and to steal or

2   otherwise wrongfully misappropriate Mattel trade secrets."[13]

3        Mattel also alleges that "[i]n an effort to increase its market share in Canada and

4   elsewhere, MGA stole Mattel trade secrets regarding Mattel's customers, sales, projects,

5   advertising and strategy."[14]  MGA induced Janine Brisbois, a Mattel employee with

6   responsibility for major Mattel accounts Toys 'R Us and Wal-Mart, to leave Mattel to

7   join MGA where she has responsibility for MGA's accounts with those retailers.  In the

8   process of leaving Mattel, Ms. Brisbois stole approximately 45 documents containing

9   Mattel trade secret and proprietary information.[15]

10       Mattel alleges that Isaac Larian, MGA's CEO, made repeated misrepresentations

11  to retailers about Mattel's products.  For example, "[i]n an effort to dissuade [one of

12  Mattel's most significant customers] from purchasing Mattel's MY SCENE MY BLING

13  BLING product with real gems, Larian knowingly made false factual statements about

14  that product to each retailer."[16]  MGA and Larian have "repeatedly issued false and

15  misleading press releases" in which they have "misrepresented Bratz's sales, Bratz's

16  market share, Bratz's position vis-a-vis Mattel's BARBIE products, sales of Mattel's

17  BARBIE products, and the market share of Mattel's BARBIE products."[17]

18       <u>MGA's Answer</u>.  MGA answered Mattel's counterclaims on August 13, 2007.[18]

19  After meeting and conferring, MGA acknowledged deficiencies in its affirmative

20

21

22

23  [13]  <u>Id.</u>, ¶ 69.

24  [14]  <u>Id.</u>, ¶ 70.

25  [15]  <u>Id.</u>, ¶ 74.

    [16]  <u>Id.</u>, ¶ 80.

26  [17]  <u>Id.</u>, ¶ 81.

27  [18]  MGA's Answer and Affirmative Defenses, dated August 13, 2007, Proctor
Dec. Ex. 14.

28

EXHIBIT ___35___

PAGE ___570___

1  defenses and served an amended answer on September 19, 2007. MGA's amended

2  answer asserted twenty-two affirmative defenses; certain of which remain deficient.[19]

3  **Argument**

4  **I.   THE COURT CAN, AND SHOULD, STRIKE LEGALLY**

5  **INSUFFICIENT DEFENSES**

6  Pursuant to <u>Rule</u> 12(f), a Court "may order stricken from any pleading any

7  insufficient defense." Courts grant motions to strike when an asserted defense is

8  insufficient as a matter of law. <u>See, e.g.</u>, <u>Bianchi v. State Farm Fire & Casualty Co.</u>,

9  120 F. Supp. 2d 837, 841 (N.D. Cal. 2000) (motion to strike is proper where defense is

10 insufficient as a matter of law); <u>Federal Deposit Ins. Corp. v. Crosby</u>, 774 F. Supp. 584,

11 585 (W.D. Wash. 1991) ("An affirmative defense may be stricken pursuant to Federal

12 Rule of Civil Procedure 12(f) if it is insufficient as a matter of law. . . . An affirmative

13 defense is insufficient if as a matter of law it cannot succeed under any

14 circumstances"); <u>Feezor v. Wal-Mart Stores, Inc.</u>, 2006 WL 220152, at *1 (S.D. Cal.

15 2006) ("A 12(f) motion is proper 'when the defense is insufficient as a matter of law.'")

16 (citing <u>Kaiser Aluminum, Etc. v. Avondale Shipyards, Inc.</u>, 677 F.2d 1045, 1057 (5th

17 Cir. 1982)). Here, MGA's Affirmative Defense Nos. 2, 8, 9, 10, 11, 13, 14, 16, 18, 19

18 and 20 are insufficient as a matter of law and the Court should strike them. <u>See</u>

19 <u>Survivor Prod. LLC v. Fox Broadcasting Co.</u>, 2001 WL 35829270 (C.D. Cal. 2001)

20 (striking unclean hands defense with prejudice as "insufficient defense" under <u>Rule</u>

21 12(f)).

22 <u>Rule</u> 12(f) similarly permits the Court to strike from any answer "immaterial" or

23 "impertinent" matter. <u>Fed. R. Civ. P.</u> 12(f). "Immaterial" matter is "that which has no

24 essential or important relationship to the claim for relief or the defenses being pleaded."

25 <u>Fantasy, Inc. v. Fogerty</u>, 984 F.2d 1524, 1527 (9th Cir. 1993), <u>rev'd on other grounds,</u>

26

27 [19] MGA's Amended Answer and Affirmative Defenses, dated September 19,

28 2007 ("MGA's Amended Answer"), Proctor Dec. Ex. 5.

EXHIBIT _____ 35

PAGE _____ 571

1 | 510 U.S. 517, 534-35 (1994)). "Impertinent" matter consists of "statements that do not
2 | pertain, and are not necessary, to the issues in question." Id.; see also In re
3 | 2TheMart.com., Inc. Securities Litig., 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000)
4 | (defining impertinent matter to include allegations "which are inadmissible as
5 | evidence").

6 | **II.** **THE MGA DEFENDANTS' UNCLEAN HANDS DEFENSE IS NOT**
7 | **LEGALLY SUFFICIENT**

8 | **A.** **The Unclean Hands Defense Is Not Transactionally Related to**
9 | **Mattel's Counterclaims**

10 | The doctrine of unclean hands "demands that a plaintiff act fairly *in the matter*
11 | *for which he seeks a remedy.*" Kendall-Jackson Winery, Ltd. v. Superior Court, 76 Cal.
12 | App. 4th 970, 978, 90 Cal. Rptr. 2d 743, 748-49 (1999) (emphasis added). "It is
13 | fundamental to the operation of the doctrine that the alleged misconduct by the plaintiff
14 | *relate directly to the transaction* concerning which the complaint is made." Dollar
15 | Systems, Inc. v. Avcar Leasing Systems, Inc., 890 F.2d 165, 173 (9th Cir. 1989)
16 | (quoting Arthur v. Davis, 126 Cal. App. 3d 684, 693-94, 178 Cal. Rptr. 920, 925
17 | (1981)) (emphasis added). "The determination of the unclean hands defense cannot be
18 | distorted into a proceeding to try the general morals of the parties." Kendall-Jackson,
19 | 76 Cal. App. 4th at 978.

20 | Mattel alleges that MGA (1) stole Mattel's trade secrets and confidential and
21 | proprietary information, (2) infringed Mattel copyrights, (3) interfered with agreements
22 | between Mattel and its employees, and (4) made knowingly false statements about
23 | Mattel's products.

24 | The factual grounds for MGA's unclean hands defense have nothing to do with
25 | Mattel counterclaims, but are a virtual grab-bag of any random allegation that MGA
26 | could contrive. MGA alleges that Mattel: (1) engaged in "efforts to infringe and dilute
27 | MGA's trade dress, copy MGA's products, packaging, themes, and advertising," (2)
28 | engaged in "efforts to fund or commission market research or studies that portray Bratz

07209/2247141.3

EXHIBIT _____ 35

PAGE _____ 572

1   or MGA products negatively; (3) "monitor[ed], 'sp[ied] on' or gain[ed] knowledge of

2   MGA's trade secrets, non-public information, non-public activities, unreleased

3   products, and product development," (4) "gain[ed] access, or attempt[ed] to gain access,

4   to MGA showrooms, Plan-o-Grams, merchandising displays, Toy Fair displays on false

5   pretenses," (5) "wrongfully obtain[ed] MGA's cost and sales information through

6   Mattel-employed category managers at retailers," (6) "covertly investigat[ed] MGA, its

7   officers and employees, and their family members," (7) engaged in "efforts to interfere

8   with MGA's acquisition of or investment in Zapf Creation AG," (8) engaged in "efforts

9   or intent to interfere with business dealings or contractual relations between MGA and

10  Smoby Group," (9) "influenc[ed] Nickelodeon to reject MGA advertisements or to limit

11  time slots for advertisements," (10) "induc[ed] non-party customers to breach

12  confidentiality agreements with MGA and divulge non-public information about

13  MGA's unreleased products," and (11) "coerc[ed] [Mattel's] employees to accept

14  restrictive covenants (right before a massive layoff) and non-compete clauses and other

15  efforts to prevent prospective MGA employees from accepting offers of

16  employment."[20]  The allegations fail to establish an unclean hands defense. They are

17  merely an excuse to broaden discovery improperly and to attempt to get unrelated "bad

18  acts" before the jury.

19      Magnesystems, Inc. v. Nikken, Inc., 933 F. Supp. 944, 953 (C.D. Cal. 1996), is

20  instructive. In Magnesystems, the plaintiff sued for patent infringement. Defendants

21  tried to defend the infringement claim by alleging that plaintiff had infringed their

22  patents. The Court rejected defendants' argument, holding that the unclean hands

23  doctrine requires "a connection to 'the matter in which [the plaintiff] seeks relief.'" Id.

24  (quoting Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,

25  324 U.S. 806, 814 (1945)). The Court found that "[p]laintiff's alleged misconduct ha[d]

26  no direct relationship to the [patent-in-suit] or [p]laintiff's conduct in obtaining the

27  ────────────

[20]   MGA Amended Answer, at 20-21, Proctor Dec. Ex. 5.

28

07209/2247141.3

EXHIBIT ___35___

PAGE ___573___

1  patent-in-suit." Id. at 953.  The Court stressed that any alleged infringement by the

2  plaintiff could, and should, be addressed in a separate action, not as an affirmative

3  defense in an unrelated case: "In essence, Defendants have trespassed upon Plaintiff's

4  property.  For this, Plaintiff can sue for damages. . . .  Conversely, if Plaintiff has

5  trespassed upon Defendants' property, Defendants can sue Plaintiff for damages. . . .

6  One trespass does not cancel the other.  Both trespasses can be remedied." Id.

7        MGA, like the defendants in Magnesystems, bases its unclean hands defense on

8  allegations having "no direct relationship" to Mattel's counterclaims. MGA could try to

9  assert those claims against Mattel separately—and, in fact MGA concedes that it has

10  asserted some of those claims, including the infringement claims, in its unfair

11  competition complaint. As for the claims not already asserted, MGA merely seeks to

12  circumvent the requirements that it first obtain the Court's leave to amend its own

13  complaint to assert those claims. See Fed. R. Civ. P. 15(a).

14        Judge Infante rejected MGA's efforts to take discovery on some of the allegations

15  in the unclean hands defense, finding that they have nothing to do with Mattel's

16  counterclaims.  For example, MGA's purported unclean hands defense includes

17  allegations that Mattel engaged in "efforts to fund or commission market research or

18  studies that portray Bratz or MGA products negatively," and that Mattel products,

19  including its "Polly Pocket" product, "infringe and dilute MGA's trade dress, copy

20  MGA's products, packaging, themes, and advertising" MGA subpoenaed Mattel

21  advertising agencies seeking documents related to "Polly Pocket" and to market

22  research relating to MGA products "Bratz," "Alien Racers" or MGA," including focus

23  groups and advertisements.[21] Judge Infante granted Mattel's motion for a protective

24  order, ruling that the requests were "far beyond the scope of permissible discovery

25

26  ———————————————
[21]  Order Granting in Part and Denying In Part Mattel's Motion for Protective

27  Order Regarding Polly Pocket Documents dated April 19, 2007, at 2:19-3:17,
   Proctor Dec. Ex. 15.

28

-8-
MATTEL'S MOTION TO STRIKE MGA'S AFFIRMATIVE DEFENSES

EXHIBIT _____ 35
PAGE _____ 574

1  under Rule 26" and only required documents to be produced to the extent that the

2  subpoenaed parties had information related to MGA's sole Polly Pocket allegation

3  already in issue.[22]

4      Similarly, Judge Infante denied MGA's requests for documents related to

5  whether Mattel "set prices based on confidential information from MGA" because no

6  allegation in MGA's complaint "related to below market pricing" or "any allegation that

7  Mattel misappropriated confidential pricing information from MGA."[23]  MGA also

8  sought, and Judge Infante denied, documents "tending to support or refute MGA's

9  assertion that Mattel interfered with MGA's dealings with such parties [buyers,

10  merchandisers, retailers, suppliers, licensees] by providing false or misleading

11  information concerning MGA products, the ownership of Bratz and exerting pressure

12  on these parties not to license or sell MGA products."[24]  Judge Infante denied MGA's

13  request because MGA made no "attempt to link these requests to any of the numerous

14  and far-ranging allegations of unfair competition in its complaint.  Instead MGA makes

15  a very generalized argument that the requests seek information relevant to its

16  allegations that Mattel interfered with MGA's business dealings with third parties."[25]

17  Judge Infante also denied MGA's motion to compel Mattel to produce documents

18  referring or relating to communications between Mattel and the press, public relations

19  firms and former MGA or Mattel employees for the same reasons.[26]

20

21

---

22      [22]  Id., at 7:2-12.

23      [23]  Order Granting in Part and Denying in Part MGA's Motion to Compel
    Documents Responsive to First Set of Requests for Production of Documents Dated

24  November 22, 2006, at 15:8-14, Proctor Dec. Ex. 16.

25      [24]  Id., at 17:3-6.
        [25]  Id., at 17:16-20, see id., at 18:25-19:20 (denying MGA motion to compel the

26  production of documents relating to business dealings between any licensee,
    supplier, manufacturer, distributor or merchandiser of MGA).

27      [26]  Id., at 18:16-23.

28

07209/2247141.3

MATTEL'S MOTION TO STRIKE MGA'S AFFIRMATIVE DEFENSES

EXHIBIT _____ 35

PAGE _____ 575

1   MGA's bad conduct litany of allegations has nothing to do with Mattel's

2   counterclaims against MGA, but are simply an effort to expand improperly the scope of

3   discovery, contrary to Judge Infante's explicit rulings, and the scope of the issues to be

4   presented to the jury.  MGA's wish to harass Mattel in discovery and to try the morals

5   of Mattel, however, do not make an unclean hands defense.  Such allegations should be

6   stricken from MGA's answer.  See Kendall-Jackson Winery, Ltd, 76 Cal. App. 4th at

7   978 ("The determination of the unclean hands defense cannot be distorted into a

8   proceeding to try the general morals of the parties").

9        **B.    Allegations Regarding Mattel's Purported Efforts to Disparage**

10            **MGA Fail For The Additional Reason That The Alleged Conduct**

11            **Is Protected**

12       MGA's unclean hands defense includes allegations that Mattel disparaged MGA;

13   however, the First Amendment protects the accused conduct.  MGA alleges that Mattel

14   engaged in efforts to (1) "create negative publicity or press about MGA, MGA

15   products, Bryant, Larian, or MGA employees," (2) "fund or commission market

16   research or studies that portray Bratz or MGA products negatively," (3) "include

17   negative references to MGA or Bratz on Mattel's "We Believe in Girls' website," and

18   (4) assist "parties in lawsuits against MGA."

19       The First Amendment renders privileged statements that are not false.  See

20   Unelko Corp. v. Rooney, 912 F.2d 1049, 1057-58 (9th Cir. 1990) (holding that

21   disparaging statements are protected by First Amendment where there is no evidence

22   the statements are false).  MGA accuses Mattel of product disparagement, which

23   requires a false statement.  See California Scents v. Surco Products, Inc., 406

24   F.3d 1102, 1109 (citing 4 J. McCarthy, McCarthy on Trademarks & Unfair

25   Competition, § 27:99 (4th ed. 2004)).  MGA has not alleged any false statements, nor

26   can it.  Rather, MGA merely alleges that Mattel created "negative" publicity or press,

27   portrayed Bratz or MGA products "negatively," and made "negative" references to

28   MGA or Bratz.  Because MGA has not alleged that the unidentified "negative"

-10-

MATTEL'S MOTION TO STRIKE MGA'S AFFIRMATIVE DEFENSES

EXHIBIT ___35___

PAGE ___576___

1 statements are false, the First Amendment protects the accused conduct. See Unelko
2 Corp. v. Rooney, 912 F.2d 1049, 1057-58 (9th Cir. 1990) (holding that disparaging
3 statements are protected by First Amendment where there is no evidence the statements
4 are false).[27]

5      Further, MGA's alleges that Mattel's claims are barred because it supposedly
6 assisted unidentified parties in unidentified ways in unidentified lawsuits against MGA.
7 California's litigation privilege, however, protects such assistance.[28] California
8 statutory law makes privileged statements made "in any . . . judicial proceeding." Cal.
9 Civ. Code § 47(b); see also ITT Telecom Products Corp. v. Dooley, 214 Cal.
10 App. 3d 307, 313-14, 262 Cal. Rptr. 2d 773 (1989). "This privilege is absolute in that it
11 applies regardless of whether a statement was uttered with malice or bad faith." Id.
12 (quoting Thornton v. Rhoden, 245 Cal. App. 2d 80, 93, 53 Cal. Rptr. 706 (1966)). In
13 ITT Telecom, the court held that statements in litigation made by a non-party consultant
14 "in order to assist ITT's adversary in litigation" were protected by the litigation
15 privilege. Id. at 315. Here, any alleged assistance Mattel has provided to MGA's
16 adversaries in *other* lawsuits, is not only insufficiently related to this suit by definition,
17 but is privileged and cannot form the basis of an unclean hands defense.

18      **C.**    **Mattel's Investigation Related To This Case Is Not Unclean Hands,**
19           **But Rather Required By The Federal Rules**

20      MGA's allegation that Mattel "covertly investigat[ed] MGA, its officers and
21 employees, and their family members" cannot form the basis of an unclean hands
22 defense because it is not inequitable conduct. See Fladeboe v. American Isuzu
23

24    [27] Protected statements are not sufficient to plead either bad faith or else
25 unconscionable or inequitable conduct because the purported misconduct is
protected by the First Amendment. See Fladeboe v. American Isuzu Motors, Inc.,
26 150 Cal. App. 4th 42, 58 Cal. Rptr. 3d 225, 235-36 (2007) (holding that "unclean
hands requires unconscionable, bad faith, or inequitable conduct").
27 [28] MGA Amended Answer, at 20, Proctor Dec. Ex. 5.
28

07209/2247141.3

EXHIBIT ___ 35
PAGE ___ 577

1 | Motors, Inc., 150 Cal. App. 4th 42, 56 (2007) ("unclean hands requires unconscionable,

2 | bad faith, or inequitable conduct"). Mattel has a duty to investigate allegations of

3 | wrongdoing including an obligation under Rule 11 to conduct an investigation to

4 | determine whether evidence supports the alleged wrongdoing. See Rhinehart v.

5 | Stauffer, 638 F.2d 1169, 1171 (9th Cir. 1979) (before filing an action, attorney has duty

6 | to investigate claims to see that they have merit). Mattel's compliance with its duty to

7 | investigate its claims cannot be inequitable conduct in support of a defense of unclean

8 | hands.

9 | **D.** **Allegations Regarding Mattel's Alleged Conduct Concerning Non-**

10 | **Parties Is Not A Valid Basis For An Unclean Hands Defense**

11 | MGA's unclean hands defense includes allegations regarding Mattel's conduct

12 | toward persons who are not parties to this litigation. Unclean hands "applies to conduct

13 | between the litigants themselves, not to conduct of a litigant towards a nonparty."

14 | Mesnick v. Caton, 183 Cal. App. 3d 1248, 1263, 228 Cal. Rptr. 779 (1986) ("The courts

15 | cannot use this doctrine to penalize a litigant's supposed inequitable conduct which is

16 | both unrelated to a matter before the court and addressed toward a party not involved in

17 | that pending matter.") (citing cases).

18 | MGA alleges that Mattel (1) "contact[ed] persons under false pretense in order to

19 | interrogate them about Bratz and this litigation," (2) "falsely inflat[ed] its Barbie sales

20 | figures in an effort to mislead the public and retailers," (3) coerced Mattel employees to

21 | accept restrictive covenants; and (4) engaged in "efforts to interfere with MGA's

22 | acquisition of or investment in Zapf Creation AG." These allegations relate to Mattel's

23 | supposed conduct toward non-parties. The first three allegations relate to Mattel's

24 | alleged conduct towards unspecified "persons," "the public and retailers," and "Mattel

25 | employees," respectively. Even if the allegations had any factual basis—and they do

26 | not—such conduct concerning persons other than MGA is no defense to Mattel's

27 | claims against MGA.

28 |

-12-

EXHIBIT _____ 35

PAGE _____ 578

1   MGA's allegation that Mattel engaged in "efforts to interfere with MGA's

2   acquisition of or investment in Zapf Creation AG" is deficient for the same reason. No

3   named defendant was involved in the "acquisition of or investment in Zapf Creation

4   AG." Lisa Tonnu, an executive at MGA, testified that MGA did not own an interest in

5   Zapf.[29] Ms. Tonnu acknowledged that the companies that acquired an interest in Zapf

6   were "not within the MGA corporate structure."[30]   MGA's allegations regarding Zapf

7   therefore cannot form the basis of an unclean hands defense because Mattel's alleged

8   misconduct concerned a non-party.   See Mesnick, 183 Cal. App. at 1263 (unclean

9   hands applies only to "conduct between the litigants themselves, not to conduct of a

10   litigant towards a nonparty").

11   Finally, in another example of Mattel's purported "bad conduct," MGA asks the

12   Court to bar Mattel's claims because it delayed in suing Bryant so that he could testify

13   for Mattel in an unrelated case. Even if (contrary to fact and law) that were a defense

14   for Bryant, it is not a defense that MGA can invoke.

15   **E.   Unclean Hands Is Not a Valid Defense to Mattel's RICO Claims**

16   Mattel's Counterclaim includes claims under the Racketeer Influenced and

17   Corrupt Organizations Act (RICO).[31] Unclean hands is not a recognized defense to a

18   RICO claim. See In re Nat'l Mortgage Equity Corp. Mortgage Pool Certificates Sec.

19   Litig., 636 F. Supp. 1138, 1156 (C.D. Cal. 1986) (unclean hands defense should not

20   prohibit action that "advances RICO's broad anti-racketeering policies") (citing Perma

21   Life Mufflers, Inc. v. Int'l Parts Corp., 392 U.S. 134, 139 (1968)); see also Bieter Co. v.

22   Blomquist, 848 F. Supp. 1446, 1448-50 (D. Minn. 1994) (defenses of unclean hands

23

24   [29]   Volume I of Lisa Tonnu's Deposition, dated July 19, 2007, at 61:4-9, attached
25   as Exhibit 1 to the Declaration of Jon D. Corey, dated October 9, 2007 ("Corey
      Dec.").
26   [30]   Volume II of Lisa Tonnu's Deposition, dated September 24, 2007, at 311:4-
27   312:24, Corey Dec. Ex. 2.
      [31]   Mattel's Counterclaims, ¶¶ 88-105, Proctor Dec. Ex. 13.
28

07209/2247141.3

MATTEL'S MOTION TO STRIKE MGA'S AFFIRMATIVE DEFENSES

EXHIBIT ___ 35

570

1  and *in pari delicto* are not valid in a RICO action).  As a matter of law, MGA's unclean

2  hands defense should be stricken as to Mattel's second and third counterclaims.

3      **F.**    <u>MGA Does Not Allege a Valid Unclean Hands Defense to Mattel's</u>

4          <u>Copyright Infringement Counterclaim</u>

5      The Ninth Circuit has recognized that the unclean hands defense "is rarely

6  effective" against a claim for copyright infringement.  <u>Los Angeles News Service v.</u>

7  <u>Tullo</u>, 973 F.2d 791, 799 (9th Cir. 1992).  It is "recognized only rarely, when the

8  plaintiff's transgression is of serious proportions and relates directly to the subject

9  matter of the infringement action."  <u>Survivor Prod. LLC</u>, 2001 WL 35829270, at *3

10  (quoting 3 M. Nimmer, <u>Nimmer on Copyright</u>, § 13.09[B] at 13-145 (1988)).

11  Generally, an unclean hands defense applies to copyright claims only when the plaintiff

12  has misused the copyrights at issue by either (1) overreaching in the protection of its

13  copyright by licensing it on unduly restrictive terms or (2) violating antitrust laws in a

14  way that "offend[s] the public policy behind the copyright grant."  <u>In re Napster, Inc.</u>

15  <u>Copyright Litig.</u>, 191 F. Supp. 2d 1087, 1102-05 (N.D. Cal. 2002) (discussing

16  copyright misuse and unclean hands defense); <u>see also</u> <u>Supermarket of Homes, Inc. v.</u>

17  <u>San Fernando Valley Bd. of Realtors</u>, 786 F.2d 1400, 1408 (9th Cir. 1986) (same).

18      MGA does not allege either.  MGA makes no allegation that Mattel has licensed

19  the copyrights at issue in Mattel's counterclaims, let alone on unduly restrictive terms.

20  MGA also makes no allegation that Mattel has violated antitrust laws.  To establish

21  unclean hands on this basis, MGA's allegations must demonstrate a "nexus between . . .

22  alleged anti-competitive actions and [Mattel's] power over copyrighted material." <u>In re</u>

23  <u>Napster, Inc. Copyright Litig.</u>, 191 F. Supp. at 1108 (quoting <u>Orth-O-Vision, Inc. v.</u>

24  <u>Home Box Office</u>, 474 F. Supp. 672, 686 (S.D.N.Y. 1979)).  "[G]eneralized antitrust

25  violations will not suffice." <u>In re Napster, Inc. Copyright Litig.</u>, 191 F. Supp. at 1108.

26  MGA's unclean hands defense includes general allegations of unfair competition, but

27  none of the allegations are related to Mattel's use of its copyrights.  MGA's unclean

28

-14-
MATTEL'S MOTION TO STRIKE MGA'S AFFIRMATIVE DEFENSES

EXHIBIT _____ 35

PAGE _____ 580

1   hands defense therefore fails as a matter of law as a defense to Mattel's copyright

2   infringement counterclaim and should be stricken as to that claim.

3   **III.   MGA'S ESTOPPEL, WAIVER, AND ACQUIESCENCE DEFENSES**

4   **ARE INSUFFICIENT AS A MATTER OF LAW**

5   MGA's Third, Ninth, Tenth, and Thirteenth Affirmative Defenses allege laches,

6   estoppel, acquiescence, and waiver, respectively.   With those defenses, MGA has

7   simply taken a single factual allegation and repackaged it under four separate headings.

8   As to each, MGA alleges:

9   Mattel believed from the time that Carter Bryant left

10   Mattel's employ that he was going to perform work for a

11   Mattel competitor.  Mattel began investigating Bryant and

12   MGA Defendants, including Bryant's role in the creation

13   and development of Bratz, at least as early as March 2002

14   and thereafter continued its investigation into Bryant's role

15   in the creation and development of Bratz, as well as his

16   work with MGA, in August 2002 after Mattel's CEO,

17   Robert Eckert, received an 'anonymous letter' that claimed

18   that Bryant stole the idea for Bratz from Mattel and sold it

19   to MGA Defendants.  Nonetheless, Mattel waited years to

20   bring suit, all the while allowing MGA Defendants to

21   spend years developing their business and invest tens of

22   millions of dollars developing the Bratz products and

23   building the Bratz brand.[32]

24

25

26

27   _____

[32]   MGA's Amended Answer, at 21-22, Proctor Dec. Ex. 5.

28

07209/2247141.3

MATTEL'S MOTION TO STRIKE MGA'S AFFIRMATIVE DEFENSES

EXHIBIT ____35____

PAGE ___581___

1    For its acquiescence defense, MGA includes an additional, vague allegation that

2    Mattel has "tolerated and condoned conduct by other employees similar to the alleged

3    conduct by Bryant and others on which Mattel bases its claims."[33]

4    **A.    MGA's Estoppel Defense Is Insufficient As A Matter Of Law**

5    Equitable estoppel "is based on the theory that the party estopped has by his

6    declarations or conduct misled another to his prejudice so that it would be inequitable

7    to allow the true facts to be used against the party misled." Scott v. Federal Life Ins.

8    Co., 200 Cal. App. 2d 384, 391, 19 Cal. Rptr. 258 (1962).  Here, MGA raises estoppel

9    as its Ninth Affirmative Defense, alleging that Mattel wrongfully delayed filing suit.

10   MGA fails to allege the necessary elements of an estoppel defense, which require that:

11   "(1) The party to be estopped must be apprised of the facts; (2) he must intend that his

12   conduct shall be acted upon, or must so act that the party asserting the estoppel had a

13   right to believe it was so intended; (3) the other party must be ignorant of the true state

14   of facts; and (4) he must rely upon the conduct to his injury." Skulnick v. Roberts

15   Express, Inc., 2 Cal. App. 4th 884, 890, 3 Cal. Rptr. 2d 597 (1992); see also Heckler v.

16   Community Health Servs., 467 U.S. 51, 59 (1984) ("the party claiming the estoppel

17   must have relied on its adversary's conduct 'in such a manner as to change his position

18   for the worse,' and that reliance must have been reasonable in that the party claiming

19   the estoppel did not know nor should it have known that its adversary's conduct was

20   misleading").

21   Mattel's alleged conduct -- "investigating Bryant and MGA Defendants,

22   including Bryant's role in the creation and development of Bratz," and then "waiting"

23   before filing suit[34] -- is not something that MGA "could reasonably believe that

24   [Mattel] intended" MGA would "act[] upon." Scott, 200 Cal. App. 2d at 391. Nor does

25   MGA allege it *did* act upon Mattel's conduct -- it cannot show detrimental reliance.

26

27   [33] Id., at 23.

28   [34] Id., at 23.

07209/2247141.3

-16-

MATTEL'S MOTION TO STRIKE MGA'S AFFIRMATIVE DEFENSES

EXHIBIT ____ 35

PAGE ____ 582

1   MGA alleges the Bratz dolls were further developed while Mattel "waited" while it
2   "investigated," but that is not detrimental reliance.  MGA has not suffered, and does not
3   allege it suffered, any harm as a result of Mattel's alleged conduct.  Quite the opposite,
4   it has greatly profited, and been unjustly enriched, from the development of the Bratz
5   dolls.
6          MGA also does not, and cannot, allege that Mattel knew the "true state of facts."
7   Skulnick, 2 Cal. App. 4th at 890.  MGA alleges that Mattel knew as of the year 2000
8   that Bryant was going to work for an alleged competitor, but even if that were true (and
9   it is not) that is not sufficient knowledge to give rise to an estoppel because Mattel
10  could not have filed suit based merely on that.  Indeed, this Court has held that Mattel's
11  claims only "became more than merely speculative and in fact became probable" on
12  November 24, 2003.[35]  Investigating and not immediately filing suit simply does not
13  give rise to an estoppel defense, and certainly does not based on MGA's allegations.
14  This defense should be stricken.  See F.T.C. v. Medicor LLC, 2001 WL 765628, at *4
15  (C.D. Cal. 2001) (striking affirmative defense of estoppel where elements of estoppel
16  were not alleged); see also Ross v. CCS Intern. Ltd., 2000 WL 1804103, at *4
17  (S.D.N.Y. 2000) (striking waiver and consent defenses where defendants failed to
18  demonstrate all of the requisite elements of the defenses).
19  **B.    MGA's Waiver Defense Is Insufficient As A Matter Of Law**
20         MGA's Thirteenth Affirmative Defense of waiver should also be stricken as
21  insufficient as a matter of law.  For waiver to apply, "it must be shown that the party
22  had knowledge of the right and the intent to waive or forego it."  Solano Concrete
23  Co. v. Lund Constr. Co., 64 Cal. App. 3d 572, 575, 134 Cal. Rptr. 552 (1976); see also
24  A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1026 (9th Cir. 2001) (waiver of
25  copyright "occurs only if there is an intent by the copyright proprietor to surrender
26
27  [35]  See Order Denying Motion for Terminating Sanctions, dated August 27, 2007, at 3, Proctor Dec. Ex. 17.
28

07209/2247141.3

-17-
MATTEL'S MOTION TO STRIKE MGA'S AFFIRMATIVE DEFENSES

EXHIBIT ___35___
PAGE    583

1   rights in his work"); Goehring v. Chapman Univ., 121 Cal. App. 4th 353, 386, 17 Cal.

2   Rptr. 3d 39 (2004) ("A finding of waiver requires clear and convincing evidence of

3   intentional relinquishment of a known right with awareness of the relevant facts");

4   United States v. King Features Entm't, Inc., 843 F.2d 394, 399 (9th Cir. 1988) ("Waiver

5   is the intentional relinquishment of a known right with knowledge of its existence and

6   the intent to relinquish it").

7       Here, MGA's allegation that Mattel improperly delayed filing suit does not

8   support a waiver defense. Mattel did not waive any rights prior to discovering MGA's

9   and Bryant's wrongdoing as it did not have the requisite "knowledge of the right and the

10  intent to waive or forego it" -- and MGA does not allege otherwise. Solano, 64 Cal.

11  App. 3d at 575. Moreover, mere alleged delay is not "clear and convincing evidence of

12  intentional relinquishment of a known right." Goehring, 121 Cal. App. 4th at 386.

13  Indeed, MGA pleads itself out of court on this entire defense because it is inconsistent

14  with the allegations MGA does make. MGA alleges that, upon learning of MGA's and

15  Bryant's unlawful activities, Mattel "began investigating Bryant and MGA

16  Defendants."[36] Such action demonstrates Mattel's desire to *protect* its interests, not an

17  intent to *waive* them. The Court should strike this defense.

18      ## C.   MGA's Acquiescence Defense Is Insufficient As A Matter Of Law

19      MGA's acquiescence defense likewise fails. MGA again alleges supposed delay,

20  but "mere delay in asserting rights is not an acquiescence or consent." Ross v. CCS

21  Intern. Ltd., 2000 WL 1804103, *4 (S.D.N.Y. 2000). Further, MGA does not identify

22  to what Mattel purportedly acquiesced or to which of Mattel's claims the defense

23  allegedly applies. See Ross v. CCS Intern. Ltd., 2000 WL 1804103, at *4 (S.D.N.Y.

24  2000) (striking acquiescence affirmative defense where defendant failed to show an

25  intentional relinquishment of copyrights); cf. F.T.C. v. Medicor LLC, 2001 WL

26

27  [36]   MGA's Amended Answer, at 24, Proctor Dec. Ex. 5.

28

EXHIBIT    35

PAGE       584

1  765628, at *3 (C.D. Cal. 2001) (striking consent affirmative defense where it "offer[ed]
2  Plaintiff no indication as to how consent would bar [Plaintiff's] claims").

3      Nor can MGA allege the necessary elements for acquiescence.  In pleading
4  acquiescence, MGA is essentially asserting a consent defense.  Cal. Civ. Code § 3516
5  ("Acquiescence in error takes away the right of objecting to it."); 2 Schwing, California
6  Affirmative Defenses, § 32:1 at 186 (2007).  To plead consent, MGA must show that
7  Mattel consented to the particular misconduct at issue; that Mattel did so absent any
8  fraud, duress, undue influence, or mistake; and that Mattel never terminated its
9  purported consent.  See 2 Schwing California Affirmative Defenses, § 32:3 at 195
10 (2007) ("To be a defense, the consent given must have been to the very act or
11 circumstance that caused the harm giving rise to the action.") (citing Restatement
12 (Second) of Torts § 892A(2)); see also Greenawalt v. Rogers, 151 Cal. 630, 635, 91 P.
13 526 (1907) ("consent is not real or free when obtained through: (1) Duress; (2) menace;
14 (3) fraud; (4) undue influence; or (5) mistake"); 2 Schwing California Affirmative
15 Defenses, § 32:5 at 206 (2007) ("Once given, consent is only effective until
16 terminated").  MGA again alleges none of the required elements.

17 **IV.    SEVERAL OF MGA'S AFFIRMATIVE DEFENSES DO NOT**
18 **PROVIDE FAIR NOTICE**

19 **A.    Fair Notice Requires More Than A Conclusory Averment Of The**
20 **Affirmative Defense**

21     Other MGA affirmative defenses should be stricken for failure to provide fair
22 notice.  "The key to determining the sufficiency of pleading an affirmative defense is
23 whether it gives plaintiff fair notice of the defense."  Wyshak v. City Nat'l Bank, 607
24 F.2d 824, 827 (9th Cir. 1979).  "Affirmative defenses are governed by the same
25 pleading standard as complaints."  Qarbon.com Inc. v. eHelp Corp., 315 F. Supp.
26 2d 1046, 1049 (N.D. Cal. 2004).  Thus, courts require that affirmative defenses be more
27 than "bare bones conclusory allegations."  U.S. v. Hempfling, 2007 WL 1299262, at *4
28 (E.D. Cal. 2007) ("If an affirmative defense is insufficient on its face, or comprises no

EXHIBIT _____35____

PAGE _____585____

1 more than 'bare bones conclusory allegations,' it must be stricken."); see also Heller
2 Financial, Inc. v. Midwhey Powder Co., Inc., 883 F.2d 1286, 1294-95 (7th Cir. 1989)
3 (striking affirmative defenses where they contained "nothing but bare bones conclusory
4 allegations" and "failed totally to allege the necessary elements of the alleged claims").

5      An affirmative defense must inform the opposing party of the nature of the
6 defense, the relevant elements of the defense, and the factual basis for the defense. See
7 Qarbon, 315 F. Supp. 2d at 1050 (striking affirmative defenses where defenses did not
8 include factual allegations); D.S. America (East), Inc. v. Chromagrafx Imaging
9 Systems, Inc., 873 F. Supp. 786, 797 (E.D.N.Y. 1995) ("An affirmative defense must
10 sufficiently apprise the opposing party of the nature of the defense, providing the
11 opposing party with adequate notice of the relevant elements of the defense"); Smith v.
12 Wal-Mart Stores, 2006 WL 2711468, at *8-9 (N.D. Cal. 2006) (striking affirmative
13 defenses of waiver, estoppel, and consent because they did not provide fair notice and
14 "could refer to any of several legal doctrines"); Renalds v. S.R.G. Restaurant Group,
15 119 F. Supp. 2d 800, 803 (N.D. Ill. 2000) (striking affirmative defense that did not
16 indicate how allegations were connected to the case at hand).

17     **B.**   **Several of MGA's Affirmative Defenses Do Not Give Mattel Fair**
18        **Notice**

19     Even after amending its Answer, MGA's Eighth, Eleventh, Fourteenth, Sixteenth,
20 Eighteenth, Nineteenth, and Twentieth Affirmative Defenses still consist of a single,
21 conclusory sentence which provides no notice as to the factual basis for each defense,
22 the claims to which the defenses apply or the required elements of each defense. Such
23 conclusory pleading is improper. See, e.g., Qarbon.com, 315 F. Supp. 2d at 1049-50;
24 Renalds, 119 F. Supp. 2d at 803.

25
26
27
28

07209/2247141.3

MATTEL'S MOTION TO STRIKE MGA'S AFFIRMATIVE DEFENSES

EXHIBIT ____35____

PAGE ____586____

1    For example, MGA "good faith" defense pleads that "Mattel's counterclaims are

2  barred in whole or in part because the MGA Defendants acted in good faith."[37]  This

3  pleading is woefully insufficient and does not put Mattel on notice as to which of

4  Mattel's counterclaims this applies to, nor does it put Mattel on notice as to which facts

5  this defense is based on. See Heller, 883 F.2d at 1294-95 (striking affirmative defense

6  of good faith which consisted of a "bare bones conclusory allegation"); S.E.C. v.

7  Brincat, 2001 WL 1662099, at *1 (N.D. Ill. 2001) (striking good faith defense where no

8  factual basis was provided).

9    With respect to its "failure to mitigate" defense, MGA simply states that "Mattel

10  failed to take reasonable steps to mitigate those purported damages" without identifying

11  what mitigating measures Mattel allegedly failed to take.  That is inadequate.  See

12  Merrill Lynch Bus. Fin. Servs., Inc. v. Performance Mach. Sys. U.S.A., 2005 WL

13  975773, at *12 (S.D. Fla. 2005) (striking failure to mitigate defense where defendant

14  did not include supporting facts); Ivanhoe Fin., Inc. v. Highland Banc Corp., 2004 WL

15  2091997, at *3-4 (N.D. Ill. 2004) (striking defense where defendant failed to state what

16  measures plaintiff allegedly failed to take to mitigate damages).

17    Other MGA defenses are similarly deficient.  MGA refers to "acts or omissions

18  of others" as its Eighth Affirmative Defense, but does not state what other acts or

19  omissions it refers to or who did them.  It pleads "abandonment" as its Fourteenth

20  Affirmative Defense, but does not identify what copyright interests Mattel has allegedly

21  abandoned or how Mattel abandoned them.  See Ross v. CCS Inter. Ltd., 2000 WL

22  1804103, at *4 (S.D.N.Y. 2000) (striking abandonment defense where defendants failed

23  to allege "some overt act which manifests an intent to surrender rights in the

24  copyrighted material").  MGA does not identify which works it claims were "jointly

25  authored" for its Sixteenth Affirmative Defense, and refused during a conference of

26  counsel to say whether the allegedly jointly authored works were even those Mattel

[37]  MGA's Amended Answer, at 25, Proctor Dec. Ex. 5.

1   claims it owns and that MGA infringes.[38]   MGA's Nineteenth and Twentieth

2   Affirmative Defenses of "lack of authority" and "lack of standing" likewise consist only

3   of conclusory averments of the title of the defense.

4          The Court should strike these affirmative defenses for failing to provide Mattel

5   with fair notice of the bases of the defenses, the claims MGA believes they apply to, or

6   how they relate to the case at hand.

7   **V.   MATTEL WILL SUFFER PREJUDICE IF MGA'S AFFIRMATIVE**

8          **DEFENSES ARE NOT STRICKEN**

9          Defendants maintained at one point that Mattel should not move to strike

10  affirmative defenses, "the pleading of which does not expand the scope of the case and

11  causes no prejudice to Mattel."[39]  No showing of prejudice is required, and in any event

12  the prejudice to Mattel from MGA's deficient pleading is apparent.

13         **A.   Mattel Need Not Show Prejudice**

14         Motions to strike are the proper means to address an inadequate pleading of an

15  affirmative defense, regardless of prejudice. See Fed. R. Civ. P. 12(f) ("[U]pon motion

16  made by a party within 20 days after the service of a pleading upon the party or upon

17  the court's own initiative at any time, the court may order stricken from any pleading

18  any insufficient defense"); Ganley v. County of San Mateo, 2007 WL 902551, at *2

19  (N.D. Cal. 2007) ("In the Ninth Circuit, motions to strike are proper, even if the

20  material is not prejudicial to the moving party, if granting the motion would make trial

21  less complicated or otherwise streamline the ultimate resolution of the action.");

22  California v. United States, 512 F. Supp. 36, 38 (N.D. Cal. 1981) (motion to strike is

23  proper where motion may have the "effect of making the trial of the action less

24  complicated or have the effect of otherwise streamlining the ultimate resolution of the

25  action"); California Practice Guide: Federal Civil Procedure Before Trial § 9:409 (The

26  ─────────────────
    [38]  Letter from Proctor to MGA Counsel, dated August 30, 2007, Proctor Dec.

27  Ex. 3.

28

EXHIBIT ____35____

PAGE ____588____

1   Rutter Group 2007) ("orders striking portions of pleadings are proper although they are

2   not shown to be prejudicial to the moving party, if granting the motion will make the

3   trial less complicated or otherwise streamline ultimate resolution of the action") (citing

4   Fantasy Inc. v. Fogerty, 984 F.2d 1524, 1528 (9th Cir. 1993).

5        **B.    Mattel Will Be Prejudiced If The Defenses Are Not Stricken**

6        In any event, the prejudice to Mattel is clear given that a number of MGA's

7   affirmative defenses are insufficient as a matter of law and purport to greatly expand

8   the issues for discovery and trial in this case.  Mattel should not have to spend its

9   resources responding to discovery regarding and preparing rebuttals to legally

10  insufficient defenses, and having to do so is prejudice.  See, e.g., Sidney-Vinstein v.

11  A.H. Robins Co., 697 F.2d 880, 885 (9th Cir. 1983) ("function of a 12(f) motion to

12  strike is to avoid the expenditure of time and money that must arise from litigating

13  spurious issues by dispensing with those issues prior to trial"); Smith v. Wal-Mart

14  Stores, 2006 WL. 2711468, at *4 (N.D. Cal. 2006).  Moreover, many of MGA's

15  affirmative defenses do not provide Mattel with adequate notice as to the bases for its

16  defenses or even the claims they purport rebut.  Without this necessary information,

17  Mattel can only guess how these defenses relate to the case , which also is prejudicial.[40]

18  **VI.   IN THE ALTERNATIVE, THE COURT SHOULD GRANT PARTIAL**

19  **SUMMARY JUDGMENT ON MGA'S AFFIRMATIVE DEFENSES**

20       In the alternative, the Court should grant partial summary judgment against

21  MGA's Affirmative Defense Nos. 2, 8, 9, 10, 11, 13, 14, 16, 19 and 20.  A court may

22

23  [39]  Letter from Glad to Proctor, dated August 29, 2007, Proctor Dec. Ex. 2.

    [40]  This prejudice could be tempered if Mattel had sufficient interrogatories to

24  assert a contention interrogatories seeking the factual basis for each affirmative

    defense, the persons with knowledge of those facts and the documents supporting

25  each defense.  The Court, however, has limited Mattel to 50 interrogatories.

26  February 12, 2007 Minute Order re Scheduling Conference, Proctor Dec. Ex. 18.  In

    light of the complexity of the consolidated cases, Mattel will seek and demonstrate

27  its need for not only additional interrogatories, but additional depositions.

28

EXHIBIT _____ 35

PAGE _____ 589

1  grant partial summary judgment on an affirmative defense pursuant to Rule 56 when

2  there is no "genuine issue as to any material fact and [] the moving party is entitled to

3  judgment as a matter of law." See Fed. R. Civ. P. 56(c). The Supreme Court has noted

4  that "the question whether a particular affirmative defense is sufficiently supported by

5  testimony to go to the jury may often be resolved on a motion for summary judgment."

6  U.S. v. Bailey, 444 U.S. 394, 412 n.9 (1980); Applied Elastometrics, Inc. v. Z-Man

7  Fishing Products, Inc., 2007 WL 2814646, at *6 (N.D. Cal. 2007) (granting partial

8  summary judgment against affirmative defense). "One of the principal purposes of the

9  summary judgment rule is to isolate and dispose of factually unsupported claims or

10  defenses." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

11       Here, MGA alleged an unclean hands defense in its original answer in

12  intervention.[41] Nevertheless, in its initial disclosures, which were supplemented as of

13  September 21, 2007, after MGA served its Amended Answer, MGA failed to identify

14  either witnesses or documents that supported its unclean hands defense (although it did

15  identify documents ostensibly supporting the claims in its unfair competition

16  complaint).[42] See Fed. R. Civ. P. 26(a)(1) (requiring the disclosure of witnesses and

17  documents relating to "claims and defenses") (emphasis added). For example, MGA

18  identified no witness or document related to Zapf, Smoby, Polly Pocket, creation of

19  negative press or publicity about MGA or its products, funding Market research or

20  studies that portray Bratz or MGA negatively, negative references on Mattel's "We

21  Believe In Girls" website, assisting parties in other lawsuits, obtaining MGA trade

22  secrets, inducing customers to breach confidentiality agreements, coercing Mattel

23  employees to accept restrictive covenants and non-compete clauses, or delaying suing

24

25

26  [41]  MGA's Answer in Intervention at 7, Proctor Dec. Ex. 19.
27  [42]  See generally MGA Entertainment, Inc.'s Supplemental Disclosures and MGA Entertainment (HK) Limited, MGAE de Mexico S.R.L. de C.V. and Larian's Initial Disclosures dated September 21, 2007, Proctor Dec. Ex. 20.

28

07209/2247141.3

-24-
MATTEL'S MOTION TO STRIKE MGA'S AFFIRMATIVE DEFENSES

EXHIBIT _____ 35

PAGE _____ 590

1  Carter Bryant.[43] It thus follows that Mattel must conclude that MGA has no evidence

2  supporting its claims—or at least no evidence disclosed to Mattel.[44]

3       Once the moving party has demonstrated the absence of evidence supporting the

4  non-moving party's defenses, it is the non-moving party's burden to "go beyond the

5  pleadings and . . . designate 'specific facts showing that there is a genuine issue for

6  trial.'" Celotex Corp., 477 U.S. at 324. It is MGA's burden to come forward with

7  sufficient evidence to create a genuine issue of material fact on each of its affirmative

8  defenses. Id.; see also Castaic Lake Water Agency v. Whittaker Corp., 272 F. Supp. 2d

9  1053, 1080 (C.D. Cal. 2003). This MGA cannot do, as its own initial discloses

10 confirm. Because MGA cannot establish with admissible evidence the elements of its

11 affirmative defenses, partial summary judgment is warranted.

12                          **Conclusion**

13       Mattel respectfully requests that the Court strike the identified Affirmative

14 Defenses or, alternatively, grant partial summary judgment against them.

15 DATED:  October 9, 2007        QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

16

17                         By _____

18                            Jon D. Corey
                              Attorneys for Mattel, Inc.

19

20

21

22

23  _____
    [43]  MGA's Amended Answer, at 20-21, Proctor Dec. Ex. 5.
24  [44]  MGA identified some witnesses who may possess knowledge related to
25  MGA's alleged defenses, but identifies for no witness the "subject of the
    information" that he or she may possess. Such vague disclosures are insufficient.
26  Fed. R. Civ. P. 26(a)(1); see Lobato v. Ford, 2007 WL 2593485, at *5 (D. Colo.
27  2007) (ruling that "the disclosing party must provide more than a perfunctory
    statement that the identified person has information "about the case.").
28

EXHIBIT 35
PAGE 591

**Exhibit 36**

ATTORNEYS' EYES ONLY

**Isaac Larian (President / CEO)**

From:           Fred Larian
Sent:           Thursday, May 25, 2000 12:49 PM
To:             Isaac Larian
Subject:        RE: Information requested by Marty Katz regarding Fireman's Fund

Your denial does not make my allegation any less true and time will prove what the real truth is. I doubt you will swear on any of your children's lives that my allegations are not true (then again, I have been surprised before).

When the time comes, we will go through both of our testimonies and prove who lied about what.

——Original Message——
From:   Isaac Larian
Sent:   Wednesday, May 24, 2000 7:15 PM
To:     Fred Larian
Subject:    RE: Information requested by Marty Katz regarding Fireman's Fund

Your allegation stated below is false, and self serving, as usual.

The records we have ( including your testimony in the Fireman Insurance case) speak for themselves.

——Original Message——
From:   Fred Larian
Sent:   Wednesday, May 24, 2000 6:32 PM
To:     Isaac Larian
Subject:    Information requested by Marty Katz regarding Fireman's Fund

You have accused me of falsifying documents. You are the one who is trying to falsify things. For example, during the week of April 24, I informed you that in response to a fax from Risa of Marty Katz's office, the originals of the health insurance termination forms on Leon Michanie (copies of which had been previously provided to Fireman's Fund) were located and that legible copies were made. You instructed me to not provide those to Marty and to tell him we could not find the originals. On April 30, 2000, at my preparation meeting with Marty, I ignored your instructions and gave the copies to Marty.

1

EXHIBIT _____ 36 _____    CG 0009

PAGE _____ 592

Exhibit 37

Confidential -- Attorneys' Eyes Only

# United States District Court

# Central District of California

## Case No. CV 04-9049 SGL (RNBx) Consolidated with Case No. 04-9059 and Case No. 05-2727

### CARTER BRYANT, an Individual, Plaintiff,

### v.

### MATTEL, INC., a Delaware corporation, Defendant

---

## Expert Report of

## Michael J. Wagner

## February 11, 2008

EXHIBIT _____ 37

i

Confidential – Attorneys' Eyes Only

## I.   Introduction

I have been retained on behalf of Mattel, Inc. ("Mattel") to provide opinions regarding profits that may be recovered from MGA Entertainment, Inc. and MGA Entertainment (HK) Limited ("MGA"), Isaac Larian, and Carter Bryant (collectively referred to as "counter-defendants").

My opinions address the following matters:

- MGA's revenues, costs and profits relating to the sale, distribution and licensing of Bratz products.
- Isaac Larian's benefit from the use, sale, distribution and licensing of Bratz products.
- Carter Bryant's benefit from payments received in connection with the consulting agreement for Bratz between Mr. Bryant and MGA.
- The appropriate prejudgment interest rate and method to calculate prejudgment interest, if applicable.
- MGA's, Isaac Larian's, and Carter Bryant's net worth.

## II.   Background

### A.   MGA

As described in MGA's complaint against Mattel, "MGA is a privately held company in the San Fernando Valley that began in 1979 as a small consumer electronics business. In 1987, the company made its first foray into the toy business when it secured rights to market handheld LCD games featuring licensed Nintendo® characters. Building on that small success, the company began marketing products for popular licensed properties such as the 'Power Rangers'® and 'Hello Kitty'®."[1] In June 2001, MGA released "BRATZ."[2]

#### 1.   BRATZ

Bratz dolls were introduced to the market in June of 2001.[3]   Today, the Bratz product line has grown to include a wide variety of products. When one clicks on the Products link at Bratz.com website, the following product categories are displayed:  Bratz, Bratz Baby, Bratz Kidz, Activities, Home Décor, Electronics, Bratz Sports, Games, and Bratzlife.

---

[1] MGA complaint against Mattel, filed April 13, 2005 [Tab E87, page 2].
[2] MGA complaint against Mattel, filed April 13, 2005 [Tab E87, page 2].

EXHIBIT _____ 37 _____                                   1

PAGE _____ 594

Confidential – Attorneys' Eyes Only

A June 2002 declaration of Lee Shiu Cheung, Managing Director of MGA HK, provides further description of the Bratz dolls and the success that MGA expected upon their release. Within the declaration, the Bratz dolls are described as "hip and cool young adolescent or teenage girls" and "4 best friends from high school who love to trade clothes, shoes and hairdos."[4] The declaration goes on to say, "there would be a lucrative business of supplying accessories to the owners of BRATZ dolls thus ensuring a steady stream of revenue."[5] In addition to the sale of dolls and accessories, license revenues are discussed as well. The declaration states, "another major source of revenue generated by the BRATZ dolls is income derived from merchandising rights by granting non-exclusive licenses to other companies worldwide."[6]

## 2.   Success of MGA's BRATZ

A March 8, 2005 report from CBS News quotes Jim Silver of Adventure Publishing Group as saying, "What Bratz has done is actually unbelievable. Barbie has owned the market. Nobody's ever done a doll over the last 20 years that's done                  . And Bratz came out of nowhere and a little past four years built up to

One need only look to the MGA website (www.mgae.com) and their press releases posted there, to see the tremendous success MGA has enjoyed as a result of the BRATZ products. A February 11, 2004 MGA press release states, "Bratz, *The Girls with a Passion for Fashion,* were introduced in June 2001, and has since become one of the world's premiere toy lines and girls lifestyle brands."[8]  Following is a summary of some of the headlines of MGA's many press releases regarding the success of BRATZ:[9]

- 1/7/2004 – MGA Entertainment announced today that it remains the fastest growing consumer entertainment company in the world.

- 5/12/2004 – BRATZ Fashion Dolls Become the #1 Best Selling Toy in the United Kingdom!

---

[3] February 11, 2004 MGA Press Release [Tab E88, page 3].
[4] Affirmation of Lee Shiu Cheung, June 18, 2002, page 3 [Tab E89].
[5] Affirmation of Lee Shiu Cheung, June 18, 2002, page 3 [Tab E89].
[6] Affirmation of Lee Shiu Cheung, June 18, 2002, page 5 [Tab E89].
[7] "Battles of Babes in Toyland", CBS News, March 8, 2005 [Tab E91, page 1].
[8] February 11, 2004, MGA Press Release [Tab E88, page 3].
[9] Variety of MGA Press Releases [Tab E92].

REDACTED

EXHIBIT _____ 37 _____    2

PAGE _____ 595

Confidential – Attorneys' Eyes Only

- 1/28/2005 – MGA Entertainment and BRATZ Creating Non-Stop Excitement at Retail

- 3/10/2005 – MGA Entertainment's BRATZ becomes the Number One Fashion Doll Brand in Australia

- 5/4/2005 – BRATZ Nominated for Five International Licensing Excellence Awards...As well as seeing a Q1 Market Share Increase

- 5/24/2005 – BRATZ Fashion Dolls report remarkable market share growth in Canada.

- 5/15/2006 – MGA Entertainment, Avi Arad Productions and Crystal Sky Pictures Announce New Motion Picture Based on the Billion Dollar BRATZ™ Toy Franchise

- 2/5/2007 - BRATZ™ becomes No. 1 in Fashion Themed Dolls and Accessories in the USA

- 4/11/2007 - BRATZ™ Takes the Coveted #1 Fashion Doll Spot in Canada

BRATZ has experienced a great deal of success.  A May 2, 2005 article written for Business Week describes Bratz as a "billion-dollar franchise."[10]

Not only did Bratz increase the profile of MGA, it also had a major impact on the financial success of the company.  Sales of Bratz products grew substantially through 2006,[11] while sales of non-Bratz products grew more moderately as shown in the following chart:

---

[10] "Hair Pulling in the Dollhouse", Business Week, May 2, 2005 [Tab E93.page 1].
[11] There is an increase in sales of Non-Bratz products as a percentage of total sales in late 2006 and 2007 resulting from the MGA 2006 acquisition of Little Tykes.

EXHIBIT _____37_____   3

PAGE _____596_____

Confidential – Attorneys' Eyes Only

Per review of the Income Statement of MGA from 1999 through 2006, the financial contribution of the BRATZ dolls helped turn a marginally profitable company into a company that earns more than            net income a year as shown in the following figure:

REDACTED

EXHIBIT ____37____   4

PAGE ____597____

Confidential – Attorneys' Eyes Only

**B.   Isaac Larian, Founder, CEO and Majority Shareholder of MGA**

   Isaac Larian is the Founder, CEO and Majority Shareholder of MGA.  As such, he has been the subject of many news articles and TV interviews.  A Business Week article describes him as the, "father, so to speak, of the fabulously successful Bratz dolls."[12]   A profile provided by Business Week for the article mentioned above credits him with creating the "enormously successful Bratz dolls, whose edgy looks and clothing sent Barbie reeling."[13]

---

[12] "Hair-Pulling in the Dollhouse" Business Week, May 2, 2005 [Tab E93, page 1].
[13] Bio of Isaac Larian, Business Week, May 2, 2005 [Tab E94, pg.1].
[14] Lisa Tonnu Deposition on January 17, 2008 [Tab E16, pages 74-76].

**REDACTED**

5

EXHIBIT _____ 37
                  590

Confidential — Attorneys' Eyes Only

### C. Carter Bryant, Designer and Former Employee of Mattel

Carter Bryant began working for Mattel in September of 1995 as a Barbie product designer. In approximately April of 1998, Mr. Bryant resigned from Mattel and then re-applied to Mattel in late 1998. He began working for Mattel again in January 1999 as a product designer and then terminated his employment again with Mattel on October 20, 2000.[16]    Mattel's counter-claim states, "As a result of the efforts of Bryant and other Mattel employees working on Bratz (which were done without Mattel's knowledge), the Bratz dolls had been designed and were far along in development during the time that Bryant was employed by Mattel and prior to the time that Bryant left Mattel on October 20, 2000."[17]

MGA and Carter Bryant entered into a Consulting Services Agreements dated September 18, 2000. The first section of the agreement states, "MGA retains Bryant to provide his services to consult with MGA and advise MGA on the design and development by MGA of a line of dolls presently know as 'Bratz' (the 'MGA Products').[18] Mr. Bryant's compensation under this agreement is, "a royalty of three percent (3%) of the Net Sales Receipts from the sales by MGA of any of the MGA Products developed by MGA on which Bryant provided his consulting services."[19] As a result of this agreement and the subsequent sales of certain Bratz products, Carter Bryant has received more than $35 million dollars in royalty payments from MGA from 2001 as of December 31, 2007.[20]

### III. Bases for Opinions

The following is a discussion of the bases supporting each of my opinions.

---

[15] Lisa Tonnu Deposition on January 17, 2008, [Tab E16, pages 75 and 76] and Isaac and Angela Larian List of Assets, 2007 [Tab E81.MGA3787279]. Note, there is a discrepancy between Angela and Isaac Larian's 2006 List of Assets [Tab E97] and what Lisa Tonnu states. Contrary to what Lisa Tonnu says, the 2006 List of Assets shows that Isaac and Angela Larian individually own some share of MGA.

[16] Mattel Inc.'s Amended Answer in Case No. 05-2727 and Counterclaims, Dated January 12th 2007 [Tab E95, pages 32 and 34].

[17] Mattel Inc.'s Amended Answer in Case No. 05-2727 and Counterclaims, Dated January 12th 2007 [Tab E95, page 34].

[18] Carter Bryant Consulting Services Agreement Dated September 18, 2000 [Tab E90, page 1].

[19] Carter Bryant Consulting Services Agreement Dated September 18, 2000 [Tab E90, page 2].

[20] Tab B1, Schedule 7.2.

6

REDACTED

EXHIBIT _____ 37

PAGE _____ 599

Confidential – Attorneys' Eyes Only

### A.  MGA's Revenue, Costs and Profits Relating to the Sales, Distribution and Licensing of Bratz Products[21]

I calculated the revenue, costs and profits earned by MGA for the sales and licensing of Bratz products for the period of 2001 through October 2007, the last period of data provided by MGA.  I have calculated actual Bratz revenues, costs, profits and distributions to shareholders for income taxes[22] attributable to Bratz.  I have been asked to make these calculations irrespective of whether all of the items I have included as costs will, in fact, be deducted at trial. The following chart depicts net revenues, cost of good sold, direct costs and calculated costs for Bratz products from 2001 through October 2007.

For further breakdown of revenues and costs between different product categories and identification of US sales see Schedules 1.1a through 1.1g at Tab B1.

---

[21] Summary of Damages, Tab B1 Schedule 1.0

REDACTED

EXHIBIT ___32___

PAGE ___1000___

7

Confidential – Attorneys' Eyes Only

### 1. Revenues

The basis for my calculation of MGA revenues of Bratz product sales is a report produced by MGA titled "Bratz Sales, 2001-2006."[23] According to Lisa Tonnu, MGA VP of Taxation[24], if she were asked to total Bratz revenues, she would use this document.[25] Within the "Bratz Sales, 2001-2006" report, the sales are categorized by profit center and then broken down by year and SKU number.[26] Included in this report are both gross sales as well as cost of sales at standard cost. I have accumulated all of the gross sales for each Bratz profit center from this report in order to determine gross sales from Bratz products for 2001 through 2006. For 2007, I used the October 2007 Sales by SKU report provided by MGA to determine gross sales for Bratz products through October 2007. See gross sales for Bratz products by year in Tab B1, Schedule 2.1.

In addition to gross sales from product sales, MGA earned revenues for Bratz from licensing agreements, DVD and TV syndication, Distribution agreements, Music sales and Theatrical productions. I used a variety of different MGA reports to find the portion of revenue for each of these sources linked to Bratz. See Tab B1, Schedule 3.1 for a summary of revenue by category for each year.

In order to determine net sales, I deducted sales returns and sales discounts and allowances from gross revenues. I used the Sales Returns by SKU reports provided by MGA for the period of 2001 through October 2007 in order to determine the sales returns for Bratz products. MGA does not track sales discounts and allowances by profit center or product line. Therefore, I allocated sales discounts and allowances to the profit centers based on the percentage of total sales discounts and allowances to total gross sales for each year.

### 2. Expenses

---

[22] MGA is a Subchapter S Corporation. As such, taxes on MGA's income are paid by the shareholders. However, since MGA makes distributions to shareholders to cover incomes taxes, those distributions are subtracted in my analysis.

[23] See [Tab E53] through [Tab E67]

[24] January 17, 2008 Deposition of Lisa Tonnu [Tab E16, page 33].

[25] January 17, 2008 Deposition of Lisa Tonnu [Tab E16, pages 28, 140 – 142].

[26] I have identified other MGA documents that list Bratz product categories consistent with the product categories in the document identified by Ms. Tonnu. Following is a sample of those documents: [Tab F3.MGA3765749 - MGA Forecasts 6-1-07.xls]; [Tab F20.MGA3721053 - 2007 Carter Bryant Royalty Statements.xls]; [Tab F36.MGA3720119 – 2006-2007 Ad Production Expense.xls]; and [Tab F37.MGA3719906 – 2006 & 2007 YTD Ad Media Expense.xls].

8

EXHIBIT _____ 32

PAGE _____ 1001

Confidential – Attorneys' Eyes Only

a)   **Direct Expenses**

For some expense categories, I was provided with adequate information to determine the direct expenses incurred by MGA for the production and sale of Bratz products.  For example, from the Report titled "Bratz Sales, 2001-2006", I accumulated the Cost of Sales at Standard cost for the Bratz products from 2001 through 2006 to deduct from the related Bratz revenue.  According to Lisa Tonnu, the standard costs provided in the sales report reflect the "agreed cost between MGA and the manufacturer."[27]  In addition to Cost of Sales, utilizing reports produced by MGA, I determined the direct costs for Production Costs (DVD, TV, and Music), Royalty Expense, Ad Production Expense, Ad Media Expense, Mold Depreciation and expenses for Tooling and Development that were incurred by MGA for Bratz.

For Ad Media and Ad Production Expense, I was provided with a report that identified direct cost by product line for 2006 and year to date (YTD) 2007.  According to Lisa Tonnu, this is the only period in which MGA tracked these expenses by product line.[28]  Therefore, for the years where detail was not provided, I used the average Ad Media and Ad Production Expense for Bratz as a percentage of total U.S. Ad Media (excluding Little Tykes) and Ad Production Expense for 2006 and 2007 and applied it to the related expenses for 2001 through 2005 to estimate Bratz Ad Media and production expense for those years.[29]

b)   **Calculated Expenses**

For all expenses that are not tracked by product or product line by MGA, I calculated incremental costs based on a regression analysis of monthly costs for various cost categories to gross revenues provided by MGA to determine the incremental costs associated with sales.  Additional costs based on these regression analyses are equal to 9.22%[30] of gross revenues.  See summary of regression results at Tab B1, Schedules 5.1 and 5.2.

In addition, since regression analysis determines additional costs associated with a $1 increase in sales and the incremental sales to MGA for the Bratz products is a substantial percentage of their total revenue, I analyzed the remaining costs that were not incremental

---

[27]  January 17, 2008 Deposition of Lisa Tonnu, [Tab E16, page 136].
[28]  January 24, 2008 Deposition of Lisa Tonnu, [Tab E120, pages 134 to 138].
[29]  See Tab B1, Schedules 3.2 and 3.3
[30]  These cost categories are: Other Sales and Marketing Expense, Product Development Expenses, Travel and Entertainment Expense, Salaries and Related Expenses, Premises Related Expenses,

Confidential – Attorneys' Eyes Only

costs associated with Bratz products as a result of my regression analysis to determine whether any of these remaining costs are attributable to Bratz products as a result of the large proportion of Bratz products to total MGA sales. Based on this additional analysis, I determined that an additional $126.3 million of costs are attributable to Bratz products. See Tab B1, Schedule 1.6 for analysis.

### c)   Distributions to Shareholders for Income Taxes

MGA, like other Subchapter S Corporations, distributes to its shareholders amounts sufficient to allow the shareholders to pay income taxes on their share of MGA income. I have not been given access to underlying documents and have relied on documents which appear to have been prepared for litigation. Mr. Larian's tax returns would contain evidence regarding the taxes due on income from MGA, Mr. Larian's specific tax rate and whether the distributions were, in fact, made for tax purposes. Absent that data, I have used a shareholders' distribution report for the period of 2001 through 2005 provided by MGA to determine the amount of the distributions made to shareholders for the payment of taxes. To determine these amounts, I have calculated the portion of the tax distributions attributable to the income from Bratz products and reduced MGA's profits by such amounts for 2001 through 2005. Total amount distributed to shareholders for 2001 through 2005 is                          See Tab B2, Schedule 6.0 for my analysis.

The following table summarizes MGA's revenues, costs and profits from Bratz for the period of 2001 through October 2007:

---

Supplies, Postage and Delivery Expense and Other Depreciation and Amortization. [Tab B1, Schedule 1.2, footnote (o)]

EXHIBIT ____37____        10

PAGE ____603____

Confidential – Attorneys' Eyes Only

A further breakdown of revenues, costs and profits earned by Bratz into different Bratz doll categories is provided at Tab B1, Schedules 1.1a through 1.1g.

**B.  Isaac Larian's benefit from sales of Bratz Products**

Isaac Larian's benefit from sales of Bratz Products is determined to be Mr. Larian's percentage of the value of Bratz plus MGA's distributions to Mr. Larian in excess of his tax obligations associated with his proportion of MGA's income.

T                                        ck.[32]  As a result of the Bratz products, the value of the stock of MGA has increased significantly since the introduction of Bratz in 2001.  In order to calculate the benefit to Isaac Larian as a result of the sales and licensing of Bratz products, I determined the Bratz contribution to the fair value of the stock currently held by the Larian Trusts.  Since MGA is not a publicly traded company, there is no readily available stock price to use to value Isaac Larian's interest in MGA.  Therefore, I have determined the fair value

---

[31] Tab B2, Schedule 1.0
[32] See Deposition of Lisa Tonnu on January 17, 2008, page 76. [Tab E16]

11

REDACTED

EXHIBIT ___37___

PAGE ___604___

Confidential – Attorneys' Eyes Only

of MGA stock attributable to the Bratz products. Fair value is the price at which an asset could be exchanged in a current transaction between knowledgeable, unrelated willing parties. Fair value does not include any increment of value resulting from cost savings normally associated with a strategic sale. I considered three generally accepted approaches to determine the fair value of MGA stock attributable to the Bratz products on December 31, 2007. These approaches are income, market and cost. I have assumed no potential cost savings in arriving at my opinion of fair value of Bratz. I will update this analysis if and when I receive full financial data for the entire year of 2007.

The following figure summarizes the results of my analysis and shows the appropriate weights assigned to each individual approach.

In my opinion, the income approach best represents the value of the on-going business as it allows for full consideration of circumstances unique to MGA. At the same time, the market approach in the form of comparable transaction analysis is least relevant because the degree of similarity between MGA and comparable acquisitions is hard to gauge, as every company's financial and business environment is unique. As a result, I have assigned a weight of 70 % to the income approach, 20% to the comparable companies analysis and 10% to the comparable transactions analysis. I also considered the cost approach but did not find it to be an appropriate measure of value of MGA's on-going business.

---

[33] Isaac and Angela Larian List of Assets, 2007 [Tab E81 MGA3787279].

**REDACTED**

EXHIBIT _____37_____

PAGE _____605_____

12

Confidential – Attorneys' Eyes Only

this implies a total company                         Separating MGA's value into Bratz and non-Bratz based on gross revenues, the implied value of Bratz is              [35]. This is greater than the                    value I derive from my analysis.  Since I was not provided with information regarding the methodology used to calculate the value assigned to MGA Entertainment on Mr. Larian's list of assets, I'm unable to provide any comments with respect to the value or methodology used.

     The following section is a discussion of my methodology.

1.   **Income Approach**

    a)  **Summary**

     I performed a valuation of the Bratz contribution to the value of MGA stock based on the income approach in the form of a discounted cash flow ("DCF") analysis.  To determine the Bratz enterprise value as of December 31, 2007, I forecasted MGA's future cash flows from Bratz and then valued these cash flows as of the date of the valuation by applying an appropriate discount rate.  I also calculated a terminal value at the end of my forecast period.  In my analysis, I relied on MGA's historical and projected financial statements.  In addition, I reviewed historical and projected sales growth for other companies in the toy industry to ensure that MGA's forecast appears reasonable in light of the industry.  Based on my DCF analysis, the fair value of Bratz on December 31, 2007,

    b)  **Methodology**

     In determining the value of the Bratz enterprise using the DCF method, I prepared a DCF model that calculates MGA's three year projected cash flows for Bratz from 2008 through 2010 and the Bratz terminal value at December 31, 2010.  These cash flows and terminal value are discounted to the valuation date using a discount rate of 11%[37].  The following is a more detailed description of the methodology and assumptions used in the DCF.

---

[34] [$1,636,380,000/81.82%] = $1,999,975,556
[35] Multiply Total Implied Company Value ($2.0 B) by Percentage Share of Bratz Revenues in 2007 of 57%. [Tab B1, Schedule 2.1].
[36] See Tab B2, Schedule 2.0
[37] See Tab B2, Schedule 3.0 for discount rate.

13

**REDACTED**    EXHIBIT _____ 37 _____

PAGE _____ 1010 ____

Confidential – Attorneys' Eyes Only

### (1)  Revenue and Expense Projections

The starting point for the revenue projections is Bratz's 2006 actual revenues since I was only provided with 10 months of data for 2007.  I projected the 2007 revenues based on sales decline in Bratz for the 10-months ending October 2007 compared with the 10-months ending October 2006.  I projected Bratz forecasted sales growth at 2% each year.  I consider these revised projections to be reasonable.  I believe the long-term growth rate of Bratz is 2%, as discussed in detail in the Terminal Value section below.

Net Income from Bratz – The net income resulting from the sale of Bratz products is based on revenues less incremental expenses associated with Bratz products.  Incremental expenses are generally based on the average of 2005 and 2006 expenses from my analysis of Bratz revenues, expenses and profits, as described above.

I also include distributions to shareholders to derive net income.  The amount is based on the historical tax payments as a percentage of net income for 2002 through 2004.

See Tab B2, Schedule 2.1 for detail.

### (2)  Adjustments to income to calculate free cash flow

Net income projections described above include non-cash charges incurred by MGA.  It is necessary to adjust for such charges in order to determine "free cash flow," or the cash flow that would be available to the owner of the enterprise.  Free cash flow is calculated by adding depreciation and amortization back to the net income and subtracting capital expenditures and investment in working capital.

Capital expenditures are projected at a constant rate of 2.6% of sales, which is the average level of capital expenditures to revenue over the previous six year period from 2001 through 2006 for MGA.[38]

Depreciation is assumed to remain constant at 100% of capital expenditures.  This is considered reasonable given the rate of depreciation to capital expenditures for 2004 through 2006[39] and that the majority of depreciation expense is related to molds[40] which have a

---

[38] See Tab B2, Schedule 2.2
[39] See Tab B2, Schedule 2.2.
[40] See Tab B1, Schedule 4.2.

14

EXHIBIT ____37____

PAGE ____607____

Confidential – Attorneys' Eyes Only

relatively short depreciable life. Per review of the MGA Tooling Depreciation[41] report, almost all of the molds developed for Bratz products have an assigned depreciable life of 24 months.

Investment in working capital is calculated by assuming that certain key ratios will remain at their average 2005-2006 levels. For instance, inventory turnover ratio, account receivable days outstanding, and account payable days outstanding are projected to remain constant.

### (3)  Terminal Value

The terminal value is the value of MGA's cash flows as a result of Bratz revenues beyond 2010 and is determined by capitalizing Bratz's 2010 cash flow. The formula to perform this calculation is:

Terminal Value = [2010 cash flow x (1+ growth rate)] / (discount rate – growth rate)

I estimate an increase in MGA's cash flows as a result of Bratz of 2% per year (growth rate in above formula) in perpetuity. This rate is considered reasonable given the historic growth rate in Bratz and per review of the historical and projected growth rates of other companies in the industry.[42]

### (4)  Discount Rate

I used the Capital Asset Pricing Model (CAPM) in order to determine the discount rate to discount future cash flows to the date of valuation. The CAPM is a common rate used in valuation to determine the equity rate of return. Since MGA has no debt attributable to Bratz, the equity rate is the discount rate. In 2006, MGA obtained               evolving loan of which                was outstanding as of December 31, 2006.[43] This loan was primarily obtained to finance the acquisition of Little Tykes in 2006.[44] Therefore, the loan is not related to the ongoing Bratz business and therefore is not considered in the calculation of the discount rate for cash flows from Bratz. The resulting CAPM of 11% is calculated in Tab B2, Schedule 3.0.

---

[41] MGA Tooling Costs and Depreciation Report [Tab F38.MGA3720189 – Tooling Costs & Depreciation.xls].
[42] See Tab B2, Schedule 12.1.
[43] 2005 and 2006 MGA audited financial statements [Tab E24.MGA0868719].
[44] Lisa Tonnu Deposition, September 24, 2007 [Tab E121, page 102].

15

REDACTED          EXHIBIT  32

PAGE  608

Confidential – Attorneys' Eyes Only

### (5)  Summary of Income Approach

The following table summarizes the annual cash flows for Bratz from 2008 to 2010 plus the terminal value.  These amounts are discounted back to 12/31/2007 to determine Bratz's enterprise value.

### 2.  Market Approach

I have used two market approaches in determining the value of MGA stock attributable to Bratz: the comparable trading company approach and the comparable market transaction approach.  While both of these approaches use market information to derive Bratz's value, they use different information as the descriptions suggest.   The comparable trading company approach uses multiples derived from trading activity of public companies that most closely resemble MGA.  The comparable market transaction approach uses multiples derived from transactions that have occurred in MGA's industry.  While no two companies are exactly alike, I have selected companies that I believe to be most similar to MGA.  I have seen numerous documents produced by MGA that use a multiples approach to value MGA and various acquisition targets at different times.  The multiples used in my analysis described below are comparable to the multiples used throughout the analysis provided in the MGA production.  See Tab B1, Schedule 7 for a summary of valuation documents reviewed.  The following sections describe the methodologies I used to derive Bratz's value based on market data.

REDACTED    EXHIBIT ___3 7_____

PAGE    609

Confidential — Attorneys' Eyes Only

### a)   Comparable Trading Company Analysis

#### (1)  Summary

Based on my analysis of comparable publicly traded companies, the fair value of MGA attributable to Bratz on December 31, 2006 was                         , as illustrated in the following figure:

I assign this methodology a weight of 20% in my final determination of value.

#### (2)  Methodology

There are no companies that are exactly comparable to MGA and more specifically, the Bratz products in their rapid growth, diversification of products and product lines.  At best, there are companies that compete with MGA and the Bratz products or companies that are similar in that they sell toys.

I have made an independent search for companies most closely resembling MGA. Based on my research, among publicly traded companies, there are six that I would consider to be in some respect comparable to MGA.[45]  All of the companies used in my analysis except for Marvel are taken from Capital IQ's MGA competitor list and Yahoo! Finance's Industry Browser for the Toys & Games Industry[46]. From the list of MGA's public competitors provided by Capital

---

[45] See Tab B2, Schedule 4.0
[46] Source: Yahoo! Finance Industry Browser – Toys and Games.
      http://biz.yahoo.com/p/315conameu.html [Tab E85]

EXHIBIT _____ 37

REDACTED      PAGE _____ 610

Confidential – Attorneys' Eyes Only

IQ and Yahoo! Finance, I excluded companies that did not have adequate current data available or were significantly less profitable than MGA. I have included Marvel in the list of comparables since Marvel's business line closely resembles that of MGA. MGA entered into a license agreement for Marvel's Super Hero products in 2006.[47] Two of the companies used in my analysis, Mattel and Hasbro, were also used by MGA in an MGA document titled, "Toy Industry Comparable Companies Analysis" that calculated an estimated enterprise value for MGA using the trading multiples of Mattel and Hasbro.[48]

For each of the six comparable companies used in my analysis, I gathered multiples of enterprise value to revenues, EBITDA and EBIT. I then applied the median of these multiples to corresponding sales, EBITDA and EBIT for the Bratz products for the last full year of data I have, 2006, as calculated in our incremental analysis in Tab B1, Schedule 1.1.

The value resulting from this analysis is the fair market value of a minority interest, and does not reflect the premium a hypothetical buyer would be willing to pay for the controlling interest. To account for this, I apply a "control premium" of 18.5% based on the premiums to unaffected stock price paid in control transaction for all industries during 2007.[49]

See Tab B2, Schedule 4.0 for detailed analysis.

### b)   Comparable Transactions Analysis

### (1)   Summary

The comparable transactions analysis uses publicly available information on acquisitions to derive multiples that are then applied to MGA's Bratz results. As with the comparable company trading approach, I consider Revenues, EBIT and EBITDA multiples to be the most appropriate multiples to use in this type of analysis for the valuation of Bratz. This approach has its limitations as it uses actual transactions in the marketplace. If there is limited activity for comparable companies, this approach results in a valuation based on this limited information. While this limitation typically exists, I find it to be a useful approach despite its limitations. This approach results in an estimated enterprise value of Bratz                    Based on the

---

[47] Source: MGA Entertainment Press Release dated January 31, 2006. "MGA Entertainment Secures Multi-Year License for Die-Cast Vehicles Based Upon Marvel Super Hero Universe." [Tab E122]

[48] MGA Toy Industry Comparable Companies Analysis [Tab E32.MGA0236491-504].

[49] Source: Mergerstat / BVR Control Premium Study, 2007, All Industries, Mergerstat Control Premium Median Value [Tab E27].

REDACTED

EXHIBIT _____ 37 _____          18

PAGE _____ 611

Confidential – Attorneys' Eyes Only

described limitations, I assign this methodology a weight of 10% in my final determination of value.

### (2)  Methodology

In summary, the methodology used was to identify relevant transactions that took place between January 1, 2001 and December 31, 2007, to obtain the Revenue, EBITDA and EBIT multiples and apply these multiples to Bratz's corresponding revenue, EBITDA and EBIT for 2006 as calculated in our full allocation analysis at Tab B1, Schedule 1.1.

The list of comparable transactions consists of two sets of M&A transaction searches performed on Capital IQ. All transaction information on Capital IQ is taken from public filings, trade journals, and press releases.[50]  First, I performed a search on all transactions that closed on or after January 1, 2001 through December 31, 2007 where the acquirer is one of the six MGA public comparable companies identified above in section (i) Comparable Trading Company Analysis.  This search returned 25 M&A transactions.  For the second search, I compiled a list of all M&A transactions that closed on or after January 31, 2001 where the target company's primary SIC code was either 3942 (Dolls and Stuffed Toys) or 3944 (Games, Toys and Children's Vehicles).  This search was further limited to transactions that included data needed for our comparables analysis.  The second search returned an additional 32 transactions over the first search method.  See further discussion of search criteria and results at Tab B2, Schedule 8.0 and Schedule 9.0.  I also performed searches on Thomson Financial Mergers & Acquisitions and Mergerstat for information missing from Capital IQ.

Based on the two searches described above, I have only used transactions in my analysis where the target company's revenues exceed $100 million but were less than $2 billion for the last twelve month period, 100% of the company was purchased, and adequate information was available for my analysis of transaction multiples.  See Tab B2, Schedule 8.0 for description of transactions used in analysis and further discussion of the transactions.

The following table shows the multiples used to calculate Bratz enterprise value.

---

[50] Source: Conversation with Capital IQ Representative

EXHIBIT ___37___

PAGE ___6/2___

Confidential – Attorneys' Eyes Only

See Tab B2, Schedule 5.0 for more detailed analysis of comparable transaction analysis.

### c)    Cost Approach

The cost approach is generally not reflective of the value of an on-going business such as MGA and the Bratz products.  Therefore, the cost approach was not used.

### 3.    Distributions Received in Excess of Tax Payments Due

Per review of the W-2's issued by MGA Entertainment Inc. for the years ending December 31, 2004, 2005 and 2006, Isaac Larian received

, respectively.[51]  In addition to his wages for these periods, as the majority shareholders of the corporation,

from MGA.  See Tab B2, Schedule 6.0 for detail of distributions made to shareholders.  I have deducted the amount of distributions identified for income taxes from total distributions to determine the distributions made in excess of payments for taxes.  I have further reduced the excess distributions received by Mr. Larian by the amount that the distributions are not related to the profits earned by Bratz.  Mr. Larian's tax returns have not been provided to me.  These tax returns would provide information regarding the taxes due on income from MGA and his specific tax rate.  Absent those documents, I have accumulated the amount of the distributions made by MGA that were related to taxes by using the listing of distributions for 2000 through

---

[51] See MGA W-2's issued to Isaac Larian [Tab E123, MGA3787330, MGA3787323, and MGA3787316].

20

REDACTED

EXHIBIT ___37___

PAGE ___1013___

Confidential — Attorneys' Eyes Only

2005 provided by Lisa Tonnu at her deposition.[52] This document provides an indication of distributions that were made to shareholders for tax purposes. See Tab B2, Schedule 6.1 for listing of tax distributions. I have included the value of distributions of                    received from MGA in excess of tax payments as an additional component of the benefit to Isaac Larian as a result of Bratz.

Furthermore, I noted that there has been a significant increase in salaries and related expenses in 2007 as compared to 2006. Salaries and related expenses for the full year of 2006 total $64,978,530[54] as compared to July Year to Date 2007 expenses of $62,976,576[55] for a seven month period. In her deposition, Lisa Tonnu stated that this was likely due to the increase in the number of entities in the MGA corporate structure, including Little Tykes.[56] However, I noted that salaries and related expenses for Little Tykes equaled approximately $4.7 million[57] in 2006 and $18.1 million[58] in 2007. Therefore, Little Tykes does not appear to account for all of the rising expense. I have not been provided with compensation information for Mr. Larian for 2007. Therefore, I reserve the right to opine on the reasonableness of Mr. Larian's salary for the 2007 time period if presented with additional information.

C.    **Carter Bryant's benefit resulting from payments received from MGA in connection with Bratz is $35,825,449.**

The calculation of the benefit to Carter Bryant as a result of Bratz is entirely related to the compensation he received as a consultant on Bratz products. As discussed above, Carter Bryant had a consulting agreement with MGA for his work on Bratz. I totaled all payments received by Carter Bryant as a result of the Bratz consulting agreement with MGA. The total payments received by Carter Bryant beginning in 2000 through the fourth quarter of 2007 were $35,825,449.[59]

---

[52] List of Distributions Tab E34.MGA3787372-391]. Per Lisa Tonnu, this list is meant to capture all dividend distribution information. Deposition of Lisa Tonnu on January 17, 2008, pages 52-53 and 78-79. [Tab E16]

[53] Tab B2, Schedule 6.0.

[54] 2006 Consolidated Statement of Operations [Tab F1.MGA3710834 – 2006 Consolidated Statement of Operations.xls].

[55] July 2007 Year to Date Consolidated Statement of Operations [Tab F2.MGA3713507 – 2007 YTD Consolidated Statement of Operations.xls].

[56] January 24, 2008 Deposition of Lisa Tonnu, page 160 [Tab E120].

[57] 2006 Consolidated Statement of Operations [Tab F1.MGA3710834 – 2006 Consolidated Statement of Operations.xls].

[58] July 2007 Year to Date Consolidated Statement of Operations [Tab F2.MGA3713507 – 2007 YTD Consolidated Statement of Operations.xls].

[59] Tab B1, Schedule 7.2.

21

REDACTED

EXHIBIT ___32___

PAGE ___614___

Confidential – Attorneys' Eyes Only

**D.** **Prejudgment interest on MGA's profits earned on the production, sales and licensing of Bratz:**

The following is the methodology I will use to calculate pre-judgment interest when asked.

1. Interest should be calculated based on MGA's cash flows from its infringing activities.

2. The appropriate prejudgment interest rate to apply to MGA's profits from Bratz is MGA's unsecured borrowing rate. Since MGA does not have any unsecured borrowings,[60] I assume MGA's unsecured borrowing rate is the prime rate.

3. Interest should be compounded monthly.

**E.** **Prejudgment interest on Isaac Larian's distributions received in excess of tax payments due:**

The following is the methodology I will use to calculate pre-judgment interest when asked.

1. Interest should be calculated based on Isaac Larian's cash flows from his infringing activities.

2. The appropriate prejudgment interest rate to apply to Isaac Larian's distributions received is his unsecured borrowing rate. However, since I have not been provided with Mr. Larian's unsecured borrowing rate, I assume his unsecured borrowing rate is the prime rate.

3. Interest should be compounded monthly.

**F.** **Prejudgment interest on Carter Bryant's payments received in connection with Bratz:**

The following is the methodology I will use to calculate pre-judgment interest when asked.

1. Interest should be calculated based on Carter Bryant's cash flows from his infringing activities.

---

[60] 2005 and 2006 Year End MGA Financial Statements [Tab E24.MGA0568710 and MGA0868719].

22

EXHIBIT _____ 37 _____

PAGE _____ 615 _____

Confidential – Attorneys' Eyes Only

2.  The appropriate prejudgment interest rate to apply to Carter Bryant's payments received is his unsecured borrowing rate. However, since I have not been provided with Mr. Bryant's unsecured borrowing rate, I assume his unsecured borrowing rate is the prime rate.

3.  Interest should be compounded monthly.

## G.  Net Worth of MGA

I have been asked by counsel to calculate MGA's Net Worth had it not made the distributions to shareholders in excess of taxes due by shareholders on MGA's profits. Net worth, adjusting for distributions to shareholders in excess of taxes due by shareholders on MGA's profits, as of December 31, 2006 is.

## H.  Net Worth of Isaac Larian

MGA produced a document titled "Isaac and Angela Larian, List of Assets, 2007."[62] In this document, total assets less total liabilities equal                    I have not been provided with adequate information to form an opinion regarding this value.

## I.  Net Worth of Carter Bryant

Carter Bryant has testified that his net worth is approximately $23 million.[63] I have not bee provided with adequate information to form an opinion regarding this value.

## IV.  Documents, Data and Other Information Considered

Volume 1, Tab C contains a complete list of documents I considered in forming my opinions. In addition, I have also had a discussion with Chuck Scothon, General Manager of Mattel's Girls Division.

## V.  Potential Additional Analyses to Perform

My opinions are based on the information received as of the date of my report. I plan on updating my analysis with the most current data produced as of the date of my testimony. I understand that discovery is continuing and I may consider other data produced through discovery to determine whether such other data impact my opinions. I will consider any

---

[61] See Tab B2, Schedule 13.0
[62] Isaac and Angela Larian, List of Assets, 2007 [E81.MGA3787279].
[63] January 24, 2008 Deposition of Carter Bryant [Tab E96, page 1100].

23

REDACTED        EXHIBIT _____ 37 _____

Confidential -- Attorneys' Eyes Only

criticisms of my opinions or bases for my opinions brought to my attention at my deposition or offered by experts retained by counter-defendants.  Any of this additional information or work may cause me to change my opinions.

I have not provided an opinion regarding the future damages that will be incurred by Mattel in the event that the court does not grant an injunction against MGA with regards to the copyrights in this case.  If it is determined that I should provide such an analysis, I will supplement this report at the time the court requires this analysis to be relevant.

I have not addressed the issue of apportionment of the profits from Bratz as I understand that MGA has the burden of proof on that issue. I will comment upon MGA's apportionment of the profits from Bratz if they make such a calculation, at the appropriate time.

## VI.     Qualifications

Volume 1, Tab D contains my *curriculum vitae* which details my qualifications, including a listing of all my publications and testimony.

## VII.    Compensation

My current billing rate is $695 per hour.

## VIII.   Signature and Date

Michael J. Wagner
February 11, 2008

24

EXHIBIT _____ 37 _____

PAGE _____ 617 _____

Exhibit 38

## CONFIDENTIALITY AND INVENTIONS ASSIGNMENT AGREEMENT

This Confidentiality and Inventions Agreement is executed by and between ABC Int'l Traders, Inc. ("Company") and _____ ("Employee").

During the course of his/her employment at the Company, Employee will have access to, will acquire, and will become acquainted with trade secrets, confidential information and property related to the Company and its customers' and vendors' businesses. The Company's trade secrets include, but are not limited to, such information as customer names, addresses, phone numbers, names, specific characteristics of suppliers and customers and their respective employees with whom the Company has dealings (whether or not such information is contained on a Rolodex, computer printout, customer list, or is orally communicated to any Company employee in the course of their duties) and the history of purchases, along with terms and conditions of credit offered to each customer; names, addresses, telephone numbers and specific characteristics of prospective customers and contacts; information regarding particular customer product peculiarities, manners of doing business, needs and requirements; product specifications and performance needs for each customer; and the prices charged to each customer; customer information reports, pricing information (such as price lists, quotation guides, previous or outstanding quotations, equipment prices or billing information), mailing labels, mailing plans and programs, sales report forms, pending projects or proposals, techniques used in approaches or results of any market research, advertising sources, employee salaries, contracts and wage information, names and addresses of the vendors, manufacturers, and other suppliers of Company products, the products they supply, the applicable prices and discounts, and the applicable product specifications; new products or inventions developed or under development by the Company; formulas, patterns, compilations, programs, devises, methods, techniques, processes, pictures, contracts, files, methods or production (including quality control and packaging), proposals, business plans and projections, budgets, financial information, software, hardware, any patent application or the contents thereof; and all other material relating in any manner whatsoever to the customers products, vendors, and suppliers of Company, including matters which should reasonably be considered trade secrets even if not expressly described herein.

All information obtained in the course of Employee's employment is to be used only for the purpose of conducting the Company's business. Employee agrees to never discuss or disclose such trade secrets, confidential information or property, either directly or indirectly, with or in the presence of persons outside the Company, either during employment, or at any time thereafter, except as required by Employee's supervisor. Employee further agrees that information in any form, including but not limited to documents, tapes, lists, computer printouts, studies, reports, drafts, pictures, charts, maps, drawings, programs, equipment, scrap, blueprints, vendor lists, customer lists, client billing information, all financial reports, payroll information, records, files and other materials pertaining to the Company, its customers and vendors, may not be removed from the facilities without the advance written permission of Employee's supervisor.

Employee acknowledges that all such trade secrets or confidential information, or any copies of summaries thereof, whether prepared by Employee, by the Company, or provided to Employee by the Company, is the exclusive property of the Company. On demand or termination of employment for any reason, Employee agrees to return to the Company all papers, records, electronic copies, and documents in Employee's possession or obtained during the course of Employee's employment with the Company and Employee further agrees that he/she will not retain any copies, nor permit anyone to retain any copies thereof, except that those who have successfully completed their 90 day introductory

1

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MGA001470

EXHIBIT_____38

PAGE_____6/8

period may keep their Franklin Planner.

Employee acknowledges and agrees that the trade secrets described herein have independent economic value in that they are not generally known within the trade they represent many years of research and development and give the Company substantial competitive advantages.

As a condition of employment, Employee agrees that he/she (1) will regard and preserve the confidential information as highly confidential, and as the trade secrets of the Company; (2) will not, at any time during or within twelve months after the termination of his/her employment with the Company, reveal, disclose, permit to be disclosed, or make known to any person, firm or corporation, any confidential information which was disclosed to Employee or of which he/she became aware during his/her employment, regardless of whether developed, prepared or created in whole or in part by Employee's efforts, except to the extent that such disclosure is necessary and is authorized in writing by the Company to carry out Employee's duties of employment; (3) will retain all confidential information in trust for the sole benefit of the Company and will not disclose to or use any confidential information in an independent business related to the scope of the Company's business (designer, manufacturer and distributor of toy); (4) will not photocopy or duplicate, and will not permit any person to photocopy or duplicate, any of the confidential information without the Company's written consent and approval; (5) will not make any use of confidential information for his/her own benefit or the benefit of any person or entity other than the Company; (6) will return all confidential information (including but not limited to customer lists, books maintained by Employee, and source lists) to the Company immediately upon request for same. Employee agrees that if he/she has any questions about whether a matter is a trade secret, to seek a determination by the Company before he/she uses any such information.

Employee agrees to maintain the same level of confidentiality regarding co workers, employee relation matters, and Company operations. Employee agrees, by accepting employment or continued employment with the Company, to comply with these rules and to maintain confidentiality of the Company's trade secrets.

Employee understands and acknowledges that the trade secrets and confidential information of the Company are not known to the general public and are the subject of reasonable efforts to maintain its secrecy. They are of a special, unique and extraordinary character, which gives them a particular value, the loss of which cannot be reasonably compensated in damages in an action at law. Employee further understands and agrees that in addition to any other rights or remedies which the Company may have, the Company shall be entitled to immediate injunctive and other equitable relief to prevent a breach of this Confidentiality and Inventions Agreement. If any legal proceeding arises under this Confidentiality and Inventions Agreement, the prevailing party shall be entitled to recover all costs and expenses, including reasonable attorney's fees and costs. California law shall apply to this agreement as to contracts wholly performed within the state.

Employee and the Company agree that this Confidentiality and Inventions Agreement shall not apply to information that Employee was aware of prior to his/her employment with the Company, or that is otherwise publicly known.

Employee further agrees that during his/her employment and for a period of twelve months after termination, Employee will not solicit the purchase of any products or services from any supplier or vendor who supplies products or services to the Company.

CONFIDENTIAL
ATTORNEY'S EYES ONLY

2

INVENTIONS ASSIGNMENT:

1. ASSIGNMENT OF INTEREST: Employee agrees to assign, and does hereby assign, to Company all interest which employee may have in all patentable and/or not-patentable ideas and/or inventions made or conceived by Employee solely or jointly with others during Employee's employment with Company. This assignment shall not apply to any idea or invention developed by Employee entirely on Employee's own time without equipment, supplies, facilities, or trade secret information of Company, unless such invention or idea: (1) relates to the business of company or to Company's actual or anticipated research or development, or (2) results from any work performed by Employee for Company. THIS AGREEMENT DOES NOT APPLY TO ANY INVENTION WHICH QUALIFIES FULLY UNDER THE PROVISIONS OF CALIFORNIA LABOR CODE SECTION 2870.

2. DISCLOSURE OF IDEAS OR INVENTIONS: Employee agrees to promptly disclose in writing to Fred Larian all inventions developed solely or jointly with others during Employee's employment with Employer, whether such inventions are patentable, not-patentable or assignable under this Agreement. Employer agrees to maintain such disclosure in confidence.

3. WRITTEN DISCLOSURE OF PRIOR INVENTIONS: Employee agrees to provide a complete list of all patented or not-patented ideas and inventions conceived by Employee or anyone else jointly with Employee, prior to the date Employee has signed this Agreement. The failure of Employee to provide Company with a written disclosure of ideas or inventions shall be deemed to constitute an affirmative acknowledgment by Employee that no such ideas or inventions exist.

If any provision of this Confidentiality and Inventions Agreement is held to be invalid or unenforceable, in whole or in part, the remaining portions of this Agreement shall continue to be valid and will be performed, construed and enforced to the fullest extent permitted by law. The invalid or unenforceable provision shall be deemed amended and limited in accordance with the intent of the parties, as determined from the face of this Agreement, to the extent necessary to permit the maximum enforceability or validation of the provision.

_10-18-01_
Date

_Mercedeh Ward_
Employee Signature

_Mercedeh Ward_
Employee Name (Printed)

_____
Date

Isaac Larian, President and CEO

CONFIDENTIAL
ATTORNEY'S EYES ONLY

3

MGA001472
EXHIBIT ____38____
PAGE ____620____

**Exhibit 39**



first-date guide: serious or see ya? you decide!

# seventeen

DECEMBER 1999

**holiday**
dreams come true

**150+**

GIVE & GET ideas

**BOY BAND BONUS**
save-it section of
the hottest group

**secrets**
of the SATs

Drew Barrymore
on the mysteries
of Christmas, her
one true friend,
and Lisa Simpson

raise your
cool quotient
past CDs ever

**glitter shine,
sparkle!**
do-it-yourself holiday looks

TEENS
who hit
bottom

www.seventeen.com

"I was on tour
with the Backstreet Boys."

U.S. $2.99 Can. $3.50

0 73917 18620 4   1 2>

EXHIBIT ___39___   M 0131043

PAGE ___421___



EXHIBIT 119   M 0131050

PAGE 022

EXHIBIT ___79___        M 0131051

PAGE ___623___



EXHIBIT ___79___          M 0131123

PAGE ___624___



EXHIBIT ___79___          M 0131173

PAGE ___625___



EXHIBIT 39

PAGE 626

M 0131209



EXHIBIT ___39___   M 0131211

PAGE ___627___



QUIZ: DO CLIQUES RULE YOUR LIFE?

seventeen

www.seventeen.com

MARCH 2000

120 COOL PROM LOOKS

dresses, shoes, bags, jewelry & hair clips

ROSWELL'S Shiri Appleby Shares Her Fave Photos

EASIEST-EVER UPDO HOW-TOS

The Wrong Reasons to Pick a College

"I WAS A BOY FOR A DAY"

*his* most embarrassing moments

guy*watch*

Josh Hartnett, Seth Green, Ashton Kutcher and more

U.S. $3.99 Can. $4.50

0  79392 18620  3    03>

EXHIBIT ___39___           M 0131251

PAGE ___628___



Princess FX Lip Stx.

Jewels FX Lip Stx with Mirrored Cap

Princess FX Lip Stx

Prom Body Jewelr Hair Magnet.

Prom Body Jewelry – Toe Ring

Cutey-Pattuti – FX Eyes

# Streetwear. Promwear. Everywhere..

EXHIBIT ____39____          M 0131270

PAGE ____629____



## Create Your Own Special FX.
Lips, eyes, cheeks, nails, body.

EXHIBIT ___39___    M 0131271

PAGE ___630___

EXHIBIT ___39___          M 0131435

PAGE ___631___



EXHIBIT 39

M 0131508



New FX Lip Stix and FX Eyes from Streetwear.

# Create Your Own Special FX.

EXHIBIT ___

PAGE ___

M 0131536