```
 1              MR. NOLAN:  Just foundation as to time, when he did

 2   it.

 3              MR. PRICE:  That will come after I show him some --

 4              THE COURT:  Is there an objection?

 5              MR. NOLAN:  No.

 6              THE COURT:  Very well.  Received.

 7              (Exhibit 10756 received.)

 8   Q.   BY MR. PRICE:  So this is a Jewel Barbie diagram you

 9   did; correct?

10   A.   Yes.

11   Q.   So looking at it, can you tell what date this is?

12   A.   Well, not with absolute certainty.

13   Q.   Fathom a guess?  What's your best estimate?

14   A.   It was either '98 or '99.

15   Q.   Well, if you'd look at your black notebook, and we can

16   put these side by side, 1155-C, if you look at the copy, it

17   might help you orient yourself.  1155-C-027.  Do you see

18   1155-C-027 in that black notebook?

19   A.   Yes.

20   Q.   And do you see any similarities between that drawing and

21   the drawing that's in Exhibit 10756?

22   A.   Um, a little bit.

23   Q.   For example, there's a -- these are Jewel Barbies;

24   right?

25   A.   Yes.
```

Exhibit _2_,
P. _56_

1   Q.   And now, Jewel refers actually to a jewel of some sort?

2   A.   Right.

3   Q.   And what's this sort of design here which we have in the

4   middle?

5   A.   Well, I'm not really sure exactly what you'd call it,

6   but I think it's just some sort of where the fabric is

7   gathered together.

8   Q.   Is that a design you use for a lot of Barbies?

9   A.   Oh, I -- I don't know.

10  Q.   And the thing on the neck, is there a name for that

11  other than a necklace?

12  A.   No.

13  Q.   It would just be a necklace?

14  A.   Yes.

15  Q.   I guess you've got the hand looks sort of similar here,

16  doesn't it?

17  A.   Um, yes.

18  Q.   Do these look like sketches you make, kind of a

19  progression?

20  A.   It's possible.

21  Q.   And let me show you now Exhibit 13657.

22       Do you recognize 13657?

23  A.   Yes.

24  Q.   This is a Jewel Barbie drawing you did?

25  A.   Yes.

Exhibit 2 ,
P. 57

1          MR. PRICE:  Move that into evidence, your Honor.

2          MR. NOLAN:  No objection.

3          THE COURT:  It's admitted.  You may publish.

4          **(Exhibit 13657 received.)**

5    **Q.**  BY MR. PRICE:  And maybe at the same time you could hold

6    this up so the jury can see it.

7          Do you see this has the same sort of waist

8    treatment?

9    **A.**  Yes.

10   **Q.**  Same kind of hand pose?

11   **A.**  Yes.  I normally draw hands like that.

12   **Q.**  You say it has also a necklace or choker or whatever

13   you'd call it?

14   **A.**  Yes.

15   **Q.**  Does this appear to be the last step at a progression

16   for this drawing from 10756 to 115-C-027?

17   **A.**  It's possible.  I often did a lot of, you know,

18   preliminary type sketches.

19   **Q.**  And what's the date of this sketch, which is

20   Exhibit 13657?

21   **A.**  It looks like it says 2/99.

22   **Q.**  If we could put 13657 perhaps side by side with that

23   page from the black notebook, 1155-C-027.  13657 is the end

24   result after kind of starting out with a rough sketch

25   1155-C-027; right?

Exhibit 2 ,
P. 58

```
 1              MR. NOLAN:  Objection, your Honor.  Lack of
 2   foundation.
 3              THE COURT:  Overruled.  You may answer.
 4              THE WITNESS:  I couldn't say definitively.  Like I
 5   said, I did, you know, a lot of preliminary type sketches.
 6   Some looked pretty similar.  Some looked similar to the --
 7   more similar to the finished product than others.
 8   Q.   BY MR. PRICE:  I'm going to show you what we'll mark for
 9   identification 12150 and 12151.
10              Is 12150 a drawing you did?
11   A.   Yes.
12   Q.   Is 12151 another drawing you did?
13   A.   I'm sorry.  What was the first one you asked me?
14   Q.   12150.
15   A.   I don't think I have that.
16   Q.   Those are both drawings you did?
17   A.   Yes.
18   Q.   They are both Jewel Barbie drawings?
19   A.   Yes.
20   Q.   And Jewel Barbie was not a main line Barbie, was it?
21   A.   Well, the first one that I worked on, I don't really
22   know what they ended up doing with it, but this other one was
23   for the collectible group.
24              MR. PRICE:  Move 12150 and 12151 in evidence, your
25   Honor.
```

Exhibit 2 ,
P. 59

3138

```
 1          MR. NOLAN:  No objection.

 2          THE COURT:  It's admitted.

 3          (Exhibits 12150 and 12151 received.)

 4  Q.   BY MR. PRICE:  If we could show 12150.  Now, this is --

 5          Blow that up, Ken.

 6          Now, Barbie Collectibles, that was what you worked

 7  on in your second stint beginning in January of 1999;

 8  correct?

 9  A.   Yes.

10  Q.   And your date on this is March '99; correct?

11  A.   Yes.

12  Q.   And if you look at 12151.  You see this is your

13  signature in February of '99; is that right?

14  A.   Yes.

15  Q.   It's true, sir, is it not, that those earlier drawings,

16  all the same day, dated January '98, were simply misdated by

17  you, just as your conflict of interest questionnaire was?

18  A.   I'm sorry.  Which drawings are you talking about?

19  Q.   The drawings I showed you earlier that were all dated

20  January 28, '98, 15601, 15603, the ones that were shown

21  earlier.  Those simply were misdated by you just as your

22  conflict of interest questionnaire was in January of '99?

23  A.   No, absolutely not.

24  Q.   I'd like you to look at Exhibit 333, Mr. Bryant.  I'm

25  not sure it's in your -- actually Exhibit 5, Bates 333.
```

Exhibit 2 ,
P. 60

3191

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                                 - - -

4          **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                                 - - -

6    MATTEL, INC.,                    :   PAGES 3191 - 3319
                                      :
7               PLAINTIFF,            :
                                      :
8        VS.                          :   NO. ED CV04-09049-SGL
                                      :   [CONSOLIDATED WITH
9    MGA ENTERTAINMENT, INC.,         :   CV04-9059 & CV05-2727]
     ET AL.,                          :
10                                    :
                                      :
11  _____DEFENDANTS._____             :

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                    RIVERSIDE, CALIFORNIA

17                    FRIDAY, JUNE 20, 2008

18                    JURY TRIAL - DAY 16

19                      MORNING SESSION

20

21

22                                MARK SCHWEITZER, CSR, RPR, CRR
     CERTIFIED                    OFFICIAL COURT REPORTER
23                                UNITED STATES DISTRICT COURT
     COPY                         181-H ROYBAL FEDERAL BUILDING
24                                255 EAST TEMPLE STREET
                                  LOS ANGELES, CALIFORNIA 90012
25                                (213) 663-3494

                         Exhibit _2_ ,
                         P._61_

1          THE COURT:  You may.

2     Q.   BY MR. NOLAN:  And again, Mr. Bryant, I think it's in

3     the white book, but hopefully you can see it on the screen.

4     A.   Okay.

5     Q.   Do you see this?

6     A.   Yes.

7     Q.   Now, you were shown -- were you shown a number of

8     drawings by Mr. Quinn during the various days your deposition

9     was taken?

10    A.   Yes.

11    Q.   And I recall from your deposition testimony that this

12    was one of the drawings that you were shown at your

13    deposition; correct?

14    A.   I believe so, yes.

15    Q.   Now I'd like to -- just leave that up, if you don't

16    mind.

17          And ask that 15393 be placed up on the screen.

18          Do you recognize 15393?

19    A.   Yes.

20    Q.   And what does 153393 depict?

21    A.   That was just a really rough sketch for, I think, a

22    greeting card idea featuring characters, these Rainy Day

23    characters that I kind of had been trying to develop.

24    Q.   And can I ask you to look at Exhibit 15333 -- which is

25    also in evidence, your Honor.  And have that put up.

**Exhibit 2,**
**P. 62**

1          Again, do you recognize 1533?

2   A.   Yes.

3   Q.   And what is depicted in 1533?

4   A.   Again, it's just another really, really rough sketch of

5   an idea that I had for these Rainy Day greeting cards.

6   Q.   And by the way, the first Rainy Day exhibit I showed

7   you, 15393, and this one, 15333, what year did you do these?

8   A.   I did those in '98.

9   Q.   And can we have 18497 on the screen?  And again, what is

10  depicted here?

11  A.   Again, just another really rough sketch of an idea for

12  the Rainy Day card line.

13  Q.   And again, 18497 was done when?

14  A.   '98.

15  Q.   And Exhibit 18494.  And this is -- what do you recognize

16  18494 to be?

17  A.   It was just -- this was just a list of some ideas that I

18  had for some different -- different characters I was thinking

19  to develop into greeting card lines or, you know, figurines

20  or whatever.

21  Q.   Now, were any of the exhibits that I've just gone

22  through with you, the Rainy Day figures, to the best of your

23  recollection, ever shown to you in your deposition?

24  A.   I don't think so.

25  Q.   And now directing your attention back to 01155-C-037.

Exhibit 2 ,
P. 103

1   Q.   You have the -- maybe you have a better copy, but what

2   is this handwriting doing on the left-hand side?  What are

3   you doing there?

4   A.   I was keeping track of my time, you know, how long I was

5   working on the project and breaks and things like that.

6   Q.   So it says 2:30 you took a break.  And then at 2:40 what

7   does that say?  Resume?

8   A.   I think so, yes.

9   Q.   And then you took another break at 4:50.  Do you see

10  that?

11  A.   Yes.

12  Q.   And then you have a total of three hours and ten

13  minutes; is that right?

14  A.   Yes.

15  Q.   Now, why were you recording your time like this?

16  A.   I was getting paid hourly when I was working on these

17  projects.

18  Q.   Let me turn to -- do you remember Mr. Price asking you

19  whether or not -- well, directing your attention to your

20  conflict of interest questionnaire where you incorrectly

21  recorded the date as '98 instead of 1999.

22  A.   Yes.

23  Q.   And then he asked you a series of questions as to

24  whether or not, since you made a mistake on that one form, is

25  it possible you made mistakes on other drawings?

Exhibit 2 ,
P. 64

```
 1   A.    Yes.

 2   Q.    You recall that?

 3   A.    Yes.

 4   Q.    I want to show you just, if I could, real quickly

 5   Exhibit 15601.

 6   A.    Okay.

 7   Q.    What's the date on that document?

 8   A.    It's 1/28/98.

 9   Q.    Did you put that down by mistake, Mr. Bryant?

10   A.    No.

11   Q.    Now, can I ask you to take a look at Exhibit 15603.

12   Again, what is depicted in 15603?

13   A.    This was another illustration from the Jewel project

14   that I did in '98.

15   Q.    And you have dated this 1998?

16   A.    Yes.

17   Q.    Did you make a mistake on that date?

18   A.    No.

19   Q.    I'd ask you to look at 15605.  And can you identify this

20   for us?

21   A.    This was another illustration from the Jewel theme

22   project that I was working on in '98.

23   Q.    Now, do you see you dated that in 1998?

24   A.    Yes.

25   Q.    Did you misdate that, Mr. Bryant?
```

Exhibit 2 ,
P. 65

1  A.    No.

2  Q.    When did you do that?

3  A.    When did I do the drawing?

4  Q.    Yes.

5  A.    1998.

6  Q.    Now, why did you put the dates on these drawings in

7  1998?

8  A.    Well, I was turning -- it was a project for Mattel.   I

9  was turning it over to my supervisor.

10  Q.    Could I have Exhibit 1327.   And by the way, your

11  supervisors were at Mattel; right?

12  A.    Yes.

13  Q.    Sir, Mr. Bryant, you heard testimony referencing poor

14  man's copyrighting?

15  A.    Yes.

16  Q.    And you heard testimony with respect to songs that you

17  wrote and the classes you took with respect to writing songs?

18  A.    Yes.

19  Q.    Sir, have you ever copyrighted the drawings that you've

20  done?

21  A.    No.   I don't think so.

22  Q.    Can I have exhibit -- do you have Exhibit 1327 in front

23  of you, sir?

24  A.    Yes.

25  Q.    01327.   Do you have that in front of you?

Exhibit 2 ,
P. 66

1          MR. NOLAN:  Objection.  Argumentative.

2          THE COURT:  Sustained.

3    Q.   BY MR. PRICE:  Mr. Nolan also showed you a number of

4    these January '98 Barbie drawings where you said you did not

5    get the date wrong.

6          Do you recall that?

7    A.   Yes.

8    Q.   They are all the same date, aren't they?

9    A.   Yes.

10   Q.   And in your deposition, you were asked to tell us about

11   the projects you did in your first stint at Barbie, you

12   didn't mention Jewel Barbie, did you?

13   A.   No, I didn't.  I had a lot of projects.

14   Q.   And originally, you said to Mr. Nolan you put the

15   January '98 drawings on those drawings because you were

16   mailing them to Barbie.

17         Do you recall that?

18   A.   I was mailing them to my supervisor at Mattel.

19   Q.   And because you were mailing them, you put in this

20   January '98 date.  That was your testimony originally.

21         Do you recall that?

22   A.   I don't remember exactly what I said.

23   Q.   Well, if you look at Exhibit 13657.  Do you recall I

24   showed you these Jewel Barbie drawings?  You see that one is

25   dated February '99, the second month in '99.

Exhibit 2
P. 66A

1   A.   Yes.

2   Q.   And you weren't mailing that to anyone, were you?

3   A.   No.

4   Q.   There was some testimony about these Rainy Day greeting

5   cards.

6        Do you recall that?

7   A.   Yes.

8   Q.   Are you aware of any evidence that those were done in

9   1998 other than your testimony?

10  A.   I think I have some finished drawings of the Rainy Day

11  Rascals that are dated in 1998.

12  Q.   Are they exhibits here?  Do you know?

13  A.   I don't know.

14  Q.   Okay.  If we look, though, at 1155-C-37, and maybe you

15  can show the jury the original in 1155 because I think it's a

16  little clearer.  This is a little whited out.  At your

17  deposition under oath you said that was a Bratz drawing;

18  correct?

19  A.   Yes.

20  Q.   And you see those large feet?

21  A.   Yes.

22  Q.   That was one of the characteristics of your Bratz

23  characters; right?

24  A.   Yes.

25  Q.   Mr. Nolan asked you whether or not there would have ever

Exhibit 2,
P. 67

1  been a Bratz doll that had rain gear.

2          Do you recall that?

3  A.    Yes.

4  Q.    And you did Bratz drawings with evening wear; right?

5  A.    Yes.

6  Q.    But there weren't any Bratz dolls with evening wear

7  either, were there?

8  A.    There were eventually.  Not the drawings that we've been

9  looking at.

10 Q.    Okay.  The ones in 2000.

11 A.    Right.

12 Q.    Because I think you said there's evening wear.  We never

13 did that evening wear.

14         Do you recall that?

15 A.    Yes.

16 Q.    Finally and, by the way, I think, as you testified

17 during your initial examination, you've been dabbling with

18 greeting cards up to the present; right?

19 A.    Yes.

20 Q.    In fact, you remember I showed you a notebook which you

21 thought had 2000 entries, and there was a Martha Stuart kind

22 of greeting card?

23 A.    Yes.

24 Q.    And kind of a lyric or something you put into the

25 greeting card?

Exhibit 2 ,
P. 68

3281

1   **A.**   Yes.

2   **Q.**   And finally, Mr. Nolan was showing you Exhibit 1748 and

3   62001, where you had some poses and faces separately.

4        Do you see that?

5   **A.**   Yes.

6   **Q.**   And these are the -- this one is notarized August of

7   '99; right?

8   **A.**   Yes.

9   **Q.**   And then he showed you Exhibit, I think, 792.  Now, that

10   combination -- volume, face, hair -- that combination you

11   didn't draw until after 1999; correct?

12        MR. NOLAN:  Objection.  Asked and answered.  Also

13   ambiguous in terms of the context of the question.

14        THE COURT:  As to the first -- I think we covered

15   this, Counsel.

16        MR. PRICE:  Well, he was showing it in parts.  I

17   just want to make sure --

18        THE COURT:  Asked and answered.  Sustained.

19   **Q.**   BY MR. PRICE:  Mr. Nolan asked you about little hair and

20   Bratz.  If you look at Exhibit 276, I believe this is the

21   photograph, I think Mr. Nolan showed you, of something you

22   may have seen.  That is, remember you said you didn't see

23   drawings, but you saw -- you saw -- that's a horrible copy.

24   Do we have a better copy here?  Here we go.  276.  You saw

25   the actual 3-D set up with these dolls in it is what you

Exhibit __2__ ,
P. __69__

3319

1

2

3

4

5

6

7                                    **C E R T I F I C A T E**

8

9

10              I hereby certify that pursuant to Title 28,

11    Section 753 United States Code, the foregoing is a true and

12    correct transcript of the stenographically reported

13    proceedings in the above matter.

14              Certified on June 20, 2008.

15

16

17              **MARK SCHWEITZER, CSR, RPR, CRR**
                Official Court Reporter
18              License No. 10514

19

20

21

22

23

24

25                          Exhibit 2 ,
                              P. 70

3320

1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                EASTERN DIVISION

4                  - - -

5     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                  - - -

7    MATTEL, INC.,                )
                                  )
8                 PLAINTIFF,      )
                                  )
9         VS.                     )   NO. CV 04-09049
                                  )
10   MGA ENTERTAINMENT, INC., ET. AL.,  )   TRIAL DAY 16
                                  )   AFTERNOON SESSION
11                DEFENDANTS.     )   PAGES 3320-3468
     _____)
12   AND CONSOLIDATED ACTIONS,    )
     _____)
13

14

15      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16               RIVERSIDE, CALIFORNIA

17              FRIDAY, JUNE 20, 2008

18                  1:41 P.M.

19

20

21              Exhibit  2 ,
22              P. 71

23           THERESA A. LANZA, RPR, CSR
           FEDERAL OFFICIAL COURT REPORTER
24            3470 12TH STREET, RM. 134
           RIVERSIDE, CALIFORNIA  92501
25                951-274-0844
               WWW.THERESALANZA.COM

CERTIFIED COPY

1    Q    DO ALL OF THE INDENTATIONS THAT YOU FIND ON A DOCUMENT

2    NECESSARILY COME FROM THE SAME SHEET OF PAPER?

3    A    OH, NO.  NO, SIR.

4    Q    WHY IS THAT?

5    A    IT'S VERY COMMON THAT IF AN INDIVIDUAL -- AND I'LL USE MY

6    YELLOW TABLET AGAIN -- THE SUBJECT PAPER, FOR EXAMPLE, IS THE

7    FOURTH PAGE DOWN.  THAT'S THE ONE I'M GOING TO CONDUCT MY

8    EXAMINATION FOR INDENTED WRITING ON.  WHILE IT'S POSSIBLE THAT

9    AT SOME POINT SOMEONE WROTE ON THE PAGE RIGHT ABOVE IT -- MAYBE

10   THE SAME PERSON OR ANOTHER PERSON WROTE ON THE PAGE ABOVE THAT

11   PAGE, AND THEN MAYBE THE SAME PERSON OR ANOTHER PERSON WROTE ON

12   THE PAGE ABOVE THAT PAGE.  WELL, IF A PERSON IS USING PRETTY

13   NORMAL PEN PRESSURE AND A BALL-POINT PEN, THE INDENTATIONS FROM

14   ALL THREE OF THESE PAGES ARE GOING TO INDENT ONTO THE SUBJECT

15   PAGE THAT I AM EXAMINING FOR INDENTED WRITING; AND, THEREFORE,

16   I'M GOING TO HAVE INDENTATIONS FROM THREE PAGES THAT HAVE KIND

17   OF INTERMINGLED WITH EACH OTHER.

18   Q    DID YOU FIND THAT IN THIS CASE; THAT IS TO SAY, DID YOU

19   FIND INDENTATIONS ON PAGES IN THE NOTEBOOK THAT CAME FROM MORE

20   THAN ONE SHEET OF PAPER?

21   A    I DID.

22   Q    AND HOW WAS THAT APPARENT TO YOU?

23   A    ON PAGE 61, MY INDENTATIONS DEVELOPED WERE THAT OF THE

24   DRAWN IMAGE OF THE DOLL, WHICH IS EXHIBIT 5-42; BUT THERE WERE

25   OTHER IMAGES, SUCH AS A DRAWING OF, APPARENTLY, A BOY ON A BOAT

Exhibit   2  ,
P. 72

1    WITH A FISHING POLE AND AN UMBRELLA, INDENTED AS WELL.

2    Q    USING INDENTATION ANALYSIS, CAN YOU EVER DETERMINE WITH

3    CERTAINTY EXACTLY WHAT PAGE WAS THE NEXT ONE BELOW, IF YOU

4    WILL, OR THE NEXT ONE ABOVE?

5    A    WELL, JUST BASED ON THE INDENTATION ANALYSIS ALONE, IT'S A

6    VERY, VERY DIFFICULT TASK TO BE ABLE TO CONCLUSIVELY STATE THAT

7    ONE PAGE WAS IN DIRECT CONTACT WITH ANOTHER PAGE.  AND THE

8    REASON FOR THAT IS, SOMETIMES WE'LL DEVELOP MORE INTENSE

9    INDENTED WRITING FROM MAYBE TWO PAGES AWAY, OR EVEN THREE PAGES

10   AWAY, ONCE AGAIN, DEPENDING ON THE WRITING INSTRUMENT, AND

11   DEPENDING, MAINLY, ON HOW MUCH PRESSURE THAT PERSON HAS APPLIED

12   TO THE PEN WHEN THEY'RE DRAWING OR WRITING.  SO TO SAY JUST

13   BECAUSE THE INTENDED WRITING LIFTS, AS I'M SHOWING YOU, SHOW

14   DARKER LINES OR MORE INTENSE LINES, IT DOESN'T NECESSARILY

15   MEAN, JUST BECAUSE THEY'RE A LITTLE DARKER OR MORE INTENSE,

16   THAT THAT WAS THE PAGE DIRECTLY ON TOP OF THE PAGE I EXAMINED.

17   IT COULD HAVE BEEN ANOTHER PAGE AWAY OR EVEN TWO PAGES AWAY.

18   Q    SO, MR. CUNNINGHAM, WHAT WERE YOUR CONCLUSIONS WITH

19   RESPECT TO WHERE IN THE BLACK NOTEBOOK THESE LOOSE PAGES, 5-39

20   AND 5-42, WERE LOCATED?

21   A    EXHIBIT 5-42, THE DRAWING OF THAT DOLL, WAS LOCATED ON TOP

22   OF PAGE 61 IN THE SPIRAL NOTEBOOK; AND EXHIBIT 5-39, THE

23   DRAWING OF THE DOLL, WAS LOCATED EITHER ABOVE OR IN CLOSE

24   PROXIMITY TO PAGE 63 IN THE SPIRAL NOTEBOOK.  BUT REGARDLESS OF

25   THE LOCATIONS OF PAGES ABOVE, THEY WERE BOTH PRESENT IN THAT

Exhibit  2  ,
P. 73

1    A    YES, SIR.

2    Q    AND YOU SPENT AN ENORMOUS AMOUNT OF TIME REVIEWING THEM,

3    DIDN'T YOU?

4    A    YES.

5    Q    DOZENS OF HOURS; IS THAT FAIR?                                    04:22

6    A    YES.

7    Q    AND YOU RECEIVED THOSE DOCUMENTS IN SEPTEMBER OF 2007;

8    CORRECT?

9    A    I BELIEVE SO.

10   Q    IN FACT, YOU SPENT OVER 80 HOURS REVIEWING THEM IN                04:23

11   SEPTEMBER 2007; CORRECT?

12   A    I BELIEVE THAT'S CORRECT.

13   Q    AND YOU REVIEWED ALL OF THOSE DOCUMENTS IN ALL OF THOSE

14   BOXES; CORRECT?

15   A    "REVIEW" IS A GOOD WORD TO USE, BECAUSE I DIDN'T EXAMINE          04:23

16   THEM ALL IN DETAIL.

17   Q    NOW, AFTER THAT INITIAL 80 HOURS, YOU SPENT AN ADDITIONAL

18   30 HOURS, OVER 30 HOURS, IN JANUARY AND FEBRUARY OF 2008,

19   PERFORMING ADDITIONAL EXAMINATIONS AND PREPARING YOUR EXPERT

20   REPORT, DIDN'T YOU?                                                    04:23

21   A    YES SIR.

22   Q    YOU SPENT SUBSTANTIALLY MORE TIME PREPARING FOR YOUR

23   DEPOSITION IN MARCH, DIDN'T YOU, SIR?

24   A    YES, SIR.              **Exhibit** 2 ,
                                 **P.** 74

25   Q    AND I ASSUME THAT YOU SPENT A SUBSTANTIAL AMOUNT OF TIME          04:23

1   A    YES.   THAT'S THE EVIDENCE THAT THEY WERE CONSIDERING AT

2   THAT TIME.

3   Q    SO SIR, I ASSUME IT WOULD ALSO BE IMPORTANT, IF YOU FOUND

4   OTHER IMAGES DEVELOPED IN EXHIBIT 13634 THAT WERE ALSO CREATED

5   BY MR. BRYANT -- WOULDN'T IT BE IMPORTANT IF YOU SAW OTHER            04:32

6   IMAGES THAT WERE ALSO IMPRESSED INTO THAT DOCUMENT?

7   A    I DID SEE OTHER IMAGES, AND I PREVIOUSLY TESTIFIED ABOUT

8   THE OTHER IMAGES.   HOWEVER, APPARENTLY, MATTEL DIDN'T THINK

9   THEY WERE AS IMPORTANT AS THE IMAGE OF THE DOLL.

10  Q    OKAY.                                                           04:32

11  A    IT'S NOT UP TO ME TO DETERMINE WHICH IS THE MOST

12  IMPORTANT.

13  Q    SIR, THE IMAGE YOU'RE TALKING ABOUT IS -- YOU SAID THERE

14  WAS A LITTLE BOY IN A RAIN HAT; CORRECT?

15  A    AND AN UMBRELLA.   IT APPEARED THAT THE LITTLE BOY WAS          04:32

16  FISHING, AND IT LOOKED LIKE A RAIN HAT; THAT'S CORRECT.

17  Q    IF I COULD JUST TRACE THIS OUT.

18       YOU'RE TALKING ABOUT THIS RIGHT HERE, THIS LITTLE BOY

19  AND THE HAT; AND THERE'S A RAIN HAT THERE.

20  A    YES.   THAT'S WHAT I PREVIOUSLY TESTIFIED ABOUT.               04:33

21  Q    OKAY.   SO LET'S JUST TRACE THIS OUT.

22       AND DO YOU SEE HE'S GOT A FACE THERE?

23  A    YES.

24  Q    LET'S TRACE OUT THE FACE.          Exhibit 2 ,
                                             P. 75

25       AND HE APPEARS TO BE HOLDING A FISHING ROD.                   04:33

1   A     YES.

2   Q     DO YOU SEE THAT FISHING ROD?

3   A     YES.

4   Q     THERE APPEARS TO BE A CLOUD THERE.

5         DO YOU SEE THAT, SIR?                                   04:33

6   A     YES.

7   Q     NOW, WHEN YOU SAW THAT IMPRESSION, DID YOU MAKE ANY

8   ATTEMPT TO DETERMINE WHAT THAT IMPRESSION MAY HAVE BEEN CREATED

9   FROM?

10  A     NOT AT THAT TIME, SIR.                                  04:33

11  Q     SIR, I'D LIKE YOU TO TAKE A LOOK AT SOMETHING WHICH HAS

12  ALREADY BEEN ADMITTED INTO EVIDENCE.  AND IT'S EXHIBIT 15393.

13        **MR. SLOAN:**  AND, YOUR HONOR, IF I COULD APPROACH, I'M

14  GOING TO HAND THIS TO THE WITNESS.

15        **THE COURT:**  YOU MAY.                                04:34

16        **MR. SLOAN:**  YOUR HONOR, THIS HAS BEEN ADMITTED.

17        COULD I HAVE IT SHOWN ON THE SCREEN, PLEASE.

18        **THE COURT:**  VERY WELL.

19  **BY MR. SLOAN:**

20  Q     SIR, EXHIBIT 15393, WHICH YOU HAVE THE ORIGINAL OF AND IS   04:34

21  ON THE SCREEN NOW, THAT'S ONE OF THE DOCUMENTS THAT MATTEL

22  PROVIDED TO YOU BACK IN SEPTEMBER OF 2007 TO REVIEW AND

23  EXAMINE, ISN'T IT, SIR?

24  A     IT IS.

25  Q     OKAY.

                        Exhibit 2 ,
                        P. 76                                      04:35

1    AND IT'S A PICTURE OF A CHILD IN A RAIN COAT, WITH AN

2    UMBRELLA AND A FISHING POLE; CORRECT?

3    A    YES, IT IS.

4    Q    AND IF WE COULD GO BACK, ACTUALLY, TO YOUR IMPRESSION ON

5    EXHIBIT 13634.                                                    04:35

6         AS YOU SAID, YOU CAN SEE THE UMBRELLA THERE; CORRECT?

7    A    YES, I CAN.

8    Q    LET'S TRACE THAT OUT.

9         I THINK IT GOES LIKE THAT, AND THEN THERE'S A POLE UP

10   HERE.                                                            04:35

11        DO YOU SEE ANY OTHER DETAILS OF THAT IMAGE IMPRESSED

12   INTO EXHIBIT 13634?

13   A    NO.  NOT AT THIS TIME, I DON'T SEE ANY.

14   Q    AND WOULD YOU AGREE THAT, IN FACT, EXHIBIT 15393 IS

15   IMPRESSED IN REVERSE ONTO THIS PAGE, WHICH IS PAGE 61 OF THE      04:36

16   BLACK NOTEBOOK?

17   A    YES.  ABSOLUTELY.

18   Q    SO YOU'VE EXAMINED IT, AND YOU THINK THAT'S A POSITIVE

19   MATCH.

20   A    YES.                                                        04:36

21   Q    AND, SIR, WERE YOU AWARE THAT MR. BRYANT TESTIFIED EARLIER

22   THIS WEEK, IN FACT JUST THIS MORNING, THAT THIS IMAGE HERE,

23   EXHIBIT 15393, WAS, IN FACT, A GREETING CARD THAT HE CREATED IN

24   1998?                              **Exhibit** 2 ,
                                        **P.** 77

25   A    I WAS NOT AWARE OF WHAT HE TESTIFIED TO TODAY, BUT I WAS     04:36

1    CONTRADICT YOUR CLIENT'S CASE, OR THEIR THEORY OF THE CASE,

2    THAT YOU WOULD BE OBLIGED, AS AN EXPERT, TO PUT THAT IN YOUR

3    REPORT; CORRECT?

4    A    DEFINITELY.

5    Q    AND DID YOU NOTICE THE IMPRESSION OF THIS RAINY DAY                    04:44

6    RASCALS GREETING CARD IN PAGE 61 OF THE BLACK NOTEBOOK WHEN YOU

7    INITIALLY EXAMINED YOUR IMPRESSION?

8    A    I DID.

9    Q    YOU DID?

10   A    YES.                                                                   04:44

11   Q    DIDN'T YOU FEEL THAT IT WAS YOUR OBLIGATION AS AN EXPERT

12   TO DETERMINE WHETHER OR NOT THAT IMPRESSION COULD TELL YOU

13   SOMETHING ABOUT WHEN THIS DOCUMENT WAS CREATED?

14   A    NO.  AS YOU MENTIONED, OF IMPORTANCE AT THAT POINT, I

15   DIDN'T KNOW, I DIDN'T HAVE A CLUE, THAT THAT BOY WAS OF                     04:44

16   IMPORTANCE.  AND IT'S UP TO MATTEL TO DETERMINE WHAT IS OF

17   IMPORTANCE TO THEIR CASE.  IT'S NOT UP TO ME TO DETERMINE THAT.

18   Q    SO YOU'RE SAYING THAT MATTEL DIDN'T TELL YOU THAT THE FACT

19   THAT THERE WAS A RAINY DAY RASCALS GREETING CARD IMPRESSED INTO

20   THAT PAGE -- THEY DIDN'T TELL YOU THAT WAS IMPORTANT?                       04:45

21   A    THAT'S CORRECT.

22   Q    AND YOU DIDN'T FEEL ANY INDEPENDENT PROFESSIONAL

23   OBLIGATION TO LOOK INTO THE SOURCE OF THIS IMPRESSION.

24        IS THAT WHAT YOU'RE SAYING?

25   A    THAT'S CORRECT.  AT THAT PARTICULAR TIME, THERE WAS NO                 04:45

Exhibit  2  ,
P. 78

1    NEED FOR ME TO DO THAT.

2    Q    EVEN THOUGH YOU HAD SPENT, WE'VE NOW ESTABLISHED, WELL

3    OVER 100 HOURS IN EXAMINING THE DOCUMENTS AND PREPARING FOR

4    THIS CASE.

5    A    THAT'S CORRECT.                                            04:45

6    Q    AND YOU DIDN'T POINT THIS OUT TO THE JURY, OTHER THAN SORT

7    OF MENTIONING IT BRIEFLY IN YOUR TESTIMONY, BECAUSE MATTEL TOLD

8    YOU NOT TO MENTION IT; CORRECT?

9    A    ABSOLUTELY NOT.  I MENTIONED IT IN MY PREVIOUS TESTIMONY,

10   AND IT WASN'T BRIEFLY.                                         04:45

11   Q    SIR, BEFORE YOU PREPARED YOUR REPORT IN THIS CASE, YOU HAD

12   READ MR. BRYANT'S TESTIMONY IN HIS DEPOSITION; CORRECT?

13   A    NOT THE ENTIRE DEPOSITION TESTIMONY.  AND AS YOU

14   PREVIOUSLY MENTIONED, THERE WERE THREE VOLUMES, AND I KNOW FOR

15   A FACT I DIDN'T READ THREE VOLUMES.                            04:46

16   Q    BUT WERE YOU AWARE THAT MR. BRYANT TESTIFIED, IN HIS

17   DEPOSITION ON NOVEMBER 4, 2004, THAT HE HAD, IN FACT, BEEN

18   CREATING GREETING CARDS WHEN HE WAS LIVING WITH HIS PARENTS IN

19   MISSOURI IN 1998?

20   A    I HAVE NO RECOLLECTION OF THAT.                           04:46

21   Q    WOULD IT POSSIBLY REFRESH YOUR RECOLLECTION IF YOU LOOKED

22   AT MR. BRYANT'S DEPOSITION TRANSCRIPT?

23   A    NO, IT WOULDN'T.

24   Q    IT WOULDN'T REFRESH YOUR RECOLLECTION?

25   A    NO.  BECAUSE I DON'T REMEMBER THAT.                       04:46

Exhibit  2  ,
P. 79

1    SIMILAR, BUT I CAN'T SAY IDENTICAL AT THIS POINT.

2    Q    AND BY THE WAY, YOU SAID YOU DID NOTICE THE IMPRESSION OF

3    THAT GREETING CARD IN YOUR INITIAL EXAMINATION OF THE FILM FROM

4    PAGE 61; CORRECT?

5    A    WOULD YOU REPEAT THAT, PLEASE.                              04:48

6    Q    YOU SAID THAT WHEN YOU INITIALLY DEVELOPED THE FILM FROM

7    PAGE 61, YOU NOTICED THE IMPRESSION OF THAT GREETING CARD; IS

8    THAT CORRECT?

9    A    I SAW IT.

10   Q    YOU DIDN'T PUT THAT IN YOUR REPORT, DID YOU, SIR?          04:48

11   A    NO.

12   Q    THAT'S BECAUSE MATTEL TOLD YOU NOT TO PUT IT IN THE

13   REPORT.

14   A    NO.

15   Q    BECAUSE MATTEL TOLD YOU THAT IT WASN'T IMPORTANT.          04:48

16   A    NO.

17   Q    DON'T YOU THINK THAT IT'S SIGNIFICANT THAT IF THERE'S A

18   KEY PIECE OF EVIDENCE AND YOU FIND AN IMPRESSION, THAT YOU

19   WOULD TELL THE RECIPIENT OF THE REPORT ABOUT OTHER IMPRESSIONS

20   THAT YOU HAD FOUND IN THE SAME FILM?                            04:49

21           MR. QUINN:  OBJECTION.  ARGUMENTATIVE.

22           THE COURT:  SUSTAINED.

23   BY MR. SLOAN:

24   Q    YOU THOUGHT THAT THIS FILM WAS A KEY PIECE OF EVIDENCE,

25   DIDN'T YOU, SIR?                                                04:49

                          Exhibit  2  ,
                          P. 80

1   A    NO.

2   Q    YOU DIDN'T THINK IT WAS IMPORTANT?

3   A    NO.

4   Q    BUT YOU DECIDED TO PUT IT INTO YOUR REPORT.

5   A    I WAS ASKED TO INCLUDE IT IN MY REPORT.          04:49

6   Q    IS IT YOUR TESTIMONY THAT YOU ONLY PUT THINGS IN YOUR

7   REPORT THAT YOU'RE ASKED TO PUT IN YOUR REPORT?

8   A    IF THAT'S THE EVIDENCE THAT'S GOING TO BE SUBMITTED TO THE

9   COURT, YES.

10  Q    SO IF THERE'S SOME EVIDENCE THAT MIGHT BE UNFAVORABLE TO    04:49

11  YOUR CLIENT AND YOUR CLIENT TELLS YOU NOT TO SUBMIT IT TO THE

12  COURT, YOU WOULDN'T PUT IT IN THE REPORT?  IS THAT YOUR

13  TESTIMONY?

14  A    I WOULD FIRST HAVE TO KNOW IT'S UNFAVORABLE.

15  Q    WELL, WHEN YOU SAW THIS IMPRESSION IN THE FILM, HOW DID     04:50

16  YOU KNOW IT WASN'T IMPORTANT?

17  A    I DIDN'T KNOW IT WAS IMPORTANT.  I DIDN'T KNOW IT WAS

18  UNFAVORABLE.  IT'S JUST AN IMAGE THAT I DEVELOPED WHICH I HAVE

19  NO COMMENT ON ABOUT THE STRENGTH OF IT ONE WAY OR ANOTHER.

20  Q    SO IF YOU FOUND AN IMAGE OF SOMETHING ELSE, WOULDN'T IT BE  04:50

21  IMPORTANT TO SAY THAT YOU ALSO FOUND ANOTHER IMAGE IN THE SAME

22  DOCUMENT?

23  A    I DID TELL THEM THAT.

24  Q    YOU TOLD MATTEL THAT?

25  A    SURE.  AND THEY COULD SEE IT THEMSELVES AS WELL.           04:50

Exhibit 2,
P. 81

1   Q   AND MATTEL TOLD YOU NOT TO PUT IT IN THE REPORT.

2   A   THEY DIDN'T TELL ME NOT TO PUT IT IN THE REPORT.  THEY

3   TOLD ME WHAT THEY WANTED IN THE REPORT REGARDING THE DRAWN

4   IMAGES OF THE DOLLS.

5   Q   SO THEY TOLD YOU WHAT THEY WANTED IN THE REPORT WAS THAT          04:50

6   THERE WAS AN IMPRESSION OF ONE OF THE BRATZ DRAWINGS IN THAT

7   PAGE; CORRECT?

8   A   THAT'S CORRECT.

9   Q   AND THEY MUST HAVE ALSO TOLD YOU, 'WE DON'T WANT YOU TO

10  MENTION ANYTHING ELSE YOU FOUND'; CORRECT?                          04:51

11  A   THEY DIDN'T SAY IT IN THOSE WORDS.  THEY JUST MENTIONED TO

12  ME, 'THIS IS THE EVIDENCE WE ARE GOING TO SUBMIT AT TRIAL, AND

13  THIS IS THE EVIDENCE WE WANT YOU TO PREPARE IN YOUR RULE 26

14  REPORT.'

15  Q   WELL, DID YOU ASK THEM WHETHER THIS OTHER IMPRESSION WAS          04:51

16  IMPORTANT?

17  A   I DON'T RECALL.

18  Q   DID YOU TELL THEM THAT YOU FOUND THIS OTHER IMPRESSION?

19  A   YES, I DID.

20  Q   AND THEY SAID, 'JUST PUT IN THE IMPRESSION OF THE DOLL.          04:51

21  DON'T PUT IN THE IMPRESSION OF THE RAINY DAY RASCALS GREETING

22  CARD'?

23  A   THEY DIDN'T PHRASE IT THAT WAY, SIR.

24  Q   WELL, THEY SAID, 'PUT IN THAT YOU FOUND THE IMPRESSION OF

25  THE DOLL, BUT DON'T PUT IN THAT YOU FOUND THE IMPRESSION OF THE       04:51

Exhibit __2__,
P. _82_

1   LITTLE CHILD WITH THE RAIN COAT'?  IS THAT WHAT THEY SAID?

2   A    NO.  THEY JUST SAID TO ME, 'INCLUDE IN YOUR REPORT THE

3   EVIDENCE OF THE IMPRESSION OF THE DOLLS THAT YOU DEVELOPED IN

4   PAGE 61 AND 63 OF THE NOTEBOOK.'

5          I DON'T THINK THAT THEY WERE MARKED AS 61 AND 63 AT     04:5

6   THAT TIME, BUT I'M USING THAT AS A REFERENCE HERE.

7   Q    WHICH ATTORNEY TOLD YOU THAT THEY ONLY WANTED YOU TO

8   MENTION THAT THERE WAS AN IMAGE OF THE DOLL ON THIS PAGE?

9   A    ATTORNEY DIANE HUTNYAN.

10  Q    SO SHE TOLD YOU ONLY TO MENTION THAT YOU FOUND THE IMAGE   04:5

11  OF THE DOLL ON THE PAGE.

12  A    YES.  AND SHE SAID, 'THAT'S THE EVIDENCE WE'RE GOING TO

13  PRODUCE IN COURT,' AND THAT I WILL TESTIFY ABOUT.

14  Q    AND YOU REALIZED THAT WAS EVIDENCE THAT WOULD BE FAVORABLE

15  TO MATTEL; RIGHT?                                              04:5

16  A    AT THAT TIME, I DIDN'T KNOW.

17  Q    SO DIANE HUTNYAN IS THE SAME WOMAN WHO TOLD YOU THAT SHE

18  FELT THE NOTARY BOOK WAS SUSPICIOUS; RIGHT?

19  A    THAT'S CORRECT.

20  Q    AND DID SHE TELL YOU THAT IT WAS IMPORTANT THAT YOU FIND   04:5

21  THE IMAGE OF THIS DOLL IN THIS PAGE?

22  A    NO.

23  Q    SIR, LET'S MOVE ON TO EXHIBIT 13635.

24         THIS IS YOUR IMPRESSION, THE IMPRESSION THAT YOU

25  DEVELOPED, OF PAGE 63 OF THE BLACK NOTEBOOK; CORRECT?          04:5

Exhibit 2 ,
P. 83

1    A      CORRECT.

2    Q      AND YOU HIGHLIGHTED IN ONE OF YOUR GRAPHICS THESE EYES,

3    AND THERE'S AN ARCHED EYEBROW, AND I THINK THERE'S AN EYEBROW

4    ON THE OTHER SIDE; CORRECT?

5    A      THAT'S CORRECT.                                              04:53

6    Q      AND YOU SAY THAT YOU BELIEVE THAT'S A POSITIVE IMPRESSION

7    FROM THE DOCUMENT THAT WAS MARKED BRYANT 179, WHICH I THINK IS

8    EXHIBIT 5-39; IS THAT CORRECT?

9    A      YES; THE BALLPOINT INK IMAGE FROM THAT DOCUMENT.

10   Q      NOW, SIR, ONE OF THE IMPORTANT TRAITS OF BEING A FORENSIC    04:54

11   DOCUMENT EXAMINER IS PATTERN RECOGNITION; IS THAT CORRECT?

12   A      THAT'S CORRECT.

13   Q      AND THAT IS THE ABILITY TO RECOGNIZE PATTERNS IN FILMS YOU

14   DEVELOP OR OTHER THINGS; IS THAT CORRECT?

15   A      YES, IT, IS.                                                 04:54

16   Q      AND, SIR, DID YOU NOTICE ANOTHER IMPRESSION THAT WAS ALSO

17   IN THIS DOCUMENT, EXHIBIT 13635?

18   A      YES; A COUPLE OF OTHER THINGS.

19   Q      DID YOU NOTICE, FOR INSTANCE, THE WORD "WHENEVER" HERE?

20   A      YES, I DID.                                                  04:54

21   Q      DID YOU NOTICE ANYTHING ELSE OF SIGNIFICANCE IN THIS

22   DOCUMENT?

23   A      YES.   THERE'S AN IMPRESSION OF A LITTLE DOG DOWN TOWARDS

24   THE CENTER OF THE PAGE.

25   Q      DID YOU NOTICE, NEAR THE BOTTOM, THE WORD "YOU"?            04:55

Exhibit _2_,
P. _84_

1          DO YOU SEE THAT ANYWHERE?

2    A    I SEE SOME ILLEGIBLE LETTER FORMS, WHICH I CAN'T MAKE OUT

3    EXACTLY WHAT THEY ARE; BUT, NO, I CAN'T MAKE THOSE OUT.

4    Q    DID YOU NOTICE THOSE THINGS WHEN YOU ORIGINALLY EXAMINED

5    THIS FILM?                                                          04:56

6    A    I DID.

7    Q    AND DID YOU MAKE ANY EFFORT TO DETERMINE THE SOURCE OF

8    THOSE IMPRESSIONS?

9    A    I THINK I DID.

10   Q    DID YOU DETERMINE THE SOURCE OF THOSE IMPRESSIONS?          04:56

11   A    YES.  I DON'T RECALL WHAT THE ACTUAL SOURCE WAS, BUT I DO

12   RECALL FINDING THE FACE OF THE DOG WITH THE LONG EARS, AND I DO

13   RECALL FINDING THE WORD "WHENEVER"; BUT I DON'T RECALL ON WHICH

14   DOCUMENTS THEY WERE ON.

15   Q    SIR, COULD I HAVE YOU LOOK AT EXHIBIT 15333, WHICH I THINK   04:56

16   YOU HAVE IN FRONT OF YOU.

17   A    YES, I HAVE IT IN FRONT OF ME.

18   Q    AND YOU'RE HOLDING UP THE ORIGINAL FOR THE JURY?

19   A    YES.

20   Q    DOES THAT APPEAR TO BE ON THE SAME NOTEBOOK PAPER AS THE    04:56

21   BLACK NOTEBOOK?

22   A    IT DOES.  VERY SIMILAR PAPER.

23   Q    AND DO YOU SEE, IN THE TOP LEFT-HAND CORNER OF THAT

24   DOCUMENT, WHERE IT SAYS "WHENEVER"?

25   A    YES.  THAT'S THE SOURCE -- I DO RECALL THAT IS THE SOURCE   04:57

Exhibit 2,
P. 85

3410

1   OF THE "WHENEVER" THAT I DEVELOPED AS INDENTED WRITING.

2   Q    SO YOU BELIEVE THAT THERE'S A POSITIVE IMPRESSION OF THIS

3   DOCUMENT, 15333, THAT IS IMPRESSED INTO PAGE 63 OF THE

4   NOTEBOOK; IS THAT CORRECT?

5   A    YES, THAT'S CORRECT.                                          04:57

6   Q    IS IT YOUR PROFESSIONAL OPINION AS AN EXPERT THAT MEANS

7   THAT THIS DOCUMENT, 15333, WAS DRAWN ON TOP OF PAGE 63 OF THAT

8   BLACK NOTEBOOK?

9   A    YES.

10  Q    AND, SIR, ARE YOU AWARE THAT 15333 IS A DOCUMENT WHICH      04:57

11  MR. BRYANT HAS TESTIFIED IN THIS COURT WAS ONE OF THE RAINY DAY

12  RASCALS GREETING CARDS HE CREATED IN 1998 WHEN HE WAS LIVING IN

13  MISSOURI?

14  A    NO, I'M NOT AWARE OF THAT.

15  Q    YOU WEREN'T AWARE OF THAT?                                   04:57

16  A    NO.

17  Q    NO ONE AT MATTEL TOLD YOU THAT?

18  A    NO.

19  Q    NOW, YOU SAID THAT YOU NOTICED THIS IMPRESSION IN

20  EXHIBIT 13635 IN YOUR FILM WHEN YOU DID THE INITIAL              04:5

21  EXAMINATION; CORRECT?

22  A    YES.

23  Q    BUT YOU DIDN'T PUT THAT IN YOUR REPORT, DID YOU, SIR?

24  A    NO, I DIDN'T.

25  Q    AND IS THE REASON YOU DIDN'T PUT THAT IN THE REPORT         04:5

Exhibit  2  ,
P. 86

| | |
|---|---|
| 1 | BECAUSE SOMEONE AT MATTEL TOLD YOU NOT TO PUT IT IN YOUR |
| 2 | REPORT? |
| 3 | A    IT WASN'T WORDED THAT WAY.  IT'S THAT THEY WERE MORE |
| 4 | INTERESTED IN THE EYES AND THE EYEBROWS OF EXHIBIT 5-39, AND |
| 5 | THAT WAS THE EVIDENCE THAT THEY WERE GOING TO SUBMIT TO THE |
| 6 | COURT. |
| 7 | Q    BUT AS AN EXPERT, SIR, YOU'RE AWARE THAT IF THERE ARE |
| 8 | IMPRESSIONS OF OTHER DOCUMENTS WHICH ARE IMPRESSED INTO ONE OF |
| 9 | YOUR FILMS, THAT MIGHT BE SIGNIFICANT IN TERMS OF BEING ABLE TO |
| 10 | DETERMINE THE DATE IN WHICH SOMETHING WAS CREATED; IS THAT |
| 11 | CORRECT? |
| 12 | A    THAT COULD BE, BUT I WOULD HAVE TO BE AWARE AND NOTIFIED |
| 13 | OF THE SIGNIFICANCE. |
| 14 | Q    SO NO ONE NOTIFIED YOU OF THE SIGNIFICANCE OF THIS |
| 15 | DRAWING. |
| 16 | A    IF YOU'RE REFERRING TO THE DOG FACE -- AND ACTUALLY, I DO |
| 17 | SEE THE WORD "YOU" ON MY LIFT AS WELL, AND THE WORD "WHENEVER" |
| 18 | I DON'T KNOW WHAT THE SIGNIFICANCE OF THOSE INDENTATIONS ARE. |
| 19 | Q    BUT SOMEONE AT MATTEL TOLD YOU JUST TO MENTION THAT YOU |
| 20 | SAW THE EYES OF EXHIBIT 539 IN THIS DOCUMENT; CORRECT? |
| 21 | A    YES.  THEY TOLD ME THAT WAS THE EVIDENCE THEY WERE GOING |
| 22 | TO PRODUCE IN COURT AND WANTED ME TO TESTIFY ABOUT. |
| 23 | Q    AND WHO TOLD YOU TO DO THAT? |
| 24 | A    ATTORNEY DIANE HUTNYAN. |
| 25 | Q    SIR, WOULD YOU AGREE THAT THE IMPRESSION FROM THIS RAINY |

Exhibit __2__ ,
P. __87__

3412

1    DAY RASCALS GREETING CARD IS STRONG, AS STRONG, AS THE

2    IMPRESSION OF THESE EYES FROM EXHIBIT 539?

3    A    IT COULD BE PLACED IN A SIMILAR CATEGORY, BUT TO SAY "AS

4    STRONG" FOR ONE OR THE OTHER, THAT WOULD BE VERY DIFFICULT TO

5    DO.                                                              05:00

6    Q    AFTER YOU FOUND THIS IMPRESSION, DID YOU ASK ANYONE AT

7    MATTEL THE SIGNIFICANCE OF THIS GREETING CARD?

8    A    NO.

9    Q    YOU JUST DECIDED NOT TO PUT IT IN THERE BECAUSE THEY TOLD

10   YOU NOT TO PUT IT IN THERE.                                      05:01

11   A    NO.  THAT'S PHRASING IT INCORRECTLY.

12        I PUT IT IN MY REPORT BECAUSE THEY MENTIONED TO ME

13   THAT THAT'S THE EVIDENCE THAT THEY WERE GOING TO PRODUCE IN

14   COURT AND THAT'S WHAT I WAS TO TESTIFY ABOUT.

15   Q    SO THEY TOLD YOU THAT THEY WANTED YOU TO TESTIFY THAT YOU   05:01

16   FOUND THE IMPRESSION OF EXHIBIT 539 IN PAGE 63; CORRECT?

17   A    CORRECT.

18   Q    WHAT I'M ASKING YOU IS, WHY DIDN'T YOU ALSO PUT IN YOUR

19   REPORT THAT YOU FOUND THIS DOCUMENT, EXHIBIT 15333?

20   A    BECAUSE APPARENTLY MY CLIENT DIDN'T PLACE THAT MUCH         05:01

21   SIGNIFICANCE ON IT.

22   Q    AND IS MS. HUTNYAN IN COURT TODAY?

23   A    I DON'T SEE HER HERE.

24   Q    SIR, LET ME ASK YOU SOME OTHER QUESTIONS ABOUT THAT BLACK

25   NOTEBOOK YOU HAVE IN FRONT OF YOU.                               05:02

Exhibit  2  ,
P.  88

```
 1          BUT MR. QUINN HAS SUGGESTED NOW TO THE JURY THAT HE

 2   MADE THIS WHOLE THING UP AFTER THE FACT BECAUSE OF THE EXPERT

 3   REPORT, AND I THINK IT'S UNFAIR FOR THE JURY --

 4          THE COURT:  I AGREE THAT THERE'S NO EVIDENCE THAT HE

 5   MADE ANYTHING UP; IT'S ONLY AN INFERENCE THAT ANYONE MADE

 6   ANYTHING UP.  THE QUESTION IS WHETHER OR NOT THERE'S EVIDENCE.

 7          MR. QUINN IS TRYING TO GET OUT THAT, IS THERE ANY

 8   EVIDENCE THAT -- AND AGAIN, WE'RE BACK TO CREDIBILITY.  WE'RE

 9   NOT LOOKING FOR ABSTRACT TRUTHS HERE; WE'RE LOOKING FOR

10   CREDIBILITY.  THE EXAMINATION OF THE WITNESS BY YOU WAS THIS

11   RAINY DAY RASCAL CARD THAT APPEARS IN THE NOTEBOOK.  THE ONLY

12   RELEVANCE OF THAT TO IMPEACH THIS WITNESS IS IF THE RAINY DAY

13   RASCALS CARD WAS DONE IN 1998.

14          MR. SLOAN:  CORRECT.

15          THE COURT:  WE DON'T KNOW IF IT WAS OR IT WASN'T.

16          WE HAVE TESTIMONY FROM CARTER BRYANT THAT IT WAS;

17   THAT HE DID THE RAINY DAY RASCAL CARD IN 1998.  AND THE REASON

18   WHY YOU GOT INTO IT TODAY IS BECAUSE THAT'S WHAT HE SAID, AND

19   HE OBJECTED TO WHAT YOU SAID.

20          MR. QUINN:  HE REMEMBERS IT THE SAME WAY.

21          MR. PRICE:  I ASKED HIM AGAIN THIS MORNING.

22          THE COURT:  IN ANY EVENT, MR. CARTER BRYANT TESTIFIED

23   TO NUMEROUS DIFFERENT GREETING CARDS THAT HE DID.

24          MR. SLOAN:  THE RAINY DAY RASCALS CARDS HE TESTIFIED

25   TO, I'M TALKING ABOUT IN COURT --
```

Exhibit 2 ,
P. 89

3468

```
 1           ALL GOOD THINGS HAVE TO COME TO AN END AT SOME POINT

 2    IN TIME.

 3           MR. QUINN:  WE HAVE TO DO A CROSS-EXAMINATION TOO.

 4           MR. NOLAN:  OF COURSE.

 5           MR. QUINN:  WE BELIEVE IN GOOD FAITH THAT WE ARE DOWN     06:18

 6    TO SOME WITNESSES WHO WILL BE PRETTY SHORT.  BUT I DON'T KNOW

 7    THAT WE CAN DO THEM AND ALSO DO MR. LYTER.

 8           THE COURT:  THE COURT IS CERTAINLY GOING TO BE AS

 9    FLEXIBLE WITH MGA AS IT HAS BEEN WITH MATTEL.

10           MR. NOLAN:  I APPRECIATE THAT.                            06:18

11           THE COURT:  VERY GOOD.

12           EVERYONE HAVE A GOOD WEEKEND.

13

14

15

16

17                         CERTIFICATE

18

19    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
      STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
20    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
      ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
21    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
      THE UNITED STATES.
22

23

24    THERESA A. LANZA, RPR, CSR           6-24-08
      OFFICIAL COURT REPORTER                DATE
25
```

Exhibit 2 ,
P. 90

1               UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                          - - -

4        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                          - - -

6   MATTEL, INC.,              :   PAGES 3469 - 3588
                               :
7           PLAINTIFF,         :
                               :
8      VS.                     :   NO. ED CV04-09049-SGL
                               :   [CONSOLIDATED WITH
9   MGA ENTERTAINMENT, INC.,   :   CV04-9059 & CV05-2727]
    ET AL.,                    :
10                             :
            DEFENDANTS.        :
11  _____:

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 RIVERSIDE, CALIFORNIA

17               TUESDAY, JUNE 24, 2008

18                JURY TRIAL - DAY 17

19                  MORNING SESSION

20

21

22   CERTIFIED      MARK SCHWEITZER, CSR, RPR, CRR
                     OFFICIAL COURT REPORTER
23   COPY           UNITED STATES DISTRICT COURT
                     181-H ROYBAL FEDERAL BUILDING
24                   255 EAST TEMPLE STREET
                     LOS ANGELES, CALIFORNIA 90012
25                   (213) 663-3494

Exhibit __2__ ,
P. __91__

1    relationship to Exhibits 15601.

2    **A.**    Say that again.

3    **Q.**    You would agree with me that the Exhibit 13675 has no

4    relationship with the drawing done by Carter Bryant on the

5    right that's shown there?

6    **A.**    Correct.

7    **Q.**    And you would also agree with me that this Exhibit 13675

8    has no relationship to Exhibit 15603, also dated by Carter

9    Bryant in January of 1998; correct?

10   **A.**    Correct.

11   **Q.**    And you would agree with me that Exhibit No. 13675, the

12   schedule, has nothing to do with Exhibit 15604 in evidence

13   and also dated and signed by Carter Bryant in 1998; correct?

14   **A.**    Correct.

15   **Q.**    And last in the series, you would agree with me that

16   Exhibit 13675 has no relationship to Exhibit 15605; correct?

17   **A.**    Correct.

18   **Q.**    I'd like to place in front of you a series of -- I don't

19   think they are in the white notebook.  Do you have some

20   papers that are loose up there?  I apologize.  Do you have

21   that now in front of you?

22   **A.**    I do.

23   **Q.**    I'd ask you to turn to Exhibit 18548.  Do you have the

24   book open to that?

25   **A.**    I do.

Exhibit  2  ,
P. 92

3511

1   Q.   And it is true that Barbie Collectibles had a project

2   named Emerald Jewel, which was copyrighted in 1998; correct?

3          MR. ZELLER:   Objection.   Lacks foundation, your

4   Honor.

5          THE COURT:   Sustained.

6   Q.   BY MR. NOLAN:   Have you ever seen the doll depicted in

7   the photographs on Exhibit 18548?

8   A.   No.

9          MR. NOLAN:   Your Honor, I'd like to approach the

10  witness with Exhibit 18556.

11  Q.   Before I do, were you shown the document marked as

12  Exhibit 18548 that has two photographs on it at Sunday's

13  meeting?

14  A.   No.

15         MR. NOLAN:   May I approach with the exhibit now?

16         THE COURT:   You may.

17         MR. NOLAN:   For the record, this exhibit, we didn't

18  introduce it this way.   It has a white piece of paper where

19  the glue has come off.   So I'm bringing up the white paper

20  with the doll itself, and we'll refasten it after I've shown

21  the witness.

22         THE COURT:   Very well.

23  Q.   BY MR. NOLAN:   Now, before I ask you to take a look at

24  this particular exhibit, what is your -- what's your title at

25  Mattel?

Exhibit  2  ,
P.  93

3588

1

2

3

4

5

6

7

8

9

10                           C E R T I F I C A T E

11

12

13          I hereby certify that pursuant to Title 28,

14   Section 753 United States Code, the foregoing is a true and

15   correct transcript of the stenographically reported

16   proceedings in the above matter.

17          Certified on June 24, 2008.

18

19

20   **MARK SCHWEITZER, CSR, RPR, CRR**
     Official Court Reporter
21   License No. 10514

22

23

24

25

Exhibit   2 ,
P.  94