EXHIBIT  5

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 090378)
2      (johnquinn@quinnemanuel.com)
      Michael T. Zeller (Bar No. 196417)
3      (michaelzeller@quinnemanuel.com)
      Jon D. Corey (Bar No. 185066)
4      (joncorey@quinnemanuel.com)
      865 South Figueroa Street, 10th Floor
5   Los Angeles, California  90017-2543
    Telephone:(213) 443-3000
6   Facsimile:(213) 443-3100

7   Attorneys for Plaintiff Mattel, Inc.

8

9                    UNITED STATES DISTRICT COURT

10                 CENTRAL DISTRICT OF CALIFORNIA

11                          EASTERN DIVISION

12  CARTER BRYANT, an individual,        CASE NO. CV 04-9049 SGL (RNBx)

13              Plaintiff,               Consolidated with Case No. CV 04-
                                         09059 and Case No. CV 05-02727
14        vs.
                                         **DISCOVERY MATTER**
15

16  MATTEL, INC., a Delaware corporation, MATTEL, INC.'S NOTICE OF
                                         MOTION AND MOTION TO
17              Defendant.               COMPEL BRYANT TO MAKE
                                         ORIGINAL DOCUMENTS
18  ─────────────────────────────       AVAILABLE FOR EXPERT
                                         EXAMINATION AND TESTING
    AND CONSOLIDATED ACTIONS            AND FOR SANCTIONS; AND
19                                       MEMORANDUM OF POINTS AND
                                         AUTHORITIES IN SUPPORT
20

21                                       Declaration of Diane C. Hutnyan,
                                         Notices of Lodging for Declarations of
22                                       Michael T. Zeller, Shane McKenzie,
                                         and Dylan Proctor, and Proposed Order
23                                       filed concurrently herewith]

24                                       Hearing Date:  TBA
                                         Time:  TBA
25                                       Place:  TBA

26                                       Discovery Cut-off: October 22, 2007
                                         Pre-trial Conference: January 14, 2008
27                                       Trial Date: February 12, 2008

28          Exhibit _5_,
               P._128_

17209/2158174.1
────────────────────────────────────────────────────
    MATTEL'S MOTION TO COMPEL ORIGINALS FOR EXPERT EXAMINATION AND TESTING

1   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2            PLEASE TAKE NOTICE that at a telephonic conference before

3   Discovery Master Hon. Edward Infante (Ret.), that will occur on a date and at a time to

4   be determined by Judge Infante, plaintiff Mattel, Inc. ("Mattel") will, and hereby does,

5   move the Court: (1) to compel Defendant Carter Bryant to make the originals of his

6   documents available for examination, analysis and testing by Mattel's experts; and (2)

7   for an award of sanctions against Bryant in the amount of $2,500, which represents a

8   portion of the fees incurred by Mattel in bringing this Motion.

9            This Motion is made pursuant to Federal Rules of Civil Procedure 34 and

10  37 on the grounds that this Court has previously ordered Bryant to allow access to his

11  originals for inspection and testing, and although Bryant concedes Mattel's right to have

12  expert examination and testing of the originals, he nevertheless has sought to impose a

13  number of limitations on the examinations which are improper and unsupported by law.

14           This Motion is based on this Notice of Motion and Motion, the

15  accompanying Memorandum of Points and Authorities, the Declaration of Diane C.

16  Hutnyan filed concurrently herewith, and the Notices of Lodging of the Declarations of

17  Michael T. Zeller, Dylan Proctor and Shane McKenzie, separately lodged concurrently

18  herewith, the records and files of this Court, and all other matters of which the Court

19  may take judicial notice.

20

21

22

23

24

25

26

27                              **Exhibit 5   ,**

28                              **P. 129**

07209/2158174.1

-1-

## Rule 37-1 Compliance

The parties have met and conferred on the subject of Mattel's and Mattel's experts' access to Bryant's originals numerous times pursuant to <u>Local Rule</u> 37-1, including most recently and explicitly with regard to access for examination, analysis and testing by Mattel's experts, on June 22, 26, 27, and 30, 2007.

DATED: July 6, 2007

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By _____
Diane C. Hutnyan
Attorneys for Plaintiff and Cross-Defendant
Mattel, Inc.

Exhibit _S_ ,
P. _130_

1

## TABLE OF CONTENTS

2

**Page**

3

4  MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

5  PRELIMINARY STATEMENT .................................................................................. 1

6  BACKGROUND .......................................................................................................... 3

7  ARGUMENT................................................................................................................ 11

8  I.   MATTEL IS ENTITLED TO HAVE ITS EXPERTS EXAMINE,
9        ANALYZE AND TEST THE ORIGINAL DOCUMENTS UNDER
      THE FEDERAL RULES ...................................................................................... 11

10 II.  BRYANT HAS NO LEGITIMATE JUSTIFICATION FOR
      REFUSING EXAMINATION, ANALYSIS AND TESTING ...................... 16

11
      A.   Non-Destructive Testing......................................................................... 16

12
      B.   Destructive Testing ................................................................................. 20

13
14 III. THE DISCOVERY MASTER SHOULD SANCTION BRYANT............... 22

   CONCLUSION............................................................................................................. 23

15
16
17
18
19
20
21
22
23
24
25
26

27  **Exhibit** _S_ ,

28  **P.** _131_

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

Braley v. Campbell,
832 F.2d 1504 (10th Cir. 1987)...........................................23

Dabney v. Montgomery Ward & Co., Inc.,
761 F.2d 494 (8th Cir. 1985)...........................................20

Diepenhorst v. City of Battle Creek,
2006 WL 1851243 (W.D. Mich. 2007)...............................18, 20, 21

Equal Employment Opportunity Commission v. Ethan Allen, Inc.,
259 F. Supp. 2d 625 (N.D. Ohio 2003)...............................13

Gielow v. Warner Bros. Pictures,
26 F. Supp. 425 (S.D.N.Y. 1938)...........................................11

Hickman v. Taylor,
329 U.S. 495 (1947)...........................................17

House v. Combined Ins. Co. of Amer.,
168 F.R.D. 236 (N.D. Iowa 1996)...........................................18

Hyde & Drath v. Baker,
24 F.3d 1162 (9th Cir. 1994)...........................................22

In re Kolinsky,
140 B.R. 79 (S.D.N.Y. 1992)...........................................11

National Hockey League, Inc. v. Metropolitan Hockey Club, Inc.,
427 U.S. 639 (1976)...........................................23

Paul Morelli Design, Inc. v. Merit Diamond Corp.,
2000 WL 1340464 (E.D. Pa. 2000)...........................................21

In re Pizza Time Theatre Securities Litigation,
113 F.R.D. 94 (N.D. Cal. 1986)...........................................19

RTC v. Dabney,
73 F.3d 262 (10th Cir. 1995)...........................................23

Sedrati v. Allstate Life Insurance Co.,
185 F.R.D. 388 (M.D. Ga. 1998)...........................................21

United States v. Yamin,
868 F.2d 130 (5th Cir. 1989)...........................................12

Exhibit 5 ,
P. 132

-ii-

**Statutes**

47 U.S.C. § 227(d)(1)(B)..........................................................................................15

28 U.S.C. § 1927.....................................................................................................22

Federal Rules of Civil Procedure

   Rule 26(b)...........................................................................................................11

   Rule 26(b)(2)......................................................................................................20

   Rule 26(c)...........................................................................................................20

   Rule 34................................................................................................................11

   Rule 34(a)...........................................................................................................11

   Rule 34(a)(1).......................................................................................................11

   Rule 37(a)(4)......................................................................................................22

Federal Rule of Evidence 1002 ..............................................................................12

**Other Authorities**

McCormick, Evidence §§ 231, 236 (4th ed. 1992) ..................................................12

Am. Jur. 2d Depositions and Discovery § 166.........................................................22

Exhibit __S__ ,

P.__133__

## MEMORANDUM OF POINTS AND AUTHORITIES

### Preliminary Statement

For more than two years, and in violation of both a Court Order and an on-the-record stipulation, Bryant has repeatedly blocked and delayed Mattel's access to the originals of his Bratz drawings and other key materials that are at the center of this litigation. After Bryant had reneged on his numerous promises to make all of his originals available for inspection,[1] Mattel filed in February 2005 a motion to compel Bryant to produce the originals of his documents, including most importantly his Bratz drawings, for inspection and photographing.[2] Before the motion was ruled upon, the case was then stayed for a year. After discovery resumed, Magistrate Judge Block ordered the parties to further meet and confer about the motion in his courtroom on June 20, 2006. At that time, Mattel's motion was resolved by an on-the-record stipulation by the parties that Bryant would make his originals available on 15 days' notice.[3]

But Bryant did not honor the stipulation. He largely ignored Mattel's requests for originals and, as even to the ones he did eventually provide, strung out Mattel for weeks by claims that he needed more time to locate his originals.[4] Then, after wearing out those excuses, Bryant purported to unilaterally jettison his on-the-record stipulation and began to insist that Mattel agree to new, and unreasonable

---

[1] Declaration of Michael T. Zeller In Support of Mattel, Inc.'s Motion to Enforce Stipulation and Compel Bryant to Make Original Documents Available and For Sanctions, dated January 19, 2007 and lodged concurrently herewith ("Zeller Dec."), ¶¶ 11, 14, 16 and Exh. 11.

[2] Id., Exh. 15.

[3] Id., ¶ 17.

[4] Declaration of Shane H. McKenzie In Support of Mattel, Inc.'s Motion to Enforce Stipulation and Compel Bryant to Make Original Documents Available and For Sanctions, dated January 19, 2007 and lodged concurrently herewith ("McKenzie Dec."), ¶ 8.

**Exhibit 5 ,**
**P. 134**

1  conditions--including access to Mattel work product--before he would allow Mattel to

2  inspect the originals.

3         Mattel therefore had to commence with the Joint Stipulation process yet

4  again to bring a second motion to compel and to enforce the parties' June 20, 2006

5  stipulation.  In the interim, Judge Infante was appointed Discovery Master, and in

6  January 2007, Mattel brought a motion to compel Bryant to make his originals

7  available on the dual grounds that these documents were the subject of the parties' June

8  20, 2006 stipulation, and that even in the absence of such stipulation, Mattel was

9  entitled to inspect and photograph the originals.  The inspection and photographing

10  were necessary to determine what other information is available on the originals (such

11  as impressions, watermarks or alterations) which is not disclosed by the poor, black-

12  and-white photocopies that Bryant produced and to determine what expert analysis of

13  them might be appropriate for such purposes as ascertaining their true dates of creation

14  and whether the documents had been altered.

15         The Discovery Master granted Mattel's motion, and ordered Bryant to

16  allow inspection and photographing by February 28.  Even in the face of that Court

17  Order, Bryant continued to string Mattel along up through May, continuing to delay

18  Mattel's access to many of the originals of the documents he had initially produced as

19  well as the approximately 16,800 additional pages of documents that the Discovery

20  Master also compelled Bryant to produce in March and April of 2007.

21         In late May and June of 2007, Bryant finally allowed Mattel to inspect and

22  photograph a substantial portion of the remaining "originals" corresponding to Bryant's

23  document productions--that is, excluding some originals Mattel had asked to see for

24  months that Bryant's counsel finally admitted do not exist, and excluding every page in

25  Bryant's production that had been redacted.  Further, Bryant provided the "originals"

26  in a scrambled order that did not correspond to their earlier-produced Bates-numbered

27  counterparts, making it extremely difficult to determine, even after hours of post-

28  inspection comparison, which originals were the documents about which Bryant and

1   other witnesses have testified.   Nonetheless, these two inspections made it possible--

2   for the first time--for Mattel to come up with at least a tentative list of those documents

3   that might be appropriate for expert analysis and might shed light on when Bryant

4   created the original Bratz drawings and when he was working with MGA on Bratz.

5         When Mattel requested access for its document experts' examination,

6   analysis and testing, Bryant said he would "make it happen," but only if Mattel

7   accepted a number of inappropriate conditions and restrictions designed to substantially

8   hinder or even preclude altogether Mattel's experts' examination and analysis of the

9   originals.  Although the parties met and conferred, and even though Mattel proposed a

10  detailed protocol to address the examination and analysis by its experts, Bryant's

11  continuing insistence on these baseless conditions and limitations could not be

12  overcome.

13        As a result, despite Bryant's concession that Mattel has a right to expert

14  examination and testing, he has chosen to force Mattel to bring yet another motion to

15  gain access to the originals to conduct that examination and testing.  Bryant should be

16  sanctioned for requiring Mattel to bring this motion to overcome the clearly improper

17  and quite substantial limitations on Mattel's expert examination and testing that he has

18  attempted to impose for no other purpose than to cause yet more delay and interfere

19  with the truth-finding function of this proceeding.

20        **Background**

21        ***Carter Bryant's Work On Bratz.***  Defendant Carter Bryant is a former

22  Mattel employee.  He worked as a Mattel product designer from September 1995 to

23  April 1998, and then again from January 1999 to October 2000.[5]  Upon starting his

24  second term of employment with Mattel, Bryant executed an Employee Confidential

25  Information and Inventions Agreement.[6]  There, he agreed that during his Mattel

26  

27     [5]  See Zeller Dec., Exh. 1 at ¶ 9, Exh. 2 at 29:16-18 & Exh. 3 at ¶ 7.
         [6]  Id., ¶ 2 and Exh. 1.

28                           Exhibit 5 ,
                               P. 136

1  employment he would not, without Mattel's express written consent, "engage in any
2  employment or business other than for [Mattel], or invest in or assist (in any manner)
3  any business competitive with the business or future business plans of [Mattel]."
4  Bryant also assigned to Mattel all rights in "inventions," including "designs," that he
5  created during his Mattel employment.  He also promised not to disclose or misuse
6  Mattel's proprietary or confidential information, an obligation that continues today.

7          Despite this, during his employment with Mattel, Bryant entered into a
8  contract with MGA, a Mattel competitor.[7]  That contract purported to grant MGA
9  ownership of works made by Bryant, both before and after the agreement's effective
10 date, in contravention of his obligations to Mattel.  It also required Bryant to provide
11 design services to MGA on a "top priority" basis, in further conflict with his then-
12 existing duties to Mattel.

13         The timing of Bryant's actions are important to many of Mattel's claims.
14 Among other things,  Bryant's drawings and other works that were created during his
15 Mattel employment are owned by Mattel and thus their dates of creation are highly
16 relevant.  Indeed, Bryant and MGA have put timing at issue by claiming that Bryant
17 created most or all of his drawings, and performed other relevant work, either during
18 the few months in 1998 when he was not working for Mattel, or else after the time he
19 had left Mattel.[8]  Bryant worked on at least two projects with MGA while he was
20 employed by Mattel.  One was the "Bratz" project.[9]  The other was an ostensibly
21 separate project known as "Angel."[10]

22         ***Bryant Agrees, But Then Refuses, To Make Originals Available.*** Much
23 of the documentary evidence produced by Bryant consists of undated design drawings,

24

25   [7]  Id., ¶ 3 and Exh. 3.
26   [8]  E.g., id., ¶ 4 and Exhs. 3 at ¶ 24 and Exh. 4 at 45:7-14, 139:23-141:8.
27   [9]  Id., Exh. 4 at 178:3-22.
     [10] Id., Exh. 4 at 178:3-18, 195:21-196:20.
28                                                      Exhibit 5  ,
                                                        P. 137

07209/2158174.1

MATTEL'S MOTION TO COMPEL ORIGINALS FOR EXPERT EXAMINATION AND TESTING

1  which Bryant produced to Mattel as black and white photocopies.[11]   Moreover,
2  information that one would naturally expect—such as complete fax headers, date and
3  time stamps and fax cover pages—are missing from the production.[12]

4         Thus, Mattel began asking Bryant to make his originals available for
5  inspection and photographing at least as early as October 25, 2004.[13]  Bryant responded
6  that Mattel could have the inspection on November 1, 2004.[14]  Mattel asked Bryant to
7  confirm that the inspection would include all the non-privileged responsive documents
8  in Bryant's possession or control and certain tangible items it had requested.[15]  Bryant,
9  however, only permitted Mattel to inspect a few tangible items and not the originals of
10  the drawings or other documents that Bryant had produced. [16]

11         Mattel again asked that the originals of Bryant's Bratz drawings and other
12  documents be made available for inspection during Bryant's November 2004
13  deposition—which took place only after two Court Orders compelling his attendance
14  and only after Bryant's counsel had broken their "word as attorneys" that he would
15  earlier appear.[17]  Although Bryant's counsel indicated that the originals would be sent
16  to Missouri for the deposition,[18] Bryant made only a few original drawings available.[19]
17  At the deposition, Bryant's counsel represented that Bryant's original documents and
18  drawings would "certainly" be made "available for inspection at a reasonable time upon
19  reasonable notice."[20]

20

21  _____
    [11]  Id., ¶ 6 and Exh. 5.
22  [12]  Id., ¶ 7 and Exh. 7.
    [13]  Zeller Dec., Exh. 9.
23  [14]  Id., Exh. 10.
24  [15]  Id., Exh. 11.
    [16]  Id., ¶ 11.
25  [17]  Zeller Dec., Exh. 12.
26  [18]  Id., Exh. 13.
    [19]  Id., ¶ 14.
27  [20]  Id., ¶ 14 and Exh. 4 at 616:17-18.

28

Exhibit  5  ,
P. 138

                    MATTEL'S MOTION TO COMPEL ORIGINALS FOR EXPERT EXAMINATION AND TESTING

1     *Mattel's Motion To Compel And The Parties' Resulting On-The-Record*

2 *June 20, 2006 Stipulation Before Judge Block.* After the deposition, and after

3 multiple additional requests from Mattel, Bryant's counsel agreed, again, to make all

4 original documents available for inspection and photographing beginning on

5 December 22, 2004.[21] Mattel's counsel, with a videographer and photographer, was

6 permitted to inspect 462 pages of the originals on December 22 and on December 23,

7 2004.[22] But Bryant's counsel did not turn over a single original Bratz drawing or

8 sketch[23] and, indeed, did not turn over the majority of the originals of the 1,588

9 documents that had been produced as of that time.[24] Bryant's counsel then claimed not

10 to be able to turn over or even locate many of the originals,[25] and repeatedly promised

11 that all original documents would be made available for inspection "when found."[26]

12     For another month, Mattel requested inspection of the remaining original

13 documents,[27] but despite Bryant's earlier promises, and more than three months after

14 Mattel began asking for the inspection, Bryant still had failed to turn over for inspection

15 and photographing the majority of the originals in his production.[28] He also had failed

16 to allow the inspection and photographing of any of the originals of Bratz drawings in

17 his production.[29] The only "originals" of Bratz drawings that Mattel had been allowed

18 to inspect and photograph were, in fact, photocopies.[30]

19

---

20   [21]  Zeller Dec., ¶ 17.

21   [22]  McKenzie Dec., ¶¶ 2-3 & Exh. 1..
  [23]  McKenzie Dec., ¶¶ 2-4 & Exh. 1.

22   [24]  Id. A complete listing of the original Bratz drawings, sketches and other

23 documents that Bryant's counsel could not account for in any way, even as to their
whereabouts, are detailed in Exhibit 1 to the McKenzie Dec.

24   [25]  McKenzie Dec., ¶¶ 3-4 & Exh. 1.

25   [26]  McKenzie Dec., ¶ 3.
  [27]  Zeller Dec., Exh. 14.

26   [28]  Id., ¶ 19.

27   [29]  McKenzie Dec., ¶ 3 & Exh. 1.
  [30]  Id.

28                               Exhibit 5 ,
                              P. 139

1        On February 18, 2005, Mattel therefore filed a motion to compel Bryant to

2  produce his originals for inspection and photographing.[31] Before the motion was heard,

3  however, the case was stayed for approximately a year while the Ninth Circuit

4  considered an interlocutory jurisdictional appeal. After the jurisdictional appeal was

5  resolved and the parties' various cases were consolidated, Judge Block ordered the

6  parties to appear in his courtroom on June 20, 2006 to further meet and confer on then-

7  pending discovery motions which included Mattel's motion to compel Bryant to

8  produce his originals.[32] After so meeting and conferring, the parties stated on the

9  record before Judge Block on June 20, 2006 their agreement that Bryant would produce

10  for inspection and photographing originals requested by Mattel (or any other party) on

11  15 days' notice.[33]

12        ***Mattel Again Seeks, And Bryant Refuses, Production Of Originals***

13  ***Pursuant To The June 20, 2006 On-The-Record Stipulation.*** Pursuant to the

14  stipulation, Mattel requested in writing on June 21, 2006 that certain originals be made

15  available by Bryant.[34] But again Bryant's counsel only made some, but not all, of the

16  requested originals available.[35] Bryant then ignored two further written requests, dated

17  August 8, 2006[36] and August 21, 2006,[37] that Bryant make his missing originals

18  available for inspection and photographing.[38]

19        Eventually, after Mattel's numerous attempts to confer on the issue and

20  after Mattel made clear it was filing another motion to obtain the originals, Bryant

21

22  [31] Zeller Dec., Exh. 15.

23  [32] Zeller Dec. ¶ 17.
     [33] Id.; see also McKenzie Dec., ¶ 3.

24  [34] McKenzie Dec., Exh. 2.
     [35] Only 267 originals were made available to Mattel at the July 21, 2006

25  inspection. McKenzie Dec. at ¶ 8.

26  [36] Id., Exh. 3.
     [37] Id., Exh. 4.

27  [38] Zeller Dec. ¶ 19.

Exhibit  5 ,
P. 146

1  claimed that Mattel was not entitled to see all of the original documents, including all
2  the original pages of a spiral notebook containing Bratz drawings.[39]  Bryant also
3  demanded that Mattel agree to conditions which were not part of the stipulation such as,
4  most notably, that Mattel surrender to him its work product photographs, before he
5  would provide his originals for inspection and photographing.[40]

6          ***The Court Orders Bryant To Allow The Inspection and Photographing***
7  ***of All His Originals By February 28, 2007, But Even By Late May, Bryant Fails To***
8  ***Comply.***  On January 23, 2007, Mattel filed its Motion To Enforce Stipulation And
9  Compel Bryant To Make Original Documents Available.[41]

10          On February 14, 2007, the Discovery Master granted the motion and
11  ordered that Carter Bryant make all original documents and three-dimensional items
12  requested by Mattel available for inspection and photographing by February 28, 2007.[42]
13  On February 27 and 28, 2007, Bryant allowed Mattel to inspect some, but not all, of the
14  remaining original documents that Bryant had refused to previously produce for
15  inspection.

16          Meanwhile, on January 25, 2007, the Discovery Master also compelled
17  Bryant to produce key documents relating to the origins of Bratz that Bryant had
18  improperly withheld from production.  Bryant produced approximately 16,800 more
19  documents in March and April of 2007.[43]  While Mattel was reviewing these, it

20  _____

21  [39]  Zeller Dec., ¶ 18 and Exhs. 16 & 17.
   [40]  Declaration of B. Dylan Proctor In Support of Mattel, Inc.'s Motion to
22  Enforce Stipulation and Compel Bryant to Make Original Documents Available and
   For Sanctions, dated January 19, 2007 and lodged concurrently herewith ("Proctor
23  Dec."), ¶ 2.
24  [41]  Declaration of Diane C. Hutnyan In Support of Mattel, Inc.'s Motion To
   Compel Bryant To Make Original Documents Available For Expert Examination
25  And Testing And For Sanctions, dated July 6, 2007 and filed concurrently herewith
26  ("Hutnyan Dec."), Exh. 1
   [42]  Hutnyan Dec., Exh. 2 at 4.
27  [43]  Hutnyan Dec., ¶ 3.

                              Exhibit ___5___ ,
28                                P.__141__

                                    -8-

1 requested again that Bryant make available for inspection key original documents
2 Bryant had never allowed Mattel to inspect and photograph:  (1) a sketch book of
3 original Carter Bryant drawings; (2) two original Bratz drawings purportedly notarized
4 by Jacqueline Prince; and (3) the notary book of Jacqueline Prince relating to those
5 Bratz drawings.[44]  After simply ignoring two letters, and in response to the third,
6 Bryant's counsel said these items would be made available but at some later,
7 unspecified time.[45]  Mattel's counsel requested again that Bryant comply with the Order
8 compelling inspection[46] and finally, the inspection was set to take place beginning on
9 May 31, 2007.[47]  Bryant's counsel then stated that they in fact intended to provide
10 "access to all originals of drawings and other documents produced by Bryant" on May
11 31.[48]

12        Although the inspection and photographing took place and even continued
13 the following morning, Bryant still did not make available many documents, notably
14 including the two purportedly notarized drawings and the sketch book Mattel had
15 specifically requested to inspect that day.[49]  Only after the inspection, when Mattel
16 threatened to bring yet another a motion to compel their inspection, did Bryant's
17 counsel finally claim that the notarized drawings and sketch book were no longer in
18 existence.[50]

19        ***Bryant Refuses To Allow Mattel's Experts' Examination and Analysis of***
20 ***His Originals.***  Bryant belatedly made further originals available for inspection and
21 photographing on June 20 and 21, after which Mattel requested that Bryant make a

22

23 [44] Hutnyan Dec., Exhs. 3, 4 and 5.
    [45] Hutnyan Dec., Exh. 6.
24 [46] Hutnyan Dec., Exh. 7.
25 [47] Hutnyan Dec., Exh. 8.
    [48] Hutnyan Dec., Exh. 9; see also Hutnyan Dec., Exh. 8.
26 [49] Hutnyan Dec., Exh. 10.
    [50] Hutnyan Dec., Exhs. 11 and 12.
27

28                           Exhibit  5  ,
                              P. 142

1  subset of the originals available to Mattel's experts for expert examination, testing and
2  analysis, and proposed a specific protocol for doing so.[51]  The protocol contemplated
3  examination and non-destructive testing of Bryant's documents, as well as a special
4  procedure for any destructive testing that might be recommended, whereby Bryant
5  would be given reasonable notice as to the items being tested and the testing being done
6  and would have the option of either objecting (at which point the matter would be
7  resolved by the Court), or of having his expert(s) attend and observe the testing.[52]

8          The parties met and conferred about the proposed protocol,[53] but Bryant's
9  counsel would only allow Mattel's experts to examine the originals if the originals to be
10  examined and tested were limited to a small number of documents--drawings only--that
11  had to be identified and cleared by Bryant's counsel in advance; if Mattel's experts were
12  identified to Bryant's counsel in advance; if the originals stayed in the "custody and
13  control" of Mattel's law firm at all times and thus could not be examined at the experts'
14  laboratories; and if Mattel would agree to share the time it had requested for its own
15  experts' examination with Bryant, even though Bryant has had unfettered, unilateral
16  access to his own originals for years.[54]  Bryant did not, however, communicate any
17  objection as to the contemplated procedure for destructive testing.[55]  Mattel attempted
18  to resolve the supposed issues in further correspondence,[56] but to no avail.[57]  Mattel

19
20
21

22    [51]  Hutnyan Dec., Exh. 13.
      [52]  Id.
23    [53]  The meet and confer session in which the protocol was first discussed was on
24  June 22, and was followed by a June 26 correspondence outlining the protocol.
    Hutnyan Dec., ¶ 13, and Exh. 13.
25    [54]  Hutnyan Dec., Exh. 14.
26    [55]  Hutnyan Dec., Exh. 14.
      [56]  Hutnyan Dec., Exh. 15.
27    [57]  Hutnyan Dec., Exh. 16.              **Exhibit  5  ,**
28                                              **P. 143**

07209/2158174.1                                -10-

1  also invited MGA's counsel to comment on or object to the proposed protocol, but

2  MGA never responded.[58]

3  **Argument**

4  I.  **MATTEL IS ENTITLED TO HAVE ITS EXPERTS EXAMINE,**

5  **ANALYZE AND TEST THE ORIGINAL DOCUMENTS UNDER THE**

6  **FEDERAL RULES**

7  Rule 34 permits Mattel, *or someone acting on its behalf,* to "inspect, copy,

8  *test,* or sample any designated documents . . . including writings, drawings, graphs,

9  charts, photographs, . . . [and] images. . . . or to inspect, copy, *test,* or sample any

10  designated tangible things which constitute or contain matters within the scope of Rule

11  26(b) and which are in the possession, custody or control of the party upon whom the

12  request is served. . . ." Fed. R. Civ. P. 34(a) (emphasis added). This language means

13  what it says. As the Advisory Committee Notes to the 2006 amendment state:

14  Rule 34(a)(1) is also amended to make clear that parties may request an

15  opportunity to test or sample materials sought under the rule in addition to

16  inspecting and copying them. That opportunity may be important for both

17  electronically stored information and hard-copy materials. The current

18  rule is not clear that such testing or sampling is authorized; *the*

19  *amendment expressly permits it.*

20  Fed. R. Civ. P. 34, Advisory Committee Notes, 2006 Amendment (emphasis added).

21  Rule 34 confers a right to test Bryant's originals specifically, as they are

22  "things which constitute or contain matters within the scope of Rule 26(b)." See also

23  In re Kolinsky, 140 B.R. 79, 87 (S.D.N.Y. 1992) (holding that parties "have a right to

24  inspect the originals"); Gielow v. Warner Bros. Pictures, 26 F. Supp. 425 (S.D.N.Y.

25  1938) (holding originals were "evidence material to any matter involved" within Rule

26  34). This is because originals can reveal significant information not obtainable from

27  [58]  Hutnyan Dec., Exh. 13.          **Exhibit** 5 ,

28  P. 144

1   copies. As McCormick has stated, "[i]t has long been observed that the opportunity to
2   inspect original writings may be of substantial importance in the detection of fraud,"
3   and "[m]any indicia of putative fraud such as watermarks, types of paper and inks, etc.,
4   will not be discernable on the copy." McCormick, Evidence §§ 231, 236 (4th ed.
5   1992). Indeed, the policies seeking to prevent inaccuracy and fraud with respect to
6   documents are what animate Federal Rule of Evidence 1002, which independently
7   requires production of originals. "[W]ritings exhibit a fineness of detail . . . which will
8   often be of critical importance. Prevention of loss of this fine detail through
9   mistransmission is a basic objective of the rule requiring production of documentary
10  originals." McCormick, supra, § 232; see also United States v. Yamin, 868 F.2d 130,
11  134 (5th Cir. 1989) (explaining purpose of rule requiring production of originals is "to
12  prevent inaccuracy and fraud when attempting to prove the contents of a writing.").

13            Allowing Mattel's experts equal access to the information shown by the
14  originals is particularly important in this case. This case involves numerous drawings
15  that were created using different kinds and colors of pencils, inks and markers.[59] They
16  also have what appears to be different handwriting from different sources made at
17  different times on them.[60] Two different third-party witnesses, Jacqueline Prince and
18  Steve Linker, also have testified that certain, highly material dates and annotations on
19  the copies of Bryant drawings as produced to Mattel by defendants here did **not** in fact
20  appear on the original drawings that defendants had previously shown them.[61] The
21  timing of the creation of these documents and of the various additional matter on them
22  can be critical in this case, and Mattel has a right to evidence that may shed light on
23  this.

24

25  _____
    [59]  E.g., Zeller Dec., ¶ 6.
26  [60]  Id.
    [61]  Zeller Dec., Exhs. 20 (at 171:25, 172-175:1-23) & 21 (at 131:22-24, 132-
27  138:1-12).

28                                          Exhibit  5  ,
                                            P. 145

1         The chemical composition of certain types of inks and papers, the

2 handwriting or printed characters, and details such as watermarks and other impressions

3 ascertainable from analysis of the originals may bear on when a document was created

4 and on when the various writings on them were made.[62]  Such information is relevant in

5 this case because it may either confirm or contradict Bryant's testimony about when he

6 was doing the work on Bratz and/or Angel that he says he did.  Information about the

7 paper used, about watermarks or impressions found on the documents, and about any

8 inks or printing or chemicals on the documents cannot be fully examined without the

9 use of microscopes, magnifiers, light sources, scanners with special filters, measuring

10 instruments and other special instruments and techniques in a laboratory.  As Bryant

11 knows, without expert examination and analysis of the original materials, it will be

12 much more difficult, if not impossible, for Mattel's experts to thoroughly assess claims

13 that the drawings and their claimed dates of creation are authentic.

14         Mattel is also entitled to information accessible through expert analysis

15 about which originals have been altered and how.  As noted, witnesses have testified

16 that key aspects of drawings, such as dates, that Bryant purports to rely on were added

17 only later.  And, as the testimony of a former MGA executive revealed, there has been

18 an alteration of originals by defendants in this case.  Victoria O'Connor was an MGA

19 executive who worked for MGA when Bryant and MGA signed what they claim is their

20 first Bratz-related agreement (the "Bryant/MGA Contract").[63]  According to Ms.

21 O'Connor, Bryant faxed a signed copy of the Bryant/MGA Contract to MGA from

22

23      [62]   See, e.g., Equal Employment Opportunity Commission v. Ethan Allen, Inc.,

24 259 F. Supp. 2d 625, 626 n.1 (N.D. Ohio 2003) ("Sometimes, the determination of

25 the type of ink used can, by itself, prove conclusively that the claimed date of
writing is false.  For example, a given ink may:  (1) have been manufactured only

26 during certain years;  and/or (2) contain 'tags,' which are chemical components
added to the ink for the precise purpose of providing a date of manufacture.").

27      [63]   Zeller Dec., Exh. 8 (at 13:2-9).

28                              **Exhibit** 5 ,
                                   **P.** 146

MATTEL'S MOTION TO COMPEL ORIGINALS FOR EXPERT EXAMINATION AND TESTING

Mattel.[64]   Upon receipt, each page of the contract included a fax header that read "Barbie Collectibles" (which is the Mattel design group that Bryant worked in) and bore the number of the Mattel fax machine that it came from, revealing that it came from Mattel's Design Center where Bryant worked.[65]   When Ms. O'Connor brought this to the attention of her boss--Isaac Larian, MGA's CEO and founder--Mr. Larian instructed her to "white out" the fax header information on all pages of the contract and send the contract, as altered, to an outside MGA attorney.[66]   At Mr. Larian's direction, Ms. O'Connor proceeded to alter each page of the contract in order to conceal, as Ms. O'Connor testified, that Bryant "was still employed at Mattel at the time the contract [between MGA and Bryant] was executed."[67]

As the District Court has noted, other documents in this case bear indicia of having been altered from their original state.  For example, Bryant had produced a fax of Bratz drawings with a fax header date of April 10, 2000[68]--a time during which Bryant was working for Mattel and during which Bryant claims he was not working on Bratz.  Although the fax header information on the page produced by Bryant states that it was the third page of a fax transmission, neither the preceding nor subsequent pages, nor any cover sheet, has been produced.[69]  Further, even though the fax header on the produced page has fields for both the sender's name and the sender's telephone number, neither the name of the sender nor the sender's telephone number appears in the fax header.[70]  That information is simply missing.  Because facsimile machines normally insert senders' names and numbers as a matter of course, and indeed is required by

---

[64]   Zeller Dec., Exh. 8 (at 18:13-14).
[65]   Zeller Dec., Exh. 8 (at 18:13-16).
[66]   Zeller Dec., Exh. 8 (at 18:13-18).
[67]   Zeller Dec., Exh. 8 (at 19:1-4, 20:8-21:18).
[68]   Zeller Dec., Exh. 7.
[69]   Zeller Dec., Exh. 6.
[70]   Zeller Dec. ¶ 7 and Exhs. 6 & 7.

Exhibit S,
P. 147

law,[71] there is reason to believe that the document was altered to conceal the sender's information. As Judge Larson has put, "the testimony elicited from Ms. O'Connor that MGA altered the fax header from other documents related to Bratz from the same time period leads to an obvious inference that other documents where spaces on other fax headers are absent suffered a similar fate."[72]

Finally, as both Judge Infante and Judge Larson have now ruled,[73] Mattel has a right to discovery as to matters relating to the destructive sampling and testing of key Bratz design drawings that defendants conducted without the Court's or Mattel's permission. MGA's potential spoliation of evidence is a very real issue in this case: *"That there are serious questions concerning the handling of these critical documents certainly causes the Court much concern about whether the truth seeking functions of the adversarial system have been fundamentally compromised in this case."[74]* Mattel certainly has a right to have its own document experts examine the documents that were subjected to unauthorized destructive sampling by defendants, to determine (1) the nature and extent of the sampling and testing, (2) whether and what evidence was destroyed as a result of the sampling and testing, and (3) whatever information can still be gained from examination of those documents. In opposing a motion by Mattel for the appointment of a neutral document examination expert, MGA and Bryant argued that their expert's secret activities did not prevent Mattel's experts from being able to do

---

[71] See 47 U.S.C. § 227(d)(1)(B) ("It shall be unlawful for any person within the United States . . . to use a computer or other electronic device to send any message via a telephone facsimile machine unless such person clearly marks, in a margin at the top or bottom of each transmitted page of the message or on the first page of the transmission, the date and time it is sent and an identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of such business, other entity, or individual.").

[72] Zeller Dec., Exh. 19 at 9:6-9.

[73] Hutnyan Dec., Exhs. 17 and 18.

[74] Zeller Dec., Exh. 19.

Exhibit 5 ,
P. 148

1   their own testing on the documents;[75] nevertheless, Bryant now seeks to prevent
2   precisely that.

3   **II.     BRYANT HAS NO LEGITIMATE JUSTIFICATION FOR REFUSING**
4          **EXAMINATION, ANALYSIS AND TESTING**

5          This motion is just the latest in a long series of efforts by Bryant to prevent
6   anyone from scrutinizing the original documents he claims help establish a timeline in
7   which he conceived of Bratz.  For literally *years,* and in violation of an on-the-record
8   stipulation and then a Court Order, Bryant has fought at every step to prevent and delay
9   Mattel from being able to inspect or photograph the original drawings and other
10  documents, hoping he could continue to conceal matters from Mattel beyond the
11  meager information conveyed in black and white photocopies. He fought appointment
12  of neutral expert witnesses that could examine and test the documents. Now, although
13  he has conceded that Mattel has the right to have its experts examine and test the
14  originals, he hopes to prevent or severely limit that process by imposing untenable
15  conditions before the originals can be analyzed.

16         Bryant has presented no justification for these conditions; indeed, there is
17  no justification, as we show in the subsection below.

18         **A.     Non-Destructive Testing**

19         Bryant's counsel says he will allow expert examination and analysis of any
20  documents, provided that his counsel can take over and control Mattel's experts'
21  examination. Specifically, his counsel has stated that Mattel must:

22             "identify a *reasonable number* of *drawings* [it] would like to test
23             (on the order of *scores,* not thousands), propose a *schedule* less
24             one-sided, *identify the experts* to whom [Mattel] wish[es] to
25             submit the documents, and provide a protocol that assures

26

27   _____

[75]  Hutnyan Dec., Exh. 19.              Exhibit  5 ,
28                                         P. 149

1        [Bryant's counsel] that the drawings will be in the *custody and*

2        *control of [Mattel's law] firm throughout* . . . ."[76]

3    Other than arguing that Mattel's proposal was "unreasonable," Bryant has provided no

4    legal or factual justification for these demands.[77]

5        That is because there is no justification.   Here, Mattel contemplates, in

6    part, the non-destructive examination, analysis and testing of Bryant's materials, by

7    experts in document examination at their laboratories, and has identified a reasonably

8    specific subset of Bryant's originals, both drawings and other documents, for that

9    purpose.[78]   And, absent exceptional circumstances, Mattel has the right to do that as

10   part of its trial preparation without the knowledge or approval of the opposing party.

11   As Bryant put it while trying to keep a Court-appointed neutral document examination

12   expert from seeing the originals, parties typically "hire their own independent expert

13   witnesses--including for the testing of ink and paper, where appropriate--and perform

14   the tests they want to perform, using the experts of their choice."[79]

15       It is well established under the <u>Federal Rules</u> that parties are entitled to

16   conduct their own trial preparation activities without the interference, supervision or

17   knowledge of opposing counsel or their opposing party. <u>Hickman v. Taylor</u>, 329 U.S.

18   495, 511 (1947).  This general rule is just as applicable to non-destructive forensic

19   document examination as it is for other types of inspection, examination and testing.

20   One District Court recently confronted a similar issue where a party would not allow

21   non-destructive forensic examination and testing of documents unless the party's

22   counsel or expert were present at all times.  The Court found:

23

24     [76]  Hutnyan Dec., Exh. 14.

25     [77]  Hutnyan Dec., 14 and 16.
  [78]  Hutnyan Dec., Exh. 13 (of the more than fifteen boxes of Bryant's originals,

26   Mattel specifically requested eight boxes and several specific folders from other
boxes to be sent for examination and testing).

27     [79]  Hutnyan Dec., Exh. 19 at 1.

28                           **Exhibit 5 ,**
                            **P. 150**

-17-

1   ... plaintiff's proposed conditions to be unreasonable. In general,

2   each party should be free to engage in its own trial preparation

3   unhampered by the intrusive supervision of the opposing party.

4   In cases such as this, where purely nondestructive testing is

5   proposed, the court generally allows the examiner to perform his

6   or her work without being scrutinized by the opposing expert. ...

7   In the absence of [special] circumstances [such as destructive

8   testing], the balance of hardships usually tips in favor of allowing

9   the examiner to work in peace.

10   Diepenhorst v. City of Battle Creek, 2006 WL 1851243, at *1 (W.D. Mich. 2007).

11   Here Bryant seeks to go much further, controlling the type and number of documents

12   Mattel's experts can even look at, and even purporting to limit their examination

13   capabilities substantially by not allowing them to examine the documents in the

14   laboratory.

15   Mattel's trial preparation, including the names of its undesignated experts

16   and the type and number of documents it seeks to examine, is its work product and

17   Bryant is not entitled to know it, much less to dictate it. "Parties should be encouraged

18   to consult experts to formulate their own cases, to discard those experts for any reason,

19   and to place them beyond the reach of an opposing party, if they have never indicated

20   an intention to use the expert at trial."   House v. Combined Ins. Co. of Amer., 168

21   F.R.D. 236, 245 (N.D. Iowa 1996). Absent "extraordinary circumstances," information

22   as to the identity of the non-testifying expert and his work falls solidly under work

23   product doctrine and is privileged from disclosure. Bryant has not and cannot show

24   that any such extraordinary circumstances exist with respect to Mattel's consulting

25   experts. Indeed, MGA has itself vehemently, and repeatedly, argued this point--

26   although quite inappropriately with respect to the "expert" who secretly took Bryant's

27   documents and *destructively* tested them without the approval or knowledge of Mattel

28   or of the Court, in the process altering the documents forever and later testified about it

1  in a declaration--that undesignated experts' identities and their work product are not
2  discoverable. See In re Pizza Time Theatre Securities Litigation, 113 F.R.D. 94, 97-98
3  (N.D. Cal. 1986).[80]

4        Mattel has made no determination as to which experts it might designate as
5  testifying experts in this litigation, and will make such disclosures and submit expert
6  reports on the schedule set by this Court and the Federal Rules of Civil Procedure.
7  Until then, Bryant is simply not entitled to the information.

8        As to timing:  Because Mattel contemplates examination, analysis and
9  testing by multiple experts at their laboratories which are in various locations
10 throughout the country, because some of their examinations may build on prior experts'
11 findings, and because it wants to keep the documents together and in their current order
12 for each of the experts and for the entire time they are in Mattel's counsel's control, it
13 requested two months' access to the documents for the primary examinations, and then
14 another one-week period of examination so as to prepare rebuttal reports, with the
15 access scheduled a week apart to allow Bryant's own experts equal access to the
16 documents to prepare their rebuttal reports.

17       Bryant complains that this schedule is "one-sided," but he fails to count the
18 three-plus years of this case that he has had unfettered access to the originals--and he
19 ignored that his expert already did testing on them.  Further, Bryant cannot be heard to
20 complain about Mattel's proposed schedule as to inspection of these materials when he
21 has wasted *years* fighting tooth and nail to prevent inspection and photographing of the
22 originals, even defying an on-the-record stipulation and the Court Order in the process.
23 May 31, 2007 was the very first time Mattel was actually allowed to see most of the
24 originals, and it wasn't until early June that Bryant's counsel finally admitted that some

25

26    [80]  See also Hutnyan Dec., Exh. 20, at 9 (arguing that "MGA and Bryant were
27 *forced* to explain in general terms the testing procedure they had used") (emphasis
   added); Hutnyan Dec., Exh. 21, at 28 (same).
28

Exhibit 5,
P. 152

1  of the documents Mattel had been trying to inspect did not exist.[81]  Had Bryant turned

2  over his originals for inspection and photographing when they were first requested, or

3  after the June 2006 stipulation--or even by the Court's February 28, 2007 deadline, the

4  parties would not be up against the expert discovery deadline, but that was Bryant's

5  choice, and Mattel should not suffer any further prejudice as a result of it.

6      **B.    Destructive Testing**

7          The term "destructive" testing means any testing that would alter the

8  documents' inherent physical status.  One example of this is taking plugs from the

9  document, as MGA's and Bryant's "expert" did; another would be treating a document

10 with chemicals.[82]

11         As set forth above, the <u>Federal Rules</u> "expressly permit" forensic testing of

12 hard-copy materials.  Advisory Committee's Notes, 2006 Amendment.  They further

13 contemplate that any "issues of burden and intrusiveness raised by requests to test or

14 sample can be addressed under Rules 26(b)(2) and 26(c)." <u>Id.</u> "The district court thus

15 retains discretion to impose reasonable conditions surrounding a request to test tangible

16 objects, especially to protect against damage by destructive testing." <u>Diepenhorst,</u>

17 2006 WL 1851243, at *1; <u>see</u> also <u>Dabney v. Montgomery Ward & Co., Inc.</u>, 761 F.2d

18 494, 498 (8th Cir. 1985) (same).

19         One or more experts might recommend that a form or forms of destructive

20 testing be done on one or more of Bryant's originals.  In its suggested protocol, Mattel

21 proposed that in the event of such a recommendation, the following procedure would be

22 used:

23

24 _____

25 [81]  Hutnyan Dec., Exhs. 11 and 12.
   [82]  "Non-destructive testing" methods, in contrast, would include examining the
26 documents using microscopes, magnifiers, light sources, scanners with special filters
27 and measuring instruments in ways that do not alter the documents.

28                                    **Exhibit** 5 ,
                                      **P.** 153

MATTEL'S MOTION TO COMPEL ORIGINALS FOR EXPERT EXAMINATION AND TESTING

1    First, Mattel will send a request in writing to Bryant explaining

2    what would be tested and what test or tests would be conducted.

3    Then Bryant will have 5 court days to object, in which case the

4    parties must meet and confer and within 3 more court days, file a

5    joint statement with Judge Infante to seek resolution of the

6    dispute. In lieu of objection, Bryant could elect to have his own

7    expert attend for any destructive testing being done, so long as he

8    makes this election in writing to Mattel within the 5-court-day

9    objection period, and so long as the testing can take place within

10    ten court days of the original request. If Bryant's expert raises any

11    issues about the testing being done, the parties agree to go

12    immediately to Judge Infante to resolve the dispute so that the

13    testing will not be delayed. If Bryant's counsel does not object or

14    seek attendance by its expert within five days of the request, the

15    proposed destructive testing will be deemed as unobjectionable

16    and will be carried out without further delay.

17    Bryant registered no objection to this portion of the protocol, perhaps

18 recognizing that the courts frequently authorize destructive testing where the party

19 seeking to do such testing notifies the opposing party in advance, so that its

20 representative may be present to observe such testing. See, e.g., Paul Morelli Design,

21 Inc. v. Merit Diamond Corp., 2000 WL 1340464, at *1 (E.D. Pa. 2000) (plaintiff shall

22 not engage in destructive testing without first giving advance notice to defendant which

23 shall be entitled to have a representative and expert present to observe such testing);

24 Sedrati v. Allstate Life Insurance Co., 185 F.R.D. 388, 391-394 (M.D. Ga. 1998)

25 (prohibiting introduction of testing evidence where plaintiff's counsel was not properly

26 notified of the date, place, and time of the proposed destructive testing, and defendant

27 failed to create a "pictorial history" memorializing the testing); Diepenhorst, 2006 WL

28 1851243, at *1 ("when a party proposes destructive testing, or there is controversy

Exhibit 5 ,

P. 154

1  concerning the nature of the test, it sometimes becomes necessary to force the experts

2  to collaborate"); 23 Am. Jur. 2d Depositions and Discovery § 166 (". . . Destructive

3  testing may be permitted in the court's discretion, [] if the rights of opposing litigants

4  are protected, such as by assuring that the object is not totally consumed[] or by giving

5  the parties adequate opportunity to photograph and inspect the object before destructive

6  testing and an opportunity to view the tests with their experts or representatives.[]

7  Protective arrangements are necessary if the test would so alter the exhibit that it would

8  be difficult for the [other party] to present his or her claim") (citations omitted).

9          Accordingly, Bryant should be compelled to immediately make his

10  originals available to Mattel for non-destructive testing, and for potential destructive

11  testing pursuant to the terms and procedure proposed by Mattel above. Mattel requires

12  at least two months for examination and testing for its initial expert reports, and at least

13  one week for examination and testing to prepare any rebuttal reports.

14  **III.   THE DISCOVERY MASTER SHOULD SANCTION BRYANT.**

15          Rule 37(a)(4) of the Federal Rules of Civil Procedure provides that a party

16  bringing a motion to compel is entitled to the "reasonable expenses incurred in making

17  the motion, including attorney's fees, unless the court finds that the motion was filed

18  without the movant's first making a good faith effort to obtain the disclosure or

19  discovery without court action, or that the opposing party's nondisclosure, response or

20  objection was substantially justified, or that other circumstances make an award of

21  expenses unjust." Fed. R. Civ. P. 37(a)(4). The burden of establishing substantial

22  justification is on the party being sanctioned. Hyde & Drath v. Baker, 24 F.3d 1162,

23  1171 (9th Cir. 1994). Independently, sanctions may be imposed under 28 U.S.C.

24  § 1927, which provides that "[a]ny attorney . . . who so multiplies the proceedings in

25  any case unreasonably and vexatiously may be required by the court to satisfy

26  personally the excess costs, expenses, and attorneys' fees reasonably incurred because

27  of such conduct." Sanctions under this section are appropriate "for conduct that,

28  viewed objectively, manifests either intentional or reckless disregard of the attorney's

Exhibit __5__,

P. _155_

1  duties to the court." RTC v. Dabney, 73 F.3d 262, 265 (10th Cir. 1995) (citing

2  Braley v. Campbell, 832 F.2d 1504, 1512 (10th Cir. 1987)).

3         There is no legitimate excuse for the restrictions Bryant has attempted to

4  impose on Mattel's experts' examination and testing.  Bryant has no say over what

5  Mattel's experts examine, or how they do it, as long as the testing is non-destructive and

6  he has an opportunity for his own experts to conduct testing.  As to destructive testing,

7  Mattel agrees to provide notice and opportunity to object or participate, which is not

8  only consistent with existing authority on the subject, but goes far beyond what Bryant

9  accepted from MGA, which was to turn over his originals to defendants' expert who

10 then admittedly conducted destructive testing on them without the Court's permission or

11 even any notice.  As Bryant has conceded, Mattel has a right to have experts examine

12 and test his originals, and his attempts to control and severely limit the examinations

13 are clearly improper.  That kind of bad faith and callous disregard of his discovery

14 obligations is sanctionable.  National Hockey League, Inc. v. Metropolitan Hockey

15 Club, Inc., 427 U.S. 639 (1976).

16        Mattel therefore requests that Bryant be ordered to pay $2,500 as partial

17 reimbursement for the fees and costs that Mattel has incurred on this motion.[83]

18

19                              **Conclusion**

20        For the foregoing reasons, Mattel respectfully requests that the Discovery

21 Master grant Mattel's motion in its entirety and order Bryant to immediately make his

22 originals available to Mattel for non-destructive examination and testing, and for

23 potential destructive testing pursuant to the terms and procedure proposed by Mattel

24

25

26

27 _____
   [83]  Zeller Dec., ¶ 35.                    **Exhibit** 5 ,
28                                             **P.** 156

07209/2158174.1                              -23-
                MATTEL'S MOTION TO COMPEL ORIGINALS FOR EXPERT EXAMINATION AND TESTING

1   above, and to pay sanctions for his bad-faith refusal to allow the examination and

2   testing.

3   DATED: July 6, 2007              QUINN EMANUEL URQUHART OLIVER &

4                              HEDGES, LLP

5

6                      By

7                          Diane C. Hutnyan
                         Attorneys for Plaintiff Mattel, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                 Exhibit __5__,

28                  P. __157__