1 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   John B. Quinn (Bar No. 90378)
2 |   (johnquinn@quinnemanuel.com)
   Michael T. Zeller (Bar No. 196417)
3 |   (michaelzeller@quinnemanuel.com)
   Jon D. Corey (Bar No. 185066)
4 |   (joncorey@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
5 | Los Angeles, California  90017-2543
   Telephone:  (213) 443-3000
6 | Facsimile:  (213) 443-3100

7 | Attorneys for Mattel, Inc.

8 | UNITED STATES DISTRICT COURT

9 | CENTRAL DISTRICT OF CALIFORNIA

10 | EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>             Plaintiff,<br><br>      vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>             Defendant.<br>_____<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 SGL (RNBx)<br>Consolidated with<br>Case Nos. CV 04-09059 & CV 05-2727<br><br>DECLARATION OF B. DYLAN PROCTOR IN SUPPORT OF MATTEL, INC.'S OPPOSITION TO MGA PARTIES' MOTION FOR PARTIAL JUDGMENT AS A MATTER OF LAW<br><br>**Phase 1:**<br>Trial Date:              May 27, 2008 |

### DECLARATION OF B. DYLAN PROCTOR

I, B. Dylan Proctor, declare as follows:

1.      I am a member of the bar of the State of California and a partner of Quinn Emanuel Urquhart Oliver & Hedges, LLP, attorneys for Mattel, Inc. ("Mattel").  I make this declaration in support of Mattel's Opposition to MGA Parties' Motion for Partial Judgment as a Matter of Law.  I make this declaration of personal, firsthand knowledge, and if called and sworn as a witness, I could and would testify competently thereto.

2.      Attached as Exhibit 1 is a true and correct copy of the Court's Order Granting in Part, Denying in Part, and Deferring in Part the Parties' Motions for Partial Summary Judgment, dated April 25, 2008.

3.      Attached as Exhibit 2 is a true and correct copy of relevant excerpts from the MGA Parties' Motion for Partial Summary Judgment, dated March 7, 2008.

4.      Attached as Exhibit 3 is a true and correct copy of the Court's Order Re Motion for Consideration, dated May 21, 2008.

5.      Attached as Exhibit 4 is a true and correct copy of relevant excerpts from MGA Parties' Revised Disputed [Proposed] Phase 1A Jury Instructions, dated July 3, 2008.

6.      Attached as Exhibit 5 is a true and correct copy of Trial Exhibit 25.

7.      Attached as Exhibit 6 is a true and correct copy of relevant excerpts from the Trial Transcript dated June 11, 2008, P.M. Session.

8.      Attached as Exhibit 7 is a true and correct copy of relevant excerpts from the Trial Transcript dated June 12, 2008, P.M. Session.

9.      Attached as Exhibit 8 is a true and correct copy of relevant excerpts from the Trial Transcript dated July 1, 2008, A.M. Session.

10.      Attached as Exhibit 9 is a true and correct copy of relevant excerpts from the Trial Transcript dated May 27, 2008, P.M. Session.

1    11.    Attached as Exhibit 10 is a true and correct copy of relevant excerpts
2  from the Trial Transcript dated May 28, 2008, P.M. Session.

3    12.    Attached as Exhibit 11 is a true and correct copy of relevant excerpts
4  from the Trial Transcript dated June 3, 2008, A.M. Session.

5    13.    Attached as Exhibit 12 is a true and correct copy of relevant excerpts
6  from the Trial Transcript dated June 5, 2008, P.M. Session.

7    14.    Attached as Exhibit 13 is a true and correct copy of Trial Exhibit 1117.

8    15.    Attached as Exhibit 14 is a true and correct copy of Trial Exhibit
9  13532.

10    16.    Attached as Exhibit 15 is a true and correct copy of Trial Exhibit
11  13620.

12    17.    Attached as Exhibit 16 is a true and correct copy of Trial Exhibit 1116.

13    18.    Attached as Exhibit 17 is a true and correct copy of Trial Exhibit 2201.

14    19.    Attached as Exhibit 18 is a true and correct copy of relevant excerpts
15  from the Trial Transcript dated June 4, 2008, A.M. Session.

16    20.    Attached as Exhibit 19 is a true and correct copy of Trial Exhibit 1.

17    21.    Attached as Exhibit 20 is a true and correct copy of Trial Exhibit 302.

18    22.    Attached as Exhibit 21 is a true and correct copy of Trial Exhibit 305.

19    23.    Attached as Exhibit 22 is a true and correct copy of relevant excerpts
20  from the Trial Transcript dated June 3, 2008, P.M. Session.

21        I declare under penalty of perjury under the laws of the United States of
22  America that the foregoing is true and correct.

23

24        Executed on July 7, 2008, at Riverside, California.

25                          /s/ B. Dylan Proctor

26                          _____
                            B. Dylan Proctor
27

28

DECLARATION OF B. DYLAN PROCTOR

# BLANK PAGE

PAGE 3

# EXHIBIT 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No.    CV 04-09049 SGL(RNBx)                    Date:  April 25, 2008
Title:      CARTER BRYANT -v- MATTEL, INC.

<u>Consolidated With Related Actions:</u>
CASE NO. CV 04-09059 SGL(RNBx):  MATTEL, INC., v. CARTER BRYANT,
CASE NO. CV 05-02727 SGL (RNBx): MGA ENTERTAINMENT, INC., v. MATTEL, INC.,
=======================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

        Jim Holmes
        Courtroom Deputy Clerk

<u>ATTORNEYS PRESENT FOR CARTER BRYANT:</u>    <u>ATTORNEYS PRESENT FOR MATTEL:</u>

None Present                     None Present

<u>ATTORNEYS PRESENT FOR MGA AND
ISAAC LARIAN:</u>

None Present

PROCEEDINGS:   ORDER GRANTING IN PART, DENYING IN PART, AND DEFERRING IN
               PART THE PARTIES' MOTIONS FOR PARTIAL SUMMARY JUDGMENT
               (IN CHAMBERS)

      This matter is before the Court on the parties' motions for partial summary judgment.  The
motions were heard on April 22, 2008, and the Court has set the motions for further hearing on
May 19, 2008, at 1:30 p.m.  As set forth below, the Court rules on a number of issues presented
by the motions for partial summary judgment and reserves ruling on other issues until after further
hearing on the motions for partial summary judgment and, in the case of MGA's affirmative
defenses, until after the Phase 1 trial.

      The parties have made hundreds of objections to evidence offered in support of and in
opposition to the motions for partial summary judgment.  Although counsel for Bryant requested

MINUTES FORM 90                             Initials of Deputy Clerk: jh
CIVIL -- GEN                  Page 1

EXHIBIT _1_
PAGE _4_

explicit rulings on the objections raised by Bryant, the Court declines to do so.  To the extent that this Order necessarily relies on evidence subject to any party's objections, the objections are implicitly overruled.

## PREEMPTION

MGA and Bryant seek summary judgment in their favor as to Mattel's claims for intentional interference with contractual relations, conversion, and unfair competition, arguing that these claims are preempted by the Copyright Act.  They are partially correct.

A state law is preempted by the Copyright Act where (1) the work at issue comes within the subject matter of copyright, and (2) the state law rights are "equivalent to rights within the general scope of copyright[.]"  Del Madera Properties v. Rhodes and Gardner, Inc., 820 F.2d 973, 977 (9th Cir.1987).  "If a state law claim includes an 'extra element' that makes the right asserted qualitatively different from those protected under the Copyright Act, the state law claim is not preempted by the Copyright Act."  Altera Corp. v. Clear Logic, Inc., 424 F.3d 1079, 1089 (9th Cir. 2005).  Generally the Copyright Act does not preempt the enforcement of contractual rights.  Id.

As to the first element, the intentional interference with contractual relations claim addresses generally an issue within the subject matter of copyright -- the underlying wrong upon which the claim is premised is Mattel's deprivation of rights to intellectual property.

As to the second element, it is clear that the tort of intentional interference with contractual relations is neither categorically preempted or categorically saved from preemption; rather, the Court must engage in a determination of whether the substance of the tort claim differs qualitatively from the copyright claim at issue.  Compare Altera, 424 F.3d at 1089 (holding that a intentional interference claim was not preempted because it was based not on copyrights but on a contractual provision) with Laws v. Sony Music Entertainment, Inc., 448 F.3d 1134, 1144 (9th Cir. 2006) (holding preempted a singer's voice misappropriation claim was not qualitatively different from her copyright claim).

Here, to the extent that the tortious interference is premised upon MGA's alleged interference with any copyrights that Mattel may have under the Inventions Agreement, it is preempted.  Such a claim is not qualitatively different from Mattel's copyright claim.  However, to the extent that the claim is based on MGA's acts that may be found to have aided and abetted the breach or induced the breach of Bryant's fiduciary duty, the claim is not preempted.  That claim is qualitatively different from Mattel's copyright claim.

Therefore, the tortious interference with contractual relations is preempted to the extent that it is based on Mattel's rights to Bratz.  It is not preempted as to Mattel's claims for breach of fiduciary duty.

The parties' arguments regarding the conversion claim address two distinct issues: Conversion of ideas and conversion of tangible things.  The Court addresses each in turn.

EXHIBIT ___1___
PAGE ___5___

Both sides acknowledge, as this Court certainly agrees, that one cannot copyright an idea. Thus, it would seem, a claim for conversion of ideas is not subject to preemption because it is not "within the subject matter of copyright." Del Madera, 820 F.2d at 977. MGA argues that ideas are not subject to a claim of conversion, to which Mattel responds that such rights in ideas may be created by contract. Mattel relies on Desny v. Wilder, 46 Cal.2d 715, 733 (1956) which, remarkably, so holds. However, that case does not support the proposition that a breach of such rights may be remedied by the tort claim of conversion rather than a breach of contract claim. The law in California regarding the tort of conversion's applicability to ideas remains the same today as in 1956: "The tort of conversion does not apply to ideas." Melchior v. New Line Productions, Inc., 106 Cal.App.4th 779 (2003). Therefore, although this claim is not preempted, it is not actionable as a tort claim. Accordingly, summary judgment in favor of MGA and Bryant is granted as to this particular claim.

Mattel also argues that its conversion claim is not preempted to the extent that it seeks the return of tangible things, most notably the original Bratz drawings. This claim is "within the subject matter of copyright," but the state rights go beyond the rights protected by the Copyright Act by allowing for the return of property.

At oral argument, counsel for MGA argued that Mattel seeks the rights that the drawings represent, not the "paper and ink" of which those drawings are comprised. Mattel disagreed with that interpretation, noting that it seeks the return of the original drawings and certain sculpts to which it may have rights under the Inventions Agreement.

The items to which Mattel lays claim are not like the manuscript at issue in Dielsi v. Falk, 916 F.Supp. 985, 992 (C.D. Cal. 1996), or the government documents at issue in Idema v. Dreamworks, Inc., 162 F.Supp.2d 1129, 1192-93 (C.D. Cal. 2001), both of which had value merely for their ability to hold and convey their contents. Rather, the materials Mattel seeks are works of art that may have value apart from the copyrights they represent or the "paper and ink" and other materials of which they are comprised. Given the role of the drawings and sculpts in developing a new, commercially successful line of fashion dolls, and given the role of these items in the present litigation, the Court discerns a possible inherent value to the materials themselves.

MGA and Bryant also pressed at oral argument that Mattel had not advanced such a claim for return of tangible items. The Court disagrees. Citing to its Complaint at ¶ 157, Mattel contends it has long sought the return of tangible items.[1] An examination of Mattel's claim for conversion reveals that it encompasses such a claim. Therefore, the conversion claim seeking the return of tangible items is not preempted. MGA and Bryant's motions for summary judgment on this issue are therefore denied.

To the extent that Mattel's statutory unfair competition claim, discussed more fully below, is

---

[1]  From a review of the record, it is clear to the Court that Mattel intended to cite ¶ 157 of its Amended Answer and Counterclaims, not its Complaint.

EXHIBIT ___1___
PAGE ___6___

based on copyright infringement, it is preempted, and the Court grants summary judgment in favor of MGA on this issue.

## STATUTE OF LIMITATIONS

The Court heard argument at length on the statute of limitations issue. Although it is not entirely clear, it appears to the Court from the hearing and from MGA's Rule 56(f) affidavit, that there remain outstanding discovery matters that may have the potential, if resolved in MGA's favor, to factor into the inquiry into the determination of the date of the accrual of any claims against Bryant and/or MGA. Accordingly, the Court defers ruling on the issue of statute of limitations at this time.

## INVENTIONS AGREEMENT

The Court addressed many issues of the enforceability of the Employee Confidentiality and Inventions Agreement in its July 17, 2006, Order. The Court finds no good reason to revisit or revise that Order.

Bryant argues that the Inventions Agreement is ambiguous on the issue of whether it covered anything other than "inventions" as that term is used in patent law. Here, Bryant was a fashion designer. He signed an agreement that assigned his "inventions" to Mattel. "Inventions" is defined by the agreement to include "designs," which was undeniably the focus of Bryant's employment with Mattel. In addition to assigning all rights to Bryant's "inventions" (i.e., "designs") to Mattel, the agreement also assigned to Mattel "all [Bryant's] right, title, and interest in any . . . copyrights . . . and copyright applications based [on those inventions]".

In order to conclude that the Inventions Agreement is ambiguous on the issue of whether it would include any copyrightable drawings or doll designs developed by an employee, the Court would have to read out of the agreement explicit terms assigning to the employer the rights to "designs," "copyrights," and "copyright applications." The Court is required to read the contract as a whole and, where possible, give effect to all its terms. Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."). To accept the interpretation advanced by Bryant, the Court would have to disregard this bedrock principle of contract construction by ignoring an explicit assignment by the employee to the employer of copyrights. The interpretation advanced by Bryant is therefore not reasonable, and the Court finds that the Inventions Agreement is not ambiguous on the issue of its scope with respect to copyrightable materials.

The Inventions Agreement explicitly conveys to Mattel an employee's interest in any copyrights or copyright applications. Assuming copyrightability and the resolution of certain (as yet unresolved) issues of timing of creation and/or alteration in Mattel's favor, the original Bratz drawings clearly fall within the scope of the Inventions Agreement.

Moreover, the Inventions Agreement incorporates, and therefore does not violate, Cal.

EXHIBIT ___1___
PAGE ___7___

Labor Code § 2870.  Pursuant to that statute (and its incorporation in the Inventions Agreement), because the subject matter at issue -- the Bratz dolls -- relate to Mattel's business of marketing fashion dolls, the factual question of whether Bryant worked on them on his own time, rather during his working hours at Mattel, is not relevant.

MGA argues that contracts of adhesion are unenforceable if they are either outside the scope of the parties' expectations or they are substantively unconscionable.  The Court previously determined that the Inventions Agreement was not substantively unconscionable, and now determines that it is not outside the scope of the parties' expectations.  As noted above, Bryant was a designer, and the plain language of the Inventions Agreement assigns his "designs" to his employer.  Objectively, therefore, it would not be surprising that Mattel would lay claim to Bryant's rights to any doll or doll fashions he designed during the period of his employment with Mattel.  Moreover, undisputed evidence establishes that Bryant's subjective understanding of the contract was that it transferred at least some of his rights to Mattel.

Bryant also argues that his actions went no further than lawful preparations to compete with his employer.  The undisputed facts, however, tell a different story:  Bryant directly competed with Mattel by entering into a contract with its competitor to produce a competing product while still employed by Mattel.

The Court grants summary judgment in favor of Mattel on the issue of the enforceability of the Inventions Agreement and the issue of applicability of the Inventions Agreement to any Bratz-related "inventions" (including any designs, improvements, ideas, concepts, and copyrightable subject matter) that he is found to have created during the period of his employment with Mattel.

### DUTY OF LOYALTY AND FIDUCIARY DUTY

Carter Bryant, like all other California employees, owed a duty of loyalty to Mattel while employed there.  See Cal. Labor Code § 2863.  The undisputed facts establish that he breached this duty by entering into a contract with Mattel's competitor, while still employed by Mattel, to produce a line of fashion dolls to be marketed in direct competition with Mattel's products.  See Huong Que, Inc. v. Luu, 150 Cal.App.4th 400, 414 (2007) ("The duty of loyalty is breached, and the breach may give rise to a cause of action in the employer, when the employee takes action which is inimical to the best interests of the employer.") (internal quotation marks and citation omitted).

Bryant also owed a fiduciary duty to Mattel by virtue of the language set forth in ¶ 1(a) of the Inventions Agreement.  Id. ("The value of the Proprietary Information depends on it remaining confidential.  The Company depends on me to maintain that confidentiality, and I accept that position of trust.").  Under California law, a confidential relationship that gives rise to a fiduciary duty is created "where a confidence is reposed by one person in the integrity of another, and . . . the party in whom the confidence is reposed . . . voluntarily accepts or assumes to accept the confidence . . . ."  City Solutions, Inc. v. Clear Channel Communications, Inc., 201 F.Supp.2d 1048, 1050-51 (N.D. Cal. 2002).  The Inventions Agreement imposed such a duty on Bryant.

EXHIBIT  1
PAGE  8

At the hearing on this matter, counsel contended that a required element for imposing a fiduciary duty -- that the party with the duty be in a superior position to the party to whom the duty is owed -- was missing.  That element is described as follows: "[T]he essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party."  City Solutions, Inc. v. Clear Channel Communications, Inc., 201 F.Supp.2d 1048, 1050 (N.D. Cal. 2002) (internal quotation marks and citation omitted).  The "superior position" to which California courts refer in this context is not superior bargaining power -- a position on which Mattel would apparently have the edge -- but rather it refers to a superior position vis-à-vis the duty imposed.  Here, because the duty imposed upon Bryant was essentially to police his own actions by maintaining Mattel's confidentiality and communicating his own "inventions" to Mattel, Bryant was "in a superior position to exert unique influence over" Mattel because he was in the best position, arguably the only one in a position, to know of and police his actions.

As with the duty of loyalty, the undisputed facts establish that Bryant breached his fiduciary duty to communicate his inventions to Mattel when, rather than doing so, he secretly entered into a contract with Mattel's competitor, while still employed by Mattel, to produce a line of fashion dolls to be marketed in direct competition with Mattel's products.

Accordingly, the Court grants Mattel's motion for summary judgment on the issues of the existence and breach of the duty of loyalty.  The Court grants Mattel's motion for summary judgment and denies Bryant's motion for summary judgment on the issue of the existence and breach of a fiduciary duty.

In its motion, MGA argued that there can be no liability for aiding and abetting a breach of fiduciary duty in the absence of a fiduciary duty.  Because the Court has rejected this argument, the Court denies MGA's motion for summary judgment on this issue.

## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

MGA moved for summary judgment as to Mattel's claim for intentional interference with contractual relations.

The elements of a claim for intentional interference with contractual relations are stated as (1) a valid contract between a plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.  Family Home & Finance Center, Inc. v. Federal Home Loan Mortg. Corp., 461 F.Supp.2d 1188, 1193 (C.D. Cal. 2006) (citing Pac. Gas & Elec. Co. v. Bear Stearns Co., 50 Cal.3d 1118, 1126 (1990)).

The undisputed facts show that the first, third, and fifth elements are met.  Mattel has raised a triable issue of fact as to the second.  The fourth element may be resolved after the

EXHIBIT __1__
PAGE ____9____

Court's further hearing on the motions for partial summary judgment. The Court therefore defers ruling on this issue.

## UNFAIR COMPETITION

MGA and Bryant's motions are granted in part and denied in part as to Mattel's unfair competition claims.

Mattel's statutory unfair competition claim, brought pursuant to Cal. Bus. & Profs. Code § 17200, survives summary judgment because Mattel has raised a triable issue of fact as to whether MGA tortiously interfered with Bryant and Mattel's contractual relationship and whether MGA engaged in commercial bribery.

However, two bases for this claim are foreclosed at this time. To the extent that the § 17200 claim is based on copyright infringement, it is preempted. To the extent that it is based on unfair conduct, summary judgment in favor of MGA is granted because the articulated unfair conduct does not approximate an antitrust violation that threatens competition. See Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal.4th 163, 186-87 (1999).

As to Mattel's common law unfair competition claim, summary judgment in favor of MGA and Bryant is granted. This claim is not, as it must be, based on the act of passing off another's goods as one's own. See Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1153 (9th Cir. 2008) (citing Bank of the W. v. Superior Court, 2 Cal.4th 1254 (1992)).

## UNJUST ENRICHMENT

Because Mattel failed to oppose this portion of Bryant's motion, the Court grants Bryant's motion for partial summary judgment on the issue of unjust enrichment.

## AFFIRMATIVE DEFENSES

Mattel seeks summary judgment as to many of the affirmative defenses asserted by the MGA entities and Carter Bryant. Most of these defenses are essentially equitable in nature, and therefore the Court **DEFERS RULING** on them until after trial. Specifically, the Court **DEFERS RULING** on the affirmative defenses of abandonment, acts and omissions of others, acquiescence, consent, estoppel, failure to mitigate, laches, unclean hands, and waiver until after trial.

For the reason set forth above in a separate section, the Court defers ruling on Mattel's motion as to the statute of limitations defense.

The final affirmative defense is based on 17 U.S.C. § 205(d). With this affirmative defense, MGA essentially contends that it is a bona fide purchaser for value of the Bratz copyrights which

EXHIBIT ___I___
PAGE _____IO___

took the rights in good faith and without notice of any prior transfer of the rights therein to Mattel. As the issue is argued by the parties, the Court would be required to determine the legal issue of whether MGA's registration of the copyrights as an "assignment" constitutes "constructive notice" in the manner required to give MGA the protection of 17 U.S.C. § 205(d). In the Court's view, this is a complex legal issue that is not thoroughly addressed by the parties' briefs. Moreover, the Court notes that a trial on the merits is likely to resolve the less complex factual issue of whether MGA acted in good faith and without notice of an earlier assignment of rights. Accordingly, the Court **DEFERS RULING** on this issue until after the Phase 1 trial.

\* \* \* \*

The Court will consider a number of remaining issues at the further hearing on these motions, set for May 19, 2008. Specifically, referencing the parties' Notices of Motion, the Court will consider the following issues:

Mattel's motion: Issue (2)(c), whether there is a factual dispute regarding the timing of certain drawings and a dummy model; issue (3), whether the first-generation Bratz dolls are substantially similar to seventeen drawings and a doll sculpt drawing or blueprint created by Bryant and whether those are original, protectable works of expression; issue (5), whether MGA and Larian are liable for aiding and abetting Bryant's breaches of the duty of loyalty and fiduciary duty; and issue (6)(a) whether Mattel is entitled to summary judgment as to the affirmative defense of statute of limitations.

Bryant's motion:  Whether Bryant is entitled to summary judgment as to Mattel's claim for copyright infringement; whether Bryant is entitled to summary judgment as to Mattel's breach of contract claim; and whether Bryant is entitled to summary judgment on any portion of his claim for declaratory relief.

MGA's motion:  Whether Mattel's claims are time barred; and whether the fourth element of intentional interference with contractual relations -- actual breach or disruption of the contractual relationship -- can be resolved on summary judgment.

Except for any updates from any party regarding the outstanding discovery matters that may be relevant to the statute of limitations, these issues are considered by the Court to be fully briefed. Any supplemental briefs by the parties on any issue other than the statute of limitations will be stricken by the Court. Any supplemental filings regarding the statute of limitations issue shall be limited to addressing the status of outstanding discovery issues and/or recently produced evidence.

**IT IS SO ORDERED.**

EXHIBIT ___ *I*

PAGE ___ *II*

Case 2:04-cv-09049-SGL-RNB     Document 3286     Filed 04/25/2008     Page 10 of 11

## NOTICE PARTY SERVICE LIST

**Case No.** CV 04-09049 SGL(RNBx)     **Case Title** Carter Bryant v. Mattel, Inc.

**Title of Document** Minute Order of April 25, 2008

| | |
|---|---|
| | Atty Sttlmnt Officer Panel Coordinator |
| | BAP (Bankruptcy Appellate Panel) |
| | Beck, Michael J (Clerk, MDL Panel) |
| | BOP (Bureau of Prisons) |
| | CA St Pub Defender (Calif. State PD) |
| | CAAG (California Attorney General's Office - Keith H. Borjon, L.A. Death Penalty Coordinator) |
| | Case Asgmt Admin (Case Assignment Administrator) |
| | Catterson, Cathy (9th Circuit Court of Appeal) |
| | Chief Deputy Admin |
| | Chief Deputy Ops |
| | Clerk of Court |
| | Death Penalty H/C (Law Clerks) |
| | Dep In Chg E Div |
| | Dep In Chg So Div |
| | Federal Public Defender |
| | Fiscal Section |
| | Intake Section, Criminal LA |
| | Intake Section, Criminal SA |
| | Intake Supervisor, Civil |
| | PIA Clerk - Los Angeles (PIALA) |
| | PIA Clerk - Riverside (PIAED) |
| | PIA Clerk - Santa Ana (PIASA) |
| | PSA - Los Angeles (PSALA) |
| | PSA - Riverside (PSAED) |
| | PSA - Santa Ana (PSASA) |
| | Schnack, Randall (CJA Supervising Attorney) |
| | Statistics Clerk |

| | |
|---|---|
| | US Attorneys Office - Civil Division -L.A. |
| | US Attorneys Office - Civil Division - S.A. |
| | US Attorneys Office - Criminal Division -L.A. |
| | US Attorneys Office - Criminal Division -S.A. |
| | US Bankruptcy Court |
| | US Marshal Service - Los Angeles (USMLA) |
| | US Marshal Service - Riverside (USMED) |
| | US Marshal Service -Santa Ana (USMSA) |
| | US Probation Office (USPO) |
| | US Trustee's Office |
| | Warden, San Quentin State Prison, CA |

✓ **ADD NEW NOTICE PARTY**
(if sending by fax, mailing address must also be provided)

Name: Ambassador Pierre-Richard Prosper

Firm:

Address (include suite or floor): P.O. Box 581103

Salt Lake City, UT  84158

*E-mail: Prosper.Pierre@Arentfox.com

*Fax No.:

* For CIVIL cases only

*JUDGE / MAGISTRATE JUDGE (list below):*

**Initials of Deputy Clerk** jh

EXHIBIT ___1___

PAGE ___12___

## NOTICE PARTY SERVICE LIST

**Case No.**  CV 04-09049 SGL(RNBx)   **Case Title**  Carter Bryant v. Mattel, Inc.

**Title of Document**  Minute Order of April 25, 2008

| | |
|---|---|
| Atty Sttlmnt Officer Panel Coordinator | US Attorneys Office - Civil Division -L.A. |
| BAP (Bankruptcy Appellate Panel) | US Attorneys Office - Civil Division - S.A. |
| Beck, Michael J (Clerk, MDL Panel) | US Attorneys Office - Criminal Division -L.A. |
| BOP (Bureau of Prisons) | US Attorneys Office - Criminal Division -S.A. |
| CA St Pub Defender (Calif. State PD) | US Bankruptcy Court |
| CAAG (California Attorney General's Office - Keith H. Borjon, L.A. Death Penalty Coordinator) | US Marshal Service - Los Angeles (USMLA) |
| Case Asgmt Admin (Case Assignment Administrator) | US Marshal Service - Riverside (USMED) |
| | US Marshal Service -Santa Ana (USMSA) |
| Catterson, Cathy (9th Circuit Court of Appeal) | US Probation Office (USPO) |
| Chief Deputy Admin | US Trustee's Office |
| Chief Deputy Ops | Warden, San Quentin State Prison, CA |

| Clerk of Court | |
|---|---|
| Death Penalty H/C (Law Clerks) | ✓  ***ADD NEW NOTICE PARTY*** **(if sending by fax, mailing address must also be provided)** |
| Dep In Chg E Div | |
| Dep In Chg So  Div | Name: Hon. Edward A. Infante (Ret.) |
| Federal Public Defender | Firm: |
| Fiscal Section | Address *(include suite or floor)*:  Two Embarcadero Center, Suite 1500, San Francisco, CA  94111 |
| Intake Section, Criminal LA | |
| Intake Section, Criminal SA | |
| Intake Supervisor, Civil | *E-mail: |
| PIA Clerk - Los Angeles (PIALA) | *Fax No.: |
| PIA Clerk - Riverside (PIAED) | * For CIVIL cases only |
| PIA Clerk - Santa Ana (PIASA) | ***JUDGE / MAGISTRATE JUDGE (list below):*** |
| PSA - Los Angeles (PSALA) | |
| PSA - Riverside (PSAED) | |
| PSA - Santa Ana (PSASA) | |
| Schnack, Randall (CJA Supervising Attorney) | |

| |
|---|
| Statistics Clerk |

**Initials of Deputy Clerk** jh

EXHIBIT  1
PAGE  13

Case 2:04-cv-09049-SGL-RNB      Document 3286      Filed 04/25/2008      Page 1 of 11

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CARTER BRYANT, | | CASE NUMBER |
|---|---|---|
| | PLAINTIFF(S), | CV 04-09049 SGL (RNBx) |
| v. | | |
| MATTEL, INC., et al., | | |
| | DEFENDANT(S), | NOTICE OF CLERICAL ERROR |

TO:     U. S. District Judge(s)
        U. S. Magistrate Judge(s)
        Counsel of Record

You are hereby notified that due to a clerical error ☐ documents associated with the filing of the new action ☐ the following scanned document ☑ docket entry   have/has been corrected as indicated below.

Title of Scanned Document:   Minute Order of 4-25-08, Granting in part, Denying in part, and Deferring in Part the Parties' MSJ

Filed Date:  4-25-08 _____     Document Number:  3285 _____

☐  Incorrect case number _____ was assigned to this ☐ action ☐ document.

☐  Case number has been corrected. The correct case number is _____

☐  Incorrect judge's initials were indicated on this ☐ action ☐ document. The correct judge's initials are _____

☐  Incorrect magistrate judge's initials were indicated on this ☐ action ☐ document. The correct magistrate judge's initials are _____

☐  Case has been reassigned from ☐ Judge ☐ Magistrate Judge _____ to

     ☐ Judge ☐ Magistrate Judge _____. The initials of the new judge(s) are _____

☐  Case was assigned to ☐ Western ☐ Southern ☐ Eastern division. Pursuant to General Order ☐ 349, ☐ 98-3 ☐ 02-06,

     the case has been reassigned to the ☐ Western ☐ Southern ☐ Eastern division. The former case number _____

     has been reassigned to new case number _____

☐  Subsequent documents must be filed at the ☐ Western ☐ Southern ☐ Eastern division. Failure to file at the proper location will result in your documents being returned to you.

☐  Case title is corrected from _____ to _____

☐  Document has been re-numbered as document number _____

☐  Incorrect ☐ Filed Date ☐ Date of Document ☐ ENTERED Date ☐ DATE ENTERED ON CM/ICMS was stamped on document. The correct date is _____

☑  Document is missing page number(s):  7 and 8 _____

☐  To ensure proper routing of documents, all documents filed with the court must reflect the following case number and judge's initials: _____

☑  Other: a complete copy with missing pages are re-scanned for service on the parties.


CLERK, U.S. DISTRICT COURT

Date  4-25-08 _____          By: _____  Jim Holmes, CRD _____
                                              Deputy Clerk

cc: Intake Supervisor / Deputy In Charge

_____

G-11 (06/05)                    NOTICE OF CLERICAL ERROR

EXHIBIT __1__
PAGE __14__

# EXHIBIT 2

CALENDARED
RECEIVED

MAR 0 7 2008

1 | THOMAS J. NOLAN (Bar No. 66992)
(tnolan@skadden.com)
2 | JASON D. RUSSELL (Bar No. 169219)
(jrussell@skadden.com)
3 | MARINA V. BOGORAD (Bar No. 217524)
(mbogorad@skadden.com)
4 | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue
5 | Los Angeles, CA 90071-3144
Tel.: (213) 687-5000 / Fax: (213) 687-5600
6
KENNETH PLEVAN (admitted *pro hac vice*)
7 | (kplevan@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
8 | Four Times Square, New York, NY 10046
Tel.: (212) 735-3000 / Fax: (212) 735-2000
9
Attorneys for MGA Entertainment, Inc., MGA Entertainment (HK) Limited,
10 | MGAE de Mexico, S.R.L. de C.V., and Isaac Larian

11 |                    UNITED STATED DISTRICT COURT

12 |                   CENTRAL DISTRICT OF CALIFORNIA

13 |                          EASTERN DIVISION

14 | CARTER BRYANT, an individual,       )  CASE NO. CV 04-9049 SGL (RNBx)
                                        )  Consolidated with Case No. 04-9059
15 |                       Plaintiff,    )  and Case No. 05-2727
                                        )
16 |              v.                     )  Honorable Stephen G. Larson
                                        )
17 | MATTEL,    INC.,    a    Delaware   )  MGA PARTIES' NOTICE OF
corporation,                           )  MOTION FOR PARTIAL SUMMARY
18 |                                     )  JUDGMENT, MOTION AND
                       Defendant.       )  MEMORANDUM OF POINTS AND
19 |                                     )  AUTHORITIES IN SUPPORT
                                        )  THEREOF;
20 | AND CONSOLIDATED ACTIONS           )
                                        )  SUBMITTED UNDER SEPARATE
21 |                                     )  COVER:
                                           1.  [PROPOSED] STATEMENT OF
22 |                                             UNCONTROVERTED FACTS
                                               AND CONCLUSIONS OF LAW;
23 | **FILED UNDER SEAL PURSUANT**       2.  REQUEST FOR JUDICIAL
**TO PROTECTIVE ORDER**                    NOTICE;
24 |                                        3.  DECLARATION OF JASON D.
                                               RUSSELL;
25 |                                        4.  DECLARATION OF ISAAC
                                               LARIAN;
26 |                                        5.  [PROPOSED] ORDER; and
27 |                                        6.  PROOF OF SERVICE.

28 |                                        Hearing Date: April 23, 2008
                                           Time: 10:00 a.m.

3 7-08

EXHIBIT 2
PAGE 15

counterclaims against him cannot be revived by relating back to that action.

## II.   MATTEL'S CONVERSION, INTENTIONAL INTERFERENCE WITH CONTRACT, AND UNFAIR COMPETITION CLAIMS ARE PREEMPTED BY THE COPYRIGHT ACT

Mattel's conversion, intentional interference with Bryant's contract with Mattel, and unfair competition with respect to MGA and Larian's alleged infringement of copyrightable material claims against MGA and Larian are preempted by the Copyright Act. Section 301 of the Copyright Act establishes a two-part test for preemption. First, the subject work must fall within the subject matter of copyright, as defined in Sections 102 and 103 of the Copyright Act. 17 U.S.C. § 301(a). Second, the rights granted under state law must be "equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 [of the Copyright Act]." Id.; see generally Melchior v. New Line Prods., Inc., 106 Cal. App. 4th 779, 792 (2003) (reciting preemption test); 1 M. Nimmer & D. Nimmer, Nimmer on Copyright § 1.01[B][1] (2007) (hereafter, "Nimmer"). Mattel's conversion, intentional interference with contract, and unfair competition claims against MGA and Larian implicate material within and rights equivalent to the Copyright Act's exclusive protective grasp.

### A.   The BRATZ concept falls within Copyright Act's scope

The expressions of the BRATZ concept, in both its drawn and sculptural forms, falls within the Copyright Act's exclusive purview. Section 102 of the Copyright Act provides protection for "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102. This includes "pictorial, graphic and sculptural works," such as "two-dimensional works of fine, graphics, and applied art … technical drawings, diagrams, [and] models." 17 U.S.C. § 101. It is the effort expended to create drawings – tangible works of authorship – that is within the scope of copyright protection. See Del Madera Props. v. Rhodes & Gardner, Inc., 820 F.2d 973, 976-77 (9th Cir. 1987), overruled on other grounds by, Fogerty v. Fantasy, Inc., 510 U.S. 517 (1994); Universal City Studios, Inc. v. J.A.R. Sales, Inc., 1982 WL 1279, 216 U.S.P.Q. 679, 680 (C.D. Cal

EXHIBIT 2
PAGE 16

1982) ("dolls are protected both as derivative works and as copyrightable subject matter in their own right"). Ownership of Bryant's original works of authorship (i.e., the BRATZ drawings) is at the heart of Mattel's counterclaims and, therefore, such claims clearly implicate subject matter within the Copyright Act's protective scope.

### B.   Mattel's conversion, intentional interference with contract, and unfair competition claims fail to meet the "extra element" test

State law claims that contain different elements from their copyright counterparts are preempted unless they contain an "extra element" that is qualitatively different from a copyright infringement claim, and that changes not just the scope of the right, but its nature as well. See Motown Record Corp. v. Hormel & Co., 657 F. Supp. 1236, 1240 (C.D. Cal. 1987). As the gravamen of Mattel's suit is the alleged infringement of copyrightable material, Mattel's claims for conversion, intentional interference with contract, and unfair competition are preempted by the Copyright Act.

#### 1.   Mattel's conversion claim

California courts consistently hold that conversion claims are preempted by the Copyright Act when they arise from the reproduction, copying and misuse of material falling within the general subject matter scope of the Act. See, e.g., Melchior, 106 Cal. App. 4th at 794 ("The tort of conversion does not apply to ideas."). For instance, in Meridian Project Sys., Inc. v. Hardin Constr. Co., 2006 WL 1062070, 79 U.S.P.Q.2d 1691, 1693 (E.D. Cal. Apr. 21, 2006), plaintiff asserted a claim for conversion of the non-copyrightable aspects of its project management software. In granting defendant's motion to dismiss the conversion claim as preempted, the court reasoned that, as the subject matter of copyright is broader than the scope of copyright protection, plaintiff's conversion claim sought to enforce rights equivalent to those asserted in plaintiff's copyright claim. Id. at 1694.

This rule applies whether the conversion claim is based on the deprivation of an idea itself or the tangible medium in which it is expressed. In Dielsi v. Falk, 916 F. Supp. 985, 992 (C.D. Cal. 1996), plaintiff's conversion claim was based on the use and

EXHIBIT __2__

PAGE ___17___

distribution of ideas expressed in a manuscript which plaintiff had given to defendant. In finding plaintiff's conversion claim was preempted, the court held that the conversion allegation "d[id] not add any additional element to the essential claim that Plaintiff's ideas were misappropriated by Defendants ... [because s]uch a claim is 'part and parcel' of a copyright claim." Id.

Although Mattel casts its conversion claim as seeking recovery of "tangible materials" (SAA ¶ 157 and at 76 ¶ 5), the focus of its claim is on the disgorgement of profits resulting from the alleged infringement of its copyrights (id. at 76-77). Plaintiff's semantic masquerade cannot save its claim – this action is not about tangible items Bryant allegedly converted[39] from Mattel, but about the BRATZ concept. Indeed, in Idema v. Dreamworks, Inc., 162 F. Supp. 2d 1129, 1192-93 (C.D. Cal. 2001), the court held that, although plaintiffs alleged that there had been a conversion of tangible documents by defendants, "[p]laintiffs claim[ed] that Defendants somehow profited from information in those documents, and/or that this information was instrumental in the [alleged infringement]. It is therefore not the documents themselves which Plaintiffs claim as their 'property' which was wrongfully converted, but the information contained therein."

Mattel cannot save a claim for conversion of copyrightable material with language indicating that it instead seeks the restoration of the documents containing the genesis of the copyrightable concept. Where (1) the "crucial" allegation in the complaint involves the use and distribution of copyrighted work, as opposed to the deprivation of its tangible embodiment (Dielsi, 916 F. Supp. at 992; Harper & Row Publrs. v. Nation Enters., 723 F.2d 195, 201 (2d Cir. 1983) ("If unauthorized publication is the gravamen

---

[39] Indeed, the items Bryant is alleged to have used in assembling the early BRATZ sculpts had been discarded by Mattel. Ex. 1 (Bryant) at 235:9-10 ("A. I think I remember it being placed in a hallway with a sign over it that said [basura]. Q. So you thought it was garbage? A. Yeah."). Discarded material cannot be the subject of a conversion claim. Ananda Church of Self-Realization v. Mass. Bay Ins. Co., 95 Cal. App. 4th 1273, 1282 (2002) ("no claim for conversion or other interference with personal property rights may be based on the taking of documents placed in a trash can").

EXHIBIT ___2___
PAGE ___18___

of their claim, then it is clear that the right they seek to protect is coextensive with an exclusive right already safeguarded by the [Copyright] Act"), rev'd on other grounds by 471 U.S. 539 (1985)), and (2) the primary measure of damages is disgorgement of profits from the unauthorized use, reproduction or distribution of copyrighted works, the allegation is equivalent to a copyright claim. See Worth v. Universal Pictures, Inc., 5 F. Supp. 2d 816, 822 (C.D. Cal. 1997). As Mattel's "crucial" claim seeks the disgorgement of profits of MGA and Larian's use and reproduction of the BRATZ concept, Mattel's conversion claim is equivalent to its copyright infringement claim and is preempted.[40]

### 2.   Mattel's intentional interference with contract claim

The elements of awareness and intent in a claim of intentional interference with contract only alter the action's scope, not its nature, and, therefore, any such claims are preempted by the Copyright Act. See Harper, 723 F.2d at 201. In claims alleging intentional interference with a contract involving copyright, the enjoyment of the allegedly infringing use is "so intimately bound up with the right itself that it could not possibly be deemed a separate element." Id. Although Mattel pled an element resembling awareness, intent, or inducement apart from its copyright infringement claim, this "additional" element "goes merely to the scope of the right; it does not establish qualitatively different conduct on the part of the [allegedly] infringing party, nor a fundamental nonequivalence between the state and federal rights implicated." Id.

Mattel's Sixth Counterclaim for Intentional Interference with Contract offers all the same flavor as its copyright infringement claim in that it alleges (1) "MGA, Larian ... knew that Bryant had assigned to Mattel, and was obligated to disclose to

---

[40]   Mattel may argue that because Judge Manella refused to find preemption of its conversion claims in connection with the briefing on remand, this Court should likewise reject MGA's preemption arguments. However, Judge Manella rejected defendant's conversion preemption argument because that complaint was "vague and generalized ... never mention[ed] what items or works Bryant allegedly converted." Mattel, Inc. v. Bryant, 441 F. Supp. 2d at 1093. Here, Mattel's Counterclaims specifically allege that Bryant converted "such proper[ty] [sic] and materials that were created by Bryant while he was a Mattel product designer." (See SAA ¶ 157.) Furthermore, Mattel's lynchpin counterclaim is for copyright infringement against MGA, Larian and Bryant. (See id. ¶¶ 82-87.) Thus, this Court's consideration of MGA and Larian's preemption argument would be based on entirely new allegations.

EXHIBIT ___2___
PAGE ___19___

Mattel all inventions, including designs and other works, created, conceived, or reduced to practice during their employment with Mattel," and that (2) "[d]espite such knowledge, Counter-defendants MGA, Larian … intentionally and without justification solicited, induced and encouraged the Mattel employees to breach their contracts with Mattel." (SAA ¶¶ 124-125.)  This allegation does not add anything to Mattel's copyright claim, which similarly seeks to place liability on MGA and Larian for MGA's role in the alleged infringement.  The addition of "elements such as awareness or intent may alter the scope of the action but not its nature." Motown Record, 657 F. Supp. at 1240 (intentional interference claim preempted by Copyright Act); see also Idema, 162 F. Supp. 2d at 1193; cf. Gemcraft Homes, Inc. v. Sumurdy, 688 F. Supp. 289, 295-6 (E.D. Tex. 1988) (claim for interference with contract preempted on allegations that defendants used copyrightable material).[41]  As Mattel's lawsuit revolves around issues of infringement, its claim for intentional interference with contract is preempted.

### 3.   Mattel's unfair competition claims

Mattel's unfair competition claims are preempted because, to the extent they are not qualitatively different from a copyright claim, they are subsumed by federal copyright law. See Lanard Toys, Ltd. v. Novelty, Inc., 511 F. Supp. 2d 1020, 1030-31 (C.D. Cal. 2007), citing Fisher v. Dees, 794 F.2d 432 (9th Cir. 1986).[42]  This principle applies whether Mattel's claim under the Copyright Act ultimately fails. See Selby v. New Line Cinema Corp., 96 F. Supp. 2d 1053, 1058 (C.D. Cal. 2000) ("[T]he shadow actually cast by the Act's preemption is notably broader than the wing of its protection"). Thus, an unfair competition argument constructed upon the premises that copyrightable

---

[41]    Although Motown Record and Idema deal with interference with economic relations, they apply here as such claims undergo the same preemption analysis – focusing on the elements of intent and awareness – as interference with contract. See Kasparian v. County of Los Angeles, 38 Cal. App. 4th 242, 260 (1995) (interference with contract has been referred to as a species of the broader tort of interference with prospective economic relations); accord Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal. 4th 376, 381-391 (1995).

[42]    Mattel's common law unfair competition claim also is preempted. See Sony Pictures Ent. Inc. v. Fireworks Ent. Group, Inc., 156 F. Supp. 2d 1148, 1164 (C.D. Cal. 2001) (statutory and common law unfair competition claims treated the same for copyright preemption analysis).

EXHIBIT   2
PAGE   20

material was (1) owned by plaintiff, and (2) was misappropriated defendants, will be considered "part and parcel of the copyright claim." Del Madera, 820 F.2d at 977.

A recent decision of this District, Lanard Toys, Ltd. v. Novelty, Inc., 511 F. Supp. 2d at 1030-31, which involved a defendant supplier's allegedly infringing "knock-off" toys, granted defendants' summary judgment motion, holding that "plaintiffs may not allege a claim for unfair competition based on defendants' alleged infringement of its copyright." Furthermore, where a plaintiff specifically incorporates allegations made earlier in its complaint, such repetition is a sufficient basis for preemption. For instance, in Kodadek v. MTV Networks, Inc., the Ninth Circuit preempted plaintiff's unfair competition claim on the ground that its complaint "expressly base[d] his unfair competition claim on rights granted by the Copyright Act," because "the unfair competition claim incorporates by reference paragraphs from the copyright infringement claim." 152 F.3d 1209, 1212-13 (9th Cir. 1998) (emphasis added); see also Watermark Publrs., 1997 WL 717677, 44 U.S.P.Q.2d at 1582 (statutory unfair competition claim predicated on "the conduct alleged above" preempted).

Mattel also incorporated its infringement allegations into its unfair competition claim. Mattel's unfair competition claim specifically "repeats and realleges each and every allegation set forth in paragraphs 1 through 162, above, as though fully set forth at length." (SAA ¶ 163.) Furthermore, Mattel bases its unfair competition claim on MGA's "foregoing conduct." (Id. ¶ 165.) Naturally, this includes allegations of Bryant's purported copyright infringement (id. ¶¶ 21-36), which precede Mattel's unfair competition allegations. Claims of unfair competition predicated on ownership, misappropriation, and infringement of a copyright add no "extra element" to distinguish it from a copyright infringement claim. Del Madera, 820 F.2d at 977 ("[Plaintiff's] ownership of the material, and the alleged misappropriation by the defendants, are part and parcel of the copyright claim"). As the essence of Mattel's complaint is derived from MGA, Larian and Bryant's alleged unauthorized use of a copyrighted work, Mattel's unfair competition claim is preempted. See Motown Record, 657 F. Supp. at

EXHIBIT __2__
PAGE __21__

1   1240 (statutory unfair competition claim preempted by Copyright Act).

2   **III.   MATTEL'S UNFAIR COMPETITION CLAIMS FAIL**

3           Mattel's statutory and common law unfair competition claims fail as to MGA and

4   Larian because, as a matter of law, MGA and Larian: (1) did not engage in

5   anticompetitive practice that would justify a finding of unfairness, (2) did not engage in

6   any deceptive practices that would justify a finding of fraudulent conduct; and (3) did

7   not commit "commercial bribery" that would support a finding of unlawful conduct.

8           **A.   MGA's and Larian's Conduct Was Not Unfair**

9           Mattel's claim that MGA and Larian engaged in unfair conduct is inadequately

10  pled and fails as a matter of law.   In California, when a party sues an ostensible

11  competitor, a defendant's business practice is only "unfair" to the extent it implicates:

12          conduct that threatens an incipient violation of an antitrust law, or violates
            the policy or spirit of one of those laws because its effects are comparable to
13          or the same as a violation of the law, or otherwise significantly threatens or
            harms competition.

14  Cel-Tech Commc'ns, 20 Cal. 4th at 186-87.   As between direct competitors, like Mattel

15  and MGA, "unfairness" must be "tethered to some legislatively declared policy or proof

16  of some actual or threatened impact on competition."   Id. at 186.   "Unfairness" cannot

17  be established where a plaintiff alleges harm to *commercial interests*, as opposed to

18  *competition*. See Watson Labs. Inc. v. Rhone-Poulenc Rorer, Inc., 178 F. Supp. 2d 1099,

19  1118-19 (C.D. Cal. 2001) (no "unfairness" where no impact on competition shown).

20          Mattel alleges no harm to competition, relying instead on allegations pertaining to

21  its alleged ownership of Bryant's drawings throughout its Second Amended Answer.

22  (SAA ¶ 21-36, 82-87).   Indeed, Mattel's claim, if accepted, actually reduces competition

23  because Mattel indisputably had a monopoly position and is seeking to eliminate a

24  competitor from the market. Furthermore, Mattel's claim also fails because mere

25  allegations of copyright ownership are not sufficient to sustain a claim of unfairness

26  under section 17200. See Sybersound Records, Inc. v. UAV Corp., __ F.3d __, 2008

27  WL 509245, at *13 (9th Cir. Feb. 27, 2008) (in action brought under Lanham and

28  Copyright Acts, plaintiff's failure to plead that "unfair" act would be an "incipient

    violation of antitrust law" defeats its claim unfair competition claim).

EXHIBIT _2_
PAGE _22_

who was not an MGA employee -- in August of 2000. (UF ¶¶ 3, 7-10.) Mattel has no evidence to suggest that MGA approached or solicited Bryant to leave his position at Mattel. Given these undisputed facts, MGA and Larian did not intentionally induce or cause Bryant to breach his Employment Agreement.

## V.    AS BRYANT DID NOT OWE A FIDUCIARY DUTY TO MATTEL, THERE CAN BE NO AIDING AND ABETTING LIABILITY

Mattel's 8th Counterclaim alleges that MGA and Larian are liable for aiding and abetting Bryant's breach of fiduciary duty owed to Mattel because they "encouraged, aided and financed Bryant to develop BRATZ," knowing Bryant was employed by Mattel and that Mattel is the "true owner of BRATZ designs and works." (SAA ¶¶ 33, 34; see also id. ¶¶ 26-27, 136-37, 139-41.) Bryant's concurrently filed summary judgment motion, in which MGA and Larian join, demonstrates that, as a matter of law, Bryant did not owe a fiduciary duty. (Bryant Br. at III.A.) Absent such a duty, a claim for aiding and abetting necessarily fails. See Richard B. LeVine, Inc. v. Higashi, 131 Cal. App. 4th 566, 574 (2005) (granting summary judgment on aiding and abetting breach of fiduciary duty where plaintiff failed to establish breach); see also MJT Securities v. Toronto Dominion Bank, 2007 WL 1725421, at **7-8 (N.D. Cal. June 14, 2007). As Bryant owed no fiduciary duty to Mattel, Mattel's claim against MGA and Larian likewise fails as a matter of law.

## CONCLUSION

For the foregoing reasons, MGA and Isaac Larian respectfully request an order granting partial summary judgment and dismissing Mattel's Phase I claims against them.

DATED: March 7, 2008

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

By: _____

Thomas J. Nolan
Attorneys for MGA Entertainment, Inc., MGA Entertainment (HK) Limited, MGAE de Mexico, S.R.L. de C.V., and Isaac Larian

505549.10-Los Angeles Server 2A - MSW

EXHIBIT _2_
PAGE _23_

# EXHIBIT 3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No.    CV 04-09049 SGL(RNBx)                    Date:  May 21, 2008
Title:       CARTER BRYANT -v- MATTEL, INC.

<u>Consolidated With Related Actions:</u>
CASE NO. CV 04-09059 SGL(RNBx):  MATTEL, INC.,  v. CARTER BRYANT,
CASE NO. CV 05-02727 SGL (RNBx): MGA ENTERTAINMENT, INC., v. MATTEL, INC.,
=====================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

            Jim Holmes                          Theresa Lanza
            Courtroom Deputy Clerk              Mark Schweitzer
                                                Court Reporters

<u>ATTORNEYS PRESENT FOR CARTER BRYANT</u>:    <u>ATTORNEYS PRESENT FOR MATTEL</u>:

Christa M. Anderson                              John B. Quinn
Matthew M. Werdegar                              Michael T. Zeller
                                                 Jon D. Corey

<u>ATTORNEYS PRESENT FOR MGA AND
ISAAC LARIAN:</u>

Thomas J. Nolan
Jason D. Russell

PROCEEDINGS:       **ORDER RE MOTION FOR RECONSIDERATION**

                   **ORDER RE THE PARTIES' MOTIONS FOR PARTIAL SUMMARY
                   JUDGMENT**

EXHIBIT  3
PAGE  84

This matter is before the Court on the parties' motions for partial summary judgment and Carter Bryant's and MGA's motion for reconsideration.[1]  The motions were heard on April 22, 2008, and again on May 19, 2008.  On April 25, 2008, the Court issued an order granting in part, denying in part, and deferring in part the motions for partial summary judgment.

The Court now issues the following further rulings regarding the motions for partial summary judgment and the motion for reconsideration.

**MOTION FOR RECONSIDERATION**

The motion for reconsideration is based on the new California Supreme Court case of <u>City of Hope Nat'l Medical Center v. Genentech, Inc.</u>, 43 Cal. 4th 375 (2008).  After fulling considering <u>City of Hope</u>, however, the Court finds that the case has little applicability to the present case and does not compel a conclusion regarding the existence of a fiduciary duty contrary to that reached by the Court.

<u>City of Hope</u> addresses whether a fiduciary duty can arise (or fail to arise) by <u>operation of law</u> due to the existence of confidential contractual relationship.  At issue in this case is whether the parties' agreement itself created a fiduciary duty.  Under California, these two situations that may give rise to a fiduciary duty -- operation of law or agreement -- are distinct, and California courts have long distinguished between the two.  Despite this clear distinction, Carter Bryant's partial summary judgment papers conflated these principles, as does the motion for reconsideration.

Related to these distinct legal concepts, there is a crucial factual difference between the present case and <u>City of Hope</u>.  The contract at issue in <u>City of Hope</u> did not contain any language that even arguably gave rise to a fiduciary duty.  In contrast, the contract at issue here, for the reasons set forth in the Court's April 25, 2008, Order, sets forth language that does give rise to such a duty.

MGA contends that this Court committed reversible error by holding that the language set forth in ¶ 1(a) of the Inventions Agreement created a fiduciary duty.  <u>City of Hope</u>, MGA contends, held that "the entrusting of secret or confidential information to another 'does not compel the imposition of fiduciary duties by operation of law.'"  Motion at 6 (quoting <u>City of Hope</u>).  As alluded to above, this argument, as well as the other two raised by MGA in the motion, overlooks both the differing contractual language in <u>City of Hope</u> and the present case, as well as the related legal distinction regarding the creation of fiduciary relationships.  Factually, the Inventions Agreement

---

[1] At the hearing, upon representation of settlement between Mattel and Carter Bryant, and pursuant to the stipulation between Mattel and Carter Bryant, the motion is moot as to Carter Bryant.  However, the Court considers the motion because MGA has joined in the motion on the issue of fiduciary duty.  As set forth on the record, because the claims against Carter Bryant have been dismissed, the Court treats MGA as the moving party.



EXHIBIT 3
PAGE 25

did more than merely entrust Bryant with confidential information; rather, as noted in the Court's first summary judgment Order, the Inventions Agreement explicitly conferred upon Bryant, and Bryant explicitly agreed to accept, a "position of trust" vis-à-vis that confidential information.  No such explicit undertaking is found in the agreement at issue in City of Hope, the relevant portions of which are set forth in the California Supreme Court opinion.

On that note, the portion of City of Hope upon which MGA relies to support its argument addresses when a fiduciary relationship arises by operation of law.  This argument is merely a continuation of Bryant's conflation, first appearing in Bryant's moving and opposition summary judgment papers, of fiduciary relationships that are created by contract and those that arise as a matter of law.  The Court's summary judgment holding clearly rests on the former; the arguments raised on reconsideration are premised on the latter.  Compare City Solutions, Inc. v. Clear Channel Communications, Inc., 201 F.Supp.2d 1048, 1050-51 (N.D. Cal. 2002) (cited by the Court and noting that a confidential relationship that gives rise to a fiduciary duty is created "where a confidence is reposed by one person in the integrity of another, and . . . the party in whom the confidence is reposed . . . voluntarily accepts or assumes to accept the confidence . . . .") with City of Hope, 43 Cal.4th 375, __, 75 Cal. Rptr.3d 333, 347 (relied on by Bryant for the proposition that the entrusting of confidential information "does not compel the imposition of fiduciary duties by *operation of law*") (emphasis added).

Although the majority of the motion for reconsideration is unmeritorious, it raises important issues, which the Court must address, regarding the scope of the fiduciary duty created, as well as the breach thereof.

Although the parties argued at length as to whether the Inventions Agreement gave rise to a fiduciary duty, they did not focus on the scope of the fiduciary duty that was created.  As noted in the Court's April 25, 2008, Order, the Court held Bryant had undertaken such a duty:

> Bryant . . . owed a fiduciary duty to Mattel by virtue of the language set forth in ¶ 1(a) of the Inventions Agreement.  Id. ("The value of the Proprietary Information depends on it remaining confidential.  The Company depends on me to maintain that confidentiality, and I accept that position of trust.").

April 25, 2008, Order at 5.

The Court also concluded that Bryant had breached that duty:

> [T]he undisputed facts establish that Bryant breached his fiduciary duty to communicate his inventions to Mattel when, rather than doing so, he secretly entered into a contract with Mattel's competitor, while still employed by Mattel, to produce a line of fashion dolls to be marketed in direct competition with Mattel's products.

EXHIBIT __3__
PAGE __26__

Case 2:04-cv-09049-DOC-RNB    Document 4093    Filed 07/07/08    Page 31 of 119    Page ID
#:102565
Case 2:04-cv-09049-SGL-RNB    Document 3738    Filed 05/21/2008    Page 4 of 10

Id. at 6.

Upon re-examination of the Inventions Agreement, however, although the Court can conclude that, as a matter of law, Carter Bryant agreed to undertake a fiduciary duty vis-à-vis Mattel's confidential information, the Court cannot make the same conclusion -- as a matter of law -- regarding whether the fiduciary duty extends beyond Mattel's confidential information.

The language creating the fiduciary relationship appears in the section of the Inventions Agreement related to "Trade Secrets" and "Proprietary Information," and is preceded by language (in the same sentence) that Mattel depends upon employees to "maintain that confidentiality." Just above the signature line of the Inventions Agreement, reference is made again to "IMPORTANT OBLIGATIONS OF TRUST," but that language is clearly meant not to create new obligations, but rather to alert the employee that those obligations are created elsewhere within the agreement.

The question of whether an agreement creates a fiduciary duty is generally a question of fact, although a Court may resolve the question as a matter of law where the relevant facts are uncontroverted. See City Solutions, Inc. v. Clear Channel Communications, Inc., 201 F.Supp.2d 1048, 1051 (N.D. Cal. 2002); GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc., 83 Cal.App.4th 409, 417 (2000). Here, although the Court concludes as a matter of law that the Inventions Agreement imposed a fiduciary duty as to Mattel's confidential information, it cannot reach a similar conclusion regarding any broader duty based on the undisputed facts.

Accordingly, the Court **VACATES** the above-quoted language from its April 25 Order finding that Bryant breached his fiduciary duty and leaves the determination of whether Bryant's fiduciary duty beyond Mattel's confidential information as an issue for trial.[2]

One more point raised in the motion for reconsideration is worthy of note. Although Carter Bryant has been dismissed from the case, he raised at least one issue in his motion, in which MGA has not joined, that should not pass without comment by this Court.[3] Clearly, and perhaps understandably, counsel for Carter Bryant were disappointed by the Court's rulings as set forth in the first summary judgment order.[4]

---

[2] The Court also notes that its previous holding necessarily rested on a finding that the materials provided to MGA were indisputably Mattel's property. As set forth in section I, relating to the summary judgment breach of contract issue, that conclusion cannot be drawn as a matter of law on the undisputed facts, and thus summary judgment may not appropriately be granted.

[3] Upon the Court's expression of concern regarding this issue at the hearing on this matter, counsel for MGA explicitly disavowed any joinder in this part of Bryant's motion.

[4] The Court addresses this part of the Order to counsel because counsel are officers of the Court and authors of the comment at issue. The Court also references "counsel" in the plural rather than the singular because all counsel -- author, editor, and signatory -- who were involved in this comment bear responsibility therefor.

Initials of Deputy Clerk: jh
Time:  2/52

EXHIBIT __3__
PAGE __27__

Case 2:04-cv-09049-DOC-RNB   Document 4093   Filed 07/07/08   Page 32 of 119   Page ID
#:102566
Case 2:04-cv-09049-SGL-RNB    Document 3758    Filed 05/21/2008    Page 5 of 10

However, in addressing what they saw as the deficiencies in the Court's Order, counsel painted with far too broad a brush. Rather than focus the Court's attention on a discrete issue -- or even a number of discrete issues -- counsel resorted to broad language incorporating every argument raised in their summary judgment papers and, without articulated foundation, impugns the integrity of this Court's deliberative process. Nowhere is this more clear than in footnote 7 of the motion for reconsideration; accordingly, the Court's discussion focuses on that portion of the motion, which reads as follows:[5]

> In deciding Mattel's motion for summary judgment, the Court should have applied this standard in Bryant's and MGA's favor. On this issue, and many others, the Court has failed to do so, instead accept Mattel's views of disputed facts and ignoring material factual disputes. Indeed, the Court declined to address objections to evidence, apparently and summarily sustaining all Mattel's objections while denying all Bryant's. Bryant will not reiterate here all of the disputed facts and issues precluding summary judgment in Mattel's favor, which already appear in his (and MGA's) summary judgment briefing and supporting papers.

Motion at 11 n.7.

With this footnote, counsel first takes issue with the Court's application of the summary judgment standard, of which counsel and the Court are well aware. This standard requires the Court to view the evidence in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of the doubt of both any disputes of fact and all reasonable inferences to be drawn from the evidence. Nevertheless, the Court's focus is on *material* facts, and the determination of what constitutes a material fact is shaped by legal rulings made by the Court. Some facts that seem material to the parties under their legal theories become immaterial in light of the Court's rulings that reject those theories.

In footnote 7, counsel misrepresents the Court's treatment of the evidence offered in support of and in opposition to the three motions for partial summary judgment. Bryant states that the Court "apparently summarily sustain[ed] all Mattel's objections [and] den[ied] all Bryant's [evidentiary objections]." Id. However, the Court merely noted that, where a ruling necessarily relied upon evidence to which parties had made objections, the objections thereto were implicitly overruled:

---

[5] Footnote 7, however, is not the only offending portion of the motion for reconsideration. See e.g., Motion at 2 n.1 (referring to "the Order's other errors, including misapplication of the summary judgment standard," stating that those errors "will also require correction," but noting that the motion "does not discuss those flaws in detail"); motion at 9 n.5 (incorporating unspecified portions of his summary judgment briefing).

EXHIBIT 3
PAGE 28

Case 2:04-cv-09049-DOC-RNB    Document 4093    Filed 07/07/08    Page 33 of 119    Page ID
#:102567
Case 2:04-cv-09049-SGL-RNB    Document 3758    Filed 05/21/2008    Page 6 of 10

> The parties have made hundreds of objections to evidence
> offered in support of and in opposition to the motions for partial
> summary judgment.  Although counsel for Bryant requested explicit
> rulings on the objections raised by Bryant, the Court declines to do so.
> To the extent that this Order necessarily relies on evidence subject to
> any party's objection, the objections are implicitly overruled.

April 25, 2008, Order at 1-2.  This is a vastly different statement than that made by counsel.
Counsel's characterization of the Court's ruling implies that the Court, without inquiry into the
merits of Bryant's objections, arbitrarily denied them all.  The Court's Order merely recognizes
that, by operation of law, to the extent a court relies upon objected-to evidence, and where, as
where, the evidence must be admissible to be relied upon for such ruling, any objections raised
thereto are implicitly overruled.

In addition to mounting an overly broad -- and baseless -- attack on the integrity of the
Court's deliberative process on a grand scale, counsel fail to support the more narrow point they
appear to be making in footnote 7.  Footnote 7 is appended to text that takes issue with the Court's
conclusion that Bryant did nothing more than merely "prepare to compete" with his employer and,
thus, in Bryant's view, did not breach his duty of loyalty or fiduciary duty.  See Motion at 10.

Although the footnote does not alert the Court to any particular material facts -- disputed or
undisputed -- which counsel contend were overlooked by the Court, the text to which the footnote
is appended provides valuable clues on this issue.  From this text, the Court's attention is directed
to Bryant's Opposition at 23-24.  The Court notes that the pages of that document refer to no
factual contentions; rather, those pages are devoted to legal arguments and conclusions.
However, reading further in the opposition, at page 29, the Court finally encounters a citation to the
facts upon which counsel rely.  They reference "SGI 151" and SGI "154-156".

Although obvious to counsel who practice in this district, and certainly to counsel of record
here, to guide the uninitiated, the Court notes that in a summary judgment opposition filed in this
Court, "SGI" clearly refers to the "Statement of Genuine Issues" filed by a party opposing a
summary judgment motion.  See Local Rule 56-2.  Referring to that document, found at docket
# 2778, one finds that material facts are numbered sequentially, and that "SGI 151" refers to the
fact numbered "151."  The subsequently cited facts, "154-156," not surprisingly, are found on the
page that follows.

Having thus traversed this far to ascertain the material facts upon which counsel relies for
its sweeping criticism of the Court's deliberative process, the Court notes those facts below.

Bryant signed the MGA contract on October 4, 2008, and gave notice of his resignation to
Mattel the same day.  SGI 151.  Before Bryant left Mattel, he told various Mattel employees,
including managerial employees, that he was going to start his own business as a freelance
designer, working on his own doll line as an independent contractor.  SGI 154.  Mattel's exit
interview form for Bryant reflects that during his exit interview, he told Mattel's HR representative,

EXHIBIT  3
PAGE  29

Case 2:04-cv-09049-DOC-RNB   Document 4093   Filed 07/07/08   Page 34 of 119   Page ID
#:102568
Case 2:04-cv-09049-SGL-RNB   Document 3758   Filed 05/21/2008   Page 7 of 10

Sandy Yonemoto, that he was leaving for a new job as a "business owner" in "illustration/product design" because an "[o]pportunity arose -- had to take it." SGI 155. Bryant did not tell anyone at Mattel that he was leaving Mattel to work with a non-competitor, nor did Mattel inquire. SGI 156.

In accordance with the summary judgment standard, the Court viewed these facts in the light most favorable to Bryant. However, on the "preparations to compete" point, these facts are not material. They relate to the circumstances of his departure; essentially, Bryant's point is that he did not lie to Mattel when he left. Although this may well be true, the circumstances surrounding the announcement of his resignation and the last days of his employment with Mattel tell only part of the story.

Even assuming Bryant gave notice of his resignation to Mattel the same day he signed his contract, it is uncontroverted that he continued working for Mattel after that date; so Bryant's fact, which tends to imply that he made a clean break with Mattel the moment he established a contractual relationship with MGA, becomes immaterial when viewed in connection with the uncontroverted fact that he continued working for Mattel after he signed his MGA contract, as the latter fact neutralizes the implication presented by the former fact when it stood alone. Additionally, notwithstanding the fact that Bryant gave notice of his resignation the same day he signed his contract, the substance of his contract remains the same, including Bryant's agreement to begin working for MGA on a "top priority" basis, as does the undisputed fact that he entered into a contract with Mattel's competitor to produce a competing product while he was still employed by Mattel.

Moreover, the fact that he gave Mattel various descriptions of what he intended to do professionally *in the future*, any one of which might imply that he was leaving to pursue independent interests that would compete with or had a tendency to compete with Mattel, similarly does not detract from his past and/or then-present actions, or the fact that he was already under contract to compete with Mattel.

Thus, counsel's criticism of the Court's deliberative process is both overly broad and unfounded. Perhaps footnote 7 should come as no surprise to the Court. The parties in this action are engaged in what they themselves have described as high-stakes "corporate warfare." However, whatever the rules of engagement may be for such warfare, those rules are decidedly **not** representative of the standard of conduct which the parties -- and their counsel -- should look to for guidance as to how they should conduct themselves in or before this Court.

Counsel for Carter Bryant, and indeed, all counsel in this case and who practice before this Court, are strongly urged to concisely and precisely articulate their requests for relief in a manner that refrains from the unintentional impugning of the integrity of the Court's deliberative process. Counsel for all parties are reminded that this Court has extended to all counsel and all parties a similar professional courtesy.

Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** the motion for



EXHIBIT   3
PAGE   30

Case 2:04-cv-09049-DOC-RNB   Document 4093   Filed 07/07/08   Page 35 of 119   Page ID
#:102569
Case 2:04-cv-09049-SGL-RNB   Document 3758   Filed 05/21/2008   Page 8 of 10

reconsideration.  The Court **VACATES** that portion of its April 25, 2008, order that found, as a matter of law, that Bryant breached his fiduciary duty.

## MOTIONS FOR PARTIAL SUMMARY JUDGMENT

## I. BREACH OF CONTRACT

Mattel seeks summary judgment on its breach of contract claim.  Resolution of the breach of contract issue is largely an issue of timing.

There are undisputed facts regarding the timing of the creation of three categories of materials, but there are factors regarding each of these three categories that preclude a grant of summary judgment at this time.

Specifically, it is uncontroverted that four drawings (each with a color and a black-and-white version) of dolls in evening wear, were created by Bryant during the period of his employment with Mattel.  However, the scope of the rights that may be assigned to Mattel under the Inventions Agreement is unclear in light of the larger disputed factual issue regarding the remaining Bratz drawings.

It is also undisputed that, during the period of his employment, Bryant created a dummy doll, anticipating it would used in his pitch of Bratz to MGA.  However, this dummy is apparently no longer in existence, and therefore the scope of any rights owned by Mattel cannot be ascertained from the undisputed facts.

Finally, it is undisputed that a drawing by Bryant, from which the sculpt of the Bratz doll was made, was created during the period of Bryant's employment with Mattel.  However, the record also reflects that this drawing was made on the basis of an earlier sculpt, and the record is not entirely clear as to who had input into that sculpt, nor is it clear what, if any, legal conclusions the Court could draw from a clear record on this issue.

Additionally, the larger timing issue regarding the remaining Bratz drawings, as admitted by the parties, involve triable issues of fact.

Accordingly, the Court **DENIES** Mattel's motion for summary judgment as to its claim for breach of contract.

## II. COPYRIGHT INFRINGEMENT

In order to establish copyright infringement, a plaintiff must establish three elements: (1) ownership of a valid copyright, (2) the defendant's access to the original, and (3) substantial similarity between the copyrighted work and the allegedly infringing work.  Lamps Plus, Inc. v. Seattle Lighting Fixture Co., 345 F.3d 1140, 1144 (9th Cir. 2003).

EXHIBIT ___3___
PAGE ___31___

Case 2:04-cv-09049-DOC-RNB    Document 4093    Filed 07/07/08    Page 36 of 119    Page ID
#:102570
Case 2:04-cv-09049-SGL-RNB    Document 5758    Filed 05/21/2008    Page 9 of 10

Here, Mattel asks the Court to undertake the fact-specific determination involved in the third element, aided in large part by expert testimony, when the first element is clearly in dispute. Although often summary adjudication of one element of a claim is appropriate, such is not the case here.  In order to conduct the substantial similarity analysis, the Court must compare a copyrighted work with an allegedly infringing work.  The Court may not perform a meaningful substantial similarity analysis without the copyrighted work that is the foundation of that analysis.

Accordingly, the Court **DENIES** Mattel's motion for summary judgment on this issue.

### III. AIDING AND ABETTING

MGA and Larian are accused of aiding and abetting Bryant's breach of the duty of loyalty and breach of fiduciary duty.

For reasons ably set forth by counsel for MGA at the hearing, the Court finds that there are triable issues of fact as to the issue of aiding and abetting any breaches of the duty of loyalty and fiduciary duty by Carter Bryant and therefore **DENIES** Mattel's motion for summary judgment on this issue.

### IV. INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

MGA moved for summary judgment as to Mattel's claim for intentional interference with contractual relations.  The Court previously denied MGA's motion, noting however, that the first, third, and fifth elements were met, and that Mattel has raised a triable issue of fact as to the second element.[6]

However, upon reflection, and in light of the Court's ruling regarding the aiding and abetting claims, the Court now concludes that, although Mattel has raised a triable issue of fact regarding the third element, the Court may not at this point conclude that the undisputed facts establish the third element.  The Court leaves undisturbed its ruling that Mattel has raised a triable issue of fact as to the second element.

As set forth above, Mattel has also raised triable issues of fact regarding its claim for breach of contract, the fourth element.

Despite these minor changes in the Court's previous ruling, the disposition of this portion of

---

[6]  The elements of a claim for intentional interference with contractual relations are stated as (1) a valid contract between a plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. Family Home & Finance Center, Inc. v. Federal Home Loan Mortg. Corp., 461 F.Supp.2d 1188, 1193 (C.D. Cal. 2006) (citing Pac. Gas & Elec. Co. v. Bear Stearns Co., 50 Cal.3d 1118, 1126 (1990)).

MINUTES FORM 90                                                        Initials of Deputy Clerk: jh

CIVIL -- GEN                          Page 9                          Time:  2/52

EXHIBIT  3
PAGE  32

MGA's motion remains unchanged:  MGA's motion is **DENIED** to the extent it seeks summary judgment on Mattel's claim for intentional interference with contractual relations.

## V. UNFAIR COMPETITION

As noted by counsel for MGA at the May 19, 2008, hearing, the Court's first summary judgment left unaddressed Mattel's statutory unfair competition claim to the extent that is based on fraudulent conduct.  Mattel did not contend in opposition to MGA's motion for partial summary judgment that this claim was based on any fraudulent conduct.

In its first summary judgment order, the Court eliminated two bases for Mattel's statutory unfair competition.  See April 25, 2008, Order (referring to the unfair competition claim to the extent it is based on copyright infringement and to the extent it is based on unfair conduct).  The Court now holds that this third basis can also be eliminated at this time.

## VI. STATUTE OF LIMITATIONS

At the second hearing on the motions for partial summary judgment, for the first time, counsel for MGA referenced evidence in support of its statute of limitations argument, attached to a declaration that had not been served on opposing counsel and that had been filed earlier the same afternoon. Counsel thereafter made legal arguments regarding the conclusions to be drawn from this evidence.

Mattel had little opportunity to respond to MGA's arguments, as it was not entirely clear at the hearing to what evidence MGA referred in making its arguments.  Accordingly, the Court has afforded Mattel the opportunity to respond to this argument and therefore **DEFERS** ruling on the statute of limitations issue until the Court has had the opportunity to review Mattel's response.

**IT IS SO ORDERED.**



EXHIBIT __3__
PAGE __33__

# EXHIBIT 4

THOMAS J. NOLAN (Bar No. 66992)
(tnolan@skadden.com)
LAUREN AGUIAR (Admitted Pro Hac Vice)
(laguiar@skadden.com)
CARL ALAN ROTH (Bar No. 151517)
(croth@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
Tel.: (213) 687-5000/Fax: (213) 687-5600

Attorneys for MGA Parties

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with Case No. 04-9059 and Case No. 05-2727 |
| v. | Honorable Stephen G. Larson |
| MATTEL, INC., a Delaware corporation, | MGA PARTIES' REVISED DISPUTED [PROPOSED] PHASE 1A JURY INSTRUCTIONS |
| Defendant. | |
| AND CONSOLIDATED ACTIONS. | |

EXHIBIT ___4___
PAGE ___34___

1  **FIDUCIARY DUTY — DEFINED**

2

3  Once a party assumes a fiduciary duty to another, that party is obligated to act on behalf of

4  the other party, to hold the interests of the other paramount over his own interests, and to

5  take no action that would further his interests over the other person's interest.

6

7  **Authority:** CACI Nos. 4100, 4102 (2008) (as modified); GAB Bus. Servs., Inc. v. Lindsey

8  & Newsom Claim Servs., Inc., 83 Cal. App. 4th 409, 417-18 (2000), overruled on other

9  grounds by Reeves v. Hanlon, 33 Cal. 4th 1140 (2004); City of Atascadero v. Merrill

10  Lynch, Pierce, Fenner & Smith, Inc., 68 Cal. App. 4th 445, 483-84 (1998).

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT ____4

PAGE ___35

1  **Authority:** CACI No. 2100 (2008); <u>Ananda Church of Self-Realization v. Mass. Bay Ins.</u>

2  <u>Co.</u>, 95 Cal. App. 4th 1273, 1282 (2002); <u>see also</u> <u>Melchior v. New Line Prods., Inc.</u>, 106

3  Cal. App. 4th 779, 793 (2003) (conversion does not apply to ideas).

4

5

6  DATED:  July 3, 2008

7              SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

8

9              By:  _____/s/ Thomas J. Nolan_____

10                        Thomas J. Nolan

11                        Attorneys for the MGA Parties

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT  4
PAGE  36

# EXHIBIT 5

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that: (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

### 1. Provisions Related to Trade Secrets

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in this Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

### 2. Ownership of Inventions

(a) I agree to communicate to the Company as promptly and fully as practicable all inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this agreement requiring me to assign my rights in any invention does not apply to an invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either (1) relate at the time of the conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer, or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

### 3. Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

### 4. Miscellaneous

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will inure to the benefit of and be binding upon the successors and assigns of the the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f) This agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

_____          MATTEL, INC.

Employee Signature                        By _____
                                          Signature

CARTER A. BRYANT                          TERESA NEWCOMB
Employee Name [print]                     Name of Witness [print]

01/04/99
Date

M 0001596

DEPOSITION EXHIBIT
25
11-8-04          SH

EXHIBIT 5
PAGE 87

EX 25-0001

# EXHIBIT 6

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    - - -

4     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                    - - -

6  MATTEL, INC.,                 :  PAGES 2226 - 2352
                                 :
7          PLAINTIFF,            :
                                 :
8     VS.                        :  NO. ED CV04-09049-SGL
                                 :  [CONSOLIDATED WITH
9  MGA ENTERTAINMENT, INC.,      :  CV04-9059 & CV05-2727]
   ET AL.,                       :
10                               :
          DEFENDANTS.            :
11  _____

12

13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16            RIVERSIDE, CALIFORNIA

17         WEDNESDAY, JUNE 11, 2008

18          JURY TRIAL - DAY 11

19           AFTERNOON SESSION

20

21

22                      MARK SCHWEITZER, CSR, RPR, CRR
                        OFFICIAL COURT REPORTER
23                      UNITED STATES DISTRICT COURT
                        181-H ROYBAL FEDERAL BUILDING
24                      255 EAST TEMPLE STREET
                        LOS ANGELES, CALIFORNIA 90012
25                      (213) 663-3494

CERTIFIED COPY

EXHIBIT __6__
PAGE __38__

1  **Appearances of Counsel:**

2

3  On Behalf of Mattel:

4      Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
       By John B. Quinn, Esq.
5          B. Dylan Proctor, Esq.
           Michael T. Zeller, Esq.
6          Harry Olivar, Esq.
           John Corey, Esq.
7          Diane Hutnyan, Esq.
           William Price, Esq.
8      855 South Figueroa Street
       10th Floor
9      Los Angeles, CA 90017
       (213) 624-7707

10

11

12  On Behalf of MGA Entertainment

13      Skadden, Arps, Slate, Meagher & Flom LLP
       By Thomas J. Nolan, Esq.
14         Carl Alan Roth, Esq.
           Jason Russell, Esq.
15         Lauren Aguiar, Esq.
           David Hansen, Esq.
16         Matthew Sloan, Esq.
       300 South Grand Avenue
17     Los Angeles, CA 90071-3144
       (213) 687-5000

18

19  For Carter Bryant:
       Keker & Van Nest
20     By Christa Anderson, Esq.
           Michael H. Page, Esq.
21     710 Sansome Street
       San Francisco, California 94111-1704
22     (415) 391-5400

23

24                              EXHIBIT __6__

25                              PAGE __39__

1                                    I N D E X

2

3    ISAAC LARIAN, PREVIOUSLY SWORN........................ 2231

4    REDIRECT EXAMINATION (CONTINUED) BY MR. PRICE:........ 2231

5    BRYAN JOSEPH ARMSTRONG, SWORN........................ 2269

6    DIRECT EXAMINATION BY MR. ZELLER:.................... 2270

7    VIDEOTAPED DEPOSITION EXCERPTS OF SARAH ODOM.......... 2318

8    CARTER BRYANT, SWORN................................. 2329

9    DIRECT EXAMINATION BY MR. PRICE...................... 2329

10                                 E X H I B I T S

11
     (Exhibits A-1, A-2, and A-3 received.)............... 2326
12
     (Exhibit 23 received.)............................... 2334
13
     (Exhibit 24 received.)............................... 2341
14
     (Exhibit 25 received.)............................... 2344
15
     (Exhibit 26 received.)............................... 2345
16

17

18

19

20

21

22

23

24

25

EXHIBIT __6__
PAGE __40__

2335

1   discoveries, improvements, processes, developments, designs,

2   know-how, data, computer programs, and formulae, whether

3   patentable or unpatentable."

4         Do you see those sections?

5   **A.**   Yes.

6   **Q.**   Now, when you began at Mattel in November '95, exactly

7   what kind of designs were you working on?

8   **A.**   I was working on designs for the Barbie group.  I'm

9   trying to think.  Some of my projects for Teen Skipper.  What

10   else did I work on?  I think I worked on a Stacy character

11   along with a number of work projects.

12   **Q.**   You mentioned a Teen Skipper.  Can you tell the jury

13   what Teen Skipper is?

14   **A.**   Teen Skipper was a character that had existed within the

15   Barbie brand for quite a while.  And they were looking to

16   update her image, update her look.

17   **Q.**   And did you actually assist in creating a new body

18   design for Teen Skipper?

19   **A.**   Not that I remember, no.

20   **Q.**   What did you do with respect to Teen Skipper?

21   **A.**   Designed fashions, designed some hairstyles, looks for

22   the face, some of her accessories.

23   **Q.**   So I just want to get some kind of idea on the type of

24   designs you were working on.  If we can go to the second page

25   of Exhibit 23.

EXHIBIT ___6___
PAGE ___41___

2336

1          You see there's a section there conflicts and other

2   activities, which says:  "My employment with the company

3   requires my undivided attention and effort.  Therefore,

4   during my employment with the company, I will fully comply

5   with the company's conflict of interest policy as it may be

6   amended from time to time.  I shall not, without the

7   company's express written consent, engage in any employment

8   or business other than for the company or invest in or assist

9   in any manner any business competitive with the business or

10  the future business plans of the company."

11          Without even seeing this sort of agreement, you

12  knew common sense that you weren't supposed to be competing

13  with Mattel while you were working at Mattel; right?

14  A.   Well, I don't know that I had that much of an

15  understanding about that at the time.

16  Q.   Well, you knew it would be unfair to, for example, take

17  a paycheck from a company which pays you for doll designs and

18  at the same time work at a competitive company that would pay

19  you for doll designs.  You know that without seeing this sort

20  of agreement; right?

21  A.   I don't know that I had that kind of an understanding.

22  I knew that other people in the company also did side

23  projects.  It was generally common knowledge.

24  Q.   When you signed this document November 6, 1995, were you

25  agreeing to devote your undivided attention and effort to

EXHIBIT   6
PAGE   42

2337

1   Mattel for the time period that you were employed by Mattel?

2   A.   Well, the thing with this agreement was, you know, it

3   was never really -- it was never really explained much.  It

4   was part of a packet that we were required to sign in order

5   to commence employment at Mattel.  There were no explanations

6   given.  So I'm not sure that I had the best understanding of

7   this contract at that time.

8   Q.   Well, whether you had a best understanding or any

9   understanding, let me ask you this:  When you worked for

10  Mattel, during this initial time period, did you believe that

11  you were obligated either legally or ethically or morally to

12  use your undivided attention and effort for Mattel?  I'm

13  talking about this first time frame when you were there

14  from -- full time from November '95 to April of '98.

15  A.   Well, again, I'm not sure what the extent of my

16  understanding was about that.

17  Q.   Well, let me ask it this way:  During this time period,

18  from November '95 to April '98, did you work for a competitor

19  at the same time you worked at Mattel?

20  A.   Well, not knowingly, no.

21  Q.   Did you during this time period assist any competitor,

22  between, November '95 to April '98?

23  A.   No, not that I can remember.

24  Q.   All right.  And you didn't think -- let me ask you this:

25  You're not telling us you thought it would be perfectly fine

EXHIBIT 6
PAGE 43

1    to go ahead and compete with Mattel without them knowing it

2    at the same time you worked for them.  You didn't think that,

3    did you?

4    A.    Well, no, I don't think I thought that.

5    Q.    So I've been focusing now on this first time frame when

6    you worked for Mattel.  Now I'd like to ask you about --

7    well, let me ask you this.  Your mom lives in Missouri?

8    A.    Yes.

9    Q.    And you recall there came a time when you were speaking

10   with her about -- when you were working at Mattel, and we're

11   talking about needing to do something to make some money.

12   A.    I'm not sure of the exact conversation you're referring

13   to.

14   Q.    Okay.  Do you remember a time when your mother suggested

15   that to make some money, perhaps you could sell some of the

16   drawings that you had done?

17   A.    No, I don't remember ever talking to her about that.

18   Q.    Do you remember your mom -- strike that.

19          Do you remember saying to your mom something to the

20   effect of I can't sell these drawings, mom, because they

21   belong to Mattel.  I did them at Mattel.

22   A.    It's possible we had that conversation, but I don't

23   recall it.

24   Q.    Certainly if your mom were to testify to something of

25   that effect, you wouldn't deny that you told her that, that

EXHIBIT 6
PAGE 44

2339

1   is, I can't sell these drawings I did at Mattel because they

2   belong to Mattel.

3   A.   Well, I wouldn't deny that that's her memory, but I

4   don't have any recollection of that conversation.

5   Q.   Okay.  And it's a long time ago.  So that's why my

6   question is a little bit different.  Although you may not

7   have a recollection of it, you certainly can't deny that you

8   said that to your mother; correct?

9   A.   Well, I can't deny that I might have said that to her.

10   But again, I don't have any recollection of that

11   conversation.

12   Q.   Well, that was in fact your understanding, which is that

13   if you did designs while you were at Mattel that relate to

14   the dolls, that related to Mattel, that Mattel owns those

15   designs.

16   A.   Well, if you're talking about in the context of this

17   conversation that I don't remember, then, you know, I'm not

18   really sure how to answer your question.

19   Q.   I'm just asking in terms of kind of your general

20   understanding in this time frame between, say, October '95,

21   April of '98, that you understood that if you're doing

22   designs while you're being paid by Mattel to do designs for

23   dolls, and you do designs for dolls, that those belong to

24   Mattel.

25           You understood that?

EXHIBIT 6
PAGE 45

1    **A.**   I think what my understanding would have been more

2    clearly would have been that any designs that I had been

3    assigned by Mattel, any drawings that I had been assigned to

4    work on would belong to Mattel.

5    **Q.**   So your view was that you were being paid as a designer;

6    correct?

7    **A.**   Yes.

8    **Q.**   And that if, while being paid as a designer for Mattel,

9    you came up with a great idea that would be of benefit to

10   Mattel, that you could just go across the street to a

11   competitor and say I've got this great idea.  I want to give

12   it to you?

13   **A.**   I don't know that I had that understanding.

14   **Q.**   Well, let's talk about what you executed, the documents

15   you executed when you went back to Mattel.

16         Now, we were talking about November '95 to April

17   '98.  So at this point I want to ask you about this second

18   stint, January '99 until October of 2000, okay?

19   **A.**   Um-hm.

20   **Q.**   And if you look in your booklet there, there's an

21   Exhibit 25.  Have you found it?

22   **A.**   Yes.

23   **Q.**   Okay.  And you recognize this as -- actually, I didn't

24   mean to do this.  Let me go back to your first stint.  I may

25   have forgotten this.



EXHIBIT 6
PAGE 46

2352

1          (Proceedings concluded at 5:10 P.M.)

2

3

4

5

6

7

8                    C E R T I F I C A T E

9

10

11          I hereby certify that pursuant to Title 28,

12  Section 753 United States Code, the foregoing is a true and

13  correct transcript of the stenographically reported

14  proceedings in the above matter.

15          Certified on June 11, 2008.

16

17

18  MARK SCHWEITZER, CSR, RPR, CRR
    Official Court Reporter
19  License No. 10514

20

21

22

23

24

25

EXHIBIT 6
PAGE 47

# EXHIBIT 7

2428

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    - - -

4     **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                    - - -

6  MATTEL, INC.,              :   PAGES 2428 - 2524
                              :
7          PLAINTIFF,         :
                              :
8      VS.                    :   NO. ED CV04-09049-SGL
                              :   [CONSOLIDATED WITH
9  MGA ENTERTAINMENT, INC.,   :   CV04-9059 & CV05-2727]
   ET AL.,                    :
10                            :
           DEFENDANTS.        :
11  _____

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17            THURSDAY, JUNE 12, 2008

18              JURY TRIAL - DAY 12

19              AFTERNOON SESSION

20

21

22                           MARK SCHWEITZER, CSR, RPR, CRR
                             OFFICIAL COURT REPORTER
23                           UNITED STATES DISTRICT COURT
                             181-H ROYBAL FEDERAL BUILDING
24                           255 EAST TEMPLE STREET
                             LOS ANGELES, CALIFORNIA 90012
25                           (213) 663-3494

CERTIFIED COPY


EXHIBIT 7
PAGE 48

2429

1   **Appearances of Counsel:**

2

3   On Behalf of Mattel:

4       Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
        By John B. Quinn, Esq.
5           B. Dylan Proctor, Esq.
            Michael T. Zeller, Esq.
6           Harry Olivar, Esq.
            John Corey, Esq.
7           Diane Hutnyan, Esq.
            William Price, Esq.
8       855 South Figueroa Street
        10th Floor
9       Los Angeles, CA 90017
        (213) 624-7707

10

11  On Behalf of MGA Entertainment:

12      Skadden, Arps, Slate, Meagher & Flom LLP
        By Thomas J. Nolan, Esq.
13          Carl Alan Roth, Esq.
            Jason Russell, Esq.
14          Lauren Aguiar, Esq.
            David Hansen, Esq.
15          Matthew Sloan, Esq.
        300 South Grand Avenue
16      Los Angeles, CA 90071-3144
        (213) 687-5000

17

18  For Carter Bryant:

19      Keker & Van Nest
        By Christa Anderson, Esq.
20          Michael H. Page, Esq.
        710 Sansome Street
21      San Francisco, CA 94111-1704
        (415) 391-5400

22

23

24

25                          EXHIBIT __7__
                            PAGE __49__

2430

1               **I N D E X**

2

3   **CARTER BRYANT, PREVIOUSLY SWORN**...................... 2433

4   DIRECT EXAMINATION (CONTINUED) BY MR. PRICE........... 2433

5

6

7               **E X H I B I T S**

8

    (Exhibit 2201 received.)............................ 2518

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT __7__
PAGE ___50___

2437

1    work for other toy companies while they were

2    employed by Mattel?

3         "ANSWER:  No."

4  Q.   BY MR. PRICE:  Mr. Bryant, do you recall giving that

5  testimony under oath?

6  A.   Yes.

7  Q.   And do you recall in your deposition there came a time

8  when there was a break of the proceedings, that is, where

9  everyone kind of got up and took a 15-minute break?

10 A.   Okay.

11 Q.   Do you recall that?

12 A.   Well --

13 Q.   There were a number of breaks --

14 A.   We took a lot of breaks.

15 Q.   You were told that if you needed a break, you just had

16 to ask, and you could go and stretch your legs; right?

17 A.   Right.

18 Q.   And do you recall there came a time when you did that

19 and then came back, and your counsel announced that you

20 wanted to amend an answer.

21         Do you remember that?

22 A.   Yes.

23 Q.   And this was after you had had a break and had time to

24 consult with your attorney at the time; correct?

25 A.   I believe so, yes.

EXHIBIT 7
PAGE 51

2438

1   Q.   And at the time you wanted to change your answer with

2   respect to the topic of moonlighting.

3          Do you remember that?

4   A.   Yes.

5   Q.   And you came and said that you wanted to add that you

6   had knowledge about moonlighting at Mattel.

7          Do you recall that?

8   A.   I remember something to that effect, yes.

9   Q.   And, of course, prior to that time in the deposition, no

10  one had actually used the word "moonlighting"; correct?

11  A.   I don't remember.

12  Q.   And you were then asked questions about moonlighting.

13         Do you recall that?

14  A.   Vaguely.

15  Q.   Let me ask you the following:   It's true that you don't

16  know anybody by name who actually moonlighted while at

17  Mattel; correct?

18  A.   I couldn't give any specific names, no.

19  Q.   You just heard rumors; correct?

20  A.   Right.

21  Q.   And you can't recall any names; correct?

22  A.   No, not at this time.

23  Q.   And you can't recall any products?

24  A.   No.

25  Q.   You can't recall any companies in particular that Mattel



EXHIBIT  7
PAGE  52

2439

1    employees were supposedly moonlighting for?

2    A.    You know, I think I had just heard that they were --

3    some employees worked for -- did other things for other toy

4    companies.

5    Q.    But you didn't hear anything about names of employees or

6    names of companies or names of product.  This is just general

7    rumors that you say you heard about; correct?

8    A.    That's right.

9    Q.    And so let me ask you this:  Was it your understanding

10   that as far as Mattel was concerned, it was perfectly okay to

11   do that, that is, to be a Mattel employee and also work for

12   another toy company or to create toys to benefit some other

13   company.  Was it your understanding that that was perfectly

14   okay?

15   A.    Well, um, no.  I don't think that was my understanding.

16   Q.    So in fact you said at your deposition, did you not,

17   that you had no opinion yourself at all as to whether it was

18   okay for a Mattel employee to do competitive work for another

19   toy company while they were employed by Mattel.  Your

20   testimony was you didn't have any opinion about that one way

21   or another; is that right?

22   A.    That's right.

23   Q.    By the way, when your deposition was taken, you were

24   prepared for your deposition by your counsel; correct?

25   A.    Yes, I spent some time with my counsel.

EXHIBIT __7__
PAGE __53__

2440

1   Q.   In fact, you recall there were three days of your

2   deposition close to each other in 2004 when you met with your

3   counsel prior to those three days of deposition.

4   A.   Yes.

5   Q.   And you met with them for over two days; correct?

6   A.   I don't recall the exact number of days.  But it was

7   more than one.

8   Q.   And as part of training you for your deposition, one

9   thing they did is they actually had you sit down and be

10  videotaped.

11       MR. NOLAN:  Objection, your Honor, with respect to

12  the characterization of training.  It's argumentative.

13       MR. PRICE:  I'll rephrase.

14       THE COURT:  Thank you, Counsel.

15  Q.   BY MR. PRICE:  In preparing you for your deposition, one

16  of the things that your attorneys did was they actually

17  videotaped you.

18  A.   Yes.

19  Q.   And did they do that before the first deposition?

20  A.   I believe so, yes.

21  Q.   And when they videotaped you, they actually sat you down

22  and asked you questions and had you give answers while being

23  videotaped; correct?

24  A.   Yes.

25  Q.   And this went on for a number of hours; correct?

EXHIBIT 7
PAGE 54

2441

1   A.   I don't remember exactly how long it went on.

2   Q.   And do you have any idea where those videos are now?

3   A.   Do I have any idea?

4   Q.   Yes.

5   A.   I have absolutely no idea.

6   Q.   So that was done before the first day of your

7   deposition, which I'll represent to you was November 4, 2004;

8   correct?

9   A.   Yes.

10  Q.   Now, if we could --

11       Your Honor, I would like to play from the November

12  5, 2004, videotaped deposition of Carter Bryant, page 269 --

13  actually, page 268, line 22, to 269, line 13.

14       THE COURT:  Any objection?

15       MR. NOLAN:  Objection.  Mr. Bryant is not a party.

16  I don't know for what purpose.  There is no question pending.

17  Is this for impeachment?

18       MR. PRICE:  Absolutely.

19       THE COURT:  Any objection?

20       MR. NOLAN:  No objection.

21       THE COURT:  Very well.  You may play.

22       WHEREUPON THE VIDEOTAPED DEPOSITION

23       EXCERPTS OF CARTER BRYANT, AS PROVIDED

24       BY COUNSEL, ARE INCORPORATED HEREIN.

25       "QUESTION:  You indicated that you met with your



EXHIBIT  7
PAGE  55

2443

1   A.   Well, I'm a little bit confused.  Are you talking about

2   the prep sessions that were videotaped?  Or are you talking

3   about being videotaped during the deposition?

4   Q.   I'm talking about the prep sessions where you met with

5   your counsel and those being videotaped and your being asked

6   questions and answering questions while being prepared by

7   your attorneys.

8   A.   Well, I mean, I -- what I remember right now is that

9   yes, I was videotaped.  If I didn't remember it at that time,

10  then, you know, I made a mistake.

11  Q.   Well, at that time, we're talking about in 2004, the

12  deposition we just played was November 5, 2004.  You were

13  also taken the day before, November 4, 2004, and you're being

14  asked about events that took place just a week prior to that;

15  is that right?

16  A.   Yes.

17  Q.   And the week prior to that, you met with your attorneys

18  for two days and six hours, and you were in fact videotaped

19  while preparing; correct?

20  A.   Well, again, I think I was.  I could be wrong.

21  Q.   In any event, at the time within just a week of

22  preparing for the deposition at that time, you denied that

23  that took place; correct?

24  A.   Well, apparently I did.  But, you know, my memory is not

25  clear now.  It might not have been clear back then either.

EXHIBIT __7__
PAGE __56__

2444

1   Q.   That's kind of something you'd remember, wouldn't you?

2   If you go to your attorney's office and they say we're going

3   to videotape you so we can ask you questions and get answers

4   and see how you look on tape?

5   A.   I don't know.  You know, there were a lot of things

6   going through my mind at that time.  So I may not have

7   remembered it.

8   Q.   So while you may not have remembered it the week after

9   it happened, you did remember it in 2008, some four years

10  after it happened; is that right?

11  A.   You know, I suppose so.

12  Q.   At the time your depositions were taken, it was your

13  testimony at that time that you had no idea whether Mattel

14  would object to you doing work for another toy company on the

15  side; is that right?

16  A.   I'm sorry.  What was the question?

17  Q.   Sure.  At the time your depositions were taken, it was

18  your testimony under oath that you had no idea whether Mattel

19  would object to your doing work for another toy company on

20  the side while working for Mattel.

21  A.   I don't remember exactly what I said in my deposition.

22  If I could be shown that document.

23  Q.   Well, let me ask it in general, then, and see whether or

24  not that's true.  Is it true that while you were at Mattel,

25  you had no idea whether Mattel would object to you doing work

EXHIBIT  7
PAGE  57

2445

1    for another toy company on the side while being employed by

2    Mattel?

3    A.    I don't know.

4    Q.    You don't know whether you had any idea one way or

5    another whether it was okay to be working for Mattel and

6    taking a paycheck, and yet on the side, unbeknownst to them,

7    working for another toy company?  You didn't have an idea one

8    way or another as to whether or not that was wrong?

9    A.    Well, I mean, I think I had a general idea that, you

10   know -- that you know -- that that might not be acceptable.

11   Q.    Well, did you have any idea that Mattel would have an

12   objection to you doing work on the side for another toy

13   company?

14   A.    I mean, maybe in general, but, you know, I don't think

15   that was anything that was ever really specifically told to

16   me.

17   Q.    Whether specifically told to you or not, I'm asking you

18   your understanding when you're a Mattel employee.  Did you

19   have any idea whether or not Mattel would have any objection

20   for you doing work on the side for another toy company?

21   A.    Are you just talking about me personally or anybody?

22   Q.    Let's talk about you.  Did you have any idea, while you

23   were working for Mattel that they might have an objection to

24   you working at Mattel and on the side working for another toy

25   company?

EXHIBIT  7
PAGE  58

2446

1  A.   You know, I don't think I really had all that much of an

2  opinion one way or the other.  I mean, I think maybe I had

3  some general understanding that they might object.

4  Q.   You later joined MGA and signed a consulting agreement;

5  correct?

6  A.   Yes.

7  Q.   If you look at Exhibit 15, which is already in evidence,

8  and if we could display that.

9       Do you see this is a copy of an agreement dated as

10 of September 18, 2000, between you and MGA?  Do you recognize

11 that agreement?

12 A.   Yes.

13 Q.   And if we could go to the second paragraph.  Do you see

14 it says:  "The term shall commence on the date of this

15 agreement.  MGA shall have the right to terminate this

16 agreement on not less than 45 days prior written notice to

17 Bryant.  During the term of this agreement, Bryant will not

18 provide consulting services to any person, firm, or

19 corporation engaged in the design, development, and

20 manufacture and sale of dolls or similar products."

21      That's agreement you signed with MGA; correct?

22 A.   Yes, on October 4th.

23 Q.   And your understanding with MGA is that they would have

24 a problem if you were consulting with them and also

25 consulting for another toy company; correct?

EXHIBIT  7
PAGE  59

2447

1   A.   Yes, because I had independent counsel who explained

2   this contract to me.

3   Q.   Okay.  So what you're saying is that if you had not had

4   independent counsel, you would not have been able to

5   understand the words in the contract with MGA which said, you

6   know, during the term of this agreement, Bryant will not

7   provide consulting services to any person, firm, or

8   corporation engaged in the design, development, and

9   manufacture and sale of dolls or similar products.

10          That would have been beyond your ability to

11  comprehend without having an attorney?

12  A.   Well, no.

13  Q.   So just reading this, you knew that MGA would have a

14  problem with you working for them and consulting for another

15  company at the same time; correct?

16  A.   I mean, again, I think I had a general understanding,

17  which was explained to me later more specifically.

18  Q.   Well, is there some reason in your mind where you --

19  where you can explain to me why you have an understanding

20  that while at MGA, MGA wouldn't want you working for another

21  toy company, but you don't have any opinion or idea as to

22  whether or not Mattel would have an objection to that?  Can

23  you explain the distinction for me?

24  A.   Well, again, when I was at Mattel, you know, the

25  contracts that were given to us to sign were, you know,

EXHIBIT __7__
PAGE __60__

2455

1    you signed the document.  And, of course, you signed the

2    document with this paragraph in it previously when you joined

3    Mattel back in '95; right?

4    A.    Yes.

5    Q.    So now we're talking about '99, when you are signing

6    basically the same document again.  Okay?

7    A.    Yes.

8    Q.    And so if we go to this, could you understand just as a

9    layperson, someone not trained in the law, what it meant when

10   it said my employment with the company requires my undivided

11   attention and effort?

12        MR. NOLAN:  Objection as to foundation, whether or

13   not he even read this at the time.

14        THE COURT:  Clarify, Counsel.

15   Q.    BY MR. PRICE:  Did you read this document before you

16   signed it?

17   A.    Um, you know, I remember looking at it, reading it the

18   best I could, understanding it the best I could.  But I

19   didn't understand everything about it.

20   Q.    All right.  So having read it and understood it the best

21   you could, my question is where it says my employment with

22   the company requires my undivided attention and effort, did

23   you understand that as just a layperson, someone who hasn't

24   had the horror of being in law school --

25   A.    I mean --

EXHIBIT __7__

PAGE __61__

2456

```
 1              MR. NOLAN:  Your Honor, I'm going to object to the

 2    gratuitous comments.  Can we just be asking questions?  It's

 3    argumentative.

 4              MR. PRICE:  I'll take out "horrible."

 5              THE COURT:  That's a good point, Mr. Nolan.

 6    Q.  BY MR. PRICE:  My employment with the company requires

 7    my undivided attention and effort.

 8              Did you understand that as someone who had not been

 9    to law school or had a legal degree?

10    A.  Well, yes.

11    Q.  And you understood that it meant you were to use your

12    undivided attention and effort for the company?

13    A.  Well, I'm not sure that I understood what undivided

14    attention meant.

15    Q.  Okay.  Well, so let's try this some more here.  During

16    my employment with the company, I willfully comply with the

17    company's conflict of interest policy as it may be amended

18    from time to time.

19              Did you understand what that meant?

20    A.  I don't remember having any understanding of that.

21    Q.  Well, you actually signed on the same day the company's

22    conflict of interest policy; correct?

23    A.  I don't remember.

24    Q.  If you look at it, I think it's in front of you there,

25    Exhibit 26.  Do you see there's a conflict of interest
```

EXHIBIT 7
PAGE 62

2457

1   questionnaire that you filled out that you reviewed

2   yesterday?

3   A.   Yes.

4   Q.   And you filled that out on the same day that you read

5   this document; correct?

6   A.   Yes.

7   Q.   And did you know that you were agreeing to comply with

8   the company's conflict of interest policy?  Did you

9   understand that?

10  A.   I don't know that I did.

11  Q.   Well, when it says "I willfully comply with the

12  company's conflict of interest policy," which of those words

13  did you not understand to mean that you would fully comply

14  with the conflict of interest policy?

15  A.   Well, at the time of signing this document, I really

16  don't recall this phrase at all.

17  Q.   Okay.  Let's go to the next sentence, then.  It says:

18  "I shall not, without the company's express written consent."

19         Now, you know what that means, express written

20  consent; right?

21  A.   Yes.

22  Q.   I shall not, without the company's express written

23  consent, engage in any employment or business other than for

24  the company."

25         You understood what that meant.  That pretty plain

EXHIBIT 7
PAGE 63

2458

1   language; right?

2   A.   Yes, sure.

3   Q.   And you understood that, without the company's express

4   written consent, you were not to work for another company or

5   engage in any business other than for the company.

6   A.   Well, yeah, I think I pretty much generally understood

7   that.

8   Q.   So you knew you weren't supposed to work for Mattel and

9   at the same time work for another toy company; right?

10  A.   Right.

11  Q.   And then it says:   "Or invest or assist in any manner

12  any business competitive with the business or future business

13  plans of the company."

14           Do you see that?

15  A.   Yes.

16  Q.   Now, when you saw that, you saw assist in any manner,

17  you knew that was a fairly broad statement; correct?

18  A.   I really don't remember this part of the paragraph.

19  Q.   Well, you did read the entire paragraph, but this part

20  you just don't remember; correct?

21  A.   That's correct.

22  Q.   Well, reading it now, then, since you've told us you

23  read it at the time, do you see anything vague about this,

24  that you can't assist in any manner any business competitive

25  with the business or future business plans of the company?

EXHIBIT __7__
PAGE __64__

2459

1  A.   No, I mean, that's pretty clear.

2  Q.   And so if you read this at the time, then you would have

3  clearly understood that, as an employee of Mattel, you

4  weren't to assist in any manner any business that was

5  competitive with Mattel; correct?

6  A.   Well, you know, again, I don't remember every -- I

7  didn't remember every little detail about this contract.  You

8  know, after I signed it.  I don't remember every single

9  provision.

10  Q.   Fair to say, though, that if you had read this at the

11  time, you would have understood that you were not supposed

12  to, as a Mattel employee, assist a competitor company in any

13  way; correct?

14  A.   More than likely.

15  Q.   And you knew that in '95 and '96 and '97 and '99 and

16  2000; right?

17  A.   I think I had a general understanding of it.

18  Q.   And yet during that time frame, you tried to assist a

19  competitor company, MGA, in developing a line of dolls called

20  Bratz.

21  A.   Well, I wouldn't really say that's true.

22  Q.   Well, let's talk about your last stint at Mattel.  To

23  begin with, it's not just MGA.  You understood that while you

24  were a Mattel employee, you weren't supposed to do anything

25  to assist any company that would be competitive with Mattel;

EXHIBIT 7
PAGE 65

2460

1  correct?

2  A.   I think so, yes.

3  Q.   And I believe we had a chart showing that you started at

4  Mattel for the second time in January of '99; correct?

5  A.   That's right.

6  Q.   And then do you recall at the end of August of '99,

7  around that time frame, you sent designs to a company called

8  Alaska Mama; correct?

9  A.   Yes.

10  Q.   And maybe I can show you the drawings I'm talking about.

11  This is Exhibit 62.  It's in, I think, the drawings binder in

12  front of you.  I'm going to cross my fingers and hope we have

13  the original.  Have you found Exhibit 62?

14  A.   Yes.

15  Q.   And if you'd look -- first, flip through these.  Do you

16  recognize these as drawings, or all or some of these, and

17  perhaps you can tell us which, which you sent to this company

18  Alaska Mama?

19  A.   Yes.

20  Q.   So the first page, is that one that you sent?

21  A.   I'm not sure if I sent this page or not.

22  Q.   Do you see it appears to have a notarization date of

23  August 25, '99?

24  A.   Yes.

25  Q.   And that's a date, again, that this was about eight



EXHIBIT ___7___
PAGE __666__

2461

1  months -- well, almost nine months after you started working

2  at Mattel that second time; correct?

3  A.    Yes.

4  Q.    And although we'll get back to this in some detail

5  later, one of the reasons you notarized this was so you could

6  establish that you had this drawing before you sent it to

7  Alaska Mama?

8  A.    Yes.

9  Q.    So that Alaska Mama couldn't later say -- later use the

10  drawing and say they came up with it; right?

11  A.    Right.

12  Q.    This would show, as of August 25, '99, you had done

13  this; correct?

14  A.    Yes.

15  Q.    So with that in mind, since you notarized this, do you

16  think this is one of the drawings you sent to Alaska Mama?

17  A.    I don't recall that I sent this to Alaska Mama.

18  Q.    It is fair to say it's a drawing that you had notarized

19  in August of '99?

20  A.    Yes.

21          MR. PRICE:  Your Honor, if I could approach with

22  the original of that.

23          THE COURT:  You may.

24          MR. PRICE:  I am going to approach, your Honor,

25  with a stack of originals, and maybe we can go through them.

EXHIBIT __7__
PAGE __67__

2462

1   **Q.**   Let's do it this way.  And perhaps I can move these in

2   all at one time.  If we could display to the jury the first

3   page of Exhibit 62.  So this is the first drawing, 62, that

4   you were talking about; correct?

5   **A.**   Yes.

6   **Q.**   And you see these faces have names on them -- Jade,

7   Lupe, Zoe, and Hallidae -- correct?

8   **A.**   Yes.

9   **Q.**   And these are the characters that you termed the Bratz?

10   **A.**   Yes.

11   **Q.**   In fact, if you look at the second page of Exhibit 62,

12   it should say Bryant 00194.

13         Do you see it?

14   **A.**   Okay.

15   **Q.**   This is one of the drawings which you sent to Alaska

16   Mama?

17   **A.**   No.  I don't think I sent black and white drawings to

18   Alaska Mama.

19   **Q.**   Well, let me ask it this way:  You had this notarized so

20   you could prove you had this drawing before something was

21   sent to Alaska Mama; correct?

22   **A.**   Yes.

23   **Q.**   So what you're saying is you might have sent them a

24   color version of this?

25   **A.**   Yes.



EXHIBIT 7
PAGE 68

2509

1   A.   Right.  Yeah.  Those fashions I don't believe were ever

2   used, though.

3   Q.   It's something you created before you saw Mr. Larian?

4            MR. NOLAN:  Objection, your Honor, to the term

5   creation.  Ambiguous.

6            THE COURT:  I'll sustain the objection, Counsel.

7   Why don't we go ahead and specify what you mean.

8            MR. PRICE:  Sure.

9   Q.   Prior to meeting with these folks in August, what we see

10  here as Exhibit 719 did not exist in this form; correct?

11  A.   What do you mean in this form?  The drawing itself?

12  Q.   There we go.  Right there.  Beautiful red lips, green

13  eyes, nice dress.  This did not exist?

14  A.   Actually, the head and the pose, that was all old --

15  those were all old drawings.

16  Q.   Did you have a picture like this where a nice green

17  dress with a purse, these shoes, did you have a picture like

18  this before you met -- before that meeting you said you had

19  in August?

20  A.   I didn't have a drawing that had that dress and those

21  shoes, no.

22  Q.   Or the purse?

23  A.   The purse I'm not sure about.

24  Q.   The bracelets?  Did you have those?

25  A.   Well, I'm not exactly sure.

EXHIBIT  7
PAGE  69

2510

1  Q.   You changed this blank poster to this sometime between

2  the August meeting and when you met with Mr. Larian; right?

3  A.   Yes.

4  Q.   And then if you look at Exhibit 722.  And I'll approach,

5  if I may, with the original.  Which character is this?

6  A.   This is -- at the time I think we were calling her

7  Hallidae.

8  Q.   And these designs, dress, et cetera, you did sometime

9  between the meeting you say happened in August and the

10 meeting with Mr. Larian; correct?

11 A.   Yes.

12 Q.   And again, this blank poster board was changed to this

13 drawing sometime between that first meeting you say you had

14 in August and the meeting with Mr. Larian; right?

15 A.   Well, yes.

16 Q.   If you'd look at Exhibit 725.  And I'll approach with

17 the original.  Your testimony is that this -- could you hold

18 that up?  And is that -- we're talking about poster board.

19 This obviously isn't poster board.

20 A.   Right.

21 Q.   How would you describe that paper?

22 A.   This paper?

23 Q.   Yeah, how would you describe --

24 A.   This is just regular like copier paper.

25 Q.   Is that what you presented as the original at the

EXHIBIT ___7___
PAGE ___70___



2511

1   meeting with Mr. Larian?

2   **A.**   I don't believe so, no.

3   **Q.**   Did you create Exhibit 725 and then do something with it

4   to present to Mr. Larian?

5   **A.**   No.   I mean, I know I created it on the same kind of

6   illustration board.   But I don't recall doing anything

7   special with it.

8   **Q.**   The designs, shoes, dress, et cetera, were done sometime

9   between this August meeting you talked about and the meeting

10   with Mr. Larian?

11   **A.**   Yes.

12   **Q.**   And you said that actually the original of this is on a

13   poster board?

14   **A.**   Right.

15   **Q.**   And that again was changed from a blank poster board to

16   what we're seeing now sometime in that time frame between

17   mid-August and early September?

18   **A.**   Well, yes.

19   **Q.**   Now let's talk about the meeting you had with

20   Mr. Larian.   And let me step back.   In the meeting you had

21   with Ms. Treantafelles and Ms. Marlow, Ms. O'Connor, did you

22   say you worked for Mattel?

23   **A.**   Um, I think I did.

24   **Q.**   Between the meeting you had with Ms. Treantafelles,

25   Ms. O'Connor, Ms. Marlow, and Mr. Larian, between that time,

EXHIBIT ___7___
PAGE ___71___


2512

1    did you have communications with anyone at MGA?

2    A.    Well, I think I may have spoken to Victoria O'Connor.

3    Q.    Did you talk with Ms. Garcia?

4    A.    I don't remember.

5    Q.    So when you had your meeting on September 1st -- let me

6    step back.  Your testimony is you had a meeting on September

7    1st; right?

8    A.    Yes, we did have a meeting September 1st.

9    Q.    And let's talk about the location of that meeting.  Was

10   it at MGA?

11   A.    Yes.

12   Q.    And September 1st, you're still an employee at Mattel;

13   correct?

14   A.    Yes.

15   Q.    And you go to MGA's offices.  Where are they located?

16   A.    Van Nuys.

17   Q.    Was there any security?  Did you have to check in with

18   someone?

19   A.    I don't remember.

20   Q.    Do you remember having to go and sign in and getting a

21   sort of a temporary tag to be escorted somewhere?

22   A.    No, I don't remember.

23   Q.    Was the meeting in Mr. Larian's office?

24   A.    I believe so, yes.

25   Q.    You understood that he was the Chief Executive Officer

EXHIBIT 7
PAGE 72

2513

1   of another toy company, a company other than Mattel, which is

2   MGA?

3   A.    Yes.

4   Q.    And you were bringing to him these designs for Bratz as

5   well as a three-dimensional creation to pitch your Bratz

6   concept; correct?

7   A.    Yes.

8   Q.    And your hope was that the CEO of MGA would agree to

9   produce the Bratz dolls; correct?

10  A.    Well, yes, sure.

11  Q.    Tell us who was at this meeting that was on September

12  1st.

13  A.    Well, it was myself, Mr. Larian, pretty sure his

14  daughter Yasmin was there, and Paula Treantafelles-Garcia,

15  Victoria O'Connor, and I think Veronica Marlow might have

16  been present.

17  Q.    Now, when you had presented your drawings to Ms. Garcia

18  and Ms. O'Connor in August, was Ms. Garcia excited about

19  them?

20  A.    Um, she seemed like it, yeah.

21  Q.    You got positive feedback; right?

22  A.    Um, yeah, I got a good vibe.

23  Q.    Who was it that suggested that you bring your designs to

24  Mr. Larian, CEO?

25  A.    Well, what I recall at that first meeting, I think that



EXHIBIT ___7___
PAGE ___73___

2514

1   Victoria had told me that Mr. Larian was out of town, but she

2   thought he would like to see them.

3   Q.   In this meeting September 1st, one of the things you

4   told Mr. Larian was that you were at that time employed by

5   Mattel; right?

6   A.   I'm quite sure that I did.

7   Q.   And when you told Mr. Larian that you were then employed

8   by Mattel, you don't recall him saying anything in response

9   to that, do you?

10  A.   I think we talked.  You know, I think he asked me maybe

11  something about, you know, are these something that you came

12  up with on your own and, you know, on your own time.  And you

13  know, I told him that yes, they were.

14        MR. PRICE:  Your Honor, I'd like to play from

15  Mr. Bryant's deposition page 91, lines 3 through --

16        THE COURT:  Help me out.  Direct me to the volume.

17        MR. PRICE:  It is volume 1.  It is dated November

18  4, 2004.  And it's lines 3 through 7.

19        THE COURT:  Any objection?

20        MR. NOLAN:  No objection.

21        THE COURT:  You may play it.

22        MR. PRICE:  Thank you.

23        WHEREUPON THE VIDEOTAPED DEPOSITION

24        EXCERPTS OF CARTER BRYANT, AS PROVIDED

25        BY COUNSEL, ARE INCORPORATED HEREIN.

EXHIBIT __7__
PAGE __74__

2515

1        "QUESTION:  When you told Mr. Larian that you

2     were then employed by Mattel, what did he say?

3        "ANSWER:  I really don't recall what he said

4     exactly.

5        "QUESTION:  Well, generally.

6        "ANSWER:  I don't even remember generally what

7     he said."

8  Q.   Now, you told Mr. Larian that you were employed by

9  Mattel because you thought it was important for him to know

10 that; right?

11 A.   Um, well, I suppose so.

12 Q.   Well, I'm asking you to more than suppose.  I'm asking

13 for your testimony now.  Isn't a reason you told Mr. Larian

14 that you were employed by Mattel is that you felt it was

15 important for him to know that?

16 A.   Well, to the best of my recollection, yes, I think so.

17 Q.   After the September 1st meeting, when you showed the

18 Bratz drawings and this doll that you created to Mr. Larian

19 and others, at that point do you think you had a good

20 reception?

21 A.   Um, you know, I thought it went fairly well.  I kind of

22 got the feeling from Mr. Larian that he kind of thought they

23 were very odd-looking characters.  But, I mean, I thought it

24 went pretty well.

25 Q.   You said you got the impression from Mr. Larian, you

EXHIBIT   7
PAGE   75

2516

1  actually used the words odd-looking characters.

2          When is the last time that you heard that phrase?

3  A.   That I heard that phrase?

4  Q.   Let me ask it this way:  Do you recall Mr. Larian saying

5  they are odd-looking characters?

6  A.   No, not specifically.  I guess I'm just paraphrasing.

7  Q.   And after that meeting, you began having discussions

8  with MGA about becoming a consultant to MGA to make Bratz a

9  reality; right?

10  A.   Yes.

11  Q.   How soon after this meeting did you get -- did someone

12  from MGA communicate with you to say, you know, we want this

13  to happen?

14  A.   Well, I don't remember the exact amount of time that

15  passed, but I think it was, you know -- it was at least

16  several days.

17  Q.   And you were contacted by an attorney from MGA?

18          MR. NOLAN:  Objection as to foundation.  Time.

19          THE COURT:  Wait a second.  Sustained.

20  Q.   BY MR. PRICE:  Within two weeks of September 1st, you

21  began engaging in negotiations with an attorney at MGA;

22  right?

23  A.   Well, I don't remember exactly who I talked to first.

24  It seemed like I talked to Isaac first after that initial

25  meeting.



EXHIBIT ___7___
PAGE ___76___

2517

1  Q.   Mr. Larian?

2  A.   Yes.  Sorry.

3  Q.   And Mr. Larian was excited?

4  A.   He seemed to be.

5  Q.   He mentioned, when he talked to you, how successful he

6  thought this might be; correct?

7  A.   Are we talking about this first conversation that we

8  had?

9  Q.   Let's say -- well, let me ask you, how many

10  conversations did you have with Mr. Larian in September?

11  A.   Oh, I don't recall.  More than one.

12  Q.   And those discussions, you talked about, for example,

13  how you might be paid?

14  A.   Yes.

15  Q.   You talked about the fact that you wanted a royalty?

16  A.   Yes, I think so.

17  Q.   You talked about how fiscally and successfully you could

18  become rich?

19  A.   I don't remember ever saying that.  That's not something

20  I really recall.

21  Q.   I'm not talking about you saying that.  I'm talking

22  about during these conversations, didn't Mr. Larian say

23  something to the effect of, with the deal we're talking

24  about, you could be rich?

25  A.   Yeah, he might have said something like that.

EXHIBIT 7

PAGE 77

2524

1

2

3

4

5

6                       C E R T I F I C A T E

7

8

9        I hereby certify that pursuant to Title 28,

10   Section 753 United States Code, the foregoing is a true and

11   correct transcript of the stenographically reported

12   proceedings in the above matter.

13        Certified on June 12, 2008.

14

15

16   MARK SCHWEITZER, CSR, RPR, CRR
     Official Court Reporter
17   License No. 10514

18

19

20

21

22

23

24

25

EXHIBIT 7
PAGE 78

# EXHIBIT 8

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                          EASTERN DIVISION

4                              - - -

5           HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                              - - -

7     MATTEL, INC.,                    )

8                      PLAINTIFF,      )

9             VS.                      )   NO. CV 04-09049

10    MGA ENTERTAINMENT, INC., ET. AL.,)

11                     DEFENDANTS.     )   TRIAL DAY 18
                                       )   MORNING SESSION
12    AND CONSOLIDATED ACTIONS,        )   PAGES 3690-3821

13

14

15         REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                     RIVERSIDE, CALIFORNIA

17                   TUESDAY, JULY 1ST, 2008

18                        8:44 A.M.

19

20

21

22

23                 THERESA A. LANZA, RPR, CSR
                  FEDERAL OFFICIAL COURT REPORTER
24                 3470 12TH STREET, RM. 134
                  RIVERSIDE, CALIFORNIA  92501
25                     951-274-0844
                   WWW.THERESALANZA.COM

CERTIFIED COPY

1   APPEARANCES:

2

ON BEHALF OF MATTEL, INC.:

3

                        QUINN EMANUEL
4                       BY:   JOHN QUINN
                              JON COREY
5                             MICHAEL T. ZELLER
                              HARRY OLIVAR
6                             TIMOTHY ALGER
                        865 S. FIGUEROA STREET,
7                       10TH FLOOR
                        LOS ANGELES, CALIFORNIA  90017
8

9

10  ON BEHALF OF MGA ENTERTAINMENT:

11                      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                        BY:   THOMAS J. NOLAN
12                            JASON RUSSELL
                              RAOUL SLOAN
13                            LAUREN AGUIAR
                              CARL ROTH
14                      300 SOUTH GRAND AVENUE
                        LOS ANGELES, CALIFORNIA  90071-3144
15                      213-687-5000

16

17

18

19

20

21

22

23

24                              EXHIBIT ___8___
25                              PAGE ___80___

TUESDAY, JULY 1, 2008              TRIAL DAY 18  MORNING SESSION

3692

```
1                          I N D E X

2                                              PAGE

3  DEFENSE CASE (CONTINUED)....................... 3705

4  PLAINTIFF CASE (INTERRUPTED)................... 3770

5

6

7  DEFENSE
   WITNESS          DIRECT      CROSS      REDIRECT      RECROSS
8  JANET LENORE BRYANT (VIA VIDEO DEPOSITION)

9  BY MR. ZELLER    3705

10

11 PLAINTIFF
   WITNESS          DIRECT      CROSS      REDIRECT      RECROSS
12 FARHAD LARIAN

13 BY MR. QUINN     3770                    3798, 3816
   BY MR. NOLAN                 3790                     3809
14

15

16

17        EXHIBITS          RECEIVED

18        734               3768
          736               3768
19        744               3768
          754               3768
20        767               3768
          774               3768
21        778               3768
          779               3768
22        781               3768
          783               3768
23        795               3768
          18569             3811
24
                                    EXHIBIT  8
25                                  PAGE  81
```

1       LEGAL PAD LIKE I HAVE HERE OR TRANSPARENCY TYPE

2       PAPER, TISSUE PAPER, BUTCHER PAPER?  YOU

3       WOULDN'T BE ABLE TO TELL ME WHAT KIND IT WAS ON?

4       A:   NOT WITH CERTAINTY.

5       Q:   WELL, WHEN YOU SAY WITH CERTAINTY, DO YOU HAVE

6       ANY RECOLLECTION AT ALL?

7       A:   IT WAS WHITE IS ALL I KNOW.

8       Q:   WAS IT TRANSLUCENT PAPER OF ANY KIND?

9       A:   I DON'T REMEMBER.

10      Q:   (BY MR. ZELLER) IS IT FAIR TO SAY THAT DURING

11      THE TIME -- YOU DON'T HAVE A SPECIFIC

12      RECOLLECTION THAT CARTER CALLED THEM BRATZ

13      DURING THE TIME HE WAS LIVING WITH YOU THERE IN

14      KIMBERLING CITY; IS THAT CORRECT?

15      A:   THAT'S CORRECT.

16      Q:   THEN TO MAKE SURE THAT I HAVE YOUR TESTIMONY ON

17      THIS, DID CARTER AT THAT TIME WHEN HE SHOWED YOU

18      THE DRAWING, DID HE TELL YOU WHAT THE SOURCE OR

19      INSPIRATION WAS EITHER THE DRAWING OR THIS IDEA

20      THAT HE HAD FOR DOLLS?

21      A:   I DON'T RECALL THAT.

22      Q:   YOU DON'T REMEMBER HIM TALKING ABOUT THAT; IS

23      THAT TRUE?

24      A:   CORRECT.

25      Q:   NOW, AT ANY TIME HAVE YOU EVER DISCUSSED THAT

1    WITH CARTER, WHAT THE SOURCE WAS OR THE

2    INSPIRATION WAS FOR THE BRATZ DOLLS?

3    A:   I DON'T RECALL THAT. I RECALL HIM SAYING I HAVE

4    BEEN THINKING ABOUT IT. I HAVE BEEN THINKING

5    ABOUT THIS IDEA.

6    Q:   DURING THE TIME WHEN CARTER WAS LIVING WITH YOU

7    THERE IN KIMBERLING CITY, DID CARTER EVER TELL

8    YOU WHAT THE SOURCE WAS OR THE INSPIRATION WAS

9    BEHIND BRATZ?

10   A:   NOT THAT I RECALL.

11   Q:   DO YOU HAVE ANY KNOWLEDGE OR INFORMATION AS TO

12   WHAT IT IS THAT INSPIRED CARTER TO COME UP WITH

13   THE BRATZ?

14   A:   NO. GOODNESS.

15   Q:   DID CARTER EVER TELL YOU THAT HE WAS INSPIRED TO

16   COME UP WITH BRATZ BY SEEING KIDS AT KICKAPOO

17   HIGH SCHOOL?

18   A:   I DON'T RECALL HIM EVER TELLING ME THAT. HE MAY

19   HAVE AND I MAY HAVE FORGOTTEN IT, BUT I DON'T

20   RECALL IT.

21   Q:   YOU DON'T HAVE A RECOLLECTION OF THAT OCCURRING;

22   IS THAT TRUE?

23   A:   RIGHT, CORRECT.

24   Q:   HAS HE EVER SAID -- EVER GIVEN YOU A REASON AS

25   TO WHY HE DIDN'T PRESENT THE BRATZ TO MATTEL

EXHIBIT 8
PAGE 83

```
 1        INSTEAD OF MGA?

 2        A:   YES. HE TOLD ME THAT IT WAS HIS IDEA AND HE

 3        WANTED ROYALTIES.

 4        Q:   DID HE GIVE ANY OTHER REASON?

 5        A:   NO.

 6        Q:   HAS CARTER EVER SAID TO YOU IN WORDS OR

 7        SUBSTANCE THAT HE EVER DID SHOW BRATZ TO ANYONE

 8        AT MATTEL WHEN HE WAS WORKING AT MATTEL.

 9        A:   NO.

10        Q:   AND WHAT OTHER CONVERSATIONS OR COMMUNICATIONS

11        HAVE YOU HAD WITH CARTER ABOUT HIS CONTRACT?

12        A:   WHEN HE WAS NOT EMPLOYED AND HE WAS TRYING TO

13        FIGURE OUT A WAY TO EARN MONEY, I SUGGESTED

14        MAYBE DOING SOME SKETCHES AND SELLING THEM, AND

15        HE JUST SAID THAT WOULD INTERFERE WITH MY

16        CONTRACT AND I DON'T WANT TO DO THAT. I

17        WOULDN'T EVER -- HE WAS VERY CONSCIENTIOUS ABOUT

18        THAT.

19        Q:   WHAT WAS IT THAT CARTER SAID IN CONNECTION WITH

20        HIS MATTEL CONTRACT THAT WOULD BE CONSIDERED

21        UNETHICAL?

22        A:   DOING ANY WORK WHILE HE WAS EMPLOYED BY THEM.

23        Q:   (BY MR. ZELLER) ANY WORK FOR A MATTEL

24        COMPETITOR?

25        A:   YES.
```

EXHIBIT  8
PAGE  84

```
1          SO AT ONE POINT YOU SUGGESTED TO CARTER

2     THAT HE FIGURE OUT A WAY TO SELL SKETCHES THAT

3     HE HAD MADE?

4     A:   YEAH.

5     Q:   AND HE SAID, WELL, I CAN'T DO THAT BECAUSE IT

6     WOULD INTERFERE WITH MY CONTRACT WITH MATTEL?

7     A:   RIGHT.

8     Q:   AND IT'S FAIR TO SAY THAT WHEN YOU HAD THIS

9     CONVERSATION WITH CARTER, IT WAS YOUR

10    UNDERSTANDING THAT HE WAS STILL EMPLOYED BY

11    MATTEL?

12    A:   YES. EXACTLY WHEN IT WAS, I DON'T REMEMBER.

13    Q:   AND DO YOU HAVE AN ESTIMATION AS TO THE NUMBER

14    OF DRAWINGS THAT HE SHOWED YOU WHEN HE WAS THERE

15    IN KIMBERLING CITY?

16    A:   NO.

17    Q:   SO YOU'RE NOT SURE IF IT WAS 10, LESS THAN 10,

18    MORE THAN 10?

19    A:   NO.

20    Q:   WHEN WAS IT THAT CARTER SHOWED YOU THAT FIRST

21    DRAWING OF THE DOLLS?

22    A:   I DON'T REMEMBER.

23    Q:   YOU'RE SURE IT WAS WHEN YOU WERE LIVING IN

24    KIMBERLING CITY?

25    A:   YES.
```

TUESDAY, JULY 1, 2008      EXHIBIT  8      TRIAL DAY 18, MORNING SESSION
                           PAGE  85

3724

1    Q:   SO BUT YOU'RE NOT SURE DURING THAT TIME PERIOD

2         WHEN CARTER WAS LIVING WITH YOU WHEN HE FIRST

3         SHOWED YOU THAT DRAWING?

4    A:   NO.

5    Q:   OR ANY BRATZ DRAWING?

6    A:   NO, I AM NOT.

7    Q:   WELL, THAT'S MY NEXT QUESTION. I ASSUME YOU

8         DIDN'T CREATE ANY DOCUMENTS OR ANY DOCUMENTATION

9         AS TO WHEN YOU FIRST SAW THESE OR SAW ANY OF

10        THOSE BRATZ DRAWINGS; IS THAT CORRECT?

11   A:   NO.

12   Q:   I'M SORRY, IT'S CORRECT?

13   A:   IT'S CORRECT WHAT YOU SAID.

14   Q:   DURING THIS TIME PERIOD WHEN CARTER WAS LIVING

15        IN KIMBERLING CITY WITH YOU, DID YOU SHOW THOSE

16        DRAWINGS TO ANYONE ELSE?

17   A:   YES.

18   Q:   WHO ELSE DID YOU SHOW THEM TO?

19   A:   MY FRIEND JEANNE.

20   Q:   AND IS THAT J-E-A-N?

21   A:   J-E-A-N-N-E GALVANO, G-A-L-V-A-N-O.

22   Q:   G-A-L-V-A-N-O?

23   A:   YES.

24   Q:   AND YOU HAD MENTIONED SHE'S A FRIEND OF YOURS?

25   A:   YES.

1    Q:   WAS SHE LIVING IN KIMBERLING CITY AT THE TIME?

2    A:   NO.

3    Q:   WHERE DID SHE LIVE?

4    A:   ALASKA.

5    Q:   THE STATE OF ALASKA I ASSUME?

6    A:   YES.

7    Q:   WAS SHE DOWN HERE VISITING?

8    A:   YES.

9    Q:   AND SHE WAS VISITING YOU?

10   A:   YES.

11   Q:   AND STAYING IN YOUR HOME?

12   A:   YES.

13   Q:   AND IS SHE SOMEONE YOU ARE STILL IN TOUCH WITH?

14   A:   YES.

15   Q:   I TAKE IT YOU MET HER WHEN YOU LIVED UP IN

16        ALASKA?

17   A:   YES.

18   Q:   AND YOU'VE KEPT IN TOUCH WITH HER SINCE THEN?

19   A:   YES.

20   Q:   HOW DID YOU MEET HER?

21   A:   HER HUSBAND INSTALLED THE CARPET IN OUR HOME,

22        AND AFTER HE HAD BEEN THERE A FEW DAYS, HE SAID,

23        WOULD YOU BE WILLING TO GO VISIT MY WIFE. SHE'S

24        DEPRESSED. WE JUST MOVED HERE.

25   Q:   'HERE' BEING ALASKA?

TUESDAY, JULY 1, 2008        EXHIBIT  8        TRIAL DAY 18, MORNING SESSION
                            PAGE  87

1    COMING BACK UNTIL 1:45.

2            ANYTHING FROM MGA?

3            **MR. NOLAN:**  NO.  WE'RE FINE.

4            (MORNING SESSION CONCLUDED.)

5

6

7

8

9

10

11

12

13                    CERTIFICATE

14

15   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
16   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
17   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

18

19

20   THERESA A. LANZA, RPR, CSR                  7-2-08
     OFFICIAL COURT REPORTER                      DATE

21

22

23

24

25

EXHIBIT 8
PAGE 88

TUESDAY, JULY 1, 2008          TRIAL DAY 18, MORNING SESSION

# EXHIBIT 9

200

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                              ---

4          HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                              ---

6   MATTEL, INC.,                :   PAGES 200 - 339
                                 :
7           PLAINTIFF,           :
                                 :
8      VS.                       :   NO. ED CV04-09049-SGL
                                 :   [CONSOLIDATED WITH
9   MGA ENTERTAINMENT, INC.,     :   CV04-9059 & CV05-2727]
    ET AL.,                      :
10                               :
            DEFENDANTS.          :
11   _____:

12

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 RIVERSIDE, CALIFORNIA

17               TUESDAY, MAY 27, 2008

18                 JURY TRIAL - DAY 2

19                 AFTERNOON SESSION

20

21

22                        MARK SCHWEITZER, CSR, RPR, CRR
                          OFFICIAL COURT REPORTER
23                        UNITED STATES DISTRICT COURT
                          181-H ROYBAL FEDERAL BUILDING
24                        255 EAST TEMPLE STREET
                          LOS ANGELES, CALIFORNIA 90012
25                        (213) 663-3494

CERTIFIED COPY


EXHIBIT 9
PAGE 89

1   **Appearances of Counsel:**

2

3   On Behalf of Mattel:

4       Quinn Emanuel
        By John B. Quinn, Esq.
5           B. Dylan Proctor, Esq.
            Michael T. Zeller, Esq.
6           Harry Olivar, Esq.
            John Corey, Esq.
7           Diane Hutnyan, Esq.
        855 South Figueroa Street
8       10th Floor
        Los Angeles, CA 90017
9       (213) 624-7707

10

    On Behalf of MGA Entertainment:
11
        Skadden, Arps, Slate, Meagher & Flom LLP
12      By Thomas J. Nolan, Esq.
            Carl Alan Roth, Esq.
13          Jason Russell, Esq.
            Lauren Aguiar, Esq.
14          David Hansen, Esq.
            Matthew Sloan, Esq.
15      300 South Grand Avenue
        Los Angeles, CA 90071-3144
16      (213) 687-5000

17

18

19

20

21

22

23

24                                    EXHIBIT __9__
                                      PAGE __90__
25

1                            **I N D E X**

2

3  OPENING STATEMENT BY COUNSEL FOR THE DEFENSE............ 214

4  **IVY ROSS, SWORN**....................................... 276

5  DIRECT EXAMINATION BY MR. QUINN:....................... 276

6  CROSS-EXAMINATION BY MR. NOLAN:   ..................... 324

7

8                          **E X H I B I T S**

9   (Exhibit 13541-1 received.)............................. 288

10  (Exhibit 293 received.)................................ 289

11  (Exhibit 13535-13540 received.)........................ 292

12  (Exhibit 432 received.)................................ 301

13  (Exhibit 316 received.)................................ 305

14  (Exhibit 314 received.)................................ 307

15  (Exhibit 257 received.)................................ 309

16  (Exhibit 257-4 and 257-6 received.)..................... 311

17  (Exhibit 258-1 and 258-6 received.)..................... 312

18  (Exhibit 259-1 and 259-5 received.)..................... 313

19  (Exhibit 48-11 received.).............................. 316

20  (Exhibit 48-1 received.)............................... 320

21  (Exhibit 48-2 received.)............................... 321

22  (Exhibit 48-008 received.)............................. 336

23                              1

24                                    EXHIBIT ___9___

25                                    PAGE ___91___

294

1  the business side.

2          So together we would look at the designers' work

3  and agree on what we thought was ready to go into the final

4  executive meetings, which is where we would decide what would

5  go to the next step.

6  **Q.**   Did you regard it as part of your job to promote

7  creativity in the design center?

8  **A.**   Oh, yes.  I mean, I have --

9  **Q.**   My next question for you is how do you do that?  How do

10  you promote creativity?

11  **A.**   Well, I think some of the ways are you have to balance

12  the realities versus the possibilities.  The realities to me

13  are things that we had to make sure that we had, like a

14  number of dolls made at a certain price point, and then

15  there's the possibilities of what a designer may come up with

16  on their own that's unique and wonderful.

17  **Q.**   Were designers encouraged to come up with ideas on their

18  own?

19  **A.**   Absolutely.  Like I said, there was a certain amount

20  that they had to get done, and there was a certain amount of

21  blue sky slots and time allotted for something they wanted to

22  do on their own.  And a designer was always free to go to

23  their management and show them an idea that she had, and the

24  manager could say absolutely.  Go do it.  So they had the

25  ability to use Mattel's resources in terms of the sculptors,

EXHIBIT ___9___

PAGE ___92___

1  hair and face paint, to take the idea to the next level and

2  then come show myself and the business partners.

3  Q.   Did you develop any particular programs or approaches in

4  order to promote new ideas?

5  A.   Well, I think this idea of letting people create their

6  own brands, I bring in inspirational speakers because I

7  believe you can't ask people for output until you give them

8  input.  So I'd bring in trend forecasters and psychologists

9  who would talk about how kids think and play to encourage

10  their minds and give them some time to take that information

11  and generate a new idea or a new play pattern.

12         There was something called project platypus, which

13  was a think tank also to help foster innovation and

14  creativity, which is where 12 people were taken out of the

15  design center, brought to another space across the street,

16  and really created new ideas and new brands.

17         So I was very much -- we were in the United States

18  the largest toy company, and it was crazy not to be creative.

19  That's why we were all in.  You have to balance that with

20  your business obligations, but the business gets the best of

21  the creativity when you're able to do both.

22  Q.   At Mattel, were you focused on toys or dolls only for

23  girls of a certain age?

24  A.   No.  I mean, we -- as Barbie started to trade down

25  younger and spread her wings, we needed to balance that with



EXHIBIT  9
PAGE  93

1  brands for the older girls.  So when I first came on, there

2  was Mystery Squad, and then we created Generation Girl and

3  then My Scene in terms of how we evolved the Barbie brand for

4  the older girl.

5  Q.    What is the role of a drawing, a two-dimensional drawing

6  in the process of creating a doll?

7  A.    I liken that to the blueprint for building a house.  I

8  mean, that's where it all starts.  That's the foundation, and

9  that drawing is given to the sculptor, the model maker.  The

10  designer, we call them the preliminary designers, they are

11  the ones that come up with the idea.  And they have that in

12  some way express their idea because what happens is other

13  team members do component parts.  So that drawing goes to the

14  sculpting, it then goes to face paint to do the face paint,

15  but without that initial drawing, it would be hard for all

16  those multiple people to be able to execute against it.  So

17  it's the blueprint in my mind.

18  Q.    Does the drawing include the artist's sort of vision for

19  what this doll might ultimately look like?

20  A.    Every artist has their own hand.  So if you're not doing

21  it on computer and you're sketching it, it tends to have a

22  certain style.  So I think everyone's drawing would show

23  their own personal style.  And that would be captured in the

24  execution of the sculpting or the face paint.

25  Q.    Now, while you were at Mattel, did the Mattel designers

EXHIBIT  9
PAGE  94

1   who were employees, did they sign inventions agreements with

2   the company?

3   A.   I don't remember what it was called, but I remember it's

4   something.   For the 35 years I've been working at companies,

5   it's something you always sign.   Companies word it

6   differently, and I don't remember what Mattel's was worded.

7   But I know when I signed on, that I did sign something

8   that --

9   Q.   You signed one yourself?

10  A.   Yes.

11  Q.   And was that true of the other artistic people in the

12  design center?

13          MR. NOLAN:   Objection.   Your Honor.   Lacks

14  foundation.

15          THE COURT:   Sustained.   Lay a foundation, Counsel.

16  Q.   BY MR. QUINN:   Do you know whether or not Mattel had a

17  policy in the design center that folks who came to work

18  there, these artistic creative people, would enter into some

19  type of agreement with the company?

20  A.   Yes, my understanding was it wasn't just the artistic

21  people, but it was everyone in the design center.   The

22  engineers, everyone needed to sign that.

23  Q.   And can you tell us what your understanding was about

24  what that agreement provided in terms of ownership of what

25  was created?


EXHIBIT  9
PAGE  95

298

1          MR. NOLAN:   Your Honor, objection.   Lack of

2    foundation.   She doesn't recall signing the document.

3          THE COURT:   Sustained.   Lay a further foundation,

4    Counsel.

5    Q.   BY MR. QUINN:   Do you recall that you signed such a

6    document yourself?

7    A.   Yes, I definitely signed the document.

8    Q.   And did you have an understanding at the time as to what

9    you were agreeing to?

10   A.   Yes.

11   Q.   And what was it that you understood you were agreeing

12   to?

13   A.   That while I was employed by Mattel, any of the ideas

14   that I -- again, this may not be the words, but it's my

15   understanding.   Again, any of the ideas that I had, no matter

16   whether it was while I was home at night or out at a trade

17   fair, as long as it was within Mattel's range of products

18   that we created, that that was the property of Mattel.   So,

19   for example, if I came up with a car design, that wouldn't be

20   the property of Mattel.

21   Q.   Not Mattel's business.

22   A.   Right.   But anything that was within Mattel's range,

23   that they owned that idea.   It's been the same wherever I've

24   worked, whether it was -- wherever I worked.   So people word

25   it differently, but it's pretty standard.

EXHIBIT __9__
PAGE __96__

299

1   Q.   Is it your experience that creative designers, people

2   who are creative and who have design jobs, who are also

3   employees in your experience in 35 years, can you tell us

4   whether or not it's customary that those types of agreements

5   are entered into?

6   A.   Yes, it is.

7   Q.   Do -- when you were there, did Mattel designers, were

8   they permitted to do some work at home rather than checking

9   into the design center?

10  A.   I remember sometimes we would allow that, yes.

11  Q.   And is that -- if folks worked at home on a toy, was it

12  the understanding that their creative contribution, even if

13  they did it at home relating to a toy, that that was owned by

14  the company?

15  A.   Absolutely.  As long as you were employed by Mattel, no

16  matter where you did it, if it was something that Mattel

17  could have been making, then they owned it.

18  Q.   All right.  Now, this design center that we looked at,

19  is that something that's open to the public?

20  A.   No.  It's a very, very tight security.

21  Q.   Can you describe that security for us, please?

22  A.   Well, there's a desk that you have to check in at, and

23  no cameras are allowed.  You have to ask -- you are asked who

24  you have come to see.  In fact, we have vendor rooms outside

25  the design center.  So often certain vendors we wouldn't even

EXHIBIT ___9___

PAGE ___97___

300

1  let behind the scenes.  It's almost like Santa's workshop.

2  So we meet with people out in the lobby in these vendor

3  rooms, because it was very secretive.  It was like for toy

4  fair, you had to protect your ideas, again, not amongst

5  ourselves, that was a culture of sharing.  But in terms of

6  the outside world, we were very secretive.

7  Q.    You referred to a toy fair.  What is a toy fair?

8  A.    Toy fair is once a year, where the toys -- in February,

9  it was in New York, and then it got moved to Mattel's campus.

10  It's kind of the great reveal.  It's where you worked all

11  year to show your new line of toys, because in the toy

12  industry, the bulk of your money is made during the Christmas

13  season.  So yeah, it was the great reveal.  It's what we all

14  worked hard toward getting the latest and greatest toys ready

15  for toy fair.

16  Q.    And who would attend these toy fairs?

17  A.    The customers.  So the retailers, and some other toy

18  companies were there because they were exhibiting.  So toy

19  companies would get to see other toy companies' work, but it

20  was mostly for the buyers and retailers.

21  Q.    All right.  And you say that toy fair was originally in

22  New York.  Over time, were there toy fairs that took place in

23  other cities around the world, such as Hong Kong?

24  A.    I don't know if they called it the toy fair.  They have

25  their own toy fair, but the toy fair was the one --



EXHIBIT ___9___
PAGE ___98___

339

1    tomorrow morning at 8:30.

2

3              (Proceedings concluded at 5:05 P.M.)

4

5

6

7

8

9

10

11

12              C E R T I F I C A T E

13

14

15        I hereby certify that pursuant to Title 28,

16   Section 753 United States Code, the foregoing is a true and

17   correct transcript of the stenographically reported

18   proceedings in the above matter.

19        Certified on May 27, 2008.

20

21   _____

22   MARK SCHWEITZER, CSR, RPR, CRR
     Official Court Reporter
23   License No. 10514

24

25


EXHIBIT 9
PAGE 99

# EXHIBIT 10

451



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

- - -

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

- - -

| | |
|---|---|
| MATTEL, INC., | ) PAGES 451-577 |
| PLAINTIFF, | ) |
| VS. | ) NO. CV 04-09049 |
| MGA ENTERTAINMENT, INC., ET. AL., | ) |
| DEFENDANTS. | ) TRIAL DAY 3, |
| AND CONSOLIDATED ACTIONS, | ) AFTERNOON SESSION |

REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

RIVERSIDE, CALIFORNIA

WEDNESDAY, MAY 28, 2008

1:18 P.M.

THERESA A. LANZA, RPR, CSR
FEDERAL OFFICIAL COURT REPORTER
3470 12TH STREET, RM. 134
RIVERSIDE, CALIFORNIA  92501
951-274-0844
WWW.THERESALANZA.COM

CERTIFIED COPY

MAY 28TH, 2008          TRIAL DAY 3, AFTERNOON SESSION

EXHIBIT 10
PAGE 100

```
 1    APPEARANCES:

 2
      ON BEHALF OF MATTEL, INC.:
 3
                           QUINN EMANUEL
 4                         BY:  JOHN QUINN
                                JON COREY
 5                              MICHAEL T. ZELLER
                                HARRY OLIVAR
 6                              TIMOTHY ALGER
                           865 S. FIGUEROA STREET,
 7                         10TH FLOOR
                           LOS ANGELES, CALIFORNIA  90017
 8                         213-624-7707

 9

10    ON BEHALF OF MGA ENTERTAINMENT:

11                         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                           BY:  THOMAS J. NOLAN
12                              JASON RUSSELL
                                RAOUL KENNEDY
13                              LAUREN AGUIAR
                           300 SOUTH GRAND AVENUE
14                         LOS ANGELES, CALIFORNIA  90071-3144
                           213-687-5000
15

16

17

18

19

20

21

22

23

24                                         EXHIBIT  10
25                                         PAGE  101
```

MAY 28TH, 2008          TRIAL DAY 3, AFTERNOON SESSION

```
 1                         I N D E X

 2                                                    PAGE

 3    PLAINTIFF CASE (CONTINUED)...................   463

 4

 5    PLAINTIFF
      WITNESS           DIRECT     CROSS    REDIRECT    RECROSS
 6    LILIANA MARTINEZ (CONTINUED)

 7    BY MR. QUINN       463                  515
      BY MR. NOLAN                  474                  518
 8

 9

10    PLAINTIFF
      WITNESS           DIRECT     CROSS    REDIRECT    RECROSS
11    PAULA GARCIA (TREANTAFELLES)

12    BY MR. PRICE       522

13

14

15

16            EXHIBITS           RECEIVED

17            276-1                 466
              17246                 504
18            193                   506
              115                   507
19            126                   509
              320                   536
20            1116                  541
              1117                  545
21            301                   549
              201 (FIRST PAGE)      554
22            402-B                 557
              402                   557
23            400                   565
              11328                 565
24            302                   566
              305                   572
25            18                    574
      /  /  /
```

EXHIBIT __10__
PAGE __102__

MAY 28TH, 2008          TRIAL DAY 3, AFTERNOON SESSION

1   Q    SO YOUR TESTIMONY IS THAT PRIOR TO OCTOBER 12TH, YOU NEVER

2   GAVE TO ANYONE, ANY OUTSIDE VENDORS, RENDERINGS OF THE OUTFITS

3   FOR BRATZ; IS THAT RIGHT?

4   A    THAT'S CORRECT.

5          TO BE CLEAR, WHEN YOU DEFINE THE FASHIONS FOR BRATZ,         03:54

6   I RECOGNIZE THAT TO BE THE FASHIONS THAT WE MANUFACTURED WITH.

7   Q    SO THIS WAS A LITTLE BIT OF A DETOUR.   I WANTED TO FIND

8   OUT IF THIS REFRESHED YOUR RECOLLECTION ABOUT MR. LINKER.

9          YOUR TESTIMONY IS THAT WHILE YOU WERE AT MATTEL, YOU

10  WEREN'T AWARE THAT MR. LINKER HAD SUGGESTED THE NAME BRATZ FOR      03:55

11  DIVA STARZ; IS THAT YOUR TESTIMONY?

12  A    THAT IS MY TESTIMONY.

13  Q    TO BE CLEAR, THAT'S SOMETHING THAT YOU'RE SURE OF; ITS NOT

14  SOMETHING THAT, BECAUSE OF THE PASSAGE OF TIME, YOU MAY HAVE

15  FORGOTTEN; CORRECT?                                                 03:55

16  A    CORRECT.

17  Q    LET ME ASK YOU THIS, THEN, ABOUT WHILE YOU WERE AT MATTEL.

18         IN FRONT OF YOU IS THIS GIGANTIC CHART I'M GOING TO

19  ASK YOU TO UNFOLD; IT'S 293; IT'S IN BINDER ONE.

20         DO YOU REMEMBER AT YOUR DEPOSITION YOU WERE SHOWN            03:56

21  THIS EXHIBIT 293?

22  A    I BELIEVE THAT I WAS SHOWN A PORTION OF THIS EXHIBIT WHERE

23  NAMES WERE WHITED OUT.

24  Q    RIGHT.

25         AND THAT'S SO YOU WOULDN'T KNOW THE NAMES SURROUNDING        03:56

EXHIBIT 10
PAGE 103

540

1   YOU ON THE CHART; CORRECT?

2   A    I'M NOT SURE.

3   Q    BUT BY LOOKING AT WHAT YOU'VE BEEN GIVEN, YOU DIDN'T KNOW

4   WHAT THE NAMES WERE OF THOSE FOLKS AROUND YOU; CORRECT?

5   A    CORRECT.                                                    03:56

6   Q    WHEN YOU LOOKED AT THE CHART THAT HAD THE WHITED OUT

7   NAMES, YOU IDENTIFIED WHERE YOU SAT FOR A CERTAIN PERIOD OF

8   TIME; CORRECT?

9   A    YES.

10  Q    AND WHERE YOU IDENTIFIED WAS, IF WE CAN LOOK AT THIS AREA   03:57

11  HERE, AND THE CUBICLE YOU IDENTIFIED WAS THE ONE HERE THAT HAS

12  "P. TREANTAFELLES" ON IT; CORRECT?

13  A    THAT'S CORRECT.

14  Q    AND YOU IDENTIFIED THAT THIS AREA HERE WAS THE MAIN

15  ENTRANCE.                                                       03:57

16  A    CORRECT.

17  Q    AND AS TO WHEN YOU WERE THERE, FIRST OF ALL, YOU SEE THAT

18  THE DATE ON THIS SAYS "REVISED, JANUARY 5, 1999."

19          DO YOU SEE THAT?

20  A    YES.                                                       03:57

21  Q    AND IT WAS YOUR TESTIMONY THAT YOU SAT AT THAT PARTICULAR

22  CUBICLE SOMEWHERE BETWEEN 12 AND 18 MONTHS; CORRECT?

23  A    YES.

24  Q    AND, OF COURSE, 18 MONTHS WOULD PUT YOU SOME TIME INTO

25  JANUARY OF '99; CORRECT?                                        03:58

MAY 28TH, 2008            TRIAL DAY 3, AFTERNOON SESSION

EXHIBIT _10_
PAGE _104_

541

1   A    YES.

2   Q    WHILE YOU WERE AT MATTEL, DO YOU RECALL YOU SIGNED

3   SOMETHING CALLED AN INVENTIONS AGREEMENT?

4            I'LL REPHRASE THAT?

5            TO MAKE IT SIMPLER, JUST LOOK AT EXHIBIT 1116, WHICH    03:58

6   IS IN VOLUME II, IF YOU WOULD LOOK AT THAT.

7            IS THIS THE EMPLOYEE CONFIDENTIAL INFORMATION AND

8   INVENTIONS AGREEMENT THAT YOU SIGNED WHEN YOU STARTED WORK AT

9   MATTEL?

10  A    YES.
                                                                    03:59

11           MR. PRICE:   MOVE EXHIBIT 1116 INTO EVIDENCE, YOUR

12  HONOR.

13           THE COURT:   ANY OBJECTION?

14           MS. AGUIAR:   NO OBJECTION.

15           THE COURT:   ADMITTED.   YOU MAY PUBLISH.    03:59

16  BY MR. PRICE:

17  Q    IS THIS YOUR SIGNATURE HERE ON THE SECOND PAGE WHERE IT

18  SAYS "JULY 4, '97"?

19  A    YES.

20  Q    THERE WAS SOMEONE THERE WHO SIGNED AT THE SAME TIME YOU

21  DID.                                                            03:59

22  A    IT APPEARS SO.

23  Q    DO YOU RECALL THAT, OR...

24  A    NO.

25  Q    DO YOU RECALL WHO IT WAS?
                                                                    03:59

MAY 28TH, 2008          TRIAL DAY 3, AFTERNOON SESSION   EXHIBIT 10

PAGE 105

542

1    A    NO.

2    Q    DO YOU RECOGNIZE THE SIGNATURE HERE?  DO YOU KNOW WHO THAT

3    IS?

4    A    NO.

5    Q    IN ANY EVENT, OF COURSE YOU READ THIS BEFORE YOU SIGNED    03:59

6    IT.

7    A    I DID NOT READ IT IN GREAT DETAIL.

8    Q    YOU READ IT IN ENOUGH DETAIL TO GET THE GIST OF WHAT IT

9    SAID; CORRECT?

10   A    YES.    04:00

11   Q    AND ONE OF THE THINGS THAT IT SAID, GOING BACK TO THE

12   FIRST PAGE, YOU UNDERSTOOD THAT IF YOU CAME UP WITH ANY

13   INVENTIONS OR DESIGNS WHILE YOU WERE AT MATTEL, WORKING FOR

14   MATTEL, THAT RELATED TO MATTEL'S BUSINESS WHILE YOU WERE

15   WORKING THERE, GETTING PAID BY THEM, THOSE DESIGNS AND    04:00

16   INVENTIONS WERE MATTEL'S.

17   A    YES.

18   Q    AND WHAT YOU ALSO KNEW WAS YOU WERE SUPPOSED TO DEVOTE

19   YOUR EFFORTS TO MATTEL AND NOT WORK FOR ANOTHER COMPANY AT THE

20   SAME TIME.    04:00

21   A    I GENERALLY UNDERSTOOD THAT, YES.

22   Q    I MEAN, YOU WOULD HAVE UNDERSTOOD THAT WITHOUT SIGNING

23   THAT DOCUMENT; RIGHT?

24   A    YES.

25   Q    YOU KNEW IT WOULD BE DISHONEST OF YOU TO BE TAKING A    04:00

MAY 28TH, 2008          TRIAL DAY 3, AFTERNOON SESSION    EXHIBIT _10_
                                                          PAGE _106_

1  PAYCHECK FROM MATTEL BUT WORKING FOR ONE OF THEIR COMPETITORS

2  AT THE SAME TIME; RIGHT?

3  A    I'M NOT SURE IF IT'S NECESSARILY DISHONEST.  I WOULD --

4  Q    LET'S SAY WRONG.  YOU WOULD KNOW THAT IT WAS WRONG TO WORK

5  FOR MATTEL AND AT THE SAME TIME, BEHIND THEIR BACK, WORK FOR     04:01

6  ONE OF THEIR COMPETITORS.

7  A    YES.

8  Q    IF YOU KNEW SOMEONE WAS DOING THAT, THAT, IN YOUR MIND,

9  WOULD CAST SOME DOUBT ON THEIR HONESTY AND THEIR CREDIBILITY;

10 RIGHT?  IF THEY WERE WORKING FOR ONE COMPANY, BUT AT THE SAME    04:01

11 TIME, BEHIND THAT COMPANY'S BACK, WORKING FOR ONE OF THEIR

12 COMPETITORS?

13 A    YES.

14 Q    IT WOULD MEAN PERHAPS YOU SHOULDN'T TRUST THAT PERSON;

15 CORRECT?                                                         04:01

16 A    YES.

17 Q    AND, IN FACT, IF WE GO TO THE SECOND PAGE OF THIS, YOU SEE

18 IT SAYS "CONFLICTS WITH OTHER ACTIVITIES," WHERE IT SAYS "MY

19 EMPLOYMENT WITH THE COMPANY REQUIRES MY UNDIVIDED ATTENTION AND

20 EFFORT.  THEREFORE, DURING MY EMPLOYMENT WITH THE COMPANY, I     04:02

21 WILL FULLY COMPLY WITH THE COMPANY'S CONFLICT OF INTEREST

22 POLICY, AS IT MAY BE AMENDED FROM TIME TO TIME.  I SHALL NOT,

23 WITHOUT THE COMPANY'S EXPRESS WRITTEN CONSENT, ENGAGE IN ANY

24 EMPLOYMENT OR BUSINESS OTHER THAN FOR THE COMPANY, OR INVEST IN

25 OR ASSIST IN ANY MANNER ANY BUSINESS COMPETITIVE WITH THE        04:02

544

1    BUSINESS OR FUTURE BUSINESS PLANS OF THE COMPANY."

2          YOU UNDERSTOOD THAT YOU HAD THAT OBLIGATION WHILE AT

3    MATTEL; CORRECT?

4    A    YES.

5    Q    NOW, YOU ALSO UNDERSTOOD THAT THIS SORT OF AGREEMENT WAS          04:02

6    TYPICAL IN THE TOY INDUSTRY.

7    A    I EXPECTED SO.  I DIDN'T KNOW FOR SURE.

8    Q    IT WAS YOUR UNDERSTANDING THAT OTHER MATTEL EMPLOYEES HAD

9    TO SIGN THIS SAME TYPE OF AGREEMENT, SAYING THAT IF THEY

10   INVENTED SOMETHING WHILE AT MATTEL, IT BELONGED TO MATTEL AND         04:03

11   THEY WEREN'T SUPPOSED TO WORK FOR COMPETITORS WHILE THEY WERE

12   BEING PAID FOR MATTEL.

13   A    YES.

14   Q    NOW YOU ALSO UNDERSTOOD THAT YOU WERE AN AT-WILL EMPLOYEE;

15   CORRECT?                                                             04:03

16   A    I'M NOT SURE WHAT AT-WILL EMPLOYEE MEANS.

17   Q    THEN, DID YOU UNDERSTAND THAT YOU COULD QUIT MATTEL FOR

18   ANY REASON; THAT YOU DIDN'T HAVE TO HAVE SOME EXCUSE FOR

19   QUITTING; THAT YOU WERE FREE TO QUIT WHENEVER YOU WANTED?

20   A    YES.                                                            04:03

21   Q    AND YOU UNDERSTOOD THAT MATTEL COULD END YOUR EMPLOYMENT

22   FOR ANY REASON, AS LONG AS IT WASN'T FOR SOME ILLEGAL REASON.

23   A    YES.

24   Q    BUT THAT WHILE YOU WERE AT MATTEL, IT WAS YOUR

25   UNDERSTANDING THAT YOU WERE REQUIRED TO COMPLY WITH                  04:03

MAY 28TH, 2008          TRIAL DAY 3, AFTERNOON SESSION        EXHIBIT  10

                                                             PAGE  108