545

```
 1   EXHIBIT 1116, THIS EMPLOYEE CONFIDENTIAL INFORMATION AND
 2   INVENTIONS AGREEMENT; CORRECT?
 3   A    YES.
 4   Q    NOW, WE TALKED ABOUT, I THINK YOU SAID YOU EXPECTED THAT
 5   OTHERS IN THE TOY INDUSTRY WOULD HAVE THE SAME SORTS OF           04:04
 6   AGREEMENTS.  YOU CAME TO LEARN THAT MGA HAD THE SAME TYPE OF
 7   AGREEMENT; CORRECT?
 8   A    YES.
 9   Q    AND IF YOU COULD LOOK AT EXHIBIT 1117, THE NEXT ONE RIGHT
10   THERE.  DO YOU RECOGNIZE EXHIBIT 1117 AS THE AGREEMENT YOU        04:04
11   SIGNED WHEN YOU WENT TO MGA?
12   A    YES.
13           MR. PRICE:  I'D MOVE EXHIBIT 1117 INTO EVIDENCE.
14           THE COURT:  ANY OBJECTION?
15           MS. AGUIAR:  NO OBJECTION.                                04:04
16           THE COURT:  ADMITTED.  YOU MAY PUBLISH.
17           MR. PRICE:  THANK YOU, YOUR HONOR.
18   BY MR. PRICE:
19   Q    IF WE COULD GO TO THE FIFTH PAGE.
20           THIS IS YOUR SIGNATURE, IN PRINTED NAME, ON APRIL 17,     04:05
21   2000; CORRECT?
22   A    CORRECT.
23   Q    AND YOU SEE THERE'S SOMETHING CALLED AN INVENTIONS
24   ASSIGNMENT?
25   A    YES.                                                         04:05
```

546

```
1    Q    AND YOU UNDERSTOOD THAT BASICALLY THIS WAS SAYING THE SAME
2    THING THAT YOUR MATTEL AGREEMENT SAID, WHICH IS THAT IF YOU
3    INVENT SOMETHING WHILE YOU'RE AT MGA THAT PERTAINS TO MGA'S
4    BUSINESS, THAT WOULD BELONG TO MGA; CORRECT?
5    A    YES.
6    Q    SO LET ME THEN MOVE FROM THESE CONTRACTS AND DISCUSSIONS
7    ABOUT YOUR OBLIGATIONS AND TALK ABOUT WHEN YOU TALKED WITH
8    CARTER BRYANT ABOUT THE CONCEPT WHICH WE'RE TERMING BRATZ.
9    OKAY?
10            ARE YOU WITH ME SO FAR?
11   A    YES.
12   Q    AND I HESITATE TO DO THIS, AFTER MS. MARTINEZ DREW ON
13   SOMETHING, BUT I'M GOING TO TRY TO DO THE BEST I CAN TO PUT UP
14   A TIMELINE HERE SO WE CAN FOLLOW WHEN YOU SAY CERTAIN THINGS
15   HAPPENED.
16            OKAY?
17   A    YES.
18   Q    NOW, I BELIEVE YOUR TESTIMONY IS THAT THE FIRST MEETING
19   THAT YOU HAD WITH MR. CARTER ABOUT BRATZ WAS SEPTEMBER 1ST; IS
20   THAT RIGHT?
21   A    THAT'S RIGHT.
22   Q    AND I BELIEVE YOUR TESTIMONY WAS THAT YOU WERE HAVING A
23   DISCUSSION WITH VERONICA MARLOW WHO WAS A FORMER MATTEL
24   EMPLOYEE AND A VENDOR; CORRECT?
25   A    CORRECT.
```

04:05

04:06

04:06

04:06

04:06

04:06

MAY 28TH, 2008          TRIAL DAY 3, AFTERNOON SESSION

EXHIBIT __10__

PAGE __110__

547

1    Q    AND THAT IN MID AUGUST, YOU WERE ON YOUR WAY TO DO A PHOTO

2    SHOOT.

3    A    YES.

4    Q    SO MS. MARLOW, THEN, IS IN MID AUGUST.

5         IS THERE AN E ON MARLOW?                                    04:08

6    A    YES.

7    Q    AND THAT AT THIS PHOTO SHOOT, YOU MENTIONED TO HER THAT

8    YOU HAD SOME INTERESTS IN GETTING INTO THE FASHION DOLL MARKET.

9    A    YES.

10   Q    SHE DIDN'T BRING IT UP TO YOU, YOU BROUGHT IT UP TO HER;    04:09

11   THAT'S YOUR TESTIMONY; CORRECT?

12   A    CORRECT.

13   Q    NOW, IT'S TRUE, IS IT NOT, THAT THERE WAS NEVER AN

14   INSTANCE PRIOR TO SEPTEMBER 1ST WHEN ISAAC LARIAN EVER ASKED

15   YOU TO LOOK INTO FASHION DOLL IDEAS; CORRECT?                    04:09

16   A    NOT THAT I CAN REMEMBER, NO.

17   Q    I MEAN, YOUR RECOLLECTION IS THAT NO ONE OTHER THAN YOU

18   EVER EXPRESSED AN INTEREST IN THE FASHION DOLL MARKET PRIOR TO

19   YOU MEETING WITH MS. MARLOW; CORRECT?

20   A    THAT'S MY MEMORY.                                           04:09

21   Q    AND IT WAS A COUPLE OF DAYS BEFORE THIS SEPTEMBER 1ST

22   MEETING WHEN YOU MENTIONED TO MR. LARIAN THAT YOU WERE

23   INTERESTED IN MGA ENTERING THIS FASHION DOLL MARKET; CORRECT?

24   A    I BELIEVE SO, YES.

25   Q    SO IF THAT'S SEPTEMBER 1ST, IT WAS SOME TIME IN THAT WEEK   04:10

MAY 28TH, 2008            TRIAL DAY 3, AFTERNOON SESSION

EXHIBIT ___10___
PAGE ___111___

548

```
 1   BEFORE SEPTEMBER 1ST AND AFTER YOU SPOKE WITH MS. MARLOW THAT
 2   YOU WENT TO MR. LARIAN AND SAID 'I'M INTERESTING IN MGA MOVING
 3   INTO THE FASHION DOLL MARKET'; CORRECT?
 4   A    YES.
 5   Q    SO YOUR TESTIMONY THEN IS THAT AFTER MEETING WITH MARLOW    04:1(
 6   AND SHE SAID 'I'VE GOT THIS GUY YOU SHOULD TALK TO;
 7   MR. BRYANT'; CORRECT?
 8   A    YES.
 9   Q    THAT YOU GOT A NOTICE, OUT OF THE BLUE, TO ATTEND A
10   SEPTEMBER 1ST MEETING.                                          04:1(
11   A    OUT OF THE BLUE?
12   Q    YOU DON'T KNOW HOW THIS NOTICE CAME ABOUT.  YOU DON'T KNOW
13   HOW THE MEETING WAS SCHEDULED.  YOU DIDN'T SCHEDULE THE
14   MEETING.  YOU JUST GOT A NOTICE SAYING THERE'S GOING TO BE A
15   SEPTEMBER 1ST MEETING AT WHICH YOU AND MR. BRYANT AND I THINK    04:11
16   MS. O'CONNOR WOULD ATTEND; CORRECT?
17   A    THAT'S CORRECT.
18        I BELIEVE I KNOW HOW THAT MEETING WAS SCHEDULED.  I'M
19   NOT CERTAIN, BUT I BELIEVE I UNDERSTAND.
20   Q    AT THE TIME OF YOUR DEPOSITION, YOU SAID YOU DIDN'T KNOW    04:11
21   HOW THAT HAPPENED; CORRECT?
22   A    I'M NOT SURE.
23   Q    IF YOU LOOK AT EXHIBIT 301, WHICH I THINK IS THAT SAME
24   VOLUME YOU'RE LOOKING AT, IS THAT THE DOCUMENT WHICH SAYS
25   THERE'S GOING TO BE A SEPTEMBER 1ST MEETING?                     04:12
```

MAY 28TH, 2008                TRIAL DAY 3, AFTERNOON SESSION

EXHIBIT _10_

PAGE _112_

```
 1   DEVELOPMENT WITH PRAYER ANGELS, I DIDN'T HAVE ANYTHING SPECIFIC
 2   THAT I NEEDED HER TO CREATE.  IT WAS A VERY VAGUE ASSIGNMENT
 3   AND IT WAS JUST TO ADJUST AS MUCH AS SHE CAN TO CHANGE THE FACE
 4   SO THAT IT DOESN'T LOOK AS MUCH LIKE A CABBAGE PATCH.
 5   Q    WELL, I'VE ASKED YOU ABOUT THIS JUNE TIME FRAME AND ABOUT
 6   MS. MORRIS AND MS. RHEE AND WHAT SHE WAS DOING IN THIS TIME
 7   FRAME, SO LET ME ASK YOU THEN ABOUT THE AUGUST TIME FRAME.
 8        PREVIOUSLY, YOU WERE SAYING THAT YOU'RE NOT SURPRISED
 9   YOU MET WITH MR. LARIAN IN SEPTEMBER BEFORE PREVIOUSLY MEETING
10   WITH MR. BRYANT.  DO YOU RECALL THAT?
11        THAT'S NOT SOMETHING THAT WOULD SURPRISE YOU.
12   A    CORRECT.
13   Q    NOW, YOU TOLD US WHO MS. O'CONNOR IS; SHE'S IN FINANCE; IS
14   THAT RIGHT?
15   A    SHE WAS RESPONSIBLE FOR LICENSING AT MGA.
16   Q    AND ISN'T IT TRUE THAT YOU HAD A MEETING IN AUGUST WITH
17   MS. O'CONNOR AND MR. BRYANT AND YOU?
18   A    I DON'T REMEMBER THAT MEETING.
19   Q    DO YOU RECALL A MEETING WHERE MR. BRYANT SHOWED YOU SOME
20   DRAWINGS AND YOU SHRIEKED AND SAID YOU LOVED THEM?
21   A    I'M SORRY.  CAN YOU PLEASE REPEAT.
22   Q    DO YOU REMEMBER A MEETING WHERE MR. BRYANT SHOWED YOU SOME
23   DRAWINGS AND YOU SHRIEKED AND SAID YOU LOVED THEM?
24   A    YES.
25   Q    AND MS. O'CONNOR HAD SAID BEFORE GOING IN, 'WHATEVER YOU
```

04:37
04:37
04:38
04:38
04:38

EXHIBIT __10__
PAGE __113__

564

1   DO, DON'T LOOK EXCITED, BECAUSE YOU KNOW WE'RE GOING TO BE

2   DISCUSSING DOLLARS AT SOME POINT.'

3   A    I BELIEVE SHE SAID TO KEEP A POKER FACE.

4   Q    OKAY.

5          THE COURT:  COUNSEL?                                    04:39

6          MS. AGUIAR:  I WAS WONDERING, I THOUGHT WE WERE

7   SUPPOSED TO QUESTION AT THE LECTERN.  I THOUGHT WE WERE

8   SUPPOSED TO BE HERE.

9          THE COURT:  COUNSEL HAS LEAVE TO APPROACH THE EASEL

10  FOR PUTTING THINGS ON THE DIAGRAM, BUT OTHERWISE STAY AT THE   04:39

11  LECTERN.

12         MR. PRICE:  YES, YOUR HONOR.

13  BY MR. PRICE:

14  Q    IF YOU WOULD LOOK AT EXHIBIT 11328; THAT'S GOING TO BE IN

15  THAT THIRD VOLUME.  DO YOU HAVE THAT?                          04:39

16  A    YES.

17  Q    AND YOU SEE THAT THIS APPEARS TO BE AN E-MAIL SENT FROM A

18  DEEDEE BROWN TO YOU AND MS. O'CONNOR REGARDING CARTER BRYANT,

19  DATED AUGUST 18, 2000.

20         DO YOU SEE THAT?                                        04:40

21  A    YES.

22  Q    AND THIS IS AN E-MAIL THAT YOU RECEIVED.

23  A    I DON'T REMEMBER THIS E-MAIL.

24  Q    AGAIN, IT APPEARS TO BE, IF YOU LOOK AT THE BOTTOM, IT HAS

25  AN MGA BATES NUMBER FROM MGA'S RECORDS; CORRECT?              04:40

EXHIBIT 10
PAGE 14

565

1    A    YES.

2    Q    DO YOU HAVE ANY REASON TO BELIEVE THIS IS NOT THE E-MAIL

3    THAT WAS SENT TO YOU ON AUGUST 18TH REGARDING MR. BRYANT?

4    A    NO.

5         **MR. PRICE:**  YOUR HONOR, I'D MOVE EXHIBIT 11328 INTO      04:41

6    EVIDENCE.

7         **MS. AGUIAR:**  NO OBJECTION.

8         **THE COURT:**  IT'S ADMITTED.

9         YOU MAY PUBLISH.

10   **BY MR. PRICE:**                                                 04:41

11   Q    DOES THIS REFRESH YOUR MEMORY THAT IN ADDITION TO THE

12   SEPTEMBER 1ST MEETING, YOU ALSO HAD A MEETING IN MID AUGUST

13   WITH MR. BRYANT ABOUT THIS BRATZ IDEA?

14   A    NO.

15   Q    CAN YOU DENY THERE WAS SUCH A MEETING?                       04:41

16   A    I CANNOT DENY IT.  I JUST DO NOT BELIEVE THAT IT HAPPENED.

17   Q    LET'S TALK, THEN, ABOUT THE MATERIALS THAT YOU GOT FROM

18   MR. BRYANT, ACCORDING TO YOU, ON SEPTEMBER 1ST.  OKAY.

19        I'M GOING TO ASK YOU TO LOOK AT VOLUME I,

20   EXHIBIT 302, AND ASK YOU TO CONFIRM THAT WITH THE EXCEPTION OF    04:41

21   THE FIRST PAGE --

22        DO YOU RECOGNIZE THESE MATERIALS?

23   A    YES.

24   Q    AND IS IT ACCURATE, IS IT YOUR TESTIMONY, THAT ON

25   SEPTEMBER 1ST, THAT THESE ARE THE MATERIALS YOU RECEIVED, WITH    04:42

EXHIBIT 10
PAGE 115

566

1    THE POSSIBLE EXCEPTION OF THIS FIRST PAGE?

2    A    CORRECT.

3         MR. PRICE:  YOUR HONOR, I MOVE EXHIBIT 302 INTO

4    EVIDENCE, I GUESS EXCEPT FOR THE FIRST PAGE.

5         THE COURT:  ANY OBJECTION?                        04:43

6         MS. AGUIAR:  NO OBJECTION TO THE WHOLE EXHIBIT, BUT

7    IF YOU WANT TO DO IT MINUS --

8         THE COURT:  BY STIPULATION, THE ENTIRE EXHIBIT IS

9    ADMITTED.

10        YOU MAY PUBLISH.                                  04:43

11   BY MR. PRICE:

12   Q    SO ON SEPTEMBER 1ST, THEN, THIS FIRST PAGE YOU DO NOT

13   RECALL SEEING; CORRECT?

14   A    I DO REMEMBER SEEING A VERSION OF THIS.

15   Q    WHAT DO YOU RECALL BEING DIFFERENT?               04:43

16   A    I'M NOT SURE IF THE LOGO AND THE COPY BELOW WAS THERE OR

17   NOT.

18   Q    YOU'RE NOT SURE THAT THE BRATZ AND THE 'ALL MATERIALS,

19   2000, COPYRIGHT CARTER BRYANT' WERE THERE.

20   A    CORRECT; I'M NOT SURE.                            04:43

21   Q    LET'S GO TO THE PAGES THAT YOU DO KNOW, THEN.

22        LET'S GO TO THE SECOND PAGE.  IT SAYS "BRATZ, MEET

23   THE BRATZ, TOTALLY TRANSFORMABLE TEENAGE DOLLS."

24        THAT WAS PART OF MR. BRYANT'S PITCH; CORRECT?

25   A    YES.                                              04:44

MAY 28TH, 2008          TRIAL DAY 3, AFTERNOON SESSION

EXHIBIT 10
PAGE 116

567

1    Q    AND SO THERE'S NO DOUBT IN YOUR MIND THAT THE VERY FIRST

2    TIME MR. CARTER SHOWED UP AND GAVE YOU MATERIALS, HE CALLED

3    THESE DOLLS "BRATZ" WITH A 'Z'; CORRECT?

4    A    CORRECT.

5    Q    SO IT'S NOT TRUE THAT MGA OR MR. LARIAN CAME UP WITH THE          04:44

6    NAME BRATZ; THAT WAS SOMETHING THAT WAS BROUGHT TO MGA BY

7    MR. CARTER; CORRECT?

8    A    THAT'S CORRECT.

9    Q    AND IF WE GO THROUGH THIS PRESENTATION TO THE NEXT PAGE,

10   YOU CAN SEE IT STARTS SHOWING YOU FOUR DIFFERENT DOLLS WITH          04:44

11   DIFFERENT OUTFITS; CORRECT?  THE FIRST ONE IS ZOE, AND THEN

12   THERE'S HALLIDAE, AND THEN THERE'S LUPE, AND JADE; RIGHT?

13   A    CORRECT.

14   Q    AND WHAT MR. CARTER WAS SHOWING YOU HERE, IF WE CAN GO

15   BACK TO THE SECOND PAGE, IS, HE WAS SAYING THAT YOU COULD POP         04:45

16   OFF THE HAIRSTYLE AND THE SHOES; CORRECT?

17   A    YES.

18   Q    SO YOU COULD CHANGE THE SHOES FROM ONE DOLL TO ANOTHER, OR

19   THE HAIRSTYLE FROM ONE DOLL TO ANOTHER; CORRECT?

20   A    CORRECT.                                                          04:45

21   Q    IN FACT, IF WE GO TO THE FOURTH PAGE OF THE DOCUMENT,

22   THERE'S AN ILLUSTRATION THERE WHERE HE ILLUSTRATES THAT;

23   CORRECT?

24   A    YES.

25   Q    AND SPECIFICALLY HE ILLUSTRATES THE REMOVABLE FEET AS A          04:46

EXHIBIT __10__

PAGE __117__

568

1    COMPONENT OF THE DOLL; CORRECT?

2    A    YES.

3    Q    SO AS FAR AS YOU KNOW, THEN, IT'S NOT TRUE THAT MR. LARIAN

4    INVENTED THE CONCEPT OF REMOVABLE FEET FROM A DOLL.

5    A    NO.                                                          04:46

6    Q    I ASKED A DOUBLE NEGATIVE.

7             **THE COURT:**  YOU DID.

8    **BY MR. PRICE:**

9    Q    AS FAR AS YOU KNOW, IS IT TRUE THAT MR. LARIAN WAS THE ONE

10   WHO INVENTED THE CONCEPT OF REMOVABLE FEET ON A DOLL?           04:46

11   A    I AM NOT AWARE THAT ISAAC LARIAN INVENTED THE REMOVABLE

12   FEET.

13   Q    YOU ARE AWARE HE HAS CLAIMED THAT, THOUGH; CORRECT?

14   A    I'M NOT AWARE OF THAT.

15   Q    LET'S TALK ABOUT THIS MEETING ON SEPTEMBER 1ST.            04:47

16             DID IT TAKE PLACE IN AN AUDITORIUM, A LARGE AREA?

17   A    IT TOOK PLACE IN ISAAC LARIAN'S OFFICE.

18   Q    WAS THERE, LIKE, A TABLE THERE THAT YOU ALL GATHERED

19   AROUND?

20   A    YES.                                                        04:47

21   Q    AND HOW MANY PEOPLE IN ALL WERE THERE?

22   A    I BELIEVE FIVE.

23   Q    COULD YOU TELL THE JURY THE FIVE PEOPLE WHO WERE THERE.

24   A    ISAAC LARIAN; VERONICA MARLOW; VICTORIA O'CONNOR, MYSELF,

25   AND JASMINE LARIAN.                                              04:48

EXHIBIT __10__
PAGE __118__

577

1  Q    AND WITH RESPECT TO THE HAIR VENDOR, IN SEPTEMBER HE

2  ACTUALLY CONTACTED THE HAIR VENDOR ON YOUR BEHALF TO TALK ABOUT

3  WHAT HAIR TO USE FOR THE BRATZ DOLLS; CORRECT?

4  A    HE CONTACTED THE SARAN HAIR MATERIAL MANUFACTURER, BUT NOT

5  THROUGH MY REQUEST; THAT WAS HIS DECISION.                      05:0(

6  Q    SO YOU DIDN'T KNOW HE WAS ACTUALLY GOING OUT AND FINDING

7  THE HAIR VENDOR THAT YOU WOULD THEN RECOMMEND TO HONG KONG?

8  A    IT'S MY MEMORY THAT I ONLY ASKED HIM FOR HIS

9  RECOMMENDATION.

10          THE COURT:  MR. PRICE, WE'RE AT THE END OF THE DAY.    05:0(

11          THE JURY IS EXCUSED FOR THIS EVENING.  REMEMBER THE

12  ADMONITION NOT TO DISCUSS THIS CASE OR RESEARCH OR READ

13  ANYTHING ABOUT IT.

14          I'LL SEE YOU BACK TOMORROW MORNING AT 9:00.

15          (WHEREUPON JURORS DEPART COURTROOM.)                   05:01

16          THE COURT:  COUNSEL, I'LL SEE YOU TOMORROW MORNING AT

17  8:30.  WE'RE IN RECESS FOR THE DAY.

18                    CERTIFICATE

19

20  I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
    STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
21  THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
    ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
22  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
    THE UNITED STATES.

23

24

25  THERESA A. LANZA, RPR, CSR                5-29-08
    FEDERAL OFFICIAL COURT REPORTER          DATE

MAY 28TH, 2008          TRIAL DAY 3, AFTERNOON SESSION   EXHIBIT  10
                                                         PAGE  119

# EXHIBIT 11

1007

1   UNITED STATES DISTRICT COURT

2   CENTRAL DISTRICT OF CALIFORNIA

3   EASTERN DIVISION

4   - - -

5   HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6   - - -

7   MATTEL, INC.,                                    )

**CERTIFIED COPY**

8                     PLAINTIFF,          )
                                          )
9        VS.                              )   NO. CV 04-09049
                                          )
10  MGA ENTERTAINMENT, INC., ET. AL.,     )   TRIAL DAY 6,
                                          )   MORNING SESSION
11                    DEFENDANTS.         )   PAGES 1007 - 1096
                                          )
12  AND CONSOLIDATED ACTIONS,             )
                                          )
13

14

15   REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16   RIVERSIDE, CALIFORNIA

17   TUESDAY, JUNE 3RD, 2008

18   8:53 A.M.

19

20

21

22

23   THERESA A. LANZA, RPR, CSR
     FEDERAL OFFICIAL COURT REPORTER
24   3470 12TH STREET, RM. 134
     RIVERSIDE, CALIFORNIA  92501
25   951-274-0844
     WWW.THERESALANZA.COM

TUESDAY, JUNE 3RD, 2008                    TRIAL DAY 6, MORNING SESSION



EXHIBIT 11
PAGE 120

```
 1   APPEARANCES:

 2

 3   ON BEHALF OF MATTEL, INC.:

 4                         QUINN EMANUEL
                          BY:  JOHN QUINN
 5                             JON COREY
                              MICHAEL T. ZELLER
 6                             HARRY OLIVAR
                              TIMOTHY ALGER
 7                             WILLIAM PRICE
                          865 S. FIGUEROA STREET,
                          10TH FLOOR
 8                         LOS ANGELES, CALIFORNIA  90017
                          213-624-7707
 9

10

11   ON BEHALF OF MGA ENTERTAINMENT:

12                         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                          BY:  THOMAS J. NOLAN
13                             JASON RUSSELL
                              RAOUL KENNEDY
14                             LAUREN AGUIAR
                              CARL ROTH
15                         300 SOUTH GRAND AVENUE
                          LOS ANGELES, CALIFORNIA  90071-3144
16                         213-687-5000

17

18

19

20

21

22

23

24

25                                          EXHIBIT  11
                                           PAGE  121
```

```
1                          I N D E X

2                                                    PAGE

3    PLAINTIFF CASE (CONT'D)......................  1015

4

5

6    PLAINTIFF
     WITNESS          DIRECT       CROSS      REDIRECT      RECROSS
7    JENNIFER LYNN MAURUS

8    BY MR. QUINN      1015                   1054, 1062
     BY MR. NOLAN                   1031                   1058, 1063
9

10

11   PLAINTIFF
     WITNESS          DIRECT       CROSS      REDIRECT      RECROSS
     NANA ASHONG (VIA VIDEOTAPED DEPOSITION)
12
                       1080
13

14

15            EXHIBITS          RECEIVED

16          1352-1               1025

17

18

19

20

21

22

23

24

25                          EXHIBIT  11
                            PAGE  122
```

TUESDAY, JUNE 3RD, 2008                    TRIAL DAY 6, MORNING SESSION

1022

1    A    THE TERRITORIES WERE BASED ON THE CORPORATE OFFICE

2    LOCATION.

3         I GUESS I DON'T UNDERSTAND YOUR QUESTION.

4    Q    WELL, AT THIS POINT, ARE YOU RESPONSIBLE FOR ALL OF MGA'S

5    BUSINESS WITH WAL-MART, FROM A MARKETING STANDPOINT, OR JUST                09:17

6    SOME PORTION OF IT?

7         MR. NOLAN:   OBJECTION, YOUR HONOR.   LEADING.

8         THE COURT:   IT'S A CLARIFICATION.   I'M GOING TO

9    OVERRULE.

10        THE WITNESS:   FROM A SALES PERSPECTIVE, YES, I WORKED            09:17

11   ON ALL OF WAL-MART'S U.S. BUSINESS.

12   BY MR. QUINN:

13   Q    AND DO YOU KNOW HOW MANY STATES THAT COVERED?

14   A    AT THAT TIME I BELIEVE WAL-MART WAS IN ALL BUT A COUPLE OF

15   STATES.                                                                09:17

16   Q    AFTER YOUR PROMOTION TO SALES MANAGER, WERE YOU PROMOTED

17   TO ANOTHER JOB AT MGA?

18   A    YES, I WAS.

19   Q    WHAT WAS YOUR NEXT POSITION?

20   A    NATIONAL SALES MANAGER.                                          09:18

21   Q    IN YOUR CAPACITY AS NATIONAL SALES MANAGER FOR MGA, WHAT

22   WERE YOUR JOB DUTIES?

23   A    I HAD A LARGER TERRITORY, AND IT MEANT THAT I MANAGED ONE

24   OF THE MAJOR NATIONAL ACCOUNTS AS WELL.   AND IT DIFFERED

25   THROUGHOUT THE TIME I HAD THAT POSITION, BUT I HAD WAL-MART AT         09:18

1023

```
1   ONE POINT; AT ONE POINT, I HAD TARGET; AND THEN AT ANOTHER

2   POINT, I HAD K-MART.

3   Q    SO WHEN YOU SAY YOU HAD THESE DIFFERENT COMPANIES AT

4   DIFFERENT TIMES, CAN YOU EXPLAIN WHAT YOU MEAN BY THAT, PLEASE.

5   A    YES.                                                          09:18

6        WE HAD SEVERAL RESTRUCTURINGS OF THE SALES

7   DEPARTMENT; SO MY TERRITORY RESPONSIBILITIES CHANGED THROUGHOUT

8   THE TIME I WAS THE NATIONAL SALES MANAGER.  SO FOR A DURATION

9   OF THE TIME, I WAS ON WAL-MART.  FOR A SHORT PERIOD, I WAS

10  MOVED TO TARGET.  THEN I WAS MOVED TO K-MART.  THEN I WAS PUT    09:19

11  BACK ON WAL-MART.

12       IN ADDITION TO THE NATIONAL ACCOUNT, I ALSO HAD A

13  TERRITORY OF MANY STATES, WHICH INCLUDED ALL OF THE OTHER

14  ACCOUNTS WITHIN THOSE STATES.

15  Q    DO YOU RECALL WHAT THOSE OTHER STATES WERE, JUST ROUGHLY?   09:19

16  A    AT SOME POINT, I HAD ABOUT 37 STATES.  I HAD THE WHOLE

17  WEST COAST.  I HAD THE SOUTHEAST.  I HAD PART OF THE SOUTH.

18  AGAIN, IT FLUCTUATED.  WE HAD A LOT OF DIFFERENT

19  REORGANIZATIONS.

20  Q    NOW, WAS THAT THE LAST JOB THAT YOU HELD AT MGA, OR DID     09:19

21  YOU GET A SUBSEQUENT POSITION?

22  A    THAT WAS THE LAST POSITION.

23  Q    AT THAT TIME, AT THE TIME THAT YOU WORKED AT MGA, SAY,

24  BEFORE THE SUMMER OF 2000, WHAT WAS THE BUSINESS OF MGA?

25  A    PRIMARILY, ELECTRONIC HANDHELD TOYS; WALKIE-TALKIES,        09:20
```

TUESDAY, JUNE 3RD, 2008                    TRIAL DAY 6, MORNING SESSION



EXHIBIT ___11___

PAGE ___124___

1024

1   LICENSED BOYS' TOYS.

2   Q    DID IT HAVE ANY KIND OF A FASHION DOLL BUSINESS?

3   A    NO.

4   Q    WERE THERE ANY FASHION DOLL DESIGNERS OR SOME TYPE OF A

5   FASHION DOLL DESIGN DEPARTMENT?

6   A    NO.

7   Q    THERE SHOULD BE A NOTEBOOK THERE IN FRONT OF YOU, MA'AM.

8   IF YOU WOULD LOOK, PLEASE, AT THE DOCUMENT BEHIND TAB 13532.

9        BEFORE WE LOOK AT THAT, IF I COULD JUST ASK YOU A

10  QUESTION.

11       AT MGA, WHILE YOU WORKED THERE, DID EMPLOYEES ENTER

12  INTO WHAT WERE CALLED INVENTIONS AGREEMENTS AND CONFIDENTIALITY

13  AGREEMENTS WITH THE COMPANY?

14  A    YES.

15  Q    AND WHAT WAS YOUR UNDERSTANDING OF WHAT THOSE INVENTIONS

16  AGREEMENTS MEANT?

17       **MR. NOLAN:**  OBJECTION, YOUR HONOR.  RELEVANCE AS TO

18  HER STATE OF MIND.

19       **THE COURT:**  OVERRULED.

20       **THE WITNESS:**  IT MEANT THAT ANYTHING WE DEVELOPED OR

21  CREATED WHILE WE WORKED AT MGA BELONGED TO MGA.

22  **BY MR. QUINN:**

23  Q    MA'AM, DID YOU SIGN ONE OF THESE AGREEMENTS YOURSELF?

24  A    YES, I DID.

25  Q    IF YOU WOULD LOOK AT THE DOCUMENT THAT'S BEHIND TAB 13532,

09:20
09:21
09:21
09:21
09:21

TUESDAY, JUNE 3RD, 2008

EXHIBIT  11
125

TRIAL DAY 6, MORNING SESSION

1025

1   I'D LIKE TO ASK YOU THE QUESTION WHETHER YOU CAN IDENTIFY THIS.

2   A    YES.

3   Q    WHAT IS THIS?

4   A    IT'S A CONFIDENTIALITY AGREEMENT AND PROPRIETARY

5   INFORMATION AGREEMENT.

6   Q   FOR MGA?

7   A    YES.

8   Q    IS THIS SOMETHING THAT YOU SAW AT THE TIME, WHILE YOU

9   WORKED AT MGA?

10   A    YES.

11        MR. QUINN:  I'D OFFER THIS INTO EVIDENCE, YOUR HONOR.

12        MR. NOLAN:  NO OBJECTION.

13        THE COURT:  IT'S ADMITTED.

14        YOU MAY PUBLISH.

15        MR. QUINN:  IF WE COULD PUT ON THE SCREEN THE FIRST

16   PAGE, EXHIBIT 1352-1.

17   **BY MR. QUINN:**

18   Q   THIS INDICATES THAT AS OF AUGUST 10, 2000, THERE'S A

19   DISTRIBUTION TO ALL MGA EMPLOYEES OF A NEWLY REVISED MGA

20   ENTERTAINMENT CONFIDENTIALITY AGREEMENT AND A NEW PROPRIETARY

21   INFORMATION AGREEMENT.

22        DO YOU SEE THAT?

23   A    YES.

24   Q    PRIOR TO THE TIME THESE NEW FORMS WERE DISTRIBUTED IN

25   AUGUST OF 2000, HAD THERE BE A PREEXISTING FORM OF

09:22
09:22
09:22
09:22
09:22

TUESDAY, JUNE 3RD, 2008               TRIAL DAY 6, MORNING SESSION



EXHIBIT 11
PAGE 126

1026

1    CONFIDENTIALITY AND PROPRIETARY INFORMATION AGREEMENT?

2    A    YES.

3    Q    WHILE YOU WERE WORKING AT MGA, DID YOU KNOW A WOMAN NAMED

4    PAULA TREANTAFELLES, NOW KNOWN AS PAULA GARCIA?

5    A    YES.                                                        09:23

6    Q    WAS SHE AN EMPLOYEE THERE WHILE YOU WERE?

7    A    YES.

8    Q    WHO STARTED WITH THE COMPANY FIRST?  YOU OR

9    MS. TREANTAFELLES?

10   A    I DID.                                                      09:23

11   Q    DO YOU RECALL WHEN SHE STARTED WITH THE COMPANY?

12   A    YES.

13   Q    WHEN DID SHE START WITH THE COMPANY?

14   A    SPRING OF 2000.

15   Q    AND BY THAT TIME, YOU HAD BEEN THERE -- I THINK YOU TOLD    09:23

16   US YOU STARTED IN JUNE OF '99, SO YOU WOULD HAVE BEEN THERE

17   ABOUT NINE MONTHS BY THEN?

18   A    YES.

19   Q    AT SOME POINT, DID YOU MEET AN INDIVIDUAL NAMED

20   CARTER BRYANT?                                                   09:24

21   A    YES.

22   Q    HOW DID YOU COME TO MEET MR. BRYANT?

23   A    PAULA INTRODUCED ME TO HIM.

24   Q    AND YOU SAID SHE STARTED IN APRIL OF 2000.

25        CAN YOU TELL US APPROXIMATELY HOW LONG AFTER SHE            09:24

TUESDAY, JUNE 3RD, 2008                    TRIAL DAY 6, MORNING SESSION


EXHIBIT 11
PAGE 107

1027

1   STARTED SHE INTRODUCED YOU TO MR. BRYANT.

2   A    A FEW MONTHS.

3   Q    CAN YOU NARROW IT DOWN AT ALL?  IF SHE STARTS IN APRIL,

4   CAN YOU SAY APPROXIMATELY HOW MANY MONTHS AFTER SHE STARTED?

5   A    APPROXIMATELY THREE.                                    09:24

6   Q    SO IT WOULD BE YOUR BEST ESTIMATE, JULY?

7        MR. NOLAN:  OBJECTION, YOUR HONOR.  LEADING.

8        THE COURT:  SUSTAINED.

9   BY MR. QUINN:

10  Q    WHAT WOULD BE YOUR BEST ESTIMATE OF THE MONTHS, IF YOU   09:24

11  CAN'T NARROW IT DOWN TO ONE MONTH?

12  A    JUNE OR JULY 2000.

13  Q    AND WHAT WERE THE CIRCUMSTANCES UNDER WHICH SHE INTRODUCED

14  YOU TO MR. BRYANT?

15  A    I WALKED OVER TO HER DESK AND HE WAS THERE WITH HER; SO   09:25

16  SHE INTRODUCED HIM.

17  Q    WAS SHE IN AN OFFICE THAT HAD, LIKE, A CLOSED DOOR, OR WAS

18  IT AN OPEN CUBICLE?  COULD YOU DESCRIBE IT FOR US.

19  A    YES.

20       AT THAT TIME, SHE WAS IN A CUBICLE, AN OPEN CUBICLE.    09:25

21  Q    WERE YOU WALKING BY, OR WERE YOU GOING TO SEE HER?  WHAT

22  WAS THE OCCASION, IF YOU RECALL?

23  A    I DON'T RECALL WHETHER I WAS WALKING BY AND STOPPED BY OR

24  IF I WENT THERE SPECIFICALLY TO TALK TO HER ABOUT AN ISSUE.

25  Q    WAS MR. BRYANT STANDING THERE?                          09:25

TUESDAY, JUNE 3RD, 2008        EXHIBIT 11        TRIAL DAY 6, MORNING SESSION
                               PAGE 128

1028

| | | |
|---|---|---|
| 1 | A | YES. |
| 2 | Q | WHEN SHE INTRODUCED YOU TO HIM, WHAT DID SHE SAY? |
| 3 | A | SHE INTRODUCED ME TO HER FRIEND, CARTER. |
| 4 | Q | DO YOU RECALL ANYTHING ELSE THAT SHE SAID, BY WAY OF |

4   Q    DO YOU RECALL ANYTHING ELSE THAT SHE SAID, BY WAY OF

5   INTRODUCTION?                                                        09:26

6   A    SHE SAID SHE WORKED WITH HIM AT MATTEL.

7   Q    SHE SAID SHE HAD WORKED WITH HIM AT MATTEL?

8   A    AS I RECALL, YES.

9   Q    DID YOU KNOW THAT MS. GARCIA HAD COME OVER TO MGA FROM

10  MATTEL?                                                             09:26

11  A    YES, I DID.

12  Q    DID SHE SAY ANYTHING ELSE ABOUT MR. BRYANT OR HER

13  RELATIONSHIP WITH HIM, OTHER THAN THAT SHE KNEW HIM FROM

14  MATTEL?

15  A    SHE REFERRED TO HIM AS HER FRIEND, CARTER.              09:26

16  Q    DID SHE SAY ANYTHING ABOUT WHAT HE WAS DOING THERE OR

17  ANYTHING FURTHER ABOUT MR. BRYANT?

18  A    YES.

19  Q    WHAT DID SHE SAY?

20  A    SHE SHOWED ME SOME DRAWINGS THAT HE HAD DONE FOR A NEW   09:26

21  PRODUCT.

22  Q    CAN YOU DESCRIBE THESE DRAWINGS FOR THE JURY.

23  A    SURE.

24       THEY WERE -- THEY LOOKED LIKE FASHION DESIGNER

25  DRAWINGS, OF A FIGURE WITH FASHIONS ON THEM.  THEY WERE COLOR   09:27

TUESDAY, JUNE 3RD, 2008                    TRIAL DAY 6, MORNING SESSION



EXHIBIT  11
PAGE  129

1029

1    LINE DRAWINGS, PROBABLY COLOR PENCIL.

2    Q    IN TERMS OF THE SIZE OF THE TORSO, THE HEAD, THE FEET, CAN

3    YOU DESCRIBE THEM AT ALL?

4    A    THE HEAD AND THE FEET WERE MORE EXAGGERATED IN

5    RELATIONSHIP TO THE MIDDLE OF THE BODY.                          09:27

6    Q    LARGER?

7    A    YES.

8    Q    AND IN TERMS OF THE FACIAL FEATURES OF THESE DRAWINGS, CAN

9    YOU DESCRIBE THOSE AT ALL?

10   A    THE FACIAL FEATURES WERE ALSO EXAGGERATED.                  09:27

11   Q    IS IT POSSIBLE TO BE ANY MORE SPECIFIC IN TERMS OF THE

12   EYES AND THE NOSE?

13   A    YES.

14        THE EYES WERE LARGE AND THE LIPS WERE LARGE.

15   Q    NOW, ON THESE DRAWINGS, WAS THERE ANY TEXT OR ANY WRITING?  09:28

16   A    I DON'T BELIEVE SO.

17   Q    WERE THERE ANY DATES?

18   A    NOT THAT I RECALL.

19   Q    DID SHE SHOW YOU ANY TEXT THAT ACCOMPANIED THE DRAWINGS,

20   OR WAS IT JUST DRAWINGS?                                         09:28

21   A    JUST DRAWINGS.

22   Q    WAS THE WORD OR NAME "BRATZ" ON ANY OF THE DRAWINGS?

23   A    NO.

24   Q    DID SHE MENTION THE WORD OR THE NAME "BRATZ"?

25   A    NO.                                                         09:28

TUESDAY, JUNE 3RD, 2008     EXHIBIT __11__          TRIAL DAY 6, MORNING SESSION

PAGE __130__

1030

1  Q    DID MR. BRYANT?

2  A    NO.

3  Q    DID SHE SAY ANYTHING ABOUT WHAT WAS GOING TO BE DONE WITH

4  THESE DRAWINGS?

5  A    YES.  SHE TOLD ME THAT THEY WERE CONCEPTS FOR A PRODUCT        09:28

6  THAT WE WERE GOING TO BE MAKING.

7  Q    DID SHE SAY WHETHER OR NOT IT WAS SOMETHING THAT

8  MR. LARIAN HAD ALREADY SEEN OR APPROVED?

9        MR. NOLAN:  OBJECTION TO THIS CONTINUING LEADING IN

10 QUESTIONS, YOUR HONOR.                                              09:29

11       THE COURT:  REPHRASE, COUNSEL.

12 BY MR. QUINN:

13 Q    DID SHE SAY ANYTHING ONE WAY OR ANOTHER ABOUT WHETHER

14 THERE HAD BEEN ANY APPROVAL TO GO FORWARD WITH THIS?

15 A    I DON'T KNOW THAT SHE USED THE TERM "APPROVAL," BUT SHE        09:29

16 INDICATED THAT IT WAS A PRODUCT THAT SHE WAS GOING TO BE

17 DEVELOPING FOR THE COMPANY.

18 Q    CAN YOU TELL US WHETHER OR NOT MR. ISAAC LARIAN'S NAME WAS

19 MENTIONED AT ALL.

20 A    YES.                                                          09:29

21 Q    WHAT WAS SAID?

22 A    SHE TOLD ME THAT ISAAC HAD SEEN THE DRAWINGS AND THAT WE

23 WERE GOING TO BE MAKING A PRODUCT BASED OFF OF IT.

24 Q    THANK YOU VERY MUCH.

25       MR. QUINN:  NOTHING FURTHER.                                 09:30

TUESDAY, JUNE 3RD, 2008                    TRIAL DAY 6, MORNING SESSION



EXHIBIT  11
PAGE  131

1031

1       THE COURT:   CROSS EXAMINATION.

2           CROSS-EXAMINATION

3  BY MR. NOLAN:

4  Q   LIKE MR. QUINN, YOU'VE NEVER MET WITH ME BEFORE, HAVE YOU?

5  A   NO.              09:30

6  Q   YOU DON'T EVEN KNOW WHAT FIRM I'M WITH?

7  A   NO.

8  Q   MR. QUINN ASKED WHETHER OR NOT YOU HAD EVER MET WITH

9  MR. QUINN.   MY QUESTION IS A LITTLE BIT DIFFERENT.

10     PRIOR TO YOUR TESTIMONY TODAY, DID YOU MEET WITH 09:30

11  LAWYERS IN MR. QUINN'S OFFICES?

12  A   I MET WITH A LAWYER, BUT NOT IN HIS OFFICE.

13  Q   WHAT WAS THE NAME OF THE LAWYER?

14  A   DYLAN PROCTOR.

15  Q   DYLAN PROCTOR?

16  A   YES.            09:30

17  Q   DO YOU SEE MR. PROCTOR IN THE COURTROOM TODAY?

18  A   YES.

19  Q   COULD YOU POINT HIM OUT FOR US.

20  A   SURE.           09:31

21     HE'S DIRECTLY BEHIND MR. QUINN.

22     MR. NOLAN:   YOUR HONOR, MAY HAVE MR. PROCTOR STAND UP

23  FOR A MOMENT.

24  BY MR. NOLAN:

25  Q   DO YOU KNOW IF MR. PROCTOR WORKS FOR MR. QUINN? 09:31

TUESDAY, JUNE 3RD, 2008     TRIAL DAY 6, MORNING SESSION


EXHIBIT 11
PAGE 132

1032

1   A   I BELIEVE HE DOES.

2   Q   WHEN DID YOU MEET WITH MR. PROCTOR?

3   A   ABOUT A MONTH AGO.

4   Q   AND WHERE WAS THAT MEETING AT?

5   A   IT WAS IN SANTA MONICA.                          09:31

6   Q   WHERE IN SANTA MONICA?

7   A   I MET HIM AT A RESTAURANT.

8   Q   HOW LONG DID THAT MEETING TAKE PLACE?

9   A   APPROXIMATELY TWO HOURS.

10   Q   WAS MR. PROCTOR REPRESENTING YOU AT THAT TIME?   09:31

11   A   NO.

12   Q   SO NOBODY AT MR. QUINN'S FIRM SERVES AS YOUR LAWYER IN

13   THIS CASE; CORRECT?

14   A   CORRECT.

15   Q   WERE YOU REPRESENTED BY COUNSEL AT THAT TWO-HOUR LUNCH   09:31

16   WITH MR. PROCTOR?

17   A   NO.

18   Q   DURING THAT MEETING, DID MR. PROCTOR SHOW YOU VARIOUS

19   DOCUMENTS?

20   A   NO.                                             09:32

21   Q   DID MR. PROCTOR REVIEW WITH YOU ANY PRIOR TESTIMONY YOU

22   MAY HAVE GIVEN CONCERNING ANY OF THESE EVENTS?

23   A   NO.

24   Q   DID YOU TAKE NOTES DURING THIS MEETING?

25   A   NO.                                             09:32

TUESDAY, JUNE 3RD, 2008                     TRIAL DAY 6, MORNING SESSION

EXHIBIT __11__
PAGE __133__

1096

1    THE COURT:  SO COUNSEL, THIS AFTERNOON THEN, WE'LL

2  PICK UP WITH THE STEVE LINKER TESTIMONY AND THEN YOU'LL HAVE

3  SOME POTENTIALLY ADDITIONAL WITNESSES TO CALL AFTER THAT.

4    MR. QUINN:  YES.

5    THE COURT:  HOW MUCH TIME OF THIS WAS ALLOCATED TO          11:36

6  THE DEFENSE?

7    MR. QUINN:  WE HAVE TO REDO THE CALCULATIONS AFTER

8  THE RULINGS.

9    THE COURT:  WHY DON'T YOU DO THAT.  JUST GIVE ME A

10  TIME TO ALLOCATE TO THE DEFENSE, AND I'LL MAKE THE ADJUSTMENT.          11:36

11  RIGHT NOW, I CREDITED ALL OF THE TIME TO THE PLAINTIFF, BUT

12  I'LL MAKE THE SWITCH AFTER YOU LET ME KNOW WHAT THAT IS.

13    HAVE A GOOD LUNCH.

14    (WHEREUPON A BRIEF RECESS WAS HELD.)

15    (MORNING SESSION CONCLUDED. )          11:37

16

17

18                    CERTIFICATE

19

20  I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
   STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
21  THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
   ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
22  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
   THE UNITED STATES.

23

24  _____          6-4-08
   THERESA A. LANZA, CSR, RPR          _____
25  FEDERAL OFFICIAL COURT REPORTER          DATE

TUESDAY, JUNE 3RD, 2008          TRIAL DAY 6, MORNING SESSION

EXHIBIT ___11___

PAGE ___134___

# EXHIBIT 12

1550

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    ---

4     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                    ---

6   MATTEL, INC.,                    :   PAGES 1550 - 1668
                                     :
7            PLAINTIFF,              :
                                     :
8       VS.                          :   NO. ED CV04-09049-SGL
                                     :   [CONSOLIDATED WITH
9   MGA ENTERTAINMENT, INC.,         :   CV04-9059 & CV05-2727]
    ET AL.,                          :
10                                   :
             DEFENDANTS.             :
11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17            THURSDAY, JUNE 5, 2008

18             JURY TRIAL - DAY 8

19             AFTERNOON SESSION

20

21

22                          MARK SCHWEITZER, CSR, RPR, CRR
    **CERTIFIED**           OFFICIAL COURT REPORTER
23                          UNITED STATES DISTRICT COURT
    **COPY**                181-H ROYBAL FEDERAL BUILDING
24                          255 EAST TEMPLE STREET
                            LOS ANGELES, CALIFORNIA 90012
25                          (213) 663-3494

EXHIBIT 12
PAGE 135

1   **Appearances of Counsel:**

2

3   On Behalf of Mattel:

4        Quinn Emanuel
         By John B. Quinn, Esq.
5           B. Dylan Proctor, Esq.
            Michael T. Zeller, Esq.
6           Harry Olivar, Esq.
            John Corey, Esq.
7           Diane Hutnyan, Esq.
            William Price, Esq.
8        855 South Figueroa Street
         10th Floor
9        Los Angeles, CA 90017
         (213) 624-7707

10

11

12   On Behalf of MGA Entertainment:

13       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
14          Carl Alan Roth, Esq.
            Jason Russell, Esq.
15          Lauren Aguiar, Esq.
            David Hansen, Esq.
16          Matthew Sloan, Esq.
         300 South Grand Avenue
17       Los Angeles, CA 90071-3144
         (213) 687-5000

18

19

20

21

22

23

24                              EXHIBIT 12
                                PAGE 136
25

1552

1

# I N D E X

2

3  MAUREEN TKACIC, VIA VIDEOTAPED DEPOSITION.............. 1559

4  ISAAC LARIAN, SWORN................................... 1572

5  DIRECT EXAMINATION BY MR. PRICE:...................... 1573

6

7

8

# E X H I B I T S

9   (Exhibit 1-A received.).............................. 1559

10  (Exhibit 11856 received.)........................... 1588

11  (Exhibit 5713 received.)............................ 1591

12  (Exhibit 5715 received.)............................ 1592

13  (Exhibit 13619 received.)........................... 1594

14  (Exhibit 8 received.)............................... 1609

15  (Exhibit 13382 received.)........................... 1618

16  (Exhibit 13620 received.)........................... 1624

17  (Exhibit 11907 received.)........................... 1648

18  (Exhibit 12842 received.)........................... 1651

19  (Exhibit 11248 received.)........................... 1655

20

21

22

23

24

25

EXHIBIT _12_
PAGE _137_

1622

1  Time period.

2          MR. PRICE:  I'll lay a foundation.

3          THE COURT:  Why don't you lay a foundation,

4  Counsel.

5  Q.   BY MR. PRICE:  Has your management style changed since

6  1999, 2000, 2001 time frame?

7          THE COURT:  I'm going to sustain the relevancy on

8  that.  Let's move along.  The only time frame that's relevant

9  is that period.

10          MR. PRICE:  The only reason, if it's the same, then

11  he could testify to it.

12          THE COURT:  I understand.  Let's move along.

13          MR. PRICE:  Your Honor, I would move Exhibit 13626

14  into evidence.

15          MR. NOLAN:  Lack of foundation, your Honor.

16          THE COURT:  Let's lay a foundation.

17          MR. NOLAN:  That's the exhibit we just went

18  through.

19          THE COURT:  What's the exhibit number?

20          MR. PRICE:  13626.  That's the one I handed up

21  separately.

22          THE COURT:  Very well.  Sustain the objection.

23  Q.   BY MR. PRICE:  Mr. Larian, let me focus now on

24  agreements that -- where you know employees didn't sign the

25  agreement.  And I'd like you to look at Exhibit 1117.

EXHIBIT 12
PAGE 138

1623

1   A.   I'm sorry.  I can't find this in here.

2   Q.   There are only four digits.  It's 1117.

3   A.   I got it.

4   Q.   And 1117 is in evidence.

5   A.   Yes, go ahead.

6   Q.   If we look at the last page of Exhibit 1117, which is

7   page 8, look at the bottom here.

8   A.   Yes.  Okay.

9   Q.   Could you tell me whose signature this is on behalf of

10  MGA?

11  A.   Looks like Eve Johnson, who was -- it looks like Eve

12  Johnson-Ford, who was head of Human Resources at the time.

13  Q.   So at this time -- this is April 2000.  Do you see that?

14  A.   I do.

15  Q.   So at this time there was contracts which were signed by

16  MGA employees; correct?

17  A.   Confidentiality agreements, yes.

18  Q.   And agreements concerning inventions as well?

19  A.   Yes.  Confidentiality agreements.

20  Q.   Did every employee have to sign such agreements?

21  A.   To the best of my recollection, I couldn't say.  Most

22  likely.  Well, no, I'm not sure.

23  Q.   Let me ask you to also look at Exhibit 13620.

24  A.   I'm sorry?

25  Q.   Exhibit 13620.

EXHIBIT 12
PAGE 139

1624

1  A.    Go ahead.

2  Q.    Look at the last page of Exhibit 13620.  Is that your

3  signature?

4  A.    It is.

5  Q.    This is dated sometime in 1999; is that right?

6  A.    Yes.

7  Q.    And you recognize this as an agreement with Kami

8  Gillmour?

9  A.    I do.

10          MR. PRICE:  Your Honor, move Exhibit 13620 into

11  evidence.

12          MR. NOLAN:  No objection.

13          THE COURT:  It's admitted.  You may publish.

14          **(Exhibit 13620 received.)**

15  Q.    BY MR. PRICE:  Previously we were looking at Paula

16  Treantafelles, now Garcia's, agreement.  This is an agreement

17  with Kami Gillmour.

18          Do you see that?

19  A.    Yes, looks like it, yes.

20  Q.    Also concerning confidentiality and inventions

21  assignment?

22  A.    That's correct.

23  Q.    And there was a reason why you had employees sign these

24  agreements; correct?

25  A.    Yes, for them to keep things confidential.



EXHIBIT 12
PAGE 140

1625

1   Q.   And if we look at the specific provisions on these, you

2   see there's a section here, assignment of interest.

3          Do you see that?

4   A.   I do.

5   Q.   And it talks about that the employee agrees to assign

6   and does hereby assign to the company all interest which the

7   employee may have in all patentable and/or not patentable

8   ideas and/or inventions made or conceived by employee solely

9   or jointly with others during employee's employment with the

10  company.

11          Do you see that?

12  A.   I do.

13  Q.   And you were familiar with this provision; correct?

14  A.   I was not -- I'm still not familiar with the whole

15  contract, but I see that's written there, yes.

16  Q.   This is the same page that your signature is on.

17  A.   That's correct.

18  Q.   And it says:  "This assignment shall not apply to any

19  idea or invention developed by employee entirely on the

20  employee's own time without equipment, supplies, facilities,

21  or trade secret information of the company, unless such

22  invention or idea relates to the business of the company or

23  to the company's actual or anticipated research or

24  development."

25          Do you see that?

EXHIBIT __12__
PAGE __141__

1626

1   A.   I do.

2   Q.   And the business of MGA Entertainment at that time was

3   at least in part the toy business.

4   A.   That's correct.

5   Q.   And the reason that you have this sort of agreement with

6   your employees is if you are paying them a paycheck, and they

7   are a designer, for example, if they come up with a great

8   design idea, and they say they came up with it, you know, on

9   a Saturday night while take a shower, you don't want them to

10  be able to go across the street and give that to one of your

11  competitors; correct?

12  A.   If they were working at MGA and they would come and go

13  with product ideas or design ideas, yes, that meant that they

14  were doing it for MGA.

15  Q.   And if it related to your business, that's even if they

16  said to you hey, you know, Isaac, I did this during a lunch

17  break or on the weekend, that didn't matter.  If they were

18  employed by MGA and they come up with a great idea related to

19  your business, that belonged to you.

20  A.   My understanding has always been that if somebody's

21  doing something on their own, when they are not on our

22  payroll, whether if they are at -- on the weekends at their

23  home, my personal understanding is that what they do on their

24  own time belongs to them.  We don't own them.

25  Q.   If that idea relates to your business, the toy business,

EXHIBIT   12
PAGE   142

1627

1    your understanding here, you've got a designer whose job is

2    to make toys.  They are on your payroll; correct?

3    A.    Correct.

4    Q.    And you want them to come up with their best toy ideas

5    and give them to you; correct?

6    A.    Yes.

7    Q.    And if they claim they come up with their toy ideas on

8    their own time, say, at 5:30 instead of 5:00 P.M. -- you with

9    me so far?

10   A.    Yes, I see what's written there.

11   Q.    That still belongs to you because they are employed by

12   you and it relates to your business; right?

13   A.    Again, my own personal understanding is that if somebody

14   is working home on Saturday or Sunday, they are not getting

15   paid for Saturday and Sunday, this is my own personal

16   understanding regardless of this contract, that if they do

17   something on the weekends on their own time, that belongs to

18   them.  I don't own the people because they just work for me.

19   Q.    Now, you said regardless of the contract.  You

20   understand what your contract says is that if it relates to

21   your business, an employee -- an employee comes up with a

22   design, it still belongs to you even if they claim they did

23   it in the shower before they came to work.

24   A.    That's correct.  That's what the contract says.

25   Q.    And this contract was signed by -- by, to your

EXHIBIT  12
PAGE  143


1628

1   knowledge, all of MGA's employees in this '99, 2000 time

2   frame; correct?

3   A.   I'm not sure if everybody in the company signed it.

4   It's possible, but I don't know.  I don't think people who

5   work in the warehouse had to sign something like this, or

6   temps who came to work.  So I don't know.

7   Q.   But people like designers, people in management, those

8   sorts of folks would have to sign this sort of thing;

9   correct?

10  A.   Yes.

11  Q.   And having been in the toy business for some 17 years?

12  13 years?  '87.  Is that it?

13  A.   21 years now, I guess.

14  Q.   Okay.  As of 2000 -- 1999, 2000, had you been in the toy

15  business for 13 years?

16  A.   Yes.

17  Q.   So having been in the toy business for that long a

18  period of time, you recognize that it was standard practice

19  for toy companies to have such provisions in connection with

20  their designers, that is, where the company is going to own

21  their designs related to this company's business?

22  A.   That's not true.  There is no such standard.

23  Q.   So, for example, you thought that Mattel wouldn't have

24  such an agreement with its employees?

25  A.   I have no idea what Mattel had or not.  I wouldn't know.



EXHIBIT 12
PAGE 144

1640

1   Q.   My question was different.   That was your assumption

2   based upon your business practice.

3   A.   No.

4           MR. PRICE:   If he we could play page 75, line 22,

5   to 76, line 1.

6           MR. NOLAN:   One moment, your Honor.   Your Honor,

7   for completeness, I'd like to play down to line 20.

8           THE COURT:   Any objection, Mr. Price?

9           MR. PRICE:   Let me read it, your Honor.

10           No objection.

11           THE COURT:   Very well.

12           DEPOSITION EXCERPT PLAYED.

13           "QUESTION:   So did you have the impression

14       that Paula and Victoria and Veronica had previously

15       met Mr. Bryant?

16           "ANSWER:   I don't recall.   Probably have.   I

17       think so, because they have -- I'm assuming.

18           "QUESTION:   All right.   I mean, do you

19       remember Paula or Victoria or Veronica expressing

20       to you that they were excited about this product or

21       idea or they thought it was a good one?

22           "ANSWER:   Yeah, I think Paula was very

23       excited.

24           "QUESTION:   Paula was real excited?

25           "ANSWER:   Right.



EXHIBIT  12
PAGE  145

1641

1       "QUESTION:  Did she indicate to you how much

2       time she had spent looking at this product or

3       talking to Carter before the meeting?

4           "ANSWER:  Not that I recall.

5           "QUESTION:  So somebody sort of introduces

6       you, here is Carter Bryant, and he's got this

7       product.   Then what happens?

8           "ANSWER:  They said let's see it, to the best

9       of my recollection.  You want to know what I

10      remember from the meeting?

11          "QUESTION:  Yeah."

12  Q.   BY MR. PRICE:  Now, Mr. Larian, the reason that probably

13  you were assuming that there was a meeting prior is because

14  you had expected your subordinates, your assistants, to have

15  met with Mr. Bryant before presenting him to you?

16          MR. NOLAN:  Objection, your Honor.  Assumes facts

17  not in evidence.

18          THE COURT:  Rephrase, Counsel.

19  Q.   BY MR. PRICE:  When you said -- when you were asked

20  whether you had the impression that Paula, Victoria, and

21  Veronica had previously met with Mr. Carter Bryant, you said,

22  "I don't recall, probably have, I think so.  I'm assuming."

23          Now, why do you assume that they met with

24  Mr. Bryant before this meeting with you?

25  A.   I just assumed that maybe they have seen.  As you saw in



EXHIBIT   12
PAGE   146

1642

1   my deposition, I said I don't recall.  And I still don't

2   recall if they have or not.  Before that.  My understanding

3   now being through this proceeding is for the first time, I

4   saw it on September 1, 2000.  I don't know if anybody else

5   has seen it before that or not.

6   Q.   Why in your deposition did you say that probably that

7   Ms. Garcia and Ms. O'Connor had met Mr. Bryant before?  Why

8   do you think that was probably the case?

9   A.   Again, I was just making assumption.

10  Q.   It wasn't based on anything, any prior experience, any

11  practice, or anything else?  Is that your testimony?

12  A.   That's my testimony.

13  Q.   Now, your testimony is that when you had this meeting on

14  September 1st, that when you came into it, you didn't even

15  know it was about a fashion doll.

16  A.   That's correct.  I thought they had brought somebody

17  to -- for an interview for a job for fashion designer.

18  Q.   So if Ms. Garcia testified -- has testified that, a

19  couple of days before September 1st, she had told you that

20  she was bringing a fashion doll idea to you, then would you

21  disagree with that?

22  A.   I don't.  I have no reason to agree or disagree with it.

23  My recollection was that he was coming in for a job

24  interview.  That's my recollection.  Again, going back seven

25  years.



EXHIBIT 12
PAGE 147

1643

1   Q.   Sure.  Now, at this meeting you had Ms. Garcia; correct?

2   A.   That's correct.

3   Q.   You had Victoria O'Connor?

4   A.   Yes.

5   Q.   You had a woman named Veronica Marlow?

6   A.   Yes.

7   Q.   And I believe your daughter was there?

8   A.   Yes, she was 12 at the time.

9   Q.   And when you got to this meeting, because you thought it

10  was for a job interview, one of the first things you asked

11  about is do you have a resume.

12  A.   I don't recall exactly.  I might have.  That's my

13  practice if someone is coming for a job interview, to ask to

14  see the resume.

15  Q.   Let me see if I can refresh your recollection.  If you

16  look at page -- you have your transcript in front of you?

17  A.   I do.  Which volume?

18  Q.   It's volume 1, page 77.

19  A.   I'm sorry.  The page?

20  Q.   Page 77.  And if you read to yourself, lines 17 through

21  19.

22  A.   Can you repeat the lines again?

23  Q.   77.  Just read to yourself 77, lines 17 through 19.

24  A.   Yes, go ahead.

25  Q.   Does that refresh your memory that because you thought

EXHIBIT 12
PAGE 148

1644

```
1    it was a job interview, that you said where are you working?
2    Do you have a resume?
3    A.   Well, can I read the whole thing to the jury?
4    Q.   I'm not asking you to read it to the jury.  I'm using
5    this to refresh your memory because you said you couldn't
6    recall.  Can you answer my question?  You can tell me yes,
7    no, or I don't recall.  At this meeting did you say where do
8    you work and do you have a resume?
9    A.   I think I have to read this whole thing to the jury so
10   they can get a context of my answer.
11   Q.   Well, my question is simple, and we can get to other
12   questions later.  How long did the meeting last?
13   A.   I don't recall.  Maybe half an hour, 45 minutes max.
14   Q.   Okay.  So let me talk to you about one aspect of the
15   meeting.  Did you ask Mr. Bryant where do you work and do you
16   have a resume?
17           THE COURT:  Answer the question the best you can.
18           THE WITNESS:  I believe I did.
19   Q.   BY MR. PRICE:  And he told you he worked at Mattel?
20   A.   He did.
21   Q.   And he said that in front of Ms. O'Connor and
22   Ms. Garcia?
23   A.   To the best of my recollection, yes, he did.
24   Q.   And he showed you at this meeting some drawings?
25   A.   Yes, he did.
```

EXHIBIT 12
PAGE 149

1645

1   Q.   And if you look at Exhibit 302, which is already in

2   evidence --

3   A.   302.  Yes.

4   Q.   -- is it your recollection that these were in fact the

5   drawings that Mr. Bryant showed in this meeting?

6   A.   Oh, you want to take a look at every page?  There are

7   many drawings in here.  Or just the one on the --

8   Q.   Just flip through the 15 pages, and your recollection

9   that this is what Mr. Bryant presented in September of 2000

10  to you.

11  A.   To the best of my recollection, yes, some of these were.

12  Some of them I remember.

13  Q.   And can you state that some weren't shown, or is it just

14  that you remember some and are not sure about others?

15  A.   The latter.

16  Q.   And looked at the second page.  It's correct, is it not,

17  that in this first presentation these dolls were called Bratz

18  with a Z?

19  A.   That's correct.

20  Q.   So in fact it was Carter Bryant who first came up with

21  the name Bratz?

22  A.   Yes.

23  Q.   And if we go to the next page, we look at

24  Exhibit 302-003.  He showed you drawings where at least one

25  of his characters was wearing hiphugger jeans and had a short



EXHIBIT   12
PAGE      160

1646

1   T-shirt; correct?

2   **A.**   That's what it says.

3   **Q.**   And you notice that if you look at the drawing, it's

4   kind of showing her midriff here?

5   **A.**   That's correct.

6   **Q.**   And let's go to the fifth page of the exhibit.   Another

7   drawing where he shows a character showing there a bare

8   midriff?

9   **A.**   Yes.

10  **Q.**   Same if you look at the next page.   Number 6.

11  **A.**   Yes.

12  **Q.**   Also have these hiphugger pants and a bare midriff?

13  **A.**   Yes.

14  **Q.**   So certainly these were sort of fashion statements that

15  were shown to you in September of 2000?

16  **A.**   These are drawings that were shown to me in September

17  2000.

18  **Q.**   And I believe you testified that according to you, I

19  guess, there was no one who worked on Bratz in September

20  because there was no contract?

21  **A.**   I'm sorry.   Can you repeat the question?

22  **Q.**   Is it true -- is it your testimony that after this

23  meeting, no one did work on Bratz in September because there

24  was no contract?

25              MR. NOLAN:   Objection, your Honor.   Vague and


EXHIBIT 12
PAGE 151

1647

1  ambiguous as to drawings for the doll.

2          THE COURT:  Rephrase, Counsel.

3  Q.  BY MR. PRICE:  In September 2000, was there any work at

4  all done on these drawings or on doll designs or anything

5  pertaining to Bratz after this meeting?

6          MR. NOLAN:  Compound, your Honor.

7          THE COURT:  Overruled.

8          THE WITNESS:  I don't know if there was or not.

9  It's possible that there was.

10 Q.  BY MR. PRICE:  It's your belief, however, that it's in

11 this month of September 2000 that, to use your words, Bratz

12 was born?

13 A.  In September of 2000 Bratz was born?  What do you mean

14 by Bratz?  Bratz drawings or Bratz dolls?  Bratz dolls did

15 not come to the market until 2001.

16 Q.  Well, if you look at Exhibit 11907.

17 A.  Exhibit?

18 Q.  11907.

19 A.  Yes, go ahead.

20 Q.  You recognize that as an e-mail that includes you and

21 Victoria O'Connor and Sandrine de Raspide?

22 A.  Your pronunciation is better than mine.

23 Q.  You recognize it as one of your e-mails?

24 A.  That's correct.

25          MR. PRICE:  Your Honor, move Exhibit 11907 into

EXHIBIT  12
PAGE  152

1668

1  topic.

2       THE COURT:  Very well.  We'll adjourn for the day.

3  We'll have the jury back tomorrow at 9:00.

4

5            (Proceedings concluded at 4:55 P.M.)

6

7

8                 C E R T I F I C A T E

9

10

11       I hereby certify that pursuant to Title 28,

12  Section 753 United States Code, the foregoing is a true and

13  correct transcript of the stenographically reported

14  proceedings in the above Mattel.

15       Certified on June 5, 2008.

16

17

18  MARK SCHWEITZER, CSR, RPR, CRR
    Official Court Reporter
19  License No. 10514

20

21

22

23

24

25

EXHIBIT 12
PAGE 153

# EXHIBIT 13



**Corporate Office:**
16730 Schoenborn Street
North Hills, CA 91343-6122 USA
Tel 818.894.2525
Fax 818.894.8094

April 4, 2000

Ms. Paula Treantafelles
5622 Sunnyview Drive
Torrance, CA. 90505

Dear Paula:

We are pleased to extend to you an offer of employment for the position of **Associate Product Manager** at MGA Entertainment.

Your compensation package will be as follows:

1. **Base Salary:**          **$50,000** per year, paid biweekly

2. **Bonus:**          Management Bonus Program: Up to a **maximum of 15%** of your base of $50,000.  Your 2000 bonus is described in the attachment.

3. **Annual Review:**          You will be reviewed in January 2001.

4. **401(k) Plan:**          Will be eligible for enrollment in 401(k) Plan in January 2001.  Company match to your contribution is 25% up to 5%.

5. **Business Travel:**          The Company will pay for coach class tickets for both international and domestic travel.

6. **Health Benefits:**          <u>Health Insurance:</u>  There is no charge for you under HMO and a monthly fee for you and your dependents under the indemnity plan (see attachment).



Exhibit 1117
Garcia
10/10/07  8  pages
J'ana Siegers, CSR 10845

**Hong Kong Office:**
Unit 707-8 Multifield Plaza
3-7A Prat Ave., TST,
Kowloon, Hong Kong
**Hong Kong Showroom:**
11 Canton Road, Suite 1015
TST, Kowloon
Tel  852.2926.8008

Confidential - Attorney's Eyes Only

EXHIBIT  13
PAGE  154

MGA 0876578

EX 1117-0001

Dental Plan: There is no charge for you under DMO and a monthly fee for you and your dependents under the indemnity plan (see attachment).

Life Insurance: 1 x annual income, premium paid by Company.

Accidental Death & Dismemberment: Up to 1x annual income, premium paid by Company.

7. **Vacation:**   Two weeks paid vacation per year

8. **Employee Handbook:**   MGA requires all employees to sign an Employee Handbook, which includes a Confidentiality Agreement, an "At Will Clause/Statement", and a Mutual Agreement to Arbitrate and Mediate. These will be presented to you for your signature upon the commencement of your employment.

This agreement is binding upon Paula Treantafelles and ABC International Traders, Inc. and their respective heirs, successors, assignees, fiduciaries or other legal representatives.

I trust this offer letter addresses all open issues and look forward to an ongoing, productive relationship.

Sincerely,

Mary Claire Tiffany
Mary Claire Tiffany
Human Resources Manager

Enclosures

EXHIBIT    13
PAGE    155

MGA 0876579

EX 1117-0002

<u>CONFIDE...TIALITY AND INVENTIONS ASC..GNMENT AGREEMENT</u>

This Confidentiality and Inventions Agreement is executed by and between ABC Int' Traders, Inc. ("Company") and _Paula Treanta Files_ ("Employee").

During the course of his/her employment at the Company, Employee will have access to, will acquire, and will become acquainted with trade secrets, confidential information and property related to the Company and its customers' and vendors' businesses. The Company's trade secrets include, but are not limited to, such information as customer names, addresses phone numbers, names, specific characteristics of suppliers and customers and thei respective employees with whom the Company has dealings (whether or not such information is contained on a Rolodex, computer printout, customer list, or is orally communicated to any Company employee in the course of their duties) and the history of purchases, along with terms and conditions of credit offered to each customer; names, addresses, telephone numbers and specific characteristics of prospective customers and contacts; information regarding particular customer product peculiarities, manners of doing business, needs and requirements; product specifications and performance needs for each customer; and the prices charged to each customer; customer information reports, pricing information (such as price lists, quotation guides, previous or outstanding quotations, equipment prices or billing information), mailing labels, mailing plans and programs, sales report forms, pending projects or proposals, techniques used in approaches or results of any market research, advertising sources, employee salaries, contracts and wage information, names and addresses of the vendors, manufacturers, and other suppliers of Company products, the products they supply the applicable prices and discounts, and the applicable product specifications; new products or inventions developed or under development by the Company; formulas, patterns compilations, programs, devises, methods, techniques, processes, pictures, contracts, files methods or production (including quality control and packaging), proposals, business plans and projections, budgets, financial information, software, hardware, any patent application o the contents thereof; and all other material relating in any manner whatsoever to the customers products, vendors, and suppliers of Company, including matters which should reasonably be considered trade secrets even if not expressly described herein.

All information obtained in the course of Employee's employment is to be used only fo the purpose of conducting the Company's business. Employee agrees to never discuss o disclose such trade secrets, confidential information or property, either directly or indirectly with or in the presence of persons outside the Company, either during employment, or at any time thereafter, except as required by Employee's supervisor. Employee further agrees tha information in any form, including but not limited to documents, tapes, lists, computer printouts, studies, reports, drafts, pictures, charts, maps, drawings, programs, equipment scrap, blueprints, vendor lists, customer lists, client billing information, all financial reports payroll information, records, files and other materials pertaining to the Company, its customers and vendors, may not be removed from the facilities without the advance written permission of Employee's supervisor.

Employee acknowledges that all such trade secrets or confidential information, or any copies of summaries thereof, whether prepared by Employee, by the Company, or provided to Employee by the Company, is the exclusive property of the Company. On demand or termination of employment for any reason, Employee agrees to return to the Company all

Confidential - Attorney's Eyes Only

EXHIBIT __13__
PAGE __156__

MGA 0876580

EX 1117-0003

papers, records, elec..onic copies, and documents in ...mployee's possession or obtained during the course of Employee's employment with the Company and Employee further agrees that he/she will not retain any copies, nor permit anyone to retain any copies thereof, except that those who have successfully completed their 90 day introductory period may keep their Franklin Planner.

Employee acknowledges and agrees that the trade secrets described herein have independent economic value in that they are not generally known within the trade they represent many years of research and development and give the Company substantial competitive advantages.

As a condition of employment, Employee agrees that he/she (1) will regard and preserve the confidential information as highly confidential and as the trade secrets of the Company; (2) will not, at any time during or within twelve months after the termination of his/her employment with the Company, reveal, disclose, permit to be disclosed, or make known to any person, firm or corporation, any confidential information which was disclosed to Employee or of which he/she became aware during his/her employment, regardless of whether developed, prepared or created in whole or in part by Employee's efforts, except to the extent that such disclosure is necessary and is authorized in writing by the Company to carry out Employee's duties of employment; (3) will retain all confidential information in trust for the sole benefit of the Company and will not disclose to or use any confidential information in an independent business related to the scope of the Company's business (designer manufacturer and distributor of toy); (4) will not photocopy or duplicate, and will not permit any person to photocopy or duplicate, any of the confidential information without the Company's written consent and approval; (5) will not make any use of confidential information for his/her own benefit or the benefit of any person or entity other than the Company; (6) will return all confidential information (including but not limited to customer lists, books maintained by Employee, and source lists) to the Company immediately upon request for same. Employee agrees that if he/she has any questions about whether a matter is a trade secret, to seek a determination by the Company before he/she uses any such information.

Employee agrees to maintain the same level of confidentiality regarding co workers, employee relation matters, and Company operations. Employee agrees, by accepting employment or continued employment with the Company, to comply with these rules and to maintain confidentiality of the Company's trade secrets.

Employee understands and acknowledges that the trade secrets and confidential information of the Company are not known to the general public and are the subject of reasonable efforts to maintain its secrecy. They are of a special, unique and extraordinary character, which gives them a particular value, the loss of which cannot be reasonably compensated in damages in an action at law. Employee further understands and agrees that in addition to any other rights or remedies which the Company may have, the Company shall be entitled to immediate injunctive and other equitable relief to prevent a breach of this Confidentiality and Inventions Agreement. If any legal proceeding arises under this Confidentiality and Inventions Agreement, the prevailing party shall be entitled to recover all costs and expenses, including reasonable attorney's fees and costs. California law shall apply to this agreement as to contracts wholly performed within the state.

Confidential - Attorney's Eyes Only

EXHIBIT 13
PAGE 157

MGA 0876581

EX 1117-0004

Employee and the Company agree that this Confidentiality and Inventions Agreement shall not apply to information that Employee was aware of prior to his/her employment with the Company, or that is otherwise publicly known.

Employee further agrees that during his/her employment and for a period of twelve months after termination. Employee will not solicit the purchase of any products or service from any supplier or vendor who supplies products or services to the Company.

INVENTIONS ASSIGNMENT:

1. ASSIGNMENT OF INTEREST: Employee agrees to assign, and does hereby assign, to Company all interest which employee may have in all patentable and/or not-patentable idea and/or inventions made or conceived by Employee solely or jointly with others during Employee's employment with Company. This assignment shall not apply to any idea o invention developed by Employee entirely on Employee's own time without equipment supplies, facilities, or trade secret information of Company, unless such invention or idea: (1 relates to the business of company or to Company's actual or anticipated research o development, or (2) results from any work performed by Employee for Company. THIS AGREEMENT DOES NOT APPLY TO ANY INVENTION WHICH QUALIFIES FULLY UNDER THE PROVISIONS OF CALIFORNIA LABOR CODE SECTION 2870.

2. DISCLOSURE OF IDEAS OR INVENTIONS: Employee agrees to promptly disclose in writing to Fred Larian all inventions developed solely or jointly with others during Employee's employment with Employer, whether such inventions are patentable, not-patentable or assignable under this Agreement. Employer agrees to maintain such disclosure in confidence

3. WRITTEN DISCLOSURE OF PRIOR INVENTIONS: Employee agrees to provide a complete list of all patented or not-patented ideas and inventions conceived by Employee or anyone else jointly with Employee, prior to the date Employee has signed this Agreement. The failure of Employee to provide Company with a written disclosure of ideas or inventions shall be deemed to constitute an affirmative acknowledgment by Employee that no such ideas or inventions exist.

If any provision of this Confidentiality and Inventions Agreement is held to be invalid or unenforceable, in whole or in part, the remaining portions of this Agreement shall continue to be valid and will be performed, construed and enforced to the fullest extent permitted by law. The invalid or unenforceable provision shall be deemed amended and limited in accordance with the intent of the parties, as determined from the face of this Agreement, to the extent necessary to permit the maximum enforceability or validation of the provision.

04.17.00
Date

_Paula Tuintatang_
Employee Signature

_Paula Tueartatclles_
Employee Name (printed)

_____
Date

_Employer Signature_

_Eve Johnson-Fried_
Name (printed)

Confidential - Attorney's Eyes Only

EXHIBIT 13
PAGE 158

MGA 0876582

EX 1117-0005

## MUTUAL AGREEMENT TO MEDIATE AND/OR ARBITRATE

We recognize that differences may arise between us. Through this mutual agreement to mediate and/or arbitrate("Agreement"), _PAULA TREANTAFLES_ ("Employee"), and ABC Int'l Traders Inc. ("Company") expect to gain the benefits of a speedy, economical, impartial dispute resolution procedure. This Agreement provides as follows:

This Agreement shall apply to all disputes or controversies, whether or not arising out of Employee's employment (or termination of that employment), that the Company may have against Employee, or that employee may have against the Company or against its officers, directors, employees, or agents("Claims"). The Claims include, but are not limited to, controversies relating to: compensation or benefits, breach of any contract, torts, discrimination under state, federal or local law, and violation of any federal, state or other governmental law, statute, regulation or ordinance. However, this Agreement shall not apply to any claim: (a) by the employee for workers' compensation or unemployment benefits; or (b) by the Company for injunctive and/or other equitable relief; including, but not limited to, unfair competition and/or the use and/or unauthorized disclosure of trade secrets or confidential information. With respect to matters referred to in sub-paragraph (b) above, the company may seek and obtain injunctive relief in court,.and then proceed with arbitration under the Agreement.

EACH PARTY WAIVES THE RIGHT TO A JURY TRIAL OR COURT TRIAL. THE SOLE AND EXCLUSIVE METHOD TO RESOLVE ANY CLAIM IS MEDIATION AND/OR ARBITRATION AS PROVIDED IN THIS AGREEMENT. The parties each waive their right to commence an action in any court to resolve a Claim. Neither party shall initiate or prosecute any lawsuit in any way related to any claim covered by this Agreement.

Any Claim by employee or the company must be processed in the manner set forth below. Otherwise, the Claim shall be void and deemed waived even if there is a  federal or state statute of limitations which would allow more time to pursue the Claim.

An Employee Claim must initially be raised verbally by Employee to the person(s) involved. If the issue cannot be resolved, the matter must be presented to the Employee's immediate supervisor within one year after you initially knew or should have known of the facts that gave rise to the Claim. The supervisor will answer the Claim within fifteen (15) days from the date the Claim was presented. If the supervisor fails to respond, then it will be considered a denial of your Claim.

If Employee is not satisfied with the supervisor's answer, or the nature of the Claim is such that Employee does not wish to present it to his supervisor, the Employee may obtain the assistance of the President, who will discuss the Claim with Employee and assist, if Employee desires assistance, in presenting the Claim in written form to the Company. Employee must present the Claim in writing to the President within fifteen (15) working days after Employee receives the supervisor's answer. However, if Employee decides not to present the Claim to his or her supervisor, Employee must present the Claim to the President, in writing, within one year after Employee initially knew or should have known of the facts that gave rise to the Claim. If Employee does not present the Claim in writing to the President within 15 days or one year, whichever is applicable, then Employee will be deemed to have accepted the Company's last stated position on the Claim and waived the right to further contest the Claim.

The President will consider Employee's written presentation, and any other information that Employee deems relevant. The President will render a written decision within fifteen (15) working

Confidential - Attorney's Eyes Only

EXHIBIT 13
PAGE 159

MGA 0876583

EX 1117-0006

days. This decision will be mailed to Employee's address, as it appears in the Company's records. If the Company fails to respond, it will be deemed a denial of your Claim.

If Employee is not satisfied with the President's decision, Employee may request a voluntary, non-binding mediation. If mediation is selected, Employee and the Company agree to utilize mediation in good faith with the goal of resolving the Claim. If the parties cannot mutually agree on the mediator, they will utilize the American Arbitration Association ("AAA") mediation dispute resolution procedures. The mediation shall take place in or near the city in which Employee resided when last employed by the Company. If mediation does not result in a settlement of the Claim, either party may serve written notice to the other party of its intention to proceed to arbitrate within fifteen (15) days from the termination of the mediation.

If Employee does not desire to mediate the Claim, then he or she may present the Claim for resolution by final and binding arbitration. Employee must serve written notice on the Company of his or her intention to arbitrate within ninety (90) days from the mailing of the President's final decision.

If the Company desires to initiate arbitration to resolve a Claim against Employee, it must serve written notice on Employee within one year after it initially knew or should have know of the facts that gave rise to its Claim.

The written notice of desire to arbitrate shall describe the factual basis of all Claims asserted, and shall be served on the other party by certified mail, return receipt requested. Written notice to Employee will be mailed to his or her address as it appears in the Company's records. Written notice to the Company, or its officers, directors, employees or agents, shall be sent to the President at the Company's principal place of business. If written notice of desire to arbitrate is not served within the applicable time period, the party who failed to timely serve notice will be deemed to have waived the right to further contest the Claim and will be deemed to have accepted the other party's last stated position on the Claim.

The arbitration shall be conducted in accordance with the then-current Model Employment Arbitration Procedures of the AAA before a single arbitrator. The Arbitrator shall be selected in the following manner. The AAA shall give each party a list of 11 arbitrators drawn from its panel of labor of employment arbitrators. Each side may strike all names on the list it deems unacceptable. If only one common name remains on the list of all parties, that individual shall be the Arbitrator. If more than one common name remains on the list of all parties, the parties shall strike names alternately, in a telephone conference no more than five days after the parties receive notice that more than one acceptable arbitrator remains, until only one remains. If no common name remains on the list of all parties, the AAA shall furnish one additional list, and the above procedures will be utilized. If no arbitrator is designated from the second list, the procedures of the AAA rules will be used to select the Arbitrator.

Either party may be represented by an attorney or other representative selected by the party. The parties waive the provision of California Code of Civil Procedure Section 1283.05. Each party shall have the right to take the deposition of one individual from, any expert witness designated by, and the other party. Each party also shall have the right to make requests for production of documents to any party. Additional discovery may be had only where the arbitrator so orders, upon a showing of substantial need. All issues related to discovery will be resolved by the Arbitrator.

Confidential - Attorney's Eyes Only

EXHIBIT __13__
PAGE __160__

MGA 0876584

EX 1117-0007

The Arbitrator will have no authority to: (i) adopt new Company policies or procedures, (ii) modify the Agreement or existing Company policies, procedures, wages or benefits, or (iii) hear or decide any matter that was not processed in accordance with this Agreement. The Arbitrator shall have exclusive authority to resolve any Claim, including, but not limited to, a dispute relating to the interpretation, applicability, enforceability, or formation of this Agreement, or any contention that all or any part of this Agreement is void or voidable. The Arbitrator will have the authority to award any form or remedy or damages that would be available in a court.

Employee and the Company each agree to pay one half of the reasonable and necessary fees of the AAA and the mediator and/or Arbitrator. The parties will pay their own attorneys' fees and expenses associated with the mediation and/or arbitration. Either party, in its sole discretion, may, in writing, waive, in whole or in part, the other's failure to follow any time limit or other requirement set forth in the Agreement.

To the extent permitted by law, Employee agrees not to initiate or prosecute against the Company any administrative action (including an administrative charge of discrimination to the extent permitted by law) in any way related to any Claim covered by this Agreement.

The mediation and/or arbitration will be conducted in private, and will not be open to the public or the media. The testimony and other evidence presented, and the results of the mediation and/or arbitration, unless otherwise agreed to by both parties, is confidential and may not be disclosed, made public or reported to any person or entity, including, but not limited to, any legal or news agency, publisher or service, except pursuant to a court order, provided that the Company or Employee gives sufficient prior written notice of any judicial proceeding at which a court order is being sought, to enable the other to seek a protective order before disclosure occurs.

The Arbitrator shall render a written decision and the award (the "Award") shall set forth the facts and reasons that support the Award. The Award shall be final and binding on both you and the Company. This Agreement shall survive the termination of your employment, and can only be revoked or modified by a writing signed by the parties which specifically states an intent to revoke or modify the Agreement. This is the complete agreement of the parties on the subject of dispute resolution, mediation or arbitration of disputes.

<u>**NOTICE: BY SIGNING THE AGREEMENT, YOU ARE AGREEING THAT ALL CLAIMS WILL BE DECIDED BY NEUTRAL MEDIATION AND/OR ARBITRATION, AND YOU ARE GIVING UP YOUR RIGHT TO A JURY TRIAL OR COURT TRIAL.**</u>

| | | |
|---|---|---|
| 04·17·00 | _Paula Treantafeles_ | Paula Treantafelles |
| Date | Employee Signature | Employee Name (printed) |

| | | |
|---|---|---|
| | _(signature)_ | Eric Johnson-Erd |
| Date | Employer Signature | Name (printed) |

Confidential - Attorney's Eyes Only

EXHIBIT    13
PAGE    161

MGA 0876585

EX 1117-0008

# EXHIBIT 14



**Corporate Office:**
16730 Schoenborn Street
North Hills, CA 91343-6122 USA
Tel 818.894.2525
Fax 818.894.8094

# Memo

| To: | All MGA Employees | From: | Michele Thompson |
|---|---|---|---|
| Re: | Confidentiality Agreement and Proprietary Information Agreement | | |
| Date: | 8/10/00 | | |

Attached please find:

1. The newly revised MGA Entertainment Confidentiality Agreement. The revision states that upon separation from employment MGA will retain ownership of the company-supplied Franklin Planner (regardless of time worked).

2. The new Proprietary Information Agreement. Please read this document carefully and sign when finished.

Please return the signed forms to me no later than August 21, 2000. Thank you for your cooperation.

**Hong Kong Office:**
Unit 707-8 Multifield Plaza
3-7A Prot Ave., TST,
Kowloon, Hong Kong

**Hong Kong Showroom:**
11 Canton Road, Suite 1015
TST, Kowloon
Tel 852.2926.8008
Fax 852.2312.0101

**The ABC Group**



MA 0001

EXHIBIT 14
PAGE 162

EX 13532-0001

## CONFIDENTIALITY AND INVENTIONS ASSIGNMENT AGREEMENT

This Confidentiality and Inventions Agreement is executed by and between MGA Entertainment ("Company") and _____ ("Employee").

During the course of his/her employment at the Company, Employee will have access to, will acquire, and will become acquainted with trade secrets, confidential information and property related to the Company and its customers' and vendors' businesses. The Company's trade secrets include, but are not limited to, such information as customer names, addresses, phone numbers, names, specific characteristics of suppliers and customers and their respective employees with whom the Company has dealings (whether or not such information is contained on a Rolodex, computer printout, customer list, or is orally communicated to any Company employee in the course of their duties) and the history of purchases, along with terms and conditions of credit offered to each customer; names, addresses, telephone numbers and specific characteristics of prospective customers and contacts; information regarding particular customer product peculiarities, manners of doing business, needs and requirements; product specifications and performance needs for each customer; and the prices charged to each customer; customer information reports, pricing information (such as price lists, quotation guides, previous or outstanding quotations, equipment prices or billing information), mailing labels, mailing plans and programs, sales report forms, pending projects or proposals, techniques used in approaches or results of any market research, advertising sources, employee salaries, contracts and wage information, names and addresses of the vendors, manufacturers, and other suppliers of Company products, the products they supply, the applicable prices and discounts, and the applicable product specifications; new products or inventions developed or under development by the Company; formulas, patterns, compilations, programs, devises, methods, techniques, processes, pictures, contracts, files, methods or production (including quality control and packaging), proposals, business plans and projections, budgets, financial information, software, hardware, any patent application or the contents thereof; and all other material relating in any manner whatsoever to the customers products, vendors, and suppliers of Company, including matters which should reasonably be considered trade secrets even if not expressly described herein.

All information obtained in the course of Employee's employment is to be used only for the purpose of conducting the Company's business. Employee agrees to never discuss or disclose such trade secrets, confidential information or property, either directly or indirectly, with or in the presence of persons outside the Company, either during employment, or at any time thereafter, except as required by Employee's supervisor. Employee further agrees that information in any form, including but not limited to documents, tapes, lists, computer printouts, studies, reports, drafts, pictures, charts, maps, drawings, programs, equipment, scrap, blueprints, vendor lists, customer lists, client billing information, all financial reports, payroll information, records, files and other materials pertaining to the Company, its customers and vendors, may not be removed from the facilities without the advance written permission of Employee's supervisor.

Employee acknowledges that all such trade secrets or confidential information, or any copies of summaries thereof, whether prepared by Employee, by the Company, or provided to Employee by the Company, is the exclusive property of the Company. On demand or termination of employment for any reason, Employee agrees to return to the Company all papers, records, electronic copies, Franklin Planner and documents in Employee's possession or obtained during the course of Employee's employment with the Company and Employee further agrees that he/she will not retain any copies, nor permit anyone to retain any copies.

1

MA 0002

EXHIBIT 14
PAGE 103

EX 13532-0002

Employee acknowledges and agrees that the trade secrets described herein have independent economic value in that they are not generally known within the trade they represent many years of research and development and give the Company substantial competitive advantages.

As a condition of employment, Employee agrees that he/she (1) will regard and preserve the confidential information as highly confidential and as the trade secrets of the Company; (2) will not, at any time during or within twelve months after the termination of his/her employment with the Company, reveal, disclose, permit to be disclosed, or make known to any person, firm or corporation, any confidential information which was disclosed to Employee or of which he/she became aware during his/her employment, regardless of whether developed, prepared or created in whole or in part by Employee's efforts, except to the extent that such disclosure is necessary and is authorized in writing by the Company to carry out Employee's duties of employment; (3) will retain all confidential information in trust for the sole benefit of the Company and will not disclose to or use any confidential information in an independent business related to the scope of the Company's business (designer, manufacturer and distributor of toy); (4) will not photocopy or duplicate, and will not permit any person to photocopy or duplicate, any of the confidential information without the Company's written consent and approval; (5) will not make any use of confidential information for his/her own benefit or the benefit of any person or entity other than the Company; (6) will return all confidential information (including but not limited to customer lists, books maintained by Employee, and source lists) to the Company immediately upon request for same. Employee agrees that if he/she has any questions about whether a matter is a trade secret, to seek a determination by the Company before he/she uses any such information.

Employee agrees to maintain the same level of confidentiality regarding co workers, employee relation matters, and Company operations. Employee agrees, by accepting employment or continued employment with the Company, to comply with these rules and to maintain confidentiality of the Company's trade secrets.

Employee understands and acknowledges that the trade secrets and confidential information of the Company are not known to the general public and are the subject of reasonable efforts to maintain its secrecy. They are of a special, unique and extraordinary character, which gives them a particular value, the loss of which cannot be reasonably compensated in damages in an action at law. Employee further understands and agrees that in addition to any other rights or remedies which the Company may have, the Company shall be entitled to immediate injunctive and other equitable relief to prevent a breach of this Confidentiality and Inventions Agreement. If any legal proceeding arises under this Confidentiality and Inventions Agreement, the prevailing party shall be entitled to recover all costs and expenses, including reasonable attorney's fees and costs. California law shall apply to this agreement as to contracts wholly performed within the state.

Employee and the Company agree that this Confidentiality and Inventions Agreement shall not apply to information that Employee was aware of prior to his/her employment with the Company, or that is otherwise publicly known.

Employee further agrees that during his/her employment and for a period of twelve months after termination, Employee will not solicit the purchase of any products or services from any supplier or vendor who supplies products or services to the Company.

2

MA 0003



EXHIBIT 14
PAGE 164

EX 13532-0003

INVENTIONS ASSIGNMENT:

1. ASSIGNMENT OF INTEREST: Employee agrees to assign, and does hereby assign, to Company all interest which employee may have in all patentable and/or not-patentable ideas and/or inventions made or conceived by Employee solely or jointly with others during Employee's employment with Company. This assignment shall not apply to any idea or invention developed by Employee entirely on Employee's own time without equipment, supplies, facilities, or trade secret information of Company, unless such invention or idea: (1) relates to the business of company or to Company's actual or anticipated research or development, or (2) results from any work performed by Employee for Company. THIS AGREEMENT DOES NOT APPLY TO ANY INVENTION WHICH QUALIFIES FULLY UNDER THE PROVISIONS OF CALIFORNIA LABOR CODE SECTION 2870.

2. DISCLOSURE OF IDEAS OR INVENTIONS: Employee agrees to promptly disclose in writing to Fred Larian all inventions developed solely or jointly with others during Employee's employment with Employer, whether such inventions are patentable, not-patentable or assignable under this Agreement. Employer agrees to maintain such disclosure in confidence.

3. WRITTEN DISCLOSURE OF PRIOR INVENTIONS: Employee agrees to provide a complete list of all patented or not-patented ideas and inventions conceived by Employee or anyone else jointly with Employee, prior to the date Employee has signed this Agreement. The failure of Employee to provide Company with a written disclosure of ideas or inventions shall be deemed to constitute an affirmative acknowledgment by Employee that no such ideas or inventions exist.

If any provision of this Confidentiality and Inventions Agreement is held to be invalid or unenforceable, in whole or in part, the remaining portions of this Agreement shall continue to be valid and will be performed, construed and enforced to the fullest extent permitted by law. The invalid or unenforceable provision shall be deemed amended and limited in accordance with the intent of the parties, as determined from the face of this Agreement, to the extent necessary to permit the maximum enforceability or validation of the provision.

| | | |
|---|---|---|
| _____ | _____ | _____ |
| Date | Employee Signature | Employee Name (Printed) |
| | | |
| _____ | _____ | |
| Date | Isaac Larian, President and CEO | |

3

MA 0004

EXHIBIT 14
PAGE 165

EX 13532-0004

## PROPRIETARY INFORMATION AGREEMENT

This Proprietary Information Agreement ("Agreement") is entered into by and between _____ ("Employee"), on the one hand, and MGA Entertainment (together with its affiliates, and their successors and assigns, the "Company"), on the other hand.

WHEREAS, the Company has offered to employ Employee on certain favorable terms and conditions, which offer is expressly conditioned upon, among other things, Employee's agreement to adhere to, among other things, the various covenants and agreements contained in this Agreement;

WHEREAS, Employee understands the terms and conditions of the Company's employment offer, including its condition that Employee agree to the various covenants and agreements set forth below. In consideration of the Company's employment of Employee and providing Employee with training, compensation and benefits, and business growth and development opportunities, and allowing Employee to have access to the Company's Proprietary Information (defined below), Employee has decided to enter into, and agrees to be bound by, this Agreement.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements set forth below, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Employee and the Company agree as follows:

## AGREEMENT

1.   CONFIDENTIALITY.   Employee understands that, by virtue of Employee's employment with the Company, Employee will acquire and be exposed to Proprietary Information of the Company. "Proprietary Information" includes all ideas, information and materials, tangible or intangible, not generally known to the public, relating in any manner to the business of the Company (as defined above), its products and services (including all trade secrets), its personnel (including its officers, directors, employees, and contractors); its clients, vendors and suppliers and all others with whom it does business that Employee learns or acquires during Employee's employment with the Company. Proprietary Information includes, but is not limited to, manuals, documents, computer programs and software used by the Company, users manuals, compilations of technical, financial, legal or other data, salary information, client or prospective client lists, names of suppliers or vendors, client, supplier or vendor contact information, business referral sources, specifications, designs, devices, inventions, processes, business or marketing plans or strategies, pricing information, media rate information, rate structures, information regarding the identity of the Company's directors, advertisers, or media experts, identity data, prototypes, forecasts, financial information, works in progress, and other technical or business information. Proprietary Information does not include basic information that is generally known and used within the Toy industry.

Employee agrees to hold in trust and confidence all Proprietary Information during and after the period of Employee's employment with the Company.

MA 0005

EXHIBIT  14
PAGE  166

EX 13532-0005

Employee shall not disclose any Proprietary Information to anyone outside the Company without the written approval of an authorized officer of the Company or use any Proprietary Information for any purpose other than for the benefit of the Company as required by Employee's authorized duties for the Company. At all times during Employee's employment with the Company, Employee shall comply with all of the Company's policies or regulations relating to the protection and confidentiality of Proprietary Information. Upon termination of Employee's employment with the Company, (a) Employee shall not use Proprietary Information, or disclose Proprietary Information to anyone, for any purpose, unless expressly requested to do so in writing by an authorized officer of the Company, (b) Employee shall not retain or take with Employee any Proprietary Information in a Tangible Form (defined below), and (c) Employee shall immediately deliver to the Company any Proprietary Information in a Tangible Form that Employee may then or thereafter hold or control, as well as all other property, equipment, documents or things that Employee was issued or otherwise received or obtained during Employee's employment with the Company. "Tangible Form" includes ideas, information or materials in written or graphic form, on a computer disc or other medium, or otherwise stored in or available through electronic, magnetic, videotape or other form.

## 2.   PROTECTION OF PROPRIETARY INFORMATION.

Employee acknowledges that (a) the Company is engaged in the business of the invention, design, development and manufacture of toys, specifically high-tech toys and electronics throughout the United States and the World; (b) the market for the Business covers the entire United States and the World and (c) as part of Employee's employment, Employee will be exposed to Proprietary Information that relates directly to the Company's Business. Employee further acknowledges that because of the nature of Employee's work at the Company, Employee's engaging in similar work for another company that, directly or indirectly, engages in the Business in California will necessarily and inevitably involve or lead to Employee's unauthorized use or disclosure of Proprietary Information. Accordingly, for a period of one (1) year following the termination of Employee's employment with the Company for any reason, Employee shall not, directly or indirectly, become employed by or provide any services to or for any company or business that is engaged in the Business throughout the United States, unless Employee demonstrates to the Company's reasonable satisfaction that such employment or service will not result in the unauthorized use or disclosure of Proprietary Information.

## 3.   NON-SOLICITATION OF CUSTOMERS, CLIENTS AND

VENDORS. Employee acknowledges that, because of the nature of Employee's work for the Company, Employee's solicitation or serving of certain customers, clients and vendors related to Employee's work for the Company would necessarily involve the unauthorized use or disclosure of Proprietary Information, and the proprietary relationships and goodwill of the Company. Accordingly, for one (1) year following the termination of Employee's employment with the Company for any reason, Employee shall not, directly or indirectly, solicit, induce, or attempt to solicit or induce, any person or entity then known to be a customer or client or vendor of the Company, for whom or, on whose behalf, Employee, during the three (3) year period immediately preceding the termination of Employee's employment, (a) performed any work or services, or (b) participated in the preparation of any proposal to provide such work or services (a

LOS_ANGELES:102871.1 015567.1001                    2.

MA 0006



EXHIBIT __14__
PAGE __167__

EX 13532-0006

"Restricted Customer/Client/Vendor"), to terminate his, her or its relationship with the Company for any purpose, including the purpose of associating with or becoming a customer, client or vendor, whether or not exclusive, of Employee or any entity of which Employee is or becomes an officer, director, member, agent, employee or consultant, or otherwise solicit, induce, or attempt to solicit or induce, any Restricted Customer/Client/Vendor to terminate his, her or its relationship with the Company for any other purpose or no purpose.

4.     NON-SOLICITATION OF PERSONNEL. During Employee's employment with the Company and for one (1) year thereafter, Employee shall not, directly or indirectly, solicit, induce, or attempt to solicit or induce, any person known to Employee to be an employee of the Company who, directly or indirectly, engages in the Business on behalf of the Company (each such person, a "Company Person"), to terminate his or her employment or other relationship with the Company for the purpose of associating with (a) any entity that engages in the Business of which Employee is or becomes an officer, director, member, partner, principal, agent, employee or consultant, or (b) any competitor of the Company in the Business, or otherwise encourage any Company Person to terminate his or her employment or other relationship with the Company for any other purpose or no purpose.

5.     COMPETING ACTIVITIES. During Employee's employment with the Company, Employee shall not engage in any activity that is or may be competitive with the Company in the Business or otherwise in any state in the United States, where the Company engages in the Business, whether or not for compensation including, but not limited to, providing services or selling products similar to those provided or sold by the Company, offering, or soliciting or accepting an offer, to provide such services or to sell such products, or taking any action to form, or become employed by, a company or business to provide such services or to sell such products.

6.     RETURN OF DOCUMENTS AND MATERIALS. Immediately upon the termination of Employee's employment or at any time prior thereto if requested by the Company, Employee shall return all records, documents, equipment, proposals, notes, lists, files, and any and all other materials, including but not limited to Proprietary Information in a Tangible Form, that refers, relates or otherwise pertains to the Company and its business, including its products and services, personnel, customers or clients (actual or potential), investors (actual or potential), and/or vendors and suppliers (actual or potential), or any of them, and any and all business dealings with said persons and entities (the "Returned Property and Equipment") to the Company at its offices in Los Angeles, California. Employee is not authorized to retain any copies or duplicates of the Returned Property and Equipment that Employee obtained or received as a result of Employee's employment or other relationships with the Company.

MA 0007



EXHIBIT   14
PAGE   168

EX 13532-0007

7.     PROPRIETARY INFORMATION OF OTHERS/COMPLIANCE WITH LAWS.  Employee shall not breach any agreement to keep in confidence, or to refrain from using, the nonpublic ideas, information or materials of a third party, including, but not limited to, a former employer or client.  Employee shall not bring any such ideas, information or materials to the Company, or use any such ideas, information or materials in connection with Employee's employment by the Company.  Employee shall comply with all national, state, local and other laws, regulations and ordinances.

8.     RIGHTS AND REMEDIES UPON BREACH.  If Employee breaches, or threatens to commit a breach of, any of the provisions of this Agreement, Employee agrees that the Company shall have the right and remedy to have each and every one of the covenants in this Agreement specifically enforced and the right and remedy to obtain temporary and permanent injunctive relief, it being acknowledged and agreed by Employee that any breach or threatened breach of any of the restrictive covenants and agreements contained herein would cause irreparable injury to the Company and that money damages would not provide an adequate remedy at law to the Company.  Moreover, if Employee breaches or threatens to commit a breach of this Agreement during Employee's employment with the Company, Employee may be subject to the immediate termination of Employee's employment.  In any such action seeking to enforce this Agreement, the prevailing party shall be entitled to recover all reasonable attorneys' fees, costs and expenses, including any expert fees, that were incurred by that party in connection with any such action.

9.     SEVERABILITY/BLUE-PENCIL.  Employee acknowledges and agrees that (a) the restrictive covenants and agreements contained herein are reasonable and valid in geographic, temporal and subject matter scope and in all other respects, and do not impose limitations greater than are necessary to protect the goodwill, Proprietary Information, and other business interests of the Company; (b) if any court subsequently determines that any of such covenants or agreements, or any part thereof, is invalid or unenforceable, the remainder of such covenants and agreements shall not thereby be affected and shall be given full effect without regard to the invalid portions; and (c) if any court determines that any of the restrictive covenants and agreements, or any part thereof, is invalid or unenforceable because of the duration or scope of such provision, such court shall have the power to reduce the duration or scope of such provision, as the case may be, and, in its reduced form, such provision shall then be enforceable to the maximum extent permitted by applicable law. Employee intends to and hereby confers jurisdiction to enforce each and every one of the covenants and agreements contained herein upon the courts of any jurisdiction within the geographic scope of such covenants and agreements, and if the courts or any one or more of such jurisdictions hold any such covenant or agreement unenforceable by reason of the breadth or scope or otherwise, it is the intention of Employee that such determination shall not bar or in any way affect the Company's right to the relief provided above in the courts of any other jurisdiction within the geographic scope of such covenants and agreements, as to breaches of such covenants and agreements in such other respective jurisdictions, such covenants and agreements as they relate to each jurisdiction being, for this purposes, severable into diverse and independent covenants and agreements.

MA 0008

EXHIBIT    14
PAGE       109

EX 13532-0008

10.   CONFIRMATION OF AT-WILL EMPLOYMENT.  Employee acknowledges and agrees that:  (a) Employee's employment with the Company is and shall be at all times on an at-will basis, and the Company or Employee may terminate Employee's employment at any time, for any reason, with or without cause or advance notice; (b) nothing in this Agreement or in the Company's employee manuals, handbooks or other written materials create or are intended to create an express or implied contract for employment; (c) nothing in the Agreement obligates the Company to hire, retain or promote Employee; (d) all definitions, terms and conditions of this Agreement apply to Employee only for the purposes of this Agreement, and for no other purpose, and do not alter or otherwise effect the at-will status of Employee's employment with the Company; and (e) no representative of the Company has any authority to enter into any express or implied, oral or written agreements that are contrary to the terms and conditions of this Agreement or to enter into any express or implied contracts for employment (other than for at-will employment) except for the President of the Company and any agreement between Employee and the President must be in writing and signed by Employee and the President.

11.   INFORMATION ON COMPANY PREMISES.  Employee acknowledges that, by virtue or Employee's employment with the Company, Employee will have use of the premises and equipment of the Company.  Employee acknowledges and agrees that the Company has the right to review and inspect any such premises and equipment, even if they contain Employee's personal information or materials.

12.   GOVERNING LAW.  This Agreement shall be construed, interpreted, and governed in accordance with either (a) the laws of the State of California, regardless of applicable conflicts of law principles, or (b) in the event of a breach of any of the covenants contained in Section 1 through 8, the law of the State where such breach actually occurs, depending on whichever choice of law shall ensure to the maximum extent that the restrictive covenants shall be enforced in accordance with the intent of the parties.

13.   ENTIRE AGREEMENT/MODIFICATION/NO WAIVER.  This Agreement (and Employee's and the Company's agreements regarding arbitration and Employee's at will employment status that are set forth in the Company's offer letter, which are incorporated by this reference herein) (a) represent the entire agreement of the parties with respect to the subject matter hereof, (b) shall supersede any and all previous contracts, arrangements or understandings between the parties hereto with respect to the subject matter hereof, and (c) may not be modified or amended except by an instrument in writing signed by each of the parties hereto.  No waiver, delay, omission or forbearance in exercising any right, option, duty or power under this Agreement (or Employee's and the Company's agreements regarding arbitration and Employee's at will employment status that are set forth in the Company's offer letter) shall affect or impair any party's rights with respect to any past or present default or breach of any of provisions of this Agreement or Employee's and the Company's agreements regarding arbitration and Employee's at will employment status that are set forth in the Company's offer letter.

MA 0009



EXHIBIT  14
PAGE  170

EX 13532-0009

14.    PARTIES IN INTEREST/ASSIGNMENT/SURVIVAL.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned, in whole or in part, by operation of law or otherwise, by Employee.  The Company may sell, assign, and transfer all of its right, title and interests in this Agreement without the prior consent of Employee, whether by operation of law or otherwise, in which case this Agreement shall remain in full force after such sale, assignment or other transfer and may be enforced by (a) any successor, assignee or transferee of all or any part of the Company's business as fully and completely as it could be enforced by the Company if no such sale, assignment or transfer had occurred, and (b) the Company in the case of any sale, assignment or other transfer of a part, but not all, of the business.  The benefits under this Agreement shall inure to and may be enforced by the Company and any of its subsidiaries, affiliates, successors, transferees and assigns.  Employee's duties and obligations under this Agreement shall survive the termination of Employee's employment by Employee or the Company.

15.    VOLUNTARY AGREEMENT/NO INDUCEMENTS.  The Company and Employee hereby acknowledge and represent that Employee and the Company each (a) has fully and carefully read this Agreement prior to signing it, (b) has been, or has had the opportunity to be, advised by independent legal counsel of Employee's and the Company's own choice as to the legal effect and meaning of each of the terms and conditions of this Agreement, and (c) is signing and entering into this Agreement as a free and voluntary act without duress or undue pressure or influence of any kind or nature whatsoever and has not relied on any promises, representations or warranties regarding the subject matter hereof other than as set forth in this Agreement.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement on the day and year written below.

MGA Entertainment

By: _____

President and Chief Executive Officer

Date: _____, 2000

EMPLOYEE

Name: _____
Address: _____
Date: _____, 2000

MA 0010



EXHIBIT  14
PAGE  171

EX 13532-0010

# EXHIBIT 15

## CONFIDENTIALITY AND INVENTIONS ASSIGNMENT AGREEMENT

This Confidentiality and Inventions Agreement is executed by and between ABC Int' Traders, Inc. ("Company") and _____ Kami Gilmartin _____ ("Employee").

During the course of his/her employment at the Company, Employee will have access to, will acquire, and will become acquainted with trade secrets, confidential information and property related to the Company and its customers' and vendors' businesses. The Company's trade secrets include, but are not limited to, such information as customer names, addresses, phone numbers names, specific characteristics of suppliers and customers and their respective employees with whom the Company has dealings (whether or not such information is contained on a Rolodex computer printout, customer list, or is orally communicated to any Company employee in the course of their duties) and the history of purchases, along with terms and conditions of credit offered to each customer; names, addresses, telephone numbers and specific characteristics of prospective customers and contacts; information regarding particular customer product peculiarities, manners of doing business, needs and requirements; product specifications and performance needs for each customer; and the prices charged to each customer; customer information reports, pricing information (such as price lists, quotation guides, previous or outstanding quotations, equipment prices or billing information), mailing labels, mailing plans and programs, sales report forms, pending projects or proposals, techniques used in approaches or results of any market research, advertising sources, employee salaries, contracts and wage information, names and addresses of the vendors, manufacturers, and other suppliers of Company products, the products they supply, the applicable prices and discounts, and the applicable product specifications; new products or inventions developed or under development by the Company; formulas, patterns, compilations, programs, devises, methods, techniques, processes, pictures, contracts, files, methods or production (including quality control and packaging), proposals, business plans and projections, budgets, financial information, software, hardware, any patent application or the contents thereof; and all other material relating in any manner whatsoever to the customers products, vendors, and suppliers of Company, including matters which should reasonably be considered trade secrets even if not expressly described herein.

All information obtained in the course of Employee's employment is to be used only for the purpose of conducting the Company's business. Employee agrees to never discuss or disclose such trade secrets, confidential information or property, either directly or indirectly, with or in the presence of persons outside the Company, either during employment, or at any time thereafter, except as required by Employee's supervisor. Employee further agrees that information in any form, including but not limited to documents, tapes, lists, computer printouts, studies, reports, drafts, pictures, charts, maps, drawings, programs, equipment, scrap, blueprints, vendor lists, customer lists, client billing information, all financial reports, payroll information, records, files and other materials pertaining to the Company, its customers and vendors, may not be removed from the facilities without the advance written permission of Employee's supervisor.

Employee acknowledges that all such trade secrets or confidential information, or any copies of summaries thereof, whether prepared by Employee, by the Company, or provided to Employee by the Company, is the exclusive property of the Company. On demand or termination of employment for any reason, Employee agrees to return to the Company all papers, records, electronic copies, and documents in Employee's possession or obtained during the course of Employee's employment with the Company and Employee further agrees that he/she will not retain

EXHIBIT __15__
PAGE __172__

MGA 0875722
EX 13620-0001

any copies, nor permit anyone to retain any copies thereof, except that those who have successfully completed their 90 day introductory period may keep their Franklin Planner.

Employee acknowledges and agrees that the trade secrets described herein have independent economic value in that they are not generally known within the trade they represent many years of research and development and give the Company substantial competitive advantages.

As a condition of employment, Employee agrees that he/she (1) will regard and preserve the confidential information as highly confidential and as the trade secrets of the Company; (2) will not, at any time during or within twelve months after the termination of his/her employment with the Company, reveal, disclose, permit to be disclosed, or make known to any person, firm or corporation, any confidential information which was disclosed to Employee or of which he/she became aware during his/her employment, regardless of whether developed, prepared or created in whole or in part by Employee's efforts, except to the extent that such disclosure is necessary and is authorized in writing by the Company to carry out Employee's duties of employment; (3) will retain all confidential information in trust for the sole benefit of the Company and will not disclose to or use any confidential information in an independent business related to the scope of the Company's business (designer, manufacturer and distributor of toy); (4) will not photocopy or duplicate, and will not permit any person to photocopy or duplicate, any of the confidential information without the Company's written consent and approval; (5) will not make any use of confidential information for his/her own benefit or the benefit of any person or entity other than the Company; (6) will return all confidential information (including but not limited to customer lists, books maintained by Employee, and source lists) to the Company immediately upon request for same. Employee agrees that if he/she has any questions about whether a matter is a trade secret, to seek a determination by the Company before he/she uses any such information.

Employee agrees to maintain the same level of confidentiality regarding co workers, employee relations matters," and Company operations. Employee agrees, by accepting employment or continued employment with the Company, to comply with these rules and to maintain confidentiality of the Company's trade secrets.

Employee understands and acknowledges that the trade secrets and confidential information of the Company are not known to the general public and are the subject of reasonable efforts to maintain its secrecy. They are of a special, unique and extraordinary character, which gives them a particular value, the loss of which cannot be reasonably compensated in damages in an action at law. Employee further understands and agrees that in addition to any other rights or remedies which the Company may have, the Company shall be entitled to immediate injunctive and other equitable relief to prevent a breach of this Confidentiality and Inventions Agreement. If any legal proceeding arises under this Confidentiality and Inventions Agreement, the prevailing party shall be entitled to recover all costs and expenses, including reasonable attorney's fees and costs. California law shall apply to this agreement as to contracts wholly performed within the state.

Employee and the Company agree that this Confidentiality and Inventions Agreement shall not apply to information that Employee was aware of prior to his/her employment with the Company, or that is otherwise publicly known.

Confidential - Attorney's Eyes Only

EXHIBIT 15
PAGE 173

MGA 0875723
EX 13620-0002

Employee further agrees that during his/her employment and for a period of twelve months after termination, Employee will not solicit the purchase of any products or services from any supplier or vendor who supplies products or services to the Company.

## INVENTIONS ASSIGNMENT:

1. <u>ASSIGNMENT OF INTEREST:</u> Employee agrees to assign, and does hereby assign, to Company all interest which employee may have in all patentable and/or not-patentable ideas and/or inventions made or conceived by Employee solely or jointly with others during Employee's employment with Company. This assignment shall not apply to any idea or invention developed by Employee entirely on Employee's own time without equipment, supplies, facilities, or trade secret information of Company, unless such invention or idea: (1) relates to the business of company or to Company's actual or anticipated research or development, or (2) results from any work performed by Employee for Company. THIS AGREEMENT DOES NOT APPLY TO ANY INVENTION WHICH QUALIFIES FULLY UNDER THE PROVISIONS OF CALIFORNIA LABOR CODE SECTION 2870.

2. <u>DISCLOSURE OF IDEAS OR INVENTIONS:</u> Employee agrees to promptly disclose in writing to Fred Larian all inventions developed solely or jointly with others during Employee's employment with Employer, whether such inventions are patentable, not-patentable or assignable under this Agreement. Employer agrees to maintain such disclosure in confidence.

3. <u>WRITTEN DISCLOSURE OF PRIOR INVENTIONS:</u> Employee agrees to provide a complete list of all patented or not-patended ideas and inventions conceived by Employee or anyone else jointly with Employee, prior to the date Employee has signed this Agreement. The failure of Employee to provide Company with a written disclosure of ideas or inventions shall be deemed to constitute an affirmative acknowledgment by Employee that no such ideas or inventions exist.

If any provision of this Confidentiality and Inventions Agreement is held to be invalid or unenforceable, in whole or in part, the remaining portions of this Agreement shall continue to be valid and will be performed, construed and enforced to the fullest extent permitted by law. The invalid or unenforceable provision shall be deemed amended and limited in accordance with the intent of the parties, as determined from the face of this Agreement, to the extent necessary to permit the maximum enforceability or validation of the provision.

| | | |
|---|---|---|
| _5/24/99_ | _Kami Gillmour_ | _Kami Gillmour_ |
| Date | Employee Signature | Employee Name (printed) |
| _5/24/99_ | _signature_ | _F Sang Larian_ |
| Date | Employer Signature | Name (printed) |

Confidential - Attorney's Eyes Only

MGA 0875724

EX 13620-0003

EXHIBIT 15
PAGE 174

# EXHIBIT 16

Employee Confidential Information
and Inventions Agreement

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that (i) I will maintain the confidentiality of the Company's trade secrets (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates, I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment by the Company and other good and valuable consideration, I agree that:

1. *Provisions Related to Trade Secrets*

   (a)  I acknowledge that the Company possess and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

   (b)  As used in the Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information of the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

   (c)  I will not disclose or use at any time, either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

   (d)  Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

2. *Ownership of Inventions*

   (a)  I agree to communicate to the Company as promptly and fully as practicable all inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the company. I hereby assign to the Company and/or its nominees all my right, title and interest in such inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

   (b)  As used in this Agreement, the term "inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data, computer programs and formulae, whether patentable or unpatentable.

   (c)  Any provision in this Agreement requiring me to assign my rights in any invention does not apply to an invention which qualifies under the provisions of Section 2870 of the California Labor Code.  That section provides that the requirement to assign "shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer, or (2) result from any work performed by the employee for the employer.  I understand that I bear the burden of proving that an invention qualifies under Section 2870.

   (d)  I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

E.  .ibit  1116
Garcia
10 10 07  7  pages
J'ana Siegers, CSR 10845

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**

EXHIBIT  16
PAGE  175

M 0079201

EX 1116-0001

3. *Conflicts with Other Activities*

(a)   My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

4. *Miscellaneous*

(a)   My obligations under this Agreement may not be modified or terminated, in whole or in part, except in a writing signed by a Vice-President of the Company. Any waiver by the Company or a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b)   Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c)   My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will inure to the benefit of and be binding upon the successors and assigns of the Company.

(d)   I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

(e)   Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f)   This Agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g)   This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.

_____
Employee Signature

MATTEL, INC.
By: _____

Paula Treantafelles
Employee Name (print)

Faith Sicelick
Name of Witness (print)

07/04/97
Date

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 10
PAGE 176

M 0079202

EX 1116-0002

# EXHIBIT 17

To: David Rosenbaum

From: Carter H. Bryant

Total Pages: 4

CONFIDENTIAL -
ATTORNEYS' EYES ONLY

DR 00029



EXHIBIT ___17___
PAGE ___177___

EX 2201-0001

September 14, 2000

Dear David,

Enclosed is a copy of my original offer of employment with Mattel. To the best of my knowledge, other than an agreement of confidentiality, there are no other expressed contracts that have been signed. I am unable to look into this too much further with our Human Resources director without risking suspicion, but I am quite certain that this should suffice.

Thank you very much.

Sincerely,

Carter H. Bryant

310-252-6099or
310-538-3615 home

CONFIDENTIAL -
ATTORNEYS' EYES ONLY

DR 00030

EXHIBIT 17
PAGE 178

EX 2201-0002



**Mattel, Inc.**

333 Continental Boulevard
El Segundo, California 90245-5012
Phone: (310) 252-2000
Telex: 188155 or 188170

December 11, 1998

Mr. Carter Bryant
1-A Sycamore Dr.
Kimberling, MO 65686

Dear Carter,
Congratulations and welcome to Mattel!

We are pleased to confirm your acceptance of our offer for the position of Project Designer, and to outline the various benefits that are available to you as a member of the Mattel team.

**Compensation**

Your annual base salary will be ▮▮▮▮ payable on a bi-weekly basis.

**Relocation**

You will receive a relocation payment of ▮▮▮▮ less appropriate federal and state taxes, payable to you no later than 30 days following commencement of your employment.

If you choose to voluntarily terminate your employment with Mattel within one year of your date of hire, you will be required to repay this amount in full.

**Benefits**

The following is a brief outline of benefits in which you will be eligible to participate as of your date of hire. Specific details and plan limitations are provided in Summary Plan Descriptions or Plan Documents, and are subject to periodic modification and revision.

You and your qualified dependents, if applicable, will be eligible for the following coverage:

- Medical
- Dental
- Vision
- Prescription

- Life Insurance – 1-1/2 x base salary
- Accidental Death & Dismemberment – 1-1/2 x base salary
- Business Travel Coverage – $1,000,000
- Short & Long-Term Disability

You will be enrolled in the Mattel Personal Investment Plan (PIP), which is a 401(k) savings/retirement plan. The plan offers both Company Automatic and Matching contribution provisions as outlined below:

DR 00031

CONFIDENTIAL -
ATTORNEYS' EYES ONLY

EXHIBIT 17
PAGE 179

EX 2201-0003

- Company Automatic Contributions
  The Company will make automatic contributions to your account ranging from 3% to 8% of your salary, based on age.

- Company Matching Provision
  The Company will match up to the first 6% of pay you contribute to your PIP account on a dollar-for-dollar basis up to 2% of your annual salary and on a fifty-cents-on-the-dollar basis for up to the next 4% of your salary.

Of course, this offer is contingent upon satisfactory verification of all information as to previous employers and academic institutions attended, eligibility to work in the United States, and the signing of a Confidential Information and Inventions Agreement. Further, you understand that this letter does not imply employment for a specific term and thus your employment is at will; either you or the Company can terminate it at any time, with or without cause. This letter acknowledges there are no oral or written side agreements or representations concerning the term or conditions of employment. Additional details of your employment relationship are contained in our employment application.

Enclosed is a packet containing various information and forms required to activate your employment. Please complete these forms and bring them with you on your first day of employment. Also, you will need to bring with you certain documents as set forth in the enclosed directions. Upon your arrival in the second floor lobby, please advise the security officer that you are a new employee. You will be escorted to an orientation session beginning at 8:00 a.m., which will last most of the morning.

Carter, we are all looking forward to you joining the Mattel team on 1/4/99. As a new member of the Mattel family, please feel free to call me at (310) 252-2535 if you have any questions.

Sincerely,

Lynne Robinson
VP, Human Resources

2

** TOTAL PAGE.04 **

DR 00032

CONFIDENTIAL –
ATTORNEYS' EYES ONLY

EXHIBIT 17
PAGE 180

EX 2201-0004

# EXHIBIT 18

1         UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3            EASTERN DIVISION

4             - - -

5   HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6            - - -

**CERTIFIED COPY**

7  MATTEL, INC.,                    )
8           PLAINTIFF,   )
9      VS.                    )  NO. CV 04-09049
10 MGA ENTERTAINMENT, INC., ET. AL.,  )
11        DEFENDANTS.  )  TRIAL DAY 7
                  )  PAGES 1255-1390
12 AND CONSOLIDATED ACTIONS,          )

13

14

15   REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16        RIVERSIDE, CALIFORNIA

17      WEDNESDAY, JUNE 4TH, 2008

18         8:28 A.M.

19

20

21

22

23      THERESA A. LANZA, RPR, CSR
       FEDERAL OFFICIAL COURT REPORTER
24     3470 12TH STREET, RM. 134
       RIVERSIDE, CALIFORNIA  92501
25       951-274-0844
       WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2

     ON BEHALF OF MATTEL, INC.:

 3
                           QUINN, EMANUEL
 4                         BY:   JOHN QUINN
                                 JON COREY
 5                               MICHAEL T. ZELLER
                                 HARRY OLIVAR
 6                               TIMOTHY ALGER
                           865 S. FIGUEROA STREET,
 7                         10TH FLOOR
                           LOS ANGELES, CALIFORNIA   90017
 8

 9

10   ON BEHALF OF MGA ENTERTAINMENT:

11                         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                           BY:   THOMAS J. NOLAN
12                               JASON RUSSELL
                                 RAOUL KENNEDY
13                               LAUREN AGUIAR
                                 CARL ROTH
14                         300 SOUTH GRAND AVENUE
                           LOS ANGELES, CALIFORNIA   90071-3144
15                         213-687-5000

16

17

18

19

20

21

22

23

24
                                        EXHIBIT  18
25                                      PAGE  182
```

```
1                        I N D E X

2                                            PAGE

3    PLAINTIFF CASE (CONTINUED)...................   1293

4

5

6    PLAINTIFF
     WITNESS          DIRECT     CROSS     REDIRECT      RECROSS
7    DENISE O'NEAL( VIA VIDEOTAPED DEPOSITION)

8                      1293

9

10   PLAINTIFF
     WITNESS          DIRECT     CROSS     REDIRECT      RECROSS
11   VICTORIA O'CONNOR

12   BY MR. QUINN    1308                 1369
     BY MR. NOLAN              1335                       1377

13

14

15        EXHIBITS          RECEIVED

16         927              1304
            15              1326
17       13383              1330
         16995              1378
18

19

20

21

22

23

24

25
```

EXHIBIT 18
PAGE 183

WEDNESDAY, JUNE 4, 2008                    TRIAL DAY 7

1310

```
1   ARE CALLED LICENSORS.

2   Q    DID YOU LATER HOLD A DIFFERENT POSITION?

3   A    I DID.

4   Q    WHAT WAS THE NEXT POSITION YOU HELD?

5   A    WELL, ALSO IN MY ROLE AS LICENSING MANAGER, I MET WITH    09:36

6   INVENTORS.  AND THESE WERE JUST REGULAR PEOPLE THAT HAD AN IDEA

7   FOR A TOY CONCEPT THAT WOULD COME TO ME AND SAY, 'I HAVE THIS

8   GREAT IDEA FOR A TOY, A DOLL, A GAME.  WOULD MGA BE INTERESTED

9   IN LICENSING IT?'

10  Q    AND THOSE ARE THE THINGS THAT YOU DID AS LICENSING    09:37

11  MANAGER?

12  A    CORRECT.

13  Q    DID YOU CHANGE JOBS AT SOME POINT, OR ASSUME A DIFFERENT

14  POSITION?

15  A    I DID.  I WAS PROMOTED TO LICENSING DIRECTOR.    09:37

16  Q    AND THAT WOULD HAVE BEEN ROUGHLY WHEN, IF YOU REMEMBER?

17  A    I BELIEVE IT WAS SOMETIME IN 2000, BUT I CAN'T SAY FOR

18  CERTAIN.

19  Q    WAS THAT A PROMOTION?

20  A    YES, IT WAS.    09:37

21  Q    DID YOUR DUTIES CHANGE WHEN YOU BECAME A LICENSING

22  DIRECTOR?

23  A    YES.  I TOOK ON ADDITIONAL RESPONSIBILITIES, INCLUDING

24  PUBLIC RELATIONS.  AND THERE WAS ALSO A BRIEF PERIOD WHEN I WAS

25  DOING HUMAN RESOURCES.    09:37
```

WEDNESDAY, JUNE 4, 2008      EXHIBIT 18      TRIAL DAY 7
                            PAGE 184

1311

1    Q    DID YOU GET A SUBSEQUENT POSITION AFTER THAT?

2    A    I DID.

3    Q    AND WHAT WAS THAT?

4    A    VICE PRESIDENT OF LICENSING.

5    Q    WAS THAT ANOTHER PROMOTION?                        09:37

6    A    YES, IT WAS.

7    Q    WHEN WAS IT THAT YOU RECEIVED THAT PROMOTION?

8    A    I BELIEVE IT WAS SOMETIME IN 2002.

9    Q    WHEN YOU FIRST STARTED AT MGA, WERE YOU THE ONLY PERSON

10   WORKING IN THE LICENSING AREA?                         09:38

11   A    YES.

12   Q    AND BY THE TIME YOU LEFT -- I THINK YOU SAID IT WAS IN

13   2003.

14   A    CORRECT.

15   Q    HOW MANY PEOPLE DID YOU HAVE WORKING DIRECTLY OR        09:38

16   INDIRECTLY UNDER YOU?

17   A    THERE WERE FIVE, AND THEN MYSELF.

18   Q    WERE YOU INVOLVED WITH MGA'S CONTACTS WITH CARTER BRYANT

19   CONCERNING THE BRATZ IDEA?

20   A    YES.                                               09:38

21   Q    AND IS THAT SOMETHING THAT WOULD BE WITHIN YOUR BAILIWICK,

22   AS IT WERE, AS A LICENSING PERSON?

23   A    BAILIWICK?

24   Q    IN YOUR AREA OF RESPONSIBILITY.

25   A    YES.                                               09:38

WEDNESDAY, JUNE 4, 2008          EXHIBIT    18          TRIAL DAY 7
                                 PAGE      185

1312

1       THE COURT:   THAT WAS A LEGAL PHRASE.

2            (LAUGHTER.)

3   BY MR. QUINN:

4   Q    JUST IN GENERAL, WHAT WAS THE NATURE OF YOUR INVOLVEMENT?

5   IF YOU COULD JUST GIVE US AN OVERVIEW OF THE NATURE OF YOUR

6   INVOLVEMENT IN DEALINGS WITH CARTER BRYANT.

7   A    SURE.

8        HE WAS ONE OF THE INVENTORS WHO HAD A DOLL CONCEPT

9   AND CAME TO MGA TO PRESENT HIS DOLL CONCEPT FOR US TO LICENSE,

10  TO SEE IF WE WERE INTERESTED IN LICENSING IT.

11  Q    DID YOU MEET WITH MR. BRYANT IN THE SUMMER OF 2000?

12  A    I DID.

13  Q    CAN YOU TELL US HOW THAT CAME TO BE SET UP.  WHAT WERE THE

14  CIRCUMSTANCES OF THAT MEETING?

15  A    THE MEETING WAS SET UP BECAUSE PAULA TREANTAFELLES TOLD ME

16  THAT SHE HAD A GENTLEMAN WHO WAS INTERESTED IN PRESENTING A

17  DOLL CONCEPT, AND I BELIEVE -- I DON'T REMEMBER WHO SCHEDULED

18  THE MEETING, BUT SHE TOLD ME THAT SHE AND I WOULD BE MEETING

19  WITH HIM AS HE PRESENTED HIS DOLL CONCEPT TO US.

20  Q    DID SHE EXPLAIN TO YOU WHY SHE WANTED YOU THERE?

21  A    SHE DIDN'T HAVE TO EXPLAIN IT TO ME, SINCE I MANAGED THE

22  INVENTOR RELATIONS.

23  Q    LOGICAL THAT YOU WOULD BE THERE?

24  A    YES.

25  Q    DID YOU ATTEND THAT FIRST MEETING WITH MR. BRYANT?

WEDNESDAY, JUNE 4, 2008        EXHIBIT   18        TRIAL DAY 7
                               PAGE   180

1   A     I DID.

2   Q     DID MS. TREANTAFELLES INDICATE WHETHER OR NOT SHE HAD MET

3   WITH MR. BRYANT PRIOR TO THAT?

4   A     YES, SHE DID.  AND SHE HAD NOT MET WITH HIM PRIOR.

5   Q     WHO WAS IN ATTENDANCE AT THAT FIRST MEETING WITH                09:40

6   MR. BRYANT, THAT YOU RECALL?

7   A     MYSELF AND PAULA.  AND AT SOME POINT, ISAAC WAS PRESENT.

8   AND I DON'T RECALL WHETHER OR NOT IT WAS THAT FIRST MEETING OR

9   THERE WAS A FOLLOW-UP MEETING.

10  Q     THAT MR. LARIAN WAS PRESENT?                                     09:40

11  A     CORRECT.

12  Q     IN THE ONE YOU'RE SURE OF, IN THE FIRST MEETING YOU'RE

13  THINKING OF, WERE YOURSELF?

14  A     CORRECT.

15  Q     MS. TREANTAFELLES?                                              09:40

16  A     YES.

17  Q     AND OBVIOUSLY, MR. BRYANT?

18  A     YES.

19         AND ALSO AT SOME POINT, DIDI BROWN, WHO WAS AN MGA

20  EMPLOYEE, WAS ALSO BROUGHT INTO THE ROOM.  AND, AGAIN, THAT WAS       09:41

21  WHEN ISAAC LARIAN WAS PRESENT.  AND I DON'T REMEMBER IF THAT

22  WAS THE INITIAL MEETING OR A FOLLOW-UP MEETING.

23  Q     WHAT WAS DIDI BROWN'S POSITION?

24  A     SHE WAS AN EXECUTIVE ASSISTANT TO MR. LARIAN.

25  Q     WHERE DID THIS INITIAL MEETING THAT YOU RECALL TAKE PLACE?      09:41

1314

1   A     IN MR. LARIAN'S OFFICE.

2   Q     HOW LONG DID THE MEETING LAST?

3   A     I DON'T RECALL.

4   Q     DID MR. BRYANT BRING WITH HIM ANY MATERIALS?

5   A     HE DID.                                                    09:41

6   Q     WHAT DID HE BRING WITH HIM?

7   A     HE BROUGHT A PROTOTYPE OF THE DOLL AND SOME DRAWINGS OF

8   THE DOLL.

9   Q     DO YOU RECALL HOW MANY DRAWINGS HE HAD?

10  A     NO.                                                        09:41

11  Q     AND DO YOU RECALL HOW MANY DIFFERENT CHARACTERS OR FIGURES

12  OF DOLLS HE HAD DEPICTIONS OF?

13  A     AT LEAST FOUR.

14  Q     DID HE REFER TO THEM BY A PARTICULAR NAME?

15  A     YES.                                                       09:41

16  Q     WHAT WAS THE NAME THAT HE USED?

17  A     THE NAME FOR ALL OF THE CHARACTERS?

18  Q     YES.

19  A     "BRATZ."

20  Q     HAD YOU EVER HEARD THE NAME "BRATZ" FOR A DOLL PRIOR TO    09:41

21  THAT FIRST MEETING WITH MR. BRYANT?

22  A     NO.

23  Q     CAN YOU DESCRIBE FOR THE JURY THIS DOLL PROTOTYPE THAT HE

24  HAD WITH HIM IN THE FIRST MEETING, THAT YOU CAN RECALL.

25  A     IT HAD A BIG HEAD.  IT WAS BEAUTIFULLY PAINTED.  SHE WAS   09:42

WEDNESDAY, JUNE 4, 2008      EXHIBIT   18           TRIAL DAY 7
                             PAGE     188

1315

1   BLONDE, LONG HAIR, AND HAD A SMALL BODY WITH BIG FEET.

2   Q    WAS THE BODY -- WAS IT LIKE A DOLL THAT HAD BEEN IN A

3   MOLD?

4           MR. NOLAN:  OBJECTION.  LEADING, YOUR HONOR.

5           THE COURT:  REPHRASE.                          09:42

6   BY MR. QUINN:

7   Q    ARE YOU FAMILIAR WITH MOLDS, MOLDED DOLL BODIES?

8   A    YES.

9   Q    COULD YOU TELL WHETHER OR NOT THIS HAD BEEN IN A MOLD?

10  A    YES.  IT LOOKED LIKE IT WAS A PART FROM ANOTHER DOLL.   09:42

11  Q    WHAT WAS IT MADE OF?  COULD YOU TELL?

12  A    I DON'T KNOW.

13  Q    YOU SAY THE FACE WAS PAINTED?

14  A    YES.

15  Q    CAN YOU DESCRIBE THE FACIAL FEATURES AT ALL?          09:43

16  A    TWO EYES, A NOSE, A MOUTH, EYELASHES.

17  Q    WERE THE EYES LARGER THAN NORMAL?

18  A    YES.

19  Q    THERE SHOULD BE A BINDER THERE IN FRONT OF YOU, AND IF YOU

20  WOULD TAKE A LOOK AT EXHIBIT 1, MY QUESTION TO YOU IS GOING TO   09:43

21  BE WHETHER THESE ARE COPIES OF -- I BELIEVE THIS IS IN

22  EVIDENCE, EXHIBIT 1 -- COULD YOU IDENTIFY EXHIBIT 1.  ARE THESE

23  PICTURES YOU'VE SEEN BEFORE?

24  A    YES.

25  Q    CAN YOU TELL US WHETHER OR NOT THESE ARE COPIES OF THE   09:43

WEDNESDAY, JUNE 4, 2008     EXHIBIT  1B
                            PAGE  189          TRIAL DAY 7

1316

1    PICTURES THAT MR. BRYANT HAD WITH HIM AT THE FIRST MEETING THAT

2    YOU HAD WITH HIM.

3    A    YES.

4              MR. QUINN:   WE'D OFFER EXHIBIT 1, YOUR HONOR.

5              THE COURT:   ANY OBJECTION?                        09:43

6              MR. NOLAN:   NO OBJECTION, YOUR HONOR.

7              THE COURT:   IT'S ADMITTED.

8              YOU MAY PUBLISH.

9              MR. QUINN:   TO JUST GIVE THE JURY SOME IDEA WHAT

10   WE'RE LOOKING AT HERE, IF WE COULD JUST GO THROUGH THOSE         09:44

11   QUICKLY.

12   BY MR. QUINN:

13   Q    IF YOU'D ALSO LOOK, PLEASE, AT THE DOCUMENT BEHIND

14   EXHIBIT 10 IN YOUR BINDER.  AFTER THE FIRST PAGE, YOU'LL SEE

15   SOME DRAWINGS.  I'M GOING TO ASK YOU THE SAME QUESTION, WHETHER  09:44

16   THOSE ALSO APPEAR TO BE COPIES OF IMAGES THAT YOU CAN IDENTIFY.

17   A    IDENTIFY AS TO HAVING SEEN THEM BEFORE?

18   Q    YES.

19   A    I DON'T RECALL SEEING THESE.

20   Q    THESE YOU HAVE NOT SEEN BEFORE?                        09:45

21   A    I COULD HAVE.  I DON'T REMEMBER.

22   Q    ONE WAY OR THE OTHER?

23   A    CORRECT.

24   Q    AT THIS MEETING, THE FIRST MEETING YOU HAD WITH

25   MR. BRYANT, DID HE INDICATE TO YOU WHETHER HE WAS EMPLOYED?     09:45

WEDNESDAY, JUNE 4, 2008       EXHIBIT   18      TRIAL DAY 7
                              PAGE   190

1317

1   A     YES.

2   Q     WHAT DID HE SAY ON THAT SUBJECT?

3   A     THAT HE WORKED FOR MATTEL AND BARBIE COLLECTIBLES AS A

4   DESIGNER.

5   Q     DID HE SAY THAT THAT WAS THEN HIS CURRENT EMPLOYMENT?     09:45

6   A     YES.

7   Q     WHEN HE SAID THAT, WAS MS. TREANTAFELLES THERE?

8   A     I DON'T BELIEVE SO OR -- I DON'T REMEMBER.

9   Q     YOU DON'T REMEMBER ONE WAY OR THE OTHER?

10  A     NO.  BECAUSE WE -- SHE HAD -- BOTH SHE AND I HAD ALREADY   09:46

11  KNOWN THAT HE WAS ALREADY WORKING AT MATTEL PRIOR TO THE

12  MEETING.

13  Q     HOW IS IT THAT YOU KNEW HE WAS WORKING AT MATTEL PRIOR TO

14  THE MEETING?

15  A     PAULA TOLD ME.                                            09:46

16  Q     DID SHE TELL YOU HOW SHE KNEW THAT HE WAS THEN A MATTEL

17  EMPLOYEE?

18  A     YES.

19  Q     WHAT DID SHE SAY?

20  A     HE CAME REFERRED THROUGH SOMEBODY THAT DID SOME FREELANCE  09:46

21  WORK FOR HER BY THE NAME OF VERONICA MARLOW.

22  Q     IF PAULA TREANTAFELLES TESTIFIED THAT SHE DIDN'T LEARN

23  THAT MR. BRYANT WAS A MATTEL EMPLOYEE UNTIL 2004, WOULD YOU

24  DISPUTE THAT?

25  A     YES.                                                      09:46

WEDNESDAY, JUNE 4, 2008   EXHIBIT   18       TRIAL DAY 7
                          PAGE   191

1318

1    Q    WHEN YOU SPOKE WITH MS. TREANTAFELLES BEFORE THE MEETING,

2    DID SHE TELL YOU WHAT AREA OF MATTEL HE WORKED IN?

3    A    I BELIEVE SHE DID, BUT I CAN'T SAY FOR CERTAIN.

4    Q    DID SHE MENTION BARBIE COLLECTIBLES?

5    A    I DON'T RECALL.                                          09:47

6    Q    WAS IT A CONCERN TO YOU AT THE TIME, AS SOMEBODY WHOSE JOB

7    IT WAS TO DEAL WITH LICENSING ARRANGEMENTS LIKE THIS, THAT YOU

8    WERE BEING PRESENTED WITH A DOLL BY SOMEBODY WHO WAS THEN, AT

9    THE TIME THEY WERE PRESENTING IT TO YOU, EMPLOYED BY A

10   COMPETITOR?                                                  09:47

11   A    YES.

12   Q    WHY WAS THAT A CONCERN?

13   A    BECAUSE HE WORKED FOR A COMPETITOR.

14   Q    HOW MANY TIMES IN YOUR CAREER UP TO THAT POINT HAD AN

15   EMPLOYEE OF A COMPETITOR, A CURRENT EMPLOYEE, COME TO YOUR     09:47

16   OFFICE AND PITCH YOU WITH AN IDEA FOR A PRODUCT THAT WOULD BE

17   COMPETITIVE?  HOW MANY TIMES DID THAT HAPPEN?

18   A    ZERO.

19   Q    DID YOU EXPRESS THE CONCERN YOU HAD TO ANYONE ABOUT

20   RECEIVING THIS PITCH FROM AN EMPLOYEE OF A COMPETITOR?        09:48

21   A    I'M SURE I DID, BUT I CAN'T RECALL SPECIFIC CONVERSATIONS.

22   Q    IF YOU, IN YOUR JOB DUTIES, CAME ACROSS A SITUATION WHICH

23   YOU THOUGHT MIGHT RESULT IN LIABILITY FOR MGA, IS THAT

24   SOMETHING THAT YOU WOULD SPEAK UP AND TALK ABOUT?

25   A    I'M SURE I WOULD.                                        09:48

WEDNESDAY, JUNE 4, 2008        EXHIBIT   18        TRIAL DAY 7
                               PAGE   192

1323

1    Q    AND IF MR. LARIAN TESTIFIED THAT HE DIRECTED YOU TO MAKE

2    SURE THAT THIS IS SOMETHING THAT MR. BRYANT HAD CREATED OUTSIDE

3    OF HIS EMPLOYMENT, WOULD YOU DISPUTE THAT?

4    A    COULD YOU REPEAT THE QUESTION.

5    Q    YES.                                                           09:53

6         IF MR. LARIAN TESTIFIED THAT HE INSTRUCTED YOU TO

7    MAKE SURE THAT THIS WAS SOMETHING THAT MR. BRYANT HAD CREATED

8    OUTSIDE OF HIS EMPLOYMENT WITH MATTEL, WOULD YOU DISPUTE THAT?

9    A    IF HE SAID HE DIRECTED ME TO DO THAT?

10   Q    YES.                                                           09:53

11   A    I WOULD DISPUTE THAT.

12        **MR. QUINN:**  IF WE COULD PUT EXHIBIT 305, WHICH IS IN

13   EVIDENCE, YOUR HONOR, ON THE SCREEN, PLEASE.

14        **THE COURT:**  YOU MAY.

15        **MR. QUINN:**  WITH ANY LUCK, THERE'S A 305 IN YOUR BOOK      09:54

16   THERE, MS. O'CONNOR.

17   **BY MR. QUINN:**

18   Q    YOU'LL SEE, THIS IS AN E-MAIL STRING WHERE YOU ASK

19   SOMEBODY, A DENNIS MEDICI ASKS VICTORIA, "PLEASE REPLY WHAT

20   AMOUNT WE SHOULD PAY CARTER AND HAVE ISAAC APPROVE."             09:54

21        DO YOU SEE THAT?

22   A    I DO.

23   Q    WHO WAS DENNIS MEDICI?

24   A    MGA ENTERTAINMENT'S CFO.

25   Q    AND YOU RESPOND, YOU E-MAIL PAULA TREANTAFELLES, SAYING     09:54

WEDNESDAY, JUNE 4, 2008      EXHIBIT __18__          TRIAL DAY 7
                             PAGE __193__

1324

1   "PLEASE LET ME KNOW HOW MANY HOURS CARTER HAS WORKED AND THE

2   DAY HE STARTED MEETINGS WITH YOU."  AND SHE RESPONDS, "I WOULD

3   SAY THAT CARTER HAS WORKED AN AVERAGE OF ABOUT FOUR HOURS A

4   DAY, AND WE BEGAN WORKING ON THIS LINE THE FIRST PART OF

5   SEPTEMBER."                                                    09:55

6            DO YOU RECALL RECEIVING THIS E-MAIL FROM

7   MS. TREANTAFELLES?

8   A    NO.

9   Q    IS THAT CONSISTENT WITH YOUR OBSERVATION THAT HE WAS

10  WORKING FOUR HOURS A DAY?                                     09:55

11           MR. NOLAN:  OBJECTION.  LACKS FOUNDATION; ALSO CALLS

12  FOR SPECULATION.

13           THE COURT:  LAY FOUNDATION AS TO HOW SHE WOULD KNOW

14  HOW MUCH HE WAS WORKING.

15  BY MR. QUINN:                                                 09:55

16  Q    DID YOU SEE MR. BRYANT IN MGA'S OFFICES?

17  A    I DID.

18  Q    ONCE OR MORE THAN ONCE?

19  A    MORE THAN ONCE.

20  Q    DID HE ATTEND DEVELOPMENT MEETINGS WITH MS. TREANTAFELLES? 09:55

21  A    I DON'T KNOW WHAT BUSINESS WAS CONDUCTED.  I WASN'T

22  INVOLVED IN THOSE MEETINGS.

23  Q    DO YOU KNOW WHAT HE WAS DOING WHEN HE WAS COMING TO THE

24  OFFICE MGA OFFICES IN SEPTEMBER?

25  A    I KNOW HE WAS MEETING WITH PAULA TO DISCUSS DOLL          09:56

EXHIBIT 18
PAGE 194

1325

1    DEVELOPMENT.

2    Q    I TAKE IT YOU'RE NOT IN A POSITION TO CONFIRM OR DENY HOW

3    MANY HOURS HE WAS WORKING.

4    A    THAT'S CORRECT.

5    Q    THE CONTRACT WAS SIGNED UP WITH MR. BRYANT, EVENTUALLY.      09:56

6    A    YES.

7    Q    DID YOU RECEIVE THAT SIGNED CONTRACT FROM MR. BRYANT?

8    A    I DID.

9    Q    HOW DID YOU RECEIVE THAT SIGNED CONTRACT?

10   A    VIA FAX.                                                     09:56

11   Q    DID HE FAX IT TO YOU?

12   A    HE DID.

13   Q    AND SO FAR AS YOU KNOW, WERE YOU THE FIRST PERSON AT MGA

14   TO RECEIVE THAT FAX?

15   A    YES.                                                         09:56

16   Q    WHEN YOU GOT THAT FAX OF THE SIGNED CONTRACT, DID IT HAVE

17   A FAX HEADER ON THE TOP?

18   A    YES.

19   Q    WHAT DID THAT FAX HEADER SAY?

20   A    IT SAID "MATTEL, BARBIE COLLECTIBLES," AND IT HAD THE FAX    09:57

21   NUMBER FROM WHERE IT WAS SENT.

22   Q    WERE YOU CONCERNED ABOUT THE FACT THAT YOU HAD RECEIVED A

23   SIGNED CONTRACT FROM MR. BRYANT WHICH HAD THIS FAX HEADER AT

24   THE TOP THAT SAID "BARBIE COLLECTIBLES"?

25   A    YES.                                                         09:57

WEDNESDAY, JUNE 4, 2008   EXHIBIT ___18___      TRIAL DAY 7
                          PAGE ___195___

1326

1   Q    WERE YOU STILL UNCOMFORTABLE THAT MR. BRYANT WAS STILL

2   WORKING FOR A MATTEL COMPETITOR?

3   A    YES.

4   Q    DID YOU SPEAK WITH MR. LARIAN OR MS. TREANTAFELLES OR

5   ANYONE ELSE ABOUT THAT FACT?

6   A    YES.

7   Q    WHO DID YOU SPEAK TO?

8   A    FOR CERTAIN, I SPOKE TO ISAAC LARIAN, AND I'M SURE I SPOKE

9   TO PAULA AS WELL.

10  Q    DID YOU CALL ATTENTION TO THE FACT THAT YOU RECEIVED THIS

11  SIGNED CONTRACT AND IT HAD THIS FAX HEADER ON THE TOP?

12  A    I DID.

13  Q    IF YOU COULD LOOK AT EXHIBIT 15.

14           I'M GOING TO ASK YOU IF YOU CAN IDENTIFY THAT

15  DOCUMENT.

16  A    OKAY.

17  Q    CAN YOU IDENTIFY IT?

18  A    YES.

19  Q    WHAT IS IT?

20  A    IT'S THE LICENSE AGREEMENT BETWEEN MGA AND CARTER BRYANT.

21  Q    AND IS THAT THE FINAL SIGNED AGREEMENT?

22  A    YES, IT APPEARS TO BE.

23           MR. QUINN:  I'D OFFER EXHIBIT 15, YOUR HONOR.

24           MR. NOLAN:  NO OBJECTION, YOUR HONOR.

25           THE COURT:  IT'S ADMITTED.  YOU MAY PUBLISH.

WEDNESDAY, JUNE 4, 2008   EXHIBIT  18   TRIAL DAY 7
                          PAGE  196

1327

BY MR. QUINN:

1  BY MR. QUINN:

2  Q    AND THIS IS THE AGREEMENT THAT YOU RECEIVED FROM

3  MR. BRYANT BY FAX.

4  A    I BELIEVE SO.

5  Q    IT SHOWS THERE, IN THE UPPER RIGHT, THAT IT'S DATED AS OF

6  SEPTEMBER 18, 2000.

7         DO YOU SEE THAT?

8  A    YES.

9  Q    WAS THAT DATE THERE WHEN YOU RECEIVED THIS DOCUMENT FROM

10  MR. BRYANT?

11  A    I BELIEVE SO, BUT I COULDN'T SAY FOR CERTAIN.

12  Q    BUT YOU DID NOTICE THAT A DATE WAS MISSING THERE.

13         THIS APPEARS TO BE THE DOCUMENT YOU GOT FROM

14  MR. BRYANT.

15  A    YES.

16  Q    AND YOU UNDERSTOOD THAT MR. BRYANT WAS STILL WORKING FOR

17  MATTEL AT THE TIME.

18  A    CORRECT.

19  Q    AND DID YOU RECEIVE THIS AROUND OR ABOUT SEPTEMBER 18,

20  2000?

21  A    I BELIEVE SO, BUT IT WAS A LONG TIME AGO.

22  Q    SURE.

23         I'D LIKE YOU TO JUMP FORWARD NOW TO SOME TIME LATER

24  IN THE NEXT YEAR, IN 2001, WERE YOU EVER ASKED TO SEND THIS

25  CONTRACT TO ANYONE?

09:58

09:59

09:59

09:59

09:59

WEDNESDAY, JUNE 4, 2008    EXHIBIT  18    TRIAL DAY 7
PAGE  197

1328

1    A    YES.

2    Q    WHO WERE YOU ASKED TO SEND IT TO?

3    A    PATTIE GLASER.

4    Q    WHO'S PATTIE GLASER?

5    A    OUTSIDE COUNSEL FOR MGA ENTERTAINMENT.                10:00

6    Q    SHE'S A LAWYER WHO DID WORK FOR MGA?

7    A    YES.

8    Q    WHO ASKED YOU TO SEND THAT AGREEMENT TO MS. GLASER?

9    A    ISAAC LARIAN.

10   Q    WHEN HE ASKED YOU TO SEND THAT AGREEMENT TO HIS OUTSIDE   10:00

11   LAWYER, DID HE GIVE YOU ANY PARTICULAR INSTRUCTIONS?

12   A    NO; NOT THAT I REMEMBER; JUST TO FAX IT TO HER.

13   Q    DID HE GIVE YOU ANY INSTRUCTIONS WITH RESPECT TO THE FAX

14   HEADER?

15   A    I WAS ASKED TO WHITE OUT THE FAX HEADER AT SOME POINT, AND   10:00

16   I DON'T RECALL IF THAT WAS UPON RECEIVING THE EXECUTED CONTRACT

17   OR AT THE TIME I SENT THE FAX TO PATTIE GLASER.

18   Q    I MAY HAVE GOTTEN THAT WRONG.  LET ME BACK UP.

19        AT SOME POINT YOU WERE ASKED TO WHITE OUT THE FAX

20   HEADER THAT SAID "BARBIE COLLECTIBLES"?                   10:00

21   A    YES.

22   Q    YOU'RE JUST NOT SURE WHEN THAT WAS.

23   A    CORRECT.

24   Q    ARE THERE A COUPLE OF POSSIBILITIES YOU'RE THINKING OF AS

25   TO WHAT THAT WAS?                                         10:01

WEDNESDAY, JUNE 4, 2008    EXHIBIT   18      TRIAL DAY 7
                          PAGE  198

1390

1    THE COURT HAS NOT RULED ON.

2              **THE COURT:**   OKAY.   THANK YOU.

3

4

5

6

7

8

9

10

11                              CERTIFICATE

12

13   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
14   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
     ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
15   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

16

17   _____          6-4-08
     THERESA A. LANZA, CSR, RPR           _____
18   FEDERAL OFFICIAL COURT REPORTER          DATE

19

20

21

22

23

24

25

WEDNESDAY, JUNE 4, 2008        EXHIBIT    18        TRIAL DAY 7
                               PAGE    199

# EXHIBIT 19



**ATTORNEY'S EYES ONLY**

BRYANT 00262



EXHIBIT 19
PAGE 000

EX 1-0001

# Bratz!

Meet the Bratz! The Totally Transformable Teenage dolls! They're four best friends from high school who love to trade clothes, shoes and hairdos! They come to school with a new look every day!

By simply popping off the hairstyle and shoes, and exchanging them for one of their other hairstyles and pairs of shoes, or a friend's hairstyle and shoes, you can create a whole new look! Complete the look by changing their pants or skirts for one of their additional garments!

Each doll comes dressed in a trendy, hip outfit, with one or two additional pieces, such as an additional skirt or t-shirt (for mix and matching.) Each doll also comes with two great hairstyles, 2 great pairs of shoes, and a cool backpack.

ATTORNEY'S EYES ONLY

BRYANT 00263

EXHIBIT 19
PAGE 201

EX 1-0002



**Meet Zoe!**

She's the queen of cool at school
with her short dark brown hair
and funky stompin' sneaks.
Hiphugger jeans, short tee shirt
and glittery vinyl backpack
complete her daytime look.

ATTORNEY'S EYES
ONLY

BRYANT 00264

EXHIBIT 19
PAGE 202

EX 1-0003



To give Zoe a whole new look for night, change her short dark brown hairstyle to her long blonde hairdo (included), change her pants to a skirt (also included) and change her sneakers to platform sandals (you get those too!)

ATTORNEY'S EYES ONLY

BRYANT 00265

EXHIBIT 19
PAGE 203

EX 1-0004



Now she has a whole new look for nighttime fun with the rest of the Bratz gang!

ATTORNEY'S EYES ONLY

BRYANT 00266

EXHIBIT 19
PAGE 204

EX 1-0005



## Meet Lupe!

She's the princess of pretty in her casual wear of tank top and wide leg khakis. Cute sweatshirt, silvery tennies , a fun red updo and fresh backpack give her a great look for school!

ATTORNEY'S EYES
ONLY

BRYANT 00267

EXHIBIT 19
PAGE 205

EX 1-0006



For partytime, change her into a short skirt, braids and silver stompers!

ATTORNEY'S EYES ONLY

BRYANT 00268

EXHIBIT 19
PAGE 206



# Meet Hallidae!

She's got the beat! Ultra trendy street wear 'n' braids for hittin' the books. Jean skirt, boots and knit cap, not to mention a funky bookpack (check out the logos!) give Hallidae a look that is all that!

ATTORNEY'S EYES ONLY

BRYANT 00269

EXHIBIT 19
PAGE 207

EX 1-0008