THOMAS J. NOLAN (Bar No. 66992)
(tnolan@skadden.com)
JASON D. RUSSELL (Bar No. 169219)
(jrussell@skadden.com)
LAUREN E. AGUIAR (*Admitted Pro Hac Vice*)
(laguiar@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071-3144
Tel.: (213) 687-5000
Fax: (213) 687-5600

Attorneys for The MGA Parties

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with Case No. 04-9059 and Case No. 05-2727 |
| v. | **PUBLIC REDACTED MGA PARTIES' MOTION FOR MISTRIAL**; and |
| MATTEL, INC., a Delaware corporation, | |
| Defendant. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**. |
| AND CONSOLIDATED ACTIONS. | Date: August 4, 2008<br>Time: 1:00 p.m. |

1

2

# **TABLE OF CONTENTS**

3   TABLE OF AUTHORITIES ................................................................................. iii

4   FACTUAL BACKGROUND AND PROCEDURAL HISTORY ........................... 4

5       A.   Juror No. 8 Failed to Disclose to the Court and the Parties
6            Her Biases Against Iranians During *Voir Dire* .......................... 4

7            1.   Juror No. 8 Was Aware During *Voir Dire* that Mr.
                 Larian Was an "Immigrant" from the "Middle East"
8                Who Was Alleged to Have Stolen the "Bratz" Idea
                 from Mattel ...................................................................... 5

9            2.   Juror No. 8 Failed to Disclose Her Strong Bias
10               Against Iranians and Misrepresented  that She Could
                 Serve Fairly and Impartially ........................................... 6

11      B.   After the Court Instructed Juror No. 8 on the Continuing
12           Duty to Disclose any Potential Biases, She Remained
             Silent............................................................................................ 7

13      C.   During the Jury's Phase 1A Deliberations, Juror No. 8
14           Made "Grossly Inappropriate Remarks" About Iranians to
             Other Jurors ................................................................................. 8

15      D.   The Court's Investigation Into the Bias of Juror No. 8.............. 9

16      E.   The Court's Written Order and Findings ................................... 11

17   ARGUMENT ...................................................................................................... 12

18   I.   MGA PARTIES ARE ENTITLED TO A MISTRIAL BECAUSE
19        THE COURT'S FINDINGS ESTABLISH JUROR NO. 8 IS
          BIASED ........................................................................................... 12

20      A.   Civil Litigants Have a Constitutional Right to a Fair and
21           Impartial Jury ............................................................................. 12

22      B.   The Conclusion that Juror No. 8 Is Biased Is Inescapable ...... 13

23      C.   Any Evidence as to the Impact of the Biased Remarks Is
             Inadmissible and Not Properly Considered on this Motion..... 17

24   II.  THE MGA PARTIES ARE ENTITLED TO A MISTRIAL
25        BECAUSE JUROR NO. 8 DID NOT DISCLOSE HER BIAS
          DURING VOIR DIRE..................................................................... 20

26      A.   A Mistrial Is Required When A Juror Fails to Disclose Bias
27           During *Voir Dire* ....................................................................... 20

28

1          B.    Juror No. 8 Failed to Indicate to the Court that She Was
2                Biased ...................................................................................... 22
           C.    Juror No. 8 Would Have Been Excluded for Cause Had
3                She Answered Honestly ............................................................ 25
4    CONCLUSION ...................................................................................................... 25

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**PAGE(S):**

**CASES**

Burton v. Johnson,
    948 F.2d 1150 (10th Cir. 1991) ...................................................... 15

Caterpillar Inc. v. Sturman Industries, Inc.,
    387 F.3d 1358 (Fed. Cir. 2004) ..................................................... 12

Davis v. Woodford,
    384 F.3d 628 (9th Cir. 2004) ......................................................... 20

Dyer v. Calderon,
    151 F.3d 970 (9th Cir. 1998) ....................................... 13, 14, 18, 20

Estrada v. Scribner,
    512 F.3d 1227 (9th Cir. 2008) ................................................. 13, 18

Fields v. Brown,
    503 F.3d 755 (9th Cir. 2007) .................................................. 13, 18

Jazzabi v. Allstate Insurance Co.,
    278 F.3d 979 (9th Cir. 2002) ......................................................... 13

Jimenez v. Dr. Eduardo Heyliger Seguros Triple S, Inc.,
    792 F. Supp. 910 (D.P.R. 1992)........................................... 13, 17, 20

Lopez v. Aramark Uniform & Career Apparel, Inc.,
    417 F. Supp. 2d 1062 (N.D. Iowa 2006) ...................................... 22

McDonough Power Equipment, Inc. v. Greenwood,
    464 U.S. 548 (1984).............................................................. 21, 25

Murray v. Laborers Union Local No. 324,
    55 F.3d 1445 (9th Cir. 1995) ......................................................... 13

Parker v. Gladden,
    385 U.S. 363 (1966).......................................................................... 20

Patton v. Yount,
    467 U.S. 1025 (1984)............................................................ 15, 21

Photostat Corp. v. Ball,
    338 F.2d 783 (10th Cir. 1964) ...................................................... 22

Rinker v. County of Napa,
    724 F.2d 1352 (9th Cir. 1983) ...................................................... 12

Rushen v. Spain,
    464 U.S. 114 (1983)..................................................................................... 18

Sassounian v. Roe,
    230 F.3d 1097 (9th Cir. 2000) ................................................................ 13, 19

Sea Hawk Seafoods v. Alyeska Pipeline Service Co.,
    206 F.3d 900 (9th Cir. 2000) ......................................................................... 12

Tobias v. Smith,
    468 F. Supp. 1287 (W.D.N.Y. 1979)............................................................. 18

United States v. Angulo,
    4 F.3d 843 (9th Cir. 1993) ............................................................................ 21

United States v. Brande,
    329 F. 3d 1173 (9th Cir. 2003) ..................................................................... 12

United States v. Gonzales,
    214 F.3d 1109 (9th Cir. 2000) ........................................... 3, 13, 15, 18, 21, 25

United States v. Heller,
    785 F.2d 1524 (11th Cir. 1986) ..................................................... 3, 16, 17, 19

United States v. Henley,
    238 F.3d 1111 (9th Cir. 2001) ................................................................ passim

United States v. Martinez - Martinez,
    369 F.3d 1076 (9th Cir. 2004) ...................................................................... 13

United States v. Olano,
    507 U.S. 725 (1993)...................................................................................... 12

United States v. Saya,
    247 F.3d 929 (9th Cir. 2001) opinion amended by No. 00-10004, 2001
    WL 476942 (9th Cir. May 8, 2001)............................................................... 19

United States v. Scott,
    854 F.2d 697 (5th Cir. 1988) ........................................................................ 22

United States v. Shapiro,
    669 F.2d 593 (9th Cir. 1982) .................................................................. 13, 16

United States v. Tucker,
    137 F.3d 1016 (1998), aff'd, 243 F.3d 499 (8th Cir. 2001) ......................... 22

**STATUTES**

Fed. R. Civ. P. 48 ................................................................................................. 12

**PRELIMINARY STATEMENT**

A touchstone of the American system of justice is that a party will have his day in court before a fair and impartial jury of his peers. This right, which is guaranteed to all by the United States Constitution, is satisfied only when each and every one of the jurors is fair and impartial. A jury is fair and impartial when none of its members harbors a bias against one litigant or another simply because of their race, ethnicity or national origin. Therefore, few occurrences undermine the judicial system's integrity more than when a jury's decision is infected by prejudice against a party on the basis of race or ethnic background. When that pernicious situation is presented, citizens begin to believe that the terms upon which justice is dispensed depend more on who you are than what is right.

What happened in this case presents just such a moment where the fundamental fairness of our justice system has been brought into question. We now know that, during deliberations over the verdict in Phase 1a of this trial, one of the jurors, Juror No. 8, made "grossly inappropriate" comments about the ethnic origin of defendant Isaac Larian, the chief executive officer of MGA Entertainment.[1] Among other things, Juror No. 8 referred to Iranians being "thieves" and to "hav[ing] stolen other person's ideas" in a case where Mattel accuses MGA of stealing its ideas.

That Juror No. 8 is biased is beyond dispute.

**REDACTED**

—————————————————————————————[2] Juror No. 8's bias was so corrosive that her presence on the jury rendered many other jurors physically and emotionally

---

[1]    Rather than identifying the juror in question by name, the MGA Parties will refer to this individual only by the designation used by the Court in its July 25, 2008 Order (the "Order").

[2]    As the only citations herein are to the Court's July 25, 2008 Order and to transcripts of proceedings before this Court, and the relevant portions are quoted, the MGA Parties have not separately attached copies of these documents. However, they can be provided to the Court promptly upon request.

1 overwrought, to the point that she was separated from the other jurors when her
2 remarks came to light. No one questioned that she was unfit to serve as a juror and,
3 the Court concluded, "[m]y sense is that everybody agrees that, under any scenario, ...
4 that Juror No. 8 [name omitted] needs to be excused." (7/25/08 Unsealed Tr. at
5 14:21-24.)

6      Experience shows, and case law confirms, that, in this day and age, statements
7 like those made by Juror No. 8 are likely made only by minds that subscribe to their
8 content. That is why courts show no tolerance for such statements; the possibility is
9 too great that the person speaking such words also believes them. And if these
10 persons believe what they say, they cannot be entrusted with the responsibility to
11 serve the ends of justice.

12      Thus, this Court's reaction to learning about the statements made by Juror No.
13 8 was appropriately swift and decisive. This Court immediately investigated the
14 matter and, after interviewing the jurors, remarked that "I really can't believe that
15 we're here at this point and we have this issue in front of us, that a juror, in this day
16 and age, would go through the *voir dire* process that we went through and then
17 harbor and make such a statement, harbor such a feeling and then make such a
18 statement." Recognizing that this bias was a "cancer" (7/25/08 Unsealed Tr. 13:24-
19 14:4, 20:6), the Court physically separated her from the other jurors while it
20 conducted its investigation and, after concluding the juror interviews and presenting
21 its preliminary findings, the Court excused Juror No. 8 from further service on the
22 jury, finding, among other things, that this juror's presence had the potential to cause
23 other jurors to become partial themselves, favoring one party or the other without
24 regard to the evidence.

25      The MGA Parties respectfully submit that the excusal of Juror No. 8 is not the
26 end of the remedial measures that must be taken. Given the nature of the statements,
27 it is clear that Juror No. 8 must have harbored bias during the deliberations over the
28 verdict in Phase 1a. It necessarily follows that her vote on the verdict was tainted. It

1 matters not what she claimed after-the-fact; persons who are biased rarely, if ever,
2 admit to their views. And it is precisely for this reason that the case law is clear that
3 jurors' denials are not to be given any weight. United States v. Heller, 785 F.2d
4 1524, 1527 & n.1 (11th Cir. 1986). Moreover, because her tainted views were not
5 disclosed until after deliberations were nearly complete, the other jurors plainly
6 could have been impacted by her views and thoughts *before* she disclosed her bias as
7 they would have had no reason to suspect that her views of the evidence were
8 colored by racist beliefs and, thus, no reason to discount or reject anything she said.
9 As the law forecloses inquiry into the deliberative process, the presumption that
10 Juror No. 8's biased views impacted others cannot be rebutted.

11   Because Ninth Circuit law establishes that the tainted vote of even one juror is
12 sufficient to nullify a verdict, this Court should declare a mistrial. As the case law
13 confirms, the error is structural, so there is no need to show actual prejudice.
14 Experience already establishes the unmistakable prejudice resulting from racial and
15 national origin bias. In the words of the Ninth Circuit, MGA's constitutional right to
16 a fair and impartial jury is "violated by 'the bias or prejudice of even a single juror.'
17 One racist juror would be enough." United States v. Henley, 238 F.3d 1111, 1120
18 (9th Cir. 2001). For a mistrial to be granted, all that needs to be shown is the
19 existence of the underlying bias, which is unmistakable in this case. United States v.
20 Gonzalez, 214 F.3d 1109, 1111 (9th Cir. 2000).

21   What is also disturbing is that Juror No. 8 was asked several times asked –
22 beginning with *voir dire* – whether there was any reason that she could not be fair or
23 impartial in the case. Critically, the question was once again put to the entire jury at
24 the close of instructions, immediately before the jury retired to deliberate. Even at
25 that juncture, when it was clear to every member of the jury that Mr. Larian is of
26 Iranian origin (indeed, a fact first introduced, intentionally, at the outset of the trial
27 by Mattel, during Mr. Quinn's opening statement), she did not alert this Court as to
28 her sentiments. Her sentiments led to statements so offensive that they caused two of

1 ‖ the jurors to break down during interviews with the Court, and for some of the jurors
2 ‖ to insist that Juror No. 8 should not serve because of her views. (Unfortunately,
3 ‖ these two jurors did not come forward right away despite their discomfort. It was
4 ‖ only after Juror No 6 courageously came forward, eight days after the verdict

5 ‖               **REDACTED**                    , that the Court or the parties learned of these
6 ‖ "grossly inappropriate remarks.") The case law establishes that if a juror fails to
7 ‖ disclose a bias, the verdict cannot stand. That occurred in this case, not once, but
8 ‖ twice. (i.e., during *voir dire* and then prior to deliberations).

9 ‖        There is no place in our judicial system for placing an official imprimatur on a
10 ‖ verdict that is tainted by the racial bias of a juror. No less than the public's
11 ‖ confidence about the integrity of our system of justice is at stake. No one should fear
12 ‖ that a jury of their peers really means of jury of people who hold innate bigoted
13 ‖ views against a party without regard to the evidence. That is why the cases compel
14 ‖ the conclusion that, in such circumstances, the verdict should not be upheld. This
15 ‖ Court has already taken the first appropriate step of dismissing the juror. This
16 ‖ motion requests that the Court take the next step (one that the MGA Parties submit is
17 ‖ inevitable in light of controlling law) of declaring a mistrial.

18 ‖ ## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

19 ‖ ### A.  Juror No. 8 Failed to Disclose to the Court and the Parties Her Biases Against Iranians During *Voir Dire*

20 ‖        *Voir dire* in this case began on the morning of May 20, 2008 with a pool of
21 ‖ fifty-six prospective jurors. A woman who ultimately became Juror No. 8 was one
22 ‖ of those prospective jurors. At the outset of the *voir dire*, the Court advised the
23 ‖ potential jurors in no uncertain terms that they were "about to embark on is a very,
24 ‖ very important process." (5/20/08 Tr. at 26:6-7.) "It is critical to all of us, the
25 ‖ Plaintiff, the Defendants, the Court, our entire system of Justice, that we assemble a
26 ‖ jury that is going to be fair and impartial." (Id. at 26:13-15.)
27 ‖        The Court implored the jurors to disclose to the Court and the parties any
28 ‖

1 relevant information that would bear on whether they would be fair and impartial
2 jurors. "I really need to depend upon your good faith and your willingness to really
3 consider and deliberate and let us know if there's any reason at all that you feel that
4 you may not be an appropriate juror in this case. Err on the side of letting us know
5 information, not the other way around." (5/20/08 Tr at 27:20-24.) As the Court
6 explained, the duty to disclose was far-reaching, extending even to information not
7 specifically requested by the Court or counsel:

8    I need to rely on your good faith, for you to seriously consider the nature
     of this case and all of the questions that we ask, and, perhaps, questions
9    that we don't ask. **If there is something in your mind that suggests
     that you would not be a completely fair and impartial juror in this**
10   **case, if you find yourself, without hearing any of the evidence, any of
     the exhibits, or any of the testimony, forming an opinion as to which**
11   **side is right or which side should receive your verdict, you've got to
     let us know. You've got to let me know. Don't hesitate.** If there's
12   any question that you're asked that you don't want to say in open court,
     or if there's any feeling that you have that you don't want to express in
13   front of the other jurors, we're happy to explore that at side-bar, outside
     the presence of the rest of the panel or public.
14
(Id. at 27:5-19 (emphasis added).)
15
16   **1.   Juror No. 8 Was Aware During *Voir Dire* that Mr. Larian
           Was an "Immigrant" from the "Middle East" Who Was
           Alleged to Have Stolen the "Bratz" Idea from Mattel**

17   Prior to questioning the prospective jurors, both parties made mini opening
18 statements to test whether there was any reason that the potential jurors could not be
19 fair and impartial. During these introductory remarks, both Mattel's counsel and
20 MGA's counsel informed the prospective jurors that Mr. Larian was an "immigrant"
21 and that Mattel alleged that he had stolen the idea for the Bratz dolls from Mattel.
22 Mr. Quinn, Mattel's counsel, told the jurors that Mr. Larian was an "immigrant to
23 this country," but asserted that his success did not reflect the "American Dream"
24 because he had succeeded through "cheating and stealing." (5/20/08 Tr. at 37:8-13.)

25   In his mini-opening, Mr. Nolan, counsel for Mr. Larian and MGA, highlighted
26 the fact that MGA was a "family-owned company. . . proudly led by an immigrant
27 who came over to this country when he was [just] 17 years old, with $750 in his
28

1  pocket." (5/20/08 Tr. at 37:24-38:1.)   Later during *voir dire*, Mr. Nolan expressly
2  stated that Mr. Larian had immigrated from the "Middle East." (Id. at 317:22-25.)

3              **2.    Juror No. 8 Failed to Disclose Her Strong Bias
                       Against Iranians and Misrepresented
4                      that She Could Serve Fairly and Impartially**

5          At the close of the parties' mini opening statements, at which point each juror
6  understood the themes of the case and Mr. Larian's ethnicity, the Court questioned
7  each juror individually.  Among other questions, the Court expressly asked each
8  juror whether, in light of the parties' opening remarks, the prospective jurors could
9  serve fairly and impartially. "Is there any reason that you cannot be a fair and
10 impartial juror in this case?"  (5/20/08 Tr. at 55:3-4.)  The Court reiterated that the
11 judicial system and the parties "really need[ed] to depend upon [the prospective
12 juror]" to consider "anything that [they have] heard or seen" in the courtroom in
13 determining whether they could sit for trial. (Id. at 55:3-6.)  "Now is the time to let
14 us know of any concerns, any problems." (Id. at 273:19-20.)

15         Some prospective jurors admitted to the Court that, in light of the parties'
16 identities or the introductory remarks of counsel, that they would be unable to serve
17 impartially and fairly. (See, e.g., 5/20/08 Tr. at 215:19-216:13.)

18         Despite Juror No. 8's strong prejudice against Iranians – as reflected in the
19 "grossly inappropriate"  comments she later made to her fellow jurors about Iranians
20 being "stubborn, "rude," "stingy" "thieves" who steal "other person's ideas" – she
21 did not disclose this bias.   Instead, she explicitly represented to the Court and the
22 parties that that "yes, I can be a fair and impartial juror." (5/20/08 Tr. at 238:2.)  She
23 also explicitly represented that she did not have "any particular feelings about one
24 company or the other." (Id. at 238:21-23.)  She maintained these answers even after
25 being asked by Mattel's counsel a series of questions about her husband and his
26 work as a commercial lawyer, – which we now know is relevant to her biased beliefs.
27 (Id. at 297:11-298:2.)

28         Also during *voir dire*, Mr. Nolan asked the entire panel *again* whether there

1 | was any reason any one of them could not be a fair and impartial juror.

> 2 | Is there anybody, based on everything that you've heard today, who now,
> 3 | as they reflect back and think, you know, I don't think if I was one of the
> parties in this lawsuit that I would like this case to proceed having a
> 4 | juror with my state of mind right now sitting on this jury? Is there
> anybody that feels that way? In other words, fair and impartial.

5 | (Id. at 316: 18-24.) Juror No. 8 did not respond affirmatively to this question.

6 | A few moments later, Mr. Nolan reiterated that Larian was an "immigrant"

7 | and that he had emigrated from the Middle East to pursue the American dream.

> 8 | MR. NOLAN: The last subject that I want to get to, which is probably
> in many ways the most difficult, but I need to ask this question. I asked
> 9 | you two different ways. I asked you with respect to sides, Mattel versus
> MGA. My client was not born in the United States. And as you heard in
> 10 | my opening statement, **my client left at an early age, the Middle East,
> came here, worked hard. He become [sic] a United States citizen**
> 11 | **and is a successful businessman.** I believe I described it as almost the
> American dream.   Does anybody here believe, still believe in that
> 12 | American dream?   Does anybody not believe in the American dream,
> that if you work hard enough, you can be a success?. . . .   Do you think,
> 13 | though, that if the opportunity arises and a person is willing to take the
> risk and reach for that opportunity, that the mere fact that he's not born
> 14 | in the United States should disqualify him from ever pursuing that dream?

15 | (Id. at 317:18-319:4) (emphasis added).

16 | Despite this clear reference to Mr. Larian's ethnicity, and the presence of

17 | several of Mr. Larian's family members in court, Juror No. 8 again failed to disclose

18 | her biases or raise any concerns about her ability to render a fair and impartial verdict.

19 | **B.   After the Court Instructed Juror No. 8 on the Continuing
20 |        Duty to Disclose any Potential Biases, She Remained Silent**

21 | On July 10, 2008, the parties presented their closing arguments in Phase 1a of

22 | the trial, and the Court instructed the jury before they began deliberations.

23 | Specifically, the Court instructed the jury on the law they were to follow and again

24 | reminded the jurors of their continuing obligation not to "be influenced by any

25 | personal likes or dislikes, opinions, prejudices, or sympathy.   That means that you

26 | must decide the case solely on the evidence before you.   You will recall that you took

27 | an oath to do so."   (7/10/08 Tr. at 4796:19-24.) This instruction was a jointly agreed

28 |

1 instruction based on 9th Cir. Model Civ. Jury Inst. 1.1C (2007) and was submitted to
2 the Court jointly by the parties under Docket Number 3463.

3 Despite being reminded of her oath to put aside prejudices and biases, and the
4 obvious reminder that she should come forward if she could not follow the Court's
5 instruction, Juror No. 8 said nothing and proceeded to participate in deliberations.

6 ### C. During the Jury's Phase 1A Deliberations, Juror No. 8 Made "Grossly Inappropriate Remarks" About Iranians to Other Jurors

8 The jurors deliberated for almost a week before rendering a verdict. During
9 much of the deliberations, Juror No. 8 apparently concealed from her fellow jurors
10 that she harbored biases against Iranians, and specifically biases as to their character
11 and veracity.[3] Apparently on the last day of deliberations, however, Juror No. 8
12 made what the Court found to be "grossly inappropriate remarks concerning" Mr.
13 Larian based on his ethnicity (Order at 1, finding No. 1), which, according to the
14 Court, were heard "by most but not all of the jurors." (7/25/08 Tr. at 5:19-22).

15 Specifically Juror Number 8 "indicated that her husband, an attorney, [had]
16 told her about [a] client or clients who are Iranian and who are stubborn, rude, stingy,
17 are thieves, and have stolen other person's ideas." (Order at 1, finding No. 1; see
18 also, 7/25/08 Tr. at 21:5-11(same)). Despite expressing these "grossly
19 inappropriate" views to the other jurors, and even though the Court determined that
20 these comments caused a number of jurors to become quite upset during interviews
21 with the Court more than a week later (Order at 2, finding No. 3), neither the
22 foreperson nor any other member of the jury brought Juror No. No. 8's statements to
23 the attention of the Court or the parties until eight days later, on July 25, 2008.

24

25 ----

[3] This conclusion is based on the Court's investigation and findings reflected in the
26 July 25, 2008 Order at 2, finding No. 4. The MGA Parties note, however, that the contents
of the deliberations and any evidence concerning the deliberative process are inadmissible
27 as a matter of law under Rule 606 of the Federal Rules of Evidence. (See Section I.__,
infra.) Consequently, the MGA Parties simply note the Court's finding but do not rely on
28 it in making any of their arguments in this motion.

1    **D.    The Court's Investigation Into the Bias of Juror No. 8**

2        The parties presented opening statements in Phase 1b of the trial on

3    Wednesday, July 23, 2008.  On the morning of July 25, Juror No. 6 sent a note to the

4    Court that he was "concern[ed]" about something, which he wanted to discuss with

5    the Court.  (7/25/08 Unsealed Tr. at 4:18-23.).

6

7

8

9

10

11

12

13

14

15                            **REDACTED**

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2                                    **REDACTED**
3

4        After interviewing Juror No. 6, the Court "found that it was necessary
5 to interview each and every one of the jurors separately." (7/25/08 Unsealed Tr. at
6 5:7-8.)                              **REDACTED**
7
8

9        The Court subsequently interviewed each of the jurors individually in
10 chambers, outside of the presence of the parties and their counsel. (7/25/08 Unsealed
11 Tr. at 5:8-11.)  At the conclusion of the Court's investigation, the Court made oral
12 findings from the bench, and then held a brief public hearing.  During the hearing,
13 the Court disclosed the substance of Juror No. 8's statements about Iranians (Id. at
14 21:5-11) and expressed grave concern both that Juror No. 8 would "harbor" such
15 prejudice in "this day and age," and that she went through the Court's thorough *voir*
16 *dire* process without disclosing her bias or admitting her inability to be a fair juror.

17          The concern that I have was well articulated by Mr. Nolan.  It's this
           sense of – I really can't believe we're here at this point and we have this
18         issue in front of us, that a juror, in this day and age, would go through
           the *voir dire* process that we went through and then harbor and make
19         such a statement, harbor such a feeling and then make such a statement.

20 (Id. at 13:23-14:4).  The Court described these biased views as a "cancer" in the
21 proceedings (id. at 20:6) and noted that "two of the jurors actually broke down in
22 chambers because they were so outraged at what had been said."  (Id. at 13:10-12.)
23 Indeed, the Court indicated that Juror No. 10 had "expressly indicted that her note to
24 the Court, indicating the pain [that] she was going through, [was] connected to [Juror
25 No. 8's] statement." (Id. at 6:11-14.)  Given the allegations about Juror No. 8's
26 comments and the Court's investigation, the Court separated Juror No. 8 from the
27 remaining nine jurors and placed her in a separate room. (Id. at 7:4-9.)  The Court
28 made clear that no matter how the matter was resolved, Juror No. 8 was unfit to

1 serve as a juror in the case, "[m]y sense is that everybody agrees that, under any
2 scenario, ... that Juror No. 8 [name omitted] needs to be excused." (Id. at 14:21-24.)

3     After hearing the Court's preliminary findings, the MGA Parties made an oral
4 motion seeking a mistrial on the grounds that they had been deprived of their right to
5 have "a unanimous verdict of a fair and impartial jury." (Id. at 10:5-11.)

6 **E.**    **The Court's Written Order and Findings**

7     The Court subsequently issued a written order on the afternoon of July 25,
8 2008, finding, in pertinent part, that:

9     (1)    Juror No. 8 made "grossly inappropriate remarks concerning defendant
10         Isaac Larian based on his ethnicity during jury deliberations." (Order 1
11         at 1, finding No. 1);

12     (2)    Juror No. 8 stated "that her husband, an attorney, [had] told her about [a]
13         client or clients who are Iranian and who are stubborn, rude, stingy, are
14         thieves, and have stolen other person's ideas." (Id.);

15     (3)    Juror No. 8's remarks had been "heard, in varying degrees, by some but
16         not all of the jurors." (Id. at 2, finding No. 2);

17     (4)    Juror No. 8's remarks were allegedly made toward the end of
18         deliberations, after the jury had purportedly reached agreement on all of
19         the questions on the Verdict Form about which the jury reached a
20         unanimous verdict. (Id. at 2, finding No. 4);

21     (5)    The jurors indicated in their interviews that they did not believe that
22         Juror No. 8's remarks affected the jury's ultimate decision. (Id. at 2,
23         finding No. 5);

24     (6)    Notwithstanding paragraph 5, above, some of the jurors believed that it
25         was important to remove Juror No. 8 from the jury and at least one juror
26         indicated that "she felt uncomfortable continuing to serve with Juror No.
27         8 after the remarks were made." (Id. at 2, finding No. 6);

28     (7)    The jurors indicated that they believed they could be fair to the parties

1               in Phase 1(b) of the trial if Juror No. 8 was removed but some feared

2               that they might actually be biased if she continued to serve. (Id. at 2,

3               finding No. 7.)

4          With the agreement of both parties, the Court dismissed Juror No. 8

5 from further service on the panel. (Order at 2).

6                          **ARGUMENT**

7 **I.**   **MGA PARTIES ARE ENTITLED TO A MISTRIAL BECAUSE THE**
**COURT'S FINDINGS ESTABLISH JUROR NO. 8 IS BIASED**

8

9       **A.**   **Civil Litigants Have a Constitutional Right to a Fair and Impartial Jury**

10     The Seventh Amendment of the United States Constitution guarantees litigants

11 in a civil case a fair and impartial jury free from bias or prejudice. This requirement

12 follows from the most basic and fundamental principles of justice underlying the

13 Constitution, whereby "'due process means a jury capable and willing to decide the

14 case solely on the evidence before it....'" United States v. Brande, 329 F.3d 1173,

15 1178 (9th Cir. 2003) aff'd, 86 Fed. Appx. 338 (9th Cir. 2004) (quoting United States

16 v. Olano, 507 U.S. 725, 738 (1993)).[4] The necessity for a fair and impartial jury,

17 coupled with the fact that the verdict of a federal jury must be unanimous, see Fed. R.

18 Civ. P. 48 ("the verdict must be unanimous and be returned by a jury of at least 6

19 members" unless the parties otherwise stipulate); Jazzabi v. Allstate Ins. Co., 278

20 F.3d 979, 984-85 (9th Cir. 2002); Murray v. Laborers Union Local No. 324, 55 F.3d

21 1445, 1451 (9th Cir. 1995), means that it takes only one juror's bias to taint the

22 verdict and to render it invalid.

23     Precedent is unequivocal and unwavering on this point, as evidenced by the

24 Ninth Circuit's frequent repetition of this principle. It has held that, for example, "it

25

---

[4] Although Brande was a criminal matter concerning the Sixth Amendment, the Ninth
26 Circuit has long held that the standards governing the Sixth and Seventh Amendment rights
to a fair and impartial jury are the same. See Sea Hawk Seafoods v. Alyeska Pipeline Serv.
27 Co., 206 F.3d 900, 906 & n.4 (9th Cir. 2000); Rinker v. County of Napa, 724 F.2d 1352,
1354 (9th Cir. 1983). Other courts of appeal adhere to the same rule. See Caterpillar, Inc. v.
28 Sturman Indus., Inc., 387 F.3d 1358, 1371 n.2 (Fed. Cir. 2004).

1 would not be necessary to demonstrate that 'prejudice pervaded the jury room' in
2 order to establish a constitutional violation"; rather, the constitutional right to jury
3 trial "is violated by 'the bias or prejudice of even a single juror.'" United States v.
4 Henley, 238 F.3d 1111, 1120 (9th Cir. 2001) (citing Dyer v. Calderon, 151 F.3d 970,
5 973 (9th Cir. 1998) (en banc)). Thus, as the Ninth Circuit again observed more
6 recently, "[t]he bias… of even a single juror would violate [defendant's] right to a
7 fair trial." Estrada v. Scribner, 512 F.3d 1227, 1239-40 (9th Cir. 2008) (citation
8 omitted); see also Fields v. Brown, 503 F.3d 755, 781 n.20 (9th Cir. 2007) (en banc);
9 United States v. Martinez-Martinez, 369 F.3d 1076, 1081 (9th Cir. 2004);
10 Sassounian v. Roe, 230 F.3d 1097, 1110 (9th Cir. 2000). The logical foundation of
11 this notion is that "'[i]f a single juror is improperly influenced, the verdict is as
12 unfair as if all were.'" United States v. Shapiro, 669 F.2d 593, 603 (9th Cir. 1982)
13 (citation omitted). Thus, "[j]uries necessarily act as a unit and the misconduct of any
14 juror, actual or implied, which forestalls or prevents a fair and proper consideration
15 of the evidence presented in a case, is misconduct of the entire jury, vitiating their
16 verdict and requiring a new trial." Jimenez v. Dr. Eduardo Heyliger Seguros Triple
17 S, Inc., 792 F. Supp. 910, 917-18 (D.P.R. 1992).

18     Finally, when the existence of a biased juror is established, the verdict must be
19 set aside. Thus, "'the presence of a biased juror cannot be harmless; the error
20 requires a new trial without a showing of actual prejudice.'" United States v.
21 Gonzales, 214 F.3d 1109, 1111 (9th Cir. 2000) (citation omitted). This is because,
22 "[l]ike a judge who is biased, the presence of a biased juror introduces a structural
23 defect not subject to harmless error analysis." Dyer, 151 F.3d at 973 n.2.

24     **B.     The Conclusion that Juror No. 8 Is Biased Is Inescapable**

25     Because this Court's particularized findings in its Order dated July 25, 2008
26 establish that Juror No. 8 was actually biased, this Court should declare a mistrial.

27     The essential findings begin with the fact that "Juror No. 8 made grossly
28 inappropriate remarks concerning defendant Isaac Larian based on his ethnicity

1 during jury deliberations." (Order at 1.) More specifically, this Court found that

2 "Juror No. 8 indicated that her husband, an attorney, has told her about client or

3 clients who are Iranian and who are stubborn, rude, stingy, are thieves, and have

4 stolen other person's ideas." (Id. at 1; see also, 7/25/08 Tr. at 21:5-11(same).)

5 Accordingly, there is no dispute that highly offensive statements were made and that

6 these statements were based on impressions that Juror No. 8 had from conversations

7 with her husband, presumably long before the verdict was reached in Phase 1(a) –

8 and, parenthetically, establishing also that Juror No. 8 violated the Court's

9 instruction not to discuss the case and not to inject outside information into the

10 deliberative process.

11      The next question is: do these statements compel a conclusion of bias? Taken

12 at face value, such statements can hardly admit of any other conclu

13

14

15

16                         **REDACTED**

17

18

19

20

21      This Court's findings also impel the conclusion of bias. The Court found that

22 these statements were so disturbing that they caused the foreperson to immediately

23 admonish Juror No. 8 and others to respond emotionally. (Order at 2, finding No. 3.)

24                         **REDACTED**

25 [5] _____                    tracks virtually verbatim
the standard for finding that a juror is not impartial for "[a] juror is considered to be
26 impartial 'only if he can lay aside his opinion and render a verdict based on the evidence
presented in court . . . .'" Gonzalez, 214 F.3d at 1114 (citing Patton v. Yount, 467 U.S.
27 1025, 1037 n.12 (1984). And, according to the Ninth Circuit, any "'[d]oubts regarding bias
must be resolved against the juror.'" Id. See also Burton v. Johnson, 948 F.2d 1150, 1158
28 (10th Cir. 1991) (same).

1 Even more, however, the intensity and impact of the statements appear to have been
2 such that "[s]ome of the jurors believed that it was important that, going forward,
3 Juror No. 8 should be removed from the jury." (Id. at 2, finding No. 6.) Indeed, one
4 juror stated that she feared that, if Juror No. 8 remained on the jury, "she would
5 overcompensate for Juror No. 8's apparent bias and not be fair to Mattel," (Id.) thus
6 resulting in bias going both ways.  Clearly, the findings indicate that at least one
7 juror believed that Juror No. 8 was biased.  Finally, the discomfort of the jurors was
8 so high and the nature of the comments so egregious, that this Court excused Juror
9 No. 8 from further service on the jury, stating that it could not believe that a juror
10 could "harbor such a feeling and then make such a statement." (7/25/08 Tr. at 14:3-
11 4.)

12      Thus, all of the particularized factual evidence, as summarized by this Court's
13 findings, coupled with this Court's appropriate action to excuse Juror No. 8,
14 inexorably point to the conclusion that Juror No. 8 was biased.  Other jurors felt that
15 they could not continue to serve with Juror No. 8; this could only have been because
16 they believed that Juror No. 8 would not be fair or objective.  And if they did not
17 believe Juror No. 8 could be fair going forward, there is no question that she was not
18 fair before the verdict was reached in Phase 1(a) – regardless of Juror No. 8's
19 protestations to the contrary, which cases hold should be disregarded for obvious
20 reasons.  See United States v. Heller, 785 F.2d 1524, 1527 & n.1 (11th Cir. 1986);
21 see also Henley, 238 F.3d at 1121 (noting that denials by a person who has made a
22 racist statement is entitled to less weight "[b]ecause the bias of a juror will rarely be
23 admitted by the juror himself…."); Shapiro, 669 F.2d at 601 (granting a mistrial due
24 to the likelihood that the jury was prejudiced by the removal of a juror despite jurors'
25 contentions that they were not influenced by the removal, and observing that,
26 "[i]ndeed, even a juror's good faith belief in his own impartiality is not dispositive").
27 It follows that the verdict from Phase 1(a) is tainted and should be set aside.

28      This  conclusion  is  further  compelled  by  case  law  with  analogous

1   circumstances.  In <u>Heller</u>, for example, the Eleventh Circuit reversed the trial court's
2   decision not to grant a new trial where jury members had made anti-Semitic
3   statements.  In that case, when one of the jurors advised the trial court that he was
4   disturbed by the anti-Semitic remarks that he had been hearing in the jury room and
5   that he "wouldn't want to be tried by anybody with this kind of mentality," the trial
6   court conducted a voir dire of the jury members.  <u>See</u> 785 F.2d at 1526.  During the
7   *voir dire*, the trial court learned that anti-Semitic statements had been made in the
8   jury room.  <u>See id.</u>   The trial court then "concluded his questioning of each of the
9   jurors in the case by asking them individually whether in light of what had occurred
10  in the jury room they would still be able to reach a decision in the case based strictly
11  on the evidence and the law without bias or prejudice," and "[e]ach juror affirmed
12  that he would be able to make such a decision."  <u>See id.</u>  Based on these assurances,
13  the trial court permitted the case to be tried to verdict.

14      The Eleventh Circuit reversed, observing that "[a] racially or religiously
15  biased individual harbors certain negative stereotypes which, despite his
16  protestations to the contrary, may well prevent him or her from making decisions
17  based solely on the facts and law that our jury system requires."  <u>See</u> 785 F.2d at
18  1527.  Then, in face of the Government's argument that the statements should be
19  treated as "jokes" and discounted, the court stated that "more importantly, anti-
20  Semitic 'humor' is by its very nature an expression of prejudice on the part of the
21  maker," adding that, "in a society in which anti-Semitism is condemned, those
22  harboring such thoughts often attempt to mask them by cloaking them in a 'teasing'
23  garb."  <u>See id.</u>

24      Expressions of bias, as the Eleventh Circuit remarked, are by "their very
25  nature an expression of prejudice on the part of the maker."  Indeed, the Ninth
26  Circuit, in a similar context, remarked that "[w]e have considerable difficulty
27  accepting the government's assumption that, at this time in our history, people who
28  use the word 'nigger' are not racially biased."  <u>See</u> <u>Henley</u>, 238 F.3d at 1121; <u>see</u>

1 | also Jimenez, 792 F. Supp. at 918 ("The issue of plaintiff's national origin is totally
2 | extraneous to the nature of the alleged malpractice claim here, and the fact that the
3 | subject of plaintiff's national origin was even introduced into the judicial mix by the
4 | alternate juror after she viewed the plaintiff's physical appearance, strongly suggests
5 | that [the alternate juror] was unable to be objective towards a plaintiff of Dominican
6 | descent.")

7 |     Following cases such as Heller, Henley and Jimenez, there can be no doubt
8 | that the statements by Juror No. 8 evidenced her bias.

9 |     **C.**    **Any Evidence as to the Impact of the Biased Remarks Is Inadmissible and Not Properly Considered on this Motion**
10 |

11 |     Mattel undoubtedly will contend that a mistrial need not be granted because
12 | this Court's July 25 Order noted that "[a]ll of the jurors clearly indicated, by both
13 | their verbal and non-verbal response to the Court's questioning, that the remarks had
14 | no impact on their decision in Phase 1(a)." (Order at 2, finding No. 5.)  This
15 | argument would be misplaced on at least two distinct grounds.

16 |     First, where, as here, bias is established, the case law forecloses inquiry into
17 | whether or not the bias had an actual impact on the verdict.  The existence of bias
18 | even in one juror creates an irrebuttable presumption of taint.  As the Ninth Circuit
19 | has held, "the presence of a biased juror cannot be harmless; the error requires a new
20 | trial without a showing of actual prejudice."  Gonzalez, 214 F.3d at 1111; see also
21 | Dyer, 151 F.3d at 973 n.2 ("the presence of a biased juror introduces a structural
22 | defect not subject to harmless error analysis").

23 |     Second, were Mattel even to make this argument, it would risk improperly
24 | encroaching on territory forbidden by Fed. R. Evid. 606. Federal Rule of Evidence
25 | 606(b) allows a juror to testify regarding "whether any outside influence was
26 | improperly brought to bear upon any juror" and thus the rule permits juror testimony
27 | regarding "any mental bias in matters unrelated to the specific issues that the juror
28 | was called upon to decide." Rushen v. Spain, 464 U.S. 114, 121 n.5 (1983).

1        But whereas an inquiry into a juror's racist or ethnocentric bias is appropriate,
2 a court may not inquire into whether that bias actually affected (or would affect)
3 deliberations. [6] As the Ninth Circuit has explained, "[j]uror testimony about
4 consideration of extrinsic evidence may be considered by a reviewing court, but juror
5 testimony about the subjective effect of evidence on the particular juror or about the
6 deliberative process may not." Fields, 503 F.3d at 778; see also Estrada, 512 F.3d at
7 1237 ("A long line of precedent distinguishes juror testimony about the consideration
8 of extrinsic evidence, which we may consider, from juror testimony about the
9 subjective effect of evidence on any of the particular jurors here, which we may not
10 consider."); United States v. Saya, 247 F.3d 929, 938 (9th Cir. 2001) ("Evidence
11 relating to the actual effect of the information on jurors is inadmissible pursuant to
12 Fed. R. Evid. 606(b)."); Sassounian, 230 F.3d at 1109 ("Therefore, although we may
13 consider testimony concerning whether the improper evidence was considered, we
14 may not consider the jurors' testimony about the subjective impact of the improperly
15 admitted evidence.").

16        Therefore, under long-standing Circuit precedent, the only relevant question is
17 whether there was bias. There may be no inquiry or argument as to whether that bias
18 affected a juror's decision-making. Juror No. 8's contrary statements – which are
19 suspect in the first place and should be discounted under cases such as Henley and
20
21

22   [6]    In the Ninth Circuit, "[r]acial prejudice is plainly a mental bias that is unrelated to
any specific issue that a juror ... may legitimately be called upon to determine." Henley,
23 238 F.3d at 1120. Thus, as the Ninth Circuit explained in Henley in a reasoned discussion,
admission of evidence of racial bias " would seem, therefore, to be consistent with the text
24 of the rule [606(b)], as well as with the broad goal of eliminating racial prejudice from the
judicial system, to hold that evidence of racial bias is generally not subject to Rule 606(b)'s
25 prohibitions against juror testimony." Id., id. at 1121 ("[W]e find persuasive those cases
that have exempted evidence of racial prejudice from Rule 606(b)'s juror incompetency
26 doctrine.").   See also Tobias v. Smith, 468 F. Supp. 1287, 1290 (W.D.N.Y. 1979)
(concluding that "statements in the juror's affidavit [demonstrating racial prejudice] are
27 sufficient to raise a question as to whether the jury's verdict was discolored by improper
influences and that they are not merely matters of jury deliberations" such that they are not
28 excluded under Rule 606(b)).

1  Heller – are consequently irrelevant.  Once there is a finding of bias, the governing
2  legal standards foreclose any further inquiry.

3      There is good reason for this stringent bright-line rule.  Even if Juror No. 8
4  does not realize the impact of her bias, that bias very likely tainted her interpretation
5  of every piece of evidence introduced in this case and consequently every comment
6  she made about the evidence during the course of deliberations.  Moreover, even
7  though, per this Court's findings, Juror No. 8 did not utter the offensive statements
8  until "after the jury had reached agreement on the Verdict Form questions that were
9  ultimately returned unanimously," given the proximity in time in which the
10 statements were made and the intensity of the content of those statements, it is
11 indisputable that Juror No. 8's views were infected.  As the Heller court noted, "[a]
12 racially or religiously biased individual harbors certain negative stereotypes which,
13 despite his protestations to the contrary, may well prevent him or her from making
14 decisions based solely on the facts and law that our jury system requires."  785 F.2d
15 at 1527.  Because it is in reality impossible to sort through the actual impact of such
16 bias on deliberations, and because the judicial system must jealously and zealously
17 guard its integrity, the law has determined that, once bias is determined, there is no
18 need to inquire further.

19     Following these principles, any suggestion by Mattel that Juror No. 8 can
20 simply be excised and the verdict retained because there was not a right to a jury of
21 more than six jurors is unavailing.  In this case, the Court ordered, and neither side
22 disagreed, that there would be a jury of six regular jurors and four alternates.
23 (5/19/08 Tr. at 15:22-25.)  As the Court made clear, "[y]ou should understand,
24 however, that if we still have 10 jurors or 9 or 8 or 7, whatever number we have, all
25 jurors remaining at the end of the case will be excused to deliberate, and they will be
26 part of the jury that deliberates."  (Id. at 15:25-16:4; accord 5/20/08 at 28:23-29:2.)
27 When it came time for the jury to retire to deliberate, there were ten jurors, including
28 Juror No. 8.  Thus, MGA was entitled to a unanimous verdict from a fair and

1  impartial jury comprised of those ten jurors. See, e.g., Parker v. Gladden, 385 U.S.
2  363, 365-66 (1966). Because these jurors are presumed to have acted as a unit
3  (Jimenez, 792 F. Supp. at 917-18) and because any bias presents a structural error
4  that cannot be remedied (Dyer, 151 F.3d at 973 n.2), the taint of Juror No. 8
5  pervaded the jury once she participated in deliberations. And the fact that she
6  participated in deliberations through and including a verdict establishes conclusively
7  that the verdict cannot be saved given her plain and obvious bias.

8  **II.  THE MGA PARTIES ARE ENTITLED TO A MISTRIAL BECAUSE JUROR NO. 8 DID NOT DISCLOSE HER BIAS DURING VOIR DIRE**
9

10  **A.  A Mistrial Is Required When A Juror Fails to Disclose Bias During _Voir Dire_**

11  As noted above, civil litigants have a constitutional right under the Fifth and
12  Seventh Amendments to a fair and impartial jury. (Supra § I.A.) "The Ninth Circuit
13  takes the spectre of jury bias very seriously. We have emphasized that 'even a single
14  partial juror violates a defendant's constitutional right to fair trial.'" Davis v.
15  Woodford, 384 F.3d 628, 652 (9th Cir. 2004). "Because even a single partial juror
16  violates a defendant's constitutional right to a fair trial, a judge must always act to
17  diligently preserve that right." United States v. Angulo, 4 F.3d 843, 848 (9th Cir.
18  1993).

19  As the Ninth Circuit has explained, "[c]hallenges for cause are the means by
20  which partial or biased jurors should be eliminated. To disqualify a juror for cause
21  requires a showing of either actual or implied bias – 'that is ... bias in fact or bias
22  conclusively presumed as a matter of law.'" Gonzalez, 214 F.3d at 1111. To enable
23  civil litigants to make a meaningful challenge for cause, they are afforded the
24  opportunity to conduct _voir dire_, which is designed to allow the trial court and the
25  litigants to uncover potential biases and prejudices that might impact a juror's ability
26  to decide the case fairly and impartially based on the evidence presented. Patton v.
27  Yount, 467 U.S. at 1038 n. 13 ("Voir dire has long been recognized as an effective
28

1 method of rooting out ... bias, especially when conducted in a careful and
2 thoroughgoing manner.").

3    Where a potential juror does not truthfully disclose biases or prejudices that
4 would render them unable to be impartial and then participates in the verdict, a civil
5 litigant has a right to a mistrial. See Henley, 238 F.3d at 1121. The Supreme
6 Court's decision in McDonough Power Equip. v. Greenwood is recognized as the
7 leading case setting forth the standard for a mistrial based on a juror's failure to
8 honestly answer questions during *voir dire* on the ground that it denies a party its
9 right to an impartial jury: "We hold that to obtain a new trial in such a situation, a
10 party must first demonstrate that a juror failed to answer honestly a material question
11 on *voir dire*, and then further show that a correct response would have provided a
12 valid basis for a challenge for cause." Id. at 556.

13    As one court framed the inquiry, "[t]he first requirement for proof of this
14 claim requires consideration of whether or not the juror 'could have honestly
15 believed' that no response to the pertinent *voir dire* question was required. ... This, in
16 turn, requires consideration of whether the answer (or presumably, the lack of an
17 answer), was 'reasonable.'" Lopez v. Aramark Uniform & Career Apparel, Inc., 417
18 F. Supp. 2d 1062, 1068-69 (N.D. Iowa 2006); accord United States v. Tucker, 137
19 F.3d 1016, 1028 (8th Cir. 1998) (reasonableness in the answer and interpretation is
20 the touchstone to evaluating whether a response is honest). "A juror may not conceal
21 material facts disqualifying him simply because he *sincerely* believes that he can be
22 fair in spite of them." United States v. Scott, 854 F.2d 697, 698 (5th Cir. 1988)
23 (finding juror's silence as to bias "withdrew from defense counsel and the court the
24 decision whether he should nevertheless serve as a juror," and ordered a new trial,
25 when juror failed to disclose that he had a family member in law enforcement in the
26 sincere belief it would not affect his judgment). Moreover, a juror may not shield his
27 or her biases behind the fact that the question asked was not sufficiently detailed for
28 "it is expected and required that jurors in their answers shall be completely truthful

1 and that they shall disclose, upon a general question, any matters which might tend
2 to disqualify them from sitting on the case for any reason." Photostat Corp. v. Ball,
3 338 F.2d 783, 786 (10th Cir. 1964).

4      A juror must disclose racial biases and prejudices and the failure to do so in
5 the face of questions that reasonably would elicit that bias is grounds for mistrial.
6 United States v. Henley, 238 F.3d 1111 (9th Cir. 2001) (remanding to district court
7 to make a factual finding as to whether juror made racist statements).

8      **B.**    **Juror No. 8 Failed to Indicate to the Court that She Was Biased**

9      As set forth above, Juror No. 8 made "grossly inappropriate" and derogatory
10 remarks casting all Iranians as "stubborn, rude, stingy, … thieves," who are prone to
11 stealing "other people's ideas." (Order at 1, finding No.1.) MGA's CEO, Isaac
12 Larian, is of Iranian descent and was accused by Mattel of stealing its ideas – a point
13 that was made plain during the *voir dire* process and repeated in trial.

14      Given the direct nexus between Juror No. 8's views on the character and
15 veracity of Iranians and their purported propensity to steal other's ideas, and the fact
16 that MGA's CEO is Iranian, was accused of stealing Mattel's idea, and his credibility
17 was central to the case, any suggestion that Juror No. 8's views were not biased or
18 prejudiced in considering the merits of this case is simply indefensible. See Henley,
19 238 F.3d at 1121 ("We have considerable difficulty accepting the government's
20 assumption that, at this time in our history, people who use the word "nigger" are not
21 racially biased."). Indeed, the Court itself noted that "I really can't believe we're
22 here at this point and we have this issue in front of us, that a juror, in this day and
23 age, would go through the voir dire process that we went through and then harbor
24 and make such a statement, harbor such a feeling and then make such a statement."
25 (7/25/08 Unsealed Tr. at 13:23-14:4.)

26      Juror No. 8's bias was a material issue that prevented her from fairly hearing
27 and deciding the case and should have been disclosed during *voir dire*. Juror No. 8
28 was aware that Mr. Larian was an immigrant prior to the start of the *voir dire* process.

1 Both Parties made express references to Mr. Larian's background during the mini
2 opening statements which preceded juror questioning. Mr. Quinn stated that Mr.
3 Larian was an immigrant to the United States. (5/20/08 Tr. at 37:8-11.) Mr. Nolan
4 also noted Mr. Larian's immigrant status during his mini opening statement.
5 (5/20/08 Tr. at 37:24-38:3.) Before a single question was asked, Juror No. 8 knew
6 she had a bias that could prevent her from fairly and impartially evaluating the case.

7       The Court made it clear from the outset that prospective jurors could serve
8 only if they could be fair and impartial. The Court specifically asked that they
9 disclose any potential biases in responses to questions they were asked, as well as
10 questions that were not asked. (5/20/08 Tr. at 27:5-14.) The Court gave jurors the
11 opportunity to express any reason they could not be fair or impartial at side bar to
12 avoid public scrutiny. "If there's any question that you're asked that you don't want
13 to say in open court, or if there's any feeling that you have that you don't want to
14 express in front of the other jurors, we're happy to explore that at side-bar, outside
15 the presence of the rest of the panel or public." (Id. at 27:15-24.)

16      The MGA Parties reminded the potential jurors that if they had any biased
17 related to that would prevent them from fairly and impartially addressing the fact.
18 "Is there anybody, based on everything that you've heard today, who now, as they
19 reflect back and think, you know, I don't think if I was one of the parties in this
20 lawsuit that I would like this case to proceed having a juror with my state of mind
21 right now sitting on this jury? Is there anybody that feels that way? In other words,
22 fair and impartial." (Id. at 316: 18-24.) Juror No. 8 gave no response to this
23 question.

24      Having received no response to his previous question regarding bias, Mr.
25 Nolan specifically raised Mr. Larian's background to remind potential jurors that if
26 they had any bias they should inform the court. "The last subject that I want to get to,
27 which is probably in many ways the most difficult, but I need to ask this question. I
28 asked you two different ways. I asked you with respect to sides, Mattel versus MGA.

1 My client was not born in the United States. And as you heard in my opening
2 statement, my client left at an early age, the Middle East...." (Id. at 317:18-24.)
3 Juror No. 8 made no mention of her bias in response.

4    Under the foregoing circumstances, Juror No. 8's failure to disclose her biases
5 against Iranians was simply unreasonable and her statements that she could be fair
6 and impartial were false. As if the Court's and the parties' inquiries during *voir dire*
7 were not alone sufficient to force Juror No. 8 to disclose her bias, the Court expressly
8 instructed all of the jurors immediately before they commenced deliberations that
9 they had a continuing obligation not to "be influenced by any personal likes or
10 dislikes, opinions, prejudices, or sympathy. That means that you must decide the
11 case solely on the evidence before you. You will recall that you took an oath to do
12 so." (7/10/08 Tr. at 4796:19-24.)

13    By the time of this instruction, Mr. Larian's Iranian heritage had been
14 mentioned or discussed countless times in front of the jury. (See, e.g., 5/27/08 Tr. at
15 68:3-14 ("Mr. Quinn: Mr. Isaac Larian says he came to this country from Iran...
16 Farhad Larian said that their wealthy parents over in Iran provided them with the
17 money to start the company"); see also id. at 247:7-23 ("Isaac went back to Iran in
18 the revolution"); 6/05/08 Tr. at 1569:2-1570:2 ("Does that refresh your recollection
19 that you understood that he had been born in Iran and only later came to the United
20 States? A. Yes.").) To rebut the issue about his background raised by Mattel, Mr.
21 Larian gave emotional testimony about his parents harrowing escape from Iran after
22 the revolution. (6/10/08 Tr. at 2064:25-2067:18.) As such, Juror No. 8 had a
23 continuing duty to, but did not come forward once it became obvious that her
24 inherent biases and prejudices against Iranians precluded her from being fair and
25 impartial as she took an oath to do.

26

27

28

1

## C. Juror No. 8 Would Have Been Excluded for Cause Had She Answered Honestly

2

3       The *voir dire* questions were more than sufficient to indicate to potential jurors

4  that they need to disclose any bias to the Court. There is no question that this type of

5  bias is material. See Henley, 238 F.3d 1111; McDonough. Juror No. 8 failed to

6  answer the Court and counsel's numerous questions that should have led to

   disclosure of her bias. As the Court stated, "I really can't believe we're here at this
7
   point and we have this issue in front of us, that a juror, in this day and age, would go
8
   through the *voir dire* process that we went through and then harbor and make such a
9
   statement." (7/25/08 Tr. at 13:23-14:3.) Juror No. 8's racial bias rendered her
10
   incapable of fairly evaluating these proceedings. See Gonzales, 214 F.3d at 1112.
11
   There is not doubt that Juror No. 8 would have been struck for cause had she
12
   honestly answer the Court's *voir dire* questions or the MGA Parties' *voir dire*
13
   questions. This case satisfies the requirements set forth by the Supreme Court in
14
   McDonough. A mistrial is necessary to preserve the parties' Constitutional rights.
15

## CONCLUSION

16
       For the foregoing reasons, the Court should grant the MGA Parties' a mistrial
17
   to insure that their constitutional right to a fair and impartial jury is not infringed.
18
   DATED: July 29, 2008
19

20                          Respectfully submitted,

21                          SKADDEN, ARPS, SLATE, MEAGHER &
22                          FLOM, LLP

23                          By: _____
24                          Thomas J. Nolan
                            Attorneys for the MGA Parties
25

26

27

28

MGA Parties' Motion for Mistrial
Case No. CV 04-9049 SGL (RNBx)
25