# EXHIBIT 2



# Design Registration and Copyright Protection in Hong Kong - A Comparative Study

*Angela Wang & Co*

Provided by Angela Wang & Co

If a designer has designed a teapot with a new shape and configuration and intends to manufacture his teapot according to his drawings in the future, how can he prevent others from infringing his design for profits? There are two possible ways in Hong Kong: registered design and copyright protection.

What are the similarities and differences between the protections? If the designer pursues copyright protection only, will it be sufficient?

What is registered design?

According to the Registered Designs Ordinance of Hong Kong (Cap. 522), "design" means features of shape, configuration, pattern or ornament applied to an article by any industrial process, being features which in the finished article appeal to and are judged by the eye, but does not include :-

1. a method or principle of construction; or
2. features of shape or configuration of an article which :-
(a) are dictated solely by the function which the article has to perform; or
(b) are dependent upon the appearance of another article of which the article is intended by the designer to form an integral part.

Once the designer has registered his design, he will have the right to prevent others from manufacturing, importing, using, selling or hiring his design.

Registered design protection is renewable for periods of 5 years up to a maximum of 25 years.

What is copyright?

Copyright is a set of exclusive right given to the owner of an original work (such as literary, dramatic, music or artistic work) to regulate the use of a particular expression of an idea or information. Copyright is automatic. It arises when a work is created. Unlike other intellectual property rights, for example, patents, trademarks and industrial designs, copyright does not require registration under the laws of Hong Kong.

The drawings of the teapot will be the artistic work for copyright purposes and the duration of the copyright in the artistic work will be the life of the author (i.e. designer) plus 50 years.

Overlap of the protection under copyright and registered design

Registered design will protect the shape and configuration of the teapot only.

According to the Copyright Ordinance of Hong Kong (Cap. 528), artistic work includes the making in 3 dimensions of a 2-dimensional work and the making in 2 dimensions of a 3-dimensional work. Therefore, if someone manufactures the teapot according to the designer's drawings without his consent, that person will infringe the copyright of the designer as copyright protects both 2 and 3 dimensional works.

Both registered design and copyright can protect the design of the teapot.

Differences in protection between copyright and registered design

Since copyright is an automatic right which does not require registration and the term of protection is the life of the author plus 50 years, is it still necessary to pursue design registration which is only for a maximum 25 years? Below are some reasons to consider :-

1. Different scope of protection :-

(a) copyright protects the design against copying whereas a registered design not only protects the design from being copied, but also against an independent creation which is not substantially different from the registered design;
(b) copyright protects artistic work whereas a registered design protects shape, configuration, configuration, pattern or ornament applied to an article by any industrial process, being features in the finished article appeal to and are judged by the eye.

2. Different test used in infringement proceedings :-

(a) a plaintiff in a copyright proceeding has to establish the elements of copying whereas the plaintiff in a registered design proceeding does not;
(b) the plaintiff in the copyright proceeding has to show that there is reproduction of the work in material form whereas it is sufficient for the plaintiff in the registered design proceeding to establish that the alleged infringement is the same or "not substantially different from the registered design.

Important issues relating to registered design

If a design owner wishes to register his design, he must show the crucial element of "novelty".

If the design has been revealed other than in one of the following situations prior to the filing of the design application with the Designs Registry, the element of "novelty" will be lost :-

1. confidential disclosure :-

(a) the disclosure by the owner to any other person in such circumstances as would make it contrary to good faith for that other person to use or publish the design;
(b) the disclosure in breach of good faith by any person other than the owner of the design;
(c) in the case of a new or original textile design intended for registration, the acceptance of a first and confidential order for goods bearing the design; or
(d) the communication of the design by the owner to a government department or to any person authorized by a government department to consider the merits of the design, or of anything done in consequence of such a communication.

2. non-prejudicial disclosure :-

(a) that a representation of the design, or any article to which the design has been applied, has been displayed, with the consent of the owner



Exhibit 2,
P. 7

of the design, at an official international exhibition;
(b) that after any such display as is mentioned in paragraph (a), and during the period of the exhibition, a representation of the design, or any article to which the design has been applied, has been displayed by any person without the consent of the owner; or
(c) that a representation of the design has been published in consequence of any such display as is mentioned in paragraph (a),

and in 2(a) to (c) above, if the application for registration of the design is made not later than 6 months after the opening of the exhibition.

If novelty has been defeated, the designer can only rely on copyright protection for his design.

Conclusion

Although overlap exits between registered design and copyright, there are differences in the protection given each of them. If a designer has a new design, he should consider whether to pursue design registration prior to disclosure of his design to the public.

Our Services

Experienced lawyers in our Intellectual Property regularly advise clients on intellectual property registration or enforcement in Hong Kong, PRC and elsewhere. If you have any question on the above article, please do not hesitate to contact us.

**ABOUT THE AUTHOR:** Angela Wang & Co
Angela Wang & Co is a focused Greater China corporate commercial practice. Our defined objective is to provide discerning users of law firms with a firm of real legal capabilities at acceptable cost. Our dynamic team of lawyers adopts a creative and practical approach to commercial solutions, with special attention to good transaction management and close client involvement. We constantly put the needs of clients first.

Copyright Angela Wang & Co

More information about Angela Wang & Co

While every effort has been made to ensure the accuracy of this publication, it is not intended to provide legal advice as individual situations will differ and should be discussed with an expert and/or lawyer. For specific technical or legal advice on the information provided and related topics, please contact the author.

Exhibit __2__,
P. __10__

# EXHIBIT 3

Westlaw.

[2002] HKEC 1338
2002 WL 1341664 (CA), [2002] HKEC 1338
(Publication page references are not available for this document.)

Page 1

**H**2002 WL 1341664

**SAN-X CO LTD v TAI PAN BREAD & CAKES CO LTD & ANOTHER**

30 October 2002

COURT OF APPEAL
CIVIL APPEAL NO. 219 OF 2002
(ON APPEAL FROM HCA 78 OF 2002)
CA
CACV 219/2002

Judge name :

Mayo V-P and Chung J

Counsel In The Case :

Mr Peter Garland, SC, and Mr Kent Yee, instructed by Messrs King & Co., for the Plaintiff.

Ms Audrey Eu, SC, and Mr Felix H. Pao instructed by Messrs Tsang, Chan & Wong, for the 1st Defendant.

Phrases :

Civil procedure - interlocutory injunction - alleged copyright infringement - whether serious question to be tried - whether damages adequate remedy - balance of convenience

Intellectual property - copyright - infringement - character merchandising - approach - whether serious question to be tried

[Appeal from [2002] HKEC 584]

Details of Judgment :

Hon Mayo VP (giving the judgment of the Court):

1. This is an appeal from a judgment of Deputy High Court Judge Reyes SC who heard two summonses. The first was a summons issued by the plaintiff for an interim injunction to restrain the 1st defendant from infringing their copyright and passing off their goods as those of the plaintiff and the second a summons issued by the 1st and 2nd defendants seeking security for their costs in the sum of $520,000.

2. The Judge granted the injunction and the 1st defendant appeals against this.

3. The plaintiff is a Japanese company which invents, owns and exploits rights in cartoon figures.

4. The cartoons which are the subject matter of these proceedings are what are known as 'bread' or 'bun' figures which are referred to as 'Kogepan characters'.

5. There are four principal Kogepan characters: (1) Kogepan, (2) Overbaked Kogepan, (3) Kireipan; and (4) Ichigopan.

6. The plaintiff has entered into licence agreements with a number of third parties to use these characters in a wide range of merchandise.

7. The plaintiff has appointed an agent R.M. Enterprises Ltd. (RM) to licence third parties in Hong Kong to use the plaintiff's characters.

8. The 1st defendant is an established Hong Kong bakery company and the 2nd defendant is its general manager.

9. RM and the 1st defendant entered into negotiations for a licence to be granted to the 1st defendant. These negotiations did not lead to a successful conclusion and no licence was ever granted to the 1st defendant.

10. The 1st defendant did however as a result of these negotiations have access to a quantity of the plaintiff's Kogepan drawings and materials.

11. The 1st defendant is now marketing five 'bread' characters in relation to the sale of their range of cookies. These are called Almond, Sesame, Honey, Croissant and Baguette.

2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 3,
P. 11

[2002] HKEC 1338
2002 WL 1341664 (CA), [2002] HKEC 1338
(Publication page references are not available for this document.)

Page 2

12. It is the 1st defendant's case that these characters were created by Mr Lo Ping-shu one of their employees and the main issue which has to be determined in this litigation is whether the 1st defendant's characters infringe the plaintiff's copyright and whether the sale of these characters amounts to a passing off of the plaintiff's rights.

13. According to Mr Lo he created the characters adopted by the 1st defendant independent of any of the plaintiff's materials.

14. In the first ground of appeal complaint is made that the Judge erred in finding that there was a serious question to be tried in respect of the allegation by the plaintiff that their copyright had been infringed.

15. More particularly, having regard to the simplicity of the copyright works the Judge had failed to make a satisfactory comparison between the 1st defendant's 'bread buddy' characters and the copyright works and appreciate that any common features that may exist between them had to constitute a substantial aspect of the Kogepan characters.

16. What is apparent from the judgment is that the Judge followed the approach laid down by Lord Millett in Designers Guild Ltd v Russell Williams Textiles Ltd [2001] FSR 113. He then set out the main features of the cases being advanced by the respective parties and came to the conclusion that there was indeed a serious question to be tried.

17. In coming to this conclusion the Judge very properly bore in mind the provisional nature of the application he was entertaining and the fact that it would necessarily be at the trial that a final determination would be made as to whether the plaintiff's copyright had been infringed.

18. The main complaint which was made by Ms Eu SC who represented the 1st defendant was that the plaintiff had presented its case on the basis of amalgamating together all of the various characteristics of their cartoon characters and then claimed that if any of the defendants' bread buddy characters displayed any of these characteristics this constituted an infringement of their copyright.

19. She developed this theme by referring us to a schedule she had prepared which compared the similarities between each of the plaintiff's characters and each of the defendants' which had been identified by the Judge. She also identified a number of what she contended were significant differences in the comparison which the Judge had failed to refer to in his judgment.

20. It is an important aspect of this appeal to determine whether the approach which is adopted by Ms Eu is the correct way to consider this matter.

21. The answer to this question can be found by analysing the principles which were laid down by Lord Millett at p. 124 of Designers Guild:

'37. It must be borne in mind that this is an action for infringement of copyright. It is not an action for passing-off. The gist of an action for passing off is deceptive resemblance. The defendant is charged with deceiving the public into taking his goods as and for the goods of the plaintiff. A visual comparison of the competing articles is often all that is required. If the overall impression is that 'they just do not look sufficiently similar' then the action will fail.

38 An action for infringement of artistic copyright, however, is very different. It is not concerned with the appearance of the defendant's work but with its derivation. The copyright owner does not complain that the defendant's work resembles his, his complaint is that the defendant has copied all or a substantial part of the copyright work. The reproduction may be exact or it may introduce deliberate variations - involving altered copying or colourable imitation as it is sometimes called. Even where the copying is exact, the defendant may incorporate the copied features into a larger work much and perhaps most of which is original or derived from other sources. But while the copied features must be a substantial part of the copyright work, they need not form a substantial part of the defendant's work: see Warwick Film Productions Ltd v. Eisinger [1969] Ch. 508. Thus the overall appearance of the defendant's work may be very different from the copyright work, but it does not follow that the defendant's work does not infringe the plaintiff's copyright.

39 The first step in an action for infringement of artistic copyright is to identify those features of the

2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 3,
P. 12

Case 2:04-cv-09049-DOC-RNB Document 4190-3 Filed 08/01/08 Page 7 of 10 Page ID #:105677

[2002] HKEC 1338
2002 WL 1341664 (CA), [2002] HKEC 1338
(Publication page references are not available for this document.)

Page 3

defendant's design which the plaintiff alleges have been copied from the copyright work. The court undertakes a visual comparison of the two designs, noting the similarities and the differences. The purpose of the examination is not to see whether the overall appearance of the two designs is similar, but to judge whether the particular similarities relied on are sufficiently close, numerous or extensive to be more likely to be the result of copying than of coincidence. It is at this stage that similarities may be disregarded because they are commonplace, unoriginal, or consist of general ideas. If the plaintiff demonstrates sufficient similarity, not in the works as a whole but in the features which he alleges have been copied, and establishes that the defendant had prior access to the copyright work, the burden passes to the defendant to satisfy the judge that, despite the similarities, they did not result from copying.

40 Even at this stage, therefore, the inquiry is directed to the similarities rather than the differences. This is not to say that the differences are unimportant. They may indicate an independent source and so rebut any inference of copying, but differences in the overall appearance of the two works due to the presence of features of the defendant's work about which no complaint is made are not material. In the present case the disposition of the flowers and (except in one instance) the colourways of the defendants' design are very different from those of the plaintiffs' design. They were not taken from the copyright work, and the plaintiffs make no complaint in respect of them. They make a significant difference to the overall appearance of the design, but this is not material where the complaint is of infringement of copyright and not passing off.

41 Once the judge has found that the defendants' design incorporates features taken from the copyright work, the question is whether what has been taken constitutes all or a substantial part of the copyright work. This is a matter of impression, for whether the part taken is substantial must be determined by its quality rather than its quantity. It depends upon its importance to the copyright work. It does not depend upon its importance to the defendants' work, as I have already pointed out. The pirated part is considered on its own (see Ladbroke (Football) Ltd v. William Hill (Football) Ltd [1964] 1 WLR 273 at 293, per Lord Pearce) and its importance to the copyright work assessed. There is no need to look at the infringing work for this purpose.'

22. This would suggest that it is necessary to initially have regard to the work as a whole rather than simply comparing the separate characters in the way that Ms Eu did.

23. Assistance can also be derived from the observations made by Lord Porter at p. 448 of King Features Syndicate Inc v O. & M. Kleeman Ltd. [1941] AC 417:

'Secondly, it is argued that Simonds J. applied the wrong test. He asks, it is said: Could this be recognized as a new material form of the essential 'Popeye'? instead of asking: Is this a copy of a material sketch? Bayley J. in West v. Francis 5 B. & Ald. 737, 743 defined a copy as 'that 'which comes so near to the original as to give to every person 'seeing it the idea created by the original.' This definition was criticized by Lord Watson in Hanfstaengl v. Baines [1895] AC 20, 27, where he pointed out that the idea created by a picture or drawing does not necessarily form an element in the original work or its design which is protected by copyright. The same idea which is suggested by the copyright work may be expressed by another painting or drawing which is in no sense a copy and does not borrow its design. No doubt, if the learned judge had asked himself whether the essential idea of 'Popeye' had been utilized in the dolls and brooches, instead of asking whether one or more of the material sketches had been copied, he would have applied the wrong test. But I do not understand him to have come to his conclusion because he thought that the idea of 'Popeye' had been copied. He meant, I think, only that the brooch sufficiently resembled the figure as drawn in any one of the strips relied on, the salient features being practically identical in each.

In my view, therefore, all the suggested infringements are in the same category.'

24. Although the underlying facts were somewhat different in that Lord Porter was considering a three-dimensional series of cartoons what needs to be borne in mind is that the plaintiff's cartoon characters do not stand in a vacuum. According to the supporting affidavit evidence the creator of the cartoons wrote a series of stories around the characters and there is an overriding theme which embraces all the various characters.

2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 3,
P. 13

Case 2:04-cv-09049-DOC-RNB   Document 4190-3   Filed 08/01/08   Page 8 of 10   Page ID #:105678

[2002] HKEC 1338                                                                                        Page 4
2002 WL 1341664 (CA), [2002] HKEC 1338
(Publication page references are not available for this document.)

25. Ms Eu also emphasised the very simple nature of the drawings and the fact that a number of the characteristics were to say the least common place.

26. As can be seen from the speech of Lord Millett earlier cited what this all boils down to is an issue of fact which has to be determined by a trial judge.

27. It may well be the case that the merits of the contentions being advanced by the respective parties were fairly evenly balanced in the present case but that would not of itself justify us in interfering with the finding of fact made by the Judge in this case.

28. What is clear from the speech of Lord Diplock in Hadmor Productions v Hamilton [1983] 1 AC 191 is that before an appellate court is justified in interfering with the exercise of a discretion of this nature by a judge at first instance it must be satisfied that he or she has misunderstood the law or the evidence or that they are plainly wrong. This is a high threshold and the 1st defendant falls short of surmounting it.

29. In the second ground of appeal a similar complaint is made in relation to the passing off allegation.

30. It needs to be borne in mind that the claim that the 1st defendant has passed off its goods as those of the plaintiff is secondary to the main complaint of copyright infringement.

31. One of the matters emphasised by Ms Eu was that in all of the defendants' promotional material their own trademark was prominently displayed. This undermined any complaint that the defendants had been passing off the plaintiff's characters.

32. The way that the Judge approached this was to accept the submissions which had been made by counsel for the plaintiff at the hearing that members of the public may well have formed an impression that the 1st defendant had obtained a licence to copy the characters. He then considered the possible implications which may flow from this.

33. Again the Judge has attempted to set out the contentions being advanced by the parties and on looking at the Judge's findings as a whole it cannot be shown that he has clearly been in error.

34. Complaint is made in the third ground that having regard to the nature of the plaintiff's licencing business it should be possible to quantify royalties which should have been payable and that being the case no injunction should have been granted.

35. The fourth ground is related to the third. It is contended that the Judge erred in holding that one of the justifications for granting the injunction was that if he did not do so there would be a loss of the plaintiff's exclusivity in the Kogepan characters which would be detrimental generally to the plaintiff's business.

36. It is convenient to deal with these grounds together.

37. After analysing submissions from counsel for both parties on these issues the Judge had this to say:

'29. I am not persuaded by Mr Pao's submission [for the defendants]. Without evidence that a change of packaging would of itself turn consumers away from the 1st defendant's products, I cannot accept that the dire consequences predicted by Mr Pao would ensue from an injunction. Business ventures often change their packaging over time. It seems unlikely that a mere package revision will be enough to destroy any consumer loyalty which has built up around a particular food product. Similarly, on the effect of a two-year wait to trial, there is as Mr Pao concedes, just no evidence on this before the Court. There is no factual material on which I can assess the likelihood or otherwise of what Mr Pao forecasts.

30. On the other hand, I agree with Mr Garland that damages resulting from the 1st defendant's activities, if wrongful, may not be adequately compensated should the plaintiff win at the end of the day.

31. Similar heads of loss as those argued by Mr Garland were pressed in Mirage Studios on the Vice-Chancellor who at 152 said this:

'The loss likely to be suffered by the plaintiffs is of two kinds ... First, they will lose royalties in the

2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 3,
P. 14

Case 2:04-cv-09049-DOC-RNB   Document 4190-3   Filed 08/01/08   Page 9 of 10   Page ID #:105679

[2002] HKEC 1338 Page 5
2002 WL 1341664 (CA), [2002] HKEC 1338
(Publication page references are not available for this document.)

sense that goods which would be or might be manufactured under licence from them will go elsewhere and also the amount of royalties that they can seek to get from those who do take licences from them is likely to be reduced since the market will not be an exclusive one. The second type of damage they will suffer will, it is said, be loss of control over the quality of the garments on which reproductions of the Ninja Turtles and related pictures are used. The evidence is (and I think is uncontroverted) that the value of a name or characters such as these is linked to maintaining the quality of the goods to which it is attached. If the goods go down-market or are poorly made, that rubs off on the value of the copyright in the character and thereby reduces its value. The loss of royalties head of damage, though possibly difficult to quantify, is certainly capable of quantification. The loss of reputation through bad quality is more difficult. Certainly, I have been shown products which do not indicate that the Turtle characters licensed by the defendants are always being applied to very high class products. It is difficult to know how one would set about at the trial quantifying that.'

The Vice-Chancellor clearly thought it was possible (although potentially difficult) to calculate both the loss of royalty for which the 1st defendant would be liable in the event of infringement and the loss of exclusivity and deterrence of potential licensees. But, while I agree that the loss of any royalty payable by the 1st defendant would be capable of quantification, I respectfully disagree on the possibility of calculating damages resulting from loss of exclusivity and deterrence of licensees. One may produce a 'projection' as Mr Pao suggests, but there are likely to be so many variables involved in the exercise (e.g., merchandise type, market sector, economic conditions, etc.) that any such exercise would be little more than guesswork. One would have little confidence that a projection corresponded with reality to a significant degree.

32. The potential loss that the plaintiff faces could be great and I am doubtful that such loss can adequately be compensated for or quantified. I therefore conclude that, on damages, the American Cyanamid test points to the grant of an injunction.'

38. Ms Eu submitted that the Judge had paid insufficient regard to the fact that in the circumstances of the present case an award of damages would sufficiently compensate the plaintiff if after the trial of the action the defendants should be found to have infringed the plaintiff's copyright.

39. In this connection the plaintiff had been prepared to enter into negotiations with the 1st defendant for the licencing of rights. This would indicate that they had no inherent objections to the way in which the 1st defendant's goods were marketed or that their goods were in any way unsuitable or unsatisfactory. Over and above this the 1st defendant had expressed a willingness to undertake to keep an account of the sale of all relevant products and furnish this to the plaintiff. Also there was no question of the 1st defendant being unable to comply with any order which might be made for them or pay damages.

40. Ms Eu placed reliance upon the observations made by Falconer J at pages 8 and 14 of Don Reynolds Limited v Ward Brothers (Sherburn) Limited & Anor (unreported) 29 July 1985:

'On this aspect, 'will damages be an adequate remedy for the plaintiffs, damages in the form of money compensation', the first submission by Mr Aldous for the defendants was that it would, and he prayed in aid the principle to be found enunciated by the Court of Appeal in the case of TJ Smith & Nephew Ltd v 3M United Kingdom PLC, to be found reported in [1983] RPC 92. This was a case too of an application for an interlocutory injunction. It came before me at first instance and I granted an injunction. The decision was upheld by the Court of Appeal.

In the Court of Appeal Lord Justice Lawton, who gave the leading judgment, at page 101 explained one of the points taken on behalf of the defendants in that case. He said: 'The second point taken by Mr Gratwick on behalf of the defendants was this. He said once the court finds a patentee being willing to negotiate royalty arrangements, it necessarily follows that he is willing to give up his monopoly position in return for money; and if he is willing to give up his monopoly position in return for money and the defendant in any infringement action is good for damages, as these defendants clearly are, then damages is an adequate remedy and an injunction is unnecessary and should not be granted'. That is a recapitulation of the submission.

At page 102, having referred to the cited case

2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 3,
P. 15

Case 2:04-cv-09049-DOC-RNB   Document 4190-3   Filed 08/01/08   Page 10 of 10   Page ID #:105680

[2002] HKEC 1338                                                                                                                   Page 6
2002 WL 1341664 (CA), [2002] HKEC 1338
(Publication page references are not available for this document.)

which Mr Gratwick relied on, Lord Justice Lawton said this, and I read from the top of the page: 'That of course was a very strong case, as Mr Gratwick accepted. He says this is almost as strong a case, because once the plaintiffs had indicated a willingness to give up their monopoly position, they cannot now say that money cannot compensate for any damage that may be done between now and the trial.

'As a general principle, I accept that if there is clear evidence of a willingness to accept a royalty payment, then that may well entitle the court to infer that damages would be adequate. But everything depends upon the facts of the particular case and, as I have already indicated, in this case the facts fall far short of indicating a willingness to accept a money payment for a licensing agreement in the United Kingdom. It follows, therefore, that by itself the evidence relating to the two meetings of the 30th September, 1981 and the 10th February, 1982 is not enough to lead the court to the inference that damages would be an adequate remedy for the plaintiffs'.'

'Taking all these matters into consideration as best I can, and in particular I have in mind the licence position which brings the plaintiffs within the principle enunciated in TJ Smith & Nephew v 3M United Kingdom PLC [1983] RPC 92, although I emphasise I am not taking that as definitive. On the damages position, which is where the balance is heavily in favour of the defendants, if the stage is ever reached of considering maintenance of the status quo, I do not regard maintenance of the status quo as requiring the defendants to be stopped. In view of all those matters and taking them all into consideration, in my judgment, this is not a case where I should grant the interlocutory injunction sought and on the plaintiffs giving the undertaking which I have read, which they offered in the form as I understand it, I dismiss the motion.'

41. As was pointed out by Mr Garland SC for the plaintiff this was a patent case where the marketing considerations which were weighed by the Judge would have no application.

42. It would appear from the reasons given by the Judge that he was concerned with the possible market disruption which would in all probability be encountered if the relief sought was withheld.

43. It cannot validly be said that in all the circumstances of the case that the Judge was manifestly in error in concluding that the injunction should issue.

44. The final ground of appeal is that the balance of convenience dictated that the 1st defendant should have been allowed to continue selling their 'bread buddy' character goods. This was on account of the fact that they had been selling the goods since August 2001.

45. There was no evidence that these goods formed a significant portion of the goods which are sold by the 1st defendant.

46. Also it needs to be borne in mind that the 1st defendant was fully aware of the plaintiff's cartoon characters and made a conscious decision to market their goods in the way they did notwithstanding this.

47. Again it has not been demonstrated that the Judge has erred in finding that the balance of convenience lay in granting an injunction.

48. For these reasons we are of the view that this appeal should be dismissed.

49. The appeal is accordingly dismissed and we make an order nisi that the plaintiff will have the costs of the appeal.

Copr. (c) Sweet and Maxwell Asia.□□□□□□□□□□□□□□□□□□□□□□□□ □□□□□□□□□□□□□□□□□□□□

END OF DOCUMENT

2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 3,
P. 16