1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
    John B. Quinn (Bar No. 090378)
2    johnquinn@quinnemanuel.com
    Michael T. Zeller (Bar No. 196417)
3    michaelzeller@quinnemanuel.com
    Jon D. Corey (Bar No. 185066)
4    joncorey@quinnemanuel.com
   865 South Figueroa Street, 10th Floor
5  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
6  Facsimile: (213) 443-3100

7  Attorneys for Mattel, Inc.

8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                   EASTERN DIVISION

12  CARTER BRYANT, an individual,        CASE NO. CV 04-9049 SGL (RNBx)

13              Plaintiff,               Consolidated with Case No. CV 04-
                                         09059 and Case No. CV 05-02727
14       vs.
                                         **[PUBLIC REDACTED]**
15  MATTEL, INC., a Delaware
    corporation,                         **REPLY IN SUPPORT OF
16                                        PLAINTIFF MATTEL INC.'S** *EX*
               Defendant.                *PARTE* **APPLICATION TO (1)
17                                        EXCLUDE BELATEDLY
                                         PRODUCED MGA FINANCIAL
18  AND CONSOLIDATED ACTIONS             RECORDS AND (2) COMPEL
                                         PRODUCTION OF BRATZ-
19                                       RELATED LITIGATION
                                         MATERIALS**

20                                       **[Declaration of James Judah filed
21                                       concurrently]**

22                                       **Phase 1**
                                         Pre-Trial Conference: May 19, 2008
23                                       Trial Date:          May 27, 2008

24

25

26

27

28

**Preliminary Statement**

First, MGA does not contest that, although long ago requested by Mattel, the tax payment information was available to it during discovery -- and, indeed, was available to it for years -- but was not produced until days ago.  The Court should preclude MGA from relying on that tax payment information.

Second, MGA does not deny that MGA has information related to the valuation or net worth of MGA going back years, that Ms. Tonnu, its designee, denied that it existed, and that MGA refused to produce it until now.  MGA likewise should not be allowed to rely on that improperly withheld information.

Third, MGA does not deny that it has failed to produce legible copies and tangible things relating to other suits *that this Court ordered them to produce.*  It is no defense to say that Judge Infante's order rejecting Mattel's *other*, broader requests trumps this Court's Order.

MGA's unexcused delays and refusals to provide tens of thousands of pages of financial information that it possessed, was compelled to produce, refused to produce, but now wishes to rely on to defend against Mattel's damages claims should not be tolerated.  MGA knew exactly what it was doing. ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  MGA made the considered decision *not* to produce that information (although compelled) and not to supplement its production.  MGA evidently did this with the hope that MGA would prevail in Phase 1(a) ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ and, if it did lose Phase 1(a), it could sandbag Mattel and disrupt Phase 1(b).  Then, having lost Phase 1(a), MGA dropped banker's box after banker's box of financial reports on Mattel and its experts within the last week.  Allowing MGA to rely on this information rewards its calculated refusal to comply with Court orders to the prejudice of Mattel.  This Court should not condone such conduct.  MGA pleads for an exception because the documents are "important."

1  They may be, but that only compels the conclusion that MGA should have produced
2  them months ago, not at the last minute.

3

4  **Argument**

5  **I.    THE MOSS ADAMS VALUATION AND ANY OTHER VALUATION**
6  **SHOULD HAVE BEEN PRODUCED IN RESPONSE TO THE**
7  **MASTER'S DECEMBER 31 ORDER**

8  **A.    The Only Net Worth Produced In Discovery Was $1.9 Billion**

9  In response to the December 31, 2007 Order, Lisa Tonnu prepared a
10  balance sheet for Mr. Larian that showed a net worth of over $1.9 billion dollars as
11  of *October 2007.* A significant portion of his net worth comes from the value of Mr.
12  Larian's portion of the MGA stock.[1] MGA admits that when it comes to "showing
13  ... [Larian's] net worth," the "valuation of MGA" is "important information." (Opp
14  at 5.) Larian produced that net worth calculation on January 15, 2008, two weeks
15  before the close of discovery. Mattel has relied on that calculation, including in its
16  extensive expert analyses.

17  As Mattel now knows, however, months before, MGA had been
18  provided the Moss Adams valuation showing a lower value of MGA as of *June*
19  *2007.* Ms. Tonnu elected not to use that valuation when responding to the
20  Discovery Master's Order, and in fact denied under oath that such valuation
21  calculations existed. Now, Larian wants to use it. Rule 37 precludes him from
22  relying on information that he possessed and refused to produce in discovery. Fed.
23  R. Civ. P. 37.

24

25

---

26  [1]   Larian should be precluded from relying on any underlying valuation
27  documents at trial because Ms. Tonnu denied that MGA had valuation calculations
   (*See* Declaration of Juan Pablo Alban, dated July 31, 2008 (Alban Dec.), Exh. 10)
28  and failed to provide any backup or support for the MGA valuation used to arrive at
   the $1.9 billion dollar net worth for Mr. Larian.

**B.    Ms. Tonnu Understood that Net Worth Was Not Book Value**

In its Opposition, MGA argues that Ms. Tonnu did not misrepresent the facts at deposition because she supposedly understood net worth to be the difference between assets and liabilities that could be calculated from the balance sheet.  (Opp. at 4.)  Not so.  Ms. Tonnu understood ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████[2]  That argument does not excuse Larian's failure.

**C.    Larian Had The Valuation Before July 23, 2008**

MGA further argues that it did not have the final Moss Adams valuation in its possession before July 23, 2008.  The statement is false on its face.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████[3]  The document itself compels the conclusion that MGA had a complete, USPAP-defined appraisal of MGA in its possession before the January 2008 discovery cut-off.  Ms. Tonnu provides no basis for any suggestion that the document was not "final" or that the document was sent to her on July 23, 2008.[4]

Second, if Larian intended to rely on Moss Adams valuations, then, even under Larian's questionable claim that he did not have the "final" report, he had

[2]  Exh. 1 to the declaration of James Judah filed concurrently (Judah Dec.) at 324:23-325:2 (Tonnu Tr. Vol. 2).
[3]  Alban Dec,, Exh. 6 at MGA 3896306.
[4]  If MGA was concerned that Moss Adams's Valuation Analysis of October 12 would be rendered incomplete or incorrect by a later "form" of the report, then the proper course of action would have been to supplement the timely production with the later, "final" valuation.  *See* Fed. R. Civ. P. 26(e).  It surely does not justify permitting MGA to withhold this information until the last minute during trial.

1  drafts of the report or he had the reports that Moss Adams had prepared in earlier
2  years.[5]  In either case, he elected not to produce the valuations, but produced instead
3  a summary showing a net worth of $1.9 billion and the value of MGA as greater
4  than $1.6 billion.

5        Finally, the claim that Larian did not possess the report because Moss
6  Adams, his tax accountants, had it, is a distinction without a difference.  Of course
7  Mr. Larian is deemed to have possession, custody and control of documents in the
8  possession of his agent, Moss Adams.  *Zaentz v. Commissioner of Internal Revenue*,
9  73 T.C. 469, 474 (1980).  There can be no question that Moss Adams long had the
10  report.  It makes no difference that, even if true, the report was only recently
11  delivered to Ms. Tonnu.

12        **D.    Larian Cannot Rely On Compelled, Unproduced Documents To**
13              **Prove His Net Worth at Trial**

14        Mattel does not dispute that Mr. Larian's net worth should be
15  determined at the time trial commences.  As a result, Mattel does not take issue with
16  the use of the more recent account statements reflecting the balances in Mr. Larian's
17  investment accounts.  Mattel, however, does take issue with MGA's effort to rely on
18  an *October 12, 2007* valuation that Larian was compelled to produce during
19  discovery, that existed in his control, but that he elected not to produce.  Rule 37
20  applies to bar MGA from using that unproduced evidence, particularly evidence that
21  MGA's Rule 30(b)(6) witness denied existed.

22  **II.    MATTEL'S REQUEST FOR UPDATED FINANCIAL INFORMATION**
23        **DOES NOT ABSOLVE MGA OF ITS CALCULATED DELAY IN**
24        **PRODUCING EARLIER FINANCIAL STATEMENTS**

25        MGA's attempts to justify its last-minute production of addition
26  financial documents -- totaling tens of thousands of pages -- are unavailing.  MGA
27
28  [5]  Albán Dec., Exh. 6 at MGA 3896312 (Moss Adams Valuation),

1  asserts that its year-end 2007 financial data and draft 2008 financial data was not
2  belatedly produced because "[t]hat data was not available until after the January 28,
3  2008 discovery cut-off." (Opp. at 8.) Therefore, MGA argues, "MGA did not -- and
4  has not -- withheld financial data" because "Mattel did not request updated financial
5  information until July 17, 2008."

6          Mattel, however, does not have to make a request. MGA, as it has
7  repeatedly recognized by providing supplemental discovery responses after the close
8  of discovery, has no excuse for failing to produce this financial information when it
9  received it, consistent with Federal Rule of Civil Procedure 26(e).[6] That Rule
10 requires that "[a] party who has ... responded to ... a request for production ... must
11 supplement or correct its ... response ... in a timely manner if the party learns that in
12 some material respect the ... response is incomplete or incorrect."

13         Here, MGA represents to the Court that it "promptly produced the
14 financial schedules available to it." (Opp. at 8.) In other words, MGA asks the
15 Court to believe that MGA only received the financial information for November
16 2007 through June 2008 in the last week or so. That is facially implausible,
17 particularly in light of MGA's ability to produce June 2008 information within
18 weeks of the time that that month ended.

19         The Ninth Circuit has made it clear that "[t]he purpose of ... the
20 Federal Rules, is to prevent unfair and prejudicial surprise, not to facilitate last-
21 minute production of evidence." *ATD Corp. v. Lydall*, 159 F.3d 534, 550-551 (Fed.
22 Cir. 1998). When Larian and MGA were asked to provide financial documents
23 "from 1999 to the present,"[7] Rule 26(e) required them to supplement that
24 information whenever new financial data rendered the prior productions incomplete.
25 The sanction for a Rule 26 violation is evidence exclusion. *See* Fed. R. Civ. P. 37.

---

[6] Judah Dec. ¶ 3.
[7] Alban Dec., Exh. 1 at 63 (Mattel's RFP to Larian, RFP No. 269) and Albán Dec., Exh. 11 at 13 (Mattel's 2nd Set of RFPs to MGA, RFP No. 45).

1   This is the quintessential "unfair and prejudicial surprise," as Mr. Wagner testified,
2   it would take weeks to review and analyze that quantity of documents with any
3   precision or accuracy.[8]  MGA and Larian cannot fail to seasonably supplement and
4   then expect not only to avoid this sanction, but to be rewarded by getting whatever
5   documents it wants as the clock strikes midnight.  The belatedly produced financial
6   documents should be excluded.

7       **A.    MGA's "Draft" 2007 Financial Data and Much of Its Draft 2008**
8              **Financial Data Is Belatedly Produced**

9       MGA attempts to dispute that its production of the financial data was
10  untimely by simply asserting that it "promptly produced the financial schedules
11  available to it."  (Opp. at 9.)  However, its definition of "available" varies depending
12  on its interest.  When it wants the 2008 data at trial, it readily has "draft" financials
13  available to produce.  However, when it doesn't want 2007 data in Mattel's hands to
14  prepare for trial, it waits to produce its "final 2007 profit-and-loss statement" until a
15  week before expert trial testimony is heard and months after expert reports were
16  prepared.  Only MGA could claim that under the circumstances, this self-serving
17  double standard has caused Mattel "no harm."

18      All of the financial records Mattel seeks to exclude should have been
19  produced either on January 17 or as supplementary responses pursuant to Rule
20  26(e).  Many of the spreadsheets give information on years prior to 2007.[9]  Others,
21  such as the mammoth Consolidated Operations Audit, are clearly dated from months
22  ago.[10]

---

[8] Judah Dec., Exh. 2 (Wagner Tr. Vol. 2) at 325:20-326:7.
[9] Alban Dec., Exh. 27.
[10] Alban Dec., Exh. 14, dated 3/26/08.

1  **III.   MGA'S TAX PAYMENT RECORDS SHOULD BE EXCLUDED**

2   MGA does not even attempt to argue against exclusion of the Tax

3  Payment Records.  Indeed, many of them are dated from *before* the discovery cut-

4  off.

5  **IV.   MATTEL NEITHER SEEKS NOR EXPECTS A DOUBLE STANDARD**

6  **TO APPLY**

7   MGA claims that Mattel seeks to introduce belatedly produced

8  financial information, just like MGA.  This is wrong.  Mattel did not produce dated

9  financial information that it had deliberately withheld until the last minute.  Mattel's

10  expert, Michael Wagner, produced updated schedules that corrected mathematical

11  errors and updated some damages calculations.  It is true that Mr. Wagner's updated

12  schedules altered his damages claim by "$100 million."  Mr. Wagner *reduced* the

13  value of MGA attributable to Bratz by more than $100 million when he relied on

14  new industry information to value Bratz as of year end 2007, rather than 2006.  Mr.

15  Wagner did not have this information when he prepared his prior reports.  If MGA

16  would like Mr. Wagner to revert to the much higher, 2006 valuation, then Mattel is

17  agreeable to that.[11]  But in no case does the mere revision of Mr. Wagner's

18  calculations justify MGA's concealment of financial information it had in its

19  possession, custody or control for months and in some cases years.

20  **V.   MGA SHOULD BE COMPELLED TO PRODUCE TANGIBLE ITEMS**

21  **AND LEGIBLE COPIES OF DOCUMENTS THAT THE COURT**

22  **COMPELLED IT TO PRODUCE**

23   MGA does not deny that it failed to produce legible copies of images of

24  dolls it alleged infringe Carter Bryant's drawings, even after this Court compelled

25  MGA to produce "all non-privileged documents that are responsive to requests 15

26

27

28  [11]  MGA also references the Kivitz report, which the Court has addressed separately.  It has no bearing on this Motion.

07209/2590988.2

1 and 23."[12] All Mattel seeks is that MGA comply with that order.[13] Producing

2 illegible copies is tantamount to not producing at all. Instead, MGA says that Mattel

3 waited too long and that it would be burdensome to comply with the Court's Order.

4 The time for MGA to make those arguments had passed when the Court compelled

5 the production of the infringement pleadings.

6         Similarly, MGA's only response to Mattel's identification of documents

7 that MGA failed to produce is to say that it "appears" that the same images were

8 used in other cases. (Opp. at 11 n.31.) So, MGA admits that it has not produced

9 these documents, but is unsure what is attached to them. That fickle, uncertain

10 response compels one conclusion. Those documents must be produced forthwith, as

11 the Court compelled.

12         Finally, with respect to both the actual dolls that MGA claimed

13 infringed Bratz and the images or photos of those dolls, they should be compelled.

14 In its May 12, 2008 Order, the Court held, "Mattel is entitled to discover the known

15 universe of court documents in which MGA has made statements what products it

16 contends has infringed its Bratz products."[14] One basis for the Court's decision was

17 that inconsistent positions taken by MGA in other proceedings would go to the

18 integrity of the judicial process. *Id.* What MGA does here continues its efforts to be

19 free to take a position in one court, and a contrary position in another court. To be

20 precise in this context, this is a visual evidence case. Whatever MGA wrote in other

21 proceedings about alleged infringement by other dolls cannot be fairly considered

22 by the jury or by the Court if MGA is allowed to prevent the Court and the jury from

23

24     [12] Alban Dec. Exh. 33 (May 12, 2008 Order) at 6.
    [13] This Court is not bound by the Discovery Master's Orders regarding

25 discovery in determining who may testify and what evidence to admit at trial. *See*
Transcript of Court Hearing dated July 24, 2008, at 5629:12-5630:9, Judah Dec.,

26 Exh. 3. Cf. *In re Aircrash in Bali, Indonesia v. Zinke*, 871 F.2d 812, 816 (9th Cir.

27 1989) ("A trial court has broad discretion to admit or exclude evidence."); *Rodella v. U. S.*, 286 F.2d 306, 309 (9th Cir. 1960) ("[T]he trial court has a very large

28 discretion as to how it will permit the introduction of evidence.").
    [14] Alban Dec. Exh. 33 (May 12, 2008 Order) at 6,

1 | seeing or appreciating either the dolls or the images of the dolls that it claims

2 | infringed, or are substantially similar to the Bratz drawings that Mattel now accuses

3 | MGA of infringing.[15]

4 | **Conclusion**

5 | For the foregoing reasons, Mattel respectfully requests that the Court grant

6 | this *Ex Parte* Application in its entirety.

7

8 | DATED:  August 4, 2008          QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP

9

10 | By /s/ Jon Corey

11 | Jon Corey
Attorneys for Mattel, Inc.

---

[15]   Indeed, on the same day it filed its Opposition to Mattel's *ex parte*, MGA also filed a motion seeking sanctions against Mattel for allegedly "misrepresenting" statements MGA made in Hong Kong litigation in Mattel's Phase 1(b) opening.  If that motion had any merit (and it does not), one would expect MGA to willingly produce the records of that litigation.  Instead, MGA is fighting desperately to avoid Mattel's obtaining additional information about MGA's positions.  Clearly MGA realizes that the materials Mattel seeks by this application will further undercut its baseless sanctions motion.