O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
CIVIL MINUTES -- GENERAL

Case No.    CV 04-09049 SGL(RNBx)                                            Date:  August 8, 2008

Title:       CARTER BRYANT -v- MATTEL, INC.
             AND CONSOLIDATED ACTIONS
=====================================================================

PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

            Jim Holmes                                               None Present
            Courtroom Deputy Clerk                                   Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:          ATTORNEYS PRESENT FOR DEFENDANTS:

None Present                                                None Present


PROCEEDINGS:   **ORDER DENYING MOTION FOR MISTRIAL**

   This matter is before the Court on MGA's motion for a mistrial.[1]  The matter was heard on August 4, 2008, at which time the Court announced its ruling.  This Order reiterates that ruling and sets forth the rationale for the Court's ruling.

## I. BACKGROUND

   After the verdict in Phase 1(a) had been rendered, on July 25, 2008, and the day after opening arguments in Phase 1(b) trial, Juror No. 6 delivered to the Court a note, stating:

   HEY, JUDGE LARSON, THERE IS AN ISSUE THAT CONCERNS
   ME THAT I'D LIKE TO TALK TO YOU ABOUT.  THE THING IS, I DON'T FEEL

---

[1] Herein, the Court refers collectively to the MGA entities defendants and Isaac Larian as "MGA."

> COMFORTABLE TALKING ABOUT IT IN FULL COURT.  COULD I SPEAK WITH
> YOU AT SIDE-BAR WITH THE LAWYERS AND COURT REPORTER PRESENT?
> OTHERWISE, I'LL KEEP THIS TO MYSELF.  THANKS, [JUROR] NUMBER 6.

July 25, 2008, Unsealed Tr. at 4.  After a preliminary interview with Juror No. 6 in the presence of counsel, counsel agreed that the Court should interview Juror No. 6 in camera, outside the presence of counsel.  Unsealed Tr. at 12-13.

The Court's interview with Juror No. 6 revealed that Juror No. 8 made inappropriate remarks regarding defendant Isaac Larian's ethnicity.  As a result of this interview, the Court determined that interviews of additional jurors was necessary; counsel consented to the additional interviews.  Thereafter, the Court interviewed in chambers each juror individually.

The transcripts of the juror interviews shall remain in camera and under seal; nevertheless, those interviews may be summarized as follows:  All ten jurors were interviewed, including Juror No. 8.  All jurors except one, Juror No. 2, were able to confirm that comments regarding the ethnicity and/or national origin of Isaac Larian were made in the jury room.  Juror No. 8 herself confirmed that she made comments regarding Mr. Larian's ethnicity and/or national origin.  Of those nine jurors, six (including Juror No. 8 herself) recounted that the remarks at issue were attributed by Juror No. 8 to her attorney-husband and that the remarks represented his assessment of individuals of Persian ethnicity and/or Iranian national origin.[2]  Of the remaining nine jurors, four of those independently recalled that Juror No. 8 used the word "stubborn" in recounting her husband's assessment of Persians and/or Iranians.  One juror specifically recalled a remark to the effect that Persians and/or Iranians "stole ideas."  Another juror recalled the adjective "stingy" being used; yet another recalled the adjective "rude"; and finally, another recalled the verb "lie" being used.  Juror No. 8's account differed:  She explained her remark was about immigrants and the potential for a language barrier problem.

As a result of those interviews, the Court made certain factual findings, which were set forth

---

[2]  Although the distinction is not of any particular relevance to the Court's current inquiry, and is one that neither the Court nor the parties have focused upon thus far, for the sake of precision, the Court must take note of the exact nature of the improper remarks.  Notably, it is unclear from the record whether the remarks were directed toward what the Court understands to be Mr. Larian's ethnicity (Persian) or his national origin (Iranian), or both.  It appears to the Court that either they were directed toward both or that the speaker was unaware of any distinction to be made.  Regardless, this point does not bear on the Court's analysis and these remarks were inappropriate in any event.  Having taken note as to what the remarks were directed, the Court also takes note of to what the remarks were not directed:  Clearly, from the record, the remarks were not directly reflective of a broader group of ethnicities and/or national origins generically described as those from "the Middle East," although it is clear that Persians and/or Iranians fall into this broader category.  Compare Tr. at 317 (MGA and Mr. Larian's counsel's reference to Mr. Larian having left "the Middle East" at an early age).  Similarly, the remarks were not directed toward Mr. Larian's race (Caucasian) rather than his ethnicity or national origin, as suggested by MGA.  See Motion at 25 (referring to Juror No. 8's "racial bias").  Finally, it is also clear from the record (and no party has suggested otherwise), that although Mr. Larian revealed his religion during his testimony (Jewish), the remarks were not directed toward his religion.

in detail in the Court's July 25, 2008, Order.[3] The Court found that specific inappropriate comments based on Mr. Larian's ethnicity were made during jury deliberations; that the jury foreperson and other jurors immediately admonished Juror No. 8 that there was no room in the deliberation process for such remarks; that the remarks were made toward the end of the deliberation process while the jury was attempting to reach a unanimous verdict on four specific drawings that were the subject of dispute among the jurors;[4] that the remarks did not influence the jury's verdict in Phase 1(a); that some jurors believed that Juror No. 8 should be removed from the jury; and that all jurors indicated that the remarks would have no effect on any deliberations or decision to be made in Phase 1(b) of this trial. See docket # 4155 at ¶¶ 1-7.

After interviewing the jurors, the Court met with counsel, who agreed with the Court's assessment that Juror No. 8 should be excused. Thereafter, the Court met with Juror No. 8 in chambers with counsel present. The Court explained to Juror No. 8 that she would be excused from further service in this case based on the statements she had made and ordered her to refrain from speaking about this case until the conclusion of Phase 1(b) of this trial.

In a letter to the Court dated July 29, 2008, Juror No. 8 reiterated her denial of wrongdoing and, in her view, the "neutral context" in which she posited certain statements relating to Isaac Larian's ethnicity and/or national origin. The letter also delves into Juror No. 8's subjective beliefs regarding the responsible approach she believes she took in the jury's deliberations. She also conveyed her personal negative reaction to the Court's factual findings and decision to dismiss her from the jury.

Based on the Court's findings, MGA made an oral motion for a mistrial on July 25, 2008. The Court granted leave to MGA to file its motion in written form and set an expedited briefing schedule for that motion. It is MGA's written motion that is presently before the Court.

## II.  AMENDMENT TO COURT'S JULY 25, 2008, ORDER

### A.   Improper Remarks

Upon review of the transcript of the juror interviews, the Court finds that it must amend the factual findings set forth in its July 25, 2008, Order. Specifically, the Court previously found, in ¶ 1 of that Order, that Juror No. 8 remarked to the other jurors that her husband has told her about a "client or clients who are Iranian and who are stubborn, rude, stingy, are thieves, and have stolen other person's ideas." Id.

---

[3] Upon a more deliberated and comprehensive review of the transcript of the juror interviews, the Court finds that it must make a slight amendment the factual findings set forth in its July 25, 2008, Order. That amendment, and the reasons therefor, are set forth infra, section II.

[4] The jury was ultimately unable to reach a verdict on these four drawings.

Although only one juror specifically recounted the remark regarding stealing another's ideas, the Court finds that the remark was made. It does so based on the fact that the juror recounting this fact was the same juror who brought this incident to the Court's attention, and who therefore had ample time to reflect upon his recollection before reporting it. Moreover, the content of this juror's interview and his demeanor throughout leads the Court to conclude that he not only recalled the details of this incident but that he also understood at the time the remarks were made that the notion of the theft of ideas was an important issue in Phase 1(a) of the trial. Finally, his recollection is supported by another juror's recollection that the term "lie" was used.

Relatedly, however, although the Court previously found that the term "thieves" was used, a review of the transcript of the interviews reveals that no juror recounted the use of that term.

The Court finds that Juror No. 8 used the term "stubborn" because it was specifically recalled, without prompting by the Court, by four of the eight jurors who heard the remarks.

The Court does not find that the adjective "stingy" was used. Only one juror recalled use of that term and, by her own admission, her recollection was not clear on this issue. In fact, the juror stated that she didn't remember the term Juror No. 8 used, but stated that she thought it was "stingy or something" or "[s]omething on that order."

The Court finds that Juror No. 8 used the term "rude" as recounted by one juror. Based on her statements during the Court's interview and her demeanor during the interview, the Court finds that the juror who recounted the use of the term "rude" was not equivocal in her recollection of the use of that term. The juror who recounted the use of the term "rude" was also personally involved in the immediate admonishment given to Juror No. 8 that there was no room in the deliberation process for such remarks and thus was, in the Court's view, fully engaged in this incident.

Accordingly, the Court **AMENDS** the factual findings set forth in the July 25, 2008, Order, by **VACATING** the second sentence of ¶ 1 and **SUBSTITUTING** the following sentence: "Specifically, Juror No. 8 indicated that her husband, an attorney, has told her about a client or clients who are Persian and/or Iranian and who are stubborn, rude, and who have stolen other people's ideas."

**B.   Effect of Remarks on Jury**

The Court does not find it necessary to amend its factual findings regarding the effect of the remark on the other jurors, set forth at ¶ 5 of the Court's July 25, 2008, Order. Specifically, the Court found that "the remarks did not, in any way, effect or influence the decision made by the jury."

At the time of the juror interviews, the Court inquired of a number of the remaining jurors (and all jurors asked responded in the negative) whether Juror No. 8's comments affected their deliberations. The Court previously expounded upon the finding of fact set forth in ¶ 5 by noting

that "[a]ll the jurors clearly indicated, by both their verbal and non-verbal response to the Court's questioning, that the remarks had no impact on their decision in Phase 1(a)."

As acknowledged by both parties in connection with the present motion, Rule 606(b) of the Federal Rules of Evidence bars consideration of the jury's mental processes.[5]  Therefore, the Court finds it appropriate to more fully articulate the basis for its finding of fact that the remarks had no impact on the jury's decision in Phase 1(a).  The Court has re-examined the transcript of its juror interviews and reconsidered whether this factual finding should be made if the Court does not consider any juror's answer that may have been based on his or her mental processes.  Excising such evidence, the Court reaffirms the finding set forth in ¶ 5 on an alternative, independent basis.  Specifically, the Court finds that the improper remarks had no effect on the jury's decision based on the reaction of the individual jurors to the remarks and based on the timing of the remarks.

### III. FED. R. EVID. 606(b)

Both sides take positions on the Court's interviews of the jurors and how the fruits thereof may be considered.  Mattel contends that the information obtained from the juror interviews may not, consistent with Fed. R. Evid. 606(b), be considered at all in connection with the current motion.  MGA, for its part, contends that although information may be used to establish the existence of bias, the Court's inquiry must end there and a mistrial must be declared based on that limited inquiry.  In the Court's view, neither side is correct about how the Court must apply Rule 606(b) and, in any event, both sides consented to the Court's interviews of the jurors without any limitation on how the results thereof could be used, thereby waiving the objections they now raise.

The Court's analysis begins with the language of the relevant Federal Rule of Evidence:

> (b) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.

Fed. R. Evid. 606(b).

---

[5] See Motion at 18; Opp. at 3; Sea Hawk Seafoods, Inc. v. Alyeska Pipeline Service Co., 206 F.3d 900, 908 (9th Cir. 2000) (citing Rushen v. Spain, 464 U.S. 114, 120 n.5 (1983)).

At issue here are Juror No. 8's recounting of statements made by her attorney-husband. These statements clearly were not part of the evidence submitted to the jury. Therefore, the Court concludes that the statements constituted "extraneous prejudicial information" into which the Court may inquire.

In cases in which extraneous information has been received by the jury, the Ninth Circuit directs the trial court to consider the following factors to determine whether a new trial is warranted:

> (1) [W]hether the material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the juror discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict.

Estrada v. Scribner, 512 F.3d 1227, 1238 (9th Cir. 2008).

As to the first factor, it is clear that the material was actually received in the jury room.

As to the second and fourth factors, the Court found, as set forth in the July 25, 2008, Order, that the remarks were made toward the end of the deliberation and after the jury had reached agreement on the Verdict Form questions that were ultimately returned unanimously. All remaining jurors who heard the remark were in agreement that the remarks came very near the end of their deliberations, and four of them specifically recalled that the remarks were made *after* agreement had been reached on all subjects upon which the jury ultimately reached a verdict.

As to the third factor, the Court notes that all remaining jurors who heard the remark were either involved in or witnessed an immediate admonishment of Juror No. 8 that a jury room was no place to express such remarks. By all accounts, there was no discussion or consideration of the substance of Juror No. 8's remarks.

As to the fifth factor, the Court can discern no other issues that suggest in any way that the extrinsic material affected the verdict. In fact, the Court is very confident, based on both the verbal and, even more importantly, non-verbal responses to the Court's questioning that the extrinsic material had *no* effect on the verdict.

Thus, application of the Estrada factors clearly compel the conclusion that MGA's motion for mistrial be denied.

In any event, prior to the Court's interview of the jurors, both sides consented thereto without limitation, and thereby have waived any objection to the Court's inquiry or use of the

information from those interviews.

## IV. VOIR DIRE OF JUROR NO. 8

MGA also argues that the motion for mistrial should be granted because Juror No. 8 was dishonest in her responses – or more accurately, in her failure to respond -- to certain questions during voir dire. Claims of this type of juror misconduct are evaluated in accordance with McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984). The Ninth Circuit has articulated the relevant inquiry as follows: "(1) [W]hether 'a juror failed to answer honestly a material question on voir dire;' and (2) whether 'a correct answer would have provided a valid basis for a challenge for cause.'" Price v. Kramer, 200 F.3d 1237, 1254 (9th Cir. 2000) (quoting McDonough Power Equip.)).

At the outset, the Court must again note its factual finding is not that Juror No. 8 was biased in the legal sense, see section VI, infra, or even that she herself held certain preconceptions regarding Persians and/or Iranians. Rather, the Court found that "Juror No. 8 indicated that her husband, an attorney, has told her about a client or clients who are Persian and/or Iranian and who are stubborn, rude, and who have stolen other people's ideas." MGA's argument regarding dishonesty in voir dire is based on an unsound premise -- that the Court has found Juror No. 8 held the views expressed by her statements. See e.g., Motion at 21 ("Where a potential juror does not truthfully disclose biases or prejudices that would render them unable to be impartial and then participates in the verdict, a civil litigant has a right to a mistrial.").

Nevertheless, the Court is mindful of the Ninth's Circuit's suggestion that those who use racial slurs – and thus, by extension, statements regarding ethnocentric bias – generally subscribe to the views that the use of such terms imply. See e.g., United States v. Henley, 238 F.3d 1111, 1121 (9th Cir. 2001). Assuming, however, that the Court were to make the factual finding upon which MGA's argument is premised, MGA's argument would still be unpersuasive.

Counsel for MGA and Mr. Larian did not, in voir dire, ask any specific questions about Mr. Larian's ethnicity and/or national origin. The closest reference in voir dire related to Mr. Larian's experience as an "immigrant" from the "Middle East" and disclosure that the claims at issue involved allegations of dishonesty on his part. Motion at 24. Counsel for MGA and Mr. Larian failed to ask questions designed to ferret out preconceptions regarding Persians and/or Iranians (or even Middle Easterners in general), nor did he ask any questions regarding the jury panel's personal experiences or business dealings – or those of their family or friends – with other individuals who share Mr. Larian's ethnicity and/or national origin. MGA simply cannot fault a juror for failing to answer a question during voir dire that it did not ask. See e.g., Sanders v. Lamarque, 357 F.3d 943, 949 (9th Cir. 2004) (no juror dishonesty in failure to disclose past gang-related issues where questions were posed to jury panel in present tense); Hard v. Burlington Northern R. Co., 870 F.2d 1454, 1460 (9th Cir. 1989) (no duty to disclose past employment where juror was questioned regarding present but not past employment); U.S. v. Aguon, 851 F.2d 1158, 1170 (9th

Cir. 1988) (no duty to disclose juror was under investigation for crime similar to the one at issue in the case in which he served as a juror).

The question wasn't asked; therefore, there was no answer to all, let alone a dishonest answer. Therefore the first part of the McDonough Power Equip. test has not been met. Moreover, in the absence of an answer, the Court cannot consider whether that answer would have provided a basis for a challenge for cause. The second part of the McDonough Power Equip. test has not been met.

The Court accordingly rejects MGA's contention that Juror No. 8 was dishonest in her voir dire answers.

### V. APPLICABILITY OF SIXTH AMENDMENT PRECEDENT TO CIVIL TRIALS

The Sixth Amendment to the United States Constitution guarantees an accused the right to a fair trial. See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."). Pursuant to the Sixth Amendment, the Ninth Circuit has held that "[t]he bias . . . of even a single juror would violate [an accused's] right to a fair trial." Estrada v. Scribner, 512 F.3d 1227, 1239 (9th Cir. 2008) (internal quotation marks and citation omitted). MGA contends that this principle should be applied to the current civil trial because a fair trial by jury is also guaranteed to civil litigants by virtue of the Seventh Amendment. See U.S. Const. amend. VII ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.").

MGA argues because both the Sixth and Seventh Amendments guarantee the right to a fair trial, "the standards governing the Sixth and Seventh Amendment rights to a fair and impartial jury are the same." Motion at 12 n.4. It makes this contention in support of its overarching argument that the presence of one biased juror violates this right and, therefore, the Court should declare a mistrial without further inquiry. Id. at 12-13. However, this argument is unpersuasive both on the facts as found by the Court and on the authority cited by MGA in support of its argument.

As a factual matter, the Court has not found, and there is not evidence before the Court to support a finding, that Juror No. 8 was biased in the legal sense of that term. See section VI, infra.

Moreover, in support of its argument, MGA cites authority that does not support the broad proposition it advances. Specifically, MGA cites Sea Hawk Seafoods v. Alyeska Pipeline Service

MINUTES FORM 90                                                              Initials of Deputy Clerk: jh
CIVIL -- GEN

Co., 206 F.3d 900, 906 n.4 (9th Cir. 2000); Rinker v. County of Napa, 724 F.2d 1352, 1354 (9th Cir. 1983); and Caterpillar, Inc. v. Sturman Indus., Inc., 387 F.3d 1358, 1371 n.2 (Fed. Cir. 2004) .

A reading of the relied-upon footnote in the Sea Hawk case, as well as the text to which it is appended, reveals only the Ninth Circuit applies precedent on a specific Rule 606(b) issue developed in criminal cases (which implicate the Sixth Amendment) to civil cases (which implicate the Seventh Amendment).  206 F.3d at 906 ("Our precedents distinguish between introduction of 'extraneous evidence' to the jury, and ex parte contacts with a juror that do not include the imparting of any information that might bear on the case. Our precedents are mostly in criminal cases, but we have applied the same rules in civil cases.").  Absent from this case is any articulation of the wholesale incorporation of Sixth Amendment principles in cases implicating the Seventh Amendment.

In Rinker, the Ninth Circuit considered the issue of an unauthorized communication between a party and a juror regarding the jury's ongoing deliberations.  724 F.2d at 1353.  It appears that MGA cites this case for the unremarkable proposition that "the integrity of the jury system is no less to be desired in civil cases."  Id. (internal quotation marks and citation omitted).  This proposition, like that stated in Sea Hawk, stops well short of the wholesale incorporation of Sixth Amendment principles to cases implicating the Seventh Amendment that MGA advances.

However, MGA's position is supported, at least up to a point, by the Ninth Circuit's reliance in Rinker, on a criminal case that sets up a rebuttable presumption of prejudice in cases in which a jury is presented with an outside influence such as a party's unauthorized communication with a juror.  724 F.2d at 1354 (citing United States v. Armstrong, 654 F.2d 1328, 1332 (9th Cir. 1981)).  Nevertheless, this case severely undercuts MGA's overarching argument that the presence of one biased juror violates this right and therefore the Court should declare a mistrial without further inquiry.  In Rinker, the Ninth Circuit specifically noted that the district court failed to undertake an extensive enough investigation into the jury incident.  Rinker, 724 F.2d at 1354 ("Given the added fact that in questions about jury incidents, we are ultimately not so concerned with their nature as with the prejudice they may have worked on the fairness of the defendant's trial, we conclude that the question of prejudicial effect deserved more consideration.") (internal quotation marks, alteration mark, and citations omitted).

Finally, the cited-to portion of Caterpillar, when read in conjunction with the authority upon which it relies, Skaggs v. Otis Elevator Co., 164 F.3d 511, 514 (10th Cir. 1998), again stands only for the unremarkable proposition that both the Sixth and the Seventh Amendments guarantee the right to a fair trial, and that, therefore, juror issues arising in criminal cases are "germane" to civil cases.  The Caterpillar case, like Sea Hawk and Rinker, does not suggest that there has been a wholesale incorporation of Sixth Amendment principles to cases implicating the Seventh Amendment.

None of the cases cited by MGA support the contention that the mere presence of a juror

MINOTES FORM 90                                                                               Initials of Deputy Clerk:  jh

CIVIL -- GEN

who makes improper remarks based on a party's ethnicity compels the Court to grant a mistrial without further inquiry. Therefore, as set forth in section III, supra, the Court has applied the test set forth in Estrada and denied the motion.

Related to MGA's argument discussed in this section is its argument that it is entitled to the unanimous verdict of all ten jurors. Implicit in this argument is that because Juror No. 8 was biased, her verdict should be treated as having been, more or less, excised from the jury's verdict, and thus MGA is left with a unanimous verdict of nine jurors although ten jurors deliberated. For support, MGA relies upon Parker v. Gladden, 385 U.S. 363 (1966).

In Parker, an accused was convicted of second-degree murder in a state-court proceeding. Id. at 363. During the jury's sequestration, a bailiff made statements on two occasions to two different jurors regarding his opinion of defendant's guilt, as well as his opinion that if the defendant was not guilty, the Supreme Court, through the appeal process, would "correct" the verdict. Id. The Supreme Court rejected the argument that, although a jury of twelve deliberated, the verdict could stand on the untainted verdict of the remaining ten jurors, as a jury of ten was permissible under the laws of the state in which the defendants was convicted. Id. at 365. The Supreme Court's decision was influenced, however, by a number of concerns not at issue here.

First, the Court was concerned with the weight of authority statements of the bailiff, as "an officer of the State" carried. Second, the Court was also concerned with the defendant's right to cross-examination. Neither of those issues are implicated here. The statements in the instant case were made not by any authority figure but by a peer. Certainly, there is no indication here that the other jurors accorded any additional weight to her statements because they were attributed to her attorney-husband. To the contrary, the record is clear that the other jurors gave no weight to her statements and, beginning with the foreperson, other jurors strongly rebuked Juror No. 8 for making the remarks. Accordingly, the concern of the lack of the opportunity to cross examine Juror No. 8 regarding her statements is of no moment because the remaining jurors could not have given any less weight to her statements.

In addition to the concerns regarding the appearance of official imprimatur on and lack of the right of cross-examination as to the remarks at issue in Parker, the Court was also concerned with the defendant's Confrontation Clause rights. That right is not implicated here. Austin v. United States, 509 U.S. 602, 608 n.4 (1993) (Confrontation Clause does not apply in civil cases).

Accordingly, the Court does not read Parker as requiring the Court to grant MGA's motion.

## VI.  PRECONCEPTIONS AND PARTIALITY

In the events that gave rise to the present motion and in the proceedings that followed on the heels of those events, the term "bias" has been used, sometimes by the Court, without regard to the term's specific legal meaning in this particular context. When the Court and the parties use

the term "bias," what is implicated is a juror's impartiality – or more precisely, lack thereof.  Cases decided under the Sixth Amendment jury trial right in a criminal case, cited by MGA, indeed conclude that the right is violated where just one biased juror participates in a verdict.  See Motion at 3 (citing, e.g., United States v. Henley, 238 F.3d 1111, 1120 (9th Cir. 2001)).  However, this rule invites the inquiry of what is meant by the term "bias."

Supreme Court precedent establishes what is not required of jurors.  Courts do not require that jurors who are called upon to serve be without preconceived notions.  Irvin v. Dowd, 366 U.S. 717, 723 (1961).  Specifically, in the cited case, the Court did not require that the jurors be without preconceived notions of the guilt or innocence of a criminal defendant, which was the ultimate issue in the case.  Id. ("To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.") (citation omitted).  In a human system, we cannot expect perfection.  Truly, perfect justice is not of this world.  Our legal system and precedent take into account our inherent imperfections.  Indeed, as has been observed before, and this Court today concurs, if a standard of perfection on jury verdicts were to be imposed, "[i]t is doubtful whether more than one in a hundred verdicts would stand such a test." Jorgensen v. York Ice, 160 F.2d 432, 435 (2d Cir.1947) (Hand, J.).

MGA contends that "'[d]oubts regarding bias must be resolved against the juror.'" United States v. Gonzalez, 214 F.3d 1109, 1114 (9th Cir. 2000) (quoting Burton v. Johnson, 948 F.2d 1150, 1158 (10th Cir. 1991)).  The case upon which MGA relies was decided at the voir dire stage when the question at issue was whether a juror who was unable to state on the record that she was able to serve fairly and impartially.  See id. ("When a juror is unable to state that she will serve fairly and impartially despite being asked repeatedly for such assurances, we can have no confidence that the juror will 'lay aside' her biases or her prejudicial personal experiences and render a fair and impartial verdict.").  Juror No. 8 had no such difficulty here.  This Court repeatedly asked the venire, including Juror No. 8, whether each could be fair and impartial, and Juror No. 8 responded affirmatively.  Notwithstanding MGA's protestations to the contrary, prospective jurors are presumed to be impartial.  See Irvin, 366 U.S. at 723.

With this standard in mind, the Court cannot, and reiterates that it has not, found that Juror No. 8 is biased -- i.e., not impartial -- in the legal sense.  Instead, as more fully set forth elsewhere, the Court has found only that Juror No. 8 introduced into the jury inappropriate comments attributed to her attorney-husband.

As explained at length herein, the jury's verdict in Phase 1(a) need not be set aside on the basis of a juror's bias.

MINUTES FORM 90  
CIVIL -- GEN

Initials of Deputy Clerk:  jh

## VII. CONCLUSION

Nothing is more important to this Court than providing a fair trial to all parties. The right to trial by jury is certainly among the greatest contributions to the rule of law in the last millennium; nevertheless, this human system, as recognized by the Supreme Court, it is not a perfect system, nor could it survive if such was the standard. See e.g., Tanner v. United States, 483 U.S. 107, 120 (1987) (O'Connor, J.) ("There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it.").

The Court deeply regrets that Juror No. 8 introduced remarks into the jury room that have no place in any courthouse, as evidenced by Juror No. 8's dismissal from the jury. At the same time, the Court is encouraged, and deeply so, by the swift and decisive response of the foreperson and other jurors who heard the extraneous remarks, a response that demonstrates that this jury fully shares the Court's commitment to fairness and justice for all of the parties.[6] This jury reacted to extraneous, potentially prejudicial information exactly as a just society would have them react. They are to be commended, not disbanded.

After careful and deliberate consideration of the circumstances present, the Court finds that a mistrial is not required.

The motion for mistrial is **DENIED**.

**IT IS SO ORDERED.**

---

[6] Defendants complain that the jury failed to report the incident to the Court in a timely manner. However, it is clear from the record that the jurors acted very promptly. Immediately after the remarks were made, the foreperson and several other jurors immediately admonished Juror No. 8. Juror No. 10 submitted a note to the Court on the same day of the remarks indicating her discomfort with jury service (which she subsequently revealed to the Court was prompted by her disgust with Juror No. 8's remarks.) Juror No. 6 submitted his note to the Court, quoted in the opening paragraph of this Order, the second trial day after the remarks were made. His delay was due in part to his mistaken assumption that Juror No. 10's note reported the remark to the Court. His delay was also due to, and the foreperson's failure to report the remark was due to, the Court's own jury instruction on July 10, 2008. See docket # 4115 at 35. As such, the limited delay in bringing the matter to the Court's attention does not strike the Court as in any way indicating the jurors' acquiescence to the remarks; to the contrary, the jurors were rightfully outraged. Rather, their delay was due to the uncertainty about the propriety of submitting such information to the Court. This sentiment is borne out in Juror No. 6's remark.