# EXHIBIT 24

883

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                        ---

4       HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                        ---

6   MATTEL, INC.,              :   PAGES 883 - 1006
                               :
7          PLAINTIFF,          :
                               :
8     VS.                      :   NO. ED CV04-09049-SGL
                               :   [CONSOLIDATED WITH
9   MGA ENTERTAINMENT, INC.,   :   CV04-9059 & CV05-2727]
    ET AL.,                    :
10                             :
           DEFENDANTS.         :
11  _____:

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                RIVERSIDE, CALIFORNIA

17               FRIDAY, MAY 30, 2008

18                JURY TRIAL - DAY 5

19                AFTERNOON SESSION

20

21

22                              MARK SCHWEITZER, CSR, RPR, CRR
    CERTIFIED                   OFFICIAL COURT REPORTER
23                              UNITED STATES DISTRICT COURT
    COPY                        181-H ROYBAL FEDERAL BUILDING
24                              255 EAST TEMPLE STREET
                                LOS ANGELES, CALIFORNIA 90012
25                              (213) 663-3494

EXHIBIT _____ 24

PAGE _____ 244

884

1  **Appearances of Counsel:**

2

3  On Behalf of Mattel:

4      Quinn Emanuel
       By John B. Quinn, Esq.
5          B. Dylan Proctor, Esq.
           Michael T. Zeller, Esq.
6          Harry Olivar, Esq.
           John Corey, Esq.
7          Diane Hutnyan, Esq.
           William Price, Esq.
8      855 South Figueroa Street
       10th Floor
9      Los Angeles, CA 90017
       (213) 624-7707

10

11

12  On Behalf of MGA Entertainment:

13      Skadden, Arps, Slate, Meagher & Flom LLP
       By Thomas J. Nolan, Esq.
14         Carl Alan Roth, Esq.
           Jason Russell, Esq.
15         Lauren Aguiar, Esq.
           David Hansen, Esq.
16         Matthew Sloan, Esq.
       300 South Grand Avenue
17     Los Angeles, CA 90071-3144
       (213) 687-5000

18

19

20

21

22

23

24

25

EXHIBIT ____ 24

PAGE ____ 245

885

1                              I N D E X

2

3    PAULA GARCIA, PREVIOUSLY SWORN......................... 886

4    CROSS-EXAMINATION (CONTINUED) BY MS. AGUIAR:........... 886

5    REDIRECT EXAMINATION BY MR. PRICE: ................... 902

6    RECROSS-EXAMINATION BY MS. AGUIAR: .................... 983

7    FURTHER REDIRECT EXAMINATION  BY MR. PRICE:........... 996

8

9                          E X H I B I T S

10

11    (Exhibit 13592 received.)............................. 909

12    (Exhibit 4501 received.).............................. 991

13    (Exhibit 4502 received.).............................. 993

14    (Exhibit 4505 received.).............................. 993

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT_____24

PAGE____240

994

1  Ayzenberg's list of alternative names for Bratz.

2  **Q.**   And are these names that were considered internally at

3  MGA in this November 2000 time frame as a potential brand

4  name for the product that was eventually manufactured?

5  **A.**   Yes.

6          MS. AGUIAR:  May I have a moment?

7          THE COURT:  You may.

8          MS. AGUIAR:  One more question.  I have to find the

9  exhibit.

10         Your Honor, I wanted to go to the exhibit where

11 they admitted just the one paragraph.

12         THE COURT:  Yes.  What exhibit number is that?

13         MS. AGUIAR:  I'm not sure when it went in.  It was

14 admitted as an exhibit number.

15         THE COURT:  Here it is.  It was Exhibit 10001.

16 Page 2, paragraph -- well, Mr. Price thinks it's paragraph 6,

17 I think it's paragraph 7.

18         MS. AGUIAR:  It's the loan paragraph.  It's the

19 mystery floating paragraph.

20 **Q.**   Okay.  In this paragraph here, where you say, "I thought

21 they were incredible and I tried to stay true to this

22 inventor/creator's vision," can you tell us what you meant

23 there?

24 **A.**   I was referring to the four characters, and I wanted to

25 stay -- this was in reference to Carter Bryant's characters

EXHIBIT _____ 24

PAGE _____ 247

995

1  in the portfolio drawings.  I wanted -- because certainly

2  there were things in that portfolio that I loved very much,

3  and we talked about that there were some that I was concerned

4  about.  And it was, you know, it was for me to say I tried to

5  stay true to this inventor's vision.  Meaning, you know, I

6  tried to do -- wherever it felt comfortable without me

7  feeling that it was going to impose on the success of Bratz,

8  I tried to stay true to his vision.

9  Q.    And were there ways in which you were not able to do

10 that?

11 A.    Yes.

12 Q.    Can you tell us what those were?

13 A.    I'm sorry?

14          MR. PRICE:  Objection at this point.

15          THE COURT:  Sustained.

16          MS. AGUIAR:  That's for another time.

17          Thank you, I have nothing further.

18

19

20

21

22

23

24

25

EXHIBIT ___ 24

PAGE ___ 248

1        **FURTHER REDIRECT EXAMINATION**

2   BY MR. PRICE:

3   **Q.**   You were asked questions about Bratz again.  It's not as

4   though someone at MGA came up with the name Bratz, though, is

5   it?  That's not true?

6   **A.**   It is not -- you know, we will attest for sure that

7   Bratz was included in Carter Bryant's September 1st, 2000,

8   portfolio.  It was MGA employees who made the decision to in

9   fact use Bratz in production.

10  **Q.**   But it would be false to say that MGA came up with it

11  because one of their employees looked at these drawings and

12  said hey, those look like Bratz.  That was my idea.

13            That would be a false statement; right?

14  **A.**   We agreed to use the term Bratz because in fact,

15  ultimately, that name very closely represented the concept of

16  Bratz, if that's what you mean.

17  **Q.**   No, I mean that no one with a fresh slate came up with

18  the name Bratz.  It was a name that was given to them by

19  Carter Bryant, and they agreed on it; right?

20  **A.**   Yes.

21  **Q.**   And with respect to Exhibit 4502, the Ayzenberg document

22  that was shown to you, it was a list of other names

23  considered.  Does that document reflect a back and forth that

24  this is where we are now as to possible names?  Or are all of

25  these names Ayzenberg's suggestions?

EXHIBIT __24__

PAGE __249__

997

1          Do you understand what I mean?

2   A.   No, I don't.

3   Q.   You hire these outside companies to help in certain

4   areas.  Is the list that you were shown on Exhibit 4502, is

5   that a list that just they came up with, or is it a list

6   which they are developing with joint back and forth with MGA?

7   A.   I believe that that e-mail was a response to a request

8   from MGA to have them and in their own internal team arrive

9   at, you know, their varieties or their suggestions as

10  alternative names to Bratz.  So that's an Ayzenberg list of

11  names.

12          MR. PRICE:  Nothing further.

13          THE COURT:  Anything further?

14          MS. AGUIAR:  Nothing further.

15          THE COURT:  Very well.

16          Ms. Garcia, you are excused.  Have a nice weekend.

17          MR. QUINN:  Your Honor, could we --

18          THE COURT:  Sure.  Well, Counsel, we have literally

19  four minutes left.

20          MR. QUINN:  I was going to ask you.

21          THE COURT:  Fair enough.

22          (SIDEBAR CONFERENCE HELD.)

23          MR. QUINN:  Your Honor, the next witness has been

24  waiting two days.  I'll throw boatloads of proposed

25  examination overboard.  I'll do it in 10 minutes.  But it's a

EXHIBIT ____ 24

PAGE ____ 290

1006

1

2

3

4

5

6

7                    C E R T I F I C A T E

8

9

10          I hereby certify that pursuant to Title 28,

11   Section 753 United States Code, the foregoing is a true and

12   correct transcript of the stenographically reported

13   proceedings in the above matter.

14          Certified on May 30, 2008.

15

16

17   MARK SCHWEITZER, CSR, RPR, CRR
     Official Court Reporter
18   License No. 10514

19

20

21

22

23

24

25

EXHIBIT____24

PAGE____251

1669

1      UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA

3      EASTERN DIVISION

4      - - -

5      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6      - - -

7  MATTEL, INC.,                    )

8                    PLAINTIFF,      )

9          VS.                       )     NO. CV 04-09049

10 MGA ENTERTAINMENT, INC., ET. AL., )

11                   DEFENDANTS.     )     TRIAL DAY 9
                                     )     MORNING SESSION
12 AND CONSOLIDATED ACTIONS,         )     PAGES 1669-1756

13

14

15      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16      RIVERSIDE, CALIFORNIA

17      FRIDAY, JUNE 6, 2008

18      9:27 A.M.

19

20

21

22

23             THERESA A. LANZA, RPR, CSR
           FEDERAL OFFICIAL COURT REPORTER
24          3470 12TH STREET, RM. 134
           RIVERSIDE, CALIFORNIA  92501
25             951-274-0844
               WWW.THERESALANZA.COM

**CERTIFIED COPY**

EXHIBIT __24__

1670

```
1    APPEARANCES:

2

3    ON BEHALF OF MATTEL, INC.:

4                        QUINN EMANUEL
                         BY:  JOHN QUINN
5                             JON COREY
                               MICHAEL T. ZELLER
6                              HARRY OLIVAR
                               TIMOTHY ALGER
7                        865 S. FIGUEROA STREET,
                         10TH FLOOR
8                        LOS ANGELES, CALIFORNIA  90017

9

10   ON BEHALF OF MGA ENTERTAINMENT:

11                       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                         BY:  THOMAS J. NOLAN
12                             JASON RUSSELL
                               RAOUL KENNEDY
13                             LAUREN AGUIAR
                               CARL ROTH
14                       300 SOUTH GRAND AVENUE
                         LOS ANGELES, CALIFORNIA  90071-3144
15                       213-687-5000

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT ___24___

1671

1    I N D E X

2                                             PAGE

3    PLAINTIFF CASE (CONTINUED)....................  1673

4

5

6    PLAINTIFF
     WITNESS            DIRECT      CROSS     REDIRECT      RECROSS
7    **ISAAC LARIAN (CONT'D)**

8    BY MR. PRICE       1673

9

10

11
            EXHIBITS              RECEIVED
12
            13621                   1708
13          17252                   1733
            4942                    1739
14           500                    1753
            1701                    1754
15

16

17

18

19

20

21

22

23

24

25
                              EXHIBIT ____24____

                              PAGE ____254____

FRIDAY, JUNE 6, 2008              TRIAL DAY 9, MORNING SESSION

1738

1    STRICKEN.

2    **BY MR. PRICE:**

3    Q    YOU'LL AGREE, THOUGH, THAT WHAT THIS LETTER IS TALKING

4    ABOUT ARE THESE MATTEL MARKS, BARBIE AND DIVA STARZ; IS THAT

5    CORRECT?                                                              11:32

6    A    THIS IS BARBIE AND DIVA STAR; IT DOESN'T HAVE THE Z AT THE

7    END.

8    Q    BUT THAT'S WHAT IT'S TALKING ABOUT.

9    A    YES.

10   Q    SO LET'S GO BACK TO EXHIBIT 4507.                                11:32

11       CARTER IS NOT A MATTEL TRADEMARK, AS FAR AS YOU KNOW;

12   CORRECT?

13   A    HE'S NOT.

14   Q    AND THE LETTER YOU GOT FROM MATTEL HAD NOTHING TO DO WITH

15   NOT MENTIONING CARTER BRYANT, DID IT?                                 11:33

16   A    NO.  BUT THAT YAHOO WEB SITE HAD CARTER BRYANT'S NAME AND

17   OTHER THINGS IN THERE, AND I JUST DIDN'T WANT TO HAVE A LAWSUIT

18   BASICALLY BROUGHT FROM MATTEL REGARDING ANY MATTER THAT WILL

19   UPSET YOU.

20   Q    SO AT THIS POINT, THEN, YOU'RE SAYING IT WASN'T YOUR            11:33

21   INTENTION TO KEEP CARTER BRYANT UNDER WRAPS?

22   A    HE WAS NOT UNDER WRAPS.  HE WAS ALREADY IN THE NEWS.

23   Q    I'M TALKING ABOUT YOUR INTENTION -- IN THIS TIME FRAME,

24   SPRING 2002, IT WAS NOT YOUR INTENTION TO KEEP CARTER BRYANT

25   UNDER WRAPS BECAUSE YOU'RE TRYING TO HIDE SOMETHING; IS THAT          11:33

EXHIBIT __24__

PAGE __255__

FRIDAY, JUNE 6, 2008

TRIAL DAY 9, MORNING SESSION

1739

1    CORRECT?

2    A    THAT IS TRUE.  WE'VE NEVER TRIED TO HIDE CARTER BRYANT'S

3    NAME.

4    Q    IN THAT CASE, LOOK AT EXHIBIT 4942 THEN IN FRONT OF YOU.

5                DO YOU RECOGNIZE THAT AS AN E-MAIL STRING WHICH AT          11:34

6    THE TOP HAS AN E-MAIL BETWEEN YOU AND DEEDEE VALENCIA?

7    A    YES.

8    Q    AND COULD YOU TELL US WHO DEEDEE VALENCIA IS?

9    A    I DON'T RECOLLECT WHO SHE WAS.  I THINK SHE WAS A PRODUCT

10   MANAGER, BUT I DO NOT REMEMBER EXACTLY.                                 11:34

11   Q    AND BY A PRODUCT MANAGER, WHAT WOULD THE DUTIES OF A

12   PRODUCT MANAGER BE?

13   A    PRODUCT MANAGERS MANAGE PRODUCTS; THEY COME UP WITH

14   PRODUCT IDEAS, ET CETERA.

15   Q    NO RELATION TO DAVID DEES, AS FAR AS YOU KNOW?                      11:34

16   A    WHO?

17   Q    DEEDEE VALENCIA.

18   A    I DON'T UNDERSTAND YOUR QUESTION.  WAS IT A JOKE?

19   Q    YOU DO RECOGNIZE THE EXHIBIT; CORRECT?

20   A    I DO.                                                              11:34

21            MR. PRICE:  MOVE EXHIBIT 4942 INTO EVIDENCE, YOUR

22   HONOR.

23            MR. NOLAN:  NO OBJECTION.

24            THE COURT:  IT'S ADMITTED YOU MAY PUBLISH.

25   / / /                                                                   11:35

EXHIBIT ___24___

PAGE ___256___

1740

1   BY MR. PRICE:

2   Q    AND IT BEGINS WITH AN E-MAIL SENT BY DEEDEE VALENCIA TO

3   YOU.

4        .    DO YOU SEE THAT?

5   A    YES.                                                          11:35

6   Q    THIS IS IN FEBRUARY OF 2003; RIGHT?

7   A    CORRECT.

8   Q    HER IDEA IS "LET'S DO A LIMITED EDITION COLLECTIBLE."

9   A    I SEE THAT.

10  Q    WHAT OFTEN HAPPENS ON THESE LIMITED EDITION COLLECTIBLES,     11:35

11  THERE'S A SIGNATURE OF SOME SORT OF A CREATOR OR SOMEONE

12  ASSOCIATED WITH THE PRODUCT.

13  A    ALL I CAN DO IS TALK ABOUT MGA, AND WE HAVE DONE

14  COLLECTIBLE DOLLS AND THEY DON'T HAVE A SIGNATURE OR ANYTHING

15  ELSE ON IT.                                                        11:35

16  Q    WELL, ACTUALLY, IN THIS E-MAIL, MS. DEES FIRST TALKS ABOUT

17  HOW ONE WOULD SELL AND DISTRIBUTE THIS COLLECTIBLE DOLL;

18  CORRECT?

19  A    WHERE ARE YOU LOOKING AT?

20  Q    LIMITED EDITION COLLECTIBLE, SELLING/DISTRIBUTION, THERE'S    11:36

21  A PARAGRAPH HERE ON WHAT THE DISTRIBUTION WOULD BE OF THE DOLL;

22  CORRECT?

23  A    IT SAYS 'SELLING AND DISTRIBUTION.'

24  Q    AND THEN THERE'S A THING HERE, WHAT WERE THE FEATURES OF

25  THIS COLLECTIBLE DOLL.                                             11:36

EXHIBIT __24__

PAGE __251__

1754

1  Q    AND IN CONNECTION WITH THIS DOCUMENT, YOU FILED A

2  DECLARATION UNDER OATH.  DO YOU RECALL THAT?

3  A    I DID.

4  Q    AND IF YOU COULD LOOK AT 1701, DO YOU RECOGNIZE THAT AS

5  THE DECLARATION YOU FILED UNDER PENALTY OF PERJURY IN          11:57

6  CONNECTION WITH MAKING THAT PATENT APPLICATION?

7  A    CORRECT.

8         MR. PRICE:  MOVE EXHIBIT 1701 INTO EVIDENCE.

9         MR. NOLAN:  NO OBJECTION, YOUR HONOR.

10        THE COURT:  VERY WELL.  IT IS ADMITTED; YOU MAY         11:57

11  PUBLISH.

12  BY MR. PRICE:

13  Q    AND IT SAYS "AS A BELOW-NAMED INVENTOR, I HEREBY DECLARE

14  THAT..."

15  A    YES.                                                     11:58

16  Q    AND YOU SAY "I BELIEVE I AM THE ORIGINAL, FIRST, AND SOLE

17  INVENTOR, IF ONLY ONE NAME IS LISTED BELOW," AND ONLY ONE NAME

18  IS LISTED BELOW:  YOURS.

19  A    YES.

20  Q    SO YOU'RE SAYING THAT YOU'RE THE ORIGINAL, FIRST, AND SOLE  11:58

21  INVENTOR OF THIS DOLL WITH AESTHETIC, CHANGEABLE FOOTWEAR;

22  CORRECT?

23  A    THAT VERSION WHICH IS USING THE PATENT, YES, I AM.

24  Q    IF WE CAN SHOW EXHIBIT 302.

25         THIS IS ONE OF THE DRAWINGS WHICH CARTER BRYANT        11:58

EXHIBIT  24

1    THAT CARTER BRYANT HAD COME UP WITH.

2    Q    SO IF YOU WEREN'T TRYING TO KEEP CARTER BRYANT UNDER

3    WRAPS, THEN WHEN YOU WERE ASKED 'HOW DID YOU COME UP WITH THE

4    NAME BRATZ,' WHY DIDN'T YOU TELL THE REPORTER THE INDIVIDUAL

5    WHO FIRST GAVE YOU THE NAME BRATZ TO ATTACH TO THESE DOLLS?          11:47

6    A    BECAUSE WE CONSIDERED MANY NAMES -- ONE OF THEM WAS

7    FASHION FRIENDS, ANOTHER ONE WAS BABEZ, THOSE ARE THE ONES THAT

8    I REMEMBER -- AND I RECALL SITTING IN THE ROOM LOOKING AT THE

9    DOLLS AND CONSIDERING THE NAMES.  ORIGINALLY I HAD CONCERNS

10   WITH NAMING THESE 'BRATZ' BECAUSE IT HAD KIND OF NEGATIVE          11:48

11   CONNOTATION.  BUT ONE OF THE PEOPLE IN THE MEETING SAID THEY

12   LOOK LIKE LITTLE BRATZ; SO THAT'S WHAT I SAID, LET'S CALL IT

13   BRATZ.  AND THAT'S WHAT THAT CLIP IS REFERRING TO.

14   Q    YOU SAID YOU HAD A LIST OF NAMES YOU WERE LOOKING AT.

15   A    YES.                                                          11:48

16   Q    AND VARIOUS PEOPLE PROVIDED VARIOUS NAMES TO CONSIDER.

17   A    CORRECT.

18   Q    AND DID YOU HAVE AN OUTSIDE COMPANY WHO ACTUALLY SAID

19   'HERE'S SOME NAMES YOU MIGHT CONSIDER'?

20   A    IT MIGHT BE.  I DON'T RECALL.  I REMEMBER TWO OF THE          11:48

21   NAMES, BECAUSE ONE CAME FROM ME AND IT WASN'T GOOD ENOUGH.

22   Q    AND ONE OF THE NAMES ON THAT LIST WAS BRATZ WITH A "Z"?

23   A    BRATZ WITH A "Z" CAME FROM CARTER BRYANT.

24   Q    THAT WAS ONE OF THE NAMES ON LIST.

25   A    CORRECT.                                                      11:49

EXHIBIT __24__

PAGE __259__

1749

1   Q    AS YOU SAID, THAT NAME ON THAT LIST CAME FROM

2   CARTER BRYANT.

3   A    CORRECT.

4   Q    I THINK YOU JUST SAID YOU WERE IN A ROOM LOOKING AT THE

5   DOLLS.                                                          11:49

6   A    LOOKING AT PICTURES OF THE DRAWINGS.

7   Q    BUT I THOUGHT YOU SAID YOU WERE IN A ROOM LOOKING AT THE

8   DOLLS.

9   A    MAYBE I MISSPOKE.  WE WERE LOOKING AT THE DRAWINGS.

10  Q    SO YOU AGREE WITH MS. GARCIA THAT IT ALL STARTS WITH THE   11:49

11  DRAWING; IT ALL STARTS WITH THAT SKETCH.

12  A    THE DRAWINGS WERE THE INSPIRATION FOR THE BRATZ.  THE

13  DRAWINGS THAT CARTER BRYANT SHOWED US ARE ABSOLUTELY THE

14  INSPIRATION FOR THE BRATZ.

15  Q    SO IT'S NOT UNEXPECTED THAT YOU MIGHT SAY, WITHOUT GREAT   11:49

16  PRECISION, 'WE WERE LOOKING AT THE DOLLS,' WHEN ACTUALLY YOU

17  WERE LOOKING AT THE DRAWINGS?

18  A    I DON'T UNDERSTAND YOUR QUESTION.

19  Q    IT'S AN UNDERSTANDABLE MISTAKE TO MAKE THAT YOU JUST MADE,

20  SAYING WHEN YOU ARE LOOKING AT THE DRAWINGS, SAYING WE'RE       11:50

21  LOOKING AT THE DOLLS?

22  A    EIGHT YEARS LATER, NOW THAT WE HAVE THE DOLLS, WE REALLY

23  ARE FOCUSING ON THE DOLLS AND NOT THE DRAWINGS.  BUT AT THE

24  TIME THERE WERE NO DOLLS, THERE WERE JUST DRAWINGS; SO YOU HAVE

25  TO PUT THAT IN CONTEXT.                                         11:50

EXHIBIT __24__

PAGE __300__

FRIDAY, JUNE 6, 2008                          TRIAL DAY 9, MORNING SESSION

1  Q   SO THEN IF, IN FACT, IT WAS MR. BRYANT WHO WAS RESPONSIBLE

2  FOR THAT NAME BRATZ BEING ON THAT LIST, WHEN YOU WERE ASKED

3  'HOW DID YOU COME UP WITH THE NAME?'  WHY DIDN'T YOU SAY,

4  'WELL, THAT WAS THE NAME THE CREATOR GAVE US WHEN HE FIRST GAVE

5  US THE DRAWINGS; THEY WERE CALLED BRATZ'?                          11:51

6  A   BECAUSE.  YOU SAW THE CLIP.  THAT'S WHAT I SAID.  THAT'S

7  WHAT I SAID IN THERE, IS THAT WE WERE SITTING AROUND THE ROOM

8  LOOKING AT -- I WILL CORRECT MYSELF, THE DRAWINGS, AND SOMEBODY

9  SAID THEY LOOK LIKE LITTLE BRATZ, LET'S CALL THEM BRATZ.  AND I

10 SAID LET'S JUST CALL THEM BRATZ.                                  11:51

11 Q   IF YOU WEREN'T TRYING TO KEEP CARTER BRYANT UNDER WRAPS,

12 AS MS. VALENCIA THOUGHT YOU WERE TRYING TO DO, IF YOU WEREN'T

13 TRYING TO DO THAT, WHY DIDN'T YOU SAY, WHEN YOU WERE ASKED 'HOW

14 DID YOU COME UP WITH THIS?'  'THE CREATOR CAME UP WITH IT;

15 CARTER BRYANT.  GOOD JOB.'                                        11:51

16 A   BECAUSE THERE WAS NO REASON TO BRING CARTER BRYANT INTO IT

17 OR NOT TO BRING INTO IT.  I WASN'T THINKING.  I WAS VERY

18 EXCITED.  WE HAD JUST WON TOY OF THE YEAR AWARD.  IT WAS RIGHT

19 AFTER THE AWARD CEREMONY.  FRANKLY, IT WAS A BIG SURPRISE THAT

20 WE HAD WON.  AND I JUST RECALL THAT MEETING, AND THAT'S WHAT I   11:52

21 SAID.

22 Q   WELL, AT THE CEREMONY ITSELF, WHY DIDN'T YOU SAY "I

23 PARTICULARLY WANT TO GIVE THANKS TO CARTER BRYANT, THE MAN WHO

24 CREATED THIS'?

25 A   MGA CREATED BRATZ.  MGA TOOK CARTER BRYANT'S DRAWINGS AS    11:52

EXHIBIT ___ 24

1754

1   Q    AND IN CONNECTION WITH THIS DOCUMENT, YOU FILED A

2   DECLARATION UNDER OATH.  DO YOU RECALL THAT?

3   A    I DID.

4   Q    AND IF YOU COULD LOOK AT 1701, DO YOU RECOGNIZE THAT AS

5   THE DECLARATION YOU FILED UNDER PENALTY OF PERJURY IN          11:57

6   CONNECTION WITH MAKING THAT PATENT APPLICATION?

7   A    CORRECT.

8            **MR. PRICE:**  MOVE EXHIBIT 1701 INTO EVIDENCE.

9            **MR. NOLAN:**  NO OBJECTION, YOUR HONOR.

10           **THE COURT:**  VERY WELL.  IT IS ADMITTED; YOU MAY      11:57

11  PUBLISH.

12  **BY MR. PRICE:**

13  Q    AND IT SAYS "AS A BELOW-NAMED INVENTOR, I HEREBY DECLARE

14  THAT..."

15  A    YES.                                                        11:58

16  Q    AND YOU SAY "I BELIEVE I AM THE ORIGINAL, FIRST, AND SOLE

17  INVENTOR, IF ONLY ONE NAME IS LISTED BELOW," AND ONLY ONE NAME

18  IS LISTED BELOW:  YOURS.

19  A    YES.

20  Q    SO YOU'RE SAYING THAT YOU'RE THE ORIGINAL, FIRST, AND SOLE  11:58

21  INVENTOR OF THIS DOLL WITH AESTHETIC, CHANGEABLE FOOTWEAR;

22  CORRECT?

23  A    THAT VERSION WHICH IS USING THE PATENT, YES, I AM.

24  Q    IF WE CAN SHOW EXHIBIT 302.

25           THIS IS ONE OF THE DRAWINGS WHICH CARTER BRYANT         11:58

EXHIBIT ___ 24

1755

1   SHOWED YOU IN SEPTEMBER OF 2000; CORRECT?

2   A    HE DID.

3   Q    IT'S CORRECT, IS IT NOT, THAT PRIOR TO CARTER BRYANT

4   TELLING YOU ABOUT THE CONCEPT OF CHANGEABLE FOOTWEAR, YOU DON'T

5   RECALL PREVIOUSLY HAVING EVER HEARD THE IDEA; THAT'S CORRECT,          11:59

6   IS IT NOT?

7   A    THAT'S CORRECT.

8   Q    AND MR. BRYANT ALSO HERE, I GUESS, TALKED ABOUT CHANGEABLE

9   HEADWEAR AS WELL.

10  A    HE DID.                                                            11:59

11  Q    IN FACT, DO YOU RECALL THAT LATER IN THAT YEAR, YOU WERE

12  SUGGESTING TO THE FOLKS WHO WORKED FOR YOU THAT YOU REALLY

13  WANTED THAT FEATURE ON YOUR DOLL?  DO YOU RECALL THAT?

14  A    WHAT FEATURE?

15  Q    THE CHANGEABLE HEADWEAR.                                          11:59

16  A    I DID.

17         **MR. PRICE:**  WOULD THIS BE A GOOD TIME FOR A BREAK?

18         **THE COURT:**  WE'LL TAKE OUR LUNCH BREAK NOW.  THE JURY

19  WILL RECONVENE AT 1:30.

20         COURT IS IN RECESS.                                             11:59

21         (CONCLUSION OF MORNING SESSION.)

22

23  / / /

24  / / /                              EXHIBIT ___ 24

25  / / /                              PAGE ___ 263

FRIDAY, JUNE 6, 2008                        TRIAL DAY 9, MORNING SESSION

1756

```
 1                              CERTIFICATE

 2

 3   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
 4   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
 5   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

 6

 7

 8   THERESA A. LANZA, RPR, CSR            6-8-08
     OFFICIAL COURT REPORTER                DATE

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                                   EXHIBIT __24__

25                                   PAGE __264__
```

FRIDAY, JUNE 6, 2008                      TRIAL DAY 9, MORNING SESSION

1756

1   CERTIFICATE

2

3   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
    STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
4   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
    ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
5   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
    THE UNITED STATES.

6

7   _____                    6-8-08
                                                 _____
8   THERESA A. LANZA, RPR, CSR                        DATE
    OFFICIAL COURT REPORTER
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                                          EXHIBIT 24

25                                          PAGE 265

FRIDAY, JUNE 6, 2008                    TRIAL DAY 9, MORNING SESSION

1753

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

**HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

- - -

|  |  |  |
|---|---|---|
| MATTEL, INC., | : | PAGES 1753 - 1888 |
| PLAINTIFF, | : | |
| VS. | : | NO. ED CV04-09049-SGL |
| | : | [CONSOLIDATED WITH |
| MGA ENTERTAINMENT, INC., ET AL., | : | CV04-9059 & CV05-2727] |
| DEFENDANTS. | : | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

FRIDAY, JUNE 6, 2008

JURY TRIAL - DAY 9

AFTERNOON SESSION

CERTIFIED COPY

MARK SCHWEITZER, CSR, RPR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
181-H ROYBAL FEDERAL BUILDING
255 EAST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012
(213) 663-3494

EXHIBIT _____ 24

PAGE _____ 266

1754

1  **Appearances of Counsel:**

2

3  On Behalf of Mattel:

4        Quinn Emanuel
         By John B. Quinn, Esq.
5           B. Dylan Proctor, Esq.
            Michael T. Zeller, Esq.
6           Harry Olivar, Esq.
            John Corey, Esq.
7           Diane Hutnyan, Esq.
            William Price, Esq.
8        855 South Figueroa Street
         10th Floor
9        Los Angeles, CA 90017
         (213) 624-7707
10

11

12  On Behalf of MGA Entertainment:

13        Skadden, Arps, Slate, Meagher & Flom LLP
          By Thomas J. Nolan, Esq.
14           Carl Alan Roth, Esq.
             Jason Russell, Esq.
15           Lauren Aguiar, Esq.
             David Hansen, Esq.
16           Matthew Sloan, Esq.
          300 South Grand Avenue
17        Los Angeles, CA 90071-3144
          (213) 687-5000
18

19

20

21

22

23

24

25

EXHIBIT ___24___

PAGE ___267___

1857

1   **A.**   Well, you know, this goes back to the 2000 -- September

2   2000.  And at that time my daughter Yasmin and her friends

3   were also wearing clothing that had midriff and -- I don't

4   even know how to say that.  I'm sorry.  Low-rise jeans,

5   et cetera.  And I put the two together.  That's what the kids

6   were wearing at that time.  And again, Carter Bryant's

7   drawings and -- look at my own kids -- was I put the two and

8   two together that I thought this kind of doll would be

9   successful.  That was one of the reasons we launched Bratz.

10   **Q.**   Were you trying to give the impression that you came up

11   with the Bratz look by just seeing the kind of clothes that

12   your daughter wore?

13   **A.**   No, I was not.

14   **Q.**   But you didn't tell Mr. Palmeri that the first time you

15   saw that look was associated with Bratz, was when Mr. Bryant

16   showed you these drawings?

17   **A.**   I did not.  Nor did I mention Paula Garcia or any other

18   designer who had worked on the Bratz.

19   **Q.**   Well, Ms. Garcia, are you saying she's the one who first

20   thought of these dolls having low-rise jeans, midriff-baring

21   shirts?

22   **A.**   No, she did not.  She was part of the whole design team

23   for the dolls.

24   **Q.**   It would be inaccurate to say that the Bratz dolls were

25   your son Jason's idea?

EXHIBIT ___24___

PAGE ___268___

1858

1   A.   Absolutely they were not my son Jason's idea.

2   Q.   But you did tell a reporter that.

3   A.   I did not.

4   Q.   If you look at Exhibit 12058.

5   A.   I'm not sure I can find this in this folder.

6   Q.   Do you have it in front of you?

7   A.   I do.

8   Q.   Have you ever seen this article before?

9   A.   I don't recall if I have or not.

10  Q.   And let me clarify.  Have you seen this article before

11  this litigation?

12  A.   Before this litigation?  No, I have seen it during this

13  litigation.

14  Q.   Before it, do you not recall one way or the other?

15  A.   I do not.

16  Q.   Did you talk with a reporter named Wes Weiss?

17  A.   I don't recall him, no.  I don't remember.  Maybe I

18  have.  I don't know.

19  Q.   Did you tell a reporter that your 17-year-old son Jason

20  came up with the idea for Bratz?

21  A.   I did not.  My son came up with a product called

22  Commandobot, but not Bratz.

23  Q.   If you look at Exhibit 11209.

24  A.   Yes, go ahead.

25  Q.   Have you seen the article that's Exhibit 11259?

EXHIBIT 24

PAGE 269

1859

1    A.    Only during the course of this litigation I have.

2    Q.    Did you ever tell a reporter that the idea for Bratz

3    came from when your daughter Yasmin and her cousins

4    complained that they were tired of Barbie?

5    A.    I don't recall -- I know that my daughter and her

6    friends were tired of Barbie.

7    Q.    The idea for Bratz came from Carter Bryant?

8    A.    It did.  The original idea for Bratz came from Carter

9    Bryant.

10   Q.    You weren't talking to your daughter, and then you came

11   up with the idea for Bratz.  That would be inaccurate;

12   correct?

13   A.    I did not come up with the idea for Bratz.  Bratz was

14   inspired by Carter Bryant's drawings.

15   Q.    So it would be false to say that you were the brain

16   child behind Bratz?

17   A.    For the Bratz drawings or Bratz dolls?

18   Q.    Say, for -- for however you use Bratz.

19   A.    No, I --

20   Q.    Let me finish.  It would be inaccurate to say that you

21   were the brain child behind Bratz?

22   A.    Absolutely.  I was the brain child behind the Bratz

23   dolls.  I created it.  I spent my money on it.  I put my

24   creative force into it.  I put my company's resources into it

25   to make it happen.  As far as the drawings were concerned

EXHIBIT ___24

PAGE ___270

1888

# C E R T I F I C A T E

I hereby certify that pursuant to Title 28,
Section 753 United States Code, the foregoing is a true and
correct transcript of the stenographically reported
proceedings in the above matter.

Certified on June 6, 2008.

**MARK SCHWEITZER, CSR, RPR, CRR**
Official Court Reporter
License No. 10514

EXHIBIT _____ 24

PAGE _____ 271

2353

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                         EASTERN DIVISION

4                           -  -  -

5          HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                           -  -  -

7    MATTEL, INC.,                    )    **CERTIFIED**
                                      )
8                   PLAINTIFF,        )      **COPY**
                                      )
9         VS.                         )    NO. CV 04-09049
                                      )
10   MGA ENTERTAINMENT, INC., ET. AL.,)
                                      )
11                  DEFENDANTS.       )    TRIAL DAY 12
     _____)    MORNING SESSION
12   AND CONSOLIDATED ACTIONS,        )    PAGES 2353-2427
                                      )
13   _____)

14

15        REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                    RIVERSIDE, CALIFORNIA

17                   THURSDAY, JUNE 12, 2008

18                        9:24 A.M.

19

20

21

22

23                  THERESA A. LANZA, RPR, CSR
                   FEDERAL OFFICIAL COURT REPORTER
24                   3470 12TH STREET, RM. 134
                   RIVERSIDE, CALIFORNIA  92501
25                        951-274-0844
                     WWW.THERESALANZA.COM           EXHIBIT ___24___

                                                    PAGE___272___

2354

APPEARANCES:


ON BEHALF OF MATTEL, INC.:

                        QUINN EMANUEL
                        BY:   JOHN QUINN
                              JON COREY
                              MICHAEL T. ZELLER
                              HARRY OLIVAR
                              TIMOTHY ALGER
                        865 S. FIGUEROA STREET,
                        10TH FLOOR
                        LOS ANGELES, CALIFORNIA   90017


ON BEHALF OF MGA ENTERTAINMENT:

                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                        BY:   THOMAS J. NOLAN
                              JASON RUSSELL
                              RAOUL KENNEDY
                              LAUREN AGUIAR
                              CARL ROTH
                        300 SOUTH GRAND AVENUE
                        LOS ANGELES, CALIFORNIA   90071-3144
                        213-687-5000

EXHIBIT ___24___

PAGE ___273___

THURSDAY, JUNE 12, 2008                    TRIAL DAY 12, MORNING SESSION

2355

```
 1                          I N D E X

 2                                              PAGE

 3   PLAINTIFF CASE (CONTINUED)....................  2372

 4

 5

 6
     WITNESS          DIRECT      CROSS     REDIRECT      RECROSS
 7   RACHEL HARRIS

 8   BY MR. QUINN     2372                  2414
     BY MR. NOLAN                 2389                    2423
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT __24__

PAGE __274__

THURSDAY, JUNE 12, 2008                    TRIAL DAY 12, MORNING SESSION

1  Q    WHEN YOU STARTED WORK AT MGA IN OCTOBER OF 2000, DID YOU

2  MEET A CARTER BRYANT?

3  A    YES.

4  Q    AND IN RELATION TO YOUR START DATE, HOW SOON AFTER THAT

5  WAS IT THAT YOU MET CARTER BRYANT?                          09:55

6  A    WITHIN, PROBABLY, A WEEK AND A HALF, AT THE MOST.

7  Q    AND HOW DID THAT MEETING COME ABOUT?

8  A    IT WAS JUST A SCHEDULED MEETING THAT I WAS TOLD I NEEDED

9  TO ATTEND.

10 Q    WHO IS IT THAT TOLD YOU THAT YOU NEEDED TO ATTEND A      09:55

11 MEETING WITH MR. BRYANT?

12 A    MOST LIKELY, IT CAME BY E-MAIL AS A MEETING REQUEST, BUT

13 IT WAS WITH PAULA, CARTER, AND MERCEDEH.

14 Q    YOU KNEW IN ADVANCE IT WAS GOING TO BE WITH THOSE FOUR

15 PEOPLE?                                                     09:56

16 A    YES.

17 Q    AND MERCEDEH, IS THAT MERCEDEH WARD?

18 A    YES.

19 Q    WHAT WAS HER POSITION?

20 A    I DON'T KNOW EXACTLY WHAT HER TITLE WAS, BUT I BELIEVE SHE  09:56

21 WAS PRODUCT DEVELOPMENT, DIRECTOR OF PRODUCT DEVELOPMENT.

22 Q    AND PAULA IS PAULA TREANTAFELLES, NOW KNOWN AS

23 PAULA GARCIA?

24 A    YES.

25 Q    AND BEFORE THE MEETING, DID YOU GET ANY UNDERSTANDING AS  09:56

EXHIBIT __24__

2375

1   TO WHAT THE PURPOSE OF THE MEETING WAS?

2   A    TO INTRODUCE MERCEDEH WARD AND I TO THE NEW DOLL LINE.

3   Q    THE NEW DOLL LINE, MEANING...

4   A    THE NEW FASHION DOLL LINE THAT WAS GOING TO BE STARTED.

5   Q    DID IT HAVE A NAME, THEN, AT THE TIME?                      09:56

6   A    NOT TO MY KNOWLEDGE.

7   Q    AT LEAST THEY DIDN'T TELL YOU THAT?

8   A    CORRECT.

9   Q    DID MS. GARCIA, IN ADVANCE OF THIS MEETING, TELL YOU

10  ANYTHING ELSE ABOUT MR. BRYANT OR WHAT WOULD BE HAPPENING AT     09:56

11  THE MEETING?

12  A    SHE JUST MENTIONED THAT CARTER WAS COMING IN AND HE WAS

13  THE CREATOR; HE HAD -- HE WAS COMING IN ON HIS LUNCH, SO WE

14  NEEDED TO KIND OF MOVE QUICKLY, THAT HE WAS GOING TO BE

15  PRESENTING THE DOLLS TO US, AND THAT WE SHOULDN'T REALLY         09:57

16  MENTION MUCH ABOUT HIM COMING HERE AT LUNCH BECAUSE HE HAD

17  ALREADY GIVEN HIS NOTICE AT MATTEL AND HE WAS GOING TO BE

18  LEAVING THERE.

19  Q    DID SHE INDICATE SHE KNEW THAT HE WAS A MATTEL EMPLOYEE AT

20  THE TIME?                                                       09:57

21  A    YES.

22  Q    DID SHE INDICATE WHETHER YOU SHOULD SAY ANYTHING ONE WAY

23  OR ANOTHER ABOUT THE FACT THAT MR. BRYANT WAS COMING OVER?

24  A    YES.  SHE MENTIONED NOT TO SAY ANYTHING BECAUSE HE WAS

25  COMING OVER DURING HIS LUNCH BREAK.                             09:57

EXHIBIT __24__

PAGE __270__

2376

1    Q    OKAY.

2          DID SHE SAY ANYTHING ABOUT WHETHER OR NOT MATTEL

3    WOULD BE UPSET IF THEY KNEW THAT MR. BRYANT WAS COMING OVER TO

4    MGA?

5    A    I DON'T RECALL IF SHE MENTIONED IT AT THAT POINT, NO.      09:58

6    Q    LET ME ENLARGE THE QUESTION, THEN.

7          AT ANY POINT, DID SHE SAY ANYTHING TO YOU ON THAT

8    SUBJECT, AS TO WHETHER MATTEL WOULD BE UPSET IF MATTEL KNEW

9    THAT MR. BRYANT WAS COMING OVER TO MGA?

10   A    I CAN'T REMEMBER EXACTLY IF SHE MENTIONED IT, BUT IT WAS   09:58

11   IMPLIED.

12   Q    DO YOU RECALL WHAT SHE SAID THAT IMPLIED THAT TO YOU?

13          MR. NOLAN:  OBJECTION, YOUR HONOR.  FOUNDATION AS TO

14   TIME; TEMPORAL FOUNDATION.

15          THE COURT:  SUSTAINED.                                   09:58

16   BY MR. QUINN:

17   Q    WHAT YOU'VE INDICATED, THAT SHE IMPLIED THAT MATTEL WOULD

18   BE UPSET IF IT WAS KNOWN THAT MR. BRYANT WAS COMING OVER, WHEN

19   WAS IT THAT MS. TREANTAFELLES SAID THIS THAT CAUSED YOU TO HAVE

20   THIS UNDERSTANDING?  WAS IT BEFORE THE MEETING?                 09:59

21   A    IT WAS JUST BEFORE THE MEETING THAT SHE HAD MENTIONED THE

22   DETAILS ABOUT HIM COMING, YES.

23   Q    THAT SHE SAID THAT?

24   A    YES.

25   Q    DID SHE INDICATE WHETHER OR NOT SHE HAD KNOWN MR. BRYANT   09:59

EXHIBIT ___ 24

PAGE ___ 277

2377

1  FROM MATTEL?

2  A    AT THAT TIME, NO.

3  Q    AT ANY TIME, DID SHE INDICATE THAT?

4  A    IN THE FUTURE, YES.

5  Q    THIS WAS SOME FUTURE CONVERSATION YOU HAD WITH HER?    09:59

6  A    YES.  JUST, SHE HAD MENTIONED THAT SHE KNEW CARTER FROM

7  MATTEL WHEN SHE WAS THERE.

8  Q    SO MS. TREANTAFELLES --

9         MR. NOLAN:  OBJECTION, YOUR HONOR.  FOUNDATION AS TO

10  TEMPORAL TIME IN THAT CONVERSATION.    09:59

11         THE COURT:  SUSTAINED.

12  BY MR. QUINN:

13  Q    CAN YOU TELL US WHEN IT WAS THAT MS. TREANTAFELLES TOLD

14  YOU THAT SHE HAD KNOWN MR. BRYANT WHEN SHE HAD WORKED AT

15  MATTEL?    09:59

16  A    I CAN'T SAY THE EXACT DATE.  I DON'T KNOW THE EXACT DATE.

17  Q    CAN YOU PUT IT, ROUGHLY?  WAS IT IN 2000, OCTOBER

18  NOVEMBER, DECEMBER?

19  A    YES.

20  Q    OTHER THAN THAT OCCASION, JUST BEFORE THE MEETING WHERE    10:00

21  SHE TOLD YOU THAT MATTEL WOULD BE UPSET AND YOU SHOULDN'T SAY

22  ANYTHING ABOUT MR. BRYANT COMING OVER, WAS THERE EVER ANY OTHER

23  OCCASION WHEN MS. TREANTAFELLES SAID TO YOU THAT YOU REALLY

24  SHOULDN'T BE SAYING ANYTHING ABOUT MR. BRYANT'S INVOLVEMENT IN

25  BRATZ?    10:00

EXHIBIT ___24___

PAGE ___278___

2378

```
 1   A     NO.

 2   Q     DID YOU EVER HAVE A CONVERSATION WITH ANYONE ELSE AT MGA

 3   WHERE IT WAS INDICATED TO YOU THAT YOU SHOULDN'T SAY ANYTHING

 4   ABOUT MR. BRYANT'S INVOLVEMENT IN BRATZ?

 5   A     YES.                                                      10:00

 6   Q     WHO WAS IT THAT YOU HAD THAT CONVERSATION WITH?

 7   A     MERCEDEH.

 8   Q     MERCEDEH WARD?

 9   A     YES.

10   Q     ANYONE ELSE THAT YOU SPOKE TO -- WELL, LET ME FOLLOW UP ON  10:01

11   THAT.

12         WHAT WAS IT THAT MERCEDEH WARD SAID ABOUT WHY YOU

13   SHOULDN'T SAY ANYTHING ABOUT MR. BRYANT'S INVOLVEMENT IN BRATZ?

14         MR. NOLAN:  OBJECTION, YOUR HONOR.  FOUNDATION AS TO

15   TIME.                                                           10:01

16         THE COURT:  SUSTAINED.

17   BY MR. QUINN:

18   Q     WHEN WAS IT THAT MERCEDEH WARD SAID THIS TO YOU?

19   A     SHE WOULD PERIODICALLY COME INTO MY OFFICE, AND WE WOULD

20   DISCUSS DIFFERENT PRODUCTS AND THINGS; SO IT WAS AT ONE OF      10:01

21   THOSE OCCASIONS THAT SHE HAD MENTIONED IT TO ME.

22   Q     DOES THAT SEEM TO YOU LIKE IT WAS SOMETIME IN THE YEAR

23   2000?

24         MR. NOLAN:  OBJECTION, YOUR HONOR.  LEADING.

25         THE COURT:  REPHRASE.                                     10:01
```

EXHIBIT  24

2379

| | |
|---|---|
| 1 | SUSTAINED. |
| 2 | BY MR. QUINN: |
| 3 | Q   CAN YOU NARROW IT AT ALL IN TIME, IN TERMS OF THE MONTH OR |
| 4 | YEAR, WHEN YOU HAD THIS CONVERSATION WITH MERCEDEH WARD? |
| 5 | A   IT WAS DEFINITELY WITHIN HER FIRST FEW WEEKS AT MGA. |
| 6 | Q   AND DO YOU KNOW WHEN MERCEDEH WARD STARTED AT MGA? |
| 7 | A   I DO.  SHE STARTED WITHIN DAYS OF MY START DATE. |
| 8 | Q   DID SHE INDICATE TO YOU WHY YOU SHOULDN'T SAY ANYTHING |
| 9 | ABOUT MR. BRYANT'S INVOLVEMENT WITH BRATZ? |
| 10 | MR. NOLAN:  OBJECT ON THE BASIS OF HEARSAY, |
| 11 | YOUR HONOR. |
| 12 | THE COURT:  SUSTAINED. |
| 13 | BY MR. QUINN: |
| 14 | Q   WHAT WAS MERCEDEH WARD'S POSITION?  WAS SHE IN CHARGE OF |
| 15 | ENGINEERING FOR BRATZ? |
| 16 | A   YES. |
| 17 | Q   AND WHEN YOU HAD THIS CONVERSATION WITH HER, DID SHE |
| 18 | INDICATE TO YOU WHY YOU SHOULDN'T SAY ANYTHING TO ANYONE ABOUT |
| 19 | HIS INVOLVEMENT IN BRATZ? |
| 20 | THE COURT:  THAT SEEMS TO BE THE SAME QUESTION, |
| 21 | COUNSEL. |
| 22 | MR. NOLAN:  SAME OBJECTIONS. |
| 23 | MR. QUINN:  THAT'S AN ADMISSION, YOUR HONOR. |
| 24 | THE COURT:  OVERRULED. |
| 25 | / / / |

Time stamps in right margin:
10:01
10:02
10:02
10:02
10:02

EXHIBIT 24
PAGE 280

THURSDAY, JUNE 12, 2008

TRIAL DAY 12, MORNING SESSION

1    BY MR. QUINN:

2    Q    DID SHE INDICATE TO YOU WHY --

3            THE COURT:  I'LL HEAR YOU AT SIDE-BAR, IF YOU WANT,

4    COUNSEL.  THIS SEEMS TO BE AN ADMISSION OF A PARTY OPPONENT.

5            MR. NOLAN:  SIDE-BAR REAL QUICKLY.                    10:02

6            (WHEREUPON, THE FOLLOWING PROCEEDINGS

7            WERE HELD AT SIDE-BAR:)

8            THE COURT:  I WASN'T THINKING ABOUT IT BEING A PARTY

9    OPPONENT.

10            MR. NOLAN:  YOUR HONOR, THIS IS A CONVERSATION BY AN   10:03

11   EMPLOYEE TWO WEEKS INTO MGA, APPARENTLY.  WHEN THE TIME THIS

12   TOOK PLACE, SHE IS NOT AN OFFICER, SHE'S NOT A DIRECTOR, SHE'S

13   NOT IN MANAGEMENT, PER SE.  SHE'S IN A PARTICULAR AREA.  THIS

14   IS WITHIN HER FIRST TWO WEEKS WHERE -- IT'S A CONFIDENTIAL

15   LINE.  I DON'T THINK THAT IS GROUNDS FOR IMPOSING UPON HER THE   10:03

16   ABILITY TO BIND THE COMPANY ON AN ADMISSION.  AND I THINK IT'S

17   JUST RANCK HEARSAY.

18            THE COURT:  COUNSEL?

19            MR. QUINN:  WHAT THE WITNESS SAID IS SHE WAS IN

20   CHARGE OF ENGINEERING FOR BRATZ.  THIS IS A CONVERSATION ON    10:04

21   THAT VERY SUBJECT.  SO, AS TO THAT SUBJECT, I THINK SHE'S FULLY

22   QUALIFIED.

23            THE COURT:  WHO IS THE SOURCE OF THE ACTUAL

24   STATEMENT?

25            MR. QUINN:  MERCEDEH WARD MAKES THE STATEMENT.        10:04

EXHIBIT  24

1          THE COURT:  WHO IS THE HEAD OF ENGINEERING.

2          MR. QUINN:  EXACTLY; THAT'S WHAT THE WITNESS SAID.

3          THE COURT:  COUNSEL, I'D LIKE TO HAVE THIS DONE

4   OUTSIDE OF THE PRESENCE OF THE JURY.

5          DOES THIS WITNESS KNOW THE -- DO WE HAVE ANYTHING                10:04

6   ABOUT WHERE MERCEDEH WARD GOT THAT INFORMATION FROM?

7          MR. QUINN:  I DON'T KNOW THE ANSWER TO THAT.  I WOULD

8   ASK.

9          THE COURT:  NO.

10         MR. NOLAN:  IT'S DOUBLE HEARSAY.                                 10:04

11         THE COURT:  SHE MAY NOT BE A DIRECTOR, BUT IT'S A

12  HIGH ENOUGH POSITION IN THE PARTICULAR CONTEXT OF THE BRATZ

13  DIVISION.  I'LL OVERRULE THE OBJECTION.

14         THANK YOU, COUNSEL.

15         (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)               10:05

16  BY MR. QUINN:

17  Q    MS. HARRIS, DID MERCEDEH WARD INDICATE TO YOU WHY YOU

18  SHOULDN'T SAY ANYTHING TO ANYONE ABOUT MR. BRYANT'S INVOLVEMENT

19  WITH BRATZ?

20  A    YES.                                                             10:05

21  Q    WHAT DID SHE SAY?

22  A    SHE HAD MENTIONED THAT CARTER HAD PREVIOUSLY WORKED AT

23  MATTEL AND HAD PRESENTED THE DOLL LINE TO MATTEL AND THEY HAD

24  TURNED IT DOWN; SO THEREFORE, ONCE HE PRESENTED IT TO MGA AND

25  DECIDED TO LEAVE, THAT WE SHOULD JUST NOT MENTION ANY OF THAT        10:05

EXHIBIT ___24

2382

```
 1   HAD HAPPENED.
 2   Q    DID SHE SAY YOU SHOULDN'T MENTION IT WITHIN MGA OR OUTSIDE
 3   OF MGA?
 4   A    OUTSIDE OF MGA.
 5   Q    WAS THERE EVER ANYONE ELSE AT MGA WHO GAVE YOU THE           10:06
 6   INSTRUCTION THAT CARTER BRYANT REALLY SHOULDN'T BE MENTIONED AS
 7   HAVING ANYTHING TO DO WITH BRATZ?
 8   A    ISAAC LARIAN, AT CERTAIN TIMES, IN JUST GENERAL MEETINGS.
 9   Q    ISAAC LARIAN?
10   A    YES.                                                         10:06
11   Q    AND THIS WAS ON ONE OCCASION OR ON MORE THAN ONE OCCASION?
12   A    AT MOST, TWO.
13   Q    WHAT DO YOU RECALL MR. LARIAN SAYING ON THE FIRST OCCASION
14   ABOUT NOT SAYING ANYTHING ABOUT MR. BRYANT HAVING ANYTHING TO
15   DO WITH BRATZ?                                                    10:06
16        MR. NOLAN:   FOUNDATION WITH RESPECT TO TIME.
17        THE COURT:   SUSTAINED.
18   BY MR. QUINN:
19   Q    WHEN, APPROXIMATELY, WAS THE FIRST OCCASION?
20   A    I WOULD SAY WITHIN THE FIRST TWO MONTHS OR SO.               10:06
21   Q    AND CAN YOU RECALL WHERE YOU WERE, WHERE HE WAS, WHEN HE
22   GAVE YOU THIS INSTRUCTION?
23   A    NO.
24   Q    AND WHAT WAS IT THAT MR. LARIAN SAID TO YOU AT THAT TIME?
25   A    I DON'T RECALL WORD FOR WORD.                                10:07
```

EXHIBIT 24

2383

```
 1   Q    ALL RIGHT.
 2              WHAT'S YOUR BEST RECOLLECTION OF THE INSTRUCTION THAT
 3   YOU RECEIVED?
 4   A    JUST THAT WE SHOULDN'T MENTION THAT CARTER WAS INVOLVED
 5   WITH IT; THAT IT SHOULD HAVE BEEN A DOLL LINE COMING FROM MGA.    10:07
 6   Q    DID HE SAY THAT YOU SHOULDN'T MENTION IT TO ANYONE WITHIN
 7   MGA, OR YOU SHOULDN'T MENTION IT TO ANYONE OUTSIDE OF MGA, OR
 8   BOTH?
 9   A    OUTSIDE OF MGA.
10   Q    WAS THERE EVER ANOTHER OCCASION -- I TAKE IT THERE WAS    10:07
11   ANOTHER OCCASION WHERE YOU RECEIVED SIMILAR INSTRUCTION FROM
12   MR. LARIAN.
13   A    I'M SURE THERE WAS.  I DON'T REMEMBER IF IT WAS E-MAILED
14   OR IN PERSON.  I DON'T RECALL.
15   Q    BUT YOU'RE CONFIDENT YOU RECEIVED THAT INSTRUCTION MORE    10:07
16   THAN ONCE?
17   A    YES.
18   Q    LET ME ASK YOU THIS ABOUT MR. LARIAN:  DID YOU GIVE ANY
19   CONSIDERATION AT ALL TO NOT FOLLOWING HIS INSTRUCTION?
20   A    NO.    10:07
21   Q    WHY?
22              MR. NOLAN:  OBJECTION AS TO THE RELEVANCE OF WHY,
23   YOUR HONOR.
24              THE COURT:  SUSTAINED.
25              WELL, OVERRULED.    10:08
```

EXHIBIT 24

PAGE 284

```
 1   BY MR. QUINN:

 2   Q    WHY?

 3   A    BECAUSE I WAS WORKING FOR THE COMPANY, AND I WAS LOYAL TO

 4   THE COMPANY.

 5   Q    WERE PEOPLE AFRAID OF MR. LARIAN AT MGA?                    10:08

 6           MR. NOLAN:  OBJECTION.  RELEVANCE; ALSO FOUNDATION.

 7           THE COURT:  SUSTAINED.

 8   BY MR. QUINN:

 9   Q    DID MR. LARIAN SAY ANYTHING TO YOU ABOUT WHAT YOU SHOULD

10   SAY ABOUT WHO CAME UP WITH THE BRATZ DOLL?  HE SAID, 'DON'T      10:08

11   MENTION CARTER BRYANT.'  DID HE SAY ANYTHING TO YOU ABOUT WHO

12   SHOULD BE CREDITED WITH COMING UP WITH THE BRATZ DOLL?

13   A    JUST MGA.

14   Q    NOW, YOU TOLD US ABOUT WHAT MERCEDEH WARD TOLD YOU ABOUT

15   MR. BRYANT HAVING PRESENTED THE BRATZ DOLL AT MATTEL.           10:08

16           THAT'S WHAT SHE SAID?

17   A    YES.

18   Q    YOU DON'T KNOW WHETHER THAT'S TRUE OR NOT?

19   A    NO IDEA.

20   Q    BASED ON THE INSTRUCTIONS THAT YOU RECEIVED FROM           10:09

21   MS. GARCIA AND MR. LARIAN, WAS IT YOUR UNDERSTANDING THAT

22   MR. BRYANT'S PARTICIPATION IN BRATZ WAS TO BE KEPT SECRET?

23           MR. NOLAN:  OBJECTION, YOUR HONOR.  FOUNDATION; ALSO

24   RELEVANCE WITH RESPECT TO HER STATE OF MIND.

25           THE COURT:  SUSTAINED.                                  10:09
```

EXHIBIT __24__

2427

1

2

3                                CERTIFICATE

4

5    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
6    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
7    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

8

9

10   THERESA A. LANZA, RPR, CSR              6-13-08
     OFFICIAL COURT REPORTER                  DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                         EXHIBIT __24__

                                         PAGE __2460__

THURSDAY, JUNE 12, 2008          TRIAL DAY 12, MORNING SESSION

4890

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                EASTERN DIVISION

4                   - - -

5     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                   - - -

7   MATTEL, INC.,                    )
                                     )
8                    PLAINTIFF,      )
                                     )
9          VS.                       )   NO. CV 04-09049
                                     )
10  MGA ENTERTAINMENT, INC., ET. AL., )  TRIAL DAY 23
                                     )   AFTERNOON SESSION
11                   DEFENDANTS.     )   PAGES 4890-5014
                                     )
12  AND CONSOLIDATED ACTIONS,        )
                                     )

13

14

15      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16               RIVERSIDE, CALIFORNIA

17              THURSDAY, JULY 10, 2008

18                   1:30 P.M.

19

20

21

22

23          THERESA A. LANZA, RPR, CSR
         FEDERAL OFFICIAL COURT REPORTER
24          3470 12TH STREET, RM. 134
         RIVERSIDE, CALIFORNIA  92501
25              951-274-0844
         WWW.THERESALANZA.COM      EXHIBIT  24
                                   PAGE  281

4891

```
 1   APPEARANCES:

 2

 3   ON BEHALF OF MATTEL, INC.:

 4                        QUINN EMANUEL
                         BY:   JOHN QUINN
 5                             JON COREY
                               MICHAEL T. ZELLER
                               HARRY OLIVAR
 6                             TIMOTHY ALGER
                               WILLIAM PRICE
 7                        865 S. FIGUEROA STREET,
                         10TH FLOOR
 8                        LOS ANGELES, CALIFORNIA   90017
                         213-624-7707
 9

10

11   ON BEHALF OF MGA ENTERTAINMENT:

12                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                         BY:   THOMAS J. NOLAN
13                             JASON RUSSELL
                               RAOUL KENNEDY
14                             LAUREN AGUIAR
                               CARL ROTH
15                        300 SOUTH GRAND AVENUE
                         LOS ANGELES, CALIFORNIA   90071-3144
16                        213-687-5000

17

18

19

20

21

22

23

24

25                                          EXHIBIT ___24___

                                            PAGE ___285___
```

THURSDAY, JULY 10, 2008                    TRIAL DAY 23, AFTERNOON SESSION

4892

1                              I N D E X

2                                                    PAGE

3    CLOSING ARGUMENTS - DEFENSE....................... 4893

4    CLOSING ARGUMENTS - PLAINTIFF.................... 4972

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT  24

PAGE  289

THURSDAY, JULY 10, 2008            TRIAL DAY 23, AFTERNOON SESSION

4900

```
1          LET'S PUT UP THE QUESTION AND THE ANSWER.  THIS IS
2   LARIAN AT PAGE 1840.
3          MR. QUINN TOLD YOU JUST AN HOUR AGO -- HE SHOWED THE
4   FIRST QUESTION AND ANSWER.
5          QUESTION:  "AND YOU DIDN'T, FOR EXAMPLE, COMMUNICATE      01:44
6   WITH VERONICA MARLOW AND, SAY, IDENTIFY WHO THESE LADIES ARE
7   WHO HAVE 100 YEARS TOTAL DOLL-MAKING EXPERIENCE AND HAVE THIS
8   SECURE EMPLOYMENT AND WHO ARE MOONLIGHTING AND WHO WOULD BE
9   FIRED AND HUMILIATED IF IT WAS DISCOVERED?"
10         ANSWER:  "AGAIN, AS I TESTIFIED, I DID NOT READ THIS      01:44
11  LONG E-MAIL.  IT WAS NOT SENT TO ME.  IT WAS SENT TO PAULA.  I
12  WAS COPIED ON IT, SO I DON'T RECALL EVEN READING THIS WHOLE
13  E-MAIL."
14         MR. NOLAN:  AND MR. LARIAN WAS RIDICULED FOR THAT
15  ANSWER.                                                         01:44
16         BUT THEN, WHAT MR. QUINN DID NOT SHOW YOU, WHAT
17  MATTEL DID NOT SHOW YOU, IS THE VERY NEXT QUESTION AND ANSWER:
18         QUESTION:  "I, SITTING HERE READING THIS TODAY, YOUR
19  DECISION STILL WOULD BE, 'I WOULDN'T DO ANYTHING ABOUT IT; I
20  WOULDN'T INVESTIGATE IT'?"                                      01:44
21         ANSWER:  "PAULA WAS WORKING WITH VERONICA, AND I
22  HOPED SHE WOULD LOOK INTO THIS.  I WAS NOT INVOLVED IN THAT
23  DETAIL, NO."
24         MR. NOLAN:  YOU KNOW FROM MR. MARLOW'S TESTIMONY
25  THAT, IN FACT, WHEN THE E-MAIL HAD BEEN WRITTEN TO              01:45
```

EXHIBIT ___24___

PAGE __290__

4901

1   ISAAC LARIAN, VERONICA MARLOW HAD QUIT, BECAUSE MEL WOODS AND

2   PAULA GARCIA WERE DEMANDING TO KNOW THE IDENTITY OF WHO THEY

3   WERE USING AS THIRD-PARTY VENDORS.

4        THAT'S THE REST OF THE STORY.  DO NOT DECIDE THIS

5   CASE, LADIES AND GENTLEMEN, ON INNUENDO.                    01:45

6        MR. QUINN SAYS THAT WE STOLE IDEAS AND DRAWINGS FROM

7   MATTEL.  THE ONLY THEFT THAT WILL OCCUR IN THIS CASE IS IF --

8   AND I DON'T BELIEVE THIS IS GOING TO HAPPEN -- IF YOU ALLOW

9   MATTEL TO TAKE IDEAS AND DRAWINGS THAT THEY DID NOT CONCEIVE

10  OF, THAT THEY DID NOT DRAW, AND DOLLS THAT THEY DID NOT MAKE.  01:45

11        THAT'S WHAT THIS CASE IS ABOUT.

12        THE CENTRAL ISSUE IN THIS CASE IS, WHEN DID

13  CARTER BRYANT FIRST CONCEIVE OF THE BRATZ CHARACTERS AND REDUCE

14  HIS IDEA TO A DRAWING?

15        MATTEL WILL DO EVERYTHING, AND DID EVERYTHING, TO      01:46

16  DISTRACT YOU FROM THAT MAIN POINT.

17        IN LATE AUGUST OF 1998, CARTER BRYANT DESCRIBED THE

18  FOUR BRATZ CHARACTERS IN HIS HANDWRITTEN NOTES.  YOU HAVE IT IN

19  EVIDENCE.  IT'S TRIAL EXHIBIT 709.

20        COULD I HAVE SLIDE 27 UP.                             01:46

21        THIS IS THE DOCUMENT, "MEET THE BRATZ."

22        THE NAME "BRATZ" IS MENTIONED RIGHT THERE.

23  CARTER BRYANT TESTIFIED THAT THIS WAS HIS CONCEPT FOR WHAT THE

24  BRATZ WOULD BE.  IT TURNS OUT THAT IT BECAME THE INITIAL

25  INSPIRATION FOR A DOLL LINE THAT WAS FABULOUSLY SUCCESSFUL,   01:47

EXHIBIT ___24___

PAGE ___291___

1   THAT MR. QUINN EVEN ADMITTED WAS HUGELY SUCCESSFUL AROUND THE

2   WORLD.  AND THAT, LADIES AND GENTLEMEN, IS COMPETITION.  AND

3   THAT IS REALLY WHAT IS GOING ON AS A SUBTEXT IN THIS CASE.

4          YES, IT'S ABOUT DOLLS; BUT, YES, IT IS SO MUCH MORE

5   IMPORTANT THAN THAT.                                          01:47

6          MATTEL AND MGA COMPETE IN THE MARKETPLACE.  AND YOU

7   NOW KNOW THAT FOR 40 YEARS, BARBIE WAS THE ONLY DOLL IN TOWN,

8   AND BRATZ CAME IN AND KNOCKED HER OFF HER PEDESTAL.  AND MATTEL

9   HAS AGGRESSIVELY ACCUSED ALL OF US IN A CONSPIRACY TO STEAL AN

10  IDEA THAT THEY NEVER HAD, THEY NEVER MADE.                    01:47

11         BRATZ WAS BORN ON AN AUGUST EVENING IN KIMBERLING

12  CITY.  THE BEST EVIDENCE OF IT IS THE TESTIMONY OF

13  JANET BRYANT.  MOTHERS DON'T LIE.  MR. QUINN EVEN ADMITTED

14  THAT.  THEY MAY BE MISTAKEN.  AND SHE CERTAINLY MADE MISTAKES

15  WITH RESPECT TO WHAT DRAWINGS SHE MAY HAVE SEEN.  BUT HER      01:48

16  DEPOSITION WAS TAKEN NINE YEARS AFTER SHE SAW THE DRAWINGS.

17  BUT IF THERE WAS A CONSPIRACY, YOU WOULD HAVE EXPECTED HER TO

18  NAIL IT; 'OH, I SAW THAT ONE; I SAW THIS ONE; I SAW THAT ONE; I

19  DIDN'T SEE THIS; OH, NO, I DIDN'T SEE THIS ONE.'

20         SHE'S HONEST.                                          01:48

21         COULD WE ALL, EVEN AFTER SEVEN WEEKS --

22         I MEAN, I'M SITTING AROUND IN A CONFERENCE ROOM,

23  GOING, 'IS THIS IN EVIDENCE?  DID WE INTRODUCE THIS IN

24  EVIDENCE?  DID I ASK QUESTIONS ABOUT THIS ONE?'

25         THERE'S A LOT OF DRAWINGS HERE.  THE FAILURE TO        01:49
    EXHIBIT ___24

PAGE ___292

1          THERE'S THE HERO SHOT.  THAT, LADIES AND GENTLEMEN,

2     THOSE ARE THE FOUR BRATZ CHARACTERS.

3          THIS IS CARTER BRYANT.

4          I'M GOING TO SHOW YOU A FEW MORE EXHIBITS, 777.

5          QUESTION:  "WERE THEY DONE IN 1998?"                    03:22

6          ANSWER:  "YES."

7          QUESTION:  "YOU CHANGED THE HAIRSTYLE?"

8          "YES."

9          ON ONE, HE LIKED THE PONYTAIL.  ON THE OTHER ONE, HE

10    LIKED THE BANDANA LOOK.  ALL HE HAD TO DO, LADIES AND         03:22

11    GENTLEMEN -- IF I MIGHT, YOUR HONOR?

12         **THE COURT:**  YOU MAY.

13         **MR. NOLAN:**  TO SHOW YOU THE IMPORTANCE OF QUESTION

14    NUMBER 1, THAT THESE WERE DONE AND CREATED IN 1998 AND PUT TO

15    PRACTICE, REDUCTION TO PRACTICE, CARTER BRYANT, YOU WILL      03:22

16    RECALL, DREW FOR YOU ON THAT BOARD, NOT SOMETHING THAT I JUST

17    ASKED HIM TO MAKE UP; I ASKED HIM TO DRAW A BRATZ.  NOT A NEW

18    CREATION.  I JUST ASKED HIM TO DRAW A BRATZ.

19         AND TO DEMONSTRATE FOR YOU, HE THEN SAT AT THIS VERY

20    CHAIR AS THOUGH HE WAS IN THE BACK OF HIS ROOM IN A STUDIO, AND  03:2

21    HE EXPLAINED VERY CAREFULLY WHAT HE WAS TAUGHT AT THE OTIS

22    SCHOOL OF ART, AND THAT WAS TO SLOWLY, SLOWLY TRACE THE

23    ORIGINAL MASTER TO REPLICATE EXACTLY WHAT HE HAD CREATED.

24         AND FROM THAT, HE WOULD MOVE AND HE WOULD TRACE AND

25    PUT ON SHOES, FASHIONS, BACKPACKS.  HE COULD SHIFT THE HAIR, IF  03:2

EXHIBIT __24__

4950

1  HE WANTED TO.  BUT THEY WERE CREATED -- THE CONCEPT, THE IDEA,

2  THEY WERE CREATED IN 1998, NOT 1999.

3          LILY MARTINEZ TESTIFIED THAT SHE USES THE SAME

4  PROCESS.  WE'RE NOT THE ONLY ONE THAT USES A LIGHT BOX.  IT'S A

5  COMMON WAY OF COPYING THE MASTERS.                            03:24

6          THE FACT THAT HE KEPT GOING BACK TO THESE DRAWINGS AS

7  THE MASTERS, FURTHER EVIDENCE THAT THOSE DRAWINGS IN 1998 WERE,

8  IN FACT, THE ORIGINAL CONCEPT DRAWINGS FOR THE BRATZ.

9          LET'S GO TO SLIDE 49, IF I COULD.

10          IN MY OPENING STATEMENT, I USED THE SAME GRAPHIC.  ON    03:24

11  THE LEFT-HAND SIDE ARE ALL OF THE DRAWINGS THAT CARTER BRYANT

12  DID IN 1998.  AND THE RED BARRIER LINE -- THERE IS A SEPARATION

13  BETWEEN 1998 AND THE PERIOD OF HIS EMPLOYMENT.  IT WAS MATTEL'S

14  BURDEN IN THIS CASE TO MOVE EACH AND EVERY ONE OF THE DRAWINGS

15  FROM THE LEFT TO THE RIGHT, AND I RESPECTFULLY SUBMIT, THEY DID   03:25

16  NOT MEET THAT BURDEN.

17          NOW, THERE'S TESTIMONY THAT CARTER BRYANT ADDED COLOR

18  FOR DRAWINGS IN 1999, 2000.  HE CERTAINLY DID THAT.  BUT EVERY

19  WITNESS WHO TOOK THE STAND SAID IT DOESN'T MATTER IF YOU ADD

20  COLOR OR NOT.                                                 03:25

21          "THIS IS BLACK AND WHITE.  THERE'S NO COLOR; RIGHT?"

22          "RIGHT."

23          "DID YOU TYPICALLY COMPLETE THE MASTER DRAWINGS

24  WITHOUT COLORING THEM?"

25          "YES."                                               03:2

EXHIBIT __24__

PAGE __294__

```
 1              "AND WHY IS THAT?"

 2              "WELL, IF I HAD THE MASTER DRAWING, I HAD THE

 3    CONCEPT.  I HAD THE CREATION.  I COULD GO BACK AND ADD COLOR

 4    LATER, YOU KNOW, WHEN I FELT LIKE IT, OR I HAD TIME, OR

 5    WHATEVER."                                                       03:25

 6              QUESTION:  "IN YOUR VIEW, DID ADDING COLOR TO MASTER

 7    DRAWINGS CHANGE THE CONCEPT OF THE DRAWING?"

 8              ANSWER:  "NO."

 9              QUESTION:  "DID IT CHANGE THE ATTITUDE OF THE

10    DRAWING?"                                                        03:25

11              ANSWER:  "NO."

12              QUESTION:  "DID IT CHANGE THE CHARACTER OF THE

13    DRAWING?"

14              ANSWER:  "NO."

15              QUESTION:  "DID IT CHANGE THE POSE OF THE DRAWING?"    03:26

16              ANSWER:  "NO."

17              MR. NOLAN:  CARTER BRYANT.  THAT SERIES OF QUESTIONS

18    AND ANSWERS WERE NEVER REFUTED BY A SINGLE MATTEL WITNESS.

19    EVEN MS. MARTINEZ ADMITTED THAT SHE DOESN'T DO COLOR FIRST;

20    SHE'LL DO THE BLACK AND WHITE.  AND IT MAKES SENSE.             03:26

21              THAT'S WHAT I SAID TO YOU IN MY OPENING STATEMENT;

22    THAT NOTWITHSTANDING THE FACT THAT MATTEL'S OPENING STATEMENT,

23    MR. QUINN PROMISED YOU THAT THEY WERE GOING TO BRING IN AN

24    EXPERT TO PROVE THAT THOSE COLOR DRAWINGS WERE DONE FIRST AND

25    THEN THE BLACK AND WHITES WERE TRACED AFTERWARDS.  YOU MAY NOT  03:26
```

EXHIBIT _Z4_

PAGE **295**

5014

1                                    CERTIFICATE

2

3      I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
       STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
4      THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
       ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
5      CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
       THE UNITED STATES.

6

7

8      THERESA A. LANZA, RPR, CSR                    7-14-08
       OFFICIAL COURT REPORTER                          DATE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
                                            EXHIBIT   24
25
                                            PAGE   296

THURSDAY, JULY 10, 2008                 TRIAL DAY 23, AFTERNOON SESSION

5324

1                UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3                   EASTERN DIVISION

4                    - - -

5      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6               - - -

**CERTIFIED COPY**

7  MATTEL, INC.,              )
                             )

8            PLAINTIFF,   )
                             )

9       VS.               )  NO. CV 04-09049
                             )

10  MGA ENTERTAINMENT, INC., ET. AL.,  )  TRIAL DAY 27
                             )  MORNING SESSION

11            DEFENDANTS.  )  PAGES 5324-5477
                             )

12  AND CONSOLIDATED ACTIONS,       )
                             )

13

14

15    REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17           WEDNESDAY, JULY 23, 2008

18                8:17 A.M.

19

20

21

22

23             THERESA A. LANZA, RPR, CSR
            FEDERAL OFFICIAL COURT REPORTER

24          3470 12TH STREET, RM. 134
          RIVERSIDE, CALIFORNIA 92501

25           951-274-0844
          WWW.THERESALANZA.COM

EXHIBIT 24

5325

```
 1   APPEARANCES:

 2

 3   ON BEHALF OF MATTEL, INC.:

 4                        QUINN EMANUEL
                         BY:  JOHN QUINN
 5                             JON COREY
                              MICHAEL T. ZELLER
 6                             HARRY OLIVAR
                              TIMOTHY ALGER
 7                             WILLIAM PRICE
                         865 S. FIGUEROA STREET,
 8                       10TH FLOOR
                         LOS ANGELES, CALIFORNIA   90017
 9                       213-624-7707

10

11   ON BEHALF OF MGA ENTERTAINMENT:

12                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                         BY:  THOMAS J. NOLAN
13                             DAVID HANSEN
                              LAUREN AGUIAR
14                             CARL ROTH
                         300 SOUTH GRAND AVENUE
15                       LOS ANGELES, CALIFORNIA   90071-3144
                         213-687-5000

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 24

PAGE 298

WEDNESDAY, JULY 23, 2008                    TRIAL DAY 27, MORNING SESSION

5326

I N D E X

PAGE

BENCH CONFERENCE................................... 5327

OPENING STATEMENT − PLAINTIFF..................... 5410

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

EXHIBIT __24__

PAGE __299__

5384

1    THINK IT BECOMES VERY CONFUSING TO THE JURY TO HAVE

2    INSTRUCTIONS UNDER HONG KONG LAW AND INSTRUCTIONS UNDER NINTH

3    CIRCUIT LAW IN TERMS OF COPYRIGHT INFRINGEMENT.

4         MR. PRICE:  TWO THINGS, YOUR HONOR.  ONE IS, IT IS A

5    FACT IN THE SENSE THAT THEY ARE USING THESE DRAWINGS AND THESE      10:17

6    ARE THE DOLLS THEY'RE TRYING TO STOP FROM MANUFACTURING.  AN

7    EXAMPLE WOULD BE -- COULD WE PUT UP FOR THE COURT AN -- AN

8    EXAMPLE WOULD BE, YOUR HONOR -- PUT UP 33.3.  IT WOULD JUST BE

9    TO ILLUSTRATE THAT -- THEY SAID, FOR EXAMPLE, IN THIS

10   PARTICULAR EXAMPLE, THAT THE DOLL WHICH THEY SUED AGAINST WAS      10:18

11   THIS DOLL HERE ON THE RIGHT.  THIS IS THE BLOWUP OF THAT DOLL.

12   AND IN THEIR ARGUMENTS, THEY MAKE FACTUAL ARGUMENTS THAT THE

13   EYES ARE THE SAME, THAT THE LIPS ARE THE SAME, THAT THE

14   EYEBROWS -- THOSE ARE FACTUAL ARGUMENTS THAT THEY'RE MAKING IN

15   COMPARING THOSE DOLLS.                                            10:18

16        SO WE THINK WE SHOULD BE ENTITLED TO SAY, 'THEY'RE

17   USING THE DRAWINGS TO PREVENT DOLLS FROM BEING MANUFACTURED,

18   AND YOU CAN SEE, THESE ARE THE DOLLS THEY'RE TRYING TO PREVENT

19   FROM BEING MANUFACTURED.'  AND THEY MAKE FACTUAL STATEMENTS

20   CONCERNING THAT.                                                  10:19

21        SO IT'S TO GIVE THIS JURY CONTEXT AS TO HOW IMPORTANT

22   THESE DRAWINGS ARE, OBVIOUSLY.

23        THE COURT:  VERY WELL.

24        LET ME HEAR MORE FROM MR. HANSEN.

25        MR. HANSEN, IF YOU WOULD, BEGIN BY ADDRESSING             10:19

EXHIBIT ___24___

PAGE __300__

1   MR. ZELLER'S FIRST POINT.  MAYBE NOT HIS FIRST POINT, BUT THE

2   JUDICIAL ESTOPPEL POINT, THE FUNDAMENTAL -- I'M WITH YOU ON THE

3   LEGAL DISTINCTION AND THE DANGERS, THE 403 DANGERS, OF HAVING

4   TO INSTRUCT THE JURY ON HONG KONG LAW AND GETTING INTO WHAT I

5   THINK MIGHT VERY WELL BE A QUAGMIRE IF WE WENT DOWN THIS ROAD          10:19

6   TOO FAR.

7          BUT THERE'S A FUNDAMENTAL UNFAIRNESS THAT MR. ZELLER

8   HAS IDENTIFIED THAT RESONATES WITH THE COURT.  FOR MGA TO BE

9   ABLE TO GO IN ONE COURT, WHETHER IT'S HONG KONG OR OREGON OR

10  WHEREVER IT IS, AND SAY, 'AHA, YOU'RE INFRINGING OUR DRAWINGS;        10:19

11  YOU'RE INFRINGING OUR DOLLS,' AND THEN TURN AROUND AND MAKE ALL

12  OF THE ARGUMENTS IN TERMS OF SIMILARITY OF EYES, SIMILARITY OF

13  WHATEVER, AND THEN TURN AROUND IN ANOTHER COURT AND SAY, 'NOW

14  WE'RE GOING TO BRING IN EXPERTS AND SAY THEY DON'T LOOK

15  ANYTHING LIKE THE DRAWINGS AND THE DOLLS DON'T EVEN LOOK ALIKE,       10:20

16  LET ALONE THE DRAWINGS AND THE DOLLS AND SOME OTHER DOLL,' THIS

17  REALLY STRIKES THE COURT AS A FUNDAMENTALLY UNFAIR POSITION FOR

18  MGA TO BE TAKING.

19          MR. HANSEN:  IF YOU'RE SPEAKING, YOUR HONOR, TO THE

20  NOTION THAT'S IN THEIR BRIEF OF WHETHER OR NOT WE'RE ARGUING         10:20

21  THAT A THREE-DIMENSIONAL ITEM CANNOT INFRINGE A TWO-DIMENSIONAL

22  DRAWING, THAT'S THE RED HERRING.

23          WE'RE NOT ARGUING THAT.

24          SO PART OF WHAT THEY'RE SAYING IS WE CAN'T COME IN

25  HERE AND SAY --                                                      10:20

EXHIBIT ___24___

5386

1          **THE COURT:**  ADDRESS WHAT MR. PRICE -- IN THE CONTEXT

2     OF MR. PRICE.

3          IN ANOTHER COURT, MGA, THROUGH MR. LARIAN, HAS STOOD

4     UP AND SAID THESE EYES LOOK ALIKE; AND NOW WE'RE GOING TO HEAR

5     EVIDENCE FROM MGA'S EXPERT SAYING THEY DON'T LOOK ANYTHING      10:20

6     ALIKE.

7          THERE'S A FUNDAMENTAL INCOHERENCE TO THAT POSITION,

8     WHICH I THINK THE DOCTRINE OF JUDICIAL ESTOPPEL DOES SPEAK TO.

9          **MR. HANSEN:**  WHAT WE HAVE, YOUR HONOR, IS -- THE

10    REASON IT DOESN'T SPEAK TO IT IS THAT -- WHAT WE'RE TALKING     10:21

11    ABOUT OVER IN HONG KONG IS -- WE HAVE -- I DON'T KNOW WHAT DOLL

12    THAT IS, SAY THE TRENDY TEENS OR --

13         **THE COURT:**  TRENDY TEENS.

14         **MR. HANSEN:**  I DON'T KNOW THE NAMES EXACTLY, BUT

15    LET'S SAY TRENDY TEENS, ONE OF THE ONES THAT THEY TALK ABOUT.   10:21

16         SO WHAT'S BEING DISCUSSED OVER THERE IS THAT A BRATZ

17    DOLL LOOKS LIKE A TRENDY TEENS DOLL.  SO THE ANALYSIS OF THAT

18    IS BASED ON -- THE THINGS THAT ARE BEING SAID ARE BEING SAID

19    UNDER THE APPLICABLE HONG KONG LEGAL PRINCIPLES; SO THE

20    ARGUMENTS ARE INTERTWINED WITH THE HONG KONG LAW.              10:21

21         WHAT'S AT ISSUE IN THIS CASE IS NOT WHETHER BRATZ

22    LOOKS LIKE TRENDY TEENS --

23         **THE COURT:**  WE'VE GOT TO BREAK THIS DOWN, BECAUSE I

24    CAN'T ACCEPT A BROAD-BASED GENERALITY.

25         IN THE CONTEXT OF THE SPECIFIC EYE COMMENT, HOW IS        10:21

EXHIBIT _____ 24

5387

1    THAT MORE A FUNCTION OF LEGAL HONG KONG PRINCIPLES VERSUS A

2    FACTUAL STATEMENT OF -- LET'S SAY -- THE EXTRINSIC TEST IS OUT

3    IN HONG KONG.  WE'VE ESTABLISHED THAT.  IT'S JUST INTRINSIC.

4    THEY'RE JUST LOOKING AT ORDINARY SIMILARITIES.  AND THAT'S PART

5    OF WHAT IS GOING TO BE GOING ON HERE.                        10:22

6         WHY SHOULD MGA BE ABLE, IN A HONG KONG SITUATION,

7    WHICH IS STRICTLY LIMITED TO INTRINSIC ANALYSIS, BE ABLE TO SAY

8    THE EYES LOOK EXACTLY THE SAME, AND THEN TURN AROUND HERE --

9    WHAT'S REALLY TROUBLESOME ABOUT THIS IS, IN HONG KONG, MGA WAS

10   SAYING THE DRAWINGS AND THE DOLLS, GROUPED TOGETHER          10:22

11   ESSENTIALLY, LOOK JUST LIKE THESE OTHER DOLLS.  AND HERE,

12   THEY'RE TRYING TO DRAW THE DISTINCTION THAT THE DRAWINGS DON'T

13   LOOK ANYTHING LIKE THE DOLLS.

14        I REALLY THINK THAT THERE'S SOME SERIOUS PROBLEM WITH

15   THAT POSITION.                                               10:22

16        **MR. HANSEN:**  THE WAY I UNDERSTAND HONG KONG LAW

17   WORKS, THE DRAWINGS ARE THERE, ESSENTIALLY, AS A STAKE IN THE

18   GROUND FROM THE BEGINNING; IT'S A NECESSARY PART OF HONG KONG

19   LAW THAT BUILDS THE CHAIN OF TITLE UP TO THE DOLLS SO THAT YOU

20   CAN MAKE THE DOLL-TO-DOLL COMPARISON.  I CAN'T SAY THAT WITH   10:23

21   DEFINITIVE HONG KONG KNOWLEDGE, BUT YOU'RE REALLY BUILDING UP

22   THE CHAIN OF TITLE.

23        IF YOU LOOK THROUGH A LOT OF THE DECLARATIONS THEY

24   ARE SUBMITTING, IT HAS THE DRAWINGS IN THE INITIAL PART; THEN

25   THEY BUILD IT UP INTO THE SCULPT THROUGH MS. LEAHY; THEN THEY 24  10:23

PAGE 303

WEDNESDAY, JULY 23, 2008              TRIAL DAY 27, MORNING SESSION

1   HAVE A WAX MODEL; AND THEN THEY HAVE VARIOUS COLOR CHARTS AND

2   VARIOUS OTHER THINGS THAT ULTIMATELY GETS TO THE DOLL; AND THEN

3   YOU HAVE THIS DOLL-TO-DOLL COMPARISON.  SO THERE IS NEVER ANY

4   STATEMENT THAT THE DRAWINGS ARE, AS THEY SAY, A DERIVATIVE WORK

5   OF THE DOLLS, WHICH IS --                                          10:23

6        THE COURT:  WE'RE GOING TO STAY AWAY FROM DERIVATIVE

7   WORKS.  I PRESSED THAT ON MONDAY, AND EVERYONE JUMPED BACK FROM

8   THAT, SO WE'RE NOT GOING TO BE TALKING ABOUT -- THOSE ARE THE

9   TYPES OF LEGAL CONCLUSIONS THAT WE'RE NOT GOING TO BE GETTING

10  INTO.                                                              10:23

11       MR. HANSEN:  AND THAT'S ONE OF THE ARGUMENTS.

12       AND I WANT TO GET BACK TO YOUR POINT, YOUR HONOR, BUT

13  THE BASED ON -- AND ONE OF THE THINGS THEY CITE IS 'BASED ON'

14  -- AND AS YOU KNOW FROM THE SUPERBOY DECISION, YOU KNOW

15  DERIVATIVE WORKS, AND 'BASED ON' IS JUST ONE LITTLE PIECE         10:23

16       THE COURT:  RIGHT.

17       MR. HANSEN:  IT'S A MUCH MORE COMPLICATED -- IT

18  SAYS -- ESSENTIALLY WHAT THEY WANT TO ARGUE IS THAT IN HONG

19  KONG, WE SAID THAT THIS IS BASED ON THAT, WHICH WE DON'T

20  DISPUTE THAT THE BRYANT DRAWINGS WERE AN INSPIRATION AND PEOPLE    10:24

21  LOOKED AT THEM, BUT THEY WANT TO TAKE THAT SINGLE WORD "BASED

22  ON" THAT WAS USED IN THE DECLARATION IN HONG KONG --

23       THE COURT:  AND GIVE IT A LEGAL IMPORT.

24       MR. HANSEN:  AND SAY IT MEANS IT'S A DERIVATIVE WORK.

25       THE COURT:  AND THE COURT IS NOT GOING TO LET THEM DO         10:24

EXHIBIT 2

PAGE 354

5402

1   IS THAT IF THE JURY IS TOLD -- THOSE STATEMENTS ARE PUT INTO

2   PLAIN ENGLISH AND TOLD TO THE JURY -- THAT'S WHAT I'M

3   SUGGESTING.

4        THIS IS REALLY A LEGAL INTERPRETATION OR CONSTRUCTION

5   POINT, WHICH, TO THE EXTENT OF WHAT THOSE STATEMENTS FALL INTO.   10:4?

6   I MEAN, THE FACT IS THAT THEY SAY -- AND THEY USE THE LEGAL

7   TERMINOLOGY, WHICH IS INEVITABLE, OBVIOUSLY, IN LITIGATION IN

8   HONG KONG, BUT THAT'S TRUE FOR ANYTHING WHERE THERE'S JUDICIAL

9   ESTOPPEL.

10       **THE COURT:**  WE'RE NOT GOING TO GO THERE.                  10:4?

11       THANK YOU, COUNSEL.

12       **MR. ZELLER:**  THANK YOU.

13       **MR. PRICE:**  YOUR HONOR, I THINK THERE WERE TWO OTHER

14  ISSUES.

15       **THE COURT:**  I UNDERSTAND -- I'M GOING TO GET TO THEM       10:4?

16  AS SOON AS I'M DONE WITH THIS ISSUE, COUNSEL.

17       **MR. PRICE:**  I THOUGHT WE WERE DONE.

18       **THE COURT:**  MR. HANSEN, ANYTHING FURTHER?

19       **MR. HANSEN:**  THE DIFFICULTY IS --  JUST TO MAKE IT

20  CLEAR -- WHAT'S HAPPENING IS THAT THIS LOOKS LIKE THIS -- IN     10:4?

21  HONG KONG, WHAT'S ACCUSED OF INFRINGEMENT IS THE STATEMENT --

22  WHAT'S HAPPENING IS THAT IT'S BYPASSING ALL OF THE FILTRATION

23  THAT IS GOING ON IN THIS TRIAL TO MAKE THE DETERMINATION

24  BETWEEN WHETHER THE BRATZ DOLL LOOKS LIKE THIS DRAWING.  SO THE

25  PREJUDICE IS THAT THE JURY IS GOING TO HAVE ALL OF THESE, 'LOOK   10:4?

EXHIBIT _____

PAGE ___ 305

5403

1    AT THIS; DON'T THEY LOOK THE SAME OR DON'T THEY LOOK

2    DIFFERENT.'

3              THE COURT:   THAT'S PART OF THE INTRINSIC ANALYSIS.

4              MR. HANSEN:   THAT'S THE INTRINSIC ANALYSIS.   AND

5    THAT'S THE POINT.   YOU DON'T DO THE INTRINSIC ANALYSIS IN        10:43

6    HONG KONG.

7              THE COURT:   I UNDERSTAND THAT.   AND THAT'S WHY THE

8    CONCLUSIONS IN THE HONG KONG COURT DON'T COME IN, BECAUSE THEY

9    ARE LACKING THAT EXTRINSIC ANALYSIS.   THAT'S MY VERY POINT AND

10   WHY I'M NOT GOING DOWN THE JUDICIAL ESTOPPEL ROAD BEING INVITED   10:43

11   BY MR. ZELLER.

12             IN TERMS OF THE INTRINSIC ANALYSIS, THE WHOLE ISSUE

13   OF SIMILARITY, IT WOULD BE ENTIRELY UNFAIR, FROM THIS COURT'S

14   PERSPECTIVE, FOR -- WHEN YOU GET TO THE COMPARISON PART, THAT

15   IS, THE INTRINSIC ANALYSIS UNDER NINTH CIRCUIT LAW, AND          10:43

16   SUBSTANTIAL SIMILARITY UNDER HONG KONG LAW -- WHICH APPARENTLY,

17   AT LEAST BASED ON WHAT WE'VE SEEN HERE, IS NOTHING BUT

18   INTRINSIC ANALYSIS -- FOR THE PARTIES TO SAY -- FOR MGA TO SAY

19   ON THE ONE HAND, THE EYES LOOK DISSIMILAR, AND ON THE OTHER

20   HAND, THEY DON'T, OR THAT THEY ARE BASED ON THE DRAWINGS OR      10:43

21   THEY ARE NOT.

22             THAT'S ALL I'M GOING ON.   I'M TRYING TO CAPTURE THAT

23   WHICH IS APPROPRIATE FOR JUDICIAL ESTOPPEL PURPOSES, WITHOUT

24   GOING THE FULL MEASURE AND DOING THE -- PRESENTING THE LEGAL

25   ARGUMENTS AND THE LEGAL CONCLUSIONS TO THE JURY.                 10:44

EXHIBIT __24__

PAGE __300__

1          **MR. HANSEN:**  WHAT'S BEING DONE IN HONG KONG IS THE

2    INTRINSIC PART OF THE TEST.  SO WHEN YOU GET TO THE END GAME,

3    ASSUMING THIS ALL COMES IN, WHAT THE JURY IS GOING TO HAVE TO

4    DO TO ACTUALLY MAKE IT PROBATIVE IN THIS CASE IS TO TAKE A LOOK

5    AT THE HONG KONG DOLLS THAT ARE BEING PUT UP, DO THE FILTERING    10:44

6    ANALYSIS THAT THEY ARE REQUIRED TO DO IN CONNECTION WITH THE

7    BRATZ DOLLS.  SO WE HAVE --

8          **THE COURT:**  THEY ARE NOT BEING CALLED UPON TO DO AN

9    INFRINGEMENT ANALYSIS OF THOSE DOLLS.  I DISAGREE WITH YOU.

10         **MR. HANSEN:**  THAT'S EXACTLY THE POINT, IS THAT WHAT'S    10:44

11   HAPPENING IS THAT YOU'RE SUGGESTING WHAT THE JURY IS SEEING IS

12   AN INFRINGEMENT ANALYSIS THAT'S DONE WITHOUT THE EXTRINSIC --

13         **THE COURT:**  THEY ARE NOT GOING TO BE DOING AN

14   INFRINGEMENT ANALYSIS.  THIS IS SIMPLY GOING TO THE ISSUE OF

15   STATEMENTS OR POSITIONS TAKEN BY MR. LARIAN AND MGA IN TERMS OF   10:44

16   WHETHER THESE DOLLS LOOK ALIKE OR NOT.

17         **MR. HANSEN:**  AND WHAT THEY ARE USING TO SAY LOOKS

18   ALIKE IS SOMETHING THAT WE CLAIM INFRINGED UNDER A DIFFERENT

19   STANDARD WHERE THE LOOK-ALIKE TEST DOESN'T FILTER OUT THE

20   ELEMENTS THAT ARE GOING TO BE FILTERED OUT HERE --              10:45

21         **THE COURT:**  I UNDERSTAND THAT.

22         **MR. HANSEN:**  -- WHERE THE INFRINGEMENT STANDARD HERE

23   IS DIFFERENT, SO THE DOLLS THERE ARE REALLY NOT PROBATIVE,

24   BECAUSE THE COMPARISON IS NOT APPLES AND APPLES.  BECAUSE IN

25   ORDER TO MAKE AN APPLES-TO-APPLES COMPARISON, YOU HAVE TO       10:45

EXHIBIT ___ 24

PAGE 357

5477

1                          CERTIFICATE

2

3    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
4    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
     ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
5    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

6

7                              7-24-08
                                                   ──────────
     THERESA A. LANZA,  CSR, RPR                      DATE
8    FEDERAL OFFICIAL COURT REPORTER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                                     EXHIBIT ___24___
                                       PAGE ___308___

WEDNESDAY, JULY 23, 2008              TRIAL DAY 27, MORNING SESSION

6191

```
 1                    UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3                         EASTERN DIVISION

 4                          - - -

 5          HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 6                          - - -

 7    MATTEL, INC.,                    )
                                       )
 8                    PLAINTIFF,       )
                                       )
 9          VS.                        )   NO. CV 04-09049
                                       )
10    MGA ENTERTAINMENT, INC., ET. AL.,)
                                       )
11                    DEFENDANTS.      )   TRIAL DAY 31
      _____)   MORNING SESSION
12    AND CONSOLIDATED ACTIONS,        )   PAGES 6191-6350
      _____)

13

14

15          REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                     RIVERSIDE, CALIFORNIA

17                 THURSDAY, AUGUST 7, 2008

18                        8:13 A.M.

19

20

21

22

23                  THERESA A. LANZA, RPR, CSR
                   FEDERAL OFFICIAL COURT REPORTER
24                    3470 12TH STREET, RM. 134
                   RIVERSIDE, CALIFORNIA  92501
25                        951-274-0844
                     WWW.THERESALANZA.COM
```

CERTIFIED
COPY

EXHIBIT ___24___

PAGE ___309___

6192

1    APPEARANCES:

2

ON BEHALF OF MATTEL, INC.:

3

                              QUINN EMANUEL
4                             BY:   JOHN QUINN
                                    JON COREY
5                                   MICHAEL T. ZELLER
                                    HARRY OLIVAR
6                                   TIMOTHY ALGER
                              865 S. FIGUEROA STREET,
7                             10TH FLOOR
                              LOS ANGELES, CALIFORNIA   90017
8

9

10   ON BEHALF OF MGA ENTERTAINMENT:

11                            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                              BY:   THOMAS J. NOLAN
12                                  JASON RUSSELL
                                    RAOUL KENNEDY
13                                  LAUREN AGUIAR
                                    CARL ROTH
14                            300 SOUTH GRAND AVENUE
                              LOS ANGELES, CALIFORNIA   90071-3144
15                            213-687-5000

16

17

18

19

20

21

22

23

24

25                                                    EXHIBIT___24

                                                      PAGE___310

THURSDAY, AUGUST 7, 2008              TRIAL DAY 31, MORNING SESSION

6193

INDEX

| PLAINTIFF WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **ISAAC LARIAN (CONTINUED)** | | | | |
| BY MR. PRICE | 6236 | | 6271 | |
| BY MR. NOLAN | | 6246 | | 6280 |

| PLAINTIFF WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **MICHAEL WAGNER** | | | | |
| BY MR. QUINN | 6281 | | | |

| EXHIBITS | RECEIVED |
|---|---|
| 655 | 6236 |
| 656 | 6237 |
| 657 | 6237 |
| 658 | 6238 |
| 659 | 6238 |
| 10188 | 6239 |
| 10722 | 6239 |
| 4947 | 6243 |
| 10195 | 6243 |
| 10219 | 6286 |
| 13931 | 6293 |
| 13932 | 6304 |
| 13908 | 6312 |

EXHIBIT ___24___

PAGE ___311___

THURSDAY, AUGUST 7, 2008

TRIAL DAY 31, MORNING SESSION

1    I'M GOING TO SET FORTH -- AND THIS WILL BE -- I'LL BE ISSUING

2    THIS IN AN ORDER IN FINAL FORM AT SOME POINT IN TIME.  I HAVE

3    THIS WRITTEN OUT, TYPED OUT, WHICH I JUST DID RIGHT NOW; AND I

4    THINK THIS WILL PROVIDE A GUIDELINE, ALTHOUGH, AGAIN, THIS IS

5    NOT DEFINITIVE; THIS IS TENTATIVE.  AND ADDITIONAL EVIDENCE

6    THAT MIGHT BE PRESENTED TO THE COURT MIGHT CAUSE THE COURT TO

7    EXPAND, RETRACT, OR REVISE THIS LIST.  BUT THIS IS BASED ON

8    EVERYTHING THAT'S BEFORE ME SO FAR IN TERMS OF WHAT ARE THE

9    PROTECTABLE ELEMENTS OF THE COPYRIGHTED CARTER BRYANT DRAWINGS

10   AND WHAT ARE THE NONPROTECTABLE ELEMENTS OF THE COPYRIGHTED

11   CARTER BRYANT DRAWINGS.  AND WHAT I HAVE TRIED TO DO IS CONSULT

12   NOT ONLY WITH THE EVIDENCE THAT WE'VE HAD PRESENTED SO FAR, BUT

13   I'VE REVIEWED THE JURY INSTRUCTIONS THAT WERE SUBMITTED LAST

14   WEEK, AND I'VE TRIED TO MAKE THE BEST ASSESSMENT I CAN.

15   IN TERMS OF NONPROTECTABLE ELEMENTS OF THE COPYRIGHTED CARTER

16   BRYANT DRAWINGS, FIRST, THE RESEMBLANCE OR SIMILARITY TO HUMAN

17   FORM AND HUMAN PHYSIOLOGY, THE MERE RESEMBLANCE OF FORM AND

18   ANATOMY AND PHYSIOLOGY BETWEEN THE DOLLS AND THE HUMAN FORM,

19   JUST LIKE MOUNTAIN LIONS AND JELLYFISH AND EVERYTHING ELSE,

20   THAT'S CLEARLY NOT PROTECTABLE.  SECOND, THE PRESENCE OF

21   CERTAIN ANATOMICAL OR PHYSIOLOGICAL FEATURES; A HEAD, HAIR, TWO

22   EYES, EYEBROWS, LIPS, NOSE, CHIN, MOUTH, OR OTHER FEATURES THAT

23   TRACK HUMAN PHYSIOLOGY AND HUMAN ANATOMY ARE NOT PROTECTABLE.

24   THIRD, HUMAN CLOTHES, SHOES, ACCESSORIES ARE NOT PROTECTABLE AS

25   HUMAN {SIC} CLOTHES, SHOES, AND ACCESSORIES.

EXHIBIT ___24___

PAGE ___312___

6197

1    AGE, RACE, ETHNICITY, AN URBAN LOOK VERSUS A RURAL LOOK; THESE

2    ARE ALSO ELEMENTS THAT ARE NOT PROTECTABLE.  COMMON OR STANDARD

3    TREATMENTS OF THE SUBJECT MATTER -- AND I'M NOT EVEN GOING TO

4    ATTEMPT TO PRONOUNCE THE FRENCH -- MR. NOLAN, DID YOU TAKE

5    FRENCH BACK IN HIGH SCHOOL?

6              **MR. QUINN:**  *SCENES-A-FAIRE.*

7              **THE COURT:**  I'LL TYPE THAT OUT IN ITALICS AND I'LL

8    LEAVE IT AT THAT.  BUT I THINK EVERYONE UNDERSTANDS, AT LEAST I

9    HOPE THEY DO, WHAT I'M REFERRING TO.

10             SO THOSE ARE ALL NONPROTECTABLE ELEMENTS.  AND THERE

11   MAY BE MORE THAT MIGHT BE HELPFUL TO IDENTIFY GOING FORWARD.

12             WHAT IS PROTECTABLE?  WHAT ARE THE PROTECTABLE

13   ELEMENTS OF THE COPYRIGHTED CARTER BRYANT DRAWINGS?

14             FIRST, PARTICULARIZED SYNERGISTIC COMPILATIONS AND

15   EXPRESSIONS OF THE HUMAN FORM AND ANATOMY THAT EXPRESS A UNIQUE

16   STYLE AND/OR CONVEY A DISTINCT LOOK OR ATTITUDE ARE

17   PROTECTABLE.

18             SECOND, PARTICULARIZED EXPRESSIONS OF THE DOLL'S

19   HEAD, THE LIPS, EYES, EYEBROWS, EYE FEATURES, NOSE, CHIN,

20   HAIRSTYLE, AND BREASTS, INCLUDING THE ACCENTUATION OR

21   EXAGGERATION OF CERTAIN ANATOMICAL FEATURES RELATIVE TO OTHERS,

22   DOLL LIPS, EYES, EYEBROWS, AND EYE FEATURES, AS WELL AS THE

23   DEEMPHASIS OF CERTAIN ANATOMICAL FEATURES RELATIVE TO OTHERS,

24   THE DOLL NOSE, RELATIVELY THIN SMALL BODIES, ARE ALL

25   PROTECTABLE ELEMENTS OF THE CARTER BRYANT DRAWINGS.

EXHIBIT ___ 24

PAGE ___ 313

1            THIRD, PARTICULARIZED NONFUNCTIONAL DOLL CLOTHES,

2    DOLL SHOES, AND DOLL ACCESSORIES THAT EXPRESS AGGRESSIVE,

3    CONTEMPORARY, YOUTHFUL STYLE ARE PROTECTABLE ELEMENTS.

4            THAT'S WHAT I HAVE SO FAR.

5            HAVING CONSIDERED THE VERY WIDE RANGE, ALMOST

6    LIMITLESS, OF POSSIBLE EXPRESSIONS FOR THESE PARTICULARIZED

7    EXPRESSIONS OF THE PROTECTABLE ELEMENTS, THE COURT FINDS, AS I

8    BELIEVE I ALREADY MADE CLEAR, BUT PERHAPS NOT CLEAR ENOUGH,

9    THAT THOSE ELEMENTS ARE TO BE AFFORDED BROAD PROTECTION.

10           THE COURT HAS ALREADY FOUND THAT THE VIRTUAL IDENTITY

11   STANDARD DOES NOT APPLY.  RATHER, THE ONLY OTHER STANDARD, OR

12   THE REGULAR STANDARD, TO BE APPLIED TO THESE PROTECTABLE

13   ELEMENT IS THE EXTRINSIC/INTRINSIC SUBSTANTIAL SIMILARITY TEST

14   OF THE NINTH CIRCUIT, AFFORDING BROAD PROTECTION TO THOSE

15   PARTICULARIZED PROTECTABLE ELEMENTS.

16           GOING THROUGH THE BRIEFS THEMSELVES, IN MGA'S BRIEF,

17   THE FIRST SUBSTANTIVE ARGUMENT IS MADE ON PAGE 2.  THEY TAKE

18   ISSUE WITH AN ARGUMENT MADE IN MATTEL'S PROPOSED JURY

19   INSTRUCTIONS, WITH WHICH I AGREE.  ON PAGE 2, LINES 13 THROUGH

20   18, MGA IS QUOTING AN OBJECTION MADE BY MATTEL IN WHICH MATTEL

21   STATES, "THE COURT HAS REJECTED MGA'S REPEATED ASSERTIONS THAT

22   BRYANT'S DESIGNS ARE SUBJECT TO ONLY THIN PROTECTION, AND

23   INSTEAD HELD, AS DEFENDANTS ACKNOWLEDGE, THAT THEY ARE SUBJECT

24   TO BROAD PROTECTION."

25           THE TWIST ON THAT IS, IT'S SUBJECT TO BROAD

EXHIBIT _____ 24

PAGE _____ 314

1    PROTECTION ONLY AS TO THE PROTECTABLE ELEMENTS, AS I JUST SAID

2    FORTH.

3         MATTEL GOES ON TO WRITE THAT "HENCE, THERE'S NOTHING

4    TO FILTER OUT WHEN PERFORMING A SUBSTANTIAL SIMILARITY ANALYSIS

5    UNDER THE EXTRINSIC TEST."  I DISAGREE WITH THAT.  THE COURT

6    MUST CONDUCT THE FILTERING OUT OF THE NONPROTECTABLE ELEMENTS

7    AND IDENTIFY FOR THE JURY THE PROTECTABLE ELEMENTS THAT ARE TO

8    BE COMPARED.

9         THAT'S THE LIST THAT I'M COMING UP WITH HERE IN TERMS

10   OF PROTECTABLE ELEMENTS.

11        SO THERE IS A NEED FOR FILTERING, AS THE COURT HAS

12   PREVIOUSLY HELD, AND I WOULD TAKE ISSUE WITH THE STATEMENT THAT

13   THERE'S NO NEED FOR FILTERING.  BUT CERTAINLY, MATTEL IS

14   CORRECT THAT THE JURY IS NOT GOING TO BE CONDUCTING THIS

15   FILTERING ANALYSIS AND THE JURY IS NOT GOING TO BE HEARING

16   EVIDENCE OF THE FILTERING.  THAT'S SOMETHING WHICH IS FOR THE

17   COURT.

18        IF MGA OR MATTEL BELIEVES THAT THE COURT NEEDS TO

19   HEAR FURTHER TESTIMONY OR EVIDENCE TO PROPERLY CONDUCT THE

20   FILTERING, THE COURT AFFORDS LEAVE TO BOTH SIDES TO DO SO; BUT

21   AT THE END, IT IS GOING TO BE FOR THE COURT TO DO THAT

22   FILTRATION, AND THE COURT WILL BE INSTRUCTING, AS A MATTER OF

23   LAW, THE JURY AS TO WHAT PROTECTABLE ELEMENTS THEY ARE TO FOCUS

24   ON IN CONDUCTING THEIR EXTRINSIC ANALYSIS.

25        TURNING TO PAGE 3, TOWARDS THE BOTTOM, CERTAINLY -- I

EXHIBIT ____ 24

PAGE ____ 315

1  CAN'T DISAGREE WITH MGA'S QUOTING OF THE COURT'S JULY 24TH

2  ORDER, BUT THE CONCLUSION THAT THEY REACH, I THINK, IS

3  MISTAKEN.

4          THEY WRITE, BEGINNING ON LINE 24, THAT "THUS,

5  CONTRARY TO THE ARGUMENTS MADE BY MATTEL, THE COURT'S ORDER

6  CLEARLY HELD THAT THE JURY WILL BE INSTRUCTED TO ANALYTICALLY

7  DISSECT THE BRYANT DRAWINGS AND FILTER OUT ELEMENTS NOT

8  PROTECTED BY COPYRIGHT LAW."

9          THAT'S NOT WHAT THE ORDER SAID.

10          ALL THE ORDER SAID IS THAT, APPLYING THE EXTRINSIC

11  TEST, THE COURT MUST FIRST EXAMINE THE SPECIFIC EXPRESSIVE

12  ELEMENTS OF THE WORKS AT ISSUE.  I DIDN'T INDICATE THAT THE

13  JURY MUST CONSIDER.

14          THAT'S ON LINES 10 AND 11 OF THE QUOTATION, OR THE

15  EXCERPT, THAT IS MADE BY MGA.  IT'S ONLY AFTER THE COURT HAS

16  CONDUCTED THE FILTRATION ANALYSIS THAT THE JURY WILL BE

17  INSTRUCTED AS TO WHAT THE PROTECTABLE ELEMENTS ARE, AS I

18  PREVIOUSLY INDICATED.

19          TURNING TO PAGE 4, MGA ASKS THE COURT TO CLARIFY, IN

20  LIGHT OF ITS LANGUAGE, THAT THE COURT CANNOT GO SO FAR AS TO

21  FIND THAT THE REGISTERED DRAWINGS ARE SUBJECT TO ONLY THIN

22  PROTECTION; THAT THE COURT DID NOT EXPRESSLY FIND THAT THEY ARE

23  ENTITLED TO BROAD PROTECTION.  BUT READING APPLE COMPUTER,

24  READING THE OTHER CASES ASSOCIATED WITH THAT, THOSE ARE THE

25  ONLY TWO OPTIONS THAT THERE ARE.  YOU EITHER APPLY THIN

EXHIBIT 24

PAGE 310

6350

1

2   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
    STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
3   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
    ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
4   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
    THE UNITED STATES.

5

6   _____           8-8-08
    THERESA A. LANZA, CSR, RPR                    . DATE
7   FEDERAL OFFICIAL COURT REPORTER

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                        EXHIBIT   24

                                        PAGE      31

THURSDAY, AUGUST 7, 2008          TRIAL DAY 31, MORNING SESSION

6363

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                        - - -

4        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                        - - -

6    MATTEL, INC.,              :   PAGES 6363 - 6493
                                :
7           PLAINTIFF,          :
                                :
8       VS.                     :   NO. ED CV04-09049-SGL
                                :   [CONSOLIDATED WITH
9    MGA ENTERTAINMENT, INC.,   :   CV04-9059 & CV05-2727]
     ET AL.,                    :
10                              :
            DEFENDANTS.         :
11

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               RIVERSIDE, CALIFORNIA

17              THURSDAY, AUGUST 7, 2008

18                JURY TRIAL - DAY 31

19                 AFTERNOON SESSION

20

21

22                        MARK SCHWEITZER, CSR, RPR, CRR
                          OFFICIAL COURT REPORTER
23                        UNITED STATES DISTRICT COURT
                          181-H ROYBAL FEDERAL BUILDING
24                        255 EAST TEMPLE STREET
                          LOS ANGELES, CALIFORNIA 90012
25                        (213) 663-3494

CERTIFIED
COPY

EXHIBIT _____ 24

PAGE _____ 318

6364

1    Appearances of Counsel:

2

3    On Behalf of Mattel:

4        Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
         By John B. Quinn, Esq.
5            B. Dylan Proctor, Esq.
             Michael T. Zeller, Esq.
6            Harry Olivar, Esq.
             John Corey, Esq.
7            Diane Hutnyan, Esq.
             William Price, Esq.
8        855 South Figueroa Street
         10th Floor
9        Los Angeles, CA 90017
         (213) 624-7707

10

11

12   On Behalf of MGA Entertainment:

13       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
14           Carl Alan Roth, Esq.
             Jason Russell, Esq.
15           Lauren Aguiar, Esq.
             David Hansen, Esq.
16           Matthew Sloan, Esq.
             Robert Herrington, Esq.
17           Raoul Kennedy, Esq.
         300 South Grand Avenue
18       Los Angeles, CA 90071-3144
         (213) 687-5000

19

20

21

22

23

24

25

EXHIBIT ___ 24

PAGE ___ 319

6365

## I N D E X

MICHAEL WAGNER, PREVIOUSLY SWORN....................... 6370

DIRECT EXAMINATION (CONTINUED) BY MR. QUINN: .......... 6370
CROSS-EXAMINATION BY MR. KENNEDY:...................... 6379

MICHAEL WAGNER, PREVIOUSLY SWORN....................... 6419

VOIR DIRE EXAMINATION BY MR. KENNEDY:.................. 6419
REDIRECT EXAMINATION BY MR. QUINN:..................... 6445
RECROSS-EXAMINATION BY MR. KENNEDY: ................... 6454
FURTHER REDIRECT EXAMINATION BY MR. QUINN: ........... 6458

MICHAEL CHRISTOPHER MOORE, SWORN....................... 6460

DIRECT EXAMINATION BY MR. ZELLER:...................... 6460
CROSS-EXAMINATION BY MR.  SLOAN:....................... 6471

## E X H I B I T S

(Exhibits 13935 and 13953 received.)................... 6375

(Exhibits 13597 and 13596 received.)................... 6379

Exhibits 13956 and 13957 received.)................... 6453

(Exhibits 13959-13969 received.)....................... 6454

(Exhibits 13873-13889 received.)....................... 6466

(Exhibits 13857-13900, 13757-13759,
13912, and 13913 received.)........................... 6471

EXHIBIT ___24___

PAGE ___310___

1   familiar with, this is the Carter Bryant-MGA agreement dated

2   as of September 18, 2000.  And I'd ask you, Mr. Moore, you

3   have seen this document before, haven't you?

4   A.   Yes, I have.

5   Q.   And when is it you first saw it?

6   A.   I first saw this document in November of 2003.  I

7   believe November 24th, 2003.

8   Q.   And what were the circumstances under which you first

9   saw this?  In other words, where were you?

10.  A.   I first saw this document at a meeting in Hong Kong that

11   I had with a toy company there called Cityworld.

12   Q.   And if you could please tell us who else was at this

13   meeting.  Obviously, you were there.

14   A.   I was at the meeting.  There was a gentleman by the name

15   of George Kesselring who represented Cityworld, and then

16   there was Cityworld's attorney, and there was also -- well,

17   you were there, Michael Zeller.

18   Q.   And did Cityworld give you a copy of this document, this

19   agreement?

20   A.   Yes.

21   Q.   And did you have an understanding as to how it is that

22   Cityworld got a copy of this agreement?

23   A.   I understood that had been sued by MGA in Hong Kong, and

24   this document had been provided to Cityworld in connection

25   with that litigation.

EXHIBIT ___24

PAGE___321

6463

1   Q.   Now, at this meeting that you had there with Cityworld

2   in late November of 2003, did you see any other documents?

3   A.   I did.

4   Q.   If you'd please turn to Exhibit 10.

5        And this is in evidence as well, your Honor.

6        If we could publish that.

7   A.   I have it.

8   Q.   And you've seen Exhibit 10 before?

9   A.   I have.

10  Q.   Was this also one of the documents that you saw at that

11  meeting with Cityworld?

12  A.   This was another document that I saw at the meeting with

13  Cityworld.

14  Q.   Now, prior to the time that you had this meeting with

15  Cityworld there in late November of 2003, did you know that

16  Carter Bryant had been working with MGA while he was still a

17  Mattel employee?

18  A.   I did not.

19  Q.   Prior to the time of this meeting, when you saw these

20  documents that Cityworld showed you, to your knowledge did

21  anyone else at Mattel know that?

22  A.   Not to my knowledge.

23  Q.   Now, prior to the time that you had this meeting with

24  Cityworld, had you heard from any source that there was the

25  possibility Carter Bryant had some kind of relationship with

EXHIBIT ___24___

PAGE ___372___

1   MGA during the time he was employed by Mattel?

2   A.   I think there were rumors that Carter Bryant had created

3   Bratz.

4   Q.   Maybe I should be a little bit more specific.  Did you

5   read anything prior to the time that you had that meeting

6   with Cityworld that suggested to you the possibility that

7   Carter Bryant had had some kind of relationship with MGA

8   while he was still a Mattel employee?

9   A.   Yes.  There was a Wall Street Journal article that was

10  published in July of 2003, and in that article, I believe it

11  stated that Isaac Larian had seen the drawings for Bratz in

12  the fall of 1999.

13       MR. ZELLER:  And if we could, please, pull up on

14  the screen Exhibit 1.  And this is in evidence.  If there's

15  1-A.  If we could go to the second page.  And blow up the

16  paragraph on the left-hand side.  I'm sorry.  My right.

17  Q.   This is a little blurry, but I don't know if you can

18  make it out.  It's that paragraph that starts off Isaac

19  Larian, chief executive of MGA.  Is that passage you're

20  talking about where he says that he chose Mr. Bryant's idea

21  for the Bratz over several others after holding a sort of

22  fashion doll design contest in late 1999?

23  A.   That's the portion I'm referring to.

24  Q.   And did you read this article during the July of 2003

25  time period?

EXHIBIT   24

PAGE   323

6465

1   A.   I did.

2   Q.   Then going back to this meeting that you had with

3   Cityworld in late November of 2003, prior to the time of that

4   meeting, did you know that Carter Bryant had created Bratz

5   during the time he was employed by Mattel?

6   A.   I did not know that.

7   Q.   Did anyone at Mattel know that to your knowledge?

8   A.   Not to my knowledge.

9   Q.   Was there sometime later where it came to your attention

10  or you learned or knew that Carter Bryant had done at least

11  some sort of creation, creative work on Bratz when he was

12  employed by Mattel?

13  A.   In late 2004, I began to know the extent of what Carter

14  Bryant had done when he was at Mattel.  I attended his

15  deposition in Springfield, Missouri.  I believe he made

16  certain statements which caused me to believe that.

17  Q.   If you could direct your attention -- there's another

18  binder up there for you.  It's a larger binder.  In order to

19  save some time here in court today, you looked at these

20  documents before we came; is that right?

21  A.   I did.

22  Q.   If you could, please look at that group that has the tab

23  A.   And for the record, these are Exhibits 13873 through

24  13889.

25          Mr. Moore, are those certificates of registration

EXHIBIT ___24___

PAGE___324___

6466

1   of copyright that Mattel obtained and the U.S. Copyright

2   Office issued?

3   A.   Yes.

4          MR. ZELLER:  Your Honor, I'd move into evidence

5   Exhibits 13873 through 13889.

6          THE COURT:  Any objection?

7          MR. SLOAN:  One moment, your Honor.

8          No objection.

9          THE COURT:  They are admitted.  You may publish.

10         (Exhibits 13873-13889 received.)

11   Q.   BY MR. ZELLER:  And the next group we have for you in

12   that binder is tab D.  Do you see that?  And for the record,

13   these are Exhibits 13890 through 13902.  Those are

14   certificates of registration that you reviewed in more detail

15   earlier today?

16   A.   Yes.

17   Q.   Do you recognize those documents as certificates of

18   registration of copyright that Mattel obtained and the U.S.

19   copyright office issued?

20   A.   Yes.

21         MR. ZELLER:  Your Honor, I move into evidence

22   Exhibits 13890 through 13900.

23         MR. SLOAN:  Objection, your Honor.  Can we have a

24   sidebar?

25         THE COURT:  Sure.

EXHIBIT ___24___

PAGE ___325___

6494

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                   EASTERN DIVISION

4                      - - -

5       HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                      - - -

7   MATTEL, INC.,                    )
                                     )
8                  PLAINTIFF,        )
                                     )
9           VS.                      )   NO. CV 04-09049
                                     )
10  MGA ENTERTAINMENT, INC., ET. AL.,)   TRIAL DAY 32
                                     )   MORNING SESSION
11                 DEFENDANTS.       )   PAGES 6494-6622
    _____)
12  AND CONSOLIDATED ACTIONS,        )
    _____)
13

14

15      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                RIVERSIDE, CALIFORNIA

17               FRIDAY, AUGUST 8, 2008

18                    8:45 A.M.

19

20

21

22

23             THERESA A. LANZA, RPR, CSR
              FEDERAL OFFICIAL COURT REPORTER
24             3470 12TH STREET, RM. 134
              RIVERSIDE, CALIFORNIA  92501
25                 951-274-0844
              WWW.THERESALANZA.COM

**CERTIFIED COPY**

EXHIBIT___24

PAGE___326

6495

```
 1   APPEARANCES:

 2

 3   ON BEHALF OF MATTEL, INC.:

 4                        QUINN EMANUEL
                          BY:   JOHN QUINN
 5                             JON COREY
                              MICHAEL T. ZELLER
 6                             HARRY OLIVAR
                              TIMOTHY ALGER
 7                             WILLIAM PRICE
                          865 S. FIGUEROA STREET,
 8                        10TH FLOOR
                          LOS ANGELES, CALIFORNIA  90017
 9                        213-624-7707

10

11   ON BEHALF OF MGA ENTERTAINMENT:

12                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                          BY:   THOMAS J. NOLAN
13                             JASON RUSSELL
                              RAOUL KENNEDY
14                             LAUREN AGUIAR
                              CARL ROTH
15                        300 SOUTH GRAND AVENUE
                          LOS ANGELES, CALIFORNIA  90071-3144
16                        213-687-5000

17

18

19

20

21

22

23

24

25
```

EXHIBIT __24__

PAGE __327__

FRIDAY, AUGUST 8, 2008                    TRIAL DAY 32, MORNING SESSION

6496

```
 1                          I N D E X

 2

 3

 4    PLAINTIFF
      WITNESS          DIRECT     CROSS    REDIRECT    RECROSS
 5    MICHAEL MOORE

 6    BY MR. SLOAN     6578

 7

 8

 9

10          EXHIBITS          RECEIVED

11          1195              6603
12          4434              6615

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT ___ 24

PAGE ___ 328

FRIDAY, AUGUST 8, 2008                    TRIAL DAY 32, MORNING SESSION

1  EVIDENCE IN THE MIDDLE OF TRIAL.  THAT'S GENERALLY DISFAVORED,

2  AND I UNDERSTAND BOTH THE RULE AND STATUTORY AND CASE LAW BASIS

3  FOR LIMITING THAT.  I'VE JUST NEVER HEARD -- AND MAYBE IT'S MY

4  OWN INEXPERIENCE, BUT IN 18 YEARS, I'VE NEVER HEARD OF A

5  POSITION THAT SOMEHOW AN OBJECTION IS WAIVED TO A LEGAL

6  ARGUMENT OR TO EVIDENCE BECAUSE IT HAS NOT BEEN RAISED IN A

7  MOTION *IN LIMINE* OR IN A REPLY TO A MOTION FOR SUMMARY

8  JUDGMENT.  THAT, TO ME, IS JUST -- YOU CAN CALL IT STRATEGY,

9  BUT, I MEAN, I JUST DON'T THINK A SIDE IS REQUIRED TO DO THAT.

10       **MS. AGUIAR:**  I UNDERSTAND.  LET ME CLARIFY THE FIRST

11  POINT AND SECOND POINT IN THE BRIEF, YOUR HONOR.

12       THE FIRST POINT WAS THAT THIS ISSUE HAS BEEN CLEARLY

13  RAISED ALL ALONG AND NEVER OBJECTED TO.

14       THE SECOND ONE WAS THAT MATTEL'S CASE-IN-CHIEF IN

15  1-B -- QUESTIONING STARTING WITH THE VERY FIRST WITNESS,

16  NINETTE PEMBLETON, AS WELL AS MR. LARIAN -- THE FOCUS CLEARLY

17  WAS, 'ALL YOU HAD WAS THESE DRAWINGS.'  THE QUESTIONS WERE,

18  'YOUR SOLE INSPIRATION' --

19       **THE COURT:**  I'M WITH YOU ON THAT.  I HAVE "FAIR GAME"

20  WRITTEN NEXT TO THAT ARGUMENT.  YOU CAN ABSOLUTELY REBUT THAT.

21  THAT'S FAIR GAME.  SO YOU'VE CONVINCED ME ON THAT.  THAT PART

22  OF THE FIRST SECTION, I'M WITH YOU.

23       **MS. AGUIAR:**  OKAY.  AND THE PURPOSE OF THAT FIRST

24  SECTION WAS TO SAY, BEFORE WE EVEN GET TO THE REASONS WHY THIS

25  IS LEGALLY RELEVANT, AS AN EQUITABLE MATTER, THIS ARGUMENT HAS

EXHIBIT 24

PAGE 329

1    BEEN PRESSED BY MGA THROUGHOUT; AND FRANKLY, I THINK, BASED ON

2    THAT, MATTEL RECOGNIZED THAT THAT'S WHAT WE WERE GOING TO

3    ARGUE; SO THIS IS THEIR STRATEGY IN THEIR 1-B CASE, WHICH

4    THEY'RE ABOUT TO REST WITHIN THE HOUR, I SUSPECT.

5              SO THEIR STRATEGY, WE NOW KNOW, BECAUSE THEY'RE ABOUT

6    TO FINISH THEIR 1-B CASE -- THEIR STRATEGY WAS TO SAY, 'THIS IS

7    ALL YOU HAD.' AND WE'RE ENTITLED TO DESCRIBE THAT THIS IS NOT

8    ALL WE HAD. WE HAD MARGARET LEAHY. MARGARET LEAHY, THROUGH

9    HER INDEPENDENT CREATIVITY --

10             **THE COURT:** LET'S GO TO THAT. THAT'S THE SECOND

11   ARGUMENT.

12             I DID REFRESH MYSELF WITH NIMMER'S CHAPTER ON

13   INDEPENDENT CREATION.

14             THE STANDARD FOR INDEPENDENT CREATION IS NOT QUITE AS

15   SIMPLE AS THE FEW CASES THAT YOU CITED. I LOOKED AT THOSE

16   CASES IN GREATER DETAIL.

17             YOU CERTAINLY HAVE A RIGHT TO PRESENT A DEFENSE OF

18   INDEPENDENT CREATION. AT THIS POINT, I DON'T HAVE THAT

19   EVIDENCE BEFORE ME.

20             **MS. AGUIAR:** WE HAVE NOT PUT IN OUR CASE YET.

21             **THE COURT:** I UNDERSTAND. BUT YOU'RE NOT GOING TO

22   PUT IT BEFORE THE JURY UNTIL I'M SATISFIED THAT THERE IS A

23   SUFFICIENT BASIS TO PRESENT IT TO THE JURY; MUCH LIKE A

24   SELF-DEFENSE OR A DURESS-DEFENSE. THE COURT NEEDS TO BE

25   SATISFIED THAT THERE IS SUFFICIENT EVIDENCE OF INDEPENDENT

EXHIBIT ____24

PAGE ____330

1   CREATION BEFORE IT GOES TO THE JURY.  AT LEAST THAT'S WHAT THE

2   AUTHORITY SEEMS TO SUGGEST.

3           BECAUSE OTHERWISE, YOU RUN INTO THE VERY DANGEROUS

4   WATERS, DESCRIBED IN THE CASE CITED BY MATTEL, OF CONFUSING THE

5   JURY ON THIS.

6           THE INDEPENDENT CREATION IS NOT JUST A MATTER OF,

7   'WELL, WE TOOK SOME OF THE COPYRIGHTED WORK, AND THEN WE ADDED

8   A WHOLE BUNCH OF STUFF TO IT OURSELVES.'  THAT'S NOT

9   INDEPENDENT CREATION.

10          MS. AGUIAR:  THAT'S NOT WHAT WE'RE ARGUING.

11          THE COURT:  INDEPENDENT IS, 'YEAH, WE DID HAVE ACCESS

12  TO THE COPYRIGHTED WORK, BUT THAT'S NOT WHAT WE LOOKED AT.  WE

13  INDEPENDENTLY CREATED THIS DOLL WHOLLY AND APART FROM THOSE

14  DRAWINGS.'

15          IF YOU HAVE EVIDENCE OF THAT, A, I'VE NOT HEARD IT;

16  B, I'VE HEARD EVIDENCE TO THE CONTRARY FROM THE CEO; AND, C,

17  I'LL GIVE YOU COMPLETE LEEWAY TO PRESENT AND PROFFER THAT

18  EVIDENCE TO THE COURT.  THEN I'M GOING TO HAVE TO BE SATISFIED

19  BEFORE I LET THAT INTO THE JURY.

20          MS. AGUIAR:  THE WAY I READ THE CASES, YOUR HONOR, IS

21  THAT WHEN MATTEL PUTS FORTH A PRIMA FACIE CASE OF ACCESS AND

22  SUBSTANTIAL SIMILARLY -- AND I'M ASSUMING FOR PURPOSES OF THIS

23  STATEMENT THAT YOU WILL CONCLUDE THAT THEY HAVE DONE THAT --

24          THE COURT:  YES.

25          MS. AGUIAR:  -- THEN WE ARE --          EXHIBIT ___ 24

                                                    PAGE __ 331

1        THE COURT:  WELL, THE SUBSTANTIAL SIMILARITY, I'M

2    GOING TO BE HEARING EVIDENCE OF THAT.  I DON'T KNOW ABOUT THE

3    SUBSTANTIAL SIMILARITY.  YOU'VE GOT EXPERTS; YOU'VE GOT PEOPLE

4    WHO SAY THAT THEY'RE NOT SUBSTANTIALLY SIMILAR AT ALL.  SO I'M

5    NOT THERE ON THE SUBSTANTIAL SIMILARITY, AND THAT EVIDENCE

6    CERTAINLY COMES IN.

7        MS. AGUIAR:  I GUESS WHAT I'M SAYING IS, THE WAY THE

8    CASES DISCUSS THE BURDEN-SHIFTING IS ALMOST LIKE A BURSTING

9    BUBBLE, THAT MATTEL SAYS, 'OKAY, YOU HAD ACCESS AND THEY'RE

10   SUBSTANTIALLY SIMILAR.'

11       THE BURDEN AT SOME POINT COMES BACK TO US, AND WHEN

12   WE START OUR CASE LATER TODAY, THAT BURDEN WILL BE ON US TO

13   SHOW THAT WE DIDN'T COPY.  SO I ACTUALLY THINK THAT TO PRECLUDE

14   US FROM OFFERING EVIDENCE THAT WE DIDN'T COPY THE WORK PREVENTS

15   US FROM PUTTING ON A DEFENSE.  -

16       THIS IS NOT A CASE, YOUR HONOR, OF BURYING

17   COPYRIGHTED MATERIAL IN OTHER MATERIAL.  THIS IS JUST NOT

18   ANALOGOUS TO THE CASES WHERE YOU HAVE A 7-CD TRACT --

19       THE COURT:  I AGREE WITH THAT.

20       MS. AGUIAR:  SO THE 7-TRACK CD CASE OR THE CHAPTERS

21   IN A BOOK, WHERE WE COPIED ONE CHAPTER --

22       THE COURT:  WAIT A SECOND.

23       ACTUALLY, DEPENDING ON HOW YOUR EVIDENCE PLAYS OUT,

24   IT MAY BE LIKE THAT, ALTHOUGH IT'S A VISUAL WORK AND NOT A

25   BOOK.  THERE'S A DIFFERENCE BETWEEN -- THE EIGHT TRACKS OF A

EXHIBIT ____ 24

1   ORIGINALITY OF THE COPYRIGHTED WORK.

2          **THE COURT:** IT DOES. BUT IT'S DIFFERENT. YOU'RE

3   RIGHT, IT DOES DISCUSS ORIGINALITY. I'LL LEAVE IT AT THAT.

4          **MS. AGUIAR:** OKAY.

5          THERE'S A CASE THAT -- WE'RE OBVIOUSLY DOING THIS IN

6   A MATTER OF TEN HOURS LAST NIGHT, YOUR HONOR, AND I WANTED TO

7   BRING TO YOUR ATTENTION A CASE FROM THE EIGHTH CIRCUIT, FROM

8   2005. AND I HAVE A COPY FOR YOU. AND IT CITES THE THREE BOYS

9   MUSIC CORP. V. BOLTON CASE, WHICH I'M SURE YOU'RE FAMILIAR WITH

10  BECAUSE IT'S A NINTH CIRCUIT CASE.

11         **THE COURT:** YES. PLEASE PASS THAT UP TO ME.

12         MR. ZELLER, DO YOU HAVE THIS?

13         **MR. ZELLER:** I DO NOT.

14         **MS. AGUIAR:** I'LL GIVE YOU MINE, BECAUSE I HAVE IT

15  WRITTEN DOWN.

16         ON THE FLAGGED PAGE, IN THE SECTION ON INDEPENDENT

17  CREATION, IT SAYS -- I DON'T KNOW IF YOU CAN SEE THAT

18  SECTION -- "FOUR SEASONS PRESENTED TESTIMONY FROM EACH ARTIST

19  EXPLAINING HOW THEY CREATED THE CARD DESIGNS. THE ARTISTS ALSO

20  IDENTIFIED THE SOURCE MATERIAL THEY USED IN CREATING THE CARD

21  DESIGNS WHILE EMPLOYED BY FOUR SEASONS. THE DISTRICT COURT AND

22  THE ADVISORY JURY EVALUATED ALL OF THIS EVIDENCE, INCLUDING THE

23  CREDIBILITY OF THE WITNESSES"; AND THEY FOUND COPYING IN THAT

24  CASE.

25         **THE COURT:** THIS IS DEAD-ON. THIS IS RIGHT. I

EXHIBIT ____ 24

PAGE ____ 333

1    COMPLETELY AGREE WITH EVERYTHING THIS STANDS FOR.

2         MS. AGUIAR:  RIGHT.  BECAUSE WE -- AND THEN IN THIS

3    PARTICULAR CASE, THIS SHOWS THAT WE ACTUALLY HAVE TO BE ABLE TO

4    PUT ON THE EVIDENCE.  IT SHOWS THAT IT'S AN ISSUE OF FACT.

5    THEY SAID THE DISTRICT COURT AND THE JURY CONSIDERED AND

6    EVALUATED THIS EVIDENCE.  AND IN THIS PARTICULAR CASE, THEY

7    DIDN'T -- IN THE CASE OF THE FOUR SEASONS, THEY DIDN'T CONVINCE

8    THE JURY.

9         THE COURT:  THE TWO MATERIAL FACTORS HERE ARE

10   PRECISELY THE TWO LINES THAT YOU HIGHLIGHTED.  AND THAT'S WHY I

11   SAY YOU'RE DEAD-ON.  "FOUR SEASONS PRESENTED TESTIMONY FROM

12   EACH ARTIST EXPLAINING HOW THEY CREATED THE CARD DESIGNS."  BUT

13   THE NEXT SENTENCE, "THE ARTISTS IDENTIFIED THE SOURCE MATERIAL

14   THEY USED IN CREATING THE CARD DESIGNS WHILE EMPLOYED BY FOUR

15   SEASONS."

16        YOU DON'T GET THE FIRST SENTENCE UNLESS THERE'S

17   EVIDENCE OF THE SECOND SENTENCE.  AND THAT'S WHAT I'M SAYING

18   NEEDS TO BE THERE AS A THRESHOLD MATTER.  THERE IS NO SOURCE

19   MATERIAL THAT I'VE HEARD YET.  AND MAYBE IT'S OUT THERE.  AND

20   IF IT'S THERE, THIS COMES IN.  BUT THERE'S BEEN NO SOURCE

21   MATERIAL, OTHER THAN CARTER BRYANT'S DRAWINGS.

22        AND I'VE HEARD THAT FROM MR. LARIAN; I'VE HEARD THAT

23   FROM YOUR OTHER LITIGATION.  I MEAN, THAT'S BEEN THE POINT.

24   AND THAT'S PART OF WHAT YOU NEED TO ESTABLISH FOR THIS

25   INDEPENDENT CREATION.  THIS IS JUST YET ANOTHER CASE WHICH

EXHIBIT _____ 24

PAGE _335_

1   ILLUSTRATES THAT.

2         MS. AGUIAR:  I WANTED TO POINT YOUR HONOR TO SOME

3   EVIDENCE THAT CAME OUT IN PHASE 1-A, WHEN MARGARET LEAHY WAS ON

4   THE STAND.

5         THE COURT:  PLEASE.

6         MS. AGUIAR:  SHE TESTIFIED THAT, IN FACT, THE STEVE

7   MADDEN AD FROM THE PUBLIC DOMAIN WAS WHAT SHE USED PRIMARILY TO

8   DO HER FIRST VERSION OF THE SCULPT.  SO I WOULD ACTUALLY

9   DISAGREE WITH YOUR CHARACTERIZATION OF THE EVIDENCE THAT HAS

10  COME IN WHEN YOU SAID THAT THERE WAS NOTHING TO SHOW THAT THERE

11  WAS ANOTHER SOURCE.  THIS DOLL STARTED WITH MARGARET LEAHY.

12        THIS DOLL NEEDED TO COME INTO BEING THROUGH A SCULPT,

13  THROUGH A THREE-DIMENSIONAL ITEM.

14        THE COURT:  THAT WOULD CERTAINLY BE ADMISSIBLE

15  EVIDENCE.  IT ALREADY IS ADMISSIBLE.  IT'S ALREADY IN TRIAL.

16  IT'S ALREADY IN FRONT OF THE JURY.

17        IF YOU CAN COME UP WITH SOURCE MATERIAL, SUFFICIENT

18  SOURCE MATERIAL, THAT'S INDEPENDENT, THEN YOU'VE GOT AN

19  INDEPENDENT CREATION DEFENSE; AND I'LL CERTAINLY ENTERTAIN THAT

20  EVIDENCE.  I DON'T THINK THAT'S WHAT MR. ZELLER IS EVEN TRYING

21  TO KEEP OUT, BECAUSE IT'S ALREADY COME IN.

22        MS. AGUIAR:  OKAY.  AND INDEPENDENT SOURCE MATERIAL,

23  WHEN YOU'RE CREATING A DOLL, HAS TO ALSO BE PEOPLE.  SO, FOR

24  EXAMPLE, IF VERONICA MARLOW AND THE PEOPLE WHO DID THE

25  PACKAGING AND PAULA GARCIA WHO DIRECTED THE FACE PAINT HAD AN

EXHIBIT __24__

PAGE __335__

1   Q    BUT YOU LOOKED AT SOME PORTION OF THIS REPORT.

2   A    I DID.

3   Q    LET ME DIRECT YOUR ATTENTION TO THE NEXT LINE, MARCH 28,

4   WHICH SAYS "MET WITH CASSIDY PARK TO GET MORE INFO ON THE MGA

5   ISSUE.  SHE SUGGESTED CARTER BRYANT AS ILLUSTRATOR/FORMER

6   EMPLOYEE WHO MAY HAVE PLAGIARIZED DESIGN OF LILY MARTINEZ AND

7   CREATED BRATZ DOLLS FOR MGA."

8        DO YOU SEE THAT?

9   A    YES.

10  Q    DOES THAT APPEAR TO BE AN ENTRY THAT WAS MADE ON MARCH 28,

11  2002?

12  A    IT SAYS MARCH 28; I'M ASSUMING 2002.

13  Q    AND DID YOU REVIEW THAT AFTER THIS LITIGATION WAS FILED?

14  A    AGAIN, I REALLY DON'T REMEMBER THIS PARTICULAR PAGE.

15  Q    SO YOU'RE NOT SAYING YOU DIDN'T REVIEW IT; YOU'RE JUST

16  SAYING YOU DO NOT RECALL REVIEWING IT; IS THAT CORRECT?

17  A    THERE ARE SO MANY DOCUMENTS IN THIS CASE.  I DON'T RECALL

18  REVIEWING THIS PARTICULAR ONE.  IT DOESN'T -- I DON'T REMEMBER.

19  Q    AND IT SAYS "AT 1500, CHECKED WITH HR FOR BRYANT'S FILE

20  TERM DATE, 10-20-2000; FILE IS AT OFF-SITE STORAGE; REQUESTED

21  IT TO BE RETRIEVED."

22        DO YOU SEE THAT?

23  A    YES.

24  Q    DO YOU THINK IT'S FAIR INTERPRETATION THAT THAT'S AN ENTRY

25  THAT WAS MADE AT 1500 HOURS, OR 3:00 P.M., ON MARCH 28, 2002?

1        MR. ZELLER:  OBJECTION AS TO INTERPRETATION.

2        THE COURT:  REPHRASE, COUNSEL.

3  BY MR. SLOAN:

4  Q    WHAT DO YOU THINK THAT 1500 MEANS THERE?

5  A    I DON'T KEEP THESE FILES.  I MEAN, I COULD SPECULATE THAT

6  IT MEANS 3:00, BUT THAT'S SPECULATION.  I DON'T KNOW.

7  Q    SIR, ARE YOU AWARE OF WHO CASSIDY PARK IS?

8  A    YES.

9  Q    DO YOU HAVE ANY REASON TO DOUBT THE ACCURACY OF THE

10  INFORMATION REFLECTED IN THIS MATTEL INVESTIGATIVE REPORT?

11        MR. ZELLER:  LACKS FOUNDATION.

12        THE COURT:  SUSTAINED.

13        MR. ZELLER:  PRIVILEGED ISSUE.

14        THE COURT:  SUSTAINED.

15  BY MR. SLOAN:

16  Q    SIR, IF YOU HAD SEEN THIS, WOULD YOU STILL HAVE TESTIFIED

17  THAT, TO THE BEST OF YOUR KNOWLEDGE, NO ONE BEFORE YOU HAD BEEN

18  INVOLVED IN INVESTIGATING WHETHER CARTER BRYANT WAS INVOLVED IN

19  CREATING BRATZ IN SOME RESPECTS?

20  A    YOU KNOW, I BELIEVE I WOULD, BECAUSE I THOUGHT -- I WAS

21  TRYING TO UNDERSTAND YOUR QUESTION, AND I ANSWERED ACCORDINGLY.

22  Q    WHAT DIDN'T YOU UNDERSTAND ABOUT MY QUESTION?

23  A    IT SOUNDED LIKE YOUR QUESTION WAS BLURRING THE DISTINCTION

24  BETWEEN WHETHER WE WERE LOOKING AT "WHEN" CARTER BRYANT CREATED

25  BRATZ VERSUS "IF" HE DID.  AND I DON'T THINK, AND TO MY     2Y

EXHIBIT ____

1    KNOWLEDGE, THAT ANYONE ELSE LOOKED AT "WHEN" CARTER BRYANT WAS

2    CREATING BRATZ REALLY UNTIL THE SUMMER, MAYBE NOVEMBER OF 2003,

3    YOU KNOW.

4    Q    BUT THIS ENTRY WOULD SUGGEST THAT AS OF MARCH 2002, THERE

5    WERE PEOPLE AT MATTEL WHO WERE INVESTIGATING WHETHER CARTER

6    BRYANT WAS INVOLVED IN THE CREATION OF BRATZ; CORRECT?

7                MR. ZELLER:  FOUNDATION; VAGUE.

8                THE COURT:  SUSTAINED.

9                THE DOCUMENT LARGELY SPEAKS FOR ITSELF; THIS WITNESS

10   DOES NOT HAVE FOUNDATION TO EXPAND ON IT.

11   BY MR. SLOAN:

12   Q    SIR, WHEN YOU SAID YOU THOUGHT YOU WERE THE FIRST PERSON,

13   YOU WERE JUST TESTIFYING THAT YOU WERE THE FIRST PERSON, TO

14   YOUR KNOWLEDGE, WHO INVESTIGATED WHEN CARTER BRYANT HAD CREATED

15   BRATZ; CORRECT?

16   A    YEAH.  THERE ARE A LOT OF PEOPLE WHO HAVE WORKED ON THIS

17   CASE.  I THINK THAT I WAS AMONG THE FIRST TO LOOK AT WHEN

18   CARTER BRYANT CREATED BRATZ.

19   Q    BUT THERE WERE OTHER PEOPLE WHO WERE INVOLVED IN

20   INVESTIGATING WHETHER CARTER BRYANT WAS INVOLVED IN THE

21   CREATION OF BRATZ BEFORE YOU GOT INVOLVED IN THE INVESTIGATION;

22   IS THAT A FAIR STATEMENT, SIR?

23               MR. ZELLER:  OBJECTION.  LACKS FOUNDATION AS TO

24   "INVOLVED WITH THE INVESTIGATION"; ALSO VAGUE.

25               THE COURT:  TO THE EXTENT THAT YOU ARE AWARE OF.

1            THE WITNESS:  I BELIEVE SOME PEOPLE WERE WONDERING

2     WHETHER HE DID.  I DON'T KNOW TO THE EXTENT OF WHAT THEY DID.

3     BY MR. SLOAN:

4     Q    AS A MATTER OF FACT, I BELIEVE THAT YESTERDAY, YOU HAD

5     SAID AT SOME POINT THAT THERE WERE SOME RUMORS; IS THAT

6     CORRECT?

7     A    I MENTIONED RUMORS YESTERDAY, YES.

8     Q    AND THOSE WERE RUMORS ABOUT CARTER BRYANT'S INVOLVEMENT IN

9     BRATZ; CORRECT?

10    A    THAT'S RIGHT.

11    Q    AND WHAT WERE THOSE RUMORS?

12           MR. ZELLER:  QUESTION IS VAGUE AS TO TIME.

13           THE COURT:  AS TO TIME, COUNSEL.

14    BY MR. SLOAN:

15    Q    YOU MENTIONED THERE WERE RUMORS FLOATING AROUND MATTEL

16    THAT CARTER BRYANT WAS INVOLVED IN THE CREATION OF BRATZ; IS

17    THAT CORRECT?  IS THAT WHAT YOU TESTIFIED TO YESTERDAY?

18    A    THAT'S RIGHT, YES.

19    Q    OKAY.

20           AND WHEN DID YOU FIRST HEAR THOSE RUMORS?

21    A    I WAS WORKING ON A CASE INVOLVING ANOTHER TOY COMPANY

22    CALLED SIMBA, AND I HEARD THEM ABOUT THE TIME THE WALL STREET

23    JOURNAL ARTICLE CAME OUT.

24    Q    SO THAT WOULD HAVE BEEN JULY 2003.        EXHIBIT ___24___

25    A    YES.                                      PAGE ___339___

1    Q    AND DID YOU, THEN, SINCE YOU WERE TRYING TO DETERMINE WHEN

2    CARTER BRYANT HAD CREATED BRATZ, DID YOU THEN GO AND TALK TO

3    THOSE PEOPLE TO INVESTIGATE THESE RUMORS?

4    A    I ASKED ABOUT THE RUMORS; I TALKED TO PEOPLE ABOUT THEM.

5    Q    OKAY.  WHO DID YOU TALK TO?

6    A    VARIOUS DESIGNERS IN OUR DESIGN CENTER.  I BELIEVE I

7    PROBABLY SPOKE WITH IVY ROSS.

8    Q    LET'S STOP THERE.

9         YOU SPOKE TO IVY ROSS.

10        WHEN DID SHE TELL YOU SHE FIRST SUSPECTED THAT

11   MR. BRYANT WAS INVOLVED IN THE CREATION OF BRATZ?

12        MR. ZELLER:  ASSUMES FACTS; PRIVILEGED.

13        THE COURT:  AS PHRASED.

14        REPHRASE.

15   BY MR. SLOAN:

16   Q    YOU SAID YOU SPOKE TO IVY ROSS; CORRECT?

17   A    YEAH, I DID.

18   Q    DID YOU ASK HER WHETHER SHE SUSPECTED THAT MR. BRYANT WAS

19   INVOLVED IN THE CREATION OF BRATZ?

20        MR. ZELLER:  QUESTION INVADES PRIVILEGE; VAGUE;

21   FOUNDATION; ASSUMES FACTS.

22        THE COURT:  IT SEEMS TO GET INTO THE PRIVILEGE,

23   COUNSEL.  YOU'RE ASKING ABOUT CONVERSATIONS BETWEEN IN-HOUSE

24   COUNSEL AND MS. ROSS.  SUSTAINED.

25   BY MR. SLOAN:

EXHIBIT ___24___

6622

1

2                    CERTIFICATE

3

4   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
    STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
5   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
    ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
6   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
    THE UNITED STATES.

7

8

9   THERESA A. LANZA, CSR, RPR                    8-9-08
    FEDERAL OFFICIAL COURT REPORTER              DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                                    EXHIBIT ___24___

                                      PAGE ___341___

FRIDAY, AUGUST 8, 2008                TRIAL DAY 32, MORNING SESSION

6627

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                   ---

4     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                   ---

6   MATTEL, INC.,              :   PAGES 6627 - 6744
                               :
7          PLAINTIFF,          :
                               :
8      VS.                     :   NO. ED CV04-09049-SGL
                               :   [CONSOLIDATED WITH
9   MGA ENTERTAINMENT, INC.,   :   CV04-9059 & CV05-2727]
    ET AL.,                    :
10                             :
           DEFENDANTS.         :
11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               RIVERSIDE, CALIFORNIA

17             FRIDAY, AUGUST 8, 2008

18              JURY TRIAL - DAY 32

19               AFTERNOON SESSION

20

21

22                    MARK SCHWEITZER, CSR, RPR, CRR
                      OFFICIAL COURT REPORTER
23                    UNITED STATES DISTRICT COURT
                      181-H ROYBAL FEDERAL BUILDING
24                    255 EAST TEMPLE STREET
                      LOS ANGELES, CALIFORNIA 90012
25                    (213) 663-3494

CERTIFIED COPY

EXHIBIT 24

PAGE 342

```
 1    Appearances of Counsel:
 2
 3    On Behalf of Mattel:
 4         Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
           By John B. Quinn, Esq.
 5            B. Dylan Proctor, Esq.
              Michael T. Zeller, Esq.
 6            Harry Olivar, Esq.
              John Corey, Esq.
 7            Diane Hutnyan, Esq.
              William Price, Esq.
 8         855 South Figueroa Street
           10th Floor
 9         Los Angeles, CA 90017
           (213) 624-7707
10
11
12    On Behalf of MGA Entertainment:
13         Skadden, Arps, Slate, Meagher & Flom LLP
           By Thomas J. Nolan, Esq.
14            Carl Alan Roth, Esq.
              Jason Russell, Esq.
15            Lauren Aguiar, Esq.
              David Hansen, Esq.
16            Matthew Sloan, Esq.
              Robert Herrington, Esq.
17         300 South Grand Avenue
           Los Angeles, CA 90071-3144
18         (213) 687-5000
19
20
21
22
23
24
25
```

EXHIBIT _____ 24

PAGE _____ 343  Page 6628

6629

## I N D E X

MICHAEL CHRISTOPHER MOORE, PREVIOUSLY SWORN............ 6648

VIDEOTAPED DEPOSITION EXCERPTS OF JANET BRYANT......... 6649

VIDEOTAPED DEPOSITION EXCERPTS OF KERRI BRODE.......... 6650

VIDEOTAPED DEPOSITION EXCERPTS OF BRYAN ARMSTRONG...... 6653

VIDEOTAPED DEPOSITION EXCERPTS OF SARAH CHUI...:....... 6663

 VIDEOTAPED DEPOSITION EXCERPTS OF CARTER BRYANT....... 6664

MARGARET ANN LEAHY, SWORN.....:.................... 6672

DIRECT EXAMINATION BY MR. NOLAN:..................... 6672

## E X H I B I T S

(Exhibits 491, 513, 565, 566, 567, 568,
569, 570, 571, 572, 5373, 574, 576, and
577 received.)..................................... 6659

(Exhibit 13738 received.)............................. 6671

(Exhibit 13958 received.)............................. 6671

(Exhibit 1141 A received.)............................ 6684

(Exhibit 1141 received.)............................. 6718

(Exhibit 1234 A received.)............................ 6723

EXHIBIT ____ '24

PAGE ____ 344

6663

1          (CONCLUSION OF SIDEBAR CONFERENCE.)

2          MR. QUINN:   Next witness, your Honor, Sarah Chui.

3          (Whereupon the videotaped deposition excerpts

4          of Sarah Chui, as provided by counsel, were

5          played for the jury as follows:)

6    Q.    When did you start working for MGA?

7    A.    It was September 1st, 1999.

8    Q.    What was your job title at that time?

9    A.    Product designer.

10   Q.    Has your job title changed since then?

11   A.    Yes.

12   Q.    What is it now?

13   A.    Now it's design director.

14   Q.    What is MGA Hong Kong's role in the production of Bratz

15   dolls?

16   A.    Production.

17          THE INTERPRETER:   Production.

18   Q.    And what do you mean by production?

19   A.    To follow up on the project and also follow up with the

20   factory on the mass -- in the area of mass production.

21   Q.    Okay.   So when it comes to the Bratz dolls, the designs

22   for the dolls are coming from Los Angeles, and MGA Hong Kong

23   is involved in reproducing and mass producing the dolls?

24   A.    I would say so.

25   Q.    Are you aware of any design work that was done -- design

EXHIBIT _____ 24

PAGE _____ 345

6664

1   work, as opposed to development or engineering work, that was

2   done at MGA Hong Kong on Bratz in the year 2000?

3   A.    I believe you have asked this question.  No.

4           (Conclusion of deposition excerpts.)

5           MR. QUINN:  And then Carter Bryant, your Honor.

6           THE COURT:  Very well.

7           (Whereupon the videotaped deposition excerpts

8           of Carter Bryant, as provided by counsel, were

9           played for the jury as follows:)

10  Q.    For example, the Bratz -- did you have a particular --

11  were there some features of the Bratz head that, you know,

12  you thought were particularly characteristic or unique?

13  A.    Could you restate your question?

14  Q.    Well, I mean, are there some things like the features of

15  the Bratz face that you thought were distinctive?

16  A.    I think the eyes were distinctive.  I think the lips

17  were distinctive.

18  Q.    Anything else?

19  A.    I think those were the most distinctive features.

20  Q.    These features that you've described to me as being

21  distinctive to one degree or another, were they -- were they

22  reflected in the drawings that you did?

23  A.    Are you talking about the 1998 drawings?

24  Q.    Yeah.  Let's start with that.

25  A.    I think they were similar, yes.

EXHIBIT _____ 24

PAGE _____ 340

6665

1    Q.    And would have been carried forward to the color copies

2    you made in 1999?

3    A.    Yes, I suppose so.

4    Q.    And the drawings that you gave to Margaret --

5    A.    Yes.

6    Q.    Did that reflect these distinctive features also?

7    A.    I think it did.

8    Q.    Okay.  Let's turn to 278.  What are we looking at here?

9    A.    This is a drawing of the actual finished doll that I

10   gave to -- this drawing I gave to Margaret to have her

11   restart the sculpt.

12   Q.    Why had you -- had you made a decision to change the

13   form of the doll?

14   A.    After Margaret had done a little bit of work on the

15   preliminary sculpt and when Mercedeh came on board, we

16   realized that the work that Margaret had done was not going

17   to work.  So Paula and Margaret -- or, I'm sorry.  Paula and

18   Mercedeh basically said that we needed to start the sculpt

19   again.

20   Q.    But the drawing of the figure there is -- that's

21   something you drew?

22   A.    Yes.

23   Q.    To guide her in her sculpting?

24   A.    Yes.

25   Q.    And that became the -- that was used for the second

EXHIBIT _____ 24

PAGE ____ 341

6666

1  sculpt of Bratz?

2  A.    Yes.

3  Q.    Which became the final sculpt?

4  A.    This was the closest drawing that I had done to what

5  became the final sculpt, yes.

6  Q.    I mean, the sculpt that was created from this drawing,

7  did that become the final sculpt?

8  A.    To the best of my knowledge.

9  Q.    It did?

10  A.    Yes.

11  Q.    Did you -- I'm noticing in Exhibit 5 the page that's

12  numbered 278, it does have -- on that head there are

13  oversized eyes and oversized lips.  Would you agree with

14  that?

15  A.    Yes.

16  Q.    Was one way that you had some input on the look of the

17  head of the second Bratz sculpt giving Margaret this page

18  that's numbered 278?

19  A.    That was the best way that I knew how to communicate,

20  was through drawing.

21  Q.    You say the best way you knew to communicate what you

22  wanted was to give a drawing?

23  A.    Yes.

24  Q.    And that -- and the best way you knew to communicate

25  your input was to give a drawing?

EXHIBIT ___ 24

PAGE ___ 348

6667

1   A.   Yes.

2   Q.   And that's what you did?  And that included the drawing

3   that was 278; correct?

4   A.   Well, I don't remember what I said last week, but that

5   was the best way I knew how to communicate with her, was

6   through drawing.

7   Q.   All right.  And the drawing you're referring to is 278?

8   A.   And the drawings from 1998.

9   Q.   And one way you had input into the look of the head was

10  by giving her those drawings?

11  A.   Yes.

12  Q.   Were any drawings used in creating the Bratz model that

13  was shown at the Hong Kong toy fair?

14  A.   Well, sure, there has to be some way of communicating to

15  other people who need to do their part, you know.  And

16  drawing is just a tool.  A drawing is a tool to communicate

17  to the other people that need to do their part to create a

18  doll.  So yeah, there were drawings.

19  Q.   And the drawings that were used in creating the model of

20  the Bratz that was shown at the Hong Kong toy fair, who

21  created those drawings?

22  A.   I did.

23  Q.   Why did you create some new drawings for that purpose?

24  A.   Um, I wanted to create actual fashion designs for these

25  dolls.  I wanted to create -- well, that's basically it.  I

EXHIBIT _____ 24

PAGE _____ 349

6668

1  just wanted to create an actual fashion that would -- would

2  eventually be produced for these dolls.

3  Q.   Are you saying that the drawings that you showed to

4  Mr. Larian could not be used for that purpose?

5  A.   Well, it's not that they couldn't have been, I guess.

6  But they didn't reflect what I kind of ultimately wanted to

7  see on the dolls.

8  Q.   What were the differences between the drawings, the

9  drawings that you showed Mr. Larian, and the drawings that

10  you created in November?

11  A.   Well, there were just a lot of differences.

12  Q.   I'd like you please to give me a list of the

13  differences.

14  A.   Well, okay.  Again, as I said, without looking at the

15  drawings, I probably couldn't give you a list.

16  Q.   Is there any difference that you can identify for me?

17  A.   Um, sure.  Let me see.  For Zoe, who eventually became

18  Cloe, her outfit was completely changed.  Her hair color was

19  completely changed.  Her face was completely changed.  For

20  Jade, her outfit was completely changed.  Her hairstyle and

21  her face were completely changed.  For Sasha, I think who was

22  originally called Hallidae, her outfit was also completely

23  changed.  Her face and her hair were also completely changed.

24  And for Yasmin, who I believe was originally called Lupe, the

25  same.  Her outfit was completely changed, and her face and

EXHIBIT _____ 24

PAGE ___ 360

6669

1  hair were also completely changed.

2  Q.   How was Lupe's face changed from the drawings that you

3  showed Mr. Larian?

4  A.   I believe it was just given a slightly softer look.

5  Q.   And how was that done?  Bigger nose, smaller nose, wider

6  eyes?  Can you describe for us how that softer look

7  manifested itself?

8  A.   I don't know.  I mean, again, as I said, I'm not a face

9  painter.  I just said, you know, what I suggested that maybe

10  we could make the face look, you know, a little bit softer.

11  Q.   Do you believe that the Bratz doll line has a similar --

12  that all the dolls in the Bratz -- do you believe that all

13  the dolls in the Bratz doll line have a similar appearance?

14  A.   Well, if you're talking about -- what exactly are you

15  talking about?  Are you referring to the fashions, the dolls

16  themselves?

17  Q.   Say the dolls themselves.

18  A.   Yes, they are similar.

19  Q.   Do you believe that all the Bratz dolls have an overall

20  similar appearance?

21  A.   Again, if you're just talking about the doll, without

22  any fashions or accessories or anything like that, then yes,

23  they're similar.

24  Q.   How about the fashions?  Do you believe that there's an

25  overall similar appearance to the Bratz fashions?

EXHIBIT _____ 24

PAGE _____ 351

6670

1    A.    No.

2    Q.    Why not?

3    A.    Well, you know, as I've said earlier, we do different

4    themes.  And all those different themes reflect different,

5    different looks, different ideas.

6    Q.    Isn't it true that there's an overall similar appearance

7    to the fashions used with the Bratz doll line?  Isn't that

8    true?

9    A.    No, I don't think that's true.

10   Q.    Well, do you believe that those accessories have an

11   overall similar appearance?

12   A.    No.

13   Q.    Okay.  So this is 1107 through 1110.  Looking at these

14   exhibits now, Mr. Bryant, are these the drawings that the

15   original release Bratz dolls were based on?

16   A.    They reflect the fashions that were released and the

17   basic hairstyles.  And the basic -- the basic look of the

18   face.

19   Q.    Do these, the fashions reflected on Exhibits 1107

20   through 1110, are those the final fashion designs?

21   A.    Are you referring to the final fashion designs for the

22   original release Bratz?

23   Q.    Yes.

24   A.    Well, they appear to be.

25              (Conclusion of deposition excerpts.)

EXHIBIT _____ 24

PAGE _____ 352

6744

# C E R T I F I C A T E

      I hereby certify that pursuant to Title 28,

Section 753 United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings in the above matter.

      Certified on August 8, 2008.


**MARK SCHWEITZER, CSR, RPR, CRR**
Official Court Reporter
License No. 10514

EXHIBIT __24__

PAGE __353__

1               UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                 EASTERN DIVISION

4                   - - -

5      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                   - - -

7  MATTEL, INC.,              )

                              )

8              PLAINTIFF,   )

                              )

9         VS.            )  NO. CV 04-09049

                              )

10  MGA ENTERTAINMENT, INC., ET. AL., )  TRIAL DAY 33

                              )  MORNING SESSION

11             DEFENDANTS. )  PAGES 6745-6855

    _____)

12  AND CONSOLIDATED ACTIONS,    )

                              )

13

14

15     REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16             RIVERSIDE, CALIFORNIA

17          TUESDAY, AUGUST 12, 2008

18              8:23 A.M.

19

20

21

22

23        THERESA A. LANZA, RPR, CSR

        FEDERAL OFFICIAL COURT REPORTER

24        3470 12TH STREET, RM. 134

        RIVERSIDE, CALIFORNIA 92501

25         951-274-0844

EXHIBIT ___24___

PAGE___3454___

```
 1    APPEARANCES:
 2
      ON BEHALF OF MATTEL, INC.:
 3
                          QUINN EMANUEL
 4                        BY:   JOHN QUINN
                                JON COREY
 5                              MICHAEL T. ZELLER
                                HARRY OLIVAR
 6                              TIMOTHY ALGER
                                WILLIAM PRICE
`7                        865 S. FIGUEROA STREET,
                          10TH FLOOR
 8                        LOS ANGELES, CALIFORNIA  90017
                          213-624-7707
 9
10
      ON BEHALF OF MGA ENTERTAINMENT:
11
                          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
12                        BY:   THOMAS J. NOLAN
                                JASON RUSSELL
13                              RAOUL KENNEDY
                                DAVID HANSEN
14                              LAUREN AGUIAR
                                CARL ROTH
15                        300 SOUTH GRAND AVENUE
                          LOS ANGELES, CALIFORNIA  90071-3144
16                        213-687-5000
17
18
19
20
21
22
23
24
25
```

EXHIBIT __24__

PAGE __355__

```
 1                          I N D E X

 2

 3                                           PAGE

 4    PROCEEDINGS                            6748

 5

 6    PLAINTIFF

      WITNESS          DIRECT       CROSS       REDIRECT       RECROSS

 7    MARGARET LEAHY  (CONTINUED)

 8    BY MR. NOLAN    6778                    6848

      BY MR. PRICE                  6832                    6852

 9

10

11

12         EXHIBITS          RECEIVED

13         17733             6800

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT ___24___

1    RIGHT?

2    A    I'M NOT A PAINTER OR A HAIR DESIGNER OR A FASHION

3    DESIGNER; SO THAT WOULD JUST BE MY OPINION.

4    Q    OKAY.

5         BACK TO CLOE, ORIGINALLY, BACK IN PHASE 1-A AND

6    ORIGINALLY HERE, YOU TESTIFIED THAT CARTER BRYANT'S DRAWINGS

7    HAD NO NOSE.  DO YOU RECALL THAT?

8    A    YES, I DO.

9    Q    IF WE LOOK AT THESE DRAWINGS, YOU SEE, FOR EXAMPLE, CLOE,

10   ON THE FAR LEFT, CLOE HAS A BRIDGE AND A SMALL NOSE INDICATED

11   IN THE DRAWING; CORRECT?

12   A    WELL, THERE'S A LINE THERE AND A LITTLE DOT, BUT IT'S NOT

13   ENOUGH INFORMATION FOR ME TO SAY, OKAY, THIS IS EXACTLY

14   SOMETHING HE WANTS.  AND I RECALL THERE'S A DRAWING OF SASHA

15   THAT DOES NOT HAVE A NOSE AT ALL.

16   Q    WELL, IF YOU LOOK AT -- YOU KNEW THAT WHAT THIS DRAWING

17   SHOWS WAS PROMINENT LIPS, OVERSIZED EYES, AND A DIMINISHED

18   NOSE; FAIR?

19   A    YES; THAT WAS THE TREND AT THE TIME, IS WHAT A LOT OF

20   PEOPLE WERE DOING.

21   Q    IN FACT, DID YOU AGREE WITH THE FOLLOWING -- IF WE COULD

22   SHOW EXHIBIT 4207; THIS IS A PLEADING IN THE HONG KONG

23   PROCEEDINGS.  IT'S IN EVIDENCE, YOUR HONOR.  IF WE COULD GO TO

24   4207, PAGE EIGHT OF PARAGRAPH 17.

25         "ONE THING THAT IS CONTRIBUTED TO THE SUCCESS OF

EXHIBIT _____ 24

1    BRATZ IS THE OVERSIZED EYES, AND THE PROTRUSIVE MOUTH THAT ARE

2    CAPABLE OF BEING DECORATED WITH MAKEUP, AND THE DIMINISHED SIZE

3    OF THE NOSE THAT SERVES NO DECORATIVE PURPOSES."

4           DO YOU SEE THAT?

5    A    I DO SEE THAT.

6    Q    AND YOU'LL AGREE THAT -- I'LL REPRESENT TO YOU, THIS IS

7    MGA TALKING UNDER OATH, SO YOU'LL AGREE WITH THAT, WON'T YOU,

8    THAT THE DOLLS HAVE THAT LOOK:  OVERSIZED EYES, PROTRUSIVE

9    MOUTH, AND A DIMINISHED SIZE OF THE NOSE; CORRECT?

10   A    CORRECT.

11   Q    AND AS YOU SAID, THAT'S EXACTLY WHAT WAS CONVEYED IN

12   CARTER BRYANT'S DRAWINGS.  IF WE CAN PUT UP THE CLOE DRAWINGS

13   AGAIN.  THAT'S WHAT'S CONVEYED IN THE DRAWINGS, RIGHT, AS YOU

14   JUST SAID:  THE PROTRUSIVE MOUTH, OVERSIZED EYES, AND A

15   DIMINISHED NOSE; CORRECT?

16   A    WELL, THAT WAS THE TREND AT THE TIME.  THERE WERE A LOT OF

17   DRAWINGS THAT LOOKED EXACTLY LIKE THAT WITH OVERSIZED EYES AND

18   LIPS AND DIMINISHED NOSES.  FOR EXAMPLE, THE DIVA STARS

19           MR. PRICE:  MOVE TO STRIKE AS NONRESPONSIVE.

20           THE COURT:  SUSTAINED.  IT IS STRICKEN.

21   BY MR. PRICE:

22   Q    YOU'LL AGREE THAT CARTER BRYANT'S DRAWINGS HAVE THE

23   FACTORS THAT MGA SAY ARE UNIQUE TO THE DOLLS, WHICH IS THE

24   OVERSIZED EYES, PROTRUSIVE, LIPS, AND THE DIMINISHED NOSE;

25   YOU'LL AGREE WITH THAT?

EXHIBIT ___ 24

PAGE ___ 358   Page 6847

1    A    I CAN AGREE WITH THAT STATEMENT.

2                MR. PRICE:  NO FURTHER QUESTIONS.

3                        REDIRECT EXAMINATION

4    BY MR. NOLAN:

5    Q    MS. LEAHY, MR. PRICE SHOWED YOU SOME TESTIMONY OF

6    CARTER BRYANT PLAYED BY VIDEOTAPE IN THIS CASE.  I WANT TO GO

7    TO A DIFFERENT PORTION, SAME TESTIMONY, PLAYED AT THE SAME

8    TIME, NOT SHOWN TO YOU.

9                MR. SHORR, COULD I HAVE FROM THE TRANSCRIPT,

10   PAGE 351, VIDEO DEPOSITION.  THIS IS FROM THE VIDEO DEPOSITION

11   PLAYED AT TRIAL, STARTING AT PAGE 351, LINES 19 ON 351, RUNNING

12   THROUGH LINE 20, ON 352.

13               THE COURT:  YOU MAY PROCEED, COUNSEL.

14               (TRANSCRIPT IS DISPLAYED.)

15   BY MR. NOLAN:

16   Q    SO HERE'S THE TESTIMONY OF CARTER BRYANT THAT'S BEEN

17   PLAYED TO THE JURY.

18               "AFTER MARGARET HAD DONE A LITTLE BIT OF WORK ON THE

19   PRELIMINARY SCULPT, AND WHEN MERCEDEH CAME ON BOARD, WE

20   REALIZED THAT THE WORK THAT MARGARET HAD DONE WAS NOT GOING TO

21   WORK; SO PAULA AND MARGARET -- OR, I'M SORRY, PAULA AND

22   MERCEDEH, BASICALLY SAID THAT WE NEEDED TO START THE SCULPT

23   AGAIN."

24               QUESTION BY MR. QUINN:  "SO THE ANSWER TO MY QUESTION

25   IS, YES, YOU DID A NEW FORM OF SCULPT.

EXHIBIT _____ 24

PAGE 359

1           OBJECTION.   OBJECTION.   MISCHARACTERIZES THE WITNESS

2    AGAIN.

3           MR. QUINN:   YOUR TURN.

4           ANSWER:   WOULD YOU RESTATE YOUR QUESTION?

5           SO DID YOU DO A NEW FORM FOR THE DOLL?

6           OBJECTION.   MISCHARACTERIZES.   WE BASICALLY STARTED

7    THE SCULPT OVER."

8           "AND THAT STARTED WITH A NEW DRAWING?"

9           ANSWER:   "YES.   THAT DEPICTED A DIFFERENT FORM FOR

10   THE DOLL; DEPICTED A DIFFERENT POSE."

11          "A MORE NEUTRAL POSE?"

12          "YES."

13          QUESTION:   "NOT JUST A POSE BUT A DIFFERENT FORM OF

14   BODY?"

15          ANSWER:   "JUST A SLIMMED DOWN BODY."

16          "DID YOU REGARD THOSE AS SIGNIFICANT CHANGES IN THE

17   BODY?"

18          ANSWER:   "YES."

19   BY MR. NOLAN:

20   Q    NOW, THE REFERENCE IS TO MERCEDEH WARD, DO YOU SEE THAT?

21   A    YES.

22   Q    WHEN WAS THE FIRST TIME THAT A SCULPT WAS PRESENTED TO

23   MERCEDEH WARD, THE DATE?

24   A    IT WAS THIS SCULPT PRESENTED ON OCTOBER 25TH.

25   Q    NOW I'D LIKED TO DO THE SAME COMPARISON THAT MR. PRICE WAS

1

2

3                                    CERTIFICATE

4

5     I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED

      STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF

6     THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-

      ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

7     CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

      THE UNITED STATES.

8

9     _____        _____

      THERESA A. LANZA, CSR, RPR                   DATE

10    FEDERAL OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24                                            EXHIBIT_____24_____

25                                            PAGE___301_____

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                         EASTERN DIVISION

4                            - - -

5          HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                            - - -

7    MATTEL, INC.,                    )
                                      )
8                        Plaintiff,   )
                                      )
9            vs.                      )   No. CV 04-09049
                                      )
10   MGA ENTERTAINMENT, inc., et. Al., )   Trial Day 35
                                      )   morning session
11                     Defendants.    )   Pages 7324-7443
                                      )
     _____)
12   AND CONSOLIDATED ACTIONS,        )
                                      )

13

14

15       REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                    RIVERSIDE, CALIFORNIA

17                  THURSDAY, AUGUST 14, 2008

18                         9:06 A.M.

19

20

21

22

23               THERESA A. LANZA, RPR, CSR
                 Federal Official Court Reporter
24               3470 12th Street, Rm. 134
                 RIVERSIDE, CALIFORNIA  92501
25                     951-274-0844
                   WWW.THERESALANZA.COM

EXHIBIT ___ZY___

PAGE ___3102___

```
1    APPEARANCES:
2
     On behalf of MATTEL, INC.:
3
                          QUINN EMANUEL
4                         By:  JOHN QUINN
                               JON COREY
5                               MICHAEL T. ZELLER
                               HARRY OLIVAR
6                               TIMOTHY ALGER
                               WILLIAM PRICE
7                         865 S. FIGUEROA STREET,
                          10TH FLOOR
8                         LOS ANGELES, California   90017
                          213-624-7707
9
10
     ON BEHALF OF MGA ENTERTAINMENT:
11
                          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
12                        BY:  THOMAS J. NOLAN
                               JASON RUSSELL
13                              RAOUL KENNEDY
                               LAUREN AGUIAR
14                              CARL ROTH
                          300 SOUTH GRAND AVENUE
15                        LOS ANGELES, CALIFORNIA   90071-3144
                          213-687-5000
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT ___24___

PAGE __363__

```
 1                        I N D E X
 2
 3    DEFENSE
      WITNESS          DIRECT      CROSS      REDIRECT      RECROSS
 4    Tim Kilpin (Continued)
 5    BY MR. NOLAN      7327
 6
 7    DEFENSE
      WITNESS          DIRECT      CROSS      REDIRECT      RECROSS
 8    Erich Joachimsthaler
 9    BY MR. KENNEDY    7355                  7394
      BY MR. QUINN                  7383                    7401
10
11
      DEFENSE
12    WITNESS          DIRECT      CROSS      REDIRECT      RECROSS
      Jill Nordquist
13
      BY MR. SLOAN      7405
14    BY MR. QUINN                  7430
15
16          EXHIBITS           RECEIVED
17          01806              7340
             4999              7354
18          17383              7424
19
20
21
22
23
24
25
```

EXHIBIT _____ 24

PAGE 364

1          THE COURT:  Any objection?

2          MR. QUINN:  Yes, there is an objection.  This relates

3   to something else, a different conversation.

4          If you look at Page 132 --

5          MR. SLOAN:  Your Honor, I can clarify that,

6   Your Honor.  I'll withdraw it and ask it a different way.

7          THE COURT:  Then everything is stricken that the jury

8   has heard about the deposition.

9          You may start over.

10  BY MR. SLOAN:

11  Q    Ma'am, after you spoke to Mr. Bryant, did you have a

12  subsequent conversation with a woman named Kitty Hammons?

13  A    Yes.

14  Q    And Kitty Hammons was a fellow employee at Mattel; is that

15  correct?

16  A    Correct.

17  Q    She is, in fact, the employee who went with you to speak

18  with Mr. Bryant to question him about his resignation?

19  A    Yes.

20  Q    And that was in October of 2000?

21  A    Yes.

22  Q    And you spoke to Mr. Bryant at his cubicle in the Mattel

23  Design Center; correct?

24  A    Yes.

25  Q    Now, just after you had that conversation with

EXHIBIT _____ 24

PAGE ___305___

1    Ms. Hammons -- I'm sorry, with Mr. Bryant, did you discuss the

2    conversation you had with Mr. Bryant with Ms. Hammons?

3    A    Yes.

4    Q    And during that conversation, you were concerned and you

5    expressed concern that Mr. Bryant was going to a competitor; is

6    that correct?

7    A    Yes.  After he had told me he wasn't going to a competitor

8    but continued to refuse to say where he was going.

9    Q    Okay.

10          And is it fair to say that at that point in time, you

11   were concerned that he was potentially going to a competitor?

12   A    Yes.

13   Q    Did you express your concerns about the fact that

14   Mr. Bryant was going to a competitor to anyone else at Mattel?

15              MR. QUINN:  Misstates the testimony; assumes facts.

16              THE COURT:  Rephrase, counsel.

17              MR. SLOAN:  Your Honor, I asked 'Did you report your

18   conversation with Bryant and your concerns to anyone else at

19   Mattel.'

20              THE COURT:  Did you hear my ruling, Counsel?

21   BY MR. SLOAN:

22   Q    Did you have any conversation with anyone at Mattel after

23   your conversation with Mr. Bryant about your concerns?

24   A    I had a conversation with Kitty Hammons.

25   Q    Besides Kitty Hammons, did you also have a conversation

EXHIBIT ____24____ Page 7411

1  with Mr. Ron Longsdorf?

2  A    I did.

3  Q    And Mr. Longsdorf was the senior vice president at Barbie

4  Collectibles.

5  A    That is correct.

6  Q    And did you express your concerns about Mr. Bryant to

7  Mr. Longsdorf?

8  A    I wouldn't say it was a concern.  We had a very casual

9  conversation during which Carter's name came up.

10  Q    When was this conversation in relation to the conversation

11  that you had with Mr. Bryant about his resignation?

12  A    Approximately one to two hours later.

13  Q    And again, the conversation with Mr. Bryant was before he

14  had left Mattel; correct?

15  A    Yes.

16  Q    And didn't you express to Mr. Longsdorf that if you were

17  Mr. Bryant's supervisor, and he had refused to tell you where

18  he was going, that you would ask him to leave Mattel

19  immediately?

20  A    I think that was -- I don't know the exact words that I

21  used, but yes, I did state that.

22  Q    And you said that because you were concerned, again, that

23  Mr. Bryant was going to a competitor; correct?

24  A    I don't think I'm comfortable with the word "concern."

25       I had asked a question, to which somebody told me no,

EXHIBIT 24

PAGE 307

**Trial - AM Session: Kilpin 7327; Joachimsthaler 7355; Nordquist 7405**

1    I'm not going to a competitor; so I don't know that I was

2    concerned.

3    Q    But when you were deposed in July of 2007, you indicated

4    that you were concerned; is that correct?

5               MR. QUINN:  Vague as to time, Your Honor.

6               THE COURT:  Rephrase, counsel.

7    BY MR. SLOAN:

8    Q    When you were deposed in July of 2007, and you were asked

9    whether you were concerned about the fact that Mr. Bryant

10   refused to tell you where he was going, you said that you were

11   concerned, absolutely; is that correct?

12              MR. QUINN:  Same objection, Your Honor; multiple

13   comments.

14              THE COURT:  Clarify as to time, counsel.

15   BY MR. SLOAN:

16   Q    I'll ask you this, Ma'am.

17              What was Mr. Longsdorf's reaction when you said that

18   if Mr. Bryant were your supervisor, that you would ask him to

19   leave immediately?

20   A    I think he shrugged.

21   Q    At some point after this, did you learn Mr. Bryant was

22   involved in the creation of Bratz?

23   A    Approximately one year after he left, I found out he

24   worked on Bratz.

25   Q    And this was approximately in the summer of 2001?

EXHIBIT ____ 24

PAGE __368__

1    A    Yes.

2    Q    And to the best of your knowledge, was that soon after

3    Bratz was released?

4    A    To the best of my knowledge.

5    Q    And did you hear from in the Mattel design center that

6    Mr. Bryant was working on Bratz?

7    A    Yes.

8    Q    Approximately how many other people told you that they

9    believed that Mr. Bryant was working on the Bratz project?

10   A    I can't quantify for certain, but I would guess maybe two

11   to three people.  I don't know, really.

12   Q    Do you recall the names of the people at the Mattel design

13   center who told you in the summer of 2001 that they knew that

14   Carter Bryant was working on Bratz?

15   A    I don't.

16   Q    But it was definitely, you said, two or three people, at

17   least?

18   A    I don't know that I said at least.  I think it was about

19   two to three people.

20   Q    Did you mention the fact that you had learned that

21   Mr. Bryant was working on Bratz to anyone at Mattel?

22   A    Yes.

23   Q    Did you mention it to Ann Parducci?

24   A    Yes.

25   Q    How did you happen to mention it to Ann Parducci?

EXHIBIT _____ 24

PAGE 309

1    A    I believe I ran into her at some point in a hallway, and

2    she was holding a Bratz doll.

3    Q    And when was this?

4    A    After Bratz were on the marketplace; I don't remember the

5    exact day or date.

6    Q    But was it in approximately the summer of 2001?

7    A    It was either the summer of 2001 or fall 2001.

8    Q    And Ms. Parducci was a fellow employee at Barbie

9    Collectibles?

10   A    She was a fellow Mattel employee.  I'm not certain what

11   her title was at the time.

12   Q    Wasn't Ms. Parducci a senior vice president at Mattel?

13   A    She was, but at that time I don't remember what her

14   specific role was.

15   Q    She's now a senior vice president; is that what you are

16   saying?

17   A    No.  I'm saying that during my course of employment, which

18   has been eleven years, I know that at some point she had been

19   senior vice president; but I don't remember what her title was

20   in the year 2001.

21   Q    And you recall in the summer or fall of 2001 when you had

22   this conversation with her, you said that she was carrying a

23   Bratz doll with her; correct?

24   A    Correct.

25   Q    And that was at the Mattel design center; correct?

EXHIBIT _____ 24

PAGE 310

1    A    No.  It was in the tower.

2    Q    But it was in a Mattel office building?

3    A    Yes.

4    Q    Is it common for people at Mattel to be carrying

5    competitor's products?

6                MR. QUINN:  Objection.  Relevance.

7                THE COURT:  Sustained.

8    BY MR. SLOAN:

9    Q    Do you know why she was carrying a Bratz product with her?

10               MR. QUINN:  Objection.  Relevance.

11               THE COURT:  Sustained.

12   BY MR. SLOAN:

13   Q    Did you report your conversation -- did you report the

14   fact that you had found out that Carter Bryant was working at

15   Mattel to anyone else in the summer or fall of 2001?

16               MR. QUINN:  Misstates the testimony, Your Honor.

17               THE COURT:  Sustained.

18   BY MR. SLOAN:

19   Q    Did you report the fact that you had learned that Carter

20   Bryant was working at MGA on Bratz in the summer or fall of

21   2001 to anyone else at Mattel?

22               MR. QUINN:  Assumes facts.

23               THE COURT:  Overruled.

24               The witness indicated she had learned Mr. Bryant was

25   working on Bratz.

EXHIBIT ___ 24

PAGE ___ 371

1          MR. QUINN:  I wouldn't have a problem with that

2   question.

3          THE COURT:  That's the question; that's all she's

4   testified to, is that she did learn that in the summer of 2001

5   that Mr. Bryant was working on Bratz.

6          You can incorporate that into your question, Counsel.

7   BY MR. SLOAN:

8   Q    You said that you reported the fact that you had learned

9   in the summer of 2001 that Mr. Bryant was working at MGA on

10  Bratz; you said that you reported that to Ann Parducci;

11  correct?

12         MR. QUINN:  That assumes facts.

13         THE COURT:  Sustained.

14         You can ask the question, though, Counsel, whether

15  she did.

16  BY MR. SLOAN:

17  Q    Did you report what you had learned to anyone besides Ann

18  Parducci?

19  A    There was nothing to report.

20  Q    Let me ask you this.  What was your initial reaction when

21  you saw the Bratz doll?

22         MR. QUINN:  Objection.  Relevance.

23         THE COURT:  Rephrase it for focus, Counsel.

24  BY MR. SLOAN:

25  Q    Did you think that the Bratz doll looked like anything

1    else that you had seen before?

2            MR. QUINN:  Objection.  Relevance; vague.

3            THE COURT:  It's foundational.  Overruled.

4            You may answer.

5            THE WITNESS:  Yes.

6    BY MR. SLOAN:

7    Q    What did you think it looked like, the Bratz doll?

8    A    I thought it was similar to -- it reminded me of

9    Diva Starz.

10   Q    And Diva Starz was another doll or a doll that was

11   produced by Mattel; is that correct?

12   A    Yes.

13   Q    And it's an electronic doll that talks; is that correct?

14   A    Yes.

15   Q    And was that released originally in approximately the year

16   2000?

17   A    I don't know the release date.

18   Q    Was it released -- as of October 2000, had it been

19   released?

20   A    I don't know the release date.

21   Q    Can you tell me why you thought that the Diva Starz -- or

22   why the Bratz doll looked similar to Diva Starz?

23           MR. QUINN:  Irrelevant, your Honor; 403.

24           THE COURT:  Sustained.

25           MR. SLOAN:  Could we have a side-bar, Your Honor?

EXHIBIT _____ 24

1        THE COURT:  Yes.

2        (Side-bar proceedings as follows:)

3        MR. NOLAN:  Your Honor, her testimony was the first

4  time she sees Bratz, she thinks it reminds her of Diva Starz.

5  The point we were going to make in the connection is that the

6  Bratz name -- which the jury finds he conceived at while at

7  Mattel -- was one of the names that was being considered for

8  Diva Starz.  And then so the concealment portion of the

9  evidence, when you look at the package art -- we would just

10  like to identify what is it about this doll that reminded her

11  that it looked like Bratz.

12        And our point, Your Honor, would be that if the

13  package art or some other component of this product, together

14  with the name Bratz which had been considered for this project,

15  was available to Mattel, that would have been more building

16  blocks.  We're trying to build on concealment.

17        MR. QUINN:  Your Honor, I think this has very

18  significant potential to just mislead and confuse the jury

19  about what the issues are in this case.  There's never been any

20  claim that the Bratz were based on Diva Starz or were a copy of

21  Diva Starz.  We've said it was Toon Teens -- was an operation,

22  and we used that to place time.  But this is really far afield.

23        MR. NOLAN:  He used Bratz the same way, the name

24  Bratz, to time it within Mattel in the 1999, 2000 time period.

25  The Exhibit that we showed, Your Honor, on the bottom, has the

EXHIBIT _____ 24

PAGE _____ 374

1    as Exhibit 17383, I believe; is that correct?

2    A    Yes.

3    Q    And do you recognize what that is?

4    A    Yes.

5    Q    Is that a Diva Starz doll?

6    A    Yes.

7    Q    If you look at the bottom of the package, can you tell me

8    what the date on that particular product is?

9    A    The exhibit date?

10   Q    No.  The date on the bottom of the Diva Starz package,

11   does it indicate what date that was created or the copyright on

12   it?

13   A    Yes.  It indicates a copyright date.

14   Q    Is that 2000?

15   A    Yes.

16           MR. SLOAN:  Your Honor, can we ask that Exhibit 17383

17   be admitted into evidence?

18           MR. QUINN:  No objection.

19           THE COURT:  It's admitted.

20           (Exhibit 17383 received.)

21   BY MR. SLOAN:

22   Q    Now, there's package art on this doll as well, is that

23   correct, on the package?

24   A    Yes.

25   Q    And the package art, would you agree it pictures four

EXHIBIT _____ 24

1    girls?

2    A    Yes.

3    Q    With big heads?

4    A    Yes.

5    Q    And big feet?

6    A    Yes.

7    Q    And they have a certain amount of attitude, don't they?

8    A    Yes.

9    Q    They also have small noses.

10   A    This may be the first time I've looked at their noses.

11   Q    Would you agree that they are small?

12   A    Yes, they are small.

13   Q    Did you also look at the package art on the Bratz dolls,

14   the first generation of Bratz dolls, that were released in the

15   summer of 2001?

16   A    At some point I looked at them, yes.

17             MR. SLOAN:   Can we display Exhibit 12286, which has

18   already been admitted into evidence side-by-side with this,

19   AARON?

20   BY MR. SLOAN:

21   Q    On the right, we have the package art from the Bratz doll,

22   12286.  Do you see that?

23   A    I do.

24   Q    And would you agree that the Bratz package art also has

25   these oversized heads?

EXHIBIT _____ 24

1    A    It's a bit blurry, but...

2    Q    The what?

3    A    The image is a bit blurry.

4    Q    Would you agree that they have oversized heads?

5    A    Yes.

6    Q    And would you agree that they also have large feet?

7    A    Yes.

8    Q    And they also have big eyes; would you agree with that?

9    Again, I'm talking about package art on the Bratz packaging.

10   A    And again, it is pretty blurry.

11   Q    But do you remember seeing the package art on the Bratz

12   dolls in the summer of 2001 when you first saw them?

13   A    The first time I saw a Bratz doll was inside a Bratz

14   package, but I don't recollect what the package looked like at

15   the time.

16            MR. SLOAN:   Your Honor, I believe there's a first

17   generation doll right behind you, right behind the witness;

18   it's Cloe, Exhibit 12286, or JADE, Exhibit 17551.

19   BY MR. SLOAN:

20   Q    Ma'am, can you tell me what exhibit you're looking at?

21   A    I'm looking at 12286.

22   Q    Is that one of the first generation Cloe Bratz dolls?

23   A    I don't know the generations of Bratz dolls.

24   Q    Assuming that's one of the first generation, that has the

25   package art we were just speaking about; is that correct?

EXHIBIT _____ 24

PAGE __377__

1          MR. QUINN:  Your Honor, calls for an assumption.

2          THE COURT:  Sustained.

3    BY MR. SLOAN:

4    Q    Can you look at the bottom of the package and me what the

5    date on that is?

6    A    The copyright?

7    Q    Yes.

8    A    2001.

9    Q    And if you look at the package arts on that, is that the

10   package arts we were looking at earlier?  Look at the physical

11   exhibit, the exhibit that you have.

12   A    Is this the packaging art that's being projected on the

13   screen?

14   Q    No.

15          Look at the packaging art there.

16          Would you agree that the package art on that

17   Exhibit 12286, the Cloe doll, is very similar in many respects

18   to the package art on the Diva Starz doll, Exhibit 17383?

19          MR. QUINN:  Vague; overbroad; improper opinion.

20          THE COURT:  Counsel, we're going to have to take a

21   side-bar on this, briefly.

22          (Side-bar proceedings as follows: )

23          THE COURT:  This is becoming surreal, almost, in

24   terms of the 403 confusing issue.

25          As I understand it, what MGA is trying to elicit from

EXHIBIT _____ 24

1    this witness is whether or not, when seeing the Diva Starz that

2    she introduced per her testimony, in response to your question,

3    that somehow because she recognized this as Diva Starz, she

4    should have assumed that Carter Bryant must have borrowed that

5    idea?

6              MR. SLOAN:  May have stolen that idea.

7              THE COURT:  Which is irrelevant to the fraudulent

8    concealment theory.  The only issue is whether or not he was

9    working at MGA.  Ultimately, this is a building block, as you

10   indicated, to indicate that he did this work while he was at

11   MGA.  I don't see how this furthers that at all.  This came out

12   in 2000.  Bratz came out in 2001.

13             Let's assume he stole this outright.  That does

14   nothing to show that he worked on this while he was still

15   employed at --

16             MR. NOLAN:  One of the other things that they contend

17   is that we stole the idea of Bratz -- conceived and owned by

18   Mattel.  And our only point is that the name Bratz -- from a

19   concealment point of view -- if the jury found that information

20   was owned by Mattel.  Our only competitor -- by looking at the

21   name Bratz she says is like Diva Starz.  And Diva Starz was one

22   of the product names being considered for Diva Starz.  I just

23   want to ask her that.

24             THE COURT:  But none of that -- we're getting into a

25   substantially similarity analysis on a product which is

EXHIBIT _____ 24

PAGE _____ 379

1   completely irrelevant.  If anything, this somewhat proves

2   Mattel's case.  I mean, to the extent this gets -- like I say,

3   this almost becomes surreal at this point.

4           MR. NOLAN:  I told Mr. Sloan, the only question that

5   he should ask her now is, without making any comparison, did

6   you know that Bratz was a name that was being considered by

7   Mattel for the Diva Starz project?

8           THE COURT:  That question hasn't come anywhere near

9   what we've gotten.

10          MR. ZELLER:  If I may, Your Honor, the two claims at

11   issue, the only ones in which they have -- the statute of

12   limitations defense is still alive.

13          THE COURT:  Intentional interference.

14          MR. ZELLER:  These aren't ideas; they are not based

15   upon what it is they are questioning this witness of.  They are

16   conversations.

17          THE COURT:  They predicate, in part, on the name

18   Bratz, for example.

19          MR. ZELLER:  Well, I guess we can take it up outside

20   of the presence of the jury.

21          THE COURT:  But the foundation isn't here.  And this

22   is getting horribly muddled on 403.  I'm not saying there's

23   another way this could have been approached, but given how this

24   is coming out, this is not coming out properly.

25          Let's go back to that.

EXHIBIT ___24___

PAGE ___380___

1          (Side-bar proceedings concluded.)

2    BY MR. SLOAN:

3    Q    Ms. Nordquist, were you aware that the name Bratz was

4    considered as an early name for the Diva Starz project?

5    A    No.

6              MR. SLOAN:  Nothing further, Your Honor.

7              THE COURT:  Very well.

8              The jury is instructed to disregard the testimony

9    about the comparison between Diva Starz and Bratz.  That's of

10   no moment.

11                      CROSS-EXAMINATION

12   BY MR. QUINN:

13   Q    Ms. Nordquist, you indicated some time in the summer or

14   fall of 2001, you learned that Mr. Bryant was working on Bratz.

15   A    Yes.

16   Q    And where did you hear that?

17   A    In the design center.

18   Q    Do you recall who said that to you?

19   A    I don't.

20   Q    At that time did you have any other information on that

21   subject other than this comment that you can't recall who said

22   it?

23   A    No.  That was all I heard.

24   Q    Did somebody tell you then that Mr. Bryant had worked on

25   Bratz while he was still employed by Mattel?

EXHIBIT ___24___

Page 7430

PAGE ___381___

1    A    Never.  No.

2    Q    When did you first learn that Mr. Bryant had worked on the

3    Bratz designs while he was employed by Mattel?

4              MR. SLOAN:  Objection.  Foundation, Your Honor.

5              THE COURT:  Sustained.

6    BY MR. QUINN:

7    Q    Did you ever learn that Mr. Bryant had worked on the Bratz

8    designs while he was employed by Mattel?

9              MR. SLOAN:  Objection.  Foundation.

10             THE COURT:  Overruled.

11             "Did you ever learn?"

12             You may answer.

13             THE WITNESS:  I believe it was in the spring of --

14             THE COURT:  It was a yes or no question.

15             THE WITNESS:  Can it be repeated or what?

16   BY MR. QUINN:

17   Q    The question is, did you ever learn that Mr. Bryant had

18   worked on the Bratz designs while he was employed by Mattel?

19   A    I guess I have a question about the question.

20   Q    Let me ask it this way.

21             Did you have any information available --

22             THE COURT:  Counsel, what's confusing is the last

23   clause of that question; she does not know what it modifies.

24             I think rephrase your question.  It's vague.

25   / / /

EXHIBIT _____ 24

PAGE _____ 382

1    BY MR. QUINN:

2    Q    At any point in time prior to this lawsuit, did you ever

3    learn any information indicating that Mr. Bryant had worked on

4    Bratz designs while employed by Mattel?

5              MR. SLOAN:  Objection.  Foundation; also assumes

6    facts.  It's not clear this witness knows when the lawsuit was

7    filed.

8              THE COURT:  It's a yes or no --

9              Overruled.  Yes or no.  Then we'll go to the

10   foundation.

11             THE WITNESS:  I only learned --

12             THE COURT:  Just yes or no question.  Do you?  Did

13   you?

14             THE WITNESS:  So can it be repeated one more time.

15             THE COURT:  The court reporter will read it back,

16   please.

17             (Last question is read.)

18             THE WITNESS:  No.

19             MR. QUINN:  Nothing further.

20             MR. SLOAN:  Nothing further, Your Honor.

21             THE COURT:  We're at the noon hour.  The court is

22   going to recess for the day.

23             The jury will be back here at 9:00 tomorrow morning.

24             My condolences to Mr. Nichols.

25             (WHEREUPON JURORS DEPART COURTROOM.)   EXHIBIT _____ 24

1    MR. QUINN:  Your Honor, the court wanted me to remind

2    the Court that we were going to discuss this Exhibit that came

3    in and was offered with the expert.

4    THE COURT:  Right.

5    I'll hear your argument on that.  My tentative is to

6    allow -- the second one, the one I think you're looking at

7    right now.

8    MR. QUINN:  Measuring the Bratz brand price premium.

9    THE COURT:  My inclination is we'll let that one in.

10   The other one seemed simple enough.  It does not come in.  The

11   question is whether or not the summary is necessary to --

12   assuming there's authentication, a foundation, that it's

13   necessary, given the complexity of the figures.  The second one

14   seems to fall into that category; the first one does not.

15   That's my tentative thought, but I'll hear from both sides on

16   that.

17   MR. QUINN:  Your Honor, I guess our thought on this,

18   the price premium slide, is that there was no indication that

19   there's any data behind this at all, to say nothing of any

20   large volume of data.  Under 1006, if it's a summary of

21   voluminous data, it may be admissible.  But there's no

22   predicate laid that this was anything other than the witness's

23   own horseback judgment.

24   THE COURT:  There was no objection to his

25   articulation of those judgments, Counsel.  EXHIBIT _____ 24

1    something new; so the parties are still trying to stay updated.

2                 THE COURT:  I've been taking notes, but I don't think

3    I've written on either of the binders; so I'll let you update

4    those at this time.

5                 MS. AGUIAR:  Great.  I'll just substitute that tab.

6                 THE COURT:  Let's get those fixed.

7                 Court is in recess.

8                 (Morning session is concluded.)

9

10

11

12

13

14

15

16

17                             CERTIFICATE

18

19   I hereby certify that pursuant to section 753, title 28, united

     states code, the foregoing is a true and correct transcript of

20   the stenographically recorded proceedings held in the above-

     entitled matter and that the transcript page format is in

21   conformance with the regulations of the judicial conference of

     the united states.

22

23   _____              _____

     THERESA A. LANZA, CSR, RPR                    Date

24   FEDERAL Official COURT Reporter

25                                          EXHIBIT ___24___

                                            PAGE ___386___

Trial - PM Session: Jury Charge Conference 7449  8/14/2008  12:00:00 PM

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                      ---

4        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                      ---

6    MATTEL, INC.,          : PAGES 7446 - 7547

                            :

7         PLAINTIFF,        :

                            :

8    VS.             : NO. ED CV04-09049-SGL

                     : [CONSOLIDATED WITH

9    MGA ENTERTAINMENT, INC.,    : CV04-9059 & CV05-2727]

     ET AL.,            :

10                       :

     DEFENDANTS.       :

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17             THURSDAY, AUGUST 14, 2008

18              JURY TRIAL - DAY 35

19              AFTERNOON SESSION

20

21

22              MARK SCHWEITZER, CSR, RPR, CRR

                OFFICIAL COURT REPORTER

23              UNITED STATES DISTRICT COURT

                181-H ROYBAL FEDERAL BUILDING

24              255 EAST TEMPLE STREET

                LOS ANGELES, CALIFORNIA 90012

25              (213) 663-3494

EXHIBIT ___24___

PAGE __386__ Page 7446

1  Appearances of Counsel:

2

3  On Behalf of Mattel:

4    Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
      By John B. Quinn, Esq.

5        B. Dylan Proctor, Esq.
         Michael T. Zeller, Esq.

6        Harry Olivar, Esq.
         John Corey, Esq.

7        Diane Hutnyan, Esq.
         William Price, Esq.

8      855 South Figueroa Street
       10th Floor

9      Los Angeles, CA 90017
       (213) 624-7707

10

11

12  On Behalf of MGA Entertainment:

13    Skadden, Arps, Slate, Meagher & Flom LLP
      By Thomas J. Nolan, Esq.

14       Carl Alan Roth, Esq.
         Jason Russell, Esq.

15       Lauren Aguiar, Esq.
         David Hansen, Esq.

16       Matthew Sloan, Esq.
         Robert Herrington, Esq.

17     300 South Grand Avenue
       Los Angeles, CA 90071-3144

18     (213) 687-5000

19

20

21

22

23

24

25

EXHIBIT ____24____

PAGE ___387___

1               I N D E X

2

3         MATTER:   JURY CHARGE CONFERENCE.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT ___24___

1          There's no excuse in the world that if they really

2     wanted to bring these to trial, they could have registered

3     them sooner, and they were not registered until July 25th or

4     later.  And the discovery issues in the case proceeded along

5     the 16 that have been registered and have serious issues as

6     to prejudice and ownership and damages and relation fact, and

7     it raises a whole host of issues, and the prejudice of adding

8     in at this point the many dozens of issues that these

9     drawings would create, we think, is just unfair.

10          THE COURT:  I need more than that, Counsel.  You

11     need to explain.  You used a big broad brush here.  I'm not

12     following.  Those aren't objections.

13          MR. HANSEN:  I'll be specific, then.

14          THE COURT:  Please.

15          MR. HANSEN:  And I don't know.  There's so many

16     things in those drawings, that honestly I have no idea what

17     exactly Mattel plans to use of those drawings.  We've seen

18     some of them.  Take, for example, the sculpt that we're

19     familiar with.  Okay?  The one that Ms. Leahy did that the

20     jury determined that Mr. Bryant had some involvement with,

21     and therefore, fell under the Phase 1 verdict.

22          It's always been our position, and it is our

23     position today, that the copyright in that work, because of

24     the mastermind of that work being Ms. Leahy, is Ms. Leahy.

25     And so to the extent that putting aside whether or not it

EXHIBIT ___24___

PAGE ___389___

1    somehow gets caught up in the contract, the copyright issue

2    has not changed.  It was -- we were not -- we were

3    specifically at Mr. Zeller's urging in part, and not to place

4    blame, but it was a simple up or down in terms of timing, and

5    we attempted in the first phase of the trial to bring

6    copyright ownership issues in and have more meaning.  And

7    that issue was rebuffed.

8         Our last discussion on this was not joint

9    authorship.  I think your Honor's point was that joint

10   authorship was waived and that we can't prove joint

11   authorship.  We are not trying to prove joint authorship.  In

12   fact, we believe we have sole authorship in the copyright,

13   and if anything, it is for Mattel to prove that Mr. Bryant's

14   contribution to that sculpt rises to the level of a joint

15   authorship, which is their burden.  We raised authorship in

16   our additional jury instructions going all the way back to

17   the first submission.

18        We have in the pleading, that is, in reference in

19   the pretrial order not only authorship, but joint authorship

20   raised.  So we think at this point to have those issues --

21        THE COURT:  Wait a second.  You said in the

22   pretrial?  Counsel misspoke, I think.  Are you saying you

23   raised joint authorship as a defense in the pretrial

24   conference order?

25        MR. HANSEN:  No.  I'm sorry, authorship is in

EXHIBIT ___24___

1    the --

2         THE COURT:  Let's be careful.  Because that was one

3    of the grounds.  If I'm mistaken on that, I want to know

4    about it because that was one of the bases that I'm keeping

5    out joint authorship.

6         MR. HANSEN:  It's in our operative pleading that is

7    referenced in the final pretrial conference order, and as to

8    the issues now --

9         THE COURT:  What is?  Authorship or joint

10   authorship?

11        MR. HANSEN:  Authorship has always been.

12   Authorship, there's never been a contention by us on that.

13   The joint authorship issue, these works were not at issue in

14   the case.

15        So there was no particular reason to take them from

16   the affirmative defense in our pleading and specifically put

17   them in the case.  Until now, these works are attempting to

18   be brought into the case in addition to the 16 that we have

19   fully addressed with all of our affirmative defenses.

20        THE COURT:  Joint authorship has never been pled?

21        MR. HANSEN:  It's an affirmative defense in MGA's

22   pleading.  It was not raised specifically with respect to

23   these works in the final pretrial conference order because

24   these works were not part of the final pretrial conference

25   order.  But even before then --

EXHIBIT ___24___

PAGE ___391___  Page 7491

Mattel v. MGA II - Trial Transcripts Phase 1     Unsigned

1    THE COURT:  What pleading are you referring to?

2    MR. HANSEN:  It is the MGA pleading that's -- it's

3    referenced in the final pretrial conference order.  The name,

4    I forget whether it's -- I have it.  Second amended answer

5    and counterclaim.  I think this is it.  No.  This is theirs

6    that lists the 16.  I apologize.

7    THE COURT:  I'm sorry, Counsel.  I turned away.

8    MR. HANSEN:  The answer and affirmative defenses of

9    MGA Entertainment to Mattel's second amended answer and

10   counterclaims, and its joint authorship is the 20th

11   affirmative defense.

12   THE COURT:  Okay.  So this goes back to your

13   initial answer.  This was never presented in any of your

14   pleadings submitted in advance of the pretrial conference; is

15   that correct?

16   MR. HANSEN:  This -- yes.  I'm not arguing that.

17   My argument in that respect is that it's an affirmative

18   defense --

19   THE COURT:  I just wanted to clarify for the

20   record.

21   MR. HANSEN:  Yes, I didn't mean to confuse that.

22   It is not in that.

23   THE COURT:  And I just want to make sure I wasn't

24   confused.  Because the Court truncated the pretrial

25   conference order dramatically.  And I would certainly have

EXHIBIT _____ 24

PAGE _____ 392

1    in this case.  And for them to somehow basically circumvent

2    what was fought over for six weeks really does seem, you

3    know, quite unfair, and it's really not right.  And we also

4    don't think it's proper under the law.

5        THE COURT:  Mr. Hansen, I'll give you the last

6    word.

7        MR. HANSEN:  Very briefly.  A couple points.  If

8    the jury, as Mr. Zeller said, found that Carter Bryant had

9    created the sculpt, we wouldn't be having this discussion.

10        THE COURT:  They did find that he created it solely

11    or jointly.

12        MR. HANSEN:  That's the issue.

13        THE COURT:  That excludes independent creation,

14    does it not?

15        MR. HANSEN:  No.

16        THE COURT:  If it was solely, then she had nothing

17    to do with it.  If it's jointly, that means that he and her

18    together created it.

19        MR. HANSEN:  Well --

20        THE COURT:  How do we get to the third possibility?

21        MR. HANSEN:  That would mean, yes, that Carter

22    Bryant had input, and there's no question that there is in

23    the record -- it's not quite the evidence that Mr. -- I would

24    suggest that Mr. Zeller is talking about, that Mr. -- for

25    example, the specific input that Ms. --

EXHIBIT ___24___

1    THE COURT:  You're suggesting it was

2    inconsequential input.  And if it was inconsequential input,

3    then there was no basis for the jury to find, as they did,

4    that it was a joint work.

5    MR. HANSEN:  I'm saying from a copyright ownership

6    standpoint, it was not addressed.  It has nothing to do with

7    what people may think sitting around and we noodle things.

8    We cited the cases, and if you look back, your Honor, I

9    apologize.  We put this in our brief.  If you look at what

10    shouldn't be actually quite surprising, because if you look

11    at how the verdict came about, Mattel argued that what the

12    verdict should say is that the works at issue were created by

13    Mr. Bryant or at the direction of Mr. Bryant.  And that was

14    rejected in favor of going with the language in the contract.

15    So if it had been what Mr. Zeller is now arguing

16    the evidence shows, that it was a direction of the mastermind

17    Carter Bryant, then we would probably not be having this

18    discussion either.  But what we have is a -- all of the

19    testimony shows that the sculptor is Margaret Leahy.  There

20    is no question that Carter Bryant had no skills in this

21    regard.  The evidence, Carter Bryant's testimony in the

22    record is that "I gave it to Margaret and said do your

23    magic."  That's both from him and from Ms. Leahy.  And you've

24    seen Ms. Leahy talk about doing the sculpting.  The only

25    direct evidence, and I would like to see more --

EXHIBIT __24__

PAGE __394__

1    THE COURT:  Carter Bryant didn't do the sculpting.

2    MR. HANSEN:  The evidence from Ms. Leahy is she put

3    them in a drawer.  Carter Bryant was at a meeting, the quiet

4    guy in the corner.  He suggested that he wanted the ankles

5    thinner, and she basically disregarded that because she does

6    the sculpting, and that that doesn't work from a

7    manufacturing standpoint.

8        All I'm saying is that the evidence in terms of

9    whether or not he was involved -- he was there.  There's no

10   question he was there.  But that doesn't mean that it's

11   sufficient under Aal Mohammed and the other case that we cite

12   to make him -- to make him a joint author.

13       This is not making us a joint author.  He's the one

14   that's trying to get -- he's not.  Mattel, now that they have

15   this sole or jointly, are trying to wedge themselves into

16   copyright ownership.  This is not us trying to do it.  It's

17   them trying to do it.  And frankly, right now, the evidence

18   is to the contrary.

19       THE COURT:  Thank you, Counsel.  You've done a good

20   job of framing this issue.

21       MS. AGUIAR:  Would your Honor entertain just a few

22   moments?  Because I feel as though I was implicated in some

23   of Mr. -- some of Mattel's comments.

24       THE COURT:  I will hear briefly, and then I have to

25   move on to the instructions issue.

EXHIBIT __24__

1    idea for the characters.  That question related to the state

2    law claims.  The jury instruction that we are proposing

3    relates to the characters as depicted in the drawings, which

4    is a separate copyright issue.

5         THE COURT:  I do understand that distinction,

6    Counsel.

7         MR. PROCTOR:  Thank you.

8         THE COURT:  All right.  Court is in recess.

9

10

11

12

13              C E R T I F I C A T E

14

15

16         I hereby certify that pursuant to Title 28,

17    Section 753 United States Code, the foregoing is a true and

18    correct transcript of the stenographically reported

19    proceedings in the above matter.

20         Certified on August 14, 2008.

21

22

23              MARK SCHWEITZER, CSR, RPR, CRR

                 Official Court Reporter

24               License No. 10514

25

EXHIBIT __24__

PAGE __396__

1                 UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF CALIFORNIA

3                          - - -

4        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                          - - -

6   MATTEL, INC.,              :   PAGES 7652 - 7873

                               :

7            PLAINTIFF,        :

                               :

8        VS.                   :   NO. ED CV04-09049-SGL

                               :   [CONSOLIDATED WITH

9   MGA ENTERTAINMENT, INC.,   :   CV04-9059 & CV05-2727]

    ET AL.,                    :

10                             :

             DEFENDANTS.       :

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 RIVERSIDE, CALIFORNIA

17                FRIDAY, AUGUST 15, 2008

18                 JURY TRIAL - DAY 36

19                 AFTERNOON SESSION

20

21

22                        MARK SCHWEITZER, CSR, RPR, CRR

                          OFFICIAL COURT REPORTER

23                        UNITED STATES DISTRICT COURT

                          181-H ROYBAL FEDERAL BUILDING

24                        255 EAST TEMPLE STREET

                          LOS ANGELES, CALIFORNIA 90012

25                        (213) 663-3494

EXHIBIT ___24___

PAGE ___397___

```
 1   Appearances of Counsel:
 2
 3   On Behalf of Mattel:
 4        Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
          By John B. Quinn, Esq.
 5            B. Dylan Proctor, Esq.
              Michael T. Zeller, Esq.
 6            Harry Olivar, Esq.
              John Corey, Esq.
 7            Diane Hutnyan, Esq.
              William Price, Esq.
 8        855 South Figueroa Street
          10th Floor
 9        Los Angeles, CA 90017
          (213) 624-7707
10
11
12   On Behalf of MGA Entertainment:
13        Skadden, Arps, Slate, Meagher & Flom LLP
          By Thomas J. Nolan, Esq.
14            Carl Alan Roth, Esq.
              Jason Russell, Esq.
15            Lauren Aguiar, Esq.
              David Hansen, Esq.
16            Matthew Sloan, Esq.
              Robert Herrington, Esq.
17            Raoul D. Kennedy, Esq.
          300 South Grand Avenue
18        Los Angeles, CA 90071-3144
          (213) 687-5000
19
20
21
22
23
24
25
```

EXHIBIT ____ 24

```
 1                         I N D E X
 2
 3   ISAAC LARIAN, PREVIOUSLY SWORN......................... 7676
 4   RECROSS-EXAMINATION (CONTINUED) BY MR. PRICE:.......... 7676
     FURTHER REDIRECT EXAMINATION BY MR. NOLAN:............ 7678
 5   FURTHER RECROSS-EXAMINATION BY MR. PRICE: ............ 7680
     FURTHER REDIRECT EXAMINATION BY MR. NOLAN:........... 7682
 6   FURTHER RECROSS-EXAMINATION BY MR. PRICE: ............ 7682
 7   PAUL KEVIN MEYER, SWORN............................... 7683
 8   DIRECT EXAMINATION BY MR. KENNEDY: ................... 7683
     VOIR DIRE EXAMINATION BY MR. PRICE: ................. 7751
 9   DIRECT EXAMINATION (RESUMED)BY MR. KENNEDY:........... 7757
     CROSS-EXAMINATION BY MR. PRICE:...................... 7761
10   REDIRECT EXAMINATION BY MR. KENNEDY:................. 7783
     RECROSS-EXAMINATION BY MR. PRICE: .................. 7785
11
12   VIDEOTAPED DEPOSITION EXCERPTS OF LILY MARTINEZ........ 7787
13   VIDEOTAPED DEPOSITION EXCERPTS OF KEVIN FARR........... 7789
14   MICHAEL JOSEPH WAGNER, SWORN.......................... 7807
15   DIRECT EXAMINATION BY MR. QUINN: ..................... 7808
     VOIR DIRE EXAMINATION BY MR. KENNEDY:................. 7815
16   DIRECT EXAMINATION (RESUMED) BY MR. QUINN:  .......... 7818
     CROSS-EXAMINATION BY MR. KENNEDY:.................... 7836
17   REDIRECT EXAMINATION BY MR. QUINN: .................. 7844
     RECROSS-EXAMINATION BY MR. KENNEDY: ................. 7845
18
19   PAUL KEVIN MEYER, PREVIOUSLY SWORN.................... 7847
20   DIRECT EXAMINATION BY MR. KENNEDY:................... 7847
     CROSS-EXAMINATION BY MR. PRICE:...................... 7848
21
22
23
24
25
```

EXHIBIT ___24___

PAGE ___**399**___ ___Page 7654___

```
1                    E X H I B I T S

2

3     (Exhibit 13861, Page 11, received.).................... 7781

4   (Exhibits 2502-A, 2504-A, 2514-A, and

      2517-A received.).................................... 7803

5

6   (Exhibits 18923, 1, 2, 4, 6, 7, 9, 10,

      11, 12, 13, 15, 16, 17, 18, 21, 24, 25,

7     26, and 32 received.)............................... 7807

8   (Exhibit 13991 received.)............................. 7818

9   (Exhibit 14626 received.)............................. 7833

10  (Exhibit 14663 received.)............................. 7834

11  (Exhibit 14664 received.)............................. 7835

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT __24__

PAGE __400__   Page 7655

1    some math; right?

2    A.    Well, that's how the schedule works.

3    Q.    Right.  So when you said you weren't doing it year by

4    year, you were just doing it overall, your methodology

5    required you to go year by year; correct?

6    A.    I had to gather the data year by year and make the

7    comparisons.

8    Q.    And using your methodology, it shows that for three of

9    the years where the dolls make, according to your figures,

10   hundreds of millions of dollars, zero percent would be

11   apportioned to Mr. Bryant's intellectual property.  That's

12   what these numbers show; right?

13   A.    I don't agree with that.  I do not agree with that.  I

14   believe if we want to go down that route, I would focus the

15   jury on 2002, the 7.25 percent, 2008, the 8.83 percent, and

16   2004, the 10.07 percent.  To use those apportionment

17   parentages.

18        My focus was to try to compare Barbie to the Bratz

19   doll to see if there was any so-called super profits from the

20   intellectual property and identify it there.  I'm the last

21   one to say there's not value in Mr. Bryant's and the property

22   now that's been awarded to Mattel.  I recognize value in that

23   property.

24        MR. PRICE:  No other questions.

25        MR. PRICE:  Nothing further.

EXHIBIT __24__

PAGE __401__

1        THE COURT:  You are excused, sir.  Thank you.

2        MR. NOLAN:  Your Honor, the next witness will be a

3   two-minute video of Lily Martinez's deposition testimony.

4        MR. QUINN:  Your Honor, would it be appropriate to

5   explain why Ms. Martinez is necessary?

6        THE COURT:  I suspect the jury has figured out why

7   Ms. Martinez is no longer with us.  As important as this case

8   might be to Ms. Martinez, there is one thing perhaps more

9   important, and she's attending to that as we speak.

10        (WHEREUPON THE VIDEOTAPED DEPOSITION EXCERPTS

11        OF LILY MARTINEZ, AS PROVIDED BY COUNSEL, ARE

12        INCORPORATED HEREIN:)

13   Q.  Could you please state your full name for the record.

14   A.  Liliana Martinez.

15   Q.  Do you consider the decal reflected on Exhibit 257 to be

16   more cartoony than the features of Barbie?

17        MR. ZELLER:  And when you say Barbie, you're

18   talking about the particular doll that's in Cool Skating?

19   Q.  That's correct.

20   A.  You're asking me to compare them?

21   Q.  Yes.

22   A.  It's not the same thing.

23   Q.  And how are they different?

24   A.  One is 3D and one's 2D.

25   Q.  Do they differ in any other way other than one being 2D

EXHIBIT _____ 24

PAGE _____ 402

1   and one being 3D?

2   A.   One is -- I mean, you can't compare something that's

3   not -- you can't compare them.

4   Q.   Do you believe that the style of Barbie's face is the

5   same as the style of the decal?

6   A.   You already asked me that, and I had already told her I

7   think one is a doll and one is a cartoonish decal.

8   Q.   What did you do with the Toon Teens materials, the dolls

9   and accessories and et cetera after you heard that Toon Teens

10  was not selected?

11  A.   Materials, meaning the actual product that we presented?

12  Q.   Yes.

13  A.   I don't remember what I immediately did.  But

14  eventually, we put it in a box.

15  Q.   Are there Bratz dolls in the design area at Mattel?

16  A.   You already asked me that.

17  Q.   How did they get there?

18  A.   We buy them.

19  Q.   Have you ever bought a Bratz doll?

20  A.   Yes, I've bought a Bratz doll.

21  Q.   Have you bought many Bratz dolls?

22  A.   I wouldn't say many, but I bought some.

23            (END OF DEPOSITION EXCERPT.)

24            MR. NOLAN:  Your Honor, just a time count with

25  respect to their cross-examination deducted from the four

EXHIBIT _____ 24

PAGE **403**

1   o'clock?  Because we have one video that's 13 minutes long.

2           MR. NOLAN:  Thank you.  The next video will be

3   Kevin Farr.

4           (WHEREUPON THE VIDEOTAPED DEPOSITION EXCERPTS

5           OF KEVIN FARR, AS PROVIDED BY COUNSEL, ARE

6           INCORPORATED HEREIN:)

7   Q.  Would you please spell your name for the record, sir.

8   A.  Kevin, K-E-V-I-N, Farr, F-A-R-R.

9   Q.  How long have you been with Mattel?

10  A.  I've been with Mattel since November of 1991.

11  Q.  What did you do in terms of employment between 1986 and

12  1991?

13  A.  I worked for Price Waterhouse at the time.

14  Q.  Are you a CPA?

15  A.  Yes, I am.

16  Q.  And you have an effective, operable license right now?

17  A.  I have a license, yes.

18  Q.  And what did you do for Price Waterhouse?

19  A.  I did auditing and did tax consulting.

20  Q.  And any other employment between 1986 and 1991 other

21  than Price Waterhouse?

22  A.  No.

23  Q.  Okay.  Was Mattel one of your clients?

24  A.  Yes.

25  Q.  Okay.  And that led to the employment at Mattel?

EXHIBIT ___ 2Y

1

2

3

4

5

6

7                              C E R T I F I C A T E

8

9

10            I hereby certify that pursuant to Title 28,

11    Section 753 United States Code, the foregoing is a true and

12    correct transcript of the stenographically reported

13    proceedings in the above matter.

14            Certified on August 15, 2008.

15

16

17                        MARK SCHWEITZER, CSR, RPR, CRR

                          Official Court Reporter

18                        License No. 10514

19

20

21

22

23

24

25

EXHIBIT ___24___

PAGE ___405___