# EXHIBIT G

HCA 3242/2003

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

ACTION NO. 3242 OF 2003

---

BETWEEN

MGA ENTERTAINMENT INC.                                                    Plaintiff

                                    and

UNION TOP (HK) COMPANY LIMITED                                     Defendant

---

## AFFIRMATION OF LEE SHIU CHEUNG

I, Lee Shiu Cheung of Room 1001, Empire Centre, 68 Mody Road, Tsimshatsui East, Kowloon, Hong Kong do solemnly, sincerely and truly affirm and say as follows:-

1.     I am the Managing Director of MGA (H.K.) Entertainment Limited (hereinafter "MGAHK"), which is a subsidiary company and manufacturing licensee of MGA Entertainment Inc., formerly known as ABC International Traders, Inc. trading as MGA Entertainment, the Plaintiff herein. I am duly authorized by the Plaintiff to make this affirmation on its behalf. Unless otherwise stated, the facts and matters

1

EXHIBIT G

PAGE 221

MGA 3892910

EX 13725-0001

contained herein are true to the best of my knowledge and belief and they either are within my own personal knowledge or gleaned from books and records of the Plaintiff to which I have free access. Insofar as facts and matters that do not fall within the aforesaid category, they are related to me by the respective sources stated hereunder and are true to the best of my knowledge and belief.



2

MGA 3892911

EX 13725-0002

over US$650 million due to the success of a range of dolls known as BRATZ which is the subject matter of this action and will be dealt with in detail below. For the year 2002, the sale of BRATZ dolls and accessories accounted for 69% of the total revenue of the Plaintiff. The Plaintiff forecasts that the sale of BRATZ dolls and accessories will account for 72% of the revenue for the year 2003.

4.  The toys designed and marketed by the Plaintiff have won international acclaim and were made the subject of numerous awards and prizes. However, the most successful toys designed and marketed by the Plaintiff must be the BRATZ dolls. For two consecutive years in 2001 and 2002, the Plaintiff has won the toy industry's most prestigious award, The People's Choice Toy of the Year for BRATZ-related toys. It has also won two consecutive Family Fun Toy of the Year award for BRATZ-related toys in 2001 and 2002. Furthermore, in 2001 and 2002, BRATZ-related toys won Today's toy tests.

5.  The BRATZ dolls come in 2 sizes. The full-sized version stands at 10 inches tall and the mini version stands at 4 and a half inches tall. This application is only concerned with the full-sized version doll.

6.  The Plaintiff is and was at all material times the owner of copyright in the works relating to the BRATZ dolls.

Subsistence and Ownership of Copyright Works

3

EXHIBIT G
PAGE 223

MGA 3892912
EX 13725-0003

7.  On or about 18ᵗʰ September 2000, the Plaintiff entered into an agreement with Mr. Carter Bryant ("Mr. Bryant") whereby Mr. Bryant transferred the rights including copyright relating to a line of dolls known as "BRATZ" originally designed and developed by him, including rights in any future works ("the Bryant Agreement"). Mr. Bryant was a graduate of Ottis College in fashion and toy design. Although BRATZ is a variation of the word "brats", the former was coined by the Plaintiff not to denote naughty or spoilt children but to denote hip and cool young adolescent or teenage girls. This idea of hip and cool is born out in the theme and design of the BRATZ dolls.

8.  Now produced and shown to me marked "LSC-2" is a copy of the Bryant Agreement. I crave leave to refer to clause 3 of the Bryant Agreement whereby all intellectual property rights including copyright subsisting in the works generated by Mr. Bryant shall be owned by the Plaintiff, regardless of whether the works were created before or after the Bryant Agreement. Pursuant and prior to the Bryant Agreement and commission, Mr. Bryant initially designed a range of 4 girls and subsequently extended the range by adding 2 more girls and 4 boys. These design works of the BRATZ dolls were all original drawings created by Mr. Bryant using his own independent labour, skill and judgement and copyright subsisted in them. At all material times, Mr. Bryant was a resident of and domiciled in the USA.

9.  Now produced and shown to me marked "LSC-3" are true copies of 18 initial concept drawings of the first 4 BRATZ dolls designed by Mr. Bryant pursuant and prior to the Bryant Agreement. These drawings were made by Mr. Bryant on divers dates

4

EXHIBIT _G_
PAGE _224_

between 1998 and 2000 in the USA. Now produced and shown to me marked "LSC-4" is a true copy of a sheet of paper setting out the initial concept and idea of the BRATZ dolls by Mr. Bryant. The girls represent best friends in high school who love to trade clothes, shoes and hairdos. Since these accessories are interchangeable, the dolls can look different everyday. The success of the BRATZ dolls ensured a lucrative business in supplying accessories to owners of the BRATZ dolls thereby creating a steady stream of revenue.

10.    The first 4 BRATZ dolls were each given a name and a different ethnic origin so they could appeal to everyone in the targeted age group of girls between 5 and 14 years old. Cloe is Caucasian, Sasha is Black, Yasmin is Hispanic and Jade is Asian. Meygan is the fifth female doll that was subsequently added to the range and is red-headed. The Plaintiff has also recently introduced the latest girl Dana, the 6th female doll in the line.

11.    After making the design drawings exhibited as "LSC-3", wax models of the sculpting of the head, body parts and shoes of the BRATZ dolls were made by Margaret Leahy, a freelance sculptor, in or about winter 2000-2001. These wax models were created by Margaret Leahy using her own independent skill, labour and judgement and copyright subsisted in them. Margaret Leahy was commissioned by the Plaintiff to make the wax models for valuable consideration. At all material times, Margaret Leahy was a resident of and domiciled in the USA. It was the understanding and agreement between Margaret Leahy and the Plaintiff that all intellectual property rights including copyright subsisting in the wax models should belong to the Plaintiff. Now produced and shown to me marked "LSC-5" is a copy assignment of copyright

5

EXHIBIT G
PAGE 225

MGA 3892914
EX 13725-0005

executed by Margaret Leahy in favour of the Plaintiff.

12. The wax models were then used to make silicon rubber moulds of the head, body parts and shoes of the BRATZ dolls. The silicon rubber moulds were made under commission by Jessie Ramirez for valuable consideration in or about winter 2000-2001. These silicon rubber moulds were created by Jessie Ramirez using her own independent skill, labour and judgement and copyright subsisted in them. At all material times, Jessie Ramirez was a resident of and domiciled in the USA. It was the understanding and agreement between Jessie Ramirez and the Plaintiff that all intellectual property rights including copyright subsisting in the silicon rubber moulds should belong to the Plaintiff. During the process of making the silicon rubber moulds, the wax models were destroyed.

13. Polyurethane samples were produced from the silicon rubber moulds. These samples were made by Jessie Ramirez using her own independent skill, labour and judgment for the purpose of making production moulds of the dolls. The silicon rubber moulds were destroyed after the polyurethane samples had been made. There are now produced and shown to me marked "LSC-6" the polyurethane samples of the head sculpt and some body parts and shoes of BRATZ dolls. It was the understanding and agreement between Jessie Ramirez and the Plaintiff that all intellectual property rights including copyright subsisting in the polyurethane samples should belong to the Plaintiff. Now produced and shown to me marked "LSC-7" is a copy assignment of copyright executed by Jessie Ramirez in favour of the Plaintiff.

6



EXHIBIT 6

PAGE 226

MGA 3892915

EX 13725-0006

14.   The facial decorations and features of the BRATZ dolls are unique and much time, effort and monetary resources have been expended in creating and perfecting them. The Plaintiff commissioned one Anna Rhee to design the facial decoration of the BRATZ dolls with the understanding and agreement that all intellectual property rights including copyright should belong to the Plaintiff. At all material times, Anna Rhee was a resident of and domiciled in the USA.

15.   Based on the initial concept drawings of Mr. Bryant and using her own independent skill, labour and judgment, Anna Rhee drew some decoration directions for the facial decorations for different series of dolls. She then created the original deco or paint masters which were hand-painted facial decoration on a rubber head sculpt of a doll. With the input of Mr. Bryant, Anna Rhee revised the deco masters a number of times until they were perfected and became the final version that were used to serve as the benchmark and template from which the original four different BRATZ dolls' individual facial decoration were mass produced by spray masking. Now produced and shown to marked "LSC-8" is the pile of decoration direction (inclusive those on the 2001 Fall series and Funk 'N' Glow Series) made by Anna Rhee from the initial concept drawings of Mr. Bryant in Winter 2000-2001, "LSC-9a-d" are the deco masters hand-painted by Anna Rhee for the 2001 Fall Series in about Winter 2000 - 2001 and "LSC-10" is a bundle of documents setting out the various changes contributed to by Mr. Bryant during the design process. There is now produced and shown to me marked "LSC-11" a copy assignment of copyright executed by Anna Rhee in favour of the Plaintiff. Copyright subsisting in the above deco masters and decoration directions made by Anna Rhee belong to the Plaintiff and is covered by the

7

EXHIBIT G

PAGE 227

MGA   3892916

EX 13725-0007

assignment exhibited as "LSC-11" and the copyright subsisting in "LSC-10" is covered by "LSC-2".

16. The Plaintiff has also registered the design of the first 4 BRATZ in the United Kingdom ("UK") in July 2001. There is now produced and shown to me marked "LSC-12" copy certificates of the design registration all dated 27th July 2001.

17. The first 4 BRATZ dolls were first published in the USA in June 2001 (2001 Fall Series) when they were offered for sale to the general public. The BRATZ dolls were available for sale in Hong Kong since December 2002. They are available for sale to the public in Hong Kong in retail outlets such as Jusco, Toys "R" Us, Sogo, Citi-Store, Seibu, Seiyu and Kalm's. They were also marketed in Taiwan at around the same time. Now produced and shown to me marked "LSC-13a-d" are samples of the first 4 BRATZ dolls in their packaging, "LSC-13e" is a sample of the red-headed Meygan added subsequently and "LSC-13f" is the photograph of the newly introduced Dana in "the Styln' Salon 'N' Spa".

18. The BRATZ dolls are very unique and each of them has an oversized head and individual facial decoration. One thing that has contributed to the success of BRATZ is the oversized eyes and the protrusive mouth that are capable of being decorated with make-up and the diminished size of the nose that serves no decorative purposes. Thus, the elements of the face that can be made-up, the eyes and mouth, are exaggerated while the element of the face that cannot be made-up, the nose, is reduced. In addition, BRATZ make-up is multi-coloured and the eyelashes are

8



EXHIBIT G

PAGE 228

MGA 3892917

EX 13725-0008

exaggerated in size but limited in number. The lipstick is also two-toned in order to draw attention to the lips. I should also mention that the BRATZ dolls have different collections with modified facial decorations to go with the collection themes. For instance, in the "Fun 'N' Glow" Collection, the BRATZ girls had an even more funky appearance for discos and dancing while in the "Slumber Party" Collection, they sport a more casual outlook.

19.    A prominent feature of BRATZ is the snap-on shoes. Mr. Bryant's design of the snap-on shoes is shown in the concept drawing with 2 identical girls standing in the same posture with four hands demonstrating the interchangeable hairdos and snap on shoes for the BRATZ dolls, that is, the drawing entitled "Basic Doll Piece Count" which narrates different interchangeable pieces of BRATZ dolls, including "Pop On / Off Sneakers" and "Pop On / Off Mary Janes" (plat-formed sandals) and the body sketch exhibited "LSC-3" hereinabove. The interchangeable shoes are an important part of the play value of BRATZ. By employing snap-on shoes, girls are able to easily change the dolls' footwear and it allows different varieties of footwear to be worn by the dolls.

20.    The current average FOB sales value of the BRATZ dolls is US$10.66 and that of the mini version is US$4.73.

21.    The BRATZ dolls and their accessories are marketed and sold in more than 52 countries and places including the European Union, the Americas, the Balkans, the Baltic, Norway, Switzerland, Russia, Ukraine, Poland, Hungary, Czech Republic,

9

EXHIBIT 6
PAGE 229

MGA 3892918
EX 13725-0009

Lebanon, UAE, Saudi Arabia, Egypt, Syria, Israel, South Africa, Australia, New Zealand, the Philippines, Indonesia, Taiwan, Thailand, Singapore, South Korea, Japan and Hong Kong.

22.     The BRATZ dolls have their own website at "www.bratzpack.com". The site provides some games, e-greetings and Mix N Match Mall of BRATZ' fashion and hairdos. The site also maintains a fan club known as BRATZ pack and maintains a list of its members. The aim of this fan club is to notify its members of new fashion trends that the BRATZ dolls will wear themselves and launch and marketing thereof. Now produced and shown to me marked "LSC-14" are downloaded copies from the said website.

23.     So far the Plaintiff has spent a total of over US$22 million in advertising and on promotion expenses worldwide in relation to BRATZ.

24.     As mentioned hereinbefore, the BRATZ dolls have become an instant success and they have become collectibles. Considerable media coverage have been given to these dolls and there is now produced and shown to me marked "LSC-15a" a selection of press cuttings and celebrity photos of the BRATZ pack, including Singtao Daily dated 13th December 2002 and the South China Morning Post dated 19th January 2003 which reported the official launch of BRATZ dolls in Hong Kong in December 2002. Now produced and shown to me marked "LSC-15b" is a bundle of press and/or marketing materials of Hasbro Hong Kong Limited, BRATZ' distributor in Hong Kong, and pictures of in-store display at some of the Hong Kong outlets. There is now

10

EXHIBIT 6
PAGE 280

MGA 3892919
EX 13725-0010

further produced and shown to me marked "LSC-15c" a copy of a recent article published on 11th August 2003 by the South China Morning Post on the competition between BRATZ and BARBIE.

25.   Another major source of revenue generated by the BRATZ dolls is income derived from merchandising rights by granting non-exclusive licences to other companies worldwide. So far, 120 merchandise licence agreements have been granted in respect of a wide range of products including paper napkins, girls clothing, jewelry, bedding, home furnishing, stationery, toiletries, video games, footwear and electrical appliances etc. Pursuant to these licenses, BRATZ branded goods are marketed in Spain, Portugal, Australia, New Zealand, Finland, Germany, Austria, Switzerland, France, Belgium, Luxembourg, Mexico, Italy, UK, Ireland, Greece, Norway, Channel Islands, Brazil, Columbia, Greece, Cyprus, Denmark, Iceland, Sweden, Columbia, Venezuela, Turkey, Peru, Israel, all Central America countries, all Carribean Island countries, Dominican Republic, Ecuador, Venezuela, Bolivia, Paraguay, Chile, UAE, Saudi Arabia, Kuwait, Iran, Lebanon, Syria, Jordan, Egypt, Qatar, Oman, Behrain, Yemen and Hong Kong. The Plaintiff projects an annual licensing revenue of US$12 million per year by year end in 2004.

26.   Furthermore, the Plaintiff has granted exclusive distribution rights of the BRATZ dolls to, inter alia, Bandai UK Ltd. in the UK and Ireland since 1st April 2001 and to Hasbro S.A. in Belgium, the Netherlands and Luxembourg.

27.   Furthermore, the Plaintiff is and was at all material times the registered owner of the

11

EXHIBIT 6

PAGE 231

MGA 3892920
EX 13725-0011

trademark "BRATZ" in Hong Kong in various international classifications, including dolls and dolls' accessories in Class 28. They are as follows:

| Date | Number | Mark | Class | Specification of Goods |
|---|---|---|---|---|
| 2.8.2001 | 200213329 | BRATZ & Device | 28 | games and playthings, dolls and doll accessories, etc. |
| 24.8.2001 | 200212579 | BRATZ | 18 | luggage, tags, umbrellas, purses, handbags, wallets, backpacks, travel cases and bags, etc. |
| 24.8.2001 | 200212580 | BRATZ | 25 | girls' clothing, garment, hosiery, footwear and other apparels, etc. |
| 24.8.2001 | 200212627 | BRATZ | 16 | scrapbooks, photo albums and other stationery, etc. |
| 5.2.2002 | 200309866 | BRATZ | 28 | dolls and dolls' accessories, etc. |

There are now produced and shown to me marked "LSC-16" copies of the certificates of trademark registrations. It should be noted that the registered owner of Trade Mark Registration No.200213329 is listed as "ABC International Traders, Inc. trading as MGA Entertainment", which was the former trading name of the Plaintiff.

12

EXHIBIT 6

PAGE 232

MGA 3892921
EX 13725-0012

**The Defendant's Infringing Activities**

28.     Due to the success of the BRATZ dolls, there are and have been numerous knock offs and unauthorized copies appearing in the market worldwide. In order to protect its intellectual property rights and business interests and the exclusivity of the BRATZ dolls, the Plaintiff has taken numerous legal actions and obtained injunctive relief against infringers in many parts of the world, including the UK and Italy. In many instances, the infringing supply in Europe was traced back to Hong Kong. In Hong Kong itself, the Plaintiff has also taken actions against suppliers of infringing copies of the BRATZ dolls and obtained interim injunctions.

29.     In approximately April of this year, one Ms Emanuela Silvestri, the Plaintiff's licensing agents in Italy, discovered some fashion dolls named "Fashion Dolls" which she believed were copies of Bratz dolls at a retail shop in Italy. She referred the matter to Mr. Isaac Larian, the Chief Executive Officer of the Plaintiff, and Mr. Larian requested her to purchase some samples of the dolls for examination. Two dolls, namely one "Fashion Doll - Hair Styling Playset" and one "Fashion Doll Playset" were then purchased and delivered to the Plaintiff's office in the USA by courier. The label at the back of the packaging boxes of the dolls showed that the infringing copies of the BRATZ dolls were imported and marketed in Martina Franca, Italy by one "General Trade SpA". The Plaintiff thus instructed its lawyers in Italy, Messrs. Trevisan & Cuonzo, to take immediate action against General Trade.

13



EXHIBIT 6
PAGE 233

MGA 3892922
EX 13725-0013

30.     In respect of the action brought in Italy, I crave leave to refer to the copy Affirmation of Donatella Anna Capelli exhibited to the Affidavit of Chan Wai Ling to be filed herein a copy of which I have read and the contents of which I verily believe to be true. It was due to discovery under the seizure order executed at the offices of General Trade in Martina Franca that the identity of Union Top (HK) Co. Ltd., the Defendant herein, as the supplier of the infringing "Fashion Doll" was uncovered.

31.     The "Fashion Doll" supplied by the Defendant is not and has never been authorized by the Plaintiff. The Plaintiff placed instructions with its lawyers in Hong Kong, Messrs. William W.F. Fan & Co., to investigate into the extent of the Defendant's infringing activities. Hence professional investigators, Kroll Facts Finders Limited ("Fact Finders"), were engaged to inquire into the Defendant's activities. For details of the investigation and finding, I would respectfully refer this Honourable Court to the Affirmation of Lam Yuen Chak to be filed herein. I have read the affirmation in draft and verily believe that its contents are true.

32.     Although Fact Finders could not manage to obtain a sample of the "Fashion Doll", their finding was very disturbing. Not only that the Defendant is persisting in its dealing of the "Fashion Doll", it also shows that the Defendant was dealing in counterfeit dolls which bore the Plaintiff's trademark "BRATZ". The counterfeit dolls were displayed alongside the "Fashion Doll" in its showroom. In other words, the Defendant did not stop at copyright infringement, but was simultaneously infringing the Plaintiff's trademark.

14

EXHIBIT 6

PAGE 234

MGA 3892923
EX 13725-0014



34. Even a cursory comparison of the "Fashion Doll" as shown in the photographs and the videotape and the BRATZ dolls and their copyright works, in particular Cloe, as exhibited above demonstrates a clear case of copyright infringement. Most if not all of the prominent features of the BRATZ dolls were taken collectively.

15

EXHIBIT 6

PAGE 235

MGA 3892924
EX 13725-0015

35.   The BRATZ dolls have been a worldwide market success and received international
      press coverage of their success.  Their rise in popularity within a relatively short time-
      span has been miraculous and is much talked of by the trade and public in Hong Kong
      and elsewhere.  Their introduction in the Hong Kong market in December 2002 was
      covered in the Chinese and English press.  This could not have escaped the attention
      of the Defendant, a business in the toy trade and dealing in dolls.  The close similarity
      between the "Fashion Doll" and the BRATZ dolls and the copying of the packaging
      feature, which I shall turn to below, show that the Defendant was dealing in the
      infringing copies with their eyes open and was well aware that the "Fashion Doll"
      was an infringing copy of the copyright works relating to the BRATZ dolls.

36.   It is also clear from the evidence of the investigator that the Defendant was offering
      counterfeit dolls bearing the trademark "BRATZ".  This is not and has never been
      authorized by the Plaintiff.  For these reasons, the Defendant has also infringed the
      trademark rights of the Plaintiff in Hong Kong.

37.   In the light of the above, the Plaintiff decided to take legal action against the
      Defendant for copyright infringement, trademark infringement and passing off.  The
      Plaintiff also wishes to apply for an ex parte entry order for the preservation of
      evidence relevant to the action.  For the purpose of the ex parte application and the
      inter partes application intended to be taken out, the Plaintiff does not rely on passing
      off.

16

EXHIBIT G
PAGE 236

MGA 3892925
EX 13725-0016

Preservation of Evidence

38.  The investigator's inquiry shows that the Defendant was dealing with the "Fashion
Doll" and was in possession of infringing copies of the BRATZ dolls.  It was also
dealing and had in its possession counterfeit dolls bearing an infringing "BRATZ"
mark.

39.  The Defendant's sales staff was very cautious in dealing with the investigator, who
was posing as an overseas buyer.  The investigator's request for samples of the
infringing dolls was refused, as was his/her request to take photographs of the same.
It is a normal business practice to supply samples to customers upon request, either on
spot or by future delivery arrangement.  When the photographs of products were
subsequently sent to the investigator, there was no photograph of any infringing doll.
Upon enquiry from the investigator, it seems clear that a pretext was given by the
Defendant in that the infringing dolls were exclusive items for a certain client.
Commercially this could hardly be the case.  A merchant could only offer product
exclusivity if he has exclusivity on the product himself.  On its own statement to the
investigator, the Defendant was supposed to have obtained supply of the infringing
dolls from two alternative sources.   If that was true, the alleged exclusivity was
meaningless.  I verily believe that, in alleging exclusivity, the Defendant was making
up a story in order to avoid supplying samples to the investigator, supposedly an
unfamiliar customer, which might expose its infringing activities and risk being sued
for infringement.

17

EXHIBIT 6

PAGE 237

MGA 3892926
EX 13725-0017



**Strong Prima Facie Case**

42.    I have looked at the "Fashion Dolls" closely from the photographs and the videotape exhibited hereinabove and find that it is a slavish copy of the BRATZ dolls and·is a ·clear infringement of the Plaintiff's copyright in the works relating to BRATZ.  In particular, I would draw attention to the following features in the "Fashion Doll", namely:

(a)    The oversized head;

(b)    The facial decoration;

18

EXHIBIT 6

PAGE 238

MGA  3892927

EX 13725-0018

(c)     The oversized eyes;

(d)     The diminished nose;

(e)     The protrusive and defined mouth;

(f)     The multi-coloured make-up;

(g)     The few and exaggerated eyelashes;

(h)     The two-toned lipstick;

(i)     The disproportionately large feet and shoes;

(j)     The snap-on shoes.



19

EXHIBIT G

PAGE 239

MGA  3892928

EX 13725-0019

BRATZ "2002 Fall Limited Edition- The Funk 'N' Glow Collection" featured a pictorial depiction of the 5 BRATZ girls dancing together both in front and at the back of the packaging. Now produced and shown to me marked "LSC-21a" is a sample of Cloe in the Funk 'N' Glow Collection packaging and "LSC-21b" is a sample Sasha in the Funk 'N' Glow Collection packaging. The packaging of the other BRATZ girls in the Funk 'N' Glow Collection was the same. The pictorial depiction was identically copied in the "Fashion Doll" packaging.

45. All of above suggest a strong case of copying of BRATZ by the "Fashion Doll". In short, the Defendant has copied the head sculpt and the facial decoration of the BRATZ dolls. I verily believe that the close similarities between the "Fashion Doll" and BRATZ could not have been coincidental and must have come about as a result of copying. At all material times, the Defendant had market access to the BRATZ dolls in Hong Kong and elsewhere.

46. We could not acquire a sample of the Defendant's "BRATZ" dolls. The investigator has seen 4 samples of the Defendant's "BRATZ" dolls of which, according to Fact Finders, the packaging and appearance looked very cheap. The Plaintiff is the registered owner of the trademark "BRATZ" in Hong Kong in respect of dolls. It has never permitted or licensed the use of the "BRATZ" trademark on the Defendant's dolls. It is obvious that the Defendant's dolls were counterfeit dolls which infringed the Plaintiff's trademark.

47. The similarities between BRATZ and the "Fashion Doll" and the infringing acts of

20

EXHIBIT G

PAGE 240

MGA 3892929

EX 13725-0020

the Defendant have raised more than a triable issue for copyright infringement and trademark infringement.

**Irreparable Damage**

48.     The success of BRATZ worldwide cannot be taken for granted. The competition is keen and BRATZ cannot afford to sit on its laurels. Similarly, the Plaintiff cannot afford to treat the success of BRATZ as self-perpetuating and needs to continuously apply its mind to build on that success and to remove any threat which jeopardizes the success of BRATZ and its image.

49.     By reason of the success of BRATZ, many knock offs have appeared in the market. The Plaintiff well understands that infringers prey on successful marks and successful products with cheap imitations for profits whilst having no commitment to the same. Once the successful marks and products are ruined, they will move on to others. In order to protect the Plaintiff's intellectual property rights and to safeguard the business interests and exclusivity of BRATZ, the Plaintiff had obtained interim injunctions in Hong Kong against at least three companies which the Plaintiff says have infringed its rights. On present information, as far as I am aware and unlike Union Top, these companies only copied the BRATZ dolls without also imitating the "BRATZ" trademark. The Plaintiff has also taken action in the UK against two companies which settled the Plaintiff's claims and paid significant amounts of damages. There was also an action taken in Italy against General Trade.

21

EXHIBIT G
PAGE 241

MGA 3892930
EX 13725-0021

50.  As already adverted to hereinabove, an important revenue stream of BRATZ are licence fees. The demand and price of BRATZ licences depend on the exclusivity and popularity of the BRATZ products and the value of "BRATZ" as a mark and brand.

51.  BRATZ is popular because of its unique funky and sassy image. I have explained the unique facial features of the BRATZ dolls. The "Fashion Doll" has copied BRATZ' image and appearance, in particular the eyes and the lips, and this will dilute the exclusivity and affect the image of the BRATZ dolls.

52.  The Plaintiff has spent multi-million dollars for the worldwide promotion of BRATZ and its image. The continuous sale of cheap imitations will no doubt affect the demand for licences and the level of fees. Any damage to the "BRATZ" mark and its reputation, dilution in exclusivity and diminution in the value of BRATZ is a loss which cannot be measured in money and cannot be adequately compensated by damages. Once a mark and its reputation is ruined, it is difficult if not impossible to re-build it.

53.  There have already been complaints to the Plaintiff from its exclusive distributors concerning the influx of cheap imitations of BRATZ in the world market. I do not mean to suggest that the Defendant solely contributed to this phenomenon, as there were other infringers. Nevertheless, the continuous sales of cheap imitations, including the "Fashion Doll", would no doubt adversely affect the sales of BRATZ. The distributors of BRATZ are very concerned with the status of BRATZ protection.

22

EXHIBIT G

PAGE 242

MGA  3892931

EX 13725-0022

Thus, the appearance in market of infringing copies such as the "Fashion Doll" have caused much concern. If the Defendant is not stopped in its track, the sales and business of distributors will be adversely affected and the interest in BRATZ will gradually diminish. It will also deal a severe blow to the Plaintiff's business relationship with the distributors and its bargaining power vis-a-vis the distributors. Two of the Plaintiff's exclusive distributors, the Bandai group of companies and the Hasbro group of companies, are the largest toy companies in the world. The Plaintiff cannot afford to maintain a weaker bargaining position with them by reason of the appearance of cheap imitations. This will also affect the terms of the distributorships when they come up for renewal. These are important factors which would ultimately lead to monetary losses to the Plaintiff and such losses are irreparable and unquantifiable.

54. The targeted consumers of BRATZ dolls are girls aged between 4 and 14 years old. They may not all be savvy or mature enough to notice the "Fashion Doll" is not the Plaintiff's product. Many customers may have mistakenly thought the "Fashion Doll" is in fact a BRATZ doll or an addition to the BRATZ line. To make matters worse, the Defendant was also engaged in trademark infringement. Even without taking the aforesaid into account, it would be a matter of conjecture as to how many sales of BRATZ dolls would have been made were it not for the Defendant's unlawful activities. It would be difficult, if not impossible, for the Plaintiff to show any diminution in projected sales attributable to the "Fashion Doll" in the market, although an entry order for the preservation of evidence may help in that respect.

23

EXHIBIT G
PAGE 243

MGA 3892932
EX 13725-0023

55.     Since toy safety laws in the USA are very stringent, MGAHK, the licensed manufacturer, has to conduct many safety, reliability and drop tests on the BRATZ products. The EU standards are also quite high. We do not know whether the "Fashion Doll" was submitted to any of these tests to comply with overseas legislation or regulations. Although there is at present no evidence to show that the "Fashion Doll" is available for sale in the USA, this does not stop North American customers form purchasing them through the Internet. We know already that the Defendant has supplied the "Fashion Doll" to Italy. Due to the similarities between the "Fashion Doll" and BRATZ, any accident caused by product defects may falsely be attributed to BRATZ and the Plaintiff. The chances of false attribution are heightened where the "BRATZ" mark is also illegitimately used. This damage to reputation, especially to a relatively new product such as BRATZ, is unquantifiable and irreparable.

56.     The Defendant was dealing with counterfeit dolls which bear the "BRATZ" trademark. The purpose was obvious, that is, to masquerade the Defendant's dolls as BRATZ. The investigator has informed us that the counterfeit dolls to which the "BRATZ" mark was applied looked "very cheap" in appearance and packaging. This is alarming. The Plaintiff holds dear its international image and reputation which were painstakingly built in marketing high quality products worldwide. The distribution of these cheap-looking dolls in any market will tarnish the reputation of BRATZ and the Plaintiff beyond redemption. The damage caused by the Defendant in trademark infringement is immense and cannot be quantified in terms of dollars and cents.

24

EXHIBIT G
PAGE 244

MGA 3892933
EX 13725-0024

57. For these reasons, I humbly pray that an interim injunction be granted to restrain the Defendant from continuing these wrongful acts.

58. I crave leave to refer to exhibit "LSC-22" the latest annual return of the Defendant. The Defendant has a paid up capital of HK$3,000,000. As shown by the Defendant's annual return, its directors and shareholders are all residents of Taiwan. As I have pointed out earlier, the launch of the BRATZ dolls in Taiwan should be around the same time as in Hong Kong.

59. As pointed out earlier, the Plaintiff is a company doing business in a substantial way and is an internationally reputable company. The aggregate turnovers of the Plaintiff's group of companies worldwide in the year 2002 was US$225 million. MGAHK's turnovers for the year 2001 was over HK$30 million and profits for the year was over HK$1.9 million. It has currently retained profits of over HK$5 million. The accounts of MGAHK for the year 2002 are yet to be audited. I have consulted Mr. Isaac Larian, Chief Executive Officer of the Plaintiff and a director of MGAHK, who has confirmed to me that the Plaintiff is able and willing to give a cross-undertaking in damages to this Honourable Court for the grant of the entry order, as well as the interim injunction prayed for. The Plaintiff is financially well able to back its undertaking on damages to this Honourable Court. For these reasons, unless required by this Honourable Court, the Plaintiff does not propose to deposit an amount of money for the fortification of the undertaking.

25

EXHIBIT G
PAGE 245

MGA 3892934
EX 13725-0025

60.     It is essential that an interim restraining order should be granted as soon as possible. As Christmas is the major peak season for toy industry, orders are normally placed at around this time. Further, the Hong Kong Houseware Fair and Hong Kong Gifts and Premium Fair has ended on 26th July 2003. According to my experience, most of the orders generated from such fair come within the first 1 to 2 months immediately after the conclusion of the fair.

26

EXHIBIT G

PAGE 246

MGA  3892935
EX 13725-0026



Affirmed at *the offices of*     )
M/s C.L. Chow & MacKson   )
Chan, Solicitors         )
                           )
this   28th   day of August 2003.    )


Before me,

C.L. Chow & Mackson Chan, Solicitors

Solicitor, Hong Kong SAR


This affirmation is filed for and on behalf of the Plaintiff.


27

EXHIBIT G
PAGE 247

MGA 3892936
EX 13725-0027

HCA NO. 3242/2003

IN THE HIGH COURT OF THE

HONG KONG SPECIAL-ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

ACTION NO. 3242 OF 2003

———————

BETWEEN

MGA ENTERTAINMENT INC.          Plaintiff

and

UNION TOP (HK) COMPANY
LIMITED                         Defendant

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

AFFIRMATION OF LEE SHIU CHEUNG

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Filed on the 29th day of Aug 2003.

**William W. L. Fan & Co.**
Solicitors

Room 507, Hang Seng Building,
77 Des Voeux Road Central,
Hong Kong.
Tel: 2110 2128        Fax: 2111 9336

Ref: WF-1975-RC/MT

28

EXHIBIT G
PAGE 248

MGA 3892937
EX 13725-0028

HCA  3 2 4 2    /2003

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

CIVIL ACTION NO. 3 2 4 2      OF 2003

BETWEEN: –

MGA ENTERTAINMENT INC.                                    Plaintiff

and

UNION TOP (HK) COMPANY LIMITED                    Defendant

This is the exhibit marked "LSC-1" referred to in the Affirmation of Lee Shiu Cheung affirmed herein on the 2 1 day of August 2003.

| DATE | DESCRIPTION | No. of page |
|---|---|---|
| Downloading Date 03.06.03 | Copy of the corporate profile of The Plaintiff | 1 |

Before me,

Chan Yiu Chee
Solicitor, Hong Kong SAR-
C.L. Chow & Macksion Chan, Solicitors

Solicitor, HKSAR

EXHIBIT  G
PAGE  249

MGA  3892938
EX 13725-0029