THOMAS J. NOLAN (Bar No. 66992)
(tnolan@skadden.com)
JASON D. RUSSELL (Bar No. 169219)
(jrussell@skadden.com)
LAUREN E. AGUIAR (*Admitted Pro Hac Vice*)
(laguiar@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, CA  90071-3144
Tel.: (213) 687-5000
Fax: (213) 687-5600

Attorneys for The MGA Parties

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with Case No. 04-9059 and Case No. 05-2727 |
| v. | Honorable Stephen G. Larson |
| MATTEL, INC., a Delaware corporation, | MGA PARTIES' STATEMENT OF POSITION REGARDING PHASE 1C ISSUES |
| Defendant. | |
| AND CONSOLIDATED ACTIONS. | Hearing Date:     November 10, 2008 |
| | Time:               1:00 PM |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................. 1

ARGUMENT ........................................................................................................ 3

    I.     LACHES BARS MATTEL'S CLAIMS TO ANY RIGHTS TO BRATZ......... 3

          A.    Mattel Unreasonably Delayed Suing, Which Prejudiced The MGA Parties .................................................................................................. 3

          B.    The Evidence Establishes That Laches Bars Mattel's Claims.................. 6

          C.    There Is Additional Evidence To Support Laches.................................... 7

    II.    ESTOPPEL BARS MATTEL'S CLAIMS TO ANY RIGHTS TO BRATZ .......................................................................................................... 9

    III.   WAIVER BARS MATTEL'S CLAIMS TO ANY RIGHTS TO BRATZ ...... 10

          A.    Waiver Applies If Mattel Took Actions That Were Utterly Inconsistent With An Intent To Enforce Its Employment Agreements ............................................................................................ 10

          B.    The Evidence Will Establish That Waiver Bars Mattel's Claims .......... 11

    IV.   MATTEL'S CLAIM FOR DECLARATORY RELIEF MUST FAIL............. 13

          A.    The Jury's Copyright Verdict Bars Mattel's Claims To BRATZ Dolls ...................................................................................................... 13

          B.    Mattel Is Not Entitled To Any Rights To The Name BRATZ ............... 14

    V.    Mattel's Unfair Competition Claim Is Not Only Largely Preempted, but Also Must Fail Because Mattel Lacks Standing and Is Not Entitled to Any Relief .............................................................................................. 17

          A.    Mattel's UCL Claim Is Preempted to the Extent It Is Based on Its Rights to BRATZ .................................................................................. 18

          B.    Mattel Lacks Standing to Pursue Its UCL Claim Because It Cannot Satisfy the Injury Requirement...................................................... 18

          C.    To the Extent Mattel Is Allowed to Recover Under the UCL, Its Recovery Must Be Limited to Restitutionary Relief and Cannot Duplicate Damages Already Awarded....................................................... 20

               1.    Mattel Failed to Introduce Evidence Supporting Any Restitution Owed to It.................................................................... 20

               2.    Any Restitution Under The UCL Cannot Duplicate Compensatory Damages Already Awarded ................................. 23

        D.      Any Evidentiary Hearing As To Mattel's UCL Claim Would Be Duplicative and, Therefore, Unnecessary ................................................. 25

CONCLUSION .................................................................................................. 25

MGA Parties' Statement of Position Regarding Phase 1C Issues – Case No. CV 04-9049 SGL (RNBx)

# TABLE OF AUTHORITIES

Page(s):

## CASES:

American Can Co. v. Mansukhani,
   814 F.2d 421 (7th Cir. 1987) ................................................................. 25

Arica Institute, Inc. v. Palmer,
   970 F.2d 1067 (2d Cir. 1992)................................................................. 15

Aviation Data, Inc. v. Am. Express Travel Related Serv. Co., Inc.,
   152 Cal. App. 4th 1522 (2007) ............................................................. 10

Baden Sports, Inc. v. Kabushiki Kaisha Molten,
   No. C06-210MJP, 2007 WL 2790777 (W.D. Wash. Sept. 25, 2007) ............................ 25

Bertram v. Terayon Communications System, Inc.,
   No. CV 00-12653 SVW RZX, 2001 WL 514358 (C.D. Cal. Mar. 27, 2001).................. 24

Bird v. Parsons,
   289 F.3d 865 (6th Cir. 2002) ................................................................. 14

Brookfield Communications, Inc. v. West Coast Entertainment Corp.,
   174 F.3d 1036 (9th Cir. 1999) ............................................................... 15

Brzozowski v. Correctional Physician Services, Inc.,
   360 F.3d 173 (3d Cir. 2004).................................................................... 3

C.B. & D.M. Entertainment, Inc. v. Galardi,
   No. 03CV21122007, WL 4219409 (S.D. Cal. Nov. 28, 2007) ......................... 21

CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.,
   97 F.3d 1504 (1st Cir. 1996) ............................................................. 14-15

Cacique, Inc. v. Robert Reiser & Co.,
   169 F.3d 619 (9th Cir. 1999) ................................................................. 17

Chirco v. Crosswinds Communities., Inc.,
   474 F.3d 227 (6th Cir.), cert. denied, __ U.S. __, 127 S. Ct. 2975 (2007)..................... 5

Colgan v. Leatherman Tool Group, Inc.,
   135 Cal. App. 4th 663 (2006) ......................................................... 21, 24

Conversive, Inc. v. Conversagent, Inc.,
   433 F. Supp. 2d 1079 (C.D. Cal. 2006) ................................................. 15

Cortez v. Purolator Air Filtration Products Co.,
   23 Cal. 4th 163 (2000) ............................................................ 17, 20, 22

Danjaq LLC v. Sony Corp.,
   263 F.3d 942 (9th Cir. 2001) ........................................................ 3, 4, 5

Daro v. Superior Court,
   151 Cal. App. 4th 1079 (2007) ............................................................. 19

Day v. AT&T Corp.,
    63 Cal. App. 4th 325 (1998) .................................................................. 20, 24

In re Ditropan XL Antitrust Litigation,
    529 F. Supp. 2d 1098 (N.D. Cal. 2007) .................................................. 20-21

Employers Insurance of Wausau v. America Intern. Specialty Lines Insurance Co.,
    No. C-02-04976 RMW, 2005 WL 1220945 (N.D. Cal. May 23, 2005) .......... 11

Environmental Defense Fund, Inc. v. Alexander,
    614 F.2d 474 (5th Cir. 1980) ...................................................................... 3

Express, LLC v. Fetish Group, Inc.,
    464 F. Supp. 2d 965 (C.D. Cal. 2006) ........................................................ 19

Feitelberg v. Credit Suisse First Boston, LLC,
    134 Cal. App. 4th 997 (2005) .................................................................... 20

Field v. Google Inc.,
    412 F. Supp. 2d 1106 (D. Nev. 2006) ..................................................... 9, 10

In re First Alliance Mortgage Co.,
    471 F.3d 977 (9th Cir. 2006) ................................................................ 17, 23

Food Lion, Inc. v. Capital Cities/ABC, Inc.,
    946 F. Supp. 420 (M.D.N.C. 1996), aff'd 116 F.3d 472 (4th Cir. 1997) ...... 13-14

GTE Sylvania Inc. v. Continental T. V., Inc.,
    537 F.2d 980 (9th Cir. 1976) ..................................................................... 25

HGI Associates, Inc. v. Wetmore Printing Co.,
    427 F.3d 867 (11th Cir. 2005) .............................................................. 9, 10

Haas v. Leo Feist, Inc.,
    234 F. 105 (S.D.N.Y. 1916) ........................................................................ 3

Hangarter v. Provident Life & Accident Insurance Co.,
    373 F.3d 998 (9th Cir. 2004) ................................................................. 18-19

Heighley v. J.C. Penney Life Insurance Co.,
    257 F. Supp. 2d 1241 (C.D. Cal. 2003) ...................................................... 17

Hennefer v. Butcher,
    182 Cal. App. 3d 492 (1986) ................................................................. 10-11

Inline, Inc. v. A.V.L. Holding Co.,
    125 Cal. App. 4th 895 (2005) .................................................................... 22

Jackson v. Axton,
    25 F.3d 884 (9th Cir. 1994), overruled on other grounds,
    Fogerty v. Fantasy, Inc., 510 U.S. 517 (1994)........................................ 3, 4, 5

Jarrow Formulas, Inc. v. Nutrition Now, Inc.,
    304 F.3d 829 (9th Cir. 2002) ................................................................... 3, 5

iv

Kling v. Hallmark Cards Inc.,
    225 F.3d 1030 (9th Cir. 2000) .................................................................. 4

Korea Supply v. Lockheed Martin Corp.,
    29 Cal. 4th 1134 (2003) ............................................................. 20, 21, 22

Kraus v. Trinity Management Services, Inc.,
    23 Cal. 4th 116 (2000) ............................................................................ 22

Lentz v. McMahon,
    49 Cal. 3d 393 (1989) ............................................................................... 9

Los Angeles Police Protective League v. Gates,
    995 F.2d 1469 (9th Cir. 1993) ................................................................ 13

MGA Entertainment, Inc. v. Mattel, Inc.,
    CV05-2727NM, 2005 WL 5894689 (C.D. Cal. Aug. 26, 2005) .................... 22

Madrid v. Perot Systems Corp.,
    130 Cal. App. 4th 440 (2005) ............................................................ 20, 24

Metropolitan Public, Ltd. v. San Jose Mercury News,
    987 F.2d 637 (9th Cir. 1993) .................................................................. 17

Miller v. Fairchild Industrial,
    885 F.2d 498 (9th Cir. 1989) .................................................................. 13

Mister Donut of Am., Inc. v. Mr. Donut, Inc.,
    418 F.2d 838 (9th Cir. 1969) .................................................................. 15

Moss v. Bluemm,
    229 Cal. App. 2d 70 (1964) ...................................................................... 9

Motown Record Corp. v. George A. Hormel & Co.,
    657 F. Supp. 1236 (C.D. Cal. 1987) ....................................................... 13

National Rural Telecommunications Cooperative v. DirecTV, Inc.,
    319 F. Supp. 2d 1059 (C.D. Cal. 2003) .............................................. 21, 24

New Era Publishing International, ApS v. Henry Holt and Co., Inc.,
    873 F.2d 576 (2d Cir. 1989) ..................................................................... 5

Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc.,
    585 F.2d 821 (7th Cir. 1978) .............................................................. 24-25

Oliker v. Gershunoff,
    195 Cal. App. 3d 1288 (1987) ................................................................ 11

Olson v. Cohen,
    106 Cal. App. 4th 1209 (2003) ............................................................... 17

Pacific Gas & Electric Co. v. Jesse M. Lange Distributor, Inc.,
    No. CIVS051180DFLKJM,
    2005 WL 3507968 (E.D. Cal. Dec. 21, 2005) ....................................... 21

Pegasus Satellite TV, Inc. v. DirecTV, Inc.,
   318 F. Supp. 2d 968 (C.D. Cal. 2004) .................................................. 21

Rubin v. Los Angeles Federal Savings & Loan Association,
   159 Cal. App. 3d 292 (1984) ........................................................ 10, 11

Seibels Bruce Group, Inc. v. R.J. Reynolds Tobacco Co.,
   No. C-99-0593 MHP, 1999 WL 760527 (N.D. Cal. Sept. 21, 1999) .............................. 22

Sengoku Works Ltd. v. RMC International, Ltd.,
   96 F.3d 1217 (9th Cir.), as modified, 97 F.3d 1460 (9th Cir. 1996) ............................ 15

Stewart v. Life Insurance Co. of North America,
   388 F. Supp. 2d 1138 (E.D. Cal. 2005) ................................................ 17

Theme Promotions, Inc. v. News America Marketing FSI,
   539 F.3d 1046 (9th Cir. 2008) ...................................................... 20, 21

Trujillo v. First American Registry, Inc.,
   157 Cal. App. 4th 628 (2007) ......................................................... 19

Tustin Community Hospital, Inc. v. Santa Ana Community Hospital Association,
   89 Cal. App. 3d 889 (1979) ........................................................... 4

United States v. Microsoft,
   253 F.3d 34 (D.C. Cir. 2001) ......................................................... 25

United States v. Sequel Contractors, Inc.,
   402 F. Supp. 2d 1142 (C.D. Cal. 2005) ................................................ 24

Vernon Firefighters Association, Local 2312 v. City of Vernon,
   178 Cal. App. 3d 710 (1986) .......................................................... 4

Walker v. USAA Casualty Insurance Co.,
   474 F. Supp. 2d 1168 (E.D. Cal. 2007) ................................................ 20

Watermark Publishers v. High Tech. System Inc.,
   1997 WL 717677, 44 U.S.P.Q. 2d 1578 (S.D. Cal. 1997) ................................. 4, 9, 10

Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc.,
   178 F. Supp. 2d 1099 (C.D. Cal. 2001) ............................................... 22, 23

Wyler Summit Partnership v. Turner Broad. System, Inc.,
   235 F.3d 1184 (9th Cir. 2000) ......................................................... 4

**STATUTES:**

37 C.F.R. § 202.1 .................................................................... 15

Cal. Evid. Code § 623 ................................................................. 9

Cal. Penal Code § 641.3(a) ........................................................... 24

## MISCELLANEOUS:

3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright
§ 12.06 (2007).................................................................................................. 4

3. J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition
§ 18:2 (4th ed.)............................................................................................... 15

United States Patent and Trademark Office, Trademark Manual of Examining
Procedure §718.07 (5th ed. 2007)................................................................... 16

MGA Parties' Statement of Position Regarding Phase 1C Issues – Case No. CV 04-9049 SGL (RNBx)

## PRELIMINARY STATEMENT

The MGA Parties submit this brief outlining their position on the claims and defenses that should be addressed at the November 10, 2008 Phase 1c hearing. The MGA Parties have three affirmative defenses – laches, estoppel, and waiver – that the Court ordered to be tried outside the presence of the jury. Each of these defenses bars Mattel's claims.

First, laches bars Mattel's claims, and specifically its copyright claims, because Mattel unreasonably delayed filing its claims to the prejudice of the MGA Parties. Although Mattel doubtless will argue that laches cannot apply here because the Court found Mattel's claims to be timely for purposes of the statute of limitations, the laches analysis is governed by different standards. Under laches, the inquiry is not when Mattel knew of the precise drawings created by Bryant but rather when Mattel knew or should have known that MGA was hiring Mattel employees and purportedly pilfering Mattel designs. Given that Mattel's claims were found timely only by a matter of days for purposes of the statute of limitations, applying the more liberal laches standards, there is ample basis to find Mattel's claims barred. As the evidence at trial made clear, Mattel had within its possession all the information it needed to investigate potential infringement claims many years before it filed suit and Mattel delayed filing because it wanted to wait and see if MGA's BRATZ line was successful. Significantly, and unlike the statute of limitations, relation back and tolling doctrines do <u>not</u> save Mattel's claims and Mattel's filing of a lawsuit does <u>not</u> bar application of the laches defense. Indeed, laches can (and here does) bar a claim even if the claim is timely under the statute of limitations. (Section I, <u>infra</u>.)

Second, estoppel also bars Mattel's claims and for similar reasons. Indeed, estoppel and laches are often viewed interchangeably. Mattel knew or should have known of the conduct giving rise to its claims and, for tactical reasons, delayed filing while MGA was investing tens and even hundreds of millions of dollars in BRATZ. (Section II, <u>infra</u>.)

Third, the evidence here establishes that Mattel waived its right to enforce the Inventions Agreement that gives rise to Mattel's claims to BRATZ. Mattel knew that there was a widespread practice among its employees of moonlighting for competitors and never

1  once took any action to discipline its employees or preclude them from such competitive

2  ventures.   To the contrary, Mattel supervisors on occasion even assisted employees in

3  obtaining jobs with competitors.  Under such circumstances, where it was understood that

4  Mattel did not literally or strictly enforce the terms of its Inventions Agreements, there is

5  ample basis to find that Mattel waived its right to enforcement.  (Section III, <u>infra</u>.)

6          During Phase 1c, the Court also will have to consider Mattel's remaining claims for

7  declaratory relief and statutory unfair competition.   Based on established law, the Court's

8  prior rulings, the jury's verdicts, and the evidence that Mattel can muster, Mattel's claims

9  for declaratory relief and unfair competition fail or have been mooted by the jury's verdicts

10 in Phases 1a and 1b.  Thus, for example, Mattel's declaratory relief claim fails because

11 Mattel  already has been compensated for its copyright infringement claim, which is the sole

12 basis for declaratory relief.  Moreover, to the extent Mattel seeks rights to the BRATZ name,

13 this gambit must be disregarded, since Mattel never used the name and MGA, not Bryant or,

14 by extension, Mattel, is the rightful owner of that trademark.  (<u>See</u> Section IV, <u>infra</u>.)

15         Mattel's unfair competition claim is preempted to the extent it is based on Mattel's

16 rights to BRATZ. In addition, the UCL allows only restitutionary relief.  To the extent such

17 relief is not subsumed in the jury's award of compensatory damages or fails due to Mattel's

18 lack of standing, Mattel would not be entitled to restitution because, by its own admission,

19 Mattel has suffered no injury here. Finally, as Mattel already has presented evidence on

20 both of predicates for its UCL claim – commercial bribery and intentional interference –

21 Mattel's claims can be resolved without further submission of evidence. (Section V, <u>infra</u>.)

22         Virtually all of the evidence necessary to decide the MGA Parties' affirmative

23 defenses, as well as Mattel's claims for declaratory relief and statutory unfair competition,

24 is already before the Court either in connection with the parties' respective summary

25 judgment motions or as part of the evidentiary record submitted to the jury.  Although there

26 is some minor additional new evidence relevant to the MGA Parties' defenses that they

27 would like the Court to consider, the MGA Parties submit that this evidence can be

28 introduced on a written record and that there is no need for an evidentiary hearing with live

1  testimony to resolve the MGA Parties' affirmative defenses or Mattel's remaining claims.

2  **ARGUMENT**

3  **I.    LACHES BARS MATTEL'S CLAIMS TO ANY RIGHTS TO BRATZ**

4      **A.    Mattel Unreasonably Delayed Suing, Which Prejudiced The MGA Parties**

5        Laches bars Mattel's declaratory relief, unfair competition, and copyright claims.[1]

6  Laches applies when there is unreasonable delay by plaintiff, and prejudice to defendant.

7  Danjaq LLC v. Sony Corp., 263 F.3d 942, 951 (9th Cir. 2001). As Judge Learned Hand

8  explained long ago, "[i]t is inequitable for the [alleged] owner of a copyright, with full

9  notice of an intended infringement, to stand inactive while the proposed infringer spends

10  large sums of money in its exploitation, and to intervene only when his speculation has

11  proved a success. Delay under such circumstances allows the owner to speculate without

12  risk with the other's money; he cannot possibly lose, and he may win." Haas v. Leo Feist,

13  Inc., 234 F. 105, 108 (S.D.N.Y. 1916).

14        The delay should be measured from the time at which Mattel should have been aware

15  of its potential claims until it brought those claims against the MGA Parties in November

16  2006. This analysis is distinct from the analysis of whether Mattel's claims were timely

17  under the statute of limitations.  Mattel's April 2004 complaint against Bryant is irrelevant

18  in the context of laches: "The relation back provisions of Rule 15 are primarily concerned

19  with alleviating unfair prejudice in circumstances involving statutes of limitations.  It has no

20  controlling force where, as here, a defendant's remedy is provided by the equitable doctrine

21  of laches."  Brzozowski v. Corr. Physician Servs., Inc., 360 F.3d 173, 182 (3d Cir. 2004)

22  (emphasis added).[2]  "On the contrary, it has been held that delay during litigation may

23  _____

24  [1]    Laches has been applied by the Ninth Circuit to bar actions for copyright infringement (see Danjaq LLC v. Sony Corp., 263 F.3d 942, 951-56 (9th Cir. 2001)), declaratory relief (Jackson v.

25  Axton, 25 F.3d 884, 887-88 (9th Cir. 1994), overruled on other grounds, Fogerty v. Fantasy, Inc., 510 U.S. 517 (1994) (barring declaration of ownership and rights to profits)), and unfair

26  competition (Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 843 (9th Cir. 2002)). The analysis of each of these claims is the same as "the standards [for laches under federal and

27  California law] are substantially similar."  Jarrow Formulas, 304 F.3d at 842.
[2]    See also Envtl. Def. Fund, Inc. v. Alexander, 614 F.2d 474, 478-79 & n.3 (5th Cir. 1980)

28  ("[i]n some circumstances application of a statute of limitations may depend upon when suit was
*(cont'd)*

1  constitute such laches as would bar the granting of relief." Tustin Cmty. Hosp., Inc. v.
2  Santa Ana Cmty. Hosp. Ass'n., 89 Cal. App. 3d 889, 904 (1979) (emphasis added).[3] As a
3  result, Mattel's delay in actually bringing its claims until more than two and half years after
4  filing its complaint against Bryant should be considered in this Court's laches analysis.[4]

5      The starting point for assessing Mattel's delay is also not necessarily the same as the
6  accrual date for limitations purposes. See, e.g., Wyler Summit P'ship v. Turner Broad. Sys.,
7  Inc., 235 F.3d 1184, 1193 (9th Cir. 2000) (while earlier opinion established accrual date for
8  statute of limitations, it "did not decide directly or by necessary implication … when a
9  possible period for laches actually accrued"). Thus, while the statute of limitations turns on
10 actual infringement, a laches analysis takes into account whether the plaintiff knew or
11 should have known of potential future infringements and nonetheless allowed the infringing
12 activity to proceed instead of bringing a claim. See, e.g., Kling v. Hallmark Cards Inc., 225
13 F.3d 1030, 1038-39 (9th Cir. 2000); Watermark Publ'rs v. High Tech. Sys. Inc., 44
14 U.S.P.Q.2d 1578, 1583-84 (S.D. Cal. 1997) (laches barred a timely infringement claim
15 where plaintiff was on notice that the defendants planned to use an infringing map but
16 remained silent). Using similar logic to determine whether any delay was unreasonable,
17 courts look to the cause of the delay (or the plaintiff's excuses for it). Danjaq, 263 F.3d at
18 954. "[D]elay is impermissible when its purpose is to capitalize on the value of the alleged
19 infringer's labor, by determining whether the infringing conduct will be profitable." Id.

20     There are two chief forms of prejudice sufficient to support a laches defense:
21 _____

*(cont'd from previous page)*
22 filed and not when a particular claim is made, for the claim may relate back to the original
   complaint … [h]owever, laches rests on policy concerns different from those of statutes of
23 limitations;" assessing delay as of date on which complaint was amended to include claim at issue,
   rather than date on which complaint was originally filed).
24 [3]    See also Vernon Firefighters Assn., Local 2312 v. City of Vernon, 178 Cal. App. 3d 710,
   720 (1986) ("the period of time to be considered as constituting possible laches includes the period
25 of time the action is pending.  Filing of the action does not toll laches"); 3 Nimmer on Copyright §
   12.06 (2007) ("Unlike the rule with respect to the statute of limitations, however, laches may be
26 asserted for undue delay in pursuing an action after as well as prior to the filing of the complaint.").
   [4]    The MGA Parties' awareness of Mattel's claims is irrelevant to the laches analysis.  "Laches
27 is based on the plaintiff's delay in beginning litigation, not on the information a defendant has
   regarding a claim." Jackson, 25 F.3d at 889; Danjaq, 263 F.3d at 953 (quoting Jackson).
28

1  evidentiary and expectations-based prejudice.  Id. at 955. Either form, standing alone, meets
2  the prejudice prong. Id. Where there is delay, some prejudice is presumed.  Jackson, 25 F.3d
3  at 889-90. Evidentiary prejudice consists of "lost, stale, or degraded evidence, or witnesses
4  whose memories have faded or who have died."  Danjaq, 263 F.3d at 955.  Expectations
5  prejudice involves a "showing [by defendant] that it took actions or suffered consequences
6  that it would not have, had the plaintiff brought suit promptly" – such as expending millions
7  of dollars in developing and promoting the purportedly infringing products.  Id.

8  Even if a plaintiff's claims are timely and the court permits them to go forward in
9  pursuit of damages, courts have found that a defendant's substantial investments present an
10  especially compelling bar to injunctive relief.  See New Era Publ'ns Int'l, ApS v. Henry
11  Holt & Co., Inc., 873 F.2d 576, 584 (2d Cir. 1989) (timely claim for injunction barred by
12  laches where plaintiff had knowledge of potential future infringement and failed to take
13  action, as defendants invested substantially in production of allegedly infringing book
14  during period of delay); Chirco v. Crosswinds Cmtys., Inc., 474 F.3d 227, 235-36 (6th Cir.
15  2007) (laches barred timely claim for injunction brought after defendants had already
16  constructed and sold infringing property, because "[s]uch a request smacks of the inequity
17  against which Judge Hand cautioned in Haas and which the judicial system should abhor");
18  Jarrow Formulas, 304 F.3d at 839-40 (laches applied to injunction request where defendant
19  made challenged material a central part of its business identity during period of plaintiff's
20  delay and would be prejudiced by injunction on using that material).

21  Here, the evidence shows that Mattel delayed for years in bringing its claims against
22  the MGA Parties. Mattel was on notice of potential future infringement by MGA in July
23  2003, if not as early as February 2001 or even December 2000 – as detailed below, Mattel
24  knew that one of its designers had gone to MGA and knew that the designer was involved in
25  the development of BRATZ. On November 23, 2003, it had confirmation of actual
26  infringement.  (6/2/08 Order (Dkt 3902) at 4.)  Nonetheless, Mattel waited to file its claims
27  against the MGA Parties until **three days** before the applicable statute of limitations on its
28  copyright and declaratory relief claims ran out.  (Id.)  This delay was both unreasonable and

5

1  prejudicial under the circumstances, regardless of the applicable statute of limitations.

2  **B.    The Evidence Establishes That Laches Bars Mattel's Claims**

3  The MGA Parties proved at trial that Mattel knew or should have known Bryant was

4  communicating with Isaac Larian and MGA a month before he left Mattel (TX 472) and

5  that Mattel suspected Bryant was leaving to work for a competitor in October 2000.  (Tr.

6  7406:9-7413:20.)   The MGA Parties also proved that Wal-mart received drawings with

7  Bryant's name clearly displayed on them as early as December 2000 (Tr. 1962:14-1967:1,

8  TX 17281), that Mattel attended the Hong Kong and New York Toy Fairs in January and

9  February of 2001, where the BRATZ were displayed, and that Mattel met with MGA and

10 Larian to discuss Mattel's distribution of BRATZ dolls in Latin America (Tr. 2009:17-

11 2018:17, TX 16925).  There was testimony – used by Mattel to bolster its own case on the

12 timing of Bryant's drawings – that Mattel employees recognized similarities between the

13 BRATZ and Mattel's "Diva Starz" and "Toon Teens" when BRATZ was released in 2001

14 (Tr. 325:17-326:2) (although Toon Teens had never been released publicly (Tr. 331:2-4,

15 513:12-15)) and that Bryant had seen Toon Teens drawings and talked to Lily Martinez at

16 length about them while still at Mattel (Tr. 464:21-470:5).  There was also testimony that

17 Mattel knew that Bryant was working on BRATZ for MGA in 2001 and 2002. (Tr. 494:25-

18 495:12, 6463:23-6464:3, 6828:20-6832:12, 7430:13-17, TX 4436.)

19 In early 2002 Mattel was monitoring a Yahoo! website which announced that former

20 Barbie designer Bryant created BRATZ; indeed, Mattel sent a cease-and-desist letter to

21 MGA threatening legal action based on alleged infringement of Mattel property on that

22 website.   (Tr. 730:1-736:22, 737:23-739:10, 1727:25-1739:3, 2023:6-2027:21, 2036:22-

23 2038:7, 2220:11-2223:19, TX 4507, TX 17252.)   Mattel's threatened lawsuit was of

24 particular concern to the MGA Parties, given what they perceived as Mattel's propensity for

25 suing competitors.  (Tr. 2028:5-13, 2030:8-2032:21, 2222:1-24, TX 4900.)  Then, in March

26 2002, Mattel began investigating the creation of BRATZ and its similarities to existing

27 Mattel products, specifically focusing on Isaac Larian and Carter Bryant, who was named in

28 the investigative report as having "created BRATZ dolls for MGA."  (TX 1195RS, Tr.

6

1   6603:19-6606:19.)   Mattel's investigation of Carter Bryant and not only his creation of

2   BRATZ, but the timing of that creation, continued into 2003.  (Tr. 6473:12-17, 6606:20-

3   6609:4.)  In July 2003, Mattel saw an article in the Wall Street Journal identifying Bryant as

4   the creator of BRATZ, which (wrongly) stated that Bryant had shown it to Larian in 1999.

5   (TX 1-A, 6464:4-6465:1.)   This Court has already held that Mattel was on notice of the

6   wrongdoing for purposes of the statute of limitations in November 2003 when Mattel

7   obtained a copy of Carter Bryant's MGA contract and the drawings he sold to MGA from a

8   company in Hong Kong being sued by MGA.  (Tr. 6461:18-6462:25; 6/2/08 Order at 4.)[5]

9        Nor is there any dispute that MGA "spent millions of dollars developing Bratz" while

10   Mattel watched and waited; indeed Mattel conceded as much more than once.  (5/21/08 Tr.

11   220:3-5; accord 5/22/08 Tr. 30:22-23 (same).)  The Court heard expert testimony regarding

12   the hundreds of millions of dollars MGA invested in product development, new employees

13   and marketing BRATZ.   (Tr. 7692:11-7693:8, 7694:1-7697:3.)   Indeed, just in product

14   development alone, MGA spent $10.53 million in 2003, $9.15 million in 2004, $13.56

15   million in 2005, and $14.16 million in 2006.  (Nolan 4/28/08 Decl. (Dkt 3396) Ex. 113, Att.

16   8.B.)  MGA's advertising expenses from 2003 to 2006 totaled $182.65 million. (Id. at Att.

17   8.C.)  Both MGA expert Paul Meyer and Mattel expert Michael Wagner agree that the cost

18   to make the BRATZ dolls between 2000 and 2006 was $1.7 billion.  (Tr. 7691:18-7692:7.)

19   **C.    There Is Additional Evidence To Support Laches**

20        Again, cognizant of this Court's prior rulings and its familiarity with the evidence

21   introduced at trial, the MGA Parties direct this Court's attention to the papers already filed

22   further support of their affirmative defenses to be determined by this Court.  (See generally

23   MGA MSJ (Dkt 2572) at 6-12, 17-20, MGA MSJ Opp'n (Dkt 2784) at 22-24, MGA MSJ

24

25   [5]     By 2003, when Mattel had reason to believe Bryant and MGA were infringing on Mattel

26   property, Barbie was indisputably losing market share to BRATZ.   (TX 11, Tr. 405:12-20, 4002:12-16.)  It is undisputed that the doll lines introduced by Mattel to (unsuccessfully) compete

27   with BRATZ (My Scene Barbie and the Flavas) have been discontinued and are no longer offered for sale by Mattel.  (Tr. 398:22-399:15, 1564:16-1565:17, 1999:6-9, 16-21, 2002:4-22, 3532:15-

28   3533:8, 3862:1-7, 3863:3-3864:25, TX 18555, TX 17378, TX 1-A.)

1  Reply (Dkt 2934) at 4-7.)   Specifically, the MGA Parties note: Mattel's attendance and
2  observation of the BRATZ dolls at various toy fairs in 2001 and the publicity of BRATZ in
3  2001 (TX 11297; Russell 3/7/08 Decl. Vol. 3 (Dkt 2579) Exs. 42, 43, 64-66); Mattel's 2001
4  discussions with MGA regarding the licensing of BRATZ in Latin America (Hitch Decl. ¶ 6
5  (Dkt 2397); Russell 3/7/08 Decl. Vol. 3 Exs. 38-39; Nolan 3/24/08 Decl. Vol. 2 (Dkt 2789)
6  Ex. 106); numerous Mattel employees thought the BRATZ were similar to Mattel products
7  Toon Teens and Diva Starz on BRATZ's arrival in the market in 2001 (MGA UF ¶¶47-51
8  (Dkt 2573), Proctor 4/14/08 Decl. (Dkt 3172) Ex. 97); Mattel knew of Bryant's role as
9  creator of BRATZ in 2002 (TX 4436); and in August 2002 Robert Eckert received an
10 anonymous letter linking Carter Bryant to the development of BRATZ, to which his head of
11 security replied that Mattel had been aware of the Bryant/BRATZ "situation" for months.
12 (Russell 3/7/08 Decl. Vol. 2 (Dkt 2578) Ex. 30, 31.)

13         Furthermore, while discussed in the MGA Opp'n to Mattel Motion in Limine No. 2 at
14 length, the record does not yet contain the extensive evidence of Mattel's interest in
15 delaying its suit against the MGA Parties.  By October 2003, as Girls' Division head Tim
16 Kilpin noted, Barbie was a "Brand in Crisis" due to the aforementioned loss in market share
17 to BRATZ.  (See Proctor 4/14/08 Decl. Ex. 103 (Barbie 2004 Marketing Plan dated October
18 28, 2003); Russell 3/7/08 Decl. Vol. 1 (Dkt 2576) Ex. 14 (Kilpin) at 168:17-23, 235:19-22;
19 Proctor 4/14/08 Decl. Ex. 93 ("2005 Barbie Spring Line Review" dated April 15, 2004).)  In
20 spring of 2004, an internal Mattel report announced that "The House is on Fire", that
21 "Barbie is losing key attribute ratings with girls", that "BRATZ is gaining share with core 5-
22 8 year old girls" and that Barbie's market share "has dropped at a chilling rate." (Proctor
23 4/14/08 Decl. Ex. 93.)  Acknowledging that "we have been out-thought and out-executed"
24 (id. Ex. 94 (April 2, 2004 e-mail from S. Ross to T. Kilpin)), Mattel concluded that its
25 response to this competition "must be … ruthless," "this is war and sides must be taken" and
26 must "fight fire with fire[.]"  (Id. Ex. 93) and that it must "damage" or "Kill BRATZ." (Id.
27 Ex. 96 (handwritten notes entitled "How Do We Accelerate My Scene", Bates numbered
28 PMH 002273).)  Because "competitive issues such as BRATZ … were forcing the decline

8

1  of Barbie," Mattel employed "litigation as a business strategy" – specifically, "one of the

2  strategies for trying to defeat BRATZ was to litigate [MGA] to death."  (Russell 3/7/08 Decl.

3  Vol. 2, Ex. 21 (Brawer) at 232:19-233:22.)  Mattel then filed suit claiming ownership of

4  BRATZ against the MGA Parties in November 2006, over three years after it knew that

5  Bryant had provided the MGA Parties with Mattel property.

6      Mattel's deliberate delay effectively deprived the MGA Parties not only of the

7  hundreds of millions of dollars spent developing, manufacturing and marketing BRATZ, but

8  also of evidence crucial to the MGA Parties' defense.  For example, internal Mattel emails

9  pertaining to MGA, BRATZ, or Bryant from 1998 through 2005 were destroyed (see

10 MGA's Mot. for Terminating Sanctions (Dkt 706), at 11-14), and numerous witnesses could

11 not remember contemporaneous events.  (Nolan 3/24/08 Decl. Vol. 1 (Dkt 2788) Ex. 77

12 (Cloonan) at 170:4-8 ("It's been too long."); id. Ex. 78 (De Anda) at 152:2-6 ("As we sit

13 here today, ten years is a long time.").)  As demonstrated in materials already before the

14 Court, the MGA Parties were clearly injured and present evidence proving that injury.

15 **II.     ESTOPPEL BARS MATTEL'S CLAIMS TO ANY RIGHTS TO BRATZ**

16     Estoppel bars all of Mattel's claims.[6]  Under California law, a plaintiff's conduct

17 constitutes estoppel when (1) the plaintiff is aware of the relevant facts and (2) intends that

18 its conduct shall be acted upon, or conducts itself such that that the defendant had a right to

19 believe it was so intended; while (3) the defendant is ignorant of the true state of facts, and

20 (4) relies upon the plaintiff's conduct to its injury.  Lentz v. McMahon, 49 Cal. 3d 393, 399

21 (1989); see also Cal. Evid. Code § 623 ("Whenever a party has, by his own statement or

22 conduct, intentionally and deliberately led another to believe a particular thing true and to

23 act upon such belief, he is not, in any litigation arising out of such statement or conduct,

24 permitted to contradict it.").  The same analysis applies in copyright actions.  See, e.g., HGI

25 Assocs., Inc. v. Wetmore Printing Co., 427 F.3d 867, 875 (11th Cir. 2005).  "A copyright

26 _____

27 [6]     Estoppel can bar claims for copyright infringement.  Field v. Google Inc., 412 F. Supp. 2d
   1106, 1116 (D. Nev. 2006); Watermark Publ'rs, 44 U.S.P.Q. 2d at 1584.  Under California law, it
28 bar actions at law as well as in equity.  Moss v. Bluemm, 229 Cal. App. 2d 70, 72-73 (1964).

owner can be estopped not only by words and actions but also by silence and inaction." Id.; see also Field, 412 F. Supp. 2d at 1116 (estoppel barred copyright claim where plaintiff knew that his work would be republished and took no steps to stop the infringing activity).[7]

As described above, Mattel investigated its potential claims against the MGA Parties repeatedly, and eventually brought suit against Bryant.  During this time, the MGA Parties were at various times made aware of Mattel's investigations and were, of course, aware of Mattel's suit against Bryant and Mattel's interest in protecting its intellectual property. When Mattel made the calculated choice to proceed only against Bryant even in light of its investigations, the MGA Parties reasonably concluded that Mattel did not seek to assert any claims against the MGA Parties, unaware of Mattel's intention to delay its suit while MGA turned BRATZ into a wildly successful doll line.  In reliance on Mattel's silence, the MGA Parties poured millions of dollars into developing the BRATZ brand and product lines – which resulted in profits that Mattel ultimately sought to claim.  Thus, just as certain of Mattel's claims are barred by laches, all of Mattel's claims are also barred by estoppel.

## III.   WAIVER BARS MATTEL'S CLAIMS TO ANY RIGHTS TO BRATZ

### A.   Waiver Applies If Mattel Took Actions That Were Utterly Inconsistent With An Intent To Enforce Its Employment Agreements

Mattel waived its rights under its employment contract with Bryant and is therefore barred from basing any claims upon those rights, such as its claim for intentional interference with that contract.  Waiver bars a party from enforcing its contractual rights. See Rubin v. Los Angeles Fed. Sav. & Loan Assn., 159 Cal. App. 3d 292, 298-300 (1984) (enforcement of right under loan contract); Aviation Data, Inc. v. Am. Express Travel Related Serv. Co., Inc., 152 Cal. App. 4th 1522, 1537 (2007) (right to arbitration); Hennefer

---

[7]   Estoppel bars copyright infringement claims where plaintiff knows of the allegedly infringing conduct and fails to pursue its claim, leaving defendant, who is ignorant of the fact that the plaintiff believes its copyright is being infringed, to detrimentally rely on the plaintiff's failure to communicate any claims.  Watermark Publ'rs, 44 U.S.P.Q.2d at 1584.  Indeed, laches and estoppel often operate interchangeably in such circumstances, because the showing required for estoppel – knowing delay by the plaintiff and the defendant's unknowing and detrimental reliance thereon – also satisfies the delay and prejudice requirements for laches.  See, e.g., id. at 1583-84.

1  v. Butcher, 182 Cal. App. 3d 492, 503 (1986) (contractual right to appraisal procedure).

2        A plaintiff waives its claims when it has a particular right and engages in conduct "so

3  inconsistent with the intent to enforce the right in question as to induce a reasonable belief

4  that such right has been relinquished." Rubin, 159 Cal. App. 3d at 298. See also Oliker v.

5  Gershunoff, 195 Cal. App. 3d 1288, 1297 (1987) ("The fact that there was no formal waiver

6  in the sense of an express relinquishment … is of no moment.  A waiver can be explicit or it

7  can be implied from a party's conduct"). Waiver relates only to one party's conduct and

8  does not require reliance by the opposing party. Rubin, 159 Cal. App. 3d at 298

9  ("[defendant] asserts that its [waiver] did not induce Rubin to change his position or act

10  otherwise than he did.  However, detrimental reliance is not a necessary element of waiver,

11  only of estoppel."); Employers Ins. of Wausau v. Am. Int'l Specialty Lines Ins. Co., 2005

12  WL 1220945, at *12 (N.D. Cal. May 23, 2005) ("waiver looks to the act, or the

13  consequences of the act, of one side only, in contrast to the doctrine of estoppel").

14        **B.    The Evidence Establishes That Waiver Bars Mattel's Claims**

15        While discussed in the MGA Opp'n to Mattel Motion in Limine No. 6 and the MGA

16  MSJ Opp'n at length, to which the Court is referred, the trial record does not contain most

17  of the evidence showing that Mattel waived its right to enforce its anti-moonlighting policy

18  as to employees bound by the same contractual obligations as Bryant, as such evidence was

19  held over for a later phase. (Tr. 6756:17-6757:22.) The Mattel employee contract prohibited

20  employees from "engag[ing] in any employment or business other than for" Mattel without

21  prior approval (see, e.g, TX 25, Tr. 4006:23-4007:3).   At trial, Mattel admitted it knew

22  Richard De Anda, vice-president of Global Security, "does do other things … other than his

23  employment at Mattel" (Tr. 4008:4-9) but sought to distinguish his acknowledged

24  moonlighting by claiming he was "approved" to do so.  (Tr. 4070:8-18.)   But De Anda

25  testified that, while he initially told his supervisor he would be "continuing" to work on

26  outside non-Mattel security matters, he never received written permission to do so and did

27  not always seek Mattel approval for his outside activities.  (Tr.  4409:19-4410:16.)

28        Similarly, the Court heard at sidebar from Margaret Leahy that while she was at

1  Mattel her supervisor Michael Hebden suggested she seek out moonlighting work from

2  Mattel vendors to earn extra money (Tr. 4122:12-4125:7, 4123:22-24) (Hebden "said check

3  with the vendors you are working with and see if they have any extra runoff work")); indeed,

4  according to her deposition testimony, Hebden introduced Leahy to the freelance sculptor

5  responsible for most of her moonlighting assignments.  (Anderson 3/7/08 Decl. (Dkt 2963),

6  Ex. 22 (Leahy) at 181:6-182:12.) Leahy's "extra" work was for Mattel competitors.  (Id. at

7  180:12-18 ("Q. Did you when you were working there at Mattel work for any Mattel

8  competitor?  A. Yes I did.  Q. Who did you work for?  A. I did a free-lance job for Hanna-

9  Barbera.  Q. And what did you do?  A. It was a Penelope Pit Stop.").)  Leahy told the Court

10  that she sought out extra work "seven or eight times" without seeking her supervisor's

11  permission (Tr. 4122:18-4123:9, 4124:15-17), and while such work was barred by her

12  contract with Mattel, "it was such a common thing … everybody did it[.]" (Tr. 4124:23-24.)

13       Indeed, it was "common knowledge" at Mattel that many people were moonlighting

14  and Mattel looked the other way.[8] Despite the prevalence of employee moonlighting, Mattel

15  did nothing to stop it. De Anda could not remember a single instance of his security

16  department investigating accusations of moonlighting at Mattel.  (Anderson 3/7/08 Decl. Ex.

17  24 (De Anda) at 157:20-25.) Nor could Mattel produce a single record of disciplinary action

18  being taken against an employee for moonlighting.  (See Nolan 4/28/08 Decl. Ex. 117; id.

19  Ex. 118 at 22:13-23:14).)  Senior Vice President of Design for Girl's Toys, Ivy Ross –

20

---

21  [8]   See Anderson 3/7/08 Decl. Ex. 23 (Marlow) at 48:8-11 ("it was common knowledge that a

22  lot of people were moonlighting and doing other work and on their times at their own homes and doing stuff") (emphasis added); id. Ex. 22 (Leahy) at 180:12-184:8 ("Q. Did you when you were

23  working there at Mattel work for any Mattel competitor?  A. Yes, I did …. We all talked about it. We all did it …. Michael Hebden, Frederick Jackson, Ray Moore, Joe Benet to name a few …

24  Carolyn Oros.  Gosh, even Hung Lee did it."); id. Ex. 21 (Cloonan) at 100:21-101:1 ("People that worked at Mattel very often would just take extra work on the side…. It was fairly common

25  knowledge that people would – the guys over in Hot Wheels called them G Jobs.").)  Indeed, Mattel employee Elise Cloonan was able to list more than fifty Mattel employees who moonlighted

26  off the top of her head.  (See id. at 102:12-103:23.) Moreover, Carter Bryant testified at trial that he had "heard that  … some employees worked for -- did other things for other toy companies" and

27  that he might have had "some general understanding that they [Mattel] might object" but that he "didn't have all that much of an opinion one way or the other" about whether Mattel condoned

28  such a practice. (Tr. 2439:2-4, 2445:22-2446:3.)

1   Bryant's supervisor – admitted that she knew about moonlighting and did nothing.  (Nolan

2   4/28/08 Decl. Ex. 75 (Ross) at 81:20-82:13 ("Q. Did you ever make any effort to determine

3   whether or not they had – any of the designers or creative people had part-time jobs outside?

4   A. No, I did not.… My understanding is that no one would actively go looking.").)

5          As the evidence in the record before this Court shows, Mattel consistently failed to

6   enforce its anti-moonlighting policy against the many employees openly engaged in

7   moonlighting activities, and, indeed, approved and encouraged such activity. Mattel's

8   failure to enforce its policy was utterly inconsistent with an intent to enforce, such that no

9   reasonable person would believe that Mattel intended to do so.

10  **IV.    MATTEL'S CLAIM FOR DECLARATORY RELIEF MUST FAIL**

11       **A.    The Jury's Copyright Verdict Bars Mattel's Claims To BRATZ Dolls**

12         In its declaratory relief claim, Mattel regurgitates its copyright claim, asking the

13  Court to declare that the MGA Parties have no interest in BRATZ and that Mattel owns

14  BRATZ instead. (SAA ¶¶ 169-170.) However, Mattel's interest in BRATZ was addressed

15  under Mattel's copyright claim, and Mattel has already been compensated for that interest

16  by the jury's verdict.  "[I]n a case where legal claims are tried by a jury and equitable claims

17  are tried by a judge, and the claims are based on the same facts, in deciding the equitable

18  claims the Seventh Amendment requires the trial judge to follow the jury's implicit or

19  explicit factual determinations."  Los Angeles Police Protective League v. Gates, 995 F.2d

20  1469, 1473 (9th Cir. 1993); Miller v. Fairchild Indus., 885 F.2d 498, 507 (9th Cir. 1989)).

21         Moreover, further litigation of Mattel's claim for declaratory relief is preempted

22  under the Copyright Act, as it seeks nothing more than a declaration of ownership and a

23  constructive trust arising from ownership. Such claims are the exclusive province of

24  copyright.  See, e.g., Motown Record Corp. v. George A. Hormel & Co., 657 F. Supp. 1236,

25  1241 (C.D. Cal. 1987) (claim for constructive trust preempted where "the facts alleged in

26  support of … the constructive trust claims are rooted primarily on contentions that

27  defendants infringed on plaintiffs' copyrighted work."); Food Lion, Inc. v. Capital

28  Cities/ABC, Inc., 946 F. Supp. 420, 422 (M.D.N.C. 1996), aff'd 116 F.3d 472 (4th Cir.

13

1   1997) ("Plaintiff's alternative, constructive trust theory is similarly unavailing. … Here,

2   Plaintiff seeks a declaration of copyright ownership based on state law.  The Copyright Act

3   sets out the elements of copyright ownership, and thus, a declaration of ownership is a right

4   exclusively provided for under federal law. Plaintiff's attempt to expand upon or circumvent

5   this right by relying on state law is preempted.").

6   **B.   Mattel Is Not Entitled To Any Rights To The Name BRATZ**

7        Mattel's claim regarding the name "BRATZ" is not the province of copyright law –

8   and it is for precisely this reason that the claim fails. The name "BRATZ" cannot be

9   copyrighted and is governed by trademark law. MGA, not Mattel, holds the trademark for

10  "BRATZ."   Mattel claims rights to the name "BRATZ" under the Inventions Agreement

11  between Mattel and Bryant (TX 25).   (See, e.g., Mattel Opp'n to MGA Phase 1b JMOL

12  (Dkt 4092) at 9-10.) That agreement states that Bryant shall assign to Mattel "all [his] right,

13  title, and interest" in any invention created by him during the period of his employment.

14  (TX 25 at 2(a).) Mattel therefore claims, without reference to any specific body of law, that

15  the name BRATZ is its property because Bryant invented it while at Mattel.[9] Mattel ignores

16  that it is only entitled to the rights Bryant was able to give – and neither copyright nor

17  trademark law provide any intellectual property rights to the "inventor" of a single word.

18       It is settled that a single word is not subject to copyright protection.  Bird v. Parsons,

19  289 F.3d 865, 881 (6th Cir. 2002) ("Courts that have addressed this issue have concluded

20  that taking a single word, or even a phrase, from a copyrighted work generally does not

21  violate the rights that copyright law provides to the owner of that work."); CMM Cable Rep,

22  Inc. v. Ocean Coast Props., Inc., 97 F.3d 1504, 1519-20 (1st Cir. 1996) ("It is axiomatic that

23  copyright  law  denies  protection  to  fragmentary  words  and  phrases  and  to  forms  of

24  _____

25  [9]     Mattel claims that the "name was part of the concept, part of the project, part of the line,
    however one characterizes it, that Carter Bryant created while he was at Mattel" (5/19/08 Tr.
26  33:17-20) but this fails to justify Mattel's intellectual property rights in the name.  Rather, it
    suggests that Mattel is simply seeking redress for the lost opportunity to make use of the concept as
27  a whole – a loss for which they have already been compensated.  (See Final Jury Instructions
    (Phase 1B) (Dkt 4267) at 41-43 (instructing the jury that Mattel is entitled to disgorgement of any
28  illegitimate profits as damages for these claims).)

1  expression dictated solely a[s] functional considerations on the grounds that these materials

2  do not exhibit the minimal level of creativity necessary to warrant copyright protection.");

3  Arica Inst. Inc. v. Palmer, 970 F.2d 1067, 1072-73 (2d Cir. 1992) (words that the defendant

4  copied did "not exhibit the minimal creativity required for copyright protection"): see also

5  37 C.F.R. § 202.1 ("words and short phrases such as names, titles and slogans" are not

6  subject to copyright protection).  Thus, Bryant could not assign any copyrights to Mattel.

7       Moreover, "[i]t is axiomatic in trademark law that the standard test of ownership is

8  priority of use.  To acquire ownership of a trademark it is not enough to have invented the

9  mark first or even to have registered it first; the party claiming ownership must have been

10  the first to actually use the mark in the sale of goods or services."  Conversive, Inc. v.

11  Conversagent, Inc., 433 F. Supp. 2d 1079, 1089 (C.D. Cal. 2006) (quoting Brookfield

12  Commc'ns, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1046 (9th Cir. 1999))

13  (emphasis added); see also Sengoku Works Ltd. v. RMC Intern., Ltd., 96 F.3d 1217, 1219

14  (9th Cir. 1996), as modified, 97 F.3d 1460 (9th Cir. 1996) (same).  In addition, "[t]he law is

15  well settled that there are no rights in a trademark alone and that no rights can be transferred

16  apart from the business with which the mark has been associated."  Conversive, Inc., 433 F.

17  Supp. 2d at 1090 (quoting Mister Donut of Am., Inc. v. Mr. Donut, Inc., 418 F.2d 838, 842

18  (9th Cir. 1969)) (emphasis added).  Thus, "where a designation has never been used as a

19  mark, there is nothing to assign."  McCarthy on Trademarks and Unfair Competition § 18:2

20  (4th ed. 2008) (citing Conversive).  Bryant simply had no rights to assign.

21       For the same reasons, Mattel cannot establish any rights to the BRATZ name

22  independent of Bryant, either.  Mattel's own documents and testimony show that the name

23  "Brats" or some derivative thereof, such as "Brat Girls", "Chat Brats", "@brats" and/or

24  "Mallbrats" was considered – but never used – for the Diva Starz line.  (See TX 314, 315;

25  Tr. 1121:25-1127:8.)  As Ivy Ross testified, "So brats, I don't remember the way it was

26  spelled, but I remember that brats was something that we absolutely thought of and was not

27  available for some reason.  We have to find names that are available across the entire world.

28  So it's really hard these days to find those names."  (Tr. 302:18-23.)  Indeed, Ross testified

1  that "chat and brat were probably two of our favorite names, and quite frankly, Diva Starz

2  was our last resort" because Mattel's legal department was unable to "clear" the "brats"

3  name.  (Tr. 303:10-13.) [10]  When Ross saw the BRATZ name on MGA Parties' products in

4  2000, however, despite her belief that Mattel's consideration of the name was "confidential"

5  to Mattel, she merely assumed the MGA Parties could use the name because it was spelled

6  differently.  (Tr. 326:3-17.)   Indeed, despite its "confidential" consideration of the name,

7  Mattel never made any effort to establish the name BRATZ as proprietary to Mattel; MGA

8  first learned Mattel had even considered the name during Phase 1a.  (Tr. 2096:17-22,

9  2097:6-8, 2150:2-18.)   Moreover, as evidenced by Ivy Ross's testimony above, Mattel

10 cannot show that it ever used the name "Brats" for a single Mattel product.

11      MGA's rights to BRATZ, on the other hand, are well-established.  MGA registered

12 its intent to use the BRATZ mark in connection with dolls on December 11, 2000.  (See

13 RJN Exs. 1, 2 (Appl. & Reg. for Trademark No. 76179479).)  MGA subsequently filed a

14 declaration stating that it first used the BRATZ trademark for dolls on May 21, 2001.  (See

15 RJN Ex. 3 (Statement of Use for Trademark No. 76179479).)  MGA's registration of the

16 BRATZ mark was opposed by Lovins, Inc., an entity which purported to have used the

17 BRATZ mark in commerce since 1994.  (See RJN Ex. 4 (Trademark Trial & Appeal Board

18 Petition No. 91150381); Ex. 5 (1st Am. Compl. Lovins Inc v. Abc Intl Traders Inc, et al.);

19 Ex. 6 (Appl. for Trademark No. 76242565); see also Tr. 2149:2-13, 6172:5-12.)   MGA

20 settled the suit with Lovins, Inc. and acquired its trademark.  (See RJN Ex. 7-8 (Assignment

21 & Registration for Trademark No. 76242565); see also Tr. 2149:2-13, 6172:5-12.)

22      Because it has no claims to the name under either copyright or trademark law, Mattel

23 is not entitled to declaratory relief on its claim to own the name "BRATZ."

24

25 [10]    A search of the U.S. Patent and Trademark Office's Trademark Electronic Search System
   (TESS) indicates application number 75558375 to register the mark "BRATS" in conjunction with
26 "wearable metal dolls" was filed on September 14, 1998 and abandoned on November 22, 1999,
   which may explain this testimony.   However, the files associated with this registration are
27 unavailable.   See Trademark Manual of Examining Procedure (TMEP) §718.07 (5th ed. 2007)
28 (files for abandoned marks are destroyed after two years).

## V.   Mattel's Unfair Competition Claim Is Not Only Largely Preempted, but Also Must Fail Because Mattel Lacks Standing and Is Not Entitled to Any Relief

Because California's Unfair Competition Law ("UCL") only provides for equitable relief, damages are not available for Mattel's statutory unfair competition claim (see In re First Alliance Mortg. Co., 471 F.3d 977, 996 (9th Cir. 2006); see also Cacique, Inc. v. Robert Reiser & Co., 169 F.3d 619, 624 (9th Cir. 1999) (plaintiff could not use the UCL to recover royalties in action alleging disclosure of trade secrets to competitor)), and Mattel must show it has no adequate remedy at law to recover under the UCL. See Stewart v. Life Ins. Co. of N. Am., 388 F. Supp. 2d 1138, 1144 (E.D. Cal. 2005), citing Heighley v. J.C. Penney Life Ins. Co., 257 F. Supp. 2d 1241, 1259-60 (C.D. Cal. 2003).

Under the UCL, the available remedies are permissive rather than required: "Section 17203 does not mandate restitution or injunctive relief when an unfair business practice has been shown." Cortez v. Purolator Air Filtration Prods. Co., 23 Cal. 4th 163, 180 (2000) (also observing that various equitable grounds may support a court's decision not to act on a UCL claim). Even where a violation of the UCL is established, the Court may refuse to award relief if equity so requires. See, e.g., Olson v. Cohen, 106 Cal. App. 4th 1209, 1214-15 (2003) (where the defendant law firm failed to register as a "law corporation" with the California State Bar, "[t]o require disgorgement of fees because of a failure to register the corporation ... is disproportionate to the wrong").

Here, Mattel's UCL claim against MGA and Larian[11] already has been held to be preempted to the extent it is based on Mattel's rights to BRATZ.  The remaining claim, to the extent Mattel seeks monetary relief, allows Mattel to restitution only – and only to the extent that Mattel has not already been awarded such relief via the compensatory damages awarded by the jury.  Even if Mattel could manage to pinpoint any evidence in support of such restitutionary claim in the current record, one insurmountable barrier still stands between Mattel and its UCL restitutionary recovery – namely, the injury requirement of the

---

[11]   Mattel's UCL claim against MGA (HK) is already subject to a pending motion for judgment as a matter of law. (See MGA Phase 1a JMOL (Dkt 4080) at 5.)

UCL standing, which, according to Mattel itself, it cannot satisfy here. Finally, given that Mattel has already presented evidence that goes toward both of the remaining predicates for its UCL claim – namely, commercial bribery and intentional interference with contract[12] – it is unnecessary to hold an evidentiary hearing regarding Mattel's UCL claim.

## A.   Mattel's UCL Claim Is Preempted to the Extent It Is Based on Its Rights to BRATZ

Mattel's unfair competition claim is preempted to the extent it is based on copyright infringement vis-à-vis Mattel's rights in BRATZ, so Mattel can find no relief there. (See 4/25/08 Order (Dkt 3286) at 7.)   The intentional interference with contract predicate for Mattel's UCL claim is also preempted to the extent it is based on Mattel's rights to BRATZ, leaving only MGA and Larian's inducement of Bryant to breach his contract with and/or duties to Mattel as a basis for Mattel's UCL claim. (See id. at 2.)   Thus, this Court's summary judgment rulings effectively foreclose Mattel's ability to claim relief based on its rights to BRATZ under its UCL claim.[13]

## B.   Mattel Lacks Standing to Pursue Its UCL Claim Because It Cannot Satisfy the Injury Requirement

Even if Mattel bases its claim on the limited actionable conduct described above, Mattel's inability to satisfy the UCL's standing requirement forecloses *any* recovery under the UCL. Proposition 64 amended the UCL to require "injury in fact" standing in suits brought by private parties: "Actions for any relief pursuant to this chapter shall be prosecuted exclusively ... [by] any person ... who has suffered injury in fact and has lost money or property as a result of such unfair competition." Cal. Prop. 64, § 3. This applies to injunctive claims as well as to claims seeking restitution.   See, e.g., Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1021-22 (9th Cir. 2004) (applying

---

[12]   The Court granted "partial summary judgment on Mattel's statutory unfair competition claims [in favor of MGA], except that Mattel's statutory unfair competition claim presented triable issues of fact relating to 'whether MGA tortiously interfered with Bryant and Mattel's contractual relationship and whether MGA engaged in commercial bribery.'" (6/7/08 Order (Dkt 3950) at 5.)
[13]   Cf. MGA Phase 1b JMOL (Dkt 4264) at 2-5 (collecting authorities showing that preempted claims are preempted as to both claims and remedies).

1  Article III rule of "standing" to UCL injunction claim and reversing injunction because

2  plaintiff "currently has no contractual relationship with Defendants and is therefore not

3  personally threatened by their conduct"); <u>Daro v. Super. Ct.</u>, 151 Cal. App. 4th 1079, 1100

4  (2007) ("a party who has suffered no injury as a result of a UCL violation cannot create

5  standing by arguing that a broad-based injunction designed to remedy the UCL violation

6  will provide him or her some incidental benefit").

7        Where the evidence shows that plaintiff suffered no injury in fact and thus no harm

8  from the conduct at issue, the UCL claim fails for lack of standing. <u>Express, LLC v. Fetish</u>

9  <u>Group, Inc.</u>, 464 F. Supp. 2d 965, 980 (C.D. Cal. 2006) (granting summary judgment on

10  UCL claim by clothing retailer for fraudulent misrepresentations regarding extent of

11  copyright held by clothing manufacturer where retailer did not show sufficient harm;

12  suggestion that retailer could have sold altered, non-infringing product if it had not been

13  misled about extent of copyright was too attenuated and speculative); <u>Trujillo v. First Am.</u>

14  <u>Registry, Inc.</u>, 157 Cal. App. 4th 628, 639 (2007) (granting summary judgment on UCL

15  claim as rejected tenants failed to show injury as result of credit reporting company's

16  incomplete unlawful detainer information in its tenant screening reports).

17        Mattel, however, has stated on several occasions that it has suffered no damages as a

18  result of the conduct at issue. (<u>See, e.g.</u>, 5/12/08 Tr. 64:5-7 ("MR. COREY: Topic 8 relates

19  to damages suffered by Mattel.  <u>Mattel's not seeking damages for its own injury</u> in this case;

20  that's not a theory that is concerned.") (emphasis added); Tr. 5267:9-14 ("COURT: I just

21  want to make sure I understood it right -- that <u>the disgorgement of profits and revenues is</u>

22  <u>the damages that you're seeking</u> with respect to all claims, not just the claim for copyright

23  infringement. Is that correct? MR. ZELLER: That's correct, Your Honor."); <u>see also</u>

24  Mattel's Reply ISO Objections to 4/11/08 Discovery Order (Dkt 3485) at 11 (stating that

25  Mattel's damages "are not at issue in Phase 1b, because <u>Mattel's damages arise only from</u>

26  <u>MGA's profits from its infringement</u>") (emphasis added).)  Indeed, Mattel cannot claim that

27  it "lost money or property", as required by the UCL "injury in fact" standing because, as

28  shown in more detail below, it cannot establish that MGA has taken money or property that

1    should be restored to Mattel.  See Walker v. USAA Cas. Ins. Co., 474 F. Supp. 2d 1168,

2    1173 (E.D. Cal. 2007).  Therefore, as the evidence shows, Mattel cannot satisfy the injury

3    requirement of the UCL as a matter of law, and its UCL claim must fail for lack of standing.

**C.    To the Extent Mattel Is Allowed to Recover Under the UCL, Its Recovery Must Be Limited to Restitutionary Relief and Cannot Duplicate Damages Already Awarded**

**1.    Mattel Failed to Introduce Evidence Supporting Any Restitution Owed to It**

Even if Mattel could overcome the standing issue, monetary relief available under the UCL is limited to restitutionary relief. See Korea Supply, 29 Cal. 4th at 1152 ("We hold that nonrestitutionary disgorgement of profits is not an available remedy in an individual action under the UCL."); see also Theme Promotions, Inc. v. News Am. Mktg. FSI, 539 F.3d 1046, 1060 (9th Cir. 2008) (UCL "allows awards of restitution, but not awards of non-restitutionary disgorgement").[14]  As one court emphasized,

> [UCL] provides for the "restoration" of money or property acquired by means of unfair competition. We think it significant that the Legislature chose to use the word "restore" in labeling that which an offending defendant may be ordered to do. The verb, as defined by the Oxford English Dictionary, means "[t]o give back, to make return or restitution of (anything previously taken away or lost)." Taken in the context of the statutory scheme, the definition suggests that [UCL] operates only to return to a person those measurable amounts which are wrongfully taken by means of an unfair business practice....

Day v. AT&T Corp., 63 Cal. App. 4th 325, 338-39 (1998); see also In re Ditropan XL

---

[14]    Accord In re First Alliance, 471 F.3d at 997 (same); Feitelberg v. Credit Suisse First Boston LLC, 134 Cal. App. 4th 997, 1017 (2005) ("[M]onetary relief in a UCL action is limited to restitution."); Cortez, 23 Cal. 4th at 172 ("[T]he trial court may not make an order for disgorgement of all benefits defendant may have received from failing to pay overtime wages [under the UCL].  It may only order restitution to persons from whom money or property has been unfairly or unlawfully obtained."); Madrid v. Perot Sys. Corp., 130 Cal. App. 4th 440, 460 (2005) (holding that plaintiff's attempt to recover under the UCL was not restitution, but rather nonrestitutionary disgorgement of wrongfully obtained profits, a remedy that was not available to plaintiff).

1   <u>Antitrust Litig.</u>, 529 F. Supp. 2d 1098, 1102 (N.D. Cal. 2007) ("disgorgement of profits is

2   allowed in UCL claims only to the extent it constitutes restitution").

3          Here, Mattel failed to introduce any evidence that demonstrates its entitlement to

4   restitutionary relief, given that there is no evidence that MGA and Larian obtained any

5   money or property from Mattel that the latter possessed in the first place, as is required by

6   the California Supreme Court that limited restitutionary awards under the UCL to "money

7   that once had been in the possession of the person to whom it [is] to be restored." <u>Cortez</u>, 23

8   Cal. 4th at 177-78 (also noting that in prior cases approving of restitution as a UCL remedy,

9   "the remedy we approved was literally restoration of money, the *return* of money acquired

10  *from* an individual *to* that individual").[15]   The only restitution Mattel could conceivably

11  claim (aside from the value of Bryant's services for the few weeks that Bryant worked for

12  both Mattel and MGA, which Mattel, as shown below, has already recovered in

13  compensatory damages) would be based on its rights to BRATZ and the value of their

14  exploitation – which, as noted above, is preempted.

15         And even if Mattel could somehow overcome the bar of preemption (which it cannot)

16  and claim entitlement to the value of the exploitation of BRATZ, the law would still

17  foreclose such relief, as Mattel cannot show that the money in question was taken from it or,

18  in other words, that it had a "vested" proprietary interest in it.[16]   Indeed, the Ninth Circuit

19  [15]   See also <u>C.B. & D.M. Entm't, Inc. v. Galardi</u>, 2007 WL 4219409, at *5 (S.D. Cal. Nov. 28,
20  2007) ("In seeking lost revenue, Plaintiffs are asking for property that was never in their possession.
    At most, they had an 'attenuated expectancy,' for which the UCL cannot provide relief."); <u>Pac. Gas</u>
21  <u>& Elec. Co. v. Jesse M. Lange Distrib., Inc.</u>, 2005 WL 3507968, at *7 (E.D. Cal. Dec. 21, 2005)
    (claim for disgorgement of "all monies saved by [defendants] by using [plaintiff]'s property … as a
22  disposal site for their wastes" is "non-restitutionary and therefore unavailable under the UCL"); <u>cf.</u>
    <u>Colgan v. Leatherman Tool Group, Inc.</u>, 135 Cal. App. 4th 663, 700 (2006) (noting that the trial
23  court "rejected as 'inequitable' … [defendant]'s gross profits as an appropriate measure of either
    the unlawful benefit to … [the defendant] or the amount necessary to restore consumers to the
24  position in which they would have been but for the unlawful conduct" under the UCL).

    [16]   See <u>Korea Supply Co.</u>, 29 Cal. 4th at 1149-50 (rejecting plaintiff's UCL claim for monetary
25  relief where contract created mere "contingent interest"); <u>Pegasus Satellite TV, Inc. v. DirecTV,</u>
    <u>Inc.</u>, 318 F. Supp. 2d 968, 979 (C.D. Cal. 2004) (because plaintiff had no vested right in the
26  defendant's anticipated revenues, no restitutionary remedy could issue; "A 'vested' interest is one
    that is 'unconditional,' 'absolute,' and 'not contingent.'  A contingent interest, on the other hand, is
27  dependent upon an uncertain future event."); <u>Nat'l Rural Telecomms. Coop. v. DirecTV, Inc.</u>, 319
    F. Supp. 2d 1059, 1082 (C.D. Cal. 2003) (UCL action may not be used to seek damages, but rather,
28                                                                                                    *(cont'd)*

1   recently referred to UCL disgorgement orders that "require the 'surrender of all profits

2   earned as a result of an unfair business practice regardless of whether those profits represent

3   money taken directly from persons who were victims of the unfair practice'" as

4   "**impermissibly broad.**" Theme Promotions, Inc., 539 F.3d at 1060 (emphasis added).

5          In fact, Mattel has already agreed that its rights under the UCL are so limited.  In its

6   May 13, 2005 Motion to Dismiss submitted to Judge Manella, Mattel argued that

7   "[r]estitution is a proper remedy under the UCL **only if a defendant obtained money from**

8   **a plaintiff**"; moreover, Mattel asserted that the remedy of "disgorgement under the UCL is

9   available only in a class action …."  (Mattel 5/13/05 MTD (Case 05-25727 Dkt 13) at 18

10  (concluding that "[b]ecause MGA has not alleged that Mattel obtained any money from it,

11  restitution is unavailable as a matter of law under the UCL") (emphasis added) (citing Kraus,

12  23 Cal. 4th at 126-127, Cortez, 23 Cal. 4th at 177, Korea Supply, 29 Cal. 4th at 1145 &

13  1151, and Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc., 178 F. Supp. 2d 1099 (C.D. Cal.

14  2001)).)[17]  Notably, in Watson, the court specifically addressed the relevant question here

15  should Mattel raise its interests in BRATZ under the UCL: "when the victim was never in

16  possession of the wrongdoer's 'benefits' and never had a property interest in those

17  'benefits'[,] does the remedy of restitution … authorize transferring that property to the

18  _____

19  *(cont'd from previous page)*
    only to seek "return of money in which [plaintiffs] have an identifiable property interest"); cf.
20  Seibels Bruce Group, Inc. v. R.J. Reynolds Tobacco Co., 1999 WL 760527, at *7 (N.D. Cal. Sept.
    21, 1999) (in suit against insurance company that indemnified manufacturers for fraudulently
21  promoting cigarettes as being "safe," rejecting plaintiff's request for "restitution" based on the
    claim that defendants profited from fraudulent practices because "the remedy plaintiff seeks is
22  'none other than an alternative measure of damages'"); Inline, Inc. v. A.V.L. Holding Co., 125 Cal.
    App. 4th 895 (2005) (where plaintiff alleged that defendant sold goods in a commercially
23  unreasonable manner, restitution was limited to the $20 in storage costs that defendant obtained
    through the sale; neither plaintiff's consequential loss (the amount paid to recoup the property) nor
24  the fair market value of the property is a proper measure of restitution under the UCL).
    [17]      Although Judge Manella apparently accepted this argument, see MGA Entm't, Inc. v. Mattel,
25  Inc., 2005 WL 5894689, at *9 n.8 (C.D. Cal. Aug. 26, 2005), citing Korea Supply, 29 Cal. 4th at
    1140 (UCL does not allow an individual to recover "disgorgement of profits allegedly obtained by
26  means of an unfair business practice ... where [those] profits are neither money taken from a
    plaintiff nor funds in which the plaintiff has an ownership interest"), she ruled it was too early to
27  "determine definitively whether MGA might be entitled to restitution and disgorgement based
    upon its UCL-related allegations."
28

1    victim?" – and answered in the negative, rejecting the plaintiff's claim for disgorgement

2    where it possessed mere "abstract property rights" in the profits sought. Id. at 1122.

3         Recently, the Ninth Circuit reaffirmed this position.  In Theme Promotions, Inc, an

4    antitrust action brought by publisher of advertising inserts against its competitor, the court

5    found that the publisher's motion for restitution under the UCL, which sought the

6    competitor's profits from transactions in which the publisher was forced to purchase inserts

7    from the competitor, was properly denied.  The court reasoned that the requested relief was

8    not "restitutionary in nature" because the evidence was insufficient to support a finding that

9    the publisher "had a property interest in all of [the competitor]'[s] profits", as the profits

10   were property taken not only from the publisher, but also from third parties.  539 F.3d at

11   1060-61 ("Evidence in the record suggests that, on some occasions, the packaged goods

12   companies paid [defendant] directly; on other occasions, [plaintiff] paid [defendant] for the

13   packaged goods companies.").[18]

14        Since Mattel cannot point to any MGA money or property obtained from Mattel

15   under California law – or, in other words, that Mattel has a vested proprietary interest in –

16   Mattel is not entitled to any monetary relief under the UCL.

**2.    Any Restitution Under The UCL Cannot Duplicate Compensatory Damages Already Awarded**

17
18        Any restitution awarded to Mattel under the UCL cannot duplicate the jury award of

19   compensatory damages for the same conduct, and that is exactly why California law

20   requires restitution under the UCL to be quantifiable and supported by evidence.  "There

21   must be evidence that supports the amount of restitution necessary to restore to the plaintiff

22   'any money ... which may have been acquired by means of such unfair competition.'"

23

_____

24   [18]    This holding is especially relevant here, where as the evidence showed the value of the
     exploitation of BRATZ (to the extent Mattel is even allowed to claim entitlement to it here) has not
25   been derived entirely from the drawings owed by Mattel; rather, that value also includes the
     tremendous independent creative effort undertaken by MGA and Mr. Larian.  See In re First
26   Alliance, 471 F.3d at 997 (holding that disgorgement of profits was inappropriate under the UCL
     where plaintiffs claimed they were defrauded by loan company via hidden fees and interest rates;
27   "there is no basis to conclude that every single dollar that ultimately flowed to … [the loan
     company] was 'ill-gotten'").
28

1   Colgan, 135 Cal. App. 4th at 697, 700 (holding that "[g]iven the absence of any evidence to

2   support the amount of restitution awarded, the trial court erred in granting its restitution

3   order"); see also Day, 63 Cal. App. 4th at 339 ("While it may be that an order of restitution

4   will also serve to deter future improper conduct, in the absence of a measurable loss the

5   [UCL] … does not allow the imposition of a monetary sanction merely to achieve this

6   deterrent effect."). Such evidence cannot duplicate proof adduced in support of a party's

7   compensatory damages recovery.  United States v. Sequel Contractors, Inc., 402 F. Supp. 2d

8   1142, 1156 (C.D. Cal. 2005) (emphasizing that plaintiff's claim that defendant county

9   caused plaintiff to incur additional payroll expenses and suffer a decline in the value of its

10  business sought "the same monetary relief in its UCL claim that it seeks in its breach of

11  contract and negligence claims" which are "damages, not restitution").[19]

12      Here, since the jury already awarded Mattel monetary relief for the conduct its seeks

13  to recover for under the UCL,[20] any additional monetary award for the same conduct would

14  constitute double recovery, unless the award in question is an identifiable fund of money

15  that was taken from Mattel and, therefore, is subject to restitution.  Indeed, "[a]ny actual

16  issues necessarily and actually decided by the jury are foreclosed under settled principles of

17  collateral estoppel from subsequent reconsideration by the district court.  The court may not

18  make findings 'contrary to or inconsistent with the jury's resolution … of that same issue as

19  implicitly reflected in its general verdict … on the damages claim.'"  Ohio-Sealy Mattress

20  ────────────────────────────

    [19]     See also Nat'l Rural Telecomms., 319 F. Supp. 2d at 1091 (finding that plaintiff was

21  seeking damages, not restitution, where plaintiff sought the same monetary recovery under its UCL
    and tort claims); Madrid, 130 Cal. App. 4th at 445 (sustaining demurrer where plaintiff "alleged no

22  viable theory upon which he could obtain restitution"); cf. Bertram v. Terayon Commc'ns Sys.,
    Inc., 2001 WL 514358, at *3 (C.D. Cal. Mar. 27, 2001) (monetary relief under the UCL cannot

23  duplicate the "out-of-pocket" damages available to the plaintiffs under other theories of recovery).
    [20]     Namely, Mattel has been already awarded compensatory damages for MGA and Larian's

24  tortious interference with Bryant's Mattel contract, which is one of the two predicates for Mattel's
    UCL claim.  As for the other predicate, commercial bribery, Mattel has also already recovered

25  damages for the conduct underlying that claim.  Specifically, to establish commercial bribery,
    Mattel needed to show: 1) Bryant's specific intent to injure/defraud Mattel; 2) that MGA "asked"

26  Bryant to use his position with Mattel for MGA's benefit; and 3) that Bryant used his position at
    Mattel to benefit MGA.  See Cal. Penal Code § 641.3(a).  This is the exact same conduct that

27  underlies Mattel's claims for breach of fiduciary duty and duty of loyalty against Bryant and claims

28  for aiding and abetting those breaches against MGA and Larian.

Mfg. Co. v. Sealy, Inc., 585 F.2d 821, 844 (7th Cir. 1978); accord GTE Sylvania Inc. v. Continental T. V., Inc., 537 F.2d 980, 986 n.7 (9th Cir. 1976). Therefore, an additional monetary recovery under the UCL would be inconsistent with the jury's findings that Mattel has been made whole for the conduct underlying its UCL claim.

### D. Any Evidentiary Hearing As To Mattel's UCL Claim Would Be Duplicative and, Therefore, Unnecessary

Finally, Mattel has already introduced its evidence relevant to the conduct underlying the remaining UCL predicates (tortious interference and commercial bribery) at trial – indeed, the jury has already made findings as to the conduct in question, as discussed above (infra n. 20).[21]  When the issues at hand have been already tried, courts can refuse to hear evidence on equitable issues.  See, e.g., Baden Sports, Inc. v. Kabushiki Kaisha Molten, 2007 WL 2790777, at **8-9 (W.D. Wash. Sept. 25, 2007) (refusing to hold a separate "unnecessary" post-verdict evidentiary hearing on equitable remedies because "[t]he Court considers these issues already tried").[22]  The Court should thus dispose of the UCL claim on the parties' papers and the evidence already adduced at trial.

### CONCLUSION

For the foregoing reasons, the MGA Parties should prevail on their affirmative defenses and Mattel's declaratory relief and unfair competition claims should be rejected.

DATED: September 29, 2008     SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____/s/ Thomas J. Nolan_____
Thomas J. Nolan
Attorneys for the MGA Parties

---

[21]    Mattel's counsel appeared to agree when asked. (See Tr. 8327:12-21 ("THE COURT:  How would you propose the statutory unfair competition claim and the equitable defenses being handled? MR. QUINN:  The statutory unfair competition claim, just thinking off the top of my head, Your Honor, it seems to me that that can be decided on the existing record.  I don't know that there's any other evidence that we'd want to proffer on that, although I guess I'd like[] a chance to think about that.  But my gut reaction is that that's something that can just be done on the papers.").)

[22]    See also U.S. v. Microsoft, 253 F.3d 34, 101 (D.C. Cir. 2001) ("A hearing on the merits – i.e., a trial on liability - does not substitute for a relief-specific evidentiary hearing unless the matter of relief was part of the trial on liability, or unless there are no disputed factual issues regarding the matter of relief."); Am. Can Co. v. Mansukhani, 814 F.2d 421, 425 (7th Cir. 1987) (the defendants were not entitled to a hearing on remedies because they failed "to explain to the district court what new proof they would present to show" that the proposed remedy was unwarranted).