EXHIBIT 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| MATTEL, INC., <br><br>        Plaintiff, <br><br>    vs. <br><br>MGA ENTERTAINMENT, <br><br>        Defendant. <br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 SGL (RNBx) <br><br>Consolidated with <br>Case No. CV 04-09059 <br>Case No. CV 05-02727 <br><br>Hon. Stephen G. Larson <br><br>**FINAL VERDICT FORM AS GIVEN** |

7-17

07209/2554627.7

EXHIBIT    1

PAGE    70

# VERDICT FORM

We answer the questions submitted to us as follows:

## Timing of Tangible Items

1.    For each of the items listed below, has Mattel proven by a preponderance of the evidence that the item was "conceived or reduced to practice" — that is, created — by Carter Bryant, alone or jointly with others, during the period in which he was employed by Mattel (January 4, 1999, to October 19, 2000)?

| Yes | No | |
|---|---|---|
| ☒ | ☐ | TX 5-52, 62-1, 624/5-74, 62-11, 10537, 15180/5-75, 62-12, 10538, 15181/5-111, 708/5-112, 62-13/5-113, /5-114/62-14/62-15, 1152-1, 1152-2, 10613/1328, /10033-3/10033-4 |
| ☒ | ☐ | TX 5-88, 35-1, 35-3, 5-101, 1327, 10153-3, 10153-4 |
| ☒ | ☐ | TX 5-35, 757 |
| ☒ | ☐ | TX 5-36, 701, 702 |
| ☒ | ☐ | TX 5-37, 703 |
| ☒ | ☐ | TX 5-38, 762 |
| ☐ | ☐ | TX 5-39, 523, 752 |
| ☐ | ☐ | TX 5-40, 753, 754, 13583 |
| ☐ | ☐ | TX 751-2, 751-3, 5-41, 755 |
| ☐ | ☐ | TX 5-42, 756 |
| ☒ | ☐ | TX 5-43, 709 |
| ☒ | ☐ | TX 5-46, 710 |
| ☒ | ☐ | TX 5-49, 704 |
| ☒ | ☐ | TX 5-50, 705 |

07209/2534627.7

-1-

EXHIBIT  1
PAGE  71

| Yes | No | |
|---|---|---|
| ☒ | ☐ | TX 5-53, 1152-5, 1152-6, 10534, 15175 |
| ☒ | ☐ | TX 5-54, 62-2, 620, 774, 775 |
| ☒ | ☐ | TX 5-55, 62-3, 785, 1152-9 |
| ☒ | ☐ | TX 5-56, 764, 15176 |
| ☒ | ☐ | TX 5-57, 776, 777 |
| ☒ | ☐ | TX 5-58, 765, 15177 |
| ☒ | ☐ | TX 5-59, 739, 740 |
| ☒ | ☐ | TX 5-60, 761 |
| ☒ | ☐ | TX 5-61, 62-4, 782, 796-1, 1748 |
| ☒ | ☐ | TX 5-62, 62-5, 621, 767, 768, 5-71, 62-10, 770, 1752-1 |
| ☒ | ☐ | TX 5-63, 758, 759, 760 |
| ☒ | ☐ | TX 5-64, 62-6, 795, 1152-14, 1750 |
| ☒ | ☐ | TX 5-65, 1152-7, 1152-8, 11789 |
| ☒ | ☐ | TX 5-66, 794, 1152-13 |
| ☒ | ☐ | TX 5-67, 62-7, 784, 1152-11, 1152-12, 10535 |
| ☒ | ☐ | TX 5-68, 62-8, 781, 786, 790, 1751-4 |
| ☒ | ☐ | TX 5-69, 11788, 5-70, 62-9, 623, 783 |
| ☒ | ☐ | TX 5-72, 1152-15, 1152-16, 10536, 15179 |
| ☒ | ☐ | TX 5-73, 741, 742 |
| ☒ | ☐ | TX 5-76, 706 |
| ☒ | ☐ | TX 5-77, 707 |
| ☒ | ☐ | TX 5-78, 10539, 18501 |
| ☒ | ☐ | TX 5-136, 711 |
| ☒ | ☐ | TX 10579, 18281 |
| ☒ | ☐ | TX 15172 |

-2-

EXHIBIT ___1___
PAGE ___72___

2.    For each of the items listed below, has Mattel proven by a preponderance of the evidence that the item was "conceived or reduced to practice" — that is, created — by Carter Bryant, alone or jointly with others, during the period in which he was employed by Mattel (January 4, 1999, to October 19, 2000)?

| Yes | No | |
|-----|-----|---|
| ☒ | ☐ | TX 3-1, 779, 780, 1-1, 2-1, 778 |
| ☒ | ☐ | TX 3-2, 726, 727, 728, 1-4, 2-5 |
| ☒ | ☐ | TX 3-3, 1152-19, 1152-20, 11838, 15182, 1-6, 2-10, 5-104, 10544 |
| ☒ | ☐ | TX 3-5, 791, 1-8, 2-2 |
| ☒ | ☐ | TX 3-6, 11837, 15184, 1-7, 2-8, 743, 744, 5-107, 1152-17, 1152-18, 10547 |
| ☒ | ☐ | TX 3-8, 789, 1-11, 2-9, 734, 5-106, 10546 |
| ☒ | ☐ | TX 3-9, 788, 1-10, 2-6, 746, 5-103, 10543 |
| ☒ | ☐ | TX 3-10, 735, 736 |
| ☒ | ☐ | TX 3-12, 792, 1-3, 2-7, 5-102, 10542 |
| ☒ | ☐ | TX 3-13, 793, 1-5, 2-3, 10-3 |
| ☒ | ☐ | TX 5-79, 1-9, 2-4, 737, 10545, 5-105 |
| ☒ | ☐ | TX 1-2 |
| ☒ | ☐ | TX 3-11 |
| ☒ | ☐ | TX 5-26, 712 |
| ☒ | ☐ | TX 5-27, 713 |
| ☒ | ☐ | TX 5-81, 720 |
| ☒ | ☐ | TX 5-82, 715 |
| ☒ | ☐ | TX 5-83, 723 |
| ☒ | ☐ | TX 3-4, 5-84, 716, 717 |
| ☒ | ☐ | TX 3-7, 5-85, 718, 719, 10-2, 63-1 |
| ☒ | ☐ | TX 5-80, 721, 722, 5-86 |
| ☒ | ☐ | TX 5-87, 5-108, 724, 725 |
| ☒ | ☐ | TX 5-34 |

Case No. CV 04-9049 SGL (RNBx)
FINAL PROPOSED VERDICT FORM FOR PHASE 1A

07209/2554627.7

EXHIBIT 1
PAGE 73

3.      For each of the items listed below, has Mattel proven by a preponderance of the evidence that the item was "conceived or reduced to practice" — that is, created — by Carter Bryant, alone or jointly with others, during the period in which he was employed by Mattel (January 4, 1999, to October 19, 2000)?

| Yes | No | |
|-----|-----|-----|
| ☒ | ☐ | TX 5-89, 35-2, 323-32, 323-33 |
| ☒ | ☐ | TX 1107, 10638 |
| ☒ | ☐ | TX 1108, 10639 |
| ☒ | ☐ | TX 1109, 771 |
| ☒ | ☐ | TX 1110, 773 |
| ☒ | ☐ | TX 5-14, 10515 |
| ☒ | ☐ | TX 5-18, 10518 |
| ☒ | ☐ | TX 5-19, 10519 |
| ☒ | ☐ | TX 5-28, 10526 |
| ☒ | ☐ | TX 5-30 |
| ☒ | ☐ | TX 5-95 |
| ☒ | ☐ | TX 5-96 |
| ☒ | ☐ | TX 5-99 |
| ☒ | ☐ | TX 323-18 |
| ☒ | ☐ | TX 323-19 |
| ☒ | ☐ | TX 323-26 |

4.   For each of the items listed below, has Mattel proven by a preponderance of the evidence that the item was "conceived or reduced to practice" — that is, created — by Carter Bryant, alone or jointly with others, during the period in which he was employed by Mattel (January 4, 1999, to October 19, 2000)?

|  | **Trial Exhibit No.** | YES | NO |
|---|---|---|---|
| The Three Dimensional Item Presented at Pitch Meeting | | X | ___ |
| Trial Exhibit 1136 | | X | ___ |

**Timing of Ideas**

5.   Has Mattel proven by a preponderance of the evidence that Carter Bryant conceived the "Bratz" characters while employed by Mattel?

Yes   X

No   ___

6.   Has Mattel proven by a preponderance of the evidence that Carter Bryant conceived the name "Bratz" while employed by Mattel?

Yes   X

No   ___

Case No. CV 04-9049 SGL (RNBx)
FINAL PROPOSED VERDICT FORM FOR PHASE 1A

07209/2554627.7

EXHIBIT   1
PAGE   75

### Intentional Interference with Contractual Relations

7.  Is MGA Entertainment, Inc. ("MGA") liable to Mattel for intentional interference with contractual relations?

Yes ___X___

No _____

8.  Is Isaac Larian liable to Mattel for intentional interference with contractual relations?

Yes ___X___

No _____

### Aiding and Abetting Breach of Fiduciary Duty

9.  Is MGA liable to Mattel for aiding and abetting breach of fiduciary duty?

Yes ___X___

No _____

10.  Is Isaac Larian liable to Mattel for aiding and abetting breach of fiduciary duty?

Yes ___X___

No _____

### Aiding and Abetting Breach of the Duty of Loyalty

11.  Is MGA liable to Mattel for aiding and abetting breach of the duty of loyalty?

Yes ___X___

No _____

Case No. CV 04-9049 SGL (RNBx)
FINAL PROPOSED VERDICT FORM FOR PHASE 1A

07209/2554627.7

EXHIBIT ___1___
PAGE ___76___

12.   Is Isaac Larian liable to Mattel for aiding and abetting breach of the duty of loyalty?

Yes   _X_

No   ___

**Conversion**

13.   Is MGA liable to Mattel for conversion?

Yes   _X_

No   ___

14.   Is Isaac Larian liable to Mattel for conversion?

Yes   _X_

No   ___

15.   Is MGA Entertainment (HK) Limited liable to Mattel for conversion?

Yes   _X_

No   ___

Once this verdict form is completed, the foreperson of the jury should sign and date on the lines below.

DATED: _July 17_, 2008

_____
                        Presiding Juror

EXHIBIT __1__
PAGE __77__

EXHIBIT 2

Case 2:04-cv-09049-SGL-RNB      Document 3286      Filed 04/25/2008      Page 2 of 11

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES – GENERAL

Case No.    CV 04-09049 SGL(RNBx)                           Date: April 25, 2008
Title:      CARTER BRYANT -v- MATTEL, INC.

Consolidated With Related Actions:
CASE NO. CV 04-09059 SGL(RNBx): MATTEL, INC., v. CARTER BRYANT,
CASE NO. CV 05-02727 SGL (RNBx): MGA ENTERTAINMENT, INC., v. MATTEL, INC.,
=================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

            Jim Holmes
            Courtroom Deputy Clerk

ATTORNEYS PRESENT FOR CARTER BRYANT:        ATTORNEYS PRESENT FOR MATTEL:

None Present                                 None Present

ATTORNEYS PRESENT FOR MGA AND
ISAAC LARIAN:

None Present

PROCEEDINGS:   ORDER GRANTING IN PART, DENYING IN PART, AND DEFERRING IN
               PART THE PARTIES' MOTIONS FOR PARTIAL SUMMARY JUDGMENT
               (IN CHAMBERS)

        This matter is before the Court on the parties' motions for partial summary judgment.  The
motions were heard on April 22, 2008, and the Court has set the motions for further hearing on
May 19, 2008, at 1:30 p.m.  As set forth below, the Court rules on a number of issues presented
by the motions for partial summary judgment and reserves ruling on other issues until after further
hearing on the motions for partial summary judgment and, in the case of MGA's affirmative
defenses, until after the Phase 1 trial.

        The parties have made hundreds of objections to evidence offered in support of and in
opposition to the motions for partial summary judgment.  Although counsel for Bryant requested

MINUTES FORM 90                                            Initials of Deputy Clerk: jh
CIVIL – GEN                        Page 1

EXHIBIT  2
PAGE  78

explicit rulings on the objections raised by Bryant, the Court declines to do so. To the extent that this Order necessarily relies on evidence subject to any party's objections, the objections are implicitly overruled.

## PREEMPTION

MGA and Bryant seek summary judgment in their favor as to Mattel's claims for intentional interference with contractual relations, conversion, and unfair competition, arguing that these claims are preempted by the Copyright Act. They are partially correct.

A state law is preempted by the Copyright Act where (1) the work at issue comes within the subject matter of copyright, and (2) the state law rights are "equivalent to rights within the general scope of copyright[.]" Del Madera Properties v. Rhodes and Gardner, Inc., 820 F.2d 973, 977 (9th Cir.1987). "If a state law claim includes an 'extra element' that makes the right asserted qualitatively different from those protected under the Copyright Act, the state law claim is not preempted by the Copyright Act." Altera Corp. v. Clear Logic, Inc., 424 F.3d 1079, 1089 (9th Cir. 2005). Generally the Copyright Act does not preempt the enforcement of contractual rights. Id.

As to the first element, the intentional interference with contractual relations claim addresses generally an issue within the subject matter of copyright -- the underlying wrong upon which the claim is premised is Mattel's deprivation of rights to intellectual property.

As to the second element, it is clear that the tort of intentional interference with contractual relations is neither categorically preempted or categorically saved from preemption; rather, the Court must engage in a determination of whether the substance of the tort claim differs qualitatively from the copyright claim at issue. Compare Altera, 424 F.3d at 1089 (holding that a intentional interference claim was not preempted because it was based not on copyrights but on a contractual provision) with Laws v. Sony Music Entertainment, Inc., 448 F.3d 1134, 1144 (9th Cir. 2006) (holding preempted a singer's voice misappropriation claim was not qualitatively different from her copyright claim).

Here, to the extent that the tortious interference is premised upon MGA's alleged interference with any copyrights that Mattel may have under the Inventions Agreement, it is preempted. Such a claim is not qualitatively different from Mattel's copyright claim. However, to the extent that the claim is based on MGA's acts that may be found to have aided and abetted the breach or induced the breach of Bryant's fiduciary duty, the claim is not preempted. That claim is qualitatively different from Mattel's copyright claim.

Therefore, the tortious interference with contractual relations is preempted to the extent that it is based on Mattel's rights to Bratz. It is not preempted as to Mattel's claims for breach of fiduciary duty.

The parties' arguments regarding the conversion claim address two distinct issues: Conversion of ideas and conversion of tangible things. The Court addresses each in turn.

EXHIBIT __2__
PAGE __79__

Both sides acknowledge, as this Court certainly agrees, that one cannot copyright an idea. Thus, it would seem, a claim for conversion of ideas is not subject to preemption because it is not "within the subject matter of copyright." Del Madera, 820 F.2d at 977. MGA argues that ideas are not subject to a claim of conversion, to which Mattel responds that such rights in ideas may be created by contract. Mattel relies on Desny v. Wilder, 46 Cal.2d 715, 733 (1956) which, remarkably, so holds. However, that case does not support the proposition that a breach of such rights may be remedied by the tort claim of conversion rather than a breach of contract claim. The law in California regarding the tort of conversion's applicability to ideas remains the same today as in 1956: "The tort of conversion does not apply to ideas." Melchior v. New Line Productions, Inc., 106 Cal.App.4th 779 (2003). Therefore, although this claim is not preempted, it is not actionable as a tort claim. Accordingly, summary judgment in favor of MGA and Bryant is granted as to this particular claim.

Mattel also argues that its conversion claim is not preempted to the extent that it seeks the return of tangible things, most notably the original Bratz drawings. This claim is "within the subject matter of copyright," but the state rights go beyond the rights protected by the Copyright Act by allowing for the return of property.

At oral argument, counsel for MGA argued that Mattel seeks the rights that the drawings represent, not the "paper and ink" of which those drawings are comprised. Mattel disagreed with that interpretation, noting that it seeks the return of the original drawings and certain sculpts to which it may have rights under the Inventions Agreement.

The items to which Mattel lays claim are not like the manuscript at issue in Diels! v. Falk, 916 F.Supp. 985, 992 (C.D. Cal. 1996), or the government documents at issue in Idema v. Dreamworks, Inc., 162 F.Supp.2d 1129, 1192-93 (C.D. Cal. 2001), both of which had value merely for their ability to hold and convey their contents. Rather, the materials Mattel seeks are works of art that may have value apart from the copyrights they represent or the "paper and ink" and other materials of which they are comprised. Given the role of the drawings and sculpts in developing a new, commercially successful line of fashion dolls, and given the role of these items in the present litigation, the Court discerns a possible inherent value to the materials themselves.

MGA and Bryant also pressed at oral argument that Mattel had not advanced such a claim for return of tangible items. The Court disagrees. Citing to its Complaint at ¶ 157, Mattel contends it has long sought the return of tangible items.[1] An examination of Mattel's claim for conversion reveals that it encompasses such a claim. Therefore, the conversion claim seeking the return of tangible items is not preempted. MGA and Bryant's motions for summary judgment on this issue are therefore denied.

To the extent that Mattel's statutory unfair competition claim, discussed more fully below, is

---

[1] From a review of the record, it is clear to the Court that Mattel intended to cite ¶ 157 of its Amended Answer and Counterclaims, not its Complaint.

EXHIBIT ___2___
PAGE ___80___

based on copyright infringement, it is preempted, and the Court grants summary judgment in favor of MGA on this issue.

## STATUTE OF LIMITATIONS

The Court heard argument at length on the statute of limitations issue. Although it is not entirely clear, it appears to the Court from the hearing and from MGA's Rule 56(f) affidavit, that there remain outstanding discovery matters that may have the potential, if resolved in MGA's favor, to factor into the inquiry into the determination of the date of the accrual of any claims against Bryant and/or MGA. Accordingly, the Court defers ruling on the issue of statute of limitations at this time.

## INVENTIONS AGREEMENT

The Court addressed many issues of the enforceability of the Employee Confidentiality and Inventions Agreement in its July 17, 2006, Order. The Court finds no good reason to revisit or revise that Order.

Bryant argues that the Inventions Agreement is ambiguous on the issue of whether it covered anything other than "inventions" as that term is used in patent law. Here, Bryant was a fashion designer. He signed an agreement that assigned his "inventions" to Mattel. "Inventions" is defined by the agreement to include "designs," which was undeniably the focus of Bryant's employment with Mattel. In addition to assigning all rights to Bryant's "inventions" (i.e., "designs") to Mattel, the agreement also assigned to Mattel "all [Bryant's] right, title, and interest in any . . . copyrights . . . and copyright applications based [on those inventions]".

In order to conclude that the Inventions Agreement is ambiguous on the issue of whether it would include any copyrightable drawings or doll designs developed by an employee, the Court would have to read out of the agreement explicit terms assigning to the employer the rights to "designs," "copyrights," and "copyright applications." The Court is required to read the contract as a whole and, where possible, give effect to all its terms. Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."). To accept the interpretation advanced by Bryant, the Court would have to disregard this bedrock principle of contract construction by ignoring an explicit assignment by the employee to the employer of copyrights. The interpretation advanced by Bryant is therefore not reasonable, and the Court finds that the Inventions Agreement is not ambiguous on the issue of its scope with respect to copyrightable materials.

The Inventions Agreement explicitly conveys to Mattel an employee's interest in any copyrights or copyright applications. Assuming copyrightability and the resolution of certain (as yet unresolved) issues of timing of creation and/or alteration in Mattel's favor, the original Bratz drawings clearly fall within the scope of the Inventions Agreement.

Moreover, the Inventions Agreement incorporates, and therefore does not violate, Cal.

MINUTES FORM 90
CIVIL -- GEN                                    Page 4                    Initials of Deputy Clerk: jh

EXHIBIT __2__
PAGE __81__

Labor Code § 2870. Pursuant to that statute (and its incorporation in the Inventions Agreement), because the subject matter at issue -- the Bratz dolls -- relate to Mattel's business of marketing fashion dolls, the factual question of whether Bryant worked on them on his own time, rather during his working hours at Mattel, is not relevant.

MGA argues that contracts of adhesion are unenforceable if they are either outside the scope of the parties' expectations or they are substantively unconscionable. The Court previously determined that the Inventions Agreement was not substantively unconscionable, and now determines that it is not outside the scope of the parties' expectations. As noted above, Bryant was a designer, and the plain language of the Inventions Agreement assigns his "designs" to his employer. Objectively, therefore, it would not be surprising that Mattel would lay claim to Bryant's rights to any doll or doll fashions he designed during the period of his employment with Mattel. Moreover, undisputed evidence establishes that Bryant's subjective understanding of the contract was that it transferred at least some of his rights to Mattel.

Bryant also argues that his actions went no further than lawful preparations to compete with his employer. The undisputed facts, however, tell a different story: Bryant directly competed with Mattel by entering into a contract with its competitor to produce a competing product while still employed by Mattel.

The Court grants summary judgment in favor of Mattel on the issue of the enforceability of the Inventions Agreement and the issue of applicability of the Inventions Agreement to any Bratz-related "inventions" (including any designs, improvements, ideas, concepts, and copyrightable subject matter) that he is found to have created during the period of his employment with Mattel.

## DUTY OF LOYALTY AND FIDUCIARY DUTY

Carter Bryant, like all other California employees, owed a duty of loyalty to Mattel while employed there. See Cal. Labor Code § 2863. The undisputed facts establish that he breached this duty by entering into a contract with Mattel's competitor, while still employed by Mattel, to produce a line of fashion dolls to be marketed in direct competition with Mattel's products. See Huong Que, Inc. v. Luu, 150 Cal.App.4th 400, 414 (2007) ("The duty of loyalty is breached, and the breach may give rise to a cause of action in the employer, when the employee takes action which is inimical to the best interests of the employer.") (internal quotation marks and citation omitted).

Bryant also owed a fiduciary duty to Mattel by virtue of the language set forth in ¶ 1(a) of the Inventions Agreement. Id. ("The value of the Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust."). Under California law, a confidential relationship that gives rise to a fiduciary duty is created "where a confidence is reposed by one person in the integrity of another, and . . . the party in whom the confidence is reposed . . . voluntarily accepts or assumes to accept the confidence . . . ." City Solutions, Inc. v. Clear Channel Communications, Inc., 201 F.Supp.2d 1048, 1050-51 (N.D. Cal. 2002). The Inventions Agreement imposed such a duty on Bryant.

EXHIBIT   2
PAGE   82

At the hearing on this matter, counsel contended that a required element for imposing a fiduciary duty – that the party with the duty be in a superior position to the party to whom the duty is owed – was missing. That element is described as follows: "[T]he essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party." City Solutions, Inc. v. Clear Channel Communications, Inc., 201 F.Supp.2d 1048, 1050 (N.D. Cal. 2002) (internal quotation marks and citation omitted). The "superior position" to which California courts refer in this context is not superior bargaining power – a position on which Mattel would apparently have the edge – but rather it refers to a superior position vis-à-vis the duty imposed. Here, because the duty imposed upon Bryant was essentially to police his own actions by maintaining Mattel's confidentiality and communicating his own "inventions" to Mattel, Bryant was "in a superior position to exert unique influence over" Mattel because he was in the best position, arguably the only one in a position, to know of and police his actions.

As with the duty of loyalty, the undisputed facts establish that Bryant breached his fiduciary duty to communicate his inventions to Mattel when, rather than doing so, he secretly entered into a contract with Mattel's competitor, while still employed by Mattel, to produce a line of fashion dolls to be marketed in direct competition with Mattel's products.

Accordingly, the Court grants Mattel's motion for summary judgment on the issues of the existence and breach of the duty of loyalty. The Court grants Mattel's motion for summary judgment and denies Bryant's motion for summary judgment on the issue of the existence and breach of a fiduciary duty.

In its motion, MGA argued that there can be no liability for aiding and abetting a breach of fiduciary duty in the absence of a fiduciary duty. Because the Court has rejected this argument, the Court denies MGA's motion for summary judgment on this issue.

## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

MGA moved for summary judgment as to Mattel's claim for intentional interference with contractual relations.

The elements of a claim for intentional interference with contractual relations are stated as (1) a valid contract between a plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. Family Home & Finance Center, Inc. v. Federal Home Loan Mortg. Corp., 461 F.Supp.2d 1188, 1193 (C.D. Cal. 2006) (citing Pac. Gas & Elec. Co. v. Bear Stearns Co., 50 Cal.3d 1118, 1126 (1990)).

The undisputed facts show that the first, third, and fifth elements are met. Mattel has raised a triable issue of fact as to the second. The fourth element may be resolved after the

EXHIBIT __2__
PAGE __83__

Court's further hearing on the motions for partial summary judgment. The Court therefore defers ruling on this issue.

## UNFAIR COMPETITION

MGA and Bryant's motions are granted in part and denied in part as to Mattel's unfair competition claims.

Mattel's statutory unfair competition claim, brought pursuant to Cal. Bus. & Profs. Code § 17200, survives summary judgment because Mattel has raised a triable issue of fact as to whether MGA tortiously interfered with Bryant and Mattel's contractual relationship and whether MGA engaged in commercial bribery.

However, two bases for this claim are foreclosed at this time. To the extent that the § 17200 claim is based on copyright infringement, it is preempted. To the extent that it is based on unfair conduct, summary judgment in favor of MGA is granted because the articulated unfair conduct does not approximate an antitrust violation that threatens competition. See Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal.4th 163, 186-87 (1999).

As to Mattel's common law unfair competition claim, summary judgment in favor of MGA and Bryant is granted. This claim is not, as it must be, based on the act of passing off another's goods as one's own. See Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1153 (9th Cir. 2008) (citing Bank of the W. v. Superior Court, 2 Cal.4th 1254 (1992)).

## UNJUST ENRICHMENT

Because Mattel failed to oppose this portion of Bryant's motion, the Court grants Bryant's motion for partial summary judgment on the issue of unjust enrichment.

## AFFIRMATIVE DEFENSES

Mattel seeks summary judgment as to many of the affirmative defenses asserted by the MGA entities and Carter Bryant. Most of these defenses are essentially equitable in nature, and therefore the Court **DEFERS RULING** on them until after trial. Specifically, the Court **DEFERS RULING** on the affirmative defenses of abandonment, acts and omissions of others, acquiescence, consent, estoppel, failure to mitigate, laches, unclean hands, and waiver until after trial.

For the reason set forth above in a separate section, the Court defers ruling on Mattel's motion as to the statute of limitations defense.

The final affirmative defense is based on 17 U.S.C. § 205(d). With this affirmative defense, MGA essentially contends that it is a bona fide purchaser for value of the Bratz copyrights which

EXHIBIT  2
PAGE  84

took the rights in good faith and without notice of any prior transfer of the rights therein to Mattel. As the issue is argued by the parties, the Court would be required to determine the legal issue of whether MGA's registration of the copyrights as an "assignment" constitutes "constructive notice" in the manner required to give MGA the protection of 17 U.S.C. § 205(d). In the Court's view, this is a complex legal issue that is not thoroughly addressed by the parties' briefs. Moreover, the Court notes that a trial on the merits is likely to resolve the less complex factual issue of whether MGA acted in good faith and without notice of an earlier assignment of rights. Accordingly, the Court **DEFERS RULING** on this issue until after the Phase 1 trial.

* * * *

The Court will consider a number of remaining issues at the further hearing on these motions, set for May 19, 2008. Specifically, referencing the parties' Notices of Motion, the Court will consider the following issues:

Mattel's motion:   Issue (2)(c), whether there is a factual dispute regarding the timing of certain drawings and a dummy model; issue (3), whether the first-generation Bratz dolls are substantially similar to seventeen drawings and a doll sculpt drawing or blueprint created by Bryant and whether those are original, protectable works of expression; issue (5), whether MGA and Larian are liable for aiding and abetting Bryant's breaches of the duty of loyalty and fiduciary duty; and issue (6)(a) whether Mattel is entitled to summary judgment as to the affirmative defense of statute of limitations.

Bryant's motion:   Whether Bryant is entitled to summary judgment as to Mattel's claim for copyright infringement; whether Bryant is entitled to summary judgment as to Mattel's breach of contract claim; and whether Bryant is entitled to summary judgment on any portion of his claim for declaratory relief.

MGA's motion:   Whether Mattel's claims are time barred; and whether the fourth element of intentional interference with contractual relations -- actual breach or disruption of the contractual relationship -- can be resolved on summary judgment.

Except for any updates from any party regarding the outstanding discovery matters that may be relevant to the statute of limitations, these issues are considered by the Court to be fully briefed. Any supplemental briefs by the parties on any issue other than the statute of limitations will be stricken by the Court. Any supplemental filings regarding the statute of limitations issue shall be limited to addressing the status of outstanding discovery issues and/or recently produced evidence.

**IT IS SO ORDERED.**


EXHIBIT __2__
PAGE __85__

## NOTICE PARTY SERVICE LIST

Case No.   CV 04-09049 SGL(RNBx)     Case Title  Carter Bryant v. Mattel, Inc.

Title of Document    Minute Order of April 25, 2008

| | |
|---|---|
| Atty Sttlmnt Officer Panel Coordinator | |
| BAP (Bankruptcy Appellate Panel) | |
| Beck, Michael J (Clerk, MDL Panel) | |
| BOP (Bureau of Prisons) | |
| CA St Pub Defender (Calif. State PD) | |
| CAAG (California Attorney General's Office - Keith H. Borjon, L.A. Death Penalty Coordinator) | |
| Case Asgmt Admin (Case Assignment Administrator) | |
| Catterson, Cathy (9th Circuit Court of Appeal) | |
| Chief Deputy Admin | |
| Chief Deputy Ops | |
| Clerk of Court | |
| Death Penalty H/C (Law Clerks) | |
| Dep In Chg E Div | |
| Dep In Chg So Div | |
| Federal Public Defender | |
| Fiscal Section | |
| Intake Section, Criminal LA | |
| Intake Section, Criminal SA | |
| Intake Supervisor, Civil | |
| PIA Clerk - Los Angeles (PIALA) | |
| PIA Clerk - Riverside (PIAED) | |
| PIA Clerk - Santa Ana (PIASA) | |
| PSA - Los Angeles (PSALA) | |
| PSA - Riverside (PSAED) | |
| PSA - Santa Ana (PSASA) | |
| Schnack, Randall (CJA Supervising Attorney) | |
| Statistics Clerk | |

| | |
|---|---|
| US Attorneys Office - Civil Division -L.A. | |
| US Attorneys Office - Civil Division - S.A. | |
| US Attorneys Office - Criminal Division -L.A. | |
| US Attorneys Office - Criminal Division -S.A. | |
| US Bankruptcy Court | |
| US Marshal Service - Los Angeles (USMLA) | |
| US Marshal Service - Riverside (USMED) | |
| US Marshal Service -Santa Ana (USMSA) | |
| US Probation Office (USPO) | |
| US Trustee's Office | |
| Warden, San Quentin State Prison, CA | |

**✓ ADD NEW NOTICE PARTY**
(if sending by fax, mailing address must also be provided)

Name: Ambassador Pierre-Richard Prosper

Firm:

Address (include suite or floor): P.O. Box 581103

Salt Lake City, UT  84158

*E-mail: Prosper.Pierre@Arentfox.com

*Fax No.:

* For CIVIL cases only

**JUDGE / MAGISTRATE JUDGE (list below):**

| |
|---|
| |
| |
| |

Initials of Deputy Clerk  jh

G-75  (03/07)                    NOTICE PARTY SERVICE LIST

EXHIBIT ___2___

PAGE ___86___

## NOTICE PARTY SERVICE LIST

**Case No.** CV 04-09049 SGL(RNBx)   **Case Title** Carter Bryant v. Mattel, Inc.

**Title of Document** Minute Order of April 25, 2008

| | |
|---|---|
| | Atty Sttlmnt Officer Panel Coordinator |
| | BAP (Bankruptcy Appellate Panel) |
| | Beck, Michael J (Clerk, MDL Panel) |
| | BOP (Bureau of Prisons) |
| | CA St Pub Defender (Calif. State PD) |
| | CAAG (California Attorney General's Office - Keith H. Borjon, L.A. Death Penalty Coordinator) |
| | Case Asgmnt Admin (Case Assignment Administrator) |
| | Catterson, Cathy (9th Circuit Court of Appeal) |
| | Chief Deputy Admin |
| | Chief Deputy Ops |
| | Clerk of Court |
| | Death Penalty H/C (Law Clerks) |
| | Dep In Chg E Div |
| | Dep In Chg So Div |
| | Federal Public Defender |
| | Fiscal Section |
| | Intake Section, Criminal LA |
| | Intake Section, Criminal SA |
| | Intake Supervisor, Civil |
| | PIA Clerk - Los Angeles (PIALA) |
| | PIA Clerk - Riverside (PIAED) |
| | PIA Clerk - Santa Ana (PIASA) |
| | PSA - Los Angeles (PSALA) |
| | PSA - Riverside (PSAED) |
| | PSA - Santa Ana (PSASA) |
| | Schnack, Randall (CJA Supervising Attorney) |
| | Statistics Clerk |

| | |
|---|---|
| | US Attorneys Office - Civil Division -L.A. |
| | US Attorneys Office - Civil Division - S.A. |
| | US Attorneys Office - Criminal Division -L.A. |
| | US Attorneys Office - Criminal Division -S.A. |
| | US Bankruptcy Court |
| | US Marshal Service - Los Angeles (USMLA) |
| | US Marshal Service - Riverside (USMED) |
| | US Marshal Service -Santa Ana (USMSA) |
| | US Probation Office (USPO) |
| | US Trustee's Office |
| | Warden, San Quentin State Prison, CA |

✓ **ADD NEW NOTICE PARTY**
(If sending by fax, mailing address must also be provided)

Name: Hon. Edward A. Infante (Ret.)

Firm:

Address (Include suite or floor): Two Embarcadero Center, Suite 1500, San Francisco, CA 94111

*E-mail:

*Fax No.:

* For CIVIL cases only

*JUDGE / MAGISTRATE JUDGE (list below):*

Initials of Deputy Clerk  jh

G-75  (03/07)                    NOTICE PARTY SERVICE LIST

EXHIBIT  2
PAGE  87

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT, | **CASE NUMBER** |
| **PLAINTIFF(S),** | CV 04-09049 SGL (RNBx) |
| v. | |
| MATTEL, INC., et al., | |
| **DEFENDANT(S),** | **NOTICE OF CLERICAL ERROR** |

TO:   U. S. District Judge(s)
      U. S. Magistrate Judge(s)
      Counsel of Record

You are hereby notified that due to a clerical error ☐ documents associated with the filing of the new action ☐ the following scanned document ☑ docket entry   have/has been corrected as indicated below.

Title of Scanned Document:  Minute Order of 4-25-08, Granting in part, Denying in part, and Deferring in Part the Parties' MSJ ·

Filed Date: 4-25-08 _____ Document Number: 3285

☐ Incorrect case number _____ was assigned to this ☐ action ☐ document.
☐ Case number has been corrected. The correct case number is _____
☐ Incorrect judge's initials were indicated on this ☐ action ☐ document. The correct judge's initials are _____
☐ Incorrect magistrate judge's initials were indicated on this ☐ action ☐ document. The correct magistrate judge's initials are _____.
☐ Case has been reassigned from ☐ Judge ☐ Magistrate Judge _____ to
    ☐ Judge ☐ Magistrate Judge _____. The initials of the new judge(s) are _____
☐ Case was assigned to ☐ Western ☐ Southern ☐ Eastern division. Pursuant to General Order ☐ 349, ☐ 98-3 ☐ 02-06,
    the case has been reassigned to the ☐ Western ☐ Southern ☐ Eastern division. The former case number _____
    has been reassigned to new case number _____
☐ Subsequent documents must be filed at the ☐ Western ☐ Southern ☐ Eastern division. Failure to file at the proper location
    will result in your documents being returned to you.
☐ Case title is corrected from _____ to _____
☐ Document has been re-numbered as document number _____
☐ Incorrect ☐ Filed Date ☐ Date of Document ☐ ENTERED Date ☐ DATE ENTERED ON CM/ICMS was stamped on
    document. The correct date is _____
☑ Document is missing page number(s):  7 and 8
☐ To ensure proper routing of documents, all documents filed with the court must reflect the following case number and judge's
    initials: _____
☑ Other: a complete copy with missing pages are re-scanned for service on the parties.

CLERK, U.S. DISTRICT COURT

Date 4-25-08 _____        By: _____ Jim Holmes, CRD
                                                           Deputy Clerk

cc: Intake Supervisor / Deputy In Charge

EXHIBIT   2
PAGE   88

EXHIBIT 3



1
2
3
4
5
6
7
8            UNITED STATES DISTRICT COURT
9            CENTRAL DISTRICT OF CALIFORNIA
10                   EASTERN DIVISION
11

| 12  MATTEL, INC., | CASE NO. CV 04-9049 SGL (RNBx) |
| 13       Plaintiff, | Consolidated with |
| 14       vs. | Case No. CV 04-09059 SGL (RNBx)<br>Case No. CV 05-02727 SGL (RNBx) |
| 15  MGA ENTERTAINMENT, INC., et al., | Honorable Stephen G. Larson |
| 16       Defendant. | **PHASE B VERDICT FORM AS GIVEN** |
| 17  AND CONSOLIDATED ACTIONS | |
| 18 | |

19
20
21
22
23
24
25
26
27
28

07209/2609529.2209/2608
584.2

PHASE B VERDICT FORM AS GIVEN

EXHIBIT ___3___
PAGE ___89___

## VERDICT FORM - PHASE B

We answer the questions submitted to us as follows:

### I.  Damages for Phase A Claims

(Answer all four questions in this section.)

### Intentional Interference With Contractual Relations

1.     In Phase A of this trial, you found that MGA Entertainment, Inc. ("MGA") and Isaac Larian are liable to Mattel for intentional interference with contractual relations.  What amount of damages, if any, should be awarded to Mattel?

As to MGA:        $   20 MILLION

As to Mr. Larian: $   10 MILLION

### Aiding and Abetting Breach of Fiduciary Duty

2.     In Phase A of this trial, you found that MGA and Isaac Larian are liable to Mattel for aiding and abetting Carter Bryant's breach of fiduciary duty.  What amount of damages, if any, should be awarded to Mattel?

As to MGA:        $   20 MILLION

As to Mr. Larian: $   10 MILLION

### Aiding and Abetting Breach of the Duty of Loyalty

3.     In Phase A of this trial, you found that MGA and Isaac Larian are liable to Mattel for aiding and abetting Carter Bryant's breach of the duty of loyalty.  What amount of damages, if any, should be awarded to Mattel?

As to MGA:        $   20 MILLION

As to Mr. Larian: $   10 MILLION

-2-

07209/2609529.2608584

## Conversion

4.      In Phase A of this trial, you found that MGA, Isaac Larian and MGA Entertainment (HK) Limited ("MGA Hong Kong") are liable to Mattel for conversion.  What amount of damages, if any, should be awarded to Mattel?

As to MGA:                      $  _31,500 Plus 7% INTEREST_

As to Mr. Larian:               $  _0_      CALCULATED FROM

As to MGA Hong Kong: $  _0_      THE DATE MATTEL'S

PROPERTY WAS

CONVERTED.

07209/2609529.2608584.2

PHASE B VERDICT FORM AS GIVEN

EXHIBIT __3__
PAGE __91__

## II.  Copyright Infringement

5.    Has Mattel proven by a preponderance the evidence that MGA is liable to Mattel for copyright infringement?

        Yes    X

        No    ____

If your answer is "yes," then answer Question 6.

If your answer is "no," then answer Question 7.

6.    Was MGA's copyright infringement willful?

        Yes    ____

        No    X

Answer Question 7.

7.    Has Mattel proven by a preponderance of the evidence that Isaac Larian is liable to Mattel for copyright infringement?

        Yes    X

        No    ____

If your answer is "yes," then answer Question 8.

If your answer is "no," then answer Question 9.

8.    Was Mr. Larian's copyright infringement willful?

        Yes    ____

        No    X

Answer Question 9.

9.    Has Mattel proven by a preponderance of the evidence that MGA Hong Kong is liable to Mattel for copyright infringement?

        Yes    X

07209/2609529.2608584

PHASE B VERDICT FORM AS GIVEN
EXHIBIT  3
PAGE  92

1    No ____

2    If your answer is "yes," then answer Question 10.

3    If your answer is "no," then answer Question 11.

4

5    10.   Was MGA Hong Kong's copyright infringement willful?

6          Yes ____

7          No   X

8    Answer Question 11.

9

10   11.   What amount of damages, if any, should be awarded to Mattel for the

11   defendants' copyright infringement?

12   (a)   Copyright Infringement by MGA

13          $   6 Million

14   (b)   Copyright Infringement by Isaac Larian

15          Distributions Mr. Larian received from MGA attributable to Bratz-

16          related works:

17          $   3 Million

18          Value of Mr. Larian's ownership percentage of MGA attributable to

19          Bratz-related works:

20          $   0

21   (c)   Copyright Infringement by MGA Hong Kong:

22          $   1 Million

23

24

25

26

27

28

07209/2609529.2608584

-5-

### III.  Punitive Damages

12.  Has Mattel proven by clear and convincing evidence that MGA acted with malice, oppression, or fraud?

Yes ____

No  _X_

If your answer is "yes," then answer Question 13.

If your answer is "no," then answer Question 14.

13.  What amount of punitive damages, if any, should be awarded against MGA?

$ _____ —0—_____

Answer Question 14.

14.  Has Mattel proven by clear and convincing evidence that Isaac Larian acted with malice, oppression, or fraud?

Yes ____

No  _X_

If your answer is "yes," then answer Question 15.

If your answer is "no," then answer Question 16.

15.  What amount of punitive damages, if any, should be awarded against Mr. Larian?

$ _____ —0—_____

Answer Question 16.

16.  Has Mattel proven by clear and convincing evidence that MGA Hong Kong acted with malice, oppression, or fraud?

Yes ____

07209/2609529.2608584

PHASE B VERDICT FORM AS GIVEN

EXHIBIT  _3_
PAGE  _94_



1          No ___X___

2      If your answer is "yes," then answer Question 17.

3      If your answer is "no," then answer Question 18.

4

5      17.    What amount of punitive damages, if any, should be awarded against

6   MGA Hong Kong?

7          $_____⊘_____

8      Answer Question 18.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07209/2609529.2608584²

-7-

PHASE B VERDICT FORM AS GIVEN
EXHIBIT __3__
PAGE __95__

### IV.  Fraudulent Concealment

(Answer all five questions in this section.)

18.   Has Mattel proven by a preponderance of the evidence that MGA fraudulently concealed the bases for Mattel's claim of intentional interference with contract against it until at least April 27, 2002?

Yes   _X_

No   ___

19.   Has Mattel proven by a preponderance of the evidence that Isaac Larian fraudulently concealed the bases for Mattel's claim of intentional interference with contract against him until at least April 27, 2002?

Yes   ___

No   _X_

20.   Has Mattel proven by a preponderance of the evidence that MGA fraudulently concealed the bases for Mattel's claim of conversion against it until at least April 27, 2001?

Yes   _X_

No   ___

21.   Has Mattel proven by a preponderance of the evidence that Mr. Larian fraudulently concealed the bases for Mattel's claim of conversion against him until at least April 27, 2001?.

Yes   ___

No   _X_

-8-

PHASE B VERDICT FORM AS GIVEN

EXHIBIT   3

PAGE   96

22.    Has Mattel proven by a preponderance of the evidence that MGA Hong Kong fraudulently concealed the bases for Mattel's claim of conversion against it until at least April 27, 2001?

        Yes  ____

        No    X

    Once this verdict form is completed, the foreperson of the jury should sign and date on the lines below.

DATED: _August 26, 2008_                    /s/
                                    Jury Foreperson

PHASE B VERDICT FORM AS GIVEN

EXHIBIT   3
PAGE      97

EXHIBIT 4

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| MATTEL, INC., | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | |
| | Consolidated with |
| vs. | CASE NO. CV 04-9059 SGL (RNBx) |
| | CASE NO. CV 05-2727 SGL (RNBx) |
| MGA ENTERTAINMENT, INC., et al., | Hon. Stephen G. Larson |
| Defendants. | |
| AND CONSOLIDATED ACTIONS | COURT'S PHASE B JURY INSTRUCTIONS AS GIVEN |

EXHIBIT  4
PAGE  98

# JURY INSTRUCTION NO. 1

Members of the Jury:

Now that you have heard all of the evidence and the arguments of the attorneys, it is my duty to instruct you as to the law of the case.

A copy of these instructions will be sent with you to the jury room when you deliberate.

You must not infer from these instructions or from anything I may say or do as indicating that I have an opinion regarding the evidence or what your verdict should be.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all important.

EXHIBIT   4
PAGE _____ 99

**JURY INSTRUCTION NO. 2**

You should decide the case as to each party separately. Unless otherwise stated, the instructions apply to all parties.

3

EXHIBIT 4
PAGE 100

## JURY INSTRUCTION NO. 3

Whether or not you have taken notes, you should rely on your own memory of the evidence. Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors.

4

EXHIBIT __4__
PAGE __101__

## JURY INSTRUCTION NO. 4

The evidence you are to consider in deciding what the facts are consists of:

1.   the sworn testimony of any witness;

2.   the exhibits which are received into evidence; and

3.   any facts to which the lawyers have agreed or stipulated.

EXHIBIT __4__
PAGE __102__

## JURY INSTRUCTION NO. 5

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

(1)   Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, will say in their closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

(2)   Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

(3)   Testimony that has been excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered. In addition sometimes testimony and exhibits are received only for a limited purpose; when I have given a limiting instruction, you must follow it.

(4)   Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

6

EXHIBIT ___4___
PAGE ___103___

# JURY INSTRUCTION NO. 6

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

7

EXHIBIT ___4___
PAGE ___104___

### JURY INSTRUCTION NO. 7

There are rules of evidence that control what can be received into evidence. When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object. If I overrule the objection, the question may be answered or the exhibit received. If I sustain the objection, the question cannot be answered, and the exhibit cannot be received. Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I have ordered that evidence be stricken from the record. That means that when you are deciding the case, you must not consider that evidence.

EXHIBIT 4
PAGE 105

# JURY INSTRUCTION NO. 8

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it. Proof of a fact does not necessarily depend on the number of witnesses who testify about it.

In considering the testimony of any witness, you may take into account:

(1) the opportunity and ability of the witness to see or hear or know the things testified to;

(2) the witness's memory;

(3) the witness's manner while testifying;

(4) the witness's interest in the outcome of the case and any bias or prejudice;

(5) whether other evidence contradicted the witness's testimony;

(6) the reasonableness of the witness's testimony in light of all the evidence; and

(7) any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.

9

EXHIBIT __4__
PAGE __106__

## JURY INSTRUCTION NO. 9

I will now say a few words about your conduct as jurors.

First, you are not to discuss this case with anyone, including members of your family, people involved in the trial, or anyone else; this includes discussing the case in internet chat rooms or through internet "blogs," internet bulletin boards or e-mails. Nor are you allowed to permit others to discuss the case with you. If anyone approaches you and tries to talk to you about the case, please let me know about it immediately;

Second, do not read or listen to any news stories, articles, radio, television, or online reports about the case or about anyone who has anything to do with it;

Third, do not do any research, such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own;

Fourth, if you need to communicate with me simply give a signed note to the bailiff to give to me; and

Fifth, do not make up your mind about what the verdict should be until after you have gone to the jury room to decide the case and you and your fellow jurors have discussed the evidence. Keep an open mind until then.

Finally, until this case is given to you for your deliberation and verdict, you are not to discuss the case with your fellow jurors.

EXHIBIT ___4___
PAGE ___107___

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### JURY INSTRUCTION NO. 10

During deliberations, you will have to make your decision based on what you recall of the evidence. You will not have a transcript of the trial.

EXHIBIT __4__
PAGE __108__

## JURY INSTRUCTION NO. 11

You must not make any assumptions about a witness based solely upon the use of an interpreter to assist that witness.

12

EXHIBIT __4__
PAGE __109__

## JURY INSTRUCTION NO. 12

From time to time during the trial, it became necessary for me to talk with the attorneys out of the hearing of the jury, either by having a conference at the bench when the jury was present in the courtroom, or by calling a recess. Please understand that while you were waiting, we were working. The purpose of these conferences is not to keep relevant information from you, but to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and error.

Of course, we have done what we could to keep the number and length of these conferences to a minimum. I did not always grant an attorney's request for a conference. Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or of what your verdict should be.

13

EXHIBIT   4
PAGE   110

## JURY INSTRUCTION NO. 13

The parties have agreed to certain facts. You should therefore treat these facts as having been proved.

EXHIBIT __4__
PAGE ___III___

### JURY INSTRUCTION NO. 14

A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth and lawyers for each party may ask questions. The questions and answers are recorded. When a person is unavailable to testify at trial, the deposition of that person, including a videotaped deposition, may be used at the trial.

EXHIBIT ___4___
PAGE ___112___

### JURY INSTRUCTION NO. 15

Some witnesses, because of education or experience, are permitted to state opinions and the reasons for those opinions.

Opinion testimony should be judged just like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

16

EXHIBIT ___4___
PAGE ___113___

## JURY INSTRUCTION NO. 16

Certain charts and summaries not received in evidence have been shown to you in order to help explain the contents of books, records, documents, or other evidence in the case. They are not themselves evidence or proof of any facts. If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.

17

EXHIBIT ___4___
PAGE ___114___

**JURY INSTRUCTION NO. 17**

Other charts and summaries have been received into evidence to illustrate information brought out in the trial.  Charts and summaries are only as good as the underlying evidence that supports them.  You should, therefore, give them only such weight as you think the underlying evidence deserves.

18

EXHIBIT **4**
PAGE **115**

### JURY INSTRUCTION NO. 18

You have heard evidence that both Mattel and MGA purchased and evaluated each other's existing products and had those products in their respective facilities.  In this trial, there is no allegation that it is illegal or improper for a company or person to purchase, possess, or evaluate the publicly available product of a competitor.

19

EXHIBIT ___4___

PAGE ___116___

# JURY INSTRUCTION NO. 19

When a party has the burden of proof on any claim by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

20

EXHIBIT __4__
PAGE __117__

1

## JURY INSTRUCTION NO. 20

2
3
4
5
6

Mattel claims that the defendants, MGA Entertainment, Inc. ("MGA"), Isaac Larian and MGA Entertainment (HK) Ltd. ("MGA Hong Kong"), engaged in copyright infringement of certain items that you found in Phase A of this trial were created by Carter Bryant when he worked at Mattel.  The defendants deny that claim.

7

Copyright is the exclusive right to copy.

8
9

This right to copy includes the exclusive rights to:

10
11

(1)   Authorize, or make additional copies, or otherwise reproduce the copyrighted work;

12
13

(2)   Recast, transform, or adopt the work, that is, to prepare derivative works based upon the copyrighted work;

14
15
16

(3)   Distribute copies of the copyrighted work to the public by sale or other transfer of ownership; and

17

(4)   Display publicly a copyrighted work.

18

It is the owner of a copyright who may exercise these exclusive rights to copy.

19
20
21
22
23
24
25
26

As a matter of law, Mattel is the owner, by assignment, of the Bratz-related items that you found were created by Carter Bryant, alone or jointly with others, while employed by Mattel, which items have been registered by Mattel at the U.S. Copyright Office.  In general, copyright law protects against production, adaptation and distribution of substantially similar copies of the owner's copyrighted work without the owner's permission.  An owner may enforce these rights to exclude others in an action for copyright infringement.

27
28

EXHIBIT  4
PAGE  118

1        You must consider each defendant's acts separately to determine whether that

2   defendant has engaged in an act that is an infringement of Mattel's copyright.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT  4
PAGE  119

## JURY INSTRUCTION NO. 21

Copyright law allows the author of an original work to prevent others from copying the way or form the author used to express the ideas in the author's work. Only the particular way of expressing an idea can be copyrighted. Copyright law does not give the author the right to prevent others from copying or using the underlying ideas contained in the work, such as any procedures, processes, systems, methods of operation, concepts, principles or discoveries.

The right to exclude others from copying extends only to how the author expressed the ideas in the copyrighted work. The copyright is not violated when someone uses an idea from a copyrighted work, as long as the particular way of expressing that idea in the work is not copied.

23

EXHIBIT   4
PAGE   120

## JURY INSTRUCTION NO. 22

Anyone who copies original elements of a copyrighted work without the owner's permission infringes the copyright.

Mattel claims that the defendants have infringed copyrights for the Bratz-related items described above. On Mattel's copyright infringement claim, Mattel has the burden of proving both of the following by a preponderance of the evidence:

1.  Mattel is the owner of a valid copyright; and

2.  The defendants copied original elements from the copyrighted work.

If you find that Mattel has proved both of these elements, your verdict should be for Mattel.

If, on the other hand, Mattel has failed to prove either of these elements, your verdict should be for the defendants.

As a matter of law, the first element is satisfied because Mattel is the owner of each of the items you found were created by Carter Bryant, alone or jointly with others, while employed by Mattel and which Mattel has registered with the U.S. Copyright Office.

Whether or not the second element is satisfied is for you to decide.

24

EXHIBIT __4__
PAGE __121__

**JURY INSTRUCTION NO. 23**

A copyright owner is entitled to exclude others from creating derivative works based upon the owner's copyrighted work.  The term derivative work refers to a work based on one or more pre-existing works.  Accordingly, Mattel is entitled to exclude others from recasting, transforming, or adapting, without Mattel's permission, the copyrighted works you found were created by Carter Bryant, alone or jointly with others, while he was employed by Mattel.

25

EXHIBIT __4__
PAGE __122__

**JURY INSTRUCTION NO. 24**

An owner is entitled to copyright protection of a compilation.  A compilation is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship.

The owner of a compilation may enforce the right to exclude others in an action for copyright infringement.

EXHIBIT ___4___
PAGE ___123___

### JURY INSTRUCTION NO. 25

As explained above, Mattel has the burden of proving that the defendants copied original elements from Mattel's copyrighted work.  There are two ways in which Mattel may meet that burden.

First, Mattel may show the defendants copied from the work by showing by a preponderance of the evidence that the defendants actually copied a significant amount of protectable expression from the work.

Second, in the alternative, Mattel may also show the defendants copied from the work by showing by a preponderance of the evidence that the defendants had access to Mattel's copyrighted works and that there are substantial similarities between the defendants' works and original elements of Mattel's works.

It is undisputed in this case that defendants had access to Mattel's copyrighted works.  Whether there are substantial similarities between the defendants' works and original elements of Mattel's works is for you to decide.

27

EXHIBIT __4__
PAGE __124__

### JURY INSTRUCTION NO. 26

You are to make a determination regarding substantial similarity according to a two-step process, which includes application of the "extrinsic test" and the "intrinsic test." To prevail on its claims for copyright infringement, Mattel must satisfy both of these tests.

First, you must apply the extrinsic test. Under the extrinsic test, Mattel must establish that specific ideas and expressive elements of the works Mattel owns and the Bratz-related products that Mattel claims are infringing are substantially similar.

The Court has determined what elements of the works that you found were created by Carter Bryant, solely or jointly while working at Mattel, are protectable under copyright law. These are the elements that you should consider for the purpose of your comparisons to each of the allegedly infringing products under the extrinsic test:

First, the particularized, synergistic compilation and expression of the human form and anatomy that expresses a unique style and conveys a distinct look or attitude;

Second, the particularized expression of a doll's head, lips, eyes, eyebrows, eye features, nose, chin, hair style and breasts, including the accentuation or exaggeration of certain anatomical features relative to others (doll lips, eyes, eyebrows, and eye features) and de-emphasis of certain anatomical features relative to others (doll nose and thin, small doll bodies); and

Third, the particularized doll clothes, doll shoes, and doll accessories that express aggressive, contemporary, youthful style.

In contrast, certain basic elements of Carter Bryant's works are not protectable. Specifically, copying of protected expression or ideas cannot be established by the mere

EXHIBIT   4
PAGE ___125___

1  fact that both Carter Bryant's works and the allegedly infringing designs bear a

2  resemblance or similarity to human form and human physiology; have hair, heads, two

3  eyes, eyebrows, lips, nose, chin, mouth, and other features that track human anatomy and

4  physiology; wear or have human clothes, shoes, and accessories; depict a certain age,

5

6  race, ethnicity, or have an "urban" appearance; possess common or standard anatomical

7  features relative to others or depict common or standard treatment of fashion doll subject

8  matter. Nevertheless, particular compilations or combinations of these otherwise non-

9  protectable elements in the works which express a particular style or convey a distinct

10

11  look or attitude, are protectable.

12      You should consider only the elements I have just listed for purposes of the

13  extrinsic test. Focusing on the protectable elements of the works by Carter Bryant as

14  compared to those elements in the allegedly infringing Bratz-related works, you must

15  determine whether Mattel has proven by the preponderance of the evidence that the works

16

17  are substantially similar. If you so find, you must next consider the intrinsic test. If you

18  do not so find, you must find for the defendants.

19      The intrinsic test looks at the overall similarity of ideas and expression in the

20  works from the perspective of an ordinary observer. You should ask yourself whether the

21  ordinary, reasonable audience, in this case girls between the ages of 7 and 12, would

22

23  determine or recognize the defendants' products as reflecting the total concept and feel, or

24  as a "picturization," of the Bratz-related works that you have found Carter Bryant created

25  alone or jointly with others while employed by Mattel.

26      Mattel does not need to establish that the works it alleges are infringing are

27  identical or virtually identical to the works it owns, nor that the allegedly infringing

28

29

EXHIBIT 4
PAGE 126

1   works do not contain any non-infringing material.  However, Mattel does need to

2   establish that, focusing on the protectable elements of Carter Bryant's designs which I

3   have identified under the extrinsic test, and the overall look and feel of the works under

4   the intrinsic test, there are substantial similarities between the copyright-protected works

5   and the allegedly infringing works.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 4
PAGE 127

## JURY INSTRUCTION NO. 27

The degree of similarity required to support a finding of substantial similarity is affected by the degree of access MGA, Isaac Larian and MGA Hong Kong had to Carter Bryant's works.  The greater the level of access, the lower the showing of similarity required to support a finding of substantial similarity.  However, the burden of proving substantial similarity by a preponderance of the evidence always remains with Mattel.

EXHIBIT __4__
PAGE __128__

## JURY INSTRUCTION NO. 28

Copyright law protects distinctive characters.  Defendants' works infringe Mattel's copyrights if they copy recognizable and distinctive traits, attributes, and elements of the personalities of the characters portrayed in Carter Bryant's works.

EXHIBIT __4__
PAGE ___129___

### JURY INSTRUCTION NO. 29

If you find that defendants had access to the copyrighted works and substantial similarity between the copyrighted works and allegedly infringing works, you must find that defendants infringed Mattel's copyrights.  Defendants contend that certain Bratz-related works were created independently, that is, that defendants did not actually copy or prepare derivative works from Carter Bryant's works when they created these Bratz-related works, notwithstanding their admitted access to these works.   A claim of independent creation applies where a defendant can prove that he or she created the allegedly infringing work without copying or adapting or preparing derivative works from the original to which he or she had access.

Defendants bear the burden of proof on the issue of independent creation.

If you find that Mattel has shown the elements of infringement and defendants have not established independent creation by a preponderance of the evidence, then you must find for Mattel on its claim of copyright infringement.

EXHIBIT __4__
PAGE __13D__

### JURY INSTRUCTION NO. 30

A two-dimensional work, such as a drawing, can be infringed by a three-dimensional work, such as a doll. A doll, which consists of different materials or includes aspects that are not visible in a copyrighted drawing, nevertheless will infringe the drawing when the works are substantially similar in their appearance under the extrinsic and intrinsic tests. A three-dimensional work is not an independent creation merely because it includes or is a result of artistic or non-artistic work not included in the copyrighted work. Rather, the question is whether the three-dimensional work is substantially similar to the two-dimensional work as a whole using the extrinsic/intrinsic test described above.

EXHIBIT ___4___
PAGE ___131___

## JURY INSTRUCTION NO. 31

A copyright can be infringed by intermediate or preparatory works, including works prepared in the product development or marketing stage, that are substantially similar to a copyrighted work, regardless of whether the end product of the copying also infringes the copyright.

35

EXHIBIT __4__
PAGE __132__

## JURY INSTRUCTION NO. 32

Mattel has presented evidence concerning certain copyright infringement lawsuits brought by MGA in Hong Kong pursuant to Hong Kong law.

The Court has excluded, and you may not consider, any reference to any legal arguments or legal conclusions associated with those lawsuits.

You may, however, consider any factual statements or factual representations that MGA made in those lawsuits.

It is for you to decide how much weight, if any, to give to those factual statements or factual representations.

36

EXHIBIT 4
PAGE 133

## JURY INSTRUCTION NO. 33

If you find that MGA infringed Mattel's copyright in the Bratz works, you may consider Mattel's claim that Isaac Larian vicariously infringed that copyright. Mattel has the burden of proving each of the following by a preponderance of the evidence:

1.   Isaac Larian profited directly from the infringing activity of MGA;

2.   Isaac Larian had the right and ability to supervise/control the infringing activity of MGA; and

3.   Isaac Larian failed to exercise that right and ability.

If you find that Mattel proved each of these elements, your verdict should be for Mattel if you also find that MGA infringed Mattel's copyright. If, on the other hand, Mattel has failed to prove any of these elements, your verdict should be for Isaac Larian on Mattel's claim for copyright infringement, unless you find that Isaac Larian is liable for contributory infringement under the instruction that follows.

37

EXHIBIT _4_
PAGE _134_

## JURY INSTRUCTION NO. 34

A defendant may be liable for copyright infringement engaged in by another if he/it knew or had reason to know of the infringing activity and intentionally materially contributes to that infringing activity.

If you find that MGA infringed Mattel's copyright in Bratz works, but that MGA Hong Kong and/or Isaac Larian did not directly or vicariously engage in acts of infringement, you should proceed to consider Mattel's claim that MGA Hong Kong and Isaac Larian contributorily infringed that copyright. To prove contributory copyright infringement, Mattel must prove both of the following elements by a preponderance of the evidence:

1.   Isaac Larian and/or MGA Hong Kong knew or had reason to know of the infringing activity of MGA; and

2.   Isaac Larian and/or MGA Hong Kong intentionally materially contributed to MGA's infringing activity.

If you find that MGA infringed Mattel's copyright and you also find that Mattel has proved both of these elements, your verdict should be for Mattel. If, on the other hand, Mattel has failed to prove either or both of these elements as against MGA Hong Kong and/or Isaac Larian, and also failed to prove direct or vicarious infringement by MGA Hong Kong and/or Isaac Larian, your verdict should be for those defendants.

38

EXHIBIT 4
PAGE 135

## JURY INSTRUCTION NO. 35

Mattel claims that defendants fraudulently concealed the facts underlying Mattel's claims of intentional interference with contract and conversion.  Defendants deny these allegations.

To prove fraudulent concealment, Mattel must show the following by a preponderance of the evidence

(1)  the defendants took affirmative steps to conceal the facts that could have led Mattel to discover that Carter Bryant created Bratz-related works while employed by Mattel or that Carter Bryant entered into a contract with and worked with MGA while he was still employed by Mattel; and

(2)  Mattel was not aware of such facts that either did or would have, with diligence, led Mattel to discover that Carter Bryant created Bratz works while employed by Mattel or that Carter Bryant entered into a contract with and worked with MGA while he was still employed by Mattel.

If you so find by the preponderance of the evidence, you should find for Mattel on its allegations of fraudulent concealment.  If not, you should find for defendants on the allegations of fraudulent concealment.

EXHIBIT 4
PAGE 136

## JURY INSTRUCTION NO. 36

It is the duty of the Court to instruct you about the measure of damages.  By instructing you on damages, the Court does not mean to suggest for which party your verdict should be rendered.

It is for you to determine what damages, if any, have been proved.

Your award must be based upon evidence and not upon speculation, guesswork or conjecture.

EXHIBIT  4
PAGE  137

## JURY INSTRUCTION NO. 37

In Phase A, you determined that Mattel had proved its claim for intentional interference with contractual relations against the defendants MGA and Isaac Larian. You must now decide how much money, if any, should be awarded as damages.

The amount of damages must include an award for each item of harm that was caused by MGA's and Isaac Larian's wrongful conduct, even if the particular harm could not have been anticipated.

Mattel must prove the amount of damages. However, Mattel does not have to prove the exact amount of damages that will provide reasonable compensation for the harm. You must not speculate or guess in awarding damages.

The following are the specific items of damages claimed by Mattel:

(1)   Compensatory and general damages, including disgorgement of profits earned by MGA and Isaac Larian as a result of their wrongful conduct;

(2)   Prejudgment interest at the maximum rate, which is 7%, calculated from the date Mattel's claim arose;

(3)   Punitive damages.

41

EXHIBIT 4
PAGE 138

### JURY INSTRUCTION NO. 38

In Phase A, you determined that Mattel had proved its claims against the defendants MGA and Isaac Larian for aiding and abetting Carter Bryant's breach of fiduciary duty and breach of the duty of loyalty. You must now decide how much money, if any, should be awarded as damages.

The amount of damages must include an award for each item of harm that was caused by MGA's and Isaac Larian's wrongful conduct, even if the particular harm could not have been anticipated.

Mattel must prove the amount of its damages. However, Mattel does not have to prove the exact amount of damages that will provide reasonable compensation for the harm. You must not speculate or guess in awarding damages.

The following are the specific items of damages claimed by Mattel:

   (1)   Compensatory and general damages, including disgorgement of profits earned by MGA and Isaac Larian as a result of their wrongful conduct;

   (2)   Prejudgment interest at the maximum rate, which is 7%, calculated from the date Mattel's claim arose;

   (3)   Punitive damages.

42

EXHIBIT 4
PAGE 139

# JURY INSTRUCTION NO. 39

Mattel is entitled to obtain disgorgement of profits as an element of its damages for the wrongful acts of aiding and abetting breach of fiduciary duty and duty of loyalty that you have found.  Accordingly, if you find that MGA and/or Isaac Larian obtained profits or advantages because of these specific wrongful acts, those profits and advantages should be awarded to Mattel.

43

EXHIBIT 4
PAGE 140

## JURY INSTRUCTION NO. 40

In Phase A of this trial, you found that Mattel had proved its claims for conversion of tangible property against MGA, Isaac Larian and MGA Hong Kong.  You must now decide how much money will reasonably compensate Mattel for the harm.  This compensation is called damages.

Mattel must prove the amount of its damages.  However, Mattel does not have to prove the exact amount of damages that will provide reasonable compensation for the harm.  You must not speculate or guess in awarding damages.

The following are the specific items of damages claimed by Mattel:

(1)   The fair market value of the tangible Bratz works created by Carter Bryant while he was employed by Mattel; and

(2)   Prejudgment interest at the maximum rate, which is 7%, calculated from the date Mattel's property was converted;

(3)   Punitive damages.

Fair market value is measured as of the time the tangible item was converted.  Fair market value is the highest price that a willing buyer would have paid to a willing seller assuming that there is no pressure on either one to buy or sell, and that the buyer and seller know all the uses and purposes for which the tangible items are reasonably capable of being used.

44

EXHIBIT  4
PAGE  141

## JURY INSTRUCTION NO. 41

If you find for the plaintiff, Mattel, on any of its copyright infringement claims against the defendants, you must determine Mattel's damages.  Mattel is entitled to recover any profits of the defendants attributable to the infringement.  Mattel must prove damages by a preponderance of the evidence.

EXHIBIT __4__
PAGE __142__

### JURY INSTRUCTION NO. 42

You may make an award of the defendants' profits only if you find that the plaintiff showed a causal relationship between the infringement and the defendants' gross revenue.

The defendants' profit is determined by deducting expenses from the defendants' gross revenue.

The defendants' gross revenue is all of the defendants' receipts from sale of a product containing or using the copyrighted work or associated with the infringement. Mattel has the burden of proving the defendants' gross revenue by a preponderance of the evidence.

Expenses are all operating costs and production costs incurred in producing the defendants' gross revenue. The defendants have the burden of proving the defendants' expenses by a preponderance of the evidence.

Indirect profits are the defendants' profits with a less direct connection or link to the infringement. A plaintiff such as Mattel may be entitled to indirect profits in addition to direct profits. To recover indirect profits, Mattel must establish a causal relationship between the infringement and the profits generated indirectly from such infringement.

In other words, Mattel must offer some evidence that the infringement at least partially caused the profits that the infringer generated as a result of the infringement.

Unless you find that a portion of the profit from the sale of a product containing or using the copyrighted work is attributable to factors other than use of the copyrighted work, all of the profit is to be attributed to the infringement. The defendants have the

EXHIBIT __4__
PAGE __143__

1 | burden of proving the portion of the profit, if any, attributable to factors other than
2 | infringing the copyrighted work.

3 |       Defendants are not required to prove with precision the percentage of its profits
4 | attributable to factors other than infringement, so long as the apportionment is reasonable
5 | and just. However, in determining what portion of the defendants' profits are attributable
6 | to copyright infringement, the benefit of the doubt should be given to Mattel and not
7 |
8 | defendants.

9 |       If the copyrighted portions are so intermingled with the rest of the infringing
10 | work that they cannot well be distinguished from it, the entire profits realized by the
11 | defendants are to be given to the plaintiff. At the same time, defendants do not need to
12 | demonstrate that the profits not attributable to infringement are completely free of
13 |
14 | infringing material.

15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

EXHIBIT   4
PAGE   144

## JURY INSTRUCTION NO. 43

Mattel also claims that defendants engaged in willful infringement of Mattel's copyrights. An infringement is considered willful when the plaintiff has proved both of the following elements by a preponderance of the evidence:

1.    The defendants engaged in acts that infringed the copyright; and

2.    The defendants knew that those acts infringed the copyright.

A defendant cannot deduct overhead expenses, operating expenses, or taxes from his/its gross revenue when the copyright infringement is willful.

48

EXHIBIT __4__
PAGE __145__

## JURY INSTRUCTION NO. 44

Mattel seeks damages under more than one legal claim or theory and as to three defendants.  In awarding damages as to any particular claim or defendant, you should not consider or discount your award based on amounts, if any, that you award as to any other claim or defendant.  That is, you should award the full amount of damages you find appropriate, if any, as to each separate claim against each defendant.  The Court will ensure, once your verdict has been reached, that the plaintiff does not obtain duplicative damages.

EXHIBIT  4
PAGE  146

### JURY INSTRUCTION NO. 45

If you decide that Isaac Larian's, MGA's or MGA Hong Kong's conduct caused Mattel harm, you must decide whether that conduct justifies an award of punitive damages. The purposes of punitive damages are to punish a wrongdoer for the conduct that harmed the plaintiff and to discourage similar conduct in the future.

You may award punitive damages against Isaac Larian only if Mattel proves by clear and convincing evidence that Isaac Larian engaged in that conduct with malice, oppression, or fraud.

When a party has the burden of proving any claim or defense by clear and convincing evidence, it means you must be persuaded by the evidence that the claim or defense is highly probable. This is a higher standard of proof than proof by a preponderance of the evidence.

You should base your decision on all of the evidence, regardless of which party presented it.

You may award punitive damages against MGA or MGA Hong Kong only if Mattel proves that MGA or MGA Hong Kong acted with malice, oppression, or fraud. To do this, Mattel must prove one of the following by clear and convincing evidence:

1.   That the malice, oppression, or fraud was conduct of one or more officers, directors, or managing agents of MGA or MGA Hong Kong, who acted on behalf of MGA or MGA Hong Kong; or

2.   That an officer, a director, or a managing agent of MGA or MGA Hong Kong had advance knowledge of the unfitness of another officer, director, or managing

50

EXHIBIT 4
PAGE 147

1   agent of MGA or MGA Hong Kong and employed that person with a knowing disregard

2   of the rights or safety of others; or

3       3.   That the conduct constituting malice, oppression, or fraud was authorized by

4   one or more officers, directors, or managing agents of MGA or MGA Hong Kong; or

5

6       4.   That one or more officers, directors, or managing agents of MGA or MGA

7   Hong Kong knew of the conduct constituting malice, oppression, or fraud and adopted or

8   approved that conduct after it had occurred.

9       "Malice" means that a defendant acted with intent to cause injury or that a

10  defendant's conduct was despicable and was done with a willful and knowing disregard of

11  the rights or safety of another. A defendant acts with knowing disregard when the

12  defendant is aware of the probable dangerous consequences of his or its conduct and

13  deliberately fails to avoid those consequences.

14

15      "Oppression" means that a defendant's conduct was despicable and subjected

16  Mattel to cruel and unjust hardship in knowing disregard of its rights.

17      "Despicable conduct" is conduct that is so vile, base, or contemptible that it

18  would be looked down on and despised by reasonable people.

19

20      "Fraud" means that a defendant intentionally misrepresented or concealed a

21  material fact and did so intending to harm Mattel.

22      An employee is a "managing agent" if he or she exercises substantial independent

23  authority and judgment in his or her corporate decision making such that his or her

24  decisions ultimately determine corporate policy.

25

26      There is no fixed formula for determining the amount of punitive damages, and

27  you are not required to award any punitive damages. If you decide to award punitive

28

EXHIBIT __4__
PAGE __148__

1  damages, you should consider all of the following separately for each defendant in

2  determining the amount:

3       a.    How reprehensible was that defendant's conduct?

4       b.    Is there a reasonable relationship between the amount of punitive damages

5  and Mattel's harm or between the amount of punitive damages and potential harm to

6

7  Mattel that the defendant knew was likely to occur because of his or its conduct?

8  Punitive damages may not be used to punish a defendant for the impact of its alleged

9  misconduct on persons other than Mattel.

10      c.    In view of that defendant's financial condition, what amount is necessary to

11 punish him or it and discourage future wrongful conduct?  You may not increase the

12

13 punitive award above an amount that is otherwise appropriate merely because a defendant

14 has substantial financial resources.  Any award you impose may not exceed that

15 defendant's ability to pay.

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 4
PAGE 149

## JURY INSTRUCTION NO. 46

You have heard testimony regarding the prospect of an injunction being issued in this case.  It is for the Court to decide what, if any, injunctive relief to order.

EXHIBIT __4__
PAGE __150__

## JURY INSTRUCTION NO. 47

When you begin your deliberations, your foreperson will preside over the deliberations and will speak for you here in Court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not hesitate to change your opinion if the discussion persuades you that you should. Do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

54

EXHIBIT **4**
PAGE **151**

## JURY INSTRUCTION NO. 48

If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiff, signed by your presiding juror or by one or more members of the jury. No member of the jury should ever attempt to communicate with me except by a signed writing; I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court. If you send out a question, I will consult with the parties before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone—including me—how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged. Do not disclose any vote count in any note to the court.

EXHIBIT 4
PAGE 152

### JURY INSTRUCTION NO. 49

A verdict form has been prepared for you. After you have reached unanimous agreement on a verdict, your presiding juror will fill in the form that has been given to you, sign and date it, and advise the court that you are ready to return to the courtroom.

56

EXHIBIT  4
PAGE  153

EXHIBIT 5

# FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT 6

# FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT 7

# FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT 8

6494

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

- - -

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

- - -

MATTEL, INC.,                          )
                                       )
                    PLAINTIFF,         )
                                       )
          VS.                          )    NO. CV 04-09049
                                       )
MGA ENTERTAINMENT, INC., ET. AL.,      )    TRIAL DAY 32
                                       )    MORNING SESSION
                    DEFENDANTS.        )    PAGES 6494-6622
_____)
AND CONSOLIDATED ACTIONS,              )
                                       )
_____)

**CERTIFIED COPY**

REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

RIVERSIDE, CALIFORNIA

FRIDAY, AUGUST 8, 2008

8:45 A.M.

THERESA A. LANZA, RPR, CSR
FEDERAL OFFICIAL COURT REPORTER
3470 12TH STREET, RM. 134
RIVERSIDE, CALIFORNIA  92501
951-274-0844
WWW.THERESALANZA.COM

EXHIBIT 8
PAGE 1288

FRIDAY, AUGUST 8, 2008                    TRIAL DAY 32, MORNING SESSION

6495

```
 1    APPEARANCES:

 2
      ON BEHALF OF MATTEL, INC.:
 3
                       QUINN EMANUEL
 4                     BY:  JOHN QUINN
                            JON COREY
 5                          MICHAEL T. ZELLER
                            HARRY OLIVAR
 6                          TIMOTHY ALGER
                            WILLIAM PRICE
 7                     865 S. FIGUEROA STREET,
                       10TH FLOOR
 8                     LOS ANGELES, CALIFORNIA  90017
                       213-624-7707
 9

10
      ON BEHALF OF MGA ENTERTAINMENT:
11
                       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
12                     BY:  THOMAS J. NOLAN
                            JASON RUSSELL
13                          RAOUL KENNEDY
                            LAUREN AGUIAR
14                          CARL ROTH
                       300 SOUTH GRAND AVENUE
15                     LOS ANGELES, CALIFORNIA  90071-3144
                       213-687-5000
16

17

18

19

20

21

22

23

24                                    EXHIBIT  8
25                                    PAGE  1289
```

FRIDAY, AUGUST 8, 2008                    TRIAL DAY 32, MORNING SESSION

6496

```
1                    I N D E X
2
3
4   PLAINTIFF
    WITNESS          DIRECT      CROSS     REDIRECT      RECROSS
5   MICHAEL MOORE
6   BY MR. SLOAN      6578
7
8
9
10
         EXHIBITS              RECEIVED
11
         1195                  6603
12       4434                  6615
13
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT 8
PAGE 1290

FRIDAY, AUGUST 8, 2008                    TRIAL DAY 32, MORNING SESSION

6538

1   WANTED TO LOOK AT THESE -- IS -- IT'S A SIMPLER CASE TO RESOLVE

2   A FIRST GENERATION BRATZ.  HERE, YOU LOOK AT THE PACKAGING

3   THERE, AND BESIDES THE DOLL AND THE ACCESSORIES, WHICH ARE

4   PROTECTABLE ELEMENTS, ALL YOU HAVE HERE, THAT I CAN SEE, IS THE

5   BRATZ LOGO, WHICH IS MATTEL'S; THE HERO SHOT, WHICH IS

6   MATTEL'S; THE NAME, WHICH IS MATTEL'S.  THERE'S NOTHING REALLY

7   IN THIS PACKAGING THAT'S NOT INEXTRICABLY INTERTWINED WITH

8   MATTEL'S WORK.

9          MR. ROTH:  THERE'S THE PACKAGE.

10         I DON'T MEAN TO BE FLIP.

11         THE COURT:  YOU'RE TALKING ABOUT THE PHYSICAL

12  PACKAGE.

13         MR. ROTH:  THE PHYSICAL PACKAGE.

14         THE COURT:  THAT IT'S NOT QUITE A SQUARE; THAT IT'S

15  ALMOST IN A PYRAMIDAL SHAPE.

16         MR. ROTH:  EXACTLY.  WE WILL PRESENT EVIDENCE FROM

17  MATTEL --

18         THE COURT:  ON THE BACK -- MR. NOLAN GAVE ME THE

19  TURNAROUND SIGNAL, BUT, AGAIN, YOU HAVE FOUR DRAWINGS, THE

20  BRATZ LOGO -- THIS PACKAGE SEEMS TO BE MORE -- I'M NOT GOING TO

21  PRECLUDE NOW THAT IT'S INEXTRICABLY INTERTWINED WITH

22  COPYRIGHTED MATERIAL, OR ALLEGEDLY COPYRIGHTED MATERIAL.  YOU

23  GET TO "TOKYO A GO-GO," AND THE QUESTION BECOMES A LITTLE

24  DIFFERENT, PERHAPS.

25         THAT'S GOING TO BE A DIFFICULT ROAD TO NAVIGATE WITH

FRIDAY, AUGUST 8, 2008        EXHIBIT  8          TRIAL DAY 32, MORNING SESSION
                                           1291

6539

1  THE 910 EXHIBITS, PRODUCTS, THAT WE HAVE.

2          HOW DO YOU PROPOSE WE DO IT?

3          MR. ROTH:  LET ME GIVE YOU AN EXAMPLE OF THE TYPE OF

4  EVIDENCE THAT WE WOULD PRESENT.

5          THE COURT:  RIGHT.

6          MR. ROTH:  THIS, YOUR HONOR, IS SOMETHING CALLED A

7  MONTHLY BRAND TRACKING REPORT.  IT IS PRODUCED BY MATTEL;

8  THAT'S A WITNESS ON OUR WITNESS LIST NEXT WEEK.  THESE ARE

9  STUDIES DONE BY MATTEL EVERY MONTH, FOR A TWO-, THREE-YEAR

10  PERIOD.

11          WHAT WE'LL SEE IS MATTEL, AND TO A LESSER EXTENT MGA,

12  BECAUSE IT JUST HAS LESS RESEARCH CAPABILITY, WAS FOCUSED ON

13  THE IMPORTANCE OF A VARIETY OF ELEMENTS OF THE DOLL.  SO YOU'LL

14  SEE THE THIRD ELEMENT IS, "IT'S PRETTIER THAN OTHER DOLLS."

15  THAT'S, WE WOULD ARGUE, RELEVANT TO WHAT THE DOLL ITSELF LOOKS

16  LIKE.  BUT THEN YOU'LL LOOK AT THE FOURTH, "CLOTHES THAT YOU

17  MOST WANT TO WEAR."  "FASHIONS."  THEY ASKED A SET OF GIRLS --

18  AND THIS IS A COMPARISON BETWEEN, AS YOU CAN SEE OVER ON THE

19  RIGHT, BRATZ AND MYSCENE BARBIE.  SO THIS IS DOING WHAT A

20  COMPANY WOULD DO; THEY'RE TRYING TO DETERMINE THE RELATIVE

21  IMPORTANCE OF WHY SOMETHING IS SUCCEEDING AND WHY IT'S NOT.

22  THAT'S WHAT A COMPANY WOULD DO.

23          LOOK AT THE SIXTH -- "COMES WITH BETTER" -- THAT'S

24  ACCESSORIES.

25          NOW, YOU'VE HEARD --

EXHIBIT 8
PAGE 1292

6540

1    THE COURT:  EXPLAIN, COUNSEL, HOW THIS IS RELEVANT TO

2  THE COPYRIGHT ISSUES.

3        MR. ROTH:  IT IS RELEVANT TO WHAT BOTH COMPANIES

4  THOUGHT WERE THE REASONS FOR THE SUCCESS OF THE BRATZ DOLLS, OF

5  FASHION DOLLS, OF FASHION DOLLS IN GENERAL, BECAUSE WE HAVE

6  MYSCENE BARBIE AND BRATZ, AND THEN WE HAVE A FOCUS ON BRATZ.

7        THE COURT:  THERE'S NO QUESTION -- I UNDERSTAND THIS

8  IS A DYNAMIC PROCESS, AND THERE'S TINKERING THAT GOES ON WITH

9  THE DOLLS AND THE DOLL FASHIONS AND THE DOLL PRESENTATIONS AND

10  THE PACKAGING.  BUT AT CORE IS A DOLL THAT HAS REMAINED

11  ESSENTIALLY UNCHANGED, AS I UNDERSTAND IT, FOR THE BETTER PART

12  OF THE LAST SEVEN OR EIGHT YEARS.

13        MR. ROTH:  IT'S JUST A MATTER OF HOW YOU DEFINE THE

14  DOLL.  WHAT HAS REMAINED UNCHANGED IS THE SCULPT, GENERALLY

15  SPEAKING.  WHAT HAS CHANGED DRAMATICALLY, AFTER WHAT WE CALL

16  THE FIRST GENERATION, IS THE WAY THE SCULPT IS PAINTED.  THE

17  CLOTHES ON THE SCULPT CHANGED CONSTANTLY.  IT'S JUST LIKE

18  CALVIN KLEIN.  THEY NEED TO SELL NEW FASHIONS EVERY YEAR.

19        THE COURT:  YOU'RE GOING TO HAVE TO CONVINCE THIS

20  JURY THAT -- I'M LOOKING AT A FIRST GENERATION AND I'M LOOKING

21  AT TOKYO A GO-GO -- YOU'RE GOING TO HAVE TO CONVINCE A JURY,

22  BECAUSE YOU'D HAVE A HARD TIME CONVINCING ME, THAT THE FACE

23  PAINTING HAS CHANGED DRAMATICALLY, THAT THE PROTECTABLE

24  ELEMENTS THAT I IDENTIFIED YESTERDAY HAVE CHANGED DRAMATICALLY

25  BETWEEN THOSE TWO DOLLS.

EXHIBIT 8
PAGE 1293

FRIDAY, AUGUST 8, 2008                    TRIAL DAY 32, MORNING SESSION

6541

1    THAT'S YOUR POSITION, IS THAT THE EYES, THE

2    PARTICULARIZED EYES IN MY RIGHT HAND, THE FIRST GENERATION, AND

3    THE PARTICULARIZED EYE IN THE TOKYO A GO-GO HAVE CHANGED

4    DRAMATICALLY?

5         MR. ROTH:  WE WOULD FOCUS ON THE COLOR OF THE SKIN.

6         THE COURT:  I JUST RULED YESTERDAY THAT COLOR OF THE

7    SKIN IS A NONPROTECTABLE ELEMENT, SO YOU'RE NOT GOING TO FOCUS

8    ON THAT AT ALL.  IT'S NOT PROTECTABLE.  IT'S OUTSIDE.

9         MR. ROTH:  I UNDERSTAND THAT.

10        THE COURT:  NO.  ANSWER MY QUESTION, COUNSEL.  YOU

11   JUST TOLD ME IT CHANGED DRAMATICALLY.

12        LET'S IDENTIFY A PROTECTABLE ELEMENT.

13        HAS IT CHANGED DRAMATICALLY?  BECAUSE I DON'T SEE IT.

14   MAYBE THE JURY WILL.  I'M NOT RULING ON IT.  THE JURY HAS TO.

15   BUT YOUR CONTENTION IS, THE EYES HAVE CHANGED DRAMATICALLY.

16        MR. ROTH:  YOUR HONOR, I CANNOT IDENTIFY FOR YOU

17   PROTECTABLE ELEMENTS THAT HAVE CHANGED DRAMATICALLY.

18        THE COURT:  THAT'S WHAT'S RELEVANT.

19        MR. ROTH:  THE QUESTION IS, WHY DID THEY BUY THE

20   DOLL?  FOR THE PURPOSES OF DETERMINING DAMAGES, THAT'S THE

21   QUESTION.

22        SO IF SOMETHING NONPROTECTABLE CHANGED, AND IF THE

23   NONPROTECTABLE ELEMENT IS THE REASON WHY THEY BOUGHT THE DOLL,

24   THAT'S RELEVANT TO APPORTIONING PROFITS.

25        LET'S SAY HYPOTHETICALLY, THE REASON THEY BUY OUR

EXHIBIT 8
PAGE 1294

6542

1  DOLLS HAS NOTHING TO DO WITH THE DOLLS; IT'S THE GREAT

2  PACKAGING.  WE GET A CHANCE TO PROVE THAT.

3        THE COURT:  I WANT TO HEAR A RESPONSE TO THAT.  I

4  UNDERSTAND THAT ARGUMENT.

5        WE'VE GOTTEN INTO A DIFFERENT ARGUMENT THAT YOU HAVE

6  NOT YET ADDRESSED, MR. ZELLER.

7        MR. ZELLER:  YES, I THINK WE HAVE; AND I THINK THERE

8  ARE REALLY TWO GLOBAL ISSUES THAT ARE ON THE TABLE.

9        ONE HERE IS THE LAST ONE THAT WE WERE DISCUSSING.

10  AND TO SAY THAT IT IS RELEVANT, WHY IT IS THAT CONSUMERS

11  WERE -- LET ME FIRST SAY THAT WHEN THEY PUT A DOCUMENT UP LIKE

12  THIS, IN SOME WAYS, I THINK WE PROBABLY HOPE THAT THIS STUFF

13  COMES IN, BECAUSE MR. ROTH ADMITTED THAT THEY ARE NOT DISPUTING

14  THAT THE DOLL IS SOMETHING -- THAT THE DESIGN IS SO INTERTWINED

15  THAT YOU CAN'T PARSE IT OUT.

16        SO WHY IT IS THAT PEOPLE ARE -- THE MOTIVATIONS FOR

17  PEOPLE BUYING THE DOLLS IS REALLY BESIDE THE POINT.  ALL OF

18  THAT CANNOT BE APPORTIONED.  IT'S IRRELEVANT.

19        THE COURT:  WHAT ABOUT THIS ARGUMENT THAT THE

20  NONPROTECTABLE ELEMENTS ARE WHAT'S -- AND CHANGES TO THE

21  NONPROTECTABLE ELEMENTS ARE WHAT'S DRIVING THE SALES OF THE

22  DOLLS?

23        MR. ZELLER:  FIRST OF ALL, IT IS A MATTER OF

24  COPYRIGHT LAW.  THAT'S COMPLETELY IRRELEVANT.  THAT'S, IN FACT,

25  THOSE CASES -- JUST TO -- AS THE FIRST PRINCIPLE THAT LED US

EXHIBIT 8
PAGE 1206

FRIDAY, AUGUST 8, 2008                    TRIAL DAY 32, MORNING SESSION

6622

```
1
2                        CERTIFICATE
3
4    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
5    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
     ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
6    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.
7
8                                             8-9-08
     THERESA A. LANZA, CSR, RPR                  DATE
9    FEDERAL OFFICIAL COURT REPORTER
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24                                    EXHIBIT 8
25                                    PAGE 1296
```

FRIDAY, AUGUST 8, 2008                    TRIAL DAY 32, MORNING SESSION

EXHIBIT 9

# FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT 10

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com

See a sample reprint in PDF format.    Order a reprint of this article now

**THE WALL STREET JOURNAL.**
WSJ.com

BUSINESS    |    SEPTEMBER 22, 2008

# Bratz Dolls Begin to Show Their Age

By NICHOLAS CASEY

Retailers that helped turn Bratz into a sensation when the pouty-lipped dolls first appeared in 2001 are giving the line a chillier reception for this holiday season.

Target Corp. and Wal-Mart Stores Inc. have both reduced stocks and shelf space for Bratz, with Target cutting its Bratz space by about 50%, according to the retailer. A key reason for the waning retailer enthusiasm is that Bratz sales have been slipping. Analysts expect Bratz, made by closely held MGA Entertainment Inc. of Van Nuys, Calif., to generate about $300 million in revenue this year, down from an estimated $400 million last year.

Some attribute the dolls' recent dip to the inevitable come-down that has hit even the most sought-after toys of years past, from Tickle-Me Elmo to the Cabbage Patch Kids. "Nothing stays hot forever," says Gerrick Johnson, a toy industry analyst at BMO Capital Markets.

But there's another reason for Bratz's decline. MGA was distracted this year as it battled a lawsuit from Mattel Inc., which claimed MGA stole the idea for the dolls from the toy giant. In July, a federal jury sided with Mattel and later awarded the company as much as $100 million in damages. Mattel is now asking a federal judge to evaluate MGA's continued ownership of the brand. MGA has agreed to consider settlement talks with Mattel before the judge approves the award, though it hasn't ruled out an appeal.

Bratz's creators had set out to design dolls that would evolve with girls' fickle tastes rather than be trampled by them. With their big eyes and skimpy outfits, the multiethnic dolls were supposed to be able to ditch trends quickly when they faded and jump on new ones. Fresh lines were rolled out each season, just like in the fashion industry.

MGA Chief Executive Isaac Larian concedes that Bratz lost their edgy looks as his company fought the allegations by Mattel, maker of rival Barbie. The change struck him as he and other employees were reviewing the current fall line earlier this year. "We said, 'Oh my God, we lost focus on what our brand was,'" Mr. Larian said. The company had standardized some of the dolls' accessories and

EXHIBIT __10__
PAGE __1306__

9/22/2008

features, reducing the individuality that had long been their appeal. "They had become the same doll with different names," he said.

For example, for this fall's line, some Bratz dolls were set to carry lookalike miniature handbags made of molded plastic. Mr. Larian says the company was able to change some of them to sewn cloth bags whose designs vary. And the company added a number of embroidery patterns to jeans that originally had been set to be plain. But other alterations won't be seen until next spring's line.

Though these details are small, Mr. Larian said recent market research indicated girls were noticing. "What attracted them to these dolls was the clothing that was different from one doll to another," he said.

Mr. Larian insisted his dolls still remain popular. Still, retailers have taken note of Bratz's problems. A Target spokesman said the reductions had been influenced by recent Bratz sales. A similar trend is afoot at Wal-Mart, the world's largest toy seller by sales, where the declines in shelf space for Bratz are 15% to 30% in some stores, according to recent research by Needham & Co., a New York investment bank.

On a recent afternoon at a Toys "R" Us store in Los Angeles, shoppers milled past dozens of items that the store had put on clearance. A Bratz hand-held game had been slashed to $6.98 from $14.99. Bratz dolls themselves also were on sale, though the original price tags had fallen off. Such markdowns have become common nationwide, analysts say, and Needham has noted double-digit shelf-space declines for Bratz at many Toys "R" Us stores.

Other dolls are facing retail problems as well, as children gravitate toward expensive consumer electronics. Shelf space for Barbie has been flat or declining at many retailers, according to Needham, and some other girls toys, such as Polly Pocket and My Little Pony, have seen their presence shrink. For the 12-month period ended July 2008, U.S. sales of fashion dolls and accessories slid 4% to $1.7 billion from the year before, according to NPD Group Inc., a market-research company.

Meanwhile, MGA faces stiffening competition from rival dolls, including toys based on characters from Walt Disney Co.'s "High School Musical" and "Hannah Montana" TV shows. These dolls, made by Mattel and Jakks Pacific Inc. of Malibu, Calif., have made triple-digit strides in shelf space at some major retailers, according to Needham. The brands are also supported by the TV shows and vast media campaigns whose halo effect extends to related consumer products.

Studios, often armed with consumer-products divisions of their own, generally

take part in retail deals and offer some negotiating clout to smaller toymakers. "It's going to be potentially harmful for [MGA] not to have a partner," said Reyne Rice, who analyzes trends for the Toy Industry Association.

Last year, MGA reached out to Lions Gate Entertainment Corp. to release a live-action feature film called "Bratz." But the movie, which featured girls with the same names as the doll characters, had a poor showing at the box office, bringing in roughly $10 million domestically, according to Box Office Mojo LLC, which tracks ticket sales. "The movie was a disappointment and personally I believe it had a negative effect on Bratz," Mr. Larian said. He now plans to focus on Bratz-themed animated movies released on cable TV to drum up attention for the brand.

**Write to** Nicholas Casey at nicholas.casey@wsj.com

Copyright 2008 Dow Jones & Company, Inc. All Rights Reserved
This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com

EXHIBIT __10__
PAGE ___1308___

EXHIBIT 11



9-10" tall

14-15yrs old

Now 7th

JOINTED HERE, @ SHOULDERS

JOINTED @ HIPS

SCULPTED FINGERNAILS

removable ankles

BASIC STK SCULPT

ATTORNEY'S EYES ONLY

BRYANT 00277

EXHIBIT 11
PAGE 1307

EX 5-0088

EXHIBIT 12

LIBRARY OF CONGRESS

## Copyright Office
## of the United States

WASHINGTON, D.C.

**THIS IS TO CERTIFY** that the attached additional certificate is a claim of copyright for **BODY DRAWING** registered under number **VAu 715-270.** This work was registered in accordance with provisions of the United States Copyright Law. (Title 17 United States Code)

**THIS IS TO CERTIFY ALSO**, that the attached photocopies are a true representation of the work entitled **BODY DRAWING** deposited in the Copyright Office on October 30, 2006 with claim of copyright registered under number **VAu 715-270.**

**THIS IS TO CERTIFY FURTHER,** that beginning October 1, 2006 the Office discontinued the practice of stamping incoming deposits with accession stamp dates. Incoming deposits are now identified with barcode labels.

**IN WITNESS WHEREOF**, the seal of this Office is affixed hereto on August 1, 2008.

Marybeth Peters
Register of Copyrights

Rosemary J. Kelly
Head
Records Research and
Certification Section
Information and Records
Division

Use of this material is governed by the U. S. Copyright law 17 U.S.C. 101 et seq.

EXHIBIT 12
PAGE 1310

M 0920260

EX 13886-0001

EXHIBIT 12



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Form VA**
For a Work of the Visual Arts
UNITED STATES COPYRIGHT OFFICE

REG **VAu 715-270**



EFFECTIVE DATE OF REGISTRATION

**OCT 3 0 2006**
Month            Day            Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1**

Title of This Work ▼
body drawing

NATURE OF THIS WORK ▼ See Instructions
drawing

Previous or Alternative Titles ▼

Publication as a Contribution  If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared. Title of Collective Work ▼

If published in a periodical or serial give:  Volume ▼    Number ▼    Issue Date ▼    On Pages ▼

**2**

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**a** NAME OF AUTHOR ▼
Carter Bryant

DATES OF BIRTH AND DEATH
Year Born ▼  Year Died ▼
1968

Was this contribution to the work a "work made for hire"?
☐ Yes
☑ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of  USA
     Domiciled in

Was This Author's Contribution to the Work
Anonymous?    ☐ Yes  ☑ No
Pseudonymous?  ☐ Yes  ☑ No
If the answer to either of these questions is "Yes," see detailed instructions.

Nature of Authorship  Check appropriate box(es). See Instructions
☐ 3-Dimensional sculpture    ☐ Map          ☐ Technical drawing
☑ 2-Dimensional artwork      ☐ Photograph   ☐ Text
☐ Reproduction of work of art  ☐ Jewelry design  ☐ Architectural work

**b** Name of Author ▼

Dates of Birth and Death
Year Born ▼  Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of
     Domiciled in

Was This Author's Contribution to the Work
Anonymous?    ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

Nature of Authorship  Check appropriate box(es). See Instructions
☐ 3-Dimensional sculpture    ☐ Map          ☐ Technical drawing
☐ 2-Dimensional artwork      ☐ Photograph   ☐ Text
☐ Reproduction of work of art  ☐ Jewelry design  ☐ Architectural work

**3**

**a** Year in Which Creation of This Work Was Completed
2000
This information must be given in all cases.

**b** Date and Nation of First Publication of This Particular Work
Complete this information ONLY if this work has been published.
Month          Day          Year          Nation

**4**

See instructions before completing this space.

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼

Mattel, Inc.
333 Continental Blvd.
El Segundo, CA 90245 - 5012

APPLICATION RECEIVED
**OCT 3 0 2006**
ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED
**OCT 3 0 2006**

FUNDS RECEIVED

Transfer If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

Assignment

---

MORE ON BACK ▶
• Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.
• Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of ____ pages

07209/1985444.1

EXHIBIT 12
PAGE 1311

M 0920261

EX 13886-0002

| EXAMINED BY | _STI_ | FORM VA |
| CHECKED BY | | |
| ☑ CORRESPONDENCE Yes | | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes  ☑ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: Previous Registration Number ▼          Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.

a. Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼

**6**
**a**

b. Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

See instructions before completing this space.

**b**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.

Name ▼                     Account Number ▼

**7**
**a**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/Zip ▼

Robert D. Walsh
Mattel, Inc. MI-1220
333 Continental Blvd.
El Segundo, CA 90245 - 5012

**b**

Area code and daytime telephone number  ( 310 ) 252-6650          Fax number  ( 310 ) 252-4991

Email

**CERTIFICATION*** I, the undersigned, hereby certify that I am the

check only one ☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☑ authorized agent of  Mattel, Inc.

Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Robert D. Walsh                                      Date  October 27, 2006

Handwritten signature (X) ▼

x  _Robert D. Walsh_

| Certificate will be mailed in window envelope to this address: | Name ▼ Robert D. Walsh Mattel, Inc. MI -1220 | ● Complete all necessary spaces ● Sign your application in space 8 |
| | Number/Street/Apt ▼ 333 Continental Blvd. | 1. Application form 2. Nonrefundable filing fee in check or money order payable to Register of Copyrights 3. Deposit material |
| | City/State/ZIP ▼ El Segundo, CA 90245 -5012 | Library of Congress Copyright Office 101 Independence Avenue SE Washington, DC 20559-6000 |

**9**

*17 USC §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Form VA  Rev: 07/2006  Printed on recycled paper          U.S. Government Printing Office: 2004-300-934/00,120

EXHIBIT 12
PAGE 1312

M 0920262

EX 13886-0003

VAu715-270

body drawing

OCT 3 0 2006

EXHIBIT 12
PAGE 1313

M 0920263

EX 13886-0004

EXHIBIT 13

# ABC International Traders, Inc.

March 2001

Business Plan Copy Number [1]

This document contains confidential and proprietary information
belonging exclusively to ABC International Traders, Inc.

Isaac Larian
Chief Executive Officer
16730 Schoenborn Street
North Hills, California 91343
818-894-2525

*This is a business plan. It does not imply an offering of Securities.*

Confidential - For Attorney's Eyes Only

EXHIBIT 13
PAGE 1315

MGA 4033288

EX 13520-0001

# Table of Contents

Vision and Mission ................................................................................................ 4

    Present Situation .......................................................................................... 4

    Vision and Mission ...................................................................................... 6

    Goals ............................................................................................................ 7

    Objectives .................................................................................................... 7

Company Overview ............................................................................................... 10

    Legal Business Description ........................................................................ 10

    Management Team ..................................................................................... 11

    Strategic Alliances ..................................................................................... 13

Market Analysis ................................................................................................... 15

    Market Definition ...................................................................................... 15

    Risk ............................................................................................................ 18

Marketing Plan ..................................................................................................... 19

    Sales Strategy ............................................................................................ 19

    Distribution Channels ............................................................................... 20

    Advertising and Promotion ....................................................................... 21

    Public Relations ........................................................................................ 23

Line List ............................................................................................................... 24

Financial Plan (TLP) ............................................................................................ 25

Media Plan ............................................................................................................ 26

2

MGA 4033289

EXHIBIT __13__
PAGE __1316__

EX 13520-0002

# Vision/Mission

### Present Situation

Barbie dominates the $655 million (per NPD TRSTS) Fashion Doll category. Out of the top 25 selling items in the category for YTD 2000, only four were not some variation of the Barbie brand. This leaves very little room to maneuver for other companies and brands hoping to break into the category. In fact, the picture gets bleaker with the realization that of the four items in the top 25 that are not part of the Barbie brand, all are licensed.

The operating environment was similarly hostile to attempted entry in 1998 and 1999. Only three of the top 25 items and two of the top 25 items respectively were not Barbie branded. Those items that were not Barbie branded, were licensed. The entire category, therefore, has a history of complete domination by Mattel, with minimal shelf space for one or two very successful licenses.

For YTD 2000, TRSTS data indicates that over 90% of all sales in the category were Mattel manufactured products. Play Along received 3.3% from its Britney Spears dolls. Kid Kore managed to grab 1.5% of the market based on its marginally successful line of non-licensed fashion dolls.

The Fashion Doll category declined −1%, 2000 vs. 1999. The #1 Fashion Doll in 2000 was Celebration Barbie with $38M in sales as compared to Barbie Millennium with $49M in sales in 1999. Celebration Barbie finished the year as the #7 ranked traditional toy. Another successful item for Mattel was the Barbie Wizard of Oz Asst., ranking #13 among all traditional toys in 2000. Barbie Wizard of Oz actually sold more individual units (1.9M units) than Celebration Barbie (1.3M units) as Barbie Wizard of Oz retailed for $15 compared to Celebration Barbie at $29 (NPD Group TRSTS, 2001)

In 2000, the top 5 Dolls were all introduced by Mattel, and all ranked among the top 25 traditional toys. These dolls include Celebration Barbie, Barbie Wizard of Oz Asst., Diva Starz Doll Asst., Barbie & Krissy Mermaids and Dancin Debbie.

ABC International Traders, Inc. is launching its own line of fashion dolls in Fall 2001, Bratz™. The Bratz are four unique fully-articulated dolls which include Cloe, Sash, Yasmin and Jade. If ABC were to achieve a moderate success in the confines of the category, it would be considered a major sales victory because of the sales dollars generated. For example, if ABC had produced the #15 selling fashion doll in 1999, that would project out to sales for ABC of $16 million or 24% of the 1999 total sales. So although manufacturing a #15 selling item carries little prestige, the success of the item in this case is unquestionable.

3

Confidential - For Attorney's Eyes Only

EXHIBIT 13
PAGE 1317

MGA 4033290

EX 13520-0003

## Company

ABC International Traders, Inc. was founded in 1979 and is presently in its growth stage. ABC International Traders, Inc. can best be described as currently being in the business of manufacturing consumer electronic toys. In recent times our key strengths have been state-of-the-art technology and innovative marketing.

## Management

Most of our management team is in place, however, we require a Chief Operating Officer and a Vice President of Product Development to complete our team by April, 2001. Also, we are currently hiring three employees to handle product development and marketing.

## Products and Services

At present, Bratz™ is in the production stage and will be on the shelves of mass market, mid-tier and drug retailers in June 2001. Each Bratz will have an MSRP of $14.99. ABC will also offer three fashion packs including Pajama Power, Study Hall Style and Dynamite Dance for an MSRP of $7.99.

Our current product line is in need of a brand extension for Spring 2002 which will consist of new fashions for the four Bratz. This new line of Bratz will also include a new hairplay feature whereby the consumer can remove the current hairpiece and replace it with another. The hairplay feature included in the doll packs will be supported by a hairpack SKU with an MSRP of $7.99. In order to be price sensitive for Spring, also offered will be a $9.99 Character Pack which will include one doll without the mix 'n match feature. In Spring, the Bratz will have new fashions and a bevy of hairstyles from which to choose.

In Fall 2002, the Bratz will become interactive. Using infared technology, they will be able to communicate with one another on various topics. ABC will still offer Cloe, Sasha, Yasmin and Jade (in new, funky fashions) but will introduce a new character as well. The interactive Bratz will have an MSRP of $24.99. Sold separately will be a BratzPack (MSRP $12.99) in which the consumer can now carry her Bratz fashion dolls and accessories. One of those accessories will include a choice of three modes of transportation all at an MSRP of $29.99; a scooter, a Vespa or a pink convertible (again using infared technology). Another introduction will be a large Bratz head where the consumer can use makeup play pattern to pretty up their Bratz. Included will be lipstick, eyeshadow, glitter, hairgels and blush for an MSRP of $19.99. As hair styles change with the seasons so too will the Bratz Hairpacks for Fall (MSRP of $7.99). Lastly, fashion packs for Fall will be refreshed (MSRP $4.99).

4

Confidential - For Attorney's Eyes Only

EXHIBIT 13
PAGE 131B

MGA 4033291

EX 13520-0004

**Market Environment**

The fashion doll marketplace has been stagnant for 30 years. We are now poised to introduce a fashion doll that Mattel does not understand.  Barbie's target demographic is girls 4-6 years old.

In August 2000, Mattel introduced an electronic mini-doll line, Diva Starz.  In 2000, Diva Starz sold over $21M (NPD TSRTS) at an average selling price of $27.37 per doll.  Diva Starz' target demographic is girls 5-7 years old.

ABC's Bratz combine the classic play pattern of Barbie and the extreme, contemporary play of Diva Starz.  It is in this offering, ABC can create a new category.  ABC's core target market is girls 7-11 years old.  Bratz creates a niche that appeals to girls that Barbie does not understand and Diva Starz simply does not appeal to.

**Customers**

Current customers who have ordered Bratz include, but are not limited to, Wal-Mart, Target, Kmart, Toys 'R Us, K*B Toys, Rite Aid and Walgreens.

**Distribution**

We have worldwide distribution and sell to more than 33,000 storefronts in the United States alone.  ABC International Traders, Inc. has over 200 sales people working out of 10 offices.

**Vision and Mission**

**Vision**

By 2002 ABC International Traders, Inc. will be a highly visible company known as a leader in the fashion doll industry. We will have developed four unique dolls and marketed these products in the mass market channels.  Sales will exceed $30,000,000 and ABC International Traders, Inc. will actively be promoting the Bratz™ through television advertising, print advertising, web site, end caps, POP and FSI.  We are also looking to secure a promotional partner by September 1, 2001.

5

Confidential - For Attorney's Eyes Only

EXHIBIT 13
PAGE 139

MGA 4033292

EX 13520-0005

**Mission Statement**

In order to achieve our Vision, ABC International Traders, Inc. commits to the following:

ABC International Traders, Inc.'s Mission is to seize and sustain 3% market share in the fashion doll and ancillary categories.  In carrying out our day-to- day business we strive to:

1.    Treat our employees with respect.

2.    Follow the philosophy that our customers are our priority.

3.    Be considered as a leader in our toy community.

Through a long-term commitment to this mission, we will be known as a company that offered consumers an alternative to Barbie in the 21st century. Our customers, vendors, and employees see ABC International Traders, Inc. as offering innovative products at an affordable price point.

## Goals & Objectives

1.    Initiate the launch strategy of Bratz
- Production start date of April 28, 2001
- Website will be live by June 1, 2001 (budget of $75k)
  - ➢ Obtain freelance developed by March 12, 2001
  - ➢ Finalize creative pitch from vendor by March 21, 2001
- Television commercial spot will air by October 1, 2001 ($150k to shoot - $2.5M in media budget)
  - ➢ Delivered to networks by September 15, 2001
  - ➢ Commercial production to begin end of second quarter 2001
  - ➢ Storyboards due by April 15, 2001
  - ➢ Bids from production companies due by April 15, 2001
  - ➢ Selection of production company by April 30, 2001
- Retailer advertising campaigns underway
  [insert info from Pat]
  - ➢ Senior Product Manager to bring product samples from Hong Kong by March 21, 2001
  - ➢ Shoot product for ad slicks the week of March 26, 2001
  - ➢ Finalize strategy with Sales Department on April 3-4, 2001
    - ◆ End caps
    - ◆ FSI
    - ◆ Floor minders
    - ◆ POP

2.    Secure $250k in Advances and/or Guarantees by December 30, 2001 through licensing of the Bratz brand.

6

Confidential - For Attorney's Eyes Only

EXHIBIT __13__
PAGE __1320__

MGA 4033293

EX 13520-0006

*Since the Bratz™ have a passion for fashion, product roll-out will begin with apparel for Fall 2002. ABC International Traders will become a licensor to a host of apparel licensees. The Bratz™ apparel will be launched at the MAGIC Show in Las Vegas, February 2002. Categories will include apparel, t-shirts, innerwear, sleepwear, outerwear and hosiery.*

*Also launching in Fall 2002 in time for Back-to-School will be stationery, calendars and diaries. ABC has already received interest from Shaw Creations, Inc. (licensee of Warner Bros. and Disney) to create Bratz™ raincoats and umbrellas.*

*In order for ABC International Traders, Inc. to attain its vision in the manner described in our mission statement, the following primary strategic goals need to be achieved:*

- Create collateral press kit to distribute to prospective licensees (mini-disc)
- Kit components to include:
  - ➢ Flash animation/website/ad slicks
  - ➢ Media Charts/Promo plans/distribution profile
  - ➢ Press Release
  - ➢ Corporate Backgrounder
  - ➢ Clips (print, tv)
  - ➢ Character profiles and Background
  - ➢ Prospective Licensee Form
  - ➢ Digital photos
  - ➢ Mini-disc completed by May 1, 2001
  - ➢ Style guide for licenses completed by June 12, 2001
- Bids from vendors due by March 20, 2001
- Exhibit Bratz at the International Licensing Show (10x20 booth) at the Jacob Javits Convention Center, June 12-14, 2001
- Facilitate Bratz RoadShow to major retailers (Wal-Mart, Kmart, Target, Toys 'R Us, K*B Toys) to begin in May 2001
- Place one Full-page ad in *License! Magazine* for May, June, July 2001 ($13,500)

3. Obtain 20M impressions by December 1, 2001
- Place full-page ads in consumer and trade publications (*License!, Jump, Cosmo Girl, Teen*)
- Launch Bratz at FAO Schwartz September 1, 2001
- Participate in PlayDate in New York, October 2001

4. Exceed break-even of 800,000 units of Bratz™ fashion dolls (goal is to ship 3.5M units by December 31, 2001). Current forecast:
- Toys 'R Us        200K pcs
- Wal-Mart         150K pcs

7

Confidential - For Attorney's Eyes Only

EXHIBIT **13**
PAGE **1321**

MGA 4033294

EX 13520-0007

- Target          60K pcs
- Kmart          80K pcs
- K*B Toys        36K pcs
- International    250K pcs
- Others          100K pcs

- Marketing department to present sales with a kit by March 12, 2001 to include:
  - Line list
  - Frequently Asked Questions (FAQs)
  - Media & Promotional Plans
  - PowerPoint Presentation
  - Press clippings (TV, print)
- Facilitate bi-weekly Bratz meeting with Sales department

5. Complete Bratz Television Series Pitch Pack by July 1, 2001
   - ABC has received interest from Kids WB, Fox Kids and Sony in developing an animated series based on the Bratz
   - ABC has received interest from Bandai Entertainment in producing the animation for the Bratz series
   - Zeke Kamm (writer of The Powerpuff Girls and Dexter's Lab) will create the Bratz Mini-Bible
   - Focus group research will be conducted at LA Focus on March 22, 2001 and March 23, 2001
   - ABC will meet with Zeke on March 26, 2001 to discuss target audience and strategy for the series
   - Mini-Bible will be completed by May 15, 2001
   - Meetings with networks will be conducted the week of May 21, 2001

6. Secure Promotional Partner by September 1, 2001
   - Possible QSR with McDonald's, Tricon, or Shell
   - Possible promotion with Coca-Cola, Kellogg's, Quaker Oats
   - Pitch pack/press kit completed by May 1, 2001
   - Three-Five Premium concepts will be presented
     - Mini-Bratz
     - Bratz candy
     - Home video
     - Tatoos
     - Female sports drink

8

Confidential - For Attorney's Eyes Only

EXHIBIT 13
PAGE 1322

MGA 4033295

EX 13520-0008

# Company Overview

## Legal Business Description

### Company Name

ABC International Traders, Inc. is the legal name of our Company but we dba MGA Entertainment.

### Legal Form of Business

The legal form of ABC International Traders is Subchapter S-Corporation.

*Business Location*

The corporate headquarters of ABC International Traders, Inc. is 16730 Schoenborn Street, North Hills, California, 91343.  Satellite locations include  MGA Entertainment (HK) Ltd., Room 1001  10/F, Empire Centre, 68 Mody Road, Tsimshatsui East, Kowloon, Hong Kong; 200 5th Avenue, Suite 1212, New York, NY, 10010; 175 Paramount Drive, 3rd Floor, Mailbox 13, Raynham, MA  02767; Dallas Market Center, 2100 Stemmons Freeway, Suite 8850, Dallas, TX  75207; 336 Hazelwood Avenue, San Francisco, CA  94127; 1012 Linden Street, Innisfil, Ontario, Canada L9S 1W4;

*Government Regulations*

Because ABC International Traders, Inc. is operating in the toy industry we are under the regulation of the FCC, FTC and FDA.

The manufacture and sale of toys is regulated by both federal and state authorities. ABC International Traders, Inc. has obtained all required federal and state permits, licenses, and bonds to operate its facilities. There can be no assurance that ABC International Traders, Inc.'s operation and profitability will not be subject to more restrictive regulation or that the ABC International Traders, Inc.'s operations and profitability will not be subject to more restrictive regulation or increased taxation by federal, state, or local agencies.

9

Confidential - For Attorney's Eyes Only

EXHIBIT 13
PAGE 1323

MGA 4033296

EX 13520-0009

## Management Team

### Officers and Key Employees

Isaac Larian, President

Fred Larian, Executive Vice President

Eli Makabi, Executive Vice President

Patrick Williams, Senior Vice President of Sales

Paul Warner, Vice President of Sales

Martin Hitch, Vice President of International Sales

Dennis Medici, Chief Financial Officer

Stephen Lee, General Manager of Hong Kong Office

Lon Ross, Director of Marketing

Paula Treantafelles, Senior Product Manager

Of the ten people who make up the corporate staff, there are three founders who hold the following positions:

*Isaac Larian, President*

*Fred Larian, Executive Vice President*

*Eli Makabi, Executive Vice President*

Responsibilities & Management Team Backgrounds

### Isaac Larian, President/CEO

Isaac Larian oversees all divisions of the company, including product development, sales, marketing, overseas operations, production and distribution. With the pioneering spirit of the MGA family and the creative minds and insights of his own children, Mr. Larian is a major contributor to the development of new products and vision behind ABC International Traders, Inc.

Under Mr. Larian's leadership, ABC International Traders, Inc. has experienced outstanding growth, with 2000 sales of more than $92 million, an increase of 43 percent. Mr. Larian founded MGA Entertainment in 1979, under the name *SURPRISE GIFT WAGON*, to import and distribute name brand consumer electronics. The company was

10

Confidential - For Attorney's Eyes Only

EXHIBIT __13__
PAGE __1324__

MGA 4033297

EX 13520-0010

incorporated under the same name in 1982, and in 1987, Mr. Larian made a strategic move to enter the world of consumer entertainment, brokering a deal with Nintendo that made ABC the first official distributor of Nintendo and CD products in the United States. In 1993, under the new name MGA Entertainment, he successfully led the company in its formal transition from a consumer electronics company to a consumer entertainment company.   Mr. Larian has a Bachelor of Science degree in Engineering.

**Fred Larian, Executive Vice President**
Should he be included?

**Eli Makabi, Executive Vice President**
Eli Makabi oversees warehouse operations, purchasing, logistics and distribution.

**Patrick Williams, Senior Vice President of Sales**
Mr. Williams brings over 20 years of sales experience including working for Mattel and Hasbro.  At ABC, he directs staffing, training and performance evaluations to develop and control sales program. Mr. Williams manages worldwide sales distribution by establishing sales territories, quotas, and goals and advises dealers and distributors concerning sales and advertising techniques. Additionally, he analyzes sales statistics to formulate policy and to assist dealers in promoting sales.  Mr. Williams manages sales office activities including customer/product/service.

**Paul Warner, Vice President of Sales**
Before joining ABC International Traders, Inc., Mr. Warner spent 10 years with Ritvik Toys Inc. (Mega Bloks).   Before joining Child World, he worked as a buyer for Fay's Drug Co., Inc.  Between 1977 and 1978, Paul was the sales representative for Supermarket Distributors, Inc.   At ABC, Paul forecasts and plans sales for all east coast accounts including Toys 'R Us and Kmart and supervises independent sales representatives.  He also oversees ABC's Canadian market sales.

**Martin Hitch, Vice President of International Sales**
Martin Hitch brings over 11 years of international and domestic sales experience while working for Mattel and Hasbro. He oversees over 40 distributors throughout the world including Tomy Japan,  Tomy U.K., Vivid Imaginations (UK), Bandai Spain, Bandai Germany, and Bandai France.

**Dennis Medici, Chief Financial Officer**
Dennis Medici's 18 year tenure in finance and accounting includes five years with Upper Deck.  Currently, he manages working capital including receivables, inventory, cash and marketable securities. Performs financial forecasting including capital budget, cash budget, pro forma financial statements, external financing requirements, financial condition requirements.

11

Confidential - For Attorney's Eyes Only

EXHIBIT 13
PAGE 1325

MGA 4033298

EX 13520-0011

**Stephen Lee, General Manager - Hong Kong**
Mr. Lee brings over 20 years of overseas operations knowledge to ABC.  He previously worked for Atari, JTS and Radofin.

**Lon Ross, Director of Marketing**
Lon Ross has held positions in entertainment/media marketing and brand management with firms that include Mattel, United Pet Group, MuchMusic USA, Cablevision Systems, and Twentieth Century Fox.  While employed within the toy industry, Mr. Ross was responsible for managing and developing licensed products representing nearly $500 million in revenues.  Mr. Ross has managed toy brands and licenses ranging from Disney Entertainment properties, Winnie the Pooh, Nickelodeon properties, the National Basketball Association (NBA), Barbie, and Matchbox/Hot Wheels.  Lon Ross is responsible for a wide range of initiative ranging from brand direction and planning, promotions, advertising, and product development strategy.  Mr. Ross holds an MBA from the Weatherhead School of Management at Case Western Reserve University and a BS in marketing from Babson College.

**Paula Treantafelles, Senior Product Manager**
Paula Treantafelles graduated from Univeristy of Southern California with her Bachelor of Science, Business Administration degree.  After graduation, Paula worked in the Sales Research and Design and Development teams for the Large and Small Doll brand groups at Mattel. Inc.  At ABC, Ms. Treantafelles is responsible the product development, brand management and marketing of the Bratz™ line.

The leadership and alignment characteristics of ABC International Traders, Inc.'s management team have resulted in the establishment of broad and flexible goals designed to meet the ever-changing demands of the quickly moving marketplace requiring our products. This is evident when the team responds to situations requiring new and innovative capabilities.

## Staffing

ABC International Traders, Inc. development team recognizes that additional staff is required to properly support marketing, sales, research, and support functions.  We are currently seeking a Chief Operating Officer, Vice President of Product Development and an Associate Product Manager.

## Strategic Alliances

ABC International Traders, Inc. has formed some very important relationships with major companies in the entertainment industry. The following is a list of existing relationships:

12

Confidential - For Attorney's Eyes Only

EXHIBIT __13__
PAGE ___1326___

MGA 4033299

EX 13520-0012

**Licensing Efforts**

ABC International Traders, Inc. has been involved in the entertainment licensing industry for 14 years beginning with Nintendo in 1987.  ABC is a member of the International Licensing Industry Merchandisers' Association (LIMA).

Character and entertainment licensing has enjoyed enormous success in the past decade, generating billions of dollars in revenues each year. It is one of the most profitable types of licensing. It is difficult to measure the precise revenue from character licensing accurately, however, due to two recent trends in the industry: a trend towards long-term relationship agreements between the licensor and the licensee, and a trend towards structuring of partial payment in terms of equity in licensee operations. Although the predominance of character and entertainment licensing in the merchandising industry continues to erode as a lot of other properties have emerged and are now available for licensing, there is little question that this segment still continues to dominate the market. This property type is also the most concentrated with just a few large players dominating the licensing activity. The major players in character and entertainment licensing are the big movie studios and broadcasting companies. Names such as Disney, Warner Bros., Nickelodeon, and Fox come to mind immediately, and these companies are launching some of the most successful licensing programs, such as the famous old (comic) book characters X-Men, Spider-Man, or Batman, TV-based properties as Looney Tunes, The Simpsons and Sesame Street or properties based on movies such as Star Wars, one of the most successful licensing programs ever. New entertainment licensing properties also stem from the videogame section such as Nintendo and Pokémon.

ABC International Traders, Inc. currently has the following Merchandise License Agreements in place:

| Property | Licensor | Length of Contract (years) |
|---|---|---|
| Got Milk? | California Milk Board | 3 |
| Monster Rancher | BKN Entertainment | 2.5 |
| Bear in the Big Blue House | Jim Henson Company | 2.5 |
| Asteroids | Infogrames | 6 |
| Centipede | Infogrames | 6 |
| Missile Command | Infogrames | 6 |
| Super Breakout | Infogrames | 6 |
| Pac-Man/Ms. Pac-Man | Namco | 8 |
| Mrs. Fields Famous Brands | Mrs. Fields | 3.5 |
| National Hot Rod Association | NHRA Properties | 3 |
| National Football League | NFL Properties | 3 |
| Power Rangers | Saban Entertainment | 8 |
| Hello Kitty | Sanrio Inc. | 3 |
| Deer Avenger 1 & 2 | Simon & Schuster | 3 |
| Crazy Bones | Toy Craze, Inc. | 2 |
| WWF | WWFE, Inc. | 4 |

13

Confidential - For Attorney's Eyes Only

EXHIBIT 13
PAGE 1327

MGA 4033300

EX 13520-0013