1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                EASTERN DIVISION

4                   - - -

5       HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                   - - -

7    MATTEL, INC.,              )
                              )
8           PLAINTIFF,   )
                              )
9       VS.              ) NO. CV 04-09049
                              )
10   MGA ENTERTAINMENT, INC., ET. AL.,  )
                              )
11          DEFENDANTS.  )  TRIAL DAY 3,
     _____)  AFTERNOON SESSION
12   AND CONSOLIDATED ACTIONS,       )
                              )
13

14

15      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16           RIVERSIDE, CALIFORNIA

17           WEDNESDAY, MAY 28, 2008

18                1:18 P.M.

19

20

21

22

23           THERESA A. LANZA, RPR, CSR

          FEDERAL OFFICIAL COURT REPORTER

24        3470 12TH STREET, RM. 134

          RIVERSIDE, CALIFORNIA  92501

25           951-274-0844

          WWW.THERESALANZA.COM

1    APPEARANCES:

2

ON BEHALF OF MATTEL, INC.:

3

             QUINN EMANUEL
4            BY:  JOHN QUINN
                 JON COREY
5                MICHAEL T. ZELLER
                 HARRY OLIVAR
6                TIMOTHY ALGER
             865 S. FIGUEROA STREET,
7            10TH FLOOR
             LOS ANGELES, CALIFORNIA  90017
8            213-624-7707

9

10   ON BEHALF OF MGA ENTERTAINMENT:

11           SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
             BY:  THOMAS J. NOLAN
12               JASON RUSSELL
                 RAOUL KENNEDY
13               LAUREN AGUIAR
             300 SOUTH GRAND AVENUE
14           LOS ANGELES, CALIFORNIA  90071-3144
             213-687-5000

15

16

17

18

19

20

21

22

23

24

25

Unsigned                                    Page  452

1                    I N D E X
2                                   PAGE
3    PLAINTIFF CASE (CONTINUED)....................   463
4
5    PLAINTIFF
     WITNESS      DIRECT    CROSS    REDIRECT    RECROSS
6    LILIANA MARTINEZ (CONTINUED)
7    BY MR. QUINN      463                515
     BY MR. NOLAN               474                518
8
9
     PLAINTIFF
10   WITNESS      DIRECT    CROSS    REDIRECT    RECROSS
     PAULA GARCIA (TREANTAFELLES)
11
     BY MR. PRICE      522
12
13
14
15
           EXHIBITS       RECEIVED
16
           276-1          466
17         17246          504
           193            506
18         115            507
           126            509
19         320            536
           1116           541
20         1117           545
           301            549
21         201 (FIRST PAGE)    554
           402-B          557
22         402            557
           400            565
23         11328          565
           302            566
24         305            572
           18             574
25
     / / /

1    RIVERSIDE, CALIFORNIA; WEDNESDAY, MAY 28, 2008; 1:18 P.M.

2          -OOO-

3    (WHEREUPON, THE CASE HAVING BEEN PREVIOUSLY

4    CALLED AND APPEARANCES GIVEN, THE FOLLOWING

5    PROCEEDINGS WERE HELD:)

6    THE COURT:  GOOD AFTERNOON, COUNSEL.

7    I JUST WANTED TO TAKE UP THIS OUTSTANDING DISCOVERY

8    MOTION ISSUE.  BASED ON WHAT I'M HEARING VIA HEARSAY THROUGH

9    JUDGE INFANTE AND WHAT I UNDERSTAND FROM THE PARTIES, I WANTED

10    TO GET A SENSE OF WHAT REALLY REMAINS TO BE DONE OR DOESN'T

11    NEED TO BE DONE.

12    I'LL HEAR FROM QUINN EMANUEL FIRST.

13    MR. QUINN:  MR. COREY WILL ADDRESS THAT.

14    MR. COREY:  YOUR HONOR, I'M NOT SURE WHERE THIS COMES

15    FROM.  THERE WAS A JOINT REPORT SUBMITTED TO JUDGE INFANTE ON

16    MARCH 28TH.  I HOPED TO HAVE A COPY OF THAT HERE TO PROVIDE TO

17    THE COURT.

18    THE COURT:  JUDGE INFANTE SENT THEM TO ME.  I HAVE A

19    COPY OF THE REPORT YOU'RE REFERRING TO.

20    MR. COREY:  I BELIEVE HE WAS CLEAR IN THE REPORT THAT

21    WE DID SEEK RULING ON ALL OF THE MOTIONS PENDING, WITH THE

22    EXCEPTION OF THOSE THAT WERE WITHDRAWN BECAUSE WE'D REACHED

23    AGREEMENT OR THEY WERE RELATED TO PHASE TWO.  THEN, I THINK THE

24    EXERCISE WE WENT THROUGH THE OTHER DAY AS FAR AS IDENTIFYING

25    THOSE THAT ARE SPECIFIC TO PHASE 1-A, I THINK THOSE NEED TO BE

1    RULED ON.  I'M NOT SURE WHAT OTHER GUIDANCE WE CAN PROVIDE THE

2    COURT OTHER THAN THAT.

3        THE COURT:  I KNOW THIS IS A DIFFICULT POSITION TO

4    PUT YOU IN, MR. COREY, BUT IS IT YOUR SENSE THAT JUDGE INFANTE

5    IS, PERHAPS, MISTAKEN IN TERMS OF HIS IMPRESSION THAT --

6        MR. COREY:  I CAN SPECULATE AS TO WHAT HAPPENED.

7        THE JOINT REPORT IS IN TWO SECTIONS, AND HE HAD ASKED

8    US TO IDENTIFY BY PRIORITY WHAT MOTIONS WE WANTED HEARD AT A

9    SPECIFIC HEARING; SO THERE WAS A SEPARATE LIST.  WE HAD THE

10    EXPECTATION THAT THERE WOULD BE A SUBSEQUENT HEARING ON THAT,

11    AS HE MADE THAT REQUEST OF US BEFORE, TO SAY OF WHAT'S

12    OUTSTANDING, WHAT DO YOU WANT HEARD AT THIS HEARING?  SO THE

13    PARTIES PRIORITIZED THAT.

14        PERHAPS HE HAD UNDERSTOOD THAT WHAT WE HAD IDENTIFIED

15    FOR THAT SPECIFIC HEARING WAS THE UNIVERSE.  BUT I THINK THE

16    JOINT REPORT, WHEN YOU LOOK AT IT AS A WHOLE, PARTICULARLY THE

17    FIRST PORTION, MADE IT CLEAR WHAT WE THOUGHT WAS NO LONGER ON

18    THE TABLE -- WHAT THE PARTIES JOINTLY THOUGHT WAS NO LONGER ON

19    THE TABLE.

20        THE COURT:  AS WE'RE HERE TODAY, IT'S YOUR POSITION

21    THAT AT LEAST WITH RESPECT TO THE 11 OF 12 MOTIONS THAT ARE ON

22    THE LIST THAT YOU PROVIDED THE COURT OVER THE WEEKEND, THOSE

23    ARE MOTIONS THAT RELATE TO PHASE ONE AND YOU BELIEVE THEY NEED

24    TO BE DECIDED?

25        MR. COREY:  CORRECT, YOUR HONOR.

1        THE COURT:  MR. NOLAN, WHAT IS MGA'S POSITION?

2        MR. NOLAN:  OUR RECOLLECTION OF WHAT WAS HAPPENING IN

3    FRONT OF JUDGE INFANTE WAS THAT JUDGE INFANTE, RECOGNIZING THAT

4    THE TRIAL WAS COMING UP, THAT DISCOVERY WAS OVER WITH -- WE HAD

5    WORN OUT HIS PATIENCE OR OUR WELCOME, OR MATTEL'S WELCOME,

6    HOWEVER YOU WANT TO TAKE IT.

7        JUDGE INFANTE SAID, 'WE NEED A PROCESS, AND WE NEED

8    TO DEAL WITH THIS.  I WANT BOTH SIDES TO PRIORITIZE THE ONES

9    THAT YOU NEED A RULING ON RIGHT NOW.  JUST DO THAT.'

10       AND THAT WAS THE EXERCISE THAT WE WENT THROUGH.

11       AND THEN THAT FRAMED THE ISSUES THAT PEOPLE HAD TO

12   PRIORITIZE ON.

13       THAT'S MY UNDERSTANDING.

14       THE COURT:  SO YOU AGREE, THEN, WITH MR. COREY THAT

15   THIS WAS A PRIORITIZATION AS OPPOSED TO 'GIVE ME THE MOTIONS

16   THAT ARE PENDING FOR PHASE ONE, AND EVERYTHING THAT'S NOT ON

17   THIS PRIORITY LIST DOES NOT NEED TO BE DECIDED FOR PHASE ONE?'

18       MR. NOLAN:  NO, YOUR HONOR.  OUR INTERPRETATION WAS

19   THAT WE WERE TO PRIORITIZE THOSE THINGS THAT NEEDED TO BE RULED

20   ON FOR PHASE ONE:  WHAT DID THE PARTIES WANT?  WHAT DID THEY

21   NEED TO GET THIS OVER WITH?

22       AND, FRANKLY, THAT'S BEEN PART OF OUR FRUSTRATION.

23   ALL IT SEEMED TO BE, YOUR HONOR, WITH DUE RESPECT, IS -- YOU

24   SAID THE SAME THING TO US IN A TELEPHONIC HEARING; 'FILE

25   EVERYTHING IN FRONT OF JUDGE INFANTE AND THEN NO MORE FILINGS.'

1    BUT WE KEEP GETTING THE FILINGS.

2        MGA'S POSITION WAS, OUR UNDERSTANDING WAS,

3    'PRIORITIZE WHAT YOU NEED A RULING ON FOR 1-A, AND THAT'S IT.'

4    THAT'S MY UNDERSTANDING AND THAT'S WHY -- DEALING WITH 11 NEW

5    MOTIONS, WHY I EXPRESSED THAT CONCERN ON FRIDAY TO YOU.

6        THAT WAS OUR UNDERSTANDING.

7        THE COURT:  SO WITH RESPECT TO THE ONE MOTION THAT

8    RELATES TO MGA, YOUR POSITION IS THAT THAT DOES NOT NEED TO BE

9    RULED UPON?

10       MR. NOLAN:  YOUR HONOR, IF I RECALL CORRECTLY, THAT'S

11   THE ONE THAT COMES IN FROM WACHOVIA.

12       THE COURT:  YES.

13       MR. NOLAN:  YOUR HONOR HAD ALREADY DISPOSED OF IT.

14       THAT ACTUALLY WAS WACHOVIA'S POSITION THAT WE WERE

15   JUST COMMUNICATING.  AND I BELIEVE IT WAS AN APPEAL FROM THE

16   JUDGE INFANTE ORDER IN THE FIRST INSTANCE.  HE HAD RULED, I

17   BELIEVE.  AND THEN THERE WAS A DEVELOPMENT FROM WACHOVIA'S

18   POSITION THAT NEEDED TO BE PRESENTED TO THE COURT.  THAT WAS MY

19   UNDERSTANDING.  BUT THAT ISSUE, I DON'T BELIEVE, IS NOT BEFORE

20   YOU AT ALL.

21       BUT THAT WACHOVIA ISSUE WAS PRESENTED TO

22   JUDGE INFANTE IN THE FIRST INSTANCE.  THAT'S MY RECOLLECTION OF

23   IT, YOUR HONOR.  IT WASN'T TECHNICALLY A NEW MOTION.

24       MR. COREY:  I THINK MR. NOLAN MAY BE REMEMBERING A

25   LITTLE BIT DIFFERENTLY WHAT HAPPENED WITH RESPECT TO WACHOVIA.

1        THERE ARE ACTUALLY TWO MOTIONS.  MGA FILED A MOTION

2    TO QUASH A DOCUMENT SUBPOENA.  THAT'S THE ISSUE THAT THE COURT

3    RULED ON.  THERE'S ALSO A SEPARATE MOTION TO QUASH A DEPOSITION

4    SUBPOENA OF WACHOVIA.  THAT'S THE MOTION THAT WAS INCLUDED ON

5    THE LIST WE DISCUSSED ON MONDAY.

6        THE COURT:  HOW WOULD YOU SUGGEST THE COURT TO

7    RESOLVE THIS?  I WAS HOPING, OF COURSE, THAT YOU WOULD BOTH

8    AGREE IN TERMS OF WHAT THESE LISTS CONSTITUTED AND WHAT THE

9    STATUS OF IT IS.  I'LL HEAR FROM MR. NOLAN ON THIS.

10        HOW AM I TO -- IF YOU HAVE WAIVED THESE MOTIONS

11    BEFORE JUDGE INFANTE -- CERTAINLY, I HAVE OTHER THINGS I COULD

12    ATTEND TO THIS WEEK BESIDES CONSIDERING THESE 12 MOTIONS.

13        AT THE SAME TIME, IF YOU DIDN'T, I BELIEVE THAT I

14    HAVE TO ADDRESS EVERY MOTION THAT'S OUTSTANDING FOR PHASE ONE.

15        SO HOW DO I RESOLVE THIS?

16        MR. COREY:  MATTEL HAS NOT WAIVED ANY OF THE MOTIONS.

17    WE'VE BEEN THROUGH THAT EXERCISE.

18        WHAT WE DID WAS WE WENT THROUGH AND PRIORITIZED THEM.

19        THE COURT:  I KNOW YOU'RE NOT WILLING TO WAIVE IT

20    NOW.  THE QUESTION IS, DID YOU WAIVE IT BASED ON THE WAY THIS

21    LIST WAS SUBMITTED, AND HOW DO I RESOLVE THIS?

22        WHAT RECORD DO YOU WANT THE COURT TO CONSIDER TO

23    DETERMINE THIS ISSUE?

24        MR. COREY:  I THINK THE COURT NEEDS TO LOOK AT THE

25    JOINT REPORT.  IF IT WOULD BE HELPFUL, WE CAN PROVIDE

1   CORRESPONDENCE GOING BACK AND FORTH AS TO WHAT THE PARTIES --

2        THE COURT:  I'D RATHER LOOK AT WHAT WAS SUBMITTED.  I

3   HAVE A COPY OF THAT, AND I'LL LOOK AT THAT.  I'LL WADE THROUGH

4   THAT.

5        MR. COREY:  ONE OF THE THINGS THE COURT SHOULD LOOK

6   AT IS THE DATE THAT MANY OF THE MOTIONS REMAINING ON THAT LIST

7   WERE FILED.

8        THE COURT:  THEY WERE ALL FILED IN DECEMBER, JANUARY,

9   AND EARLY FEBRUARY, IF I RECALL.

10       MR. COREY:  THEY'VE BEEN PENDING FOR QUITE A WHILE.

11   AND SOME OF THOSE ARE MOTIONS WHERE JUDGE INFANTE MADE

12   PRELIMINARY RULINGS, PROVIDED GUIDANCE TO THE PARTIES.

13   SPECIFICALLY WITH RESPECT TO SOME OF THE PRIVILEGED LOGS, THOSE

14   WERE RESOLVED, AND SO THERE WERE FOLLOW-ONS BASED ON HIS

15   GUIDANCE.

16       THE COURT:  MR. NOLAN, WHAT DO YOU SUGGEST?

17       MR. NOLAN:  WELL, YOUR HONOR, I SUGGEST THAT

18   JUDGE INFANTE WAS CLEAR.  I REPRESENT TO THE COURT THAT WE --

19       THE COURT:  WHERE WAS HE CLEAR?  WHERE WOULD I FIND A

20   RECORD OF THAT?  I'M TRYING TO PIN THIS DOWN SO THAT THIS

21   DOESN'T BECOME AN ISSUE WHEN THIS TRIAL IS OVER.

22       MR. NOLAN:  OF COURSE.

23       YOUR HONOR, THE HEARINGS BEFORE JUDGE INFANTE WERE

24   ALWAYS TRANSCRIBED, SO THERE SHOULD BE A TRANSCRIPTION OF IT.

25   I DON'T BELIEVE I HAVE IT HERE, BUT WE COULD EASILY MAKE IT

1     AVAILABLE TO YOU, YOUR HONOR.

2          I WILL REPRESENT TO YOU THAT FOLLOWING THIS STATEMENT

3     BY JUDGE INFANTE, WHETHER OR NOT IT WAS COMMUNICATED TO US

4     THROUGH HIS ASSISTANT, HIS ADMINISTRATIVE ASSISTANT, WHICH

5     SOMETIMES WOULD OCCUR, AN E-MAIL TO US, OR ON A TELEPHONIC

6     CALL -- AND I WISH MR. KENNEDY WAS HERE, BECAUSE HE USUALLY

7     HANDLED THESE -- IT WAS CLEAR TO US THAT WE HAD TO PUT UP OR

8     FOLD.

9          THE COURT:  LET ME SUGGEST, THEN, A WAY OF

10    PROCEEDING.  I'LL TAKE A LOOK AT THESE JOINT REPORTS SUBMITTED,

11    AND I'LL SEE IF THERE'S ANY LANGUAGE IN THAT WHICH WOULD

12    SUGGEST, AS YOU'RE SUGGESTING, THAT THIS WAS NOT SIMPLY A --

13    YOU KNOW, PRIORITIZE THE ONES YOU WANT ME TO GET THROUGH FIRST,

14    BUT I'M GOING TO EVENTUALLY GET THROUGH ALL OF THEM, WHICH IS

15    MR. COREY'S POSITION.  AS OPPOSED TO YOUR POSITION, THAT BY

16    PRIORITIZING, YOU'RE SUGGESTING THAT YOU'RE WAIVING ANY ONES

17    THAT ARE NOT ON THAT PRIORITY LIST.

18         I'LL TAKE A LOOK AT THE JOINT REPORTS WHICH JUDGE

19    INFANTE DID SEND ME.  I'LL GIVE LEAVE TO EITHER SIDE TO SUBMIT

20    ANY EVIDENCE OF WHAT TRANSPIRED HERE; JUST THE EVIDENCE.  I

21    DON'T NEED ARGUMENT.  I DON'T WANT TO WADE THROUGH THE

22    TRANSCRIPTS MYSELF, BUT IF YOU CAN IDENTIFY FOR THE COURT A

23    TRANSCRIPT FROM ONE OF THESE HEARINGS WHICH INDICATED THIS KIND

24    OF WAIVER, THE COURT WILL CONSIDER THAT.

25         IN THE INTERIM, I WILL ASK -- SINCE 11 OF THE 12 OF

1    THESE MOTIONS ARE FROM MATTEL, I'M GOING TO IMPOSE THIS BURDEN

2    ON MATTEL, TO BASICALLY CREATE A BINDER, AS WAS CREATED THIS

3    WEEKEND, WHICH SETS FORTH ALL 12 OF THOSE MOTIONS, INCLUDING

4    MGA'S MOTION WITH THE MOVING PAPERS, THE RESPONDING PAPERS, AND

5    A REPLY, IF ANY, JUST AS YOU DID THIS WEEKEND.

6        IF I HAVE TO, I GUESS I'LL DECIDE THE MOTIONS.

7    CERTAINLY, IF THERE'S CLEAR EVIDENCE OUT THERE THAT THESE WERE

8    WAIVED, I'D LIKE TO SEE THAT EVIDENCE.  LET'S GET THIS TO THE

9    COURT BEFORE 8:30 TOMORROW MORNING, BOTH BINDER AND ANY

10   EVIDENCE; AND THE COURT, IN THE MEANTIME, WILL TAKE A LOOK AT

11   THESE JOINT REPORTS.

12       YOU ALL SHOULD HAVE RECEIVED BY NOW THE COURT'S

13   RULING ON THE STATUTE OF LIMITATIONS ISSUE.  THERE'S FURTHER

14   BRIEFING ON THAT REQUIRED BY 8:30 TOMORROW MORNING AS WELL.

15   HOPEFULLY, THEN I'LL BE ABLE TO SET THE FRAMEWORK FOR RESOLVING

16   ANY OUTSTANDING MOTIONS.

17       HAS SOMEONE SUBMITTED THE PROPOSED ORDER FROM

18   YESTERDAY'S RULINGS?

19       I GATHER THE ANSWER IS NO.

20       MR. COREY:  I DON'T BELIEVE WE HAVE, YOUR HONOR.

21       THE COURT:  IF I COULD GET THAT BY 8:30 TOMORROW

22   MORNING AS WELL.

23       MR. COREY:  OF COURSE.

24       MR. NOLAN:  AND I'LL CHECK WITH MR. KENNEDY.  HE IS

25   HERE.

1          THE COURT:  MAYBE HE HAS SOME --

2          MR. NOLAN:  I'LL STAND CORRECTED IF HE TELLS ME NO,

3     THAT WASN'T THE UNDERSTANDING.  BUT WE'LL SUBMIT ANYTHING WE

4     NEED TO, YOUR HONOR.

5          THE COURT:  VERY WELL.

6          I'M NOT REALLY INTERESTED IN A DECLARATION FROM THE

7     PARTIES IN TERMS OF THEIR RECOLLECTION.  I'M LOOKING FOR ACTUAL

8     EVIDENCE.  IN THE ABSENCE OF ACTUAL EVIDENCE, I'M GOING TO

9     PROCEED WITH THE MOTIONS.

10         MR. NOLAN:  UNDERSTOOD, YOUR HONOR.

11         YOUR HONOR, BEFORE THE JURY COMES IN, CAN WE RAISE

12    ONE POINT THAT WILL COME UP IN THE EXAMINATION SHORTLY?

13         THE COURT:  WHAT'S THAT?

14         MR. NOLAN:  I UNDERSTAND THAT MR. QUINN WOULD LIKE TO

15    PLAY PORTIONS OF A VIDEO OF A FOCUS GROUP THAT WAS CONDUCTED

16    WITHIN MATTEL ON -- OUTSIDE OF MATTEL.

17         MR. QUINN:  I'M NOT GOING TO.

18         MR. NOLAN:  OH, YOU'RE NOT GOING TO DO IT?

19         I APOLOGIZE.  GREAT.

20         THE COURT:  LET'S BRING THE JURY IN.

21         MS. MARTINEZ, IF YOU WOULD COME BACK TO THE WITNESS

22    STAND.

23         (WHEREUPON, JURORS ENTER COURTROOM.)

24         THE COURT:  GOOD AFTERNOON, MEMBERS OF THE JURY.

25    WE'RE BACK ON THE RECORD.

1          COUNSEL, YOU MAY PROCEED.

2          MR. QUINN:  WE'VE GIVEN EXHIBIT NUMBERS TO

3    MS. MARTINEZ'S DRAWINGS.  THE MERMAID IS EXHIBIT 13573; THE

4    FASHION DESIGN IS EXHIBIT 13574; AND THE CROQUI?

5          THE WITNESS:  CROQUI [PRONUNCIATION].

6          MR. QUINN:  -- IS EXHIBIT 13575.

7          THE COURT:  VERY WELL.

8          THE CLERK WILL TAKE CUSTODY OF THOSE EXHIBITS DURING

9    THE TRIAL.

10          DIRECT EXAMINATION (CONTINUED)

11   BY MR. QUINN:

12   Q   MS. MARTINEZ, WHEN WE BROKE FOR LUNCH, I BELIEVE I HAD

13   ASKED YOU WHEN YOU FIRST MET CARTER BRYANT.

14   A   YES.

15   Q   DO YOU RECALL WHEN THAT WAS?

16   A   I DON'T RECALL THE TIME, BUT I RECALL HOW I MET HIM.

17   Q   AND WHAT WERE THE CIRCUMSTANCES?

18   A   ELISE CLOONAN, WHO WAS WORKING IN MY TEAM, HAD TALKED VERY

19   HIGHLY OF HIM BEFOREHAND; 'MY FRIEND CARTER, YOU KNOW, THIS AND

20   THAT, HE USED TO WORK HERE.  HE'S GREAT.  YOU'LL SEE.  YOU'LL

21   MEET HIM.  HE'S INTERVIEWING TODAY.'

22          APPARENTLY, HIS INTERVIEW WAS AROUND LUNCHTIME, SO WE

23   WERE GOING TO GO FOR LUNCH.  THERE'S A CAFETERIA IN FRONT OF

24   THE MATTEL BUILDING, LIKE, NEXT TO THE LOBBY, AND HE WOULD HAVE

25   BEEN IN THE LOBBY, AND WE WOULD HAVE PASSED BY HIM.  PLUS, I

1    BELIEVE THEY HAD COORDINATED TO COME BY AND SAY 'HI.'  SO WE

2    WENT TOGETHER TO LUNCH, AND THAT'S HOW I MET HIM.

3    Q   DID YOU UNDERSTAND THAT AT THAT TIME, MR. BRYANT WAS

4    COMING BACK TO BE -- HE WAS INTERVIEWING TO BE REEMPLOYED BY

5    MATTEL?

6    A   YES.

7    Q   THAT HE HAD WORKED FOR MATTEL AT SOME TIME IN THE RECENT

8    PAST?

9    A   YES.

10        MR. NOLAN:  OBJECTION, YOUR HONOR.  LEADING.

11        THE COURT:  SUSTAINED.

12        REPHRASE YOUR QUESTION, COUNSEL.

13   BY MR. QUINN:

14   Q   CAN YOU TELL US WHETHER OR NOT, BASED ON YOUR

15   UNDERSTANDING, MR. BRYANT HAD WORKED FOR MATTEL SOMETIME IN THE

16   RECENT PAST.

17   A   YES.

18   Q   AND HAD HE?

19   A   I BELIEVE THAT'S WHAT ELISE TOLD ME; THAT HE HAD ALREADY

20   WORKED THERE AND HE WAS GOING TO COME BACK.

21   Q   NOW, DID YOU EVER TALK TO MR. BRYANT ABOUT TOON TEENS,

22   YOUR TOON TEENS PROJECT?

23   A   YES.

24   Q   AND HOW DID THAT COME ABOUT?

25   A   ELISE ACTUALLY BROUGHT HIM OVER TO OUR OPEN AREA WHERE OUR

1    DESIGN TABLE WAS AT.  I WAS AT A CORNER OF THE TABLE WORKING ON

2    TOON TEENS, THE PROJECT, FUSSING OVER IT, FIXING HAIR,

3    WHATEVER.  SHE BROUGHT HIM OVER.  I SAW THEM WALK TOWARDS ME.

4    SHE'S, LIKE, 'HEY, I BROUGHT CARTER TO SEE THE' -- 'I'VE BEEN

5    TALKING TO HIM ABOUT IT, TOON TEENS, WHATEVER; SO TALK TO HIM'

6    -- 'WHAT YOU DID,' AND I'M, LIKE, 'SURE.'  WHOEVER WANTED TO

7    LISTEN, I WOULD TELL THEM ABOUT MY PROJECT.  SO I TOLD THEM

8    ABOUT EACH CHARACTER, WHAT IT CAME WITH, AND WHATEVER.  AND HE

9    WAS, LIKE -- YOU KNOW, HE REALLY LIKED IT AND HE'S, LIKE, 'OH,

10   GREAT.  MATTEL WOULD BE CRAZY IF THEY DON'T MAKE THIS.'

11   Q   WERE YOUR PROTOTYPES FOR THE DOLLS, THE TOON TEEN DOLLS,

12   ACTUALLY THERE?

13   A   YES.

14   Q   AND THE TWO-DIMENSIONAL DRAWINGS WHICH YOU TOLD US YOU HAD

15   PINNED UP, WERE THEY PINNED UP AS WELL?

16   A   NO.  IT WAS JUST THE PROTOTYPES, THE 3-D.

17   Q   OKAY.

18       WHEN WAS IT THAT THIS HAPPENED, THAT MR. BRYANT CAME

19   BY?

20   A   I DON'T REMEMBER THE EXACT DATE.

21   Q   WAS THIS AT A TIME WHEN THE PROTOTYPES WERE BASICALLY

22   DONE, OR NEARLY DONE?

23   A   I BELIEVE SO, BECAUSE I REMEMBER NOT DOING ANYTHING CRAZY

24   WITH THEM.  I WAS JUST, LIKE, FIXING THEIR HAIR AND STUFF.

25   THEY WERE PRETTY DISPLAYED WHERE I HAD THEM ON AN L-BOARD; SO,

1    YEAH, IT WAS PRETTY MUCH -- THE PRODUCT WAS ALMOST COMPLETE.

2    Q   WHAT'S AN L-BOARD?

3    A   IT'S SOMETHING WE USE TO PRESENT THE PRODUCT.  IT'S

4    LITERALLY IN AN L-SHAPE.  AND IT CAN BE VERY ELABORATE OR IT

5    CAN BE VERY SIMPLE.  ELABORATE, IT CAN HAVE PROPS AND THINGS,

6    DECORATIONS, LIKE A LITTLE MINI SET, LIKE A STAGE, FOR THE

7    PRODUCT.

8    Q   COULD YOU TAKE A LOOK AT EXHIBIT 276-1, PLEASE.

9         MY QUESTION TO YOU IS GOING TO BE WHETHER YOU CAN

10   IDENTIFY THAT FOR US.

11   A   YES.

12   Q   WHAT IS THAT?

13   A   THAT'S WHAT I WAS FUSSING OVER.  THAT'S THE L-BOARD,

14   CONTAINING THE THREE DOLLS AND SOME OTHER PROPS AND PRODUCTS.

15        MR. QUINN:  I'D OFFER EXHIBIT 276-1, YOUR HONOR.

16        THE COURT:  ANY OBJECTION?

17        MR. NOLAN:  NO OBJECTION, YOUR HONOR.

18        THE COURT:  IT'S ADMITTED.

19        YOU MAY PUBLISH.

20   BY MR. QUINN:

21   Q   THIS REAL DOESN'T TRANSLATE VERY WELL TO THE LARGE SCREEN

22   HERE, BUT CAN YOU TELL US WHAT THIS IS.

23   A   YEAH.  THAT'S THE L-BOARD.  IT'S ACTUALLY TWO L-BOARDS.

24   ONE L-BOARD, IT'S LIKE A LIVING ROOM TYPE OF AN ENVIRONMENT,

25   WITH THE THREE DOLLS.  AND THEN THERE WAS A CONNECTING L-BOARD

1    THAT HELD THE CAR AND A LITTLE PUPPY THAT WAS ALSO CONSIDERED.

2    Q   ARE WE LOOKING AT PHOTOGRAPHS HERE?

3    A   YES.

4    Q   ARE THESE TWO PHOTOGRAPHS, ESSENTIALLY, OF THE SAME

5    L-BOARD?

6    A   YES.

7    Q   AND DO YOU KNOW WHO TOOK THIS PHOTOGRAPH?

8    A   YES.  I DID.

9    Q   AND WAS YOUR CAMERA SET TO HAVE A DATE STAMP ON THE PRINT

10    WHEN YOU TOOK A PICTURE?

11    A   I BELIEVE IT DID, YES.

12    Q   CAN YOU SEE THAT DATE HERE?

13    A   YES.

14    Q   I THINK IT'S IN THE LOWER RIGHT-HAND CORNER.  IT'S HARD TO

15    READ, BUT CAN YOU TELL US WHAT THAT DATE SAYS, WHEN THIS WAS

16    TAKEN?

17    A   I BELIEVE IT SAYS -- IT'S REALLY HARD TO READ, BUT I

18    REMEMBER TAKING IT.  IT'S 8-4-99.

19    Q   AND DOES SEEING THAT HELP REFRESH YOUR RECOLLECTION AS TO

20    THE APPROXIMATE TIME WHEN MR. BRYANT WOULD HAVE COME BY THE

21    LARGE WORK AREA WITH ELISE CLOONAN AND SEEN THE PROTOTYPE

22    DOLLS?

23    A   IT COULD HAVE BEEN CLOSE TO THIS TIME SINCE THIS

24    PICTURE -- I TOOK THIS BECAUSE THE PRODUCT WAS PRETTY MUCH

25    COMPLETE.

1    Q   AND IS IT YOUR RECOLLECTION THAT THE PRODUCT WAS PRETTY

2    MUCH COMPLETE AND THERE IN THE LARGE WORK AREA WHEN MR. BRYANT

3    CAME BY?

4    A   YES; IT WAS ON THE TABLE.

5    Q   ALL RIGHT.

6        AND YOU TOLD US THAT YOU HAD YOUR ACTUAL DRAWINGS --

7    WHAT DO YOU CALL THEM?  PUSH PINS?

8    A   YEAH.  WITH PUSH PINS, OR T-PINS, UP ON MY CUBICLE.

9    Q   IS YOUR CUBICLE CLOSE TO THIS OPEN SPACE WORK AREA?

10   A   YES; IT'S IN THE NEXT AISLE.

11   Q   WE'VE HEARD THAT SOME PEOPLE HAD, LIKE, A CLOTH OR A DRAPE

12   OR SOMETHING THAT BLOCKED OFF PEOPLE FROM SEEING INSIDE,

13   SOMETIMES, THEIR CUBICLE.

14       DID YOU HAVE THAT?

15   A   I DON'T REMEMBER.  I MIGHT HAVE.

16   Q   BUT GENERALLY, WAS IT POSSIBLE FOR SOMEBODY COMING IN AND

17   OUT OF YOUR OFFICE OR WALKING DOWN THE HALL TO SEE INTO YOUR

18   CUBICLE?

19   A   OH, SURE.

20   Q   AND TO SEE THE THINGS THAT YOU HAD UP WITH PUSH PINS ON

21   THE BOARD?

22   A   YEAH.

23   Q   NOW, ELISE CLOONAN, YOU INDICATED -- DID SHE HAVE SOME

24   TYPE OF RELATIONSHIP WITH MR. BRYANT, DO YOU KNOW?

25   A   I JUST REMEMBER THEM BEING -- SHE, BEFORE HE WORKED THERE,

1   SAID HE WAS REALLY A GOOD FRIEND OF HERS AND HE WAS A REALLY

2   GOOD ARTIST AND THAT THEY WERE FRIENDS.

3   Q   DO YOU KNOW WHETHER OR NOT THEY WERE EVER ROOMMATES?

4   A   I'M NOT CERTAIN.

5   Q   DID ELISE CLOONAN HAVE ANYTHING TO DO WITH THE TOON TEENS

6   PROJECT?

7   A   YES.

8   Q   WHAT WAS HER INVOLVEMENT WITH THE TOON TEENS PROJECT?

9   A   SHE WAS MY VISUAL DESIGNER.  AND AT THE TIME, LIKE I HAD

10   STATED BEFORE, IF IT WOULD HAVE GOTTEN APPROVED, IT WOULD HAVE

11   GONE TO THAT PHASE WHERE SHE WOULD HAVE TAKEN IT OVER, TO BE

12   MORE PRODUCTION-READY.  BUT AT THAT POINT, SINCE IT WASN'T --

13   SHE WAS JUST HELPING ME WITH FACILITATING THINGS, LIKE HELPING

14   ME WITH WORK ORDERS.  SINCE SHE HAD BEEN THERE LONGER, SHE HAD

15   RELATIONSHIPS WITH CERTAIN DEPARTMENTS AND CERTAIN PEOPLE, SO

16   SHE WAS MY HOOKUP.

17   Q   DID MR. BRYANT EVER SEE EITHER THE PROTOTYPES OR DID HE

18   EVER SEE THE DRAWINGS ON ANY OTHER OCCASION?

19   A   NOT THAT I'M AWARE OF.  I DON'T KNOW.

20   Q   DID HIS FRIEND ELISE CLOONAN SIT NEAR YOU?  WAS HER

21   CUBICLE NEAR YOURS?

22   A   YES.  THERE WAS A CUBICLE BETWEEN HER CUBICLE AND MY

23   CUBICLE.

24   Q   DID MR. BRYANT COME BY TO SEE ELISE CLOONAN FROM TIME TO

25   TIME?

1    A   YEAH.  SURE.

2    Q   WOULD THIS INCLUDE DURING THE TIME PERIOD FROM MID '99

3    THROUGH NOVEMBER OF 1999?

4    A   YEAH.  THIS IS THE -- YEAH.  WHENEVER HE WAS WORKING FOR

5    THE COMPANY, I SAW HIM THERE.

6    Q   THERE IS AN EXHIBIT, 293, WHICH IS A FLOOR PLAN, WHICH IS

7    IN EVIDENCE, WHICH YOU HAVE A COPY OF THERE.

8        MR. QUINN:  IF I COULD REQUEST THAT BE DISPLAYED.

9        THE COURT:  YES.

10   BY MR. QUINN:

11   Q   MS. MARTINEZ, THIS IS HARD TO READ, BUT YOU SHOULD HAVE A

12   LARGER FOLD-OUT IN YOUR BOOK THERE, A LARGER BLUEPRINT OF

13   EXHIBIT 293.  IT MAY BE EASIER FOR YOU TO WORK WITH.

14       DO WE HAVE A LASER PEN UP THERE?

15       CAN YOU TAKE A MOMENT TO LOOK AT THAT.

16       CAN YOU SEE WHERE THE ENTRANCE TO THE DESIGN CENTER

17   IS THERE?

18   A   UH-HUH.

19   Q   THE MAIN ENTRANCE?

20   A   YEAH.

21   Q   COULD YOU POINT THAT OUT, USING THAT PEN, UP ON THE SCREEN

22   HERE.

23   A   YES.  THE MAIN ENTRANCE WOULD PROBABLY BE RIGHT THERE.

24   Q   ALL RIGHT.

25       AND WITH THAT ORIENTATION, CAN YOU SHOW US WHERE YOU

1   SAT BACK IN MID 1999, SUMMER OF 1999?

2   A   YES.  I SAT -- GOOD LORD -- I THINK IT'S --

3   Q   MAYBE IF YOU CAN TELL US THE GENERAL AREA TO BLOW UP.

4        CAN YOU TELL, FROM LOOKING AT THAT, WHICH WOULD HAVE

5   BEEN YOUR CUBICLE?

6   A   I THINK IT WOULD HAVE BEEN THAT ONE.

7   Q   THAT PARTICULAR ONE SAYS "MCMAHON."

8   A   UH-HUH.  I DON'T KNOW.  THAT'S NOT MY NAME, BUT THEN,

9   AGAIN, I WAS A TEMP, SO I ACTUALLY SHARED CUBICLES WITH ANOTHER

10  ASSISTANT.

11  Q   OKAY.

12       BUT TO THE BEST OF YOUR RECOLLECTION, WHAT YOU'VE

13  IDENTIFIED THERE IS WHERE YOU SAT.

14  A   YES.

15  Q   AND CAN YOU IDENTIFY WHERE MS. CLOONAN SAT?

16  A   RIGHT THERE.

17  Q   AND THAT APPEARS TO BE HER NAME THERE.

18  A   NO.  IT ACTUALLY SAYS "GOODMAN."

19       YEAH, THIS LOOKS OLD; LIKE, BEFORE ME, BEFORE I WAS A

20  TEMP.

21  Q   ARE YOU CONFIDENT WE'VE GOT THIS ORIENTED CORRECTLY?

22  A   YES.

23  Q   CAN YOU TELL US WHERE THIS WORK AREA WAS, THE GENERAL WORK

24  AREA THAT YOU ARE REFERRING TO?

25  A   YES.  THERE WAS A TABLE RIGHT HERE; LIKE, A BIG

1    RECTANGULAR TABLE RIGHT HERE.

2    Q   DO YOU REMEMBER WHEN MR. BRYANT LEFT MATTEL?

3    A   I DON'T REMEMBER THE TIME, BUT I REMEMBER AROUND THE TIME

4    THAT HE SAID HE WAS LEAVING.

5    Q   DID YOU HAVE A CONVERSATION WITH HIM AT THAT TIME?

6    A   I DID.  I REMEMBER TELLING HIM THAT -- I HAPPENED TO BE IN

7    IVY'S OFFICE, SHOWING HER A PRODUCT, AND SHE TOLD ME TO COME IN

8    HER OFFICE.  SHE WAS THE BOSS, SO SHE HAD A NICE OFFICE, A

9    PRETTY BIG OFFICE, AND SHE HAD, LIKE, A LITTLE MEETING TABLE

10   ASIDE FROM HER OFFICE WHERE SHE HAS HER DESK AND HER COMPUTER.

11   SHE WAS ON THE PHONE; SHE TOLD ME TO COME IN; AND SHE TOLD ME

12   TO WAIT FOR HER WHILE SHE WAS ON THE PHONE.

13       SHE WAS TALKING, AND I OVERHEARD HER CONVERSATION,

14   AND FROM WHAT I GOT, SHE WAS TALKING ABOUT CARTER AND THAT, YOU

15   KNOW -- SOMETHING ABOUT THAT THEY DIDN'T WANT TO LET HIM LEAVE,

16   THAT, YOU KNOW -- I DEDUCTED SHE WAS TALKING TO ADRIENNE,

17   ADRIENNE FONTANELLA, WHO'S, LIKE, THE BOSS BOSS.

18   Q   I'M REALLY FOCUSING ON YOUR CONVERSATION WITH

19   CARTER BRYANT.

20       MR. NOLAN:  OBJECTION, YOUR HONOR.  MOTION TO STRIKE.

21   SPECULATION AS TO WHO SHE WAS TALKING TO ON THE PHONE.

22       THE COURT:  SUSTAINED.

23       MR. QUINN:  I JOIN.

24   BY MR. QUINN:

25   Q   FOCUS ON THE CONVERSATION WITH MR. BRYANT.

1       DID YOU SPEAK WITH HIM?

2   A   YES.  SO WHAT HAPPENED IS, AFTER THAT -- BECAUSE SHE WAS

3   TALKING VERY HIGHLY OF HIM.  THEY DIDN'T WANT TO LET HIM GO.  I

4   WAS, LIKE, 'OH, YOU KNOW, MAYBE HE DOESN'T KNOW THIS.'  SO

5   AFTER I MET WITH HER, WHATEVER, I LEFT, AND I HAPPENED TO SEE

6   HIM.  AND I THINK ELISE WAS THERE TOO.  AND I SAID, 'HEY, YOU

7   KNOW, I HAPPENED TO OVERHEAR A CONVERSATION.  THEY'LL OFFER YOU

8   MORE MONEY IF YOU STAY.'  AND HE WAS VERY, LIKE, 'NO.  I'VE

9   MADE UP MY MIND, AND NO.'

10      SO I SAID, 'WHERE ARE YOU GOING?  LIKE, WHAT'S GOING

11  ON?'  AND HE WAS JUST VERY -- HE ACTED VERY STRANGE.  LIKE, HE

12  DIDN'T WANT TO SAY; LIKE, 'OH, IT'S BETTER IF YOU DON'T KNOW.'

13  AND I'M, LIKE, 'OKAY.'  I DIDN'T WANT TO PRY, BECAUSE HE

14  WASN'T, LIKE, A GOOD FRIEND OF MINE.  I JUST KNEW HIM THROUGH

15  ELISE.  IT WAS JUST VERY ODD, HIS BEHAVIOR.  'IT'S BETTER IF

16  YOU DON'T KNOW,' I THINK IS WHAT HE SAID.

17      MR. QUINN:  NOTHING FURTHER.

18      THANK YOU.

19      MR. NOLAN:  WE'VE NEVER MET.  I REPRESENT MGA.  MY

20  NAME IS TOM NOLAN.

21      LET ME OFFER MY CONGRATULATIONS.

22      THE WITNESS:  NICE TO MEET YOU.

23      MR. NOLAN:  IS IT A BOY OR A GIRL, DO YOU KNOW?

24      THE WITNESS:  MY THIRD BOY.  DON'T CRY FOR ME.  I

25  KNOW.  I WANTED A GIRL, BUT IT'S OKAY.  THEY'RE MOMMA'S BOYS.

1          MR. NOLAN:  ALL RIGHT.

2          THIS IS A SERIOUS ISSUE, SO LET ME GET DOWN TO THE

3    SERIOUSNESS OF IT.

4              CROSS-EXAMINATION

5    BY MR. NOLAN:

6    Q   I WANT TO GO BACK, IF I MIGHT, JUST TO THIS LAST MINUTE OR

7    SO OF YOUR EXAMINATION.

8          HAD YOU EVER SOCIALIZED WITH CARTER BRYANT?

9    A   IN WHAT WAY?  LIKE, WORK?

10   Q   DID YOU EVER GO OUT TO DINNER WITH HIM?

11   A   I DON'T THINK I WENT OUT TO DINNER.  I DON'T RECALL.

12   Q   DID YOU EVER SPEND ANY TIME WITH CARTER BRYANT OUTSIDE OF

13   MATTEL?

14   A   YES.  I THINK I RECALL BEING AT HIS HOUSE, VAGUELY, WITH

15   ELISE.

16   Q   AND WAS THAT ONE TIME OR SEVERAL TIMES?

17   A   I DON'T REMEMBER.

18   Q   DO YOU RECALL IF ANYBODY ELSE WAS PRESENT?

19   A   I THINK HIS PARTNER.

20   Q   RICHARD IRMEN?

21   A   THERE WERE DOGS.  THERE WERE TWO DOGS.

22   Q   DO YOU RECALL WHAT TIME OF YEAR THIS MEETING WAS?

23   A   NO, I DON'T.

24   Q   WHEN YOU SAW HIM ON THE DAY YOU WERE RECOUNTING FOR US,

25   AND YOU SAID THAT YOU HAD PASSED ON TO CARTER THAT IVY ROSS HAD

1    BEEN SPEAKING VERY HIGHLY OF HIM, WHAT MADE YOU COME TO THE

2    CONCLUSION THAT MATTEL WOULD OFFER HIM MORE MONEY TO STAY?

3    A   BECAUSE I THINK I OVERHEARD HER SAY THAT; THAT SHE WOULD

4    GIVE HIM MORE MONEY.

5    Q   ARE YOU SURE YOU HEARD THAT ON THE PHONE?

6    A   YES.

7    Q   AND THAT WAS IVY ROSS?

8    A   YES.

9    Q   WHO ELSE WAS WITH YOU WHEN YOU HAD THE CONVERSATION WITH

10   CARTER ON THAT DAY, FOLLOWING THE PHONE CALL?

11   A   I BELIEVE ELISE WAS THERE.

12   Q   ARE YOU CERTAIN?

13   A   MOST CERTAIN, YEAH.

14   Q   NOW, BEFORE THAT TIME, HAD YOU EVER TALKED TO CARTER ABOUT

15   HIS EMPLOYMENT IDEAS OR EXPERIENCES OR ANTICIPATIONS?

16   A   CAN YOU REPEAT THAT AGAIN.

17   Q   HAD YOU EVER TALKED TO CARTER BRYANT BEFORE THAT ABOUT HIS

18   EMPLOYMENT PLANS OR DREAMS?

19   A   NOT THAT I RECALL -- ANYTHING PARTICULAR.

20   Q   AND YOU HAVE JUST A GENERAL RECOLLECTION OF WHAT CARTER

21   SAID IN THAT CONVERSATION TO YOU.

22   A   YEAH.  LIKE, WHAT I STATED.

23   Q   AND THAT IS THAT IT WOULD BE BETTER IF YOU DIDN'T KNOW.

24   A   YEAH.  I CAN REMEMBER HIM SAYING SOMETHING TO THAT EFFECT.

25   Q   DIDN'T YOU THINK THAT WAS ODD?

1    A   I DID.

2    Q   SO DID YOU GO BACK TO IVY ROSS OR ANYBODY AT MATTEL AND

3    TELL THEM ABOUT YOUR CONVERSATION WITH CARTER BRYANT?

4    A   I MEAN, IT WAS ODD, BUT NOT -- I MEAN, THAT WAS HIS

5    RESPONSE.  I DIDN'T SPECULATE ANYTHING.  I'M JUST, LIKE,

6    'OKAY.'

7    Q   WELL, DID YOU THINK IT WAS INAPPROPRIATE FOR CARTER TO

8    TELL YOU THAT HE DIDN'T WANT TO TELL YOU BECAUSE IT WOULDN'T BE

9    GOOD FOR YOU?

10   A   NO.  HE JUST DIDN'T WANT TO SAY ANYTHING.  LIKE, IN MY

11   PREVIOUS EXPERIENCES, WHEN OTHER PEOPLE LEAVE, THEY OPENLY SAY

12   WHETHER THEY'RE GOING SOMEWHERE OR THEY'RE NOT OR THEY'RE

13   STAYING AT HOME, WHATEVER, AND HE WAS JUST VERY -- DIDN'T WANT

14   TO TALK ABOUT IT, LIKE, WHAT HE WAS DOING.  AND I WAS, LIKE,

15   'WELL, THAT'S HIM.'  I MEAN, I DON'T KNOW HIM.  SO, LIKE,

16   THAT -- TO, LIKE, BE, 'WELL, WHY NOT?  JUST TELL ME.'  I WAS,

17   LIKE, 'OKAY.  THAT'S FINE.'

18   Q   THAT'S WHAT I GUESS I WAS GETTING AT.

19        DID YOU HAVE THE TYPE OF RELATIONSHIP WITH CARTER

20   SUCH THAT YOU EXPECTED HIM TO SHARE WITH YOU WHAT HE WAS DOING?

21   A   WELL, I MEAN, I KNEW HIM THROUGH ELISE.  I DIDN'T THINK --

22   I MEAN, SINCE HE WAS STAYING THERE THE TWO WEEKS, THAT USUALLY

23   MEANS HE'S NOT DOING -- LIKE, HE'S NOT GOING TO COMPETITION OR

24   ANYTHING, SO IT'S USUALLY SOMETHING UNRELATED.  SO I DIDN'T

25   KNOW WHY HE WASN'T DISCLOSING THAT.

1       AND I DON'T REALLY CARE, BECAUSE THAT'S HIS LIFE;

2    WHATEVER HE WANTS TO DO, THAT'S GREAT.  BUT I JUST FOUND IT ODD

3    THAT -- IT WASN'T SO MUCH WHAT HE SAID, BUT, LIKE, HIS DEMEANOR

4    ABOUT IT.  HE WAS JUST VERY, LIKE -- I CAN'T DESCRIBE IT.  HE

5    WAS JUST VERY, LIKE, 'YEAH, WHATEVER.'  AND I WOULD BE, LIKE,

6    'REALLY?  SHE WANTED' -- I DON'T KNOW.  IT WAS JUST A LITTLE

7    STRANGE.

8    Q   SO IT WAS MORE HIS DEMEANOR THAT MADE YOU THINK IT WAS

9    STRANGE THAN WHAT HE TOLD YOU?

10   A   I MEAN, BOTH THINGS, BUT HIS DEMEANOR WAS A LITTLE

11   DIFFERENT.

12   Q   AT ANY TIME BEFORE THIS LAWSUIT WAS FILED, DID YOU EVER

13   TELL ANYBODY ABOUT THAT CONVERSATION?

14   A   I DON'T REMEMBER.

15   Q   LET'S GO BACK, IF I MIGHT, NOW TO -- REMEMBER, I TOLD YOU

16   NOT TO UNFOLD THE CHART.

17   A   I KNOW.  I DIDN'T UNFOLD IT.

18       DID IT FALL?

19       THE CLERK:  I HAVE IT.

20   BY MR. NOLAN:

21   Q   YOU'VE SEEN THIS CHART BEFORE, HAVE YOU NOT?

22   A   I DON'T KNOW IF THIS PARTICULAR ONE, BECAUSE -- YEAH, I

23   MIGHT HAVE.  YEAH.

24   Q   DO YOU KNOW WHO PREPARED THIS CHART?

25   A   I DON'T KNOW WHO PREPARED THIS CHART, OTHER THAN WHAT I

1    HEARD IVY SAY.

2    Q   DO YOU KNOW WHAT YEAR THE CHART DEPICTS IN TERMS OF THE

3    ORGANIZATION?

4    A   THIS SAYS MARCH 8, '98, AND THEN -- WAIT -- IT SAYS

5    REVISED, 1-5-99.

6    Q   DO YOU KNOW WHETHER OR NOT CARTER BRYANT WAS WORKING FOR

7    MATTEL IN MARCH OF 1998?

8    A   I DON'T REMEMBER.

9    Q   DID ANYBODY TELL YOU --

10   A   YOU SAID MARCH '98.

11       I DIDN'T START WORKING THERE UNTIL APRIL OF '98; SO I

12   WOULDN'T KNOW.

13   Q   IT SAYS IT WAS REVISED AS OF 9-5-98 [SIC], YOU SAID?

14   A   YEAH.

15   Q   DO YOU KNOW THE DATE THAT --

16       MR. QUINN:  1999.

17       MR. NOLAN:  1999.  I APOLOGIZE.

18   BY MR. NOLAN:

19   Q   9-5-99; CORRECT?  IS THAT WHAT IT SAYS?

20   A   IT SAYS 1-5-99.

21   Q   1-5-99; CORRECT?  JANUARY 5, 1999?

22   A   YES.

23   Q   DO YOU KNOW WHAT DATE CARTER BRYANT CAME BACK TO WORK THE

24   SECOND TIME AT MATTEL?

25   A   NO, I DON'T.  I DON'T REMEMBER.

1   Q   WHAT WAS YOUR UNDERSTANDING OF WHERE CARTER BRYANT'S

2   OFFICE WAS?  WAS HE ASSIGNED TO BARBIE COLLECTIBLES?

3   A   YEAH.  THE COLLECTOR DEPARTMENT AREA.

4   Q   COULD YOU -- IF YOU HAVE THE PEN -- WE CAN BLOW THIS UP

5   FOR YOU -- COULD YOU POINT TO THE AREA WHERE BARBIE

6   COLLECTIBLES DESIGNERS WERE SITTING.

7   A   I THINK THE BARBIE COLLECTOR AREA IS AROUND HERE, THIS

8   AREA.

9   Q   YOU THINK THAT'S WHERE IT IS?

10  A   YEAH.

11  Q   ARE YOU SURE OF THAT?

12  A   YEAH, THAT'S THE BARBIE COLLECTOR AREA.

13      MR. NOLAN:  CAN YOU GO UP TO THE TOP LEFT-HAND CORNER

14  AND BLOW THAT UP.

15  BY MR. NOLAN:

16  Q   I'VE HIGHLIGHTED THIS AREA, WHICH IS NOT IN THE AREA THAT

17  YOU WERE POINTING TO.

18      IT SAYS "COLLECTIBLE BARBIE."

19      DO YOU SEE THAT?

20  A   UH-HUH.

21  Q   ISN'T THAT WHERE BARBIE COLLECTIBLES WERE?

22  A   AS I RECALL, SINCE I'VE BEEN WORKING THERE, THE AREA HAS

23  BEEN WHERE I SHOWED YOU.

24  Q   DO YOU HAVE ANY REASON, THEN, TO KNOW WHY BARBIE

25  COLLECTIBLES IS MARKED IN AN AREA THAT IT WAS NOT LOCATED AT AT

1    MATTEL?

2    A   I DON'T.

3    Q   LET'S GO BACK DOWN TO WHERE YOU TOLD THE JURY YOU WERE

4    SITTING, IF I MIGHT.

5        LET'S GO BACK DOWN IN THIS AREA RIGHT HERE.

6        NOW, YOU WOULD AGREE WITH ME THAT YOUR NAME DOES NOT

7    APPEAR ON ANY OF THESE CUBICLES; CORRECT?

8    A   RIGHT.

9    Q   AND YOU SAID THAT YOU DO NOT KNOW MR. MCMAHON.

10   A   I SAID THAT, BUT, NO, I DON'T THINK I KNOW WHO THAT IS.

11   Q   DID YOU SAY YOU WERE A TEMP AT THIS TIME?

12   A   AT WHAT TIME?

13   Q   AT ONE TIME.

14       BUT YOU DON'T KNOW WHETHER OR NOT YOU WERE A TEMP AT

15   THE PARTICULAR TIME DEPICTED IN THIS.

16   A   NO, I DON'T KNOW.

17   Q   AND THEN YOU HAVE IDENTIFIED FOR US ON THIS CHART -- TWO

18   CUBICLES OVER, WHERE IT SAYS "GOODMAN."

19       DO YOU SEE THAT?

20   A   YES.

21   Q   DO YOU KNOW AN EMPLOYEE BY THE NAME OF GOODMAN?

22   A   IT SOUNDS FAMILIAR, BUT I DON'T REMEMBER.

23   Q   NOW, THE WORK TABLE -- AND I BELIEVE AT YOUR DEPOSITION

24   YOU MAY HAVE MARKED IT.

25       DO YOU SEE THOSE TWO TT'S, TOON TEENS?

1    A   YES.

2    Q   DO YOU SEE THAT RIGHT ABOVE THERE?

3        IS THAT THE WORK AREA WHERE YOU HAD THE 3-D DEPICTION

4    OF TOON TEENS?

5    A   YES.

6    Q   AND TO GET TO THAT WORK AREA, COULD YOU JUST, WITH YOUR

7    LIGHT, EXPLAIN HOW YOU WOULD GET TO THAT FROM YOUR CUBICLE.

8    A   I CAN EITHER WALK LIKE THIS OR WALK LIKE THIS.

9    Q   AND SO WHAT'S BEHIND THAT DARKER LINE IS A WALL BETWEEN

10   YOUR CUBICLE AND THE WORK AREA?

11       SO WHERE YOU WERE JUST POINTING THE DOT, THAT WAS THE

12   WALL; CORRECT?

13   A   CORRECT.

14   Q   YOU TESTIFIED THAT THERE WAS A MEETING WHERE ELISE CLOONAN

15   CAME BY WITH CARTER BRYANT AND YOU HAD OUT THE L-BOARDS; IS

16   THAT CORRECT?

17   A   CORRECT.

18   Q   YOU RECALL THAT HAPPENING ON ONE OCCASION?

19   A   YES.

20   Q   BUT CAN YOU TELL THE JURY WHEN THAT OCCURRED, WHAT DATE?

21   A   I DON'T REMEMBER.  LIKE I SAID, IT WAS SOMETIME WHEN I

22   ALMOST WAS COMPLETED, BECAUSE I REMEMBER JUST, LIKE, TOUCHING

23   UP STUFF WITH THE PRODUCT.

24   Q   IF YOU CAN REMEMBER, HOW LONG DID THAT MEETING TAKE PLACE,

25   WITH YOU, CARTER BRYANT, AND ELISE CLOONAN, WHEN YOU HAD THE

1    3-D DIMENSION OF TOON TEENS ON THE TABLE?

2    A   THE MEETING THAT I WAS -- WELL, I DON'T KNOW IF IT WAS A

3    MEETING.

4        WHEN SHE BROUGHT HIM OVER?

5    Q   YEAH.

6    A   IT WAS VERY BRIEF; NO MORE THAN TEN MINUTES; LESS THAN

7    THAT.

8    Q   DID CARTER BRYANT HAVE A CAMERA WITH HIM?

9    A   NO.

10   Q   DID CARTER BRYANT HAVE A SKETCH BOARD OR ANYTHING ELSE?

11   A   NO.

12   Q   DO YOU HAVE ANY PERSONAL KNOWLEDGE THAT CARTER BRYANT EVER

13   COPIED YOUR TOON TEENS DRAWINGS?

14       MR. QUINN:  OBJECTION.  THERE'S NO CLAIM IN THIS CASE

15   THAT HE COPIED THE TOON TEENS DOLLS.

16       THE COURT:  REPHRASE YOUR QUESTION, COUNSEL.

17   BY MR. NOLAN:

18   Q   DO YOU HAVE ANY PERSONAL KNOWLEDGE THAT CARTER BRYANT USED

19   YOUR TOON TEENS DRAWINGS FOR HIS INSPIRATION FOR BRATZ?

20   A   NOT THAT I KNOW OF.

21   Q   LET ME GO TO THIS DRAWING.  I THINK MR. QUINN SAID THAT IT

22   MIGHT TAKE HIM A WEEK TO DO SOMETHING LIKE THAT.  I PROMISE

23   YOU, I CAN'T EVEN DO IT IN A YEAR.  BUT I'M INTERESTED IN

24   SOMETHING.

25       THE FIRST DRAWING THAT YOU DID FOR THE JURY, WHICH I

1    BELIEVE MR. QUINN URGED YOU TO JUST LET THE LINES SPEAK; DO YOU

2    RECALL THAT?

3    A   YES.

4    Q   NOW I'M REFERRING TO EXHIBIT NUMBER 13573.

5        DO YOU SEE THAT?

6    A   YEAH.

7    Q   NOW, TO ME, THIS LOOKS FAMILIAR.

8        HAVE YOU EVER DRAWN A MERMAID BEFORE?

9    A   YES.  MANY TIMES.  I LOVE MERMAIDS.

10   Q   DID YOU EVER DRAW THIS AT MATTEL, WHAT'S DEPICTED IN

11   EXHIBIT NUMBER 13573?

12   A   THIS PARTICULAR ONE?  I DON'T KNOW.  I'VE DRAWN MANY

13   MERMAIDS FOR MATTEL.  I DON'T KNOW IF THIS PARTICULAR ONE --

14   IT'S JUST A MERMAID.

15   Q   I WAS WONDERING, IS THIS AN ORIGINAL DRAWING THAT YOU HAVE

16   DONE FOR THE JURY, OR IS IT BASED ON SOMETHING THAT YOU HAVE

17   DONE IN THE PAST?

18   A   I'VE DOODLED THAT BEFORE.

19   Q   IN FACT, WERE YOU THE ARTIST ON SOMETHING

20   CALLED "GLAMERMAID"?

21   A   YES.

22   Q   AND COULD YOU TELL THE JURY WHAT GLAMERMAID IS.

23   A   GLAMERMAIDS?

24   Q   MAIDS.  I APOLOGIZE.  THERE'S TWO OF THEM; THERE'S MORE

25   THAN TWO.

1   A   WELL, THAT'S WHAT THEY'RE CALLED, "GLAMERMAIDS," BECAUSE

2   THERE ARE A FEW OF THEM.

3   Q   WHAT ARE GLAMERMAIDS?

4   A   IT'S A CONCEPT THAT I DID FOR MATTEL, LIKE A DOLL CONCEPT.

5   Q   WAS IT A MERMAID?

6   A   IT WAS A MERMAID CONCEPT.

7   Q   SO ORIGINALLY IT WAS A MERMAID CONCEPT.

8       DID THAT CONCEPT EVER DEVELOP INTO A DOLL?

9   A   NOT AS IS.

10   Q   WERE CHANGES MADE TO YOUR CONCEPT?

11   A   YES.

12   Q   AND BY WHOM?

13   A   CHANGES BY ME, BY -- BUT CHANGES TO WHAT?  TO JUST --

14   Q   BAD QUESTION.

15       DID THE GLAMERMAIDS CONCEPT GET TRANSFORMED AT MATTEL

16   AND ACTUALLY GET MADE INTO A DOLL?

17   A   YES.

18   Q   WHAT DOLL DID YOUR GLAMERMAIDS CONCEPT TRANSFORM INTO?

19   A   TO "MY SCENE."

20   Q   THAT'S MY SCENE, THE DOLL?

21   A   MY SCENE, THE DOLL.

22   Q   NOW, MY SCENE, THE DOLL -- I THOUGHT WE HAD MY SCENE HERE,

23   BUT THAT'S OKAY; WE'LL COME BACK TO THAT IN A MINUTE.

24       MY SCENE, WAS THAT INTRODUCED INTO RETAIL BEFORE

25   BRATZ OR AFTER BRATZ?

1        MR. QUINN:  YOUR HONOR, THIS IS IRRELEVANT TO THIS

2    PHASE.

3        THE COURT:  LAY A FOUNDATION.  I'LL OVERRULE IT.

4        YOU MAY ASK THE QUESTION.

5    BY MR. NOLAN:

6    Q   THE MY SCENE DOLL THAT WAS OFFERED AT RETAIL, THE ORIGINAL

7    CONCEPT, IS DERIVED FROM YOUR DRAWING OF GLAMERMAIDS; CORRECT?

8    A   CORRECT.

9    Q   AND YOU DREW GLAMERMAIDS WHEN?

10   A   I DREW GLAMERMAIDS IN JANUARY OF 2002.  IT WAS MARTIN

11   LUTHER KING'S WEEKEND, BECAUSE I REMEMBER WORKING OVER THE

12   WEEKEND.

13   Q   BY THE TIME THAT YOU DREW GLAMERMAIDS, HAD YOU EVER SEEN A

14   BRATZ DOLL BEFORE?

15       MR. QUINN:  IRRELEVANT, YOUR HONOR.

16       MR. NOLAN:  YOUR HONOR, IF I COULD JUST --

17       THE COURT:  I'LL GIVE YOU SOME LEEWAY, COUNSEL.

18       OVERRULED.

19   BY MR. NOLAN:

20   Q   WHEN DID YOU FIRST KNOW THAT CARTER BRYANT WAS THE

21   ILLUSTRATOR AND DESIGNER OF BRATZ?

22   A   I DON'T REMEMBER.  I DIDN'T KNOW -- I DON'T KNOW.  I

23   DIDN'T KNOW HE WAS UNTIL, LIKE, WE WERE IN THE MIDDLE OF ALL OF

24   THIS.

25   Q   THE MIDDLE OF ALL THIS LAWSUIT?

1    A   YEAH.

2    Q   COULD YOU LOOK IN THE WHITE NOTEBOOK THAT'S IN FRONT OF

3    YOU.  I'D ASK YOU TO LOOK AT EXHIBIT NUMBER 04436.

4    A   REPEAT THAT.

5    Q   SURE.  THE NUMBER IS 04436.

6    A   YES.

7    Q   DO YOU KNOW WHEN THE LITIGATION IN THIS CASE WAS FILED?

8    A   I DON'T.  I DON'T KNOW.

9    Q   DO YOU KNOW WHAT IS MEANT BY "MY SCENE 360 MEETINGS"?

10   A   MY SCENE 360 MEETINGS WERE MEETINGS THAT WE HAD EITHER --

11   I THINK BIWEEKLY OR ONCE A MONTH, WHERE THE VARIOUS DEPARTMENTS

12   THAT ARE INVOLVED WITH THE BRAND WOULD GATHER AND SHARE UPDATES

13   ON WHAT'S GOING ON.

14   Q   AND WOULD YOU ATTEND THOSE MEETINGS?

15   A   SOMETIMES.

16   Q   AND WOULD YOU ATTEND SOME OF THOSE MEETINGS ON BEHALF OF

17   THE DESIGN DEPARTMENT?

18   A   YES, SOMETIMES.

19   Q   AND I ASK YOU TO TAKE A LOOK AT THIS DOCUMENT.  IT'S

20   MARKED OCTOBER 24, 2002.

21       AND DO YOU SEE UNDER "DESIGN," YOUR NAME, "LILY"?

22   A   YES.

23   Q   AND IS IT TRUE THAT FOLLOWING THESE MY SCENE 360 MEETINGS,

24   MINUTES WOULD BE PREPARED OF THE MEETINGS?

25   A   I'M SORRY.  SAY THAT AGAIN, PLEASE.  60 MINUTES?

1    Q   AFTER THESE MEETINGS, NOTES WOULD BE TAKEN AT THE MEETING,

2    WHERE AN AGENDA WOULD BE SET.

3    A   I DON'T REMEMBER.

4    Q   TAKING A LOOK AT THIS DOCUMENT, DO YOU HAVE -- HAVE YOU

5    SEEN THIS DOCUMENT BEFORE?

6    A   I'VE RECEIVED DOCUMENTS LIKE THIS.  I DON'T REMEMBER THIS

7    PARTICULAR ONE.

8    Q   NOW, DOCUMENTS LIKE THIS ONE ARE DOCUMENTS THAT COME OUT

9    OF OR FOLLOW MY SCENE 360 MEETINGS THAT YOU WOULD ATTEND;

10   CORRECT?

11   A   I'M SORRY.  SAY THAT AGAIN.

12   Q   SURE.

13       DOCUMENTS SUCH AS THE ONES THAT I HAVE MARKED HERE AS

14   4436 ARE MINUTES, NOTES, FOLLOWING A PARTICULAR MY SCENE 360

15   MEETING; CORRECT?

16   A   THESE NOTES?

17   Q   THIS DOCUMENT.

18       YOU'VE SEEN THIS TYPE OF DOCUMENT BEFORE?

19   A   YEAH.  THIS WAS ACTUALLY, I THINK, HANDED BEFORE THE

20   MEETING, LIKE -- YEAH.

21   Q   BUT YOU'VE SEEN THESE TYPE OF DOCUMENTS WHILE AT MATTEL;

22   CORRECT?

23   A   YES.

24   Q   IN CONNECTION WITH MY SCENE, THE DOLL?

25   A   YES.

1        MR. NOLAN:  YOUR HONOR, WE'D OFFER EXHIBIT 4436.

2        MR. QUINN:  THERE IS NO AUTHENTICATION OR FOUNDATION

3   FOR THIS PARTICULAR DOCUMENT.  IT'S ALSO IRRELEVANT AND BEYOND

4   THE SCOPE, YOUR HONOR, OF THE DIRECT EXAMINATION.

5        MR. NOLAN:  IT'S FOR IMPEACHMENT.

6        THE COURT:  IT IS RELEVANT BASED ON IMPEACHMENT.

7        LAY A FURTHER FOUNDATION FOR IT.

8   BY MR. NOLAN:

9   Q   DO YOU RECALL ATTENDING ANY OF THE MY SCENE 360 MEETINGS

10  IN OCTOBER OF 2002?

11  A   I DON'T RECALL SPECIFIC ONES, BUT I'M POSITIVE I ATTENDED

12  SOME MEETINGS.

13  Q   HOW OFTEN WERE THESE MEETINGS CONDUCTED?

14  A   LIKE I SAID, PROBABLY BIWEEKLY, ONCE A MONTH.

15  Q   AND PRIOR TO THE MEETING, AGENDAS WOULD BE HANDED OUT IN

16  THE GENERAL FORMAT THAT IS MARKED AS EXHIBIT 4436?

17  A   YEAH.  THIS WOULD BE HANDED OUT BEFORE, OR, LIKE, IN THE

18  BEGINNING OF THE MEETING.

19  Q   AND WOULD YOU REVIEW THOSE MINUTES, OR THOSE NOTES?

20  A   YEAH.  I THINK -- IF I REMEMBER CORRECTLY, WE WOULD GO

21  DOWN THE LINE AS TO WHAT EACH PERSON, EACH DEPARTMENT, WOULD

22  TALK ABOUT.

23       MR. NOLAN:  YOUR HONOR, WE'D OFFER 4436.

24       THE COURT:  THE FOUNDATION IS NOT THERE YET, COUNSEL.

25  / / /

1   BY MR. NOLAN:

2   Q   DO YOU RECALL, AT ONE OF THESE MEETINGS, EVER TALKING

3   ABOUT PARTICULAR NAMES FOR PROPOSED MY SCENE DOLLS?

4   A   WE MIGHT HAVE TALKED ABOUT NAMES.

5   Q   DO YOU RECALL EVER DISCUSSING, AT A MY SCENE 360 MEETING,

6   THE USE OF THE NAME "BRYANT" FOR A MY SCENE DOLL?

7   A   YEAH.  WE PROBABLY TALKED ABOUT IT; THAT WAS ONE OF THE

8   NAMES OF ONE OF OUR DOLLS.

9   Q   DO YOU REMEMBER BEING AT A MEETING WHERE YOU MADE ANY

10   COMMENTS WITH RESPECT TO THE USE OF THE NAME "BRYANT" IN

11   CONNECTION WITH A MY SCENE DOLL?

12   A   I DON'T REMEMBER A MEETING, BUT I REMEMBER MENTIONING IT

13   TO MARKETING, ABOUT THE NAME "BRYANT."

14   Q   WHAT DO YOU RECALL MENTIONING TO MARKETING?

15   A   I REMEMBER SAYING TO THEM, 'HEY, YOU KNOW, I'VE BEEN

16   HEARING BUZZ ABOUT THIS, YOU KNOW, BRYANT THING, ASSOCIATED

17   WITH BRATZ.  LIKE, I DON'T WANT TO HAVE ANYTHING TO DO WITH

18   THAT.  DO YOU THINK WE SHOULD USE THAT NAME?"  AND MARKETING

19   IS, LIKE, 'OH, THERE'S NO PROBLEM; THERE'S NOTHING WRONG WITH

20   THAT, BECAUSE WE'RE' -- ALL OF OUR NAMES FROM MY SCENE ARE

21   BASED ON STREETS OR PLACES IN NEW YORK; THE DOLLS ARE BASED IN

22   NEW YORK.  SO WE HAVE, LIKE, "CHELSEA" AND "KENNEDY."  AND

23   "BRYANT" IS FOR BRYANT PARK.  WE ALSO HAVE OTHER BOY NAMES,

24   CALLED "HUDSON" AND "RIVER," HUDSON RIVER.  SO THAT WAS NOT

25   WHAT THE ORIGIN OF THAT WAS.  I JUST THOUGHT I POINTED IT OUT.

1    Q   BUT YOU RECALL POINTING THAT OUT WITH RESPECT TO THE NAME

2    "BRYANT," THE SPECIFIC NAME "BRYANT"?

3    A   RIGHT.

4        MR. NOLAN:  YOUR HONOR, I'D OFFER 4436.

5        THE COURT:  COUNSEL, I THINK YOU'VE ACHIEVED WHAT YOU

6    WANTED WITH THIS DOCUMENT.  THERE'S NO FOUNDATION FOR THIS OVER

7    THE HEARSAY CONCERNS.

8        MR. NOLAN:  LET ME GO FURTHER.

9        THE COURT:  IF YOU'RE GOING TO ADOPT THIS -- UNLESS

10   YOU CAN GET HER TO ADOPT WHAT YOU'RE SEEKING TO GET OUT OF

11   THIS, OR REFRESH HER RECOLLECTION, WHICH APPARENTLY DOESN'T

12   NEED REFRESHING.

13   BY MR. NOLAN:

14   Q   DO YOU RECALL, AT A MEETING, BEING ADVISED THE NAME

15   "BRYANT" HAD BEEN CLEARED WORLDWIDE FOR TRADEMARK PURPOSES, BUT

16   YOU POINTED OUT THAT THE FORMER MATTEL DESIGNER IS THE CREATOR

17   OF BRATZ --

18       MR. QUINN:  MAY WE APPROACH?

19       THE COURT:  SIDE-BAR, COUNSEL.

20       (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

21   SIDE-BAR:)

22       THE COURT:  THE COURT IS PERMITTING THIS ON THE BASIS

23   THAT SHE'S ALREADY TESTIFIED THAT SHE DIDN'T HEAR ABOUT BRYANT

24   BEING A DESIGNER OF BRATZ UNTIL THIS LITIGATION.  THIS

25   IMPEACHES THAT.

1          COUNSEL, THIS IS A HEARSAY DOCUMENT.  SHE DIDN'T

2     WRITE THIS DOCUMENT.  SHE HAS ADOPTED THE DOCUMENT.  YOU HAVE

3     THE BASIS TO ASK HER QUESTIONS ABOUT THE DOCUMENT.  AND IF SHE

4     CAN'T REMEMBER, PERHAPS THIS MIGHT REFRESH HER RECOLLECTION.  I

5     DON'T SEE ANY BASIS FOR GETTING THIS IN.

6          YOUR OBJECTION, SHE'S ALREADY SAID, IN HER

7     LANGUAGE -- WHICH, QUITE FRANKLY, I'VE LISTENED TO THIS WITNESS

8     FOR AN HOUR NOW, IT SOUNDS PROBABLY MORE LIKE WHAT SHE SAID AS

9     OPPOSED TO THIS FORMAL WRITING HERE; THAT DOESN'T SOUND LIKE

10    HER WORDS.  I DON'T KNOW WHAT MORE YOU NEED OUT OF IT.  SHE'S

11    ADMITTED THAT SHE SAID AT THIS MEETING THAT, YEAH, WHY ARE WE

12    DOING THIS?  YOU CAN ASK HER THE NEXT QUESTION NOW.

13    'OBVIOUSLY, YOU WERE AWARE OF THIS BEFORE THIS LITIGATION.'

14         MR. QUINN:  YOUR HONOR, THE REASON I ASKED FOR THIS

15    CONFERENCE WAS, THIS HAS HAPPENED A FEW TIMES NOW, THAT THE WAY

16    MR. NOLAN POSES THE QUESTION AFTER THE WITNESS CAN'T

17    AUTHENTICATE THE DOCUMENT.

18         THE COURT:  AND THE OBJECTION TO THAT IS --

19         MR. QUINN:  HE GOES INTO THE CONTENTS AND BUILDS IT

20    INTO A QUESTION.

21         THE COURT:  AND THE OBJECTION TO THAT IS, 'COUNSEL IS

22    TESTIFYING,' AND I WILL SUSTAIN THAT.

23         BE CAREFUL ON THAT.

24         MR. QUINN: THANK YOU, YOUR HONOR

25         (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

1        THE COURT:  YOU MAY ASK YOUR NEXT QUESTION, COUNSEL.

2        MR. NOLAN:  THANK YOU.

3    BY MR. NOLAN:

4    Q    IN LOOKING AT THE DOCUMENT THAT'S BEEN MARKED AS 4436,

5    HAVE YOU HAD AN OPPORTUNITY TO READ THE NOTES UNDER "PRODUCT"?

6    A    YES.

7    Q    AFTER READING IT, DOES THAT REFRESH YOUR RECOLLECTION AS

8    TO WHEN YOU KNEW CARTER BRYANT WAS THE CREATOR OF BRATZ?

9        MR. QUINN:  YOUR HONOR, I OBJECT.  COUNSEL IS

10   TESTIFYING.

11       THE COURT:  WE HAVEN'T ESTABLISHED THAT SHE'S

12   FORGOTTEN ANYTHING, COUNSEL, SO I'LL SUSTAIN THE OBJECTION.

13       REPHRASE YOUR QUESTION.

14   BY MR. NOLAN:

15   Q    WHEN DID YOU KNOW THAT CARTER BRYANT WAS THE CREATOR OF

16   BRATZ?

17   A    I DON'T REMEMBER KNOWING -- I DIDN'T WRITE THIS.  ALL I

18   SAID IS, I POINTED IT OUT THAT THERE WAS BUZZ THAT HE HAD

19   SOMETHING TO DO -- YOU KNOW, WAS INVOLVED WITH THAT BRAND.

20       THE COURT:  THAT'S NOT RESPONSIVE.

21       PLEASE ANSWER THE QUESTION.

22       WHEN DID YOU KNOW?

23       THE WITNESS:  I DON'T RECALL A SPECIFIC TIME, OR LIKE

24   I SAID -- YEAH, I DON'T RECALL A SPECIFIC TIME, OR THAT HE WAS

25   "THE" CREATOR.

1    BY MR. NOLAN:

2    Q   WHEN DID YOU FIRST HEAR THE BUZZ THAT CARTER BRYANT MAY

3    HAVE BEEN ONE OF THE DESIGNERS OR CREATORS OF BRATZ?

4    A   I DON'T REMEMBER.  I DON'T REMEMBER.

5    Q   WAS IT BEFORE YOUR DEPOSITION IN THIS CASE?

6    A   YES.

7    Q   DO YOU KNOW WHETHER OR NOT IT WAS BEFORE THE LAWSUIT WAS

8    FILED?

9    A   I'M NOT REALLY SURE WHEN THE LAWSUIT WAS FILED.

10   Q   IN FACT, DID MATTEL SELL A MY SCENE DOLL NAMED "BRYANT"?

11   A   YES, WE SOLD A DOLL NAMED "BRYANT."

12   Q   DO YOU KNOW WHEN YOU OFFERED THE MY SCENE DOLL NAMED

13   "BRYANT" FOR SALE?

14   A   I THINK IT WAS THE SECOND WAVE OF PRODUCT.  I DON'T HAVE A

15   SPECIFIC DATE.  YOU SEE, I WORKED ON THE PRELIMINARY ASPECT OF

16   IT, SO MY DATES -- WE WORKED AHEAD OF TIME, SO WHEN IT ACTUALLY

17   COMES OUT, I DON'T REALLY REMEMBER.

18        MR. NOLAN:  YOUR HONOR, MAY I APPROACH FOR A MOMENT?

19        THE COURT:  YOU MAY.

20        YOUR HONOR, I'M PLACING BEFORE THE WITNESS EXHIBIT

21   NUMBER 17818.

22   BY MR. NOLAN:

23   Q   MS. MARTINEZ, CAN YOU TELL THE JURY WHETHER OR NOT YOU

24   RECOGNIZE THE DOLL THAT'S DEPICTED IN THE BOX THAT I'VE PLACED

25   IN FRONT OF YOU.

1    A   YES.  IT'S A MY SCENE BOY, NAMED "BRYANT."

2    Q   IS THERE ANYTHING ON THE PACKAGING THAT REFERS TO

3    NEW YORK?

4    A   THERE MIGHT BE.  LIKE, IN THE BACK, THERE'S, LIKE, A

5    GRAPHIC THAT HAS WORDS AND STUFF.

6        YES.  THIS IS SOMETHING ABOUT A VINTAGE STORE IN

7    SOHO.

8    Q   NOW, DO YOU RECALL SEEING THIS DOLL?

9    A   YES, I'VE SEEN THIS DOLL BEFORE.

10   Q   WHEN YOU SAW THE DOLL, DID YOU TELL ANYBODY THAT IT WAS

11   ODD THAT MATTEL WAS NAMING A DOLL 'MY SCENE' AFTER THE CREATOR

12   OF BRATZ?

13       MR. QUINN:  OBJECTION.  ASSUMES FACTS NOT IN

14   EVIDENCE.

15       THE COURT:  REPHRASE, COUNSEL.

16   BY MR. NOLAN:

17   Q   DID YOU EVER TALK TO ANYBODY AT MATTEL AFTER MATTEL NAMED

18   THE MY SCENE DOLL "BRYANT" AND SAY, 'WHY DID WE NAME A MY SCENE

19   DOLL BRYANT AFTER THE CREATOR OF BRATZ,' OR WORDS TO THAT

20   EFFECT?

21       MR. QUINN:  SAME OBJECTION, YOUR HONOR.

22       THE COURT:  IT'S COMPOUND AS WELL.

23       REPHRASE.

24   BY MR. NOLAN:

25   Q   DID YOU EVER COMPLAIN TO ANYBODY AT MATTEL ABOUT THE NAME

1    "BRYANT" ON A MY SCENE DOLL?

2    A   I DIDN'T COMPLAIN.  I JUST POINTED IT OUT TO MY MARKETING

3    PARTNER THAT THE NAME "BRYANT" IS THE LAST NAME OF A PERSON

4    THAT USED TO WORK AT MATTEL THAT HAD SOMETHING TO DO WITH THE

5    BRAND BRATZ.

6    Q   WHO WAS YOUR MARKETING PARTNER?

7    A   I THINK I TOLD JEAN GOMEZ.

8    Q   DO YOU RECALL THE DATE OF THAT CONVERSATION?

9    A   NO, I DON'T.

10   Q   DO YOU RECALL THE YEAR?

11   A   IT MUST HAVE BEEN AROUND THIS TIME.  IF IT'S BROUGHT UP IN

12   THIS MEETING, IT MUST HAVE BEEN AROUND THAT TIME.

13   Q   WHAT POSITION, IF ANY, DID YOU HOLD WITH RESPECT TO THE

14   MY SCENE DOLL LINE?

15   A   I CAME UP WITH THE DOLL LINE FROM MY MERMAID, SO I WAS THE

16   LEAD DESIGNER ON IT.

17   Q   MY SCENE WAS YOUR CONCEPT AND IDEA?

18   A   I DIDN'T COME UP WITH THE NAME, BUT THE ESSENCE OF WHAT I

19   CAPTURED IN THE GLAMERMAIDS -- MIND YOU, MY SCENE IS NOT

20   MERMAID -- WAS THEN TRANSLATED TO THE MY SCENE DOLL.

21   Q   WAS THAT INITIAL CONCEPT AN IDEA THAT YOU CAPTURED IN

22   GLAMERMAIDS, SHOWN IN A DRAWING THAT YOU DID INITIALLY?

23   A   YEAH, IT SHOWED DRAWINGS OF GLAMERMAIDS.

24   Q   BEFORE MATTEL, YOU ATTENDED FASHION SCHOOL; IS THAT

25   CORRECT?

1   A   CORRECT.

2   Q   FOR, I UNDERSTAND, TWO YEARS?

3   A   MY DEGREE WAS FOR TWO YEARS, AND I ATTENDED A THIRD YEAR

4   IN THE SAME SCHOOL.

5   Q   THE THIRD YEAR, WAS THAT A YEAR THAT YOU WERE ALSO WORKING

6   FOR MATTEL?

7   A   NOT AT THE SAME TIME I WAS GOING TO SCHOOL.

8   Q   AT YOUR FASHION SCHOOL, DID YOU DO DESIGNS, ILLUSTRATIONS,

9   DRAWINGS?

10   A   YES.

11   Q   WHEN YOU WENT TO WORK AT MATTEL, WERE YOU REQUIRED TO SIGN

12   AN EMPLOYEE'S CONFIDENTIALITY AGREEMENT?

13   A   YES, I SIGNED ONE.

14   Q   DID YOU ASSIGN THE DRAWINGS AND IDEAS AND CONCEPTS THAT

15   YOU HAD AT THE FASHION INSTITUTE TO MATTEL WHEN YOU JOINED

16   MATTEL?

17   A   NO.  IT WAS TWO SEPARATE THINGS.

18   Q   WHAT DO YOU MEAN BY "TWO SEPARATE THINGS"?

19   A   THAT WAS STUFF FOR SCHOOL, AND IT WAS MORE FASHION STUFF

20   FOR CLOTHING.  IT WAS DIFFERENT.  IT WAS SCHOOL.  AND NOW I'M

21   WORKING FOR MATTEL, DOING TOYS.

22   Q   WHEN YOU WERE IN FASHION SCHOOL, WERE THEY ASKING YOU TO

23   COME UP WITH YOUR OWN IDEAS FOR FASHIONS AS A PART OF THE

24   HOMEWORK ASSIGNMENT?

25   A   OF COURSE.

1  Q   YOU JUST WEREN'T SIMPLY COPYING SOMEBODY ELSE'S IDEAS OF

2  FASHION.

3  A   OF COURSE NOT.  YOU ARE INSPIRED BY THINGS, BUT YOU COME

4  UP -- YOU'RE A DESIGNER; YOU DESIGN THINGS.

5  Q   SO THOSE DESIGNS THAT YOU CAME UP WITH WHILE YOU WERE AT

6  THE FASHION SCHOOL, DID YOU CONSIDER THOSE TO BE YOUR ORIGINAL

7  IDEAS AND CONCEPTS?

8  A   YES.

9  Q   AND IT'S THOSE ORIGINAL IDEAS AND CONCEPTS THAT YOU DID

10  NOT TRANSFER TO MATTEL ONCE YOU SIGNED THE EMPLOYEE'S

11  CONFIDENTIALITY INFORMATION AGREEMENT; IS THAT CORRECT?

12  A   WELL, I MEAN, THEY ARE MY DRAWINGS AT THE TIME, SO IF I

13  HAD DONE SOMETHING AND I CAN UTILIZE IT AT WORK, I COULD

14  UTILIZE IT AT WORK.

15  Q   I WANT TO ASK YOU ABOUT THESE DRAWINGS AGAIN.  GO BACK TO

16  13573, 13574, AND 13575, THE THREE ILLUSTRATIONS.

17      I NOTED AFTER YOU DID THE DRAWINGS THAT YOU DATED

18  THEM TODAY; CORRECT?

19  A   YES.

20  Q   WHY DID YOU DO THAT?

21  A   I THINK FOR OBVIOUS REASONS.

22      TO DATE THEM?  BECAUSE TODAY IS WHEN I DID THEM.

23  Q   AND IS IT YOUR PRACTICE TO ALWAYS DATE YOUR DRAWINGS WHEN

24  YOU DO THEM?

25  A   I DIDN'T ALWAYS DATE THEM, BUT I DO NOW.

1    Q   WHEN DID YOU START DATING THEM?

2    A   I DON'T REMEMBER SPECIFIC TIMES.  I MEAN, SOMETIMES I

3    STILL DON'T DATE THEM, BUT FOR THE MOST PART, I DATE MOST OF MY

4    DRAWINGS.

5    Q   I'D LIKE TO GO BACK TO -- AND WE'LL USE THE EXHIBIT

6    NUMBERS THAT HAVE BEEN USED BY MATTEL HERE.

7         DO YOU STILL HAVE THE BLACK NOTEBOOK IN FRONT OF YOU?

8    A   YES.

9    Q   WOULD YOU TAKE A LOOK AT EXHIBIT 263.

10        DO YOU HAVE THAT IN FRONT OF YOU?

11   A   YES.

12        MR. NOLAN:  YOUR HONOR, I BELIEVE 263 IS IN EVIDENCE.

13        MAY WE PUBLISH IT?

14        THE COURT:  YES, YOU MAY.

15   BY MR. NOLAN:

16   Q   WE'VE SEEN THIS DRAWING BEFORE.

17        THIS IS TOON TEENS; RIGHT?

18   A   YES.

19   Q   THAT'S YOUR CONCEPT AND IDEA FOR TOON TEENS?

20   A   YES.

21   Q   DO YOU SEE A DATE ON THAT?

22   A   YES.

23   Q   WHAT IS THAT DATE?

24   A   THIS IS JUNE '99.

25   Q   WHEN YOU DID THE DRAWING, YOU DIDN'T DATE IT JUNE '99, DID

1    YOU?

2    A   NO.  I PUT THE DATE AFTER.

3    Q   HOW LONG AFTER DID YOU PUT THE DATE ON IT?

4    A   I DON'T REMEMBER.

5    Q   CAN WE GO TO EXHIBIT NUMBER 263-002.

6        AGAIN, THIS IS THE CONCEPT OF TOON TEENS.

7        THAT'S YOUR DRAWING?

8    A   YES.

9    Q   DO YOU HAVE THAT IN FRONT OF YOU?

10   A   YES.

11   Q   AGAIN, LOOKING IN THE LOWER RIGHT-HAND CORNER, DO YOU SEE

12   A DATE THERE?

13   A   YES; SAME THING; JUNE '99.

14   Q   AND DID YOU PUT THAT DATE ON IT WHEN YOU DID THE DRAWINGS?

15   A   NO.  AFTER.

16   Q   CAN YOU LOOK AT 263-003.

17       AGAIN, THE CONCEPT IS YOUR TOON TEENS; YES?

18   A   YES.

19   Q   AND AGAIN THERE'S A DATE, JUNE OF 1999.

20       DID YOU PUT THAT DATE ON THAT DRAWING IN JUNE OF

21   1999?

22   A   NO.  I PUT IT AFTER.

23   Q   263-004.

24       DO YOU RECOGNIZE THIS AS JUST ANOTHER VARIATION OF

25   THE CONCEPT OF TOON TEENS THAT YOU DREW?

1    A   YES.

2    Q   AND BOTH OF THESE PANELS APPEAR TO BE DATED JUNE OF 1999;

3    CORRECT?

4    A   YES.

5    Q   AND DID YOU DATE THESE AFTER YOU ACTUALLY DID THE

6    DRAWINGS?

7    A   THAT WOULD BE CORRECT.

8    Q   CAN I ASK YOU TO LOOK AT EXHIBIT 263-005.

9        THIS ALSO BEARS DATES.

10        THE DATE WAS PLACED ON THESE DRAWINGS BY YOU AFTER

11   YOU ORIGINALLY DID THEM.

12   A   YES.

13   Q   AND YOU DON'T REMEMBER HOW FAR AFTER.

14   A   NO.

15   Q   AND IS THAT TRUE ALSO FOR EXHIBIT 263-006?

16        IT HAS A DATE OF JUNE 1999.

17        THIS, AGAIN, WAS PUT IN SOMETIME LATER?

18   A   YES.  IT'S TRUE FOR -- UNTIL 009.  LIKE, ALL OF THE ONES

19   YOU HAVE IN THIS SECTION, I PUT THE DATE AFTER.

20   Q   HOW DO YOU KNOW YOU DID THESE IN JUNE OF 1999?

21   A   BECAUSE I GOT A CALL -- I DON'T REMEMBER WHEN, BUT AFTER

22   JUNE '99, ABOUT -- THE LEGAL DEPARTMENT CONTACTED ME AND SAID,

23   'HEY, WE MIGHT NEED ALL YOUR TOON TEENS STUFF, YOUR SKETCHES

24   AND WHATEVER YOU HAVE.'  AND I SAID, 'OH, OKAY.'  AND I HUNG UP

25   THE PHONE, AND I GATHERED MY STUFF; AND AT THAT POINT, I SAID I

1    BETTER DATE THEM BEFORE I FORGET EXACTLY WHEN I DID THIS.  AND

2    THAT'S WHY I PUT THE DATE AFTERWARDS.

3    Q   SO YOU PUT THE DATE ON IT BEFORE YOU SENT IT UP TO THE

4    LEGAL DEPARTMENT.

5    A   I BELIEVE SO.  I DON'T KNOW IF THEY -- THEY JUST TOLD ME,

6    LIKE, 'HEADS UP.  WE MIGHT NEED THAT STUFF.'  I DIDN'T SEND

7    THEM RIGHT AFTER.  I DON'T REMEMBER WHEN I ACTUALLY GAVE MY

8    STUFF TO THE LEGAL DEPARTMENT.

9    Q   OKAY.  THANK YOU.

10       I JUST WANT TO TAKE A LOOK AT TOON TEENS.

11       FIRST OF ALL, IT'S OBVIOUS FROM THAT, AND THIS

12   DRAWING, THAT YOU'RE A TALENTED ARTIST.  I JUST WANT TO DRAW,

13   THOUGH, A DISTINCTION BETWEEN WHAT YOU HAVE DRAWN FOR THE JURY

14   OVER HERE ON THE BUTCHER PAPER AND TOON TEENS.

15       IS THERE A DIFFERENCE IN THE CONCEPT BETWEEN THAT

16   DRAWING OF THE MERMAID AND TOON TEENS?

17   A   WHAT DO YOU MEAN?  IT'S TWO DIFFERENT THINGS.

18   Q   SO THEY'RE TWO DIFFERENT EXPRESSIONS AND IDEAS?

19   A   YEAH.  ONE'S A MERMAID; ONE'S NOT.

20   Q   OKAY.

21       DESCRIBE THE AGE OF THE CHARACTER THAT'S DEPICTED IN

22   YOUR TOON TEENS DRAWINGS.

23   A   I DON'T KNOW IF I WOULD GIVE THEM AGES.  THE DRAWING LOOKS

24   LIKE A YOUNG -- SHE'S, LIKE, A BABY FACE.  SHE LOOKS YOUNG.

25   Q   WHAT WAS YOUR INSPIRATION FOR TOON TEENS?

1   A   DIFFERENT THINGS.

2        FOR TOON TEENS, I DID A LOT OF THINGS THAT I LOVED TO

3   DO.  WHEN I DID THE DECAL, WHICH IS WHERE THIS ORIGINATED -- I

4   MEAN, THE INSPIRATION FOR THAT WAS A LITTLE BIT DIFFERENT

5   BECAUSE I WAS ASKED TO MAKE IT INTO ACTUAL 3-D FORM.  I HAD TO

6   TAKE INTO CONSIDERATION WHAT WOULD INSPIRE ME TO ACTUALLY DO A

7   DOLL VERSUS WHAT WOULD ACTUALLY MAKE ME DO A DECAL, SO...

8        YEAH, IT WAS A VARIETY OF THINGS.

9        I HAPPENED TO HAVE A DOLL THAT -- ACTUALLY, I STILL

10  HAVE -- OF COURSE, LIKE -- ANYWAYS, HER -- A DOLL CALLED "HOT

11  LOOKS."  AND I'VE HAD THIS -- WHEN I WAS, I THINK, 11 OR

12  SOMETHING LIKE THAT, I STILL HAD THAT DOLL.  BUT IT WAS A

13  PRETTY BIG DOLL, LIKE THIS, AND SHE WAS PLUSH, AND IT MEANT SO

14  MUCH TO ME.  I STILL KEPT IT, AND I LIKED IT, AND I'M, LIKE, 'I

15  WANT TO DO THIS DOLL AGAIN.'  SO THAT WAS THE INSPIRATION FOR

16  THE 3-D TO BE THE WAY IT WAS.

17       THEN FOR OTHER THINGS, LIKE -- I REALLY LIKE GIRLY,

18  CUTESY STUFF; I REALLY LIKE PRETTY, GIRLY THINGS; AND I WANTED

19  TO COMBINE THAT WITH -- I KNOW I POINTED THIS OUT, I LIKE

20  MAKEUP A LOT; LIKE, A LOT.  AND SO, YOU KNOW -- I DO MY MAKEUP.

21  THAT'S HOW I DRAW.  AND THE EYEBROWS AND THE EYELASHES AND LOTS

22  OF LIPSTICK.

23       SO YOU CAN SAY THAT -- YOU KNOW, IT'S EASY FOR ME TO

24  DO A FACE, BECAUSE I PUT ON MY MAKEUP, AND I LIKE TO THINK I DO

25  A GOOD JOB OF PUTTING ON MY MAKEUP.  AND SO THAT WAS PARTLY IT.

1    THERE WAS SOME OTHER STUFF THAT, YOU KNOW, OBVIOUSLY INFLUENCES

2    ME, THAT I GRAVITATE TOWARDS, LIKE, WHATEVER, MAGAZINES,

3    MOVIES, WHATEVER.

4    Q   SO MAGAZINES SERVE AS AN INSPIRATION FOR YOU IN DOING YOUR

5    DESIGNS?

6    A   SURE.  IT COULD BE INSPIRATION.

7    Q   ARE YOU FAMILIAR WITH THE MAGAZINE SEVENTEEN?

8    A   YES, I'M FAMILIAR WITH THAT MAGAZINE.

9    Q   ARE YOU FAMILIAR WITH THE TERM "TEAR SHEETS"?

10   A   YES.

11   Q   AND CORRECT ME IF I'M WRONG, A TEAR SHEET IS SIMPLY A PAGE

12   OR AN ADVERTISEMENT TORN OUT OF A MAGAZINE; CORRECT?

13   A   YES.

14   Q   HAVE YOU EVER SEEN TEAR SHEETS POSTED IN CUBICLES WITHIN

15   THE DESIGN CENTER AT MATTEL?

16   A   I HAVE.  I'VE SEEN THEM.

17   Q   IN FACT, HAVE YOU EVER USED AND POSTED TEAR SHEETS FOR

18   INSPIRATION FOR YOU IN YOUR OWN CUBICLE?

19   A   SURE.  YES, I HAVE.

20       MR. NOLAN:  YOUR HONOR, MAY I SHOW THIS TO MR. QUINN?

21       THE COURT:  IS THE MAGAZINE IDENTIFIED BY A NUMBER?

22       MR. NOLAN:  YES, YOUR HONOR.  IT'S EXHIBIT NUMBER

23   17246.

24       YOUR HONOR, AS I POINTED OUT TO MR. QUINN, I'VE

25   TAGGED SOME OF THE PAGES, JUST SO THAT WE DON'T HAVE TO BE

1    GOING THROUGH PAGE BY PAGE.

2        THE COURT:  DO YOU HAVE A COPY FOR THE COURT?

3        MR. NOLAN:  YES, YOUR HONOR.

4        YOU HAVE THE LONGER VERSION.  I APOLOGIZE.

5    BY MR. NOLAN:

6    Q   SO YOU RECOGNIZE THIS AS A SEVENTEEN MAGAZINE?

7    A   YES.

8    Q   AND THIS IS THE AUGUST 1998 EDITION?

9    A   THAT'S WHAT IT SAYS.

10   Q   THANK YOU.

11       I'D ASK YOU TO TURN TO THE PAGE OF WHERE THERE'S A

12   PARIS BLUES AD.  AND I'VE MARKED IT ON THE SIDE.

13       THE COURT:  COUNSEL, WHAT PAGE IS THAT?  DO YOU KNOW?

14       MR. NOLAN:  127, YOUR HONOR.

15       THE COURT:  THANK YOU.

16       THE WITNESS:  YES.

17       MR. NOLAN:  YOUR HONOR, WE'D OFFER THIS SEVENTEEN

18   MAGAZINE INTO EVIDENCE.

19       THE COURT:  ANY OBJECTION?

20       MR. QUINN:  NO OBJECTION.

21       THE COURT:  ADMITTED.

22       MR. NOLAN:  AND I'D LIKE TO PUBLISH IT.

23       THE COURT:  YOU MAY.

24       MR. QUINN:  RATHER THAN THE WHOLE THING, YOUR HONOR.

25   IF I COULD -- JUST THE PARTICULAR PAGES THAT HAVE ALREADY BEEN

1    SHOWN.  I ASSUME COUNSEL DOESN'T NEED THE WHOLE MAGAZINE.

2        THE COURT:  THAT WOULD MAKE SENSE.

3        YOU HAVE NO OBJECTION TO ANY PART OF THE MAGAZINE?

4    YOU JUST WANT TO INTRODUCE THE PAGES THAT ARE BEING REFERRED

5    TO?

6        MR. QUINN:  RIGHT.

7        THE COURT:  FAIR ENOUGH, MR. NOLAN?

8        MR. NOLAN:  FAIR ENOUGH, AS LONG AS THE ORIGINAL IS

9    AVAILABLE FOR INSPECTION.

10       THE COURT:  WE'LL HAVE OTHER MAGAZINES FOR THE JURY

11   TO READ BACK THERE.

12       MR. NOLAN:  I DIDN'T MEAN IT THAT WAY.  I APOLOGIZE.

13       IF THE COPY WAS BAD.

14   BY MR. NOLAN:

15   Q   TURNING YOUR ATTENTION TO THE PARIS BLUES AD, DO YOU

16   RECOGNIZE THE PARIS BLUES BRAND?

17       WHAT IS PARIS BLUES?  DO YOU KNOW?

18   A   IT'S A DENIM COMPANY.

19   Q   AND DO YOU RECALL EVER SEEING THIS PARTICULAR AD IN ANY OF

20   THE FASHION MAGAZINES THAT YOU LOOKED AT?

21   A   I MIGHT HAVE.  I DON'T REMEMBER SPECIFICALLY.

22   Q   NOW, WOULD YOU AGREE WITH ME THAT IN LOOKING AT THIS PARIS

23   BLUES AD, THERE'S A FEW FEATURES THAT STAND OUT?  FOR INSTANCE,

24   THE EYES ARE RATHER LARGE AND PROMINENT; RIGHT?

25   A   SURE.

1    Q    WOULD YOU SAY THAT THE LIPS ARE PRONOUNCED?

2    A    NOT SO MUCH.

3    Q    WHAT ABOUT BIG FEET?

4    A    I DON'T KNOW ABOUT BIG FEET, BUT BIG SHOES.

5    Q    BIG SHOES.

6    A    BIG PLATFORMS.

7    Q    THE SHOES SEEM TO FIT THE FEET?

8    A    THEY LOOK LIKE REGULAR SIZE FEET, JUST BIG PLATFORMS.

9    BUT, YEAH, BIG SHOES.

10   Q    MY DEFICIT IN FASHION IS REALLY SHOWING HERE.  I

11   APOLOGIZE.

12       THOSE ARE, LIKE, PLATFORM SHOES?

13   A    YES.

14   Q    NOW, DO YOU RECALL EVER SEEING A PICTURE OF PARIS BLUES

15   BEING DEPICTED WITHIN ANY OF THE DESIGN CENTERS AT MATTEL?

16   A    I DON'T KNOW.  THE DESIGN CENTER IS HUGE, SO I DON'T GO

17   ON PEOPLE'S -- NO.

18       MR. NOLAN:  CAN WE TURN TO THE COKE AD.

19   BY MR. NOLAN:

20   Q    IF YOU'D TURN TO PAGE 193.

21       MR. NOLAN:  I ALSO HAVE IT MARKED FOR YOU, FOR THE

22   COKE.

23       THE COURT:  193 IS ADMITTED, AND YOU MAY PUBLISH.

24   BY MR. NOLAN:

25   Q    NOW, THIS IS AN AD THAT ALSO APPEARED IN THE AUGUST 1998

1     MAGAZINE SEVENTEEN.

2         DO YOU SEE THAT?

3     A   YES.

4     Q   HAVE YOU EVER SEEN THIS AD BEFORE?

5     A   I DON'T RECALL, OTHER THAN HERE.  LIKE, YOU'VE SHOWN IT

6     BEFORE, HERE.

7     Q   AGAIN, YOU WOULD AGREE WITH ME THAT THIS ADVERTISEMENT

8     DEPICTS A CHARACTER WITH A BIG HEAD; YES?

9     A   WELL, THE BODY IS KIND OF BIG TOO.  SHE'S JUST CROUCHING.

10    BUT, YEAH, IT'S A PRETTY BIG HEAD.

11    Q   DO YOU THINK THE EYES ARE PRETTY BIG?

12    A   IT'S A STYLIZED ILLUSTRATION, SO...  YEAH, I GUESS THEY'RE

13    BIG FOR -- IF YOU COMPARE IT TO, LIKE, A HUMAN TYPE

14    ILLUSTRATION.

15    Q   RIGHT.

16        AND THE LIPS ARE PRONOUNCED?

17    A   THE LIPS ARE BIG, YES.

18    Q   AND, AGAIN, THE SHOES SEEM LARGE?

19    A   THEY SEEM LARGE.

20    Q   AND THE LAST ONE I WANTED TO -- IF YOU GO TO THE

21    STEVE MADDEN AD.  AND THIS IS AT PAGE 115.

22        MR. NOLAN:  WE'D OFFER 115, YOUR HONOR, AND PUBLISH

23    IT.

24        THE COURT:  THAT'S ADMITTED, AND YOU MAY PUBLISH.

25        MR. NOLAN:  THANK YOU.

1    BY MR. NOLAN:

2    Q   AGAIN, APART FROM THIS LITIGATION, ARE YOU FAMILIAR WITH

3    THE SHOEMAKER STEVE MADDEN?

4    A   STEVEN MADDEN, THE BRAND, YES.

5    Q   AND HAVE YOU SEEN HIS ADS IN THE PAST?

6    A   YES, I HAVE.

7    Q   HAVE YOU EVER USED A STEVE MADDEN AD AS AN INSPIRATION FOR

8    ANY OF YOUR DESIGN WORK?

9    A   YES.

10   Q   HOW WOULD YOU DESCRIBE FOR US, FROM A DESIGNER'S

11   PERSPECTIVE -- I'M TIRED OF HEARING FROM A LAWYER'S

12   PERSPECTIVE.  TELL ME WHAT ARE THE DISTINCTIVE FEATURES OF THIS

13   AD FROM STEVE MADDEN.

14   A   WELL, IT LOOKS LIKE IT'S DONE IN PENCIL, LIKE COLOR

15   PENCILS.  IT LOOKS LIKE IT'S A PERSPECTIVE DRAWING.  SO, LIKE,

16   TO ME, I SEE IT, LIKE, IF YOU WERE TO HAVE A CAMERA, TAKING A

17   PICTURE FROM UP; YOU KNOW, FROM BELOW, LOOKING UP.

18       I MEAN, SHE LOOKS LIKE SHE'S GOT ATTITUDE, AND SHE'S

19   DRESSED VERY SKIMPY.

20   Q   BY THE WAY, DID YOUR TOON TEENS HAVE AN ATTITUDE?

21   A   I THINK THEIR FACE, WITH THEIR MAKEUP, WAS EXPRESSIVE.

22   Q   WHAT WAS THE ATTITUDE THAT YOU WERE ATTEMPTING TO EXPRESS?

23   A   A SWEET ATTITUDE, WITH, YOU KNOW, A LITTLE BIT OF SASS.

24   Q   AND THE TOON TEENS DOLL WAS TARGETED TO WHAT AGE GROUP?

25   A   I HADN'T SPECIFIED, BUT IT LOOKS LIKE FOR A YOUNGER GIRL

1    TYPE OF PRODUCT.

2    Q   WERE YOU INTENDING THAT EXPRESSION OF -- AS YOU'VE

3    EXPLAINED TOON TEENS, TO BE DIRECTED TO THE AGE MARKET OF,

4    LET'S SAY, THE AGES OF 8 TO 13?

5    A   I DON'T THINK SO.

6    Q   AND THE LAST AD THAT I WOULD LIKE TO LOOK AT HERE IS ON

7    PAGE 126.  TURN TO PAGE 126.  I THINK YOU'LL SEE A DIXIE CHICKS

8    AD.

9        THE COURT:  126 IS ADMITTED, AND YOU MAY PUBLISH.

10       MR. NOLAN:  THANK YOU.

11       LET'S PUT THIS UP FOR A MOMENT.

12   BY MR. NOLAN:

13   Q   FIRST OF ALL, HAVE YOU EVER HEARD OF THE DIXIE CHICKS?

14   A   YES, I HAVE.

15   Q   AND WHO ARE THE DIXIE CHICKS?

16   A   I BELIEVE THEY ARE A COUNTRY MUSIC TRIO GROUP.

17   Q   THIS AD, WHICH WAS SHOWN IN THE AUGUST 1998, HAS "CHICKS

18   WITH ATTITUDE"; IS THAT CORRECT?

19   A   YEAH, THAT'S WHAT IT SAYS.

20   Q   WOULD YOU AGREE THAT THE EXPRESSION IN THAT ADVERTISEMENT

21   -- AND PARDON THE POLITICALLY INCORRECT REFERENCE TO "CHICKS

22   WITH ATTITUDE" -- THAT'S A CORRECT DESCRIPTION OF THAT

23   ADVERTISEMENT?

24   A   OF THE GROUP HERE?

25   Q   YES.

1   A   I DON'T KNOW.  MAYBE THE ONE, THE FIRST ONE, THE ONE IN

2   ALL BLACK, SHE LOOKS LIKE SHE'S GOT A LITTLE ATTITUDE, BUT...

3   Q   THANK YOU.

4   A   THE OTHER ONES LOOK KIND OF FRIENDLY TO ME.

5   Q   WAS IT YOUR INTENTION IN DOING TOON TEENS TO DEPICT GIRLS

6   -- LIKE CHICKS WITH ATTITUDE?

7   A   NOT NECESSARILY.

8   Q   WE WERE TALKING ABOUT THE 3-D DOLL, THE TOON TEENS DOLL

9   ITSELF.

10       I WANT TO TURN NOW, FIRST, TO THE DECAL, WHICH IS

11   WHAT I UNDERSTAND WAS YOUR FIRST DRAWING, THE TOON TEENS DECAL,

12   THAT APPEARED ON SKATING BARBIE; IS THAT RIGHT?

13   A   RIGHT.  IT WAS A DECAL.  THEN I DID OTHER DRAWINGS FROM

14   THAT THAT BECAME THE TOON TEENS.

15   Q   HERE'S WHAT I WANT TO GET TO:  WHAT WAS YOUR INSPIRATION

16   FOR THE DRAWING ON THE DECAL?  WAS IT DIFFERENT THAN YOUR

17   INSPIRATION FOR THE DOLL ITSELF, THE 3-D VERSION?

18   A   I BELIEVE SO.

19   Q   WHAT DO YOU BASE THAT ON?  WHAT WAS YOUR INSPIRATION FOR

20   THE DECAL THAT APPEARED?

21   A   IT WAS MY ASSIGNMENT.  IT WAS MY PROJECT.  MY MANAGER TOLD

22   ME SHE WANTED SOMETHING, YOU KNOW, STYLIZED OR SOMETHING, JUST

23   COME UP WITH SOMETHING COOL.  SHE WANTED A CHARACTER.  SO

24   THAT'S WHAT I DID.  IT HAD TO BE ROLLERBLADE KIND OF, YOU

25   KNOW -- RELATED TO THE ROLLERBLADING CONCEPT; SO THAT WAS WHERE

1    THAT CAME FROM.

2    Q   SO BEFORE YOU DID THE ORIGINAL DRAWING THAT WAS USED AS

3    THE DECAL ON THE ROLLERBLADE BARBIE, THE IDEA FOR THAT CAME

4    FROM YOUR MANAGER?

5    A   NO.

6    Q   IT WAS AN ASSIGNMENT THAT YOU RECEIVED FROM MANAGEMENT?

7    A   SHE SAID TO COME UP WITH A COOL DECAL.

8    Q   FOR SOMEONE SKATING; CORRECT?

9    A   FOR THE COOL SKATING BARBIE.

10   Q   SINCE IT WAS BARBIE, DID YOU UNDERSTAND THAT YOU WERE

11   GOING TO BE APPEALING TO A CERTAIN AGE GROUP?

12   A   NO.  SHE JUST SAID, 'COME UP WITH SOMETHING CUTE AND

13   GIRLY,' LIKE WHAT I SAID.

14   Q   AND WHEN YOU WERE DOING SOMETHING CUTE AND GIRLY, DID YOU

15   LOOK AT ANYTHING TO GET SOME INSPIRATION?

16   A   I DON'T REMEMBER ANYTHING SPECIFIC, BUT, LIKE I SAID, I

17   LOOKED AT MAGAZINES, TOO, AND THERE WAS OTHER STUFF; LIKE I

18   SAID, MY OWN STYLE, HOW I DO MY MAKEUP, HOW I LIKE THINGS TO

19   LOOK, AND THINGS I GRAVITATE TOWARDS.

20   Q   DO YOU RECALL ANY SPECIFIC ADVERTISEMENT THAT YOU LOOKED

21   AT FOR THE INSPIRATION OF THE DECAL?

22   A   NO.  THERE'S ONE THAT COMES TO MIND.  IT WAS A SPICE GIRLS

23   ADVERTISEMENT FOR THEIR VIDEO GAME.  THEY HAD CUTE LITTLE

24   CHARACTERS WITH BIG HEADS AND BIG FEET.  POWERPUFF GIRLS, I

25   THINK, WERE BIG THEN TOO.  SO, YOU KNOW, IT'S COOL; IT LOOKED

1    REALLY COOL.

2    Q    WOULD YOU AGREE THAT OVER THE COURSE OF YOUR DESIGNING,

3    YOU HAVE READ OR REFERRED TO TEENY-BOPPER MAGAZINES, SUCH AS

4    SEVENTEEN, FOR INSPIRATION?

5    A    I MIGHT HAVE.  I DON'T KNOW.  THERE'S A LOT OF

6    PUBLICATIONS IN THAT GENRE.

7    Q    DO YOU KNOW WHO MADE THE DOLL "HOT LOOKS" THAT YOU USED AS

8    YOUR INSPIRATION FOR TOON TEENS, THE 3-D MODEL?

9    A    NO, I DON'T.

10   Q    YOU'RE NOT A SCULPTOR, ARE YOU?

11   A    NOT PROFESSIONALLY, BUT I DO SCULPT; I HAVE SCULPTED.

12   Q    DID YOU ATTEMPT TO DO A SCULPT OF ANY OF THE TOON TEENS

13   DOLLS?

14   A    ACTUALLY, I THINK I DID.

15   Q    HOW SUCCESSFUL WERE YOU?

16   A    LIKE I SAID, I'M NOT A PROFESSIONAL, BUT I DABBLE.

17   Q    I'M NOT COMPLAINING OR CRITICIZING.

18   A    I LIKED BETTER WHAT THE SCULPTING DEPARTMENT DID.

19   Q    SO YOU RELIED ON THE SCULPTORS AT MATTEL; IS THAT CORRECT?

20   A    YES.

21   Q    WHEN YOU GAVE THEM YOUR TOON TEENS DRAWINGS, DID YOU GIVE

22   THEM SPECIFIC DIRECTIONS TO FOLLOW YOUR DRAWINGS TO THE T?

23   A    NOT TO THE T.  AGAIN, I WAS NEW.  I WAS STILL AN ASSISTANT

24   DESIGNER, SO I RELIED ON PEOPLE'S EXPERTISE, AND I JUST --

25   'HERE'S MY DRAWINGS.  THIS IS WHAT I'M LOOKING FOR.'

1        AND AT THE TIME, THE SCULPTOR EXPLAINED TO ME, 'WELL,

2   YOU KNOW, WE'RE REALLY BUSY.  WE'RE REALLY SWAMPED.  DO YOU

3   MIND IF WE, LIKE, GO AHEAD AND USE AN EXISTING HEAD AND MODIFY

4   IT FOR YOU?  WE'LL TRY AND GIVE YOU THAT LOOK YOU WANT.'  AND I

5   SAID, 'OKAY.  WELL, THAT'S YOUR PROCESS.  DO IT LIKE' -- I WAS

6   JUST HAPPY TO GET SOMETHING.

7   Q   SO YOU TRUSTED THE CAPABILITIES AND THE TALENTS OF THE

8   SCULPTORS TO INTERPRET YOUR DRAWINGS.

9   A   YEAH.  WITH KNOWING THAT I KNOW THAT IF THEY SHOWED ME

10  SOMETHING, I COULD TOTALLY CHANGE IT; I STILL HAD CREATIVE LEAD

11  ON IT.

12  Q   TOON TEENS WAS NEVER MADE INTO A DOLL.

13  A   A PROTOTYPE DOLL.

14  Q   BUT IT NEVER SOLD AT RETAIL.

15  A   PRODUCTION, NO.

16  Q   AFTER YOU DID YOUR 3-D PROTOTYPE -- AND THIS IS THE LAST

17  TOPIC I WANT TO GET INTO -- CAN YOU EXPLAIN TO THE JURY THE

18  PROCESS, THE LEVEL OF REVIEW, THAT YOU HAD TO GO THROUGH AT

19  MATTEL IN TRYING TO GET THE 3-D PROTOTYPE MADE AS A DOLL.

20  A   GO THROUGH THE PROCESS OF WHAT IT TOOK FOR ME TO DO THE

21  DOLL?

22  Q   NO.  THE PRESENTATIONS THAT YOU MADE.

23        DO YOU HAVE TO PRESENT IT TO ANY OF YOUR SUPERIORS OR

24  EXECUTIVES?

25  A   YEAH.  I THINK I DID.

1    Q   DO YOU RECALL HOW MANY STEPS THAT INCLUDED?

2    A   I DON'T.  I DON'T.  I KNOW, OBVIOUSLY, I HAD TO SHOW MY

3    MANAGER, MY IMMEDIATE MANAGER.  AND THEN WE HAVE WEEKLY

4    MEETINGS, WITH CASSIDY AND IVY AT THE TIME, WHO WERE THE VP'S,

5    OR WHATEVER; SO I WOULD SHOW THEM WHEN I FELT I HAD SOMETHING

6    TO SHOW OR WHATEVER.  I DON'T REMEMBER A SPECIFIC TIME WHERE I

7    SHOWED THEM.

8         THEN EVENTUALLY, WHEN EVERYBODY WAS READY, I REMEMBER

9    THERE WAS A BIGGER MEETING, WHERE EVERYBODY SHOWED THEIR

10   CONCEPTS.

11   Q   DID YOU THINK CARTER BRYANT WAS TALENTED?

12   A   YES, I DID.

13   Q   DID YOU LIKE CARTER BRYANT?

14   A   LIKE HIM IN WHAT RESPECT?

15   Q   AS A PERSON.

16   A   HE SEEMED LIKE A NICE PERSON.

17   Q   DID ANYBODY EVER TELL YOU, ONE OF YOUR FELLOW WORKERS,

18   THAT THEY THOUGHT CARTER BRYANT WAS DISHONEST?

19   A   NO.

20        MR. NOLAN:  THANK YOU.  NOTHING FURTHER.

21        THE COURT:  VERY WELL.

22        WHY DON'T WE TAKE OUR AFTERNOON BREAK AT THIS TIME,

23   AND WE'LL RESUME WITH YOUR REDIRECT EXAMINATION.

24        (BRIEF RECESS TAKEN.)

25         (JURORS ENTER COURTROOM.)

1          THE COURT:  WE'RE BACK ON TRACK NOW.

2               REDIRECT EXAMINATION

3     BY MR. QUINN:

4     Q    MS. MARTINEZ, IF YOU LOOK AT EXHIBIT 263, IF WE COULD PUT

5     THAT UP ON THE SCREEN.  MR. NOLAN SHOWED YOU THE DATES THAT YOU

6     PUT ON YOUR TOON TEENS DRAWINGS, IF WE COULD LOOK AT THAT,

7     PLEASE, JUNE OF 1999.

8          NOW, DID YOU PUT THE MONTH HERE IN WHICH YOU ACTUALLY

9     CREATED THIS?

10         MR. NOLAN:  OBJECTION, YOUR HONOR.  LEADING.

11         THE COURT:  REPHRASE YOUR QUESTION, COUNSEL.

12    BY MR. QUINN:

13    Q    THE DATE YOU PUT HERE, CAN YOU TELL US WHETHER THAT'S THE

14    MONTH IN WHICH YOU CREATED THIS DRAWING?

15    A    APPROXIMATELY, YES.

16    Q    YOU DIDN'T PUT DOWN A DATE WHERE YOU'D ACTUALLY CREATED IT

17    A YEAR BEFORE.

18         MR. NOLAN:  OBJECTION, YOUR HONOR, LEADING.

19         THE COURT:  SUSTAINED.

20    BY MR. QUINN:

21    Q    IF WE LOOK AT EXHIBIT 275, IF YOU WOULD TURN TO THAT; THIS

22    IS NOT IN EVIDENCE; I'D ASK YOU, PLEASE, IF YOU COULD IDENTIFY

23    THAT.

24    A    275.  YES.  IT LOOKS LIKE THE PICTURE I TOOK.

25    Q    THE PICTURE YOU TOOK.

1    A   OF THE TOON TEENS L-BOARD WITH PRODUCTS.

2         MR. QUINN:  WE'D OFFER THAT, YOUR HONOR, INTO

3    EVIDENCE.

4         THE COURT:  ANY OBJECTION?

5         MR. NOLAN:  NO, YOUR HONOR.

6         THE COURT:  ADMITTED.  YOU MAY PUBLISH.

7    BY MR. QUINN:

8    Q   CAN YOU TELL US WHETHER THIS IS ANOTHER PHOTOGRAPH YOU

9    TOOK WHICH HAD THE DATE STAMP IN THE LOWER RIGHT CORNER?

10   A   YES.

11   Q   AND CAN YOU SEE THE DATE THERE:  AUGUST 4, 1999?

12   A   YES.

13   Q   IS THAT CONSISTENT WITH THE DATE YOU PUT ON YOUR TOON

14   TEENS DRAWINGS THAT YOU WOULD HAVE HAD THE L-BOARD IN AUGUST OF

15   1999 AND HAD THE DRAWINGS IN JUNE?

16        MR. NOLAN:  YOUR HONOR, OBJECTION, LEADING.

17        THE COURT:  SUSTAINED.

18   BY MR. QUINN:

19   Q   CAN YOU TELL US WHETHER OR NOT THAT IS CONSISTENT WITH THE

20   DATING ON THE DRAWINGS?

21   A   YEAH.  IT LOOKS ABOUT THE RIGHT TIME FRAME BECAUSE, LIKE I

22   SAID, THE PREVIOUS DRAWINGS THAT YOU SHOWED ARE MY WORKING

23   SKETCHES; SO IT WOULD HAVE TAKEN SOMETIME TO DEVELOP ALL OF

24   THESE COMPONENTS; SO AUGUST IS STILL SUMMER, AROUND THAT TIME

25   FRAME.

1   Q   ALL RIGHT.

2       THEN YOU WERE SHOWN, AND ACTUALLY WE MARKED AS AN

3   EXHIBIT, THE BRYANT DOLL.

4   A   YES.

5   Q   DID MATTEL NAME A DOLL AFTER CARTER BRYANT?

6   A   NO.  NOT THAT I -- NO, THEY DIDN'T; NOT TO MY KNOWLEDGE.

7   Q   YOU MENTIONED THERE WERE A SERIES OF DOLLS THAT HAD NAMES

8   RELATED TO NEW YORK SCENES OR LOCATIONS?

9   A   YES.

10  Q   YOU MENTIONED A COUPLE.  CAN YOU RECALL THE NAMES OF ANY

11  OTHER DOLLS?

12  A   I'M NOT TOO FAMILIAR WITH NEW YORK.  I'VE ONLY BEEN THERE

13  A FEW TIMES.  BUT WE HAD A CHARACTER NAMED KENNEDY, ROBERT

14  KENNEDY AIRPORT; MADISON, FOR MADISON AVENUE; CHELSEA, FOR

15  CHELSEA DISTRICT, I BELIEVE; NOLEE, I THINK IT WAS SHORT FOR

16  NOLITA.  I THINK THAT'S LIKE A SECTION OF NEW YORK, BUT I'M NOT

17  SURE.  HUDSON, FOR THE HUDSON RIVER; RIVER WAS ONE OF THE NAMES

18  AS WELL; AND BRYANT FOR BRYANT PARK.

19  Q   WAS THERE A MADISON?

20  A   YEAH, MADISON AVENUE.

21  Q   YOU MENTIONED THERE WAS SOME BUZZ AT ONE POINT WITHIN THE

22  DESIGN CENTER THAT CARTER BRYANT HAD SOMETHING TO DO WITH THE

23  CREATION OF BRATZ.  DO YOU RECALL TELLING THAT IN RESPONSE TO

24  MR. NOLAN'S QUESTIONS?

25  A   I DO.

1    Q   WAS THERE EVER ANY BUZZ THAT MR. BRYANT HAD CREATED BRATZ

2    WHILE HE WAS EMPLOYED BY MATTEL?

3    A   I DIDN'T HEAR THAT.

4        MR. QUINN:  NOTHING FURTHER.

5            RECROSS-EXAMINATION

6    BY MR. NOLAN:

7    Q   HOW LONG DOES IT TAKE, TYPICALLY, TO BRING A DOLL FROM

8    CONCEPT DRAWING TO RETAIL?

9    A   IT DEPENDS ON THE PROJECT AND HOW COMPLICATED IT IS.

10   Q   DO YOU HAVE AN AVERAGE TIME FOR US THAT YOU COULD GIVE TO

11   THE JURY?

12   A   I CAN'T SAY ITS AVERAGE.

13   Q   COULD IT TAKE LONGER THAN A YEAR?

14   A   IT COULD.

15   Q   COULD IT TAKE NINE MONTHS?

16   A   MAYBE.

17   Q   WHAT ABOUT THREE MONTHS?

18   A   YEAH.  MAYBE.  FROM THE ACTUAL PRELIMINARY TO PRODUCTION,

19   LIKE, ON THE SHELF?

20   Q   YES.

21   A   SOUNDS AGGRESSIVE, BUT MAYBE.  I DON'T KNOW.  I'M NOT

22   SURE.

23   Q   HOW LONG DID IT TAKE YOU TO GO FROM GLAMERMAIDS TO

24   OFFERING MY SCENE AT RETAIL?

25       MR. QUINN:  OBJECTION.  IRRELEVANT; BEYOND THE SCOPE.

1          THE COURT:  SUSTAINED.

2          REPHRASE, COUNSEL.  IT IS BEYOND THE SCOPE.  IT'S

3     CONNECTED TO SOMETHING NOT ON REDIRECT.

4     BY MR. NOLAN:

5     Q   DO YOU HAVE 275 IN FRONT OF YOU; THE EXHIBIT THAT WAS JUST

6     PUT UP; IT'S IN EVIDENCE.

7     A   YES.

8     Q   THIS IS THE PHOTOGRAPH THAT IS STAMPED IN THE RIGHT CORNER

9     BY YOUR CAMERA, I GUESS AUTOMATICALLY.

10    A   I BELIEVE SO.

11    Q   DID YOU SET THE TIME ON YOUR CAMERA?

12    A   I DON'T RECALL DOING THAT.

13    Q   SO OTHER THAN THIS DATE ON THE PICTURE -- WITHDRAW THAT.

14          YOU DON'T HAVE ANY RECOLLECTION OF EVER SETTING THE

15    CURRENT DATE FOR YOUR CAMERA.

16    A   NO.

17    Q   NOW, AS I LOOK AT THIS PICTURE, WHAT'S DEPICTED HERE, JUST

18    TO BE CERTAIN, THESE ARE THE L-BOARDS; CORRECT?

19    A   THEY ARE L-BOARDS.

20    Q   IS THIS MORE OR LESS THE DISPLAY IN THE WORK AREA WHEN YOU

21    HAD THE CONVERSATION WITH CARTER BRYANT AND ELISE CLOONAN?

22    A   YES.

23    Q   NOW, IT'S HARD TO TELL HERE, BECAUSE OBVIOUSLY THE

24    PHOTOGRAPH IS 2-D, BUT DO I UNDERSTAND THAT ALL OF THESE

25    OBJECTS THAT ARE SHOWN HERE ARE ACTUALLY THREE DIMENSIONAL

1    OBJECTS?

2    A   SOME OF THEM ARE; SOME OF THEM ARE 2-D.

3    Q   FOR INSTANCE, TOON TEENS, ARE THERE ANY TWO DIMENSIONAL

4    TOON TEENS DEPICTED IN THIS L PRESENTATION?

5    A   ARE THERE TOON TEENS 2-D'S?

6    Q   YES.

7    A   YEAH.

8        YOU KNOW, ACTUALLY, NOW THAT I'M LOOKING AT THIS, IT

9    LOOKS LIKE IN THE BACKGROUND, THE BULLETIN BOARD, IT LOOKS LIKE

10   A TINY LITTLE PICTURE OF -- I CAN'T TELL IF IT'S THE DECAL,

11   OR -- I CAN'T TELL, BUT IT LOOKS LIKE THE SHAPE OF WHAT MY

12   DRAWING WAS.  I MIGHT HAVE SHRUNK IT TO MAKE IT TO SCALE TO THE

13   DOLLS AS A PICTURE ON THE WALL.

14   Q   BUT EVEN AS YOU'RE SITTING HERE, YOU'RE NOT SURE.

15   A   HERE, IT LOOKS VERY CLOSE.  IT LOOKS VERY CLOSE.  I WOULD

16   SAY 98 PERCENT ACCURATE, THAT COULD BE MY DRAWING.

17   Q   THE CONVERSATION THAT YOU HAD WITH CARTER BRYANT AND

18   ELISE CLOONAN OUTSIDE OF THIS PARTICULAR AREA, DO YOU EVER

19   RECALL POINTING CARTER BRYANT TO THAT SMALL LITTLE DECAL ON THE

20   BACK OF THE BOARD?

21   A   I DON'T RECALL IF I DID OR DIDN'T.

22   Q   BUT EACH OF THE OTHER TOON TEENS DOLLS DEPICTED HERE ARE

23   ACTUALLY THE 3-D PROTOTYPES OF THE DOLL; YES?

24   A   YES.  THERE'S THREE PROTOTYPES OF THE DOLLS.

25       MR. NOLAN:  THANK YOU.

1       NOTHING FURTHER.

2       THE COURT:  MR. QUINN?

3       MR. QUINN:  NOTHING FURTHER, YOUR HONOR.

4       THE COURT:  VERY WELL.

5       YOU'RE EXCUSED.  YOU MAY STEP DOWN.

6       PLAINTIFF'S NEXT WITNESS?

7       MR. PRICE:  OUR NEXT WITNESS IS PAULA GARCIA.

8       MR. NOLAN:  COULD WE TAKE DOWN THE DRAWINGS AND PLACE

9   THEM AS EVIDENCE?

10      THE COURT:  THE COURTROOM DEPUTY WILL TAKE CUSTODY OF

11  THAT.

12      MR. PRICE:  I HAD HOPED WE COULD USE THAT AS A

13  TIMELINE FOR THE WITNESS.

14      THE COURT:  VERY WELL.

15      LET'S FOLD IT OVER FOR NOW.

16      (NEXT WITNESS TAKES STAND.)

17      THE CLERK:  DO YOU SOLEMNLY STATE THAT THE TESTIMONY

18  YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT SHALL

19  BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO

20  HELP YOU GOD.

21      THE WITNESS:  YES, I DO.

22      THE CLERK:  PLEASE STATE YOUR FULL NAME AND SPELL

23  YOUR LAST NAME FOR THE RECORD.

24      THE WITNESS:  PAULA BIANCHI GARCIA.

25  / / /

1          DIRECT EXAMINATION

2      BY MR. PRICE:

3      Q   I'M BILL PRICE.  I REPRESENT MATTEL.

4          PERHAPS YOU COULD TELL US, WHO DO YOU WORK FOR?

5      A   MGA.

6      Q   AND WHAT'S YOUR CURRENT POSITION?

7      A   I'M VICE PRESIDENT OF PRODUCT DESIGN AND DEVELOPMENT.

8      Q   SO YOU FIRST JOINED MGA IN ABOUT APRIL OF 2000; IS THAT

9      RIGHT?

10     A   CORRECT.

11     Q   BEFORE THAT, YOU WORKED AT MATTEL.

12     A   CORRECT.

13     Q   BETWEEN ABOUT JULY OF '97 UNTIL APRIL OF 2000; CORRECT?

14     A   YES.

15     Q   AND YOU WERE HERE YESTERDAY.  I WASN'T, BUT I HAVE THE

16     TRANSCRIPT.  YOU WERE HERE YESTERDAY WHEN MR. NOLAN GAVE HIS

17     OPENING STATEMENT; CORRECT?

18     A   YES.

19     Q   AND I WANT TO GO OVER HOW YOU GOT TO MATTEL AND THEN WHAT

20     HAPPENED WHEN YOU WERE THERE.

21         SO MY UNDERSTANDING IS THAT YOU WENT TO THE

22     UNIVERSITY OF SOUTHERN CALIFORNIA AND MAJORED IN MARKETING;

23     CORRECT?

24     A   BUSINESS ADMINISTRATION, YES.

25     Q   INITIALLY, YOU TRIED TO APPLY TO MATTEL IN THE MARKETING

1   DEPARTMENT; RIGHT?

2   A   NO.

3   Q   WHERE DID YOU INITIALLY TRY TO APPLY FOR?

4   A   I ORIGINALLY JOINED MATTEL THROUGH THEIR SALES RESEARCH

5   DEPARTMENT.

6   Q   AND WAS THAT THE JOB THAT YOU APPLIED FOR?

7   A   YES.

8   Q   WHY DID YOU APPLY FOR SALES?

9   A   PRIOR TO MATTEL I HAD AN INTERNSHIP AT O'MELVENY -- O&M,

10   WHICH IS AN ADVERTISING FIRM, AND WHILE I WAS AT O&M, I HAD

11   EXPOSURE TO THE MATTEL ACCOUNTS.  I WORKED IN THE MEDIA

12   DEPARTMENT.  AND IN THERE WITH THAT, AND CERTAINLY THROUGH MY

13   EDUCATION, MY FOCUS WAS IN MARKETING AND ADVERTISING.  IN SALES

14   RESEARCH, MY INTEREST WAS TO START THERE SO THAT I COULD HAVE A

15   GENERAL UNDERSTANDING OF WATCHING THE EFFECTIVENESS OF TV

16   COMMERCIALS.

17   Q   DID THERE COME A TIME, THEN, WHEN YOU TRIED TO GET INTO

18   THE MARKETING DEPARTMENT AT MATTEL?

19   A   YES.

20   Q   WHEN WAS THAT?

21   A   I CAN'T REMEMBER EXACTLY.

22   Q   JUST THE YEAR.

23   A   I WOULDN'T BE ABLE TO REMEMBER EXACTLY.

24   Q   WELL, AT SOME POINT YOU GOT INTO BEING A PRODUCTION

25   MANAGER; CORRECT?

1    A   PRODUCT PLANNER.

2    Q   AND THAT WAS ABOUT WHEN?

3    A   RIGHT AFTER MY SALES RESEARCH RESPONSIBILITIES.

4    Q   BETWEEN YOUR SALES RESEARCH AND BECOMING A PRODUCT

5    PLANNER, BETWEEN THOSE TIMES, DID YOU TRY TO GET INTO THE

6    MARKETING DEPARTMENT?

7    A   NO.

8    Q   WHEN YOU WERE ACCEPTED INTO PRODUCT PLANNING, MY

9    UNDERSTANDING IS YOU WENT TO THE LARGE/SMALL DOLLS.

10   A   YES.

11   Q   I WAS GOING TO SAY 'DIVISION,' BUT I'M NOT SURE; WOULD

12   THAT BE A DIVISION OR AN AREA, A DEPARTMENT?

13   A   DIVISION.

14   Q   OKAY.  AND THE LARGE AND SMALL DOLLS DIVISION IS NOT

15   BARBIE; CORRECT?

16   A   CORRECT.

17   Q   IN FACT, I THINK IT'S CORRECT THAT YOU WERE THE ONLY

18   PRODUCT PLANNER IN THAT DIVISION FOR A WHILE; ISN'T THAT RIGHT?

19   A   NO.  THAT WOULDN'T BE TRUE.

20   Q   THERE WERE OTHERS?

21   A   YES.

22   Q   HOW MANY WERE THERE?

23   A   THERE WAS MY BOSS, WHOSE NAME WAS PAM PRETTS, AND THERE

24   WAS ALSO A PLANNER NAMED CHRISTINE ORDELISE.

25   Q   AND HOW LONG WERE YOU IN THAT DIVISION, THE LARGE/SMALL

1    DOLLS?

2    A   FOR THE REST OF MY TENURE AT MATTEL.

3    Q   AND AT NO TIME AT MATTEL DID YOU ACTUALLY WORK WITH

4    BARBIES.

5    A   CORRECT.

6    Q   SO YOU WERE WORKING WITH THINGS LIKE CABBAGE PATCH DOLLS,

7    THINGS OF THAT NATURE.

8    A   CORRECT.

9    Q   AND THEN THERE CAME A TIME WHEN YOU WEREN'T HAPPY BEING A

10   PRODUCT PLANNER AT MATTEL; CORRECT?

11   A   I WASN'T SATISFIED, YES.

12   Q   AND YOU DIDN'T THINK IT WAS WORKING OUT AS A PRODUCT

13   PLANNER; CORRECT?

14   A   CAN YOU BE MORE SPECIFIC, PLEASE.

15   Q   WELL, YOU WERE HERE WHEN MR. NOLAN SAID THAT 'TRY AS SHE

16   MIGHT,' SHE, REFERRING TO YOU, 'IT JUST WASN'T WORKING OUT.'

17       THAT'S THE REASON I'M ASKING.  DID THERE COME A TIME

18   YOU THOUGHT IT JUST WASN'T WORKING OUT AS A PRODUCT PLANNER FOR

19   THESE NON-BARBIE DOLLS?

20   A   TO CLARIFY, IT WASN'T FULFILLING ME.  IT WASN'T FULFILLING

21   MY DREAM.

22   Q   NOW, WHEN YOU DECIDED IT WASN'T WORKING OUT, WHAT YOU DID

23   WAS YOU THEN APPLIED FOR MARKETING POSITIONS IN SEVERAL MATTEL

24   DIVISIONS; CORRECT?

25   A   YES.

1    Q   SO WHEN YOU THOUGHT IT WASN'T WORKING OUT AS A PRODUCT

2    PLANNER FOR THESE NON-BARBIE DOLLS, YOU INTERVIEWED FOR

3    MARKETING POSITIONS AT LARGE AND SMALL DOLLS; CORRECT?

4    A   YES.

5    Q   AND YOU DID NOT GET THAT POSITION.

6    A   CORRECT.

7    Q   AND THEN YOU INTERVIEWED FOR A MARKETING POSITION FOR

8    DISNEY WITHIN BARBIE; CORRECT?

9    A   YES.

10   Q   AND YOU DIDN'T GET THAT POSITION.

11   A   CORRECT.

12   Q   AND THEN YOU INTERVIEWED FOR A MARKETING POSITION FOR THE

13   PRESCHOOL DIVISION IN NEW YORK; CORRECT?

14   A   NO.

15   Q   DID YOU EVER INTERVIEW FOR THAT POSITION?

16   A   I INTERVIEWED FOR A POSITION IN PLANNING, SPECIFICALLY

17   WITHIN FISHER PRICE.

18   Q   AND DID YOU GET THAT POSITION?

19   A   NO.

20   Q   AND THEN YOU INTERVIEWED FOR A POSITION, AGAIN, WITHIN

21   MATTEL, FOR NICKELODEON.

22   A   YES.

23   Q   AND YOU DIDN'T GET THAT POSITION; IS THAT CORRECT?

24   A   CORRECT.

25   Q   AND THIS WAS IN THE EARLY PART OF 2000; CORRECT?

1    A   YES.

2    Q   SO AFTER NOT BEING ABLE TO PURSUE -- YOU WERE INTERESTED

3    IN GOING INTO MARKETING IN THESE DIVISIONS BECAUSE YOU WERE

4    INTERESTED IN THEIR ACCOUNTABILITY AND THEIR ROLES AND

5    RESPONSIBILITIES; CORRECT?

6    A   YES.

7    Q   SHORTLY AFTER NOT BEING ABLE TO REALIZE THAT DREAM, THAT

8    IS, NOT GETTING THESE JOBS YOU INTERVIEWED FOR WITHIN MATTEL,

9    YOU NOTICED A JOB POSTING FOR A COMPANY CALLED MGA.

10   A   YES.

11   Q   AND AT THE TIME YOU SAW THE JOB POSTING FOR MGA, YOU

12   WEREN'T SURE -- YOU'D ACTUALLY NEVER EVEN HEARD OF THEM BEFORE

13   YOU SAW THE POSTING; RIGHT?

14   A   CORRECT.

15   Q   SO IT'S FAIR TO SAY THAT YOUR LEAVING MATTEL HAD NOTHING

16   TO DO WITH YOUR DISSATISFACTION WITH THE SHAPE OF BARBIE OR

17   ANYTHING LIKE THAT; RIGHT?

18   A   THAT'S CORRECT.

19   Q   IT HAD TO DO WITH THE FACT THAT MATTEL HAD NOT GIVEN YOU

20   FOUR POSITIONS YOU HAD INTERVIEWED FOR THAT YOU WOULD HAVE BEEN

21   HAPPY TO HAVE ACCEPTED; CORRECT?

22   A   CORRECT.

23   Q   AND LET ME JUST BRIEFLY TALK ABOUT MGA, WHEN YOU WENT

24   THERE IN APRIL OF 2000.  CERTAINLY AT THAT TIME MGA DID NOT

25   HAVE A FASHION DOLL; CORRECT?

1    A    NO.

2    Q    IS THAT CORRECT?

3    A    THAT'S CORRECT.

4    Q    AND THEY DIDN'T HAVE ANY FASHION DOLL DESIGNERS THAT WERE

5    ACTUALLY WORKING IN-HOUSE; CORRECT?

6    A    CORRECT.

7    Q    AND WITH RESPECT TO LATER -- FLASH FORWARD TO THE

8    SEPTEMBER AND OCTOBER 2000 TIME FRAME -- YOU BEGAN TO BE THE

9    PRODUCT PLANNER OR -- TELL ME IF I'M WRONG ABOUT THE

10   DESIGNATION OF THE TITLE -- YOU BECAME PRODUCT MANAGER FOR THE

11   LINE CALLED BRATZ; CORRECT?

12   A    YES.

13   Q    LET ME TALK ABOUT SOME OF THE PEOPLE THAT YOU USED AT MGA

14   TO ASSIST YOU IN DOING YOUR DUTIES; OKAY?

15   A    OKAY.

16   Q    OF COURSE, ONE PERSON WE'LL TALK ABOUT IS CARTER BRYANT;

17   HE WORKED WITH YOU ON BRATZ; CORRECT?

18   A    CORRECT.

19   Q    AND THEN WE TALKED ABOUT HOW YOU NEEDED A SCULPTOR WHEN

20   YOU ARE GOING TO DO ONE OF THESE PRODUCT LINES; CORRECT?

21   A    YES.

22   Q    AND FOR A SCULPTOR, YOU USED MARGARET LEAHY; IS THAT

23   RIGHT?

24   A    YES.

25   Q    AND SHE HAD RESIGNED FROM MATTEL IN SEPTEMBER OF 2000; IS

1   THAT RIGHT?

2   A   I'M NOT CERTAIN WHEN MARGARET LEFT.

3   Q   IN ANY EVENT, LATER IN SEPTEMBER OF 2000, YOU BEGAN

4   WORKING WITH MS. LEAHY AS A SCULPTOR ON BRATZ; CORRECT?

5   A   TO BE CLEAR, I WAS WORKING WITH MARGARET LEAHY TOWARDS THE

6   END OF SEPTEMBER ON AN EXPLORATION SCULPT FOR BRATZ.

7   Q   AND THEN ALSO WITH RESPECT TO BRATZ, YOU NEEDED SOMEONE TO

8   DESIGN AND WORK ON OR LEAST TO WORK ON THE CLOTHES, THE

9   FASHIONS; RIGHT?

10   A   YES.

11   Q   AND AGAIN, YOU TURNED TO AN OUTSIDE CONTRACTOR FOR THAT;

12   CORRECT?

13   A   CORRECT.

14   Q   AND THAT WAS VERONICA MARLOW WHO HAD BEEN A FORMER MATTEL

15   DESIGNER; RIGHT?

16   A   CORRECT.

17   Q   YOU ALSO NEEDED A FACE PAINTER AT SOME POINT; CORRECT?

18   A   YES.

19   Q   AND TO DO THE FACE PAINTING, A PERSON YOU TURNED TO WAS AN

20   OUTSIDE VENDOR NAMED ANNA RHEE; CORRECT?

21   A   YES.

22   Q   SHE WAS A FORMER MATTEL FACE PAINTER; CORRECT?

23   A   YES.  I BELIEVE SO.

24   Q   AND THEN THERE WAS A WOMAN NAMED -- TELL ME IF I GET THE

25   PRONUNCIATION WRONG -- MERCEDE WARD?

1    A   I UNDERSTOOD IT TO BE PRONOUNCED MERCEDEH.

2    Q   SO THERE WAS A WOMAN NAMED MERCEDEH WARD WHO WORKED AT

3    MATTEL UNTIL ABOUT OCTOBER OF 2000; CORRECT?

4    A   I'M NOT CERTAIN WHEN MERCEDEH WORKED AT MATTEL.

5    Q   DIDN'T SHE CONTACT YOU WHILE SHE WAS AT MATTEL TO SAY THAT

6    SHE WANTED TO JOIN YOU AND WORK WITH YOU AT MGA?

7    A   I DON'T REMEMBER THAT.

8    Q   IN ANY EVENT, SHE HAD ENGINEERING EXPERIENCE; CORRECT?

9    A   YES.

10   Q   AND SHE AT LEAST WORKED AT MATTEL, AS FAR AS YOU KNOW,

11   THROUGH THE SUMMER OF 2000; CORRECT?

12   A   AGAIN, I'M NOT CERTAIN WHEN MERCEDEH WORKED THERE.

13   Q   YOU ENDED UP USING HER TO WORK WITH HONG KONG TO ASSIST IN

14   MANUFACTURING, OVERSEEING THE MANUFACTURING; CORRECT?

15   A   YES.

16   Q   NOW, LET ME STEP BACK A BIT AND TALK ABOUT YOUR TIME AT

17   MATTEL.  I'M GOING TO TAKE YOU BACK TO THE TIME BETWEEN

18   JULY 1997 AND APRIL OF 2000.  OKAY?

19       DURING THAT TIME FRAME, THERE WAS A PERIOD OF TIME

20   WHERE YOU DID SOME PLANNING WORK FOR SOMETHING CALLED CHATT

21   GIRLS.

22   A   I HAD A SMALL AMOUNT OF -- A SHORT PERIOD OF TIME IN

23   RESPONSIBILITIES TO PLANNING.  I'M NOT SURE IF IT WAS REFERRED

24   TO AS CHATT GIRLS OR, LATER, DIVA STARZ.

25   Q   ACTUALLY, CHATT GIRLS WAS AN EARLIER NAME FOR WHAT

1    EVENTUALLY BECAME DIVA STARZ; CORRECT?

2    A   I BELIEVE SO, YES.

3    Q   THEN, JUST TO REFRESH YOU, MAYBE YOU COULD LOOK IN YOUR

4    BINDER THERE, AND IT'S IN, I THINK, THE SECOND VOLUME,

5    EXHIBIT 1113.

6    A   OKAY.

7    Q   IF YOU LOOK AT EXHIBIT 1113, DO YOU SEE THAT THE LOWER

8    PART OF THAT IS AN E-MAIL FROM YOU TO VARIOUS FOLKS -- THERE

9    ARE THREE E-MAILS HERE.  THE FIRST APPEARS TO BE TO YOU AND

10   THEN THE ONE ABOVE THAT SEEMS TO BE FROM YOU.

11       DO YOU SEE THAT?

12   A   YES.

13   Q   AND JUST TO BE CLEAR, WHEN I SAY FROM 'YOU,' WE KNOW YOU

14   NOW AS PAULA GARCIA, BUT BACK IN THAT TIME YOU HAD A DIFFERENT

15   NAME.

16   A   YES.

17   Q   AND I'M GOING TO ASK YOU TO TELL ME WHAT IT IS SO I DON'T

18   MISPRONOUNCE IT.

19   A   MY MAIDEN NAME IS TREANTAFELLES.

20   Q   I'M STILL GOING TO MISPRONOUNCE IT AT SOME POINT.

21       DO YOU RECOGNIZE THIS AS AN E-MAIL WHICH YOU SENT AND

22   RECEIVED SOMEWHERE AROUND AUGUST 27, 1998?

23   A   YES.

24       MR. PRICE:  I'D MOVE THAT INTO EVIDENCE.

25       THE COURT:  ANY OBJECTION?

1        MS. AGUIAR:  NO OBJECTION.

2        THE COURT:  YOU MAY PUBLISH.

3    BY MR. PRICE:

4    Q   MS. GARCIA, THIS IS YOUR MAIDEN NAME HERE, RIGHT,

5    PAULA TREANTAFELLES?

6    A   YES.

7    Q   AND THIS IS REFERRING TO CHATT GIRLS.  DO YOU SEE THAT?

8    A   YES.

9    Q   AND IT'S TALKING ABOUT 'ADJUSTING SOMETHING IN TRACKS, IF

10   YOU HAVEN'T ALREADY.'  WHAT DOES THAT MEAN?

11   A   'TRACKS' WAS A PROGRAM THAT MATTEL USED TO TRACK AND,

12   THEREFORE, ACTUALIZE THEIR MILESTONES, THEIR PRODUCTION

13   MILESTONES.

14   Q   WAS THAT SOMETHING YOU WOULD DO AS A PRODUCT PLANNER?

15   A   YES.

16   Q   SO THIS SHOWS, AT LEAST IN THIS TIME PERIOD, THAT AT THIS

17   TIME, YOU HAD SOME DUTIES AND RESPONSIBILITIES WITH RESPECT TO

18   THIS PREDECESSOR TO DIVA STARZ, CHATT GIRLS; RIGHT?

19   A   YES.

20   Q   AND YOU KNEW A WOMAN NAMED MAUREEN MULLEN?

21   A   YES.

22   Q   SHE WAS A FRIEND OF YOURS.

23   A   YES.

24   Q   FRIEND, MEANING YOU WOULD SOMETIMES SEE HER OUTSIDE OF

25   MATTEL.

1    A   YES.

2    Q   AND WHEN YOU WENT TO MGA, YOU EVENTUALLY HIRED HER.

3    A   AS A FREELANCER.

4    Q   SHE EVENTUALLY LEFT MATTEL AND BEGAN WORKING WITH YOU AT

5    MGA; CORRECT?

6    A   YES.

7    Q   AND SHE WAS ACTUALLY THE DESIGNER BEHIND DIVA STARZ;

8    CORRECT?

9    A   I KNOW THAT MAUREEN WAS VERY INVOLVED IN DIVA STARZ.

10   Q   AND YOU HAD SOME CONVERSATIONS WITH HER ABOUT DIVA STARZ.

11   A   YES.

12   Q   IT'S POSSIBLE YOU MAY HAVE WORKED WITH A WOMAN NAMED

13   RENE PASKO ON DIVA STARZ.

14   A   I DON'T REMEMBER WORKING WITH RENE PASKO ON DIVA STARZ.

15   Q   CAN YOU DENY OR DO YOU JUST NOT REMEMBER ONE WAY OR

16   ANOTHER?

17   A   I DON'T REMEMBER.

18   Q   YOU HAD SOME DISCUSSIONS WITH YOUR BOSS, PAM PRETTS --

19   A   YES.

20   Q   -- ABOUT DIVA STARZ AS WELL; CORRECT?

21   A   I DON'T REMEMBER ANY SPECIFIC CONVERSATIONS WITH PAM.

22   Q   GENERALLY, YOU REMEMBER YOU HAD SOME CONVERSATIONS WITH

23   YOUR BOSS, THOUGH, ABOUT DIVA STARZ.

24   A   I DON'T REMEMBER ANY.

25   Q   ONE WAY OR THE OTHER.

1    A   ONE WAY OR ANOTHER.

2    Q   YOU KNOW A GENTLEMAN NAMED LINKER?

3    A   YES.

4    Q   IT'S TRUE, IS IT NOT, THAT THE DIVA STARZ PROJECT AT

5    MATTEL, THAT ONE OF THE NAMES THAT WAS THROWN OUT THERE WHILE

6    YOU WERE THERE WAS THE NAME BRATZ?

7    A   I'M NOT AWARE OF THAT.

8    Q   WELL, LET ME SHOW YOU EXHIBIT 314, IF YOU WOULD; THAT IS

9    IN VOLUME I.

10        MR. PRICE:  I BELIEVE 314 IS ALREADY IN EVIDENCE,

11   YOUR HONOR.

12        THE COURT:  VERY WELL.

13        MR. PRICE:  IF WE COULD DISPLAY IT.

14        THE COURT:  YOU MAY.

15   BY MR. PRICE:

16   Q   MS. GARCIA, 314 IS AN E-MAIL FROM LIZ HOGAN, COPYING STEVE

17   LINKER.  YOU KNOW WHO THOSE INDIVIDUALS ARE; CORRECT?

18   A   YES.

19   Q   IN FACT, MR. LINKER AND MS. HOGAN ARE OUTSIDE VENDORS THAT

20   HAVE A BUSINESS THAT WORKS ON OR ASSISTS MATTEL AT THIS TIME

21   FOR PACKAGING; CORRECT?

22   A   I'M NOT CERTAIN.

23   Q   WELL, LET'S LOOK AT THE ENTIRE DOCUMENT, IF WE CAN, AGAIN.

24        DO YOU RECALL THAT IN SEPTEMBER OF 2000, YOU

25   CONTACTED MR. LINKER TO GET A BID ON BRATZ?

1    A   I DO NOT REMEMBER CONTACTING STEVE LINKER FOR A BID ON

2    BRATZ.

3    Q   DO YOU REMEMBER ANY CONVERSATION AT ALL WITH MR. LINKER IN

4    CONNECTION WITH DOING PACKAGING OR OTHER WORK ON BRATZ?

5    A   I DO NOT REMEMBER HAVING A CONVERSATION WITH STEVE LINKER

6    IN ASSOCIATION WITH BRATZ.

7    Q   LET ME ASK YOU THIS.  ISN'T IT TRUE THAT IN SEPTEMBER OF

8    2000, YOU CALLED MR. LINKER AND SAID THAT YOU LOVED HIS WORK ON

9    DIVA STARZ AND ONE WANTED HIM TO WORK WITH YOU ON BRATZ?

10   A   NO.  I DON'T REMEMBER THAT.

11   Q   WELL, THEN, LET ME SEE IF I CAN CLARIFY, THEN.

12       ARE YOU DENYING THAT CONVERSATION TOOK PLACE, OR IS

13   IT JUST THAT IT'S SO LONG AGO, YOU DON'T RECALL YOU ONE WAY OR

14   THE OTHER?

15   A   I DON'T REMEMBER HAVING THAT CONVERSATION WITH STEVE

16   LINKER.

17   Q   I'M JUST TRYING TO SEE WHETHER THAT'S A FUNCTION OF TIME

18   OR WHETHER YOU CAN STATE THAT DIDN'T HAPPEN.

19       CAN YOU TELL ME THAT DIDN'T HAPPEN, THAT YOU DIDN'T

20   CALL MR. LINKER IN SEPTEMBER OF 2000 AND SAY 'I LOVED YOUR WORK

21   ON DIVA STARZ AND I WOULD LIKE TO TALK TO YOU ABOUT WORKING ON

22   BRATZ'?  CAN YOU DENY THAT HAPPENED?

23   A   I CANNOT DENY IT, BUT I DON'T BELIEVE IT TO BE TRUE.

24   Q   LET'S SEE IF I CAN REFRESH YOUR MEMORY ABOUT WORKING WITH

25   MR. LINKER.

1        IF YOU WOULD LOOK IN THAT SAME BINDER THERE,

2    EXHIBIT 320.

3        INCIDENTALLY, I SAID SEPTEMBER OF 2000.  DO YOU

4    BELIEVE YOU ALSO DID NOT HAVE ANY SUCH CONVERSATION WITH

5    MR. LINKER IN OCTOBER OF 2000?

6    A   IT WAS MORE LIKELY THAT I HAD A CONVERSATION -- I DON'T

7    REMEMBER ANY CONVERSATIONS WITH STEVE LINKER AND LIZ HOGAN AS

8    IT RELATES TO BRATZ, EVEN IN OCTOBER.

9    Q   SO YOU'D GIVE THE SAME ANSWERS TO MY QUESTIONS IF I HAD

10   SAID OCTOBER INSTEAD OF SEPTEMBER; CORRECT?

11   A   CORRECT.

12   Q   AND IF YOU WOULD LOOK AT EXHIBIT 320, YOU SEE THAT'S AN

13   E-MAIL FROM LIZ HOGAN TO PAULA TREANTAFELLES, DATED OCTOBER 12,

14   2000.

15   A   YES.

16   Q   DO YOU HAVE ANY REASON TO BELIEVE YOU DID NOT RECEIVE THIS

17   E-MAIL FROM MS. HOGAN?

18   A   NO.

19   Q   SO YOU ACTUALLY BELIEVE YOU RECEIVED THIS; CORRECT?

20   A   I DON'T REMEMBER IT, BUT IT'S POSSIBLE THAT I RECEIVED IT.

21       MR. PRICE:  YOUR HONOR, WE'D MOVE EXHIBIT 320 INTO

22   EVIDENCE.

23       THE COURT:  ANY OBJECTION?

24       MS. AGUIAR:  NO OBJECTION.

25       THE COURT:  ADMITTED.  YOU MAY PUBLISH.

1    BY MR. PRICE:

2    Q   SO COULD YOU TELL US YOUR UNDERSTANDING OF WHAT MR. LINKER

3    AND MS. HOGAN DID?  WHAT WAS THEIR BUSINESS?

4    A   I UNDERSTAND LIZ AND STEVE TO BE ARTISTS.

5         TO BE CLEAR, STEVE LINKER WORKED WITH ME ON

6    PROJECTS -- NOT BRATZ -- WHERE I CONTRACTED HIS SUPPORT IN

7    DEVELOPING A SCOOTER SAMANTHA CHARACTER ART, AS WELL AS SOME

8    RENDERINGS ON A HOPPITY BOUNCY BABY LOGO.

9    Q   AT MATTEL OR MGA?

10   A   MGA.

11   Q   IF WE GO INTO THE BODY OF THIS OCTOBER 12, 2000 E-MAIL,

12   YOU SEE IT SAYS, "PAULA AND CARTER, PLEASE FORWARD TO CARTER.

13   I DON'T HAVE HIS E-MAIL."

14        DOES THIS REFRESH YOUR MEMORY THAT, IN FACT, YOU AND

15   MR. BRYANT, IN EARLY OCTOBER OF 2000, WHILE HE STILL WORKED FOR

16   MATTEL, HAD A MEETING WITH MR. LINKER AND LIZ HOGAN TO DISCUSS

17   BRATZ?

18   A   NO.

19   Q   MAYBE THIS WILL HELP.

20        IT SAYS, "STEVE AND I WOULD LIKE TO MEET WITH YOU AND

21   CARTER ON MONDAY TO MAYBE GET SOME OF THE ART SO WE CAN GET

22   GOING.  LET US KNOW WHAT TIME AND WHERE IS GOOD FOR YOU."

23        DOES THAT HELP REFRESH YOUR MEMORY THAT IN EARLY

24   OCTOBER, WHILE MR. BRYANT WAS STILL WORKING FOR MATTEL, THAT

25   YOU AND HE WERE HAVING CONVERSATIONS WITH MR. LINKER AND

1    MS. HOGAN ABOUT BRATZ?

2    A   NO.

3    Q   DOES ANY OF THE REST OF THIS, WHERE IT SAYS "HERE ARE SOME

4    QUESTIONS AND COMMENTS ON THE BRATZ PROJECT," AND ASKING FOR

5    SPEC SHEETS AND ART BOARDS, ET CETERA, DOES THAT REFRESH YOUR

6    MEMORY THAT WHILE MR. BRYANT WAS STILL WORKING FOR MATTEL, THAT

7    YOU AND HE WERE HAVING CONVERSATIONS WITH MR. LINKER AND

8    MS. HOGAN ABOUT BRATZ?

9    A   NO.

10   Q   DO YOU RECALL ANY CONVERSATIONS WITH MR. BRYANT CONCERNING

11   MR. LINKER AND THE SEPTEMBER/OCTOBER 2000 TIME FRAME?

12   A   CAN YOU PLEASE REPEAT YOUR QUESTION.

13   Q   DO YOU RECALL ANY CONVERSATIONS WITH MR. BRYANT ABOUT

14   CONVERSATIONS WITH MR. LINKER OR MS. HOGAN?

15   A   NO.

16   Q   YOU SEE NUMBER FIVE, WHERE IT SAYS "ARE THERE RENDERINGS

17   OF THE OUTFITS WE SAW, THE CONFIRMED OUTFITS THAT YOU WILL BE

18   MANUFACTURING?"

19       FIRST I'D ASK YOU THIS.  BY EARLY OCTOBER, IT'S TRUE

20   THAT YOU, AT MGA, HAD RENDERINGS OF THE OUTFITS FOR THE BRATZ

21   DOLLS; CORRECT?

22   A   THAT'S NOT CORRECT.

23   Q   SO WOULD IT BE INCORRECT, THEN, THAT AS OF OCTOBER 12 THAT

24   THERE WOULD HAVE BEEN RENDERINGS OF THE OUTFITS?

25   A   I BELIEVE THAT WOULD BE THE CASE, YES.

1    Q   SO YOUR TESTIMONY IS THAT PRIOR TO OCTOBER 12TH, YOU NEVER

2    GAVE TO ANYONE, ANY OUTSIDE VENDORS, RENDERINGS OF THE OUTFITS

3    FOR BRATZ; IS THAT RIGHT?

4    A   THAT'S CORRECT.

5        TO BE CLEAR, WHEN YOU DEFINE THE FASHIONS FOR BRATZ,

6    I RECOGNIZE THAT TO BE THE FASHIONS THAT WE MANUFACTURED WITH.

7    Q   SO THIS WAS A LITTLE BIT OF A DETOUR.  I WANTED TO FIND

8    OUT IF THIS REFRESHED YOUR RECOLLECTION ABOUT MR. LINKER.

9        YOUR TESTIMONY IS THAT WHILE YOU WERE AT MATTEL, YOU

10   WEREN'T AWARE THAT MR. LINKER HAD SUGGESTED THE NAME BRATZ FOR

11   DIVA STARZ; IS THAT YOUR TESTIMONY?

12   A   THAT IS MY TESTIMONY.

13   Q   TO BE CLEAR, THAT'S SOMETHING THAT YOU'RE SURE OF; ITS NOT

14   SOMETHING THAT, BECAUSE OF THE PASSAGE OF TIME, YOU MAY HAVE

15   FORGOTTEN; CORRECT?

16   A   CORRECT.

17   Q   LET ME ASK YOU THIS, THEN, ABOUT WHILE YOU WERE AT MATTEL.

18       IN FRONT OF YOU IS THIS GIGANTIC CHART I'M GOING TO

19   ASK YOU TO UNFOLD; IT'S 293; IT'S IN BINDER ONE.

20       DO YOU REMEMBER AT YOUR DEPOSITION YOU WERE SHOWN

21   THIS EXHIBIT 293?

22   A   I BELIEVE THAT I WAS SHOWN A PORTION OF THIS EXHIBIT WHERE

23   NAMES WERE WHITED OUT.

24   Q   RIGHT.

25       AND THAT'S SO YOU WOULDN'T KNOW THE NAMES SURROUNDING

1    YOU ON THE CHART; CORRECT?

2    A   I'M NOT SURE.

3    Q   BUT BY LOOKING AT WHAT YOU'VE BEEN GIVEN, YOU DIDN'T KNOW

4    WHAT THE NAMES WERE OF THOSE FOLKS AROUND YOU; CORRECT?

5    A   CORRECT.

6    Q   WHEN YOU LOOKED AT THE CHART THAT HAD THE WHITED OUT

7    NAMES, YOU IDENTIFIED WHERE YOU SAT FOR A CERTAIN PERIOD OF

8    TIME; CORRECT?

9    A   YES.

10   Q   AND WHERE YOU IDENTIFIED WAS, IF WE CAN LOOK AT THIS AREA

11   HERE, AND THE CUBICLE YOU IDENTIFIED WAS THE ONE HERE THAT HAS

12   "P. TREANTAFELLES" ON IT; CORRECT?

13   A   THAT'S CORRECT.

14   Q   AND YOU IDENTIFIED THAT THIS AREA HERE WAS THE MAIN

15   ENTRANCE.

16   A   CORRECT.

17   Q   AND AS TO WHEN YOU WERE THERE, FIRST OF ALL, YOU SEE THAT

18   THE DATE ON THIS SAYS "REVISED, JANUARY 5, 1999."

19      DO YOU SEE THAT?

20   A   YES.

21   Q   AND IT WAS YOUR TESTIMONY THAT YOU SAT AT THAT PARTICULAR

22   CUBICLE SOMEWHERE BETWEEN 12 AND 18 MONTHS; CORRECT?

23   A   YES.

24   Q   AND, OF COURSE, 18 MONTHS WOULD PUT YOU SOME TIME INTO

25   JANUARY OF '99; CORRECT?

1    A   YES.

2    Q   WHILE YOU WERE AT MATTEL, DO YOU RECALL YOU SIGNED

3    SOMETHING CALLED AN INVENTIONS AGREEMENT?

4        I'LL REPHRASE THAT?

5        TO MAKE IT SIMPLER, JUST LOOK AT EXHIBIT 1116, WHICH

6    IS IN VOLUME II, IF YOU WOULD LOOK AT THAT.

7        IS THIS THE EMPLOYEE CONFIDENTIAL INFORMATION AND

8    INVENTIONS AGREEMENT THAT YOU SIGNED WHEN YOU STARTED WORK AT

9    MATTEL?

10   A   YES.

11       MR. PRICE:  MOVE EXHIBIT 1116 INTO EVIDENCE, YOUR

12   HONOR.

13       THE COURT:  ANY OBJECTION?

14       MS. AGUIAR:  NO OBJECTION.

15       THE COURT:  ADMITTED.  YOU MAY PUBLISH.

16   BY MR. PRICE:

17   Q   IS THIS YOUR SIGNATURE HERE ON THE SECOND PAGE WHERE IT

18   SAYS "JULY 4, '97"?

19   A   YES.

20   Q   THERE WAS SOMEONE THERE WHO SIGNED AT THE SAME TIME YOU

21   DID.

22   A   IT APPEARS SO.

23   Q   DO YOU RECALL THAT, OR...

24   A   NO.

25   Q   DO YOU RECALL WHO IT WAS?

1    A   NO.

2    Q   DO YOU RECOGNIZE THE SIGNATURE HERE?  DO YOU KNOW WHO THAT

3    IS?

4    A   NO.

5    Q   IN ANY EVENT, OF COURSE YOU READ THIS BEFORE YOU SIGNED

6    IT.

7    A   I DID NOT READ IT IN GREAT DETAIL.

8    Q   YOU READ IT IN ENOUGH DETAIL TO GET THE GIST OF WHAT IT

9    SAID; CORRECT?

10   A   YES.

11   Q   AND ONE OF THE THINGS THAT IT SAID, GOING BACK TO THE

12   FIRST PAGE, YOU UNDERSTOOD THAT IF YOU CAME UP WITH ANY

13   INVENTIONS OR DESIGNS WHILE YOU WERE AT MATTEL, WORKING FOR

14   MATTEL, THAT RELATED TO MATTEL'S BUSINESS WHILE YOU WERE

15   WORKING THERE, GETTING PAID BY THEM, THOSE DESIGNS AND

16   INVENTIONS WERE MATTEL'S.

17   A   YES.

18   Q   AND WHAT YOU ALSO KNEW WAS YOU WERE SUPPOSED TO DEVOTE

19   YOUR EFFORTS TO MATTEL AND NOT WORK FOR ANOTHER COMPANY AT THE

20   SAME TIME.

21   A   I GENERALLY UNDERSTOOD THAT, YES.

22   Q   I MEAN, YOU WOULD HAVE UNDERSTOOD THAT WITHOUT SIGNING

23   THAT DOCUMENT; RIGHT?

24   A   YES.

25   Q   YOU KNEW IT WOULD BE DISHONEST OF YOU TO BE TAKING A

1    PAYCHECK FROM MATTEL BUT WORKING FOR ONE OF THEIR COMPETITORS

2    AT THE SAME TIME; RIGHT?

3    A   I'M NOT SURE IF IT'S NECESSARILY DISHONEST.  I WOULD --

4    Q   LET'S SAY WRONG.  YOU WOULD KNOW THAT IT WAS WRONG TO WORK

5    FOR MATTEL AND AT THE SAME TIME, BEHIND THEIR BACK, WORK FOR

6    ONE OF THEIR COMPETITORS.

7    A   YES.

8    Q   IF YOU KNEW SOMEONE WAS DOING THAT, THAT, IN YOUR MIND,

9    WOULD CAST SOME DOUBT ON THEIR HONESTY AND THEIR CREDIBILITY;

10   RIGHT?  IF THEY WERE WORKING FOR ONE COMPANY, BUT AT THE SAME

11   TIME, BEHIND THAT COMPANY'S BACK, WORKING FOR ONE OF THEIR

12   COMPETITORS?

13   A   YES.

14   Q   IT WOULD MEAN PERHAPS YOU SHOULDN'T TRUST THAT PERSON;

15   CORRECT?

16   A   YES.

17   Q   AND, IN FACT, IF WE GO TO THE SECOND PAGE OF THIS, YOU SEE

18   IT SAYS "CONFLICTS WITH OTHER ACTIVITIES," WHERE IT SAYS "MY

19   EMPLOYMENT WITH THE COMPANY REQUIRES MY UNDIVIDED ATTENTION AND

20   EFFORT.  THEREFORE, DURING MY EMPLOYMENT WITH THE COMPANY, I

21   WILL FULLY COMPLY WITH THE COMPANY'S CONFLICT OF INTEREST

22   POLICY, AS IT MAY BE AMENDED FROM TIME TO TIME.  I SHALL NOT,

23   WITHOUT THE COMPANY'S EXPRESS WRITTEN CONSENT, ENGAGE IN ANY

24   EMPLOYMENT OR BUSINESS OTHER THAN FOR THE COMPANY, OR INVEST IN

25   OR ASSIST IN ANY MANNER ANY BUSINESS COMPETITIVE WITH THE

1   BUSINESS OR FUTURE BUSINESS PLANS OF THE COMPANY."

2      YOU UNDERSTOOD THAT YOU HAD THAT OBLIGATION WHILE AT

3   MATTEL; CORRECT?

4   A   YES.

5   Q   NOW, YOU ALSO UNDERSTOOD THAT THIS SORT OF AGREEMENT WAS

6   TYPICAL IN THE TOY INDUSTRY.

7   A   I EXPECTED SO.  I DIDN'T KNOW FOR SURE.

8   Q   IT WAS YOUR UNDERSTANDING THAT OTHER MATTEL EMPLOYEES HAD

9   TO SIGN THIS SAME TYPE OF AGREEMENT, SAYING THAT IF THEY

10   INVENTED SOMETHING WHILE AT MATTEL, IT BELONGED TO MATTEL AND

11   THEY WEREN'T SUPPOSED TO WORK FOR COMPETITORS WHILE THEY WERE

12   BEING PAID FOR MATTEL.

13   A   YES.

14   Q   NOW YOU ALSO UNDERSTOOD THAT YOU WERE AN AT-WILL EMPLOYEE;

15   CORRECT?

16   A   I'M NOT SURE WHAT AT-WILL EMPLOYEE MEANS.

17   Q   THEN, DID YOU UNDERSTAND THAT YOU COULD QUIT MATTEL FOR

18   ANY REASON; THAT YOU DIDN'T HAVE TO HAVE SOME EXCUSE FOR

19   QUITTING; THAT YOU WERE FREE TO QUIT WHENEVER YOU WANTED?

20   A   YES.

21   Q   AND YOU UNDERSTOOD THAT MATTEL COULD END YOUR EMPLOYMENT

22   FOR ANY REASON, AS LONG AS IT WASN'T FOR SOME ILLEGAL REASON.

23   A   YES.

24   Q   BUT THAT WHILE YOU WERE AT MATTEL, IT WAS YOUR

25   UNDERSTANDING THAT YOU WERE REQUIRED TO COMPLY WITH

1      EXHIBIT 1116, THIS EMPLOYEE CONFIDENTIAL INFORMATION AND

2      INVENTIONS AGREEMENT; CORRECT?

3      A    YES.

4      Q    NOW, WE TALKED ABOUT, I THINK YOU SAID YOU EXPECTED THAT

5      OTHERS IN THE TOY INDUSTRY WOULD HAVE THE SAME SORTS OF

6      AGREEMENTS.  YOU CAME TO LEARN THAT MGA HAD THE SAME TYPE OF

7      AGREEMENT; CORRECT?

8      A    YES.

9      Q    AND IF YOU COULD LOOK AT EXHIBIT 1117, THE NEXT ONE RIGHT

10     THERE.  DO YOU RECOGNIZE EXHIBIT 1117 AS THE AGREEMENT YOU

11     SIGNED WHEN YOU WENT TO MGA?

12     A    YES.

13          MR. PRICE:  I'D MOVE EXHIBIT 1117 INTO EVIDENCE.

14          THE COURT:  ANY OBJECTION?

15          MS. AGUIAR:  NO OBJECTION.

16          THE COURT:  ADMITTED.  YOU MAY PUBLISH.

17          MR. PRICE:  THANK YOU, YOUR HONOR.

18     BY MR. PRICE:

19     Q    IF WE COULD GO TO THE FIFTH PAGE.

20          THIS IS YOUR SIGNATURE, IN PRINTED NAME, ON APRIL 17,

21     2000; CORRECT?

22     A    CORRECT.

23     Q    AND YOU SEE THERE'S SOMETHING CALLED AN INVENTIONS

24     ASSIGNMENT?

25     A    YES.

1    Q    AND YOU UNDERSTOOD THAT BASICALLY THIS WAS SAYING THE SAME

2    THING THAT YOUR MATTEL AGREEMENT SAID, WHICH IS THAT IF YOU

3    INVENT SOMETHING WHILE YOU'RE AT MGA THAT PERTAINS TO MGA'S

4    BUSINESS, THAT WOULD BELONG TO MGA; CORRECT?

5    A    YES.

6    Q    SO LET ME THEN MOVE FROM THESE CONTRACTS AND DISCUSSIONS

7    ABOUT YOUR OBLIGATIONS AND TALK ABOUT WHEN YOU TALKED WITH

8    CARTER BRYANT ABOUT THE CONCEPT WHICH WE'RE TERMING BRATZ.

9    OKAY?

10        ARE YOU WITH ME SO FAR?

11   A    YES.

12   Q    AND I HESITATE TO DO THIS, AFTER MS. MARTINEZ DREW ON

13   SOMETHING, BUT I'M GOING TO TRY TO DO THE BEST I CAN TO PUT UP

14   A TIMELINE HERE SO WE CAN FOLLOW WHEN YOU SAY CERTAIN THINGS

15   HAPPENED.

16        OKAY?

17   A    YES.

18   Q    NOW, I BELIEVE YOUR TESTIMONY IS THAT THE FIRST MEETING

19   THAT YOU HAD WITH MR. CARTER ABOUT BRATZ WAS SEPTEMBER 1ST; IS

20   THAT RIGHT?

21   A    THAT'S RIGHT.

22   Q    AND I BELIEVE YOUR TESTIMONY WAS THAT YOU WERE HAVING A

23   DISCUSSION WITH VERONICA MARLOW WHO WAS A FORMER MATTEL

24   EMPLOYEE AND A VENDOR; CORRECT?

25   A    CORRECT.

1   Q   AND THAT IN MID AUGUST, YOU WERE ON YOUR WAY TO DO A PHOTO

2   SHOOT.

3   A   YES.

4   Q   SO MS. MARLOW, THEN, IS IN MID AUGUST.

5       IS THERE AN E ON MARLOW?

6   A   YES.

7   Q   AND THAT AT THIS PHOTO SHOOT, YOU MENTIONED TO HER THAT

8   YOU HAD SOME INTERESTS IN GETTING INTO THE FASHION DOLL MARKET.

9   A   YES.

10  Q   SHE DIDN'T BRING IT UP TO YOU, YOU BROUGHT IT UP TO HER;

11  THAT'S YOUR TESTIMONY; CORRECT?

12  A   CORRECT.

13  Q   NOW, IT'S TRUE, IS IT NOT, THAT THERE WAS NEVER AN

14  INSTANCE PRIOR TO SEPTEMBER 1ST WHEN ISAAC LARIAN EVER ASKED

15  YOU TO LOOK INTO FASHION DOLL IDEAS; CORRECT?

16  A   NOT THAT I CAN REMEMBER, NO.

17  Q   I MEAN, YOUR RECOLLECTION IS THAT NO ONE OTHER THAN YOU

18  EVER EXPRESSED AN INTEREST IN THE FASHION DOLL MARKET PRIOR TO

19  YOU MEETING WITH MS. MARLOW; CORRECT?

20  A   THAT'S MY MEMORY.

21  Q   AND IT WAS A COUPLE OF DAYS BEFORE THIS SEPTEMBER 1ST

22  MEETING WHEN YOU MENTIONED TO MR. LARIAN THAT YOU WERE

23  INTERESTED IN MGA ENTERING THIS FASHION DOLL MARKET; CORRECT?

24  A   I BELIEVE SO, YES.

25  Q   SO IF THAT'S SEPTEMBER 1ST, IT WAS SOME TIME IN THAT WEEK

1    BEFORE SEPTEMBER 1ST AND AFTER YOU SPOKE WITH MS. MARLOW THAT

2    YOU WENT TO MR. LARIAN AND SAID 'I'M INTERESTING IN MGA MOVING

3    INTO THE FASHION DOLL MARKET'; CORRECT?

4    A   YES.

5    Q   SO YOUR TESTIMONY THEN IS THAT AFTER MEETING WITH MARLOW

6    AND SHE SAID 'I'VE GOT THIS GUY YOU SHOULD TALK TO;

7    MR. BRYANT'; CORRECT?

8    A   YES.

9    Q   THAT YOU GOT A NOTICE, OUT OF THE BLUE, TO ATTEND A

10   SEPTEMBER 1ST MEETING.

11   A   OUT OF THE BLUE?

12   Q   YOU DON'T KNOW HOW THIS NOTICE CAME ABOUT.  YOU DON'T KNOW

13   HOW THE MEETING WAS SCHEDULED.  YOU DIDN'T SCHEDULE THE

14   MEETING.  YOU JUST GOT A NOTICE SAYING THERE'S GOING TO BE A

15   SEPTEMBER 1ST MEETING AT WHICH YOU AND MR. BRYANT AND I THINK

16   MS. O'CONNOR WOULD ATTEND; CORRECT?

17   A   THAT'S CORRECT.

18        I BELIEVE I KNOW HOW THAT MEETING WAS SCHEDULED.  I'M

19   NOT CERTAIN, BUT I BELIEVE I UNDERSTAND.

20   Q   AT THE TIME OF YOUR DEPOSITION, YOU SAID YOU DIDN'T KNOW

21   HOW THAT HAPPENED; CORRECT?

22   A   I'M NOT SURE.

23   Q   IF YOU LOOK AT EXHIBIT 301, WHICH I THINK IS THAT SAME

24   VOLUME YOU'RE LOOKING AT, IS THAT THE DOCUMENT WHICH SAYS

25   THERE'S GOING TO BE A SEPTEMBER 1ST MEETING?

1    A   YES.

2    Q   AND THIS IS SOMETHING WHICH YOU RECEIVED.

3    A   YES.

4        MR. PRICE:  I'D MOVE EXHIBIT 301 INTO EVIDENCE, YOUR

5    HONOR.

6        MS. AGUIAR:  NO OBJECTION.

7        THE COURT:  IT'S ADMITTED.  YOU MAY PUBLISH.

8    BY MR. PRICE:

9    Q   SO THIS IS A DOCUMENT THAT WAS CREATED WHICH BASICALLY

10   SAID THERE'S GOING TO BE A MEETING ON SEPTEMBER 1ST AT WHICH

11   YOU AND VICTORIA O'CONNOR WILL MEET WITH MR. BRYANT; IS THAT

12   CORRECT?

13   A   CORRECT.

14   Q   AND THAT WAS GOING TO BE IN MR. LARIAN'S OFFICE?

15   A   CORRECT.

16   Q   COULD YOU TELL US WHO VICTORIA O'CONNOR IS.

17   A   SHE WAS IN CHARGE OF LICENSING AT MGA.

18   Q   NOW, IF YOU COULD LOOK AT EXHIBIT 11 IN YOUR BINDER.  IT'S

19   IN THE FIRST BINDER.  DO YOU HAVE THAT?

20   A   YES.

21   Q   NOW, YOU SEE THIS APPEARS TO BE A PRINTOUT OF A WALL

22   STREET JOURNAL ARTICLE.

23   A   YES.

24   Q   DID YOU EVER SEE THIS ARTICLE?

25   A   NO.

1   Q   WELL, LET ME ASK YOU THIS.

2        YOU'RE NOT AWARE OF THERE EVER BEING, IN LATE 1999 OR

3   EVEN PRIOR TO SEPTEMBER 2000, A FASHION DOLL DESIGN CONTEST

4   THAT RESULTED IN MGA GOING FORWARD WITH THE BRATZ PROJECT;

5   CORRECT?

6   A   I DON'T REMEMBER ONE, NO.

7   Q   YOUR MEMORY IS IT WAS YOUR IDEA; CORRECT?

8        LET ME REPHRASE THAT.

9        YOUR MEMORY IS IT WAS YOUR IDEA FOR MGA TO GO FORWARD

10   WITH THE FASHION DOLL TO TRY AND ENTER THAT MARKET; CORRECT?

11   A   I DEFINITELY HAD MY INTERESTS, AND I DON'T KNOW IF I WAS

12   EXCLUSIVE TO THAT INTEREST IN PURSUING A FASHION DOLL.  BUT I

13   CERTAINLY KNOW THAT I WAS INTERESTED.

14   Q   WELL, WHAT YOU KNOW IS, AS FAR AS YOU COULD TELL, NO ONE

15   ELSE AT MGA HAD EXPRESSED AN INTEREST IN THE FASHION DOLL

16   MARKET PRIOR TO YOU TALKING TO MR. LARIAN JUST A FEW DAYS

17   BEFORE SEPTEMBER 1ST; CORRECT?

18   A   THAT'S MY MEMORY, YES.

19   Q   AND MR. LARIAN NEVER CAME TO YOU AND SAID 'WE'RE DOING A

20   FASHION DOLL CONTEST AND I'M GOING TO SELECT THE WINNER';

21   CORRECT?  HE NEVER DID THAT?

22   A   I DON'T REMEMBER THAT, NO.

23   Q   NOW LET'S TALK, IN THIS TIMELINE, TALK ABOUT YOUR

24   RECOLLECTION ABOUT THE FIRST MEETING ON SEPTEMBER 1ST.

25        MS. MARLOW HADN'T GIVEN YOU ANY DESIGNS OR DRAWINGS

1    FOR BRATZ; CORRECT?

2    A    NO.

3    Q    SO PRIOR TO SEPTEMBER 1ST, YOU DIDN'T HAVE ANY PORTFOLIO

4    DESIGNS OR ANYTHING IN WRITING THAT DESCRIBED WHAT THIS

5    PROPOSED FASHION DOLL WAS GOING TO LOOK LIKE; CORRECT?

6    A    CORRECT.

7    Q    AND MR. LARIAN IS THE CEO OF THE COMPANY; HE'S FAIRLY

8    IMPORTANT IN THE COMPANY; RIGHT?

9    A    YES.

10   Q    AND YOUR MEMORY IS THAT MR. LARIAN MET WITH MR. BRYANT AND

11   YOU ON SEPTEMBER 1ST, BEFORE YOU HAD EVEN HAD ANY OPPORTUNITY

12   TO LOOK AT ANY OF MR. BRYANT'S DRAWINGS OR HAVE ANY DISCUSSION

13   WITH MR. BRYANT ABOUT HIS CONCEPT.

14   A    YES.  THAT'S MY MEMORY.

15   Q    YOU HAVE TO ADMIT, THAT WOULD HAVE BEEN REALLY UNUSUAL,

16   WOULDN'T IT, FOR MR. LARIAN TO ATTEND A PITCH MEETING BEFORE

17   YOU HAD HAD ANY CHANCE TO EVEN LOOK AT ANY DRAWINGS OR HAVE ANY

18   DISCUSSIONS WITH THE ARTIST?

19   A    NO.  NOT AT MGA, AND NOT IN ASSOCIATION WITH ISAAC, NO.

20   Q    DO YOU KNOW A WOMAN NAMED JENNIFER MAURUS?

21   A    YES.

22   Q    SHE WAS A SALES PERSON AT MGA; CORRECT?

23   A    YES.

24   Q    AND IS IT CORRECT THAT YOU HAD DISCUSSIONS WITH HER ABOUT

25   BRATZ IN MID JUNE OF 2000?

1    A    NO.

2    Q    WELL, IS IT CORRECT THAT AT MGA YOU WERE USING THE NAME

3    BRATZ AS OF MID JUNE OF 2000?

4    A    NO.

5    Q    I'D LIKE YOU TO LOOK, IF YOU COULD, IN YOUR BINDER -- THIS

6    TIME, I'M PRETTY SURE THIS IS IN THE THIRD BINDER -- IT'S

7    EXHIBIT 11897.  DO YOU HAVE THAT?

8    A    YES.

9    Q    DO YOU RECOGNIZE THIS E-MAIL FROM THE FIRM OF RUSS,

10   AUGUST, CABBOTT & KENT?

11   A    NO, I DON'T.

12   Q    PERHAPS IF YOU LOOK AT THE SECOND PAGE; YOU SEE THERE'S A

13   'DEAR PAULA...'

14   A    YES.

15   Q    DO YOU RECALL RECEIVING AN E-MAIL FROM RUSS, AUGUST,

16   CABBOTT & KENT, ASKING YOU TO CONFIRM THAT THE DATE OF FIRST

17   USE OF THE BRATZ NAME WAS JUNE 15, 2000?

18         MR. KENNEDY:  OBJECTION, YOUR HONOR.  LACK OF

19   FOUNDATION.

20         THE COURT:  SUSTAINED.

21   BY MR. PRICE:

22   Q    HAVE YOU EVER SEEN THIS BEFORE?

23         AND I'M REFERRING NOW TO EXHIBIT 11897.

24   A    I DON'T REMEMBER.

25   Q    LET ME ASK YOU THIS.  DO YOU HAVE ANY REASON TO BELIEVE

1    YOU DID NOT RECEIVE THIS -- IT LOOKS LIKE A FAX --

2    EXHIBIT 11897?

3    A    NO.

4    Q    AND YOU SEE AT THE BOTTOM WHERE IT HAS A BATES NUMBER,

5    MGA, YOU UNDERSTAND THIS WAS PRODUCED FROM MGA'S FILES;

6    CORRECT?

7    A    YES.

8    Q    AND TO CLARIFY, FLIPPING THROUGH THE DOCUMENT, YOU HAVE NO

9    REASON TO BELIEVE YOU DID NOT RECEIVE THIS; CORRECT?

10   A    NO.

11   Q    IS THAT CORRECT?

12   A    THAT'S CORRECT.

13        THE COURT:  WE'VE ESTABLISHED THAT TWICE NOW,

14   COUNSEL.

15        MR. PRICE:  IN THAT CASE, I THINK IT'S SUFFICIENT

16   FOUNDATION.

17        MS. AGUIAR:  OBJECTION, YOUR HONOR.

18        THE COURT:  STATE THE LEGAL OBJECTION.

19        MS. AGUIAR:  LACK OF FOUNDATION.

20        THE COURT:  SUSTAINED.

21   BY MR. PRICE:

22   Q    LET ME ASK YOU ABOUT ANOTHER EVENT IN JUNE OF 2000.

23        YOU KNOW A WOMAN NAMED ANNA RHEE?

24   A    YES.

25   Q    AND MS. RHEE WAS A FACE PAINTER; CORRECT?

1    A   CORRECT.

2    Q   AND IF YOU LOOK AT VOLUME I, EXHIBIT 201, DO YOU RECOGNIZE

3    201 AS A COLLECTION OF INVOICES FROM MS. RHEE FOR FACE

4    PAINTING?

5    A   YES.

6    Q   AND THESE WERE INVOICES SENT TO MGA.

7    A   YES.

8    Q   WOULD YOU REVIEW THESE INVOICES --

9    A   YES.

10   Q   -- AND EITHER APPROVE OR DISAPPROVE PAYMENT?

11   A   YES.

12   Q   AT THIS POINT, LET'S LOOK AT THE FIRST PAGE.

13       YOU RECOGNIZE THIS AS AN INVOICE YOU GOT ON JUNE 12,

14   2000, FROM MS. RHEE?

15   A   YEAH.

16       MR. PRICE:  I'M GLAD TO MOVE THE ENTIRE EXHIBIT 201

17   INTO EVIDENCE, OR JUST THE FIRST PAGE.

18       MS. AGUIAR:  NO OBJECTION TO THE FIRST PAGE.

19       THE COURT:  IT'S ADMITTED.  JUST THE FIRST PAGE.

20   BY MR. PRICE:

21   Q   YOU SEE WHERE THIS SAYS JUNE 12, 2000, AND IT SAYS TWO

22   ANGEL BABY DOLL HEADS.  DO YOU SEE THAT?

23   A   YES.

24   Q   AND YOU'RE AWARE THAT MS. RHEE SAID SHE WAS PAINTING BRATZ

25   HEADS AND THAT THIS WAS A CODE NAME; CORRECT?

1    A   I'M NOT SPECIFICALLY FAMILIAR WITH THAT TESTIMONY.

2    Q   WELL, WHAT YOU'VE TESTIFIED TO IS THAT WHAT SHE WAS

3    PAINTING HERE WERE CABBAGE PATCH DOLL HEADS; RIGHT?

4    A   YES.

5    Q   NOW LET'S LOOK AT THAT.

6        ONE OF THE REASONS YOU SAY THAT IS AS OF JUNE 12,

7    2000, THERE WERE NO ANGEL BABY DOLL HEADS TO PAINT; CORRECT?

8    A   I JUST WANT TO MAKE SURE THAT I'M REPRESENTING MY

9    INFORMATION CLEARLY.

10   Q   SURE.

11   A   ANGEL BABY DOLL HEADS HAD NO RELATIONSHIP TO BRATZ

12   WHATSOEVER.  I JUST WANTED TO MAKE SURE WE WERE --

13   Q   I UNDERSTAND.  YOU'RE DENYING THAT.

14   A   OKAY.

15   Q   I WANT TO ASK YOU THIS.  AS OF JUNE 12, 2000, THERE WERE

16   NO ANGEL BABY DOLL HEADS IN EXISTENCE TO PAINT; CORRECT?

17   A   I HAD NOT COMPLETED MY SCULPT FOR OUR PRAYER ANGEL BABY

18   DOLL.

19   Q   SO THE ANSWER IS YES, THERE WERE NO ANGEL BABY DOLL HEADS

20   THAT WERE ACTUALLY THE HEADS OF ANGEL BABY DOLLS IN EXISTENCE

21   AS OF JUNE 2000.

22   A   OF MGA'S ANGEL BABY, CORRECT.

23   Q   AND, IN FACT, THE FIRST TIME THAT YOU HAD -- AND I'LL ASK

24   YOU TO GIVE ME A DEFINITION -- YOU'VE HEARD OF THE TERM ROTO

25   CAST?

1    A   YES.

2    Q   COULD YOU EXPLAIN TO THE JURY WHAT THAT IS.

3    A   ROTO CAST IS A MATERIAL TYPE THAT THE HEAD IS MADE OUT OF;

4    SO WHEN YOU GUYS PURCHASE A DOLL FROM THE OPEN MARKET, IT'S THE

5    RUBBERY HEAD MATERIAL THAT IS ON MOST EVERY DOLL, FASHION DOLL,

6    LARGE DOLL, OR WHATNOT.

7    Q   AND THE FIRST TIME THAT YOU HAD THAT SORT OF HEAD -- IT'S

8    MADE OF VINYL?

9    A   YES.

10   Q   THE FIRST TIME YOU HAD THAT SORT OF HEAD TO PAINT WAS IN

11   AUGUST OF 2000; CORRECT?

12   A   I BELIEVE SO, YES.

13   Q   AN EXAMPLE, IF YOU COULD LOOK AT EXHIBIT 402, WHICH IS

14   ALSO IN VOLUME I -- THIS IS A COPY FROM YOUR DEPOSITION; AND IF

15   YOU NEED HELP, I CAN GIVE YOU A BETTER COPY.

16       DO YOU RECOGNIZE EXHIBIT 402?

17   A   YES.

18   Q   AND WHAT IS THAT?

19   A   I BELIEVE THAT'S THE CAST OF THE MGA PRAYER ANGEL BABY

20   DOLL HEAD.

21       MR. PRICE:  YOUR HONOR, I'VE MARKED EXHIBIT 402-B, A

22   BETTER COPY.  MAY I PRESENT THAT TO THE WITNESS?

23       MS. AGUIAR:  NO OBJECTION TO THAT, YOUR HONOR.

24       THE COURT:  VERY WELL.  YOU MAY PROCEED.

25   / / /

1    BY MR. PRICE:

2    Q    IS EXHIBIT 402-B A BETTER COPY OF THAT HEAD?

3    A    I BELIEVE SO, YES.

4    Q    AND IF WE COULD JUST SHOW THE JURY QUICKLY WHAT --

5         MR. PRICE:  I MOVE 402-B INTO EVIDENCE.

6         MS. AGUIAR:  NO OBJECTION.

7         THE COURT:  IT'S ADMITTED.  YOU MAY PUBLISH.

8         MR. PRICE:  I MOVE 402 INTO EVIDENCE AS WELL.

9         MS. AGUIAR:  NO OBJECTION.

10        THE COURT:  YOU MAY PROCEED.

11   BY MR. PRICE:

12   Q    SO THAT'S WHAT THIS ROTO CAST VINYL HEAD LOOKED LIKE, AT

13   LEAST FOR THE BABY ANGEL DOLL; CORRECT?

14   A    TO BE CLEAR, THE IMAGE INCLUDED ON THE SCREEN IS ACTUALLY

15   A CAST OF WHAT BECAME EVENTUALLY THE ROTO CAST HEAD.

16   Q    AND AT SOME POINT SOMEONE DID PUT PAINT ON THAT, ON THE

17   ROTO CAST VINYL HEAD.

18   A    THAT'S RIGHT.

19   Q    SO GETTING BACK TO, THEN, EXHIBIT 201, THE INVOICE, THE

20   ONE THING WE KNOW IS THAT WHATEVER MS. RHEE WAS PAINTING IN

21   JUNE OF 2000, IT WASN'T THIS BLANK VINYL HEAD FOR THE ANGEL

22   BABY DOLL; CORRECT?

23   A    MGA SCULPT, NO.

24   Q    AND YOUR TESTIMONY, IF WE CAN SHOW THE FULL PAGE HERE, YOU

25   SEE IT SAYS "REQUESTED BY KERRI LEGG."  DO YOU SEE THAT?

1   A   YES.

2   Q   YOU UNDERSTAND HER NAME NOW IS KERRI BRODE?

3   A   YES.

4   Q   AND HAVE YOU TALKED TO HER ABOUT THIS, ABOUT THE PAYMENT

5   OF THIS INVOICE IN JUNE OF 2000?

6   A   NO.

7   Q   YOUR TESTIMONY IS THAT WHAT WAS SENT TO MS. RHEE TO PAINT

8   WAS A CABBAGE PATCH DOLL.

9   A   I BELIEVE SO, YES.

10   Q   AND IF WE COULD MARK THAT FOR IDENTIFICATION AS

11   EXHIBIT 13564.

12        AND I'LL SHOW IT TO COUNSEL.

13        THE COURT:  PLEASE.

14   BY MR. PRICE:

15   Q   13564.  IT LOOKS LIKE A DOLL.  PERHAPS YOU CAN TELL ME IF

16   THIS IS A CABBAGE PATCH DOLL.

17   A   IT IS.

18   Q   AND IF WE LOOK AT THAT DOLL, WE SEE THAT THERE'S ALREADY

19   PAINT ON THE FACE; CORRECT?

20   A   YES.

21   Q   AND I'M JUST USING THIS AS A DEMONSTRATIVE, YOUR HONOR.

22        SO, FOR EXAMPLE, TO THE JURY, IT'S ALREADY GOT A

23   MOUTH PAINTED; CORRECT?

24   A   YES.

25   Q   AND EYES.

1    A   YES.

2    Q   AND A LITTLE THING ON ITS CHEEK.

3    A   YES.

4    Q   SO YOUR TESTIMONY IS THAT YOU PERSONALLY DELIVERED, OR

5    SOMEONE AT MGA PERSONALLY DELIVERED, A CABBAGE PATCH DOLL LIKE

6    THIS TO MS. RHEE TO PAINT AS AN ANGEL BABY DOLL HEAD; IS THAT

7    RIGHT?

8    A   YES.

9         I'D LIKE TO JUST MAKE SURE THAT IT'S CLEAR THAT WE

10   WERE IN DEVELOPMENT OF A PRAYER ANGEL DOLL, A DOLL THAT PRAYED,

11   AND WE WERE IN FULL DEVELOPMENT OF THE BODY AND FASHIONS, AND

12   WE HAD NOT YET COMPLETED OUR SCULPT OF THE HEAD.  AND TO HELP

13   US PULL THE WHOLE IMAGE OF THE DOLL TOGETHER, WE PURCHASED A

14   SIMILAR SIZED HEAD FROM THE OPEN MARKET TO ACT AS A STAND-IN

15   UNTIL OUR HEAD WAS DONE.  JUST TO BE CLEAR.

16   Q   SO YOU USED CABBAGE DOLL HEADS AS A SUBSTITUTE FOR AN

17   ANGEL BABY DOLL HEAD PRIOR TO HAVING THE ROTO CAST, THE VINYL;

18   CORRECT?

19   A   A SUBSTITUTE FOR SCALE.

20   Q   BUT WHAT YOU'RE SAYING IS THAT IN ADDITION TO JUST USING

21   THAT AS A SUBSTITUTE, PUTTING IT ON A BODY, YOU ACTUALLY HAD

22   MS. RHEE REPAINT THE CABBAGE PATCH DOLL HEAD; CORRECT?  THAT'S

23   YOUR TESTIMONY?

24   A   YES.  WE ASKED HER TO CHANGE THE EYES.

25   Q   AND YOU'VE IDENTIFIED, ACTUALLY, PHOTOGRAPHS IN JULY, THE

1    MONTH AFTER THIS, THAT YOU SAY ARE PHOTOGRAPHS OF CABBAGE PATCH

2    DOLL HEADS THAT MS. RHEE PAINTED; CORRECT?

3    A   I BELIEVE SO.

4    Q   AND IF YOU LOOK AT EXHIBIT 400; THAT'S GOING TO BE IN THE

5    SAME VOLUME, VOLUME I.  DO YOU HAVE THAT?

6    A   YES.

7    Q   AND I BELIEVE YOU'VE IDENTIFIED THE SECOND PAGE THERE AS A

8    PHOTO OF AN ANGEL BABY DOLL HEAD THAT MS. RHEE PAINTED FOR YOU.

9    A   I BELIEVE SO.  I'M NOT SURE, BUT I BELIEVE SO.

10   Q   SO IT'S YOUR TESTIMONY YOU BELIEVE THAT IS WHAT YOU'RE

11   PAYING FOR WHEN YOU'RE PAYING $433 IN JUNE OF 2000.  NOT FOR AS

12   A CODE NAME FOR BRATZ, BUT TO REPAINT THE ANGEL BABY DOLL HEAD;

13   CORRECT?

14   A   CORRECT.

15       MR. PRICE:  IN FACT, YOUR HONOR, I'D MOVE EXHIBIT 400

16   INTO EVIDENCE.

17       MS. AGUIAR:  NO OBJECTION.

18       MR. PRICE:  IF WE COULD DISPLAY EXHIBIT 400, THE

19   SECOND PAGE.

20   BY MR. PRICE:

21   Q   I'D LIKE YOU TO LOOK AT THE DOLL IN FRONT OF YOU.

22       HAVE YOU HAD A CHANCE TO LOOK AT IT?

23   A   YES.

24       MR. PRICE:  MAY I SHOW IT TO THE JURY, YOUR HONOR?

25       THE COURT:  YES.

1    BY MR. PRICE:

2    Q   THE DOLL HAS THE SAME EYES, THE ONE IN THE PICTURE OF 400

3    HAS THE SAME EYES AS THE DOLL YOU CAN BUY OFF THE RACK IN THE

4    STORE; CORRECT?

5    A   NO.

6    Q   YOU DON'T BELIEVE THESE EYES ON THIS DOLL ARE THE SAME AS

7    THE EYES IN THAT PARTICULAR PICTURE?

8    A   NO.

9    Q   HOW ABOUT THE MOUTH?  IS THE MOUTH THE SAME?

10        THE PICTURE IS A LITTLE DARKER, BUT ISN'T THAT THE

11   SAME SHAPE?  EVERYTHING?

12   A   CERTAINLY, THE SHAPE OF THE SKIN ITSELF LIMITS THE SHAPE

13   OF THE LIP; SO IF YOU COMPARE THE LIP COLOR ON THE ONE IN YOUR

14   HAND, IT'S LIGHTER THAN THE VERSION THAN THE ONE IN THE

15   PICTURE.

16   Q   THIS THING ON THE CHEEK, THE BUTTERFLY, THAT'S STILL IN

17   THAT EXHIBIT 400; RIGHT?

18   A   I'M NOT SURE.  CLEARLY THERE'S SOMETHING ON THE CHEEK.

19   I'M NOT SURE IF IT'S A BUTTERFLY.

20   Q   SO YOUR TESTIMONY IS MS. RHEE WAS PAID OVER $400 TO ADD A

21   LITTLE COLOR TO THE LIPS AND, YOU BELIEVE, MAKE SOME CHANGES TO

22   THE EYES.

23   A   I WILL SAY THAT I DON'T BELIEVE THAT -- AND IN RECEIVING

24   THE SAMPLE, I DON'T BELIEVE THAT ANNA MADE A SIGNIFICANT

25   DIFFERENCE FROM THE PRODUCTION SAMPLE AND WHAT WE ACTUALLY

1    RECEIVED.

2    Q   LOOK AT THE THIRD PAGE, ANOTHER PICTURE.  THAT'S A PRETTY

3    BAD PICTURE, ISN'T IT?

4        LET ME SHOW YOU WHAT WE'VE MARKED AS 400-B.

5        SAME BATES NUMBER, YOUR HONOR, JUST A BETTER PICTURE.

6        DO YOU RECOGNIZE THIS AS THE SECOND PHOTOGRAPH THAT

7    WAS ATTACHED TO THE JULY 7TH E-MAIL?

8    A   YES.

9        MR. PRICE:  YOUR HONOR, WE'D MOVE INTO EVIDENCE

10   EXHIBIT 402-B.

11       MS. AGUIAR:  NO OBJECTION.

12       THE COURT:  ADMITTED.  YOU MAY PUBLISH.

13   BY MR. PRICE:

14   Q   IS IT YOUR TESTIMONY THAT YOU PAID MS. RHEE $400 TO CHANGE

15   THIS CABBAGE DOLL FACE INTO THIS FACE?

16   A   FIRST, I'M NOT SURE THAT THE PICTURE THAT YOU ARE HOLDING

17   NOW ACTUALLY IS THE ADJUSTED FACE, BECAUSE I FIND THE EYES WERE

18   SO SIMILAR.  YOU'LL NOTICE ONLY IN THE LIP COLOR THAT -- FROM

19   THE IMAGES THAT I HAVE, THAT THE LIPS SEEM LIGHTER THAN THE

20   DOLL IN THE PACKAGE.  BUT IT'S VERY DIFFICULT TO TELL FROM THE

21   IMAGES.

22   Q   ISN'T IT TRUE THAT YOU WOULDN'T PAY $400 TO HAVE A FACE

23   PAINTER SEND YOU A CABBAGE PATCH DOLL FACE THAT MIGHT HAVE

24   SLIGHTLY DARKER LIPS?  YOU WOULDN'T DO THAT.

25   A   WHEN I WORKED WITH ANNA RHEE, ESPECIALLY IN THIS PHASE OF

1    DEVELOPMENT WITH PRAYER ANGELS, I DIDN'T HAVE ANYTHING SPECIFIC

2    THAT I NEEDED HER TO CREATE.  IT WAS A VERY VAGUE ASSIGNMENT

3    AND IT WAS JUST TO ADJUST AS MUCH AS SHE CAN TO CHANGE THE FACE

4    SO THAT IT DOESN'T LOOK AS MUCH LIKE A CABBAGE PATCH.

5    Q   WELL, I'VE ASKED YOU ABOUT THIS JUNE TIME FRAME AND ABOUT

6    MS. MORRIS AND MS. RHEE AND WHAT SHE WAS DOING IN THIS TIME

7    FRAME, SO LET ME ASK YOU THEN ABOUT THE AUGUST TIME FRAME.

8         PREVIOUSLY, YOU WERE SAYING THAT YOU'RE NOT SURPRISED

9    YOU MET WITH MR. LARIAN IN SEPTEMBER BEFORE PREVIOUSLY MEETING

10   WITH MR. BRYANT.  DO YOU RECALL THAT?

11        THAT'S NOT SOMETHING THAT WOULD SURPRISE YOU.

12   A   CORRECT.

13   Q   NOW, YOU TOLD US WHO MS. O'CONNOR IS; SHE'S IN FINANCE; IS

14   THAT RIGHT?

15   A   SHE WAS RESPONSIBLE FOR LICENSING AT MGA.

16   Q   AND ISN'T IT TRUE THAT YOU HAD A MEETING IN AUGUST WITH

17   MS. O'CONNOR AND MR. BRYANT AND YOU?

18   A   I DON'T REMEMBER THAT MEETING.

19   Q   DO YOU RECALL A MEETING WHERE MR. BRYANT SHOWED YOU SOME

20   DRAWINGS AND YOU SHRIEKED AND SAID YOU LOVED THEM?

21   A   I'M SORRY.  CAN YOU PLEASE REPEAT.

22   Q   DO YOU REMEMBER A MEETING WHERE MR. BRYANT SHOWED YOU SOME

23   DRAWINGS AND YOU SHRIEKED AND SAID YOU LOVED THEM?

24   A   YES.

25   Q   AND MS. O'CONNOR HAD SAID BEFORE GOING IN, 'WHATEVER YOU

1    DO, DON'T LOOK EXCITED, BECAUSE YOU KNOW WE'RE GOING TO BE

2    DISCUSSING DOLLARS AT SOME POINT.'

3    A   I BELIEVE SHE SAID TO KEEP A POKER FACE.

4    Q   OKAY.

5        THE COURT:  COUNSEL?

6        MS. AGUIAR:  I WAS WONDERING, I THOUGHT WE WERE

7    SUPPOSED TO QUESTION AT THE LECTERN.  I THOUGHT WE WERE

8    SUPPOSED TO BE HERE.

9        THE COURT:  COUNSEL HAS LEAVE TO APPROACH THE EASEL

10   FOR PUTTING THINGS ON THE DIAGRAM, BUT OTHERWISE STAY AT THE

11   LECTERN.

12       MR. PRICE:  YES, YOUR HONOR.

13   BY MR. PRICE:

14   Q   IF YOU WOULD LOOK AT EXHIBIT 11328; THAT'S GOING TO BE IN

15   THAT THIRD VOLUME.  DO YOU HAVE THAT?

16   A   YES.

17   Q   AND YOU SEE THAT THIS APPEARS TO BE AN E-MAIL SENT FROM A

18   DEEDEE BROWN TO YOU AND MS. O'CONNOR REGARDING CARTER BRYANT,

19   DATED AUGUST 18, 2000.

20       DO YOU SEE THAT?

21   A   YES.

22   Q   AND THIS IS AN E-MAIL THAT YOU RECEIVED.

23   A   I DON'T REMEMBER THIS E-MAIL.

24   Q   AGAIN, IT APPEARS TO BE, IF YOU LOOK AT THE BOTTOM, IT HAS

25   AN MGA BATES NUMBER FROM MGA'S RECORDS; CORRECT?

1    A    YES.

2    Q    DO YOU HAVE ANY REASON TO BELIEVE THIS IS NOT THE E-MAIL

3    THAT WAS SENT TO YOU ON AUGUST 18TH REGARDING MR. BRYANT?

4    A    NO.

5         MR. PRICE:  YOUR HONOR, I'D MOVE EXHIBIT 11328 INTO

6    EVIDENCE.

7         MS. AGUIAR:  NO OBJECTION.

8         THE COURT:  IT'S ADMITTED.

9         YOU MAY PUBLISH.

10   BY MR. PRICE:

11   Q    DOES THIS REFRESH YOUR MEMORY THAT IN ADDITION TO THE

12   SEPTEMBER 1ST MEETING, YOU ALSO HAD A MEETING IN MID AUGUST

13   WITH MR. BRYANT ABOUT THIS BRATZ IDEA?

14   A    NO.

15   Q    CAN YOU DENY THERE WAS SUCH A MEETING?

16   A    I CANNOT DENY IT.  I JUST DO NOT BELIEVE THAT IT HAPPENED.

17   Q    LET'S TALK, THEN, ABOUT THE MATERIALS THAT YOU GOT FROM

18   MR. BRYANT, ACCORDING TO YOU, ON SEPTEMBER 1ST.  OKAY.

19        I'M GOING TO ASK YOU TO LOOK AT VOLUME I,

20   EXHIBIT 302, AND ASK YOU TO CONFIRM THAT WITH THE EXCEPTION OF

21   THE FIRST PAGE --

22        DO YOU RECOGNIZE THESE MATERIALS?

23   A    YES.

24   Q    AND IS IT ACCURATE, IS IT YOUR TESTIMONY, THAT ON

25   SEPTEMBER 1ST, THAT THESE ARE THE MATERIALS YOU RECEIVED, WITH

1    THE POSSIBLE EXCEPTION OF THIS FIRST PAGE?

2    A   CORRECT.

3        MR. PRICE:  YOUR HONOR, I MOVE EXHIBIT 302 INTO

4    EVIDENCE, I GUESS EXCEPT FOR THE FIRST PAGE.

5        THE COURT:  ANY OBJECTION?

6        MS. AGUIAR:  NO OBJECTION TO THE WHOLE EXHIBIT, BUT

7    IF YOU WANT TO DO IT MINUS --

8        THE COURT:  BY STIPULATION, THE ENTIRE EXHIBIT IS

9    ADMITTED.

10       YOU MAY PUBLISH.

11   BY MR. PRICE:

12   Q   SO ON SEPTEMBER 1ST, THEN, THIS FIRST PAGE YOU DO NOT

13   RECALL SEEING; CORRECT?

14   A   I DO REMEMBER SEEING A VERSION OF THIS.

15   Q   WHAT DO YOU RECALL BEING DIFFERENT?

16   A   I'M NOT SURE IF THE LOGO AND THE COPY BELOW WAS THERE OR

17   NOT.

18   Q   YOU'RE NOT SURE THAT THE BRATZ AND THE 'ALL MATERIALS,

19   2000, COPYRIGHT CARTER BRYANT' WERE THERE.

20   A   CORRECT; I'M NOT SURE.

21   Q   LET'S GO TO THE PAGES THAT YOU DO KNOW, THEN.

22       LET'S GO TO THE SECOND PAGE.  IT SAYS "BRATZ, MEET

23   THE BRATZ, TOTALLY TRANSFORMABLE TEENAGE DOLLS."

24       THAT WAS PART OF MR. BRYANT'S PITCH; CORRECT?

25   A   YES.

1    Q   AND SO THERE'S NO DOUBT IN YOUR MIND THAT THE VERY FIRST

2    TIME MR. CARTER SHOWED UP AND GAVE YOU MATERIALS, HE CALLED

3    THESE DOLLS "BRATZ" WITH A 'Z'; CORRECT?

4    A   CORRECT.

5    Q   SO IT'S NOT TRUE THAT MGA OR MR. LARIAN CAME UP WITH THE

6    NAME BRATZ; THAT WAS SOMETHING THAT WAS BROUGHT TO MGA BY

7    MR. CARTER; CORRECT?

8    A   THAT'S CORRECT.

9    Q   AND IF WE GO THROUGH THIS PRESENTATION TO THE NEXT PAGE,

10   YOU CAN SEE IT STARTS SHOWING YOU FOUR DIFFERENT DOLLS WITH

11   DIFFERENT OUTFITS; CORRECT?  THE FIRST ONE IS ZOE, AND THEN

12   THERE'S HALLIDAE, AND THEN THERE'S LUPE, AND JADE; RIGHT?

13   A   CORRECT.

14   Q   AND WHAT MR. CARTER WAS SHOWING YOU HERE, IF WE CAN GO

15   BACK TO THE SECOND PAGE, IS, HE WAS SAYING THAT YOU COULD POP

16   OFF THE HAIRSTYLE AND THE SHOES; CORRECT?

17   A   YES.

18   Q   SO YOU COULD CHANGE THE SHOES FROM ONE DOLL TO ANOTHER OR

19   THE HAIRSTYLE FROM ONE DOLL TO ANOTHER; CORRECT?

20   A   CORRECT.

21   Q   IN FACT, IF WE GO TO THE FOURTH PAGE OF THE DOCUMENT,

22   THERE'S AN ILLUSTRATION THERE WHERE HE ILLUSTRATES THAT;

23   CORRECT?

24   A   YES.

25   Q   AND SPECIFICALLY HE ILLUSTRATES THE REMOVABLE FEET AS A

1    COMPONENT OF THE DOLL; CORRECT?

2    A    YES.

3    Q    SO AS FAR AS YOU KNOW, THEN, IT'S NOT TRUE THAT MR. LARIAN

4    INVENTED THE CONCEPT OF REMOVABLE FEET FROM A DOLL.

5    A    NO.

6    Q    I ASKED A DOUBLE NEGATIVE.

7         THE COURT:  YOU DID.

8    BY MR. PRICE:

9    Q    AS FAR AS YOU KNOW, IS IT TRUE THAT MR. LARIAN WAS THE ONE

10   WHO INVENTED THE CONCEPT OF REMOVABLE FEET ON A DOLL?

11   A    I AM NOT AWARE THAT ISAAC LARIAN INVENTED THE REMOVABLE

12   FEET.

13   Q    YOU ARE AWARE HE HAS CLAIMED THAT, THOUGH; CORRECT?

14   A    I'M NOT AWARE OF THAT.

15   Q    LET'S TALK ABOUT THIS MEETING ON SEPTEMBER 1ST.

16        DID IT TAKE PLACE IN AN AUDITORIUM, A LARGE AREA?

17   A    IT TOOK PLACE IN ISAAC LARIAN'S OFFICE.

18   Q    WAS THERE, LIKE, A TABLE THERE THAT YOU ALL GATHERED

19   AROUND?

20   A    YES.

21   Q    AND HOW MANY PEOPLE IN ALL WERE THERE?

22   A    I BELIEVE FIVE.

23   Q    COULD YOU TELL THE JURY THE FIVE PEOPLE WHO WERE THERE.

24   A    ISAAC LARIAN; VERONICA MARLOW; VICTORIA O'CONNOR, MYSELF,

25   AND JASMINE LARIAN.

1    Q   AND CERTAINLY DURING THIS MEETING, YOU DID NOT HAVE ANY

2    TROUBLE HEARING THE PEOPLE WHO WERE TALKING AT THE MEETING;

3    CORRECT?

4    A   NO.

5    Q   DOUBLE NEGATIVE.

6        DID YOU HAVE ANY TROUBLE HEARING THE PEOPLE WHO WERE

7    TALKING AT THE MEETING?

8    A   NO.

9    Q   AND ONE OF THE THINGS YOU KNEW AT THAT VERY FIRST MEETING

10   WHEN MR. BRYANT WAS PRESENTING THIS TO YOU WAS THAT HE WAS THEN

11   EMPLOYED BY MATTEL.

12   A   I DO NOT REMEMBER CARTER BRYANT SPEAKING ABOUT HIS

13   EMPLOYMENT AT MATTEL.

14   Q   YOU SAID MR. LARIAN WAS THERE; CORRECT?

15   A   YES.

16   Q   ARE YOU AWARE OF WHAT HIS MEMORY IS ABOUT THAT MEETING?

17   A   NO.

18   Q   ARE YOU AWARE OF WHAT ANY OF THE OTHER FOLKS' MEMORIES ARE

19   ABOUT THAT MEETING?

20   A   NO.

21   Q   CERTAINLY, WHETHER MR. BRYANT WAS THEN WORKING AT MATTEL

22   WOULD HAVE BEEN AN IMPORTANT FACT FOR YOU TO KNOW; CORRECT?

23   A   NOT NECESSARILY, NO.

24   Q   WELL, YOU DEALT WITH MR. CARTER OVER THAT NEXT MONTH OF

25   SEPTEMBER; CORRECT?

1    A    IN A LIMITED WAY, YES.

2    Q    IF YOU HAD KNOWN THAT HE WAS WORKING FOR MATTEL AT THAT

3    SAME TIME, YOU WOULD HAVE KNOWN THAT HE WAS DISHONEST AND COULD

4    NOT BE TRUSTED; CORRECT?

5    A    CAN YOU PLEASE REPHRASE THE QUESTION.  I DON'T UNDERSTAND.

6    Q    THAT MONTH OF SEPTEMBER AS YOU WERE DEALING WITH

7    MR. BRYANT, CERTAINLY IF YOU HAD KNOWN HE WAS WORKING FOR

8    MATTEL, YOU WOULD HAVE KNOWN HE WAS DISHONEST AND COULD NOT BE

9    TRUSTED.

10   A    NO.  THAT'S NOT TRUE.

11   Q    WELL, DURING THAT MONTH OF SEPTEMBER, HE WAS WORKING FOR

12   MGA ON THE BRATZ PROJECT, WASN'T HE?

13   A    TO BE CLEAR, CARTER'S INVOLVEMENT WITH BRATZ THROUGH THE

14   MONTH OF SEPTEMBER WAS IN RELATION TO MY EXPLORATIONS ON THE

15   BRATZ CONCEPT -- ON HIS PORTFOLIO CONCEPTS.

16   Q    LET ME BREAK THIS DOWN.

17        WHEN YOU GOT A JOB AT MGA, YOU TOLD MATTEL; CORRECT?

18   A    YES.

19   Q    AND YOU DIDN'T WORK FOR MGA AT THE SAME TIME YOU WORKED

20   FOR MATTEL, DID YOU?

21   A    NO.

22   Q    BECAUSE, AS YOU SAID BEFORE, YOU KNEW THAT WOULDN'T BE

23   RIGHT; THAT WOULD BE WRONG; CORRECT?

24   A    YES.

25   Q    IT WOULD REVEAL YOU AS THE TYPE OF PERSON WHO SHOULDN'T BE

1    TRUSTED, COULDN'T BE TRUSTED; RIGHT?

2    A   YES.

3    Q   SO YOU DID THE HONEST THING; YOU TOLD MATTEL, 'I'M LEAVING

4    TO WORK FOR MGA'; CORRECT?

5    A   YES.

6    Q   AND WHAT HAPPENED TO YOU IS, WHEN YOU SAID THAT, THE DAY

7    YOU TOLD MATTEL THAT, YOU WERE LOCKED OUT OF THE DESIGN CENTER.

8    A   CORRECT.

9    Q   THAT DIDN'T SURPRISE YOU, DID IT?

10   A   NO.

11   Q   BECAUSE YOU KNEW THAT THE GENERAL PRACTICE WAS THAT IF

12   YOU'RE LEAVING FOR A COMPETITOR, THEN YOU HAVE TO LEAVE MATTEL;

13   CORRECT?

14   A   YES.

15   Q   AND IT WAS CERTAINLY THE PRACTICE THAT YOU COULDN'T WORK

16   FOR A COMPETITOR AT THE SAME TIME YOU WORKED FOR MATTEL; ISN'T

17   THAT RIGHT?

18   A   THAT'S CORRECT.

19   Q   AND WHAT MR. CARTER DID DURING SEPTEMBER WAS WORK WITH YOU

20   ON THE BRATZ PROJECT AT THE SAME TIME HE WORKED FOR MATTEL.

21   A   I JUST WANT TO BE SURE TO BE CLEAR THAT ALL WORK EXTENDED

22   IN THE MONTH OF SEPTEMBER OF 2000, I PERSONALLY DO NOT

23   RECOGNIZE AS BRATZ.

24   Q   WELL, LOOK AT EXHIBIT 305, WHICH IS IN VOLUME I.

25        DO YOU HAVE THAT?

1    A   YES.

2    Q   AND YOU RECOGNIZE EXHIBIT 305 AS AN E-MAIL STRING

3    INCLUDING AN E-MAIL THAT YOU SENT TO VICTORIA O'CONNOR;

4    CORRECT?

5    A   CORRECT.

6         MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 305 INTO

7    EVIDENCE.

8         MS. AGUIAR:  NO OBJECTION.

9         THE COURT:  YOU MAY PUBLISH.  IT'S ADMITTED.

10   BY MR. PRICE:

11   Q   CAN YOU SEE ON OCTOBER 10TH, DENNIS MEDICI SENT AN E-MAIL

12   TO VICTORIA O'CONNOR REGARDING CARTER COMPENSATION:  "VICTORIA,

13   PLEASE REPLY WHAT AMOUNT WE SHOULD PAY CARTER AND HAVE ISAAC

14   APPROVE.  THANKS."

15        AND THEN THAT WAS FORWARDED TO YOU; CORRECT?

16   A   YES.

17   Q   SO IN OCTOBER 10TH, YOU GOT AN E-MAIL FROM MS. O'CONNOR,

18   "PLEASE LET ME KNOW HOW MANY HOURS CARTER HAS WORKED AND THE

19   DAY HE STARTED MEETINGS WITH YOU.  THANKS."

20        PERHAPS YOU CAN TELL US, WHO'S DENNIS MEDICI?

21   A   I BELIEVE HE WORKED WITH THE ACCOUNTING AND FINANCE

22   DEPARTMENT FOR MGA AT THE TIME.

23   Q   YOU ALREADY TOLD US WHO MS. O'CONNOR IS.

24   A   YES.

25   Q   AFTER RECEIVING THIS REQUEST FROM MS. O'CONNOR ON

1    OCTOBER 10TH, YOU RESPONDED THE SAME DAY; CORRECT?

2    A   YES.

3    Q   WHAT YOU TOLD HER WAS "I WOULD SAY THAT CARTER HAS WORKED

4    ON AVERAGE ABOUT FOUR HOURS A DAY, AND WE BEGAN WORKING ON THIS

5    LINE THE FIRST PART OF SEPTEMBER."

6        THAT WAS WHAT YOU TOLD HER; CORRECT?

7    A   I WROTE IT, BUT I WROTE IT INCORRECT.

8    Q   YOU UNDERSTOOD THAT MS. O'CONNOR WAS SAYING I WANT YOU TO

9    TELL ME HOW MANY HOURS CARTER HAS BEEN WORKING SINCE HE BEGAN

10   MEETING WITH YOU; CORRECT?

11   A   YES.

12   Q   YOU KNEW THIS INFORMATION WAS OF SOME IMPORTANCE TO

13   MS. O'CONNOR.

14   A   YES.

15   Q   AND WHEN YOU PUT IN WRITING THAT HE HAD BEEN WORKING FOUR

16   HOURS A DAY, DID YOU EVER DO ANYTHING AFTER THAT TO CORRECT

17   THIS E-MAIL TO SAY OH, NO, I MADE A MISTAKE, HE WASN'T WORKING

18   FOUR HOURS A DAY?

19   A   I DON'T REMEMBER.

20   Q   CERTAINLY YOU CAN'T RECALL EVER SENDING ANY E-MAIL SAYING

21   I MADE A MISTAKE, HE WASN'T WORKING HERE FOUR HOURS A DAY.

22   A   NO.

23   Q   YOU WOULD AGREE THAT IF HE WAS DOING THAT WHILE HE WAS

24   WORKING AT MATTEL, THAT HE WAS BEHAVING INAPPROPRIATELY; THAT

25   HE WAS BEING DISHONEST.

1    A   YES.  BUT TO BE CLEAR, HE WAS NOT WORKING FOUR HOURS A DAY

2    DURING THIS TIME PERIOD.

3    Q   WELL, IN FACT, HE WAS HEAVILY INVOLVED IN WORKING ON BRATZ

4    IN SEPTEMBER, WASN'T HE?

5    A   NO, HE WASN'T.

6    Q   LET ME CALL YOUR ATTENTION TO EXHIBIT 18.

7        DO YOU RECOGNIZE EXHIBIT 18 AS AN E-MAIL YOU SENT ON

8    SEPTEMBER 27, 2000, REGARDING BRATZ?

9    A   YES.

10       MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 18 INTO

11   EVIDENCE.

12       MS. AGUIAR:  NO OBJECTION.

13       THE COURT:  ADMITTED.  YOU MAY PUBLISH.

14   BY MR. PRICE:

15   Q   CALLING YOUR ATTENTION TO -- THIS IS THE E-MAIL YOU'RE

16   SENDING TO HONG KONG?

17   A   YES.

18   Q   AND HONG KONG IS WHERE BRATZ WOULD BE MANUFACTURED.

19   A   CHINA, YES.

20   Q   AND YOU ARE SENDING ALONG WITH THIS E-MAIL, OR YOU SENT

21   THE SAME DAY, A BINDER DESCRIBING THIS NEW SMALL DOLL LINE

22   CALLED BRATZ.

23       DO YOU SEE THAT?

24   A   YES.

25   Q   AND YOU ACTUALLY DID SEND A BINDER.

1    A   I BELIEVE SO.

2    Q   AND THAT INCLUDED SOME OF MR. BRYANT'S DRAWINGS.

3    A   I BELIEVE SO.

4    Q   AND IF WE GO DOWN HERE, IF YOU LOOK AT WHERE IT SAYS, "THE

5    SECOND TO THE LAST PAGE REFLECTS A DOLL PIECE COUNT, 2 HAIR

6    STYLES, ONE PURSE, ET CETERA."

7        DO YOU SEE THAT?

8    A   YES.

9    Q   AND YOU CAME UP WITH THAT BY HAVING DISCUSSIONS WITH

10   MR. BRYANT THROUGHOUT SEPTEMBER AS TO WHAT THAT SHOULD LOOK

11   LIKE; CORRECT?

12   A   NO.

13   Q   IT'S YOUR TESTIMONY YOU HAD NO DISCUSSIONS WITH MR. BRYANT

14   AFTER SEPTEMBER 1ST CONCERNING WHAT SHOULD BE IN THE DOLL PACK

15   PIECE COUNT.

16   A   TO BE CLEAR, IT'S MY MEMORY THAT I ARRIVED BY MYSELF ON

17   WHAT I BELIEVED SHOULD BE INCLUDED IN THE DOLL PACK AS THE

18   PIECE COUNT FOR BRATZ.

19   Q   AND HAD NO DISCUSSIONS WITH MR. BRYANT?

20   A   I CAN'T REMEMBER ANY PARTICULAR DISCUSSIONS ON PIECE

21   COUNTS WITH CARTER BRYANT DURING SEPTEMBER.

22   Q   LET'S GO, THEN, TO THE NEXT LINE HERE, WHICH IS THE VERY

23   LAST PAGE OF THIS BINDER.  IT INDICATES "PREFERRED HAIR VENDOR,

24   APPROXIMATE AMOUNT AND WEIGHT OF HAIR." DO YOU SEE THAT?

25   A   YES.

1    Q   THAT WAS MR. BRYANT WHO CHOSE THAT, WASN'T IT?

2    A   I THINK THAT IT'S IMPORTANT TO STOP AND JUST MAKE SOME --

3    JUST TO CLARIFY A FEW THINGS.

4        THIS DOCUMENT OR THIS E-MAIL THAT I SENT TO HONG KONG

5    WAS PART OF MY EXPLORATION.  IT WAS MY INTEREST TO SEND THIS

6    E-MAIL TO HONG KONG, TO EXPLORE AND TO ASK THEM TO GIVE ME SOME

7    GENERAL INFORMATION ON COSTING.  AND, LIKE A REFERENCE TO THE

8    SARAN HAIR, THIS IS ALSO PART OF AN EXPLORATION CONVERSATION

9    THAT I HAD WITH CARTER JUST ASKING, YOU KNOW, THE WAITING

10   PERIOD, WHILE THE CONTRACT WAS BEING SIGNED, WHAT HIS

11   RECOMMENDATION OR HIS PREFERENCE IN HAIR MATERIAL WAS.

12       JUST TO BE CLEAR.

13   Q   WHETHER YOU CALL THIS EXPLORATION OR ACTUALLY WORKING ON

14   BRATZ, EITHER WAY, IT'S WRONG FOR MR. BRYANT TO BE WORKING WITH

15   YOU ON THIS WHILE HE'S AT MATTEL.  DO YOU AGREE WITH THAT?

16   A   TO BE FAIR, HE WASN'T WORKING ON ANYTHING IN PARTICULAR.

17   Q   I UNDERSTAND THAT, BUT WE'RE GOING TO GET INTO WHAT WORK

18   HE DID.  BUT YOU'LL AGREE THAT IF HE WAS WORKING ON EXPLORATION

19   OR WHATEVER WITH MGA, THAT'S WRONG.

20   A   DO YOU MEAN AS IT RELATED TO THE RECOMMENDATION OF SARAN

21   HAIR MATERIAL OR JUST --

22   Q   IF HE'S DOING ANYTHING TO HELP A COMPETITOR OF MATTEL

23   WHILE HE'S WORKING FOR MATTEL, THAT'S WRONG.

24       WOULD YOU AGREE WITH THAT?

25   A   YES.

1    Q   AND WITH RESPECT TO THE HAIR VENDOR, IN SEPTEMBER HE

2    ACTUALLY CONTACTED THE HAIR VENDOR ON YOUR BEHALF TO TALK ABOUT

3    WHAT HAIR TO USE FOR THE BRATZ DOLLS; CORRECT?

4    A   HE CONTACTED THE SARAN HAIR MATERIAL MANUFACTURER, BUT NOT

5    THROUGH MY REQUEST; THAT WAS HIS DECISION.

6    Q   SO YOU DIDN'T KNOW HE WAS ACTUALLY GOING OUT AND FINDING

7    THE HAIR VENDOR THAT YOU WOULD THEN RECOMMEND TO HONG KONG?

8    A   IT'S MY MEMORY THAT I ONLY ASKED HIM FOR HIS

9    RECOMMENDATION.

10       THE COURT:  MR. PRICE, WE'RE AT THE END OF THE DAY.

11       THE JURY IS EXCUSED FOR THIS EVENING.  REMEMBER THE

12   ADMONITION NOT TO DISCUSS THIS CASE OR RESEARCH OR READ

13   ANYTHING ABOUT IT.

14       I'LL SEE YOU BACK TOMORROW MORNING AT 9:00.

15       (WHEREUPON JURORS DEPART COURTROOM.)

16       THE COURT:  COUNSEL, I'LL SEE YOU TOMORROW MORNING AT

17   8:30.  WE'RE IN RECESS FOR THE DAY.

18           CERTIFICATE

19

20   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED

     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF

21   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE

     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

22   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

     THE UNITED STATES.

23

24   _____          _____

25   THERESA A. LANZA, RPR, CSR          DATE

     FEDERAL OFFICIAL COURT REPORTER