1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    ---

4      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                    ---

6   MATTEL, INC.,          : PAGES 700 - 822

                          :

7        PLAINTIFF,       :

                          :

8      VS.              : NO. ED CV04-09049-SGL

                        : [CONSOLIDATED WITH

9   MGA ENTERTAINMENT, INC.,    : CV04-9059 & CV05-2727]

    ET AL.,               :

10                       :

    DEFENDANTS.      :

11

12

13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16           RIVERSIDE, CALIFORNIA

17        THURSDAY, MAY 29, 2008

18           JURY TRIAL - DAY 4

19           AFTERNOON SESSION

20

21

22           MARK SCHWEITZER, CSR, RPR, CRR

             OFFICIAL COURT REPORTER

23           UNITED STATES DISTRICT COURT

             181-H ROYBAL FEDERAL BUILDING

24           255 EAST TEMPLE STREET

             LOS ANGELES, CALIFORNIA 90012

25           (213) 663-3494

1    Appearances of Counsel:

2

3    On Behalf of Mattel:

4      Quinn Emanuel

        By John B. Quinn, Esq.

5      B. Dylan Proctor, Esq.

        Michael T. Zeller, Esq.

6      Harry Olivar, Esq.

        John Corey, Esq.

7      Diane Hutnyan, Esq.

        William Price, Esq.

8      855 South Figueroa Street

      10th Floor

9      Los Angeles, CA 90017

      (213) 624-7707

10

11

12   On Behalf of MGA Entertainment:

13   Skadden, Arps, Slate, Meagher & Flom LLP

      By Thomas J. Nolan, Esq.

14    Carl Alan Roth, Esq.

      Jason Russell, Esq.

15    Lauren Aguiar, Esq.

      David Hansen, Esq.

16    Matthew Sloan, Esq.

      300 South Grand Avenue

17   Los Angeles, CA 90071-3144

      (213) 687-5000

18

19

20

21

22

23

24

25

1        I N D E X

2

3    PAULA GARCIA, PREVIOUSLY SWORN.......................... 713

4    DIRECT EXAMINATION (CONTINUED) BY MR. PRICE:............ 713

5    CROSS-EXAMINATION BY MS. AGUIAR:....................... 737

6        E X H I B I T S

7    (Exhibit 1236 received.)................................ 713

8    (Exhibit 1107 received.)................................ 718

9    (Exhibit 1107-B received.).............................. 719

10   (Exhibits 1108 and 1108-B received.)................... 721

11   (Exhibits 1109 and 1109-B received.)................... 722

12   (Exhibits 1110 and 1110-B received.)................... 724

13   (Exhibit 4507 received.)................................ 731

14   (Exhibit 391 received.)................................. 749

15   (Exhibit 18457 received.).............................. 766

16   (Exhibit 1136-A received.)............................. 801

17   (Exhibit 17403 received.).............................. 807

18   (Exhibit 201-13 received.)............................. 813

19   (Exhibit 16440-2 received.)............................ 816

20   (Exhibit 16440-3 received.)............................ 818

21

22

23

24

25

1          Riverside, California; Thursday, May 29, 2008

2                      1:20 P.M.

3          (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

4          THE COURT:  Back on record.

5          Mr. Price, I understand you had an issue?

6          MR. PRICE:  Yes, your Honor.  I would ask that the

7    witness be excused if she's here.  She's not.

8          Your Honor, obviously, Ms. Garcia has been

9    encouraged, I think, to say, in response to almost every

10   question, yes, we did this, but this had nothing to do with

11   the actual doll that was out there.  Yes, we did this, but

12   this wasn't the final one, the actual doll, et cetera.

13         What I'd like to do, I don't think it opens the

14   door, I want to make sure it doesn't open the door to Phase

15   1-B, the next phase, to be able to say what you've said a

16   number of times.  These drawings have nothing to do with the

17   full doll.  Here's a drawing you got.  Here's a picture of an

18   actual doll.  Do you agree this is a picture of the actual

19   doll.  This is a picture that you got from Mr. Bryant prior

20   to October 19, 2000.

21         I feel like I'm entitled to do that because in a

22   nonresponsive way, she keeps saying that, and I don't think

23   that should open the door to then get into millions in

24   development and everything that happened.

25         So that's my suggestion as to how to correct the

1    way she's been coached.

2        THE COURT:  Thank you, Mr. Price.

3        Mr. Nolan, or Ms. Aguiar?

4        MS. AGUIAR:  I disagree, obviously, with Mr. Price,

5    that first of all, that Ms. Garcia was coached or suggested

6    in any way as to what to say.  Number two, I think as to the

7    substance of her answers, she's not giving him a simple yes

8    or no.  She's giving him a full answer, and I disagree that

9    in those answers she has made repeated comparisons to the

10   final doll.  I don't agree with that.

11       THE COURT:  What is she comparing it, then, to?

12   Because I do know what Mr. Price is referring to.  She does

13   seem to be, and I agree with you, and I'm not making any

14   findings on coaching or anything of that nature.  But just in

15   terms of her answers, she does repeatedly seem to be making a

16   distinction that I suspect everybody in this courtroom is

17   aware of the distinction she's making.

18       MS. AGUIAR:  I think if I could explain that, in

19   the creative world and when you're developing a toy, and you

20   have a finished manufactured product that goes to market, you

21   don't think of sculpts, clothes, face paint, accessories, or

22   anything that was in early stages of development as the final

23   product.  In other words, if there was a sculpt that was

24   being explored in early October of 2000, that sculpt is not a

25   sculpt of a Bratz doll.  Her sense of what a Bratz sculpt is,

1    and we'll see it in Phase 1-B, is the final body that went to

2    market.

3         So I think she's just trying to say that, when the

4    lawyers keep saying to her the Bratz sculpt, the Bratz

5    fashions, I think in fairness she's just trying to say that's

6    not what they were.  Because to her, Bratz sculpt has a very

7    specific meaning, and Bratz fashions have a very specific

8    meaning.  And those things did not come into being until

9    later.  So without that clarification, I think the suggestive

10   questions and the way that we are loaded up, the way the

11   questions are worded, necessitates her saying these were

12   not -- these were not Bratz.

13        So I think that it's not necessary for us to do a

14   comparison at this point of the dolls and the drawing.  If

15   we're going to get into that, I think we may argue that we do

16   that with other witnesses, too.  I'm loath to do it.

17   Frankly, if that's the way you want to go, I think she'll do

18   fine with that.  I think she'll do just fine.  But I don't

19   know if we want to go down that road.

20        THE COURT:  I think, Mr. Price, you are certainly

21   entitled to explore her answers.  If she makes a distinction,

22   you can certainly explore what that distinction is.  The

23   explanation that I was given, even by counsel, I don't know

24   if that is her explanation or not.  That's what counsel is

25   proffering.  You are certainly entitled to get that

1    explanation if it is in fact her explanation.  If it's

2    something else, it's something else.

3           But I don't think that you are opening any doors to

4    anything beyond this witness at this time.  If another

5    witness makes the same type of distinction in response to

6    cross-examination, because that's essentially what's going on

7    here, then that door may be opened with another witness.

8           But I certainly understand and have been following

9    the distinction that's being made, and that has not been

10   explained, and I think either side or both sides have a right

11   to explore that distinction in your examination.  If that

12   means -- well, let the examination lead you to the evidence

13   and see how it plays out.

14          MR. PRICE:  And I guess the only thing I was trying

15   to alert the Court as to what I plan to do, which was, again,

16   show her the drawings that we've been discussing, show her

17   the doll, and say you're saying, I think you said that this

18   doll is not based on this drawing.

19          THE COURT:  I think you need to lay a foundation

20   for this in terms of her explanation before you get into the

21   drawings.  Don't lead with any drawings or anything else.

22   Explore what she means.  I mean, she's given you these

23   answers repeatedly, and there hasn't been the follow-up, what

24   do you mean by this distinction and by that distinction.  If

25   she means well, I'm not talking about -- and I don't know if

1    I fully understand how you distinguish a Bratz sculpt from

2    the earlier Bratz drawing and the ultimate Bratz doll.

3        It seems to the Court anyway, from what I'm hearing

4    so far, that it's all part of a continuum or process of

5    design and creation. It's not as neatly packaged, I think,

6    as has been submitted. But that's something for you to

7    explore in examination.

8        MR. PRICE: Well, what I don't want to do, your

9    Honor, I think those answers have been nonresponsive. I know

10   you struck one answer. Because I have been saying this is

11   the Bratz sculpture. I have been putting the documents and

12   saying you created this sculpture under the Bratz product.

13   And the answers should have been yes, this was in pursuing

14   this vision or whatever. But instead, she keeps adding, you

15   know, this is not the final product.

16       And that's really the next phase.

17       THE COURT: I think it's going to be difficult to

18   defend a position. I don't think even counsel is suggesting

19   that the Bratz sculpt or the Bratz drawings have nothing to

20   do with the ultimate Bratz doll. If that's the position she

21   wants to take for the jury, then I think you can let her take

22   her position with little harm to your client's position.

23       MR. PRICE: But I would like her to take it in

24   Phase 1-B where it belongs. And the only reason I think it's

25   limited, I can say, is it your testimony that the drawings

1    you got from Mr. Bryant were not drawings -- have nothing to

2    do with the eventual -- and show --

3        THE COURT:  I'm basically saying yes to your

4    question, Counsel, with the caveat that just be sure you lay

5    a foundation for it with this witness in terms of her

6    explanation.  I'm not going to assume that the explanation

7    just given by counsel is her explanation.  I want to hear

8    that from the witness first, and then you can take it where

9    it leads you without danger of opening the door to anything

10   else beyond this witness.

11       MR. PRICE:  Thank you.

12       MS. AGUIAR:  I think in his explanation to you just

13   now, Mr. Price highlighted again why she has answered some of

14   the questions the way she does.  He actually just said right

15   now, "I asked her isn't this the Bratz sculpt."  Well, he

16   just again highlighted what the problem is.  The preliminary

17   sculpt that we've been discussing this morning in the time

18   frame late September early October is not the Bratz sculpt.

19       THE COURT:  And I suspect, Counsel, you're going to

20   make a big point of this in your examination.

21       MS. AGUIAR:  I understand that, but I'm just trying

22   to explain that I don't know that her answers have

23   necessitated going down this road.  So let me make one other

24   point.

25       What Mr. Price suggests to do is take the drawings

Unsigned

Page  708

1    and the actual doll, and have her compare them.  But I don't

2    think this morning, even under his interpretation of what she

3    has done, that she has said that the drawings had no purpose

4    or no role.  What she said is she's made a distinction about

5    the sculpt.  So I think maybe if he wants to take the sculpt

6    and compare it to the final sculpt --

7         THE COURT:  I've indicated that he needs to lay the

8    appropriate foundation.

9         MS. AGUIAR:  Thank you.

10        MR. PRICE:  And I guess my concern is the 1-B story

11   that they want to tell about development is through this

12   witness.  So, your Honor, we say this doesn't open the door

13   to anything except this witness.  I want to make sure it does

14   not open the door even for this witness to go into that long

15   development story about Bratz, which is supposed to be in

16   1-B.  I don't think that her volunteering these answers opens

17   that door.  The only purpose of this examination --

18        THE COURT:  Well, Counsel, then you need to make a

19   decision.  You're either having to have to make a motion to

20   strike, which you have not done for a number of these

21   answers, or you're going to have to clarify them, and I will

22   give you leave, and certainly if the foundation is there to

23   bring in the final product, but I'm not going to limit the

24   defense from responding to that.  So you kind of control your

25   own examination yourself in terms of which way you want to

1    go.

2          MR. PRICE:  Can you give me one moment, your Honor,

3    so I can give you a decision on that?

4          THE COURT:  Sure.

5          MR. PRICE:  In that case I have a motion, if I may,

6    your Honor.  I would request that Ms. Garcia's testimony as

7    to whether or not these are -- these sculptures are the

8    drawings that were used in the final product be stricken at

9    this phase and that the jury be told that's not an issue in

10   this phase.

11         The issue is the work Mr. Bryant did, you know,

12   prior to his leaving Mattel.

13         THE COURT:  Counsel, this is not timely at this

14   point if you're talking about testimony from this morning.

15   The time to have made that motion was when she gave the

16   testimony.

17         MR. PRICE:  Well, I -- if you're going to deny the

18   motion, I understand, but that is my motion.  At least I

19   would request an instruction to the jury that this phase is

20   focused on who owns these drawings and what efforts

21   Mr. Bryant made prior to leaving Mattel.  And that testimony

22   concerning what happened after that is not --

23         THE COURT:  The jury will be instructed at the end

24   of this trial in terms of what they are to find.  Counsel all

25   understand what this phase is limited to.  They have gone

Unsigned                                              Page 710

1    over that in great detail.  If you want the Court to strike

2    an answer, you have to make the objection and motion at the

3    time the answer is given.  I've not going to go back now and

4    pull out a transcript and start going through this on

5    testimony that was given this morning.

6           Going forward, if you want to make that motion to

7    strike, the Court will consider it in its context.  But the

8    answers are out there.  And you can explore them, counsel can

9    explore them.  And if we're getting beyond the scope of Phase

10   1-A, someone should make an objection on relevancy grounds,

11   and the Court will rule.

12          MR. PRICE:  I understand your ruling.  One thing I

13   would respectfully disagree with is since I did not follow up

14   on the voluntary answers to yes or no questions, I think it

15   would be inappropriate for them, for MGA then to basically,

16   you know, ride that horse further and say well, you

17   volunteered this answer.  Let's explore that and go into

18   further explanation --

19          THE COURT:  Counsel, when I was hearing those

20   answers, I probably have it doodled down here someplace.  I

21   was prepared to sustain nonresponsive objections, and I

22   didn't receive them.  And I think what would not be

23   appropriate now is to say I did not make an objection, but I

24   should have, I wish I would have, and I don't want them to

25   follow up on that.

Unsigned                                                    Page 711

1         This is out there.  I think you need to explore

2    this and do what you want with it in your examination.  And

3    counsel can do what they want.  But this is out there.

4    You're asking us to rewrite the testimony from this morning.

5         MR. PRICE:  I understand your ruling that you're

6    not going to go back through the transcript and strike

7    testimony.

8         THE COURT:  Frankly, I agree, at the time there

9    were nonresponsive answers.  There was no objection made and

10   no motion made.  It's waived.  We're past that now.

11        MR. PRICE:  I understand.  And that does not,

12   however, waive my ability to object to them trying to explore

13   those irrelevant answers.  That is, I, as a trial attorney,

14   can decide I'm going to try to keep moving on and focusing on

15   what's in the trial.  But because a witness volunteers

16   something --

17        THE COURT:  Fair enough.  I will consider that in

18   the context of an appropriate objection being made to a

19   question that they ask.  I'm not going to rule in advance on

20   the objections.  I'm not going to rule on things in the past.

21   So let's focus on the present.

22        MR. PRICE:  I'll do that.

23        THE COURT:  And in the present, we're already four

24   minutes past our start time.  So let's bring the jury in.

25   And just for future planning, at 11:00, I have an emergency

1    criminal matter to take up tomorrow morning.  So we'll be

2    breaking at 11:00 tomorrow, and then we'll resume after

3    lunch.

4         (WHEREUPON THE JURY ENTERS.)

5         THE COURT:  Good afternoon, members of the jury.

6         Mr. Price, you may proceed.

7            PAULA GARCIA, PREVIOUSLY SWORN.

8            DIRECT EXAMINATION (CONTINUED)

9    BY MR. PRICE:

10   Q.   There are a couple more documents from this October time

11   frame I want to ask you about.  And I'd like you to look at

12   Exhibit 1236.  And that's in your second volume.  And if you

13   could look at the bottom two thirds of that page, you

14   recognize that as an e-mail you sent on or about October

15   24th?

16   A.   Yes.

17        MR. PRICE:  Your Honor, I move Exhibit 1236 into

18   evidence.

19        THE COURT:  Any objection?

20        MS. AGUIAR:  I object, based on the date, as being

21   beyond the scope.

22        THE COURT:  The objection is overruled.  You may

23   publish.

24        (Exhibit 1236 received.).

25   Q.   BY MR. PRICE:  So this is again an e-mail you're sending

1    to Cecelia Kwok in Hong Kong?

2    A.  Yes.

3    Q.  And I want to focus in on the second paragraph here.

4    You tell Hong Kong on October 24th, quote, we have finalized

5    the fashion designs, and I am releasing the following final

6    design packages to you on our Friday.

7         Do you see that?

8    A.  Yes.

9    Q.  And so it's true that as of Tuesday, October 24th, you

10   had finalized the fashion designs; correct?

11   A.  That's not correct.

12   Q.  Well, it's true that as of October 24th, that's what you

13   told Hong Kong, that, quote, we have finalized the fashion

14   designs.

15   A.  I'm not sure in context what I meant by those particular

16   fashions, but I can tell you that the final fashion designs

17   weren't released and were not finalized until December of

18   2000.

19   Q.  Well, let me see if I can find out, then, what you're

20   talking about here.  First of all, you talk about doll pack

21   packages?

22   A.  Yes.

23   Q.  And it says there eight doll fashions that are designed

24   and swatched.  Do you see that?

25   A.  Yes.

1    Q.  Is that one of the designs you're referring to as the

2    fashion design?

3    A.  I don't know what I meant by that.

4    Q.  Do you know whether the doll backpacks, where it says --

5    that's one of the fashion designs you're referring to?

6    A.  I'm sorry.  Can you repeat the question?

7    Q.  Sure.  Where you've got the four doll backpacks, those

8    have been designed and swatched.  Is that one of the things

9    you were talking about when you say we have finalized the

10   fashion designs?

11   A.  I'm not sure that I understand the question.

12   Q.  Do you see here where you said we have finalized the

13   fashion designs?

14   A.  Yes.

15   Q.  Is one of the fashion designs you're referring to the

16   four doll backpacks designed and swatched?

17   A.  It's possible.

18   Q.  Well, certainly you didn't -- the fashion designs

19   weren't created in a matter of days; correct?

20   A.  No, they weren't.

21   Q.  They were worked on over a period of time; correct?

22   A.  Yes.

23   Q.  So these fashion designs, which you're saying here were

24   finalized, were worked on throughout the October time period;

25   correct?

1    A.  No.  I mean, all I can -- you know, I just want to be

2    clear to say that the -- what I remember is that fashions did

3    not -- fashions that we actually manufactured did not

4    actually take place until after the shopping, the shopping

5    trip by Carter and Veronica.  And I remember that to happen

6    in mid-October.  And I remember all the final fashions being

7    released in December of 2000.

8    Q.  Well, let me ask it this way:  Whatever you're referring

9    to here as we finalize the fashion designs, whatever you're

10   referring to on October 24th wasn't done in a day.  That was

11   done over a period of time; correct?

12   A.  I'm not sure what I meant by final fashion designs.  I

13   don't understand -- I don't remember what that was.

14   Q.  Okay.  Well, Mr. Bryant did some further drawings with

15   fashions on them; correct?  In the October time frame.

16   A.  Yes.

17   Q.  So, for example, if you'd look in your binder at

18   Exhibit 1107.  Have you got it?

19   A.  Yes.

20   Q.  And you recognize that as a drawing that Mr. Carter

21   made -- Mr. Bryant made?

22   A.  Yes.

23   Q.  And is this what you might have been referring to here

24   when you say we have finalized the fashion designs?

25   A.  I recognize this to be a final fashion, but I don't know

1    if what I made reference to relates to this particular

2    drawing.

3    Q.  If this is one of the things you're referring to as a

4    final fashion -- let me step back.  So you're saying this is

5    a final fashion drawing?

6    A.  I'm not even -- it is a drawing that represents one of

7    the fashions that we went to production with.

8    Q.  And you believe that might be one of the things you're

9    referring to when you talk about having finalized the fashion

10   designs?

11   A.  No.

12   Q.  Well, certainly this drawing would have been done before

13   October 24th when you wrote this e-mail about having

14   finalized the fashion designs.

15   A.  No.

16   Q.  This was a drawing that you presented to -- was it

17   Kmart? -- just a week or so later on November 7th; right?

18   A.  I'm not sure that this drawing was presented to Kmart.

19   Q.  If you would look at your deposition transcript.  And

20   line 4, which is dated October 10, 2007, and if I could call

21   your attention to page 1023, line 5, to 1024, line 9.  If you

22   could read that to yourself.

23   A.  I see that.

24   Q.  So is Exhibit 1107 actually a drawing that was created,

25   a drawing that was among the materials that were featured at

1   the retailer meeting around November 7th?

2   A.  I'm sorry.  Could you please repeat the question?

3   Q.  Sure.  Is Exhibit 1107 in front of you one of the

4   drawings depicted in a retailer meeting on November 2nd,

5   2007?

6        My question, looking at Exhibit 1107, isn't that a

7   drawing done by Mr. Bryant that was presented at a retailer

8   meeting on November 7th?

9   A.  I do not know.  I am not sure that this drawing was

10   presented at a November 7 retailer meeting.

11   Q.  You believe that it was, in fact, though?

12   A.  No, I'm not sure.

13        MR. PRICE:  Your Honor, in that case, perhaps I

14   could read page 1023, and I'll begin at line 11 and go to

15   1024, line 9.

16        THE COURT:  Any objection?

17        MS. AGUIAR:  No objection.

18        THE COURT:  You may read.

19        MR. PRICE:  Thank you.  And in fact, your Honor,

20   before that, I'd move Exhibit 1107 into evidence.

21        MS. AGUIAR:  No objection.

22        THE COURT:  Admitted.  It may be published.

23        (Exhibit 1107 received.)

24        MR. PRICE:  May I approach the witness?  Because

25   the copies from the deposition aren't great, we've marked

1      1107-B as hopefully a better copy.  I'll provide a copy.

2          THE COURT:  You've seen that?

3          MS. AGUIAR:  Yes, that's fine.

4          THE COURT:  Very well.  You may approach.

5      Q.  BY MR. PRICE:  Is 1107-B the same drawing as 1107?

6      A.  I believe so.

7          MR. PRICE:  I move 1107-B into evidence as well,

8      your Honor.

9          MS. AGUIAR:  No objection.

10         THE COURT:  It's admitted.  You may publish.

11         (Exhibit 1107-B received.)

12         MR. PRICE:  If I may read from 1023, 11, to 1024,

13     line 9.

14         THE COURT:  All right.  That portion will be

15     lodged, and the court reporter need not report it.

16         MR. PRICE:  (Reading.)

17         "QUESTION:  You do know that there was a

18     retail meeting that MGA had pertaining to Bratz on

19     or about November 7, 2000; correct?  A meeting with

20     any retailer that included among other products or

21     potential products, Bratz?

22         "ANSWER:  I believe there was.

23         "QUESTION:  Are you aware of any that occurred

24     before November 7th?

25         "ANSWER:  No.

1     "QUESTION:  Is it your understanding and

2     information that the drawing that we have a

3     depiction of as Exhibit 1107 was among the

4     materials that were provided to the retailer at

5     that meeting?

6     "ANSWER:  I believe so.

7     "QUESTION:  So it's fair to say that it's your

8     understanding that this drawing we've marked as

9     Exhibit 1107 was created sometime prior to November

10    7th; right?

11    "ANSWER:  Yes."

12    Q.  If you'd look at the next exhibit, ma'am, which is

13    Exhibit 1108 --

14    And if I may approach, your Honor, I also have a

15    1108-B, which I hope is a slightly better one.

16    THE COURT:  You may.

17    Q.  BY MR. PRICE:  Ms. Garcia, you recognize 1108 as being a

18    drawing that was done by Carter Bryant?

19    A.  Yes.

20    Q.  And 1108-B is a slightly better copy of that same

21    drawing?

22    A.  Yes.

23    Q.  And it's true, is it not, that Exhibit 1108 was also a

24    drawing that was provided at this November 7th retailer

25    meeting?

1    A.  It's possible.  I don't remember.

2        MR. PRICE:  Move to admit 1108-B and 1108.

3        MS. AGUIAR:  No objection.

4        THE COURT:  Both are admitted.  You may publish.

5        (Exhibits 1108 and 1108-B received.)

6        MR. PRICE:  If I may read from the rest of the

7    deposition testimony, and that would be 1024, line 18,

8    through 1025, line 4.

9        THE COURT:  Any objection?

10        MS. AGUIAR:  No objection.

11        THE COURT:  Very well, you may proceed, Counsel.

12        MR. PRICE:  (Reading.)

13        "QUESTION:  Directing your attention to

14    Exhibit 1108, is the drawing that's depicted here a

15    Carter Bryant drawing?

16        "ANSWER:  Yes.

17        "QUESTION:  Is this one that by your

18    understanding and your best information was

19    presented to a retailer on or about November 7,

20    2000?

21        "ANSWER:  Yes, I believe so.

22        "QUESTION:  You'll agree with me that this

23    drawing was created at some point prior to November

24    7, 2000; is that correct?

25        "ANSWER:  Yes."

1    Q.   I'd now direct your attention, Ms. Garcia, to

2    Exhibit 1109.  And if I may approach with what we marked as

3    1109-B?

4         THE COURT:  You may.

5    Q.   BY MR. PRICE:  Ms. Garcia, do you recognize 1109 as a

6    drawing which was done by Carter Bryant?

7    A.   Yes.

8    Q.   And 1109-B is a slightly better copy of that same

9    drawing?

10   A.   Yes.

11        MR. PRICE:  Move Exhibit 1109 and 1109-B into

12   evidence.

13        MS. AGUIAR:  No objection.

14        THE COURT:  Admitted.  You may publish.

15        (Exhibits 1109 and 1109-B received.)

16   Q.   BY MR. PRICE:  And it's correct, Ms. Garcia, that 1109-B

17   was a drawing that was presented at this retailer meeting on

18   November 7, 2000, and created at some date prior thereto?

19   A.   I'm sorry.  What is the question?

20   Q.   That this 1109 and 1109-B were drawings that were

21   presented at this retailer meeting on November 7, 2000, and

22   created sometime before that?

23   A.   I don't remember.  It's possible.

24        MR. PRICE:  We can read now, your Honor, from 1025,

25   line 13, to line 23.

1       MS. AGUIAR:  No objection.

2       THE COURT:  You may do so.

3       MR. PRICE:  (Reading.)

4       "QUESTION:  Do you recognize Exhibit 1109 as a

5    Carter Bryant drawing?

6       "ANSWER:  Yes.

7       "QUESTION:  Do you recognize this as a drawing

8    that was presented to a retailer on or about

9    November 7, 2000?

10      "ANSWER:  Yes, I believe so.

11      "QUESTION:  And this drawing that we've marked

12    as Exhibit 1109 was created prior to November 7,

13    2000; is that correct?

14      "ANSWER:  Yes."

15    Q.  I think we have one more of these, Ms. Garcia.  If you'd

16    look at 1110.

17      If I may approach, your Honor, with 1110-B.

18      THE COURT:  You may.

19    Q.  BY MR. PRICE:  Ms. Garcia, is Exhibit 1110 a drawing

20    that was made by Carter Bryant?

21    A.  Yes.

22    Q.  And 1110-B is a slightly better copy of that drawing?

23    A.  Yes.

24      MR. PRICE:  Move Exhibit 1110 and 1110-B into

25    evidence.

1          MS. AGUIAR:  No objection.

2          THE COURT:  Both are admitted.  You may publish.

3          (Exhibits 1110 and 1110-B received.)

4     Q.  BY MR. PRICE:  And is it true, Ms. Garcia, that

5     Exhibit 1110 was a drawing that was shown to a retailer on or

6     about November 7, 2000, and was created sometime prior to

7     that?

8     A.  I don't remember.  I'm not sure if this drawing was

9     shown for sure.

10         MR. PRICE:  I'd like to read Ms. Garcia's

11    deposition transcript, this time 1026, lines 7 through 15.

12         THE COURT:  Any objection?

13         MS. AGUIAR:  No.  No objection.

14         MR. PRICE:  (Reading.)

15         "QUESTION:  Do you recognize Exhibit 1110 as a

16    Carter Bryant drawing?

17         "ANSWER:  Yes.

18         "QUESTION:  Is this a drawing that was shown

19    to a retailer on or about November 7, 2000?

20         "ANSWER:  Yes, I believe so.

21         "QUESTION:  This drawing was created prior to

22    November 7, 2000; correct?

23         "ANSWER:  Yes."

24    Q.  Now, Ms. Garcia, looking back, then, at what we were

25    looking at, Exhibit 1236, which is dated October 24, 2000,

1    having seen those exhibits, 1107 to 1110, those Carter Bryant

2    drawings, isn't it correct that that's one of the things

3    you're referring to when you say we have finalized the

4    fashion designs as of October 24th?

5    A.   I'm not sure that my reference in that e-mail related to

6    these drawings.

7    Q.   It's fair to say that whatever you are referring to here

8    was not necessarily completed on October 24th.  It was

9    something that might have been completed even prior to

10   October 24th; correct?

11   A.   I'm not -- again, I just want to make reference, I'm not

12   sure what I was referring to in this October 24th meeting,

13   but I can be sure that whatever I was referring to is not --

14   had no -- I believe did not have any relation to the fashions

15   that we actually manufactured.

16       MR. PRICE:  Your Honor, move to strike the latter

17   part of the answer.

18       THE COURT:  The last portion of that answer is

19   stricken.  Objection sustained.

20   Q.   BY MR. PRICE:  Let me try to narrow it, then.  I know

21   you don't recall exactly what you're referring to here.

22   Would you agree that whatever it is you're referring to was

23   done over a period of time and was not necessarily completed

24   on October 24, 2000, that is, it may have been completed

25   prior to that?

1    A.  I'm sorry?

2    Q.  If you don't know, you can say that.  I'm saying would

3    you agree that whatever you are referring to here, where you

4    are telling Hong Kong that you finalized the fashion designs,

5    that whatever you're referring to would have been completed

6    prior to October 24.  You're not saying it was completed on

7    that day.

8    A.  Correct.

9    Q.  And when you showed Exhibits 1107 to 1110 to a retailer,

10   that retailer, was it Kmart?

11   A.  I believe so.

12   Q.  What you're showing the retailer are things that you

13   intend to actually give them, the three-dimensional form,

14   later; correct?

15   A.  I remember when pitching specific to this Kmart pitch,

16   that we were presenting just drawings, and those drawings

17   were to represent a tone and a style and the concept just

18   generally.

19   Q.  You were actually a part of that presentation; correct?

20   A.  I don't remember being a part of that presentation.

21   Q.  Didn't you actually lead that presentation?

22   A.  I don't remember that, no.

23   Q.  Do you have any names as to what was -- do you know who

24   was a part of that presentation?

25   A.  It's possible that a salesperson named Jennifer Morris

1    might have been a part of that presentation.

2    Q.   Let me ask you, during this October time frame, did MGA

3    do any focus groups with respect to this Bratz project?

4    A.   That I remember?  It's possible.  I just don't remember.

5    Q.   And why do you say that it's possible that MGA was in

6    fact doing focus groups as early as October of 2000?

7    A.   Let me back up.  We did not do any formal focus groups

8    on Bratz until into 2001.  I will say, though, it may have

9    been possible we did some informal focus groups in the Simi

10   Valley area at an elementary school.  And there were times

11   when we would bring in really informal questions to the kids.

12   I don't know if anything related to Bratz was part of that

13   research.

14   Q.   So no formal focus groups until 2001; correct?

15   A.   Yeah, it was very -- it was close to the end of our

16   development cycle.

17   Q.   And you said that informal focus group in Simi Valley.

18   What time are you talking about with respect to that?

19   A.   It could have happened -- you know, at any time.  And

20   I'm not even sure it actually happened.  I'm just saying that

21   those focus groups that MGA would participate in within that

22   time period sometimes happen in Simi Valley.  I'm not sure,

23   again, if Bratz was participating in any of those.  Sorry.

24   Q.   Now, with respect to this presentation to Kmart, these

25   fashion drawings we've identified, Exhibits 1107 to 1110,

1    when was that meeting set up?

2    A.  The Kmart meeting?

3    Q.  Yes.

4    A.  I don't remember exactly.  It would have had to have

5    happened after we pitched to our sales team, and we didn't

6    even pitch to our own internal sales team until mid-October.

7    Q.  Until mid-October?

8    A.  Yes.

9    Q.  So it's your best recollection that somewhere between

10   mid-October and the end of October, that the meeting with

11   Kmart was set up?

12   A.  I'm not sure when the formal meeting with Kmart was set

13   up.

14   Q.  Now, did you ever say -- were you ever told in any form,

15   by Isaac Larian or anyone else at MGA, that you were to keep

16   secret the fact that Carter Bryant was involved with Bratz

17   for MGA?

18   A.  No.

19   Q.  Do you know a woman named Rachel Harris?

20   A.  Yes.

21   Q.  Who is Ms. Harris?

22   A.  Rachel Harris was in charge of packaging for Bratz.  I

23   believe she was hired in October of 2000.

24   Q.  And do you recall having a conversation with Ms. Harris

25   where you mentioned that Mr. Bryant was coming into MGA on

1    his lunch hour and that you had to keep quiet about that

2    because Mattel would be upset if they found out?

3    A.  I do not remember having that conversation.

4    Q.  Let me ask you another way.  Can you deny that you had

5    that conversation with Ms. Harris?

6    A.  I do not believe that I would say something like that to

7    Rachel Harris.

8    Q.  Isn't that what you believed in October of 2000?  Well,

9    two steps.  First, Mr. Bryant was coming over at his lunch

10   hour, wasn't he?

11   A.  I'm not sure.  I mean, I can't remember in this

12   particular time.

13   Q.  By the way, when you were pitching to your internal

14   sales meeting in mid-October, what were you using for the

15   pitch?

16   A.  Carter's portfolio drawings.

17   Q.  Those were the ones that he had provided to you,

18   according to your testimony, on September 1st?

19   A.  That's right.

20   Q.  And any revised drawings in the internal sales pitch

21   meeting?

22   A.  I don't believe so.

23   Q.  For example, Exhibits 1107 to 1110, were those used in

24   the internal pitch meetings?

25   A.  No, I don't believe so.

1    Q.   If you'd look at Exhibit 4507.

2    A.   Okay.

3    Q.   And do you recognize that as an e-mail exchange between,

4    among others, yourself and Mr. Isaac Larian?

5    A.   Yes.

6         MR. PRICE:  Your Honor, move Exhibit 4507 into

7    evidence.

8         MS. AGUIAR:  The e-mail exchange between the

9    witness is only a part of the exhibit.  So I would just

10   object on the grounds that there isn't foundation for the

11   entire exhibit.

12        THE COURT:  Lay a further foundation, Counsel.

13   Q.  BY MR. PRICE:  You see midway down the first page where

14   it says from Paula Treantafelles to, among others, Isaac

15   Larian?

16        Do you see that?

17   A.   Yes.

18   Q.   And it says original message.  That was attaching the

19   message that's below that; correct?

20   A.   Yes.

21   Q.   And the message below that that you were attaching and

22   sending to Mr. Larian is the rest of this e-mail.  That is,

23   it goes from the first page to the fourth page; correct?

24   A.   Yes.

25   Q.   And then in response to you forwarding that entire

1    e-mail string to Mr. Larian, he sent an e-mail to the various

2    folks including you?

3    A.  Yes.

4        MR. PRICE:  Your Honor, again I move Exhibit 4507

5    into evidence.

6        MS. AGUIAR:  No objection.

7        THE COURT:  Admitted.

8        (Exhibit 4507 received.)

9        MR. PRICE:  May I show it, your Honor?

10       THE COURT:  Yes.

11   Q.  BY MR. PRICE:  Now, let's go down to this section here,

12   the bottom section.  This is the e-mail which you were

13   forwarding to Mr. Larian in March of 2002; correct?

14   A.  Yes.

15   Q.  And it was an e-mail from a Davis Dees, who was

16   forwarding you e-mail from Bratzworld, the Bratzworld Club on

17   Yahoo?

18   A.  You know, I have to be -- I'm not certain because in

19   fact the e-mail seems to have gone from David Dees to Carter

20   Bryant.  I don't have my name there.

21   Q.  Pardon?

22   A.  My name isn't present in the to subject.

23   Q.  I'm sorry.  Let's see if we can show from here down.

24   The e-mail is from you to Isaac Larian, and you're forwarding

25   everything that's below that; correct?

1    A.  Yes.

2    Q.  And you don't believe Mr. Dees directly sent this to

3    you; correct?

4    A.  I'm not sure.

5    Q.  But in any event, this is an e-mail you received, an

6    e-mail from David Dees to Carter Bryant; correct?

7    A.  Yes.

8    Q.  And in that, he talks about -- he's posting a wonderful

9    letter from David Dees.  Do you see that?

10   A.  Yes.

11   Q.  And if we can go to the next page.  It starts, you see

12   there's an e-mail here which talks about hello, my name is

13   Christian.  I'm a girl.  And I do a fan list for the Bratz

14   dolls, and I was wondering if you could post and maybe share

15   some of your other Bratz art that we may not have seen.

16        And you read this portion of the e-mail; correct?

17   A.  Yes.

18   Q.  And as part of this e-mail, there's a response from

19   Mr. Dees which begins right after that.  If we can show that.

20   It says Hi, Christian.  You saw that when you received the

21   e-mail; correct?

22   A.  Yes.

23   Q.  And if we go down to the last paragraph here, the second

24   sentence says:  "However, I can't take credit for creating

25   the Bratz dolls, or even the first Bratz illustrations, for

1    that honor would go to a fellow named Carter Bryant, who is

2    truly a genius of fashion and the soul and only person who

3    first drew those great pouty lips and that extreme look that

4    only our heroes share."

5        You saw that in this e-mail as well?

6    A.  Yes.

7    Q.  And you forwarded the entire e-mail string to

8    Mr. Larian --

9        THE COURT:  Counsel, take that off the screen,

10   please.

11       Sidebar.

12       (SIDEBAR CONFERENCE HELD.)

13       THE COURT:  Counsel, this document was the subject

14   of a pretrial motion, and the Court issued very specific

15   instructions on the redaction of this, and what you're

16   showing to the jury is not the redacted version.  Let's clean

17   it up.

18       MR. PRICE:  Okay.

19       (CONCLUSION OF SIDEBAR CONFERENCE.)

20       MR. PRICE:  Your Honor, we've followed your

21   instructions.

22       THE COURT:  Thank you, Counsel.

23       MS. AGUIAR:  Your Honor, I'm sorry.  I still think

24   that's not correct.  So I object to this being published on

25   the screen at this point.

                    Unsigned                        Page  733

1          THE COURT:  From what I see, it's correct.

2          MS. AGUIAR:  Do you want to do this on the side?  I

3     believe that there's still at least one name that was

4     supposed to be redacted.

5          MR. PRICE:  Would you tell us?  Perhaps counsel can

6     show us and we can see.

7          (Pause.)

8          MS. AGUIAR:  We didn't have clarity, but I agreed

9     to let him publish it the way it is.

10          THE COURT:  All right.  You may proceed, Counsel.

11          MR. PRICE:  Thank you.

12     Q.  Ms. Garcia, we were going over the e-mail that you

13     forwarded to Mr. Larian, and was it your practice to forward

14     to Mr. Larian all e-mails you received from Mr. Bryant or

15     others concerning Bratz?

16     A.  No, certainly not.

17     Q.  And is there a particular reason you forwarded this

18     e-mail to Mr. Larian?

19     A.  Yes.

20     Q.  And you noticed that one of the things that the e-mail

21     you received did was it identified Carter Bryant as being the

22     person who should take the credit for creating the Bratz

23     dolls; correct?

24     A.  Yes.

25     Q.  And is that the reason you forwarded it to Mr. Larian,

1    that this e-mail, which was -- this e-mail was published on

2    Yahoo; is that right?

3    A.  I believe so.

4    Q.  Did you forward this to Mr. Larian because this e-mail

5    which had been posted on Yahoo actually identified Mr. Bryant

6    as the person who should take credit for creating the Bratz

7    dolls?

8    A.  That is not the reason why I forwarded this e-mail to

9    Isaac Larian.

10   Q.  Well, let's look at his response.  And perhaps you can

11   tell us who some of these folks are that we haven't heard of

12   prior to now.

13       We've heard of Ms. O'Connor.

14       Dave Malacrida, who was that?

15   A.  He was responsible for P.R., continues to be.

16   Q.  For public relations?

17   A.  Yes.

18   Q.  And Aileen Storer?

19   A.  She is responsible for packaging.  Continues to be.

20   Q.  Margot Chasen?

21   A.  Margot Chasen was a product manager at MGA at that time.

22   Q.  Julie Mote?

23   A.  I'm not sure.

24   Q.  Let's call her Julie.

25   A.  I am not certain, but I believe that Julie was involved

1    in the legal department at MGA at the time.

2    Q.  And Beth Cahill?

3    A.  Same.

4    Q.  And do you see the question?  "Victoria, Dave, who gave

5    David Dees info and what he does for us to this Yahoo lady

6    and why?  This Yahoo lady is giving us too much legal grief

7    even though she does not mean it.  Please do not send any

8    information or reply to her e-mails unless you have cleared

9    it with me."

10          And then:  "Julie/Beth/Abe.  There must be no

11    mention about Mattel or any of their properties, Carter, any

12    MGA Bratz art, et cetera."

13          Do you see that?

14    A.  Yes, I do.

15    Q.  And you were not one of the folks to whom this sentence

16    is directed.  This is directed to Julie and Beth and Abe;

17    correct?

18    A.  It seems.

19    Q.  And the reason for that is that you knew already that

20    you weren't to make any mention that Carter Bryant was the

21    creator behind Bratz?

22    A.  No.

23          MR. PRICE:  At this time I have no further

24    questions.

25          THE COURT:  All right.

Unsigned                                                    Page  736

1              CROSS-EXAMINATION

2      BY MS. AGUIAR:

3      Q.  Hi, Ms. Garcia.

4      A.  Hello.

5      Q.  Is this your first time testifying in open court?

6      A.  Yes.

7      Q.  And how are you enjoying it so far?

8      A.  I've had better times.

9      Q.  You and I did speak last night after you started your

10     testimony yesterday; isn't that right?

11     A.  Yes.

12     Q.  And without waiving any privilege here, what basically

13     did I say to you last night when you and I were discussing

14     your testimony from yesterday?

15          MR. PRICE:  I object.  That does waive a privilege.

16     I would inquire if she's asking what they talked about.

17          THE COURT:  I'll decide whether the privilege is

18     waived or not.  Counsel, your question can be answered.

19          THE WITNESS:  The conversation was that I believe

20     you were noticing that I was quite nervous yesterday.  And I

21     agreed that I was very nervous.  And you encouraged me to

22     relax and to tell the story, to tell my story.

23          MS. AGUIAR:  I'd like to actually put back up on

24     the screen the very last document that we were just looking

25     at, which is Trial Exhibit 4507.

1        And with your permission, your Honor, I'd like to

2    hand the witness Trial Exhibit 17252.

3        THE COURT:  You may.

4    Q.  BY MS. AGUIAR:  Have you had a chance to look at

5    Exhibit 17252?

6    A.  Yes.

7    Q.  And do you notice that the e-mail chain between you and

8    Mr. Larian regarding the Yahoo posting, do you notice the

9    date there?

10   A.  Monday, March 11th.

11   Q.  Were you aware as of the time of this e-mail exchange,

12   that MGA had received what's called a cease-and-desist

13   letter, a warning letter, from Mattel's outside lawyers,

14   Quinn Emanuel, regarding certain legal issues, and that

15   letter is Exhibit 17252.  Were aware of that?

16       MR. PRICE:  Assumes facts not in evidence.

17       THE COURT:  Rephrase your question, Counsel.

18   Q.  BY MS. AGUIAR:  Were you aware, as of March 2002, that

19   MGA had received a letter from Mattel regarding certain legal

20   matters?

21       MR. PRICE:  Assumes facts not in evidence as

22   phrased.

23       THE COURT:  As phrased, Counsel, it does.

24   Q.  BY MS. AGUIAR:  Were you aware that Mattel had made

25   certain allegations to MGA as of the time period in March

Unsigned                                                    Page  738

1    2002?

2         MR. PRICE:  To be helpful, your Honor, I think the

3    "were you aware of" is what assumes facts not in evidence,

4    which is why I object.  That may be of some assistance.

5         THE COURT:  It does, Counsel.

6         Why don't you just rephrase the beginning of your

7    question.

8    Q.  BY MS. AGUIAR:  Had you seen the letter that is marked

9    as Trial Exhibit 17252 as of March of 2002?

10   A.  No, I hadn't.

11   Q.  Did you have -- had you had any conversations with

12   anyone at MGA prior to March 11, 2002, regarding a

13   cease-and-desist letter from Mattel?

14   A.  No.

15   Q.  Let's go back to your background.  Would you remind the

16   jury of your current title at MGA?

17   A.  My title is vice-president of product design and

18   development.

19   Q.  Describe for us what your position entails exactly.

20   A.  I see that I have three general roles.  The first one is

21   in what I design as preliminary design.  And preliminary

22   design, I work with some designers, my designers, to arrive

23   at concepts, designs.  And those designs are created against

24   a theme that we also arrive at.

25        So we might decide that we'd like to do a cowboy

1    Bratz doll line.  I would have worked with my team to arrive,

2    first, that we want to do a cowboy Bratz doll line.  And then

3    I would work with my preliminary design team to arrive at

4    sketches of a cowboy Bratz doll.

5         There will be versions that they may present to me

6    in different kinds of executions, and I work with the team to

7    refine the designs so that the designs reflect kind of --

8    reflect the position of what Bratz represents.  And once we

9    get the attitude and that style down, I then transfer it to

10    my development design team, who also report to me, and that

11    team is actually very skilled in manufacturing, sourcing, and

12    costing.

13         So they take that preliminary design, transfer it

14    to Hong Kong, and they work with Hong Kong to find fabrics

15    and sewing executions from the manufacturing plant.  They go

16    back and forth to make sure that the Chinese -- that the

17    China manufacturing plant is representing, sewing, and

18    executing just like my preliminary design team created.

19         And then that team, they also work with costing to

20    make sure that the cost is coming in affordable so that when

21    we actually sell a product, we can make some money on it.

22         Outside of my own individual team, I also, because

23    I try very hard to marshal, you know, the brand and the brand

24    consistency, to make sure that everything represents the

25    position of Bratz.

1        I'll work with team members outside of my own

2    individual team, such as the commercial team or the packaging

3    team to make sure that what they represent, the Bratz cowboy

4    commercial will represent the same tone and essence and

5    position that we originated or that the packaging team was

6    creating a package that still is synonymous and, you know,

7    equally representative of our first vision and our first

8    instinct.

9    Q.   To whom do you report at MGA in this capacity that you

10   just described?

11   A.   Isaac.

12   Q.   How many people report to you currently?

13   A.   About 20.

14   Q.   Without getting into specific names, who are your direct

15   reports, and if you could describe them by their positions.

16   A.   Sure, I have five managers who report to me.  I have a

17   preliminary design manager, who is helping me arrive at those

18   preliminary designs, that first fashion design, or doll

19   design.

20        I have a development design manager.  And those two

21   managers are specifically focused on dolls.  But I also have

22   two other managers who work and employ sets.  So if I did a,

23   you know, cowboy Bratz doll, you might want to do a horse or

24   horse stable to work with the doll.  So I have two managers,

25   a preliminary manager and a development manager also working

1    on accessories or play sets.

2          And finally I, have a manager who manages the

3    resource team.  The preliminary designers come up with the

4    concepts.  The guys that are actually going to make it, bring

5    it to fruition, is our resource team made up of hair rooters,

6    face painters.  And I have like five sample makers who

7    actually sew all the fashions that the fashion designers

8    sketch.  So I have about five managers.

9    Q.   Just in general terms, and you went into it a little

10   bit, but what are the skill sets of those people who directly

11   report to you?

12   A.   I think we are very, very grateful and blessed to have

13   them.  They are incredibly talented.  Our fashion design team

14   are true fashion designers.  They come from fashion schools

15   or from like Bibi, which is a really hot fashion store.

16          So they are skilled in fashion designing, but my

17   development designers are very good in engineering, sourcing,

18   costing.  We have a gentleman who has come from the Orient

19   who is working with me, who has worked with manufacturing

20   plants himself.

21   Q.   Let's go back now to talk about the years that you were

22   at Mattel.  So I'll take you back in time.

23          If you were interested in the marketing aspects of

24   the business, can you explain why you started in sales

25   research and in product planning?

1    A.   Yes, I was very, very passionate about becoming somebody

2    in marketing for Mattel.  I understood and I continue to

3    understand that the Mattel marketing team is a very, very

4    exciting team, a very powerful team.  They are very much, the

5    way I see it, they really made sure that they were making

6    decisions, and a lot of the team members at Mattel would

7    follow their direction.

8         I knew that when I got my chance, or if I got my

9    chance at Mattel, that I needed to make sure that when I made

10   decisions, I really knew how I was affecting the people I

11   was -- I wanted to make sure that I understood how my

12   decisions were going to affect other people.  And that was

13   specific in the product planning role.

14        I really wanted to understand the product planning

15   process because I wanted to understand what it took to

16   actually create a concept and that if I made a decision, what

17   that meant to that whole team who had to turn around and

18   either back up and make revisions or move forward.  So I --

19   it was my thought that I was being responsible to sort of

20   kind of jump into some of those groups to think and act and

21   understand their inner workings so when I became a marketeer,

22   that I could really --

23   Q.   Sorry.  If you would slow down.

24   A.   I really understood how I would be affecting them when I

25   made the decisions that I did.

1    Q.  How did you go from your sales research position to your

2    product planning position?

3    A.  I interviewed for the position.

4    Q.  Do you recall who you interviewed with at Mattel for the

5    product planning position?

6    A.  I can't remember.

7    Q.  Once you got into the planning organization at Mattel,

8    were you promoted within the planning department?

9    A.  Yes.

10   Q.  Can you describe to us how that -- how you work?

11   A.  I don't remember all the formal titles that I had within

12   planning, but I do remember that I was doing a pretty good

13   job, and I remember that I was definitely, you know, starting

14   on a very junior level.  And by the time I had left Mattel, I

15   was doing some senior project planning.  I believe I might

16   have gone from an associate product planner to a product

17   planner, at least that jump.

18   Q.  During your time at Mattel, did you receive salary

19   increases?

20   A.  Yes.

21   Q.  And did you also receive performance evaluations?

22   A.  Yes.

23   Q.  And what do you recall, if anything, about the

24   performance evaluations that you received?

25   A.  You know, it's been a long time, but I do remember a

1    performance -- I would generally say, pretty humbly speaking,

2    that I did well in my performances.  It did seem that I was

3    always, you know, performing favorably.  And I would also say

4    that I remember my planning function that I, you know,

5    towards the latter part of my planning responsibilities, that

6    I -- I got -- I reviewed pretty well, very well, actually.

7    Q.   And I believe -- I don't want to go over testimony you

8    already gave, but is it correct that you worked in the

9    department called large, small, and plush dolls; is that

10   right?

11   A.   Yeah.  LSP.

12   Q.   I'm sorry?

13   A.   It was referred to as LSPA.

14   Q.   So based on your experience at Mattel, what was your

15   view of the culture within the large, small, plush doll

16   department at Mattel while you were there?

17        MR. PRICE:  Object.  Calls for a characterization

18   that's irrelevant.

19        THE COURT:  I'm sorry, Counsel?

20        MR. PRICE:  Calls for a characterization, and it's

21   irrelevant.

22        THE COURT:  On the second basis, sustained.

23   Q.   BY MS. AGUIAR:  Do you feel that you learned any -- what

24   lessons do you feel that you learned based on your experience

25   at Mattel regarding operating within a corporate culture?

1          MR. PRICE:  Same objection.  Irrelevant.

2          THE COURT:  Sustained.

3          Counsel, this is general background.  Rephrase your

4    question, Counsel.

5          MS. AGUIAR:  It's okay.  I'll move on.

6          THE COURT:  Very well.

7    Q.  BY MS. AGUIAR:  Toward the end of your tenure at Mattel,

8    did you have a view about whether Mattel was maximizing

9    opportunities for girls' toys?

10         MR. PRICE:  Objection.  That's irrelevant as well

11   in this phase.

12         MS. AGUIAR:  I believe we've had testimony --

13         THE COURT:  Yes, we have.  Overruled.

14         Counsel, I'll ask for a response to objections.  I

15   think I've made that clear.

16         THE WITNESS:  You know what?  I apologize.  Could

17   you please repeat the question?

18   Q.  BY MS. AGUIAR:  Let me see if I can remember it.  Toward

19   the end of your tenure at Mattel, did you have a view about

20   whether Mattel was maximizing the marketing opportunities for

21   toys geared toward girls?

22   A.  In leaving Mattel, I felt that they were not maximizing

23   a very specific part of the market, which were girls seven to

24   ten.

25   Q.  And what did you think was lacking in that regard?

1    A.   Well, you know, they did and continue to do a really

2    incredible job with Barbie.  Barbie in my opinion is for a

3    very young consumer, four to six years old.  There's a very

4    particular experience for a very particular type of consumer,

5    that particular age group.  However, there's that older

6    consumer who is seven to ten years old, who might also be

7    very interested in purchasing toys or products.  And I felt

8    that though they may still be interested, that more likely

9    the older consumer wasn't purchasing, you know, fashion dolls

10   because maybe Barbie just wasn't relevant, for a couple of

11   reasons.

12          Well, first, kind of who she was and -- okay.  Let

13   me back up.  For me the seven- to ten-year-old consumer is

14   very different from the four- to ten-year-old consumer.  The

15   seven- to ten-year-old consumer is a little more savvy.  It

16   was my perception that these consumers were starting to

17   listen to music and be interested in the kind of fashions

18   that they wore.  They were into celebrities and fashion

19   magazines.  They were in a transitional stage where they are

20   not little girls anymore.

21          Well, they are little girls, but maybe feel that

22   they are a little bit older and may not play with the

23   traditional fashion doll at Barbie, but a different fashion

24   doll could be really very appropriate if the product was

25   designed with attitude and they were savvy, if they were

1     fashionable like some of the posters they collected or some

2     of the stuff they see in their magazines.  But also I thought

3     it was really important that at this time there would be a

4     fashion doll that was also multi-ethnic, that it wasn't just

5     about being the blonde-haired, blue-eyed character, that

6     there were diversities and -- because frankly, I look around,

7     and I know that that's very real in our own lives.

8          So I thought that an older consumer would maybe

9     even be more interested in finding a fashion doll that wasn't

10    just blonde hair and blue eyes, but a character that might

11    look closer to them.  Or not.  Just different.

12    Q.  We'll come back to that area.  Let me ask you, did you

13    know Carter Bryant when you worked at Mattel?

14    A.  No.

15    Q.  I believe it was yesterday, Mr. Price showed you a map

16    of the Mattel design center.  Do you recall that?

17    A.  Yes.

18    Q.  Do you recall -- can we get that on the screen?  It's

19    Exhibit 293.  And I believe we should have a large copy of

20    293.

21          Do you see where you're located on that map?

22    A.  Yes.

23    Q.  Do you recall seeing a different version of this map at

24    your deposition in this case?

25    A.  Yes.

1    Q.  If you can, and I know it's a little awkward there with

2    the big map in front of you, but can you turn to Exhibit 391

3    in your binder.

4         And just to be sure, we're using the white binder

5    now.

6         Do you recognize Exhibit 391?

7    A.  Yes.

8    Q.  What is it?

9    A.  This, I believe, was the version of the Mattel design

10   center that I was presented in my deposition.

11   Q.  And is that your handwriting on Exhibit 391?

12   A.  Yes.

13        MS. AGUIAR:  Your Honor, I offer Exhibit 391 into

14   evidence.

15        MR. PRICE:  No objection.

16        THE COURT:  Admitted.  You may publish.

17        (Exhibit 391 received.)

18   Q.  BY MS. AGUIAR:  So the version of this map that you were

19   shown at your deposition is the one on the bottom.  I think

20   it's fairly evident.  But can you describe for the jury the

21   differences between the version that you were shown at your

22   deposition and the version that's now in front of you today?

23   A.  The version that I was shown during my deposition was a

24   cropped area, an isolated area of that bigger map.  And also

25   the version that I was shown, it seemed that the names were

1    either removed or whited out, only to leave my name.  So all

2    the names within the squares or cubicles or offices, whatever

3    they indicated, all those names were removed.

4    Q.  So when you were at your deposition and being asked

5    questions about this, you were not able to tell what the

6    names were that were in the squares next to you, in the

7    cubicles next to you?

8    A.  That's right.

9    Q.  And were you able to tell where your section of the map

10   fit into the larger context of the whole design center map?

11   A.  Generally, given the location of the front entrance.

12   Q.  And on the version that you looked at, that you were

13   shown at your deposition, did it have the other areas?  Were

14   you allowed to look at the other areas of the map during your

15   deposition?

16   A.  No.

17   Q.  So let's just focus on 293, which is the large one that

18   you have in front of you.  And tell me who it shows sitting

19   next to you on that map.

20   A.  The person indicated next to me on this map references

21   Carter, C. Bryant.

22   Q.  Do you believe that this Exhibit 293 that's the map

23   that's being offered into evidence as being a floor plan of

24   Mattel design center accurately represents who sat next to

25   you while you were sitting here in the Mattel design center?

Unsigned                                                      Page  750

1  A.  No.

2  Q.  How can you be sure of your answer?

3  A.  Okay.  First, I remember that Christine Wergeles sat

4  next to me.

5  Q.  And if you could describe where she sat by reference to,

6  say the right or the top.

7  A.  She definitely sat to my right.  I will say that I

8  believe that she sat right next to me, right next to me.  And

9  if it wasn't right next to me, she was definitely within that

10  row that I sat within.

11         In this map, it actually has C. Bryant next to me.

12  But more importantly, if you look above, in the row above,

13  Christine -- or C. Wergeles, which I believe is Christine

14  Wergeles, actually sat on the opposite side of the wall.

15         I know for sure even further that wouldn't be

16  correct because if -- at Mattel we all sat very -- I remember

17  to be that everybody sat segregated.  Everybody sat in their

18  own individual groups.

19         The wall, that thicker line represented the rows

20  that separated us, the cubicle walls, and the opposite side

21  of my row, and it's noted actually here, the product design

22  male action group.  Christine Wergeles worked on LSPA with

23  me.  Frankly, I think she worked on the P part of LSPA.  It

24  would be very suspect -- it wouldn't make sense that

25  Christine would be sitting in the, you know, male action

1    group.  She would actually be sitting with us.

2         And if C. Bryant should represent Carter Bryant,

3    then it would make absolutely no sense for Carter to sit in

4    the LSPA group, because Carter --

5    Q.  Was Carter Bryant, while you were working at Mattel, did

6    you know someone named Carter Bryant who worked in the LSPA

7    group?

8    A.  No.

9    Q.  If I were to represent to you for purposes of this

10   question that Mr. Bryant's testimony is that he worked in the

11   Collector Barbie department, do you see where the Collector

12   Barbie group is on the map?

13   A.  Yes.

14   Q.  Can you point out where on the map that area is?

15   A.  General area is almost opposite diagonal in the top

16   left-hand corner.

17   Q.  All the way to the top of the map?

18   A.  Yes.  So the difference is --

19   Q.  I'm sorry.  You have to speak into the microphone.

20   A.  The differences are pretty extreme.

21   Q.  What do you mean by the differences are extreme?

22   A.  May I show you on the map then?

23   Q.  Sure.

24   A.  LSPA was here.  The Collector Barbie group was here.

25   Q.  So they were on totally different sides of the design

1    center?

2    A.  That's right.

3    Q.  You can put that away.

4         Keeping for a few minutes about your time at

5    Mattel.  There's a document already in evidence, Trial

6    Exhibit 432.  And I'm going to have you look at that on the

7    screen.

8         Do you recognize the graphic that's been put up as

9    Exhibit 432?

10   A.  Yes.

11   Q.  And what do you recognize it as?

12   A.  A manufactured Diva Starz doll.

13   Q.  While you were at Mattel, was the Diva Starz doll on the

14   market?

15   A.  No.

16   Q.  And what do you remember about the Diva Starz project

17   from the time that you worked at Mattel?

18   A.  Generally, I remember that Diva Starz, as a project,

19   was -- that I personally was assigned -- I believe that I was

20   personally assigned responsibility of planning for the -- for

21   Diva Starz, but only for a very, very short period in time,

22   for the very, very -- just at the very beginning part of Diva

23   Starz.

24        I believe thereafter somebody inherited the

25   responsibilities for planning for that project.

1           But I do know, you know, that this project was

2       pretty aggressive, that it was pretty stressful for those

3       that might have been involved in it.  I know because of my

4       friend Maureen Mullin, who was quite involved.  She was the

5       designer at the time.  And she was so stressed out.  I

6       remember her coming to me and representing how stressed out

7       she was.  She was actually letting me know that her hair was

8       falling out of -- out of her head because she was so stressed

9       out by it.

10      Q.  There was some testimony yesterday that you gave and you

11      were shown a document, I believe, regarding the consideration

12      by Mattel of the name Bratz with an S, and Mall Brats.

13          Did you ever receive an e-mail or other document

14      while you were at Mattel regarding the consideration of the

15      names Brats or Mall Brats for this project?

16      A.  No.

17      Q.  Were you ever part of a meeting or other communication

18      in your years at Mattel regarding the consideration of Brats

19      or Mall Brats for any project?  Do you think that the image

20      that is on the screen here, Diva Starz, is similar to

21      Mr. Bryant's pitch book drawings that were first shown do you

22      in September of 2000?

23          MR. PRICE:  Objection.  That's not in issue in this

24      phase.

25          THE COURT:  Sustained.

1    Q.  BY MS. AGUIAR:  I'd like to move on to some testimony

2    you gave yesterday about applying for a few marketing

3    positions at Mattel.  And you described that you interviewed

4    for a few of them.

5          Why do you think those positions didn't pan out?

6          MR. PRICE:  Object.  That calls for speculation,

7    your Honor.

8          THE COURT:  Rephrase the question, Counsel.

9    Q.  BY MS. AGUIAR:  Do you have a view, based on the

10   conversations that you had while you were at Mattel and your

11   experience there as to why you did not receive those

12   positions that you entered before?

13         MR. PRICE:  Same objection.  It's speculation based

14   on hearsay.

15         THE COURT:  Overruled.  You can answer.

16         THE WITNESS:  It's my belief that I did not get any

17   of those marketing positions at the time -- I honestly

18   believe my decision to jump into product planning first.

19   Q.  BY MS. AGUIAR:  What do you mean by that?

20         MR. PRICE:  I object.  There's no foundation for

21   this opinion.  And I move to strike.

22         THE COURT:  You're asking what do you mean by that?

23   Q.  BY MS. AGUIAR:  I'm sorry.  When you say you believe it

24   was because you decided to enter the product planning

25   department first, can you explain what you mean by -- what

1    you mean by that answer?

2         THE COURT:  Lay a foundation, Counsel.  I'm

3    sustaining the objection on foundation.  How she knows.

4         MS. AGUIAR:  I understand.

5    Q.  Can you describe for us what your understanding is based

6    on, please?

7    A.  It was my own -- I'm not sure that I understand.

8    Q.  Okay.  Do you have a belief as to why you didn't get the

9    marketing jobs that you applied for?

10   A.  Yes.

11   Q.  And what is that belief based on?

12   A.  It's based on -- it's based on sort of my perception of

13   how marketing -- how marketing and the decisions that

14   marketing made at Mattel.  I believe that in accepting a

15   position like product --

16        MR. PRICE:  I object.  Now we're going beyond the

17   question.

18        THE COURT:  Next question, Counsel.

19        MS. AGUIAR:  Okay.

20   Q.  Did you have a view, based on your years at Mattel, as

21   to why people who started in product planning didn't often

22   progress to positions in the marketing group?

23        MR. PRICE:  Object.  One, it assumes --

24        THE COURT:  It's a yes or no question.  You may

25   answer yes or no.

1          THE WITNESS:  Can you repeat the question?

2     Q.  BY MS. AGUIAR:  Sure.  Do you have an understanding,

3     based on your experience at Mattel, as to whether people who

4     started in the product planning group often did not progress

5     into marketing positions?

6     A.  I --

7          THE COURT:  Yes or no.

8          THE WITNESS:  Yes.

9     Q.  BY MS. AGUIAR:  And what is the basis, or what is that

10    belief, and what is your basis for that belief?

11         What's your basis for your belief that those who

12    started in product planning didn't progress to marketing

13    positions?

14    A.  It was my perceptions, it was my understanding.  It was

15    less likely --

16         THE COURT:  Stop.  That's beyond the question.

17         Next question, Counsel.

18    Q.  BY MS. AGUIAR:  And what is your understanding?

19         MR. PRICE:  My objection, lack of foundation.

20         THE COURT:  Sustained, Counsel.  This is based on

21    nothing more than subjective perception.

22         Let's go ahead and take our break at this time.

23         (WHEREUPON THE JURY WITHDRAWS.)

24         THE COURT:  Mr. Price, I want to explore the

25    objection that the Court sustained on Diva Starz.

Unsigned                                                      Page  757

1        So are you taking the position, is Mattel now

2    taking the position that Carter Bryant's exposure to Diva

3    Starz was not a basis for his inspiration in terms of Bratz?

4        MR. PRICE:  The only evidence that's been adduced

5    so far is that -- is exposure to Toon Teens.

6        THE COURT:  Okay.  So you are taking the position

7    that Diva Starz is not a reference point, then?

8        MR. PRICE:  Mr. Olivar will answer.

9        THE COURT:  You understand the question.  You just

10   can't have it both ways.  Either you're going to have --

11   we're going to take Diva Starz off, and it's not going to be

12   relevant, and I'll sustain the objection, or if you're going

13   to take the position that the timing element --

14       MR. OLIVAR:  What has been at issue so far with

15   respect to Diva Starz has been the name.  And that there was

16   Brats considered, B-R-A-T-S, and also a variant on that, Mall

17   Brats.

18       THE COURT:  So you're just going to use Diva Starz

19   for the claim?

20       MR. OLIVAR:  Correct.  As of that point.

21       Now, the dolls themselves is not going to be a

22   basis of any argument on our part.

23       Now, there may be some artwork, depending on where

24   the case heads, that we would raise as having similarities.

25   But we're not there at that point yet.  But right now, what

1    we --

2          THE COURT:  We're at that point with the witness.

3    So you need to make a decision, Counsel.

4          MR. OLIVAR:  Well, I thought, and perhaps I

5    misunderstood where we were in the testimony, but I thought

6    so far what was at issue was similarities over the dolls.

7    And that, I can assure the Court, is off the table.  That's

8    not an argument we are making.

9          THE COURT:  Very well.  Then I'll continue to

10   sustain the objection.  It's off the table.  And the only

11   thing you're preserving at this point is the name itself

12   potentially.

13         MR. OLIVAR:  And potentially artwork.  It has not

14   been raised yet.

15         THE COURT:  Artwork unrelated to the doll itself.

16         MR. OLIVAR:  It's part of the project.

17         THE COURT:  I understand.

18         MR. OLIVAR:  But it's not the doll.

19         THE COURT:  I understand.  All right.  Very well.

20         MR. NOLAN:  Your Honor, very briefly, though, the

21   artwork that they are referring to is artwork of the

22   character Diva Starz.  They can't have it both ways, your

23   Honor.

24         THE COURT:  Ms. Garcia seems to differ, Counsel.

25         MR. NOLAN:  With respect to what?  Diva Starz?

1          THE COURT:  No.  With respect to the -- with

2     respect to her testimony earlier today.

3          MR. NOLAN:  Your Honor, with all due respect, we

4     don't have the original concept drawings of Diva Starz to

5     make a comparison to the characters that are on the artwork.

6     And with all due respect, this case --

7          THE COURT:  I'll cross that bridge when we get to

8     it, but in terms of what we were comparing here was the doll

9     itself, and I'll sustain the objection that it's not relevant

10    provided -- I don't want to hear from Mattel down the road

11    that they are going to make a comparison or use the doll

12    itself or Carter Bryant's exposure to the doll as proof of a

13    timing issue.

14         MR. NOLAN:  I understand that, your Honor.  And my

15    only point is that I believe that what is being said is that

16    the artwork that they are referring to is artwork of Diva

17    Starz, which is a representative of the doll.  That's the

18    point I'm making.

19         THE COURT:  And I don't have that before me right

20    now.  So I'm not going to cross the bridge at this point.

21         All right.  So I'll maintain by sustaining the

22    objection.

23         (Recess taken.)

24         (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

25         THE COURT:  Okay.  Mr. Nolan.

1          MR. NOLAN:  I think I can do this in one minute,

2     your Honor.  The display of the unredacted Exhibit No. 4507,

3     I just want to go back and make certain that all parties

4     understand the exhibit books that we were handed and which we

5     are relying on has the redacted version.

6          THE COURT:  Right.

7          MR. NOLAN:  And the published version should never

8     differ from what's in our exhibits.

9          THE COURT:  The Court agrees.

10          MR. NOLAN:  Because otherwise -- I appreciate the

11    Court catching it, and we probably would have caught it

12    hopefully within about a half hour after you caught it.  But

13    the other thing is there's been an order to exclude witnesses

14    in this case.  Mattel has its witness, one of its witnesses

15    in this courtroom, and this witness, Andreas Koch, was

16    present.  They know each other.

17          He was making facial gestures, not intimidating in

18    any way, your Honor.  I'm not suggesting that at all.  They

19    are friends actually.  But he was more or less pointing to

20    his clock and telling her to speed up.  Now, I think that all

21    lawyers in this case should be able to identify who their

22    next witnesses are.  Mr. Koch is going to be a witness either

23    today or tomorrow.  But I would just ask the Court to remind

24    all of us that there is an exclusion order.  We've stipulated

25    to that.  We don't know some of these witnesses.  I'm certain

Unsigned                                              Page 761

1    Quinn Emanuel lawyers know this.  They have got enough of

2    them in the courtroom.  That should not happen.

3        THE COURT:  Mr. Price?

4        MR. PRICE:  I agree.  That should not happen.  I

5    wasn't aware of it, looking this way, obviously.  But I will

6    obviously make sure that doesn't happen.

7        THE COURT:  I accept that, Mr. Price, but

8    Mr. Nolan's point, there are enough lawyers, and someone

9    should be watching this.

10       MR. COREY:  Mr. Koch was in the room for less than

11   a minute.  When he walked in the door, he was recognized.

12       THE COURT:  Very well.  So you're on top of it.

13       MR. PRICE:  And with respect to redaction, I agree.

14   I assumed what was scanned was the redacted documents.  I

15   think it was -- it won't happen again.

16       THE COURT:  Very well.  All right.  Let's resume.

17       (WHEREUPON THE JURY ENTERS.)

18       THE COURT:  Counsel, you may proceed.

19       MS. AGUIAR:  Thank you.

20   Q.  Right before the break, we were talking about the end of

21   your tenure at Mattel and why you decided to leave.  Why did

22   you decide to leave Mattel?

23   A.  I decided to leave Mattel because I felt that I was not

24   going to have an opportunity to be part of the marketing team

25   or to be part of brand marketing management.

Unsigned                                                    Page  762

1    Q.   Why did you choose MGA as a place to go work after

2    Mattel?

3    A.   I remember arriving at MGA for my interview, and upon --

4    or after my interview, I was really, really excited about

5    MGA.  It was small, and it was intimate, and as soon as you

6    walked in, it was a ton of energy.  It was a lot of -- a lot

7    of really fun people running around doing a lot of fun

8    things.  It just seemed really, really inspiring, and it felt

9    like there weren't so many restrictive rules.  It was very

10   family oriented, and it just felt like skies were the limit.

11   The possibilities could have been endless there.

12   Q.   When you arrived at MGA -- well, let me place this in

13   time.  Remind us when you got there, to MGA.

14   A.   Around April of 2000.

15   Q.   So in April of 2000, when you got to MGA, had MGA

16   developed any dolls that it had brought to the market?

17   A.   Yes.

18   Q.   If you remember, can you name some of the dolls that MGA

19   had developed through the process and already brought to the

20   market?

21   A.   They had manufactured Singing Bouncy Baby, which I

22   believe received a toy of the year award, Bathtime Bouncing

23   Baby, Casey Cheerleader, Giddy-Up Girl.  Those are a few that

24   I remember.

25   Q.   Do you recall a doll named My Dream Baby?

1    A.  Yes.

2    Q.  Was that a doll that MGA had developed as of the time

3    you arrived?

4    A.  When I arrived at MGA, My Dream Baby was in full

5    development at that time.

6    Q.  Do you recall a doll named Hopscotch Heather?

7    A.  Yes.

8    Q.  Was that a doll that was already on the market as of the

9    time you arrived at MGA in April of 2000?

10   A.  Yes.

11       MS. AGUIAR:  Your Honor, I'd like permission to

12   hand the witness one of the tangible exhibits.  It's Trial

13   Exhibit 18457.  And I'll show it to counsel.

14       THE COURT:  Please.  Any objection?

15       MR. PRICE:  No objection.

16       THE COURT:  Very well.

17   Q.  BY MS. AGUIAR:  Ms. Garcia, can you identify for me what

18   Exhibit 18457 is?

19   A.  This is a production sample of Singing Bouncy Baby.

20   Q.  And can you identify for me anywhere on the box where it

21   indicates the date that that was produced?

22   A.  Would that be the TM circle C?

23   Q.  I'm sorry.  I didn't hear you.

24   A.  Would that be the TM circle C date on the back of the

25   package?

1   Q.  I believe so, yes.

2   A.  This one says 2001.

3        MS. AGUIAR:  Your Honor, I want to offer into

4   evidence the tangible Exhibit 18457.

5        THE COURT:  Any objection?

6        MR. PRICE:  Yes, your Honor.  It's beyond the scope

7   of the, quote, direct.

8        THE COURT:  Why don't you lay a foundation,

9   Counsel.  The Court doesn't understand where it's going.

10   Q.  BY MS. AGUIAR:  Was this one of the dolls that MGA had

11   already developed by the time that you had arrived there in

12   April 2000?

13   A.  Yes.

14   Q.  And did you have an understanding that MGA was a company

15   that had developed at least three or four dolls through the

16   development phase to the market as of April of 2000?

17   A.  Yes.

18   Q.  And was Singing Bouncy Baby one of them?

19   A.  Yes.

20   Q.  Did this doll receive any awards that you are aware of?

21        MR. PRICE:  Objection.  That's irrelevant and also

22   based on hearsay.

23        THE COURT:  Overruled, Counsel.  This is going to

24   rebuttal.  Overruled.  It's admitted.

25        MS. AGUIAR:  18457 is in evidence?

1        THE COURT:  It's admitted.

2        (Exhibit 18457 received.)

3        THE COURT:  She may answer the last question.

4        THE WITNESS:  On the front of the packages, the

5    sticker on the front of the package represents the award,

6    Family Fun Toy Winner.

7    Q.  And does that say what year that was awarded, or do you

8    remember what year it was awarded?

9    A.  No, I'm sorry.

10   Q.  Did MGA have any dolls in the development process at the

11   time that you arrived in April of 2000?

12   A.  Yes.

13   Q.  Do you recall which ones those were?

14   A.  Well, My Dream Baby was definitely in development.  To

15   make it clear, when I arrived at MGA, we were about to begin

16   a new season of new developed toys.

17   Q.  And what were some of those toys, if you recall, that

18   were in development at the time?

19   A.  Prayer Angels.  I believe around the early part of my

20   tenure, Scooter Samantha, Hoppity Bouncy Baby.  There was a

21   project we worked on called Jumping Jenny.

22   Q.  Do you recall a doll by the name of Toddler Tabitha?

23   A.  Yes.

24   Q.  Was that a doll that was in development at MGA in the

25   2000 time period?

1    A.  I believe so.

2    Q.  When you joined MGA, would it be accurate to describe

3    the company as one that was not capable of developing a doll

4    and bringing it to market in your view?

5    A.  No.

6    Q.  When you joined MGA, what did you understand your

7    various roles to be in your position?

8    A.  My role at MGA was pretty fun, and it was pretty

9    involving.  Being that I was a product manager, I would

10   identify a product, an opportunity for a product, and I

11   would, you know, the general responsibility of product

12   management was to then pass off your concept or your vision

13   to designers, at the time, free-lancers outside of MGA.  And

14   we would work with designers to sketch concepts that could

15   help kind of complete your vision or your hope to create a

16   product.

17          It would not only get it sketched, but then we

18   would move on to get it physically designed, revisions, make

19   sure it's approved.  We would actually then get those

20   physical pieces and then pass it off to the Hong Kong team,

21   where we would also be responsible for waiting for the

22   submissions from the Hong Kong team of countersourced pieces

23   that would later become -- be a manufactured good that would

24   match the preliminary decision.  But we'd also be involved in

25   packaging, making sure the package was all appropriate to the

1    product and matching kind of the first vision and as much as

2    being involved in commercials and commercial development for

3    the products as well.  It was -- it was kind of a whole lot.

4    Q.  How did you go from just doing planning at Mattel to

5    doing these numerous other functions at MGA?

6    A.  You know, I think that the understanding, first, of kind

7    of how to develop a product was clear for me.  And I

8    understood how to get to design quick.  First, it was about

9    instinct and making sure that you went for your first vision

10   and your first instinct and you made that happen quickly with

11   good resources and good free-lancers who could help bring

12   that to fruition and to a good 3-D form.

13   Q.  In your view, you talked before about a market that you

14   thought about for girls' toys that was untapped.  In your

15   view is it important to identify the potential market for a

16   doll before the product is actually developed?

17   A.  Absolutely.

18   Q.  Can you describe why it is so important to take it in

19   that order and identify the market and then develop a

20   product?

21   A.  Yeah.  In everything that we do, it's really, really

22   important that you identify your consumer, not only

23   necessarily by age group, but maybe even just consumer type,

24   such as -- can I give an example of Prayer Angels?

25   Q.  Sure.

1   A.  There's a very particular purpose for why we created

2   Prayer Angels, and it's a very particular consumer.  And so

3   it's very important to understand who your consumer is so

4   that you can design the right product.  In that particular

5   case, you know, the doll, you know, prayed.  So we need to

6   make sure that the prayer was appropriate and the design was

7   appropriate so that the consumer was more likely to purchase

8   a product, found it to be all encompassing and perfect.

9          So it's really important to establish who your

10  consumer is first so that everything you do reaches them and

11  they approve it for every reason and it all makes sense to

12  them.

13  Q.  So as it relates to the market you thought was untopped

14  in girls' toys, can you be a little bit more specific about

15  this market you referenced earlier?

16  A.  Yeah.  So as a seven to ten year old, that's who I

17  identified to be the market.  You know, I was once a little

18  girl.  So I kind of used a lot of my own growing up and my

19  own experience to help me kind of identify who this consumer

20  was.  And for me, this is just for me, but I remember being

21  seven to ten, and I remember it being kind of an awkward

22  stage.  Your body is changing.  You're not exactly a little

23  girl.  Your body is kind of morphing a little bit, if that's

24  appropriate to say.

25          Your interests change quite a bit.  I think you

1    start to kind of identify who you are as a consumer or as a

2    little girl.  You start to try and figure out who you are.

3    You know, four- to six-year-old consumers are, when they

4    approach toys, they play.  They get into them and they play,

5    and it's most important that you provide a great experience

6    for them that they can exchange and play with.

7        As a consumer who is seven to ten, maybe they are

8    not -- when they buy toys, it's my perception that they may

9    not be wanting to play and get dirty with it, but certainly

10   when you're seven to ten, you might be interested in things

11   that represent an attitude, a style.  It's all about a tone

12   and a mood, I believe, for that consumer.

13   Q.  So was there anything, when you're talking about this

14   idea that you had and what this market would want to go out

15   and buy, was there anything particular in your background

16   that led you to develop this idea?

17   A.  I grew up in a Greek family.  Both my mother and father

18   are Greek, and our culture was very, very much a part of our

19   lives.  So here I was a Greek girl living in the U.S. and

20   being an American and being kind of Greek at the same time.

21        And you know, I felt that I was very proud of being

22   Greek.  I was also very proud about being American.  So you

23   know, I remember just growing up with Barbie, respecting her

24   very much but not really connecting with her because I

25   personally didn't really, you know, I wasn't blonde hair and

1    blue-eyed.  And I didn't relate to her as much.  And so I

2    felt that maybe other consumers, especially now later, where

3    I think the multi-ethnic mixes, I mean --

4    Q.   You've got to speak up a little bit.  I was missing what

5    you said.  So I assume some other people did, too.

6    A.   I'm just saying that even later today and even now today

7    I believe that it's very, very real that ethnicities are

8    mixing even more, and you see that in schools.  And so I

9    realize even more today that maybe there are more girls who

10   understand what I sort of felt back then.

11           Making sure that girls have a doll that they can

12   relate to, that they can sort of connect with.  And so that,

13   I just want to be clear, is not only in, you know, attitude

14   and fashion and being savvy and looking cool and being

15   something to aspire to, but it's also to represent their

16   reality, what's really happening.  It's about being diverse

17   and being different.

18   Q.   So beyond what you just said, did you have any core

19   concepts or core ideas that you thought needed to be worked

20   into the new doll idea that you had?

21   A.   Yes.  I thought it was, you know, on a very preliminary

22   level, I knew that it couldn't be about one single character,

23   but that it had to be, you know, a few of them.  And that

24   those characters had to be, you know, they had to look

25   different, and they had to look diverse.

1    Q.  Can I stop you?  On the four characters, why four?  Why

2    not just one?

3         MR. PRICE:  Objection as to the time frame.  What

4    time frame this new idea is.

5         MS. AGUIAR:  Sure, absolutely.

6         THE COURT:  Sustained.

7    Q.  BY MS. AGUIAR:  When did you start thinking about the

8    idea that you've been testifying about?

9    A.  It would have been, you know, right when I approached

10   MGA.  I really -- once I arrived at MGA, I really put some

11   deep thought to building who my consumer is and trying to

12   understand a little more.  So it would have been, you know,

13   April of 2000.

14   Q.  And in this time frame, what was it about the four

15   characters?  Why not just do one single doll?

16   A.  Well, to be clear, back then it wasn't necessary that it

17   had to be four.  It just had to be more than one.  Because I

18   think that it's, you know -- it was really, really important

19   to be able to recognize so many different, you know,

20   diversities.  I wanted to be sure that there was an Asian

21   character, a very much African-American character, and

22   potentially a Hispanic character or just at least skin tones

23   so that you had darker skins, maybe a little girl who is

24   Indian.

25        I remember a research group where a little Indian

1    girl actually reached out to a darker skinned character and

2    made a relationship between that doll and herself.  Well, she

3    looks like me.  So I'm not sure that it necessarily had to be

4    four.  If just needed to be more than one and make sure that

5    the varieties have enough to make sure that the most number

6    of little girls were able to at least connect to one.

7    Q.   So this idea that you were developing in your head, did

8    you at one point express this to someone at MGA?  And that

9    can be someone you're working with or someone who is an MGA

10   employee.

11   A.   I expressed my interest in creating a kind of street,

12   urban, sassy fashion line to Veronica Marlow.

13   Q.   And I think the jury has heard her name a few times, but

14   just so we can keep reminding ourselves, can you tell us who

15   she was and what your connection was to her?

16   A.   Veronica Marlow was a free-lance vendor that I worked

17   with a lot.  She was really great because I felt like she and

18   I very much connected with one another.  I think she kind of

19   knew what I was looking for in terms of design.  She had

20   worked on --

21   Q.   You need to slow down.

22   A.   I'm sorry.  I obviously get pretty excited when I --

23   okay.

24   Q.   I was asking you about Veronica Marlow.

25   A.   I remember Veronica most specifically as it related to

1       Prayer Angels.  Prayer Angels was it's all -- it was

2       pretty -- it was a difficult design challenge, I have to say.

3       And she was really very, very capable of meeting exactly what

4       I wanted and what my vision was and what my position was on

5       the design.  So she was a designer that helped me in that

6       case, or at least up to this point, help me with development

7       of fashions and some product concepts.

8       Q.  What's your best recollection of when you had that first

9       conversation with Veronica Marlow where you two discussed

10      your idea for wanting to do a new doll?

11      A.  I remember it to be August 15th.

12      Q.  Just kind of curious, because it was a long time ago.

13      So why do you remember or why do you think you remember that

14      was the time that you had the conversation with her?

15      A.  August 15th is in my religion, my Orthodox religion,

16      August 15th is a date for the Virgin Mary.  And so that date

17      stuck to me.  I don't know why that -- I remember it being

18      that day.  And I remember that conversation specifically with

19      Veronica.  I connected those two.

20      Q.  Do you remember where you were or the context of the

21      conversation at all?

22      A.  I remember it to be in the lobby of the MGA offices.

23      Q.  And just tell us as much as you recall about the

24      conversation itself.

25      A.  I remember that we were -- I'm not sure.  I believe that

1    we were leaving MGA to go to a photo shoot for Hoppity Bouncy

2    Baby.  And I had asked Veronica to accompany me at the photo

3    shoot because I needed her help to make sure the doll looks

4    awesome in the photos.  And on our way out, I remember

5    talking to her and saying gosh, these large dolls are great.

6    I love the baby dolls, but I just -- I very much want to

7    create a very, very cool, edgy, urban doll line.  And I

8    remember her kind of stopping and looking and saying, "You

9    know what?  You need to meet a guy named Carter Bryant."

10   Q.  And what do you recall her saying about Carter Bryant

11   and why she thought you should meet him?

12   A.  You know, she didn't -- she didn't say very much after

13   that.  She just said that he has a potential concept that

14   might fit kind of what I was looking for, what I was

15   interested in.

16   Q.  When Veronica mentioned to you I have this friend Carter

17   Bryant, and he has a concept, did you say to her, oh, yeah,

18   that rings a bell as someone I already know from Mattel or

19   from somewhere else?

20   A.  No.  I had not known Carter Bryant at that time.

21   Q.  Did you tell her during that conversation that you

22   already knew somebody by the name of Carter Bryant?

23   A.  No.

24   Q.  Did you ever ask Veronica, during that meeting or at any

25   other time, to hook you up with a Mattel doll designer?

1   A.  No.

2   Q.  Let's extend it beyond Veronica.  Did you ever ask

3   anybody, hey, can you hook me up with a Mattel doll designer.

4   I'm looking for an idea?

5   A.  No.

6   Q.  Let's move forward in time.  When is the first time you

7   remember meeting Carter Bryant?

8   A.  I remember meeting Carter Bryant for the first time on

9   September 1st of 2000.

10   Q.  There's been some testimony, and you were questioned

11   yesterday and today about a possible meeting prior to

12   September 1st that you may have attended with Mr. Bryant.

13        Do you recall that area of testimony?

14   A.  Yes.

15   Q.  And is it correct that you do not recall that earlier

16   meeting?

17   A.  That's correct.

18   Q.  Can you describe to the jury -- can you tell them why

19   you feel so sure that the first time you met him and the

20   first time you recall the pitch drawings is September 1st?

21   Can you explain that?

22   A.  To me, I remember the meeting that I met Carter Bryant

23   for the first time very vividly.  Should I explain?

24   Q.  Sure.  Well, and where was the meeting, the September

25   1st meeting?

1    A.   The September 1st meeting took place in Isaac Larian's

2    office at the MGA offices.

3    Q.   Was Victoria O'Connor, was she someone also at the

4    meeting?

5    A.   Yes.

6    Q.   And can you tell us why you feel sure that the first

7    time you saw the drawings was at the September 1st meeting?

8    A.   I remember very, very clearly that I stood -- it's kind

9    of complicated to say, but Isaac had two entries to his

10   office.  One was from the -- from all of the cubicles or the

11   open area direct into his office.  And there was another door

12   that led into his office from his administrative assistant's

13   office that sat side by side.

14        So you entered to Isaac's office from his

15   assistant's office or from the outside.  Anyway, I remember

16   standing outside of the door.  The door was closed.  And I

17   was standing at the door with Victoria, the door that was

18   inside the administrative assistant's office.  And I remember

19   Victoria, you know, stopping me at the door, and she was --

20   probably because she knows who I am.  She stopped me and said

21   no matter what, you know, something to this effect.  I don't

22   remember the exact words, but Paula, whatever you see today,

23   whether you love it or you hate it, but especially if you

24   love it, you've got to remain poker-faced.  You've got to

25   play cool.  Just got to play chill.  And I remember kind of

1    laughing to myself.  Just I realized how well she knew me,

2    and I said okay, you've got it.

3    Q.  Do you have an understanding as to why she felt poker

4    face was the way to go at this first meeting, like why you

5    shouldn't visibly show you were excited?

6    A.  I'm not sure.  Maybe that was her way of, you know, if

7    later -- I don't know.  It's only my -- my assumption that

8    maybe if later on MGA decided that we're going to pursue this

9    concept, that Carter wouldn't know how much I loved it, so

10   they could negotiate.  I'm not sure.

11   Q.  Before we get to the pitch book, which I'm going to do

12   in a minute, there was some testimony yesterday about a woman

13   named Jennifer Maurus.  Who was she?

14   A.  I remember Jennifer Maurus to be a salesperson at MGA.

15   Q.  Was she involved in the decision to -- was she involved

16   in the initial pitch meeting?

17   A.  No.

18   Q.  Was she involved in the decision whether or not to

19   explore the Bratz concept?

20   A.  No.

21   Q.  If someone -- if someone said that they saw you and

22   Carter Bryant and the pitch book drawings in the early summer

23   of 2000, would that be right?

24   A.  No.

25   Q.  Hopefully, I'll be speaking loud enough here.

1         Mr. Price, on his chart that he drew for you

2    yesterday, he made a time line running from June over to

3    October of 2000.  Do you recall that?

4    A.  Yes.

5    Q.  And he put on the time line pretty much in the middle of

6    June.  So somewhere between -- he placed on here the name

7    between June and July.  So if Jennifer Maurus said that she

8    saw you and Carter Bryant and the pitch drawings in the

9    middle of June of 2000, would that be correct?

10   A.  That cannot be correct.

11   Q.  Tell us why you think that is not right?

12   A.  For a couple of reasons.  First, I would -- there would

13   have been no way for Jennifer to have seen the pitch

14   drawings, Carter's pitch drawings in June because I hadn't

15   even seen them until September.  But I also know -- I also

16   believe that the first time Jennifer would have seen those

17   drawings would have been in an internal sales meeting that we

18   held after September, and I believe it was sometime around

19   mid-October.

20   Q.  So let's move to the pitch book that you saw on

21   September 1st at the meeting in Isaac's office.

22        I believe this is in evidence, Trial Exhibit 302.

23        Actually, your Honor, we have the original.  So I'm

24   going to find out if it's marked as a different exhibit

25   number, and I'll provide it to the witness.

1        THE COURT:  Very well.

2        MR. PRICE:  My objection is this doesn't appear to

3    be everything that's in the --

4        MS. AGUIAR:  Why don't we sort it out amongst

5    ourselves this evening.  I'm happy to go with the exhibit

6    that's in evidence right now, and we can deal with the

7    originals later.

8        MR. PRICE:  I have no objection once they find the

9    originals to put those in.

10        THE COURT:  Very well.

11    Q.   BY MS. AGUIAR:  What I'm going to ask Aaron to do is

12    just flip through the pages of Exhibit 302 and ask you to

13    tell me whether it's the drawings that you remember seeing at

14    that meeting.  And there's text also.

15        Are these the drawings that you remember seeing at

16    the September 1st meeting?

17    A.   Yes.

18    Q.   Just to be clear, you think you may have testified

19    previously that with regard to the first page, you're not

20    sure if the word Bratz was there; is that right?

21    A.   That's right.

22    Q.   Okay.  So I just want to get that out there, but do you

23    recall seeing the four-character image on the first page?

24    A.   Yes.

25    Q.   Okay.  When you first saw Mr. Bryant's drawings, what

1    was your reaction?

2    A.  I loved them.  I felt they were amazing.  I was so

3    excited when I saw the drawings.

4    Q.  Tell me why.  Why did you like them?

5    A.  Because in my mind and up until now, you know, I was --

6    in my mind, I knew that I needed to find a concept that was

7    going to appeal to these girls seven to ten, and I knew that

8    they had to be hot.  I knew that they had to have attitude.

9    I knew that they had to be, you know, really stylized.  I

10   wanted them to be, you know, urban.  I needed them to be, you

11   know, unrefined.  I needed them to be teenagers.  I wanted

12   them to create reality, and more importantly, not more

13   importantly, but equally as important was to show diversity,

14   to show, you know, different characters.  All looking very

15   different, all with, you know, their own individuality.

16   Q.  Let's take the other side of it, though.  When you first

17   saw these drawings or when you were initially considering

18   them, was there anything about them that you had any

19   reservations about?

20   A.  Yes.

21   Q.  And if you want to go to different pages, when you

22   answer this question, just let us know which page you're

23   looking at, and we'll flip to that one.

24   A.  Page -- how do I refer to it?

25   Q.  If you look in what should be the bottom right-hand

1    corner, it should have Exhibit 203 and then a dot and then a

2    number.  Or a dash.

3    A.  So dash 006.

4    Q.  So this is -- what's depicted on this page?

5    A.  This is a character that he referred to as Lupe.  And

6    you know, I absolutely loved this drawing.  Through these

7    portfolio sketches, if I might say also, what I really

8    realized in these drawings was that most importantly first

9    and foremost is I believed that I had found --

10        MR. PRICE:  I'm sorry to object.  I think this is

11   way beyond the scope of the question.

12        MS. AGUIAR:  I'll accept that, and I'll direct a

13   specific question.

14        THE COURT:  Sustained.  Both counsel, just state

15   your legal objection.  Rephrase the question.

16   Q.  BY MS. AGUIAR:  What reservations did you have about the

17   drawing on this page?

18        MR. PRICE:  Objection.  Reservations are irrelevant

19   to this phase, Phase 1-A of the trial.

20        THE COURT:  Overruled.  You may answer the

21   question.

22        THE WITNESS:  I loved this page because it

23   represented something really specific.  But I felt that there

24   were a few things about this that may have just gone a little

25   too far.  I wanted to be able to represent multi-ethnic or

1    ethnic, but you know, things like the term Lupe.  What I

2    believed he was representing was a Hispanic character here.

3    And the reference to Lupe, Lupe to me felt kind of like a

4    stereotyped Hispanic name.  And also like the extreme arched

5    eyebrow on Lupe.  I remember and I still realize that in some

6    kids, and maybe predominantly Hispanic girls, there's this

7    trend to shave their eyebrows and redraw them with a pencil

8    and the kind of really, really extreme arch in the eyebrow.

9          Personally, when I saw this drawing, I felt like

10    maybe he was kind of trying to hint to that.  And also I made

11    reference before to va-va-voom.  And it just felt that if you

12    look at the overall body, that maybe she was just a little

13    too voluptuous, maybe a little too sexy for the extreme

14    fullness and the exchange between the hips and the waist and

15    the upper thighs.  I wanted to create a cool attitude, kind

16    of a unique kind of stylized doll, but I also wanted to be

17    appropriate.  I didn't want to go too far.  I didn't want to

18    be inappropriate.

19          So I felt they were just components that may have

20    gone a little too far.

21    Q.  BY MS. AGUIAR:  Are there any other pages in the exhibit

22    that you have in front of you that exemplifies any

23    hesitations that you had with moving ahead with the concept

24    as expressed in his drawings?

25    A.  Yeah.

1        MR. PRICE:  Your Honor, continuing objection for

2    relevance.

3        THE COURT:  Counsel, I'll give you some leeway.

4    Let's move along.

5    Q.  BY MS. AGUIAR:  From your perspective as a branding

6    person, when you were thinking about whether to move ahead

7    with this concept, did you think that the concept that was

8    expressed in the drawings could be directly transferred into

9    your idea for a doll?

10       MR. PRICE:  Objection.

11       THE COURT:  Sidebar, please.

12       (SIDEBAR CONFERENCE HELD.)

13       THE COURT:  I'm going to need something here.

14    Where are you going with this?

15       MS. AGUIAR:  I think it relates to their process of

16    deciding whether to move ahead with this, and then as they

17    were moving ahead with it, it relates to what Mr. Bryant did

18    on this and what MGA in the early stages did.  And we've had

19    a lot of testimony.

20       THE COURT:  That seems to get squarely into the

21    apportionment issue, which the Court has repeatedly ruled is

22    a 1-B issue.

23       MS. AGUIAR:  I just feel like we've had a lot of

24    testimony, though, your Honor, about -- even this morning

25    when he was questioning this witness, about which comments

1      Carter gave on the sculpt, and he questioned her extensively

2      as well, isn't it true that Mr. Bryant was assisting you and

3      he was giving comments.

4            THE COURT:  But that goes to his duty of loyalty

5      and the various breaches alleged.  I'm going to sustain the

6      objection.  I'm giving you more leeway than I should on this

7      issue.

8            MS. AGUIAR:  I appreciate that.  Thank you.

9            (CONCLUSION OF SIDEBAR CONFERENCE.)

10     Q.  BY MS. AGUIAR:  Did Mr. Bryant bring anything with him

11     to the September 1st pitch meeting other than his drawings?

12     A.  Yes.

13     Q.  What do you remember him bringing with him?

14     A.  I remember him bringing a mock-up of -- I don't want to

15     call it a doll.  There was a piece where he had glued

16     different parts of what I think are different doll bodies to

17     pull together something.  I believe the unit was meant to

18     kind of make a relationship between that piece and his

19     portfolio drawings.

20     Q.  I'm sorry.  I just want to make sure, the first word you

21     were using to describe it was a mock-up?

22     A.  Yeah.

23     Q.  So we can go with that for now.  What was your reaction

24     to the mock-up he brought to the meeting?

25     A.  I didn't understand it.  I didn't particularly think it

1    was impressive.  I didn't think it was something maybe he

2    should have shown.

3    Q.  I'm sorry.  You said shouldn't have shown it?

4    A.  Yeah.

5    Q.  Why?

6    A.  It was -- it was just not attractive to me.  I didn't

7    think it did a great job of representing the portfolio

8    drawings.

9    Q.  Did you think that the mock-up doll looked like the

10   drawings?

11   A.  No.

12   Q.  Did you -- do you remember seeing that mock-up at any

13   time after the September 1st meeting?

14   A.  No, I don't remember.

15   Q.  What did you understand Mr. Bryant's area of expertise

16   to be when you met him and you saw the drawings?  And I'm

17   sorry.  Let me clarify.  Was he a sculptor?  Was he an

18   engineer?  What was his primary area of expertise?

19   A.  I understood his strengths were in fashion designing.

20   Q.  There was a good bit of questioning, I think both

21   yesterday and this morning, about your testimony that as of

22   this time -- and when I say this time, I mean as of September

23   1st, 2000 -- you were not aware that Mr. Bryant worked at

24   Mattel.  Do you remember that area of your testimony?

25   A.  That's right.

1    Q.  And that you did not know that for quite some time

2    after.

3         Do you remember that?

4    A.  Yes.

5    Q.  Why do you think that you did not know that?  Why are

6    you so sure that you didn't know that until later?

7    A.  As we mentioned, I had been working on a concept called

8    Prayer Angels.  And Veronica was doing a great job at helping

9    me kind of define the position, kind of my vision and the

10   body and the fashion and I felt like I had a pretty good

11   handle of what I wanted the face, the sculpt to look like.

12   But I was having a very difficult time identifying the eye

13   designs.  I've been taught, and I believe very much that the

14   soul to a doll, they say, is through a doll's eyes.  And

15   because in particular this one was a Prayer Angels doll, it

16   was really important to make sure that I got a very specific

17   kind of eye, the angelic, sweet eye.

18        I tried to get that look that I was looking for to

19   no avail.  And I was frustrated.  And Veronica knew of my

20   frustration because she had been working pretty intimately

21   with me on the Prayer Angel concept.  So she had recommended

22   hey, why don't you give Carter Bryant a try on it.  And I

23   didn't have any other options at that moment.  Well, I had

24   options, but I said yeah, sure.  Let's give him a shot.

25        And with that, actually Carter Bryant took a shot.

1   He had sketched some varieties of different angelic cherub

2   eyes, and he had submitted them to me.  I know that Carter

3   Bryant -- well, I believed -- let me even back up further.

4          I would not have given Carter Bryant an assignment

5   to work on an MGA confidential doll, because it hadn't been

6   released to the market.  I would not have given Carter Bryant

7   the task to know anything about or to design anything for an

8   MGA doll that had not been released to the market.  It would

9   be insane for me to give up information to a competitive doll

10   designer about what I was doing with MGA by tasking him with

11   the responsibility of designing faces.

12   Q.  So what was the time frame when you -- when he sent you

13   some -- I'm sorry.  You said some drawings of eyes for Prayer

14   Angels.  What time frame was this?

15   A.  I don't remember exactly.  It was before the September

16   1st meeting.

17   Q.  And what did you understand his employment status to be

18   at that time that he drew the eyes for you?

19   A.  I assumed that he was a free-lancer.

20   Q.  Do you recall at any point, after he drew the eyes for

21   you, anyone ever directly telling that you he was not a

22   free-lancer and that he was employed by Mattel?

23   A.  No.

24   Q.  I just want to fast forward for a moment while we're on

25   the subject of the original drawings and Mr. Bryant.

1        At any later point in time, did you ever have a

2   conversation with Carter when he talked with you about his

3   inspiration for his drawings?

4   A.   Yes.

5   Q.   When was this conversation?

6   A.   I don't remember.

7   Q.   Okay.  Let me ask you, then, do you recall -- what do

8   you recall about it?  Do you remember where you were when it

9   happened?

10   A.   Yeah, I remembered being on Third Street Promenade in

11   Santa Monica.

12   Q.   Why do you remember that's where you were?

13   A.   We were walking through the promenade.  We were doing

14   some shopping to get inspired with some of the stores that

15   were on the promenade.  And I remember walking past a

16   billboard within the center of that promenade, and I remember

17   us stopping at it and Carter making a point about it.  It was

18   a Steve Madden ad.  It was a really, you know, hot campaign.

19   A few of those posters or those designs, I should say, had

20   been released, a number of them.  This happened to be one

21   that was posted inside, you know, a billboard on the

22   promenade.  And he had mentioned --

23        MR. PRICE:  Your Honor, I object.  That's hearsay,

24   anything that Bryant said.

25        THE COURT:  Sustained.

1    Q.  BY MS. AGUIAR:  Did you have any other understanding of

2    Mr. Bryant's inspiration for his drawings other than the

3    Steve Madden campaign?

4         MR. PRICE:  Well, object and move to strike since

5    there's no evidence of that.

6         THE COURT:  Lay a foundation, Counsel.

7    Q.  BY MS. AGUIAR:  Did you at some point have an

8    understanding for what one of his inspirations was for his

9    drawings?

10   A.  The only other time I remember was -- and very vaguely I

11   remember during a pitch meeting --

12        MR. PRICE:  I'm going to object.

13        THE COURT:  That's not responsive.  It was a yes or

14   no question.

15        MS. AGUIAR:  Let me just ask a better question.

16   Q.  At some point during your interaction with him on the

17   Third Street Promenade, did you gain an understanding of what

18   his -- what one of his inspirations was for the drawings?

19        MR. PRICE:  I object to her understanding as

20   irrelevant.  And hearsay can't be offered for the truth.

21        THE COURT:  It's a yes or no question.

22        THE WITNESS:  Yes.

23   Q.  BY MS. AGUIAR:  And what was your understanding --

24        THE COURT:  No, Counsel.  Foundation.  What was the

25   basis for the understanding?

1    Q.  BY MS. AGUIAR:  What was the basis of your understanding

2    for one of the bases for the drawings?

3    A.  It was the poster.

4         THE COURT:  No, no.  Was it a conversation that you

5    had with him?  Did he send you a letter?  How did you know

6    this?

7         THE WITNESS:  It was a conversation that we had.

8    Q.  BY MS. AGUIAR:  And what was your understanding as to

9    one of the -- based on this conversation, what was your

10   understanding for one of his inspirations for the drawings?

11        MR. PRICE:  Objection.  Hearsay.

12        THE COURT:  Sustained.

13   Q.  BY MS. AGUIAR:  Do you recall anything else regarding

14   Mr. Bryant's inspirations for the drawings other than what he

15   told you during this trip to the promenade?

16   A.  Yes.

17   Q.  And what is your understanding based on?

18   A.  It was based on what he -- what he mentioned in the

19   September 1st meeting.

20   Q.  Did you ever -- did Mr. Bryant ever mention to you that

21   he was inspired to do his drawings by Toon Teens?

22   A.  No.

23   Q.  Did Mr. Bryant ever mention to you that he was inspired

24   to do his drawings by any artwork for Diva Starz doll?

25        MR. PRICE:  I object.  That's irrelevant, and we're

1    getting into hearsay again.

2          THE COURT:  Hearsay, Counsel.

3          MS. AGUIAR:  On the irrelevance, can I have a

4    clarification --

5          THE COURT:  Hearsay.  I'm inviting a response on

6    hearsay.  Your response to the hearsay objection?

7          MS. AGUIAR:  I'll withdraw the question.

8          THE COURT:  Very well.  I agree with you that it's

9    relevant.  I'm just saying there's a hearsay problem.

10   Q.  BY MS. AGUIAR:  Let's move back.  You have the September

11   1st meeting.  After that September 1st meeting, what do you

12   remember happening next in relation to this idea of exploring

13   the Bratz project?

14   A.  I went through -- I personally went through a few steps

15   and exploration to prove out, you know, some of the content

16   or tone or mood in Carter's portfolio drawings.

17   Q.  Just in broad strokes, what were the things that you

18   recall doing in this early phase, and roughly we're talking

19   about the time period up through the October 20th.  So late

20   October 2000.

21   A.  You know, actually it was discussed a little bit earlier

22   today.  First was an exploratory sculpt, which I asked

23   Margaret Leahy to create.  Again, as mentioned, some of the

24   drawings felt a little too sexy for me.  A little too, you

25   know, curvy.  I use the term va-va-voom, and there was too

1    much of that.

2          So one of the explorations was to prove out his

3    sketches into a 3D form with Margaret.

4    Q.  So there was the sculpt.  What were the other primary

5    things that you considered in the early stage?

6    A.  I was interested in just getting a general understanding

7    for how much it would cost to manufacture a fashion doll like

8    what would have potentially have been Bratz.  So I had

9    compiled an e-mail asking my Hong Kong offices to give me a

10   general idea of how much they thought a doll like this would

11   cost.

12   Q.  And I think we saw that e-mail earlier today.  We'll

13   come back and touch on each of these issues.

14         So we've got the sculpt, the questions to Hong Kong

15   about costing.  Anything else in this early stage that you

16   remember?

17   A.  I also discussed earlier was my questions to Carter

18   about what he thought his preference in hair material type

19   was for a potential fashion doll.

20   Q.  And we've heard by now this name that probably none of

21   us heard before in this trial, this type of doll hair called

22   Saran, S-A-R-A-N; is that right?

23   A.  That's right.

24   Q.  Prior to Mr. Bryant mentioning Saran hair to you, were

25   you familiar with what it was?

1     A.  Yes.

2     Q.  Had MGA used Saran hair on any of its dolls, or were you

3     familiar with it in another way?

4     A.  To answer the question, the dolls that I was a part of

5     personally, MGA had not used that hair material type.  But

6     there are very few hair manufacturers in China.  So it would

7     not be difficult to not know.

8     Q.  Did you have an understanding that the Saran hair

9     manufacturer was an exclusive manufacturer of hair for

10    Mattel?

11    A.  No.

12    Q.  Could you obtain the contacts information about the

13    Saran hair manufacturer from some public source or some

14    public way?

15    A.  Yes.

16    Q.  Who made the ultimate decision to go with Saran hair?

17    A.  It was my decision to go with Saran hair.

18    Q.  And did you make that final decision to use the hair for

19    the Bratz dolls before October 20th or after October 20th?

20    A.  After October 20th.

21    Q.  And was any hair actually -- was any of it actually

22    rooted or stuck into a doll head prior to October 20th?

23    A.  No.

24    Q.  Do you remember that there was an image in Mr. Bryant's

25    pitch book that showed characters with like the back of their

1    heads popping off, their hair?

2    A.   Yes.

3    Q.   Did you personally -- did you want to pursue the idea of

4    removable hair when you saw the drawings?

5    A.   No.  When seeing the drawings and seeing the feature of

6    this removable hair, I personally thought it was a little

7    strange.  I thought it -- I'll also say that the removable or

8    snap-on hair thing wasn't necessarily unique at all, you

9    know, that Carter might have brought to MGA that day.  But

10   I'll also say that I wasn't sure.  I was a little skeptical.

11   I was willing to try it out.  But I wasn't sure that I liked

12   it or I would like it.

13   Q.   Why did you -- why were you skeptical about it?

14   A.   I was worried about -- I understood the play pattern,

15   and I understood that it could be fun for girls to exchange

16   different hair colors and different hairstyles quickly that

17   way.  But if it meant that it would compromise kind of the

18   attitude and the style and the sassy and urban and all of

19   those things that I thought were really important to this

20   seven- to ten-year-old consumer, then I wasn't willing to

21   risk it.  This play pattern could jeopardize the look and the

22   collectibility and design.  It could also be young.  It could

23   be too young for the consumer.

24   Q.   Too young?  I just wanted to make sure I heard you.

25   A.   That it may, as a play pattern, have been too young and

1    therefore inappropriate to the seven- to ten-year-old

2    consumer.

3    Q.  I also just wanted to ask you about some lingo you were

4    using.  You said the play pattern.  Have you -- I mean, I

5    think we all understand the words play pattern, but as it

6    relates to what you do in designing a doll, could you explain

7    what that means?

8    A.  Absolutely.  A play pattern from a branding perspective

9    is very important.  The play pattern is in fact how you play

10    with the doll, how you expect and you hope the consumer is

11    going to play with the doll.

12    Q.  So you mentioned a couple of things this you were doing

13    early on.  Another one of them was that you, I believe, you

14    were asking Hong Kong for some information regarding costing;

15    is that correct?

16    A.  That's correct.

17    Q.  Beyond the requests regarding costing, was MGA's

18    Hong Kong facility involved in any other way in this early

19    period up until October 20th?

20    A.  No.

21    Q.  Was any manufacturing done on a Bratz doll in the period

22    up to October 20th, 2000?

23    A.  No.

24    Q.  Let's turn to the sculpt.  You mentioned that as another

25    one of the things that you did.  And there's -- you've given

1    a lot of testimony about the sculpt.  One of the points of

2    contention earlier was whether you had asked for the sculpt

3    or whether Mr. Bryant called Ms. Leahy first or whether you

4    did.

5        Can you explain to me why you believe that the

6    sculpt was done at your request?

7    A.  Yes.  As mentioned a few times today.  In seeing

8    Carter's portfolio drawings and loving so much about it, the

9    one area I was very concerned about was the shape of that

10   body and making sure that it was appropriate, that I hadn't,

11   you know, kind of pushed the attitude or the appropriateness

12   too far.

13       So I am sure that the exercise was to make sure

14   that when you translate, you know, it's very different too

15   look at something in a 2D image and understand what that

16   translates once it's in 3D.  So it was very important for me

17   to make sure that I made sure that I saw that translation

18   happen between 2D and 3D.

19   Q.  So is it possible, when you all were reaching out to

20   Ms. Leahy, that Carter Bryant was the one who physically

21   picked up the phone and called her first to make contact with

22   her?

23   A.  I'm sorry.  Could you repeat?

24   Q.  I understand you're saying that it was done generally at

25   your request.  Is it possible that he was the first one to

1    make contact with her by phone?

2    A.  It's possible.

3    Q.  Was Carter Bryant a sculptor at the time?  Did you

4    understand him to be a sculptor?

5    A.  No.

6    Q.  And to your knowledge had he ever sculpted a fashion

7    doll?

8    A.  No.

9    Q.  And why did you decide to use Margaret to do this

10   sculpt?

11   A.  Carter actually had recommended that we give, you know,

12   that if I was interested in proving this sculpt out against

13   his drawings, that we should consider Margaret.

14   Q.  Did you agree with the suggestion?

15   A.  Sure.

16   Q.  Were you aware generally of Margaret Leahy prior to

17   hearing her name from Carter?

18   A.  I didn't necessarily recognize that name.

19   Q.  Okay.  When you retained Margaret to do this sculpt, was

20   she an employee of Mattel?

21   A.  No.

22   Q.  Did you know when she had worked at Mattel?

23   A.  No.

24   Q.  Let's focus on the very -- if you can go back in time,

25   and I realize it was a long time ago, and you've testified

1    that there were numerous iterations, numerous versions of the

2    sculpt, but if you can do your best to remember the first one

3    that you saw.  Do you have a memory of that?

4    A.  Yes, very much.

5    Q.  When you saw this first exploratory sculpt, was it the

6    whole shebang?  Was it the head and the body, or was it just

7    a body?

8    A.  It was the head and the body.

9    Q.  What was your reaction when you saw this first sculpt?

10    A.  My reaction was that of concern.  I was concerned at how

11    sexy, how voluptuous the doll had translated in 3D.

12    Q.  Can you be specific about the concerns that you had

13    about how the drawing was being, as you are saying,

14    translated into a three-dimensional object?

15        MR. PRICE:  I want to object.  It's not relevant to

16    this phase.

17        THE COURT:  Sustained.  Let's move along, Counsel.

18    Q.  BY MS. AGUIAR:  Do you recall Mr. Bryant's reaction to

19    the early sculpt?

20    A.  You know, not vividly, no.

21    Q.  When you saw the sculpt for the first time, did you make

22    comments regarding the sculpt?

23    A.  Yes.

24    Q.  When you saw this first sculpt as of that time, had MGA

25    made the decision to move ahead with the process of producing

1     a doll?

2     A.  No.

3          MR. PRICE:  Objection.  That's not relevant to this

4     phase, your Honor.

5          THE COURT:  Sustained.  The answer is stricken.

6     Q.  BY MS. AGUIAR:  During any of the reviews of the

7     sculpts, did you refer back to Mr. Bryant's initial drawings?

8     A.  It's possible that his portfolio drawing may have been

9     present.  I don't remember.

10    Q.  If you had referred back to it, why would you have been

11    looking at the drawing in the process of reviewing the

12    sculpt?

13    A.  Because the process, because the exercise was to

14    compare -- because the exercise was to create a 3D version of

15    those 2D drawings, it was very likely that those drawings

16    were there to then compare its 3D version with those

17    relationships.

18    Q.  Do you recall at some point in this early stage seeing

19    that you're referring to as a casting of the exploratory

20    sculpts?

21    A.  Yes.

22    Q.  I believe the evidence earlier -- and I won't go back to

23    it in the interests of time -- but that it was, I believe you

24    testified in mid-October; is that correct?

25    A.  Yes.

Unsigned                                                 Page  800

1    Q.  And what I'm going to do is I also think it was

2    Exhibit 1136, which is a photograph of the cast that you

3    identified.  But I'd also like to show you the tangible item.

4         Your Honor, I'll show this to counsel, and then if

5    I could bring it up to the witness.

6         THE COURT:  Very well.

7    Q.  BY MS. AGUIAR:  Do you recognize Exhibit 1136-A?

8    A.  Yes.

9    Q.  And what is it?

10   A.  It is a casting of that exploratory sculpt.

11   Q.  How do you know that to be the case?

12   A.  Just in the natural shape of the body.

13   Q.  And is this the cast that you recall being produced in

14   mid-October of 2000?

15   A.  That's right.

16        MS. AGUIAR:  Your Honor, I want to move into

17   evidence 1136-A.

18        MR. PRICE:  No objection.

19        THE COURT:  It's admitted.

20        (Exhibit 1136-A received.)

21   Q.  BY MS. AGUIAR:  What was your reaction to this cast when

22   you -- when did you first see the sculpt that has been marked

23   as 1136-A?

24   A.  Do you mean the sculpt of the --

25   Q.  I'm sorry.  I used the wrong terminology.  When did you

1    first see the cast that was marked as 1136-A?

2    A.  I only remember it to be about mid-October.

3    Q.  What was your reaction to it when you saw it?

4       MR. PRICE:  Objection.  Irrelevant at this phase.

5       THE COURT:  Sustained.

6    Q.  BY MS. AGUIAR:  Do you recall multiple people commenting

7    on this mid-October version of the cast?

8    A.  Other than myself?

9    Q.  Yes.  Do you remember multiple people giving comments on

10    the changes that needed to be made to this mid-October 2000

11    cast?

12    A.  Yes.

13       MS. AGUIAR:  Your Honor, would it be okay if I put

14    1136-A back in the book and passed it to the jury?

15       THE COURT:  Sure.

16    Q.  BY MS. AGUIAR:  When you were working --

17       THE COURT:  Let's wait for the jury, Counsel.

18       MS. AGUIAR:  Oh, sure.  I'm sorry.

19    (Pause.)

20       THE COURT:  You may proceed, Counsel.

21       MS. AGUIAR:  Thank you.

22    Q.  Did Carter Bryant make this casting that's 1136-A?

23    A.  No.

24    Q.  Is this a cast that reflects only the work of Carter

25    Bryant?

1   A.  No.

2   Q.  Is it a cast that reflects only comments by Carter

3   Bryant on the exploratory sculpt?

4   A.  No.

5   Q.  When you were working with Margaret Leahy on the

6   exploratory sculpt and when you started to actually work on

7   Bratz, during that time, did you ever tell her that she

8   shouldn't talk to anyone about this project?

9   A.  No.

10   Q.  Did you ever tell Margaret Leahy not to tell people that

11   Carter Bryant was involved in the project?

12   A.  No.

13   Q.  Before we move on this sculpt, do you know a person

14   named Mercedeh Ward?

15        And my apologies, on the last series of questions,

16   if I used the word sculpt and not cast, would your answers be

17   the same to my questions?  I may have used the word sculpt

18   rather than cast.

19   A.  Yes.

20   Q.  So you know Mercedeh Ward?

21   A.  Yes.

22   Q.  Was she hired at MGA in the time period we're talking

23   about, October of 2000?

24   A.  Yes.

25   Q.  And for what reason was she hired?  In other words, what

1    was her role meant to be?

2    A.  I understood that her role was to act as more of -- I

3    believe she was an engineer, and she was to act from an

4    engineering and development standpoint for all MGA toys.

5    Q.  Did Mercedeh also work on the exploratory sculpts and

6    the ultimate Bratz sculpt?

7    A.  The ultimate sculpt we went to manufacture with?

8    Q.  Yes.

9    A.  Yes.

10    Q.  Did the casting that we've all just seen, 1136-A, did

11    that casting reflect any input or comments by Mercedeh Ward?

12    A.  No.

13    Q.  We looked at a drawing that Mr. Price showed you, and

14    I'd like Aaron to put it back up on the screen.  This is

15    Trial Exhibit 323, page 32, and it's in evidence.  And

16    there's been testimony about this already.  And I won't go

17    over it again.

18          Do you have an understanding of what the term

19    control drawing means to you?

20    A.  Yes.

21    Q.  Tell me what your understanding is of the term control

22    drawing.

23    A.  My understanding of a control drawing, and my experience

24    with control drawings are generally created by an engineer,

25    and a control drawing to me is pretty synonymous with an

1    engineering drawing.  You know, it doesn't mean an engineer

2    has to create it.  It just means a control drawing is to

3    control or be specific about, I guess, it would be a 3D

4    object.  It's usually, you know, my experience is that it's

5    usual to have dimensions assigned to them.  There's just --

6    yeah.

7    Q.  Have you seen -- under your definition of control

8    drawing, have you seen control drawings in the course of your

9    work at MGA?

10   A.  Yes.

11   Q.  And had you seen control drawings in the course of your

12   work at Mattel?

13   A.  Yes.

14   Q.  And did any of the control drawings that you saw, either

15   at Mattel or MGA, look like this?  And when I say look like

16   this, I don't mean was it of this doll, but I mean of this

17   level of detail?

18   A.  No.  I remember it to have a lot more detail and notion.

19   Q.  And just so we're clear, when you say you remember them

20   to have more detail, were you referring to the control

21   drawings that you saw?

22   A.  Yes.

23   Q.  I believe you testified that this drawing was done by

24   Mr. Bryant; correct?

25   A.  That's right.

1    Q.  And I think you said it was done after the sculpting

2    process had started; is that right?

3    A.  Yes.

4    Q.  By reference to this exhibit, will you tell me why it is

5    that you believe it was done after Margaret had already

6    started to do the sculpt?

7    A.  I believe that the way that I remember is that this

8    drawing was created by Carter after his review of what I term

9    the first generation sculpt by Margaret Leahy.

10   Q.  Is there anything about the drawing itself, the body,

11   the way it looks, the proportions that leads you to say that?

12   A.  No.  The specific area I go to first is the hip and

13   upper thigh area, and this drawing, the upper thighs and hip

14   area have been reduced, refined.  They have been more modest.

15   Q.  They have been more?

16   A.  They have become more --

17   Q.  More modest.  I'm sorry.

18        When you say reduced or more modest, reduced from

19   what?

20   A.  Reduced from the exploratory sculpt.

21   Q.  Did you ever use this drawing in any way in the

22   development of Bratz?

23        MR. PRICE:  Objection.  Not in this phase.

24   A.  Sustained.

25   Q.  BY MS. AGUIAR:  You've mentioned Prayer Angels.  Briefly

1    would you tell us what Prayer Angels was?

2    A.   Prayer Angels was a -- what I term a feature doll.  It

3    was a soft body doll.  Obviously with a roto-cast head.

4         The play pattern of Prayer Angels was the consumer

5    was -- we hoped the consumer would actually bend the knees of

6    this angel baby into a kneel position and put her hands into

7    a prayer position, and when you squeezed the hands together,

8    she would recite sentences from a prayer.  Like there were

9    different themes of the dolls.  One was help me, bless me,

10   thank you, that kind of thing.

11   Q.   I was going to try to help you out a little bit just

12   with -- giving you the tangible item.

13        Your Honor, I have Trial Exhibit 17403.  I'll show

14   it to counsel, and if I can bring it to the witness.

15        Can you identify what this is?

16   A.   It is a thank you version of Prayer Angels.

17   Q.   Is this a version of the doll that was offered on the

18   market by MGA?

19   A.   Yes.

20        MS. AGUIAR:  Your Honor, I want to move into

21   evidence Trial Exhibit 17403.

22        MR. PRICE:  No objection.

23        THE COURT:  It's admitted.

24        (Exhibit 17403 received.)

25   Q.   BY MS. AGUIAR:  How long was the Prayer Angels

1    collection on the market?

2    A.  I can't remember exactly.  Possibly two years.

3    Q.  And can you -- you were explaining to us before the

4    general concept of the doll.  Now that you have it in front

5    of you, can you just show us what -- you mentioned a play

6    pattern.  Can you show us?

7    A.  Actually, the doll is already bent in sort of her

8    kneeling position, and her hands are already put in sort of

9    the prayer position.  Should I activate it?

10   Q.  Sure.

11   A.  Okay.

12   Q.  I assume the court reporter wasn't getting that, but

13   that's okay.

14        I just want to place Prayer Angels in time.  When

15   was the doll in development at MGA?

16   A.  I started designing as soon as I arrived at MGA, which

17   would have been as early as April of 2000.  Mid-April of

18   2000.

19   Q.  And yesterday we went through the whole deal with the

20   Cabbage Patch head and whatnot.  And I won't repeat any of

21   that.  But can you explain where you were in development of

22   this doll as of June of 2000?  Let me just take it in pieces.

23   Can you describe where you were in development of the doll as

24   of that time, June of 2000?

25   A.  I believe -- and I'm not sure -- I believe I had written

1   the prayers, the language of the prayers.  We had worked -- I

2   worked with Veronica to arrive at this body, the sewing

3   pattern of the body as well as the little fashions.  The

4   little T-shirt and the little diapers.

5   Q.  Did you already have -- had you already developed the

6   head part of the doll as of June?

7   A.  I don't believe we had started sculpting on the head.

8   But I can't be sure.

9   Q.  And can you explain to the jury why it is that somebody

10  went out and bought a Cabbage Patch head in June of 2000 as

11  it related to Prayer Angels?  What was the purpose of doing

12  that?

13  A.  You know, it was looking at this doll sort of headless

14  for a period of time.  And because I didn't have a head, the

15  Prayer Angel head sculpted by this time and done, I really

16  wanted to kind of pull it all together.  So the only option

17  that I felt I had was to go to the open market and find a

18  head that I could, you know, put on this body that was about

19  the same size or kind of represented the correct scale.

20  Q.  Was your intention to use the Cabbage Patch head down

21  the line as the head for the Prayer Angels doll?

22  A.  No way.

23  Q.  Did you have an intention to buy the Cabbage Patch head

24  so that you could copy it for purposes of using Prayer

25  Angels?

1    A.  No.

2    Q.  So it was serving what purpose at that time for you?

3    A.  It was just a place holder, if you will, for us at that

4    time.

5    Q.  Do you recall the testimony yesterday about a woman

6    named Anna Rhee?

7    A.  Yes.

8    Q.  What is Anna Rhee's area of expertise?

9    A.  Anna is an incredible face painter.

10   Q.  Was she a Mattel employee -- well, let me back up.

11   Again, I don't want to repeat it, but you hired Anna Rhee to

12   do face painting on Prayer Angels; is that right?

13   A.  That's right.

14   Q.  Was she a Mattel employee at the time you retained her?

15   A.  No.

16   Q.  Were you aware of when she had worked at Mattel?

17   A.  No.

18   Q.  When did Anna first do work for you on Prayer Angels?

19   A.  She had worked on -- the first work that Anna did as it

20   related to Prayer Angels was around the middle of June where

21   she adjusted the Cabbage Patch face that I bought from the

22   open market.

23   Q.  I'd like to put up on the screen a document that was

24   admitted into evidence yesterday, Trial Exhibit 201.  I

25   believe it's dash 1.

1          And, your Honor, I believe that yesterday Mr. Price

2     had offered the whole document.  At the time I said maybe

3     let's just do the page that's relevant.  We can do the whole

4     document now.

5          THE COURT:  Any objection?

6          MR. PRICE:  I would object because many of them are

7     way outside the time frame that are relevant.

8          MS. AGUIAR:  I thought we --

9          THE COURT:  Just give me the pages, Counsel.

10         MS. AGUIAR:  Sure, sure.  May I publish the one

11    that's in evidence, 201-1?

12         THE COURT:  Right now all we have is the first one.

13    So yes.

14    Q.  BY MS. AGUIAR:  Do you -- and maybe we can zoom in a

15    little bit.  Do you recognize what has been put in evidence

16    as 201-1?

17    A.  Yes.

18    Q.  And what is it?

19    A.  It is an invoice that Anna Rhee submitted for her work

20    on the Prayer Angel baby doll.

21    Q.  And do you see the -- what is the date on this invoice?

22    A.  June 12th of 2000.

23    Q.  Tell us how -- other than the document saying angel baby

24    doll heads, how do you know that the work that Anna was doing

25    at this time in June of 2000 pertained to Prayer Angels?

1    A.   Because I was working on Prayer Angels at this time.

2    Q.   So if it was represented to you that she believes that

3    she was working not on Prayer Angels but on Bratz as of June

4    of 2000, would that be correct?

5    A.   No.

6    Q.   And just going back to Mr. Price's time line, again, in

7    this June to July of 2000 time frame, when he was talking

8    with you yesterday, he inserted a line here in the middle of

9    June, and inserted the name Rhee.  Do you remember that?

10   A.   Yes.

11   Q.   So if there was an assertion that there was work done on

12   Bratz in this mid-June 2000 time frame, would that be right?

13        MR. PRICE:  I have no objection to counsel creating

14   her own demonstratives, but I think writing on counsel's is a

15   little verboten.  May be a little late.

16        THE COURT:  Very well.

17        MS. AGUIAR:  I'm sorry.  It wasn't in evidence.  So

18   I apologize.

19   Q.   Did Anna Rhee eventually do work on the Bratz project?

20   A.   Yes.

21   Q.   And when did Anna do that?

22   A.   I believe it was sometime around December of 2000.

23   Q.   You should have it in your binder, but I'd like you to

24   look at tab 201, and if you'd look at page 13 in the bottom

25   right-hand corner.

1          Do you recognize Trial Exhibit 201-13?

2     A.  Yes.

3     Q.  And what do you recognize it to be?

4     A.  An invoice that Anna Rhee submitted for face paint work

5     on an Asian, Hispanic white and black doll face.

6     Q.  And what is the date of this invoice?

7     A.  12/7/2000.

8     Q.  Do you recall asking Anna Rhee to do face painting on

9     four doll heads in December of 2000?

10    A.  Yes.

11    Q.  And what project did that pertain to?

12    A.  Bratz.

13    Q.  And do you remember -- did you regularly receive these

14    types of invoices from Ms. Rhee in this period?

15    A.  Yes.

16         MS. AGUIAR:  Your Honor, I offer 201-13.

17         MR. PRICE:  No objection.

18         THE COURT:  It's admitted.

19         (Exhibit 201-13 received.)

20    Q.  BY MS. AGUIAR:  Is this the only work that Ms. Rhee did

21    on face painting for Bratz?

22    A.  No.

23    Q.  What is your recollection of the work that she did on

24    Bratz as it related to face painting?

25    A.  Anna pretty much was the exclusive face painter for

1    Bratz.  So she had done all of our paint masters, which we

2    actually sent to Hong Kong for manufacturing.  And any of

3    those -- anything that needed face painting prior to that.

4    Q.  So what I'd like to do is just go back to 201-1, which

5    is Ms. Rhee's invoice from June on the right-hand side there

6    that says angel baby.  Sorry.  On the left-hand side.  That

7    says angel baby doll heads.  Were you aware -- I think you

8    are because Mr. Price told you yesterday -- that Ms. Rhee

9    asserts that that work that she did in June of 2000, for

10   which she submitted an invoice, is actually Bratz and is not

11   angel -- Prayer Angels?  Do you understand that?

12   A.  Yes.

13   Q.  And what is your response to that assertion that that

14   invoice on the left that says angel baby in fact pertains to

15   Bratz?

16   A.  There is no way that that invoice can pertain to Bratz

17   when in fact I didn't even personally see the portfolio

18   drawings until September 1st of 2000.  There would have been

19   no way for Anna Rhee to have any connection requested by me

20   in June of 2000.

21   Q.  Did you ever use a code name at MGA for the Bratz

22   project?

23   A.  No.

24   Q.  Are you aware of anybody else at MGA ever using a code

25   name for the Bratz project?

1    A.  No.

2    Q.  Have you ever heard of whether it was a code or -- have

3    you ever heard of anyone using the word angel when they meant

4    to be referring to Bratz?

5    A.  No.

6    Q.  In your experience when you were working at Mattel, did

7    Mattel and its designers and project planners ever use code

8    names when they had dolls in development?

9    A.  No.

10   Q.  And how about -- and is the same true for MGA?  Have you

11   ever used code names for doll development projects?

12   A.  No.

13   Q.  If you'd look in your binder at tab 16440.  And I'm

14   going to direct your attention just to two specific pages of

15   that exhibit.  If you'd look at 16440-2 and tell me whether

16   you recognize -- what you recognize that to be.

17   A.  I recognize that to be an invoice submitted by Anna

18   Rhee.

19   Q.  And can you tell us whether it looks familiar to you?

20   Does it look familiar to you?

21   A.  Yes.

22   Q.  Do you recall what project it was for?

23   A.  For the Prayer Angel baby doll.

24   Q.  And in the upper -- in the space where the date would

25   be, this is a bad copy of the invoice.  Do you recognize this

1    to be a different copy of the same June invoice that we were

2    looking at earlier?

3    A.  Yes.

4         MS. AGUIAR:  Your Honor, I wanted to move this

5    page, and I'm going to do the next page next, but I wanted to

6    move 16440-2.

7         THE COURT:  Any objection?

8         MR. PRICE:  No.

9         THE COURT:  Admitted.  You may publish.

10        (Exhibit 16440-2 received.)

11   Q.  BY MS. AGUIAR:  And if you'd look at 16440-3, and if

12   you'd identify that for me.

13   A.  That is a purchase order form, an MGA purchase order

14   form.

15   Q.  Is this a document that MGA regularly prepares in the

16   course of its business?

17   A.  I know that it regularly prepared it back then at this

18   time.

19   Q.  And so you recognize this form of document?

20   A.  Yes.

21   Q.  And do you recognize what project this pertains to?

22   A.  Yes.  Prior Angel Baby doll.

23   Q.  Does this purchase order relate in any way, 16440-3,

24   does it relate in any way to the page before it, which is the

25   invoice?

1    A.   Yes.  I believe this is the purchase order form to the

2    invoice that precedes it.

3    Q.   And under the reference on 16440-3, where it says our

4    reference, do you see that?

5    A.   Yes.

6    Q.   What do you understand that column of the purchase order

7    to indicate?

8    A.   It identifies the name of the project.

9         MS. AGUIAR:  Your Honor, I'd offer 16440-3.

10        MR. PRICE:  Object.  Lack of foundation and

11   hearsay.

12        THE COURT:  Concerning what, Counsel?

13        MR. PRICE:  Pardon?

14        THE COURT:  Concerning what?

15        MR. PRICE:  It's being offered for the truth of the

16   matter.  So that's the basis of the objection.

17        THE COURT:  Response?

18        MS. AGUIAR:  I think it's a business record, your

19   Honor.

20        THE COURT:  Lay the foundation for that.

21        MS. AGUIAR:  Okay.

22   Q.   Do you recognize this form of document?

23   A.   Yes.

24   Q.   And have you seen it before in the course of your work

25   at MGA?

1    A.  Yes.

2    Q.  Is it a document that is prepared by one of the

3    departments at MGA?

4    A.  Yes.

5    Q.  And generated by MGA?

6    A.  Yes.

7    Q.  If you have to go back in the course of what you do and

8    check to see what vendors have been paid for what and when,

9    would this be a document that you would rely on?

10   A.  Yes.

11        MS. AGUIAR:  Your Honor, I think --

12        MR. PRICE:  No objection.

13        THE COURT:  Very well.  It's admitted.

14        (Exhibit 16440-3 received.)

15   Q.  BY MS. AGUIAR:  Does this support your recollection that

16   in the period of June 2000, that Ms. Rhee was paid for work

17   that she did face painting on, the Prayer Angels project?

18        MR. PRICE:  Leading.

19        THE COURT:  Rephrase.

20   Q.  BY MS. AGUIAR:  Does this confirm your -- any

21   understanding that you have about work that Ms. Rhee did for

22   MGA in this time period?

23   A.  Yes.

24   Q.  And what is that understanding?

25   A.  It confirms -- it further confirms that she was working

1    on the Prayer Angels baby doll at this time period.

2        MS. AGUIAR:  Your Honor, I was going to move on to

3    a slightly different subject.

4        THE COURT:  Why don't we go ahead and wrap it up

5    because we're a minute from the end of the day.

6        Ladies and gentlemen, I'll see you tomorrow morning

7    at 9:00.  Have a good evening.

8        (WHEREUPON THE JURY WITHDRAWS.)

9        THE COURT:  Please be seated.

10       Mr. Price, I understand your objections concerning

11   phasing in terms of what is ultimately used in the ultimate

12   Bratz doll and not being relevant to this phase.  Phrase the

13   objection as an objection on relevancy.  I don't want to keep

14   referencing to the jury that there would be phasing to the

15   jury.

16       MR. NOLAN:  Your Honor, I know it's late.  But

17   would your Honor hear a motion for reconsideration on an

18   objection that was sustained?

19       THE COURT:  Very well.

20       MR. NOLAN:  Your Honor, I believe the question my

21   colleague asked was at the time this sculpt was being worked

22   on, had MGA made a decision to move forward with the Bratz

23   project.  And Mr. Price objected to that.

24       THE COURT:  The question was whether or not they

25   had moved forward with the process of producing the doll was

1       the question.

2              MR. NOLAN:  Okay.  I'll go back --

3              THE COURT:  It was the producing the doll part.  At

4       this point we're not -- what the doll ultimately was produced

5       and what it ultimately looked like is simply not relevant to

6       this phase.  You had this discussion at sidebar.

7              MR. NOLAN:  I understand it, and actually I talked

8       to counsel about it.  I just want to go back and look at the

9       transcript because I do want to make a point that Mr. Price

10      pushed the envelope considerably without making any

11      objections as to raising the credibility of when certain

12      documents were being sent to Hong Kong and whether or not it

13      was credible that the project hadn't been completed, and

14      there were completed fashions and what have you.

15             They opened the door up, and I wanted to make sure

16      that we understood the basis for the question, and if we

17      tightened up the question, it may be relevant.

18             THE COURT:  Anything related to specific

19      submissions that were being made in the time period of

20      September, October 2000, that is all relevant.  But when

21      you're starting to make comparisons between what was done

22      then and what was ultimately the doll, you're getting into

23      the whole apportionment issue, which is reserved for Phase

24      1-B.

25             MR. NOLAN:  I appreciate your patience, and we'll

                              Unsigned                              Page  820

1    go back and take a look.  And that gives me much clarity.

2         THE COURT:  There were a series of questions, and I

3    tried to make a note of them because I know they come close

4    to the line.  There were a couple of them almost in a row

5    there, the way they were phrased, they were clearly

6    apportionment type issues.

7         MR. NOLAN:  I appreciate that.  We'll take a look

8    at it.  Thank you for your patience.

9         MR. QUINN:  Your Honor, could we ask for an update

10   of the running times as of close of business today?

11        THE COURT:  As of the close of business today, it's

12   seven hours and 54 minutes for plaintiff and five hours and

13   21 minutes for the defense.  You have plenty of time.

14        And keep in mind, this is for Phase 1-A and 1-B.

15   Sounds like lots of stuff in that second phase.  Maybe not.

16        All right.  Let's see you at 8:30, 8:45 time frame

17   just in case something comes up.

18        There's a designation I need to rule on for which

19   one?

20        MR. OLIVAR:  Ashong.

21        THE COURT:  Very good.  All right.  Thank you,

22   Counsel.  Good evening.

23             (Proceedings concluded at 5:04 P.M.)

24

25

1

2

3

4

5          C E R T I F I C A T E

6

7

8          I hereby certify that pursuant to Title 28,

9    Section 753 United States Code, the foregoing is a true and

10   correct transcript of the stenographically reported

11   proceedings in the above matter.

12          Certified on May 29, 2008.

13

14

                _____

15          MARK SCHWEITZER, CSR, RPR, CRR

            Official Court Reporter

16          License No. 10514

17

18

19

20

21

22

23

24

25