1                    UNITED STATES DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3                        EASTERN DIVISION

4                              - - -

5          HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                              - - -

7     MATTEL, INC.,            )
                               )
8              PLAINTIFF,   )
                               )
9          VS.            )  NO. CV 04-09049
                               )
10    MGA ENTERTAINMENT, INC., ET. AL.,  )
                               )
11             DEFENDANTS.  )  TRIAL DAY 8,
      _____)  MORNING SESSION
12    AND CONSOLIDATED ACTIONS,      )  PAGES 1391-1514
                               )
13

14

15        REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16               RIVERSIDE, CALIFORNIA

17               THURSDAY, JUNE 5, 2008

18                    8:39 A.M.

19

20

21

22

23          THERESA A. LANZA, RPR, CSR

          FEDERAL OFFICIAL COURT REPORTER

24          3470 12TH STREET, RM. 134

          RIVERSIDE, CALIFORNIA  92501

25               951-274-0844


                         Unsigned                    Page  1391

1    APPEARANCES:

2

     ON BEHALF OF MATTEL, INC.:

3

               QUINN EMANUEL

4          BY:  JOHN QUINN

               JON COREY

5              MICHAEL T. ZELLER

               HARRY OLIVAR

6              TIMOTHY ALGER

               DYLAN PROCTOR

7          865 S. FIGUEROA STREET,

               10TH FLOOR

8          LOS ANGELES, CALIFORNIA  90017

9

10

     ON BEHALF OF MGA ENTERTAINMENT:

11

               SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

12         BY:  THOMAS J. NOLAN

               JASON RUSSELL

13             RAOUL KENNEDY

               LAUREN AGUIAR

14             CARL ROTH

               300 SOUTH GRAND AVENUE

15             LOS ANGELES, CALIFORNIA  90071-3144

               213-687-5000

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2                              PAGE

3     MOTION HEARING..............................   1394

4     PLAINTIFF CASE (CONTINUED)...................   1418

5

6

7     PLAINTIFF

      WITNESS      DIRECT    CROSS    REDIRECT    RECROSS

8     LUCY ARANT

9     BY MR. ZELLER 1418         1469, 1503, 1510

      BY MR. NOLAN          1452           1508

10

11

12

        EXHIBITS      RECEIVED

13

        11937

14      (PARAGRAPHS 3,4,5)  1427

        11897         1442

15      11192         1496

        00557         1460

16      00558         1463

        00559         1465

17      00560         1466

        00561         1468

18      00562         1468

        00563         1468

19      5528          1498

        5529          1498

20      18477         1498

        18478         1498

21      18479         1498

22

23

24

25

1     RIVERSIDE, CALIFORNIA; THURSDAY, JUNE 5, 2008; 8:39 A.M.

2         -OOO-

3     THE CLERK:  CALLING CASE NUMBER CV04-09049-SGL,

4   MATTEL, INC., V. MGA, INC., ET AL.

5     MAY WE HAVE COUNSEL PLEASE STATE YOUR APPEARANCES FOR

6   THE RECORD.

7     MR. QUINN:  JOHN QUINN, BILL PRICE, MIKE ZELLER FOR

8   MATTEL.

9     MR. NOLAN:  TOM NOLAN, JASON RUSSELL, LAUREN AGUIAR

10  ON BEHALF OF MGA.

11    THE COURT:  GOOD MORNING TO YOU ALL.

12    WE'RE ON CALENDAR THIS MORNING FOR THE TRIAL.  THERE

13  WERE A FEW MATTERS FROM MONDAY THAT WE PUT OVER TO THIS

14  MORNING, AND I WANTED TO TAKE THOSE UP AT THIS TIME.

15    COUNSEL, I'LL LEAVE IT UP TO YOU AS TO HOW YOU WISH

16  TO PROCEED.

17    WHO'S READY TO GO?

18    MS. ANDERSON, NICE TO HAVE YOU BACK.  I'M SURE YOU'RE

19  THRILLED TO BE BACK.

20    MS. ANDERSON:  ALWAYS A PLEASURE.

21    THE COURT:  THIS IS THE MOTION THAT WAS BROUGHT

22  CONCERNING THE COMPUTER, THE HARD DRIVES, FOR MR. BRYANT, AND

23  WE TOOK THIS UP, BUT OBVIOUSLY, YOU HAD NOT RECEIVED ENOUGH

24  NOTICE ABOUT THE HEARING.  THIS WAS ONE OF A SERIES OF MOTIONS

25  THAT THE COURT HAD THOUGHT HAD BEEN RESOLVED BUT I FOUND OUT

1   LAST WEEK HAD NOT BEEN RESOLVED, SO I CONSIDERED THEM, I TOOK

2   THEM BACK FROM JUDGE INFANTE, AND I DECIDED THEM MYSELF.  BUT I

3   WANTED TO HEAR FROM YOU BEFORE WE WENT FURTHER ON THIS MOTION.

4        MS. ANDERSON:  THANK YOU, YOUR HONOR.  THIS IS

5   CHRISTA ANDERSON FOR NONPARTY CARTER BRYANT.

6        IF I MIGHT MAKE A BRIEF PRELIMINARY STATEMENT BEFORE

7   I BEGIN.

8        THE COURT:  PLEASE.

9        MS. ANDERSON:  WE'RE HERE, SIMPLY, YOUR HONOR, TO

10  PROVIDE INFORMATION TO THE COURT.  BECAUSE WE'RE NOT A PARTY,

11  WE DO NOT BELIEVE WE'RE PROPERLY HERE TO BE HEARD ON THIS

12  MOTION.  WE DON'T THINK IT SHOULD BE BEFORE THE COURT.  BUT I

13  WOULD LIKE TO PROVIDE THIS INFORMATION FOR THE COURT.

14       THE COURT:  PLEASE.

15       MR. MILLER:  EXCUSE ME, YOUR HONOR.

16       I'M WILLIAM MILLER, AND I REPRESENT LITTLER

17  MENDELSON.

18       WITH WHAT LITTLE I KNOW, WHAT SHE JUST SAID

19  APPARENTLY INVOLVES LITTLER MENDELSON AS WELL.

20       MS. ANDERSON:  ACTUALLY --

21       THE COURT:  NO.  I THINK THAT'S ANOTHER MOTION.

22       MR. MILLER:  SINCE I FOUND OUT ABOUT THIS AT ALMOST

23  3:00 YESTERDAY AFTERNOON, I HAVE NO CLUE, SO YOU LET ME KNOW

24  WHEN I --

25       THE COURT:  I'LL LET YOU KNOW -- YOU'LL HAVE ANOTHER

1    ONE, AND WE'LL CERTAINLY WANT TO HEAR FROM YOU BEFORE WE GO ANY

2    FURTHER ON THAT ONE.

3         THIS IS THE CARTER BRYANT MOTION WITH RESPECT TO THE

4    HARD DRIVES.

5         MS. ANDERSON:  YES.  THANK YOU, YOUR HONOR.

6         NOW, WE'RE PRESENTING THIS INFORMATION WITHOUT

7    WAIVING ANY OBJECTIONS TO JURISDICTION OR OTHER ISSUES.

8         AS THE COURT IS AWARE, MR. BRYANT HAS BEEN DISMISSED

9    WITH PREJUDICE.  THERE IS A SETTLEMENT IN THIS CASE.  THE

10   SETTLEMENT IS CONFIDENTIAL, BUT I UNDERSTAND THE COURT HAS BEEN

11   PROVIDED WITH A COPY OF IT.

12        THE COURT:  YES.  IN-CAMERA.  YOU SHOULD MAKE NO

13   REFERENCE TO THE SUBJECT MATTER.

14        MS. ANDERSON:  I WILL NOT.

15        BUT THAT SETTLEMENT ABSOLUTELY BARS PROCEEDING ON

16   THIS MOTION.

17        ASIDE FROM THE FACT THAT THE MOTION CONCERNS A

18   REQUEST FOR PRODUCTION UNDER RULE 34, WHICH IS A REQUEST THAT

19   CAN ONLY BE MADE TO A PARTY AND REQUESTS SANCTIONS UNDER A RULE

20   THAT ONLY PERMITS SANCTIONS TO A PARTY UNLESS THERE'S CERTAIN

21   CIRCUMSTANCES PRESENT, WHICH ARE NOT HERE.

22        SO, YOUR HONOR, I AM HAPPY TO ENTERTAIN ARGUMENT IN

23   WHATEVER FORM YOU THINK IS APPROPRIATE, GIVEN THE CONFIDENTIAL

24   NATURE OF THIS SETTLEMENT; BUT IT IS CRITICALLY IMPORTANT TO MY

25   CLIENT THAT THE RIGHTS THAT HE OBTAINED THROUGH SETTLEMENT WITH

1    MATTEL BE ACKNOWLEDGED AND RESPECTED.  WE HAD REQUESTED THAT

2    MATTEL'S COUNSEL PROVIDE YOU WITH THIS INFORMATION, AND

3    APPARENTLY, THEY DID NOT.  AND THAT'S WHY WE'RE HERE TODAY.

4         AGAIN, I DON'T KNOW WHAT THE COURT WOULD LIKE TO DO

5    IN TERMS OF THE APPROPRIATE PROCEDURE TO BE FOLLOWED IN THIS

6    REGARD.

7         THE COURT:  I MAY NEED TO TAKE COUNSEL FOR MATTEL AND

8    YOU IN CHAMBERS AND DO SOMETHING UNDER SEAL, BECAUSE I THINK WE

9    PROBABLY NEED -- I'M LOOKING AT THE SETTLEMENT AGREEMENT NOW.

10   I THINK WE MAY NEED TO DISCUSS THE TERMS OF THE SETTLEMENT

11   AGREEMENT, AND I THINK IT WOULD BE APPROPRIATE TO DO SO IN

12   CHAMBERS.

13        IS THERE ANYTHING FURTHER, BESIDES THE SETTLEMENT

14   AGREEMENT, OR FROM YOUR PERSPECTIVE, THIS ENDS THE DISCUSSION

15   AT THIS POINT?

16        MS. ANDERSON:  BETWEEN THE FACT THAT HE'S NOT A PARTY

17   AND CAN'T BE SUBJECT TO RULE 34 AND RULE 37 RELIEF REQUESTS,

18   AND THE SETTLEMENT COMBINED, THERE'S NO MOTION THAT CAN BE HAD

19   HERE; NO RELIEF AVAILABLE; IT'S BEEN WAIVED.

20        THE COURT:  PERHAPS WE CAN ADDRESS THIS WITHOUT EVEN

21   GETTING TO THE SETTLEMENT AGREEMENT ITSELF.

22        LET ME HEAR FROM SOMEONE FROM MATTEL.

23        MR. ZELLER, ARE YOU SPEAKING ON THIS?

24        MR. ZELLER:  MR. COREY WILL ADDRESS IT.

25        THE COURT:  THIS IS MORE OF A PROCEDURAL ISSUE.  I'M

1    NOT SAYING THAT AT THE END OF THE DAY, THERE MAY NOT BE SOME

2    OTHER PROCEDURE IN WHICH TO OBTAIN THE INFORMATION YOU HAVE.

3    BUT BASICALLY, THE POSTURE OF THE PARTIES HAS CHANGED

4    DRAMATICALLY SINCE THE INITIAL DISCOVERY WAS SERVED AND THE

5    INITIAL MOTION WAS BROUGHT, ARGUABLY, FROM CARTER BRYANT'S

6    PERSPECTIVE, RENDERING THIS MOOT.

7        MR. COREY:  AND I UNDERSTAND THE ARGUMENT AND I

8    UNDERSTAND THAT THE POSTURE HAS CHANGED, YOUR HONOR.  BUT THAT

9    REALLY DOESN'T MATTER, BECAUSE WHAT WE'RE TALKING ABOUT HERE IS

10   NOT A RULE 34 REQUEST.  WHAT WE'RE TALKING ABOUT HERE IS

11   COMPLIANCE WITH A PREVIOUSLY-EXISTING COURT ORDER; SO IT'S NOT

12   A REQUEST.

13       THE QUESTION HERE IS, THESE HARD DRIVES HAVE BEEN

14   COMPELLED.  THERE'S AN ORDER THAT'S IN PLACE BY THE DISCOVERY

15   MASTER; THAT WAS NOT APPEALED, EFFECTIVELY BECOMING AN ORDER OF

16   THIS COURT.  AND THE FACT THAT THE PARTY DID NOT COMPLY AND HAS

17   NOW BEEN DISMISSED DOESN'T EXCUSE THEIR FAILURE TO COMPLY WITH

18   THE ORDER.

19       THEY ARE IN THE POSSESSION OF INFORMATION THAT

20   JUDGE INFANTE HAS FOUND TO BE RELEVANT, AND WE BELIEVE WE

21   SHOULD HAVE IT FOR PURPOSES OF THIS PHASE OF THE TRIAL.

22       THE COURT:  FROM THEIR PERSPECTIVE -- I MEAN, IT'S

23   SET FORTH IN THEIR OPPOSITION; I UNDERSTAND YOU DISAGREE WITH

24   THIS -- THEY DID COMPLY WITH THE ORDER.

25       MR. COREY:  AND I UNDERSTAND THAT THEY HAVE AN

1    ARGUMENT IN THAT REGARD, AND WE HAVE A RESPONSE TO THAT.

2        THE COURT:  AND YOU DO.  AND WITHOUT GETTING TO THE

3    SUBSTANCE, JUST PROCEDURALLY -- I MEAN, ONCE YOU STIPULATED TO

4    DISMISS THIS PARTY -- IT'S HARD TO IMAGINE HOW YOU CAN CONTINUE

5    TO LITIGATE WHAT IS ESSENTIALLY A DISCOVERY DISPUTE.

6        MR. COREY:  I THINK WHAT WE NEED TO COME BACK TO IS,

7    DOES THEIR DISMISSAL ABSOLVE THEM OF THEIR RESPONSIBILITY TO

8    COMPLY WITH THE COURT'S ORDERS?  AND I HAVEN'T FOUND ANY

9    AUTHORITY THAT SUGGESTS THAT IS, IN FACT, THE LAW.

10       THE COURT:  BUT THINK ABOUT THIS.  PLAY THIS OUT.

11       I MEAN, ONCE ANY PARTY IS DISMISSED, WOULD YOU

12   SUGGEST THAT THEY HAVE CONTINUING DISCOVERY OBLIGATIONS UNDER

13   OTHER ORDERS THAT HAVE BEEN ISSUED?  IS MATTEL CONTINUING TO

14   SERVE DISCOVERY, AS IT PRODUCES DISCOVERY TO MGA, TO CARTER

15   BRYANT AT THIS POINT?

16       ISN'T IT UNDERSTOOD THAT WHEN YOU REACH A SETTLEMENT

17   AND A DISPOSITION AND A PARTY IS DISMISSED, THAT THOSE

18   DISCOVERY OBLIGATIONS -- AND I HAVEN'T RESEARCHED THIS, SO THIS

19   IS NEW TO THE COURT IN TERMS OF -- YOU'RE GETTING LOTS OF NOTES

20   AND LOTS OF SUGGESTIONS FROM YOUR LEARNED COLLEAGUES, SO I'LL

21   BE INTERESTED TO HEAR WHAT YOU HAVE TO SAY.

22       MR. COREY:  I'M THE PUPPET TODAY.  THEY'RE PULLING

23   THE STRINGS.

24       THE COURT:  YOU'RE ANYTHING BUT A PUPPET, MR. COREY.

25       MR. COREY:  I UNDERSTAND.

1      THE COURT:  YOU'RE NOT CONTINUING TO PROVIDE

2   DISCOVERY TO CARTER BRYANT, ARE YOU?

3      MR. COREY:  NO, I'M NOT.

4      THE COURT:  WHY NOT?

5      MR. COREY:  THEY HAVEN'T REQUESTED IT, AND AS FAR AS

6   I'M AWARE, WE HAVE COMPLIED WITH ALL THE COURT ORDERS THAT

7   MATTEL HAS BEEN SUBJECT TO, THAT MR. BRYANT HAS OBTAINED.

8      THE COURT:  WELL, IT'S NOT JUST ABOUT COURT ORDERS.

9   I MEAN, IT'S ABOUT THE WHOLE PROCESS OF DISCOVERY.

10     ALL THE COURT ORDER DID WAS CLARIFY THE DISCOVERY

11  PARAMETERS; CORRECT?

12     MR. COREY:  THE COURT ORDER COMPELLED A CERTAIN

13  ACTION THAT THEY HAD TO UNDERTAKE, AND IT COMPELLED AN ACTION

14  LONG BEFORE THEY WERE DISMISSED.

15     MATTEL SHOULD NOT BE PREJUDICED BY THEIR FAILURE TO

16  COMPLY WITH A COURT ORDER FOR MONTHS.

17     THE COURT:  LET'S SAY YOU HAD SETTLED WITH MGA AS

18  WELL.  I UNDERSTAND THAT YOU HAVEN'T, BUT LET'S HYPOTHETICALLY

19  SAY YOU HAD AND THERE WAS NO TRIAL GOING ON RIGHT NOW.

20     WOULD CARTER BRYANT BE OBLIGATED TO PRODUCE THE HARD

21  DRIVE THAT YOU CLAIM THEY HAVEN'T PRODUCED?

22     MR. COREY:  NO.  IN THAT CIRCUMSTANCE, THEY WOULD

23  NOT.

24     THE COURT:  HOW IS THIS ANY DIFFERENT?

25     MR. COREY:  WELL, NOW WE DO HAVE A TRIAL GOING ON,

1   AND THAT INFORMATION IS RELEVANT TO THE TRIAL, AND WE WOULD

2   LIKE INFORMATION FROM THAT TO PRESENT TO THE JURY.

3       THE COURT:  WOULD THEY NOT HAVE TO PROVIDE IT BY

4   VIRTUE OF THE FACT THAT YOU NO LONGER NEEDED IT OR BY VIRTUE OF

5   THE FACT THAT THE CASE AGAINST THEM HAD BEEN DISMISSED, IN MY

6   HYPOTHETICAL?

7       MR. COREY:  IN YOUR HYPOTHETICAL, THERE'S NO TRIAL

8   CONTINUING TO GO ON.

9       THE COURT:  SO WOULD THAT BE THE REASON?  WOULD IT BE

10  THE FACT THAT YOU NO LONGER NEEDED THE INFORMATION, OR WOULD IT

11  BE BY VIRTUE OF THE FACT THAT THE CASE HAD BEEN DISMISSED?

12      MR. COREY:  IT WOULD BE BY VIRTUE OF THE FACT THAT

13  THE CASE HAD BEEN DISMISSED AND ANY OF THE ORDERS WOULD BE

14  MOOT.  BUT WE DON'T HAVE THAT SITUATION HERE.

15      IF THE WAY THE COURT WOULD LIKE --

16      THE COURT:  WE DO HAVE THAT SITUATION HERE.

17  CARTER BRYANT HAS BEEN DISMISSED.  THERE IS NO CASE AGAINST

18  CARTER BRYANT ANYMORE.  YOU'VE GOT THIS RELATED BUT, FROM

19  CARTER BRYANT'S PERSPECTIVE, IRRELEVANT CASE AGAINST MGA.

20      MR. COREY:  IT'S NOT IRRELEVANT, YOUR HONOR.

21      THE COURT:  WELL, FROM CARTER BRYANT'S PERSPECTIVE --

22  CARTER BRYANT, AT THIS POINT, PROBABLY -- I MEAN, CERTAINLY, HE

23  CARES BECAUSE HE HAS TO SHOW UP AS A WITNESS IN THIS CASE, BUT

24  BEYOND THAT, AS FAR AS HE'S CONCERNED, THE CASE IS OVER; RIGHT?

25      MR. COREY:  I ACTUALLY CAN'T RESPOND TO THAT HERE,

1    YOUR HONOR.

2         THE COURT:  YOU CAN'T?

3         MR. COREY:  I CANNOT.  BUT I WOULD LIKE THE

4    OPPORTUNITY TO ADDRESS THAT.

5         THE COURT:  PLEASE.

6         MR. COREY:  BUT I CANNOT IN THIS CONTEXT.

7         DOES THE COURT UNDERSTAND?

8         I CANNOT ANSWER THAT IN OPEN COURT.

9         THE COURT:  FAIR ENOUGH.

10        SO IT LOOKS LIKE WE'RE GOING TO HAVE TO HAVE A

11   HEARING UNDER SEAL.

12        MR. COREY:  IF THE COURT WOULD LIKE US TO PROCEED

13   WITH AN EX-PARTE APPLICATION, TO SERVE THEM AS A THIRD PARTY TO

14   OBTAIN THIS INFORMATION...  I'M VERY RELUCTANT TO DO THAT.

15        THE COURT:  I'M NOT ASKING YOU TO DO ANYTHING.  I'M

16   ONLY GOING TO RESOLVE THE MOTION BEFORE ME.  I'M NOT GOING TO

17   RESOLVE EX-PARTES THAT HAVEN'T BEEN FILED YET.  I DON'T NEED TO

18   ADVISE YOU IN TERMS OF WHAT OTHER RECOURSES YOU MIGHT HAVE TO

19   OBTAIN THE SAME INFORMATION.  THAT'S A SEPARATE ISSUE.

20        MR. COREY:  I UNDERSTAND.

21        THE COURT:  I HAVE A PARTICULAR MOTION BEFORE ME THAT

22   I WANT TO RESOLVE, THAT SHOULD HAVE BEEN RESOLVED A FEW WEEKS

23   AGO, BUT IT WASN'T.

24        BE THAT AS IT MAY, I WANT THIS MOTION RESOLVED.

25        WHAT OTHER RECOURSES YOU MIGHT TAKE TO GET THE

1    INFORMATION, THAT'S NOT BEFORE THE COURT RIGHT NOW.

2       MR. COREY:  I WOULD PREFER NOT TO DO THAT.  I DON'T

3    THINK THAT'S THE APPROPRIATE COURSE.  I DO THINK THAT THE COURT

4    CAN RESOLVE THE MOTION, AND I THINK IT SHOULD BE BY THEM

5    COMPLYING WITH THE ORDER.

6       THE COURT:  LET ME ASK YOU THIS; AND I'LL ASK BOTH

7    COUNSEL THIS:  I CERTAINLY UNDERSTAND THE ARGUMENT.  PER

8    CHANCE, IS THERE ANY AUTHORITY WHICH MIGHT ADDRESS A SITUATION

9    LIKE THIS?

10      MS. ANDERSON:  FUNNY YOU SHOULD ASK, YOUR HONOR.

11   I DO HAVE A CASE, AND I DID NOT INCLUDE IT IN MY LETTER BRIEF

12   BECAUSE BY POINTING YOUR HONOR TO THIS AUTHORITY, BY ANALOGY, I

13   DIDN'T WANT OTHER FOLKS TO ARGUE THAT I HAD INADVERTENTLY

14   REVEALED THE NATURE OF OUR SETTLEMENT.

15      THE COURT:  JUST HELP THE COURT OUT AND GIVE ME THE

16   CITE, COUNSEL.

17      MS. ANDERSON:  I HAVE A CASE FOR YOU, TOO.

18      THE COURT:  IF YOU WOULD.

19      MS. ANDERSON:  THE CASE CITE IS 649 F.2D 646, AND

20   IT'S ENTITLED DART INDUSTRIES; AND IT'S A NINTH CIRCUIT CASE.

21      THE COURT:  IF YOU WOULD PROVIDE THAT TO THE COURT,

22   AS AN OFFICER OF THE COURT AND NOT IN ANY OTHER FUNCTION, I

23   WOULD APPRECIATE THAT, COUNSEL.

24      AND, OF COURSE, COUNSEL, IF YOU WOULD GIVE A COPY TO

25   COUNSEL AS WELL.

1        AND I INVITE MATTEL TO DO THE SAME THING.

2        MS. ANDERSON:  YES.

3        THE COURT:  I'M NOT ASKING FOR BRIEFING AT THIS

4    POINT, BUT IF THERE IS ANY AUTHORITY THAT...

5        MS. ANDERSON:  THE DISCUSSION STARTS ON PAGE 490.

6        THE COURT:  WHY DON'T WE DO THIS:  I DON'T WANT TO

7    TAKE TOO MUCH MORE TIME HERE, BECAUSE I DO WANT TO START THE

8    TRIAL AT 9:00.  BUT, COUNSEL, I WOULD ASK YOU, PERHAPS DURING

9    THE BREAK, IF WE COULD HAVE OUR SESSION IN CHAMBERS AND

10   CONTINUE THIS.  WE'LL BE BREAKING IN ABOUT AN HOUR AND

11   15 MINUTES OR 20 MINUTES, AROUND 10:20 OR SO.  IF I COULD ASK

12   YOU TO STAY AROUND UNTIL THEN.  AND THEN WE'LL GO FROM THE

13   COURT INTO CHAMBERS AND CONTINUE THIS CONVERSATION.

14       AND IN THE MEANTIME, I SUGGEST, MR. COREY, IF YOU

15   COULD LOOK AT THIS CASE, AND IF THERE'S ANYTHING ELSE THAT YOU

16   WANT TO PRESENT TO THE COURT, JUST BY WAY OF AUTHORITY, AND

17   THEN WE CAN RESOLVE THIS.

18       MR. COREY:  OF COURSE, YOUR HONOR.

19       MS. ANDERSON:  THANK YOU, YOUR HONOR.

20       THE COURT:  LET'S TAKE UP THE LITTLER MENDELSON

21   MATTER.

22       MR. MILLER:  WILLIAM MILLER, FOR LITTLER MENDELSON.

23       THE COURT:  THERE IS A MOTION TO COMPEL A DEPOSITION,

24   ESSENTIALLY, OF YOUR FIRM, OF THE PERSON MOST KNOWLEDGEABLE.

25       ARE YOU FAMILIAR WITH THAT MOTION?

1       MR. MILLER:  NO.

2       THE COURT:  HAVE YOU HAD A CHANCE TO REVIEW THAT?

3       MR. MILLER:  I'VE BEEN GIVEN A TRANSCRIPT OF THE

4   PROCEEDING ON MONDAY, IN WHICH A REPRESENTATION WAS MADE THAT

5   LITTLER MENDELSON WAS REPRESENTED, WHICH IT WAS NOT.

6       WITH RESPECT TO THAT MOTION, WHAT LITTLER THINKS IT

7   WAS BASED ON WAS A DECEMBER MOTION THAT WAS MADE, APPARENTLY,

8   TO BE HEARD BY JUDGE INFANTE.

9       THE COURT:  YES.

10      MR. MILLER:  AND THEY GAVE ME THAT.  BUT THAT DOESN'T

11  SEEM TO BE THE MOTION THAT'S BEFORE THE COURT, BECAUSE, READING

12  IT, IT SEEMS, ON ITS FACE, THAT THE ISSUE WAS WHAT THE STATE OF

13  THE COMPUTER INFORMATION WAS AT A PARTICULAR DATE, WHEN, IN

14  EFFECT, A SNAPSHOT WAS TAKEN OF THAT.  BUT ALL OF THE QUESTIONS

15  ARE WHAT HAPPENED AFTER THAT, WHICH DOESN'T MAKE ANY SENSE.  SO

16  I DON'T THINK THAT'S THE MOTION.

17      SO THERE MUST BE ANOTHER MOTION THAT IS BEFORE THE

18  COURT THAT I DON'T HAVE.

19      THE COURT:  LET ME ASK COUNSEL.

20      WHO'S REPRESENTING --

21      MR. PROCTOR:  I BELIEVE IT'S THE SAME MOTION,

22  YOUR HONOR.

23      THE COURT:  IT'S THROUGH THIS MOTION THAT PART OF THE

24  RELIEF THAT YOU'RE SEEKING IS AN ORDER FROM THE COURT TO

25  BASICALLY PROVIDE A 30(B) DEPOSITION, OR A

Unsigned                                          Page  1405

1    PERSON-MOST-KNOWLEDGEABLE DEPOSITION, FROM LITTLER MENDELSON

2    TO, IN FACT, PROVIDE ANY FACTUAL INFORMATION, NONPRIVILEGED

3    FACTUAL INFORMATION, CONCERNING ANY INFORMATION THAT LITTLER

4    MENDELSON MIGHT HAVE ABOUT THE STATUS OF SAID COMPUTER.

5        MR. PROCTOR:  CORRECT.

6        THE COURT:  THAT IS WHAT MATTEL IS SEEKING FROM THE

7    COURT.  IT WAS BEFORE JUDGE INFANTE.  JUDGE INFANTE DID NOT GET

8    AROUND TO DECIDING THIS, SO THAT'S WHY I TOOK THE MOTION BACK.

9        I DO NOT WANT TO PROCEED UNTIL YOU'VE HAD A CHANCE TO

10   BASICALLY REVIEW THE MOTION AND OPPOSE IT, BECAUSE IT AFFECTS

11   YOUR RIGHTS MUCH MORE SO THAN PROBABLY ANYBODY ELSE'S RIGHTS.

12       MR. MILLER:  WHAT THE COURT HAS JUST STATED IS ALSO

13   DIFFERENT THAN WHAT I'VE BEEN TOLD, WHICH WAS THAT

14   JUDGE INFANTE HAD RULED ON IT AND DENIED IT.

15       THE COURT:  NO, NO, NO.  THAT HAS NOT BEEN RULED ON.

16       MR. MILLER:  OKAY.  THEN, AGAIN, I DON'T KNOW.

17       THE COURT:  I PUT IT OFF PRECISELY BECAUSE I ASSUMED

18   THAT SOMEONE FROM LITTLER MENDELSON MIGHT HAVE SOMETHING TO SAY

19   ABOUT THIS.

20       MR. MILLER:  WELL, WE'LL RESPOND IN DUE COURSE.  BUT

21   WE NEED TO, ONE, KNOW WHAT THE MOTION IS.  I THINK IT'S THIS.

22   I'VE BEEN TOLD IT'S THIS.  BUT I'D LIKE TO HAVE IT FROM THE

23   PEOPLE WHO MADE THE MOTION.  AND THEN WE'LL RESPOND.

24       THE COURT:  OKAY.

25       TIME IS SOMEWHAT OF THE ESSENCE, BECAUSE WE'RE

1    RESOLVING A DISCOVERY DISPUTE IN THE MIDST OF TRIAL; SO WE NEED

2    TO MOVE EXPEDITIOUSLY ON THIS.  I WILL CONTINUE THIS MATTER FOR

3    A FEW DAYS TO GIVE YOU A CHANCE TO GET A HANDLE ON IT, BUT I'M

4    NOT GOING TO BE ABLE TO GIVE YOU THE NORMAL TIME THAT YOU WOULD

5    BE AFFORDED TO RESPOND TO A MOTION.

6        MR. MILLER:  UNDERSTOOD, YOUR HONOR.

7        THE COURT:  I WANT TO MAKE SURE THAT YOU HAVE

8    EVERYTHING THAT YOU NEED.

9        MR. MILLER:  RATHER THAN TRYING TO GUESS AT IT, IT

10   WOULD BE HELPFUL.

11       THE COURT:  FAIR ENOUGH.

12       LET ME HAVE MR. PROCTOR STATE ON THE RECORD EXACTLY

13   EVERYTHING THAT THE COURT HAS, BASICALLY, THAT HAS BEEN

14   SUBMITTED TO THE COURT, AND THAT MATTEL BELIEVES IS RELEVANT TO

15   THIS MOTION.

16       MR. PROCTOR:  IF I MAY, YOUR HONOR.

17       THIS IS THE FIRST THAT MATTEL HAS BEEN INFORMED THAT

18   THE KEKER FIRM IS NOT REPRESENTING LITTLER MENDELSON IN

19   CONNECTION WITH THIS.

20       THE COURT:  THAT'S FINE.  I ACCEPT THAT.  AND I

21   UNDERSTAND THAT COUNSEL JUST INDICATED THAT IT WAS A

22   MISREPRESENTATION.  BUT I UNDERSTAND THAT THERE MAY BE

23   CONFUSION ON THIS.  THAT'S WHY WE'RE HAVING A HEARING THIS

24   MORNING.

25       MR. PROCTOR:  SURE.

1        AND TO ELABORATE ON WHAT THE COURT JUST SAID, THE

2    HEARING ON "EVIDENCE ELIMINATOR" IS SCHEDULED FOR NEXT MONDAY.

3    MR. BRYANT IS EXPECTED TO TESTIFY EARLY NEXT WEEK.  THE

4    DEPOSITION OF LITTLER MENDELSON, IF IT IS TO GO FORWARD, WE

5    WOULD SUBMIT, NEEDS TO GO FORWARD BEFORE THEN; SO TIME TRULY IS

6    OF THE ESSENCE ON THIS.

7        THIS IS A MOTION THAT WE FILED SIX MONTHS AGO AT THIS

8    STAGE, AND THE KEKER FIRM REPRESENTED LITTLER THROUGHOUT THE

9    BRIEFING ON IT.

10        THE MOTION WAS FILED ON DECEMBER 13, 2007.  IT'S

11    CALLED "MATTEL, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL

12    DEPOSITION OF LITTLER MENDELSON, PC, PURSUANT TO SUBPOENA."

13    THERE IS AN OPPOSITION FROM MR. BRYANT, DATED DECEMBER 19TH.

14    THERE IS A REPLY OF MATTEL, DATED DECEMBER 24TH.  THERE IS A

15    LETTER THAT MATTEL SENT TO JUDGE INFANTE, SEEKING A RULING ON

16    THE MATTER, DATED MAY 7TH, WHICH HAS ATTACHMENTS WHICH

17    INCLUDES -- AND I MAY BE ABLE TO CLARIFY THIS.

18        JUDGE INFANTE DID HEAR THIS MOTION PRELIMINARILY.  HE

19    QUASHED THE SUBPOENA THAT WE SERVED AS TO THE DRAWINGS, AS TO

20    THE INK TESTING ON THE DRAWINGS; SO HE QUASHED THAT; THAT HAS

21    BEEN RESOLVED, THAT ASPECT OF THE MOTION.  AS TO THE HARD

22    DRIVES, IT HAS NOT.  HE SUGGESTED HE WANTED TO HEAR WHAT

23    HAPPENED AT THE CARTER BRYANT DEPOSITION.

24        THERE'S A RESPONSE FROM THE KEKER FIRM, REPRESENTING

25    LITTLER, DATED MAY 8TH.  AND THEN THERE ARE A SERIES OF --

1        THE COURT:  I WANT TO TAKE A LOOK AT THAT LATER.

2        THAT IS EXHIBIT WHAT?

3        MR. PROCTOR:  I BELIEVE IT'S EXHIBIT 4 IN YOUR

4    BINDER, ALTHOUGH I DON'T THINK I HAVE AN EXACT DUPLICATE OF THE

5    BINDER THAT WENT TO THE COURT IN FRONT OF ME.

6        THE COURT:  VERY WELL.

7        CONTINUE, COUNSEL.

8        MR. PROCTOR:  THERE IS A DECLARATION OF

9    MICHAEL ZELLER IN SUPPORT OF THE MOTION, DATED DECEMBER 13,

10   2007.  THERE'S A DECLARATION OF JOHN TRINIDAD OF THE KEKER FIRM

11   IN OPPOSITION TO THE MOTION, DATED DECEMBER 19, 2007.  THERE'S

12   A DECLARATION OF HEIDI FROMM OF MATTEL IN SUPPORT OF THE

13   MOTION, DATED DECEMBER 24, 2007.

14       TO THE BEST OF MY KNOWLEDGE, THAT IS THE RECORD.

15       THE COURT:  VERY WELL.

16       WHAT I'M GOING TO ASK YOU TO DO IS MAKE SURE THAT

17   COUNSEL, THIS MORNING, HAS A COPY, IS PROVIDED A COPY OF THESE

18   DOCUMENTS, SO THAT HE CAN LEAVE THIS COURTHOUSE ARMED WITH

19   EVERYTHING THAT IS RELEVANT TO THIS MOTION.

20       COUNSEL, I KNOW IT'S VERY SHORT NOTICE, BUT I'M GOING

21   TO HAVE TO GET A RESPONSE BACK FROM YOUR FIRM BY THE CLOSE OF

22   BUSINESS TOMORROW.  THAT PROVIDES YOU TWO DAYS TO REVIEW THIS.

23   BUT WE DO HAVE A HEARING SET FOR MONDAY, AND THAT'S WHEN -- NOT

24   FOR MONDAY.

25       MR. PROCTOR:  IT IS FOR MONDAY.

1        THE COURT:  WHAT TIME ON MONDAY?

2        MR. PROCTOR:  1:30.

3        AS THE COURT KNOWS, IF IT'S ORDERED, WE NEED SOME

4    LEAD TIME ON THE DEPOSITION ITSELF.

5        THE COURT:  WHEN IS CARTER BRYANT BEING CALLED AT

6    THIS POINT, MR. QUINN?

7        MR. PROCTOR:  EARLY NEXT WEEK.

8        MR. QUINN:  THE WAY THINGS ARE GOING, I WOULD BE

9    SURPRISED IF IT WERE BEFORE -- IT SHOULD BE TOWARDS THE END OF

10   NEXT WEEK.

11       THE COURT:  MAYBE WE CAN MOVE THIS MONDAY HEARING,

12   JUST TO GIVE COUNSEL A LITTLE BIT MORE TIME, AND ALSO TIME, IF

13   THERE'S GOING TO BE A DEPOSITION, TO HAVE A DEPOSITION.

14       MR. PROCTOR:  ONE CONCERN, IF I MAY, WITH THAT IS,

15   THERE HAS BEEN -- AND THIS IS WITH OUR OWN EXPERT -- THERE HAS

16   BEEN SCHEDULING PROBLEMS, BECAUSE HE'S IN TRIAL IN ANOTHER CASE

17   NEXT WEEK; SO GETTING HIM LINED UP FOR MONDAY IS SOMETHING THAT

18   TOOK SOME WORK.  I'M HAPPY TO LOOK INTO WHATEVER ELSE YOU WANT,

19   BUT IF WE MOVE IT LATER IN THE WEEK, AS THE COURT SUGGESTED,

20   THERE'S GOING TO BE LIVE TESTIMONY FROM AT LEAST THREE

21   WITNESSES, AND IT'S GOING TO TAKE SOME TIME.  AND THE COURT'S

22   CONCERN WAS TAKING AWAY JURY TIME, WHICH I THINK IS A VALID

23   CONCERN.  IT'S NOT GOING TO BE A 15-MINUTE HEARING.

24       THE COURT:  BUT JUST SAYING THAT, IT SEEMS -- HAVING

25   A LAW FIRM SUBMIT TO A DEPOSITION IS A SERIOUS MATTER, AND JUST

1    GIVING TO THE CLOSE OF BUSINESS TOMORROW, THAT JUST DOESN'T

2    SEEM LIKE A REASONABLE AMOUNT OF TIME FOR ANY LAW FIRM.  I

3    THINK I NEED TO GIVE AT LEAST THE WEEKEND TO LITTLER MENDELSON

4    TO ADDRESS THIS.  IT JUST SEEMS THAT THAT'S REASONABLE.

5         MR. PROCTOR:  ONE SUGGESTION I CAN MAKE:  WE COULD

6    PROCEED WITH THE EVIDENTIARY HEARING WITHOUT THE BENEFIT OF THE

7    DEPOSITION.  THAT WAY, THE HEARING CAN GO FORWARD ON MONDAY;

8    THE PARTIES WILL KNOW WHAT'S GOING TO BE IN PLAY, WHAT'S NOT

9    GOING TO BE IN PLAY, WHICH IS IMPORTANT FOR SCHEDULING.  WE

10   NEED TO SCHEDULE THE EXPERT TESTIMONY IN FRONT OF THE JURY, IF

11   THE EXPERT TESTIMONY IS GOING TO BE COMING IN.

12        TO THE EXTENT WE CAN GET A RULING AS EARLY AS

13   POSSIBLE, MONDAY, AND TO THE EXTENT THE COURT CAN GIVE SOME

14   GUIDANCE TODAY AS TO HOW EXPEDITIOUSLY IT WILL EXPECT THE

15   DEPOSITION TO OCCUR, SO THAT WE CAN HAVE THE RESULTS OF THE

16   DEPOSITION BEFORE THE ACTUAL EXPERT TESTIMONY, AND POTENTIALLY,

17   BEFORE MR. BRYANT'S TESTIMONY, THAT MIGHT BE ONE WAY TO

18   PROCEED.

19        THE COURT:  VERY WELL.

20        WHAT I'M GOING TO DO, COUNSEL, I'M GOING TO GIVE YOU

21   TO THE CLOSE OF BUSINESS ON MONDAY TO RESPOND.  THEN I'M GOING

22   TO ASK YOU TO APPEAR FOR A HEARING ON -- THIS IS JUST ON THE

23   POTENTIAL DEPOSITION FOR LITTLER MENDELSON -- ON TUESDAY

24   MORNING AT 8:00.  I'M SORRY TO BRING YOU IN SO EARLY IN THE

25   MORNING, BUT WE'VE JUST GOT TO DO IT.

Unsigned                                          Page  1411

1         MR. MILLER:  IT'S NOT A PROBLEM.

2         THE COURT:  YOU'LL HAVE THE BENEFIT OF THE DOCUMENTS

3    TODAY.  YOU'LL HAVE TODAY, TOMORROW, SATURDAY, SUNDAY, AND

4    MONDAY TO GET A RESPONSE IN.  I THINK THAT PROVIDES SUFFICIENT,

5    ALTHOUGH EXPEDITED, OPPORTUNITY TO RESPOND.  AND THEN WE'LL

6    TAKE UP THAT ISSUE MONDAY MORNING.

7         LET ME THINK SOME MORE ABOUT THE HEARING ON MONDAY

8    AND WHETHER OR NOT THAT CAN PROCEED WITHOUT THIS.  BUT WE'LL GO

9    FROM THERE.  BUT WE'LL HAVE THAT ON MONDAY MORNING -- I MEAN ON

10   TUESDAY MORNING, WITH A FILING BY THE END OF THE DAY.  AND ALL

11   I'M GOING TO ASK IS THAT BY THE CLOSE OF BUSINESS ON MONDAY

12   THAT YOU FAX TO CHAMBERS -- AND YOU CAN GET THE FAX NUMBER FROM

13   MR. HOLMES -- WHATEVER YOUR RESPONSE IS.

14        MR. MILLER:  TWO MATTERS.  ONE IS THAT MR. JACOBY,

15   WHO IS ONE OF THE PEOPLE REQUESTED FOR DEPOSITION, HAS PAID FOR

16   A VACATION NEXT WEEK, STARTING ON TUESDAY.  AND SO THAT'S GOING

17   TO BE AN ISSUE.

18        MR. WICKHAM WOULD BE AVAILABLE NEXT WEEK, BUT

19   MR. JACOBY WILL NOT BE AFTER TUESDAY.

20        THE COURT:  WELL, WHAT I BELIEVE MATTEL IS LOOKING

21   FOR IS A DEPOSITION FROM A PERSON MOST KNOWLEDGEABLE.  AND IT

22   SOUNDS LIKE, IF SOMEONE IS NOT GOING TO BE AVAILABLE, THAT

23   KNOWLEDGE CAN BE IMPARTED LAWYER TO LAWYER TO SOMEBODY ELSE IN

24   THE FIRM.

25        SO WHAT I WOULD ORDER, AS OF THIS MORNING, JUST IN

1    LIGHT OF WHAT I KNOW SO FAR, IS THAT IF ANYONE IS NOT GOING TO

2    BE AVAILABLE, THAT THEY MAKE SURE THAT THE PERSON MOST

3    KNOWLEDGEABLE AT THE LAW FIRM HAS WHATEVER INFORMATION THAT IS

4    RELEVANT.  AND YOU'RE GOING TO SEE THROUGH THESE PAPERS THE

5    CLEAR SUBJECT MATTER THAT'S AT ISSUE HERE.  IT'S RATHER

6    LIMITED.  BUT THAT INFORMATION NEEDS TO BE IMPARTED TO SOMEBODY

7    WHO CAN COMPETENTLY TESTIFY.  BECAUSE I DON'T WANT TO BE IN THE

8    POSITION IN THE MIDDLE OF NEXT WEEK HAVING SOMEONE SAY, 'WELL,

9    THE ONLY PERSON THAT KNOWS IT IS OFF ON VACATION,' AND THEN

10   HAVE TO BRING THAT PERSON BACK.

11        MR. MILLER:  I UNDERSTAND A PMK DEPOSITION UNDER RULE

12   30 IS A CORPORATE DEPOSITION; SO PERSONAL KNOWLEDGE IS NOT THE

13   ISSUE.

14        THE COURT:  YOU NEED TO MAKE SURE THAT THERE'S

15   SOMEBODY AVAILABLE, IF THE COURT ORDERS IT ON TUESDAY MORNING,

16   TO SPEAK COMPETENTLY ON THIS SUBJECT MATTER FOR THE FIRM.

17   WHOEVER THAT IS IS UP TO YOU.

18        MR. MILLER:  UNDERSTOOD.

19        THE COURT:  ANYTHING FURTHER?

20        MR. MILLER:  I'M SURE THE CONFUSION IS THAT THE KEKER

21   FIRM REPRESENTED MR. BRYANT AND THE ISSUE RELATED TO

22   MR. BRYANT'S FORMER COUNSEL IN DISCOVERY THAT THEY ENGAGED IN

23   AND THE CONDUCT THEY ENGAGED IN.  SO I PRESUME THAT THE

24   CONFUSION CAME FROM THE FACT THAT THE KEKER FIRM OPPOSED THE

25   MOTION ORIGINALLY ON BEHALF OF THEIR CLIENT, WHO WAS IN THE

1    CASE, ABOUT THEIR FORMER ATTORNEYS.

2          HOWEVER, AT THE PRESENT TIME, MR. BRYANT IS NOT IN

3    THE CASE, AND THIS IS RELATED TO THE COMPELLING TESTIMONY FROM

4    A THIRD PARTY, AND THEY WERE NOT REPRESENTED BEFORE THIS COURT

5    BEFORE I SHOWED UP TODAY.

6          THE COURT:  I APPRECIATE THAT.  AND I DON'T KNOW IF

7    IT'S NECESSARY FOR THE COURT TO GET TO THE BOTTOM OF WHY MATTEL

8    IS UNDER THE BELIEF THAT THE KEKER FIRM WAS OR WAS NOT

9    REPRESENTING.  I'D RATHER NOT OPEN THAT CAN OF WORMS IF I DON'T

10   HAVE TO.  BUT SUFFICE IT TO SAY, I WANT TO HAVE A RESPONSE TO

11   THIS FROM YOUR FIRM, AND WE WILL PROCEED ON TUESDAY MORNING.

12         MS. ANDERSON?

13         MS. ANDERSON:  TWO VERY BRIEF STATEMENTS.

14         LESS MY SILENCE BE TAKEN AS A CONCESSION, THE KEKER

15   VAN NEST FIRM DID NOT REPRESENT LITTLER WITH REGARD TO THESE

16   MATTERS.  WE FILED OBJECTIONS AND MOTIONS ON BEHALF OF

17   CARTER BRYANT WHERE HIS INTERESTS WERE IMPLICATED.

18         SECOND OF ALL, IN TERMS OF THE TIMING OF THE

19   SCHEDULING, I HAD UNDERSTOOD THE COURT HAD WANTED A HEARING ON

20   MONDAY WITH RESPECT TO WHICH MR. BRYANT MAY BE TESTIFYING,

21   DEPENDING ON WHAT THE COURT REQUESTS.  AND I UNDERSTOOD THAT

22   MATTEL WOULD BE CALLING MR. BRYANT AS A WITNESS ON TUESDAY, OR

23   SOMETIME SHORTLY THEREAFTER.

24         THE COURT:  WE'RE NOW HEARING IT'S GOING TO BE LATER

25   IN THE WEEK.

1          MS. ANDERSON:  I'M NOW HEARING IT'S LATER IN THE

2    WEEK.

3          THE COURT:  MR. BRYANT SHOULD MAKE HIMSELF AVAILABLE

4    ON STANDBY THROUGHOUT THIS TRIAL.

5          MS. ANDERSON:  AND WE HAVE BEEN, YOUR HONOR.  AND

6    WHAT WE HAD AGREED -- WHICH IS PART OF THE PUBLIC RECORD, SO I

7    CAN SAY IT -- IS TO APPEAR, IN PHASE 1-A, AS A WITNESS.

8          HOWEVER, I WOULD REQUEST THAT TO THE EXTENT THIS IS

9    TAKEN INTO ACCOUNT IN SCHEDULING OF HEARINGS -- AND IF

10   ADDITIONAL TIME IS NEEDED TO ACCOMMODATE THE LITTLER MENDELSON

11   LAWYERS -- PUSHING THE HEARING BACK TO ENABLE MR. BRYANT NOT TO

12   HAVE TO TRAVEL BACK AND FORTH FROM MISSOURI MANY, MANY TIMES IN

13   A ROW WOULD BE GREATLY APPRECIATED.  AND I DON'T KNOW WHAT THE

14   COURT HAS IN MIND FOR SCHEDULING, BUT THAT WOULD BE

15   APPRECIATED.

16         THE COURT:  WE'VE GOT A LOT OF CALENDARS WITH A LOT

17   OF VERY IMPORTANT PEOPLE, AND I CONSIDER EVERYONE INVOLVED IN

18   THIS CASE IMPORTANT ON AN EQUAL LEVEL.  I DO UNDERSTAND THAT

19   THERE ARE INCONVENIENCES.

20         MS. ANDERSON:  I JUST WANTED TO RAISE THAT TO THE

21   COURT'S ATTENTION THAT HE'S TRAVELING QUITE A DISTANCE.

22         THE COURT:  I'M MINDFUL OF THAT, AND I'M SURE MATTEL

23   IS MINDFUL OF THAT.

24         MS. ANDERSON:  THANK YOU, YOUR HONOR.

25         MR. ZELLER:  IF I MAY JUST, FOR THE RECORD, YOUR

1    HONOR.

2         I DON'T BELIEVE THAT THE COURT REALLY NEEDS TO

3    RESOLVE THE WHOLE REPRESENTATION ISSUE.

4         WE DON'T HAVE AN OBJECTION, THEORETICALLY, AS LONG AS

5    IT DOES NOT CREATE TOO MUCH DELAY IN HAVING LITTLER MENDELSON

6    FILE A SEPARATE RESPONSE.  BUT FOR THE RECORD, I COMMUNICATED

7    WITH KEITH JACOBY OF LITTLER MENDELSON IN WRITING BY E-MAIL, IN

8    WHICH I ACTUALLY INVITED HIM AT THE OUTSET, AS TO WHETHER OR

9    NOT HE WANTED LITTLER TO BE DIRECTLY INVOLVED.  HE TOLD ME --

10   AND THIS IS IN WRITING -- THAT HE WANTED THE KEKER FIRM TO

11   HANDLE IT.

12        AND BY THE WAY, THE KEKER FIRM IS THE ONE THAT DID

13   FILE, I BELIEVE, OBJECTIONS, OR THE MOTION TO QUASH.  I MEAN,

14   THEIR NAME IS ON IT AS REPRESENTING LITTLER MENDELSON; SO I

15   JUST WANT THE RECORD TO BE CLEAR ON THAT POINT.

16        IN TERMS OF THE TIMING OF MR. BRYANT'S TESTIMONY, WE

17   WILL, OF COURSE, SURELY TALK WITH MR. BRYANT'S COUNSEL AND MAKE

18   ARRANGEMENTS AS BEST AS WE CAN.  OBVIOUSLY, THERE'S ONLY SO

19   MUCH CONTROL WE HAVE OVER THE SCHEDULE, AS THE COURT IS AWARE.

20   BUT IT'S NOT OUR PURPOSE TO INCONVENIENCE ANYONE OR HAVE THEM

21   WAITING AROUND ENDLESSLY.  AND I'M SURE, IN THE NEXT DAY OR SO,

22   WE'LL HAVE A CLEARER IDEA OF EXACTLY WHEN NEXT WEEK IT IS MORE

23   LIKELY THAT MR. BRYANT WILL BE APPEARING, WHETHER IT'S LATER IN

24   THE WEEK, WHETHER IT'S WEDNESDAY, WHATEVER THE CASE MAY BE.

25        THE COURT:  VERY GOOD.

1          I APPRECIATE THAT, MR. ZELLER, AND I, TOO, HOPE THAT

2     I'M NOT GOING TO HAVE TO RESOLVE THIS ISSUE ON REPRESENTATION.

3     I JUST THINK IT'S IMPORTANT TO GIVE LITTLER MENDELSON AN

4     OPPORTUNITY TO RESPOND TO THIS, GIVEN THAT WE'RE ASKING -- IT'S

5     A RATHER EXTRAORDINARY MEASURE TO HAVE ANY LAW FIRM TESTIFY IN

6     THIS CAPACITY ABOUT INFORMATION THAT WAS GOING BACK AND FORTH

7     BETWEEN A CLIENT.  I WOULD WANT TO EXTEND THAT TO ANY LAW FIRM

8     APPEARING BEFORE THIS COURT.

9          MR. ZELLER:  AND WE HAVE NO QUARREL WITH THAT.

10         THE COURT:  VERY WELL.

11         IF THERE'S NOTHING ELSE THAT WE HAVE TO ADDRESS RIGHT

12    NOW, I'D RATHER GET THE JURY IN HERE.  LET'S GET A WITNESS

13    GOING, AND WE CAN TAKE UP MATTERS DURING LUNCH TODAY AND DURING

14    BREAKS.

15         BRING THE JURY IN, MR. HOLMES.

16         MR. QUINN:  WE HAVE THE TIME ALLOCATIONS FOR THE

17    WITNESS WHO APPEARED BY VIDEO YESTERDAY, O'NEAL.

18         THE COURT:  I CREDITED ALL OF THE TIME TO MATTEL, SO

19    HOW MUCH SHOULD I SUBTRACT FOR --

20         MR. QUINN:  WELL, MGA HAD 28 SECONDS.

21         (LAUGHTER.)

22         THE COURT:  IT'S ON YOUR TIME, COUNSEL.  MY CLOCK

23    JUST DOES MINUTES, IT DOESN'T DO SECONDS; NO SECOND HAND.

24         IF MR. NOLAN CAN KEEP EVERY CROSS-EXAMINATION UNDER A

25    MINUTE, HE'S NOT GOING TO LOSE A SINGLE...

1        MR. QUINN:  I ASSUME THAT GOES BOTH WAYS.

2        MR. NOLAN:  NOW YOU TELL ME.

3        THE COURT:  THE SUBMISSION THAT YOU GAVE ME THIS

4   MORNING, COUNSEL, I TRUST WE CAN TAKE UP LATER IN THE DAY

5   TODAY?

6        MR. NOLAN:  YES, WE WILL, YOUR HONOR.  I ONLY DID IT

7   BECAUSE I NEED TO ASK YOUR PERMISSION TO FOLLOW UP AND FILE

8   SOMETHING.

9        THE COURT:  LETS HOLD OFF.  WE'LL TAKE THAT UP LATER.

10       AND THEN DURING THE BREAK, WE'RE GOING TO TAKE UP THE

11   IN-CHAMBERS MATTER WITH MS. ANDERSON.

12       (WHEREUPON, JURORS ENTER COURTROOM.)

13       THE COURT:  COUNSEL, YOUR NEXT WITNESS.

14       MR. ZELLER:  WE WOULD CALL LUCY ARANT.

15       THE CLERK:  DO YOU SOLEMNLY STATE THAT THE TESTIMONY

16   YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT SHALL

17   BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO

18   HELP YOU GOD?

19       THE WITNESS:  I DO.

20       THE CLERK:  PLEASE STATE YOUR FULL NAME AND SPELL

21   YOUR LAST NAME FOR THE RECORD.

22       THE WITNESS:  LUCY ARANT, A-R-A-N-T.

23            DIRECT EXAMINATION

24   BY MR. ZELLER:

25   Q   YOU AND I HAVE NOT MET.  MY NAME IS MIKE ZELLER.  I'M A

1    LAWYER FOR MATTEL.

2         YOU ARE A LAWYER WHO HAS REPRESENTED MGA IN THE PAST;

3    IS THAT CORRECT?

4    A    TRUE.

5    Q    AND YOU'RE HERE TO TESTIFY TODAY BECAUSE MATTEL SENT YOU A

6    SUBPOENA?

7    A    YES.

8    Q    AND YOU STARTED PRACTICING LAW BACK IN 1980?

9    A    YES.

10   Q    AND YOUR AREA OF LEGAL PRACTICE IS TRADEMARK LAW; IS THAT

11   CORRECT?

12   A    YES.

13   Q    YOU'VE BEEN A TRADEMARK LAWYER FOR ABOUT 25 YEARS OR SO

14   NOW?

15   A    YES.

16   Q    IF YOU COULD GIVE US YOUR EDUCATIONAL BACKGROUND.

17   A    I HAVE A BA IN SPANISH; I HAVE AN MA IN COMPARATIVE

18   LITERATURE; AND I HAVE A JD IN LAW.

19   Q    AND WHAT YEAR DID YOU GET YOUR LAW DEGREE?

20   A    1980.

21   Q    AND THAT'S WHEN YOU BEGAN PRACTICING LAW?

22   A    YES.

23   Q    IF YOU COULD TELL US BRIEFLY YOUR EMPLOYMENT HISTORY AS A

24   TRADEMARK LAWYER.

25   A    I BEGAN AT THE UNITED STATES PATENT AND TRADEMARK OFFICE

1    IN WASHINGTON, D.C., AS A TRADEMARK EXAMINING ATTORNEY.  I THEN

2    WORKED AT STEVEN BERRY IN SEATTLE, WASHINGTON.  I THEN WORKED

3    AT KNOBBE, MARTENS, OLSEN & BEAR IN NEWPORT BEACH, CALIFORNIA.

4    I THEN WORKED AT BODY GLOVE, AMERICAN MARKETING WORKS.  I THEN

5    WORKED AT RUSS, AUGUST, KABAT & KENT.  AND I'M PRESENTLY AT

6    MITCHELL, SILBERBERG & KNUPP.

7    Q    DURING THIS TIME PERIOD, THESE VARIOUS POSITIONS, YOU

8    PRACTICED TRADEMARK LAW?

9    A    YES.

10   Q    IF YOU COULD PLEASE TELL US A LITTLE BIT ABOUT WHAT YOU

11   DID WHEN YOU WERE AN EXAMINING ATTORNEY THERE AT THE U.S.

12   TRADEMARK OFFICE.

13   A    I LOOKED OVER PEOPLE'S APPLICATIONS FOR TRADEMARKS AND

14   DECIDED IF THEY MET THE STATUTORY CRITERIA TO RECEIVE A

15   TRADEMARK.

16   Q    SO YOU'VE BEEN WORKING ON OR PREPARING TRADEMARK

17   APPLICATIONS FOR OVER 25 YEARS NOW?

18   A    YES.

19   Q    AND IF YOU COULD TELL US A LITTLE BIT ABOUT WHAT A

20   TRADEMARK APPLICATION IS.

21   A    A TRADEMARK CAN BE A WORD OR A DESIGN OR A COMBINATION OF

22   BOTH, AND A PERSON USES IT AS A SOURCE INDICATOR.  THAT'S THE

23   PURPOSE OF A TRADEMARK.

24   Q    AND IN SOME CIRCUMSTANCES, PEOPLE FILE APPLICATIONS WITH

25   THE FEDERAL GOVERNMENT, THE TRADEMARK OFFICE, IN ORDER TO GET

1    PROTECTION FOR THAT PARTICULAR TRADEMARK, IF THE TRADEMARK

2    OFFICE GIVES THEM THE REGISTRATION?

3    A   CORRECT.

4    Q   AND THE TRADEMARK OFFICE IS PART OF THE FEDERAL

5    GOVERNMENT?

6    A   YES.

7    Q   NOW, HAS IT BEEN YOUR USUAL PRACTICE, IN PREPARING

8    TRADEMARK APPLICATIONS, TO GATHER INFORMATION FROM YOUR CLIENTS

9    BEFORE YOU FILE IT?

10   A   PERSONALLY OR THROUGH AN ASSISTANT?

11   Q   EITHER WAY.

12   A   YES.

13   Q   WHAT KIND OF INFORMATION, JUST AS A GENERAL MATTER, DO YOU

14   TYPICALLY GATHER, WHETHER YOURSELF OR THROUGH AN ASSISTANT,

15   FROM YOUR CLIENTS BEFORE YOU FILE A TRADEMARK APPLICATION?

16   A   WHAT THE MARK THAT THEY WISH TO HAVE PROTECTED IS; WHETHER

17   OR NOT THEY'VE USED THE MARK; IF SO, THE DATES OF FIRST USE;

18   HOW THEY'VE USED THE MARK; WAS IT ON A LABEL, A HANG TAG,

19   PACKAGING FOR THE GOODS?  IS IT A SERVICE MARK?  WHO WILL OWN

20   THE MARK?  WHAT GOODS OR SERVICES IN CONNECTION WITH WHICH THE

21   MARK WILL BE USED?

22   Q   AND THAT'S ALL INFORMATION THAT'S IMPORTANT FOR YOU TO

23   KNOW AS A TRADEMARK ATTORNEY IN ADVANCE OF FILING AN

24   APPLICATION SO YOU CAN GIVE PROPER LEGAL ADVICE AND ALSO MAKE

25   SURE THAT YOU FILE AN ACCURATE APPLICATION WITH THE TRADEMARK

1    OFFICE; IS THAT TRUE?

2    A   YES.

3    Q   YOU DID MENTION THERE WAS THIS CONCEPT OF "DATE OF FIRST

4    USE."

5        WHAT IS THAT?

6    A   THERE ARE DIFFERENT TYPES OF TRADEMARK APPLICATIONS; SOME

7    CAN BE FILED BASED ON USE, AND OTHERS CAN BE FILED ON AN

8    INTENT-TO-USE BASIS.

9    Q   THE DATE OF FIRST USE, JUST GENERALLY SPEAKING, IS WHEN

10   THE NAME OR THE MARK THAT'S GOING TO BE THE SUBJECT OF THE

11   APPLICATION WAS FIRST USED BY THE CLIENT FOR PARTICULAR GOODS

12   OR SERVICES; IS THAT TRUE?

13   A   WAS FIRST OFFERED FOR SALE IN INTERSTATE COMMERCE OR IN

14   COMMERCE BETWEEN THE UNITED STATES AND A FOREIGN COUNTRY.

15   Q   AND THAT CAN HAPPEN IN VARIOUS WAYS; RIGHT?

16   A   I'M NOT SURE I KNOW WHAT YOU MEAN BY "VARIOUS WAYS."

17   Q   WELL, A CLIENT CAN USE A TRADEMARK EVEN BEFORE THERE'S AN

18   ACTUAL PRODUCT ON THE MARKET; ISN'T THAT TRUE?

19   A   THAT WOULD BE AN INTENT-TO-USE, BECAUSE IT HADN'T BEEN

20   OFFERED FOR SALE YET IN INTERSTATE COMMERCE.

21   Q   THE DISTINCTION I'M MAKING HERE IS, IF IT'S OFFERED FOR

22   SALE, THAT CAN BE SUFFICIENT AS A USE; IS THAT TRUE?

23   A   AS LONG AS IT'S OFFERED FOR SALE IN INTERSTATE COMMERCE OR

24   COMMERCE BETWEEN THE U.S. AND A FOREIGN COUNTRY.

25   Q   AND YOU'VE BEEN USING THE TERM "INTERSTATE COMMERCE."

1        WHY DON'T YOU TELL US WHAT THAT IS.

2    A   FROM ONE STATE TO ANOTHER.

3    Q   IT'S SIMPLY COMMERCE THAT'S OUTSIDE THE STATE OF

4    CALIFORNIA.

5    A   CORRECT.

6    Q   NOW, IN YOUR EXPERIENCE AS A TRADEMARK LAWYER, YOU'LL

7    AGREE THAT IT'S IMPORTANT FOR YOU TO GET ACCURATE FIRST-

8    DATE-OF-USE INFORMATION FROM YOUR CLIENT; IS THAT TRUE?

9    A   YES.

10   Q   AND PLEASE TELL US, GENERALLY SPEAKING, WHY THAT IS.

11   A   BECAUSE IN THE UNITED STATES, AS OPPOSED TO SOME OTHER

12   FOREIGN COUNTRIES, A PERSON WOULD HAVE SUPERIOR RIGHTS TO A

13   TRADEMARK BASED ON ITS FIRST DATE OF USE, RATHER THAN THE DATE

14   OF FILING.

15   Q   AND HAVING ACCURATE FIRST-USE-DATE INFORMATION IS

16   IMPORTANT, BECAUSE IT CAN AFFECT YOUR CLIENT'S RIGHTS; IS THAT

17   TRUE?

18   A   YES.

19   Q   AND, IN FACT, GENERALLY SPEAKING, THERE ARE CERTAIN

20   CIRCUMSTANCES IN WHICH, IF A CLIENT OF YOURS GIVES FALSE

21   INFORMATION ON AN APPLICATION TO THE TRADEMARK OFFICE, ANY

22   REGISTRATION THAT COMES ABOUT FROM IT CAN THEN BE INVALID;

23   RIGHT?

24   A   YES.

25   Q   SO YOU CONSIDER THAT INFORMATION TO BE IMPORTANT IN YOUR

1    PRACTICE AS A TRADEMARK LAWYER; IS THAT TRUE?

2    A   YES.

3    Q   AND THEN, ALSO, YOU KNOW FROM YOUR EXPERIENCE IN THE

4    TRADEMARK FIELD THAT THE TRADEMARK OFFICE ITSELF BELIEVES,

5    EXPECTS, AND REQUIRES THAT APPLICANTS PROVIDE ACCURATE AND

6    TRUTHFUL INFORMATION TO IT; IS THAT TRUE?

7    A   YES.

8    Q   BACK IN THE 2000 TIME PERIOD, YOU WERE A TRADEMARK LAWYER

9    AT A LAW FIRM CALLED RUSS, AUGUST, KABAT & KENT; IS THAT

10   CORRECT?

11   A   YES.

12   Q   AND YOU PREPARED TRADEMARK APPLICATIONS FOR MGA BACK THEN?

13   A   YES.

14   Q   YOU PREPARED TRADEMARK APPLICATIONS FOR MGA FOR BRATZ BACK

15   IN 2000; IS THAT TRUE?

16   A   YES.

17   Q   NOW, BACK IN 2000, YOU ALSO PREPARED TRADEMARK

18   APPLICATIONS FOR MGA FOR THE INDIVIDUAL BRATZ DOLL NAMES,

19   SASHA, YASMIN, AND JADE; IS THAT TRUE?

20   A   YES.

21   Q   IN ORDER TO PREPARE THESE APPLICATIONS, YOU GATHERED

22   INFORMATION FROM MGA.

23       MR. NOLAN:  OBJECTION.  LACK OF FOUNDATION AS TO THE

24   WORD "YOU."

25       THE COURT:  SUSTAINED.

1        MR. ZELLER:  I'M SORRY.  I'M NOT SURE I UNDERSTAND

2    THE OBJECTION.

3        MR. NOLAN:  FOUNDATION.

4        THE COURT:  HOW SHE KNOWS.

5        MR. ZELLER:  I SEE.

6    BY MR. ZELLER:

7    Q    YOU WERE INVOLVED IN PREPARING THOSE APPLICATIONS FOR THE

8    "BRATZ" NAME; IS THAT TRUE?

9    A    YES.

10   Q    AND YOU WERE PERSONALLY INVOLVED IN PREPARING THE

11   APPLICATIONS FOR THE SASHA, YASMIN, AND JADE APPLICATIONS; IS

12   THAT TRUE?

13   A    COULD YOU PLEASE ELABORATE ON WHAT YOU MEAN BY "PERSONALLY

14   INVOLVED."

15   Q    YOU HAVE PERSONAL KNOWLEDGE OF WHAT WAS DONE IN PREPARING

16   THOSE APPLICATIONS; IS THAT TRUE?

17   A    NO.

18   Q    THERE SHOULD BE A BINDER THERE IN FRONT OF YOU.  PLEASE

19   TURN TO TAB 11937.

20   A    YES.

21   Q    AND IF YOU LOOK AT THE LAST PAGE, YOU RECOGNIZE THAT THIS

22   IS A DECLARATION THAT YOU SIGNED UNDER OATH ON OR ABOUT

23   AUGUST 31, 2007; IS THAT TRUE?

24   A    YES.

25   Q    NOW, IF YOU COULD PLEASE JUST TAKE A LOOK AT PARAGRAPHS

1    THREE AND FOUR OF THIS DECLARATION.  JUST READ IT TO YOURSELF

2    AT THIS STAGE.  AND IF YOU COULD PLEASE READ IT AND TELL ME IF

3    THAT REFRESHES YOUR RECOLLECTION THAT YOU GATHERED INFORMATION

4    FROM MGA IN PREPARING THOSE TRADEMARK APPLICATIONS FOR BRATZ

5    AND THE INDIVIDUAL DOLL NAMES WE WERE DISCUSSING.

6    A   YES.

7    Q   HAVING HAD AN OPPORTUNITY TO READ THIS DECLARATION OF

8    YOURS, DOES THAT REFRESH YOUR RECOLLECTION THAT YOU HAD

9    COMMUNICATIONS WITH MGA IN WHICH YOU GATHERED INFORMATION IN

10   CONNECTION WITH THOSE APPLICATIONS?

11   A   NO.

12   Q   DID PEOPLE DO THAT UNDER YOUR DIRECTION?

13   A   YES.

14   Q   SO THEN --

15   A   WELL, GENERALLY SPEAKING.  I DON'T KNOW ABOUT THIS

16   PARTICULAR...

17   Q   WELL, ISN'T IT TRUE THAT YOU HAD COMMUNICATIONS WITH MGA

18   PERTAINING TO THE APPLICATIONS?

19   A   I DON'T REMEMBER.

20   Q   WELL, LET'S THEN GO BACK TO EXHIBIT 11937.

21       YOU RECOGNIZE THIS DOCUMENT AS A DECLARATION THAT YOU

22   SIGNED IN THIS CASE; IS THAT TRUE?

23   A   YES.

24   Q   AND YOU MADE IT UNDER OATH; IS THAT TRUE?

25   A   YES.

1    Q    YOU READ IT BEFORE YOU SIGNED IT AND SUBMITTED IT TO THIS

2    COURT; CORRECT?

3    A    YES.

4    Q    YOU SEE PARAGRAPHS THREE AND FOUR THAT I JUST DIRECTED

5    YOUR ATTENTION TO; CORRECT?

6    A    UH-HUH.  YES.

7        MR. ZELLER:  YOUR HONOR, AT THIS TIME, I WOULD SUBMIT

8    EXHIBIT 11937 INTO EVIDENCE; FOR THE MOMENT, JUST PARAGRAPHS

9    THREE, FOUR, AND FIVE.

10       THE COURT:  ANY OBJECTION?

11       MR. NOLAN:  NO OBJECTION, YOUR HONOR.

12       THE COURT:  ADMITTED.

13       YOU MAY PUBLISH THREE, FOUR, AND FIVE.

14   BY MR. ZELLER:

15   Q    DIRECTING YOUR ATTENTION TO PARAGRAPH THREE, IT SAYS,

16   "WHILE AT RUSS, AUGUST, KABAT & KENT, I SERVED AS U.S.

17   TRADEMARK COUNSEL FOR MGA ENTERTAINMENT, INC."

18       DO YOU SEE THAT?

19   A    YES.

20   Q    THAT'S A TRUE STATEMENT?

21   A    YES.

22   Q    THE NEXT SENTENCE SAYS, "ONE OF MY RESPONSIBILITIES IN

23   THIS CAPACITY WAS TO PREPARE INTENT-TO-USE TRADEMARK

24   APPLICATIONS FOR BRATZ AND INDIVIDUAL BRATZ DOLLS, INCLUDING

25   SASHA, YASMIN, AND JADE."

1          IS THAT A TRUE STATEMENT?

2     A   YES.

3     Q   THE NEXT PARAGRAPH, FOUR, SAYS, "FROM TIME TO TIME, I

4     NECESSARILY COMMUNICATED WITH EMPLOYEES OF MGA ENTERTAINMENT,

5     INC., TO OBTAIN INFORMATION FOR MGA'S TRADEMARK APPLICATIONS."

6          DO YOU SEE THAT?

7     A   YES.

8     Q   THAT'S A TRUE STATEMENT?

9     A   I DON'T REMEMBER ANYMORE.

10    Q   YOU SIGNED THIS DECLARATION IN AUGUST OF LAST YEAR; IS

11    THAT TRUE?

12    A   YES.

13    Q   DID YOU REMEMBER THAT YOU HAD DONE THAT, WHAT'S REFLECTED

14    HERE IN PARAGRAPH FOUR, BACK IN AUGUST OF 2007?

15    A   I DON'T REMEMBER.

16    Q   SO IT'S YOUR TESTIMONY THAT YOU'RE NOT SURE ONE WAY OR

17    ANOTHER WHETHER, WHEN YOU SIGNED THIS, YOU KNEW IT WAS TRUE.

18    A   NO.  WHEN I SIGNED IT, I BELIEVED IT TO BE TRUE.

19    Q   AND WHY DID YOU BELIEVE IT TO BE TRUE WHEN YOU SIGNED IT?

20    A   BECAUSE I WOULDN'T SIGN ANYTHING UNDER PENALTY OF PERJURY

21    I DIDN'T BELIEVE TO BE TRUE.

22    Q   WELL, MY QUESTION IS A MORE SPECIFIC ONE THAN THAT.

23          WHAT IS IT THAT YOU DID TO SATISFY YOURSELF, IN ORDER

24    TO MAKE THIS STATEMENT UNDER OATH, THAT IT WAS TRUE?

25    A   I DON'T KNOW.

1    Q   YOU DON'T HAVE ANY REASON TO DISPUTE, AS YOU SIT HERE NOW

2    BEFORE THE JURY, THAT WHAT YOU SAID IN PARAGRAPH FOUR IS TRUE;

3    IS THAT CORRECT?

4    A   I DON'T HAVE ANY REASON TO AGREE OR DISPUTE, BECAUSE I

5    DON'T REMEMBER.

6    Q   TELL US ALL OF THE REASONS WHY YOU WOULD DISPUTE THE

7    CONTENT OF WHAT YOU SAID IN THIS SWORN DECLARATION AT

8    PARAGRAPH FOUR.

9    A   BECAUSE I MIGHT NOT HAVE BEEN THE ONE WHO HAD COMMUNICATED

10   WITH MGA.  IT MIGHT HAVE BEEN MY ASSISTANT OR MY PARALEGAL.  IT

11   MIGHT NOT HAVE BEEN ME PERSONALLY.

12   Q   I'M NOT ASKING WHAT MIGHT HAVE HAPPENED.  I'M ASKING YOU,

13   WHAT DO YOU KNOW?  AND IT SAYS HERE, "I NECESSARILY

14   COMMUNICATED WITH EMPLOYEES OF MGA ENTERTAINMENT."

15       DO YOU STAND BY THAT STATEMENT?

16   A   THE "I NECESSARILY," I COULD HAVE INTERPRETED IT TO MEAN I

17   OR THROUGH MY ASSISTANT AND MY PARALEGAL COMMUNICATED.  THERE

18   WAS SOME COMMUNICATION FROM SOMEBODY TO GET THE INFORMATION.

19   Q   WELL, LET'S TAKE A LOOK AT PARAGRAPH FIVE.

20       DO YOU SEE WHERE IT SAYS, QUOTE, "IN LATE 2000, FOR

21   PURPOSES OF OBTAINING THE STRONGEST AND EARLIEST POSSIBLE

22   TRADEMARK PROTECTION FOR THE BRATZ MARK, AND OTHER BRATZ DOLLS,

23   I COMMUNICATED WITH PAULA TREANTAFELLES"?

24       DO YOU SEE THAT?

25   A   YES, I DO.

1   Q   IS THAT A TRUE STATEMENT?

2   A   I DON'T REMEMBER.

3   Q   YOU'RE NOT SURE?

4   A   CORRECT.

5   Q   YOU BELIEVED IT WAS A TRUE STATEMENT WHEN YOU WROTE IT

6   BACK IN AUGUST OF 2007; IS THAT TRUE?

7   A   I'M NOT SURE I WROTE THAT.

8   Q   YOU DON'T THINK YOU WROTE IT?

9   A   NO.

10   Q   BUT YOU READ IT BEFORE YOU SIGNED IT.

11   A   YES.

12   Q   DO YOU HAVE ANY REASON TO DOUBT OR DISPUTE THAT THAT'S A

13   TRUE STATEMENT?

14   A   AGAIN, I DON'T REMEMBER WHETHER IT WAS ME OR MY ASSISTANT

15   OR PARALEGAL.

16   Q   BUT WHETHER IT WAS YOURSELF PERSONALLY OR THROUGH YOUR

17   ASSISTANT, YOU DO BELIEVE THAT YOU HAD SOME COMMUNICATIONS WITH

18   MGA AS IT PERTAINED TO THESE TRADEMARK APPLICATIONS; IS THAT

19   CORRECT?

20   A   ALTHOUGH I DON'T PERSONALLY REMEMBER, EITHER I OR MY

21   ASSISTANT DID.

22   Q   YOU'LL GENERALLY AGREE WITH ME THAT IF YOU DID NOT BELIEVE

23   THESE STATEMENTS THAT WE'VE BEEN TALKING ABOUT HERE, IN

24   PARAGRAPHS THREE, FOUR, AND FIVE OF YOUR DECLARATION, IF YOU

25   DIDN'T THINK THEY WERE TRUE, YOU WOULDN'T HAVE SWORN TO THEM

1     UNDER OATH; IS THAT TRUE?

2     A   TRUE.

3     Q   NOW, IS IT THE CASE THAT BACK IN DECEMBER OF 2000, WHEN

4     YOU WERE PREPARING THESE TRADEMARK APPLICATIONS, THAT YOU HAD

5     OR YOUR ASSISTANT HAD, OR SOMEBODY ON YOUR BEHALF HAD, SOME

6     COMMUNICATIONS WITH MS. TREANTAFELLES ABOUT WHEN THE "BRATZ"

7     NAME WAS FIRST USED?

8     A   I DON'T REMEMBER.

9     Q   I'M SORRY?

10    A   I DON'T REMEMBER.

11    Q   ARE YOU DISPUTING THAT YOU DID, OR YOU'RE JUST NOT SURE?

12    A   I DON'T REMEMBER.  IT WAS EIGHT YEARS AGO.  I DON'T

13    REMEMBER.

14    Q   IF WE COULD LOOK AT EXHIBIT 11897 FOR IDENTIFICATION.

15    THAT SHOULD BE IN YOUR BINDER THERE.  IF YOU COULD LET US KNOW

16    WHEN YOU'VE HAD A CHANCE TO LOOK AT THAT.

17    A   OKAY.

18    Q   THIS IS A FAX THAT YOU HAD SENT TO PAULA TREANTAFELLES ON

19    OR ABOUT DECEMBER 12, 2000.

20    A   IT LOOKS LIKE IT WAS SENT BY MY ASSISTANT.

21    Q   YOU DON'T HAVE ANY REASON TO DOUBT THAT THIS FAX WAS SENT

22    ON YOUR BEHALF TO PAULA TREANTAFELLES ON OR ABOUT DECEMBER 12,

23    2000; IS THAT CORRECT?

24        MR. NOLAN:  OBJECTION, YOUR HONOR.  LACK OF

25    FOUNDATION.

1        THE COURT:  OVERRULED.

2        THE WITNESS:  COULD YOU REPEAT THE QUESTION, PLEASE.

3    BY MR. ZELLER:

4    Q   YOU DON'T HAVE ANY REASON TO DOUBT THAT THIS FAX, WHICH IS

5    THIS EXHIBIT HERE, WAS SENT BY YOU, THROUGH YOUR ASSISTANT, TO

6    PAULA TREANTAFELLES ON OR ABOUT DECEMBER 12, 2000; IS THAT

7    CORRECT?

8    A   IT SAYS DECEMBER 7TH HERE.

9    Q   I APOLOGIZE.

10       YOU DON'T HAVE ANY REASON TO DOUBT THAT'S WHEN IT WAS

11   SENT; IS THAT CORRECT?

12   A   THAT'S CORRECT.

13       MR. ZELLER:  YOUR HONOR, I WOULD MOVE EXHIBIT 11897

14   INTO EVIDENCE.

15       THE COURT:  ANY OBJECTION?

16       MR. NOLAN:  YOUR HONOR, STILL LACK OF FOUNDATION AS

17   TO WHETHER OR NOT SHE HAS PERSONAL KNOWLEDGE OF THIS DOCUMENT.

18       THE COURT:  SUSTAINED.

19   BY MR. ZELLER:

20   Q   PLEASE TAKE A LOOK AT THE SECOND PAGE OF THIS EXHIBIT.

21       DO YOU SEE YOUR NAME THERE?

22   A   YES.

23   Q   THIS REFLECTS WHAT IS A NOTE THAT YOU EXPECT THAT YOU SENT

24   TO PAULA TREANTAFELLES ON OR ABOUT DECEMBER 7TH; IS THAT TRUE?

25       MR. NOLAN:  OBJECTION.  ASSUMES FACTS NOT IN

1    EVIDENCE; LACK OF FOUNDATION.

2        THE COURT:  REPHRASE.

3    BY MR. ZELLER:

4    Q    YOU RECOGNIZE THE SECOND PAGE AS HAVING YOUR NAME THERE AT

5    THE BOTTOM; RIGHT?

6    A    YES.

7    Q    YOU DON'T HAVE ANY REASON TO DISPUTE THAT THIS IS A NOTE

8    THAT YOU SENT TO PAULA TREANTAFELLES, WHETHER DIRECTLY OR

9    THROUGH YOUR SECRETARY, BACK IN DECEMBER OF 2000; ISN'T THAT

10   TRUE?

11   A    I DON'T REMEMBER.

12   Q    YOU ALSO SEE YOUR NAME ON OTHER PAGES OF THIS EXHIBIT; IS

13   THAT TRUE?

14   A    MY NAME TYPED, YOU MEAN?

15       I DON'T SEE MY SIGNATURE.  I SEE MY NAME TYPED IN.

16   Q    I'M SORRY.  I COULDN'T HEAR ALL OF THAT.

17   A    I DON'T SEE MY SIGNATURE.  I SEE MY NAME TYPED IN.

18   Q    RIGHT.  I JUST ASKED IF YOU SAW YOUR NAME ON THIS

19   DOCUMENT.

20   A    YES.  UH-HUH.

21   Q    ON OTHER PLACES AS WELL.

22       TURNING TO THE FIRST PAGE, YOU RECOGNIZE THIS AS THE

23   LETTERHEAD OF THE LAW FIRM YOU WERE WORKING AT; IS THAT TRUE?

24   A    YES.

25   Q    AND THEN SHARON LITTMAN, LEGAL ASSISTANT, WAS YOUR

1    ASSISTANT; RIGHT?

2    A   YES.

3    Q   AND THEN YOU ALSO RECOGNIZE THE LETTERHEAD OF THE LAW FIRM

4    YOU WERE WORKING AT ON THE SECOND PAGE OF THIS DOCUMENT; IS

5    THAT CORRECT?

6    A   YES.

7    Q   AND THE INFORMATION THAT'S REFLECTED IN THIS FAX IS THE

8    TYPE OF INFORMATION THAT YOU REGULARLY SOLICITED FROM CLIENTS

9    IN YOUR ROLE AS A TRADEMARK ATTORNEY; IS THAT TRUE?

10   A   YES.

11   Q   AND YOU DOCUMENT COMMUNICATIONS WITH YOUR CLIENTS IN THE

12   NORMAL COURSE OF YOUR WORK AS A TRADEMARK ATTORNEY; IS THAT

13   TRUE?

14   A   IN GENERAL, YES.

15   Q   AND IT WAS YOUR REGULAR PRACTICE TO DOCUMENT ANY

16   COMMUNICATIONS WITH YOUR CLIENTS, THE KIND OF INFORMATION

17   THAT'S SHOWN IN THIS FAX; IS THAT TRUE?

18       MR. NOLAN:  OBJECTION, YOUR HONOR.  FOUNDATION AS TO

19   "YOU" DOCUMENTED.

20       THE COURT:  CLARIFY THAT, COUNSEL, AS TO WHO WOULD DO

21   IT.

22   BY MR. ZELLER:

23   Q   WAS IT YOUR REGULAR PRACTICE, WHETHER YOURSELF OR THROUGH

24   YOUR ASSISTANT, TO DOCUMENT ANY COMMUNICATIONS WITH YOUR

25   CLIENTS THE TYPE OF INFORMATION THAT'S SHOWN IN THIS FAX, IN

1  CONNECTION WITH THE PREPARATION OF TRADEMARK APPLICATIONS?

2      MR. NOLAN:  OBJECTION, YOUR HONOR.  COMPOUND AS TO

3  HER ASSISTANT AND HERSELF.

4      THE COURT:  IT IS COMPOUND.  BREAK IT UP, COUNSEL.

5  BY MR. QUINN:

6  Q   WAS IT YOUR REGULAR PRACTICE, YOU YOURSELF, TO DOCUMENT

7  SUCH COMMUNICATIONS?

8  A   SOMETIMES I DID; SOMETIMES MY ASSISTANT DID.

9  Q   BUT WHETHER IT WAS EITHER WAY, IT WAS PART OF YOUR REGULAR

10  PRACTICE AS A TRADEMARK ATTORNEY; IS THAT TRUE?

11  A   THAT THE MATERIAL BE DOCUMENTED.

12  Q   AND IT WAS YOUR REGULAR PRACTICE TO DOCUMENT

13  COMMUNICATIONS WITH YOUR CLIENTS AT OR ABOUT THE TIME THAT YOU

14  HAD THEM; IS THAT TRUE?

15  A   EITHER I OR MY ASSISTANT.

16  Q   AND YOU DON'T HAVE ANY REASON TO DOUBT THAT'S WHAT YOU DID

17  HERE WITH THIS FAX; IS THAT TRUE?

18      MR. NOLAN:  OBJECTION, YOUR HONOR.  LACK OF

19  FOUNDATION; CALLS FOR SPECULATION.

20      THE COURT:  OVERRULED.

21      YOU MAY ANSWER THAT QUESTION.

22      THE WITNESS:  I DON'T REMEMBER ANYTHING ABOUT THIS

23  PARTICULAR APPLICATION.

24  BY MR. ZELLER:

25  Q   BUT YOU'RE NOT DISPUTING THAT; RIGHT?

1    A   I HAVE NO PERSONAL KNOWLEDGE.  I DON'T REMEMBER.

2    Q   IT WAS YOUR REGULAR PRACTICE TO DOCUMENT, WHETHER

3    YOURSELF -- I'LL BREAK IT DOWN, IN LIGHT OF THE COURT'S PRIOR

4    RULING.

5         IT WAS YOUR REGULAR PRACTICE, BACK IN THAT TIME

6    PERIOD, TO DOCUMENT COMMUNICATIONS WITH YOUR CLIENTS ACCURATELY

7    AND BASED ON KNOWLEDGE THAT YOU HAD AT THE TIME; ISN'T THAT

8    TRUE?

9         MR. NOLAN:  YOUR HONOR, JUST --

10        THE COURT:  JUST THE OBJECTION, COUNSEL.

11        MR. NOLAN:  AMBIGUOUS AS TO "YOU."

12        IS SHE TALKING ABOUT PERSONALLY?

13        THE COURT:  SUSTAINED.

14   BY MR. ZELLER:

15   Q   DO YOU HAVE ANY REASON TO DOUBT THAT THIS FAX THAT YOU

16   HAVE IN FRONT OF YOU IS AN ACCURATE RECORD OF YOUR LAW FIRM,

17   YOUR FORMER LAW FIRM?

18        MR. NOLAN:  OBJECTION.  LACK OF FOUNDATION.

19        THE COURT:  OVERRULED.

20        THE WITNESS:  I CAN'T SAY ONE WAY OR THE OTHER.

21        MR. ZELLER:  I WOULD ASK THAT THIS EXHIBIT BE MOVED

22   INTO EVIDENCE, YOUR HONOR.

23        MR. NOLAN:  YOUR HONOR, OBJECTION.  LACK OF

24   FOUNDATION.

25        THE COURT:  LET ME SEE YOU AT SIDE-BAR, COUNSEL.

1          (WHEREUPON, THE FOLLOWING PROCEEDINGS

2          WERE HELD AT SIDE-BAR:)

3          THE COURT:  I DON'T KNOW WHAT TO SAY.

4          IF THE DOCUMENT IS WHAT IT PURPORTS TO BE, THEN THIS

5    TESTIMONY IS UNBELIEVABLE.  HOWEVER, I TEND TO AGREE.

6    TECHNICALLY, THE FOUNDATION IS NOT HERE.

7          MR. ZELLER:  HERE'S WHAT I'D LIKE TO DO, YOUR HONOR.

8          THIS IS BEING OFFERED AS A PRIOR INCONSISTENT

9    STATEMENT FOR IMPEACHMENT, BECAUSE SHE'S CLAIMED SHE DOES NOT

10   REMEMBER HAVING THIS COMMUNICATION OR KNOWING ABOUT THIS

11   COMMUNICATION.

12         THE COURT:  BUT YOU HAVEN'T SUCCEEDED IN

13   AUTHENTICATING THAT THIS IS HER PRIOR STATEMENT.

14         I WOULD AGREE WITH YOU, BUT THAT'S THE FOUNDATION

15   THAT'S MISSING.

16         COUNSEL, WHAT IS GOING ON HERE?

17         IS THERE SOMEONE REPRESENTING THIS ATTORNEY HERE?

18         MR. NOLAN:  LARRY MCFARLAND IS, YOUR HONOR.

19         BUT HERE'S THE POINT.  THIS WOMAN FILES -- MGA WAS

20   NOT HER PERSONAL CLIENT; IT'S THE FIRM'S CLIENT.  SHE WAS ASKED

21   TO DO SOME WORK.  SHE HAS NO RECOLLECTION OF -- EACH YEAR, SHE

22   FILES APPROXIMATELY 3,000 OR 2000 A YEAR.  SHE HAS NO

23   INDEPENDENT RECOLLECTION OF THIS PARTICULAR DOCUMENT; NO

24   RECOLLECTION OF ANY CONVERSATIONS WITH --

25         THE COURT:  THAT'S WHY WE -- ALL OF US AS LAWYERS,

1     HAVE LOTS OF PAPERS THAT COME AND GO; THAT'S WHY WE -- AS YOUR

2     BUSINESS PRACTICE, THAT'S PLACE OF BUSINESS -- YOU NEED TO LAY

3     FOUNDATION FOR THIS AS A BUSINESS RECORD.

4          MR. NOLAN:  I UNDERSTAND THE COURT'S CONCERN.

5          THE COURT:  I DON'T WANT THERE TO BE A FRAUD ON THE

6     COURT.  BECAUSE THIS APPEARS TO THE COURT -- UNLESS IT'S A

7     FORGERY -- IT APPEARS TO BE A STANDARD LEGAL MEMORIALIZATION.

8     THIS IS A BUSINESS MEMORIALIZATION.

9          MR. NOLAN:  I UNDERSTAND.  BUT PAULA GARCIA TESTIFIED

10    SHE DIDN'T HAVE -- HAS NO MEMORY OF EVER RECEIVING THIS.  BUT

11    THE DOCUMENT, AT THE END OF THE DAY, HAS A JUNE 2000 --

12    RECEIVED IN 2001.  THIS ATTORNEY HAS NO INDEPENDENT

13    RECOLLECTION OF HAVING THESE SPECIFIC CONVERSATIONS.  THIS IS

14    NO DIFFERENT THAN --

15         THE COURT:  WHERE DID THIS COME FROM?

16         MR. ZELLER:  THIS DOCUMENT WAS PRODUCED BY MGA, WHICH

17    HAS NOT DISPUTED THE AUTHENTICITY.  THEY HAVE NOT OBJECTED TO

18    THE AUTHENTICITY; SO THAT'S NOT A FOUNDATION PROBLEM.

19         THE COURT:  UNLESS THIS IS A FORGERY BY MGA, THIS

20    DOCUMENT IS WHAT IS BEING PURPORTED TO BE -- I'M JUST CONCERNED

21    ABOUT WHAT'S GOING ON HERE.

22         MR. NOLAN:  YOUR HONOR, ALL SHE'S SAYING IS THAT SHE

23    DOES NOT REMEMBER THIS DOCUMENT.

24         THE COURT:  FAIR ENOUGH.

25         MR. NOLAN:  BUT, YOUR HONOR, NO DISRESPECT INTENDED,

1    BUT WHEN I TRIED TO GET IN E-MAILS DIRECTED TO IVY ROSS OR

2    DOCUMENTS FOR LILY MARTINEZ, OR EVEN VICTORIA O'CONNOR, WHEN IT

3    DIDN'T REFRESH HER RECOLLECTION, EVEN THOUGH THE DOCUMENTS WERE

4    COMMUNICATIONS, THEY WERE OBJECTING ON FOUNDATION.

5        THE COURT:  I GUESS, COUNSEL, I DO HOLD A SLIGHTLY

6    DIFFERENT STANDARD WHEN I HAVE AN ATTORNEY OF LAW ADMITTED TO

7    PRACTICE BEFORE THIS COURT, SITTING ON THE WITNESS STAND.  AND

8    I DON'T CARE WHICH SIDE PRODUCES IT, I EXPECT ATTORNEYS TO --

9    IF THIS IS HER RECORD -- AND I DON'T KNOW IF IT IS OR NOT

10    BECAUSE I DON'T KNOW IF THE FOUNDATION HAS BEEN LAID FOR

11    THAT -- I EXPECT AN ATTORNEY OF RECORD TO BE ABLE TO RECOGNIZE

12    AND AUTHENTICATE WHETHER OR NOT THIS IS THEIR RECORD.

13        MR. ZELLER:  IF I MAY ADD, YOUR HONOR, NUMBER ONE,

14    THE DOCUMENTS THAT MR. NOLAN IS ATTEMPTING TO INTERJECT, WHICH

15    I THINK ARE IRRELEVANT, THOSE ARE NOT DOCUMENTS THOSE PEOPLE

16    AUTHORIZED OR RECEIVED.  THAT'S THE DISTINCTION.  THIS IS AN

17    ATTORNEY.

18        THE COURT:  I UNDERSTAND THE DISTINCTION.  I THINK

19    MR. NOLAN DOES AS WELL.

20        MR. NOLAN:  ALL I'M POINTING OUT, AGAIN, IS, LET ME

21    SHOW YOU SOMETHING.  THERE ARE DOCUMENTS BACK HERE WHERE SHE

22    WILL, I ASSUME, ADMIT BECAUSE THEY ARE HER SIGNATURES THAT ARE

23    FILED.

24        THE COURT:  BETWEEN THE DECLARATIONS SUBMITTED, SHE

25    DID SIGN THESE DOCUMENTS.  THIS COURT HAS COMPLETE CONFIDENCE

1    THAT THESE DOCUMENTS AND THE FACT THESE WERE PRODUCED BY MGA --

2    THIS COURT HAS CONFIDENCE THESE DOCUMENTS WERE, IN FACT,

3    PRODUCED WHEN THEY WERE SAID TO BE.

4        MR. NOLAN:  THAT'S FINE.  I COMPLETELY ACCEPT THE

5    COURT'S RATIONALE.  BUT ALL I'M SAYING IS THAT THEY KEEP ASKING

6    HER 'IS THIS YOUR...'  'DID YOU DO THIS...'

7        SHE HAS NO INDEPENDENT MEMORY OF THAT.

8        THE COURT:  I UNDERSTAND THAT'S TRUE.

9        IF YOU LAY BUSINESS FOUNDATION --

10       MR. ZELLER:  BUT SHE WAS FIGHTING ME EVEN ON THAT,

11   HOWEVER.  SHE KEPT ON SAYING -- SHE WOULDN'T EVEN TELL ME IF

12   SHE COULD DOUBT SOMETHING.  SHE WAS SAYING 'I DON'T KNOW,' 'I

13   DON'T REMEMBER.'

14       MR. PRICE:  HE'S ESTABLISHED THIS IS THEIR

15   LETTERHEAD.  SHE DOES IT THROUGH HER SIGNATURE.  HER NAME IS ON

16   IT.  IT'S THE PRACTICE OF THE FIRM.  I THINK HE'S ESTABLISHED

17   THE BUSINESS RECORD.

18       THE COURT:  WE'RE PRETTY CLOSE TO IT.  I'LL GIVE YOU

19   LEEWAY.  I SUSTAIN THE FOUNDATION AT PRESENT.

20       MR. NOLAN:  IF HE CAN ESTABLISH IT AS A BUSINESS

21   RECORD, I WOULDN'T OBJECT ON THAT BASIS.

22       THE COURT:  I ASSURE YOU, MR. NOLAN, IF YOU CALL AN

23   ATTORNEY AND THE SAME THING HAPPENS...  IT IS JUST NONSENSE

24   WITH AN ATTORNEY TO BE DOING THIS.

25       MR. NOLAN:  BUT FRANKLY, YOUR HONOR, I THINK THE WAY

1    THAT THE QUESTIONS HAVE BEEN ASKED SPECIFICALLY TO HER WITH

2    RESPECT TO LOOKING AT THE DOCUMENT, THE DOCUMENT -- SHE DOES

3    NOT EVEN KNOW THAT SHE SENT IT BECAUSE IT'S NOT HER SIGNED

4    NAME.  SOMEONE MAY HAVE TYPED IT FOR HER.  THAT'S THE POINT.

5        THE COURT:  FAIR ENOUGH.

6        MR. NOLAN:  I THINK AS AN ATTORNEY SHE WOULD BE MORE

7    PRECISE ON THAT PARTICULAR POINT THAN OTHERWISE.

8        THE COURT:  FAIR ENOUGH.

9        (SIDE-BAR PROCEEDINGS CONCLUDED.)

10        THE COURT:  YOU MAY PROCEED, COUNSEL.

11        MR. NOLAN:  THE LAST OBJECTION WAS SUSTAINED,

12    YOUR HONOR?

13        THE COURT:  YES.

14    BY MR. ZELLER:

15    Q   DIRECTING YOUR ATTENTION TO THE EXHIBIT THAT WE WERE

16    DISCUSSING, THIS IS THE TYPE OF DOCUMENT THAT YOU AND YOUR FIRM

17    MAINTAINED IN THE NORMAL COURSE OF ITS BUSINESS; IS THAT TRUE?

18    A   THE TYPE OF DOCUMENT?  YOU MEAN A FAX ON LETTERHEAD WOULD

19    BE...

20    Q   RIGHT.  THAT REFLECTS COMMUNICATIONS THAT YOUR LAW FIRM

21    HAD WITH YOUR CLIENTS AND ATTACHES DRAFT TRADEMARK

22    APPLICATIONS.

23    A   IN GENERAL, YOU MIGHT FIND INFORMATION LIKE THIS IN THE

24    FILE.

25    Q   AND WHEN YOU WANTED TO CHECK ON COMMUNICATIONS WITH YOUR

1    CLIENT OR WHAT YOU HAD SENT THEM, THIS IS THE TYPE OF DOCUMENT

2    YOU WOULD GO BACK AND LOOK IN YOUR FILES AND FIND TO RELY UPON;

3    IS THAT TRUE?

4    A   IN GENERAL.

5    Q   AND WHEN YOU WANTED TO CHECK ON THE CONTENTS OF A DRAFT

6    TRADEMARK APPLICATION THAT YOU HAD SENT TO YOUR CLIENT, THIS IS

7    THE TYPE OF DOCUMENT THAT YOU WOULD GO BACK AND CONSULT AND

8    RELY ON; IS THAT TRUE?

9    A   AT TIMES.

10       MR. ZELLER:  AGAIN, YOUR HONOR, I'D ASK THAT THIS

11   EXHIBIT BE MOVED IN.

12       MR. NOLAN:  NO OBJECTION, YOUR HONOR.

13       THE COURT:  IT'S ADMITTED.

14       MR. ZELLER:  IF WE COULD PULL THAT EXHIBIT UP.

15       THE COURT:  YOU MAY PUBLISH.

16   BY MR. ZELLER:

17   Q   IF WE COULD GO TO PAGE DASH 3 AND DASH 4.

18       DO YOU HAVE THAT IN FRONT OF YOU?

19   A   YES.

20   Q   AND YOU'LL SEE THAT THIS IS AN APPLICATION FOR TRADEMARK

21   REGISTRATION FOR THE NAME "JADE" THAT YOU OR YOUR OFFICE

22   PREPARED BACK IN THE 2000 TIME PERIOD.

23   A   YES.

24   Q   THIS WAS DONE FOR MGA.

25   A   YES.

Unsigned                                                      Page  1442

1    Q    DIRECTING YOUR ATTENTION, THEN, TO DASH 5 AND DASH 6, THIS

2    IS AN APPLICATION FOR TRADEMARK REGISTRATION FOR THE NAME

3    "YASMIN" THAT YOU OR YOUR OFFICE PREPARED FOR MGA BACK IN 2000;

4    IS THAT TRUE?

5    A    YES.

6    Q    AND BY THE WAY, THE NAMES "JADE" AND "YASMIN," THOSE ARE

7    NAMES FOR INDIVIDUAL BRATZ DOLLS; IS THAT RIGHT?

8    A    THAT'S MY UNDERSTANDING.

9    Q    IF WE COULD LOOK AT DASH 7 AND DASH 8.

10        THIS IS AN APPLICATION FOR TRADEMARK REGISTRATION FOR

11   THE NAME "SASHA" THAT YOUR LAW FIRM PREPARED FOR MGA BACK IN

12   THE 2000 TIME PERIOD; IS THAT CORRECT?

13   A    YES.

14   Q    AND THEN, FINALLY, IF WE COULD LOOK AT DASH 9, DASH 10.

15        THIS IS AN APPLICATION FOR TRADEMARK REGISTRATION FOR

16   THE "BRATZ" NAME THAT YOU PREPARED, OR YOUR LAW FIRM PREPARED,

17   I SHOULD SAY, BACK IN THE 2000 TIME PERIOD; IS THAT CORRECT?

18   A    YES.

19   Q    IF WE COULD HAVE THE FIRST PAGE OF THIS EXHIBIT, 11897.

20   A    YES.

21   Q    YOU'LL SEE THERE AT THE TOP -- THIS IS, OF COURSE, A FAX

22   COVER PAGE; RIGHT?

23   A    YES.

24   Q    AND IT SHOWS THAT YOUR OFFICE SENT THIS FAX TO

25   PAULA TREANTAFELLES ON DECEMBER 7, 2000; IS THAT RIGHT?

1    A   YES.

2    Q   AND YOU DON'T HAVE ANY REASON TO DOUBT THAT, DO YOU?

3    A   I DON'T KNOW ONE WAY OR ANOTHER.

4    Q   LET'S LOOK AT THE SECOND PAGE.

5        NOW, YOU'LL SEE THE TEXT HERE AT THE TOP.  THIS IS

6    THE SECOND PAGE.  AND YOU'LL SEE THAT THE TEXT HERE REFLECTS A

7    NOTE THAT YOU SENT, WHETHER DIRECTLY OR THROUGH YOUR ASSISTANT,

8    TO MS. TREANTAFELLES BACK IN DECEMBER OF 2000; IS THAT RIGHT?

9    A   YES.

10   Q   IN FACT, IT STARTS OFF, "DEAR PAULA," WHO IS

11   PAULA TREANTAFELLES.

12   A   I DON'T REMEMBER.

13   Q   YOU DON'T HAVE ANY REASON TO DOUBT THAT THAT'S WHO THE

14   PAULA HERE IS, DO YOU?

15   A   NO.

16   Q   I'D LIKE TO FOCUS YOUR ATTENTION -- DO YOU SEE WHERE IT

17   SAYS, QUOTE, "YOU INDICATED THAT ALL FOUR OF THE APPLICATIONS

18   HAVE A DATE OF FIRST USE OF JUNE 15, 2000"?

19       DO YOU SEE THAT?

20   A   YES.

21   Q   AND IT'S YOUR UNDERSTANDING THAT THE "YOU" HERE IS

22   PAULA TREANTAFELLES.

23   A   SO IT WOULD APPEAR.

24   Q   YOU DON'T DENY THAT.

25   A   I DON'T KNOW ONE WAY OR THE OTHER.  I DON'T DENY IT.

1    Q   AND THE FOUR APPLICATIONS THAT ARE BEING REFERRED TO HERE

2    IN THIS SENTENCE ARE THE FOUR TRADEMARK APPLICATIONS WE JUST

3    LOOKED AT; NAMELY, FOR THE "BRATZ" NAME AND THE THREE

4    INDIVIDUAL BRATZ DOLL NAMES; IS THAT CORRECT?

5    A   I DON'T REMEMBER.

6    Q   YOU DON'T HAVE ANY REASON TO DISPUTE THAT, DO YOU?

7    A   NOT ONE WAY OR ANOTHER.  I DON'T KNOW.

8    Q   AND I TAKE IT, HAVING SEEN THIS, IT DOES NOT REFRESH YOUR

9    RECOLLECTION WHETHER YOU HEARD FROM PAULA TREANTAFELLES, BACK

10   IN DECEMBER OF 2000, THAT THE FIRST USE OF THE "BRATZ" NAME OR

11   THESE THREE INDIVIDUAL BRATZ DOLL NAMES WAS JUNE 15TH OF 2000;

12   IS THAT TRUE?

13   A   I HAVE NO MEMORY OF THAT, NO.

14   Q   BUT YOU'RE NOT DENYING THAT'S THE STATEMENT THAT WAS MADE;

15   IS THAT TRUE?

16   A   I DON'T REMEMBER.

17   Q   SO AS FAR AS YOU CAN TELL THE JURY HERE TODAY, YOU CAN'T

18   DISPUTE THAT THAT'S WHAT PAULA TREANTAFELLES TOLD YOU; IS THAT

19   RIGHT?

20   A   I CAN'T SAY ONE WAY OR ANOTHER.

21   Q   IN THE FIRST SENTENCE HERE, YOU TALK -- THIS IS ON THE

22   SECOND PAGE OF THIS EXHIBIT -- YOU REFER TO, QUOTE,

23   "INTENT-TO-USE TRADEMARK APPLICATIONS FOR MR. LARIAN'S REVIEW

24   AND SIGNATURE."

25       DO YOU SEE THAT?

1    A   YES.

2    Q   AND YOU UNDERSTAND "MR. LARIAN" HERE IS ISAAC LARIAN.

3    A   YES.

4    Q   NOW, ONE TYPE OF TRADEMARK APPLICATION THAT YOU'RE

5    FAMILIAR WITH IS CALLED AN INTENT-TO-USE APPLICATION; IS THAT

6    RIGHT?

7    A   YES.

8    Q   AND SOMETIMES PEOPLE ABBREVIATE THAT AS "ITU".

9    A   YES.

10   Q   AND EVEN THOUGH THESE TYPES OF TRADEMARK APPLICATIONS ARE

11   CALLED "INTENT-TO-USE APPLICATIONS," YOU HAVE, AS A TRADEMARK

12   LAWYER, PREPARED THESE APPLICATIONS EVEN WHERE THE CLIENT HAS

13   TOLD YOU THAT THE TRADEMARK WAS ALREADY BEING USED; IS THAT

14   TRUE?

15   A   THAT HAS HAPPENED.

16   Q   AND ONE REASON THAT YOU HAVE FILED ITU APPLICATIONS,

17   INTENT-TO-USE APPLICATIONS, EVEN WHERE THE CLIENT HAS TOLD YOU

18   THAT THEY'RE ALREADY USING THE TRADEMARK IN SOME WAY, IS

19   BECAUSE THAT'S A FASTER PROCEDURE; YOU'D HAVE TO HAVE LESS

20   DOCUMENTATION; IS THAT RIGHT?

21   A   IN GENERAL, YES.

22   Q   RETURNING TO THE SENTENCE HERE, WHERE IT SAYS, "TO

23   PAULA TREANTAFELLES," YOU INDICATED THAT ALL FOUR OF THE

24   APPLICATIONS HAVE A DATE OF FIRST USE OF JUNE 15, 2000.

25       DO YOU HAVE ANY RECOLLECTION OF PAULA TREANTAFELLES

1   CONTACTING YOU AND TELLING YOU THAT THIS INFORMATION THAT WAS

2   REFLECTED HERE WAS INCORRECT?

3   A   NO.

4   Q   DID ANYONE AT MGA?

5   A   I DON'T REMEMBER.

6   Q   YOU DON'T HAVE A RECOLLECTION OF THAT HAPPENING?

7   A   NO, I DON'T REMEMBER SPEAKING WITH ANYONE AT MGA.

8   Q   NOW, ONE WAY THAT YOU, AS A TRADEMARK ATTORNEY, HAVE

9   TRACKED INFORMATION ABOUT TRADEMARK APPLICATIONS, WHETHER

10  YOURSELF OR THROUGH YOUR STAFF, IS TO BASICALLY PUT THE

11  INFORMATION INTO KINDS OF DATABASES; IS THAT RIGHT?

12  A   SOMEONE AT THE FIRM WOULD DO IT.  NOT ME.

13  Q   IN GENERAL, AS A TRADEMARK LAWYER, YOU CONSIDER IT

14  IMPORTANT TO TRACK THE VARIOUS DEADLINES THAT GO ALONG WITH

15  APPLICATIONS; IS THAT TRUE?

16  A   OH, YES.

17  Q   AND LAW FIRMS, INCLUDING THE LAW FIRMS THAT YOU'VE WORKED

18  AT, THEY HAVE COMPUTER DATABASES AND SOFTWARE THAT THEY USE TO

19  MAKE SURE THAT THAT'S DONE PROPERLY.

20  A   YES.

21  Q   AND IT'S IMPORTANT TO MAINTAIN ACCURATE INFORMATION IN

22  THOSE KINDS OF DATABASES; RIGHT?

23  A   YES.

24  Q   BECAUSE IF THERE ARE MISTAKES IN THERE, IT COULD MEAN THAT

25  DEADLINES ARE MISSED, TRADEMARK REGISTRATIONS CAN LAPSE, AND IT

1    CAN OTHERWISE AFFECT THE RIGHTS OF THE CLIENT.

2    A    TRUE.

3    Q    AND SOMETIMES THESE KINDS OF DATABASES ARE SOMETHING

4    CALLED "TRADEMARK DOCKETS" OR "TRADEMARK DOCKET SHEETS".

5    A    YES.

6    Q    AND BACK IN 2000, YOUR FIRM CREATED A TRADEMARK DOCKET

7    SHEET THAT ALSO DOCUMENTED THIS CONVERSATION WITH

8    PAULA TREANTAFELLES ABOUT THE JUNE 15, 2000 FIRST-USE DATE; IS

9    THAT TRUE?

10   A    I WOULDN'T KNOW THAT.

11   Q    IF YOU WOULD LOOK AT EXHIBIT 11192.  IN PARTICULAR, WE'LL

12   FOCUS ON THE SECOND PAGE OF THIS DOCUMENT; IT'S THE ONE DASH

13   TWO.

14        YOU RECOGNIZE THIS AS A PRINTOUT OF A RUSS AUGUST

15   TRADEMARK DOCKET SHEET; IS THAT TRUE?

16   A    NO.

17   Q    DO YOU HAVE ANY REASON TO DOUBT THAT'S WHAT IT IS?

18   A    I HAVE NO REASON TO SAY ONE WAY OR ANOTHER.  I'VE NEVER

19   LOOKED AT THE DOCKET SHEET.

20   Q    YOU'RE SAYING YOU'VE NEVER IN YOUR ENTIRE LIFE SEEN A

21   TRADEMARK DOCKET SHEET IN THIS FORM?

22   A    I HAVE SEEN A DOCKET SHEET, BUT IT ISN'T MY USUAL PRACTICE

23   TO LOOK AT THE INFORMATION ON THE DOCKET SHEET.

24   Q    WHETHER IT'S YOUR USUAL PRACTICE OR NOT, THOUGH, YOU'VE

25   SEEN THEM.

1    A   I HAVE SEEN A DOCKET SHEET IN MY LIFE, YES.

2    Q   AND YOU HAVE A GENERAL UNDERSTANDING AS TO WHAT THEY'RE

3    USED FOR; IS THAT TRUE?

4    A   YES.

5    Q   AND HOW THEY'RE MAINTAINED?

6    A   NO -- YES.

7    Q   YOU KNOW GENERALLY THE KINDS OF INFORMATION THAT GO INTO

8    THEM AND THE PROCESSES AND PROCEDURES THAT ARE USED TO MAINTAIN

9    THEM; IS THAT TRUE?

10   A   YES.

11   Q   AND, IN FACT -- WELL, MAYBE YOU DON'T DO IT FREQUENTLY --

12   YOU DO, FROM TIME TO TIME, CONSULT WITH THIS KIND OF

13   INFORMATION, OR HAVE OTHER PEOPLE OBTAIN THIS KIND OF

14   INFORMATION, SO YOU CAN PROVIDE ADVICE TO CLIENTS; IS THAT

15   TRUE?

16   A   COULD YOU REPEAT THE QUESTION AGAIN.  I WANT TO MAKE SURE

17   I ANSWER IT ACCURATELY.

18   Q   SURE.

19       WHILE I UNDERSTAND THAT YOU'RE SAYING THAT YOU DON'T

20   CONSULT THEM FREQUENTLY, FROM TIME TO TIME, IN THE COURSE OF

21   YOUR PRACTICE, YOU HAVE LOOKED AT TRADEMARK DOCKET SHEETS OF

22   THIS KIND IN ORDER TO LEARN INFORMATION OR REFRESH YOURSELF

23   ABOUT INFORMATION SO YOU CAN PROVIDE LEGAL ADVICE; IS THAT

24   TRUE?

25   A   I HAVE.

1          MR. NOLAN:  IF MR. ZELLER WANTS TO OFFER THIS AS A

2     BUSINESS RECORD --

3          THE COURT:  HE HASN'T OFFERED ANYTHING YET.

4          MR. NOLAN:  I WAS JUST GOING TO SAY I DIDN'T OBJECT

5     TO IT.  I'M JUST TRYING TO SHORTCUT THIS.

6          MR. ZELLER:  I APPRECIATE THAT.

7          I WOULD THEN MOVE THIS EXHIBIT INTO EVIDENCE,

8     YOUR HONOR.

9          MR. NOLAN:  WE HAVE NO OBJECTION.

10          MR. ZELLER:  THEN WE DON'T HAVE TO GO THROUGH THE

11     BUSINESS RECORD AGAIN.

12          THE COURT:  VERY WELL.

13          MR. QUINN:  IF WE COULD PLEASE PULL UP EXHIBIT

14     11192-2 IN EVIDENCE.  ONLY PAGE 2.  I'M NOT INTERESTED IN

15     PAGE 1.

16     BY MR. ZELLER:

17     Q   NOW, IN GENERAL, YOU RECOGNIZE THIS AS A TRADEMARK DOCKET

18     SHEET OF THE LAW FIRM YOU WERE WITH BACK IN 2000; IS THAT

19     RIGHT?

20     A   IN GENERAL.

21     Q   AND YOU'LL SEE THAT THERE'S A CLIENT NUMBER THERE, AND

22     HERE, IT SAYS "2067-57."

23          DO YOU SEE THAT?

24     A   YES.

25     Q   AND THAT POINT 57 MEANS THAT THAT'S, LIKE, THE 57TH MATTER

1   THAT YOUR FIRM HAS HANDLED FOR THE PARTICULAR CLIENT?  IS THAT

2   GENERALLY TRUE?

3   A   YES.

4   Q   AND THEN IT SAYS, "ATTORNEY:  LBA."

5        THAT'S YOU?

6   A   YES.

7   Q   AND THEN IF YOU LOOK DOWN FURTHER, YOU'LL SEE THAT THE

8   TRADEMARK REFERENCED HERE IS BRATZ.

9   A   YES.

10   Q   AND YOU DON'T HAVE ANY REASON TO DOUBT THAT THAT'S WHAT

11   THIS DOCKET SHEET IS ABOUT; IT'S ABOUT BRATZ.

12   A   CORRECT.

13   Q   THEN IF WE CAN GO FURTHER DOWN TO THE REMARK SECTION.

14        YOU'LL SEE, RIGHT THERE AT THE BEGINNING, IT SAYS,

15   "DATES OF USE:  6-15-2000."

16        DO YOU SEE THAT?

17   A   I SEE THAT.

18   Q   AND YOU DON'T HAVE ANY REASON TO DISPUTE THAT THAT'S THE

19   INFORMATION THAT WAS PUT INTO THE RUSS AUGUST DOCKET SHEET; IS

20   THAT TRUE?

21   A   TRUE.

22   Q   AND THEN IT GOES ON TO SAY, "CLIENT WANTS TO FILE ASAP, SO

23   ITU STATUS AS OF 12-7-00."

24        DO YOU SEE THAT?

25   A   YES.

1   Q   AND DO YOU AGREE WITH ME THAT THIS REFLECTS THAT MGA

2   WANTED THE APPLICATION FILED AS AN ITU SO, AS WE TALKED ABOUT

3   EARLIER, IT COULD BE FILED AS QUICKLY AS POSSIBLE?

4   A   THAT'S WHAT THAT NOTATION WOULD SEEM TO INDICATE.

5       THE COURT:  WHAT DOES "ITU" STAND FOR?

6       THE WITNESS:  INTENT TO USE.

7   BY MR. ZELLER:

8   Q   JUST A COUPLE MORE QUESTIONS, THEN.

9       MGA IS PAYING FOR YOUR LEGAL REPRESENTATION IN THIS

10  CASE; IS THAT TRUE?

11  A   YES.

12  Q   AND THE LAWYER INVOLVED IS A LARRY MCFARLAND?

13  A   YES.

14  Q   HE'S REPRESENTING YOU?

15  A   YES, HE IS.

16  Q   AND YOU'RE GENERALLY AWARE THAT MR. MCFARLAND HAS

17  REPRESENTED MGA FOR A NUMBER OF YEARS; IS THAT TRUE?

18  A   I WASN'T AWARE OF THAT.

19      MR. ZELLER:  THANK YOU.

20          CROSS-EXAMINATION

21  BY MR. NOLAN:

22  Q   MS. ARANT, COULD YOU TELL THE JURY APPROXIMATELY HOW MANY

23  TRADEMARK APPLICATIONS YOU FILE FOR CLIENTS EACH YEAR.

24  A   EACH YEAR?  WELL, I HAPPENED TO LOOK UP THAT I FILED 4,917

25  SINCE 2000.

1   Q   I'M NOT GOING TO ASK YOU QUESTIONS ABOUT EACH ONE OF

2   THOSE; BUT GENERALLY, IF I DID, WOULD YOU BE ABLE TO RECALL ANY

3   OF THEM SPECIFICALLY?

4   A   NOT ONCE.  DEPENDS HOW RECENTLY I'VE DONE THEM; BUT NO.

5   Q   WHAT ABOUT GOING BACK EIGHT YEARS?

6   A   DEFINITELY NOT.

7   Q   HAVE YOU OR YOUR ASSISTANT, IN ANY OF THOSE 4,917

8   APPLICATIONS, EVER NOTICED A TYPO OR AN ERROR BEING MADE IN A

9   PARTICULAR APPLICATION?

10  A   YES.

11  Q   WHAT HAPPENS WHEN THERE'S A MISTAKE IN AN APPLICATION?  IS

12  THERE A PROCEDURE WHEREBY A CLIENT CAN CORRECT THOSE ERRORS?

13  A   YES.

14  Q   CAN YOU EXPLAIN TO THE JURY HOW THOSE PROCEDURES FOR

15  CORRECTING ERRORS OCCUR.

16  A   YOU CAN FILE A NEW STATEMENT OF USE OR A NEW ALLEGATION OF

17  USE WITH THE TRADEMARK OFFICE, SAYING THERE HAD BEEN A MISTAKE

18  IN THE ORIGINAL DATES OF USE AND YOU WISH TO CORRECT IT.

19  Q   AND WERE THOSE NOTICES OF CORRECTION FILED?

20  A   IN CERTAIN CASES, YES.

21  Q   AND WHERE ARE THEY FILED?

22  A   AT THE UNITED STATES PATENT AND TRADEMARK OFFICE.

23  Q   THOSE ARE PUBLIC FILINGS?

24  A   YES, THEY ARE.

25  Q   AS YOU SIT HERE TODAY -- AND I KNOW YOUR RECOLLECTION IS

Unsigned                                    Page  1453

1    NOT GOOD, BUT IN THAT LAST DOCUMENT --

2          MR. NOLAN:  CAN WE GO BACK TO THE LAST EXHIBIT THAT

3    WAS UP FOR THE JURY.

4    BY MR. NOLAN:

5    Q   THIS IS EXHIBIT 11192-002.

6          DID YOU INPUT ANY OF THIS DATA?

7    A   NO.

8    Q   IF WE COULD JUST GO DOWN TO DATES OF USE.

9          IF I UNDERSTAND FROM YOUR TESTIMONY, MS. ARANT, THE

10   DATES OF USE WOULD BE THAT THE PRODUCT HAD BEEN OFFERED FOR

11   SALE IN EITHER INTERSTATE COMMERCE, FOREIGN, OR IN THE UNITED

12   STATES; CORRECT?

13   A   YES.

14   Q   DO YOU HAVE ANY PERSONAL KNOWLEDGE AS TO WHEN BRATZ, THE

15   DOLL, WAS EVER OFFERED FOR SALE IN EITHER THE UNITED STATES OR

16   FOREIGN COMMERCE?

17   A   NO.

18   Q   IF THERE WAS TESTIMONY IN THIS CASE FROM COMPETENT

19   WITNESSES THAT INDICATED THAT THE BRATZ DOLL WAS FIRST OFFERED

20   FOR USE IN INTERSTATE COMMERCE, IN EITHER SPAIN OR THE UNITED

21   STATES, ON JUNE 15, 2001, WOULD YOU HAVE ANY BASIS TO DISPUTE

22   THAT EVIDENCE?

23         MR. ZELLER:  MISSTATES THE TESTIMONY, YOUR HONOR.

24   LACKS FOUNDATION.

25         MR. NOLAN:  I'M JUST ASKING IF SHE WOULD DISPUTE IT.

1          THE COURT:  I UNDERSTAND, COUNSEL.

2          I'M GOING TO SUSTAIN THE OBJECTION.

3          REPHRASE YOUR QUESTION.

4     BY MR. NOLAN:

5     Q   A PRIOR EMPLOYEE OF MGA, VICTORIA O'CONNOR, TESTIFIED

6     YESTERDAY THAT THE FIRST TIME THAT BRATZ WAS SOLD WAS IN SPAIN

7     IN JUNE OF 2001; AND MY QUESTION TO YOU IS, DO YOU HAVE ANY

8     EVIDENCE OR KNOWLEDGE THAT WOULD DISPUTE VICTORIA O'CONNOR'S

9     TESTIMONY?

10    A   NO.

11         MR. ZELLER:  I THINK THAT STILL MISSTATES THE

12    TESTIMONY, YOUR HONOR.  IT DOES LACK FOUNDATION, IN ANY EVENT.

13         THE COURT:  OVERRULED.  FOUNDATION, I'LL SUSTAIN.

14         LAY A FOUNDATION FOR THIS WITNESS TO KNOW THAT,

15    COUNSEL, TO DISPUTE THE JUNE 2001 DATE.

16    BY MR. NOLAN:

17    Q   AS I RECALL YOUR TESTIMONY, YOU HAVE NO INDEPENDENT

18    RECOLLECTION OF ANY CONVERSATION WITH ANY REPRESENTATIVE OF

19    MGA; CORRECT?

20    A   CORRECT.

21    Q   NOR DO YOU HAVE ANY RECOLLECTION OF ANY COMMUNICATIONS

22    BETWEEN YOUR ASSISTANT AND YOURSELF REGARDING ANY

23    COMMUNICATIONS BACK IN THE YEAR 2000 WITH A REPRESENTATIVE OF

24    MGA; CORRECT?

25    A   CORRECT.

1   Q   GOING BACK TO 11192-002.  THIS IS THE TRADEMARK DOCKET

2   ENTRY SHEET.

3        DO YOU SEE IT SAYS, "DATES OF USE:  6-15-2000;

4   AWAITING SPECIMENS; CLIENT WANTS TO FILE ASAP, SO ITU STATUS OF

5   12-7-00"?

6        THAT'S WHAT MR. ZELLER DIRECTED YOU TO.

7        I WANT TO DIRECT YOU TO THE NEXT POINT.

8        IT SAYS, "VICTORIA O'CONNOR AT ABC D.B.A. MGA" --

9   THAT'S KIND OF A FANCY WAY OF SAYING IT'S MGA; RIGHT?

10  A   YES.

11  Q   "STATUS OF APPLICATION:  SHE CALLED ON MARCH 26, 2001.

12  SHE IS THE LICENSING DIRECTOR AT MGA.  HER EXTENSION IS 194."

13       DO YOU SEE THAT?

14  A   YES.

15  Q   NOW, DO YOU HAVE ANY BASIS TO SAY THAT YOUR KNOWLEDGE OF

16  THE STATUS OF THE DATE OF FIRST USE FOR BRATZ WAS SUPERIOR TO

17  THAT OF VICTORIA O'CONNOR?

18  A   NO.

19  Q   SO IF SOMEONE WANTED TO KNOW THE ACTUAL AND CORRECT DATE

20  OF FIRST USE FOR THE BRATZ DOLL, BY LOOKING AT THIS TRADEMARK

21  TRACKING SHEET, IF YOU HAD TO CONTACT SOMEONE, WHO WOULD YOU

22  CONTACT TO GET THAT INFORMATION?

23  A   VICTORIA O'CONNOR.

24  Q   EXPLAIN TO ME AGAIN, SO THAT I'M CLEAR ON THIS, WHEN YOU

25  SAY 'DATE OF FIRST USE FOR BRATZ:  6-15-2000.'  IN YOUR MIND,

1    WHAT DOES THAT MEAN?  THAT IT WAS ACTUALLY OFFERED FOR SALE IN

2    INTERSTATE COMMERCE IN EITHER FOREIGN OR THE UNITED STATES?

3    A    YES.

4         MR. ZELLER:  LACKS FOUNDATION AS TO THIS DOCUMENT.

5         THE COURT:  REPHRASE YOUR QUESTION, COUNSEL.

6    BY MR. NOLAN:

7    Q    WITHOUT REFERENCE TO THIS DOCUMENT, JUST BASED ON YOUR

8    EXPERIENCE AS A LAWYER, WHAT WOULD IT MEAN IF THE DOCUMENT SAID

9    THAT THE FIRST DATE OF USE WAS JUNE 15, 2000?

10   A    THAT WOULD MEAN IT WAS OFFERED FOR SALE IN INTERSTATE

11   COMMERCE OR IN COMMERCE BETWEEN THE UNITED STATES AND A FOREIGN

12   COUNTRY.

13   Q    WOULD IT BE SUFFICIENT JUST TO SAY THAT THE DOLL WAS IN

14   DEVELOPMENT BUT NOT OFFERED FOR RETAIL?

15   A    NO.

16   Q    SO BASED ON YOUR EXPERIENCE, IN ORDER FOR THAT DATE OF

17   FIRST USE TO BE ACCURATE, IT WOULD HAVE TO BE TIED TO THE

18   ACTUAL DATE THAT THE BRATZ DOLL WAS OFFERED FOR RETAIL IN

19   INTERSTATE COMMERCE; CORRECT?

20        MR. ZELLER:  FOUNDATION.

21        THE COURT:  LAY A FOUNDATION.

22   BY MR. NOLAN:

23   Q    HOW LONG HAVE YOU BEEN A LAWYER?

24   A    SINCE 1980; 28 YEARS.

25   Q    AND YOU'VE FILED OVER 4,900 APPLICATIONS?

1    A   YES.

2    Q   IN THOSE APPLICATIONS, YOU, AS MR. ZELLER POINTED OUT, ARE

3    FAMILIAR WITH THE VARIOUS TERMS THAT ARE USED IN THE TRADEMARK

4    APPLICATIONS; CORRECT?

5    A   YES.

6    Q   AND YOU TRY TO BE CORRECT WHEN YOU FILE THESE

7    APPLICATIONS?

8    A   OF COURSE.

9    Q   SOMETIMES YOU MAKE MISTAKES; CORRECT?

10   A   CORRECT.

11   Q   BUT NEVERTHELESS, YOUR UNDERSTANDING OF FIRST DATE OF USE

12   OF A PRODUCT, FOR PURPOSES OF FILING A DOCUMENT WITH THE U.S.

13   TRADEMARK OFFICE, IS BASED ON YOUR YEARS OF EXPERIENCE;

14   CORRECT?

15   A   CORRECT.

16   Q   AS WELL AS BEING AN EXAMINER AT THE OFFICE; CORRECT?

17   A   CORRECT.

18   Q   SO CAN YOU PLEASE EXPLAIN TO THE JURY WHAT "DATE OF FIRST

19   USE" MEANS WITH RESPECT TO OFFERING BRATZ FOR RETAIL.

20   A   "DATE OF FIRST USE" MEANS FIRST OFFERED FOR SALE IN

21   INTERSTATE COMMERCE OR OFFERED FOR SALE BETWEEN THE UNITED

22   STATES AND A FOREIGN COUNTRY.

23   Q   I'D LIKE YOU TO TURN YOUR ATTENTION TO EXHIBIT 00557

24   THAT'S IN FRONT OF YOU.

25       CAN YOU IDENTIFY FOR THE JURY WHAT THIS DOCUMENT IS.

1    A   IT APPEARS TO BE A COPYRIGHT REGISTRATION.

2    Q   TURN TO 557-0003.

3        DO YOU SEE YOUR SIGNATURE?

4    A   YES.

5    Q   WHAT PAGE DOES THAT APPEAR ON?

6    A   557-003.

7    Q   AND THIS DOCUMENT IS A COPYRIGHT APPLICATION, CERTIFICATE

8    OF REGISTRATION, FILED WITH THE UNITED STATES COPYRIGHT AND

9    TRADEMARK OFFICE; CORRECT?

10   A   IT APPEARS TO BE, YES.

11   Q   AND THIS WAS FILED ON OR AROUND JUNE 18, 2001.

12   A   THE DATE I SEE IS JULY 16, 2001.

13       MR. ZELLER:  YOUR HONOR, THIS IS OUTSIDE THE SCOPE.

14   WE'RE GETTING INTO DIFFERENT ISSUES THAN WAS ADDRESSED THROUGH

15   MY DIRECT.

16       THE COURT:  OVERRULED.

17       MR. NOLAN:  THANK YOU.

18   BY MR. NOLAN:

19   Q   YOU'RE CORRECT ON THE DATE.  I APOLOGIZE.

20       IN ANY EVENT, DID YOU CAUSE THIS DOCUMENT TO BE FILED

21   WITH THE COPYRIGHT OFFICE OF THE UNITED STATES OF AMERICA?

22   A   I DON'T REMEMBER PERSONALLY.

23   Q   BUT YOU DID SIGN IT; CORRECT?

24   A   YES.

25   Q   IN SIGNING IT, DID YOU HAVE THE INTENT TO HAVE IT FILED

1    WITH THE COPYRIGHT OFFICE?

2    A   YES.

3        MR. NOLAN:  YOUR HONOR, WE'D OFFER

4    EXHIBIT NUMBER 00557.

5        MR. ZELLER:  NO OBJECTION, YOUR HONOR.

6        THE COURT:  IT'S ADMITTED.

7        MR. ZELLER:  IF I COULD HAVE THIS ON THE SCREEN.

8    BY MR. NOLAN:

9    Q   NOW, THIS IS A DOCUMENT WITH A GOLD SEAL.

10       SO THIS IS THE FIRST PAGE OF THE DOCUMENT THAT'S

11   FILED WITH THE COPYRIGHT OFFICE; CORRECT?

12   A   AGAIN, I DON'T KNOW FOR SURE, BUT IT SEEMS TO BE.

13   Q   TURN TO THE SECOND PAGE.  AND THIS IS THE CERTIFICATE, AND

14   THERE'S A "FORM VA" ON IT.

15       DO YOU SEE THAT?

16   A   YES.

17   Q   THE FIRST LINE REFERS TO THE JADE DOLL CONFIGURATION,

18   ACCESSORIES, AND PACKAGING.

19       DO YOU SEE THAT?

20   A   YES.

21   Q   TURN YOUR ATTENTION DOWN TO THE LEFT-HAND CORNER, RIGHT

22   ABOVE "COPYRIGHT CLAIMANTS."  IT SAYS, "YEAR IN WHICH CREATION

23   OF THIS WORK WAS COMPLETED."

24       DO YOU SEE THAT?

25   A   YES.

1   Q   WHAT IS THE DATE THERE?

2   A   2000.

3   Q   AND THEN IT SAYS, "DATE AND NOTICE OF FIRST PUBLICATION OF

4   THIS PARTICULAR WORK."

5       DO YOU SEE THAT?

6   A   YES.

7   Q   AND THAT DATE IS FEBRUARY 12, 2001.

8   A   YES.

9   Q   IF YOU COULD TURN TO THE SECOND PAGE; THIS IS THE PAGE

10   THAT HAS YOUR SIGNATURE ON IT.

11       DO YOU RECOGNIZE YOUR SIGNATURE?

12   A   YES.

13   Q   AND THE DATE OF YOUR SIGNATURE IS 7-16-01.

14   A   YES.

15   Q   KEEPING THAT DOCUMENT CLOSE BY, FLIP TO EXHIBIT 00558.

16       FIRST OF ALL, BEFORE I GO OFF OF THAT LAST DOCUMENT,

17   DO YOU REMEMBER WHERE YOU GOT ANY OF THE INFORMATION THAT WAS

18   LISTED IN THAT APPLICATION THAT YOU SIGNED?

19   A   NO.

20   Q   DIRECTING YOU TO 0558, DO YOU SEE THIS DOCUMENT?

21   A   YES.

22   Q   THIS IS A CORRECTION FORM DOCUMENT FILED WITH THE

23   COPYRIGHT AND PATENT OFFICE; CORRECT?

24   A   IT'S A DIFFERENT ONE THAT'S ON THE SCREEN; CORRECT?

25       I JUST WANT TO MAKE SURE WE'RE LOOKING AT THE SAME

1     THING.

2          MR. ZELLER:  THIS HASN'T ACTUALLY BEEN OFFERED INTO

3     EVIDENCE YET.  I DON'T HAVE AN OBJECTION TO IT BEING

4     INTRODUCED, BUT I DON'T THINK THERE'S FOUNDATION TO ASK THE

5     WITNESS ABOUT IT.

6          THE COURT:  VERY WELL.

7          MR. NOLAN:  YOUR HONOR, INSTEAD OF GOING THROUGH THE

8     FOUNDATION, COULD I JUST OFFER IT INTO EVIDENCE?

9          THE COURT:  LAY A FOUNDATION COUNSEL.  KEEP IT IN

10    ORDER.

11    BY MR. NOLAN:

12    Q   SO DO YOU HAVE NOW IN FRONT OF YOU 00558?

13    A   YES.

14    Q   AND ON THE TOP, IT SAYS "FORM CA."

15        DO YOU SEE THAT?

16    A   YES.

17    Q   IT'S DATED MARCH 28, 2005.

18    A   YES.

19    Q   AND THERE IS A REGISTRATION NUMBER ON THERE OF VA

20    1090-287.

21    A   YES.

22    Q   AND THEN RIGHT ABOVE THAT REGISTRATION NUMBER, AGAIN, IT

23    HAS THE DESCRIPTION OF "JADE DOLL CONFIGURATION, ACCESSORIES,

24    AND PACKAGING."

25    A   YES.

1    Q   AND WHAT IS THIS DOCUMENT?

2    A   THIS IS A CORRECTED FORM THAT YOU WOULD FILE IF THERE HAD

3    BEEN A MISTAKE IN A COPYRIGHT.

4    Q   AND THIS IS FILED WITH WHICH OFFICE?

5    A   I'M NOT A COPYRIGHT ATTORNEY.  I'M NOT SURE.  BUT THE

6    COPYRIGHT OFFICE.

7    Q   IF YOU TURN TO THE SECOND PAGE, DO YOU SEE THERE THAT

8    THERE'S A SPACE WHERE CORRECTIONS CAN BE MADE TO THE DOCUMENT

9    THAT YOU HAD PREVIOUSLY SIGNED?

10   A   I SEE THAT.

11        MR. NOLAN:  YOUR HONOR, WE'D OFFER THIS.

12        MR. ZELLER:  NO OBJECTION TO THE INTRODUCTION OF THE

13   EXHIBIT; BUT, AGAIN, I DON'T THINK THERE'S PROPER FOUNDATION

14   WITH THIS WITNESS.

15        THE COURT:  OVERRULED.

16        YOU MAY INTRODUCE IT.

17   BY MR. NOLAN:

18   Q   SO THE FIRST PAGE, WE TALKED ABOUT.

19        I JUST WANT TO GO TO THE SECOND PAGE.  THIS IS THE

20   BLOCK WHERE THERE'S ROOM FOR THE CORRECTIONS TO BE MADE.

21        DO YOU SEE THAT?

22   A   YES.

23   Q   AND I JUST WANT TO MAKE CERTAIN WE PUT THIS IN CONTEXT.

24   THE DOCUMENT THAT I SHOWED YOU FIRST, WHERE YOU WERE FILING THE

25   COPYRIGHT APPLICATION THAT YOU SIGNED FOR JADE COLLECTIBLES,

1   HAD A DATE DURING WHICH CREATION OF THIS WORK WAS THE YEAR

2   2000.

3       DO YOU REMEMBER THAT?

4   A   THE ONE YOU JUST SHOWED ME BUT TOLD ME TO KEEP, YES.

5   Q   NOW, IF YOU WOULD GO BACK TO THE CORRECTED FORM, WHICH IS

6   THE NEXT EXHIBIT.  DO YOU SEE THAT?

7   A   YES.

8   Q   LET'S GO UP TO 3-A, LINE 3-A; YEAR OF COMPLETION:

9   INCORRECT INFORMATION, 2000, AND THEN CORRECTED INFORMATION,

10  YEAR 2001; CORRECT?

11  A   I SEE THAT, YES.

12  Q   AND THIS IS A FORM WHEREBY THE APPLICANT CAN GO BACK TO

13  THE UNITED STATES TRADEMARK AND COPYRIGHT OFFICE AND SAY, 'HEY,

14  ONE OF THE FORMS HAD THE WRONG DATE ON IT.  IT'S EITHER A TYPO,

15  MISINFORMED, AND THE CORRECTED INFORMATION IS THERE OF 2001';

16  CORRECT?

17  A   YES.

18  Q   IF YOU COULD TURN TO 00559.

19      DO YOU SEE THAT?

20  A   YES.

21  Q   AND THIS IS AN APPLICATION FOR COPYRIGHT FOR THE SASHA

22  DOLL CONFIGURATION, ACCESSORIES, AND PACKAGING; CORRECT?

23  A   YES.

24  Q   AND THIS WAS FILED WITH THE COPYRIGHT OFFICE?

25  A   YES.

1    Q   AND THE DATE OF CREATION ON THIS WAS THE YEAR 2000?

2    A   YES.

3        MR. NOLAN:  YOUR HONOR, WE'D OFFER EXHIBIT NUMBER

4    00559.

5        MR. ZELLER:  NO OBJECTION.

6        THE COURT:  IT'S ADMITTED.

7        YOU MAY PUBLISH.

8    BY MR. NOLAN:

9    Q   LET'S GO TO THE YEAR, WHERE IT SAYS 2000, CREATION,

10   SIMILAR TO THE APPLICATION FOR JADE, RIGHT, THAT I JUST SHOWED

11   YOU?

12   A   YES.

13   Q   SO NOW, IF YOU COULD LOOK AT 00560, WHICH IS NEXT IN YOUR

14   BOOK.

15       DO YOU RECOGNIZE THIS DOCUMENT ALSO AS A CORRECTION

16   FORM?

17   A   YES.

18   Q   SO THIS IS, AGAIN, THE CORRECTION FORM FOR SASHA DOLL

19   CONFIGURATION, ACCESSORIES, AND PACKAGING, A CORRECTION FORM

20   FOR THAT EARLIER COPYRIGHT APPLICATION; CORRECT?

21   A   YES.

22   Q   AND IF YOU TURN TO PAGE 2, DO YOU SEE CORRECTIONS WERE

23   MADE ON THAT PAGE?

24   A   YES.

25       MR. NOLAN:  YOUR HONOR, WE'D OFFER EXHIBIT NUMBER

1   00560.

2        MR. ZELLER:  NO OBJECTION, YOUR HONOR.

3        THE COURT:  IT'S ADMITTED.

4        YOU MAY PUBLISH.

5        MR. NOLAN:  GO TO LINE 3-A.

6   BY MR. NOLAN:

7   Q   DO YOU SEE WHERE THE INCORRECT INFORMATION WAS 2000 AND

8   THE CORRECT INFORMATION WAS THE YEAR 2001?

9   A   YES.

10  Q   THIS ONE APPEARS TO BE SIMILAR TO THE OTHER ONE,

11  CORRECTING A TYPO.

12  A   YES.

13  Q   NOW GOING BACK TO --

14       MR. ZELLER:  LET ME MAKE A BELATED OBJECTION.

15       "CORRECTING THE TYPO," THERE'S NO FOUNDATION FOR

16  THAT.

17       THE COURT:  SUSTAINED.

18  BY MR. NOLAN:

19  Q   IT IS CORRECTING THE DATE OF 2000 TO THE YEAR 2001;

20  CORRECT?

21  A   YES.

22  Q   IT APPEARS THAT THE DATE OF 2000 WAS PLACED ON THE FORM

23  INCORRECTLY; YES?

24  A   IT APPEARS.

25       MR. ZELLER:  FOUNDATION.  AND, ALSO, THERE'S LOTS OF

1    LEADING QUESTIONS AS WELL.

2         THE COURT:  LET'S STOP.

3         I SUSTAIN THE OBJECTION TO THAT LAST QUESTION.

4    BY MR. NOLAN:

5    Q   LET'S GO TO 00561.

6         THE COURT:  COUNSEL, THIS IS THE SAME ISSUE.

7         COULD WE GET A STIPULATION ON THIS?  IS THIS A MATTER

8    OF DISPUTE, COUNSEL?

9         MR. NOLAN:  I'M HAPPY TO GO THROUGH IT, BECAUSE

10   THERE'S ONLY A FEW MORE.

11        THE COURT:  MR. ZELLER?

12        MR. ZELLER:  THERE'S NOT NECESSARILY A MATTER OF

13   DISPUTE AS TO THE AUTHENTICITY OR ADMISSIBILITY OF THESE

14   DOCUMENTS.

15        THE COURT:  FOR ALL FOUR?

16        MR. ZELLER:  THERE IS WITH RESPECT TO WHAT THIS

17   WITNESS CAN TESTIFY TO ABOUT THEM.

18        THE COURT:  THAT'S WHY I'M SUGGESTING A STIPULATION

19   AT THIS POINT, IN THE INTEREST OF TIME.

20        MR. NOLAN:  IF I MIGHT, YOUR HONOR, I WOULD STIPULATE

21   THAT WE WOULD OFFER INTO EVIDENCE THE COPYRIGHT APPLICATION

22   MARKED 00561, FOR CLOE DOLL; AND THE CORRESPONDING CORRECTED

23   FORM, WHICH IS TRIAL 00562; AND THEN THE CORRECTED FORM, SHOWN

24   00563, FOR YASMIN; AND 00564, WHICH IS ANOTHER CORRECTED FORM,

25   YOUR HONOR, FOR THE DOLLS.  AND THAT'S THE LAST IN THE SERIES

1    OF THOSE.

2         THE COURT:  ANY OBJECTION TO THOSE THREE BEING

3    ADMITTED, COUNSEL?

4         MR. ZELLER:  NO, YOUR HONOR.

5         THE COURT:  VERY WELL.

6         MR. NOLAN:  THANK YOU, YOUR HONOR, FOR SPEEDING THAT

7    UP.

8    BY MR. NOLAN:

9    Q   HAS ANYBODY SUGGESTED TO YOU THAT YOU SHADE YOUR TESTIMONY

10   IN THIS CASE?

11   A   NO.

12   Q   OR THAT YOU SHOULD FORGET APPLICATIONS THAT YOU FILED IN

13   THE YEAR 2000?

14   A   NO.

15   Q   BASED ON YOUR EXPERIENCE, BOTH AS AN EXAMINER AND AS A

16   PRACTICING ATTORNEY, HAVING FILED OVER 4,917 TRADEMARK

17   APPLICATIONS, ATTORNEYS AND CLIENTS SOMETIMES MAKE MISTAKES;

18   CORRECT?

19   A   CORRECT.

20   Q   THERE'S A PROCEDURE, AUTHORIZED BY LAW, TO MAKE

21   CORRECTIONS; CORRECT?

22        MR. ZELLER:  QUESTION IS VAGUE AS TO WHAT CORRECTIONS

23   HE'S TALKING ABOUT.

24        THE COURT:  FAIR ENOUGH.

25        SPECIFY, COUNSEL.

1   BY MR. NOLAN:

2   Q   SO THERE ARE PROCEDURES APPROVED BY THE COPYRIGHT OFFICE

3   THAT ALLOW CLAIMANTS, EITHER THROUGH THEIR LAWYERS OR BY

4   THEMSELVES, TO FILE FORMS TO CORRECT INFORMATION THAT HAS BEEN

5   CONTAINED IN EARLIER APPLICATIONS; CORRECT?

6   A   CORRECT.

7   Q   AND MANY OF YOUR CLIENTS TAKE ADVANTAGE OF THE OPPORTUNITY

8   TO CORRECT INFORMATION THAT WAS PUT IN BY ERROR ON FORMS.

9   A   MANY?

10  Q   SOME.

11  A   SOME.

12  Q   MGA IS NOT THE ONLY CLIENT THAT YOU KNOW OF WHO'S EVER

13  FILED A CORRECTED FORM WITH THE COPYRIGHT OFFICE; IS THAT

14  CORRECT?

15  A   NO.

16  Q   THANK YOU.

17      MR. NOLAN:  NOTHING FURTHER.

18          REDIRECT EXAMINATION

19  BY MR. ZELLER:

20  Q   COUNSEL JUST TOOK YOU THROUGH A SERIES OF WHAT HE CALLED

21  CORRECTION FORMS; RIGHT?

22  A   CORRECT.

23  Q   THOSE ARE CORRECTION FORMS WITH THE U.S. COPYRIGHT OFFICE;

24  CORRECT?

25  A   CORRECT.

1    Q    THEY ARE NOT CORRECTION FORMS WITH THE U.S. TRADEMARK

2    OFFICE, ARE THEY?

3    A    NO.

4    Q    THOSE ARE SEPARATE OFFICES AND DIFFERENT PARTS OF THE

5    FEDERAL GOVERNMENT, AREN'T THEY?

6    A    YES.

7    Q    AND, IN FACT, A CORRECTION IN THE COPYRIGHT OFFICE IS NOT

8    A CORRECTION TO A TRADEMARK APPLICATION; RIGHT?

9    A    RIGHT.

10   Q    SO YOU'LL AGREE WITH ME THAT THOSE FORM CA'S THAT HE

11   SHOWED YOU, THESE CORRECTIONS FOR COPYRIGHT APPLICATIONS, HAVE

12   NOTHING TO DO WITH STATEMENTS THAT WERE MADE TO YOU, THAT WE'VE

13   SEEN IN THESE DOCUMENTS, REGARDING THE FIRST USE OF THE "BRATZ"

14   NAME; IS THAT TRUE?

15   A    TRUE.

16   Q    AND, IN FACT, ARE YOU AWARE OF ANY EFFORTS EVER MADE BY

17   MGA TO CORRECT STATEMENTS MADE TO THE TRADEMARK OFFICE ABOUT

18   WHEN THE "BRATZ" NAME WAS FIRST USED?

19   A    I'M NOT AWARE, NO.

20   Q    AND THEN FOCUSING SPECIFICALLY ON THE FACTS THAT I SHOWED

21   YOU THAT CAME FROM YOUR OFFICE TO PAULA TREANTAFELLES, ARE YOU

22   AWARE OF ANY EFFORT EVER MADE BY MGA TO CORRECT

23   PAULA TREANTAFELLES'S STATEMENT THAT THE FIRST-USE DATE OF THE

24   "BRATZ" DOLL NAME OR THE INDIVIDUAL BRATZ DOLL NAMES WAS

25   JUNE 15, 2000?

1    A   NO.

2    Q   ARE YOU AWARE OF ANY EFFORT EVER MADE BY YOUR LAW FIRM OR

3    BY MGA TO CORRECT THE FIRST-USE DATE OF JUNE 15, 2000, FOR THE

4    BRATZ TRADEMARK, AS REFLECTED IN THE DOCKET SHEET THAT I SHOWED

5    YOU?

6    A   NO.

7    Q   NOW, YOU WERE ASKED BY COUNSEL IF YOU'VE EVER MADE A

8    MISTAKE OR A TYPO; I HAD A TYPO IN THE DOCUMENT.

9         DO YOU HAVE ANY INFORMATION OR KNOWLEDGE THAT THE

10   JUNE 15, 2000 DATE REFLECTED IN YOUR FAX, THE FAX OF YOUR

11   OFFICE, AND THE DOCKET SHEET WAS A TYPO?

12   A   I HAVE NO INFORMATION ONE WAY OR THE OTHER.

13   Q   YOU DON'T KNOW IF IT WAS A MISTAKE OR NOT; ISN'T THAT

14   TRUE?

15   A   TRUE.

16   Q   SO YOU CAN'T TURN TO THE JURY AND TELL THEM THAT DATE WAS

17   A TYPO OR A MISTAKE; IS THAT TRUE?

18   A   TRUE.

19   Q   AND I TAKE IT YOU DO NOT HAVE PERSONAL KNOWLEDGE OF WHEN

20   THE "BRATZ" NAME WAS FIRST USED; IS THAT TRUE?

21   A   THAT'S TRUE.

22   Q   OR THE INDIVIDUAL DOLL NAMES?

23   A   THAT'S TRUE.

24   Q   AND, IN FACT, WHAT YOU DO AS A TRADEMARK LAWYER -- YOU

25   DON'T GO OUT AND INDEPENDENTLY INVESTIGATE WHAT THE CLIENTS

1    TELL YOU; ISN'T THAT TRUE?

2    A    TRUE.

3    Q    SO IF THEY TELL YOU THE FIRST-USE DATE OF SOMETHING LIKE

4    THE BRATZ TRADEMARK WAS JUNE 15, 2000, YOU HAVE TO RELY ON THE

5    CLIENT.

6    A    YES.

7    Q    AND SO, AS FAR AS YOU KNOW, THE INFORMATION THAT WAS

8    CONVEYED TO YOU AND WHAT'S REFLECTED IN THOSE DOCUMENTS IS, IN

9    FACT, WHAT PAULA TREANTAFELLES SAID TO YOUR OFFICE BACK IN

10   DECEMBER OF 2000; IS THAT TRUE?

11   A    I DON'T KNOW ONE WAY OR ANOTHER.

12   Q    YOU CAN'T DISPUTE IT.

13   A    I HAVE NO REASON TO DISPUTE IT.  I JUST DON'T REMEMBER.

14   Q    YOU RECALL THAT MR. NOLAN, MGA'S COUNSEL, SHOWED YOU WHAT

15   WAS CALLED THE "FORM CA," WHICH IS A COPYRIGHT OFFICE FORM THAT

16   HAS NOTHING TO DO WITH THE TRADEMARKS; RIGHT?

17   A    CORRECT.

18   Q    AND YOU ANSWERED QUESTIONS WITH HIM ABOUT WHAT THE FORM CA

19   MEANS; IS THAT TRUE?

20   A    YES.

21   Q    WHAT I'D LIKE TO DO IS -- YOUR DEPOSITION SHOULD BE UP

22   THERE.  IF YOU COULD TAKE A LOOK AT IT.  I'D LIKE TO DIRECT

23   YOUR ATTENTION TO PAGE 51, LINES 2 THROUGH 18.

24   A    YES.

25   Q    DO YOU SEE THAT TESTIMONY THERE?

1    A   YES.

2        THE COURT:  ANY OBJECTION FROM MR. NOLAN?

3        MR. NOLAN:  NO OBJECTION, YOUR HONOR.

4        THE COURT:  VERY WELL.  YOU MAY PROCEED.

5    BY MR. ZELLER:

6    Q   YOU'LL SEE HERE THAT MR. WEBSTER, A MATTEL ATTORNEY, WAS

7    ASKING YOU A QUESTION; RIGHT?

8    A   YES.

9    Q   BY THE WAY, YOU GAVE YOUR DEPOSITION IN MAY OF THIS YEAR;

10   RIGHT?

11   A   YES.

12   Q   AND YOU REMEMBER THAT WHEN YOU GAVE THE DEPOSITION, YOU

13   RAISED YOUR HAND AND YOU SWORE TO TELL THE TRUTH.

14   A   YES.

15   Q   YOU CERTAINLY INTENDED TO DO THAT; RIGHT?

16   A   YES.

17   Q   SO THEN LOOKING BACK HERE, STARTING AT LINE 2,

18   "MR. WEBSTER, LET'S MARK AS THE NEXT EXHIBIT" -- AND THEN IT

19   SHOWS EXHIBIT 5531 WAS MARKED.

20       QUESTION:  "HAVE YOU EVER PREPARED COPYRIGHT

21   APPLICATIONS DURING YOUR CAREER?"

22       ANSWER:  "YES."

23       QUESTION:  "DO YOU RECOGNIZE THIS FORM AS A FORM THAT

24   IS PREPARED FOR THE COPYRIGHT OFFICE?"

25       ANSWER:  "YES."

1          QUESTION:  "WHAT'S THIS KIND OF FORM PREPARED FOR?

2     WHAT REASON?"

3          AND THERE'S AN OBJECTION.

4          ANSWER:  "YEAH.  OKAY.  I HAVEN'T DONE THE CA ONES IN

5     A WHILE, SO I DON'T REALLY REMEMBER WHAT THEY'RE FOR.'

6     BY MR. ZELLER:

7     Q   THAT'S THE TESTIMONY THAT YOU GAVE AT YOUR DEPOSITION

8     ABOUT A MONTH AGO.

9     A   YES.

10    Q   SO WHAT IS IT THAT YOU'VE DONE TO BE ABLE TO COME IN AND

11    TELL THE JURY WHAT THE PURPOSE OF A FORM CA IS IN RESPONSE TO

12    MR. NOLAN'S QUESTIONS?

13    A   BECAUSE AFTER I SAW THE FORM CA, I EDUCATED MYSELF AS TO

14    WHAT THEY'RE FOR.

15    Q   AND SO HOW DID YOU GO ABOUT DOING THAT?

16    A   I SPOKE WITH THE PARALEGAL IN OUR OFFICE ABOUT WHAT THE

17    CA FORMS ARE USED FOR.  I LOOKED AT A FEW OF THEM, SO I WOULD

18    KNOW WHAT THEY'RE FOR.

19    Q   SO YOU COULD COME IN AND TESTIFY FOR MGA?

20    A   SO -- NO, NOT --

21    Q   WHAT WAS THE PURPOSE, JUST BETWEEN LAST MONTH AND TODAY,

22    SUDDENLY NOW KNOWING, OR REMEMBERING, I SHOULD SAY, THE PURPOSE

23    OF THE FORM CA IS?

24    A   FOR MY OWN PERSONAL BETTERMENT.  I HAD SEEN THE CA AT THE

25    DEPOSITION.  I WANTED TO KNOW WHAT THEY WERE FOR AND I ASKED

1       THE PARALEGAL ABOUT IT.

2       Q   SO IT WAS A COINCIDENCE.

3       A   NO.  IT WAS SOMETHING THAT I HAD BEEN EXPOSED TO AT THE

4       DEPOSITION THAT I WANTED TO EDUCATE MYSELF ABOUT.

5       Q   BUT YOU DID THAT ON YOUR OWN, JUST SO IN THE EVENT

6       MR. NOLAN ASKED YOU QUESTIONS ABOUT IT, YOU COULD ANSWER HIM?

7       A   NO.  I WANTED TO KNOW FOR MY OWN BETTERMENT.

8       Q   IF WE COULD, PLEASE -- AND THIS IS IN YOUR WHITE BINDER --

9       TAKE A LOOK AT THE FIRST EXHIBIT, 557 IN EVIDENCE, IN

10      PARTICULAR, THE SECOND PAGE.

11      A   YES.

12      Q   THAT'S ON THE SCREEN.

13          IN PARTICULAR, YOU'LL SEE WHERE IT SAYS, "YEAR IN

14      WHICH CREATION OF THIS WORK WAS COMPLETED."

15          DO YOU SEE THAT?

16      A   YES.

17      Q   BY THE WAY, YOU FILLED OUT THIS FORM AND YOU SIGNED IT AND

18      SENT IT TO THE COPYRIGHT OFFICE; RIGHT?

19      A   I DON'T REMEMBER -- ACTUALLY, I DID NOT FILL IT OUT.

20      Q   WELL, YOU SIGNED IT AS MGA'S ATTORNEY?

21      A   YES.

22      Q   AND IT WAS SUBMITTED TO THE COPYRIGHT OFFICE?

23      A   YES.

24      Q   DID YOU READ IT BEFORE IT WENT?

25      A   YES.

1  Q   AND BY THE WAY, THE INFORMATION THAT'S REFLECTED IN THIS

2  FORM, THAT'S INFORMATION THAT YOU OR YOUR OFFICE RECEIVED FROM

3  MGA; RIGHT?

4  A   YES.

5  Q   SO WHERE IT SAYS, "YEAR IN WHICH CREATION OF THIS WORK WAS

6  COMPLETED," AND IT SAYS 2000, THAT IS INFORMATION MGA GAVE YOUR

7  OFFICE?

8  A   I DON'T KNOW PERSONALLY IN THIS CASE, BUT --

9  Q   YOU DON'T HAVE ANY REASON TO DOUBT THAT?

10  A   I DON'T KNOW.

11  Q   BUT IT'S YOUR EXPECTATION THAT'S WHERE IT CAME FROM?

12  A   YES.

13  Q   AND THIS FORM VA IS A COPYRIGHT APPLICATION FOR THE BRATZ

14  JADE DOLL; ISN'T THAT TRUE?

15  A   YES.

16  Q   SO AT THE TIME, WHEN THIS COPYRIGHT APPLICATION WAS

17  PREPARED AND YOU SIGNED IT AND IT WAS SUBMITTED TO THE

18  COPYRIGHT OFFICE, YOU BELIEVED, BASED ON INFORMATION THAT MGA

19  GAVE YOU, THAT THE JADE DOLL HAD BEEN COMPLETED BY THE END OF

20  2000; ISN'T THAT TRUE?

21  A   YES.

22  Q   DIRECTING YOUR ATTENTION TO EXHIBIT 558, WHICH IS THE

23  FORM CA FOR THIS JADE DOLL REGISTRATION.  IT SHOULD BE THE NEXT

24  ONE IN THAT WHITE BINDER.

25  A   YES.

1    Q   THIS FORM CA WAS NOT SUBMITTED BY YOU; IS THAT TRUE?

2    A   TRUE.

3    Q   YOU YOURSELF, PRIOR TO THIS LAWSUIT, NEVER SAW THIS FORM;

4    IS THAT TRUE?

5    A   TRUE.

6    Q   YOU DON'T HAVE ANY KNOWLEDGE OR INFORMATION ABOUT WHY

7    THINGS WERE CHANGED, SHOWING IN THIS FORM, OR WHAT THE BASIS OF

8    IT WAS; IS THAT TRUE?

9    A   TRUE.

10   Q   NOW, YOU'LL SEE THE DATE ON THIS IS MARCH 28, 2005.

11   A   YES.

12   Q   AND SO, GENERALLY, YOU UNDERSTAND THAT MGA WENT BACK TO

13   THE COPYRIGHT OFFICE AND MADE CHANGES TO THE REPRESENTATIONS IT

14   HAD MADE TO THE COPYRIGHT OFFICE PREVIOUSLY IN THAT

15   REGISTRATION YOU SIGNED; RIGHT?

16   A   I HAVE NO PERSONAL KNOWLEDGE, BUT THAT'S WHAT THIS

17   DOCUMENT WOULD SEEM TO INDICATE.

18   Q   YOU KNOW THAT BASED ON THE KNOWLEDGE YOU'VE NOW OBTAINED

19   ABOUT FORM CA'S; RIGHT?

20   A   YES.

21   Q   AND DO YOU SEE THE DATE ON WHICH THIS WAS FILED, MARCH 28,

22   2005?

23   A   YES.

24   Q   THAT'S ALMOST A YEAR AFTER THIS LAWSUIT WAS FILED; ISN'T

25   IT?

1    A   I DON'T KNOW WHEN THIS LAWSUIT WAS FILED.

2    Q   YOU DON'T HAVE ANY INFORMATION ABOUT WHETHER OR NOT

3    MARCH 28, 2005 IS AFTER THE LAWSUIT WAS FILED, THE ONE THAT

4    BRINGS US HERE TODAY?

5    A   I DON'T KNOW WHEN IT WAS FILED.

6    Q   ARE YOU PERSONALLY FAMILIAR WITH SITUATIONS WHERE YOU'VE

7    HAD CLIENTS, AFTER LITIGATION HAS STARTED, GO BACK TO THE

8    COPYRIGHT OFFICE THREE, FOUR YEARS LATER AND CHANGE INFORMATION

9    IN THE COPYRIGHT APPLICATIONS THEY HAD PREVIOUSLY SUBMITTED?

10   A   HAVE I PERSONALLY?

11   Q   RIGHT.

12   A   NO.

13   Q   SO YOU CAN'T TELL US THAT'S A NORMAL EVENT; ISN'T THAT

14   TRUE?

15       MR. NOLAN:  OBJECTION.  LACK OF FOUNDATION.

16       THE COURT:  IT'S ALSO VAGUE AS TO "NORMAL."  I'LL

17   SUSTAIN THE OBJECTION TO THE QUESTION.

18       YOU CAN REPHRASE, COUNSEL, IF YOU WISH.

19   BY MR. ZELLER:

20   Q   THERE'S NOT A SINGLE EPISODE IN YOUR CAREER THAT YOU CAN

21   TELL US ABOUT WHERE YOU HAD A CLIENT GO BACK THREE, FOUR YEARS

22   LATER, AFTER A LAWSUIT WAS FILED, AND CHANGE THE

23   REPRESENTATIONS THEY HAD MADE TO THE COPYRIGHT OFFICE ABOUT

24   WHEN THE WORK THAT'S AT ISSUE IN THE LAWSUIT WAS CREATED; IS

25   THAT TRUE?

1    A   THAT'S TRUE.

2    Q   DIRECTING YOUR ATTENTION TO EXHIBIT 559 --

3        THE COURT:  COUNSEL, I DON'T KNOW HOW LONG THIS IS

4    GOING TO GO.  LET'S TAKE OUR MORNING BREAK.

5        (WHEREUPON, JURORS DEPART COURTROOM.)

6        THE COURT:  COUNSEL, WE'RE GOING TO SET UP BACK IN

7    CHAMBERS.  IT'S GOING TO TAKE US ABOUT FIVE MINUTES TO DO THIS

8    IN-CAMERA, UNDER-SEAL HEARING.

9        MS. ANDERSON, IF YOU WOULD COME BACK; AND COUNSEL FOR

10   MATTEL.

11       I KNOW YOU WANT TO BE THERE, MR. NOLAN, BUT, AGAIN,

12   YOU'RE NOT GETTING THE SETTLEMENT AGREEMENT AT THIS POINT.

13       I AM GOING TO ASK, ON BEHALF OF THE COURT REPORTER,

14   TO SHUT DOWN THE REAL TIME TRANSMISSION; SO LET'S MAKE SURE

15   THAT'S DONE.  AND THEN ONCE WE'VE COMPLETED BACK THERE, THE

16   COURT WILL TAKE ANOTHER FIVE MINUTES BEFORE WE RESUME.

17       COURT IS IN RECESS.

18       (BRIEF RECESS TAKEN.)

19       THE CLERK:  ALL RISE FOR THE JURY.

20       (JURORS ENTER COURTROOM.)

21   BY MR. ZELLER:

22   Q   GOOD MORNING AGAIN.

23       IF WE COULD PLEASE TAKE A LOOK AT EXHIBIT 559; AND IF

24   WE CAN PULL THE SECOND PAGE UP ON THE SCREEN; IT'S IN EVIDENCE.

25       YOU'LL SEE HERE THAT THIS IS A COPYRIGHT REGISTRATION

1    THAT YOU SIGNED AND SUBMITTED TO THE COPYRIGHT OFFICE FOR THE

2    SASHA DOLL; IS THAT TRUE?

3    A   I DON'T SEE MY SIGNATURE HERE.  559?

4    Q   I APOLOGIZE.  IT COULD BE THE WAY IT WAS PRODUCED IN THIS

5    FORM; IT DOESN'T HAVE THE SIGNATURE PAGE.

6         BUT YOU'LL SEE YOUR NAME DOES APPEAR ON THIS.

7         MR. NOLAN:  SOMETHING WAS BEING SHOWN THAT WAS

8    INCONSISTENT WITH HER TESTIMONY.  I DIDN'T KNOW WHERE THE PAGE

9    WAS.

10        THE COURT:  IS THIS IN EVIDENCE?

11        MR. ZELLER:  I BELIEVE SO, AS 559.

12        THE COURT:  VERY WELL.  YOU MAY PROCEED.

13   BY MR. ZELLER:

14   Q   YOU DON'T HAVE ANY REASON TO DOUBT THAT BACK IN THE 2001

15   TIME PERIOD, YOU SIGNED AND SUBMITTED TO THE COPYRIGHT OFFICE

16   FOR MGA FOUR DIFFERENT COPYRIGHT APPLICATIONS FOR FOUR BRATZ

17   DOLLS; IS THAT TRUE?

18   A   I HAVE NO REASON TO DISPUTE THAT.

19   Q   AND FROM WHAT WE'VE SEEN IN THE DOCUMENTS, THAT WOULD BE

20   THE CLOE DOLL, THE SASHA DOLL, AND THE JADE DOLL.

21   A   YES.

22   Q   AND YOU DON'T HAVE ANY REASON TO DOUBT THAT IN EACH OF

23   THOSE APPLICATIONS, ALL FOUR OF THEM THAT YOU SUBMITTED TO THE

24   COPYRIGHT OFFICE, THAT YOU, ON BEHALF OF MGA, REPRESENTED TO

25   THE COPYRIGHT OFFICE THAT THE YEAR THAT THE DOLLS WERE

1    COMPLETED OR WAS COMPLETED WAS THE YEAR 2000; IS THAT TRUE?

2    A   I HAVE NO REASON TO DISPUTE THAT.

3    Q   AND YOU HAVE NO REASON TO DISPUTE THAT AS WITH RESPECT TO

4    ALL FOUR APPLICATIONS SUBMITTED TO THE COPYRIGHT OFFICE, THAT

5    YOU OR SOMEONE AT YOUR OFFICE RECEIVED THAT INFORMATION FROM

6    MGA.

7    A   TRUE.

8    Q   IN FACT, IT'S YOUR EXPECTATION THAT'S WHERE IT CAME FROM.

9    A   YES.

10   Q   ISN'T IT TRUE WITH RESPECT TO ALL FOUR APPLICATIONS AND

11   WITH RESPECT TO THE FORM CA'S THAT WERE FILED THAT MR. NOLAN

12   SHOWED YOU FOR EACH OF THOSE REGISTRATIONS, AS FAR AS YOU KNOW,

13   ALL OF THOSE WERE FILED AFTER THIS LAWSUIT WAS FILED; IS THAT

14   TRUE?

15   A   AGAIN, I DON'T KNOW WHEN THIS LAWSUIT WAS FILED, SO...

16   Q   BUT YOU CAN'T DISPUTE THAT.

17       MR. NOLAN:  WITHOUT KNOWING THE DATE OF THE LAWSUIT,

18   YOUR HONOR, I DON'T KNOW HOW SHE WOULD HAVE FOUNDATION TO

19   DISPUTE IT ONE WAY OR THE OTHER.

20       THE COURT:  IS THERE A STIPULATION CONCERNING WHEN IT

21   WAS FILED?

22       MR. NOLAN:  WHY DON'T WE STIPULATE WHEN THE FIRST

23   LAWSUIT WAS FILED.

24       THE COURT:  LETS ELIMINATE THE MYSTERY.

25       MR. ZELLER:  I BELIEVE IT'S APRIL 27, 2004.

1       MR. NOLAN:  WE WILL STIPULATE TO THAT, YOUR HONOR.

2       THE COURT:  MEMBERS OF THE JURY, THE LAWSUIT WAS

3   FILED APRIL 27, 2004.

4       YOU MAY PROCEED.

5   BY MR. ZELLER:

6   Q   THEN IF WE COULD LOOK AT THE OTHER FORM CA'S, AND THE

7   FIRST ONE IS EXHIBIT 560.  YOU'LL REMEMBER MR. NOLAN ASKED YOU

8   QUESTIONS ABOUT THIS FORM CA, AND YOU SEE THIS ONE IS DATED

9   MARCH 28, 2005.

10  A   YES.

11  Q   AND YOU DON'T HAVE ANY REASON TO DOUBT THAT'S WHEN IT WAS

12  FILED; IS THAT TRUE?

13  A   I DON'T KNOW ONE WAY OR THE OTHER.

14  Q   DIRECTING YOUR ATTENTION TO EXHIBIT 562, ONE OF THE OTHER

15  FORM CA'S MR. NOLAN ASKED YOU ABOUT.

16  A   YES.

17  Q   YOU'LL SEE THIS ONE IS DATED MARCH 28, 2005.

18  A   YES.

19  Q   AND YOU DON'T HAVE ANY REASON TO DOUBT THAT IS, IN FACT,

20  WHEN IT WAS FILED; IS THAT TRUE?

21  A   NO REASON TO DOUBT THAT.

22  Q   AND THEN, FORTUNATELY, THE VERY LAST ONE IS EXHIBIT 564.

23  YOU'LL SEE THIS IS ANOTHER ONE OF THE FORM CA'S THAT MR. NOLAN

24  ASKED YOU ABOUT.  YOU'LL SEE IT'S DATED MARCH 28, 2005 AS WELL.

25  A   YES.

1    Q   AND YOU DON'T HAVE ANY REASON TO DISPUTE THAT IS WHEN IT

2    WAS FILED WITH THE COPYRIGHT OFFICE CHANGING THE YEAR OF THE

3    DATE OF CREATION OF THE DOLLS; IS THAT TRUE?

4    A   TRUE.

5    Q   I KNOW MR. NOLAN ASKED YOU SOME QUESTIONS ABOUT THE RATHER

6    LARGE VOLUME OF TRADEMARK APPLICATIONS THAT YOU'VE FILED OVER

7    THE YEARS OR BEEN RESPONSIBLE FOR OR PARTICIPATED IN FILING

8    OVER THE YEARS.  DO YOU REMEMBER THAT?

9    A   YES.

10   Q   BUT YOU'LL AGREE WITH ME THAT THIS CASE IS A LITTLE

11   DIFFERENT.  IN THIS CASE, YOU ACTUALLY SWORE TO CERTAIN

12   CIRCUMSTANCES SURROUNDING THE PARTICULAR APPLICATIONS, THE

13   TRADEMARK APPLICATIONS, FOR THE BRATZ NAME AND THE INDIVIDUAL

14   BRATZ DOLL NAMES, WITHIN THE LAST YEAR; RIGHT?

15   A   YOU MEAN IN THE DECLARATIONS THAT YOU WERE REFERRING TO?

16        YES.

17   Q   THAT'S NOT SOMETHING YOU DO ALL OF THE TIME, IS IT?

18   A   WELL, THIS IS THE FIRST LITIGATION I'VE BEEN INVOLVED IN,

19   SO, NO.

20   Q   SO THAT'S PRETTY MEMORABLE.

21   A   YES.

22   Q   SO YOU UNDERSTOOD THAT WHEN YOU WERE SUBMITTING --

23        LET'S ACTUALLY CLEAR SOMETHING UP FIRST, TOO.

24        YOU SUBMITTED THAT DECLARATION BECAUSE MGA ASKED YOU

25   TO SUBMIT IT; IS THAT TRUE?

1    A   YES.

2    Q   AND YOU UNDERSTOOD THAT YOU WERE SUBMITTING THAT

3    DECLARATION IN SUPPORT OF MGA'S EFFORTS TO WITHHOLD FROM MATTEL

4    THE FACTS THAT I SHOWED YOU THAT REFERS TO THE JUNE 15, 2000

5    DATE OF FIRST USE; CORRECT?

6        MR. NOLAN:  YOUR HONOR, OBJECT.  FOUNDATION; ALSO 403

7    PURPOSES SUBJECT TO AN EARLIER RULING.

8        THE COURT:  LAY FOUNDATION, COUNSEL.

9    BY MR. ZELLER:

10   Q   MGA CAME TO YOU AND ASKED YOU TO PROVIDE A SUPPORTING

11   DECLARATION FOR THAT; IS THAT RIGHT?

12   A   YES.

13   Q   AND YOU UNDERSTOOD FROM YOUR CONVERSATIONS WITH THE MGA

14   LAWYERS AND YOUR COMMUNICATIONS WITH THE MGA LAWYERS, WHY YOU

15   WERE SUBMITTING THE DECLARATION; IS THAT TRUE?

16   A   NO.

17   Q   THAT WAS NEVER DISCUSSED WITH YOU?

18   A   NOT AT THAT TIME.

19   Q   WELL, AT SOME POINT WAS IT DISCUSSED WITH YOU?

20   A   WHILE I WAS DOING IT, YES.

21   Q   AND AT SOME POINT, YOU LEARNED THAT YOU WERE PROVIDING

22   THIS DECLARATION IN SUPPORT OF MGA'S EFFORTS TO AVOID HAVING TO

23   PRODUCE THAT DECEMBER 2000 FAX THAT I SHOWED YOU EARLIER; IS

24   THAT TRUE?

25       MR. NOLAN:  OBJECTION, YOUR HONOR.  SUBJECT TO MOTION

1    IN LIMINE WITH RESPECT TO VARIOUS LITIGATION ISSUES AND

2    POSITIONS TAKEN IN THIS LAWSUIT.

3          THE COURT:  LET ME SEE YOU AT SIDE-BAR.

4          (SIDE-BAR PROCEEDINGS HELD AS FOLLOWS:)

5          THE COURT:  YOUR RESPONSE --

6          MR. ZELLER:  I THINK IT GOES TO BIAS.  WE'VE ALREADY

7    TALKED ABOUT THE DECLARATION.  SHE'S GIVEN TESTIMONY ABOUT --

8          THE COURT:  HOW DOES IT GO TO HER BIAS, THOUGH?

9          MR. ZELLER:  BECAUSE SHE SAID CERTAIN THINGS JUST A

10   FEW MONTHS AGO WHERE SHE BASICALLY SAYS IN HER DECLARATION, "I

11   REMEMBER THE CIRCUMSTANCES UNDER WHICH I DID THESE

12   APPLICATIONS."  SHE PURPORTS TO SAY SHE UNDERSTOOD, REMEMBERED,

13   WHY IT WAS SHE HAD COMMUNICATIONS WITH PAULA TREANTAFELLES IN

14   THAT DECLARATION.

15         THE COURT:  WHEN WAS THAT DECLARATION SUBMITTED?

16         MR. NOLAN:  I BELIEVE ABOUT A YEAR AGO, YOUR HONOR.

17   I CAN GIVE YOU THE CIRCUMSTANCES, IF I MIGHT, YOUR HONOR.

18         I WANT TO SAY THAT IS THE ONE OF THE MOST OUTRAGEOUS

19   QUESTIONS I'VE HEARD ASKED IN THIS CASE, FOR THIS REASON.  THEY

20   KNOW THAT THERE WAS A MOTION THAT THEY BROUGHT TO WAIVE THE

21   ENTIRE ATTORNEY-CLIENT COMMUNICATIONS BETWEEN MS. ARANT AND HER

22   CLIENT.  JUDGE INFANTE RULED PARTIALLY THAT THE PRIVILEGE

23   EXTENDED TO CERTAIN COMMUNICATIONS, BUT NOT TO THIS PARTICULAR

24   FAX.  HE GRANTED THE MOTION IN PART AND THEN RELEASED THIS.

25         AGAIN, YOUR HONOR, NOW WHAT MR. ZELLER IS DOING --

1    KNOWING THAT AND KNOWING WE HAVE A MOTION IN LIMINE IN THIS

2    CASE WHERE WE'RE NOT ALLOWED TO GO INTO VARIOUS ARGUMENTS THAT

3    WERE MADE, HE'S NOW POISONED THIS JURY REGARDING WHY WE WERE

4    TRYING TO BLOCK THIS FAX.  THAT'S NOT WHAT WE WERE TRYING TO

5    BLOCK.  WE WERE TRYING TO BLOCK THE WAIVER OF THE PRIVILEGE

6    WITH AN ATTORNEY.  THAT'S INAPPROPRIATE.

7          THE COURT:  I THINK THIS OPENS THE DOOR, IN A WAY.

8    AND I UNDERSTAND YOUR THEORY.  I'M GOING TO SUSTAIN THE

9    OBJECTION.  LET'S MOVE ON TO ANOTHER AREA, COUNSEL.

10         MR. ZELLER:  THANK YOU.

11         (SIDE-BAR PROCEEDINGS CONCLUDED.)

12         THE COURT:  OBJECTION IS SUSTAINED.  THE JURY IS TO

13   DISREGARD THE LAST QUESTION.

14         MR. ZELLER, ANYTHING FURTHER?

15         MR. NOLAN:  MOTION TO STRIKE ANY RESPONSE FROM THE

16   WITNESS.

17         THE COURT:  THERE WASN'T A RESPONSE; THAT'S WHAT I

18   WAS CHECKING.

19   BY MR. ZELLER:

20   Q   IS IT THE CASE THAT IN-BETWEEN THE TIME THAT YOU REVIEWED

21   AND SIGNED THE DECLARATION THAT WE SHOWED PARAGRAPHS FROM,

22   IN-BETWEEN THE TIME THAT YOU DID THAT AND THEN THE TIME THAT

23   YOUR DEPOSITION WAS TAKEN, DID YOU REVIEW ANYTHING TO TRY AND

24   REFRESH YOUR RECOLLECTION ABOUT WHAT YOU HAD DONE FOR MGA IN

25   CONNECTION WITH THESE BRATZ RELATED TRADEMARK APPLICATIONS?

1    A   NO.

2    Q   DID YOU DO ANYTHING BETWEEN THE TIME THAT YOU SIGNED THAT

3    DECLARATION AND THE TIME THAT YOU CAME HERE TO TESTIFY TODAY AT

4    TRIAL HERE TO BETTER YOUR RECOLLECTION ON THOSE EVENTS?

5    A   YES.  I FILED A SUBSTITUTE DECLARATION.

6    Q   YOU DID SOMETHING -- YOU REFRESHED YOURSELF IN SOME WAY TO

7    FILE THE SUBSTITUTE DECLARATION?

8    A   NO.

9    Q   MY QUESTION GOES TO WHAT YOU DID TO REFRESH YOURSELF ABOUT

10   SOMETHING; SO MY QUESTION LET ME JUST ASK IT MORE BROAD THAN

11   THAT.

12        IN-BETWEEN THE TIME THAT YOU REVIEWED AND YOU SIGNED

13   THE DECLARATION, WHICH IS BACK IN AUGUST OF 2007, WE TALKED

14   ABOUT, DID YOU DO ANYTHING TO REFRESH YOUR RECOLLECTION ABOUT

15   THOSE EVENTS BETWEEN THAT TIME AND THE TIME THAT YOU CAME IN

16   HERE TO TESTIFY TODAY?

17   A   NO.

18   Q   THANK YOU.

19        MR. NOLAN:  YOUR HONOR, COULD WE HAVE A SIDE-BAR FOR

20   A MOMENT?  I'D ASK FOR A STIPULATION.

21        THE COURT:  YES.

22        (SIDE-BAR PROCEEDINGS AS FOLLOWS:)

23        MR. NOLAN:  YOUR HONOR, I ASKED MR. ZELLER WHETHER OR

24   NOT HE WOULD STIPULATE TO WHEN MGA WAS SUED IN THIS CASE, SINCE

25   HE'S DRAWING THE INFERENCE THAT HE WANTS TO, WITH RESPECT TO

1       THIS LITIGATION.  HE'S REFUSING TO.  THIS IS A TIME YOU TAKE

2       JUDICIAL NOTICE OF THE FILING OF THE LAWSUIT AGAINST MGA.  I

3       THINK IT'S IMPROPER HAVING IT ONLY OUT THERE BY STIPULATION --

4       WHEN THE FIRST LAWSUIT WAS AGAINST CARTER BRYANT AND NOT

5       AGAINST MGA.

6           THE COURT:  WHEN WAS THAT?

7           MR. NOLAN:  WE WERE SUED IN --

8           THE COURT:  I SHOULD KNOW THIS; I'VE GONE THROUGH

9       THESE DATES.

10          MR. ZELLER:  MGA BECAME A PARTY IN THE BRYANT SUIT IN

11      DECEMBER OF 2004 AND THEN THEY FILED THEIR LAWSUIT IN 2005.

12          THE COURT:  I THINK FOR THIS, THE RELATIONSHIPS ARE

13      SO CLOSE, COUNSEL.

14          MR. NOLAN:  BUT THE CLAIMS WERE NOT BEING BROUGHT

15      AGAINST MGA IN THIS CASE BY MATTEL UNTIL LATER.  IT'S UNFAIR,

16      AND HE KEPT RAISING IT.

17          THE COURT:  CAN WE AGREE ON WHAT DATE THAT WAS?

18          MS. AGUIAR:  JANUARY OF 27.

19          THE COURT:  JANUARY OF 2007.

20      WHICH IS AFTER THE DATE ON THE DOCUMENT.

21          MR. ZELLER:  THAT'S NOT CORRECT.  I DON'T THINK

22      THAT'S A CORRECT --

23          THE COURT:  THIS IS SOMETHING WE CAN DO -- BECAUSE

24      THIS WITNESS DOES NOT KNOW WHEN IT WAS BROUGHT.

25          MR. NOLAN:  BUT MR. ZELLER HAS REPEATEDLY NOW BEEN

1   BACK TO 'AND THIS WAS AFTER THE LAWSUIT, THIS WAS AFTER THE

2   LAWSUIT,' AND I WANT TO MAKE CERTAIN THAT THE JURY NOW KNOWS

3   RIGHT NOW WHAT THE DATE WAS THAT THE CLAIMS WERE FILED AGAINST

4   MGA.

5       THE COURT:  I THINK THAT SOUNDS REASONABLE; TO COME

6   UP WITH -- TO EXPLAIN TO THE JURY THAT THE VARIOUS DATES THAT

7   THE LAWSUITS WERE BROUGHT, JUST TO CLARIFY.  IF YOU TWO CAN

8   STIPULATE AND GIVE ME A PIECE OF PAPER WITH THE DATES OF WHEN

9   THE MAJOR PLAYERS IN THIS LAWSUIT WERE BROUGHT, I WILL READ

10  THAT TO THE JURY.

11      MR. NOLAN:  IN THE INTERIM --

12      THE COURT:  I'LL DO THAT AS SOON AS YOU HAVE THAT

13  READY.

14      MR. NOLAN:  IN THE INTERIM --

15      THE COURT:  IN THE INTERIM, GO ASK SOME QUESTIONS.

16      (SIDE-BAR PROCEEDINGS CONCLUDED. )

17  BY MR. NOLAN:

18  Q   MS. ARANT, DO YOU KNOW HOW MANY LAWSUITS HAVE BEEN FILED

19  IN THIS CASE?

20  A   NO.

21  Q   DO YOU KNOW WHEN THE FIRST LAWSUIT WAS FILED NAMING MGA AS

22  A PARTY?

23  A   NO.

24  Q   MR. ZELLER ASKED YOU SOME QUESTIONS ABOUT WHETHER OR NOT

25  ANY CORRECTED FORMS WERE FILED BY YOU OR BY YOUR OFFICE

1    FOLLOWING YOUR FILING OF THE INTENDED USE TRADEMARK

2    APPLICATION; CORRECT?

3    A   I DIDN'T KNOW HE STIPULATED WHETHER THEY WERE FILED BY OUR

4    FIRM OR NOT.

5    Q   BUT IN ANY EVENT, YOU KNEW OF ANY EFFORTS TO CORRECT THE

6    APPLICATIONS THAT YOU HAD FILED.

7    A   HE DID ASK ME THAT QUESTION.

8    Q   OKAY.

9        IF YOU COULD GO BACK IN MATTEL'S EXHIBIT BOOK TO

10   EXHIBIT 11897.  WHAT I'D LIKE TO DO IS PUT THIS UP IN EVIDENCE,

11   YOUR HONOR -- PUT UP FOR THE JURY 11897-0003.

12       THIS IS THE APPLICATION FOR REGISTRATION THAT YOU

13   PREPARED FOR JADE; CORRECT?

14   A   YES.

15   Q   WILL YOU EXPLAIN TO THE JURY WHETHER OR NOT THIS WAS A

16   STATED USE APPLICATION OR AN INTENDED TO USE APPLICATION.

17   A   OKAY.  JUST ONE SECOND.  I'M ON THE WRONG -- I WAS TOLD IT

18   WAS 11897, AND WHAT I'M LOOKING AT AT 11897 DOESN'T MATCH WHAT

19   IS UP ON THE SCREEN.

20       MR. NOLAN:  MAY I HAVE A MOMENT TO LOOK AT HER

21   NOTEBOOK.

22       THE COURT:  YOU MAY.

23       THE WITNESS:  I'M SORRY.  IT'S PAGE 03 AND I WAS

24   LOOKING AT 01.

25   BY MR. NOLAN:

1    Q    ARE YOU THERE?

2    A    YES, I AM.

3    Q    AND THIS IS THE APPLICATION THAT YOU FILED?

4    A    YES.

5    Q    THIS IS THE INTENDED USE APPLICATION?

6    A    YES.

7    Q    TAKE A MINUTE, IF YOU NEED TO, BUT COULD YOU PLEASE TELL

8    THE JURY IF THERE'S ANY PLACE IN THE APPLICATION THAT YOU FILED

9    WHERE YOU PUT IN A DATE OF USE OF THIS DOLL.

10    A    THERE IS NOT.

11    Q    SO WHEN MR. ZELLER ASKED YOU IF THEY EVER CORRECTED IT,

12    WHAT WOULD HAVE BEEN CORRECTED?

13    A    NOTHING.

14    Q    AND THAT'S BECAUSE THIS WAS AN INTENDED USE APPLICATION;

15    CORRECT?

16    A    RIGHT; AN INTENT TO USE APPLICATION, SO IT HAD NO DATES.

17    Q    IN FACT, YOU SEE THERE, THE SECOND PARAGRAPH, THE

18    APPLICANT HAS A BONA FIDE INTENTION...

19         DO YOU SEE THAT?

20         MR. ZELLER:  HE'S NOW LAPSING BACK INTO THE LEADING

21    QUESTIONS, SO I DON'T THINK IT'S APPROPRIATE.

22         MR. NOLAN:  I WAS LEADING AARON.  I MEANT TO LEAD

23    AARON AND NOT THE WITNESS.  I'M SORRY.

24         THE COURT:  VERY WELL.

25    BY MR. NOLAN:

1    Q   I HAVE UP ON THE SCREEN A STATEMENT THAT'S CONTAINED IN

2    THE APPLICATION THAT YOU PREPARED; CORRECT?

3    A   YES.

4    Q   AND YOU FILED THIS WITH AN AGENCY OF THE UNITED STATES

5    GOVERNMENT.

6    A   YES.

7    Q   AT THE REQUEST OF MGA.

8    A   YES.

9    Q   AND COULD YOU JUST READ THIS TO THE JURY AND THEN EXPLAIN

10   WHAT IS MEANT BY THAT TERM.

11   A   YES.

12       THE APPLICANT HAS A BONA FIDE INTENTION TO USE THE

13   MARK IN COMMERCE ON OR IN CONNECTION WITH THE ABOVE IDENTIFIED

14   GOODS/SERVICES.  15 USC 1051(B) AS AMENDED.  THIS IS THE

15   LANGUAGE THAT YOU USE IN A TRADEMARK APPLICATION FOR THE ITU,

16   OR THE INTENT TO USE APPLICATIONS.  THEY ARE KNOWN AS 1-B

17   APPLICATIONS, FOR THAT SMALL 'B,' MEANING THERE ARE NO DATES

18   BECAUSE THE MARK ISN'T YET IN USE IN COMMERCE IN CONNECTION

19   WITH THE GOODS OR SERVICES.

20   Q   AND THAT WAS FOR JADE; RIGHT?

21   A   YES.

22   Q   NOW, IF YOU TURN TO 11897-005, DO YOU SEE THIS IS AN

23   APPLICATION THAT YOU PREPARED AND SUBMITTED TO THE UNITED

24   STATES AGENCY FOR YASMINE?

25   A   YES.

1    Q   AND, LOOK AT THIS.  MR. ZELLER ASKED YOU, 'DID ANYBODY

2    EVER CORRECT IT?'  WAS THERE ANY NEED TO CORRECT THAT DOCUMENT?

3    A   THERE'S NOTHING TO BE CORRECTED BECAUSE IT'S AN INTENT TO

4    USE APPLICATION.

5        MR. ZELLER:  A BELATED OBJECTION.  MISCHARACTERIZES

6    THE QUESTIONS THAT WERE ASKED.

7        THE COURT:  SUSTAINED.  REPHRASE THE QUESTION,

8    COUNSEL.

9    BY MR. NOLAN:

10   Q   AGAIN, WE'RE GOING TO LOOK AT THIS DOCUMENT.

11       IS THERE ANYWHERE IN THIS DOCUMENT THAT YOU LIST A

12   DATE WHERE YASMINE WAS INTRODUCED INTO INTERSTATE COMMERCE?

13   A   NO.

14   Q   IN FACT, THIS APPLICATION FOR YASMINE CONTAINS THE SAME

15   PARAGRAPH WE READ EARLIER ABOUT "THE APPLICANT HAS A BONA FIDE

16   INTENTION TO USE THE MARKS IN COMMERCE"; CORRECT?

17       MR. ZELLER:  LEADING.

18       THE COURT:  SUSTAINED.

19   BY MR. NOLAN:

20   Q   I'D ASK YOU TO TAKE A LOOK AT THIS DOCUMENT.  DO YOU SEE

21   ANYWHERE ON THIS DOCUMENT LANGUAGE WHICH WOULD SUGGEST --

22   STRIKE THAT.

23       COULD YOU READ THE SECOND PARAGRAPH TO THE JURY.

24   A   YES.

25       "THE APPLICANT HAS A BONA FIDE INTENTION TO USE THE

1    MARK IN COMMERCE ON OR IN CONNECTION WITH THE ABOVE IDENTIFIED

2    GOODS/SERVICES.  15 USC 1051(B) AS AMENDED.

3    Q   I'D ASK YOU NOW TO TURN TO THE SAME EXHIBIT, 11897-0007.

4        DO YOU RECOGNIZE THIS AS THE INTENT TO USE

5    APPLICATION FOR TRADEMARK THAT YOU PREPARED FOR THE DOLL, FOR

6    THE MARK SASHA?

7    A   YES.

8    Q   DO YOU SEE ANYWHERE WHERE THERE'S A DATE OF USE LISTED IN

9    THIS APPLICATION FOR SASHA?

10   A   NO.

11   Q   AGAIN, COULD YOU READ TO THE JURY THE SECOND PARAGRAPH ON

12   THIS APPLICATION.

13   A   "THE APPLICANT HAS A BONA FIDE INTENTION TO USE THE MARK

14   IN COMMERCE ON OR IN CONNECTION WITH THE ABOVE IDENTIFIED

15   GOODS/SERVICES, 15 USC 1051(B) AS AMENDED."

16   Q   CAN YOU TURN TO THE NEXT, 0009, THIS IS FOR THE MARK

17   BRATZ.

18       DO YOU SEE THAT?

19   A   CORRECT.

20   Q   AND THIS IS AN INTENDED USE APPLICATION THAT YOU PREPARED

21   FOR MGA CONCERNING THE MARK BRATZ?

22   A   YES.

23   Q   AND THIS APPLICATION WAS FILED WITH THE UNITED STATES

24   AGENCY?

25   A   YES.

1    Q   I'D ASK YOU TO LOOK AT THIS.  IN THIS APPLICATION THAT YOU

2    FILED, DO YOU LIST ANY DATE OF USE FOR BRATZ?

3    A   NO.

4    Q   IN FACT, COULD YOU READ AGAIN THE SECOND PARAGRAPH OF THIS

5    APPLICATION?

6    A   "THE APPLICANT HAS A BONA FIDE INTENTION TO USE THE MARK

7    IN COMMERCE ON OR IN CONNECTION WITH THE ABOVE IDENTIFIED

8    GOODS/SERVICES, 15 USC 1051(B) AS AMENDED."

9    Q   I WANT TO GO BACK VERY QUICKLY TO ANOTHER EXHIBIT THAT

10   MR. ZELLER SHOWED YOU; THIS IS 11192; IT'S IN HIS BLACK BOOK.

11   THESE ARE DOCKET SHEETS AND THEN A TRADEMARK DOCKET FORM FROM

12   YOUR FIRM; CORRECT?

13   A   YES.

14   Q   FIRST OF ALL, MR. ZELLER ASKED YOU WHETHER OR NOT MGA EVER

15   CORRECTED THESE FORMS; CORRECT?

16   A   I BELIEVE HE ASKED ME THAT.

17   Q   DOES THE CLIENT SEE THESE FORMS?

18   A   NO.

19   Q   LET'S GO TO THE FIRST SHEET FOR JUST A MOMENT.

20       THIS IS THE DOCKET SHEET.

21       IS THERE ANYTHING ON YOUR DOCKET SHEET, YOUR INTERNAL

22   DOCKET SHEET, THAT SHOWS A DATE OF FIRST USE?

23       MR. QUINN:  YOUR HONOR, THIS IS TECHNICALLY NOT IN

24   EVIDENCE.  I DIDN'T MOVE PAGE 1.  THIS IS PAGE 1 OF 2; I DON'T

25   KNOW WHAT THIS DOCUMENT IS.  MGA PRODUCED IT.

1        MR. NOLAN:  TAKE IT DOWN.

2        MR. ZELLER:  I DON'T HAVE AN ISSUE WITH IT BEING

3    INTRODUCED.  JUST SO THE RECORD IS CLEAR, THAT PAGE HAS NOT

4    BEEN INTRODUCED.

5        THE COURT:  I RECALL YOU INTRODUCING THE EXHIBIT AND

6    SAYING THAT YOU WANTED TO SKIP PAGE 1 AND PAGE 2, BUT I WAS NOT

7    CLEAR THAT YOU WERE ONLY INTRODUCING PAGE 2.

8        MR. ZELLER:  I'M SORRY IF I WAS UNCLEAR, BUT THE ONLY

9    THING I PUT IN AND ASKED HER ABOUT SO FAR WAS PAGE 2.

10        THERE IS NO FOUNDATION FOR PAGE 1.

11        THE COURT:  DO YOU HAVE AN OBJECTION TO PAGE 1 BEING

12    INTRODUCED?

13        MR. ZELLER:  NO.

14        THE COURT:  VERY WELL.  THE ENTIRE DOCUMENT IS

15    INTRODUCED.  YOU MAY PROCEED AND PUBLISH.

16        MR. NOLAN:  THIS IS 11192-001.

17        THE COURT:  THE ENTIRE 11192 IS IN EVIDENCE.  YOU MAY

18    USE IT AS YOU WISH.

19    BY MR. NOLAN:

20    Q   THIS IS AN INTERNAL DOCKET SHEET AT YOUR LAW FIRM?

21    A   YES.

22    Q   COULD YOU LOOK AT THIS _FIRST OF ALL, DO YOU KNOW WHAT

23    THIS DOCKET SHEET IS?  CAN YOU EXPLAIN THE PURPOSE?

24    A   IT'S A DOCKET SHEET SO WE CAN KEEP TRACK OF DEADLINES; AND

25    THIS INFORMATION IS INPUT INTO A COMPUTER SO THAT WE CAN MAKE

1    SURE WE DON'T MISS ANY DEADLINES.

2    Q   THIS DOCKET SHEET, IS THERE ANY STATEMENT WITH RESPECT TO

3    THE DATE OF FIRST USE?

4    A   THERE IS NOT.

5    Q   AND THEN THE SECOND, THE TRADEMARK DOCKET, WHICH IS-0002,

6    IF YOU OPEN THIS UP AND GO DOWN UNDER "REMARKS" IT SAYS DATE OF

7    USE, 6-15-2000.  DO YOU SEE THAT?

8    A   YES.

9    Q   IS THIS A DOCUMENT, IN YOUR EXPERIENCE, THAT'S EVER MAILED

10   TO THE CLIENT?

11   A   NEVER.

12        MR. NOLAN:  MAY I APPROACH THE WITNESS?

13        AND I HAVE A SET FOR THE CLERK.

14        THE COURT:  DO WE HAVE THOSE DATES YET?

15        MS. AGUIAR:  WE'RE WORKING ON IT, YOUR HONOR.

16        THE COURT:  MR. ZELLER, HAVE YOU SEEN THIS YET?

17        MR. ZELLER:  I'M LOOKING AT IT NOW; I WAS JUST HANDED

18   IT.

19        THE COURT:  VERY WELL.

20   BY MR. NOLAN:

21   Q   I'VE PLACED BEFORE YOU, MS. ARANT, EXHIBITS 5528, 5529,

22   EXHIBIT 18477, EXHIBIT 18478, AND EXHIBIT 18479.

23        DID I AT LEAST READ THE NUMBERS CORRECTLY?

24   A   YES.

25   Q   SO YOU HAVE THE SAME PACKAGE I DO.

1   A   YES.

2   Q   NOW, EACH OF THESE DOCUMENTS HAVE ON THE FRONT PAGE -- YOU

3   HAVE A BLACK AND WHITE COPY -- A COPY OF A SEAL AND IT SAYS

4   UNITED STATES OF AMERICA, CERTIFICATE OF REGISTRATION; THEN IT

5   SAYS PRINCIPAL REGISTER.

6       TAKE A LOOK AT IT.  DO YOU RECOGNIZE THIS FORM?

7   A   YES.

8   Q   WITHOUT DISCLOSING THE CONTENTS OF THE FORM, CAN YOU

9   DESCRIBE WHAT THE FORM IS?

10  A   THIS IS YOUR OFFICIAL -- IF IT HAD THE GOLD SEAL AND IT

11  WERE THE ORIGINAL, IT WOULD BE YOUR ORIGINAL CERTIFICATE OF

12  REGISTRATION FOR THE TRADEMARK LISTED INSIDE.

13  Q   AND WHERE ARE THESE FORMS FILED?

14  A   THEY COME TO US FROM THE TRADEMARK OFFICE ONCE WE ACHIEVE

15  REGISTRATION.

16  Q   SO THEY ARE ACTUALLY ISSUED BY THE UNITED STATES TRADEMARK

17  OFFICE?

18  A   YES.

19      MR. NOLAN:  YOUR HONOR, WE WOULD OFFER INTO EVIDENCE

20  EXHIBITS 5528, 5529, 18477, 18478, AND 18479.

21      THE COURT:  ANY OBJECTION?

22      MR. ZELLER:  NO OBJECTION, YOUR HONOR.

23      THE COURT:  ADMITTED.  YOU MAY PUBLISH.

24  BY MR. NOLAN:

25  Q   THIS IS EXHIBIT 5528 NOW.

1        WE HAVE A BLACK AND WHITE VERSION OF THE SEAL, BUT,

2    MORE IMPORTANTLY, I WANT TO TURN TO THE SECOND PAGE.  THIS IS

3    THE CERTIFICATE OF REGISTRATION.  AND THEN ON THE SECOND PAGE,

4    THERE ARE SOME DATA.  BUT I WANT TO TURN TO THE THIRD PAGE.

5        CAN YOU READ THAT?

6    A   YES.

7    Q   WHAT IS THIS?

8    A   THIS IS THE INFORMATION ABOUT THE TRADEMARK AS IT APPEARS

9    ON THE PRINCIPAL REGISTER.

10       MR. ZELLER:  IF I COULD INTERJECT A FOUNDATION

11   OBJECTION AT THIS POINT.  IF HE'S GOING TO HAVE HER -- I DON'T

12   KNOW IF SHE'S EVER SEEN THEM BEFORE.

13       THE COURT:  LAY THE FOUNDATION, COUNSEL.

14       I'LL SUSTAIN THE FOUNDATIONAL OBJECTION.

15   BY MR. NOLAN:

16   Q   MS. ARAN, YOU'VE SEEN FORMS SIMILAR TO THIS; CORRECT?

17   A   YES.

18   Q   AND YOU'RE FAMILIAR WITH THE INFORMATION THAT IS SET FORTH

19   IN THE PRINTED FORM ISSUED BY THE UNITED STATES TRADEMARK

20   OFFICE; YES?

21   A   YES.

22   Q   IS THE INFORMATION THAT IS SET FORTH, BY THE FORMS FILED

23   BY APPLICANTS AND REGISTERED WITH THE UNITED STATES PATENT

24   OFFICE AND TRADEMARK OFFICE, SOMETHING THAT YOU WERE FAMILIAR

25   WITH WHEN YOU WERE AN EXAMINER IN THE OFFICE?

1    A   YES.

2    Q   HAVE YOU PERSONALLY REVIEWED THE ACTUAL TRADEMARK

3    PRINCIPAL REGISTER FOR THE NAME BRATZ?

4    A   I DON'T KNOW.

5    Q   THE FORM HAS A DATE LISTED UNDER FIRST USE.  WHAT I WANT

6    TO KNOW IS, BASED ON YOUR EXPERIENCE, WHEN THE TERM 'FIRST USE'

7    IS INCLUDED ON AN OFFICIAL PRINCIPAL REGISTRATION TRADEMARK

8    ISSUED BY THE PATENT OFFICE, WHAT DOES THAT MEAN?

9         MR. ZELLER:  OBJECTION.  FOUNDATION.  SECONDLY, THIS

10   IS OUTSIDE OF THE SCOPE.

11        THE COURT:  OVERRULED.  YOU MAY ANSWER.

12        THE WITNESS:  THIS MEANS THAT THE MARK THAT WAS FIRST

13   USED ON THE GOODS COVERED BY THAT TRADEMARK REGISTRATION --

14   FIRST OFFERED FOR SALE IN INTERSTATE COMMERCE ON, IN THIS CASE,

15   IT WOULD BE MAY 21, 2001.

16   BY MR. NOLAN:

17   Q   WOULD YOU PLEASE READ TO THE JURY THE DATES THAT FOLLOW

18   FOR BRATZ FOR FIRST USE.

19   A   MAY 21, 2001.

20   Q   AND AFTER 'IN COMMERCE.'

21   A   5-21-2001.

22   Q   ASKING YOU NOW TO TURN TO EXHIBIT 5529.

23        DO YOU RECOGNIZE THAT AS BEING A SIMILAR FORM THAT IS

24   ISSUED BY THE UNITED STATES OF AMERICA AT THE TRADEMARK OFFICE?

25   A   YES, I DO.

1    Q   AND I'D ASK YOU TO TURN TO THE THIRD PAGE, AND THIS TAKES

2    GENERALLY THE SAME FORM AS THE EARLIER ONE; THIS IS THE

3    DIFFERENCE INVOLVING THE MARK.

4         WHAT MARK IS THIS FOR?

5    A   YASMINE.

6    Q   AGAIN, DOES IT HAVE A LISTING OF FIRST USE IN COMMERCE?

7    A   YES.

8    Q   COULD YOU READ FOR THE JURY THE FIRST USE DATE.

9    A   MAY 13, 2001.

10   Q   AND COULD YOU READ IN COMMERCE THE DATE LISTED?

11   A   MAY 13, 2001.

12   Q   LOOK AT 18477, AGAIN, THE FRONT PAGE, THIS IS THE OFFICIAL

13   FORM ISSUED BY THE UNITED STATES OF AMERICA THROUGH THE

14   TRADEMARK OFFICE; CORRECT?

15   A   YES.

16   Q   TURN TO THE THIRD PAGE, IF YOU WOULD.

17        THIS IS FOR THE MARK 'JADE'?

18   A   YES.

19   Q   COULD YOU READ THE DATE THAT IS LISTED AFTER FIRST USE.

20   A   5-21-01.

21   Q   AND IN COMMERCE.

22   A   5-21-01.

23   Q   AND FOR EXHIBIT 18478, THIS IS THE CERTIFICATE

24   REGISTRATION OF THE TRADEMARK; CORRECT?

25   A   YES.

1    Q   FROM THE TRADEMARK OFFICE.  I APOLOGIZE.

2        IF YOU TURN TO PAGE 3, YOU SEE THE NAME OF THE MARK.

3    A   YES.

4    Q   WHAT'S THE NAME OF THE MARK?

5    A   SASHA.

6    Q   COULD YOU READ TO THE JURY THE FIRST USE DATE.

7    A   5-22-2001.

8    Q   CAN YOU READ THE FIRST DATE OF IN COMMERCE.

9    A   5-22-2001.

10   Q   TURNING TO THE LAST EXHIBIT, DO YOU HAVE EXHIBIT 18479 IN

11   FRONT OF YOU?

12   A   YES.

13   Q   DO YOU RECOGNIZE THIS IS ALSO ISSUED BY THE UNITED STATES

14   TRADEMARK OFFICE?

15   A   YES.

16   Q   TURNING TO THE THIRD PAGE OF THIS DOCUMENT, COULD YOU TELL

17   THE JURY WHICH OFFICIAL TRADEMARK REGISTRATION CERTIFICATE THIS

18   IS FOR?

19   A   CLOE.

20   Q   AND COULD YOU READ FOR THE JURY THE FIRST USE FOR THE MARK

21   CLOE?

22   A   5-21-2001.

23   Q   COULD YOU ALSO READ FOR THE JURY THE FIRST DATE FOR IN

24   COMMERCE?

25   A   5-21-2001.

1          MR. NOLAN:  NOTHING FURTHER.

2               FURTHER REDIRECT EXAMINATION

3     BY MR. ZELLER:

4     Q   MR. NOLAN WAS ASKING YOU QUESTIONS ABOUT THESE TRADEMARK

5     REGISTRATIONS WHICH HE BEGAN WITH EXHIBIT 5528.

6          DO YOU HAVE THOSE?

7     A   YES.

8     Q   AND YOU UNDERSTOOD THROUGH HIS QUESTIONING HE WAS TRYING

9     TO SUGGEST SOMEHOW THE TRADEMARK OFFICE HAD INVESTIGATED AND

10    ACTUALLY DETERMINED THAT'S WHEN MGA FIRST USED THE BRATZ

11    TRADEMARK; IS THAT TRUE?

12    A   NO.

13    Q   YOU DIDN'T UNDERSTAND THE QUESTIONS THAT WAY.

14    A   NO.

15    Q   BECAUSE ISN'T IT A FACT THAT THE TRADEMARK OFFICE DOES NO

16    INVESTIGATION AS TO WHEN AN APPLICANT, SUCH AS MGA, CLAIMS TO

17    HAVE FIRST USED THE MARK?

18    A   NO.

19    Q   THAT IS TRUE, ISN'T IT?

20    A   THAT IS TRUE.

21    Q   SO THE TRADEMARK OFFICE RELIES UPON THE HONESTY OF THE

22    APPLICANT'S STATEMENTS AS TO WHEN THE APPLICANT FIRST BEGAN

23    USING THE TRADEMARK; IS THAT TRUE?

24    A   YES.

25    Q   AND SO LET'S USE EXHIBIT 5528 AS AN EXAMPLE.

1         IF WE CAN PLEASE HAVE PAGE 3 BLOWN UP.

2         FOCUSING YOUR ATTENTION ON THE PORTION THAT MGA'S

3    COUNSEL HIGHLIGHTED, WHERE IT SAYS HERE "FIRST USE, 5-21-2001;

4    IN COMMERCE, 5-21-2001."

5         THAT INFORMATION, DO YOU SEE THAT?

6    A   YES.

7    Q   NOW, THIS REFLECTS INFORMATION THAT WAS GIVEN TO THE

8    TRADEMARK OFFICE BY MGA AT SOME POINT; RIGHT?

9    A   YES.

10   Q   AND THE TRADEMARK OFFICE DOESN'T VALIDATE, DOESN'T

11   INVESTIGATE.  DOES NOT ISSUE A REGISTRATION, THAT CONFIRMS THAT

12   THAT'S WHEN IT WAS ACTUALLY FIRST USED; IS THAT TRUE?

13   A   I'M NOT SURE I UNDERSTAND THE QUESTION.

14   Q   I'LL BREAK IT DOWN A LITTLE BIT, THEN.

15        SO WE TALKED ABOUT HOW THE FIRST USE DATE, IN BOTH

16   FIRST USE AND IN COMMERCE DATES, THOSE ARE BASED ON

17   REPRESENTATIONS THAT MGA MADE TO THE TRADEMARK OFFICE; YOU

18   UNDERSTAND THAT?

19   A   YES.

20   Q   AND WHEN THOSE REPRESENTATIONS WERE MADE BY MGA TO THE

21   TRADEMARK OFFICE, THE TRADEMARK OFFICE DIDN'T DO ANYTHING TO

22   INVESTIGATE WHETHER MGA WAS TELLING THE TRUTH OR NOT; IS THAT

23   TRUE?

24   A   YES.

25   Q   SO THE TRADEMARK OFFICE IS NOT AGREEING THAT WAS THE DATE

1   OF FIRST USE; IS THAT CORRECT?

2   A   RIGHT.

3   Q   IT RELIES ON WHAT MGA TOLD IT.

4   A   RIGHT.

5   Q   IF I ASKED YOU THOSE SAME QUESTIONS ABOUT THE OTHER

6   REGISTRATIONS THAT YOU WERE SHOWN, EXHIBITS 5529,

7   EXHIBIT 18477, EXHIBIT 18478, AND 18479, YOU WOULD GIVE ME THE

8   SAME ANSWERS.

9   A   YES, I WOULD.

10   Q   SO FOR ALL OF THEM, THE TRADEMARK OFFICE DIDN'T

11   INVESTIGATE THE DATES OF FIRST USE THAT MGA TOLD IT?

12   A   TRUE.

13   Q   AND WHAT IS REFLECTED IN ALL THOSE REGISTRATIONS IS JUST

14   WHAT IT IS THAT MGA TOLD THE TRADEMARK OFFICE.

15   A   YES.

16   Q   NOW, DO YOU KNOW ONE WAY OR ANOTHER, WHETHER MGA EVER TOLD

17   THE U.S. TRADEMARK OFFICE THE TRUE FIRST USE DATE OF THE USE OF

18   THE BRATZ NAME?

19   A   I HAVE NO PERSONAL KNOWLEDGE.

20   Q   I COULDN'T HEAR THAT.

21   A   I KNOW SOMEBODY GAVE THEM THE DATES OF FIRST USE, BUT IT

22   WASN'T ME.

23   Q   IT WASN'T YOU.  AND YOU DON'T KNOW IF THEY ARE ACCURATE OR

24   NOT, DO YOU?

25   A   PERSONALLY?  NO.

1    Q   BECAUSE YOU, TOO, JUST LIKE THE TRADEMARK OFFICE, RELY ON

2    WHAT MGA TOLD YOU WITH RESPECT TO FIRST USE.

3    A   IN GATHERING INFORMATION, CERTAINLY.

4    Q   IF WE COULD PLEASE PULL UP EXHIBIT 11192; AND BOTH PAGES

5    ARE NOW IN EVIDENCE.  IF WE COULD BLOW UP THE MGA PORTION.

6        I KNOW YOU'RE NOT A LITIGATOR, BUT YOU GENERALLY

7    UNDERSTAND WHERE IT SAYS "MGA" AND THEN IT HAS THAT SEQUENCE OF

8    NUMBERS, THIS MEANS IT WAS PRODUCED IN THIS CASE BY MGA.

9        DO YOU RECOGNIZE THAT?

10   A   IF YOU SAY SO, YES.

11   Q   LOOKING AT THE SECOND PAGE, YOU'LL SEE THERE'S ALSO THE

12   MGA STAMP, AND SO YOU'LL AGREE WITH ME THAT THIS DOCKET SHEET

13   WE TALKED ABOUT ALSO APPEARS TO HAVE BEEN PRODUCED OUT OF MGA'S

14   OWN FILES AT SOME POINT.

15   A   I DIDN'T KNOW WHAT THAT DESIGNATION MEANT, BUT IF THAT'S

16   WHAT IT MEANS --

17       MR. NOLAN:  YOUR HONOR, I'M GOING TO OBJECT.

18   FOUNDATION; 403; IT'S ALSO ARGUMENTATIVE.

19       THE COURT:  I'LL SUSTAIN THE OBJECTION ON FOUNDATION.

20       MR. ZELLER:  LET ME TRY IT THIS WAY.

21   BY MR. ZELLER:

22   Q   MR. NOLAN ASKED YOU A SERIES OF QUESTIONS THAT SEEMED TO

23   SUGGEST -- AND TELL ME IF I WAS WRONG -- THAT SOMEHOW THESE TWO

24   PAGES DIDN'T COME FROM YOUR CLIENT FILES.

25       IN OTHER WORDS, YOUR CLIENTS DON'T SEE THESE

1    DOCUMENTS.  DO YOU RECALL THAT?

2    A   YES.

3    Q   AND SO MY QUESTION IS, DO YOU HAVE ANY BASIS TO DISPUTE

4    THAT, IN FACT, THESE DOCUMENTS, WHICH YOU SEEM TO SUGGEST YOUR

5    CLIENTS DIDN'T SEE, IN FACT, WERE SEEN BY MGA?

6    A   AS I SAID, I DO NOT KNOW WHAT THAT STAMP MEANS.  I'M NOT A

7    LITIGATOR.  I DON'T KNOW WHAT IT MEANS.

8    Q   SO IT'S FAIR TO SAY THAT YOU DON'T KNOW --

9    A   I DON'T KNOW.

10   Q   -- WHETHER OR NOT MGA HAD THESE DOCUMENTS IN THEIR FILE OR

11   HOW LONG THEY HAVE HAD THEM IN THEIR FILE OR WHETHER THEY HAVE

12   SEEN THEM OR NOT; RIGHT?

13   A   THAT'S RIGHT.

14   Q   MR. NOLAN ASKED YOU SOME QUESTIONS ABOUT THE INTENT TO USE

15   APPLICATION, AND THIS IS THE FAX THAT WE HAD TALKED ABOUT

16   WHICH, FOR THE RECORD, IS EXHIBIT 11897.

17        IF YOU RECALL, MR. NOLAN WALKED THROUGH THESE

18   APPLICATIONS WITH YOU AND MADE A POINT THAT THESE WERE INTENT

19   TO USE APPLICATIONS.  DO YOU RECALL THAT?

20   A   YES.

21   Q   BUT IT'S TRUE, ISN'T IT, THAT IN THE COURSE OF YOUR WORK

22   AS A TRADEMARK ATTORNEY, YOU HAVE FILED INTENT TO USE

23   APPLICATIONS WHERE THE CLIENT HAS ALREADY BEEN USING THE

24   TRADEMARK OR TOLD YOU THAT THEY HAD ALREADY BEEN USING IT.

25   A   YES.

1  MR. ZELLER:  NOTHING FURTHER.

2   FURTHER RECROSS-EXAMINATION

3 BY MR. NOLAN:

4 Q   MR. ZELLER WAS POINTING YOU TO A STAMP NUMBER ON THE

5 BOTTOM WHERE IT SAYS "MGA."  DO YOU SEE THAT?

6 A   YES.

7 Q   DO YOU HAVE ANY IDEA HOW DOCUMENTS HAVE BEEN PRODUCED IN

8 THIS LAWSUIT?

9 A   NO.

10 Q   DO YOU KNOW WHETHER OR NOT THAT DOCUMENT AND THAT

11 PRODUCTION NUMBER IN ANY WAY SUGGESTS THAT MGA, AT THE TIME OF

12 THE ENTRIES IN THE INTERNAL RECORDS OF YOUR LAW FIRM, HAD

13 ACCESS TO THEM?

14 A   I DON'T KNOW WHAT IT MEANS.

15 Q   QUICKLY GO TO 5528; THIS IS THE MARK FOR BRATZ.

16  DO YOU SEE THE REGISTRATION DATE?

17 A   YES.

18 Q   COULD YOU READ THE REGISTRATION DATE?

19 A   DECEMBER 2, 2003.

20 Q   WHAT DOES THE REGISTRATION DATE MEAN?

21 A   THAT IS THE DAY THAT THE TRADEMARK HAS OFFICIALLY BECOME

22 REGISTERED WITH THE UNITED STATES PATENT TRADEMARK OFFICE.

23 Q   THAT WAS FOR BRATZ; RIGHT?

24 A   YES.

25 Q   IF YOU LOOK AT 5529, PAGE 3, RIGHT CORNER, THIS IS THE

1    MARK FOR YASMINE; YES?

2    A   YES.

3    Q   AND THE DATE FOR THAT REGISTRATION IS?

4    A   DECEMBER 30, 2003.

5    Q   AND IF YOU GO TO EXHIBIT 18477, THE MARK FOR JADE?

6        MR. ZELLER:  I'LL OFFER TO STIPULATE TO THESE.

7        MR. NOLAN:  I JUST HAVE TWO MORE; IT'S VERY QUICK.

8        THE WITNESS:  JULY 30TH, 2002.

9    BY MR. NOLAN:

10   Q   THE LAST ONE IS 18478, PAGE 2, THE REGISTRATION DATE IS

11   APRIL 22, 2003.

12   A   YES.

13   Q   THE LAST ONE IS 18479, GO TO PAGE THREE, THIS ONE IS FOR

14   CLOE.

15   A   YES.

16   Q   THE LAST ONE WAS FOR THE MARK OF SASHA; RIGHT?

17       SO THE REGISTRATION DATE FOR CLOE IS JUNE 17, 2003?

18   A   YES.

19   Q   WHEN YOU WERE TESTIFYING EARLIER, THERE WAS A STIPULATION

20   THAT THE FIRST LAWSUIT IN THIS CASE WAS FILED IN APRIL OF 2004.

21       ALL OF THE DATES FOR ALL OF THE REGISTRATIONS FOR

22   THOSE DOCUMENTS WERE ISSUED BY THE UNITED STATES TRADEMARK

23   OFFICE PRIOR TO THE LAWSUIT; YES?

24   A   YES.

25       MR. NOLAN:  THANK YOU.

1          NOTHING FURTHER.

2          THE COURT:  MR. ZELLER?

3             FURTHER REDIRECT EXAMINATION

4    BY MR. ZELLER:

5    Q   NOW, TO YOUR KNOWLEDGE, MGA, AND CERTAINLY, YOU, NEVER

6    TOLD THE U.S. TRADEMARK OFFICE THAT PAULA TREANTAFELLES HAD

7    TOLD YOU THAT, IN FACT, THE FIRST USE DATE OF BRATZ WAS

8    JUNE 15, 2000; CORRECT?

9          MR. NOLAN:  OBJECTION.  LACKS FOUNDATION.

10         THE COURT:  YOU'RE ASKING WHAT SHE TOLD --

11         MR. ZELLER:  YES.

12         THE COURT:  OVERRULED.

13         THE WITNESS:  CORRECT.

14   BY MR. ZELLER:

15   Q   YOU NEVER TOLD THE TRADEMARK OFFICE THAT.

16   A   NO.

17   Q   SO AS FAR AS YOU KNOW, PAULA TREANTAFELLES TOLD YOU THAT

18   THE TRUE FIRST USE DATE OF BRATZ WAS JUNE 15, 2000, AND THAT

19   WAS NEVER DISCLOSED TO THE TRADEMARK OFFICE' RIGHT?

20   A   I DON'T KNOW.

21   Q   YOU CAN'T DENY THAT.

22         MR. NOLAN:  I WITHDRAW THE OBJECTION.

23         THE COURT:  VERY WELL.

24   BY MR. ZELLER:

25   Q   YOU'RE NOT DENYING THAT.

1    A   DENYING WHAT?

2    Q   YOU'RE NOT DENYING THAT AS FAR AS YOU KNOW, NO ONE EVER

3    TOLD THE TRADEMARK OFFICE THE TRUE FIRST USE DATE FOR BRATZ.

4    A   I DON'T KNOW.

5    Q   AND YOU DON'T HAVE ANY KNOWLEDGE OR INFORMATION THAT WOULD

6    ALLOW YOU TO DENY THAT; RIGHT?

7    A   TRUE.

8    Q   NOW, MR. NOLAN WAS SHOWING YOU THE TRADEMARK REGISTRATIONS

9    AND MAKING A POINT ABOUT THE DATE IN WHICH THEY WERE ISSUED.

10       YOU'LL AGREE WITH ME THAT, AS FAR AS YOU KNOW, THE

11   CORRECTIONS MADE TO THE COPYRIGHT APPLICATIONS THAT HAD TOLD

12   THE COPYRIGHT OFFICE THAT THE BRATZ DOLLS WERE COMPLETED IN THE

13   YEAR 2000, AS FAR AS YOU KNOW, THOSE STATEMENTS WERE NEVER

14   CHANGED UNTIL AFTER THIS LAWSUIT WAS FILED IN 2004; CORRECT?

15   A   I DON'T KNOW.

16   Q   WELL, YOU NOW KNOW WHAT THE DATE OF THE LAWSUIT IS; YOU

17   ANSWERED IT IN RESPONSE TO MR. NOLAN'S QUESTIONS; CORRECT?

18   A   CORRECT.

19   Q   SO DID YOU SEE ANY CORRECTIONS, ANY CHANGES, TO THOSE

20   COPYRIGHT OFFICE REPRESENTATIONS THAT MGA HAD MADE, NAMELY THAT

21   YOU HAD MADE, TO THE COPYRIGHT OFFICE THAT THE BRATZ DOLLS WERE

22   COMPLETED IN THE YEAR 2000 THAT WAS DONE BEFORE THIS LAWSUIT

23   WAS FILED IN 2004?

24   A   WE NEVER MADE ANY CHANGES TO THE COPYRIGHT REGISTRATIONS.

25   I WASN'T THE PERSON WHO DID THOSE CHANGES.

1   Q   LET'S BE CLEAR ABOUT THIS.

2       YOU TOLD THE U.S. COPYRIGHT OFFICE, ON BEHALF OF MGA,

3   IN THOSE REGISTRATIONS THAT THE BRATZ DOLLS WERE COMPLETED IN

4   THE YEAR 2000.  DO YOU RECALL THAT?

5   A   THAT WAS, YES, WHAT THEY SAID, UH-HUH.

6   Q   AS FAR AS YOU KNOW, THERE WAS NO CHANGE EVER MADE, BY YOU

7   OR ANYBODY ELSE, TO THAT REPRESENTATION THAT THE DOLLS WERE

8   COMPLETED IN 2000 UNTIL AFTER THIS LAWSUIT WAS FILED IN 2004;

9   IS THAT CORRECT?

10  A   YES.

11      MR. ZELLER:  THANK YOU.

12      MR. NOLAN:  VERY BRIEFLY.

13  BY MR. NOLAN:

14  Q   YOU DON'T HAVE ANY RECOLLECTION OF A CONVERSATION WITH

15  PAULA TREANTAFELLES, DO YOU?

16  A   THAT'S TRUE.

17  Q   YOU DON'T HAVE ANY PERSONAL KNOWLEDGE AS TO WHETHER OR NOT

18  PAULA TREANTAFELLES EVEN SPOKE WITH YOU OR WITH YOUR ASSISTANT;

19  CORRECT?

20  A   TRUE.

21  Q   YOU DON'T EVEN HAVE ANY KNOWLEDGE AS TO WHETHER OR NOT

22  PAULA TREANTAFELLES RESPONDED TO THE E-MAIL FROM YOUR

23  ASSISTANT; CORRECT?

24  A   CORRECT.

25  Q   AND ISN'T IT TRUE THAT VICTORIA O'CONNOR, THE HEAD OF

1      LICENSING AT MGA, WOULD HAVE MORE KNOWLEDGE WITH RESPECT TO THE

2      DATE OF FIRST USE THAN YOU DO?

3            MR. ZELLER:  FOUNDATION.

4            THE COURT:  SUSTAINED.

5            THE LAST ANSWER WAS STRICKEN.  ARE YOU WITHDRAWING

6      THE QUESTION?  I SUSTAINED THE OBJECTION.

7      BY MR. NOLAN:

8      Q   WOULD YOU EXPECT THAT IF A WITNESS TESTIFIED IN THIS CASE,

9      VICTORIA O'CONNOR, YESTERDAY, THAT THE FIRST SALE OF BRATZ WAS

10     SOMETIME IN MID 2001, YOU HAVE NO EVIDENCE TO DISPUTE THAT, DO

11     YOU?

12     A   I SAID --

13           MR. ZELLER:  LACKS FOUNDATION.

14           THE COURT:  DON'T ANSWER.  WHEN THEY ARE STANDING UP,

15     THAT MEANS THEY ARE MAKING AN OBJECTING.

16           COUNSEL?

17           MR. ZELLER:  ARGUMENTATIVE; LEADING; LACKS

18     FOUNDATION.

19           THE COURT:  SUSTAINED.

20           REPHRASE, COUNSEL.

21     BY MR. NOLAN:

22     Q   DO YOU HAVE ANY EVIDENCE THAT WOULD DISPUTE TESTIMONY FROM

23     A REPRESENTATIVE OF MGA THAT BRATZ DOLLS WERE FIRST SOLD IN

24     INTERSTATE COMMERCE IN MAY/JUNE OF 2001?  DO YOU HAVE ANY SUCH

25     EVIDENCE?

1          MR. ZELLER:  LEADING; ARGUMENTATIVE; LACKS

2    FOUNDATION.

3          THE COURT:  SUSTAINED ON FOUNDATION, COUNSEL.

4    BY MR. NOLAN:

5    Q   AS YOU SIT HERE, DO YOU HAVE ANY PERSONAL KNOWLEDGE AS TO

6    WHEN THE BRATZ DOLLS WERE FIRST INTRODUCED INTO COMMERCE?

7    A   NO.

8          MR. NOLAN:  NOTHING FURTHER.  THANK YOU.

9          MR. ZELLER:  NOTHING, YOUR HONOR.  THANK YOU.

10         THE COURT:  YOU'RE EXCUSED, MA'AM.

11         WE'RE GOING TO TAKE OUR LUNCH BREAK AT THIS TIME.

12         I'M GOING TO EXCUSE THE JURY.  I'LL SEE THE JURY BACK

13   HERE AT 1:30.

14         (CONCLUSION OF MORNING SESSION.)

15

16

17

18              CERTIFICATE

19

20   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED

     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF

21   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-

     ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

22   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

     THE UNITED STATES.

23

24   _____        _____

     THERESA A. LANZA, CSR, RPR          DATE

25   FEDERAL OFFICIAL COURT REPORTER