1                    UNITED STATES DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3                         EASTERN DIVISION

4                              - - -

5           HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                              - - -

7     MATTEL, INC.,              )

                                 )

8               PLAINTIFF,   )

                                 )

9           VS.              ) NO. CV 04-09049

                                 )

10    MGA ENTERTAINMENT, INC., ET. AL.,   )

                                 )

11              DEFENDANTS.  )  TRIAL DAY 13

      _____)  MORNING SESSION

12    AND CONSOLIDATED ACTIONS,       )  PAGES 2525-2601

                                 )

13

14

15          REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                      RIVERSIDE, CALIFORNIA

17                     FRIDAY, JUNE 13, 2008

18                          9:50 A.M.

19

20

21

22

23          THERESA A. LANZA, RPR, CSR

            FEDERAL OFFICIAL COURT REPORTER

24          3470 12TH STREET, RM. 134

            RIVERSIDE, CALIFORNIA  92501

25              951-274-0844

                WWW.THERESALANZA.COM

1    APPEARANCES:

2

     ON BEHALF OF MATTEL, INC.:

3

                    QUINN EMANUEL
4               BY:  JOHN QUINN
                    JON COREY
5               MICHAEL T. ZELLER
                    HARRY OLIVAR
6               TIMOTHY ALGER
                865 S. FIGUEROA STREET,
7               10TH FLOOR
                LOS ANGELES, CALIFORNIA  90017

8

9

10   ON BEHALF OF MGA ENTERTAINMENT:

11              SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                BY:  THOMAS J. NOLAN
12              JASON RUSSELL
                    RAOUL KENNEDY
13              LAUREN AGUIAR
                    CARL ROTH
14              300 SOUTH GRAND AVENUE
                LOS ANGELES, CALIFORNIA  90071-3144
15              213-687-5000

16

17

18

19

20

21

22

23

24

25

Unsigned                                          Page  2526

1                    I N D E X

2                              PAGE

3     PLAINTIFF CASE (CONTINUED)...................... 2535

4

5

6     PLAINTIFF

      WITNESS       DIRECT     CROSS     REDIRECT     RECROSS

7     CARTER BRYANT (CONTINUED)

8     BY MR. PRICE  2535

9

10

11        EXHIBITS       RECEIVED

12      11904        2547

        11905        2550

13      5023         2584

        504          2592

14

15

16

17

18

19

20

21

22

23

24

25

Unsigned                                    Page  2527

1      RIVERSIDE, CALIFORNIA; FRIDAY, JUNE 13, 2008; 9:50 A.M.

2                   -OOO-

3      THE CLERK:  CALLING CASE NUMBER CV04-09049-SGL,

4   MATTEL, INC., V. MGA, INC., ET AL.

5      MAY WE HAVE COUNSEL PLEASE STATE YOUR APPEARANCES FOR

6   THE RECORD.

7      MR. QUINN:  JOHN QUINN, BILL PRICE, MIKE ZELLER FOR

8   MATTEL.

9      MR. NOLAN:  TOM NOLAN, LAUREN AGUIAR, AND

10   MATTHEW SLOAN ON BEHALF OF MGA.

11      THE COURT:  GOOD MORNING, COUNSEL.

12      WE'RE BACK ON THE RECORD FOLLOWING OUR IN-CHAMBERS

13   HEARING THIS MORNING ON THE ORDER TO SHOW CAUSE THAT THE COURT

14   ISSUED YESTERDAY.  AS SET FORTH IN GREATER DETAIL ON THE RECORD

15   IN CHAMBERS, THE COURT FINDS THAT THE ORDER TO SHOW CAUSE HAS

16   BEEN SATISFIED.

17      SEPARATE AND APART FROM THAT FINDING, THE COURT DOES

18   ORDER MR. RUSSELL OF SKADDEN ARPS TO CERTIFY FOR THE COURT

19   WITHIN 30 DAYS THAT HE HAS SAT FOR RETRAINING ON THE ELECTRONIC

20   FILING PROCEDURES FOR THE CENTRAL DISTRICT OF CALIFORNIA.

21      THE COURT, AT THE END OF THE DAY YESTERDAY, ASKED FOR

22   CERTAIN PROPOSED ORDERS TO BE SUBMITTED, JUST TO ADDRESS, FOR

23   DOCKET PURPOSES, THE LAST OF THE OUTSTANDING MOTIONS.

24      HAS THE COURT RECEIVED THAT, OR HAS THAT BEEN

25   PROFFERED?

Unsigned                                    Page  2528

1       MR. PAGE:  I BELIEVE THE ORDER ON HARD DRIVE HAS BEEN

2    SUBMITTED, YOUR HONOR.

3       MR. COREY:  THAT WAS PROVIDED TO MR. HOLMES THIS

4    MORNING.

5       THE COURT:  VERY WELL.

6       IS THERE ANYTHING FURTHER AT THIS TIME?  MAY WE

7    PROCEED?

8       MR. PRICE:  IF YOU RECALL, I SAID I THINK WE FOUND

9    THE TARGET-ON-THE-BACK CASE.  AND I CONFIRMED WITH MR. NOLAN

10   THAT THE CASE WE IDENTIFIED IS THE CASE WHICH MENTIONS THAT.  I

11   THINK HE SAYS THERE ARE SOME OTHER CASES FOR OTHER COURTS

12   MENTIONING THAT, AND WE WILL SUBMIT A COPY TO THE COURT.

13   UNFORTUNATELY, WE HAD SEVERAL COPIES HERE WHICH ARE NOT HERE

14   ANYMORE.  I HAVE ONE WHICH I CAN GIVE TO YOU, BUT IT HAS

15   HANDWRITING ON IT.

16      JUST SO YOU KNOW, THE RELIEF WE'RE GOING TO SEEK --

17   WHAT THE COURT SAYS HERE -- IT WAS AN APPEAL OF A GRANTING OF A

18   SLAP MOTION, A DEFAMATION SUIT BY MATTEL.  THE COURT OVERRULED

19   IN PART, AND THE CASE WENT FORWARD.  BUT IN THIS CASE, ONE OF

20   THE DEFAMATION CLAIMS WAS THAT A WITNESS, MATTEL'S FORMER

21   EMPLOYEE, TESTIFIED THAT MATTEL AGGRESSIVELY DEFENDS AGAINST

22   ENTRIES IN THE FASHION DOLL BUSINESS AND, QUOTE, "ANYONE WHO

23   MAKES AN ELEVEN-AND-A-HALF-INCH FASHION DOLL PAINTS A TARGET ON

24   THEIR BACK."

25      WHAT THE COURT FOUND HERE WAS THAT IT'S UNDISPUTED

1    THAT A FORMER MATTEL EMPLOYEE HAD TESTIFIED TO THAT AND,

2    THEREFORE, MATTEL COULD NOT GO FORWARD ON THAT ALLEGEDLY

3    DEFAMATORY STATEMENT BUT IT COULD GO FORWARD ON OTHER

4    DEFAMATORY STATEMENTS.  BUT THE COURT NEVER SAID -- AND I DON'T

5    KNOW OF ANY COURT THAT'S EVER CONCLUDED THAT IT IS TRUE THAT

6    MATTEL -- THAT IF YOU GET INTO THE FASHION DOLL BUSINESS, AS

7    FAR AS MATTEL IS CONCERNED, YOU HAVE A TARGET ON YOUR BACK.

8         OBVIOUSLY, THE JURY HAS A MISIMPRESSION AS TO WHAT A

9    FEDERAL COURT CONCLUDED.

10        THAT DISCUSSION IS ON PAGE 7.

11        THE COURT:  I'M LOOKING AT IT RIGHT NOW.

12        MR. PRICE:  SO WHEN WE HAVE APPROPRIATE TIME,

13   YOUR HONOR, WE'D ASK FOR A -- THE ONLY WAY TO DEAL WITH THIS IS

14   WITH AN INSTRUCTION; YOU CAN TAKE JUDICIAL NOTICE OF THIS AND

15   SAY, 'I JUST WANT THE JURY TO KNOW THAT NO FEDERAL COURT HAS

16   EVER RULED,' AND THEN USE THE LANGUAGE THAT WAS USED IN THE

17   TESTIMONY.  BECAUSE IT'S SIMPLY UNTRUE.

18        THE COURT:  ORDINARILY, I WOULD BE INCLINED TO IGNORE

19   THIS AND SIMPLY MOVE ON AT THIS POINT, BUT AS I EXPRESSED THE

20   OTHER DAY, THE CONCERN I HAVE IS THE ATTRIBUTION OF THE

21   STATEMENT TO A FEDERAL JUDGE.

22        LET ME HEAR FROM MS. AGUIAR IN TERMS OF MGA'S

23   THOUGHTS ON HOW TO PROCEED.

24        MS. AGUIAR:  I UNDERSTAND YOUR HONOR'S HESITATION

25   ABOUT THE STATEMENTS THAT WERE MADE.  I DON'T WANT TO GET INTO

1    ARGUING WHETHER, IN THE CASE, THIS JUDGE, WHO WAS A CALIFORNIA

2    COURT OF APPEALS JUDGE, IT LOOKS LIKE, RATHER THAN A FEDERAL

3    JUDGE -- WHETHER THAT WOULD MATTER TO THE JURY.  I DON'T WANT

4    TO GET INTO WHETHER OR NOT THE WAY THIS IS PHRASED -- AND YOUR

5    HONOR CAN SEE THE PARAGRAPH -- WHETHER THE COURT ACTUALLY WAS

6    FINDING THAT THAT STATEMENT WAS, QUOTE, "SUBSTANTIALLY TRUE"

7    AND WHETHER IT WAS REASONABLE FOR MR. LARIAN TO THEN READ THIS

8    AND TO THINK, 'WELL, THE COURT BASICALLY SAID IT'S

9    SUBSTANTIALLY TRUE THAT MATTEL'S OWN EMPLOYEE ADMITTED THIS.'

10    THE COURT:  WAIT A SECOND.  THERE'S A TWIST THERE.

11    THE QUESTION IS WHETHER THE COURT FOUND THAT IT'S

12    SUBSTANTIALLY TRUE THAT ANYONE WHO ENTERS THE FASHION DOLL

13    BUSINESS HAS A PAINTED TARGET ON THEIR BACK, VERSUS WHETHER THE

14    COURT THINKS IT'S TRUE THAT A FORMER MATTEL EMPLOYEE SAID THAT.

15    THAT'S A HUGE DISTINCTION, COUNSEL.

16    MS. AGUIAR:  RIGHT.

17    THE COURT:  SO LET'S NOT CONFUSE THOSE.

18    MS. AGUIAR:  OKAY.  AND THAT'S FAIR.

19    I THINK THERE ARE A NUMBER OF OTHER STATEMENTS MADE,

20    INCLUDING ONE BY A FEDERAL JUDGE IN THE GOLDBERGER CASE, WHICH

21    WAS NOT THE SAME LANGUAGE, BUT IT WAS LANGUAGE THAT SPEAKS TO

22    WHETHER MATTEL IS A REPEAT PLAYER IN THESE KINDS OF CASES.  I

23    THINK WHAT THIS IS GOING TO IS MR. LARIAN'S BELIEF AND

24    MR. LARIAN'S STATE OF MIND THAT HE HAS READ A NUMBER OF CASES,

25    NOT JUST ONE --

1        THE COURT:  AND THAT'S FAIR ENOUGH.  I THINK THAT

2    LINE OF QUESTIONING IS APPROPRIATE, AND I THINK MR. LARIAN'S

3    ANSWERS ALONG THOSE LINES WERE HIS ANSWERS.

4        THE CONCERN I CONTINUE TO HAVE IS THE ATTRIBUTION TO

5    A FEDERAL JUDGE OF A PARTICULAR STATEMENT, INDICATING THAT IT

6    WAS A FINDING OF THAT JUDGE.  AND I THINK THAT, PERHAPS, WE CAN

7    ADDRESS THIS -- I MEAN, IT CLEARLY WASN'T.  AS YOU STATE, IT

8    WAS A CALIFORNIA JUDGE.

9        I'M JUST LOOKING AT THIS NOW, BUT IT LOOKS LIKE THE

10   FINDING WAS THAT THE FORMER EMPLOYEE SAID THIS; NOT THAT THE

11   JUDGE WAS MAKING SOME KIND OF INDEPENDENT FINDING THAT ANYONE

12   WHO ENTERS THE FASHION DOLL BUSINESS HAS A TARGET ON THEIR

13   BACK.

14       PERHAPS A VERY, VERY BRIEF -- AND I'M JUST THINKING

15   OUT LOUD RIGHT NOW -- BRIEF INSTRUCTION TO THE JURY THAT 'YOU

16   HEARD TESTIMONY THAT A FEDERAL JUDGE MADE AN INDICATION, IN

17   FACT, THAT REFERENCES TO A WITNESS IN A CASE BEFORE ANOTHER

18   COURT, AND IT WAS NOT A STATEMENT BY A FEDERAL JUDGE; AND

19   YOU'RE ONLY TO FOLLOW THE INSTRUCTIONS AND DIRECTIONS OF THIS

20   COURT.'

21       I DON'T KNOW.  SOMETHING ALONG THOSE LINES.  BUT I'D

22   LIKE COUNSEL TO WORK OUT -- I DO THINK MR. PRICE IS RIGHT THAT

23   SOMETHING NEEDS TO BE SAID, BECAUSE IT DOESN'T -- I'M NOT

24   CRITICIZING MR. LARIAN OR SUGGESTING THAT HE DID NOT EARNESTLY

25   BELIEVE WHAT HE SAID.  BUT BECAUSE IT'S PATENTLY NOT THE CASE,

1     AND BECAUSE OF THE DANGER TO A JURY OF HEARING WHAT A FEDERAL

2     JUDGE SAYS WHEN A FEDERAL JUDGE DIDN'T SAY THAT, I THINK THERE

3     NEEDS TO BE SOME WAY OF ADDRESSING THIS; SO I'D LIKE THE FOCUS

4     TO BE ON THE REMEDY.

5          MS. AGUIAR:  I LIKE HOW YOUR HONOR HAS FRAMED IT.

6          I THINK WE CAN TALK WITH MR. PRICE TO COME UP WITH

7     SOME LANGUAGE THAT DEALS WITH OUR CONCERN THAT WHATEVER

8     INSTRUCTION YOU DO GIVE THEM DOESN'T LEAVE THE RESIDUE OF THAT

9     MR. LARIAN'S MADE THIS UP OR HE HAD NO BASIS.  SO AS LONG AS WE

10    CAN COME TO A BALANCING OF THAT -- AND I HOPE THAT WE CAN --

11    WE'LL DO THAT.

12         THE COURT:  THAT'S EXACTLY WHAT I WANT TO ACHIEVE,

13    BECAUSE I THINK MR. LARIAN WAS BEING ASKED QUESTIONS THAT WERE

14    NOT BEING OBJECTED TO AND HE WAS TRYING TO CONVEY HIS STATE OF

15    MIND.  AND THAT IS LEGITIMATE.  IT'S JUST THE ACTUAL CHOICE OF

16    WORDS.

17         MS. AGUIAR:  I THINK WE SHOULD BE ABLE TO DO THAT.

18         THE COURT:  MR. PRICE, YOUR THOUGHTS?

19         MR. PRICE:  THE ANSWER CAME IN RESPONSE TO A QUESTION

20    AS TO WHETHER OR NOT MATTEL HAD PREVAILED IN THE FOUR CASES HE

21    HAD IDENTIFIED.  AND HIS RESPONSE WAS, 'NO, I THINK IN ONE OF

22    THOSE CASES, IN FACT, A FEDERAL JUDGE FOUND THAT...', ET

23    CETERA.

24         THE COURT:  I'D LIKE TO TAKE A LOOK AT THAT

25    TRANSCRIPT AGAIN.  WHY DON'T WE GET THAT AND THEN -- BUT I'M

Unsigned                                    Page  2533

1    ALSO ACCEPTING THE NOTION THAT SOMETHING NEEDS TO BE SAID TO

2    THE JURY.

3        MR. PRICE:  I THINK THE JURY NEEDS TO BE TOLD NO

4    FEDERAL JUDGE -- NO JUDGE HAS EVER CONCLUDED THAT, OR WE CAN

5    SAY NO FEDERAL JUDGE.  I'M AFRAID IF YOU SAY, 'A WITNESS IN A

6    CASE DID SAY THAT,' THEN WE WOULD HAVE TO ALSO SAY, 'HOWEVER,

7    MATTEL PREVAILED IN THE ACTION,' OR SOMETHING LIKE THAT.

8    BECAUSE OTHERWISE, IT'S LIKE, IN ANOTHER CASE, ME SAYING THAT A

9    WITNESS IN THIS CASE -- TELLING A JURY, AGAINST MGA, 'A WITNESS

10   IN THIS CASE SAID THAT THEY WERE UNETHICAL.'  WE DON'T HAVE THE

11   CHANCE TO CROSS-EXAMINE THAT WITNESS, ET CETERA.

12       THE COURT:  WHAT I'LL ASK YOU TO DO IS, IF YOU CAN

13   AGREE ON COMMON LANGUAGE, THAT'S GREAT; IF YOU CAN'T, SUBMIT ME

14   A SINGULAR PIECE OF PAPER WITH YOUR TWO PROPOSALS, AND THE

15   COURT WILL DO THE BEST IT CAN TO FIGURE OUT WHAT'S APPROPRIATE.

16       LET'S DO THAT TODAY SO THAT WE CAN DO THIS IN THE

17   SAME WEEK THE TESTIMONY WAS GIVEN AND THEN WE CAN MOVE ON.

18       ANYTHING ELSE?

19       LET'S BRING THE JURY IN.

20       MR. BRYANT, IF YOU WOULD TAKE THE WITNESS STAND.

21       (WHEREUPON, JURORS ENTER COURTROOM.)

22       THE COURT:  GOOD MORNING TO THE JURY.

23       COUNSEL, YOU MAY RESUME WITH YOUR EXAMINATION.

24       MR. PRICE:  THANK YOU, YOUR HONOR.

25   / / /

Unsigned

1            DIRECT EXAMINATION (CONTINUED)

2      BY MR. PRICE:

3      Q   WHEN WE LEFT, WE HAD EXHIBIT 30 UP ON THE SCREEN.

4            AS OF SEPTEMBER 18TH, I'D LIKE YOU TO TELL ME AS OF

5      THAT DATE HOW MANY OF YOUR CO-WORKERS AT MATTEL HAD YOU

6      INVOLVED IN CONNECTION WITH YOUR BRATZ PROJECT AT MGA?

7            MR. NOLAN:  YOUR HONOR, OBJECT TO THE

8      CHARACTERIZATION OF THE "BRATZ PROJECT AT MGA."  THERE'S NO

9      BRATZ PROJECT.

10           MR. PRICE:  I MEANT "AND MGA."

11           THE COURT:  SUSTAINED.

12     BY MR. PRICE:

13     Q   IN THE SEPTEMBER TIME FRAME, AUGUST-SEPTEMBER TIME FRAME,

14     WE'VE TALKING ABOUT YOU PREPARING FOR A PITCH AT MGA FOR YOUR

15     BRATZ IDEA, AND HERE WE ARE IN SEPTEMBER AND YOU'RE TAKING SOME

16     ACTIONS IN CONNECTION WITH THAT; SO I'M FOCUSING ON THAT TOPIC.

17           HOW MANY OF YOUR MATTEL CO-WORKERS DID YOU INVOLVE IN

18     THAT?

19     A   WELL, THE ONLY ONES THAT I CAN THINK OF ARE THE TWO THAT

20     WE DISCUSSED YESTERDAY; SHEILA HAD DONE FACE PAINTING, AND

21     CARMEN HAD ROOTED SOME HAIR.

22     Q   THAT'S SHEILA KYAW AND CARMEN MONTEAGUDO?

23     A   YES.

24     Q   THIS LETTER IS TO A COMPANY CALLED UNIVERSAL; IS THAT

25     RIGHT?

1   A   YES.

2   Q   AND UNIVERSAL WAS A VENDOR OF MATTEL'S; THAT IS, MATTEL

3   WOULD GET HAIR SAMPLES FROM UNIVERSAL; CORRECT?

4   A   YES.

5   Q   AND PRIOR TO THIS LETTER HERE, YOU HAD A CONVERSATION,

6   OBVIOUSLY, WITH MR. KANUYO AT UNIVERSAL; RIGHT?

7   A   I BELIEVE SO, YES.

8   Q   AND IN TRYING TO REACH HIM, YOU HAD TO SOMEHOW FIND OUT

9   WHAT PHONE NUMBER TO CALL; RIGHT?

10   A   YES.

11   Q   AND IN DOING THAT, YOU WENT AND ASKED JENNIFER SHAW AT

12   MATTEL FOR THE UNIVERSAL PHONE NUMBER.

13   A   I THINK I MAY HAVE, YES.

14   Q   AND COULD YOU TELL THE JURY WHAT JENNIFER SHAW'S POSITION

15   WAS.

16   A   SHE WORKED FOR THE HAIR ROOTING DEPARTMENT.

17   Q   AND YOU THOUGHT SHE WOULD HAVE THE NUMBER BECAUSE SHE

18   WORKS WITH THE HAIR THAT'S USED ON THE MATTEL DOLLS.

19   A   YES.

20   Q   WHEN YOU ASKED MS. SHAW FOR THE PHONE NUMBER FOR

21   UNIVERSAL, DID YOU TELL HER THAT IT WAS SO YOU COULD CONTACT

22   THEM AND SAY YOU WERE WITH MGA ENTERTAINMENT AND NEEDED SOME

23   HAIR SAMPLES?

24   A   I DON'T RECALL THE DETAILS OF THE CONVERSATION.

25   Q   SO YOU'RE SAYING YOU MAY HAVE TOLD HER THAT?

1    A   IT'S POSSIBLE, BUT I DON'T REMEMBER TELLING HER THAT.

2    Q   DO YOU THINK YOU TOLD HER YOU WANTED TO GET A QUOTE, TO

3    GET SAMPLES OF HAIR FOR THIS BRATZ PROJECT?

4    A   I DON'T RECALL IF I DID OR NOT.

5         MR. PRICE:  YOUR HONOR, IF WE COULD PLAY FROM

6    MR. BRYANT'S DEPOSITION TRANSCRIPT, PAGE 136, LINE 2 --

7         THE COURT:  VOLUME I?

8         MR. PRICE:  YES, YOUR HONOR.

9         NOVEMBER 4, 2004.  ACTUALLY, WE SHOULD START ON PAGE

10   135, LINE 22, TO GET IT IN CONTEXT, TO 136, LINE 14.

11        MR. NOLAN:  NO OBJECTION.

12        THE COURT:  VERY WELL.  YOU MAY PLAY IT.

13        (WHEREUPON, VIDEO DEPOSITION IS PLAYED;

14        EXCERPTS PROVIDED BY COUNSEL AS FOLLOWS:)

15   Q  WHO DO YOU THINK YOU MIGHT HAVE ASKED?

16   A  I MAY HAVE ASKED -- I MAY HAVE ASKED THE MANAGER OF

17       THE HAIR DEPARTMENT, JENNIFER SHAW.

18   Q (BY MR. QUINN) DID YOU TELL HER THE REASON THAT YOU

19       WANTED THE PHONE NUMBER?

20   A  I DON'T RECALL WHAT I SAID TO HER.

21   Q  DO YOU THINK YOU TOLD HER THAT YOU WANTED TO GET A

22       QUOTE FOR -- OR GET SAMPLES OF HAIR FOR THIS

23       BRATZ PROJECT?

24   A  NO.

25   Q  WHY DON'T YOU THINK YOU TOLD HER THAT?

1        A  I JUST DON'T RECALL TELLING HER THAT.

2        Q (BY MR. QUINN) THAT WASN'T SOMETHING YOU WERE

3           TALKING TO PEOPLE AT MATTEL ABOUT; IS THAT TRUE?

4        A  I WASN'T TRYING TO ADVERTISE, NO.

5        (END OF EXCERPT.)

6    BY MR. PRICE:

7        Q  IN FACT, MR. BRYANT, YOU'VE TESTIFIED THAT YOU DON'T

8    RECALL THE REASON THAT YOU WEREN'T SAYING ANYTHING TO PEOPLE AT

9    MATTEL ABOUT YOUR WORK WITH MGA AND THE BRATZ PROJECT.

10       A  WELL, I GUESS AT THE TIME, I DIDN'T REALLY CONSIDER

11   MYSELF -- I WASN'T WORKING FOR MGA.  IT WAS JUST A POSSIBILITY.

12       Q  SO NOW YOU RECALL A REASON THAT YOU WEREN'T TELLING PEOPLE

13   AT MATTEL, FOR EXAMPLE, WHY YOU NEEDED THE PHONE NUMBER TO CALL

14   UNIVERSAL, OR WHY YOU NEEDED HAIR ROOTED OR WHY YOU NEEDED

15   FACES PAINTED?  NOW YOU RECALL THERE'S A REASON YOU DIDN'T TELL

16   THEM?

17       A  I'M NOT SURE WHAT YOU MEAN.

18       Q  I THINK NOW YOU'RE JUST GIVING US A REASON THAT YOU DIDN'T

19   TELL FOLKS AT MATTEL ABOUT THESE ACTIVITIES WITH MGA.

20       A  WELL, YOU KNOW, I MEAN, THERE WAS -- AGAIN, IT WAS JUST A

21   POSSIBLE PROJECT THAT MIGHT HAPPEN.  I DIDN'T KNOW THAT IT

22   WOULD, YOU KNOW, SO...

23       Q  SO THAT'S THE REASON?

24       A  WELL, YES.

25           MR. PRICE:  IN THAT CASE, YOUR HONOR, I'D LIKE TO

1    PLAY FROM THE SAME TRANSCRIPT, PAGE 137, LINES 7 THROUGH 12;

2    NOVEMBER 4, 2004, VOLUME I.

3         MR. NOLAN:  NO OBJECTION.

4         THE COURT:  YOU MAY PLAY IT.

5         (WHEREUPON, VIDEO DEPOSITION PLAYS;

6         EXCERPTS PROVIDED BY COUNSEL AS FOLLOWS:)

7    Q  (BY MR. QUINN)  AND WAS THERE A REASON THAT YOU

8         WEREN'T SAYING ANYTHING TO PEOPLE AT MATTEL

9         ABOUT YOUR WORK WITH MGA ON THE BRATZ PROJECT?

10   A  I DON'T RECALL.

11    Q  YOU DON'T RECALL WHETHER THERE WAS A REASON OR

12        NOT?

13   A  I DON'T RECALL WHY I DIDN'T TALK ABOUT IT.

14   (END OF EXCERPT.)

15        MR. NOLAN:  YOUR HONOR, COULD I JUST HAVE THE NEXT

16   QUESTION AND ANSWER ADDED TO THAT PLAY, FOR COMPLETENESS

17   PURPOSES?

18        MR. PRICE:  I'M GOING TO ASK THAT EXACT QUESTION

19   RIGHT NOW.

20   BY MR. PRICE:

21   Q   ISN'T IT TRUE, SIR, THAT YOU DIDN'T TALK ABOUT IT BECAUSE

22   YOU THOUGHT IT MIGHT BE INCONSISTENT WITH YOUR OBLIGATIONS TO

23   MATTEL?  ISN'T THAT THE REASON?

24   A   WELL, I DON'T KNOW IF I THOUGHT ABOUT IT EXACTLY LIKE

25   THAT.  BUT, AGAIN, YOU KNOW, IT WAS JUST -- IT WAS A

1    POSSIBILITY OF SOMETHING THAT MIGHT HAPPEN.  I DIDN'T KNOW IF

2    ANYTHING WOULD COME OF IT.  YOU KNOW, I DIDN'T WANT TO

3    NECESSARILY, YOU KNOW, SOMEHOW, YOU KNOW, JEOPARDIZE THE JOB

4    THAT I ALREADY HAD.

5    Q   SO WHEN YOU WERE UNDERTAKING THESE ACTIVITIES --

6        MR. NOLAN:  YOUR HONOR, FOR COMPLETENESS PURPOSES,

7    I'D LIKE TO HAVE THE NEXT QUESTION AND ANSWER PLAYED FROM THE

8    CLIP THAT MR. PRICE PLAYED.

9        MR. PRICE:  I WOULD OBJECT.

10       THE COURT:  MR. PRICE, YOU MAY LEAD YOUR EXAMINATION

11   AS YOU SEE FIT.

12   BY MR. PRICE:

13   Q   SO AT THE TIME THAT YOU --

14       THE COURT:  MR. NOLAN, YOU'LL HAVE AN OPPORTUNITY IN

15   YOUR EXAMINATION TO FOLLOW UP.

16       MR. NOLAN:  I UNDERSTAND.  I JUST THOUGHT HE WAS

17   GOING TO PLAY IT.

18       THE COURT:  VERY WELL.

19       MR. PRICE, YOUR NEXT QUESTION.

20   BY MR. PRICE:

21   Q   SO THE ANSWER THAT YOU JUST GAVE, ONE OF THE REASONS YOU

22   WEREN'T TELLING ANYONE THAT, FOR EXAMPLE, YOU HAD TALKED TO

23   SOMEONE AT MATTEL ABOUT PAINTING THIS FACE OR ASKED SOMEONE TO

24   ROOT THE HAIR OR ASKED FOR THIS PHONE NUMBER, IS THAT IF THE

25   PEOPLE AT MATTEL KNEW, THAT WOULD, IN YOUR WORDS, JEOPARDIZE

1      YOUR JOB; RIGHT?

2      A   WELL, I DON'T KNOW THAT I -- MAYBE I MISSTATED THAT.

3          YOU KNOW, I GUESS, MAYBE WHAT I WAS THINKING WAS THAT

4      I DIDN'T NECESSARILY WANT PEOPLE THINKING THAT I WAS THINKING

5      ABOUT, YOU KNOW, POSSIBLY LEAVING THE COMPANY.

6      Q   SO JUST TO BE CLEAR, THE ANSWER YOU GAVE JUST A MINUTE OR

7      SO AGO, WHERE YOU SAID ONE OF THE CONCERNS IS THAT TELLING

8      PEOPLE THIS MIGHT JEOPARDIZE YOUR JOB, YOU'RE NOW TELLING US

9      YOU WERE NOT QUIET FOR THAT REASON; THAT IS, THAT WASN'T THE

10     REASON YOU DIDN'T TELL PEOPLE ABOUT THIS, BECAUSE IT MIGHT

11     JEOPARDIZE YOUR JOB.

12     A   WELL, NO.  I THINK I KIND OF MISSTATED MYSELF.

13     Q   SO THEN, IN SEPTEMBER, WHEN YOU'RE UNDERTAKING THESE

14     ACTIVITIES, YOU HAD NO FEAR THAT IF MATTEL KNEW THAT YOU WERE

15     DOING THESE, YOUR JOB WOULD BE IN JEOPARDY?

16         IS THAT WHAT YOU'RE TELLING US?

17     A   I DON'T -- WELL, YEAH.  I DON'T THINK I REALLY HAD A REAL

18     FEAR ABOUT THAT, NO.

19     Q   SO IF THAT'S TRUE, I'M JUST WONDERING WHY A FEW MINUTES

20     AGO YOU SAID THAT ONE OF THE REASONS YOU WERE BEING QUIET ABOUT

21     THIS IS BECAUSE YOU THOUGHT IT MIGHT JEOPARDIZE YOUR JOB.

22         WHY DID YOU SAY THAT?

23     A   WELL, AGAIN, I THINK MAYBE I JUST MISSTATED MYSELF.

24     Q   EVEN THOUGH YOU WEREN'T TELLING THE PEOPLE AT MATTEL, YOU

25     WERE TELLING THE PEOPLE AT MGA WHAT YOU WERE DOING; RIGHT?

1        MR. NOLAN:  OBJECTION.  LACKS FOUNDATION AS TO WHAT

2    HE WAS DOING.

3        THE COURT:  SUSTAINED.

4    BY MR. PRICE:

5    Q   YOU KNOW WHAT YOU WERE TELLING MGA; RIGHT?

6        MR. NOLAN:  OBJECTION.  AGAIN, CAN WE JUST HAVE A

7    FOUNDATION AS TO TIME.

8        THE COURT:  AS TO TIME?

9        MR. NOLAN:  TEMPORAL.

10       THE COURT:  VERY WELL.

11   BY MR. PRICE:

12   Q   IN THIS SEPTEMBER TIME FRAME, YOU RECALL THE

13   COMMUNICATIONS, SOME OF THEM AT LEAST, THAT YOU HAD WITH MGA?

14   A   YES, I RECALL SOME OF THEM.

15   Q   AND, FOR EXAMPLE, WITH RESPECT TO CONTACTING UNIVERSAL TO

16   GET HAIR SAMPLES, YOU WEREN'T TELLING PEOPLE AT MATTEL THAT;

17   RIGHT?

18   A   NO, I DON'T THINK SO.

19   Q   YOU DID TELL PAULA GARCIA WHAT YOU WERE DOING, THOUGH;

20   RIGHT?

21   A   I DO BELIEVE THAT I HAD MENTIONED TO HER THAT, YES; THAT I

22   WAS LOOKING INTO GETTING SOME HAIR SAMPLES.

23   Q   IN FACT, YOU LATER, AS A RESULT OF THAT REQUEST ON

24   SEPTEMBER 18TH, YOU ACTUALLY GOT HAIR SAMPLES; RIGHT?

25   A   YES.

1   Q   AND THE INVOICE WAS SENT TO THE ADDRESS -- LET'S GO TO

2   EXHIBIT 30 AGAIN -- THAT WAS SENT TO YOUR HOME ADDRESS;

3   CORRECT?

4   A   YES.

5   Q   AND MGA PAID THE INVOICE.

6   A   I DON'T REMEMBER THERE BEING ANY KIND OF CHARGE.

7   Q   OKAY.

8       BUT YOU TOLD MS. GARCIA ABOUT THAT.

9   A   I BELIEVE I DID.

10   Q   BY THE WAY, YOUR UNDERSTANDING, IN YOUR RELATIONS WITH

11   MS. GARCIA, IS THAT SHE KNEW YOU WERE A MATTEL EMPLOYEE; RIGHT?

12   A   I THOUGHT SHE DID.

13   Q   YOU'VE RECENTLY HEARD THAT SHE'S TESTIFIED UNDER OATH THAT

14   SHE DIDN'T KNOW UNTIL 2004 THAT YOU WERE A MATTEL EMPLOYEE; YOU

15   HEARD THAT; CORRECT?

16   A   YES.

17   Q   IN FACT, IN OCTOBER, YOU REMEMBER, THERE WAS A MEETING

18   WHERE YOU CAME OVER TO MGA FROM YOUR LUNCH HOUR FROM MATTEL.

19   DO YOU RECALL THAT?

20   A   NOT PARTICULARLY, NO.

21   Q   DO YOU RECALL, BETWEEN OCTOBER 4TH AND OCTOBER 19TH, GOING

22   TO THE MGA FACILITIES TO MEET WITH MS. GARCIA OR OTHERS?

23   A   I THINK THERE MIGHT HAVE BEEN SOME OCCASIONS, YES.

24   Q   AND YOU WOULD TRY TO DO THAT ON YOUR OFF TIME, YOUR LUNCH

25   HOUR; RIGHT?

1    A   I DON'T RECALL EVER GOING DURING MY LUNCH HOUR.  I RECALL

2    GOING FRIDAY AFTERNOONS.  WE GOT OFF WORK AT MATTEL AT 1:00 ON

3    FRIDAYS, SO I RECALL ON SOME OCCASIONS GOING AFTER THAT.

4    Q   DO YOU RECALL TELLING MS. GARCIA THAT YOU DIDN'T WANT

5    MATTEL KNOWING THAT DURING THIS TIME FRAME, WHEN YOU WERE STILL

6    WORKING AT MATTEL, YOU WERE GOING TO MGA'S OFFICES?

7    A   I DON'T RECALL EVER TELLING HER THAT, NO.

8    Q   CAN YOU DENY THAT YOU SAID THAT?

9    A   I MEAN, AGAIN, ANYTHING IS POSSIBLE.  BUT I DON'T REMEMBER

10   THAT.

11   Q   IT'S FAIR TO SAY THAT IN THIS TIME FRAME, IN SEPTEMBER AND

12   OCTOBER, WHEN YOU'RE DEALING WITH MS. GARCIA, YOU WERE NOT

13   HIDING FROM HER THE FACT THAT YOU WERE WORKING AT MATTEL?

14   A   NO.

15   Q   IT'S FAIR TO SAY, THOUGH, THAT IN THIS SAME TIME FRAME OF

16   SEPTEMBER, OCTOBER, UP THROUGH OCTOBER 19TH, YOU WERE HIDING

17   FROM MATTEL THE FACT THAT YOU WERE HAVING DEALINGS WITH MGA?

18   A   WELL, I DON'T KNOW THAT I WAS HIDING IT, BUT, YOU KNOW, I

19   WASN'T SAYING A WHOLE LOT ABOUT IT.

20   Q   A WHOLE LOT.

21       YOU WEREN'T SAYING ANYTHING ABOUT IT.

22   A   I DON'T KNOW THAT I WASN'T SAYING ANYTHING.

23   Q   YOU DON'T RECALL TELLING ANYONE AT MATTEL, 'HEY, I'VE GOT

24   THESE DISCUSSIONS WITH MGA; I'M CONTACTING VENDORS TO GET HAIR

25   SAMPLES FOR A PROJECT WITH MGA,' OR ANYTHING LIKE THAT?

1   A   YOU KNOW, I MAY HAVE TOLD A COUPLE OF PEOPLE ABOUT WHAT

2   MAY BE HAPPENING.  I REMEMBER HAVING A CONVERSATION WITH

3   MINA MIRKAZIMI.  I THINK I HAD A CONVERSATION WITH

4   SUZANNE BRYANT.

5   Q   THAT YOU WERE WORKING WITH MGA AND ASSISTING THEM?

6   A   NO, NOT THAT I WAS WORKING WITH THEM BUT THAT I WAS

7   THINKING ABOUT GOING TO WORK WITH THEM.

8   Q   AT THE TIME THAT YOU RESIGNED, WERE YOU ASKED BY ANYONE,

9   LIKE IVY ROSS, WHAT YOU WERE GOING TO BE DOING?

10   A   YES.  I THINK SHE ASKED ME SOMETHING ABOUT THAT.

11   Q   AND YOU DIDN'T TELL HER YOU WERE GOING TO WORK WITH MGA,

12   DID YOU?

13   A   I DON'T THINK I DID, NO.

14   Q   IN FACT, YOU TOLD HER YOU WEREN'T GOING TO WORK WITH A

15   COMPETITOR; RIGHT?

16   A   I DON'T RECALL BEING ASKED IF I WAS GOING TO WORK FOR A

17   COMPETITOR.

18   Q   YOU WERE JUST ASKED, 'WHAT ARE YOU DOING NEXT?'

19   A   THAT'S WHAT I REMEMBER, YES.

20   Q   AND YOU DIDN'T SAY, 'I'M GOING TO WORK WITH MGA,' WHO'S

21   ONE OF YOUR COMPETITORS.

22   A   NO, I DON'T THINK I DID.  BUT AT THE SAME TIME, I MEAN, I

23   DIDN'T REALLY THINK OF MGA AS A COMPETITOR.

24   Q   THEY WERE A TOY COMPANY.

25   A   SURE.

1    Q   BY THE WAY, YOU KNEW THAT IT WAS MATTEL'S POLICY THAT IF

2    SOMEONE GAVE A COUPLE OF WEEKS NOTICE THAT THEY WERE LEAVING

3    MATTEL AND GOING TO WORK FOR ANOTHER TOY COMPANY, THAT PERSON

4    WOULD BE WALKED OUT OF MATTEL AT THE TIME THEY GAVE THAT

5    NOTICE?  YOU UNDERSTOOD THAT, DIDN'T YOU?

6    A   NO, SIR.

7    Q   YOU NEVER DISCUSSED THAT WITH MS. GARCIA?

8    A   NO.

9    Q   DID YOU TELL MS. GARCIA YOU WERE GIVING YOUR NOTICE AT

10   MATTEL?

11   A   I BELIEVE SO.

12   Q   AND WHEN YOU TOLD MS. GARCIA YOU WERE GIVING YOUR NOTICE,

13   SHE DIDN'T TALK WITH YOU ABOUT HER UNDERSTANDING OF THE MATTEL

14   POLICY, AS SHE SAW IT, WHICH IS THAT WHEN YOU GIVE NOTICE AND

15   SAY YOU'RE GOING TO ANOTHER TOY COMPANY, YOU'RE ESCORTED OUT

16   THE DOOR RIGHT THEN AND THERE?

17   A   NO.

18   Q   WE'RE LOOKING AT EXHIBIT 30, WHICH IS THE LETTER YOU SENT

19   TO UNIVERSAL.  I'D LIKE YOU NOW TO LOOK AT EXHIBIT 11904.

20   A   THESE THINGS ARE CONFUSING.

21   Q   THERE ARE A LOT OF THEM, BUT IT'S WAY NEAR THE BACK.

22       DO YOU HAVE IT?

23   A   YES.

24   Q   DO YOU RECOGNIZE THIS AS WHAT IS LABELED AN INVOICE THAT

25   YOU RECEIVED SOMETIME AROUND OCTOBER 5TH?

1   A   THAT'S WHAT IT APPEARS TO BE.

2        MR. PRICE:  MOVE EXHIBIT 11904 INTO EVIDENCE.

3        MR. NOLAN:  CAN WE JUST HAVE A LITTLE FURTHER

4   FOUNDATION AS TO HIS PERSONAL KNOWLEDGE OF THIS?

5        THE COURT:  LAY FURTHER FOUNDATION, COUNSEL.

6   BY MR. PRICE:

7   Q   MR. BRYANT, THIS APPEARS TO BE AN INVOICE YOU RECEIVED AT

8   YOUR HOME ADDRESS ON OR ABOUT OCTOBER 5, 2000, FROM UNIVERSAL

9   COMMERCE CORPORATION LIMITED; CORRECT?

10   A   YES.

11   Q   AND IF YOU SEE DOWN THERE, THERE'S THESE BATES NUMBERS; IT

12   SAYS, "BRYANT 01211."

13        DO YOU SEE THAT?

14   A   YES.

15   Q   IT'S YOUR UNDERSTANDING YOU PRODUCED THAT TO US FROM YOUR

16   RECORDS?

17   A   THAT'S POSSIBLE.  BUT I PRODUCED A LOT OF THINGS.  I DON'T

18   REMEMBER EVERY LAST THING.

19        MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 11904 INTO

20   EVIDENCE.

21        MR. NOLAN:  NO OBJECTION.

22        THE COURT:  IT'S ADMITTED.

23        YOU MAY PUBLISH.

24        (EXHIBIT 11904 RECEIVED.)

25   / / /

1    BY MR. PRICE:

2    Q   YOU SEE THIS; IT SAYS, "MGA ENTERTAINMENT," AND IT HAS AN

3    ADDRESS OF 1319 WEST 160TH.

4        DO YOU SEE THAT?

5    A   YES.

6    Q   THAT'S YOUR HOME ADDRESS.

7    A   IT WAS.

8    Q   IT WAS YOUR HOME ADDRESS IN 2000.

9    A   YES.

10   Q   AND WAS IT ON OCTOBER 5, 2000, THAT YOU RECALL RECEIVING

11   THIS INVOICE?

12   A   THAT'S THE DATE ON THE INVOICE, BUT AS TO WHETHER OR NOT I

13   RECEIVED IT THAT DAY, I DON'T REALLY REMEMBER.

14   Q   FAIR ENOUGH.

15       IT SAYS HERE IT CAME FROM TOKYO, JAPAN, TO

16   LOS ANGELES.  THIS WAS OCTOBER 6TH.

17       DO YOU RECALL THAT THIS WAS SOMETHING COMING FROM

18   OVERSEAS?

19   A   YES.

20   Q   AND IF WE COULD LOOK AT THE REST OF THIS.

21       WHAT YOU WERE RECEIVING WERE THESE SPOOLS OF HAIR

22   SAMPLES THAT YOU HAD REQUESTED FOR BRATZ.

23   A   YES.

24   Q   IF WE GO TO THE NEXT PAGE, YOU SEE THIS IS THE AIR BILL.

25   A   YES.

1   Q   AND IT'S TO, AGAIN, YOUR HOME ADDRESS, YOUR THEN HOME

2   ADDRESS, ATTENTION:  MR. CARTER BRYANT.

3   A   YES.

4   Q   AND YOU SEE THERE'S A DATE OF -- "ACCEPTED BY ABJ,

5   OCTOBER 5TH."

6        DO YOU SEE THAT?

7   A   YES.

8   Q   WHAT THEY WERE SENDING YOU WERE WHAT ARE CALLED HOLLOW

9   SARAN STRAIGHT HAIR SAMPLES; CORRECT?

10  A   YES.

11  Q   BY THE WAY, UNIVERSAL WAS ACTUALLY THEN SELECTED TO BE THE

12  VENDOR THAT SUPPLIED THE HAIR FOR THE BRATZ DOLLS; CORRECT?

13  A   ARE YOU TALKING ABOUT AS OF THIS DATE?

14  Q   YES, IN THE 2000 TIME FRAME.

15  A   I BELIEVE THAT, YEAH, EVENTUALLY, IT WAS.

16  Q   AND THE PURPOSE OF LOOKING AT THEIR SAMPLES WAS TO SEE

17  WHETHER OR NOT THEY WOULD MEET MUSTER.

18  A   RIGHT.

19  Q   IF YOU WOULD LOOK AT 11905.

20       BY THE WAY, WHAT DID YOU DO WITH THOSE HAIR SAMPLES

21  THAT WERE SENT TO YOU AT YOUR HOME ADDRESS ON OCTOBER 5TH, OR

22  THEREABOUTS?

23  A   I THINK I EVENTUALLY JUST TURNED THEM OVER TO MGA.

24  Q   SO YOU ORDERED THEM SEPTEMBER 18TH AND ONCE YOU RECEIVED

25  THEM, YOU HANDED THEM TO SOMEONE AT MGA.

1    A   I DON'T REMEMBER EXACTLY WHEN I TURNED THEM OVER TO THEM,

2    BUT IT WAS SOMETIME AFTER THAT.

3    Q   WITHIN A MONTH?

4    A   I COULDN'T SAY.  I DON'T REMEMBER.

5    Q   WHO DID YOU HAND THEM OVER TO?

6    A   THAT, I DON'T REMEMBER EITHER.

7    Q   WHO WAS YOUR MAIN CONTACT AT MGA IN OCTOBER OF 2000?

8    A   LET'S SEE.  IT WOULD PROBABLY EITHER HAVE BEEN PAULA OR,

9    POSSIBLY, VICTORIA O'CONNOR.

10   Q   IF YOU LOOK AT EXHIBIT 11905.

11   A   OKAY.

12   Q   DO YOU RECOGNIZE THIS AS AN AIRBORNE EXPRESS AIR BILL

13   DATED OCTOBER 20TH, SENT TO YOU AT YOUR HOME ADDRESS?

14   A   YES.

15       MR. PRICE:  MOVE EXHIBIT 11905 INTO EVIDENCE, YOUR

16   HONOR.

17       MR. NOLAN:  NO OBJECTION.

18       THE COURT:  IT'S ADMITTED.

19       YOU MAY PUBLISH.

20       (EXHIBIT 11905 RECEIVED.)

21   BY MR. PRICE:

22   Q   YOU SEE, MR. BRYANT, AGAIN, WE HAVE THIS ADDRESS HERE, MGA

23   ENTERTAINMENT, 1319 WEST 160TH STREET.

24       THAT WAS YOUR HOME ADDRESS AT THE TIME.

25   A   YES.

1   Q   BUT IT WAS TO YOUR ATTENTION; CORRECT?

2   A   YES.

3   Q   CERTAINLY, BY THIS TIME, YOU THOUGHT THAT YOU HAD

4   SUCCEEDED IN CONVINCING UNIVERSAL THAT YOU WORKED WITH MGA

5   ENTERTAINMENT.

6        MR. NOLAN:  OBJECTION, YOUR HONOR.  LACK OF

7   FOUNDATION; CALLS FOR SPECULATION.

8        THE COURT:  LAY A FOUNDATION, COUNSEL.

9   BY MR. PRICE:

10   Q   WHEN YOU WROTE YOUR LETTER SEPTEMBER 18TH THAT SAID, YOU

11   KNOW, CARTER BRYANT, MGA ENTERTAINMENT, AT THAT TIME DID YOU

12   HAVE CONCERNS THAT MAYBE UNIVERSAL WOULDN'T BELIEVE YOU WERE

13   WITH MGA?

14   A   WELL, I DON'T REMEMBER HAVING ANY CONCERNS OF THAT SORT.

15   Q   YOU THOUGHT THEY WOULD TAKE YOUR WORD FOR IT THAT YOU

16   WERE, IN FACT, WITH MGA ON SEPTEMBER 18, 2000; RIGHT?

17   A   I DON'T HAVE ANY RECOLLECTION OF WHAT I WAS THINKING ABOUT

18   THAT.

19   Q   CERTAINLY, AFTER RECEIVING A COUPLE OF THESE INVOICES FROM

20   THEM, YOUR BELIEF WAS THAT UNIVERSAL THOUGHT THAT YOU, IN FACT,

21   WORKED WITH MGA ENTERTAINMENT; THAT WAS YOUR BELIEF.

22        MR. NOLAN:  OBJECTION, YOUR HONOR.  LACK OF

23   FOUNDATION; CALLS FOR SPECULATION AS TO THE BELIEF.

24        THE COURT:  WHAT THE BELIEF IS BASED ON, COUNSEL.

25   / / /

1    BY MR. PRICE:

2    Q   YOU KNOW WHAT YOU BELIEVED, RIGHT, BETTER THAN ANYBODY

3    ELSE?

4    A   WELL, I'M SURE THAT I DID.  I CAN'T REALLY RECALL RIGHT

5    THIS MINUTE, YOU KNOW, WHAT MY THOUGHTS WERE.

6    Q   SO THEN MAYBE YOU'VE ANSWERED MY QUESTION.

7        BY THE TIME YOU RECEIVED THIS SECOND INVOICE, DID YOU

8    HAVE A BELIEF THAT, 'WELL, UNIVERSAL CERTAINLY THINKS I WORK

9    WITH MGA'?

10       MR. NOLAN:  AGAIN, YOUR HONOR.  CALLS FOR

11   SPECULATION.

12       THE COURT:  OVERRULED.

13       YOU MAY ANSWER.

14       THE WITNESS:  AGAIN, I'M NOT REALLY SURE THAT I

15   BELIEVED, YOU KNOW, ANYTHING OF THAT SORT.

16   BY MR. PRICE:

17   Q   WHY DID YOU TELL THEM YOU WORKED WITH MGA ON SEPTEMBER 18,

18   2000?  WHAT WAS YOUR REASON?

19   A   WELL, I DON'T REALLY REMEMBER.

20   Q   IT WASN'T A RANDOM ACT, WAS IT?

21   A   WHAT DO YOU MEAN?

22   Q   YOU HAD A REASON TO DO IT; RIGHT?

23   A   I SUPPOSE SO.

24   Q   AND YOUR TESTIMONY IS THAT SITTING HERE TODAY, YOU DON'T

25   RECALL THE REASON YOU TOLD UNIVERSAL ON SEPTEMBER 18TH THAT YOU

1    WORKED WITH MGA?

2    A   NO, I DON'T.

3    Q   THESE HAIR SAMPLES YOU RECEIVED ON OCTOBER 20TH, CORRECT;

4    OR AROUND OCTOBER 20TH?

5    A   I BELIEVE SO, YES.

6    Q   NOW, WAS THAT IN RESPONSE TO THAT SEPTEMBER 18TH REQUEST

7    THAT YOU MADE, OR HAD YOU MADE ANOTHER REQUEST BETWEEN THE TIME

8    YOU RECEIVED THE FIRST HAIR SAMPLES AROUND OCTOBER 5TH AND THE

9    TIME YOU RECEIVED THESE HAIR SAMPLES AROUND OCTOBER 20TH?

10   A   I'M NOT SURE.

11   Q   WELL, THE HAIR SAMPLES THAT WERE REFLECTED IN

12   EXHIBIT 11904, YOU GOT AROUND OCTOBER 5TH, OR THEREABOUTS?

13   A   YES.

14   Q   IT HAS A WHOLE LIST -- IF WE CAN SHOW THAT VERY QUICKLY --

15   12 SPOOLS, IT HAD VARIOUS COLORS, AND ALL THAT YOU NEEDED WAS

16   TO SEE WHETHER OR NOT THE HAIR SAMPLES FROM UNIVERSAL WERE UP

17   TO SNUFF?

18   A   I DON'T REMEMBER IF THAT WAS THE ONLY REQUEST OR NOT.

19   Q   LET'S PUT IT THIS WAY:  WHEN YOU GOT THE SECOND SET OF

20   HAIR SAMPLES AROUND OCTOBER 20TH, YOU WEREN'T SURPRISED WHEN

21   YOU GOT THOSE, WERE YOU?  YOU WERE EXPECTING THEM?

22   A   YEAH, I THINK I WAS EXPECTING THEM.

23   Q   SO THAT MEANS THAT AT SOME POINT YOU HAD REQUESTED THEM;

24   RIGHT?

25   A   RIGHT.

1    Q    AND IT WAS SOMETIME, OBVIOUSLY, BEFORE OCTOBER 20TH.

2    A    I WOULD ASSUME SO.

3    Q    I MEAN, YOUR EXPERIENCE IS THAT WHEN YOU REQUESTED

4    SOMETHING FROM UNIVERSAL, FROM JAPAN, YOU DIDN'T GET IT THE

5    NEXT DAY OR THE DAY AFTER; RIGHT?

6    A    CORRECT.

7    Q    IT WOULD TAKE A COUPLE OF WEEKS; RIGHT?

8    A    I DON'T REMEMBER HOW LONG IT TOOK TO RECEIVE THEM, BUT

9    LONGER THAN A COUPLE OF DAYS, YES.

10   Q    WELL, THE FIRST TIME YOU ASKED ON SEPTEMBER 18TH AND YOU

11   GOT THEM ON OCTOBER 5TH, OR THEREABOUTS; RIGHT?

12   A    I THINK SO, YES.

13   Q    SO FOR THE SECOND SET OF HAIR SAMPLES YOU GOT ON

14   OCTOBER 20TH, YOUR BELIEF IS THAT YOU PROBABLY WOULD HAVE HAD

15   TO HAVE ASKED FOR THAT AT LEAST A WEEK OR TWO IN ADVANCE;

16   RIGHT?

17   A    PROBABLY.

18   Q    WHILE YOU WERE STILL WORKING AT MATTEL.

19   A    YES.

20   Q    WE TALKED ABOUT THESE COMMUNICATIONS WITH UNIVERSAL.

21        THROUGHOUT THE SEPTEMBER TIME FRAME, YOU WERE CALLING

22   MGA FROM YOUR EXTENSION AT MATTEL; CORRECT?

23   A    YES.

24   Q    AND I'D LIKE YOU TO LOOK AT EXHIBIT 472.

25        YOUR EXTENSION AT MATTEL WAS 6099?

1    A   YES.

2    Q   AND HAVE YOU EVER SEEN EXHIBIT 472 BEFORE?

3    A   I DON'T THINK SO.

4    Q   SITTING HERE TODAY, DO YOU HAVE A SPECIFIC MEMORY OF WHEN

5    YOU MADE CALLS IN SEPTEMBER FROM YOUR EXTENSION AT MATTEL TO

6    SOMEONE AT MGA?

7    A   SPECIFIC DATE?

8    Q   YES.

9    A   NO, NOT REALLY.

10   Q   WOULD LOOKING AT PHONE RECORDS OF CALLS FROM YOUR

11   EXTENSION AT MATTEL FOR THE MONTH OF SEPTEMBER ASSIST YOU IN

12   REMEMBERING HOW MANY CALLS YOU MADE TO MGA AND WHEN YOU MADE

13   THEM?

14        MR. NOLAN:  OBJECTION, YOUR HONOR.  LACK OF

15   FOUNDATION AS TO HOW THIS DOCUMENT WAS PREPARED.

16        THE COURT:  LAY A FOUNDATION.

17        MR. PRICE:  YOU CAN REFRESH WITH A HAM SANDWICH, I

18   THINK IS THE PHRASE.

19        I THINK THERE NEEDS TO BE FOUNDATION FOR REFRESHING.

20        MR. NOLAN:  IT'S NOT A HAM SANDWICH; IT'S PHONE

21   RECORDS FROM MATTEL.  I JUST WANT TO KNOW WHETHER OR NOT HE

22   KNEW OF THEM.

23        THE COURT:  OVERRULED.

24   BY MR. PRICE:

25   Q   LET ME JUST CALL YOUR ATTENTION, MR. BRYANT, TO PAGE 13.

1    IT'S 472-0013.

2    A   WHAT PAGE NUMBER?

3    Q   472-0013, THESE LITTLE PAGE NUMBERS AT THE BOTTOM.

4    A   OKAY.

5    Q   NOW, THE MAIN LINE FOR MGA, THERE'S BEEN TESTIMONY THE

6    PHONE NUMBER WAS 818-894-2525.

7        DOES THAT SOUND RIGHT TO YOU?

8    A   YES.

9    Q   DO YOU RECALL MAKING A COUPLE OF CALLS TO MGA'S MAIN

10   NUMBER ON SEPTEMBER 11TH?

11   A   YES.  IT LOOKS LIKE I DID.

12   Q   I'M ASKING, DO YOU HAVE ANY RECOLLECTION OF ANY SUCH

13   CALLS?

14   A   I DON'T REMEMBER MAKING THE PHONE CALL.

15   Q   HOW ABOUT ON SEPTEMBER 12TH?  DO YOU RECALL MAKING FIVE

16   PHONE CALLS TO MGA ON SEPTEMBER 12TH FROM YOUR MATTEL

17   EXTENSION?

18   A   NO.  I MEAN, I DON'T RECALL MAKING THE CALLS.

19   Q   CERTAINLY, YOU HAVE NO REASON TO THINK YOU DID NOT MAKE

20   CALLS ON THAT DATE TO MGA; RIGHT?

21   A   WELL, IT'S RIGHT HERE IN THE PHONE RECORD, SO I'M ASSUMING

22   THAT I DID.

23   Q   ON THE 13TH, DO YOU RECALL MAKING A PHONE CALL TO MGA?

24   A   WELL, AGAIN, IT LOOKS LIKE THERE WAS A CALL PLACED, BUT I

25   DON'T REMEMBER MAKING THE CALL.

1    Q   DO YOU RECALL MAKING A COUPLE OF CALLS ON THE 14TH TO MGA,

2    FROM YOUR MATTEL EXTENSION?

3    A   AGAIN, IT LOOKS LIKE IT'S ON THE LIST, BUT I DON'T RECALL

4    MAKING PHONE CALLS.

5    Q   DO YOU RECALL THAT DURING THE MONTH OF SEPTEMBER, YOU WERE

6    MAKING CALLS TO MGA FROM YOUR MATTEL EXTENSION ALMOST EVERY

7    DAY?

8    A   I DO REMEMBER THAT I DID MAKE SEVERAL PHONE CALLS TO THEM,

9    YES.

10   Q   AND DO YOU RECALL THAT THEY WERE FAIRLY FREQUENT IN THE

11   MONTH OF SEPTEMBER?

12   A   YES, I THINK THEY WERE.

13   Q   AND SO THESE FREQUENT PHONE CALLS YOU WERE MAKING FROM

14   YOUR MATTEL EXTENSION TO MGA IN SEPTEMBER, WHO WERE YOU

15   CALLING?

16       I'M TALKING ABOUT THE GENERAL LINE NOW.

17   A   I DON'T REALLY RECALL.  I PROBABLY CALLED A NUMBER OF

18   DIFFERENT PEOPLE.

19   Q   WELL, YOU KNEW MR. LARIAN'S DIRECT EXTENSION; RIGHT?

20   A   I DON'T KNOW THAT I DID.

21   Q   DO YOU KNOW AN EXTENSION 894-3150?

22       THERE'S BEEN SOME TESTIMONY HERE THAT THAT'S HIS

23   DIRECT EXTENSION.

24   A   I DON'T KNOW IF THAT'S HIS DIRECT EXTENSION OR NOT.

25   Q   IF YOU WOULD GO TO THE 15TH PAGE THERE, I'D ASK YOU, DO

1     YOU RECALL MAKING A PHONE CALL FROM YOUR MATTEL EXTENSION

2     DIRECTLY TO MR. LARIAN ON OR ABOUT SEPTEMBER 20TH?

3     A   WELL, THE PHONE NUMBER THAT YOU JUST MENTIONED IS ON HERE,

4     BUT, AGAIN, I DON'T REMEMBER MAKING THE CALL.

5     Q   SO YOUR MEMORY IS JUST THAT THEY THERE WERE FREQUENT PHONE

6     CALLS FROM YOU TO MGA TO THE VARIOUS PEOPLE.

7     A   YES.

8     Q   AND COULD YOU TELL US TO WHOM YOU WERE MAKING THESE

9     FREQUENT CALLS FROM YOUR EXTENSION AT MATTEL TO MGA?

10    A   WELL, I PROBABLY COULDN'T TELL YOU EVERYBODY, BUT I

11    PROBABLY TALKED WITH PAULA; I PROBABLY TALKED WITH

12    VICTORIA O'CONNOR; I MIGHT HAVE SPOKEN WITH SOMEBODY FROM THEIR

13    LEGAL DEPARTMENT.

14    Q   DO YOU REMEMBER WHO MOST OF YOUR CONVERSATIONS WERE WITH

15    IN SEPTEMBER AT MGA?

16    A   NOT REALLY, NO.

17    Q   YOU CAN'T DISTINGUISH BETWEEN MS. GARCIA AND MS. O'CONNOR

18    OR MR. LARIAN AS TO FREQUENCY?

19    A   WELL, IT DEFINITELY WOULD HAVE BEEN MORE PAULA OR

20    VICTORIA.

21    Q   ONE OF THE PEOPLE YOU WERE TALKING TO IN SEPTEMBER WAS A

22    MS. MARLOW; CORRECT?

23    A   YES.

24    Q   WAS MS. MARLOW A FRIEND OF YOURS?

25    A   YES.

1    Q   PRIOR TO OCTOBER 4TH, YOU HAD CONVERSATIONS WITH

2    MS. MARLOW ABOUT PATTERN WORK AND CLOTHING CUTOUTS FOR BRATZ

3    DOLLS; CORRECT?

4    A   YES.  I TALKED TO HER ABOUT, YOU KNOW, THIS POSSIBLE

5    PROJECT AND ASKED HER IF, YOU KNOW, SHE MIGHT BE INTERESTED.

6    Q   YOU HAD A NUMBER OF CONVERSATIONS WITH HER ABOUT THAT, BUT

7    PRIOR TO OCTOBER 4TH; RIGHT?

8    A   I DON'T RECALL HOW MANY CONVERSATIONS I HAD, BUT MORE THAN

9    ONE.

10   Q   DID YOU ACTUALLY GO ON SHOPPING TRIPS WITH HER PRIOR TO

11   OCTOBER 4TH?

12   A   I DON'T REMEMBER.

13   Q   ONE WAY OR THE OTHER?

14   A   NO.

15   Q   YOU DON'T REMEMBER ONE WAY OR THE OTHER?

16   A   I DON'T THINK SO.

17   Q   HAVE YOU EVER SEEN MS. MARLOW'S INVOICES FOR THE WORK SHE

18   DID ON BRATZ DOLLS?

19   A   WELL, IT'S POSSIBLE, BUT I DON'T REMEMBER THEM.

20   Q   LET ME ASK YOU, THEN, TO LOOK AT EXHIBIT 606.

21       MR. PRICE:  THIS IS ALREADY IN EVIDENCE, YOUR HONOR,

22   A FEW PAGES OF IT ARE.  I'LL SHOW THE ONES THAT I KNOW ARE IN

23   EVIDENCE.

24   BY MR. PRICE:

25   Q   IF YOU'LL LOOK AT PAGE 2, 606.

1          IS THIS AN INVOICE THAT YOU MIGHT HAVE SEEN FROM

2     MS. MARLOW REGARDING BRATZ DOLLS RESEARCH FROM SEPTEMBER 29TH

3     TO OCTOBER 20TH?

4     A   NO.  I DON'T RECOGNIZE THIS INVOICE.

5     Q   HOW ABOUT ON 606-005?  IS THIS AN INVOICE THAT YOU SAW,

6     FROM OCTOBER 13TH TO OCTOBER 20TH, FROM MS. MARLOW?

7     A   NO.  I DON'T RECOGNIZE IT.

8     Q   LET ME ASK YOU ABOUT THE ACTIVITY YOU'RE AWARE OF, THOUGH.

9          PRIOR TO OCTOBER 20TH, YOU HAD A DISCUSSION WITH

10    MS. MARLOW ABOUT ACTUALLY SEWING FASHIONS FOR THE BRATZ DOLLS;

11    CORRECT?

12    A   YES.

13    Q   AND, IN FACT, BY OCTOBER 20TH, YOUR OBSERVATION WAS THAT

14    MS. MARLOW HAD SPENT QUITE A BIT OF TIME SHOWING FASHIONS AND

15    ENGAGING IN PATTERN-MAKING SUPPORT?

16    A   WELL, I DON'T KNOW HOW MUCH TIME SHE HAD SPENT ON IT, AND

17    I DON'T REMEMBER SEEING A LOT OF ACTUAL, YOU KNOW, THINGS THAT

18    SHE HAD MADE.

19    Q   DID YOU -- AGAIN, LET'S SAY PRIOR TO OCTOBER 20TH -- GO

20    OUT WITH HER AND LOOK AT SAMPLES AND LOOK AT PATTERNS, THINGS

21    LIKE THAT.

22    A   I DON'T REMEMBER REALLY.

23    Q   ONE WAY OR THE OTHER?

24    A   NO.

25    Q   WE TALKED ABOUT UNIVERSAL AND MS. MARLOW.

1        LET ME GO TO ANOTHER TOPIC NOW.

2        ALSO PRIOR TO OCTOBER 4TH, IT'S YOUR RECOLLECTION

3   THAT YOU HAD CONVERSATIONS WITH MS. GARCIA ABOUT BRATZ PRICE

4   POINTS, POTENTIAL PRICE POINTS, AND THE NUMBER OF SKU'S IN THE

5   LINE -- AND I'LL ASK YOU WHAT THAT MEANS AFTER I GET THIS

6   ANSWER.

7        I'LL RE-ASK IT.  PRIOR TO OCTOBER 4TH, DO YOU BELIEVE

8   YOU SPOKE WITH MS. GARCIA AT MGA ABOUT THE BRATZ LINE, POSSIBLE

9   PRICE POINTS, AND THE NUMBER OF SKU'S?

10  A   WELL, AGAIN, IT'S POSSIBLE.  I DON'T REALLY REMEMBER.

11       I REMEMBER TALKING TO HER ABOUT THOSE SORTS OF

12  THINGS, BUT I DON'T REMEMBER EXACTLY WHEN.

13  Q   I TAKE IT, GIVEN YOUR VIEW OF THINGS, IT WOULDN'T HAVE

14  MATTERED TO YOU IF YOU HAD DONE THAT WHILE YOU WERE STILL

15  WORKING AT MATTEL?

16  A   I DON'T THINK IT WOULD HAVE, NO.

17  Q   COULD YOU TELL THE JURY WHAT SKU'S ARE.

18  A   WELL, I GUESS SORT OF GENERALLY, AN SKU IS -- I'M TRYING

19  TO THINK OF THE BEST WAY TO PUT -- IT'S A NUMBER OF PRODUCTS

20  THAT ARE GOING TO BE IN A SPECIFIC PRODUCT LINE.  FOR INSTANCE,

21  WE MIGHT SAY WE WANT TO HAVE FIVE SKU'S FOR OUR LINE.

22  Q   ONE PERSON YOU SPOKE WITH IN SEPTEMBER WAS MS. LEAHY;

23  CORRECT?

24  A   YES.

25  Q   MS. LEAHY WAS A SCULPTOR?

1    A   YES.

2    Q   YOUR UNDERSTANDING IS THAT YOU WERE THE FIRST PERSON TO

3    CONTACT MS. LEAHY ABOUT DOING A BRATZ SCULPT.

4    A   I BELIEVE I WAS, YES.

5    Q   AND THAT'S BECAUSE YOU CONTACTED HER AND SAID YOU WANTED

6    TO TALK TO HER ABOUT BEING INVOLVED IN DOING A BRATZ SCULPT;

7    RIGHT?

8    A   I CALLED HER, YEAH.  I DON'T KNOW THAT I SAID "BRATZ

9    SCULPT," BUT I DID TALK TO HER ABOUT DOING A SCULPT.

10   Q   AND YOU ACTUALLY MET WITH HER PRIOR TO OCTOBER 4TH TO TALK

11   TO HER ABOUT YOUR CONCEPTS.

12   A   I BELIEVE SO, YES.

13   Q   AND WHEN YOU MET WITH HER TO TALK TO HER ABOUT YOUR

14   CONCEPTS, YOU ACTUALLY GAVE HER A DRAWING THAT SHE COULD USE

15   FOR AN INITIAL SCULPT.

16   A   WHAT I GAVE HER WAS ONE OF MY DRAWINGS.  BUT, YOU KNOW, I

17   WASN'T A SCULPTOR, SO, YOU KNOW, I DIDN'T HAVE ANYTHING OTHER

18   THAN JUST THE DRAWING TO GIVE TO HER.

19   Q   SO WHAT YOU GAVE TO HER IS A DRAWING WHICH WAS YOUR

20   CONCEPT OF WHAT A BRATZ BODY WOULD LOOK LIKE?

21   A   YES.

22   Q   YOU ALSO GAVE HER SOMETHING TO GIVE HER AN IDEA OF WHAT

23   THE HEAD SHOULD LOOK LIKE.

24   A   I THINK SO.

25   Q   AND WAS THAT THE SAME DRAWING, OR WAS IT SOMETHING ELSE?

1    A   I THINK IT WAS THAT SAME DRAWING.

2    Q   AND FOR THE SCULPTOR -- I MEAN, THEY'RE NOT DOING THE

3    PAINTING, SO YOU'RE JUST GIVING HER AN IDEA OF THE SHAPE OF THE

4    HEAD.

5    A   WELL, YES.

6    Q   IF YOU'LL LOOK IN THE DRAWINGS BINDER, THERE'S AN

7    EXHIBIT 5.  I THINK IT'S 0088.  I'LL SEE IF I CAN FIND THE

8    ORIGINAL FOR YOU.  IT'S ALSO SEPARATELY IDENTIFIED AS BATES

9    NUMBER 277; SO IT'S EXHIBIT 5, THE BATES NUMBER IS 00277, BUT I

10   THINK IT'S AT PAGE 88, IF THAT'S NOT TOO CONFUSING.

11        MR. PRICE:  IF I MAY APPROACH WITH THE ORIGINAL.

12   BY MR. PRICE:

13   Q   SO WE'RE LOOKING NOW AT A DRAWING WHICH YOU GAVE TO

14   MS. LEAHY SOMETIME BEFORE OCTOBER 4TH SO SHE COULD HAVE AN IDEA

15   OF WHAT TO SCULPT; RIGHT?

16   A   YES.

17   Q   DO YOU RECALL WHAT YOU GAVE HER FOR THE HEAD?

18   A   I GAVE HER ONE OF MY OLD DRAWINGS.

19   Q   WOULD YOU BE ABLE TO IDENTIFY IT?  DO YOU RECALL THE

20   SPECIFIC DRAWING THAT YOU GAVE HER?

21   A   NO.  I DON'T REMEMBER EXACTLY.

22   Q   SO WE'LL COME BACK TO MS. LEAHY.

23        AFTER YOU MET WITH HER PRIOR TO OCTOBER 4TH AND GAVE

24   HER THE DRAWINGS, YOUR UNDERSTANDING IS THAT SHE, IN FACT, DID

25   DO A SCULPT TO SHOW YOU; RIGHT?

1    A   YES.

2    Q   SO THERE CAME A TIME WHEN YOU SAW THE SCULPT THAT SHE DID.

3    A   YES.

4    Q   WHAT WAS THE TIME FRAME OF THAT?  BEFORE OR AFTER

5    OCTOBER 4TH?

6    A   I DON'T REALLY RECALL.

7    Q   IT WOULDN'T MATTER TO YOU IF IT WAS BEFORE OCTOBER 4TH OR

8    AFTER; RIGHT?

9    A   WELL, NO, I SUPPOSE NOT.

10   Q   I'M SAYING THAT BECAUSE ON OCTOBER 4TH YOU GAVE YOUR TWO

11   WEEKS NOTICE TO MATTEL; RIGHT?

12   A   RIGHT.

13   Q   AND THE REASON OCTOBER 4TH DOESN'T GIVE YOU A GUIDEPOST AS

14   TO WHEN YOU MET WITH MS. LEAHY IS BECAUSE IT WOULDN'T HAVE

15   MATTERED TO YOU WHETHER YOU MET HER BEFORE YOU GAVE YOUR NOTICE

16   OR AFTER; RIGHT?

17   A   I DON'T KNOW THAT IT DID MATTER TO ME.  I MEAN, AT THIS

18   POINT, IT WAS STILL, YOU KNOW, A VERY SPECULATIVE -- WELL,

19   BEFORE OCTOBER 4TH, IT WAS VERY SPECULATIVE WHETHER OR NOT THE

20   PROJECT WAS GOING TO HAPPEN AT ALL.

21   Q   IS THAT WHAT YOU TOLD MS. LEAHY WHEN YOU GAVE HER THE

22   DRAWINGS AND THE HEAD AND SAID, 'COULD YOU DO A SCULPT'?

23       DID YOU TELL HER, 'BY THE WAY, THIS IS VERY

24   SPECULATIVE; YOU MIGHT BE WASTING YOUR TIME'?

25   A   WELL, I DON'T KNOW IF I DID OR NOT.  I DON'T RECALL SAYING

1    ANYTHING LIKE THAT.

2    Q   INSTEAD, YOU TOLD HER, 'THIS IS FOR A PROJECT I'M GOING TO

3    BE DOING WITH MGA'; RIGHT?

4    A   I DON'T RECALL IF I SAID THAT EITHER.

5    Q   AT THE MEETING THAT YOU HAD WITH HER, WHEN SHE SHOWED YOU

6    THE SCULPTS SHE DID, WAS MS. GARCIA PRESENT?

7    A   I DON'T THINK SHE WAS AT THE FIRST MEETING.

8    Q   SO THE FIRST MEETING IS JUST YOU AND MS. LEAHY LOOKING AT

9    THE SCULPT; CORRECT?

10   A   RIGHT.

11   Q   AT THAT MEETING, DID YOU GIVE HER ANY COMMENTS ABOUT

12   CHANGES YOU THOUGHT SHOULD BE MADE TO THE SCULPT?

13   A   WELL, I THINK I GAVE HER SOME GENERAL, YOU KNOW, COMMENTS.

14   I SAID I LIKED CERTAIN THINGS.  I SAID, YOU KNOW, CERTAIN

15   THINGS LOOK A LITTLE BIT STRANGE OR, YOU KNOW, THOSE SORTS OF

16   THINGS.

17   Q   YOU'RE NOT A SCULPTOR; RIGHT?

18   A   NO.  DEFINITELY NOT.

19   Q   YOU HAD AN IDEA OF WHAT YOU WANTED THE BRATZ DOLLS TO LOOK

20   LIKE.

21   A   YES.

22   Q   SO IN THIS MEETING, WHEN YOU GAVE HER YOUR COMMENTS, DID

23   SHE REACT NEGATIVELY?  DID SHE SEEM RECEPTIVE TO THOSE

24   COMMENTS?

25   A   I DON'T REMEMBER HER REACTING NEGATIVELY.  SHE'S A

1    PROFESSIONAL.

2         MR. PRICE:  I DON'T KNOW WHERE THE TANGIBLE ITEMS

3    ARE, BUT 1136 IS IN EVIDENCE.  IT'S A SCULPT.  I CAN COME BACK

4    TO IT, BECAUSE I SEE WE DON'T HAVE A CLERK HERE.

5    BY MR. PRICE:

6    Q   WE'VE PUT UP ON THE SCREEN A PHOTO OF IT.

7         DO YOU RECOGNIZE THIS AS BEING THE FIRST SCULPT THAT

8    YOU SAW, THAT YOU MADE COMMENTS ON?

9         THE COURT:  MR. PRICE, LET ME STOP YOU.

10        MR. NOLAN, DO YOU AGREE THAT THIS IS IN EVIDENCE?

11        MR. NOLAN:  YES, YOUR HONOR.

12        THE COURT:  VERY WELL.  IT WASN'T BEFORE NOW.  IT IS

13   NOW.

14        MR. PRICE:  I WAS TOLD IT WAS.

15   BY MR. PRICE:

16   Q   DO YOU RECOGNIZE THIS AS BEING THE FIRST SCULPT YOU SAW

17   WHEN IT WAS JUST YOU AND MS. LEAHY AND YOU'RE GIVING YOUR

18   COMMENTS?

19   A   WITHOUT ACTUALLY SEEING THE THREE-DIMENSIONAL SCULPT, I'M

20   NOT REALLY SURE THIS WAS THE FIRST ONE THAT I SAW.

21   Q   LET ME ASK YOU THIS WAY:  WHEN YOU GAVE HER SUGGESTIONS,

22   IS IT YOUR UNDERSTANDING THAT SHE THEN WENT BACK TO TRY TO DO

23   WHAT YOU SUGGESTED?

24   A   WELL, I WOULD ASSUME SO.

25   Q   BECAUSE YOU SAW ANOTHER SCULPT AFTER THAT; RIGHT?

1    A   YES.

2    Q   DID IT APPEAR TO YOU THAT SHE HAD TRIED TO DO WHAT YOU

3    SUGGESTED?

4    A   WELL, I MEAN, YEAH, I THINK SHE TRIED TO, YOU KNOW, THINK

5    ABOUT WHAT I HAD SAID.  BUT I HAD TOLD HER, YOU KNOW, 'I'M NOT

6    A SCULPTOR; HERE'S THE DRAWING, YOU KNOW; JUST, YOU KNOW, PUT

7    YOUR OWN SPIN ON IT.'

8    Q   AND THIS MEETING THAT YOU HAD WITH MS. LEAHY, THESE

9    CONTACTS, YOU WERE KEEPING MS. GARCIA INFORMED ABOUT THAT;

10   RIGHT?

11   A   I DON'T REMEMBER IF I TOLD HER ABOUT THAT OR NOT.

12   Q   WELL, SHE CAME TO THE NEXT MEETING; THAT IS, THE ONE AFTER

13   YOU GAVE YOUR INITIAL SUGGESTIONS -- THERE WAS ANOTHER MEETING

14   WHERE MS. LEAHY SHOWED YOU A SCULPT; RIGHT?

15   A   YES.

16   Q   AND MS. GARCIA CAME TO THAT?

17   A   I BELIEVE SO, YES.

18   Q   AND YOU'RE THE ONE WHO ASKED MS. GARCIA TO COME TO THAT.

19       MR. NOLAN:  OBJECTION, YOUR HONOR.  JUST FOUNDATION

20   AS TO TIME.

21       THE COURT:  JUST AS TO TIME, COUNSEL.

22   BY MR. PRICE:

23   Q   YOU TOLD US THAT THIS INITIAL SCULPT WAS SOMETIME IN

24   SEPTEMBER OF 2000, RIGHT, THE VERY FIRST ONE?

25   A   YES.

1    Q   SO AFTER GIVING YOUR SUGGESTIONS, YOU SAW A SECOND SCULPT;

2    CORRECT?

3    A   YES.

4    Q   AND MS. GARCIA WAS THERE, LOOKING AT THIS SECOND SCULPT;

5    RIGHT?

6    A   YES.

7    Q   SO ABOUT WHEN WAS THAT SECOND SCULPT?

8    A   I REALLY AM NOT SURE.  I DON'T RECALL.

9    Q   IT WAS PRIOR TO YOU LEAVING MATTEL.

10   A   I'M NOT SURE OF THAT EITHER.

11   Q   THIS IS A MEETING THAT MS. GARCIA ATTENDED AS WELL, FOR

12   THE SECOND SCULPT.

13   A   YES.

14   Q   THIS MEETING TOOK PLACE AT MS. LEAHY'S HOUSE.

15   A   YES.

16   Q   AND THAT MEETING HAPPENED BEFORE YOUR LAST DAY OF

17   EMPLOYMENT AT MATTEL; RIGHT?

18   A   I DON'T REMEMBER.

19        MR. PRICE:  YOUR HONOR, IF WE COULD PLAY FROM

20   MR. BRYANT'S DEPOSITION, PAGE 80, LINE 13, TO PAGE 81, LINE 8.

21   THIS IS THE NOVEMBER 4, 2004, VOLUME I.

22        THE COURT:  ANY OBJECTION?

23        MR. NOLAN:  NO OBJECTION, YOUR HONOR.

24        THE COURT:  VERY WELL.

25        (WHEREUPON, VIDEO DEPOSITION PLAYS;

1        EXCERPTS PROVIDED BY COUNSEL AS FOLLOWS:)

2        Q  WERE YOU EVER PRESENT IN A MEETING BETWEEN MS.

3           LEAHY AND SOMEBODY FROM MGA?

4        A  YES.

5        Q  AND DID THAT MEETING HAPPEN BEFORE YOUR LAST DAY OF

6           EMPLOYMENT AT MATTEL?

7        A  YES.

8        Q  ALL RIGHT. WHERE DID THAT MEETING TAKE PLACE?

9        A  IT WAS AT MS. LEAHY'S HOUSE.

10       Q  AND DO YOU RECALL WHAT TIME OF DAY IT WAS THAT THE

11          MEETING TOOK PLACE?

12       A  I DON'T RECALL EXACTLY.

13       Q  IT MIGHT HAVE BEEN DURING THE BUSINESS DAY, IT

14          MIGHT HAVE BEEN AT NIGHT OR ON WEEKENDS, YOU JUST

15          DON'T RECALL; IS THAT TRUE?

16       A  RIGHT.  I DON'T RECALL.

17       Q  AND WHO WAS THE PERSON FROM MGA WHO WAS IN

18          ATTENDANCE AT THIS MEETING;

19       A  PAULA TREANTAFELLES.

20       Q  AND WHAT WAS THE PURPOSE OF THIS MEETING IN YOUR

21           UNDERSTANDING?

22       A  WE WERE THERE TO REVIEW THE PRELIMINARY SCULPT.

23       (END OF EXCERPT.)

24    BY MR. PRICE:

25       Q  AT THAT MEETING, YOU AGAIN GAVE MS. LEAHY SOME FEEDBACK.

1    A   I BELIEVE SO, YES.

2    Q   AND YOUR FEEDBACK WAS YOU THOUGHT THAT IT WAS PRETTY GOOD;

3    YOU WANTED SOME ADDITIONAL WORK DONE.

4    A   I THINK SO, YES.

5    Q   AND WHEN YOU SAY YOU TOLD HER TO PUT HER OWN SPIN ON IT,

6    YOU DIDN'T EXPECT HER TO COME BACK AND ABANDON, YOU KNOW, THE

7    BRATZ AS YOU HAD DRAWN THEM; RIGHT?

8    A   WELL, NO, I DON'T THINK I EXPECTED THAT.  BUT, AGAIN, I

9    TOLD HER, YOU KNOW, 'I'M NOT A SCULPTOR, SO I DON'T KNOW

10   EXACTLY WHAT TO TELL YOU TO DO.'

11   Q   YOU COULDN'T TELL HER HOW TO CREATE A CERTAIN CURVE OR

12   WHAT WAS PHYSICALLY POSSIBLE TO DO; RIGHT?

13   A   RIGHT.

14   Q   BUT YOUR EXPECTATION WAS THAT SHE WOULD BE CONSISTENT WITH

15   YOUR SUGGESTION, GOING TO TRY TO APPROXIMATE YOUR DRAWINGS.

16   A   WELL, YEAH, AGAIN.  BUT I TOLD HER, YOU KNOW, TO PUT HER

17   OWN CREATIVITY INTO IT.

18        THE COURT:  COUNSEL, LET'S TAKE A BREAK.  I KNOW

19   WE'VE ONLY BEEN GOING FOR AN HOUR, BUT THE COURT REPORTER HAS

20   BEEN GOING SINCE 9:00.

21        (WHEREUPON, JURORS DEPART COURTROOM.)

22        (WHEREUPON, A BRIEF RECESS WAS HELD.)

23        (WHEREUPON, JURORS ENTER COURTROOM.)

24        THE COURT:  MR. PRICE, IS THERE AN ISSUE?

25        MR. PRICE:  YES.  THIS WILL HAVE TO BE AT SIDEBAR.

1    IT'S ON AN AREA OF CROSS-EXAMINATION, AND NEITHER WITNESS NOR

2    ATTORNEY --

3          THE COURT:  SIDE-BAR?  THAT'S FINE.

4          (SIDE-BAR PROCEEDINGS AS FOLLOWS:)

5          THE COURT:  BEFORE WE GET INTO THIS, I UNDERSTAND

6    YOUR POINT ABOUT THE HAM SANDWICH.  STILL, WE NEED THE

7    FOUNDATION THAT THAT IS SOMETHING THAT CAN REFRESH THE

8    WITNESS'S RECOLLECTION BEFORE WE GET INTO THE SUBSTANCE OF WHAT

9    IT IS THAT YOU'RE USING IT FOR.

10         MR. PRICE:  I WAS DOING MY BEST TO NOT SAY "THIS SAYS

11   THAT," BUT HE WAS SAYING --

12         THE COURT:  TRY HARDER.  TRY HARDER, COUNSEL.

13         MR. NOLAN:  I DIDN'T THINK POINTING TO THE HAM --

14         MR. PRICE:  YOUR HONOR, WHAT I, IN EFFECT, WANT TO DO

15   IS IMPEACH THIS WITNESS, AND OBVIOUSLY, THE DATES ARE VERY

16   IMPORTANT HERE.

17         THE COURT:  THEY ARE.

18         MR. PRICE:  -- ESTABLISH HIS COUNSEL TELLS HIM TO

19   GIVE CERTAIN DATES, THAT HE WILL GAVE THAT DATE.  AND THIS IS

20   WITH REGARD TO HIS DECLARATION ON THE PATENT.  I'M NOT GOING TO

21   GET INTO 'DID HE ATTEMPT' -- THIS GENTLEMEN IS NOT A MECHANICAL

22   ENGINEER.  HE'S NOT MECHANICAL.  HE DOESN'T KNOW EXACTLY HOW

23   THESE ARE MADE.  HE'S THE DESIGNER.

24         WHAT I'M GOING TO DO IS SHOW THE 2001 DOLL AND ASK

25   HIM "YOU'VE SEEN THIS, AND YOU SEE JUST THE PHYSICAL THING THAT

1    IT'S" --

2         MGA'S COUNSEL WANTS TO TALK TO MR. BRYANT ABOUT THIS,

3    IF I'M PERMITTED TO EXAMINE HIM ON IT.

4         THE COURT:  THEY WOULDN'T.

5         MR. PRICE:  I'M GOING TO ASK HIM, "YOU HAVE THIS

6    FLESH COLORED -- IT'S THE SAME COLOR AS HER LEG, AND TO SHOW

7    THEM HOW IT HAS A PROTUBERANCE ON THE LEG.  THIS SHOE SNAPS

8    INTO THE LEG AND THIS COLOR IS THE SAME COLOR OF THIS COLOR;

9    THAT'S WHAT I WANT TO ASK HIM.  BECAUSE HIS DECLARATION, YOUR

10   HONOR, SAYS THAT THERE'S A STRAP-TYPE SHOE THAT HAS A SNAP

11   FEATURE ABOUT THE ANKLES, WHICH THIS HAS, SO THAT THE

12   (INAUDIBLE) ON THE DOLL REGARDING THE STRAP SHOE COLOR OF THE

13   SKIN TONE IN THE AREAS ARE MATCHED TO THE COLOR OF THE LEGS.  I

14   JUST WANT TO ASK HIM IF ALL THESE ARE TRUE ABOUT THIS DOLL.

15        THE COURT:  THE DANGER HERE, THOUGH, IS THAT WE'RE

16   GOING TO BE GETTING INTO -- THAT'S A DECLARATION SUBMITTED THAT

17   MR. BRYANT PREPARED.  HE'S RESPONSIBLE FOR THAT AND YOU CAN

18   IMPEACH HIM WITH THAT.

19        WHAT YOU CANNOT GET INTO IS THE PATENT APPLICATION

20   ITSELF.

21        MR. PRICE:  I'LL JUST GET INTO HIS DECLARATION IN

22   SHOWING THAT ALL THESE FEATURES THAT HE SAYS THAT HE TALKED

23   ABOUT IN HIS DECLARATION ARE ON HIS 2001 DOLL.  I'M NOT GETTING

24   INTO THE PATENT APPLICATION.

25        THE COURT:  I'LL HEAR FROM MS. AGUILAR.

1         MS. AGUIAR:  RESPECTFULLY, I THINK WHAT HE IS

2    PROPOSING TO DO IS A POTENTIAL END RUN AROUND THE ORDER THAT

3    YOU GAVE YESTERDAY, AND LET ME EXPLAIN WHY.  BECAUSE THESE

4    TERMS THAT ARE USED IN MR. BRYANT'S FEBRUARY 2003 DECLARATION

5    ARE, IN FACT, THE TERMS THAT ARE USED IN THE PATENT

6    APPLICATION.

7         THE COURT:  THE PROBLEM -- I DON'T DISAGREE WITH YOU.

8    I WOULDN'T SAY IT IS AN END RUN, BUT THEY ARE TRYING TO GET

9    THIS DECLARATION IN.  THIS IS THE PROBLEM WHEN SOMEONE WHO,

10   FRANKLY, IS NOT A PATENT ATTORNEY, WHO DOESN'T HAVE -- I DON'T

11   KNOW HOW CLUELESS OR NOT HE IS.  YOU SAY HE'S NOT MECHANICAL.

12   I DON'T KNOW IF HE IS OR NOT.  BUT HE WAS USED, IN THIS

13   DECLARATION, AS THE PERSON TO MAKE THESE DESCRIPTIONS.  HE CAN

14   CERTAINLY BE EXAMINED WHAT IT IS HE MEANT WHEN HE SAID THIS.

15        MS. AGUIAR:  I UNDERSTAND THAT.  BUT LET'S KEEP ONE

16   THING IN MIND IN THIS DECLARATION.  IN HIS DECLARATION, HE IS

17   TALKING ABOUT THE DOLL DESIGNS SHOWN IN THE ATTACHED DRAWINGS;

18   SO THE ATTACHED DRAWINGS ARE THE DRAWINGS FROM THE PATENT

19   APPLICATION.

20        WHAT MR. PRICE IS PROPOSING TO DO IS TO TAKE THE

21   DECLARATION, WHICH CONCERNS THE PATENT APPLICATION, HAVE

22   MR. BRYANT TAKE THIS PHYSICAL DOLL OUT OF ITS PACKAGE, AND TALK

23   ABOUT WHETHER THESE PIECES OF THE PHYSICAL DOLL ARE, IN FACT,

24   THE SAME AS THE TERMS IN THE DECLARATION WHICH SPEAK TO THE

25   FIGURES IN THE PATENT APPLICATION; SO IT'S THIS THREE-WAY --

1        THE COURT: I DO UNDERSTAND THE CONCERN.  BUT I DO

2    THINK, COUNSEL, YOU CAN EXAMINE HIM ON THIS DECLARATION.  IF

3    YOU CAN LAY FOUNDATION THAT HE'S TALKING ABOUT THIS DOLL, THEN

4    THAT'S PROPER IMPEACHMENT.  I DON'T THINK YOU CAN EXCLUDE THE

5    DOLL.  I DON'T KNOW WHETHER HE'S TALKING ABOUT IT OR NOT.

6        DO YOU KNOW WHAT HE WAS TALKING ABOUT?

7        MS. AGUIAR:  WHAT I CAN SAY IS THAT WHEN HE SAYS IN

8    PARAGRAPH THREE, "I AM FAMILIAR WITH THE DOLL DESIGNS AS SHOWN

9    IN THE ATTACHED DRAWINGS."

10        THE COURT:  SO THEREFORE, BY HIS OWN ADMISSION, HE'S

11   COMPETENT TO TALK ABOUT THESE DRAWINGS.

12        MS. AGUIAR:  AND WHEN HE TALKS ABOUT THE DOLLS HAVING

13   STRAP-TYPE SHOES, AGAIN, HE'S TALKING ABOUT THE DRAWINGS OF THE

14   DOLLS IN THE PATENT APPLICATION; SO OBVIOUSLY HE'S EXPRESSLY

15   NOT TALKING ABOUT THIS 2001 DOLL.

16        THE COURT:  I DON'T KNOW IF HE IS OR NOT.  HE SAYS "I

17   WAS ACTIVELY INVOLVED IN THE DOLL ITSELF," AND THIS RELEASE DID

18   NOT OCCUR IN 2002.

19        COUNSEL IS ENTITLED TO TEST THE VORACITY OF THAT

20   STATEMENT.

21        MR. PRICE:  INSTEAD OF -- THEY WANT ME TO CONDUCT MY

22   EXAMINATION SO HE WILL KNOW WHAT I'M GETTING AT BEFORE I SET

23   THE TRAP, AND THAT'S UNFAIR.  WHAT I PLAN TO DO IS --

24        THE COURT:  NO ONE IS DOING ANYTHING OF THAT SORT.

25   LET'S NOT GO THERE.

1        MR. PRICE:  I WILL SHOW HIM THE 2001 DOLL.

2        THE COURT:  DO WE HAVE THE 2002 DOLL, BY CHANCE?

3        MR. PRICE:  YES.

4        I WANT TO SHOW HIM THE 2001 DOLL, AND SHOW IT TO THE

5  JURY.

6        THE COURT:  IS THERE ANY DIFFERENCE BETWEEN THE 2001

7  AND 2002 DOLL?

8        MR. NOLAN:  MAY I MAKE A PROFFER?

9        THE COURT:  YES.

10        MR. NOLAN:  YOUR HONOR, IN THE VERY EARLY PRODUCTION

11  RUNS, THE FEET WERE COMING OFF, SLIPPING OFF.  AND IN

12  MR. BRYANT'S DRAWINGS, YOU'D SEE THERE'S A MALE AND A FEMALE

13  FIGURE WHERE THE DOLL IS COMING -- WHAT HAPPENED IS EARLY IN

14  THE RUN, THEY HAD A PROBLEM.  THERE WAS A MEETING.

15  ISAAC LARIAN, WHO WAS AN ENGINEER, WAS THERE, AND A CHANGE WAS

16  MADE.  IT WAS CALLED A RUN CHANGE; YOU DON'T CALL BACK TO THE

17  PRODUCTION, YOU JUST MAKE A CHANGE IN THE LINE.

18        THEY ADDED A LITTLE BIT OF A PROTUBERANCE TO MAKE THE

19  CONNECTION TIGHTER.

20        THE COURT:  WHEN WAS THAT DONE?

21        MR. NOLAN:  AT THE TIME THEY FILED THE PATENT

22  APPLICATION.

23        THE COURT:  2002?

24        MR. NOLAN:  SOMEWHERE AROUND THERE; I CAN GET THE

25  DATE.

1   NOW, AT SOME POINT IN TIME, THERE ARE MODELS THAT

2 WERE CHANGED, BUT THERE ARE OTHERS OUT THERE THAT WERE NOT

3 CHANGED; SO BY LOOKING AT ONE PARTICULAR ONE, YOU COULD NOT

4 EFFECTIVELY TELL THAT'S THE EXACT ONE WHERE A MANUFACTURING

5 CHANGE WAS MADE.

6   THE COURT:  IF THAT'S THE CASE, THEN CARTER BRYANT

7 SHOULD NOT HAVE BEEN THE DECLARANT IN SUPPORT OF THAT PATENT

8 APPLICATION.

9   I UNDERSTAND THE UNFAIRNESS THAT YOU WANT TO AVOID

10 HERE.  BUT IT'S ALSO -- IT CAN'T BE A SWORD AND A SHIELD.  IF

11 CARTER BRYANT DIDN'T UNDERSTAND THESE DISTINCTIONS YOU'RE

12 MAKING HERE, AND HE CAN'T TELL THE DIFFERENCE BETWEEN A 2001

13 AND A 2002 DOLL, THAT GOES TO HIS VORACITY.  NOT THE TRUTH OF

14 WHETHER OR NOT THAT PATENT APPLICATION WAS PROPER OR NOT.  IT

15 NOW GOES TO THE CREDIBILITY ISSUE HERE.

16   I THINK THAT'S FAIR GAME TO BE EXPLORED.

17   I AGREE THAT WE HAVE TO COME FAR SHORT OF MAKING ANY

18 CONCLUSION ABOUT THE PATENT APPLICATION OR WHETHER THE PATENT

19 APPLICATION WAS LEGITIMATE OR NOT LEGITIMATE.  YOU'RE GOING TO

20 NEED TO JUSTIFY THIS DECLARATION.  AND I THINK OUT OF FAIRNESS

21 YOU NEED TO HAVE A 2002 DOLL AS WELL.

22   MR. PRICE:  WE DO.  WE'LL SHOW BOTH.

23   THE COURT:  SO MR. BRYANT CAN EXPLAIN WHAT MR. NOLAN

24 JUST EXPLAINED ABOUT THESE DIFFERENCES BETWEEN THE 2001 AND

25 2002 AND THE LATTER BEING SOMETHING THAT HE WAS TALKING ABOUT,

1    THAT'S FAIR GAME.

2         BUT IF HE HAD NO IDEA WHAT HE WAS TALKING ABOUT.  IF

3    HE WAS JUST SIGNING SOME DECLARATION PREPARED BY A PATENT

4    ATTORNEY, AND FOR ALL INTENTS AND PURPOSES, HE VIEWS THESE

5    DOLLS AS ONE AND THE SAME, THAT GOES TO CREDIBILITY.

6         MS. AGUIAR:  I AGREE WITH YOUR HONOR ABOUT HIS

7    VORACITY.  MY CONCERN IS THAT WE ARE GOING TO BE RIGHT BACK

8    WHERE WE WERE A DAY AND A HALF AGO WITH MY ASSERTION THAT IF WE

9    GET INTO WHETHER OR NOT CERTAIN CHANGES WERE OR WERE NOT MADE

10   BETWEEN 2001 AND 2002 AND WHETHER THE 2001 DOLL IS JUST LIKE

11   THE PATENT, THEN WE HAVE TO THEN PUT ON EVIDENCE THAT --

12        THE COURT:  NO.  I GRANTED YOUR MOTION ON 403,

13   BECAUSE THAT'S PRECISELY WHAT I THINK WAS AN UNDUE WASTE OF

14   TIME.  BUT IN TERMS OF THIS WITNESS'S UNDERSTANDING, THAT'S

15   SOMETHING THAT'S FAIRLY TESTABLE IN TERMS OF HIS CREDIBILITY.

16   THAT'S ALL IT'S GOING TO.

17        WE'RE NOT GOING TO BRING IN ANY COLLATERAL EVIDENCE

18   FROM MATTEL OR FROM MGA TO DETERMINE WHAT ACTUALLY HAPPENED.  I

19   JUST WANT TO FIND OUT WHAT THIS WITNESS THINKS HE DID.  BUT YOU

20   CAN'T JUST USE THE 2001 DOLL.

21        MR. PRICE:  I'LL USE BOTH.

22        TESTING CREDIBILITY.  I'M NOT SAYING THE PATENT IS

23   INVALID.  THERE MAY BE A HUMONGOUS CHANGE.  BUT WHAT I WANT TO

24   SHOW IS THAT HE DESCRIBED THIS DOLL, AND HE GETS A LETTER FROM

25   HIS COUNSEL SAYING "HERE'S YOUR DECLARATION."

1       THE COURT:  THE KEY THING, AT LEAST BASED ON

2    MR. NOLAN'S PROFFER, THAT CHANGED IN 2001 AND 2002 WAS THE

3    NATURE OF THE FEATURE ABOUT THE ANKLE OF THE DOLL SOLD AND HOW

4    THE DIFFERENT FOOTGEAR MAY BE MOUNTED ON THE DOLL.  AND YOU SAY

5    THEY WERE FALLING OFF.

6       IF, IN FACT, THIS IS A LEGITIMATE DECLARATION, THEN

7    CERTAINLY MR. BRYANT WOULD KNOW THAT DISTINCTION.  IF HE

8    DOESN'T, I THINK THAT'S A CREDIBILITY ISSUE.

9       MS. AGUIAR:  I THINK THAT CREDIBILITY ISSUE CAN BE

10   TESTED AND I AGREE THAT THEY SHOULD BE ABLE TO TEST IT.  IT

11   DOESN'T REQUIRE A COMPARISON OF A 2001 DOLL TO WHAT HE WAS

12   SAYING IN SEPARATION, BECAUSE, YOUR HONOR, WHAT THEY ARE

13   SETTING UP -- I CAN SEE THIS COMING -- WHAT THEY ARE SETTING UP

14   IS THAT THE UNDERLYING PATENT APPLICATION WAS ALLEGEDLY A

15   MISSTATEMENT.

16      THE COURT:  I AGREE WITH MS. AGUIAR, THAT YOU DON'T

17   LEAD WITH THE DOLLS, YOU LEAD WITH THE DECLARATION.  YOU ONLY

18   RESORT TO THE DOLLS TO MAKE A COMPARISON.

19      MR. PRICE:  I WAS WRONG IN THE FOLLOWING SENSE -- I'M

20   JUST SAYING HE CAN'T SHOW THAT HE CAN TELL THE DIFFERENCE,

21   BECAUSE HE'S THE ONE STATING IT UNDER OATH.

22      THE COURT:  LAY THAT THROUGH YOUR TESTIMONY.  THAT'S

23   PROPER IMPEACHMENT.  WE'RE NOT GOING TO GET INTO THE PATENT,

24   BUT WE ARE GOING TO GET INTO HIS DECLARATION.

25      MR. PRICE:  JUST SO THERE ARE NO SURPRISES, BUT IF

1    THERE'S A DECLARATION THAT HE SEES THIS BEFORE HE SIGNS IT FROM

2    HIS ATTORNEY, SAYING "YOU'VE GOT TO SAY 2002 INSTEAD OF 2001."

3        THE COURT:  I UNDERSTAND WHAT YOUR POINT IS.  YOU CAN

4    TEST THAT WITH HIM.  FAIR ENOUGH.

5        (SIDE-BAR PROCEEDINGS CONCLUDED. )

6        THE COURT:  LET'S BRING THE JURY IN.

7        WE'RE GOING TO GO UNTIL 12:10 TODAY.

8        (JURORS ENTER COURTROOM.)

9        THE COURT:  COUNSEL, YOU MAY PROCEED.

10   BY MR. PRICE:

11   Q   MR. BRYANT, LET ME ASK YOU, ARE YOU AN ENGINEER?

12   A   NO.

13   Q   DO YOU HAVE A GOOD UNDERSTANDING OF, LIKE, THE BRATZ

14   DOLLS, HOW THEY ARE ACTUALLY MADE IN HONG KONG, OR HOW THEY

15   WERE MADE?

16   A   WELL, NO.  NOT REALLY A GOOD UNDERSTANDING.

17   Q   IF I SHOWED YOU A DOLL FROM TODAY VERSUS 2003, VERSUS

18   2002, VERSUS 2001, COULD YOU POINT OUT -- NOT THE SHAPE

19   DIFFERENCES, BUT COULD YOU POINT OUT THE MECHANICAL DIFFERENCES

20   IN THOSE DOLLS?

21   A   PROBABLY NOT.

22   Q   WHY DO YOU THINK YOU'D BE UNABLE TO DO THAT, TO POINT OUT

23   A TECHNICAL MECHANICAL DIFFERENCE IN THE WAY THAT IT'S MADE?

24   A   WELL, FOR ONE THING, I DON'T GET THOSE KIND OF UPDATES,

25   GENERALLY, AND I'M NOT AN ENGINEER.

Unsigned                                           Page  2579

1    Q   WHAT KIND OF UPDATES DO YOU GET?

2         MR. NOLAN:  WITH RESPECT TO THE CERTAIN SUBJECT

3    MATTER?  FOUNDATION.

4         THE COURT:  SUSTAINED.

5         MR. PRICE:  YOU SAID YOU WOULDN'T GET THOSE KINDS OF

6    UPDATES ABOUT MECHANICALLY HOW THE DOLL WAS STRUCTURED.  WHAT

7    KIND OF UPDATES WOULD YOU GET?

8         WHAT SORT OF THINGS WOULD YOU GET?

9    A   I MEAN, I HAVE NO IDEA.  I CAN'T REALLY RECALL GETTING

10   UPDATES ON CHANGES OR ANYTHING LIKE THAT.

11   Q   FOR EXAMPLE, IF THERE WAS A CHANGE IN THE WAY THE HEAD

12   MOVED, WOULD YOU GET AN UPDATE ON THAT, THE MECHANISM FOR THAT?

13   A   PROBABLY NOT.

14   Q   AND WHY WOULDN'T YOU GET AN UPDATE ON THAT SORT OF

15   MECHANICAL THINGS?

16   A   WELL, IT JUST DOESN'T REALLY HAVE MUCH TO DO WITH WHAT I

17   DO ON THE BRATZ PROJECT.

18   Q   WELL, WHAT DO YOU DO ON THE BRATZ PROJECT?

19   A   WELL, I DESIGN THE FASHIONS.  SOMETIMES I'LL DESIGN

20   ACCESSORIES, HAIRSTYLES.  I DO LOOKS FOR THE FACE.  THOSE SORTS

21   OF THINGS.

22   Q   I'LL HAND THE WITNESS THE EXHIBIT 11898.

23        DO YOU HAVE EXHIBIT 11898?

24   A   YES.

25   Q   THAT'S A COMMUNICATION YOU GOT FROM ATTORNEY ALAN ROSE IN

1    AUGUST OF 2003; CORRECT?

2    A   I BELIEVE SO, YES.

3    Q   AND IT CONCERNS A DECLARATION UNDER PENALTY OF PERJURY

4    WHICH MGA WANTS YOU TO SIGN; CORRECT?

5    A   WHAT, NOW?

6    Q   IT CONCERNS A DECLARATION UNDER PENALTY OF PERJURY WHICH

7    MGA WANTS YOU TO SIGN.

8        MR. NOLAN:  OBJECTION, YOUR HONOR.  MISCHARACTERIZES

9    THE LETTER.

10       THE COURT:  SUSTAINED.

11   BY MR. PRICE:

12   Q   IT ENCLOSES A DECLARATION FOR YOUR SIGNATURE; CORRECT?

13   A   YES.

14   Q   MR. ROSE, IT'S YOUR UNDERSTANDING, REPRESENTED WHOM?

15   A   WHAT, NOW?

16   Q   WHO DID THIS ATTORNEY MR. ROSE REPRESENT?

17   A   MGA.

18   Q   SO THIS IS A LETTER SENT TO YOU FROM MGA'S ATTORNEY

19   ENCLOSING A DECLARATION FOR YOUR SIGNATURE; CORRECT?

20   A   YES.

21       MR. PRICE:  WE'D MOVE EXHIBIT 11898 INTO EVIDENCE.

22       MR. NOLAN:  NO OBJECTION.

23       THE COURT:  IT'S ADMITTED.  YOU MAY PUBLISH.

24       (EXHIBIT 11898 RECEIVED.)

25   / / /

Unsigned                                          Page  2581

1    BY MR. PRICE:

2    Q   AMONG THE THINGS THAT HE SENDS YOU IS SOME BACKGROUND

3    INFORMATION; IS THAT RIGHT?

4    A   THAT'S WHAT IT SAYS IN THE LETTER.

5    Q   AND HE SAYS "OUR PATENT APPLICATION WAS FILED FEBRUARY 24,

6    2003, SO A RELEASE BACK IN 2001 WOULD BE ANTICIPATORY, WHILE

7    THE RELEASE IN THE FALL OF 2002 WOULD BE WITHIN THE ONE-YEAR

8    GRACE PERIOD."

9        DO YOU SEE THAT?

10   A   YES.

11   Q   AND YOU UNDERSTOOD THAT FROM THAT, WHAT MR. ROSE WAS

12   SAYING IS, WE NEED YOU TO SAY THERE WAS A RELEASE IN 2002, NOT

13   IN 2001.

14       MR. NOLAN:  OBJECTION.  THE WORDS ARE THE WORDS.

15       THE COURT:  OVERRULED.

16       YOU CAN ASK HIM HIS UNDERSTANDING.

17       THE WITNESS:  I DON'T REALLY RECALL WHAT MY

18   UNDERSTANDING OF THIS PASSAGE WAS.

19   BY MR. PRICE:

20   Q   WELL, YOU SAW HE'S GIVING YOU TWO DATES; 2001 VERSUS 2002.

21       DO YOU SEE THAT?

22   A   YES.

23   Q   AND YOU UNDERSTOOD THIS HAD SOMETHING TO DO WITH SOME SORT

24   OF PATENT APPLICATION; RIGHT?

25   A   BASICALLY, YES.

Unsigned                                    Page  2582

1    Q    AND YOU UNDERSTOOD HE WAS MAKING A DISTINCTION BETWEEN

2    THOSE TWO YEARS, 2001 AND 2002; RIGHT?

3    A    RIGHT.

4    Q    AND YOU NOTICE THAT HE'S SAYING THAT 2002 WOULD BE WITHIN

5    SOME ONE-YEAR GRACE PERIOD.

6         DO YOU SEE THAT?

7    A    YES.

8    Q    SO YOU UNDERSTOOD FROM THIS THAT 2002 IS BETTER FOR MGA

9    THAN 2001; YOU UNDERSTOOD THAT.

10   A    YOU KNOW, I CAN'T RECALL IF I UNDERSTOOD THAT AT THE TIME

11   OR NOT.

12   Q    BUT READING IT TODAY, YOU UNDERSTAND THAT.

13   A    WELL, I HAVE A LITTLE BIT MORE INFORMATION ABOUT IT, YES.

14   Q    AND THEN, IF WE GO FURTHER, THERE'S A DECLARATION OF

15   CARTER BRYANT ATTACHED.

16        DO YOU SEE THAT?

17   A    YES.

18   Q    IF WE COULD GO TO PAGE 5.

19        YOU HAVEN'T SIGNED THIS ONE YET.  THIS IS BEING SENT

20   TO YOU FOR SIGNATURE; CORRECT?

21   A    YES.

22   Q    ONE OF THE THINGS YOU SAY IS THAT "I'M FAMILIAR WITH THE

23   DOLL DESIGNS AS SHOWN IN THE ATTACHED DRAWINGS FROM THE ABOVE

24   IDENTIFIED PATENT APPLICATION."

25        DO YOU SEE THAT?

1    A   YES.

2    Q   HAD YOU REVIEWED A PATENT APPLICATION?

3    A   I DON'T THINK SO.

4    Q   YOU SEE THERE, THERE'S SOME DRAWINGS ATTACHED -- ACTUALLY

5    I DON'T SEE THEM HERE.

6          IN WHAT YOU GOT, WAS THERE A DRAWING ATTACHED?

7    A   YES.

8    Q   I'LL SHOW YOU EXHIBIT 502.

9          DO YOU RECOGNIZE 502 AS A DECLARATION YOU SIGNED?

10   A   YES.

11         MR. PRICE:  AND MAYBE WE CAN MOVE EXHIBIT 502 INTO

12   EVIDENCE, YOUR HONOR?

13         MR. NOLAN:  NO OBJECTION.

14         THE COURT:  IT'S ADMITTED.  YOU MAY PUBLISH.

15         (EXHIBIT 5023 RECEIVED.)

16   BY MR. PRICE:

17   Q   502, YOU SEE IN THE SECOND PAGE, HAS YOUR SIGNATURE;

18   RIGHT?

19   A   YES.

20   Q   GETTING BACK, IT SAYS "ATTACHED, TWO SHEETS."

21         DO YOU SEE THAT?

22   A   YES.

23   Q   IF YOU LOOK AT THE NEXT PAGES, THREE AND FOUR, THERE ARE

24   SOME DRAWINGS.  DO YOU SEE THOSE?

25   A   YES.

1    Q   WITH A LOT OF LITTLE NUMBERS ON THEM.

2    A   RIGHT.

3    Q   AND THERE'S, I GUESS, ANOTHER PAGE, THE NEXT PAGE.

4        DO YOU SEE THOSE?

5    A   YES.

6    Q   DID YOU KNOW WHAT ALL THOSE LITTLE NUMBERS MEANT?

7    A   NO.

8    Q   YOU'RE NOT A MECHANICAL PERSON, SO YOU WOULDN'T KNOW THAT

9    SORT OF THING; RIGHT?

10   A   I'M NOT A MECHANICAL PERSON OR AN ENGINEER.

11   Q   SO LOOKING AT THESE DRAWINGS THEN, ON PAGE 3 AND FOUR, DO

12   YOU HAVE ANY IDEA WHAT THEY ARE SHOWING MECHANICALLY?

13   A   NO, NOT REALLY.

14   Q   I MEAN, YOUR FAMILIARITY WITH THE DOLLS IS, YOU KNOW HOW

15   THEY LOOK; RIGHT?

16   A   RIGHT.

17   Q   AND YOU KIND OF KNOW HOW THEY FUNCTION; RIGHT?

18   A   RIGHT.

19   Q   BUT YOU DON'T KNOW THE DETAILS OF HOW THEY GET IT TO

20   FUNCTION THE WAY IT FUNCTIONS; RIGHT?

21   A   NO.  NOT NECESSARILY.

22   Q   LIKE, FOR EXAMPLE, A HIP JOINT OR A KNEE JOINT OR THAT

23   SORT OF THING, YOU'RE JUST NOT FAMILIAR WITH THAT; RIGHT?

24   A   RIGHT.

25   Q   SO LET'S GO TO YOUR DECLARATION, THEN.  IT SAYS "I'M

1    FAMILIAR WITH ALL THE DESIGNS AS SHOWN IN THE ATTACHED DRAWINGS

2    FROM THE ABOVE IDENTIFIED PATENT APPLICATION."

3        DO YOU SEE THAT?

4    A    YES.

5    Q    YOU WEREN'T REALLY FAMILIAR WITH THOSE ATTACHED DRAWINGS,

6    WERE YOU?

7    A    WELL, I MEAN, I GUESS I WAS FAMILIAR WITH, YOU KNOW, THAT

8    THEY WERE A DRAWING OF, YOU KNOW, WHAT APPEARS TO BE A BRATZ

9    BODY.

10   Q    BUT OTHER THAN LOOKING AT THOSE AND SAYING, WELL, THEY ARE

11   A DRAWING OF A BRATZ DOLL, DID YOU HAVE ANY OTHER FAMILIARITY

12   WITH THOSE DRAWINGS?

13   A    NO.

14   Q    SO WHAT YOU'RE SAYING HERE IS THESE DRAWINGS ARE OF BRATZ

15   DOLLS; RIGHT?

16   A    WELL, I ASSUMED THAT THE BODY AT LEAST WAS A BRATZ BODY;

17   IT LOOKS LIKE ONE.

18   Q    THE HEAD DOESN'T LOOK VERY BRATZ-LIKE, DOES IT?

19   A    NO.

20   Q    WHEN YOU SAY YOU ASSUMED THE BODY WAS A BRATZ BODY, WHY

21   DID YOU MAKE THAT ASSUMPTION?

22   A    IT JUST LOOKS LIKE THE SHAPE OF A BRATZ BODY.

23   Q    LET'S GO TO THE FIRST PAGE OF THE DRAWINGS ON PAGE 3.

24        SO THIS IS WHAT YOU SAID KIND OF LOOKS LIKE A BRATZ

25   BODY; RIGHT?

1    A   RIGHT.

2    Q   AND 22, WHAT'S THAT?  LINE 22, THERE'S A LITTLE NUB THERE.

3    A   WELL, I WOULD ASSUME THAT'S KIND OF THE LITTLE MODE THAT

4    IS ATTACHED TO THE LEG THAT HELPS THE FOOT ATTACH.

5    Q   DO YOU KNOW HOW LONG THAT NUB IS OR ANYTHING LIKE THAT?

6    A   NO.  NOT SPECIFICALLY.

7    Q   DO YOU KNOW ANYTHING ABOUT THE SHAPE OR THE DIMENSION OF

8    THE NUB?

9    A   WELL, NO.  NOT REALLY.

10   Q   YOU HAVE SEEN IT WORK, THOUGH.

11   A   YES.

12   Q   LET'S GO TO THE OTHER DRAWING ON THIS PAGE.

13       YOU SEE THIS FIGURE TWO HERE?

14   A   YES.

15   Q   DO YOU HAVE ANY IDEA WHAT THAT IS?

16   A   IT JUST LOOKS TO BE LIKE AN ENLARGED DRAWING OF MAYBE THAT

17   LITTLE NUB.

18   Q   DO YOU KNOW THAT THE NUB ACTUALLY IS THIS SHAPE, AS

19   OPPOSED TO A DIFFERENT SHAPE?

20   A   WELL, WITHOUT LOOKING AT AN ACTUAL DOLL, I MEAN, IT DOES

21   SORT OF LOOK LIKE WHAT I REMEMBER THEM LOOKING LIKE.

22   Q   YOU REMEMBER THEM LOOKING LIKE THAT FROM DAY ONE WHEN THEY

23   WERE BEING SOLD; RIGHT?

24       MR. NOLAN:  OBJECTION.  LACK OF FOUNDATION, YOUR

25   HONOR.

1          THE COURT:  SUSTAINED.

2          THE WITNESS:  I DON'T KNOW.

3          MR. PRICE:  SUSTAINED MEANS I HAVE TO ASK YOU ANOTHER

4     QUESTION.

5          THE WITNESS:  SORRY.  I WAS NOT LISTENING VERY WELL.

6     BY MR. PRICE:

7     Q   WHEN THE DOLLS FIRST CAME OUT, I MEAN, THIS WAS YOUR BABY;

8     RIGHT?

9          MR. NOLAN:  OBJECTION.

10         MR. PRICE:  THIS IS YOUR CREATION.

11         THE WITNESS:  I MEAN, IT WAS MY IDEA, BUT IT WAS

12    MGA'S BABY.

13    BY MR. PRICE:

14    Q   BUT YOU WERE GETTING THREE PERCENT OF EVERY SALE; RIGHT?

15    A   NOT EVERY SALE.

16    Q   BUT MOST SALES THAT YOU HAD SOMETHING TO DO WITH DESIGNING

17    WORK ON; RIGHT?

18    A   RIGHT.

19    Q   AND YOU GOT THAT WHETHER MGA MADE ANY MONEY OR NOT, RIGHT,

20    RIGHT OFF THE TOP?

21    A   I'M NOT REALLY SURE.  I'M NOT REALLY SURE HOW THE CONTRACT

22    WAS SET UP.

23    Q   WHEN THEY CAME OUT, YOU WERE EXCITED THAT YOUR BRATZ DOLLS

24    WERE BEING SOLD.

25         MR. NOLAN:  OBJECTION TO THE CHARACTERIZATION.

1        THE COURT:  OVERRULED.

2        MR. NOLAN:  ALSO ASSUMES FACTS NOT IN EVIDENCE.

3   BY MR. PRICE:

4   Q   YOU WERE EXCITED WHEN THESE BRATZ DOLLS FIRST CAME OUT,

5   WEREN'T YOU?

6   A   WELL, SURE.

7   Q   SO YOU PROBABLY LOOKED AT THEM.

8   A   WELL, YEAH, I LOOKED AT THEM.

9   Q   YOU LOOKED AT THEM.  THERE'S BEEN EVIDENCE THAT, FOR

10  EXAMPLE, THEY WERE SOLD IN THE UNITED STATES IN MID 2001.

11       YOU AGREE WITH THAT.

12  A   YES.

13  Q   AND YOU SAW THEM WHEN THAT HAPPENED; RIGHT?

14  A   YES.

15  Q   AND YOU LOOKED AT THEM; RIGHT?

16  A   SURE.

17  Q   OKAY.

18       CAN YOU TELL ME WHAT THE NUB LOOKED LIKE ON THE LEG?

19  A   NOT REALLY.  I MEAN, THAT WAS ONE OF THOSE THINGS, IT WAS,

20  LIKE, OKAY, IT WORKS.  I DIDN'T REALLY PAY TOO MUCH ATTENTION

21  TO THAT.

22  Q   AND THAT'S TRUE WHEN YOU SAW THE LATER BRATZ DOLLS AS

23  WELL; RIGHT?  YOUR ATTITUDE WAS 'IT WORKS, I'M NOT GOING TO PAY

24  TOO MUCH ATTENTION TO IT.'

25  A   WELL, YEAH.

1    Q    SO YOU DON'T KNOW WHETHER THE NUB ON THE LEG IN 2001 OR

2    2002 OR 2003 OR 2004 LOOKED LIKE THIS NUB IN THIS DRAWING;

3    RIGHT?

4    A    NO.  I COULDN'T SAY THAT POSITIVELY.

5    Q    SO WHEN WE GO BACK TO YOUR DECLARATION AND WE GO TO THAT

6    THIRD PARAGRAPH, YOU SAY "I'M FAMILIAR WITH THE DOLL DESIGNS."

7    YOU SEE WHERE IT SAYS "THESE DOLLS HAVE STRAP-TYPE SHOES."

8        DO YOU SEE THAT?

9    A    YES.

10   Q    WERE YOU REFERRING TO SOME TECHNICAL TERM WHEN YOU SAY

11   STRAP-TYPE SHOE, OR ARE YOU TALKING ABOUT JUST THE WAY A LAY

12   PERSON WOULD DESCRIBE A STRAP-TYPE SHOE?

13   A    I THINK I WAS JUST THINKING OF THE, YOU KNOW, THE

14   AESTHETIC IDEA THAT, YOU KNOW, THE SHOES HAD A STRAP ON IT.

15   Q    AND THEN "THE DOLLS HAVE A SNAP-ON FEATURE AT ABOUT THE

16   ANKLE OF THE DOLL SO THAT THE DIFFERENT FEET GEAR MAY BE

17   MOUNTED ON THE DOLL."

18       DO YOU SEE THAT?

19   A    YES.

20   Q    AND THERE YOU'RE TALKING ABOUT THAT NUB WHICH GOES INTO

21   THE SHOE; RIGHT?

22   A    YES.

23   Q    AND AGAIN YOU'RE TALKING, YOUR LAYMEN'S VIEW, YOU SAW THIS

24   NUB AND THE SHOE WOULD SNAP INTO IT; CORRECT?

25   A    RIGHT.

1    Q   YOU DIDN'T KNOW THE SPECIFIC DIMENSIONS OF THE SHAPES AND

2    THE NUB AND THE HOLE IN THE SHOE, OR ANYTHING LIKE THAT.

3    A   NO.

4    Q   AND THEN IT SAYS "REGARDING STRAP-TYPE SHOES AS DISCLOSED

5    IN THE PATENT APPLICATION, THE COLORING OF THE SKIN TONE ON THE

6    FEET ARE MATCHED TO THE COLORING OF THE LOWER LEG OF THE

7    DOLLS"; RIGHT?

8    A   RIGHT.

9    Q   AND DID YOU MEAN ANYTHING TECHNICAL BY THAT, OR DID YOU

10   MEAN THAT THE SKIN ON THE FOOT IS THE SAME AS THE SKIN ON THE

11   DOLLS?

12   A   RIGHT.  I MEANT THE SKIN ON THE FOOT WAS THE SAME AS THE

13   SKIN ON THE DOLL.

14       MR. PRICE:  YOUR HONOR, AT THIS POINT MAY I SHOW HIM

15   THE DOLL?

16       THE COURT:  YOU MAY PROCEED, COUNSEL.

17       MR. PRICE:  EXHIBIT 17551 IS IN EVIDENCE, BUT I DON'T

18   WANT TO RIP IT UP.  I'D LIKE TO MARK FOR IDENTIFICATION

19   EXHIBIT 504, WHICH IS EASIER ACCESS TO OPENING.

20       THE COURT:  YOU MAY PROCEED.

21   BY MR. PRICE:

22   Q   DO YOU RECOGNIZE THIS AS A JADE DOLL?

23   A   YES.

24   Q   AND YOU CAN LOOK AT THE BOTTOM AND DETERMINE WHEN THAT

25   DOLL WAS SOLD, CORRECT, OR WHEN IT CAME TO THE MARKET?

1    A   IT SAYS "2001."

2    Q   IF YOU WOULD LOOK AT THAT JADE DOLL.  DO YOU THINK YOU

3    MIGHT BE ABLE TO TAKE IT OUT OF THERE?

4    A   (WITNESS COMPLIES. )

5        MR. PRICE:  BY THE WAY, YOUR HONOR, I'D MOVE

6    EXHIBIT 504 INTO EVIDENCE.

7        THE COURT:  ANY OBJECTION.

8        MR. NOLAN:  NO OBJECTION.

9        THE COURT:  IT'S ADMITTED.

10       (EXHIBIT 504 IS RECEIVED.)

11   BY MR. PRICE:

12   Q   LET'S GO BACK TO YOUR DECLARATION HERE; 502, PAGE 1.

13       DOES THAT JADE DOLL HAVE STRAP-TYPE SHOES?

14   A   YES, SHE DOES.

15   Q   COULD YOU SHOW THE JURY WHAT YOU'RE TALKING ABOUT WHEN YOU

16   SAY STRAP-TYPE SHOES.

17   A   IT WOULD HAVE BEEN THESE.

18   Q   AND, IN FACT, LOOK AT THAT SPECIFIC STRAP-TYPE SHOE.

19       DID THAT LOOK LIKE ACTUALLY ONE OF THE DRAWINGS IN

20   YOUR DECLARATION, IF YOU LOOK AT THE FOURTH PAGE ON FIGURE

21   THREE?

22   A   WELL, NO.  IT'S DIFFERENT.

23   Q   OKAY.

24       THE AESTHETIC DESIGN IS DIFFERENT.

25   A   YES.

Unsigned                                              Page  2592

1    Q    LET'S GO TO YOUR DECLARATION.

2        THAT'S A STRAP-TYPE SHOE; RIGHT?

3    A    YES.

4    Q    AND IT SAYS "THE DOLLS HAVE A SNAP-ON FEATURE ABOUT THE

5    ANKLES OF THE DOLL SO THAT THE DIFFERENT FOOT GEAR MAY BE

6    MOUNTED ON THE DOLL."

7    A    RIGHT.

8    Q    IS THAT, ON THAT DOLL, THIS SNAP-ON FEATURE ABOUT THE

9    ANKLE THAT YOU'RE TALKING ABOUT?

10   A    YES.

11   Q    COULD YOU SHOW THE JURY THAT SNAP-ON FEATURE.

12   A    THE FOOT SNAPS OFF, LIKE SO.

13   Q    SO THAT SHOE, FOR EXAMPLE, YOU COULD SNAP THAT ON AND SNAP

14   ANOTHER SHOE ON; RIGHT?

15   A    RIGHT.

16   Q    IN FACT, IN THE LATER BRATZ DOLLS, CAN YOU TAKE THE SHOES

17   OFF THEM AND ALSO SNAP IT ONTO THE EARLIER BRATZ DOLLS?

18   A    I BELIEVE SO, YES.

19   Q    AND THEN IT SAYS REGARDING THOSE STRAP-TYPE SHOES, "THE

20   COLORING OF THE SKIN TONE ON THE EXPOSED AREA OF THE FEET ARE

21   MATCHED TO THE COLORING OF THE LOWER LEG OF THE DOLLS."

22       IS THAT TRUE WITH THIS JADE 2001 DOLL?

23   A    YES.

24   Q    COULD YOU SHOW THE JURY WHAT YOU MEAN BY THAT AND WHAT YOU

25   MEANT IN YOUR DECLARATION.

1    A   THIS IS SUPPOSED TO BE SKIN RIGHT HERE, AND IT'S SUPPOSED

2    TO MATCH HER SKIN TONE.

3    Q   SO FROM YOUR PERSPECTIVE, THAT IS, AS THE DESIGNER, THIS

4    PARAGRAPH DESCRIBES PRETTY ACCURATELY THAT DOLL, EXHIBIT 504;

5    CORRECT?

6    A   YEAH.  MORE OR LESS, I SUPPOSE.

7    Q   EVERY DETAIL WE'VE GONE THROUGH WHERE YOU DESCRIBE THE

8    DOLLS, IT MATCHES THIS DOLL IN 2001; RIGHT?

9    A   WELL, YES.

10   Q   YOU UNDERSTAND THAT IN THIS CASE, MR. BRYANT, THAT THE

11   DATES THAT YOU DID THE DRAWINGS IS CRITICAL; RIGHT?

12   A   YES.

13   Q   DO YOU REMEMBER WHEN I STARTED YOUR EXAMINATION, WE TALKED

14   ABOUT WHEN YOU WORKED AT MATTEL AND HOW YOU STARTED TEMPORARILY

15   IN SEPTEMBER OF '95 AND WORKED AT MATTEL UNTIL APRIL 29, 1998

16   AND THEN YOU STARTED BACK AGAIN IN JANUARY 4, 1999.

17   A   RIGHT.

18   Q   AND THEN YOU QUIT OCTOBER 19, 2000.

19   A   RIGHT.

20   Q   AND YOU UNDERSTAND THAT IN THIS CASE, THAT YOU HAVE TAKEN

21   THE POSITION THAT BECAUSE YOU DID SOME ORIGINAL BRATZ DRAWINGS

22   IN THIS TIME FRAME, IN 1998, WHEN YOU WEREN'T WORKING FOR

23   MATTEL, THAT THOSE DRAWINGS DO NOT BELONG TO MATTEL; IS THAT

24   CORRECT?

25   A   YES.

1   Q   SO ONE OF THE ISSUES HERE IS DID YOU REALLY DO THEM IN

2   1998 OR DID YOU DO THEM IN 1999?

3       YOU UNDERSTAND THAT; CORRECT?

4   A   YES.

5   Q   AND YOU ALSO UNDERSTAND THAT THE GOOD ANSWER FOR MGA AND

6   FOR YOU IS 1998; CORRECT?

7   A   WELL, THAT'S THE TRUTH.

8   Q   WELL, IT'S TRUE, THOUGH, HOWEVER, SIR, THAT IF MGA TELLS

9   YOU TO TAKE THE POSITION THAT SOMETHING IS DONE ON A CERTAIN

10  DATE SO THEY CAN ACQUIRE CERTAIN RIGHTS, YOU'RE GOING TO SAY

11  THAT WHETHER IT'S THE TRUTH OR NOT?

12  A   NO.

13  Q   LOOK AT YOUR DECLARATION, EXHIBIT 502.

14  A   RIGHT.

15  Q   YOU KNEW FROM READING THE LETTER FROM THE ATTORNEY THAT IN

16  TERMS OF THIS PATENT APPLICATION, 2002 IS A BAD -- 2001 IS A

17  BAD RELEASE DATE, AND 2002 IS A GOOD ONE; RIGHT?

18  A   WELL, THIS WAS ONLY DISCUSSED WITH ME VERY BRIEFLY, SO I

19  DON'T REALLY KNOW THAT AT THAT TIME I REALLY UNDERSTOOD WHAT IN

20  FACT THEY WERE TRYING TO -- WHAT THEY WERE TRYING TO

21  ACCOMPLISH.

22  Q   WELL, WHAT YOU DID UNDERSTAND, IF YOU LOOK AT

23  EXHIBIT 11898, THE FIRST PAGE, WHAT YOU DID UNDERSTAND IS THAT

24  YOU WOULD SAY UNDER OATH THAT DOLLS WITH THOSE FEATURES THAT WE

25  JUST WENT THROUGH -- IF YOU WOULD SAY THAT WASN'T DONE UNTIL

1    2002, YOU KNEW THAT MGA WOULD GET A GRACE PERIOD; RIGHT?

2    A   AGAIN, I HAD VERY LITTLE UNDERSTANDING OF THIS DOCUMENT.

3    Q   LETS GO BACK TO YOUR DECLARATION, THEN, THE FIRST PAGE.

4        YOU KNOW FOR A FACT THAT BRATZ DOLLS HAVE THE STRAP-

5    TYPE SHOES AND THE DOLLS HAVE A SNAP-ON FEATURE AT ABOUT THE

6    ANKLE SO THAT DIFFERENT FOOT GEAR MAY BE MOUNTED ON THE DOLL;

7    WHERE THE STRAP-TYPE SHOES, THE COLORING OF THE SKIN TONE ON

8    THE EXPOSED AREA OF THE FEET ARE MATCHED TO THE COLORING OF THE

9    LOWER LEGS OF THE DOLL -- YOU KNEW THAT DOLLS WITH ALL OF THOSE

10   FEATURES WERE SOLD IN 2001.

11   A   YES.

12   Q   THAT WAS YOUR UNDERSTANDING AS TO THE FIRST RELEASE DATE

13   FOR DOLLS WITH EVERY FEATURE THAT'S IN PARAGRAPH THREE; RIGHT?

14       MR. NOLAN:  OBJECTION, YOUR HONOR WITH RESPECT TO

15   FOUNDATION.

16       MR. PRICE:  NO SPEAKING OBJECTIONS, YOUR HONOR.

17       MR. NOLAN:  FOUNDATION; IT ALSO MISSTATES THE

18   DOCUMENT.

19       THE COURT:  OVERRULED.

20       THE WITNESS:  I MEAN, YEAH.  AS FAR AS THAT PARAGRAPH

21   GOES, I THINK I UNDERSTOOD THAT.

22   BY MR. PRICE:

23   Q   AND BECAUSE OF THE OBJECTION, I JUST WANT TO MAKE SURE

24   THAT WE UNDERSTAND.

25       YOU UNDERSTOOD THAT WHAT WAS DESCRIBED IN

1    PARAGRAPH THREE, WERE RELEASED IN 2001.

2    A   YES.  I THINK I UNDERSTOOD THAT.

3    Q   NOW LET'S GO TO THE SECOND PAGE OF YOUR DECLARATION, THEN.

4        HERE YOU SAY "I WAS ACTIVELY INVOLVED WITH THE

5    RELEASE OF THE BRATZ DOLLS OF THE CONFIGURATION AS SET FORTH IN

6    PARAGRAPH THREE ABOVE."

7        WAS THAT STATEMENT TRUE, THAT YOU WERE ACTIVELY

8    INVOLVED IN THE RELEASE OF THE BRATZ DOLLS AS DESCRIBED IN

9    PARAGRAPH THREE?

10   A   YES.

11   Q   AND THEN YOU SAID, UNDER PENALTY OF PERJURY, UNDER OATH,

12   "THIS RELEASE DID NOT OCCUR UNTIL THE FALL OF THE YEAR 2002."

13       DO YOU SEE WHERE YOU SAID THAT?

14   A   YES.

15   Q   THAT'S A FALSE STATEMENT, ISN'T IT?

16   A   WELL, LOOKING BACK AT IT NOW, YOU KNOW, I SUPPOSE THAT

17   MAYBE IT IS.  BUT AGAIN, I HAD VERY LIMITED KNOWLEDGE OF THIS

18   DOCUMENT.  IT WASN'T REALLY EXPLAINED TO ME WHY THEY WERE

19   ASKING FOR IT, YOU KNOW, AND I REMEMBER JUST GOING THROUGH THIS

20   DOCUMENT RATHER QUICKLY.

21   Q   YOU MADE THIS STATEMENT -- LET'S GO BACK.

22       YOU KNOW THAT STATEMENT IS FALSE; CORRECT?  THE

23   STATEMENT THAT THE DOLLS, THE CONFIGURATION AS SET FORTH IN

24   PARAGRAPH THREE, THAT THE RELEASE DIDN'T OCCUR UNTIL THE FALL

25   OF 2002.  YOUR UNDERSTANDING IS THAT'S FALSE.

1  A   WELL, I MEAN, IT SEEMS LIKE IT, YES.

2  Q   AND YOU WERE MAKING THIS STATEMENT TO THE FEDERAL PATENT

3  OFFICE; RIGHT?

4  A   I REALLY DIDN'T KNOW THAT.

5  Q   WELL, LET'S GO TO THE FIRST PAGE HERE.

6      YOU SEE IT SAYS, "MAIL STOP, NON FEE AMENDMENT,

7  COMMISSIONER FOR PATENTS, P.O. BOX 1450, ALEXANDRIA, VIRGINIA,

8  22313-1450."

9      DO YOU SEE THAT?

10 A   YES.

11 Q   YOU KNEW THIS WAS GOING TO THE PATENT OFFICE; RIGHT?

12 A   I REALLY DON'T RECALL HAVING THAT KNOWLEDGE.

13 Q   WELL, ASSUMING YOU READ THIS AT THE TIME BEFORE SIGNING IT

14 UNDER PENALTY OF PERJURY, YOU WOULD HAVE KNOWN THEN IT WAS

15 GOING TO THE PATENT OFFICE; RIGHT?

16 A   NO.  NOT NECESSARILY.

17 Q   WHY NOT NECESSARILY?  WHY, IF YOU GOT THIS, YOU WERE ASKED

18 TO SIGN IT UNDER PENALTY OF PERJURY, WHY WOULD YOU NOT HAVE

19 KNOWN IT WAS GOING TO THE PATENT OFFICE?

20 A   WELL, I DON'T REALLY THINK, FIRST OF ALL, THAT I

21 UNDERSTOOD THIS WAS UNDER PENALTY OF PERJURY.  YOU KNOW, AT

22 THIS TIME I WAS NOT FAMILIAR WITH THESE TYPE OF DECLARATIONS,

23 AND I, YOU KNOW -- IT WAS JUST SOMETHING THAT I WAS ASKED TO

24 SIGN.  AND, YOU KNOW, I TRIED TO UNDERSTAND IT AS BEST I COULD.

25 Q   SO YOU DIDN'T UNDERSTAND THAT BEFORE YOU PUT YOUR

1    SIGNATURE THERE, THAT YOU WERE DECLARING THAT "ALL OF THE

2    STATEMENTS MADE HEREIN OF MY OWN KNOWLEDGE ARE TRUE AND THAT

3    ALL STATEMENTS MADE ON INFORMATION AND BELIEF ARE BELIEVED TO

4    BE TRUE, AND, FURTHER, THAT THESE STATEMENTS WERE MADE WITH THE

5    KNOWLEDGE THAT WILLFUL FALSE STATEMENTS, THE LIKE, SO MADE ARE

6    PUNISHABLE BY FINE OR IMPRISONMENT OR BOTH UNDER SECTION 1001

7    OF TITLE 18 OF THE UNITED STATES CODE, AND THAT SUCH WILLFUL

8    FALSE STATEMENTS MAY JEOPARDIZE THE VALIDITY OF THE APPLICATION

9    OR ANY PATENT APPLICATION ISSUING THEREON."

10       YOU READ THAT BEFORE YOU SIGNED IT; RIGHT?

11    A   YOU KNOW, YEAH, I THINK I SKIMMED OVER IT.

12    Q   AND SO AT LEAST AS OF THE DATE OF THIS DECLARATION, YOU

13    WERE WILLING TO STATE UNDER OATH A FALSE DATE SO THAT MGA COULD

14    HAVE PROPERTY RIGHTS, PATENT RIGHTS; YOU WERE WILLING TO DO

15    THAT; RIGHT?

16    A   YOU KNOW, I DON'T RECALL AT THAT TIME BELIEVING THAT THIS

17    WAS A FALSE STATEMENT.  YOU KNOW, LOOKING AT IT NOW, PERHAPS IT

18    WAS.  BUT AT THAT TIME, NO, I DID NOT BELIEVE THAT.

19    Q   IS THERE ANY REASON YOU BELIEVE THAT -- AT THE TIME YOU

20    SIGNED THIS STATEMENT, YOU KNEW THAT THE DOLLS, WHICH HAD ALL

21    OF THE FEATURES DESCRIBED IN PARAGRAPH THREE, HAD BEEN RELEASED

22    IN 2001; RIGHT?

23    A   YEAH.  I HAD A GENERAL UNDERSTANDING OF THAT.

24    Q   SO AT THE TIME YOU SIGNED THIS STATEMENT, YOU KNEW THAT

25    WHAT YOU SAID IN PARAGRAPH FOUR WAS FALSE, WHICH IS THAT THEY

1    WEREN'T RELEASED UNTIL 2002; RIGHT?

2    A   NO, SIR.  I DON'T THINK I HAD THAT UNDERSTANDING.

3    Q   IS THAT BECAUSE YOU JUST DIDN'T READ PARAGRAPH FOUR

4    CAREFULLY?

5    A   YOU KNOW, I DON'T THINK I READ THIS DECLARATION ALL THAT

6    CAREFULLY.

7    Q   SO YOUR TESTIMONY IS THAT INSTEAD OF MAKING A FALSE

8    STATEMENT THAT YOU'RE WILLING TO MAKE ANY STATEMENT THAT MGA

9    ASKED YOU TO MAKE WITHOUT EVEN READING IT CAREFULLY SO THAT

10   THEY COULD GET PATENT RIGHTS.

11   A   WELL, YOU KNOW, I DON'T RECALL THAT I NECESSARILY FELT

12   THAT WAY EITHER.  AGAIN, IT WAS JUST SOMETHING THAT THEY ASKED

13   ME TO SIGN AND, YOU KNOW, I BELIEVED AT THE TIME THAT, YOU

14   KNOW, THERE WAS NOTHING WRONG WITH IT.

15       IF I HAD BELIEVED THAT THERE WAS SOMETHING WRONG WITH

16   IT, THEN I WOULDN'T HAVE SIGNED IT.

17       THE COURT:  COUNSEL, WE'RE AT LUNCHTIME.

18       WE'LL SEE THE JURY AT 1:30.

19

20

21

22

23

24   / / /

25   / / /

1                    CERTIFICATE

2

3      I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED

       STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF

4      THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE

       ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

5      CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

       THE UNITED STATES.

6

7

       _____        _____

8      THERESA A. LANZA, RPR, CSR        DATE

       OFFICIAL COURT REPORTER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Unsigned                                    Page  2601