1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                       ---

4         HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                       ---

6    MATTEL, INC.,          : PAGES 2818 - 2935

                            :

7         PLAINTIFF,        :

                            :

8         VS.               : NO. ED CV04-09049-SGL

                            : [CONSOLIDATED WITH

9    MGA ENTERTAINMENT, INC.,    : CV04-9059 & CV05-2727]

     ET AL.,                :

10                          :

          DEFENDANTS.       :

11

12

13

14

15         REPORTER'S TRANSCRIPT OF PROCEEDINGS

16             RIVERSIDE, CALIFORNIA

17             TUESDAY, JUNE 17, 2008

18             JURY TRIAL - DAY 14

19             AFTERNOON SESSION

20

21

22             MARK SCHWEITZER, CSR, RPR, CRR

               OFFICIAL COURT REPORTER

23             UNITED STATES DISTRICT COURT

               181-H ROYBAL FEDERAL BUILDING

24             255 EAST TEMPLE STREET

               LOS ANGELES, CALIFORNIA 90012

25             (213) 663-3494

```
 1    Appearances of Counsel:
 2
 3    On Behalf of Mattel:
 4      Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
          By John B. Quinn, Esq.
 5        B. Dylan Proctor, Esq.
          Michael T. Zeller, Esq.
 6        Harry Olivar, Esq.
          John Corey, Esq.
 7        Diane Hutnyan, Esq.
          William Price, Esq.
 8      855 South Figueroa Street
        10th Floor
 9      Los Angeles, CA 90017
        (213) 624-7707
10
11
12    On Behalf of MGA Entertainment:
13      Skadden, Arps, Slate, Meagher & Flom LLP
          By Thomas J. Nolan, Esq.
14        Carl Alan Roth, Esq.
          Jason Russell, Esq.
15        Lauren Aguiar, Esq.
          David Hansen, Esq.
16        Matthew Sloan, Esq.
          Robert Herrington, Esq.
17      300 South Grand Avenue
        Los Angeles, CA 90071-3144
18      (213) 687-5000
19    On Behalf of Carter Bryant:
20      Keker & Van Nest
          By Christa Anderson, Esq.
21      Michael H. Page, Esq.
        710 Sansome Stret
22      San Francisco, CA  94111-1704
        (415) 391-5400
23
24
25
```

1          I N D E X

2

3    CARTER BRYANT, PREVIOUSLY SWORN...................... 2821

4    CROSS-EXAMINATION (CONTINUED) BY MR. NOLAN: ......... 2821

5

6

7          E X H I B I T S

8

9    (Exhibit 15471-266 received.)........................ 2846

10   (Exhibit 15471-276 received.)........................ 2847

11   (Exhibit 15471-124 received.)........................ 2848

12   (Exhibit 15439 received.)............................ 2850

13   (Exhibit 18544 for identification.).................. 2858

14   (Exhibit 18545 for identification.).................. 2862

15   (Exhibits 18544 and 18545 received.)................. 2863

16   (Exhibit 15609 received.)............................ 2894

17   (Exhibits 18460-001 and 15601-001 received.)......... 2897

18   (Exhibit 15243-001 received.)........................ 2898

19   (Exhibit 18486 received.)............................ 2899

20   (Exhibit 11167 received.)............................ 2901

21   (Exhibit 18494 received.)............................ 2903

22   (Exhibits 18497 and 18498 received.)................. 2911

23

24

25

1       Riverside, California; Tuesday, June 17, 2008

2              1:47 P.M

3           (WHEREUPON THE JURY ENTERS.)

4        THE COURT:  Mr. Bryant, members of the jury.

5        Mr. Nolan, you may proceed.

6           CARTER BRYANT, PREVIOUSLY SWORN.

7           CROSS-EXAMINATION (CONTINUED)

8     BY MR. NOLAN:

9     Q.  Mr. Bryant, shortly before our lunch hour, I was asking

10    you to describe to the jury in your own words your concept of

11    Bratz.

12           Do you recall that?

13    A.  Yes.

14    Q.  Do you have in front of you the white notebook that has

15    exhibits in it, and if so, I'd ask you to turn to Trial

16    Exhibit No. 00709.

17    A.  Okay.

18    Q.  And do you recognize what I've marked as 709?

19    A.  Yes.

20    Q.  And what is it?

21    A.  This was a little blurb that I wrote right when I was

22    first thinking about the Bratz and just kind of gave a little

23    bit of a description of each one.  Each one of the

24    characters.

25    Q.  Do you recognize the handwriting on Exhibit 709?

1    A.  Yes.

2    Q.  Whose handwriting is it?

3    A.  It's mine.

4    Q.  And when did you write this?

5    A.  This was written in 1998.

6    Q.  Do you recall approximately the month?

7    A.  I believe this was sometime around August.

8    Q.  So you're not working at Mattel; correct?

9    A.  Right.

10   Q.  And you're not under employment with Mattel; right?

11   A.  That's right.

12        MR. NOLAN:  Your Honor, we'd offer Exhibit 709 if

13   it's not in.

14        It's in evidence, your Honor.  May we publish it?

15        THE COURT:  You may.

16        MR. NOLAN:  Thank you.

17   Q.  So let me just walk through this, if you don't mind,

18   with me, Mr. Bryant.  Again, this is all your handwriting;

19   correct?

20   A.  Yes.

21   Q.  And again, it says meet the Bratz -- okay.  Can you read

22   this?

23   A.  It's not very legible.

24        Okay.  "Meet the Bratz.  They are the cool girls

25   from your school.  Four best friends with totally

1    transformable looks.  Simply pop off their hair and shoes and

2    trade for a new look.  Each doll comes with two pop-off wigs

3    and two pairs of shoes plus two hip fashions."

4          Then it says:  "Meet Zoe, also known as Angel.

5    She's the queen of cool in class in her short dark brown hair

6    and funky stompin' sneaks.  At night, she likes to go long

7    and blonde, with a skirt and sandals for a sweeter look."

8          Then it says:  "Meet Lupe, also known as Princess.

9    She's the Hispanic girl with lotsa 'tude.  For school, it's

10   casual in wide-leg khakis and sweatshirt and a fun red updo.

11   At night, long brown braids and a mini do the trick."

12         Then it says:  "Meet Hallidae, known as Hip Hop.

13   She's got the beat, ultra trendy street-wear 'n' braids for

14   hittin' the books, and on date night, it's a sassy short

15   dress and totally new do."

16         Then it says:  "Meet Jade, also known as Little

17   Star.  She's got the lock on far-out fashion.  Twisty black

18   hair with fun blue streaks for school zone.  And for tearing

19   it up with friends on the weekends, it's fantasy time in

20   light blue hair, short skirt, and boots."

21   Q.  So it says light blue hair?

22   A.  I guess so.

23   Q.  Okay.  This idea in concept for Bratz was conceived by

24   you in around August of 1998.  Is that your testimony?

25         MR. PRICE:  Objection.  Leading and asked and

Unsigned                                    Page  2823

1     answered.

2          THE COURT:  Sustained.

3     Q.  BY MR. NOLAN:  Did your original concept for the Bratz

4     characters change from the time you conceived of it to the

5     pitch meeting at MGA?

6     A.  No.

7     Q.  At any time during the period that you were employed at

8     Mattel in the second stint, did you ever present your idea

9     for Bratz to Mattel?

10    A.  No.

11    Q.  And why not?

12         MR. PRICE:  Objection.  Irrelevant.

13         THE COURT:  Overruled.

14         THE WITNESS:  Well, I was working in the Barbie --

15         THE COURT:  Counsel, let me see you at sidebar,

16    please.

17         (SIDEBAR CONFERENCE HELD.)

18         THE COURT:  I can see the relevance of asking about

19    what he did with Mattel for purposes of timing and chronology

20    here.  What I don't want to get into is Mattel bashing.

21         MR. NOLAN:  I understand that.  And I accept that,

22    your Honor.  I actually was going to a different idea, and

23    that is that they elicited testimony under the guise of a

24    party admission by Mercedeh Ward, who is not a witness here,

25    but they had Rachel Harris testify to a statement that

1    Mercedeh Ward said that he presented it to Mattel while he

2    was at Mattel.

3         It came in over our objection.  Because we had a

4    discussion that it could have been a party admission.  And

5    since they opened that, because I was aware of the Court's

6    ruling, but they opened it up, and now I think I should be

7    able to ask him why.  It's not going to be Mattel bashing.

8    It's just going to be --

9         THE COURT:  My concern is the confusion of the jury

10   issue.  Because if he testifies that Mattel would never have

11   run with this thing and Mattel didn't want to do this, I --

12   that's my concern pursuant to the motion in limine ruling.

13        Let me hear you address the concern he's raising.

14        MR. PRICE:  It's undisputed we didn't present it.

15   We're not presenting it as a fact that he did.  That will

16   never come up before this jury.  Both sides would say he did

17   not present it to Mattel.

18        MR. NOLAN:  I'm a little curious, then, as to why

19   they elicited that testimony and argued to you that it was a

20   party admission.

21        MR. PRICE:  The part that came in was that he said

22   that he was working at Mattel and that he knew Paula Garcia,

23   et cetera.  She added to the effect, and I don't know if it

24   was in our examination, that Paula said that he did or --

25        MS. AGUIAR:  It wasn't Paula.

1          MR. ZELLER:  It was Mercedeh.

2          MR. PRICE:  And the follow-up question from us was

3     well, wait a minute, you don't know if that's true or not.

4     Because we're not saying that he did that.

5          THE COURT:  Why don't we do this.  Instead of

6     focusing on Mattel, let's focus on a particular individual,

7     and you can rebut the particular individual as opposed to

8     this whole, you know, did you ever present it to Mattel.

9     Because that's the part that I think runs the danger of

10    raising the issues that are just so far afield, but you're

11    still able to rebut anything that they said with respect to

12    Mercedeh Ward.  Let's focus on the person and not the --

13         MR. PRICE:  If he wanted to tell the jury, the

14    parties will stipulate that he did not present it to Mattel.

15         MS. AGUIAR:  Isn't it relevant why did he pitch it

16    to MGA?  Can he be asked why did he pitch it to MGA?

17    Verdicts, why he was pursuing -- it's a question that I think

18    the jury is going to have in their mind, and I think there

19    are some things that we've gotten into in 1-A that could be

20    classified as far afield.  This one I frankly don't think is

21    far afield.  I mean --

22         THE COURT:  How is it relevant?  I understand the

23    curiosity factor.

24         MS. AGUIAR:  Well, I think the jury is going to be

25    wondering if he's employed by Mattel, and they are saying

1    that he didn't pitch it to them, but he did want to pitch his

2    idea, and he went to pitch it to MGA, why can we not get into

3    that, just that very next question, and maybe what we can do

4    is -- I mean, I don't know how we would do this.  It's not

5    Mattel bashing.  It's a question of because I had an

6    understanding at the time that it wouldn't fly there, and so

7    I pitched it somewhere where it would.  I think that's a

8    relevant fact.

9         THE COURT:  Relevant to what?

10        MS. AGUIAR:  I think it's relevant to his

11    credibility.  I think it's relevant to why he did what he

12    did.  We're examining everything about what Carter Bryant did

13    in this time period and why he did it.  And I just think in

14    the range of --

15        THE COURT:  Let me think about that.  We're not

16    there right now.  You can go ahead and ask him about the

17    particular person that they inquired into without using the

18    big Mattel -- the M word.

19        MR. NOLAN:  So I can lose the little M?

20        THE COURT:  Very good.  Thank you.

21        (CONCLUSION OF SIDEBAR CONFERENCE.)

22        THE COURT:  Counsel, you may proceed.

23        MR. NOLAN:  Thank you.

24    Q.  Mr. Bryant, do you know somebody by the name of Mercedeh

25    Ward?

1    A.  Yes.

2    Q.  And how do you know her?

3    A.  She was an employee at Mattel when I worked at Mattel my

4    first stint.

5    Q.  And did you ever see her subsequently after you left

6    Mattel?

7    A.  Yes.

8    Q.  And was that in connection with your consulting

9    arrangement with MGA?

10   A.  Yes.

11   Q.  Was Mercedeh Ward also at some point -- was Mercedeh

12   Ward employed at MGA at some point in time?

13   A.  Yes.

14   Q.  Did you ever tell Mercedeh Ward that you had presented

15   the Bratz idea to Mattel?

16   A.  No.

17   Q.  Have you told anybody at any time anywhere that you

18   presented the Bratz concept and drawings to Mattel?

19   A.  No.

20   Q.  You were working the second time at Mattel in Barbie

21   Collectibles; correct?

22   A.  Yes.

23   Q.  Now, can I go back to Exhibit 709 for a moment.  That's

24   the description of Bratz.  You read for us your description

25   of the Bratz concept; correct?

1    A.  Yes.

2    Q.  And I was curious, when you were working on Barbie

3    Collectibles, did any of these same ideas apply to the Barbie

4    Collectibles you were working on?

5    A.  No.

6    Q.  Do you know Lily Martinez?

7    A.  Yes.

8    Q.  And when did you meet Lily Martinez?

9    A.  I met her my second stint at Mattel.

10   Q.  And how did you meet Ms. Martinez?

11   A.  I don't recall exactly.  I think she sat by my roommate,

12   Elise Cloonan.

13   Q.  Did you ever heard of a project by the name of Toon

14   Teens?

15   A.  Yes.

16   Q.  How did you come to know a project by the name of Toon

17   Teens?

18   A.  I believe it was set out on a big table kind of in a

19   central work area over in one of the other design areas.  And

20   I remember walking by and seeing it.

21   Q.  Do you have in front of you Exhibit No. 275?  It may be

22   in the black notebook.  I don't think it's up there.

23        It is in evidence, your Honor.  If I could publish

24   that.

25        THE COURT:  You may.

Unsigned                                            Page  2829

1          MR. NOLAN:  Thank you.

2     Q.  Not probably the best color, but do you recognize this,

3     Mr. Bryant?

4     A.  Yes.

5     Q.  And what is that?

6     A.  I think that was the Toon Teens -- I don't know what

7     they were called, but I think that was the concept.

8     Q.  And that's Lily Martinez's concept?

9     A.  As far as I know, yes.

10    Q.  Okay.  Now, at the time -- and you saw this while you

11    were at Mattel; correct?

12    A.  Yes.

13    Q.  Had you already conceived of your idea of Bratz before

14    you saw that?

15    A.  Yes.

16    Q.  Were you influenced in any way by Lily Martinez's Tune

17    Teen projects in developing the Bratz characters?

18    A.  No.

19    Q.  Did you have an understanding as to what the market,

20    target market would be for Toon Teens in terms of, let's say,

21    age?

22          MR. PRICE:  Objection.  Lack of foundation.

23          THE COURT:  Sustained.

24    Q.  BY MR. NOLAN:  Did you ever have a conversation with

25    Lily Martinez about Toon Teens?

1    A.  We spoke briefly about it.

2    Q.  And did you say words to the effect that you liked them

3    or that you didn't like them?

4    A.  No.  I remember I told her that I liked them.

5    Q.  Now, other than this display of Toon Teens, do you

6    recall ever seeing any drawings of Toon Teens?

7    A.  Not that I can remember.

8         MR. NOLAN:  Well, could I place on the screen, and

9    it's in evidence, your Honor, Exhibit No. 276?

10        THE COURT:  You may.

11   Q.  BY MR. NOLAN:  Again, is this just another photograph of

12   the display that you saw?

13   A.  I think so, yes.

14   Q.  The Toon Teens that are depicted in this photograph seem

15   to be like prototypes of the doll itself; correct?

16        MR. PRICE:  Objection.  Leading.

17        THE COURT:  Sustained.

18   Q.  BY MR. NOLAN:  Well, do you know what those objects are

19   with respect to Toon Teens?

20        MR. PRICE:  I'll object.  Foundation.

21        THE COURT:  Sustained.

22        THE WITNESS:  It hard for --

23        THE COURT:  Sustained.  He has to rephrase his

24   question.

25        THE WITNESS:  I'm sorry.

Unsigned                                          Page  2831

1    Q.  BY MR. NOLAN:  Have you seen this picture before?

2    A.  Yes.

3    Q.  And you said you saw the display?

4    A.  Yes.

5    Q.  And do you recall, when you saw the display, what did

6    you see in that display with respect -- that applied to Toon

7    Teens?

8    A.  Um, well, I mean, I think I saw basically that.  That

9    little set.

10    Q.  Okay.  And do you recall whether or not that set

11    included any 3-D objects?

12    A.  Yes.  There were some three-dimensional dolls and

13    some -- I think there were some other things.  I'm not sure.

14    Q.  Now, did you use any of the three-dimensional objects

15    from this display of Toon Teens in any way to influence your

16    concept of Bratz?

17    A.  No.

18    Q.  I want to show you another exhibit that's in evidence.

19    And this is Trial Exhibit No. 48.

20        Have you seen -- did you ever see Exhibit 48 while

21    you were at Mattel?

22    A.  No, not that I remember.

23    Q.  You notice the hand poses on this drawing?

24    A.  Yes.

25    Q.  Do you think that they are, based on your experience,

1    unique or creative in any fashion?

2    A.   No, I think that's a fairly typical way to draw hands.

3    Q.   Have you seen that pose in other drawings?

4    A.   What do you mean by that pose?

5    Q.   Well, the hand pose.  In particular, the arms, the

6    placement of the hands.  Have you seen it in drawings or

7    magazine articles or ads?

8    A.   I think so, yes.

9    Q.   This is Exhibit No. 48.  If we blow it up, can you see

10   there's a date there in the lower right-hand corner.  Do you

11   see that?  Do you see that it says June 1999?

12   A.   Yes.

13   Q.   Okay.  And Ms. Martinez testified that she did not date

14   the Toon Teens drawing at the time that she did that.  And my

15   question to you is did you always date your drawings when you

16   did them?

17   A.   No.

18   Q.   Ms. Martinez testified that she placed that date, June

19   1999, on Exhibit 48 after she was called by the legal

20   department at Mattel.

21        My question to you, sir, is did you ever date a

22   Bratz doll in this case because you were told by the legal

23   department to date it?

24   A.   No.

25   Q.   I want to go back to your contract with Mattel,

1    Exhibit No. 25.

2        Can I have that back up, Aaron?

3        So this is an employee confidential information and

4    inventions agreement.  We've already testified to that;

5    correct?

6    A.  Yes.

7    Q.  Let me ask you this question, sir.  By signing this

8    contract, did Mattel promise you a specific term of

9    employment?

10        MR. PRICE:  Objection.  That's totally irrelevant.

11        THE COURT:  Overruled.  You may answer.

12        THE WITNESS:  No.

13    Q.  BY MR. NOLAN:  In fact, when you were first hired, you

14    were hired part time; correct?  Back in 1995?

15    A.  Yes.

16    Q.  When you came back on the second time, you were assigned

17    to Barbie Collectibles; correct?

18    A.  Yes.

19    Q.  Was there a guarantee, for instance, that you would work

20    at Mattel for a year?

21        MR. PRICE:  Objection.  This is irrelevant.

22        THE COURT:  Counsel, I'm not sure where you're

23    going with this.

24        MR. NOLAN:  Let me do it another way.  I apologize.

25        THE COURT:  All right.

Unsigned                                      Page  2834

1    Q.  BY MR. NOLAN:  Mr. Bryant, when you signed

2    Exhibit No. 25 and the conflict of interest questionnaire,

3    Exhibit No. 26, on your first day of employment, January 24,

4    1999, did Mattel give you a copy of these agreements?

5    A.  I don't remember.

6    Q.  Was there anything in this agreement that you thought

7    would prohibit you from ever seeking other employment?

8    A.  No.

9    Q.  Do you understand the term "at-will employee"?

10    A.  Generally, yes.

11    Q.  What was your understanding of an at-will employee?

12       MR. PRICE:  Irrelevant to this case.

13       THE COURT:  Sustained, Counsel.  Why don't you

14    rephrase.

15    Q.  BY MR. NOLAN:  While you were working at Mattel the

16    second time, did you have an understanding as to whether or

17    not you could be subject to a layoff?

18       MR. PRICE:  Objection.  This is irrelevant.

19       THE COURT:  Counsel, where is this going?  To what

20    issue?

21       MR. NOLAN:  Just a real quick sidebar.

22       THE COURT:  Very well.

23       (SIDEBAR CONFERENCE HELD.)

24       THE COURT:  I want to give you leeway to obviously

25    get into this witness's understanding of the contract.  But

1    this seems to be going into the motive for why he might have

2    left Mattel, and I don't see the relevance of that.

3        MR. NOLAN:  Your Honor, I think what this goes to

4    is his perception that he was entitled to go out and seek

5    employment.  He could interview.  He could participate in

6    pitch meetings, that the work that he was doing within

7    Mattel, using any of their supplies --

8        THE COURT:  Then let's ask those questions.

9        MR. NOLAN:  I was trying to lead up to --

10       THE COURT:  You're getting into whether it was an

11   at-will contract.

12       MR. NOLAN:  It sounded so legal.

13       THE COURT:  You know, this is someone who has

14   clearly indicated that he doesn't understand, or he needed to

15   refer to lawyers to understand anything about a declaration

16   that he was examined on.  So getting into at-will law and all

17   of that, I just don't see where that goes.  You are certainly

18   able to get into what his understanding of his contract was.

19   That was examined at great length and has been explored by

20   Mattel's counsel.

21       MR. NOLAN:  Okay.

22       THE COURT:  And --

23       MR. PRICE:  In a nonleading way.

24       THE COURT:  In a nonlegal way.

25       MR. PRICE:  And a nonleading way.

1        THE COURT:  That's a separate issue.  I haven't

2    heard that objection.  But I will be looking out for that

3    one.

4        MS. AGUIAR:  The substance is what we're asking --

5    whether it's legal in nature --

6        THE COURT:  Yes, and in addition to which have no

7    consequence to the breach of contract claim that's being

8    brought here.

9        MR. NOLAN:  Got it.

10        THE COURT:  Okay?

11        MR. NOLAN:  I appreciate it.

12        THE COURT:  I guess I wouldn't be so inclined to

13    sustain a relevancy objection if it was on point to what the

14    breach of contract claim is here.  But whether he was an at

15    will or not doesn't have any effect to whether or not he was

16    bound by the inventions agreement or his understanding of the

17    inventions agreement unless you can lay a foundation to show

18    that somehow that was relevant.  I want to give you some

19    leeway.

20        MR. PRICE:  My understanding is that eventually

21    we're going to ask the Court to tell the jury he was bound as

22    you've ruled.

23        THE COURT:  In the instructions.

24        MR. PRICE:  In the instructions.  That's sort of a

25    red herring to talk about, well, he could interview with

1    other companies.  Of course, he could.  We're not saying he

2    couldn't interview.  We're not saying he couldn't try to seek

3    other positions.  That is irrelevant.

4         The question is could he come up with a doll idea

5    and pitch that to somebody else.  And all this other stuff is

6    irrelevant.  It's not something that we -- that is contested.

7         THE COURT:  Yes, and at the end of the day -- I do

8    think that given the way in which you went into his

9    understanding of the contract, I'm going to give some

10   latitude to Mr. Nolan to get into his understanding of the

11   parameters of it, but there does come a point in time where

12   you get too far afield of what this particular breach alleged

13   here is all about; all right?

14        MR. NOLAN:  I think I understand the direction.

15        THE COURT:  Thank you.

16        (CONCLUSION OF SIDEBAR CONFERENCE.)

17   Q.  BY MR. NOLAN:  Mr. Bryant, after you executed your

18   employment agreement in January of 1999, did you have an

19   understand as to whether or not you could ever seek

20   employment at another toy company other than Mattel?

21   A.  Yes.

22   Q.  And what was that understanding?

23   A.  My understanding was that if I wanted to go work

24   somewhere else, I was free to do so.

25   Q.  In fact, during the time that you were working at

Unsigned                                    Page  2838

1    Mattel, did you know of any other colleagues that left

2    Mattel's employment, either voluntarily or by layoffs, and go

3    to work at other toy companies?

4    A.  Well, I'm sure there were some, I can't really recall

5    any names right at this moment.

6    Q.  When we talk about the contract and what you did during

7    various phases of your employment at Mattel, and now I'm

8    particularly talking about anything that you may have done

9    between September 1 and October 20th of 2000, that period of

10   time being the period from the first pitch meeting to the

11   first day after you had physically left the employment of

12   Mattel; correct?

13        MR. PRICE:  Well, I object.  That states facts not

14   in evidence.

15        THE COURT:  Sustained as phrased.

16   Q.  BY MR. NOLAN:  I just want to focus you now on the

17   September time period after the pitch meeting.  Okay?

18   A.  Okay.

19   Q.  And now I'm talking about the pitch meeting that you had

20   with Isaac Larian.  And do you recall the date of that

21   meeting?

22   A.  I believe it was September 1st.

23   Q.  Of what year?

24   A.  Of 2000.

25   Q.  Now, do you understand that in this litigation Mattel

Unsigned                                          Page  2839

1    contends that you did acts inconsistent with your obligations

2    under your employment agreement prior to meeting with Isaac

3    Larian on September 1st?

4         Do you understand that?

5    A.  Yes.

6    Q.  In fact, that was the subject of the litigation that you

7    were involved in against Mattel; correct?

8    A.  Yes.

9    Q.  And that included approaching an employee at Mattel in

10   the design center to paint the eyes on a so-called dummy

11   doll; correct?

12   A.  Yes.

13   Q.  And you understand that they contended that was a

14   violation of your contract?

15       MR. PRICE:  At this point we're getting into a lot

16   of leading questions.  Objection.  Leading.

17       THE COURT:  Sustained.

18   Q.  BY MR. NOLAN:  Do you have an understanding as to

19   whether or not Mattel contended that asking a co-worker to

20   paint the eyes on a dummy doll was a violation of your

21   contractual obligations to Mattel?

22   A.  Yes.

23   Q.  And what is your understanding as to whether or not

24   Mattel thought that was right or wrong?

25       MR. PRICE:  Objection.  Ambiguous, irrelevant,

1    calls for a legal conclusion.

2         THE COURT:  Well, first of all, let's back up and

3    lay a foundation for his views, Counsel, and then the Court

4    will evaluate the additional objections.

5    Q.  BY MR. NOLAN:  We'll do it this way:  Did there come a

6    time when you approached another Mattel employee and asked

7    her to do something with respect to what's been termed a

8    dummy doll?

9    A.  Yes.

10   Q.  And what did you ask that employee to do with respect to

11   this dummy doll?

12   A.  Well, I asked one employee to root some hair on a head.

13   Q.  Stop for just a moment.  What was the name of that

14   employee?

15   A.  Her first name was Carmen.  I don't know how to

16   pronounce her last name.

17   Q.  Okay.  And was there a second employee?

18   A.  Yes.  A woman named Sheila Kyaw, I think was her last

19   name.

20   Q.  And Sheila Kyaw was assigned to what part of Mattel?

21   A.  She was a face painter.

22   Q.  She did face painting for Mattel?

23   A.  Yes.

24   Q.  Was she a full-time employee at Mattel?

25   A.  That, I don't know.

1    Q.  And what about the lady you approached with respect to

2    the hair?  Was she a full-time employee at Mattel?

3    A.  I don't know that either.

4    Q.  Did you approach both of these employees at Mattel's

5    premises?

6    A.  I think so.  I didn't --

7    Q.  With respect to Sheila, the eye painter, did you

8    actually show to her your drawings of Bratz so that she could

9    do the face painting?

10   A.  Yes.

11   Q.  Now, did you meet and have the eye painter paint the

12   eyes and the hair rooter to root the hair before you ever met

13   with anybody from MGA?

14   A.  No.

15   Q.  When did you ask the hair rooter and face painter to do

16   work for new connection with when you first saw somebody at

17   MGA?

18   A.  I think it was between the first meeting I had with MGA

19   and the second meeting.

20   Q.  Did anybody from MGA ever ask you to have a Mattel

21   employee paint the eyes on a dummy doll?

22   A.  I'm sorry.  Can you give me the question again?

23   Q.  Sure.  Before you met with Isaac Larian -- let me

24   approach it this way:  You had a dummy doll at the first time

25   you met Isaac Larian; correct?

1    A.  Yes.

2    Q.  And that dummy doll had eyes painted by Sheila; correct?

3    A.  Yes.

4    Q.  Did anybody at MGA direct you to go to a Mattel employee

5    and have them paint eyes on a dummy doll?

6    A.  No.

7    Q.  Did anybody at MGA ever direct you to go to a hair

8    rooter at Mattel and root hair on a dummy doll?

9    A.  No.

10   Q.  Mattel sued you in this case and alleged that you

11   breached your contract with Mattel; correct?

12   A.  Yes.

13   Q.  And for four years you litigated that matter; correct?

14        MR. PRICE:  Object.  This is irrelevant to this.

15        THE COURT:  Sustained.

16   Q.  BY MR. NOLAN:  Mr. Bryant, you've settled your claims

17   with Mattel, have you not?

18        MR. PRICE:  Objection.  Irrelevant.

19        THE COURT:  The Court has already instructed the

20   jury as far as -- with as much information as the jury needs

21   with respect to this, Counsel.  Let's move on.  I think that

22   was by stipulation of the parties.

23   Q.  BY MR. NOLAN:  Sometime in September of 2000, you made

24   contact with a hair supplier located in Hong Kong; correct?

25   A.  I'm not sure that it was Hong Kong, but yes.

1    Q.  Did someone at MGA instruct you to make that contact, or

2    did you do it on your own?

3    A.  Um, I think I did it on my own.

4    Q.  Going back in time, I just want to make certain we've

5    cleared this up.  With respect to the Toon Teens project, did

6    you take any of the ideas or concepts in Toon Teens and use

7    them in any way in your Bratz concept?

8    A.  No.

9    Q.  Let's talk a little bit about how you got here, not

10   Riverside physically, but how you found yourself to be an

11   artist.

12          Mr. Bryant, taking you back, and we'll do this

13   rather briefly, but we've been asking a lot of questions, but

14   we don't know that much about you or your background.

15          Where were you raised?

16   A.  I was born in Santa Ana, raised in California until I

17   was about five.  And we moved to Washington State.  We then

18   moved -- we lived there for about five years and moved to

19   Alaska and then moved back to California, and I went to high

20   school at Apple Valley High.

21   Q.  When did you graduate from Apple Valley High?

22   A.  1987.

23   Q.  When did you first realize that you had an interest in

24   art?

25   A.  From day one.

1    Q.  Well, assuming it was after you got home from the

2    hospital.  But was there some point in time when you, you

3    know, can place for us an age where this became more serious

4    than just doodling on the sidewalk with chalk?

5    A.  Really, really early.  I remember being less than two

6    and always having a pencil or pen in my hand.

7    Q.  I want to ask you if you have in front of you

8    Exhibit 15471.

9         I've placed before you the original of Trial

10   Exhibit 15471.  Do you recognize this?

11   A.  Yes.

12   Q.  And what is that?

13   A.  This is a scrapbook that my mom had kept over the years

14   of, you know, things that I had done throughout the years.

15   Q.  Mothers tend to do that sometimes.  But I'm not going to

16   ask you to look at all of the pictures in there.  So don't be

17   afraid of that.  I just want to ask you to look at a couple

18   things.  Could you look -- and I think that if you look in

19   the exhibit itself, the original, or in the copy of it that

20   we have, I want to direct your attention to page 266.

21   A.  Page 266.  Okay.

22   Q.  It might be easier to work from the actual exhibit in

23   the book.  No, not the original, the copy that was made.

24   A.  Okay.  Which exhibit is it again?

25   Q.  15471-266.

1    A.  Which page number?

2    Q.  266.

3    A.  Okay.

4    Q.  Are you there?

5    A.  Yeah.

6    Q.  Do you recognize this?

7    A.  Yes.

8    Q.  And what is it?

9    A.  This is a drawing that I did of some Archie comic book

10   characters.

11   Q.  What grade were you in?

12   A.  I think I was probably in about sixth grade.

13       MR. NOLAN:  Your Honor, could we offer 15471-266?

14       MR. PRICE:  No objection.

15       THE COURT:  It's admitted.

16       (Exhibit 15471-266 received.)

17       THE COURT:  You may publish.

18   Q.  BY MR. NOLAN:  And was this a particular comic strip

19   that you enjoyed as a child?

20   A.  Yes.

21   Q.  Did you ever enter a contest for the Archie comic

22   series?

23   A.  Yes.

24   Q.  And what was the nature of that contest?

25   A.  Um, I think in each issue of the magazine, they would

1    publish fashion designs that, you know, kids would send in

2    that they would publish the ones that they really liked, and

3    I think a couple of mine got picked.

4    Q.  I'd ask you to look at page 276 in the same exhibit,

5    Mr. Bryant.

6    A.  Okay.

7    Q.  Do you recognize this drawing?

8    A.  Yes.

9    Q.  What is this drawing?

10   A.  This is the drawing showing some of the winners of the

11   contest.  It shows that my design had been chosen, the figure

12   on the left.

13            MR. NOLAN:  Your Honor, we'd offer 276.

14            THE COURT:  Any objection?

15            MR. PRICE:  Relevance.

16            THE COURT:  It's admitted.

17            (Exhibit 15471-276 received.)

18   Q.  BY MR. NOLAN:  Do you see it says Veronica's outfit by

19   Carter Bryant, Solootna, Alaska?

20   A.  Right.

21   Q.  How old were you when you won that contest?  Or what

22   grade?  Do you remember?

23   A.  I think I was about 12.

24   Q.  And I just want to go through a couple more of these

25   real quick.  Can you look at Exhibit 124.  Same exhibit, sir.

Unsigned                                          Page  2847

1    A.  Okay.

2    Q.  Do you recognize that drawing?

3    A.  Yes.

4    Q.  And what is that?

5    A.  That was a fashion sketch that I had done when I was,

6    you know, probably 12 or 13.

7        MR. NOLAN:  Your Honor, this is the last in the

8    series.  Could I just offer 124.

9        MR. PRICE:  No objection.

10       THE COURT:  It's admitted.

11       (Exhibit 15471-124 received.)

12       MR. NOLAN:  May we publish?

13       THE COURT:  You may.

14   Q.  BY MR. NOLAN:  And this is one of your early drawings?

15   A.  Yes.

16   Q.  And again, could you estimate for us how old you were

17   when you drew it?

18   A.  I don't know.  12 or 13.

19   Q.  Okay.  Thank you.  After high school, after graduating

20   from Apple Valley High School, what did you do next?  Did you

21   go to college?

22   A.  No, not readily.  I was playing in a rock band, and, you

23   know, trying my hand at being a rock star.

24   Q.  Is this when you conceived of some of those memorable

25   song titles we talked about on Friday?

1    A.  Yes.

2    Q.  After performing as a rock star, did you attend any art

3    schools?

4    A.  Yes.

5    Q.  And did you apply to many or just one, or what was the

6    background on that?

7    A.  I applied to a couple.  I applied to Parsons School of

8    Design, and I also applied to Otis College of Art and Design.

9    Q.  Did you get into both?

10   A.  Yes.

11   Q.  Now, Parsons is in New York; right?

12   A.  Yes.

13   Q.  And Otis is located where?

14   A.  Los Angeles.

15   Q.  And were you able to go to Parsons School of Design in

16   New York?

17   A.  No, I decided not to because it cost quite a bit more.

18   Q.  And so did you attend Otis?

19   A.  Yes.

20   Q.  I want to ask you to direct your attention to

21   Exhibit 15439 for a moment.

22   A.  Okay.

23   Q.  Do you recognize that exhibit?

24   A.  Yes.

25   Q.  And what is it, sir?

1    A.  That was an assignment that we were given in my fashion

2    illustration class.

3    Q.  At what school?

4    A.  At Otis College of Art and Design.

5        MR. NOLAN:  Your Honor, we'd offer Exhibit 15439.

6        MR. PRICE:  Objection.  Relevance.

7        MR. NOLAN:  It's already admitted.  It was

8    stipulated.

9        THE COURT:  Very well.  It's admitted.

10       (Exhibit 15439 received.)

11   Q.  BY MR. NOLAN:  So tell me what we're looking at here.

12   Can you describe that for us?

13   A.  They would ask us at various times to do studies of

14   heads, faces, hair, how to render hair and faces and how to

15   accurately draw the anatomy.

16   Q.  And what year are we talking about when you were at Otis

17   College?

18   A.  This was '94.

19   Q.  Now, can you briefly describe for us, you know, the

20   inspiration process that you use in terms of coming up with

21   unique designs?

22   A.  Well --

23       MR. PRICE:  Objection.  Lack of foundation.

24       THE COURT:  Let's lay the foundation that he has --

25   yes, sustained.

1    Q.  BY MR. NOLAN:  You've designed many things over your

2    life; correct?

3    A.  Yes.

4    Q.  And many of them are unique and creative to yourself;

5    correct?

6    A.  Yes.

7    Q.  And they are original artistic works that you've done?

8    A.  Yes.

9    Q.  Can you generally explain to us the -- how you come

10   about with an idea?

11   A.  Well, I mean, it's kind of different every time.  You

12   know, it could be that I'm looking through magazines or I've

13   been out shopping or I've seen something, you know, on TV or,

14   you know, I'm in a fabric store and I find a fabric that

15   inspires me.  There's all kinds of places to start from.

16          And usually what happens is, you know, you kind of

17   take your starting point, and then you, you know, you put

18   your perspiration into it.  Somebody said it's 10 percent

19   inspiration and 90 percent perspiration.

20   Q.  What would be your first step, though, in developing

21   designs?  Would you do a sculpt or a sketch?  Can you explain

22   that process for us?

23   A.  What kind of a design?

24   Q.  Let's talk about a fashion design.

25   A.  Fashion design.  Well, it just depends.  A lot of times

1   it will start with a fabric.  You know, I'll have a fabric,

2   and I'll, you know, say I want to do something with this.  Or

3   it could be that I'll just sit down and start sketching some

4   ideas for how the -- you know, what the cut of the outfit

5   might be.  It could be, you know, for instance, in my work on

6   Bratz, sometimes I'm given some sort of direction.  They say

7   we'd like to do, you know, a line of beachwear or something

8   like that.

9          So then I might start thinking of things that you'd

10  wear at the beach.

11  Q.  What about for the early concept of Bratz?  Explain that

12  process to us from inspiration to starting to sketch.

13         MR. PRICE:  Objection.  I believe this was asked

14  and answered earlier.  Kickapoo, Brad Pitt.

15         THE COURT:  Yes, I recall, Counsel.  Let's not

16  cover ground that's already covered, Counsel.

17         MR. NOLAN:  Let me do it a little bit differently.

18  Q.  I want to just focus on sketching for a moment; all

19  right?

20         This is a study that you took at Otis College?

21  A.  Yes.

22  Q.  And what's your methodology in sketching?  Could you

23  explain that to somebody like me who can't draw a stick?

24  A.  You mean sketching a figure?

25  Q.  Yes.

1    A.   Generally the way it starts is I will use a piece of

2    paper, whatever it might be, and I'll begin sketching a pose.

3    Once I get a pose that I kind of like, I will start adding

4    details, basically making a sketch of a body, and then

5    sometimes I'll put that aside for a minute and put another

6    piece of paper on top of it and sketch a fashion that might

7    go on a body.

8    Q.   Do you have a typical way of doing this?  In other

9    words, do you do it in notebooks or on regular paper?  Is

10   there a normal process that you follow?

11   A.   Um, not really.  I mean, typically if I'm inspired by

12   something, I just grab the first thing I can grab to start

13   getting it onto paper before I lose the idea.

14   Q.   We have an easel next to you, and I've been told that

15   there might be a pencil and pen up there.  Is there one

16   available?

17   A.   Yes.

18       MR. NOLAN:  Your Honor, with the Court's

19   permission, could I just ask him --

20   Q.   What I want to direct you to, if you could, is using as

21   a tutorial, if you would, the process.  Could you draw one of

22   the Bratz characters for us?

23   A.   Okay.

24       THE COURT:  Proceed.

25       MR. NOLAN:  Your Honor, should we use the

1    microphone?

2          THE COURT:  Yes, if he wants to talk.

3          THE WITNESS:  I'll get to be a rock star after all.

4          All right.  What I'm doing here now is called a

5    gesture.  And this is just to help me establish some sort of

6    a pose.  And then once I kind of have a pose that I'm fairly

7    comfortable with, then I'll begin fleshing it out a little

8    bit.

9          So then after that's established, I start adding

10    some detail.  And then where the anatomy would be -- I'm

11    sorry.  This process takes a few minutes.  And then from this

12    point, I'm going to start figuring out how the head is going

13    to be positioned and start putting in some detail.

14    Q.   BY MR. NOLAN:  Do you actually draw the head at that

15    time?

16    A.   Not always.  A lot of times what I'll do is I'll wait to

17    draw the head later.  But I can do it however you'd like to

18    see me do it right now.

19    Q.   That's fine.  I just was curious.

20    A.   I'll just draw the complete figure.  I'll start working

21    out placement of features on the face.  I'm going to keep

22    adding in some of the details here.  Then after I've got that

23    figured out, I might move on to putting a fashion on her.

24    Any requests?

25    Q.   No, I'm going to stop you short of the fashion for a

1    second and focus on the pose.

2         After you do the sketch, what takes you to what we

3    refer to as the master drawing?

4    A.  Well, what I would do after this is I would probably ink

5    this figure in.

6    Q.  Do you always start with pencil?

7    A.  Yes.

8    Q.  Is there a reason for that?

9    A.  Yeah.  It's just that it's easier to work with, and then

10   once I get it inked in, I can go back and erase the pencil

11   lines.

12   Q.  Can you do this on a computer?

13   A.  I can barely do anything on a computer.

14   Q.  So you do pencil, and then how do you do it with the ink

15   now?  What do you next do with the ink?

16   A.  What I'm going to do is I'm going to just kind of ink it

17   in.  And I'm basically picking out -- I'm picking out the

18   lines that I've drawn that seem to make the most sense.

19   Q.  Now, while you're tracing this ink, let me just ask you

20   this question.  Do you do that tracing in ink quickly, or is

21   that a slow process?

22   A.  No, it's fairly meticulous.  You know, you want this to

23   be a drawing that you can work with over and over again.

24   Q.  What do you mean by that?

25   A.  Well, what I mean by that is once it's inked in, it's,

1    you know, a master drawing.  I can take pieces of

2    illustration board and put it on a light box, and I can make

3    a hundred different drawings of this same exact pose.

4    Q.   So continue with the ink, if you could.

5    A.   I'm actually working a little quicker than I might

6    normally work.

7    Q.   Well, while you're drawing the ink line, I just want to

8    ask you a question.

9    A.   Okay.

10   Q.   Do you color the drawing before you start to trace it in

11   ink?

12   A.   No.

13   Q.   So you create the master drawing without color?

14   A.   That's right.

15   Q.   And again, as you are drawing this, is this method that

16   you're using, that is, pencil and then tracing slowly with

17   ink, something that you taught yourself or used for the first

18   time in Bratz?  Where did you learn how to use this process?

19   A.   I learned how to do this in college.

20   Q.   Is that at the Otis Art School?

21   A.   Yes.

22   Q.   And do you always create the master drawings on a

23   particular type of paper, like tracing paper, or can it vary?

24   A.   It can vary.  Tracing paper is just kind of nice because

25   it's inexpensive.  It's really easy to work with it with a

1   light box.  And probably details like shoes and things like

2   that would be left for later.  I'm just kind of -- actually,

3   I'll put some detail in there.

4         Okay.  So that's -- whoops.  She needs eyebrows.

5         Okay.  Then what I would do is I'd let this dry for

6   just a few seconds and take a rubber eraser.

7   Q.  What are you erasing now?

8   A.  I'm erasing the gesture drawing, the pencil drawing

9   where I was just kind of feeling my way through the pose.

10  And the reason that I do that is so that when I go to put,

11  for instance, another piece of tracing paper on top of it to

12  draw the fashion and the hair and things like that, I'm not

13  confused by all of these random lines.

14  Q.  And is this the methodology that you used in developing

15  the concept and the drawings for Bratz?

16  A.  Yes.

17  Q.  Now, once you have made the master drawings, you talked

18  about being able to trace over that with respect to the use

19  of a light box.

20  A.  Right.

21  Q.  Do I understand that correctly?

22  A.  Yes.

23  Q.  Now, we're thinking of doing that, but I don't want to

24  take up the time.  But can you just explain to the jury in

25  your own words what this light box is and the process that

1    you use?

2           THE COURT:  Counsel, let me stop you there.  Are

3    you finished with the drawing?

4           MR. NOLAN:  Yes.

5           THE COURT:  Why don't we identify this as an

6    exhibit as we did with the other drawings that Ms. Martinez

7    did.

8           MR. NOLAN:  This is going to be 18544, if I may

9    approach.

10          THE COURT:  You may.

11          MR. NOLAN:  18544.

12          THE COURT:  Very well.  You may return if you wish.

13          (Exhibit 18544 for identification.)

14   Q.  BY MR. NOLAN:  Disregarding the mechanical set up for a

15   minute.  I want to talk about the light box for a second.

16   You have the master.  Is this a process, by the way, you did

17   in art school?

18   A.  Yes.

19   Q.  Okay.  Can you explain how you would use a master

20   drawing to make copies of the same master drawing?

21   A.  Yes.  I would use a light box.

22   Q.  Okay.

23   A.  And a light box basically is just sort of a square box

24   that's got a fluorescent light inside of it, and it's got

25   sort of a translucent top, and anyway, what you do when you

1    turn this light on is it allows you to put your drawing onto

2    the light box, and then you can put another piece of paper --

3    it can be a fairly thick piece of paper -- on top of this

4    drawing, and you can just basically mechanically trace it,

5    you know, as many times as you want.  Kind of like a

6    production.

7    Q.   And when you trace it, in your view, are you creating a

8    new master drawing?

9    A.   No.  I've already done that with this.

10   Q.   By placing the master drawing on a light box and tracing

11   it, are you changing the attitude or the concept?

12   A.   No.

13        MR. NOLAN:  Your Honor, we do have set up a light

14   box.  If I could just ask Mr. Bryant to step down and use

15   this maybe as an example of the light box just for

16   illustrative purposes.

17        THE COURT:  Any objection?

18        MR. PRICE:  No objection.

19        THE COURT:  Very well.  You may do so, Mr. Bryant.

20   Q.   BY MR. NOLAN:  Mr. Bryant, do you want to take the

21   drawing that you just did on the easel and just use part of

22   it for the light box, or what's the easiest way for to you do

23   this?

24   A.   I can do that.  I'll probably only be able to do part of

25   the drawing because it's so big.

Unsigned                                        Page  2859

1    Q.  Right.  Why don't you take that, tear it out, if you

2    don't mind, and then we'll see what portion can fit on the

3    light box.  And you can just explain that process.  Okay?

4    A.  Okay.  We'll do the face.

5    Q.  Okay.  We're going to do the face of the master drawing

6    that you just did on the easel.

7    A.  Yes.  And what I'm going to do now is use like a low

8    tack tape just to tape it down so it doesn't slip.  Okay.

9    Then I'm going to take a sheet of illustration paper, which

10   is a little heavier, a little more durable.  And I'll put it

11   right on top of that drawing.  And I'm also going to tape

12   that.  And in this process, it's called transferring the

13   drawing.

14   Q.  This process that you refer to is transferring the

15   drawing, you're tracing it with pencil now?

16   A.  Yes.

17   Q.  From the master drawing?

18   A.  Yes.

19   Q.  In transferring it by tracing it on a light box, are you

20   attempting in any way to change the concept or attitude,

21   let's say, of this face?

22   A.  No.  Once I'm satisfied with my master drawing, I try

23   and trace it as exactly as possible.  As exact as possible.

24   Q.  Now, just out of curiosity, as you're doing this, I see

25   you're actually tracing the eyelashes.  Why do you do that?

1    A.  Well, in my master drawing, like I said, I try and get

2    everything exactly the way I want it.  So when I get to this

3    point where I'm transferring the drawing, I'm trying to draw

4    exactly -- I'm trying to trace it exactly as I drew it.

5            How far down would you like me to go?

6    Q.  That's fine.  Because you're off the screen now.

7            When Mr. Price was asking you questions about

8    transferring, I think you described this as a mechanical

9    process; is that right?

10   A.  Yes.

11   Q.  That is the tracing using the light box over the master

12   is a mechanical process; correct?

13   A.  Yes.  It's very, very boring.

14   Q.  Are you using any creative juices when you're tracing on

15   the master?

16   A.  No.

17   Q.  Can you show to us now and to the jury maybe what you've

18   transferred to the other piece of paper?

19   A.  Yes.  I have this.

20   Q.  And now you're holding up the drawing that was traced

21   and transferred from the original master drawing; is that

22   correct?

23   A.  Yes.

24   Q.  And could you hold up the master drawing for the jury

25   just to make a comparison?

1    A.  Yes.  And at this point I can make however many of these

2    as I need.

3    Q.  Okay.  Thank you.  If you could resume your seat.

4        THE COURT:  Very well.  Let's also mark the trace.

5        MR. NOLAN:  It will be marked, the transfer

6    document will be marked 18545, your Honor.

7        (Exhibit 18545 for identification.)

8    Q.  BY MR. NOLAN:  Mr. Bryant, where were you living during

9    the second stint of your employment at Mattel?

10   A.  I was living in Gardena, California.

11   Q.  Did you have a studio at that home?

12   A.  Eventually, yes.

13   Q.  Did you have a light box there?

14   A.  Yes.

15   Q.  Mr. Price asked you a number of questions, and you

16   identified a number of drawings.  I'm not going to go through

17   all of them, but when he was talking about the transfer

18   process, do you recall that line of questioning?

19   A.  Yes.

20   Q.  Is that the transfer process that you were referring to

21   in answering Mr. Price's questions?

22   A.  Yes.

23   Q.  And when you did that transfer process, were you

24   physically located at your cubicle at Mattel?

25   A.  Oh, no.  That was at home.

1    Q.  And using the studio at home?

2    A.  Yes.

3        THE COURT:  Counsel, before you move on, are you

4    moving these two Exhibits, 18544 and 18545, into evidence?

5        MR. NOLAN:  I am.

6        THE COURT:  Any objection?

7        MR. PRICE:  No, your Honor.

8        THE COURT:  Very well.  Both of them are received.

9        (Exhibits 18544 and 18545 received.)

10       THE COURT:  Counsel, perhaps this is a good time

11   for us to take a break.

12       (Recess taken.)

13       THE COURT:  You may proceed, Counsel.

14       MR. NOLAN:  Thank you.

15   Q.  Mr. Bryant, what I'd like to do is have you turn to

16   Trial Exhibit 00762.  Do you have that in front of you,

17   Mr. Bryant?

18   A.  Yes.  762?

19   Q.  Yes.

20   A.  Okay.  All right.

21   Q.  Do you recognize that?

22   A.  Yes.

23   Q.  And what is it?

24   A.  That's a pose sketch.

25   Q.  For what project?

1   A.  It's one of the Bratz.

2   Q.  And when did you do this?

3   A.  This is from '98.

4        MR. NOLAN:  Your Honor, we'd offer -- it's already

5   in evidence.  May we publish?

6        THE COURT:  You may.

7   Q.  BY MR. NOLAN:  Can you explain to the jury what this is?

8   A.  This is sort of like what I was just doing a few minutes

9   ago.  It's sort of a gestural drawing, trying to get the pose

10  kind of how I want it to be.

11  Q.  I never use one of these things, but I'm just doing it

12  for the first time here.

13        I see that the pencil lines around here do not seem

14  as precise as the one that you did on the light box.

15  A.  That's right.

16  Q.  And can you explain why that is?

17  A.  This would have been just kind of like what I was doing

18  over here on the easel, where I was trying to -- feeling my

19  way through the pose.  And the drawing that I did there on

20  the light box, I had, you know, had gone back over it in ink

21  pen to define the lines.

22  Q.  One thing I should have established before we took the

23  break is the master drawing that you created this afternoon

24  of a Bratz character, is that an identical copy of your

25  original Bratz concept drawing?

1    A.  No.

2    Q.  And why is that?

3    A.  Well, I'd have to have that master drawing to make it an

4    identical copy.

5    Q.  And if you wanted -- if I wanted to show to the jury how

6    you would make an identical copy of the original Bratz

7    drawing, could you explain the process that we would have

8    gone through today?

9    A.  Yes.

10   Q.  And could you walk us through?

11   A.  Sure.  I would have taken the master drawing, again,

12   placed it on the light box.  And then I would have taken a

13   piece of heavier illustration board, again, just traced the

14   master drawing, and then I think I had the faces on a

15   different piece of paper.  So then I would have edited in the

16   face using the same technique.

17   Q.  So if I asked you -- if I had asked you to recreate the

18   original concept of Bratz today, June 2008, it's your

19   testimony that you could replicate the original concept by

20   referring back to your 1998 drawings?

21   A.  Yes.

22   Q.  Let's go to Trial Exhibit 00710.  And you would have

23   been able to do that through the process you just explained

24   to us; correct?

25   A.  Yes.

Unsigned                                    Page  2865

1    Q.   So now could I ask you to look at Trial Exhibit 00710.

2    And do you recognize that?

3    A.   Hold on a second.  Yes.

4    Q.   And what is 710?

5    A.   These are kind of more of the same types of drawings

6    that we were just looking at, sort of gestural, trying to

7    figure out what the pose is going to be.

8    Q.   Did you do these in 1998?

9    A.   Yes.

10   Q.   So if you wanted to replicate these drawings, would you

11   use the same transfer process you just explained to us?

12   A.   Well, these types of drawings would be a little bit hard

13   to replicate just because they are not finished off with, you

14   know, an ink pen that would, you know, give me a definite

15   line.

16   Q.   Let's look at Trial Exhibit 15176.  This is also in

17   evidence.  And explain to us what is Exhibit 15176?

18   A.   That's the master pose drawing.

19   Q.   Do you have that in front of you?

20   A.   I can't seem to find it, but I can see it, yes.

21   Q.   And when did you do this master drawing pose?

22   A.   That would have been in 1998.

23   Q.   Can we put back up 0710 that we just had up.  This is

24   the one you just talked about a few minutes ago?

25   A.   Yes.

1    Q.  And you said that you wouldn't consider this to be a

2    master drawing, referring to 710.

3    A.  Right.

4    Q.  And the one on your right in your mind would be the

5    master drawing?

6    A.  Yes.

7    Q.  How would you describe the difference between these two

8    exhibits for the jury?

9    A.  Well, the drawing on the right has been inked in with a

10   definitive line so that I could follow it, you know,

11   precisely.

12   Q.  And did you do this master drawing pose 15176 in August

13   of 1998?

14       MR. PRICE:  Objection.  These are leading

15   questions.

16       THE COURT:  Sustained.

17   Q.  BY MR. NOLAN:  When did you do the master drawing 15176?

18   A.  That was in 1998.

19   Q.  Can you look at Exhibit 15177.  You recognize this

20   document that's in evidence?

21   A.  Yes.

22   Q.  What is this?

23   A.  That's another master pose drawing.

24   Q.  How do you know it's a master pose drawing?

25   A.  I can just tell because the line is very definitive, and

1    there don't appear to be a lot of small sketchy lines.

2    Q.   When did you do the master drawing depicted in

3    Exhibit 15177?

4    A.   That was also done in 1998.

5    Q.   Do you recall a month?

6    A.   I believe it was August.

7    Q.   Where were you living?

8    A.   Kimberling City, Missouri.

9    Q.   Were you living with your parents?

10   A.   Yes.

11   Q.   Can we look at Exhibit No. 761.  Do you recognize 761?

12   A.   Yes.

13   Q.   And what is 761?

14   A.   These appear to be -- these appear to be closer to

15   master drawings of some of the poses.

16   Q.   When you say some of the poses, what do you mean?

17   A.   Well, these were some of the poses that I had created

18   for a shot of the four girls together.

19   Q.   When you say the four girls together, is there a term

20   that you use to describe that picture of the four girls?

21   A.   Just like a group shot.

22   Q.   You did this when?

23   A.   1998.

24   Q.   I was referring to Trial Exhibit 761.  Now let's look at

25   621 for a moment.

1        Do you recognize 621?

2    A.  Yes.

3    Q.  And what is 621?

4    A.  This appears to be, again, a master drawing of a pose,

5    not so much the head, but of the body.

6    Q.  Now, how do you know that that's a master drawing of the

7    body?

8    A.  Um, well, again, the line's very definitive.  There

9    aren't a lot of sketchy marks on it.  It's very defined.

10   Q.  Now, when did you do the drawing, the master drawing?

11   A.  That was done in 1998.

12   Q.  There is a stamp on the left-hand corner.

13       Do you see that?

14   A.  Yes.

15   Q.  And does that appear to be a notary stamp do you?

16   A.  Yes.

17   Q.  It has a date August 26, 1999, on it?

18   A.  Yes.

19   Q.  Isn't that the date that you did the master drawing?

20   A.  No.

21   Q.  How do you know?

22   A.  Well, I just remember doing them in -- when I was living

23   at home in Kimberling City in 1998.

24   Q.  Let's turn to Trial Exhibit 01152-008.  What is depicted

25   on the screen here?

1      A.  This looks like sort of a gestural drawing of a pose for

2      a male figure.

3      Q.  Is this part of the Bratz family?

4      A.  I think that's what it was intended for, yes.

5      Q.  And whose intention was that?

6      A.  Mine.

7      Q.  When did you do this drawing?

8      A.  Same time, 1998.

9      Q.  Is this a master drawing?

10     A.  No.

11     Q.  Can you look at 758 for me, 00758.  And can you describe

12     for us -- first of all, who drew this?

13     A.  I drew that.

14     Q.  When did you draw Exhibit 758?

15     A.  Again, around the same time, 1998.

16     Q.  While you were living at home with your parents in

17     Missouri?

18     A.  Yes.

19     Q.  Now, describe this for me.  What does this depict?

20     A.  This depicts the four girls together in sort of a group

21     shot I was talking about.

22         MR. NOLAN:  And if I might, your Honor, just

23     approach with the exhibit.

24         THE COURT:  You may.  This is the original?

25         MR. NOLAN:  Yes, your Honor.

1    Q.  Mr. Bryant, I've placed in front of you the original of

2    Exhibit 00758.

3          Do you see that?

4    A.  Yes.

5    Q.  And do you mind just holding up to the jury the

6    original?  Now, describe that paper for us that's on the

7    original.

8    A.  This is a tracing paper.

9    Q.  And is that tracing paper -- did you use that tracing

10   paper for the master drawing?

11   A.  Which master drawing?

12   Q.  For the particular exhibit that's on the screen right

13   now.  Is that the original of it?

14   A.  Yes.

15   Q.  Okay.  And all the other exhibits that I've been showing

16   you of this body shows, do they have similar originals that

17   are actually on tracing paper?

18   A.  Yes.

19   Q.  And all of the tracing paper drawings, when were those

20   done?  In what year?

21   A.  Those were done in 1998.

22   Q.  I'd like to show you Exhibit 01752-001.

23          And you recognize this document?

24   A.  Yes.

25   Q.  And what is this drawing?

1    A.  I'm sorry?

2    Q.  What is this drawing?

3    A.  I'm not sure.  I think that might have been a copy of

4    one of the master drawings.

5    Q.  Is this a pose of a Bratz character?

6    A.  Yes.

7    Q.  And then the last one of the poses, can you look at

8    00035-003.  Do you have that in front of you, Mr. Bryant?

9    A.  What was the number again?

10   Q.  It's 00035-003.

11   A.  I'm not finding it, but I recognize it.

12   Q.  And you recognize it's on the screen?

13   A.  Yes.

14   Q.  And what is this drawing?

15   A.  That is a -- again, that just looks like another master

16   pose drawing.

17   Q.  When did you do this master drawing?

18   A.  That was in 1998.

19   Q.  Okay.  Again, back while you were living in Missouri?

20   A.  Right.

21   Q.  So I've shown you -- let's see, one, two, three, four --

22   about eight different poses.  Why different poses?

23   A.  In general?

24   Q.  Yes.  Well, for the Bratz characters that you created in

25   August.

1    A.   Um, I don't know.  I guess maybe just to make them more

2    interesting and, you know, show that they were each a little

3    bit different.

4    Q.   Can we put up the last one, 35-003.  And then what I

5    want to do is go to the group shot.  I apologize.  752-001.

6    And you can take that exhibit down.  I just called up the

7    wrong one.

8         Can you put up 1752-001.  I apologize.  I was

9    trying to get to the group shot.  758.

10        We've identified this before.  This is a group shot

11   of the four characters?

12   A.   Yes.

13   Q.   Do you know which characters these are depicting?

14   A.   Yes.

15   Q.   And do you have the original in front of you?

16   A.   Yes.

17   Q.   Could you hold up the original of this exhibit?

18   A.   Yes.

19   Q.   And you did the original in 1998?

20   A.   Yes.

21   Q.   Okay.  What are the characters that are depicted here?

22   A.   Well, their original names were Lupe, Zoe, Hallidae, and

23   Jade.

24   Q.   Now, through this master drawing of the four characters,

25   could you explain to us in your own words the concept or

1    attitude that you were depicting in these drawings?

2    A.  You mean the feeling I was trying to get across with it?

3    Q.  Yes, that's a better way to ask it.  Sorry.

4    A.  You know, I guess I was just trying to show that they

5    were, you know, close knit and they were, you know, powerful

6    and, you know, they were independent.  Nobody was going to

7    tell them what to do.

8    Q.  Could you use this master drawing to replicate the four

9    characters?

10   A.  I'm not sure that I could use this one exactly just

11   because this looks more like an outline.  The details aren't

12   filled in.

13   Q.  Because some of these do not have heads.  Do you have

14   Trial Exhibit 62-015 in front of you?

15        Your Honor, may I approach with the original?

16        THE COURT:  You may.

17   Q.  BY MR. NOLAN:  I want to turn now to a different part of

18   the anatomy, the heads.  The drawing that you did for the

19   jury today had a head on the master drawing; correct?

20   A.  Yes.

21   Q.  Do you always draw a head on a master drawing?

22   A.  No.

23   Q.  And first of all, explain to me that concept.  Why not?

24   A.  This was just something that we learned to do in

25   college.  We learned that it would be a little bit easier to

1    get your figures, you know, on one page and your heads on

2    another so that you could interchange them.  You could use,

3    you know, the head from over here on a body from over here

4    and vice versa.  So you weren't stuck with a particular head.

5    Q.  I want to -- do you have the original 62.015?

6    A.  Yes.

7        MR. NOLAN:  Your Honor, this is in evidence.  Can

8    we put it on the screen?

9        THE COURT:  Yes.

10       MR. NOLAN:  Thank you.

11   Q.  Now, for the jury's sake, looking at the screen,

12   Mr. Bryant, what's depicted on this exhibit?

13   A.  These are the faces of the four Bratz characters.

14   Q.  And when did you do this drawing?

15   A.  This was done in 1998.

16   Q.  When in 1998?

17   A.  August.

18   Q.  At about the same time of the other drawings we've been

19   talking about?

20   A.  Yes.

21   Q.  Is this a master drawing?

22   A.  Yes, I would consider it a master drawing.

23   Q.  I see here in the left-hand corner this has a notary

24   stamp.  You see where this says August 26, 1999?

25   A.  Right.

1    Q.  Does that in any way refresh your recollection that you

2    did these master drawings of the heads for the characters in

3    August of 1998?

4    A.  No.  It does not.

5    Q.  Now, you have the names Jade, Lupe, I think I

6    mispronounced it in my opening statement as Lupee.  Lupe.

7    A.  Close enough.

8    Q.  Zoe, and then Hallidae.

9        Do you see that?

10   A.  Yes.

11   Q.  Why four heads?

12   A.  You mean on all on one sheet of paper?

13   Q.  Yes.

14   A.  Just so that it would be convenient to refer back to at

15   a later time.  I wouldn't have to go search for each

16   individual drawing of the head.

17   Q.  Well, I'm pointing now to the drawing of Jade's face;

18   correct?

19   A.  Yes.

20   Q.  Am I better to say Jade's face or sculpt or head?

21   A.  I guess I'd call them heads.

22   Q.  Is Jade's head different on this than Zoe's head?

23   A.  Do you mean her overall head design, or do you mean the

24   face itself?

25   Q.  The face itself.  The attitude or the expression.

1   A.  Yes, it's different.

2   Q.  And why did you want them to be different?

3   A.  Well, I wanted each one to be distinctive.

4   Q.  Is that true also for Lupe?

5   A.  Yes.

6   Q.  That is, her expression in your mind was different from

7   Jade and Zoe?

8   A.  Yes.

9   Q.  Is the same true of Hallidae?

10  A.  Yes.

11  Q.  And can you explain to me why you did these heads --

12  first of all, does this represent the master drawing of the

13  heads?

14  A.  Yes.

15  Q.  And you have the original that you are holding up?

16  A.  Yes.

17  Q.  Do you mind holding that original up to the jury?

18  A.  Okay.

19  Q.  And I notice that it's on tracing paper?

20  A.  Yes.

21  Q.  Is it possible for you to transfer those heads to one of

22  the poses that we just saw a few minutes ago?

23  A.  Yes.

24  Q.  Can you explain to the jury the process you would use to

25  transfer the head from that exhibit to, say, the pose

1   exhibit?

2   A.  Well, I would just take the drawing of the pose, and

3   again, I'd probably place it on my light box, and then I

4   would pick whichever head I wanted to use, and I would lay it

5   on top, and I would be able to clearly see the body.  And

6   then I would take a piece of heavier illustration paper and

7   reproduce the entire thing.

8   Q.  And again, you did the master drawing original when?

9   A.  August '98.

10  Q.  Now, do you have Exhibit 62-001 close by?  And I may

11  have put it in the folder next to you.

12  A.  Yes.

13  Q.  Do you see that?

14  A.  Yes.

15  Q.  All right.  And this is also in evidence.  Can you

16  explain for us what 62-001 is and what relationship, if any,

17  it has to the original master drawing that we've identified

18  as 62-015?

19  A.  It just looks like a -- it looks like a copy, but it

20  looks like the size might have been reduced a little bit.

21  Q.  Now, how do you reduce the size from the original master

22  drawing?

23  A.  I would just take this master drawing and put it on a

24  copy machine and reduce it by, you know, 5 or 10 percent.

25  Q.  And when did you reduce the size that's depicted now in

1    62-001?

2    A.  That was in -- it was in '98.

3    Q.  Okay.  Do you have in front of you Trial Exhibit 11788?

4    I'm sorry.  11788.  It may not be one of the folders.  It may

5    be in the notebook, Mr. Bryant.

6    A.  Okay.  What was the number again?

7    Q.  Yes, it's 11788.  Maybe I can approach with the

8    original.

9    A.  I'm not finding it.

10   Q.  Now, we've talked about poses, and we've talked about

11   heads and faces.  Did you also draw samples of hairstyles?

12   A.  Yes.

13   Q.  And were those sample hairstyles intended for Bratz?

14   A.  Yes.

15   Q.  Do you have in front of you Exhibit No. 11788?

16   A.  Which one was that?

17   Q.  11788.

18   A.  Okay, yes.

19   Q.  Do you have that?

20   A.  Yes.

21       MR. NOLAN:  This is in evidence, your Honor.

22   Q.  Now, what in the world is 11788?

23   A.  This looks like a drawing for one of the boy characters

24   and a bunch of different hairstyle ideas for that boy

25   character.

1    Q.  And do you recall when you did these?

2    A.  These were also done in August of 1998.

3    Q.  All right.  And do you have 18501 in front of you?

4    A.  Yes.

5    Q.  And this is also in evidence.  And what is depicted in

6    18501?

7    A.  These are some explorations of girls' hairstyles that

8    could have been placed on the drawing of the heads.

9    Q.  Now, are these master drawings of the different

10   hairstyles?

11   A.  Um, I'm not really sure.  I don't think so.  I think I

12   did some later more finalized drawings.

13   Q.  Do you recall when you did this exhibit, these drawings?

14   A.  Again, this is August of '98.

15   Q.  And when you did the more stylized and final hairdos,

16   when did you create those master drawings?

17   A.  Around that same time, I believe.

18   Q.  Now I want to turn to the fashions and how you create

19   that.

20       Do you have Exhibit 15175 in front of you?

21       Can I ask you to first look at 15157.  Do you have

22   that?

23   A.  Yes.

24   Q.  This is in evidence.  Now, tell me what we're looking at

25   here in 15715, Mr. Bryant.

1    A.  This looks like a drawing of one of the fashions for the

2    Bratz characters.

3    Q.  And you see the name here to the right?

4    A.  Yes.  It says Zoe.

5    Q.  And when did you do this drawing?

6    A.  This was also August '98.

7    Q.  And is this a master drawing that you could copy from?

8    A.  I wouldn't necessarily consider this one a master, but I

9    could copy from this one.

10   Q.  Could you look at hopefully next in order, 739.

11   A.  Okay.

12   Q.  And this is also in evidence.  Can we have this up.

13        And what is 739?  And you have the original.  You

14   could show the jury the original.

15   A.  Yes.  This is a master drawing of one of the fashions

16   for Hallidae.

17   Q.  And when did you do this master drawing?

18   A.  This was also August of '98.

19   Q.  Let's turn to 1750-001.  So I have 1750-001.  Do you see

20   that?

21   A.  Yes.

22   Q.  Is that a master drawing?

23   A.  I believe so.  I'm not able to find it here.

24   Q.  What happened to the face?

25   A.  You know, there's no reason to draw the face over and

1    over on, you know, a master drawing of the fashion when I

2    already had the master drawing of the face finished.

3    Q.  This is back and white.  There's no color; right?

4    A.  Right.

5    Q.  Did you typically complete the master drawings without

6    coloring them?

7    A.  Yes.

8    Q.  And why is that?

9    A.  Well, if I had the master drawing, you know, I had

10   the -- I had the concept.  I had the creation.  I could go

11   back and add color later.  You know, when I felt like it or

12   had time or whatever.

13   Q.  In your view, did adding color to a master drawing

14   change the concept of the drawing?

15   A.  No.

16   Q.  Did it change the attitude of the drawing?

17   A.  No.

18   Q.  Did it change the character of the drawing?

19   A.  No.

20   Q.  Did it change the pose of the drawing?

21   A.  No.

22   Q.  Let's look at Exhibit 05751-004.  And can you identify

23   this for us.

24   A.  This looks like a drawing that I thought we looked at a

25   second ago.

1    Q.  I apologize if we did.

2    A.  This looks like -- I'm not sure if this is a master

3    drawing because it's kind of sketchy, but it's a drawing of

4    one of the Bratz fashions.

5    Q.  Well, when did you do this drawing?

6    A.  That was also August of '98.

7    Q.  And then Exhibit 15179.  Do you recognize 15179?

8    A.  Yes.

9    Q.  And this is Zoe?

10   A.  Yes.

11   Q.  And when did you -- is this a master drawing?

12   A.  Yes, it is.

13   Q.  Do you have the original there?

14   A.  Yes.

15   Q.  Can you show the jury that?

16   A.  Yes.

17   Q.  And again, Zoe, in August of 1998, seems faceless here.

18   A.  Yes.

19   Q.  Is that a problem?

20   A.  Is that a problem?

21   Q.  Well, I mean, where do you get a face from?

22   A.  From the master drawing that I had all the four faces

23   on.

24   Q.  And how would you do that physically?

25   A.  Let's see if I can just kind of show you.  Is that okay?

1    Q.  Sure.

2    A.  If I find that face and kind of show you?

3         Again, if I had my light box, I would take this

4    drawing and choose her face.  This is not the right size

5    exactly, but I don't know if you can really see it all that

6    well.  But I would just put them together like that, and if

7    it was flat, you'd be able to see the face very clearly.

8    Q.  Do you have in front of you still the reduced size

9    62-001?

10    A.  Yes.

11    Q.  Is that the reduced size?

12    A.  Yes.  So it would be kind of like -- kind of like so.

13    Q.  And then would you put both of those on the light box;

14    is that correct?

15    A.  Right.

16    Q.  And then would you trace the entire figure again,

17    including the face?

18    A.  Yes.

19    Q.  And then can I ask you to look at 00741.

20    A.  Okay.

21    Q.  And do you have 741 there?

22    A.  Yes.

23    Q.  This is also in evidence.  Can you tell me what 741 is?

24    A.  This is a master drawing for the Lupe character.

25    Q.  And when did you do this master drawing?

1      A.  This was also August of 1998.

2      Q.  And then take a look at Trial Exhibit 1748.  And you

3      recognize 1748.

4      A.  Yes.

5      Q.  Okay.  What is 1748?

6      A.  This is a master drawing of the Jade character.

7      Q.  And when did do you this?

8      A.  This is created in August of 1998.

9      Q.  Now, just the last in the series, could you turn to

10     00794.

11     A.  Okay.

12     Q.  Do you have that in front of you?

13     A.  Yes.

14     Q.  Do you have the original?

15     A.  Yes.

16     Q.  Okay.  Could you just show that, publish it in the jury.

17          And what is depicted in 00794?

18     A.  This is a master drawing for the character Lupe.

19     Q.  And then when did you do this drawing?

20     A.  This was also August of 1998.

21     Q.  I see here that on the -- on the faceless figure you

22     have -- what is this I'm pointing at here?  A bandana?

23     A.  Yes, you could call it a bandana.

24     Q.  And this is a hairstyle for Lupe?

25     A.  Yes.

Unsigned                                              Page  2885

1    Q.  What's next to it on the right-hand side?

2    A.  That was an alternative hairstyle.  I wasn't really sure

3    that I liked the first one that I did.  So I did an alternate

4    one on the side there.

5    Q.  And is this a master drawing?

6    A.  Yes.

7    Q.  When did you do this?

8    A.  This is also August of 1998.

9    Q.  So can you just explain to me what you would do with

10   these different hairstyles if you wanted to change?

11   A.  Um, well, if I wanted to change, probably what I would

12   do would be to just draw the body onto my illustration board

13   using my light box.  Then I'd get out my drawing of the head,

14   and then I would draw the face, and then from there I could

15   add whichever hairstyle I preferred.

16   Q.  Did you also in 1998 draw any accessories for the Bratz

17   characters?

18   A.  I think I drew some backpacks.

19   Q.  Can I ask you to take a look at Trial Exhibit 00706.

20       May I approach with the original?

21       THE COURT:  You may.

22   Q.  BY MR. NOLAN:  When did you draw 00706?

23   A.  This was also August of '98.

24   Q.  Now, is this a master drawing of some shoes?

25   A.  I guess I'd consider the boots to be the master drawing

1    on this page because they are inked in.

2    Q.  Now, again -- well, before I ask you this, can you look

3    at 18281 for me, which is the other folder I brought up.

4    A.  Okay.

5    Q.  And you referred earlier to backpacks.

6    A.  Yes.

7    Q.  Do you recall drawing backpacks for your Bratz

8    characters?

9    A.  Yes.

10   Q.  And when did you draw those?

11   A.  This was -- I believe this was drawn the same time,

12   August of 1998.

13   Q.  While you were living with your parents?

14   A.  Yes.

15   Q.  Now, here you have different backpacks.  One is for

16   Jade, is it; is that correct?

17   A.  Yes.

18   Q.  And another one for Zoe?

19   A.  Yes.

20   Q.  And one more for Lupe?

21   A.  Yes.

22   Q.  And then one for Hallidae?

23   A.  Yes.

24   Q.  Why four different ones?

25   A.  Well, again, I wanted them all to have, you know,

1    distinctive fashions, distinctive personalities.  It would

2    look kind of silly if they were all carrying the same

3    backpack.

4    Q.  In your mind, did each of these backpacks convey a

5    different look?

6    A.  Yes.

7    Q.  A different attitude?

8    A.  Yes.

9    Q.  Did you have in your mind, for instance, that the

10   backpack with the word Jade below it would work better with

11   Jade than the backpack for the Zoe character?

12   A.  Yes.

13   Q.  When did you do these?

14   A.  I think those were done in August of 1998 as well.

15   Q.  I'd like to turn to Trial Exhibit 62.02.

16        Do you recognize 62-002?

17   A.  Yes.

18   Q.  And this is in evidence.  And can you tell us what is

19   depicted in 62-002?

20   A.  This is a group shot of all four of the characters

21   together.

22   Q.  Now, this has a notary stamp of August 26, 1999.

23        Do you see it?

24   A.  Yes.

25   Q.  Now, is that the date that you created this hero shot?

1    A.  No.

2    Q.  When did you create the hero shot master drawing?

3    A.  This also was created in August of 1999.  I'm sorry.

4    August of 1998.

5    Q.  Was it done -- was it notarized in August of 1999?

6    A.  Yes, it was.

7    Q.  And when did you -- where were you when you did the

8    original master drawing?

9    A.  I was living in Kimberling City, Missouri.

10   Q.  Do you have the original of this?

11   A.  Yes.

12   Q.  Can you hold the original of this up to the jury?

13   A.  Yes.

14   Q.  Okay.  Now, this master drawing is not colored; is that

15   correct?

16   A.  Yes, that's correct.

17   Q.  Did you add color to this at some point later?

18   A.  Yes.

19   Q.  By adding color to the hero shot, did you have an intent

20   to change the concept in any way?

21   A.  No.

22   Q.  What about the attitude?

23   A.  No.

24   Q.  By adding color, did you change any of the poses?

25   A.  No.

1    Q.  I want to go back to one additional point, and we'll try

2    to do this quickly.  You've got a lot of exhibits in front of

3    you, Mr. Bryant.  Can you look at 62-001.

4    A.  Oh, boy.  They are all mixed up.  Which one now?

5    Q.  62-001.  Do you see that as a master drawing of the four

6    heads?

7    A.  Yes, sir.

8    Q.  I want you to set that aside for a moment.  Can you take

9    a look at Exhibit 18281.

10   A.  I'm sorry.  These are mixed up.  I'm not finding it.

11   Q.  You know what I'm going to do to speed this along?  I'll

12   reorganize these so that it's a little bit easier for you to

13   follow, and I'll come back to this later if you don't mind.

14   A.  Okay.

15   Q.  Was Bratz the only project that you conceived of in

16   August of 1998?

17   A.  Well, no, I was doing other projects.

18   Q.  Can you describe for the jury -- let's go back in time,

19   and let's put up the time line for the employment that we're

20   looking at.

21          And let's just go to your April 29, 1998,

22   resignation from Mattel.  As I recall from your testimony

23   from Mr. Price, you were employed at Mattel for a period of

24   time from 1995 through April of 1998; correct?

25   A.  Yes.

1    Q.  Could you tell the jury whether or not you were always

2    actually physically working in the Mattel building for that

3    entire period of time?

4    A.  Well, no.

5    Q.  Did there come a time when you left the physical

6    building of Mattel and moved back home?

7    A.  Yes.

8    Q.  And do you recall when that was?

9    A.  That was -- I think it was right before Christmas of

10   1997.

11   Q.  And you were working in Barbie Basics at the time; yes?

12   A.  Right.

13   Q.  Was there a particular reason why you started thinking

14   about leaving Mattel?

15         MR. PRICE:  Object.  Irrelevant.

16         THE COURT:  Sustained.

17   Q.  BY MR. NOLAN:  Did you move back to Missouri before

18   Christmas of 1997?

19   A.  Yes.

20   Q.  And before leaving, did you have a conversation with

21   anybody at Mattel regarding your departure?

22   A.  Yes.

23   Q.  And who did you have that conversation with?

24   A.  I spoke with my supervisor, Cassidy Park.

25   Q.  And what did you tell Cassidy Park?

1          MR. PRICE:  Object.  That's hearsay, your Honor.

2          THE COURT:  How is that not hearsay, Counsel?

3          MR. NOLAN:  Okay.  I don't know.  I was just

4    trying.  I'm sorry.

5          THE COURT:  Sustained.

6    Q.  BY MR. NOLAN:  You had a conversation when you left;

7    correct?

8    A.  Yes.

9    Q.  Now, did your employment status at Mattel change?

10   A.  Yes.

11   Q.  And how did it change?

12   A.  I went from being a full-time employee to being

13   basically a part-time employee.

14   Q.  And when you moved to be a part-time employee, when you

15   moved to become a part-time employee, did you have a physical

16   move in residence?

17   A.  Yes.

18   Q.  And where did you move to?

19   A.  I moved to Kimberling City, Missouri.

20   Q.  And during that period of time, did you continue to do

21   some work for Mattel?

22         MR. PRICE:  Object as to the period of time.

23   Q.  BY MR. NOLAN:  The period of time that you were back in

24   Missouri in early 1998.

25   A.  Yes.

1    Q.  Okay.  Could you describe for the jury --

2        THE COURT:  Could you please tell, just for the

3    record, you're referring to January to April of 1998?

4        MR. NOLAN:  Yes.  I apologize.  January to April.

5    Q.  In fact, why don't we just time this for a moment.

6    Let's go to Exhibit 15609.  Do you have that in front of you?

7    A.  Probably.

8    Q.  15609.  Do you have that in front of you?

9    A.  Yes.

10       MR. NOLAN:  This is in evidence, your Honor.

11   Q.  And do you recognize this letter?

12   A.  Yes.

13   Q.  Did you sent it?

14   A.  Yes.

15   Q.  And who is it addressed to?

16   A.  It was addressed to Cassidy Park, Cynthia Miller, and

17   Human Resources.

18   Q.  And why did you send this letter to Mattel on April 15th

19   of 1998?

20       MR. PRICE:  Objection.  That's irrelevant, your

21   Honor.

22       THE COURT:  Sustained.  As to his reason.

23   Q.  BY MR. NOLAN:  After sending Exhibit 15609, did you

24   consider yourself to be an employee of Mattel?

25   A.  No.

Unsigned                                                    Page  2893

1    Q.  Now, in the letter, it said:  "I will still be available

2    for free-lancing projects."

3           Do you see that?

4           Your Honor, we'd offer 15609.

5           MR. PRICE:  No objection.

6           THE COURT:  It's admitted.  You may publish.

7           (Exhibit 15609 received.)

8           MR. NOLAN:  Thank you.

9    Q.  Now, this is the resignation.  It says:  "Dearest

10   Cassidy, Cynthia, and others concerned, please accept this

11   written notice of my resignation effective two weeks after

12   the date above, April 29, 1998.  I have decided to stay in

13   Missouri and pursue other interests.  I just want to say

14   thank you both so much for everything you've done for me

15   while I have been at Mattel.  My time and experience there

16   has been extremely valuable.  I will still be available for

17   free-lancing projects in the future, should you decide you

18   want to work with me on a project."

19          Do you see that?

20   A.  Yes.

21   Q.  So from the time you physically moved from El Segundo

22   and went back to Missouri in early January 1998, was it true

23   you were continuing to do free-lance projects for Mattel?

24          MR. PRICE:  Vague as to time.

25          MR. NOLAN:  During the period of January through

1    April of 1998.  April 15th.

2        THE WITNESS:  I wasn't really doing free-lance

3    projects so much.  I was just doing, you know, whatever

4    project they had that came up that they asked me to do.

5    Q.  BY MR. NOLAN:  I'd like to ask you to turn your

6    attention to Trial Exhibit 18460-001.

7    A.  Yes.

8    Q.  Do you recognize that exhibit?

9    A.  Yes.

10   Q.  Is there a date on that document?

11       Your Honor, I'd ask to approach.

12       THE COURT:  You may.

13   Q.  BY MR. NOLAN:  18460.001.  Do you have that?

14   A.  Yes.

15   Q.  And do you recognize that, sir?

16   A.  Yes.

17   Q.  And what is that exhibit that you are holding up?

18   A.  This is a master drawing of one of the projects that I

19   was working on for Mattel at the time.

20   Q.  And what time?

21   A.  I think this was January of '98.

22   Q.  While you were in Missouri?

23   A.  Yes.

24   Q.  And is that -- what's that project named?  Does it have

25   a name?

1   A.  Something about Jewels.  I don't remember exactly what

2   it was called.

3   Q.  I'd ask you to take a look at Trial Exhibit 15601-001.

4   Do you have that in front of you?

5   A.  Yes.

6   Q.  Do you recognize 15601-001?

7   A.  Yes.

8   Q.  And how do you recognize it?

9   A.  It's from the same project, same Jewel project.

10   Q.  When you say the same project, what are you referring

11   to?

12   A.  I'm referring to what -- this was the master of this

13   other exhibit.

14   Q.  And the two exhibits that you are referring to now as

15   the master is 18460-001, the tracing paper; is that correct?

16   A.  Yes.

17   Q.  And the other exhibit you were comparing was 15601-001?

18   A.  Yes.  Yes.

19   Q.  And is 15601-001 dated?

20   A.  Yes.

21   Q.  And what date is on there?

22   A.  It looks like 1/28/98.

23   Q.  And who put that date on it?

24   A.  I did.

25   Q.  And how do you know that?

1   A.  I recognize my handwriting.

2       MR. NOLAN:  Your Honor, I would offer into evidence

3   18460-001, the tracing paper, and Exhibit 15601-001.

4       MR. PRICE:  No objection.

5       (Exhibits 18460-001 and 15601-001 received.)

6   Q.  BY MR. NOLAN:  Could we put up 18460-001.  And on the

7   right side is 15601-001.

8       Do you see that?

9   A.  Yes.

10  Q.  And the exhibit on the right, 15601-001, do you see on

11  the far right-hand side, do you see your name and date?

12  A.  Yes.

13  Q.  And you were in Missouri at the time when you did this

14  drawing?

15  A.  Yes.

16  Q.  And both of those projects relate to something -- Jewel

17  something Barbie?

18  A.  It was a Jewel-related something or other.

19  Q.  And just to show the breadth of your talents, can I ask

20  you to take a look at 15243-001.

21  A.  Yes.

22      MR. NOLAN:  May I approach with the originals?

23      THE COURT:  You may.

24  Q.  BY MR. NOLAN:  Do you recognize 15243?

25  A.  Yes.

1    Q.  And what is it?

2    A.  I believe this was some kind of jewelry maker or

3    something that somebody dreamed up that they wanted me to

4    redesign so it was prettier or something.

5         MR. NOLAN:  Your Honor, we'd offer 15243-001.

6         MR. PRICE:  No objection.

7         THE COURT:  It's admitted.

8         (Exhibit 15243-001 received.)

9    Q.  BY MR. NOLAN:  So this looks a little bit different than

10   the drawings we've been looking at.

11   A.  Right.

12   Q.  And so you were asked to do something to this project?

13   A.  Yes.

14   Q.  What were you asked to do?

15   A.  I don't remember a lot about it other than they asked me

16   to kind of redesign the unit itself so that it was, you know,

17   more aesthetically pleasing.

18   Q.  And do you have 18486 in front of you?

19   A.  Yes.

20   Q.  And can you identify that for us?

21   A.  Yes.

22   Q.  And what is that exhibit?

23   A.  This looks like the solution that I came up with for

24   this project.

25        MR. NOLAN:  Your Honor, we'd offer 18486.

1          MR. PRICE:  No objection.

2          THE COURT:  It's admitted.

3          (Exhibit 18486 received.)

4     Q.  BY MR. NOLAN:  Can you publish that, Mr. Bryant, to the

5     jury?

6     A.  Yes.

7     Q.  So that was your idea?

8     A.  Well, you mean the project itself?

9     Q.  Yes.

10    A.  No.

11    Q.  And this is something you were asked to do by Mattel?

12    A.  Yes.

13    Q.  And all of this was done before you issued your

14    resignation, which is Trial Exhibit 15609; right?

15    A.  Yes.

16    Q.  I want to turn now to your life after resignation from

17    Mattel in April of 1998.  Did you take on any effort to align

18    yourself with an artist representative?

19    A.  Yes.

20    Q.  And can you explain to the jury the circumstances

21    leading to that?

22    A.  Well, I was really feeling that, you know, I wanted to

23    be a free-lance artist.  I wanted to do more illustrating as

24    far as it could be fashion illustrating or illustrating for

25    books or something like that.  And I felt like finding an

1    artist representative, which is somebody who actually takes

2    your work around to different people and shows them what you

3    do and, you know, what you are capable of.  And I thought

4    that would help me.

5    Q.  And do you remember the name of the agent or agency that

6    you hooked up with?

7    A.  I don't.

8    Q.  Were you successful through this agent or agency getting

9    any work?

10    A.  No.

11    Q.  Did you continue to pursue free-lance work?

12    A.  Yes.

13    Q.  And can you explain to the jury roughly what you were

14    doing with respect to efforts to sell free-lance work from,

15    let's say, April of 1998 through August of 1998?

16    A.  Well, I was doing a lot of greeting card designs.  I was

17    real interested in that.  I was doing some work for the

18    Ashton Drake galleries, doing some fashion illustrating for

19    them.  I'm trying to think.  Some of the other things that I

20    was doing were just kind of like test projects that I had

21    been given but really didn't lead anywhere.

22    Q.  Did you -- do you recall whether or not you did any work

23    with respect to Hallmark cards?

24    A.  I didn't do any work with them, but I did apply for a

25    job at Hallmark.

1    Q.  And what type of job were you looking for at Hallmark?

2    A.  To be a greeting card illustrator.

3    Q.  I'd like to ask you to take a quick look at

4    Exhibit 11167.  Do you have that readily available?

5    A.  Yes.

6    Q.  And what is 11167?

7    A.  This looks like an application for a fictitious business

8    name.

9    Q.  And did you -- how do you recognize it, sir?

10   A.  I just remember that I applied for this application.  Or

11   I filled out this application.

12         MR. NOLAN:  Your Honor, we'd offer 11167.

13         MR. PRICE:  No objection.

14         THE COURT:  It's admitted.

15         (Exhibit 11167 received.)

16         MR. NOLAN:  Can we publish it?

17         THE COURT:  Yes.

18   Q.  BY MR. NOLAN:  Now, this is a dba for Sophie Says?

19   A.  Yes.

20   Q.  And what was the purpose for Sophie Says as a dba for

21   you?

22   A.  Well, I don't exactly remember.  You know, I guess I was

23   hoping that I was going to be getting free-lancing work and

24   that, you know, this would be a way for me to get set up in

25   business and get moving.

1    Q.  Now, were you doing this in or after April of 1998?

2    A.  Yes.

3    Q.  In fact, the date of that is May 11, 1998?

4    A.  Yes.

5    Q.  And who is Sophie?

6    A.  Sophie was my basset hound.

7    Q.  I'm sorry?

8    A.  She was my basset hound.  And the reason I named it

9    Sophie Says is because whatever Sophie said went.

10   Q.  Did you also do other types of greeting cards during

11   this period of time?

12   A.  Yes.

13   Q.  Have you ever heard of a group or an idea named Rainy

14   Day Rascals?

15   A.  Yes.

16   Q.  And what is Rainy Day Rascals?

17   A.  Those were some characters that I was sketching, trying

18   to think of concepts for.  They were a group of just children

19   and the overall theme was, you know, that there was a rainbow

20   within every cloud, something like that.

21   Q.  Could I ask you to turn to 18494, Trial Exhibit 18494.

22       Do you have that?

23   A.  Yes.

24   Q.  And what is 18494?

25   A.  These were just some ideas that I was thinking of for,

1    you know, different characters that I could develop or

2    different, you know, brand ideas.  Just things I was thinking

3    about.

4        MR. NOLAN:  Your Honor, we'd offer 18494.

5        MR. PRICE:  No objection.

6        THE COURT:  It's admitted.  You may publish.

7        MR. NOLAN:  May I approach with the original, your

8    Honor?

9        THE COURT:  You may.

10       (Exhibit 18494 received.)

11   Q.  BY MR. NOLAN:  This document is entitled card group

12   ideas/licensing.

13       Do you see that?

14   A.  Yes.

15   Q.  Do you recall when you did this document?

16   A.  Sometime in 1998.

17   Q.  Now, after you resigned from Mattel?

18   A.  I believe so, yes.

19   Q.  And before you went back to work for Mattel in 1999;

20   correct?

21   A.  Yes.

22   Q.  Do you have 15393?

23   A.  Yes.

24   Q.  And do you also have 15333 in front of you?

25       I believe both of these are in evidence, your

1    Honor.

2         THE COURT:  Very well.

3         MR. NOLAN:  Then I'll approach with the exhibits.

4    Q.  Do you recognize 15393 and 15333?

5    A.  Yes.

6    Q.  And first, 15393.  Could you describe that for us?

7    A.  It is just a very rough sketch of one of my ideas for

8    the card line that I had been calling Rainy Day Rascals.

9    Q.  And it says Best of Luck on the outside, and then it

10   says -- or on the inside.  Best of luck in all your

11   endeavors.

12        Do you see that?

13   A.  Yes.

14   Q.  Is that all in your handwriting?

15   A.  Yes.

16   Q.  Did you draw that?

17   A.  Yes.

18   Q.  And when did you draw this?

19   A.  It was back in '98.

20   Q.  And then can you look at the original of that exhibit

21   for just a moment.

22        Do you have that?

23   A.  Yes.

24   Q.  Can you show it?

25   A.  Yes.

1    Q.  And this looks like it's on lined paper.

2    A.  Right.

3    Q.  And there's some perforations on the side.

4         Do you see that?

5    A.  Yes.

6    Q.  And is that just ripped out of a notebook?

7    A.  Yes.

8    Q.  I want you to take a look at 15333.

9    A.  Okay.

10   Q.  And do you recognize 15333?  This is in evidence.

11   A.  Yes.

12        MR. NOLAN:  Could we have this up?

13        THE COURT:  You may.

14   Q.  BY MR. NOLAN:  All right.  And this is -- well, what is

15   this?

16   A.  This is just another very, very rough sketch of a

17   concept for this Rainy Day card line.

18   Q.  And what is the saying up here?  "Whenever I need you,"

19   and then at the bottom, it says:  "There you are."

20   A.  Right.

21   Q.  And when did you do this drawing?

22   A.  '98.

23   Q.  Do you have exhibit -- I'm sorry.  Do you have the

24   original of this up there?

25   A.  Yes.

1    Q.  And could you pull it out for us.  Again, is this on --

2    describe the paper for us.

3    A.  It's just ordinary lined notebook paper.  Some

4    perforations on the side, and it looks like it was torn out.

5    Q.  Did you rip this out for this trial?

6    A.  No.

7    Q.  Mr. Price was asking you questions concerning notebooks.

8        Do you recall that?

9    A.  Yes.

10   Q.  And I think he was pointing out that in some of the

11   notebooks that you were looking at, there were pages that

12   were removed from the notebook.

13       Do you recall that testimony?

14   A.  Yes.

15   Q.  And, in fact, do you recall that some of the pages were

16   in fact taken out?

17   A.  Yes.

18   Q.  Did you rip any of those pages out as part of this

19   litigation?

20   A.  No.

21   Q.  Can you look at Exhibit 18497 for me.  And do you

22   recognize 18497?

23   A.  Okay, yes.

24   Q.  And what is 18497?

25   A.  These are just, again, some more drawings of these Rainy

1    Day kids, more card ideas.

2    Q.  Do you have the original there?

3    A.  I don't think so.

4    Q.  All right.

5         This is in evidence, your Honor.  May I approach

6    with the original?

7         THE COURT:  You may.

8    Q.  BY MR. NOLAN:  I'm placing in front of you the original

9    of 18497.  And could you hold up for the jury the original of

10   18497?

11        Now, this is the rainy day rascal drawing that we

12   just saw; correct?

13   A.  I think one of them is some sort of exploration of the

14   same idea, yes.

15        MR. NOLAN:  Now, your Honor, this is in evidence, I

16   believe.  Could we have this up?

17        THE COURT:  Very well.

18   Q.  BY MR. NOLAN:  So although it doesn't show on the

19   projected screen, if you hold up the original of the

20   document, now, this is on yellow paper; correct?

21   A.  Yes.

22   Q.  And if you just go back to the earlier exhibit that I

23   asked you to look at, which is 15333, the one with the

24   perforations.

25   A.  Yes.

1    Q.  So was there a method to your madness in terms of when

2    you would do something on notebook paper or a yellow paper --

3    and I didn't mean anything about method of madness.

4    A.  That's okay.  No, not really.  I just tended to grab

5    whatever was closest, and I just, you know, flipped to an

6    open blank page and started drawing.

7    Q.  Well, let's focus on these notebooks for just a moment,

8    if I can.

9         These notebooks were maintained by you; correct?

10   A.  What do you mean by maintained?

11   Q.  Well, I mean we have them.  They are in evidence.  And I

12   was just curious that before this lawsuit was filed, you had

13   the notebooks in your possession; correct?

14   A.  Yes.

15   Q.  And you produced those notebooks as part of the

16   litigation in this case; correct?

17   A.  Yes.

18   Q.  All right.  Now, before you produced those notebooks,

19   did you tear any of the pages out?

20   A.  No.

21   Q.  When you used the notebooks, can you explain to me

22   whether or not you had an intent or a practice to use the

23   pages sequentially in any notebook?

24   A.  No, I didn't have any kind of practice like that.  Like

25   I said before, you know, if I had an idea, I just grabbed a

1    notebook, opened it up, you know, and started drawing

2    wherever there was, you know, a blank spot.

3    Q.  Well, would you go to the very next available page in

4    the notebook and then start writing?

5    A.  No.  I just -- like I said, I would just kind of open it

6    willy-nilly.

7    Q.  Well, the exhibit that has been marked in this case, the

8    copy of the notebook is marked sequentially; correct?  Do you

9    remember the exhibit?

10        MR. PRICE:  I'll object as vague.  There are a

11   couple of notebooks.

12        MR. NOLAN:  I will come back to that.  I was trying

13   to do it a little bit quicker than I should have, your Honor.

14   I'm do it a different way.

15        THE COURT:  Very well.

16   Q.  BY MR. NOLAN:  Before I get to the actual notebooks, I

17   want to show you -- do you have Exhibit 18515 in front of

18   you?

19   A.  Yes.

20   Q.  And what is 18515?

21   A.  This looks like one of my greeting card designs that I

22   had done in '98.

23        MR. NOLAN:  Your Honor, we'd offer 18515.  It's in

24   evidence.  Can we show it on screen, and may I approach with

25   the original, your Honor?

Unsigned                                          Page  2909

1          THE COURT:  Very well.

2     Q.  BY MR. NOLAN:  So do you recognize what's on the screen

3     and what you are now holding up?

4     A.  Yes.

5     Q.  And what exactly is it?

6     A.  It was a greeting card design for a Valentine's greeting

7     card design.

8     Q.  Did you offer that greeting card up to anybody?  Were

9     you successful in selling that?

10    A.  No.

11    Q.  When did you do this greeting card?

12    A.  This was in 1998.

13    Q.  After you resigned from Mattel?

14    A.  I'm not sure.  I think I did it sometime early in the

15    year, but I don't recall exactly.

16    Q.  Do you have Exhibit 18498 in front of you?  Before we

17    leave this exhibit, in the right-hand corner, do you see that

18    there's a date on it?

19    A.  Yes.

20    Q.  And what does that date say?

21    A.  It says CHB-98.

22    Q.  And those are your initials?

23    A.  Yes.

24    Q.  Do you have Exhibit 18498 in front of you?

25    A.  Yes.

1    Q.  And what is 18498?

2    A.  This was just another greeting card design.

3         MR. NOLAN:  And this is in evidence, your Honor.

4         THE COURT:  Very well.

5    Q.  BY MR. NOLAN:  And this is another greeting card?

6    A.  Yes.

7    Q.  Okay.  And did you do this while you were in Missouri?

8    A.  Yes.

9    Q.  Do you recall the exact date when you did this one?

10   A.  Just that it was sometime in 1998.

11   Q.  Could you bring back the greeting card --

12        MR. PRICE:  If I may have a moment with Mr. Nolan.

13        MR. NOLAN:  Your Honor, we'd offer 18498 and 18497.

14   Our stipulation shows that they are in.

15        MR. PRICE:  Ours doesn't, but we have no objection.

16        THE COURT:  Very well.

17        (Exhibits 18497 and 18498 received.)

18   Q.  BY MR. NOLAN:  And directing your attention to 18497, do

19   you see the Rainy Day Rascals?

20   A.  Yes.

21   Q.  And do you see the various phrases that you have

22   depicted here under Rainy Day Rascals?

23        Can we blow up the handwritten portion, Aaron?

24        Do you see the "Hearing from you, brightens up the

25   whole day"?

1    A.  Yes.

2    Q.  And then it says:  "Whenever I need you, there you are"?

3         Do you see that?

4    A.  Yes.

5    Q.  And the last one is "Blowing love your way."

6         Do you see that?

7    A.  Yes.

8    Q.  And then in the big card that I gave you, which I

9    believe is Exhibit 18515.

10   A.  Yes.

11   Q.  And you see that the line there is "Blowing love your

12   way"?

13   A.  Yes.

14   Q.  That's the same phrase that was written out on what we

15   just showed, 18497; correct?

16   A.  Yes.

17   Q.  Now, do you have the notebook 1155-C in front of you?

18   It's the exhibit.

19   A.  Yes.

20        MR. NOLAN:  And, your Honor, with your permission,

21   I'll approach and take away some of these exhibits.

22        THE WITNESS:  Yeah, it's getting kind of crazy.

23        THE COURT:  You may.

24        MR. NOLAN:  Thank you.

25   Q.  Do you recognize this document?

1   A.  Yes.

2   Q.  I'm sorry.  I guess it's a tablet?

3   A.  Yes.

4   Q.  And it's a black notebook?

5   A.  Right.

6   Q.  And Mr. Price showed that to you; correct?

7   A.  Yes.

8   Q.  Can you hold up the original?

9   A.  Yes.

10  Q.  And that's a 120-page pen tab; is that correct?

11  A.  It seems to be, yes.

12  Q.  Do you know what date you -- well, strike that.

13       Did you date this notebook?

14  A.  No.

15  Q.  Was this a notebook -- do you recall when you purchased

16  the notebook?

17  A.  I have no idea.

18  Q.  Was it your practice, Mr. Bryant, to have a particular

19  notebook for each year, for instance, 1997, the work that you

20  did in 1997 would be contained in a notebook marked 1997?

21  A.  No, I hadn't had any practice like that at all.

22  Q.  So you don't have notebooks for individual years, let's

23  say for 1997; correct?

24       MR. PRICE:  Objection.  Leading.

25       THE COURT:  Sustained.

1          MR. NOLAN:  I'm sorry.  I'll rephrase.

2     Q.  Do you have notebooks that are identified by you for

3     only 1997 work?

4     A.  No.

5     Q.  Do you have a notebook identified by you which contained

6     only work that you did in 1998?

7     A.  No.

8     Q.  Do you have a notebook, Mr. Bryant, that is dated 1999

9     and contains only the work that you did or drawings that you

10    did in 1999?

11    A.  No.

12    Q.  And if I asked you the same questions for the years

13    2000, 2001, through today, would your answers be the same?

14    A.  Yes.

15    Q.  Looking at the black notebook that Mr. Price was asking

16    you questions about, he directed your attention to a notation

17    in there with respect to deposits and checks that were

18    written on a particular bank account.  Can you pull that out

19    for us?

20    A.  Yes.

21    Q.  Can you hold that up?

22    A.  Yes.

23    Q.  All right.  In the exhibit itself, which is marked

24    sequentially, it's marked as 1155-C-057.  Do you see that?

25    You don't have it, but let me do it this way.  The notebook

1    that you are handling right now, does it have any page

2    numbers on it at all?

3    A.  What do you mean by page numbers?  It's got these little

4    stickers on it.

5    Q.  Well, no, what I'm talking about is the tablet.  Did the

6    tablet come presold with numbers on the bottom?

7    A.  Oh, no.

8    Q.  So you can't tell what page number in the tablet that

9    notation from your bank account is contained on; right?

10   A.  No, I can't.

11   Q.  I want you to take a minute, and take as long as you

12   need.  Go through that notebook and tell me whether or not,

13   other than on that one page, you can point to any other bank

14   notations for any other month of any year.

15   A.  No, I can't.

16   Q.  Do you have any recollection -- do you have any

17   recollection of having a practice of reconciling a bank

18   statement in any particular notebooks?

19   A.  No.

20   Q.  And as you're sitting here, can you say to the jury what

21   reason you had for writing down things from a 1999 bank

22   statement in this black book?

23   A.  It was probably just the closest notebook that I had

24   laying around.

25   Q.  Does the fact that you have handwritten notations from a

1    bank statement in 1999 indicate to you that everything in

2    that black notebook was entered in the year 1999?

3    A.  No, not at all.

4    Q.  I'd like to ask you to take a look, if you would, and

5    tell me whether or not you can see in any of the drawings, do

6    you see any drawings that resemble the drawings that you

7    previously identified as relating to the Jewel Barbie

8    project?

9    A.  Yes.

10   Q.  And how far into the notebook are those?

11   A.  Well, it's this first page.

12       MR. NOLAN:  Your Honor, I believe this is all in

13   evidence.  Can we put this up?  This is 1155-C-005.

14       THE COURT:  You may.

15   Q.  BY MR. NOLAN:  Do you see that, sir?

16   A.  Yes.

17   Q.  Does that relate to Jewel Barbie?

18   A.  Yes.

19   Q.  And you were working on Jewel Barbie at Mattel in the

20   year 1998; correct?

21       MR. PRICE:  Objection.  Leading.

22       MR. NOLAN:  I apologize, your Honor.  It's the

23   lateness of the hour.

24       THE COURT:  Very well.

25   Q.  BY MR. NOLAN:  Do you recall, Mr. Bryant, that I was

1    showing you drawings a few minutes ago with respect to

2    something related to a Jewel Barbie?

3    A.  Yes.

4    Q.  You recall that line of testimony?

5    A.  Yes.

6    Q.  And when do you recall working on Jewel Barbie for

7    Mattel?

8    A.  My first Jewel Barbie project was sometime in January of

9    1998.

10         MR. PRICE:  Your Honor, I move to strike the answer

11   as nonresponsive.

12         THE COURT:  Sustained.  The answer is stricken.

13         Mr. Nolan, do you wish to have a question answered?

14         MR. NOLAN:  Yes.

15         THE COURT:  Will the reporter please read the

16   question.

17         (Record read.)

18         THE WITNESS:  There was one in 1998 and also one in

19   1999.

20   Q.  BY MR. NOLAN:  Do you have a brother by the name of

21   Wade?

22   A.  Yes.

23   Q.  Is he married?

24   A.  Yes.

25   Q.  What's his wife's name?

1      A.  Lisa.

2      Q.  Do they have any children?

3      A.  Yes.

4      Q.  And what are the names of the children?

5      A.  Christopher and Allison.

6      Q.  And do you recall Wade, Lisa, Christopher, and Allison

7      visiting your parents in Missouri?

8      A.  Yes.

9      Q.  I'd like to ask you to draw your attention to the

10     original notebook and ask you if you can identify any letter

11     from Wade and Lisa that's set forth in this notebook.

12     A.  Yes.

13     Q.  And I believe this is in evidence.  1155-C-087.

14          Do you see that?

15          Your Honor, can we publish this?

16          THE COURT:  You may.

17          THE WITNESS:  Yes.

18     Q.  BY MR. NOLAN:  It says:  "Mom and dad, thanks for

19     everything.  Here's a little grocery money.  We enjoyed our

20     stay so much.  This place is so beautiful.  We look forward

21     to coming back again in the next few weeks.  Love you so.

22     Wade, Lisa, Christopher, and Allison."

23          Do you see that?

24     A.  Yes.

25     Q.  Do you have any explanation how it is that your brother

1    had access to your notebook to write a letter?

2    A.  It must have just been laying around, you know, could

3    have been on the dining table or something.

4    Q.  And looking at this notebook, can you see any artwork

5    from Allison or Christopher, your nephew and niece?

6    A.  Yes.

7    Q.  Can you hold up for me one that I can see and recognize

8    and put up on the screen.

9         Let me ask you -- that's not page number -- can you

10   hold that up for the jury?

11        Mr. Bryant, did you do that drawing?

12   A.  No.

13   Q.  Can I ask you to look in your notebook to see whether or

14   not you could come up with some other drawings, and in

15   particular, maybe you could go to the actual exhibit itself,

16   1155-C-071.

17        And this is in evidence, your Honor.  Can we have

18   this up?

19        THE COURT:  You may.

20   Q.  BY MR. NOLAN:  Maybe I can ask you to look at this,

21   Mr. Bryant, given the lateness of the hour.

22   A.  Yes.

23   Q.  Can you find that in your notebook?

24   A.  Yes.

25   Q.  Your black notebook?

1    A.  Yes.

2    Q.  You see that drawing on the right-hand side?

3    A.  Yes.

4    Q.  That's not your drawing.

5    A.  No.

6    Q.  Any idea how or do you know who drew that?

7    A.  My best guess is that my little niece Allison did it.

8    Q.  How did Allison have access to your notebook?

9    A.  It must have, you know, been laying on the, you know,

10   dining table or something in my parents' home, and they might

11   have grabbed it and started coloring in it.

12   Q.  Do you remember Wade, Lisa, Allison, and Christopher

13   visiting your parents in Missouri in 1998?

14   A.  Vaguely.

15       MR. NOLAN:  Your Honor, would this be a good time

16   to stop?

17       THE COURT:  You're moving onto another area?

18       MR. NOLAN:  Yes, I am.

19       THE COURT:  Very well.  We'll take our recess for

20   the day.  And I'll see the jury tomorrow morning at 9:00.

21       (WHEREUPON THE JURY WITHDRAWS.)

22       THE COURT:  Counsel, please be seated.  I

23   understand there's a few issues that counsel wanted to take

24   up at the end of the day.  Or perhaps not.

25       MS. AGUIAR:  I just didn't want to stand up first.

1    It seemed like we were able to get another binder for your

2    Honor regarding deposition designations.

3         THE COURT:  All right.

4         MS. AGUIAR:  Janet Bryant.

5         THE COURT:  Very good.  So I have both now Janet

6    Bryant and Galvano.

7         MS. AGUIAR:  Yes.  And I also understand that

8    we've -- well, we've been able to arrange this nonparty

9    witness question, work out some things so far today,

10   Mr. Zeller and I.  Mr. Kamarck, K-A-M-A-R-C-K, will be coming

11   in tomorrow at 1:30.

12        THE COURT:  Very well.  So we'll take him out of

13   order if we need to?

14        MS. AGUIAR:  That's what we had sort of thought,

15   that he would be at the point where he could testify after

16   lunch.

17        They had also requested a Margaret Leahy.  I

18   informed Mr. Zeller that we intended to call her because she

19   said that she wasn't available tomorrow.  So I said we're

20   going to call her in our case, and we talked about the fact

21   that they could question Ms. Leahy when we called her in our

22   case.

23        THE COURT:  Was that agreeable, Mr. Zeller?

24        MR. ZELLER:  Yes, although what I offered to do was

25   not to just take Mr. Kamarck out of order regardless.  What

1    my expectation was was by that time we would be between

2    experts.  It was not if Mr. Bryant is still on the stand.  I

3    mean, just to be very clear about that.  That was not a

4    subject that we had discussed, and certainly if Mr. Bryant is

5    still on the stand, I don't see us agreeing to interrupt

6    that.

7         THE COURT:  Very well.

8         MR. ZELLER:  To have Mr. Kamarck.  So I expressed

9    some willingness to be flexible.  And my, but that's a

10   different kettle.

11        THE COURT:  Is Mr. Kamarck available tomorrow

12   afternoon?

13        MS. AGUIAR:  I didn't mean to suggest that either.

14   That's sort of what I meant by Mr. Zeller, and I thought we

15   would be at a point where we wouldn't have to interrupt a

16   major witness.  He is available.  He does have family issues.

17   So if he comes tomorrow afternoon, he does have to testify

18   tomorrow afternoon at some point.  He just can't come back.

19        THE COURT:  Okay.

20        MS. AGUIAR:  The question is still outstanding

21   regarding Farhad Larian, and I don't know whether we've

22   worked that out because he was not available for tomorrow.

23   And lastly, Peter Marlow.  I think, again, he's on the list

24   for tomorrow, and I think that we'd like to have now a

25   proffer from Mattel --

1          THE COURT:  Well, where is Mr. Farhad Larian?

2          MR. ZELLER:  I'm sorry?

3          THE COURT:  Where is Mr. Farhad Larian?  Perhaps

4    someone from MGA can answer that question.

5          MS. AGUIAR:  I don't know, your Honor.  I'm sorry.

6    I don't know where he is physically.

7          THE COURT:  He was subpoenaed to be in the trial;

8    right?

9          MR. ZELLER:  That's correct.  And maybe to cut to

10   the chase on this, your Honor, I understand that he is

11   available on Friday.  I did receive an e-mail to that effect.

12   I believe that that is confirmed.  As certain as I can be of

13   that date in the courtroom, of course, and, of course,

14   with -- but I believe that that has been resolved.

15         THE COURT:  All right.

16         MR. NOLAN:  On that point, we don't represent

17   Farhad Larian.  My understanding is that there have been

18   moving dates, nobody's fault, as to when he would be

19   available.  Tomorrow he's not available.  We agreed that even

20   if we had to take him out of order and interrupt our case on

21   Friday, they could do that.  So I don't think there's any

22   issue there.

23         THE COURT:  All right.  So that's it?

24         MR. QUINN:  One thing, your Honor.  Looking forward

25   to the defense beginning their case this week, we assume,

Unsigned                                                    Page  2923

1   we've been told that one of the early witnesses they want is

2   Mr. Kilpin.  Mr. Kilpin is the Mattel marketing executive who

3   is the author of documents that highlight terms such as house

4   on fire, brand in crisis, those types of things.  He was not

5   even employed by Mattel at the time of these events in 2000.

6   He comes on board a couple of years later.

7       These are documents, I think, in my view, that go

8   only to the question of what was Mattel's purpose in bringing

9   this suit.

10      Now, there was a motion in limine on this subject,

11  and as I recall, the Court said that in principle, the Court

12  did not think the purpose of bringing this suit was relevant.

13      So I guess I'd like to -- following the -- what

14  counsel did here is get a proffer on Mr. Kilpin, because if

15  he's only going to be called to deal with these issues about

16  the purpose in which for the lawsuit, that Mattel was in

17  trouble, that Barbie was in trouble and that somehow that's

18  relevant to this, I'd like to have some understanding of

19  that.

20      THE COURT:  Well, I'm not going to require either

21  side to have proffers of their witnesses, of upcoming

22  witnesses at this point.  That what is the purpose of

23  depositions.

24      Counsel and anyone calling the witness runs the

25  risk, if that witness doesn't have relevant information, of

1   being shut down on the stand.  But I'm not going to do things

2   in the abstract or entertain motions in limine.  I have ruled

3   on motions in limine, and probably with both of these

4   witnesses, take the Court's guidance and run your own risk.

5         MR. QUINN:  Okay.  I'm also reminded that perhaps

6   the Court was going to give us some guidance today on what

7   affirmative defenses are in 1-A and 1-B, perhaps in

8   particular the remaining statute of limitations issues.

9         THE COURT:  Is there -- I believe I've already

10   spoken to the affirmative defenses other than statute of

11   limitations; is that correct?  Or is there still confusion?

12         MR. QUINN:  I'll defer to Mr. Zeller.

13         MR. ZELLER:  Yes, your Honor, and whether there was

14   ever a definitive statement by the Court, I'll leave to the

15   Court.  But the Court certainly seemed inclined the last time

16   there was a full-blown discussion of it, that defenses would

17   be in 1-B, with the question of statute of limitations and

18   whether that would be in 1-A.

19         THE COURT:  Well, I think that we had not resolved

20   the issue.  The Court had not issued its final ruling on

21   statute of limitations whether we had that discussion.  Is

22   there any reason why the statute of limitation evidence

23   cannot wait until 1-B from Mattel's perspective?

24         MR. ZELLER:  From our perspective, no.

25         THE COURT:  Let me hear from MGA.

1         MR. NOLAN:  Yes, your Honor.  Let me just go back.

2    I'll answer your question there in just a second.  I don't

3    think that Mr. Zeller is absolutely correct that there was a

4    definitive ruling from the Court, that the affirmative

5    defenses would be tried in 1-B.  There was certainly

6    discussion about it, but I don't think a definitive answer

7    was made.  At least I didn't understand it, and I thought --

8    I took away that the Court was going to see how the evidence

9    came in to see whether or not it made sense to do that.

10         With respect to the statute of limitations, your

11   Honor, we believe that they have opened up a door in so many

12   ways.  When we started this trial, we expected, based on the

13   rulings of the Court, and certainly the Court has not changed

14   its view at all in this regard, that the date of October 19th

15   was the critical line of demarcation, if you would.  And we

16   would submit that we think the record is quite clear that

17   that date has been opened and pushed considerably further

18   into the development of Bratz way past any time limitation.

19         The concealment evidence, your Honor, and this I

20   think was the key point where your Honor wanted to see how

21   the evidence was going to be developing, Mr. Larian was

22   subject to a considerable amount of testimony,

23   cross-examination on whether or not he was intending to

24   conceal the state of Carter Bryant's attachment to the Bratz

25   project all the way out into, I think, the last evidence that

1    they introduced was the year 2004.

2        We want to be able to put into context, your Honor,

3    what was actually going on in the marketplace because they

4    had Ivy Ross come up here and testify, and I can give you

5    line and verse tomorrow morning.

6        I don't think I can do it right now, but such that

7    I remember being able to ask Ivy Ross was she aware, based on

8    Kilpin, about the house on fire, Mattel, the brand Barbie was

9    in crisis because of the testimony that they had elicited

10   from Ivy Ross with respect to the innovation of the design,

11   the design center, how creative they were, the blue sky days

12   that they had where people were free to bring in their

13   projects, not limited in time, and also to the success of

14   Barbie.

15       And at that time I asked her the questions. There

16   was an objection. The record will reflect that the Court

17   overruled those objections at the time. We believe that they

18   opened up the door to that to allow us to put in those

19   documents with respect to Mr. Kilpin.

20       Now, with respect to the statute of limitations, it

21   goes to the same point, your Honor. They -- I submit

22   respectfully it's been a moving target for us. I'm still not

23   certain I understand what their position is with Toon Teens.

24       I now understand that they are saying they are not

25   contending that it was the idea that we took and that they

1   were only using it for a limited purpose of putting a time

2   frame as to when Carter Bryant did his drawings.

3          THE COURT:  You are only now coming to that

4   conclusion?

5          MR. NOLAN:  No, I'm being facetious.

6          THE COURT:  I hope so.

7          MR. NOLAN:  I'm sorry.  I understood that, but

8   there was all that testimony about the arms and the pose and

9   the creative nature of it from Lily -- from Ivy Ross and Lily

10   Martinez.  And my only point on that, your Honor, is that, if

11   they introduce that evidence, that triggers their knowledge

12   of any similarities between Carter Bryant's drawings and Lily

13   Martinez.  And, in fact, I believe on direct examination,

14   your Honor, with Ivy Ross, and I think again with Lily

15   Martinez, there was quite a bit of testimony about Toon Teens

16   and the relevance of Toon Teens.

17          Our only point, your Honor, is we believe that that

18   is now relevant for the trier of fact to understand, wow,

19   Toon Teens has some relevance here.  They were on notice, and

20   they should have been on notice to make inquiry notice as to

21   what's going on.  I think it's relevant to the statute of

22   limitations in particular.

23          I think that it also is relevant to the question of

24   concealment and whether or not this concealment, and we've

25   cited case law in summary judgment, that concealment is a

1    pretty cool doctrine in terms of -- well, that's not very

2    legalese of me.  Is a recognized defense, a tolling of the

3    statute of limitations, but there's case law that we've cited

4    to if the alleged concealment is not successful, and if the

5    other side is already on notice of certain things, that that

6    doesn't stop them from doing a reasonable investigation.

7            That's that whole point, we believe that that's why

8    now it's relevant in Phase 1-A.  I don't think it takes up a

9    lot of time, but that's my point.

10           THE COURT:  Very well.  These are my thoughts.  I

11   have tried to keep the line at October 19th as best as

12   possible.  And when the line has been blurred, I've allowed

13   it to be blurred, if that's the right word, for one of two

14   reasons, either one, because it's evidence of things

15   happening after October 19 that relates back to the

16   pre-October 19th time period, or two, it goes to issues of

17   credibility, for example, the declaration that Mr. Bryant

18   submitted along with the patent application.

19           Those are the only two occasions in my mind that

20   I've permitted that evidence in.

21           Otherwise, I have tried to keep from both sides

22   evidence beyond that out.  If the jury comes back in favor of

23   MGA at the close of the case, of Phase 1-A, all of these

24   affirmative defenses, the statute of limitations, all of that

25   is irrelevant.  This trial is over.  MGA wins.  We're done.

1          If the jury comes back in favor of Mattel at the

2    end of Phase 1-A, all of these affirmative defenses are still

3    in play.  That is the time to bring the rest of the evidence

4    related to the affirmative defenses in.  The door is then

5    blown wide open.

6          We no longer have to have this distinction.  It's

7    the same jury that's heard all of the evidence that,

8    Mr. Nolan, you say has already come in.  Plus they will hear

9    all the additional evidence from 1-B, and they will be able

10   to the extent the Court needs an advisory opinion on any of

11   these affirmative defenses, the Court could ask for it at

12   that time.

13         To the extent the Court doesn't, the Court will

14   have all of that evidence before it.  It's just from a

15   standpoint of judicial economy, from a standpoint of avoiding

16   undue prejudice of the evidence and confusing the jury about

17   this post-October 19th evidence.

18         I think it makes sense for the Court to reaffirm

19   what I think Mr. Zeller described not as the Court's final

20   ruling but the inclination to reserve the affirmative

21   defenses and not only include that the statute of limitations

22   for Phase 1-B.  I think that keeps it a lot clearer.  Because

23   to the extent we fully open the door at this point, I've got

24   to give Mattel leave to bring in all of their evidence.

25         I think it muddies the waters tremendously, and

1    like I said, if MGA prevails in Phase 1-A, it will have all

2    been for something.  MGA is not giving up anything by

3    reserving this except perhaps the undue prejudice and

4    confusion of the issues that I think is a real risk if all of

5    this evidence were to come in in 1-A.  So that's my ruling.

6          Is there anything further from Mattel on this

7    point?

8          MR. ZELLER:  No, your Honor.

9          THE COURT:  Anything further from MGA on this

10   point?

11         MR. NOLAN:  No, your Honor.  Thanks for the

12   clarity.

13         THE COURT:  Very well.  So that's the Court's

14   decision on that.

15         Anything else that we need to take up at this time?

16         MR. QUINN:  No, your Honor.

17         MS. AGUIAR:  May I just go back to one point, your

18   Honor?

19         THE COURT:  Yes, Ms. Aguiar.

20         MS. AGUIAR:  I'm recalling one of your Honor's

21   comments at the beginning of Bryan Armstrong's testimony

22   where he had gotten three or four questions in, and I

23   requested a sidebar, and we were talking about the scope of

24   his testimony.  And I know you commented to me why are we

25   just raising this now when he's on the stand.  I think we're

1    going to have a similar issue with Peter Marlow.  And I

2    appreciate your comments about not requesting proffers on

3    every witness.

4         Mr. Marlow is not just a nonparty.  He's the

5    husband of a nonparty.

6         THE COURT:  Well, let me stop you.  Mr. Armstrong,

7    we knew exactly where he was going with that, and that's what

8    prompted the Court's comment.  There's no confusion in terms

9    of what Mr. Armstrong was going to be testifying to unless

10   that was my mistake.

11        MS. AGUIAR:  I guess my point is that to avoid

12   having sidebars in front of the jury, he did not work with

13   Carter Bryant during the relevant time period, he testified

14   that he doesn't know what work Carter Bryant did during the

15   relevant time period, he wasn't an MGA employee, he wasn't

16   directly an MGA vendor.  He was the husband of Veronica

17   Marlow.

18        I'm not saying he shouldn't take the stand.  I'm

19   just saying in terms of the scope and relevance of his

20   testimony to this phase of the trial, I think -- I just think

21   we may end up with a lot of distraction and a lot of waste of

22   the jury's time tomorrow when he's on the stand.  I just

23   wanted to raise that issue now.

24        THE COURT:  I appreciate that, and you're probably

25   right, Ms. Aguiar.  I don't like going through the process of

1    calling the witness and then -- my reference earlier to you

2    run the risk, I mean that was Mattel who called

3    Mr. Armstrong.  And then we had to unceremoniously remove

4    Mr. Armstrong.  So I don't think there's any prejudice,

5    certainly, to MGA by not having this proffer that you're

6    asking for.

7         MS. AGUIAR:  Not at all.  And I wasn't suggesting

8    that.  I was really just saying for efficiency's sake --

9         THE COURT:  I thought you were asking for a

10   proffer.  I must have misunderstood.

11        MS. AGUIAR:  No, I was just saying I think this is

12   an issue, and it's going to come up again tomorrow, and

13   that's the reason I was trying to figure out where we're

14   going.

15        THE COURT:  And I appreciate your bringing it up,

16   but what I'm not going to do is go down the road of asking

17   either side to make proffers on the record in terms of what

18   witnesses are going to say.  So I'm not doing that, but I

19   will encourage you to continue to let me know prior to,

20   during a break, in the morning, right now, to bring up these

21   issues with respect to concerns about whether we could say

22   categorically nothing that the witness is going to say will

23   be relevant.

24        You've articulated reasons why it might not be.

25   I'll hear from Mattel in the morning.  Right now I have to

1    run off because I have to teach a class at 6:00.

2         MR. NOLAN:  Real quick.  The filing that was the

3    subject of the in-chambers discussion, the opposition has

4    been filed, and we were just curious as to whether or not we

5    could have leave to file a very quick brief.

6         THE COURT:  This is the -- which motion is this?

7         MR. NOLAN:  This is the motion that led to the OSC.

8         THE COURT:  Yes.

9         MR. NOLAN:  This is for the additional discovery.

10        THE COURT:  I think I'm prepared -- I did receive

11   an e-mail indicating that an opposition had been filed.  Let

12   me take a look at what's been filed, and if I need anything

13   further from counsel before I make a decision, I'll let you

14   know.

15        MR. NOLAN:  Thank you very much.

16        THE COURT:  Anything further from either side?

17        Good evening.

18

19        (Proceedings concluded at 5:19 P.M.)

20

21

22

23

24

25

1

2

3

4

5

6

7          C E R T I F I C A T E

8

9

10         I hereby certify that pursuant to Title 28,

11    Section 753 United States Code, the foregoing is a true and

12    correct transcript of the stenographically reported

13    proceedings in the above matter.

14         Certified on June 17, 2008.

15

16

          _____

17         MARK SCHWEITZER, CSR, RPR, CRR

          Official Court Reporter

18         License No. 10514

19

20

21

22

23

24

25