1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    ---

4       HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                    ---

6    MATTEL, INC.,          : PAGES 3469 - 3588
                            :
7          PLAINTIFF,       :
                            :
8       VS.          : NO. ED CV04-09049-SGL
                     : [CONSOLIDATED WITH
9    MGA ENTERTAINMENT, INC.,    : CV04-9059 & CV05-2727]
     ET AL.,          :
10                    :
          DEFENDANTS.    :
11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17              TUESDAY, JUNE 24, 2008

18              JURY TRIAL - DAY 17

19               MORNING SESSION

20

21

22          MARK SCHWEITZER, CSR, RPR, CRR
            OFFICIAL COURT REPORTER
23          UNITED STATES DISTRICT COURT
            181-H ROYBAL FEDERAL BUILDING
24          255 EAST TEMPLE STREET
            LOS ANGELES, CALIFORNIA 90012
25          (213) 663-3494


                    Unsigned                    Page  3469

1    Appearances of Counsel:

2

3    On Behalf of Mattel:

4    Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
     By John B. Quinn, Esq.
5      B. Dylan Proctor, Esq.
       Michael T. Zeller, Esq.
6      Harry Olivar, Esq.
       John Corey, Esq.
7      Diane Hutnyan, Esq.
       William Price, Esq.
8    855 South Figueroa Street
     10th Floor
9    Los Angeles, CA 90017
     (213) 624-7707
10

11

12   On Behalf of MGA Entertainment:

13   Skadden, Arps, Slate, Meagher & Flom LLP
     By Thomas J. Nolan, Esq.
14     Carl Alan Roth, Esq.
       Jason Russell, Esq.
15     Lauren Aguiar, Esq.
       David Hansen, Esq.
16     Matthew Sloan, Esq.
       Robert Herrington, Esq.
17   300 South Grand Avenue
     Los Angeles, CA 90071-3144
18   (213) 687-5000

19

20

21

22

23

24

25

1            I N D E X

2

3     CASSIDY PARK, SWORN...................................... 3486

4     DIRECT EXAMINATION BY MR. ZELLER: ..................... 3486
       CROSS-EXAMINATION BY MR. NOLAN:  ..................... 3494
5     REDIRECT EXAMINATION BY MR. ZELLER: ................... 3554
       RECROSS-EXAMINATION BY MR. NOLAN: .................... 3559
6     FURTHER REDIRECT EXAMINATION BY MR. ZELLER:............ 3562
       FURTHER RECROSS-EXAMINATION BY MR. NOLAN: ............ 3563

7
       CRAIG HOLDEN, SWORN.................................... 3564
8
       DIRECT EXAMINATION BY MR. QUINN: ...................... 3564
9     CROSS-EXAMINATION BY MS. AGUIAR:...................... 3569

10
       VIDEOTAPED DEPOSITION EXCERPTS OF JACKIE RAMONA PRINCE. 3574
11

12

13

14           E X H I B I T S

15

16    (Exhibit 13675 received.).............................. 3491

17    (Exhibits 13677, 13678, and 13676 received.)........... 3493

18    (Exhibit 15952 received.).............................. 3499

19    (Exhibit 250 received.)................................ 3526

20    (Exhibit 10034 received.).............................. 3569

21    (Exhibit 13629 received.).............................. 3572

22

23

24

25

1        Riverside, California; Tuesday, June 24, 2008

2                9:50 A.M.

3        (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

4        THE COURT:  Good morning, Counsel.  A couple of

5    matters the Court wanted to take up as a follow on from last

6    evening.  Do we have an agreement on the stipulation

7    concerning Mr. Menz?

8        MR. NOLAN:  We do, your Honor, subject to all of

9    the previous objections that we've reserved.

10       THE COURT:  Very well.

11       MR. NOLAN:  We've agreed on the language that the

12   Court mediated last night.

13       THE COURT:  Maybe I should just type out a

14   stipulation for the rest of the trial, and subject to your

15   objections, we can move along.

16       MR. NOLAN:  The one I raised with Mr. Quinn is I

17   advised him that last night, because he wasn't here, that you

18   ruled that when you run out of time, you have to leave the

19   courtroom.

20       THE COURT:  Very good.  All right.  I'll then trust

21   the parties will at some point in time.

22       Mr. Corey, I don't know if you'll be doing it for

23   Mattel or somebody will read that into the record for the

24   jury.

25       MR. QUINN:  We'll do that, your Honor.

1          THE COURT:  Very well.  All right.  I'll leave that

2     up to you.

3          MR. NOLAN:  Your Honor, I apologize.  I assume the

4     introduction would be that in lieu of the introduction of

5     expert testimony, the following stipulation has been reached.

6          THE COURT:  Very good.

7          MR. NOLAN:  You know, since MGA was not aware of

8     the use of Evidence Eliminator, I want to make certain that

9     the jury just knows that this is to avoid the calling of

10     expert -- the two expert witnesses.

11          THE COURT:  Very good.  I'll explain that to the

12     jury.

13          MR. COREY:  And just to make it perfectly clear,

14     the web page is coming into evidence.

15          THE COURT:  Yes, that is clear.  All right.  You

16     know, I've spent too much time thinking about Peter Marlow.

17     And this is what I've decided to do.  And I'm certainly not

18     calling this an inspired decision, but this is a decision.

19          The ex parte application will be denied.  I'm not

20     going to categorically exclude Peter Marlow from the witness

21     stand; however, the 2005 e-mail is in evidence.  It's been

22     examined vis-a-vis Mr. Larian.  I think we've heard enough

23     about the 2005 e-mail at this time.

24          MGA had people working for them, either knowingly

25     or unknowingly, that were Mattel employees during the

1   relevant time period.  There is a hotly disputed issue as to

2   whether or not MGA, particularly Mr. Larian, knew about that.

3   I view that as a factual dispute.  Both sides may present

4   their evidence and their argument concerning that point, and

5   Mr. Marlow can be questioned about it.  MGA can call whoever

6   they want to question about that, and we'll let the jury

7   decide that issue.  I think at the end this is one that is

8   simply best handled by allowing the witnesses to go forward.

9          Although I'm denying the ex parte application,

10  particularly in light of the Court's ruling on the motion in

11  limine, MGA is preserving and may exercise all of its

12  objections based on foundation, hearsay, or anything else

13  that they want to make sure during the course of Peter

14  Marlow's testimony.  All I'm ruling at this point is I am not

15  categorically excluding Peter Marlow from the witness stand,

16  although I am indicating that the Court, the jury has heard

17  enough about the 2005 e-mail from Mr. Larian.

18         MR. NOLAN:  Your Honor, the one point that didn't

19  come out yesterday, we've always understood that the real

20  purpose and subtext of Peter Marlow's testimony is Mattel's

21  effort to try to get before the jury the assertion of the

22  Fifth Amendment privilege by him.  That's why of all of the

23  witnesses that could testify at this point, that's why we

24  believe Peter Marlow is being called to the stand.  There

25  would be no mention of the assertion of the Fifth Amendment

1    privilege unless there was a sidebar conference ahead of

2    time.

3         THE COURT:  I think that's appropriate to do a

4    sidebar.  The law is quite clear that the assertion of the

5    Fifth Amendment privilege is admissible in a civil trial

6    provided that it serves or provides as a prior inconsistent

7    statement.

8         So there would have to be a showing that in fact it

9    is inconsistent with a prior -- with the Court testimony as

10   opposed to simply having been exercised or invoked and now

11   he's telling the truth.  So that will be the standard the

12   Court will employ if and when that objection is raised by

13   MGA.

14        But I do agree that we should not blurt out in

15   front of the jury about the Fifth Amendment absent a sidebar.

16   So I'm hoping that the testimony will come in in such a way

17   that it's not even necessary to go there.

18        Mr. Zeller.

19        MR. ZELLER:  Yes, your Honor.  And I understood,

20   from the Court's prior comments from the other day, that we

21   would have a sidebar before there's any mention of the Fifth

22   Amendment.

23        THE COURT:  Very well.

24        MR. ZELLER:  Now, one question I did have just to

25   make sure I understand with respect to Mr. Marlow, is the

1    Court saying we cannot make inquiry of the 2005 e-mail?

2         THE COURT:  Basically.  I'm saying it's cumulative

3    at this point in time.  It's -- yes.  On 403 grounds let's

4    just stay away from the 2005.  It's already in evidence.  The

5    jury has already seen it.  Mr. Quinn may use it in his

6    closing argument.  But I think we've had enough on that.

7         MR. ZELLER:  And I assume that that's subject to

8    potential redirect, assuming what -- so in other words, I'll

9    stay away from it on direct.

10        THE COURT:  Exactly.  Exactly.

11        MR. ZELLER:  And then assume the same --

12        THE COURT:  Prior to getting into it on redirect

13   again, let's front this with the Court.

14        MR. ZELLER:  Thank you.

15        THE COURT:  Any other questions?

16        Very well.  Is the jury ready?

17        THE CLERK:  They are here.

18        THE COURT:  I'll do the transcript during the

19   break.

20        MR. QUINN:  Your Honor, before the jury comes in,

21   could I raise just a couple of issues?

22        THE COURT:  Yes.

23        MR. QUINN:  First, your Honor, we'd request leave

24   to file a motion with the Court.  We've prepared a five-page

25   set of moving papers, and what it's directed to is the issue

1    of waiver, subject matter waiver of the attorney-client

2    privilege with respect to the documents that we discussed in

3    chambers last Friday.

4         We think the issue -- it seems to us that the issue

5    of whether those documents which were the subject of that

6    conference should be usable has gotten linked in a way to the

7    Rosembaum documents in a way that analytically we think

8    doesn't really -- isn't appropriate.  I mean, just in a

9    nutshell, whether or not the Rosembaum documents ever come

10   into evidence, they were provided to us.  And that

11   constitutes a waiver and we believe a subject matter waiver

12   under Ninth Circuit law under which those other documents

13   should now come in.

14        So putting aside, we understand the Court's ruling

15   on crime fraud, there's an issue there about whether there

16   has been a subject matter waiver.  That's the subject of the

17   motion.  It's a five-page motion.  We've got it prepared and

18   are prepared to submit it to the Court.

19        THE COURT:  I mean, I thought we had discussed

20   waiver, but to be honest, the Court was focused on the crime

21   fraud exception.  Let me hear from Mr. Nolan very briefly and

22   see if this is something which justifies a written

23   submission.

24        MR. NOLAN:  Your Honor, I do believe that we had

25   talked about waiver so much in this case.  In fact, even I

1    think during the process of motions for claw back on

2    particular documents, when the issues came up, and motions to

3    compel. I can't cite to page and reference, but I know that

4    we talked about subject matter waiver. I agree that in the

5    in-chambers conference that specifically was not discussed,

6    but I think this is beating a dead horse, with all due

7    respect, your Honor.

8        THE COURT: Yeah, it may very well be. And I will

9    officially declare the horse dead if this does not

10    resuscitate it. But I didn't focus on waiver up to this

11    point. So you may file your motion. And MGA may file a

12    response. No reply. And the Court will consider it.

13        MR. QUINN: Understood. Thank you, your Honor.

14    And then another issue which is going to come up --

15        THE COURT: If I don't buy the waiver argument, we

16    understand that you will not raise this issue again.

17        MR. QUINN: The horse is buried and cremated and

18    forever gone.

19        THE COURT: Very well.

20        MR. QUINN: One issue that's going to come up with

21    the first witness, Cassidy Park, your Honor, MGA has provided

22    to us a list of documents that they want to use with

23    Ms. Park. These are the brand in crisis, house on fire,

24    those types of documents relating to problems with Barbie and

25    its response to Bratz as a competitive nature.

1          THE COURT:  What is Cassidy Park being called for?

2          MR. QUINN:  She's being called with respect to the

3     Jewel drawings.  And her testimony will be when those were

4     done or when those must have been done.  And the timing of

5     the Jewel project.  We anticipate the direct exam will be,

6     your Honor, five to ten minutes.

7          THE COURT:  All right.

8          MR. QUINN:  So it's going to be very narrow.  In

9     response to that, we've received -- MGA has given us

10    appropriate notice about what documents they intend to use,

11    and they are these documents that -- they are not only beyond

12    the scope, which is something that hasn't played a big role

13    in this trial, but they are irrelevant to this phase.  And if

14    they are relevant to anything, they may be relevant to some

15    affirmative defense.  And, you know, we can do it on a

16    question-by-question basis.

17         THE COURT:  Why don't we do it on a

18    question-by-question basis.  I appreciate your making

19    the Court aware of it.  I think everybody understands the

20    Court's ruling.

21         Anything further from Mattel?  Mr. Proctor?

22         MR. PROCTOR:  There was issue regarding the Prince

23    transcript.  I know we covered that yesterday, but if the

24    Court would reconsider this one issue.  It's page 146.  Page

25    146, there's some testimony, the Court sustained an objection

Unsigned                                         Page  3479

1   to testimony that this is the first time the notary ever

2   notarized the drawings.  I do think that's relevant

3   information.

4        THE COURT:  Why is that relevant?

5        MR. PROCTOR:  We have different theories regarding

6   a notary.  One theory is potentially that the notary book was

7   forged.  Another theory is that Mr. Bryant went to the notary

8   smack in the middle of his employment with Mattel and tried

9   to come up with a way to backdate his drawings.

10       The fact that notaries typically don't notarize

11  drawings, the irregularity of the procedure that Mr. Bryant

12  tried to get Ms. Prince to employ on MGA's theory is relevant

13  information.  It supports the idea this is an unusual thing

14  that Mr. Bryant's doing in an attempt to take drawings he

15  created when he notarized them in August of 1999 and backdate

16  them in some fashion with this, you know, sort of unusual

17  notary book entry about 13 drawings done from Missouri in

18  1998.

19       THE COURT:  Counsel?

20       MR. HERRINGTON:  Your Honor, on page 146, the

21  question and answer is is this the first time you had ever

22  notarized any kind of drawing.  There isn't any sort of

23  inference to be drawn from this testimony that this is

24  unusual for all notaries or unusual necessarily at all.  It

25  was just this individual woman had not notarized drawings

Unsigned                                          Page  3480

1    before.

2        It also does not -- as I heard the argument

3    articulated by Mattel's counsel, that this somehow supports

4    the idea that these were backdated.  This portion doesn't

5    have anything to do with backdating.  It doesn't have

6    anything to do with not writing down the information that's

7    represented to you by the person requesting the notarization.

8    The question is simply have you ever notarized drawings.  No.

9    Not relevant.

10       THE COURT:  Mr. Proctor, I'm struggling with how --

11   the function of the notary, as I understand it, and how she

12   testifies, is to take information.  All she's saying is that

13   this is being recorded on this particular date.  What it is

14   she takes, as I understand it, at face value whatever it is

15   that Mr. Bryant or any other person retaining her services is

16   going to say it is.  She's not in the business of conducting

17   an investigation.

18       So whether it's a drawing or whether it's something

19   that she's never seen before or in a type of document that

20   she's never dealt with before, I guess to me it's -- I

21   understand how it kind of infers this sense, oh, there's

22   something special, something unique about it.  But that's

23   precisely why under 403 it might be, I don't want to say

24   misleading, but confusing.

25       MR. PROCTOR:  Let me try to articulate it a little

1    better, perhaps.  What I think it goes to is Mr. Bryant's

2    savviness.  There's been testimony in the case that

3    Mr. Bryant did this poor man's copyright.  That was his term

4    for it.

5        THE COURT:  Now you're suggesting that he picked

6    her because she's never done it before as opposed to

7    something else?

8        MR. PROCTOR:  No.  I'm suggesting that he came up

9    with this unusual mechanism that is not typically done.  And

10    Jacqueline Prince can only testify to her knowledge.  I'm not

11    proposing that we bring in a bunch of notaries to ask them if

12    they have ever notarized drawings before.

13        Mr. Bryant picked this unusual mechanism to try to

14    backdate his drawings because, you know, what he usually

15    does, the poor man's copyright, send it in the mail in a

16    sealed envelope, that's not something that's going to work in

17    this situation because the postmark is going to be August

18    1999, smack in the middle of his Mattel employment.

19        So he comes up with this unusual mechanism, hey, I

20    can go to a notary and tell them I did it a year ago and have

21    her write down in the notary book, hey, he did this a year

22    ago.

23        THE COURT:  I appreciate your argument, but there's

24    no foundation that it's unusual beyond this one.  And that's

25    the point Mr. Herrington made.

1          MR. PROCTOR:  Okay.  And the next issue, your

2      Honor, page 148, the Court overruled the objections, and

3      that's because for some reason we objected on foundation, but

4      not hearsay.

5          THE COURT:  Yes.  That's exactly what you -- what

6      you objected on.

7          MR. PROCTOR:  Correct.  Lines 14 to 17, if the

8      Court would entertain a hearsay objection, I think it's

9      meritorious.

10         THE COURT:  Who had the belated objection

11     yesterday?

12         MR. PROCTOR:  That was MGA.

13         THE COURT:  It is hearsay.

14         MR. NOLAN:  This is really belated.

15         THE COURT:  I got to restore balance to this now.

16         MR. NOLAN:  This is a do-over.

17         THE COURT:  It is hearsay.

18         MR. HERRINGTON:  Your Honor, what she is testifying

19     to, if I understand it correctly, is the question is was it

20     your understanding that Mr. Bryant was telling you that the

21     doll ideas were from 1998 Missouri or that the sketches were.

22     And what they are doing is asking about the specific entry

23     that is written down in Exhibit 60, the notary book.  It has

24     a reference to doll ideas.  It has a reference to sketches.

25         What she's doing is she's clarifying what it is

1   that was told to her.  And we're not offering that for the

2   truth of the matter asserted.  In other words, that the doll

3   idea -- I'm sorry, the sketches were done in 1998.  We're

4   doing it as part of essentially the verbal act, what was

5   being communicated and then written down during this exchange

6   with the notary.  It goes to clarifying what is in fact in

7   the notary book, and it goes to fully explaining what

8   happened during that exchange at Ms. Prince's apartment.

9        THE COURT:  What do you think, Mr. Proctor?

10        MR. PROCTOR:  It's testimony that Mr. Bryant told

11   her, he did the sketches in 1998.  That's offered for the

12   truth whether MGA says it's offered for the truth or not.

13        THE COURT:  I trust we have nothing else besides

14   this?

15        MR. PROCTOR:  This is the last one.

16        MR. NOLAN:  Nothing further from us.

17        THE COURT:  Ordinarily, I think this probably would

18   be hearsay.  But arguably everything in that journal is

19   hearsay, but a notary plays a special role in our society,

20   even in our legal system, and there's a certain indicia in

21   reliability in statements recorded by a notary and the basis

22   upon which they make those statements.  I think it's a little

23   different, and I think it's probably enough to survive what

24   otherwise would be a valid, if belated, hearsay objection.  I

25   will maintain the Court's overruling the objection.

1          MR. PROCTOR:  Thank you.

2          THE COURT:  Thank you, Counsel.

3          (WHEREUPON THE JURY ENTERS.)

4          THE COURT:  Good morning, members of the jury.

5     Welcome back.  Just to remind you, we just have the one day

6     this week.  So you'll -- we're just having trial today.

7     There's no trial for the remainder of the week, and from the

8     looks on your faces, apparently I did not -- I have not told

9     you that before.  So you do have time to catch up with the

10    rest of your life this week.  The delay this next week, I'm

11    going to be up in Anchorage at the U.S. District Courthouse

12    in Anchorage, Alaska, for the remainder of this week,

13    attending to a matter with the Ninth Circuit Court of

14    Appeals.

15         So I will not be here.  We'll be again resuming

16    next week.  And then, of course, we'll be taking the 4th of

17    July off.  So next week will be just a three-day week.  But

18    we just have the one day today.

19         Mr. Zeller?

20         MR. ZELLER:  Good morning, your Honor.

21         THE COURT:  You may call your next witness.

22         MR. ZELLER:  Mattel calls Cassidy Park.

23         THE CLERK:  May we please have the next witness

24    step up to this side of the court.

25         Good morning, ma'am.  Would you please raise your

1    right hand.

2              CASSIDY PARK, SWORN.

3              THE CLERK:  Thank you.  Please be seated.  Please

4    state your full name for the record, and spell your last

5    name.

6              THE WITNESS:  Cassidy Park, P-A-R-K.

7              THE CLERK:  Thank you.

8              DIRECT EXAMINATION

9    BY MR. ZELLER:

10   Q.  Good morning, Ms. Park.

11   A.  Good morning.

12   Q.  You are currently employed by Mattel?

13   A.  I am.

14   Q.  Are you employed by a full-time or part-time basis right

15   now?

16   A.  I'm a part-time employee.

17   Q.  If we could for some context see graphic 21-B, please.

18   This graphic, for the record, has been shown to various

19   witnesses.  It shows Carter Bryant's first stint of

20   employment, the time he was in Missouri, and then the second

21   stint of employment beginning on January 4th, 1999.

22        Now, Ms. Park, at some point you were Carter

23   Bryant's supervisor; is that correct?

24   A.  Correct.

25   Q.  Was that during this first stint of his employment?

1    A.  Yes.

2    Q.  Now, if -- tell me if I'm right or wrong about this, but

3    you didn't supervise him during the second stint?

4    A.  I did not.

5    Q.  Did you work with him during the second stint?

6    A.  No.

7    Q.  Back during the time period when you were his

8    supervisor, what department were you and Mr. Bryant in?

9    A.  The Barbie Main Line Doll Group.

10   Q.  And the department is called Main Line?

11   A.  It is called, yes, Main Line.

12   Q.  And is that a different department than Collector?

13   A.  Yes.

14   Q.  And you say back in that second stint, when Carter

15   Bryant was in Collector, that's when you were not his

16   supervisor?

17   A.  Correct.

18   Q.  But you were supervisor in Main Line in this first

19   stint?

20   A.  Correct.

21   Q.  And back during Mr. Bryant's first stint of employment,

22   did you have regular contact with him?

23   A.  I did.

24   Q.  Did you work with him on projects?

25   A.  Yes.

1    Q.  At some point was there a project in Main Line Barbie

2    called Jewel or Jewel Girl?

3    A.  Yes, there was.

4    Q.  Did you have some role with that project?

5    A.  Yes.

6    Q.  Please tell us what that project -- what your role was

7    in that project.

8    A.  I was the managing supervisor on that project and

9    assigned the work to the designers.  We collaborated on

10    coming up with concepts for that project.

11    Q.  It was a project you directly worked on?

12    A.  Yes.

13    Q.  Generally speaking, how was the main line department

14    different than the collector department back in this time

15    period we've been talking about, say, 1998, 1999, 2000?

16    A.  Main Line Barbie dolls are heavily advertised to a

17    volume product that is targeted towards younger girls.  The

18    collector dolls are a little bit more sophisticated in their

19    fashion style sense, and they are targeted towards an older

20    girl, all the way to adults.

21    Q.  If we could, please, take a look at Exhibit 15601, which

22    is in evidence.  And, Ms. Park, there should be a binder

23    there in front of you that has a picture in it.  And we'll

24    also put it up on the screen, please.  If you can please let

25    us know when you've had a chance to look at that drawing.

1   A.  Okay.

2   Q.  And then if you could also take a look at Exhibit 15603,

3   which is another drawing.  And if we could see that.

4       This is in evidence, your Honor.

5       THE COURT:  Very well.

6       THE WITNESS:  Yes.

7   Q.  BY MR. ZELLER:  And then next, if you could please look

8   at Exhibit 15604 in evidence.

9   A.  Yes.

10  Q.  And finally, if you could please look at Exhibit 15605

11  in evidence.

12  A.  Yes.

13  Q.  With reference to these four drawings, Ms. Park, Carter

14  Bryant testified in this case that he created those drawings,

15  those four drawings, for a Main Line Barbie Jewel project in

16  January of 1998.

17      MR. NOLAN:  Your Honor, I'm going to object to the

18  reference to testimony outside of the province of this

19  witness, lack of foundation.

20      THE COURT:  Rephrase your question, Counsel.

21  Q.  BY MR. ZELLER:  Well, I will represent to you, Ms. Park,

22  that Carter Bryant has testified in this case --

23      MR. NOLAN:  Your Honor, same objection.  He has to

24  lay a foundation as to her knowledge.

25      THE COURT:  Can you ask a question without

1    characterizing testimony?

2        MR. ZELLER:  The trial testimony, your Honor, was

3    allowed previously.

4        THE COURT:  Do you have the trial testimony?

5        MR. ZELLER:  I'm sorry?

6        THE COURT:  Do you have the trial testimony?

7        MR. ZELLER:  I do, but to short-circuit it, I will

8    try and shorten it up.

9        THE COURT:  Speak with Mr. Nolan right now and see

10   if you can agree to move this along.  Because I've allowed

11   the trial testimony in.

12   Q.  BY MR. ZELLER:  Is it possible, Ms. Park, that design

13   drawings were created for this Main Line Jewel project in

14   January of 1998?

15   A.  No.

16   Q.  And why do you say that?

17   A.  Main Line Jewel Barbie was a design started in September

18   of 1998.

19   Q.  With reference to these drawings that I've shown you, do

20   you see any other -- do you know of any other reason why it's

21   not possible that these drawings dated January of 1999 were

22   part of the Jewel Barbie Main Line project?

23   A.  They look nothing like a Main Line doll project, nothing

24   like Jewel Girl Barbie for sure.

25   Q.  Did the Jewel Girl Barbie dolls that came from Main

1    Line, did they have dresses?

2    A.  No, not full dresses.

3    Q.  Did they have dresses like the kind that we've seen of

4    these four drawings?

5    A.  No.  Nothing like that.

6    Q.  You mentioned that the Jewel Girl Main Line Barbie

7    project didn't start until September of 1998.

8        What do you base that on?

9    A.  A planning document that I referred to.

10   Q.  If you could please take a look at Exhibit 13675.

11   A.  Yes.

12   Q.  Do you recognize that document?

13   A.  Yes.  This is the planning document for Jewel Barbie,

14   Main Line Jewel Barbie.

15       MR. ZELLER:  I would move Exhibit 13675 into

16   evidence, your Honor.

17       THE COURT:  Any objection?

18       MR. NOLAN:  No objection.

19       THE COURT:  It's admitted.  You may publish.

20       (Exhibit 13675 received.)

21   Q.  BY MR. ZELLER:  In looking at the top there, it

22   references Girl Barbie, 2000?

23   A.  Correct.

24   Q.  And what's the 2000 date referring to?

25   A.  The market launch date of the product.

1   Q.  And when you say market launch date, that's when it was

2   actually on the shelves?

3   A.  When it would be in retail stores, yes.

4   Q.  Being sold in stores?

5   A.  Correct.

6   Q.  And Jewel Girl Barbie, that's the Jewel project that was

7   going on in Main Line Barbie starting in September of 1998?

8   A.  Yes.

9   Q.  Directing your attention to the first page, do you see

10  that section in the middle where it says preliminary design?

11  A.  Yes.

12  Q.  And this shows a design start date of September 20th,

13  1999.

14  A.  Correct.

15  Q.  What is that referring to?

16  A.  When the actual design of the product would have

17  started.

18  Q.  If we take a look at the second page of this exhibit,

19  you'll see that there are two engineering fields.  One says

20  engineering sort body, and the other says engineering Barbie

21  legs; correct?  And they show a project start date of

22  September 1st, 1998 for both of those?

23  A.  Correct.

24  Q.  What are those referring to?

25  A.  The actual body parts of the doll that engineering would

1    have been working on.

2    Q.  Was there something different or unusual from your

3    perspective about the Jewel Girl Barbie body?

4    A.  Yes.  It had an innovation to the waist area of the doll

5    that allowed her to twist and turn for the first time ever.

6    It was fairly complex.

7    Q.  If we could, I believe we have some dolls to show you.

8        Your Honor, if I may approach with Exhibits 13677,

9    13678, and 13676.

10       THE COURT:  You may approach.

11       MR. ZELLER:  Thank you.

12   Q.  Ms. Park, do you recognize what I've shown you here with

13   these three exhibits?

14   A.  I do.

15   Q.  Please tell us what they are.

16   A.  This is the Main Line Jewel Girl Barbie doll.

17       MR. ZELLER:  I would move the three exhibits into

18   evidence, your Honor.

19       MR. NOLAN:  No objection, your Honor.

20       THE COURT:  Very well.  They are admitted.

21       (Exhibits 13677, 13678, and 13676 received.)

22   Q.  BY MR. ZELLER:  You were mentioning that there was that

23   special feature with the waist for these dolls.  Maybe if you

24   could hold one up and show the jury kind of the portion that

25   you're talking about with that.

1    A.  It's called the ever-flex waist here.  It was a twist

2    and turn waist that was a new innovation of materials and

3    engineering for the Barbie doll.

4    Q.  And the midriff of these dolls is exposed?

5    A.  It is.  It's also the first time you'll see a

6    bellybutton.

7    Q.  Was there a particular reason why the clothing was

8    designed to show the midriff of this doll?

9    A.  Well, it was the highlighting feature of the doll.  So

10   it was really what brought her to life and was an

11   advertisable feature.

12   Q.  And from the start of the Jewel Girl Barbie project, was

13   that always the plan or idea for it?

14   A.  Yes.

15        MR. ZELLER:  Thank you.  That's all I have.

16        THE COURT:  Very well.  Cross-examination?

17        MR. NOLAN:  Yes.

18             CROSS-EXAMINATION

19   BY MR. NOLAN:

20   Q.  Good morning, Ms. Park.

21   A.  Good morning.

22   Q.  We've never met.  I'm Tom Nolan, and I represent MGA.

23        I'm just curious, when did you learn you were going

24   to be a witness this morning?

25   A.  It wasn't this morning.

1    Q.  I'm sorry.  When were you first asked by Mattel to show

2    up in court today and be a witness?

3    A.  Oh, gosh, a couple of days ago.

4    Q.  And did you meet with Mattel lawyers in preparation for

5    your deposition -- I'm sorry, for your trial testimony today?

6    A.  Yes.

7    Q.  Who did you meet with?

8    A.  Mr. Zeller.

9    Q.  Did you meet with anybody else?

10   A.  Bridget.

11   Q.  Now, we know Bridget's first name.  Do you know her last

12   name, for the record?

13   A.  I don't.

14   Q.  That's fine.  And did Mr. Zeller and -- I can't --

15   wouldn't want to call her Bridget -- Ms. Holler tell you what

16   areas you were going to testify to this morning?

17   A.  Yes.

18   Q.  And did they ask you to go out and find particular

19   documents that would be used in your testimony today?

20          MR. ZELLER:  Your Honor, privilege.  Asking about

21   the content of attorney-client communications.

22          THE COURT:  Counsel?

23          MR. NOLAN:  I'll withdraw it.

24          THE COURT:  Very well.

25   Q.  BY MR. NOLAN:  Approximately how long did you meet with

1    the attorneys for Mattel in preparation for your testimony

2    today?

3    A.  Several hours.

4    Q.  And what day did you meet with them?

5    A.  Sunday.

6         MR. NOLAN:  May I have the graphic of the

7    employment status back up on the screen so we can follow

8    this.

9    Q.  So from your testimony, I understand that you were

10   Mr. Bryant's supervisor at Mattel for what we've described as

11   the first stint of his employment; correct?

12   A.  Correct.

13   Q.  Well, is that really true?  I mean, were you his

14   supervisor between September 1995 and April 29, 1998?

15   A.  Yes.

16   Q.  Where was Mr. Bryant in April of 1998?

17   A.  April of 1998.  Well, I believe that's about the time he

18   resigned.  And it might have been closer to first of the year

19   when he resigned.

20   Q.  I'm sorry.  The first of what year?

21   A.  Of 1998.

22   Q.  When did you stop supervising Mr. Bryant?

23   A.  Approximately April of 1998.

24   Q.  Did he resign from Mattel in January of 1998?

25   A.  That could be.  I'm not a hundred percent clear of that

1    date.

2    Q.  Well, do you have an explanation as to why, if you were

3    his supervisor, you don't know what date he resigned from

4    Mattel?

5    A.  It was 10 years ago.

6    Q.  So your memory is you would agree that trying to recall

7    events ten years ago is a bit difficult; correct?

8         MR. ZELLER:  The question is overbroad, foundation.

9         THE COURT:  Overruled.  You may answer.

10        THE WITNESS:  At times.

11   Q.  BY MR. NOLAN:  Well, I want to focus for a moment on

12   this period of, let's say, January 1st of 1998 through April

13   29th, 1998.

14        Is it your testimony before this jury that you were

15   supervising Carter Bryant during this period of time, that

16   particular period of time?

17        MR. ZELLER:  Asked and answered.

18        THE COURT:  It has been.  Go ahead and answer it.

19        THE WITNESS:  I believe that was when he was

20   actually not in El Segundo.  He was in -- he was out of

21   state.  I was listed as his supervisor during that period of

22   time.  So, you know, I was his -- I was his corporate

23   supervisor.

24   Q.  BY MR. NOLAN:  Well, explain to me what you mean by

25   corporate supervisor.

1    A.  I was listed as his supervisor until his resignation

2    date.

3    Q.  All right.  And when you say resignation date, what date

4    are you referring to?

5    A.  The April 1998 date.

6    Q.  Okay.  But you didn't have any idea of what projects

7    Mr. Bryant was working on after he left El Segundo and moved

8    back to Missouri; correct?

9    A.  Are you referring to between January and April?

10   Q.  Yes.

11   A.  Any projects that he would have been working on would

12   have gone through me.

13   Q.  I'm sorry.  Did I understand that?  Anything that Carter

14   Bryant was working on from January 1, 1998, through his

15   resignation on April 29, 1998, those projects were not coming

16   through you; correct?

17   A.  No, they would have come through me.

18   Q.  They would have come through you?

19   A.  Yes.

20   Q.  I'd like to show you Exhibit 15952.

21        Your Honor, may I approach?

22        THE COURT:  You may.

23   Q.  BY MR. NOLAN:  Do you recognize this document?

24   A.  Yes.

25   Q.  And what is it?

1    A.   It is a -- it is a document that Mattel would use to

2    document someone's status, employment status.

3    Q.   And is this a document that is kept at Mattel in the

4    business records of Mattel?

5    A.   I'm sorry.  Can you say that again?

6    Q.   Is this a document that is kept at Mattel as part of its

7    business records?

8    A.   Yes.

9    Q.   And is this -- the purpose of it is to reflect changes

10   in the status of employees?

11   A.   Correct.

12   Q.   And at the time that this document was prepared -- the

13   effective date is January 5th, 1998 -- you were the corporate

14   supervisor of Carter Bryant?

15   A.   Correct.

16   Q.   And is this an employee turnaround document for Carter

17   Bryant?

18   A.   Yes.

19        MR. NOLAN:  Your Honor, we'd offer Exhibit 15952.

20        THE COURT:  Any objection?

21        MR. ZELLER:  No objection, your Honor.

22        THE COURT:  It's admitted.  You may publish.

23        (Exhibit 15952 received.).

24   Q.   BY MR. NOLAN:  Now, I just want to ask you to walk

25   through this, if you don't mind.  This has to do with the

1    time period where Carter Bryant is no longer in El Segundo,

2    and he is back in Missouri; correct?

3    A.  Correct.

4    Q.  And can you tell us whether or not during this time

5    period Mr. Bryant was considered to be a full-time employee

6    of Mattel?

7    A.  It appears not.

8    Q.  What was his status during that period of time?

9    A.  He had reduced hours.

10   Q.  Was he paid a salary, or was he paid on an hourly basis?

11   A.  I don't know that for sure.

12   Q.  Okay.  In any event, do you recall talking to Carter

13   Bryant in or about January or late December of -- I'm sorry.

14   In or about the end of 1997, where Carter Bryant came to you

15   and had a discussion about wanting to leave Mattel?

16   A.  Very vaguely.

17   Q.  And what do you recall about that conversation, if

18   anything?

19   A.  That Carter wanted to leave Mattel.

20   Q.  And do you recall why he wanted to leave Mattel?

21   A.  No.

22   Q.  Do you recall where he wanted to move to?

23   A.  Missouri.

24   Q.  And do you recall why Missouri of all the states?

25   A.  His family was in Missouri.

1    Q.  Do you recall what discussions you had with Carter

2    Bryant about the type of work that he could do for Mattel on

3    a reduced schedule while in Missouri?

4    A.  No.

5    Q.  Well, looking at this form here for a moment, do you see

6    anywhere here where there's any indication that the only work

7    that Mr. Bryant could do while in Missouri would be limited

8    to Main Line Barbie?

9        MR. ZELLER:  Argumentative.  Also assumes facts,

10   lacks foundation.

11       THE COURT:  Sustained.

12   Q.  BY MR. NOLAN:  Do you recall in your conversation with

13   Mr. Bryant, in the end of 1997, where you advised him that he

14   could only work on projects that you assigned him?

15   A.  No.

16   Q.  Do you recall ever telling Mr. Bryant, at the end of

17   December, that he would be prohibited from working on

18   projects, let's say from other Barbie departments within

19   Mattel?

20   A.  No.

21   Q.  Isn't it true that you have no recollection of the work

22   that Carter Bryant was doing for Mattel from the period of

23   January through April of 1998?

24   A.  Correct.

25   Q.  So you have no basis to tell this jury that during the

1   period of January 1st, 1998, through and including April 29,

2   1998, Carter Bryant could not have been working on a Jewel

3   Barbie project; correct?

4          MR. ZELLER:  Argumentative.  Also --

5   mischaracterizes the witness's testimony.

6          THE COURT:  Just rephrase it, Counsel.  You can ask

7   the question another way.

8   Q.  BY MR. NOLAN:  Isn't it true that you have no knowledge

9   of whether or not Carter Bryant was working on a Jewel Barbie

10  project during the period of January 1st through April 29th,

11  1998?

12  A.  I know that Carter was not working on the Main Line

13  Jewel Girl project during that time.

14  Q.  Well, can you hold up the Main Line Jewel Barbie?  And

15  as I understand it, this is the first time that Jewel Barbie

16  was going to have her bellybutton exposed.

17  A.  Well, it's the first time she has an indent of a

18  bellybutton.

19  Q.  I apologize.  I referred to a head another day and

20  wanted to know who it belonged to.  So the indentation is

21  intended to be the bellybutton?

22  A.  Absolutely.

23  Q.  Okay.  So there's no doubt in your mind that there was

24  no intended bellybutton displayed in any Jewel Barbie in

25  1998 -- correct? -- for Main Line Barbie?

1    A.  Well, this is Main Line Barbie.

2    Q.  Okay.  What about from Barbie Collectibles?

3    A.  Correct.

4        MR. NOLAN:  Aaron, could I put up 13677.  I'm

5    sorry.  I apologize.  15671.  And this is in evidence.

6    15601.

7    Q.  Now, first of all, let's look over here on the

8    right-hand side.  Do you see this is dated January of 1998?

9    A.  Yes.

10   Q.  When was the first time you were shown this drawing?

11   A.  Sunday.

12   Q.  Sunday, this Sunday?

13   A.  Yes.

14   Q.  Mr. Zeller showed you this?

15   A.  Yes.

16   Q.  Did you notice the date of this of January 28, 1998?

17   A.  Yes.

18   Q.  Did you take any steps to conduct an investigation as to

19   whether or not any department at Barbie was making a Jewel

20   type Barbie model other than Barbie Main Line?

21       MR. ZELLER:  The question is vague.

22       THE COURT:  As to what, Mr. Zeller?

23       MR. ZELLER:  "Investigation."

24       THE COURT:  Why don't you rephrase.

25       MR. NOLAN:  Sure.

1    Q.   When you saw this on Sunday, did you notice that this

2    Jewel Barbie doesn't have an intended bellybutton?

3         MR. ZELLER:  Assumes facts as to Jewel Barbie.

4         THE COURT:  Sustained.

5    Q.   BY MR. NOLAN:  In any event, after you were shown this

6    on Sunday of this week by Mr. Zeller, did you do anything to

7    ascertain whether or not Barbie Collectibles in 1998 were

8    designing any Jewel Barbies?

9    A.   No.

10   Q.   Were you asked to look into that?

11   A.   No.

12   Q.   Okay.  Let's go to -- so you have no personal knowledge

13   as to whether or not Carter Bryant was mistaken when he dated

14   this drawing January 28th, 1998, do you?

15   A.   I don't.

16   Q.   In fact, you don't even know what he was working on for

17   Mattel on January 28, 1998, do you?

18        MR. ZELLER:  Assumes facts.

19        THE COURT:  Sustained.  Revise.

20   Q.   BY MR. NOLAN:  You don't have any knowledge whether

21   Carter Bryant was working on a Jewel Barbie for Barbie

22   Collectibles in January of 1998, do you?

23   A.   I know he was not working on the Jewel Girl for Main

24   Line Barbie.

25   Q.   Sure.  And we know that because if he was, then the

1    intended bellybutton would be shown for the Jewel Barbie,

2    yes?

3    A.  Well, no.  The -- no.

4    Q.  No, it would not have an intended bellybutton, or it

5    would have an intended bellybutton if it was a Jewel Barbie?

6    A.  I know that based on the date, the design start of the

7    project.

8    Q.  You do not know what Barbie Collectibles was doing in

9    1998 with respect to a Jewel Barbie doll, do you?

10   A.  No.

11   Q.  Let's go to 15603.  The same question.  When was the

12   first time that you were shown this drawing?

13   A.  Sunday.

14   Q.  After the meeting on Sunday, did you do anything to

15   determine whether or not, in January of 1998, Barbie

16   Collectibles was working on a Jewel Barbie?

17   A.  No.

18   Q.  And would you agree with me -- well, strike that.

19       Do you have any knowledge, personal knowledge, to

20   say that Carter Bryant on January 28, 1998, did not do the

21   drawing that's depicted in this trial exhibit?

22   A.  No.

23   Q.  Let's go to 15604.  I want to show you 15604.  And have

24   you seen this before?

25   A.  No.

1    Q.  Were you shown this on Sunday?

2    A.  Yes.

3    Q.  So prior to Sunday, when Mr. Zeller showed you this, you

4    had never seen this before?

5    A.  Excuse me.  Correct.

6    Q.  And you would agree with me that this does not appear to

7    be a version of the Jewel Barbie that was being designed

8    Barbie Main Line; correct?

9    A.  Correct.

10   Q.  Because, of course, here again, we don't have the

11   midriff being shown; correct?

12   A.  Well, that's not the only reason.

13   Q.  But you would agree that's one of the reasons?

14   A.  For consideration.

15   Q.  And again, do you have any knowledge that Carter Bryant

16   did not do the fashion drawing depicted in this trial exhibit

17   and dated January 28, 1998?

18   A.  No.

19   Q.  Let's go to Exhibit 15605.  Were you shown this exhibit

20   on Sunday by Mr. Zeller?

21   A.  Yes.

22   Q.  And prior to Sunday, had you ever seen this drawing?

23   A.  No.

24   Q.  Following Sunday's meeting, did you do anything to

25   determine whether or not Barbie Collectibles for any other

1    department at Mattel was designing a Jewel Barbie for the

2    Barbie Collectible group?

3    A.   No.

4    Q.   And you have no basis to say that Carter Bryant did not

5    do this drawing and date it January 28th, 1998, do you?

6    A.   No.

7    Q.   Mr. Zeller asked you to identify, and it's now in

8    evidence, and that's Exhibit 13675.

9         Can we have this on the screen?  It's in evidence,

10   your Honor.

11        THE COURT:  You may.

12   Q.   BY MR. NOLAN:  I'm a little curious about this document.

13   When was the first time you saw this document, Ms. Park?

14   A.   The first time I saw it was probably back in 1998.

15   Q.   And then how many times -- in 1998.  And why did you see

16   it in 1998?

17   A.   The project was within my group, the Jewel Barbie Main

18   Line doll.

19   Q.   Okay.  And so there was, if I understand your testimony,

20   a Jewel Barbie in your department in 1998?

21   A.   The design start is September of 19 -- I'm sorry.  1999.

22   Q.   So how could it be that you saw this in 1998?

23   A.   I'm sorry.  I just confused my dates.

24   Q.   Okay.  I -- I didn't want to catch you on that.  That's

25   my question, though.  This is something that you could not

1    have seen in 1998.  You saw this in 1999; correct?

2    A.  Correct.

3    Q.  Now, since 1999 -- let me ask you something.  Did you

4    bring this document with you to your meeting with Mr. Zeller?

5    A.  No.

6    Q.  Or do --

7    A.  No, I did not bring it.

8    Q.  So they showed you this document?

9    A.  Yes.

10   Q.  On Sunday?

11   A.  Yes.

12   Q.  Before Sunday, when do you think the last time was that

13   you saw this document?

14   A.  1999.

15   Q.  So do you think -- this is just a rough guess.  Do you

16   think that, between 1999 and last Sunday, you had ever seen

17   the document before?

18   A.  Probably not.

19   Q.  And this is a Jewel Barbie 2002.  It looks like just a

20   schedule with some dates on it; right?

21        MR. ZELLER:  Objection.  Characterization,

22   misstated the year, I think.

23        MR. NOLAN:  I apologize.

24        THE COURT:  Very well.

25   Q.  BY MR. NOLAN:  Again, tell me what the purpose of this

1    document is?

2    A.  It's a schedule planning document.

3    Q.  For Barbie Main Line; right?

4    A.  Correct.

5    Q.  Well, do you remember on Sunday -- I'm sorry.  Let me

6    ask it this way.  So you were shown this document on Sunday

7    by Mr. Zeller; correct?

8    A.  Correct.

9    Q.  At the same time or in the same period of time that you

10   were shown those four rather elaborate fashion designed dolls

11   that were dated by Carter Bryant 1998; correct?

12   A.  Correct.

13   Q.  Well, at that meeting were you shown similar forms that

14   related to any Jewel Barbie project that was going on at

15   Mattel?

16       MR. ZELLER:  The question is vague.

17       THE COURT:  Overruled.  You may answer.

18       THE WITNESS:  No.

19   Q.  BY MR. NOLAN:  Do you recall asking Mr. Zeller, well,

20   you know, since you've gotten this document for me, have you

21   looked for any similar schedules for other Jewel Barbies that

22   may have been done by Barbie Collectibles in 1998?

23       Did you ask to see that?

24   A.  No.

25   Q.  You would agree with me that this Exhibit 13675 has no

1    relationship to Exhibits 15601.

2    A.   Say that again.

3    Q.   You would agree with me that the Exhibit 13675 has no

4    relationship with the drawing done by Carter Bryant on the

5    right that's shown there?

6    A.   Correct.

7    Q.   And you would also agree with me that this Exhibit 13675

8    has no relationship to Exhibit 15603, also dated by Carter

9    Bryant in January of 1998; correct?

10   A.   Correct.

11   Q.   And you would agree with me that Exhibit No. 13675, the

12   schedule, has nothing to do with Exhibit 15604 in evidence

13   and also dated and signed by Carter Bryant in 1998; correct?

14   A.   Correct.

15   Q.   And last in the series, you would agree with me that

16   Exhibit 13675 has no relationship to Exhibit 15605; correct?

17   A.   Correct.

18   Q.   I'd like to place in front of you a series of -- I don't

19   think they are in the white notebook.  Do you have some

20   papers that are loose up there?  I apologize.  Do you have

21   that now in front of you?

22   A.   I do.

23   Q.   I'd ask you to turn to Exhibit 18548.  Do you have the

24   book open to that?

25   A.   I do.

1    Q.   And it is true that Barbie Collectibles had a project

2    named Emerald Jewel, which was copyrighted in 1998; correct?

3         MR. ZELLER:  Objection.  Lacks foundation, your

4    Honor.

5         THE COURT:  Sustained.

6    Q.   BY MR. NOLAN:  Have you ever seen the doll depicted in

7    the photographs on Exhibit 18548?

8    A.   No.

9         MR. NOLAN:  Your Honor, I'd like to approach the

10   witness with Exhibit 18556.

11   Q.   Before I do, were you shown the document marked as

12   Exhibit 18548 that has two photographs on it at Sunday's

13   meeting?

14   A.   No.

15        MR. NOLAN:  May I approach with the exhibit now?

16        THE COURT:  You may.

17        MR. NOLAN:  For the record, this exhibit, we didn't

18   introduce it this way.  It has a white piece of paper where

19   the glue has come off.  So I'm bringing up the white paper

20   with the doll itself, and we'll refasten it after I've shown

21   the witness.

22        THE COURT:  Very well.

23   Q.   BY MR. NOLAN:  Now, before I ask you to take a look at

24   this particular exhibit, what is your -- what's your title at

25   Mattel?

1    A.   What is my -- excuse me?

2    Q.   What's your title at Mattel?  We know you're a part-time

3    employee, but I don't think we know what your position is.

4    A.   Vice-president of product design.

5    Q.   And how long have you been vice-president of product

6    design?

7    A.   Ah, oh, boy, seven years, eight, perhaps.

8    Q.   And what was your position before that?

9    A.   Director of product design.

10   Q.   And when you were director of product design, what

11   products were you the director of, the design of?

12   A.   Main Line dolls.  Director of Main Line Barbie product

13   design, I should have said.

14   Q.   And how long have you been employed at Mattel?

15   A.   15, almost 16 years.

16   Q.   Now, during the time that you were director of design

17   within Barbie Main Line, are you allowed to look at any of

18   the other dolls that are manufactured by Mattel?

19   A.   Sure.

20   Q.   And did you have any opportunities during the span of, I

21   don't know, a number of years to see any of the Barbie

22   Collectible dolls?

23   A.   Probably.

24   Q.   Were these generally shown in, you know, various

25   meetings, design meetings from time to time?

1    A.  Not really.

2    Q.  How would it be that you would be able to see, let's

3    say, other fashion dolls manufactured by Mattel?

4    A.  I would have had to go search them out.

5    Q.  I've handed up to you the doll that we've marked as

6    Exhibit 18556.

7         Do you see that?

8    A.  Yes.

9    Q.  Have you ever seen this doll before?

10   A.  I don't believe so.

11   Q.  Do you know whether or not Barbie Collectibles in 1998

12   manufactured a Jewel Barbie which is in your hands right now?

13        MR. ZELLER:  Assumes facts, lacks foundation.

14        THE COURT:  Sustained.

15   Q.  BY MR. NOLAN:  Just do you have any knowledge, Ms. Park,

16   as a senior manager of Mattel, of whether or not Mattel or

17   any department, any department at Mattel, ever distributed a

18   Jewel Barbie in 1998?

19   A.  I don't believe they did.  But, you know, my job was in

20   Main Line Barbie dolls.  I was focused on Main Line.

21   Q.  As part of your assignment in terms of the subject

22   matter that you were going to testify to for Mattel this

23   morning, did you go back to determine whether or not Mattel

24   was making a Jewel Barbie in 1998?

25   A.  No.

1          MR. ZELLER:  Assumes facts, lacks foundation.

2          THE COURT:  The way it's phrased, it does.

3    Sustained.

4    Q.  BY MR. NOLAN:  As you sit here today, you cannot tell

5    this jury, can you, that Carter Bryant was not doing a Jewel

6    Barbie fashion design for Barbie Collectibles in January of

7    1998; correct?

8          MR. ZELLER:  Asked and answered.

9          THE COURT:  It was.  Sustained.

10   Q.  BY MR. NOLAN:  You recall your deposition was taken in

11   this case March 2nd of 2005?

12   A.  Yes.

13   Q.  And you recall that you were asked to confirm that, as

14   you did today, that you were Carter Bryant's supervisor

15   during his first stint of employment at Mattel; correct?

16   A.  Correct.

17   Q.  It's true, is it not, that in your deposition, you

18   testified that you were not familiar with the form of the

19   inventions agreement, confidentiality agreement that Carter

20   Bryant signed when he became a Mattel employee; correct?

21         MR. ZELLER:  Assumes facts.  Relevance.

22         THE COURT:  Overruled.  You may answer.

23         THE WITNESS:  Could you restate the question,

24   please?

25         MR. NOLAN:  Sure.

1    Q.   Isn't it true that you, as Carter Bryant's supervisor,

2    you were not familiar with the actual form of confidentiality

3    and inventions agreement that Carter Bryant signed when he

4    began working at Mattel in 1995; correct?

5    A.   Correct.

6    Q.   And isn't it true that you also were not familiar with

7    the form of the confidentiality and inventions agreement that

8    Carter Bryant signed at Mattel January 4th of 1999 when he

9    started his second stint at Mattel; correct?

10        THE COURT:   Counsel, I guess I understand

11   Mr. Zeller's objection now.  The question suggested there

12   were different forms.  Why don't you lay a foundation for

13   that.

14        MR. NOLAN:   Sure.

15   Q.   Do you know whether or not there was a different form of

16   confidentiality and inventions agreement signed by Carter

17   Bryant in connection with this first stint of employment and

18   his second stint of employment?

19   A.   I don't know that.

20   Q.   So as his supervisor at Mattel, you were not familiar

21   with the form of the confidentiality and inventions agreement

22   that Carter Bryant signed; correct?

23   A.   I have very vague familiarity with that form, yes.

24   Q.   So the answer is you don't know specifically the

25   contents of the confidentiality and inventions agreement that

1    Carter Bryant signed while at Mattel.

2    A.  I could only make an assumption on the forms that he

3    signed.  I don't know that right now for a fact.

4    Q.  But you did not know at the time when Carter Bryant was

5    executing the agreement, the terms of those agreements;

6    correct?

7    A.  Vaguely.

8    Q.  You didn't have a specific knowledge of the specific

9    terms of the confidentiality and inventions agreement that

10   Carter Bryant signed when he began working at Mattel;

11   correct?

12   A.  I was not sitting with Carter when he signed any kind of

13   agreement.

14   Q.  Regardless of whether or not you were sitting with

15   Carter or not, when he signed this inventions agreement,

16   isn't it true that you did not know the specifics of the form

17   confidentiality agreement, inventions agreement that Carter

18   Bryant signed when he became a Mattel employee?

19   A.  Well, it's customary that an employee would sign a form

20   or document.  I can only make an assumption that he side the

21   document.  But I don't really have a clear fact or memory of

22   that, actually.

23   Q.  Do you have your deposition transcript?

24   A.  No.

25   Q.  Okay.  We'll bring it up to you.  I'd ask you to turn to

1    page 250 of your deposition.  And directing your attention to

2    lines 6 through 17.

3    A.  Okay.

4         MR. NOLAN:  Your Honor, we'd ask to play this

5    portion of the deposition.

6         THE COURT:  You may.  Well, is there any objection?

7         MR. ZELLER:  I think for completeness, your Honor,

8    it ought to go through page 251, line 8.

9         MR. NOLAN:  No objection.

10        THE COURT:  Very well.

11        WHEREUPON THE VIDEOTAPED DEPOSITION EXCERPTS

12        OF CASSIDY PARK, AS PROVIDED BY COUNSEL, ARE

13        INCORPORATED HEREIN:

14        "ANSWER:  No.

15        "QUESTION:  Take a look at this document that

16    I placed in front of you, which was signed by

17    Carter Bryant on 11/6/95.  Have you ever seen this

18    form of agreement before?

19        "ANSWER:  I don't recognize this.

20        "QUESTION:  When you say I don't recognize

21    this, do you mean -- are you -- is your -- does

22    your -- is your answer said to mean that you're not

23    sure whether you've seen this form of the agreement

24    or you are sure and you've never seen it and you

25    don't recognize it?

1      "ANSWER:  I don't recognize this agreement.

2      "QUESTION:  What I'm trying to do is make the

3   distinction between you saying, I'm certain I've

4   never seen this before, and I can't say one way or

5   the other whether I've seen this before, both of

6   which could be represented by I don't recognize

7   this agreement.  So --

8      "ANSWER:  I'm so sorry, but I don't understand

9   the difference in what you're -- those two versions

10   of what you're saying.

11      "QUESTION:  I presume if I asked you have you

12   ever seen the agreement that Carter Bryant signed,

13   you would say --

14      "ANSWER:  I've never seen it.

15      "QUESTION:  Okay.  I wouldn't expect that you

16   would.

17      "ANSWER:  Right."

18      MR. NOLAN:  Your Honor, I'd ask the witness to take

19   a look at page 262.  My question was directed to the 1995

20   agreement.

21   Q.  Why don't you turn to page 262 of your deposition and

22   direct your attention to lines 22 through 25 on page 262 and

23   then turn to page 263, lines 1 through 9.

24      And, your Honor, again, we'd like to play this?

25      MR. ZELLER:  No objection.

1        THE COURT:  Very well.  You may.

2        WHEREUPON THE VIDEOTAPED DEPOSITION EXCERPTS

3        OF CASSIDY PARK, AS PROVIDED BY COUNSEL, ARE

4        INCORPORATED HEREIN:

5        "QUESTION:  First, let me ask you, have you

6    ever seen not just the form, but the Exhibit 46,

7    Carter Bryant's employee confidential information

8    and inventions agreement dated 04/99?

9        "MR. ZELLER:  Excluding any instances in which

10    you may have seen it with -- from counsel.

11        "THE WITNESS:  No.

12        "QUESTION:  Have you ever seen this form of

13    agreement?

14        "MR. ZELLER:  Same instruction.

15        "THE WITNESS:  I don't recognize it."

16        MR. NOLAN:  Thank you.

17    Q.  And just for the record, let's be clear in 1995, the

18    date of the first confidentiality and inventions agreement

19    signed by Carter Bryant, you were the supervisor, yes?

20    A.  Yes.

21    Q.  And what was your position in 1995?

22    A.  Oh, boy.  I believe I was a senior manager.

23    Q.  In Main Line Barbie?

24    A.  Main Line Barbie product design, yes.

25    Q.  And then the last clip that we played had to do with

1    Exhibit No. 25, which was the January 4th, 1999,

2    confidentiality and inventions agreement signed by Carter

3    Bryant.

4          Could you tell the jury what your position was at

5    Mattel in January of 1999?

6    A.   Director of Main Line Barbie product design.

7    Q.   In both -- well, let me ask it this way:  As director of

8    Main Line Barbie, that was a senior management position at

9    Mattel?

10         MR. ZELLER:  Misstates the witness's testimony.

11         MR. NOLAN:  I'll rephrase it.

12         THE COURT:  Okay.

13   Q.  BY MR. NOLAN:  You would agree with me that in 1999 you

14   were a member of the senior management at Mattel?

15   A.   Yes.

16   Q.   Now, if I recall, you also were part of the interview

17   process of Carter Bryant when he joined Mattel in 1995;

18   correct?

19   A.   Correct.

20   Q.   And it's true, is it not, that as part of that interview

21   process, you asked Carter Bryant to do what you described as

22   a test project; correct?

23         MR. ZELLER:  Assumes facts.  Relevance.

24         THE COURT:  Sustained.

25   Q.  BY MR. NOLAN:  It's true that before Carter Bryant was

1    hired at Mattel, you paid him for work that he did on a

2    project for Mattel before he became a part-time employee;

3    correct?

4         MR. ZELLER:  Relevance.

5         THE COURT:  Overruled.

6         THE WITNESS:  I'm sorry.  Could you restate the

7    question?

8    Q.  BY MR. NOLAN:  Sure.  You recall that you interviewed

9    Carter Bryant in 1995; correct?

10   A.  Correct.

11   Q.  And as part of the interview process, at some point in

12   time, you authorized the payment of moneys to Carter Bryant

13   in exchange for work that he did at your request as part of

14   the interview process; correct?

15   A.  I don't actually recall that.

16   Q.  Do you recall that you asked him to do a drawing with

17   respect to some project that was underway at Mattel?

18   A.  No, I don't recall.

19        THE COURT:  Counsel, can I see you at sidebar for a

20   second.

21        (SIDEBAR CONFERENCE HELD.)

22        THE COURT:  My question is this:  How is this

23   relevant to a Phase 1-A issue as opposed to a Phase 1-B?

24        MR. NOLAN:  Well, I think it goes to this, your

25   Honor.  I think that in 1-A, we still have the issue of

1    whether or not Carter Bryant actually violated or breached

2    his contract of employment.  And one of the things that

3    Mattel has taken on is this issue that he did certain eye

4    painting for a competitor and that that was somehow a breach

5    of not only his contract but possibly breach of royalty.

6         And I wanted to establish, and I believe --

7         THE COURT:  So this goes to his mental state.

8         MR. NOLAN:  Yes, and Mattel's own practices.

9         THE COURT:  See, that's what I want to avoid.

10        MR. NOLAN:  Well, I'll stop.

11        MR. ZELLER:  And I would say, your Honor, there's

12   no foundation as to, you know, the mental state.  There's no

13   foundation for its relevance in the sense that this is 1995.

14   The witness doesn't have a recollection so far.  There's

15   nothing to say that there was such a project that was done.

16        THE COURT:  Foundational.  I'll overrule the

17   relevance.  Just state of mind of Carter Bryant.  This was a

18   recent experience.  This was -- maybe reflects his

19   understanding of his contract with Mattel.  That's as far as

20   it goes.

21        MR. ZELLER:  And just so the record is clear, what

22   Mr. Nolan is asking the witness about was in 1995.

23        THE COURT:  That's fair.  Very well.

24        (CONCLUSION OF SIDEBAR CONFERENCE.)

25        THE COURT:  You may proceed, Counsel.

1          MR. NOLAN:  Your Honor, may I approach with a

2    document?

3          THE COURT:  You may.

4    Q.  BY MR. NOLAN:  Ms. Park, I'd like to direct your

5    attention to what I've marked as 00250.

6          Do you see this?

7    A.  Yes.

8    Q.  And do you recognize your signature on the bottom of it?

9    A.  I do.

10   Q.  And what is this document?

11   A.  It looks like an invoice.

12   Q.  Was this an invoice that you approved while at Mattel?

13   A.  Yes.

14   Q.  With respect to Carter Bryant?

15   A.  Yes.

16         MR. NOLAN:  Your Honor, we'd offer Exhibit No. 250.

17         MR. ZELLER:  Foundation, relevance.

18         THE COURT:  Lay a further foundation, Counsel.

19   Q.  BY MR. NOLAN:  Does this refresh your recollection that

20   you did ask Carter Bryant to work on something called Power

21   Girl project prior to him being offered a position of

22   employment at Mattel?

23         MR. ZELLER:  Assumes facts.

24         THE COURT:  Sustained as phrased.  Rephrase.

25   Q.  BY MR. NOLAN:  Do you recall a project called Power Girl

1     at Mattel?

2     A.  No.

3     Q.  There's been a lot of projects; right?

4     A.  Yes.

5     Q.  Do you recall asking Carter Bryant, as part of the

6     interview process, to do some project for Mattel for which

7     you ended up paying him before you started working?

8     A.  No.

9     Q.  So looking at Exhibit No. 250, can you offer an

10    explanation as to why -- strike that.

11          Do you know why you would approve an invoice to

12    Carter Bryant before he began working at Mattel?

13          MR. ZELLER:  Assumes facts.

14          THE COURT:  Sustained.

15    Q.  BY MR. NOLAN:  Was it a regular practice of yours while

16    at -- during the 1995 time period, to ask prospective

17    employees to do like try-out work, to fill out a project for

18    you so you could evaluate their talents?

19          MR. ZELLER:  Relevance.

20          THE COURT:  Let's just focus on, I think,

21    Counsel -- yes, sustained.

22    Q.  BY MR. NOLAN:  Would it have been improper for Carter

23    Bryant, as part of his interview process at Mattel in 1995,

24    to actually do work that was assigned to him before you?

25    A.  Did you say would it have been improper?  I didn't hear

1    the first part.

2    Q.  Yes, would it have been improper for Carter Bryant to do

3    work on a project, before he was employed by you, if you

4    asked him to do it?

5    A.  No.

6    Q.  And in your opinion, would it have been improper for

7    Carter Bryant for an exchange of doing some work you assigned

8    to him before his employment to expect to be paid for that?

9    A.  We would pay people for their work, absolutely.

10   Q.  Even before they were offered positions at Mattel;

11   correct?

12          MR. ZELLER:  Assumes facts.

13          THE COURT:  Overruled.  You may answer.

14          THE WITNESS:  I'm sorry.  Could you ask the

15   question again?

16          MR. NOLAN:  Sure.

17   Q.  You didn't believe that it was improper for you to pay

18   prospective applicants --

19          THE COURT:  Let's focus on Mr. Bryant.

20   Q.  BY MR. NOLAN:  You didn't believe that it was improper

21   to pay Carter Bryant for work that he did, in response to

22   your request, before he was actually offered a job at Mattel,

23   did you?

24   A.  Correct.

25   Q.  And as you are sitting here today, do you have any

1    reason to believe that Exhibit No. 250, this invoice that you

2    signed, is not in fact an accurate copy of the invoice

3    approval that you signed in connection with work done by

4    Carter Bryant?

5    A.   No.

6    Q.   And do you have any doubt that, when you signed the

7    document that I've marked as Exhibit No. 250, that you

8    intended in fact for Mattel to pay Carter Bryant the amount

9    that's depicted in Exhibit No. 250?

10   A.   That was intended to be paid; correct.

11   Q.   And do you have any reason to believe that in fact your

12   approval was not authorized -- I'm sorry.  Let me rephrase

13   it.

14        Do you have any reason to believe that Carter

15   Bryant in fact was not paid the amount of money that you

16   approved in Exhibit No. 250?

17   A.   No.

18        MR. NOLAN:  Your Honor, we'd offer Exhibit No. 250.

19        THE COURT:  Any objection?

20        MR. ZELLER:  No objection.

21        THE COURT:  It's admitted.  You may publish.

22        (Exhibit 250 received.)

23   Q.   BY MR. NOLAN:  So this is the exhibit.  Your signature

24   is on the lower left-hand corner; correct?

25   A.   Yes.

1    Q.   And this is for the Power Girl project artwork and

2    prints.  And the name is Carter Bryant on the top?

3         Do you see that?

4    A.   Yes.

5    Q.   And then there's 54 hours at $15 per hour?

6    A.   Yes.

7    Q.   And then if you turn to the next page.  Do you see this?

8    This one is dated 9/27/95.  And this is again Carter Bryant.

9         Do you see that?

10   A.   Yes.

11   Q.   And now this is for 33 1/2 hours.

12   A.   Yes.

13   Q.   Do you see that?

14   A.   Yes.

15   Q.   And now you're paying $17 an hour; is that right?

16   A.   Yes.

17   Q.   And that's dated by you 9/27/95; correct?

18   A.   Yes.

19   Q.   Both of these invoices are before Carter Bryant was

20   offered employment at Mattel; correct?

21        MR. ZELLER:  Assumes facts.  Lacks foundation.

22        THE COURT:  Sustained.

23   Q.   BY MR. NOLAN:  Do you know whether or not this work was

24   done before Carter Bryant became an employee at Mattel?

25        MR. ZELLER:  The question is vague.

1          THE COURT:  Overruled.

2          THE WITNESS:  I believe this was work before he was

3    a full-time employee; correct.

4    Q.  BY MR. NOLAN:  Do you know Lily Martinez?

5    A.  Yes.

6    Q.  And how long have you worked with Lily Martinez?

7    A.  Eight to nine years, probably.

8    Q.  Do you ever recall directing that Lily Martinez not

9    speak to a Wall Street Journal reporter?

10         MR. ZELLER:  Relevance.

11         THE COURT:  Overruled.

12         THE WITNESS:  No.

13   Q.  BY MR. NOLAN:  Do you have Exhibit No. 15708 in front of

14   you?

15   A.  Would it be in my white book?

16   Q.  I believe it should be in your white notebook.

17   A.  Could you say that number again, please?

18   Q.  Sure.  15708.

19   A.  Yes.

20   Q.  And do you recognize 15708?

21   A.  Yes.

22   Q.  And what is 15708?

23   A.  It looks like some e-mail communication.

24   Q.  Between whom?

25   A.  I'd have to read this.  Can I take a moment to read it?

1     Q.  Oh, of course, please.

2          THE COURT:  While she's doing that, Counsel, why

3     don't we go to sidebar.

4          (SIDEBAR CONFERENCE HELD.)

5          THE COURT:  Where is this going?

6          MR. NOLAN:  Your Honor, this is going -- she's on

7     our witness list anyway, and I thought for efficiency, we

8     would go into this.  What they have done is they have put

9     into evidence the fact that this Wall Street Journal article,

10    in it Isaac Larian made an admission that the Bratz doll sort

11    of contest was conducted in 1999.

12         As you know, we contend that was a typo.  In fact,

13    in The Wall Street Journal article, it says that the Toon

14    Teens project was canceled in 1998.  The evidence that Mattel

15    has presented is that it was canceled in 1999.  And I want to

16    establish that neither Cassidy Park nor Lily Martinez ever

17    contacted The Wall Street Journal to tell them that they were

18    incorrect with respect to the date that Toon Teens was

19    scrapped or to establish that in fact Toon Teens was scrapped

20    in 1998 before Carter Bryant was --

21         THE COURT:  I don't see the relevance of that,

22    Counsel.

23         MR. NOLAN:  Well, the issue here, your Honor, is

24    that they are inferring that we should have called The Wall

25    Street Journal article, the author, the writer, and said wow,

Unsigned                                          Page  3529

1   you made a mistake.  You put 1999 down for the design of

2   Bratz.  They are claiming that we should have corrected that,

3   and we're saying, your Honor, that they should have corrected

4   an inaccuracy that appeared in The Wall Street Journal.

5       The other point that I would make is -- and this

6   goes to a couple of points.  One is that although they are

7   now contending that it was resembling Toon Teens and Lily

8   Martinez testified to that in this e-mail, she is saying that

9   this story sounds pretty shady to me.  And Cassidy Park is

10  telling her not to contact The Wall Street Journal, and I

11  want to establish that Mattel also had a policy of people not

12  contacting the press.

13      THE COURT:  All right.  That's where we're starting

14  to get far afield here about, first of all, a couple of

15  things.  Just administratively, Mr. Zeller is going to get

16  beat up at the end of the day by a bunch of third party

17  lawyers who are not going to have their witnesses on.  A

18  25-minute witness has now taken an hour and 20 minutes.  And

19  I understand she's on your witness list, and all that's

20  relevant to the Court is that the chess clock is going as we

21  speak.

22      So I'm not concerned about it.  But Mr. Zeller

23  seems to be the punching bag for this at the end of each day.

24  And we're trying to get through the plaintiff's case today.

25  That's just a logistical issue.

1          Is there any mistake in The Wall Street Journal

2     about the 1998 thing?  If there is, why don't we just

3     stipulate do it and tell the jury about it and call it a day?

4          MR. ZELLER:  I'll just say, your Honor, I don't

5     think the e-mail gets Mr. Nolan to where he wants to be.  If

6     there's an incorrect date in there, you know, saying, for

7     example, that Toon Teens was abandoned in 1998, then yes, we

8     would stipulate that the date is incorrect.

9          THE COURT:  That way we don't get into this

10    prejudicial information.

11         MR. NOLAN:  And that it was not corrected by

12    Mattel.

13         THE COURT:  Fair enough.

14         MR. ZELLER:  I would have to check into that.  And

15    I can represent if there was a correction requested, it would

16    not have been made through this witness.  I can guarantee

17    that if a request for a correction was made, it would not

18    have been through this witness.

19         THE COURT:  Let's do this.  Two things.  If there's

20    a mistake, let's stipulate to the mistake.  If a correction

21    was requested by somebody, indicate so.  If not, let's

22    indicate otherwise, and let's move on this point.

23         Thank you, Counsel.

24         (CONCLUSION OF SIDEBAR CONFERENCE.)

25         MR. NOLAN:  Your Honor, we're going to deal with

1    this later.

2         THE COURT:  Very well.

3    Q.  BY MR. NOLAN:  Ms. Park, do you recall that a Wall

4    Street Journal article ran concerning a doll line at Mattel

5    in or around July of 2003?

6    A.  Vaguely.

7    Q.  And without getting into the specifics of the particular

8    e-mail exchange between Lily Martinez and yourself, do you

9    have a recollection of directing Lily Martinez not to talk to

10   the press about the story?

11   A.  No, not really.

12   Q.  Do you know Lily Martinez as being involved in the

13   design of a doll line called My Scene?

14   A.  Yes.

15   Q.  And does My Scene compete with Bratz?

16        MR. ZELLER:  Relevance.

17        THE COURT:  Sustained.

18        MR. NOLAN:  Quick reconsideration, your Honor, on

19   bias.

20        THE COURT:  Overruled.

21        MR. NOLAN:  Thank you.

22   Q.  Does My Scene compete with Bratz?

23   A.  It's a fashion doll.

24   Q.  Are you familiar with a doll that was manufactured and

25   distributed by Mattel called Flavas?

1    A.  Yes.

2    Q.  And was Flavas also a competitor to Bratz?

3    A.  Again, it was a fashion doll, yes.

4    Q.  And is Flavas offered for sale anymore by Mattel?

5    A.  I don't believe so.

6    Q.  And is My Scene distributed by Mattel domestically

7    anymore?

8    A.  I'm not a hundred percent sure of that.

9    Q.  Do you know whether or not Lily Martinez has ever been

10   identified in the press or advertisements by Mattel as being

11   the designer of My Scene?

12   A.  I would think she has, yes.

13   Q.  Do you have a specific recollection of seeing any

14   article to that effect?

15   A.  Oh, yes.

16   Q.  And what article do you recall that?

17   A.  I don't have a very specific recollection of an actual

18   article, but I have recollection of that has been stated.

19        MR. NOLAN:  One moment.  This is the last series of

20   questions.  If I could just have a couple seconds before we

21   take our break.

22        THE COURT:  You may.

23   Q.  BY MR. NOLAN:  Are you familiar with a doll by the name

24   of What's Her Face?

25   A.  Yes.

1    Q.  And what is What's Her Face?

2    A.  Another fashion doll that Mattel produced.

3    Q.  Are you familiar with a doll by the name of -- I'm

4    sorry, a concept by the name of Toon Teens?

5    A.  Yes.

6    Q.  Was that a design of Lily Martinez?

7    A.  Yes.

8    Q.  Do you know what year that Toon Teens was -- well, was

9    Toon Teens, the concept, ever made into a doll?

10   A.  No.

11   Q.  Do you have any idea as to when Toon Teens was scrapped

12   by Mattel?  What year?

13   A.  No.

14   Q.  Do you have Exhibit 286 in front of you?

15   A.  Where would I find that?

16   Q.  I believe in the white notebook.

17   A.  286.

18        THE COURT:  286 or 1286, Counsel?

19        MR. NOLAN:  286, your Honor.

20        THE WITNESS:  Yes.

21   Q.  BY MR. NOLAN:  Okay.  I'd ask you to take a look at

22   this.  And I just want to direct your attention to two things

23   first.

24        You see where there's a reference to Toon Teens?

25   A.  Yes.

1    Q.  And then do you see that this column has recommended

2    action?

3    A.  Yes.

4    Q.  And then if you turn to the second page, do you see a

5    box that says What's Her Face, a reference to What's Her

6    Face?

7    A.  Yes.

8    Q.  And then there's a recommended action column?

9        Do you see that?

10   A.  Yes.

11   Q.  Have you seen this one before?

12   A.  Probably.

13   Q.  Looking at it, does this refresh your recollection as to

14   when Toon Teens was scrapped by Mattel?

15   A.  Yes.

16   Q.  And what was the date?

17   A.  The date on this document is November 17th, 1999.

18   Q.  Do you know a gentleman by the name of Larry Clayton?

19   A.  Yes.

20   Q.  And who is Larry Clayton?

21   A.  He's a design director at Mattel.

22   Q.  In what department?

23   A.  Barbie Main Line fashion dolls.

24   Q.  Are you familiar with the project called Glamour Maids?

25   A.  Yes.

1    Q.  And what was Glamour Maids?

2    A.  It was a rough concept idea for a line of fashion doll

3    characters.

4    Q.  Isn't it true that Glamour Maids was the early concept

5    that eventually led to My Scene?

6         MR. ZELLER:  Relevance.

7         MR. NOLAN:  Just to tie it up, your Honor.

8         THE COURT:  Very well.  Overruled.

9         THE WITNESS:  I -- I -- I don't really recall that.

10   Q.  BY MR. NOLAN:  Okay.  I'd like to take you to

11   Exhibit 1286 for a moment.  And do you see that this is an

12   e-mail within Mattel?

13   A.  Yes.

14   Q.  And it's from Larry Clayton to Paul Cheung, C-H-E-U-N-G.

15        Do you see that?

16   A.  Yes.

17   Q.  Could you tell the jury who Paul Cheung is?

18   A.  Paul Cheung was our offshore development engineering

19   partner in Hong Kong.

20   Q.  And he was an employee at Mattel?

21   A.  Yes.

22   Q.  Do you have any explanation as to why Larry Clayton,

23   while employed at Mattel --

24        MR. ZELLER:  Your Honor, he's going to be

25   summarizing this document without foundation.

1        MR. NOLAN:  I'll --

2        THE COURT:  Sustained.

3        MR. NOLAN:  I'll rephrase it.

4    Q.  Do you have any knowledge that in April of 2002, Larry

5    Clayton sent to Paul Cheung --

6        MR. ZELLER:  Your Honor, the same point.  He's

7    stating the content of a document that is not in evidence,

8    and there's no foundation for it.

9        MR. NOLAN:  I'm not referring to the document, your

10   Honor.

11       THE COURT:  I'm not really sure what it is that

12   you're going to say, but I suspect we need a sidebar.  Why

13   don't we take our morning break.

14       MR. NOLAN:  This is the last question.

15       THE COURT:  Then let's do it at sidebar.

16       (SIDEBAR CONFERENCE HELD.)

17       THE COURT:  What's going on here?

18       MR. NOLAN:  Repeatedly, Mr. Price, when he couldn't

19   get a document into evidence, would refer to the subject

20   matter.  At first he would be referring to the document, and

21   then he'd go to the subject matter.  All I'm doing, your

22   Honor, is asking her in her capacity whether or not she had

23   knowledge that Mattel was sending to Hong Kong a copy of a

24   Bratz doll in connection with the development of My Scene.

25   They have raised the point with Isaac Larian that the Skipper

1   doll was sent to Hong Kong in connection with the development

2   of Bratz.  And I wanted to establish whether or not she knows

3   that in fact Bratz was sent --

4        THE COURT:  What possible relevance does that have

5   to this phase of the trial?

6        MR. NOLAN:  Your Honor, the same relevance it has

7   with respect to why they asked Isaac Larian that question.

8        THE COURT:  Wait a second.  His guilty knowledge is

9   relevant to the claims; Mattel's guilty knowledge is not.

10   It's an affirmative defense.

11        MR. NOLAN:  I respectfully disagree.  I think it

12   goes to the premise of the assumption that it goes to guilty

13   knowledge.  It shows that it's not guilty to do this, that

14   it's not wrong to send this.

15        THE COURT:  If a defendant is accused of stealing,

16   the fact that the plaintiff stole as well is not a defense.

17   It's an affirmative defense of unclean hands, apparently, but

18   that's been reserved expressly to Phase 1-B.

19        You get a second bite at this, Counsel.

20        MR. NOLAN:  I guess what I'm going to is just the

21   point as to whether or not it's wrong in the first instance

22   to take a doll that's offered at retail, like the Skipper

23   doll, or the Bratz doll, and use it for guidance in

24   manufacturing by a toy company, which is what they were

25   trying to establish is Isaac Larian's guilty mind.  I'm

1    saying that it's not showing of guilt in any way.  And I

2    think since they opened this up, I should be allowed to

3    establish this.

4          THE COURT:  Let me hear from Mr. Zeller.

5          MR. ZELLER:  Number one, this is not the same

6    relevant time period, not the relevant products.  You'll see,

7    this is April of 2002, your Honor.  I mean, there are many

8    things where we have not been able to put in, including

9    copying during the course of the Bratz development, of other

10   products.  The reason why Skipper came in was because that's

11   a product Carter Bryant worked on.  It went to his guilty

12   knowledge.  He's trying to basically mix apples and oranges

13   here.

14         Just because one person sends a body for reference,

15   one purpose, does not mean it's the same thing as to the

16   purpose by another company during another time period on

17   another project.  So my point is certainly it's 403 material

18   at a bare minimum, but I also think it's completely

19   irrelevant.

20         There are many things, Judge, that we have been

21   precluded from putting on in terms of their copying in 2000.

22   There's a litany of these documents.  If this gets opened up,

23   then we should be able to call Mr. Larian back to the stand,

24   when was Diva Starz products and packaging -- there's

25   literally dozens of pages of this.

1           THE COURT:  I think it's fair game, but I think

2    it's preserved to 1-B.  I think.

3           MR. NOLAN:  Okay.

4           THE COURT:  And as far as your form goes, I don't

5    intervene unless there's an objection.

6           MR. NOLAN:  I agree.  I guess I just wanted to make

7    certain that if he's going to do it and doesn't object, that

8    it kind of sets the standard.  But now I understand.

9           Can we have the stipulation?  I showed you the two

10   documents.

11          MR. ZELLER:  We agree with the stipulation as to

12   the time.  The problem is that that particular paragraph of

13   The Wall Street Journal is not in evidence yet.

14          THE COURT:  It's not.  Let's put it in evidence.

15          MR. ZELLER:  That's what we have to do, is sort

16   out --

17          THE COURT:  Why don't we do this, just to let

18   Mr. Nolan be able to wrap it up with the jury.  Why don't you

19   just announce the stipulation that we'll be stipulating that

20   the 1998 reference date in The Wall Street Journal article

21   was incorrect for Toon Teens.  Is that --

22          MR. ZELLER:  Yes.

23          THE COURT:  I want to give Mr. Nolan some coverage

24   because I'm sustaining the objection.

25          MR. ZELLER:  But on the correction part, that I

1     have to confirm first.

2          THE COURT:  Right.  It won't go into evidence.

3     You're not going to put it up on the screen.  You can work

4     that out later.  Fair enough?

5          MR. ZELLER:  Sure.

6          THE COURT:  All right.

7          (CONCLUSION OF SIDEBAR CONFERENCE.)

8          THE COURT:  All right, Mr. Nolan, you may simply

9     announce the stipulation, and we'll wrap this up.

10          MR. NOLAN:  Yes, your Honor.  In advance of the

11     stipulation, I'd like to just introduce or offer into

12     evidence the document that refreshed her recollection, which

13     is Exhibit No. 286.

14          MR. ZELLER:  286?

15          MR. NOLAN:  Yes.  The one she just testified to.

16          THE COURT:  Any objection to 286?

17          MR. ZELLER:  No objection, your Honor.

18          THE COURT:  Very well.  286 is admitted.  And then

19     you may state the stipulation, Counsel.

20          (Exhibit 286 received.)

21          MR. NOLAN:  It's stipulated between MGA and Mattel

22     that The Wall Street Journal article which was published in

23     July -- on July 18 of 2003 contained a statement that the

24     Toon Teens project had been scrapped by Mattel in 1998 and

25     that that was an error in the article.

1        THE COURT:  Very well.  So stipulated, Mr. Zeller?

2        MR. ZELLER:  Yes.  Error as to the date.

3        MR. NOLAN:  As to the date.

4        THE COURT:  Right.  And we will reform the exhibit,

5   redact the exhibit to include that paragraph in the exhibit.

6        MR. ZELLER:  And anything else we deem necessary

7   for context.

8        THE COURT:  Very well.

9        Ladies and gentlemen, we'll take our morning break

10   at this time.

11        (WHEREUPON THE JURY WITHDRAWS.)

12        THE COURT:  Please be seated.

13        Mr. Zeller, you'll resume after the break.

14        MR. ZELLER:  Yes, your Honor.

15        THE COURT:  Very well.  And it's clear that you've

16   only taken five or ten minutes with this witness.

17        MR. ZELLER:  That's right.

18        THE COURT:  All right.  The next witness will be?

19        MR. ZELLER:  We have the Custodian of Records, who

20   I believe is designated as Mr. Holden for purposes of

21   introducing some documents.  And then I think beyond that --

22   I assume that the Menz stipulation or the stipulation

23   obviates the need to call Mr. Menz at this point.

24        So that just leaves, then, for today Mr. Marlow,

25   and as I last understood it, Mr. Marlow isn't going to be

1    here until early afternoon because of his counsel's

2    commitments to -- I think there was a hearing in front of

3    Judge King.  And so it may be that we'll actually need to

4    rest conditionally at that point after the Custodian of

5    Records, depending on when we finish with that.

6          THE COURT:  All right.  Just so we make sure we

7    have plenty of material to get through today, let me go

8    through the Court's decisions on the Richard Irmen

9    deposition.  Who is going to be fielding this?

10          MS. AGUIAR:  Mr. Herrington.

11          THE COURT:  And Mr. Proctor?

12          MR. PROCTOR:  Yes.  It's me, your Honor.

13          THE COURT:  Very well.

14          MR. PROCTOR:  And before you start on it, in going

15    over it again this morning, I assure you we are not going to

16    make a practice of this.  If the Court will consider, we do

17    think there's a meritorious hearsay and foundation objection

18    which is not stated, for some unknown reason, in the

19    document.

20          THE COURT:  In this one?

21          MR. PROCTOR:  In Mr. Irmen's deposition.

22          THE COURT:  Why don't you refer to that.

23          MR. PROCTOR:  Pages 185 to 188 and 190 to 192.

24    It's a series of questions and answers where Mr. Irmen is

25    talking about documents he's seen, drawings he's seen, which

1    is fine, but the hearsay aspect of it is Mr. Bryant's

2    statement to him that these are Bratz.  His only foundation

3    for knowing they are Bratz is that hearsay statement.

4        THE COURT:  So you're talking about 185 to 189.

5        MR. PROCTOR:  Page 189 is just testimony about what

6    he saw.  So I don't think there's an objection to that.  It's

7    really the statements that, you know, that Mr. Bryant said it

8    was Bratz and the statements about, you know, Mr. Irmen has

9    no foundation to know that it's Bratz.

10       MGA does actually get that later in the deposition,

11   because we showed Mr. Irmen particular drawings which

12   everyone in this room knows Mr. Bryant has testified and the

13   jury knows Mr. Bryant has testified are Bratz drawings, and

14   he said yes, this is what I saw.  But in this excerpt, he's

15   talking about what Mr. Bryant told him back in the beginning

16   of 1999.  He said, "These are the Bratz."  That's the hearsay

17   statement, and that's the lack of foundation.

18       THE COURT:  Isn't it more just an identification as

19   opposed to an actual matter of these are the Bratz?

20       MR. PROCTOR:  I appreciate that argument, but it is

21   a statement that is being offered for the truth of the matter

22   asserted.

23       THE COURT:  Identification is an express exception

24   to hearsay.  So if it is identification, if he is simplifying

25   these as those are the Bratz as opposed to this is the Bratz.

1        MR. PROCTOR:  Okay.

2        THE COURT:  Very well.  I'll accept the "okay" as

3    no further argument.

4        Let's roll through this.

5        MR. HERRINGTON:  Your Honor, I'm sorry.  Just to

6    clarify, Richard Irmen?

7        THE COURT:  Yes, that's where we're at.  Page 16,

8    overruled.

9        17, overruled.

10        I believe we skip now to 36, overruled.

11        37, overruled.

12        43 is sustained, calling for speculation.  No

13    foundation there.

14        44, sustained.

15        MR. PROCTOR:  Your Honor, just for clarification,

16    is that the entirety?

17        THE COURT:  Yes, total of 43, 44, and 45 are

18    sustained.

19        MR. PROCTOR:  Thank you.

20        THE COURT:  54 is sustained, based on hearsay.

21    54 -- and 55 is sustained up until line 23.  And then I'm

22    going to overrule it from 23 on because now we're getting out

23    of the hearsay area.

24        MR. PROCTOR:  Line 23 of which page, your Honor?

25        THE COURT:  I'm sorry?

1        MR. PROCTOR:  Line 23 on which page?

2        THE COURT:  55.

3        MR. PROCTOR:  Thank you.

4        THE COURT:  This is where you were with Carter when

5    he moved back from Kimberling City.  These are actions now

6    that we're getting into now and not hearsay.  He was living

7    in the house, et cetera, et cetera, the way through 57.  It's

8    overruled.

9        67 is sustained based on hearsay.

10        88, which is the next set of objections, is

11    overruled.  Those questions I've allowed of all witnesses so

12    far.

13        133, sustained.

14        134, what I'm sustaining is not a question or an

15    answer, but it's something inserted in there was a speaking

16    objection.  That is sustained, as is the speaking objection

17    on the page of 135.

18        On 136, I'm going to sustain the objections.

19    There's just no foundation here, in addition to not being

20    relevant.  The witness answers I don't remember, I don't

21    remember, I just don't remember, I don't think I did, I don't

22    remember.  That's two pages of that on 136 and 137.  Those

23    are all sustained, as are the objections on 138.  The form of

24    the requests.

25        Turning to page 160, I'm going to sustain the

1    objections to the first question and answer.  That's lines 16

2    through 20.  I will overrule the objection on lines 21

3    through 25 and on page 161, lines 1 through 2.

4          162, sustain the objection.

5          Page 182, it's actually a pretty funny concept.

6    Tomb Teens needs to be changed to Toon Teens.

7          And hopefully the jury will be realizing it.  The

8    idea of Tomb Teens, what a concept for a doll.

9          MR. NOLAN:  We thought it was a Freudian slip, your

10   Honor.

11         THE COURT:  Outside of that, it's overruled.

12   Although once we get too far afield on 183, I'll sustain the

13   objections on 183 and 184 until we get to line 21.  I'll

14   overrule the objection at 21 and the answer that then appears

15   on page 185.  That's a question about contact on the lawsuit.

16         MR. PROCTOR:  I'm sorry, your Honor.  I think I

17   lost track.  Is that on 183?

18         THE COURT:  I'm sorry.  On 183, I'm sustaining the

19   objection.  On 184, it's a continuing objection which I

20   sustained down through line 21, but I'm permitting the

21   question on lines 21 through 23 and the answer on page 185.

22         MR. PROCTOR:  Thank you.

23         THE COURT:  We've already addressed the next

24   several pages.

25         Page 192, objection is overruled.

1        Page 205, it is a compound question.  And I'll

2    sustain the objection.

3        Page 220, I'll sustain the objection there.

4        225, it is hearsay.  I'll sustain the objection

5    there.

6        However, I'm going to sustain the objection for

7    just the first question and answer.  So 225, lines 24 and 25,

8    sustained.

9        226, lines 1 through 3, sustained.  But the rest is

10    admissible on that page 226.

11        Page 231 is sustained.  There's no foundation

12    there.  The witness keeps saying no, I do not recall.

13        241, I'll sustain the objection.

14        Skipping ahead now, there's nothing until page 286,

15    and I will overrule that objection.

16        Page 288, I'll overrule that objection.

17        On page 289, I'll sustain the objection from lines

18    2 through 7.  I'll overrule the objection on lines 8 and 9.

19        305, is it in evidence that Evidence Eliminator was

20    in both the laptop and the desktop?  Or just the desktop?

21        MR. HERRINGTON:  Just the laptop.

22        THE COURT:  Thank you.

23        MR. QUINN:  No, actually, I think it's on both.

24        MR. HERRINGTON:  Well, it is on both, but --

25        MR. QUINN:  It's on both, your Honor.

Unsigned                                Page  3548

1          MR. HERRINGTON:  But as we understood the Court's

2     rulings, in terms of 403, the only use of Evidence Eliminator

3     was going to be the running of that program on I believe it

4     was July 12th, 2004.  And that was even the laptop.  And now

5     we're going to be adding in yet another layer in terms of

6     adding in the desktop, which is why we objected on 402 and

7     403 grounds.

8          THE COURT:  I see.

9          MR. HERRINGTON:  The other issue, your Honor, is

10    that that computer, the desktop, I think it's undisputed was

11    given to Carter Bryant's niece.

12         THE COURT:  I understand that.  It's overruled.

13         305 as well.  However, 305 is overruled on the

14    question on line 25 of 306 and down to line 2 on 30 of 6 --

15    the question on 305, line 26, through the answer on -- that

16    ends on line 2 of 306, but I'll sustain the objection with

17    respect to lines 3 through 6 on page 306 regarding any other

18    computer.

19         And then I'll sustain the objection on 312.  We're

20    getting quite cumulative at that point.

21         And that's it.

22         MR. PROCTOR:  Just the last point.  Did you say

23    sustained on 312?

24         THE COURT:  Yes.  It's getting cumulative at that

25    point.

1          MR. PROCTOR:  Okay.  If I could be heard on one

2     series of questions and answers on 133 to -35.

3          THE COURT:  Yes.  These are the speaking

4     objections.

5          MR. PROCTOR:  Right.  And I would characterize it

6     somewhat differently.  Normally I wouldn't designate anything

7     like this.  The reason that we did is because MGA is trying

8     to create a misleading impression from our perspective by the

9     excerpts that it has designated.

10          If you look at the top of 134, prior to this

11     there's testimony about Carter Bryant meeting with Ann Wang,

12     and Richard Irmen was present at that meeting.  And then they

13     say prior to the time that Carter Bryant left Mattel, had he

14     expressed any concern about being sued by Mattel for any

15     reason.  Answer, no.  Did you ever discuss with Carter Bryant

16     agreements or contracts that you had with Mattel?  Answer,

17     no.

18          That's what MGA designated.

19          Now, what we've counterdesignated here, and it's

20     solely for the purpose of clarifying exactly what Mr. Irmen's

21     answer was, he excluded information based on privilege

22     because he was instructed to.

23          And that's on page 133.  He would not disclose

24     anything.  He would not disclose, for example, whether Mattel

25     has discussed his meeting with Ann Wang.  That's fine.  That

Unsigned                                         Page  3550

1    may be an appropriate assertion of privilege, but it's

2    necessary to get that out in order to clarify that.  And then

3    the speaking objection, it's a long objection, but it's not

4    really a speaking objection.  It's a speaking objection

5    coupled with a limiting instruction not to answer.

6    Ms. Anderson is saying in that objection exclude from your

7    answer X, Y, and Z.

8         THE COURT:  Wait a second.  Is Ms. Anderson

9    Mr. Irmen's attorney?

10        MR. PROCTOR:  There was a privilege assertion

11   between Mr. Bryant and Mr. Irmen present together consulting

12   with Ms. Wang.  There was a privilege assertion, I believe.

13   Perhaps somebody can correct me.  I believe that the position

14   was taken that Ms. Wang represented Mr. Irmen and Mr. -- and

15   Ms. Anderson represented Mr. Irmen.

16        THE COURT:  What Ms. Anderson says, says, "I would

17   instruct you not to answer on the grounds of privilege, but

18   otherwise, you may answer."  She's not saying --

19        MR. PROCTOR:  It's --

20        THE COURT:  I'd instruct you is a contraction for I

21   would instruct you, not that she is instructing him, and then

22   she's saying go ahead and answer.

23        MR. PROCTOR:  As I understand, this happened in

24   this case a decent bit.  I think MGA will confirm there were

25   these -- I don't know the correct terminology.  I think we

1    call them limited admonitions or cautionary statements or

2    something like that, where defending a deposition, the lawyer

3    would say you can answer the question if you have percipient

4    knowledge, but I don't want you to disclose anything, any

5    conversations that took place while counsel was present.  I

6    want you to exclude privileged conversations from your

7    answer, and otherwise you can answer.

8        Mr. Irmen then says, "No, Carter Bryant never

9    mentioned anything about Mattel."  But that's a misleading

10   answer in the abstract without getting out that she

11   instructed him not to answer.  Well, did you have

12   conversations with your lawyer about this?  Did Mr. Bryant

13   have conversations with his lawyer about this?  That's needed

14   simply for context.

15       THE COURT:  But those aren't asked.  Those

16   follow-up questions aren't asked.

17       MR. PROCTOR:  That's what we designated on 133.

18       THE COURT:  Oh, very well.

19       MR. PROCTOR:  That's the point of these counters.

20       THE COURT:  That makes more sense.

21       All right.  Let me hear from Mattel on this.

22       I think they are probably entitled to one or the

23   other.  Either the -- see that the question is being -- there

24   is some sort of limiting instruction being given by counsel

25   or the clarification on 133 that there were discussions with

1    the attorneys, and obviously that's separate and apart from

2    the percipient answer that he's giving here.  But I think one

3    or the other probably should be given.  I don't like either

4    of them, quite frankly.  It's an awkward way to approach it,

5    but I think out of fairness, there needs to be some context

6    given.

7        MR. HERRINGTON:  Your Honor, let's just make this

8    easy because it's going to end up being confusing.  We'll

9    just withdraw the designations that Mattel is calling into

10    question, and it will just make it cleaner.

11        THE COURT:  Very well.  So I'm sustaining

12    everything on 133, 134, 135, 136, and 137.  It's all out.

13    Excellent.

14        Very good.  All right.  Any other questions on the

15    Irmen deposition from MGA's perspective?

16        MR. HERRINGTON:  No, your Honor.

17        THE COURT:  Very well.

18        MR. NOLAN:  A quick procedural point.  I know we're

19    on break.  When they conditionally rest, I don't want to -- I

20    just want to preserve all of our motion practice until they

21    actually rest.  I don't have to make for the record --

22        THE COURT:  Fair enough.

23        MR. NOLAN:  -- a conditional motion.  If that could

24    be understood.

25        THE COURT:  I will give you leave to make that when

1    they formally rest.  What I would like to have, though, so

2    there's no moving target here, is a clear indication from

3    Mattel.  I want the names of who it is that we're

4    conditionally resting upon.  And understand that that will be

5    it.  I'm not going to give leave, after you've made your

6    conditional rest, to add people to that list.

7        MR. QUINN:  Understood, your Honor.

8        THE COURT:  Very well.  Let me take about a five-

9    or ten-minute recess, and we'll resume.

10       MR. HERRINGTON:  Just one comment, your Honor.  The

11   only one we don't have rulings on is Ms. Jean Galvano.

12       THE COURT:  I didn't give those last night?

13       MS. AGUIAR:  We can --

14       MR. HERRINGTON:  We can pick that up later.

15       THE COURT:  Why don't we pick that up later.  All

16   right.  I do have them.  I just have to announce them.  Very

17   well.  We'll do that at the next break.

18       (Recess taken.)

19       (WHEREUPON THE JURY ENTERS.)

20       THE COURT:  You may proceed.

21       MR. ZELLER:  Thank you, your Honor.

22               REDIRECT EXAMINATION

23   BY MR. ZELLER:

24   Q.  Ms. Park, I'd like to draw your attention to some

25   testimony Mr. Bryant gave in this case.  This is at page

1    3128, lines 12 to 22.  And if we could put that up on the

2    screen?

3           MR. NOLAN:  Objection.  As to the purpose.

4    Foundation, argumentative.

5           THE COURT:  I don't know what this is.

6           MR. NOLAN:  We don't either.

7           THE COURT:  Why don't you take a look at it.  The

8    Court has permitted this practice previously.  Any objection,

9    Mr. Nolan?

10          MR. NOLAN:  No objection.

11          THE COURT:  Very well.  You may proceed.

12   Q.  BY MR. ZELLER:  Ms. Park, I'd like to focus your

13   attention on this particular statement that Carter Bryant

14   made at trial in this case, and I have some questions about

15   it for you.

16          You'll see this is a question.  (Reading.)

17          "And you talked about Jewel, the project

18   Jewel.  Do you recall that?

19          "ANSWER:  Yes.

20          "QUESTION:  And I believe your testimony was

21   that the Jewel project you worked on both in '98

22   and '99.

23          "ANSWER:  Yes, there were two different

24   projects.

25          "QUESTION:  Now, could you tell us who your

1      supervisor was in '98 on the Jewel project?

2         "ANSWER:  Cassidy Park.

3         "QUESTION:  And that was during your first

4      stint at Mattel; correct?

5         "ANSWER:  Yes."

6      Q.  My question for you, Ms. Park, is focusing on this '98

7      Jewel project that he's testifying about, is it possible that

8      Mr. Bryant was working on a Jewel project in 19 -- in January

9      of 1998 for you?

10     A.  No.

11     Q.  And why is that?

12     A.  Because Main Line Jewel project had a start date much

13     after that.

14     Q.  Now, Mr. Nolan asked you a number of questions about

15     collector and collector dolls and collector project, and

16     particularly, a collector Jewel project.

17         Did you ever give Mr. Bryant any collector

18     projects?

19     A.  No.

20     Q.  Did you ever give him one in 1998 for any reason?

21     A.  No.

22     Q.  Have you ever worked in the Barbie collector department

23     at Mattel?

24     A.  No.

25     Q.  Now, other than this Jewel Girl project, those dolls

1    that we saw earlier, was there any other project called Jewel

2    that you worked on as a supervisor or in any other capacity

3    during this time period?

4    A.  No.

5    Q.  If we could please take a look at Exhibit 15952 in

6    evidence.  This is the turnaround document that you talked

7    about previously.  And there's a field there that says

8    original hire date.  And it shows October 30th, 1995, for

9    Mr. Bryant.

10   A.  Yes.

11   Q.  Do you see that?

12        Now, prior to the time he was actually hired

13   formally as a full-time employee at Mattel, did Mr. Bryant do

14   work for Mattel?

15   A.  He did some vendor work.

16   Q.  And what do you mean by vendor work?

17   A.  He was a temp employee, or he would have done, you know,

18   project work.

19   Q.  If we could take a look, then, at Exhibit 250.  And in

20   particular, the first page of Exhibit 250, please.

21        And Mr. Nolan showed you this document.  The first

22   page is dated September 15, 1995, and the second page is

23   dated September 27, 1995.

24        Do you see that?

25   A.  Yes.

1    Q.  Was that during the time period when Carter Bryant was

2    working as a vendor or a temp for Mattel?

3    A.  I believe so.

4    Q.  And does this reflect -- well, let me ask this:  During

5    the time period when Carter Bryant, just prior to the time he

6    became a full-time employee and when he was working as a temp

7    or a vendor for Mattel and doing this work that's reflected

8    here in Exhibit 250, was he working for another toy company?

9    A.  No.

10    Q.  At any time have you ever asked Mr. Bryant to do work on

11    any toy project during the time he was employed by some other

12    toy company?

13    A.  No.

14    Q.  In your view, would it have been proper to do that?

15    A.  Oh, no.

16    Q.  And at any time are you aware of Mr. Bryant being paid

17    by Mattel for work on a toy project during any time period

18    when Mattel knew that or you knew that Mr. Bryant was working

19    for another toy company?

20    A.  Could you restate the first part of your question?  I'm

21    sorry.

22         MR. ZELLER:  I have nothing further, your Honor.

23         THE COURT:  Actually, she asked you to restate the

24    first part of your question.

25         MR. ZELLER:  I'm sorry?

1          THE COURT:  She asked you to restate the first part

2    of the question.

3          MR. ZELLER:  I apologize.  I thought you answered

4    the question sufficiently.  I apologize.

5    Q.  My question is Mr. Nolan had asked you about payments

6    that were made to Mr. Bryant in connection with Exhibit 250.

7          Do you remember that?

8    A.  Yes.

9    Q.  Now, to your knowledge, was -- were these payments made

10   to Mr. Bryant during a time when he was employed by some

11   other toy company?

12   A.  No.

13   Q.  And have you ever done that with respect to Mr. Bryant?

14   A.  No.

15         MR. ZELLER:  I have nothing further.

16         THE COURT:  Very well.  Anything further?

17         MR. NOLAN:  Yes, your Honor.

18         Could I just ask him to put up the trial testimony

19   again?  Can we have up the same testimony that you displayed?

20              RECROSS-EXAMINATION

21   BY MR. NOLAN:

22   Q.  Now, Mr. Zeller asked you to take a look at this

23   testimony.  You, of course, were not in the courtroom when

24   Mr. Bryant testified; correct?

25   A.  Correct.

1    Q.  But I assume you recall your testimony this morning when

2    Mr. Zeller first started asking you questions; correct?

3    A.  Yes.

4    Q.  And isn't it true that this morning you said that during

5    Mr. Carter Bryant's first employment stint at Mattel, you

6    were his corporate supervisor; correct?

7    A.  Yes.

8    Q.  So it is true that in 1998 you were Carter Bryant's

9    corporate supervisor; correct?

10   A.  Yes.

11   Q.  But you do not recall what projects Carter Bryant worked

12   on -- correct? -- during that period of time while he was in

13   Missouri?

14   A.  Yes.

15   Q.  Yes, you don't recall?

16   A.  I don't have clear -- right.  Correct.

17   Q.  By the way, during the break did you get a chance to

18   talk to Mr. Zeller?

19   A.  No.

20   Q.  Remember Mr. Zeller just asked you questions about

21   whether or not you thought it was proper to ask an employee

22   to -- a prospective employee to do a test project?

23       Do you recall that testimony?

24       MR. ZELLER:  Mischaracterizes the questions.

25       THE COURT:  Are you withdrawing, Counsel?

1          MR. NOLAN:  Yes, your Honor.

2     Q.  I'd like to turn to your deposition transcript.  I'd ask

3     you to look at page 122 of your deposition.  Specifically,

4     draw your attention to lines 21 to 25 on page 122, and then

5     on page 123, lines 1 through 8.  And we'd ask permission to

6     publish that, your Honor.

7          MR. ZELLER:  Your Honor, relevance.  Foundation as

8     well as relevance based on the sidebar conversation.

9          MR. NOLAN:  I would just say, your Honor, it was

10    opened up on redirect.

11         THE COURT:  This appears to go beyond Mr. Bryant,

12    Counsel.

13         MR. NOLAN:  Your Honor, respectfully, the question

14    was broader than Mr. Bryant on redirect.

15         THE COURT:  Very well.  Overruled.

16         MR. NOLAN:  Thank you.

17         MR. ZELLER:  Your Honor, I apologize.  Then I would

18    ask that it be read through line 12.  I'm sorry.  Line 14,

19    page 123.

20         THE COURT:  Very well.

21         MR. NOLAN:  No objection.

22         MR. NOLAN:  Can we play that, Aaron.

23         WHEREUPON THE VIDEOTAPED DEPOSITION EXCERPTS

24         OF CASSIDY PARK, AS PROVIDED BY COUNSEL, ARE

25         INCORPORATED HEREIN:

1      "QUESTION:  Does it -- does it make any

2      difference if you're hiring or looking to hire

3      someone and you want to see what their skills are,

4      does it make any difference to you whether or not

5      they are employed, currently employed when deciding

6      whether or not to ask them to do something to show

7      you their skills?

8      "MR. ZELLER:  The question is overbroad.

9      "THE WITNESS:  Not really.

10     "QUESTION:  Okay.  Do you recall whether or

11     not you asked Carter Bryant to do anything to

12     demonstrate his skills for you before you hired

13     him?

14     "MR. ZELLER:  Asked and answered.

15     "ANSWER:  I don't recall that."

16     MR. NOLAN:  Nothing further.

17              FURTHER REDIRECT EXAMINATION

18     BY MR. ZELLER:

19     Q.  Do you think there would be anything improper in the

20     following situation, if you were considering hiring somebody,

21     if that person was already working for a competing toy

22     company, and then you paid them to do work, would you

23     consider that to be proper or improper?

24     A.  Improper.

25     Q.  This question and answer that Mr. Nolan played for you

1      from your deposition talked about having someone do

2      something, quote, to show you their skills, end quote.  And

3      is that something that typically happens as part of an

4      interview process, you expect them to show you drawings or

5      other works that they have done of some kind?

6      A.   Well, prospective candidates would definitely bring a

7      portfolio.  We look through their portfolio.  If they are

8      from a different industry or if they are fresh out of school

9      or something like that, we may very well ask them to do a

10     little test project.

11     Q.   And have you ever -- did you ask Mr. Bryant to do such a

12     thing while he was employed by another company?

13            MR. NOLAN:  Asked and answered.

14            THE COURT:  Overruled.

15            THE WITNESS:  I don't believe so, no.

16     Q.   BY MR. ZELLER:  Have you ever asked anyone who was

17     working for a competing toy company at the time to do

18     anything like that and paid them for it?

19     A.   No.

20            MR. ZELLER:  I have nothing further.

21            MR. NOLAN:  Very quickly.

22               FURTHER RECROSS-EXAMINATION

23     BY MR. NOLAN:

24     Q.   Ms. Park, have you ever hired another designer from

25     another toy company?

1          MR. ZELLER:  Relevance.

2          THE COURT:  Overruled.

3          THE WITNESS:  I'm sure we have, yes.

4          MR. NOLAN:  Nothing further, thank you.

5          THE COURT:  Anything further?

6          MR. ZELLER:  No, your Honor.

7          THE COURT:  All right.  You are excused, ma'am.

8          MR. QUINN:  Your Honor, the next witness would be

9    Craig Holden, a Custodian of Records designated by MGA.

10          THE CLERK:  Raise your right hand.

11              CRAIG HOLDEN, SWORN.

12          THE CLERK:  Thank you.  Please be seated.

13          Please state your full name for the record, and

14    spell the last name.

15          THE WITNESS:  Craig Holden, H-O-L-D-E-N.

16          THE CLERK:  Thank you.

17              DIRECT EXAMINATION

18    BY MR. QUINN:

19    Q.  Good morning, Mr. Holden.

20    A.  Good morning.

21    Q.  It's my understanding that you're the one that got the

22    lucky assignment of being designated Custodian of Records,

23    responding with documents we subpoenaed from MGA?

24    A.  Yes.

25    Q.  You're a lawyer employed by MGA?

1    A.  That's correct.

2    Q.  There should be a black binder up there.  And the first

3    document is tabbed 1932.

4    A.  Okay.

5    Q.  And you recognize this as a document that was produced

6    in this case by MGA?

7    A.  It does have an MGA Bates number on it.

8         MR. QUINN:  I offer this in evidence, your Honor.

9         MS. AGUIAR:  Objection, your Honor.  Lack of

10   foundation.

11        MR. QUINN:  There's no dispute about the

12   authenticity, your Honor.

13        THE COURT:  Counsel?

14        MS. AGUIAR:  I don't know -- do you want to do this

15   at sidebar?

16        THE COURT:  Sure.

17        (SIDEBAR CONFERENCE HELD.)

18        THE COURT:  What's your foundational objection?

19        MS. AGUIAR:  We do not dispute the authenticity of

20   this document, your Honor.  But this witness, if asked the

21   question, has never seen this document before, doesn't know

22   anything about this document, doesn't know how it was

23   prepared, nor had any involvement in preparing the document.

24   He wasn't there --

25        THE COURT:  Well, who did?  He is your designated

1    Custodian of Records.

2        MS. AGUIAR:  I understand that.  But a Custodian of

3    Records is not -- I've looked at the cases on Custodian of

4    Records, and Custodian of Records don't need to be the person

5    who has personal knowledge of these documents.  He just said

6    it came from MGA's files.  I had an e-mail exchange with

7    Mr. Zeller specifically telling him who the witness was who

8    this document could come in through.  And I identified that

9    witness as Daphne Gronich.  We gave him a date for

10   Ms. Gronich, and she's prepared to testify about this

11   document.  But this witness, other than saying it has a Bates

12   number on it and agreeing to authenticate --

13       THE COURT:  You're calling Ms. Gronich; correct?

14       MR. QUINN:  We are.  But it should come into

15   evidence.  I've got a live witness.  It's relevant.  There

16   was a motion in limine that was overruled.  I should be able

17   to offer it into evidence and publish it.

18       THE COURT:  What about these other exhibits?  Are

19   there similar objections?

20       MS. AGUIAR:  Yes, there are.  Because again, first

21   of all, this is an exhibit, Exhibit No. 5561, that has a

22   Bates stamp with a prefix KMW/M.  So that's not even an MGA

23   Bates number.  So I don't know what we can -- what this

24   document custodian from MGA can say about that document, and

25   it's from O'Melveny to another law firm concerning Veronica

Unsigned                                          Page  3566

1    Marlow.

2        And then the last one in the binder, 10034, is MGA,

3    but I would -- I have objections to that based on relevance

4    and 403 and your Honor's ruling this morning.

5        THE COURT:  Well, let's go back to this O'Melveny &

6    Myers document.  You're saying this is not an MGA document?

7        MR. QUINN:  It's not produced by MGA, your Honor,

8    but he supervised this litigation.  He knows that O'Melveny

9    has represented MGA.  The only fact in there that we wanted

10   was that MGA is paying for the Marlows' representation.

11        THE COURT:  This is -- Ms. Gronich can testify to

12   this?

13        MR. QUINN:  Ms. Gronich can testify to that,

14   presumably.

15        THE COURT:  What's the relevance of this?

16        MR. QUINN:  This is one of the three women

17   working --

18        THE COURT:  Okay.

19        MR. QUINN:  -- her employment application to MGA.

20   She said she did the first patterns for the first released

21   Bratz dolls.

22        MS. AGUIAR:  But my objections on this document are

23   along the lines of what I'm going to immediately object to

24   when Peter Marlow takes the stand.  First of all, this

25   document, the date is hard to see, but it's a date in 2003,

1    which is well outside the relevant time period, and there is

2    no foundation or relevance for this document coming in

3    because a predicate for this document coming in is MGA having

4    knowledge that this, at the relevant time, this employee

5    worked simultaneously for Mattel and the Marlows.  And that

6    has not been established.

7        MR. QUINN:  Your Honor, I can't get that through

8    the Marlows.  I've got a witness on the stand who can

9    authenticate this document as being the employment

10   application.  And there is no dispute about the authenticity.

11       THE COURT:  This is what I'm going to do on this.

12   We're going to conditionally admit this.  Let's go through

13   the Peter Marlow deposition and see how that plays out.  And

14   the Court will rule on relevance.  But this is a witness who

15   can lay the foundation for this document.

16       MS. AGUIAR:  Right.  But I mean -- and I have

17   relevance and 403 objections to this document.

18       THE COURT:  Okay.  I'm going to overrule --

19       MS. AGUIAR:  Because Mr. --

20       THE COURT:  That's why I'm going to say

21   conditionally.  If Mr. Marlow doesn't say that, it comes out.

22   Let's use Ms. Gronich to get the other two documents in.

23       MR. QUINN:  All right, your Honor.

24       (CONCLUSION OF SIDEBAR CONFERENCE.)

25   Q.  BY MR. QUINN:  Mr. Holden, if you'd turn, please, to the

1    tab 10034.

2        Do you see that, sir?

3    A.  I do.

4    Q.  And without getting into the detail of it, do you see a

5    Bates number there that this is a document, an employment

6    application that was produced by MGA?

7    A.  Yes, I see the MGA Bates numbers.

8        MR. QUINN:  So we would offer that exhibit, your

9    Honor, 10034.

10       THE COURT:  Any objection outside of what was

11   stated at sidebar?

12       MS. AGUIAR:  With the express condition of what we

13   stated at sidebar, we have no objection.

14       THE COURT:  Very well.  I'm going to admit this

15   conditionally.  Counsel, I'm not going to let you publish

16   this until the Court hears further testimony.

17       (Exhibit 10034 received.)

18       MR. QUINN:  I have nothing further.  Shortest

19   witness so far.

20       THE COURT:  Very well.

21       Cross-examination?

22            CROSS-EXAMINATION

23   BY MS. AGUIAR:

24   Q.  Mr. Holden, what's your position at MGA?

25   A.  I'm in-house counsel.

1          MS. AGUIAR:  Thank you very much.  Nothing further.

2          THE COURT:  Thank you, Counsel.  You may step down,

3     sir.

4          Mattel's next witness.

5          MR. QUINN:  Your Honor, at this point we have a

6     stipulation that we've entered into with MGA in order to

7     avoid having to call some expert witnesses.

8          THE COURT:  Very well.

9          MR. QUINN:  So if I might just read it, your Honor.

10         THE COURT:  You may.  The jury will hear the

11    stipulation.  This actually is a stipulation which obviates

12    the need to call a witness from either side.  So this is

13    basically the combined testimony of these two expert --

14    computer experts.

15         Counsel?

16         MR. QUINN:  Carter Bryant purchased a laptop

17    computer in November 2001 and downloaded the Evidence

18    Eliminator program from the Internet and then installed it on

19    his laptop computer on September 10th, 2002.

20         Exhibit 13629 is the Evidence Eliminator website

21    for 2002.

22         And, your Honor, I believe that there is a

23    stipulation that that is to be received in evidence, and we

24    would offer that in evidence.

25         THE COURT:  It is admitted.  I'll be waiting to

1    hear from counsel when they join in the stipulation.  But

2    we'll get to that in a moment.

3         MR. QUINN:  Evidence Eliminator ran in the

4    background when Carter Bryant's laptop computer was turned

5    on.  Evidence Eliminator includes a function called safe

6    shutdown which permanently eliminates the residue of deleted

7    files and renders such files unrecoverable by computer

8    forensic experts.

9         The laptop computer was imaged on July 14th, 2004,

10   by a technician who was hired by counsel for Carter Bryant in

11   this case.

12        On July 12th, 2004, the safe shutdown feature of

13   the Evidence Eliminator program was run on the laptop.  It

14   took approximately one half hour to operate the safe shutdown

15   feature of Evidence Eliminator.

16        No adult content was located in Carter Bryant's

17   profile on the hard drive of the laptop computer.

18        The Spy Hunter software program, which is designed

19   to block out pop-up advertisements, was installed on the

20   laptop computer.

21        Just one moment, your Honor.

22        THE COURT:  You may.

23        MR. QUINN:  That's the conclusion.

24        MR. NOLAN:  Subject to the other objections we

25   made, yes, we join in the stipulation.

1        And, your Honor, with respect to Exhibit 13629,

2    with respect to the objections that we've previously made,

3    Mr. Quinn is correct that that document can come into

4    evidence subject to the earlier objections.

5        THE COURT:  Very well, Counsel.  So the 13629 is

6    admitted.

7        (Exhibit 13629 received.)

8        THE COURT:  And the stipulation is to be treated as

9    having been proven to the members of the jury.

10       Mr. Quinn, you may call your next witness.

11       MR. QUINN:  Your Honor, at this time Mattel is

12   prepared to conditionally rest.

13       THE COURT:  Very well.

14       MR. QUINN:  Subject to calling certain witnesses

15   who have not been available who are going to be scheduled.

16       THE COURT:  Very well.  Members of the jury, there

17   are a few witnesses that -- whose schedules the Court is

18   accommodating.  One we anticipate being called this

19   afternoon.  A few more will be called next week that are part

20   of Mattel's case in chief, but just to move this along, we're

21   now going to shift and permit the defense to start their case

22   in chief.

23       You've heard an extensive amount of testimony

24   elicited by both sides.  As I've previously instructed you,

25   it does not matter which side calls the witness.  In fact, to

1    move this case along, what I've directed counsel to do is

2    when one side has called a witness that the other side was

3    intending to call as well, that they ask all their questions

4    at once, even if it is outside the scope of the questions

5    being asked by the side who called the witness.

6          So the bottom line basically is at the end of this

7    trial, you should consider all the evidence you've heard

8    without regard to who called that witness.  The references to

9    so-and-so's case or someone else's case is not really -- it's

10   more for the Court's case management.  You should just

11   consider all of the evidence that you hear from the witness

12   stand, all of the exhibits that are admitted into evidence,

13   and base your decision upon that coupled with the Court's

14   instructions.

15         So having said all of that, I'll now turn this over

16   to Mr. Nolan.  You may call your first witness.

17         MR. NOLAN:  Thank you, your Honor.  Our first

18   witness will be by videotape.  It is Jackie Ramona Prince.

19   The deposition was conducted December 121, 2004, in the city

20   of Atlanta, Georgia, taken by Counsel Mike Zeller for Mattel.

21   It runs, your Honor, about 45 minutes and two seconds, give

22   or take a few seconds.  And what I was going to ask the Court

23   is we can start, cut it at noon, or just be guided by however

24   you want to proceed.

25         THE COURT:  Very well.  Let's -- the Court has

1    another matter starting at noon.  So I am going to have to

2    take a break at noon from 12:00 until 1:30.  So what we'll do

3    is hear the first 15 minutes, and then -- actually, we're

4    going to be breaking until 1:45 because the Court has another

5    criminal matter right at 1:30.  So we'll resume at 1:45 and

6    go to 2:15.

7           MR. ZELLER:  Just as a reminder, that Mr. Marlow, I

8    understand, is supposed to be here right after lunch.

9           THE COURT:  Let's get through this video and then

10   you can tell Mr. Marlow that he'll be going at approximately

11   2:15.

12          MR. ZELLER:  Jackie Ramona Prince deposition, taken

13   December 21, 2004.

14          THE COURT:  You may proceed.

15          WHEREUPON THE VIDEOTAPED DEPOSITION EXCERPTS

16          OF JACKIE RAMONA PRINCE, AS PROVIDED BY COUNSEL,

17          ARE INCORPORATED HEREIN:

18   Q.  Good morning, Ms. Prince.

19   A.  Good morning.

20   Q.  If you could please tell us your full name for the

21   record.

22   A.  Jacqueline Ramona Prince.

23   Q.  If you could please tell me where you currently reside?

24   A.  I currently reside at 300 Timber Laurel Lane,

25   Lawrenceville, Georgia 30043.

1    Q.  During the time you were living in California and

2    working at Mattel, you lived in Torrance, California; is that

3    correct?

4    A.  Uh-huh.

5    Q.  That's a "yes"?

6    A.  Yes, sorry.

7    Q.  If you could please tell me just generally what your

8    educational background is.

9    A.  I have a Bachelor of Science in sociology, and I'm

10   currently working on my Master's degree in special education.

11   Actually, Bachelor of Science and Social Science.

12   Q.  And where is it that you got your BS in social science?

13   A.  University of Southern Mississippi.

14   Q.  And at some point, you, through the temp agency, ended

15   up working for Mattel as a temp or interim employee?

16   A.  Actually, I found out -- I -- they had an onsite temp

17   agency.  And my neighbor across in the next building, her

18   first name was Mary, but I don't remember her last name, she

19   knew that I was looking for something permanent, and she said

20   why don't you temp through the Mattel's on-site agency, and

21   you'll have a high chance of getting in once you temp for

22   them for a while, permanent.  And I said okay.  So I tried

23   it.  And I thought I was going to Hot Wheels at first, but I

24   wound up going to Barbie.

25   Q.  And if you could please tell me what you first did when

1    you were a temp for Mattel.

2    A.  At first I was in Barbie marketing in the tower for a

3    little while.  And then I interviewed for a temp position in

4    Barbie Collectibles in the design center with Ruby Noss, and

5    she hired me as a temp, and then later I became permanent.

6    Q.  Do you recall what Ruby's title or position was when she

7    first hired you?

8    A.  Vice-president of Barbie Collectibles.

9    Q.  Of design?

10   A.  Yes.  I think it was vice-president, Barbie

11   Collectibles, design and development maybe.

12   Q.  And once you moved to that cubicle that ended up being

13   right across from Ron's office, did you stay in that cubicle

14   the rest of the time you worked at Mattel?

15   A.  Yes.

16   Q.  And so is it accurate that there were two locations in

17   total that you worked at --

18   A.  Yes.

19   Q.   -- in the design center?

20   A.  Yes.

21   Q.  Did you meet him through work?

22   A.  Yes.  It would have had to have been at work because it

23   was in my department.  He's very quiet, and that could be

24   why.  Everybody else was so flamboyant, and Carter's just so

25   mellow and quiet.

1    Q.  But you do remember at some point Carter was somebody

2    who became known to you at work?

3    A.  Yes, I just remember that he was very quiet and seemed

4    really down to earth and normal compared to everybody else

5    there.

6    Q.  We talked a little bit previously about a time when Ron

7    Longsdorf asked you to start focusing more on research.

8    A.  Uh-huh.

9    Q.  And that was something that you started doing then?

10   A.  Yes.

11   Q.  Was it pretty much the whole time you were working with

12   Ron until the time that you then went to sculpting?

13   A.  Pretty much, yes.  He thought I had a knack for

14   research.  He asked me to do a few things in the beginning

15   and surf the Internet and go to the library, you know,

16   whatever, make calls and ask questions.

17        So he thought I'd be really valuable for the

18   company doing that.  And he said I will -- you know, I'm

19   going to push for a promotion for you to be the research

20   assistant for Barbie Collectibles and hopefully the design

21   center.  And -- but it never happened, even though he had

22   business cards printed up for me.

23   Q.  With that title?

24   A.  With that title.

25   Q.  And this kind of falling out, we'll call it, with Ron --

1    A.  Uh-huh.

2    Q.  Was that right before he left?

3    A.  Yeah, pretty much.  I heard he left not too long after I

4    had gone to the Silicon Valley, if I remember right.  I

5    think -- I don't really remember when he left.  I just --

6    Q.  If I told you that you left Mattel in approximately

7    September of 2000, would that sound right to you?

8    A.  Yeah, that sounds right.

9    Q.  And if I told you that records seem to indicate that you

10   moved over to the sculpting department and started working

11   with Abbey in approximately July of 2000, does that sound

12   right?

13   A.  Yeah, that sounds right.

14   Q.  I'm sorry.  So the record is clear, that sounds about

15   right?

16   A.  That sounds right, yes.

17   Q.  So it was maybe a two-month period or so that you were

18   working with Abbey?

19   A.  Yes.

20   Q.  Over in sculpting?

21   A.  That sounds about right.

22   Q.  And if I told that you Ron also left in about the

23   August, September, 2000, time period, would that sound right

24   to you?

25   A.  Yeah, that does sound right.  Because I was just

1    thinking maybe he left after I left Barbie Collectibles.  I

2    don't remember exactly when, I just remember that oh,

3    suddenly now he's gone.

4    Q.   And by the way, do you remember Carter leaving at the

5    time when you were there?

6    A.   I don't remember.  I didn't really talk to him much

7    after that.  I mean, we weren't that close.  I mean, I really

8    liked him.  I thought he was a nice guy, but you know, he's

9    in his world, and I was in my world.

10   Q.   And was that particularly true by the time you moved

11   over to sculpting?

12   A.   Oh, yes, and then I just, you know, worked for that

13   little department and then went home.

14   Q.   Are there any occasions on which you had any kind of

15   social occasion or gathering where Carter was also present?

16   A.   I went to his home one time for dinner.

17   Q.   Was that while you were still working at Mattel?

18   A.   Yes.

19   Q.   Was Richard Irmen there, too?

20   A.   Yes.

21   Q.   Did you know Richard before then?

22   A.   No.

23   Q.   That was the first time you met him?

24   A.   Right.

25   Q.   And who else was at that occasion?

1    A.  That was it.

2    Q.  Was this something that Carter had asked you to come

3    over?

4    A.  Yes.

5    Q.  And so that the record is clear on this point, you

6    mentioned, of course, the occasion on which you went to

7    dinner at Carter's house.  Was that the only social occasion

8    where you -- you ever ran across Carter?

9    A.  Yes.

10   Q.  I'm talking about any time including up through today.

11   A.  The only thing I remember.

12   Q.  Is the one you've told me about?

13   A.  Right.

14   Q.  Did Carter ever come over to your house?

15   A.  Yes, when he got -- wanted me to notarize the -- his

16   signature on the drawings.

17   Q.  And I guess, just so it's clear, that was your

18   apartment; right?

19   A.  Yes, my apartment.

20   Q.  Now, other than that occasion when Carter came over to

21   have the drawings notarized, did Carter ever visit your

22   apartment?

23   A.  No.

24   Q.  So that was the only time?

25   A.  Right.

1    Q.  During the time that you were working for Mattel, had

2    you ever heard of a company called MGA?

3    A.  No.

4    Q.  And so I take it that outside the context of this

5    litigation or lawsuit, you'd never heard of MGA?

6    A.  Never.

7    Q.  Have you ever heard of a doll called Bratz?

8    A.  Yes.

9    Q.  And how is it you have heard of -- heard of Bratz?

10   A.  They're in the stores everywhere.  That's the way --

11   that's where I've heard of them and seen them.

12   Q.  Did you see Bratz dolls before you became aware of this

13   lawsuit?

14   A.  Yes.

15   Q.  And so that was something you were familiar with

16   independent of the lawsuit?

17   A.  Right.

18   Q.  And then you saw them on the store shelves?

19   A.  Exactly.

20   Q.  Did you have any awareness or familiarity with Bratz

21   other than seeing the dolls on the store shelves?

22   A.  No.

23   Q.  Is it fair to say that the first time you ever heard

24   Bratz used for a doll or a toy or a design or anything like

25   that was when you first saw them as dolls on the store

1    shelves?

2    A.  Exactly.

3    Q.  And there's no other context in which you'd run across

4    them?

5    A.  No.

6    Q.  Or that name, Bratz?

7    A.  No.

8    Q.  Have you ever spoken with anyone at MGA?  And I'm

9    talking about even in the context of this lawsuit.

10   A.  No.

11   Q.  Have you ever spoken with an attorney who represents

12   MGA?

13   A.  No.

14   Q.  I take it at some point you became familiar with or you

15   obtained an understanding that there was a lawsuit between

16   Mattel and Carter; right?

17   A.  Right.

18   Q.  And how is it you first learned about that?

19   A.  I got a phone call from an attorney.

20   Q.  Who was that attorney?

21   A.  Dale Cendali.

22   Q.  Was it your understanding that Dale represented MGA?

23   A.  No.  No, I only remember her saying that she represented

24   Carter Bryant.

25   Q.  And I take it that the phone call that you received was

1    sometime this year?

2    A.  Yes.

3    Q.  Can you tell me your best recollection of what time this

4    year?

5    A.  No.

6    Q.  Was it sometime, say, in the summer of this year?

7    A.  That sounds good.  That sounds right.  It was warm.

8    Q.  And did you get that call at home?

9    A.  Yes.

10   Q.  And if you could please tell me what it is that you can

11   recall you were -- you were informed of about the lawsuit.

12   A.  Not much.  I remember that she said she represented

13   Carter Bryant and did I remember him and that there's a

14   lawsuit, and she couldn't give me any details, but would I be

15   willing to talk to someone about, you know, about what I know

16   and did I notarize the documents, some documents for Carter.

17   And that was about it.

18   Q.  And when she asked you whether you were willing to talk

19   to this other person, what did -- what did you say to that?

20   A.  Sure.  That I loved Carter and I think he's a good guy,

21   and I would do anything to help him.

22   Q.  And did you end up then talking to somebody else other

23   than Dale?

24   A.  Yes.  A female attorney came to my home to talk to me

25   and to take the -- that packet right there with the notary

1    book and stamping, anything to do with those documents in

2    there.

3    Q.   And when you say that she came to your home, that was

4    here in Georgia; right?

5    A.   Right.  In Lawrenceville.

6    Q.   And you mentioned that she -- when she left your house,

7    that she took with her the notary book and the stamp?

8    A.   Yes.  She gave me a letter that she signed and I signed,

9    too, that that's the proof that I gave her the notary book

10    and stamp.  As a receipt for me.

11    Q.   So you turned it over to her.  She took it, and then at

12    some time, she returned it?

13    A.   No, I've never gotten it back.

14    Q.   You never got the notary book back?

15    A.   No.

16    Q.   I'm sorry.  You never got what back?

17    A.   This packet with the notary book in it and the notary

18    stamp.  It's been in the hands of attorneys since I gave it

19    to her.

20    Q.   And so if I understand the sequence of events, though,

21    now that I think you've cleared it up for me, is what the

22    attorney took with her the original of your notary journal

23    and the notary stamp; right?

24    A.   Right.

25    Q.   So you don't have any knowledge as to what happened to

1    the notary journal, and the original I'm talking about, and

2    the notary stamp after the time that you provided it to that

3    attorney who came and visited you?

4    A.  Right.

5    Q.  And who -- what was your understanding as to who the

6    attorney who came to visit you represented?  Was it MGA or

7    Carter Bryant?

8    A.  Carter.

9    Q.  Now, you mentioned that there was a letter that both of

10   you signed?

11   A.  Yes.

12   Q.  And if -- I think what you said was it's something

13   like -- that the letter referenced the fact that you were

14   giving this person the original of your notary journal and

15   the stamp?

16   A.  Right.

17   Q.  And she signed it, and you signed it?

18   A.  Right.

19   Q.  Now, other than those instances, did you have -- have

20   you had any other communications of any kind, whether it's

21   phone call or e-mail or letter or anything else with anyone

22   representing Carter Bryant or MGA?

23   A.  No.

24   Q.  So if you could please take a look at Exhibit 60 and let

25   me know when you've had a chance to look in it.  Have you had

1    a chance to take a look at Exhibit 60?

2    A.  Yes.

3    Q.  And do you recognize Exhibit 60 as including copies of

4    pages from your notary journal?

5    A.  Yes.

6    Q.  You had mentioned earlier in your testimony that you

7    became a notary when you were working for Western States

8    Mechanical?

9    A.  Right.

10   Q.  And are you a notary today?

11   A.  No.

12   Q.  When is it that your notary commission expired last?

13   A.  It was 1999, I believe.

14   Q.  When we see some notary stamps later on, maybe this will

15   help your recollection, but let me try this question first.

16       If I told you that by your notary stamp, it

17   appeared that your commission expired in late December of

18   1999, would that be consistent with your recollection?

19   A.  Correct.

20   Q.  And I take it after your commission expired, you kept

21   the original of the notary journal?

22   A.  Yes.

23   Q.  You kept the notary stamp as well?

24   A.  Right.

25   Q.  So if you could please describe for me what the

1    circumstances were when you first went in and looked for the

2    journal.

3    A.  All I remember is that they asked me to -- if I could

4    look if I still had it, which I said yes.  I was told to

5    always keep it.  And would I have it available and be willing

6    to submit it for evidence or whatever for the purpose it

7    would serve, and I said sure, no problem.  That's all I

8    remember.

9    Q.  And let me make sure I'm on the same page with this.  In

10    your conversation with Dale Cendali, did she ask you to go

11    and find your journal?

12    A.  Oh, yes, she did.

13    Q.  And then I take it that when she came and she had the

14    visit with you is when you turned over the journal to her?

15    A.  Exactly.

16        MR. NOLAN:  Your Honor, I think this may be an

17    opportune time to break.

18        THE COURT:  I agree.  We'll take our lunch recess

19    and resume at 1:45.

20        The court is in recess.

21

22        (Lunch recess taken at 12:05 P.M.)

23

24

25

1

2

3

4

5

6

7

8

9

10          C E R T I F I C A T E

11

12

13          I hereby certify that pursuant to Title 28,

14   Section 753 United States Code, the foregoing is a true and

15   correct transcript of the stenographically reported

16   proceedings in the above matter.

17          Certified on June 24, 2008.

18

19
          _____
20          MARK SCHWEITZER, CSR, RPR, CRR
          Official Court Reporter
21          License No. 10514

22

23

24

25