1               UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3                        ---

4          HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                        ---

6    MATTEL, INC.,          : PAGES 3822 - 3880

                            :

7          PLAINTIFF,       :

                            :

8       VS.                 : NO. ED CV04-09049-SGL

                            : [CONSOLIDATED WITH

9    MGA ENTERTAINMENT, INC.,    : CV04-9059 & CV05-2727]

     ET AL.,                :

10                          :

           DEFENDANTS.      :

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               RIVERSIDE, CALIFORNIA

17               TUESDAY, JULY 1, 2008

18               JURY TRIAL - DAY 18

19               AFTERNOON SESSION

20

21

22          MARK SCHWEITZER, CSR, RPR, CRR

            OFFICIAL COURT REPORTER

23          UNITED STATES DISTRICT COURT

            181-H ROYBAL FEDERAL BUILDING

24          255 EAST TEMPLE STREET

            LOS ANGELES, CALIFORNIA 90012

25          (213) 663-3494

1    Appearances of Counsel:

2

3    On Behalf of Mattel:

4    Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
       By John B. Quinn, Esq.

5     B. Dylan Proctor, Esq.
       Michael T. Zeller, Esq.

6     Harry Olivar, Esq.
       John Corey, Esq.

7     Diane Hutnyan, Esq.
       William Price, Esq.

8    855 South Figueroa Street
       10th Floor

9    Los Angeles, CA 90017
       (213) 624-7707

10

11

12   On Behalf of MGA Entertainment:

13   Skadden, Arps, Slate, Meagher & Flom LLP
      By Thomas J. Nolan, Esq.

14    Carl Alan Roth, Esq.
      Jason Russell, Esq.

15    Lauren Aguiar, Esq.
      David Hansen, Esq.

16    Matthew Sloan, Esq.
      Robert Herrington, Esq.

17   300 South Grand Avenue
     Los Angeles, CA 90071-3144

18   (213) 687-5000

19

20

21

22

23

24

25

1                    I N D E X

2

3     ROBERT A. ECKERT, SWORN............................. 3838

4     DIRECT EXAMINATION BY MR. NOLAN: ...................... 3839

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        Riverside, California; Tuesday, July 1, 2008

2                1:40 P.M.

3        (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

4        THE COURT:  Back on the record in this matter.

5   We've been trying all through lunch to get some prisoner

6   witnesses in attendance.  The marshals have told us it's

7   going to be another 15 minutes.  So I'm going to have to take

8   a break to attend to that criminal matter.  I was hoping to

9   have it done by this point in time, but we haven't.  In any

10  event, I did ask you to be back at 1:30.

11       Mr. Holmes indicated that the jury would like an

12  update just on scheduling issues to know where we stand.  So

13  let me toss that to the parties.

14       Mr. Nolan?

15       MR. NOLAN:  We were going to raise the same thing

16  at the end of the day.  I think we're in our case.  We keep

17  getting interrupted.  We're making progress, I hope.  Your

18  Honor, it is our hope and desire that we try to rest our case

19  by the end of Thursday.  But a lot of it -- I mean, that's my

20  best representation I can make to you.  But there's been a

21  lot of hiccoughs along the way and scheduling issues and

22  interruptions, but that's what our goal is.

23       I must say, your Honor, that last night at 9:45 I

24  received an e-mail.  Generally we're copied on any

25  communications with witnesses when they are going to come in

1    and stuff like that.  Last time I received an e-mail from

2    Carter Bryant's counsel asking me to confirm when we were

3    expecting to rest because Mattel had called out and reached

4    out and apparently indicated that they may call Carter Bryant

5    in rebuttal.

6            I was somewhat struck by that since we had played

7    one video and they were now predicting that they were going

8    to call Carter Bryant in rebuttal.  I have a grave concern.

9    I've talked about the hours.  I'm not worried about that

10   right now.  That's not my issue, your Honor.  I am very

11   concerned about this jury and the length of the time that 1-A

12   has taken in this case.  And I can only control my side of

13   it.  We haven't been presenting that much evidence.

14           But I have grave concerns that if we're going to go

15   into a lengthy rebuttal, Carter Bryant was on the stand for

16   five days.  I can't imagine that, after playing one video,

17   that they are going to decide that they are going to use him

18   as a rebuttal witness.

19           THE COURT:  I'm sure the jury can observe who is

20   and who isn't using time.  So I suspect the punishment, if

21   any, is built in.

22           MR. NOLAN:  I agree with that.  I'm not -- I am

23   worried about running out of time with this jury.

24           THE COURT:  Well --

25           MR. NOLAN:  That's the point.  Because the

1    clearance that the Court, you know, you told the jury early

2    when we first --

3        THE COURT:  Mr. Holmes, was it two or three months

4    that we time qualified them?

5        THE CLERK:  Three.

6        THE COURT:  We time qualified them for three

7    months.

8        MR. NOLAN:  I was only cleared for two months by my

9    wife. So --

10       THE COURT:  That's a separate issue you need to

11   take up with Mrs. Nolan.  And while you're doing that, you

12   may want to talk to Mrs. Larson as well.  She's got some

13   serious concerns as well.

14       But no, the jury itself is time qualified for three

15   months.  That's May 20th through August 20th.  And we will be

16   done by August 20th.  But you know, what I'm thinking of

17   doing, and I'll hear from Mattel as well on this, but my

18   tentative thoughts would be simply to explain to the jury

19   essentially how the Court is marshaling or managing this

20   trial, that each side was given 60 hours.

21       The Court has kept careful track of the time.  The

22   parties can use it however they feel it most effectively

23   needs to be used.  I think I need to explain to them that we

24   anticipate the -- the defense anticipates it will rest this

25   week, but it may not, depending on how things may develop,

1    that there's a second phase to this trial, that just because

2    one phase is over, that don't think the whole thing is over.

3    But I'll remind them that they were time qualified for the

4    three months, and we certainly don't anticipate it going

5    anywhere near that amount of time.

6         60 hours for each side should essentially be 20

7    trial days, and I don't think we've gone through 20 trial

8    days yet.  That may be a little optimistic.  So maybe more

9    like five hours a day as opposed to six hours a day.  But

10   still, that's 24 trial days, and we certainly will get

11   through that sometime in early to mid-July.

12        And that's -- that's the best I can tell the jury.

13        MR. NOLAN:  Your Honor, the other point, I'm just

14   not certain that they know, I realize we all realize that the

15   Court has criminal duty with respect to this other criminal

16   matter that takes time from time to time.  I don't know

17   whether the jury understands --

18        THE COURT:  I'll explain that to them.

19        MR. NOLAN:  I'm worried that they think that it's a

20   criminal case involving us.  Or that, you know, there's

21   something that we're being --

22        THE COURT:  I'll explain to them that they are

23   wholly unrelated criminal matters.  At least so far.

24        Mr. Quinn, your thoughts.

25        MR. QUINN:  I think your Honor's proposed comments

1     to the jury do make some sense.  If the Court is going to

2     tell the jury that the defense hopes to, no promises, but

3     that they might be able to rest the end of this week, if the

4     Court is going to say that, we would request that the Court

5     just alert them to the possibility that there might be a very

6     brief rebuttal case.  We're not convinced of that yet.

7         THE COURT:  And we're going to have to come back

8     and set aside time for jury instructions, and what I'm hoping

9     to do is if you can rest this week, whether there's a

10    rebuttal case or not, I probably will not instruct until

11    Tuesday the 8th so that we can spend the 7th finishing up our

12    jury instruction disputes.

13        MR. QUINN:  Do you understand, your Honor, that

14    we're going to be -- we have all next week available?

15        THE COURT:  We do.  The criminal matter scheduled

16    for the 8th that I was going to perhaps pick a jury on has

17    been continued entirely until August.  So we have all of next

18    week and all of the following week, if necessary.

19        MR. QUINN:  Okay.  Your Honor, if we're done with

20    that, there was another issue that I wanted to raise with the

21    Court.

22        THE COURT:  And that is?

23        MR. NOLAN:  Well, your Honor, just so that we don't

24    get a reaction from the jury, the transcript that I'm looking

25    at at page 26 of the court proceedings is a colloquy that the

Unsigned                                        Page  3829

1    Court had with the jury on May 20th, and it says we are about

2    to begin the jury selection process for a case that may last

3    up to two months.

4         THE COURT:  Right.  When I say time qualified, what

5    I was referring to was the questionnaire that went out to

6    them indicated is there any reason why you can't serve for

7    three months.  What I meant to say there was I anticipated

8    the trial itself would last for two months, or no more than

9    two months, with the time.

10        Mr. Holmes, if you would confirm my understanding

11   that the questionnaire was in fact three months.

12        THE CLERK:  Well, the request I sent to the jury

13   department was for three months.

14        THE COURT:  Very good.  So that's what I mean.  I

15   understand that I anticipated this to be a two-month trial,

16   and I still do, but be that as it may.

17        All right.  Mr. Quinn, you said you have another

18   matter that -- I do have the witnesses now for that other

19   criminal matter.  But if there's something briefly.

20        MR. QUINN:  Well, your Honor, the issue is really a

21   witness that MGA has indicated that they would like to call

22   this afternoon from the Mattel side.  We got notice sometime

23   late last week that they want to call Jill Thomas, who is the

24   house counsel for Mattel, who really has been a part of this

25   team, our side, our litigation team, from the very beginning.

1    And she was not on their witness list.

2         After we raised that issue, they have served a

3    supplemental list last week and put her name on it.  You

4    know, I think that, you know, we have witness lists for a

5    reason in advance.  I can't imagine what she can contribute.

6    She's an attorney who has worked in a capacity as an

7    attorney.  And we don't understand -- we don't think it's

8    appropriate that she would be a witness in this case.  We

9    can't imagine what she can testify to.

10        THE COURT:  Mr. Nolan?

11        MR. NOLAN:  Your Honor, very briefly.  Jill Thomas

12   was added to the witness list shortly after we heard for the

13   first time Rachel Harris's testimony that sometime before the

14   start of this trial, her first introduction to what this

15   litigation was about was based on a visit that she had with

16   Jill Thomas.  Jill Thomas went to her house.

17        We have issued a subpoena, Custodian of Records

18   subpoena to Mattel to ask whether or not Jill Thomas produced

19   any -- or presented any documents to Rachel Harris with

20   respect to this litigation.  They didn't represent Rachel

21   Harris.  Rachel Harris was an independent witness.  And it is

22   in the -- in that circle of activity, your Honor, that we

23   wanted to, out of an abundance of caution, advise Mr. Quinn

24   we added her to the witness list.

25        They have the subpoena.  They have issued a

1    response to the subpoena. I think we can take it from there.

2    I'm not saying that for certain we're going to call

3    Ms. Thomas, but out of an abundance of caution, I alerted

4    Mr. Quinn as soon as the issue developed on our side.

5         THE COURT: Very well.

6         Mr. Quinn?

7         MR. QUINN: Your Honor, we got the supplemental

8    witness list the end of last week. It wasn't right after

9    Rachel Thomas testified. And what it says, you know, the

10   Court required on the original witness list to state just in

11   a phrase or two what the subject matter of the witness's

12   testimony would be. And as to Jill Thomas, it doesn't say

13   anything about Rachel Harris. It says Bryant credibility.

14        So I mean we're completely in the dark on this.

15   The point about the Custodian of Records, the witness's

16   testimony, was Rachel Harris's testimony was that Jill Thomas

17   didn't show her any documents, didn't have any documents with

18   her. I just don't know where this is going. We're facing a

19   prospect of calling a lawyer, in-house lawyer who really has

20   been in an integrated way part of our trial team on the

21   witness stand.

22        I'm not hearing a persuasive reason why we should

23   disregard the rule that the witness list is created before

24   trial, and those are the witnesses the folks are going to

25   call.

1          THE COURT:  Thank you, Counsel.  I'll consider

2      that.  If there's nothing further, for this criminal matter,

3      I will be asking to close the courtroom.  So I'll take a

4      recess now and ask everyone to step outside into the hall.

5          (Recess taken to 3:54 P.M.)

6          THE COURT:  Back on the record, Counsel.  I

7      apologize for the delay in the last hearing.  But it's a

8      matter that the Court couldn't give short shrift to.

9          Mr. Quinn, I understand there was something you

10     wanted to raise?

11         MR. QUINN:  Did your Honor say that it was your

12     intention to tell the jury that there is a phase --

13         THE COURT:  I think so.

14         MR. QUINN:  Because in the past we've kind of

15     steered clear of that.

16         THE COURT:  Generally the Court does because I

17     don't want the jury to be influenced in their deliberations,

18     well, if we go one way, we'll get out of here.  If we go

19     another way, we don't.  You're the one that suffers the

20     prejudice for that.  What are your thoughts?

21         MR. QUINN:  That was my concern as I thought about

22     it, how one communicates to the jury to say there will be a

23     Phase 2 or there may not be a Phase 2.

24         THE COURT:  I don't want to say anything to suggest

25     that the Court expects there to be a Phase 2.

1        MR. QUINN:  I'm wondering whether the safest thing

2    to do would be not to say anything about a Phase 2.

3        THE COURT:  I understand your concern.  I was

4    taking your silence as assent, but that's what happens when I

5    give you too much time to I think about it.

6        Mr. Nolan, your thoughts?

7        MR. NOLAN:  Well, your Honor, I have a lot of

8    thoughts on it, but I guess what I think I would suggest is

9    that the jury just be told what the schedule is and that you

10   have allocated certain hours to both sides of the case and

11   that you are monitoring them just as you described it.

12       THE COURT:  Why don't I give them an update where

13   we are on that.  Because we have a total of, say, 45 hours

14   left, which is about eight trial days left, assuming that we

15   can get in five and a half or so hours a day.

16       So let's say we round that up to nine.  Today is

17   the first.  So the 2nd, 3rd, four days next week is six.  The

18   latest that we would anticipate this going through is the

19   middle of the second full week of July, around the 16th or

20   17th, based on the Court's hourly schedule, and not get into

21   the whole phases or not.

22       MR. QUINN:  That sounds appropriate, your Honor.

23       MR. NOLAN:  Your Honor, the only suggestion is to

24   the backhand, that gives them a date, and you don't factor in

25   any jury deliberations.

1          THE COURT:  Right.  That's true.

2          MR. NOLAN:  That's the issue.  And then I don't

3     think -- then I think that begs the issue about the phasing.

4     So maybe you could just pull up short by a sentence and not

5     give them a prediction.

6          THE COURT:  And just explain the hours to them.

7     Very good.

8          MR. NOLAN:  That might be the safest way of doing

9     it.

10          THE COURT:  I think that is the safest way of doing

11     it.  Very good.  And then I will -- why don't we bring the

12     jury in.  And I'll talk to them about these other matters and

13     that this is all the Court's fault and all that.

14          MGA is ready to call their next witness?

15          MR. NOLAN:  Yes, your Honor.

16          (WHEREUPON THE JURY ENTERS.)

17          THE COURT:  Good afternoon, members of the jury.

18     The Court apologizes for the delay this afternoon, which had

19     absolutely nothing to do with this case.  The Court had a

20     criminal matter which started right after lunchtime and was

21     supposed to take a few minutes but ended up taking several

22     hours instead.  Unfortunately for all concerned, this is not

23     the only case the Court has on its docket.  And there's other

24     matters that I need to manage at the same time.  And

25     particularly when criminal matters come to the forefront, the

1    Court needs to give priority to those matters.

2         There was a question concerning the timing of the

3    trial, and I wanted to speak to that.  What the Court has

4    done -- you may have seen me from time to time with my chess

5    clock here.  To manage the time in this trial, the Court

6    restricted both sides to 60 hours of testimony, which, given

7    the complexity of the case and the volume, was quite an

8    imposition on both sides.  But both sides have had to adapt

9    to the Court's restriction, and it's basically mindful of

10   your time, even though the Court did what we call time

11   qualify this jury.  We sent you -- we wanted to make sure you

12   were available for a long time.

13        At the same time, we want to get through this as

14   expeditiously as possible.  Just so you know, Mattel has --

15   the plaintiffs in this case have used approximately 43 hours

16   of time, and the defendants have used about 31 hours of time.

17   Sometimes the Court has to make adjustments based on certain

18   issues that come up in the midst of that testimony, but

19   that's roughly where we stand right now.

20        So we are well through two thirds, I would say, of

21   the trial here.  We still have hours to go before we sleep,

22   or before you deliberate, as the case may be.  But they are

23   on a clock.  We are mindful of your time.  We are very

24   hopeful to have this accomplished as soon as possible.  We do

25   now have a couple weeks where the Court does not have any

1    other matters, at least, that's going to take it away for an

2    entire day.

3         So hopefully we'll move fairly quickly here.  Once

4    we get to a deliberation phase at any point where you need to

5    do deliberations, we're able to run Monday through Friday,

6    and you will control your calendar at that point in time.  So

7    if you want to deliberate for a longer or shorter period

8    during the day, that's going to be in your discretion.

9         But as far as the -- getting through the trial

10   itself, the testimony part of it, the Court will very

11   carefully watch the clock here.  So that's the best I can

12   give you at this point.  I appreciate your patience.  You

13   have been a tremendous jury to date.

14        The attention that you've been paying to the

15   witnesses and to the counsel is greatly appreciated by the

16   Court.  And I know I speak for the parties as well, that

17   you've been an extraordinarily attentive jury, and we do have

18   some time to go, but we've moved this along as effectively

19   and efficiently as we can.

20        So if there's nothing further from the jury at this

21   time, we still have an hour left today.

22        Yes.

23        A JUROR:  I don't know if the clerk asked you about

24   next week.  I think he said there was a change for next week.

25   Are we coming in the 8th and the 9th?

1          THE COURT:  And the 10th and the 11th, yes.

2          A JUROR:  Because it was blocked off before.

3          THE COURT:  Right.  You may have seen this calendar

4    here.  It was blocked off.  The Court had some personal

5    matters that it was going to attend to, but no longer.

6          A JUROR:  Okay.  Thank you.

7          THE COURT:  So that is -- we are going to have all

8    four days, the 8th, 9th, 10th, and 11th.  And the only day

9    that we're not going to have is this Friday for the 4th of

10   July.  But all four days next week and all four days the

11   following week.  And we'll hopefully see where we are at that

12   point.

13         If there's nothing further, Counsel, I'll turn this

14   back over to you.  MGA may call their next week.

15         MR. NOLAN:  Thank you very much.  MGA calls Bob

16   Eckert.

17         THE CLERK:  May we have the witness please come

18   forward.  Good afternoon, sir.  Would you please take the

19   witness stand.  Please raise your right hand.

20            ROBERT A. ECKERT, SWORN.

21         THE CLERK:  Thank you, sir.  Please be seated.

22         Please state your full name for the record, and

23   spell the last name.

24         THE WITNESS:  My name is Robert, middle initial A,

25   last name Eckert, E-C-K-E-R-T.

1        THE CLERK:  Thank you, sir.

2                 DIRECT EXAMINATION

3     BY MR. NOLAN:

4     Q.  Good afternoon, Mr. Eckert.

5     A.  Hello, Mr. Nolan.

6     Q.  We met at your deposition a few months ago; correct?

7     A.  That is correct.

8     Q.  I just want to ask some background questions.  How are

9     you currently employed?

10    A.  I'm employed at Mattel.

11    Q.  And what is your position?

12    A.  I am the Chairman and Chief Executive Officer at Mattel.

13    Q.  How long have you served as the Chairman and Chief

14    Executive Officer at Mattel?

15    A.  Since May of 2000.  So a bit over eight years.

16    Q.  Now, in preparation for your testimony today, did you

17    meet with counsel?

18    A.  Yes, I did.

19    Q.  And on how many occasions did you meet with counsel?

20    A.  I would say -- for today and the deposition?

21    Q.  That's a good question.  Thanks.  Why don't we start

22    with just today's testimony.

23    A.  Perhaps twice.

24    Q.  Could it have been more than twice?

25    A.  It could have been.

1    Q.   And which lawyers did you meet with?

2    A.   I met with Mr. Quinn and some of his partners, and I met

3    with some in-house Mattel counsel.

4    Q.   Can you give me an estimate, sir, for preparation of

5    your testimony today in trial, approximately how many of the

6    lawyers were involved in the preparation for your testimony?

7    Just numbers.

8    A.   Four, five.  Some number of four or five.

9    Q.   And then you had a deposition in this case; correct?

10   A.   That's correct.

11   Q.   And then prior to that deposition, you had met with

12   lawyers to prepare for your appearance; correct?

13   A.   That's correct.

14   Q.   And do you recall how many days you met in preparation

15   for your deposition?

16   A.   I believe I met three times in preparation for my

17   deposition.

18   Q.   Now, most recently for today's appearance, did you

19   review certain questions that might be asked of you today?

20   A.   No, I don't believe I reviewed specific questions.

21   Q.   How about just general topics that would likely be asked

22   of you?

23   A.   Yes, I did.

24   Q.   And was there any jury consultants available to give you

25   advice with respect to how to testify?

1    A.  No.

2    Q.  Did you think there was anything improper about meeting

3    with counsel before you testified in a case?

4    A.  No.

5    Q.  Before becoming Chairman of Mattel, you were Chairman of

6    Kraft Foods; correct?

7    A.  No, I was the President and Chief Executive Officer of

8    Kraft Foods.

9    Q.  And how long have you held that position at Kraft?

10   A.  Approximately three years.

11   Q.  I don't want to go through all of your employment

12   history.  Counsel may for Mattel, but I just want to go to

13   something else.

14        Can you give us your educational background, just

15   college and any advanced degrees you have, especially in

16   business.

17   A.  I have a Bachelor of Science degree in business

18   administration from the university of Arizona in 1976.  And I

19   have a Master's of Management degree from Northwestern in

20   1977.

21   Q.  How long had you worked at Kraft in any capacity before

22   you accepted the position at Mattel?

23   A.  23 years.

24   Q.  And by the way, your -- the position that you assumed at

25   Mattel, your level entry position was Chairman and Chief

1    Executive Officer; correct?

2    A.  That is correct.

3    Q.  All right.  So you went in at the very top?

4    A.  That's correct.

5    Q.  Is it fair to say that by leaving Kraft, you took a

6    position at Mattel that afforded you more financial benefits

7    than you were receiving at Kraft?

8    A.  Yes, I think that could be a conclusion.

9    Q.  I don't want to get into the details, but at Mattel,

10    your compensation is structured, as I understand it, in three

11    basic ways.  One is that you have a base salary; correct?

12    A.  That's correct.

13    Q.  And then you have another component that includes bonus;

14    correct?

15    A.  That's correct.

16    Q.  And then you are granted some stock options; correct?

17    A.  That's correct.

18    Q.  And then in addition to that, there are various loans

19    that have been made to you by the Board of Directors, and

20    from time to time those loans have been forgiven; is that

21    correct?

22    A.  There was one loan in the year 2000.

23    Q.  And that loan was forgiven?

24    A.  That's correct.

25    Q.  And the amount of that loan was?

1    A.   I believe it was $5.5 million.

2    Q.   Okay.  Now, is it also fair to assume that the bonus

3    that you are paid is determined by the Board of Directors,

4    depending on the performance of Mattel's share prices;

5    correct?

6    A.   No, that's not correct.

7    Q.   What do you understand are the metrics which are applied

8    to how you would be compensated at Mattel with respect to

9    bonus?  And I don't want to get into any details of the

10   amounts.

11   A.   Well, there's a -- it's determined by two things.

12   Roughly three quarters of the bonus is determined by the

13   performance of the company on a measure of profitability less

14   a charge for the assets or capital, if you will, that we

15   deployed to create those profits.  And the second, the final

16   quarter of the bonus is related to annual specific

17   quantifiable business objectives.

18   Q.   Thanks for that clarification.  So it is true that a

19   substantial percentage of whatever bonus you might be paid

20   depends on the profitability of Mattel; correct?

21   A.   Yes.

22   Q.   Let me ask you this question.  You were present for the

23   opening statements of counsel for Mattel, Mr. Quinn; correct?

24   A.   Yes, I was.

25   Q.   But you haven't been back to trial since then, have you?

1    A.  That's correct.

2    Q.  Have you been updated along the way as to how the trial

3    has been going?

4    A.  I've been reading media reports.

5    Q.  Okay.  What about any other summaries of trial

6    testimony?

7    A.  No.

8    Q.  Do you know an individual, I think it was the first

9    witness that was called by Mattel in this case, named Ivy

10   Ross?

11   A.  I do know Ivy Ross.

12   Q.  How do you know Ivy Ross?

13   A.  She was an employee of Mattel when I joined the company.

14   Q.  What was her position when you joined the company?

15   A.  She was in charge of design for our girls business.

16   Q.  How long did she stay in that capacity after you were

17   employed; do you know?

18   A.  I don't remember specifically.  I could speculate

19   there's maybe three or four years.

20   Q.  And isn't it true that you were part of the

21   decision-making process to change Ivy Ross's responsibilities

22   within Mattel; correct?

23   A.  No, I don't believe that's true.

24   Q.  Did you ever -- were you aware of a project called

25   Project Platypus?

1    A.  Yes, I was.

2    Q.  And what was Project Platypus?

3    A.  Project Platypus was part training program and part

4    ideation program for the design team started in our girls

5    division, where a group could go away from their day-to-day

6    jobs and blue sky or think about new ideas beyond the kinds

7    of businesses we were currently in.

8    Q.  And has anybody advised you as to how Ivy Ross described

9    the environment at Mattel while she was employed in charge of

10   the girls division?

11   A.  No.

12   Q.  Well, my question to you, sir, is when you arrived at

13   Mattel, that was approximately May of 2000; correct?

14   A.  That's correct.

15   Q.  And isn't it true that it was your opinion at that time

16   that Mattel had lost its focus?

17        MR. QUINN:  Your Honor, I object on relevance.

18        MR. NOLAN:  Your Honor, goes to impeachment.

19        THE COURT:  Sustained as phrased, Counsel.

20   Q.  BY MR. NOLAN:  Isn't it correct, Mr. Eckert, that upon

21   taking the job at Mattel, you made an assessment of the state

22   of operations at Mattel?

23   A.  Yes, I did.

24   Q.  And in particular, one of the areas that you looked at

25   was the performance of the girls division; correct?

1    A.  That would have been one of the areas, yes.

2    Q.  And that's because Barbie would be included within the

3    girls division; correct?

4    A.  No, that's because I looked at all of the operations of

5    the business.

6    Q.  Am I correct, though, that Barbie does reside, if you

7    will, within the girls division at Mattel?

8    A.  Yes, that's correct.

9    Q.  She doesn't -- the brand doesn't have its own division.

10   A.  That's correct.  It does not.

11   Q.  And you would agree with me that the Barbie brand is a

12   substantial component of the girls division at Mattel?

13   A.  Yes, that's correct.

14   Q.  And assume, then, in taking over in May of 2000, you

15   took steps to ascertain whether or not the girls division,

16   including that line dealing with Barbie, was creative and

17   innovative; correct?

18   A.  Could you repeat the question?  I heard two different

19   things.  I'm sorry.

20   Q.  Okay.  At the time that you took over as Chairman and

21   Chief Executive Officer at Mattel, in approximately May of

22   2000, did you spend time taking a look at the state of

23   operations in the girl's division?

24   A.  Yes, I did, as part of the overall review of the

25   company, yes.

1    Q.   And what conclusion had you reached with respect to the

2    performance of the girl's division in May of 2000?

3         MR. QUINN:  Your Honor, again, objection on

4    relevance grounds.

5         THE COURT:  Counsel, is this still impeachment?

6         MR. NOLAN:  Your Honor, yes.  The presentation that

7    was made through the testimony of Ivy Ross and Mr. Quinn

8    presented a certain picture of Mattel, and I think that I

9    should be allowed to explore that.

10        MR. QUINN:  Your Honor, I --

11        THE COURT:  Sidebar, please.

12        (SIDEBAR CONFERENCE HELD.)

13        THE COURT:  Counsel is correct that there has been

14   some testimony from Ivy Ross and others about the conditions.

15        MR. QUINN:  I went back and looked at that

16   testimony, your Honor.  And Ivy Ross talked about the design

17   center and how there are creative people there and the

18   company comes up with new toys.  But I did not sponsor or

19   elicit any testimony that Barbie was doing well, that Mattel

20   is a relatively innovative company compared to others.  I

21   know this is -- this has been repeated many times by defense

22   counsel, but that testimony is not in there.

23        THE COURT:  Mr. Nolan?

24        MR. NOLAN:  Your Honor, at page 66, lines 5 through

25   7, Mattel's opening statement, Mr. Quinn described Barbie as

1    having wonderful success, leading fashion doll for decades.

2    Success was due to constant innovation.  The toys are new

3    each year due to millions of dollars in development.  The

4    atmosphere at the design center was open and collaborative.

5        THE COURT:  Well, that's not what you're asking.

6    The atmosphere is fine.  I have heard testimony from a number

7    of witnesses on the atmosphere.  I'm not sure how it's all

8    that relevant to anything, but there has been some --

9        MR. NOLAN:  Your Honor, the presentation made

10   through Ivy Ross with respect to the collaboration within

11   Mattel, Mr. Eckert is quoted in the press media with respect

12   to how that is absolutely not true, that he found that --

13       THE COURT:  Well, ask him about that.

14       MR. NOLAN:  This is just foundation, though.

15       THE COURT:  That's what I thought it was initially.

16   But I think you're asking for more than that now to that

17   area.  The collaboration and the workings of what was going

18   on, but let's stay away from the other.  I'll sustain the

19   objection.

20       (CONCLUSION OF SIDEBAR CONFERENCE.)

21   Q.  BY MR. NOLAN:  Mr. Eckert, do you recall being

22   interviewed and making comments in a story called, quote,

23   Shaking up the Toy Shop?

24   A.  No, I don't remember that specific title of an article.

25   Q.  Could you take a look at Exhibit 18560, sir, that's in

1    your white notebook.

2    A.  18560?

3    Q.  18560.  Do you have that?

4    A.  I'm getting it.

5        MR. QUINN:  Your Honor, I -- this document does not

6    have a Bates stamp on it, which raises a question about

7    whether it was produced.

8        MR. NOLAN:  Your Honor, it's a public newspaper

9    article.  It's an interview that Mr. Eckert participated in.

10   He's been on the witness list and exhibit list, and it's

11   contained in our books.

12       MR. QUINN:  I see it has an exhibit number, but it

13   was not produced, your Honor.

14       THE COURT:  I'm sorry, Counsel.  Do I have the

15   binder?

16       THE CLERK:  I have it here.

17       THE COURT:  What exhibit number, Counsel?

18       MR. NOLAN:  It's 18560.

19       THE COURT:  18560?

20       MR. NOLAN:  Yes.

21       THE COURT:  All right.  Was this on the exhibit

22   list?

23       MR. QUINN:  It has an exhibit number.  And I'm sure

24   it was, if counsel says it was.

25       THE COURT:  Overruled.  You may proceed.

1       MR. NOLAN:  Thank you.

2   Q.  Directing your attention to this article, and I'm not

3   asking you to read it --

4       MR. QUINN:  I'm sorry, your Honor.  I'm told it was

5   added to the exhibit list last night.  And it has a print

6   date, which I think tells us something about when the

7   document was printed out.

8       THE COURT:  Objection is overruled.  You may

9   proceed.

10      MR. NOLAN:  Thank you.

11  Q.  Mr. Eckert, do you recall being interviewed in around

12  June of 2006 for a news article in Work Force Management?

13  A.  I don't remember the specific time, but I do recall

14  being interviewed by Work Force Management.

15  Q.  Let me ask you this, sir:  Do you recall that when you

16  came to Mattel, it was -- in May of 2000, it was your

17  impression that the Mattel various work divisions were

18  actually working in silos and were not very collaborative?

19  A.  Yes, that is a conclusion I had.

20  Q.  And it was also your conclusion at the time that Mattel

21  had lost its focus and needed to focus on creativity; is that

22  correct?

23      MR. QUINN:  Your Honor, objection.  Relevance.

24      THE COURT:  Overruled.  You may answer.

25      THE WITNESS:  I'm sorry.  Could you repeat the

1    question?

2    Q.  BY MR. NOLAN:  Sure.  Isn't it also true that in

3    addition to finding that the employees at various divisions

4    were working in silos, that you also believed that Mattel

5    needed to focus on creativity; is that correct?

6    A.  No.  My conclusion at the time was that Mattel needed to

7    refocus on its core toy business.

8    Q.  And what was its core toy business?

9    A.  The brands I'm hopeful you are familiar with:  Barbie,

10   Fisher-Price, Hot Wheels, American Girl, Match Box, and the

11   many other core toys we make.

12   Q.  And was it your sense at the time that the core brand of

13   Barbie, for instance, needed to refocus and become more

14   innovative?

15        MR. QUINN:  Objection.  Relevance.

16        THE COURT:  Sustained as worded.

17   Q.  BY MR. NOLAN:  Isn't it true that one of the first

18   things that you came to identify at Mattel, when you joined

19   it, was that you wanted to acknowledge that kids were getting

20   older younger?

21   A.  I acknowledged that the phenomenon we call kids are

22   getting older younger.  But I don't believe it was a

23   conclusion I drew when I first came to Mattel.

24   Q.  Is it correct, sir, that one of the steps that you took

25   was to ascertain or ask for a management survey to be

1    conducted amongst senior management?

2    A.  No.  We did an employee survey, but I would not call

3    something a management survey.

4    Q.  And what was the purpose of the employee survey?

5    A.  To take a reading of how employees felt about the

6    company and what we could do better from their perspective.

7    Q.  I'd like to turn your attention in the white book to

8    Exhibit 16196.  16196.

9        Do you see that document, sir?

10   A.  I do.

11   Q.  I'd like to ask you to turn to page 9 of the document.

12   Do you see that there are set forth a list of some of the

13   senior management that was interviewed as part of that

14   survey?

15   A.  No.  I may be on the wrong document.

16   Q.  Are you in 16196?

17   A.  16196.  I'm on page 9.  Oh, page 7 is page 9.

18   Q.  Oh, it is?

19   A.  Well, it's page 7 of whatever this is.  And it's page 9

20   someplace else.  I'm sorry.

21   Q.  It's Okay.   It's page 9 on my outline.  That's why I

22   went to that.  I apologize.  But in any event, on page 7 is

23   there a list of managers that were included in the survey?

24       MR. QUINN: Objection.  Foundation.

25       THE COURT:  Sustained.

1    Q.  BY MR. NOLAN:  Is this one of the surveys that you asked

2    to be performed after joining Mattel?

3    A.  I don't know.  I'm not familiar with this document.

4    Q.  Have you ever seen this document before?

5    A.  I don't know that I have.  I don't believe I have.

6    Q.  Whether or not you've seen the document, do you recall

7    being advised in August of 2002 of certain recommendations

8    that were being made to Mattel management concerning the

9    Barbie brand?

10   A.  No, I don't remember any August 2002 presentation about

11   the Barbie brand recommendations.

12   Q.  Do you recall any presentation with respect to

13   management interview findings following the survey of the

14   employees?

15   A.  We've had several surveys of employees, and I've been --

16   I've reviewed the results of those surveys several times in

17   my career.

18   Q.  And go back and take me back to when you first recall

19   reviewing such a survey while at Mattel.

20   A.  I'm sorry.  I didn't know what the question was.

21   Q.  Sure.  You've just testified that you recall reading

22   results of various surveys taken, and what I'm asking you to

23   do is to take us back to one of the earlier surveys that have

24   been conducted at or about the time you started to work at

25   Mattel.

1          Do you recall that?

2     A.   Do I recall reviewing the results of the survey?  I

3     don't remember the specifics, but yes, I have gone through

4     every survey, every set of employee surveys that we've done

5     over the years.

6     Q.   Okay.  But looking at the document that's marked in

7     front of you now as Exhibit 16196, you don't remember ever

8     seeing that?

9     A.   That's correct.

10    Q.   All right.  Can you identify for us your recollection,

11    Mr. Eckert, of what the survey results were in the period of

12    2000 and 2001 when you took over?

13    A.   Yes.  I was impressed with what I viewed to be the

14    positive imagery that employees had about the company.  They

15    felt good about the company.  There was a wide scale response

16    to the survey.

17    Q.   When you say wide --

18    A.   Very good response rate.

19    Q.   So a lot of employees filled them out.

20    A.   Yes.

21    Q.   All right.  So you talked about the positives.  Were

22    there any negatives that you recall?

23    A.   There were opportunities for improvement.

24    Q.   So let's focus on the opportunities for improvement.

25    Can you identify what the strong responsive employees

1    identified as opportunities for improvement at Mattel?

2    A.  I remember the biggest one was in the area of leadership

3    development, training programs in building leadership

4    capabilities.

5    Q.  And what was the opportunity that you saw?

6    A.  I don't remember the specific score, but it was lower

7    than I had hoped.  So it was one of the things we worked on

8    over the next several years to do a better job for employees

9    in that area.

10   Q.  Do you recall ever being advised or reviewing any

11   surveys that reported back that marketing was too involved in

12   product development?

13   A.  No, I don't remember that.

14   Q.  Do you ever recall any survey results suggesting that

15   Mattel was scared and defensive about Barbie, its premiere

16   brand?

17        MR. QUINN:  Your Honor, object.  It's irrelevant.

18        THE COURT:  Sustained.

19   Q.  BY MR. NOLAN:  Mr. Eckert, Mr. Price asked this question

20   of Mr. Larian.  By the way, do you know Isaac Larian?

21   A.  No, I do not.

22   Q.  You've never met him?

23   A.  That's correct.

24   Q.  How long -- I mean, is MGA competing with Mattel?

25   A.  Yes, it is.

1    Q.  What products, what fashion dolls does Mattel

2    manufacture that compete with Bratz?  Do you know?

3    A.  Well, we manufacture several lines of fashion dolls,

4    including the Barbie line.  We manufacture dolls for Disney

5    Princesses, for High School Musical, as an example.

6    Q.  But what products, what doll itself competes against

7    Bratz; do you know?

8    A.  I'm not sure I understand the question.  A specific doll

9    competed against a specific doll?  Or against the brand

10    Bratz?

11    Q.  Against the brand Bratz.

12    A.  I'm not sure I understand what you're trying to --

13    Q.  It's probably inarticulate.  I just want to figure out

14    this.

15         You know that there is a doll that's distributed by

16    MGA, and it's referred to as Bratz; right?

17    A.  That's correct.

18    Q.  In fact, you know about Bratz; correct?

19    A.  I know of the brand, yes.

20    Q.  All right.  In fact, when, to your knowledge, when was

21    the first time you learned that Bratz was offered for sale in

22    the retail market?

23    A.  Probably in the fall of 2001.

24    Q.  And how did you come to learn that?

25    A.  I don't remember the specific source.

1    Q.   And do you recall where Bratz was offered for retail at

2    that time?

3    A.   Yes, I believe it was in Spain.

4    Q.   I'll come back to this, but do you recall in your

5    deposition answering the question that you first heard of

6    Bratz being offered for sale in June of 2001?

7    A.   It may have been.

8    Q.   So as you sit here now, is your best recollection that

9    it was in June of 2001 or the fall of 2001?

10   A.   It was sometime, I think, in 2001, June arguably isn't

11   the fall, but it was sometime, I would say now, in mid-2001.

12   Q.   I asked -- do you know Cassidy Park?

13   A.   Yes, I do.

14   Q.   And how do you know Cassidy Park?

15   A.   She worked in the design center at Mattel.

16   Q.   She was a witness in this case.  Did you know that?

17   A.   No, I didn't.

18   Q.   And where is Cassidy Park -- is Cassidy Park still an

19   employee at Mattel?

20   A.   No, I do not believe she is.

21   Q.   And did you cause her to be terminated?

22   A.   No, I did not.

23   Q.   Do you know the circumstances by which she left the

24   employment of Mattel?

25   A.   No, I don't.

1    Q.  How is it that you know she's not employed at Mattel?

2    A.  Because I know she's not employed at Mattel.

3    Q.  How do you know that, sir?

4    A.  I don't know.  I mean, I was either somehow apprised of

5    that --

6    Q.  Do you know that she testified under oath that she was

7    employed by Mattel at the time she was testifying?

8    A.  No, I didn't know she was testifying until you just told

9    me, I believe.

10   Q.  Okay.  But she's not a Mattel employee; correct?

11   A.  I believe so.  I believe she's not a Mattel employee.

12   Q.  Do you know whether or not she's a consultant to Mattel?

13   A.  I don't know.

14   Q.  When was the first time you learned that Cassidy Park

15   was no longer an employee at Mattel?

16   A.  I don't recall a specific time.

17   Q.  What was her position before she left the employment of

18   Mattel?

19   A.  I don't know her specific title, but she was head of the

20   design team of Barbie, I believe.

21   Q.  Was she the head of the design team for Barbie when you

22   first got to Mattel?

23   A.  I do not believe she was.

24   Q.  Did you promote her into that position?

25   A.  No, I did not.

1    Q.  And is it your testimony, sir, that you had no input or

2    responsibility for any alteration in the responsibilities of

3    Cassidy Park?

4    A.  Sorry.  I heard a couple of negatives.

5    Q.  I try to be positive.  I'm sorry.  I didn't mean to be

6    negative.

7    A.  That's okay.

8    Q.  Let me ask it this way.

9        Do you have any reason that you can explain why a

10   person put up as a Mattel witness would testify that they

11   were an employee of Mattel when they are not?

12       MR. QUINN:  Argumentative, your Honor.

13       THE COURT:  Sustained.

14   Q.  BY MR. NOLAN:  To the best of your recollection, when

15   was the last time that Cassidy Park was employed by Mattel?

16   A.  I don't know when her employment ceased.

17   Q.  Was it within the last month?

18   A.  I don't know.  I don't know.

19   Q.  Who apprised you that Cassidy Park was no longer an

20   employee at Mattel?

21   A.  I don't remember specifically who told me what when.

22   Q.  Would it have been within the past year, do you know?

23   A.  Do I know if it would have been within the past year?

24   Q.  Was it within the last year that you learned that

25   Cassidy Park was not an employee at Mattel?

1    A.  I believe it could be.

2    Q.  Could it be two years that you learned that Cassidy Park

3    was no longer an employee at Mattel?

4    A.  I don't think so.

5    Q.  So we've narrowed it to be within the last two years?

6    A.  I believe so.

7    Q.  Without remembering who told you that, can you tell the

8    jury the circumstances by which you learned that Cassidy Park

9    was no longer an employee at Mattel?

10   A.  No, I believe she may have resigned from Mattel.  I

11   don't know the circumstances.

12   Q.  Do you know whether or not she was asked to resign from

13   Mattel?

14   A.  No, I do not.

15   Q.  Is it true that Mattel has a doll, a fashion doll,

16   called My Scene?

17   A.  Yes, we have a line of fashion dolls under the My Scene

18   sub-brand, yes.

19   Q.  So it would be easier if I refer to it as the My Scene

20   sub-brand; is that correct?

21   A.  That's fine.  Or the My Scene line or My Scene.

22   Q.  And do you know whether or not the Bratz line of dolls

23   came out before the My Scene brand?

24   A.  I believe the Bratz line of dolls was in the marketplace

25   before the My Scene line.

1    Q.  And then how soon after the launch of Bratz was the My

2    Scene sub-brand of fashion dolls introduced in the

3    marketplace?  Do you know?

4    A.  I believe Bratz was introduced into the marketplace in

5    2001.  The My Scene subline of Barbie may have been

6    introduced in -- it's either 2002 or 2003.

7    Q.  Now, it was your understanding as the Chairman and Chief

8    Executive Officer of Mattel that My Scene sub-brand of Barbie

9    was introduced to compete with Bratz?

10        MR. QUINN:  Objection.  Relevance.

11        THE COURT:  As phrased, Counsel.  I don't see the

12    relevance.

13        MR. NOLAN:  Just a quick offer, your Honor.  I

14    asked the same question of Cassidy Park, and we didn't get an

15    answer.  And I just want to impeach her with respect to the

16    competition of the two.

17        THE COURT:  As phrased, sustained.

18        MR. NOLAN:  Thank you.

19    Q.  Do you know in your capacity at Mattel, does the My

20    Scene brand compete against Bratz?

21        MR. QUINN:  Okay.  Objection.  Relevance.

22        THE COURT:  It's a foundational question.

23    Overruled.

24        THE WITNESS:  I'm sorry.  Could you repeat the

25    question?

1    Q.  BY MR. NOLAN:  Sure.  Is it your understanding that the

2    My Scene sub-brand competes with Bratz?

3    A.  My belief is that all of the dolls in the fashion doll

4    category are competitive with one another.

5    Q.  So that would include Barbie?

6    A.  As being competitive with?

7    Q.  Bratz.

8    A.  Yes, I believe that's true.

9    Q.  And what about -- are you familiar with a doll called

10   Princess?  The Princess line?

11   A.  I'm familiar with several princess doll lines.

12   Q.  And are any of those products made by Disney?

13   A.  We produce some dolls for Disney under the Disney

14   Princess brand, yes.

15   Q.  Now, does Disney also offer for sale the Disney Princess

16   line that you are the licensee for?

17   A.  That's the line I was just referring to, yes.

18   Q.  So Disney distributes it as well as you distributing it

19   as a licensee of Disney; correct?

20   A.  Yes, Disney distributes it, for example, in the Disney

21   stores.  We distribute it, for example, in Toys-R-Us or

22   Wal-Mart or Target.

23   Q.  Do you agree with me that the Disney Princess doll

24   distributed by Disney competes with the Disney Princess doll

25   that you distributed -- you distribute for Disney; correct?

1   A.  I think they are one and the same.  That's the same

2   product in two different distribution outlets.

3   Q.  Are you familiar with a doll called Flavas?

4   A.  I am.

5   Q.  And how are you familiar with Flavas?

6   A.  It was a line of dolls introduced by Mattel.

7        MR. NOLAN:  Your Honor, may I approach the witness?

8        THE COURT:  You may.

9   Q.  BY MR. NOLAN:  I've placed in front of you a doll,

10   Exhibit 18555.

11        Do you recognize that doll?

12   A.  No, I don't.

13   Q.  Do you recognize the brand?

14   A.  Yes, I do.

15   Q.  What's the brand?

16   A.  Flavas.

17   Q.  And was Flavas a brand manufactured and distributed by

18   Mattel?

19   A.  Yes, it was.

20   Q.  Is Flavas -- was Flavas a fashion doll?

21   A.  Yes, it was.

22   Q.  And do you recall when it was launched by Mattel?

23   A.  I believe Flavas was launched in 2003.

24   Q.  So was Flavas launched after My Scene?

25   A.  Yes, I believe that's true.

1    Q.   So both My Scene and Flavas were launched after Bratz;

2    correct?

3    A.   That's correct.

4    Q.   Now, Flavas, is Flavas still offered for sale by Mattel?

5    A.   No, it is not.

6    Q.   So it's no longer sold by Mattel?

7    A.   That's correct.

8    Q.   The My Scene sub-brand of Barbie, is that still sold

9    domestically?

10   A.   In the United States?

11   Q.   Yes.

12   A.   It is for sale at retail, but I do not believe that

13   Mattel currently offers it for sale.

14   Q.   You do not offer for sale My Scene domestically at

15   retail; correct?

16   A.   I believe that's correct.

17   Q.   And when did My Scene brand stop being distributed for

18   retail?  Do you know?

19        MR. QUINN:  Objection.  Relevance.

20        THE COURT:  Counsel?

21        MR. NOLAN:  It's a foundational question.

22        THE COURT:  All right.  Overruled.

23        THE WITNESS:  I believe My Scene was discontinued

24   in the United States either late last year or earlier this

25   year.

1    Q.  BY MR. NOLAN:  Have you found coming to Mattel that the

2    toy industry is a little bit more competitive than the cheese

3    business at Kraft?  Do you have a view one way or another?

4    A.  I do have a view.  I view businesses like these to be

5    very competitive.  Both the cheese business and the toy

6    business.

7    Q.  Mr. Price asked Mr. Larian, when he was on the stand,

8    whether or not he believed in the Golden Rule.  And I guess I

9    want to ask you the same question.  Do you ascribe to the

10   Golden Rule in business?

11   A.  By the Golden Rule you're referring to do unto others?

12   Q.  Well, not only do unto others, but the reciprocal part

13   of it.

14   A.  Yes, I do.  I'm sorry.  I'm not sure I understood your

15   question.  Do I -- could you ask the question again?

16   Q.  Okay.  Tell me what you understand by the term the

17   Golden Rule.

18   A.  What I understand by the term the Golden Rule is do unto

19   others as they would do unto you.

20   Q.  And you would agree that that's a pretty good role to

21   play even in business; correct?

22   A.  No, I don't.

23   Q.  Oh, you don't?

24   A.  That's correct.

25   Q.  Why not?

1    A.   Because I think there are times when one needs to have

2    an independent point of view and do the right thing

3    regardless of the situation.

4    Q.   Now, you were recruited out of Kraft; correct?

5    A.   That's correct.

6    Q.   By a headhunter?

7    A.   By an executive recruiting firm, yes.

8    Q.   I'm sorry.  I didn't mean to -- by an executive research

9    group.  In other words, Mattel approached you at Kraft and

10   targeted you for the position, and they began to interview

11   you; correct?

12   A.   An executive recruiting firm did that on Mattel's

13   behalf, yes.

14   Q.   And how long did that interview process take place

15   before you accepted the position at Mattel?

16   A.   In the neighborhood of, I would say, probably two

17   months.

18   Q.   Do you think it's improper to recruit executives from

19   competitive toy companies?

20   A.   No.

21   Q.   Do you know an individual by the name of Tim Kilpin?

22   A.   Yes, I do.

23   Q.   And explain to the jury, first of all, who Tim Kilpin

24   is.

25   A.   Tim Kilpin is the general manager of Mattel's boys toys

1    division.

2    Q.  It's true that prior to being employed as general

3    manager of the boys division, Tim Kilpin served as the head

4    of the girls division at Mattel; correct?

5    A.  That is correct.

6    Q.  In fact, you participated in the recruitment of Tim

7    Kilpin and lured him to come to Mattel; correct?

8    A.  I participated in the interviewing process, yes.

9    Q.  Where was Mr. Kilpin working at the time that someone

10    approached him to hire him at Mattel?  Do you know?

11    MR. QUINN:  Object.  Relevance.

12    THE COURT:  Sustained, Counsel.

13    Q.  BY MR. NOLAN:  Do you know Lily Martinez?

14    A.  Yes, I do.

15    Q.  When was the first time you met her?

16    A.  I don't have a specific date in mind, but I would say it

17    was probably 2002 or 2003.  Five or six years ago.

18    Q.  And is she part of the management at Mattel?

19    A.  Described management as a --

20    Q.  Let me ask you this:  She's been designated as the

21    corporate representative of Mattel for this trial.

22    A.  Was that a question?

23    Q.  Yes.

24    A.  Yes.

25    Q.  Did you designate her?

1    A.  No, I did not.

2    Q.  Does -- what's Lily Martinez's role at Mattel?  Do you

3    know?

4    A.  She works in the design department of our girls

5    business.

6    Q.  But what are her responsibilities?  Do you know?

7    A.  She works in girls toys and specifically, as I know her,

8    has worked in Barbie.

9    Q.  A particular part of Barbie?

10   A.  I don't -- I don't know what particular part she works

11   on.

12   Q.  Do you know why she's been designated as a corporate

13   representative in this case?

14          MR. QUINN:  Objection.  Relevance.

15          THE COURT:  Counsel, relevance to what?

16          MR. NOLAN:  I could do it at sidebar, but your

17   Honor, I think it goes to --

18          THE COURT:  Let's do it at sidebar.  We can take up

19   other matters as well.

20          (SIDEBAR CONFERENCE HELD.)

21          THE COURT:  Where's this going?

22          MR. NOLAN:  It goes to impeachment.  Lily Martinez

23   has been a witness in this case, takes the stand and offers

24   up various opinions and what have you, and I think now we

25   need to be able to explore with the jury and from the jury

Unsigned                                              Page  3868

1    that Lily Martinez is involved in the My Scene brand, which

2    is a competitor to Bratz.  I think it goes to her bias and

3    the view of her credibility as a witness in this case.  I

4    think it goes to the entire presentation of Mattel in this

5    case --

6         THE COURT:  There's two separate things.  The first

7    thing you've already explored in detail what Lily Martinez is

8    involved in.  It's cumulative of that.  We already know.  But

9    as far as -- what it appears to the Court that you're trying

10   to get at is that you don't like the idea that Lily Martinez

11   has been sitting there as Mattel's representative.

12        MR. NOLAN:  I love it.  I'm sorry.  We're on the

13   record.  What I mean by that is I just want to show, your

14   Honor, that Lily Martinez is here as part of My Scene, which

15   is a direct competitor of Bratz.

16        THE COURT:  That's already before the jury.  That's

17   cumulative at this point.

18        MR. NOLAN:  Okay.  All right.  Can I go back to

19   another ruling you made?

20        THE COURT:  Okay.

21        MR. NOLAN:  With all due respect, your Honor, we

22   went through with Mr. Larian the Golden Rule about hiring

23   away people and executives and what have you, and we believe

24   that it is fair game for us to show that Mattel recruits

25   executives and management people away from other competitors,

1    including toy companies.

2         THE COURT:  But there's nothing wrong with

3    recruitment.  I mean, that's a given.  I think we'd all

4    stipulate to that, I presume, that people recruit from one

5    side to the other.  The issue is whether you work for two

6    people at one time.

7         MR. NOLAN:  Then I wonder why we had so much

8    testimony about Mr. Larian during this period of 1999 and

9    2000  targeting Mattel employees to hire at MGA --

10        THE COURT:  I've tried to draw the line on that as

11   I've only permitted testimony where it's shown that somebody

12   is working for somebody else while they are employed by the

13   previous employer.  Not simply -- if you can lay the

14   foundation for that, that they have brought somebody over

15   that was still working for somebody else and had been working

16   for the two places, but that's a unique circumstance.

17        MR. NOLAN:  But, your Honor, with all due respect,

18   I think the testimony was that they were going out and

19   recruiting from Mattel, not Carter Bryant.  They were talking

20   about other employees.  Mr. Larian testified that he did so

21   because at that period of time Mattel was laying off a lot of

22   employees.  They were having tough financial times, and I

23   want to corroborate Mr. Larian's testimony on that point by

24   having this witness establish that during that time period

25   Mattel was laying off employees and that --

1          THE COURT:  Well, this is something else.  You're

2     kind of being a moving target with me right now.

3          MR. NOLAN:  I don't mean to be.  I'm trying to tie

4     it back to Tim Kilpin.  This whole process of the volatility

5     of the market at that time.

6          MR. QUINN:  As I recall, we were limited to

7     recruiting up to October of 2000.  We couldn't go beyond

8     that.  And I think the testimony related to people who were

9     recruited to work on the Bratz project.  We couldn't go after

10     October 2000.  The witness has already said he sees nothing

11     wrong with recruiting people away from other toy companies.

12     He's got that.

13          THE COURT:  And you can ask him about that.  But --

14     and besides, the only objection I sustained was you're asking

15     what company someone else came from.  You're getting so far

16     afield that I don't think it's relevant.

17          MR. QUINN:  Again, your Honor, we were limited to

18     up to October of 2000.  He shouldn't be able to now review

19     anybody Mattel has hired at any time from any other toy

20     company.

21          THE COURT:  You can ask about recruitment and

22     general policies.  That's all fair game.

23          MR. NOLAN:  I wanted to go back with Tim Kilpin

24     because he was recruited from Disney, that there was an

25     interview of Mr. Kilpin by Mr. Eckert while Mr. Kilpin was

1    still working at Disney without Disney knowing about it.

2         THE COURT:  I don't think anyone is contending that

3    interviews are inappropriate.

4         MR. QUINN:  Of course not.

5         THE COURT:  And go ahead and ask that.  But let's

6    move on.  All right.  We're wasting time.

7         (CONCLUSION OF SIDEBAR CONFERENCE.)

8    Q.  BY MR. NOLAN:  Mr. Eckert, I want to take you back to

9    Tim Kilpin for just a moment.  It's true that you personally

10   conducted an interview of Tim Kilpin before you hired him;

11   correct?

12   A.  Yes, I certainly had a discussion with him.

13   Q.  And those discussions were held at Mattel; correct?

14   A.  I believe at least one discussion may have been held at

15   Mattel, and one discussion may have been held outside of

16   Mattel.

17   Q.  And at that time Mr. Kilpin was employed by Disney;

18   correct?

19   A.  That's correct.

20   Q.  During Mr. Quinn's opening statement, do you recall that

21   there were numerous -- not numerous, but newspaper articles

22   that were shown that contained statements in various

23   newspaper articles?

24   A.  No, I don't remember seeing those.

25   Q.  Is it correct, Mr. Eckert, that in your position, it's

Unsigned                                    Page  3872

1    been your experience that journalists make mistakes?

2    A.  I have seen journalists make mistakes.

3    Q.  And isn't it correct, sir, that it's your personal

4    opinion that you believe journalists are sloppier, less

5    professional, less moral, less caring, more biased, less

6    honest about their mistakes than they were in the 1990's?

7    A.  No, I don't remember drawing that conclusion.

8    Q.  Do you recall giving a commencement speech to the UCLA

9    Anderson School of Management?

10   A.  I have.

11   Q.  On how many occasions?

12   A.  One.

13   Q.  And was that on June 19th of 2004?

14   A.  I don't remember the specific date.  Could have been.

15   Q.  I'd ask you to take a look at Trial Exhibit 18275.

16   A.  18275?

17   Q.  Correct.

18   A.  Yes.

19   Q.  Do you recognize this as a transcript of a commencement

20   address that you offered to the UCLA Anderson School of

21   Management on or about June 18, 2004?

22   A.  Can I familiarize myself just for a minute with it

23   before I answer?

24   Q.  Sure.  Please do.

25   A.  Yes, I believe it is.

1           MR. NOLAN:  Your Honor, we have redacted a portion

2    of this commencement speech.  And it's in the exhibit book as

3    18275-A.  And what I'd like to do is just have --

4    Q.   Mr. Eckert, if you could turn to the next slot, if you

5    would, and it's 18275-A.  And you see that we've redacted

6    some of the comments from your speech?

7    A.   Yes.

8    Q.   And I'd ask you to take a look at what's marked as

9    18275-A-002.  And it starts off "According to the Edelman

10   Trust Barometer Survey" -- do you see that?

11   A.   Yes, I do.

12   Q.   Do you recall making those statements?

13          MR. QUINN:  Your Honor, hearsay, relevance.

14          THE COURT:  Let's rephrase.

15   Q.   BY MR. NOLAN:  Do you remember --

16          Well, your Honor, I offer it for impeachment.

17          THE COURT:  You're asking to introduce the

18   evidence?

19          MR. NOLAN:  Just the redacted form.

20          THE COURT:  Any objection?

21          MR. QUINN:  It's irrelevant.

22          MR. NOLAN:  Goes to the relevancy of the accuracy

23   of quotes and stories written in newspaper articles that have

24   been shown.

25          THE COURT:  For that purpose, overruled.

1        MR. NOLAN:  Thank you.

2        Permission to publish?

3        THE COURT:  Give the redacted version.

4        MR. NOLAN:  Yes, of course.

5   Q.  And I'm going to turn you to the redacted portion of

6   this.  And here this is what you -- I think these are your

7   words.

8        "According to the Edelman Public School Trust

9   Barometer Survey, nine out of ten people agree that a

10  corporation's reputation plays a large role in forming

11  opinions about products and services.  The eight out of ten

12  agree to pay more money for goods and services from a company

13  with a well regarded labor and environmental record.  And if

14  you think the business world is under a microscope when it

15  comes to the issue of trust, the media is really taking a

16  beating.

17       "According to a survey by journalism.org entitled

18  The State of the News Media in 2004, Americans think

19  journalists are sloppier, less professional, less moral, less

20  caring, more biased, less honest about their mistakes and

21  generally more harmful to democracy than they did in the

22  80's.  I happen to agree."

23       Do you see that?

24  A.  I do see that.

25  Q.  And you made that statement to the graduates of the

                    Unsigned                    Page  3875

1    Anderson School of Management?

2    A.  I may have, yes.

3    Q.  So in this case, are you aware that Mattel has taken the

4    position that Isaac Larian and MGA were attempting to conceal

5    Carter Bryant's involvement in Bratz by statements made in

6    the press?  Are you aware of that?

7         MR. QUINN:  Your Honor, it's argumentative.

8         THE COURT:  Counsel?

9         MR. NOLAN:  It's foundational.  That's the

10   testimony.

11        THE COURT:  Rephrase your question.

12        MR. NOLAN:  Sure.

13   Q.  Let me approach it this way.  Do you have Trial

14   Exhibit No. 1 in front of you?

15   A.  Yes, I do.

16   Q.  Do you recall this as a Wall Street Journal article that

17   appeared July 19th of 2003?

18   A.  Yes, I do.

19   Q.  You read it when it was published?

20   A.  Yes, I believe I did.

21   Q.  Did you notice any inaccuracies in this story?

22   A.  I don't remember the specifics of it to pass judgment

23   now.

24   Q.  Well, I'll direct your attention to the second page of

25   this exhibit, and it says that the history of the Bratz is

1    intertwined with Mattel.  MGA says that Bratz were designed

2    by Carter Bryant, a former member of the Barbie team.

3        Let me just stop there for a moment.  Do you recall

4    recalling a public statement in The Wall Street Journal

5    identifying Carter Bryant has the creator of Bratz?

6    A.  I recall this statement, yes.

7    Q.  And you read it at the time; correct?

8    A.  I believe I did, yes.

9    Q.  That wasn't the first time you had heard that Carter

10   Bryant, a former Mattel employee, was the creator or the

11   inspiration for the Bratz line, was it?

12   A.  It may have been.

13   Q.  Are you certain of that?

14   A.  No.

15   Q.  And it says:  "Inside Mattel, some are convinced the

16   Bratz borrow liberally from a Mattel project that was

17   scrapped at the testing stage in 1998.  Mattel declined

18   comment."

19       Do you see that?

20   A.  No, I don't.  I'm sorry.

21   Q.  I'm sorry?

22   A.  Where are you in the document?

23   Q.  The same paragraph.  Just next sentence.  It says:

24   "Inside Mattel, some are convinced that Bratz borrowed

25   liberally" --

1    A.   Yes, I see.

2    Q.   Do you see that?

3    A.   Yes.

4    Q.   Did I read that correctly?

5    A.   I'm sorry.  I wasn't following the words that you were

6    saying.  I was trying to find where you were in the article.

7    Q.   Okay.  So now you know where I'm at in the article.

8    A.   Yes.

9    Q.   And you see it refers to a project within Mattel that

10   was scrapped at the testing stage in 1998; correct?

11   A.   That's correct.

12   Q.   Do you know what project that was?

13   A.   No, I do not.

14   Q.   Did you ever ask anybody after you read this article?

15   A.   Ask anybody what project that was?

16   Q.   Yes.

17   A.   I don't remember doing so.

18   Q.   Well, do you recall whether or not Carter Bryant was

19   ever employed at Mattel in El Segundo in 1998?

20   A.   I don't know the exact dates of his employment.

21   Q.   Mr. Eckert, would you agree with me that if Carter

22   Bryant conceived of the idea for Bratz and drew the concept

23   drawings for Bratz while not employed at Mattel, those were

24   his ideas?

25   A.   I believe the way he phrased the statement, his idea was

1    his idea.  So yes, I believe his idea was his idea.

2    Q.  And do you have any information that from the period of

3    April 29th of 1998 through January 4th of 1999, whether

4    Carter Bryant was under any contractual obligation to Mattel?

5    A.  I don't know.

6    Q.  If Carter Bryant developed the concept for Bratz and

7    drew the drawings for Bratz during that period of time, that

8    is, between April 29th of 1998 and January 4th of 1999, the

9    Bratz concept is not owned by Mattel; is that correct?

10        MR. QUINN:  Objection, your Honor.  It's an

11   incomplete hypothetical as phrased.  Also calls for a legal

12   conclusion.

13        THE COURT:  Sustained.  Rephrase, Counsel.

14   Q.  BY MR. NOLAN:  When an employee agrees to go to work at

15   Mattel and signs a confidentiality agreement with Mattel, is

16   it your view that they transfer all of the ideas and dreams

17   that they had before they began to work at Mattel?

18   A.  No.

19        MR. NOLAN:  Is this convenient?

20        THE COURT:  Yes.  We're going to break now and

21   continue with Mr. Eckert's testimony in the morning.

22

23        (Proceedings concluded at 5:00 P.M.)

24

25

1

2

3

4

5

6

7            C E R T I F I C A T E

8

9

10          I hereby certify that pursuant to Title 28,

11    Section 753 United States Code, the foregoing is a true and

12    correct transcript of the stenographically reported

13    proceedings in the above matter.

14          Certified on July 1, 2008.

15

16

_____

17          MARK SCHWEITZER, CSR, RPR, CRR

            Official Court Reporter

18          License No. 10514

19

20

21

22

23

24

25