1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    ---

4     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                    ---

6    MATTEL, INC.,          : PAGES 6048 - 6190

                           :

7        PLAINTIFF,      :

                           :

8    VS.              : NO. ED CV04-09049-SGL

                       : [CONSOLIDATED WITH

9    MGA ENTERTAINMENT, INC.,    : CV04-9059 & CV05-2727]

     ET AL.,              :

10                        :

     DEFENDANTS.     :

11

12

13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16            RIVERSIDE, CALIFORNIA

17        WEDNESDAY, AUGUST 6, 2008

18            JURY TRIAL - DAY 30

19            AFTERNOON SESSION

20

21

22            MARK SCHWEITZER, CSR, RPR, CRR

              OFFICIAL COURT REPORTER

23            UNITED STATES DISTRICT COURT

              181-H ROYBAL FEDERAL BUILDING

24            255 EAST TEMPLE STREET

              LOS ANGELES, CALIFORNIA 90012

25            (213) 663-3494

1    Appearances of Counsel:

2

3    On Behalf of Mattel:

4    Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
     By John B. Quinn, Esq.

5    B. Dylan Proctor, Esq.
     Michael T. Zeller, Esq.

6    Harry Olivar, Esq.
     John Corey, Esq.

7    Diane Hutnyan, Esq.
     William Price, Esq.

8    855 South Figueroa Street
     10th Floor

9    Los Angeles, CA 90017
     (213) 624-7707

10

11

12   On Behalf of MGA Entertainment:

13   Skadden, Arps, Slate, Meagher & Flom LLP
     By Thomas J. Nolan, Esq.

14   Carl Alan Roth, Esq.
     Jason Russell, Esq.

15   Lauren Aguiar, Esq.
     David Hansen, Esq.

16   Matthew Sloan, Esq.
     Robert Herrington, Esq.

17   300 South Grand Avenue
     Los Angeles, CA 90071-3144

18   (213) 687-5000

19

20

21

22

23

24

25

                    Unsigned                              Page  6049

1    I N D E X

2

3 EDMOND YEUNG, PREVIOUSLY SWORN........................ 6059

4 CROSS-EXAMINATION BY MR. HANSEN: ...................... 6059

 REDIRECT EXAMINATION BY MR. QUINN: ................... 6074

5 RECROSS-EXAMINATION BY MR. HANSEN: ................... 6082

 FURTHER REDIRECT EXAMINATION BY MR. QUINN: ........... 6084

6

7 ISAAC LARIAN, PREVIOUSLY SWORN........................ 6085

8 DIRECT EXAMINATION BY MR. PRICE:....................... 6085

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    E X H I B I T S

2

3       (Exhibit 13520 received.)............................. 6094

4       (Exhibit 630 received.)................................ 6106

5       (Exhibit 1319 received.)............................. 6108

6       (Exhibit 12428 received.)............................ 6140

7       (Exhibit 911 received.)................................ 6142

8       (Exhibit 13934 received.)............................ 6160

9       (Exhibit 13729 received.)............................ 6162

10      (Exhibit 13858 received.)............................ 6168

11      (Exhibit 13859 received.)............................ 6173

12      (Exhibit 13871 received.)............................ 6174

13      (Exhibit 13872 received.)............................ 6175

14      (Exhibit 13918 received.)............................ 6177

15      (Exhibit 13917 received.)............................ 6179

16      (Exhibits 13784 and 13785 received.)................... 6182

17

18

19

20

21

22

23

24

25

1      Riverside, California; Wednesday, August 6, 2008

2                        1:29 P.M.

3      (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

4            THE COURT:  We're back on the record outside the

5      presence of the jury.  I just noticed there's a fifth binder

6      here.  Have we added a videotaped deposition?  Somebody?

7            MR. PROCTOR:  We may have.  Is it --

8            MR. NOLAN:  Not guilty.

9            THE COURT:  They are not spawning.  There's a fifth

10     binder here.

11           MR. PROCTOR:  Is the name Brode?  If yes, they have

12     added that one.

13           THE COURT:  It's Carter Bryant's.

14           MR. PROCTOR:  Then there's a sixth coming.  Carter

15     Bryant was No. 5, your Honor.

16           THE COURT:  That's No. 5 of the first four.  What's

17     going on?  Which would it be of benefit for me to start with?

18           MR. PROCTOR:  I would say Janet Bryant.

19           THE COURT:  Okay.

20           MR. PROCTOR:  I think your Honor's been through the

21     first four.  They are all fairly short.

22           THE COURT:  Janet Bryant's not going to take me too

23     long.

24           MS. AGUIAR:  I don't know whether the Court is

25     probably aware that the witness is here.

1          THE COURT:  Actually, you may step down just for a

2     few minutes.  I don't think this really touches upon anything

3     the witness is covering.  But for a lot of these, there's a

4     lot of pages between entries at times.  So if I skip over

5     anything, please let me know.  But for Janet Bryant, if I'm

6     correct, all I have basically is page 193.  I don't think

7     there's anything before then.  And 194 and 195.  And I'm

8     going to overrule the objections from line 12 through 25 on

9     193 and lines 1 and 2, but sustain the objection from line 3

10    through 25 of page 194 and lines 1 through 7 of 195.

11         MR. PROCTOR:  If I may, your Honor, this is an

12    issue that I think you're going to see on the Brode

13    designations as well, which you don't have yet but which are

14    coming.

15         THE COURT:  Okay.

16         MR. PROCTOR:  It's relate testimony, testimony

17    where a witness, an MGA employee or someone in this case

18    affiliated with MGA, acknowledges that the drawings appear to

19    them to be Bratz dolls or to look like Bratz dolls.

20         THE COURT:  That's what the jury is going to

21    decide.  And I certainly can understand, but what I overruled

22    were the objections to her testimony as to what Carter Bryant

23    said.  Now, that's certainly important or relevant to the

24    extent that Carter Bryant, who actually did the drawings, for

25    him to say or allegedly say that the dolls look like my

Unsigned                                                    Page  6053

1    drawings.

2        But for his mom or just to bring other people in

3    here, bring my mom or whatever, I mean that's not -- I don't

4    see where that moves the ball forward at all.  These are just

5    people who think -- and again, if it was someone from MGA

6    saying, and I've let a whole bunch of evidence in in the form

7    of these -- the foreign litigation about MGA saying that the

8    drawings and the doll are connected.  But Janet Bryant has

9    nothing to do with MGA other than being Mr. Bryant's mom.

10        MR. PROCTOR:  Maybe that's a fair distinction.  And

11    the next binder that's coming is a woman named Ms. Brode, who

12    is an MGA employee who makes such statements.  They are

13    probative --

14        THE COURT:  I've not going to rule on that until I

15    see that one.  That's my reasoning behind the ruling on Janet

16    Bryant.  I just don't think her saying this looks like it is

17    any more relevant than my mom saying it looks like it or

18    doesn't look like it.

19        MR. PROCTOR:  Okay.  And in terms of order, I

20    don't know if the Court is prepared to give us rulings on the

21    other three.  I suspect we will play all of these back to

22    back.

23        THE COURT:  We can proceed with Sasha Chui.  Okay.

24    Beginning on page 16, I'll sustain objections on lines 9

25    through 16.  It's really of no moment.  She answers not sure,

1    not aware of in any event.  So we'll start with line 17

2    through line 25.  That's -- actually, that's not objected to.

3    So that's of no moment.

4        The problem I have with pages 17 and all is

5    foundation in terms of Los Angeles.  This is someone who is

6    in Hong Kong, and it's -- at least in terms of what's been

7    designated -- it's not clear she has the foundation.  So I'll

8    sustain the objection on 17 and 18.

9        I'll overrule the objection, however, on 22 and 23.

10   Because she would know that based on the foundation issues --

11       MR. NOLAN:  Your Honor, I apologize.  I think there

12   was an objection to page 19.

13       THE COURT:  I'm sorry.  18?

14       MR. NOLAN:  19.

15       THE COURT:  19?

16       MR. NOLAN:  You ruled on 17 and 18, but I think

17   there was one on 19.

18       THE COURT:  There is no objection on 19.  There's

19   nothing designated on 19.

20       MR. NOLAN:  We must have a different page number.

21   At least not on my page 19 there's nothing.

22       MR. PROCTOR:  Mine neither.

23       THE COURT:  The next one, I guess, is page 52, 53.

24   We have a compound question, and her answer as to what

25   Hong Kong was involved in is fine, but the problem is the --

1    I have sustained now as to form.  It was a poorly worded

2    question.  I'm going to sustain the objection.

3         Page 72 I have as the next one.  I overruled the

4    objection there.

5         86, overrule the objection.

6         88, sustain the objection.

7         I'm somewhat confused where there's the word

8    deleted on page 95.  I'm looking here at pages 93 through 95.

9    What is deleted?

10        MR. PROCTOR:  That is -- that's in the exchange

11   between the parties, that's a designation which we initially

12   made and withdrew.  So the Court with ignore that.

13        THE COURT:  So that is gone.  So there is an

14   objection, though, as I understand it, to lines 18 through

15   25, and the objection is improper designation.  And I guess

16   my question is it's not clear what's -- what was even

17   designated.

18        MR. PROCTOR:  Yeah, this --

19        THE COURT:  I'm confused.  Someone is going to have

20   to explain to me what's going on on page 95.

21        MR. PROCTOR:  I apologize.  This entire page has

22   been withdrawn.  It's out.

23        THE COURT:  Very good.  I overruled the objection

24   on 93.

25        Okay.  Turning to page 99, I don't have line 12 in

1   this binder so can't consider on how to rule on it.  I'll

2   come back to that.

3        MR. PROCTOR:  Your Honor, I'll short-circuit this.

4   Page 99 has also been withdrawn.

5        THE COURT:  Withdrawn.

6        MR. PROCTOR:  Yes.

7        THE COURT:  All right.  That takes care of that.

8   And I think that's just about it; is that correct?  Or is it?

9        Okay.  Bryan Armstrong.  Do you have that,

10   Mr. Proctor?

11        MR. PROCTOR:  Yes, sir.

12        THE COURT:  I think page 157 is the first -- not

13   157, but rather 158, and that is overruled.

14        159 is overruled.

15        Mattel's objections on 161 are overruled.

16        163, overruled.

17        I believe the next objections are on page 265.  And

18   that is overruled.

19        These are all basically the same objection to the

20   same line of questioning that I overruled.

21        Overrule on 267.

22        Sustain the objection on 268.

23        Calls for a legal conclusion concerning derivative

24   work.

25        269 I will overrule.

1        273, overrule.

2        277, overrule.

3        I believe the next is 359.  359, the objections are

4    overruled.

5        362, the objections are sustained.

6        363, overruled.

7        363, 364, 365, 366, 367, and 368 are all overruled.

8        As is 369 and 373 and 374.

9        The style guide comes in.

10       386 and 387 is overruled.

11       389 is sustained.

12       391, overruled.

13       392, overruled.

14       393, 394, 395 are all overruled.

15       397 is sustained.

16       411, I believe, is the next one.  That is

17   overruled, as is 412.

18       And I believe that brings us to the end unless I've

19   missed something.

20       MR. PROCTOR:  I think that's it.

21       THE COURT:  Very good.  Let's go ahead and bring

22   the jury in at this time.  I'll take up -- that's three of

23   the videotapes.  I have Edmond Lee, which I've completed.  I

24   have Carter Bryant, which I have not completed, and then you

25   indicated there's one more coming.

1           MR. PROCTOR:  Correct.

2           THE COURT:  And that will be the last one?

3           MR. PROCTOR:  Yes.

4           THE COURT:  Very well.

5           MR. PROCTOR:  Thank you.

6           (WHEREUPON THE JURY ENTERS.)

7           THE COURT:  Counsel.

8           MR. HANSEN:  Thank you.

9               EDMOND YEUNG, PREVIOUSLY SWORN.

10                  CROSS-EXAMINATION

11    BY MR. HANSEN:

12    Q.  Good afternoon, Mr. Yeung.  I'm David Hansen, counsel

13    for MGA.  I'd like to ask you a few questions.  Do you have

14    the binder in front of you that has exhibit -- let's start

15    with Exhibit 13784.  It would be -- I'm not sure which --

16    it's in one of the dark ones.

17    A.  Yes.

18    Q.  13784.

19    A.  13784-A?

20    Q.  There should be one in front of it called 13784.  Let's

21    use 13784-A.  You have that?

22    A.  Yes.

23    Q.  I think you mentioned that you are counsel for Hung Lam?

24    A.  Yes.

25    Q.  Could you identify this for me as the statement and

1    claim in Hung Lam?

2    A.  Yes.

3    Q.  You've seen this document before?

4    A.  Yes.

5    Q.  Could we put up 13784.  And this is the statement of

6    claim in connection with MGA's claim against Hung Lam in

7    Hong Kong?

8    A.  Yes.

9    Q.  And that's one of the actions in which you had a client

10   against MGA?

11   A.  Yes.

12   Q.  Could you look, please, at page dash 008.  You don't

13   have 13784?

14   A.  Just A.

15   Q.  Do you have 13785 in the binder?

16   A.  84 is here.

17   Q.  84 is there?

18   A.  Yes.

19   Q.  Okay.  So --

20   A.  08?

21   Q.  Yes.  And the date of this document is the 3rd of

22   November, 2003; is that correct?

23   A.  Yes.

24   Q.  Could you look, please, at -- back at the first page

25   under paragraph 3.

1    A.  Yes.

2    Q.  And that paragraph says, quote, the plaintiff is at all

3    material times, has been the owner of the copyright

4    subsisting in original artistic works in respect of the

5    plaintiff's Bratz fashion dolls, paren, quote, the said

6    artistic works, close quote.

7         Do you see that?

8    A.  Yes.

9    Q.  And then if we look on the next page, page dash 002.

10   A.  Yes.

11   Q.  Do you have that?

12   A.  Yes.

13   Q.  And you see under a heading particulars of original

14   artistic works.

15   A.  Yes.

16   Q.  You see that?

17   A.  Yes.

18   Q.  And it lists items A through E; right?

19   A.  Yes.

20   Q.  And so item A is action models of the head of the Bratz

21   dolls?

22        Do you see that?

23   A.  Yes.

24   Q.  Item B is silicone rubber molds and polyurethane samples

25   of the head of the Bratz dolls?

1    A.  Yes.

2    Q.  Item C is four drawings of the facial decoration of the

3    Bratz fashion dolls?

4    A.  Yes.

5    Q.  D is eight drawings, four of which are pantone color

6    guides of the facial decorations of the Bratz fashion dolls?

7    A.  Yes.

8    Q.  And E is four hand-painted Deco masters on four rubber

9    head sculpts.

10          Do you see that?

11   A.  Yes.

12   Q.  And those items A through E are defined collectively as

13   the artistic works; right?

14   A.  That's right.

15   Q.  And those would be the copyrighted works upon which

16   MGA's claims against Hung Lam would be based?

17   A.  Yes.

18   Q.  So MGA's claim against Hung Lam in Hong Kong is based on

19   all of those artistic works; correct?

20   A.  Yes.

21   Q.  The claim is not just based on the drawings; right?

22   A.  From what I can read from this statement of claim.

23   Q.  So do you have any reason -- have you seen this

24   statement of claim before?

25   A.  Yes.

1    Q.  Do you have some reason to believe this is inaccurate?

2    A.  No, no, no.

3    Q.  Okay.  So the claims that MGA made are based on all five

4    of these items, not just on drawings; right?

5    A.  Yes.

6    Q.  So any statement that MGA's claims against Hung Lam in

7    Hong Kong are just based on drawings would be incorrect; is

8    that right?

9    A.  I can't remember if there's an amended statement of

10    claim that's been filed subsequently.  But from reading this,

11    this seems to be the case.

12    Q.  Okay.  Could you look, then, please, at 73855 -- wait.

13    Pardon me.  In the same binder.  I'm sorry.  13785.

14    A.  Yes.

15    Q.  Do you have that document in front of you?

16    A.  Yes, I do.

17    Q.  And Union Top was another one of your clients; is that

18    correct?

19    A.  Did you say 13855?

20    Q.  I apologize.  It's 13785.

21    A.  13785.  Yes.

22    Q.  Do you have that?

23    A.  Yes.

24    Q.  And I think you mentioned that Union Top was another one

25    of your clients?

1    A.  Yes.

2    Q.  Can we put 13785 up.  Can you identify this for me, sir,

3    as the statement of claim in MGA's claims against Union Top

4    in Hong Kong?

5    A.  Yes.

6    Q.  And if you would look for me, please, at page 20 in this

7    document.

8    A.  Yes.

9    Q.  And the date of this claim is September 2003.  Would you

10   agree?

11   A.  Yes.

12   Q.  And now if you would also look, please, at paragraph 6,

13   starting at the bottom of page 2.

14   A.  Yes.

15   Q.  And do you see under the heading copyright?

16   A.  Yes.

17   Q.  And the paragraph 6 is under the heading copyright;

18   correct?

19   A.  Yes.

20   Q.  And paragraph 6 states, quote, the plaintiff is the

21   owner of copyright subsisting in the following original works

22   relating to the design of the quote Bratz dolls.

23       Do you see that?

24   A.  Yes.

25   Q.  And that's defined as the copyright works?

1    A.  Yes.

2    Q.  Okay.  And then it lists on the next page, if you would

3    turn, please, to page 3.

4    A.  Yes.

5    Q.  It lists items A through D.

6         Do you see that?

7    A.  Yes.

8    Q.  Okay.  And item A is drawings made by Carter Bryant?

9    A.  Yes.  That's right.

10   Q.  And then item B is wax models made by Margaret Leahy?

11   A.  Yes.

12   Q.  Do you know who Margaret Leahy is?

13   A.  Do I know who she is?

14   Q.  Yes.

15   A.  She is one of the designers.

16   Q.  Do you have any idea what work she did on the Bratz

17   doll?

18   A.  She made the wax models based on drawings --

19        MR. QUINN:  Your Honor, lacks foundation.

20        THE COURT:  Sustained.

21   Q.  BY MR. HANSEN:  Ms. Leahy has stated in this Paragraph B

22   that she worked on the head sculpt for the Bratz dolls.

23        Do you see that?

24        MR. QUINN:  Misstates the document.

25        MR. HANSEN:  Let me read it, your Honor.

1           THE COURT:  Please.

2           MR. HANSEN:  Quote, wax model made by Margaret

3    Leahy in or about the winter of 2000-2001 in respect of the

4    head sculpt of the Bratz dolls.

5    Q.  Do you see that?

6    A.  Yes.

7    Q.  Have you ever spoken with Ms. Leahy?

8    A.  Of course not.

9    Q.  Have you ever deposed Ms. Leahy?

10   A.  No.

11   Q.  Okay.  In terms of item C.  Silicone rubber molds made

12   by Jessie Ramirez.

13          Do you see that?

14   A.  Yes.

15   Q.  And that's listed as one of the artistic works?

16   A.  Yes.

17   Q.  And then item D is decoration and Deco masters made by

18   Anna Rhee.

19          Do you see that?

20   A.  Yes.

21   Q.  So that's also listed as one of the copyright works,

22   excuse me, in this case?

23   A.  Yes.

24   Q.  So MGA's claims against Union Top were based on all four

25   of the artistic works listed here; right?

1    A.  Yes.

2    Q.  So the claims were not just based on the drawings listed

3    on item A; correct?

4    A.  Repeat, please.

5    Q.  I apologize.  The top of page 3.  Paragraph A, the

6    claims that MGA made against Union Top in this case were not

7    just based on the drawings; is that right?

8    A.  That's right.

9    Q.  So any statement to that effect would be incorrect?

10    A.  Sir, repeat, please.

11    Q.  Any statement that the claims that MGA made in Hong Kong

12    against Union Top being made solely on the Carter Bryant

13    drawings would be incorrect; right?

14    A.  Is that an opinion?

15    Q.  In your opinion.  Fine.  Well, in this document, all

16    four of these items are listed as artistic works; correct?

17    A.  Yes.

18    Q.  And the claim is based on all four of the items.

19    A.  Yes.

20    Q.  So any statement that the claims are based solely on one

21    of the items would be incorrect; right?

22    A.  Yes.

23    Q.  Okay.  Let me ask you, have you ever represented a

24    client that has been -- whose offices have been raided and

25    counterfeit Bratz dolls seized?

Unsigned                             

1        MR. QUINN:  Objection.  Relevance.

2        THE COURT:  It's a yes or no question.  Overruled.

3        THE WITNESS:  I should answer?

4        THE COURT:  Yes.

5        THE WITNESS:  Yes.

6    Q.  BY MR. HANSEN:  And --

7    A.  Sorry, has been raided.

8    Q.  And in connection with the raid, were counterfeit Bratz

9    dolls seized?

10   A.  Yes.

11       MR. QUINN:  Relevance.

12       THE COURT:  Counsel, where is this going?

13       MR. HANSEN:  This is going to the fact that he's

14   also represented clients that have knock-off Bratz dolls.

15       THE COURT:  I'm not asking, Counsel, for you

16   disclose the content of the testimony you're trying to

17   elicit --

18       MR. HANSEN:  It relates to what specifically --

19   specifically to one of the issues that was discussed on

20   direct.  And --

21       THE COURT:  I'll give you some leeway.  Overruled.

22   Q.  BY MR. HANSEN:  The answer to my question was "yes"?

23   A.  The question is?

24   Q.  Counterfeit Bratz dolls were seized.

25   A.  Items were seized.  I don't know whether I can call it

1    counterfeit or not.

2    Q.  But items that had Bratz -- that looked like Bratz dolls

3    and had the word Bratz on the packaging?

4    A.  Yes.

5    Q.  And those items were not authorized by MGA?

6    A.  That's right.

7    Q.  Okay.  And that would be Union Top; correct?

8    A.  Yes.

9    Q.  And that actually would also relate to another one of

10   your clients, wouldn't it?

11   A.  One of the cases of --

12       MR. QUINN:  Your Honor, I don't think anything has

13   been linked up here.

14       THE COURT:  I need to explore this at sidebar,

15   Counsel.  Thanks.

16       (SIDEBAR CONFERENCE HELD.)

17       THE COURT:  Counsel, help me out here, Mr. Hansen.

18       MR. HANSEN:  Correct and bias, your Honor, correct

19   and bias against MGA.

20       THE COURT:  That he has a bias against MGA?

21       MR. HANSEN:  Yes, because he represents a client

22   who had counterfeit Bratz dolls seized, and he filed an

23   affidavit in that case attempting to avoid summary judgment

24   based on matters in this case.  This is my last question on

25   this.

1          MR. QUINN:  He's already got the fact that he

2     represented multiple MGA adversaries.  To get into

3     counterfeits and seizure implicitly, we're talking about

4     questions of Hong Kong law.

5          THE COURT:  Right.  But it's not for the purpose of

6     the Hong Kong law.  It's for bias.  Overruled.

7          (CONCLUSION OF SIDEBAR CONFERENCE.)

8          THE COURT:  You may proceed, Counsel.

9          MR. HANSEN:  Your Honor, may I approach the

10    witness?

11         THE COURT:  You may.

12    Q.  BY MR. HANSEN:  Mr. Yeung, I've handed you what's been

13    marked in this case as Trial Exhibit 32.

14         Do you see that?

15    A.  Yes.

16    Q.  And could you tell me -- identify this.  Have you seen

17    this document before?

18    A.  Yes.

19    Q.  And can you identify this for me, please, as the

20    statement of claim in the MGA versus Uni-Fortune toys case?

21    A.  It is.

22    Q.  And if we -- page 3 actually has the statement of claim

23    heading on it.

24    A.  Yes.

25    Q.  If you look, please, at page 15 of Exhibit 32, can you

1    tell me that this -- confirm for me, please, that the

2    statement of claim was filed on the 6th -- is dated the 16th

3    day of October, 2003?

4    A.  That's right.

5    Q.  And could you also look, then, at page -- back to page

6    3.

7    A.  Yes.

8    Q.  And here again, at the bottom we have a listing of what

9    is called here particulars of original artistic works.

10       Do you see that?

11    A.  That's correct.

12    Q.  And this is the statement of claim, again, Uni-Fortune

13    was one of your clients?

14    A.  Yes.

15    Q.  And item A on page 3 lists 18 design drawings of various

16    Bratz fashion dolls; is that correct?

17    A.  Yes.

18    Q.  Item B lists wax models of the head, body, and shoes of

19    the Bratz fashion dolls; is that correct?

20    A.  Yes.

21    Q.  Item C lists silicone rubber molds and polyurethane

22    samples made there?

23    A.  Yes.

24    Q.  And D is four drawings of the facial decoration of the

25    Bratz fashion dolls; is that correct?

1    A.  Yes.

2    Q.  And then E is eight drawings, four of which are pantone

3    color guides of the facial decorations; is that right?

4    A.  Yes.

5    Q.  And then F is four hand-painted Deco masters on four

6    rubber head sculpts; is that correct?

7    A.  Yes.

8    Q.  And all of those items A through F together are defined

9    as the artistic works; is that right?

10   A.  Yes.

11   Q.  And those items all form the basis of MGA's claims

12   against Uni-Fortune toys; correct?

13   A.  Yes.

14   Q.  So the claims by MGA against Uni-Fortune toys were not

15   based just on Mr. Bryant's drawings; is that right?

16   A.  Yes.

17   Q.  And any statement to that effect would be untrue?

18   A.  Yes.

19   Q.  Okay.  Mr. Yeung, can you tell me -- you live in

20   Hong Kong; right?

21   A.  Yes.

22   Q.  When did you get to the United States?

23   A.  Sunday.

24   Q.  Sunday.  And are you staying in a hotel?

25   A.  Yes.

1    Q.  Who is paying for your hotel expenses?

2    A.  Mattel.

3    Q.  Mattel.  And who paid for your plane flight?

4    A.  Mattel.

5    Q.  Are you -- you're a solicitor in Hong Kong?

6    A.  I am.

7    Q.  That's a lawyer, basically?

8    A.  Yes.

9    Q.  And lawyers typically charge by the hour?

10   A.  Yes.

11   Q.  Do you charge by the hour?

12   A.  Yes, I do.

13   Q.  Are you expecting to be compensated for your time here

14   today?

15   A.  Yes, I am.

16   Q.  And who will pay you for that?

17   A.  Mattel.

18   Q.  And when was the first time that you spoke with Mattel

19   in connection with this lawsuit?

20   A.  Friday, the 1st.

21   Q.  Friday, the 1st.  And you had never spoken with anybody

22   from Mattel or Quinn Emanuel about this lawsuit prior to that

23   time?

24   A.  No.

25   Q.  Can you tell me what your hourly rate is?

1   A.  3,005.

2   Q.  3,005?

3   A.  Hong Kong dollars.

4   Q.  That's a hundred thousand dollars here.  No, I'm

5   kidding.  Strike that.

6        Could you just tell me how much that is in U.S.

7   dollars?

8   A.  Divide it by eight.

9   Q.  Okay.  So that's about $500, $400 an hour?

10  A.  Yes.

11       MR. HANSEN:  I have nothing further, your Honor.

12       THE COURT:  I was afraid we were going to lose all

13  the attorneys here and go to Hong Kong.

14       MR. QUINN:  I was going to ask if they are still

15  accepting applicants for Bar admission.

16              REDIRECT EXAMINATION

17  BY MR. QUINN:

18  Q.  Could I ask you to take a look at 13572, which is in

19  evidence.  It's an answer for request for particulars.

20  A.  Yes.

21  Q.  This is a document that you served on behalf of

22  Uni-Fortune in that case, a request for particulars?

23  A.  13572.

24  Q.  Yes.

25  A.  That's an answer.

1    Q.   It's an answer to a request for particulars.

2    A.   Yes.

3    Q.   And could you explain to the jury what a request for

4    particulars is under Hong Kong procedure just in general?

5    A.   Right.  The plaintiff files a statement of claim.  If

6    the defendant believes the statement of claim is not -- does

7    not contain full particulars, then the defendant is entitled

8    to serve on the plaintiff a request for further and better

9    particulars.  And the plaintiff has to file an answer to that

10   request.

11   Q.   So it's a way of -- is it a way of requesting more

12   information about the plaintiff's claim?

13   A.   Yes, it is.

14   Q.   And on behalf of Uni-Fortune, did you serve in the

15   Uni-Fortune -- the MGA versus Uni-Fortune case a request for

16   particulars?

17   A.   Yes.

18   Q.   And is that what we're looking at here?

19   A.   Yes, that's an answer to my request.

20   Q.   All right.  And if we could put the first page up on the

21   screen on the bottom there.  Is what we're looking at here,

22   number one, first, when you get an answer to a request for

23   particulars, do they first include what the request was?

24   A.   Yes.

25   Q.   All right.  And is this the request you served for more

1    information about these artistic works?

2    A.  Sorry.  That is a repetition of the statement of claim.

3    Q.  Okay.

4    A.  So I'll repeat what the statement of claim is.  And on

5    the next page --

6    Q.  If we could go to the next page, please.  Enlarge the

7    top.

8    A.  Give full particulars.  That's my request.  And

9    underneath would be the answers.

10   Q.  So you first quote the statement of claim.

11   A.  Yes.

12   Q.  And then you ask the particulars, the information that

13   you wanted; is that correct?

14   A.  Yes.

15   Q.  And could you just tell the jury in general, just

16   describe in general terms, this is legal language, what in

17   general was the nature of the additional information you were

18   seeking about MGA's claim?

19   A.  Because in that case -- may I refer to the statement of

20   claim?

21   Q.  Yes.

22   A.  Okay.  Going back to the last page, please.  MGA claims

23   they own a copyright.  They are the copyright owner of item A

24   to E.  So I need to know whether B was based on A, C was

25   based on B, D was based on C, and so forth.

1        So I need to know for each item whether any

2    antecedent, that is, previous materials, will refer to when

3    the author created that particular item.  So that's the

4    purpose of my request.

5        MR. HANSEN:  Your Honor, move to strike this.  This

6    is -- now we're getting into discussions of Hong Kong law and

7    Hong Kong procedures.  This is explaining what a --

8        THE COURT:  I understand what he's doing.  He's

9    placing the factual statements in context, not -- let me see

10   you at sidebar, Counsel.

11       (SIDEBAR CONFERENCE HELD.)

12       THE COURT:  I didn't want to get into this on the

13   record, but what I think he's doing is placing into context

14   what these statements mean.  Otherwise, this jury is going to

15   be confused.  It's not so much getting into -- it is

16   Hong Kong law or procedure as opposed to substantive law.

17       What I absolutely won't be allowing in is the

18   substantive copyright law.  This is more trying to explain

19   what these documents mean, and I think I'm going to give some

20   leeway on that.  But I wanted to hear your point.

21       MR. HANSEN:  One of the issues that we have is the

22   use of based on, which is sort of permeating a lot of the

23   issues in the case.  Based on, as you know, is part of the

24   derivative work definition.  And I am not certain if that's

25   where they are going, but they are attempting to bootstrap --

1          THE COURT:  We're not there yet, and I haven't

2     heard any explanation or definition of based on.  And if the

3     definition that we heard, reproduction, earlier, and there's

4     now evidence to using that more in a vernacular sense or

5     common sense, I would give the jury the benefit of

6     understanding the common usage of English words.

7          What I'm not going to do is give them the benefit

8     of the legal definition of words without the Court's

9     instruction.  And I'm reluctant to start instructing at this

10    point.  So having said all of that, to the extent that we're

11    not using legal phraseology, this is simply trying to put

12    into context, I'm going to overrule the objection.

13         MR. NOLAN:  The last problem, his reference to the

14    antecedent works, I think that's the issue where we got

15    into --

16         THE COURT:  Why don't you have him explain what

17    that means.  Or let's try to avoid -- whenever either side

18    hears legal words, if it can't be explained -- if it can be

19    explained without getting into the law of copyright.

20         MR. NOLAN:  I don't think it can, your Honor.  My

21    point is that's the reason why we really objected on this

22    basis.  I would not want him to explore what antecedent works

23    are because we have no reason to believe that he wouldn't be

24    including an analysis under Hong Kong law.

25         THE COURT:  That's what was kind of opened up with

1    Mr. Hansen's questioning, is what the claim is based on.  So

2    that door has already been opened to a certain extent, and I

3    think I've got to give Mr. Quinn an opportunity to try to

4    explain that.  We're fine right now.  Objection is overruled.

5         (CONCLUSION OF SIDEBAR CONFERENCE.)

6    Q.  BY MR. QUINN:  When you asked for particulars of

7    antecedent works, what do you mean by antecedent works?

8    A.  Any work or materials the author based on which in

9    creating his particular work.

10   Q.  So if it was based -- if an author's work is based on

11   some other previous work, that would be an antecedent work?

12   A.  Yes.

13   Q.  All right.  If we could look at the next page, please.

14   A.  Yes.

15   Q.  I'm sorry.  We were there.  And if we could now enlarge

16   the answer.  And what you were told -- and is this MGA's

17   answer now that we're looking at?

18   A.  Yes.

19   Q.  And could you help us understand what MGA told you here

20   in response to your question about whether any of these works

21   that they identified were based on any of the other works?

22   A.  Well, basically all the wax models, silicone rubber

23   models, four drawings and eight drawings were based on the 18

24   design drawings made by -- 18 design drawings listed under

25   item A.

Unsigned                                    Page  6079

1       MR. HANSEN:  Your Honor, move to strike.  Now we're

2   into legal conclusions.

3       THE COURT:  Counsel, let's -- I'm going to strike

4   this.  Let's go back to what the document says.

5       MR. QUINN:  Okay.

6       THE COURT:  The jury is to disregard that last

7   answer.  Let's focus on the document.

8   Q.  BY MR. QUINN:  When it says here in the second

9   paragraph -- the second sentence, the author of the artistic

10  works pleaded in subparagraphs B, D, E, F, and G of the

11  particulars of original works referred to the drawings in

12  subparagraph A of the particulars of original works, what did

13  you understand that MGA was telling you?

14      MR. HANSEN:  Objection, your Honor.  We're going

15  outside of his interpretation of English.  It's either plain

16  English or it's not.

17      THE COURT:  That is overruled.  You may answer.

18  Your understanding of what that meant.

19      THE WITNESS:  My understanding is that the max

20  models, the four drawings of facial decoration, the eight

21  drawings, four of which are pantone color guides, and the

22  four hand-painted Deco masters all referred to the 18

23  drawings listed under item A.

24  Q.  BY MR. QUINN:  When you say they referred to, do you

25  mean that the author, authors of those works, Ms. Leahy,

1    referred to the drawings?

2        MR. HANSEN:  Objection, leading.

3        THE COURT:  Sustained.

4    Q.  BY MR. QUINN:  When you say referred to, who did you

5    understand referred to the original 18 drawings?

6    A.  I'll repeat.  The author of the wax models, the author

7    of the silicone rubber molds -- sorry.  The author of the

8    four drawings of facial decoration, the author of the eight

9    drawings, four of which are pantone color guides, and the

10   author of the four hand-painted Deco masters referred to the

11   18 design drawings when he or she created the respective

12   copyright works.

13   Q.  And you had asked the question whether any of these were

14   antecedent works.  Can you tell us whether or not you

15   understood MGA was telling you that those other items -- B,

16   D, E, and F -- that there was an antecedent work for all of

17   them, and that was the drawings?

18       MR. HANSEN:  Objection, your Honor.  Leading again.

19       THE COURT:  Sustained.  Rephrase.

20   Q.  BY MR. QUINN:  Was it your understanding that there was

21   an antecedent work for items B, D, E, and F?

22   A.  Yes.

23   Q.  And what were those?

24   A.  Item A.

25   Q.  And as to A itself, did MGA tell you whether or not that

1     was an original work as to which there were no antecedent

2     works?

3     A.   There's no antecedent work to A.

4          MR. QUINN:  Thank you.  Nothing further.

5                    RECROSS-EXAMINATION

6     BY MR. HANSEN:

7     Q.   Very briefly, in terms of -- in connection with your

8     testimony today, did you meet with my lawyers from Quinn

9     Emanuel?

10    A.   Say that again.

11    Q.   In connection with your testimony today, did you meet

12    with any lawyers from Quinn Emanuel?

13    A.   Yes.

14    Q.   And how many times?

15    A.   Once on Sunday and another time on Monday.

16    Q.   Did you review your expected testimony at that time?

17    A.   No.  I was -- I was told what my -- how do you say it?

18    What I might be referred to in this -- in my understanding of

19    the pleadings and documents filed.

20    Q.   Let's look again for a second at the paragraph you were

21    just talking about.

22    A.   Yes.

23    Q.   1.  Number 1, little I.  Have you ever -- you've never

24    spoken with any of the authors of the works in any of these

25    works; right?

1    A.  No.

2    Q.  So you've never spoken with the authors of the works

3    that are the wax models?

4    A.  No.

5    Q.  Never spoke to the author of the silicone rubber molds?

6    A.  No.

7    Q.  Or any of the authors; right?

8    A.  No.

9    Q.  So you have no idea what use the authors of those

10   drawings --

11   A.  Use?

12   Q.  When they referred to the drawings, you have no idea

13   what they did in connection with that; right?

14   A.  I never asked.  I didn't understand your question.

15   Q.  You never deposed any of the authors of any of the works

16   involved in the case?

17   A.  Depose, that means?

18   Q.  Take a sworn statement.

19   A.  I don't think any of them has given a statement in any

20   of that.

21   Q.  So you have no knowledge as to what use any of these

22   authors may or may not have made of the drawings; right?

23   A.  That's right.

24   Q.  And were you asked to bring dolls from any of the cases

25   that you were involved in?

1    A.  I have.

2    Q.  You have.  Okay.  And was this one of the documents that

3    you looked at when you met with the Quinn Emanuel lawyers,

4    Exhibit 13572?

5    A.  Yes.

6        MR. HANSEN:  Okay.  I have nothing further.

7        THE COURT:  Mr. Quinn?

8            FURTHER REDIRECT EXAMINATION

9    BY MR. QUINN:

10   Q.  Mr. Hansen just asked you whether you had spoken to any

11   of the authors.  That answer to the request for particulars,

12   that's MGA's answer; correct?

13   A.  Yes.

14   Q.  Would you expect that MGA would have spoken to the

15   authors before they gave that answer under oath?

16       MR. HANSEN:  Objection, your Honor.  Calls for

17   speculation.

18       THE COURT:  Overruled.  You may answer.

19       THE WITNESS:  In Hong Kong, lawyers from one side

20   do not have a chance to depose or ask any of the witnesses

21   from the other side.  There's only on two occasions we'll

22   know what the witnesses will say.  One is what we call a

23   witness statement.  This is a written statement filed by each

24   side, which is supposed to be exchanged.  And the other

25   occasion would be at trial.  So there's no system of

1    deposition or whatever in Hong Kong.

2    Q.  BY MR. QUINN:  But would you expect that, before MGA

3    gave an answer under oath to your request for particulars,

4    that MGA would speak to the authors in order to get that

5    information?

6    A.  Yes.  And pleadings is part of a pleaded case.  So that

7    is MGA's case as such.

8          MR. QUINN:  Thank you.

9          THE COURT:  Mr. Hansen?

10         MR. HANSEN:  We have nothing further, your Honor.

11         THE COURT:  You are excused, sir.  Thank you.

12         THE WITNESS:  Thank you.

13         THE COURT:  Plaintiff may call their next witness.

14         MR. PRICE:  We call Mr. Larian.

15         THE CLERK:  Please be advised you are still under

16   oath.

17         THE WITNESS:  Yes.

18            ISAAC LARIAN, PREVIOUSLY SWORN.

19               DIRECT EXAMINATION

20   BY MR. PRICE:

21   Q.  Mr. Larian, when Mr. Bryant showed you the drawings he

22   created at Mattel in September of 2000, when he showed you

23   Mattel's confidential information, that day changed the

24   course of MGA, didn't it?

25   A.  No.

1    Q.  Well, prior to that day, September 2000, I think you

2    told the jury in the last phase that you had actually been

3    looking for a fashion doll.

4          Do you recall saying that?

5    A.  Yes.

6    Q.  You told the jury that you'd been looking for one ever

7    since some buyer at Wal-Mart said he wanted something to

8    compete with Barbie.

9          Do you recall that?

10   A.  Yes.

11   Q.  You told the jury that you had done a sort of fashion

12   doll contest, and tried to find some ideas for a fashion

13   doll.

14          Do you recall that?

15   A.  That's one of the things I did.

16   Q.  Pardon?

17   A.  That's one of the things, yes.

18   Q.  And how long had this search for creative ideas for a

19   fashion doll been going on?

20   A.  I think for a couple years.

21   Q.  So as of September of 2000, if wasn't for lack of effort

22   that you didn't have any ideas for a fashion doll that you

23   wanted to pursue, was it?

24   A.  No.

25   Q.  What it was is you didn't have the creativity.  You

1    didn't have people who had the idea for a fashion doll that

2    MGA might want to make; right?

3    A.  That's not correct.

4    Q.  Well, are you aware of any documentation dated prior to

5    September of 2000 where you said you liked an idea for a

6    fashion doll and were going to pursue it?

7    A.  No.

8    Q.  Didn't you tell the jury in the first phase that prior

9    to September of 2000, MGA had never done a fashion doll?

10   A.  That's correct, yes, I did.

11   Q.  Didn't you tell them that in response to this search for

12   ideas, the only thing that was brought to you was Carter

13   Bryant?

14   A.  At that time I did say that, but subsequent to that, I

15   got a lot of letters and e-mails for support from people in

16   the industry, and one of those was from a lady named Maureen

17   Samparro (phonetic) who works for a company called San Pan

18   (phonetic).  And she sent me a copy of a letter as well as a

19   DVD of a presentation for a fashion doll that she had made to

20   us in 1998.  When I was here in front of you in Phase 1-A, I

21   did not recall that.  She reminded me of that, and we have

22   turned over those documents to Mattel.

23   Q.  So you're saying that in this search for a creative

24   idea, that you actually got a response in 1998 from some

25   woman; correct?

1   A.  Yes, Maureen.

2   Q.  And in the last phase, you had forgotten about that

3   entirely?

4   A.  I did not recall.  It was so long ago.

5   Q.  And you didn't pursue that, did you?

6   A.  No, we did not.

7   Q.  You rejected it.

8   A.  I'm sorry.  You mean pursue her idea?

9   Q.  Yes.

10   A.  No, we did not pursue it.

11   Q.  You rejected that idea; right?

12   A.  Yes.

13   Q.  And so my question, then, is prior to Carter Bryant

14   coming in in September of 2000 and showing you Mattel's

15   confidential information, prior to that time, you had done a

16   two-year search for a good idea for a fashion doll and had

17   failed; right?

18   A.  I don't characterize it as a failure.  We just hadn't

19   come up with one.

20   Q.  And you finally came up with one when Mr. Bryant walked

21   through the door and showed you Mattel's confidential

22   information; right?

23   A.  That's not correct.  And that's not what I testified to.

24   Q.  Well, prior to Mr. Bryant showing you Mattel's

25   confidential information, you had not located in a two-year

1    search any designs or any ideas for a fashion doll that you

2    thought were acceptable; correct?

3    A.   We had not done one, that's correct.

4    Q.   You hadn't located one; right?

5    A.   Yes.

6    Q.   And then the designs you received in September of 2000

7    were designs that were handed to you by a Mattel designer who

8    was then working in the Mattel design center; right?

9    A.   That's correct.

10   Q.   And you understand that in the first phase of this, the

11   jury has found that you knowingly assisted Mr. Bryant in

12   breaching his fiduciary duty.

13        You understand that?

14   A.   I do.

15   Q.   And that fiduciary duty pertained to Mattel's

16   confidential information.

17        You understand that?

18   A.   I'm not a lawyer.  But I understand that and respect

19   what the jury has found.

20   Q.   I want to look, then, at this information you got in

21   September, this confidential information that Mr. Bryant

22   showed you, okay?  If you look at Exhibit 302.  And you

23   recall the testimony is that this is the presentation that

24   Mr. Bryant made --

25   A.   Can you bear with me for a moment?  These exhibits start

1    with 6?

2    Q.  It's 302, sir.  It should be the third one in from the

3    binder.

4    A.  I don't find 302.

5        MR. PRICE:  May I approach, your Honor?

6        THE WITNESS:  Thank you.

7    Q.  BY MR. PRICE:  Now, the testimony is that this is the

8    presentation that Mr. Bryant made in September of 2000.  And

9    if we look at the second page, you recall one of the things

10   you were aware of was his dolls are going to be trendy.  They

11   were going to have trendy, hip outfits.  That presentation

12   was made to you?

13   A.  Where are you referring to?  Yes.

14   Q.  And if you look at the next page, you see it has a

15   drawing of Zoe.  And it talks about her being the queen of

16   cool, and she has funky stompin' sneaks.

17       That presentation was made to you; correct?

18   A.  Yes.

19   Q.  And if you look at the eighth page in, you see there's a

20   character at that point called Hallidae.  Ultra trendy street

21   wear.

22       Do you see that?

23   A.  I do.

24   Q.  And if you look at the tenth page, you see there's a

25   picture of Jade, talking about how she loves far-out fashion.

1    This is part of the presentation Mr. Bryant made to you;

2    right?

3    A.  Yes.

4    Q.  Trendy, hip, cool, funky, ultra trendy street wear,

5    far-out fashion.  These were part of the concepts, Mattel's

6    confidential information, that Mr. Bryant gave to you in

7    September 2000; right?

8         MR. NOLAN:  Your Honor, I'm going to object to the

9    term confidential information with respect to concepts.

10         THE COURT:  On what ground --

11         MR. NOLAN:  I think it's an improper

12    characterization of the finding.

13         THE COURT:  Overruled.

14         THE WITNESS:  Sir, can you repeat the question?

15    Q.  BY MR. PRICE:  Sure.  As part of the ideas and concepts,

16    confidential information that Mr. Bryant gave you in

17    September of 2000 was this idea for a doll that was trendy,

18    hip, cool, funky, with far-out fashions, ultra trendy street

19    wear.  All of that was in the presentation?

20    A.  These were in the presentation of drawing.  The dolls

21    came later from MGA.

22         MR. PRICE:  Move to strike as nonresponsive.

23         THE COURT:  Stricken.

24    Q.  BY MR. PRICE:  I'll ask the question again.

25         Part of the confidential information that

1    Mr. Bryant gave you was the concept, the idea of dolls that

2    were trendy, hip, cool, funky, far-out fashions and ultra

3    trendy street wear, all of that was in the presentation you

4    got from Mr. Bryant in September of 2000?

5    A.  Yes.

6    Q.  And when you looked at these drawings, you noticed some

7    things about the drawings themselves; correct?  Let me make

8    it more clear.  If we can go to page 3.  Zoe.

9        One thing you have noticed is that in the drawings,

10   the eyes were bigger than you would have on a normal human

11   being.

12       You noticed that; right?

13   A.  They had big eyes.  But I've seen human beings with big

14   eyes, too.

15   Q.  You noticed that lips were pronounced in the drawings;

16   right?

17   A.  Yes.

18   Q.  You noticed that the feet and the head were oversized in

19   proportion to the rest of the body; right?

20   A.  I don't see any feet, but I see the shoes are oversized.

21   Q.  And if you go through it, you'd see, for example, on the

22   fourth page, or the fifth page, you see these are oversized,

23   this area here, what you call the shoes; right?

24   A.  Yes.

25   Q.  And you noticed that the shoes were kind of chunky.  You

1    said the shoes were oversized; correct?

2    A.   You said oversized, and I said yes.

3    Q.   And the fashions were trendy, hip, urban; correct?

4    A.   Those fashions in there?

5    Q.   Yes.

6    A.   That's what it says.

7    Q.   That's the presentation he made to you; correct?

8    A.   That's correct.

9    Q.   Prior to September of 2000, you didn't have doll designs

10   or doll ideas for dolls with pronounced lips, large eyes,

11   oversized feet and head that were trendy and urban; correct?

12   A.   What I think, if you look at the PC dolls, I think they

13   were called by Maureen Samparo (phonetic).  They had similar

14   features.

15   Q.   Prior to -- to?

16   A.   My recollection.

17   Q.   Prior to September 2000, after this two-year search for

18   some creative ideas so that you could do a fashion doll,

19   prior to that, you didn't have these ideas, did you?  The

20   ideas Carter Bryant gave to you in September 2000.

21   A.   That's correct.

22   Q.   And these features -- the large eyes, the pronounced

23   lips, the oversized feet, the oversized head, the urban

24   street wear -- those are the features that characterize the

25   Bratz dolls; correct?

1    A.   Those are some of the characteristics, some of the

2    features that characterize Bratz dolls, yes.

3    Q.   And your understanding is that those features were

4    unlike anything that was on the market.

5    A.   That's not my understanding.

6    Q.   Well, if you'd look at in your binder there in

7    Exhibit 13520.

8    A.   I'm sorry.  I'm having a tough time finding these.

9    Q.   You recognize that as a business plan for ABC

10   International Traders, which was doing business as MGA;

11   correct?

12   A.   That's what the document says, yes.

13   Q.   Pardon?

14   A.   That's what the document says, yes.

15       MR. PRICE:  Your Honor, move Exhibit 13520 into

16   evidence.

17       THE COURT:  Any objection?

18       MR. NOLAN:  No objection, your Honor.

19       THE COURT:  It's admitted.  You may publish.

20       (Exhibit 13520 received.)

21   Q.   BY MR. PRICE:  Look at the first page.  This a business

22   plan which you did in March of 2001; correct?

23   A.   I personally?

24   Q.   Someone at MGA on your behalf created this business

25   plan; correct?

1      A.  I see my name on it.  I don't recall it.  But I think

2      yes, it's a business plan of MGA.  It looks like a business

3      plan that MGA did.

4      Q.  And, in fact, go down a little bit, Ken, where you see

5      it is a business plan does not imply offering of securities.

6      It's correct, is it not, that this is a business plan that

7      you were using to try to get funding for MGA in March of

8      2001?

9      A.  I don't recall that one way or another.  I do not recall

10     it.  It's possible, but I don't recall it.

11     Q.  As of March of 2001, in any event, the Bratz dolls

12     themselves had not been presented to the public; correct?

13     A.  At March 2001 to the public, that's correct, no, they

14     were not.

15     Q.  And if you'll look at page 15 of this document, you see

16     there's a section called Strengths.  You see that in your

17     business plan?

18     A.  Yes.

19     Q.  And you say, "In terms of product strength, Bratz has

20     several distinct advantages over the competition.  First is

21     its marked advancement in the physical appearance of the

22     dolls.  The Bratz are unique in many ways; their eyes are big

23     with a hint of anime style; their lips are more pronounced.

24     Their feet and heads are oversized.  There is no fashion doll

25     on the market that bears the resemblance to the Bratz."

1      That's what MGA wrote in its business plan of March

2   of 2001; correct?

3   A.  Yes.

4   Q.  Now, prior to September of 2001, when Mr. Bryant

5   presented you -- prior to September of 2000, when Mr. Bryant

6   presented you with Mattel's confidential information and

7   design, did MGA have any plans to introduce an advanced

8   design of a doll with big eyes, pronounced lips, where their

9   head and feet were oversized?

10   A.  Not that I recall, no.

11   Q.  And you'll agree that the designs, the drawings, the

12   confidential information Mr. Bryant gave you in September

13   2000, those drawings are drawings of dolls where the eyes are

14   big, the lips are pronounced, the feet and heads are

15   oversized; correct?

16   A.  Those were drawings that were the inspiration for the

17   Bratz dolls that MGA created, yes.

18      MR. PRICE:  Move to strike as nonresponsive.

19      THE COURT:  Would you rephrase your question,

20   Counsel.

21   Q.  BY MR. PRICE:  You'll agree that the drawings you saw in

22   September 2000, Mattel's confidential information, those

23   drawings showed, were drawings of figures where the eyes were

24   big, the lips were pronounced, and the feet and heads were

25   oversized.

1          You'll agree with that; correct?

2     A.   Those drawings had those features, yes.

3     Q.   And by the way, the first phase, you described the

4     contest you had as sort of a fashion doll contest.

5          You recall that?

6     A.   Yes.

7     Q.   You didn't call it a fashion drawing contest; correct?

8     A.   No.

9     Q.   Okay.  That's correct?

10    A.   That's correct.

11    Q.   That's because you were looking for a fashion doll;

12    right?

13    A.   Yes.

14    Q.   Now, prior, in the first phase of this case, you recall

15    that you told the jury that if what you were shown in

16    September of 2000 were Mattel drawings, you wanted nothing to

17    do with them.

18         Do you recall that?

19    A.   Yes.

20    Q.   And that's because you had that thought, or you said

21    that because you knew that if what Carter Bryant was showing

22    you was Mattel property, their confidential information, you

23    shouldn't be looking at it; correct?

24    A.   I just didn't want to have anything to do with it.

25    Q.   Well, let me ask you.  You knew in September of 2000

1    that if someone came to you with confidential information of

2    a competitor, you shouldn't even look at it.

3         You knew that, didn't you?

4    A.  All I know is what I testified to.  That if they at that

5    time, if I believed that they belonged to Mattel, I didn't

6    want to have anything to do with it.  And that's the truth.

7    Q.  And my question is different, sir.  I'm asking about

8    your -- the way you practice as a businessman.

9    A.  Yes.

10   Q.  In September of 2000, you knew that if what Carter

11   Bryant was showing you belonged to Mattel and was

12   confidential and proprietary, that you should not even be

13   looking at it.  You knew that, didn't you?

14   A.  I cannot answer that one way or another state of my mind

15   at that time.  So I cannot answer that truthfully beside what

16   I answered.

17   Q.  Well, I'm just asking you about the way you would do

18   business.  Are you telling the jury it was your understanding

19   it was okay to look at another company's confidential,

20   private information -- I'll stop the question there.  That

21   was okay?  That's even okay business practice?

22   A.  No, and I told the jury it's not.  And I told you on the

23   Phase 1-A that if they belonged to Mattel, I didn't want to

24   have anything to do with it.

25   Q.  Okay.  So you just told the jury it's not okay.  And my

Unsigned                                    Page  6098

1    question is simple.  You knew in September 2000 that you

2    should not be looking at a competitor's confidential

3    information; right?

4    A.  I shouldn't be looking at -- I guess you can say that,

5    yes.

6    Q.  And you told us that if you knew that that was Mattel's

7    property, their confidential information, you wouldn't have

8    looked at it; right?

9    A.  I didn't say that.  I said that -- I said -- you're

10   asking me to speculate what would I have done.  And I said to

11   you and I said to this jury that if I believed those belonged

12   to Mattel, I wanted nothing to do with it.

13   Q.  And you say that because you know it would have been

14   wrong for you to build a business based upon Mattel's

15   proprietary confidential information.  You know that, don't

16   you?

17   A.  It is wrong -- I don't understand your question.  You

18   said it wouldn't be wrong?

19   Q.  It would be wrong.

20   A.  To do what?

21   Q.  It would be wrong to create a business based upon

22   Mattel's confidential proprietary information; right?

23   A.  Yes.

24   Q.  It would be wrong for you to profit a penny by using

25   Mattel's proprietary confidential information.

1       You understand that?

2    A.  Yes.

3    Q.  Now, you said that these drawings, this Mattel

4    confidential information inspired you.

5       Do you recall saying that?

6    A.  I said those drawings were the inspiration for what

7    became the Bratz dolls, which MGA created through many, many

8    changes and many employees.

9    Q.  Well, you know --

10   A.  And a lot of investment.  Over seven years.

11   Q.  You also know, sir, that you shouldn't be inspired to

12   act by looking at a competitor's private confidential

13   information.  You know that, don't you?

14   A.  Yes.

15   Q.  So let's talk about how you were inspired to act based

16   upon this Mattel information.  Within a couple of weeks you

17   had decided you are going to spend millions to make Bratz

18   into a brand.

19       Do you recall that?

20   A.  Yes.

21   Q.  And if you look at Exhibit 16788.

22       And that's already admitted, your Honor, if we can

23   put that up.

24   A.  Go ahead.

25   Q.  And this is September 13th, not even two weeks after

1    Mr. Bryant has shown you his drawings and his concept for

2    this doll; correct?

3    A.  That's correct.

4    Q.  And by this time, September 13th, you don't have a doll,

5    do you?

6    A.  We don't.

7    Q.  You don't have sculpts; right?

8    A.  No, we don't.

9    Q.  You -- no one's come and done any face painting as far

10   as you know; correct?

11   A.  That's correct.

12   Q.  All you have looked at is Mattel's proprietary

13   confidential information concerning Mr. Bryant's designs and

14   ideas; correct?

15   A.  Yes.

16   Q.  And having looked just at that, you are writing an

17   e-mail to Ms. O'Connor saying we're going to risk and spend

18   millions making this brand and line happen.

19        You see that?

20   A.  Yes.

21   Q.  Now, in the toy business, making a brand is sort of the

22   Holy Grail, isn't it?

23   A.  I apologize.  I don't know that.

24   Q.  Creating a brand is the way to really be able to make

25   high profits; correct?

1    A.  Making a brand is building a brand from the ground up,

2    and that's what MGA did.

3    Q.  You heard Ms. Pembleton, you heard her testify about how

4    MGA had created this Bratz brand.

5        Do you recall that?

6    A.  Yes, and we did.

7    Q.  And you create the brand, and you can put the name on

8    things like flip-flops because it's associated with the

9    brand, and that will help sell it; correct?

10   A.  I don't understand your question.  Please repeat.

11   Q.  Well, creating a brand, a brand is something valuable;

12   right?

13   A.  Yes, it is.

14   Q.  And having seen just Mattel's confidential information

15   about Bratz and about those designs, you had decided a few

16   weeks later you were going to try to make Bratz into a brand;

17   correct?

18   A.  Yes, and I said maybe it does, maybe it doesn't.  We

19   have made the brand, and not him.  And that's a fact.  And

20   that's what I said on September 13th, 2000.

21   Q.  You would agree that it would be wrong for you to try to

22   make a profitable brand if the inspiration for that is

23   looking at Mattel's confidential information and designs.

24   You'll agree with that; right?

25   A.  Yes, if we knew that at that time that those drawings

1    were from Mattel, that would be correct.

2    Q.   And by the way, how long had you been in the toy

3    business as of September 2000?

4    A.   About 13 years.

5    Q.   So in that 13 years' time frame, prior to seeing Carter

6    Bryant's drawings, Mattel confidential information, had you

7    spent millions trying to make a brand?

8    A.   Make it what kind of brand?

9    Q.   A brand, like Bratz or Hippity-hoppity Baby or anything

10   like that.  Had you taken a fashion doll, for example, and

11   tried to make a brand in those 13 years prior to meeting

12   Mr. Bryant?

13        MR. NOLAN:  Your Honor, with the lead-in, I think

14   it's compound.

15        THE COURT:  Sustained.

16   Q.   BY MR. PRICE:  Let me rephrase.

17        THE COURT:  Rephrase, Counsel.

18   Q.   BY MR. PRICE:  In those 13 years that you were in the

19   toy business prior to seeing Mattel's confidential

20   information, had you spent millions or done anything to try

21   to make a brand of a fashion doll?

22   A.   No.

23   Q.   In that time frame, had you spent millions to try to

24   make a brand of Hoppity Bouncy Baby?

25   A.   Yes.

1    Q.  And so let's talk about that.  So for Hoppity Bouncy

2    Baby and making that a brand, you want to make it a name so

3    you can sell accessories, so you can license, things like

4    that?

5    A.  When you launch a brand, you hope that you spend the

6    money and take a lot of risk to do that.  Sometimes it

7    happens; sometimes it doesn't happen.

8    Q.  And it hadn't happened prior to meeting Mr. Bryant;

9    correct?

10   A.  Prior to --

11   Q.  September of 2000.  You hadn't successfully made a brand

12   with the people who worked at MGA; right?

13   A.  That's not true.

14   Q.  Well, for example, we've seen some licensed products

15   here with Bratz on it like helmets and things like that.

16       Prior to Bratz, a licensed product is where someone

17   else wants to have permission to use your brand; right?

18   A.  That's correct.

19   Q.  Where it's so valuable, others are saying we will pay

20   you for the right to, for example, put Bratz on a pillow or

21   on a bicycle helmet; correct?

22   A.  Yes.

23   Q.  And that's --

24   A.  Because we build the brand.

25   Q.  Pardon?

1    A.   Because MGA built the brand, seven years.

2    Q.   And that's a very valuable thing to be able to do, to be

3    able to license your brand that you built; correct?

4    A.   I think it's very valuable first to build the brand with

5    all the hard work of MGA employees and the investment we made

6    and then license it, yes.

7    Q.   And prior to meeting Mr. Bryant, prior to Bratz, MGA had

8    not developed a single item that it was able to license;

9    correct?

10   A.   That's not correct.

11   Q.   You had licensed items prior to that?

12   A.   Yes, we had.

13   Q.   Okay.  Sir, if you'll look at in your binder there, at

14   Exhibit 630.

15   A.   Go ahead.

16   Q.   Have you found it?

17   A.   Yes.

18   Q.   And you see this is an e-mail string.  The last one is

19   dated June 30, 2003, from Isaac Larian.

20        You see that?

21   A.   I do.

22        MR. PRICE:  Your Honor, move Exhibit 630 into

23   evidence.

24        MR. NOLAN:  No objection.

25        THE COURT:  It's admitted.

1          (Exhibit 630 received.)

2      Q.   BY MR. PRICE:  If we could just blow this up.  Do you

3      see this is an e-mail where someone from License Europe

4      Magazine has asked questions, and then answers are being

5      supplied by MGA.

6          Do you see that?

7      A.   Yes.

8      Q.   And then you are sending it to yourself where it says

9      below?

10     A.   I'm sending it to myself?

11     Q.   Isaac Larian to Isaac Larian and Bonnie Blume?

12     A.   Yes.

13     Q.   And what you did is you wrote answers to this

14     gentleman's questions.

15         Do you see that?

16     A.   I can't tell you one way or -- yes, it looks like it,

17     yes, that's correct.

18     Q.   And let's go to the second page.  And one of the

19     questions you were asked is had you been a licensor before?

20         You see that?

21     A.   Yes.

22     Q.   And a licensor is where again, you have the rights to

23     something that you built with your people, and you are giving

24     someone else, the licensee, the right to do that?

25     A.   That's correct.

1    Q.    And the answer you wrote is no.  This is the first time.

2    But we have been a licensee many times; correct?  That's what

3    you wrote.

4    A.    I did.

5    Q.    And what a licensee means is that you go to someone

6    else, say, Marvel Comics, and say can I put Spiderman on my

7    stuff; right?

8    A.    Right.

9    Q.    And so getting back, then, to your September 13th

10    e-mail, which is Exhibit 16788.  Now, when you wrote that

11    e-mail saying that we're going to make this brand happen and

12    spend millions on it, at that time are you aware of any

13    e-mails or anything saying we're going to do that, but we're

14    going to make sure the dolls don't look like the confidential

15    information Carter Bryant gave us that's inspiring us to

16    create the line?

17    A.    The answer to your question, if I'm aware of an e-mail

18    like that, is no.

19    Q.    Or even a discussion as of September 13th, when you're

20    talking about risking malls to make Carter Bryant's line

21    happen.  Any discussion saying we don't like those drawings.

22    We want the dolls to look different.

23    A.    No, because we didn't have a contract as of September

24    13th.

25    Q.    Well, let's look, then, before then, actually, on

1    September 8th, based just on the confidential information you

2    have, you are talking within MGA about selling accessories to

3    those dolls; correct?

4    A.  I don't recall.  Do you have something?

5    Q.  Sure.  If you look at Exhibit 1319.

6    A.  Go ahead.  I have it.

7    Q.  And you recognize that as an e-mail that you sent to

8    Paula Garcia and Carter Bryant on September 8th of 2001?

9    A.  Yes, I think before it says --

10    Q.  I'm going to correct that.

11    A.  You did it on purpose?

12    Q.  I'm going to correct that.  Is that something you said

13    on September 8th of 2001?

14    A.  I did, a year after.

15    Q.  But let's look at what you said.  On September 8th of

16    2001.

17        By the way, I move 1319 into evidence.

18        MR. NOLAN:  The one dated 2001, no objection.

19        THE COURT:  Very well.

20        (Exhibit 1319 received.)

21    Q.  BY MR. PRICE:  Now, look here, sir.  You're talking

22    about brands, Barbie, Amazon brands, Barbie.

23        Do you see that?

24    A.  I do.

25    Q.  Part of branding is you want to sell accessories to the

1    dolls; correct?

2    A.  That's correct.

3    Q.  And you had seen prior to September 2000, that's what

4    Barbie had done with its brand; correct?  It sold

5    accessories?

6    A.  Yes.

7    Q.  And so having -- seeing the confidential information

8    that Mr. Bryant gave you about Bratz -- ultra trendy, hip,

9    et cetera -- you decided to make a brand; right?

10   A.  We decided to license that drawing from Carter Bryant

11   and then come up with Bratz dolls.  That's what we decided to

12   do.  And then later on make a brand.

13   Q.  But by making a brand, even when you were talking about

14   it in that prior e-mail, you're talking about creating a line

15   of accessories and licensing and all of that; correct?

16   A.  That's part of building a brand.

17   Q.  That's part of creating a brand; right?

18   A.  That's correct.

19   Q.  And so you had that in mind less than two weeks after

20   seeing Mattel's confidential information, that you were going

21   to make Bratz a line with accessories where you would license

22   the Bratz products; correct?

23       MR. NOLAN:  Objection, your Honor.

24   Mischaracterizes the testimony.  Lack of foundation.

25       THE COURT:  I don't think he's -- Counsel, are you

Unsigned                                    Page  6109

1     referring to the document?

2          MR. PRICE:  No.

3          THE COURT:  I didn't think so.  Why don't we take

4     that document off.  He's not referring to the document,

5     Counsel.

6          MR. NOLAN:  Thank you, your Honor.

7          THE COURT:  Very well.

8     Q.   BY MR. PRICE:  As of September 2000, as we discussed

9     when you said we're going to pursue a Bratz line after seeing

10    Mattel's confidential information, when you had Bratz' line

11    in mind, you thought of something with accessories, something

12    we were going to license Bratz; correct?

13    A.   No.  At that time we were thinking about if we license

14    this drawing, it can be manufactured.  So A can be

15    manufactured to a doll, B, request we make it to a brand.

16    And this was just going to give you -- Carter Bryant brought

17    to us some seeds.  And he said that he owns.  MGA bought the

18    land.  MGA hired employees --

19          MR. PRICE:  Your Honor, move to strike as

20    nonresponsive.

21          THE COURT:  The question is -- next question,

22    Counsel.

23    Q.   BY MR. PRICE:  You knew those were Mattel's drawings and

24    confidential information at the time Mr. Bryant gave them to

25    you; right?

1   A.  No.

2   Q.  You understand the jury has found that you knowingly

3   assisted Mr. Bryant in breaching his fiduciary duty of

4   confidentiality; correct?

5   A.  Yes, that's what the jury has found.  I respect the

6   jury's decision.

7   Q.  My question, though, is this:  When you think of brand,

8   when you thought of that in 2000, I think you told us a brand

9   means you're going to have accessories and try to get

10   licensees; correct?

11   A.  No.  What I told you is that's part of building a brand.

12   Q.  Okay.  So in September of 2000, when you said you were

13   going to try to build the brand, what you had in mind was

14   inspired or based on Mr. Bryant's confidential information,

15   was to build a brand which had accessories and licensees;

16   correct?

17   A.  No.

18   Q.  Well, let's look at September 2001, then, where we have

19   this e-mail Exhibit 1319.  And you see, you say don't Bratz

20   need their own house and hotel and clubs to hang out in?

21      You see that?

22   A.  Yes.

23   Q.  Now, those are accessories; right?

24   A.  That's correct.

25   Q.  And you say look at what are the three top sellers for

Unsigned

1    Barbie; correct?

2    A.   Yes, on public, on Amazon dot com.

3    Q.   So you're telling your people for ideas, let's look in

4    the public for nonconfidential information; correct?

5    A.   That's correct.

6    Q.   And let's look at what Barbie's done; correct?

7    A.   Yes.

8    Q.   Okay to do that, to use public information; right?

9    A.   I believe it is.

10   Q.   Okay.  And then you attached here, if we can go to the

11   next page, things such as Barbie Jam 'n Glam tour bus?  You

12   saw that?

13   A.   Looks like I just attached the link to the Amazon dot

14   com, where they had all of these products in it.  And I sent

15   it to Paula and other people.

16   Q.   By the way, did Bratz end up doing a bus at some point

17   as one of the accessories?

18   A.   We did.

19   Q.   And the next page, it has a grand hotel is a super

20   gymnast Barbie doll?

21   A.   Yes.

22   Q.   And Bratz ended up doing at some point a gymnast Bratz;

23   right?

24   A.   We did.

25   Q.   And if we go to the next page, it's got like a rock and

1    roll radio house and further on down, it's got Harley

2    Davidson.  Various types of accessories that Barbie was using

3    for its brand; correct?

4    A.  I'm sorry.  I don't understand your question.

5    Q.  This lists various accessories that Barbie was using for

6    its brand; correct?

7    A.  Which was displayed on Amazon dot com.

8    Q.  And part of branding is to try to sell accessories

9    associated with the core of your brand; correct?

10   A.  That's one of the things, yes.  That's one of the

11   things.

12   Q.  And so your idea was I've got the Bratz doll now.  Part

13   of branding is then to make money by selling accessories;

14   correct?

15   A.  2001, you mean; right?  Not 23001.

16   Q.  Let's say 2001.

17   A.  No, let's not say 2001.  If was 2001.

18   Q.  That's my question.  2001.

19   A.  Right.

20   Q.  Although that's what you're going to do with the brand

21   when you think of it in 2000.  That's what you hope to

22   accomplish; right?

23   A.  You hope to launch first the dolls to make sure they do

24   well and then build something around it.  That's what you

25   hope to do every time you get in the toy business.  And you

1    do hundreds of ideas.  One of them takes off.  99 of them

2    doesn't.

3    Q.  Getting back to 2000, before you ever had a doll, before

4    you ever had a doll, you hired Veronica Marlow to do

5    fashions; right?

6    A.  I'm sorry.  Before 2000 we did have a doll.  We did not

7    have a fashion doll.

8    Q.  Let me be clear.  September, October 2000, before you

9    had a doll, when all you had was the confidential information

10   for Mattel, you hired Veronica Marlow to do fashions; right?

11   A.  We hired Veronica Marlow, yes, to do some of the

12   fashions, yes.

13   Q.  And before you had --

14   A.  You're talking about Bratz; right?  You're not talking

15   about any doll.

16   Q.  I'm talking about Bratz.

17   A.  Right.

18   Q.  So in October -- September, October 2000, again, you

19   didn't have a Bratz doll, when all you had to inspire you was

20   Mattel's confidential information.  You hired Margaret Lahey

21   to do a sculpt; correct?

22   A.  Yes, we did.

23   Q.  And by the way, if you want to make the doll, even if

24   you want to make it look exactly like a drawing, to do that,

25   if you want to make it look like it to the millimeter, you've

1    got to have someone sculpt it; right?

2    A.  Yes.

3    Q.  And you've got to make a mould of some sort; right?

4    A.  Yes.

5    Q.  And you've got to do face painting?

6    A.  Right.

7    Q.  There are various processes you always have to go

8    through in going from a drawing to a doll; correct?

9    A.  The dolls are just inspiration.  Whether it's Bratz or

10   another product, the drawings are just the basis, the

11   inspiration for making the product.  Usually products come

12   out to be a lot different than the drawings.  You cannot just

13   manufacture those drawings.

14   Q.  My question is different.  If you want to go from a

15   drawing to a doll, even if you want to do it identically, you

16   have to go through steps of making a sculpt, making a mould,

17   doing face painting, et cetera; right?  You have to do that

18   every time.

19   A.  Yes, you do.

20   Q.  And so getting back to, then, what you were doing after

21   seeing this confidential information, in addition you hired

22   Mercedeh Ward and Rachel Harris --

23   A.  Yes.

24   Q.  Both worked for Mattel for many years; correct?

25   A.  Rachel Harris, to the best of my knowledge, Rachel

1    Harris didn't work for Mattel.  I didn't know.

2    Q.  Let me ask you about Mercedeh Ward.  You put her in

3    charge of interacting with Hong Kong with respect to the

4    manufacture of the Bratz doll; correct?

5    A.  Yes.

6    Q.  And when you hired her, you told her that you had no one

7    at MGA capable of completing the Bratz doll, and that's why

8    you wanted to hire her.

9    A.  She was one of the people we needed to make the Bratz

10   dolls, yes.  She was instrumental.

11   Q.  And so you hired her, again, in October of 2000, when

12   all you had to, I'll use your words, inspire you, was the

13   confidential information and designs that Mr. Bryant had

14   given you; correct?

15   A.  We had -- all we had at that time were the drawings that

16   became the inspiration for making the Bratz doll.

17   Q.  In fact, you hired Ms. Ward in September of 2000;

18   correct?

19   A.  I don't remember exactly when we hired her.  I don't

20   think that's correct.  But I don't know.  I don't remember

21   exactly when we hired her.

22   Q.  If you look at -- moving on as to what you did as a

23   result of seeing these drawings, if you look at

24   Exhibit 16789.  And that's way toward the back of your binder

25   here.

1          You see 15, 2000.  Now, as of this date, again, all

2     you have as your inspiration, as you put it, is this

3     confidential information that you received from Mr. Bryant;

4     correct?

5     A.  That's correct.

6     Q.  So based on that, on Mattel's property and ideas, you

7     are thinking of doing an entire new showroom for Bratz

8     products; correct?

9     A.  No, we had a new showroom.  We were going to get a new

10    showroom in New York because we were growing.  And she was

11    asking me where are we going to show it?  In the hallway?

12    And I said no, in the new showroom.

13    Q.  And let's look here in the bottom e-mail, where it says

14    Isaac to Carter Bryant and Paula, importance, high.  Where

15    you're talking about you need to think different, think

16    fashion, you know, basically put 16 hours a day.  That was

17    the e-mail that started all this; correct?

18    A.  Yes.  It started that e-mail chain.

19    Q.  Started the e-mail chain.  And then Ms. O'Connor asked

20    you in response, "Where do you think this catwalk is going to

21    be?  In the hallway?  I love the idea, but we don't have the

22    space."

23          Do you see that?

24    A.  Yes.

25    Q.  And the idea, we're talking about Bratz.

1    A.  To show the Bratz line, right.

2    Q.  Yes.  And your response is a new showroom for the Bratz

3    line; correct?

4    A.  No.  We didn't have one showroom just for the Bratz

5    line.  We had one showroom that we showed all of our toys in.

6    And we moved to a bigger showroom.

7    Q.  If you'd look at exhibit -- by the way, this is -- all

8    of this here in this e-mail, we were telling these folks to

9    think accessories, think fashion, think commercial.  All of

10   this is to exploit that idea, the confidential idea that

11   belonged to Mattel that Mr. Bryant had given you in September

12   of 2000; right?

13   A.  It was just the idea when if we're going to make these

14   dolls, we need to design accessories.  We need to do a

15   commercial, have a showroom to show it.  That's what it was

16   saying.

17   Q.  Yes, but the idea that you're talking about exploiting

18   belonged to Mattel; right?

19   A.  I think this jury has found that those drawings belonged

20   to Mattel.

21   Q.  And you will agree that it would be wrong for MGA to

22   make any profits by exploiting an idea that belonged to

23   Mattel?

24        MR. NOLAN:  Your Honor, cumulative.  Asked and

25   answered.

1          THE COURT:  Sustained.

2     Q.  BY MR. PRICE:  And then based again just on Mattel's

3     property that you had seen, you were saying we're going do

4     start doing line extensions to Bratz; is that right?  In

5     October of 2000.

6     A.  October, I'm not sure if October 2000 or before.  Can

7     you show me a document?

8     Q.  Sure.  I'll put up 11276, which is already admitted.

9     And you say there's an e-mail that begins with October 15 of

10    2000.  Talking about brainstorming, about sports activity,

11    dolls, et cetera, and then the response to that is from Paula

12    Garcia Treantafelles, what about the line extension to Bratz?

13         Do you see that?

14    A.  Yes, I do.

15    Q.  And then your response, yes, all caps, everything;

16    correct?

17    A.  Everything means all product line.

18    Q.  Including Bratz?

19    A.  That's correct.

20    Q.  So in October 2000, you were getting together to try to

21    figure out how to do line extensions based upon Mattel's

22    property?

23    A.  Based on -- we were going to launch a line of Bratz

24    dolls inspired by Carter Bryant's drawings, and we were going

25    to launch accessories and other products to go with it.

1    Q.  Okay.  And you said based on Carter Bryant's drawings.

2    Inspired by Carter Bryant's drawings.  That's all you had at

3    the time, was Mattel's property to inspire you; right?

4        MR. NOLAN:  Objection, your Honor.  Compound, based

5    on, inspired --

6        MR. PRICE:  I'll rephrase.

7    Q.  Here you are in October 2000 talking about doing

8    extensions to the Bratz line.  What you're talking about is

9    doing extensions to a Bratz concept and idea that belonged to

10   Mattel.

11   A.  That's not correct.  The only thing that the jury has

12   found that belonged to Mattel are those drawings on a piece

13   of paper.

14   Q.  But you said that as of this date, all you had to

15   inspire you, all you had to create a line was the

16   confidential information that Carter Bryant gave you which

17   belonged to Mattel; correct?

18       MR. NOLAN:  Objection, your Honor.  Misstates his

19   testimony.  Also argumentative.

20       THE COURT:  Overruled.  You may answer.

21       THE WITNESS:  Can you repeat the question again,

22   please?

23   Q.  BY MR. PRICE:  As of October 2000, what was inspiring

24   this, and the only thing inspiring this, was the confidential

25   information, the design drawings you had seen which belonged

1   to Mattel?

2       MR. NOLAN:  Objection, your Honor.  Foundation as

3   to the -- and ambiguous.  October.  There are 31 days in

4   October.

5       THE COURT:  Fair enough.  Rephrase, Counsel.

6   Q.  BY MR. PRICE:  October 16, 2000.

7   A.  That's correct.

8   Q.  As of that date, the only thing that was inspiring this

9   business, this idea of a line extension, was that you had

10  seen confidential information that belonged to Mattel;

11  correct?

12  A.  I don't know as of October 16 if we had other things

13  besides just those drawings.  I don't recall.  I got to look

14  at papers to say that.

15  Q.  You understand that the jury found that Mr. Bryant came

16  up with the name Bratz while he was at Mattel.  You

17  understand that?

18  A.  I'm not sure if we found out about that or not.  I know

19  we bought the name of Bratz from someone named --

20      MR. PRICE:  Move to strike as nonresponsive.

21      THE COURT:  Sustained.  It's stricken.

22  Q.  BY MR. PRICE:  And in fact, a sculpt had been done by

23  mid-October 2000; correct?

24  A.  It's possible, yes.

25  Q.  And you understand that the jury found that Mr. Bryant

1    created that sculpt while he was at Mattel, along with

2    others?

3         Mr. Bryant by himself or jointly with others

4    created that sculpt --

5    A.  Excuse me.  I understood that the jury found that Carter

6    Bryant, along with other people, such as Margaret Leahy and

7    other people he worked with at MGA, came up with that sculpt.

8    That's what I understood that they found.

9    Q.  Okay.  Well, why don't you look at exhibit --

10   A.  I think the verdict says jointly.

11   Q.  If you'd look at Exhibit 11277.  That's admitted.  This

12   is October 31st.  As of October 31st, you didn't have a doll;

13   correct?

14   A.  We did not.

15   Q.  As of October 31st, what you had, again, to base your

16   business plans and projections on, were the designs of Carter

17   Bryant, which belonged to Mattel; correct?

18   A.  I believe by October 31st, 2000, we had more than just

19   those drawings.  Again, I think we had done at least some

20   preliminary sculpts that the jury found was done by Carter

21   Bryant jointly with MGA.  And some other things.

22   Q.  Well, certainly the jury knows what the jury meant to

23   do.  So let me ask you --

24        MR. NOLAN:  Objection, your Honor.  Motion to

25   strike.

Unsigned                                    Page  6122

1          THE COURT:  It's stricken.

2     Q.  BY MR. PRICE:  I'll ask you this:  As of October 31st,

3     before you had -- before you had a doll, you were projecting

4     25 million in sales; correct?

5     A.  I was.

6     Q.  The entire year before, all of your revenues over all of

7     your products for 2000 was about 70 million; right?

8     A.  I don't remember exactly.  But I think maybe more than

9     that.  But I don't recall exactly how much it was.

10    Q.  And that's the year in which overall you lost money;

11    correct?

12    A.  I'm sorry?

13    Q.  In 2000 overall you lost money.

14    A.  We ended up losing money at the end of 2000; that's

15    correct.

16    Q.  So you were projecting in October 2000 that Bratz would

17    be far and away for the next year the most successful product

18    you had ever launched; correct?

19    A.  That is not correct.  I have -- that's not correct.

20    Q.  You had never launched a product which had made

21    $25 million in revenue in one year.

22    A.  I don't know if we have or not.  But your statement

23    before is not correct.  If we look at other projections we

24    had done at that time, if there were other brands we thought

25    was going to do better than Bratz, that they never happened.

Unsigned                                    Page  6123

1    Q.  Well, let's talk about what happened next.  You had

2    meetings with a major customer set up in November of 2000;

3    right?

4    A.  I'm not sure if we had major meetings.  I think we do,

5    as I explained to you last time, what we call pretoy fair,

6    prepresentation.

7    Q.  That was to Kmart in November of 2000?

8    A.  Yes.

9    Q.  And one of the things you were trying to do is see

10   whether or not they were interested in dolls you were

11   planning to come out with; correct?

12   A.  Yes, that's one of the things.

13   Q.  All right.  And you sent someone to Kmart to see if they

14   would be interested in Bratz dolls; correct?

15   A.  Amongst other products that we had made.

16   Q.  And what you used to see whether or not Kmart would be

17   interested in buying Bratz dolls, what you used to do that

18   was Mattel's property.

19   A.  I don't recall exactly what we showed them.  I know that

20   we showed them boards because there was not a doll in

21   November 2000.  But I don't remember what was on those

22   boards.

23   Q.  Well, you recall the previous testimony.  I'm going to

24   show you Exhibits 1107 -- if we can show that -- 1108, 1109,

25   and 1110.

1          When you went to Kmart to try to get customers to

2     buy Bratz dolls, what they were shown, as has been previously

3     testified, were the boards of Carter Bryant's drawings, which

4     are Mattel's property; right?

5     A.   Again, I wasn't in that presentation.  I know that our

6     salespeople showed to Kmart drawings.  I cannot tell you one

7     way or another if they were Carter Bryant's drawings or other

8     drawings that were done afterward.  I cannot testify to that.

9     Q.   You do understand that MGA had no right to try to get

10    customer interest in Bratz dolls by showing customers

11    Mattel's property.  You know that.

12    A.   Know that as of when?

13    Q.   At the time it did it.  You know that MGA had no right

14    to solicit customer interest in Bratz dolls by going out and

15    showing customers Mattel's property.

16    A.   I think this jury came to that verdict.  I believed that

17    Carter Bryant had done those drawings in 1998, when he was

18    not working at Mattel, and that's what he had represented to

19    us.  So I did not in November 2000 believe that he was lying

20    to us basically.  And you settled with him.

21    Q.   So let's ask it this way.  Certainly you would agree

22    that it would be in appropriate for MGA to make any profits

23    by soliciting customer sales by using Mattel's confidential

24    property.  You would agree that would be inappropriate?

25    A.   Yes, if you know about it, yes.

1    Q.  And by the way, you've always known that what was shown

2    to Kmart was drawings or boards, not dolls; right?

3    A.  That's correct.

4    Q.  But when you made the presentation to Kmart, I assume

5    you're telling them this is what the dolls are going to look

6    like; right?

7    A.  As I said --

8         MR. NOLAN:  Objection, your Honor.  Lack of

9    foundation, ambiguous as to what he would say, and also best

10   evidence rule, what was presented to --

11        THE COURT:  Overruled.  It's a question.  You may

12   answer it.

13        THE WITNESS:  I was, as I testified before, I was

14   not in that presentation to Kmart.  Or any of those

15   customers.  So I don't know what our salespeople showed and

16   presented.  I know that we didn't have a doll.  And I know

17   that they showed them boards.  What was on those boards, they

18   were drawings.  Were they Carter Bryant's drawings?  Were

19   they other drawings?  I cannot tell you.  I don't know.

20   Q.  BY MR. PRICE:  I take it you would have expected that

21   your salespeople would have shown a customer drawings that

22   were to be representative of the dolls that the customer's

23   going to be asked to buy; right?

24   A.  I think they were shown to them drawings that were going

25   to become the inspiration for the dolls.

1          Your Honor?  I apologize.  But that lady back

2     there, she is making faces at me, and I don't think it's

3     appropriate.

4          THE COURT:  Very good.  Why don't we take a break

5     at this time, and I'll take that up during the break,

6     Mr. Larian.

7          (WHEREUPON THE JURY WITHDRAWS.)

8          THE COURT:  You may step down.

9          THE WITNESS:  That has been going on through the

10    trial, and I have not --

11         THE COURT:  Speak with your attorney.  Thank you,

12    Mr. Larian.

13         Mr. Nolan, I'd like to see you and your client,

14    Mr. Larian, along with Mr. Quinn and Ms. Martinez in

15    chambers.

16         (Hearing in chambers.)

17         THE COURT:  We're on the record outside the

18    presence of the jury.  Why don't you make your appearances of

19    who is here.

20         MR. QUINN:  John Quinn, Lily Martinez, who has been

21    Mattel's trial representative.

22         MR. NOLAN:  Tom Nolan and Isaac Larian.

23         THE COURT:  I understand very much that this is

24    a -- an important case to all sides.  And I understand it's

25    also a very emotional case because it not only goes -- it's

1    not just about dollars and cents, but it's about people's

2    sweat and ideas, and to a large extent, one's personality

3    becomes very much involved in one's ideas.

4        The individuals on both sides, or individuals on

5    both sides have shown emotion during this trial.

6    Ms. Martinez on numerous occasions has made facial reactions

7    to testimony, to statements during opening, statements during

8    close.

9        Mr. Larian, you and members of your family have

10    made reactions to statements made.  We're human.  That's

11    normal.  We can't -- we're not a bunch of computers.  The

12    jury is human.  It's a human system.  Perfect justice is not

13    of this world.  We all know that.

14        At the same time we do need to insist upon a

15    certain level of professionalism.

16        Ms. Martinez, you are representing not just

17    yourself and your own interest in this case, but you are

18    representing Mattel.  You are the face of Mattel.

19        And, Mr. Larian, of course, is not only

20    representing MGA, he very much is MGA.  And certainly he is

21    himself as a defendant.

22        My own experience has taught me, both as a trial

23    attorney and as a prosecutor and as a judge, that the

24    punishment for making facial reactions and expressions is

25    built into the reactions themselves.  Jurors uniformly hate

1    it. They really feel uncomfortable when witnesses or

2    observers or participants make facial reactions. They react

3    very negatively to them. And I suspect Mr. Nolan and

4    Mr. Quinn, who have more years of trial experience than I do,

5    can corroborate that based just on their own interaction with

6    jurors.

7        So I say this to both of you and both your teams,

8    for the sake of professionalism and decorum in the courtroom,

9    let's knock it off. But also be mindful of the fact that you

10    are your own worst enemy when you do it.

11        So I'm going to leave it at that. I'm not going to

12    say anything further. And I'll just expect, you know, we're

13    in a different phase of the trial now. Certain findings have

14    been made which make it all the more difficult not to be

15    emotional one way or another on both sides. It's tough on

16    the lawyers, and they are even held by the Court to a higher

17    standard than you as ordinary citizens are.

18        So I know it's difficult. But we've got less than

19    two weeks left, and we have to bear with this process and do

20    the best we can.

21        Is there anything further from either counsel?

22    MR. QUINN: Not from me.

23    THE COURT: Mr. Larian?

24    MR. LARIAN: Your Honor, I have tried to keep a

25    very -- it's very emotional for me, keep a poker face. My

1    family members sitting in the back, of course, they are very

2    concerned and worried.  I don't know if they were, and I'm

3    going to talk to them about this.  In regards to Lily

4    Martinez, during the first phase of this trial, I told

5    Mr. Quinn about this personally.  And Mr. Quinn says, "I

6    appreciate you telling me that.  I will talk to her and make

7    sure it doesn't happen again."  And it happened again.

8          And also now today, frankly, I saw members of

9    Mr. Quinn's law firm in the back making faces.  And I don't

10   think that's appropriate.  That's the only thing I would say.

11   Lawyers who work for Mr. Quinn.

12         THE COURT:  It's not appropriate.  I don't disagree

13   with you.  It's not appropriate.  Like I say, the punishment

14   is somewhat built in.  A -- the jury doesn't think it's

15   appropriate either.  And I certainly don't think it's

16   appropriate.  But it's something which -- what I'm trying to

17   balance here is natural human reaction versus maintaining

18   professional decorum.  I didn't see the particular incident,

19   but I am not -- I've seen other reactions.  And I trust I

20   have nothing further -- I won't have to have another

21   conversation like this.

22         Ms. Martinez?

23         MS. MARTINEZ:  Your Honor, I would like to say that

24   I am appalled that he would insinuate that I'm looking at

25   him.  He's talking.  I am looking at him.  It is not my fault

1    he feels uncomfortable by me looking at him.  I don't think I

2    am giving him a specific look or looks.  I am looking at him.

3    And it is very emotional because you know, he gets to sit

4    there and talk, oh, all this about, you know, MGA this.

5         You know, I'm representing my company, and all the

6    hard work of my employees, too.  And because we are a huge

7    corporation, you don't get to see that because it's not

8    family owned.  But it is -- we are a family.  And so I -- if

9    he feels uncomfortable by me looking at him, then I don't

10   know what to tell you.  But I cannot look -- I'm listening to

11   him.  I'm being alert as to what he's saying.

12        THE COURT:  Ms. Martinez, you certainly are

13   entitled to look at him.  There's nothing wrong with that.  I

14   have, however, seen the faces that Mr. Larian is referring

15   to.  I have seen you react in a very facially expressive way.

16   You are a very expressive person, which I suppose is not

17   surprising.  You're an artist.  So that's not inconsistent

18   with your personality.

19        But a trial is a time that one must try to express

20   a more stoic expression, and I say this to you at this time

21   for your respective own good.  Because I can assure you a

22   jury finds that distasteful.  And if you cannot sit there and

23   be stoic in your expression, then perhaps you, Mr. Quinn,

24   Mr. Eckert, might want to consider having someone else.

25        Mr. Eckert has sat in ever since he testified, and

1    maybe it's more the nature of a CEO than a designer or an

2    artist, but he's been very stoic, and that is the demeanor

3    that is called for in a courtroom.  And I must insist upon

4    this.

5         MS. MARTINEZ:  I agree.

6         THE COURT:  So, Counsel, I will leave it to you to

7    appropriately instruct your team and everyone associated with

8    your team and your side.  You have the Court's understanding,

9    but it's the Court's tolerance only up to a point.

10        MR. QUINN:  Understood, your Honor.

11        THE COURT:  Very good.

12        (In chambers conference concluded.)

13        (Recess taken.)

14        (WHEREUPON THE JURY ENTERS.)

15        MR. NOLAN:  Your Honor, could we have a quick

16   sidebar?

17        THE COURT:  Very well.

18        (SIDEBAR CONFERENCE HELD.)

19        THE COURT:  Yes, sir.

20        MR. NOLAN:  Your Honor, I wanted to take a moment

21   and explain an objection that I made which has been repeated

22   over and over, and that is a constant use of "the jury has

23   found confidential information belonging to Mattel."  In

24   truth, your Honor, we believe that, looking back at the

25   summary judgment rulings, that the jury was asked to find

1   with respect to the designs that they were inventions, not

2   confidential information, that it could be proprietary.

3        THE COURT:  Proprietary.

4        MR. NOLAN:  And that has a significant difference,

5   because it only has value if disclosed outside -- I mean,

6   it's a nuance in the contracts and everything else, but

7   that's the basis for the objection.  And I didn't want to

8   make a speaking one, obviously, but this repeat of the

9   reference to confidential information is not in the jury

10  instructions, at least a quick look.  That was not part of

11  the elements that they were making a determination.  It was

12  more a timing of an invention during that period of time of

13  his employment.

14       MR. PRICE:  In the jury instructions, on the breach

15  of fiduciary duty, they were referring the jury to breach of

16  the confidentiality provision and the contract.

17       THE COURT:  And there has been a finding that he

18  breached the confidentiality, but you're referring to the

19  drawings as being confidential information.  It is true and

20  accurate to say that they are proprietary information, but

21  Mr. Nolan has a point that they may not be confidential in

22  the sense that --

23       MR. PRICE:  I'm saying the drawings and the idea

24  for Bratz, his discussion of the Bratz dolls, the name Bratz.

25       THE COURT:  Those might be --

1          MS. AGUIAR:  Can I take a stab at actually sort of

2    setting this out?  There's two different provisions in the

3    contract; right?  There's one --

4          THE COURT:  I'm painfully aware of that.

5          MS. AGUIAR:  But I'm saying one is proprietary.

6    And proprietary, I believe Mr. Price is using proprietary and

7    confidential almost synonymously.  So I was just wanting to

8    go back to what your Honor said about well, maybe it's

9    proprietary, but it's not confidential.  I actually disagree.

10   And I think that your Honor has held in your summary judgment

11   decision --

12         THE COURT:  The value of the proprietary

13   information depends on it remaining confidential.

14         MS. AGUIAR:  Right.  So, for example, the value of

15   the proprietary information, as we see from the definition

16   here and as you pointed out in your second summary judgment

17   ruling, for example, a customer list or trade secrets, it

18   remains private and confidential.  Therefore, it has value.

19   These drawings are almost the opposite.  These drawings have

20   value by remaining not confidential.  The only value in these

21   drawings is if someone actually --

22         THE COURT:  That's not the case at all.  If a

23   company comes up with drawings that they have not

24   manufactured, no, that's not even the case at all.  That's

25   not even close to the case.

Unsigned                                      Page  6134

1          A company's drawings -- think about any company

2     that has drawings.  We've almost got to think

3     counterfactually here.  Imagine -- not counterfactually.  We

4     know these drawings were now done, according to the jury,

5     while he was working for -- Carter Bryant was working for

6     Mattel.  Mattel has every right to expect that until and

7     unless it publishes in the public its drawings or its dolls,

8     that anything that is drawn, all the designs, formula,

9     patterns, et cetera, are kept confidential.

10          MS. AGUIAR:  But what you just read from, designs,

11    et cetera, that --

12          THE COURT:  I read from up here in proprietary

13    information.

14          MS. AGUIAR:  It says formula, pattern, compilation,

15    device, method, technique, or process.  And, your Honor, you

16    made a distinction in your summary judgment ruling, and you

17    found that the drawings were a design under the definition of

18    invention.  So in your first ruling --

19          THE COURT:  That does not exclude them from being

20    part of the proprietary information.  I can't think of

21    anything more proprietary to a company than design drawings.

22    I can't think of anything being more important to a toy

23    company than their design drawings.

24          If MGA had some design drawings and they had a

25    similar confidentiality agreement and someone from Mattel

1    broke in, stole them, and started passing them around at toy

2    fairs, would that not be a violation of proprietary and

3    confidential information?  And the list here, proprietary

4    information means any information that derives independent

5    economic value from being not generally known to the public.

6        That's clearly design drawings that have not yet

7    been turned into a product and published certainly derive

8    their value from being -- they are trade secrets.  They are

9    designs of Mattel.

10       MR. NOLAN:  Your Honor, I would just add that

11   this --

12       THE COURT:  I understand you don't like the phrase,

13   but I think given the findings, it's -- and I, you know,

14   could debate whether it's effective to keep saying it over

15   and over again or counterproductive.

16       MR. NOLAN:  I've already talked about that with my

17   team.  Because the jury -- I agree.  I may have taught the

18   same trial advocacy class.  My only point --

19       THE COURT:  Not to in any way impugn upon

20   Mr. Price's outstanding litigation skills.

21       MR. NOLAN:  No, no.  My point is by using this

22   definition of confidentiality, I know the Court has ruled

23   that we're not allowed to show that Mattel would not have

24   given an economic value to these drawings.  They wouldn't

25   have designed them.  That's sort of the testimony that has

1    been brought up.  And all of that.  And I just want to

2    consider coming back and making a pitch to you.  You may not.

3    And I'm not going to take up any more time on this.

4          THE COURT:  We have a jury waiting for us.

5          MR. NOLAN:  I know.  But that's --

6          THE COURT:  The objection in terms of him using

7    that phrase is overruled.  You reserve your right to make

8    that pitch.

9          MR. NOLAN:  Thank you.

10         (CONCLUSION OF SIDEBAR CONFERENCE.)

11         THE COURT:  All right, Counsel.  You may proceed.

12   Q.  BY MR. PRICE:  Mr. Larian, we were talking about the

13   pitch to Kmart in November of 2000.  And to figure out where

14   we were, you'll agree that although you weren't there, you

15   knew that what was used at Kmart was some sort of boards, not

16   actual dolls; correct?

17   A.  That's correct.

18   Q.  But the way you characterized that, the way you

19   characterized it before this case, was that Kmart was shown

20   the Bratz dolls.

21   A.  I don't recall doing that.  We showed -- all I know is

22   that there were no dolls in 2000, all of 2000 there were no

23   dolls.

24   Q.  But the distinction you're making, that is, showing them

25   the drawings that they were based upon versus the dolls,

1    prior to this case, the way you characterized it was that by

2    showing Kmart those drawings, those Carter Bryant drawings,

3    you described that as being the Bratz dolls; right?

4    A.  I don't recall doing that.  There were no dolls in 2000.

5    Q.  If you look at Exhibit 12 --

6    A.  Exhibit?

7    Q.  Exhibit 12, which is in evidence.  And remember, this

8    was an affidavit you signed under penalty of perjury in your

9    lawsuit against Cityworld.

10        Do you recall that?

11   A.  Do I recall what?

12   Q.  Do you recall that you signed this affidavit under

13   penalty of perjury, the same oath you're taking today, in the

14   Cityworld case?

15   A.  Yes.

16   Q.  And if we turn to page 5, paragraph 13, what you said

17   then under penalty of perjury was the Bratz dolls were first

18   exhibited in the USA in November 2000.  They were further

19   exhibited in Hong Kong in January 2001.  And then they were

20   made available for retail in August 2001.

21        You recall that that's a statement you made under

22   oath?

23   A.  That's a statement.  And may I explain?

24   Q.  Well, actually, I'll ask you, is it true that --

25   A.  May I explain or not?

Unsigned                                              Page  6138

1    Q.   No, I get to ask questions.  Your attorney can ask you

2    questions.

3           It's true that in the first phase, what you told

4    the jury was that what you were referring to when you said

5    the Bratz dolls, that what you were referring to were the

6    drawing boards which had been presented to Kmart.

7    A.   I said they were boards, yes.

8    Q.   And those same drawing boards were presented not just to

9    Kmart, but later in the month, around mid-November, they were

10   also presented to Target, those same Carter Bryant drawings

11   owned by Mattel.

12   A.   It's possible.  I don't recall.  But it's very possible.

13   Q.   Well --

14   A.   But I'm not sure if they were those drawings or other

15   drawings.  Again, I was not in the presentation.  Any of

16   these presentations.  But I believe there were boards shown

17   with drawings.

18   Q.   If you look at Exhibit 12428.  This will refresh your

19   memory that there was a presentation to Target?

20   A.   Would you repeat the --

21   Q.   It's 12428.

22   A.   Are these in numerical order?

23   Q.   They are.  Sometimes four digits.  Sometimes there's

24   three.  Would you like to have someone up there helping

25   you --

1    A.  I got it.

2    Q.  That's an e-mail from you to Julie Hamilton, for the

3    Target file which attached meeting notes from the Target line

4    review November 14, 2000.

5         Do you see that?

6    A.  Yes, I do.

7         MR. PRICE:  Move Exhibit 12428 in, your Honor.

8         MR. NOLAN:  No objection.

9         THE COURT:  It's admitted.

10        (Exhibit 12428 received.)

11   Q.  BY MR. PRICE:  And if we look at the first page, you

12   see -- actually, let's go to the second page, Ken.

13        It says meeting notes from Target line review

14   November 14, 2000.  Do you see that?

15   A.  I do.

16   Q.  And down toward the bottom, in fact, the bottom bullet

17   point says:  "Bratz, Laura finally came to life when these

18   were shown."

19        Do you see that?

20   A.  Yes.

21   Q.  Do you know who Laura refers to?

22   A.  I have no idea.  This is note I think from Julie Choma

23   (phonetic), who is our salesperson.  And she was sending to

24   me, and I'm commenting back.

25   Q.  So as best as you know, in November of 2000, MGA was

1    going to prospective buyers and using Mattel's property to

2    try to get interest in a Bratz doll line; correct?

3    A.  Again, I am not sure as of November 14th, 2000, if we

4    were showing Carter Bryant's drawings or other drawings that

5    were done.  All I know, there were no dolls until 2001.

6    Q.  Let me call your attention, then, to there was something

7    called the Hong Kong toy fair.  Do you recall that?

8    A.  Yes.

9    Q.  And approximately when was that?

10   A.  It is usually in the first week of January.  Every year.

11   Q.  So that would have been in January 2001.  It would have

12   been a Hong Kong toy fair?

13   A.  That's correct.

14   Q.  And MGA had a showroom at that toy fair; correct?

15   A.  Yes, we have a showroom in there.

16   Q.  And I'm going to -- it's true, sir, that at that

17   showroom, you displayed both prototype Bratz dolls as well as

18   the Mattel drawings?

19   A.  I know that we had four prototypes that we had made.

20   That's what I remember.  I don't remember drawings.  There

21   could be drawings, but I don't remember that one way or

22   another.

23       MR. PRICE:  May I approach, your Honor?

24   Q.  I'd like to show you what's been marked as 911.  I'm

25   going to ask if you could look at the attachments.  Pages 2

1    through 4.

2        Do you see those?

3    A.  I do.

4    Q.  And do you see those -- in fact, if you look at the

5    first page, you'll see this is an e-mail from a Sarah Chui to

6    Paula Treantafelles and Victoria O'Connor, among others.

7        Do you see that?

8    A.  I do.

9    Q.  Now, you were actually at the Hong Kong toy fair;

10   correct?

11   A.  To the best of my recollection, I was.

12   Q.  And if you look at these pictures, these are pictures

13   that were taken at the Hong Kong toy fair; correct?

14   A.  I am not sure if they are or not.  It says Hong Kong

15   showroom set up.  So I assume.  But I don't recall that many

16   years back.  It's very possible.

17   Q.  And your recollection, this is kind of what your

18   showroom looked like there; right?

19   A.  Frankly, going back, what, seven, eight years, I don't

20   recall it.  I don't.  It's possible.  It's very possible.

21       MR. PRICE:  Your Honor, I move Exhibit 911 into

22   evidence.

23       MR. NOLAN:  No objection.

24       THE COURT:  It's admitted.

25       (Exhibit 911 received.)

1    Q.  BY MR. PRICE:  If we can put -- this is the cover page

2    which, subject, Hong Kong showroom setup.

3         Do you see that?

4    A.  Yes.

5    Q.  And let's go to the second page.  And we can blow this

6    up.  And you can see that what we have here is you have these

7    dolls; correct?

8    A.  Four dolls; that's correct.

9    Q.  And we have some large poster boards here.  You see

10   Cloe, Sasha, Yasmin, Sasha, and what's been called the hero

11   shot.

12        Do you see that?

13   A.  Yes.

14   Q.  And then at the bottom here, you see -- do you see this

15   photograph here?

16   A.  I do.

17   Q.  And that's one of the Carter Bryant Mattel drawings;

18   correct?

19   A.  I cannot make --

20        MR. NOLAN:  Your Honor, objection to the

21   mischaracterization.  Joint and solely.

22        THE COURT:  Yes.  Counsel, rephrase.

23        MR. PRICE:  Let's blow this up.

24   Q.  Do you see this drawing here?

25   A.  It's very difficult.

1   Q.  Well, let's see if we can refresh your memory, if we can

2   put up 11 -- you see this is Cloe?

3   A.  I'm sorry.  I had eye surgery, but I can't see that.

4       THE COURT:  It is hard to see from this angle,

5   Counsel.

6   Q.  BY MR. PRICE:  How about over here?  You see this

7   drawing?

8   A.  Yes.

9   Q.  You recognize that as the Jade drawing, which the jury

10  has found Carter Bryant -- was done while Carter Bryant was

11  at Mattel?

12  A.  It's very possible.  Again, very fuzzy picture.  It's

13  very possible.

14  Q.  You can see it in front of you on the screen?

15  A.  I can.  But again, it's very difficult to see.  But I

16  don't doubt if it is or not.

17  Q.  Okay.  Well, let's step back and see.  Perhaps we can

18  see over here.  Do you recognize this as the Sasha drawing

19  here?

20  A.  Again, I'm not trying to be difficult.  But those

21  pictures are very difficult for me to recognize.  It's

22  possible.

23  Q.  As far as you know, however, the Hong Kong toy fair,

24  when you first showed prototypes of the Bratz dolls, you also

25  displayed the drawings which Carter Bryant had done while he

1    was at Mattel?

2    A.  It is very possible.

3    Q.  And by the way, these dolls that were displayed in the

4    Hong Kong toy fair, I think you previously testified that

5    they didn't look like the dolls that went to market.

6         Do you recall that?

7    A.  I'm sorry?

8    Q.  You previously testified these dolls you showed at the

9    Hong Kong toy fair did not look like the dolls that went to

10   market.

11   A.  I think we made a lot of changes, yes.  We made changes

12   all the way to May, but I cannot make anything out of those

13   pictures.

14   Q.  Well, let's look, if you could, at Exhibit 912-B, which

15   is already in evidence.  And the testimony, sir, is that

16   these were the Hong Kong toy fair dolls that were displayed.

17   Look at the first page.

18   A.  Yes.

19   Q.  This is the Cloe doll, which was displayed at the time

20   at the Hong Kong toy fair when you were also displaying the

21   drawing Carter Bryant did while at Mattel; correct?

22   A.  It's very possible.

23   Q.  And if you look a few pages in, say, page -- these do

24   not have page numbers.  So it's Bates 45955.

25   A.  Yes.

1    Q.  Actually, let's look at 912B-14.

2    A.  What Bates number, sir?

3    Q.  It's 912B-14.  And you see this was the Jade doll which

4    was done at the Hong Kong toy fair?

5    A.  Can you tell me the Bates page on this Exhibit.

6    Q.  912B-14.  Bates number 45956.  This is the Jade doll

7    that was presented at the Hong Kong toy fair; correct?

8    A.  I don't recall exactly.  But that's what the front page

9    of this exhibit says.

10   Q.  And if we look at 912B-18.

11   A.  912B- -- can you just refer me to the Bates number?

12   Q.  Sure.  This was the Sasha doll shown to the Hong Kong

13   toy fair.

14   A.  Yes, I believe so.  Not the doll, just the prototype.

15   Q.  The prototype.  And then the 912B-24.

16   A.  I'm sorry.  Give me Bates --

17   Q.  This is the last page.  Do you recognize this as Yasmin?

18   A.  Again, this looks like a prototype that most likely we

19   were showing Hong Kong.

20   Q.  If I could, sir, I'd like to show you and ask you some

21   questions.  There are some exhibits which are in evidence

22   which I would like you to look at and compare.  And these

23   are -- the first are Cloe.  It's Exhibit 2-3, Exhibit 1109-B,

24   Exhibit 912 --

25   A.  I'm not going to be able to remember all of --

1    Q.  No, I'm going to put them up for you.  912-B, page 5,

2    and then the first generation Cloe doll, 13903.  See the far

3    left, this is what you were shown by Carter Bryant in

4    September of 2000; correct?

5    A.  Yes.

6    Q.  And to the right, this is another drawing which Carter

7    Bryant did while he was employed at Mattel; correct?

8    A.  Yes.

9    Q.  And on the right here, that is the prototype Cloe doll;

10   correct?

11   A.  Yes.

12   Q.  And the one on the far right is the first wave Cloe doll

13   that came out; right?

14   A.  I believe so, yes.

15   Q.  And now if we could do for Sasha, and we'll go through

16   the same type of exhibits.

17       You see the far left is the drawing which

18   Mr. Bryant showed you in September of 2000; right?

19   A.  Yes.

20   Q.  The one from the second from the defendant is another

21   drawing he did while still employed at Mattel; correct?

22   A.  Yes.

23   Q.  And the one third from the left is the prototype?

24   A.  Yes.

25   Q.  And the final one is the Sasha doll, the first wave that

1    came out in its box; correct?

2    A.  Looks like it, yes.

3    Q.  And if we can do Jade.

4         So here we have far left, the first drawing shown

5    to you by Mr. Bryant; correct?

6    A.  That's right.

7    Q.  Next one is another drawing Mr. Bryant did while

8    employed at Mattel; correct?

9    A.  Yes.

10   Q.  The one that others have testified was shown to Kmart in

11   November; correct?

12   A.  I don't know what they have testified to.

13   Q.  And the third from the left, that's the prototype;

14   correct?

15   A.  Looked like it, right.

16   Q.  And by the way, when you were at the Hong Kong toy fair

17   showing them Mr. Bryant's drawings and the dolls, the idea

18   was to show them, you know, what you're going to be coming

19   out with when the dolls hit the market; correct?

20   A.  We were showing them the prototypes, and those

21   prototypes changed.

22   Q.  Well, my question, sir, is you were trying to -- you

23   were showing them, saying this is substantially what we think

24   the doll is going to look like.

25   A.  We never used the word substantially or anything like

1    that.  We were showing everything we had.

2    Q.   Okay.  But was the idea to show them something that

3    would mislead them, that would look different than what you

4    were actually going to be trying to be selling them later?

5    Was that the idea?

6    A.   We were showing them four dolls and those drawings.  And

7    those dolls were not actually manufactured dolls.  They were

8    prototypes that were changed.  And I'd be happy to show the

9    jury what was shown.

10   Q.   Well, you got to admit the prototype for Jade and the

11   final doll for Jade look substantially similar, don't you

12   think?

13   A.   No, there are many differences.  May I approach and show

14   the differences, your Honor?

15   Q.   I'm not going ask the many differences.  I'm asking

16   about the overall look.  Do we agree that the Jade doll

17   prototype and the Jade doll that came out look substantially

18   similar?

19   A.   They have similarities, but there are many differences

20   that I'll be happy to approach and show the jury.

21   Q.   Well, when you showed the prototype, was your intent to

22   inform the buyers that you planned to come out with a doll

23   that looks kind of like the doll you're showing them?  Was

24   that your intent?

25   A.   Our intent was to show them that we're going to come out

1   with a line of fashion dolls.

2   Q.  You didn't show them a Barbie doll, did you?

3   A.  No, we did not.

4   Q.  Okay.  So the reason you showed them this doll is you

5   wanted to give the impression that's sort of what the doll is

6   going to look like when it comes out; right?

7   A.  No.

8   Q.  Okay.  Let's go now to Yasmin.

9   A.  Would you like me to approach and show the jury the

10   differences?

11   Q.  Your attorney can ask you questions.  I'm on a clock.

12        THE COURT:  Wait for the questions.

13   Q.  BY MR. PRICE:  And Yasmin, the one to the far left was

14   the drawing that Mr. Bryant gave you in September 2000;

15   correct?

16   A.  Yes.

17   Q.  And second from the left is the drawing which was done

18   by Mr. Bryant while at Mattel and testimony is shown at

19   Hong Kong; correct?

20   A.  Yes.

21   Q.  And then this one third over is the Yasmin doll

22   prototype; correct?

23   A.  Looks like the picture you showed me, yes.

24   Q.  And then on the far right, it's what actually hit the

25   market; correct?

1   A.  That's correct.

2   Q.  Now, it's true that when -- step back.

3        It's true that MGA did not want others selling

4   dolls that look substantially similar to Bratz?

5   A.  We didn't want infringement; that's correct.

6   Q.  And you would actually pay attention to, for example,

7   what was in the market to see whether or not, hey, this looks

8   like the Bratz dolls and should not be produced; correct?

9   A.  Yes.

10  Q.  And I can call your attention to -- I think it's in the

11  smaller binder.  There's an Exhibit 13561.

12        And this is one of those documents, your Honor,

13  which was in evidence, but the only part that will actually

14  go to the jury is what we bring up in front of the witness.

15        And I'd like you to look at 13561, pages 37, 38,

16  and 39.

17  A.  Can you repeat the pages, please?

18  Q.  37, 38, and 39.

19  A.  Not the Bates number, but the page number.

20  Q.  It will say at the bottom 13561, page 37, 38, and 39.

21        And if I may display those pages, your Honor.  And

22  this is an e-mail --

23  A.  Excuse me.  I'm not there.  I have to find that.  I'm

24  sorry.  13561?

25  Q.  13561, page 37, 38, and 39.  And you see this starts

1    with an e-mail from Mr. Black to you talking about a company

2    which produce Mini Trendy Teenz dolls, which I believe are

3    similar to Bratz.

4         Do you recall getting that e-mail?

5    A.  I don't recall it, but my name is on it.  So I must have

6    received it.

7    Q.  And he sent you copies of the boxes of those dolls.

8         Do you recall that?

9    A.  I do not.  I do not recall it one way or another.

10   Q.  Who is Ray Black?

11   A.  He's an attorney for MGA in the U.K.

12   Q.  And your response to this, if we can go to the next

13   page, page 37.  I'm sorry.  The response down here to

14   Mr. Black is, "Damn these people."

15        Do you see that?

16   A.  Yes, I do.

17   Q.  And actually, if we can go to 38, your signature line on

18   your e-mails by this time is Isaac Larian, CEO, MGA

19   Entertainment.  And then it has "Meet the girls with the

20   passion for fashion, www.BratzPack dot com.

21        Do you see that?

22   A.  As of 2003, yes.

23   Q.  So that's something that automatically went on your

24   e-mails from MGA when that went out?

25   A.  I believe so, yes.

1    Q.  Bratz was a pretty important part of the company?

2    A.  Yes.  So was MGA dot com.

3    Q.  Let's go back to page 37, then.  And blowing this up,

4    you see the subject is Toy Depot Limited.  That was a

5    distributor for Double Grand; correct?

6    A.  I don't know.

7    Q.  You weren't here this morning when there was testimony

8    about Toy Depot being a distributor for Double Grand?

9    A.  I was not.  I was attending some other business.

10   Q.  Okay.  And if we go further up here, you tell Mr. Black,

11   this e-mail here, where it says original message.  "Ray, we

12   need to hurt them so the word gets out.  Don't settle for

13   just stopping and paying 10,000 pounds."

14       That's what you told Mr. Black in March 2003 in

15   connection with these tweens, mini-tweens dolls that were in

16   the market?

17   A.  It looks like what I said, yes.

18   Q.  I'm sorry?

19   A.  It looks like what I said, yes.

20   Q.  And you said that because you thought there was

21   something on the market which looked similar to your Bratz.

22   A.  I don't remember the state of mind, but yes, very

23   possible.

24   Q.  And this is already in evidence.  And this is

25   Exhibit 13696.

1    A.  In the same book?

2    Q.  I'm sure it's in the book.  It's a photograph I want to

3    show you which is in evidence.  It came in evidence today.

4    So it may not be.  13696, I believe.

5         Now, this was the doll that was getting you so

6    upset because it was in the market and looked similar to your

7    Bratz dolls; correct?

8    A.  I don't recall it, but if you say that's the doll, then

9    I accept your representation.  I don't recall the doll.

10   Q.  Well, your view is that that looked similar to your

11   Bratz doll.

12   A.  I don't recall this.  This is Ray Black coming to us and

13   saying that that doll is similar to Bratz dolls.

14   Q.  Well, he sent you photographs; correct?

15   A.  I don't recall if he did or not.

16   Q.  Your response was damn these people.  And we need to

17   hurt them; correct?

18   A.  I did, yes.  That's the response.

19   Q.  And the reason you needed to hurt them is because they

20   had put on the market this Mini Trendy Teenz doll which you

21   thought looked substantially like your Bratz dolls?

22   A.  Again, I did not -- I don't see any correspondence in

23   here where I said they look substantially similar to Bratz

24   dolls.  I am responding to Ray Black who looks like -- who

25   found these dolls in the U.K. and came to us.

1    Q.  Now, before you did your e-mail here, where you said you

2    wanted to hurt these people, I take it you are not aware of

3    anyone doing any scientific analysis to say, for example,

4    whether or not the body sculpt on this Mini Trendy Teenz doll

5    was the same as on your Bratz dolls?

6    A.  I'm not aware of any scientific -- what did you call it?

7    Scientific test, no.

8    Q.  In fact, by the way, have you -- do you sell Bratz dolls

9    that are without clothing?

10    A.  No, we don't.  Not that I'm aware of, anyway.

11    Q.  But the face is always visible; right?

12    A.  I'm sorry?

13    Q.  The face is always visible.  Even if the body is

14    clothed.

15    A.  Yes.

16    Q.  Okay.  And at the time, certainly it's fair to say that

17    you wouldn't have said damn these people, we need to hurt

18    them, if you thought their dolls weren't similar, you

19    wouldn't be saying that; right?

20    A.  Again, I was just relating back to what Ray Black has

21    found in the market and came back to us.  And I think -- I

22    didn't read the whole e-mail.  I don't want to waste time.

23    But I think he was representing that they were a knock-off or

24    something.  I got to go back to that exhibit to read it

25    exactly.  And I was accepting his representation as my

1    lawyer.

2    Q.  I'm going to show you what's in evidence as 13695.  This

3    is the actual doll which was so similar to Bratz, that you

4    wanted to hurt the company that was selling it; correct?

5    A.  Again, I don't recall ever seeing the doll.  So I don't

6    know.

7    Q.  If we could put up 13696 again.  You'll agree with me

8    that that doll has some similarities with Bratz?

9    A.  There are some similarities, yes.

10   Q.  I mean, for example, the head is oversized in proportion

11   to the rest of the body; correct?

12   A.  It's a big head, yes.

13   Q.  And the eyes are prominent; correct?

14   A.  I can see eyes, yes.

15   Q.  And you see that they seem to be prominent just as the

16   Bratz dolls are; correct?

17   A.  I'm not sure if these are prominent.  They are ugly.

18   But they are eyes.

19   Q.  They are bigger than on a human being.  The size in

20   proportion to the rest of the face, just as with the Bratz

21   dolls.

22   A.  Can you give me any human being, maybe, who like --

23   Angelina Jolie?

24   Q.  Let's go to Angelina Jolie.  Although I haven't gotten

25   to the lips yet.  I'm talking about the eyes.

1    A.  I haven't looked at the eyes.

2    Q.  If we could look at the face there.  Remember in your

3    business plan, you talked about how the Bratz dolls had

4    prominent eyes compared to anything else in the market.

5         Do you recall that in your business plan?

6    A.  Yes, I do.

7    Q.  And these eyes are about the same size proportion as on

8    the Bratz dolls; correct?

9    A.  I don't think they are the same size as the Bratz dolls'

10   eyes, no.

11   Q.  Okay.  Well, what about this doll is similar to the

12   Bratz dolls, then?

13   A.  Well, first thing, you know, looking at this, the

14   packaging, I don't have a Bratz doll sample here.  So the

15   packaging, the overall look, the packaging is trapezoid also.

16   And there are similarities.  Are they exactly the same and

17   they are not.

18   Q.  I'm not asking you that.  I'm asking you what are the

19   similarities between this doll and the Bratz doll?

20   A.  Again, the oversized head -- can I take this out of the

21   box?

22   Q.  Feel free.

23   A.  I think the shoes are a little bit like platform and

24   big.

25   Q.  Yes.

1    A.   And those are really the biggest similarities I see.

2    Q.   And you thought that was among the unique

3    characteristics that kind of defined the Bratz doll, was an

4    oversized head and the oversize feet and chunky shoes;

5    correct?

6    A.   Well, no feet.  I said oversize -- did I say feet?  I

7    apologize.  Oversize shoes.  But they are some of the

8    characteristics of the Bratz dolls.  There are.  Those are

9    some of the characteristics of the Bratz dolls.

10   Q.   Now, you remember another e-mail you sent was to a

11   company called Bandai concerning this Glamma Jammaz dolls.

12        Do you recall that?

13   A.   I don't.

14   Q.   If you'd look at 13729.

15   A.   Can you give me one minute to look at this.  I have

16   never seen it.

17   Q.   Actually, I don't want you to multi task, but if we can

18   put up 13696 again.  The Funky Tweens doll.  And also put up,

19   I believe this is already in evidence.  Let me show you

20   what's in evidence, Exhibit 14780.  And it's correct that

21   this is another Bratz character, Nevra?

22   A.   Yes, it is.

23   Q.   And I guess my question is it's fair to say that Nevra

24   looks more like the four original Bratz dolls than, say, the

25   doll you sued on in Hong Kong, this Mini Trendy Teenz?

Unsigned                                                Page  6158

1    A.  I'm sorry.  Can you repeat that again?

2    Q.  Sure.  It's accurate to say that Nevra, your other Bratz

3    character that you created, looks more like the first four

4    Bratz dolls than the Mini Trendy Teenz doll?

5        MR. NOLAN:  Objection, your Honor.  403.  Also

6    calls for legal conclusion with respect to Hong Kong.

7        THE COURT:  Overruled.

8        THE WITNESS:  I'm sorry.  Can you repeat the

9    question?

10       THE COURT:  You're not asking under Hong Kong

11   standards.

12       MR. PRICE:  No.

13   Q.  You'll agree that Nevra, that new Bratz character, looks

14   more like the original four Bratz dolls than the Mini Trendy

15   Teenz doll?

16   A.  But Nevra looks different than the first original four

17   Bratz dolls, but it does have more similarity to the first

18   four Bratz dolls than what we're seeing there on the screen.

19   Q.  And maybe you could just turn that around.  I don't know

20   how well the jury can see that.

21       It's true that this other Bratz character, Nevra,

22   for example, has the same oversized head as the original four

23   Bratz dolls; correct?

24   A.  It does.

25   Q.  It has -- in fact, it's the exact same sculpt, facial

1    sculpt?

2    A.  I'm not sure if it's a -- if it's the same sculpt or

3    not.  But the face paint is for sure different.

4    Q.  My question is the sculpt is the same; right?

5    A.  I believe so, yes.

6    Q.  And certainly the face painting on the Nevra doll looks

7    more like the original four Bratz dolls than, say, the Mini

8    Trendy Teenz.

9         And perhaps, your Honor, if we could put up

10   Exhibit 13934.  If I may approach.

11        THE COURT:  You may.

12   Q.  BY MR. PRICE:  Do you recognize 13934 as a picture of

13   Nevra?

14   A.  Yes, looks like it, yes.

15        MR. PRICE:  Your Honor, move Exhibit 13934 into

16   evidence.

17        MR. NOLAN:  No objection.

18        THE COURT:  It's admitted.  You may publish.

19        (Exhibit 13934 received.)

20   Q.  BY MR. PRICE:  And if we could put that side by side

21   with the Mini Trendy Teenz.  You'll agree that the facial

22   decorations on this other Bratz doll look more like the four

23   original Bratz dolls than the facial decorations on the Mini

24   Trendy Teenz?

25   A.  Again, as I testified, I think Nevra has more

1    similarities than the first original four Bratz dolls, but

2    definitely the faces are different.

3    Q.  And actually, if we could put up maybe both 13934 and

4    13901.  If we compared the later Bratz characters to the

5    earlier ones, again, they have the same shape head; correct?

6    A.  Yes.

7    Q.  They have the same prominent lips; correct?

8    A.  The lips are prominent, yes.

9    Q.  Same --

10   A.  But there are differences.

11   Q.  Same oversized eyes?

12   A.  Yes, but there are differences.

13   Q.  And I'm talking about similarities.

14         What you told folks in your business plan was that

15   what made Bratz unique was the oversized head, oversized

16   feet, large eyes, prominent lips; correct?  That's what made

17   them unlike anything else out there.

18   A.  What I said was that -- I didn't write that business

19   plan.  Somebody wrote it and presented it, but that's what

20   that business plan says.

21   Q.  Your name is on the business plan; right?

22   A.  It's on the front of the business plan.

23   Q.  You approved what was on that business plan, that those

24   were the unique characteristics of Bratz, what made them

25   unique from the rest of the dolls?

1   A.  I don't recall reading that business plan one way or

2   another.  It was so many years ago, I cannot recall that.

3   Q.  Well, if you look at Exhibit 13729.  I think you found

4   your way to that.  And do you see this is an e-mail which you

5   wrote to Nishimoto Cynthia around February 6, 2006?

6   A.  Looks like it, yes.

7        MR. PRICE:  Move Exhibit 13729 into evidence, your

8   Honor.

9        MR. NOLAN:  No objection.

10       THE COURT:  It's admitted.  You may publish.

11       (Exhibit 13729 received.).

12  Q.  BY MR. PRICE:  And here you wrote to Nishimoto Cynthia

13  that Bandai's Glamma Jammaz dolls are a shameful copyright

14  infringement of Bratz dolls.

15       Do you see that?

16  A.  I do.

17  Q.  And you say you have copied the Bratz dolls to the point

18  of copyrighted birthmark we have on the Yasmin doll, its

19  eyes, its nose, and much more; correct?

20  A.  I do.

21  Q.  And what you're referring to in this is -- I can show

22  you what's in evidence.  13732, the Glamma Jammaz doll.

23  That's a photo, if we can put that up.  What you're talking

24  about is that Mya doll, the Glamma Jammaz doll done in 2003

25  by Bandai; correct?

1    A.  I'll not sure if that's the doll or something else.  To

2    the best of my recollection, they did changes to the doll,

3    but again, I don't recall that far back.

4    Q.  Do you recall what the doll looked like that made you so

5    upset, where you said it was a shameful copyright

6    infringement?

7    A.  Over six years ago, no.

8    Q.  Can you deny that this is the doll, this 2003 Bandai

9    Glamma Jammaz doll with the birthmark near the left side?

10   Can you deny that that's the doll that was causing you to

11   write your e-mail?

12   A.  I cannot deny or accept it because I do not remember it.

13   Q.  Well, sitting here looking at it, do you believe that

14   what we have up here, this photograph, is a copy of the Bratz

15   dolls?

16   A.  No, it's not.

17   Q.  Does it look similar enough that you wouldn't want it

18   being sold on the market?

19   A.  That doll here is not a copy of Bratz doll.

20   Q.  So I guess now your testimony is there's no way this was

21   the doll that you were writing about and saying you shouldn't

22   sell this because it's a copy?

23       MR. NOLAN:  Objection, your Honor.  Argumentative.

24       THE COURT:  Why don't you rephrase your question,

25   Counsel.

1    Q.  BY MR. PRICE:  You just said that doesn't look like

2    Bratz.

3    A.  It does not.

4    Q.  Does that lead you to now -- does that lead you to

5    testify that this couldn't be the doll that you were

6    referring to in your e-mail to Nishimoto Cynthia in February

7    of 2003?

8        MR. NOLAN:  Objection to lack of foundation.

9        THE COURT:  Lack of foundation?  Overruled.

10        THE WITNESS:  My testimony is that I don't recall

11    what I was referring to.  And I don't know if it's this doll

12    or another doll.

13    Q.  BY MR. PRICE:  Would you have been referring to a

14    doll --

15    A.  Can I finish my answer?

16        THE COURT:  Wait a second.  It was a yes or no

17    question.  Go ahead and finish your answer.

18        THE WITNESS:  I don't remember if it was a doll or

19    something in the website or a picture.  I don't recall what I

20    was looking at.

21    Q.  BY MR. PRICE:  Would you have sent an e-mail saying that

22    Bandai had copied the Bratz doll to the point of a

23    copyrighted birthmark we have on Yasmin doll, its eyes, its

24    nose, and much more?  Would you have sent that e-mail out if

25    you didn't think that the doll looked like Yasmin?

1    A.  I don't recall.  I don't know.  If what I was looking at

2    was similar, again, I don't remember what it was to Bratz,

3    then I would have sent it.  And I'm not a lawyer.

4         So I see I put here copyrighted birthmark.  I'm not

5    sure we can copyright birthmarks.  But that's what the

6    lawyers --

7    Q.  At any rate, is it true that MGA attempted to prevent

8    other companies from putting on the market dolls which look

9    similar to its Bratz dolls?

10   A.  Yes, I believe we did.

11   Q.  And if we could zoom in on this.  In your mind, would it

12   have been copying or inappropriate for Bandai to put this

13   birthmark on the Glamma Jammaz doll?

14   A.  No, it would not.

15   Q.  Let me switch topics and ask you about branding and

16   about what happened after the Hong Kong toy fair.  You

17   remember I had asked you to look at your business plan for

18   March of 2001.

19   A.  Right.

20   Q.  If you'd look at that again, that's 13520.

21   A.  135 --

22   Q.  13520.  It's almost right in the middle of the binder.

23   And I'm going to turn to page 16.  There's a section,

24   unexploited opportunities.

25        Do you see that?

1    A.  I do.

2    Q.  And you talk about ABC -- and that was the official

3    name?  The company was doing business as MGA?

4    A.  ABC International, right.

5    Q.  -- can effectively leverage the Bratz brand by

6    introducing not only apparel, but accessories such as

7    handbags, book bags, footwear, eyewear, headwear, jewelry,

8    watches, and luggage to name a few.

9        Do you see that?

10   A.  Yes.

11   Q.  And this was your concept, again, before the Bratz dolls

12   were even being sold to the public; right?

13       MR. NOLAN:  Objection, your Honor.  Lack of

14   foundation.

15       THE COURT:  Lay a foundation for that, Counsel.

16   Q.  BY MR. PRICE:  If you look at the first page of this,

17   this is March of 2001?

18   A.  It is.

19   Q.  That's before any Bratz dolls were being sold to the

20   public; correct?

21   A.  That's correct.

22   Q.  And so getting back to page 16, then, this was part

23   of -- you remember back in September 2000, you said we're

24   going to develop a Bratz brand.

25       Do you recall that?

1    A.  I do.

2    Q.  And this was part of the idea, that you could leverage

3    that brand by putting out accessories, eyewear, headwear,

4    et cetera; correct?

5    A.  That's correct.

6    Q.  And you have here the cost to do that is minimal.  The

7    cost to begin licensing is minimal.

8         Do you see that?

9    A.  That's what the business plan says, yes.

10   Q.  And that's because basically someone is paying you to

11   use the brand; right?

12   A.  Somebody is paying us to use the brand; that's correct.

13   Q.  So you're not paying for their manufacturing costs or

14   anything.  They are just -- you're getting paid for the right

15   to use the Bratz brand; right?

16   A.  That's correct.

17   Q.  And you point out that the only risk involved is that

18   the Bratz dolls do not sell through at retail; correct?

19   A.  Yes.

20   Q.  So in other words, you're not going to be able to

21   license this very effectively unless the public goes for the

22   core of the brand Bratz dolls?

23   A.  The four Bratz dolls were originally what came out to

24   the market, and we spent a lot of money --

25        MR. PRICE:  Move to strike as nonresponsive.

1          THE COURT:  Sustained.  Stricken.

2          Mark, would you please read back the last question?

3          (Record read.)

4          THE WITNESS:  I'm not sure I can understand the

5     question.  I can't answer it the way you phrased it.

6     Q.  BY MR. PRICE:  Let me rephrase it, then.

7          You're not going to get the licensing revenue

8     unless the public accepts the Bratz dolls.

9     A.  No.  If the Bratz brand becomes successful, then we can

10    get licensing.

11    Q.  And the core, the core of the Bratz brand, what you are

12    leveraging off of here, is the dolls; right?

13    A.  No, we are leveraging the Bratz brand.  The Bratz brand

14    was launched with four dolls in 2001.

15    Q.  If you look at Exhibit 13858.  Do you recognize that as

16    an e-mail you sent in March 2002 to a Gariochi Dario Berte?

17    And I apologize for the pronunciation.

18    A.  Looks like an e-mail I send.

19          MR. PRICE:  Move Exhibit 13858 into evidence.

20          MR. NOLAN:  No objection.

21          THE COURT:  It's admitted.

22          (Exhibit 13858 received.)

23    Q.  BY MR. PRICE:  And you see.  E-mail is concerning

24    licensing products for Bratz.  Do you see it talks about we

25    will not over license this brand and make products that do

1    not fit within the core consumer need and our marketing

2    timing strategy.

3         Do you see that?

4    A.  Yes.

5    Q.  And if you go to the third to the last paragraph, which

6    again is at the same time:  "Please understand that we will

7    not license every category.  This is for every territory, and

8    not only Italy.  And every product right away.  The core of

9    the brand are the dolls, and we do not want to harm the sales

10   of the dolls."

11        That's what you were telling Mr. Gariochi Dario in

12   March of 2002; correct?

13   A.  That's correct.

14   Q.  Let's go back to your 13520, your business plan, and we

15   were at page 16.  We were talking about the only risk

16   involved is that the Bratz dolls do not sell through at

17   retail.

18        Do you see that?

19   A.  I do.

20        MR. PRICE:  And if I may approach the well, your

21   Honor, to pick up an exhibit.

22   Q.  I have Exhibit 18801, which you may have seen yesterday,

23   a bicycle helmet.  The point is if the core of the brand, the

24   Bratz dolls, aren't selling through, you're not going to have

25   anyone interested in putting Bratz names or pictures on a

1    bicycle helmet; right?

2    A.   If the brand is not successful, yes, you cannot license

3    the Bratz brand.  That's correct.

4    Q.   My question is a little more specific.  If the Bratz

5    dolls aren't selling through at retail, no one is going to be

6    interested in licensing a bicycle helmet that has Bratz on

7    it; right?

8         MR. NOLAN:  Objection.  Lack of foundation as to

9    time.  At what point?

10        THE COURT:  As to time, overruled.

11        THE WITNESS:  Again, the Bratz brand started with

12   four dolls.  The four dolls had to sell with marketing and

13   advertising to establish the brand, and then once the brand

14   became successful, we were able to license it, and that's how

15   the licensing business works.

16   Q.   BY MR. PRICE:  And with respect to -- actually, let's do

17   this.  If you look at page 17.  And if we look at the last

18   paragraph of your business plan.  It says, "If the fashion

19   dolls to (Sic) not sell through at retail, this can cause a

20   backlash with licensees who have already spent moneys in

21   advances and product development."

22        Do you see that?

23   A.   I do.

24   Q.   You're tying this to the dolls; correct?

25   A.   That's what the business plan is saying, yes, that if

1    the dolls that were -- basis of launching the Bratz brand

2    were not successful, then the licenses will not be

3    successful.

4    Q.   And then if we look at page 18, it says:  "To be

5    effective, other financial -- other licensed products depend

6    on the presence of our Bratz."

7          Do you see that?

8    A.   Bratz trademark, Bratz brand, yes.

9    Q.   And this is before a Bratz doll had ever been shown to

10   the retail public; correct?

11   A.   No, they were shown -- to the public.  They were not

12   shown to the public yet.  They were not in the market yet.

13   Q.   You wouldn't have gone down this road to develop a Bratz

14   brand with dolls that have oversized heads and prominent eyes

15   and prominent lips if Carter Bryant hadn't shown you Mattel's

16   confidential proprietary property in September of 2000;

17   right?

18   A.   I'm sorry.  Can you repeat the question?

19   Q.   You never would have gone down this road.  You never

20   would have been here trying to license Bratz, trying to sell

21   these dolls if Carter Bryant hadn't shown up at MGA and shown

22   you Mattel's confidential information, these designs, Bratz

23   designs, and the concept of these dolls with oversized heads

24   and prominent eyes and prominent lips?

25   A.   Again, as I said, Carter Bryant showed us some drawings

1    that became the inspiration and basis for Bratz.  The Bratz

2    dolls came to the market in many, many changes, and we

3    marketed it and built it.  And that's what became the brand.

4    So I don't know how else to answer your question.

5    Q.  Without that inspiration, you never would have done what

6    you did, which was create the Bratz dolls, license the Bratz

7    name, create the Bratz brand; correct?

8    A.  You ask so many questions all at the same time.  We

9    could have -- theoretically we could have had the name Bratz

10   because it was in existence since 1984 and put it on another

11   product.  And it belonged to somebody else, didn't belong to

12   Mattel or Carter Bryant or MGA.

13   Q.  It's certainly correct to say that after a two-year

14   search leading up to September of 2000, you had not, even

15   with all your efforts, found a fashion doll like Bratz.

16   A.  Which was Carter Bryant's drawings as an inspiration to

17   launch the Bratz dolls.

18   Q.  Your definition of inspiration is you wouldn't have

19   done anything if not for Carter Bryant showing you that

20   confidential information; right?

21   A.  That's not correct.  We would have found something else.

22   Q.  And getting back to this branding.  You recall, I think

23   there was a Bratz pet that was shown to Ms. Pembleton.

24        You recall that?

25   A.  I do.

1    Q.  And when you are developing something like that, one of

2    the things you're trying to do is connect that extension,

3    line extension, to the Bratz dolls; right?

4    A.  The execution of it, yes.  For all the brand to

5    basically mesh together, yes.

6    Q.  So, for example, if you look at Exhibit 13859, you

7    recognize this as an e-mail you sent in 2002?

8    A.  November of 2002, yes.

9         MR. PRICE:  Move 13859 into evidence, your Honor.

10        MR. NOLAN:  No objection.

11        THE COURT:  It's admitted.

12        (Exhibit 13859 received.)

13   Q.  BY MR. PRICE:  And you say -- you see this is talking

14   about Bratz pets, and you say:  "We want the pets to look

15   like Bratz, big face, big eyes, fantasy, and not like the

16   plush in slumber party"; correct?

17   A.  Yes.

18   Q.  And this is an example of tying kind of an unrelated

19   product back to the core of the brand, which are the Bratz

20   dolls.

21   A.  Again, it has to all -- it's mixed together.  It's like

22   Nike.  When you buy the shoes, the shirt has -- they all -- a

23   shirt doesn't look like a shoe, but as a brand, they all mesh

24   together.

25   Q.  And if you look at 13871, do you recognize this as an

1    e-mail string between you and Karen Bonde?

2    A.  Yes, looks like it, yes.

3        MR. PRICE:  Move 13871 into evidence, your Honor.

4        MR. NOLAN:  No objection.

5        THE COURT:  It's admitted.

6        (Exhibit 13871 received.)

7    Q.  BY MR. PRICE:  And you see e-mails to you concerning the

8    Bratz pets:  "I think we've done a good job of that.  Now we

9    have to make the most of the Bratz connection.  At one point

10   we talked about creating a cross-sell piece to be included in

11   the Tokyo Bratz dolls.  Did that happen?  Can we do something

12   on the website that explains where these little pets came

13   from and their connection to the Bratz girls?"

14       Do you see that?

15   A.  I do.

16   Q.  And your response is:  "Thanks for being proactive on

17   this.  Please follow through."

18       Do you recall that?

19   A.  Yes.

20   Q.  And then the ideas for commercials included having the

21   Bratz dolls, for example, with one of the pets.

22       Do you recall that?

23   A.  I'm sorry?

24   Q.  Ideas for commercials for the Bratz pets was to --

25   A.  What are you referring to, sir?

1    Q.  I'll refer you to a document if we need to.  I'm just

2    asking if you recall this.  That one of the ideas, then, was

3    to -- well, you understood kids kind of wanted the owners of

4    each pet associated with a pet?

5    A.  I'm having a tough time understanding you.

6    Q.  Your marketing people told you that the way to sell this

7    commercial is to have a Bratz character in a commercial with

8    a Bratz pet.

9    A.  How do you sell a commercial?  I'm not sure if I

10   understand your question.  I'm sorry.

11   Q.  Let me see if I can just go -- look at Exhibit 13872.

12   It's dated February 8, 2006, an e-mail that you are copied on

13   from Shoreh Larian?  I know I mispronounced that.  How is

14   that pronounced, sir?

15   A.  It's okay.  Go ahead.

16   Q.  Okay.  Do you have 13872 in front of you?

17   A.  I do.

18   Q.  And is that an e-mail that you received?

19   A.  It has my name on it, yes.

20        MR. PRICE:  Move that into evidence, your Honor.

21        MR. NOLAN:  No objection.

22        THE COURT:  It's admitted.  You may publish.

23        (Exhibit 13872 received.)

24   Q.  BY MR. PRICE:  And the subject is hot button research

25   for ad development results for Bratz pets?

1   A.  I see that.

2   Q.  And if we go to the third page, there's a section:

3   "Commercial to include most kids want the owners of each pet

4   associated with the pet itself in the commercial, i.e., Sasha

5   could be displayed with Bunny Boo."

6         And was Bunny Boo the icon that was put on some of

7   Sasha's accessories?

8   A.  I believe so, yes.

9   Q.  And it says:  "It will be good to have the owners

10  displayed with the pet so that people recognize them and buy

11  them together, so that people know who each pet belongs to,

12  so that if you have a specific doll, you know which pet to

13  buy for it."

14        Do you see that?

15  A.  I do.

16  Q.  The idea was to leverage the idea of the popularity of

17  the Bratz dolls so you can sell the Bratz dolls --

18  A.  To leverage the Bratz brand in order to sell Bratz pets

19  and other products.  It's all about branding, sir.

20  Q.  And specifically you're talking about Bratz dolls;

21  correct?

22  A.  Let me see that.

23  Q.  Sasha is a doll; right?

24  A.  Yes.  But Sasha is also a TV character.  Sasha is many

25  things.  But Sasha is one of the dolls.

1    Q.  Now, again, Ms. Pembleton was talking about accessories

2    and such.  You remember she mentioned something about -- she

3    talked about doing Bratz twins.

4            Do you recall that?

5    A.  I'm sorry?

6    Q.  Do you recall she was talking about doing Bratz twins as

7    kind of an extension of the Bratz line?

8    A.  I don't remember exactly.  But she might have, yes.

9    Q.  And I'd like you to look, if you would, at

10   Exhibit 13918.

11   A.  Go ahead.

12   Q.  You found it?

13   A.  Yes.

14   Q.  There is an e-mail from you to Ms. Garcia?

15   A.  Yes.

16   Q.  This is an e-mail from you to Ms. Garcia?

17   A.  Yes, it is.

18   Q.  And Ms. Pembleton?

19   A.  Yes.

20          MR. PRICE:  Move 13918 into evidence.

21          MR. NOLAN:  No objection.

22          THE COURT:  Admitted.

23          (Exhibit 13918 received.)

24   Q.  BY MR. PRICE:  It says:  "Subject, Bratz twins," an

25   attachment, "Olsen twins, TRST."

1          Do you see that?

2     A.  Yes, I do.

3     Q.  And if we go all the way down, it says:  "Spreadsheet

4     attached.  I'll bring pictures to you."

5          Do you see that?

6     A.  Yes.

7     Q.  And do you know what TRST stands for?

8     A.  Toy retail sales tracking.

9     Q.  If we go to the attached spreadsheet, this is showing

10    you are tracking sales of a Mattel doll, the Olsen twins?

11    A.  TRST is toy retail sales tracking is a system that

12    tracks sales of not only Mattel products or MGA products.

13    All the toy products.

14    Q.  But when --

15    A.  And you can buy it, and we did buy.  So you can buy that

16    service.

17    Q.  But here what you're tracking is the Olsen twins, which

18    are manufactured by Mattel.

19    A.  They were licensed to Mattel.  Yes, Mattel was

20    manufacturing those; that's correct.

21    Q.  And if we go back to the first page of this, in addition

22    to getting these spreadsheets, what you wanted to get from

23    the Ninette in connection with this subject, Bratz twins, was

24    you wanted to get pictures of the Mattel product.

25    A.  They are available at retail.  You can get pictures of

1    them.  You can go to Wal-Mart or Toys-R-Us and buy them and

2    take pictures of them.

3    Q.   And if you go to 13917, that's the same e-mail string,

4    but Ms. Pembleton has sent you what you asked for, which are

5    attachments which show pictures of the Olsen twins?

6    A.   I'm sorry, I cannot find it.

7    Q.   13917.  It's right before 13918.

8    A.   I found it.  Go ahead.

9    Q.   Is this the response from Ms. Pembleton to you, giving

10   you what you asked for?

11   A.   Looks like, yes, with a series of pictures attached

12   which she probably got from -- I don't know where she got it

13   from.

14          MR. PRICE:  Move Exhibit 13917 into evidence.

15          MR. NOLAN:  No objection.

16          THE COURT:  It's admitted.

17          (Exhibit 13917 received.)

18   Q.   BY MR. PRICE:  And this is the response.  "Here's a

19   start."  And then has attachments, and if you look at them,

20   those are pictures of the Olsen twins dolls; correct?

21   A.   As of 2004, yes.

22   Q.   And this --

23   A.   Looks like it.  Again, I don't remember the Olsen twins

24   dolls.  These are black and white pictures.  But it looks

25   like them, yes.

1    Q.  And this is something which you do with a brand.  You

2    look at competitors' ideas, and you come up with your own

3    ideas, and you compete; right?

4    A.  That's correct.  We come up with our own execution.

5    Q.  Another product you had was something called Bratz Big

6    Head.

7         Do you recall that?

8    A.  I don't think we have a product called Bratz Big Head.

9    Q.  Let me rephrase that.  Bratz Funky Fashion Makeover.

10        MR. NOLAN:  It's close but not --

11        MR. PRICE:  Yes.

12        THE WITNESS:  I hope it wasn't a southern

13   interpretation of a big head.  Go ahead.

14   Q.  BY MR. PRICE:  So Bratz Funky Fashion Makeover.  Let me

15   show you 17533, which is in evidence.  This is an example of

16   something else that MGA came out with to leverage the Bratz

17   brand; right?

18   A.  That's correct.

19   Q.  And in doing that --

20   A.  Hold on one second.  It says date of 2004, yes.

21   Q.  And doing that, one thing it did was sent to the

22   manufacturer enlarged Barbie heads; right?

23   A.  It's possible.  I don't know.

24   Q.  If you'd look at Exhibit 11179.

25   A.  Can you repeat that again?  119 --

1    Q.  11179.

2    A.  This is a series of e-mails.  You want me to read the

3    whole thing?

4    Q.  Well, if you'd turn 11179-0008 and -0010, you see there

5    are some photographs there?

6    A.  There is.

7    Q.  One being of a large Barbie head?

8    A.  Yes.

9    Q.  And you see this is an e-mail from Elly Shinohara to

10   Paula Treantafelles concerning Bratz Big Head?

11   A.  Yes.

12   Q.  And were you aware of this communication concerning the

13   development of this large head Bratz doll?

14   A.  I was not.  I'll not on the e-mail.

15   Q.  You never talked to Ms. Garcia about sending Barbie

16   large heads to the manufacturing company to assist in

17   developing the Bratz head?

18   A.  I might have.  I don't remember.  This is dated 2001.  I

19   don't recall that far back.

20        MR. PRICE:  I'd move in 11179 into evidence.

21        MR. NOLAN:  Your Honor, lack of foundation.

22        THE COURT:  Counsel?

23        MR. PRICE:  Best I can do with it.  It's an MGA

24   document produced by MGA.  They are calling Ms. Garcia.  We

25   could put it in through her, if necessary --

1          MR. NOLAN:  Your Honor, I apologize.  We'll take a

2    look at the document.  Right now --

3          THE COURT:  It's past five o'clock.  Why don't we

4    take it up in the evening, and we'll take it up first thing

5    in the morning.

6          Members of the jury, I'll see you at nine o'clock

7    tomorrow morning.

8          (WHEREUPON THE JURY WITHDRAWS.)

9          THE COURT:  Please be seated.  The Court has a

10   conference call at 5:15 that I need to take up.  Is there

11   anything else that you need the Court to attend to this

12   evening that cannot wait until tomorrow morning at 8:00?

13   Mr. Proctor, are we all right?

14         MR. PROCTOR:  I think it can wait until tomorrow.

15         THE COURT:  There's another binder you were going

16   to get me for Brode, did you say?

17         MR. PROCTOR:  I believe it's in MGA's hands right

18   now.  I think we should have it, but it may not be here yet.

19         THE COURT:  Thank you.

20         MS. AGUIAR:  Very quickly, your Honor.  We reached

21   a stipulation with Mr. Quinn because during the exam of

22   Mr. Yeung, we meant to move in a couple of exhibits.  May I

23   read the numbers in?  13784 and 13785.

24         THE COURT:  Very well.  Those are admitted.

25         (Exhibits 13784 and 13785 received.)

1         THE COURT:  You're still working on the other

2     stipulation, though, concerning Ms. Gronich?

3         MS. AGUIAR:  Yes, we'll read something in tomorrow.

4         THE COURT:  Very good.

5         MS. AGUIAR:  And two other things.  Just if we

6     could get a time count, and I wanted to raise something

7     regarding scheduling so that we could plan if your Honor had

8     any indication of when you might want the parties in for the

9     charging conference.  We wanted to make sure to start

10    thinking about that.

11        THE COURT:  I'm working on my Monday calendar on

12    that.  So I'll have information on that tomorrow.  It largely

13    depends on that.  Time count is 18:05 for MGA and 6:15 for

14    Mattel.

15        I assume the issue with respect to attorney

16    McFarland is resolved?

17        MR. QUINN:  Yes, it is, your Honor.

18        THE COURT:  We're past that?

19        MR. QUINN:  We are.

20        THE COURT:  Very well.  The Court is still waiting

21    for a proposed order on certain rulings I made pretrial in

22    this case from the parties.

23        MS. AGUIAR:  Oh, you know what?

24        THE COURT:  I see a lot of fingers going around.

25        MS. AGUIAR:  Pretrial, you mean pre 1-B?

1          THE COURT:  The series of motions that I did

2     telephonically.

3          MS. AGUIAR:  We did give our comments to the Quinn

4     firm about a week or so ago.  We're just waiting to hear

5     back, I believe is the state of play.

6          MR. ZELLER:  But I'll look into it, and we'll get

7     it resolved.  We'll respond tonight.

8          THE COURT:  Let's get those in tomorrow if we can.

9          There are a few outstanding motions which I plan to

10    take up tomorrow morning at 8:00.  Do we have an opposition

11    at all?  Are there any additional briefs on any of the

12    motions that were submitted, the three motions submitted by

13    MGA and the ex parte?  I think I've ruled on most, except for

14    the motion for sanctions and the motion for clarification.

15         Is there anything further, any further briefing

16    that I should be expecting, or do I have everything that the

17    parties have submitted?

18         MR. ZELLER:  The second motion you mentioned was

19    the reconsideration motion?

20         THE COURT:  Reconsideration clarification.

21         MR. ZELLER:  One that MGA brought.

22         THE COURT:  Yes.

23         MR. ZELLER:  I know that there is the motion

24    concerning our expert, and I believe it's an oral motion.

25    I'm not aware of anything in writing.  But it's our expert,

1    Frank Keiser.

2        THE COURT:  It was referenced earlier today by

3    Mr. Quinn, I believe.

4        MR. ZELLER:  Right.  And that was something that

5    MGA was raising.  I believe it could probably be tabled for

6    the moment if only because we have decided we're not going to

7    call him in our case in chief.  We reserve to call him in

8    rebuttal, but at least the issue could be tabled at the

9    moment.

10        If the Court's question was have we filed an

11   opposition to the clarification/reconsideration motion, the

12   answer is that we have.  I know it was over at the court here

13   today, earlier today.

14        THE COURT:  If you'd provide a courtesy copy to the

15   courtroom deputy.

16        MR. ZELLER:  I believe we have.

17        THE COURT:  Maybe it was submitted outside?

18        MR. ZELLER:  I understand that it was provided to

19   Mr. Holmes earlier today.

20        THE COURT:  Very well.  So it should be sitting on

21   my desk, then.  I'll take up those two motions at least to

22   the extent that I'm going to take them up.  To a large

23   extent, as I already indicated, that clarification/

24   reconsideration motion is going to be largely decided in the

25   context of the jury instructions that Ms. Aguiar just

1    referred to.  But I will try to give some guidance for the

2    witnesses that you are calling.

3          As far as the motion for sanctions, I do want to

4    get that resolved tomorrow morning.  So we'll hear you on

5    that tomorrow morning at 8:00.  Because the Court has heard

6    testimony as well about the subject matter there.

7          MS. AGUIAR:  Okay, great.  We just, if we have time

8    to put in a short reply on the sanctions motion, we will try

9    to do that.  I didn't know when you were going to want to

10   rule on it.  So we have not had an opportunity, since I guess

11   we got the opposition yesterday morning.

12         THE COURT:  Okay.

13         MS. AGUIAR:  And so I --

14         THE COURT:  I haven't been having replies in these

15   motions during the trial.  I'll give you leave to make your

16   argument tomorrow morning.  I assume we're past all the

17   evidence on this point; is that correct?

18         MR. PRICE:  Yes, I think we're past the evidence on

19   that point.

20         THE COURT:  Yes, we are?

21         MR. PRICE:  Yes, we're past it.  And there is no

22   more evidence about the Hong Kong dolls.

23         THE COURT:  Very well.  I'll take that up tomorrow

24   morning and give both parties and opportunity to argue at

25   8:00.

1        Anything else for Mattel?

2        MR. QUINN:  No, your Honor.

3        THE COURT:  Ms. Aguiar, Mr. Nolan, anything else

4   from MGA?

5        MS. AGUIAR:  Will your Honor be taking argument on

6   the motion for clarification, or really at that point just

7   telling us what your views are?

8        THE COURT:  Right.

9        MS. AGUIAR:  The latter?

10        THE COURT:  I'm going to -- I'll do that in the

11   morning.

12        MS. AGUIAR:  Right.  But I was just wondering

13   whether you were going to take argument on it or just say

14   look, this is what you plan to do.  Because Mr. Hansen, who

15   has been working with me on that, has a medical procedure in

16   the morning.  So I actually really do -- we obviously do want

17   to have resolution of it.  But I'm just trying to --

18        THE COURT:  I feel pretty comfortable at this point

19   explaining the Court's position without further argument.

20   But if you would rather me put it off until noon tomorrow, I

21   can.

22        MS. AGUIAR:  If you're comfortable with your

23   position, but certainly there are quite a few things, and I

24   just skimmed it at lunch today.  There are quite a few things

25   that Mattel says in its opposition which we really disagree

1    with.  But --

2        THE COURT:  We've had extensive argument on all of

3    these points up to this.  I think this is something that --

4    and ultimately, it's not going to be decided as much as I'm

5    going to give guidance on my previous order.  We will be

6    revisiting all of these issues in the context of the jury

7    instructions and the verdict form.

8        MS. AGUIAR:  That's what I thought.  So tomorrow

9    morning is fine.

10        THE COURT:  Very well.

11        MR. NOLAN:  Your Honor, real quick.  We may change

12    the procedure tomorrow in that I know that we have

13    historically taken our case and put it in through, let's say,

14    with Mr. Larian.  It may be that tomorrow, because of other

15    business commitments that he might have to attend to, that I

16    might just do the technical cross-exam to deal with the

17    issues that they raised but then reserve the right to call

18    him back in my case in chief, if that's okay.  And I just

19    wanted to alert the Court and Mattel for scheduling purposes.

20        THE COURT:  What time are Mr. Larian's business

21    commitments?

22        MR. NOLAN:  Later in the morning.  It won't

23    override the importance of what we're doing here.

24        THE COURT:  Very well.

25        MR. NOLAN:  There's other reasons why we may want

1    to do it in our case in chief rather than doing it at this

2    time.

3        THE COURT:  Okay.  We'll take that up in the

4    morning as well.

5        MR. PRICE:  When you said nothing further on the

6    doll, I assume you're talking about the doll we were talking

7    about in opening, the plush doll.

8        THE COURT:  Yes.

9        MR. PRICE:  Because there is still the issue about

10   photographs of other dolls and whether or not they are clear

11   enough.  You'll recall there's still that discussion going

12   on.

13       THE COURT:  I understand that.  But based on

14   Ms. Aguiar's statements this morning, that's been worked out.

15   We're making progress on that.

16       MR. PRICE:  I was trying to keep Mr. Zeller off the

17   podium.

18       MR. ZELLER:  That's substantially so.  There are

19   some issues.  I sent an e-mail.  Hopefully, we'll get that

20   issue resolved.

21       THE COURT:  Very good.  We'll revisit this in the

22   morning.  Okay.  If there's nothing further, I need to speak

23   very briefly with Mr. Nolan and Mr. Quinn off the record at

24   sidebar, and then we're done for the day, and then we'll see

25   the rest of you at 8:00 tomorrow morning.

1        Court is in recess.

2        (Proceedings concluded at 5:12 P.M.)

3

4

5              C E R T I F I C A T E

6

7

8        I hereby certify that pursuant to Title 28,

9    Section 753 United States Code, the foregoing is a true and

10   correct transcript of the stenographically reported

11   proceedings in the above matter.

12       Certified on August 6, 2008.

13

14

         _____

15       MARK SCHWEITZER, CSR, RPR, CRR

         Official Court Reporter

16       License No. 10514

17

18

19

20

21

22

23

24

25

                          Unsigned                              Page  6190