1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                    ---

4       HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                    ---

6    MATTEL, INC.,          : PAGES 7652 - 7873
                            :
7         PLAINTIFF,        :
                            :
8    VS.              : NO. ED CV04-09049-SGL
                      : [CONSOLIDATED WITH
9    MGA ENTERTAINMENT, INC.,   : CV04-9059 & CV05-2727]
     ET AL.,               :
10                         :
          DEFENDANTS.       :
11

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                RIVERSIDE, CALIFORNIA

17                FRIDAY, AUGUST 15, 2008

18                JURY TRIAL - DAY 36

19                AFTERNOON SESSION

20

21

22           MARK SCHWEITZER, CSR, RPR, CRR
             OFFICIAL COURT REPORTER
23           UNITED STATES DISTRICT COURT
             181-H ROYBAL FEDERAL BUILDING
24           255 EAST TEMPLE STREET
             LOS ANGELES, CALIFORNIA 90012
25           (213) 663-3494

1    Appearances of Counsel:

2

3    On Behalf of Mattel:

4        Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
         By John B. Quinn, Esq.
5          B. Dylan Proctor, Esq.
           Michael T. Zeller, Esq.
6          Harry Olivar, Esq.
           John Corey, Esq.
7          Diane Hutnyan, Esq.
           William Price, Esq.
8        855 South Figueroa Street
         10th Floor
9        Los Angeles, CA 90017
         (213) 624-7707
10

11

12   On Behalf of MGA Entertainment:

13       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
14         Carl Alan Roth, Esq.
           Jason Russell, Esq.
15         Lauren Aguiar, Esq.
           David Hansen, Esq.
16         Matthew Sloan, Esq.
           Robert Herrington, Esq.
17         Raoul D. Kennedy, Esq.
         300 South Grand Avenue
18       Los Angeles, CA 90071-3144
         (213) 687-5000
19

20

21

22

23

24

25

                        Unsigned                        Page  7653

1                    I N D E X

2

3     ISAAC LARIAN, PREVIOUSLY SWORN......................... 7676

4     RECROSS-EXAMINATION (CONTINUED) BY MR. PRICE:.......... 7676
      FURTHER REDIRECT EXAMINATION BY MR. NOLAN:............. 7678
5     FURTHER RECROSS-EXAMINATION BY MR. PRICE: ............. 7680
      FURTHER REDIRECT EXAMINATION BY MR. NOLAN:............. 7682
6     FURTHER RECROSS-EXAMINATION BY MR. PRICE: ............. 7682

7     PAUL KEVIN MEYER, SWORN................................ 7683

8     DIRECT EXAMINATION BY MR. KENNEDY: .................... 7683
      VOIR DIRE EXAMINATION BY MR. PRICE: .................. 7751
9     DIRECT EXAMINATION (RESUMED)BY MR. KENNEDY:........... 7757
      CROSS-EXAMINATION BY MR. PRICE:....................... 7761
10    REDIRECT EXAMINATION BY MR. KENNEDY:.................. 7783
      RECROSS-EXAMINATION BY MR. PRICE: .................... 7785
11

12    VIDEOTAPED DEPOSITION EXCERPTS OF LILY MARTINEZ........ 7787

13    VIDEOTAPED DEPOSITION EXCERPTS OF KEVIN FARR........... 7789

14    MICHAEL JOSEPH WAGNER, SWORN.......................... 7807

15    DIRECT EXAMINATION BY MR. QUINN: ..................... 7808
      VOIR DIRE EXAMINATION BY MR. KENNEDY:................. 7815
16    DIRECT EXAMINATION (RESUMED) BY MR. QUINN:  .......... 7818
      CROSS-EXAMINATION BY MR. KENNEDY:..................... 7836
17    REDIRECT EXAMINATION BY MR. QUINN: ................... 7844
      RECROSS-EXAMINATION BY MR. KENNEDY: .................. 7845
18

19    PAUL KEVIN MEYER, PREVIOUSLY SWORN.................... 7847

20    DIRECT EXAMINATION BY MR. KENNEDY:.................... 7847
      CROSS-EXAMINATION BY MR. PRICE:....................... 7848
21

22

23

24

25

1          E X H I B I T S

2

3     (Exhibit 13861, Page 11, received.)..................... 7781

4     (Exhibits 2502-A, 2504-A, 2514-A, and
      2517-A received.)..................................... 7803
5

6     (Exhibits 18923, 1, 2, 4, 6, 7, 9, 10,
      11, 12, 13, 15, 16, 17, 18, 21, 24, 25,
7     26, and 32 received.)................................. 7807

8     (Exhibit 13991 received.)............................. 7818

9     (Exhibit 14626 received.)............................. 7833

10    (Exhibit 14663 received.)............................. 7834

11    (Exhibit 14664 received.)............................. 7835

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Unsigned                                        Page  7655

1          Riverside, California; Friday, August 15, 2008

2                    12:34 P.M.

3          (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

4          THE COURT:  Okay.  There's a few issues the Court

5    wanted to take up from this morning that we never got around

6    to, but before I did that, I want to rule on --

7          Mr. Price, Mr. Zeller?  Mr. Price, is Mattel ready

8    to proceed?

9          MR. PRICE:  Yes, your Honor.

10         THE COURT:  Very well.  Let me first resolve the

11   issue that we discussed in chambers under seal.  The Court

12   has explored in length the competing issues and concerns that

13   it has with respect to the -- on the one hand, the testimony

14   of Mr. Larian that we heard concerning what he, his attorneys

15   at the time discussed and about the Carter Bryant's design

16   and development of the works in question, as well as the

17   e-mails that have been submitted to the Court in camera under

18   seal involving attorney-client work product.

19         It's a close case, but the Court believes that the

20   attorney-client privilege needs to be protected.  So the

21   Court is going to reseal those e-mails.  The Court is not

22   going to permit them to be introduced to the jury.

23   Furthermore, the Court itself will strike them from its

24   consideration of the evidence, both during the trial and, of

25   course, in any third phase where the Court must consider the

1    equitable defenses.  So they are not at issue.

2         However, some address or redress of the testimony

3    has to be made.  The Court is going to strike, pursuant to

4    Mr. Nolan's suggestion, Ms. Aguiar's suggestion.  The Court

5    is going to strike the testimony of Mr. Larian concerning his

6    conversations with his attorneys and instruct the jury that

7    they are not to consider that evidence for any purpose at

8    this point.  And leave it at that.  I think that strikes the

9    balance.

10        Given the whole host of issues that the Court needs

11   to weigh here, I think that strikes the balance.  And the

12   e-mails are resealed, and as indicated, they will be of no

13   moment to the jury.  They are no longer of any issue to the

14   Court.  And they will be disregarded.

15        Any questions concerning the Court's ruling,

16   Mr. Price?

17        MR. PRICE:  No questions, your Honor.  I'm

18   wondering whether, when the Court instructs the jury to

19   disregard Mr. Larian's testimony concerning any

20   communications he may have had with counsel, whether the

21   Court can say any testimony given in this phase or in the

22   prior phase.

23        THE COURT:  They are not to consider any evidence

24   of any of Mr. Larian's testimony regarding his communications

25   with counsel.  As I indicated in chambers, I probably should

1    have kept all of that out to begin with, and this is the best

2    that I can do.  I mean, I have two ways to go.  I either let

3    it all come in, or I keep it out.  I think given where we are

4    right now, to leave it part in, part out is not appropriate.

5        MR. PRICE:  I just think unless you specifically

6    tell them any testimony, whether given in the first phase or

7    this phase.  Because going forward, they can consider

8    obviously anything that happened in the prior --

9        THE COURT:  Obviously, the prejudicial impact to

10    Mattel on the earlier testimony is diminished.  The testimony

11    won't be heard in closing regarding the communication between

12    the attorneys.  And that was at this point frankly, months

13    ago.

14        So I'm less concerned about that earlier testimony

15    than the testimony now.  But the way I intend to do the

16    instruction is simply I am striking the testimony by

17    Mr. Larian concerning his communications with counsel.  You

18    are to disregard it.  I'm sure the jury will be focused on

19    the testimony today.  That certainly applies to any testimony

20    concerning communication with counsel.  I'm not going to

21    bring up the previous testimony because I think that quite

22    frankly just highlights evidence that we are actually asking

23    the jury to disregard.

24        MR. NOLAN:  Your Honor, just would the Court

25    consider saying, you know, the testimony is stricken.  You

1    are to disregard the comments with respect to the

2    communications with counsel.  And just say that MGA,

3    Mr. Larian, have asserted the attorney-client privilege, and

4    you are not to draw any adverse inference from the assertion

5    of the privilege?

6        THE COURT:  If I go down that road, to balance

7    that, I would have to say that all that is protected by the

8    attorney-client privilege, and you cannot -- and that

9    evidence one way or the other cannot be --

10        MR. NOLAN:  If the Court --

11        THE COURT:  I think it's better just to keep it

12    simple, Counsel.

13        MR. NOLAN:  Thank you.

14        THE COURT:  Thanks.  All right.  So that takes up

15    that issue.

16        Getting back to the jury instructions, the

17    substantial similarity instruction, I have two competing

18    instructions.  I have one from MGA and one from Mattel.  What

19    I wanted to hear is I have received also a trial brief

20    concerning unprotectable elements in the Bryant drawings from

21    MGA, which I'll review.

22        I guess I wanted to give -- I've held off in

23    issuing my order, which I tentatively announced several days

24    ago, concerning the Court's findings with respect to

25    protectable elements.  I've held off on that because I wanted

1    to give counsel an opportunity to explore that with the Court

2    and suggest any changes and additions.  And I don't think I

3    can hold off any further.

4         I need to issue that order because quite frankly,

5    those protectable elements need to be incorporated into the

6    instruction on substantial similarity.  So I guess I will

7    hear any further argument that counsel wishes to make.

8         I should just add that the points made in MGA's

9    brief are to a certain extent well taken.  I thought I

10   previously addressed them.  Words and short phrases are not

11   protected by copyright.  I don't think there's any issue on

12   that.  Mattel is not seeking copyright, obviously, on the

13   word Bratz or any of the character names.  And that's not --

14   to the extent the names are part of the copyrighted drawings,

15   the Court will include that amongst the list of

16   nonprotectable elements.

17        Similarly, the idea and concepts that are not

18   original to Bryant are not protected by copyright.  I think

19   that's fully addressed in a number of the instructions.  I am

20   giving the instruction that MGA requested that specifically

21   addresses the issue of ideas.

22        The third, the final point made was that common or

23   standard treatments of the subject matter, the scenes a

24   faire, that is certainly one that I'm adding.  And I think I

25   previously indicated that that would be part of the Court's

1    order.

2         Otherwise, I didn't take anything further from that

3    submission that needs to be added to the Court's order.  But

4    at this time I wanted to give both parties and opportunity to

5    address the Court for a time on this issue, and then I will

6    issue an order.

7         MR. NOLAN:  Your Honor, I don't intend to go beyond

8    the briefs.  We've briefed this.  The only other thing I

9    wanted to make absolutely clear on the record, though, is

10   that the submissions that have been previously made to the

11   Court in the context of both the summary judgment hearings,

12   which would include, obviously, the deposition testimony of

13   the various experts that have testified in this case

14   constitute part of this record upon which the Court is basing

15   its ruling.

16        THE COURT:  It is.  I think it's all inextricably

17   intertwined.  When I issue my ruling, and actually the order

18   is going to be issued pursuant to MGA's motion for

19   clarification of my earlier order, which itself was a --

20   basically a renewal of a motion that was initially brought as

21   part of the partial summary judgment.  This is all wrapped

22   up.

23        MR. NOLAN:  We refer to that motion internally,

24   your Honor, as the jellyfish motion.

25        THE COURT:  The jellyfish motion.  Okay.  I know

                    Unsigned                          Page  7661

1    exactly what you're talking about.

2        MR. NOLAN:  I'll also go for one more moment of

3    levity if I could.  We bought on line, and you can actually

4    buy on line T-shirts, "If you mess with the jellyfish, you

5    mess with me."  So too much insight probably, but we'll

6    submit on that, your Honor.

7        THE COURT:  The jellyfish is actually a pretty apt

8    metaphor for that particular motion, in more ways than one.

9    But I'll leave that alone.

10        MR. NOLAN:  Actually, after that hearing, that

11    weekend there was a report on the national news that there

12    was an attack of jellyfish in unprecedented numbers this

13    year.  And I sent an e-mail saying I didn't think it had

14    anything to do with your interpretation of Satava.

15        THE COURT:  I appreciate that, Counsel.

16    Mr. Zeller?

17        MR. ZELLER:  Thank you, your Honor.  One

18    administrative matter.  We have typed up an inverse ratio

19    revised instruction.

20        THE COURT:  I'm looking forward to seeing it.  I

21    trust you've given a copy to MGA?

22        MR. ZELLER:  We have.

23        THE COURT:  This should be interesting.  And,

24    Mr. Zeller, while I have you, particularly on this point, I

25    guess what I want to take up with you is in your submitted

1    instruction or Mattel's submitted instruction -- I don't want

2    to -- the three elements that you set forth as not

3    protectable do not track the language of the Court that I

4    issued.  And maybe it's because you didn't have the order.

5    But I want to hear you on that.

6            MR. ZELLER:  Well, it was our intention to track

7    the Court.  It may be just an administrative error.  But it

8    was our intention to track the Court.  I would say that

9    substantively, the main thing that we did want the Court to

10   instruct on and would ask the Court to instruct on is making

11   it clear that an original combination, even of otherwise

12   unprotected elements, can still itself be protected.

13           That was the one point we did want to get across,

14   and we added some elements, I know, into our jury

15   instruction.  Otherwise, it was largely our intent to simply

16   track what the Court had already ruled as a tentative matter.

17           THE COURT:  Just to make that clear, the elements

18   that are protectable, and the way I'm planning to write this,

19   is these are the elements that you should consider for the

20   purpose of your comparisons under the extrinsic test, and

21   then list the three that the Court identified.  The

22   particularized synergistic compilation and expression of the

23   human form and anatomy that expresses a unique style and

24   conveys a distinct or deliberate attitude.  That's, for lack

25   of a better phrase, that Bratz look as conveyed by the

1    drawings.

2        Second is the particularized expression of the

3    doll's head, lips, eyes, eyebrows, eye features, nose -- I'm

4    tempted to say or lack thereof, but I'm sure the jury knows

5    what we're talking about -- chin, hairstyle, and breasts,

6    including the accentuation or exaggeration of certain

7    anatomical features relative to others, paren, doll lips,

8    eyes, eyebrows, and eye features, close paren.  And

9    deemphasis of certain anatomical features relative to others,

10   paren, doll nose, and thin small doll bodies, close paren.

11       And they, the third, is the particularized

12   nonfunctional doll clothes, doll shoes, and doll accessories

13   that express aggressive contemporary youthful style.

14       So that expands a little on language you both used,

15   and I've been tweaking with this all week long, so I know

16   that's somewhat different from what I actually articulated on

17   the record.  But those are the elements that are protectable.

18       Then in the next paragraph, I will identify those

19   certain nonprotectable elements of the works.  And I have

20   six.  The resemblance or similarity to human form and human

21   physiology, to the presence of hair, heads, two eyes,

22   eyebrows, lips, nose, chin, mouth, and other features that

23   track human anatomy and physiology.  Third, human clothes,

24   shoes, and accessories.  Fourth, age, race, ethnicity, and

25   urban or rural appearances.  Five, common or standard

1    anatomical features relative to others.  Common or standard

2    anatomical features.  And then, six, the scenes a faire.

3         That's what I'm proposing to do.  And that's what I

4    want to hear comment on.  If I'm missing something that's

5    protectable or if I've included something that's protectable

6    that you think shouldn't be, let me know.

7         If you think that there's something nonprotectable

8    that you want to be able to argue and you think that I have

9    not included it, let me know that as well.  I've tried to

10   include everything that, based on the evidence in this case,

11   that is either being suggested as being protectable or

12   nonprotectable.

13        MR. NOLAN:  Your Honor, that sounds workable.  We

14   didn't have the live feed.  So it's hard to track.  So what I

15   would propose, if it's possible, is when we get it in written

16   form, your Honor, look at it.  Assume we're coming back on

17   Monday to address questions.

18        THE COURT:  You'll have from me today, and it's

19   almost done, a full draft of the instructions that I intend

20   to give.  And I should say this for the record now just in

21   case I forget before, the Court has fully considered all

22   objections by both sides, the responses thereto.  To the

23   extent that I have included instruction language proposed by

24   one side or the other, I am overruling the objections

25   thereto.  To the extent that I am not including proposed jury

1    instruction language, I am sustaining the objections thereto.

2    And for the reasons well set forth in both briefs.

3        I'm not going to go through and try to parse

4    through on the record every objection or every thought.  But

5    be assured that the Court has read several times now your

6    positions on these, and what I'm going to be producing today

7    will reflect essentially the Court's rulings on the

8    objections and the submissions.  And they are tentative, and

9    you are correct, and you're going to have an opportunity on

10   Monday, then, to come back, and that's when we'll do the

11   final instructions and verdict form.

12       MR. NOLAN:  And I accept that this is the court

13   order.  I just wanted to have the benefit of looking at it in

14   written form.

15       THE COURT:  You will.  It's right here.  And I'm

16   going to hopefully have the order issued today and the

17   instructions, and you'll find those elements both in the

18   order and in the instructions on substantial similarity.

19       MR. NOLAN:  And just to complete the -- complete

20   the -- what's sometimes called the Kabuki dance, which, as

21   the Court indicated, you're sustaining your position,

22   obviously just for the record, we preserve all of the

23   objections and stance, and we're not waiving anything.

24       THE COURT:  That's the nature of it.  When I

25   overrule an objection, you've made the objections.  The

1    objections are certainly part of the record.

2         MR. NOLAN:  Thank you.

3         MS. AGUIAR:  There was one instruction, your Honor,

4    that we had sort of talked about informally along the lines

5    of the using competitive product, which we are in the process

6    of providing to you.  There's another one on the whole

7    Hong Kong issue, if you will.

8         THE COURT:  Well, you submitted one, and I am

9    planning to include one.

10        MS. AGUIAR:  Okay.  I just didn't know whether we

11   were addressing that separately.

12        THE COURT:  You'll see that the Hong Kong one, or

13   at least the Court's modification of the Hong Kong one is in

14   the instructions.

15        MS. AGUIAR:  And the parties are working on that.

16        THE COURT:  You didn't get quite everything you

17   were asking for on that.

18        MS. AGUIAR:  The parties are working on then, too,

19   I guess, separately.  That would maybe not be in the document

20   you have, and that would be the competitor product one and

21   the inverse ratio; right?  Those are sort of ones that came

22   up this morning.

23        THE COURT:  Right.  I just received the inverse

24   ratio one.

25        MS. AGUIAR:  And my understanding was that you had

1    asked the parties to see if we could do something, but we --

2    we were still trying to do that.  So I'm wondering shouldn't

3    we do that and try to --

4        THE COURT:  I always encourage you to work

5    together.  If you can agree, that's always better.

6        MS. AGUIAR:  Because we are in the process of

7    putting together something.  So if you want to give us until

8    the end of the day and see if the parties can get closer,

9    because we didn't have a chance get to give them our

10    response.

11        THE COURT:  I will.  All right.

12        Mr. Zeller, did you have anything further?  You

13    kind of got moved off.

14        MR. ZELLER:  I frankly think that, to echo

15    Mr. Nolan's thought, I think it's best we just get the new

16    language.  We can go through it and probably give the Court a

17    more considered response as to any further revisions or

18    requests.

19        THE COURT:  Very good.  Thank you.  All right.

20    Okay.  So I'll continue to work on that as best I can as we

21    will proceed forward.  Let's turn to the issue of this

22    afternoon.  And have you decided about the Custodian of

23    Record as to when the custodian is going to be called?

24        MS. AGUIAR:  Given the time considerations, your

25    Honor, we may do the custodian a bit later because obviously,

1    if we run out of time, we want to get our damages expert on.

2        THE COURT:  Excellent.

3        MS. AGUIAR:  I would still like to be able to

4    address the documents outside the presence of the jury and

5    sort of resolve the objections if we have time to do that,

6    but I'd rather not do that right now.

7        THE COURT:  We're starting right at one o'clock,

8    assuming that the jury is back.

9        All right.  Is there anything else for this

10   afternoon?

11       Mr. Corey.

12       MR. COREY:  I would like to talk about Mr. Meyer

13   before he takes the stand.

14       THE COURT:  Yes.  What exactly is your concern

15   about Mr. Meyer?  I know you've been harboring this for

16   several days now.

17       MR. COREY:  I have.  And I'm just so anxious to get

18   here.  No.  Mr. Roth stood in front of the Court and said

19   these are the six things that we're going to consider when we

20   talk about apportionment.  And there are two problems that he

21   created when he did that.

22       First, we understand that Mr. Meyer is going to be

23   offering a number of apportionment approaches that don't take

24   into consideration those factors at all, that are completely

25   separate and apart from --

1          THE COURT:  Additional apportionment factors.

2          MR. COREY:  Well, there are two problems here.

3    Actually, three problems.  The apportionment approaches are

4    not tied to the factors even a little bit.  They focus on

5    things like how much MGA paid Carter Bryant, the royalty

6    percentage.  And so we're really talking about two separate

7    universes of approaches to how we're going to apportion

8    things.

9          And so based on Mr. Roth's representation that the

10   Court has on the yellow sticky pad, I think that ship kind of

11   has sailed.

12         Now, with respect to these factors that Mr. Roth

13   identified, there's some pretty significant 702 and 703

14   problems there because they are really just created out of

15   whole cloth.  But one of the things that experts have to do

16   is rely on something that has some objective, reliable basis.

17   And Mr. Roth has articulated for you five or six factors that

18   he considers to be reasonable.  And those come out of

19   Mr. Meyer's report.

20         But Mr. Meyer's source for those factors is just

21   Mr. Tonner, who the Court has excluded, and Ms. Garcia, who

22   is just a fact witness of MGA.  So there's nothing empirical

23   or objective that Mr. Meyer is looking to say this is what

24   one should consider when valuing a doll or valuing any

25   consumer product.  He's not a doll expert.  And he admitted

Unsigned                                    Page  7670

1     in his deposition that he has never been involved in anything

2     professionally that relates to the sales or marketing of

3     dolls.

4             And so he has to rely on Mr. Tonner and Ms. Garcia

5     for these particular factors.

6             Now, the other piece of this is these six factors

7     or these seven factors, they really are just picked out of

8     the air.

9             THE COURT:  Well, you said it a couple times, but

10    the Court has already heard evidence on a number of these

11    factors from other witnesses.  So I don't --

12            MR. COREY:  I'm not suggesting at all that these

13    are not relevant factors, not even a little bit, your Honor.

14    What I am saying is the selection of the seven or whatever

15    the number is is completely arbitrary.

16            THE COURT:  Six.

17            MR. COREY:  It's completely arbitrary.

18            THE COURT:  It was the original five that Mr. Roth

19    identified and one that the Court basically gleaned from the

20    evidence.

21            MR. COREY:  Right.  And the design of the doll I'm

22    assuming the Court is including.  Because I don't know that

23    that's on Mr. Roth's list.  But again, MGA is going --

24            THE COURT:  No, the design of the doll was not on

25    his list.  That was not submitted as a basis for

1    apportionment.  And the Court made a strong mental note of

2    that, Counsel.

3         MR. COREY:  I appreciate that.  I won't address

4    that any further, then.

5         But Mr. Gruca, who I understand MGA will present,

6    has done a survey where he has two additional factors that

7    have no bearing, completely unrelated to those five factors,

8    MGA itself has presented evidence of Mattel documents where

9    Mattel says that there are other factors that are relevant

10   for considering -- which attribute to the value of the doll,

11   including is it funner to play with, does my mom like it,

12   things like that.

13        So the suggestion is the selection and the use of

14   these 11 factors really doesn't meet the standards required

15   by 702 or 703.  So there's no basis to use them that way as

16   the basis for expert testimony.

17        THE COURT:  It sounds like these are foundational

18   objections and, as I've indicated throughout, you reserve all

19   of your foundational objections.  And I think I've made the

20   statement before, that any side submitting any witness runs

21   the risk of that witness not testifying if they are not able

22   to establish a foundation.

23        So I -- just having your presentation right now, I

24   haven't heard from MGA on any of this, but I'll be mindful of

25   your concerns.

1          MR. COREY:  And I appreciate that, because I do

2     think this was something easier to do outside the presence of

3     the jury rather than trying to do it on the fly.

4          I was just passed a note, and I know this is

5     something that we had been attempting to raise with the

6     Court.  Mr. Gruca, who MGA intends to offer, was presented

7     solely as a rebuttal witness.  And Carol Scott, the witness

8     that he is purporting to rebut, was not called in our case.

9          THE COURT:  That reminds me.  We had a ruling on

10    this before.  What was the Court's ruling on that?

11         MR. ROTH:  Your Honor, I must object at this point.

12    That argument was offered and rejected.  I mean, we had a

13    series of hearings on this exact issue.

14         THE COURT:  I thought so.

15         MR. ROTH:  And you'll recall the result was that

16    Mattel was going to be permitted to offer up Mr. Kivetz.

17    That was the consult of three or four hearings on this issue.

18    That exact argument has been raised and frankly --

19         THE COURT:  I do recall that.

20         MR. ROTH:  Your Honor, with respect to -- if your

21    Honor is prepared to proceed, we can.  I will say --

22         THE COURT:  We don't have time for a hearing

23    outside the presence of the jury.  We need to start with the

24    jury at one o'clock.  So we're going to have to proceed and

25    call your witness, and the Court will rule on the objections

1    as they come up.  This is the last day of trial after three

2    months.  You are certainly aware of their objections, and you

3    are aware of your positions, and I assume both sides are

4    ready to proceed.

5         MR. ROTH:  The one thing I'd say is this is new.

6    Our approach, our apportionment factors were set out in a

7    report that was served in February.

8         THE COURT:  I understand that.

9         MR. ROTH:  And no Daubert --

10        THE COURT:  You're not backing away from the

11   apportionment factors that you gave the Court.

12        MR. ROTH:  No.  Just so we're clear, on the design

13   of the doll, just so you're not alarmed, we're distinguishing

14   that from the other factors that we believe to be

15   unprotected.  We're not saying the design of the doll is an

16   apportionment factor that's sort of on our side of the

17   ledger.

18        What we're distinguishing between is the design of

19   the doll on the one hand and things like accessories and

20   packaging and themes we've been talking about on the other

21   hand to measure those.

22        THE COURT:  I asked about what factors are you

23   seeking the apportionment on.  And I got a list, and that's

24   it.

25        MR. ROTH:  Your list is correct.

1          THE COURT:  Because doll design apportionment would

2     have raised a whole bunch of issues that we would have had to

3     get into, and I presume that you were not going down that

4     road just because the complexities.

5          I mean, Patry writes at length on this in his

6     discussion of Sheldon, that this can be a very complicated

7     analysis.  Putting doll design aside, and that's why when we

8     start taking dolls apart and things of that nature, the Court

9     sustained objections on relevancy grounds.

10          But I really did rely on these on packaging

11     noncopyrighted accessories, promotional themes, additional

12     characters.  I did get into mechanical maneuverability just

13     because I thought even though that goes to doll design,

14     that's so clearly divorced from doll design aspects of how

15     the doll looks and arguably the protectable element issues,

16     that I thought that was easily severed out.

17          So I've given you actually a sixth factor, but I'm

18     not -- doll design as a concept like that, that is waived.

19     That is gone.

20          MR. ROTH:  Not comparing arms to legs.

21          THE COURT:  Very good.  So we're good on that.

22          Anything else?  It's past one o'clock.  I really

23     want to bring the jury in because we only have two and a half

24     hours of testimony left, and we've got a rebuttal witness,

25     and we've got to get through here by 5:30.  So let's move

                    Unsigned                          Page  7675

1   forward.

2        MR. ROTH:  Very good, your Honor.

3        THE COURT:  All right.  Let's bring the jury in.

4        (WHEREUPON THE JURY ENTERS.)

5        THE COURT:  Good afternoon, members of the jury.

6   The Court has an instruction to provide concerning some

7   testimony you heard earlier.  You heard testimony earlier

8   about conversations between Mr. Larian and his counsel

9   concerning when Carter Bryant did the drawings and the works

10  in question.

11       That testimony is stricken, and you are instructed

12  to disregard any testimony or evidence concerning

13  communications between Mr. Larian and his counsel.  That

14  should not affect your decision at all.

15       Counsel, you may continue.

16       ISAAC LARIAN, PREVIOUSLY SWORN.

17       RECROSS-EXAMINATION (CONTINUED)

18  BY MR. PRICE:

19  Q.  I think you said a couple times in your examination that

20  you respected the jury's verdict; is that right?

21  A.  I do.

22  Q.  The day of the jury's verdict, you spoke with The Wall

23  Street Journal, didn't you?

24  A.  I don't recall.  I might have.

25  Q.  And do you recall telling that reporter in connection

1    with the jury's verdict that, quote, Mattel succeeded in

2    confusing the jury.

3    A.  I said that, yes.

4    Q.  You also -- Mr. Nolan asked you about whether you had

5    any malice toward Mattel.

6         Do you recall that?

7    A.  I'm sorry?

8    Q.  Mr. Nolan asked you whether you had any malice toward

9    Mattel.

10        Do you recall that?

11   A.  Do I have any malice toward Mattel?

12   Q.  Yes.  Do you recall Mr. Nolan's --

13   A.  In regards to what?

14   Q.  Mattel.

15   A.  Yes, I heard the question.

16   Q.  And you said you did not; correct?

17   A.  That's correct.

18   Q.  I believe your testimony was that the idea for a fashion

19   doll began when someone at Wal-Mart said they wanted

20   something to compete with Mattel?

21   A.  I believe one of the things that was -- that I said

22   created the idea for fashion doll was Ron Stover, who was a

23   Wal-Mart buyer, said bring me something that competes with

24   Barbie.

25   Q.  And in connection with that competition and talking with

1    employees at MGA, you have used the phrase that you want to,

2    quote, kick Mattel's ass; correct?

3    A.  I'm sorry?  Have I said that?

4    Q.  Yes, to your employees.

5    A.  Yes, I have.

6         MR. PRICE:  No further questions.

7              FURTHER REDIRECT EXAMINATION

8    BY MR. NOLAN:

9    Q.  Mr. Larian, do you compete with Mattel in the

10   marketplace?

11   A.  Yes, fiercely.

12   Q.  For how long?

13   A.  For at least the past seven years.

14   Q.  Do you want to kick their ass in the marketplace?

15   A.  Yes, I do.

16        MR. NOLAN:  Nothing further.

17   Q.  Well, you know, Mr. Price asked you a series of

18   questions regarding percentages of effort with respect to

19   various product lines at MGA.

20        Do you remember that line of questioning?

21   A.  I do.

22   Q.  And he was asking you percentages.  Have you done any

23   analysis on the percentages --

24        MR. PRICE:  I'll object.  It is beyond the scope of

25   my recross.

1          THE COURT:  It is beyond the scope.

2          MR. NOLAN:  Your Honor, permission just to reopen

3     for one moment on this?

4          THE COURT:  Make it brief, Counsel.

5     Q.  BY MR. NOLAN:  Remember those questions and answers?

6     A.  I do.

7     Q.  Asking you various percentages?

8     A.  Yes.

9     Q.  Prior to today, have you done any calculations with

10    respect to the amount of expenses or allocation of expenses

11    on product lines?

12    A.  I have never done any calculation prior to today or

13    today.  I just was guessing.

14    Q.  And there's an expert that has been retained for MGA to

15    offer such an opinion; is that correct?

16    A.  I believe it is.  I don't know the exact.

17    Q.  Would you defer to his analysis of the actual records of

18    MGA on those points?

19         MR. PRICE:  Object.  Lack of foundation that

20    Mr. Larian knows the basis of that analysis.

21         THE COURT:  Sustained.

22    Q.  BY MR. NOLAN:  Have you met with the damage expert in

23    this case?

24    A.  I have met him, just somebody introduced me, as Paul

25    somebody.  But I don't even remember his last name.  If your

1     question is I've met with him to discuss anything, I have

2     not.

3     Q.  Okay.  One way or the other, you've not done any factual

4     calculations, though, with respect to efforts on one product

5     versus another product; correct?

6     A.  I have not.  I'm not an accountant.

7          MR. NOLAN:  Thank you.  Nothing further.

8          FURTHER RECROSS-EXAMINATION

9     BY MR. PRICE:

10    Q.  You said you just want to compete with Mattel in the

11    marketplace; right?

12    A.  Absolutely.

13    Q.  You have a website for MGA, don't you?

14    A.  Yes, called MGA dot com.

15    Q.  And if you go to that website, one of the questions it

16    asks is is Mattel racist.  That's still on your website right

17    now.  Isn't it?

18    A.  Yes.

19    Q.  And with respect to the expenses, I was asking you about

20    people's efforts on Bratz versus non-Bratz products.

21         Do you recall that?

22    A.  I'm sorry.  Can you repeat that?

23    Q.  I was asking you about folks' efforts, the time they

24    spent on Bratz versus non-Bratz product; correct?

25    A.  Yes.

1    Q.   And as the Chief Executive Officer of the company, you

2    gave me your best estimate; correct?

3    A.   I gave you my guess, yes.

4    Q.   Are you saying you don't know what your employees are

5    working on?

6    A.   We have 1,600 employees.  And I don't know what everyone

7    is working on.  Mr. Eckert didn't know what the senior

8    vice-president of Mattel was working on.

9    Q.   But you have an idea as to how your company is using its

10    resources so that you can try to make a profit.  You have

11    some general idea about that, don't you?

12    A.   I do.

13    Q.   Okay.  And that's what you were using when you were

14    telling me the percentage of MGA's time and effort that went

15    to non-Bratz products; right?

16        MR. NOLAN:  Objection, your Honor.  Misstates the

17    question that was asked in the first instance by Mr. Price.

18        THE COURT:  Rephrase your question, Counsel.  Watch

19    the speaking objections, please.

20    Q.   BY MR. PRICE:  When you were saying, when you were

21    testifying that, quote, a lot of time went into non-Bratz

22    products, do you recall saying that?

23    A.   Yes.

24    Q.   And you recall giving percentages between 50 percent to

25    30 to 50 percent to 60 to 70 percent.

1          Do you recall that?

2     A.   That's my guess, yes.

3     Q.   And you said at the time that was your best estimate;

4     correct?

5     A.   Best estimate or best guess.  I have a language barrier.

6     Q.   And you were giving that best estimate of the amount of

7     time that was spent on non-Bratz products based on your

8     general understanding as to how MGA was allocating its

9     resources over those years; correct?

10    A.   I gave you just my best estimate.

11    Q.   Based upon your general understanding as the CEO of MGA;

12    correct?

13    A.   That's right.

14         MR. PRICE:  No further questions.

15            FURTHER REDIRECT EXAMINATION

16    BY MR. NOLAN:

17    Q.   The actual acting and allocations would be best found in

18    the financial records of MGA; is that correct?

19    A.   100 percent accurate.

20         MR. NOLAN:  Thank you.  Nothing further.

21            FURTHER RECROSS-EXAMINATION

22    BY MR. PRICE:

23    Q.   Those general expenses, people's salary, research and

24    development, you know, how much time they are working on

25    different products, that's not allocated in MGA's accounting

Unsigned                                        Page  7682

1    records; right?

2        MR. NOLAN:  Objection, your Honor.  Lack of

3    foundation.

4        THE COURT:  Overruled.

5        THE WITNESS:  I don't know.  I'm not an accountant.

6        MR. PRICE:  Nothing further.

7        MR. NOLAN:  Nothing further.

8        THE COURT:  All right.  Mr. Larian, you may step

9    down.  Thank you.

10       Defendant's next witness.

11       MR. KENNEDY:  Your Honor, we call Paul K. Meyer.

12       THE CLERK:  Please raise your right hand.

13           PAUL KEVIN MEYER, SWORN.

14       THE CLERK:  Please take the stand.

15       Please be seated.  State your full name for the

16   record, and spell your last name.

17       THE WITNESS:  Paul Kevin Meyer, M-E-Y-E-R.

18           DIRECT EXAMINATION

19   BY MR. KENNEDY:

20   Q.  Good afternoon, Mr. Meyer.  Would you tell us where

21   you're currently employed.

22   A.  Yes.  I'm a managing director at a consultant company

23   called Navigant Consulting.

24   Q.  What does Navigant Consulting do?

25   A.  It's a large consulting company, about 2,000 people.

1    And we do lots of financial, economic studies in many

2    industries from financial to banking to entertainment, to

3    construction.  I focus mostly on intellectual property.

4    Q.  What is your title at Navigant?

5    A.  I'm managing director.

6    Q.  How long have you been with Navigant?

7    A.  About four and a half years.

8    Q.  Have you been retained in this case by MGA to offer

9    certain expert opinions?

10    A.  Yes, I have been.

11    Q.  And are those generally regarding MGA's profits from

12    Bratz and Mattel's other damage claims?

13    A.  That would be correct.

14    Q.  And have you formed opinions in that regard?

15    A.  Yes, I have.

16    Q.  Before we get to those opinions, I'd like to start with

17    a brief overview of your educational background, with

18    particular emphasis upon how it bears on the opinions you've

19    reached in this case.

20         Can you give us a summary, please, of that

21    educational background starting at the college level.

22    A.  Yes.  I attended the University of Virginia in

23    Charlottesville.  I studied business there and received a

24    degree in business with a concentration in accounting and

25    quantitative methods.  That was in 1979.

1          Since then, I've maintained my sort of training and

2     education through being a Certified Public Accountant, where

3     I've taken a variety of courses over the last almost 30

4     years.

5     Q.   In addition to being a CPA, you have a CPA accreditation

6     in business valuation?

7     A.   Yes, as part of being a CPA, I took a separate exam

8     about 10 years ago and was accredited in a business valuation

9     certification, which is focused on valuing businesses,

10    valuing divisions, product lines, that type of thing.

11    Q.   In addition to your consulting duties at Navigant, do

12    you have any teaching positions?

13    A.   Yes.  I've been teaching at Stanford University for

14    about 17 years.  And I teach there -- first it was two

15    full-time courses.  I'm now back to the fall quarter.  I

16    teach a class basically in financial analysis, in accounting

17    that really is focused on helping engineers when they go out

18    and run companies and divisions, understanding their

19    financial data, understanding how the company's finances

20    work, divisions to corporations to product lines.

21          So it's geared on a financial analysis.  That's

22    been the last 17 years in the fall quarter.

23    Q.   Have you testified before in court as an expert witness

24    with regard to those kinds of areas?

25    A.   Yes, I've been in about 60 trials.

1    Q.  And have you also been deposed out of trial in other --

2    in those and other cases?

3    A.  Yes, in a wide variety of financial analysis and damage

4    cases, about 200 times.

5    Q.  Have you previously testified as an expert concerning

6    damages in copyright cases?

7    A.  Yes, I have.

8    Q.  Have you been hired by both plaintiffs and defendants in

9    copyright cases over the years?

10    A.  Yes, I have.

11    Q.  In the course of your experience, would you say that you

12    developed expertise -- tell us whether or not in analyzing

13    and reviewing financial statements?

14    A.  Yes, I've spent a lot of time over the last 30 years

15    analyzing, reviewing, preparing financial statements, and

16    also lecturing and teaching on the components and results of

17    financial statements.

18    Q.  And how about with regard to analyzing costs associated

19    with particular products.  What have you done in that regard?

20    A.  I've done a lot of product line analysis, and a big part

21    of my Stanford class each year, we pick one company and take

22    the company and break it down and study it -- all its

23    operations, all its financial results, all its financing --

24    and try to figure out where the company's been, where it's

25    going, look at product lines.  And that's really the big part

1    of the course for the students and that fall semester class

2    at Stanford.

3    Q.   And how about calculating profits earned for particular

4    products.  Is that something you've had occasion to do?

5    A.   Yes, on many occasions.

6    Q.   How about determining the value of businesses?  Have you

7    done that?

8    A.   Yes, I have.

9    Q.   And approximately how many hours have you personally

10   spent on this case?

11   A.   On this case, probably about 500 hours.

12   Q.   And in addition to the 500 hours you've spent

13   personally, have other people from Navigant assisted you on

14   this case?

15   A.   Yes, they have.

16   Q.   And approximately how many hours have you and your

17   colleagues at Navigant spent on this case in toto?

18   A.   I believe around in total, about 4,000.

19   Q.   And your personal billing rate is how much per hour?

20   A.   $550 an hour.

21   Q.   And the other people are less than that?

22   A.   That's correct.

23   Q.   But they are charging for their time as well?

24   A.   Yes, sir.

25        MR. KENNEDY:  Your Honor, we would offer Mr. Meyer

1      as an expert in financial analysis.

2            THE COURT:  Any objection?

3            MR. PRICE:  No objection.

4            THE COURT:  So designated.

5      Q.  BY MR. KENNEDY:  Now, in the course of working on this

6      case, have you attempted to evaluate profits from MGA's sale

7      of Bratz-related products?

8      A.  Yes, I have.

9      Q.  Did you also review Mr. Wagner, the plaintiff's economic

10     damages expert's valuation of the Bratz franchise damages

11     theory?

12     A.  I've also done that.

13     Q.  And could you tell us whether you also reviewed

14     Mr. Wagner's distribution damages theory with regard to

15     Mr. Larian?

16     A.  I've looked at that also.

17     Q.  And have you also looked at Mr. Wagner's net worth

18     calculations for MGA and Mr. Larian?

19     A.  Yes, I have.

20     Q.  Okay.  Now, turning -- and in the course of analyzing

21     that material, could you give us a brief summary of the kinds

22     of information that you've considered and reviewed?

23     A.  Yes.  It's been quite comprehensive.  I wanted to come

24     to understand the financial operations of the MGA business.

25     So I spent a lot of time looking at their audited financial

1    statements. We call it a profit-and-loss statement. And

2    then I went deeper than that and looked at a system that was

3    basically their general ledger system of accounts. That was

4    called an Exacta (phonetic), and Great Plains was their

5    summary of their general ledger account, which is all their

6    accounts for their business.

7         Then there's a system called Target, which tracks

8    for MGA their -- for each product and what they call stock

9    keeping unit, SKU, all the revenues and the costs of goods

10   and royalties and some tooling. So I looked at those

11   financial records.

12        I spent a lot of time looking at marketing and

13   other business records of MGA for background on the Bratz

14   business. I spent a lot of time going and looking at

15   Mattel's records and the records about marketing and selling

16   their fashion dolls and some surveys that were done for their

17   fashion doll purposes.

18        I interviewed persons at MGA about the business,

19   the product managers, the financial people, some of the tax

20   people, and I did some third party research to look at

21   analyst reports and outside information to help me

22   corroborate my findings.

23        So it was sort of three prongs, looking at MGA,

24   looking at Mattel, and then looking at third party outside

25   sources.

1    Q.  And have you prepared a graphic depicting the overall

2    methodology that you've employed in attempting to determine

3    both Bratz-related profits and the portion of those profits

4    that's attributable to Mattel's property?

5    A.  Yes, I have.

6    Q.  And calling your attention to slide 102, which we just

7    put up entitled Overview methodology.  Could you explain for

8    us what the steps are there and also the color coding that

9    you've used.

10   A.  Yes, I can.  It's a simple but important chart.  I start

11   at the top.  The first row is basically I come up with, in

12   this case, the total Bratz-related revenues, and I did a

13   bunch of work in addition to that to break out those

14   revenues.  And we'll discuss that.

15           I then deduct from the revenues the costs and

16   expenses that it's taken MGA to both manufacture and market

17   and do product development and support those Bratz revenues.

18   So I deduct the expenses from the revenues to come up with

19   row 3 there, which is the profit.  And that would be the

20   overall profit on all the Bratz-related accounts.

21           And then once I'm at the profit level, I then go

22   one step further, and I do an analysis that relates to

23   apportioning those profits to, in this case, what we call the

24   Mattel's protected property.  And I come up with an analysis

25   of that and a percentage.  And I multiply that percentage

1    times the profits, the green box there.  And then come up

2    with what I call the total damages in this case based on my

3    analysis and my study.

4    Q.   And focusing in on the profits, the blue revenue, the

5    gold expenses and the green profit.  Have you prepared a

6    graphic depicting where you and Mr. Wagner disagree?

7    A.   Yes, I have.

8         MR. NOLAN:  Aaron, could we see 148-02, please.

9    Q.   And is it correct -- to try to move this along, you and

10    Mr. Wagner are basically in agreement concerning the total

11    revenues that were generated by Bratz products?

12    A.   Yes, sir.

13    Q.   You take all of the revenues from all of the stuff on

14    the floor here and all of the products upstairs in the other

15    courtroom, and you both agree the total revenues rounded are

16    about 3.1 billion?

17    A.   That's correct.

18    Q.   And then is it correct that you and Mr. Wagner are also

19    in agreement as to what should be subtracted from that 3.1

20    billion for costs of goods sold?

21    A.   That's correct.  There's some rounding there, but

22    basically we don't disagree with the $1.7 billion of the cost

23    of goods; that's correct.

24    Q.   And just as a reminder, what sorts of things are

25    included within costs of goods?

Unsigned                                           Page  7691

1    A.  I think the picture you should have is that you think

2    about what it takes to actually assemble the doll and to

3    build the doll in terms of the manufacturing costs, the

4    contract costs, and to package it up and have it ready to be

5    shipped.  So it's the costs of all of the hair, the contract

6    manufacturing, and the molds and tooling and what not, but

7    that's basically the costs of goods, the cost of production.

8    Q.  And so far you and he are in agreement for the first two

9    lines there?

10   A.  I would say generally, that is correct.

11   Q.  Now we get to operating expenses.  And is it correct

12   that he believes the operating expenses that are attributable

13   to the Bratz line are about 600 million while you believe

14   they are more like 800 million?

15   A.  That's correct.

16   Q.  Okay.  And again, just as a reminder, what sorts of

17   things are included within operating expenses as opposed to

18   cost of goods sold?

19   A.  Well, that would be your selling and marketing expenses,

20   would be your advertising, producing your commercials and

21   buying the placement, the media.  It would include all your

22   premises and facility costs, of all your different warehouses

23   and home office.  It would include all the salaries of the

24   people that support the product line.  So it's all those

25   costs that are really the infrastructure of the company to

1    help make its sales.

2    Q.  And to determine operating expenses in this case, does

3    that require some kind of allocation of MGA's total operating

4    expenses to get to the Bratz expenses?

5    A.  Yes.  Because MGA has the Bratz business and some other

6    businesses and so you have to make some determinations as to

7    how to divide the costs out between their businesses, between

8    Bratz and non-Bratz.  So that's part of the effort.

9    Q.  And you and Mr. Wagner both tried, and you came up with

10   different answers.

11   A.  That's correct.

12   Q.  We'll talk about that more in a minute.

13        Now, coming down to taxes, you're also in

14   disagreement with Mr. Wagner there; correct?

15   A.  That's correct.

16   Q.  Again, he doesn't feel that federal taxes should be

17   deducted.  You feel that they should.

18   A.  That's correct.

19   Q.  And when Mr. Wagner was here, he told us that applying

20   his methodology, the total Bratz profits were just under

21   $778 million.  777.9.  What in your opinion are Bratz' total

22   profits for the entire line?

23   A.  My figure is the bottom right-hand side there.  It's the

24   405 million.  It's actually 405.4 million would be my amount.

25   That's the profits on Bratz.

1    Q.   Okay.  Now, let's focus in first on your disagreement

2    with Mr. Wagner about operating expenses.  And did you

3    prepare a slide showing the steps that you took in attempting

4    to determine what portion of MGA's operating expenses should

5    be ascribed to the Bratz line?

6    A.   Yes, I have.

7         MR. KENNEDY:  And, Aaron, could we see 194, please.

8    Q.   And could you briefly explain to the jury what the steps

9    are that you took, and this is with regard to the operating

10   expenses; is that right?

11   A.   Yes, it is.  I can do that.  I'll take this at a higher

12   level.  There's various steps here that allowed me to have a

13   methodology to come up with what I think is the right amount

14   for operating expenses.  The first line, I investigated how

15   MGA did its own accounting and its own overhead allocations

16   and confirmed I was consistent with that.

17        Secondly, he spent a lot of time looking at the

18   change in head count at MGA, between the year 2000 and the

19   year 2006.  And I saw a large increase in head count, that

20   was important to coming up with my operating expense opinion.

21        I spent a lot of time comparing the results of my

22   Bratz financial analysis versus MGA to be consistent amongst

23   all the financial records that I fully accounted for

24   everything to be consistent there.

25        The fourth step is probably one of the most

1    important.  And that is I looked at the MGA business before

2    and after the release of Bratz. And so I went back to the

3    calendar year 2000, studied all the operating expenses, and

4    then I documented how those expenses grew significantly after

5    2000 when Bratz was released, looking at the relationship of

6    the costs being spent to support the sales.  I had

7    discussions with MGA's financial people and talked a lot

8    about things with them.

9         And then in a moment, I'll talk about this in more

10   depth, but I ran a statistical model called a regression

11   analysis to confirm the relationship of the operating

12   expenses to sales.  I reviewed Mr. Wagner's approach.  And

13   then lastly, I determined that my analysis and the costs I

14   deducted were consistent with how Mattel accounts for its

15   costs with its Barbie product line.

16   Q.  And in the course of this, did you attempt to just

17   reconstruct how MGA's operating costs as a whole, operating

18   expenses as a whole changed between 2000 and 2006?

19   A.  I certainly documented that and reviewed those changes.

20   Q.  And did you prepare a graph showing those changes?

21   A.  Yes, I have.

22        MR. KENNEDY:  And, Aaron, if we could see 146.

23   Q.  Can you tell us first, if we can clarify, whose expenses

24   are we talking about here?  Is this MGA as a whole or just

25   Bratz?

1    A.  This is MGA as a whole.

2    Q.  And can you --

3        MR. PRICE:  In that case, I object as being

4    argumentative, the title.  Given the testimony.

5        THE COURT:  Why don't you rephrase, Counsel.

6        MR. KENNEDY:  Your Honor, not to quarrel with the

7    Court, we've tried to remove the offending --

8        THE COURT:  Recharacterize it.

9    Q.  BY MR. KENNEDY:  Showing you part of Exhibit 142.

10        THE COURT:  There we go.

11   Q.  BY MR. KENNEDY:  Looking to the chart as it's now on the

12   board, can you explain what those columns represent?

13   A.  Yes.  In the lighter shade, that's the amounts in the

14   calendar year 2000 before Bratz was released.  And these are

15   operating expense accounts for MGA.  So you'll see those

16   amounts in the lighter shade.  So for example, the premise is

17   a million dollars, and the darker orange color is basically

18   in 2006 those same accounts and what those amounts are.  And

19   so, for example, with sales and marketing in 2006, it's about

20   $79.4 million.  And that compares with 13.4 million in the

21   calendar year 2000.

22        So the purpose was to analyze over time how those

23   accounts changed and then to match that up with the growth in

24   the Bratz sales.

25        And to give you a sense, there was no Bratz sales

1    in the calendar year 2000.  And then by 2006, those sales

2    were $628 million.  And so as the sales went up, I tracked

3    how the costs changed.

4    Q.  Now, we've heard in this case that MGA acquired a

5    company called Little Tykes.  Is whatever happened because of

6    Little Tykes reflected on this chart?

7    A.  No.

8    Q.  Why not?

9    A.  That acquisition took place in late 2006.  And so those

10   amounts are not in these numbers.

11   Q.  From your review, the Little Tykes numbers don't start

12   showing up until 2007?

13   A.  In our analysis, that's correct.  In 2007.

14   Q.  In addition to seeing what happened to MGA's operating

15   expenses after the launch of Bratz, did you also check to see

16   what was the history with regard to MGA's head count, number

17   of employees during those years?

18   A.  Yes, I did.

19      MR. KENNEDY:  And, Aaron, could we see 147 without

20   the title.

21   Q.  And again, this is covering the period through 2006.  So

22   any head count of Little Tykes isn't included on here.

23   A.  That's correct.  This is MGA without Little Tykes, and

24   it shows the growth in the head count from 2001.  The 135

25   employees up to 837 as of 2006.  And so that's the growth

1    that I mapped out there.  And then it's compared against the

2    MGA total sales in that period.

3    Q.  Okay.  And then you've got a yellow staggered line.

4    What is that referring to?

5    A.  That's the MGA total sales for that period.  So

6    you'll see that by the end of that period, 2006, those sales

7    were $685 million, and they were back in 2001, they were

8    $25 million.  In fact, let me clarify.

9         Those are the Bratz sales.  And so Bratz sales in

10    2001 are about 25 million.  And by 2006, they are 685

11    million, and that's in gross revenues.

12    Q.  So the gray columns are showing the number of employees

13    each year, and the yellow or gold staggered bar is showing

14    Bratz sales; is that correct?

15    A.  That's correct.

16    Q.  Okay.

17         Having seen those numbers, there was nothing there

18    that established that growth was necessarily caused by Bratz,

19    was there?

20    A.  Well, there was two things.  First, those kinds of

21    comparisons, and I made many others, and my other work steps

22    indicated to me that these operating costs were highly

23    variable with the sales, but I wanted to go the next step and

24    say could I run a statistical model to take that one step

25    further and confirm that relationship of, as sales go up, do

Unsigned                                                    Page  7698

1    the costs go up in a certain relationship, and that's what I

2    did next.

3    Q.   And is there a statistical tool that allows us to

4    determine whether those increases are just coincidence or

5    whether they are causally related.

6    A.   You can run financial analyses.  It's called a

7    regression analysis.  And that's a financial model that

8    allows you to look at the relationship of two variables.  In

9    this case, the Bratz sales comparing it to the operating

10   costs.

11   Q.   And Mr. Wagner told us he also did a regression

12   analysis.  Did you two guys do exactly the same analysis?

13   A.   We both ran regression analyses.  We structured the

14   calculations differently.  So we have different formulas and

15   different approaches to actually doing the calculations.

16   Q.   We've heard the word model used in connection with a

17   regression analysis.  Is that what it is?

18   A.   It is a financial model.

19   Q.   And what do you do -- do you just get a book off a shelf

20   and that provides the model, or is there judgment involved in

21   how you do that?

22   A.   Well, the formulas are straightforward, but you have to

23   think about what you are analyzing, and you should set up the

24   model in a way that's consistent with the type of business

25   that you're looking at and the data you have and the time

1    periods you have.

2         So you actually want to do some planning on the

3    front end to run the model in a way that will make the most

4    sense and fit your circumstances.

5    Q.  And is the $405 million profit figure that we talked

6    about earlier the product of your regression analysis?

7    A.  It's the product of two things.  It's the product of

8    looking at the relationship of sales and costs and then

9    confirming that by running the regression model and adopting

10   those results.  So it's the combination of the two.

11       MR. KENNEDY:  Aaron, could we put up 148.02 again,

12   please.

13   Q.  Going back to the third line, the operating expenses, is

14   the 800 million the product of your regression analysis?

15   A.  The regression analysis supports that, that's correct.

16   Q.  And then the 405 million is the product of the

17   regression analysis plus your assumptions?

18   A.  Plus the other analyses, that's correct.

19   Q.  And is it your understanding that Mr. Wagner's

20   600 million is the product of his regression analysis?

21   A.  That plus some other adjustments that he makes.

22   Q.  Okay.  You say adjustments that Mr. Wagner made.  Can

23   you explain what you're referring to?

24   A.  Yes.  He ran a regression model for the same time period

25   that I analyzed, and then he got the results of that model,

1    and then he overrode those results and made some adjustments,

2    and so he adjusted the result by, I believe, 125 million

3    dollars approximately.  And so in some respects he doesn't

4    really use his regression model.  He starts with it, and then

5    he makes deviations.

6    Q.  In your opinion, if you've come up with a proper

7    regression analysis model, and you run the regression

8    analysis, should you then have to adjust it upwards or

9    downwards by $125 million?

10    A.  I certainly don't believe that you should adjust it by

11    that much.  That was an approximate 30 percent adjustment to

12    his result.  And so that was a very significant adjustment.

13    And I wouldn't accept that kind of approach.

14    Q.  Okay.  And I believe Mr. Wagner testified that he then

15    did a second analysis -- same model, but using new numbers.

16    Are you familiar with that one?

17    A.  Yes, I am.

18    Q.  And I believe he testified he did about a $40 million

19    net adjustment on that one.  Are you familiar with that?

20    A.  Yes, I am.

21    Q.  And again, if you've got a properly constructed

22    regression model and you've made the right assumptions, in

23    your experience, should you have to make a $40 million

24    adjustment at the end?

25    A.  I wouldn't agree with that.  I think that he should not

1    have done that.

2    Q.  Recognizing you're getting paid by MGA and maybe your

3    opinion as to whose regression analysis might be something

4    other than totally objective, are there objective tests that

5    you can apply to regression analysis to determine which one

6    is more reliable?

7    A.  There's a couple of statistics that come out of the

8    model that tell you basically how good a formula, how good a

9    model is.  There's one that's called the t-stat, S-T-A-T, and

10   that gives you feedback on whether or not you should actually

11   be running the model.

12        So you need to have a t-stat that's greater than 2

13   and the higher the value, the better.  That's your first

14   metric.  And secondly, the one we probably all hear about is

15   called R squared, and that basically says how good of a

16   prediction are you getting with your formula.  In this case,

17   we're looking at the change in sales of Bratz versus the

18   operating costs of MGA.  So the higher the

19   R squared, the better equation, the better predicted value

20   you have of your formula.

21        So you want a high R squared, and you want a t-stat

22   that also is higher certainly than -- the higher the better.

23   So those are just metrics that you receive when you run your

24   formulas, and they allow to you grade out your results.

25   Q.  Okay.  And did you prepare a slide comparing the t-stat,

1 that's small letter T, hyphen S-T-A-T, results for your

2 regression analysis and Mr. Wagner's first regression

3 analysis?

4 A. Yes, I have.

5  MR. KENNEDY: Aaron, could we see that, please.

6 Q. The code here is Mr. Wagner's t-stat is in gray, and

7 you've decided to grade yourself in gold?

8 A. Gold or orange. Whatever your eyes tell you.

9 Q. And is the right-hand side of the chart higher?

10 A. Yes, it would go from zero up to 20. So the right-hand

11 side, it's a higher value.

12 Q. So did you find that the t-stat for your analysis versus

13 Mr. Wagner's original analysis was higher for each category?

14 A. Yes. If you track down by row, you'll see that the gold

15 or the orange bar is higher than the gray bars, and so it

16 indicates that I have a better predictive formula.

17 Q. Did you compare and prepare a slide comparing your

18 regression analysis with Mr. Meyer's second regression

19 analysis, the one with the $40 million adjustment?

20 A. Yes, I compared Mr. Wagner to my results also with his

21 second regression analysis.

22  MR. KENNEDY: Aaron, could we see 243.02.

23 Q. And again, in the interests of time, can you summarize

24 who came out better this time?

25 A. Well, we have similar color schemes, and so you'll see

1    the gray, and you'll see the orange or the gold, and once

2    again, the results are better for the T values in comparing

3    my calculations to his, the second calculation.

4    Q.  Did you also prepare a graph comparing the R squared

5    results for your regression analysis versus Mr. Meyer's first

6    regression analysis?

7    A.  I also compared Mr. Wagner to my results on the R

8    squared, a similar structure.

9        MR. KENNEDY:  Aaron, could we see 243.01 again,

10   please.

11   Q.  Mr. Meyer, it's been pointed out to me that at the

12   bottom of 243.01, we've got better headed towards zero and

13   worse headed towards the top.  Is that the way it should be?

14   A.  Better is to the right-hand side.  So those are actually

15   inverted.  Better is at the 20 and worse is at the zero.

16   Q.  So we've got an error in the graphic?

17   A.  I would agree with that.

18   Q.  Okay.  Thank you very much.

19       Sorry for the interruption.  Did you do a graph

20   depicting how your regression analysis compared with

21   Mr. Wagner's original analysis in terms of R squared?

22   A.  Yes, I have done that.

23       MR. KENNEDY:  Aaron, could we see 156 version 1.

24   Q.  First, have we got better and worse on the right sides

25   this time?

1    A.   Yes, the worse is at 0 percent, and the better is at a

2    hundred percent.  So this one is set up in a similar fashion,

3    but it's a different scale.  Mr. Wagner's in the gray, and my

4    R squares are in the orange or the gold.  And you'll see the

5    orange or gold bars are higher than his gray bars, indicating

6    that I have a better predictive model, formula, for the

7    operating expenses.

8    Q.   Finally, did you do a similar analysis and graph for

9    Mr. -- or the R squared on Mr. Wagner's revised or second

10   regression analysis?

11   A.   Yes, I've done that also.

12        MR. KENNEDY:  Aaron, could we see 156.02, please.

13   Q.   And once again, who has the better R squared?

14   A.   It would be similar result.  And so you'll see once

15   again that the orange and gold bars are to the right-hand

16   side towards the higher hundred percent.  And the grays are

17   lagging behind.  This is on the updated analysis that he --

18   that Mr. Wagner did.

19   Q.   And did you make any attempt to determine why it was

20   that your regression analysis came out with better t-stats

21   and a better R squared than Mr. Wagner's?

22   A.   Yes, I did.

23   Q.   Okay.  And can you tell us in general what you found

24   that to be due to?

25   A.   It's my opinion that because we're talking about a

1    business that is highly seasonal. It's a business that

2    provides dolls and toys that are sold in retail, and the vast

3    majority of the sales occur between August and really

4    November, some December.

5         So we have a very highly seasonal business. And so

6    my analysis of regression was run on an annual basis. So I

7    ran it year by year. And it's my position you get a better

8    equation and a better result because we're looking at a

9    situation where costs are incurred throughout the year by MGA

10   to support the holiday rush, almost like selling Christmas

11   trees. You may have all year long and have very little

12   revenue, but then you have lots of revenue in November and

13   December.

14        So it's important to look at the costs, I believe,

15   that are incurred all year and match them up with your sales

16   all year. So, for example, selling and marketing early in

17   the year, product development early in the year for MGA

18   benefits the holiday season. So by grouping the 12 months

19   together, sales and costs, you get a much better

20   relationship, and that's why I believe my results are

21   superior to Mr. Wagner's results.

22   Q.  You said you did yours on an annual basis. What time

23   period did Mr. Wagner use for his?

24   A.  He ran it on a monthly basis. So he compared the sales

25   to the costs each month. And his formulas are based on

1    monthly results.  Not annual results.  And so we differ on

2    that sort of basic fundamental issue.

3    Q.   And did you prepare a graph summarizing what you believe

4    are the differences and the reason for the different scores

5    on the two regression analyses?

6    A.   Yes, I have.

7         MR. KENNEDY:  Aaron, could we see 154.

8    Q.   Briefly explain the significance of using annual versus

9    monthly data in this context.

10   A.   I believe this chart corroborates the position about the

11   seasonality.  And so you'll see that the left side, the axis

12   is millions of dollars, and then we go from January to

13   December, and what we track is the total operating expenses

14   are in the orange.  That's the lower line.  And you'll see

15   that how the sales change month to month, and this is for

16   2006, as an example, calendar year 2006.

17        You'll see that basically from June to November

18   there's a real -- I guess June to October -- a real up-tick

19   in the sales.  A little drop, and then back up in November.

20   And that's all the holiday shipments.

21        So it's my position that you get a much better

22   correlation of your sales and costs by looking at the whole

23   year knowing that some of the costs early in the year are

24   being incurred to help you sell later in the year.  And this,

25   I believe, backs up my regression formula in a qualitative

1    way.  It says I ran it correctly because I matched up this

2    business and its sales and costs to how it does its business

3    in contrast to Mr. Wagner.

4    Q.  Let's turn now to the other area of disagreement you've

5    identified with Mr. Wagner.  Taxes.  And tell us why you

6    think that taxes ought to be deducted to determine profits in

7    this case.

8    A.  I believe that taxes are amounts that now have been paid

9    to the IRS based on the results of MGA's business.  There are

10   amounts that are not retained by MGA.  In a sub-S corporation

11   like MGA, they are actually paid by the shareholders.  So

12   Mr. Larian has to pay the taxes on behalf of the company.

13   And that's the corporate issue.  But these amounts have been

14   provided to the IRS.  They are not profits.  They are

15   dispersed.  They are not retained earnings.  They are not

16   retained by MGA.  They are not retained by Mr. Larian.  And

17   from my perspective, they are detectable costs if you want to

18   come up with profits.

19          So the $200 million of taxes that I deduct, these

20   amounts have been paid to the IRS.  They are not sitting with

21   Mr. Larian or MGA.  And that is sort of my basic position on

22   it.  And it's also consistent with how Mattel accounts for

23   Barbie.  They deduct taxes in getting their product line

24   profitability for Barbie.

25   Q.  Okay.  Changing topics.  Going back to that full

1    3.1 billion in Bratz revenues, did you attempt to break

2    it down into percentage components?

3    A.  Yes, I have.

4    Q.  And did you prepare a graph showing the results of your

5    breaking down of the 3.1 billion by component?

6    A.  Yes, I have.

7         MR. KENNEDY:  Aaron, could we see 142, please.

8    Q.  Looking to the pie chart that's on the screen now, could

9    I ask you to start over in the bold blue that's been labeled

10   first generation Bratz fashion dolls we've been hearing about

11   in this case, and tell us what percentage you found there,

12   and then let's proceed on clockwise, if you could,

13   identifying the key areas here.

14   A.  Okay.  The entire pie, the value of the entire pie is

15   $3.1 billion.  And the first pie slice is that first

16   generation Bratz fashion dolls.  And that's 2 1/2 percent of

17   the total $3.1 billion.

18        Then I went to the next level and broke out for you

19   what I call the later generation Bratz fashion dolls.  And

20   that's where the arrow is, and that's about 38 percent.  And

21   those are fashion dolls beyond the original group of four.

22        And then if we continue on to the left-hand side of

23   the -- the low left-hand side of the pie, you'll see what I

24   call other product lines.  There's a variety of products in

25   there.  There's Bratz Boyz, Bratz Kidz, Bratz Pets, and

1    that's about 22 percent of the $3.1 billion.

2            And then if we move towards the top, we'll see play

3    sets.  That's about 8 percent.  And then the next item up

4    would be the vehicles at 5.9 percent.  Then we sort of change

5    gears and go into licensing revenues.  That's about 5.8

6    percent of the total 3.1 billion.  And then just moving

7    along, we see electronics at 5.7 percent.  And then what's

8    been called life-style products at 3.9 percent.  And then

9    outdoor at 2.7 percent.  Fashions are 1.6 percent.  Games at

10   1.4 percent.

11           Then we're down to a couple small categories.

12   There's an accessories there at .8 percent and entertainment

13   at 1 percent.  So that's a breakdown of the $3.1 billion on a

14   product line basis.

15           MR. KENNEDY:  Your Honor, Mr. Price and I have both

16   noticed that the jury is taking a lot of notes, which makes

17   me happy.  But he's agreed that everything so far will be

18   going into evidence.  So they will have the benefit of it,

19   for which I thank him.  So from here on, I assume Mr. Price

20   will make a suitable objection if there's anything here that

21   won't be for the jury to actually have in their possession.

22           MR. PRICE:  The only issue may be the title.

23           THE COURT:  Very well.  Thank you, Counsel.

24           MR. KENNEDY:  Thank you, Mr. Price.

25   Q.  In addition to breaking down the 3.1 billion by

1    category, did you also break it down by dollar amounts?

2    A.  Yes, I have.

3    Q.  And let me guess.  Is there a graphic that just happens

4    to do that?

5    A.  Yes, there is.

6    Q.  How fortunate.

7         Could we have 168, please.

8         Starting at the bottom we've got 3 billion 68

9    million.  Is that the number rounded that comes to 3.1

10   billion that we've been talking about?

11   A.  Yes, it is.

12   Q.  It's the same number, but it's been rounded previously?

13   A.  That's correct.

14   Q.  Okay.  And you've taken first generation Bratz dolls,

15   and they represent how much of that 3.1 billion?

16   A.  The actual amount is 77.9 million, and I've rounded that

17   to 80 million elsewhere, but that's the first cut of the

18   fashion dolls.

19   Q.  Okay.  And I'm sure the jury would love us to go through

20   each of these numbers, but since they will have it, just

21   summarizing, you have a billion two total for Bratz fashion

22   dolls?

23   A.  That's correct.  Fashion dolls are the $1.2 billion

24   right there.  That's correct.

25   Q.  And then you've got these other product lines, 762

1    million when you round it off?

2    A.  That's correct.

3    Q.  And Bratz-branded merchandise, 844 million?

4    A.  That's correct.

5    Q.  And then numbers for licensing and entertainment?

6    A.  Yes.

7    Q.  Let's focus in on that Bratz-branded merchandise line,

8    the fifth one up from the bottom that's the 844 million.

9         Did you also do a breakdown of that item by

10   component?

11   A.  Yes, I have.

12   Q.  And did you prepare a chart summarizing that?

13   A.  Yes, I have.

14        MR. KENNEDY:  Aaron, could we have 161, please.

15   Q.  And down in the lower right-hand corner, we've got our

16   844 million number.  And just to move this along, this starts

17   with, in the upper left-hand corner, fashion doll play sets

18   generate revenues of just under 150 million?

19   A.  That's correct.

20   Q.  And then in descending order, sales and TV is 13.7

21   million, and various other items coming down ultimately to

22   electronics and other audio, video of a million?

23   A.  That's right.  It goes from the top to the highest

24   revenue branded product and it wraps down to the right-hand

25   side to a million dollars for the electronics.  And so these

1    are all of the breakouts for these different branded

2    merchandise categories.

3    Q.  Now, changing topics again, did your assignment in this

4    case also include a request to try to determine whether the

5    entirety of that $405 million in profits that you've

6    calculated was due to Mr. Bryant's drawings?

7    A.  Yes, that was part of my assignment.

8    Q.  Okay.  And in that regard, did you attempt to acquaint

9    or educate yourself at all with the elements that at least

10   MGA thought were important in creating the Bratz line, or the

11   Bratz fashion doll?

12   A.  Yes, as it relates to the Bratz profits, I did some

13   research to try to determine if there were other factors that

14   related and contributed to the profits at Bratz that were

15   other than Mr. Bryant's materials or his drawings.  And so I

16   studied a wide variety of records.

17       I looked at first MGA's records about its Bratz

18   products and what it believed was important as they went to

19   market and developed certain generations of fashion dolls

20   over the period of 2001 to 2007.  I spent a lot of time

21   looking at Mattel's documents and Mattel's surveys and what

22   they felt was important in selling their fashion dolls, both

23   Barbie and My Scene, and there was lots of information both

24   in MGA's records and Mattel's records about really what it

25   was called was themes, and the goal was to sell the fashion

1    dolls within these themes.

2        So I began to understand that themes were important

3    to creating profits and fashions and accessories and how the

4    products are packaged and the importance of selling --

5        MR. PRICE:  Your Honor, I'm going to object.  This

6    is improper expert testimony.

7        THE COURT:  Sustained, that last sentence is

8    stricken.  Next question, Counsel.

9        MR. KENNEDY:  Yes, your Honor.

10   Q.  You mentioned the word themes.  In the course of this

11   work, or your work, did you attempt to identify when --

12   first, did you attempt to identify when MGA first started

13   using themes in connection with the Bratz dolls?

14   A.  Yes, I did.

15   Q.  Okay.  And when did you find that was?

16   A.  That was November of 2001 and basically for the calendar

17   year of 2002.  It was a large part of their business.

18   Q.  And did you then attempt to track revenue by theme

19   coming forward after that?

20   A.  Yes, I have.

21   Q.  And were you able to do so?

22   A.  Yes, sir.

23   Q.  And did you -- were you able to prepare a graphic

24   showing the amount of revenue generated by theme over the

25   years?

1    A.   Yes, I have.

2         MR. KENNEDY:  Aaron, could we see 118, please.

3    Q.   Now, on 118, what does each of the horizontal gray bars

4    represent?

5    A.   These are fashion dolls that are sold within a theme or

6    thematic sort of offering, and so each one of these gray bars

7    represents the total sales for that theme.  And the total of

8    all the gray bars is about $1.1 billion.  And so I've mapped

9    out for the 77 themes by theme how much the sales were.

10   Q.   So there were 77 themes all together?

11   A.   That's correct.

12   Q.   And did you also make up a chart showing the themes by

13   name and amount of revenue generated?

14   A.   Yes, I have.

15        MR. KENNEDY:  Aaron, quickly to 165.02.

16   Q.   And we'll go back to the graph in a moment, but just to

17   put this in context, for example, starting up at No. 1, the

18   Bratz play sports theme generated revenues of $73 million?

19   A.   That's correct.

20   Q.   And at the other end of the line, No. 77, Bratz hair

21   play generated total revenues of how much?

22   A.   It was actually under a hundred thousand dollars.  So it

23   was -- that's .1.  That means a hundred thousand dollars.

24   Q.   You've listed the other 75 themes according to the

25   amount of revenue they generated; correct?

1    A.  That's correct.

2         MR. KENNEDY:  Aaron, 118.01, the graph.

3    Q.  Now, based on the work you did in this case, did all of

4    those themes involve plastic dolls?

5    A.  Yes.

6    Q.  Did they also involve, as you understood it, whatever

7    other intellectual property Mattel owns in this case?

8    A.  That's my understanding.

9    Q.  And in looking at that variation in revenues, did that

10   cause you to form any working hypothesis with regard to

11   whether the intellectual property was responsible for the

12   entirety of the profits?

13   A.  Yes, it did.

14   Q.  And what was that?

15   A.  The position I adopted was that there was a factor, that

16   being themes, other than the property in this lawsuit that

17   was creating profits for the Bratz line.

18   Q.  And did you further try to drill down by examining the

19   themes when they first started getting released in 2002?

20   A.  Yes, I did.

21   Q.  And did you prepare a graphic summarizing your analysis

22   of that first set of themes in 2002?

23   A.  Yes, I did.

24        MR. KENNEDY:  Aaron, could we see 199 version 1.

25   Q.  And can you tell us what you found and are summarizing

Unsigned                                              Page  7716

1    here?

2    A.  Yes.  This was in 2002.  I knew that the Bratz sales in

3    2001 in total were $25 million.  So I was trying to figure

4    out why the sales were so much higher in 2002.  I determined

5    that there was four themes released by MGA in 2002.  And

6    these are the total sales for the whole period.

7         So they are released in 2002, but they may sell for

8    several years, and I just aggregated it all together to show

9    you how each theme did.  It indicates to me that these were

10   all successful releases, and from the Funk 'N Glow to Holiday

11   and Strut It.  And the high was 53.7 for Bratz Strut It.  And

12   the low was for Funk 'N Glow 26.9 million, indicated to me

13   that the themes were successful.

14        It also indicated to me that there was variation

15   and wide variation in the success of the themes.  Because one

16   was double the others, or the first one.

17   Q.  Did you approach this part of your assignment on the

18   assumption that Mr. Bryant's original drawings, Mattel's

19   intellectual property, had made a contribution to the success

20   of the Bratz line?

21   A.  Yes, I did.  And I assume that that contribution was in

22   all of these releases.

23   Q.  Okay.  And assuming that Mr. Bryant's drawings, Mattel's

24   other intellectual property, are the sole reason for the

25   success of the Bratz line, were you able to find any

1    explanation as to why every theme doesn't generate the same

2    sales?

3    A.  No, I wasn't.  And so I focused on the themes and looked

4    beyond the property that we're talking about.

5    Q.  And just while we're talking about themes, Bratz Strut

6    It, the 53.7 million for that one theme?

7    A.  That's correct.

8    Q.  And how much did the original first generation Bratz

9    dolls derive in all?  Do you need to see your pie chart in

10   all?

11   A.  I believe it was about $78 million for the first

12   generation.

13   Q.  And going back to 118, if we can for a moment.  The most

14   successful theme over on the far right-hand side is

15   generating about how much?

16   A.  I believe it was $73 million.

17   Q.  So that one theme generated within $5 million of the

18   total revenue of the first generation?

19   A.  That's correct.  That's Bratz play sports, $73 million.

20   Q.  Following your analysis of the 2002 themes, did you

21   attempt to do a similar analysis for the 2003 themes?

22   A.  Yes, I did.

23   Q.  And did you prepare a chart summarizing what you found

24   there?

25   A.  Yes, I did.

1        MR. KENNEDY:  And, Aaron, could we see 199.

2    Q.  Now, this tells us that in 2003, sales from themes were

3    what, $218 million?

4    A.  Well, it was for the total sales for the themes released

5    in 2003 over their entire life for $218 million dollars.  And

6    so these were six themes released in 2003 that generated

7    about 220 million in total for MGA.

8    Q.  So we have six themes that year?

9    A.  Yes.

10   Q.  And once again, how much was it that the first

11   generation dolls generated totally?

12   A.  About $80 million in revenue.

13   Q.  So doing my arithmetic, these six themes generate about

14   two and a half times the total revenue of the first

15   generation dolls?

16   A.  I would agree with that.

17   Q.  Did that cause you to believe that themes might have

18   something to do with the overall profitability of the Bratz

19   dolls?

20        MR. PRICE:  Objection.  Beyond his expertise.

21        THE COURT:  Sustained.

22   Q.  BY MR. KENNEDY:  Following up on your analysis of

23   themes, did you attempt to -- strike that.

24        Following up on your analysis of themes you just

25   talked about, did you then attempt to apply your expertise to

Unsigned                                              Page  7719

1    see if you could come up with any bases upon which the total

2    profits might be apportioned between the Carter Bryant

3    drawings on the one hand and other factors on the other hand?

4    A.  Yes, I did.

5    Q.  Okay.  And stop right there.  Is this something that's a

6    science that you were doing?

7    A.  It takes judgment, but I use financial techniques and

8    experience I've had for 30 years in doing those kinds of

9    analyses.

10   Q.  Were any of the opinions you formed something that can

11   be expressed with mathematical certainty?

12   A.  I don't believe that's the case.

13   Q.  Any of the methods you came up, with they gradable on

14   the basis or their R squared or their t-stat?

15   A.  They would not be.

16   Q.  Okay.  And given that admitted imprecision, did you come

17   up with what you thought were at least rational approaches

18   for attempting to apportion the Bratz profits in this case?

19   A.  Yes, I have.

20   Q.  And did you have one that involved the royalties that

21   MGA actually paid Mr. Bryant?

22   A.  Yes, I do.

23   Q.  And did you prepare a graph depicting that possible

24   method of apportionment?

25   A.  Yes, I have.

1          MR. KENNEDY:  Aaron, could we see 113.

2     Q.  And could you describe for the jury what it is that

3     you've done in this particular calculation.

4     A.  Yes.  In this calculation, I'm basing the apportionment

5     on -- I'm setting it up this way.

6          MR. PRICE:  Objection.  Irrelevant.  Not based on

7     the factors.

8          THE COURT:  Sustained.  Lay a foundation.

9          MR. PRICE:  And until the foundation is laid, your

10    Honor, I think this should come down.

11    Q.  BY MR. KENNEDY:  Have you done apportionment analyses in

12    previous intellectual property cases?

13    A.  Yes, I have.

14    Q.  Have you studied the literature with regard to

15    methodologies for doing apportionment among factors in

16    intellectual property cases?

17    A.  Yes, I have.

18    Q.  And can you tell us whether one of the accepted factors

19    is to look and see what the real parties in a true arm's

20    length transaction have done in terms of evaluating certain

21    properties?

22    A.  Yes, it would be.

23    Q.  And did you attempt to employ a real life arm's length

24    transaction analysis to the royalties that MGA actually paid

25    to Mr. Bryant?

1    A.  Yes.  There's techniques, one is called relief from

2    royalty.  And that's when you look at if somebody acquires a

3    property and can bring it into its company, what you paid for

4    that, and it's an accepted financial and economic technique.

5    And I've used that foundation, that theoretical foundation in

6    coming up with one of my apportionment analyses.

7    Q.  And in this instance, were you trying to apportion

8    between doll design, the entirety of the doll, not just the

9    drawings, on the one hand, and other possible factors that

10   could have contributed to profitability on the other hand?

11   A.  That was my objective.  That's correct.

12   Q.  And did you prepare a graphic summarizing your analysis

13   in that regard?

14   A.  Yes, I have.

15        THE COURT:  Counsel, why don't you approach

16   sidebar.  Let me take a look at this graphic.

17        (SIDEBAR CONFERENCE HELD.)

18        THE COURT:  Just while I have you at sidebar, MGA

19   has nine minutes left of its 60 hours.  The Court is going

20   to, as I indicated, afford additional time to both sides

21   today.  However, Mattel has an hour and 15 minutes of its

22   allotted time.  As I indicated a few days ago, I want to make

23   sure that both sides have their full allotted time.

24        So I don't know how much longer you have with this

25   witness, but Mattel, I know, has a rebuttal witness that's

Unsigned                                                    Page  7722

1    going to take at least an hour, or two rebuttal witnesses

2    that will take an hour.  And it's now 2:20.  So keep this in

3    mind.  I don't want to interrupt, but --

4        MR. KENNEDY:  Maybe I shouldn't fight too hard.

5        THE COURT:  No, let's just move along.

6        Okay.

7        MR. KENNEDY:  What he's done is taken the royalties

8    paid by Bryant as reflecting real life analysis of what the

9    Bryant contribution was worth on the one hand as opposed to

10   other factors on the other hand.

11       THE COURT:  The problem with all of this is the

12   royalties paid to Bryant are not identified as an

13   apportionment factor.  And this is not a foundational

14   argument so much as -- I'm glad Mr. Price didn't stand up and

15   say this violates the stipulation or the previous court

16   order.  But this was not a factor that was identified.

17       MR. ROTH:  Your Honor, what we're attempting to do

18   with these, we've identified seven factors, one of which is

19   doll design.

20       THE COURT:  Stop with the doll design.  I don't

21   know where this doll design comes in.  I have five.  I added

22   one.  Six.  I don't know where the seventh comes from.

23       MR. ROTH:  We're trying to value -- we're trying to

24   place a value on the design of the doll, which we agree --

25       THE COURT:  Okay.  I'm sorry.  I catch you.

1       The six nondoll design factors that you want to

2    apportion out.

3       MR. ROTH:  Versus doll design.

4       THE COURT:  Excellent.  With respect to royalties,

5    where in those six does that fall into ?

6       MR. ROTH:  Royalties is trying to place a value, a

7    percentage value on doll design as compared to everything

8    else.

9       THE COURT:  How does royalties --

10      MR. ROTH:  It's the value attributed by the

11   parties.

12      THE COURT:  It's how much was paid.  Not

13   necessarily for the value in terms of the value in terms of

14   the profits generated.

15      MR. ROTH:  But case law provides that royalties is

16   a factor that you can admit in the apportionment analysis.

17      THE COURT:  I'm not suggesting that it's not.  But

18   that's not identified as one of the factors that can be

19   apportioned out of.

20      MR. ROTH:  What we're trying to apportion is the --

21      THE COURT:  You're saying that royalties is a

22   substitute for the value of the infringing item itself.

23      MR. ROTH:  Yes.

24      THE COURT:  Where is that case authority?

25      MR. ROTH:  I'd be happy to get that for you.

1          THE COURT:  Okay.

2          MR. ROTH:  My notes.  This is the cite.

3          THE COURT:  Guskin, G-U-S-K-I-N, versus

4    G-U-R-A-L-N-I-K.  It's a 1988 Southern District of New York

5    case which stands for the proposition that the Court based an

6    award of 25 percent of the defendant's profits from the

7    defendant as performance on the plaintiff's willingness to

8    license his script for 10 percent of a performer's gross.

9          MR. ROTH:  So what we're attempting to do is put in

10   a series of numbers which would provide a range of what we

11   think the apportioned percentage of profits should be.

12         THE COURT:  That the entire doll itself is worth.

13   Let me hear your response to this.  This is not so much an

14   apportionment argument.  But this is basically the value of

15   one of the apportioned factors, but as I understand it, this

16   is the value that they are trying to place on the doll design

17   itself, assuming that it's all inextricably intertwined.

18         MR. ROTH:  That's correct.

19         MR. COREY:  Well, I have a couple things to say

20   about that.  The first is we have to look back at what the

21   statute says.  The statute says let's figure out this is

22   504(b), what the profits are.  We're splitting up profits.

23   You can't go back and look at the costs of what somebody paid

24   for something years and years in the past and come up with a

25   value for the profit today.

1          So what we have done is strayed really far from

2     what the statute requires.  So there's not -- it really isn't

3     a reliability basis for that to come in --

4          THE COURT:  We're trying to apportion profits.

5          MR. COREY:  Right.

6          THE COURT:  And I guess my bigger question is how

7     could you have ever been close to establishing the entire

8     value of the doll based on what was paid to the doll

9     designer.  You're assuming for the sake of argument or for

10     the sake of this witness that Carter Bryant is the doll

11     designer.

12          MR. ROTH:  Um-hm.

13          THE COURT:  How -- I can see on an actor.  That's a

14     little different scenario, that Southern District of New York

15     case that you just cited.  But I'm thinking -- I just am not

16     seeing how royalties by itself could possibly give you the

17     value of the doll.  That doesn't make any sense to me, any

18     more than adding up -- let's say the costs of producing the

19     infringing item is somehow equal to the value of that

20     infringing item.  That doesn't make any sense.

21          MR. ROTH:  It's the market value placed on the

22     intellectual property, which is one factor the courts allow

23     in in gauging the apportionment analysis.  If this had been

24     bought.  This apportionment analysis has been in our reports

25     for six months.  We could have had -- they filed a Daubert

1   motion on it, we could have cited you a whole series of

2   cases.  They waited until --

3        THE COURT:  See, I've got to decide this on what's

4   before me right now.  I don't want to hear about what's out

5   there in the library.  On apportionment, the burden is on the

6   defense, not on the plaintiff.

7        MR. ROTH:  Understood.

8        THE COURT:  So this is your burden to come forward

9   with this.  If you have any other cases for me to look at,

10  now is the time.

11       MR. ROTH:  I just have the one case that I've cited

12  to you.  And I've got -- the Court found the expert testimony

13  regarding the standard royalties paid for usage of

14  photographs was admissible.  Seventh Circuit.

15       THE COURT:  For the purposes of apportioning

16  profits.

17       MR. ROTH:  Recognized Sixth Circuit case.

18       MR. COREY:  There's a difference between clearly

19  having an expert coming in to say this is what the market

20  value of this is right now.  That's a different animal.  And

21  that's what I'm hearing those cases say.  What they are

22  saying is we want to go back in time in this specific case,

23  and we want to base the value of the profits from this

24  product in 2008 from the costs --

25       THE COURT:  You already have evidence in there of

1    how much royalties were paid.  $30 million.  So you can make

2    whatever argument you want based on the royalties that were

3    paid.  That's in there.

4         MR. COREY:  This is not based on the amount of

5    royalties paid.  This is just based on a percentage.  This is

6    just based on the percentages.  The royalty rate.  So they

7    are not even taking it to the dollar figure.

8         MR. ROTH:  What Mr. Kennedy has handed me is

9    another analysis.  And this is an attempt to compare the

10   value of what was paid to Mr. Bryant.  So what we paid for

11   the intellectual property versus what we license it out for.

12   So we license it out for 12-.  We paid Mr. Bryant 3-.  He

13   takes a percentage of that.  So again, this is --

14        THE COURT:  Well, I understand how this could be

15   relevant.  You're trying to value -- goes back to what you

16   said.  You're trying to come up with a fair market value of

17   the intellectual property that was contributed to the doll.

18        MR. ROTH:  We're conceding, in terms of the doll,

19   all of that intellectual property, that's Mattel's for the

20   purposes of the apportionment analysis.

21        THE COURT:  But that's what I'm missing right now.

22   It's not clear to me that that is the standard.  Do you have

23   any cases which suggest that that's how we calculate?

24        MR. ROTH:  I have the Guskin case, which suggests

25   that the amount that was in fact offered to the plaintiff was

1      relevant in determining the apportionment percentage.

2              THE COURT:  Okay.  And you have the amount.  That's

3      in evidence.  So you've got that evidence in.  Now you want

4      to go one step further --

5              MR. ROTH:  Take that number, and make it clear what

6      the percentage --

7              THE COURT:  Do you have any authority, Counsel?

8              MR. COREY:  702 and 703 and 504(b).  What we have

9      to look at is the profits.

10             THE COURT:  That's for damages, right.

11             MR. COREY:  We're dividing the value of the IP.  If

12     you're dividing up within the profit the value of the

13     intellectual property versus the value of whatever those

14     factors are, so once you get away from the governments

15     profits and you start looking at costs, particularly costs

16     that were incurred eight years ago --

17             THE COURT:  I'm sorry.  I'm going to have to take a

18     brief recess and take a look at these cases.  I don't want to

19     get this wrong.  All right.

20             (CONCLUSION OF SIDEBAR CONFERENCE.)

21             THE COURT:  Ladies and gentlemen, I'm going to have

22     to send you on a brief recess.

23             (Recess taken.)

24             (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

25             THE COURT:  Okay.  We're outside the presence of

                        Unsigned                              Page  7729

1    the jury.  The Court just wanted a minute to take up this

2    issue.  I've looked at the -- I certainly haven't read them

3    all, but I'm familiar with most of them, and I reviewed the

4    portions identified by counsel for MGA.  I'm somewhat

5    thinking out loud here.  So we'll see where this leads.

6           But first of all, the issue of the 3 percent, the

7    $30 million, is in evidence.  So certainly MGA to the extent

8    that they want to make some argument that that's it or that's

9    the value of Carter Bryant's contribution because that's what

10   he was paid, they are in a position to make that argument.

11          As far as having the expert or having further

12   evidence introduced that this is the fair market value and

13   that this is the measure by which the doll as opposed to the

14   other nondoll factors, for lack of a better phrase, are to be

15   evaluated, I guess part of the concern I have is the unique

16   nature of this case.

17          This isn't a case like the one cited here where the

18   agreements or the assessments are being made based on a true

19   fair market value assessment.  This jury has already found

20   that Carter Bryant -- the jury has found what they found.

21   Everybody knows what the jury found.

22          So what was going on here was not an aboveboard,

23   arm's length transaction.  So the Court is reluctant to place

24   too much emphasis on that 3 percent or that $30 million or

25   whatever it is as a real indicator of what the value of the

1    nonapportioned elements of the doll are.

2         Each one of these cases is unique in its own

3    respect in terms of how the Court goes about doing this.  And

4    you know, again, the information on the licensing is also in

5    the record.  Let me hear argument from either side.  We need

6    to move forward.  This isn't something that we have a

7    particularly large amount of time to discuss.

8         MR. ROTH:  Our basic position, your Honor, is that

9    as you've seen from these cases, in particular, the Guskin

10   case, the issue of the royalties paid either standard in the

11   industry or to the parties involved, is a piece of evidence

12   that can come in that an expert can take into account in

13   determining what the appropriate apportionment is.

14        THE COURT:  But these cases, I can certainly see in

15   a situation where a record -- a product brings in a hundred

16   dollars in revenue.  All right.  That's the profit from the

17   product.  And, well, we don't know how much profit to give to

18   one side or the other.  And you look back to the arrangement

19   that the two artists who were engaged in it agreed to, and

20   one artist agreed to take 20 percent of the profits, and the

21   other artist agreed to take 80 percent of the profits, and

22   then using that percentage as a basis to split up their

23   apportionment of profits.  And that makes sense.

24        But this is a much different situation, where the

25   allegation is here, it's unclear what the jury is going to

1    find with respect to copyright, but that the essential

2    contribution of Carter Bryant permeated essentially all of

3    the infringing works.  That's the allegation.  If, at the end

4    of the day, that's what the jury finds, to sit back and say

5    that all of Carter Bryant's contribution is this 3 percent, I

6    don't think it is quite frankly legally cognizable under

7    these bases as an argument for apportionment.  This is

8    different than the cases you argue.

9           MR. ROTH:  It is true that Mr. Bryant made

10   contributions to the doll line following his departure from

11   Mattel.  You know, he made contributions in terms of fashion

12   design and other matters.  That is not among the body of

13   property that Mattel is claiming ownership to.  What they are

14   claiming that they own is the body of intellectual property

15   that existed as of the time that Mr. Bryant left Mattel and

16   went to MGA.

17          THE COURT:  That's not the body of work that they

18   are claiming ownership to but the body of work for which they

19   are claiming copyright infringement and which they are

20   claiming alternatively may be derivative works over which

21   they have control goes far and beyond the first generation of

22   dolls.  For example, it goes far beyond arguably the value of

23   what Mr. Bryant was paid for.  It gets back to these cases

24   that you've submitted, again, they are trying to apportion

25   profits where you have a pie of profits, and the question is

Unsigned                                        Page  7732

1    how much did the lyricist deserve.  How much does the

2    individual actor, to use the case that you submitted at

3    sidebar, deserve.  Well, out of the total profits, what did

4    the actor agree to at the beginning.  I think that's much

5    different than the situation we have here.

6          MR. ROTH:  I respectfully submit that what we have

7    here again is an agreement between the parties where Carter

8    Bryant is transferring the intellectual property that is at

9    issue here, and there's an agreement between the parties

10   about the value of that.  Expressed in percentage terms, in

11   percentage terms that we're simply trying to translate from

12   one body, that is, net sales, to --

13         THE COURT:  It wasn't between the parties.  It was

14   between Carter Bryant and MGA.  And that was done, as the

15   jury has found, under fraudulent circumstances.

16         MR. ROTH:  Well, I'm not sure that -- that's a

17   different argument.  I'll not sure that fraud has been found.

18         THE COURT:  Well, not fraud, but under intentional

19   interference of contractual relations, induce the breaches of

20   fiduciary duty and duty of loyalty, and under circumstances

21   of theft.

22         MR. ROTH:  But there's no suggestion that

23   Mr. Bryant's arrangement with MGA was anything other than an

24   arm's length transaction.  There's been no evidence here that

25   the nature of the relationship between Mattel and Mr. Bryant

1    in some way entered into the terms that those two parties

2    agreed to.

3        So again, what we're trying to do here is to value

4    doll design on the one hand versus all of the other factors

5    that we've identified for the Court.  And one proxy for that

6    is the royalty in fact agreed to by Mr. Bryant.  As the Court

7    indicated, that evidence is already before the jury, and this

8    expert is simply translating that to a pool of profits

9    identified by the parties.

10        THE COURT:  And that's the part that I'm concerned,

11    just seeing the two charts that I've seen, is it gets

12    confusing.  All right.  Let me hear from Mattel.

13        MR. PRICE:  Your Honor, on the last point, the jury

14    has found that Carter Bryant didn't have the right to sell

15    these things and that MGA knowingly induced the breach of

16    fiduciary duty, knowingly converted.

17        THE COURT:  So you agree that this is not an arm's

18    length transaction?

19        MR. PRICE:  This is how much would a fence get for

20    stolen property.  The person buying is taking a risk that

21    they will get caught.

22        THE COURT:  I do think that makes it different than

23    the cases.  Are any of the cases similar, at all related?  As

24    I understand the ones that you've presented, these were --

25    there weren't these other allegations.

1        MR. ROTH:  Well, no.  I mean, the cases simply

2    involved contexts where the court was willing to entertain

3    evidence regarding either industry royalty rates or the

4    royalty rates of the parties involved in the case.  And that

5    was admitted into evidence as one factor among many that

6    could be considered.

7        THE COURT:  Very well.  This Court has admitted

8    that into evidence, and I'm going to leave it at that.  We're

9    not going to hear anything further on this.

10        MR. COREY:  We're going to run into a similar issue

11    probably with Mr. Kennedy's next set of questions.

12        THE COURT:  Which are directed towards what?

13        MR. COREY:  Directed towards some proffered

14    apportionment theories that really have no bearing on the

15    factors that Mr. Roth articulated.

16        THE COURT:  Specifically what do they deal with?

17        MR. COREY:  There are two apportionment theories in

18    which Mr. Meyer is going to try to explain how he can discern

19    the value of the intellectual property associated with Bratz

20    by comparing it to Barbie's profitability without any effort

21    to segregate out the intellectual property associated with

22    either Bratz or Barbie.

23        THE COURT:  But didn't your expert do this with

24    respect to other toy companies?

25        MR. COREY:  What our expert did was remove

1    everything but the intellectual property.

2         Here, what Mr. Meyer is doing is not removing

3    anything.  He's saying there's a product here that has

4    valuable intellectual property, which is Barbie.  There's

5    another one that has valuable intellectual property, which is

6    Bratz.  And I'm going to compare the two and reach a

7    conclusion about value without segregating out intellectual

8    property related to either of those.

9         THE COURT:  Mr. Roth?

10        MR. ROTH:  Your Honor, what Mr. Corey is referring

11   to is a critique that Mr. Meyer has made of a valuation

12   apportionment analysis submitted by Mr. Wagner.  Mr. Wagner

13   made a comparison between what he determined were the excess

14   profits as between Bratz and a series of different

15   definitions of the toy industry.

16        Our critique of that was, well, those are much

17   different.  I mean, we've got diversified companies.  They

18   are going to have a different profit structure than a

19   specific fashion doll line.  So what we did in response to

20   that, accepting that model for the purposes of analysis, we

21   took the information that we received from Mattel across a

22   series of fashion dolls and made the same comparison, which

23   we think is more apt.  And that -- in using Mr. Wagner's

24   methodology, came up with a number that we think is more

25   appropriate.  So we have every right, after Mr. Wagner --

1          THE COURT:  Very well.  Thank you, Counsel.

2          MR. COREY:  Just very briefly, but it's not even

3    being offered as a critique of Mr. Wagner.  It's being

4    offered affirmatively.  They are going to try to come up with

5    a percentage that they think the jury should use to reduce

6    Mattel's damages based on this analysis, this comparison

7    of --

8          THE COURT:  And you're going to have Mr. Wagner

9    come back in rebuttal and respond to this.

10          MR. COREY:  Thank you, your Honor.

11          THE COURT:  Was there anything else?

12          MR. COREY:  I don't believe so.

13          THE COURT:  Very well.  So I'm going to sustain the

14    objection to the royalties at least -- any further evidence

15    of royalties at this point.  The evidence is already in.

16    I'll overrule the objection.

17          It's a quarter to 3:00 right now.  I'm going to

18    take five minutes myself.  As I indicated at sidebar, MGA has

19    used all 60 hours.  Mattel still has an hour and 15 minutes

20    left.  I'll permit MGA to continue, but only to four o'clock.

21    At four o'clock, we're going to turn this over to Mattel for

22    their rebuttal case, and we're going to wrap this up by 5:30.

23          MS. AGUIAR:  Your Honor, could we get a

24    clarification?  Are you saying that between 4:00 and 5:30 is

25    all allocated to Mattel?

1          THE COURT:  Well, they said they have two experts.

2     Each one is willing to last about a half hour.  So I figure a

3     half hour for each expert and a half hour of

4     cross-examination.

5          MS. AGUIAR:  But when your Honor said that if there

6     was time left over, and I asked would that time be allocated,

7     the quote, unquote, extra time be allocated evenly to both

8     parties.

9          THE COURT:  Mattel still has an hour and 20 minutes

10    left.  They get to use that.

11         MS. AGUIAR:  I understand that.  I was just

12    wondering once that time is used up, is the remaining time

13    equally divided?

14         THE COURT:  Something like that.  But, Counsel, if

15    Mattel uses an hour and 20 minutes, we'll be at -- I don't

16    know how much longer you have.

17         MS. AGUIAR:  I was just trying to get clarity.

18    Once we both run out of time, if there's anything else --

19         THE COURT:  The Court will handle it.

20         I'm going to take a very brief recess, and then

21    let's resume.

22         (Recess taken.)

23         (WHEREUPON THE JURY ENTERS.)

24         THE COURT:  Counsel, let's have Mr. Meyer back on

25    the stand, and we can proceed.

1        MR. KENNEDY:  Your Honor, Mr. Quinn tells me we're

2    missing a lawyer.

3        THE COURT:  That's not good.

4        MR. QUINN:  Here he comes.

5        THE COURT:  All right, Counsel.

6        MR. KENNEDY:  Thank you, your Honor.

7    Q.  Mr. Meyer, in the course of your work on this case, did

8    you have occasion to consider Mr. Wagner's apportionment

9    method?

10   A.  Yes, I did.

11   Q.  And that involved comparing MGA's performance with

12   various other companies.

13        Do you recall that?

14   A.  Yes, I do.

15   Q.  And do you agree with that approach to apportionment?

16   A.  I believe it's proper at times to make comparisons to a

17   benchmark or to something else.  I didn't believe that

18   comparing to other companies like he did was appropriate.

19   But the overall method is okay.  To compare against some kind

20   of a benchmark standard.

21   Q.  How about as far as comparing the Bratz product line

22   portion of MGA with entire other companies?  In your opinion

23   is that an appropriate basis for comparison in this case?

24   A.  No, it would not be in my opinion.  Mr. Wagner compared

25   three companies.  So he compared the Bratz product line to

1    the companies of Hasbro, a company called Jakks, and also

2    Mattel.  That was one comparison he made.  And he compared

3    against those companies and across all their results.  And so

4    Hasbro, as an example, has many different products.  Mostly

5    board games.  And they have no fashion dolls.  As an example.

6    So I wouldn't think that's a proper comparison against a

7    Hasbro.

8         Jakks is a very large company that does a lot of

9    licensing in.  So it licensed in like the world wrestling

10   enterprise character, and they make dolls for that.  They are

11   a big licensing in company that makes sales, toys and dolls.

12   And it's very diverse.  And I wouldn't compare against Jakks.

13   And with Mattel's business, it's certainly a very diversified

14   business.  Certainly not just fashion dolls.  But looking at

15   Mattel, which I think is more appropriate, looking at Mattel

16   and that business.

17   Q.  And did you in fact perform a comparison between the

18   Bratz line and the overall Barbie line?

19   A.  Yes, I did.

20   Q.  And can you tell us what you did in that regard?

21   A.  What I did was I obtained information from Mattel that

22   was identified by Mr. Kerner, who was the controller and

23   senior vice-president at Mattel, and I provided information

24   in really two categories.

25         It had results for Barbie, and Barbie included the

1    My Scene doll.  And so I had the profits, revenues less costs

2    less taxes to get to the profits for the Barbie line.  I also

3    had the information for other girls brands at Barbie.

4            So outside of -- or at Mattel.  Outside of Barbie

5    and My Scene, I had other information from Mattel that I was

6    able to look at that was more closely related to like the

7    Bratz fashion doll.  So I first focused on making a

8    comparison against Barbie's profits which also included the

9    My Scene doll.

10   Q.   And what was the result of that analysis?

11   A.   I went back, and I compared the Barbie earnings, as I

12   mentioned, against the Bratz earnings.  In making that

13   comparison, I determined that if Barbie is the baseline, and

14   we're comparing Bratz against it, the question is do the

15   Bratz profits exceed the Barbie profits.  And if you recall

16   Mr. Wagner's comparison, he compared the Bratz profits

17   against the three companies, and he said since Bratz had

18   higher profits than those three companies, that an additional

19   amount of profits, he hypothesized, was due to in this case

20   the Carter Bryant materials, the drawings.  Then he said I'll

21   leave that to others to decide that, but that was my

22   comparison.

23           So in lieu of comparing against those companies, I

24   compared the Bratz product profits against Barbie's profits

25   and determined that it was a period of three years where

1    Bratz's profits exceeded Barbie's profits.  I make those

2    mathematical calculations, I come up with a 5 percent

3    apportionment factor saying based on comparing against

4    Barbie, Bratz is 5 percent better off, and if I use

5    Mr. Wagner's methodology, he would say potentially that

6    relates to in this case the Carter Bryant materials.

7          That's that increment.  That's that increment over

8    and above Barbie's profitability.  So I did those

9    calculations.

10    Q.  And when you compared with Barbie, was that Barbie the

11    doll or Barbie the brand?

12    A.  That was Barbie the brand.  So it included the fashion

13    doll plus other things that are sold along with Barbie.  It

14    also includes the My Scene doll and related accessories and

15    fashions.

16    Q.  And similarly, did you make an attempt to compare Bratz

17    profits with the Mattel girls brand, including Barbie, My

18    Scene, Diva Starz, Flavas, and other girls products?

19    A.  Yes, I did.

20    Q.  And similar methodology to what you just described?

21    A.  Yes, I compared the Bratz profits against the

22    combination of profits for the Mattel girls brand.  And I

23    looked for the periods if the situation was where Bratz's

24    profits exceeded the girls brand profits.

25          Then I said well, if Bratz performed like the girls

1    brand product line, they would have similar profitability.

2    So if it has additional profitability, it may provide insight

3    into apportioning to the Carter Bryant materials in this

4    case.

5    Q.   And what percentage did you find when you compared Bratz

6    with the entire Mattel girls line?

7    A.   It was three periods where the Bratz profits exceeded

8    the Mattel girls brand profits.  When I did those

9    calculations, it indicated an apportionment percentage of

10   about 11.9 percent, making that comparison against the girls

11   brand baseline.

12   Q.   Now, turning back to the analysis you did of the

13   performance of the 77 themes, did you conclude that there was

14   an apportionment analysis that would reflect the impact of

15   themes upon the overall profitability of Bratz?

16   A.   Yes, I have done that.

17   Q.   Okay.  And did you prepare a graph depicting what you

18   did in that regard?

19   A.   Yes, I have.

20        MR. KENNEDY:  Aaron -- don't put it up.  I feel an

21   objection coming up.

22        THE COURT:  Counsel?

23        MR. PRICE:  Foundation at this point.

24        THE COURT:  Lay a further foundation, Counsel.

25   With respect to the graph.

1          MR. KENNEDY:  I understand, your Honor.

2     Q.  Mr. Meyer, could you describe for us the methodology

3     that you employed in examining the comparative performance of

4     those 77 themes as providing a basis for overall profit

5     apportionment in this case?

6     A.  Yes.  What I did was as follows.  I examined the sales

7     of the 77 themes that I mentioned before.  And I made the

8     assumption that all of those 77 theme sales included the

9     Carter Bryant materials.  The infringing materials.  And so I

10    was interested in examining and comparing the differences

11    between the different themes that were released.

12          So I tracked all those sales from the lowest

13    performing theme, which was about under a hundred thousand

14    dollars of sales, to the highest performing, which was about

15    73 million for the Bratz play sports, and I said okay, if all

16    of these themes include the infringement, and they all

17    include the Carter Bryant materials, let's establish that

18    baseline.  And so what I did was I stratified all the

19    information 1 through 77.

20          I began to walk through all the sales.  And I

21    wanted to make certain that whatever comparison I made, that

22    the theme had finished selling so that I wasn't comparing

23    data for a product that was still selling.

24          So I had sort of a cutoff issue.  I didn't have all

25    the sales.  And so I examined all the themes that were fully

1   sold out, and I began walking through the data from the

2   lowest selling up higher and higher.  And I determined that

3   there were three themes that had been released that --

4        MR. PRICE:  At this point I'll object as his

5   methodology being irrelevant.

6        THE COURT:  Are you still maintaining a

7   foundational objection, Counsel?

8        MR. PRICE:  I'm having -- having heard the

9   foundation, I'd object to there being any relevance to this

10   analysis.

11        THE COURT:  Why don't you proceed with your next

12   question, Counsel.

13   Q.  BY MR. KENNEDY:  Had you completed your discussion of

14   the --

15        Your Honor, I'm sorry.  I need guidance whether I

16   need to continue laying foundation?

17        THE COURT:  I think you can proceed, yes.

18   Q.  BY MR. KENNEDY:  Mr. Meyer, had you finished your

19   discussion of the methodology that you employed with regard

20   to the themes?

21   A.  I was almost there.  I was going to wrap that up.

22   Q.  If you could, please.

23   A.  So what I did was I said okay, the first -- I start at

24   the bottom, and I said the first three lowest performing

25   themes had sales under a million dollars.  And if I

1    compared -- if I said that was basically how all the themes

2    would sell, I would get basically a 5 percent apportionment

3    factor.  If I said let's keep going and go a little higher

4    because remember, I'm trying to establish a baseline, that

5    across all the themes, how would they -- they would -- they

6    sell consistently as they include the Carter Bryant

7    materials.

8        So I went up to two themes that sold between

9    1 million and $5 million and determined that if that became

10   the baseline to compare, that if all 77 included the Carter

11   Bryant materials, basically that means all 77 would sell

12   $3.2 million of sales.  I compared that $3.2 million of sales

13   against the average selling value for all the remaining

14   themes, which was 19.2 million.  I compared 3.2 million

15   against 19.2 million, and I said basically 16 percent of the

16   sales relate to --

17       MR. PRICE:  Objection, your Honor.  It's a

18   conclusion now.

19       THE COURT:  Next question, Counsel.

20   Q.  BY MR. KENNEDY:  And as a result of that methodology,

21   what did you conclude with regard to the discrepancy,

22   difference between the base and the average?

23       MR. PRICE:  I'll object at this point.  Foundation

24   and relevance to damages.

25       THE COURT:  Counsel?

1        MR. KENNEDY:  We have a graphic.  Would you like?

2    It will help put it in perspective.

3        THE COURT:  Very quickly at sidebar, Counsel.

4    (SIDEBAR CONFERENCE HELD.)

5        THE COURT:  You're not rearguing the position that

6    I ruled on during the break.  This is coming in.

7        MR. PRICE:  This is a different issue.

8        MR. ROTH:  This is a measurement of -- it goes to

9    the core of one of our apportionment factors, the use of

10   themes.  So it's how did the themes vary.  All the themes

11   have the same intellectual property.  Yet their sales vary.

12   So we wanted to translate that into -- use a baseline to

13   compare the -- what we expect an average theme to do versus

14   what --

15       THE COURT:  That's the foundation that Mr. Price

16   has objected to.  How do you know what you'd expect on

17   average?

18       MR. COREY:  Exactly.

19       MR. ROTH:  Because what we've done is we've taken

20   the baseline.

21       THE COURT:  What happened to be the average?  Is

22   that what it is?

23       MR. ROTH:  No.  We've taken what we thought was a

24   point in the sales --

25       THE COURT:  Where did you come up with that?

1          MR. ROTH:  By looking at the various themes and

2   seeing how they performed.

3          THE COURT:  That's the foundation that's missing.

4   The foundation for the baseline.

5          MR. PRICE:  He's testified to -- the complete

6   foundation was he took a low selling theme, eliminated these

7   for various reasons and assumed that that's the value of the

8   intellectual property.  So anything sold above that must be

9   the theme.

10          THE COURT:  How does he come up with that?

11   Mr. Kennedy, why don't you lay the foundation for that.  It's

12   the baseline that I don't understand.

13          MR. KENNEDY:  Okay.  I'll have him explain it

14   again.

15          THE COURT:  Very well.

16          (CONCLUSION OF SIDEBAR CONFERENCE.)

17   Q.  BY MR. KENNEDY:  Mr. Meyer, I want to direct your

18   attention back to the baseline that you established in

19   preparing your theme based apportionment work.

20          And can you tell us again, go through the steps,

21   again in terms of how you settled on that particularly 3.2

22   million as the baseline.

23   A.  What I did was I focused on themes that had totally sold

24   through.

25   Q.  What does totally sold through mean?

1    A.   All the sales had been made.  So the product was off the

2    shelves, and I started with that.  I looked at it, and I went

3    from the lowest selling theme, and I began working through

4    the list.

5         And as I mentioned, the first three themes that had

6    totally sold through and were off the shelf had sold less

7    than 1 million sales.  And so I said if all of these themes

8    are practicing the Carter Bryant materials, you could

9    establish the baseline at a million dollars.  Because you had

10   three themes that basically had sold out at that level or

11   less.

12   Q.   Why didn't you stop there and make that your baseline?

13   A.   Because I wanted to be conservative and go a little

14   deeper, and I said basically if I stop there, I'd have a 5

15   percent apportionment, comparing the million dollar sales

16   level to the average for all the themes.

17        So I went deeper and said let's look at the next

18   level of sales, and there were two products that sold between

19   $1 million and $5 million.  And when I did that analysis, I

20   came up with the largest selling was $3.2 million, Midnight

21   Dance.  It was the 21st lowest selling.  So there were 20

22   other themes that had sold less than that.  Four had totally

23   come off the shelves.  And I said if that's the baseline, it

24   would be 16.7 percent by comparing 3.2 million dollars to the

25   average for all the other themes.

1          MR. PRICE:  Move to strike.  Now he's talking about

2     conclusions.

3          THE COURT:  Counsel.  I'm going to permit you to

4     conduct some voir dire here.

5          Mr. Kennedy, you finish yours, and then I'm going

6     to let Mr. Price do his before I find on foundation.  Ask all

7     the foundational questions you want, and then I'll allow

8     Mr. Price to ask foundational questions.

9     Q.  BY MR. KENNEDY:  Mr. Meyer, is there anything further

10    that you did as far as your methodology and process you

11    haven't told us about so far?

12    A.  Well, I can wrap it up.  So basically I established

13    the baseline of $3.2 million and said if you compare that

14    against the average for all the remaining themes, which are

15    $19 million, it indicates that there's a 16.7

16    apportionment -- 16.7 percent apportionment factors, and

17    that's how I went through the process.  And so it was the

18    21st slowest selling theme, and it was the fifth lowest

19    selling, including ones that were off the shelves, and that's

20    what I did.

21         MR. KENNEDY:  Thank you.

22         THE COURT:  Counsel, limit it to this foundational

23    issue.

24    ///

25    ///

1              VOIR DIRE EXAMINATION

2    BY MR. PRICE:

3    Q.  Mr. Meyer, for the $39.2 million theme -- with me so

4    far?  You're assuming that that establishes the value of the

5    intellectual property for all themes sold; correct?

6    A.  What I'm saying is that becomes the baseline of the

7    value of whether we're calling it the accused property, the

8    intellectual property, whatever it may be, but whatever the

9    Carter Bryant materials are, since all of these 77 themes

10   include, assume, include that baseline property, that becomes

11   the average selling value of a theme.  That's what I'm

12   saying.

13   Q.  And for the sale of these themes, you didn't control for

14   seasonality, which you thought was a big deal; right?

15   A.  I wouldn't agree with that.  I look at all 77 over the

16   entire history of the company up and down, whatever year it

17   may be.  I get them all in there.

18   Q.  Don't dolls sell better in certain seasons than others?

19   A.  I think that the beauty we have here is that we have

20   themes that sell across many years.  And so, as we saw this

21   morning --

22   Q.  My question is --

23   A.  Let me finish.

24        MR. PRICE:  Nonresponsive.

25        THE COURT:  You have an attorney that will be able

Unsigned                                    Page  7751

1    to ask you questions.

2    Q.  BY MR. PRICE:  For foundation, my question was don't

3    some dolls sell better in certain seasons than others?

4    A.  I believe the biggest selling is the holiday season.

5    The dolls are released twice a year, late spring and then for

6    the fall season.

7    Q.  With respect to these themes, don't they have, for

8    example, different numbers in the themes?

9    A.  They would vary.  The lowest I saw was three characters,

10   and the highest I saw was six characters.  There's usually a

11   combination of different dolls in an offering.  They will be

12   sold individually and as part of an assortment.

13   Q.  And for some of these themes, doesn't MGA have an

14   exclusive on some of these themes, that they give only to

15   certain stores?

16   A.  I don't think that's a big issue.  I know at times for

17   some of the stores they have some of those arrangements.  I

18   didn't see that as being an issue that would impact the

19   analysis.

20   Q.  So can you tell us which one of these themes were

21   exclusive?

22   A.  Of the 77, I cannot do that.  But I determined, from

23   talking to persons at MGA, that that was not a major

24   restricting issue.  They would sell as much product as they

25   could to maximize sales.  That was one of the things they

1    were trying to do.

2    Q.   And they also had themes that were limited edition

3    themes, collectibles?

4    A.   Some were collectibles.

5    Q.   And can you identify which of the 77 were collectibles?

6    A.   I can't tell you that specifically.

7    Q.   So given what you've told us, the basis for assuming

8    that $3.2 million is the value of the Carter Bryant property,

9    is that you identified a theme, a low-selling theme, that

10   sold 3.2 million?

11   A.   I wouldn't characterize -- I described my methodology.

12   I believe I could have gone lower.  I tried to come up with

13   some baseline that represented all the themes.  It included

14   the property that you're talking about in this case.  And I

15   thought about all of those issues of characters and

16   seasonality and I believe across all 77 were okay because

17   there's ups and downs.

18   Q.   You couldn't even tell us which themes had how many

19   characters sitting here right now?

20   A.   I generally have a feel for that.  I can't tell you

21   exactly which one.  But I know generally which ones have four

22   or five or six, and I can represent to the jury that across

23   all of them, you'll see a real mixed bag.  There are three to

24   six released individually and with assortments, and I believe

25   I've factored that into the analysis.

1          MR. PRICE:  Objection.  Foundation.

2          THE COURT:  Briefly at sidebar.

3          (SIDEBAR CONFERENCE HELD.)

4          THE COURT:  I understand what he did.  But I have

5     no confidence that there's any scientific basis for what he

6     did.  The $3.2 million he picked, he could have picked the

7     $1 million.  What he was basically saying is you have 10

8     products.  They sold at different rates.  Let's pick one of

9     the low ones and say that's -- that must capture Carter

10    Bryant's intellectual property.  And we'll use that as the

11    baseline.  But how it is expressed in different products

12    might be different.  And then for the value of the Carter

13    Bryant property as expressed in the different products can be

14    dramatically different.

15          So we don't know if the $3.2 million product was a

16    poorer, more accurate, or fuller use of the Carter Bryant

17    property or vice versa.  It could be less than 3.2.  It could

18    be more than 3.2.  He doesn't know which products.  I don't

19    see how this is defensible at all.

20          MR. PRICE:  If I can add one thing.  After 2003,

21    people are going in and they are having to choose among

22    themes.  All these dolls have themes.  So they are choosing

23    them on themes.  So some themes they don't like, and some

24    themes they do.  It doesn't mean that Carter Bryant's

25    intellectual property is valued at the worst theme they can

1      come up with.

2            THE COURT:  I understand the methodology.  I'm just

3      not following the logic.

4            MR. ROTH:  Obviously, it's not the worst theme.  He

5      picked a theme that he felt was reflective of the baseline

6      and did the calculations.

7            THE COURT:  Again, I understand how he came up with

8      this.  But why is that an accurate depiction?  How do we know

9      that that $3.2 million doll, with that theme, that that theme

10     is of any truly representative -- we don't know what it is.

11     He's just -- I'm not following the logic of this.

12           MR. ROTH:  Your Honor, we know that that is a --

13     it's not one of the worst themes.  We were being

14     conservative.  And we felt it was a baseline which was --

15           THE COURT:  Are you conceding, then, that all of

16     these dolls are the same?

17           MR. ROTH:  No.

18           THE COURT:  I didn't think so.  Each doll is

19     different.  Each doll to a certain extent, I assume you would

20     argue, I assume you're going to be arguing on Wednesday, has

21     more or less attributable aspects to Carter Bryant's work.

22           MR. ROTH:  Each doll is different, yes.

23           THE COURT:  How do we come up with a baseline

24     without taking into account the extent to which Carter

25     Bryant's work is involved in a particular expression of a

1    particular theme?

2         MR. ROTH:  I think the same amount --

3         THE COURT:  Unless the contribution isn't -- is

4    truly the same in each one.

5         MR. ROTH:  Well, we think the dolls are different

6    based upon nonprotectable elements.  In other words, the --

7    what makes each of them different is the nonprotectable

8    elements you see.

9         THE COURT:  So you are assuming, then, that each

10   doll, each theme has the same exact amount.  The only way

11   that this makes logical sense to me is if each theme has the

12   same amount of protectable elements in it.

13        MR. ROTH:  That's right.

14        THE COURT:  That's patently -- that's not supported

15   by the evidence in this case.  So I'm going to sustain the

16   objection.

17        MR. PRICE:  And I'd like to strike the testimony on

18   this because he gave the conclusion three or four times.

19        THE COURT:  I'm going to tell the jury we're moving

20   on.

21        (CONCLUSION OF SIDEBAR CONFERENCE.)

22        THE COURT:  Ladies and gentlemen, the Court is

23   sustaining that last objection.  That last analysis is to be

24   stricken.

25   ///

1                DIRECT EXAMINATION (RESUMED)

2       BY MR. KENNEDY:

3       Q.  Mr. Meyer, did you also undertake to evaluate the value

4       of Mr. Larian's ownership interest in the Bratz line?

5       A.  Yes, I did.

6       Q.  And in that regard, did you see Mr. Wagner's opinion and

7       testimony?

8       A.  Yes, I did.

9       Q.  And do you agree with his definition of fair market

10      value?

11      A.  Not in these circumstances.

12      Q.  He told us the fair market value equals the price,

13      something which sells for between a willing buyer and a

14      willing seller, assuming they both knew the facts.

15      A.  I agree with that.  I thought you were asking about his

16      result.  I apologize.  I do accept that definition.

17      Q.  Okay.  And to make sure, eliminate any confusion, we

18      have a slide here with his definition.

19              139, Aaron.

20              The definition.  Fair market value is the price

21      something would sell for between a willing buyer and a

22      willing seller, assuming they both know the facts.  You're

23      comfortable with that definition?

24      A.  I can accept that.

25      Q.  Now, taking everything you've learned about Bratz sales

1    and performance, including recent history in that regard, and

2    including this jury's verdict so far in this case, and

3    including what you understand to be the moneys that Mattel is

4    seeking in this portion of the case, do you have an opinion

5    as to what a willing buyer that knew all of the facts would

6    be willing to pay for Mr. Larian's interest in the Bratz line

7    portion of MGA today?

8    A.  I do have an opinion.

9    Q.  And what is that?

10   A.  That opinion --

11        MR. PRICE:  Your Honor, I object.  This is not only

12   irrelevant, but not in the report or deposition testimony.

13        THE COURT:  Is it?

14        MR. KENNEDY:  I have to let Mr. Roth speak.

15        THE COURT:  Counsel, why don't you confer among

16   yourselves.

17        MR. KENNEDY:  I think I know what your Honor's

18   concerned about, and we can clear it up in just a second.

19        THE COURT:  Very well.  Yes.

20        (SIDEBAR CONFERENCE HELD.)

21        THE COURT:  I didn't think that was in the report

22   myself.

23        MR. ROTH:  Your Honor, this is based upon the new

24   information that has come in since the verdict in this case.

25   And what he's going to say is he can't place a value on it.

1    He's not going to give the number.  It's exactly what I told

2    the Court that our expert would be saying.  He's not going to

3    give the precise number.

4         THE COURT:  Well, what's the answer?  What is he

5    going to say?

6         MR. ROTH:  He's going to say given the

7    uncertainties of the company, he cannot place a value on it

8    today.

9         THE COURT:  He cannot place a value?

10        MR. ROTH:  Right.

11        THE COURT:  Okay.

12        MR. COREY:  But that's the answer.  If he says you

13   can't put a value on it, they are going to say --

14        THE COURT:  If all he says is I can't place a

15   value, there are uncertainties.  I mean, the Court is going

16   to instruct the jury to do their best job to come up with a

17   value.

18        MR. PRICE:  But he's going to go further.

19        THE COURT:  I thought this was going to --

20        MR. PRICE:  I did, too.  But I think what he's

21   suggesting is that no one could.  So --

22        MR. ROTH:  Well, I will tell you --

23        THE COURT:  You know, this is fine.  That's

24   overruled.

25        (CONCLUSION OF SIDEBAR CONFERENCE.)

1    Q.   BY MR. KENNEDY:  Given everything you've learned in this

2    case about sales performance of Bratz, including the first

3    half of 2008 and taking into account the jury's verdict

4    that's already been returned in this case, and taking into

5    account the fact that we are still in trial in this case, and

6    taking into account the monetary amounts that Mattel is

7    seeking in this phase of the case, do you have an opinion as

8    to whether it is presently possible to place a value on

9    Mr. Larian's interest in the Bratz line portion of MGA?

10   A.   With all those issues, it would be my opinion that you

11   could not place a value on Mr. Larian's interest at this

12   point in time.  You just could not do that.

13   Q.   And is that also true of MGA's interest in the Bratz

14   line?

15   A.   It would be my opinion with all those issues and

16   uncertainties, you could not place a value on MGA at this

17   point in time.

18   Q.   And finally, did you prepare a graphic providing a

19   breakdown of profits according to segments of the overall

20   revenue for the Bratz line?

21   A.   Yes, I have.

22        MR. KENNEDY:  Aaron, could we see Exhibit 162.

23   Q.   And knowing we're short on time here, is what you've

24   done here taking the 3.1 billion in revenues, when you round

25   it up and broken that down into at least five of the overall

1    components that go to make it up?

2    A.   That's right.  If you go back to the prior schedules,

3    you'll see how this summary aligns with those schedules that

4    I've grouped together for the jury, the revenues and profits

5    from the various products and subbrands for the Bratz line,

6    and the total is the 3.1 billion.  Revenue, the total

7    profits, 405, and you'll see that spread amongst the various

8    categories.

9         MR. KENNEDY:  Thank you very much.  I have no

10    further questions, your Honor.  And I would move in all of

11    the exhibits except for the ones that Mr. Price has objected

12    to.  I think he and I can reach closure on that.

13         THE COURT:  Very well.  Why don't you confer

14    afterwards.

15         Thank you, Mr. Kennedy.

16         Mr. Price?

17              CROSS-EXAMINATION

18    BY MR. PRICE:

19    Q.   Mr. Meyer, I want to ask you a little bit about your

20    testimony about Stanford.  Do you recall about teaching

21    there?

22    A.   At Stanford?

23    Q.   And Stanford has a terrific business school.  Do you

24    teach in the business school?

25    A.   I teach in the engineering school.  I teach business to

1     engineers.

2     Q.  So they have a good economics department, too.  You

3     don't teach there, do you?

4     A.  I'm not in the economics department.

5     Q.  And, in fact, you are not a tenured professor; is that

6     right?

7     A.  I would not have tenure; that's correct.

8     Q.  In fact, you're not even on a tenure track.

9     A.  I've never approached it that way.  I'm just a

10    consulting professor.  I've been there 17 years.

11    Q.  And the way that's often referred to is a guest

12    lecturer; right?

13    A.  That's not correct.  That is absolutely not correct.  I

14    was approached by the school in the late 80's, and they were

15    interested in having someone come in and teach their

16    engineers about finance and business and business analysis.

17    And they wanted someone that would invest the time to tailor

18    it to their engineering group, and I took on that assignment

19    and began teaching two classes in 1991.  Taught two quarters

20    for about seven or eight years, full time consulting to

21    business, and then had some young kids --

22         MR. PRICE:  Your Honor, move to strike.

23    Nonresponsive.

24         THE COURT:  It is.

25    Q.  BY MR. PRICE:  Mr. Meyer, you've heard the phrase in

1    academia "publish or perish"?

2    A.  I believe in a general sense.

3    Q.  Which means that professors, particularly at a

4    prestigious institution like Stanford, are expected to

5    publish in their fields of expertise so that they can become

6    professors and get tenured; correct?

7    A.  That may be.  I've never approached by teaching on a

8    tenure track.  I've approached it to give back to the

9    students, as I'm a consultant, and I do this to help out the

10   students.

11   Q.  And I was looking at your resume.  In all the years, it

12   appears as if you haven't published a single thing; is that

13   right?

14   A.  I don't write.  I consult.  And I teach.  And I have

15   young kids.  That's what I do.

16   Q.  So the answer to my question is yes, I haven't published

17   a single thing.

18   A.  The answer is yes, I don't have time to write.

19   Q.  And with respect to this teaching students in the -- I

20   think it's the civil and environmental engineering school; is

21   that right?

22   A.  That's correct.

23   Q.  So what percentage of your income per year over the last

24   five years has been doing that as opposed to being an expert?

25   A.  I reached an accommodation years ago where I donate my

1    fee back to the school.  So I basically do it for nothing.

2    I'm part of the faculty, but I teach for free.

3    Q.   And the benefit you get is you get to come into court

4    and tell people that you're a Stanford professor.

5    A.   No, the benefit I get is I get to talk to young people

6    about real issues every year, and it's very enjoyable talking

7    about these issues to people that are interested in hearing

8    about it.

9    Q.   In your report, do you recall saying something to the

10   effect of without Bratz sales, MGA would be an entirely

11   different business.  Do you recall writing that in your

12   report?

13   A.   I believe that's correct.  I believe that.

14   Q.   And if we could put up -- I believe it's Meyer 1.

15   Looking at your methodology, you see how you subtract from

16   revenue expenses, get a profit, and you have an apportionment

17   multiplied.

18        Do you see that?

19   A.   Yes.

20   Q.   And you understand that applies only to the causes of

21   action for copyright or intellectual property infringement.

22   You understand that; correct?

23        MR. KENNEDY:  Objection.  Legal conclusion.

24        THE COURT:  Rephrase, Counsel.

25   Q.   BY MR. PRICE:  See where it says total damages?

1    A.   Yes, sir.

2    Q.   So obviously, to come up so that you can tell the jury

3    what damages were, you had to have some idea of what the --

4    some understanding of what the law required you to do to

5    calculate damages from a given cause of action; right?

6    A.   I can't speak to the law.  I know how to value

7    intellectual property.  I can't speak to legal issues.

8    Q.   So you thought that in evaluating intellectual property,

9    for example, if there had been some sort of infringement of

10   copyright or infringement of intellectual property, that you

11   did an apportionment analysis; correct?

12   A.   I believe what's asked is that one apportions the

13   profit.  You identify profits attributable to factors other

14   than the intellectual property.  So you look for other

15   reasons why the company is profitable.  You identify those

16   and you apportion to that.  That's my understanding from

17   working in intellectual property cases for 25 years.

18   Q.   And are you familiar with the cause of action breach or

19   aiding and abetting a breach of fiduciary duty?

20   A.   I would say from a nonlegal perspective, I am.

21   Q.   Okay.  And you don't purport to calculate damages for

22   that wrong, that is, for aiding and abetting a breach of

23   fiduciary duty; correct?

24        MR. KENNEDY:  Calling for a legal conclusion as

25   phrased.

1          THE COURT:  There's no foundation.

2     Q.  BY MR. PRICE:  Did you attempt to calculate damages for

3     anything other than an infringement of some sort of

4     intellectual property?

5          MR. KENNEDY:  Objection.  Lack of foundation.

6          THE COURT:  Well, as phrased, overruled.

7          Do you understand the question?

8          THE WITNESS:  I think in a general sense.  As I

9     testified in my deposition to one your colleagues, I believe

10    that my amounts relate to those causes of action, but I was

11    clear to say that I would defer to the lawyers in the case

12    and the judge to make that determination.  I've done those

13    calculations.  I believe they apply, but I'm not a lawyer.

14    So I would defer to those of you that are lawyers and judges.

15    Q.  BY MR. PRICE:  Okay.  Well, let me ask you, you recall

16    one of the things that you showed the jury was a number of

17    products.  I'm going to try to find the right graphic here.

18         It's graphic 142, Ken.

19         You did this breakdown of revenues?

20    A.  Yes, I remember that.

21    Q.  And you recall testifying -- for example, you've got

22    play sets, other product lines, licensing.

23         You see that?

24    A.  Yes, I do.

25    Q.  And you got fashions.

1          Do you see that?

2     A.  Yes.

3     Q.  And you recall testifying that your understanding in the

4     industry is that you wouldn't have any fashions sold without

5     a fashion doll.

6          Do you recall testifying to that?

7     A.  I believe in deposition I was asked if there was no

8     fashion doll, and that was the hypothetical, would there be

9     fashions, and I said I don't believe they would have fashions

10    if there was no doll.

11    Q.  And you also testified that the success of a fashion

12    doll directly leads to licensing opportunities.

13         Do you recall testifying to that?

14    A.  I believe in my report and at my deposition I said that

15    the company builds a brand, and part of that process they are

16    able to license, and part of that company is the fashion

17    doll.

18    Q.  Well, I didn't ask you about a brand.  Do you recall

19    saying, quote, the -- the fashion doll success directly leads

20    to additional licensing opportunities?

21    A.  That wouldn't surprise me in the context of my

22    deposition.  That wouldn't surprise me.

23    Q.  And you understand that Mattel is asking both for -- in

24    the infringement area, both direct profits from direct

25    infringement and indirect profits that result from that.

Unsigned                                              Page  7767

1          Do you understand that?

2      A.  I wouldn't know how you phrase them.  I believe that

3      there's a request for $3.1 billion of the Bratz revenues

4      however you decide to describe that.

5      Q.  And do you understand what is being asked for for

6      damages for the aiding and abetting the breach of fiduciary

7      duty of Mr. Bryant?  Do you have any idea of what's being

8      sought for that?

9      A.  What the damage claim is?

10     Q.  Yes.

11     A.  From what I can tell, reading the transcripts, it

12     appears that Mattel is seeking the same damages for those

13     state claims as it is for the intellectual property claims.

14     Q.  Do you understand that under that claim, Mattel is

15     seeking disgorgement of all benefit that resulted as a result

16     of the aiding and abetting and the breach of fiduciary duty?

17     A.  That may be.  I'm not a lawyer.  So I don't know how you

18     would phrase that, but I do understand that Mattel is asking

19     for profits on $3.1 billion is my understanding.

20     Q.  Any event, your analysis of the company, which I guess

21     was a number of hours, led you to the conclusion that without

22     the Bratz sales, MGA itself would be in your words, an

23     entirely different business; right?

24     A.  I believe it would be a different business if there

25     was -- if there wasn't a Bratz product.

1    Q.  Now, another calculation, I'd like you to look, if you

2    could, at -- this is where you compare yourself to

3    Mr. Wagner.

4         You recall that?

5    A.  Yes, sir.

6    Q.  And the difference here, we have these operating

7    expenses where Mr. Wagner subtracts 600 million and you

8    subtract 800 million.

9         You see that?

10   A.  Yes, I do.

11   Q.  And do you have any understanding as to whether or not,

12   if the jury finds willful infringement, whether or not any

13   amount is subtracted to come up with damages?

14   A.  I believe that's a legal question.  So I wouldn't have

15   an opinion under willful infringement.  I can tell you under

16   a financial analysis, this is the profits of the product

17   line.  If there's an issue for the judge or the lawyers, I

18   would defer to you on that.

19   Q.  So you aren't really testifying as to what legal damages

20   are or what sort of calculation the jury should make, at

21   least economically?

22   A.  I'm providing the economics for the jury to consider and

23   make their decision.

24   Q.  Okay.  So, for example, though, using your numbers,

25   you'll admit that if the jury finds willful infringement and

1    they are told that if there's willful infringement, you don't

2    subtract these operating expenses, you'll agree that your

3    number would increase by about 800 million?

4         MR. KENNEDY:  Your Honor, calling for a legal

5    conclusion.

6         THE COURT:  You're going to have to rephrase,

7    counsel.

8    Q.  BY MR. PRICE:  If you are asked, Mr. Meyer, to calculate

9    damages using these figures, and you were told that you could

10   not, should not subtract operating expenses, you'll agree

11   that your profits figure insurance creases by $800 million?

12   A.  I would agree that you should listen to the judge.  And

13   if that's what the judge determines, then that's what I would

14   tell the jury to do.

15   Q.  And here you have taxes of 200 million.  And one thing

16   you mentioned is that Mattel -- and I assume other companies

17   that you've seen, when they do financial reports, they

18   subtract taxes to get profits?

19   A.  They do deduct taxes to get profits, that's correct.

20   Q.  That's something you have probably seen in every

21   financial statement of a company you've looked at; right?

22   A.  If they are doing things in a legal fashion in this

23   country, that's correct.

24   Q.  But you understand the question here, the question is

25   how much damages should be awarded; right?

1    A.  Well, I believe we're focusing on in this case the

2    profits from the Bratz product line.  I think the Court and

3    the jury will decide damages, but as relates to profits,

4    these are the appropriate costs.

5    Q.  Well, in the Mattel information you saw, was it in the

6    context of there already having found liability in connection

7    with some sort of litigation that Mattel was taking the

8    position that you should subtract taxes?

9    A.  I don't follow that question.

10   Q.  Well, let me ask it this way:  You understand that an

11   award of compensatory damages in a case is tax deductible?

12   A.  You're getting into legal issues now.  Legal and tax

13   issues.  Tax planning issues.

14   Q.  Okay.  So maybe you're not the person to ask this.  So

15   what you're telling us is you don't have the expertise to be

16   able to tell us whether or not an award of compensatory

17   damages is tax deductible.

18   A.  I can tell you what the profits are on this product

19   line.  I think when you're talking about compensatory

20   damages, you want to define in the context of this profit

21   stream what that is going to be, that may help me a little

22   bit.

23   Q.  My question is different.  Are you telling us, because I

24   asked you whether or not compensatory damages are tax

25   deductible, are you telling us that you don't have the

1    expertise to tell the jury whether or not compensatory

2    damages are tax deductible?

3    A.  I need it broken down.  So we're moving away from the

4    profits, and now we're just talking about a damage award

5    that's compensatory versus punitive or something like that?

6    I'm not really clear on your question.

7    Q.  I'll try to make it clearer.

8         Compensatory damages, not punitive damages.  You

9    understand the difference?

10   A.  As a nonlawyer.

11   Q.  Okay.  And I'm just asking whether or not you have the

12   expertise to tell the jury whether or not compensatory

13   damages are tax deductible.

14        MR. KENNEDY:  Legal conclusion.

15        THE COURT:  I'm sorry?

16        MR. KENNEDY:  Legal conclusion.

17        THE COURT:  Overruled.

18        THE WITNESS:  I believe it's really an issue for

19   the tax lawyers and the tax planners, and it's a complicated

20   issue.  And I wouldn't have a separate opinion about that.  I

21   know that these are the taxes deducted in the course of this

22   business.  But with the damage award and how that's handled

23   vis-a-vis the tax authorities, I wouldn't want to be offering

24   opinions about that.

25   Q.  BY MR. PRICE:  So the answer to my question is yes, you

1    don't have the expertise to tell the jury whether or not a

2    damages award is tax deductible?

3    A.   I wouldn't have the expertise to walk the jury through

4    that and advise on that.

5    Q.   And as a CPA, you would not able to give an opinion as

6    to whether or not damages are tax deductible?

7    A.   I think we're getting back to another issue.  But I

8    wouldn't want to be giving advice on how to handing a damage

9    award in light of someone's tax requirements.

10   Q.   Now, you did talk about just some raw data that got into

11   evidence about how different themes sold at different

12   amounts.

13       Do you recall that?

14   A.   Yes, I believe I testified that there was a wide variety

15   of different sales for the themes of the Bratz dolls.

16   Q.   Now, is it your understanding that after, say, 2003,

17   that if you walked into a store to buy a Bratz doll, if you

18   wanted to buy a Bratz doll, you were confronted with themes;

19   right?

20   A.   It would be my understanding that most of the products

21   released after 2003 were on some thematic scale.  The company

22   was focusing on the releases around these different themes.

23   Q.   So in fact most months -- if not virtually all -- if you

24   walked into a store and you wanted to buy a Bratz doll, you

25   had to choose among themes; right?

1    A.  That's right.  Because the first generation had

2    basically sold out.  Demand was gone.  It was the same doll.

3    So the company was trying to extend the demand by augmenting

4    the product line, adding fashions and accessories and making

5    the theme so there were still sales.  You couldn't sell the

6    same old doll because they had already been sold.

7    Q.  The answer to my question is "yes"?

8    A.  I think it's a combination.  There were some

9    combinations of sales, and the company was trying to spurr on

10   sales, and they sold on themes.

11   Q.  My question is after 2003, if a child went into a store

12   and wanted to buy a Bratz doll, that child had to pick among

13   themes; right?

14   A.  I would say generally they were sold by themes; that's

15   correct.

16   Q.  And so when the child is confronted with wanting to buy

17   a Bratz doll and they are confronted with themes, some themes

18   they chose and some themes they didn't at different rates;

19   correct?

20   A.  Well, based on what the young girls were looking for,

21   they bought certain themes and didn't buy others.  And you

22   heard my points on direct.  But there was a vast difference

23   in terms of what was successful with those theme sales.

24   Q.  Now, one of the analyses that you did was that you said

25   in response to what Mr. Wagner did in making a comparison

1    among companies, you did your comparison using figures from

2    Mattel; is that right?

3    A.   Right.  I took his analysis and I believe improved it

4    with a better benchmark, a better baseline.

5    Q.   And this was not an analysis that was contained in your

6    first expert report; correct?

7    A.   That's correct.

8    Q.   I mean, this was you were critiquing Mr. Wagner's

9    analysis; correct?

10   A.   He put forth an apportionment methodology, and I picked

11   it up, and I said I believe it's not very good the way it is,

12   but I believe I can make it better, and that's what I did.

13   Q.   Okay.  So in your analysis, if we could look at your

14   supplemental report.  Is it up in front of you?  The

15   supplemental report dated July 1, 2008?  I think it's 13861.

16   A.   Yes, I have it in front of me.

17   Q.   And this is the report in which you make this analysis

18   compared to -- comparing Bratz to Mattel; correct?

19   A.   I do two things.  One, I address the Barbie

20   profitability, which we had just received, and then I also

21   update Mr. Wagner's analysis.

22   Q.   And I'm talking about the updating of Mr. Wagner's

23   analysis using Mattel's financials, in that you're including

24   the value of Mattel's intellectual property when looking at

25   their profits; right?

1    A.  I would agree if we're comparing against Mattel

2    products, we're comparing against their intellectual

3    property.  I agree with that.

4    Q.  And if you're looking at the Bratz figures, you're

5    looking at figures which include the value of Bratz

6    intellectual property; correct?

7    A.  I agree with that.

8    Q.  But the purpose of the analysis, I understand, was to

9    find out how much of those sales was due to something besides

10   intellectual property; correct?

11   A.  No, I believe the purpose was to establish a baseline.

12   If the hypothesis of Mr. Wagner was that let's compare

13   against companies that had strong brands, distribution

14   recognition, and then profits over and above that must be due

15   to something that's super.  In this case, it may be

16   Mr. Bryant's materials, the materials in front of the court

17   here.

18          So I said well, I can improve upon that, and I

19   think by doing it, by comparing it to a fashion doll.  And

20   then if there's a difference, to me that's a better way of

21   trying to identify or carve out what may be important to the

22   jury, those additional profits.

23   Q.  And as part of your analysis, you came up with a figure

24   which you labeled excess profitability.

25          Do you recall that?

1    A.  I believe I called it excess -- it was the amount

2    comparing the two products.  It's the difference.  And if

3    it's in the favor of Bratz, it's excess.  And if it was in

4    the favor of Barbie, I sort of set that aside.

5    Q.  And the purpose of that was you were trying to find out

6    how much of the profits generated by Bratz were due to the

7    design of the doll; correct?

8    A.  I was basically trying to improve upon Mr. Wagner's

9    approach and say if we compare fashion doll products, can we

10   find some baseline and potentially above that baseline that

11   would be related to the copyrighted materials and the other

12   items in front of the Court.

13   Q.  Let me ask you again.  What you were trying to do is

14   come up with a figure.  So you could determine what

15   percentage of the profits generated by profits were

16   attributable to the design of the doll; correct?

17   A.  If we can agree that design of the doll is the broad

18   definition of the property, Carter Bryant's materials and all

19   of that, I would say yes, that's true.

20   Q.  And if we look at attachment 3 to your report, this is

21   Exhibit 13861, you see your calculations as to how you come

22   up with your percentage as to what portion of Bratz profits

23   is due to the design of the doll.

24       Do you see that?

25   A.  I see the schedule.  I'm not certain I follow your

1    point.  But I'm on the schedule.

2    Q.   You see the last line, apportion the percentage, and you

3    arrange those out, and you get a percentage which you say is

4    the percentage of Bratz profit attributable to the Bratz

5    design or Mr. Carter's intellectual property; right?

6    A.   I agree with that in a general sense.

7    Q.   And in doing that, you see you calculated a raw figure

8    as to what portion of the profits were due to the design of

9    the doll.  That's under the excess profitability line.

10       Do you see that?

11   A.   The $31 million figure?

12   Q.   Total figure, yes.  Do you see that?

13   A.   Yes, I do.

14   Q.   Okay.  So let's look at that.  So in 2001, based on your

15   analysis, the amount of Bratz profits in total due to the way

16   the doll looks, that is, Mr. Carter Bryant's designs, the

17   total number of dollars of profit attributable to that were

18   zero.

19   A.   That's right.  That was a year of heavy costs for Bratz.

20   The Bratz line was ramping up, and there was a lot of heavy

21   costs.  So it is zero.

22   Q.   Were there no profits for Bratz in 2001?

23   A.   I believe we saw on the board it was about $4 million

24   total.

25   Q.   Okay.  So for $4 million, using your technique, $4

1    million of profits, according to your technique, zero

2    attributed to the design or look of the doll; correct?

3    A.  It you're going line by line, and I explained this in my

4    deposition differently, but I would agree based on that

5    comparison, there would be nothing assigned as additional

6    profitability.

7    Q.  Let's put on Exhibit 13861, page 11, on the screen.  And

8    we're looking here at the excess profitability figure here.

9    And if we can compare that along years.

10       So I talked about 2001.  So in 2005, now, on your

11   calculations, using your apportionment, using the way you did

12   it, what were the profits in 2005 for Bratz?  The total

13   profits?

14   A.  Under this methodology, since Barbie in that year

15   exceeded Bratz, there's nothing apportioned off to Bratz.

16   Q.  You're jumping ahead of me.  My question was different.

17   I'm asking to you tell the jury what, under your

18   calculations, were the Bratz profits for the year 2005.

19   A.  I'm sorry.  The profits.  They were $63 million.

20   Q.  Okay.  So using your technique, of that $63 million

21   profits, the amount that you attribute to the design and look

22   of the doll, to the intellectual property, is zero.

23   A.  That's right.  In that year, based on this methodology,

24   that's correct.

25   Q.  By the way, most methodologies you use, you have to do

1    kind of a gut check to see if they make any rational sense.

2        Would you agree with that?

3    A.  Well, now, we're backing up to the fact that I took

4    Mr. Wagner's methodology and, I believe, improved upon it.

5        MR. PRICE:  Move to strike as nonresponsive.

6        THE COURT:  Sustained.  It's stricken.

7    Q.  BY MR. PRICE:  You will agree that in evaluating

8    methodology, you want to use a gut check to see if it makes

9    rational sense?

10   A.  I wouldn't argue with that.

11   Q.  So then we are in the year 2006, under your

12   calculations, using the way you allocate expenses, you've got

13   Bratz profits of 117 million; correct?

14   A.  That's correct.

15   Q.  Okay.  And the amount of those profits of 117 million

16   that you use, that you say is attributable to the

17   intellectual property, is zero; correct?

18   A.  That's correct.

19   Q.  And then in 2007, you've got, according to your

20   calculations, 71 million in profits; correct?

21   A.  That's correct.

22   Q.  And the amount that you attribute to any intellectual

23   property is, again, zero; correct?

24   A.  That's correct.  Year by year, that's correct.

25       MR. PRICE:  Your Honor, I move page 11 of

1    Exhibit 13861 into evidence.

2         THE COURT:  Any objection?

3         MR. KENNEDY:  No objection, your Honor.

4         THE COURT:  It's admitted.

5         (Exhibit 13861, Page 11, received.)

6    Q.  BY MR. PRICE:  And finally, Mr. Meyer, you were asked

7    about the possibility of evaluating the value of MGA on a

8    going forward basis at this time.

9         Do you recall those questions?

10   A.  I believe I was asked about could one actually value the

11   company today based on where the verdict stands in this case

12   and the company's downward slide in 2008.  And I testified

13   that you could not value the company right now at this point

14   in time.

15   Q.  However, I guess it's your opinion that after there's a

16   verdict, then the business or Mr. Larian's going forward net

17   worth could be evaluated?

18   A.  It would depend a lot on what that verdict is and where

19   the company is.  If the sales -- company's sales and profits

20   are down from 2008, way down from 2006.  So a lot depends on

21   what the verdict is and what the company has to face in the

22   way of its cash flow.

23   Q.  You're aware that MGA gave us numbers and projections

24   after the jury's verdict as to profitability, et cetera;

25   correct?

1          MR. KENNEDY:  Objection, your Honor.  Lack of

2    foundation.

3          THE COURT:  It's a foundational, yes.  Overruled.

4          THE WITNESS:  Could the question be read back,

5    please?

6          (Record read.)

7          THE WITNESS:  I can't speak to when they provided

8    projections to you.

9    Q.  BY MR. PRICE:  If the jury came back with a very low

10   verdict, you would agree -- say because they thought MGA, we

11   can't figure out their value going forward.  You with me so

12   far, that hypothetical?

13   A.  So you're saying a low verdict.  So can you give me an

14   amount, for example?

15   Q.  What you would consider low.

16   A.  $10 million.

17   Q.  Okay.  So let's say the jury came back with a

18   $10 million verdict because, among other things, they thought

19   it was too difficult to value the value of MGA going forward.

20         You with me so far?

21   A.  I believe so.

22   Q.  So then after the verdict, because there was such a low

23   one, MGA's value would increase dramatically, wouldn't it?

24   A.  I don't follow that.  I mean, if you're asking me to

25   assume there's a $10 million verdict, could you then -- all

1    other things being considered equal, place a value on the

2    company?  Potentially, I'd have to know what else came out of

3    the court's decision.  But if all we're doing is talking

4    about a $10 million verdict and nothing else, I mean,

5    everything else is, I should say, pre this law suit.

6            So you could most likely place a value on the

7    company.

8    Q.   And if that's what the jury did, then Mr. Larian would

9    be able to profit from the wrong he committed because,

10   according to you, the jury can't make a calculation of his

11   net worth at this moment.

12           MR. KENNEDY:  Objection.  Lack of foundation, legal

13   conclusion.

14           THE COURT:  Overruled.  You may answer.

15           THE WITNESS:  If I understand the question, I think

16   that's all relative to what the jury finds.  I would defer to

17   the jury and trust their judgment.  I can't sit here and --

18   I'm not going to judge Mr. Larian.  That's up to the jury to

19   do.

20           MR. PRICE:  Nothing further.

21               REDIRECT EXAMINATION

22   BY MR. KENNEDY:

23   Q.   Mr. Meyer, I'd like to direct your attention back to

24   the horizontal version of page 1 in attachment 3 to your

25   supplemental report that Mr. Price was just asking you about.

Unsigned                                    Page  7783

1           And first, I think you testified that in 2001, you

2    thought that Bratz made a profit of $4 million.  My question

3    is were you talking about what the first generation dolls did

4    or what happened in 2001?

5    A.  Excuse me.  That was the first generation dolls.

6    Q.  Okay.  So as you've told us during direct, when you take

7    the first generation dolls for all the years they were sold,

8    they made $4 million; is that correct?

9    A.  That is correct.

10   Q.  Okay.  However, if we look at Bratz for 2001, did it

11   make a profit?  It's up on the board here.  To speed things

12   along, is there a $4 million loss shown?

13   A.  That's correct.

14   Q.  And in this analysis, you were attempting to compare

15   Bratz profits with Barbie profits; is that correct?

16   A.  That is correct.  Barbie and My Scene.

17   Q.  Okay.  And you were attempting to determine to what

18   extent Bratz was making greater profits than Barbie.

19   A.  That was the objective of the comparison.  That's

20   correct.

21   Q.  In this analysis, were you making any attempt to decide

22   what Mr. Bryant's drawings contributions were in a particular

23   year?

24   A.  No, my focus was overall.  So I would take you to the

25   far right-hand side, and I would say I focused on those

1    totals over this whole period.  If you look at what happened

2    based on this methodology, there was excess profitability of

3    $31 million.  And that translates to a 5.22 percent

4    apportionment percentage.  And I felt across the whole

5    period, across all of the themes and characters that were

6    sold, that was the most appropriate focus point as opposed to

7    any one year.  I didn't focus on cut-off issues.  Just

8    overall.

9    Q.  Is it your opinion that for any of these years, the

10   Bryant drawings made absolutely no contribution to the Bratz

11   profits?

12   A.  No, I believe I recognize that the Bryant drawings were

13   an important first step, and I've recognized value to those

14   drawings going through the apportionment percentages and

15   through the profits I've laid out for the jury today.

16        MR. KENNEDY:  Thank you very much.  No further

17   questions.

18             RECROSS-EXAMINATION

19   BY MR. PRICE:

20   Q.  You said what you were doing was coming to an overall

21   contribution, and then you pointed to this far right-hand

22   corner figure of 5.22; right?

23   A.  That's correct.  Across all the years.

24   Q.  So that's overall.  But the way you got that overall was

25   by adding up the percentages for the years and then doing

1    some math; right?

2    A.   Well, that's how the schedule works.

3    Q.   Right.  So when you said you weren't doing it year by

4    year, you were just doing it overall, your methodology

5    required you to go year by year; correct?

6    A.   I had to gather the data year by year and make the

7    comparisons.

8    Q.   And using your methodology, it shows that for three of

9    the years where the dolls make, according to your figures,

10   hundreds of millions of dollars, zero percent would be

11   apportioned to Mr. Bryant's intellectual property.  That's

12   what these numbers show; right?

13   A.   I don't agree with that.  I do not agree with that.  I

14   believe if we want to go down that route, I would focus the

15   jury on 2002, the 7.25 percent, 2008, the 8.83 percent, and

16   2004, the 10.07 percent.  To use those apportionment

17   parentages.

18        My focus was to try to compare Barbie to the Bratz

19   doll to see if there was any so-called super profits from the

20   intellectual property and identify it there.  I'm the last

21   one to say there's not value in Mr. Bryant's and the property

22   now that's been awarded to Mattel.  I recognize value in that

23   property.

24        MR. PRICE:  No other questions.

25        MR. PRICE:  Nothing further.

1        THE COURT:  You are excused, sir.  Thank you.

2        MR. NOLAN:  Your Honor, the next witness will be a

3    two-minute video of Lily Martinez's deposition testimony.

4        MR. QUINN:  Your Honor, would it be appropriate to

5    explain why Ms. Martinez is necessary?

6        THE COURT:  I suspect the jury has figured out why

7    Ms. Martinez is no longer with us.  As important as this case

8    might be to Ms. Martinez, there is one thing perhaps more

9    important, and she's attending to that as we speak.

10        (WHEREUPON THE VIDEOTAPED DEPOSITION EXCERPTS

11        OF LILY MARTINEZ, AS PROVIDED BY COUNSEL, ARE

12        INCORPORATED HEREIN:)

13    Q.  Could you please state your full name for the record.

14    A.  Liliana Martinez.

15    Q.  Do you consider the decal reflected on Exhibit 257 to be

16    more cartoony than the features of Barbie?

17        MR. ZELLER:  And when you say Barbie, you're

18    talking about the particular doll that's in Cool Skating?

19    Q.  That's correct.

20    A.  You're asking me to compare them?

21    Q.  Yes.

22    A.  It's not the same thing.

23    Q.  And how are they different?

24    A.  One is 3D and one's 2D.

25    Q.  Do they differ in any other way other than one being 2D

1   and one being 3D?

2   A.  One is -- I mean, you can't compare something that's

3   not -- you can't compare them.

4   Q.  Do you believe that the style of Barbie's face is the

5   same as the style of the decal?

6   A.  You already asked me that, and I had already told her I

7   think one is a doll and one is a cartoonish decal.

8   Q.  What did you do with the Toon Teens materials, the dolls

9   and accessories and et cetera after you heard that Toon Teens

10   was not selected?

11   A.  Materials, meaning the actual product that we presented?

12   Q.  Yes.

13   A.  I don't remember what I immediately did.  But

14   eventually, we put it in a box.

15   Q.  Are there Bratz dolls in the design area at Mattel?

16   A.  You already asked me that.

17   Q.  How did they get there?

18   A.  We buy them.

19   Q.  Have you ever bought a Bratz doll?

20   A.  Yes, I've bought a Bratz doll.

21   Q.  Have you bought many Bratz dolls?

22   A.  I wouldn't say many, but I bought some.

23      (END OF DEPOSITION EXCERPT.)

24      MR. NOLAN:  Your Honor, just a time count with

25   respect to their cross-examination deducted from the four

1    o'clock?  Because we have one video that's 13 minutes long.

2        MR. NOLAN:  Thank you.  The next video will be

3    Kevin Farr.

4        (WHEREUPON THE VIDEOTAPED DEPOSITION EXCERPTS

5        OF KEVIN FARR, AS PROVIDED BY COUNSEL, ARE

6        INCORPORATED HEREIN:)

7    Q.  Would you please spell your name for the record, sir.

8    A.  Kevin, K-E-V-I-N, Farr, F-A-R-R.

9    Q.  How long have you been with Mattel?

10   A.  I've been with Mattel since November of 1991.

11   Q.  What did you do in terms of employment between 1986 and

12   1991?

13   A.  I worked for Price Waterhouse at the time.

14   Q.  Are you a CPA?

15   A.  Yes, I am.

16   Q.  And you have an effective, operable license right now?

17   A.  I have a license, yes.

18   Q.  And what did you do for Price Waterhouse?

19   A.  I did auditing and did tax consulting.

20   Q.  And any other employment between 1986 and 1991 other

21   than Price Waterhouse?

22   A.  No.

23   Q.  Okay.  Was Mattel one of your clients?

24   A.  Yes.

25   Q.  Okay.  And that led to the employment at Mattel?

1    A.  That's correct.

2    Q.  Okay.  And what was your initial position at Mattel?

3    A.  Director of tax.

4    Q.  Okay.  And can you explain generally the duties or jobs

5    you had between 1991 and 2000 at Mattel?

6    A.  Yeah.  I was director of tax.  Then I became the head of

7    the tax department shortly thereafter, and in 1996,

8    September, I became controller of Mattel, and then ultimately

9    I became CFO of Mattel in February of 2000.

10   Q.  Do you have a design background?

11   A.  No.

12   Q.  Marketing background?

13   A.  I've got a marketing major at Northwestern University,

14   but I don't really have marketing expertise, no.

15   Q.  As of November 2001, was there such a thing as the

16   management committee at Mattel?

17   A.  Yes.

18   Q.  Okay.  And were you part of that management committee?

19   A.  Yes, I was.

20   Q.  Could you explain what the management committee is?

21   A.  The management committee is Bob Eckert's direct reports,

22   the CEO of Mattel.

23   Q.  Other than the fact that these people are direct reports

24   to Mr. Eckert, does the committee have any other function?

25   Does it meet in a committee, for instance, to discuss

1    particularly important policy issues for the company?

2    A.  No.

3    Q.  You know what I'm referring to when I say the Bratz

4    dolls?

5    A.  Yes.

6    Q.  What are the Bratz dolls?

7    A.  Bratz dolls are fashion dolls.

8    Q.  What's a fashion doll?

9    A.  Fashion doll, I believe, is an 11 1/2-inch doll that

10   looks like, you know, an adult or a teenager.

11   Q.  Okay.  What do you mean by fashionable?

12   A.  It's about on-trend fashion.  It's about fashion play

13   where you're playing with doll clothes and dressing up the

14   doll with doll clothes.

15   Q.  And that's an important element for Barbie?

16   A.  It's one element of Barbie.

17   Q.  Okay.

18   A.  It's one element of fashion doll play.

19   Q.  Okay.  And Bratz is also a fashion doll; is that right?

20   A.  Yes.

21   Q.  When did you first hear of Bratz?

22   A.  Probably around 2001, 2002.

23   Q.  How did you come to find out about that?

24   A.  Just in the competitive marketplace, keeping up with

25   what's happening in the toy business.

1    Q.  Do you recall specifically how you heard about Bratz?

2    A.  No.

3    Q.  I'd like to mark as Exhibit 2502, I believe, a

4    multi-page document, Bates Nos. M 0356622 through -629.

5        This is a multi-page document with an e-mail cover

6    sheet and then some text attached from Julia Jensen to Kevin

7    Farr, Jerry Bossick, and Glen Bozarth.  I assume that Kevin

8    Farr is you?

9    A.  Yes.

10   Q.  Down at the bottom of the page, about three, four lines

11   from the bottom, it says the Barbie aisle completely stocked

12   with the new look.

13       Do you see that?

14   A.  Yes.

15   Q.  Do you know what that refers to?

16   A.  I think it was a change in packaging.

17   Q.  Okay.  And how was the packaging changed?

18   A.  Well, if you read on, it says the package changed with a

19   fresh, light, contemporary world look for girls.

20   Q.  Is packaging something that's important for Barbie?

21   A.  Well, I think packaging is part of the element of the

22   product.  So yeah, it's important.

23   Q.  Okay.  Does Mattel have a packaging department?

24   A.  Yes.

25   Q.  And their responsibility is to work on the packaging for

1    all of the -- all of Mattel's products; correct?

2    A.   Well, I think there's a packaging department responsible

3    for particular brands, and there is probably more than one

4    packaging group --

5    Q.   Okay.

6    A.   But yeah, it is responsible for packaging.

7    Q.   But that's something that Mattel puts a lot of focus and

8    energy on; correct?

9    A.   Well, I think Mattel puts a lot of focus on packaging,

10   but it's really the entire product that is the focus.

11   Q.   When you say the entire product, what do you mean by

12   that?

13   A.   The product in and of itself, the play value of the

14   product, and the packaging, and the advertising and the

15   marketing programs.

16   Q.   Would you go to page 7 of this document, please.  At the

17   very top, it says:  "We have seen a real impact with the new

18   packaging and fresh product offerings in the Barbie fashion

19   lines."

20        Do you see that?

21   A.   Yes.

22   Q.   Do you recall that in 2000 that there was an emphasis on

23   new packaging for Barbie?

24   A.   Yes.

25   Q.   Do you have an understanding as to why there was a new

1   emphasis on packaging for Barbie back in 2000?

2   A.  Again, I think that we saw some declines in the prior

3   years, and I think people thought that refreshing the

4   packaging could have a positive impact on the product sales.

5   Q.  Has there been a focus on packaging as a way to generate

6   sales since 2000?

7   A.  Well, I think there's a focus on packaging every year

8   that, you know, is supposed to help sales.

9   Q.  Do you know whether the company tracks the effect of

10  packaging on sales?

11  A.  Well, I think that's a very difficult thing to determine

12  at the end of the day.  So I think it's a -- you know, you've

13  got a product.  Some products sell.  Other products can have

14  great packaging and not sell, and, you know, it's difficult

15  to isolate each of the factors that relate to why a product

16  sells well and why a product doesn't sell well.

17         In the individual components, which I look at, is

18  what is the overall sales of the product, and are those

19  products moving in the right direction.  If that's the case,

20  and presumably you've got the right product, you got the

21  right packaging, and you got the right marketing program

22  around it.  So it's difficult to isolate, you know, what one

23  component does relative to the entire product.

24  Q.  Have you ever heard the phrase life-style brand before

25  today?

1    A.  Yes, I have.

2    Q.  When did you hear that?

3    A.  I think over the years.  So, you know, I would say the

4    last five years or so, eight years.

5    Q.  Okay.

6    A.  Something like that.

7    Q.  Do you have an understanding of what that phrase means?

8    A.  Well, I think what it means is more than just a toy, and

9    it relates back to, you know, we do licensing business with

10   Barbie and Fisher-Price and Hot Wheels, and they include

11   products that are outside of just the traditional toy, the

12   doll, the accessory, things like apparel, things that

13   perfume.  So more of things that relate to everyday life is

14   my understanding of what that would mean.

15   Q.  Okay.  Are you familiar with the word "brand"?

16   A.  Yes.

17   Q.  Okay.  And what does the word mean to you?

18   A.  It refers to -- to me, it refers to -- you know,

19   recognizable brands like Barbie, like Chanel, like

20   Louis Vuitton.

21   Q.  And does brand have an existence in your mind separate

22   and apart from the products?

23   A.  No.

24   Q.  So it's possible to have a strong brand but a weak

25   product at the same time?

1    A.  Yes.

2    Q.  Turn to page 7.  About seven bullet points down the

3    page, it says:  "Focused on building brand equity versus just

4    selling a toy."

5         Do you see that?

6    A.  Yes.

7    Q.  Do you have any understanding of that concept generally?

8    A.  Again, I think it's about building brand equity, and

9    that's about the brand, and versus a toy means that a toy can

10   stand alone without a brand because there's play value with

11   that toy.  It's fun to play with whether it's a branded toy

12   or not.

13   Q.  Okay.  I would like to mark as next in order Mattel's

14   2003 Form 10-K.

15        Mr. Farr, do you recognize this document?

16   A.  Yes.

17   Q.  What is it?

18   A.  It's the Form 10-K for the year ended December 31st,

19   2003.

20   Q.  And you signed this document; correct?

21   A.  Yes, I did.

22   Q.  Did you review it to ensure it was accurate before you

23   signed it?

24   A.  Correct.

25   Q.  Okay.  If you would turn to page 4 of the document.  If

1    you look in the upper right-hand corner, there's a 5 of 109,

2    but at the bottom, it's actually 4.

3    A.  Yes, yes.

4    Q.  All right.  The third paragraph there under domestic

5    segment, it says:  "In 2004, Mattel expects to expand its

6    existing products or introduce new products, including a new,

7    quote, words of, close quote, strategy within the Barbie

8    brand."  And then it goes on to explain the words of.  The

9    words are Ferry Topia, Happy Family, Cali Girl.

10        Do you see this?  Cali Girl.  Do you see that?

11   A.  Yes.

12   Q.  Do you know what the worlds of strategy was within the

13   Barbie brand?

14   A.  Yes.

15   Q.  Can you explain that, please?

16   A.  Basically, it was to have content which told a story and

17   then building a product line around that content or story so

18   the girls could buy the product line and play out the story.

19   Q.  So the word content in your business generally refers to

20   the story associated with the doll?

21   A.  Yes.

22   Q.  So if you could give me an example.

23   A.  One of these lines was Princess and the Pauper.  We did

24   a direct video, direct to consumer video which basically told

25   the Princess and Pauper story, and then we built a line

1   around the princess and the story with regard to accessories,

2   like a carriage and other characters in the film so that our

3   little girl could bring that story to life with our toys and

4   replay the story in their living room.

5   Q.  Okay.  So a story around the doll, at least as of 2003,

6   2004, was an important element of that doll; is that correct?

7   A.  It was an important element of the play pattern

8   presumably.

9   Q.  Okay.  Can you explain that?

10   A.  Well, it was basically the play pattern was to play

11   around the story.  So the story was, you know, the element

12   that you wanted little girls to focus in on, buy the toy

13   line, and then replay the story.

14   Q.  Okay.  So a doll would have a particular life story; is

15   that right?

16   A.  Correct.

17   Q.  And this is something that Mattel would create for the

18   doll?

19   A.  Correct.

20   Q.  And is this something that was new as of 2003, 2004, is

21   this element of stories for dolls?

22   A.  It was new that it was -- that a major portion of the

23   line would be built around that.  It wasn't new in the

24   concept we had doing these direct to consumer DVD's for

25   several years, and that those particular -- having the DVD

1    and the toys around the story so that they could bring the

2    store toy life was very successful.  So the thought was why

3    not do that across the line to the extent that that made

4    sense.

5    Q.  So do you recall that in the 2003, 2004 time frame, this

6    concept of using stories with dolls was something that was

7    particularly focused on?

8    A.  Yes.

9    Q.  Okay.  Is that something that Matt Bousquette was the

10   primary driver behind?

11   A.  Yes.

12   Q.  Could you describe again what that world of strategy is?

13   A.  Again, it was our strategy to have a story, some type of

14   content around Barbie product line and have the product line

15   built around that story, and then kids, by buying the product

16   line, could bring that story to life in a play pattern.

17   Q.  And this is a strategy that was implemented in 2004?

18   A.  I believe so.

19   Q.  Across the broader part of the line?

20   A.  There was a strategy prior to that where we were doing

21   our entertainment properties around that strategy.  So when

22   we talk the words of strategy, it was around the broader part

23   of the line, Barbie line.

24   Q.  Okay.  So it was the use of the strategy which was

25   building stories around dolls directly with Barbie that was

1    new in 2004; is that right?

2    A.  Correct.

3    Q.  Okay.  And did you do anything to familiarize yourself

4    with that strategy in preparation for this conference call?

5    A.  I saw the presentations that we, you know, made to

6    customers about the worlds of strategy, and I think we did at

7    one time present this strategy to the board.  So I understood

8    it with respect to it was building content and then building

9    a product line around the story.

10   Q.  You say you saw the presentations that were made to

11   customers.  Does that mean you were at presentations with

12   customers or that someone did a mock for you in a sense and

13   ran through a presentation that would then later be presented

14   to customers?

15   A.  I was at customer presentations of what we call -- where

16   we bring them into our offices and present the product line

17   to them.

18   Q.  Do you have a recollection today -- do you recall

19   understanding in 2004 that the world of strategy was working

20   in 2004?

21   A.  I believe some of the worlds were working, and I believe

22   some of them weren't working.

23   Q.  Uh-huh.  Do you recall --

24   A.  That's my recollection.

25   Q.  Do you recall which worlds of were working?

1    A.  Specifically, no.

2    Q.  Okay.  Could you go to page No. M 0079735.  It's about

3    five pages back.  It says:  "Fight fire with fire."  Do you

4    see that?  And three sentences down, it talks about product

5    packaging, marketing, and sales.

6         Do you see that?

7    A.  Yes.

8    Q.  Okay.  Do you recall that, in the spring of 2004, the

9    focus with respect to Barbie was on product packaging,

10   marketing, and sales?

11   A.  Well, I think you know, over my history at Mattel, it's

12   been about product packaging, marketing, and sales.  So I

13   don't see this being any different than any other years, but

14   I think it's a focus across the entire product line.

15   Q.  Do you recall which worlds were working and which

16   weren't?

17   A.  I -- you know, I know that the entertainment specific

18   worlds were working such as in the prior year in the Princess

19   and the Pauper, I believe.  But I don't recall in this

20   particular year which worlds were working and which worlds

21   weren't working.

22   Q.  So in each of the worlds, you had a Barbie doll with a

23   different theme; right?

24   A.  Well, we had a story.

25   Q.  Okay.

1      A.   And then the Barbie doll would be developed -- the

2      Barbie product line would be developed around that story.  So

3      a girl could bring that story to life.

4      Q.   Okay.  So focusing just on the doll, not the fashions or

5      the accessories or the story, but just on the doll, what was

6      the difference between the doll in the various worlds, if

7      any?

8      A.   Again, that's not my area of expertise.  Again, it was

9      an 11 1/2-inch fashion doll, and it, you know, related back

10     to how does that fashion doll relate back to the story.

11     Q.   Do you recall discussing with Felicia Kantor Hendrix the

12     need to communicate the Barbie brand better?

13     A.   Yes.

14     Q.   What was said about that?

15     A.   Well, I think what we talked about with regard to the

16     Barbie brand is to have a more consistent description of the

17     brand in talking to consumers.  So it was really about taking

18     the -- having a more consistent message from both a brand

19     perspective in -- really with regard to speaking to consumers

20     and with regard to packaging; that we felt like the packaging

21     had gotten, you know, confusing because it wasn't

22     standardized packaging.  So I think it was more consistency

23     from that perspective.

24     Q.   So there was -- the focus, then, was on packaging?

25     A.   No, it was on the entire brand.  So it was packaging.

1   It was advertising.  It was about play patterns as opposed do

2   just worlds.  We felt like the worlds were appropriate in

3   certain circumstances but not across the line.  We felt like

4   that we were trying to take good product with good play value

5   and put it in a world, and it didn't have a place in the

6   world.

7        So we went back and said, "Look, we need to go back

8   to some of the basic Barbie business," which is about, you

9   know, basic play, which is fashion play, which is hair play,

10  which is role play, and put some of that back in line, and

11  also accessory play.

12       So Barbie just with a, say, a Barbie cruise ship,

13  that girls like to play with Barbie in a cruise ship, and

14  they don't need a whole world of product around that, or

15  Barbie with a car, a cool car.

16       (END OF DEPOSITION EXCERPT.)

17       MR. NOLAN:  Your Honor, MGA would move in the

18  redacted exhibits that are referenced in the video.  2502-A,

19  2504-A, 2514-A, 2517-A.

20       THE COURT:  Those are the redacted versions?

21       MR. NOLAN:  That's correct, your Honor.

22       THE COURT:  Very well.  They are admitted.

23       (Exhibits 2502-A, 2504-A, 2514-A, and

24        2517-A received.)

25       MR. NOLAN:  And real quickly, your Honor, last

1    point is that we have provided to Mattel, pursuant to the

2    earlier discussion the documents that have been redacted that

3    we were otherwise going to do through a Custodian of Records.

4    To those that they have an authenticity objection, we'll note

5    that, but to those that are not authentic or if they have an

6    authenticity objection to that, we would like to take that up

7    at sidebar.

8           But the rest of documents, your Honor, I think are

9    Mattel documents, and we would offer those in evidence

10   instead of calling a Custodian of Records.  And then we would

11   rest on that, your Honor.

12          THE COURT:  Why don't we take this up at sidebar.

13          (SIDEBAR CONFERENCE HELD.)

14          THE COURT:  I'm sorry.  I guess I wasn't clear on

15   that.

16          MS. AGUIAR:  If this is going to take five minutes,

17   I was wondering if the jury wants to take a restroom break.

18          THE COURT:  We really don't have time for that.

19          MR. NOLAN:  Did I misunderstand?  Your Honor, these

20   are the documents.  And they have gone through them, and I

21   think they have an issue with respect to authenticity of some

22   of the documents, and some have 403 objections.

23          MR. ZELLER:  Well, I mean, as the Court is aware,

24   the custodians aren't sufficient to move in documents to

25   which there's an authenticity objection.

1          THE COURT:  Unless they can lay the authenticity.

2          MR. ZELLER:  Which this witness could not.

3          THE COURT:  I don't know if it could or not.  We're

4     not changing the rules at this late gauge.

5          MR. NOLAN:  And we're not asking to.  I accept the

6     representation that the custodian cannot --

7          THE COURT:  There's two ways it comes in.  One is

8     by stipulation, one is by a witness.  Are any of these

9     documents that you're stipulating to?

10          MR. ZELLER:  No.

11          THE COURT:  The only other way they come in is

12     through a witness.  And we're really out of time on that.

13          MR. NOLAN:  All right.

14          MR. ZELLER:  Thank you.

15          MR. NOLAN:  I will only point out, your Honor, that

16     earlier in our -- when we were raising the same issue, the

17     Court did in 1-B say listen, if it's authentic and it's a

18     business record, that it can come in subject to 403.

19          THE COURT:  I'm asking, are there stipulations on

20     authenticity?  Right.  I did say that.  I think I just asked

21     that question.

22          MR. NOLAN:  I'm sorry.  But that we weren't allowed

23     to withhold objections in bad faith.  In other words, to

24     cause a witness merely to take the stand to lay a foundation

25     for the authenticity of it.  These are not being objected to

1    on authenticity.

2         THE COURT:  That means there's a stipulation on

3    authenticity.  I just asked is there a stipulation on

4    authenticity.

5         MS. AGUIAR:  There is on all of them except for

6    one.

7         MR. ZELLER:  No, there is not.  There is not.  I

8    don't know what they are referring to when they say there's a

9    stipulation.  We've objected to these documents on a variety

10   of grounds.

11        THE COURT:  Okay.  To the extent there's not an

12   objection to authenticity, we can take that up later.

13        MS. AGUIAR:  That's the point.

14        THE COURT:  And just so I understand, if there is

15   an objection on authenticity grounds --

16        MR. NOLAN:  We accept that.

17        THE COURT:  Subject to that, then you rest?

18        MR. NOLAN:  Yes.

19        THE COURT:  Very well.  Why don't you state that

20   for the jury so it's clear.

21        (CONCLUSION OF SIDEBAR CONFERENCE.)

22        MR. NOLAN:  Subject to the sidebar, we're going to

23   work out the issue with respect to authenticity on a couple

24   of these documents.  I would also move in the slides that

25   were referenced with Mr. Wagner -- I'm sorry, Mr. Meyer --

1    Trial Exhibits 18923, 1, 2, 4, 6, 7, 9, 10, 11, 12, 13, 15,

2    16, 17, 18, 21, 24, 25, 26, and 28, and 32.

3          THE COURT:  Any objection?

4          MR. NOLAN:  Strike 28.

5          THE COURT:  Very well.  Any objection?

6          MR. PRICE:  Your Honor, no objection subject to

7    eliminating some of the titles.

8          THE COURT:  Very well.

9          (Exhibits 18923, 1, 2, 4, 6, 7, 9, 10,

10           11, 12, 13, 15, 16, 17, 18, 21, 24, 25,

11           26, and 32 received.)

12          MR. NOLAN:  And subject to the offer that we made

13    with respect to these other exhibits that I referenced at

14    sidebar, your Honor, MGA rests.

15          THE COURT:  Very well.  Thank you, Counsel.  I

16    understand there's a brief rebuttal case.

17          MR. QUINN:  Yes, your Honor.  Mattel calls Mike

18    Wagner.

19          THE COURT:  Very well.

20          THE CLERK:  Please raise your right hand.

21          MICHAEL JOSEPH WAGNER, SWORN.

22          THE CLERK:  Please take the stand.  Please state

23    your full name for the record, and spell your last name.

24          THE WITNESS:  Michael Joseph Wagner, W-A-G-N-E-R.

25    ///

1          DIRECT EXAMINATION

2     BY MR. QUINN:

3     Q.  Welcome back, Mr. Wagner.  Couldn't stay away?

4     A.  I could stay away, but you asked me to come back.

5     Q.  You have been here and heard the testimony of MGA's

6     damages expert, Mr. Meyer?

7     A.  I've been here during his entire examination.

8     Q.  And I take it there are some points on which you and

9     Mr. Meyer have some areas of disagreement.

10    A.  There are.

11    Q.  Let's talk about the first one.  The question of these

12    operating expenses, and if we could put up on the screen

13    Meyer slide 2.  And there was testimony about this difference

14    between the operating expense numbers here, the 600 million

15    and the 800 million.  Could you please remind us what it is

16    we're talking about here?

17    A.  We're talking about sales, general and administrative.

18    It's the expenses that the company incurs besides the actual

19    products cost to make the Bratz products.

20    Q.  Would they -- which of these, perhaps as overhead, is

21    that a similar type of term to cover this?

22    A.  That's an ambiguous term because there's overhead and

23    cost of goods sold as well.  But a lot of people call it

24    overhead.

25    Q.  And what is the effort that you and Mr. Meyer were going

Unsigned                                          Page  7808

1    to here?  What was it you were trying to do with these

2    operating expense numbers?

3    A.  Well, the goal was to figure out how these costs

4    increase with an increase in Bratz sales.  We're trying to

5    get the cause and effect relationship between an increase in

6    Bratz sales and an increase in these types of expenses.

7    Q.  All right.  So these general administrative expenses,

8    and you're trying to figure out how much of them are fairly

9    allocated to, say, Bratz products?

10   A.  That's fair.

11   Q.  All right.  Now, if there's an issue -- in your

12   understanding, if there's a finding of willful infringement,

13   is there any deduction that is made from revenues at all on

14   this issue?

15          MR. KENNEDY:  Legal conclusion, your Honor.

16          THE COURT:  Lay a foundation.

17   Q.  BY MR. QUINN:  Do you know whether or not there's a

18   deduction for these general administrative expenses if

19   there's a finding of willful infringement?

20          MR. KENNEDY:  Still a legal conclusion.

21          THE COURT:  Actually, it's a yes or no question.

22          THE WITNESS:  I do.

23   Q.  BY MR. QUINN:  How is it that you know what you know?

24   A.  I'VE been calculating damages for 31 years.  I've done

25   many copyright cases.

1    Q.  Based on that knowledge and experience, if there's a

2    finding of willful infringement, is there any deduction for

3    these operating expenses at all?

4        MR. KENNEDY:  Legal conclusion.

5        THE COURT:  Counsel, there's a stipulated

6    instruction on this point, I believe.  Sidebar.

7        (SIDEBAR CONFERENCE HELD.)

8        THE COURT:  Willful infringement taxes come off.

9    That's an instruction the jury is going to hear.

10       MR. KENNEDY:  That's for your Honor.  This is

11   pre-instructing the jury.

12       MR. ROTH:  He's just reading the cases.  That's

13   just the witness providing instruction.

14       THE COURT:  Fair enough.  Let's move on.

15       (CONCLUSION OF SIDEBAR CONFERENCE.)

16       THE COURT:  The Court will instruct on the

17   deduction.  Let's move on, Counsel.

18       MR. QUINN:  Thank you, your Honor.

19       Let's put that slide back up, Ken.

20   Q.  Could you describe for the jury what the nature of your

21   disagreement with Mr. Meyer is concerning the calculation of

22   these operating expenses?

23   A.  Well, quantitatively, it's rounded to $200 million, and

24   I just think that there was far more costs being incurred in

25   the other unsuccessful product lines than Mr. Meyer does.

1    Q.   And can you explain what you mean by that?

2    A.   Yes, the -- you have this very successful product.  And

3    you are also trying to sell other products.  And I showed you

4    a chart that had at least the top 10 products.  They have

5    about 50 brands that they sell.  You're generating this cash

6    in this one product line, and you're going to try to use that

7    money, invest in your company, and try to develop other

8    successful brands.

9         So you're spending money in the sales and general

10   administrative expense and those other areas probably far

11   beyond the sales you receive in these other products lines.

12   Q.   If we could take a look at Exhibit 13957.  This is the

13   chart you were referring to?

14   A.   It is.

15   Q.   And could you explain -- just pick an example here.

16   Explain with reference to one of these products what you mean

17   about how a product may be less profitable but still have a

18   substantial burden of general and administrative expenses.

19   A.   Well, I don't think the jury could read it, but the

20   product -- it's the second to the right from the Bratz, which

21   is the 80 percent bar, is Forever Best Friends.  Example,

22   that is a brand that MGA was trying to sell.  And if they

23   spent a lot of money trying to generate interest in that

24   product but it didn't sell well, based on Mr. Meyer's

25   approach, you're not going to allocate costs to that.  In

1    fact, you'll actually allocate 80 percent of those costs to

2    Bratz because it has 80 percent of the sales.

3    Q.  So did he allocate costs, then, more in terms of where

4    the profits were?

5    A.  Yes, it's called an ability to bear methodology.  And

6    what it means is it's a fair way to allocate costs, but it's

7    not cause and effect.  You just have the most successful

8    products carrying most of the costs and the less successful

9    products carrying less of the costs.

10    Q.  And when you say it's a fair way to allocate costs, in

11    terms of figuring out the profitability of Bratz, is it a

12    fair way to allocate costs to determine the profitability of

13    Bratz?

14    A.  Not for a damage calculation.  It should be cause and

15    effect.

16    Q.  All right.  And how is -- what was your method for

17    allocating these general and administrative expenses in

18    contrast to Mr. Meyer?

19    A.  Well, I used, as I explained in my direct examination, a

20    statistical analysis, a regression analysis, which is

21    scientific, which proves the cause and effect relationship.

22    Q.  And how does it do that?  How does it prove it?

23    A.  It proves it because it tells you what the relation is,

24    and it also gives you these metrics, as Mr. Meyer explained,

25    a t-stat and an R squared that tells you whether you have a

1 valid relationship or not.  It's not based on judgment.  It's

2 based on science.

3 Q.   Now, have you been provided with some information that

4 Mr. Larian gave the jury earlier today in terms of how MGA

5 has allocated its efforts since 2001?

6 A.   Yes.

7 Q.   And based on Mr. Larian's testimony, have you done some

8 calculations concerning how these general and administrative

9 costs should be allocated?

10 A.   Yes.  I have used the percentages that Mr. Larian

11 testified this morning as to where the effort was placed in

12 MGA between Bratz and non-Bratz products by year during the

13 entire damage period and applied those to these operating

14 expenses to see what the result would be.

15 Q.   And why was Mr. Larian's testimony about where MGA

16 placed its efforts, why was that significant to you in terms

17 of deciding how to allocate general and administrative

18 expenses?

19 A.   Because that is some evidence of cause and effect.  If

20 they are spending 55 percent of their effort on non-Bratz

21 products in a year, you would expects 55 percent of their

22 costs to be in that area.

23 Q.   Do you have before you a copy of Exhibit 13991?

24 A.   I do.

25 Q.   And can you identify for us what that is?

1          We have a copy for the Court, your Honor.

2          THE COURT:  Please.

3     Q.  BY MR. QUINN:  Could you please explain to the jury what

4     Exhibit 13991 is?

5     A.  It's actually a replication of one of Mr. Meyer's

6     schedules that I had my staff prepare, which is basically his

7     calculation of the profitability of Bratz which he testified

8     to in his examination.  But instead of using his allocation

9     by sales methodology where he allocates 80 percent of all

10    operating expenses to Bratz, I used the percentages that

11    Mr. Larian testified to to see what effect it would have on

12    his numbers.

13    Q.  And this is data that you -- these are numbers that you

14    and your staff crunched since Mr. Larian testified this

15    morning.

16    A.  That is correct.

17         MR. QUINN:  Your Honor, I would offer

18    Exhibit 13919.

19         MR. KENNEDY:  Objection.  Lack of foundation.

20         THE COURT:  Lay further foundation, Counsel, on

21    where the numbers come from.

22    Q.  BY MR. QUINN:  Where do these numbers come from?

23    A.  They come from two sources.  First source is from

24    attachment 4.3-U to Mr. Meyer's March 17th, 2008, report.

25    And then the adjustments I made came from Mr. Larian's oral

1    testimony this morning in court, which broke out by year the

2    percent of effort of MGA between Bratz products and non-Bratz

3    products.

4    Q.  All right.  So the data here for revenues and expenses

5    is data that you took from MGA's damages expert's report; is

6    that true?

7    A.  That is correct.

8    Q.  And then you did another calculation adjusting the

9    allocation numbers based upon Mr. Larian's testimony; is that

10   correct?

11   A.  That is accurate.

12        MR. QUINN:  On that basis, your Honor, we would

13   offer this exhibit.

14        MR. KENNEDY:  Still object.  Lack of foundation.

15   May I voir dire?

16        THE COURT:  Foundation as to what aspect?  I'll see

17   you at sidebar, Counsel.  Thank you.

18        Actually, that's a better solution.  Why don't you

19   voir dire, Counsel.

20              VOIR DIRE EXAMINATION

21   BY MR. KENNEDY:

22   Q.  What did Mr. Larian mean this morning when he used the

23   word "efforts"?

24   A.  He meant the effort that MGA, both he and the other

25   people at MGA, were putting into these different products.

1   Q.  And you did a lot of analyses in this case before this

2   morning.  You never did one based on proportionate effort,

3   did you?

4   A.  Well, I had no information from the Chairman of the

5   company as to that statistic.  That statistic is not

6   reported.  So you're correct, I did not.

7   Q.  And in the 106 or 107 cases where you've testified in

8   court, you've never done an allocation on the basis of

9   effort; correct?

10   A.  Oh, I have.  I've done that a number of times.

11   Q.  Effort?

12   A.  Yes.  Usually it's when I can work with my client and

13   talk about level of effort.  I've done that a number of

14   times.

15   Q.  Okay.  And how do you measure a company's effort?  Do

16   you have somebody there keeping track of how people spend

17   their days?  How do you do that?

18   A.  Well, some companies do it.  It's a rare company that

19   they actually have their people in effect fill out --

20   professionals fill out timecards to say what they are doing.

21   Other times it's usually interviews with the management, like

22   Mr. Larian, and they have to give you those statistics.

23   Q.  In this case, what does effort mean?  What was happening

24   over at MGA?

25   A.  That they had 50 product lines that they were trying to

1    make successful, and they were putting efforts into each one

2    of those, and this was a breakout between all the other

3    product lines and Bratz by the Chairman of the company.

4    Q.  Does that mean money was being spent on that?  The

5    percentage of the employee's time?  The amount of time they

6    spent in meetings talking about it?  Where did the effort

7    come from?

8    A.  I would think it's all of those things.  I would agree

9    that everything would be relevant to that effort that you

10   just described.

11   Q.  Do you know if that in fact was the case?  Did you see

12   anything in the records to indicate that 70 percent of the

13   money in any given year was being spent on non-Bratz

14   products?

15   A.  I didn't ever use 70 percent in my numbers.

16   Q.  How about 30 percent?  50 percent?

17   A.  I've used those figures.  I am relying upon Mr. Larian's

18   sworn testimony.  I did not hear him explain the basis for

19   his decisions.

20   Q.  And you have no idea whether he had any kind of a

21   reasoned basis for his use of the word evident, do you?

22   A.  I have not talked to Mr. Larian.  So I would not be able

23   to answer the question.

24       MR. KENNEDY:  Your Honor, I submit there's a lack

25   of foundation.

1        THE COURT:  The foundation is based on Mr. Larian's

2   testimony.  The jury can consider the weight of that

3   testimony since they heard it themselves this morning.

4        Objection is overruled.

5           DIRECT EXAMINATION (RESUMED)

6   BY MR. QUINN:

7   Q.   And by the way, we talk about effort.  General and

8   administrative expenses, did that include salaries of people

9   working?

10  A.   That's the biggest expense in sales, general and

11  administrative expenses.

12  Q.   Reflecting efforts of people who are paid salaries?

13  A.   That is correct.

14       MR. QUINN:  So, your Honor, may I publish Exhibit

15  13991?

16       THE COURT:  It's admitted.

17       (Exhibit 13991 received.)

18       THE COURT:  Counsel, just to make sure I

19  understand.  Pull it down for a second.  All of the numbers

20  above the line are predicated -- can you clarify what all the

21  numbers above the line are predicated on?

22       MR. QUINN:  Yes, your Honor.

23       THE COURT:  Thank you.

24  Q.   BY MR. QUINN:  Mr. Wagner, the numbers above the line at

25  the bottom, those numbers come from where?

1      A.  Straight from Mr. Meyer's report.

2      Q.  Did you make any adjustments to the numbers at all?

3      A.  No.

4          THE COURT:  Very well.  It's admitted.

5      Q.  BY MR. QUINN:  And could we publish below the line here.

6      Can you tell us what this reflects?

7      A.  Well, this reflects an allocation of these operating

8      expenses that Mr. Meyer had on his schedule, which isn't 100

9      percent of the operating costs.  It's only the percent that

10     he allocated to Bratz and breaking it up in the percentages

11     between Bratz and non-Bratz as testified to by Mr. Larian.

12     Q.  We only have part of this exhibit here on the screen,

13     but each of these columns represent a year?

14     A.  That is correct.

15     Q.  And it goes from 2001 to Year to Date, June 2008?

16     A.  Right.  And I misspoke.  The last column is actually the

17     total of all the years.

18     Q.  This one over here is the total?

19     A.  Correct.

20     Q.  And the other one is each column represents that year

21     2001 to 2007?

22     A.  No, the second to the last column is half of the year

23     2008.

24         THE COURT:  Counsel, why don't we show the entire

25     exhibit, and then you can break it down.

1        MR. QUINN:  Okay.  Let's put up the whole document.

2    Q.  This is what we're referring to here.  We've got the

3    years here?

4    A.  We do.

5    Q.  And then perhaps if we could enlarge this at the bottom.

6    These are all expense items here that Mr. Meyer identified

7    along the left-hand side?

8    A.  Well, the top line in this bottom is the total operating

9    expenses that he has allocated to Bratz and is basically 80

10   percent of all of the operating expenses incurred by MGA

11   during this time period.

12   Q.  All right.  So where he says Meyer operating expense.

13   That's these numbers along here?

14   A.  Yes, and if you went up higher in the schedule, you'd

15   actually see those numbers under total operating expenses in

16   the schedule.

17   Q.  And then below that, you have operating expense based on

18   Larian's percentage of effort.  This says operating expense

19   based upon Larian's percentage of effort; is that correct?

20   A.  It does.

21   Q.  And what does that reflect?

22   A.  That reflects multiplying the operating expenses that

23   Mr. Meyer calculated for Bratz by the percent that Mr. Larian

24   testified MGA actually spent in the way of effort on Bratz in

25   that year.

1    Q.  And when you do that, what does that yield?

2    A.  Well, it yields a significantly lower number than he had

3    in his calculation.

4    Q.  All right.  And below that, we have --

5        If we could just enlarge maybe say this much, Ken.

6        We have percentage of effort on non-Bratz products,

7    percentage of effort on Bratz products.  For those years.

8    Where do those percentages come from?

9    A.  The percentages come from the testimony of Mr. Larian

10   this morning.

11   Q.  All right.  And so you incorporated those percentages

12   into the calculation for each year?

13   A.  Yes.

14   Q.  And what did that -- using Mr. Larian's own allocation

15   about how efforts are divided between Bratz and non-Bratz

16   products, did that shed any light in your own mind as to

17   whether your calculation of general administrative expense

18   allocations was appropriate or whether Mr. Meyer's was

19   appropriate?

20   A.  Yes.  Basically using Mr. Larian's own estimates

21   confirms my numbers.  I am very close to him, and yet

22   Mr. Meyer is about $177 million off using his approach.

23   Q.  And using Mr. Larian's approach, what is the total

24   number that you got to for G and A?

25   A.  Well, it's actually not on the schedule because

1    actually, I don't know why the last line of the schedule

2    is not printed.  But the total number is approximately

3    $177 million difference between what Mr. Meyer calculated and

4    what Mr. Larian's estimated would have happened.

5    Q.  All right.  And what does this total number reflect down

6    here in the bottom?  The 141,692,023.  What does it reflect?

7    A.  Well, it reflects the change -- only looking at what he

8    did for Bratz products, you have to divide that by .8 because

9    you really -- basically 80 percent, to really bring it up to

10   the total operating expenses to actually use Mr. Larian's

11   percentages.  And I did that on one line below this, which

12   didn't print out on your schedule.  And so the actual number

13   is $177 million overstatement if you use Mr. Meyer's

14   approach.

15   Q.  $177 million in Mr. Meyer's -- you're saying Mr. Meyer's

16   allocation was $177 million off based upon Mr. Larian's

17   testimony?

18   A.  Right.  He has included 177 million more in the way of

19   operating expenses to be allocated to the Bratz product line

20   than Mr. Larian's estimates today, which means, again, he has

21   understated damages by that amount.

22   Q.  All right.  So if we can go back to Mr. Meyer's slide

23   No. 2.  Are you saying if we were to adjust Mr. Meyer's

24   analysis to take into account Mr. Larian's testimony, we

25   would have to reduce this by $147 million approximately?

1    A.  No.  I said 177-.  It would be rounded to 200 million.

2    Basically, he came up with the same number that I came up

3    with.

4    Q.  I'm sorry.  I misspoke.  177 million -- it would be much

5    closer to your 600 million than Mr. Meyer's 800 million?

6    A.  Well, again, my 600 million is rounded to hundreds of

7    millions as well.  But he would confirm my number.  Our

8    numbers would be basically the same.

9    Q.  All right.  So let's talk now about taxes.  You saw that

10   Mr. Meyer in doing his calculations of profits deducted taxes

11   when he calculated Bratz profits.  Do you agree with that?

12   A.  I absolutely disagree with that.

13   Q.  Why do you disagree with that?

14   A.  I disagree because I have been calculating damages for

15   31 years.  I have seen hundreds of other damage experts

16   calculate commercial damages as well.  I have never seen a

17   damage expert calculate damages after tax in a commercial

18   damage case in my career.  I've written on it.  It's in my 25

19   publications.  I've spoken on the topic to practitioners.  I

20   teach at the AICPA's national litigation services conference.

21   And I teach this type of information.  And no one I know

22   would do that.

23   Q.  Why?

24   A.  Because it's tax deductible to the defendant who pays

25   the compensatory damages.

1    Q.  Was it surprising to you that Mr. Meyer, as a CPA, and

2    said he has testified over a hundred times doesn't know that

3    compensatory damages are tax deductible?  Was that surprising

4    to you?

5         MR. KENNEDY:  Irrelevant.

6         THE COURT:  Sustained.

7    Q.  BY MR. QUINN:  Let me just ask it this way:  Is that

8    common knowledge in your field?  Do you believe that

9    compensatory damages are tax deductible?

10   A.  It is.

11   Q.  What would be the result, if you did what Mr. Meyer

12   suggests and deducted taxes?  What would be the result in

13   terms of what it would mean for Mattel and MGA and

14   Mr. Larian?

15   A.  Well, it would reduce by approximately $200 million

16   rounded the damages you should award Mattel, and it would

17   give that money to Mr. Larian, who then would not pay taxes

18   with that money because he gets basically 12 years of use of

19   that money.  He can go back two years and recapture those

20   actual taxes he's paid in the last two years, but he can go

21   forward 10 years and not pay taxes until he has recouped all

22   of this money.  So he'll be paying no taxes for 12 years.

23   Q.  You say go back two years.  What do you mean by that?

24   A.  He can re-file his last two years' tax returns and

25   basically get all the taxes that he's paid back.

1    Q.  And when you say go forward, are you saying that that's

2    a tax deductible item that he can carry forward in future

3    years?

4    A.  Yes, for another 10 years.

5    Q.  And if we deduct the taxes in arriving at the damage

6    figure here, would that result in effect in a double recovery

7    for Mr. Larian?

8    A.  I don't know if it's a double recovery.  What it means

9    is MGA or Mr. Larian has this money any his pocket.  And the

10   U.S. government and Mattel do not have that money in their

11   pocket.

12   Q.  Let's turn now to the issue of apportionment.  I

13   believe -- if I could back up for a second before we leave

14   the subject of these general administrative expenses.

15        Mr. Meyer said that his results are more

16   statistically significant.  He gives you very low grades on R

17   squared and t-stats.  You heard that testimony?

18   A.  I did.

19   Q.  And what is your response to that, sir?

20   A.  First off, his charts are accurate.  I'm not going to

21   dispute that at all.  But this is a tool, a scientific tool

22   that you have to use as a professional and apply your

23   judgment.  And there's one reason why his results are better

24   than mine, and that is because I use monthly data, and he

25   showed you a chart that sees there's a lot of variation in

1    monthly data.  He will compress 12 months of data into two

2    points.  And when you smooth data, you automatically get a

3    better R squared and a higher T-stat.  That is not surprising

4    to me.

5         And when he says he takes into consideration

6    seasonality, actually he's disguising it.  He's assuming it's

7    not there because he only uses annual data points.  And the

8    real problem with using annual data points in this case is

9    that he only has 10 data points.  Normally, you want far more

10   than that to do a regression analysis.  The more data, the

11   better.  That's why I did a monthly analysis.  And four and a

12   half of his data points that he uses predates Bratz being

13   sold by MGA.  So they are really irrelevant data points.

14        What we are looking for is the cost behavior of

15   what happens when Bratz is part of MGA's business.  So he

16   only has five pure data points that you can actually run his

17   regression with if he really wanted to use this tool on an

18   annual basis.  And if you do that, which I have done, you get

19   nonsensical results.  Many of the cost relationships become

20   statistically insignificant, and also you get crazy results

21   like negative fixed expenses.  So it really makes no sense to

22   do what he did, in my opinion.

23   Q.  What's a negative fixed expense?

24   A.  Which means if you actually believe the science that

25   you're using, if MGA did no business, they'd actually be

1    making money, which makes no sense.

2    Q.  You said a number of things there.  You said that you --

3    they used 10 data points?  What are the 10 data points you

4    are referring to?

5    A.  It's the annual results of MGA from 1997 through 2006.

6    And remember, Bratz only was introduced in this company in

7    the second half of 2001.  So using information from 1997 and

8    1998 and 1999 and 2000 and the first half of 2001 is really

9    irrelevant.

10    Q.  You said by using annual data, one data point for each

11    year, he smoothed the data.  What do you mean by that?

12    A.  That you take a lot of variation out of the data.

13    There's a lot less up and down on your two-dimensional chart.

14    And by definition, the smoother the line, the better fit

15    you're going to have with your line you draw through it.

16    Q.  You indicated that you use monthly data points.

17    A.  I did.

18    Q.  All right.  Now, he criticized your saying you didn't

19    take into account seasonality.

20    A.  He did.  I don't agree with that.

21    Q.  Why not?

22    A.  Because my data does look at the seasonality of the

23    business.  I realize it's going to give me worse results.

24    But it is the best measure of what's actually happening in

25    that company.

1    Q.  Taking data bi-monthly points rather than smoothed out

2    data for the whole year, does that take into account

3    seasonality?

4    A.  I think my approach does consider seasonality.  I think

5    his approach ignores it.

6    Q.  All right.  Let's turn now to what's been referred to as

7    apportionment.  I think you testified, when you were here

8    before, that you understand that apportionment is something

9    that may apply in some circumstances to a copyright claim.

10   A.  That is correct.

11   Q.  And you saw some numbers that Mr. Meyer used where he

12   compared Barbie profitability to Bratz profitability, and he

13   came up with a 5 percent apportionment factor, that 5 percent

14   is attributed to the design of the doll.

15         Did you hear that?

16   A.  I did.

17         MR. KENNEDY:  Object.  Mischaracterization of the

18   testimony.

19         THE COURT:  Rephrase, Counsel.

20   Q.  BY MR. QUINN:  Did you hear Mr. Meyer say he compared

21   Barbie profitability and came up with a 5 percent

22   apportionment factor?

23   A.  That's wrong.  Your earlier question was wrong.  And he

24   was right.  It's actually 5.22.

25   Q.  I defer to both of you.

1         Do you agree with that approach, an allocation of

2    5.2 percent to the value of the design?

3    A.  I do not.

4    Q.  Why?

5    A.  Because what he is doing, he's comparing the most

6    successful brand of all time in the toy industry and saying

7    if you took away this Bratz design, that's what MGA would

8    earn.  That is not appropriate in my professional opinion.

9    He is trying to measure what is the value of the Bratz brand

10   or the Bratz design, I should say.

11        So you have to isolate out that from your

12   yardstick, and his yardstick does include that.  And I'll

13   admit that my yardsticks include that as well, but I've

14   diluted it to such a degree that I think I'm comfortable with

15   my yardsticks, although my yardsticks still overstate the

16   issue -- I should say understate the contribution of these

17   other companies to their product lines based on their

18   intellectual property.

19   Q.  Can you tell from Mr. Meyer's own charts that his

20   analysis is flawed?

21   A.  Yes.  I was here during the cross-examination by

22   Mr. Price, and his results don't make sense.  Four out of the

23   seven years, there is no attribution to the Bratz design

24   based on his approach.

25   Q.  Let's take a look at Exhibit 13861-11.  This is

1    Mr. Meyer's schedule.  Is this the schedule you are referring

2    to?

3    A.   It is.

4    Q.   And you indicated that this leads to a nonsensical

5    result, this analysis?

6    A.   Right.  Four out of the seven years they are saying

7    there's no value to the Bratz design to MGA.  It's either

8    there all the time or it's not there at all.  This doesn't

9    make any sense.

10   Q.   And your approach, as we recall, you came up with a

11   couple different apportionment approaches based upon what

12   type of company the jury concluded MGA was, which was the

13   most appropriate comparators; is that correct?

14   A.   I gave two yardsticks.

15   Q.   And what were those?

16   A.   One, I used the three top leading toy companies in the

17   world:  Mattel, Hasbro, and Jakks.  And then I used the

18   average of the publicly reporting toy industry 11 companies.

19   And I think my testimony was mischaracterized.  I don't think

20   Bratz is a diversely identified company like these other

21   companies.

22          All I'm saying is if you use the average

23   performance of those companies and said they could produce a

24   product like the average product that those companies or

25   yardsticks use, that's a good measure.

1    Q.  There was also some testimony about apportionment

2    regarding themes and putting a value of intellectual

3    property, attaching a value based on themes.

4    A.  I was here for that testimony.

5    Q.  All right.  Did you agree with that?

6         MR. KENNEDY:  Objection.  Lack of foundation.  Move

7    to strike.

8         THE COURT:  Lay a foundation, Counsel.  And I will

9    strike the testimony until we've had a foundation on themes.

10         MR. QUINN:  May I approach?

11         THE COURT:  Okay.

12         (SIDEBAR CONFERENCE HELD.)

13         THE COURT:  Okay.

14         MR. QUINN:  Your Honor, there were some numbers.  I

15    know the Court struck some of Mr. Meyer's testimony around

16    this issue of themes.  I'm concerned that there were some

17    numbers that did come in.  He did mention before the sidebar,

18    he got out that 18.6 number.

19         MR. PRICE:  Mr. Quinn was at the sidebar.  At

20    sidebar I said he gave his conclusion, and you said I'm going

21    to tell the jury to disregard.

22         THE COURT:  I did.

23         MR. PRICE:  And I don't think Mr. Quinn was aware

24    of that, and just for the record, that is stricken?

25         THE COURT:  Yes.

1      MR. QUINN:  I'll move on.

2      THE COURT:  Mr. Price is correct, Mr. Quinn.

3      MR. QUINN:  He usually is.

4      (CONCLUSION OF SIDEBAR CONFERENCE.)

5   Q.  BY MR. QUINN:  There were some questions that you were

6   asked or that Mr. Meyer was asked about whether it's possible

7   to value MGA or Mr. Larian's interest in MGA.

8        You heard that testimony?

9   A.  I did.

10  Q.  And are you aware of any additional information

11  concerning valuation being provided by MGA other than the

12  documents that you referenced in your testimony before that

13  were received after the first verdict?

14  A.  No.

15  Q.  And the information that was received after the

16  first verdict, where you opine that MGA's net worth was

17  $540.5 million, and Mr. Larian's, the value of Mr. Larian's

18  interest was $723.3 million; is that correct?

19  A.  No, that's not quite correct.  The 723 million is

20  Mr. Larian's net worth, and only a portion of his net worth

21  is due to his interest in MGA.

22  Q.  All right.  And of that amount, how much of that, based

23  upon the numbers provided after the first verdict, is

24  attributable to Mr. Larian's interest in MGA?

25  A.  It's 81.82 percent of the value of MGA.

1    Q.   Have you -- we saw a pie chart here.  Have you prepared

2    some slides showing MGA's profits on Bratz by profit center?

3    A.   I have.

4    Q.   And what is a profit center?

5    A.   A profit center is a collection of products that are all

6    related, as an example, all the fashion dolls is a profit

7    center, and all the fashion doll accessories would be another

8    profit center.

9    Q.   And based upon your review of MGA's financial records,

10   does MGA itself track its profits from Bratz by profit

11   center?

12   A.   Only down to what's called the standard gross margin

13   level.  Not all the way to the profit number we need.

14   Q.   All right.  Do you have Exhibit 14664 up there with you?

15   A.   I do.

16   Q.   And what is this, 14626?

17   A.   I have that.

18   Q.   What is that?

19   A.   That is my calculation expressed in a pie chart of the

20   Bratz profits by major profit center from 2000 through June

21   of 2008.

22        MR. QUINN:  We'd offer that, your Honor.

23        THE COURT:  Any objection?

24        MR. KENNEDY:  No objection, your Honor.

25        THE COURT:  It's admitted.

1          (Exhibit 14626 received.)

2          MR. QUINN:  If we may publish, your Honor?

3          THE COURT:  You may.

4     Q.  BY MR. QUINN:  What does this reflect, Mr. Wagner?

5     A.  This reflects my calculation of the profits from Bratz

6     products by profit center as reported by the company.

7     Q.  And have you also done a calculation of these profits

8     that the jury should take into account in the event that

9     there's a determination of willful infringement?  You

10    testified to that previously.

11    A.  I did, and I do have such a chart.

12    Q.  And is that Exhibit 14663?

13    A.  It is.

14         MR. QUINN:  We'd offer that as well, your Honor.

15         MR. KENNEDY:  No objection, your Honor.

16         THE COURT:  It's admitted.  You may publish.

17         (Exhibit 14663 received.)

18    Q.  BY MR. QUINN:  And how is this one different than the

19    one we just looked at?

20    A.  It basically does not subtract sales, general and

21    administrative expenses to arrive at the profits.

22    Q.  That's the operating expense item that we began this

23    examination discussing?

24    A.  It is.

25    Q.  And both of these slides that we've just looked at,

1    these are based on your review and your staff's review of the

2    thousands of pages of financial information that MGA

3    provided?

4    A.  It is.

5    Q.  And then if you'd take a look at Exhibit 14664.  What is

6    this?

7    A.  This is an allocation of copyright damages to Mr. Larian

8    based on a starting point of $990.2 million of benefit that

9    he has received from the sale of the Bratz products.

10   Q.  And where did that number come from?

11   A.  That was my number that I calculated before receiving

12   the information right before my testimony that updated their

13   information through June of 2008.

14   Q.  All right.  So this is the number, the calculation

15   concerning the -- Mr. Larian's willful infringement, the

16   apportionment based upon the earlier October 2007 information

17   that MGA had provided?

18   A.  Well, it's both willful infringement and nonwillful

19   infringement.  The number is not different.

20        MR. QUINN:  I'd offer Exhibit 14664, your Honor.

21        MR. KENNEDY:  No objection.

22        THE COURT:  It's admitted.  You may publish.

23        (Exhibit 14664 received.)

24   Q.  BY MR. QUINN:  And could you just briefly walk us

25   through these numbers?

1    A.  Well, I'll start at the bottom.  The bottom is just if

2    there's no allocation at all.  That's the total amount that I

3    calculated based on his distributions and also what I

4    calculated the value of MGA to be, as of the date I did this

5    analysis.

6           The toy industry return is giving MGA and

7    Mr. Larian the benefit of earning the typical profits earned

8    by the 11 toy companies I used as the yardstick, and the

9    average profits that they earn on a product.  And I

10   subtracted that from the $990.2 million.

11   Q.  So this reflects an apportionment analysis with respect

12   to Mr. Larian's own benefit in the event the jury decides

13   apportionment is appropriate, based upon the numbers from

14   October of 2007?

15   A.  Correct.

16          MR. QUINN:  Thank you.

17          THE COURT:  Any cross-examination?

18              CROSS-EXAMINATION

19   BY MR. KENNEDY:

20   Q.  Mr. Wagner, I take it from your testimony that you've

21   been continuing to update your work on this case since we

22   were last together on July 23; correct?

23   A.  That is accurate.

24   Q.  And, in fact, the continuing updating has even continued

25   right up until minutes before you took the stand here;

1    correct?

2    A.  I'd say it would be an hour, but that's close.

3    Q.  Okay.  And between July 23 and today, have you happened

4    to be able to find anybody who would be willing to buy

5    Mr. Larian's interest in Bratz right now for any price?

6    A.  I didn't do that before then.  I still haven't done it.

7    Q.  You didn't include that in your updated efforts.

8    A.  That's correct.  Because that would be a waste of my

9    time.

10   Q.  Even though you knew I was going to ask you about that

11   if you took the stand?

12   A.  I was certain you were going to ask me that.

13   Q.  Okay.  When you were first retained in this case, you

14   were given relative freedom as to whatever you thought would

15   be the best methodology for establishing what portion of

16   MGA's operating costs were due to Bratz; right?

17   A.  That's true.

18   Q.  And you decided regression analysis was the way to go?

19   A.  I did.

20   Q.  And you got to draft your own model of a regression

21   analysis; correct?

22   A.  I did.

23   Q.  And you ran that analysis, and you found it was

24   unsatisfactory by over a hundred million dollars; correct?

25   A.  In the first calculation I did, I agree with you.

1    Q.   Okay.  And you then took this scientific method that you

2    had selected and built and altered it by over a hundred

3    million dollars; right?

4    A.   That is true.

5    Q.   Okay.  And then, when you got additional information in

6    the case earlier this year, you took that same model that you

7    got to create and did the science again; correct?

8    A.   Right.  I got more data and it gave me better science,

9    but it still wasn't good enough.

10   Q.   So the science wasn't good enough for you.

11   A.   Yes, science often isn't good enough for me.

12   Q.   So basically your job is to improve on science?

13   A.   Based on my experience and judgment, yes.

14   Q.   What's wrong with science?

15   A.   There's nothing wrong with science.  But unfortunately,

16   damages is not a hard science.  I'm not a physicist.  I'm not

17   a chemist.  I am a financial expert.  Our science isn't

18   perfect.

19   Q.   So regression analysis is science, but it's soft

20   science?

21   A.   Well, it's mathematics.  It's good mathematics, but the

22   data you apply to it isn't perfect.

23   Q.   But you get to choose the model for the data to apply to

24   it, don't you?

25   A.   You do.

1    Q.  And in this case, apparently you were imperfect, weren't

2    you?  Because there was nothing wrong with the math, but

3    there was something wrong with the regression analysis, and

4    that leaves you; right?

5    A.  That leaves my judgment, and then I have been validated

6    by Mr. Larian that my judgments were accurate.

7    Q.  Sticking with your regression analysis, you decided what

8    the analysis would be, and then the numbers spoke for

9    themselves, and you found the results were unsatisfactory;

10   right?

11   A.  Right.  If I had not done anything more, I would have

12   greatly overstated the damages to Mattel.  I do not want to

13   do that.

14   Q.  Okay.  So therefore, we can agree there was something

15   wrong with the judgment that you used in creating your

16   regression analysis; right?

17   A.  No.  I still think it's a good tool.  I'd use it again

18   with hindsight.  I don't think I'd change my analysis at all.

19   Q.  Except you have to adjust it because in and of itself,

20   it isn't sufficient?

21   A.  Right, because of the unique aspects of this case.

22   Q.  And you decided that the same guy who had gotten the

23   inadequate model is the one who should decide how to fix it;

24   right?

25   A.  Yeah, I don't think that the jury, unfortunately, has

1       this expertise that they have, and they need my expertise.

2       Q.   And you do agree, as you told us in deposition, the R

3       squared is important, isn't it?

4       A.   I said it -- I said everything else being equal.

5       Q.   And that in general, it's better to have an R squared

6       that's higher; correct?

7       A.   I absolutely agree with that statement.

8       Q.   And likewise, it's better to have a t-stat that's

9       higher; correct?

10      A.   I agree with that statement as well.

11      Q.   And you agree in this case that Mr. Meyer's R squares

12      and T stats are both higher than yours; correct?

13      A.   That is absolutely correct.

14      Q.   And you also agree that Mr. Meyer's regression analyses,

15      he didn't find any need to adjust them after he ran them,

16      didn't he?

17      A.   Well, he didn't use them.  That's what's perplexing to

18      me.  What he did, and I think is what he testified to the

19      jury, is he used it as a reasonableness check.  The

20      methodology he used wasn't a regression at all.  All he did

21      was allocate operating expenses to Bratz based on the amount

22      of sales that Bratz made each year.  There was no science

23      done.

24      Q.   There was no regression analysis?

25      A.   Not if you look at the financial numbers he presented to

1    this jury.  He never told us what the numbers are if he used

2    a regression analysis rather than the methodology he actually

3    did use.

4    Q.  So Mr. Meyer really didn't run a regression analysis?

5    A.  That's not what I said.  He did it to criticize me, and

6    he said that he got very different results than I got, which

7    I agree with, but he didn't use them affirmatively in this

8    case.

9    Q.  We do agree he ran something that had a better R squared

10   than you got?

11   A.  We do.

12   Q.  And he ran something that got a better t-stat than you

13   did?

14   A.  I agree with that as well.

15   Q.  And that something was a regression analysis?

16   A.  Clearly.

17   Q.  Now, turning to Mr. Larian, as you told us when you were

18   here before, your role is a fairly limited one.  You take --

19   you're not here to sponsor the facts; correct?

20   A.  That's true.

21   Q.  You take factual data that other witnesses provide, and

22   then you do the math or arithmetic as the case may be?

23   A.  That's something that I do, yes.

24   Q.  And what you did today was, after Mr. Larian said in a

25   given year, effort was 50 percent Bratz, 50 percent

1    non-Bratz, you took MGA's total operating expenses and

2    divided them in half?

3    A.  Correct.

4    Q.  And said that therefore, 50 percent of them go to Bratz,

5    50 percent of them don't; correct?

6    A.  Yes.

7    Q.  And your arithmetic is only as good as the factual

8    assumptions, i.e., Mr. Larian's testimony; correct?

9    A.  I agree with that statement.

10   Q.  And if this jury hypothetically should conclude that

11   Mr. Larian was just pulling figures out of the air this

12   morning and giving estimates on the stand, that would also

13   impact on your arithmetic, wouldn't it?

14   A.  It doesn't impact the arithmetic.  I think it impacts

15   the weight the jury should give to those numbers.

16   Q.  Are you aware of any discovery in this case where MGA

17   was ever asked to apportion the effort that had been done on

18   Bratz versus non-Bratz?

19   A.  Not before the questions that were asked in court this

20   morning.

21   Q.  Okay.  So as far as you know, Mr. Larian's answers this

22   morning are the entirety of what you've ever heard about any

23   attempt to allocate Bratz and non-Bratz effort; correct?

24   A.  That is correct.

25   Q.  Turning to taxes, you're aware that the damages that are

1    being sought in this case are a disgorgement of MGA's

2    profits?

3    A.  I do.

4    Q.  Okay.  And we're all familiar with personal injury cases

5    where the damages consist of the chiropractor bill and the

6    lost wages and things of that sort; correct?

7    A.  That's correct, but you're getting into an area where

8    taxes are treated differently in employment cases.

9    Q.  But this case is a little bit different in that Mattel

10   isn't claiming that it was harmed, that its profits were less

11   than what they otherwise would have been; correct?

12   A.  I think they firmly believe that they have been

13   impacted, but they are not asking for lost profits as a

14   remedy.

15   Q.  But what they are seeking here is MGA's profits.

16   A.  That is correct.

17   Q.  And it's your belief that there's no financial analyst

18   or damages expert in the world besides Mr. Meyer who feels

19   that in determining what the profits were that should be

20   disgorged, you subtract the money that went to the IRS.

21   A.  That is correct.  If it's a compensatory damage award.

22   Q.  And finally, on apportionment, it's your belief that

23   it's more accurate instead of comparing the Bratz doll line

24   with another doll line, to compare it with whole companies

25   that do such things as making the Monopoly board game; is

1    that correct?

2    A.  I do.

3         MR. KENNEDY:  Your Honor, I would move to strike

4    the gratuitous comment that Mattel believes they were harmed

5    even though they are not seeking damages for it.

6         THE COURT:  Fair enough.  It's stricken.

7         MR. KENNEDY:  With that, I have nothing further.

8         THE COURT:  Mr. Quinn.

9              REDIRECT EXAMINATION

10   BY MR. QUINN:

11   Q.  So Mr. Meyer's t-stat numbers and R squared numbers are

12   higher than yours.  Well, how come?

13   A.  Well, I think I explained it.  It's because he smooths

14   the data.  I know enough about statistics that I can improve

15   my results by things that I do.  And I'm not saying he's

16   manipulated the data in any way intentionally to improve his

17   R squares.  It's the result of his work.

18   Q.  It's the result of the smoothing of the data you

19   referred to?

20   A.  Correct.

21   Q.  And taking just one annual data point?

22   A.  Right.

23   Q.  You indicated that Mr. Meyer didn't actually make

24   affirmative use of his regression analysis.  What did you

25   mean by that?

1   A.  That once he decided that here's a useful tool, I'm

2   going to use it to calculate what I think the profits are to

3   be earned, or was earned by Bratz, he didn't ever do that.

4   Q.  What did he do?

5   A.  Again, he used this ability to bear methodology that has

6   nothing to do with cause and effect and just said that if 80

7   percent of the sales in this year are by Bratz, then I'm

8   going to allocate 80 percent of all the operating expenses to

9   that product line.

10  Q.  If you had not made the adjustments that you made after

11  you ran the regression analysis and just left the results the

12  way they were, the way the program, the model kicked the

13  numbers out, would that have resulted in a benefit to MGA or

14  a benefit to Mattel?

15  A.  A benefit to Mattel.  It would have increased my damages

16  numbers by over a hundred million dollars.

17  Q.  So by making the adjustments that you made, you

18  actually -- those were in MGA's favor.

19  A.  Yes, it was.

20       MR. QUINN:  Nothing further.

21       THE COURT:  Mr. Kennedy?

22            RECROSS-EXAMINATION

23  BY MR. KENNEDY:

24  Q.  And you didn't make those adjustments because you

25  thought you owed MGA a favor, did you?

1   A.  No, I'm trying to do what I think is correct.

2   Q.  And you knew without those adjustments, the numbers that

3   had come from your regression analysis would have been

4   totally indefensible?

5   A.  I agree with that.  I would have not wanted to defend

6   those numbers.

7        MR. KENNEDY:  Thank you very much.  No further

8   questions, your Honor.

9        THE COURT:  Very well.

10       MR. QUINN:  No further questions.

11       THE COURT:  You are excused, sir.

12       Mr. Quinn, do you have one further witness?

13       MR. QUINN:  I'm not sure we could do it justice,

14   your Honor, frankly.  You know.  That commercial you see

15   where the guy talks really, really fast, I can't do that.

16   We're prepared to rest, your Honor.

17       THE COURT:  Very well.

18       Anything further?

19       MR. KENNEDY:  Yes, your Honor, we would recall

20   Mr. Meyer for a very brief, I promise, inside of a

21   six-and-a-half-minute rebuttal.

22       THE COURT:  All right.  You made the promise to the

23   jury.

24       MR. QUINN:  Cross?

25       THE COURT:  You'll have a chance to cross.

1          PAUL KEVIN MEYER, PREVIOUSLY SWORN.

2               DIRECT EXAMINATION

3     BY MR. KENNEDY:

4     Q.  Mr. Meyer, are you the only damage expert that believes

5     profits need to be deducted in determining -- excuse me --

6     taxes need to be deducted in determining profits?

7     A.  I don't believe so.  I think the confusion is that

8     when -- if I could take a moment.

9          When one looks at a lost profit calculation,

10    something that didn't happen and project revenues and costs,

11    because in that situation, taxes have not been paid, the

12    damage number is gross tax.  And so you basically leave the

13    tax out because those moneys are not taxable.

14         In our situation, the question really is what were

15    the profits that were made on Bratz.  And that $200 million

16    of taxes has been paid to the IRS.  It's been paid.  It's

17    deducted.  MGA doesn't have it.  Mr. Larian doesn't have it.

18    So those are the profits of MGA.  I've testified to that.

19    I'll leave it up to the Court and the lawyers to figure out

20    where it goes from there, but those are costs that basically

21    have been paid to the IRS.

22    Q.  I realize you've told us you're not a tax accountant.

23    Are you aware of the concept that in order to have a

24    deduction, you've got to have income to deduct it from?

25    A.  I do understand that.

1          MR. PRICE:  Object.  Beyond his expertise.  Based

2    upon earlier testimony.

3          THE COURT:  Sustained, based on the earlier

4    testimony.

5          MR. PRICE:  Move to strike.

6          THE COURT:  It's stricken.

7    Q.  BY MR. KENNEDY:  Mr. Meyer, as a real person, rather

8    than an expert witness, do you pay taxes?

9          MR. PRICE:  Objection.  Irrelevant.

10         THE COURT:  Sustained.

11         MR. KENNEDY:  Thank you, I have nothing further.

12         THE COURT:  Very well.  Mr. Price?

13              CROSS-EXAMINATION

14    BY MR. PRICE:

15    Q.  Having heard Mr. Wagner's testimony, you certainly

16    cannot dispute, can you, that a compensatory damages award is

17    tax deductible?  You're in no position to dispute that

18    because it's not within your expertise; correct?

19    A.  I cannot address the issue of the ultimate tax issue.

20    What I can address is were taxes paid and deducted to get to

21    the profits of the Bratz line for what I call a disgorgement

22    claim.  I can address that.

23    Q.  My question is different.  In doing your analysis, you

24    could not tell the jury or dispute what Mr. Wagner said,

25    which is that compensatory damages awards are deductible;

Unsigned                                          Page  7848

1    correct?

2    A.  I believe that's a legal issue.  But I can't speak to

3    that.

4    Q.  But do you understand that whether something is or is

5    not tax deductible has economic impact; correct?  That you do

6    know.

7    A.  I'm not sure I follow that question.  I don't follow

8    that.

9    Q.  When you deduct taxes, you do know that that has an

10   economic impact on the person that's deducting?

11   A.  I would agree with that.

12          MR. PRICE:  Nothing further.

13          THE COURT:  Anything further, Counsel?

14          MR. KENNEDY:  Nothing further.

15          THE COURT:  Very well.  You may step done.

16          Both sides rest?

17          MR. QUINN:  Mattel rests.

18          MR. NOLAN:  MGA rests subject to the documents that

19   are still at issue.

20          THE COURT:  I understand.

21          All right.

22          MR. QUINN:  Mr. Larian rests as well, I assume?

23          MR. NOLAN:  Let me be clear.  MGA and Isaac Larian

24   rest.

25          THE COURT:  Very well.  Thank you, Counsel.

1        All right, ladies and gentlemen of the jury, you've

2    now heard all of the evidence in this second phase of the

3    trial.  As I indicated to you earlier, we are not going to

4    have closing arguments until Wednesday.  I will again,

5    Wednesday morning at 9:00 sharp, be instructing you on the

6    law that will govern your deliberations both with respect to

7    copyright infringement and the damages issues.

8        Between now and then, do not discuss this case with

9    anybody.  Do not read about the case.  Just put it aside for

10   the time being.  When you come here at 9:00 Wednesday, you

11   will be assembling in your normal place.  After I've read the

12   instructions to you and you've heard the closing arguments,

13   I'm going to move you to a different -- actually, I take that

14   back.  We'll assemble in your normal place on Wednesday

15   because we will not have the other jury here on Wednesday.

16       Starting Thursday, there will be another jury using

17   your jury room in a criminal trial that I'm selecting on

18   Tuesday.  So you'll be moved to a jury room adjacent to the

19   courtroom, where all of the physical exhibits will be located

20   for your use during the deliberations.

21       So I will see you on Wednesday.  That will be

22   August 20th at 9:00 A.M.  Until then, you are excused.

23       (WHEREUPON THE JURY WITHDRAWS.)

24       THE COURT:  Counsel, please be seated.  I want to

25   take a brief recess before I take up these other matters.

1          (Recess taken.)

2          THE COURT:  Okay, counsel.  Are there some

3     additional documents you want to move in?

4          MR. NOLAN:  Yes, your Honor.  And I believe you've

5     been provided the notebook.

6          THE COURT:  I think I was.  It's entitled Custodian

7     of Records.

8          MR. NOLAN:  It's white.  I thought I did have that

9     notebook.  Here they are.  Right here.  Custodian of Records.

10    Okay.

11         MR. NOLAN:  Your Honor, the first one is

12    Exhibit 1805.  And Mattel takes the position that they attack

13    the authenticity of the document.  I'll withdraw that

14    exhibit, your Honor.

15         THE COURT:  Very well.

16         MR. NOLAN:  In light of that, the next document is

17    Exhibit 1811-A, which is a document.  I believe there's no

18    issue of authenticity.  It was produced by Mattel in this

19    litigation.  It's a business record similar to the ones that

20    we've introduced over the past week.

21         The next Exhibit, your Honor, and maybe I would

22    just go through the exhibits, and Mr. Zeller can make his

23    comments, because they are all general, the same kind of

24    issue.  Is that okay?

25         THE COURT:  Very well.

1          MR. NOLAN:  Exhibit 15676-A is the redacted

2     version.  And what we've done, your Honor, from this internal

3     business record of Mattel which was produced to us, redacted

4     out those pages that only pertain to Bratz, and those are set

5     forth in 15676-A, consistent with the pattern that we were

6     doing with, for instance, Mr. Kilpin.

7          15788 is a business record of Mattel, produced in

8     this case.  I don't think there's an issue with respect to

9     authenticity.  The redacted version is 15788-A.  And that,

10    your Honor, I submit, only refers to the Bratz data that

11    Mattel had.

12         The next document is Exhibit 16074.  And the

13    related redacted version is 16074-A.  And again, business

14    record produced by Mattel redacted to only apply to the data

15    that they had on Bratz.

16         And then the last -- I have two more.  I'm sorry.

17    No, this is the last exhibit.  18286.  Again, this is a

18    worldwide consumer research report maintained in the ordinary

19    course of business, produced by Mattel in this case for the

20    relevant period of time.  And we had submitted an earlier one

21    redacted in a similar fashion, and this was, you know,

22    Heather Polk.

23         So we've redacted only to reflect data that Mattel

24    maintains with respect to the Bratz products.

25         THE COURT:  Counsel, a number of these reflect data

1    that Mattel was maintaining with regard to Bratz.  What

2    relevance does that have to anything that Mattel was

3    maintaining certain data regarding Bratz?

4         MR. NOLAN:  When I say data, making comments and

5    observations.

6         THE COURT:  Well, with respect to the last one, for

7    example, we can go through these one by one, but you're going

8    to have to give me some proffer on relevancy.  Given the

9    Court's earlier rulings on these types of documents --

10        MR. NOLAN:  Your Honor, for instance, on the last

11   one, 18286 --

12        THE COURT:  I don't see any comments.  I see a

13   bunch of redacted categories, and I previously kept out these

14   types of charts that are incomplete.  I mean, this just

15   says -- it has a list of attributes.

16        MR. NOLAN:  Your Honor, this goes to the question

17   of what they were tracking at that period of time, what are

18   the attributes that they were talking about.  It doesn't

19   reflect -- and I agree, your Honor, we've cut out here the

20   Bratz is the only brand that's reflected, and it shows that

21   during this period of time for transitional girls five to

22   seven, they were tracking those attributes for each of the

23   years of the girls in question.

24        It just goes more to the point that in July of

25   2005, they were including in their brand tracking study Bratz

1    performance during that year, for those attributes.

2         THE COURT:  All right.  With respect to 16074.

3         MR. NOLAN:  16074, your Honor, is, again, redacted

4    e-mail, marketing is ultimately the keeper of the brand, but

5    no one functional group can or should manage alone.

6         THE COURT:  Who is Adrian Fontanella?

7         MR. NOLAN:  She was the former president of the

8    girls division at Mattel, senior management person.  She

9    talks about the various components and functions.  And the

10   one previous to that is 15788-A.  And there you do have

11   specific references to Bratz and the various attributes

12   covered for the period of months covered in this report,

13   similar to what we were able to put in through Mr. Kilpin.

14        But, of course, Mr. Kilpin was only there for a

15   particular period of time, and that's why we needed a

16   Custodian of Records for that period of time.

17        Same with the other exhibit, 15676-A.  Again,

18   similar.  This shows -- I think shows consistent with

19   Mr. Kilpin the retail display of Bratz, the fact that they

20   were tracking that goes to the importance of, for instance,

21   in the business report of -- business plan of MGA, where the

22   Court may recall that in 2001 we were talking about retail

23   presence.

24        In fact, Mr. Kilpin talked about the importance of

25   retail presence.  This is just a fact set forth in their own

1    reports that they were tracking the retail presence of Bratz.

2    And then the last one again is similar to the others that

3    I've talked about, which is 1811-A.  I'm sorry.  15676-A.

4    No, I did.  That was the retail display.  I'm reading that

5    upside down.

6         The last one, your Honor, is an internal document

7    by Mattel.  Bratz, what's working, what's not.  It's only

8    related to Bratz.

9         THE COURT:  Very well.

10        Mr. Zeller?

11        MR. ZELLER:  Thank you, your Honor.  As a threshold

12   matter, I think that the rules really preclude the

13   introduction of these exhibits.  I mean, we had to live with

14   a regime, a rule that was in fact initially advocated by MGA,

15   which is that documents don't come in unless there's a

16   stipulation or a live witness it comes through.  There are

17   many documents in this case.  We could undoubtedly have

18   several binders of them, of documents that we wish we had

19   gotten in as well if we had the time and we had live

20   witnesses to get them in through.

21        So I think as a threshold matter, you know, that

22   both sides have run out of time.  This is, you know, the

23   parties are in parity with this situation.  I mean, if it

24   didn't come in through a live witness or a stipulation, they

25   are not admissible.  And I don't think Mr. Nolan has really

1    addressed that.  Or why it is that the rules should be

2    changed at this juncture.

3        THE COURT:  The rules aren't changed.  I said just

4    a few minutes ago at sidebar, if there's a stipulation to

5    authenticity, and I did modify it slightly at this phase, I

6    indicated if there's a stipulation for authenticity, that the

7    Court would consider relevancy or foundation or any other

8    objections.  If you are stipulating to authenticity, they

9    come in.  If you're not, they are not.

10       MR. ZELLER:  I mean, I can certainly address these,

11   but I don't think that was entirely consistent with at least

12   our understanding.  We put up live witnesses to put in the

13   documents that we thought we had to have in.

14       THE COURT:  Well, why don't you go through these,

15   Counsel.

16       MR. ZELLER:  Certainly, your Honor.  I think with

17   respect to Exhibits 1811, and this is the redacted version, I

18   think is the one that focuses on Bratz.  We have objected to

19   this as not being a business record.  And so I don't see how

20   that objection is overcome.  Particularly if there's no live

21   witness and there's no basis in the record for establishing

22   that this is a business record.

23       The other thing I would say, and this will be a

24   theme, as I go through these other documents, we do have 402

25   and 403 issues with each of them.  Bottom line is that, of

1    course, they don't track the factors that MGA itself is

2    touted for apportionment.  And without that connection,

3    without that nexus, they are irrelevant or at best going to

4    cause confusion.  And, of course, in some respects, some of

5    this looks highly cumulative of, you know, of the testimony

6    that has already been provided.

7         So I'm not really sure why it's a basis for

8    introducing a document when, as Mr. Nolan pointed out at

9    least with respect to one of them --

10        THE COURT:  Counsel, why don't we just go through

11   the exhibits and state your objections.

12        MR. ZELLER:  So with respect to Exhibit 1811, we

13   have objections based on proper business record.  It's

14   therefore hearsay.  And we also don't think it's relevant,

15   and we think it's 403 for that very reason I was just

16   discussing, which is there's no basis for saying that it

17   lines up with those factors.

18        THE COURT:  Next, Counsel.

19        MR. ZELLER:  The next one that I have is

20   Exhibit 15676-A, which is the retail experience one.  I

21   assume that the principal basis for why MGA wants to rely

22   upon it is the key findings page on the second page of the

23   exhibit.  That column in the far left-hand side.  And again,

24   this goes -- this clearly includes, just even on its face

25   matter, matters that do not fall within the factors that MGA

1    says should give rise to apportionment.  So it's therefore

2    irrelevant and also should be excluded under 403 for that

3    reason as well.

4          The next one that I have is 15788.  And this is a

5    redacted version that I'm looking at, which is the A version.

6    This really is the same comments as the other exhibits.  And

7    moreover, it does have these categories, whether these

8    categories line up with the testimony, you know, it's just

9    pure speculation at this point.  There's no basis for

10   introducing it.  And so we again object on 402 and 403

11   grounds as to that document.

12         THE COURT:  What about the statements on page 3 of

13   this document?  If appears to be Mattel's statements to the

14   effect that Bratz equals cool friends having fun and Bratz

15   spreading its fashion excitement, energy, and --

16         MR. ZELLER:  I think it's the same point, which is

17   there's no demonstrable nexus to the factors that MGA itself

18   is saying are relevant to apportionment.  And to the extent

19   that it is, they already have that kind of testimony.  They

20   already have those documents in.

21         I mean, that is something that they did explore at

22   great length with Mr. Kilpin.  And I think introducing these

23   documents, you know, is at best cumulative and at worst is

24   something that doesn't have that kind of connection.

25         THE COURT:  Next one is 18 -- 16074-A.

1          MR. ZELLER:  Yes.  And this one is, I think -- I

2     mean, among all of them, probably the clearest one that is

3     403 material and largely irrelevant under 402.  I mean, this

4     is clearly discussing Mattel's internal organization and

5     saying what it is that Mattel does.

6          I mean, I don't see a basis, unless I'm

7     misunderstanding this document, for saying that this is

8     anything to do with Bratz.  This appears to be reflecting

9     some sort of either actual or potential or considered

10    organization within Mattel.  And on that basis, we don't

11    think it has any relevance at all.

12         And then the last one that I have is 18286, and

13    these are these tracking studies that, you know, that we went

14    through at sidebar previously.  And it seems to be -- first

15    of all, redacted in a way that is not consistent with what

16    the Court did in excluding charts previously.  I guess it

17    takes out the chart portion itself, but it still leaves

18    numbers there, or I guess at least categories, categories

19    that are already in evidence to the extent that they have any

20    relevance.

21         So I don't think that this document, you know, adds

22    anything, and certainly has the potential just simply to

23    cause confusion because of the way that it's being presented

24    here.

25         THE COURT:  Very well.

1        Mr. Nolan?

2        MR. NOLAN:  Your Honor, Mr. Zeller's painting with

3    a broad brush when he says that none of this relates to any

4    of the factors.  I mean, most of these comments go to

5    marketing or packaging or the themes, the presentation of

6    Bratz and Mattel's comments with respect to that.  You know,

7    there's instances where there's references to cool packaging.

8    And so I respectfully submit, your Honor, that they fall

9    squarely within evidence that has been already received.

10   It's not cumulative.  It's different time periods.

11       THE COURT:  It does strike me as cumulative,

12   Counsel, almost across the board.  I don't think there's

13   anything really unique here that I can see.

14       MR. NOLAN:  Your Honor, it goes to different

15   periods of time to show that this pattern continues.  If they

16   only have certain documents in there and they relate to,

17   let's say Mr. Kilpin --

18       THE COURT:  Just because -- there's no substance.

19   Any of this stuff.  There's a bunch of labels.  And I'm not

20   seeing any substance.  There's no question that all of these

21   issues are important to Mattel and they have been discussed

22   in some detail by witnesses in this case.  Most fun to play

23   with, cooler than other dolls, prettier than other dolls.

24   All of that has come in.  And the packaging and retail

25   experience, there's no substance here.  It's just that Mattel

1    is concerned about packaging and material and advertising and

2    how the dolls look.

3          Is there anything substantive that you can point me

4    to in any of these exhibits?  If there's some -- is there

5    something in particular here that I'm missing?  I just don't

6    see it.

7          MR. NOLAN:  Your Honor, for example, and by way of

8    example, go to 1811 for a minute.

9          THE COURT:  Hold on.  1811.  I'm there.

10         MR. NOLAN:  My Scene and Bratz, what's working,

11   what's not.  What's working, Mattel's commentary or

12   observations that what is working is bling, aesthetic --

13         THE COURT:  I was painting with a broad brush

14   there.  1811-A is the one that is substantive.  Let's come

15   back to that one.  Any of these others.  By problem with

16   1811-A is that I have no idea who is saying this or what they

17   are saying or what this is based on.  These are just

18   statements, and they are not even coherent statements.  They

19   are just bullet points.

20         MR. NOLAN:  Well, your Honor, I would submit

21   that --

22         THE COURT:  Several of which end in question marks.

23         MR. NOLAN:  But okay.  This is what I'm going to

24   say, is there many times when a document was produced to

25   us -- I'm sorry -- came out of our records where we would say

1    gee, it's not a business record.  This document from Mattel

2    was produced in response to discovery on specific topics.  It

3    is authentic.  It is included in the business records of the

4    company.  And you had sometimes challenged me, you know, is

5    my objection really in good faith as to a foundational point.

6    I'll a little surprised and bewildered to have Mr. Zeller

7    say --

8            THE COURT:  I'm beyond the authenticity.  I'm not

9    challenging -- I'm talking about what this means.  I mean,

10   this is --

11           MR. NOLAN:  Well, for instance, if you go to -- if

12   we're now -- are you on 15676-A?  Is that the one?  I just

13   want to make certain I'm on the same one you are.

14           THE COURT:  I was on 1811-A.  Most of them don't

15   have any substance to them really.

16           MR. NOLAN:  I want to go back to 1811, your Honor.

17   The subsignificance there is the marketing and the product

18   and the content.  And this is obviously an issue that the

19   jury will be looking at.  And Mattel is breaking down and

20   analyzing just -- I don't think there's any dispute from the

21   record evidence that Mattel, through its worldwide research

22   group and the marketing department, made monthly assessments

23   and observations on, for instance, Bratz packaging and --

24           THE COURT:  How can you connect that to the

25   worldwide marketing group?  That's --

1          MR. NOLAN:  How can I tie this to it?

2          THE COURT:  This is why I have tried to sift

3     throughout this trial on having a witness that can at least

4     tell us what the document is.  This jury has never seen this

5     document.  The jury has been excused for the day.  And come

6     Wednesday, you're going to have this up on the screen, and

7     you're going to be telling them about a document that they

8     have no idea and I have no idea other than it came from

9     Mattel.  And I'm not questioning that it came from Mattel and

10    somebody in the thousands of workers at Mattel put this

11    together on some basis.

12          But what that is, I am not saying that there's

13    other documents that I haven't pressed you on, but it's been

14    self-evident either who has done them or -- I'm going to

15    sustain the objections, Counsel.

16          MR. NOLAN:  My only other point, your Honor, was

17    that since it came out of the marketing department at Mattel,

18    I would think it would be self-authenticating --

19          THE COURT:  How do we know that it came out of the

20    marketing department?

21          MR. NOLAN:  We have other reports, your Honor,

22    where they have admitted through Mr. Kilpin that on a monthly

23    basis they were tracking such things as product and marketing

24    and content of Bratz.

25          THE COURT:  We have Mr. Kilpin, who testified in

1    this case.

2          MR. NOLAN:  That's correct.

3          THE COURT:  Why --

4          MR. NOLAN:  I made my point on this, your Honor.

5          THE COURT:  If this was that important to get in, I

6    suspect you could have taken 15 seconds to bring this in.

7          MR. NOLAN:  I accept that.

8          THE COURT:  I'm going to sustain the objections.

9          MR. NOLAN:  To all of them, your Honor?

10         THE COURT:  I'm sorry?

11         MR. NOLAN:  To all of them?

12         THE COURT:  I am.  I don't see -- that was the only

13   one that seemed to have any substance on it.  If you want to

14   go through them briefly, 15676-A is nothing but pictures and

15   some bullet points here which say key findings, but they are

16   not any -- they are not sentences.  They are just

17   observations.  And there was a bunch of pictures of Bratz

18   products.

19         15788-A is some statements that we already have in

20   evidence several times over.

21         And 16074 is a -- is just a statement about

22   marketing and a pie chart that just shows there's a bunch of

23   different departments at Mattel.  And then there is yet

24   another tracking study, and again, that's Exhibit 18286.  And

25   we already had all of these elements introduced into

1    evidence.

2         So between 402 and 403 concerns and -- the 403

3    concern being cumulative, I'm going to sustain the

4    objections.

5         MR. NOLAN:  Your Honor, on the point that you made

6    with respect to 15676-A, that it's just simply pictures --

7    I'm sorry.  You said it's just pictures of retail space.

8         THE COURT:  I said two things.  I said there's key

9    findings which are incomplete sentences.  I assume they are

10   observations on the pictures.  Metallic and bright colors,

11   cohesive color pallet, edgy and appealing.  They are

12   statements, not even sentences.  I don't know what this

13   means.  Smaller to bigger sizes of packages from top to

14   bottom.

15        I would assume that these are good things, but

16   that's not expressly stated.  I really don't know what it is.

17   It's just pictures and descriptive adjectives as to what the

18   pictures depict.  If these were critical, Counsel, we've had

19   lots of witnesses over the last three months who could have

20   discussed these.

21        MR. ROTH:  Just one document, your Honor.  I

22   apologize.  It's the very last document.  It's the monthly

23   brand tracking reports which have --

24        THE COURT:  18286-A?

25        MR. ROTH:  Yes.  Mr. Kilpin did, in fact, as I

1    recall, identify this form of work.  And --

2         THE COURT:  All this came in previously in

3    evidence.

4         MR. ROTH:  Although what I understand is that the

5    categories, if you look on the second page, there are a bunch

6    of categories, most fun to play with, do you see that?  In

7    its unredacted form, it actually had bars, and it was

8    measuring.

9         THE COURT:  It was up there on the screen.

10        MR. ROTH:  That was up on the screen, actually, in

11   argument, not in front of the jury, when I was discussing it

12   with the Court.  We understood from your Honor that the

13   concern was the comparison between Bratz, Barbie, and My

14   Scene.  So what we have attempted to do was take all of that

15   out and simply lay out the categories.

16        THE COURT:  But these categories have been

17   described in court.

18        MR. ROTH:  But not in these documents.  And, your

19   Honor, here's what we're getting at.

20        THE COURT:  But in the context of a worldwide

21   consumer research report.

22        MR. ROTH:  I don't believe that the documents with

23   these categories have come in.

24        THE COURT:  What do the documents with -- what does

25   the document with these categories, what does that prove to

1    the jury?  We're now on Wednesday.  It's up there, the jury

2    is there.  What's the argument?

3        MR. ROTH:  As you recall, we've been discussing

4    with respect to apportionment.  Mattel's argument that if the

5    various factors are inextricably intertwined, then there's an

6    issue on apportionment.

7        THE COURT:  Yes.

8        MR. ROTH:  Our argument is they can be and are

9    measured separately as proven by these reports.  These

10   reports measure these various factors.  And these line up to

11   a certain extent --

12       THE COURT:  There was testimony on that very point.

13   And I don't think there's foundation for that conclusion.

14   And if that's how you're going to use the -- well, there was

15   a discussion from Mr. -- it was the Mattel employee explained

16   that that's not what that reflects.  I'm going to sustain the

17   objection to that.

18       All right.  I have the jury instructions.  These

19   are not final.  I'll write draft on it.  I anticipate certain

20   objections from both sides concerning some of the

21   instructions that are proposed.  And I will entertain those

22   on Monday.

23       I have a busier criminal calendar than a civil

24   calendar.  So why don't we take this up at 11:00 on Monday

25   morning.  And I'll hear any further objections to the

1    proposed instructions.  And we'll also take up the issue of

2    the verdict form.

3        MR. ZELLER:  Your Honor, may I make a request?

4    Since I've been handling the charging conferences, I actually

5    have to be in front of Judge Matz at 1:30 on Monday

6    afternoon.  Otherwise, my schedule is entirely yours.  But

7    that is a scheduling conference that, as lead counsel there,

8    I'm obligated to attend.

9        THE COURT:  Why don't we advance it in the morning,

10   then.  Why don't we start at 9:00 and get through this.  Will

11   that work for you, Mr. Zeller?

12       MR. ZELLER:  Yes, that will be fine.

13       THE COURT:  We have a status conference at 9:00 in

14   the MGA insurance cases.

15       MS. AGUIAR:  Do you want us at 9:30?

16       THE COURT:  No, 9:00.  It's not going to be long.

17       MS. AGUIAR:  We have three things to submit to you.

18   Sorry to end on a note where the parties were not able to

19   agree, but we will each submit our own instruction on the

20   competitive products and the so-called inverse ratio rule.

21       THE COURT:  The Court has included somewhat of a

22   modified version of the inverse ratio rule based on what's

23   been submitted.  I'll consider this as well.

24       MS. AGUIAR:  Okay.  So we can submit these to you?

25       THE COURT:  Go ahead, and we'll take this up on

1      Monday morning.

2           MS. AGUIAR:  And there's a supplemental instruction

3      on willful infringement.

4           THE COURT:  Let me take a look at these right now.

5      Does Mattel have a competitive product?

6           MR. ZELLER:  I'm sorry?

7           THE COURT:  Do you have a proposed competitive

8      product instruction?

9           MR. ZELLER:  We had proposed one to the other side.

10     We have not submitted it to the Court just yet.  We'll do

11     that as soon as we're done.

12          THE COURT:  Okay.  The Court also had put in a

13     willful infringement instruction, but I'll take this up as

14     well.  Just so that you know, obviously what's being handed

15     out does not reflect my receipt of these, and we'll revisit

16     these on Monday morning.  And then the same thing with the

17     inverse ratio rule.  I haven't had a chance to consider this,

18     but I'll take all three of these with me, and at least the

19     proposed instructions that I'm handing out will give us a

20     starting place.

21          Anything else?

22          MR. ZELLER:  Yes, your Honor.  If we could have

23     leave to file a JMOL.

24          THE COURT:  Yes.  When will you have that filed?

25          MR. ZELLER:  I would suspect that we can probably

Unsigned                                              Page  7869

1    have it filed, I would say, end of Tuesday.

2         THE COURT:  Okay.  And, of course, MGA will have

3    leave to file an opposition.  Are you in a position -- what

4    will this be directed towards?

5         MR. ZELLER:  I'm sorry?  That was directed to me?

6         THE COURT:  Yes.  What is the motion being directed

7    toward?

8         MR. ZELLER:  Well, it's still a work in progress,

9    of course.  What I would say is that we do intend to move for

10   judgment as a matter of law on substantially the grounds that

11   were articulated in the summary judgment motions.  I would

12   certainly say that substantial similarity on at least some of

13   the dolls is going to be a basis for the JMOL.  And I know

14   that we were intending to move against certain of the

15   affirmative defenses.

16        Obviously, a number of them were withdrawn

17   yesterday.  So that will undoubtedly require some revamping.

18   And so that I'm not a hundred percent sure of.  But I

19   certainly know that on the merits of the copyright

20   infringement claim, we'd be seeking judgment as a matter of

21   law.  At least in part.

22        THE COURT:  Anything else from Mattel?

23        MR. ZELLER:  Nothing, your Honor.

24        THE COURT:  Mr. Proctor?

25        MR. PROCTOR:  Could we have the Court's jury

1   instructions e-mailed like you did last time?

2         THE COURT:  I was working on them all afternoon

3   during the testimony, and the headings disappeared when I

4   sent them over to Ms. North to print them out.  And they had

5   to go and hand put them in.  But we'll get them to you.

6         MR. NOLAN:  Your Honor, I indicated, when Mattel

7   rested, we'd also ask for leave to file a JMOL motion.

8         THE COURT:  What will yours be directed towards?

9         MR. NOLAN:  We're look at considering this weekend

10   doing more research is the preemption argument under the

11   Uniform Trade Secret Act.  And then there's another argument

12   that is directed to the punitive damage claim.  And the

13   absence of economic harm to Mattel.  We'll try to get

14   those -- did we talk about filing them on Monday?

15         THE COURT:  Why don't we have both of them filed by

16   five o'clock on Monday, the 18th, and let's have oppositions

17   by five o'clock -- or responses five o'clock on the 20th.

18   That way if the Court does not decide to take them under

19   submission -- and I actually think that something needs to be

20   ruled on -- I can do so before the jury starts substantive

21   deliberations on the 21st.

22         MR. NOLAN:  My last point, your Honor, is just for

23   leave, similar to how Mr. Quinn and Mr. Price divided their

24   argument, could Mr. Kennedy and I divide our closing

25   argument?

1          THE COURT:  I think -- between damages and

2     copyright?

3          MR. NOLAN:  Yes.

4          THE COURT:  I generally don't do that, but this

5     isn't my normal case.  So I suppose I'll give you leave to do

6     so.

7          MR. NOLAN:  I appreciate the courtesy.  We

8     understand it's not the typical --

9          THE COURT:  No slapping hands, though.

10         MR. NOLAN:  We'll try to make the switch as

11     efficient as possible.

12         THE COURT:  That makes sense in a case of this

13     nature.  That's fine.  I look forward to hearing from

14     Mr. Kennedy as well.

15         All right.  If there's nothing further, I thank you

16     for your tremendous efforts on bringing this case to a close

17     this afternoon.  And I'll look forward to your closing

18     arguments on Wednesday.  In the interim, we'll have our

19     charging instruction on Monday morning at 9:00.  Court is

20     adjourned for the day.

21

22         (Proceedings concluded at 6:15 P.M.)

23

24

25

1

2

3

4

5

6

7                    C E R T I F I C A T E

8

9

10          I hereby certify that pursuant to Title 28,

11   Section 753 United States Code, the foregoing is a true and

12   correct transcript of the stenographically reported

13   proceedings in the above matter.

14          Certified on August 15, 2008.

15

16

                    _____

17          MARK SCHWEITZER, CSR, RPR, CRR
            Official Court Reporter
18          License No. 10514

19

20

21

22

23

24

25

Unsigned                                          Page  7873