1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3        EASTERN DIVISION

4        - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6        - - -

7    MATTEL, INC.,      )

                      )

8        PLAINTIFF,  )

                      )

9       VS.       ) NO. CV 04-09049

                      )

10   MGA ENTERTAINMENT, INC., ET. AL., )

                      )

11       DEFENDANTS.  )

    _____) MOTIONS IN LIMINE

12   AND CONSOLIDATED ACTIONS,    ) AFTERNOON SESSION

                      )

13

14

15       REPORTER'S TRANSCRIPT OF PROCEEDINGS

16        RIVERSIDE, CALIFORNIA

17        THURSDAY, MAY 22, 2008

18         1:34 P.M.

19

20

21

22

23       THERESA A. LANZA, RPR, CSR

        FEDERAL OFFICIAL COURT REPORTER

24       3470 12TH STREET, RM. 134

        RIVERSIDE, CALIFORNIA  92501

25       951-274-0844

        WWW.THERESALANZA.COM

1    APPEARANCES:

2

ON BEHALF OF MATTEL, INC.:

3

QUINN EMANUEL

4    BY:  JOHN QUINN

JON COREY

5    MICHAEL T. ZELLER

HARRY OLIVAR

6    TIMOTHY ALGER

DIANE HUTNYAN

7    865 S. FIGUEROA STREET,

10TH FLOOR

8    LOS ANGELES, CALIFORNIA  90017

213-624-7707

9

10

ON BEHALF OF MGA ENTERTAINMENT:

11

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

12   BY:  THOMAS J. NOLAN

JASON RUSSELL

13   MATTHEW E. SLOAN

300 SOUTH GRAND AVENUE

14   LOS ANGELES, CALIFORNIA  90071-3144

213-687-5000

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2                                PAGE

3        MOTIONS IN LIMINE.............................        4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       RIVERSIDE, CALIFORNIA; THURSDAY, MAY 22, 2008; 1:34 P.M.

2                   -OOO-

3       THE COURT:  WE'RE BACK ON THE RECORD.

4       LET'S BEGIN WITH THE MATTEL MOTIONS IN LIMINE.

5       THE FIRST MOTION IN LIMINE IS MATTEL'S MOTION TO

6    EXCLUDE EVIDENCE RELATING TO THE UNCONSCIONABILITY OF THE

7    CONTRACT, ESSENTIALLY.  THE COURT HAS PREVIOUSLY RULED -- I

8    SUSPECT THIS MOTION IN LIMINE WAS PREPARED PRIOR TO THE COURT'S

9    RULINGS.  THE COURT HAS PREVIOUSLY RULED THAT EVEN IF

10   PROCEDURALLY UNCONSCIONABLE, THE CONTRACT IS NOT SUBSTANTIVELY

11   UNCONSCIONABLE AS APPLIED IN THIS PARTICULAR CASE.  SO THE

12   COURT IS INCLINED TO GRANT THIS MOTION, ALTHOUGH, I GATHER,

13   IT'S PROBABLY BEEN MADE MOOT BY THE COURT'S RULING.

14       MR. RUSSELL:  YOUR HONOR, WE DID JOIN THIS MOTION,

15   AND THERE WAS ONE PIECE OF IT THAT I THINK WE WANTED TO

16   ADDRESS; AND THAT WAS, THERE'S ESSENTIALLY THREE FORMS OF

17   RELIEF THEY WANT.  ONE IS WITH RESPECT TO THE

18   UNCONSCIONABILITY.  YOU DEALT WITH THAT, YOUR HONOR.  WE'RE NOT

19   GOING TO REARGUE THAT.  THE SECOND ONE IS WITH RESPECT TO

20   JAN DUFFY.  WE'VE ALSO AGREED ON THAT.  BUT THE THIRD ONE IS

21   WITH RESPECT TO OTHER VERSIONS OF MATTEL'S INVENTIONS

22   AGREEMENT.  ON THAT ONE, I THINK THE MGA PARTIES DO CONTEST THE

23   MOTION AND THINK THAT YOUR HONOR SHOULD ALLOW IN SUBSEQUENT

24   VERSIONS OF THE CONTRACT; IN OTHER WORDS, VERSIONS AFTER THE

25   1998 VERSION THAT MR. BRYANT SIGNED.

1       THE COURT:  TO SHOW WHAT?

2       MR. RUSSELL:  AMONG OTHER THINGS, TO SHOW COURSE OF

3   CONDUCT; TO SHOW THE FACT THAT THEY MADE CHANGES TO PARTICULAR

4   LANGUAGE IN THE CONTRACT; TO SHOW THAT MATTEL --

5       THE COURT:  WHAT DOES THAT PROVE?

6       MR. RUSSELL:  AMONG OTHER THINGS, IT WILL PROVE, WE

7   BELIEVE, THAT THEY RECOGNIZE THAT THERE WAS A PROBLEM AND THAT

8   PEOPLE WITHIN MATTEL UNDERSTOOD THAT THE CONTRACT EITHER WAS

9   NOT BEING ENFORCED OR THAT THERE WAS A PROBLEM WITH ITS

10  ENFORCEMENT.  THIS GOES TO A PANOPLY OF THE AFFIRMATIVE

11  DEFENSES THAT THE MGA PARTIES HAVE ASSERTED:  ACQUIESCENCE,

12  ABANDONMENT, CONSENT, ESTOPPEL, LACHES.

13      I THINK YOU HEARD MR. NOLAN TALK TO YOU PREVIOUSLY

14  ABOUT THE MEETING THAT HE LEARNED ABOUT WHEN HE DEPOSED

15  MR. BOUSQUETTE, WHERE ALL OF MATTEL'S EMPLOYEES WERE BROUGHT

16  INTO A ROOM AND ASKED TO SIGN A SUBSEQUENT VERSION OF THE

17  CONTRACT THAT MADE MATERIAL CHANGES TO THE INVENTIONS AGREEMENT

18  AND SPECIFICALLY MADE VERY MATERIAL CHANGES TO WHAT WAS AND

19  WASN'T GOING TO BE TRANSFERRED TO MATTEL BY ITS EMPLOYEES.  AND

20  WE BELIEVE THAT WILL BE RELEVANT FOR A JURY TO HEAR THAT,

21  BECAUSE IT PUTS INTO CONTEXT PRECISELY WHAT IT WAS THAT MATTEL

22  UNDERSTOOD INTERNALLY AND WHAT ITS EMPLOYEES UNDERSTOOD IN

23  TERMS OF ITS RIGHTS TO INVENTIONS THAT MATTEL EMPLOYEES WERE

24  CREATING.

25      SO FOR EXAMPLE, THIS WOULD BE APPLICABLE TO

1    MOONLIGHTING.  AND THAT'S ONE OF THE KEY ELEMENTS IN THIS CASE.

2    THE FACT THAT MATTEL FELT IT IMPORTANT ENOUGH TO BRING

3    LITERALLY EVERYONE IN THE DESIGN CENTER INTO AN AMPHITHEATER

4    AND HAVE A PRIVILEGED SESSION AND THEN ESSENTIALLY FORCE THEM

5    TO SIGN AN AMENDED VERSION OF THE CONTRACT THAT MAKES

6    SUBSTANTIAL CHANGES; I THINK THE JURY SHOULD HEAR THAT,

7    PARTICULARLY GIVEN THE TESTIMONY THAT WE THINK THE JURY IS

8    GOING TO HEAR ABOUT HOW IT WAS WIDESPREAD, SO WIDESPREAD THAT

9    THERE WAS EVEN A NICKNAME FOR IT, "G JOBS."  SO THIS IS WHERE

10   IT SHOULD COME IN.  WE SHOULD BE ALLOWED TO SHOW THOSE CHANGES

11   AND HAVE THE JURY DRAW WHAT CONCLUSIONS THEY MAY.

12       THE COURT:  THANK YOU, COUNSEL.

13       MR. QUINN.

14       MR. QUINN:  YOUR HONOR, THE CHANGES THAT MATTEL MADE

15   IN LATER CONTRACTS SHOULD BE IRRELEVANT TO WHAT MR. BRYANT'S

16   OBLIGATIONS WERE UNDER HIS CONTRACT.  THIS IS AN ARGUMENT THAT

17   WAS MADE BY BRYANT'S COUNSEL AT THE TIME OF THE SUMMARY

18   JUDGMENT MOTION, WHICH IS NOW IN THE PAST.

19       I DON'T THINK THE COURT SHOULD CHANGE ITS RULING

20   HERE.

21       THE COURT:  THANK YOU, COUNSEL.

22       MOTION NUMBER ONE IS GRANTED.

23       MOTION NUMBER TWO GOES TO THE MOTIVE FOR FILING THE

24   LAWSUIT.  AND ESSENTIALLY, THE ARGUMENT HERE BY MGA IS THAT

25   THIS IS RELEVANT TO A VARIETY OF AFFIRMATIVE DEFENSES.  I

1   SUPPOSE I SHOULD SPEAK ON THE COURT'S VIEW ON THE AFFIRMATIVE

2   DEFENSES.  I THOUGHT I'D PREVIOUSLY INDICATED TO THIS, BUT

3   PERHAPS I WASN'T CLEAR, BECAUSE BOTH SIDES CITE THE COURT'S

4   PREVIOUS STATEMENTS FOR SUPPORT.

5      I DID INDICATE, AS MATTEL POINTS OUT IN SEVERAL

6   PLACES IN ITS MOTIONS AND IN SEVERAL MOTIONS, THAT I'M GOING TO

7   RULE ON THE AFFIRMATIVE DEFENSES AFTER THE TRIAL.  BUT I

8   CERTAINLY NEVER INDICATED THAT THE EVIDENCE WITH RESPECT TO THE

9   AFFIRMATIVE DEFENSES WOULD SOMEHOW BE SEVERED OUT AND BE PART

10   OF A SEPARATE BENCH TRIAL.

11      I AM GOING TO RULE ON THE AFFIRMATIVE DEFENSES AFTER

12   THE TRIAL, BUT WE ARE GOING TO HEAR ALL OF THE EVIDENCE RELATED

13   TO THIS CASE, INCLUDING THE AFFIRMATIVE DEFENSES, DURING THE

14   TRIAL.  THERE'S GOING TO BE ONE TRIAL, AT LEAST ON PHASE ONE.

15   THERE WILL BE A SECOND TRIAL ON PHASE TWO.  THERE'S NOT GOING

16   TO BE SOME SEPARATE BENCH TRIAL, THOUGH, JUST TO MAKE THAT

17   CLEAR.

18      IT WAS NEVER THIS COURT'S INTENTION TO INDICATE THAT

19   SOMEHOW, BY SUGGESTING THAT I WAS GOING TO RULE ON THE

20   AFFIRMATIVE DEFENSES AFTER THE TRIAL, THAT THE EVIDENCE FOR THE

21   AFFIRMATIVE DEFENSES WOULD COME IN AFTER THE TRIAL.

22      MR. QUINN:  I UNDERSTAND, YOUR HONOR.

23      I THINK THE PARTIES ARE IN AGREEMENT THAT IF THERE

24   WERE OVERLAP IN THE FACTS, RELATING TO LEGAL ISSUES FOR THE

25   JURY AND EQUITABLE ISSUES FOR THE COURT, THAT SHOULD ALL BE

1    PRESENTED BEFORE THE JURY.

2         BUT IF THE EVIDENCE DOES NOT OVERLAP, AND IF THERE'S

3    EVIDENCE THAT BEARS ONLY ON AN EQUITABLE DEFENSE AND OTHERWISE

4    HAS NOTHING TO DO WITH WHAT THE JURY IS GOING TO DECIDE, WE

5    SUBMIT THAT'S NOT PROPERLY PRESENTED TO THE JURY.  AND SO, IF

6    THAT PROPOSITION IS CORRECT --

7         THE COURT:  THERE IS A LOT OF CASE LAW OUT THERE,

8    COUNSEL, THAT SAYS IT'S PERFECTLY PERMISSIBLE FOR THE COURT TO

9    HEAR ALL OF THE EVIDENCE AT THE SAME TIME.  I CAN GIVE

10   INSTRUCTIONS TO THE JURY IN TERMS OF WHAT EVIDENCE THEY CAN AND

11   CAN'T CONSIDER.  BUT I'M NOT FAMILIAR WITH ANY CASE LAW WHICH

12   SUGGESTS THAT I CANNOT PERMIT EVIDENCE RELATED TO AFFIRMATIVE

13   DEFENSES, EVEN IF IT'S EVIDENCE THAT ONLY RELATES TO THE

14   AFFIRMATIVE EQUITABLE DEFENSES, TO BE PRESENTED DURING THE

15   TRIAL.

16        MR. QUINN:  I WOULDN'T GO SO FAR AS TO SUGGEST THAT

17   THAT'S THE LAW, YOUR HONOR.

18        THE COURT:  OKAY.

19        MR. QUINN:  I THINK THE COURT DOES HAVE DISCRETION TO

20   MAKE THAT DETERMINATION.

21        BUT WE'RE NOW TALKING ABOUT THIS IN THE ABSTRACT, SO

22   WE'RE NOT FOCUSING ON WHAT IT IS THE JURY WOULD HEAR.

23        THE COURT:  AND THAT'S FAIR ENOUGH.  AND I SAY THAT

24   AS AN OVERVIEW TO THESE MOTIONS; NOT AS A MEANS OF RESOLVING

25   THESE MOTIONS.  I WANT TO TAKE THAT ISSUE, THOUGH, OUT OF IT.

1    I DON'T WANT TO HEAR, AS A REASON TO GRANT A MOTION IN LIMINE

2    OR NOT TO GRANT IT, THAT IT GOES TO AN EQUITABLE DEFENSE.

3         MR. QUINN:  UNDERSTOOD, YOUR HONOR.

4         THE COURT:  VERY WELL.

5         SO WITH THAT IN MIND, LET'S PROCEED.

6         MR. OLIVAR:  YOUR HONOR, I DON'T THINK THAT WHAT

7    YOUR HONOR MENTIONED AFFECTS THE RESULT ON THIS MOTION, AS THE

8    CASE LAW IS CLEAR THAT MATTEL'S MOTIVE IN FILING SUIT IS

9    IRRELEVANT TO ANYTHING IN THIS CASE.  I KNOW WE DID NOTE THE

10   COURT'S STATEMENT ABOUT EQUITABLE DEFENSES, BUT WE ALSO WENT

11   THROUGH THEM AND EXPLAINED THAT THE REASON WHY MATTEL DID OR

12   DID NOT DECIDE TO BRING A LAWSUIT AT ANY PARTICULAR POINT IN

13   TIME IS NOT RELEVANT EVIDENCE.

14        THE COURT:  WHY IS IT NOT RELEVANT TO LACHES?

15        MR. OLIVAR:  IT'S NOT RELEVANT BECAUSE THE TEST UNDER

16   LACHES IS DELAY AND UNDUE PREJUDICE TO MGA.  AND THAT MATTEL

17   DELAYED, THE FACT THAT THEY DELAYED, AND MAYBE MGA'S ARGUMENTS

18   AS TO HOW IT MAY HAVE BEEN PREJUDICED BY THE DELAY OR HOW IT

19   MAY BE RELEVANT TO LACHES -- BUT WHY MATTEL DECIDED TO WAIT, OR

20   THEIR THEORY -- THEY'VE ARTICULATED THAT THE THEORY ON MOTIVE

21   IS THAT MATTEL WAITED UNTIL IT HAD DETERMINED THAT "THE

22   BARBIE-THREATENING NEWCOMER BRATZ NEEDED TO BE DESTROYED SO

23   BARBIE COULD REASCEND HER THROWN AS QUEEN OF THE FASHION

24   DOLLS."  THAT'S APPARENTLY WHAT THEY WANT TO ARGUE TO THE JURY;

25   THAT'S IN THEIR OPPOSITION.

1        THAT HAS NOTHING TO DO WITH LACHES.  LACHES IS SIMPLY

2    DELAY AND UNDUE PREJUDICE TO THE OTHER SIDE.  SO WHY SOMEONE

3    DID OR DIDN'T DECIDE TO FILE SUIT AT SOME POINT IN TIME DOES

4    NOT FACTOR INTO THE LACHES CALCULATION.

5        THE COURT:  THANK YOU, COUNSEL.

6        MR. NOLAN.

7        MR. NOLAN:  YOUR HONOR, I THINK THIS IS ANOTHER ONE

8    WHERE OUR POSITION IS PRETTY WELL STAKED OUT IN THE PAPERS.

9        I DO WANT TO POINT OUT, THOUGH, YOUR HONOR, THAT

10   MATTEL'S POSITION IN HERE TO EXCLUDE MOTIVE EVIDENCE IS NOT

11   SUPPORTED IN THE LAW.  THE LACHES DEFENSE THAT WE HAVE GOES TO

12   UNREASONABLE DELAY, MOTIVE -- AND WE CITED THE RANDOR MUSIC

13   INTERNATIONAL CASE, AS WELL AS THE MEMORY CORPORATION KENTUCKY

14   OIL CASE, WHICH TALKS ABOUT THAT IT'S ALSO RELEVANT TO BIAS OF

15   THE WITNESSES AND CREDIBILITY OF SOME OF THE MATTEL EXECUTIVES

16   WHO ARE GOING TO COME IN HERE, YOUR HONOR; SO I THINK IT'S ALL

17   INTERTWINED.  THIS JURY SHOULD HEAR THE TRUE STORIES OF WHAT

18   WAS HAPPENING.

19       YOUR HONOR SAID EARLIER THIS MORNING THAT BOTH

20   COMPANIES ARE NOT GOING TO BE HAPPY ABOUT THE TYPE OF EVIDENCE

21   THAT'S GOING TO GO BEFORE THIS JURY.  IT IS CERTAINLY OUR

22   POSITION -- AND WE'VE ARGUED IT -- THAT THE LACHES IN THIS CASE

23   WAS AN UNREASONABLE DELAY AND IT WAS CAUSED BY AN INTENTIONAL

24   DECISION BY MATTEL TO SIT BACK AND ALLOW BRATZ, WHETHER OR NOT

25   THEY THOUGHT IT WAS A FAD OR WHATEVER THEIR EXCUSE IS GOING TO

1    BE -- THAT ON THE ONE HAND, THEY SHOULD NOT BE ALLOWED TO

2    INTRODUCE EVIDENCE, AS THEY DID AND AS THEY'RE GOING TO IN THE

3    OPENING STATEMENT, ABOUT WHY MR. LARIAN MADE SOME OF THE

4    STATEMENTS THAT HE DID OR THE SO-CALLED ALLEGED FRAUDULENT

5    CONCEALMENT, WITHOUT, AT THE SAME TIME, YOUR HONOR, EXPLAINING

6    THE OTHER SIDE OF THE EQUATION OF WHAT MATTEL WAS THINKING

7    ABOUT, WHAT ITS EXECUTIVES WERE THINKING ABOUT.

8         I THINK THEY NEED TO KNOW THAT TWO WEEKS BEFORE THE

9    CLAIMS WERE FILED, MATTEL'S HEAD OF MARKETING WAS SAYING SUCH

10   THINGS AS, 'BARBIE'S IN DISTRESS; BRAND IN CRISIS;' THAT TYPE

11   OF THING.  IT GIVES THE TRIER OF FACT, I THINK, A LEVEL PLAYING

12   FIELD UPON WHICH TO JUDGE THE BIAS AND CREDIBILITY OF THE

13   WITNESSES, AND IT ALSO ALLOWS US TO FULLY DEVELOP OUR LACHES

14   DEFENSE.

15        THE COURT:  LET'S BREAK THIS DOWN, COUNSEL.

16        IT'S EASIER FOR THE COURT TO UNDERSTAND EVIDENCE

17   RELATED TO THE DELAY; AS YOU SUGGEST, THE UNREASONABLE DELAY.

18   AND COUNSEL MENTIONED THAT LACHES IS NOT DELAY, BUT I THINK YOU

19   MORE ACCURATELY CAPTURE THAT IT'S ABOUT UNREASONABLE DELAY.

20   AND THAT'S WHAT BRINGS IN THE NOTION OF WHY THE DELAY WAS

21   TAKING PLACE BECOMES ARGUABLY RELEVANT TO THAT AFFIRMATIVE

22   DEFENSE.

23        I'M CONCERNED WITH HOW FAR YOU'RE GOING TO GO WITH

24   THIS.  AND WHAT I DON'T WANT TO SEE IS JUST ATTACKS ON

25   CORPORATE MATTEL UNDER THE GUISE OF AN AFFIRMATIVE DEFENSE.

1    AND THE WAY SOME OF THIS PROFFERED EVIDENCE PLAYS OUT, IT SEEMS

2    TO BE MORE ALONG THE LINES OF THE LATTER THAN THE FORMER,

3    PARTICULARLY WHEN YOU GET INTO THE EVIDENCE OF THE

4    LITIGIOUSNESS OF MATTEL AND THE OVERZEALOUSNESS OF MATTEL.

5        TO A CERTAIN EXTENT, THAT REALLY -- I NEED TO BE ABLE

6    TO CABIN THIS IN SOME REASONABLE WAY, AND YOU'RE NOT REALLY

7    OFFERING ME A WAY TO DO THAT.

8        MR. NOLAN:  LET ME TRY TO ADDRESS THAT, IF I CAN.

9        JUDGE TAKASUGI USED TO DESCRIBE IT AS PUTTING A

10   LITTLE BIT TOO MUCH MUSTARD ON THE HOT DOG, IN TERMS OF MAKING

11   AN ARGUMENT, WHICH I ALWAYS THOUGHT WAS A VERY COLORFUL WAY OF

12   DESCRIBING, FOR TRIAL COUNSEL, 'DON'T GO TOO FAR ON SOMETHING.'

13   AND I CERTAINLY UNDERSTAND.  BUT LET'S PUT SOME CONTEXT TO THIS

14   JUST FOR A MOMENT.

15       THERE'S THIS ARGUMENT ABOUT ISAAC LARIAN WANTING TO

16   CONCEAL, ALLEGEDLY CONCEAL, THE IDENTITY OF CARTER BRYANT AS A

17   DESIGNER OF BRATZ AND ALL OF THE NEGATIVE INFERENCES THAT COME

18   FROM THAT.

19       THE RECORD EVIDENCE, YOUR HONOR, THAT MR. LARIAN HAS

20   TESTIFIED TO IS THAT WHEN HE UNDERTOOK THE PROJECT, HE

21   UNDERSTOOD -- AND ESPECIALLY WHEN HE GOT THE LETTER FROM

22   QUINN EMANUEL WITH RESPECT TO THE CEASE AND DESIST ON THE YAHOO

23   PAGE -- THAT ANYBODY WHO TOOK ON BARBIE -- THIS IS HIS PERSONAL

24   BELIEF.

25       AND I WON'T CITE TO ANY COURT OPINION THAT TALKS

1    ABOUT THEIR AGGRESSIVENESS.  I WON'T CITE TO THE DISTRICT COURT

2    OPINION.  I WON'T INTRODUCE WHAT JUDGE RAYKOFF SAID ABOUT THEIR

3    AGGRESSIVE STYLE.  I'M NOT GOING TO DO THAT.  BUT I DO THINK

4    IT'S FAIR FOR MR. LARIAN TO BE ABLE TO EXPLAIN THAT ONE OF THE

5    REASONS WHY HE WAS CONCERNED ABOUT THE IDENTITY OF CARTER

6    BRYANT BEING KNOWN TO THE GENERAL PUBLIC IS THAT, GENERALLY

7    SPEAKING, DESIGNERS OF NEW PRODUCTS ARE EASILY PICKED OFF BY

8    OTHER COMPETITORS, AND THINGS LIKE THAT.  HE ALSO UNDERSTOOD

9    THAT MATTEL HAD SUED NUMEROUS OTHER PEOPLE AND THAT THEY WERE

10   LITIGIOUS, AS FAR AS HE WAS CONCERNED, AS A TOY MAKER, AND HE

11   WANTED TO BE VERY, VERY CAREFUL ABOUT REFERENCES HE MADE.

12       THERE WAS AN E-MAIL, FOR INSTANCE, AN EXCHANGE,

13   FOLLOWING THE POSTING ON THE INTERNET, THE YAHOO INTERNET, THAT

14   THEY WANT TO CONTEND -- AND IT WAS PART OF THE CLAWBACK

15   DOCUMENT THAT YOU RECENTLY RULED ON.  WE SHOULD BE ABLE TO

16   EXPLAIN THAT ONE OF THE REASONS WHY HE INSTRUCTED PEOPLE TO

17   TAKE ALL REFERENCES TO MATTEL, BARBIE, CARTER BRYANT, AND THE

18   BRATZ ART OFF OF THE FAN WEBSITE WAS BECAUSE OF HIS CONCERN

19   THAT MATTEL WAS AGGRESSIVE.  IT'S HIS PERSONAL VIEW.  I'M NOT

20   GOING TO INTRODUCE 25 LAWSUITS OR ANYTHING ELSE LIKE THAT.  BUT

21   I THINK THAT'S GOING TO BE IMPORTANT FOR US TO BE ABLE TO

22   EFFECTIVELY SAY WHAT ISAAC LARIAN'S STATE OF MIND WAS.

23       THE COURT:  LET ME STOP YOU THERE.

24       WITH THAT SORT OF FOUNDATION, ASSUMING THAT SOMETHING

25   WERE TO PLAY OUT IN THAT MANNER, BASED ON WHAT PRECEDES THAT, I

1    CAN SEE THAT BEING RELEVANT.  I GUESS WHAT I'M INCLINED TO DO

2    ON THIS IS DENY THE MOTION AS IT'S WRITTEN, CATEGORICALLY,

3    SAYING 'ALL MOTIVE EVIDENCE IS OUT,' BUT PROVIDING LEAVE TO

4    MATTEL TO RAISE OBJECTIONS TO PARTICULAR MOTIVE EVIDENCE IN THE

5    COURSE OF THE TRIAL ITSELF, WHETHER OR NOT FOUNDATION HAS BEEN

6    RAISED, WHETHER OR NOT IT IS RELEVANT IN THE CONTEXT OF A

7    PARTICULAR EXAMINATION.

8         BUT THE CONCERN NOW COMES BACK TO THE OPENING

9    STATEMENTS.  YOU BOTH HAVE CHILLED ME SOMEWHAT, CHILLED ME

10   SOMEWHAT, WITH YOUR MINI OPENING STATEMENTS.  I'M CONCERNED

11   ABOUT GIVING TOO MUCH LICENSE TO EITHER OF YOU, BASED ON WHAT

12   HAPPENED DURING THE MINI OPENING STATEMENTS.

13        IF YOU'RE GOING TO BE STANDING UP, MR. NOLAN, AND

14   TURNING TO THE JURY AND JUST LAMBASTING MATTEL, I'M GOING TO

15   STOP IT.

16        MR. NOLAN:  OF COURSE.  AND, YOUR HONOR --

17        THE COURT:  AND VICE VERSA.

18        MR. NOLAN:  I GUESS THERE WAS A COMMENT MADE THAT

19   WHOEVER GOES FIRST SETS THE TONE, AND I GUESS THE OTHER PERSON

20   WHO'S DRAFTING OFF OF THAT HAS TO KIND OF EVEN THE TONE.

21        BUT I DO THINK THIS, YOUR HONOR:  OUR CONTENTION IN

22   THIS CASE IS THAT -- WHAT EXPLAINS SO MUCH OF WHAT HAS GONE ON

23   IN THIS CASE HAS TO DO WITH A DECISION BY MATTEL TO SEEK, IN

24   THE COURTROOM, WHAT IT COULD NOT ACHIEVE IN THE MARKETPLACE.

25        THE COURT:  BUT THERE, YOU'RE PAINTING WITH THOSE

1    BROAD BRUSHES AGAIN.  THIS ISN'T ABOUT EXPLAINING TO THE JURY

2    WHAT'S GOING ON IN THIS OVERALL CASE.  IT'S ABOUT PHASE 1-A,

3    ADDRESSING THE PARTICULAR ISSUES OF OWNERSHIP OF BRATZ; AND

4    PHASE 1-B WILL BE DAMAGES.

5        THE PURPOSE HERE IS NOT TO EXPLAIN, IN THESE

6    GRANDIOSE TERMS, WHAT IS GOING ON IN THIS CASE.  THAT'S

7    PRECISELY WHAT I'M CONCERNED ABOUT.

8        I'M DIRECTING THIS TO YOU RIGHT NOW, BUT I'M JUST AS

9    CONCERNED ABOUT IT ON THE OTHER SIDE.

10       MR. NOLAN:  I UNDERSTAND.

11       BUT, YOUR HONOR, WITH RESPECT TO THE MOTIVES IN THIS

12   CASE, AS TO WHETHER OR NOT THE EMPLOYMENT CONTRACT OF CARTER

13   BRYANT WAS ACTUALLY EVER INTENDED TO BE PURSUED BY OR ENFORCED

14   BY MATTEL, I THINK THAT IS A RELEVANT ISSUE TO OUR AFFIRMATIVE

15   DEFENSES OF MITIGATION, ABANDONMENT, AND THOSE TYPE OF THINGS.

16       FRANKLY, YOUR HONOR, WE BELIEVE THAT THE ONLY TIME

17   THAT THEY SOUGHT TO FILE THE LAWSUIT IN THIS CASE WAS WHEN

18   BRATZ WAS A COMPLETE SUCCESS AND BARBIE WAS LOSING SALES.  I

19   MEAN, THE PAPERS AND THE DOCUMENTS --

20       THE COURT:  MAYBE A SOLUTION TO THIS IS THE COURT

21   REQUIRING THAT ALL EVIDENCE RELATED TO THE AFFIRMATIVE

22   DEFENSES, THE EQUITABLE DEFENSES, WHICH DO NOT GO TO THE JURY

23   AND ARE NOT INTENDED TO AFFECT THE JURY'S DECISION ON THE ISSUE

24   THAT THEY HAVE BEFORE THEM, GO TO 1-B.

25       MR. NOLAN:  GIVE ME A MINUTE TO SPIN THAT OUT OF MY

1   MIND.

2        THE COURT:  THE IDEA OF HAVING THIS EVIDENCE IN THE

3   TRIAL IS FOR THE COURT'S BENEFIT AND FOR JUDICIAL EFFICIENCY

4   AND FOR JUDICIAL ECONOMY.  I DON'T WANT TO HAVE A THIRD TRIAL

5   HERE.  BECAUSE THESE ARE EQUITABLE DEFENSES; I'VE ALREADY RULED

6   THAT.

7        I'M GOING TO DENY MOTION IN LIMINE NUMBER FOUR, WHICH

8   SAYS THAT THE EQUITABLE DEFENSES SHOULD BE TRIED SEPARATELY.

9   THAT'S GOING TO GO.  BUT THE COURT CERTAINLY HAS THE DISCRETION

10  TO PLACE THE EVIDENCE IN WHATEVER PHASE IT BELIEVES IS

11  APPROPRIATE.

12        PERHAPS, THE BEST WAY TO AVOID ANY OF THIS IS TO

13  STICK THE EQUITABLE DEFENSES IN 1-B.

14        MR. NOLAN:  YOUR HONOR, AS ATTRACTIVE AS THAT MIGHT

15  SOUND TO THE COURT, HERE'S THE DIFFICULTY, I BELIEVE:  THIS

16  EVIDENCE, AS THE COURTS HAVE RECOGNIZED IN OTHER DECISIONS,

17  ALSO GOES TO THE MOTIVE AND BIAS OF MATTEL'S TESTIMONY IN THIS

18  CASE FROM SOME OF THEIR EXECUTIVES.  FOR EXAMPLE, LET ME JUST

19  GIVE A HYPOTHETICAL:  AN EMPLOYEE TAKES THE STAND,

20  LILLIE MARTINEZ, OR SOMETHING ELSE LIKE THAT.  WHY SHOULDN'T I

21  BE ALLOWED, IN 1-A, TO CROSS-EXAMINE HER WITH RESPECT TO HER

22  BIAS AND CREDIBILITY WITH RESPECT TO THE POSITIONS THAT SHE'S

23  ASSERTING IN FRONT OF THE JURY?

24        THE COURT:  YOU CAN, WITH RESPECT TO POSITIONS THAT

25  PARTICULAR EMPLOYEE HAS.  THAT'S A DIFFERENT BALL GAME THAN

1    OFFERING -- THAT TYPE OF CROSS-EXAMINATION YOU CAN ALWAYS

2    IMPEACH.  AND NOTHING THAT I'M SUGGESTING HERE WOULD BE A

3    RESTRICTION OR A LIMITATION ON YOU IMPEACHING A WITNESS.

4    EVERYONE IS WELL AWARE, I THINK, OF THE LIBERAL STANDARD ON

5    IMPEACHMENT IF YOU HAVE A PARTICULAR POINT TO MAKE WITH A

6    PARTICULAR WITNESS.

7         MR. NOLAN:  YOUR HONOR, WHAT I'M SAYING, THOUGH, IS

8    IMPEACHMENT, BUT ALSO BIAS.  I MEAN, BIAS IS A SEPARATE ISSUE

9    WITH RESPECT TO IMPEACHMENT.  AND I THINK THAT IT IS ENTIRELY

10   RELEVANT FOR A TRIER OF FACT IN 1-A TO UNDERSTAND WHAT WAS

11   GOING ON IN THE MARKETPLACE, FOR THIS REASON:  CARTER BRYANT IS

12   GOING TO TESTIFY -- AND THEY WILL PROBABLY ARGUE, 'GEE,

13   CARTER BRYANT SHOULD HAVE BROUGHT HIS IDEA' -- ASSUME FOR A

14   MOMENT THAT I'M ON THE COLUMN OF 1998 VERSUS 1999.  IF HE DID

15   CREATE IT IN 1998, WHY DIDN'T HE GIVE IT TO MATTEL WHEN HE WENT

16   TO MATTEL IN 1999?

17        I THINK I NEED TO BE ABLE TO DEMONSTRATE TO THE JURY

18   THE STATUS OF BARBIE WITHIN MATTEL AND WHY MATTEL WOULD NEVER

19   HAVE ENTERTAINED THAT KIND OF A PROJECT AT THAT TIME, AND THAT

20   CARTER BRYANT, WHEN HE COMES BACK TO MATTEL, KNOWS THAT.

21   THAT'S WHY HE HAS HIS PORTFOLIO AND HE DOESN'T PRESENT IT TO

22   MATTEL.  AND YOU CAN ONLY DO THAT, YOUR HONOR, BY TALKING ABOUT

23   BARBIE AND THE SIGNIFICANCE OF BARBIE AND WHAT EFFORTS WERE

24   BEING DONE WITH BARBIE AT THE TIME.  BECAUSE AS THEY ARGUE TO

25   THE JURY -- THEY DID IT IN THEIR OPENING STATEMENT -- THAT

1    'HERE YOU HAVE A TALENTED ARTIST, AND, GEE, IF MR. NOLAN IS

2    TRYING TO MAKE YOU BELIEVE THAT HE DID THE DRAWINGS IN 1998, IS

3    THAT REALLY CREDIBLE?  BECAUSE HERE HE IS, EMPLOYED BY THE

4    LARGEST TOY MAKER IN THE WORLD; WHY DIDN'T HE COME IN AND SAY,

5    'GOSH, I'VE GOT THE GREATEST IDEA FOR A NEW DOLL.  LET'S GO

6    AHEAD AND DO IT'.'

7         I THINK I NEED TO BE ABLE TO EXPLORE THAT THAT'S --

8         THE COURT:  WHAT DOES THAT HAVE TO DO WITH HIM

9    BREACHING A CONTRACT?

10        MR. NOLAN:  BECAUSE THEY'RE GOING TO ARGUE,

11   YOUR HONOR, THAT IF OUR CLAIM WAS THAT HE DID THE DRAWINGS IN

12   1998 AND NOT 1999, WHY DIDN'T HE, WHEN HE WALKED THROUGH THE

13   DOOR, SAY TO MATTEL, TO KIND OF SHOW OFF, 'HEY, I'VE GOT THIS

14   NEW PROJECT I'D LIKE TO SHOW YOU; LET'S TRY TO LAUNCH IT.'  I

15   THINK WE NEED TO BE DEVELOPING THE EVIDENCE -- WE SHOULD BE

16   ABLE TO SHOW, THROUGH CARTER AND OTHER TESTIMONY, THAT THAT

17   WOULD NEVER HAVE HAPPENED.

18        FOR INSTANCE, THERE'S TESTIMONY FROM THEIR OWN

19   EXPERT -- HE'S QUOTED IN A NEWSPAPER ARTICLE -- THAT THEY WOULD

20   NEVER HAVE LAUNCHED BRATZ.

21        THE COURT:  MAYBE I'M JUST BEING THICK.  I'M STILL

22   NOT GETTING HOW THAT HAS ANYTHING TO DO WITH THE BREACH OF

23   CONTRACT.  WHETHER HE DID OR HE DIDN'T DISCLOSE IT IS NOT THE

24   ISSUE.  I DON'T THINK THE CONTRACT REQUIRED HIM SIMPLY TO

25   DISCLOSE EVERY IDEA THAT HE EVER HAD IN HIS LIFE.

1        MR. NOLAN:  YOUR HONOR, THERE IS AN AGREEMENT THAT

2    THEY'VE CONTENDED IN THIS CASE; IT'S CALLED THE CONFLICT

3    QUESTIONNAIRE, THAT YOU SIGN ON TO WHEN YOU --

4        THE COURT:  YES.

5        MR. NOLAN:  NOW, THEY'VE CONTENDED AND THEY'VE TAKEN

6    THE POSITION THAT CARTER, IF HE HAD TRULY DONE THE ART IN 1998,

7    SHOULD HAVE DISCLOSED ON THAT CONFLICT OF INTEREST

8    QUESTIONNAIRE, AND EXCEPTED OUT, IF YOU WOULD, THE WORK THAT HE

9    DID IN 1998.  HE DID ASHTON DRAKE; HE DISCLOSED ASHTON DRAKE ON

10   THAT.

11       THE COURT:  RIGHT.

12       MR. NOLAN:  BUT OUR ARGUMENT -- AND THE EVIDENCE WILL

13   SHOW -- IS THAT THAT FORM ONLY REQUIRED CARTER TO DISCLOSE WORK

14   THAT HE HAD DONE WITH A POTENTIAL SUPPLIER, DISTRIBUTOR,

15   COMPETITOR OF MATTEL.

16       SINCE THESE DRAWINGS WERE DONE HIMSELF, HE HAD NO

17   REASON TO DISCLOSE IT.

18       THEY'RE GOING TO GO FURTHER, THOUGH, AND SAY, 'IF

19   CARTER BRYANT DID THE DRAWINGS IN 1998, A, WHY DIDN'T HE

20   DISCLOSE IT TO MATTEL, AND WHY DIDN'T HE OFFER IT TO MATTEL?'

21       YOU HEARD THAT IN THE VOIR DIRE TO THE JURY, OF 56

22   JURORS.  MR. QUINN WAS ASKING THOSE KIND OF QUESTIONS; 'WHY

23   DIDN'T HE GIVE IT TO MATTEL AS AN IDEA.  IF IT WAS HIS OWN

24   IDEA, THEY SHOULD HAVE HANDED IT OVER.'

25       IN THE DEPOSITION THAT I TOOK OF MATT BOUSQUETTE ON

1    SATURDAY -- AND THIS IS RELEVANT TO THIS QUESTION -- I ASKED

2    THE FOLLOWING QUESTION TO MR. BOUSQUETTE:

3        'MR. BOUSQUETTE, AS FORMER PRESIDENT OF MATTEL

4    BRANDS, IS IT YOUR POSITION THAT AN EMPLOYEE WHO CONCEIVES OF

5    AN IDEA BEFORE HE GOES TO WORK AT MATTEL, THEN SIGNS AN

6    INVENTIONS AGREEMENT, THAT MATTEL OWNS THAT IDEA?'

7        MR. ZELLER, AT THE DEPOSITION, IN A SPEAKING

8    OBJECTION SAID, 'COUNSEL, YOU LOST THAT POINT ON SUMMARY

9    JUDGMENT.  YOU DON'T LIKE THE RULING, BUT THAT'S THE RULING.'

10       AND, YOUR HONOR, I'VE READ THAT ORDER MANY TIMES.  I

11   DO NOT BELIEVE THAT WAS THE BREADTH OF YOUR SUMMARY JUDGMENT

12   MOTION; THAT AN EMPLOYEE WHO CAME UP AND CONCEIVED OF AN IDEA

13   BEFORE HE WENT TO WORK AT MATTEL, BY GOING TO WORK,

14   AUTOMATICALLY TRANSFERS THAT IDEA TO MATTEL.  YET, THAT WAS THE

15   INTERPRETATION APPLIED IN MR. BOUSQUETTE'S DEPOSITION.

16       THE COURT:  LET ME HEAR FROM MATTEL ON THIS.  I'LL

17   NEED CLARIFICATION OF MATTEL'S POSITION ON THESE POINTS.

18       MR. OLIVAR:  MR. NOLAN, I BELIEVE, GAVE HIS FULL

19   ARGUMENTS FOR NUMBER FIVE AND NUMBER EIGHT JUST THEN, AS WELL

20   AS NUMBER TWO.  IF YOUR HONOR WOULD LIKE TO KEEP THEM IN ORDER,

21   I CAN CONCLUDE THE ONE SMALL POINT ON NUMBER TWO, AND THEN WE

22   CAN EITHER WAIT UNTIL NUMBER FIVE AND NUMBER EIGHT, AND

23   MR. QUINN CAN ADDRESS THE OTHER ISSUE HE INJECTED.

24       HOWEVER YOUR HONOR WOULD LIKE TO PROCEED.

25       THE COURT:  ALL RIGHT.

1       WE'LL TAKE THAT UP WITH NUMBER EIGHT; IT DOES COME

2   UP.

3       MR. OLIVAR:  THAT WAS NUMBER EIGHT, WHICH HE JUST

4   SPENT THE LAST TEN MINUTES ARGUING, YOUR HONOR.

5       THE COURT:  RIGHT.  THIS IS THE ISSUE ON THE --

6       MR. OLIVAR:  WHETHER MATTEL WOULD HAVE --

7       THE COURT:  THE INEVITABLE BREACH; RIGHT.

8       WE'LL TAKE THAT UP ON NUMBER EIGHT.

9       MR. OLIVAR:  THANK YOU.

10      BRIEFLY, WITH RESPECT TO NUMBER TWO, AND THEN I'LL

11  TURN IT OVER TO MR. QUINN.

12      THE COURT:  YOU HEARD THE COURT'S TENTATIVE THOUGHTS,

13  THOUGH, IN TERMS OF THIS ACTUAL MOTION, IN TERMS OF ITS

14  BREADTH.

15      MR. OLIVAR:  YES, I DID.

16      THE COURT:  I CAN CERTAINLY THINK OF -- AND I THINK

17  MR. NOLAN DID A GOOD JOB OF ILLUSTRATING A FEW EXAMPLES OF

18  WHERE, DEPENDING ON HOW THE TESTIMONY PLAYS OUT, MOTIVE MIGHT

19  COME INTO -- WHAT YOU'RE DESCRIBING HERE AS MOTIVE, MIGHT COME

20  INTO PLAY.

21      MR. OLIVAR:  I THINK THERE'S A TREMENDOUS POTENTIAL

22  FOR ABUSE HERE, AS WE'VE SEEN IN THEIR PAPERS.

23      THE COURT:  THERE IS.

24      MR. OLIVAR:  THERE MAY BE A SITUATION WHERE THE DOOR

25  IS OPENED; THERE MAY NOT BE.  I DISAGREE THAT IT'S RELEVANT TO

1    LACHES, BUT I THINK IT COULD ONLY BE RELEVANT TO LACHES.  AND

2    IF THE COURT IS GOING TO HEAR LACHES EVIDENCE, IT HAS TO BE PUT

3    VERY NARROWLY, AS YOUR HONOR SUGGESTS.

4         BUT THE TWO CASES HE CITED AS JUSTIFICATION REALLY

5    HAVE NOTHING TO SAY TO SUPPORT MGA AT ALL.  BOTH HAD TO DO WITH

6    INDIVIDUALS.  ONE DIDN'T EVEN RULE MOTIVE WAS RELEVANT; IT JUST

7    DEFERRED RULING ON A MOTION IN LIMINE.  AND THE OTHER ONE HAD

8    TO DO WITH WHETHER AN INDIVIDUAL'S WEALTH SHOULD COME IN,

9    WHETHER AN INDIVIDUAL SHOULD BE CROSS-EXAMINED ON WEALTH, WHICH

10   UNDERMINES THEIR POSITION AS TO MR. LARIAN, BECAUSE WEALTH

11   MIGHT GO TO MOTIVE AND BIAS.  THAT'S ALL THEY HAVE.  I MEAN,

12   THERE'S REALLY NO LAW WHATSOEVER THEY CAN CITE THAT SAYS MOTIVE

13   IS RELEVANT IN THIS CASE; WHY MATTEL SUED IS RELEVANT.

14        THE COURT:  VERY WELL, COUNSEL.

15        MR. OLIVAR:  ONE SMALL POINT ON THIS IS THAT THERE

16   WAS ANOTHER PIECE OF THE MOTION, WHICH I THINK THEY HAVEN'T

17   EVEN CONTESTED, WHICH IS THAT THE CONSEQUENCES TO MGA OF MATTEL

18   PREVAILING OUGHT NOT TO COME INTO EVIDENCE.  THEY'RE OUGHT NOT

19   BE ABLE TO ARGUE THAT GIRLS WILL BE DEPRIVED OF BRATZ OR THAT

20   THEY'LL HAVE TO LAY OFF EMPLOYEES IF THEY LOSE PHASE ONE.

21        AND I DON'T EVEN THINK THAT'S BEEN DISPUTED IN THE

22   OPPOSITION.  BUT IT IS PART OF THE MOTION, AND I WANT TO MAKE

23   SURE THAT YOUR HONOR'S RULING IS NOT SEEN AS AN INVITATION TO

24   BRING IN THAT SORT OF ARGUMENT.

25        THE COURT:  MR. NOLAN, YOU'RE NOT GOING TO BE TALKING

1       ABOUT THE CONSEQUENCES TO MGA IF MATTEL PREVAILS?

2              MR. NOLAN:  NO, YOUR HONOR, I'M NOT GOING TO ARGUE

3       THAT.  BUT I DO WANT TO GO BACK TO ONE THING.

4              IF THE COURT IS THINKING OF PUTTING MOTIVE INTO 1-B,

5       I BELIEVE THAT MOTIVE EVIDENCE IS IMPORTANT IF MR. LARIAN IS

6       GOING TO BE, TO USE THE LEGAL TERM, "SKEWED," WITH THIS --

7              THE COURT:  COUNSEL, I'M NOT GOING TO STRICTLY LIMIT

8       MOTIVE EVIDENCE TO 1-B.  WHAT I'M GOING TO DO IS, I'M SERIOUSLY

9       THINKING OF MOVING THE AFFIRMATIVE DEFENSES TO 1-B.

10             BUT I'M GOING TO DENY THIS MOTION IN LIMINE, ITS

11      CATEGORICAL APPROACH, WITH THE FOLLOWING STIPULATIONS:  FIRST

12      OF ALL, THE STIPULATION THAT WAS JUST REFERENCED HERE,

13      CONSEQUENCES TO MGA IF MATTEL PREVAILS, THAT'S OUT.

14             SECOND, MATTEL FULLY PRESERVES ITS RIGHTS TO OBJECT

15      TO ANY PARTICULAR PIECE OF MOTIVE EVIDENCE.  AND YOU NEED TO BE

16      MINDFUL OF LAYING -- OR WHOEVER IS DOING THE EXAMINATION OF A

17      PARTICULAR WITNESS -- YOU NEED TO BE MINDFUL OF LAYING A

18      FOUNDATION FOR BOTH THE RELEVANCY AND THE ADMISSIBILITY OF THE

19      MOTIVE EVIDENCE.

20             MR. NOLAN:  RIGHT, YOUR HONOR.  AND I APPRECIATE THE

21      COURT'S ORDER.  AND I THINK, AS ALWAYS, THE DETAILS --

22             THE COURT:  THE DEVIL IS IN THE DETAILS.  I

23      UNDERSTAND THAT.  BUT I'M NOT GOING TO GO WITH THE CATEGORICAL

24      APPROACH SUGGESTED BY MATTEL.

25             MR. NOLAN:  I APPRECIATE THAT, YOUR HONOR.

1       THANK YOU VERY MUCH.

2       THE COURT:  THE THIRD MOTION IN LIMINE.  THIS IS

3   MATTEL'S VERSION OF THE 1-A, 1-B, PHASE TWO.  MY SENSE IS,

4   APPORTIONMENT IS RELEVANT TO 1-B.  AND I'M GOING TO BE RULING

5   IN THE CONTEXT OF MGA'S MOTION IN LIMINE NUMBER SIX, ON THE

6   EXTENT TO WHICH THE ISSUE OF MGA'S ALLEGED INNOVATIONS

7   CONTRIBUTED TO THE SUCCESS OF BRATZ AND HOW AND TO WHAT EXTENT

8   MATTEL CAN RESPOND TO THAT AND HOW THE DOOR MIGHT BE OPEN FOR

9   POTENTIAL PHASE TWO EVIDENCE, DEPENDING ON HOW THAT PLAYS OUT.

10  BUT I STILL SEE THAT AS BEING STRICTLY A 1-B ISSUE AND HAVING

11  NO ROLE IN 1-A.  1-A IS SIMPLY THE EMPLOYMENT, THE CONTRACTS,

12  WHO OWNS BRATZ.  1-B IS THE COPYRIGHT, THE DAMAGES.

13      AND SO, ESSENTIALLY, I WOULD GRANT IN PART AND DENY

14  IN PART THE MOTION IN LIMINE HERE, RULING THAT APPORTIONMENT

15  AND ANY RESPONSES TO APPORTIONMENT IS GOING TO BE IN 1-B AND

16  NOT IN 1-A.  AS FOR THE REST, WE'RE GOING TO HAVE TO SEE HOW

17  THE EVIDENCE PLAYS OUT.  I'M CERTAINLY REAFFIRMING, AS I DID

18  YESTERDAY, THE PHASE DISTINCTION THAT WE HAVE.

19      IS THERE ANYTHING FURTHER FROM EITHER SIDE ON THIS,

20  OR IS THIS UNDERSTOOD?

21      MR. QUINN:  NOT FROM US, YOUR HONOR.

22      MR. NOLAN:  YOUR HONOR, LET ME JUST ASK FOR ONE

23  CLARIFICATION ON THIS.

24      THE SO-CALLED REDUCTION TO PRACTICE, THE MAKING OF

25  THE DOLL, I NEED CLARIFICATION ON THIS, IF I MIGHT, BECAUSE IT

1    DOESN'T ARISE, REALLY, UNDER ANY OTHER CIRCUMSTANCE.

2         WHEN WE TALK ABOUT THE REDUCTION TO PRACTICE ISSUE,

3    I'M NOT TALKING ABOUT IN THE PATENT SENSE, YOUR HONOR.  IT'S

4    JUST THAT WE MADE THE DOLL, THAT PAULA GARCIA AND MGA MADE THE

5    DOLL.  WHEN THEY ARGUE ABOUT ISAAC LEARN AND THE WEALTH OF

6    CONCEALMENT EVIDENCE THAT'S GOING ON -- AND I'M TRULY REACTING

7    TO THE FIVE-MINUTE PRESENTATION THAT WAS MADE IN THE OPENING

8    STATEMENT -- I NEED TO BE ABLE TO INTRODUCE INTO 1-A THAT ISAAC

9    AND MGA BELIEVED THAT IT HAD MADE A DOLL THAT WAS CRAFTED AND

10   BUILT -- IT'S NOT GOING TO TAKE A LONG TIME -- BY PAULA GARCIA,

11   THAT THE DOLL ITSELF, AND THAT IT WAS STARTING TO BE LAUNCHED.

12   AND THAT'S THE REASON WHY THERE WAS --

13        IF THEY ALLEGE IT TO BE FRAUDULENT CONCEALMENT, THAT

14   I HAVE A MOTIVE, AN EXPLANATION, FOR THIS JURY AS TO WHY THERE

15   WAS CONCEALMENT, AT WORST, OR AT BEST, AS TO WHY PEOPLE WERE

16   NOT OUT GOING, 'HEY, GUESS WHAT, WORLD?  WE HAVE THIS NEW DOLL

17   THAT WE THINK IS GOING TO BE TAKING ON BARBIE.'

18        I THINK I SHOULD, IN 1-A, BE ABLE TO COUNTER THAT

19   EVIDENCE, INDICATE THAT PAULA GARCIA AND OTHERS AT MGA WERE

20   MAKING THAT DOLL, MAKING THE SCULPTS.

21        THE COURT:  THAT EVIDENCE RELATED TO THE OWNERSHIP OF

22   BRATZ WILL BE ADMISSIBLE IN 1-A.

23        MR. NOLAN:  AND THAT WOULD INCLUDE THE DEVELOPMENT OF

24   THE SCULPTS.  THAT'S WHAT I UNDERSTAND.  THANK YOU, YOUR HONOR.

25        MR. QUINN:  SEE, IT'S THAT LAST PART.

1    I'M NOT SURE WHAT MR. NOLAN WANTS THERE.

2    THE COURT:  I'M NOT SURE EXACTLY MYSELF, COUNSEL.

3    I MEAN, THE GENERAL PRINCIPAL IS THAT EVIDENCE THAT

4    IS RELEVANT TO THE OWNERSHIP OF BRATZ IS ADMISSIBLE IN 1-A.

5    MR. NOLAN:  RIGHT.

6    THE COURT:  WITHOUT HAVING A PARTICULAR PIECE OF

7    EVIDENCE IN FRONT OF ME, I'M NOT GOING TO ISSUE AN ADVISORY

8    OPINION WITH RESPECT TO A PARTICULAR PIECE OF EVIDENCE.  IF YOU

9    WANT TO PRESENT A PARTICULAR EXHIBIT OR A PARTICULAR DEPOSITION

10   TESTIMONY, I'LL RULE ON THAT.  BUT ABSENT THAT, I'M NOT GOING

11   TO DO ANYTHING MORE IN THE ABSTRACT BEYOND WHAT I'VE STATED

12   HERE.

13   MR. NOLAN:  YOUR GUIDANCE HAS BEEN VERY HELPFUL TO

14   ME, YOUR HONOR.  THANK YOU VERY MUCH.

15   THE COURT:  ALL RIGHT.

16   MR. QUINN:  THE WAY THIS WAS PHRASED IN THE TRIAL

17   SCHEDULING ORDER WAS, WHO OWNS THE DRAWINGS?  AND THE THIN END

18   OF THE WEDGE HERE, WHERE HE'S NOW -- MR. NOLAN IS NOW SATISFIED

19   THAT THE COURT IS SEEMINGLY GOING ALONG WITH WHO OWNS BRATZ.

20   THAT'S A BIG DIFFERENCE.

21   WHO OWNS THE DRAWINGS AND THE THINGS THAT MR. BRYANT

22   CREATED WHILE HE WAS EMPLOYED BY MATTEL ARE REALLY -- SINCE THE

23   COURT HAS RULED THAT MATTEL OWNS WHAT HE CREATED WHILE HE WAS

24   WORKING AT MATTEL, THE ONLY QUESTION NOW IS, WHAT DID HE CREATE

25   WHILE HE WAS WORKING AT MATTEL?

1        AND AGAIN, THAT'S THE THIN END OF THE EDGE.

2        THE COURT:  RIGHT.  YOU'RE GOING TO CLAIM THAT WHAT

3   HE CREATED WHILE WORKING AT MATTEL GAVE RISE TO THE DOLL BRATZ.

4        MR. QUINN:  1-B.  YES.  YES.  1-B, WE WILL EXACTLY DO

5   THAT.  WE WILL SAY -- AND THERE WILL BE A FIGHT OVER THAT,

6   BECAUSE THEY SAY THEY'RE NOT SUBSTANTIALLY SIMILAR.  AND IT'S

7   NOW PRETTY SIMPLE:  WHAT DID HE CREATE?  AND IT WAS TEED UP IN

8   THE TRIAL SCHEDULING ORDER.  IT SAYS "DRAWINGS" THERE, BUT I

9   ACTUALLY SUBMIT, THERE ARE ALSO SOME SCULPTS AND SOME OTHER

10  TANGIBLE THINGS THAT ARE AT ISSUE AS TO WHETHER HE CREATED THEM

11  WHILE HE WAS STILL AT MATTEL.

12       THE COURT:  WHAT I'LL DO IN RESPONSE TO THIS MOTION

13  IS TRY TO MORE CLEARLY ARTICULATE, BASED ON WHAT WE'VE ALREADY

14  AGREED TO OVER MANY MONTHS AGO, IN TERMS OF WHAT IS GOING TO BE

15  THE SCOPE OF PHASE 1-A, SO THAT THERE'S NO CONFUSION.  AND THAT

16  WILL BE MY BENCHMARK.  AND THIS IS GOING TO BE INCORPORATED

17  INTO THE PRETRIAL CONFERENCE ORDER TOMORROW SO THAT THERE WILL

18  BE NO CONFUSION.  THAT WILL BE MY BENCHMARK IN EVALUATING ANY

19  OBJECTION MADE BY EITHER SIDE RELATED TO RELEVANCY.

20       MR. QUINN:  I THINK THE COURT APPRECIATES OUR CONCERN

21  THAT 1-A WILL BECOME INFECTED WITH WHAT THEY WANT TO OFFER

22  ABOUT ALL OF THEIR EVIDENCE ABOUT WHAT THEY DID TO CREATE THIS

23  PRODUCT.  AND ANOTHER WORD FOR THAT IS THEIR SIDE OF THE

24  APPORTIONMENT.

25       THE COURT:  RIGHT.  BUT TO THE EXTENT THAT

1    EVIDENCE -- AND TO A LARGE EXTENT, MR. NOLAN IS GOING TO BE

2    RESPONDING.  THIS IS YOUR CASE.  YOU'RE GOING FIRST.  SO TO A

3    LARGE EXTENT, YOU CONTROL HOW WIDE THIS DOOR SWINGS OPEN,

4    MR. QUINN.  AND TO THE EXTENT THAT YOU MAKE ARGUMENTS ABOUT

5    FRAUDULENT CONCEALMENT WHICH GO TO THE ISSUE OF WHAT MR. LARIAN

6    THOUGHT OR WHY HE THOUGHT IT, I'M GOING TO GIVE LEAVE TO

7    MR. NOLAN TO RESPOND TO THAT.  I'M NOT GOING TO ALLOW YOU TO

8    INTRODUCE EVIDENCE AND MAKE ARGUMENTS TO WHICH THE OTHER SIDE

9    CAN'T RESPOND, AND VICE VERSA.

10        MR. QUINN:  I WOULDN'T EXPECT THE COURT WOULD

11   ENTERTAIN THAT.

12        THE COURT:  ALL RIGHT.

13        MR. QUINN:  AND THAT'S NOT WHAT I'M ASKING.

14        BUT I DON'T UNDERSTAND WHY -- IF THE ISSUE IN 1-A IS,

15   WHO OWNS THE DRAWINGS THAT MR. BRYANT CREATED, IF THAT'S THE

16   ISSUE, WHY ARE WE EVER TALKING ABOUT THEIR DEVELOPMENT OF A

17   DOLL IN 1-A?

18        THE COURT:  WE MAY NOT BE.

19        MR. NOLAN:  YOUR HONOR, LET ME JUST FINISH OFF ON

20   THIS.

21        WE MAY NOT BE.  EXCEPT LET'S JUST FOLLOW THIS TRAIN

22   ON THIS FRAUDULENT CONCEALMENT, JUST FOR A MOMENT.  THIS IS MY

23   PROFFER.

24        THEY'RE GOING TO SAY -- AND YOU'VE HEARD IT IN THE

25   OPENING STATEMENT ALREADY -- THAT ISAAC LARIAN CONCEALED THIS

1    THING; DESCRIPTION:  A MASSIVE CONSPIRACY.

2        YOUR HONOR, THE EVIDENCE WILL BE THAT THE DOLL, THE

3    DOLL, IS PRODUCED TO THE TOY FAIRS; THAT WE APPROACHED MATTEL

4    AND EVEN ASKED MATTEL WHETHER OR NOT THEY WANTED TO LICENSE IT.

5    WE HAVE TO PROVE THAT THE DOLL WAS MADE BEFORE THE TOY FAIRS.

6        THEY REALLY SHOULD NOT BE ABLE TO HAVE IT BOTH WAYS.

7        I NEED TO EXPLAIN ISAAC LARIAN'S STATE OF MIND ON

8    CONCEALMENT.  AND I'M NOT GOING TO ASK ABOUT SIMILARITIES OR

9    ANYTHING.

10        THE COURT:  MR. NOLAN, PLEASE BE ASSURED, I AM NOT

11    GOING TO PREVENT YOU FROM RESPONDING TO ANYTHING THAT MATTEL

12    PLACES AT ISSUE IN THIS TRIAL.

13        IF ISAAC LARIAN'S STATE OF MIND IS PLACED IN ISSUE BY

14    THE PLAINTIFF IN 1-A, YOU'RE GOING TO BE ABLE TO RESPOND WITH

15    EVIDENCE OF WHAT ISAAC LARIAN'S STATE OF MIND WAS IN 1-A.

16        MR. NOLAN:  THANK YOU, YOUR HONOR.  I UNDERSTAND.

17        THE COURT:  MOTION IN LIMINE NUMBER FOUR, AS I

18    INDICATED, I'M GOING TO DENY.  THE EQUITABLE DEFENSES ARE NOT

19    GOING TO BE EXCLUDED FROM THE TRIAL.

20        MR. QUINN:  IN TERMS OF THE DETAILS THERE, GETTING

21    BACK TO THE DEVIL, WHAT THEY WANT TO DO AND PUT ON IN 1-A IS

22    THAT WE DIDN'T SUE UNTIL BARBIE'S HOUSE WAS ON FIRE; THAT WE

23    DELAYED; THAT BRATZ WAS EATING UP BARBIE IN THE MARKETPLACE.

24        I DON'T UNDERSTAND HOW THAT'S RELEVANT TO ANY

25    AFFIRMATIVE DEFENSE, EVEN.

1        AND LET'S TALK ABOUT OUR DELAY.  WE SUED WHEN WE

2    SUED.  OKAY.  WE'RE EITHER GOING TO SURVIVE THE STATUTE OF

3    LIMITATIONS OR WE'RE NOT.  BY HYPOTHESIS, WE SURVIVED THAT.

4        THE COURT:  ALL RIGHT.

5        MR. QUINN:  THEN WE SUED WHEN WE SUED.  SO IN TERMS

6    OF OUR DELAY, WHAT DOES IT MATTER?  WE SUED WHEN WE SUED.

7    THEIR THEORY, THEN --

8        THE COURT:  YOU'RE COLLAPSING, YOU'RE CONFLATING, THE

9    STATUTE OF LIMITATIONS ISSUE WITH LACHES, AS IF THEY'RE ONE AND

10   THE SAME IN TERMS OF TIMING.  AND I'M NOT SO SURE THAT'S --

11       MR. QUINN:  NO.  I DON'T THINK THEY'RE ONE AND THE

12   SAME.  BUT I THINK THEY ASSUME THERE'S A COMMON ELEMENT OF

13   DELAY.  LACHES REQUIRES A CERTAIN AMOUNT OF UNREASONABLE DELAY.

14       THE COURT:  LACHES, YOU'RE CORRECT, REQUIRES

15   UNREASONABLE DELAY.

16       SO THE QUESTION BECOMES WHETHER OR NOT THE DELAY WAS

17   OR WAS NOT UNREASONABLE AND WHETHER THERE WAS PREJUDICE TO THE

18   OTHER SIDE.  BOTH ELEMENTS.  NOT JUST ONE.

19       MR. QUINN:  I AGREE, YOUR HONOR.  I AGREE COMPLETELY.

20       AND I THINK YESTERDAY I SAID, AS TO THAT OTHER PART,

21   OF WHETHER THERE WAS SOME PREJUDICE TO THE OTHER SIDE, WHETHER

22   THERE WAS SOME DETRIMENT.  WE'LL STIPULATE THEY SPENT MILLIONS

23   OF DOLLARS IN DEVELOPING BRATZ.  AGAIN, I DON'T THINK THAT

24   SHOULD BECOME THE VEHICLE BY WHICH WE INSERT INTO 1-A THE WHOLE

25   ISSUE OF EVERYTHING THEY DID; APPORTIONMENT; EVERYTHING THEY

1    DID TO DEVELOP THE BRAND.

2        THAT'S NOT REALLY LACHES.

3        THE COURT:  WHAT ABOUT THE COURT'S PROPOSAL OF MOVING

4    THE AFFIRMATIVE DEFENSES TO 1-B?

5        MR. QUINN:  I THINK THAT WORKS, YOUR HONOR, BECAUSE I

6    DON'T KNOW WHAT'S FAIR GAME IN --

7        THE COURT:  EXCEPT TO THE EXTENT, MR. NOLAN, THAT

8    IT'S INTRODUCED AND THE DOOR IS OPENED IN 1-A.

9        MR. QUINN:  YEAH.  I MEAN, OTHERWISE, I DON'T KNOW

10   WHAT IS GOING TO BE IN OPENING STATEMENTS IN 1-A.

11       I REALLY DON'T UNDERSTAND, YOUR HONOR -- I DON'T

12   UNDERSTAND WHY THE FACT THAT WE DIDN'T SUE UNTIL BRATZ STARTED

13   TO TAKE SIGNIFICANT MARKET SHARE FROM BARBIE -- WHY THAT IS

14   RELEVANT TO LACHES, EVEN.

15       LET'S ASSUME BY HYPOTHESIS THAT WE DELAYED; LET'S

16   ASSUME BY HYPOTHESIS THAT DURING THAT DELAY, THEY SPENT

17   MILLIONS OF DOLLARS.  PUT THOSE TOGETHER.  THERE'S A LACHES

18   DEFENSE.

19       THE COURT:  NOT NECESSARILY.  BECAUSE IF YOUR DELAY

20   WAS NOT UNREASONABLE, IF THERE WAS GOOD REASON FOR YOUR DELAY,

21   EVEN IF THERE WAS PREJUDICE, THAT MAY NOT BE SUFFICIENT TO

22   ESTABLISH A LACHES DEFENSE.  THEY BEAR THE BURDEN OF SHOWING

23   THAT YOUR DELAY WAS UNREASONABLE.  AND THAT'S WHAT THIS

24   EVIDENCE, FROM THEIR PERSPECTIVE, TENDS TO SHOW.

25       MR. QUINN:  I'M TRYING TO SEE IF I CAN TRACK ON THE

1   THEORY HERE NOW THAT WE DELIBERATELY DELAYED WHEN THIS PRODUCT

2   CAME OUT UNTIL IT HAD DONE US SOME REAL DAMAGE AND THEN DECIDED

3   TO SUE.

4        THE COURT:  RIGHT.

5        MR. QUINN:  WHAT WE'RE GOING TO SEE -- AND WHY I'M

6   CONCERNED HERE -- THERE ARE DOCUMENTS -- THEY ATTRIBUTE THEM TO

7   US; IT'S ACTUALLY AN OUTSIDE MARKETING CONSULTANT -- THAT SAY,

8   'KILL BRATZ.'

9        THE COURT KNOWS ABOUT THE 'HOUSE-ON-FIRE' DOCUMENTS;

10  'BRAND IN CRISIS.'  MY CONCERN IS THAT WE'RE GOING TO SEE ALL

11  THAT AND THAT, THEN, JUST BECOMES A SIDESHOW AND WE'RE GOING TO

12  START SEEING IT IN OPENING STATEMENTS IN 1-A.

13       THE COURT:  I DON'T THINK YOU'RE GOING TO SEE THAT IN

14  OPENING STATEMENTS, NOT IF THE COURT MOVES THE LACHES DEFENSES

15  AND THE AFFIRMATIVE DEFENSES TO 1-B, BECAUSE THEN THE ONLY WAY

16  THAT THESE BECOME RELEVANT IN 1-A IS IF YOU OPEN THE DOOR TO

17  THEM.

18       MR. QUINN:  ALL RIGHT.

19       JUST ONE OTHER SPECIFIC THING.  THERE'S A LOT OF

20  THINGS FLOATING AROUND.  MOONLIGHTING.

21       THE COURT:  WE'RE GOING TO GET TO THAT, COUNSEL.

22  THAT'S THE SUBJECT OF MOTION IN LIMINE NUMBER FIVE.

23       MR. QUINN:  SO A SEPARATE MOTION ON THAT?

24       THE COURT:  SIX.  YES.

25       MR. QUINN:  SEE, I STILL DON'T KNOW THEM, YOUR HONOR,

1    BUT I'M GOING TO LEARN THEM.

2         MR. NOLAN:  YOUR HONOR, WE'RE RUNNING OUT OF MOTIONS

3    IN LIMINE, SO HE DOESN'T HAVE TO MASTER THAT BY THE END OF THE

4    DAY.

5         YOUR HONOR, I JUST WANT TO GET OFF THIS ONE ISSUE.

6         THE COURT:  SO DO I.

7         MR. NOLAN:  THE REFERENCE TO 'KILL BRATZ.'  IT REALLY

8    DOES GO TO THE POINT ABOUT HOW FAR THEY OPEN UP THE DOOR WITH

9    THIS FRAUDULENT CONCEALMENT.

10        THE COURT:  YOU'RE NOT GOING TO DO IT IN YOUR OPENING

11   STATEMENT, COUNSEL.

12        MR. NOLAN:  I UNDERSTAND THAT.

13        UNLESS, IN HIS OPENING STATEMENT, HE'S TALKING ABOUT

14   A MASSIVE CONSPIRACY AND A FRAUDULENT CONCEALMENT.  IF HE OPENS

15   THE DOOR IN HIS OPENING STATEMENT, I THINK I SHOULD

16   RESPECTFULLY BE ABLE TO WALK THROUGH THAT DOOR AND EXPLAIN WHY

17   ISAAC LARIAN WAS TAKING SOME OF THE POSITIONS THAT THEY CONTEND

18   TO BE FRAUDULENT CONCEALMENT.

19        THE COURT:  WHAT WE'RE GOING TO DO IS, WE'RE GOING TO

20   HAVE A BREAK BETWEEN THE OPENING STATEMENTS, AND WE CAN REVISIT

21   THAT QUESTION AT THAT TIME.

22        ALL RIGHT?

23        MR. NOLAN:  THAT'S PERFECT.  THANK YOU, YOUR HONOR.

24        MAYBE WE COULD EXCHANGE OPENING STATEMENTS; THAT

25   WOULD HELP.

1       (LAUGHTER.)

2       THE COURT:  48 HOURS IN ADVANCE; RIGHT?

3       MR. QUINN, HOW LONG DO YOU THINK YOUR OPENING

4    STATEMENT IS GOING TO BE?

5       MR. QUINN:  I THINK MY OPENING STATEMENT, YOUR HONOR,

6    DEPENDS, IN PART, ON THE OUTCOME OF THESE RULINGS.

7       I'VE BEEN THINKING MAYBE AN HOUR AND A HALF.

8       THE COURT:  ALL RIGHT.

9       SO WE'LL START; THE COURT WILL HAVE ABOUT 20 MINUTES

10   WORTH OF JURY INSTRUCTIONS TO THE JURY, PRELIMINARY

11   INSTRUCTIONS.  WE'LL THEN HAVE AN HOUR-AND-A-HALF OPENING

12   STATEMENT.  WE'LL TAKE OUR MORNING RECESS.  YOU CAN RAISE THE

13   ISSUE, THIS PARTICULAR ISSUE, AT THAT TIME.  AND THEN WE'LL

14   HAVE AN OPENING STATEMENT BY MR. NOLAN.

15      MR. NOLAN:  AND ANY POSSIBLE MOTION FOR MISTRIAL.

16      MR. QUINN:  BUT I DO WANT TO BE CLEAR, I THINK THE

17   COURT'S IDEA OF MOVING THE AFFIRMATIVE DEFENSES INTO 1-B SOLVES

18   A LOT OF THESE PROBLEMS.

19      THE COURT:  SOME.  NOT ALL.

20      ALL RIGHT.  NUMBER FIVE:  EXCLUDING EVIDENCE OF OTHER

21   LAWSUITS.

22      I ESSENTIALLY DEALT WITH THIS ON THE SIMILAR MOTIONS

23   BROUGHT BY MGA.  MY SENSE HERE IS, SIMPLY BECAUSE IT'S ANOTHER

24   LAWSUIT, IT DOES NOT EXCLUDE THE EVIDENCE.  HOWEVER, THERE ARE

25   ANY NUMBER OF OBJECTIONS TO PARTICULAR PORTIONS FROM THESE

1    LAWSUITS THAT ARE OBJECTIONABLE.  AGAIN, I THINK THIS CATEGORY

2    OF EXCLUDING ALL EVIDENCE SIMPLY BECAUSE IT'S FROM ANOTHER

3    LAWSUIT IS TOO BROAD.

4         IF YOU TAKE A LOOK AT THE MOTION ITSELF, ON PAGE 2

5    AND 3, THERE ARE 11 BULLET POINTS THAT HAVE BEEN IDENTIFIED IN

6    THE MOTION AS THE SUBJECT OF THE REQUEST FOR EXCLUSION.  MY

7    TENTATIVE WOULD BE TO EXCLUDE NUMBERS ONE THROUGH FOUR AND

8    NUMBER TEN; NAMELY, "MATTEL ALLEGEDLY ENGAGES IN SCORCHED EARTH

9    LITIGATION OR IS LITIGIOUS"; "MATTEL ALLEGEDLY MISTREATS ITS

10   EMPLOYEES"; "MATTEL PRODUCTS CONTAIN LEAD"; "MATTEL ALLEGEDLY

11   ENGAGED IN SECURITIES FRAUD OR OTHERWISE VIOLATED SECURITIES

12   LOGS:  AND FINALLY, NUMBER TEN, "MATTEL ALLEGEDLY AGGRESSIVELY

13   DEFENDS AGAINST NEW ENTRANTS INTO THE FASHION DOLL BUSINESS BY

14   SUING THEM."

15        THESE ARE ALL VERY BROAD-BASED, BROAD-BRUSHED

16   ALLEGATIONS DESIGNED, FROM THE COURT'S PERSPECTIVE, FROM WHAT

17   I'M SEEING HERE, TO DIRTY UP MATTEL.  I'M NOT SAYING THAT

18   YOU'RE INTENDING TO DO ANY OF THESE THINGS, BUT THAT'S JUST

19   BASED ON WHAT'S BEING ALLEGED HERE.

20        TO THE CONTRARY, EVIDENCE THAT "MATTEL ALLEGEDLY

21   CONDUCTED SURVEILLANCE OF ISAAC LARIAN OR HIS FAMILY"; I COULD

22   SEE HOW THAT MIGHT BE ADMISSIBLE, DEPENDING ON THE FOUNDATION

23   LAID FOR IT:

24        "MATTEL GRILLED OR INTERROGATED EMPLOYEES CONCERNING

25   BRATZ OR LARIAN," HOWEVER YOU PHRASED IT.  I COULD SEE A BASIS

1    FOR THAT BEING ADMITTED, DEPENDING ON WHETHER OR NOT THE

2    APPROPRIATE FOUNDATION WAS LAID.

3        "MATTEL INTIMIDATED OR THREATENED EMPLOYEES NOT TO

4    DISCLOSE INFORMATION CONCERNING MATTEL OR ITS PROPRIETARY

5    INFORMATION."  THAT COULD BE RELEVANT, AGAIN DEPENDING ON THE

6    FOUNDATION LEADING UP TO IT.

7        "MATTEL ALLEGEDLY COERCED ITS EMPLOYEES TO ACCEPT

8    RESTRICTIVE COVENANTS AND NONCOMPETE CLAUSES."  THAT MAY OR MAY

9    NOT BE RELEVANT TO ONE OF THE AFFIRMATIVE DEFENSES.

10       "MATTEL ALLEGEDLY CONTACTED POTENTIAL WITNESS UNDER

11   FALSE PRETENSES TO INTERROGATE THEM."  WE'RE ALL FAMILIAR WITH

12   WHAT THAT ALLEGATION IS IN REFERENCE TO.  WHETHER OR NOT IT'S

13   TRUE OR NOT REMAINS TO BE SEEN.

14       "MATTEL ENGAGED IN OTHER ALLEGED CONDUCT RELEVANT TO

15   DEFENSES, WHICH DEFENDANTS HAVE ABANDONED OR WHICH WERE

16   DISMISSED BY THE COURT."  I'M NOT REALLY SURE WHAT THAT MEANS.

17       IN ANY EVENT, THAT'S MY TENTATIVE TAKE, READING

18   THROUGH THE MOTIONS AND REFLECTING ON THE PARTICULAR ITEMS.

19       AS TO THOSE ITEMS THAT ARE BROAD-BRUSHED, I AGREE

20   WITH YOU.  AS TO THE ITEMS THAT SPECIFICALLY RELATE TO THIS

21   CASE, I WOULD DECLINE TO MAKE A RULING AS A MATTER OF

22   CATEGORICAL EXCLUSION AT THIS POINT, IN FAVOR OF CONSIDERING AN

23   OBJECTION AT THE TIME THAT SUCH EVIDENCE WAS ATTEMPTED TO BE

24   INTRODUCED.

25       BUT THAT'S MY INITIAL THOUGHT, COUNSEL.

1          MR. OLIVAR:  I THINK YOUR HONOR'S RULING IS WHAT

2    WE'RE LOOKING FOR ON THIS MOTION; THAT WHAT THEY ARGUE IN THEIR

3    OPPOSITION, THAT MATTEL HAD A GRAND SCHEME FOR DEALING WITH

4    THREATS TO BARBIE'S MARKET POSITION BY WAY OF INTIMIDATION AND

5    SCORCHED EARTH LITIGATION, THAT THEORY IS NOT COMING IN AND

6    THAT'S NOT GOING TO BE AN ARGUMENT IN OPENING ARGUMENTS OR

7    OTHERWISE.

8          I DO TAKE YOUR HONOR'S POINT THAT THERE MAY BE SOME

9    CIRCUMSTANCES WHERE DOORS MAY BE OPENED OR SOME OF THESE

10   PARTICULAR INSTANCES MAY BE RELEVANT IN CROSS-EXAMINATION OR

11   IMPEACHMENT, BUT WHAT WE'RE LOOKING FOR HERE IS THE ATTEMPT TO

12   SMEAR MATTEL WITH THE ARGUMENT AND THIS IS WHAT IT DOES TO

13   DEFEND BARBIE; IT'S A BAD ACTOR AND IS VERY LITIGIOUS.  I

14   APPRECIATE YOUR HONOR'S RULING THAT THAT'S NOT COMING IN.

15         THE ONE ARGUMENT MR. NOLAN MADE ON THIS MOTION

16   EARLIER, WHEN HE WAS STANDING UP, ABOUT MR. LARIAN'S GOOD

17   FAITH, I DON'T THINK A GOOD FAITH DEFENSE -- I THINK YOUR HONOR

18   HAS INCORPORATED THIS IN THE RULING -- DOES NOT OPEN THE DOOR

19   BECAUSE SOMEONE IS ALLEGING GOOD FAITH.  IT DOESN'T SAY, 'I WAS

20   IN GOOD FAITH BECAUSE I NEEDED TO BE CAUTIOUS.  I NEEDED TO BE

21   CAUTIOUS BECAUSE THE OTHER SIDE HAD ALL OF THESE HORRIBLE BAD

22   ACTS.'

23         THAT'S NOT A VEHICLE TO GET THIS THEORY IN, EITHER.

24         SO I DO TAKE THE POINT THAT THERE MIGHT BE PARTICULAR

25   EVIDENCE, AS THE TRIAL PROGRESSES, THAT MIGHT COME WITHIN SOME

1       OF THE SUBHEADINGS YOUR HONOR DIDN'T INCLUDE IN THE RULING.

2           THE COURT:  THANK YOU, COUNSEL.

3           MR. NOLAN.

4           MR. NOLAN:  WE ACCEPT THE COURT'S GUIDANCE IN THIS

5       CASE, AND WE'LL APPLY IT.

6           I DO JUST WANT TO ADDRESS, IN A LIMITED FASHION, THE

7       LAST POINT THAT YOU EXCLUDED, WHICH IS, "MATTEL ALLEGEDLY

8       AGGRESSIVELY DEFENDS AGAINST NEW ENTRANCE INTO THE FASHION DOLL

9       BUSINESS BY SUING THEM."

10          I'M NOT GOING TO DO THAT.

11          HOWEVER, YOUR HONOR, MR. LARIAN'S STATE OF MIND, IN

12      TERMS OF WHAT HE WAS THINKING AND DOING, AND TO EXPLAIN SOME OF

13      HIS ACTIONS BASED ON HIS EXPERIENCE AND HIS KNOWLEDGE -- WE'RE

14      NOT GOING TO BE REFERRING TO LAWSUITS OR SOMETHING ELSE LIKE

15      THAT.  BUT MR. LARIAN HAS TESTIFIED THAT HE WAS WORRIED THAT

16      THERE WOULD BE A TARGET ON HIS BACK IF HE INTRODUCED A FASHION

17      DOLL.  IT WOULD BE FROM MR. LARIAN.  WE'RE NOT GOING TO BRING

18      IN ANY OTHER EVIDENCE AT THAT POINT.

19          THE COURT:  BUT LET ME STOP YOU THERE.  THAT DOESN'T

20      MAKE SENSE TO THE COURT.  HE DID INTRODUCE A FASHION DOLL.

21          MR. NOLAN:  RIGHT.  BUT IT GOES TO THE FRAUDULENT

22      CONCEALMENT ISSUE.

23          THE COURT:  MR. LARIAN HAD NO PROBLEM INTRODUCING THE

24      FASHION DOLL.  NOW, HE MAY NOT HAVE WANTED TO HAVE IT

25      IDENTIFIED WITH BRYANT, BUT HE CERTAINLY HAD NO PROBLEM

1      INTRODUCING A FASHION DOLL.  THIS IS A BROADLY WORDED --

2          MR. NOLAN:  THIS IS GOING TO SOMETHING ELSE.

3          THE COURT:  -- DEFENSE AGAINST ANY NEW ENTRANTS INTO

4      THE FASHION DOLL BUSINESS BY SUING THEM.

5          MR. LARIAN ENTERED THE FASHION DOLL BUSINESS.

6          MR. NOLAN:  YOUR HONOR, I ACCEPT THAT, THAT

7      EXPLANATION.  IN FACT, I ACTUALLY THINK THE BRATZ ENTRANCE INTO

8      THE MARKET PLACE HAS PREVENTED ANTI-TRUST CLAIMS TO BE BROUGHT

9      AGAINST BARBIE, BECAUSE THE MARKET ENTERED --

10         THE COURT:  NOW WE'RE GETTING FAR AFIELD.

11         MR. NOLAN:  NO, NO.  I'M NOT GOING TO GET INTO THAT.

12     I'VE SAID ENOUGH.  I UNDERSTAND YOUR POINT.

13         THE COURT:  VERY WELL.  THANK YOU, COUNSEL.

14     THAT WILL BE THE COURT'S RULING ON THAT ONE.

15         NOW WE'RE AT MOONLIGHTING, MR. QUINN, IF YOU WOULD

16     LIKE TO BE HEARD ON THIS.

17         MR. QUINN:  NO.  ACTUALLY, MR. ZELLER WOULD,

18     YOUR HONOR.

19         THE COURT:  MR. ZELLER.

20         MOTION IN LIMINE NUMBER SIX, ACTIONS AGAINST OTHER --

21     OR AS IN THIS CASE, LACK OF ACTIONS AGAINST OTHER EMPLOYEES.

22         MR. ZELLER:  AND WE WERE DEALING A LITTLE BIT WITH A

23     MOVING TARGET HERE, TOO, IN TERMS OF SOME OF THE ISSUES.  SO,

24     PERHAPS, IF I PARSE IT OUT MAYBE A LITTLE BIT DIFFERENTLY THAN

25     THE WAY -- I THINK THE SAME KINDS OF ISSUES ARE STILL

1    APPLICABLE AS THEY'VE BEEN BRIEFED.  BUT I THINK WE MAY BE KIND

2    OF AT A CONCLUSION THAT'S A LITTLE DIFFERENT FROM HOW THINGS

3    GOT PARSED OUT IN THE BRIEFS, PARTLY BECAUSE, OF COURSE, AS THE

4    COURT IS AWARE, WE HAVE BEEN TAKING DEPOSITION DISCOVERY FROM

5    PETER MARLOW, ANA CABRERA, MORALES, AND SALAZAR.

6         AND AS WE'VE TALKED ABOUT BEFORE, THERE ARE CERTAINLY

7    OTHER ISSUES THAT WE'RE GOING TO HAVE TO ADDRESS CONCERNING THE

8    ASSERTION OF THE FIFTH AMENDMENT AND THE LIKE, BUT AT THE END

9    OF THE DAY, CONSIDERING THAT WORK WAS GOING ON SIMULTANEOUS,

10   BACK IN 2000 -- AT LEAST THAT'S WHEN IT STARTED -- IT'S

11   CERTAINLY GOING TO HAVE A BEARING ON MGA'S STATE OF MIND.

12        I GUESS I WOULD PHRASE THIS SO-CALLED MOONLIGHTING

13   ISSUE -- WHICH, I THINK YOU'VE HEARD ME SAY BEFORE, IS A

14   SERIOUS MISNOMER, BECAUSE THEY USE IT, BASICALLY, AS A BUCKET

15   FOR ANYTHING THAT'S GOING ON THAT'S NOT MATTEL, AND, IN FACT,

16   SOMETIMES EVEN THINGS THAT ARE INSIDE MATTEL.  JUST BY WAY OF

17   BACKGROUND, THEY USED THE TERM "G JOB" TO SOMEHOW PRETEND THAT

18   THAT'S WORK FOR A COMPETITOR.  IN FACT, THAT IS AN AUTHORIZED

19   MATTEL PROJECT THAT'S BEING DONE WITH THE COMPANY'S APPROVAL,

20   AND THE COMPANY CHOOSES TO GIVE IT AWAY, TO CHARITY, FOR AN

21   AUCTION, OR WHATEVER THE CASE MAY BE.

22        TO OBVIOUSLY EQUATE THAT, AS MGA ATTEMPTS TO DO, WITH

23   WHAT MR. BRYANT DID, WHICH WAS DEVELOPING A FASHION DOLL TO

24   COMPETE WITH MATTEL WHILE HE WAS WITHIN MATTEL'S DESIGN CENTER,

25   I THINK SPEAKS FOR ITSELF.

1    SO THERE ARE DIFFERENT KINDS OF PARSING ISSUES THAT

2  ARE INVOLVED IN THAT.  THE "G JOBS," I THINK, FRANKLY, ARE JUST

3  SIMPLY IRRELEVANT TO THIS CASE.

4    TO THE EXTENT THAT WE'RE TALKING ABOUT PEOPLE WHO ARE

5  WORKING OUTSIDE OF MATTEL, THE ONES WHO I DO THINK ARE

6  RELEVANT, AND THE ONES WHO I DO THINK SHOULD BE THE SUBJECT OF

7  EVIDENCE AND TESTIMONY, ARE THOSE WHO WERE DOING IT FOR MGA.

8  AND THE REASON IS THAT THAT'S RELEVANT TO MGA'S KNOWLEDGE, OR

9  AT LEAST THE INFERENCE OF KNOWLEDGE.  BECAUSE CERTAINLY, IT'S

10  GOING TO BE HARDER AND HARDER FOR MGA TO SAY, 'WELL, OKAY, IT

11  TURNS OUT WE HAD MORE THAN ONE PERSON; WE ENDED UP HAVING FOUR

12  OR FIVE THEN-CURRENT MATTEL EMPLOYEES WORKING ON BRATZ, BUT WE

13  HAD NO IDEA.'  I THINK THAT'S ONE OF THOSE INSTANCES WHERE THE

14  SUM IS GREATER THAN THE WHOLE -- WHERE THE WHOLE IS GREATER

15  THAN THE INDIVIDUAL PIECES, AND I THINK THAT'S A VERY POWERFUL

16  PIECE OF EVIDENCE.

17    WE'LL HAVE MORE EVIDENCE, SURELY, TO SHOW MGA'S

18  KNOWLEDGE AND INTENT AND THE LIKE, BUT, OF COURSE, AS THE COURT

19  KNOWS, THESE ARE ELEMENTS CERTAIN OF OUR CLAIMS IN PHASE 1-A.

20    THE COURT:  JUST A SECOND.

21    THIS DOVETAILS WITH MOTION IN LIMINE NUMBER SIX.

22    MR. ZELLER:  I GUESS THE WAY I WOULD PUT IT IS, WE

23  OBVIOUSLY -- THERE ARE A NUMBER OF OTHER PEOPLE WHO THEY WANT

24  TO ATTEMPT TO BRING INTO THIS AND KIND OF FALSELY EQUATE, WE

25  WILL SAY, WITHOUT -- PERHAPS THAT WAS TOO STRONG -- WE'LL SAY

1    WITHOUT FOUNDATION ARE ATTEMPTING TO EQUATE AS BEING THE SAME

2    CONDUCT THAT MR. BRYANT ENGAGED IN AND SAYING, 'WELL, IT'S

3    RELEVANT TO OUR DEFENSES.'  BUT THE KINDS OF INSTANCES THAT

4    THEY'RE TRYING TO BRING IN IS, SAY, JONI PRATTE, WHO WORKED ON

5    A VOLLEYBALL AND BASKETBALL BOOK FOR HER DAUGHTER'S HIGH

6    SCHOOL, AND DISCLOSED IT TO MATTEL.  THAT WOULD SEEM TO BE A

7    CLASSIC.

8         THE COURT:  I TEND TO AGREE THAT JUST THE BROAD-BRUSH

9    'ALL MOONLIGHTING COMES IN' IS OVERBROAD.

10        MR. ZELLER:  RIGHT.

11        THE COURT:  I ALSO TEND TO AGREE WITH THE POINT MADE

12   BY MGA IN THEIR BRIEF THAT YOUR REQUEST TO EXCLUDE ALL

13   MOONLIGHTING IS TOO BROAD.

14        MR. ZELLER:  AND I THINK I AGREED WITH THAT AT THE

15   BEGINNING.

16        THE COURT:  FAIR ENOUGH.

17        TO THE EXTENT THAT PARTICULAR EMPLOYEES AT MATTEL,

18   WHETHER THEY BE DESIGNERS LIKE CARTER BRYANT HIMSELF OR OTHER

19   PEOPLE WHERE THE ANALOGY IS FITTING, WHERE THE PROPER

20   FOUNDATION CAN BE LAID, THE COURT CAN SEE THE RELEVANCE TO,

21   PERHAPS, SOME OF THE AFFIRMATIVE DEFENSES THAT HAVE BEEN

22   ARTICULATED, AGAIN ASSUMING THAT THE PROPER FOUNDATION MIGHT BE

23   LAID.

24        AND THAT KIND OF NARROWING OF WHAT IS PROPER

25   MOONLIGHTING EVIDENCE, AS OPPOSED TO SIMPLY, ON THE ONE HAND

1     EXCLUDING IT, AS YOU'RE SUGGESTING, OR ON THE OTHER HAND, JUST

2     SIMPLY ALLOWING ALL MOONLIGHTING EVIDENCE IN, AS MGA IS

3     SUGGESTING TO ME, IS A MORE APPROPRIATE APPROACH ON THIS.

4          MR. ZELLER:  AND I ABSOLUTELY AGREE.  THAT'S WHERE I

5     STARTED, YOUR HONOR.  I DO THINK THAT BOTH OF THE PARTIES

6     REALLY HAD IT WRONG IN TERMS OF HOW THEY INITIALLY POSITIONED

7     THIS PARTICULAR ISSUE.

8          BUT ULTIMATELY, YOU KNOW, THE ISSUE IS WHETHER OR NOT

9     THERE WERE OTHER PEOPLE WORKING FOR A COMPETITOR.  I MEAN,

10    THAT'S REALLY THE LINE THAT WE'RE TALKING ABOUT.  THEN THERE

11    ARE A BUNCH OF OTHER CATEGORIES.  THEY INVOLVE PEOPLE WHO HAD

12    PERMISSION FROM MATTEL.  THIS, AGAIN, ALMOST GETS US INTO, YOU

13    KNOW, MR. QUINN'S INFAMOUS CLINT EASTWOOD'S "MAKE MY DAY" LINE,

14    WHICH IS, IF THEY WANT TO TALK ABOUT ALL OF THE PEOPLE WHO GOT

15    PERMISSION FROM MATTEL TO DO THAT KIND OF NONCOMPETITIVE WORK,

16    THAT'S GOING TO HURT THEM.  SO MAYBE WE DON'T WANT TO ACTUALLY

17    HAVE ALL OF THIS EXCLUDED.

18         BUT IT DOES STRIKE ME ULTIMATELY AS BEING, FRANKLY, A

19    WASTE OF TIME AND DOES CREATE THE POTENTIAL FOR CONFUSION,

20    WHICH IS WHY WE DO THINK THAT, CERTAINLY, MATTERS THAT ARE NOT

21    COMPETITIVE, THAT HAVE MATTEL'S PERMISSION AND THE LIKE -- THAT

22    SEEMS TO BE CLASSIC KIND OF 403 MATERIAL.  NOT BECAUSE IT'S

23    UNDULY PREJUDICIAL, BUT JUST SIMPLY BECAUSE IT'S A WASTE OF

24    TIME AND DOESN'T REALLY GET US VERY FAR.

25         THE COURT:  THANK YOU.

1        MR. NOLAN:  YOUR HONOR, I DON'T THINK ON THIS ONE WE

2   CAN JUST, WITH A BROAD BRUSH, PUT IT OVER INTO 1-B.  LET ME

3   TELL YOU THAT IF IN 1-A, WE'RE ALSO TRYING THE AIDING AND

4   ABETTING OF A FIDUCIARY DUTY -- ASSUMING THAT A FIDUCIARY DUTY

5   EXISTS -- AND WE'RE TRYING AIDING AND ABETTING OR THE

6   INTENTIONAL INTERFERENCE WITH A CONTRACT, BOTH HAVE THE

7   REQUISITE MENTAL INTENT REQUIREMENT ON THE PART OF MGA.  THE

8   EVIDENCE THAT EMPLOYEES AT MATTEL WOULD MOONLIGHT IS

9   PARTICULARLY RELEVANT TO OUR BELIEF, OR OUR UNDERSTANDING,

10  OF -- FOR EXAMPLE, THEY MAKE A POINT -- AND IT'S GOING TO BE IN

11  THE EVIDENCE, BECAUSE I THINK MR. QUINN ALSO REFERRED TO

12  THIS -- THAT THERE WAS A TEST PROJECT THAT CARTER BRYANT

13  ENGAGED IN WITH RESPECT TO PRAYER ANGELS.

14      THE COURT:  WELL, THERE'S SOME DISPUTE, GIVEN AN

15  INTERROGATORY RESPONSE ON THAT, BUT WE'LL BE GETTING INTO THAT

16  SHORTLY.

17      MR. NOLAN:  RIGHT.  BUT LET'S JUST ASSUME FOR THE

18  SAKE THAT THAT'S AN ARGUMENT THAT'S GOING TO BE MADE.  WE THINK

19  WE SHOULD BE ALLOWED TO INTRODUCE EVIDENCE BY EMPLOYEES AT MGA

20  ABOUT THEIR KNOWLEDGE OF MOONLIGHTING AT MATTEL AND THE

21  PERMISSION THAT WAS GIVEN IN THAT REGARD.

22      THE COURT:  WHAT DO YOU MEAN?

23      ADDRESS THE COURT'S ISSUE ON THIS FOUNDATION.  I'M

24  NOT GOING TO PERMIT SOMEONE TO JUST GET UP AND SAY, 'OH, YEAH,

25  I HEARD HEARSAY RUMORS THAT THERE'S LOTS OF MOONLIGHTING GOING

1    ON OVER AT MATTEL.'  THAT'S NOT GOING TO FLY.  IT'S GOT TO BE A

2    SPECIFIC INCIDENT OF APPLES AND APPLES THAT A PERSON, IN A

3    POSITION LIKE CARTER BRYANT, IS MOONLIGHTING FOR A COMPANY,

4    EITHER MGA ITSELF OR LIKE MGA, WITHOUT GETTING PERMISSION.

5    WE'VE GOT TO MAKE SURE THAT WE'RE NOT JUST PAINTING WITH A

6    BROAD BRUSH.

7        MR. NOLAN:  RIGHT.  AND IF I SAID ANYTHING TO SUGGEST

8    THAT I WOULD TRY TO PUT THAT EVIDENCE IN THAT WAY, I TAKE IT

9    BACK, BECAUSE THAT'S NOT OUR INTENT.

10       THE COURT:  THE COURT HAS PROPOSED AN IDEA.  I WANT

11   YOU TO EITHER AGREE WITH THAT OR DISAGREE AND TELL ME WHAT

12   OTHER PARAMETERS YOU WOULD SET.

13       I'M INTERESTED IN SETTING PARAMETERS HERE.

14       MR. NOLAN:  RIGHT.

15       I DISAGREE THAT IT SHOULD BE ALL PART OF 1-B.

16       THE COURT:  I DIDN'T SAY IT SHOULD BE THAT.

17       MR. NOLAN:  MAYBE I MISHEARD.

18       I WOULD OFFER SPECIFIC TESTIMONY FROM, LET'S SAY,

19   MARGARET LEAHY, AND MARGARET LEAHY WOULD TESTIFY IN THE FIRST

20   PERSON THAT WHILE SHE WAS EMPLOYED AT MATTEL, AFTER SHE ADOPTED

21   HER DAUGHTER, SHE NEEDED TO EARN EXTRA MONEY.  SHE GOT LEADS AS

22   TO MOONLIGHTING JOBS THAT SHE COULD DO ON PROJECTS.  SHE WAS

23   AWARE THAT SHE WAS DOING IT HERSELF.

24       VERONICA MARLOW, SIMILAR SITUATION, WAS AWARE THAT A

25   LOT OF THESE DESIGNERS AT MATTEL -- BECAUSE SHE WAS FORMERLY AT

1    MATTEL -- WOULD ENGAGE IN MOONLIGHTING, AND SHE HAD A READY

2    LIST OF EMPLOYEES AT MATTEL THAT SHE COULD RETAIN TO DO

3    MOONLIGHTING.  IT GOES TO OUR STATE OF MIND THAT WHILE THIS

4    THING THAT WE THOUGHT WOULD BE GOING ON HERE IS THAT WE WOULD

5    BE ACCUSED OF BREACHING A FIDUCIARY DUTY OR INTENTIONALLY

6    INTERFERING.

7          I UNDERSTAND THAT IT CAN'T BE WITH A BROAD BRUSH, BUT

8    I WOULD SAY THAT IF I LAY A PROPER FOUNDATION ON THAT, THAT

9    WOULD GO INTO MGA'S STATE OF KNOWLEDGE ON THAT SUBJECT.

10         THE COURT:  IF YOU CAN CONNECT IT TO MGA'S STATE OF

11   MIND, THEN I'M, MOST LIKELY, GOING TO OVERRULE THE OBJECTION.

12         NOW, I IMAGINE MR. ZELLER IS GOING TO TELL ME RIGHT

13   NOW THAT THE BIG DIFFERENCE BETWEEN THAT AND THIS CASE IS THAT

14   THERE, THE LEADS WERE BEING PROVIDED BY MATTEL AND SHE HAD THE

15   PERMISSION OF MATTEL TO DO WHAT SHE WAS DOING; WHEREAS HERE, NO

16   SUCH PERMISSION WAS PROVIDED.

17         MR. QUINN:  ACTUALLY, WITH MS. LEAHY, SHE WAS DOING

18   IT THEN AND DID NOT LET PEOPLE KNOW.

19         WHAT I ACTUALLY WOULD LIKE TO SAY ON THIS IS THAT I

20   DON'T KNOW THAT WE ACTUALLY HAVE MUCH AGREEMENT, FROM AT LEAST

21   THE MGA SIDE, AS TO ONE OF THE MAIN DRIVERS OF THIS MOTION.

22   AND I BELIEVE THAT THE COURT'S BEEN VERY CLEAR ON THIS, BUT I

23   STILL DON'T KNOW WHAT MGA'S POSITION IS.

24         I THINK HE'S TRYING TO CREATE THIS EXCEPTION, THROUGH

25   STATE OF MIND, TO HAVE PEOPLE GO UP AND SAY EXACTLY WHAT SOME

1    OF THEIR FORMER PEOPLE HAVE CONVENIENTLY SAID, WHICH IS, 'WELL,

2    EVERYBODY DID IT.'

3         THE COURT:  THEN THAT'S HEARSAY.  AND YOU'RE GOING TO

4    STAND UP AND YOU'RE GOING TO SAY, 'OBJECTION; HEARSAY'; I'M

5    GOING TO SAY, 'SUSTAINED'; AND WE'RE GOING TO GO ON TO THE NEXT

6    QUESTION.

7         MR. ZELLER:  AND HE'S GOING TO SAY, OF COURSE, 'WELL,

8    THAT'S AN EXCEPTION BECAUSE IT BEARS ON OUR STATE OF MIND.'

9    THAT'S GOING TO BE HIS ARGUMENT.

10        THAT IS ONE CONCERN THAT WE HAVE OVER THIS.

11        THE COURT:  YOU UNDERSTAND, MR. NOLAN, THAT'S NOT

12   GOING TO WORK.

13        MR. NOLAN:  I UNDERSTAND.  BUT I'M GOING TO TAKE DOWN

14   THESE SUGGESTIONS, BECAUSE --

15        THE COURT:  I'LL SPELL THIS OUT IN THE ORDER FOR THE

16   MOTION IN LIMINE, BUT I'M DENYING THE MOTION IN LIMINE AS

17   PHRASED, HOWEVER, SUBJECT TO THE STRICT LIMITATIONS THAT I'M

18   DISCUSSING HERE.

19        NUMBER SEVEN:  ADVICE OF COUNSEL.

20        MGA TAKES THE POSITION THAT THEY'RE NOT RELYING ON

21   ADVICE OF COUNSEL.  AND IF THEY DO RELY ON THE ADVICE OF

22   COUNSEL, OF COURSE THEY'RE GOING TO HAVE TO PRODUCE PRIVILEGED

23   DOCUMENTS RELATED TO THAT ADVICE.  THEY SEEM TO READILY

24   RECOGNIZE THAT.  SO I GUESS IT'S NOT CLEAR TO ME WHAT THE

25   PROBLEM IS AT THIS POINT.

1        MR. PROCTOR:  THE PROBLEM IS THAT MGA WANTS TO -- I

2    DON'T PARTICULARLY LIKE THIS EXPRESSION, BUT IT FITS -- "HAVE

3    ITS CAKE AND EAT IT TOO."

4        YOU CAN RELY ON ADVICE OF COUNSEL IMPLIEDLY.

5        WHAT MGA WANTS TO DO IS CALL MR. ROSENBAUM, THEIR

6    COUNSEL, AND SAY, 'I PERFORMED A DOLL OWNERSHIP INQUIRY,' AND

7    SAY, 'MR. ROSENBAUM WAS TASKED TO PERFORM A DOLL OWNERSHIP

8    INQUIRY AND INVESTIGATE WHETHER MR. BRYANT OWNED THESE

9    DRAWINGS, WHICH HE THEN WARRANTED TO US HE OWNED.'  THEY'RE NOT

10   GOING TO SAY WHAT MR. ROSENBAUM ACTUALLY ADVISED THEM.

11       BUT WHEN YOU COMBINE THE FACT THAT HE PERFORMED A

12   DOLL OWNERSHIP INQUIRY, ACCORDING TO THEM, THE TESTIMONY THAT

13   HE PERFORMED A DOLL OWNERSHIP INQUIRY, INVESTIGATED, AND THEN

14   THEY PURCHASED BRATZ FROM MR. BRYANT AND THEY HIRED A LAWYER TO

15   DO THIS -- THAT'S GOING TO BE A MAJOR PART OF THE PRESENTATION.

16   THE OBVIOUS INFERENCE TO THE JURY IS, 'HEY, HE MUST HAVE SIGNED

17   OFF ON IT.  THE LAWYER MUST HAVE APPROVED IT.'

18       AND THAT IS ABSOLUTELY, IF THEY DO THAT,

19   UNEQUIVOCALLY, A WAIVER OF THE PRIVILEGE.

20       THERE'S A CASE -- MGA CITED IT, ACTUALLY; IT'S THE

21   BROADCOM CASE; THIS COURT, TWO YEARS AGO -- IT'S DIRECTLY ON

22   POINT.  "A RELIANCE ON COUNSEL PRIVILEGE WAIVER DOES NOT

23   REQUIRE A PARTY'S DIRECT STATEMENT THAT COUNSEL WAS RELIED

24   UPON.  IT MAY ALSO ARISE FROM MORE INDIRECT EVIDENCE, WHERE A

25   PARTY AFFIRMATIVELY RAISES AN INFERENCE OF RELIANCE ON COUNSEL

1    FOR THE PARTY'S OWN BENEFIT."

2        IN THEIR OPPOSITION, THEY TALK ABOUT HOW WE'RE TRYING

3    TO PRECLUDE THEIR GOOD FAITH DEFENSE.  THIS ISN'T ABOUT THEIR

4    GOOD FAITH DEFENSE.  MGA DENIES INTENT, HAS A GOOD FAITH

5    DEFENSE, AND IT'S ENTITLED TO PUT ON EVIDENCE ON THAT.  THAT'S

6    NOT WHAT IT'S ABOUT.  BUT WHAT IT'S NOT ENTITLED TO DO IS MAKE

7    A SUGGESTION TO THE JURY, A VERY OBVIOUS INTENTIONAL

8    SUGGESTION, AS TO WHAT ITS LAWYERS ADVISED IT, WITHOUT ACTUALLY

9    PRODUCING ITS LAWYERS' ADVICE ON THE SUBJECT MATTER.

10        THE COURT:  MR. RUSSELL?

11        MR. RUSSELL:  YOUR HONOR, I WAS AT MR. ROSENBAUM'S

12    DEPOSITION.  I AM PROBABLY THE MOST FAMILIAR PERSON IN THIS

13    ROOM WITH THIS TESTIMONY.  I WAS AT MS. WANG'S DEPOSITION AS

14    WELL.  THE TESTIMONY THAT MR. PROCTOR IS REFERRING TO WAS

15    ELICITED BY MATTEL'S COUNSEL, ESSENTIALLY TRYING TO EXPERTISE

16    MR. ROSENBAUM ABOUT HIS EXPERIENCE --

17        THE COURT:  EXPERTISE?

18        MR. RUSSELL:  YES; THAT WAS THE WORD THEY USED.

19        EXPERTISE; TO MAKE HIM AN EXPERT ON THE TOY INDUSTRY

20    AND WHAT TYPES OF INQUIRIES ONE COULD DO.

21        THE TESTIMONY MR. ROSENBAUM IS GOING TO GIVE IS QUITE

22    SIMPLE.  IT'S NO DIFFERENT THAN IF, TO USE THE EXAMPLE FROM

23    THEIR PAPERS, "THE JANITOR DID IT."

24        ALL HE'S GOING TO TALK ABOUT IS, HE ASKED MR. BRYANT,

25    'DO YOU OWN THE RIGHTS TO BRATZ?  ARE YOU SUBJECT TO A

1    CONTRACT?'

2       HE COULDN'T DO ANY ANALYSIS.  THE EVIDENCE -- IN

3    FACT, THEY WANT TO USE IT AGAINST US -- THE EVIDENCE IS, HE

4    DIDN'T SEE MR. BRYANT'S CONTRACT; HE COULDN'T ACCESS IT; SO HE

5    ASKED MR. BRYANT.  AND HE PUT DOWN INTO A CONTRACT A

6    REPRESENTATION THAT MR. BRYANT SIGNED OFF ON THAT SAID, 'I OWN

7    THE RIGHT TO BRATZ.  IT'S NOT SUBJECT TO RIGHTS FROM ANY OTHER

8    PARTY.  AND I AGREE TO INDEMNIFY MGA IF I, CARTER BRYANT, AM

9    NOT TELLING THE TRUTH.'

10      HE WILL ALSO TESTIFY THAT HE SPOKE WITH MS. WANG AND

11   HE ASKED MS. WANG, CARTER BRYANT'S ATTORNEY, 'IS THIS CONTRACT

12   SUBJECT TO ANY AGREEMENT WITH MATTEL?'  MS. WANG, AN

13   EXPERIENCED PATENT ATTORNEY, TOLD HIM 'NO.'

14      THAT INFORMATION WAS CONVEYED TO MGA.  THAT IS NOT

15   ADVICE OF COUNSEL.  THAT IS A RELAYING OF FACTUAL INFORMATION.

16      WE'VE NEVER PLACED AT ISSUE MR. ROSENBAUM'S ADVICE.

17   THEY DON'T NEED TO RELY ON IT.  IN FACT, YOUR HONOR, WE CITE

18   YOU TO A NUMBER OF CASES IN OUR BRIEF.  THE NINTH CIRCUIT CASE

19   IN RE: GEOTHERMAL IS THE KEY ONE, WHEREAS HERE, YOU'VE GOT

20   MULTIPLE SOURCES OF INFORMATION VERIFYING A PARTICULAR PIECE OF

21   FACTUAL INFORMATION.  AND THERE'S EVEN AN ARGUMENT, BY

22   INFERENCE, THAT THE ATTORNEY-CLIENT PRIVILEGE COULD COME UP.

23   THERE'S NO WAIVER.

24      THE COURT:  YOU WOULD AGREE THAT IF, IN THE COURSE OF

25   THIS TRIAL, YOU ELICIT LEGAL ADVICE, YOU WILL HAVE PIERCED THE

1 PRIVILEGE?

2  MR. RUSSELL:  YES, I DO, YOUR HONOR.

3  I JUST WANT TO TAKE A STEP BACK AND NOTE THE IRONY

4 HERE, OF COURSE.

5  AS WE NOTE IN OUR PAPERS, WE OFFERED TO MATTEL TO

6 MAKE AVAILABLE THESE PRIVILEGED DOCUMENTS THAT THEY'RE SO

7 ANXIOUS TO TALK ABOUT, BECAUSE WE NOTED THE INCONSISTENCY

8 BETWEEN THEIR POSITION ON THE INVESTIGATION AND OURS HERE.

9  THE COURT:  I READ THAT.

10  MR. RUSSELL:  NOT ONLY DID THEY WITHDRAW THEIR MOTION

11 SEEKING THE PRIVILEGED INFORMATION; THEY SAID THEY DON'T NEED

12 IT.  AND NOW THEY TURN AROUND -- AND IT'S NOT US TRYING TO HAVE

13 OUR CAKE AND EAT IT TOO.  IT'S THEM.  THEY'RE THE ONES WHO WANT

14 TO -- HAVING WALKED AWAY FROM THE RIGHT TO GET DISCOVERY,

15 HAVING WALKED AWAY FROM A CHANCE TO GET THIS IN-CAMERA, THEY

16 NOW, AT TRIAL, WOULD LIKE YOUR HONOR TO FORCE US TO THIS POINT

17 OF PRIVILEGE.

18  THE COURT:  I'M GOING TO GRANT THE MOTION THAT YOU

19 ARE NOT TO RELY ON ADVICE OF COUNSEL, BECAUSE YOU HAVE NOT

20 PRODUCED THE PRIVILEGE.  BUT I WILL ENTERTAIN AN APPROPRIATE

21 OBJECTION IF IT COMES UP DURING THE TRIAL THAT YOU ARE RELYING

22 ON ADVICE OF COUNSEL, AND WE'LL SEE WHERE WE'RE AT.  BUT YOU'RE

23 NOT TO DO THAT.  THE MOTION IS GRANTED.  THERE'S REALLY NO

24 DISAGREEMENT HERE.

25  MR. RUSSELL:  I JUST WANT TO BE CLEAR ON THE RECORD

1       THAT THAT IS NOT THE SAME AS SAYING MR. ROSENBAUM IS SOMEHOW

2       PRECLUDED FROM RELAYING HIS CONVERSATIONS WITH MS. WANG OR

3       RELAYING HIS CONVERSATIONS WITH MR. BRYANT.

4              IN OTHER WORDS, THERE'S NO PROHIBITION --

5              THE COURT:  I DON'T HAVE A COPY OF THE DEPOSITION

6       BEFORE ME.  I'M NOT REALLY SURE EXACTLY WHAT IS GOING TO BE

7       SAID OR NOT SAID, BUT WHAT I'M COMFORTABLE IN RULING IS THAT

8       THERE IS TO BE NO ADVICE OF COUNSEL PROVIDED.

9              IF WHAT YOU'RE SAYING IS ACCURATE -- AND I HAVE NO

10      REASON TO QUESTION IT; YOU KNOW THE DEPOSITION BETTER THAN ANY

11      OF US --

12             MR. RUSSELL:  I DO.

13             THE COURT:  -- THAT THE ONLY INFORMATION THAT'S GOING

14      TO COME OUT IS NONADVICE, NONOPINION TESTIMONY, FROM THE

15      ATTORNEY, I'M NOT GOING TO EXPERTISE ANYBODY AND YOU'RE NOT

16      GOING TO EXPERTISE ANYBODY.  WE'RE NOT GOING TO HAVE A PROBLEM.

17             MR. RUSSELL:  WITH THAT UNDERSTANDING, I THINK WE'RE

18      FINE.

19             THE COURT:  GOOD.

20             NUMBER EIGHT:  WHETHER MATTEL WOULD HAVE MARKETED

21      BRATZ.

22             THIS IS THE ONE THAT WE REFERRED TO EARLIER AS WELL,

23      THE INEVITABLE BREACH MOTION IN LIMINE.

24             MR. OLIVAR:  THE INEVITABLE BREACH THEORY.

25             IT IS NOT A DEFENSE TO A CRIME OR A TORT TO SAY THAT

1    SOMEONE ELSE WOULD HAVE DONE IT OR TO SAY THAT I STOLE THE

2    VEHICLE BUT THE OWNER WASN'T USING IT ANYWAY.  THOSE ARE NOT

3    DEFENSES.  BUT THOSE ARE THE TWO ARGUMENTS THAT ARE IN THE

4    OPPOSITION ON THIS MOTION.

5        THE COURT:  THEY RELATE TO DAMAGES, THOUGH; NO?

6        MR. OLIVAR:  THEY DON'T, BECAUSE THE DAMAGES WE'RE

7    SEEKING ARE PURE DISGORGEMENT IN THIS CASE.  I'M SURE SOMEONE

8    WILL CORRECT ME IF I'M WRONG.

9        THE DAMAGES THEORY IS SOLELY FOCUSED ON WHAT MGA AND

10   MR. LARIAN AND THE OTHER DEFENDANTS RECEIVED AS A RESULT OF

11   THEIR IMPROPER CONDUCT.  NOT WHAT MATTEL COULD HAVE MADE.

12   THERE'S NO EVIDENCE BEING PRESENTED ON THAT POINT.  THEY

13   HALF-HEARTEDLY PUT THAT IN A FOOTNOTE, BUT WE DEALT WITH IT IN

14   OUR REPLY.  THEY DON'T RELATE TO ANY DAMAGE THEORY BEING

15   PRESENTED AT ANY PORTION OF ANY TRIAL HERE.

16       SO WITH THAT, GIVEN THAT -- WHAT MATTEL MIGHT HAVE

17   DONE IN A HYPOTHETICAL WORLD IF THINGS HAD GONE DIFFERENTLY HAS

18   NOTHING TO DO WITH MGA'S CONDUCT.  AND THE CASES THEY CITE TO

19   SAY THAT IT HAS SOMETHING TO DO WITH CAUSATION ARE ALL

20   COMPLETELY OFF THE MARK.  YOU CAN GO CASE BY CASE AND LOOK AT

21   THE FACTS OF THE THINGS -- THEY LIKE SOME LANGUAGE FROM SOME

22   CASES AND CITE THEM, BUT IF YOU ACTUALLY LOOK AT THE HOLDING OF

23   ANY OF THE CASES CITED IN THEIR OPPOSITION, IT SHOWS THAT THEY

24   HAVE NO CASE THAT SUPPORTS EITHER OF THE THEORIES ADVANCED IN

25   THEIR OPPOSITION.

1       THEY HAVE A CASE WHERE A SUPERVISOR WAS DEMANDING

2    KICKBACKS FROM AN EMPLOYEE, AND THE OWNERS, FOR A DIFFERENT

3    REASON, DECIDED THE EMPLOYEE SHOULD BE FIRED.  AND THEY SAY

4    THAT HAS SOMETHING TO DO WITH THEIR ARGUMENT HERE.  IT HAS

5    NOTHING TO DO WITH IT AT ALL.

6       YOU KNOW, WE WENT THROUGH THE FACTS IN OUR REPLY

7    ABOUT THE MENDELSON CASE, THE CONDON V. SOLOMON CASE.  NONE OF

8    THEM SAY THAT THE THEORY THAT 'SOMEONE ELSE WOULD HAVE DONE IT

9    IF WE HADN'T DONE IT' IS A RELEVANT THEORY THAT CAN BE

10   PRESENTED, AND NONE OF THEM SUPPORT THE THEORY THAT 'THE PERSON

11   WHO OWNED IT WOULDN'T HAVE MADE GOOD USE OF IT, SO WE WERE OKAY

12   APPROPRIATING IT.'

13      WITH THAT, YOUR HONOR, I'LL SUBMIT.  THERE REALLY IS

14   NOTHING TO THIS OPPOSITION.

15      THE COURT:  VERY WELL.

16      MR. RUSSELL?

17      MR. RUSSELL:  YOUR HONOR, THE FIRST POINT THAT I

18   DIDN'T HEAR OPPOSING COUNSEL EVEN REFERENCE, BUT, OF COURSE, IS

19   CENTRAL TO THIS ISSUE, IS THE FACT THEY NEED TO ESTABLISH THAT

20   MY CLIENT INDUCED MR. BRYANT TO BREACH ANY OF THESE DUTIES.

21      NOW, THE RECORD EVIDENCE IS GOING TO BE THAT

22   MR. BRYANT BELIEVED THAT MATTEL WOULD NEVER HAVE MARKETED

23   BRATZ.  THAT'S THE FIRST POINT.

24      AND THAT IS CERTAINLY RELEVANT, FROM OUR PERSPECTIVE,

25   TO SHOW WE DIDN'T INDUCE HIM.  HE SAYS IT'S NOT RELEVANT TO

1    SHOW IF SOMEONE ELSE WOULD HAVE DONE THE CRIME.  WELL, THAT'S

2    NOT THE ISSUE.  THE ISSUE IS, MR. BRYANT IS GOING TO COME UP

3    HERE; HE'S GOING TO TESTIFY ON THAT STAND; HIS VIEW WAS, HE

4    SHOPPED IT TO ALASKA MAMA; HE NOTARIZED THESE THINGS.  HE DID A

5    LOT OF THINGS WITHOUT SHOWING IT TO MATTEL, BECAUSE HE NEVER

6    BELIEVED MATTEL WOULD, IN FACT, MARKET OR USE BRATZ.

7         THAT'S FIRST; IT'S DIRECTLY RELEVANT TO NEGATING KEY

8    ELEMENTS TO TORTIOUS INTERFERENCE AND AIDING AND ABETTING.  SO

9    RIGHT THERE, DIRECTLY RELEVANT.

10         BUT IT'S ALSO RELEVANT WITH RESPECT TO DAMAGES.  AND

11   HE SAYS WE ONLY MAKE A HALF-HEARTED ARGUMENT.  WELL,

12   PROFESSOR JOACHIMSTHALER, OUR BRANDING EXPERT, IS GOING TO TALK

13   ABOUT THIS, AND HE'S GOING TO SAY HOW IT'S RELEVANT TO OUR

14   APPORTIONMENT AND OTHER ARGUMENTS; IT'S DIRECTLY RELEVANT.

15         THE COURT:  WHY DON'T YOU TELL ME HOW IT'S RELEVANT.

16         MR. RUSSELL:  THE FACT IS THAT, AS JOACHIMSTHALER

17   SAYS IN HIS REPORT, BIG ENTRENCHED COMPANIES LIKE MATTEL DON'T

18   WANT TO CANNIBALIZE EXISTING PRODUCT LINES.

19         THE COURT:  HOW IS THIS RELEVANT TO DISGORGEMENT,

20   COUNSEL?

21         MR. RUSSELL:  WELL, IT'S NOT DISGORGEMENT.  IT'S

22   REALLY MORE TO APPORTIONMENT THAN ANYTHING ELSE.  IT'S GOING TO

23   SHOW THAT MATTEL WOULD NOT HAVE BEEN ABLE TO MARKET AND BRAND

24   SOMETHING IN THE SAME WAY THAT MGA DID; THAT MGA WAS UNIQUELY

25   POSITIONED, BY VIRTUE OF THE TYPE OF COMPANY THAT IT WAS, TO

1    TAKE ADVANTAGE OF AND MARKET THIS; AND THAT HAD A MATERIAL

2    AFFECT ON THE SUCCESS OF BRATZ.  IT GOES DIRECTLY TO THE

3    APPORTIONMENT DEFENSE.

4         SO IT'S NOT JUST A QUESTION OF DISGORGEMENT, BUT

5    RATHER, WHAT IT IS THAT'S INFRINGING VERSUS NOT INFRINGING AND

6    WHAT IT IS, THIS PROFIT THAT THEY MAY PROPERLY TAKE ADVANTAGE

7    OF VERSUS PROFIT THAT THEY MAY NOT PROPERLY TAKE ADVANTAGE OF.

8         I THINK IT'S DIFFICULT AT THE OUTSET, WITHOUT

9    CONTEXT, FOR YOUR HONOR TO ASSESS THIS.  I CERTAINLY THINK ONCE

10   YOU SEE DR. JOACHIMSTHALER ON THE STAND, YOU WILL UNDERSTAND

11   BETTER WHAT IT IS THAT WE'RE TALKING ABOUT, BECAUSE IT IS

12   DIFFICULT IN THE ABSTRACT.  BUT AT A MINIMUM, GIVEN THE INTENT

13   ELEMENTS THAT I POINTED OUT, THIS SEEMS TO BE, QUITE CLEARLY,

14   DIRECTLY RELEVANT.

15        THE COURT:  THANK YOU, COUNSEL.

16        MR. OLIVAR:  BRIEFLY, YOUR HONOR.

17        MR. BRYANT'S CONTRACTUAL OBLIGATIONS WERE CLEAR.

18   THAT HE MAY HAVE INTENDED TO DO SOMETHING WRONG WITH SOMEBODY

19   ELSE IS NOT RELEVANT EVIDENCE.  THEY CAN CITE NO CASE

20   QUESTIONING CAUSATION WHERE THE DEFENDANT'S MISCONDUCT WAS

21   SHOWN AND THE MISCONDUCT HARMED THE PLAINTIFF, AS HERE.

22        THERE'S NO QUESTION MATTEL HAS BEEN HARMED BY MGA'S

23   TAKING BRATZ AND COMPETING AND GAINING THE AMOUNTS OF MONEY

24   IT'S GAINED FROM BRATZ.

25        IF CAUSATION IS SET FORTH IN THE NIELSON CASE, ALL

1    MATTEL NEEDS TO SHOW IS THAT MGA WAS A SUBSTANTIAL FACTOR IN

2    CAUSING THE HARM THAT IT SUFFERED.  AND THERE'S NO QUESTION

3    THAT MGA WAS A SUBSTANTIAL FACTOR IN MISAPPROPRIATING BRATZ AND

4    OBTAINING THE MONIES THAT MATTEL SAY SHOULD BE DISGORGED.  I

5    MEAN, THE LAW IS VERY CLEAR ON THIS SUBJECT, AND THE

6    HYPOTHETICALS AND THE OPPOSITION JUST DON'T REALLY HAVE ANY

7    RELEVANCE TO ANYTHING.  AND THERE'S ALSO A 403 PROBLEM.

8         THE COURT:  THANK YOU, COUNSEL.

9         I AGREE WITH YOU WITH RESPECT TO PHASE ONE.  I DON'T

10   SEE ANY RELEVANCE AT ALL ON THAT, AND I WILL GRANT THE MOTION

11   THERE.

12        ON THE DAMAGES, I'M HAVING TROUBLE, BUT I'LL DEFER

13   UNTIL PHASE 1-B AND WE CAN REVISIT THE ISSUE AT THAT TIME.

14        MR. ZELLER:  IF I MAY JUST ADD A SLIGHT COPYRIGHT

15   NUANCE ON THIS, BECAUSE I THINK THAT'S WHAT MR. RUSSELL WAS

16   REFERRING TO, WAS SOMEHOW THAT IT WAS RELEVANT TO APPORTIONMENT

17   FOR COPYRIGHT DAMAGES.

18        UNDER 405, ACTUALLY A PLAINTIFF HAS THREE DIFFERENT

19   MECHANISMS OF DAMAGES.  NUMBER ONE IS A STRAIGHT DISGORGEMENT;

20   IT IS THE INFRINGER'S PROFITS; AND THAT IS WHAT WE ARE SEEKING

21   IN THIS CASE FOR PURPOSES OF COPYRIGHT INFRINGEMENT.

22        CERTAINLY, THEY ARE FREE TO ATTEMPT TO SHOW TO A JURY

23   THAT SOMEHOW THEY AREN'T DERIVING THEIR PROFITS FOR THE DOLLS

24   FROM THE DOLLS, WHAT PEOPLE ARE CALLING APPORTIONMENT.  BUT

25   WHETHER OR NOT MATTEL WOULD HAVE EVER MARKETED IT HAS

1    ABSOLUTELY NOTHING TO DO WITH WHETHER OR NOT A JURY AWARDS, AND

2    IN WHAT AMOUNT THE JURY AWARDS, THE INFRINGER'S PROFITS.

3        THE COURT:  YOU MAY BE RIGHT, MR. ZELLER.  I'M JUST

4    SAYING I'M GOING TO HOLD OFF ON MAKING THAT RULING UNTIL BEFORE

5    THE PHASE 1-B.

6        MR. ZELLER:  THANK YOU.

7        MR. NOLAN:  ONE POINT OF CLARIFICATION, YOUR HONOR,

8    ON THIS, JUST TO GO BACK TO MR. BRYANT'S STATE OF MIND AS TO

9    WHETHER OR NOT HE THOUGHT THAT MATTEL WOULD EVER TAKE HIS IDEA

10   AND WHETHER OR NOT HE SHOULD GIVE IT TO MATTEL.  I THINK THAT

11   GOES TO HIS STATE OF MIND.  AND IT'S RELEVANT TO SHOW AND

12   SUPPORT THAT IT WASN'T US WHO INDUCED HIM.

13       IN OTHER WORDS, THEIR ARGUMENT IS THAT WE CAME UP

14   WITH THIS CONSPIRACY TO GET THIS FASHION DOLL -- THAT'S WHAT

15   THEY'VE BEEN TOLD ALREADY -- AND THAT WE WENT IN AND STOLE

16   CARTER FROM MATTEL AND BROUGHT HIM OUT TO DO THE FASHION DOLL.

17   THAT'S WHAT WAS OUTLINED.

18       I THINK WE SHOULD BE ABLE TO INTRODUCE TESTIMONY THAT

19   NOT ONLY WAS IT CARTER WHO APPROACHED US THROUGH AN INDEPENDENT

20   CONSULTANT, BUT THAT HE ALSO DID SO THINKING THAT MATTEL WOULD

21   HAVE NO INTEREST IN PURSUING THIS KIND A DOLL.

22       THE COURT:  YOU'RE REFERRING TO CARTER BRYANT'S STATE

23   OF MIND?

24       MR. NOLAN:  CARTER BRYANT'S STATE OF MIND, WHICH IS

25   GOING TO BE RELEVANT TO THE ESTABLISHMENT OF A FIDUCIARY DUTY

1    AND ALSO WHETHER OR NOT WE INTENTIONALLY AIDED AND ABETTED.

2    I'M GOING BACK TO THAT STATE OF EVIDENCE, YOUR HONOR.  AND I

3    JUST WANTED TO MAKE CERTAIN THAT IF THE RULING --

4         THE COURT:  WELL, YOUR MOTION FOR RECONSIDERATION,

5    LIKE MR. ZELLER'S MOTION FOR RECONSIDERATION, IS OVERRULED.

6    THE COURT HAS RULED ON THIS MOTION IN LIMINE, COUNSEL.

7         MR. NOLAN:  I'M SORRY.

8         THE COURT:  AND I'VE ALSO RULED ON THE EXISTENCE OF A

9    FIDUCIARY DUTY AND FULLY RECONSIDERED THAT ORDER AND DENIED

10   THAT MOTION FOR RECONSIDERATION AS WELL; THAT WAS ISSUED THIS

11   MORNING.

12        MOTION IN LIMINE NUMBER NINE.  MY TENTATIVE HERE IS

13   TO DENY THIS.  THIS IS WITH RESPECT TO EXPERT TESTIMONY

14   REGARDING BARBIE AND OTHER MATTEL DOLLS.  TO THE EXTENT THAT

15   THIS IS RELATED TO BRATZ -- THIS IS ONE OF THESE CLEAR ONES

16   WHERE I'M GOING TO HAVE TO LOOK AT THE CONTEXT IN WHICH THIS IS

17   COMING UP, AND THE COURT IS NOT GOING TO RULE CATEGORICALLY AT

18   THIS POINT.

19        I'LL HEAR BRIEFLY FROM MATTEL, IF YOU THINK I'M

20   MISSING SOMETHING HERE.

21        MR. COREY:  YOUR HONOR, I THINK THAT THE NOTICE IN

22   THE CAPTION MAY HAVE BEEN STYLED A LITTLE BIT MORE BROADLY THAN

23   WE WOULD HAVE LIKED.  I THINK THIS MOTION, IN PARTICULAR,

24   SHOULD FALL WITHIN THE CATEGORIES OF HOW THE COURT IS GOING TO

25   DEAL WITH THE EXPERTS, BECAUSE WHAT IT REALLY IS, IT'S TARGETED

1       AT SOME FAIRLY INFLAMMATORY RHETORIC, IN ONE EXPERT'S OPINION.

2           THE COURT:  AND AS I CONSIDER THE EXPERTS, I WILL.

3       I'M CERTAINLY RESERVING THAT.  I UNDERSTAND THAT THAT'S PART OF

4       WHAT'S GOING ON HERE.

5           BUT IN TERMS OF ANY CATEGORICAL EXCLUSION --

6           MR. COREY:  I UNDERSTAND THAT, YOUR HONOR.

7       THANK YOU.

8           THE COURT: -- MOTION IN LIMINE NUMBER NINE IS DENIED.

9           NUMBER 10, NUMBER 12, AND NUMBER 13 ARE GOING TO BE

10      DEALT WITH, AS I INDICATED EARLIER.  TO THE EXTENT THAT THOSE

11      WITNESSES ARE STILL GOING TO BE CALLED -- AND I NOTE

12      PROFESSOR MENELL MAY NO LONGER BE CALLED -- BUT TO THE EXTENT

13      THAT THOSE WITNESSES ARE GOING TO BE CALLED, THE COURT WILL

14      HAVE MOTIONS OF HEARINGS ON THOSE IN ADVANCE OF THEM BEING

15      CALLED AND PROVIDE OPPOSING COUNSEL AN OPPORTUNITY TO CONDUCT

16      VOIR DIRE ON THOSE WITNESSES TO DETERMINE IF AND TO WHAT EXTENT

17      THEY'RE QUALIFIED TO TESTIFIED, AND IF AND TO WHAT EXTENT THEIR

18      EXPERT REPORTS WILL BE ADMISSIBLE.

19          NUMBER 11, THE MOTION RELATED TO WHAT'S DESCRIBED AS

20      IMPROPERLY DISCLOSED EVIDENCE.  THIS IS WHAT I REFERRED TO

21      EARLIER.  THIS IS ALL WRAPPED UP IN THE INTERROGATORY REQUEST

22      AND WHETHER OR NOT THERE WAS A TRIAL TEST, ET CETERA.

23          MR. OLIVAR:  I BELIEVE THE FIRST PART ABOUT THE FOUR

24      EXPERTS AND THE APPORTIONMENT ANALYSIS, THAT'S SUBJECT TO

25      YOUR HONOR'S RULING ABOUT IT BEING HEARD BEFORE TRIAL.

1        BUT WITH RESPECT TO THE TRIAL -- AND THIS IS A SMALL

2    PART OF THE ARGUMENT -- BUT THERE CLEARLY WAS AN INTERROGATORY

3    RESPONSE FROM MGA SAYING, 'WE'RE NOT GOING TO ARGUE OR PRESENT

4    EVIDENCE THERE'S A TEST PROJECT; WE DON'T CONTEND THERE WAS

5    ONE.'  AND NOW WE'RE HEARING THAT THERE WAS ONE.  AND WE JUST

6    THINK THEY OUGHT TO BE FORCED TO STICK TO THEIR INTERROGATORY

7    RESPONSE.  THEY CAN'T COME UP WITH SOMETHING THEY SAID DIDN'T

8    EXIST IN THE COURSE OF DISCOVERY.

9        AND THEN THE THIRD PART OF THE MOTION IS FOCUSED ON

10   THE FAILURE TO LIST THE FACT IN AN INTERROGATORY RESPONSE ALSO,

11   EVIDENCE SUPPORTING AN AFFIRMATIVE DEFENSE THAT THERE WAS AN

12   OFFER TO LICENSE BRATZ TO AN EMPLOYEE OF MATTEL TO MEXICO; SO I

13   THINK THOSE TWO PIECES ARE WHAT'S LEFT OF THE MOTION.

14       THE COURT:  VERY WELL.

15       LET ME HEAR FROM MGA.

16       MR. ROTH:  JUST SO WE'RE CLEAR, THE FIRST PORTION OF

17   THIS MOTION, DEALING WITH THE EXPERTS, MR. GRUCA, MR. TONNER,

18   MR. MEYER, HAS BEEN SET ASIDE TO A LATER TIME.

19       THE COURT:  YES; THAT IS CORRECT.

20       MR. ROTH:  I THINK THIS IS A RATHER STRAIGHTFORWARD

21   ISSUE.  I THINK WHAT WE SAID IN OUR INTERROGATORY RESPONSE WAS

22   THAT MGA HAD NOT CAUSED, REQUESTED, ASKED, OR SOLICITED

23   MR. BRYANT TO ENGAGE IN A TRYOUT OF A TEST PROJECT.

24       THE COURT:  THAT DOESN'T MEAN THAT MR. BRYANT DIDN'T,

25   IN FACT, PROVIDE SUCH A TRYOUT PROJECT.

1        MR. ROTH:  AND THAT IS THE DISTINCTION THAT WE MADE

2   CLEAR IN OUR SUMMARY JUDGMENT --

3        THE COURT:  THE COURT UNDERSTANDS THE DISTINCTION,

4   AND WE'LL HAVE TO SEE WHAT MR. BRYANT TESTIFIES TO, WHICH WILL

5   BE MOST INTERESTING, I'M SURE, TO EVERYBODY.

6        MR. ROTH:  AND BEYOND THAT, YOUR HONOR, IN TERMS OF

7   THE AFFIRMATIVE DEFENSES, ANOTHER ISSUE, AS YOUR HONOR MAY

8   KNOW, WE HAVE, IN FACT, SUPPLEMENTED OUR INTERROGATORY

9   RESPONSES.

10        THE COURT:  THANK YOU, COUNSEL.

11        THEY'RE STANDING BY THEIR RESPONSE:  MGA DID NOT

12   REQUIRE A TRYOUT.

13        MR. OLIVAR:  WELL, THEIR RESPONSE INCLUDES ABOUT SIX

14   DIFFERENT WORDS, AND I THINK THEY CAN'T FAIRLY PRODUCE

15   EVIDENCE; THEY CAN'T SPONSOR EVIDENCE OF A TRYOUT PROJECT THAT

16   SQUARES WITH THEIR RESPONSE.  OTHERWISE, IT WAS THE MOST

17   EVASIVE, CUTE RESPONSE THAT SOMEBODY COULD EVER SERVE.

18        THEY SAID MGA DID NOT REQUIRE, USE, ET CETERA, A TEST

19   PROJECT.  NOW THEY'RE SAYING, 'WELL, IT WAS SOMETHING BRYANT

20   GAVE TO US.'  IT'S JUST NOT FAIR DISCLOSURE IN DISCOVERY.  WE

21   CLEARLY SAID, 'WAS THERE A TEST PROJECT OF ANY TYPE?'  TEST

22   PROJECT WAS DEFINED ABOUT AS BROADLY AS CAN BE.

23        THE COURT:  WAIT A SECOND.

24        I READ YOUR REQUEST CAREFULLY, I THOUGHT.  LET ME

25   FIND IT AGAIN.

1          PAGE 12 OF YOUR MOTION, "IDENTIFY FULLY AND

2     COMPLETELY EACH AND EVERY TEST PROJECT THAT YOU CAUSED, HAD,

3     REQUESTED, ASKED, OR SOLICITED ANY PERSON TO PERFORM DURING THE

4     TIME OF JANUARY 1, 1998, THROUGH DECEMBER 31, 2004, INCLUSIVE,

5     AND IDENTIFY ALL PERSONS WITH KNOWLEDGE THEREOF AND ALL

6     DOCUMENTS."

7          SO THEY SAID NO.

8          THEY RESPONDED THAT THERE WAS NO SUCH -- "MGA DOES

9     NOT CONTEND THAT IT CAUSED, HAD, REQUESTED, ASKED, OR SOLICITED

10    BRYANT TO PERFORM A TEST PROJECT."

11         THAT'S ESTABLISHED.  AND I WILL HOLD THEM TO THAT.

12    NO QUESTION.

13         MR. OLIVAR:  THANK YOU, YOUR HONOR.  THAT'S ALL WE

14    NEEDED ON THAT ONE.

15         MR. ROTH:  THANK YOU, YOUR HONOR.

16         THE COURT:  OKAY.

17         14, THAT'S A MOTION IN LIMINE TO EXCLUDE EVIDENCE OR

18    ARGUMENT RELATED TO CERTAIN DISCOVERY MATTERS.

19         MR. NOLAN, DO YOU PLAN ON TALKING ABOUT THE BREADTH

20    OF DISCOVERY?  YOU'VE DONE THIS SEVERAL TIMES WITH ME, TO THE

21    POINT THAT I THINK I COULD PROBABLY RECITE THE NUMBERS MYSELF,

22    BUT YOU'RE CERTAINLY NOT GOING TO DO THIS WITH THE JURY.

23         MR. NOLAN:  NO.  WE WERE JUST TRYING TO IMPRESS YOU

24    WITH HOW LARGE THE CASE IS.

25         THE COURT:  VERY WELL.

1          MOTION IS GRANTED.

2          FINALLY, MOTION NUMBER 15, CHRISTINA TOMIYAMA.  THE

3    COURT RULED ON THIS IN THE CONTEXT -- OR AT LEAST SPOKE TO THIS

4    IN THE CONTEXT OF THE MOTION TO DISQUALIFY SKADDEN ARPS FROM

5    REPRESENTING MGA.  AND WHILE I DENIED THE MOTION, I EXCLUDED

6    THE EXPERT, AND I ALSO INDICATED IN THAT ORDER -- I ESSENTIALLY

7    INVITED MATTEL TO PRECLUDE THE THEORY ARTICULATED BY THAT

8    EXPERT, THE 2-D, 3-D THEORY; SO I AM INCLINED TO GRANT THIS AS

9    PART OF THE SANCTION, THE MODIFIED OR MITIGATED SANCTION, THAT

10   THE COURT IMPOSED FOR WHAT I PREVIOUSLY RULED ON.  BUT I'LL

11   HEAR FURTHER FROM MGA, IF THEY WISH SPEAK TO THIS.

12          MR. NOLAN:  THANK YOU, YOUR HONOR.

13          FIRST OF ALL, TO GO BACK TO THE CORE ISSUE WITH

14   MS. TOMIYAMA, AS I UNDERSTOOD, THE ISSUE THAT WAS PRESENTED IN

15   THAT INSTANCE WAS HOW WE WERE USING HER AS AN EXPERT.  AND WE

16   NEVER INTENDED TO USE HER AS AN EXPERT TO SAY THAT IT'S

17   IMPOSSIBLE TO MAKE A COMPARISON OR IT'S DIFFICULT TO GO FROM

18   2-D TO 3-D.  I MEAN, THAT IS A FUNDAMENTAL PRINCIPAL THAT IS

19   OUT THERE IN THE PUBLIC DOMAIN.

20          THE COURT:  SHE SPEAKS TO IT IN HER EXPERT REPORT.

21   THERE'S A PORTION OF HER REPORT DEVOTED TO THAT.

22          CAN YOU POINT TO ANY EXPERT REPORT DISCLOSED BY MGA

23   PRIOR TO THAT THAT WOULD CAPTURE THAT SAME ANALYSIS?

24          MR. NOLAN:  SAM KHARE, WHO IS A 30(B)(6) WITNESS FROM

25   MGA, TESTIFIED IN HIS DEPOSITION TO EXACTLY THAT POINT, ABOUT

1    THE DIFFICULTIES OF GOING 2-D TO 3-D.  HE WAS A 30(B)(6)

2    WITNESS PROFFERED BY MGA.

3         THE COURT:  PRIOR TO SKADDEN ARPS' COMMUNICATION, OR

4    WITH ANY PRIOR DEFENSE ATTORNEY'S COMMUNICATION WITH

5    MS. TOMIYAMA?

6         MR. NOLAN:  YOUR HONOR, I'LL DOUBLE-CHECK, BUT

7    THAT --

8         THE COURT:  THAT'S THE QUESTION.

9         MR. NOLAN:  I'LL HAVE TO GET THE EXACT DATE ON IT,

10   YOUR HONOR, BUT THE PRINCIPAL --

11        THE COURT:  YOU SEE THE PROBLEM?

12        MR. NOLAN:  NO.  I MEAN, I UNDERSTAND THE PROBLEM

13   THAT'S BEEN IDENTIFIED, YOUR HONOR.

14        THE COURT:  THE COURT HAS FOUND THAT THIS

15   TESTIMONY -- THERE'S A TAINT TO IT.  AND SHORT OF THE RATHER

16   DRASTIC REMEDY SOUGHT BY MATTEL, THE COURT TRIED TO CABIN THE

17   REMEDY SUCH THAT IT STRICTLY ADDRESSED THE PROBLEM.  PART OF

18   THAT IS NOT ONLY REMOVING MS. TOMIYAMA, BUT ALSO REMOVING WHAT

19   SHE BROUGHT TO THE TABLE.  THIS WAS PART OF WHAT SHE BROUGHT TO

20   THE TABLE.

21        MR. NOLAN:  OKAY, YOUR HONOR.  BUT LET'S JUST TAKE

22   GLENN VILPPU, WHO FILES A REPORT AS AN EXPERT IN HIS OWN RIGHT,

23   NOT RELYING ON MS. TOMIYAMA, NEVER SEEING TOMIYAMA'S REPORT;

24   THEN HE SAYS, YOU KNOW, IN HIS WORLD OF MAKING COMPARISONS IN

25   EXPLAINING TO GO FROM 2-D TO 3-D, HE MAKES CERTAIN

1    OBSERVATIONS.

2         SO DOES MR. TONNER.

3         THE SCULPTOR HERSELF, MARGARET LEAHY, BEFORE ANY

4    RETENTION OF TOMIYAMA, OFFERS TESTIMONY IN THIS CASE ABOUT HOW

5    SHE INTERPRETS FROM A 2-D OBJECT IN MAKING A 3-D DOLL.  THAT'S

6    HER LIFEBLOOD.  THAT'S WHAT SHE'S DONE ALL OF HER CAREER.

7    THAT'S HOW SHE'S TALENTED IN DOING WHAT SHE DOES.  AND SHE

8    TALKS ABOUT HOW CARTER'S DRAWINGS DID NOT GIVE HER SUFFICIENT

9    DEPTH, OR THREE DIMENSIONS, SO SHE THEN INTERPRETS IT HER OWN

10   WAY.

11        THAT HAS NOTHING TO DO WITH ANYTHING THAT WE LEARNED

12   FROM TOMIYAMA.

13        SAM KHARE'S DEPOSITION, I'VE BEEN TOLD, YOUR HONOR,

14   WAS SEPTEMBER 20, 2007, WHICH IS THE DATE BEFORE WE RETAINED

15   MS. TOMIYAMA.  WE WEREN'T EVEN IN THE CASE AT THE TIME.

16        THE COURT:  YOU WEREN'T IN THE CASE, BUT WAS

17   MS. TOMIYAMA -- SHE WAS MEETING WITH --

18        MR. QUINN:  I CAN HELP, YOUR HONOR.

19        THE COURT:  PLEASE.

20        MR. QUINN:  JUNE 2007.  THEY WOULDN'T TELL US WHEN

21   THE FIRST TIME THEY WERE CONTACTED, WHEN THEY FIRST HAD

22   CONTACT -- AND THIS IS A PREDECESSOR -- THAT WE COULDN'T LEARN

23   WHEN O'MELVENY FIRST HAD CONTACT WITH TOMIYAMA, BUT WE KNOW OF

24   CONTACT, AS OF JUNE 2007, WHICH WAS BEFORE ALL OF THESE

25   DEPOSITIONS THAT COUNSEL IS REFERRING TO.

1        MR. NOLAN:  YOUR HONOR, I'M LOOKING AT PAGE 9 OF OUR

2    PAPERS.  IT SAYS, "THERE ARE A NUMBER OF REASONS WHY MATTEL

3    FAILED TO JUSTIFY THIS BROAD EXCLUSION OF EVIDENCE IT SEEKS.

4    FIRST, MATTEL FAILED TO LINK THE 2-D TO 3-D FACTUAL ARGUMENTS

5    TO PRIVILEGED COMMUNICATIONS.  SHE DID NOT PERFORM THAT

6    ANALYSIS FOR MATTEL."

7        WHETHER OR NOT SHE DID IT FOR MATTEL OR NOT IS NOT

8    RELEVANT, YOUR HONOR, TO THE ISSUE.

9        IF SHE HAD DONE THAT TYPE OF ANALYSIS AT MATTEL, I

10   COULD UNDERSTAND WHY YOU THEN WOULD SAY, WE, OR ANY OTHER

11   EXPERT OUT THERE, SHOULD EVER BE PRECLUDED FROM COMING IN,

12   BECAUSE IT MIGHT BE TAINTED SINCE SHE WAS DOING THAT ANALYSIS

13   AT MATTEL.

14       SHE DIDN'T DO THAT ANALYSIS AT MATTEL, YOUR HONOR.

15   WE DIDN'T BORROW ANYTHING FROM HER THAT WOULD HAVE ANYTHING TO

16   DO WITH THE PRIVILEGED COMMUNICATION REGARDING THAT SUBJECT.

17       THE COURT:  HOW DO WE KNOW THAT?  WHAT DID YOU JUST

18   QUOTE FROM THERE?

19       MR. NOLAN:  MY DECLARATION.

20       (LAUGHTER.)

21       MR. NOLAN:  I'M REFERRING TO THE DQ TRANSCRIPT.  IN

22   HER DEPOSITION, SHE DENIED EVER DOING THAT ANALYSIS.

23       MR. TONNER TESTIFIED THAT HE REACHED HIS VIEW, HIS

24   INDEPENDENT EXPERT VIEW, WITHOUT ANY REFERENCE TO ANYTHING

25   TOMIYAMA SAID.  ALL OF THE OTHER EXPERTS WHO HAVE BEEN OFFERED

1    ON THAT SUBJECT HAVE COME TO THE SAME CONCLUSION, INDEPENDENT

2    OF ANYTHING WITH TOMIYAMA.

3         WHAT I'M SAYING HERE, YOUR HONOR, IS THAT FOR US TO

4    BE EXCLUDED FROM MAKING THE ARGUMENT OF THE DIFFICULTY OF GOING

5    2-D TO 3-D, WHICH IS EVEN MENTIONED IN SOME OF THE CASES THAT

6    WE'VE ARGUED IN SUMMARY JUDGMENT MOTIONS, IS REALLY PAINTING

7    WITH A BROAD BRUSH.  WE HAVE ALREADY BEEN PENALIZED BY TAKING A

8    KEY EXPERT ON FACE PAINTING OUT OF THIS CASE.  BUT NOW TO

9    EXTEND IT SO THAT WE CAN'T EVEN REFER TO SOMETHING THAT'S SO

10   WELL KNOWN OUT THERE THAT CASE AUTHORITIES ARE CITING TO IT --

11   I RESPECTFULLY ASK, YOUR HONOR, TO CONSIDER THAT IN TERMS OF

12   YOUR TENTATIVE INDICATION.

13        MR. VILPPU HAD NO ACCESS TO TOMIYAMA.  HE'S 72 YEARS

14   OLD.  HE HAS A CAREER ON THESE VERY TYPES OF ISSUES.

15        MR. TONNER IS ONE OF THE LEADING DOLL EXPERTS IN THE

16   WORLD.  HE CAME TO HIS CONCLUSION WITHOUT ANY REFERENCE TO

17   ANYTHING THAT TOMIYAMA DIDN'T DO AT MATTEL.

18        THAT'S THE POINT:  SHE DIDN'T DO THAT AT MATTEL.

19        THE COURT:  VERY WELL.

20        MR. NOLAN:  THANK YOU.

21        THE COURT:  LET ME HEAR FROM MATTEL.

22        MR. QUINN:  YOUR HONOR, I TAKE IT THAT IT'S NOT

23   CONTROVERTED.  IT WASN'T CONTROVERTED IN THE PAPERS.  THEY HAD

24   AN OPPORTUNITY TO PRESENT AN EARLIER DATE OR AN EARLIER

25   CONSULTATION, IF THEY COULD.  I TAKE IT IT'S UNCONTROVERTED AT

1    THIS POINT THAT THEY WERE COMMUNICATING WITH MS. TOMIYAMA

2    BEFORE ANY OF THESE OTHER PEOPLE, WHO COUNSEL HAS IDENTIFIED,

3    TESTIFIED.  AND THE REASON WE'RE DISCUSSING THIS IS BECAUSE THE

4    COURT FOUND THERE WAS A TAINT TO THIS.

5        THE COURT:  I DO.

6        MR. QUINN, I GUESS THE POINT IS -- MR. NOLAN MAKES

7    THE POINT THAT WE'RE NOT TALKING ABOUT A UNIQUE IDEA OR OPINION

8    OR EXPRESSION OF MS. TOMIYAMA.  THIS IS SOMETHING WHICH THE

9    COURT CERTAINLY HAS STUMBLED ACROSS IN SEVERAL CONTEXTS.  THIS

10    IDEA, THIS ISSUE, OF WHETHER OR NOT 2-D TRANSFERS TO 3-D IS

11    SOMETHING WHICH, CERTAINLY, THERE WILL BE A DISPUTE OVER, OR

12    THERE WILL BE COMPETING EXPERTS OVER, WHETHER OR NOT

13    MS. TOMIYAMA EVER WAS INVOLVED IN THIS CASE OR NOT.

14        THE QUESTION IS, I GUESS, IS THE COURT GOING TOO FAR

15    IN THIS ISSUE PRECLUSION, BASICALLY, OR EVIDENCE PRECLUSION, AS

16    A PUNISHMENT FOR THIS TAINT?  BECAUSE IT'S HARD FOR ME TO

17    CONCLUDE THAT IT REALLY IS A RESULT OF TAINT.  IT'S MORE A

18    QUESTION OF HOW FAR THE PUNITIVE MEASURE SHOULD BE TAKEN.

19    BECAUSE IT'S OUT THERE.  AND YOU HAVE EVIDENCE TO SUGGEST THAT

20    IT IS TRANSFERRABLE.  THEY HAVE EVIDENCE TO SUGGEST IT'S NOT.

21    BUT THIS DIDN'T ARISE AND FALL WITH MS. TOMIYAMA.

22        MR. QUINN:  THE REASON WE'RE HAVING THIS CONVERSATION

23    AGAIN, YOUR HONOR, IS BECAUSE THEY SPOKE, HAD RETAINED, HAD

24    COMMUNICATIONS, WITH SOMEBODY WHO WAS AN INTERNAL CONSULTANT ON

25    THESE ISSUES, TO MATTEL'S LAWYERS, INCLUDING RELATING TO THIS

1   LITIGATION.  THAT'S WHY WE'RE HERE.  THAT'S WHY WE'RE HAVING

2   THIS CONVERSATION.

3        WE TALKED LAST TIME AND WE WENT AND LOOKED AT SOME OF

4   THE LANGUAGE FROM SOME OF THE CASES THAT SAY THE IMPORTANCE OF

5   PERCEPTIONS, LEVELING THE PERCEPTION OF THE LEVEL PLAYING

6   FIELD.  WE ALL KNOW THE PROCESS OF EXPERT TESTIMONY AND EXPERT

7   REPORTS AND THE ROLE OF LAWYERS IN THAT.  THE FACT THAT NONE OF

8   THESE OTHER INDIVIDUALS, WHOSE REPORTS WERE RELEASED LATER,

9   SPOKE TO MS. TOMIYAMA -- OR THEY SAY THAT THEY DIDN'T SPEAK TO

10  HER -- THAT WOULD BE IRRELEVANT EVEN IF IT WERE TRUE.  BUT THE

11  TESTIMONY WAS THAT MS. TOMIYAMA AND SEVERAL OF THEIR OTHER

12  EXPERTS -- I CAN'T RECALL THE OTHER NAMES -- ALL GOT TOGETHER

13  AT A MEETING AT SKADDEN ARPS.  SHE TESTIFIED ABOUT THIS.

14       AND I DON'T HAVE THE TRANSCRIPT, AND I CAN'T SAY

15  WHETHER IT'S THOSE INDIVIDUALS THAT COUNSEL REFERRED TO, BUT IT

16  WOULDN'T BE A SURPRISE TO ANY OF US TO KNOW THAT COUNSEL WAS

17  INVOLVED IN FRAMING THE OPINIONS THAT EXPERTS ARRIVE AT AND PUT

18  IN THEIR REPORTS AND TESTIFY TO.  IT WOULDN'T BE A SURPRISE TO

19  ANY OF US TO KNOW THAT COUNSEL IS INVOLVED IN COORDINATING WHAT

20  EXPERT IS GOING TO SAY WHAT AND MAKING SURE IT'S CONSISTENT.

21       I COME BACK TO THE FIRST POINT, YOUR HONOR:  IT'S NOT

22  PUNITIVE SO MUCH; IT'S THE IMPORTANCE OF THE LEVELING OF THE

23  PLAYING FIELD.

24       THIS WAS NOT A SMART THING TO DO, TO RETAIN THIS

25  WOMAN, KNOWING WHAT THEY KNEW.  AND THE CONSEQUENCES,

1   YOUR HONOR, I THINK, ARE THE RESULTS OF A POOR DECISION THAT

2   WAS MADE.

3        THE COURT:  THANK YOU, COUNSEL.

4        MR. NOLAN:  YOUR HONOR, ONE QUICK POINT.

5        YOUR HONOR, I APPRECIATE THE COMMENT ABOUT THAT THIS

6   IS MORE PUNITIVE THAN A TAINT ISSUE BECAUSE SHE DIDN'T DO THAT

7   ANALYSIS.

8        I WOULD POINT, YOUR HONOR, TO THE NOTION THAT IN SUCH

9   A BROAD AND VERY SERIOUS SANCTION, THE LAWYERS INVOLVED WOULD

10  HAVE TO BE SHOWN TO HAVE ACTED IN BAD FAITH, THAT WE DID THIS

11  INTENTIONALLY.  AND WE CITED TO THAT PROPOSITION, UNITED STATES

12  V. SUMITOMO MARINE AND FIRE INSURANCE COMPANY, AT 617 F.2D --

13  THEY SIMPLY DID NOT MAKE THAT POINT.

14       YOUR HONOR, IN YOUR RULING, WITH RESPECT TO THE

15  DISQUALIFICATION, IF I COULD READ, IT SAYS, "THERE'S NO

16  EVIDENCE FOR THIS -- AND ADDING FROM AN EARLIER FINDING OF,

17  "ANY FINDING OF INTENTIONAL WRONGDOING BY MGA OR ITS COUNSEL,

18  SO I'M UNWILLING TO INFER THAT ATTORNEYS HAVE ENGAGED IN ANY

19  MISCONDUCT MERELY BECAUSE THEY HAD THE OPPORTUNITY TO DO SO,

20  EVEN AN AMPLE OPPORTUNITY TO DO SO."

21       WE DIDN'T ACT IN BAD FAITH, YOUR HONOR.  YOU'LL

22  RECALL THAT THE MINUTE WE WERE EVEN BROUGHT TO THIS ATTENTION,

23  WE OFFERED TO EXCLUDE THE EXPERT ON OUR OWN.  WE RECALLED ALL

24  OF HER REPORTS.  WE TRASHED IT.

25       TO NOW SAY THAT BASED ON THAT, YOUR HONOR, WE SHOULD

1    BE FURTHER PUNISHED BY NOT BEING ABLE TO MAKE AN ARGUMENT THAT

2    IT'S OUT IN THE PUBLIC DOMAIN AND CITED IN COPYRIGHT CASES,

3    CITED BY EXPERTS, KIND OF COMMON IN THE INDUSTRY AS TO THE

4    DIFFICULTY BETWEEN GOING FROM 2-D TO 3-D, I THINK WOULD BE A

5    BREATHTAKING PUNITIVE SANCTION THAT IS NOT SUPPORTED IN THE

6    RECORD.

7        AND I'LL SUBMIT ON THAT.

8        THE COURT:  THIS WOULD BE A 1-B ISSUE, I PRESUME?

9        MR. NOLAN:  YES.

10       MR. QUINN:  IT WOULD BE 1-B.

11       BUT I DON'T RECALL AN OFFER EVER BEING MADE TO

12   EXCLUDE THE EXPERT.  I THINK THAT HAPPENED BECAUSE OF THIS

13   COURT'S RULING.

14       MR. NOLAN:  YOUR HONOR, IN THE PAPERS, PAUL ECKLES,

15   MY PARTNER IN NEW YORK, IN A MEET-AND-CONFER, THE FIRST TIME

16   THIS WAS RAISED IN THE FIRST MEET-AND-CONFER -- AND I BELIEVE

17   THIS IS IN THE PAPERS IN CONNECTION WITH THE

18   DISQUALIFICATION -- THERE WAS A DISCUSSION -- I FORGET WHO IT

19   WAS FROM MATTEL -- WHERE WE SAID, 'LISTEN, WOULD IT BE

20   SUFFICIENT IF WE AGREED TO EXCLUDE AND DROP MS. TOMIYAMA?'  AND

21   THEY SAID, 'NO.  WE'RE GOING TO BE FILING THIS MOTION.'

22       THE COURT:  VERY WELL.

23       I'M GOING TO DEFER A RULING ON THIS ONE UNTIL BEFORE

24   THE 1-B TRIAL.  YOU BOTH RAISE GOOD ARGUMENTS ON THIS, AND I

25   WANT TO THINK ABOUT THE NEED TO IMPOSE THIS AS A SANCTION,

1    BECAUSE THAT'S CERTAINLY THE EXTENT TO WHICH IT WILL BE DONE.

2         I WANT TO GO BACK TO YESTERDAY AND RULE ON A COUPLE

3    OF MOTIONS THAT I DEFERRED.

4         MGA'S MOTION IN LIMINE NUMBER FOUR RELATED TO THE MGA

5    EMPLOYMENT AGREEMENT; THAT MOTION IS DENIED.

6         WITH RESPECT TO MOTION IN LIMINE NUMBER SIX, IT IS

7    GRANTED IN PART AND DENIED IN PART.  I DENY THE MOTION

8    IN LIMINE WITH RESPECT TO EVIDENCE OF MGA'S HIRING OF MATTEL

9    EMPLOYEES, WHICH IS THE FIRST ISSUE.  I GRANT THE MOTION

10   IN LIMINE WITH RESPECT TO THE SECOND ISSUE; THAT IS, EVIDENCE

11   THAT MGA BORROWED MATTEL IDEAS TO CREATE MGA PRODUCTS.

12        MR. QUINN:  GRANT AS TO EXCLUDING TOON TEENS?

13        THE COURT:  YES.

14        I'M SORRY?

15        MR. QUINN:  GRANT AS TO EXCLUDING --

16        THE COURT:  NO.  I'M SORRY.  I'M SAYING THIS IN

17   REVERSE.

18        THANK YOU, COUNSEL.

19        THAT WOULD BE INCONSISTENT WITH -- I HAVE IT DOWN AS

20   RELEVANT TO TIMING.  I'M SORRY.  THAT IS DENIED.  I HAD IT

21   REVERSED.

22        WITH RESPECT TO THE THIRD ISSUE, MGA USE OF MATTEL

23   COMPANY INFORMATION FOR MARKETING AND BRANDING, I THINK I

24   INDICATED IN MY RULING ON THIS EARLIER, WITH RESPECT TO THE SIX

25   EMPLOYEES, THE MOTION IS GRANTED.  WE'RE NOT GETTING INTO THE

1    PHASE TWO.  THE COURT WOULD RECONSIDER, OF COURSE, AS WE GET

2    INTO THE APPORTIONMENT ISSUE IN PHRASE 1-B, DEPENDING ON WHAT

3    EVIDENCE IS INTRODUCED BY MGA ON THAT POINT.  BUT FOR RIGHT

4    NOW, I'M GOING TO GRANT THE MOTION IN LIMINE WITH RESPECT TO

5    THAT THIRD ISSUE.

6          WITH RESPECT TO THE FOURTH EVIDENTIARY ISSUE IN THIS

7    MOTION IN LIMINE, EVIDENCE THAT MGA LAUNCHED PRODUCTS TO

8    INTERFERE WITH MATTEL'S SUCCESS, THAT IS MOOT BY STIPULATION.

9          THE FIFTH CATEGORY, EVIDENCE THAT MGA INDUCED MATTEL

10    EMPLOYEES TO WORK OFF HOURS FOR MGA, IT IS DENIED WITH RESPECT

11    TO THAT.

12          AND WITH RESPECT TO THE SIXTH ISSUE, THAT MGA DEFAMED

13    MATTEL TO VENDORS AND THE PUBLIC, THAT IS MOOT BY STIPULATION;

14    SO IT'S ESSENTIALLY DENIED.  THE MOTION IN LIMINE IS DENIED,

15    EXCEPT FOR THOSE AREAS WHERE IT'S MOOT BY STIPULATION, AND IT'S

16    GRANTED WITH RESPECT TO THE THIRD ISSUE, AT LEAST WITH RESPECT

17    TO 1-A.  THE DOOR MAY BE OPENED TO IT IN 1-B, BUT FOR THE TIME

18    BEING AND FOR PURPOSES OF OPENING STATEMENTS, IT IS GRANTED.

19          I'LL SPELL THIS OUT IN THE ORDER THAT I WILL ISSUE.

20          BUT AS FAR AS THE TOON TEENS, THE SECOND ISSUE, IT IS

21    RELEVANT AS TO TIMING OF THE REDUCTION OF PRACTICE BY

22    MR. CARTER BRYANT.

23          THOSE ARE THE MOTIONS IN LIMINE.

24          I WILL TRY TO GET OUT A COMPREHENSIVE ORDER WHICH

25    ADDRESSES ALL 30 OF THESE, OR AT LEAST THE COURT'S POSITION ON

1   ALL 30 OF THESE, BY THE END OF TODAY, OR TOMORROW MORNING AT

2   THE LATEST.

3      I HAVE TWO DISCOVERY MOTIONS, AND I WANT TO TALK

4   ABOUT THE SETTLEMENT AGREEMENT.

5      LET ME TAKE UP THE DISCOVERY MOTIONS AND THE

6   SETTLEMENT AGREEMENT AFTER A BREAK FOR THE COURT REPORTER.

7      (BRIEF RECESS.)

8      THE COURT:  WE'RE BACK ON THE RECORD TO TAKE UP THE

9   MOTIONS.  LET'S BEGIN, BECAUSE IT'S BEFORE ME RIGHT NOW, WITH

10   THE MOTION FOR PROTECTIVE ORDER LIMITING THE PROTECTIVE SCOPE

11   OF THE PRIVILEGE LOG.

12      I'M SORRY.  THIS IS MATTEL'S MOTION OBJECTING TO THE

13   DISCOVERY MASTER'S MAY 6TH, 2008 ORDER, DENYING MATTEL'S MOTION

14   FOR THE PROTECTIVE ORDER LIMITING THE TEMPORAL SCOPE OF ITS

15   PRIVILEGE LOG; SO THIS IS MATTEL'S MOTION.

16      MR. ALGER:  THIS IS A LESS THORNY ISSUE.

17      THE QUESTION IS WHETHER MATTEL SHOULD UNDERTAKE THE

18   BURDEN OF PUTTING TOGETHER, DOCUMENT BY DOCUMENT, A PRIVILEGE

19   LOG FOR THE PERIOD OF TIME AFTER THERE IS NO DISPUTE MATTEL WAS

20   AWARE OF ITS CLAIMS IN THIS CASE WHICH OCCURRED ON, AT THE

21   LATEST, I GUESS, IN MGA'S VIEW, NOVEMBER 24, 2003.

22      WE HAVE OFFERED TO DO A CATEGORICAL DESCRIPTION OF

23   THESE DOCUMENTS; THAT'S QUITE VOLUMINOUS.  WE THINK IT

24   UNNECESSARY TO BE LOGGING THE DOCUMENTS FROM THAT TIME WHEN WE

25   HAD NOTICE OF OUR CLAIMS UP UNTIL THE FILING.  IT JUST GIVES A

1    ROAD MAP TO THE OTHER SIDE AS TO WHAT KIND OF INVESTIGATION WE

2    DID DURING THAT PERIOD OF TIME.  THE DISCOVERY MASTER ERRED

3    BECAUSE HE SIMPLY DECIDED WE HADN'T MADE A SUFFICIENT SHOWING

4    OF UNDUE BURDEN.

5         THE REAL ANALYSIS IS WHAT'S THE MATERIAL BENEFIT OF

6    SUCH A LOG?  THE DISCOVERY MASTER DID NOT REACH THAT, IGNORED

7    THAT ISSUE AS TO WHETHER THERE WAS ANY MATERIAL BENEFIT.  IT'S

8    OUR VIEW THAT THERE'S NO MATERIAL BENEFIT, GIVEN THE FACT

9    THERE'S NO DISPUTE MATTEL WAS ON NOTICE OF ITS CLAIMS.  IT

10   FILED ITS COMPLAINT IN APRIL OF 2004; SO THERE'S NO NEED TO GO

11   THROUGH THE PROCESS OF PULLING ALL OF THE LITIGATION FILES FROM

12   MATTEL, GOING THROUGH SIMPLY TO WRITE, PREPARE A LOG THAT'S OF

13   NO USE TO ANYONE.

14        THE COURT:  HOW WOULD YOU BEST ARTICULATE THE

15   RELEVANCY OF THIS LOG?

16        MR. NOLAN:  YOUR HONOR, WE ARE ENTITLED TO A

17   PRIVILEGE LOG THAT OUTLINES WHAT THE DOCUMENTS ARE THAT THEY

18   CONTEND ARE PRIVILEGE DURING A RELEVANT PERIOD OF THIS CASE.

19        THIS IS NOT SO MUCH A QUESTION OF RELEVANCE, BUT IT

20   IS RELEVANT.  WE ARE ENTITLED TO LOOK AT A LOG.  THEY HAVE OUR

21   PRIVILEGED LOG.  THIS IS A SIMPLE CASE, YOUR HONOR, OF -- THE

22   RULES IN THIS CASE SHOULD APPLY EQUALLY TO BOTH PARTIES.

23        THE FIRST ASSIGNMENT THAT WE HAD WHEN WE CAME INTO

24   THIS CASE WAS A HEARING BEFORE JUDGE INFANTE WHERE, BECAUSE

25   O'MELVENY HAD NOT DONE A PRIVILEGE LOG, OR IT WAS DELAYING ITS

1    LOG --

2        THE COURT:  I RECALL.

3        MR. NOLAN:  -- VERY SERIOUS SANCTIONS.  THEY WANTED

4    TO WAIVE THE ENTIRE ATTORNEY-CLIENT PRIVILEGE.

5        I SUBMIT TO YOU, YOUR HONOR, THAT MGA SPENT MORE THAN

6    A MILLION DOLLARS TRYING TO COMPLY WITH THAT ORDER, AND WE DID

7    SO SUCCESSFULLY IN FRONT OF JUDGE INFANTE.

8        THIS, IN FACT, IS AN ORDER THAT WAS ISSUED IN MARCH

9    BY JUDGE INFANTE THAT THEY DID NOT APPEAL.  WHEN THEY REALIZED

10   THAT THEY DID NOT APPEAL, THEY WENT IN FOR A PROTECTIVE ORDER

11   AND JUDGE INFANTE RIGHTFULLY SAID, WAIT A MINUTE, YOU'RE THE

12   SAME PARTY THAT HAS COME IN AND MADE FRED LARIAN DO THIS,

13   ISAAC LARIAN DO THIS, MGA DO THIS, AND YOU DON'T WANT TO DO IT?

14   BURDEN?  I'M SORRY.  START NOW AND PRODUCE IT BEFORE THE 19TH.

15       WE THEN LEARNED FOR THE FIRST TIME, THROUGH MEET AND

16   CONFER, THAT THEY HAD NOT EVEN LOOKED AT THESE DOCUMENTS YET,

17   AND YET THEY ARE NOT PUTTING THEM ON A PRIVILEGE LOG.  THEY

18   WERE ORDERED ABOUT THE NHB.

19       YOUR HONOR, YOU TALK ABOUT A BURDEN -- WE WERE

20   REQUIRED TO FILE A SUPPLEMENTAL INTERROGATORY LISTING ALL OF

21   THE BATES NUMBERS GOING BACK TO ALL OF THE CONTENTIONS

22   INTERROGATORIES, AND WE HAD TO DO THAT YESTERDAY.  I THINK IT'S

23   ABOUT 280 PAGES OF BATES NUMBERS, LINING THEM UP TO PARTICULAR

24   CONTENTIONS.  WE WERE REQUIRED TO DO THIS.

25       WE'RE THE FIRM THAT'S BEEN IN HERE FOR SIX MONTHS.

1    WE'VE HAD TO STEP UP AND DO ALL OF THIS.  AND FOR THEM TO NOW

2    COME IN AND SAY, THE BURDEN IS JUST TOO GREAT FOR US, ON THE

3    EVE OF TRIAL.  THESE DOCUMENTS ARE RELEVANT.  IF YOU DON'T DO A

4    PRIVILEGE LOGGED, YOU'VE WAIVED THE PRIVILEGE.  THAT'S THE LAW.

5        THE COURT:  I UNDERSTAND COUNSEL.

6        MR. ALGER?

7        I THINK MR. NOLAN DOES A GOOD JOB OF EXPLAINING THIS.

8    LET ME ASK YOU A COUPLE OF QUESTIONS.  IT'S A SIX-MONTH TIME

9    PERIOD, FROM NOVEMBER TO APRIL; CORRECT?

10       MR. ALGER:  YES, YOUR HONOR.

11       THE COURT:  ANY QUESTION THAT THERE ARE DOCUMENT

12   REQUESTS PERTINENT TO THAT TIME PERIOD?

13       MR. ALGER:  I WOULDN'T HAVE AN ANSWER FOR THAT, YOUR

14   HONOR.  WE'RE JUST TALKING --

15       THE COURT:  DOES SOMEBODY KNOW THE ANSWER TO THAT

16   QUESTION ON THE MATTEL'S TIME?  ARE THERE DOCUMENT REQUESTS

17   PERTINENT TO THAT TIME PERIOD.

18       MR. ZELLER:  NOT REALLY, YOUR HONOR.  THAT'S WHAT

19   WE'RE STRUGGLING WITH IS THAT DURING THAT TIME PERIOD -- THIS

20   IS QUITE CLEARLY, AND I THINK YOU KNOW THIS FROM MR. MOORE'S

21   TESTIMONY FROM THE HEARINGS WE'VE HAD EARLIER THIS YEAR --

22   DURING THAT TIME PERIOD, THERE'S BEEN OUTSIDE COUNSEL, IN-HOUSE

23   COUNSEL, WORKING TO PREPARE AND FILE A COMPLAINT.  THE

24   PRIVILEGE LOG WOULD LOOK SOMETHING LIKE THIS:  INTERNAL

25   COMMUNICATIONS BETWEEN QUINN EMANUEL LAWYERS; MEMOS THAT WE HAD

1    ASSOCIATES PREPARE.

2         THE COURT:  I APPRECIATE THAT, MR. ZELLER, AND I

3    APPRECIATE THE BURDEN.

4         MY QUESTION IS, ARE THERE DOCUMENT REQUESTS PERTINENT

5    THAT APPLY TO THAT TIME PERIOD.

6         MR. ALGER:  I'M GOING THROUGH MY HEAD.  IT'S

7    DIFFICULT TO IMAGINE THERE WOULD BE ANY DOCUMENT REQUESTS THAT

8    COVER THAT PERIOD OF TIME.

9         THE COURT:  THEN WHAT'S THE ISSUE?

10        MR. ALGER:  THE ISSUE IS THAT -- FOR INSTANCE, IF

11   THEY HAVE DOCUMENT REQUESTS THAT --

12        THE COURT:  THIS QUESTION IS TO MGA.  THEY ARE SAYING

13   THERE ARE NO REQUESTS THAT COVER THAT PERIOD OF TIME.

14        MR. NOLAN:  I SUBMIT THAT TIME PERIOD IS RELEVANT TO

15   THIS LITIGATION.

16        THE COURT:  I'M GOING TO ASK YOU A REALLY CLEAR

17   QUESTION:  IS THERE A DOCUMENT REQUEST THAT IS APPLICABLE TO

18   THE TIME PERIOD IN QUESTION?

19        MR. NOLAN:  YES.

20        MR. ALGER:  IT DEPENDS ON HOW YOU --

21        THE COURT:  STOP.  STOP.

22        WHAT DOCUMENT REQUEST?

23        MR. NOLAN:  YOUR HONOR, WE'LL GET IT.  BUT WE HAVE

24   ISSUED A NUMBER OF DOCUMENT REQUESTS SINCE WE'VE COME INTO THE

25   CASE ASKING THEM TO PRODUCE DOCUMENTS ON RELEVANT SUBJECTS

1    DURING THIS PERIOD OF TIME.

2        THE COURT:  IF THERE IS A DOCUMENT REQUEST, IF THE

3    ANSWER TO THE QUESTION IS YES, AND YOU'RE SUGGESTING THAT YOU

4    DO NOT HAVE TO PRODUCE DOCUMENTS BECAUSE THEY ARE PRIVILEGED,

5    THEN YOU HAVE TO CREATE A PRIVILEGE LOG.  IF THERE'S NO

6    DOCUMENT REQUEST COVERING THAT PERIOD, THEN THERE'S NOTHING TO

7    PRODUCE.  IT'S AS SIMPLE AS THAT.

8        MR. ALGER:  IT DEPENDS HOW YOU DEFINE -- THEY HAVE

9    LAID ON US A NUMBER OF REQUESTS THAT SAY "ALL DOCUMENTS RELATED

10   TO CARTER BRYANT; ALL DOCUMENTS RELATED TO THE ORIGINS OF

11   BRATZ."

12       THE COURT:  AND THAT'S FINE, AND WE'RE NOT GOING TO

13   LITIGATE --

14       MR. ALGER:  WE'RE GOING TO HAVE --

15       THE COURT:  MR. ALGER, DON'T SPEAK OVER ME OR I'M

16   GOING TO SEND YOU RIGHT OUT OF THIS COURTROOM.  THIS IS NOT THE

17   FIRST TIME I'VE SPOKEN TO YOU ABOUT SPEAKING OVER THIS COURT.

18       DO YOU UNDERSTAND ME?

19       MR. ALGER:  YES, YOUR HONOR.

20       THE COURT:  IF YOU WANT TO CONTINUE TO PRACTICE IN

21   THIS COURT, WHEN I'M SPEAKING, YOU'RE GOING TO HAVE TO STOP

22   SPEAKING.  DO YOU UNDERSTAND THAT?

23       MR. ALGER:  YES, YOUR HONOR.

24       THE COURT:  ALL RIGHT.

25       I'M NOT GOING TO GET INTO THE BREADTH OR THE

1    OVERBREADTH OF DOCUMENT REQUESTS WHEN WE'RE SITTING HERE ON THE

2    EVE OF TRIAL.

3         IF THERE'S A DOCUMENT REQUEST, AND WHAT I MEAN BY

4    DOCUMENT REQUEST, A REQUEST FOR PRODUCTION OF DOCUMENTS, SET

5    NUMBER ONE, SET NUMBER TWO, SET NUMBER 300 -- I DON'T CARE WHAT

6    IT IS -- THAT COVERS THIS TIME PERIOD, WE'RE LONG PAST THE DATE

7    FOR OBJECTING TO THE REQUESTS FOR DOCUMENTS.  WE'RE LONG PAST

8    THE DATE FOR OBJECTING TO THE WORDING OF THE REQUESTS.

9         IT'S A SIMPLE MATTER OF WHETHER OR NOT THERE'S A

10   REQUEST THAT COVERS THIS TIME PERIOD.

11        IF THERE IS AND IF THERE ARE RESPONSIVE DOCUMENTS

12   THAT YOU ARE CLAIMING A PRIVILEGE, THEN PRODUCE A PRIVILEGE

13   LOG.  IF THERE IS NO REQUEST FOR DOCUMENTS THAT COVER THAT TIME

14   PERIOD, THEN THERE'S NOT AN ISSUE HERE.  BUT UNLESS YOU CAN BE

15   CERTAIN THAT THERE IS NO REQUEST FOR DOCUMENTS THAT COVER THIS

16   TIME PERIOD, I DON'T CARE HOW BROAD THE REQUESTS ARE OR WHAT

17   THEY ARE AT THIS POINT, BECAUSE WE'RE WAY TOO LATE TO ADDRESS

18   THAT ISSUE.  THEN IT'S NOT CLEARLY ERRONEOUS, GIVEN THE

19   JUDGMENT MADE BY THE DISCOVERY MASTER.

20        I'M NOT SAYING THAT I WOULD MAKE THE SAME JUDGMENT IN

21   THE FIRST INSTANCE.  I'M NOT SAYING IT'S NOT A BURDEN; THAT

22   IT'S NOT BROAD.  BUT THE ONLY QUESTION AT THIS POINT, GIVEN THE

23   TREMENDOUS BURDENS PLACED ON EVERYBODY IN THIS CASE, IF THERE

24   ARE REQUESTS FOR THAT TIME PERIOD AND YOU'RE SAYING THAT YOU

25   ARE NOT GOING TO PRODUCE THE DOCUMENTS BECAUSE THEY ARE

1    PRIVILEGED, THEN PRODUCE THE PRIVILEGE LOG.

2         AND YOU'RE SAYING, NO, THERE'S NOT.  MGA IS SAYING,

3    YES, THERE IS.  IF YOU WANT ME TO GO THROUGH THE BURDEN OF

4    HAVING SOMEONE PRODUCE THAT, I WILL, BUT YOU'D BETTER BE

5    CERTAIN YOU'RE RIGHT IF YOU'RE GOING TO REPRESENT TO THE COURT

6    HERE THAT THERE'S NOT A REQUEST COVERING THAT PERIOD.

7         COUNSEL?

8         MR. ALGER:  THANK YOU, YOUR HONOR.

9    WE'D LIKE 14 DAYS TO PREPARE THE LOG.

10        THE COURT:  MR. NOLAN?

11        MR. NOLAN:  YOUR HONOR, WE WOULD -- I JUST THINK TWO

12   WEEKS IS EXCESSIVE.  THEY WERE UNDER ORDER TO DO THIS.

13        I WOULD SAY THAT IT BE PRODUCED IN SEVEN DAYS.

14        WE WERE REQUIRED TO DO SIMILAR STUFF ON QUICK NOTICE.

15   WE'VE HAD TO DO IT.  THE LAST ONE -- AND I KNOW -- AND I'M NOT

16   COMPLAINING, BUT WE DID IT, WE COMPLIED, PRODUCING ALL OF THE

17   DOCUMENTS FROM HONG KONG.  WE SPENT EXTRAORDINARY AMOUNT OF

18   EFFORTS TO GET THOSE IN AND LOG THEM.  I THINK SEVEN DAYS IS A

19   REASONABLE PERIOD OF TIME UNDER THE CIRCUMSTANCES.

20        THE COURT:  THANK YOU, COUNSEL.

21        I'M GOING TO DENY THE MOTION.

22        HOWEVER, I WILL AFFORD THE 14 DAYS, GIVEN WHERE WE

23   ARE AT IN THIS TRIAL.  THAT'S REASONABLE, GIVEN THE COURT'S

24   ASSESSMENT THAT THE LIKELIHOOD THAT ANY OF IT IS GOING TO BE

25   RELEVANT AND BASED ON MR. NOLAN'S EARLIER ARGUMENT THAT THIS IS

1    MORE JUST A MATTER OF FAIRNESS TO REQUIRE COUNSEL TO DO WHAT

2    THEY HAVE BEEN REQUIRED TO DO.  I THINK THE 14 DAYS IS A

3    REASONABLE REQUEST, AND THAT'S WHAT I WILL ORDER IN THIS CASE;

4    14 DAYS TO PRODUCE THE PRIVILEGE LOG.

5         MR. ALGER:  THANK YOU, YOUR HONOR.

6         THE COURT:  THE NEXT MOTION I WANT TO TAKE UP IS

7    MATTEL'S EX-PARTE APPLICATION FOR AN ORDER THAT THERE IS NO

8    BASIS UNDER THE PROTECTIVE ORDER FOR MATTEL TO RETURN FIVE

9    DOCUMENTS PRODUCED BY MGA.

10        WHO IS SPEAKING TO THAT?

11        MR. COREY?

12        MR. COREY:  THANK YOU, YOUR HONOR.

13        WE BROUGHT THIS BECAUSE -- AND I THINK BOTH PARTIES

14   AGREE -- THERE'S A CLAWBACK PROVISION IN THE PROTECTIVE ORDER.

15   BOTH PARTIES HAVE BEEN COMPLYING WITH THAT.  WE'VE RECEIVED

16   WITHIN THE PAST TWO WEEKS OR SO REQUESTS FOR ABOUT 15 OR 16

17   DOCUMENTS BACK.  MANY OF WHICH -- SOME OF WHICH WE HAVE ON OUR

18   TRIAL EXHIBIT LISTS.  THERE ARE A NUMBER OF THOSE THAT WE DON'T

19   THINK THAT REQUEST IS APPROPRIATE; SO WE DO SEEK SOME RELIEF

20   FROM OUR OBLIGATIONS UNDER THE PROTECTIVE ORDER AND OUR

21   OBLIGATIONS UNDER THE STATE COMPENSATION FUND.  IN LIGHT OF THE

22   FACT THAT WE CAN NO LONGER BRING MOTIONS IN FRONT OF JUDGE

23   INFANTE, WE BROUGHT THIS TO YOU TO GET A RULING ON THE

24   PRIVILEGE VALIDITY.

25        AS FAR AS I'M AWARE -- AND WE HAVE ASKED FOR THIS AT

1    LEAST WITH RESPECT TO SOME OF THESE DOCUMENTS -- THEY HAVE NOT

2    BEEN IDENTIFIED ON A PRIVILEGE LOG.  I DON'T HAVE THE

3    DOCUMENTS.  I DO KNOW WE DID LODGE COPIES OF THEM WITH THE

4    COURT.  I WOULD INVITE COURT TO LOOK AT THEM.  LET ME TALK

5    ABOUT EACH OF THEM VERY BRIEFLY.

6        ONE IS A BRATZ SALES DOCUMENT THAT SIMPLY CONTAINS

7    SOME NUMBERS ON IT.  THE ASSERTION OF PRIVILEGE BEING MADE WITH

8    RESPECT TO THAT IS THE WORK PRODUCT PRIVILEGE.  AND IF THE

9    COURT LOOKS AT MR. KHARI'S DECLARATION, THERE'S NO BASIS FOR

10    WORK PRODUCT THAT APPARENTLY WAS CREATED IN CONNECTION WITH

11    APPLICATION TO A TRADEMARK OFFICE IN INDIA.  BUT THAT DOCUMENT

12    IS RELEVANT BECAUSE SOME OF THE SALES INFORMATION IS

13    INCONSISTENT WITH SOME OF THE SALES INFORMATION WE WERE BEING

14    PROVIDED BY MGA OTHERWISE IN DISCOVERY; AND THAT WAS MARKED IN

15    MS. TONNU'S DEPOSITION IN SEPTEMBER.  TWO OF THE OTHER

16    DOCUMENTS ARE EMPLOYEE LISTS.

17        BEFORE I LEAVE THAT, MR. KAHARI CAN'T EVEN IDENTIFY

18    THE AUTHOR OF THAT PARTICULAR DOCUMENT.

19        THE TWO OTHER DOCUMENTS ARE LISTS OF EMPLOYEES THAT

20    WERE PREPARED BY MGA'S HUMAN RESOURCES DEPARTMENT AND THEY WERE

21    PREPARED FOR THE PURPOSE OF EDUCATING A RULE 30(B)(6) WITNESS

22    TO TESTIFY, AND THEY WERE SHOWN TO THE RULE 30(B)(6) WITNESS

23    AND WERE ACTUALLY PRODUCED AND INQUIRED ABOUT.  EXHIBIT 664 WAS

24    PRODUCED AND INQUIRED ABOUT AT THE RULE 30(B)(6) WITNESS'S

25    DEPOSITION AND AT TWO OTHER WITNESSES' DEPOSITIONS, INCLUDING

1    THE DEPOSITION OF MR. KAHARI, WHO IS NOW SUBMITTING A

2    DECLARATION SAYING THAT THOSE SHOULD NOT HAVE BEEN PRODUCED IN

3    THE FIRST INSTANCE.

4         NOTHING CONTAINED IN THOSE DOCUMENTS IS PRIVILEGED

5    INFORMATION.

6         EXHIBIT 1932 IS A DIFFERENT VERSION OF THE EMPLOYEE

7    LIST SHOWING WHEN PEOPLE LEFT MATTEL, WHEN THEY STARTED AT MGA,

8    THEY WERE PREPARED FOR ALLOWING THIS 30(B)(6) WITNESS TO ANSWER

9    QUESTIONS ABOUT WHETHER, WHILE THESE PEOPLE WERE MATTEL

10   EMPLOYEES, THEY EITHER WORKED FOR MGA OR THEY RECEIVED PAYMENTS

11   FROM MGA.  THAT'S THE PURPOSE OF THE INFORMATION.  IT'S NOT

12   PRIVILEGED.

13        THE COURT:  MR. COREY, THE COURT HAS QUESTIONS ABOUT

14   HOW PRIVILEGED SOME OF THIS INFORMATION IS.  MGA REPRESENTS IN

15   THEIR PAPERS THAT THE PROCESS THAT EVERYONE ENGAGED IN

16   THROUGHOUT THIS LITIGATION HAS BEEN, WHEN THERE'S BEEN A

17   REQUEST FOR A CLAWBACK, THAT IT'S BEEN HONORED, AND THE PROCESS

18   HAS BEEN TO GIVE IT BACK AND THEN MAKE THE MOTION TO COMPEL.

19        MR. COREY:  ABSOLUTELY TRUE.

20        THE COURT:  AND THEN, THERE'S NOTHING IN THE

21   PROTECTIVE ORDER WHICH SUGGESTS A TIME LIMIT.  I UNDERSTAND YOU

22   HAVE HAD A NUMBER OF THESE DOCUMENTS FOR A WHILE.  THERE'S

23   NOTHING IN THE PROTECTIVE ORDER WHICH IMPOSES A TIME LIMIT ON

24   THE CLAWBACK.  GIVEN THE CIRCUMSTANCES OF THIS CASE WHERE A LOT

25   OF DOCUMENTS HAVE GONE BACK AND FORTH -- I'M SURE MR. NOLAN

1    COULD GIVE US THE ACTUAL BREAKDOWN -- BUT A LOT OF DOCUMENTS

2    HAVE GONE BACK AND FORTH.  IT'S NOT SURPRISING THAT THINGS HAVE

3    SLIPPED THROUGH THE CRACKS A NUMBER OF TIMES, ON BOTH SIDES,

4    AND WE'VE HAD THE CLAWBACK.

5        WHY SHOULD THE COURT IMPOSE A DIFFERENT PROCEDURE

6    WITH RESPECT TO THESE PARTICULAR DOCUMENTS?

7        MR. COREY:  WITH RESPECT TO THE SALES DOCUMENT AND

8    THE EMPLOYEE LISTS, THE ARGUMENT REALLY IS NOT THEY WAITED TOO

9    LONG.  I'M LOATHE TO MAKE THAT ARGUMENT BECAUSE OF THE AMOUNT

10   OF TIME THAT HAS GONE BY.

11       THE ARGUMENT REALLY IS MORE ONE OF, YOU KNEW EXACTLY

12   WHAT THESE DOCUMENTS WERE; WE HAD USED THEM IN DEPOSITIONS;

13   SOME OF THEM WERE PART OF THE SUMMARY JUDGMENT PAPERS WHICH

14   HAVE BEEN UNSEALED.  THIS IS NOT A, YOU WAITED TOO LONG'; THIS

15   IS 'YOU KNEW WHAT WAS IN THESE DOCUMENTS; YOU ELECTED NOT TO

16   ACT.'  IT'S MORE OF A WAIVER ARGUMENT BASED ON KNOWLEDGE THAN A

17   WAIVER.

18       THE COURT:  THAT'S WITH RESPECT TO WHICH DOCUMENT?

19       MR. COREY:  WITH RESPECT TO THE BRATZ SALES

20   DOCUMENTS.  AND I APOLOGIZE, YOUR HONOR, IF YOU GIVE ME ONE

21   SECOND, I CAN TELL YOU THE BATES NUMBERS, IF THAT WOULD BE

22   HELPFUL.

23       THE BRATZ SALES SHEET IS MGA.  IF YOU LOOK AT PAGE 3

24   OF THE APPLICATION, MAYBE THAT WOULD BE EASIEST.

25       IF YOU LIKE, I'M MORE THAN HAPPY TO HAND UP THIS

1      PAGE.

2          THE COURT:  I HAVE THE DOCUMENTS YOU SUBMITTED

3      IN-CAMERA RIGHT HERE BEFORE ME.

4          MR. COREY:  THAT IS A PAGE FROM THE APPLICATION; IF I

5      COULD USE THAT TO REFER THE COURT, AND THAT WILL IDENTIFY THE

6      SPECIFIC DOCUMENTS THAT WE'RE TALKING ABOUT.

7          THE COURT:  ALL RIGHT.

8          I'VE GOT THE EX-PARTE IN CAMERA SUBMISSION OF THE

9      FIVE DOCUMENTS, BUT THERE'S ONLY FOUR TABS.

10         MR. COREY:  MGA HAD ASKED FOR FIVE DOCUMENTS THAT WE

11     TOOK ISSUE WITH, AND THEY WITHDRAW, AT THE LAST MOMENT, ONE OF

12     THOSE DOCUMENTS BECAUSE JUDGE INFANTE HAD ALREADY RULED THAT IT

13     WAS NOT PRIVILEGED.

14         THE COURT:  SO THERE'S ONLY FOUR.

15         MR. COREY:  FOUR THAT ARE SUBJECT TO THE CURRENT

16     MOTION.

17         THE COURT:  TWO, THREE, FOUR, AND FIVE.

18         MR. COREY:  NUMBER ONE IS ON THE PRIOR PAGE; THAT IS

19     NO LONGER AT ISSUE.

20         THE COURT:  SO EXHIBIT A IS THE BRATZ SALES SHEET?

21         MR. COREY:  THE COURT WILL HAVE TO GO BY BATES

22     NUMBERS.  I DON'T KNOW WHAT NUMBER THE IN-CAMERA LODGING WAS

23     IN.

24         THE COURT:  THIS IS THE APPLICATION FOR REGISTRATION.

25         MR. COREY:  THAT IS THE ONE THAT SHOULD HAVE BEEN

1       WITHDRAWN.  I'M NOT SURE WHAT'S IN THE IN-CAMERA SUBMISSION.

2               THE COURT:  IS THAT CORRECT?

3               MR. NOLAN:  YES.

4               THE COURT:  SO NOW WE HAVE THREE.

5               MR. COREY:  EXCUSE ME.  THE SALES DOCUMENT WAS

6       ACTUALLY RETURNED; THAT WAS ASKED FOR EARLIER.  THAT WAS

7       RETURNED TO COUNSEL.  I DON'T HAVE A COPY OF THAT.

8               THE COURT:  SO THAT'S ALREADY BEEN RETURNED.

9               MR. NOLAN:  YES, YOUR HONOR.

10              MR. COREY:  AND I DON'T KNOW IF THE COURT HAS A COPY.

11              THE COURT:  IF IT'S ALREADY RETURNED, THEN IT'S MOOT;

12      RIGHT?

13              MR. COREY:  WE WOULD STILL LIKE THE RULING ON THE

14      PRIVILEGE ISSUE WITH RESPECT TO THAT DOCUMENT.

15              THE COURT:  DO I HAVE A COPY OF THAT BEFORE ME?

16              MR. COREY:  IT HAD BEEN RETURNED AT THE INITIAL

17      REQUEST.

18              THE COURT:  OKAY.

19              SO THE EMPLOYEE LIST NUMBER ONE AND EMPLOYEE LIST

20      NUMBER TWO.  I'VE GOT FORMER MATTEL EMPLOYEES AND THEY ARE

21      LISTED HERE UNDER EXHIBIT C, AND THEN I HAVE ANOTHER LIST OF

22      FORMER MATTEL EMPLOYEES LISTS; SO I ASSUME C AND D ARE

23      EMPLOYEES LISTS ONE AND TWO?

24              MR. COREY:  CORRECT.

25              THE COURT:  AND THEN THE PAYMENT LIST, THAT WOULD

1    BE -- DO I HAVE THAT?

2         MR. COREY:  I WOULD HOPE SO, YOUR HONOR.

3         THE COURT:  THE BRATZ SALES SHEET.

4         WHAT IS THIS ONE THAT HAS THREE COLUMNS:  RECIPIENT,

5    DATE, RECORD, SOURCE DOCUMENT?

6         MR. COREY:  ON SPECULATION, I BELIEVE THAT IS A

7    PAYMENT LIST.  I HAVE NOT SEEN THAT DOCUMENT, YOUR HONOR.

8         WE'RE TRYING TO WALK THE LINE BETWEEN HAVING THE

9    COURT MAKE THE ASSESSMENT OF PRIVILEGE WITHOUT THE BENEFIT OF

10   OUR INPUT.

11        THE COURT:  YES, THIS IS THE PAYMENT LIST; SO, THAT'S

12   EXHIBIT B.

13        AND THE SALES SHEET YOU SAY WAS RETURNED.

14        MR. COREY:  CORRECT, YOUR HONOR.

15        AND JUST A FOOTNOTE ON THAT --

16        THE COURT:  WHICH ONES OF THESE ARE YOU SAYING THAT

17   WERE USED IN THE MOTION FOR SUMMARY JUDGMENT?

18        MR. COREY:  I BELIEVE ONE OF THE EMPLOYEE LISTS WAS

19   USED IN THE MOTION FOR SUMMARY JUDGMENT.

20        THE COURT:  WHAT ABOUT THE PAYMENT LIST?

21        MR. NOLAN IS SHAKING HIS HEAD NO.

22        MR. COREY:  I DON'T BELIEVE THE PAYMENT LIST WAS

23   USED, AND I KNOW THAT THE BRATZ SALES SHEET WAS NOT USED; THAT

24   HAD BEEN RETURNED.

25        THE COURT:  VERY GOOD.

1        WITH RESPECT TO THE ONES THAT WERE NOT USED IN

2    SUMMARY JUDGMENT, WERE THEY USED ANY OTHER PLACE?

3        MR. COREY:  THE EMPLOYEE LISTS AND THE BRATZ SALES

4    SHEET WERE MARKED AT MULTIPLE DEPOSITIONS, AND THE EMPLOYEE

5    LIST, I BELIEVE, IS ONE OF THE DOCUMENTS THAT APPEARS IN THE

6    COURT'S FILE IN CONNECTION WITH VARIOUS PLEADINGS.

7        THE COURT:  MR. NOLAN?

8        MR. NOLAN:  YOUR HONOR, WITH RESPECT TO -- AND I CAN

9    DO WHICHEVER ONE IS IN FRONT OF YOU -- BUT IF I COULD TURN TO

10   THE LIST OF FORMER MATTEL EMPLOYEES.

11       THE COURT:  LET'S START WITH ONE AND TWO; I HAVE BOTH

12   OF THOSE IN FRONT OF ME.

13       MR. NOLAN:  THESE TWO DOCUMENTS ARE SUPPORTED BY THE

14   DECLARATION BY THE FORMER GENERAL COUNSEL OF MGA.  MS. GRONICH

15   TESTIFIED THAT IN RESPONDING TO INTERROGATORY REQUESTS AND

16   OTHER MATERIAL BEING REQUESTED, TO IDENTIFY INTERNALLY THOSE

17   MATTEL EMPLOYEES THAT WERE PRESENTLY WORKING FOR MGA.  A LIST

18   WAS PREPARED AND THESE ARE THE TWO LISTS.  IT WAS SPECIFICALLY

19   TO IDENTIFY THE DATES SO THAT WE COULD RESPOND TO PRODUCTION

20   THAT WAS BEING SERVED ON US.

21       THERE'S TWO OF THEM, YOUR HONOR.  THE DIFFERENCE IS

22   THAT IN THE COLUMN THAT SAYS UNDER MATTEL'S DATES, THERE IS

23   'YES' AND 'NO.'  WHEN IT GETS TO ANNA RHEE AND CARTER BRYANT,

24   IT SAYS 'DON'T ASK.'  AND THE REASON FOR THAT IS THAT BOTH OF

25   THEM WERE REPRESENTED BY SEPARATE COUNSEL -- AND THIS IS

1      SPELLED OUT IN THE SUBMISSION THAT WE MADE TO THE COURT.

2           THE COURT:  WERE THESE USED IN YOUR MOTION FOR

3      SUMMARY JUDGMENT?

4           MR. NOLAN:  NO.  WE DIDN'T USE THESE, YOUR HONOR.

5           THE COURT:  I JUST HEARD FROM MR. COREY THAT THEY

6      WERE SUBMITTED.

7           MR. NOLAN:  NOT BY OURS.

8           THE COURT:  THEY WERE SUBMITTED BY MATTEL.

9           MR. COREY:  IF THE COURT UNDERSTOOD THEY WERE

10     SUBMITTED BY MGA, THEN I MISSPOKE.

11          MR. NOLAN:  YOUR HONOR, WITH THE TON OF PAPERS, IT

12     WAS UPON REVIEWING EVERYTHING; AND ACTUALLY IT CAME UP MORE IN

13     THE CONTEXT OF THE TRIAL EXHIBIT LISTS WHICH WE'VE TALKED ABOUT

14     BEFORE WHERE WE CAME IN AND ASKED TO STRIKE BECAUSE THEY HAD

15     SUBMITTED 21,000 EXHIBITS.

16          WE LOOKED AT THIS AND REALIZED THAT THESE DOCUMENTS,

17     IN TERMS OF SUPPORTING IT, THERE WAS NO SUPPORT IN ANY OF THE

18     DEPOSITION TRANSCRIPTS AND STUFF LIKE THAT.  WE WENT BACK AND

19     CONFIRMED WITH MS. GRONICH, WHO IS NO LONGER EMPLOYED AT MGA;

20     SHE'S STILL AVAILABLE FOR THE DECLARATION SHE SUBMITTED.

21          THIS IS CLEARLY WORK PRODUCT USED INTERNALLY.

22          THE COURT:  I AGREE MR. NOLAN.

23          THE PAYMENTS LIST IN THE BRATZ SALES SHEET.

24          MR. NOLAN:  THE PAYMENT SHEET, AS WE'VE SET FORTH IN

25     SUBMISSIONS BY A REPRESENTATIVE OF KAYE SCHOLER.  THIS IS A

1 DOCUMENT PREPARED BY KAY SCHOLER LAWYERS.  NOT BY MGA.  IT'S A

2 LIST OF PAYMENTS, AGAIN.  IT'S NOT SURPRISING, IN RESPONDING TO

3 DOCUMENTS AND DOCUMENT REQUESTS, THEY CAME UP WITH A LIST OF

4 INTERNAL RECORDS, THEIR ANALYSIS OF THE VARIOUS PAYMENTS.

5  THIS INFORMATION WAS DISCOVERED THROUGH DISCOVERY BY

6 MATTEL.  IT'S NOT AS THOUGH THEY DIDN'T HAVE OTHER SOURCES TO

7 IT.

8  THE COURT:  THAT WAS GOING TO BE -- YOU ACTUALLY TOOK

9 MY WORDS.

10  MR. COREY, DO YOU HAVE THIS INFORMATION IN OTHER

11 SOURCES?  FOR EXAMPLE, WHETHER THERE WAS AN INVOICE FOR CARTER

12 BRYANT FOR $162.38, AUGUST 31, 2000?

13  DO YOU HAVE THAT EVIDENCE?

14  MR. COREY:  WE HAVE EVIDENCE OF WHAT CARTER BRYANT

15 WAS PAID.  I HAVE NOT SEEN THAT DOCUMENT.  I DON'T KNOW WHAT

16 ELSE IT SAYS WITH RESPECT TO OTHER EMPLOYEES.  I CAN TELL YOU

17 WITH RESPECT TO CARTER BRYANT, WE HAVE THAT INFORMATION.

18  MR. NOLAN:  I WOULD REPRESENT, YOUR HONOR, THAT

19 VERONICA MARLOW, A NAME FAMILIAR TO THE COURT, IS REPRESENTED

20 BY --

21  THE COURT:  SO YOU HAVE THE PAYMENTS TO CARTER BRYANT

22 BUT NOT TO THE OTHER EMPLOYEES?

23  MR. COREY:  I DON'T KNOW WHO ELSE IS ON THE LIST.  I

24 HAVEN'T SEEN THAT DOCUMENT.

25  MR. ZELLER:  IF I MAY JUST ADDRESS WHAT MR. NOLAN WAS

1   SAYING.  BECAUSE I'M NOT SURE, OF COURSE, WHAT THIS DOCUMENT

2   SAYS.  WE ARE, AS MR. COREY SAID, TRYING TO BE CIRCUMSPECT.

3   BUT WE HAVE RECEIVED DOCUMENTS OF CERTAIN KINDS FROM THE

4   MARLOWS PERTAINING TO PAYMENTS AND ALSO PAYMENTS THEY MADE TO

5   OTHERS AND THAT THEY HAVE RECEIVED FROM MGA.

6        HOWEVER, WE HAVE BEEN OBSTRUCTED ON THAT BECAUSE OF

7   THEIR INDICATION OF THE FIFTH AMENDMENT; SO I WOULDN'T TAKE IT

8   AS A GIVEN THAT WE HAVE RECEIVED THAT INFORMATION FROM SOME

9   OTHER SOURCE.  THAT IS AN ISSUE THAT I ALLUDED TO IN COURT,

10  BECAUSE WE WILL BE BRINGING THAT MOTION.  I EXPECT IT'S WITHIN

11  THE NEXT -- IF IT'S NOT TODAY, IT'S GOING TO BE TOMORROW.  BUT

12  IT IS ON THOSE KINDS OF RECORDS, THE MARLOWS, PETER MARLOW IN

13  PARTICULAR, REPEATEDLY INVOKED THE FIFTH AMENDMENT; SO WE HAVE

14  PROBLEMS ON THOSE SORT OF DOCUMENTS.

15       MR. NOLAN:  YOUR HONOR, IF I COULD RESPOND.

16       THEY TOOK A 30(B)(6) DEPOSITION, MR. COREY TOOK IT,

17  LISA TONNU, OUR INTERNAL ACCOUNTING PERSON AT MGA, WHERE WE

18  GAVE THEM SCHEDULES OF PAYMENTS AND THEY HAD FULL ACCESS TO ALL

19  OF THAT.  PETER MARLOW IS NOT LISTED ON THIS.  THE FIFTH

20  AMENDMENT IS NOT IMPLICATED ON THIS AT ALL.  WE PRESENTED A

21  30(B)6 WITNESS WHO PROVIDED ALL INFO RELEVANT TO PAYMENTS

22  REQUESTED.  ALL OF THIS INFORMATION WAS ASKED OF US.  ITS BEEN

23  PROVIDED.

24       THIS IS A DOCUMENT THAT WAS PREPARED BY KAYE SCHOLER

25  EARLY ON IN THE LITIGATION.  IT'S CLEARLY WORK PRODUCT AND IT'S

1    CLEARLY PRIVILEGED.

2         WE DID NOT MAKE PICK THIS UP UNTIL WE SAW IT ON THE

3    EXHIBIT LIST.  IT HAD NEVER BEEN USED IN A DEPOSITION, TO MY

4    KNOWLEDGE.

5         THE COURT:  WHAT ABOUT THE BRATZ SALES SHEET?

6         THAT WAS USED IN A DEPOSITION; CORRECT?

7         MR. NOLAN:  YES.  THE BRATZ SALES SHEET, YOUR HONOR

8    -- THEY HAVE ALL OF OUR DOCUMENTS WITH RESPECT TO SALES.  IN

9    THE DEPOSITIONS, WE PRESENTED THOUSANDS OF PAGES OF SALES.

10   THIS PARTICULAR DOCUMENT WAS PREPARED INTERNALLY IN CONNECTION

11   WITH AN EXPECTED TRADEMARK APPLICATION IN INDIA THAT NEVER WENT

12   FORWARD.  THESE NUMBERS WERE NEVER SCRUBBED OR ANYTHING ELSE.

13        WHAT WE DID WHEN WE HAD TO RESPOND TO DISCOVERY, WE

14   WENT BACK AND HAD THE 30(B)(6) WITNESS FROM MGA CONFIRM THE

15   ACCURACY OF THESE DOCUMENTS.  WHAT THEY WANT TO DO IS USE A

16   DOCUMENT PREPARED INTERNALLY BY LAWYERS.

17        THE COURT:  I'M SATISFIED, MR. NOLAN, BASED ON YOUR

18   PAPERS, BASED ON THE DISCOVERY MASTER'S FINDING, THAT THESE ARE

19   APPROPRIATE SUBJECTS OF THE CLAWBACK AND THERE IS NO TIME LIMIT

20   ON THIS.

21        BUT I'M ALSO CONVINCED THAT ALL OF THE INFORMATION IN

22   HERE IS RELEVANT.  IT'S NOT PRIVILEGED INFORMATION.  IT'S

23   ATTORNEY WORK-PRODUCT INFORMATION, JUST BECAUSE IT WAS PUT

24   TOGETHER UNDER THE DIRECTION OF AN ATTORNEY.

25        I WANT TO MAKE SURE THAT ALL OF THIS INFORMATION HAS

1    BEEN PRODUCED IN SOME FORM TO MATTEL AND THEY ARE ABLE TO USE

2    IT.  THAT'S THE CONCERN I HAVE AT THIS POINT.

3          MR. NOLAN:  YOUR HONOR, I REPRESENT TO YOU THAT THIS

4    INFORMATION HAS BEEN PROVIDED IN OTHER FORMS OF DISCOVERY TO

5    MATTEL WITH RESPECT TO THE IDENTITY OF EMPLOYEES.  THE DANGER

6    -- LET'S JUST LOOK AT THESE EMPLOYEE DOCUMENTS FOR JUST A

7    MOMENT, FORMER MATTEL EMPLOYEES -- AND, YOUR HONOR, THIS WAS

8    ONE OF THE DOCUMENTS THAT MR. QUINN REFERRED TO IN HIS OPENING

9    STATEMENTS NOTWITHSTANDING THAT IT WAS SUBJECT TO A CLAWBACK

10   MOTION.  THIS IS THE ONE THAT SAYS 'DON'T ASK' ABOUT CARTER

11   BRYANT, AS THOUGH WE WERE -- DON'T ASK ANYBODY ABOUT CARTER

12   BRYANT'S EMPLOYMENT DATE.

13         YOUR HONOR, EVERYBODY KNOWS CARTER BRYANT'S

14   EMPLOYMENT DATE.  THE ONLY RELEVANCE OF THAT STATEMENT IS

15   CLEARLY A DIRECTION FROM THE GENERAL COUNSEL OF MGA:  NO

16   EMPLOYEE AT MGA SHOULD CONTACT CARTER BRYANT WITH RESPECT TO

17   GETTING INFORMATION FROM HIM ABOUT THIS LAWSUIT, BECAUSE HE'S

18   REPRESENTED BY SEPARATE COUNSEL.  SAME THING WITH RESPECT TO

19   ANNA RHEE.

20         I RESPECTFULLY SUBMIT, YOUR HONOR, THAT THIS

21   INFORMATION HAS BEEN AVAILABLE TO MATTEL.  THE MISCHIEF THAT IS

22   AVAILABLE HERE IS THAT THE JURY WILL SAY, OH, MGA IS KEEPING

23   TRACK OF ALL OF THEIR FORMER MATTEL EMPLOYEES, AND WE'RE GOING

24   TO HAVE TO EXPLAIN, 'WELL, IT WAS A RESPONSE TO THESE

25   INTERROGATORIES,' AND STUFF LIKE THAT.  I SUBMIT, THERE'S

1     NOTHING BEING HID FROM THEM.  IT'S JUST THAT THE NEGATIVE

2     IMPLICATION --

3          THE COURT:  THANK YOU, COUNSEL.

4          MR. COREY.

5          MR. COREY:  THANK YOU, YOUR HONOR.

6          THE EMPLOYEE LIST, THE EVIDENCE YOU HAVE BEFORE YOU

7     IS THAT A WITNESS, WHO THEY HAD BEEN ORDERED TO PREPARE TO

8     TESTIFY ON THESE TOPICS ABOUT PAYMENTS TO MATTEL EMPLOYEES

9     WHILE THEY WERE CURRENT MATTEL EMPLOYEES, LOOKED AT THIS

10    DOCUMENT, REVIEWED THE DOCUMENT, AND RELIED ON IT.  THAT'S A

11    WAIVER.  JUDGE INFANTE HAS RULED THAT.  AND THERE HAVE BEEN

12    PRIOR INSTANCES, SPECIFICALLY THE PRESERVATION MEMOS, THE

13    DOCUMENT PRESERVATION MEMOS THAT MGA HAD SENT OUT, WERE GIVEN

14    TO A 30(B)(6) WITNESS AND JUDGE INFANTE FOUND THAT TO BE A

15    WAIVER, AND THAT'S IN THE TONNU TESTIMONY THAT THE COURT HAS IN

16    FRONT OF IT.

17         JUDGE INFANTE MADE THE SAME RULING WITH RESPECT TO

18    INFORMATION TO BE PREPARED TO BE PROVIDED TO A TRADEMARK OFFICE

19    OR TRADEMARK APPLICATION; THAT'S FACTUAL INFORMATION AS TO

20    WHICH NO CLAIM OF PRIVILEGE.

21         THE COURT:  ADDRESS THE CONCERN THAT MR. NOLAN

22    RAISES; THAT THIS DOCUMENT IS CREATED IN THE CONTEXT OF

23    LITIGATION.  HOW DO YOU INTEND ON USING THIS AS AN EXHIBIT IN

24    THIS TRIAL?

25         MR. COREY:  I CAN TELL YOU RIGHT NOW, I WILL NOT USE

1       IT TO ARGUE THAT MGA IS KEEPING TRACK OF MATTEL EMPLOYEES.

2           THE COURT:  HOW ARE YOU GOING TO USE IT?

3           MR. COREY:  THE WAY HE SAID IT WOULD BE USED.

4           HE CAN DRAW AN INFERENCE AND HE CAN PROVIDE

5       EXPLANATION FOR WHAT 'DON'T ASK' MEANS.  BUT IT'S EQUALLY

6       RELEVANT TO MATTEL'S CLAIM THAT IT GOES TO CONCEALMENT.  THAT'S

7       ABSOLUTELY A FAIR INFERENCE TO BE DRAWN FROM THAT.  THAT IS

8       NOT, IN ANY RESPECT, WORK PRODUCT OR PRIVILEGED.  AND EVEN TO

9       THE EXTENT IT WAS, I THINK MR. NOLAN, BY PROVIDING AN

10      EXPLANATION TO THE COURT, MAY HAVE WAIVED THAT, ABOUT WHAT THE

11      JUSTIFICATION FOR PUTTING IT ON THERE WAS; CONVERSATIONS WITH

12      MS. GRONICH.

13          EVEN IF THE COURT DETERMINES THAT THE REST OF THE

14      INFORMATION ON THAT DOCUMENT MAY BE WORK PRODUCT, THERE CAN'T

15      BE A CLAIM OF WORK PRODUCT WITH RESPECT TO THE INFORMATION

16      RELATED TO CARTER BRYANT.  IT DOESN'T MEET THE THRESHOLD.

17          AND THE SALES DOCUMENTS -- THEY HAVE GIVEN US A LOT

18      OF THE SAME SALES INFORMATION --

19          THE COURT:  YOU WANT TO USE THE 'DON'T ASK' LINE HERE

20      ON CARTER BRYANT --

21          MR. COREY:  ABSOLUTELY.

22          THE COURT:  -- TO ARGUE THAT WHAT?

23          MR. COREY:  THAT IT'S JUST ANOTHER STEP, ANOTHER LINK

24      IN THE CHAIN, OF TRYING TO CONCEAL OR PREVENT PEOPLE, EVEN

25      INTERNALLY AT MGA, FROM MAKING AN INQUIRY AS TO WHEN CARTER

1    BRYANT STARTED WORKING FOR MGA.

2        BECAUSE IF THE COURT LOOKS AT THE COLUMN HEADING,

3    THAT IS WHAT IT ASKS.

4        MR. QUINN:  YOUR HONOR, IN THE SUMMARY JUDGMENT

5    BRIEFING, THERE MUST BE -- I'M GOING TO GUESS THAT THERE ARE

6    FOUR OR SIX BRIEFS ON FILE THAT QUOTE THIS DOCUMENT, 'DON'T

7    ASK.'  WHEN DID CARTER BRYANT START WORKING -- THIS IS MGA

8    TALKING TO MGA INTERNALLY:  'WHEN DID CARTER BRYANT START

9    WORKING FOR US?  DON'T ASK.'

10        THE COURT:  BUT GIVEN THIS EXPLANATION, THAT THIS WAS

11    A 'DON'T ASK' BECAUSE HE'S REPRESENTED BY SEPARATE COUNSEL, YOU

12    REJECT THAT?

13        MR. QUINN:  YEAH.

14        MR. COREY:  THAT'S FOR THOSE PEOPLE TO DECIDE WHETHER

15    THAT'S A CREDIBLE EXPLANATION OR NOT.  I THINK THAT'S WHAT

16    MATTEL SHOULD BE ENTITLED TO DO WITH THAT.

17        MR. QUINN:  WHAT IS THE CONFIDENTIAL INFORMATION

18    THAT'S BEING COMMUNICATED HERE?  WHAT IS THE WORK PRODUCT

19    THAT'S EMBODIED IN THE PHRASE 'DON'T ASK'?

20        THE COURT:  IT'S PART OF THE DIRECTION OF THE WORK

21    PRODUCT.  IT'S PART OF THE DIRECTION OF THE ATTORNEY TO THE

22    PERSON WHO PREPARED THIS GRAPH, ACCORDING TO MR. NOLAN.

23        YOU'RE ASKING ME TO INTERVENE AT THIS LATE DATE IN

24    SOMETHING WHICH HAS BEEN FULLY LITIGATED BEFORE THE DISCOVERY

25    MASTER, AND THAT'S WHERE I'M REALLY RELUCTANT TO GET INTO THIS.

1        MR. QUINN:  THIS HASN'T BEEN BEFORE THE DISCOVERY

2    MASTER BECAUSE THIS CLAWBACK WAS JUST RECENTLY DONE.

3        MR. COREY:  JUDGE INFANTE HAS NOT MADE A RULING ON

4    PRIVILEGE WITH RESPECT TO ANY OF THE DOCUMENTS THAT REMAIN AT

5    ISSUE IN THIS MOTION.

6        THE COURT:  ALL RIGHT.

7        MR. QUINN:  SO IT IS LATE, BUT IT'S LATE AFTER THIS

8    HAS BEEN USED A LOT IN THIS CASE, IN THE PRETRIAL PROCEEDINGS,

9    AND IT'S AFTER -- THE COURT HAS SEEN THE USE THAT WE WOULD MAKE

10   OF THIS.

11       IT'S THEIR BURDEN TO ESTABLISH THE PRIMA FACIE CASE

12   THAT THERE'S SOME WORK PRODUCT IN THAT PHRASE.  I'D SUBMIT THEY

13   HAVEN'T DONE IT.

14       THE COURT:  I'M GOING TO LOOK CLOSER AT THIS.

15       MR. COREY:  ON THE SALES DOCUMENTS, IF I MAY, YOUR

16   HONOR, THEY HAVE GIVEN US MILLIONS OF PAGES OF SALES

17   INFORMATION.  THE SIGNIFICANCE OF THIS PARTICULAR DOCUMENT IS

18   THAT THE SALES THAT IT RECORDS FOR BRATZ PRODUCTS ARE HUNDREDS

19   OF MILLIONS OF DOLLARS HIGHER, MAYBE A HUNDRED MILLION DOLLARS

20   HIGHER, THAN THE OTHER SALES INFORMATION THEY ARE SAYING THAT

21   WE'RE BEING PROVIDED; SO THAT'S A PRETTY SIGNIFICANT INCREASE

22   BUMP THAT WE WOULD LIKE TO GET TO THE BOTTOM OF.  ITS THE

23   SUBJECT OF A 30(B)(6) DEPOSITION TOPIC THAT WE WERE NOT ABLE TO

24   INQUIRE BECAUSE THE DOCUMENT HAD BEEN CLAWED BACK.

25       MR. NOLAN:  YOUR HONOR, I KNOW THEY SAY THAT

1    MR. NOLAN'S REPRESENTING THIS.  YOUR HONOR, WE'VE SUBMITTED THE

2    DECLARATIONS OF THE COUNSEL THAT WERE INTIMATELY INVOLVED WITH

3    THIS.

4         THE COURT:  I KNOW YOU HAVE.  I NEED TO LOOK CLOSER

5    AT THOSE.

6         MR. NOLAN:  I UNDERSTAND THAT.

7         I WANT TO POINT OUT, THOUGH, THAT THERE HAVE BEEN SO

8    MANY DOCUMENTS IN THIS CASE THAT HAVE BEEN USED IN DEPOSITIONS

9    THAT AFTERWARDS, MATTEL HAS CLAWED BACK, AND IT'S JUST ONE OF

10   THOSE FACTS OF LIFE THAT HAS OCCURRED IN THIS CASE.  YOUR

11   HONOR, THE ONE DOCUMENT THAT MR. COREY SAID HE WOULDN'T USE IT

12   A CERTAIN WAY BUT THEY WANT TO USE IT ANOTHER WAY.

13        MR. QUINN, IN HIS ARGUMENT ON TUESDAY, I DON'T KNOW

14   IF HE KNEW THIS WAS THE SUBJECT OF A MOTION; MAYBE SOMEONE ON

15   HIS TEAM DIDN'T TELL HIM; BUT THIS IS WHAT HE SAID.  THEY ARE

16   TALKING ABOUT THE LIST, AND HE SAYS: "AND THEY LIED TO THE

17   WORLD ABOUT WHERE IT CAME FROM.  THEY CAN'T PRODUCE THE FACT

18   THAT THEY HAD WORKED WITH CARTER BRYANT UNDER WRAPS.  YOU WILL

19   SEE INTERNAL MGA DOCUMENTS WHERE THEY SAY MAKE NO REFERENCE TO

20   CARTER BRYANT WHERE THEY ARE TALKING ABOUT HOW LONG THEIR LIST

21   OF EMPLOYEES' LONGEVITY AND TALKING ABOUT HOW LONG THEY HAD

22   WORKED FOR THE COMPANY.  BUT UNDER CARTER BRYANT'S NAME, IT

23   SAYS 'DON'T ASK.'

24        THE COURT:  REFRESH ME AGAIN, WHEN DID YOU EXERCISE

25   YOUR CLAWBACK OPTIONS?  WHEN DID YOU ASK FOR THESE DOCUMENTS?

1        MR. NOLAN:  ABOUT THREE WEEKS AGO, YOUR HONOR.  IT'S

2    BEEN PENDING.  THEY REFUSED TO PROVIDE IT TO US.

3        WE SAID, THIS IS THE WAY WE DO IT, CLAWED BACK TO US,

4    AND THEN LET'S GO TO JUDGE LARSON AND WE'LL FILE THE MOTION.

5    BUT THAT'S NOT WHAT HAPPENED IN THIS CASE.

6        THE COURT:  I APPRECIATE THAT.

7        AT THIS JUNCTURE THERE'S NOT SUFFICIENT TIME TO DO

8    WHAT HAS BEEN THE PROTOCOL UP TO THIS POINT.

9        MR. NOLAN:  RESPECTFULLY, I GUESS I AGREE, WITH ONE

10   EXCEPTION.  THERE WASN'T TIME TO GO TO JUDGE INFANTE BECAUSE

11   YOU INSTRUCTED US NOT TO FILE ANYMORE IN FRONT OF JUDGE

12   INFANTE.  BUT THE WHOLE PURPOSE OF THIS CLAWBACK PROVISION IS

13   THAT IF A PARTY IN GOOD FAITH ASSERTS THAT THERE'S A PRIVILEGED

14   DOCUMENT THAT WAS INADVERTENTLY PRODUCED -- THERE'S NO TIMING

15   ISSUE, THERE ARE NO RESTRICTION ON --

16       THE COURT:  I AGREE WITH YOU.  AND GUESS WHAT I'M

17   THINKING RIGHT NOW, SITTING HERE ON THURSDAY AFTERNOON BEFORE

18   THE TUESDAY TRIAL DATE IS, DO I SAY, FINE, CLAWBACK THE

19   DOCUMENTS; LEAVE TO MATTEL TO FILE ITS MOTION ON AN EXPEDITED

20   BASIS FOR TURNING OVER THESE DOCUMENTS, MAKING THE SAME

21   ARGUMENT I HAVE BEFORE ME.  OR DO I SIMPLY TAKE A CLOSE LOOK AT

22   THIS AND DECIDE WHETHER OR NOT THESE DOCUMENTS SHOULD BE TURNED

23   OVER OR NOT?

24       MR. NOLAN:  I APOLOGIZE.  I WAS NOT STANDING ON THE

25   PROCEDURAL ASPECT OF IT.  I WAS JUST POINTING THAT OUT AS TO

1    WHY THIS IS NOW BEFORE YOU.  AND I ASK THE COURT TO TAKE A LOOK

2    AT THE SUBMISSIONS THAT HAVE BEEN PRESENTED BY BOTH KAYE

3    SCHOLER AND MS. GRONICH WITH RESPECT TO THE PREPARATION OF

4    THESE DOCUMENTS.

5        THE COURT:  I NEED TO DO THAT.

6        I HAVE AN EX-PARTE APPLICATION AS WELL FROM MATTEL TO

7    STRIKE PORTIONS OF THE EXPERT REPORTS OF DR. LYTER AND

8    MR. KULMAN.  THE COURT IS GOING TO TAKE THAT UP RIGHT LONG WITH

9    THE OTHER EXPERTS WHEN THOSE EXPERTS ARE BEING CALLED.

10       COUNSEL, IS THERE ANYTHING ELSE?

11       THESE ARE RELATED TO WITNESSES THAT ARE GOING TO BE

12   CALLED BY --

13       MS. HUTNYAN:  BY MGA.

14       THE COURT:  AND IS THERE ANY REASON WHY THE COURT

15   CAN'T ADDRESS THEM IN THE CONTEXT OF WHETHER AND TO WHAT EXTENT

16   THEY ARE GOING TO BE TESTIFYING AT ALL?

17       MS. HUTNYAN:  WELL, YOUR HONOR, THERE ARE SEVERAL

18   OPINIONS HERE THAT SHOULD NOT BE ADVANCED AT ALL.  WE DON'T

19   HAVE THE BASIS THAT THEY HAVE USED FOR THESE OPINIONS.  SO WE

20   CAN'T ADEQUATELY PREPARE FOR TRIAL.  SO TO GET TO THAT POINT

21   AND THEN SAY, OKAY, NOW I'LL LOOK AT THIS ISSUE CREATES REAL

22   PROBLEMS FOR US BECAUSE WE'RE STILL BATTLING WITH FINDING OUT

23   THE DATA AND THE BASIS FOR THE OPINIONS THEY WOULD LIKE TO

24   OPINE ON.

25       THE COURT:  IS THERE A REASON FOR ME TO SEVER OUT

1    THESE EXPERTS AS OPPOSED TO THE OTHER EXPERTS?  THESE ARGUMENTS

2    ARE MADE WITH A NUMBER OF OTHER EXPERTS.  PEOPLE ARE

3    CHALLENGING EXPERTS ON BOTH SIDES.  WE'VE GOT A LOT OF PENDING

4    CHALLENGES.

5         IS THERE A REASON WHY THESE TWO PARTICULAR REPORTS

6    SHOULD BE TREATED DIFFERENTLY THAN I'M TREATING ALL OF THE

7    OTHER REPORTS AND ALL OF THE OTHER CHALLENGES?

8         MS. HUTNYAN:  YES.

9         I'M NOT FAMILIAR WITH ALL OF THE MOTIONS, BUT MY

10   UNDERSTANDING IS THAT THAT'S BASED ON THEIR QUALIFICATIONS OR

11   ON THE QUALITY OF THEIR OPINIONS.  THIS IS A WHOLLY DIFFERENT

12   BASIS, YOUR HONOR.  THIS IS ABOUT NOT HAVING FULL DISCLOSURE

13   UNDER RULE 26(A), AND THE COURT MUST NOT ALLOW THAT KIND OF

14   OPINION TESTIMONY THAT'S UNTESTED.  AND WE HAVE SEVERAL

15   INSTANCES WHERE IT'S NOT BEEN TESTED BECAUSE MGA HAS NOT CHOSEN

16   TO SHARE WITH US THE BASIS THAT THEIR EXPERTS ARE RELYING ON.

17   AND THESE ARE VERY CONCRETE SITUATIONS.

18        THERE'S ACTUALLY A NEW ONE AS OF THE 19TH.  WE'VE NOW

19   BEEN GETTING NEWS OF AN INTERNATIONAL INVESTIGATION INTO THE

20   PRESENCE OF MENTHOL IN INK.  THAT WAS NOT SOMETHING THAT'S EVEN

21   BEEN IN AN EXPERT REPORT BEFORE, AND WE JUST NEED TO CUT IT

22   OFF.

23        WITH RESPECT, MR. NOLAN SAID THAT THE RULES NEED TO

24   BE APPLIED EVENLY.  AND HERE, THE RULES NEED TO BE APPLIED

25   EVENLY.  EXPERT DISCOVERY IS OVER, AND WE HAVE NOT BEEN GIVEN

1    THE OPPORTUNITY TO LOOK INTO SOME OF THESE NEW OPINIONS.  WE

2    STILL DON'T HAVE THE BASIS FOR MANY OF THEM.  AND SO THEY

3    SHOULD NOT BE ABLE TO PURSUE THEM.

4         THE COURT:  THANK YOU, COUNSEL.

5         MR. NOLAN:  YOUR HONOR, MR. SLOAN IS GOING TO HANDLE

6    THIS.

7         MR. SLOAN:  I THINK THE FIRST AND MOST TELLING POINT

8    IN OUR MOTION PAPERS IS THAT THE REASON THAT THIS IS DIFFERENT

9    FROM ALL OF THE OTHER MOTIONS IN LIMINE IS THAT THIS SHOULD

10   HAVE BEEN FILED AS A MOTION IN LIMINE WITH THE ORIGINAL 15.

11   THIS IS PROCEDURALLY BARRED, YOUR HONOR.

12        IT IS JUST LIKE EVERY OTHER MOTION IN LIMINE.

13        THE COURT:  SEVERAL OF THE OTHER MOTIONS IN LIMINE DO

14   GO AFTER THE REBUTTAL REPORTS AND PORTIONS OF THE REPORTS.

15        MR. SLOAN:  YES.  YOUR ORDER SAID EACH SIDE MAY FILE

16   UP TO BUT NOT MORE THAN 15 PHASE 1 MOTIONS IN LIMINE, INCLUDING

17   ANY AND ALL DALBERT MOTIONS OR MOTIONS TO PRECLUDE EXPERT

18   TESTIMONY OR STRIKE EXPERT REPORTS; THAT'S DOCKET NUMBER 2618.

19        I DON'T KNOW HOW IT COULD BE MORE CLEAR THAN THAT,

20   THAT IF THEY WANTED TO MOVE -- AND, YOUR HONOR, JUST FOR

21   PURPOSES OF CLARIFICATION, THEY ARE MOVING TO STRIKE TWO

22   SEPARATE SETS OF EXPERT REPORTS.  THERE ARE EXPERT REPORTS BY

23   DR. LYTER AND MR. KULMAN WHO ARE OUR FORENSIC DOCUMENT

24   EXAMINERS WHO HAVE PROVIDED TESTIMONY ABOUT OR PROVIDED REPORTS

25   AND TESTIMONY ABOUT THE SEQUENCING OF DOCUMENTS, WHICH IS A

1    VERY PERTINENT ISSUE.

2         THOSE REPORTS WERE DISCLOSED ON MARCH 17.

3         MATTEL HAD UNTIL APRIL 14TH TO DECIDE WHETHER OR NOT

4    TO MOVE TO STRIKE THOSE EXPERT REPORTS.  THEY, FOR TACTICAL

5    REASONS WHICH I'M NOT AWARE OF, DECIDED NOT TO.  AS A MATTER OF

6    FACT, THERE'S A LETTER FROM MR. PROCTOR TO SKADDEN ARPS ON

7    MARCH 25TH WHICH IS INCLUDED IN THE MATERIALS WHICH EXPRESSLY

8    SAYS THAT THEY WERE CONSIDERING FILING A MOTION AT LEAST

9    AGAINST MR. LYTER, TO STRIKE HIS EXPERT OPINION.

10        THE TIME HAS PASSED.  THIS IS THE 16TH MOTION.  IT'S

11   A MONTH LATE.  AND IT'S ONE TOO MANY.  AND FOR THAT REASON

12   ALONE, THE CHALLENGE TO THE MARCH 17TH REPORT AND THE EXPERT

13   OPINIONS OF DR. LYTER AND MR. KULLMAN ARE TOO LATE.

14        THE COURT:  THANK YOU, COUNSEL.

15        I APPRECIATE YOU HAVE ARGUMENTS WITH THE RESPECT TO

16   THE MERITS AS WELL.  BUT IF I AM GOING TO CONSIDER THEM, I AM

17   GOING TO CONSIDER THEM AS I AM WITH THE OTHER EXPERT WITNESSES.

18   BUT I DO WANT TO HEAR MATTEL'S RESPONSE TO THIS ARGUMENT THAT

19   THIS IS ESSENTIALLY A 16TH MOTION IN LIMINE.

20        MS. HUTNYAN:  IT'S NOT A 16TH MOTION, YOUR HONOR.

21        MOST OF THESE ISSUES DIDN'T EVEN COME UP UNTIL LAST

22   COUPLE OF WEEKS.  AND THERE IS ONE ACCESS ISSUE, THE ONE THAT

23   HE'S REFERRING TO --

24        THE COURT:  HOW DOES THAT NOT MAKE IT A MOTION IN

25   LIMINE?

1       MS. HUTNYAN:  IT'S A MOTION TO STRIKE EXPERT

2   TESTIMONY ON THE BASIS OF LACK OF DISCLOSURE.  IT'S NOT BECAUSE

3   IT SHOULD BE EXCLUDED ON SOME EVIDENTIARY BASIS OR ON THE BASIS

4   OF PREJUDICE.

5       THE COURT:  COUNSEL, WHAT IS A MOTION IN LIMINE?

6   WHAT'S A MOTION IN LIMINE?

7       MS. HUTNYAN:  IT IS A WAY OF EXCLUDING CERTAIN KINDS

8   OF EVIDENCE.

9       THIS IS WHAT WE'RE DEALING WITH, YOUR HONOR --

10      THE COURT:  YOU'RE RIGHT.

11      I WAS ASKED THAT BY JUDGE KELLEHER IN MY SECOND TRIAL

12  AS A U.S. ATTORNEY.  HE ACTUALLY ASKED ME TO DEFINE IN LATIN IN

13  LIMINE, AND I HAD NO IDEA.  I STARTED TALKING ABOUT LIMITING,

14  AND HE GAVE ME THE LECTURE OF MY LIFE.

15      I'M NOT GOING TO DO THE SAME THING.

16      BUT YOU'RE RIGHT, IT'S A MOTION TO EXCLUDE EVIDENCE.

17  YOU'RE TRYING TO EXCLUDE EVIDENCE, RIGHT?

18      MS. HUTNYAN:  BUT ON BASES THAT HAVE NOW COME UP

19  SINCE THE OTHER MIL'S.  BASICALLY, MGA HAS USED THIS AS A

20  LICENSE TO COME UP WITH ALL KINDS OF UNTESTED OPINION EVIDENCE

21  THAT THEY WOULD LIKE TO SHARE WITH THE JURY WITHOUT OUR EXPERTS

22  GETTING TO SEE THE UNDERLYING FACTS THAT SUPPORT THESE

23  OPINIONS?

24      I MEAN, THERE'S A CASE IN MY BRIEFING --

25      THE COURT:  YOU MAY HAVE A STRONG ARGUMENT HERE AS TO

1    WHY THE EVIDENCE SHOULD BE EXCLUDED, AND I'M NOT GOING TO GET

2    INTO THE MERITS RIGHT NOW.  I'M STRUGGLING WITH HOW THIS IS NOT

3    A MOTION IN LIMINE; HOW THIS IS NOT A MOTION TO EXCLUDE

4    EVIDENCE.

5         THE FACT YOU'VE USED UP YOUR MOTIONS IN LIMINE ON

6    OTHER EVIDENCE IS NOT A REASON TO CHARACTERIZE THIS AS

7    SOMETHING OTHER THAN A MOTION IN LIMINE.  UNLESS YOU'VE USED UP

8    YOUR MOTION IN LIMINES.

9         MS. HUTNYAN:  THESE ISSUES CAME UP AFTER THE MOTIONS

10   IN LIMINE.  IF YOU WANT TO CHARACTERIZE IT AS A MOTION IN

11   LIMINE, PERHAPS IT IS A 16TH ONE.  BUT THAT'S NOT THE ISSUE.

12   THE ISSUE IS RULE 37 SAYING THE COURT MUST EXCLUDE UNTESTED

13   OPINION.  IT'S AN AUTOMATIC SANCTION.  IT HAS TO BE REMOVED

14   FROM THE CASE.  I HAVE SPECIFIC INSTANCES WHERE I'M GETTING --

15   YESTERDAY, 53 MINUTES BEFORE MY DEPOSITION STARTED, I GOT A

16   SERIES OF DOCUMENTS PERTAINING TO AN INTERNATIONAL

17   INVESTIGATION THAT OCCURRED AFTER DR. LYTER'S SECOND REPORT WAS

18   DUE AND IN TO US.  BRAND NEW INVESTIGATION.  BRAND NEW FACTS.

19   THEY ARE GOING AHEAD AND INVESTIGATING IT.

20        DO MY EXPERTS HAVE TIME TO DEAL WITH THAT?  DO THEY

21   HAVE TIME TO DO THEIR INVESTIGATION?  NO, THEY DON'T.  AND

22   THAT'S WHAT I'M TALKING ABOUT.  IT'S THAT KIND OF CONTINUING

23   ANALYSIS GOING WELL INTO TRIAL THAT IS IMPROPER UNDER RULE 26

24   AND RULE 37.  IT HAS TO BE EXCLUDED.  AND OUR EXPERTS HAVE A

25   LOT TO DO.  OUR REPORTS ARE FILLED WITH ALL KINDS OF IMPORTANT

1    FORENSIC FINDINGS, AND WHAT THEY ARE WANTING TO PUT BEFORE THE

2    COURT ARE UNTESTED OPINIONS BECAUSE WE HAVE NOT BEEN ABLE TO

3    SEE THE BASIS OF THEM.  THAT IS JUST CUT AND DRY.

4         THIS IS NOT ABOUT WHOSE EXPERT IS BETTER; WHO HAS

5    BETTER QUALIFICATIONS; THIS IS ABOUT WE'VE NEVER SEEN THE DATA.

6    WE HAVE NEVER SEEN THE BASIS OR THE REASONS FOR THEIR OPINIONS.

7    THAT IS SOMETHING THAT THE COURT CAN LOOK AT AND STRIKE.  IT

8    CAN EXCISE PORTIONS -- IT SHOULD EXCISE THE PORTIONS OF THEIR

9    REPORT THAT DEAL WITH THESE ASPECTS.

10        THERE ARE A FEW ASPECTS THAT ARE JUST SO CUT AND DRY.

11   I DON'T KNOW WHY WE WOULDN'T JUST DEAL WITH THEM NOW.  AND IT'S

12   IMPORTANT, BECAUSE OUR EXPERTS ARE STILL, AS I SAID, THEY NEED

13   -- HOW ARE THEY EVEN SUPPOSED TO PREPARE FOR TRIAL?

14        THE COURT:  THANK YOU, COUNSEL.

15        IT SOUND LIKE THERE'S SOME POTENTIALLY VALID

16   OBJECTIONS HERE.  I'LL CERTAINLY GIVE MATTEL LEAVE TO RAISE

17   THOSE OBJECTIONS BEFORE THIS WITNESS IS CALLED.

18        MS. HUTNYAN:  THANK YOU, YOUR HONOR.

19        THE COURT:  ANY OTHER MOTIONS PENDING BEFORE THE

20   COURT?

21        MR. NOLAN:  HOPEFULLY NOT, YOUR HONOR.

22        MR. QUINN:  I DON'T THINK SO, YOUR HONOR.

23        MR. NOLAN:  WE SHOT THE PERSON THAT WRITES OUR

24   MOTIONS.

25        MR. COREY:  THERE IS A MOTION TO ENFORCE AN ORDER

1    THAT JUDGE INFANTE ISSUED THAT WAS FILED YESTERDAY.  IT'S

2    RELATIVELY SHORT.

3         THE COURT:  ARE YOU IGNORING SOME ORDER OF JUDGE

4    INFANTE?

5         MR. NOLAN:  NOT THAT I'M AWARE OF.

6         THE COURT:  THEY SAY THERE'S NO REASON TO ENFORCE ANY

7    ORDER; THEY ARE ABIDING BY ALL ORDERS OF JUDGE INFANTE.

8         MR. NOLAN:  YOUR HONOR, I DON'T THINK WE ARE.  WE'RE

9    NOT SUPPOSED TO, I DON'T THINK.

10        THE COURT:  NO, YOU'RE NOT.  YOU SHOULD BE FOLLOWING

11   ANY ORDER OF JUDGE INFANTE AT THIS POINT.

12        THE LIKELIHOOD OF THIS COURT REVERSING ONE OF JUDGE

13   INFANTE'S ORDERS AT THIS POINT IS PRETTY LOW.

14        MR. NOLAN:  I HAVEN'T READ THIS MOTION, ONLY BECAUSE

15   I WOKE UP AT 2:00 IN THE MORNING WHEN MY BLACKBERRY WENT OFF,

16   AND THEN THEY FILED ERRATA SHEETS.

17        MR. COREY:  I'M MORE THAN HAPPY TO DISCUSS THIS WITH

18   MR. NOLAN.

19        THE COURT:  WHY DON'T YOU DO THAT AND SEE IF YOU

20   CAN'T WORK THIS OUT BETWEEN THE TWO OF YOU.

21        WHAT I'D LIKE TO DO TOMORROW IS MEET IN THE

22   AFTERNOON.  I HAVE A SETTLEMENT CONFERENCE THAT I'M CONDUCTING

23   IN THE MORNING ON A TRIAL THAT I HAVE HAD, A TRIAL THAT I'M

24   GOING TO TRY TO AVOID, AND THEN I'LL BE READY TO ADDRESS THE

25   PRETRIAL CONFERENCE ORDER AT 1:30.

1          WHAT I'D LIKE YOU TO DO BETWEEN NOW AND THEN IS

2     REVIEW THE COURT'S ORDER THAT I ISSUED THIS MORNING, COUPLED

3     WITH THE -- YOU KNOW MY RULINGS ON THE MOTIONS IN LIMINE, OR AT

4     LEAST THE VAST MAJORITY OF THEM.  I'LL TRY TO GET SOMETHING OUT

5     TO YOU TONIGHT OR TOMORROW MORNING, BUT I THINK YOU KNOW WHAT

6     THEY ARE.

7          LET'S TRY TO GET A REVISED PRETRIAL CONFERENCE ORDER

8     TOGETHER.  I KNOW WE'LL HAVE TO DEAL WITH THIS ISSUE OF THE

9     BRATZ NAME AND ALL THAT.  WE CAN DEAL WITH THAT TOMORROW

10    AFTERNOON.  BUT LET'S TRY TO DO WHAT WE CAN TO GET THE PRETRIAL

11    CONFERENCE ORDER TO REFLECT ALL OF THE COURT'S RULINGS ON BOTH

12    THE MOTIONS FOR PARTIAL SUMMARY JUDGMENT, THE MOTION FOR

13    RECONSIDERATION, AND THE MOTIONS IN LIMINE.

14         WE'LL RECONVENE AT 1:30.

15         MR. NOLAN:  ONE LAST THING.  MATTEL WAS ORDERED TO DO

16    AN INVESTIGATION AND TO REPORT BACK TO YOU WITH RESPECT TO

17    COMMENTS MADE.

18         THE COURT:  YES.  THANK YOU.

19         I WANT TO TAKE UP THE SETTLEMENT AGREEMENT ISSUE.

20         THANK YOU, MR. NOLAN.

21         MR. QUINN, WHY DON'T I BEGIN WITH YOU ON THAT.

22         MR. QUINN:  WOULD YOU RATHER I FIRST DISCUSS THE

23    QUESTION THE COURT RAISED ABOUT WHAT THE JURY SHOULD HEAR ABOUT

24    MR. BRYANT?

25         THE COURT:  LET'S START WITH YOUR REPORT, COUNSEL.

1        MR. QUINN:  OKAY.

2        THE GENTLEMAN AT MATTEL, WHOSE NAME IS

3   MICHAEL SAILOR, DID KNOW THE TERMS OF THE SETTLEMENT.  HE'S A

4   SENIOR PERSON AT MATTEL.  HE DID KNOW THE TERMS OF THE

5   SETTLEMENT.  HE DID MAKE A STATEMENT TO THIS PERSON THAT THERE

6   WAS A PAYMENT.

7        I THINK ONE CAN DISCUSS WHETHER IN A VACUUM THAT

8   WOULD BE A VIOLATION OR WHETHER THAT SHOULD BE OF CONCERN TO

9   MGA OR OF THIS COURT.  BUT I THINK, YOUR HONOR, THIS WHOLE

10  DISCUSSION HAS GOT TO BE PUT IN CONTEXT HERE.  HE WAS

11  RESPONDING TO AN E-MAIL OR A CALL THAT CAME IN TO HIM AS A

12  RESULT OF MR. LARIAN CONTACTING THIS PERSON IN THE FINANCIAL

13  COMMUNITY WHERE MR. LARIAN EXPRESSES THE OPINION THAT THERE WAS

14  NO PAYMENT INVOLVED.  SO THIS PERSON WHO'S HEARD THIS FROM

15  MR. LARIAN MAKES THIS INQUIRY OF THE INDIVIDUAL AT MATTEL, AND

16  HE SAYS, WELL, THERE WAS A PAYMENT INVOLVED.

17       WE'RE AT THIS POINT BECAUSE A PRESS RELEASE, WHICH

18  AMBASSADOR PROSPER AND THIS COURT HAVE SAID IS INACCURATE, WAS

19  ISSUED.  THE STATEMENT WAS MADE THAT THIS WAS A WALKAWAY.  AND

20  UNFORTUNATELY, THAT'S WHAT SET THIS GOING, BECAUSE AS THIS

21  COURT KNOWS AND HAS BEEN SAID IN THIS COURT, IT WASN'T A WALK-

22  AWAY.

23       THE COURT:  COUNSEL, YOU CERTAINLY UNDERSTAND.  I

24  DON'T NEED TO INSULT YOU BY EXPLAINING THAT SIMPLY BECAUSE ONE

25  PERSON MAKES A MISTAKE, IT JUSTIFIES THE OTHER SIDE FROM TRYING

1    TO CORRECT THAT MISTAKE BY FURTHER COMPOUNDING THE PROBLEM BY

2    VIOLATING THE CONFIDENTIALITY PROVISION THEMSELVES.  IT'S THE

3    'TWO WRONGS DON'T MAKE A RIGHT.'  ASSUMING THAT THERE ARE

4    WRONGS INVOLVED HERE.

5         MR. QUINN:  I THINK AMBASSADOR PROSPER WAS OF THE

6    VIEW THAT MERELY SAYING -- AND HE WAS DEEPLY INVOLVED WITH

7    THIS, AS THE COURT KNOWS -- THAT THERE WAS A PAYMENT WAS NOT A

8    VIOLATION.

9         THE COURT:  I DON'T RECALL AMBASSADOR PROSPER SAYING

10   THAT, COUNSEL.

11        ALL I REMEMBER AMBASSADOR PROSPER SAYING IS THAT

12   THERE'S AN AGREEMENT THAT HAS BEEN REACHED.  IT RESULTS IN A

13   MUTUAL RELEASE AND DISMISSAL AND THE TERMS OF THE SETTLEMENT

14   AGREEMENT ARE CONFIDENTIAL.  THAT'S ALL I REMEMBER.

15        MR. QUINN:  I MAY BE MISTAKEN, CONFUSING SOME OTHER

16   CONVERSATION WITH WHAT WAS SAID IN COURT HERE, YOUR HONOR.

17        THE COURT:  PERHAPS.

18        MR. QUINN:  I AGREE.  IT'S MY VIEW THIS SHOULDN'T BE

19   A SUBJECT OF DISCUSSION.

20        THE COURT:  I AGREE.

21        MR. QUINN:  I REGRET THE TIME WE'VE ALL SPENT.

22        THE COURT:  HAVE YOU TAKEN APPROPRIATE STEPS WITH THE

23   VICE PRESIDENT IN QUESTION, AS WELL AS WITH YOUR CLIENT, TO

24   ENSURE THIS IS NOT GOING TO HAPPEN AGAIN?

25        MR. QUINN:  THE WORD HAS GONE OUT THAT THERE SHOULD

1    BE NO COMMENTS OF THIS NATURE.

2         THE COURT:  ARE YOU CONFIDENT THAT YOUR CLIENT

3    APPRECIATES THAT?

4         MR. QUINN:  YES, RECOGNIZING THAT MY CLIENT CONSISTS

5    OF A LOT OF PEOPLE.

6         THE COURT:  I DO RECOGNIZE THAT.

7         MR. QUINN:  BUT, YES.

8         THE COURT:  WHEN I SAY YOU, I RECOGNIZE THAT YOU

9    CONSIST OF A LOT OF PEOPLE.

10         MR. QUINN:  I SUBMIT THAT MAYBE MGA SHOULD BE UNDER A

11   SIMILAR --

12         THE COURT:  I'M GOING TO TALK TO MR. NOLAN IN A

13   SECOND, MR. QUINN.  I'M SPEAKING TO MATTEL RIGHT NOW.

14         MR. QUINN:  WHILE I'M STILL HERE, YOUR HONOR, WOULD

15   YOU LIKE TO DISCUSS THE SUBJECT OF THE ROLE OF THE SETTLEMENT

16   OR MR. BRYANT'S PAST PENDENCY IN THE CASE AND WHAT THE JURY

17   SHOULD DO?

18         THE COURT:  WE'LL GET TO THAT.  I WANT TO GET THIS

19   ISSUE PUT TO REST.

20         MR. QUINN:  THE COURT SHOULDN'T HAVE ANY DOUBT.  I

21   HOPE THE COURT DOESN'T HAVE ANY DOUBT.  I DON'T WANT THE COURT

22   TO HAVE ANY DOUBT ABOUT OUR COMMITMENT TO NOT DISCUSSING THIS

23   AT ALL.  IT WAS NEVER OUR INTENTION TO DO.  ITS UNFORTUNATE

24   IT'S HAPPENED.  WE REGRET THE WHOLE THING.

25         THE COURT:  BECAUSE I DO THINK, WHILE IT'S CERTAINLY

1   MR. BRYANT AND MATTEL'S PLACE TO HAVE STANDING TO INVOKE THIS

2   COURT'S JURISDICTION OVER THE SETTLEMENT AGREEMENT.  AS I

3   INDICATED THE OTHER DAY, THE SETTLEMENT AGREEMENT AND THE

4   FRUSTRATION OF THE CONFIDENTIALITY OF THE SETTLEMENT AGREEMENT

5   HAS IMPLICATIONS, NOT ONLY FOR THE RELATIONSHIP BETWEEN MATTEL

6   AND CARTER BRYANT, BUT ALSO THE TRIAL THAT'S BEFORE THIS COURT;

7   SO I DO BELIEVE THE COURT HAS A BASIS TO TAKE WHATEVER

8   APPROPRIATE REMEDIAL ACTION THAT IT DEEMS APPROPRIATE TO ENSURE

9   THAT CONFIDENTIALITY.  AND THE COURT WILL TAKE THE APPROPRIATE

10  ACTION.

11       SO YOU'RE ON NOTICE, YOUR CLIENT IS ON NOTICE, THAT

12  IT MUST ABIDE BY THE TERMS OF THAT AGREEMENT.  AND YOUR CLIENT

13  WILL BE HELD RESPONSIBLE GOING FORWARD FOR ANY VIOLATION,

14  REGARDLESS OF WHETHER OR NOT CARTER BRYANT INTENDS TO BRING

15  THAT TO THE COURT'S ATTENTION.

16       THAT'S UNDERSTOOD?

17       MR. QUINN:  UNDERSTOOD, YOUR HONOR.

18       THE COURT:  VERY WELL.

19       MR. NOLAN?

20       MR. NOLAN:  YOUR HONOR, A PUBLIC STATEMENT WAS MADE

21  TO THE FINANCIAL COMMUNITY THAT A PAYMENT WAS MADE.  THAT IS A

22  REFERENCE TO CONFIDENTIAL TERMS THAT WE DON'T HAVE ACCESS TO.

23  BUT MORE IMPORTANTLY, YOUR HONOR, I DON'T KNOW, SINCE THE

24  AGREEMENT IS CONFIDENTIAL, WHETHER OR NOT THAT'S AN ACCURATE

25  STATEMENT.

1    WHAT I WOULD SUGGEST OR ASK, RESPECTFULLY, IS THAT

2    THE COURT, EITHER INDEPENDENTLY OR ON TUESDAY BEFORE THE

3    HEARING OR WHATEVER, ASK AMBASSADOR PROSPER TO CONFIRM -- AND

4    IT COULD BE TO YOURSELF, YOUR HONOR -- THAT A PAYMENT WAS

5    ACTUALLY MADE BY MR. BRYANT.

6        IF THE ANSWER IS YES, I THINK THAT MAYBE TAKES US A

7    DIFFERENT WAY.  BUT IF THE ANSWER IS NO, THEN MATTEL PERSONNEL

8    -- AND WE'RE NOT TALKING ABOUT A LOW-LEVEL EMPLOYEE; WE'RE

9    TALKING ABOUT SOMEONE DIRECTLY RESPONSIBLE FOR COMMUNICATIONS

10   WITH THE INVESTING COMMUNITY -- TELLS A FINANCIAL ANALYST --

11   AND THIS IS THE SAME FINANCIAL ANALYST, YOUR HONOR, WHO I

12   TALKED ABOUT EARLIER WHO WROTE A STORY SAYING THAT MATTEL HAS

13   SCIENTIFIC PROOF OF THE BRATZ FAMILY BEING DONE WITHIN THE

14   BARBIE FAMILY; THAT WAS THE SUBJECT -- AND I ALREADY MADE THIS

15   REFERENCE -- TO MOTIONS THAT ARE UNDER SEAL WITH THE COURT WITH

16   RESPECT TO THESE EXPERT WITNESSES.  SO THIS IS THE SECOND

17   INSTANCE WHERE WE BELIEVE INFORMATION HAS BEEN PROVIDED IN

18   VIOLATION OF THE ORDER.

19       NOW, I'M NOT TALKING TO THE PRESS, AND I APOLOGIZED

20   ALREADY FOR THAT.  AND I FEEL BADLY ABOUT THAT, YOUR HONOR.

21   BUT FOR MATTEL ON THE BACK END TO NOW BE TELLING THE PRESS OR

22   THE FINANCIAL WORLD, 'THAT'S NOT TRUE, HE PAID MONEY,' THAT'S

23   JUST NOT FAIR.  THE COMMUNITY SHOULD NOT HAVE ACCESS TO THAT

24   INFORMATION IF I CAN'T HAVE ACCESS TO THAT INFORMATION.

25       MATTEL KNEW.  MR. QUINN HAS ADMITTED TO THIS

1     GENTLEMAN, WHO'S A HIGH-LEVEL MANAGEMENT, WAS FAMILIAR WITH THE

2     TERMS OF THE AGREEMENT.  I SUSPECT THAT INCLUDES THAT HE WAS

3     AWARE OF THE CONFIDENTIALITY PROVISIONS OF THAT AGREEMENT.  I

4     THINK THAT WE SHOULD HAVE AMBASSADOR PROSPER CONFIRM WHETHER OR

5     NOT A PAYMENT WAS MADE.  AND AT TRIAL, I SHOULD BE ALLOWED TO

6     ASK MR. BRYANT NOT THE AMOUNT, BUT JUST A SIMPLE QUESTION:  DID

7     YOU PAY MONEY TO SETTLE THIS CASE?

8         THE COURT:  THESE ARE TWO SEPARATE ISSUES.  I STOPPED

9     MR. QUINN FROM GOING INTO IT AT TRIAL, AND I'M GOING TO STOP

10    YOU AS WELL.  BUT THIS IS THE SECOND TIME YOU'VE ASKED ME NOW

11    TO ASK AMBASSADOR PROSPER THE TERMS OF THE SETTLEMENT.

12        I'VE BEEN RELUCTANT TO DO THAT UP TO THIS POINT, AND

13    I'M STILL RELUCTANT, BECAUSE I DON'T SEE WHAT IS SERVED BY ME

14    KNOWING, EVEN IN CAMERA, FOR ME KNOWING WHAT THE TERMS OF THE

15    AGREEMENT ARE.

16        WHAT IS THE BENEFIT OF THAT AT THIS POINT?

17        WE'LL TALK ABOUT WHAT'S GOING TO HAPPEN IN TRIAL IN A

18    FEW MOMENTS.  BUT IN TERMS OF THIS ISSUE HERE, WHAT DOES ME

19    KNOWING, LET ALONE YOU KNOWING, THE TERMS OF THE AGREEMENT

20    SERVE?  BECAUSE I WOULD GENERALLY BE RELUCTANT TO LEARN OF THE

21    TERMS OF SUCH A CONFIDENTIAL AGREEMENT.

22        MR. NOLAN:  THE FIRST STEP, YOUR HONOR, IS WHETHER OR

23    NOT THE STATEMENT THAT MATTEL MADE TO THE FINANCE COMMUNITY IS

24    TRUE.

25        THE COURT:  WHETHER IT'S TRUE OR FALSE, IT SHOULDN'T

1    BE MADE.  AND MR. QUINN, I THINK, UNDERSTANDS THAT.  AND BASED

2    ON HIS REPRESENTATION, I BELIEVE MATTEL UNDERSTANDS THAT.  NOT

3    THAT THEY SHOULDN'T HAVE UNDERSTOOD IT BEFORE, BUT GOING

4    FORWARD, THEY CLEARLY UNDERSTAND THAT NOW.

5         MR. NOLAN:  I UNDERSTAND THAT.  BUT IF THAT STATEMENT

6    THAT WAS MADE WAS INACCURATE, I THINK THAT'S A SERIOUS ISSUE

7    THAT THE COURT SHOULD TAKE INTO CONSIDERATION IN FASHIONING A

8    RELIEF AS TO WHAT THIS COURT SHOULD DEAL WITH.  THIS JURY

9    SHOULD LEARN ABOUT THE SETTLEMENT.  I THINK THAT'S THE FIRST

10   STEP.

11        I DON'T KNOW.  IT MAY BE THAT IT WAS ACCURATE.  I

12   DON'T KNOW.  BUT I DON'T THINK IT'S FAIR FOR US TO BE --

13        THE COURT:  I DON'T THINK THE ACCURACY OF THE

14   STATEMENT MAKES IT ANY LESS OR BETTER OR WORSE.  WHETHER IT'S

15   SPIN, WHETHER IT'S TRUE, WHETHER IT'S FALSE, THE STATEMENT

16   SHOULD NOT HAVE BEEN MADE BECAUSE IT WAS A CONFIDENTIAL

17   AGREEMENT.  PERIOD.

18        SO I TAKE IT SERIOUSLY, AS I'VE INDICATED FROM THE

19   GET GO.  I ASKED YOU TWO DAYS AGO WHAT RELIEF YOU WANTED.  YOU

20   SET FORTH THE RELIEF YOU REQUESTED.  I DENIED THAT RELIEF

21   BECAUSE I DIDN'T SEE HOW THAT FURTHERED ANYTHING.  BUT I DID

22   IMPOSE ON MR. QUINN A CERTAIN OBLIGATION.  HE'S FULFILLED

23   THOSE.  I TAKE HIS WORD.  AND SO FROM THAT PERSPECTIVE, I'M

24   SATISFIED GOING FORWARD.

25        IF THIS HAPPENS AGAIN, MR. NOLAN, I ASSURE YOU, THERE

1    WILL BE SERIOUS CONSEQUENCES.

2         MR. NOLAN:  I ACCEPT THAT, YOUR HONOR.

3         THE COURT:  I WANT TO DIRECT THE SAME TO YOU.

4    BECAUSE BOTH SIDES HAVE NOT COME BEFORE THIS COURT WITH CLEAN

5    HANDS IN TERMS OF STATEMENTS MADE TO THE PRESS IN THE CONTEXT

6    OF THIS SETTLEMENT.

7         MR. NOLAN:  I UNDERSTAND, YOUR HONOR.

8         THE COURT:  I TRUST THAT I CAN GET THE SAME

9    REPRESENTATION FROM YOU THAT YOU HAVE MADE CLEAR TO MR. LARIAN

10   AND YOUR CLIENT, MGA ENTERTAINMENT, AND THAT YOU YOURSELF

11   UNDERSTAND THERE IS TO BE NO MORE OF THIS DISCLOSURE, WHETHER

12   TRUE, FALSE, OR OTHERWISE, OF THE CONTENTS OF THE CONFIDENTIAL

13   SETTLEMENT AGREEMENT WITH CARTER BRYANT.

14        MR. NOLAN:  I UNDERSTAND THAT AND I UNDERTAKE THAT

15   RESPONSIBILITY.

16        MR. QUINN:  OR SPECULATION.  THEY DON'T ACTUALLY

17   KNOW.  THEY COULDN'T DISCLOSE IT, BUT --

18        THE COURT:  THAT'S WHY I SAID TRUE OR FALSE OR SPIN.

19        VERY WELL.

20        NOW, THE NEXT ISSUE IS GOING FORWARD.  WHAT DO WE DO

21   WITH THE TRIAL?

22        THE ISSUE, AS I SEE IT, IS WE HAVE STRONG POLICY

23   ISSUES ON THE ONE HAND TO PRESERVE THE CONFIDENTIALITY OF THE

24   SETTLEMENT AGREEMENTS.  WE HAVE A FEDERAL RULE OF EVIDENCE

25   WHICH SPEAKS TO THE CONTENTS OF COMMUNICATIONS CONDUCTED IN

1    SETTLEMENT.  AT THE SAME TIME, THERE ARE ISSUES OF CREDIBILITY

2    AND THE MANNER IN WHICH THE SETTLEMENT, OR WHATEVER AGREEMENT

3    WAS REACHED BETWEEN MATTEL AND CARTER BRYANT, MIGHT AFFECT

4    CREDIBILITY AND BIAS, ET CETERA.

5         THAT'S THE ISSUE THAT I WANT TO HAVE ADDRESSED NOW SO

6    THAT THE COURT CAN MAKE A CLEAR RULING ON THIS AND THERE ARE

7    STRICT PARAMETERS FOR HOW WE CONDUCT THIS AT TRIAL.  THAT IS

8    NOW THE ISSUE I'D LIKE BOTH COUNSEL TO ADDRESS.  I DON'T WANT

9    TO HEAR ANYTHING MORE ABOUT WHAT HAS HAPPENED IN THE PAST.

10   I'VE GOT THE CONFIRMATIONS THAT I WANTED ON THE RECORD.  WE'RE

11   NOW GOING FORWARD.

12        SO I WILL BEGIN WITH MR. QUINN, SIMPLY BECAUSE THIS

13   WAS THE AGREEMENT BETWEEN HIS CLIENT AND MR. BRYANT, AND I'D

14   LIKE TO HEAR YOUR SUGGESTIONS AND THEN I'LL HEAR FROM

15   MR. NOLAN.

16        MR. QUINN:  YOUR HONOR, I THINK THE JURY OUGHT TO BE

17   TOLD THAT MR. BRYANT WAS, AT ONE POINT, A PARTY TO THIS CASE;

18   HE IS NO LONGER A PARTY TO THIS CASE; THE REASONS HE IS NO

19   LONGER A PARTY TO THIS CASE ARE NOT OF ANY CONCERN TO THE JURY.

20        THE COURT:  SO THE JURY SHOULD NOT SPECULATE AS TO

21   WHY HE IS NO LONGER A PARTY.

22        MR. QUINN:  EXACTLY.  I THINK IF WE GO BEYOND THAT,

23   WE REALLY DO WADE INTO A MORASS.

24        THE COURT:  WHAT ABOUT THE IMPEACHMENT VALUE OR

25   POTENTIAL FOR BIAS IN LIGHT OF THE SETTLEMENT AGREEMENT?  HOW

1    SHOULD THE COURT DEAL WITH THAT ISSUE?

2        MR. QUINN:  IT'S A TRICKY ISSUE.

3        I'M THINKING OUT LOUD NOW, YOUR HONOR, IN REALTIME;

4    IT'S A DANGEROUS THING TO DO.

5        THE COURT:  IT IS, PARTICULARLY AT THE END OF THE

6    DAY.

7        MR. QUINN:  THE WITNESS COULD BE ASKED, 'DO YOU HAVE

8    ANY TYPE OF UNDERSTANDING REGARDING THE SUBSTANCE OF YOUR

9    TESTIMONY?  HAVE YOU MADE ANY PROMISES TO ANYONE ABOUT YOUR

10   TESTIMONY?

11       THE FACT IS THE MAN WAS DEPOSED OVER THE COURSE OF

12   FIVE DAYS, SO HE'S PRETTY LOCKED IN AS TO WHAT HIS TESTIMONY

13   IS.

14       THE COURT:  YES.

15       MR. QUINN:  IF MR. NOLAN WANTED TO ASK HIM, 'DID YOU

16   MAKE ANY PROMISES TO ANYBODY ABOUT CHANGING YOUR TESTIMONY OR

17   ANYTHING LIKE THAT?  MAYBE THAT'S SOME KIND OF FAIR GAME.

18       IT WOULD BE SUICIDAL, I THINK, IN THIS CIRCUMSTANCE

19   FOR ANY PARTY TO ENTER INTO AN AGREEMENT IN A SITUATION LIKE

20   THIS WITH A WITNESS WHERE THERE WAS ANY KIND OF UNDERSTANDING

21   ABOUT HOW THE RESOLUTION WOULD AFFECT THEIR TESTIMONY.

22       THE COURT:  NOT ONLY SUICIDAL, BUT QUITE UNETHICAL.

23       MR. QUINN:  SO I DON'T THINK WE CAN GO BEYOND THAT,

24   YOUR HONOR.

25       IT WAS MR. BRYANT WHO ASKED THAT THIS THING BE

1    CONFIDENTIAL, BY THE WAY.

2         THOSE ARE MY THOUGHTS.  I DON'T THINK IT'S A

3    SETTLEMENT LIKE ANY OTHER.  THIS ISN'T THAT UNUSUAL A SITUATION

4    WHERE YOU HAVE MULTIPLE PARTIES TO A CASE; ONE HAS SETTLED; AND

5    THE JURY IS TOLD -- A LOT OF TIMES YOU DON'T EVEN TELL THE JURY

6    THE PERSON WAS EVER IN THE CASE.  THAT'S ANOTHER ALTERNATIVE I

7    THOUGHT ABOUT.  MY EXPERIENCE IS, WITH SO MANY CAPTIONS AND

8    TESTIMONY AND LAWYERS ON THE RECORD, AS BEST YOU TRY TO CLEAN

9    UP THE VIDEO DEPOSITION, THE JURY IS GOING TO GET IT.  AT SOME

10   POINT THEY ARE GOING TO UNDERSTAND AT SOME POINT THAT

11   MR. BRYANT WAS INVOLVED IN THIS CASE.  SO I DON'T THINK IT'S

12   PRACTICAL; THAT WILL SOMEHOW LEAK OUT TO THEM.

13        IT SEEMS TO ME THE LOGICAL THING IS TO TELL THEM THAT

14   HE WAS PART OF THE CASE; HE'S NOT ANYMORE; AND IT'S NOT YOUR

15   CONCERN; YOU'RE NOT TO SPECULATE.

16        IT'S A PRETTY COMMON SITUATION.

17        THE COURT:  THANK YOU, COUNSEL.

18        MR. NOLAN, YOUR THOUGHTS?

19        MR. NOLAN:  YOUR HONOR, I DON'T AGREE WITH MR. QUINN

20   WITH RESPECT TO WHAT HE THINKS ARE THE LIMITS OF WHAT SHOULD BE

21   TOLD TO THE JURY, NOR THAT THIS IS A COMMON INSTANCE.

22        THE COURT:  TELL ME WHAT YOU THINK SHOULD BE TOLD TO

23   THE JURY.

24        MR. NOLAN:  I THINK THE JURY SHOULD BE TOLD THAT A

25   LAWSUIT WAS BROUGHT BY MATTEL AGAINST CARTER BRYANT AND THAT

1    MATTER WAS SETTLED, AND THE DATE OF THE SETTLEMENT.  THAT IT'S

2    A PART OF THE SETTLEMENT THERE WAS NO ADMISSION OF WRONGDOING,

3    WHICH IS A PUBLIC STATEMENT; THERE WAS NO ADMISSION OF

4    WRONGDOING OR LIABILITY BY MR. BRYANT.

5        THE COURT:  OR BY ANY PARTY.

6        AMBASSADOR PROSPER MADE THAT CLEAR.

7        BECAUSE CARTER BRYANT ALSO SUED; CORRECT?

8        MR. NOLAN:  THAT'S CORRECT.

9        IN OTHER WORDS, I THINK WHAT SHOULD BE EXPLAINED TO

10   THE JURY --

11       THE COURT:  WHO SUED FIRST?

12       MR. NOLAN:  CARTER BRYANT.  CARTER BRYANT SUED

13   MATTEL.  MATTEL ALSO SUED CARTER BRYANT; THAT THOSE LAWSUITS

14   HAVE BEEN RESOLVED, WITH NO ADMISSION OF LIABILITY, OR WHATEVER

15   THAT WORD WAS AMBASSADOR PROSPER -- DENYING RESPONSIBILITY, OR

16   WHATEVER THAT IS -- MY MIND IS NOT WORKING RIGHT NOW.

17       THE COURT:  NO ADMISSION OF WRONGDOING OR OF

18   LIABILITY.

19       MR. NOLAN:  THANK YOU.  AND THAT THE MATTER WAS

20   SETTLED ON SUCH AND SUCH A DATE, AND YOU SHOULD NOT SPECULATE

21   ANY FURTHER THAN THAT.

22       HERE'S THE ISSUE, THOUGH, YOUR HONOR, THAT'S CAUSING

23   ME PAUSE.

24       WE HAVE IN OUR CONTRACT WITH CARTER BRYANT, WHICH WE

25   HAVE NOT SETTLED, I MEAN, IT'S NOT EVEN AN ISSUE RIGHT NOW, AND

1    THAT IS THAT CARTER BRYANT ENTERED INTO A CONTRACT WITH MGA

2    WHERE HE INDEMNIFIED AND REPRESENTED CERTAIN FACTS TO US.  AND

3    WHAT I EXPECT -- MAYBE NOT; MAYBE MR. QUINN CAN CONFIRM THAT --

4    THAT WE'RE GOING TO ARGUE THAT WE RELIED ON THAT STATEMENT FROM

5    CARTER BRYANT IN THIS INDEMNIFICATION; THAT INDEMNIFICATION IS

6    STILL IN EFFECT.

7         I SUSPECT MR. QUINN WILL USE THAT AS BIASED AGAINST

8    MR. BRYANT IF THEY DON'T LIKE HIS TESTIMONY.

9         IN OTHER WORDS, 'GEE, MR. BRYANT, YOU'RE REALLY

10   WORRIED, AREN'T YOU, THAT IF MGA LOSES THIS CASE, THEY ARE

11   GOING TO COME AFTER YOU; ISN'T THAT TRUE?'

12        OR WORDS TO THAT EFFECT.

13        THEN I'M IN A PICKLE, BECAUSE I CAN'T GO INTO THE

14   SITUATION WHICH WOULD SUGGEST THAT CARTER DOESN'T HAVE A BIAS

15   IN THIS REGARD BECAUSE THE TERMS PROVIDE FOR X, Y AND Z.  IT

16   SEEMS WHERE THIS IS A ONE-WAY STREET WHERE I'M THE ONLY ONE

17   THAT CAN BE HEARD.  THAT'S WHAT MAKES THIS SITUATION UNIQUE.

18        IT'S ALSO INTERESTING -- I DON'T KNOW, I HAVEN'T

19   CHECKED WITH --

20        THE COURT:  SO LET ME MAKE SURE I UNDERSTAND YOU.

21        YOU'RE CONCERNED THERE MAY BE SOME SIMILAR

22   INDEMNIFICATION OR REPRESENTATIONS MADE TO MATTEL IN THIS

23   AGREEMENT THAT YOU'RE NOT AWARE OF, AND YOU CAN'T MAKE THAT

24   SAME ARGUMENT.

25        MR. NOLAN:  THAT'S CORRECT.

1      AND THAT MR. QUINN HAS A LICENSE, HAVING SETTLED WITH

2    CARTER BRYANT, HAVING MADE SERIOUS CLAIMS AGAINST HIM IN THIS

3    CASE, AND HAVING DISMISSED WITH PREJUDICE ALL OF THOSE CLAIMS

4    WITHOUT AN ADMISSION OF WRONGDOING AND A DENIAL OF LIABILITY --

5    THE FIELD IS NOT A LEVEL PLAYING FIELD FOR ME.  AND THAT'S THE

6    CONCERN I WOULD HAVE.

7      SO I GUESS WHAT I WOULD ADD TO WHAT I JUST SAID WAS

8    THAT A DISMISSAL HAS BEEN ENTERED BY MATTEL AND BY CARTER

9    BRYANT.

10      THE COURT:  YOU DON'T THINK THESE QUESTIONS ABOUT

11   PROMISES TO ANYONE REGARDING THE TESTIMONY, OR ANY

12   UNDERSTANDINGS REGARDING THE SUBSTANCE OF TESTIMONY, WOULD

13   SUFFICE TO INQUIRE AS TO WHETHER OR NOT THE AGREEMENT HAS ANY

14   PROVISIONS OF REPRESENTATION OR INDEMNIFICATION?

15      MR. NOLAN:  I THINK THOSE WOULD HELP.  I JUST WANT TO

16   NOT BE IN A SITUATION WHERE THE JURY IS BELIEVING THAT

17   CARTER BRYANT PAID BACK ALL OF HIS ROYALTIES AND WHAT HIS REAL

18   CONCERN NOW IS THAT WE'RE GOING TO SUE HIM, AND THAT'S WHY HIS

19   TESTIMONY WILL COME OUT A CERTAIN WAY.  THAT'S THE CONCERN I

20   HAVE.

21      SO THEY ARE GOING TO BE USING OUR INDEMNIFICATION

22   AGAINST CARTER BRYANT IN ARGUING BIAS.  AND I HAVE NO ABILITY

23   TO SAY TO THE JURY, 'ALL THESE CLAIMS, ALL OF THESE ARGUMENTS

24   ABOUT CARTER BRYANT HAVE ALREADY BEEN RESOLVED.  MATTEL

25   DISMISSED IT.'

1        THAT'S THE CONCERN I HAVE, YOUR HONOR.  I PROBABLY

2    DID NOT ARTICULATE IT WELL.

3        THE COURT:  NO, YOU HAVE.

4        IT DOESN'T SOUND LIKE WE'RE ALL THAT FAR APART.

5    MATTEL WANTS ME TO SAY BRYANT WAS A PARTY TO THIS CASE.  MGA

6    WANTS ME TO SAY THERE WAS A LAWSUIT BY CARTER BRYANT AGAINST

7    MATTEL AND MATTEL AGAINST CARTER BRYANT.

8        I THINK I CAN ACCOMPLISH THAT ELEMENT THERE BY COMING

9    UP WITH SOME NEUTRAL LANGUAGE WHICH SUGGESTS THAT BY VIRTUE OF

10   SUING MATTEL AND BEING SUED BY MATTEL, HE WAS A PARTY OF THIS

11   CASE.

12       SECOND, THAT THE CASE WAS SETTLED.  MR. QUINN WANTS

13   TO HAVE ME SAY NO LONGER A PARTY IN THE CASE.  MR. NOLAN SAYS

14   SETTLED; HE'S NO LONGER A PARTY BECAUSE HE SETTLED.  I THINK WE

15   CAN ACCOMPLISH THAT THROUGH SOME LANGUAGE.

16       MR. NOLAN:  BUT BOTH HAVE SETTLED.  IN OTHER WORDS,

17   MATTEL HAS SETTLED WITH CARTER BRYANT.

18       THE COURT:  AND CARTER BRYANT HAS SETTLED WITH

19   MATTEL.

20       MR. NOLAN:  IT SOUNDED AS THOUGH IT WAS JUST THAT

21   CARTER BRYANT HAD SETTLED THE MATTER.

22       THE COURT:  RIGHT.

23       AND COUPLED WITH THE LANGUAGE PROPOSED BY MR. QUINN,

24   THAT NO ONE IS TO SPECULATE AS TO WHY HE'S NO LONGER A PARTY OR

25   WHAT THE AGREEMENT WAS OR WHAT THE SETTLEMENT WAS.

1        MR. QUINN:  RIGHT.

2        ACTUALLY, YOUR HONOR, AS A MATTER OF HISTORY, THE

3    FIRST CASE FILED, THE HERITAGE OF THIS IS IT STARTS WITH THE

4    CASE 'MATTEL VERSUS CARTER BRYANT.'  HOW THE CAPTION EVER GOT

5    BRYANT VERSUS -- MAYBE IT WAS REMOVED OR SOMETHING SOMEHOW;

6    THAT FIRST CASE WAS MATTEL VERSUS CARTER BRYANT.

7        THE COURT:  HOW DID IT BECOME BRYANT VERSUS MATTEL AT

8    SOME POINT?

9        MR. NOLAN:  BECAUSE CARTER BRYANT FILED A CLAIM IN

10   FEDERAL COURT.

11       THE COURT:  SO THE DECLARATORY RELIEF WAS JUST

12   REVERSE OF THE STATE COURT ACTION.

13       MR. ZELLER:  CONSOLIDATING ALL THREE, AND THEN YOU

14   MADE BRYANT VERSUS MATTEL CASE THE LEAD ONE.

15       THE COURT:  BECAUSE THAT WAS THE LOWEST NUMBERED

16   FEDERAL CASE.  THAT MAKES SENSE.

17       IN ANY EVENT, THIS WOULD BE LOST ON A JURY, I TRUST

18   YOU.  IT'S ALMOST LOST ON ME.  BUT IT WOULD CERTAINLY BE LOST

19   ON THE JURY.

20       THE BOTTOM LINE IS THERE IS THIS LAWSUIT INVOLVING

21   THESE PARTIES.  CARTER BRYANT IS NO LONGER A PART OF THIS.

22   THERE'S BEEN A RESOLUTION.  YOU'RE NOT TO SPECULATE AS TO WHY

23   HE'S NO LONGER A PARTY OR WHAT THAT RESOLUTION WAS.

24       NO ADMISSION OF WRONGDOING OR LIABILITY BY EITHER

25   PARTY.

1        MR. QUINN:  WE HAVE A PROBLEM WITH THAT, YOUR HONOR.

2        THERE IS NOTHING IN THE RECORD ON THAT.  THE PUBLIC

3    DOCUMENTS DON'T SAY THAT.  THE DISMISSAL SAYS THAT.

4        BY THE WAY, IT'S POINTED OUT THAT THE PUBLIC DOCUMENT

5    ACTUALLY RECITES -- THE DISMISSAL CITES THAT THIS IS TO HAVE NO

6    AFFECT WHATSOEVER ON THE SUBSTANCE OF MR. BRYANT'S TESTIMONY.

7    THAT'S IN THE PUBLIC DOCUMENT.

8        BUT THERE IS NOTHING IN THE PUBLIC DOCUMENT ABOUT

9    WHETHER THERE'S AN ADMISSION OR NOT AN ADMISSION, A DISCLAIMER

10   OF LIABILITY ONE WAY OR THE OTHER.

11        NOW, I CAN'T TELL THE COURT, WITHOUT VIOLATING THE

12   CONFIDENTIALITY PROVISION, ABOUT WHAT THE UNDERLYING DOCUMENT

13   SAYS ON THAT SCORE.

14        THE COURT:  I'VE ALREADY HEARD THAT; THAT IS THE ONE

15   THING THAT AMBASSADOR PROSPER DID TELL THE COURT HERE WAS THAT

16   THERE WAS NO ADMISSION OF LIABILITY BY EITHER SIDE.

17        MR. NOLAN:  THAT'S CORRECT.

18        THE COURT:  SO THAT IS PART OF THE PUBLIC RECORD.

19        MR. QUINN:  THAT THEN BECOMES, I THINK I'M CONCERNED,

20   A SIGNIFICANT DATA POINT FOR THE JURY, THAT STATEMENT THAT

21   AMBASSADOR PROSPER SAID.

22        WHY SHOULD A STATEMENT BY AMBASSADOR PROSPER HERE IN

23   THIS COURTROOM THEN BECOME SOMETHING THAT THE JURY HEARS?

24        THEY WANT THAT VERY MUCH.  I THINK THERE ARE OBVIOUS

25   REASONS WHY THEY WANT IT, SO THAT IT APPEARS THAT THERE WAS A

1    SETTLEMENT AND THEY WANT THE JURY TO CONCLUDE THAT THERE WAS NO

2    KIND OF ADMISSION OF LIABILITY.

3         THE COURT:  AND I SUSPECT YOU DON'T WANT IT TO BE.

4         MR. QUINN:  YEAH.  I THINK IT SHOULD BE SILENT ON

5    THAT.  PLAIN VANILLA.

6         NOW, THE FACT IS AMBASSADOR PROSPER SAID SOMETHING,

7    BUT THAT SHOULDN'T BECOME A FACTOID THAT WE THEN ALL HAVE TO

8    WRESTLE WITH AND IT GOES BEFORE THE JURY BECAUSE

9    AMBASSADOR PROSPER SAID THAT.  IT SHOULD SIMPLY BE 'DON'T

10   SPECULATE.'  THAT IS AN INVITATION TO SPECULATION AS TO WHY WAS

11   THERE A SETTLEMENT; WHAT COULD THAT HAVE MEANT IF THERE WAS NO

12   ADMISSION OF LIABILITY?

13        ANDY BY THE WAY, HOW MANY TIMES DO YOU HAVE A

14   SETTLEMENT AGREEMENT WHERE THE PARTIES SETTLING ADMIT TO

15   LIABILITY?  I'M NOT SURE I'VE EVER DONE ONE.

16        THE COURT:  IF ANYTHING, MR. QUINN, THERE'S

17   OFTENTIMES LANGUAGE IN THERE DISCLAIMING ANY ADMISSION OF

18   LIABILITY.

19        MR. QUINN:  YOU SEE THAT SOMETIMES.  BUT I JUST THINK

20   THAT THEN THAT'S ANOTHER PIECE THAT THE JURY SIMPLY DOESN'T

21   HAVE TO HEAR.

22        THE COURT:  WHAT IF WE PHRASE THIS THAT THE JURY IS

23   INSTRUCTED THAT THEY ARE NOT TO -- AND I'M THINKING OUT LOUD

24   HERE -- TAKE THE SETTLEMENT OR TAKE THE RESOLUTION OR THE FACT

25   THAT CARTER BRYANT AND MATTEL NO LONGER HAVE CLAIMS AGAINST

1    EACH OTHER, THEY ARE NOT TO TAKE FROM THAT ANY EVIDENCE OF AN

2    ADMISSION OF LIABILITY OR ADMISSION OF WRONGDOING.

3        MR. QUINN:  I'M FINE WITH THAT.  IT'S A NEUTRAL FACT.

4    IT DOESN'T TEND TO INDICATE THAT MR. BRYANT WAS LIABLE OR NOT

5    LIABLE.

6        THE COURT:  AS OPPOSED TO SPEAKING TO WHAT THE

7    SETTLEMENT AGREEMENT ACTUALLY CALLS FOR.

8        MR. QUINN:  EXACTLY.

9        THE COURT:  I'LL CONSIDER THAT.

10       WHAT DO YOU THINK, MR. NOLAN?

11       MR. NOLAN:  I THINK THAT IT'S ABSOLUTELY CRITICAL

12   THAT THE JURY BE TOLD WHAT HAS BEEN TOLD ON THE PUBLIC RECORD;

13   THAT BOTH PARTIES, MATTEL AND CARTER BRYANT, NEITHER PARTY

14   ADMITTED ANY WRONGDOING OR LIABILITY, EITHER PARTY AGAINST EACH

15   OTHER.  BECAUSE THAT IS A NEUTRAL STATEMENT; IT IS ALSO TRUE.

16       AMBASSADOR PROSPER DIDN'T DO ANYTHING WRONG BY

17   PUTTING THAT ON THE RECORD.  THAT IS WHAT HE REPORTED IN COURT.

18       BY YOUR HONOR SIMPLY SAYING TO THE JURY, 'PLEASE

19   DON'T SPECULATE ABOUT WHETHER OR NOT THERE WAS AN ADMISSION OF

20   LIABILITY,' ALLOWS SOMEBODY --

21       THE COURT:  THAT'S NOT WHAT I'M SUGGESTING.  I THINK

22   STRONGER LANGUAGE IS APPROPRIATE.

23       I WILL TELL THEM NOT TO SPECULATE.  BUT IN ADDITION

24   TO THAT, WHAT I'M SUGGESTING TO MR. QUINN AND ALSO TO YOU IS

25   THAT I SAY THAT THERE IS NOTHING ABOUT THE SETTLEMENT OR

1    THERE'S NOTHING ABOUT THIS RESOLUTION THAT THE JURY SHOULD TAKE

2    AS AN ADMISSION OF LIABILITY OR WRONGDOING BY ANYONE.  AS

3    OPPOSED TO INSERTING THAT THIS IS FROM THE SETTLEMENT AGREEMENT

4    ITSELF.

5         IT'S JUST A SMALL SPIN, IF YOU WOULD, BUT IT TAKES IT

6    OUT OF THE SETTLEMENT AGREEMENT AND PLACES IT MORE IN THE FORM

7    OF AN INSTRUCTION FROM THE COURT:  NO LIABILITY, NO WRONGDOING,

8    FROM ANY OF THIS, AND YOU'RE NOT TO SPECULATE AS TO WHETHER

9    THERE'S ANY IMPACT; JUST A CLEAR INSTRUCTION TO THE JURY.

10        I'LL WORK ON THIS TONIGHT AND TRY TO COME UP WITH IT.

11        AS FAR AS INDEMNIFICATION AND REPRESENTATION TO

12   MATTEL, SHOULD THAT EXIST, I THINK THE QUESTIONS MR. QUINN HAS

13   SUGGESTED HERE ABOUT UNDERSTANDINGS REGARDING TESTIMONY,

14   PROMISES TO ANYONE; 'PROMISE' IS A LAY TERM FOR

15   'INDEMNIFICATION'; I THINK THAT YOU CAN GET TO THAT.

16        I INDICATED MY RELUCTANCE TO LOOK AT THE AGREEMENT,

17   BUT PERHAPS, IF ALL PARTIES AGREE -- AND I'D WANT AN EXPRESS

18   WAIVER FROM MATTEL, MGA, AND CARTER BRYANT, I WILL REVIEW

19   IN-CAMERA THE AGREEMENT JUST SO THAT I AM IN A POSITION TO

20   BASICALLY ENFORCE ANYTHING SHOULD ANY MISREPRESENTATION ABOUT

21   THE AGREEMENT BE MADE.

22        MR. QUINN, WOULD THAT BE...

23        MR. QUINN:  YES; THAT'S FINE, YOUR HONOR.

24        THE COURT:  MR. NOLAN.

25        MR. NOLAN:  YES, YOUR HONOR.

1        THE COURT:  I'LL DIRECT MR. HOLMES TO INQUIRE FROM

2    MR. KEKER OR MS. ANDERSON IF THAT IS ALL RIGHT WITH

3    CARTER BRYANT.  AND IF IT IS, THEN I'LL REVIEW IT IN-CAMERA SO

4    THAT I'M IN A POSITION TO RULE ON ANY DISPUTES IN CASE CARTER

5    BRYANT ANSWERS --

6        I ASSUME, BASED ON WHAT'S BEING DISCUSSED HERE, THAT

7    HE'S GOING TO ANSWER THESE QUESTIONS IN THE NEGATIVE.  BUT IF

8    HE DOESN'T -- WHATEVER; AT LEAST SOMEBODY IN HERE KNOWS WHAT'S

9    GOING ON.

10        I'LL WORK ON AN INSTRUCTION TO THE JURY ON THAT AND

11    I'LL GIVE THAT INSTRUCTION BEFORE CARTER BRYANT TAKES THE --

12    SHOULD I DO THAT AT THE BEGINNING, OR DO THAT BEFORE CARTER

13    BRYANT TAKES THE STAND?

14        MR. NOLAN:  DEFINITELY PRELIMINARY INSTRUCTIONS,

15    BASED ON THE OPENING STATEMENTS.  WE HAVE TO, TO AVOID ANY

16    MISCHIEF.

17        THE COURT:  THAT MAKES SENSE.

18        MR. ZELLER?

19        MR. ZELLER:  I JUST WANT TO MAKE SURE I UNDERSTAND

20    THE TASK WE'LL HAVE TONIGHT AND GOING INTO TOMORROW MORNING.

21        THE COURT:  I TAKE IT YOU'RE GOING TO BE TASKED WITH

22    THE TASK.

23        MR. ZELLER:  I'M ASSUMING RESPONSIBILITY, WHETHER I

24    LIKE IT OR NOT.

25        SO WE'LL COME BACK AT 1:30.

Unsigned                                                        Page  131

1          I ASSUME THE COURT WOULD LIKE TO SEE A DOCUMENT BY

2     THAT TIME?

3          THE COURT:  I WOULD LIKE TO SEE IT AT NOONTIME SO

4     THAT I CAN LOOK AT IT DURING LUNCH.  AND WHAT I'M LOOKING FOR

5     IS ESSENTIALLY AN AMENDED AMENDED PRETRIAL CONFERENCE ORDER

6     WHICH INCORPORATES THE COURT'S RULINGS ON THE MOTION FOR

7     RECONSIDERATION, THE MOTIONS FOR PARTIAL SUMMARY JUDGMENT, AND

8     THE MOTIONS IN LIMINE.  TO THE EXTENT POSSIBLE.  I UNDERSTAND

9     THERE MAY BE ISSUES IN DISPUTE.

10         AND IF YOU COULD IDENTIFY, EVEN IF YOU JUST HAD A

11    PIECE OF PAPER, DON'T EVEN FILE IT, JUST HAVE SOMETHING FOR ME

12    TO IDENTIFY THOSE ISSUES THAT ARE IN DISPUTE.  NOT TO HAVE THE

13    SUBSTANCE OF THE ARGUMENT, BUT JUST SOMETHING FOR ME TO GO BY

14    UP HERE, I WOULD REALLY APPRECIATE THAT.

15         MR. ZELLER:  SOMETHING ALONG THE LINES OF A PUNCH

16    LIST.

17         THE COURT:  YES.

18         MR. ZELLER:  WE CAN DO THAT.

19         THE COURT:  APPROPRIATELY TITLED.

20         MR. ZELLER:  THEN OVERALL, IN TERMS OF ITS FORMAT,

21    THE INFORMATION THAT WAS IN THE DOCUMENT, DID THE COURT HAVE

22    ANY COMMENTS, ANY REACTIONS, THAT WE SHOULD BE AWARE OF?

23         THE COURT:  NONE THAT I WANT TO PUT ON THE PUBLIC

24    RECORD.

25         MR. ZELLER:  FAIR ENOUGH.

1        I APPRECIATE THAT VERY MUCH.

2        THE COURT:  GOOD EVENING, EVERYONE.

3        (PROCEEDINGS CONCLUDED.)

4

5

6

7

8

9

10

11              CERTIFICATE

12

13   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED

     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF

14   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-

     ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

15   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

     THE UNITED STATES.

16

17   _____        _____

     THERESA A. LANZA, CSR, RPR            DATE

18   FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25