1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    ---

4     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                    ---

6   MATTEL, INC.,              :   PAGES 1 - 81
                               :
7          PLAINTIFF,          :
                               :
8      VS.                     :   NO. ED CV04-09049-SGL
                               :   [CONSOLIDATED WITH
9   MGA ENTERTAINMENT, INC.,   :   CV04-9059 & CV05-2727]
    ET AL.,                    :
10                             :
           DEFENDANTS.         :
11  _____

12

13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16           RIVERSIDE, CALIFORNIA

17          FRIDAY, MAY 23, 2008

18

19

20

21

22             MARK SCHWEITZER, CSR, RPR, CRR
               OFFICIAL COURT REPORTER
23             UNITED STATES DISTRICT COURT
               181-H ROYBAL FEDERAL BUILDING
24             255 EAST TEMPLE STREET
               LOS ANGELES, CALIFORNIA 90012
25             (213) 663-3494

CERTIFIED COPY

1   **Appearances of Counsel:**

2

3   On Behalf of Mattel:

4        Quinn Emanuel
         By John B. Quinn, Esq.
5            Dylan Proctor, Esq.
             Michael T. Zeller, Esq.
6            Harry Olivar, Esq.
             John Corey, Esq.
7            Diane Hutnyan, Esq.
         855 South Figueroa Street
8        10th Floor
         Los Angeles, CA 90017
9        (213) 624-7707

10

11   On Behalf of MGA Entertainment:

12        Skadden, Arps, Slate, Meagher & Flom LLP
          By Thomas J. Nolan, Esq.
13            Carl Alan Roth, Esq.
              Jason Russell, Esq.
14            Robert Harrington, Esq.
              Lauren Aguiar, Esq.
15        300 South Grand Avenue
          Los Angeles, CA 90071-3144
16        (213) 687-5000

17

18

19

20

21

22

23

24

25

1                        **I N D E X**

2

3           MATTER:   PRETRIAL CONFERENCE.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **Riverside, California; Friday, May 23, 2008**

2                              **1:35 P.M.**

3                   WHEREUPON THE CASE HAVING BEEN CALLED

4                   AND APPEARANCES GIVEN, THE FOLLOWING

5                   PROCEEDINGS WERE HELD:

6          THE COURT:  Good afternoon to you all.  The Court

7    would love to conduct a pretrial conference at this time, but

8    I understand we don't have a pretrial conference order.

9          MR. QUINN:  Your Honor, it's our fault.  We

10   apologize to the Court.  We had a number of internal problems

11   assembling this.  It's entirely our fault.  We did e-file it,

12   but we blew the e-filing deadline by an hour and a half.

13   Hard copies are on the way over.

14         THE COURT:  When do you think they will be here?

15         MR. ZELLER:  I would imagine 10 minutes.

16         THE COURT:  The Court will need some time to review

17   this.  How many pages is it?

18         MR. QUINN:  Your Honor, it's in excess of 150

19   pages.

20         THE COURT:  Okay.  As soon as it comes here,

21   obviously give a copy to both sides.  I'm sure Mr. Nolan

22   would want to take a look at it before he stipulates to it.

23         MR. QUINN:  I told him that he'll have no problem

24   with it, your Honor.

25         MR. NOLAN:  Your Honor, they were ordered to do it

1    by a certain time.  We'd move to dismiss the case.

2            THE COURT:  That's the most persuasive argument

3    I've heard all day.

4            MR. QUINN:  Your Honor, they didn't meet and confer

5    on that motion.

6            THE COURT:  I'll waive the meet and confer part.

7            All right.  Why don't we reconvene at 3:00.  That

8    way Mr. Nolan and I can take a look at it.  The key thing

9    that I want to go over is make sure that we have an

10   understanding of what the claims are, what the defenses are,

11   what's left in the case.

12           MR. QUINN:  And we do apologize.

13           THE COURT:  These things happen.

14           MR. NOLAN:  To assist the Court, we have submitted

15   punch lists.  Unfortunately, we sent them to Mr. Holmes.

16           THE COURT:  Mr. Holmes has left the building.  He's

17   given up.  He's gone.

18           MR. NOLAN:  So we do have a punch list of items

19   that arose out of discussions that we've had during the

20   evening.  The other thing is that I don't believe that there

21   are many differences or issues in the pretrial conference

22   order that's been submitted to your Honor.  So it's not as

23   though we're going to be going through lines and lines of

24   stuff.

25           THE COURT:  Why don't you give that punch list to

1    Ms. Taylor, and I'll take a look at it back in chambers, and

2    let's reconvene at 3:00.

3              The court is in recess.

4              (Recess taken to 3:00 P.M.)

5              THE COURT:  Good afternoon.  All right.  We're

6    continuing with our pretrial conference.  Why don't we go

7    through the punch list from both parties as a starting point.

8    I think that might be helpful.  And then let's go through the

9    pretrial conference order.

10             Who would like to go first?  Mr. Zeller?

11             MR. NOLAN:  May I just say something, your Honor?

12   We left something off of the bunch list because we did not

13   see it until we saw a printed copy of the pretrial conference

14   order.  When I said before we got to print our order that we

15   thought there weren't going to be any problems, there's a

16   significant addition of a new trademark.

17             THE COURT:  We'll take of that.

18             MR. NOLAN:  So when we get to that, but it's not on

19   our punch list.

20             THE COURT:  All right.  I'll make a note of that.

21   Why don't we start with Mattel's list.

22             MR. ZELLER:  The first item that we have, your

23   Honor, is the issue about whether the Doe defendants should

24   be dismissed.  I think you saw from the document that the

25   parties have taken contrary positions on this.  Our position

1    is that there shouldn't be any dismissal at this point of

2    Doe's, and MGA is taking a different position, saying that

3    they should be dismissed.

4         Obviously, our concern is that this is only Phase 1

5    of the trial.  We all know that there's a Phase 2.  We have

6    claims, RICO claims, that go back even to that same time

7    period.  So I don't think one could even make an artificial

8    distinction of some kind and say well, if it relates to phase

9    1, per se, that somehow they should be dismissed.

10        Also, I would only assume, given the history of the

11   case, that there was some parameters on what kinds of Doe's

12   are dismissed, then we're going to have an endless debate

13   about whether any new Doe's who are added were part of that

14   or should have been part of that.  And I submit there's no

15   reason to do it at this point.

16        THE COURT:  Is it fair to say that there will be no

17   new Doe's added for purposes of Phase 1?

18        MR. ZELLER:  I think that's true.  We're obviously

19   not aware of them by definition since they are still Doe's.

20   But say six months down the road, because we obviously have

21   not had Phase 2 discovery, then we find something now new,

22   and then they are going to say whatever dismissal there was

23   as part of phase 1, you couldn't include them now.  It seems

24   to me it would be opening kind of a Pandora's box to be doing

25   it at this point and potentially creating issues.

1          MR. RUSSELL:  Your Honor, it is our position that

2     the Doe defendants should be dismissed not only for Phase 1

3     but for Phase 2 as well.  The only justification that I heard

4     Mr. Zeller make with respect to RICO claims, and that is of

5     course, a federal claim.  Rule 15 would apply there.  Doe

6     defendant procedures would not apply to a federal claim.  I

7     think that's undisputed.  There has been more than four years

8     of discovery prior to the phasing.

9          I don't think we've heard any justification for why

10    it is that they can't be on the minimal notice required to

11    have as sustained who the proper parties are, given the

12    millions of pages of documents that have been produced and

13    the dozens of depositions that have been taken.

14          THE COURT:  I suppose the concern on that point is

15    that discovery was stayed by the Court.  So if we had

16    completed discovery, that would be a better argument to make.

17    Is there any prejudice to MGA?  I want to make sure I'm not

18    missing something.  I certainly am going to rule that for

19    purposes of Phase 1, there will be no new Doe's added.  But

20    for purposes of Phase 2, waiting until after this trial is

21    over and Phase 1 is over, is there any real prejudice to MGA?

22          MR. RUSSELL:  Well, your Honor, at this point we're

23    arguing about the prejudice to people allegedly as yet

24    unknown.  And I think the problem is discovery wasn't stayed

25    for Phase 2 until February 24.  It's not as if they haven't

1    had years and years and years to obtain this discovery.  They

2    had a suit as early back as April of 2004 with essentially

3    unlimited discovery.  And for them to suggest -- in fact,

4    your Honor, we briefed in our summary judgment motion that

5    you've got two current defendants who were not properly

6    before this court who should be dismissed on statute of

7    limitations grounds because they themselves are not proper

8    Doe defendants, namely, Isaac Larian and MGA Hong Kong.

9         I mean, the standards that are required to insert

10   somebody as a Doe defendant are essentially de minimis.  You

11   have to know the identity, and you have to have some sense of

12   the nexus between that defendant and the case.  I mean, that

13   is virtually no burden whatsoever.  I don't see any reason

14   why we shouldn't be cutting off allegedly unknown Doe

15   defendants.  But more particularly, we should be cutting off

16   two existing defendants with respect to the state law claims

17   in Phase 1.

18        THE COURT:  Thank you, Counsel.  The Court is going

19   to defer ruling on the Doe defendants as they relate to

20   Phase 2; however, as I indicated, there will be no further

21   Doe defendants with respect to Phase 1.  This is something

22   I'll take up after this trial.

23        Your second point, Mr. Zeller, is the import of the

24   Court's rulings on Mattel's statutory unfair claim relating

25   to commercial bribery and tortious interference.

1        MR. ZELLER:  This was the result of yesterday's

2   order.  It may be that we were just being overly cautious in

3   understanding and interpreting the Court's order.

4        THE COURT:  Yesterday's order?

5        MR. ZELLER:  Correct.  The further order.  Because

6   at some point it seemed to suggest that all of the remainder

7   of the unfair competition claim was dismissed.  I assume that

8   the portions the court already found had survived in its

9   original summary judgment order are still in.  And I think in

10  fairness as well, I could just also point to MGA's portions

11  on page 120, I regret to say, of the pretrial conference

12  order, where I think that they also recognize it.

13       MR. RUSSELL:  If I might, your Honor, I apologize,

14  but we agree with what Mr. Zeller is saying.  We don't think

15  that the Court intended to dismiss all --

16       THE COURT:  No, what I did is there is basically --

17  I identified and analyzed this as three different components

18  to the unfair competition claim, the antitrust or unfair

19  aspect, I previously ruled, was not in play here.  The

20  fraudulent aspect, Mattel did not oppose that.  That was out.

21  What was still in was the unlawful component.  There you

22  needed underlying unlawful act, and I think I identified the

23  commercial bribery which, of course, is a Phase 2 issue, but

24  the tortious interference is in play here.  So to the extent

25  that we have an unfair competition, tortious interference

1  claim connected to the intentional interference, that's --

2          MR. RUSSELL:  That's precisely our understanding,

3  your Honor.

4          MR. ZELLER:  And one other clarification, so we

5  understand, is that there are commercial bribery components

6  to the conduct involving Carter Bryant, for example.  I mean,

7  that was one thing that we had always thought was in play.

8  Even for purposes of Phase 1.  Because there were, of course,

9  payments made to him while he was a Mattel employee.

10          THE COURT:  That's your understanding as well;

11  right, Mr. Russell?

12          MR. RUSSELL:  Yes.

13          THE COURT:  I'll clarify that.  I can see how that

14  last line in section 5 might be misread.  Thank you, Counsel.

15          Your third point, proper to include recitation of

16  Bryant pleadings.  In what?

17          MR. ZELLER:  Well, in the portion of the pretrial

18  conference order, where it talks about the pleadings that are

19  involved in this case.  There is a list of them.  This starts

20  at page 2.  And then license until page 4.  And that's

21  Mattel's portions.  And then part of what the MGA parties'

22  position is articulated in the document, is that they are

23  objecting to the reference to those pleadings.  I confess

24  that I'm not -- I don't necessarily understand what the basis

25  of the objection is, but it's there.

1          THE COURT:  I see that.  Well, let me hear from

2     Mr. Russell or Mr. Nolan.

3          MR. NOLAN:  Your Honor, with respect to -- we think

4     it's appropriate and proper to have the claims that were

5     against Carter Bryant and the releases -- this goes to the

6     discussion that I think we're going to have to have when we

7     start talking about Carter Bryant's settlement agreement, the

8     various claims that were asserted, and each side has released

9     those claims.  To the extent those claims are in this case,

10    that's why they should be referred to.  That's what we're

11    talking about.

12         THE COURT:  Okay.  I'm confused as to what's in

13    dispute here.

14         MR. NOLAN:  I don't know.  That was our intention.

15    We didn't want them to be reading from parts of Carter

16    Bryant's pleadings in this case.  If that was an issue -- I

17    don't know.  This wasn't my point that they raised on their

18    bullet list.

19         THE COURT:  Mr. Zeller?  I'm sorry.

20         MR. NOLAN:  We're just talking about the claims by

21    Mattel against Carter Bryant.  That's all we're talking

22    about.

23         THE COURT:  And you want those in or out?

24         MR. NOLAN:  We want them in.

25         MR. RUSSELL:  I think he has it backwards.  The

1    claims that Mattel has against Bryant we want out.

2          THE COURT:  Mr. Zeller, you want these removed?

3          MR. ZELLER:  No, your Honor, and if I may, we have

4    a list of pleadings that began on page 2.

5          THE COURT:  I see those.

6          MR. ZELLER:  And then the MGA parties' position

7    starts on page 4.

8          THE COURT:  I read that.

9          MR. ZELLER:  Specifically, at line 13 it says to

10   the extent that Mattel continues to list pleadings that

11   address claims asserted by or against Bryant and failed to

12   exclude them specifically from the list, the MGA parties

13   object to Mattel's list of pleadings.

14         THE COURT:  They just told me that they don't

15   object.

16         MR. RUSSELL:  I misspoke.  Can I try to clarify?

17         THE COURT:  That would be helpful.  Because you're

18   saying you want them and then you don't want them.

19         MR. RUSSELL:  This is what happens when you try to

20   telephone -- the document was in flux.  I think, your Honor,

21   the position that we're asserting and Mr. Nolan will

22   articulate a little bit more clearly later, the claims that

23   Mr. Bryant has against Mattel shouldn't be referenced, but

24   the claims that Mattel has against Bryant should be

25   referenced with a notation that they have been dismissed and

1   released.  Mr. Nolan will talk about the significance when we

2   get there, but there's no reason to talk about their client's

3   claims against Mattel at this point.

4              THE COURT:  What is the harm?  I guess I don't

5   see --

6              MR. RUSSELL:  Well, there's no harm.  It's not

7   relevant.

8              THE COURT:  I understand your position.  Thank you.

9              MR. ZELLER:  And one minor point on this.  Not to

10  belabor this particular point, but from our perspective, and

11  of course, I'm sure the Court will recall, there are any

12  number of pleadings that Bryant has in this case that MGA has

13  joined in.  So it's not, I guess, as cut and dry as they have

14  said.  And, of course, we have various pleadings

15  incorporating other pleadings.  So I don't think it's really

16  an appropriate objection.

17             THE COURT:  Very well.  I think prudent -- the

18  prudent course at this point would be to keep them in,

19  because I don't see any downside of leaving them in, and you

20  indicate, there may be problems if we strike them at this

21  point.

22             The proper standard for enlargement of time.  What

23  do you mean by that?

24             MR. ZELLER:  There is a -- bear with me.  I

25  apologize, since the pages have changed.

1          THE COURT:  Enlargement of time in terms of how

2    many hours you have?

3          MR. ZELLER:  That's correct.  And that's on page 10

4    of the document.  And you'll see that there's a portion

5    starting at line 8 stating Mattel's position, and then line

6    11 stating the MGA parties' position.  And there appears to

7    be some dispute as to which standard should be applied.  I

8    would submit, your Honor, on this, that there's probably no

9    reason to decide that at this moment.  But I did want to

10   alert the Court.

11         THE COURT:  I'll let you know if you get more time.

12         Should there be special jury findings on equitable

13   defenses?

14         This is a good question, and I think it's more

15   properly taken up when we have our charging session for the

16   Interrogatory we're going to submit to the jury.

17         The Court continues to work with the statute of

18   limitations issue.  I am hopeful to have a ruling, at least

19   providing the parties guidance on how we proceed with that

20   issue before the trial starts.  It looks like it's going to

21   carry into this weekend before I'm able to finish.  It is a

22   thorny issue to say the least.  Both sides have done an

23   extraordinary job of briefing and arguing the respective

24   positions.

25         As for the remainder of the equitable defenses, the

1  Court may very well want, depending on how the evidence plays

2  out, factual advisory findings by the jury on these issues.

3  But I think it's better to take that up at the time that we

4  deal with the other jury instructions and verdict form and

5  Interrogatories.

6          MR. ZELLER:  And you'll have no disagreement from

7  Mattel on that.  It's just, again, another issue that was

8  raised in the document that we wanted to alert you to.

9          THE COURT:  No, I appreciate that.

10          Phasing issues.

11          MR. ZELLER:  Again, this is not to, of course,

12  reargue what we've already talked about, I think at some

13  length, about the phasing issues.  I did want to alert the

14  Court that there is some back and forth.

15          THE COURT:  Where is that set forth here?  That's

16  an area that I would like to spend some time on.

17          MR. ZELLER:  Unfortunately, it may take me a moment

18  to find it because it's interspersed throughout the document

19  as part of the issue.

20          MR. NOLAN:  Our position is set forth at page 140,

21  MGA's position is at 140.

22          THE COURT:  140?

23          MR. NOLAN:  Yes.

24          MR. ZELLER:  I believe there are some references

25  earlier as well, some discussion.

1          THE COURT:  There seems to be relative agreement

2     with respect to two positions, that the claims and

3     counterclaims to be tried in Phase 1 are set forth within

4     this document, and the claims remaining for trial in Phase 2

5     are set forth on pages 8 and 9 of Mattel's memorandum of

6     trial structure filed on June 20th, 2007, as adopted by the

7     July 2nd, 2007, order.

8          What further guidance from the Court at this point

9     would be of assistance, Mr. Zeller?

10          MR. ZELLER:  I don't think Mattel at this moment

11     thinks that there's additional argument that's really

12     warranted at this point.  I think that in general the parties

13     do agree, and the Court has, of course, ruled as to which

14     claims are in and which claims are out for purposes of Phase

15     1.  So I do think that at that general level, as we were

16     talking about the other day, I think that's pretty well

17     settled.

18          Of course, the particulars of that, there is some

19     reference, some debate, some disagreement that's set forth in

20     the document, but I don't believe it is probably materially

21     different than the kinds of argument and differences that the

22     Court has heard over the course of the last few days as to

23     what's in and out.  And in many respects, I think, you know,

24     the Court has already given the parties guidance.

25          THE COURT:  I hope so.  In the last hour -- and

1    I've not read this 150-page document.  What I will do is see

2    this this weekend, and I know you have the different

3    positions set in, and literally just go through, and I'll

4    just strike the position with which I disagree and leave the

5    position which is most in accord with the Court's position

6    and interlineate any modifications that I think are necessary

7    and have that document available for the parties on Tuesday

8    morning.

9            I don't think there's going to be any major

10   substantive change from the position the Court has

11   articulated this past week.  But just so that we have a --

12   going forward for the next six to eight weeks, we have a

13   clearly detailed document, that is the final word, as it

14   were, I think that might be helpful.

15           MR. NOLAN:  Your Honor, may I just add one thing?

16   With reference to working this weekend, I guess when I woke

17   up this morning, I felt a little bit better that it was

18   raining outside.  So it's not like a great weekend for

19   weather.  But I apologize that we have to force the Court to

20   do this over the weekend.

21           Here's the issue, and I will just cut through it

22   because I think it's fairly straightforward what the issue

23   it.  It arose in the conversation that we had yesterday when

24   I was talking about what we were going to be doing in Phase 1

25   A.

1          As we understood it, from looking at the January

2     '07 transcript, when the Court first envisioned a compression

3     between Phase 1-A and Phase 1-B, everything that we've

4     litigated is a structure where, if a ruling came down in 1-A,

5     that Carter Bryant's drawings were reduced to practice in

6     1998, did not belong to Mattel, trial is over with.  We could

7     go on and revisit each other in Phase 2 down the road maybe.

8          The issue that we're concerned about, your Honor,

9     seems to be that we have never had clarification and a

10    meeting of the minds on the term reduction to practice in the

11    employment agreement.  We have understood the Court in

12    referring to reduction to practice to refer to it not in its

13    patent use but rather that Carter did his drawings, he wrote

14    them down and put his concept on a drawing.

15          If reduction to practice, however, Mattel takes the

16    reduction to practice issue involves when the doll was made,

17    then that's a totally different issue for us, and it was

18    raised, as I was walking away from the podium when I said and

19    we're talking about the sculpt.

20          THE COURT:  The so-called dummy skull?

21          MR. NOLAN:  Now we're fine and on the same page.

22    We refer to the sculpt, your Honor, as meaning the dolls and

23    the sculpts that were actually used and produced in making

24    the Bratz doll.

25          The sculpt is often called the dummy doll, and if

1   the terminology that we're all working with is the same, and

2   that is that so-called dummy doll is what was referred to in

3   your original summary judgment ruling as the sculpt, then I

4   think we're getting perfect clarity here.  That's the state

5   of confusion.

6           THE COURT:  Let me hear from Mr. Zeller on this and

7   see if he has anything.

8           MR. ZELLER:  I think you've seen this in our

9   papers, and it is in the final pretrial conference order.  It

10  is our position that anything that Carter Bryant created

11  during the term of his Mattel employment that relates to

12  Bratz is owned by Mattel.  This has been talked about in

13  various ways.

14          THE COURT:  And this is part of the purpose of the

15  trial, is to find out what, if anything, Carter Bryant

16  created related to Bratz during his time at Mattel.

17          MR. ZELLER:  Correct.  And some of those are --

18          THE COURT:  But at this point, could you proffer to

19  the Court and, for the benefit of Mr. Nolan, what it is you

20  believe the evidence will show that Carter Bryant made while

21  he was at Mattel?

22          MR. ZELLER:  And I think I can give the Court a

23  representative list.  I can't promise an exhaustive one.  But

24  what I would say is this:  That number one, there is the

25  concept, the idea of the dolls.  That includes the name, as

1    we'll talk about undoubtedly later.  Number two, it would

2    include as well matters such as the concept of the removable

3    feet, which has certainly been at issue in this case and has

4    been a matter of discovery.

5         In addition, there are two-dimensional works, most

6    of those people variously refer to as sketches or drawings.

7    Sometimes they can have different terminology associated with

8    them.  But at the bottom they are two-dimensional works.

9         In addition, there are various kinds of

10   three-dimensional works that are potentially at issue.  There

11   is what people call the dummy.  That is the model that Carter

12   Bryant put together and, according to his testimony, he

13   showed to MGA, that MGA -- that Carter Bryant showed to MGA

14   at the pitch meeting.

15        There also are three-dimensional sculptures.

16   People use the shorthand, "sculpts."  And sometimes people

17   use that terminology interchangeably with prototypes or

18   models, but essentially they are three-dimensional

19   representations of artistic works.  Those include the sculpts

20   that Carter Bryant at a bare minimum contributed to and

21   probably had more to do with that were made by persons such

22   as Margaret Leahy.  So he has an authorship in those sculpts

23   that he provided.

24        So it's the panoply of created works, the ideas,

25   and other matters that he came up with or put into a fixed

1    form during the time he was employed by Mattel.  And so it's

2    that kind of grouping of materials that are at issue by

3    probably the largest, just physically in terms of the

4    materials, we're talking probably drawings.

5            THE COURT:  The 17 drawings.

6            MR. ZELLER:  The 17 drawings, and there's actually

7    a number of other drawings that are potentially at issue.

8    But certainly there will be the color drawings the Court is

9    very familiar with.  And there are also the various types of

10   marker drawings.  There are outline-type drawings.  And those

11   materials, I think, we can expect.

12           We will be able to present evidence that they were

13   created during the time that Carter Bryant was employed by

14   Mattel.

15           THE COURT:  Mr. Nolan.

16           MR. NOLAN:  Your Honor, that adds clarity.  I have

17   to admit it was broader than what we thought leaving

18   yesterday, because we thought the reduction to practice was

19   limited to the drawings.

20           THE COURT:  Well, I mean, it's limited to what the

21   evidence proves to have been reduced to practice in the

22   course of his employment.  So it's -- Mr. Zeller is setting

23   forth or proffering this.  This is just what he believes the

24   evidence will show.  It's extraordinarily difficult under any

25   circumstance to prove the existence or creation of an idea.

1    I mean, that's -- and for purposes of copyright, as we all

2    know, that's probably the reason you can't copyright ideas.

3    There has to be a reduction to practice.  So what Mattel is

4    going to be able to prove or not prove remains to be seen,

5    but that is what we will see in Phase 1-A.

6         MR. NOLAN:  Right.  And so in 1-A, then we will see

7    the development of the Bratz sculpt.  That's what I hear was

8    the work that's being done.  Because we believe, your Honor,

9    to meet that story, because there was work done, a sculpt

10   separate from the dummy.

11        THE COURT:  That's what we're hearing.

12        MR. NOLAN:  That's what we're hearing.  And what

13   our position is, then, in 1-A, since they have raised this

14   issue, we will bring in Margaret Leahy, and we'll have to

15   talk about the development of this sculpt and the work that

16   was done, including, your Honor, though, the work that was

17   done on the Bratz sculpt through the finalization of the

18   sculpt.

19        THE COURT:  Well, let's see what comes in.  We'll

20   certainly have to see how that plays out.

21        MR. NOLAN:  Thank you.  I mean, we're just -- but

22   in the opening statement, your Honor, I would intend for

23   1-A's opening statement to tell the Bratz development, the

24   drawing in 1998, and how the Bratz sculpts were developed --

25        THE COURT:  The story you're trying to tell this

1    jury is that everything about Bratz was developed -- was

2    apart from any work that Carter Bryant did, and Mattel is

3    going to say that everything Mr. Bryant did on Bratz was

4    while he was working at Mattel.

5           MR. ZELLER:  If I may make a brief comment in

6    response, your Honor, what Mr. Nolan is attempting to do is

7    conflate different works and different issues.  What we're

8    talking about with respect to Margaret Leahy's sculpts, these

9    doll sculptures, are discrete, three-dimensional, tangible

10   items.  Whether Mattel owns those or does not own those would

11   certainly be a proper subject of Phase 1-A trial.

12          What Mr. Nolan is really saying is that he wants to

13   show that the dolls were developed independently of those

14   sculptures.  But that's 1-B, and that is substantial

15   similarity for copyright infringement.  I would submit, your

16   Honor, that there's not any need to get into the entire

17   development story.  We'll be here for weeks if that is the --

18   and we may be anyway, of course, but that would certainly

19   take a dimension of the case involving largely substantial

20   similarity and putting it into Phase 1-A.  Because at the end

21   of the day, if the jury says well, you, Mattel, don't own

22   those sculpts, then they are not going to be, obviously, the

23   subject of a substantial similarity analysis.

24          THE COURT:  I understand your argument, Mr. Zeller.

25   I don't know how the sculpts that you're referring to, the

 1    prototypes, the models, I guess I'm not sure exactly what

 2    prototypes, models, sculpts, that you're referring to.  To

 3    the extent that those were done by Carter Bryant at Mattel

 4    and you can prove that, I can see where that might be part of

 5    your case.

 6            MR. QUINN:  If I may, your Honor.  Exactly.  The

 7    question is what did he create while he was employed at

 8    Mattel.  That's Phase 1-A.  We believe we can prove that he

 9    created, contributed to creatively, certain three-dimensional

10    works in addition to the drawings.  All right?  We might lose

11    that.  We might win that.  If we win that, then Phase 2 is

12    the question -- we then get into what Mr. Nolan wants to talk

13    about, and that is is what we own substantially similar to

14    the doll that was ultimately sold.  Is the sculpt that we own

15    substantially similar to what they are going to say is the

16    final sculpt.  That's all Phase 1-B.

17            And, again, this is an effort to tear down that

18    barrier between 1-A and 1-B.  1-A, as I understand it, is

19    only limited to what did he make while he was employed at

20    Mattel.  That does not implicate their Bratz development

21    story.  If we prevail in 1-A, they will have a chance to tell

22    that.  It's not a defense to the issue of when these works

23    were created, to tell how the final doll was built.  Two

24    separate questions.  Second question is 1-B.

25            THE COURT:  Mr. Nolan?

1          MR. NOLAN:  You know, your Honor, it's their

2    contract.  Their contract talks about conception and

3    reduction to practice of the concept.

4          THE COURT:  We're trying to find out under 1-A,

5    just to play that out, because that's exactly what it is.

6    We're trying to find out in 1-A what it was that Carter

7    Bryant did pursuant, while under the terms of that contract,

8    that might form a basis for a copyright infringement claim,

9    which is the subject of 1-B; correct?

10         MR. NOLAN:  Right, your Honor.

11         THE COURT:  Okay.

12         MR. NOLAN:  And included in that, though, is --

13         THE COURT:  And your position is that he did

14   nothing that would be subject to a copyright infringement

15   claim.

16         MR. NOLAN:  No, your Honor.  Our position is that

17   whatever he did with respect to contributions to the

18   sculpt -- and this is where they want to avoid a huge issue

19   in this case -- did not end up in the reduction to practice

20   of his idea while he was at Mattel.  And we can't stop that

21   short story without talking about the developments of the

22   sculpt, certainly while Carter was, quote, under contract by

23   Mattel.  That's the problem.  They want to stop the story.

24         THE COURT:  I guess I'm going to have to physically

25   see.  The sculpt that you're referring to, Mr. Zeller, what

1   did it look like from your perspective when it left?  Was it

2   a sculpt of a doll?

3           MR. ZELLER:  Yes, it was, your Honor.  And there

4   was more than one.  Roughly speaking, the chronology was that

5   the first sculpt was done in September of 2000.  We believe

6   that it was at the direction and with basically the entire

7   guidance of Carter Bryant.  This was a three-dimensional doll

8   sculpture.  You can envision it, and I may not be a hundred

9   percent in the materials.  But you can envision it like a

10  clay sculpture.  People, when they make dolls, they are

11  actually sculpting it like they would a larger piece of art.

12          They, of course, are smaller, but nevertheless,

13  they will make it out of clay or a particular kind of

14  sculpting wax, and it's a process where they make a doll

15  that is a sculpture.  So in many respects, it's a

16  three-dimensional form, but again, it's like the drawings.

17  These are these -- how do you start development.  What are

18  these particular works.

19          And in many respects it's not -- mechanically, it's

20  perhaps different than what Carter Bryant claims is his

21  dummy.  But it's still a three-dimensional representation.

22          THE COURT:  What question do you see as asking the

23  jury at the end of 1-A?

24          MR. ZELLER:  Well, I think it may be a

25  determination, and we'll have to see how specific it is and

1  how lengthy the list is, but it would be potentially a list

2  of what are the works that Carter Bryant created when he was

3  employed by Mattel.  What were the concepts that he created

4  when he was employed by Mattel.

5       And, you know, whether that's an open-ended

6  question, whether that's, you know, something that's a

7  checklist, we can obviously visit that at the appropriate

8  time.  But I think how we're envisioning it ultimately is

9  that the jury in 1-A will simply decide this is the universe

10  of what Carter Bryant created when he was employed by Mattel

11  that relates to Bratz.  And then from our perspective,

12  whatever is in that group, in that universe, then that's

13  what's compared ultimately for purposes of substantial

14  similarity, for purposes of copyright infringement as part of

15  1-B.

16       THE COURT:  In addition to that, though, the jury

17  is also going to be asked in 1-A about the alleged aiding and

18  abetting, the interference, and all of that with the

19  contractual relations.

20       MR. ZELLER:  And in many respects, I mean, that is

21  absolutely correct, your Honor.  There's no question about

22  that.

23       But that relates to, again, the course of conduct

24  that was occurring when Carter Bryant was employed by Mattel.

25  The fact that MGA made payments of money to him.  The fact

1    that while a Mattel employee, he conveyed some of these works

2    that we believe we own to MGA.   The fact that he conveyed

3    works at any time that Mattel owned.   You know, those are

4    very --

5              THE COURT:   You certainly concede, getting back to

6    the point the Court was making earlier, Mr. Nolan is entitled

7    to tell his story, MGA's story, and that Mattel is entitled

8    to tell their story, that these items you claim were made by

9    Carter Bryant, while he was an employee at Mattel, and not

10   just the things reduced to practice, but the things, the

11   concepts that you claim he came up with while employed at

12   Mattel, Mr. Nolan is able to in his opening statement explain

13   what evidence he believes will show that those ideas and

14   those concepts and those items, however long this list is

15   that you've given us of five things here, were made when he

16   was not working at Mattel.

17             MR. QUINN:   Absolutely.   No question.

18             THE COURT:   That's kind of the dividing line.   I do

19   understand how getting into a comparison of the dolls is a

20   Phase 1-B issue, because that gets into the substantial

21   similarity.   But Mr. Nolan should not be limited in terms of

22   what evidence that is relevant and probative of the issue of

23   when Carter Bryant or when these things were developed or

24   when these ideas came into existence.

25             Mr. Nolan can present evidence that it was before

1    1998, before he went back to Mattel, or after the point in

2    2000 when he went to work for MGA, or well after that point

3    that these things came into existence.

4          So it's -- I think the Court understands your

5    position, and Mr. Nolan's position.  We're just going to have

6    to see how this plays out.

7          MR. ZELLER:  I think the Court is absolutely right

8    in the sense that, as long as it's related to the materials

9    that we're saying, two-dimensional, three-dimensional ideas,

10   concepts, whatever the case may be, that was created by

11   Carter Bryant while employed by Mattel.

12         THE COURT:  I understand that, and I think

13   Mr. Nolan would understand that MGA at this Phase 1-A is not

14   to go off into things that you are not claiming were created

15   by Carter Bryant while he was at Mattel, because that

16   wouldn't be relevant in the 1-A section.  It may very well be

17   relevant in 1-B when you get into the copyright infringement

18   elements; right, Mr. Nolan?

19         MR. NOLAN:  No, your Honor.  Respectfully.  1-A is

20   a contract issue.

21         THE COURT:  Yes.

22         MR. NOLAN:  All right.  The contract that Mattel

23   has that is enforceable gives them the right to ideas that

24   were created or reduced to practice during the course of

25   their employment.

1    THE COURT:  Doesn't have to be reduced to contract.

2    The contract covers more than that, more than what was

3    reduced to practice.

4    MR. NOLAN:  I was trying to shorten it because I

5    think this just frames the issue.

6    We want to live by the opportunity to live by the

7    structure here, that if the jury comes back with an

8    affirmative answer in MGA's favor in 1-A, that it's clear

9    that there is no need for 1-B.  And I think that's always

10   been the operating principle.

11   THE COURT:  That is the object.  It's not going to

12   be the easiest thing in the world to do because you're

13   clearly going to have to establish -- you're basically going

14   to have two bites of the apple in the first phase.  You're

15   going to have to establish that there was nothing related to

16   Bratz that Carter Bryant either conceived of or reduced to

17   practice while he was employed by Mattel.

18   If you get that, you get the whole -- you got it

19   all.  You're set.  There's no 1-B.  Mr. Zeller, you would

20   agree with that?  Mr. Zeller, if you can't prove that Carter

21   Bryant either conceived of or reduced to practice the idea of

22   Bratz during that period where he was under the inventions

23   agreement, you're done in Phase 1.

24   MR. ZELLER:  Correct.  And, of course, with the

25   synonyms of this, create, made, whatever else is used in the

1   contract, I absolutely agree.  If the contract requires a

2   reduction to practice --

3          THE COURT:  And even if you do establish that one

4   of these five things that you listed was conceived of or

5   reduced to practice during that time, then your second hurdle

6   that you have to come over is to show the copyright

7   infringement, and that's where you get into substantial

8   similarity and the rest.

9          MR. ZELLER:  That's correct.

10          THE COURT:  So back to you, Mr. Nolan.  Yes, do you

11   get your question that you potentially win outright on Phase

12   1-A.

13          MR. NOLAN:  So let's just get the detail.  What the

14   evidence will show is that there is a sculpt, let's say, and

15   let's just pick the date, not an arbitrary date.  It's

16   October 20th, the first day he's working for MGA.  And

17   October 19th is his last day at Mattel; all right, your

18   Honor?  The reduction to practice issue under the contract is

19   whether or not the Bratz doll, his idea, his concept, was

20   reduced to practice.  And what Mattel is asking you to do is

21   to stop the movie in the middle of the story.

22          What I'm saying, your Honor, is that we should be

23   allowed -- Margaret Leahy, who will have to testify because

24   she's the sculptor up through the period of September 1st

25   through the creation of the final sculpt, must be able to

1  finish her testimony as to what was done with the sculpt, and

2  I'll make a proffer to you, your Honor, if I might -- and

3  this is all in the deposition testimony -- that Carter

4  Bryant, when he showed the drawings to the sculptor, she

5  makes a version of the sculpt.

6          That sculpt goes through various iterations and

7  changes by MGA personnel, not by Carter Bryant.  Carter

8  Bryant's responsibility, primary responsibility, starts

9  talking about fashions for the doll.  The idea and concept

10  that he had for a doll is reduced to practice --

11          THE COURT:  Mr. Nolan, you're getting into 1-B area

12  very clearly.

13          MR. NOLAN:  Well, we're stopping the story in the

14  middle of the frame.

15          THE COURT:  That's part of the difficulty of

16  whenever you have to decide up issues, and it's not going to

17  be unusual to have -- what you're suggesting now is -- the

18  benefit that you have of being able to basically stop Mattel

19  dead in their tracks in this trial is that this is set up

20  where they have to meet the threshold issue first of Carter

21  Bryant having done anything while he was at Mattel as a

22  preliminary issue.

23          Before we even get into what happened after he left

24  Mattel and MGA developed their product, and then whether or

25  not what they developed somehow violates a copyright or some

1    kind of right that Mattel has from virtue of Carter Bryant's

2    employment at Mattel.   And then we get into that comparison.

3    But you don't get it both ways.   You don't get the benefit of

4    having Mattel put first to the test of establishing that

5    there's anything that they have a proprietary interest in and

6    also at the same time bring in all of this information of the

7    later developments of the doll.   That will horribly confuse

8    the jury.

9            MR. NOLAN:   Let me ask you this question, your

10   Honor.   Then if Margaret Leahy, because they referenced her

11   as a witness now in 1-A, she's the sculptor, would I be

12   allowed to ask her -- let's say they bring her right up to

13   October 19th.   And we're talking about all of the work that's

14   being done up until October 19th, because Carter is still

15   employed at Mattel.

16           THE COURT:   Right.

17           MR. NOLAN:   We stop on that date.   Could I -- would

18   I be allowed to ask her about the amount of work that she put

19   into the sculpt up to that period?

20           THE COURT:   Up to that period, if that sculpt is

21   being -- yes, you would.   It just would be after that period

22   would not be relevant.

23           MR. NOLAN:   And can the last question be --

24           THE COURT:   You understand?

25           MR. NOLAN:   I know.   I disagree, but I appreciate

1    it.   Would I be able to say that that sculpt that existed as

2    of October 18 is the sculpt that was used for the Bratz doll?

3            THE COURT:   You'd be able to ask that question in

4    1-B.   You would be able to ask that question, but not until

5    1-B.   That's the copyright infringement predicate.   That's

6    not relevant to whether or not Carter Bryant developed that

7    sculpt while he was employed by Mattel.

8            MR. NOLAN:   Okay.   Then I guess this is going to be

9    coming out more in the jury instructions issue.

10           THE COURT:   The jury instructions and the

11   Interrogatory.

12           MR. NOLAN:   Because, your Honor, I guess then we

13   get to the question of what is the reduction to practice.

14   Because again, all I'm doing, I'm not bragging.   I'm not

15   saying I'm going to do this.   I just want to have the

16   opportunity to win for my family's sake.   I can promise that

17   I might be able to come home sooner than August.   Is that we

18   might be able to construct the case?

19           We all understand it today at the pretrial

20   conference order, that there will be inquiries of the jury

21   that with respect to the reduction of practice issue, there's

22   a definition that is whether or not what was done as of

23   October 18th is, quote, a reduction to practice for a design

24   doll.   That's the point that I want to be able to --

25           THE COURT:   Right.   And you are emphasizing the

1  reduction to practice.  And I understand why you would, and

2  that's probably going to be the easiest part to -- for the

3  jury to comprehend and for Mattel to establish to the extent

4  they can.  But you understand the contract is not just

5  limited to those things, and their rights are not just

6  limited to those things that are reduced to practice.

7       MR. NOLAN:  I understand.  But right now I'm

8  talking about the reduction to practice story of the sculpt

9  and whether or not that sculpt, that final thing was actually

10  a doll.

11       THE COURT:  Yeah, I don't know what the evidence is

12  going to show, Counsel.

13       MR. NOLAN:  That's what I'm saying.  I realize I'm

14  not going to go beyond --

15       THE COURT:  You're not going to go beyond that.

16  And that may mean, with respect to that one witness, that

17  she's going to have to testify in both phases, and I

18  understand that's not preferred.  If we collapsed all of

19  Phase 1 together, we would have avoided that, but I think

20  there are some efficiencies.

21       If Mattel can't establish that Carter Bryant really

22  did anything while he was at Mattel or that everything that

23  he did do was outside these parameters, then there's no need

24  to even reach the copyright issue.

25       MR. NOLAN:  Right.  Or whatever he did do had no

1    value to it.

2              THE COURT:  Had no value as a --

3              MR. NOLAN:  Or contribution to the sculpt.

4              MR. ZELLER:  That's definitely 1-B.

5              THE COURT:  That collapses the issue.  We need

6    to -- whether or not it has value, whether or not there is an

7    infringement here, that comes in in the 1-B phase.  All we're

8    looking at in 1-A is whether or not he did things for Bratz

9    while he was at Mattel.  Whether he created it, whether he

10   conceived of the idea or reduced it to practice while he was

11   at Mattel.

12             MR. NOLAN:  So we're clear, the reduction to

13   practice, now that we're talking about, is different than --

14   and it's used in a different way and will be defined for

15   the --

16             THE COURT:  Because what you're pressing me to do

17   is to allow you to introduce evidence of what the Bratz doll

18   ultimately looked like and whether or not that's what Carter

19   Bryant did while he was at Mattel.  And no one is contending

20   that.  Not even Mattel on their best day is contending that

21   he developed that sculpt while he was at Carter Bryant.

22             And the distinctions of whether they are

23   substantially similar and whether there was copyright

24   infringement is going to come in subject to our expert

25   Daubert hearings in Phase 1-B.  If I let you get into that

1    now, then you really are collapsing the two different phases.

2            MR. NOLAN:  Well, actually, your Honor, I do

3    respectfully disagree that the term -- I'm just taking the

4    contract term as it's used in Mattel's contract, the term

5    reduction to practice and trying to understand what that

6    means.  And if --

7            THE COURT:  Reduction to practice, it's not

8    necessarily the full-fledged doll.  It's just something

9    that's a drawing, an idea reduced to practice.  It doesn't

10   need to be -- no, not at all.  Reducing to practice just says

11   that it goes from being up here to being down here.

12   Something physical.

13           MR. NOLAN:  On the drawing --

14           THE COURT:  Whether or not what's physically

15   produced or what was up here is somehow a violation of your

16   copyright, registered copyright, that's the 1-B.  I'll try to

17   be clear.  I don't know if I can say this any other way than

18   I'm saying it.

19           MR. NOLAN:  I guess -- no, and we're getting into

20   detail, and I know we've got a lot to cover.  I know this is

21   helpful because our position is the way it was phrased in the

22   arguments is that he reduced his two-dimensional idea to

23   drawings.  And we believe that those drawings were done in

24   1998.

25           THE COURT:  Whether his idea was two-dimensional

1    or -- we normally think in three dimensions.

2          MR. NOLAN:  I understand.  That will be an issue.

3    And then we're going to have to deal with the story, and I

4    understand the story will stop as of October 19th, and the

5    question will be what, if anything --

6          THE COURT:  Related to Bratz that he did.

7          MR. NOLAN:  Right.  Or whether or not, during that

8    period of time, what was being done to it was being done by

9    MGA as opposed to Carter Bryant.  That's the point that I

10   need.

11         THE COURT:  Up to October 19th.

12         MR. NOLAN:  Thank you, your Honor.

13         THE COURT:  I wish I could give you a more precise.

14   I think, and I emphasize I think, I think I understand this.

15   And this is the basis upon which I'm going to sustain or

16   overrule the relevancy objections which are doubtedly coming,

17   and I'll do the best I can.  And that's all I can give you,

18   Counsel.

19         Let's move along to the references to releases.

20   Are you talking about the releases in the settlement

21   agreement?

22         MR. ZELLER:  Yes, your Honor.

23         THE COURT:  Okay.  What I'm going to read, I think,

24   in terms of a settlement agreement, as Mr. Nolan suggested at

25   the beginning of the trial, because I think that is the

```
 1   appropriate place to do it.  And I've tried to come up with
 2   the most neutral language as I could which would be the
 3   following:  Carter Bryant was previously a party in this
 4   case.  Carter Bryant filed suit against Mattel in this court,
 5   and Mattel filed suit against Carter Bryant in this court.
 6   Carter Bryant is no longer a party to this case.  You should
 7   not infer any admission of wrongdoing or liability from the
 8   fact that Carter Bryant and Mattel resolved their claims, nor
 9   are you to speculate as to the terms and conditions of that
10   resolution.  Period.
11               MR. ZELLER:  That's good with us, your Honor.
12               THE COURT:  Mr. Nolan?
13               MR. NOLAN:  This is the issue that we talked about
14   where it says you should not infer.  Well, we would just say,
15   your Honor, make it completely neutral.  Neither Mattel nor
16   Carter Bryant admitted liability, whatever that language is.
17               THE COURT:  See, that actually gets into the terms.
18   This is what is neutral.  This is telling the jury you are
19   not to infer any liability or wrongdoing.
20               What you want me to do -- and this is the
21   discussion we had yesterday and I thought we resolved this --
22   is you want me to say that neither Carter Bryant nor Mattel
23   did admit wrongdoing or liability and actually tell the jury
24   what the settlement agreement says, and that's what I want to
25   avoid doing.
```

1        MR. NOLAN:  Now I understand, your Honor, and I'm

2   not asking for reconsideration.

3        THE COURT:  I'm saying you should not infer any

4   admission or wrongdoing from the fact that they resolved

5   their claims.  I'm not even using the word settlement.

6   Because I don't want the jury to even speculate that there

7   was a settlement.  I really just -- he was here.  He's not

8   here.  Don't infer anything.  Don't speculate.  There's no

9   liability.  There's no wrongdoing.  There's nothing.  It's a

10  nonissue.  And I tried to choose words and use tenses of

11  verbs that do not imply anything.

12       MR. NOLAN:  And I respect that.  I just want to now

13  move to another issue on the same subject.

14       THE COURT:  I know you have that on your punch list

15  as well.  Why don't you do it now.

16       MR. NOLAN:  Your Honor, we have thought about this

17  issue, and we're still awaiting the Court's order with

18  respect to the final ruling with respect to the statute of

19  limitations.

20       THE COURT:  I know.

21       MR. NOLAN:  And its application possibly to the

22  state claims but not the copyright claims or to the whole

23  case or to whatever.

24       Here's what our thinking is in this regard, your

25  Honor.  The state claims in this case we believe give us the

1   right, because we're a co-tort-feasor.  That under CCP 887,

2   we have a right as a co-tort-feasor to have a hearing on the

3   fairness of that settlement.

4              THE COURT:  I saw you raise that in your pretrial.

5              MR. NOLAN:  Right, your Honor.  And we haven't

6   filed the brief yet.  Because A, I wanted to ask the Court

7   for leave to do that.  We're still researching this issue.

8   But we think the law allows a co-tort-feasor, a nonsettling

9   co-tort-feasor to actually test the proportionality of the

10  responsibility of the tort-feasor such that if damages were

11  awarded, and I dropped a footnote here.

12             Later on we're going to have a problem because

13  Mattel has never articulated any basis for this jury to

14  disaggregate from its damage study damages that could be

15  accorded singly for breach of fiduciary duty or a breach of

16  the tortious interference of contract.

17             Their whole damage study is all in, all

18  disgorgement, and I forget what the amount of money is.  It's

19  breathtaking.  They want the key chains and everything else.

20  The jury is completely incapable of disaggregating that

21  damage model down to -- you know, we just find that there was

22  an aiding and abetting breach and we want to give them that

23  amount of money.

24             We believe respectfully under the law, which we

25  would like to brief to, as a co-tort-feasor, we're entitled

1   to the benefit of an offset of the amount of money, if any,

2   that Carter Bryant has paid or in the alternative, to have

3   the proportionality of responsibility assessed, and that

4   amount be established as to how it would affect our offset.

5          THE COURT:  Your offset on a disgorgement, and I'm

6   thinking out loud here, on the disgorgement theory, you're

7   being asked -- what Mattel is seeking from Isaac Larian and

8   MGA is for them to disgorge the profits they made,

9   essentially the profits that Carter Bryant made would be

10  disgorged if he was still in the case.

11         MR. NOLAN:  No, Carter Bryant has a continuing

12  royalty interest in the Bratz line.  So what we would say,

13  your Honor, is that if the jury concludes -- if this question

14  is presented to you and you rule that we are allowed under

15  the statute as the co-tort-feasor if there is a complete

16  release of all of the claims in the settlement, which I

17  believe is what was --

18         THE COURT:  That's of public record, yes.

19         MR. NOLAN:  As publicly stated, then we, as

20  co-tort-feasor, if the state claims are still in this case

21  and are still being tried to the jury, we should be able to

22  produce to the jury evidence that if there was a violation of

23  Carter's contract, Mr. Bryant's contract, and he breached his

24  fiduciary duty, what percentage of responsibility does his

25  conduct -- that's the issue that we would like to brief.

1      THE COURT:  I don't have that motion before me now.

2  Let's get that motion before me.  I don't even have the

3  settlement agreement before me, although I have requested it.

4  I did receive confirmation from Mr. Keker's firm that there

5  is no objection from them as well.  So I will be receiving

6  the settlement agreement over the weekend.  And if you want

7  to make a motion on those grounds, that's fine.

8      MR. NOLAN:  I just wanted to -- as a courtesy, I

9  wanted to alert you of this issue as we develop this more and

10  more.  Because the more it sounded like, it arises out of the

11  idea that what we're trying in this case is Phase 1-A, the

12  contract breach by Carter Bryant, who they have released any

13  responsibility and have given him a complete release.  And it

14  flows from that as to why it's almost double dipping to now

15  come back after us on the state claim theory.

16      That's the issue, your Honor, and we'd like to

17  brief it a little bit more.

18      THE COURT:  Mr. Zeller, would you like to say

19  anything on that?  Again, it's hypothetical because we don't

20  have the motion before us.

21      MR. ZELLER:  I do think that -- certainly I should

22  say at the outset that Mr. Nolan continues to characterize

23  terms of the settlement agreement that MGA does not have and

24  presume that they have not seen.  So obviously, I'm somewhat

25  at a predicament since he's making assertions about what was

```
 1   released and what wasn't and the like.

 2           But I -- the Court will see, of course, what the

 3   settlement is.  In fact, I have a copy of it with me now that

 4   I can provide to the Court.  We can do separately a notice of

 5   lodging of --

 6           THE COURT:  I would prefer -- I've asked Ambassador

 7   Prosper to give me his copy.  Not that I would have any

 8   question whatsoever about the copy you would provide, but I

 9   think it's best just for me to receive it from the mediator.

10           MR. ZELLER:  So we do not have to do it, then?

11           THE COURT:  You do not have to do it.

12           MR. NOLAN:  Mr. Zeller said presumably we do not

13   have a copy of it.  I want to categorically say to the Court

14   we do not have a copy of the settlement agreement.

15           THE COURT:  I believe that.

16           MR. ZELLER:  I certainly didn't mean to suggest

17   otherwise.

18           THE COURT:  We all must choose our words very

19   carefully.  And justifiably.  So I want everyone to choose

20   their words very carefully, particularly when talking to the

21   press.

22           MR. ZELLER:  And I do think that once the Court has

23   the benefit of seeing the agreement, once we have MGA's

24   brief, we can address those issues.

25           THE COURT:  Very well.  All right.
```

1           Outstanding discovery motions.  I have the five

2    documents that MGA wants back.  I'm taking a careful look at

3    that based on the arguments that were made yesterday.

4           There's another one floating around that I've seen,

5    and there may be more.  Perhaps you could do me the favor of

6    identifying what's out there.

7           MR. ZELLER:  Yes, your Honor.  I do have a list.

8    Currently before your Honor, and not to suggest all of these

9    are fully briefed or anything, we have, number one, the

10   ex parte application that the Court referenced, which is for

11   the five documents.

12          Number two, we have Mattel's motion for discovery

13   order enforcing the Court's December 27th, 2007, order.

14          THE COURT:  That's the one.

15          MR. ZELLER:  Compelling Isaac Larian to produce

16   documents.

17          And I believe that there is an opposition to that

18   which was filed the 22nd.

19          THE COURT:  Why don't we just call it what it is,

20   yesterday.

21          MR. ZELLER:  I wasn't entirely sure.

22          Number 3 is that there is a motion pertaining to

23   Wachovia.

24          THE COURT:  To what?

25          MR. ZELLER:  Wachovia, W-A-C-H-O-V-I-A.  It is a

1    financial institution that has documents pertaining to

2    largely the 2000 time period we believe are relevant.

3              THE COURT:  Are these financial documents?

4              MR. ZELLER:  Correct.

5              THE COURT:  Related to Phase 1-B?

6              MR. ZELLER:  Yes.  And, in fact, it's our view that

7    these documents relate to exactly what was in development and

8    what MGA was doing at given times within 2000.  And

9    fortunately, I believe most of the issues we have with

10   Wachovia have been resolved in recent days, but there are

11   still some issues that I understand are not resolved.

12             THE COURT:  And that's subject of this motion.

13             MR. ZELLER:  Correct.

14             THE COURT:  Any other motions?

15             MR. ZELLER:  I suspect the Court is going to see at

16   least a couple more of these, and they are motions pertaining

17   to trial subpoenas.

18             THE COURT:  Well, I have the one that I actually

19   asked you to treat as one, the one from Amy Myers.

20             MR. ZELLER:  That's correct.  And I believe it has

21   not been filed and will be filed shortly, which is one

22   relating to a Donald Moon, M-O-O-N.  And there are some

23   others that I'm not entirely sure whether they have been

24   filed or not, but I know that there are various trial

25   subpoena issues that have been under discussion.

1    I believe that there has been another one
2  pertaining to trial subpoenas filed with respect to Anna
3  Cabrera and Beatrice Morales.  And I believe that was filed
4  this morning.

5      THE COURT:  Well, what do you expect the Court to
6  do with these motions?  I'm going home at some point in time
7  today, Counsel.

8      MR. ZELLER:  I mean, of course, we would hope that
9  they will get resolved and dealt with in the normal course.
10  I think people are concerned that obviously they are not
11  waiving any rights, particularly with respect to trial
12  subpoenas.  Some of the people, and, of course, you've seen
13  Ms. Myer's motion.  So certain people have the viewpoint that
14  they shouldn't be testifying at all in this case.  It's, I
15  guess, not at all surprising that people don't seem to be
16  anxious to come in and testify.

17      So I think some of those issues will hopefully get
18  resolved.  I don't think that necessarily they are matters
19  that the Court needs to resolve today.  That's for sure.

20      THE COURT:  Well, everyone understands that as of
21  the 27th, there are to be no motions filed absent express
22  leave of the Court.  And I just gave Mr. Nolan leave to file
23  this motion with respect to a good faith settlement.  And
24  that's it so far.  So just keep that in mind.  That was
25  something I've indicated several times now.

1        What we'll do is take these up, I suppose, Tuesday

2   morning at 8:30 and see what's left of them, and we'll go

3   from there.

4        MR. ZELLER:  And I regret to tell you, your Honor,

5   that I wasn't done.  There are two more -- there was one that

6   was also filed, and I apologize if I did mention this one

7   already.  But we have one that pertains to the Fifth

8   Amendment that I've been mentioning.  That has either been

9   filed or is being filed now.

10        THE COURT:  Whose Fifth Amendment rights?

11        MR. ZELLER:  That's the one that pertains to the

12   invocation of the Fifth Amendment by certain of the people

13   who are involved in Bratz, namely, Peter Marlow.

14        THE COURT:  Yes, yes.

15        MR. ZELLER:  I believe that actually I saw the

16   notice of manual filing.  So I believe that that's already

17   been filed.

18        THE COURT:  While we're on the subject, Mr. Nolan,

19   do you have any other outstanding motions that you are aware

20   of?

21        MR. NOLAN:  Your Honor, when the subject comes up

22   in our office, we shoot the person and send them back to L.A.

23   I'm being very serious about this.  I had understood the rule

24   to be that on Monday we had to seek leave.  We went through

25   this exercise before where you asked us all what are the

1    motions.  And now we have this list of motions.  I'll tell

2    you right now, your Honor, the Amy Myers issue, whether or

3    not this is just to avoid work for you or to save the trees,

4    we have a video deposition of Amy Myers.  We would be fine

5    using her video deposition, your Honor.

6          We're not making this woman come in, and we're

7    happy to use her video.  That may be a resolution here on

8    that one.  And maybe the Court doesn't have to waste a lot of

9    worry about that one.  So that's -- we don't represent the

10   people who have asserted the Fifth Amendment.

11         THE COURT:  Mr. Zeller?

12         MR. ZELLER:  I apologize, your Honor.  I believe

13   that that offer is satisfactory.  I believe that will be a

14   resolution to it.  My understanding is that she only has very

15   discrete information that we would want to elicit at trial.

16   Obviously, if there's a hardship --

17         THE COURT:  So there's a stipulation to grant what

18   I'm viewing is a motion to quash.  She does have some serious

19   concerns here.

20         MR. NOLAN:  Absolutely.

21         MR. ZELLER:  And I don't think we disagree.

22         THE COURT:  All right.  That's one less one.  What

23   about this Donald Moon?

24         MR. ZELLER:  Mr. Moon, and the Court will forgive

25   me because I'm not as close to this motion.  I'll try and be

```
 1    in the ballpark with facts.

 2            As I understand it, Mr. Moon is an investigator.

 3    He was served with a subpoena to appear at trial.  His

 4    involvement has been limited to serving process on Isaac

 5    Larian and other people who have worked with MGA.  The reason

 6    that those individuals were served, including Isaac Larian,

 7    is, as the Court will recall, of course, that we had sought

 8    leave and obtained leave for the amended client or

 9    counterclaims to be filed.

10            Mr. Larian's counsel refused to accept service on

11    his behalf.  So we had to go and find him.  And that was

12    Mr. Moon's involvement.

13            THE COURT:  And you are moving to quash his

14    subpoena?

15            MR. ZELLER:  Whether it's in our name or

16    Mr. Moon's, I don't have that information, your Honor.

17            MR. NOLAN:  Your Honor, we haven't seen the motion.

18    I will say that Mr. Moon may be a process server.  But he

19    apparently is, and this has now been confirmed, an

20    investigator hired by Mattel.  Your Honor, he's been

21    surveilling Mr. Larian.  We also believe he's been

22    surveilling Mr. Larian not for service of process.  There was

23    a confrontation back in -- I believe it was December or

24    January.

25            I believe I got it over a holiday weekend where the
```

1  police were actually called, I understand, because Mr. Larian

2  was fearful of his safety because there was somebody

3  following him.  He stopped, took a picture of the car.

4  That's how we located Mr. Moon.

5          And that's why he's under subpoena.  It's not about

6  process serving, your Honor.  But I'd like to see the motion.

7          THE COURT:  What I'll do on all of these motions

8  except for Amy Myers, which I'm going to grant that motion to

9  quash right now, and the Wachovia documents is a 1-B issue.

10  So let's put that off, and hopefully you can resolve the

11  remaining issues.  Do you need that for 1-A?

12          MR. ZELLER:  I do, your Honor.  I apologize.  I

13  thought you meant Phase 1.  It's definitely a Phase 1-A

14  issue.

15          THE COURT:  All right.

16          MR. ZELLER:  I apologize.

17          THE COURT:  I'll take these up at 8:00 on Tuesday

18  morning.  I don't know what else to say.

19          MR. NOLAN:  Your Honor, one of my team members was

20  told that Mattel was going to file an omnibus crime fraud

21  exception motion to waive all of our attorney-client

22  privilege.

23          MR. ZELLER:  If I may, your Honor.

24          THE COURT:  Please.

25          MR. ZELLER:  Two things.  Number one, because it's

1   now in the public record, this additional accusation of

2   surveillance, I promise not to belabor it.  There has been no

3   such surveillance.  The fact is that MGA and Mr. Larian

4   actually concocted this situation by refusing to accept

5   service of process in this case.

6          As the Court knows, it's taken three orders

7   compelling Isaac Larian to sit in a chair and have a

8   deposition in this case, including the imposition of

9   sanctions.  We have over and over to serve him with process

10  in this case, including routine courtesies that one would

11  expect in a case like this.  It's been refused.

12         We have offered and said we certainly do not want

13  to send process servers to go and find your people.  We would

14  prefer to do it through the attorneys.  They refused.  And

15  that has created a situation where obviously we must serve

16  them with process, and then they create this fiction that

17  somehow it is investigation, surveillance, and they add these

18  nefarious tones to it to a situation they created and that

19  we're legally entitled to pursue because we're entitled to

20  serve them with process.

21         THE COURT:  So what are you going to do now?

22         MR. ZELLER:  Well, I just want to clear the record

23  on that because, again, there are these public accusations

24  that are made in the record of this case, and I just wanted

25  to make that crystal clear.

1        THE COURT:  Okay.

2        MR. ZELLER:  Because I don't think we have

3   responded to them.  We've tried to take the high road on it

4   and largely ignored them.  Well, it's in The Wall Street

5   Journal today, too, those same kinds of allegations.

6        Number two, your Honor, we have filed a motion, and

7   this is the last motion I was headed toward.  It's a

8   motion -- and again, whether it's been filed this second or

9   not, I'm not a hundred percent sure, but it will be filed

10  today -- is a motion that does seek waiver of the

11  attorney-client privilege, but it is not for all matters.  It

12  is on a particular document that we believe comes under the

13  crime fraud exception.  And it pertains to a particular

14  document.

15       THE COURT:  Why are you filing a motion like this

16  on the Friday before trial?

17       MR. ZELLER:  Because the facts that supported this

18  became aware to us when Patty Glazer was deposed last week.

19  And so we put it together, and we are filing it is our

20  intention.

21       It's not just a single one.  It's a dozen

22  documents.  But it's not a complete waiver.  So I guess

23  somewhere in the middle.

24       THE COURT:  All right.

25       MR. ZELLER:  But it pertains to particular -- I

1   guess there are a series of communications.

2           THE COURT:  But you filed the motion today.  You

3   certainly don't expect a response by Monday, do you?

4   Tuesday?

5           MR. ZELLER:  I don't think we do, your Honor.  I

6   think as part of the normal course of this, we have certainly

7   talked with them about trying to come up with a briefing

8   schedule that, you know, is livable by everyone and that is

9   convenient and acceptable for the Court.  I don't know if

10  that kind of arrangement was reached in this particular

11  instance, but I wouldn't suggest to the Court and I certainly

12  didn't mean to suggest that this was going to be opposed and

13  aired fully on Monday.  I just was alerting the Court to what

14  we have filed and what we have -- what we're going to be

15  filing shortly.

16          THE COURT:  Well, I'm not making any promises about

17  any of these motions, Counsel.

18          MR. ZELLER:  I understand.

19          MR. NOLAN:  Your Honor, and I say this with all due

20  respect, in my next life I hope I'm blessed with the patience

21  that you have.  I'm tempted to ask for a reconsideration of

22  the motion in limine with respect to the litigious nature of

23  Mattel.  And I mean this, your Honor.  This -- there's a

24  simple reason for saying this.

25          We were told at the meet and confer that this was a

1    motion that they have been thinking about for a while and

2    have been working on.  Yes, there is a purpose on a Friday

3    before opening statements, before the start of trial, to have

4    us have to distract resources to respond to this.  I know it

5    sounds like you are probably thinking Nolan, you are

6    complaining?  Your staff has to deal --

7             THE COURT:  Don't talk about my staff.  My law

8    clerk assigned to this case is on bed rest.  So don't even go

9    there with me right now.

10            MR. NOLAN:  I'm just frustrated, your Honor.  I've

11   never had a moving target like this.  But it's completely

12   designed to distract everybody from the real issues in this

13   case.

14            I think that there are legitimate issues that come

15   up from time to time, like the settlement, and I raise the

16   issue and ask the Court for permission to do that.

17            THE COURT:  I'm not going to give anyone permission

18   to make a motion for reconsideration at this point.  We're

19   not going to go back to the motion in limine.  What I mean

20   when I say I'm not making any promises about these motions,

21   I'm seriously not making any promises about whether I'll be

22   able to get to them.  So we'll just have to play it out.

23            MR. NOLAN:  And I'm also saying I haven't seen some

24   of these motions.

25            THE COURT:  I'm not imposing a briefing schedule on

1    you, Counsel.

2              MR. NOLAN:  Thank you very much.

3              THE COURT:  All right.  Let's go through the -- is

4    there anything further on your punch list, Mr. Zeller?

5              MR. ZELLER:  I think I'm happy to represent that is

6    the end of ours.

7              THE COURT:  All right.  Mr. Nolan.

8              MR. NOLAN:  Thank you.

9              THE COURT:  We've covered several of the issues on

10   your punch list in this context, but there's some we haven't.

11   We've discussed the treatment of the Bryant settlement before

12   the jury, the first issue.

13             The second issue is the scope of Phase 1-A trial.

14   I have nothing further to say on that.

15             MR. NOLAN:  Nor do I, your Honor.  Thank you.  And

16   you actually clarified the issue that we wanted to raise.

17             THE COURT:  And the clarification of the issues in

18   the Court's May 22, 2008 order, is there anything further I

19   can clarify on that?

20             MR. NOLAN:  No, your Honor.  I think that the -- I

21   think we've clarified that.

22             THE COURT:  All right.  That was the issue

23   regarding -- okay.

24             Potential break between 1-A and 1-B.

25             It really depends on our timing on this.  I'm being

1   pressed, you may have seen in the Daily Journal, and that's

2   the case I was referring to today, that Marine Corps case,

3   and I have that that's being pressed by speedy trial

4   considerations.  I've got to get that jury picked in the

5   middle of July before the Ninth Circuit conference.  So

6   that's what this is pushing up against.

7          So I -- we have enough time to get through this

8   trial with the time that I've allocated to you.  I don't know

9   how much of a break I'm going to able to take between the

10  phases.  It may be just a day or so.  It may be -- if we can

11  do longer, we can do longer.

12         But part of it will depend, if we can get through

13  Phase 1-A and counsel can represent to me that they believe

14  they can get through 1-B in a shorter period of time than

15  anticipated, then perhaps we can take some time, but that

16  will really depend on how efficiently you get through 1-A.

17         MR. NOLAN:  Your Honor, this may sound like it was

18  asking for a vacation break or a day off from school.  That's

19  really not -- I wish -- I would never impose that on the

20  Court because I know the Court's schedule.  It was more

21  whether or not we were just anticipating that maybe almost

22  like a pretrial conference, before we start 1-B to address

23  those kind of issues.

24         THE COURT:  We're definitely going to have to have

25  a regrouping to see where we are.  And it may very well be

1    that several of these motions are going to be deferred until

2    that time.

3              MR. NOLAN:  Correct, your Honor.  Right.  And so

4    your Honor, there's also No. 5, limitation on Daubert

5    motions.  This is just from the recent experience yesterday.

6              THE COURT:  And the answer to that question is yes.

7              MR. NOLAN:  Thank you.

8              THE COURT:  The only Daubert motions that I'm

9    hearing, the only 8:30 A.M. motions I'm hearing are those

10   where there was a motion in limine filed and I'm making the

11   one exception -- I don't know if she's here today, the

12   ex parte application, which I'm treating as Motion in Limine

13   No. 16, that is the one exception.

14             MR. NOLAN:  Right.  So there are no more

15   exceptions.

16             THE COURT:  No more exceptions.

17             MR. NOLAN:  And I will probably hate that I just

18   asked for that, but nevertheless, I think we're going to have

19   the better of that one.  If I could just find out who is

20   filing these motions over at Quinn Emanuel, I want to hire

21   them at Skadden and have them put away for a while.

22             THE COURT:  6 is process of resolving parties'

23   objections on trial exhibits.

24             I'm not going to sit and go through the exhibit

25   list to resolve all of the exhibits before trial.  As they

1  come in, no one shows anything to the jury or reveals the

2  substance of anything to the jury until I have said the

3  magical words "Admitted.  You may publish."

4       Literally, the last jury trial I had ended in a

5  mistrial on this very issue.

6       MR. NOLAN:  It may not surprise you, your Honor,

7  that we have not been making as much progress as we would

8  like on the meet and confer.  On the objections --

9       THE COURT:  Don't assume that, because you have a

10  stipulation concerning an exhibit, that it's in.  It's not in

11  until -- and I do that just for case management.  Because

12  Mr. Holmes or whoever is sitting as the courtroom deputy on

13  that day does not admit it until I say those words.  The

14  court reporter doesn't record it.  And it does not go to the

15  jury until those words are said.

16       MR. NOLAN:  We appreciate that and understand that.

17  And that gives us the clarity we needed.

18       THE COURT:  And if you want to introduce groups, if

19  you want to say that Exhibits 1 through 10, we move to admit

20  them pursuant to stipulation by the parties, I will ask the

21  opposing party is there any objection, no.  And we can move

22  them in en masse.  I don't mind moving them in in large

23  groups, but they are not in until they are in.

24       And as far as the objections themselves, objection.

25  State the ground for it.  Hearsay, relevance, foundation.

 1    And then I will let you know if I need further argument from

 2    anyone.   And I'll sustain or overrule it.   And that's it.

 3            The one objection that I don't like is objection to

 4    the form of the question.   Do let me know what form objection

 5    you're making, whether it's vague and ambiguous.   Don't leave

 6    me there guessing as to what particular part of the form.

 7    Just go that one step further and indicate the basis of the

 8    form objection.   But beyond that, just state the legal

 9    objection.

10            MR. NOLAN:   Your Honor, Mr. Quinn handed up a note.

11    Mr. Quinn and I are meeting before the opening statement and

12    showing each other the exhibits and graphics that we intend

13    to use.   We've both agreed to comply with -- I don't know if

14    it's the local rule, but it's the preference not to use video

15    in an opening statement.   Because we'd be fighting over

16    what's a counterdesignation and things like that.   And we've

17    agreed that's not going to be an issue.   I guess one of the

18    questions would be the ability to show an exhibit in opening

19    statement to which there are objections.

20            THE COURT:   Oh, no.   Only if it's stipulated to.

21            MR. NOLAN:   Great.   I understand that, your Honor.

22            MR. QUINN:   But does the Court have any problem

23    with the process we've described that, if we can meet,

24    exchanges, enter an agreement --

25            THE COURT:   If you can agree, I'll let the two of

1   you do just about anything that you agree to do in opening

2   statement.  I have the confidence of knowing that there's

3   probably very little that you'll agree to do.  But if the two

4   of you, if John Quinn and Tom Nolan can agree on something in

5   opening statement, have at it.

6          MR. QUINN:  Your Honor, we've agreed to meet at

7   8:00 and have breakfast.

8          THE COURT:  I'm just talking about opening

9   statement.  You two can agree to it, then I'm not going to

10  stop you.

11         MR. NOLAN:  You'd be surprised.  We're not the --

12         THE COURT:  As far as the next question,

13  transcripts in resolving designation, counterdesignation, if

14  there arises the rare occasion where you don't agree on a

15  designation, just identify that for the Court.  What I want

16  you to do is submit, if the entire witness is going to be on

17  a deposition transcript, video deposition or use -- use the

18  multi-color pens.  One side indicate and the other side

19  indicate what they want read.

20         If you have objections, literally write the

21  objections next to the transcript, and then I'll go down

22  outside the presence of the jury, rule on them, and do it

23  just as you would with oral testimony.  But do it in advance,

24  and you've got the 48-hour rule.  So give it to me in enough

25  time so I can look at it, read it, and make the rulings.

1          MR. NOLAN:  That's actually what I was asking you

2    about.  First of all, I assume we can do it on a rolling

3    basis?

4          THE COURT:  Yes.  Provide it to me.  And the other

5    thing that I think is very helpful, and I've enjoyed this the

6    last few good trials that I've had.  If counsel can have an

7    exhibit book for the witness as opposed to having just the

8    wall of exhibits and trying -- of having the witness trying

9    to find the exhibits.  If you can have kind of a particular

10   exhibit book for that witness with that witness's exhibits in

11   it, it just seems to move things along much more efficiently,

12   and it's a lot less stressful on the Court and the witness.

13         MR. NOLAN:  Your Honor, how does the Court wish to

14   handle the exhibit copies?  Would you want a similar binder

15   for yourself?

16         THE COURT:  I would like a binder of the -- of what

17   the witness has.  And if you are able to put together an

18   exhibit binder for the witness and give that to me as well,

19   that's fine.  That saves me the trouble of having to find it

20   in the Court's exhibits.

21         MR. NOLAN:  Right.  And maybe we can work out a

22   protocol.  There shouldn't be a surprise when the witness

23   gets on that we also give each other a copy of the binder,

24   and we have little time, that would be what we would prefer.

25         I just want to go back to the videotapes.  This

1   48-hour notice issue with the videos, I think there's a

2   different issue that's involved with videos.  Because of the

3   processing that's required, the cutting, the objections, the

4   reviewing, the designations.  You probably will not be

5   surprised that -- and we probably designated a lot.

6           But currently we have 130 hours of video

7   designations of Mattel's witnesses, which I think that they

8   will either be playing them at the same time the live

9   witnesses will be testifying in order to accommodate it in 30

10  hours or whatever time you are going to want.

11          There's going to be a lot of processing that's

12  going to be required.  With respect to the video, what we

13  would propose, and I apologize that you have to get involved

14  in it, but we haven't been able to resolve it, is some

15  protocol where we are given, each side provides more than 48

16  hours' notice with respect to the videos so they can be

17  reviewed.

18          MR. QUINN:  That's okay.  Another 24 hours?

19          MR. NOLAN:  We were thinking about --

20          THE COURT:  Mr. Quinn, you agree to that?

21          MR. QUINN:  I was proposing another 24 hours for

22  designation.  Give the designations.  So 72 hours before you

23  propose to play it.  Then counterdesignations to each other,

24  get it to the Court in time for the Court to rule.

25          THE COURT:  That sounds reasonable.  72 hours,

1    Mr. Nolan?

2              MR. NOLAN:  Yes, your Honor.

3              THE COURT:  All right.  Let's go with that.

4              MR. NOLAN:  Thank you.  Tangible items, the custody

5    and notice for use at trial.  These tangible items are not

6    here in the courtroom.  Some of them we don't actually

7    possess.  We have a safe at the hotel where some of these

8    tangible products, like the original molds, are there.  We

9    asked them for -- I forget.  What was the notice?  We asked

10   for 24 hours' notice if they needed the tangible items in

11   court.

12             They wanted to have an hour's notice to us, which

13   under the circumstances, your Honor, I just think -- I don't

14   think it's practicable to be able to say go back, bring them

15   from the safe.  So we would ask for 24 hours' notice if they

16   want the original of the drawings, or the original of the

17   tangible items themselves, the molds.  It's just a

18   convenience so that we have them here, and yet they are still

19   secure.  A lot of these molds, your Honor, they are not that

20   big, but they are very -- some of them are rather small and

21   delicate pieces.  And so we keep them under lock and key.

22             THE COURT:  Very well.

23             Mr. Quinn, your thoughts?

24             MR. QUINN:  As I understand it, the only issue is

25   actually getting the original here to court.  We already have

```
 1   a notice agreement about the use of exhibits.

 2            MR. NOLAN:  Right.  All I'm saying is if you need

 3   the original here, let us know the day before, and we'll be

 4   certain to bring them here.

 5            MR. QUINN:  If something comes up during the day,

 6   we're talking about things that are either in the Mission Inn

 7   or are going to be locked here.  And our concern is suppose

 8   something can easily be gotten and we forget about it.

 9            THE COURT:  What I hear Mr. Quinn saying is that he

10   will make every effort to give you 24 hours' notice.  There

11   may be the rare occasion where something is missed, and you

12   can go and get it, and it will be charged to Mr. Quinn's

13   witness time.

14            MR. QUINN:  You mean while the messenger goes over?

15            MR. NOLAN:  Yes.  And he's going to walk back to

16   the Mission hotel.  That shouldn't be a problem.

17            THE COURT:  That's been the hallmark of this case,

18   is accommodation.  That will be my lasting impression of this

19   case, is the tremendous accommodations.

20            All right.  Is there anything else?

21            MR. NOLAN:  Yes.  This is the one that I mentioned

22   earlier.

23            THE COURT:  The trademark?

24            MR. NOLAN:  Yes, your Honor.  If you could turn to

25   page 66 of the amended pretrial conference order.
```

1           Your Honor, we're talking about the copyright

2    rather than a trademark.  It's No. 3VAU 960-439.  We have not

3    seen this before.   This was not in the pretrial conference

4    order before.

5           THE COURT:  I'm sorry.  Where are we looking?

6           MR. NOLAN:  Line 13, page 66.

7           THE COURT:  VAU960-439?

8           MR. NOLAN:  Yes.  We have not seen that in the

9    earlier pretrial conference order.  We had never seen this

10   before, and so we got a download.  We noticed this when we

11   finally got the hard copy of the pretrial conference order.

12   This, your Honor, was filed May -- this copyright was filed

13   May 15, 2008.

14          THE COURT:  Hm.

15          MR. NOLAN:  This is a visual material.  It is a

16   doll sculpt drawing.  And the claimant is Mattel, Inc., gives

17   you the address, date of creation, 2000.  The authorship on

18   application is Carter Bryant, 1968.

19          You know, can we go to the control drawing?  You've

20   seen this drawing.  It has been the subject of a lot of

21   arguments and a lot of motions in this case.  This is the one

22   we pointed out that they never applied for a copyright

23   application before, but apparently last week they did for the

24   first time.  It was never part of -- even though it was

25   raised in the motions for summary judgment, this was never

1    discussed before with us, your Honor.

2         We saw it, as I said, in the conference room as we

3    were reading the final copy of the pretrial conference order.

4    I'm not saying it wasn't in on the one they gave us at 10:12

5    this morning for the first time, but I will point out to you,

6    your Honor, that this document has been well-known to Mr. --

7    to Mattel.

8         And I'll represent to your Honor, and I can

9    actually play it, if you wish, this document, this control

10   drawing, which is a drawing that Carter Bryant draws from a

11   sculpt, was produced to Mattel in this case on August 12th of

12   2004.  It has Bates No. 278.  It was used in the deposition

13   of Carter Bryant on November 5th of 2004 as Exhibit No. 5.

14        Forget for a moment the lateness of this being

15   brought to anybody's attention or this being inserted as a

16   copyright claim, it was not asserted in this case until this

17   pretrial conference order.  They have known about this issue

18   well beyond the three-year statute of limitations applicable

19   to such a claim.  They understood that we were claiming

20   ownership to this.  They were on notice.  It's been used.

21   They couldn't be surprised.  There is no concealment

22   allegations with this document.

23        We've seen it in court numerous times.  This is the

24   document right after the Clint Eastwood moment during the

25   motion for summary judgment.  I pointed out that document and

1  indicated to the Court that this control drawing is a

2  copyright -- is not copyrighted by Mattel and that actually

3  it was used by and relied on by their expert, Mr. Loetz, in

4  making a description of the doll and this control drawing.

5          And even at his deposition, he did not realize that

6  this control drawing was not -- that's a term of art that

7  they used in the deposition.  It's not a control drawing.

8  I'm just using it for purposes of the record.  It's not an

9  admission on our part.  But he did not know that this drawing

10  was not part of Carter Bryant's drawings.  This drawing is

11  from a work, an artistic work, a sculpt done by Margaret

12  Leahy.

13          But more important, your Honor, there's a lot of

14  rules that apply.  Some are under exceptions.  There can be

15  no good faith exception for putting it into a nearly 140-page

16  pretrial conference order on Friday after we have picked the

17  jury.  Had we not proofread this carefully, we were never

18  told about this.

19          THE COURT:  So what are you asking the Court to do,

20  Mr. Nolan?

21          MR. NOLAN:  To strike this application.

22          THE COURT:  Strike this particular application,

23  No. 3.

24          MR. NOLAN:  Yes.  It's not part of this case.

25          MR. ZELLER:  Your Honor, first of all, just in

1    terms of yet another allegation of nefariousness here.  We

2    sent a red-lined document to the other side.  They saw

3    exactly what the changes were.  And there is no question that

4    this drawing has been at issue in the case since the very

5    beginning.  And, in fact, that is ultimately what defeats

6    Mr. Nolan's argument.  There is no prejudice, and there is no

7    surprise.

8            What we have done is that we now have in fact

9    registered it with the U.S. Copyright Office.  As the Court

10   will notice there at the very bottom, MGA designated

11   attorneys eyes only, and that thwarted our ability to

12   register it.  We don't have a copy of this document and can't

13   go ahead and register it with the U.S. Copyright Office

14   because of their designation.  And, of course, the Court will

15   recall well that the recent unsealing of these documents

16   allowed us, because it's still for a litigation purpose, to

17   register with the U.S. Copyright Office.

18            THE COURT:  When did I unseal the document?

19            MR. ZELLER:  I'm sorry?

20            THE COURT:  When did I unseal the document?

21            MR. ZELLER:  I believe Mr. Alger can tell you

22   precisely.

23            THE COURT:  Mr. Alger?

24            MR. ALGER:  We had the discussion on the telephone

25   regarding the motion for summary judgment documents.  This

1    was among those documents, and I asked the Court if it was so

2    ordered that the documents were unsealed, and that's when it

3    occurred.

4              THE COURT:   And that was before you registered

5    this?

6              MR. ALGER:   Yes, your Honor.   As your Honor

7    ordered, I told the folks that they could go ahead with this.

8              THE COURT:   Thank you, Mr. Alger.

9              MR. ZELLER:   So to reiterate the point, they are

10   not surprised by this, it's been in many depositions, and

11   there's the issue they raised, which is that supposedly

12   Carter Bryant copied this from the sculpt.   Mr. Bryant's

13   testimony is to the contrary.   So that's disputed.   But for

14   present purposes, having the registration in the case does

15   not change the scope --

16             THE COURT:   Very well.   Let me hear Mr. Nolan's

17   response to this argument.   There's certainly no surprise

18   about the document itself.   As you pointed out, Mr. Nolan,

19   this document has been around.   The concern is the late

20   registration.   They are claiming that the only way they could

21   have registered it was after the Court lifted the AEO --

22             MR. NOLAN:   I think it's a creative excuse for

23   trying to overcome a gotcha.   Your Honor, this was raised in

24   the summary judgment motion, saying unequivocally that this

25   is not copyrighted by Mattel.   There was never an issue in

1   four years in this case, and there was a process, and there

2   has been a process in place through the protective order that

3   if the party wanted to unseal a document for whatever

4   purpose, there was a procedure that was employed that you

5   could ask for clarification of AEO material.

6          We have never rejected that.  That was always

7   available to them, your Honor.  To excuse them by saying oh,

8   gee, it was AEO, you were prevented from using it, that is

9   belied by the terms of the protective order that this Court

10  put in.  It was that express purpose for putting in that

11  provision in a protective order to allow for these issues.

12         THE COURT:  Thank you, Counsel.  Well, I'll look at

13  this while I go through the entire pretrial order this

14  weekend.  And then I'll give you my own signed version of the

15  pretrial conference order Tuesday morning.  If someone could

16  provide me a second copy.  I've already started writing and

17  making notes on this, and I'll use this as my working draft

18  this weekend, but then I'll want to take a fresh copy and

19  actually go through and cross out, initial, interlineate any

20  changes that I'm making to it.  And that's what you'll have

21  on Tuesday.  I'd appreciate it.

22         MR. NOLAN:  Your Honor, very briefly on this one

23  document.  I do want -- we're going to go back.  I don't know

24  whether or not all of the production documents of this were

25  marked AEO.  This particular exhibit at the trial, and at the

1    deposition contains AEO.  I've going to go back and look at

2    Carter Bryant's original production and see whether or not it

3    was actually produced without that prohibition on it.

4              THE COURT:  Very good.  So this is the second copy?

5              MR. COREY:  Yes, your Honor.

6              THE COURT:  All right.

7              MR. ZELLER:  If I may briefly address Mr. Nolan's

8    last comments.  Number one, there is in fact a very long

9    history in this case of us requesting and being refused the

10   designation of materials that's been throughout the case.

11             THE COURT:  Did you request actually this

12   particular document?

13             MR. ZELLER:  I did, your Honor.  I did.

14             THE COURT:  Not that I'm questioning you, but would

15   you be able to substantiate the request on this basis to get

16   a copyright for it?

17             MR. ZELLER:  I do believe -- I'm sorry,

18   substantiation of the --

19             THE COURT:  That was the basis.  That you asked to

20   have it released so you could send it to the copyright office

21   and have it registered.

22             MR. ZELLER:  Absolutely.  And I believe there is

23   correspondence on it.

24             THE COURT:  If you could provide that

25   correspondence, that would be helpful.  Because I tend to

1    agree with Mr. Nolan's last point, that if this was something

2    you really wanted to get, that would be the good cause that

3    would allow the Court to allow you to deviate from the

4    protective order.  But if you're saying you made the request

5    and it was denied, that puts it in a different light.  So

6    let's find out what happened here.

7            MR. ZELLER:  And I can certainly tell you that

8    there is a -- there is some correspondence, and I spoke

9    with --

10           THE COURT:  Well, let me take a look at that

11   Tuesday.  This is an easy thing for me at the last minute to

12   strike out or leave in depending on what happened.  If there

13   was a good faith effort made by Mattel to try to get this

14   released and that was denied, then I could see good cause for

15   waiting until after the telephone conversation that Mr. Alger

16   referred to.  If there's not, then I think Mr. Nolan is

17   correct, and it should be stricken.  So not that I'm

18   questioning anybody, but let me see the documents.

19           Anything else?

20           MR. ZELLER:  Yes, your Honor.  And I would just

21   reiterate on that point.  It doesn't change the scope of the

22   case at all.

23           THE COURT:  I understand.

24           MR. ZELLER:  So there was one other issue,

25   actually, two.  Number one is that in terms of the originals

1  that are available to us, I don't know if MGA has in its

2  possession Carter Bryant's originals of certain of the

3  drawings and other materials that are going to be at issue in

4  this case.  That's obviously -- that will be very important

5  from our perspective for the jury to be able to see and

6  witnesses to be potentially examined on.  But we have not

7  been able to determine from MGA whether that's the case.

8          THE COURT:  Well, do you need the originals?

9          MR. ZELLER:  Yes, your Honor, we do.

10          THE COURT:  The originals of the drawings?

11          MR. ZELLER:  Yes.  Originals of the drawings.  The

12  drawings that Carter Bryant has in his possession.

13          THE COURT:  Have you discussed this with Mr. Nolan?

14          MR. ZELLER:  I believe we have.  I myself have not

15  personally.  But I believe that we have asked whether or not

16  the originals that they have are among those.  I do know for

17  a fact that we have talked to Carter Bryant's counsel, and

18  there was an issue about whether or not originals would be

19  made available to us.  I don't believe it was fully resolved

20  by the time the parties reached a resolution.

21          MR. NOLAN:  When I was referring to tangible items,

22  this is the type of thing I was including in the tangible

23  items.  If they give us notice of when they need it, we will

24  make certain they have them.

25          THE COURT:  Excellent.

1          MR. ZELLER:   Thank you, your Honor.

2          Then the last point is I know there's also an issue

3    that they have raised in terms of an amendment, and that's

4    with respect to the Bratz name.   We have filed a response to

5    that.   But what I would note, your Honor, is that contrary to

6    what MGA says in its objection, that paragraph, you know,

7    that reference to the name has not only been in our

8    counterclaim from the time we filed it years ago, but that

9    same language was actually in the original pretrial

10   conference order that was submitted to your Honor.   And that

11   was on page 37, specifically lines 23 to 24 of that original

12   pretrial conference order.

13          Moreover, it goes on to be discussed further on

14   pages -- on the next page, 38, lines 4 to 11.   So not only

15   has this been an issue and a litigated issue throughout the

16   case, it was referenced in our original final pretrial

17   conference order.   We did through the amendment reference it

18   in a couple more places for purposes of clarity, but it was

19   always there.

20          THE COURT:   You're done; right, Mr. Zeller and

21   Mr. Quinn?

22          MR. ZELLER:   Yes.

23          MR. QUINN:   Your Honor, just on opening statement,

24   I talked to Mr. Nolan.   Two hours a side, would that be

25   acceptable to the Court?

1      THE COURT:  Yes.

2      MR. QUINN:  And in terms of counsel gives the

3  opening from the --

4      THE COURT:  From the lectern.  I was very lax in

5  the voir dire process, but that was an awkward thing because

6  you've got people behind you and all.  But now that we're

7  settled down and have the 10 jurors in the box, everything

8  from the lectern.  Objections, please rise, speak clearly

9  into the microphone for the benefit of the court reporter,

10  and we've got to maintain a certain degree of federal

11  formality.

12      MR. NOLAN:  One hand on the lectern at all times.

13      THE COURT:  If you can reach the lectern, you're

14  okay.

15      MR. NOLAN:  Your Honor, two quick things.  To

16  respond to Mr. Zeller, our whole point is just to confirm

17  that with this addition to the pretrial conference order,

18  they're not adding a trademark claim against the ownership of

19  Bratz.  We understand that that's not the case.  That's -- in

20  fact Mr. Zeller made that explicit in his representation to

21  the Court last week.  It was just that the name Bratz was

22  apparently proprietary to Mattel.

23      THE COURT:  Pursuant to the contract, according to

24  their theory.

25      MR. NOLAN:  According to that.

1          THE COURT:  Yes.

2          MR. NOLAN:  And I think it's only fair because we

3    raised that ourselves now in support of the summary -- the

4    statute of limitations argument.

5          The last thing, your Honor, that we have is that

6    the Court did not rule on when it would conduct the hearing

7    on -- actually whether or not it was going to conduct a

8    hearing in advance on the use of the Evidence Eliminator and

9    what we would want to do, since we do not have a ruling on

10   that --

11         THE COURT:  I'm sorry.  I should have.  I am going

12   to -- I'm still working on the order.  I think I gave most of

13   them.  That was one I didn't.  I am going to conduct a

14   hearing on that.  I'm going to conduct a hearing, and the

15   first witness is going to be Carter Bryant.  And then we're

16   going to hear from Mattel's expert, MGA's expert.

17         MR. NOLAN:  So would there be no mention of that in

18   the opening statement?

19         THE COURT:  No, there's not going to be a mention

20   of Evidence Eliminator in opening statement.  Thank you for

21   reminding me of that.  I know that's one motion in limine

22   that I had not given an indication on the record.

23         MR. NOLAN:  Your Honor, this is my last point.

24         THE COURT:  Very well.  I'll hold you to that.

25         MR. NOLAN:  We have this 48-hour notice rule about

1  witnesses.  And so it's 13 minutes to 5:00 on a rather long

2  weekend.  Mr. Quinn -- I've asked him several times because I

3  want to go out to dinner with the family tonight -- if he

4  could just give us -- could I ask that we have it 13 minutes

5  early?

6          THE COURT:  We do need to get the witnesses for the

7  first day.

8          MR. QUINN:  I understand, your Honor.  And I'm

9  really frankly kind of disappointed that he's bringing this

10 up with you, I have to say.  I've said 5:00 on Friday.

11 What's the point exactly?

12         MR. NOLAN:  I'll wait 15 minutes.  I'm sorry.  It's

13 an important case.

14         THE COURT:  Very well.

15         MR. NOLAN:  And it's also for Tuesday and

16 Wednesday.

17         THE COURT:  I think Mr. Quinn understands his

18 obligations.  But he's just going to wait until 5:00.

19         MR. ZELLER:  Just since Mr. Nolan continues to

20 characterize our claims and what they are, we have not said

21 that the name Bratz is, quote, proprietary, end quote, to

22 Mattel.  That is not the basis of our theory.  The name is

23 part of the concept.  If is part of the idea.  It is part of

24 what it is that Carter Bryant created when he was employed by

25 Mattel that relates to Bratz.  That is among the inventions

1    that he created.  And therefore, we own it.

2              THE COURT:  Your --

3              MR. ZELLER:  Exactly.

4              THE COURT:  Under the contract.

5              MR. ZELLER:  Correct.  Well, not necessarily

6    copyright theory per se.  It's more under the contractual

7    theory because there's doctrine that says short phrases and

8    statements couldn't be copyright.

9              THE COURT:  I said under the contract.

10             MR. ZELLER:  Okay.  Exactly.  So with that

11   clarification, and certainly the name Bratz is relevant to

12   our claims because it also shows timing.  Mattel is

13   considering it a late '99, early 2000 time period.  So it

14   serves double duty.

15             THE COURT:  I understand your case as well as I'm

16   going to understand it.  I'm not saying I understand it

17   perfectly, but I understand it as well as I can.  So let's

18   just go forward with the trial and see what happens.  Have a

19   good weekend.

20

21             (Proceedings concluded at 4:50 P.M.)

22

23

24

25

1

2

3

4

5

6

7                    C E R T I F I C A T E

8

9

10          I hereby certify that pursuant to Title 28,

11   Section 753 United States Code, the foregoing is a true and

12   correct transcript of the stenographically reported

13   proceedings in the above matter.

14          Certified on May 23, 2008.

15

16

17   **MARK SCHWEITZER, CSR, RPR, CRR**
     Official Court Reporter
18   License No. 10514

19

20

21

22

23

24

25