883

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3                    - - -

4    **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                    - - -

6    MATTEL, INC.,                    :    PAGES 883 - 1006
                                      :
7              PLAINTIFF,             :
                                      :
8        VS.                          :    NO. ED CV04-09049-SGL
                                      :    [CONSOLIDATED WITH
9    MGA ENTERTAINMENT, INC.,         :    CV04-9059 & CV05-2727]
     ET AL.,                          :
10                                    :
              DEFENDANTS.             :
11   _____  :

12

13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16             RIVERSIDE, CALIFORNIA

17            FRIDAY, MAY 30, 2008

18             JURY TRIAL - DAY 5

19             AFTERNOON SESSION

20

21

22   CERTIFIED          MARK SCHWEITZER, CSR, RPR, CRR
                        OFFICIAL COURT REPORTER
23   COPY               UNITED STATES DISTRICT COURT
                        181-H ROYBAL FEDERAL BUILDING
24                      255 EAST TEMPLE STREET
                        LOS ANGELES, CALIFORNIA 90012
25                      (213) 663-3494

**Appearances of Counsel:**


On Behalf of Mattel:

    Quinn Emanuel
    By John B. Quinn, Esq.
      B. Dylan Proctor, Esq.
      Michael T. Zeller, Esq.
      Harry Olivar, Esq.
      John Corey, Esq.
      Diane Hutnyan, Esq.
      William Price, Esq.
    855 South Figueroa Street
    10th Floor
    Los Angeles, CA 90017
    (213) 624-7707


On Behalf of MGA Entertainment:

    Skadden, Arps, Slate, Meagher & Flom LLP
    By Thomas J. Nolan, Esq.
      Carl Alan Roth, Esq.
      Jason Russell, Esq.
      Lauren Aguiar, Esq.
      David Hansen, Esq.
      Matthew Sloan, Esq.
    300 South Grand Avenue
    Los Angeles, CA 90071-3144
    (213) 687-5000

1                              **I N D E X**

2

3   **PAULA GARCIA, PREVIOUSLY SWORN**........................ 886

4   **CROSS-EXAMINATION (CONTINUED)** BY MS. AGUIAR:........... 886

5   **REDIRECT EXAMINATION** BY MR. PRICE: ................... 902

6   **RECROSS-EXAMINATION** BY MS. AGUIAR: ................... 983

7   **FURTHER REDIRECT EXAMINATION**  BY MR. PRICE:........... 996

8

9                          **E X H I B I T S**

10

11    (Exhibit 13592 received.)............................. 909

12    (Exhibit 4501 received.)............................. 991

13    (Exhibit 4502 received.)............................. 993

14    (Exhibit 4505 received.)............................. 993

15

16

17

18

19

20

21

22

23

24

25

1       Riverside, California; Friday, May 30, 2008

2                    1:30 P.M.

3             (WHEREUPON THE JURY ENTERS.)

4         WHEREUPON THE CASE HAVING BEEN CALLED

5         AND APPEARANCES GIVEN, THE FOLLOWING

6         PROCEEDINGS WERE HELD:

7         THE COURT:  Good afternoon, Counsel.

8         Counsel may continue.

9             PAULA GARCIA, PREVIOUSLY SWORN.

10            CROSS-EXAMINATION (CONTINUED)

11   BY MS. AGUIAR:

12   Q.   Ms. Garcia, before we move off the topic totally of the

13   retailer meeting in, I believe you said, November of '07,

14   that's what we were talking about before the break, to bring

15   us back to where we were.  Can you look in your white binder

16   at tab 13586.  And why don't you take a minute to familiarize

17   yourself with the document.

18   A.   Okay.

19   Q.   I want to direct your attention to the top e-mail, and

20   the document is not in evidence.  So I won't say what the

21   substance of it says, but directing your attention to the top

22   e-mail, does this do anything to refresh your recollection

23   that you attended the retailer meeting in early November

24   2007?

25   A.   In reading this e-mail, it does suggest that there was a

1    possibility that I would have attended this Kmart meeting.

2    Q.    Now, do you have a specific recollection of having

3    attended the meeting?

4    A.    No.

5    Q.    Do you think it's possible that you were there?

6    A.    It's possible.  I don't remember.

7    Q.    You can put that aside.

8            If there was testimony during this trial by a

9    colleague of yours at MGA that indicated that you once told

10   her to keep Carter Bryant a secret and to not discuss him

11   outside of the company, what would your response be to that

12   testimony?

13   A.    I would respond that that was untrue.

14   Q.    Was there ever a time when you told people at MGA not to

15   speak about Carter Bryant?

16   A.    No.

17   Q.    Was there ever a time when you heard anyone else at MGA

18   tell people -- and I want to -- we looked at an e-mail

19   yesterday where Mr. Larian had mentioned that there should be

20   no references on the website.

21           Do you recall that?

22   A.    Yes.

23   Q.    Excepting that from my question, do you recall anyone at

24   MGA ever telling people not to speak about Carter Bryant

25   outside of the company?

1    A.    No.

2    Q.    And did you ever tell Carter himself not to tell anyone

3    that his drawings were presented to MGA?

4    A.    No.

5    Q.    And how about did you ever suggest to him that he should

6    say that he was involved in the Bratz project?

7    A.    No.

8    Q.    Moving on to a different subject.  In your position at

9    MGA, do you review sketches or concept drawings that are

10   submitted to you by doll designers and artists?

11   A.    Yes.

12   Q.    Did you do that at all in your position at Mattel?

13   A.    No.

14   Q.    So over the years that you've done this at MGA, just

15   ballpark, how many would you say you've seen, how many

16   sketches and drawings and concepts that you have seen?

17   A.    Hundreds.

18   Q.    I'd like to ask Aaron to put up -- it's already in

19   evidence, 263-3.

20         Do you recognize what's on the screen?

21   A.    Yes.

22   Q.    What do you recognize it to be?

23   A.    I recognize it to be a sketch of a Toon Teens drawing.

24         MR. PRICE:  I would object and move to strike

25   unless there's some foundation that she saw this before

889

1    trial.

2              THE COURT:  Overruled for now.

3    Q.   BY MS. AGUIAR:  Do you see the arm and the hand pose

4    that's depicted in this drawing?

5    A.   Yes.

6    Q.   Based on your experience reviewing concept drawings in

7    your position at MGA, in your view is this arm and hand pose

8    a unique one?

9              MR. PRICE:  Objection.  Improper opinion.  Beyond

10   the scope.

11             THE COURT:  Foundation, Counsel.  I'll sustain it.

12   Q.   BY MS. AGUIAR:  In the course of doing what you do at

13   MGA, do you often review sketches like this from artists and

14   doll designers?

15   A.   Yes.

16   Q.   And do you think that you are familiar with the style

17   and -- with the style of artists when they are drawing,

18   making drawings like this?

19   A.   Yes.

20   Q.   And looking at the drawing that's on the screen right

21   now, does that arm and the hand pose, have you ever seen that

22   before in the drawings that you have viewed?

23             MR. PRICE:  Same objection.

24             THE COURT:  Overruled.  You may answer.

25             THE WITNESS:  Is the question have I seen arm poses

1  like this?

2  **Q.**   BY MS. AGUIAR:  Yes, have you seen hand and arm poses

3  like this --

4        THE COURT:  Other than on a Toon Teen?

5        MS. AGUIAR:  Sorry.  Thank you for that.

6  **Q.**   Other than the other drawings of Toon Teens that you've

7  seen here in court in the last week or so, have you seen an

8  arm and hand posed like this in drawings that you've reviewed

9  in your work with MGA?

10  **A.**   Yes.

11  **Q.**   Can you -- are there either specific examples, or can

12  you tell us what you recall about having seen this before?

13  **A.**   It's -- in the experience that I've had, in the nine

14  years at MGA, it is common for, you know, for artists or for

15  designers, especially in my experience fashion designers, to

16  draw their artwork with hands built out in this posture.  I

17  have a designer right now who designs and drawings hand

18  positions in that very way, even up to today.

19  **Q.**   Do the arms and the hand pose in this drawing that you

20  are looking at here resemble the arm and the hand poses in

21  Mr. Bryant's pitch book drawings?

22        MR. PRICE:  Objection.  Beyond the scope.  It's

23  improper opinion.  It's not this phase.

24        THE COURT:  Sidebar, please.

25        **(SIDEBAR CONFERENCE HELD.)**

891

1        THE COURT:  Mr. Quinn elicited from his witness a

2  witness of similar qualifications testimony about this pose

3  and the uniqueness of this pose, and this is rebuttal to

4  that.  So I'm not following your objection.

5        MR. PRICE:  Well, you're right.  We didn't say this

6  was unique.  We explained he was exposed to this while he was

7  at -- while he was at Mattel.  But this witness, my direct

8  had nothing to do with this at all.  I know you're talking

9  about for efficiency --

10       THE COURT:  There was more to being exposed to

11  this.  The witness actually described it as being unique and

12  went into some explanation as to why it was unique, and this

13  is a response to that, that it's not unique.

14        Now, they're a temporal issue.  The critical

15  question is whether or not she had seen this prior to Toon

16  Teens, and that's one of the reasons I called you over here.

17  Because if it was something after Toon Teens, it could be

18  another artist copying Toon Teens.  So for it to have

19  relevance, it would have to be before.  So that's a further

20  foundation that you're going to have to double back on.

21        MR. PRICE:  If she asks that, she shouldn't be

22  leading.  When is the first time.  But my objection is I know

23  we're trying to be efficient here, but, you know, we've had a

24  long, quote, direct examination.  This has nothing to do with

25  what she was asked on her, quote, cross.

1        THE COURT:  And you're correct on that.  I'm

2 permitting this to rebut an earlier witness.

3        MR. QUINN:  I don't think I ever actually elicited

4 testimony that it was unique.  I don't think I did, your

5 Honor.  I mean, what we did was we went through the story

6 about the roller skates.

7        THE COURT:  I can't say that the word unique was

8 used, but the testimony, to the best of my recollection, was

9 that it was something which was different, unusual, struck

10 the witness as something special.  And I think that goes to

11 your case.  I think that's strong evidence for you in terms

12 of seeing those things manifest.  So I think that's a

13 legitimate basis to rebut.

14       But I'm concerned about the temporal issue.  If

15 that temporal issue is not established, I want to go back and

16 strike it, and you guys have the benefit of having the

17 testimony.  If you can identify for me, but that's my

18 recollection.

19        MR. NOLAN:  That's my recollection.

20        MS. AGUIAR:  May I have a word?  I specifically

21 remember more than one witness saying that it was unique.  In

22 fact, I can remember almost the words of one witness saying I

23 recognize Lily Martinez's drawings because Lily has a unique

24 style.

25        THE COURT:  If I'm mistaken, you can bring it up.

1          MR. QUINN:   I agree with what counsel just said.

2   Ms. Ross did say she would recognize Lily's style because it

3   looks like Lily.  And she talked about the lips and the --

4          THE COURT:   No, she specifically talked about the

5   hands because it's all tied up.  If I'm mistaken, you point

6   it out to me, Counsel.

7              **(CONCLUSION OF SIDEBAR CONFERENCE.)**

8          THE COURT:   Go ahead and lay that foundation we

9   discussed at sidebar.

10  **Q.**   BY MS. AGUIAR:  Do you recall when was the very first

11  time that you have seen an arm or a hand pose similar to the

12  one that's depicted on the screen right now?

13  **A.**   It could have been -- do you mean in the -- at all in

14  general?

15  **Q.**   At all in general.  I'm just trying to place your

16  experience or your memory of seeing similar arm poses, place

17  it in time, and the earliest one you remember.

18  **A.**   The only reason I can't put a particular date is that,

19  you know, it's possible that these hands could have been on

20  dolls that I have seen and, you know, even prior to my coming

21  to MGA.  It's just a really common position to illustrate --

22         MR. PRICE:   I'm going to move to strike.

23         THE COURT:   That last answer is stricken.  Let's

24  lay a foundation on the time.

25         MS. AGUIAR:   Okay.

894

1  **Q.**  Do you recall having seen an arm pose like this even

2  prior to the time that you came to MGA?

3  **A.**  It is possible, yes.

4  **Q.**  Do you -- and again, I'm going to ask --

5      MR. PRICE:  Your Honor, I'm going to move to strike

6  that for substantive --

7      THE COURT:  I'm not going to strike the answer, but

8  we're not quite done with this.

9  **Q.**  BY MS. AGUIAR:  If we can put up one of the drawings

10  from Mr. Bryant's pitch book.

11      Do you think the arms and the hands in the Toon

12  Teens drawing resemble the arms and the hands in Mr. Bryant's

13  pitch book depicted on the right?

14      MR. PRICE:  Objection.  Irrelevant.  She's not

15  testifying --

16      THE COURT:  Counsel, do you have anything further

17  on the temporal foundation?

18      MS. AGUIAR:  Should we go to the side again?

19      THE COURT:  Do you have anything further on the

20  temporal issue?

21      MS. AGUIAR:  May I have a moment?

22      THE COURT:  You may.

23  **Q.**  BY MS. AGUIAR:  I'm trying to get a little more into

24  time frames here.  Prior to September 1st, 2000, had you seen

25  drawings with arm and hand poses like the one on the left?

895

1   **A.**   You know, I can't recall any in particular right now,

2   but it's very possible.

3   **Q.**   Do you believe that you saw drawings or sketches with a

4   similar arm and hand pose prior to 1999?

5              MR. PRICE:   It's calling for speculation.

6              THE COURT:   Overruled.  You may answer.

7              THE WITNESS:   Prior to 1999.

8   **Q.**   BY MS. AGUIAR:   Let me give you another question,

9   because I want to broaden it.  Not just -- have you also seen

10  this arm and a hand pose in any other media, popular media,

11  magazines, fashion books or anything like that?  And again,

12  I'll narrow it down to time, but have you ever seen this arm

13  and hand pose in other media?

14             MR. PRICE:   Objection.  Assumes facts not in

15  evidence.  And it is leading.

16             THE COURT:   I'm going to sustain the objection at

17  this point.  I -- let's move on, Counsel.  Go to another

18  area.

19             MS. AGUIAR:   May I ask a specific question about

20  time?  Because I hadn't let her answer the last question.

21             THE COURT:   Let's move on to another area.

22             MS. AGUIAR:   Okay.  Can I ask about the comparison

23  here?

24             THE COURT:   I'm sorry, Counsel.  I'm going to have

25  to see you at sidebar.

1      **(SIDEBAR CONFERENCE HELD.)**

2          THE COURT:  What I don't like about this is you

3   asked basically the same question prior to coming to MGA and

4   before 1999 and the first time she says it's possible.  The

5   next time -- and all of a sudden she remembers something.  I

6   just think we're getting --

7          MS. AGUIAR:  May I break it down, though?  I think

8   there are two separate issues.  One is whether or not in her

9   view that hand pose is unique.  And I understand the

10  objection about time.  In other words, that if she had not

11  seen an arm and a hand pose --

12         THE COURT:  Let's deal with that issue first.

13  We'll get to the comparisons in a second.

14         MS. AGUIAR:  I'll let it go.

15         THE COURT:  I think I need to instruct the jury to

16  disregard the prior testimony because I overruled the

17  objection and allowed the testimony in.  And then I thought

18  better of it at sidebar, because of the lack of the temporal

19  foundation, and I, like I say, I don't understand how this

20  witness can testify one moment that it's only possible that

21  she saw this before going to MGA, and then you asked the

22  question a different way, and now all of a sudden she knows

23  for sure that she saw it prior to 1999.

24         MS. AGUIAR:  She didn't give an answer.

25         THE COURT:  I heard and the court reporter both

1    recorded that her answer was prior to 1999.

2            MR. NOLAN:  Your Honor, with respect to the

3    temporal aspect of it, can I just be clear about something?

4    Because when -- is the foundation -- the witness is not here.

5            THE COURT:  It's not relevant that she saw somebody

6    else do it after Toon Teens came out.  It only impeaches if

7    it was done before Toon Teens was designed or developed.

8            MS. AGUIAR:  But Toon Teens never came out.

9            MR. QUINN:  It's actually the decal that comes out

10   in 1999.

11           THE COURT:  The decal on the Barbie doll.  That's

12   the -- when was that?

13           MR. QUINN:  1999.

14           THE COURT:  That was 1999.  The question was right,

15   but I am sorry.  You just don't find this at all -- I think

16   there's almost a leading issue here.  When someone answers a

17   question "It's possible," and then turns around when the

18   question is framed slightly differently, I'm going to sustain

19   the objection and just have the jury disregard this

20   particular testimony.

21           MR. NOLAN:  Your Honor, in 1-A, though, we may

22   later have to deal with this through an expert.

23           THE COURT:  And that's fine.  We can work it out

24   later.  Let's not be dealing with it here.

25           MS. AGUIAR:  So then the second question, which has

898

1  nothing to do with when she first saw it, which is as a

2  design person, which their witnesses have testified to, same

3  type of experience, Lily Martinez, Ivy Ross, do these two

4  look similar to you, that has nothing to do with time.  That

5  has nothing to do with when she first saw the pose.  That

6  just has to do with look at this one and look at this one.

7       THE COURT:  I agree with you, if you can convince

8  me that it's relevant.  What is it relevant to?

9       MS. AGUIAR:  Mr. Quinn in his opening and has

10  elicited testimony from the first two fact witnesses that

11  Mr. Bryant was influenced specifically by Toon Teens and by

12  the arm and the hand pose in Toon Teens in doing his

13  drawings.  If that were the case, she'd think they look

14  similar.

15       THE COURT:  Fair enough.

16       MR. PRICE:  Actually, that's wrong.  The witnesses

17  weren't asked to make the comparison.  The witnesses weren't

18  asked to give an expert opinion on similarity.  We have

19  experts on that in another phase, the Bratz dolls and the

20  drawings.  That's why you have experts.  The witnesses just

21  lay the foundation that these drawings existed and he saw

22  them.  Therefore, the jury, a layperson can determine whether

23  it's --

24       THE COURT:  My recollection is they testified a

25  little bit more than they saw them.  They indicated that they

899

1   thought they were inspired by them.

2          MR. QUINN:  Your Honor, I think what folks are

3   remembering is my opening statement.  I never had either Ivy

4   Ross or Lily Martinez say that.

5          MS. AGUIAR:  There was extensive testimony about

6   how she looked unique because she looked like she was roller

7   blading and trying to catch her balance --

8          THE COURT:  Stop.  I'm going to give the

9   instruction to strike.  I'm going to grant your objection on

10  foundational grounds and permit very limited testimony on

11  observations, from a layperson's perspective, and then we'll

12  move along.

13              **(CONCLUSION OF SIDEBAR CONFERENCE.)**

14          THE COURT:  Members of the jury, I am going to

15  sustain the foundational objection by Mr. Price and instruct

16  you to disregard this witness's answer with respect to

17  whether or not she has seen other drawings similar to the

18  Toon Teens drawing on the left with respect to the arm

19  position.  That is stricken from the record.

20          Counsel, you may proceed.

21          MS. AGUIAR:  Thank you.

22  **Q.**  Ms. Garcia, I'd like to ask you whether you believe that

23  the arm and the hand pose in Toon Teens drawing on the left

24  of the screen, which is Exhibit 263-3, resembles in your view

25  the arm and the hand poses in the photographs on the --

1    sorry, of the drawings on the right that come from

2    Mr. Bryant's pitch book.

3    **A.**   I do not find similarities.

4    **Q.**   Would you tell me why you think they are not similar?

5    **A.**   If you look at the drawings on the right, which

6    represent the Bratz drawings, you'll see that both characters

7    have a wrist that's cocked very, very strong and hard.  And

8    especially, I guess, the characters -- the character's right

9    hand drawn on the left-hand side.

10   **Q.**   I want to make sure I'm following you.  Can you give

11   that to me again?  I want to make sure which drawing you're

12   referring to.

13   **A.**   Okay.  In the drawings to the right, which represent the

14   2000 portfolio drawings, you'll see that the wrist in the

15   character's right hand would be drawn on the left side of the

16   drawing is cocked really, really strong at the wrist.  It's

17   bent down in a more extreme position.  And the arm on that

18   character that is opposite, which would be her left or drawn

19   on the right, her arm is actually placed, you know, down

20   lower.

21   **Q.**   So you're talking still about the drawings on the

22   right-hand side, and you're talking about the character's

23   left arm?

24   **A.**   Right.  I'd also like to just say because again, in

25   terms of branding, I talk a lot about branding --

901

1          MR. PRICE:  Objection.

2          THE COURT:  Stricken.  Next question, Counsel.

3    **Q.**   BY MS. AGUIAR:  You just need to stick to the question I

4    ask you.

5          So you described something about the right arm

6    wrist and then the left arm.  Is there any other reason why

7    you think that the Toon Teen arm and hand pose is not similar

8    to the arm and hand pose in Mr. Bryant's drawings?

9    **A.**   I would say that the arm poses that are in Mr. Bryant's

10   drawings represent a tone and a mood that's very, very

11   different from that of the Toon Teen drawings next to it.

12   **Q.**   What do you mean by that?

13   **A.**   In the Toon Teen drawing, it's to me -- I receive it

14   that, you know, she is very sweet, that maybe she's off

15   balance --

16          THE COURT:  Counsel, I think we may be beyond the

17   arms.

18   **Q.**   BY MS. AGUIAR:  Let me just clarify.  When you're

19   speaking in giving your answer right now, are you talking

20   about the arms?

21   **A.**   Yes.  The arms denote this tone or mood.  They help to

22   express.

23   **Q.**   You are dealing with probably most people in the room

24   that are not creative people and who have never referred to

25   arms as expressing a tone.  I would think that would be fair

1    to say.  So can you explain to us why an arm or a hand pose

2    in a drawing can convey a tone to you?

3    **A.**   You know, drawings obviously, they can't speak.  So as

4    drawings, you -- it is the way that you draw your characters

5    that help you to express an attitude or a mood or a tone.

6    And I believe that the way that Mr. Bryant's arms are drawn

7    set the tone that they are sassy, that they have attitude,

8    that they are, you know, that they are confident.

9            However, the arms drawn in the drawing in Toon

10   Teens represent a different attitude, not necessarily sassy,

11   not necessarily with attitude.  They seem to exude an

12   attitude of, to me, sweet or delicate or, you know, I don't

13   know.  I just -- I think that they represent two different

14   things when looking at them.

15   **Q.**   Had you ever been exposed to the Toon Teen drawings

16   prior to this litigation?

17   **A.**   No.

18           MS. AGUIAR:  I have nothing further, your Honor.

19   Thank you.

20           THE COURT:  Further direct examination by

21   plaintiff?

22           MR. PRICE:  Thank you, your Honor.

23                    **REDIRECT EXAMINATION**

24   BY MR. PRICE:

25   **Q.**   Ms. Garcia, I want to take you back to the beginning of

1   your examination by counsel.  When you were talking about at

2   the time you left Mattel and joined MGA, the question was

3   that you had this new doll idea in April 2000.

4          Do you remember that testimony?

5   A.    Yes.

6   Q.    And you told the jury that you had identified a market,

7   the seven- to ten-year-old market.

8          Do you recall that?

9   A.    Yes.

10  Q.    That Barbie tended to be more of a younger girl's doll,

11  and you thought that there was this gap in this market.  You

12  remember that?

13  A.    Yes, I do.

14  Q.    And this was your idea back in April 2000; correct?

15  A.    That's right.

16  Q.    But that wasn't your idea.  You knew that idea at

17  Mattel, didn't you?

18  A.    First of all, it wasn't an idea.  It was an

19  understanding that there is -- that there was not a market,

20  that there was not a doll that appealed to those girls seven

21  to ten.  I don't know what you mean by idea.

22  Q.    Well, what I mean is when you were at Mattel, you knew

23  that that was the concern of the people at Mattel, that they

24  had done research and that they had had feedback and that

25  they identified that they needed to somehow appeal to this

904

1   market, this seven- to ten-year-old market.  You knew that at

2   Mattel.

3   **A.**    No, I did not know that.  I wasn't privy to any of that

4   kind of information.  That was something that I received that

5   I perceived in studying the market.

6   **Q.**    Okay.  So since you weren't privy to that information,

7   you certainly can't tell the jury that this was some unique

8   idea of yours; correct?

9   **A.**    No.

10   **Q.**    That this was an idea that might have been actually

11   well-known in the doll industry, and, in fact, at Mattel by

12   April of 2000.

13   **A.**    I don't know what you mean by idea.  It was -- I

14   believe, if you're a consumer of any kind, that if you're a

15   close consumer to the girls' market, you would have

16   recognized that there were no dolls at that time that were

17   appropriate to girls seven to ten.

18   **Q.**    Okay.  So I think you just said if you were a consumer,

19   you'd recognize that.  You don't deny that folks at Mattel

20   recognized that gap in the market.  You don't deny that?

21            MS. AGUIAR:  Objection.  Calls for speculation.

22   She's already said she doesn't know what people at Mattel

23   knew.

24            THE COURT:  Overruled.  You may answer.

25            THE WITNESS:  Because that I was not part of any

1    group that would have done this sort of research and to have

2    arrived at this kind of information, I had no idea that

3    Mattel would have identified that to be a problem.

4    Q.    BY MR. PRICE:   Well, you just said that any consumer

5    would understand that.   I mean, so don't you think people at

6    Mattel would?

7    A.    You were specific to speak of research that Mattel had

8    collected and that I might have been privy to that notion.

9    Q.    At any of these job interviews at Mattel with various

10   divisions, where you were interviewing for the four marketing

11   divisions; right?

12   A.    Yes.

13   Q.    And that was sort of a marketing issue, that as you

14   tried to find out what the consumer wants, whether there's a

15   gap that needs to be fulfilled sort of; right?

16   A.    I don't understand your question.

17   Q.    Well, let me ask you, when you were interviewing for any

18   of these four jobs within Mattel, the ones that you didn't

19   get, did you say hey, I've got -- I've noticed there's this

20   gap in the market.   We need to try to focus on seven to ten

21   year olds?

22   A.    I was not approaching in my individual interviews with

23   the recognition that there's a gap in the market related to

24   fashion dolls, no.

25   Q.    Let me go to the other aspect of your testimony, which

1   is you did testify that you had this new doll idea in about

2   April of 2000, this doll that would appeal to the seven year

3   old market and be sassy and have attitude; correct?

4   **A.**   Yes, but let me just, if I might, maybe the word idea

5   was the incorrect word to use.  I simply want to be able to

6   say that I recognized a void in the market for girls seven to

7   ten, and I recognized that there needed to be a fashion doll

8   appropriate to that consumer.  And if you call recognizing

9   that -- if you call recognizing that we needed to create a

10  fashion doll with attitude and urban and sassy and all of

11  those appropriate things to a seven to ten year old, then I

12  guess that's an idea.

13  **Q.**   So let's examine that.  First, did you talk about how

14  Mattel -- let me rephrase it.

15          You did talk about how you wanted to have different

16  ethnicities of that doll.  That was part of your idea;

17  correct?

18  **A.**   That's right.

19  **Q.**   And, of course, when you were at Mattel, you knew they

20  had dolls with different ethnicities; correct?

21  **A.**   That's right.

22  **Q.**   Such as Diva Starz?

23  **A.**   If I might just finish.

24  **Q.**   You may go beyond the scope of the question.

25          MR. NOLAN:  Objection.

1   Q.   BY MR. PRICE:  Go ahead.

2           THE COURT:  Is there anything further?

3           THE WITNESS:  Yes, sir.

4           THE COURT:  Please.

5           THE WITNESS:  You mentioned that there were other

6   dolls that had other -- that a doll might have had other

7   ethnicities such as Diva Starz or such as Barbie.  I don't

8   mean to deny that those brands, especially Barbie, didn't

9   have other ethnicities, it's just that in the case of

10  Barbie's dress, she was sort of the hero.  The brand is

11  called Barbie, and she's the blonde-haired, blue-eyed

12  character.

13          I don't mean to suggest that there weren't other

14  characters with different ethnicities.  I just wanted to make

15  sure that in my brand, those other characters were equally as

16  important as the blonde-haired, blue-eyed character.

17  Q.   BY MR. PRICE:  Let's go to different ethnicities.  Was

18  Diva Starz, was that a Barbie product?

19  A.   No.

20  Q.   And Diva Starz had Alexis, who was a blonde?

21  A.   Yes.

22  Q.   And Tia, who was African-American; correct?

23  A.   I don't know for sure.

24  Q.   Well, do you remember they had an African-American and a

25  Latin, that this is a non-Barbie doll?

908

1   A.   Okay.

2   Q.   Do you recall that at all?

3   A.   Yes.

4   Q.   And I think you mentioned that Barbie herself had

5   different ethnicities, although the lead was a blonde;

6   correct?

7   A.   Yes.

8   Q.   And that's true in the marketplace, that, for example,

9   Bratz has a blonde, Chloe?

10  A.   Yes.

11  Q.   And it has dolls of different ethnicities; correct?

12  A.   That's right.

13  Q.   And what you've discovered in the marketplace, just

14  consumer choice, is that Chloe, the blonde, outsells the

15  others by two to one almost?

16  A.   That's not true.

17  Q.   Does the blonde -- is that by far the biggest seller?

18  A.   That is not true.

19  Q.   Do you know of a company called Consumer Quest?

20  A.   Yes.

21  Q.   And they do research for MGA for Bratz?

22  A.   Correct.

23  Q.   And I'll hand you what's been marked as 13592 for

24  identification.

25          May I approach?

909

1          THE COURT:  You may.

2    Q.    BY MR. PRICE:  Have you had a chance to look at

3    Exhibit 13592?

4    A.    Not completely.

5    Q.    Go ahead.

6    A.    Okay.

7    Q.    And this you recognize as a market research report

8    prepared for MGA on about January 29 of 2002?

9    A.    That's right.

10          MR. PRICE:  Your Honor, I move this in evidence.

11          THE COURT:  Any objection?

12          MS. AGUIAR:  No objection.

13          THE COURT:  It's admitted.

14          **(Exhibit 13592 received.)**

15   Q.    BY MR. PRICE:  And if you look at the fifth page of the

16   document, the third paragraph there, do you see they talk

17   about -- display that.  Chloe is the blonde of the Bratz

18   dolls?

19   A.    That's right.

20   Q.    And in your report of 2002, Chloe is clearly the top

21   character with roughly twice the appeal of each Yasmin and

22   Jade.  Sasha has far less appeal.  This is a report that you

23   received as the product manager of Bratz?

24   A.    Yes.

25   Q.    And clearly you did want different ethnicities.  You

910

1    thought that was important; right?

2    **A.**    Yes, very much.

3    **Q.**    And you said you had this, we'll call, as did you in

4    your examination, new idea which you were excited about about

5    the time you joined MGA, April of 2000; correct?

6    **A.**    Yes.

7    **Q.**    And you then told the jury, though, about the dolls that

8    MGA had at the time, including Toddler Tabitha?

9    **A.**    Yes.

10   **Q.**    And Bathtime Bouncy Baby?

11   **A.**    Yes.

12   **Q.**    And Singing Bouncy Baby?

13   **A.**    Yes.

14   **Q.**    And My Dream Baby?

15   **A.**    Yes.

16   **Q.**    Hopscotch Heather?

17   **A.**    Yes.

18   **Q.**    Prayer Angel?

19   **A.**    Yes.

20   **Q.**    None of these dolls fulfilled your vision.  They didn't

21   encompass your new idea of an urban, sassy, multi-ethnic

22   doll; correct?

23   **A.**    Well, to be clear, all of those had at least two

24   ethnicities, and some had as many as four.

25   **Q.**    So these dolls, this is what you're talking about.  MGA

911

1  already had on the market this fashion doll, this idea that

2  you had.  Is that what you're saying?

3  **A.**    MGA had diverse ethnicities within their large dolls.

4  And as established at that time, MGA had not established a

5  fashion doll as of yet.  That's the difference.  I wanted to

6  establish different ethnicities within a fashion doll

7  concept.

8  **Q.**    But you wanted to be urban and sassy as well.

9  **A.**    Sure.

10  **Q.**    None of these dolls meet that description obviously; is

11  that right?

12  **A.**    They weren't meant to.

13  **Q.**    So there was this gap at MGA which you recognized in

14  April of 2000 as well.  MGA did not have a fashion doll which

15  was urban and sassy and multi-ethnic?

16  **A.**    That's right.

17  **Q.**    So you had this new idea in April 2000, but the first

18  time you ever mentioned it was in mid-August of 2000 to

19  Veronica Marlow.  Is that your testimony?

20  **A.**    That's exactly my testimony.

21  **Q.**    So even though this was your idea and you were excited

22  about it, you didn't tell anybody at MGA about it in April of

23  2000; correct?

24  **A.**    That's correct, because to keep in mind, I had started

25  MGA in mid-April.  I had been assigned, when coming to MGA,

1   to be responsible for the doll division.  When I started at

2   MGA, I had already had dolls waiting for me that I needed to

3   get started.  That was my first responsibility.

4            So, you know, I took at least, you know, three and

5   a half months to get those dolls going, as promised and as

6   assigned to my responsibility, which is Prayer Angels,

7   Hoppity Bouncy Baby and the like.  And it was three months

8   later that I felt I had those under control so much so that I

9   would be able to start really focusing on this fashion doll

10  idea.

11  Q.   So you didn't mention it in April, May, June, or July to

12  anyone, not a soul at MGA; correct?

13  A.   That's right.  I was busy on my large dolls.

14  Q.   So you were too busy, for example, to say to Mr. Larian

15  or to a co-worker, you know, I have this idea that really

16  excites me about a fashion doll that's urban and sassy and

17  hip.  You didn't have time during those months to even

18  mention it once to anyone before mentioning it to Veronica

19  Marlow; is that right?

20  A.   That's right.  My focus was doing the responsibility I

21  was hired for, which is to focus on an established designs

22  for large dolls first.

23  Q.   And there's certainly nothing in writing during any of

24  those months concerning this new idea you believe you had as

25  of April 2000; correct?

1    A.    No.

2    Q.    I'm sorry.  Is that correct?

3    A.    That's correct.

4    Q.    And then you didn't talk to Mr. Larian about your idea

5    until after you had had a conversation with Veronica Marlow

6    where she had mentioned Mr. Bryant; correct?

7    A.    Yes, that's right.

8    Q.    And, in fact, you didn't tell Mr. Larian about the idea

9    until after you had actually seen Mr. Bryant's drawings in

10   August along with Mr. Bryant and Veronica Marlow and Victoria

11   O'Connor; right?

12   A.    No, that's not true.

13   Q.    Well, in any event, let's talk about the conversation

14   you had with Ms. Marlow.  And you have a good relationship

15   with Ms. Marlow?

16   A.    Yes, I do.

17   Q.    Are you friends?

18   A.    Yes.

19   Q.    And you actually have, for example, financial dealings

20   outside of work?

21   A.    I don't know what you mean.

22   Q.    Well, if you look in your binder at Exhibit 1317?

23   A.    Okay.

24   Q.    And this appears to be a check from either Peter or

25   Maria Marlow to you?

1    A.    Yes.

2    Q.    And is this -- does this have to do with MGA, or is this

3    a personal matter?

4    A.    This is a personal matter.  It was a present, a wedding

5    present that they extended to my husband and I.

6    Q.    And this is a check for $8,000?

7    A.    That's right.

8              MR. PRICE:  Your Honor, move Exhibit 13172 into

9    evidence.

10             MS. AGUIAR:  No objection.

11             THE COURT:  It's admitted.  You may publish.

12             **(Exhibit 13172 received.)**

13   Q.    BY MR. PRICE:  And just so I understand, at this point,

14   when you received an $8,000 wedding present, Ms. Marlow was a

15   vendor of MGA; correct?

16   A.    Yes.

17   Q.    Someone that you would give business to?

18   A.    She was a free-lancer, if that's what you mean.

19   Q.    What I mean is you would be the one who would decide who

20   to give that sort of work to; correct?

21   A.    Yes.

22   Q.    And you would give free-lance work to Ms. Marlow;

23   correct?

24   A.    Yes.

25   Q.    Now, Ms. Marlow, focusing on your conversation with her

915

1   in mid-August, isn't it the case that Ms. Marlow is the one

2   who brought up fashion dolls and not you?

3   **A.**   I'm sorry.  I didn't understand the question.

4   **Q.**   Sure.  In this August meeting that you had with

5   Ms. Marlow, isn't it a fact that she's the one who brought up

6   to you fashion dolls, not the other way around?

7   **A.**   That is not how I remember it.

8   **Q.**   Well, let me ask you if that's possible.  Is it possible

9   that it was Ms. Marlow who is the one who brought up fashion

10  dolls to you and not the other way around?

11  **A.**   I don't believe that's possible.

12  **Q.**   And so she would be wrong if that was her testimony?

13  **A.**   I would think that she was wrong, according to my

14  memory.

15  **Q.**   Well, do you recall that during that testimony, you were

16  talking about Prayer Angels because you were asking her to

17  work on Prayer Angels?

18  **A.**   I'm sorry.  Could you --

19  **Q.**   Sure.  Let me.  During the conversation, it began, did

20  it not, because you and Ms. Marlow were talking about the

21  project she was then working on, Prayer Angels?

22  **A.**   No, that is not the way it went.

23  **Q.**   Did you talk about Prayer Angels in this conversation?

24  **A.**   We may have been talking about our Hoppity Bouncy Baby.

25  Are you speaking about the August 15th meeting?

1  **Q.**   I am.  And in that meeting, did you not talk about --

2  you're talking about the first meeting where you two

3  discussed fashion dolls; correct?

4  **A.**   I'm just trying to establish that Veronica Marlow and I

5  spoke for the first time about a fashion doll walking out of

6  the lobby of MGA on our way to a Hoppity Bouncy Baby shoot on

7  August 15th, the day of the Virgin Mary day in my church.

8  **Q.**   Did you around this time frame have a discussion with

9  Ms. Marlow about Prayer Angels where she was saying that she

10  had an idea, so it would be a traditional angel, but she was

11  telling you how to make it trendy and cute and more sexy?

12        Do you recall that?

13  **A.**   No, I don't.

14  **Q.**   And you don't recall saying that you liked that concept

15  and wanted to talk about it?

16  **A.**   No.

17  **Q.**   So if Ms. Marlow testified to that, she would be wrong?

18  **A.**   I don't believe she would be correct.

19  **Q.**   Isn't it true that when Ms. Marlow suggested a fashion

20  doll, your response was that -- initially, it was you weren't

21  interested in a fashion doll at that time?

22  **A.**   I do not remember Ms. Veronica Marlow suggesting a

23  fashion doll to me.

24  **Q.**   Well, let me ask this, then.  You did have a -- some

25  testimony about Prayer Angels and Mr. Carter Bryant,

917

1    Mr. Bryant doing some Prayer Angel drawings for you.

2              Do you recall that?

3    **A.**   Yes.

4    **Q.**   And Ms. Marlow was the one who suggested he do those

5    drawings; correct?

6    **A.**   That's right.

7    **Q.**   And you in fact received drawings from him?

8    **A.**   That's right.

9    **Q.**   Did he fax them to you, or how did you get those?

10   **A.**   I believe that he e-mailed them to me.

11   **Q.**   So Mr. Bryant knew that he was doing this work for

12   someone from MGA; correct?

13   **A.**   Yes.

14   **Q.**   And this Prayer Angels project, this was a project which

15   had a green light; correct?

16   **A.**   I don't know what you mean.  Can you be more specific?

17   **Q.**   Sure.  I mean we were talking earlier about Bratz and

18   when you kind of had a green light approval to go forward.

19   And you had done your PDF.

20              Do you recall that?

21   **A.**   Yes.

22   **Q.**   Now, Prayer Angels was at that stage?

23   **A.**   It was in development, yes.

24   **Q.**   So MGA had a doll in development for which you asked

25   Carter Bryant to do some drawings; correct?

1  A.    Yes.

2  Q.    And the idea, I think what you testified was that you

3  weren't satisfied with the faces that you were getting, and

4  you wanted other ideas that you might use on this project,

5  which was actually in development at MGA; correct?

6  A.    Yes.

7  Q.    And I believe you testified that you never would have

8  given such an assignment to someone that you knew was a

9  Mattel employee because it would have been confidential

10 information and Mattel was a competitor.

11        That's what you testified; correct?

12 A.    That's right.

13 Q.    Okay.  And so Carter Bryant then, to your understanding,

14 withheld critical information from you such that you never

15 would have asked him to do those drawings if you had known he

16 was a Mattel employee; right?

17 A.    I don't know what you mean.

18 Q.    Well, didn't you testify in your examination that, if

19 you had known Carter Bryant was a Mattel employee, you never

20 would have asked him to draw those faces that you might use

21 on your product?

22 A.    Yes.

23 Q.    And so my question is, then, Mr. Carter, who knew he was

24 a Mattel employee, apparently withheld from you critical

25 information that would have led you not to use him; correct?

919

1   A.    I do not know if Carter deliberately withheld

2   information.  I'm not sure what Carter's understanding was.

3   I'm not sure what Carter understood.  I understood to be in

4   his way of employment, but I wouldn't suggest that he

5   deliberately withheld information.

6   Q.    I'm trying to understand this.  Because you, as someone

7   who works in the toy industry, knew that it would have been

8   inappropriate for a Mattel employee to provide drawings to

9   you at MGA that would be considered to be used on a product

10  competitive with Mattel.

11        You knew that; right?

12  A.    I'm sorry.  Could you repeat that, please?

13  Q.    Yes.  At the time you knew it would have been improper

14  for an employee at a competitive company such as Mattel to be

15  doing drawings for you at MGA for consideration to be used on

16  an MGA doll in production, you knew that that would be

17  inappropriate?

18  A.    Yes.

19  Q.    And that's why you would never have asked Mr. Bryant to

20  do that if you had known he was a Mattel employee; right?

21  A.    That's right.

22  Q.    And certainly it's your understanding that Mr. Bryant

23  knew he was supplying you at MGA faces to be considered for

24  this baby angel or angel baby; correct?

25  A.    I'm sorry.  I'm getting a little tired.  Can you please

1  repeat the question?

2  Q.   Sure.   Your understanding is Mr. Carter knew that he was

3  drawing designs of faces that you wanted to consider for your

4  doll at MGA, Prayer Angels.

5  A.   I don't know what Carter knew he was submitting those

6  designs for, if in fact they were intended to be used for

7  production, or maybe he thought he was submitting those

8  drawings as a test to see -- for me to see his abilities

9  before the September 1st meeting.   I don't know what his

10  intentions were in sending me those drawings.

11  Q.   Well, I take it that since you've learned that he was a

12  Mattel employee at that time, that you haven't asked him what

13  his view was.   Why was he giving you these drawings when he

14  was a Mattel employee, and you had this competitive product,

15  Prayer Angels?

16  A.   I haven't had a conversation like that with him.

17  Q.   Certainly, we talked about this with respect to the

18  Bratz drawings, but certainly that would affect your

19  evaluation -- or Carter Bryant's honesty and ethics if he

20  was, while a Mattel employee, doing designs for a competitive

21  product at MGA.

22  A.   That would not adjust my assessment of Carter Bryant.

23  Q.   It's your view that MGA did not do a test product of

24  Prayer Angels with Carter Bryant?

25  A.   From MGA's perspective, that's correct.

1  **Q.**  Now, I'm going to call your attention to my artwork,

2  which your counsel added to here.  It's not pretty, but you

3  can see this sort of; is that right?  So in your counsel

4  examination, she went through this time line, and first she

5  went to June, and she talked about, you know, if Ms. Maurus

6  said that there was a meeting concerning Bratz, that she was

7  wrong and you were correct, that there was not one; correct?

8  **A.**  Yes, that's correct.

9  **Q.**  And then she said that Ms. Rhee was painting a Bratz

10  head, then she's wrong and you were correct, that there was

11  no such painting; correct?

12  **A.**  That's right.

13  **Q.**  And then moving forward, in August, early August, that

14  if Ms. O'Connor testified that there was a meeting before

15  September 1st where you saw the Bratz drawing, that she's

16  wrong, and you're correct?

17  **A.**  As I mentioned before, I'm not sure that there was a

18  meeting prior to September 1st in August.  I don't remember

19  it, but I can't suggest that it's absolutely impossible that

20  it took place.

21  **Q.**  Well, if that did take place, you recall in your

22  testimony in your original examination was that the reason

23  you might not have heard on September 1st what everybody else

24  heard, which is that Carter Bryant was then an employee of

25  Mattel, that the reason was you were so excited about these

922

1    drawings you were seeing for the first time.

2              Do you recall that testimony?

3    **A.**   Yes, I do.

4    **Q.**   Well, that excuse wouldn't really apply if you had seen

5    those drawings earlier in mid-August in a meeting with

6    Ms. O'Connor and Mr. Bryant; right?

7    **A.**   I'm sorry.  I don't understand your question.

8    **Q.**   That is, you were saying that the reason you might not

9    have heard Mr. Carter Bryant say he was a Mattel employee was

10   because you were so excited by these drawings you were seeing

11   for the first time.

12             Well, that would not be the reason you didn't hear

13   him say that if in fact you had seen those drawings for the

14   first time in a prior meeting with Ms. O'Connor and

15   Mr. Bryant; right?

16   **A.**   That's exactly why I believe in fact in my heart that

17   the first time I saw those drawings was on September 1st of

18   2000.

19   **Q.**   I've gone through the time line and points where you say

20   other people are wrong and you're right.  Now I'd like to

21   show you some documents and try to go through these to make

22   sure I'm clear on this.

23             You remember Exhibit 305 which I showed you?

24   **A.**   No, I don't.

25   **Q.**   I'll have this gentleman put it up.  We actually

923

1    remember the numbers.

2            Now, in this case, your testimony is that October

3    10th, that in this case, you were wrong, that is, that saying

4    that Mr. Carter Bryant had worked four hours a day since the

5    1st of September, that in this case you're wrong on that;

6    right?

7    A.    I believe I told you that I believe I wrote this

8    incorrectly.

9    Q.    By the way, just to clarify, though, when you say

10   working on this line, what you're referring to there is

11   working, and this is your e-mail of October 10th, on the

12   Bratz line.

13   A.    As I mentioned earlier, the term working, I'd like to

14   clarify.  He was not working on designs for Bratz at this

15   time.  He was accompanying me through exploration exercises

16   such as the sculpt.  You know, sort of the exploration

17   period.  He was not designing during this time.

18   Q.    My question is different.  Where it says this line, what

19   you are referring to is the Bratz line?

20   A.    The potential for the Bratz line, that's right.

21   Q.    No, no.  What you're referring to is the Bratz line.

22   A.    Yeah.

23   Q.    And then if we have -- could you show Exhibit 1103.  And

24   I'll come back to this, but I believe your testimony on this

25   is that every single date on this is wrong?

1    A.    No.

2    Q.    But your testimony, and we'll come back to it, though,

3    is that that second date, which is highlighted in gray,

4    control drawings to L.A. designer, that that date is wrong?

5    A.    As I mentioned earlier, the October 2nd date could have

6    been the date in fact that I -- that the portfolio drawings

7    were passed to Ms. Leahy for the exploration sculpt; however,

8    that sculpt did not become the manufactured Bratz product.

9    Q.    So, ma'am, remember, we went through this, and you said

10   that -- your initial testimony was that that date was wrong.

11   It was a typographical error.

12            Do you remember that?

13   A.    No, I don't.

14   Q.    Well, I'll move on, then.  And we'll get back to this at

15   some point.

16            But if you look at Exhibit 1236.  And if we can

17   highlight the part of this.  I think your testimony is that

18   in this October 24th e-mail that you wrote, where you said we

19   have finalized the fashion designs, and I am releasing the

20   following final design packages, is it your testimony that

21   you were wrong in saying you had finalized the fashion

22   designs?

23   A.    I believe what I said is -- I'm not sure what I meant by

24   the finalized fashions.  Today we showed when the fashions

25   were finalized, which would have been identified in the

925

1    swatch packages which were marked November and some early

2    December.

3    Q.    Well, actually, what you were referring to in those,

4    finalizing the fashion designs, you remember you said it all

5    starts with the sketch?  Do you remember saying that in your

6    examination?

7    A.    Yes, I do.

8    Q.    That you have a designer.  They do a design sketch;

9    right?

10   A.    Yep.

11   Q.    And then it's sort of like Giorgio Armani doesn't always

12   sell his own clothes?

13   A.    That's right.

14   Q.    So once you get the design, the sketch, you then work

15   with someone with fabrics?

16   A.    Sure.

17   Q.    And someone actually has to do sewing; right?

18   A.    Right.

19   Q.    And then someone has to do the sculpting; right?

20   A.    That's right.

21   Q.    And in doing all of this, what you're trying to do is

22   stay true to that vision of that designer, who is assisting

23   you in working with these people; right?

24   A.    I don't understand what you mean.  Do you mean that the

25   sketches, that everybody matches exactly to the sketches?

926

1   Q.   That everyone uses the fashion designer's designs as

2   their guide to try to realize that fashion designer's vision?

3   A.   Sure.  So long as the fashion designer's sketches don't

4   revise.

5   Q.   In fact, you've testified that that is what you did on

6   the Bratz line.  Whatever happened, your goal was to stay

7   true to Carter Bryant's designs.

8   A.   Can you please be more specific?  I don't understand.

9   Q.   Well, let me help you.  If you'd look at Exhibit 10001.

10  A.   Would that be in volume 1 or 2?

11  Q.   2.  10001.

12  A.   My book seems to start at --

13  Q.   It's 10001, not 1001.  One zero zero zero one.

14  A.   Okay.

15  Q.   Do you recognize this as an e-mail exchange between you

16  and a gentleman named Robert Haynes Peterson in about May of

17  2001?

18  A.   Yes.

19  Q.   And what he did was he e-mailed questions to you, and

20  then you went to his e-mail and wrote out the answers?

21          MS. AGUIAR:  Objection.  Relevance.

22          THE COURT:  Overruled for the time being.  You are

23  laying the foundation, Counsel?

24          MR. PRICE:  Yes.

25  Q.   So instead of being a normal interview process where a

927

1    reporter talks to you and takes notes and writes up what he

2    thinks you said, in this case, Mr. Haynes Peterson sent you

3    an e-mail with questions, and then you went into that e-mail

4    and typed out the answers to the questions?

5    A.    It seems so.

6    Q.    And what this e-mail reflects is those questions and

7    those answers; right?

8    A.    That's right.

9    Q.    And you remember I was asking you, you testified in your

10   examination that you had, for example, Ms. Leahy do the

11   sculpting, and you had Veronica Marlow assist with the

12   fabrics, and there were people who actually sewed the dolls,

13   and you said, "I think Carter Bryant didn't do the actual

14   sewing."

15         Do you recall that?

16   A.    Yes, I do.

17   Q.    And then you said, however, "It all starts with the

18   sketch"; right?

19   A.    Sure.

20   Q.    And my question to you is with respect to Bratz, that's

21   what happened.   That is, you, as the product manager, thought

22   that Mr. Carter Bryant's sketches were terrific, and you

23   tried to stay true to Carter Bryant's, the creator's, the

24   designer's vision?

25   A.    Could you please point me to where that might be?

928

1   **Q.**   Sure.   Look at the second page.   And would you like me

2   to read the question to you?

3   **A.**   Sure.

4   **Q.**   How did MGA --

5               THE COURT:   Wait a second.

6               MS. AGUIAR:   I have a continuing objection.

7               THE COURT:   Before you read the question, Counsel,

8   you have to move this in evidence.

9               MR. PRICE:   I move Exhibit 10001 into evidence.

10              MS. AGUIAR:   I have a relevancy objection, your

11  Honor.

12              THE COURT:   I'll sustain the objection to all but

13  the seventh paragraph of the second page.   So just that.   I

14  assume that's the paragraph you're after, Counsel.

15              MR. PRICE:   I counted six, but you --

16              THE COURT:   I think you know which one you're

17  after.   Just that paragraph.

18  **Q.**   BY MR. PRICE:   The question was:

19              "How did MGA design the four different girls?

20          Both inspiration for the overall design and the

21          look of each girl?

22              "ANSWER:   The four girls were already

23          concepted when presented by the inventor during our

24          first meeting.   I thought they were incredible, and

25          I tried to stay true to this inventor/creator's

1    vision."

2       That was the answer you wrote; correct?

3  **A.**   But I believe -- I'd like to explain if I may.

4  **Q.**   I want to focus on September through October 20th with

5  respect to Mr. Bryant.  Okay?  Focusing on that.

6       And you testified, for example, that there were

7  meetings with the sculptor.  Do you recall testifying to that

8  in your direct or your cross-examination by your counsel;

9  yes?

10  **A.**   Yes.

11  **Q.**   And Mr. Bryant, Carter Bryant was there in the meeting

12  you were in; correct?

13  **A.**   That's right.

14  **Q.**   And, in fact, he was in previous meetings with that same

15  sculptor without you; correct?  Without you being present.

16  **A.**   As mentioned earlier, I remember being present at the

17  sculpt meetings both with Carter Bryant and Margaret.  It's

18  possible that I may not have been part of one.  I don't

19  remember personally.

20  **Q.**   But in any event, he didn't do the actual sculpting;

21  right?

22  **A.**   No, he didn't.

23  **Q.**   I mean, that's what you have a sculptor for.

24  **A.**   Sure.

25  **Q.**   And he worked with Veronica Marlow on the fashions;

930

1   correct?

2   **A.**   How do you mean?

3   **Q.**   Well, he talked to her about his ideas.   He provided her

4   with sketches.   He approved some of her swatches.

5           MS. AGUIAR:   Objection on foundation grounds, your

6   Honor.

7           THE COURT:   Sustained.

8   **Q.**   BY MR. PRICE:   Let me ask you this, then.   In September

9   and October, do you know the interaction that Carter Bryant

10  had with Ms. Marlow, who introduced you to him?

11  **A.**   I believe I do, yes.

12  **Q.**   And how do you know that?

13  **A.**   I mean, I knew what we were working on in September and

14  October of 2000, if that's what you mean.

15  **Q.**   And you remember we showed you all of those invoices of

16  the 160 hours prior to October 20th that Ms. Marlow billed;

17  correct?

18  **A.**   That's right.

19  **Q.**   And you know that Mr. Bryant, as the visionary, the

20  creator, worked with her during that time frame?

21  **A.**   I don't know that, no.

22  **Q.**   If you would look at Exhibit 1765 -- which I believe is

23  in evidence, your Honor.

24          THE COURT:   I believe so.

25  **Q.**   BY MR. PRICE:   Now, this is October 23.   See just the

931

1    first paragraph there.  Going down there.  That's correct.

2    That's from Mr. Carter Bryant to you; correct?

3    A.    Yes.

4    Q.    And you see down here, where it says:  "So here's a

5    rundown of what we plan to have for you by Friday."

6           Do you see that?

7    A.    Yes.

8    Q.    You can tell who he's talking about when he says "we";

9    correct?

10   A.    No, not necessarily.

11   Q.    Who is doing the doll fashions and the swatching?

12   A.    Okay.  Veronica.

13   Q.    And the fashion pack designs and swatching there?

14   A.    Veronica.

15   Q.    And this was, I believe -- is it Tuesday?  Monday.  This

16   was -- I'll represent to you this was a Monday because that's

17   what I've been told.

18           And it says:  "We're going to have all of these

19   things for you by Friday."  And you see that?

20   A.    Yes.

21   Q.    And obviously, being familiar with how this industry

22   works, they didn't start working on these on Monday; right?

23   A.    I'm not sure what they were working on during this time

24   in reference to this e-mail.

25   Q.    Well, you had the bill dated October 20th -- the bills

1  of 160 hours doing design and the swatching; right?

2  **A.**   Mr. Price, I believe that yesterday I testified that I'm

3  not sure what Ms. Veronica was doing, but if she was doing

4  anything in regards to that invoice, that was more likely to

5  be exploratory stuff, especially related to the exploratory

6  sculpt.

7  **Q.**   She was doing swatching and designs right there in those

8  invoices; right?

9  **A.**   Um, I'm not sure what she was swatching, because in fact

10  the final fashion designs were not released until, you know,

11  close to early December, and, in fact, the sculpt wasn't even

12  complete at that time.

13  **Q.**   I'm trying to focus on what Mr. Carter Bryant did during

14  this time frame and who you worked with.  You paid for 160

15  hours worth of work for Ms. Marlow for designing and

16  swatching with respect to the Bratz project; right?  You,

17  meaning MGA.

18  **A.**   I do not believe that the hours attributed that I did

19  pay for were in relation to actually the manufactured

20  fashions that I released to production.

21  **Q.**   And I'm not asking you that.  I'm asking you, focusing

22  on what Carter Bryant did in September and October on what

23  you say is the final or interim or the third variation, I'm

24  not focusing on that.  I'm just trying to get you to agree

25  that the creator, the designer, who does the sketches for

933

1  which this follows, was working with Ms. Marlow in September

2  and October on these designs.

3  **A.**   On which designs, Mr. Price?

4  **Q.**   The designs you paid for, the 160 hours you paid for in

5  September and October?

6  **A.**   I just want to be clear, that I may have paid for

7  those -- for the work that Veronica had rendered, but I'm not

8  sure what work they were.  But I'm certain that they were not

9  the product that we actually manufactured.  They could have

10  been exploratory fashions.  I'm not sure what they were.

11           MR. PRICE:  Move to strike the latter part of the

12  answer.

13           THE COURT:  Which part?

14           MR. PRICE:  The part "I don't know if they were

15  exploratory or whatever."  It's irrelevant to this phase.

16           THE COURT:  The part that I think you are objecting

17  to, Counsel, is the reference to the final product.

18           MR. PRICE:  Yes.

19           THE COURT:  Everything else is not stricken.  The

20  reference to the final product is stricken.

21  **Q.**   BY MR. PRICE:  Let's try to wrap this up.  You do agree

22  that Mr. Bryant, September and October, while he was still an

23  employee at Mattel, was working with Veronica Marlow on some

24  sort of designs and fashions relating to Bratz?

25  **A.**   What I remember within this time period is that I

1    believe that Mr. Carter Bryant, as it related to fashions,

2    had a shopping experience, as I confirmed earlier, a shopping

3    spree with Ms. Veronica Marlow around the middle of October.

4    That's what I understand him to have been doing around this

5    time period as it related to fashions.

6    Q.   And if we can go to the Exhibit 1236, where it talks

7    about these final fashion -- your October 24th e-mail.

8              MS. AGUIAR:  I didn't object before, but can we get

9    the whole document on the screen?  Because I think the

10   sentence at the bottom is also relevant.  It's the whole

11   bottom e-mail.

12             MR. PRICE:  Blow up the whole thing.

13             THE COURT:  Very well.  Is that sufficient,

14   Counsel?

15             MS. AGUIAR:  Thank you.

16             THE COURT:  Yes.

17   Q.   BY MR. PRICE:  Now, when it talks about the finalized

18   fashion designs, in your examination from your counsel, you

19   recall that she asked you about these Exhibits 1107 to 1110?

20             Do you recall that?

21   A.   I'm sorry.  I was just reviewing the document.

22   Q.   Sure.  Do you recall that, in your examination with your

23   counsel, she showed you these drawings, 1107 to 1110.

24             Do you recall those sketches?

25   A.   No, I don't.

1  **Q.**   Okay.  I can understand.  Let's put 1107 up.  This might

2  help refresh your memory.

3       Does this help you remember?  You had 1107, 1108,

4  1109, 1110, which are these drawings by Carter Bryant?

5  **A.**   Yes.

6  **Q.**   And it's true, is it not -- I'm trying to find your depo

7  transcript.

8       THE COURT:  Counsel, why don't we go ahead and take

9  our break at this time.

10      **(WHEREUPON THE JURY WITHDRAWS.)**

11      THE COURT:  Counsel, I want to take up an issue.

12  I'm going to ask the witness to step outside for this

13  discussion.

14      **(WHEREUPON THE WITNESS WITHDRAWS.)**

15      THE COURT:  I'd like to hear from both sides on

16  this issue of this distinction the witness is making

17  regarding the final product and the exploration.  Because I'm

18  afraid that it's infecting a legal issue in this first phase

19  that is potentially opening up the apportionment issue in the

20  second phase.  And at the same time I want this witness to be

21  able to answer based on her understanding of what was

22  happening.  But I would like to hear from both sides on it.

23      MR. PRICE:  My perspective.  First, your Honor, I

24  will ask her didn't Mr. Bryant work with the sculptor in this

25  time frame.  And her answer will almost always be yes, but

1  let me be clear, it wasn't the final sculpt.  Did she work

2  with the fashion designer?  Yes, but let me be clear, this

3  wasn't the final fashions.

4          THE COURT:  I'm hearing that as well, Counsel.  And

5  I --

6          MR. PRICE:  And actually --

7          THE COURT:  I should begin with Ms. Aguiar.

8          MR. PRICE:  And if I can tell, my remedy, I'm not

9  asking about that.  I'm asking what did the designer who was

10  guiding this do in that time frame.  That's how I'm trying to

11  limit it.

12          THE COURT:  I think you are entitled to the answer

13  to that question, and then at the same time I think

14  Ms. Garcia is entitled to answer it as best she can.  But,

15  Counsel, she does seem to be sticking in this -- I don't want

16  to call it a legal defense, but it definitely seems to be a

17  distinction that she has in her mind that frankly is not

18  relevant to this phase of the trial.  And I'm getting to the

19  point where I'm going to call for an instruction to the jury

20  on this.  So I'd like to hear your thoughts on this.

21          MS. AGUIAR:  I think that she has a very -- keep in

22  mind, this is the person who developed the Bratz line.  And

23  she has a very specific idea of what is Bratz.  And she has

24  been trying to explain that during this early time period,

25  for example, if they were buying fabrics or making clothes,

1   they were doing it to see what some of his ideas might look

2   like.  She even testified that if they did make something,

3   she thinks they might have been making them off of this very

4   large --

5          THE COURT:  Is the defense taking the position in

6   this case that what was going on in, say, October, November,

7   December of 2000 was not a development of the Bratz doll?  Is

8   that MGA's position?

9          MS. AGUIAR:  I don't believe so, your Honor.  I

10  think --

11         THE COURT:  Because this is the person most

12  knowledgeable about MGA's position or MGA's company.  So I

13  really don't think that you can take the position and

14  introduce evidence through your witness, through your person

15  most knowledgeable that's contrary to the position that you

16  as a company are taking.  So something's got to give here.

17         MS. AGUIAR:  I think that she is not intending to,

18  and I will represent to the Court that she has not been

19  prepared to support any legal defense.

20         THE COURT:  I'm not suggesting anything, but I

21  think it may be incumbent upon counsel, and if you don't do

22  it, the Court may have to do it in terms of an instruction,

23  because I think what we're doing is we're creating a

24  distinction that is confusing the issue that's being

25  litigated here, and I'd like to hear from you on that point.

938

1          I'm not suggesting coaching or anything else.

2     She's a very intelligent woman, and she's certainly capable

3     of coming up with whatever theories.  I'm not suggesting that

4     she needs to be coached on anything.  I'm simply saying that

5     I understand the objection that Mattel is making on this

6     point.

7          And it's conflicting -- her testimony is

8     conflicting with what we all understand to be undisputed.

9     It's not -- and unless I'm mistaken, and if I am, let me hear

10    it now, because I may have to revisit some other decisions

11    that I've made in terms of phasing here.

12          MS. AGUIAR:  As I said yesterday, and I think we

13    talked about this yesterday morning preliminarily before the

14    jury came in, and what I was also trying to explain is that I

15    think Mr. Price, I think he may be bringing on some of the

16    answers by putting in his question Bratz, the Bratz sculpt,

17    or the Bratz fashions.

18          I understand that that may seem like slicing it

19    thin, but for her it's not because the manufactured Bratz

20    doll and what they may have been doing early on to figure out

21    whether this was something they even could do are two

22    different things.  So can I make a suggestion?

23          THE COURT:  Please.

24          MS. AGUIAR:  That we do two things here.  One, I

25    can't control, and one I can.  The one I can't control is the

1  suggestion that when the questions are asked, they are asked

2  in a way that are not loaded up with this concept of Bratz.

3  Because I think that's what's tripping her answer.

4         THE COURT:  Counsel, there's got to be a reference

5  to Bratz here.  That's what this is about.  The question is

6  whether or not -- you're asking me to tell Mattel that they

7  are to exclude Bratz from their questions?

8         MS. AGUIAR:  Not at all.  But I'm just saying when

9  he says the Bratz sculpt, I think that that is what's causing

10 some of the problem.  And if he just says the sculpt or

11 whatever.  Again, I can't control that.  I'm just trying to

12 explain why I think she's answering the way she is.

13        The thing I can control is that we can mention to

14 her what this issue is.  I mean, if you think it's

15 appropriate, we can address it with her.  And if she can

16 answer in a way that does not keep making the reference to

17 the final product, I'm happy to do that.  Because clearly we

18 don't want to go down the road of having the instruction.  I

19 don't think it's necessary at this point.  I think it would

20 be prejudicial to us to have such an instruction.

21        So I'm just trying to point out that I think it's

22 a -- the problem is coming from two ends, and so I can

23 speak -- we can speak to her about the issue, but I do think

24 it's the wording of the question.  And, of course, I'm not

25 suggesting we never mention the word Bratz.  I've been using

```
 1   it.  Everyone's been using it.

 2            THE COURT:  And that's just the point.  When you

 3   have used it, there hasn't been a problem.  And that's the

 4   concern that I have, and that's why I've asked the witness to

 5   step out and the jury to step out.  I've been following along

 6   here and taking notes where many times that you will use the

 7   same phraseology that Mr. Price uses it, when you use it, she

 8   is not making this elaboration.  When Mr. Price uses it, she

 9   is.  And that's the concern I have.  She seems to fully

10   understand it when you use it.  She doesn't seem to

11   understand it when Mr. Price uses it.

12            MS. AGUIAR:  You know, I'm not disputing what

13   you're saying.  I just don't -- I haven't looked at the

14   transcript of what my questions are and whether I've been

15   asking her the questions worded in the same way.  I believe

16   what you're saying.  I just -- so as I said, I don't think we

17   should go down or need to go down the road of an instruction.

18   I think it would be prejudicial.

19            We can address it with the witness.  And we can

20   explain to her that if she can answer her question without

21   drawing this distinction, we can try to do that.  But I think

22   it's --

23            THE COURT:  I feel uncomfortable about ever telling

24   a witness what they can and cannot say.  I think there's a

25   bigger issue.
```

941

1          Mr. Nolan, you seem anxious to say something.

2          MR. NOLAN:  Your Honor, I'll just represent to you

3   without waiving any privileges, I explained the Court's

4   phasing order in terms of do not get into this final project,

5   okay?

6          THE COURT:  Do you understand, Mr. Nolan, the

7   Court's concern?

8          MR. NOLAN:  No, no, I understand the Court's

9   concern, your Honor, and I do respectfully, though, disagree

10  with the difference in the types of questions.  I think

11  here's the issue.

12         Mr. Price, and I understand why he's doing it, has

13  a document on the screen that says we're sending the final

14  fashions.  He's always talking about the final fashions with

15  respect to Bratz.  It's always tied that way.

16         I believe, if you go through the transcript, you

17  will never hear a question from Ms. Aguiar that is loaded in

18  the beginning with such things -- I don't mean it in a

19  pejorative way, that he's pointing to a document that refers

20  to a final fashion --

21         THE COURT:  I understand that.  And I'm not talking

22  about the final fashion.  I'm just saying when you use simply

23  the word Bratz, it appears that it's triggering a different

24  response, depending on who it's coming from.

25         MR. NOLAN:  Well, your Honor, I think we pointed

1  out pretty early on that if there was a distinction between

2  the Bratz drawings and the Bratz doll, because the Bratz doll

3  is Phase 1-B.  We've always understood that.  The difference,

4  though, your Honor, here is when we're talking and asking

5  questions, with all due respect, I believe Bratz is related

6  to the drawing.  That's the concern I have.

7          THE COURT:  You're correct.  We're talking about

8  the Bratz drawings at this phase.  And whatever else

9  Mr. Bryant did or didn't do while he was still working at

10 Mattel.  You're correct.

11          But what this witness is doing through these

12 repeated insertions is suggesting that the Bratz drawings, or

13 whatever it is that was going on here, has nothing to do at

14 all with the final product.  And she is repeatedly putting

15 this wedge in there and referencing the final product, making

16 comparisons with the final product.  And that seems to be

17 decidedly Phase 1-B.

18          I just went through this deposition this morning,

19 and you make this very same objection, and I think -- I have

20 tentatives in your favor across the board on this issue on

21 objecting to Phase 1-B issues in infecting Phase 1-A.  But

22 that's precisely what is happening here.

23          MR. NOLAN:  Well, your Honor, I respectfully

24 disagree because I'll give you one last example.  Mr. Price

25 showed a document.  You sustained the objection as to all

1   paragraphs other than paragraph 7; however, that document and

2   that interview was conducted well beyond October 20th of

3   1999, the relevant date.  For some reason Mr. Price decided

4   to go over to an interview well beyond the October 19th date.

5           THE COURT:  Well, let me stop you there.  He did,

6   but the one paragraph that I permitted in was making

7   reference to a meeting that took place at the time that we're

8   talking about.  It talks about our first meeting, and I

9   gather, based on the foundation, that that was a reference to

10  the time period.  Are you suggesting it's not?

11          MR. NOLAN:  I do not believe it is.  When she's

12  saying that we try to stay true to the vision of, at least

13  that's how I understood the document.

14          THE COURT:  Wait a second.  The line says -- if I'm

15  mistaken on that, then I should reverse my ruling.  But the

16  paragraph states the four girls, which I assume everyone

17  agrees are the Bratz dolls, in context here, were already

18  concepted when presented by the inventor during our first

19  meeting.

20          Are you saying that that's not the meeting?

21          MR. NOLAN:  No, your Honor.  I -- that is the

22  September 1st meeting.  But may I just explain to you --

23          THE COURT:  That's why it's in.

24          MR. NOLAN:  I'm sorry.  What is happening, though,

25  is when she says, "I tried to stay true to his vision as

1    expressed in the drawings," they are drawing the inference

2    that back at that point in time, and that's why they use the

3    document to impeach her on what she's trying to say was the

4    interpretation.  To allow her to just have to say we tried to

5    stay true to his vision, the vision and the doll are

6    different.  That's the point.  And I think that's the

7    confusion that's coming in.

8              THE COURT:  The vision and the doll are different,

9    but they are not unconnected.  And she appears to be

10    suggesting that they are unconnected.

11              MR. NOLAN:  Your Honor, we are not taking that

12    position.  That's not --

13              THE COURT:  I wouldn't think so.

14              MR. NOLAN:  Of course not.  Your Honor, that's not

15    what is happening.  And that's not -- I mean, I can't get

16    into her head.  I mean, if -- she can testify in 1-B, too,

17    your Honor.  But I understand the Court's concern.

18              THE COURT:  You understand the concern.

19              MR. NOLAN:  And we'll talk.  We'll both talk about

20    it again and make certain that she is mindful of that

21    distinction.  But I would urge Mr. Price to maybe, when

22    you're looking at final fashions and pointing to a document

23    in October, and your Honor, he even went to an October 23

24    date when Carter Bryant is working for us.

25              THE COURT:  Right.  But the October 23 date, I mean

1    to the extent that there is a -- I'm allowing some, and I've

2    overruled a couple of the objections that you've made that

3    have been slightly past the October 19th date simply because

4    it appeared to the Court that the document relates back to

5    information or work or developments that predated October

6    19th.  I think there was a fair inference, and you both can

7    argue that.

8                 MR. NOLAN:  Right.

9                 THE COURT:  And you know, when I limit -- when I

10   indicated on the record that Mr. Price is entitled to the

11   answer, you're certainly free to fully examine and bring out

12   whatever additional explanations you want.  It's just that

13   I'm really concerned about this one explanation that keeps

14   coming up in the context, and I guess I'm still not satisfied

15   as to how we address T perhaps part of the solution is what

16   you're suggesting is to remind her of the Phase 1-A, 1-B

17   distinction.

18                 Mr. Price, anything further from Mattel's

19   perspective.

20                 MR. PRICE:  I believe -- it has been confusing.

21   And I think an instruction is proper, and not which suggests

22   she's doing anything wrong.  But an instruction that says

23   something to the effect that, you know, that in this part of

24   the trial, we're trying to determine, you know, what Mr. --

25   what Carter Bryant did while he was still employed at Mattel

1    and who owns the drawings.  And the final product is not an

2    issue at this point.  And it's not for you to worry about.

3                THE COURT:  I think I understand this.  But what do

4    you want me to do, Counsel?

5                MR. PRICE:  I think they should be told that,

6    because I think right now they are having to decide that,

7    because it is every other answer.  At least 20 times where

8    she said but the final product, blah, blah.  But the final

9    product, et cetera.

10               And I think you need to tell the jury that they

11   don't have to worry about that right now because they are

12   working hard on this.  And they have got to try to categorize

13   this.  And I think just telling them something which all

14   sides agree to.

15               THE COURT:  Well, Mr. Price, I'm close to doing

16   that, but I'm not there yet.  I think that would be -- I

17   think Mr. Nolan and Ms. Aguiar are correct, that that would

18   be unfair at this point.  It's going to be part of the

19   instructions at the end of this phase, no question, and I'm

20   hoping that this can perhaps be corrected during the break,

21   and I'll give you leave to recover some of this ground if you

22   want.

23               MR. PRICE:  Thank you.

24               THE COURT:  I'm in mind of the concern.

25               Mr. Nolan, Mr. Quinn, can I see you in chambers for

1    a second on an unrelated matter.

2              (Recess taken.)

3              THE COURT:  Yes, Counsel.

4              MR. QUINN:  One issue I wanted to alert the Court

5    to.  The next witness we would call is Victoria O'Connor, who

6    has been waiting around for two days.  I asked counsel

7    whether we could interrupt to try to get her on and off.  I

8    think my direct examination would be maybe 20 minutes with

9    her.

10             My concern is that we may finish up with this

11   witness, and then we would only have time to do our direct

12   with Ms. O'Connor.  Her mother is having surgery on Tuesday.

13   She cannot come back Tuesday.  She might be able to come back

14   next Wednesday afternoon.  That's the earliest she could come

15   back.  She's got a trip out of state Thursday and Friday.  So

16   I think -- what I fear, our choice may be either to interrupt

17   this witness and try to get Ms. O'Connor on or off, or we may

18   be in an situation where we do our direct, and they don't

19   have a chance to cross her until next Wednesday afternoon at

20   the earliest.  And that's only a maybe.  So I'm alerting the

21   Court to this situation.

22             THE COURT:  Thank you, Mr. Quinn.

23             Mr. Nolan?

24             MR. NOLAN:  My suggestion to Mr. Quinn or what I

25   told Mr. Quinn was that we at times would be willing to

1    accommodate such situations.  Ms. Garcia has this week put

2    off all of the buyer meetings for the spring line, and they

3    are set for next week, and I am hoping that we're going to be

4    able to finish her today.  I'm worried that if Victoria

5    O'Connor comes on, that we'll have to bring back Ms. Garcia,

6    and I don't know whether she's going to be available.  What

7    I'm suggesting is that we can put Victoria O'Connor on

8    Wednesday afternoon and finish her off then.

9            I don't want to interrupt with the surgery, but I

10   think we should try to get Ms. Garcia finished and do that.

11   I don't -- I think it would be tough to interrupt

12   Ms. Garcia's testimony right now.  She's been on the stand

13   for quite a while.  I probably don't want to put this on the

14   public record.  I apologize.  She's pregnant, and she gets

15   tired.  But we've pushed off all of her work for next week

16   and asked her to commit to this week.

17           So I would ask not to have her interrupted right

18   now.  I'd like to get this witness finished up today.

19           MS. AGUIAR:  If it would help with regard to

20   planning, I have at this point extremely limited redirect.

21           THE COURT:  Why don't we just proceed, and I think

22   everybody is aware of the situation.

23           Thank you, Counsel.

24           Mr. Price, let's bring in the jury.  We should

25   bring the jury in before Mr. Price resumes questioning.  A

1  minor detail.

2          (WHEREUPON THE JURY ENTERS.)

3          THE COURT:  Counsel, you may proceed.

4          MR. PRICE:  Thank you, your Honor.

5          1236 again.

6  Q.   Ms. Garcia, I'm going to try to focus on what you may

7  have meant in this memo and ask you questions about this

8  phrase here about having finalized the fashion designs,

9  because I'm trying to get a handle on what Mr. Carter Bryant

10 did before he left Mattel.

11         You recall I showed you Exhibit 1107.  Do you have

12 1107 in front of you?  That would be in the first volume --

13 no, second volume.  I'm going to show you those and 1108,

14 1109 so we can show the jury what we're talking about here.

15 And it's correct that the fashions shown on Exhibit 1107,

16 we'll go to that first, those are fashions that -- 1107 --

17 that ultimately ended up being sold with dolls; correct?

18 A.   Yes, it appears so.

19 Q.   And Exhibit 1108, that's -- the same is true?

20         MS. AGUIAR:  Objection.  Relevance.

21         MR. PRICE:  What drawing she's referring to when

22 she says final fashion designs, and it's our contention that

23 she's referring to these --

24         THE COURT:  Let's ask that question, Counsel.

25         MR. PRICE:  Okay.

950

1   Q.   There were drawings that Carter Bryant did separate and

2   apart from 1107 through 1110 that were provided for the

3   development, the fashions as part of the dolls; correct?

4   A.   I don't understand.   Can you please rephrase your

5   question?

6   Q.   Sure.   We've got this 1107, 1108, 1109, 1110.   And these

7   are drawings, actually, which you've testified were shown to

8   Kmart in November; correct?

9   A.   Yes, I believe so.

10  Q.   And you said you don't know exactly when these

11  particular drawings were created, whether it was a couple

12  weeks before or prior to that; correct?   You don't recall.

13  A.   I don't recall exactly.

14  Q.   Okay.   And you've got the phrase in that e-mail which

15  talks about the final fashion designs.   The phrase which you

16  don't really recall what you meant; correct?

17  A.   Do you mean in this document?

18  Q.   No.   Remember the other document we had up?   1236, where

19  you talked about final fashion designs, and you don't recall

20  what you meant by that.

21  A.   That's right.

22  Q.   So let's look at what was happening then.   These 1107,

23  1108, 1109, 1110, the fashions in those pictures prior to

24  those pictures being drawn, Carter Bryant drew designs for

25  those fashions.   That's what you expect to be true; correct?

1   **A.**   That I -- I don't understand.  I'm sorry.  I really

2   don't understand the question.

3   **Q.**   It's okay.  It's late, and I'm not terribly articulate.

4   So let's go to 1107 and give a specific example.

5          Now, you told us these ended up actually being on a

6   doll.  So what I'm saying is these fashions here; all right?

7   This shirt and these drawings here, the drawings for those

8   were done by Carter Bryant before this full drawing was done,

9   that is, the designs that he drew -- Carter Bryant drew

10   designs for these fashions before he did Exhibit 1107.

11   That's what you expect; correct?

12   **A.**   No, not necessarily.

13          MR. PRICE:  Your Honor, if I could read from her

14   deposition transcript.  This is on October 10, 2007.

15          THE COURT:  Which volume, Counsel?

16          MR. PRICE:  4.  October 10, 2007.

17          THE COURT:  Page?

18          MR. PRICE:  Page 1031, line 17 to line 25.

19          THE COURT:  Any objection?

20          MS. AGUIAR:  Just a relevance objection.

21          THE COURT:  Overruled.  And the objection within

22   the context is overruled as well.

23          MR. PRICE:  (Reading.)

24          "QUESTION:  And if I understand your testimony

25          correctly, there were drawings that Carter Bryant

952

1        did separate and apart from what we've marked here

2        as Exhibits 1107 through 1110 that were provided

3        for the development of the fashions as part of the

4        dolls; is that correct?

5            "ANSWER:  I expect so, yes."

6    **Q.**   And it's true, ma'am, that those design drawings that

7    Carter Bryant did for fashions that are shown on Exhibit 1107

8    were provided to MGA prior to the time that Exhibit 1107 was

9    provided?

10   **A.**   No.

11           MR. PRICE:  Your Honor, if I could read from page

12   1032, line 22, through 1033, line 5.

13           THE COURT:  Any objection?

14           MS. AGUIAR:  No.

15           THE COURT:  The objection is overruled.  You may

16   read it.

17           MR. PRICE:  (Reading.)

18           "QUESTION:  Is it true that those design

19       drawings that Carter Bryant did for the fashions

20       that are shown in Exhibit 1107 --

21           "ANSWER:  Um-hm.

22           "QUESTION:  Were provided to MGA prior to the

23       time that Exhibit 1107 was provided?

24           "ANSWER:  Yes."

25           Actually, your Honor, if I could just continue

1    reading down to line 20.

2           THE COURT:  Down to line -- I'm sorry?

3           MR. PRICE:  On page 1033.

4           THE COURT:  Any objection?

5           MS. AGUIAR:  No objection.

6           THE COURT:  Through line 20?

7           MR. PRICE:  Yes, your Honor.

8           "QUESTION:  And is the same true for the

9    fashions in Exhibit 1108?

10          "ANSWER:  Yes.

11          "QUESTION:  Is the same true for the fashions

12   shown in Exhibit 1109?

13          "ANSWER:  Yes.

14          "QUESTION:  Is the same true for the fashions

15   shown in Exhibit 1110?

16          "ANSWER:  Yes."

17   Q.   So, Ms. Garcia, having seen this testimony and seeing

18   these drawings and having testified that the fashion designs

19   for those drawings were created before you got those

20   drawings, I'd like to go back now to 1236, where you inform

21   Korea that "we finalized the fashion designs."

22          Do you see that?  Is it possible that what you're

23   referring to there are the drawings Carter Bryant did before

24   he did Exhibits 1107 through 1110 but which were designs of

25   the fashions on Exhibit 1107 through 1110?  You follow me?

1  A.    Yes.  And I don't believe so.

2  Q.    But you do agree, after looking at this, obviously MGA

3  had from Carter Bryant some time prior to getting

4  Exhibits 1107 through 1110, that MGA had these design

5  drawings from Mr. Bryant that had those fashions on them.

6  You now believe that; correct?

7  A.    It is possible that prior to receiving the final

8  drawings, the drawings that you referenced as 1107 through

9  1110, it's possible that there were some drawings a few days

10 prior to receiving the final drawings.  That is possible.

11 Q.    And would you have at that time referred to those as

12 finalized fashion designs if in fact those were fashions that

13 ended up being sold with the dolls?  Would that have led you

14 to use this language here?

15 A.    I'm sorry.  I'm just -- give me time.

16 Q.    I'm trying to figure what you meant here by this.

17 Because you can't remember when you say finalized the fashion

18 designs.

19       Would you have used that phrase because the designs

20 in 1107 to 1110 actually ended up being sold with the dolls?

21 A.    I don't believe the drawings that 1107 to 1110 was

22 necessarily in reference to this particular e-mail.

23 Q.    And so focus on this question, then.  Would you have

24 used that phrase, though, "finalized the fashion designs," if

25 you were thinking here I have these sketches of designs that

1  actually were used on the dolls?  Would that have been

2  something that might have been referred to?

3  **A.**    I'm sorry.  I just don't understand your question.

4  **Q.**    Okay.  I'll try it one more time, and then I'll move on

5  to something else, because it's late, and perhaps you just

6  don't remember what this means.

7         Assume the following.  Assume that you had 1107

8  through 1110, those drawings.  And assume that the fashions

9  on those drawings, you know, ended up on the dolls.  Okay?

10  And assume that you had the design sketches for those before

11  October 24th.  Are you with me so far?  I haven't asked a

12  question yet.

13         MS. AGUIAR:  I have a relevance objection.

14         THE COURT:  I'm sorry?

15         MS. AGUIAR:  A relevance objection.

16         THE COURT:  Overruled.  I'll give you some

17  latitude.

18  **Q.**    BY MR. PRICE:  If you were with me, you may not be now.

19  **A.**    Can you start over for me?

20  **Q.**    Sure.  Assume 1107 through 1110 -- that those drawings

21  showed fashions that ultimately ended up being sold with the

22  dolls.  Okay?  Assume that.  And assume that prior to getting

23  those drawings, you got, as you testified to, design drawings

24  from Carter Bryant for those specific fashions.

25  **A.**    To be clear, rougher versions of the versions 1107 to

1   1110.

2   **Q.**   What I'm talking about is just design drawings that he

3   did for the fashions that are in those pictures as you've

4   testified to.

5   **A.**   I'd just like to clear my testimony to say that if I had

6   gotten sketches prior to the sketches referenced as 1107 to

7   1110, it may have been rougher versions of those very

8   drawings.  Just being clear.

9   **Q.**   So those drawings that he did, if you knew at the time

10  you did this that those drawings, those designs were going to

11  be the designs that ended up on the dolls, might you have

12  referred to those October 24th, using the loose language, we

13  have finalized the fashion designs, could that be what you're

14  referring to?

15  **A.**   Mr. Price, I don't believe that those drawings have any

16  relationship to this particular e-mail.

17  **Q.**   So sitting here today, you have no idea really what you

18  are referring to in this e-mail when you say we have

19  finalized the fashion designs?

20  **A.**   As mentioned, I do not know what I could have meant by

21  final fashion designs as today I confirmed in my testimony

22  that the designs were not finalized until the swatch packages

23  were released in early December.

24             MR. PRICE:   I move to strike everything after --

25             THE COURT:   In context, I'm going to deny the

1    request.

2    **Q.**    BY MR. PRICE:   So having said when you believe final

3    fashion designs were done, I'm just asking a very simple

4    question.   I'm not asking what this doesn't refer to, I'm

5    asking what it does refer to, okay?   Do you have any idea

6    what this does refer to when you tell Korea --

7    **A.**    Hong Kong.

8    **Q.**    Hong Kong.   Thank you.   Do you have any idea what you

9    did refer to when you told Hong Kong in October 2000 that you

10   had finalized the fashion designs?

11   **A.**    As I mentioned, I am not sure what I meant.   It was like

12   eight years ago.   I am not sure.

13   **Q.**    Let me then switch topics because I think we've gotten

14   your memory on this as best we can.

15          You remember in examination, I believe you were

16   asked about the September 1st meeting, and your counsel

17   showed you pictures of the removable feet and the removable

18   hair.   Exhibit 302, I think.

19          Do you recall that?

20   **A.**    Yes, I believe so.

21   **Q.**    And you testified that when you saw these drawings, you

22   were excited, but that you really didn't think much about

23   this removable hair part.

24   **A.**    I believe that I mentioned that I wasn't certain of that

25   feature.

1   Q.   Well, and you explained that it kind of bothered you at

2   the time.  You had reservations.

3            MS. AGUIAR:  Objection.  Mischaracterizes her

4   testimony.

5            THE COURT:  Why don't you rephrase your question,

6   Counsel.

7   Q.   BY MR. PRICE:  Did you say you had reservations about

8   this part, that is, the removable hair?

9   A.   I don't remember my exact words.  I believe I was just

10  unsure of its execution.  I wanted to prove that out.

11  Q.   Because, actually, what happened is MGA tried to be able

12  to do that, and had problems with its production in doing

13  that; correct?

14  A.   I believe the way that it went was that we tried, and

15  Hong Kong was absolutely able to produce it, but the way I

16  remember it is that I didn't like the way it looked in the

17  version that Hong Kong was able to manufacture.

18  Q.   Well, as late as December, you recall that you had done

19  some informal kind of focus groups with girls who weren't

20  crazy about the idea of a bald-headed doll.

21  A.   I don't remember that.

22  Q.   You remember suggesting to Mr. Larian, though, that you

23  were going to try to do this removable head feature to see if

24  it would in fact physically work?

25  A.   I don't remember exactly.

1   **Q.**   Do you remember telling Mr. Larian that you wanted this

2   hair feature to be the big news for year two?

3               MS. AGUIAR:   Relevance.

4               MR. PRICE:   She said she didn't like it.

5               THE COURT:   Overruled.

6               THE WITNESS:   I'm sorry.   Could you please repeat

7   the question?

8   **Q.**   BY MR. PRICE:   Yes.   For from not liking this feature,

9   you told Mr. Larian in December of 2000 that you wanted this

10  feature to be the big plus for year two?

11  **A.**   I believe in context, and this has been a while.   So I

12  hope I -- I'll represent what I remember.   I believe what I

13  meant in that was that it really wasn't working the way that

14  I really hoped it to look.   And I wanted to make sure that

15  those dolls looked perfect to market as we launched them.

16  And because they weren't looking so great, because they

17  weren't looking the way that I had hoped them to or I was

18  worried that the way Hong Kong was able at that time to be

19  able to execute the feature, the decision was at that time to

20  not incorporate it in the first release of the Bratz dolls

21  and try again in the second release, give it more time to

22  make sure that we can finesse it.

23               I wanted to still try and make it happen if, and

24  only if, it didn't impose on the aesthetics.   It wasn't

25  happening in the first release.   So my thought was let's put

1    it off, leave it alone, and try and implement it in the

2    second.

3    **Q.**    But you never sent Mr. Larian, who was your boss, an

4    e-mail saying I don't like this feature.  I think it's a bad

5    idea to pursue this.  You never did that?

6    **A.**    I'm not sure.  I might have.  I'm not -- you know, I

7    don't know if it was a verbal conversation or if there were

8    e-mail exchanges.

9    **Q.**    It's true that in December of 2000, what you told

10   Mr. Larian was this -- let's see if this looks and works

11   great, and we'll surprise them with this as an added bonus.

12          Do you remember saying that?

13   **A.**    Do you have a particular e-mail you could show me?

14   **Q.**    Let me show you what we have identified as Exhibit 1110

15   for identification.

16          Do you recognize this, Ms. Garcia, as an e-mail you

17   sent to Mr. Larian and others around December 13, 2000?

18   **A.**    Yes.

19          MR. PRICE:  Move it into evidence, your Honor.

20          MS. AGUIAR:  No objection.

21          THE COURT:  Admitted.  You may publish.

22          **(Exhibit 1110 received.)**

23   **Q.**    BY MR. PRICE:  And this is concerning that hair

24   mechanism; correct?

25   **A.**    It seems so, yes.

1  Q.   Because Mr. Larian thought it was a good idea?

2  A.   I don't know if he did generally or not.

3  Q.   Okay.  What's an MDB situation?

4  A.   That referred to My Dream Baby situation.

5  Q.   I won't get into My Dream Baby.  Apparently somebody

6  within MGA.  But Mr. Larian, you say, until we receive a

7  sample with a hair mechanism, I will continue to sell Bratz

8  without this feature.  If we find that it looks/works great,

9  we will surprise them with this added bonus.

10          Do you see that?

11  A.   Yes.

12  Q.   So as of this time, you hadn't received yet a sample

13  from Hong Kong of the hair mechanism.

14  A.   I actually believe that we had received a sample of the

15  mechanism at this time, but I'm not exactly sure.  I might

16  have actually seen images or photos from Hong Kong.  I'm not

17  sure.  I don't remember.

18  Q.   Well, you have no reason to believe that what you stated

19  here was incorrect when you were talking to your boss, that

20  you hadn't received a sample of the mechanism yet?

21  A.   May I have a chance to read further into the document?

22  Q.   Sure.

23  A.   Okay.

24  Q.   To put it in context, let's look at the first e-mail

25  from Isaac Larian.  It starts here telling you who it's from,

1  but you don't actually see the e-mail.  All you see in this

2  page is from Isaac to Samuel Wong.  And then go to the page

3  where Mr. Larian is saying, "If the savings to do only one

4  hair set is 32 cents, then I want to have both hair sets.

5  This is what makes our product different.  If it can't be

6  done, I want to know why, in detail."

7      Do you see that?

8  A.   Yes, I do.

9  Q.   By the hair sets, he's talking about the ones that you

10 can plug into the head.  That's talking about that removable

11 hair feature?

12 A.   Yes.

13 Q.   So that's the context of the string.  And then back to

14 the next page.  Where Mr. Wong says the savings is 32 cents

15 only if we take away one hair set.

16      And then what is sent to you is Mr. Larian's

17 e-mail, "Put back and do both hair.  The product must look

18 great."

19      That's the one that you received that you are

20 referring to, I'm sorry, that you responded to; correct?

21 This e-mail here?

22 A.   Yes.

23 Q.   And so you understood Mr. Larian really wanted to do

24 this feature that Mr. Bryant had shown in his original

25 drawings.

1  **A.**   I think that Isaac really wanted to give that feature a
2  shot.  It was, you know, pretty neat.
3  **Q.**   So did you respond by saying, you know, ever since
4  September 1st, I've never really thought much about this
5  feature and had reservations about it.
6       Did you respond like that?
7  **A.**   No.
8  **Q.**   So if we can see your response to Mr. Larian.  And this
9  is your response where you say until we receive a sample,
10 you'll continue to sell without the feature.  It's true, you
11 didn't want to delay the product launch because the earlier
12 marketing a great product, the better.
13 **A.**   I didn't understand the last part.
14 **Q.**   I didn't say this that well.  You didn't want to delay
15 the launching of these dolls because there was some
16 difficulty in Hong Kong in giving you a sample of the hair
17 mechanism; right?
18 **A.**   No, that's not the case at all, no.
19 **Q.**   Well, you were going to continue to sell Bratz without
20 the feature until you got from Hong Kong a sample of the hair
21 mechanism.  That's correct; right?
22 **A.**   Until I got a mechanism?
23 **Q.**   A sample of the hair mechanism.
24 **A.**   You know, I have to be clear.  As mentioned, I actually
25 think that I was at least seeing images from Hong Kong of the

964

1    mechanism that they were executing in Hong Kong with this

2    hair feature.  I may not have received an actual sample.  I

3    may have.  I'm not sure.

4    Q.   Okay.  Is the reason you put things in e-mails so that,

5    you know, eight years later you might be able to determine

6    what actually happened, because your memory might not be so

7    good?

8    A.   I don't believe that I write e-mails expecting to go

9    reflect on them eight years later, if that's what you mean,

10   sir.

11   Q.   That's fair enough.

12          Do you like to have some record, though, of the

13   development of the product, and when something was done and

14   what time?

15   A.   I use e-mail to correspond, you know, within that --

16   within that situation at that time.

17   Q.   Okay.  And you are certainly trying to be accurate in

18   your e-mails at that time when you're talking to your boss.

19   A.   Sure.

20   Q.   Okay.  And then at the end, it says, "Please, let's not

21   make this a MDB situation where we give it all to consumers

22   at one time.  I want this hair feature to be the big news for

23   year two."  What you refer to as year two, what's that refer

24   to?

25   A.   I believe that to be launch two, like the second

965

1    release.

2    **Q.**    Okay.   And just to define it, I don't want to get into

3    what was launched, but just to define it, what time frame is

4    that talking about, when you wanted that snapping hair

5    feature to be the big news?   What time period are we talking

6    about?

7    **A.**    That would have been for the coming season.   I guess

8    that would have been the spring launch, the following product

9    launch.

10   **Q.**    Had the first product launch occurred as of December

11   2000?

12   **A.**    No.

13   **Q.**    I didn't think so.   So that's why I want to make sure no

14   one is confused.   What year, then, would year two have been?

15   **A.**    What year would year two have been?   Let's see, I went

16   to production on May 15th of 2001.   So the following season

17   would have been six months later.   So that would have been

18   the spring.   It would have been the spring of 2002.

19   **Q.**    So in December of 2000, you're talking about that hair

20   feature being the big news for spring of 2002.   That's the

21   time frame we're talking about?

22   **A.**    The launch, product availability.

23   **Q.**    You're talking about calculating launches, et cetera.

24   At Mattel you were a product manager.   That's what you did

25   for a couple years?

1   A.    Yes.

2   Q.    And you spoke, in your examination with your, counsel

3   about Exhibit 1103, which is this Excel spreadsheet.

4          Do you recall that?

5   A.    Yes.

6   Q.    And if we can put that up.  I know that's hard to read,

7   so we might get individual entries in a second.  But this is

8   the format that you used as a product planner at Mattel, that

9   you had been trained to do those two or three years at

10  Mattel; correct?

11  A.    Yes.

12  Q.    And when you were telling the jury about how -- and you

13  have, for example, the spring date, and you're taught to kind

14  of work backward from the launch date and there's actually

15  software packages that help you do that, you learned all of

16  that as a product planner at Mattel?

17  A.    Yes.

18  Q.    And when we look at this document, Exhibit 1103, you

19  mentioned that there's some software which, if you put in one

20  date, it then backs in other dates using obviously some sort

21  of formula.

22  A.    It's -- the Excel program is what I meant, yes.

23  Q.    And that's, for example, if you have an FEP, can you

24  remind us what that means?

25  A.    First engineering pilot.

1  Q.   And then PP?

2  A.   Production pilot.

3  Q.   And PS?

4  A.   Production start.

5  Q.   So the way do you it as a planner is you said these are

6  kind of industry goals that you are trying for a certain

7  season in the April, May time frame?

8  A.   Which ones?

9  Q.   The PP and PS?

10  A.   Those are production milestones.  Every product has to

11  set this.

12  Q.   And I believe you testified that April is sort of

13  typical in the industry because that's kind of seasonal, the

14  time when you do these production starts?

15  A.   That's the optimum.  That would be the ideal production

16  start during a season.

17  Q.   And there are software programs so that if you have a

18  target of April 1st as a production start, that then that

19  would fill in other dates to lead up to that; correct?

20  A.   Not in this particular case.  This is a -- like a hand

21  built -- I shouldn't say hand built, but I personally built

22  this Excel document.  It's like an Excel program that

23  probably most are pretty common with.  So I literally, every

24  square -- the letters, the words, and literally the date

25  durations, the week, number of weeks, the single numbers that

1  are in the column that just precede the actual dates, I

2  physically built that document with all of those and then

3  linked all of that information together that when you enter

4  that first PS date, all the durations are linked

5  themselves --

6  Q.   So you created the program?

7  A.   I created the document.

8  Q.   So that if you put in an April 1, 2000, as the

9  production start, then that would link to then six months

10  prior to that you were going to have to do something else,

11  and two months prior to that, something else?  Is that what

12  you mean by linked?

13  A.   I would have an -- in the Excel document, in the program

14  I would have linked like, for example, 4/1/2000 date to a

15  duration.  Like, for example, the number 4.  I would have

16  manually built that formula in my Excel document so that when

17  I in fact then put a date there, it would calculate based on

18  my durations.

19  Q.   Okay.  However, if your production starts in April 2000,

20  then obviously you have to do the development before then.

21  A.   Right.  But the production didn't start in April.

22  Q.   Exactly.  So, for example, if this were done through

23  some computer program where you were trying to link them and

24  say if production starts April 2000, nine months before that,

25  we're going to have to have fabric approval, for example,

1    then the fabric approval date would obviously be before April

2    of 2000; right?  If it was done automatically.  You can't

3    have fabric approval after the production started; right?

4    A.    No, you can't.

5    Q.    Right.  So if this was done through some sort of link,

6    then if you put in April 1, 2000, then the steps leading up

7    to that would have to be prior to April 1, 2000; right?

8    A.    I'm sorry.  Can you please repeat the question?

9    Q.    Sure.  If there's some link where you're using a time

10   difference so that you start with the production date and

11   work backwards, then obviously, if you're using a link so

12   that that's done automatically, if you put in April 1, 2000,

13   then, for example, fabric approval would have to be before

14   the April 1, 2000, date; right?

15   A.    Can we find a different -- I just want to make sure that

16   we're not basing anything on the incorrect date of April

17   2000.

18   Q.    I know that date is incorrect.  I'm just saying that if

19   it were linked mathematically, the way you would do that is

20   you would make sure that the dates leading up to April 1,

21   2000, were before April 1, 2000.

22   A.    Right.

23   Q.    Okay.  However, if you look at these dates here, the

24   ones other than the gray dates.  Let's look at the ones other

25   than the gray dates, they are kind of going in ascending

1    order.  October 30th, and then November 27th, and on forward.

2           Do you see that?

3    A.   Is it possible to enlarge this?

4    Q.   Yes, let's enlarge this.  As you see, for sculpting, for

5    example, you've got control drawings, wax, resubmit,

6    resubmit, up to production mold.

7           Do you see that?

8    A.   Yes.

9    Q.   And you'd expect those to be maybe not those exact

10   dates, but this step is going to be before this step, which

11   is going to be before this step, which is going to be before

12   this step; correct?

13   A.   Correct.

14   Q.   And doing that, you're projecting at least after this

15   gray area, you're projecting forward.  You're, I wouldn't say

16   guessing, but you're trying to set goals, milestones to reach

17   in the future; correct?

18   A.   Yes.

19   Q.   And obviously on this document, those goals, milestones,

20   aren't linked to -- if we can go back to the left, Ken.  They

21   aren't linked to these dates here, which are obviously

22   incorrect; right?  Because if you're going to have a start

23   date of April 1, 2000, you're not going to start with a wax

24   six months after that; right?

25   A.   I don't believe, and I wouldn't say that the dates in

1  the squares or in the boxes are linked to the target column

2  that you have here.

3  **Q.**   Right.  So putting this aside, these here that you did,

4  I think what you testified to is you actually did them by

5  hand from scratch.

6  **A.**   I inputted -- what I meant by inputting, I input the

7  dates, a date, for example.  I'd have to look at the, you

8  know, the program or how I linked to identify which are links

9  and which are actually inputted dates.

10 **Q.**   Okay.  So if we look at this, though -- and Ken, let's

11 go back to the full document.  And blow this up just so we

12 can see the overall document.

13         Now, what you have here, though, you have both

14 dates which are a record of what has already happened, and

15 then milestones, goals in the future; correct?

16 **A.**   Can you be more specific, please?  Do you mean --

17 **Q.**   Well, you recall that you said that there are areas

18 where you, on the computer, both inputted the date and then

19 grayed it to indicate this is not a date in the future.  This

20 is something that happened in the past.

21 **A.**   Yes, and I -- just to be clear, the October 2nd of 2000

22 date, and if I might, I might clarify again --

23 **Q.**   Well, I move to strike as nonresponsive.  My question is

24 simply whether you gray --

25         THE COURT:  Sustained.

1   **Q.**   BY MR. PRICE:  We'll get to that.  But that is, the

2   process was let's start -- you wanted to gray the dates that

3   you thought had already occurred; right?

4   **A.**   Yes.

5   **Q.**   Okay.  And you didn't gray these dates here.  You see

6   the April 20, 2000, the March, and the May 2000?  You didn't

7   gray those, even though, if you look at them, technically

8   they are in the past; right?

9   **A.**   I didn't actualized them because in fact I expected that

10  should have said April 1st of 2001.

11  **Q.**   Exactly.  Because you knew that these dates wouldn't be

12  past dates.  They couldn't be; right?  So you didn't gray it.

13  **A.**   I don't understand your question.  I'm sorry.

14  **Q.**   When you look at this chart and you decide I'm going to

15  take the additional steps of graying the dates, that I am

16  recording things that have already happened, you did not gray

17  these incorrect numbers because it wouldn't have made sense

18  that these dates already happened.

19  **A.**   That's right.

20  **Q.**   So what you did is you went through and took this

21  additional step of graying the dates that you knew had

22  happened in the past; correct?

23  **A.**   Yes.

24  **Q.**   And so, for example, you got the PDF date, October 16,

25  2000.   That had happened on October 16.

1   A.   Yes.

2   Q.   In fact, we saw the documents that show that, that that

3   had happened on October 16th.

4   A.   That's right.

5   Q.   And then you specifically grayed this date, control

6   drawings to L.A. designer.  And you grayed that date as

7   October 2nd, 2007, correct?

8   A.   Yes.

9   Q.   And that was a date, obviously, that had happened in the

10  past, prior to your doing this schedule; correct?

11  A.   Yes.

12  Q.   And whatever you define as these control drawings,

13  whatever they are in your mind, they are drawings done by

14  Carter Bryant.

15  A.   Yes, I believe they are the portfolio drawings.

16  Q.   Now, you also testified in your examination earlier, you

17  were asked questions about who came up with Bratz.  You

18  remember being asked by your counsel about that?

19  A.   Bratz, the term Bratz, the word Bratz?

20  Q.   The word Bratz as being associated with this project

21  we've been talking about, yes.

22  A.   Yes.

23  Q.   And if we could put up 302, I believe you testified

24  that, well, the name Bratz wasn't approved until much later.

25           Do you recall that?

974

1    A.    Yes.

2    Q.    And I think you said it was -- did you have a time frame

3    as to when it was approved?

4    A.    I don't remember exactly.

5    Q.    But what you do agree with is that when Mr. Bryant came

6    into MGA, you're saying on September 1st, with these

7    drawings, if we can go to the second page, that he was

8    calling this doll line Bratz.

9    A.    That's right.

10   Q.    And, you know, we've gone through a number of e-mails

11   over the last few days.

12   A.    We sure have.

13   Q.    Yeah.  And you notice that on almost all of those

14   e-mails in September and October, the word that is associated

15   with this project is in fact Bratz.

16   A.    Actually, there are other e-mails that you may not have

17   shown me where in fact we use a different term other than

18   Bratz in referring to the project.

19   Q.    Well, for example, let's look at that early one,

20   March -- Exhibit 305.  Let me ask you about this.  Your

21   testimony under oath is that this is what you're referring

22   to, you're referring to as the Bratz line; correct?

23   A.    What document is this?  Where can I refer to this?

24   Q.    This is Exhibit 305.  This doesn't say Bratz on it, but

25   you recall you testified what line you were referring to

 1  here.  And you already said that the line you were referring

 2  to is the Bratz line; correct?

 3  **A.**   The brand we're talking about right now today, yes.

 4  **Q.**   And it's true, is it not, that at that point and October

 5  within MGA this was referred to as Bratz?

 6  **A.**   It was, and it's possible that it may be in October,

 7  could have been referred to as other things, such as Fashion

 8  Frenzies.  I'm not sure.

 9  **Q.**   Let me show you Exhibit 18.  This is September 27, when

10  you were sending the materials to Hong Kong; right?

11        The subject, how you titled this, the subject you

12  referred to was Bratz; correct?

13  **A.**   At this time, yes.

14  **Q.**   And, of course, that's the name that stuck, Bratz.

15  **A.**   I don't understand what you mean.

16  **Q.**   That is the name that has been used ever since the line

17  has been public to refer to that line, is Bratz.  It's Bratz?

18  **A.**   What do you mean by public?

19  **Q.**   Well, let's say those four dolls that you sell, they are

20  called Bratz.

21  **A.**   Mr. Price, I don't mean to be difficult.  I mean only to

22  say that there was certainly e-mails where in fact we

23  referred to them as Bratz, and there's a period of time, in

24  fact, where we referred to them as something other than

25  Bratz.  I'm not going to suggest that we didn't at any time

1    even in development sometimes refer to them as Bratz.

2    **Q.**    The name you settled on was the same name that Carter

3    Bryant brought to you, you're saying in September of 2000,

4    which is Bratz.   That's the name that was settled on.

5    **A.**    We settled on the name Bratz.

6    **Q.**    By settled, I don't mean to mean you made compromises.

7    That's the name that actually went to the public?

8    **A.**    We produced our line as Bratz.

9    **Q.**    So it would be accurate to say that it was a group of

10   MGA folks getting around and talking that came up with the

11   name Bratz.   That's not true, is it?   It was Carter Bryant

12   who came up with that name, and MGA approved it.

13   **A.**    I think that there were -- and I testified to this

14   earlier -- that there were a group of people at MGA who made

15   the decision to go forward with the term Bratz.

16   **Q.**    But those people, when they got together to come up with

17   this decision, they knew that one of the possibilities, as

18   suggested by Carter Bryant, was Bratz.

19   **A.**    It was definitely a consideration among others,

20   definitely.

21   **Q.**    And all I'm asking is it's not true that these MGA folks

22   are the ones who came up with the name.   That was Carter

23   Bryant; right?   They simply said yeah, we agree to that.

24   **A.**    That would be correct.

25   **Q.**    Thank you.   You also testified briefly that, when you

1    went to MGA, you were talking about a friendly -- you talked

2    about how it was your opinion, your view, that it was a

3    friendly family atmosphere.  Do you recall that?

4    A.    Yes, I do.

5    Q.    But you are aware that other people at MGA don't share

6    your view of that being a family atmosphere?

7                  MS. AGUIAR:  Relevance.

8                  MR. PRICE:  I didn't bring it up.  She did in her

9    examination.

10                  THE COURT:  Let's lay a foundation for it, Counsel.

11                  MR. PRICE:  Sure.

12   Q.    First of all, you recall you were examined by your

13   counsel; correct?

14   A.    I didn't hear you.

15   Q.    You recall you were examined by your counsel?

16   A.    Yes.

17   Q.    And that she asked you what you liked about MGA?

18   A.    Yes.

19   Q.    And you said that it had a family atmosphere, a friendly

20   atmosphere, conducive to creativity.

21   A.    That was absolutely my perception.

22   Q.    And what I want to make clear to the jury is, although

23   that's your perception, you know that that is not everyone's

24   perception at MGA.

25                  THE COURT:  I'm going to sustain the relevance

1   objection.  Move along, Counsel.

2   Q.   BY MR. PRICE:  One of the questions you were asked, I

3   believe, by your counsel was concerning Ms. Leahy, the woman

4   who did the sculpts.

5   A.   Yes.

6   Q.   And I think you were asked, did you tell Ms. Leahy not

7   to talk to anyone about Carter Bryant.

8             Do you remember that?

9   A.   Yes.

10  Q.   Let me ask you.  When MGA uses a vendor, is that vendor

11  free to talk to people about the project that MGA is working

12  on?

13  A.   Are they free to talk?  I'm not sure what you mean.

14  Q.   Well, you consider these things confidential, don't you?

15  I mean, you consider these swatches and these sculpts and the

16  direction you're going and what you're doing as confidential.

17  You don't want your competitors to know about that; right?

18  A.   Sure.

19  Q.   So you've got Ms. Leahy, and you give her an assignment;

20  correct?

21  A.   Yes.

22  Q.   And let's say that you say I want you to work with

23  Carter Bryant on this assignment for Bratz.

24  A.   Yes.

25  Q.   Okay.  She actually has to sign an agreement, a

```
 1   confidentiality agreement, not to talk to anybody except

 2   people at MGA or people you approve of about anything to do

 3   with that project; isn't that right?

 4   A.    I sign confidentiality agreements with my free-lancers

 5   because that's part of our MGA practice.  But it is not the

 6   reason that I was trying to necessarily conceal Carter

 7   Bryant.

 8   Q.    I'm not suggesting that, ma'am.  I'm not suggesting that

 9   that's the reason you have them sign the agreement.

10   A.    I'm sorry.  I must have misunderstood your question.

11   Q.    You were asked by your counsel whether you were

12   specifically told, when you specifically told Ms. Leahy, a

13   vendor, not to talk about Carter Bryant.  You recall that

14   question?

15   A.    Oh, yes.

16   Q.    And you didn't have to tell her that, because she was

17   under an obligation to MGA not to talk to anyone about having

18   anything to do with the Bratz project; right?

19   A.    Yeah, I mean I was asking her not to, you know, if she

20   signed a confidentiality agreement, I expected that any work

21   she did for me would not be something that she would share

22   with anyone else.

23   Q.    Exactly.  She's not even supposed to tell anybody else

24   that she's doing work for you.

25   A.    That's not necessarily true.
```

1  Q.    Let me rephrase that.  She's not supposed to tell anyone

2  else that she's working on a particular sculpt, with a

3  particular person, a particular project; correct?

4  A.    She's not supposed -- it's my understanding that she is

5  not supposed to divulge necessarily what she is -- what I've

6  asked her to create.

7  Q.    You didn't want anyone in the world other than folks

8  within MGA to know that she was working on Bratz.

9  A.    Mr. Price, I don't understand your question.  I give

10  her, like every single vendor that I work with, even up to

11  today, a confidentiality agreement for them to sign to

12  protect the creative -- that that person, who I'm paying, to

13  keep safe, to keep confidential.

14  Q.    And because you give that agreement to everyone and they

15  sign it, do you have conversations with Ms. Leahy every time

16  you give her a project to do something, to say hey, you've

17  got to keep this quiet?  You don't have to do that, do you?

18  A.    I'm just not understanding.  What do you mean?

19  Q.    Because you have this -- these signed contracts with

20  Ms. Leahy, the confidentiality contracts, you don't have to

21  specifically go and tell her every time you give her a

22  project, Margaret, this is on the, you know, hush-hush.

23  Don't tell anybody about it.  That's just standard operating

24  practice that it's confidential; right?

25  A.    Yeah, I mean I would expect, if a vendor is going to do

1  work with me and on my group on any designs, that they would

2  not divulge any kind of information on the aesthetics that

3  they are working on, on the designs that they are working on,

4  if that's what you mean.

5  Q.   A final thing.  On control drawings, remember the

6  exhibit that refers to control drawings?  I think you told

7  the jury that what you're referring to there are -- when you

8  use control drawings, you mean engineering runs.

9        Do you recall telling them that?

10  A.   I understand the term control drawings to be -- yeah,

11  more like engineering drawings containing information like

12  dimensions, specific information like dimensions.

13  Q.   And actually, ma'am, control drawing can mean one of two

14  things.  It can be either an engineering drawing, or it can

15  be a drawing on a conceptual level, an aesthetic level and

16  how to approach the actual creative part of the concept.

17  A.   I don't understand.

18  Q.   Pardon?

19  A.   Can you please repeat or rephrase the question.

20  Q.   Control drawing, as used in that exhibit, where you say

21  control drawing, object second, in that reference it can be

22  either an engineering drawing or a conceptual level aesthetic

23  level drawing and how to approach the actual creative part of

24  the concept?

25  A.   I would say it's careful to, you know -- it's careful.

1    That particular word can be termed loosely in the -- in a

2    creative environment, but I recognize more that a control

3    drawing is more likely to be a drawing that includes very

4    specific information.  Engineering information, dimensional

5    information, that kind of thing.

6            MR. PRICE:  Your Honor, if I could read from

7    Ms. Garcia's deposition transcript.  This is volume 3.  The

8    date is October 9, 2007.

9            THE WITNESS:  Which volume would that be?

10           MR. PRICE:  That's 3, ma'am.  And it's going to be

11   page 778, line 11, to 779, line 4.

12           "QUESTION:  What is a" --

13           THE COURT:  Wait, Counsel.

14           MS. AGUIAR:  No objection.

15           THE COURT:  Very well.  You may proceed.

16           MR. PRICE:  (Reading.)

17           "QUESTION:  What is a control drawing as used

18       in Exhibit 1103?

19           "ANSWER:  Control drawing is a reference.

20       It's a drawing that is released to the sculptor for

21       a few things.  It could be a control drawing from

22       an engineering perspective considering armatures

23       and whatnot.  It can also be a control drawing from

24       a conceptual level, an aesthetic level, and how to

25       approach the actual creative part of the concept.

 1              "QUESTION:  Were you the one who put in this

 2       entry indicating that the control drawings to the

 3       L.A. designer occurred on October 2, 2000?

 4              "ANSWER:  I'm not sure, but I believe so.

 5              "QUESTION:  What particular control drawings

 6       for Bratz were being referred to here?

 7       Exhibit 1103?

 8              "ANSWER:  I can't be sure.  It is -- as

 9       mentioned by definition, it's either the

10       engineering control drawing or an aesthetic control

11       drawing.  I don't remember."

12              No further questions, your Honor.

13              THE COURT:  Anything further?

14                    **RECROSS-EXAMINATION**

15   BY MS. AGUIAR:

16   **Q.**  Let's go back to one of the exhibits Mr. Price showed

17   you this afternoon, 13592.  I believe he handed it to you

18   separately.  It was not in your binder.  If we can have it on

19   the screen.

20              And my recollection is he pointed you to one single

21   page.  We don't have it because it was a new exhibit.

22              THE COURT:  You can use the Elmo.  It's page 5, I

23   believe.

24   **Q.**  BY MS. AGUIAR:  Because the jury doesn't have this in

25   front of them on the screen, can you let us know how many

1    pages are in this document?  Do you have a copy of?

2    **A.**    I'm so sorry.  I don't have the document.

3    **Q.**    It's not in the binders.  It was handed up to you.

4    Actually, let's look at this so we understand what it is.

5    Can you look at the first page and tell us what it is?

6    **A.**    It's titled 2002 Bratz Commercial Test and Product

7    Appeal Study.  It seems to be a focus group conducted by

8    Consumer Quest.

9    **Q.**    So Mr. Price brought you directly to page 5 regarding

10   one line of this document.  But can you tell us how many

11   pages total are in this document?

12   **A.**    29 pages.

13   **Q.**    It's a 29-page document.  And can you tell us what this

14   29-page document is, what it summarizes?

15   **A.**    This document represents the result of a focus group

16   that apparently took place on January 29th of 2002.  A

17   general research study is a study where you poll a small set

18   of girls, in this case, to get their general opinion about

19   appeal to the particular product.

20   **Q.**    Do you remember that Mr. Price showed you this document

21   as evidence that Chloe was the blonde character, and

22   therefore, she sold the most?

23          Do you recall that?

24   **A.**    Yes.

25   **Q.**    So the information that he showed you in this document,

985

1  is this actual sales information?

2  **A.**   No, absolutely not.

3  **Q.**   Is this actual data that demonstrates how many dolls

4  have been sold to the public?

5  **A.**   No.

6  **Q.**   So tell us, if you would, based on your knowledge of

7  actual sales of the Bratz line, whether Chloe, the blonde

8  character, in fact outsells all the other characters.

9         MR. PRICE:  Object to vague.  Combined?  Or each

10  character?

11        MS. AGUIAR:  I'll clarify my question.

12        THE COURT:  Thank you, Counsel.

13  **Q.**   BY MS. AGUIAR:  Is Chloe the hottest selling of the four

14  dolls?

15        MR. PRICE:  Objection as to time.

16  **Q.**   BY MS. AGUIAR:  Over all of the life of the Bratz line,

17  is Chloe the hottest selling of the four lines?

18        THE COURT:  Very well.  You may answer.

19        THE WITNESS:  No, she's not.

20  **Q.**   BY MS. AGUIAR:  Why don't you tell me generally speaking

21  what is your understanding of which one is the one that flies

22  off the shelves more than the others.

23  **A.**   It's my understanding that Yasmin, the Hispanic

24  character, is the best-selling character of the Bratz

25  collection.

986

1  Q.   And Yasmin is not blonde?

2  A.   No.

3  Q.   And she's not meant to look white?

4  A.   No.

5  Q.   Let's look at another document.  This one is about the

6  hair feature that Mr. Price was referring you to.  It's

7  Exhibit 1100, and I think we can put that one up on the

8  screen.

9       Do you recall your testimony about your view of the

10  pop-off hair feature?

11  A.   Yes.

12  Q.   And looking not just at the first sentence of this

13  e-mail, and looking just at the last sentence of this e-mail

14  that you were directed to during your cross-examination, but

15  looking at the whole response that you wrote to Mr. Larian,

16  can you tell me whether you believe that's consistent with

17  the view that you've always held about the pop-off hair

18  feature?

19  A.   Yes, it is.

20  Q.   And can you tell us -- explain in the second paragraph

21  there what you wrote and how it's consistent with the view

22  you've always held about the hair feature, the second

23  paragraph that starts the product is excellent as it is?

24  A.   The product -- should I just read it?

25  Q.   Yes, or you can read it or whatever portions of it you

1  think are relevant.

2  A.   It says this was definitely -- okay.   The product is

3  excellent as it is.

4  Q.   And when you say the product is excellent as it is, as

5  is means what?

6  A.   Means as the fashion doll, as a fashion doll or without

7  the hair feature.   This was definitely the feature that

8  caused the girls to feel a bit uncomfortable.   And as I

9  mentioned earlier, if that -- if this feature, the inclusion

10  of this feature should make little girls not necessarily love

11  our fashion doll or should impede on its style or its

12  asthetic quality, then I was not comfortable to include it in

13  the product.

14  Q.   And was this a view that you consistently held over

15  time?

16  A.   Absolutely.

17  Q.   So if you want to keep going in the paragraph.

18  A.   They were also concerned that their doll will always be

19  bald if they happen to lose one of their hairs.

20  Q.   What do you mean by that?

21  A.   Given that the doll -- an effort to include this hair

22  feature, it requires that you always have to have a hair to

23  snap onto the head to ensure that the doll has hair.   Should

24  you lose those snap hair pieces, should you lose them, then

25  your doll won't have anything to have on her head, which

1   would leave the doll bald.

2            And again, that goes back to my concern that, you

3   know, this fashion doll was meant to be appropriate to the

4   seven- to ten-year-old consumer, were very savvy, and this

5   doll always had to look impeccable and beautiful because they

6   would expect as such.  And this feature would have impeded --

7   would impede on, you know, on its aesthetic should a consumer

8   have lost that hair.

9   Q.   When you say in the last sentence of that paragraph, "I

10  am confident that the consumer will be satisfied with

11  traditional hair play, long and pretty," what do you mean by

12  traditional hair play?

13  A.   Traditional hair play is -- I meant the traditional way

14  a girl would play with hair on a doll, which is traditionally

15  about brushing and combing the hair.  It's fixed and rooted

16  in the head permanently.

17  Q.   Was this another way you're saying that you were

18  confident that the consumer would be satisfied with the doll

19  as MGA was already producing it?

20  A.   No.  Was in production?

21  Q.   Yes.  In other words, as of this time -- I'm sorry.

22  That was a bad question.

23           Are you saying here that you are confident the

24  consumer will be satisfied with a doll that does not have

25  pop-off hair?

1  A.    That's right.

2  Q.    And in the third paragraph, if you'd just comment on

3  that.  As soon as the hair mechanism is done, I want to put

4  it in front of girls to see how they react.

5  A.    I meant it that as soon as Hong Kong was, you know, had

6  refined and finished the hair mechanism in a way that I felt

7  was appropriate or looked aesthetically, you know, perfect,

8  it would be then that I would get that sample from Hong Kong

9  and put that in front of girls to see, you know, what their

10  general opinion was.

11  Q.    And this e-mail was December 13th of 2000.  This was --

12  at this time Mr. Bryant was under contract with MGA and

13  working for MGA; correct?

14  A.    Yes.

15  Q.    We're in the home stretch.  Two other short things.

16         Mr. Price asked you whether you had learned your

17  scheduling or your planning system through your time at

18  Mattel.  Do you recall that?

19  A.    Yes.

20  Q.    And does Mattel use, based on your years there and from

21  what you remember back when you worked there for a few years,

22  did they use a particular name of a software in order to do

23  their planning?

24  A.    Yes.

25  Q.    And what was the name of that software package?

1  **A.**   It's called Tracks.

2  **Q.**   T-R-A-C-K-S?

3  **A.**   Yes.

4  **Q.**   And did you at MGA ever use the Tracks system?

5  **A.**   No.

6  **Q.**   So you were not using the same planning system that you

7  were using at Mattel?

8  **A.**   No.

9  **Q.**   Is it your understanding that the dates required in a

10 doll production process are fairly standard in the industry?

11 **A.**   I don't know what you mean.

12 **Q.**   Sure.   In other words, the times that are required

13 between each step, is that something that was unique to what

14 you learned at Mattel, or was that something -- those were

15 dates that were standard in the industry?

16 **A.**   Standard in the industry.

17 **Q.**   Lastly, we were talking about the name Bratz, where it

18 came from and how you ended up there.

19        Do you remember that?

20 **A.**   Yes.

21 **Q.**   And you're not contending, are you, that the name

22 didn't -- let me take out all the negatives.   Mr. Bryant came

23 to MGA and presented the characters with the name Bratz;

24 right?

25 **A.**   That's right.

1  Q.   But over time, MGA considered changing the brand name to

2  another name; correct?

3  A.   Yes.

4  Q.   And Mr. Price showed you some e-mails where the name

5  Bratz was used internally, yes?

6  A.   Yes.

7  Q.   Let me ask you to turn in your binder to Exhibit 4501.

8  Can you tell us what Exhibit 4501 is?

9  A.   Yes.

10  Q.   What is it?

11  A.   It's an e-mail from me to Rachel Harris, Aileen Storer,

12  Carter Bryant, Peter Marlow.

13  Q.   Do you recognize this as an e-mail that you authored and

14  sent to those people?

15  A.   Yes.

16          MS. AGUIAR:  Your Honor, I offer 4501.

17          THE COURT:  Any objection?

18          MR. PRICE:  Objection to the date because it's

19  outside the time frame.

20          THE COURT:  Overruled in light of the examination.

21  It's admitted.  You may publish.

22          **(Exhibit 4501 received.)**

23  Q.   BY MS. AGUIAR:  Can you tell us what the Re line of this

24  is?

25  A.   Girlfrenz packaging meeting.

1   **Q.**   What does the reference to Girlfrenz packaging meeting

2   refer to?

3   **A.**   Girlfrenz was one of the alternative names that we

4   considered for the Bratz line.

5   **Q.**   So you know, when you use the term Girlfrenz here in

6   December of 2000, it's not some other doll that you were

7   thinking of developing.  This was a reference to the project

8   that eventually was produced as Bratz?

9   **A.**   Yes.

10  **Q.**   And let me ask you to turn to the next exhibit in your

11  binder, which is 4502.

12  **A.**   I've got it.

13  **Q.**   Can you describe to us what that document is?

14  **A.**   This is a document produced by a free-lance house,

15  packaging free-lance house called -- who is referred to as

16  Ayzenberg.

17  **Q.**   And that's -- can you spell it?

18  **A.**   A-Y-Z-E-N-B-E-R-G.

19  **Q.**   And is this a document that you referred on or about

20  November 13th, 2000?

21  **A.**   Yes.

22           MS. AGUIAR:  Move 4502, your Honor.

23           THE COURT:  Any objection?

24           MR. PRICE:  No objection.

25           THE COURT:  Admitted.

1          **(Exhibit 4502 received.)**

2  **Q.**   BY MS. AGUIAR:  So I see on the front of this document

3  it says Ayzenberg, which is the name of the vendor, and it

4  says MGA entertainment style squad pitch.  Can you tell us

5  what Style Squad is a reference to?

6  **A.**   Style Squad was even another one of the many alternative

7  names we were considering for Bratz.

8  **Q.**   And was this the name that you were referring -- that

9  you were using to refer to the project in your dealings with

10  Ayzenberg?

11         Your Honor, I have one last exhibit.  May I have

12  someone bring up copies?

13         THE COURT:  Please.

14  **Q.**   BY MS. AGUIAR:  Can you tell us what Exhibit 4505 is,

15  please?

16  **A.**   This is an e-mail from Jessica McConnell to myself, CC

17  Rachel Harris.

18         MR. PRICE:  No objection to this coming into

19  evidence, if it helps.

20         THE COURT:  It's admitted.

21         **(Exhibit 4505 received.)**

22  **Q.**   BY MS. AGUIAR:  And now that we have it on the screen,

23  can you describe what we're looking at?

24  **A.**   There is an e-mail submitted from Jessica McConnell, and

25  it's titled further name exploration.  And this was

1   Ayzenberg's list of alternative names for Bratz.

2   **Q.**   And are these names that were considered internally at

3   MGA in this November 2000 time frame as a potential brand

4   name for the product that was eventually manufactured?

5   **A.**   Yes.

6           MS. AGUIAR:  May I have a moment?

7           THE COURT:  You may.

8           MS. AGUIAR:  One more question.  I have to find the

9   exhibit.

10           Your Honor, I wanted to go to the exhibit where

11   they admitted just the one paragraph.

12           THE COURT:  Yes.  What exhibit number is that?

13           MS. AGUIAR:  I'm not sure when it went in.  It was

14   admitted as an exhibit number.

15           THE COURT:  Here it is.  It was Exhibit 10001.

16   Page 2, paragraph -- well, Mr. Price thinks it's paragraph 6,

17   I think it's paragraph 7.

18           MS. AGUIAR:  It's the loan paragraph.  It's the

19   mystery floating paragraph.

20   **Q.**   Okay.  In this paragraph here, where you say, "I thought

21   they were incredible and I tried to stay true to this

22   inventor/creator's vision," can you tell us what you meant

23   there?

24   **A.**   I was referring to the four characters, and I wanted to

25   stay -- this was in reference to Carter Bryant's characters

1   in the portfolio drawings.  I wanted -- because certainly

2   there were things in that portfolio that I loved very much,

3   and we talked about that there were some that I was concerned

4   about.  And it was, you know, it was for me to say I tried to

5   stay true to this inventor's vision.  Meaning, you know, I

6   tried to do -- wherever it felt comfortable without me

7   feeling that it was going to impose on the success of Bratz,

8   I tried to stay true to his vision.

9   **Q.**   And were there ways in which you were not able to do

10  that?

11  **A.**   Yes.

12  **Q.**   Can you tell us what those were?

13  **A.**   I'm sorry?

14           MR. PRICE:  Objection at this point.

15           THE COURT:  Sustained.

16           MS. AGUIAR:  That's for another time.

17           Thank you, I have nothing further.

18

19

20

21

22

23

24

25

1          **FURTHER REDIRECT EXAMINATION**

2     BY MR. PRICE:

3     **Q.**    You were asked questions about Bratz again.  It's not as

4     though someone at MGA came up with the name Bratz, though, is

5     it?  That's not true?

6     **A.**    It is not -- you know, we will attest for sure that

7     Bratz was included in Carter Bryant's September 1st, 2000,

8     portfolio.  It was MGA employees who made the decision to in

9     fact use Bratz in production.

10    **Q.**    But it would be false to say that MGA came up with it

11    because one of their employees looked at these drawings and

12    said hey, those look like Bratz.  That was my idea.

13              That would be a false statement; right?

14    **A.**    We agreed to use the term Bratz because in fact,

15    ultimately, that name very closely represented the concept of

16    Bratz, if that's what you mean.

17    **Q.**    No, I mean that no one with a fresh slate came up with

18    the name Bratz.  It was a name that was given to them by

19    Carter Bryant, and they agreed on it; right?

20    **A.**    Yes.

21    **Q.**    And with respect to Exhibit 4502, the Ayzenberg document

22    that was shown to you, it was a list of other names

23    considered.  Does that document reflect a back and forth that

24    this is where we are now as to possible names?  Or are all of

25    these names Ayzenberg's suggestions?

1          Do you understand what I mean?

2    **A.**    No, I don't.

3    **Q.**    You hire these outside companies to help in certain

4    areas.  Is the list that you were shown on Exhibit 4502, is

5    that a list that just they came up with, or is it a list

6    which they are developing with joint back and forth with MGA?

7    **A.**    I believe that that e-mail was a response to a request

8    from MGA to have them and in their own internal team arrive

9    at, you know, their varieties or their suggestions as

10   alternative names to Bratz.  So that's an Ayzenberg list of

11   names.

12              MR. PRICE:  Nothing further.

13              THE COURT:  Anything further?

14              MS. AGUIAR:  Nothing further.

15              THE COURT:  Very well.

16              Ms. Garcia, you are excused.  Have a nice weekend.

17              MR. QUINN:  Your Honor, could we --

18              THE COURT:  Sure.  Well, Counsel, we have literally

19   four minutes left.

20              MR. QUINN:  I was going to ask you.

21              THE COURT:  Fair enough.

22              **(SIDEBAR CONFERENCE HELD.)**

23              MR. QUINN:  Your Honor, the next witness has been

24   waiting two days.  I'll throw boatloads of proposed

25   examination overboard.  I'll do it in 10 minutes.  But it's a

1  real problem for her to come back.  If we could just do it, I

2  will race right through it.

3          THE COURT:  If there's no objection from Mr. Nolan,

4  I'll ask the jury if they are willing to stay.

5          MR. NOLAN:  Your Honor, I strongly object because I

6  know the content of what they are going to try to bring out

7  and elicit, which is going to take -- not substantial, but I

8  can't do cross-examination within three minutes or five

9  minutes.  I think it would be grossly unfair in three minutes

10  after this to just drop something in where she's going to

11  have to come back anyway on Wednesday or Thursday afternoon

12  or whenever.  Not for three minutes, your Honor.  It's just

13  not fair.

14          MR. QUINN:  Your Honor, we've had this lady waiting

15  around based on estimates we've been given as to how long the

16  examinations will take.

17          THE COURT:  I understand.

18          MR. QUINN:  These things happen.

19          THE COURT:  They do.

20          MR. QUINN:  I'm not happy with rushing it myself,

21  but this woman, her mother is having surgery.  It's only a

22  maybe about whether she'll come back.  It's been a real

23  sacrifice to her.  She's real unhappy.

24          MR. NOLAN:  We have a full deposition.

25          THE COURT:  Who is the witness?

```
 1              MR. QUINN:  Victoria O'Connor, former MGA.

 2              THE COURT:  Wow.  This is --

 3              MR. NOLAN:  Your Honor, if she can't come back for

 4    whatever reason, I mean, there is a full deposition, and I

 5    think it has already been designated that we can play it in

 6    the absence of her live testimony.  But to just do this and

 7    drop two minutes on a Friday after a very long week, what

 8    they want is a prejudicial piece like this to leave with the

 9    jury for the weekend, which I think will be very prejudicial

10    for us under the circumstances.

11              THE COURT:  How long do you feel a full-fledged

12    cross-examination would take?

13              MR. NOLAN:  I believe my examination is 20, 25

14    minutes, your Honor.

15              THE COURT:  And how long is your direct

16    examination?

17              MR. QUINN:  I've offered to get it inside 10

18    minutes.

19              THE COURT:  If the jury were able to stay for

20    another 35 or 40 minutes -- and believe me, I'm the last one

21    that wants to stay.  I've got 12 motions to work on.  And I

22    can't wait to get home and work on those.  But would that be,

23    assuming that you got -- and I wouldn't -- I wouldn't

24    indicate who is going to take how much time.

25              I'd simply ask the jury are you able to stay for 45
```

1  minutes for someone who has a medical situation next week.  I

2  understand your argument and I'm reluctant, but does that

3  sound -- these professional requests are going to come around

4  on both sides during the course of the trial.

5       MR. NOLAN:  I accommodate.  But when I first talked

6  to Mr. Quinn, her mother is having the surgery on Tuesday.

7  It's not her medical condition.

8       THE COURT:  This may be moot.  Because if any

9  member of the jury says they have a commitment, I'm going to

10  protect the jury before I protect the witness.  So the

11  question is whether I ask the jury if they are able to stay

12  for 45 minutes, which would afford you your cross-examination

13  uninterrupted, unabridged.  We'll get the witness on.  May I

14  ask the jury?

15       MR. NOLAN:  I feel -- I'm so -- I feel like calling

16  my wife because it's my daughter's graduation this weekend,

17  but your Honor, if the jury will stay, we can do it.

18       THE COURT:  I'll ask if there's any member of the

19  jury that cannot stay for another 45 minutes.

20       You're a brave man.

21       Members of the jury, ordinarily we would be

22  breaking at this time, and we can if we need to.  We have a

23  witness who has a family medical matter to attend to next

24  week.  She's been waiting here today to testify.  It looks

25  like we will need 45 minutes.  I have told counsel if there

1   is any juror who cannot stay for another 45 minutes, we're

2   going to end it today and find another time to bring the

3   witness in.  But if, and I know this is Friday afternoon, and

4   we all want to get home, but if all the members of the jury

5   can stay for another 45 minutes, I've told the lawyers that

6   the Court would accommodate this one witness.

7          Is there a juror that has an issue?

8          I see a couple of hands.  I'm sorry.  We're going

9   to have to conclude for the day, and we'll resume tomorrow.

10         MR. PRICE:  Tomorrow?

11         THE COURT:  A Freudian slip.

12         We'll see you on Tuesday at 9:00.

13         All rise for the jury.

14         **(WHEREUPON THE JURY WITHDRAWS.)**

15         THE COURT:  Please be seated.  Mr. Quinn, I will

16  give you leave to bring that witness out of order whenever

17  it's appropriate to do so.

18         MR. QUINN:  Thank you.

19         THE COURT:  Very well.  I think he indicated

20  earlier that I'll see whoever is arguing the motions at 1:30

21  on Monday.  I'll see you at 1:30 on Monday.  Is there

22  anything else we need to take up?

23         MR. NOLAN:  Just on your local rules, you normally

24  require lead trial counsel to be here.  There is a

25  possibility, because of a commitment on 1:30 on Monday, that

1    I will not be here.  And I think Jason Russell and --

2              THE COURT:   I'd rather see the attorneys that

3    actually wrote the motions.

4              MR. NOLAN:   I thought.  So no offense taken.

5              THE COURT:   So Mr. Russell and Mr. Zeller, I

6    presume.

7              MR. NOLAN:   Pardon me?

8              THE COURT:   And Mr. Zeller, I presume?

9              MR. NOLAN:   I assume so.

10             THE COURT:   And a few other supporting cast.

11             MR. ZELLER:   Your Honor, I have not read it, but

12   there is an opposition to the Fifth Amendment motion we had

13   filed, and I didn't know if this came within the parameters

14   of what the Court had already ordered, but I'd request an

15   opportunity to file some sort of reply.

16             THE COURT:   You don't think you've sufficiently

17   addressed the issue in your motion?

18             MR. ZELLER:   I would hope so, and I do caveat it by

19   saying I have not read the opposition.  I know it was filed.

20             THE COURT:   Let me take a look at the opposition

21   this weekend, and take it up with me on Monday if you are

22   here, or Tuesday morning, and we'll see if the Court needs

23   further briefing on this.  Given that I'm treating these as

24   trial briefs and not as a motion per se, I may dispense with

25   the optional reply.

1          Are there any other deposition transcripts besides

2    the Nana Ashong deposition?  I'll rule on that at 1:30 as

3    well.

4          MR. ZELLER:  There is another transcript.  I do not

5    know if the Court has received it yet, but it should be

6    imminent, which is deposition testimony from a Steve Linker,

7    L-I-N-K-E-R.

8          THE COURT:  Will that be on Tuesday or Wednesday?

9          MR. ZELLER:  I think that the current plan is that

10   it will probably be someday other than Tuesday, with the

11   caveat that because things have run long, and a number of the

12   next witnesses who we planned on calling were in a position

13   of Ms. O'Connor in the sense that they are third party

14   witnesses, and some are difficult to control their schedule,

15   our plan is to try and put as many of those people as

16   possible on Tuesday, and then if we have additional time left

17   over, we would probably play some video either of Nana Ashong

18   or Steve Linker.

19         THE COURT:  Very well.  I just wanted to make sure

20   I don't have to go through that this weekend.

21         MR. ZELLER:  We will certainly have it before you

22   on Monday morning.

23         THE COURT:  And speaking of time, plaintiffs have

24   used ten hours and one minute, and I've got the defense

25   having used seven hours and 45 or 44 minutes.  That's where

1   we're at at present.

2           Anything else?

3           MR. NOLAN:  Your Honor, I just want to be clear.

4   So there are no new witnesses for Tuesday other than what

5   we've already --

6           MR. ZELLER:  Let me clarify something that we

7   talked about earlier.  I am informed that the Court should

8   already have the Prince designations as well as Steve Linker.

9           THE COURT:  Do we have those, Gina?  Here they are.

10  Here's Linker, and here is Prince.  Yes, Counsel, I have both

11  of them.  So nothing else for Mattel?

12          MR. PROCTOR:  Two things.  Number one, for

13  clarification on Monday, are you intending to hear arguments

14  on statutes of limitations briefs?

15          THE COURT:  I have received them, and we'll be

16  working on that as well.  I don't think I -- I am not going

17  to hear any more argument on statute of limitations, and I

18  want to compliment whoever did the briefs, I guess it was

19  Mr. Zeller and Mr. Russell, for addressing the issues that

20  the Court asked to be addressed and only the issues that the

21  Court asked to be addressed.

22          So they were very helpful, and I think the Court

23  should be prepared to make its final ruling on the statute of

24  limitations on Monday, but there will be no argument.  We've

25  heard enough of that.

1    MR. PROCTOR:  And we could use a little

2  clarification on the motion -- discovery motion No. 4, the

3  privilege log motion.  I understand that the Court wanted the

4  motion narrowed in some way, but there's a lack of clarity on

5  our side as to exactly what the Court's directions are.

6    THE COURT:  To be honest, I haven't really looked

7  at it other than what is set forth in the index.  So I may

8  not be able to give that to you until Monday.  But thank you.

9    Anything further from MGA?

10    MR. NOLAN:  No, your Honor.

11    THE COURT:  All right.  Everyone try to have a good

12  weekend and get some rest, and we'll see you on Monday.

13

14    (Proceedings concluded at 5:10 P.M.)

15

16

17

18

19

20

21

22

23

24

25

1006

1

2

3

4

5

6

7                          C E R T I F I C A T E

8

9

10           I hereby certify that pursuant to Title 28,

11    Section 753 United States Code, the foregoing is a true and

12    correct transcript of the stenographically reported

13    proceedings in the above matter.

14           Certified on May 30, 2008.

15

16

17    _____
      MARK SCHWEITZER, CSR, RPR, CRR
18    Official Court Reporter
      License No. 10514

19

20

21

22

23

24

25