4890

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

- - -

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

- - -

MATTEL, INC.,                    )
                                 )
                    PLAINTIFF,   )
                                 )
          VS.                    )   NO. CV 04-09049
                                 )
MGA ENTERTAINMENT, INC., ET. AL.,)   TRIAL DAY 23
                                 )   AFTERNOON SESSION
                    DEFENDANTS.  )   PAGES 4890-5014
_____)
AND CONSOLIDATED ACTIONS,        )
_____)

**CERTIFIED COPY**

REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

RIVERSIDE, CALIFORNIA

THURSDAY, JULY 10, 2008

1:30 P.M.

THERESA A. LANZA, RPR, CSR
FEDERAL OFFICIAL COURT REPORTER
3470 12TH STREET, RM. 134
RIVERSIDE, CALIFORNIA  92501
951-274-0844
WWW.THERESALANZA.COM

```
 1    APPEARANCES:

 2
      ON BEHALF OF MATTEL, INC.:
 3
                            QUINN EMANUEL
 4                          BY:   JOHN QUINN
                                  JON COREY
 5                                MICHAEL T. ZELLER
                                  HARRY OLIVAR
 6                                TIMOTHY ALGER
                                  WILLIAM PRICE
 7                          865 S. FIGUEROA STREET,
                            10TH FLOOR
 8                          LOS ANGELES, CALIFORNIA  90017
                            213-624-7707
 9

10
      ON BEHALF OF MGA ENTERTAINMENT:
11
                            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
12                          BY:   THOMAS J. NOLAN
                                  JASON RUSSELL
13                                RAOUL KENNEDY
                                  LAUREN AGUIAR
14                                CARL ROTH
                            300 SOUTH GRAND AVENUE
15                          LOS ANGELES, CALIFORNIA  90071-3144
                            213-687-5000
16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                                                    PAGE

3    CLOSING ARGUMENTS - DEFENSE...................... 4893

4    CLOSING ARGUMENTS - PLAINTIFF.................... 4972

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

THURSDAY, JULY 10, 2008              TRIAL DAY 23, AFTERNOON SESSION

4893

1    RIVERSIDE, CALIFORNIA; THURSDAY, JULY 10, 2008; 1:30 P.M.

2                              -OOO-

3          (WHEREUPON, JURORS ENTER COURTROOM.)

4          **THE COURT:**  MR. NOLAN, YOU MAY BEGIN.

5          **MR. NOLAN:**  THANK YOU.

6                  **CLOSING ARGUMENT - DEFENSE**

7          **MR. NOLAN:**  GOOD AFTERNOON, LADIES AND GENTLEMEN.

8          LET ME START, FIRST, BY THANKING YOU.  I DON'T WANT

9    TO WAIT UNTIL THE END.  THANK YOU SO MUCH ON BEHALF OF MGA,

10   MR. LARIAN, AND HIS FAMILY, WHO HAVE BEEN HERE EVERY DAY, AND

11   MY TRIAL TEAM.  YOU HAVE BEEN A TERRIFIC JURY, AND I APPRECIATE

12   YOUR PATIENCE.  THE HOURS HAVE BEEN LONG, BUT YOUR ATTENTION

13   HAS BEEN SPECTACULAR.  AND YOU LAUGHED AT MOST OF MY JOKES,

14   INCLUDING THE FAMOUS LINE, 'WHOSE HEAD WAS IT IN THE TRASH,'

15   WHICH I'LL ALWAYS BE REMEMBERED FOR.  BUT WHEN I WAS LISTENING

16   TO MR. QUINN, I WAS STRUCK BY ONE THING.  AND IT'S A COMMENT

17   THAT SOMETIMES WE MAKE AT HOME:  GO BIG OR GO HOME.

18         EVERYTHING THAT MR. QUINN SAYS TO YOU, LADIES AND

19   GENTLEMEN, IS DEPENDENT ON ONE OVER-ARCHING THEME:  EVERY

20   WITNESS WHO TESTIFIED FOR MGA IS A LIAR; EVERY LAWYER WHO

21   PARTICIPATED IN THE PREPARATION OF A WITNESS OR THE DRAFTING OF

22   A DOCUMENT IS INVOLVED IN A MASSIVE CONSPIRACY.  EVERY SINGLE

23   PERSON.

24         MR. LARIAN SAID WHEN HE TOOK THE STAND, AND HE TOLD

25   YOU DURING CROSS-EXAMINATION BY MR. PRICE, THAT WHEN HE SIGNED

01:30
01:30
01:31
01:31
01:31

```
 1   UP, TOOK THE RISK, RISKED MILLIONS OF DOLLARS TO TAKE MATTEL

 2   ON, HE KNEW FROM HIS EXPERIENCE IN THE MARKETPLACE THAT HE HAD

 3   A TARGET ON HIS BACK.

 4        WELL, ONE OTHER THING WE'VE LEARNED NOW IS THAT IF

 5   YOU DARE TO BE A WITNESS IN A MATTER BROUGHT BY MATTEL, YOU ARE   01:32

 6   GOING TO HAVE A TARGET ON YOUR BACK AND THAT TARGET AND THAT

 7   LABEL IS, YOU ARE LYING, AND IF YOU HAPPEN TO BE A LAWYER THAT

 8   TAKES ON MATTEL, YOU TOO WILL BE PAINTED WITH THAT WIDE BRUSH.

 9        IT JUST CAN'T BE.

10        WHAT I IMPLORE YOU TO DO, AND I AM CONFIDENT THAT   01:32

11   YOU'RE GOING TO DO IN WEIGHING THE EVIDENCE, IS TO LOOK AT BOTH

12   SIDES, AND THEN TO APPLY COMMON SENSE.  IT'S THE BEST SENSE,

13   WHEN YOU'RE LOOKING AT THIS, WHEN YOU'RE LOOKING AT THIS CASE.

14        I INVITE YOU TO LOOK AT THE INTEGRITY OF THE

15   PRESENTATION THAT YOU SAT THROUGH FOR SEVEN WEEKS, AND I AM   01:3?

16   CONFIDENT AND QUITE COMFORTABLE TO HAVE MY INTEGRITY AND OUR

17   PRESENTATION'S INTEGRITY JUDGED BY EACH AND EVERY ONE OF YOU.

18        YOU KNOW, I HARKEN BACK TO THE FIRST DAY THAT WE MET

19   IN OPENING STATEMENTS.  OPENING STATEMENTS BY A TRIAL LAWYER

20   ARE NOT POLITICAL SPEECHES, FOR POLITICIANS CAN MAKE PROMISES   01:3.

21   TO GET YOUR VOTE AND THE ELECTION IS ALWAYS HELD BEFORE THOSE

22   PROMISES HAVE TO BE COMMITTED, OR MET.

23        IN A TRIAL, WHEN A TRIAL LAWYER STANDS BEFORE YOU IN

24   OPENING STATEMENT AND TELLS YOU, THIS IS WHAT THE EVIDENCE IS

25   GOING TO PROVE, YOU, LADIES AND GENTLEMEN, GET TO VOTE AFTER   01:3
```

1   THEY HAVE TRIED TO MEET THOSE COMMITMENTS.

2        IN MR. QUINN'S OPENING STATEMENT, MR. QUINN LAID OUT

3   TO YOU WHAT THE EVIDENCE IN THIS CASE WAS GOING TO PROVE.

4        I SUBMIT, LADIES AND GENTLEMEN, YOU HAVE BEEN HERE.

5   YOU SEE ALL OF THE LAWYERS BEHIND EACH OF THE TEAMS.  DO YOU        01:34

6   THINK FOR A MOMENT THAT WE STOOD UP HERE NOT EXPECTING TO KNOW

7   WHAT THE EVIDENCE WAS GOING TO SHOW?

8        I SUBMIT THAT WHEN YOU COMPARE THE OPENING STATEMENT

9   OF MATTEL ON THE FIRST DAY TO WHAT THEY ACTUALLY PROVED IN THE

10  TRIAL, IT SHOWS ONE GLARING THING; AND THAT IS THE SAME GLARING    01:34

11  THING THAT WAS MISSING FROM MR. QUINN'S ARGUMENT THIS MORNING:

12  MATTEL HAS THE BURDEN IN THIS CASE TO PROVE EACH AND EVERY ONE

13  OF THE ELEMENTS OF THE CLAIMS THAT THEY ARE SEEKING.

14       THEY HAVE THE BURDEN TO PROVE THAT THE DRAWINGS OF

15  CARTER BRYANT WERE NOT DONE IN 1998, THAT THEY WERE DONE AT        01:35

16  MATTEL.  AND THEY CANNOT SATISFY THAT BURDEN MERELY BY YELLING,

17  BY GOING FAST, AND SAYING, WELL, HE'S LYING, SHE'S LYING, THE

18  MOTHER -- IT'S OKAY TO BE MISTAKEN IF YOU'RE THE MOTHER.

19       THINK ABOUT THIS.  THINK ABOUT TEN YEARS FROM NOW AND

20  SOMEONE ASKS YOU, 'DID YOU SEE THIS DRAWING IN THE BRATZ          01:35

21  TRIAL?'  HOW CERTAIN ARE YOU THAT YOU'RE GOING TO SAY, 'I'M

22  ABSOLUTELY CERTAIN I SAW THIS PARTICULAR ONE'?

23       YOU KNOW, MATTEL WANTS IT BOTH WAYS.  IN ONE SENSE,

24  THEY SPEND SO MUCH TIME IN THEIR PRESENTATION TALKING ABOUT

25  CARTER BRYANT'S CREDIBILITY AND THE USE OF EVIDENCE ELIMINATOR.   01:36

1    WE HEARD SO MANY QUESTIONS ABOUT THE SOFTWARE PACKAGE, EVIDENCE

2    ELIMINATOR.  PLEASE REMEMBER THAT THAT TESTIMONY WAS PRECEDED

3    BY AN INSTRUCTION FROM HIS HONOR WHICH SAID THAT IT WAS ONLY

4    BEING OFFERED FOR THE LIMITED PURPOSE OF CARTER BRYANT'S

5    CREDIBILITY; MGA HAD NO KNOWLEDGE OF IT.                                  01:36

6            BUT WHAT MR. QUINN AND MATTEL WANTS YOU TO BELIEVE IS

7    THAT THE EVIDENCE ELIMINATOR WAS USED TO ELIMINATE ALL OF THIS

8    EVIDENCE.

9            WELL, IF MR. BRYANT USED SUCH SOFTWARE, HE DID SO AT

10   THE TIME MATTEL WELL KNEW ABOUT IT, IN THE SENSE THAT THEY'VE          01:36

11   SETTLED THEIR CLAIMS AGAINST CARTER BRYANT EVEN THOUGH THEY

12   KNEW HE HAD USED, ALLEGEDLY, EVIDENCE ELIMINATOR.

13           IF THE EVIDENCE WAS ELIMINATED THAT WAS SO IMPORTANT

14   IN THIS CASE, WHY DOES CARTER BRYANT PRESENT AND PRODUCE OTHER

15   DOCUMENTS THAT WE'VE SPENT SEVEN WEEKS GOING OVER; THE HUNDREDS        01:37

16   OF PHOTOGRAPHS, THE PICTURES, THE DRAWINGS, THE NOTEBOOK

17   ITSELF?  IT DOESN'T MAKE SENSE.

18           THEY DID THAT TO SMEAR CARTER BRYANT.  THEY WANTED

19   YOU TO BELIEVE THAT SOMEONE WHO MAY BE EMBARRASSED ABOUT THE

20   INTERNET SITES HE VISITS AND WANTS TO SHIELD THAT FROM HIS            01:37

21   FAMILY MEMBERS -- THAT IT'S WRONG TO TRY TO DO THAT.  THEY

22   SUCCEEDED IN EMBARRASSING HIM.

23           ISAAC LARIAN'S FAMILY WAS BROUGHT INTO THIS CASE.

24           WHAT RELEVANCE TO THE QUESTION IN THIS CASE AS TO

25   WHEN THE DRAWINGS WERE DONE DID THE QUESTION OF WHETHER OR NOT        01:3

1    MR. LARIAN'S PARENTS HAD WEALTH IN IRAN, OR THAT HE HAD A

2    DISPUTE WITH HIS BROTHER?

3            WHY THE SIDE SHOW?

4            PERHAPS TO BIAS YOU?

5            EVEN MR. QUINN, IN HIS OPENING PART OF THE ARGUMENT,   01:38

6    TALKED ABOUT THE TESTIMONY OF FARHAD LARIAN, THE BROTHER, AND

7    HE EVEN SAID THAT MR. LARIAN'S LAWSUIT AGAINST HIS BROTHER

8    RELIED ON A NOTION THAT HE WAS CONCEALED OF INFORMATION FROM

9    BRATZ.

10           YOU KNOW THE REST OF THE STORY.  MR. LARIAN RELIED ON   01:38

11   A TYPOGRAPHICAL ERROR IN THE WALL STREET JOURNAL, AND DURING

12   THE COURSE OF THE PRESENTATION OF THAT ARBITRATION, RECOGNIZING

13   THE EVIDENCE DIDN'T SUPPORT THE ALLEGATIONS, GAVE IT UP.

14           BUT MATTEL WILL TWIST THAT AND SAY, 'OH, BECAUSE

15   ISAAC LARIAN GAVE A PROMISE TO HIS FATHER, WHO DIED ON   01:39

16   JANUARY 20TH OF THIS YEAR, THAT HE WOULD NOT GO AFTER HIS

17   BROTHER TO COLLECT THE ATTORNEY FEES THAT HAD BEEN AWARDED TO

18   ISAAC -- MR. LARIAN TURNS THAT AROUND AND SAYS THAT'S PAYOFF

19   MONEY TO FARHAD.

20           THAT'S NOT EVIDENCE, LADIES AND GENTLEMEN.  THAT'S   01:39

21   DRAMA.  THAT'S A SIDE SHOW.  THAT'S A DISTRACTION.

22           I'M GOING TO GET TO THIS IN A MOMENT.

23           I ACTUALLY AGREE WITH ONE THING THAT WAS SAID BY

24   MR. QUINN; AND THAT IS THAT MR. CUNNINGHAM'S TESTIMONY IN THIS

25   CASE WAS A GAME CHANGER.   01:39

```
 1              AARON, CAN I HAVE UP ON THE SCREEN THAT SLIDE,
 2    PLEASE.
 3              I ABSOLUTELY AGREE THAT MR. CUNNINGHAM, THE DOCUMENT
 4    EXAMINER, WITH YEARS OF EXPERIENCE, LOOKED AT THE DRAWING, AND
 5    USING THE INDENTION MATERIALIZER, PROVED THAT THE BRATZ DRAWING   01:40
 6    WAS IN THE NOTEBOOK, THE NOTEBOOK THAT CARTER BRYANT PRODUCED.
 7    AND YOU'LL RECALL THE TESTIMONY, I'M SURE, VIVIDLY:
 8              'WHO HIGHLIGHTED THAT, MR. CUNNINGHAM?'
 9              'WELL, MATTEL'S GRAPHIC DEPARTMENT DID.'
10              'WHAT WAS THE PURPOSE IN DOING THAT?'                   01:40
11              'WE WANT TO SHOW TO THE JURY THAT IT WAS THE ORIGINAL
12    BRATZ DOLL THAT WAS IN THE DRAWING, AND DRAWING IN THE
13    NOTEBOOK, AND THAT THERE WAS AN INDENTION ON A DIVIDER.'
14              YOU'LL REMEMBER THAT.  THAT WAS THE DIRECT
15    EXAMINATION.                                                     01:40
16              MY COLLEAGUE, MR. SLOAN, STOOD UP AND, ON
17    CROSS-EXAMINATION, SAID -- LET'S GO TO THE NEXT SLIDE --
18    BECAUSE, OF COURSE, WE HAD ALREADY HEARD ABOUT RAINY DAY
19    RASCALS AND GREETING CARDS BY CARTER BRYANT -- WE STARTED TO
20    TRACE IN THE BACK.                                               01:41
21              AARON DID IT WITH THE BLUE.
22              A PAID EXPERT BY MATTEL COMES IN, RELIED NOW AND
23    EMBRACED BY MR. QUINN, EMBRACED BY MR. QUINN, AND SAID IT
24    CHANGED THE COURSE OF THIS CASE.
25              I AGREE.  IT CHANGED THE COURSE OF THIS CASE.          01:41
```

4899

1    YOU CANNOT BRING AN EXPERT WITNESS, NO MATTER IF YOU

2  PAY HIM $200 AN HOUR OR WHAT, TO MISLEAD A JURY.

3    WHY DIDN'T HE PICK THAT OUT?  WHY DIDN'T HE DRAW?

4  WHY DIDN'T HE IDENTIFY RAINY DAY RASCALS?

5    BECAUSE THE MATTEL LAWYER TOLD HIM NOT TO.    01:41

6    SIGNIFICANT?

7    OF COURSE.

8    YOU KNOW THE SIGNIFICANCE.

9    RAINY DAY RASCALS, THAT WAS NOT HIGHLIGHTED, YET

10  PRESENT ON THE INDENTION OF THAT DIVIDER, WAS TESTIFIED TO BY    01:42

11  CARTER BRYANT AS HAVING BEEN DRAWN WHILE HE WAS IN KIMBERLING

12  CITY IN 1998, WHILE HE WAS NOT EMPLOYED BY MATTEL.

13    IN MY TIME ALLOTTED TODAY, I WANT TO TALK TO YOU

14  ABOUT THE OVERVIEW OF THE FACTS, I WANT TO TALK TO YOU ABOUT

15  THE JURY INSTRUCTIONS, TO TRY TO OVERLAY THOSE JURY    01:42

16  INSTRUCTIONS WITH THE QUESTIONS THAT YOU'RE GOING TO BE ASKED.

17    BUT I WANT TO DO ONE MORE THING BEFORE I GET THERE.

18    WHEN I STOOD UP IN MY OPENING STATEMENT, I REMINDED

19  YOU OF A NEWSCASTER CALLED PAUL HARVEY IN HIS 'THE REST OF THE

20  STORY.'  THERE'S ALWAYS THE REST OF THE STORY.  AND DURING THIS    01:4

21  CASE, I BELIEVE THAT SO MANY TIMES, WITNESS AFTER WITNESS AFTER

22  WITNESS, THE REST OF THE STORY CAME OUT ON CROSS-EXAMINATION.

23    MR. QUINN, IN HIS CLOSING TODAY, TALKED TO YOU ABOUT

24  THE TESTIMONY OF PETER MARLOW AND QUOTED AN EXCHANGE BETWEEN

25  MR. LARIAN AND THE QUESTIONER.    01:4

1    LET'S PUT UP THE QUESTION AND THE ANSWER.  THIS IS

2  LARIAN AT PAGE 1840.

3    MR. QUINN TOLD YOU JUST AN HOUR AGO -- HE SHOWED THE

4  FIRST QUESTION AND ANSWER.

5    QUESTION:  "AND YOU DIDN'T, FOR EXAMPLE, COMMUNICATE       01:44

6  WITH VERONICA MARLOW AND, SAY, IDENTIFY WHO THESE LADIES ARE

7  WHO HAVE 100 YEARS TOTAL DOLL-MAKING EXPERIENCE AND HAVE THIS

8  SECURE EMPLOYMENT AND WHO ARE MOONLIGHTING AND WHO WOULD BE

9  FIRED AND HUMILIATED IF IT WAS DISCOVERED?"

10    ANSWER:  "AGAIN, AS I TESTIFIED, I DID NOT READ THIS       01:44

11  LONG E-MAIL.  IT WAS NOT SENT TO ME.  IT WAS SENT TO PAULA.  I

12  WAS COPIED ON IT, SO I DON'T RECALL EVEN READING THIS WHOLE

13  E-MAIL."

14    **MR. NOLAN:**  AND MR. LARIAN WAS RIDICULED FOR THAT

15  ANSWER.       01:44

16    BUT THEN, WHAT MR. QUINN DID NOT SHOW YOU, WHAT

17  MATTEL DID NOT SHOW YOU, IS THE VERY NEXT QUESTION AND ANSWER:

18    QUESTION:  "I, SITTING HERE READING THIS TODAY, YOUR

19  DECISION STILL WOULD BE, 'I WOULDN'T DO ANYTHING ABOUT IT; I

20  WOULDN'T INVESTIGATE IT'?"       01:44

21    ANSWER:  "PAULA WAS WORKING WITH VERONICA, AND I

22  HOPED SHE WOULD LOOK INTO THIS.  I WAS NOT INVOLVED IN THAT

23  DETAIL, NO."

24    **MR. NOLAN:**  YOU KNOW FROM MR. MARLOW'S TESTIMONY

25  THAT, IN FACT, WHEN THE E-MAIL HAD BEEN WRITTEN TO       01:45

1   ISAAC LARIAN, VERONICA MARLOW HAD QUIT, BECAUSE MEL WOODS AND

2   PAULA GARCIA WERE DEMANDING TO KNOW THE IDENTITY OF WHO THEY

3   WERE USING AS THIRD-PARTY VENDORS.

4        THAT'S THE REST OF THE STORY.  DO NOT DECIDE THIS

5   CASE, LADIES AND GENTLEMEN, ON INNUENDO.                    01:45

6        MR. QUINN SAYS THAT WE STOLE IDEAS AND DRAWINGS FROM

7   MATTEL.  THE ONLY THEFT THAT WILL OCCUR IN THIS CASE IS IF --

8   AND I DON'T BELIEVE THIS IS GOING TO HAPPEN -- IF YOU ALLOW

9   MATTEL TO TAKE IDEAS AND DRAWINGS THAT THEY DID NOT CONCEIVE

10  OF, THAT THEY DID NOT DRAW, AND DOLLS THAT THEY DID NOT MAKE.  01:45

11       THAT'S WHAT THIS CASE IS ABOUT.

12       THE CENTRAL ISSUE IN THIS CASE IS, WHEN DID

13  CARTER BRYANT FIRST CONCEIVE OF THE BRATZ CHARACTERS AND REDUCE

14  HIS IDEA TO A DRAWING?

15       MATTEL WILL DO EVERYTHING, AND DID EVERYTHING, TO       01:46

16  DISTRACT YOU FROM THAT MAIN POINT.

17       IN LATE AUGUST OF 1998, CARTER BRYANT DESCRIBED THE

18  FOUR BRATZ CHARACTERS IN HIS HANDWRITTEN NOTES.  YOU HAVE IT IN

19  EVIDENCE.  IT'S TRIAL EXHIBIT 709.

20       COULD I HAVE SLIDE 27 UP.                              01:46

21       THIS IS THE DOCUMENT, "MEET THE BRATZ."

22       THE NAME "BRATZ" IS MENTIONED RIGHT THERE.

23  CARTER BRYANT TESTIFIED THAT THIS WAS HIS CONCEPT FOR WHAT THE

24  BRATZ WOULD BE.  IT TURNS OUT THAT IT BECAME THE INITIAL

25  INSPIRATION FOR A DOLL LINE THAT WAS FABULOUSLY SUCCESSFUL,   01:47

1    THAT MR. QUINN EVEN ADMITTED WAS HUGELY SUCCESSFUL AROUND THE

2    WORLD.  AND THAT, LADIES AND GENTLEMEN, IS COMPETITION.  AND

3    THAT IS REALLY WHAT IS GOING ON AS A SUBTEXT IN THIS CASE.

4         YES, IT'S ABOUT DOLLS; BUT, YES, IT IS SO MUCH MORE

5    IMPORTANT THAN THAT.                                        01:47

6         MATTEL AND MGA COMPETE IN THE MARKETPLACE.  AND YOU

7    NOW KNOW THAT FOR 40 YEARS, BARBIE WAS THE ONLY DOLL IN TOWN,

8    AND BRATZ CAME IN AND KNOCKED HER OFF HER PEDESTAL.  AND MATTEL

9    HAS AGGRESSIVELY ACCUSED ALL OF US IN A CONSPIRACY TO STEAL AN

10   IDEA THAT THEY NEVER HAD, THEY NEVER MADE.                   01:47

11        BRATZ WAS BORN ON AN AUGUST EVENING IN KIMBERLING

12   CITY.  THE BEST EVIDENCE OF IT IS THE TESTIMONY OF

13   JANET BRYANT.  MOTHERS DON'T LIE.  MR. QUINN EVEN ADMITTED

14   THAT.  THEY MAY BE MISTAKEN.  AND SHE CERTAINLY MADE MISTAKES

15   WITH RESPECT TO WHAT DRAWINGS SHE MAY HAVE SEEN.  BUT HER      01:48

16   DEPOSITION WAS TAKEN NINE YEARS AFTER SHE SAW THE DRAWINGS.

17   BUT IF THERE WAS A CONSPIRACY, YOU WOULD HAVE EXPECTED HER TO

18   NAIL IT; 'OH, I SAW THAT ONE; I SAW THIS ONE; I SAW THAT ONE; I

19   DIDN'T SEE THIS; OH, NO, I DIDN'T SEE THIS ONE.'

20        SHE'S HONEST.                                           01:48

21        COULD WE ALL, EVEN AFTER SEVEN WEEKS --

22        I MEAN, I'M SITTING AROUND IN A CONFERENCE ROOM,

23   GOING, 'IS THIS IN EVIDENCE?  DID WE INTRODUCE THIS IN

24   EVIDENCE?  DID I ASK QUESTIONS ABOUT THIS ONE?'

25        THERE'S A LOT OF DRAWINGS HERE.  THE FAILURE TO          01:49

1    IDENTIFY WITH SPECIFICITY A PARTICULAR DOCUMENT, I SUBMIT TO

2    YOU, LADIES AND GENTLEMEN, IS A TESTAMENT TO HER TRUTH, BECAUSE

3    SHE WASN'T COLORING HER TESTIMONY.

4           AARON, CAN YOU PLAY THE TESTIMONY FROM MRS. BRYANT.

5           (EXCERPT PLAYED AS FOLLOWS.)                          01:49

6           QUESTION: "PLEASE TELL US WHAT YOU CAN RECALL ABOUT

7    THE OCCASION IN WHICH CARTER FIRST SHOWED YOU ANY BRATZ

8    DRAWINGS OF ANY KIND."

9           ANSWER:  "HE KNOCKED ON MY BEDROOM DOOR, SAID, 'MOM,

10   I WANT TO SHOW YOU SOMETHING.  WHAT DO YOU THINK OF THIS IDEA?   01:50

11   WHAT DO YOU THINK OF THESE?'"

12          (END OF EXCERPT PLAYED.)

13          **MR. NOLAN:**  MR. BRYANT, AT THE TIME, WAS WORKING AT

14   OLD NAVY.

15          AND, AGAIN, IF YOU CAN'T CONFRONT THE EVIDENCE AND      01:50

16   YOU CAN'T DEAL WITH IT ON A TRUTHFUL BASIS, THEN RIDICULE IT.

17   I SUBMIT, RESPECTFULLY, THAT'S HOW MATTEL HANDLED THIS.

18          IN THE OPENING STATEMENT, SO MUCH TIME AND EFFORT WAS

19   SPENT ON KICKAPOO HIGH SCHOOL AND THE ROUTE THAT WAS DRAWN.

20   YOU'LL RECALL -- DO YOU HAVE THE SLIDE THAT WAS USED IN OPENING   01:50

21   STATEMENT, AARON -- OF COURSE, THIS IS THE ROUTE THAT WAS

22   PRESENTED TO YOU BY MATTEL, WHERE IT SHOWS OLD NAVY AND A

23   CIRCUITOUS ROUTE AROUND THE AREA OF THE HIGH SCHOOL, AND THEN

24   THE ROUTE HOME TO THE PARENTS' HOUSE.

25          THAT'S WHAT MATTEL WANTED YOU TO BELIEVE WAS THE       01:51

1    ROUTE.

2            BUT THEN, OF COURSE, WHEN CARTER BRYANT TESTIFIED, HE

3    GAVE YOU -- AND HE'S THE ONE WHO ACTUALLY LIVED THERE -- HE

4    GAVE YOU THE CORRECT ROUTE, THE ROUTE THAT TAKES HIM BACK TO

5    HIS PARENTS' HOUSE, FROM OLD NAVY TO HIS PARENTS' HOUSE, THAT          01:51

6    GOES RIGHT BY KICKAPOO HIGH SCHOOL.

7            BUT GIVE ME THE SLIDE THAT GIVES ME HIS TESTIMONY.

8            REMEMBER HOW MANY TIMES HE WAS ASKED QUESTIONS ABOUT

9    THIS BY MR. PRICE, OVER AND OVER AND OVER AGAIN, 'YOU MUST HAVE

10   DRIVEN THE WAY MATTEL WANTS YOU TO SAY YOU DROVE HOME.'  BUT         01:51

11   MR. BRYANT, AFTER FIVE DAYS -- I RESPECTFULLY SUBMIT I THINK WE

12   GOT TO KNOW MR. BRYANT QUITE WELL AFTER FIVE DAYS.  HE'S NOT

13   THE MOST FORCEFUL PERSON.  BUT EVEN MR. BRYANT SAID IN

14   RESPONSE -- 'AND SO YOUR TESTIMONY IS THAT YOU WERE NEVER AWARE

15   OF THE ROUTE SHOWN IN THIS MAP FROM KIMBERLING CITY, GOING OVER      01:51

16   THE INTERSTATE AT HIGHLANDVILLE, UP TO 65 TO THE BATTLEFIELD

17   MALL?'

18           AND HIS ANSWER WAS, 'YOU KNOW, YOU CAN ASK ME THIS

19   MANY TIMES, BUT I'M GOING TO KEEP TELLING YOU THE ROUTE I TOOK

20   WAS TO TAKE HIGHWAY 160 UP TO SPRINGFIELD.'                          01:52

21           ANOTHER EXAMPLE OF, IF YOU DON'T FIT IN TO MATTEL'S

22   THEORY OF THIS CASE, YOU'RE BRANDED A LIAR.  IF THE EVIDENCE IS

23   AGAINST YOU, YOU PRESENT A MISLEADING GRAPHIC.

24           THREE WITNESSES SAW THE BRATZ CHARACTER DRAWINGS AND

25   THE IDEA IN 1998.  AND THESE ARE THE WITNESSES THAT MATTEL          01:52

1    CANNOT TOUCH, OTHER THAN TO SAY, 'ISN'T IT SUSPICIOUS THAT THEY

2    COULDN'T REMEMBER EXACTLY THE DRAWINGS THAT THEY SAID THEY

3    SAW?'

4         I SHOWED YOU ONE CLIP FROM JANET BRYANT.  I'D LIKE TO

5    SHOW ANOTHER CLIP FROM HER TESTIMONY.

6         THIS IS SLIDE 247, AARON.

7         (VIDEO EXCERPT PLAYED AS FOLLOWS:)

8         QUESTION:  "DURING THE TIME THAT CARTER BRYANT LIVED

9    WITH YOU THERE IN KIMBERLING CITY, MISSOURI, DO YOU RECALL

10   SHOWING TOM ANY DRAWINGS THAT CARTER HAD DONE, OTHER THAN THE

11   GREETING CARD DRAWINGS?"

12        ANSWER:  "YES."

13        QUESTION:  "WHAT OTHER ONES DO YOU REMEMBER HIM

14   SHOWING YOU?"

15        ANSWER:  "THE BRATZ, THE BIRTH OF THEM."

16        QUESTION:  "WHAT DID YOU SHOW TOM BRYANT IN

17   CONNECTION WITH THE BRATZ?"

18        ANSWER:  "THE SKETCHES HE HAD DONE.  I BELIEVE THEY

19   WERE IN PENCIL.  THE CONCEPT OF THE BIG HEAD AND THE BIG FEET

20   AND THE LITTLE BODIES."

21        (END OF VIDEO EXCERPT PLAYED.)

22        MR. NOLAN:  THEN LET'S PLAY SLIDE 23,

23   JEANNE GALVANO'S VIDEO CLIP.

24        VIDEO EXCERPT PLAYED AS FOLLOWS:)

25        QUESTION:  "I BELIEVE YOU MENTIONED THAT THERE WAS

```
 1    THE OTHER OCCASION IN WHICH JANET SHOWED YOU SKETCHES THAT

 2    CARTER BRYANT HAD DONE."

 3              ANSWER:  "YES."

 4              QUESTION:  "HOW MANY SKETCHES DID SHE SHOW YOU?"

 5              ANSWER:  "I BELIEVE THERE WERE THREE PAPERS."         01:54

 6              QUESTION:  "WHEN YOU SAY 'THREE PAPERS,' DO YOU MEAN

 7    THREE PAGES?"

 8              ANSWER:  "YES."

 9              QUESTION:  "WHEN IS IT THAT JANET SHOWED YOU THOSE

10    DRAWINGS?"                                                     01:54

11              ANSWER:  "WHEN I WAS OUT THERE IN '98; THAT'S WHAT I

12    BELIEVE IT WAS."

13              QUESTION:  "YOU SAY THAT'S WHEN YOU BELIEVE IT WAS.

14    ARE YOU SURE IT WAS 1998 VERSUS 1999?"

15              ANSWER:  "IT COULDN'T HAVE BEEN IN 1999.  IT WOULD    01:54

16    HAVE TO HAVE BEEN IN '98."

17              QUESTION:  "SO YOUR TESTIMONY IS THAT YOU'RE NOW SURE

18    IT WAS 1998?"

19              ANSWER:  "YES."

20              QUESTION:  "WHAT DID THESE DRAWINGS LOOK LIKE?"       01:55

21              ANSWER:  "THEY WERE ON ONE PAGE.  THERE WERE SEVERAL.

22    THEY DIDN'T SEEM TO HAVE HEADS.  THEY HAD BIG FEET.  THERE

23    WASN'T A LOT OF DETAIL ON ONE OF THEM.  AND ON THE OTHERS I

24    REMEMBER THERE BEING MORE HEAD LIKE -- MORE HEADS, BUT NOT

25    FACES, AND/OR JUST EYES AND MOSTLY JUST FIGURES AND POSES."     01:55
```

```
 1              (END OF EXCERPT PLAYED.)

 2         MR. NOLAN:  MR. QUINN WILL HAVE YOU BELIEVE THAT

 3   MRS. GALVANO IS LYING.  YOU WATCHED HER VIDEO.  YOU SAW HER

 4   BACKGROUND.  AND, YES, SHE'S A FRIEND OF JANET BRYANT, BUT

 5   MERELY BEING A FRIEND OR A PARENT OR A PARTNER OF CARTER BRYANT    01:56

 6   DOES NOT DISQUALIFY YOU FROM BEING ABLE TO BE A TRUTHFUL

 7   WITNESS.  UNLESS YOU'RE OFFERING TESTIMONY AGAINST MATTEL.

 8              LET'S LOOK AT THE NEXT WITNESS, RICHARD IRMEN'S VIDEO

 9   CLIP.

10              (VIDEO EXCERPTS PLAYED AS FOLLOWS:)                     01:56

11              QUESTION:  "WHEN DID YOU FIRST HEAR ABOUT BRATZ,

12   B-R-A-T-Z, AS A NAME?"

13              ANSWER:  "I BELIEVE THAT WAS THE -- JANUARY 1ST WHEN

14   CARTER VISITED ME, IN '99."

15              QUESTION:  "AND THAT WAS THE VISIT THAT YOU DESCRIBED    01:57

16   EARLIER, WHERE YOU WERE STAYING AND HOUSE-SITTING FOR SOMEONE

17   THERE IN LANCASTER; IS THAT CORRECT?"

18              ANSWER:  "YES, THAT IS CORRECT."

19              QUESTION:  "WHAT IS IT THAT -- WHAT ARE THE

20   CIRCUMSTANCES UNDER WHICH YOU FIRST HEARD THE NAME 'BRATZ'?"       01:57

21              ANSWER:  "I BELIEVE CARTER TOLD ME THE NAME."

22              QUESTION:  "WHAT DID HE SAY?"

23              ANSWER:  "SOMETHING LIKE, 'THESE ARE THE BRATZ.'"

24              QUESTION:  "I TAKE IT HE WAS SHOWING YOU SOMETHING?"

25              ANSWER:  "YES."                                        01:57
```

1      QUESTION:  "WHAT WAS HE SHOWING YOU?"

2      ANSWER:  "HIS PORTFOLIO."

3      QUESTION:  "WERE THESE DRAWINGS?"

4      ANSWER:  "YES."

5      QUESTION:  "IN THAT PORTFOLIO, WERE THERE DRAWINGS OF

6  THINGS OTHER THAN BRATZ?"

7      ANSWER:  "YES."

8      QUESTION:  "WHAT OTHER THINGS DO YOU RECALL BEING IN

9  THAT PORTFOLIO?"

10     ANSWER:  I THINK GREETING CARDS, CHRISTMAS CARDS,

11  FASHION ILLUSTRATIONS; ALL THE STUFF HE HAD BEEN WORKING ON

12  IN '98."

13     QUESTION:  "IS THERE ANYTHING ELSE THAT YOU CAN

14  RECALL?"

15     ANSWER:  "AND THE BRATZ."

16     (END OF VIDEO EXCERPTS PLAYED.)

17     **MR. NOLAN:**  NOW, THE DIFFICULTY AND THE DILEMMA THAT

18  MATTEL FACES WAS REALLY EVIDENCED BY THE PRESENTATION OF

19  EVIDENCE IN THIS TRIAL AND ALSO THE DEDICATION OF EFFORT IN THE

20  OPENING STATEMENT BY MR. QUINN.

21     I COUNTED THAT IT TOOK AN HOUR AND TEN MINUTES FOR

22  HIM TO GET TO THE DATE ISSUE OF WHEN THESE BRATZ DRAWINGS WERE

23  ACTUALLY CREATED.  SO MUCH TIME IN THIS CASE, WHEN YOU THINK

24  BACK ABOUT IT AND REFLECT ABOUT IT, WAS SPENT ON A PERIOD OF

25  TIME IN THE CONTRACT, SEPTEMBER 1ST THROUGH OCTOBER 19TH.

1    THERE WAS JUST SO MUCH TESTIMONY ABOUT IT; VERY LITTLE

2    ATTENTION GIVEN TO THAT TIME PERIOD EXCEPT WHEN WE WERE

3    PRESENTING OUR CASE.

4            I THINK THE BEST TESTIMONY THAT CAPTURED WHY THIS

5    TESTIMONY PRESENTS A PROBLEM FOR MATTEL WAS OFFERED BY ITS OWN

6    CHIEF EXECUTIVE OFFICER, BOB ECKERT.

7            CAN I HAVE SLIDE 54, PLEASE.

8            REMEMBER, YOU KNOW ABOUT THE CONTRACT, THE INVENTIONS

9    AGREEMENT, THAT CARTER SIGNED ON JANUARY 4, 1999, WHEN HE

10   RESUMES EMPLOYMENT.

11           MY QUESTION TO MR. ECKERT:  "WHEN AN EMPLOYEE AGREES

12   TO GO TO WORK AT MATTEL AND SIGNS A CONFIDENTIALITY AGREEMENT

13   WITH MATTEL, IS IT YOUR VIEW THAT THEY TRANSFER ALL OF THE

14   IDEAS AND DREAMS THAT THEY HAD BEFORE THEY BEGAN TO WORK AT

15   MATTEL?"

16           ANSWER:  "NO."

17   **MR. NOLAN:**  IVY ROSS, FIRST WITNESS THAT MATTEL

18   OFFERED IN THIS CASE, LADIES AND GENTLEMEN -- AND THIS IS AT

19   SLIDE 56 -- SAID THE SAME THING.  AND I BELIEVE THAT SHE WAS

20   ONE OF THE SUPERVISORS IN THE GIRLS DIVISION.

21           QUESTION:  "WELL, IS THE REASON WHY, IN YOUR OPINION,

22   THAT MATTEL DOESN'T OWN THE IDEAS BECAUSE YOU DID THEM A LONG

23   TIME AGO OR BEFORE YOU STARTED YOUR EMPLOYMENT WITH MATTEL?"

24           ANSWER:  "BEFORE I STARTED MY EMPLOYMENT WITH

25   MATTEL."

01:59

01:59

02:00

02:00

02:00

1          **MR. NOLAN:**  YOU'LL RECALL HER TESTIMONY THAT SHE USED

2   TO DESIGN TOY CARS FOR A MUSEUM.  SHE USED TO WORK FOR A MUSEUM

3   IN THE PAST.  MY QUESTION WAS, MATTEL HAS HOT WHEELS; DOES THAT

4   MEAN THAT SHE AUTOMATICALLY TRANSFERRED OVER THOSE IDEAS THAT

5   SHE DID BEFOREHAND?                                          02:0C

6          LADIES AND GENTLEMEN, THE EVIDENCE IS CLEAR THAT

7   MATTEL WANTS THE BRATZ.  THEY WANT THE IDEA; THEY WANT THE

8   CONCEPT; AND THEY WANT THE DRAWINGS.  BUT IF THOSE DRAWINGS

9   WERE DONE IN 1998, THEY DON'T BELONG TO MATTEL.  YOU CAN TAKE

10  IT FROM ME, YOU CAN ALSO TAKE IT FROM THE CHIEF EXECUTIVE     02:0?

11  OFFICER OF MATTEL.

12         NOW, MATTEL, IN ORDER TO TRY TO DEAL WITH THIS

13  EVIDENCE, SHOWS YOU THAT THERE ARE VARIOUS DOCUMENTS ALLEGEDLY

14  CONTAINED IN A BLACK NOTEBOOK.  AND THIS BLACK NOTEBOOK IS THE

15  EXHIBIT THAT WAS ON THE SCREEN BEFORE.  IT'S 1155-C.          02:0?

16         LET'S PUT THIS ON THE SCREEN FOR JUST A MOMENT,

17  AARON, IF I COULD.

18         THIS IS THE BLACK NOTEBOOK.

19         NOW, MR. QUINN TOLD YOU, STOOD BEFORE YOU IN CLOSING

20  ARGUMENT AND SAID THAT HE CAN PUT A DATE ON EVERY DOCUMENT IN  02:0?

21  THIS BLACK NOTEBOOK AS 1999.

22         I RESPECTFULLY SUBMIT THAT THE EVIDENCE SIMPLY DOES

23  NOT SUPPORT THAT.

24         ALL OF THE TESTIMONY OFFERED BY THIS PERSON WHO

25  ACTUALLY USES THIS SAID THAT CARTER BRYANT USES THIS, NOT IN   02:02

1    ANY SEQUENTIAL ORDER, AND THAT HE GRABS A NOTEBOOK WHEN HE

2    NEEDS TO MAKE A NOTE; HE OPENS IT UP -- AND MY TEAM WOULD

3    ATTEST TO IT; IF I SEE A YELLOW NOTEBOOK, I'LL OPEN IT UP AND

4    START WRITING A NOTE.   THAT'S EXACTLY HOW MR. BRYANT USED THIS.

5              AND THE ARGUMENT THAT MR. QUINN MADE AGAIN TODAY IS       02:02

6    SIMPLY NOT SUPPORTED BY THE EVIDENCE.

7              AND, AGAIN, LET'S GO TO SLIDE 87, WHICH IS THE

8    OVERLAY FROM CUNNINGHAM.

9              ON THE RIGHT SIDE IS A GREETING CARD.

10             YOU HEARD THAT RICHARD IRMEN, IN THE PIECE THAT I        02:02

11   JUST PLAYED TO YOU, SAID THAT WHEN HE SAW THE PORTFOLIO OF

12   CARTER BRYANT'S WORK THAT HE DID IN 1998, IN ADDITION TO THE

13   BRATZ, HE SAW THE GREETING CARDS.

14             CARTER BRYANT, ON THE STAND, SUBJECT TO

15   CROSS-EXAMINATION, WAS ASKED A NUMBER OF QUESTIONS.   BUT MOST      02:03

16   IMPORTANTLY, HE WAS NEVER ASKED ABOUT THIS RAINY DAY RASCALS.

17   I ASKED MR. BRYANT, 'WHEN DID YOU DO THIS RAINY DAY RASCALS?'

18   HE SAID, 'THIS WAS DONE IN 1998.'   THE IMPRESSION ON THE

19   RIGHT-HAND SIDE, WHICH IS DATED 1998, WHICH IS UNCONTROVERTED

20   BY MATTEL'S SCIENTIFIC EVIDENCE, BECAUSE MATTEL'S SCIENTIFIC       02:03

21   EVIDENCE ACTUALLY PROVED THAT THE IMPRESSION -- AND IT'S JUST

22   THE MIRROR IMAGE FROM THE TESTIMONY OF MR. CUNNINGHAM -- IS

23   ACTUALLY IMPRINTED ON THE DIVIDER THAT THEY RELY SO HEAVILY ON.

24             NOW, MATTEL HAS THE BURDEN, LADIES AND GENTLEMEN, OF

25   CONVINCING YOU THAT BECAUSE THE BRATZ DRAWING IS INDENTED INTO     02:04

1    THE DIVIDER, THAT MEANS -- BECAUSE ON THE VERY NEXT PAGE BEFORE

2    THE DIVIDER, THERE'S A BANK RECONCILIATION FROM 1999 -- IT HAD

3    TO BE DONE IN 1999.  AND I SUBMIT TO YOU, THAT SIMPLY IS NOT

4    THE CASE.  THE EVIDENCE IS THAT IF HE DID DO IT SEQUENTIALLY,

5    HE JUST WOULD HAVE USED THE PAGE BEFORE IT OR AFTERWARDS.  HE          02:04

6    USED A DIFFERENT ONE.  HE PICKED IT UP, HE TURNED IT OVER TO A

7    POINT WHERE THE DIVIDER WAS, AND HE DREW BRATZ.

8          MR. QUINN MADE A BIG ARGUMENT ABOUT, 'OH, AND THEN HE

9    PULLED IT OUT.'  THAT'S ANOTHER COMMON THEME.  ALL OF THE

10   WITNESSES IN THIS CASE DESTROYED EVIDENCE.  THAT'S MATTEL'S          02:04

11   THEORY, THAT CARTER BRYANT RIPPED THIS BOOK OUT AND THEN HE

12   PROUDLY SAT THROUGH A DEPOSITION AND WAS CONFIDENT THAT NO ONE

13   WOULD EVER BE ABLE TO SAY, 'OH, IT WAS DONE IN THAT BLACK

14   NOTEBOOK.'

15         NONSENSE.  THIS ISN'T A SURPRISE PRODUCTION.                   02:05

16   REMEMBER AFTER THE BREAK, MR. QUINN SAYS, 'I WANT TO GO TO A

17   SURPRISE DOCUMENT, EVIDENCE IN THIS CASE THAT MGA AND CARTER

18   BRYANT NEVER THOUGHT WOULD BE FOUND.'

19         MR. BRYANT PRODUCED THE NOTEBOOK.

20         MR. BRYANT PRODUCED THE DRAWING OF THE BRATZ DRAWING.          02:05

21         THAT'S HOW MR. CUNNINGHAM HAD IT IN THE FIRST PLACE.

22         THEN THEY SAID WE WOULD HAVE PRODUCED EVIDENCE, IF

23   THERE WAS ANY EVIDENCE, THAT MR. BRYANT HAD PREVIOUSLY ANSWERED

24   QUESTIONS ABOUT RAINY DAY RASCALS IN DEPOSITIONS AND THAT MAY

25   SOMEHOW PROVE THAT WE JUST SIMPLY MADE IT UP AFTER WE SAW           02:0

1   MR. CUNNINGHAM'S TESTIMONY.

2              WELL, THAT'S JUST NOT TRUE, LADIES AND GENTLEMEN.

3              YOU KNOW THAT DURING THE COURSE OF MR. CUNNINGHAM'S

4   TESTIMONY, HE ADMITTED UNDER OATH THAT HE HAD RECEIVED A BOX OF

5   DOCUMENTS, INCLUDING THE BLACK NOTEBOOK, AND INCLUDING THE                02:06

6   RAINY DAY RASCALS, IN, I BELIEVE, SEPTEMBER OF 2007; AND HE

7   IDENTIFIED RAINY DAY RASCALS AS AN IMPRESSION ON THE DIVIDER.

8   AND THEN YOU KNOW, BECAUSE MR. PRICE, WHEN CROSS-EXAMINING

9   MR. BRYANT, SHOWED PASSAGES FROM A JANUARY 2008 DEPOSITION,

10  MR. BRYANT'S DEPOSITION WAS TAKEN BY MATTEL IN JANUARY OF 2008,          02:06

11  FOUR MONTHS AFTER THEIR OWN EXPERT HAD IDENTIFIED THE

12  IMPRESSION OF RAINY DAY RASCALS ON THAT DIVIDER, AND THEY NEVER

13  ASKED HIM A SINGLE QUESTION ABOUT RAINY DAY RASCALS.  IF THEY

14  HAD, MATTEL WOULD HAVE SHOWN YOU.

15             SO THE ARGUMENT THAT CARTER BRYANT AND/OR MGA THEN            02:07

16  WAS FACED WITH A DISASTER AND WE HAD TO COME UP WITH THE STORY

17  ABOUT RAINY DAY RASCALS JUST DOESN'T FLY, LADIES AND GENTLEMEN.

18  APPLY YOUR COMMON SENSE.

19             THE PEOPLE WHO ARE IGNORING THE EVIDENCE IN THIS CASE

20  IS MATTEL.  IT IS MATTEL'S OWN LAWYERS WHO TOLD MR. CUNNINGHAM,          02:07

21  'DO NOT HIGHLIGHT RAINY DAY RASCALS.  WHEN YOU'RE TALKING TO

22  THE GRAPHICS DEPARTMENT AT MATTEL AND YOU'RE HIGHLIGHTING THE

23  BRATZ ORIGINAL DOLL, DO NOT DRAW IN THE BACKGROUND THAT IMAGE

24  THAT YOU SEE AND YOU'VE TOLD US ABOUT, BECAUSE WE'RE NOT GOING

25  TO PRESENT THAT TO THE JURY.'                                           02:08

1        HOW CAN ANYONE SITTING AS A TRIER OF FACT IN THIS

2 CASE TRUST THE EVIDENCE AND THE ARGUMENTS THAT MATTEL MAKES

3 WHEN THEY PAY AN EXPERT TO COME IN HERE AND MISREPRESENT THE

4 STATE OF THE EXAMINATION THAT THEY DID?  BECAUSE THEY WERE

5 TOLD, 'DON'T RAISE IT.'                                02:08

6        WHAT?  WITH THE HOPE, IN A CASE LIKE THIS, OF THIS

7 IMPORTANCE, THAT WE DIDN'T KNOW ABOUT RAINY DAY RASCALS AND WE

8 DIDN'T KNOW THAT IT WAS IN THERE?

9        THIS MORNING, CASSIDY PARK COMES IN, AND IN MANY WAYS

10 THIS MORNING, ALTHOUGH IT WENT FAST AND IT WAS A BRIEF WITNESS,  02:08

11 AND SHE INTRODUCED THE RAINY DAY RASCALS AND HAD A 1999 DATE ON

12 IT, I WAS STRUCK DURING THE LUNCH HOUR THINKING ABOUT THIS.  OF

13 ALL OF THE ATTACKS THAT ARE MADE ON WITNESSES PRESENTED BY MGA,

14 GALVANO, RICHARD IRMEN, MS. BRYANT, YOU, MATTEL, CAN PRESENT

15 CASSIDY PARK, WHO IS A PART-TIME EMPLOYEE?                02:09

16        AS SOON AS THIS CASE IS OVER, I'M GOING TO APPLY FOR

17 THAT PART-TIME POSITION, BECAUSE THE PAY IS PRETTY DARN GOOD.

18 AND YOUR ROLE IS YOU GET TO BE AN AMBASSADOR FOR MATTEL AND

19 YOU'RE PAID $210,000 A YEAR, OR MAYBE I'M PAID $165,000; I'M

20 NOT CERTAIN.  BUT ONE THING I AM CERTAIN OF IS, IF I GET A CALL  02:10

21 FROM MATTEL AT 10:20 AT NIGHT, TO BE ABLE TO IDENTIFY THE

22 HANDWRITING OF A PERSON THAT WORKED FOR ME TEN YEARS AGO, I'M

23 THERE.  JUST LET ME SEE THE DOCUMENT.

24        BUT, OH, IN A DEPOSITION, IF I'M ASKED TO IDENTIFY

25 THE HANDWRITING OF THE CORPORATE REPRESENTATIVE OF MATTEL WHO  02:10

1   WORKED FOR HER AND WORKED WITH HER FOR TEN YEARS, WHO SHE'S

2   ALSO SEEN HUNDREDS OF DRAWINGS OF, 'OH, I DON'T KNOW.  I DON'T

3   KNOW.  I DON'T THINK SO.'

4         I'M NOT MAKING THAT UP, LADIES AND GENTLEMEN.  YOU

5   SAW THAT THIS MORNING.  DO YOU BELIEVE IN YOUR HEART THAT IF I       02:10

6   ASKED YOU TO CLOSE YOUR EYES FOR A MOMENT AND GO BACK AND THINK

7   OF A PERSON TEN YEARS AGO THAT YOU KNEW, THAT YOU'VE NEVER SEEN

8   SINCE, AND YOU HAD NOT SEEN THEIR HANDWRITING SINCE, THAT YOU

9   WOULD CONFIDENTIALLY BE WILLING TO STAND UP AND PLACE YOUR

10  RIGHT HAND AND TAKE AN OATH TO TELL THE TRUTH AND THEN SAY,        02:11

11  'THAT'S IT'?

12        BUT WHAT WAS THE MOMENT OF THAT TESTIMONY?

13        THE MOMENT OF THE TESTIMONY WAS TO GET IN A RAINY DAY

14  RASCALS WITH A DATE OF 1999 -- AARON PUT THAT ON THE SCREEN FOR

15  JUST A MOMENT -- WITH THE HOPE, WITH THE HOPE THAT BECAUSE THIS    02:11

16  RAINY DAY RASCALS HAS A 1999 DATE ON IT, THEN THE OTHER RAINY

17  DAY RASCALS MUST HAVE BEEN DONE IN 1998 {SIC}.

18        THIS IS THE QUALITY OF THE EVIDENCE THAT THEY ARE

19  SUGGESTING TO YOU, LADIES AND GENTLEMEN, CARRIES THE BURDEN OF

20  THE DAY.                                                           02:11

21        WHEN THEIR WITNESS, WHO'S ONLY SPENT TEN HOURS IN

22  MATTEL'S OFFICES IN THE LAST YEAR, COMES IN AND SAYS, 'OH, I

23  KNOW THAT SIGNATURE.  THAT'S CARTER BRYANT' -- BUT I WOULDN'T

24  DISPUTE THE SIGNATURE.  THAT'S NOT THE ISSUE.  WHAT'S IMPORTANT

25  IS, SHE DOESN'T KNOW THE SIGNIFICANCE OF THIS.  SHE DOESN'T       02:11

1   KNOW WHETHER OR NOT CARTER BRYANT DID IT IN 1998 AND THEN DATED

2   IT IN 1999 WHEN HE WAS SENDING IT OUT TO SOMEBODY, THE COURSE

3   AND THE PATTERN THAT HE TESTIFIED THAT'S WHEN HE USUALLY DATED

4   DOCUMENTS.

5        THAT RAINY DAY RASCALS IS NOT THE SAME RAINY DAY          02:12

6   RASCALS THAT'S IMPRINTED IN THE BLACK NOTEBOOK.  AND THAT,

7   LADIES AND GENTLEMEN, IS THE TRUTH OF THE DAY.  THAT ON THE

8   LEFT WAS A SHOW, A SIDE SHOW, AND A POOR ONE AT THAT.

9        BUT, BOY, IT WAS A TROPHY AT THE END OF THE DAY.

10  YOU'RE GOING TO END YOUR CASE, THAT HAS TAKEN UP SEVEN WEEKS OF   02:13

11  YOUR LIVES, BY BRINGING IN A WITNESS TO TRY TO IDENTIFY

12  HANDWRITING FOR A PERSON THEY HAVEN'T SEEN IN TEN YEARS, WHEN

13  THAT DOCUMENT CANNOT TRUMP THE EVIDENCE IN 1998?

14       AND IF THERE'S A MOMENT IN A TRIAL LAWYER'S LIFE WHEN

15  THEY KNOW THAT THEY'RE IN DIFFICULTY, IT'S WHEN THEY GO TOO FAR   02:13

16  TO TRY TO OVERCOME THE MOST TROUBLESOME EVIDENCE IN THE CASE.

17       THAT DRAWING ON THE RIGHT IS IN 1998.

18       PLEASE GO BACK TO THE CUNNINGHAM OVERLAY AGAIN.

19       THE ONE ON THE RIGHT IS 1998; THE ORIGINAL BRATZ

20  DRAWING, 1998.  AND THEY DIDN'T WANT YOU TO SEE THAT.            02:14

21       BUT THEY SURE WANTED YOU TO SEE THE RAINY DAY

22  RASCALS, THAT DOESN'T EVEN LOOK LIKE THAT, DATED 1999.

23       YOU KNOW, I'VE NEVER BEEN A JUROR.  I DON'T THINK

24  IT'S LIKELY I'LL EVER BE SELECTED.  MAYBE I'M TOO OPINIONATED,

25  TOO AGGRESSIVE, WHATEVER; BUT PROBABLY AS A TRIAL LAWYER, I'LL   02:14

```
 1   NEVER MAKE IT.  I HAVE THE MOST RESPECT, HOWEVER, FOR PEOPLE
 2   WHO SIT ON A JURY.  I THINK IT'S THE HIGHEST PUBLIC SERVICE
 3   THAT CITIZENS CAN PROVIDE.  THIS IS A WONDERFUL COUNTRY.  THINK
 4   ABOUT THIS FOR A MOMENT.  WE BRING TEN OF YOU FROM DIVERSE
 5   BACKGROUNDS TOGETHER.  YOU DON'T KNOW EACH OTHER.  YOU DON'T          02:14
 6   HAVE LEGAL BACKGROUNDS.  YOU'RE NOT LAWYERS, THANK GOD.  AND
 7   YOU'RE NOT JUDGES.  JUDGE LARSON IS THE JUDGE OF THE LAW.  AT
 8   THE END OF THE DAY, YOU'RE GOING TO BE THE JUDGES OF THE FACTS.
 9   THE WORLD WILL LONG FORGET THE WORDS OF QUINN AND PRICE AND
10   ZELLER AND NOLAN AND MS. AGUIAR, BUT THEY WILL LONG REMEMBER          02:15
11   THE DECISIONS THAT YOU RENDER IN THIS CASE.
12              AND I ASK YOU, IN EVALUATING THAT EVIDENCE, TO LOOK
13   PAST THE SMOKE SCREENS THAT MATTEL CONSTRUCTED IN THIS CASE.
14              LET'S LOOK AT THIS OTHER BLACK NOTEBOOK, THE LETTER
15   FROM WADE.                                                           02:15
16              IF I COULD HAVE UP 1155-C, PAGE 7.
17              THIS IS ALSO OUT OF THE BLACK NOTEBOOK.  MR. QUINN
18   SAYS THAT HE'S PUT EVERY DOCUMENT IN THIS BLACK NOTEBOOK IN
19   1999.  HERE'S THE LETTER, "MOM AND DAD."  IT'S SIGNED BY WADE,
20   LISA, CHRISTOPHER, AND ALLISON.  ACTUALLY, I DESCRIBE THIS AS        02:16
21   WADE'S LETTER.  I THINK THIS IS THE NOTE THAT LISA WROTE.  I
22   THINK THAT'S WHAT MR. BRYANT TESTIFIED TO.
23              LET'S GO TO THE NEXT PAGE, BECAUSE IT'S HIS NIECE OR
24   NEPHEW'S ARTWORK THAT'S IN THERE.  THIS IS THE SAME NOTEBOOK
25   THAT, YES, HAS THE RECONCILIATION FROM A 1999 BANK STATEMENT.        02:16
```

1    INTERESTINGLY, IT'S THE ONLY BANK STATEMENT THAT'S

2  EVER RECONCILED IN THAT BOOK.  SO THEY'VE GOT ONE DOCUMENT IN

3  THERE.  AND, BOY, WHEN YOU THINK ABOUT MATTEL JUST FOR A

4  SECOND -- IF YOU REALLY THINK THAT CARTER BRYANT HAS THAT

5  MALICIOUS AND EVIL OF A HEART THAT HE'S GOING TO DESTROY

6  EVIDENCE BY USING, BUYING, AND DOWNLOADING SOMETHING CALLED

7  EVIDENCE ELIMINATOR, DO YOU NOT THINK THAT A PERSON OF THAT

8  MINDSET WOULD HAVE RIPPED OUT A PIECE OF PAPER THAT RECONCILED

9  A 1999 BANK STATEMENT?  DOES THAT MAKE SENSE TO YOU?

10    IN ANY EVENT, THIS IS THE ONE THAT CARTER BRYANT SAID

11  HE RECALLS WHILE HE WAS LIVING IN KIMBERLING CITY IN 1998; THAT

12  WADE, LISA, CHRISTOPHER, AND ALLISON WERE THERE.  HE HAD HIS

13  NOTEBOOK.

14    NOW, MR. QUINN COUNTERS THAT AND SAYS, 'WELL, WE

15  SHOWED YOU ATM RECORDS OF CARTER BRYANT BEING IN KIMBERLING

16  CITY IN 1999, THAT HE WENT BACK AND VISITED HIS PARENTS FOR

17  THANKSGIVING; SO HE WAS THERE, SO IT COULD HAVE BEEN IN 1999.'

18    THEY SHOWED YOU SOME TESTIMONY IN THAT REGARD.

19    LADIES AND GENTLEMEN, CARTER BRYANT BEING IN 1999 IN

20  KIMBERLING CITY IS NOT THE ISSUE.

21    WE NEVER DENY THAT HE WAS BACK VISITING HIS PARENTS.

22  WHAT MATTEL NEVER COUNTERED WITH WAS ANY EVIDENCE THAT WADE OR

23  LISA WERE PRESENT IN 1999.  THE BEST YOU HAVE AS EVIDENCE

24  OFFERED BY MATTEL IS A STATEMENT THAT WADE AND LISA LIVED

25  12 HOURS AWAY, SO THEY MUST HAVE GONE TO THANKSGIVING AND

```
 1   CHRISTMAS.
 2          WHAT IF THAT YEAR THEY WERE VISITING LISA'S FAMILY?
 3   NOT UNUSUAL THAT FAMILY'S SWITCH OFF HOLIDAYS.  CARTER SAYS HE
 4   DOESN'T REMEMBER THEM THERE.  BUT THAT'S NOT EVEN THE REAL
 5   ISSUE.  CARTER BRYANT TESTIFIED THAT HE DIDN'T TRAVEL WITH HIS      02:18
 6   NOTEBOOK, SO THE NOTEBOOK WOULD HAVE HAD TO HAVE BEEN IN
 7   KIMBERLING CITY IN 1999 FOR THIS TO REALLY SUPPORT MR. QUINN'S
 8   ARGUMENT.
 9          BUT BY 1999, MR. BRYANT HAS MOVED BACK TO CALIFORNIA.
10   SO MATTEL WANTS YOU TO SPECULATE -- AND THEY HAVE THE BURDEN --     02:19
11   THEY WANT YOU TO SPECULATE THAT MR. BRYANT IS GOING BACK TO HIS
12   FAMILY FOR THANKSGIVING IN 1999 -- AND WE'VE ALL DONE THIS;
13   WE'RE PACKING UP THE CLOTHES, SOME GIFTS, IF YOU ARE BRINGING
14   THEM BACK -- AND THEN CARTER GOES -- HE RUNS BACK DOWN TO THE
15   CAR AND GOES, 'OH, I FORGOT MY NOTEBOOK.  I NEED MY NOTEBOOK.'      02:19
16   THAT'S WHAT THEY WANT YOU TO BELIEVE TO MAKE THIS STORY
17   BELIEVABLE.
18          BUT THE LAST POINT I WANT TO MAKE WITH YOU WAS THIS:
19   MR. QUINN SAID, 'WHY DIDN'T THEY CALL WADE OR LISA?'
20          WE DON'T HAVE THE BURDEN.  WHY DIDN'T THEY?                  02:19
21          YOU'VE SEEN FROM THE VIDEOS THAT LAWYERS CAN TRAVEL
22   FROM ANCHORAGE, ALASKA, TO SPRINGFIELD, MISSOURI AND TAKE
23   DEPOSITIONS IN THIS CASE.  WHY DIDN'T MATTEL, WHEN THEY WERE IN
24   SPRINGFIELD, MISSOURI, TAKING THE DEPOSITION OF JANET BRYANT,
25   SIMPLY TAKE THE DEPOSITION OF WADE OR LISA?  THAT'S THEIR          02:20
```

```
 1   RESPONSIBILITY IF THEY'RE GOING TO MEET THIS BURDEN.

 2           SO WHEN MR. QUINN STATES BOLDLY TO YOU, 'I CAN PUT

 3   EVERY DOCUMENT IN THAT BLACK NOTEBOOK IN 1999,' HE'S SIMPLY

 4   OVERSTATING.

 5           THE LAST DOCUMENT I WANT TO GO TO IN THIS ONE IS THE    02:2(

 6   REFERENCE TO -- I HAVE TWO MORE REFERENCES TO THIS BLACK

 7   NOTEBOOK, AND THEN I'LL BE OUT OF THE BLACK NOTEBOOK.

 8           LET'S TALK ABOUT JEWEL BARBIE.  LET'S GO TO

 9   EXHIBIT 13675.

10           THIS IS SOME EVIDENCE THAT MATTEL OFFERED WITH          02:21

11   CASSIDY PARK TO TALK ABOUT JEWEL BARBIE IN THE YEAR 2000.  AND

12   YOU PROBABLY DIDN'T THINK MUCH OF IT AT THE TIME.  YOU KNOW,

13   YOU'VE SEEN SO MANY DOCUMENTS. BUT HERE'S THE SETUP.  YOU SEE,

14   CARTER BRYANT TESTIFIED AT TRIAL THAT HE ACTUALLY WORKED ON TWO

15   JEWEL PROJECTS, ONE IN 1998 AS A FREELANCER AND THEN ONCE AGAIN  02:21

16   IN 1999 WHEN HE WENT BACK TO WORK.  HE IDENTIFIED, IN THE BLACK

17   NOTEBOOK, THE JEWEL BARBIE COMPOSITION THAT HE DID, 1155-C5.

18   THAT'S OUT OF THE SAME BLACK NOTEBOOK.  CARTER BRYANT, ON

19   EXAMINATION, TESTIFIED THAT HE DID THAT DRAWING IN 1998.

20   THAT'S HIS TESTIMONY.                                           02:2;

21           NOW, YOU WILL BE INSTRUCTED THAT IF A PARTY OFFERS

22   WEAKER EVIDENCE THAN THEY WOULD OTHERWISE BE ABLE TO OFFER, YOU

23   CAN TAKE THAT INTO CONSIDERATION.

24           I MAY HAVE DONE A LITTLE BIT OF DISSERVICE TO THAT

25   INSTRUCTION, BUT WE CAN POST IT HERE IN JUST A MINUTE.  THAT'S   02:2;
```

1    JURY INSTRUCTION NUMBER 9.

2         "IF WEAKER AND LESS SATISFACTORY EVIDENCE IS OFFERED

3    BY A PARTY, WHEN IT WAS WITHIN THAT PARTY'S ABILITY TO PRODUCE

4    STRONGER AND MORE SATISFACTORY EVIDENCE, THE EVIDENCE OFFERED

5    SHOULD BE VIEWED WITH DISTRUST."                                02:23

6         SO YOU KNOW THE IMPORTANCE OF JEWEL BARBIE.  YOU KNOW

7    THAT CARTER BRYANT HAS TESTIFIED THAT HE DID IT IN 1998.  SO

8    WHAT'S THE EVIDENCE THAT MATTEL OFFERS TO COUNTER THIS?

9         WHAT THEY DO IS THEY BRING IN CASSIDY PARK.

10   CONVENIENT.  SHE'LL BE A HANDWRITING EXPERT ONE DAY, AND THEN   02:23

11   SHE'LL BE ANOTHER TYPE OF EXPERT FOR MATTEL ON AN EARLIER DATE.

12   WELL, THE FIRST TIME WHAT CASSIDY PARK CAME UP AND TESTIFIED TO

13   IS THAT SHE WAS IN MAINLINE BARBIE, MAINLINE BARBIE, AND THAT

14   MAINLINE BARBIE DID NOT MAKE A JEWEL BARBIE IN 1998.

15        KNEW IT, SWORE TO IT.  IN FACT, WE KNOW THAT BECAUSE       02:2

16   SHE ACTUALLY SHOWED US THE JEWEL BARBIE THAT CAME OUT OF BARBIE

17   MAINLINE.  SO THAT WAS PRETTY COOL.

18        THE PROBLEM IS THAT THE JEWEL BARBIE, IN 1999, WAS

19   THE ONE -- REMEMBER, IT WAS SO NEW; IT WAS THE FIRST TIME THAT

20   THE -- I DESCRIBED IT AS THE BELLY BUTTON, AND SHE CORRECTED    02:2

21   ME, THAT IT WAS JUST AN INVENTION THAT WAS SUPPOSED TO BE THE

22   BELLY BUTTON.  BUT IN ANY EVENT, IT WAS THE FIRST TIME BARBIE

23   WAS GOING TO HAVE HER NAVAL EXPOSED BECAUSE SHE COULD MOVE AT

24   THE WAIST.

25        WELL, THAT'S FINE.  THAT'S MAINLINE BARBIE.              02:2

```
 1            WHY DIDN'T MATTEL BRING SOMEONE IN HERE FROM BARBIE
 2   COLLECTIBLES AND SAY, 'WE NEVER MADE A JEWEL BARBIE IN 1998,
 3   AND CARTER BRYANT IS LYING'?
 4            YOU KNOW, IT'S CURIOUS.  THEY BROUGHT IN IVY ROSS,
 5   FIRST WITNESS, NO LONGER EMPLOYED AT MATTEL.  SHE'S THE ONE
 6   THAT WAS IN PROJECT PLATYPUS AND THEN SHE LEFT AND THEN SHE
 7   WENT TO THE DISNEY STORE, AND NOW I THINK SHE'S LEFT AND SHE'S
 8   GOING SOMEWHERE ELSE; THAT WAS THEIR FIRST WITNESS.  AND THEN
 9   CASSIDY PARK, WE KNOW SHE'S A PART-TIME EMPLOYEE.  BUT WHY NOT
10   BRING IN A FULL-TIME EMPLOYEE FROM BARBIE COLLECTIBLES?
11            WHILE YOU'RE BACK THERE, UNDERSTAND THE IMPORTANCE OF
12   JEWEL BARBIE.  CARTER BRYANT HAS SAID THAT HE DID IT IN 1998.
13   AND NO MATTER HOW FAST MR. QUINN TALKS, OR HOW AGGRESSIVE HE
14   CAN BE IN TERMS OF ARGUMENT, AND AS ARTICULATE AS HE IS -- AND
15   I HAVE THE GREATEST RESPECT FOR HIM AS A TRIAL LAWYER -- BUT
16   YOU KNOW WHAT, SOMETIMES IT'S JUST NOT ENOUGH TO BE A GOOD
17   LAWYER.  YOU'VE GOT TO BRING IN THE WITNESS.
18            WHY DIDN'T THEY BRING IN SOMEONE FROM BARBIE
19   COLLECTIBLES TO KNOCK IT OUT OF THE PARK FOR YOU?
20            WHY BRING IN SOMEONE FROM BARBIE MAINLINE TO DEAL
21   WITH AN ISSUE -- CAN WE PUT UP A JEWEL BARBIE DOLL, AARON.
22            CASSIDY PARK IDENTIFIED THE HANDWRITING OF THIS THIS
23   MORNING.
24            HERE IT IS.  THESE ARE THE JEWEL BARBIE 1998
25   DRAWINGS.  CARTER BRYANT TESTIFIED TO IT.
```

02:25
02:25
02:25
02:26
02:26

1    YOU KNOW, CARTER BRYANT, HE'S SETTLED.  WHAT DOG DOES

2 HE HAVE IN THE FIGHT?  HE'S COME IN HERE; HE'S SETTLED.  THEY

3 DISMISSED THEIR CLAIMS.  HE DISMISSED HIS CLAIMS.  HE COMES IN

4 AND HE TESTIFIES, 'I DID THESE IN 1998.  I DID THIS ONE' -- AND

5 THEN HE SHOWS FOUR ON THE RIGHT, JEWEL BARBIES, SIGNATURE NOW,

6 IDENTIFIED BY CASSIDY PARK.  BUT HERE'S SOMETHING ELSE THAT'S

7 INTERESTING.

8    AARON, CAN YOU BLOW UP -- AND YOU KNOW THIS NOW FROM

9 THE CUSTODIAN OF RECORDS THAT WAS INTRODUCED IN THE LAST DAY OF

10 TRIAL, THIS "M" NUMBER.  YOU PROBABLY KNOW MORE ABOUT

11 PRODUCTION NUMBERS THAN YOU EVER WANTED TO KNOW.  I'M SORRY

12 ABOUT THAT.  BUT HERE'S THE KEY:  EACH ONE OF THESE JEWEL

13 BARBIES THAT CARTER BRYANT IDENTIFIED AS BEING PROJECTS THAT HE

14 WORKED ON IN 1998, JANUARY 28, 1998, WHILE EMPLOYED BY MATTEL,

15 WERE IN MATTEL'S RECORDS AND PRODUCED BY MATTEL.

16    WHY DIDN'T WE HEAR A WITNESS FOR MATTEL, A FULL-TIME

17 EMPLOYEE, AN ACTUAL FULL-TIME EMPLOYEE, CURRENTLY EMPLOYED BY

18 MATTEL, TAKE THIS WITNESS STAND, RAISE THEIR RIGHT HAND, AND

19 SAY, 'I WORK IN BARBIE COLLECTIBLES.  THAT DOLL, THAT OUTFIT,

20 WAS NEVER DESIGNED'?

21    OR BETTER YET, BRING IN SOMEONE FROM MATTEL WHO SAID,

22 'YOU KNOW, WE PRODUCED THESE, THESE DRAWINGS THAT ARE DATED IN

23 1998 BY CARTER BRYANT,' AND WHICH ARE LIKE THE DRAWING THAT IS

24 IDENTIFIED IN THE BLACK NOTEBOOK AND IDENTIFIED BY

25 CARTER BRYANT AS HAVING BEEN DONE IN 1998.  BRING IN SOMEONE

```
 1   FROM MATTEL TO SAY, 'YOU KNOW WHAT, I'M GLAD YOU ASKED ME ABOUT
 2   THESE, BECAUSE I RECEIVED THEM IN THE MAIL ONE DAY, AND I
 3   CALLED UP CARTER BRYANT AND I SAID, CARTER, WHY DID YOU DATE
 4   THEM IN 1998?  THEY'RE WRONG.'
 5           MR. QUINN AND MATTEL, WHO HAVE THE BURDEN IN THIS       02:29
 6   CASE, WANT YOU TO BELIEVE AND SPECULATE ON PURE SPECULATION
 7   THAT -- AND THIS IS HOW THEY EXPLAIN AWAY THE DIFFICULT
 8   EVIDENCE -- THAT'S A MISTAKE; THAT'S SIMPLY A MISTAKE.  BECAUSE
 9   WE ALL KNOW THAT WHEN THE YEAR CHANGES, OFTENTIMES YOU FORGET
10   TO CONTINUE TO WRITE THE RIGHT DATE.  THAT'S THE QUALITY OF THE  02:29
11   EVIDENCE THAT MATTEL HAS PRODUCED TO YOU TO OVERCOME THIS
12   CRITICAL PIECE OF EVIDENCE.
13           HE MADE A MISTAKE ON HIS CONFLICT QUESTIONNAIRE.  HE
14   WROTE DOWN JANUARY 4, 1998.
15           REMEMBER THAT?  YOU ALL REMEMBER THAT MISTAKE?          02:30
16           SO THEN, ON A TOTALLY DIFFERENT ISSUE, ON A TOTALLY
17   DIFFERENT PIECE OF EVIDENCE, SO ABSOLUTELY CRITICAL TO THIS
18   CASE, THEY REACH BACK AND THE BEST THAT THEY CAN DO IS TO SAY,
19   'WOW, HE MISWROTE IT OVER HERE.  POOF, THAT EXPLAINS WHY.
20   THESE ARE DATED.  THEY'RE ALL WRONG.  THAT'S EXPLAINING WHY     02:30
21   THEY WERE PRODUCED FROM US.  NO NEED TO CALL CARTER UP.
22   EVERYBODY KNOWS EVERYBODY IS GETTING THE DATE WRONG WHEN YOU
23   SWITCH TO THE NEW YEAR.  THAT'S HOW WE HANDLE THIS DIFFICULT
24   PIECE OF EVIDENCE.'
25           THE BURDEN IS ON MATTEL.                                02:30
```

```
 1        COMMON SENSE IS THE BEST SENSE I KNOW OF, LADIES AND
 2   GENTLEMEN; AND THAT'S WHY YOU, AND NOT ALL OF THE LAWYERS, ARE
 3   SITTING AS TRIERS OF FACT.  BUT ASK YOURSELF THIS QUESTION IN
 4   DELIBERATIONS:  WHERE WAS SOMEONE FROM MATTEL FROM
 5   COLLECTIBLES?                                              02:31
 6        THEY'RE GOING TO SAY, 'WELL, CASSIDY PARK WAS HIS
 7   SUPERVISOR IN JANUARY OF 1998.'
 8        YOU REMEMBER, THAT'S WHAT SHE TESTIFIED WHEN
 9   MR. ZELLER WAS ASKING HER QUESTIONS:  'DID YOU SUPERVISE
10   MR. BRYANT WHEN HE WAS LIVING IN KIMBERLING CITY?'         02:31
11        'WELL, YES, I DID.'
12        ON CROSS-EXAMINATION, HOWEVER, YOU'LL REMEMBER,
13   'WELL, I WAS IN EL SEGUNDO; HE'S IN KIMBERLING CITY; AND I
14   DON'T KNOW WHAT ASSIGNMENTS HE'S WORKING ON.  YES, I'M, QUOTE,
15   THE CORPORATE SUPERVISOR, BUT I'M NOT CERTAIN OF THE WORK THAT  02:31
16   HE WAS BEING HANDED DURING THAT PERIOD OF TIME.'
17        WHY NOT SOMEONE FROM BARBIE COLLECTIBLES TO COME IN
18   HERE AND NAIL THIS?
19        REMEMBER, "IF WEAKER AND LESS SATISFACTORY EVIDENCE
20   IS OFFERED BY A PARTY, WHEN IT WAS WITHIN THE PARTY'S ABILITY  02:32
21   TO PRODUCE STRONGER AND MORE SATISFACTORY EVIDENCE, THE
22   EVIDENCE OFFERED SHOULD BE VIEWED WITH DISTRUST."
23        THE LAST DOCUMENT IN THIS BLACK NOTEBOOK THAT I WANT
24   TO DEAL WITH ARE THE ANGEL NOTES, BECAUSE, AGAIN, THIS BLACK
25   NOTEBOOK IS IMPORTANT, LADIES AND GENTLEMEN, YOU KNOW IT,  02:32
```

1  BECAUSE IF THEY WERE DONE IN 1998, THEY BELONG TO

2  CARTER BRYANT.  MR. ECKERT TOLD YOU THAT.

3        SO WHAT THEY HAVE TO DO IS, THEY HAVE TO PROVE TO YOU

4  THAT EVERY DOCUMENT IN THIS CASE, IN THAT BLACK BOOK, IS FROM

5  1999.  I TOLD YOU THEY PULLED UP SHORT ON JEWEL BARBIE.  I TOLD        02:33

6  YOU THAT THEY INTENTIONALLY, INTENTIONALLY TOLD THEIR EXPERT TO

7  NOT IDENTIFY THE RAINY DAY RASCALS IN THAT NOTEBOOK.

8        THE THIRD PIECE OF EVIDENCE I WANT TO TURN TO IS THE

9  SO-CALLED ANGEL NOTES.

10        IF WE GO TO 1155-C, AT PAGE 13.        02:33

11        THESE ARE JUST NOTES, AGAIN NOT DATED, BUT IN THE

12  BLACK NOTEBOOK; "NOTES, IDEAS, ON LARGE ANGEL."

13        NOW, MR. BRYANT TESTIFIED THAT HE WORKED ON TWO

14  DIFFERENT PROJECTS.  ONE WAS AN ANGEL PROJECT FOR MATTEL, AND

15  ONE FOR ASHTON DRAKE.  MATTEL, HAVING THE BURDEN, NEVER        02:34

16  INTRODUCED A WITNESS TO IDENTIFY FOR YOU THE ANGEL PROJECT THAT

17  CARTER BRYANT WAS DOING AT MATTEL.

18        WHY?

19        WOULDN'T THAT HAVE BEEN JUST GREAT?  THEN YOU WOULD

20  HAVE KNOWN WHETHER OR NOT THESE NOTES REFERRED TO THAT ANGEL        02:34

21  PROJECT OR THE ASHTON DRAKE PROJECT THAT HE WAS DOING IN 1998.

22        YOU KNOW WHAT WE DID?  WE SHOWED YOU THE ANGEL

23  PROJECT THAT HE WAS WORKING ON FOR ASHTON DRAKE.

24        THIS IS 15364.

25        THIS IS THE ANGEL PROJECT.  THERE'S A COUPLE OF        02:3

1    INTERESTING THINGS ABOUT THIS DOCUMENT.  IF YOU GET A CHANCE,

2    I'D ASK YOU TO TAKE A LOOK AT IT FOR AT LEAST A COUPLE OF

3    REASONS WHEN YOU'RE LOOKING AT IT.

4         FIRST OF ALL, THIS IS AN ANGEL PROJECT THAT COULD

5    HAVE BEEN DONE AND REFERRED TO THE NOTES THAT ARE CONTAINED IN          02:35

6    THE BLACK NOTEBOOK.  WHILE YOU'RE LOOKING AT IT, REMEMBER, WHY

7    DIDN'T MATTEL BRING IN THE ANGEL PROJECT SO WE COULD MAKE A

8    COMPARISON?  I MEAN, YOU KNOW THIS IS AN ANGEL.

9         HIS NOTES TALK ABOUT 17TH CENTURY ARCHANGELS,

10   STAINED-GLASS WINDOWS.                                                 02:35

11        CAN WE GO BACK FOR A MOMENT TO THE BLACK NOTEBOOK,

12   PLEASE.

13        SEE "STAINED GLASS" RIGHT THERE, "17TH, 18TH

14   CENTURY"?

15        WHY DIDN'T MATTEL COME IN WITH SOMEBODY FROM BARBIE               02:36

16   COLLECTIBLES OR BARBIE MAINLINE OR SOMEONE AT MATTEL TO PROVE

17   THAT BARBIE WAS DOING AN ANGEL PROJECT THAT HAD STAINED GLASS?

18        I DON'T KNOW, BUT I CAN IMAGINE THAT THERE'S SOME

19   STAINED-GLASS WORK IN HERE.  IT SEEMS LIKE TO BE SOMEWHAT OF A

20   RELIGIOUS ANGEL.  BUT I'M NOT ASKING YOU TO SPECULATE ON THAT,         02:36

21   LADIES AND GENTLEMEN.  I PRODUCED THIS EVIDENCE.  WE PRODUCED

22   THIS EVIDENCE.

23        BUT THE OTHER THING I WANT YOU TO TALK ABOUT IS --

24   MR. QUINN CAN THROW AROUND AS EASILY AS HE WANTS ABOUT DISTRUST

25   AND LIARS AND EVERYTHING ELSE, AND YOU KNOW FROM YOUR LIFE,            02:36

1  LADIES AND GENTLEMEN, YOUR OWN LIFE EXPERIENCES, WHEN YOU PAINT

2  WITH A BROAD BRUSH, THE INTEGRITY OF HUMAN BEINGS, YOU BETTER

3  BE RIGHT.  BECAUSE WHILE YOU'RE DELIBERATING ABOUT HOW

4  DISHONEST THIS MAN IS, CARTER BRYANT, WHEN HE IS A FREELANCER,

5  WHEN NO ONE IS LOOKING OVER HIS SHOULDER AND HE'S BEING PAID BY      02:37

6  THE HOUR, LOOK WHAT HE'S DOING.  IT SAYS, MONDAY, FIVE AND A

7  HALF HOURS; FRIDAY, ONE AND A HALF HOURS.  BUT LOOK AT THE

8  SCHEDULE.  HE'S WORKING AT HOME; NOBODY IS THERE; HE'S KEEPING

9  TRACK.  AND HE ACTUALLY TAKES A TEN-MINUTE BREAK, AND HE

10  DOESN'T CHARGE HIS EMPLOYER FOR THAT TEN MINUTES.                   02:37

11        OH, HE HAS AN EVIL HEART, AS LONG AS HE'S TESTIFYING

12  AGAINST MATTEL, OR AS LONG AS HE CAME UP WITH AN IDEA THAT

13  MATTEL SO DESPERATELY WANTS BUT DOESN'T DESERVE.

14        NOW, MR. QUINN TOLD YOU THAT THERE'S NOT A SINGLE

15  DOCUMENT THAT CARTER BRYANT DATED IN 1998 AT THE TIME HE DID       02:38

16  IT.  ALL RIGHT.  WE KNOW IT.  THERE WAS BACKDATING, SO-CALLED

17  BACKDATING, OF PUTTING A 1998 DATE ON SOME OF THESE DRAWINGS.

18        BUT I, FOR ONE, AM TIRED OF THE DOUBLE STANDARD THAT

19  APPLIES WHEN YOU'RE TALKING ABOUT MGA AND CARTER BRYANT AND

20  MR. LARIAN; THEY'RE ALL LIARS; THEY CAN'T BE TRUSTED; THEY'VE      02:3

21  BROKEN THE SIGN OF INTEGRITY.

22        BUT WHEN LILY MARTINEZ CAN TAKE THE STAND AND DRAW

23  FOR YOU, AND MR. QUINN -- AND I'M NOT MIMICKING THIS; I'M JUST

24  SAYING I REMEMBER IT VIVIDLY WHEN MR. QUINN ASKS LILY MARTINEZ

25  TO TAKE A STEP DOWN AND DRAW SOMETHING FOR YOU; AND SHE SAYS,      02:3

1    'WHAT SHOULD I DRAW,' AND MR. QUINN SAYS, 'I DON'T KNOW.  LET

2    THE LINES TALK TO YOU.'  BECAUSE THAT'S THE SETUP.  THAT'S WHAT

3    SHE WAS SAYING:  'THAT'S HOW I GET MY INSPIRATION; THE LINES

4    SPEAK TO ME.'

5            WELL, WHAT MS. MARTINEZ'S LINES SPOKE TO HER IS THE

6    DRAWING THAT SHE MAKES, WHICH IS THE PROTOTYPE DRAWING THAT

7    ULTIMATELY BECOMES MY SCENE; AND ON CROSS-EXAMINATION, SHE

8    ADMITS SHE'S DONE IT TENS OF TIMES.  BUT HERE'S THE KEY:  ON

9    THE DATES -- SHE ADMITTED ON TOON TEENS THAT THE DATES THAT ARE

10   APPEARING ON THESE DRAWINGS, 1999, SHE PUTS THE 1999 ON THEM

11   YEARS LATER WHEN SHE GOT A CALL FROM A LEGAL DEPARTMENT.  AND

12   THEY'RE ASKING YOU, AND THEY'RE ASKING YOU, THEY'RE ASKING YOU

13   TO JUDGE CARTER BRYANT BECAUSE HE PUT DATES OF 1998.

14           BUT YOU KNOW WHAT, LADIES AND GENTLEMEN OF THE JURY,

15   I DON'T FAULT MS. MARTINEZ.  SHE'S A LOVELY WOMAN, AND I KNOW

16   THAT I'VE SELECTED HER FOR A PURPOSE.  WHEN SHE PUT 1999 ON

17   THOSE DRAWINGS, IT'S BECAUSE THAT WAS THE DATE SHE DREW THEM.

18   IT'S THE SAME REASON, WHEN CARTER BRYANT PUT THE 1998 DRAWINGS

19   ON -- IT'S BECAUSE HE KNEW HE DID THEM WHEN HE WAS IN

20   KIMBERLING CITY.

21           YOU SEE?

22           "AND IS IT YOUR PRACTICE TO ALWAYS DATE YOUR DRAWINGS

23   WHEN YOU DO THEM?"

24           ANSWER:  "I DIDN'T ALWAYS DATE THEM THEN, BUT I DO

25   NOW."

02:39

02:39

02:40

02:40

02:40

1            **MR. NOLAN:**  I SUSPECT MR. BRYANT HAS THE SAME VIEW.

2            QUESTION:  "HOW DO YOU KNOW YOU DID THESE IN JUNE OF

3    1999?"

4            ANSWER:  "BECAUSE I GOT A CALL -- I DON'T REMEMBER

5    WHEN, BUT AFTER JUNE 1999, THE LEGAL DEPARTMENT CONTACTED ME          02:41

6    AND SAID, 'HEY, WE MIGHT NEED ALL OF YOUR TOON TEENS STUFF,

7    YOUR SKETCHES, AND WHATEVER YOU HAVE,' AND I SAID, 'OH, OKAY.'

8    AND I HUNG UP THE PHONE AND I GATHERED MY STUFF, AND AT THAT

9    POINT, I SAID, 'I BETTER DATE THEM BEFORE I FORGET EXACTLY WHEN

10   I DID THIS.'  AND THAT'S WHY I PUT THE DATE AFTERWARDS."             02:41

11           **MR. NOLAN:**  ALL WE'RE ASKING, ALL WE'RE ASKING,

12   LADIES AND GENTLEMEN, IS THE SAME STANDARD.

13           AND, OH, IS IT BIAS BECAUSE CARTER BRYANT MADE SO

14   MUCH MONEY IN ROYALTIES AND THAT'S WHAT MAKES HIS TESTIMONY SO

15   UNTRUSTWORTHY?                                                       02:41

16           DO YOU NOT BELIEVE FOR A MOMENT THAT THIS CASE ISN'T

17   IMPORTANT TO MATTEL AND THE EMPLOYEES AT MATTEL?  AND EVEN

18   MS. MARTINEZ, WHO'S ONE OF THE DESIGNERS OF MY SCENE, WHICH IS

19   LAUNCHED AFTER THE INTRODUCTION OF BRATZ, TO COMPETE AGAINST

20   BRATZ, BUT IS NO LONGER SOLD DOMESTICALLY?  IS IT ONLY AN MGA        02:42

21   WITNESS THAT MIGHT HAVE A CLAIM OF BIAS THROWN AGAINST THEM?

22           MATTEL HAS A STAKE IN THIS CASE.  THEY WANT AN IDEA

23   THAT THEY DIDN'T CONCEIVE.  THEY WANT DRAWINGS THEY DIDN'T DRAW

24   AND ARE NOT ENTITLED TO.

25           ANOTHER WAY THEY TRY TO PUT THESE DRAWINGS INTO 1999         02:42

```
 1   RATHER THAN 1998 IS THEY USE TOON TEENS.  AND I WANT TO TURN TO

 2   TOON TEENS, IF I MIGHT.  YOU SEE, WE'RE OUT OF THE BLACK

 3   NOTEBOOK FOR JUST A MOMENT.

 4        AND RESPECTFULLY, IF YOU LOOK AT JURY INSTRUCTION

 5   NUMBER 9, THE WEIGHT OF MR. QUINN'S ELOQUENT CLOSING ARGUMENT

 6   IS NOT A SUBSTITUTE FOR EVIDENCE THAT YOU CAN HOLD ON TO.  AS

 7   PASSIONATELY AS IT WAS DELIVERED, IT'S AS FLEETING AS IT

 8   SOUNDED.  BECAUSE AT THE END OF THE DAY, THERE WAS NO EVIDENCE

 9   TO SUPPORT THOSE CLAIMS.  THEY COULD HAVE BROUGHT IN SOMEBODY

10   FROM MATTEL TO REALLY MAKE IT CLEAR, TO MEET THEIR BURDEN.

11        TOON TEENS.  THEY SAY, 'ALL RIGHT, ANOTHER REASON WHY

12   YOU SHOULD KNOW THAT CARTER BRYANT DID THESE DRAWINGS IN 1999

13   IS BECAUSE HE WAS AT MATTEL; TOON TEENS WAS MADE AT MATTEL;

14   THERE WERE SOME CUBICLES, AND ELISE CLOONAN SAT NEAR

15   LILY MARTINEZ, AND ELISE CLOONAN IS FRIENDS WITH CARTER BRYANT,

16   AND CARTER BRYANT MUST HAVE WALKED BY THE CUBICLE WITH

17   ELISE CLOONAN AND SEEN THE DRAWING THAT WAS IN THE CUBICLE.'

18        THAT'S THE EVIDENCE.

19        I'M NOT MAKING THIS UP.  THAT'S THE QUALITY OF THE

20   EVIDENCE.

21        CARTER BRYANT SAID HE SAW THE 3-D L-BOARD DISPLAY

22   THAT WAS OPEN IN THE PUBLIC AFTER TOON TEENS HAD BEEN SCRAPPED.

23   BUT HE SAID, 'I NEVER SAW THE DRAWING.'

24        BUT HERE'S ANOTHER QUESTION I HAVE FOR YOU.  THAT'S

25   WHAT CARTER BRYANT SAID HE SAW.  AND YOU REMEMBER THE TESTIMONY
```

02:43

02:43

02:43

02:4·

02:4

```
 1   THAT, 'OH, BLUE SKIES, IT'S SUCH A WONDERFUL PLACE TO WORK,

 2   THAT EVEN WHEN DESIGNER'S PROJECTS DON'T GET GREEN-LIGHTED,

 3   THEY'RE PUT ON AN L-SHAPED BOARD SO EVERYBODY CAN GO BY AND

 4   TAKE A LOOK AT IT.'  AND YOU SEE THESE 3-D OBJECTS ARE IMAGES

 5   OF THE DOLLS.  BUT YOU'LL REMEMBER THAT LILY MARTINEZ SAID,          02:44

 6   'WELL, YOU KNOW, MY DECAL, THE ORIGINAL TOON TEENS DRAWING, IT

 7   IS IN THERE.  IT'S ABSOLUTELY IN THERE.  CARTER BRYANT COULD

 8   HAVE SEEN THAT.'

 9          NOW, MIND YOU, THEY'RE ASKING YOU TO SPECULATE.

10   THEY'RE ASKING YOU TO ASSUME THAT CARTER BRYANT WALKED BY, SEES     02:45

11   THE L-BOARD, AND -- YOU SEE THIS LITTLE DECAL THAT'S

12   HIGHLIGHTED.  THAT'S SUPPOSEDLY THE TOON TEENS DRAWING THAT

13   CARTER BRYANT WAS INSPIRED BY, TO COME UP WITH THE NOW FAMOUS,

14   WORLD SUCCESSFUL BRATZ LINE.

15          NOW, IN ORDER TO SET THIS UP, THOUGH, ASK YOURSELF,          02:45

16   WHY DID MATTEL HAVE TO PUT IN FRONT OF YOU SEATING CHARTS THAT

17   HAD BEEN ALTERED?  YOU MIGHT RECALL AT THE VERY BEGINNING OF

18   THE CASE -- IT'S A LONG TIME AGO; IT'S SEVEN WEEKS, AND I KNOW

19   THAT YOU'VE BEEN DILIGENT, AND ALL OF US ARE -- YOU KNOW, THE

20   WEEKEND, REVIEWING THIS EVIDENCE, AND YOU'LL BE ABLE TO SEE IT      02:45

21   IN THE BACK WHEN YOU'RE STARTING TO DELIBERATE.  BUT REMEMBER,

22   SEATING CHARTS WERE PUT UP THERE.  SEATING CHARTS WERE SHOWN

23   JUST LIKE THAT.  THIS WAS ONE THAT WAS SHOWN TO PAULA GARCIA.

24          I ASKED PAULA GARCIA, 'DID YOU SIT THERE?'

25          'NO.'                                                       02:4
```

1       THEY ASKED CARTER BRYANT SIMILAR QUESTIONS.  NONE OF

2  THEM COULD IDENTIFY THE SEATING ARRANGEMENTS THAT WOULD HAVE

3  PROVIDED THEM CLOSE ENOUGH ACCESS TO ALLOW THE INFERENCE THAT

4  CARTER BRYANT WALKED DOWN THIS HALL, TURNED LEFT, CAME RIGHT,

5  PICKED UP ELISE CLOONAN, WALKED OVER, SAW THE CUBICLE, MUST        02:46

6  HAVE SEEN TOON TEENS, 'WOW, THAT'S INSPIRATIONAL.  I'M GOING TO

7  MAKE A DOLL OUT OF IT.'

8       THAT'S THEIR STORY.

9       TO SUPPORT THIS, THOUGH, THEY GIVE YOU A SEATING

10  CHART THAT'S INCORRECT.                                          02:46

11      LILY MARTINEZ, WHEN SHE'S IDENTIFYING IT -- AND WE'RE

12  BLOWING IT UP -- LILY MARTINEZ SAYS, 'THAT'S WHERE I'M SITTING.

13  I'M SITTING RIGHT IN THAT ONE CUBICLE.'

14      AND ON CROSS-EXAMINATION, I SAID, 'OKAY, BUT THAT'S

15  THE CUBICLE WITHOUT YOUR NAME.'                                  02:46

16      'YES.  I KNOW.  THAT'S NOT MY NAME, BUT THAT'S WHERE

17  I WAS SITTING.'

18      'WELL, WHAT ABOUT THE PERSON NEXT TO YOU?'

19      'WELL, THAT'S WHERE ELISE CLOONAN WAS SITTING.'

20      'YEAH.  BUT THAT DOESN'T HAVE ELISE CLOONAN'S NAME ON         02:47

21  IT EITHER.'

22      'I KNOW.  THAT'S SOMEBODY ELSE'S NAME.'

23      WHY DIDN'T THEY BRING YOU THE SEATING CHARTS THAT

24  WERE ACCURATE AT THE TIME OF THE POINT THAT THEY'RE TRYING TO

25  MAKE?                                                            02:47

1        SURELY THEY COULD HAVE DONE THAT.

2        OR THEY COULD HAVE BROUGHT IN SOMEBODY ELSE THAT WAS

3   SITTING IN THE CUBICLES AND SAID, 'YOU KNOW WHAT, I DON'T HAVE

4   A DOG IN THE FIGHT.  I KNOW BECAUSE CARTER BRYANT DID WALK BY

5   AND HE SAW THE TOON TEENS DRAWING.'                          02:47

6        THEY TRIED THE SAME SEATING CHART ISSUE IN ORDER TO

7   PROVE THAT CARTER BRYANT AND PAULA TREANTAFELLES GARCIA KNEW

8   EACH OTHER WHILE THEY WERE WORKING AT MATTEL.  THEY SHOWED A

9   CHART.  THEY SHOWED YOU A CHART THAT HAD CARTER BRYANT SITTING

10  NEXT TO PAULA TREANTAFELLES.  THE NAME.  THAT CHART WAS FALSE.  02:47

11  EVERYONE HAS TESTIFIED IT WASN'T ACCURATE.

12        IF YOU SEE IT BACK THERE, YOU'LL REMEMBER IT.  IT

13  JUMPS OUT AT YOU.  PLEASE SAY TO YOURSELF, WHY?

14        BUT LET'S GO TO TOON TEENS.

15        ANOTHER THING IS, THEY SAY, 'WELL, TOON TEENS CLEARLY  02:48

16  IS THE INSPIRATION OF BRATZ.'  AND THIS IS WHY.

17        LET'S GO TO A PICTURE OF TOON TEENS FOR JUST A

18  MOMENT.

19        THIS IS TOON TEENS.

20        NOW, THE TESTIMONY IN TOON TEENS -- AND I'M NOT GOING  02:48

21  TO GO THROUGH IT ALL BECAUSE WE DON'T HAVE THE TIME HERE --

22  THEY WERE SAYING IT'S THE POSE.  THIS IS WHAT -- IT'S A

23  UNIQUE -- REMEMBER THAT IVY ROSS TESTIFIED TO IT; LILY MARTINEZ

24  TALKED ABOUT IT.  IT'S THE POSE.  THAT'S WHAT WAS UNIQUE.

25  THAT'S WHAT INSPIRED CARTER BRYANT TO GO OFF AND DO THE HUGELY  02:48

4935

1    SUCCESSFUL, MULTI-ETHNIC, HIP BRATZ.

2         WELL, WHAT'S INTERESTING ABOUT IT -- AND YOU'LL GO

3    BACK AND REVIEW YOUR NOTES -- WHEN I ASKED IVY ROSS ABOUT IT,

4    SHE DESCRIBED THAT POSE AS BEING DEFIANT.  WHEN I ASKED

5    LILY MARTINEZ, SHE SAID, 'IT KIND OF LACKS CONFIDENCE.'  TWO        02:49

6    DIFFERENT STYLES.  BUT THEY'RE TRYING TO TELL YOU, 'OH, THIS IS

7    THE INSPIRATION FOR BRATZ.'

8         I ASKED MS. MARTINEZ -- I CAN'T DRAW THIS.  I'M NOT

9    IN ANY WAY TRYING TO DISPARAGE MS. MARTINEZ'S TALENT.  SHE'S A

10   VERY TALENTED WOMAN -- I ASKED HER, 'WHAT AGE GROUP WAS THIS       02:49

11   INTENDED TO BE?'

12        'YOUNG CHILDREN.'

13        LOOK AT THE LEGS.  LOOK AT THE BOOTS.  THIS IS A

14   YOUNG CARTOONISH-LOOKING GIRL, INCREDIBLY CUTE, BIG EYES; BUT

15   ALL THEY'RE SAYING, LADIES AND GENTLEMEN, IS IT'S THE POSE.        02:49

16        AND THEY WANT YOU TO BELIEVE THAT BECAUSE THAT MEANS

17   THAT CARTER BRYANT LOOKED AT THAT, RAN OUT OF THE CUBICLE, DID

18   ALL OF HIS DRAWINGS FOR BRATZ, AND THEN WENT TO RAMONA PRINCE

19   AND HAD THEM NOTARIZED; BECAUSE THE TESTIMONY IS THAT -- AND

20   MS. MARTINEZ SHOWED US THE PICTURE OF THE L-BOARD.  THE            02:50

21   PHOTOGRAPH HAS AUGUST OF 1999 ON IT.  WELL, IN AUGUST OF 1999,

22   CARTER BRYANT IS TAKING HIS DRAWINGS AND SENDING THEM TO

23   ALASKA MAMA.  WE KNOW THAT BECAUSE OF JACQUELINE PRINCE.

24        TOON TEENS.  IF THAT'S THE BEST THEY HAVE, I

25   RESPECTFULLY SUBMIT, IT DOESN'T MEET THEIR BURDEN.                 02:50

1          I MENTIONED THE NOTARY.  LET'S TALK ABOUT THE NOTARY

2    FOR A MOMENT, BECAUSE THIS IS ALSO A PIECE OF EVIDENCE THAT'S

3    VERY IMPORTANT.

4          THE FIRST DAY WE MET YOU, IN OPENING STATEMENTS,

5    MR. QUINN PUT THIS GRAPHIC IN FRONT OF YOU.  AND THIS IS THE          02:51

6    GRAPHIC WITH RESPECT TO THE NOTARY, THE FRAUDULENT NOTARY BOOK.

7    I BORROWED IT FROM MATTEL.  THE NOTARY BOOK WAS FORGED.  AND

8    THEN THEY HAVE THE BLOWUP.  AND THEN WE HAVE THE REPRESENTATION

9    BY MR. QUINN IN HIS OPENING STATEMENT.

10          MR. QUINN, IN HIS OPENING STATEMENT, SAID THAT THIS          02:51

11    WAS FALSE.  AND WE HAD AN INK EXPERT COME AND LOOK AT THIS, AND

12    THE INK EXPERT FOUND THAT THE ADDITIONAL LANGUAGE THERE, "FROM

13    MISSOURI 1998" -- REMEMBER, THAT'S THE STORY THEY WANT TO TELL

14    YOU DURING THE GAP OF HIS EMPLOYMENT, AND THAT'S IN DIFFERENT

15    INK.  THAT'S THE REST THERE.          02:52

16          THAT'S WHAT WAS TOLD TO YOU.

17          THERE WAS NO INK EXPERT.  MR. CUNNINGHAM, HOWEVER --

18    DO WE HAVE MR. CUNNINGHAM'S SLIDE AND HIS TESTIMONY, PLEASE --

19    MR. CUNNINGHAM, THEIR EXPERT, CAME IN AND SAID, UNDER

20    EXAMINATION BY MR. SLOAN, "AND, SIR, YOU DETERMINED THAT YOU          02:52

21    WERE UNABLE TO DETERMINE WHETHER THE INK ON THE FOURTH LINE' --

22    'THE INK USED TO WRITE THE FOURTH OR THE FIFTH LINE WAS

23    DIFFERENT FROM ANY OF THOSE OTHER INKS, DIDN'T YOU."

24          ANSWER:  "I COULD NOT DIFFERENTIATE BETWEEN THE INK

25    USED FOR THE FIRST FOUR LINES AND THE INK USED FOR THE FIFTH          02:52

```
 1   LINE."

 2          QUESTION:  "THAT WAS USING A MICROSCOPIC EXAMINATION;

 3   CORRECT?"

 4          ANSWER:  "CORRECT."

 5          QUESTION:  "AND YOU COULDN'T DISTINGUISH WITH A           02:53

 6   REFLECTED INFRARED LIGHT?"

 7          ANSWER:  "CORRECT."

 8          QUESTION:  "YOU COULDN'T DISTINGUISH USING INFRARED

 9   LUMINOUS?"

10          ANSWER:  "CORRECT."                                       02:53

11          QUESTION:  "AND YOU ALSO USED UV LIGHT, DIDN'T YOU,

12   SIR?"

13          ANSWER:  "A UV LIGHT AND A DICHROIC FILTER."

14          QUESTION:  "AND THOSE ARE ALL VERY POWERFUL DEVICES

15   TO TRY TO DISTINGUISH BETWEEN THE INKS IN DIFFERENT QUESTIONED    02:53

16   ENTRIES; CORRECT?"

17          ANSWER:  "I DON'T USE THE TERM 'POWERFUL,' BUT

18   THEY'RE SCIENTIFIC INSTRUMENTATION I USED."

19          MR. NOLAN:  NO EXPERT.  THE INK IS THE SAME.  THE

20   BEST MR. CUNNINGHAM COULD DO IS SAY, 'WOW, SOMEONE WHO WROTE IN   02:53

21   "FROM MISSOURI 1998" WROTE REALLY SLOW, IN DELIBERATE

22   HANDWRITING.'

23          AND THE OTHER THING IS, REMEMBER, AT THE VERY

24   BEGINNING, 'MR. CUNNINGHAM, DID YOU LOOK AT THE DEPOSITION OF

25   RAMONA PRINCE?'                                                  02:53
```

```
 1              'NO.  THAT WOULD BE INAPPROPRIATE.'

 2              'WHY WOULD IT BE INAPPROPRIATE?'

 3              'WELL, BECAUSE I NEED TO MAKE MY OWN SCIENTIFIC

 4    CONCLUSIONS.'

 5              MR. NOLAN:  WELL, WHEN WE LOOKED AT HIS REPORT, HE        02:54

 6    HAD TO IDENTIFY THAT, OF COURSE, HE HAD READ DEPOSITIONS.

 7              SO YOU MUST BE THINKING TO YOURSELF AT THAT POINT,

 8    WHY ISN'T HE ADMITTING THAT HE READ HER DEPOSITION?

 9              WELL, I SUSPECT THIS MAY BE ONE OF THE REASONS.

10              CAN WE PLAY THE VIDEO CLIP.                              02:54

11              I JUST WANT TO ADD ONE MORE THING.

12              RAMONA PRINCE IS A NOTARY THAT IS NOTARIZING BRATZ

13    DRAWINGS IN AUGUST OF 1999.  AT THAT TIME, YOU KNOW, MATTEL'S

14    GRAND CONSPIRACY THAT MGA, ISAAC LARIAN, CARTER BRYANT, AND THE

15    WORLD, INCLUDING THE LAWYERS, ARE LYING ABOUT WHEN THIS SCHEME    02:54

16    DEVELOPED.  WERE THE DRAWINGS IN 1998 OR 1999?  LET'S HIDE THE

17    FACT THAT THEY WERE REALLY DONE IN 1999 AND AT MATTEL AND THEY

18    DON'T BELONG TO US.  LET'S ALL COME UP WITH THIS.

19              AT THIS TIME, LADIES AND GENTLEMEN, CARTER BRYANT

20    DOESN'T EVEN KNOW MGA HAD NEVER HEARD OF IT.                      02:55

21              AND THEN THE OTHER THING I WANT YOU TO KNOW IS THAT

22    IF HE WAS SO WORRIED, WHY, OF ALL OF THE NOTARIES THAT YOU

23    WOULD GO TO TO HAVE DRAWINGS NOTARIZED FOR YOU, YOU GO TO THE

24    SECRETARY OF THE ADMINISTRATIVE VICE PRESIDENT IN THE DESIGN

25    CENTER AT MATTEL, WHO HE DOESN'T KNOW VERY WELL, HAD HER OVER     02:5.
```

4939

1    FOR DINNER ONE TIME, AND THEN HE'S GOING TO SHOW HER, ACCORDING

2    TO MATTEL, THESE SECRET DRAWINGS THAT HE HAS DONE WHILE AT

3    MATTEL.

4           IT DOESN'T MAKE SENSE.  IT DOESN'T MAKE SENSE.

5           BUT IN ANY EVENT, HE GOES TO HER.  HE ASKS HER TO       02:55

6    NOTARIZE THE BOOK.

7           THEY WANT YOU TO BELIEVE THAT THIS NOTARY BOOK IS

8    FORGED.  IT HAS TO BE FORGED FOR MATTEL TO WIN THIS CASE,

9    BECAUSE OTHERWISE, THIS IS REALLY SIGNIFICANT EVIDENCE.  HERE

10   IS A PERSON, RAMONA PRINCE, WHO DOESN'T KNOW ANYTHING ABOUT     02:56

11   ANYTHING.  SHE'S JUST ASKED TO NOTARIZE SOME ENTRY IN A NOTARY

12   BOOK, WITH HER CHILD AT HOME THAT NIGHT, FOR SOMEONE FROM

13   MATTEL; FAVORS THAT SHE'S DONE BEFORE.

14          THIS IS HER TESTIMONY.  IT WAS THE LAST QUESTION.  I

15   SUSPECT THIS IS WHY MR. CUNNINGHAM DID NOT WANT TO ADMIT THAT   02:56

16   HE READ THE DEPOSITION, BECAUSE IT DEBUNKS THEIR WHOLE ARGUMENT

17   ABOUT THE FORGED NOTARY.

18          (VIDEO EXCERPTS PLAYED AS FOLLOWS:)

19          QUESTION:  "DO YOU HAVE ANY REASON TO BELIEVE THAT

20   ANYONE AT ANY TIME ALTERED IN ANY WAY THE ENTRY IN YOUR JOURNAL 02:57

21   DATED AUGUST 26, 1999 FOR MR. BRYANT?"

22          ANSWER:  "NO."

23          (VIDEO EXCERPT ENDS.)

24          **MR. NOLAN:**  YOUR HONOR, IT'S 3:00.  WOULD THIS BE AN

25   APPROPRIATE TIME FOR A QUICK BREAK?                            02:57

1        **THE COURT:**  VERY WELL.

2           (BRIEF RECESS TAKEN.)

3           (WHEREUPON, JURORS ENTER COURTROOM.)

4        **THE COURT:**  COUNSEL, YOU MAY RESUME.

5        **MR. NOLAN:**  THANK YOU.                                03:06

6           I NEED TO GO BACK AND POINT OUT ONE OTHER THING, IF I

7    MIGHT.

8           WE TALKED ABOUT RAINY DAY RASCALS.  I DIDN'T WANT TO

9    LEAVE THE IMPRESSION THAT THAT LITTLE TINY FIGURINE WAS THE

10   ONLY ONE IN 1998.                                            03:06

11          COULD I HAVE UP SLIDES 84 AND 85.

12          THESE ARE OTHER RAINY DAY RASCALS IDENTIFIED BY

13   CARTER BRYANT AS HAVING BEEN DONE IN 1998, FURTHER EVIDENCE

14   THAT HE WAS DOING THE SERIES OF RAINY DAY RASCALS IN 1998.

15   TRIAL EXHIBIT 15333, AND THEN TRIAL EXHIBIT 18497.  AND THE   03:07

16   KEY, IF YOU LOOK UP ON THE LEFT-HAND SIDE -- WE DID THIS DURING

17   EXAMINATION -- ON THE TRIAL EXHIBIT 1533, IT SAYS, "WHENEVER I

18   NEED YOU," AND THEN YOU GO OVER TO THE NEXT DRAWING, WHICH IS A

19   SEPARATE EXHIBIT, TRIAL EXHIBIT 18497.  HE CAPTURES THAT IMAGE,

20   THAT PHRASE, "WHENEVER I NEED YOU," AND THEN YOU GO TO THE     03:07

21   DRAWING OVER IN THE TOP RIGHT-HAND -- WE HAVE IT IN YELLOW --

22   IT SAYS, "WHENEVER I NEED YOU."

23          SO, AGAIN, IT'S NOT JUST THAT SMALL IMPRESSION THAT

24   WAS ON THE INVENTION OF THAT BLACK NOTEBOOK.  HE'S DOING RAINY

25   DAY RASCALS IN 1998.  RICHARD TESTIFIES HE SHOWED HIM GREETING  03:07

1   CARDS THAT WERE DONE IN 1998.  MS. GALVANO, EVEN IN HER VIDEO,

2   SAID THAT SHE SAW GREETING CARDS WHEN SHE WAS VISITING IN

3   MISSOURI.

4          BY THE WAY, THE OTHER POINT I WANTED TO MAKE ON

5   MS. GALVANO -- I THINK IT'S VERY, VERY INTERESTING -- TO PROVE     03:08

6   THAT MS. GALVANO WAS BACK IN MISSOURI DURING THAT PERIOD OF

7   TIME -- AND WHILE YOU'RE BACK THERE, LOOK AT HER CALENDAR; IT'S

8   THERE -- SHE HAS THE EIGHT HUNDRED NUMBER TO ALASKA AIRLINES.

9   SHE HAS THE MILES ON HER ACCOUNT, VERIFYING THAT SHE HAD ENOUGH

10  MILES TO TAKE THE FLIGHT.                                          03:08

11         THERE IS SOME QUESTION ABOUT, WELL, SHE DIDN'T HAVE

12  ANY RECORD EVIDENCE.  BUT YOU HEARD HER TESTIMONY.  SHE CALLED

13  ALASKA AIRLINES.  SHE CALLED CITY BANK.  SHE TRIED TO GET ALL

14  OF THE DOCUMENTS TO PROVE TO YOU THAT SHE WAS IN MISSOURI.  BUT

15  I THINK FROM THE DEMEANOR, YOU CAN SEE.                            03:08

16         AND THESE CERTAINLY ARE DONE IN 1998.

17         NOW, ONE OTHER THING I WANT TO DO BEFORE I LEFT

18  TOON TEENS HAS TO DO WITH THE ACTUAL POSES.

19         REMEMBER, THE TESTIMONY IS HOW UNIQUE THAT POSE WAS

20  OF TOON TEENS.                                                     03:09

21         BUT IF I COULD, COULD WE GO UP TO THE NEXT GRAPHIC.

22         THESE ARE OTHER POSES BY CARTER BRYANT.  IN THE SIXTH

23  GRADE CLASS, HE WON THE CONTEST FOR DRAWING VERONICA IN THE

24  CARTOON SERIES ARCHIE, AND THEN IN HIGH SCHOOL, HE WAS USING

25  THESE HAND POSES OUT TO THE SIDE.  IN JANUARY OF 1998, ONE OF      03:09

 1    THE JEWEL DRAWINGS WERE THERE; SO TO ARGUE THAT THE ARMS

 2    EXTENDED LIKE THIS IS SOMEHOW A UNIQUE CREATION TO AN ARTIST,

 3    ITS HANDS, ITS POSES -- YES, YOU CAN GET AN ATTITUDE FROM THEM,

 4    BUT CERTAINLY, THAT CANNOT BE THE WAY MATTEL CAN MEET ITS

 5    BURDEN OF PROVING THAT THESE WERE DONE AT MATTEL, BECAUSE HE          03:09

 6    WAS INSPIRED BY TOON TEENS.

 7            LET'S TURN TO THE DRAWINGS, IF I MIGHT.

 8            MR. BRYANT WENT THROUGH A NUMBER OF -- I APOLOGIZE.

 9    I WANT TO GO TO THE STEVE MADDEN DEVILS AD JUST FOR A MOMENT.

10    THIS IS THE OTHER PIECE OF EVIDENCE THAT THEY USED.  THIS IS          03:10

11    SLIDE 132.  I BELIEVE THIS IS THE LAST PIECE OF EVIDENCE THEY

12    INTRODUCED TO YOU, TO SHOW HE MUST HAVE BEEN INSPIRED BY THIS.

13    THIS IS A STEVE MADDEN AD THAT MR. BRYANT GAVE TO

14    MARGARET LEAHY TO HAVE MARGARET LEAHY USE IT AS INSPIRATION.

15            YOU KNOW, FOR MOST OF THE TRIAL, MOST OF THE USE OF          03:10

16    THIS EXHIBIT WAS TO SUGGEST TO YOU THAT THIS CAME OUT OF THE

17    AUGUST 17, 1999 SEVENTEEN MAGAZINE, THUS PROVING IT MUST HAVE

18    BEEN AUGUST '99.  BUT IN TRUTH, AS WE PROVED WITH

19    MARGARET LEAHY, THESE ARE NOT THE SAME.  THE ADVERTISEMENTS ARE

20    NOT THE SAME.  THE ONE ON THE RIGHT IS FROM THE SEVENTEEN           03:11

21    MAGAZINE, AND THE ONE THAT'S ON THE LEFT IS A DIFFERENT AD.

22            AND YET, MATTEL -- THE QUALITY OF ITS PROOF -- WANTS

23    YOU TO SAY 'OH, GEE, AT LEAST THE PHOTOGRAPH IS SIMILAR FROM A

24    SEVENTEEN MAGAZINE IN 1999.'  BUT THEY CAN'T DATE THIS AD.

25    THEY WANT YOU TO ASSUME, JUST SPECULATE, THAT THIS CAMPAIGN         03:1?

1    ONLY RAN IN ONE YEAR, FOR ONE LIMITED PERIOD OF TIME.

2           THERE'S NO EVIDENCE OF THAT.  THEY COULD HAVE BROUGHT

3    IN EVIDENCE FROM THE ADVERTISING CAMPAIGN MANAGER TO DATE THIS

4    FOR YOU, BUT THEY DIDN'T.  THEY WANT YOU TO SPECULATE.

5           LET'S GO TO SLIDE 27.  THIS, AGAIN, YOU'VE SEEN "MEET     03:12

6    THE BRATZ," THE IDEA, THE CONCEPT, IN 1998.

7           ONE OF THE QUESTIONS THAT YOU'LL BE ASKED ON THE JURY

8    VERDICT FORM -- I BELIEVE IT'S QUESTION NUMBER 5 -- WILL ASK

9    YOU WHEN HE CAME UP WITH THE CONCEPT.

10          NOW, IN MY MIND, NUMBER 5 IS REALLY THE STARTING          03:12

11   POINT IN TERMS OF HOW YOU FRAME THIS ISSUE, BUT IT'S THE FIFTH

12   QUESTION.  THE FIRST QUESTION WE'RE GOING TO GO THROUGH IN JUST

13   A MINUTE TALKS ABOUT WHICH DRAWINGS GO INTO WHAT BUCKET.  BUT

14   THE CONCEPT, LADIES AND GENTLEMEN, THE EVIDENCE, I SUBMIT, IS

15   OVERWHELMING THAT THE CONCEPT AND THE INITIAL DRAWINGS FOR      03:13

16   BRATZ WAS DONE IN LATE SUMMER, IN KIMBERLING CITY, MISSOURI.

17          SO THAT'S "MEET THE BRATZ."

18          CARTER'S TESTIMONY IS THAT HE DID THAT WHILE THERE IN

19   1998.  HE TYPED IT UP FOR CERTAIN BEFORE THE PITCH MEETING.  WE

20   KNOW THAT, BECAUSE IT WAS ORIGINALLY WRITTEN, AND, LOOK, HE'S   03:13

21   USING THE NAME BRATZ.  THAT'S GOING TO BE ANOTHER QUESTION ON

22   THIS JURY VERDICT FORM:  WHEN DID HE COME UP WITH THE NAME

23   BRATZ?

24          HE CAME UP WITH THE NAME BRATZ BACK IN KIMBERLING

25   CITY, MISSOURI.  AND DESPITE WHAT THEY WANT IN TERMS OF THE     03:13

4944

```
 1   FACT THAT IT JUST SO HAPPENED THERE WAS BRATS BEING CONSIDERED
 2   WITHIN MATTEL FOR A POTENTIAL PROJECT, THEY DID NOT BRING IN A
 3   SINGLE PERSON THAT COULD SAY CARTER BRYANT HAD ACCESS TO THE
 4   MEMO THAT SAID ONE OF THE NAMES HERE IS BRATZ.  THERE IS NOT A
 5   SCINTILLA OF EVIDENCE THAT CARTER BRYANT KNEW THAT THE NAME       03:14
 6   BRATS, WITH AN S, WAS BEING CONSIDERED AT MATTEL.  THEY WANT
 7   YOU TO SPECULATE BECAUSE SOME OUTSIDE VENDOR PROVIDED A LIST TO
 8   A DEPARTMENT AT MATTEL THAT INCLUDED ONE OF, I THINK, 20 NAMES,
 9   BRATZ.
10           BUT WHEN I ASKED IVY ROSS WHETHER OR NOT SHE THOUGHT     03:14
11   MR. BRYANT HAD ACCESS TO THAT MEMO, BECAUSE HE'S NOT ON THE
12   MEMO, SHE SAID, 'NO, I HAVE NO BASIS TO SAY THAT MR. BRYANT SAW
13   THIS.'
14           BUT THEY ARE CLAIMING THAT MR. BRYANT GOT THE NAME
15   BRATZ FROM MATTEL.  IT'S A LITTLE BIT LIKE THEIR THEORY THAT HE  03:14
16   WAS WALKING DOWN THE CUBICLE, TURNED LEFT, SAW THE DRAWINGS,
17   AND THEN MOVED ON, ON TOON TEENS.
18           IT'S NOT THERE.  IT'S LIKE GRABBING JELLY AND HOLDING
19   ONTO IT.  IT DOESN'T SUPPORT THE BURDEN THEY HAVE TO MEET IN
20   THIS CASE.                                                      03:15
21           LET'S TURN TO SLIDE 28.
22           THESE ARE THE MASTER DRAWINGS, THE POSE, THE GESTURAL
23   MARKS.  YOU'VE SEEN THESE BEFORE.  I'VE MARKED THEM TRIAL
24   EXHIBIT 762.  THESE ARE THE POSES OF THE BRATZ.  EVEN LOOKING
25   AT THEM IN THIS EARLY FORM, YOU SEE THE ATTITUDE, YOU SEE THE    03:15
```

1    DIFFERENCE, YOU SEE THE IMAGINATION AND INSPIRATION THAT

2    CARTER BRYANT HAD.  THEY GO AND THEY SAY, 'OH, THE AUGUST 1998

3    PARIS BLUES AD DOES NOT LOOK LIKE THIS, AND THE COCA-COLA AD IN

4    THE AUGUST MAGAZINE DOESN'T LOOK LIKE THIS, OR THE STEVE MADDEN

5    AD IS DIFFERENT, OR THE KICKAPOO HIGH SCHOOL KIDS ARE NOT                03:16

6    MULTI-ETHIC.'

7                 FIRST OF ALL, CARTER BRYANT DIDN'T TESTIFY TO THAT.

8    THE ONLY PERSON WHO TRIED TO TESTIFY TO THAT, BUT HE CAN'T GET

9    COMPETENT EVIDENCE, IS MR. QUINN.  WE'RE NOT DISPARAGING THE

10   KIDS AT KICKAPOO HIGH SCHOOL.  WHAT CARTER BRYANT SAID WAS THAT        03:16

11   HE DROVE BY AND HE SAW THE IMAGE, THE ENERGY OF THOSE KIDS AND

12   THOUGHT, 'WOW, THIS IS A GENERATION THAT BARBIE IS NO LONGER

13   APPEALING TO.  WOULDN'T IT BE COOL IF I COULD DEVELOP AN IDEA,

14   A CONCEPT.'  AND THEN HE LOOKED AT THE MAGAZINE, AND HE SAW THE

15   BIG EYES, THE BIG LIPS, THE ATTITUDE.                                  03:16

16                 NO ONE IS ASKING YOU AND NO ONE IS SUGGESTING THAT

17   YOU SHOULD COMPARE ANY ONE OF THESE TO THE DIXIE CHICKS, CHICKS

18   WITH ATTITUDE.  NOBODY IS SAYING HE COPIED THAT.  THIS IS

19   INSPIRATION.  IT CAUSED HIM TO THINK.  AND HE COMBINED ALL OF

20   THOSE.  HE COMBINED THE BACKPACKS WITH THE FIGURES, THE ENERGY;        03:17

21   AND THIS WAS THE CONCEPT.  AND WHEN HE KNOCKED ON HIS MOTHER'S

22   BEDROOM DOOR AND SAID 'DO YOU LIKE MY IDEA,' THAT'S WHAT HE WAS

23   REFERRING TO.

24                 I SHOWED YOU THE POSES.

25                 LET'S GO TO SLIDE 29, PLEASE.                            03:17

1    THESE WERE DONE IN 1998.  THESE ARE THE MASTER BRATZ

2  DRAWINGS, THE HEADS.  ONE IS ON TRACING PAPER.  THE OTHER IS A

3  REDUCED COPY OF IT.  YOU'RE GOING TO HAVE THESE IN EVIDENCE.

4    YOUR HONOR, DO YOU MIND, WITH THE ORIGINAL, IF

5  MS. AGUIAR COULD JUST STAND HERE?                            03:17

6    **THE COURT:**  VERY WELL.  THAT'S FINE, AS LONG AS

7  MATTEL CAN SEE.

8    **MR. NOLAN:**  THANK YOU.

9    WHAT WE'VE DONE IS, ON THE VERDICT FORM, YOU'RE GOING

10  TO -- IN FACT, COULD WE FLASH UP THE VERDICT FORM QUESTION, THE   03:17

11  FIRST QUESTION.

12    THE VERY FIRST QUESTION IS GOING TO BE:  FOR EACH OF

13  THE ITEMS LISTED BELOW, HAS MATTEL PROVEN BY A PREPONDERANCE OF

14  THE EVIDENCE THAT THE ITEM WAS CONCEIVED OR REDUCED TO

15  PRACTICE, THAT IS, CREATED, BY CARTER BRYANT, ALONE OR JOINTLY   03:18

16  WITH OTHERS, DURING THE PERIOD IN WHICH HE WAS EMPLOYED BY

17  MATTEL, JANUARY 4, 1999, TO OCTOBER 19, 2000?

18    AND THEN WHAT FOLLOWS IS A SERIES OF EXHIBITS.

19    THIS IS NOT GOING TO BE A MEMORY TEST FOR YOU,

20  BECAUSE I COULDN'T PASS IT MYSELF.  WHAT THE PARTIES HAVE DONE   03:18

21  IS PUT THEM INTO THREE PORTFOLIOS.  IN THIS ONE, MS. AGUIAR HAS

22  QUESTION NUMBER 1, TRIAL EXHIBITS.  THESE ARE THE DRAWINGS THAT

23  CARTER BRYANT DID IN MISSOURI IN 1998.  AND WE WOULD ASK THAT

24  FOR EACH ONE OF THESE DRAWINGS, THAT YOU WOULD ANSWER "NO" TO

25  THIS QUESTION, BECAUSE MATTEL HAS NOT MET ITS BURDEN THAT       03:18

1    CARTER BRYANT "CONCEIVED OR REDUCED TO PRACTICE" THESE DRAWINGS

2    WHILE EMPLOYED AT MATTEL.

3           I SHOWED YOU THE "MEET THE BRATZ" DRAWING.  I'VE

4    SHOWN YOU THE POSE.  NOW LET'S GO TO -- WE'VE SHOWN YOU THE

5    MASTER DRAWINGS FOR THE HEADS, SLIDE 29.  THAT'S ALSO IN THIS

6    BOOK.  SLIDE 30 IS THE FACELESS FASHIONS.  CARTER BRYANT

7    CONFIRMED HE DREW THESE MASTER DRAWINGS IN AUGUST 1998.  THESE

8    ARE THE EXHIBITS THAT ARE SET FORTH IN THIS BOOK.

9           EACH AND EVERY ONE OF THESE WAS DONE WHILE HE WAS NOT

10   EMPLOYED AT MATTEL, AND MATTEL HAS NOT MET ITS BURDEN THAT

11   THESE WERE CREATED WHILE HE WAS EMPLOYED AT MATTEL.

12          LET'S GO TO SLIDE 31.

13          SLIDE 31 HAS A SERIES OF EXHIBITS ON IT.  YOU SEE THE

14   VARIOUS HAIR PATTERNS.  YOU SEE IN THE LOWER RIGHT CORNER THE

15   BACKPACKS, DIFFERENT BACKPACKS.  YOU SEE IN TRIAL EXHIBIT 706,

16   THE BOOTS, THE DIFFERENT SHOES.  EACH ONE ARE TRANSFORMABLE.

17   EACH ONE CAN MOVE BACK AND FORTH.

18          LET'S SHOW SLIDES 260 THROUGH 279.  START WITH 260.

19          HERE'S HIS TESTIMONY WITH RESPECT TO "MEET THE

20   BRATZ."  HE TESTIFIED HE DID THAT IN 1998.  WITH RESPECT TO

21   TRIAL EXHIBIT 6215, THE HEADS, HIS TESTIMONY, THESE WERE DONE

22   IN 1998.

23          NEXT SLIDE.

24          THIS GESTURAL POSE, TRIAL EXHIBIT 7620 IN THAT BOOK.

25   DO YOU RECOGNIZE IT?"

```
 1              "YES."

 2              "WHEN DID YOU DO IT?"

 3              "1998."

 4         NEXT ONE.

 5              THESE THREE EXHIBITS, THEY ARE THE POSES.  I ASKED        03:20

 6    HIM, WHAT IS 710?  WHAT IS 761?  WHAT IS 758?

 7              AND HE IDENTIFIES THEM ALL AS HAVING BEEN DONE IN

 8    1998 WHILE IN MISSOURI.  THEY ARE IN THAT BOOK.

 9              YOU SHOULD ANSWER "NO" TO QUESTION NUMBER 1.  THESE

10    WERE NOT DONE AT MATTEL.  MATTEL HAS NOT MET ITS BURDEN OF        03:21

11    PROOF THAT THEY WERE DONE THEN.

12              DIRECTING YOUR ATTENTION TO 774.

13              "IS THIS A DRAWING YOU SAW BACK AT THE TIME WHEN

14    CARTER BRYANT WAS LIVING IN KIMBERLING CITY?

15              "YES."                                                  03:21

16              "AND YOU SPECIFICALLY RECALL THAT; IS THAT CORRECT?"

17              ANSWER:  "YES."

18              THAT'S FROM HIS MOTHER'S TESTIMONY.  SHE TESTIFIED TO

19    THAT.

20              RICHARD IRMEN ALSO TESTIFIED.                           03:21

21              DIRECTING YOUR ATTENTION TO THIS EXHIBIT:

22              "IS THAT THE BLACK AND WHITE SKETCH?"

23              "YES."

24              "IS THIS THE ONE YOU RECALL SEEING THERE IN LANCASTER

25    ON JANUARY 2, 1999, BEFORE HE STARTS WORKING AT MATTEL?"         03:21
```

1          THERE'S THE HERO SHOT.  THAT, LADIES AND GENTLEMEN,

2     THOSE ARE THE FOUR BRATZ CHARACTERS.

3          THIS IS CARTER BRYANT.

4          I'M GOING TO SHOW YOU A FEW MORE EXHIBITS, 777.

5          QUESTION:  "WERE THEY DONE IN 1998?"                    03:22

6          ANSWER:  "YES."

7          QUESTION:  "YOU CHANGED THE HAIRSTYLE?"

8          "YES."

9          ON ONE, HE LIKED THE PONYTAIL.  ON THE OTHER ONE, HE

10    LIKED THE BANDANA LOOK.  ALL HE HAD TO DO, LADIES AND        03:22

11    GENTLEMEN -- IF I MIGHT, YOUR HONOR?

12          **THE COURT:**  YOU MAY.

13          **MR. NOLAN:**  TO SHOW YOU THE IMPORTANCE OF QUESTION

14    NUMBER 1, THAT THESE WERE DONE AND CREATED IN 1998 AND PUT TO

15    PRACTICE, REDUCTION TO PRACTICE, CARTER BRYANT, YOU WILL     03:22

16    RECALL, DREW FOR YOU ON THAT BOARD, NOT SOMETHING THAT I JUST

17    ASKED HIM TO MAKE UP; I ASKED HIM TO DRAW A BRATZ.  NOT A NEW

18    CREATION.  I JUST ASKED HIM TO DRAW A BRATZ.

19          AND TO DEMONSTRATE FOR YOU, HE THEN SAT AT THIS VERY

20    CHAIR AS THOUGH HE WAS IN THE BACK OF HIS ROOM IN A STUDIO, AND    03:2:

21    HE EXPLAINED VERY CAREFULLY WHAT HE WAS TAUGHT AT THE OTIS

22    SCHOOL OF ART, AND THAT WAS TO SLOWLY, SLOWLY TRACE THE

23    ORIGINAL MASTER TO REPLICATE EXACTLY WHAT HE HAD CREATED.

24          AND FROM THAT, HE WOULD MOVE AND HE WOULD TRACE AND

25    PUT ON SHOES, FASHIONS, BACKPACKS.  HE COULD SHIFT THE HAIR, IF    03:2

1    HE WANTED TO.  BUT THEY WERE CREATED -- THE CONCEPT, THE IDEA,

2    THEY WERE CREATED IN 1998, NOT 1999.

3              LILY MARTINEZ TESTIFIED THAT SHE USES THE SAME

4    PROCESS.  WE'RE NOT THE ONLY ONE THAT USES A LIGHT BOX.  IT'S A

5    COMMON WAY OF COPYING THE MASTERS.                                03:24

6              THE FACT THAT HE KEPT GOING BACK TO THESE DRAWINGS AS

7    THE MASTERS, FURTHER EVIDENCE THAT THOSE DRAWINGS IN 1998 WERE,

8    IN FACT, THE ORIGINAL CONCEPT DRAWINGS FOR THE BRATZ.

9              LET'S GO TO SLIDE 49, IF I COULD.

10             IN MY OPENING STATEMENT, I USED THE SAME GRAPHIC.  ON  03:24

11   THE LEFT-HAND SIDE ARE ALL OF THE DRAWINGS THAT CARTER BRYANT

12   DID IN 1998.  AND THE RED BARRIER LINE -- THERE IS A SEPARATION

13   BETWEEN 1998 AND THE PERIOD OF HIS EMPLOYMENT.  IT WAS MATTEL'S

14   BURDEN IN THIS CASE TO MOVE EACH AND EVERY ONE OF THE DRAWINGS

15   FROM THE LEFT TO THE RIGHT, AND I RESPECTFULLY SUBMIT, THEY DID  03:2(

16   NOT MEET THAT BURDEN.

17             NOW, THERE'S TESTIMONY THAT CARTER BRYANT ADDED COLOR

18   FOR DRAWINGS IN 1999, 2000.  HE CERTAINLY DID THAT.  BUT EVERY

19   WITNESS WHO TOOK THE STAND SAID IT DOESN'T MATTER IF YOU ADD

20   COLOR OR NOT.                                                     03:2!

21             "THIS IS BLACK AND WHITE.  THERE'S NO COLOR; RIGHT?"

22             "RIGHT."

23             "DID YOU TYPICALLY COMPLETE THE MASTER DRAWINGS

24   WITHOUT COLORING THEM?"

25             "YES."                                                  03:2

1        "AND WHY IS THAT?"

2        "WELL, IF I HAD THE MASTER DRAWING, I HAD THE

3   CONCEPT.  I HAD THE CREATION.  I COULD GO BACK AND ADD COLOR

4   LATER, YOU KNOW, WHEN I FELT LIKE IT, OR I HAD TIME, OR

5   WHATEVER."                                                          03:25

6        QUESTION:  "IN YOUR VIEW, DID ADDING COLOR TO MASTER

7   DRAWINGS CHANGE THE CONCEPT OF THE DRAWING?"

8        ANSWER:  "NO."

9        QUESTION:  "DID IT CHANGE THE ATTITUDE OF THE

10  DRAWING?"                                                           03:25

11       ANSWER:  "NO."

12       QUESTION:  "DID IT CHANGE THE CHARACTER OF THE

13  DRAWING?"

14       ANSWER:  "NO."

15       QUESTION:  "DID IT CHANGE THE POSE OF THE DRAWING?"   03:26

16       ANSWER:  "NO."

17       **MR. NOLAN:**  CARTER BRYANT.  THAT SERIES OF QUESTIONS

18  AND ANSWERS WERE NEVER REFUTED BY A SINGLE MATTEL WITNESS.

19  EVEN MS. MARTINEZ ADMITTED THAT SHE DOESN'T DO COLOR FIRST;

20  SHE'LL DO THE BLACK AND WHITE.  AND IT MAKES SENSE.                 03:26

21       THAT'S WHAT I SAID TO YOU IN MY OPENING STATEMENT;

22  THAT NOTWITHSTANDING THE FACT THAT MATTEL'S OPENING STATEMENT,

23  MR. QUINN PROMISED YOU THAT THEY WERE GOING TO BRING IN AN

24  EXPERT TO PROVE THAT THOSE COLOR DRAWINGS WERE DONE FIRST AND

25  THEN THE BLACK AND WHITES WERE TRACED AFTERWARDS.  YOU MAY NOT     03:26

1    RECALL -- I SAID, 'THAT'S LIKE YOU ALL GOING OUT AND BUYING A

2    COLORING BOOK THAT'S ALREADY COLORED IN.'  WELL, GUESS WHAT?

3    THEY NEVER PRODUCED THAT TESTIMONY.  AND YOU KNOW WHY?  IT

4    DIDN'T MAKE SENSE.

5           THE MASTER DRAWINGS WERE DONE IN 1998, AND WHETHER OR    03:27

6    NOT YOU ADD CALL OR A DIFFERENT DRESS OR YOU PUT THEM IN

7    EVENING WEAR, IT DOESN'T CHANGE THE ATTITUDE; IT DOESN'T CHANGE

8    THE CHARACTER; AND IT DIDN'T CHANGE THE POSE.  AND YOU KNOW

9    WHAT?  ADDING COLOR TO ZOE DIDN'T CHANGE ZOE.  ADDING COLOR TO

10   JADE OR SASHA OR YASMINE DIDN'T CHANGE THE CHARACTERS.  THE    03:27

11   FOUR CHARACTERS CONCEIVED OF BY CARTER BRYANT WERE CONCEIVED IN

12   1998.

13          LET'S PUT UP THE TIMELINE FOR JUST A MOMENT, OF THE

14   EMPLOYMENT.

15          YOU KNOW, MATTEL, WHEN THEY DISPLAY THEIR GRAPHIC,      03:27

16   PUTS THE 1998 IN A LITTLE TINY SLIVER OF PERIOD OF TIME, APRIL

17   THROUGH THE END OF THE YEAR, AS BEING THE TINY LITTLE PERIOD OF

18   TIME THAT WE'RE TRYING TO SHOVE EVERYTHING INTO AND HOW THAT

19   DOESN'T MAKE THE FACT THAT BRATZ WAS DONE IN 1998 CREDIBLE.

20          MIND YOU, THEY NEVER BROUGHT IN A WITNESS, OTHER THAN   03:28

21   THE ONES WE SAW, WHICH, I THINK YOU ALREADY KNOW WHAT I BELIEVE

22   THE CREDIBILITY OF IS; BUT NEVERTHELESS, LOOK AT 1998.

23   JANUARY 5TH HE BEGINS HIS FREELANCE WORK IN MISSOURI, PART TIME

24   FOR MATTEL.  HE DOESN'T TELL.  MATTEL ASSIGNMENT.  APRIL 15,

25   1998, THE MAN RESIGNS FROM MATTEL.  BECAUSE HE SIGNED ON AS A   03:28

 1   REPRESENTATIVE -- HERE GOES THE CREDIBILITY ISSUE AGAIN -- HE

 2   SIGNS ON AS A REPRESENTATIVE, SO HE SUBMITS HIS RESIGNATION

 3   LETTER TO MATTEL.  MATTEL WOULD NOT HAVE KNOWN IF HE WAS

 4   SENDING STUFF OUT TO ASHTON DRAKE.  ASHTON DRAKE WOULDN'T HAVE

 5   KNOWN IF HE TOOK TEN MINUTES ON BREAK OR NOT, BUT MR. BRYANT          03:29

 6   RESIGNS.  AND THEN DURING 1998, BECAUSE HE'S TRYING TO DO WORK,

 7   HE TRIES LIKE THE DEVIL TO GET TO DO WORK FOR ASHTON DRAKE.  HE

 8   DOES GREETING CARDS, INCLUDING RAINY DAY RASCALS.  HE DOES A

 9   DOLL, THE SABRINA DOLL CONCEPT.  HE DOES BRATZ CONCEPTS.  THE

10   SABRINA DOLL CONCEPT IN 1998, YOU'LL SEE IT HAS THE IDEA OF           03:29

11   REMOVABLE HAIR, REMOVABLE FEET.  THOSE ARE ALL THE SAME IDEAS

12   IN BRATZ.  IT'S ALL ABOUT 1998.  IT IS ALL ABOUT 1998 IN THIS

13   CASE, LADIES AND GENTLEMEN.

14           AND THEN HE SHOWS THE DRAWINGS IN AUGUST THROUGH

15   SEPTEMBER; JEANNE GALVANO; HIS MOTHER SEES THEM; THOMAS, HIS          03:29

16   FATHER, SEES THEM.  THEN ON JANUARY 1ST, HE SHOWS THESE CONCEPT

17   DRAWINGS, THE BRATZ SKETCHES, TO RICHARD.  AND THEN HE HAS THE

18   EMPLOYMENT; AND NOW WE'RE IN BARBIE COLLECTIBLES.  ON HIS OWN,

19   WITHOUT ANY KNOWLEDGE OF US, HE DOESN'T EVEN KNOW ABOUT US, HE

20   GOES AND HE PUSHES THESE THINGS AND TRIES TO SELL THEM TO            03:30

21   ALASKA MAMA.  HE GETS THEM NOTARIZED.  I TALKED ABOUT THAT

22   BEFORE.  HE THEN PUTS THEM AWAY.

23           NOW HE COMES TO THIS PERIOD OF THE CONTRACT PERIOD OF

24   TIME, THAT PERIOD OF SEPTEMBER 1ST THROUGH OCTOBER 4, 1999.

25   AND IN THE LITTLE TIME THAT I HAVE LEFT, I WANT TO TALK ABOUT         03:30

1    THAT, IF I MAY.  YET, IT TOOK UP SO MUCH EVIDENCE IN THIS CASE

2    AND SO MUCH ATTENTION BY MATTEL.

3              I THINK IT REALLY WAS TO DISTRACT US FROM REALLY WHAT

4    WAS IMPORTANT.

5              AT THE END OF THE DAY, THE COURT HAS INSTRUCTED YOU          03:30

6    THAT CARTER BRYANT BREACHED HIS DUTY OF LOYALTY AND BREACHED

7    HIS DUTY OF FIDUCIARY DUTY TO MATTEL BY SIGNING A CONTRACT ON

8    OCTOBER 4TH.  WHILE AT THE SAME TIME CONTINUING TO MOVE FORWARD

9    WITH HIS LIFE, HE SIGNED A CONSULTING AGREEMENT.  AND RATHER

10   THAN RESIGN, AS ISAAC LARIAN DIRECTED HIM TO -- THE IRONY OF          03:30

11   THIS CASE, LADIES AND GENTLEMEN, IS THAT CARTER BRYANT GAVE

12   TWO-WEEKS NOTICE TO MATTEL.  NOT ONE SINGLE MATTEL EMPLOYEE

13   CAME IN TO TELL YOU THAT DURING THAT TWO-WEEK PERIOD OF TIME,

14   CARTER BRYANT WASN'T DOING WHAT HE WAS SUPPOSED TO BE DOING FOR

15   MATTEL.  NOT ONE WITNESS HAS COME IN HERE TO TELL YOU THAT           03:31

16   THERE WAS A PROJECT THAT WAS DROPPED BY CARTER BRYANT.

17   CARTER BRYANT EVEN TOLD YOU THAT ALTHOUGH HE KNEW HE WAS

18   SUPPOSED TO RESIGN, HE THOUGHT IT WAS THE RIGHT THING TO DO TO

19   GIVE TWO-WEEKS NOTICE.

20             BUT, YOU KNOW, LADIES AND GENTLEMEN, WE DIDN'T KNOW         03:31

21   THAT HE DIDN'T RESIGN.

22             YOU KNOW, WHEN YOU GET TO THE BACK END OF THIS

23   VERDICT FORM -- AND LET'S GO TO THE QUESTIONS, IF WE CAN, ON

24   THE DUTY OF LOYALTY AND THE BREACH OF FIDUCIARY DUTY PART OF

25   THE VERDICT FORM -- YOU'RE GOING TO BE ASKED SIMPLE QUESTIONS,       03:3

1    STARTING WITH QUESTION NUMBER 7, ABOUT INTENTIONAL INTERFERENCE

2    WITH A CONTRACTUAL RELATIONSHIP.  IS MGA ENTERTAINMENT LIABLE

3    TO MATTEL FOR INTENTIONAL INTERFERENCE WITH CONTRACTUAL

4    RELATIONS?

5         HE HAD A VALID AND ENFORCEABLE CONTRACT.  THERE'S NO          03:32

6    DOUBT ABOUT THAT.  BUT, AGAIN, MATTEL OWES THE BURDEN ON THIS.

7    THEY HAVE TO PROVE TO YOU THAT MGA INTENTIONALLY INTERFERED

8    WITH THAT CONTRACT.  YOU'RE GOING TO BE TOLD, IN THE

9    INSTRUCTION, THAT THE MERE OFFER OF EMPLOYMENT IS NOT

10   SUFFICIENT.                                                        03:32

11        THERE WAS A LOT OF TESTIMONY AND A LOT OF ARGUMENT

12   THAT ISAAC LARIAN KNEW THAT CARTER BRYANT WAS UNDER EMPLOYMENT

13   AT MATTEL.  WE'RE NOT DENYING THAT.  BUT, YOU KNOW, WHEN I

14   ASKED CASSIDY PARK WHAT WERE THE TERMS OF THE CONTRACT THAT

15   CARTER BRYANT HAD SIGNED, SHE DIDN'T KNOW.                         03:33

16        ISAAC LARIAN AND MGA OFFERED AN OPPORTUNITY FOR

17   EMPLOYMENT TO CARTER BRYANT.  HE REJECTED THAT.  HE SIGNED A

18   CONSULTING AGREEMENT.

19        CAN I HAVE UP THE E-MAIL THAT ISAAC LARIAN SENT ON

20   OCTOBER 4TH.                                                       03:33

21        OCTOBER 5TH.  CARTER.  CONTRACT WAS SIGNED

22   OCTOBER 4TH.  "CARTER, NOW THAT WE HAVE THE AGREEMENT IN PLACE,

23   WE NEED YOU AND PAULA TO FOCUS 200 PERCENT ON GETTING THIS

24   DONE.  THINK DIFFERENT.  THINK THE FASHION.  THINK IN DESIGN

25   ACCESSORIES.  THINK ABOUT THE COMMERCIAL.  THINK ABOUT THE         03:3

1    NEW YORK SHOWROOM PRESENTATION.  WE ARE THINKING CAT WALK.

2    THINK ABOUT ALL OF THE ROYALTY YOU'RE GOING TO MAKE.  CARTER,

3    THIS IS YOUR BIG BREAK.  I HAVE PUT MY WHOLE RESOURCES, MONEY,

4    PEOPLE, DEVELOPMENT, ON THIS, TO MAKE YOUR DREAM HAPPEN,

5    BECAUSE I BELIEVE IN YOUNG PEOPLE'S DREAMS.  NOW IT IS UP TO          03:34

6    YOU.  YOU NEED TO PUT 16 HOURS A DAY, STARTING NOW, ON THIS,

7    AND NOTHING ELSE.  THAT IS THE ONLY WAY IT WILL HAPPEN."

8            ISAAC LARIAN THOUGHT THAT MR. BRYANT HAD QUIT.  IT'S

9    AS SIMPLE AS THAT, LADIES AND GENTLEMEN.

10           LOOK BACK AT THE TESTIMONY DURING THIS PERIOD OF             03:34

11   TIME.

12           WHAT DID WE KNOW?

13           WE ONLY KNEW IT AS A PITCH TO US FOR A CONCEPT THAT

14   HE TOLD US HE DID IN MISSOURI.  WE LOOKED AT IT.  PAULA WAS IN

15   LOVE WITH IT.  ISAAC THOUGHT THEY WERE LOOKING A LITTLE BIT          03:35

16   ALIEN; NOT SO CERTAIN.  VICTORIA O'CONNOR TESTIFIES THEY WERE

17   CONSIDERING OTHER MATTERS.  SO WHEN MR. QUINN CHIVES US ABOUT

18   THE SO-CALLED 'DOLL SHOW' OR DOLL CONTEST THAT'S IN THE WALL

19   STREET JOURNAL ARTICLE, VICTORIA O'CONNOR TESTIFIED THEY, IN

20   FACT, WERE LOOKING AT OTHER ENTRIES.  PAULA WAS A PROJECT            03:35

21   MANAGER ON THE DOLL SIDE OF THIS.  SHE WAS NOT ON THE BUSINESS

22   SIDE OF IT.  VICTORIA O'CONNOR KNEW CARTER WAS WORKING AT

23   MATTEL.  ISAAC KNEW HE WAS WORKING AT MATTEL.  THERE WAS NO

24   ISSUE ABOUT THAT.  THEY ASKED THAT LAWYERS GET INVOLVED.

25           AND, YES, WE DIDN'T CALL THE LAWYERS.  THERE WAS A           03:3

1    TIME RESTRICTION IN THIS CASE.  WE MADE THE DECISION THAT ALL

2    YOU NEEDED TO DO WAS HEAR ANOTHER TWO LAWYERS TALK.  YOU HAVE

3    THE CONTRACT.  YOU HAVE THE CONTRACT IN EVIDENCE.  AND IN THAT

4    CONTRACT, THERE ARE REPS AND WARRANTIES THAT WERE MADE TO US --

5    THIS IS ON TRIAL EXHIBIT 15, PAGE 3 TO 4 -- REPS AND                03:36

6    WARRANTIES.  CARTER BRYANT IS TELLING US, REPRESENTING TO US,

7    THROUGH THE LAWYERS, THAT HE HAS THE RIGHT AND IS FREE TO

8    EXECUTE THIS AGREEMENT TO GRANT THE RIGHTS GRANTED BY HIM TO

9    MGA.  "NEITHER THE EXECUTION AND DELIVERY OF THIS AGREEMENT,

10   NOR THE PERFORMANCE BY BRYANT OF ANY OF HIS OBLIGATIONS            03:36

11   HEREUNDER, WILL CONSTITUTE A VIOLATION OR DEFAULT UNDER ANY

12   AGREEMENT.  THE BRYANT WORK PRODUCT SHALL BE FREE OF ALL LIENS

13   AND THERE WILL BE NO CLAIMS, DEMANDS, OR ACTIONS PENDING OR

14   THREATENED WITH RESPECT THERETO; AND THAT THE BRYANT WORK

15   PRODUCT IS ORIGINAL AND NO PART THEREOF INFRINGES OR SHALL         03:36

16   INFRINGE ON ANY COMMON LAW OR STATUTORY RIGHTS OR INTELLECTUAL

17   PROPERTY RIGHTS OF ANY THIRD PARTY, INCLUDING, WITHOUT

18   LIMITATION, CONTRACTUAL RIGHTS..."

19          "HE SHALL COMPLY WITH ALL LAWS.  HE SHALL INDEMNIFY

20   AND HOLD MGA HARMLESS FROM AND ASSIST AGAINST AND ALL CLAIMS,      03:37

21   LOSSES, COSTS, AND JUDGMENTS."

22          WE DID WHAT EVERY COMPANY DOES.

23          MATTEL -- YOU HEARD ME ASK MR. KILPIN THE SAME

24   QUESTIONS.  WHEN YOU'RE DEALING WITH AN INVENTOR, YOU GET WITH

25   THE LEGAL DEPARTMENT.  MGA DIDN'T HAVE A LEGAL DEPARTMENT,         03:37

1    PER SE.  THEY HAD OUTSIDE COUNSEL TO DEAL WITH THIS.  THIS IS A

2    LEGALLY-DRAFTED DOCUMENT.

3              I WANT TO TURN TO THE LAST PAGE OF THIS DOCUMENT.

4              THIS IS THE CONTRACT YOU'VE HEARD SO MUCH ABOUT; THIS

5    ALLEGATION THAT WE WHITED OUT, SEPTEMBER 18, 2000.                      03:37

6              DO YOU SEE THAT?  AND THEN ON THE RIGHT-HAND SIDE,

7    THE WHOLE IDEA OF WHITING OUT THE STUFF ON THESE CONTRACTS.

8              THERE IS NO DOUBT THERE WAS NO EFFORT TO TRY TO

9    CONCEAL THAT CARTER BRYANT HAD SIGNED THE CONTRACT WHILE HE WAS

10   AT MATTEL.  IT'S SIGNED AND DATED AS OCTOBER 4TH.                       03:38

11             BOTTOM LINE, THE FOOTER, IT'S DATED OCTOBER 4TH.  THE

12   DAY HE SIGNS THE CONTRACT, THERE'S NO DOUBT, WE'RE NOT TRYING

13   TO CONCEAL THE FACT HE SIGNS IT ON A DIFFERENT DATE.

14             WHY SEPTEMBER 18TH WAS NOT INCLUDED ON THE COPY THAT

15   WAS SENT TO PATTY GLASER, ISAAC LARIAN'S LONG-TIME ATTORNEY, WE         03:38

16   DON'T KNOW.  BUT IT DOESN'T MAKE ANY SENSE IF ALL THE OTHER

17   COPIES -- AND THEY'RE PRODUCED -- LOOK IN THE FILES BACK THERE;

18   LOOK AT THIS EXHIBIT; MGA PRODUCED A COPY OF THIS VERY

19   AGREEMENT WITH SEPTEMBER 18TH ON IT.

20             I HAVE NO EXPLANATION FOR THAT.  BUT I WILL SUBMIT           03:38

21   THIS:  IT DOESN'T MAKE ANY SENSE.  THERE'S NOTHING TO BE DRAWN

22   FROM IT.  BUT IT'S ALL PART OF THE CONSPIRACY.

23             IF WE WERE TRYING TO CONCEAL ANY OF THIS, WE WOULD

24   HAVE, I SUPPOSE, ERASED OUT -- OH, MY GOSH, THE FOOTER, WE

25   BETTER TAKE THAT OUT, BECAUSE THAT SAYS OCTOBER 4TH, AND WE            03:3

1   BETTER TAKE OFF THE FAX LINE THAT SAYS OCTOBER 4TH, THAT IT WAS

2   SIGNED BY ISAAC LARIAN.

3          LET'S TALK ABOUT CONCEALMENT.

4          BEFORE I GO THERE, ONE OTHER THING.

5          YOU KNOW WHAT, THERE IS NOT A SHRED OF EVIDENCE THAT

6   WE KNEW THAT CARTER BRYANT APPROACHED ANYBODY AT MATTEL TO FACE

7   PAINT.

8          WE DID NOT KNOW AND DID NOT ASK HIM TO GO TO A FACE

9   PAINTER AND PAINT SOMETHING.  WE DID NOT KNOW HE WAS GOING TO A

10  FRIEND TO GET HAIR ROOTING DONE ON A PROTOTYPE DOLL THAT WAS

11  NEVER USED, AND NOBODY REALLY LIKED IT, APPARENTLY, EXCEPT

12  VICTORIA O'CONNOR.  BUT WE KNOW SHE WAS FIRED BY MGA.  SO WAS

13  SHE BIASED?  SHE'S THE ONLY ONE WHO THOUGHT THIS DOLL MEANT

14  ANYTHING.

15         YOU SAW THAT TESTIMONY IN THEIR CLOSING ARGUMENT.

16         WE DID NOT KNOW ABOUT THE LETTER GOING TO UNIVERSAL

17  ABOUT THE HAIR.  WE CANNOT BE BLAMED FOR SOMETHING, LADIES AND

18  GENTLEMEN, WE DID NOT DIRECT OR ASK HIM TO DO.

19         WE DID NOT AUTHORIZE HIM TO SAY THAT HE WAS WORKING

20  FOR OR WITH US.  HE WASN'T.

21         ANOTHER PIECE OF EVIDENCE -- AND I THINK THIS WAS

22  INTERESTING -- YOU'LL HAVE THESE PHONE RECORDS.  WE MOVED THEM

23  IN.  MR. PRICE, A LOT OF QUESTIONS, A LOT OF PHONE CALLS, YOU

24  RECALL CONSTANTLY, EVERY DAY, YOU WERE ON THE PHONE, AND THEN

25  YOU GOT AN E-MAIL FROM PAULA TREANTAFELLES GARCIA, SAYING FOUR

```
 1    HOURS A DAY; HE HAD BEEN WORKING FOUR HOURS A DAY DURING THIS
 2    PERIOD OF TIME.
 3               YOU KNOW WHAT, LADIES AND GENTLEMEN?  IT'S TRUE.
 4               DID MGA MAKE TYPOGRAPHICAL ERRORS?
 5               YES.                                            03:40
 6               THAT MANY?
 7               I DON'T KNOW.  BUT ONE THING FOR SURE, MATTEL, WITH
 8    ITS MACHINE, FOUND EVERY SINGLE ONE OF THEM.  THERE'S NO DOUBT
 9    ABOUT THAT.  DOES THAT ADD UP TO CRIMINAL, ILLEGAL, AS
10    MR. QUINN DESCRIBED IT, CONSPIRACY OF CONCEALMENT?          03:40
11               I RESPECTFULLY SUBMIT NOT.  I RESPECTFULLY SUBMIT
12    THAT'S NOT THE CASE AT ALL.
13               BUT YOU KNOW WHAT?  I'M NOT SAYING THAT MR. BRYANT
14    DIDN'T USE POOR JUDGMENT.  I'M NOT GOING TO PASS JUDGMENT ON
15    HIM.  NOR ARE YOU.  HE'S NOT A PARTY TO THIS CASE.  IF THAT  03:41
16    ISSUE WAS DEALT WITH, IT WAS DEALT WITH BY MATTEL AND HIM.
17               WE DID NOT KNOW IT.
18               WE SIGNED ON THE DOTTED LINE ON OCTOBER 4TH AND
19    THOUGHT HE HAD RESIGNED.  WE DID NOT ENCOURAGE A BREACH OF
20    LOYALTY.  WE DID NOT ENCOURAGE BREACH OF FIDUCIARY DUTY.  HE  03:41
21    HAD ALREADY, A YEAR BEFORE, THOUGHT ABOUT SELLING HIS IDEAS
22    ABOUT BRATZ.  WE'RE NOT PART OF THAT, LADIES AND GENTLEMEN.
23    WHEN YOU GET TO THE CONTRACT CLAIM HERE --
24               LET'S GO BACK TO THE VERDICT FORM WHILE WE'RE DOING
25    THAT.  I DROPPED MY THOUGHT -- I TALKED TO YOU ABOUT THE PHONE 03:42
```

1    RECORDS.  PHONE CALL AFTER PHONE CALL AFTER PHONE CALL.  YOU'RE

2    GOING TO SEE THEM.  IF I ADDED THIS UP RIGHT LAST NIGHT, IN THE

3    ENTIRE MONTH OF SEPTEMBER, I THINK IT'S 47 MINUTES, THE LONGEST

4    PHONE CALL IS, I BELIEVE -- ONE PHONE CALL, I THINK IT TOOK 11

5    MINUTES.  ALL OF THE REST OF THEM ARE ABOUT A MINUTE, MINUTE        03:42

6    AND A HALF.  THEY ARE STATED IN SECONDS, SO YOU CAN TELL.

7            BUT WHEN MR. QUINN THREW AWAY THE BACK OF HIS HAND,

8    "IT DOESN'T TAKE LONG WHEN YOU'RE TALKING TO YOUR BOSS..."

9    THERE WAS NO EMPLOYMENT AGREEMENT.  THERE WAS NO CONSULTING

10   AGREEMENT.                                                          03:42

11           YOU KNOW WHAT WAS THERE?

12           YOU KNOW, WHEN YOU THINK ABOUT THAT PITCH MEETING, IT

13   WAS A GUY GOD BLESSED WITH A LOT OF ARTISTIC TALENT, WHO,

14   FRANKLY, ALTHOUGH A GOOD EMPLOYEE, WANTED TO BRANCH OUT FROM

15   BARBIE.  HE SIMPLY WANTED HIS OWN LIFE, HIS OWN FREELANCING.        03:43

16   HE LIKED HIS IDEA AND HIS CONCEPT.  HE HOOKED UP WITH VERONICA

17   MARLOW.  SHE TOLD HIM ABOUT MGA.  WE DIDN'T GO OUT AND REACH

18   HIM.  THIS IDEA THAT WE WERE SOME START-UP COMPANY, NO TALENT,

19   AND WE HAD TO GO OUT AND STEAL FROM THE MIGHTY MATTEL TO GET

20   THIS DESIGN IS BUNK, AND IT'S A DISSERVICE TO ALL OF THE HARD       03:4:

21   WORK OF ISAAC LARIAN, AND, YES, EVEN FARHAD, HIS BROTHER, WHO

22   WAS PART OF THE BUSINESS FROM THE BEGINNING.  AND IT'S A

23   DISSERVICE TO ALL OF THE EMPLOYEES OF MGA WHO, UP UNTIL THE

24   TIME OF SEPTEMBER 1ST, HAD ISSUED AND MANUFACTURED AND DESIGNED

25   AWARD-WINNING DOLLS.  BUT IN ORDER FOR MATTEL TO MAKE THEIR         03:4

1   STORY WORK, THEY HAVE TO PUSH MGA DOWN.  THEY HAVE TO REMIND

2   YOU THAT THEY HAVE FILED BANKRUPTCY.

3         YOU KNOW WHY THEY FILED BANKRUPTCY.  THEY TOOK A

4   DEFAULT ACTION IN TEXAS.  THEY HAD TO HAVE THAT SET ASIDE

5   BECAUSE FARHAD HAD NOT ANSWERED THE COMPLAINT IN A TIMELY          03:44

6   FASHION.  IT'S AS SIMPLE AS THAT.  BUT YET, THE PICTURE WAS

7   PAINTED THAT WE WERE DESPERATE AND WE HAD TO REACH OUT FOR

8   MATTEL IN THE YEAR 2000 BECAUSE WE DIDN'T HAVE THE DESIGN.

9         WELL, WHEN YOU THINK ABOUT THAT ARGUMENT, LADIES AND

10  GENTLEMEN, REMEMBER THE TESTIMONY OF MR. ECKERT WITH RESPECT TO   03:44

11  WHAT HE FOUND IN THE SAME TIME PERIOD, SAME YEAR, 2000, WHEN WE

12  WERE SUPPOSED TO BE STEALING THE DESIGNS.

13        I ASKED MR. ECKERT -- REMEMBER -- FIRST IMPRESSION,

14  'MR. ECKERT, DID YOU SEE ANY SURVEYS?'

15        'YES, I DID.  I WAS QUITE IMPRESSED BY THEM.'           03:44

16        'WHAT IMPRESSED YOU?'

17        'WELL, THERE WAS A GOOD RESPONSE RATE.  AND THE

18  PEOPLE WERE COMMITTED TO MATTEL.'

19        **MR. NOLAN:**  THAT'S WHAT HE SAID.  BUT WHEN WE PUSHED

20  ON THAT AND WE SAID, 'OH, THAT'S INTERESTING.  LET'S LOOK AT     03:45

21  WHAT YOU WROTE IN OTHER PUBLICATIONS DESCRIBING HOW YOU

22  PERCEIVED MATTEL WHEN YOU WENT THERE...' -- BECAUSE REMEMBER,

23  WITH IVY ROSS, IT WAS BLUE SKIES FOR EVERYBODY; IT WAS

24  COLLABORATIVE.

25        QUESTION:  "MR. ECKERT, CEO, I SHOW HIM THE HARVARD      03:45

1   BUSINESS REVIEW.

2            "LIKE ANY NEW CEO WHO WALKS INTO A STRUGGLING

3   COMPANY, I WAS FACING UNREALISTIC EXPECTATIONS FROM ALL KINDS

4   OF PEOPLE WHO HAD NEVER MET ME.  NOT JUST WALL STREET ANALYSTS

5   AND CUSTOMERS, BUT ALSO MATTEL EMPLOYEES AROUND THE WORLD.'          03:45

6            "THAT'S HOW YOU FELT WHEN YOU TOOK THIS JOB; RIGHT?"

7            ANSWER:  "YES."

8            NEXT SLIDE, PLEASE.

9            QUESTION:  "SO IT'S TRUE THAT WHEN YOU CAME TO

10  MATTEL, YOU KNEW AND FOUND THAT YOU NEEDED TO FOCUS ON             03:45

11  CREATIVITY AT MATTEL; CORRECT?"

12           ANSWER:  "YES."

13           NEXT SLIDE.

14           QUESTION:  "MATTEL HAD LOST ITS FOCUS.  IT WAS LOSING

15  UP TO $1 MILLION A DAY ON THE LEARNING COMPANY, A SOFTWARE FIRM     03:46

16  ACQUIRED DURING MY PREDECESSOR'S REIGN.  MATTEL WAS BORROWING

17  MONEY TO STAY AFLOAT.  MORALE WAS AT AN ALL-TIME LOW, AND THE

18  STOCK PRICE WASN'T FAR BEHIND.  MATTEL NO LONGER KNEW WHAT IT

19  WAS OR WHAT IT STOOD FOR.  IT WAS TIME TO REFOCUS.  THAT'S HOW

20  YOU FELT WHEN YOU TOOK THIS JOB; RIGHT?"                           03:46

21           ANSWER:  "YES."

22           NEXT SLIDE.

23           QUESTION:  "YOU SAID THAT YOU WOULDN'T AGREE WITH MY

24  TERM 'STRUGGLE.'  USE YOUR OWN WORDS TO DESCRIBE BARBIE BRAND

25  IN 2000, 2001, WHEN YOU GOT THERE."                                03:46

1    ANSWER:  "I BELIEVE THAT BARBIE SALES WERE DECLINING

2 IN THE U.S. IN 2000 AND 2001."

3    **MR. NOLAN:**  LET'S GO TO IVY ROSS, FIRST WITNESS,

4 FORMER HEAD OF THE GIRLS' DIVISION AT MATTEL.

5    QUESTION:  "MS. ROSS, BY THE TIME YOU LEFT BARBIE                    03:47

6 TOWARD THE END OF 2003, IT'S TRUE THAT BARBIE HAD LOST

7 SIGNIFICANT MARKET SHARE TO BRATZ; CORRECT?"

8    ANSWER:  "I DON'T KNOW IF I WOULD USE THE WORD

9 'SIGNIFICANT.'  IT DEFINITELY LOST SOME MARKET SHARE TO BRATZ."

10    QUESTION:  "WAS IT A CONCERN WITHIN MATTEL?"                        03:47

11    ANSWER:  "IT WAS SOMETHING WE WERE ALL AWARE OF, LIKE

12 WE WERE AWARE OF THE COMPETING ISSUES, FIGHTING FOR MARKET

13 SHARE, SO WE WERE CONCERNED, YES."

14    **MR. NOLAN:**  THIS CASE, LADIES AND GENTLEMEN, IS ABOUT

15 COMPETITION.                                                          03:47

16    BUT THE LAST SERIES OF CHARTS -- WE TALKED ABOUT

17 MOTHERS AND WHETHER OR NOT THEY WOULD LIE, AND WE TALKED ABOUT

18 JANET BRYANT.  SHE WAS ACCURATE AND HONEST.  I DID DRAW FROM A

19 COMMENT THAT I USED TO BE TOLD GROWING UP BY MY OWN MOTHER:

20 PEOPLE WHO LIVE IN GLASS HOUSES SHOULDN'T THROW ROCKS.             03:47

21    MATTEL HAS NO RIGHT, NO BUSINESS, IN THIS COURTROOM,

22 TO DISPARAGE THE ASPIRATIONS OF THE EMPLOYEES OF MGA AND MAKE

23 IT APPEAR TO YOU THAT THEY COULD NOT SHOOT STRAIGHT AND THEY

24 COULD NOT DESIGN A DOLL ON ITS OWN.  IT WAS HARD WORK.  IT TOOK

25 A LOT OF DEDICATION.  AND THEY DID IT.                               03:4

```
 1            THE LAST POINT I WANT TO GO TO, VERY LAST POINT,
 2   BECAUSE I HAVE -- I THINK I HAVE ABOUT TEN MINUTES, YOUR HONOR.
 3            THE COURT:  YOU HAVE 20 MINUTES, COUNSEL.
 4            MR. NOLAN:  CAN YOU PUT UP THE TIMELINE ON THE
 5   CONCEALMENT SOURCE.                                            03:48
 6            SPENT A LOT OF TIME ON NEWSPAPER ARTICLES.  WE WERE
 7   SUPPOSED TO HAVE CONCEALED CARTER BRYANT'S INVOLVEMENT.  NOT
 8   TRUE, LADIES AND GENTLEMEN.  THE LARGEST DISTRIBUTION BUSINESS
 9   MAGAZINE, NEWSPAPER ARTICLE, WALL STREET JOURNAL, WE DISCLOSED
10   CARTER BRYANT'S IDEA.                                          03:48
11            BUT YOU KNOW WHAT'S INTERESTING?  THEY WENT
12   AFTERWARDS -- I DON'T KNOW IF YOU NOTICED THIS; YOU'LL SEE IT
13   IN THE EVIDENCE -- AFTER WE DISCLOSED IN THE WALL STREET
14   JOURNAL ARTICLE CARTER BRYANT'S NAME, THEY ARE STILL CITING TO
15   YOU EVIDENCE IN THE BUSINESSWEEK, CHICAGO SUN-TIMES,           03:49
16   SAN FERNANDO VALLEY BUSINESS JOURNAL, MISSTATEMENTS, MISQUOTES,
17   TYPOGRAPHICAL ERRORS AS ALLEGATIONS OF CONCEALMENT.
18            GIVE ME A BREAK.  IT DOESN'T EXIST.
19            LET'S GO TO THE VERDICT FORM.
20            I'D LIKE TO GO TO QUESTION ONE.                       03:49
21            ONE LAST PIECE ON THE CONCEALMENT ISSUE.
22            CAN I ASK FOR EXHIBIT 2006 FOR A MOMENT.
23            WHEN YOU'RE TALKING ABOUT THE QUALITY OF EVIDENCE AND
24   THE PROOF OF THE CONCEALMENT -- AND MR. QUINN EVEN DID THIS IN
25   HIS ARGUMENT TODAY -- THIS IS THE DOCUMENT, INTERNAL TO MGA,   03:50
```

1   THAT AFTER CARTER BRYANT'S NAME AND ANNA RHEE'S NAME, IT SAYS

2   "DON'T ASK."

3         DO YOU SEE THAT?  "DON'T ASK."

4         GO TO THE DATE, PLEASE, AARON.

5         THE DATE OF THE DOCUMENT IS 4-20-2006, 2006.  THE    03:5(

6   LAWSUIT HAS ALREADY BEEN FILED.  WHAT ARE WE CONCEALING?

7         DAPHNE GRONICH, GENERAL COUNSEL, WHO WAS AWARE OF THE

8   PREPARATION OF THIS DOCUMENT, CAME IN AND TOLD YOU THIS WAS IN

9   RESPONSE TO A REQUEST FOR DISCOVERY.  THEY WERE DOING THINGS

10   INTERNALLY.  AND BECAUSE CARTER HAD HIS OWN LAWYER -- AND    03:5(

11   ANNA RHEE WAS ALSO REPRESENTED BY COUNSEL NOT CONNECTED TO

12   MGA -- THE POINT WAS, "DON'T ASK THEM FOR INFORMATION.  DON'T

13   CALL THEM DIRECTLY."

14         IT'S A SIMPLE AS THAT, LADIES AND GENTLEMEN.

15         AND YET, MR. QUINN AND MATTEL, WITH ALL ITS FANFARE,    03:5(

16   SAYS, 'THEY'RE EVEN SAYING DON'T ASK.'

17         IN 2006, WHEN THIS LAWSUIT IS PUBLISHED AROUND THE

18   WORLD, WHERE CARTER BRYANT HAS BEEN IN LITIGATION FOR TWO

19   YEARS, THEY ARE TRYING TO RELY ON AN INTERNAL LEGAL DOCUMENT.

20         WHY?    03:5J

21         WHERE WAS SOMEONE FROM MATTEL ON JEWEL BARBIE?  WHY

22   DID CUNNINGHAM NOT DISCLOSE RAINY DAY RASCALS?

23         LET'S GO TO THE VERDICT FORM.

24         QUESTION NUMBER 1.  ALL OF THESE DOCUMENTS, ALL OF

25   THESE EXHIBITS, ALL OF THEM WERE PREPARED IN KIMBERLING CITY,    03:5:

MISSOURI, 1998.  THEY WERE NOT CONCEIVED OR REDUCED, THAT IS,

CREATED, BY CARTER BRYANT, ALONE OR JOINTLY WITH OTHERS, DURING

THE PERIOD OF TIME HE WAS EMPLOYED BY MATTEL, JANUARY 4, 1999,

TO OCTOBER 19, 2000.

    I RESPECTFULLY SUBMIT, THE EVIDENCE IS OVERWHELMING.

ALTHOUGH WE DIDN'T HAVE THE BURDEN, WE HAVE ESTABLISHED THAT.

BUT REMEMBER, IT WAS MATTEL'S BURDEN TO PROVE THAT THESE

DRAWINGS WERE DONE WHILE EMPLOYED BY MATTEL.

    WHEN YOU HAVE THIS PORTFOLIO, QUESTION NUMBER 1,

TRIAL EXHIBITS, WITH ALL OF THE MASTER DRAWINGS OF BRATZ, THE

OVERWHELMING AMOUNT OF EVIDENCE IN THIS CASE ESTABLISHES THAT

EACH AND EVERY SINGLE ONE OF THEM WAS DONE BY CARTER BRYANT

WHILE NOT EMPLOYED AT MATTEL.

    THE SECOND PORTFOLIO WILL BE A BUNCH OF TRIAL

EXHIBITS THAT CONTAIN COLORED DOCUMENTS, COLORED DRAWINGS, OF

THE BRATZ CHARACTERS; AND THE QUESTION THAT YOU WILL BE ASKED

ON THIS FORM IS WHETHER OR NOT CARTER BRYANT CONCEIVED OR

REDUCED TO PRACTICE, THAT IS, CREATED, BY CARTER BRYANT, ALONE

OR JOINTLY WITH OTHERS, DURING THE PERIOD OF EMPLOYMENT BY

MATTEL.

    IF YOU BELIEVE THAT THEY HAVE MET THEIR BURDEN ON

THAT, THAT HE COLORED THIS WHILE HE WAS EMPLOYED AT MATTEL,

THEN MATTEL OWNS IT.  IT'S UP TO YOU TO DETERMINE WHETHER OR

NOT THEY MET THAT BURDEN.

    IT'S COLOR.

1     EACH ONE OF THESE DRAWINGS IN ANSWER TO QUESTION

2   NUMBER 2, PORTFOLIO TWO, WERE CONCEIVED IN 1998, AND, BY THE

3   USE OF A LIGHT BOX PROCESS, COPIED BY CARTER BRYANT.

4        **MR. PRICE:**  THAT'S IMPROPER ARGUMENT.  HE'S SAYING

5   THEY SHOULD CHECK "NO."                                          03:54

6        **THE COURT:**  YOU'LL HAVE YOUR CHANCE.

7        OVERRULED AT THIS TIME.

8        **MR. NOLAN:**  THEN THERE'S A THIRD PORTFOLIO THAT

9   YOU'LL BE ASKED TO IDENTIFY, AND THESE ARE DRAWINGS THAT ARE

10   REPRESENTED AND REFERENCED IN QUESTION NUMBER 3 ON THE VERDICT   03:54

11   FORM, AND THESE ARE WHETHER OR NOT THESE PARTICULAR DRAWINGS

12   WERE DONE -- "THAT THE ITEMS CONCEIVED OR REDUCED TO PRACTICE,

13   THAT IS, CREATED, BY CARTER BRYANT, ALONE OR JOINTLY WITH

14   OTHERS, DURING THE PERIOD IN WHICH HE WAS EMPLOYED BY MATTEL."

15        THESE ARE THE DRAWINGS THAT CARTER BRYANT TESTIFIED       03:54

16   TO THAT WERE DONE AFTER HE LEFT MATTEL.  MATTEL, I WOULD

17   RESPECTFULLY SUBMIT, HAS THE BURDEN TO PROVE THAT THESE

18   DRAWINGS -- HAD THE BURDEN BY COMPETENCE EVIDENCE TO PROVE THAT

19   THESE DRAWINGS WERE DONE, CREATED, WHILE EMPLOYED AT MATTEL.

20        WE BELIEVE THE EVIDENCE IS THAT THEY WERE NOT CREATED      03:55

21   WHILE EMPLOYED BY MATTEL; THAT THEY WERE NOT REDUCED TO

22   PRACTICE OR CREATED WHILE EMPLOYED AT MATTEL.

23        IN THE REMAINING MOMENTS, I JUST WOULD LIKE TO ADMIT

24   TO YOU THAT PEOPLE WORKED VERY HARD IN PROVIDING THE REST OF

25   THE STORY, DAY IN AND DAY OUT, TO TRY TO PRESENT THE EVIDENCE    03:56

1    IN AS CLEAR AND CONCISE A FASHION AS POSSIBLE.  AT THE END OF

2    EVERY CASE, YOU GET TO THE POINT WHERE YOU HAVE, THANKFULLY,

3    SAID EVERYTHING YOU CAN.  YOU'VE MADE EVERY ARGUMENT YOU COULD

4    POSSIBLY MAKE.  YOU'VE TRIED TO MAKE EVERY POINT THAT YOU HAVE

5    MADE OR WANTED TO MAKE.  AND ALL OF THE LONG HOURS OF          03:56

6    ORGANIZATION, THE LATE NIGHTS OF TRYING TO ORGANIZE THE

7    EXHIBITS, TO LOOK SOMEWHAT ORGANIZED BEFORE YOU, COMES TO A

8    POINT WHEN I SIT DOWN.

9         NOW, MATTEL, BECAUSE THEY HAVE THEIR BURDEN, GETS A

10   SECOND SHOT.  MR. PRICE NOW WILL GET UP TO ARGUE.  SOMEONE     03:56

11   ASKED ME -- I DON'T KNOW IF IT WAS MY DAUGHTER OR SOMEONE

12   ELSE -- IS THAT FAIR?  THEY GET TWO LAWYERS ARGUING AGAINST

13   YOU?  AND YOU KNOW -- AND I DON'T MEAN TO BE FLIP ABOUT THIS,

14   BECAUSE I HAVE THE GREATEST RESPECT FOR MR. QUINN AND

15   MR. PRICE.  BUT WITH RESPECT TO EVIDENCE, TWO TIMES ZERO EQUALS  03:57

16   ZERO.  NO MATTER HOW MANY TIMES THEY TRY TO MAKE AN ARGUMENT,

17   THE EVIDENCE IS NOT THERE.  THEY DID NOT MEET THEIR BURDEN.

18        IF SOMEONE MADE A MISTAKE ON IDENTIFYING AN EXHIBIT

19   OR A DRAWING, I RESPECTFULLY SUBMIT TO YOU -- REMEMBER WHAT I

20   SAID TO YOU, TEN YEARS FROM NOW, IF SOMEONE COMES UP AND ASKS   03:5

21   YOU, DO YOU REMEMBER SEEING THIS DRAWING OR THAT DRAWING, THIS

22   DRAWING OR THAT DRAWING?

23        GOD FORBID IT WOULD BE MR. ZELLER ASKING YOU THOSE

24   QUESTIONS, BECAUSE HE WOULD HAVE ABOUT 15 EXHIBITS.  I HAVE THE

25   GREATEST RESPECT FOR MR. ZELLER.  BUT YOU, TOO, MIGHT NOT NAIL   03:5

1   IT.  BUT WHAT YOU WOULD REMEMBER, WHAT YOU WOULD REMEMBER FROM

2   THIS CASE, IS THAT CARTER BRYANT CONCEIVED THE IDEA OF FOUR

3   CHARACTERS; BRATZ.  HE DREW THEM IN KIMBERLING CITY, MISSOURI,

4   IN 1998.

5          LET'S GO BACK TO PORTFOLIO NUMBER ONE.                    03:58

6          AARON, COULD YOU JUST HIGHLIGHT FOR THE JURY

7   EXHIBIT 62-15, 1152-1, 1152-2.

8          ONE OF THE POINTS I SHOULD MAKE IS, I WANT YOU TO

9   LOOK AT THESE NAMES WHEN YOU'RE TALKING ABOUT THE MASTER

10  DRAWINGS, THEIR NAMES; IT'S JADE, LUPE, ZOE, HALLIDAE.          03:59

11         WHEN YOU GO BACK AND YOU LOOK AT EACH ONE OF THESE,

12  YOU SEE THE ATTITUDE AND THE EXPRESSION IS ALL REFLECTED IN THE

13  MASTER DRAWINGS, AND EACH AND EVERY SINGLE ONE OF THESE

14  EXHIBITS DESERVES TO BE PUT IN THAT FIRST BUCKET AS BEING

15  CREATED NOT AT MATTEL, BUT IN KIMBERLING CITY, INCLUDING THE    03:59

16  ORIGINAL BRATZ DRAWING THAT HAD THE IMPRINT OF RAINY DAY

17  RASCALS BEHIND IT IN THE BLACK NOTEBOOK.

18         "MEET THE BRATZ.  THEY ARE FOUR COOL GIRLS FROM YOUR

19  SCHOOL, FOUR BEST FRIENDS, WITH TOTALLY TRANSFORMABLE LOOKS.

20  SIMPLY POP OFF THEIR HAIR AND SHOES AND TRADE FOR A NEW LOOK.   04:00

21  EACH DOLL COMES WITH TWO POP-OFF WIGS AND TWO PAIRS OF SHOES,

22  PLUS TWO HIP FASHIONS.  MEET ZOE, A/K/A ANGEL.  SHE'S THE QUEEN

23  OF THE CLASS IN HER SHORT DARK BROWN HAIR AND FUNKY-STOMPING

24  SNEAKS.  AT NIGHT, SHE LIKES TO GO LONG BLOND WITH A SKIRT AND

25  SANDALS, FOR A SWEETER LOOK."                                  04:0

1    "MEET LUPE, ALSO KNOWN AS PRINCESS.  SHE'S THE

2  HISPANIC GIRL, WITH LOTS OF ATTITUDE.  FOR SCHOOL, IT'S CASUAL,

3  IN WIDE-LEG KHAKIS AND A SWEATSHIRT, AND A FUN RED UPDO AT

4  NIGHT."

5    "MEET HALLIDAE, ALSO KNOWN AS HIP HOP."                    04:01

6    "MEET JADE.  SHE'S GOT THE LOCK ON FAR-OUT FASHION.

7  TWISTY BLACK HAIR WITH FUN BLUE STREAKS FOR SCHOOL ZONE AND FOR

8  TEARING UP WITH FRIENDS ON THE WEEKENDS.  IT'S FANTASY TIME IN

9  LIGHT BLUE HAIR."

10    WITH RESPECT TO PORTFOLIO NUMBER TWO, THAT'S THE ONE     04:0

11  THAT HAS VARIOUS DATES IN 1999.  MR. BRYANT EXPLAINED TO YOU

12  AND TESTIFIED AT LENGTH, AS I DID HERE FOR A FEW MOMENTS AT THE

13  LIGHT BOX, AS TO HOW HE CREATED EACH OF THOSE DRAWINGS BY

14  REFERENCE BACK TO THE MASTER DRAWINGS THAT HE DID IN 1998.

15  AGAIN, CONFIRMATION THAT THE MASTER DRAWINGS FOR THE CONCEPT OF  04:0

16  BRATZ WAS IN 1998.

17    WHEN YOU SEE ON THIS QUESTION NUMBER 2, LINE 9, THE

18  VARIOUS EXHIBIT NUMBERS THAT FOLLOW IT -- A LOT OF TIMES IN

19  THIS CASE, YOU'LL KNOW THAT ONE DRAWING CAME IN WITH DIFFERENT

20  EXHIBIT NUMBERS.  THAT'S JUST SIMPLY A GATHERING OF THE SAME    04:0

21  DOCUMENT THAT HAS THE SAME EXHIBITS ON IT.  SO MS. AGUIAR,

22  STANDING THERE, IS HOLDING UP COLOR VERSIONS THAT HAVE FASHIONS

23  THAT EXISTED IN 1998 AND NOW ARE COLORED IN IN 1999.  IT WAS

24  MATTEL'S BURDEN, NOT OURS, TO PROVE TO YOU THAT THESE WERE

25  CONCEIVED AND/OR REDUCED TO PRACTICE, CREATED, AT MATTEL.     04:0

1          ON BEHALF OF MR. LARIAN AND HIS FAMILY, ALL OF THE

2     EMPLOYEES AT MGA, AND ALL OF THE LAWYERS THAT I HAVE BEEN

3     PRIVILEGED TO WORK WITH IN THIS CASE, I, WITHOUT ANY

4     HESITATION, GIVE YOU, HAND TO YOU, THE DEFENSE OF MGA.

5          MATTEL SHOULD NOT BE ALLOWED TO TAKE WHAT THEY DIDN'T    04:03

6     MAKE, WHAT THEY DIDN'T THINK OF, WHAT THEY DIDN'T DESIGN.

7          WE BRING YOU FROM BACKGROUNDS.  WE ASK YOU TO APPLY

8     YOUR COMMON SENSE.  AS THE LATE TIM RUSSERT SAID -- HE PASSED

9     AWAY DURING THE TRIAL, BUT HE HAD A SAYING OF 'WHAT A COUNTRY!'

10    WHAT A COUNTRY, RELYING ON YOU, TEN HONEST AND TRUE MEN AND    04:04

11    WOMEN, TO RENDER A FAIR VERDICT.  WE COME TO COURT SEEKING

12    JUSTICE.

13          THANK YOU VERY MUCH.

14          **THE COURT:**  THANK YOU, COUNSEL.

15          WE'LL TAKE OUR AFTERNOON BREAK AT THIS TIME, AND THEN    04:0

16    WE'LL RESUME.

17          (WHEREUPON, JURORS DEPART COURTROOM.)

18          (WHEREUPON, A BRIEF RECESS WAS HELD.)

19          (JURORS RE-ENTER COURTROOM.)

20          **THE COURT:**  COUNSEL, YOU MAY PROCEED.    04:1.

21          **MR. PRICE:**  THANK YOU.

22                **FINAL CLOSING ARGUMENT - PLAINTIFFS**

23          **MR. PRICE:**  I WANT TO ADDRESS A FEW MANTRAS THAT YOU

24    HEARD DURING MR. NOLAN'S ARGUMENT, AND ONE WAS HOW MANY TIMES

25    DID YOU HEAR MR. NOLAN SAY MATTEL HAS THE BURDEN OF PROOF,    04:1

1    MATTEL HAS THE BURDEN OF PROOF.

2        WELL, MR. NOLAN AND I HAVE BOTH BEEN ON THE CRIMINAL

3    SIDE EARLIER IN OUR CAREERS, AND I THINK HE'S A LITTLE CONFUSED

4    HERE, BECAUSE THE INSTRUCTION ON BURDEN OF PROOF IN A CIVIL

5    CASE IS -- THAT INSTRUCTION IS A TIE BREAKER.

6        WHAT BURDEN OF PROOF MEANS -- AND THE COURT HAS

7    INSTRUCTED YOU, AND WE CAN PUT THAT UP, IT'S INSTRUCTION NUMBER

8    TWO -- IS THAT IN CIVIL TRIALS, SUCH AS THIS ONE, "THE PARTIES

9    ARE REQUIRED TO PROVE SOMETHING BY A PREPONDERANCE OF THE

10   EVIDENCE NEED PROVE ONLY THAT IT IS MORE LIKELY TO BE TRUE THAN

11   NOT TRUE.  THAT IS, YOU NEED TO WEIGH THE EVIDENCE AND DECIDE

12   WHAT'S MORE LIKELY IS TRUE."

13       AND WHAT THE BURDEN OF PROOF KICKS IN IS IF, WHAT IF

14   IT'S A TIE?  WHAT IF YOU JUST CAN'T DECIDE WHICH SIDE IS MORE

15   LIKELY?  THEN MATTEL LOSES, BECAUSE THEN WE HAVE NOT SATISFIED

16   OUR BURDEN OF PROOF.

17       BUT THE QUESTION YOU NEED TO ASK ON THESE ISSUES

18   ISN'T 'WAS THIS PROVEN BEYOND A REASONABLE DOUBT?'  'DID ALL OF

19   THE WITNESSES COME IN IN THE WORLD THAT MIGHT HAVE?'

20       IT IS, 'GIVEN THE EVIDENCE YOU HEARD, WHAT DO YOU

21   THINK IS MORE LIKELY?'  AND IF YOU CAN ANSWER THAT QUESTION

22   EITHER WAY, YOU CAN COME TO A VERDICT.

23       NOW, IN DOING THAT, OF COURSE, IN WEIGHING THE

24   EVIDENCE, YOU HAVE TO ASSESS CREDIBILITY.  AND SO I WANT TO

25   ADDRESS SOMETHING ELSE THAT MR. NOLAN SAID, WHICH IS THAT

```
 1   MATTEL'S CALLING EVERYONE A LIAR.  AND THAT'S NOT TRUE.  WE'LL
 2   GET INTO THAT IN A SECOND.  BUT, YES, WE ARE SAYING CARTER
 3   BRYANT IS DISHONEST AND UNTRUTHFUL AND LIED.  WE'RE SAYING THAT
 4   PAULA GARCIA IS DISHONEST AND UNTRUTHFUL AND LIED.  WE'RE
 5   SAYING THAT MR. LARIAN WAS UNTRUTHFUL AS WELL.  YOU REMEMBER        04:17
 6   WHEN MR. QUINN GAVE YOU CHARACTER-DEFINING EXAMPLES ABOUT THAT
 7   DISHONESTY, BECAUSE THAT'S SOMETHING YOU MUST WEIGH.
 8         MR. NOLAN, AT LEAST WITH RESPECT TO MS. GARCIA AND
 9   MR. BRYANT, DIDN'T EVEN ATTEMPT TO TELL YOU THAT THEY WERE
10   BEING HONEST.                                                       04:17
11         SO, FOR EXAMPLE, REMEMBER MS. GARCIA -- PUT UP SLIDE
12   TEN -- YOU REMEMBER SHE SAID UNDER OATH, BEFORE YOU, THAT SHE
13   DIDN'T KNOW CARTER BRYANT WAS A MATTEL EMPLOYEE UNTIL SOME TIME
14   IN 2004.  AND MR. QUINN EXPLAINED WHY THAT WAS A CRITICAL
15   IMPORTANT LIE FOR MGA'S DEFENSE SO THEY COULD PRETEND WE DIDN'T     04:18
16   KNOW WHAT HIS OBLIGATIONS WERE UNDER HIS CONTRACTS.  BECAUSE
17   MS. GARCIA SAID SHE SIGNED THE SAME CONTRACTS AND SHE KNEW HIS
18   OBLIGATIONS.  NOT EVEN AN ATTEMPT TO DEFEND THAT ABSOLUTE
19   FALSEHOOD; DIDN'T EVEN TRY.
20         WITH RESPECT TO MR. BRYANT, DO YOU REMEMBER MR. QUINN        04:18
21   SHOWED YOU, I THINK IT WAS SLIDE 107.1, WHERE WE SHOWED HIM
22   THAT SEPTEMBER 8TH INVOICE AND WE ASKED HIM, WHERE IT SAYS --
23   NOT THE INVOICE, I'M SORRY, THE LETTER, WHERE IT SAYS "THE
24   COMPANY I'M WORKING WITH IS CALLED MGA ENTERTAINMENT," AND HE
25   SAID UNDER OATH, "I WASN'T TRYING TO GIVE THEM THE IMPRESSION      04:18
```

```
 1   THAT I WORKED WITH MGA," AND HE SAID YOU COULD EVALUATE HIS

 2   TESTIMONY ON THE TRUTHFULNESS OF THAT ANSWER.

 3            WE'RE NOT ARGUING THAT.  HE TOLD YOU THAT UNDER OATH

 4   THAT WAS SOMETHING YOU COULD LOOK AT TO SEE WHETHER OR NOT YOU

 5   SHOULD TRUST HIM.                                               04:19

 6            HOW MANY TIMES IN HIS CLOSING DID MR. NOLAN SAY

 7   'MR. BRYANT SAID'; 'MR. BRYANT SAID'; 'LOOK WHAT MR. BRYANT

 8   SAID'?

 9            WELL, I'M HERE TO TELL YOU WHATEVER MR. BRYANT SAYS,

10   YOU CANNOT TRUST.  YOU HAVE GOTTEN TO KNOW HIM FAIRLY WELL IN   04:19

11   THIS FIVE DAYS.  YOU'VE GOTTEN TO EVALUATE WHETHER OR NOT YOU

12   CAN TAKE HIS WORD ON ANYTHING.

13            DO YOU RECALL THAT IN MR. QUINN'S CLOSING, WE POINTED

14   OUT TO YOU HOW MR. BRYANT HAD PREVIOUSLY LIED UNDER OATH TO THE

15   U.S. PATENT OFFICE SO THAT MGA COULD GET A PATENT.  WE TOOK YOU 04:19

16   THROUGH ALL OF THAT.  AND HIS EXCUSES WERE 'I DIDN'T KNOW IT

17   WAS UNDER OATH...' -- EVEN THOUGH IT SAYS YOU CAN GO TO JAIL.

18   'I DIDN'T KNOW IT WAS THE PATENT OFFICE.'  YOU HEARD THAT

19   TESTIMONY.  YOU HEARD HIM TRY TO RUN FROM IT.  YOU HAVE BEEN

20   HERE AND BEEN ABLE TO EVALUATE HIS CREDIBILITY.                 04:19

21            AND ONE THING MR. NOLAN CANNOT DO IS GET UP HERE AND

22   ESTABLISH MR. BRYANT'S CREDIBILITY.  HE DIDN'T EVEN TRY.  ALL

23   HE COULD SAY IS 'THAT'S WHAT MR. BRYANT SAID'; 'THAT'S WHAT

24   MR. BRYANT SAID.'  WHENEVER YOU HEAR THAT IN YOUR MINDS WHEN

25   YOU ARE DELIBERATING, YOU SHOULD ASK YOURSELF, 'YES, BUT IS     04:20
```

```
 1    THERE ANY PROOF OF IT?'  BECAUSE THE MAN IS AN ADMITTED

 2    PERJURER.  THE MAN WILL LIE IF IT'S TO MGA'S BENEFIT AND TO HIS

 3    OWN.

 4          AND YOU HEARD MR. LARIAN, AND WE EXPLAINED HOW

 5    MR. LARIAN SAID THAT AT NO TIME WAS HE TRYING TO HIDE CARTER      04:20

 6    BRYANT.  WE SHOWED YOU THAT; WE SHOWED YOU THE DOCUMENTS WHICH

 7    TALKED ABOUT HIDING CARTER BRYANT, AND WE SHOWED YOU MR. NOLAN

 8    SAYING, WELL, AT TIMES HE WAS TRYING TO HIDE CARTER BRYANT

 9    BECAUSE WE DIDN'T WANT PEOPLE TO KNOW THAT HE WORKED FOR US.'

10    AND MR. LARIAN SAID, WELL, YEAH, THERE WERE THOSE TIMES.         04:20

11          AGAIN, IN EVALUATING THIS EVIDENCE, YOU'VE GOT TO

12    JUDGE THE CREDIBILITY OF PEOPLE.  YOU'VE GOT TO JUDGE WHETHER

13    OR NOT IN THE SUMMER OF 2000, WHAT WAS HAPPENING WAS

14    COMPETITION, LEGITIMATE COMPETITION, OR WAS IT SOMETHING ELSE.

15    WAS IT THE STEALING OF IDEAS?  WAS IT ENCOURAGING A MATTEL       04:21

16    DESIGNER?

17          DO YOU REMEMBER WHAT HAPPENED HERE?  A MATTEL

18    DESIGNER CAME TO MGA WITH DESIGNS.  AT THE TIME CARTER BRYANT,

19    THAT MATTEL DESIGNER, WORKED AT THE MATTEL DESIGN CENTER.  ONE

20    OF THE KEY EXECUTIVES, PAULA GARCIA, KNEW WHAT OBLIGATIONS       04:21

21    CARTER BRYANT WOULD HAVE.

22          THEY SEE HIS DESIGNS; THEY KNOW HE'S A DESIGNER; THEY

23    KNOW HE WORKS IN THE DESIGN CENTER; THEY KNOW HE WORKS FOR A

24    COMPETITOR.  AND WHAT DO THEY SAY?  MR. LARIAN, YOU SAW HIS

25    TESTIMONY, HE SAID, "I DIDN'T SAY ANYTHING TO HIM ABOUT WHETHER  04:21
```

1    HE DID THOSE AT MATTEL."

2            IN FACT, YOU HEARD MR. LARIAN SAY -- I THINK IT WAS

3    SLIDE 151.  HE WAS ASKED:  "DID IT MATTER TO YOU, WOULD IT HAVE

4    BEEN A PROBLEM IF CARTER BRYANT CREATED OR MADE ANY OF HIS

5    DRAWINGS (UNINTELLIGIBLE)?"                                          04:22

6            HIS ANSWER WAS "NO, IT WOULDN'T HAVE MADE ANY

7    DIFFERENCE TO ME."

8            THESE ARE THE KIND OF PEOPLE THAT WE'RE DEALING WITH

9    HERE.  THIS ISN'T COMPETITION.  THIS IS ILLEGAL, INAPPROPRIATE

10   CONDUCT.  IT IS ENCOURAGING A MATTEL EMPLOYEE TO HELP YOU TO        04:22

11   CREATE A COMPETITIVE PRODUCT WHILE HE'S STILL WORKING FOR

12   MATTEL.

13           AND YOU HEARD MR. NOLAN SAY "WE THOUGHT HE RESIGNED

14   ON OCTOBER 4TH."

15           WELL, YOU HEARD, OF COURSE, MS. HARRIS SAY THAT IN          04:22

16   MID OCTOBER THAT CARTER BRYANT WOULD COME OVER AND MS. GARCIA

17   WOULD SAY 'DON'T TELL ANYONE HE'S COMING; IT'S HIS LUNCH HOUR,

18   BECAUSE HE'S STILL AT MATTEL.'

19           BUT EVEN MORE IMPORTANTLY, WHAT ABOUT ALL OF

20   SEPTEMBER OF 2000?  WHAT ABOUT WHAT WAS GOING ON THEN, AFTER        04:22

21   THIS MEETING, SEPTEMBER 1ST, WHERE IT WAS DECIDED, MS. O'CONNOR

22   SAID 'WE'RE GOING TO GO FORWARD WITH THIS DOLL IDEA.'

23           AND BY THE WAY, THERE'S NO EVIDENCE MS. O'CONNOR WAS

24   FIRED.  SHE DIDN'T TESTIFY TO THAT.  I HAVE TO ASSUME THAT WAS

25   A MISSTATEMENT BY MR. NOLAN, AND I WOULD HAVE NO OBJECTION IF       04:2

1    HE GOT UP HERE AND WAS GIVEN A MINUTE TO PROVE THAT STATEMENT

2    IF HE STILL BELIEVES IT'S TRUE.  IT JUST ISN'T TRUE.

3          SO WHAT HAPPENED IN SEPTEMBER?

4          IF YOU LOOK AT THE EVIDENCE, YOU RECALL, YOU'VE SEEN

5    THE SEPTEMBER 18TH LETTER TO THE HAIR VENDOR.  THERE'S A          04:23

6    SEPTEMBER 27TH E-MAIL THAT PAULA GARCIA SENT TO HONG KONG

7    SAYING 'WE'VE SELECTED THE HAIR VENDOR.'  THAT'S EXHIBIT 18.

8          HOW DID SHE GET THAT INFORMATION?

9          WHY, FROM CARTER BRYANT, OF COURSE, BECAUSE THEY ARE

10   WORKING TOGETHER TO COMPETE FOR MATTEL IN SEPTEMBER.              04:23

11         REMEMBER, MR. BRYANT CALLS MARGARET LEAHY WITH

12   MS. GARCIA'S APPROVAL.  AGAIN, THEY ARE STARTING ON THE SCULPT

13   FOR THE COMPETITIVE PRODUCT IN SEPTEMBER.  AND THERE'S NO

14   QUESTION THAT MGA KNOWS THIS.  THERE'S NO QUESTION THEY ARE

15   ENCOURAGING IT.                                                  04:24

16         MR. NOLAN REFERRED TO THESE PHONE LOGS.  IF YOU LOOK

17   THROUGH THE PHONE LOGS -- AND I'VE GOT IT; THE PHONE LOG ITSELF

18   IS EXHIBIT 472, AND I'VE GOT ONE HERE; IT'S EXHIBIT 21-R -- IF

19   YOU GO THROUGH THOSE, THERE WERE, I GUESS, 24 CALLS TO THE MGA

20   MAIN OFFICE; TWO CALLS TO ISAAC LARIAN PERSONALLY; 21 CALLS TO    04:24

21   VERONICA MARLOW; AND 7 TO MARGARET LEAHY DURING THIS MONTH OF

22   SEPTEMBER, WHERE HE'S TALKING TO THE VENDORS WHO ARE GOING TO

23   WORK ON THIS COMPETITIVE PRODUCT; HE'S TALKING TO MGA; AND HE'S

24   TALKING TO ISAAC LARIAN.

25         AND THIS SHOWS IN EVIDENCE -- THIS IS MGA'S MAIN            04:24

1   PHONE NUMBER:  894-2525; ISAAC LARIAN IS 894-3150;

2   VERONICA MARLOW, (818)367-9158 MARGARET LEAHY, (626)791-2137.

3   IN THE MONTH OF SEPTEMBER, CARTER BRYANT AND PAULA GARCIA, WHO

4   IS IN CHARGE OF THIS PRODUCT, BRATZ DEVELOPMENT, ARE WORKING

5   TOGETHER TO FIND HAIR; TO FIND A SCULPTOR.  IN EARLY OCTOBER,        04:25

6   THEY ARE WORKING TO FIND PACKAGING, WITH MR. LINKER, I BELIEVE

7   HIS NAME WAS.  SHE'S WORKING WITH VERONICA MARLOW AND

8   MR. BRYANT DURING THE MONTH OF SEPTEMBER, ACTUALLY DOING THE

9   SAMPLES, THE CLOTHES THAT WILL GO ON THE DOLLS.  THEY CANNOT,

10  WITH A STRAIGHT FACE, DENY THAT THEY WERE ENCOURAGING CARTER        04:25

11  BRYANT TO BREACH HIS DUTIES; TO BE DISLOYAL.

12          AND OF COURSE HE'S DOING THIS WHILE HE'S BEING PAID

13  BY MATTEL, WHICH HE SHOULDN'T BE DOING.

14          THE JURY INSTRUCTIONS SAY THERE HAS TO BE HARM SOME

15  WAY, AND WE'RE NOT QUANTIFYING IT HERE, BUT THAT'S ONE WAY.         04:26

16  BUT A MORE IMPORTANT WAY IS THAT CARTER BRYANT IS GIVING MGA

17  THAT HEAD START IN SEPTEMBER AND OCTOBER TO HELP THEM COME OUT

18  WITH A COMPETING DOLL FOR THE TOY FAIR AT THE BEGINNING OF THAT

19  YEAR.  HE'S HELPING THEM COMPETE WITH MATTEL WHILE HE'S STILL A

20  MATTEL EMPLOYEE.  AND MGA KNEW IT.  THE OVERWHELMING EVIDENCE.      04:26

21          WHAT DID MS. GARCIA TELL YOU THAT TELLS YOU ABOUT

22  SOMEONE?  THAT THEY ARE DISHONEST AND THEY CANNOT BE TRUSTED.

23  SO WHEN YOU HEAR ABOUT CARTER BRYANT, AND YOU THINK, 'OH, BUT

24  CARTER BRYANT SAID THIS,' THEN I SUGGEST THAT YOU SAY 'I DON'T

25  BELIEVE IT UNLESS IT'S SUPPORTED SOMEHOW.'                          04:26

1        SO LET ME SWITCH NOW AND TALK VERY QUICKLY -- I GUESS

2   I HAVE TO BE QUICK -- ABOUT THE CREATION OF BRATZ, THAT STORY.

3        AND YOU REMEMBER MR. NOLAN CAME UP HERE AND WENT

4   AFTER MR. CUNNINGHAM AGAIN.  AND WHAT YOU SAW IN MR. CUNNINGHAM

5   WAS ONE OF THE MOST CYNICAL TRICKS I'VE EVER SEEN IN A                04:27

6   COURTROOM.  MR. CUNNINGHAM TESTIFIED THAT THROUGH INDENTATION

7   ANALYSIS THAT YOU CAN SEE THOSE FIRST BRATZ DRAWINGS, OR AT

8   LEAST TWO OF THEM, IN THIS NOTEBOOK.

9        HIS ASSIGNMENT AT THE TIME HE WAS GIVEN IT, HE KNEW

10  THE BRATZ DRAWINGS WERE RELEVANT.  YOU DON'T JUST TELL AN           04:27

11  EXPERT, 'GO FIND STUFF.'  IT'S LIKE, 'HEY, THIS CASE IS ABOUT

12  BRATZ.  WAS ANYTHING EVER IN HERE?'

13        SO HE DOES THAT ANALYSIS; AND WHILE HE DOES IT, HE

14  SEES OTHER INDENTATIONS TOO.  A GREETING CARD.  HE HAS NO

15  REASON TO THINK THAT IS RELEVANT TO THIS CASE AT ALL.  DO YOU      04:27

16  KNOW WHY?  BECAUSE IF YOU RECALL THE TESTIMONY, CARTER BRYANT

17  IN HIS PREVIOUS DEPOSITION TESTIMONY, HAS SAID 'I DID GREETING

18  CARDS ALL OF THE TIME.'  FROM 1995 UNTIL THE PRESENT, HE HAS

19  DONE GREETING CARDS.

20        HE NEVER TESTIFIED HE DID GREETING CARDS JUST IN '98.    04:28

21  HE NEVER TESTIFIED HE DID GREETING CARDS -- RAINY DAY RASCALS

22  GREETING CARDS IN '98.  THAT TESTIMONY DID NOT EXIST IN THIS

23  CASE, AT ALL, UNTIL HE TOOK THE STAND IN THIS TRIAL.

24        SO WHAT DID THEY DO WITH MR. CUNNINGHAM?

25        THEY SAID 'YOU DIDN'T TELL US -- DID YOU HEAR THAT       04:28

1    CARTER BRYANT SAID THIS WAS DONE IN '98?  YOU DIDN'T TELL US

2    ABOUT THAT.'

3          HE SAID, 'YEAH, I DIDN'T.'

4          HOW WOULD HE HAVE KNOWN THAT WOULD HAVE BEEN RELEVANT

5    AT ALL?  AND IT ONLY BECAME RELEVANT AFTER CARTER BRYANT

6    REALIZED THAT THE ORIGINAL DRAWINGS HE RIPPED OUT OF THIS BOOK

7    COULD BE PUT RIGHT BACK INTO IT THROUGH SCIENTIFIC ANALYSIS.

8    AND THAT ANALYSIS IS UNDISPUTED, ABSOLUTELY UNDISPUTED.

9          THEY DIDN'T CALL AN EXPERT TO SAY IT WAS INCORRECT.

10   IN FACT, MR. BRYANT EVENTUALLY ADMITTED AT TRIAL -- AFTER

11   MR. CUNNINGHAM'S REPORT, AND THAT'S SLIDE 30.3 -- HE ADMITS,

12   'YES, HIS DRAWINGS CAME OUT OF HERE.'

13         SO THEN, WITH THAT, WHAT WAS SURPRISING ISN'T THAT WE

14   HAD THIS NOTEBOOK, BECAUSE MR. BRYANT TESTIFIED 'I THREW AWAY

15   THE NOTEBOOK WITH THE DRAWINGS, AND HE THOUGHT WE COULDN'T

16   PROVE IT.  IT WAS OTHERWISE.  WHAT WAS SURPRISING TO MR. BRYANT

17   WAS THAT -- CSI, MAYBE YOU HAVEN'T SEEN ONE OF THOSE SHOWS --

18   YOU COULD ACTUALLY GO IN AND SEE THESE INDENTATIONS.  HE DIDN'T

19   KNOW YOU COULD DO THAT.

20         SO WE COME HERE AND WE SHOW YOU, THESE DRAWINGS ARE

21   HERE.  WE SHOW YOU A JULY 1999 CALCULATION FROM A BANK

22   STATEMENT THAT WERE IN HERE.  WE SHOWED YOU THAT ANGEL PAGE.

23   DO YOU REMEMBER THAT?  AND, IN FACT, I THINK THAT'S 1155-C-13,

24   AND YOU CAN SEARCH THAT.

25         WHAT YOU NEED TO DO IS REMEMBER WHAT MR. BRYANT SAID

1    BEFORE HE KNEW THE IMPORTANCE OF THIS NOTEBOOK AND WHAT HE SAID

2    AFTER HE REALIZED THE VERY FIRST DRAWINGS WERE HERE.  BECAUSE

3    AT HIS DEPOSITION WHEN WE SHADOWED THIS, HE SAID 'THAT'S IN

4    1999.'  MR. QUINN SHOWED YOU THAT TESTIMONY.

5              SO WHY DID MR. NOLAN GET UP HERE AND AGAIN SHOW YOU        04:30

6    ASHTON DRAKE AND AGAIN SHOW YOU AN ANGEL?

7              BY THE WAY, REMEMBER THE ANGEL DRAWING THAT HAS THIS

8    TUNIC THAT COMES DOWN HERE TO THE WAIST.  I DON'T REMEMBER IF

9    YOU REMEMBER THE FIRST QUESTION I ASKED MR. BRYANT AFTER

10   MR. NOLAN DID THAT.  I SAID, 'SO WHAT'S AN EMPIRE WAIST?        04:30

11             HE SAYS, OH, THAT'S A WAIST THAT COMES UP HERE.

12   THAT'S A WAIST THAT'S A LONG EVENING GOWN.'

13             AND I ASKED HIM THAT BECAUSE, OF COURSE, THIS TALKS

14   ABOUT AN EMPIRE WAIST.  AND THEN I ASKED MR. BRYANT, AND SAID

15   QUINN SHOWED YOU THIS TESTIMONY.  YOU TOLD US THIS RELATES TO        04:30

16   1999; RIGHT?

17             YES.

18             THIS DOESN'T REFER TO THE ASHTON DRAKE THING.

19             HE SAID NO.

20             THEN I ASKED, WHY IS YOUR ATTORNEY DOING THIS, EXCEPT        04:30

21   TO CONFUSE THE JURY?

22             AND THAT WAS AN IMPROPER QUESTION.

23        MR. NOLAN:  OBJECTION.  THIS IS IMPROPER ARGUMENT.

24        THE COURT:  OVERRULED.

25        MR. PRICE:  THAT WAS AN IMPROPER QUESTION.        04:3

1        YOU'RE NOT ALLOWED TO ARGUE WHEN YOU ARE EXAMINING

2   WITNESSES.  BUT I CAN ARGUE NOW.

3        WHAT WAS THE POINT OF THAT, EXCEPT TO CONFUSE YOU?

4   AND THERE'S NO ANSWER TO THAT.

5        AND MR. NOLAN SAYS, WHY DIDN'T WE BRING SOMEONE IN TO     04:31

6   SHOW YOU THAT THERE WAS AN ANGEL DOLL?

7        WE DIDN'T HAVE TO.  MR. BRYANT GAVE YOU -- IT'S HIS

8   TESTIMONY.  THIS IS 1999.

9        BUT WE HAVE TO FIND SOMETHING IN '98 HERE.

10       DO YOU REMEMBER, THEY DID THE JEWEL DRAWINGS.            04:31

11       AGAIN, MR. NOLAN SAYS, WHY DIDN'T YOU BRING IN

12   SOMEONE BESIDES CASSIDY PARK?

13       I'LL TELL YOU WHY WE BROUGHT HER IN.  BECAUSE

14   MR. BRYANT SAID CASSIDY PARK WAS HIS SUPERVISOR WHEN HE SAYS HE

15   DID JEWEL BARBIE DRAWINGS; THAT'S WHY.                       04:31

16       AND THEN MR. NOLAN SAID THAT MS. PARK SAID SHE WASN'T

17   FAMILIAR WITH HIS ASSIGNMENTS.

18       DO WE HAVE 3498?

19       THAT'S NOT WHAT SHE TESTIFIED.

20       WHAT SHE TESTIFIED TO WAS THAT EVERY ASSIGNMENT IN      04:3:

21   '98 WENT THROUGH HER.

22       "ANY PROJECTS HE HAD BEEN WORKING WENT THROUGH ME

23   BETWEEN JANUARY AND APRIL OF 1998, AND HE DIDN'T GET ANY JEWEL

24   BARBIE PROJECTS."

25       AND YOU KNOW SOMETHING ELSE?                            04:3

1              AT HIS DEPOSITION, UNDER OATH, BEFORE HE REALIZED HE

2    HAD PUT SOMETHING IN HERE IN 1998, WE SAID 'WHAT WERE YOUR

3    PROJECTS?'

4              HE DIDN'T MENTION JEWEL BARBIE.

5              WE SHOWED YOU THAT IN THE CLOSING.  WE ASKED HIM,

6    'WHAT DID YOU DO WHEN YOU STARTED IN '99?

7              WELL, I DID JEWEL BARBIE THEN.

8              THAT'S WHAT HE SAID BEFORE HE REALIZED HOW IMPORTANT

9    THIS WAS.

10             AND THEN WE SHOWED YOU THE FEBRUARY '99 JEWEL BARBIE

11   DRAWING, WHICH COMES FROM HERE, FEBRUARY '99 AND ALL HE CAN SAY

12   IS, OH, LOOK, THERE'S SOME DATED JANUARY '98; EVEN THOUGH

13   PREVIOUSLY MR. BRYANT SAID HE DIDN'T DO THEM IN '98; EVEN

14   THOUGH MS. CASSIDY PARK SAID HE DIDN'T DO THEM IN '98.

15             AND, YES, THERE IS AN EXPLANATION.  YOU SAW IT ON HIS

16   CONFLICT OF INTEREST QUESTIONNAIRE; WHEN HE WAS SUPPOSED TO PUT

17   JANUARY '99, HE PUT JANUARY '98.  AND THEN THERE WERE OTHER

18   DRAWINGS IN FEBRUARY WHERE HE GOT IT RIGHT, WHERE IT'S

19   FEBRUARY '99; NOTHING IN '98 IN HERE THEY CAN IDENTIFY.

20             SO HE SAYS RAINY DAY RASCALS; THAT'S IT; IT'S RAINY

21   DAY RASCALS.

22             AGAIN, SAYS WHO?

23             WHAT EVIDENCE DO YOU HAVE THAT RAINY DAY RASCALS WERE

24   DONE IN 1998?  ANYTHING BESIDES MR. BRYANT'S WORD?

25             NO.  YOU HAVE NOTHING.

1    IN FACT, DO YOU RECALL, I ASKED MR. BRYANT HAS HE

2    EVER SEEN A RAINY DAY RASCALS ANYWHERE DATED 1998?

3    HIS RESPONSE WAS 'I MIGHT HAVE.  I DON'T KNOW.'

4    SO THAT WAS A CHALLENGE TO THEM.  OKAY.  BRING IT ON.

5    BRING IT ON.  SHOW US THIS GREETING CARD DONE IN '98.          04:33

6    NO ONE ELSE HAS EVER TESTIFIED, NO ONE ELSE

7    TESTIFIED; MR. IRMEN, NO ONE SAID THEY SAY A RAINY DAY RASCALS

8    GREETING CARD IN '98.  BUT WE LOOKED AND LOOKED AND LOOKED, AND

9    WE FOUND ONE DATED 1999, AND THAT'S EXHIBIT 10624.  WE CAN SHOW

10   YOU THAT.  AND MR. NOLAN DOESN'T DISPUTE THAT'S HIS SIGNATURE.   04:34

11   YOU HEARD HIM SAY THAT.  THIS IS PRODUCED BY MR. BRYANT FROM

12   HIS DOCUMENTS.  THIS IS THE ONLY RAINY DAY RASCALS DRAWING THAT

13   EXISTS THAT IS DATED.

14   AND ALTHOUGH MR. NOLAN REPEATED DOZENS OF TIMES,

15   RAINY DAY RASCALS 1998, RAINY DAY RASCALS 1998, HE REPEATS IT    04:34

16   AGAIN AND AGAIN, THERE'S NO PROOF OF IT.  NONE AT ALL.

17   MORE LIKELY THAN NOT, WHAT'S THE DATE OF THIS

18   NOTEBOOK?

19   AND THEN WE HAVE, OF COURSE, THE 'WADE' NOTE.

20   WELL, AGAIN, MR. BRYANT, THIS WASN'T TESTIFIED TO AT    04:34

21   HIS DEPOSITION, FOR THE FIRST TIME EVER, HE TAKES THE STAND AND

22   SAYS 'AH, THAT WAS 1998.'

23   IF WE COULD SHOW THAT NOTE; THAT'S 1155-C OF 87.

24   WHO DO WE HAVE TO TRUST WITH THAT?

25   WHAT PROOF IS THERE THAT WAS '98?                        04:3

```
 1          WE HAVE MR. BRYANT'S WORD.  OF COURSE, THAT'S A LOT
 2    TO GO ON.
 3          DO YOU RECALL, WHEN I SAID, 'THIS NOTE IS
 4    INTERESTING.  IT SAYS WE'RE GOING TO BE BACK IN A FEW WEEKS.
 5    HOW LONG OF A DRIVE IS THAT?'                                04:35
 6          I DIDN'T KNOW THE ANSWERS TO THIS STUFF, FOLKS.  IT'S
 7    THE FIRST TIME HE HAD EVER SAID THIS WAS '98, IN FRONT OF YOU.
 8    SO WHY WOULD YOU BE COMING BACK SO QUICKLY ON A 12-HOUR DRIVE?
 9    WHY WOULD YOU LOOK FORWARD TO COMING BACK AGAIN IN THE NEXT FEW
10    WEEKS?  COULD BE BECAUSE OF THANKSGIVING AND CHRISTMAS.  YEAH, 04:35
11    THAT'S A POSSIBILITY.  THEIR FAMILIES GOT TOGETHER THANKSGIVING
12    AND CHRISTMAS.
13          DIDN'T THAT HAPPEN IN '99?
14          HE SAYS IT'S POSSIBLE.  I DON'T KNOW.  IT'S POSSIBLE
15    THAT WE WERE THERE IN '99, AS WAS WADE AND HIS FAMILY.  AND    04:35
16    THEN WE SHOWED YOU THE RECORDS.
17          AND MR. NOLAN SAYS WE'VE GOT TO PROVE IT WAS 1999.
18          NO, WE DON'T.  WE'VE PROVEN TO YOU THAT THE IMPORTANT
19    INFORMATION IN HERE IS 1999.  EVERYTHING WE CAN DATE
20    POSITIVELY, THE BANK RECORDS, FOR EXAMPLE, 1999; ANGEL, 1999;  04:3
21    THE JEWEL DRAWING, 1999.
22          HE DOESN'T GET TO SAY 'AH HA, 1998, YOU CAN'T PROVE
23    ME WRONG.'
24          YOU'VE GOT TO WEIGH THE EVIDENCE AND SAY IS THAT TRUE
25    OR NOT?                                                       04:3
```

1           THAT INSTRUCTION SAYING YOU SHOULD BRING IN THE BEST

2    EVIDENCE WE CAN; THAT IS IF YOU CONTROL THAT EVIDENCE.

3           MR. BRYANT DIDN'T SAY THIS WAS 1998 UNTIL HE TOOK

4    THAT STAND.  AND WE COULDN'T GO OUT AND TAKE WADE'S DEPO OR

5    LISA'S.  WE CERTAINLY COULDN'T HAVE DONE IT IN SPRINGFIELD,          04:36

6    BECAUSE THEY WERE 12 HOURS AWAY.

7           BUT WHO COULD HAVE BROUGHT THEM?

8           YOU DIDN'T HEAR ANY TESTIMONY ABOUT THAT THIS IS A

9    1999 NOTEBOOK, AND THIS ESTABLISHES THAT THE VERY FIRST BRATZ

10   DRAWINGS WERE DONE IN 1999.  AND IF YOU LOOK AT THE EVIDENCE,       04:36

11   YOU'VE GOT TO LOOK AND SEE WHAT'S MORE LIKELY THAN NOT.

12          YOU'VE GOT MR. BRYANT'S STORY ABOUT 1998; RIGHT?

13          HE HAS NO DOCUMENTS TO BACK THAT UP AT ALL.  BUT

14   HERE'S THE EVIDENCE THAT WE DO KNOW.  WE KNOW THAT IN 1998, HE

15   WAS WORKING ON SOMETHING CALLED SABRINA.  AT LEAST THAT'S WHAT      04:37

16   HE SAYS.  AND YOU SAW SOME EXHIBITS OF THAT.  AND WE KNOW THAT

17   IN '98 HE HAD AN AGENT.  MR. NOLAN TOLD YOU THAT HE HAD AN

18   ARTIST AGENT IN '98.  REMEMBER THAT?  IN FACT, REMEMBER IN

19   SEPTEMBER OF '98, HE SAID HE LEARNED FROM ASHTON DRAKE ABOUT

20   ALASKA MAMA.  HE KNEW ABOUT ALASKA MAMA.                           04:37

21          THEY DIDN'T BRING THOSE FOLKS IN TO SAY 'HEY, HE HAD

22   THIS EXCITING PROJECT CALLED BRATZ THAT HE TRIED TO SEND AROUND

23   IN 1999.'

24          NOT AT ALL.

25          WHAT WAS THIS AGENT DOING?                                  04:37

1    OTHER THINGS WHICH MR. BRYANT HAD CREATED AND WAS

2    TRYING TO SELL.  HE DIDN'T WANT TO BE AN OLD NAVY EMPLOYEE.  HE

3    WANTED TO BE A FREELANCER.  HIS TESTIMONY OF AUGUST OF '98:  'I

4    CAME UP WITH THIS GREAT IDEA, I PUT IT IN A FOLDER, AND I NEVER

5    SENT IT TO ANYONE UNTIL AUGUST OF '99.'                    04:38

6    DOES THAT MAKE SENSE, GIVEN THE POSITION HE WAS IN

7    WERE HE WANTED TO BE A FREELANCER?  HE'S TRYING TO SELL THIS

8    STUFF?

9    NO.  IT DOESN'T MAKE SENSE AT ALL.

10    SO WE HAVE HIS '98 STORY.  LET'S COMPARE THAT WITH,     04:38

11    THEN, WHAT HAPPENED IN '99.

12    IF WE COULD PUT UP EXHIBIT 25-R.

13    I CREATED THIS DEMONSTRATIVE JUST TO SHOW YOU.

14    IN '99, HERE'S WHAT WAS HAPPENING:

15    FIRST YOU HAVE THE TOON TEENS DRAWINGS DISPLAYED IN    04:38

16    LILY'S CUBICLE; EXHIBIT 48.  MR. BRYANT DIDN'T DENY HE SAW

17    THEM; HE SAID, I DON'T REMEMBER.'  YOU HEARD MS. MARTINEZ'

18    TESTIMONY ABOUT ELISE BRINGING HIM BY.

19    THEN IN JULY WE HAVE THAT STEVE MADDEN AD, AUGUST

20    1999, SEVENTEEN MAGAZINE.  AND YOU'VE SEEN THAT OVER AND OVER    04:3

21    AGAIN.

22    MR. NOLAN'S ONLY RESPONSE IS, 'OH, THAT'S NOT EXACTLY

23    THE SAME ONE THAT MS. LEAHY GOT, BECAUSE IT HAS DIFFERENT

24    PRINTING AT THE BOTTOM.'

25    WELL, AGAIN, HE SAID HE READ SEVENTEEN.  WE BRING IN    04:3

1    THE SEVENTEEN MAGAZINE.  IT LOOKS VERY MUCH LIKE BRATZ, DOES IT

2    NOT?  EVEN THOUGH MR. BRYANT WOULDN'T ADMIT IT.  EVEN THOUGH

3    IT'S WHAT MR. BRYANT GAVE MS. LEAHY FOR HER INSPIRATION; SO

4    HE'S SEEN BOTH OF THESE IN THE JUNE/JULY TIME FRAME.

5            THE EVIDENCE IS RIGHT THERE.                         04:39

6            AND THEN IN THAT SAME TIME FRAME, WE'VE GOT THESE

7    INDENTATIONS IN THIS BLACK NOTEBOOK ABOUT THE BANKING

8    STATEMENTS, JULY '99; RIGHT HERE IN THE SAME NOTEBOOK THAT HE

9    HAS THOSE VERY FIRST DRAWINGS.

10           IN EARLY AUGUST, MS. GARCIA HAS DISPLAYED HER DOLLS    04:39

11   IN THAT DESIGN CENTER; IF YOU LOOK AT THE PICTURE, THE DATE OF

12   THAT IS AUGUST OF '99.

13           THEN AUGUST 26TH, HE HAS THESE DOCUMENTS NOTARIZED,

14   THESE DRAWINGS.  AND MR. NOLAN SAID WE HAVE TO PROVE THAT'S

15   FORGED TO PROVE OUR CASE?  TO THE CONTRARY, THAT PROVES OUR    04:40

16   CASE.  WE DON'T NEED TO SHOW THAT WAS FORGED.

17           YOU KNOW WHY YOU NOTARIZE DOCUMENTS IN '99?  TO PROVE

18   THE DOCUMENTS EXISTED IN EL SEGUNDO, CALIFORNIA, IN '99; THAT'S

19   THE REASON.  MARKING A DOCUMENT SHOWS THAT YOU HAD IT ON THE

20   DATE THAT YOU MARKED IT.                                     04:4

21           IF WE COULD PUT UP EXHIBIT 40-R.

22           FOR EXAMPLE, ONE OF THOSE COPYRIGHT WAYS OF DOING IT,

23   THE CHEAP WAY, IS TO SEND YOURSELF AN ENVELOPE SO IT WILL HAVE

24   A DATE ON IT, A STAMP ON IT; THAT'S ONE WAY OF SHOWING YOU DID

25   SOMETHING ON A CERTAIN DAY.                                  04:4

1        IF THAT'S IN AUGUST OF '99, IT WOULDN'T HELP YOU TO

2    PUT '98 DOCUMENTS IN THERE, WOULD IT?  IT WOULDN'T PROVE TO

3    ANYONE THAT YOU DID IT IN '98.  IT WOULD PROVE THAT YOU DID IT

4    IN '99.

5        IT MAKES NO SENSE TO HAVE THAT STAMP PUT ON THERE TO

6    PROVE YOU DID IT IN '98.  YOU WOULDN'T DO THAT WITH ANY FORGED

7    DOCUMENT.  SAME THING WITH NOTARIES.

8        IF WE COULD PUT UP 39-R.

9        IT'S STAMPING A DOCUMENT ON THE DATE THE NOTARY SAW

10   IT.  THAT'S WHAT YOU SEE IN EXHIBIT 62; DRAWINGS THAT ARE

11   STAMPED AT THAT TIME.  AND ALL THAT SHOWS -- IN FACT, IT SHOWS

12   DEFINITIVELY, IT PROVES THOSE DOCUMENTS EXISTED IN AUGUST OF

13   1999.

14       NOW, HE'S SENDING THEM TO ALASKA MAMA HERE AT THIS

15   TIME.  WHY HE DID HE CHOSE AUGUST '99?  I SUBMIT, BECAUSE

16   THAT'S WHEN HE DID THEM, AFTER ALL OF THE EVENTS I JUST SHOWED

17   YOU IN THE '99 TIME FRAME; THAT'S WHY HE SENT THEM.

18       SO HE WANTS TO NOTARIZE THEM AND SAY 'I HAD THEM

19   BEFORE ALASKA MAMA,' SO HE HAS THEM NOTARIZED.  THEN IF YOU

20   LOOK AT THE NOTARY BOOK -- AND MR. QUINN SHOWED IT TO YOU -- IF

21   THAT NOTARY BOOK STOPS AT THAT PERIOD WHERE -- IF IT STOPPED

22   THERE, THIS CASE WOULDN'T EVEN -- IT WOULD BE A SLAM DUNK.  IF

23   THIS STOPS HERE, THIS PERIOD, WE WOULD HAVE PROOF POSITIVE

24   THESE THINGS WERE DONE IN AUGUST OF '99.

25       AND MR. BRYANT IS NOT DUMB.  MR. BRYANT SAYS, "OH, MY

```
 1    GOSH, THIS PROVES IT'S IN '99.  COULD YOU PUT IN ALSO 'MISSOURI
 2    1998,' BECAUSE I'M WORKING AT MATTEL NOW AND THESE BELONG TO
 3    MATTEL."
 4         THIS PART FROM '98 IS, AGAIN, MR. BRYANT'S WORD.
 5    IT'S NOTHING MORE THAN HIS WORD, AND IT'S USELESS.  IN FACT, IT    04:42
 6    SHOWS HIS KNOWLEDGE OF GUILT.  BECAUSE, 'OH, MY GOSH, LOOK WHAT
 7    I'VE JUST PROVEN.'
 8         IF WE COULD GO BACK TO THE TIMELINE, 25-R.
 9         HE HAS THESE DRAWINGS NOTARIZED AFTER ALL OF THIS
10    THAT'S GOING ON IN '99.  AND THEN THE NEXT DAY, AUGUST 27TH, HE    04:43
11    DRAWS ANOTHER ONE AND HE DATES IT, HE DATES IT, AUGUST 27TH,
12    '99.
13         IF WE CAN SHOW EXHIBIT 777.
14         HE'S GOT THE GROUP THAT HE SENDS TO ALASKA MAMA,
15    AUGUST 26, '99.  AND THEN HE MAKES A CHANGE THE NEXT DAY, THE      04:43
16    VERY NEXT DAY.  AUGUST 27, 1999 HE DECIDES TO CHANGE LUPE, GIVE
17    HER A DIFFERENT HAIRSTYLE.  ALL OF THIS CREATIVITY IS TAKING
18    PLACE IN 1999.
19         AND THEN SOME TIME AFTER THAT, HE SENDS THE BRATZ
20    DRAWINGS TO ALASKA MAMA, AND THEN THOSE DRAWINGS ARE DATED.        04:43
21    ALSO SHORTLY AFTER THAT, SEPTEMBER 19TH, IF YOU LOOK AT
22    EXHIBIT 1327 AND 1328; DATED 1999, BECAUSE THAT'S WHEN THE
23    CREATIVITY WAS TAKING PLACE.
24         AND I DON'T MEAN TO MINIMIZE THIS, BUT THEY COME BACK
25    WITH HIS MOTHER, WHO, MR. NOLAN SAID, 'WELL, WHAT DO YOU          04:44
```

```
 1    EXPECT; SHE'S THINKING OF WHAT HAPPENED TEN, NINE YEARS AGO.'
 2           WELL, THAT'S RIGHT.  THAT'S THE POSITION MR. BRYANT
 3    PUT HER IN.  HE KNOWS HOW TO PROVE DOCUMENTS ARE DONE ON A
 4    CERTAIN DATE.  HE'S DONE COPYRIGHTS.  HE KNOWS HOW TO SEND
 5    SOMETHING TO YOURSELF.  HE KNOWS HOW TO GET THEM NOTARIZED.  HE     04:44
 6    DIDN'T DO THAT, SO HE HAS TO GO TO MOM AND SAY 'DO YOU REMEMBER
 7    THIS WAS IN '98?  DO YOU REMEMBER THAT, MOM?'
 8           AND IT'S LIKE, WHAT IS IT, THE STORY OF THE MOTHER
 9    WHO'S GOING TO A PARADE, HER SON IS IN THE PARADE, SHE'S
10    PROUDLY WATCHING JIMMY WALK BY AND SHE'S BEAMING WITH PRIDE.        04:44
11    AND SHE TURNS TO THE OTHER MOTHERS AND SAYS 'ISN'T IT
12    WONDERFUL, JIMMY IS IN STEP AND EVERYBODY ELSE IS OUT OF STEP.'
13    THAT'S HOW MOMS SEE THINGS; AND THAT'S WHAT HE PUT HER IN, AND
14    SHE WAS WRONG.
15           AND THEN WE HAVE MS. GALVANO, LADIES AND GENTLEMEN.          04:45
16    THEY BROUGHT IN MS. GALVANO, AND SHE COULDN'T SHOW YOU A SINGLE
17    DOCUMENT IN THE WORLD THAT SHE SAW IN AUGUST OF '98.  SHE MAY
18    HAVE SEEN SOMETHING.  SHE MAY HAVE SEEN SABRINA.  BUT THAT'S
19    LIKE HAVING A LINEUP, YOU KNOW, YOU ARREST SOMEONE; THE COPS
20    HAVE LINEUPS.  THEY SAY, MA'AM WHICH OF THOSE SIX WAS IT?  SHE      04:45
21    GOES, WELL, IT COULD HAVE BEEN NUMBER THREE.
22           WAS IT NUMBER THREE?
23           OH, ABSOLUTELY NOT; BUT IT KIND OF LOOKED LIKE NUMBER
24    THREE, EXCEPT HE DOESN'T HAVE A FACE.
25           AND THEN YOU PROSECUTE NUMBER THREE.                         04:45
```

1        THAT'S WHAT MS. GALVANO -- SHE WANTS TO HELP, SHE

2   REALLY DOES.  WE'RE NOT SAYING SHE'S LYING; WE'RE SAYING SHE

3   HAS NOTHING TO ADD.

4        THEN YOU HAVE HIS LIFE PARTNER -- I MEAN, THIS IS THE

5   BEST THEY COULD DO -- WHO TOLD YOU, YEAH, I SAW SOMETHING THAT          04:45

6   SAID BRATZ WHEN NO ONE ELSE HAS HEARD THE BRATZ NAME UNTIL IT'S

7   PRESENTED TO MGA OVER A YEAR LATER, OR MORE THAN THAT,

8   ACTUALLY.

9        THAT'S THE QUALITY OF EVIDENCE THAT YOU HAVE TO WEIGH

10  IN DECIDING THIS CASE.  AND YOU WAY THAT AGAINST JUST THE UTTER         04:46

11  DISHONESTY OF THE PEOPLE WHO REALLY GOT CARTER BRYANT ON THIS

12  PATH.

13       NOW, I WANT TO TALK TO YOU A LITTLE ABOUT THE VERDICT

14  FORM, IF I COULD FIND IT HERE.  ON THE VERDICT FORM, IT'S

15  DIVIDED INTO THESE SPECIFIC QUESTIONS, AND YOU REMEMBER                 04:46

16  MR. NOLAN SAYING THE FIRST QUESTION HERE LISTS ALL OF THE

17  DOCUMENTS THAT CARTER BRYANT SAYS HE DID IN 1998.  AND THE

18  QUESTION IS SIMPLE:  WHAT DO YOU THINK IS MORE LIKELY, GIVEN

19  THE PHYSICAL EVIDENCE, GIVEN THE DOCUMENTARY EVIDENCE, GIVEN

20  HIS TESTIMONY?                                                         04:46

21       WHAT DO YOU THINK IS MORE LIKELY?

22       IS HE TELLING THE TRUTH OR NOT?

23       YOU KNOW, MR. LARIAN SAID THAT HE WANTED TO DO AN

24  INVESTIGATION ABOUT WHETHER THESE WERE '98.

25       ASK YOURSELF THIS:  IF YOU WERE TO DO AN                          04:47

1    INVESTIGATION OF THIS, MR. BRYANT IS THERE IN FRONT OF YOU,

2    WOULD YOU SAY TO HIM, "DO YOU HAVE ANY DOCUMENTS THAT SAY IT?

3    WHAT NOTEBOOK WAS IT THAT YOU PUT IT IN?"

4         WOULD YOU SAY THOSE SORTS OF THINGS, OR WOULD YOU

5    SAY, OKAY, SO WHAT'S THE NAME OF YOUR MOM?  HOW ABOUT YOUR          04:47

6    LOVER?  HOW ABOUT YOUR MOM'S BEST FRIEND?

7         YOU HAVE TO ASK YOURSELF, WHO DO YOU BELIEVE.

8         I THINK THE ANSWER IS CLEAR.  YOU CAN'T BELIEVE

9    MR. BRYANT IF ALL OF THE PHYSICAL EVIDENCE, THE SCIENTIFIC

10   EVIDENCE, TELLS YOU THIS WAS DONE IN 1999.  THE INSPIRATIONAL     04:4

11   EVIDENCE, THE MADMAN OF '99.

12        SO THEN WE HAVE THE SECOND QUESTION HERE.  THE SECOND

13   QUESTION IS, FOR EACH OF THE ITEMS LISTED BELOW, HAS MATTEL

14   PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT THESE WERE

15   CONCEIVED AND REDUCED TO PRACTICE.                                04:4

16        THESE ARE, AS MR. NOLAN SAID, THE COLORED-IN

17   DOCUMENTS.  AND MR. BRYANT TESTIFIED THAT ALL OF THESE, IF YOU

18   SEE A DOCUMENT WHERE IT'S COLORED IN, THAT WAS DONE WHILE I WAS

19   AT MATTEL.

20        THAT'S ACTUALLY AT PAGE 2466, IT'S LINES 9 TO 11.            04:4

21        "QUESTION:  THAT PROCESS, PROJECTING IT, TRACING IT,

22   COLORING IN, THAT PROCESS WAS DONE WHILE YOU WERE AT MATTEL?

23        ANSWER:  YES."

24        MR. PAGE:  IN FACT, MR. BRYANT TESTIFIED THAT, IF YOU

25   SEE A DRAWING WITH A HEAD AND A FACE THAT ARE TOGETHER, THAT      04:4

THURSDAY, JULY 10, 2008                 TRIAL DAY 23, AFTERNOON SESSION

```
 1    THAT WAS DONE SOME TIME AFTER 1998.

 2            HE WAS ASKED -- AND THIS IS THE FOLLOWING PAGE, 3246,

 3    LINE 15-23 --

 4            "QUESTION:  THE DRAWING WITH A BODY AND A FACE

 5    TOGETHER DIDN'T EXIST IN 1998; CORRECT?                           04:48

 6            ANSWER:  I DON'T REMEMBER THAT IT DID.

 7            QUESTION:  AND THAT'S TRUE OF THE OTHER EXHIBITS I

 8    WAS SHOWING YOU WHICH HAD THE CHARACTERS, YOU KNOW, WITH THE

 9    BODY AND THE FACE.  AND YOU WOULD SAY, OH, BUT THERE WAS A

10    MASTER DRAWING.  THE MASTER DRAWINGS IN AUGUST 1998 DIDN'T HAVE   04:49

11    THE FASHIONS AND THE FACE AND THE BODY ALL TOGETHER; RIGHT?

12            ANSWER:  NO.  I DON'T THINK SO."

13            MR. PAGE:  IF YOU SEE A PICTURE WITH A HEAD AND A

14    BODY AND FASHIONS TOGETHER, THAT'S DONE AFTER 1999.

15            THAT'S THE SECOND QUESTION YOU HAVE IN THE VERDICT        04:49

16    FORM, WHICH IS THIS GROUP OF THE DOCUMENTS, WHICH, REALLY,

17    MR. BRYANT ADMITS HE DID WHILE HE WAS AT MATTEL.

18            SO YOU HAVE A THIRD GROUP OF DOCUMENTS HERE, AND

19    THESE ARE ONES THAT MR. BRYANT SAYS HE DID AFTER MATTEL.  AND

20    IF YOU LOOK AT EXHIBIT, FOR EXAMPLE, 323-32, THIS DRAWING HERE,   04:4

21    REMEMBER, THIS IS A SCULPTOR DRAWING.  MR. BRYANT SAYS IT WAS

22    DONE AFTER HE LEFT MATTEL IN OCTOBER 19.  OF COURSE, HE ALSO

23    SAID HE KNOWS THAT IF HE SAYS IT'S BEFORE THEN, WE OWN THAT.

24            HOWEVER, MS. GARCIA TOLD YOU THIS WAS DONE BETWEEN

25    OCTOBER 4TH AND OCTOBER 19TH, IF WE CAN PUT UP HER TESTIMONY; I   04:5
```

1   BELIEVE THAT'S SLIDE 12-R.  MS. GARCIA WAS ASKED:

2          "QUESTION:  WHAT INFORMATION DO YOU HAVE ON THAT

3   SUBJECT?

4          ANSWER:  I KNOW THIS WAS CREATED PRIOR TO

5   OCTOBER 19TH OF 2000."                                        04:50

6          **MR. PRICE:**  THE REASON SHE KNOWS THAT IS BECAUSE IT

7   WAS HANDED TO THE SCULPTOR TO BE USED BY MS. LEAHY TO SCULPT.

8   SO THE EVIDENCE IS THAT THAT WAS DONE NOT AFTER HE LEFT MATTEL

9   BUT WHILE HE WAS AT MATTEL.

10         THE NEXT THREE DRAWINGS; 1107, 1108, 1109, AND 1110,    04:50

11  I'LL SHOW YOU THOSE, BECAUSE THESE WERE FASHION DRAWINGS THAT

12  WERE DONE.

13         MR. BRYANT SAYS, OH, THESE WERE DONE AFTER I LEFT

14  MATTEL.  BUT WHEN YOU LOOK AT WHAT WAS GOING ON IN OCTOBER,

15  THAT MAKES NO SENSE.                                          04:51

16         IF WE CAN PUT UP 26-R.

17         REMEMBER, CARTER BRYANT WAS INSTRUCTED TO WORK

18  FULL-TIME STARTING OCTOBER 6TH.  MR. NOLAN SHOWED YOU THAT.

19  YET, YOU DON'T START SEWING AND DOING PATTERN MAKING FOR THE

20  DOLLS UNTIL YOU HAVE THE FASHIONS DESIGNED.  THE WORKERS DON'T  04:51

21  JUST MAKE UP STUFF.  THEY DON'T GO BUY THEIR OWN FABRIC.  THEY

22  DON'T CREATE THEIR OWN DESIGNS.  THEY ARE GIVEN THE DESIGNS BY

23  THE DESIGNER; THAT'S HOW IT WORKS.

24         VERONICA MARLOW STARTED SEWING AND PATTERN MAKING

25  BEGINNING OCTOBER 13TH; THAT'S WHEN SHE STARTED DOING THE       04:51

1    ACTUAL PATTERNS; AND THAT'S EXHIBIT 606-5; THOSE ARE HER BILLS

2    WHICH SHOW THAT BETWEEN OCTOBER 13TH AND OCTOBER 20, BUT

3    STARTING WITH OCTOBER 13, SHE'S DOING SEWING AND PATTERN

4    MAKING; SEWING AND PATTERN MAKING; AND BILLING THAT, THAT'S A

5    HECK OF A LOT OF HOURS, I MIGHT SAY.  THIS WAS A RUSH JOB.          04:52

6    WE'RE TALKING 81 HOURS HERE OF SEWING AND PATTERN MAKING.

7              SHE HAD A PRIOR BILL WHICH WAS ANOTHER 80 HOURS

8    LEADING UP TO OCTOBER 13TH WHICH WAS JUST DOING THE RESEARCH.

9    BUT THEY DON'T DO THIS UNLESS YOU HAVE THE DESIGNS DONE.

10             AND THEN YOU'VE GOT MS. GARCIA, IN 26-R, MS. GARCIA        04:52

11   SENDS THE FINAL FASHIONS TO HONG KONG OCTOBER 24.  THAT MEANS

12   THEY ARE DONE.  THAT'S EXHIBIT 1236.  THIS IS THE ONE WHERE

13   MS. GARCIA SAID I DON'T KNOW WHAT YOU ARE TALKING ABOUT.  I

14   DON'T EVEN KNOW WHAT FINAL FASHION DESIGN MEANS.  BUT SHE'S

15   SENDING THIS ON THE 23RD.  WE KNOW IT WAS DONE BEFORE THEN.         04:5

16             AGAIN, WHAT'S MORE LIKELY?

17             IT WAS DONE BEFORE THEY ACTUALLY MADE THE FASHIONS.

18   YOU DON'T MAKE THE FASHIONS WITHOUT THE DESIGNS.

19             SO IF WE GO BACK TO 26-R.  SO MR. BRYANT HAD TO HAVE

20   COMPLETED THOSE DESIGNS IN ADVANCE OF THIS ACTIVITY TAKING          04:5

21   PLACE.

22             THOSE DRAWINGS THAT WE JUST SHOWED YOU WERE THE

23   DRAWINGS THAT WERE SHOWN TO THE CUSTOMER IN EARLY NOVEMBER.

24   REMEMBER HOW THEY WENT TO K-MART; WE'VE GOT THIS HERE, THE

25   FASHIONS, AND ALL THAT STUFF.                                       04:5

THURSDAY, JULY 10, 2008              TRIAL DAY 23, AFTERNOON SESSION

1          SO THOSE DRAWINGS, WE BELIEVE THAT THE EVIDENCE IS

2    MORE LIKELY THAN NOT CONSISTENT WITH THE DOCUMENTS THEY TRY TO

3    RUN AWAY FROM WERE DONE BEFORE HE LEFT MATTEL IN OCTOBER 19TH.

4          THE SAME IS TRUE, ACTUALLY, IF WE GO TO THE VERDICT

5    FORM, PAGE 4, IF YOU GO THROUGH THESE OTHER DRAWINGS, THEY ARE    04:53

6    THE SAME SORTS OF DRAWINGS AND FASHIONS, AND THEN YOU SEE 323,

7    18, 19, AND 26.  323 IS THE PACKAGE OF DOCUMENTS WHICH

8    MR. LINKER SAID HE WAS GIVEN IN MID OCTOBER SO THAT HE COULD

9    START DOING THE PACKAGING.  THAT'S EXHIBIT 323.  THAT, AGAIN,

10   IS BEFORE CARTER BRYANT LEAVES MATTEL.                           04:54

11         SO WE THEN GO TO NUMBER FOUR:  "FOR EACH OF THE ITEMS

12   BELOW, HAS MATTEL PROVEN BY A PREPONDERANCE OF THE EVIDENCE..."

13   THERE ARE TWO PHYSICAL ITEMS HERE.  ONE IS THIS

14   THREE-DIMENTIONAL ITEMS PURSUANT TO THE PITCH, THE ONE THAT

15   MR. GARCIA AND MR. LARIAN SAID WAS UGLY, AND THE ONE            04:5

16   MS. O'CONNOR SAID WAS BEAUTIFUL IN 11 OUT OF TEN.

17         NO QUESTION THAT WAS DONE WHILE CARTER BRYANT WORKED

18   AT MATTEL.

19         THEN YOU HAVE EXHIBIT 1136, THAT'S THE SCULPT THAT

20   MS. LEAHY DID.  AND DO YOU REMEMBER MS. LEAHY'S TESTIMONY?  IT   04:5

21   TOOK AWHILE TO GET OUT, BUT DO YOU RECALL WHAT HAPPENED?

22         SHE MEETS WITH MR. BRYANT.  HE GIVES HER THE DESIGNS.

23   HE GIVES HER THE STEVE MADDEN AD.  HE SAYS I WANT YOU TO MAKE

24   BRATZ FOR ME.  AND IN JUST A 2-DAY PERIOD, SHE COMES UP WITH A

25   SCULPT ON SEPTEMBER 29TH.  AND YOU SAW HER NOTES OF            04:5

1    SEPTEMBER 29TH.  WHAT SHE DID WAS SHE WENT AND SHE MET WITH

2    MR. BRYANT; SHE SAID 'HERE'S THE SCULPT.'  AND HE SAID 'THAT'S

3    GREAT, BUT HERE ARE MY SPECIFIC COMMENTS...'"  AND YOU REMEMBER

4    HE LISTED ABOUT FOUR OR FIVE COMMENTS IN HER NOTES.

5             AND WHAT SHE TESTIFIED TO AT HER DEPOSITION WAS, YOU

6    KNOW, I TOOK HIS COMMENTS AND I INCORPORATED EACH AND EVERY ONE

7    OF THOSE COMMENTS.  AND SHE DOES A SCULPT, A SCULPT UNDER THE

8    ARTIST 'S GUIDANCE, MR. BRYANT'S GUIDANCE, TO BE A BRATZ DOLL,

9    TO BE A BRATZ SCULPT.

10            SO BECAUSE MR. BRYANT WAS THE DESIGNER OF THIS,

11   BECAUSE HE'S THE ONE WHO GAVE HER THE DRAWINGS, BECAUSE HE'S

12   THE ONE WHO GAVE HER THE COMMENTS, AS SHE ORIGINALLY SAID,

13   BECAUSE THIS WAS TO FULFILL HIS VISION; AND THIS IS DONE

14   BETWEEN -- SEPTEMBER 18TH WAS THE FIRST WAS WHEN HE FIRST

15   CONTACTED HER.  THIS ALSO WOULD BE MATTEL PROPERTY.

16            WHAT MS. LEAHY SAID SHE DID DO WAS SHE THEN TRIED TO

17   MAKE IT MANUFACTURABLE BECAUSE, YOU KNOW, YOU JUST HAVE TO DO

18   SOME THINGS TO MAKE IT MANUFACTURABLE.  BUT THAT'S

19   CARTER BRYANT'S DIRECTION, HIS VISION, HIS SCULPTOR FOR HIS

20   BRATZ.

21            AND THEN YOU GET TO THE QUESTIONS WHICH DON'T HAVE

22   LONG NUMBERS AFTER THEM, LISTS AND LISTS AND LISTS, AND THAT IS

23   -- FIVE AND SIX IS WHETHER HE CONCEIVED THESE WHILE AT MATTEL;

24   AND, AGAIN, THAT'S THE '99 EVIDENCE.  AND THAT HE CONCEIVED THE

25   NAME BRATZ.  AND THAT'S, AGAIN, THE EVIDENCE YOU HEARD FROM,

1    FOR EXAMPLE, MS. RHEA, WHO SAID HE HADN'T EVEN COME UP WITH IT

2    BY JUNE, BUT HE DID COME UP BY THE SEPTEMBER 1ST MEETING WHEN

3    HE WAS AT MATTEL.

4              AND THEN WE HAVE INTENTIONAL INTERFERENCE AND THE

5    AIDING AND ABETTING AND THE DUTY OF LOYALTY.  REALLY, WHAT MORE      04:5?

6    IS THERE TO SAY HERE ABOUT THIS?  IT'S REALLY UNDISPUTED WHAT

7    HAPPENED HERE.

8              DID MGA KNOW IT?

9              OH, COME ON, MS. GARCIA WAS IN THIS UP TO HER NECK.

10             IN FACT, THE BUILDER, I THINK MR. NOLAN SAID, 'WELL,       04:5?

11   BUT HE PAID THIS MATTEL PAINTER, AND THERE'S NO EVIDENCE THAT

12   WE KNEW ANYTHING ABOUT THAT."

13             ACTUALLY, IF YOU LOOK AT THE EVIDENCE -- DO WE HAVE

14   THOSE EXHIBITS NUMBER -- THERE'S A CHECK WHICH MR. BRYANT WROTE

15   -- OH, LET'S TRY 1310, I THINK -- THERE'S A CHECK MR. BRYANT         04:5?

16   WROTE FOR $150 TO SHEILA FOR HER FACE PAINTING.  I DON'T

17   REMEMBER THAT.  SHEILA WAS THE MATTEL EMPLOYEE.  AND YOU RECALL

18   TESTIMONY FROM MS. RHEA THAT THIS PROJECT HAD AN 'ANGEL' CODE

19   NAME.  DO YOU REMEMBER, I ASKED MR. BRYANT, DID ONE OF YOUR

20   DOLLS HAVE THE NICK NAME OF ANGEL?  HE SAID ABSOLUTELY NOT.         04:5

21   AND THEN WE SHOWED YOU HIS HANDWRITTEN DESCRIPTIONS OF THEM

22   WHERE, YES, ONE OF THEM'S NICK NAME WAS AKA ANGEL.

23             THIS IS MR. BRYANT'S CHECK.

24             AND THEN 593, THIS IS A COUPLE OF DAYS, A FEW DAYS

25   LATER.  WHAT DOES MR. BRYANT DO?  HE SENDS AN INVOICE TO            04:5

1    MS. GARCIA FOR $150.  IT SAYS 'ANGEL FACE HAIR DESIGNS AND

2    SKETCHES.'

3            HEY, YOU KNOW, IT SAYS AUGUST 31ST FOR MR. BRYANT, BY

4    THE WAY.  DO YOU SEE THIS?  HE'S A MATTEL'S EMPLOYEE.

5            WHAT?  HE'S DOING WORK FOR MGA NOW IN AUGUST?        04:5?

6            DOES THAT MAKE ANY SENSE TO YOU?

7            NO.

8            MS. GARCIA:  THANKS, PAULA; A LITTLE SMILEY FACE

9    THERE.  MS. GARCIA WAS IN ON THIS WITH MR. BRYANT AT THE TIME.

10   HE'S HELPING THEM CREATE A DOLL THAT WILL COMPETE WITH MATTEL.  04:5?

11   HE'S HAVING FACES PAINTED FOR THE PITCH.  REMEMBER HIS INITIAL

12   PITCH, AUGUST 15TH, OR MID AUGUST; THAT'S WHAT MR. BRYANT SAYS;

13   THAT'S WHAT MRS. O'CONNOR SAYS; AND THEN THEY'RE GOING TO MEET

14   WITH MR. LARIAN.  AND IT'S DURING THAT TIME FRAME THAT

15   MR. BRYANT DOES THIS DOLL AND HAS IT PAINTED AND PAYS SHEILA.   04:5?

16   BUT NOT BEFORE HE'S USING THE CODE NAME ASKING TO BE REIMBURSED

17   FOR IT.

18           AND THEN, OF COURSE, THE MOST COMPELLING EVIDENCE ON

19   THIS AIDING AND ABETTING IS THE DATE ON THE CONTRACT ITSELF.

20   AS OF SEPTEMBER 18, 2000, THAT'S WHEN MR. BRYANT WAS WORKING    05:00

21   FOR THEM.  EXHIBIT 30 IS THAT LETTER TO THE VENDOR, UNIVERSAL,

22   SEPTEMBER 18, 2000; THE FIRST CONTACT WITH MS. LEAHY

23   SEPTEMBER 17TH, SEPTEMBER 20TH OF 2000.

24           MGA RECOGNIZED WHAT IT WAS DOING AND INDUCING A

25   MATTEL EMPLOYEE WHO CREATED MATTEL DESIGNES TO BRING HIS        05:00

```
 1   DESIGNS TO MGA.  THEY DIDN'T GIVE A HOOT WHETHER THEY WERE DONE
 2   AT MATTEL OR NOT.  BUT THEY WANTED HIM TO MAKE SURE THEY COULD
 3   COMPETE AS QUICKLY AS POSSIBLE WITH MATTEL.
 4          YOU'RE MORE TIRED THAN I AM; YOU HAVE TO LISTEN TO
 5   ALL OF THIS.  BUT I WANT TO THANK YOU FOR YOUR PATIENCE.  AND    05:00
 6   BOTH PARTIES HAVE PUT A LOT OF EFFORT INTO THIS.  OUR EFFORT
 7   HAS BEEN GEARED TOWARDS ONE THING:  IT'S UNFAIR IF A COMPANY
 8   COMPETES WITH YOU BY STEALING FROM YOU.  IT'S UNFAIR IF A
 9   COMPANY COMPETES WITH YOU BY TAKING ONE OF YOUR BEST DESIGNERS,
10   WHILE HE STILL WORKS FOR YOU, AND GIVES YOU IDEAS, EFFORT, AND   05:01
11   HELPS YOU GET INTO THE MARKET TO COMPETE.
12          MATTEL ISN'T ANTI-COMPETITIVE.  IT IS ANTI-FRAUD.  IT
13   DOES BELIEVE YOU SHOULD COMPETE FAIRLY; THAT BOTH SIDES SHOULD
14   PLAY FAIRLY.  AND THAT'S WHAT WE'RE ASKING YOU TO SAY TO THE
15   WORLD.  MR. NOLAN SAID 'PEOPLE FORGET WHAT I SAID HERE AND WHAT  05:01
16   HE SAID HERE.'  THAT'S A SAD TRUTH.  BUT WHAT THEY WON'T FORGET
17   IS YOU SAYING THERE'S A RIGHT WAY AND A WRONG WAY TO COMPETE,
18   AND WHAT YOU DID HERE CROSSED THAT LINE.  AND YOU HAVE A CHANCE
19   TO REMEDY IT.
20          WE THANK YOU.                                            05:01
21          THE COURT:  THANK YOU, COUNSEL.
22          JUST A COUPLE OF THINGS BEFORE I EXCUSE THE JURY AT
23   THIS TIME.
24          I UNDERSTAND THAT WE HAVE TWO MEMBERS OF THE JURY WHO
25   NEED TO TAKE SMOKE BREAKS.  WITHOUT COMMENTING ON THE HEALTH    05:02
```

1    EFFECTS OF SMOKING, I WILL LEAVE THAT UP TO YOU AT THIS POINT.

2         THAT'S PART OF THE SCHEDULE, THOUGH, THAT'S IN YOUR

3    HANDS AT THIS POINT.  IF YOU NEED TO TAKE A BREAK FOR WHATEVER

4    PURPOSE, THAT'S FOR YOU TO DECIDE.

5         HOWEVER, WHEN ONE OF YOU OR TWO OF YOU OR ANY OF YOU        05:02

6    ARE NOT PRESENT TOGETHER, WHEN YOU ARE NOT ALL TOGETHER, YOU

7    SHOULD NOT BE DISCUSSING THE CASE; SO IF ONE OR TWO PEOPLE NEED

8    TO TAKE A BREAK FOR WHATEVER PURPOSE, STOP DISCUSSING THE CASE,

9    LET THEM TAKE THEIR BREAK, AND WAIT FOR THEM TO COME BACK AND

10   THEN RESUME YOUR DELIBERATIONS.  BUT DO NOT BE DELIBERATING     05:02

11   UNLESS ALL TEN ARE TOGETHER AT A TIME; SO IN TERMS OF

12   SCHEDULING YOUR BREAKS, I'LL LEAVE THAT UP TO YOU.

13        I'M GOING TO BE GIVING YOU THREE ENVELOPES; THE FIRST

14   ENVELOPE IS LABELED "JURY VERDICT FORM"; IT HAS THE JURY

15   VERDICT FORM; ONE COPY; AND THAT'S THE ONE THAT YOUR PRECEDING  05:03

16   JUROR WILL FILL OUT, SIGN, DATE, AND RETURN ONCE YOU HAVE

17   REACHED A UNANIMOUS VERDICT.

18        THE SECOND FORM ARE THE JURY NOTES.  I HAVE CORRECTLY

19   LISTED THEM, ONE THROUGH 15.  I DON'T KNOW WHY THE LAST JURY I

20   HAD DID THIS, BUT, FOR WHATEVER REASON, THEY JUST PICKED THEM   05:03

21   RANDOMLY AND THEY WEREN'T IN ORDER.  IT HELPS US IF YOU COULD

22   PICK NUMBER ONE, MAKE YOUR FIRST NOTE BE JUROR NUMBER ONE, TWO,

23   THREE, FOUR, FIVE, JUST BE MINDFUL OF THAT.

24        THE ONE JURY NOTE WE'D LIKE TO GET BACK AS SOON AS

25   POSSIBLE -- I KNOW WE'RE AT THE END OF THE DAY TODAY, SO I      05:03

1    DON'T EXPECT IT TODAY, BUT TOMORROW MORNING -- IS JUST AN

2    INDICATION OF YOUR SCHEDULE THAT YOU ARE GOING TO BE KEEPING

3    TOMORROW AND THEREAFTER, JUST SO THAT I CAN LET THE ATTORNEYS

4    KNOW.  BECAUSE I'LL EXPECT LEAD COUNSEL FOR BOTH SIDES TO BE

5    PRESENT WHENEVER YOU ARE DELIBERATING.                         05:03

6             AND THEN THERE ARE COPIES OF THE JURY INSTRUCTIONS

7    THAT I READ THIS MORNING.  THERE ARE TEN COPIES, ONE FOR EACH

8    OF YOU, TO USE; SO THOSE ARE THE THREE FOLDERS THAT WILL BE

9    GOING BACK WITH YOU TO THE JURY ROOM.

10            AT THIS TIME, I'D ASK THE BAILIFF TO COME FORWARD AND   05:04

11   BE SWORN IN.

12            THE CLERK:  PLEASE STATE YOUR NAME FOR THE RECORD.

13            BAILIFF:  SCOTT EVANS.

14            (CLERK GIVES OATH TO BAILIFF. )

15            BAILIFF:  I DO.                                        05:04

16            THE COURT:  VERY WELL.

17            LET'S EXCUSE THE JURY AT THIS TIME.

18            MR. HOLMES, IF YOU WOULD TAKE THESE THREE FOLDERS

19   WITH YOU.

20            ALL RISE FOR THE JURY.                                 05:04

21            (WHEREUPON JURORS DEPART COURTROOM.)

22            THE COURT:  COUNSEL, I CONGRATULATE BOTH SIDES ON

23   OUTSTANDING CLOSING ARGUMENTS.  IT WAS TRULY A PLEASURE.  BOTH

24   SIDES MADE OBJECTIONS, THAT I OVERRULED.  I THINK THAT THERE

25   MAY HAVE BEEN A NUMBER OF STATEMENTS MADE THROUGHOUT BOTH       05:0

1   CLOSINGS THAT CERTAINLY PUSHED THE LINE, PERHAPS, BUT I BELIEVE

2   OVERALL THAT YOU STAYED WELL WITHIN THE DEFINED PARAMETERS AND

3   REPRESENTED YOUR CLIENTS VERY ZEALOUSLY, BUT FAIRLY, AND ANY

4   CONCERNS WERE FULLY ADDRESSED BY THE JURY INSTRUCTIONS AND THE

5   REPEATED ADMONITIONS TO THE JURY ABOUT THE ROLE OF ARGUMENTS BY     05:06

6   COUNSEL AND THE PRIMARY ROLE, OF COURSE, OF THE EVIDENCE AND

7   THE COURT'S INSTRUCTIONS; SO I DID NOT INTERRUPT OR FURTHER

8   INTERVENE.

9         JUST FOR THE RECORD, PLAINTIFF USED ALL BUT ONE

10   MINUTE OF THEIR TWO AND A HALF HOURS, AND DEFENSE USED ALL BUT     05:06

11   FOUR MINUTES OF THEIR TWO AND A HALF HOURS, SO THEIR ESTIMATES

12   WERE PRETTY CLOSE.  I APPRECIATE YOUR EFFORTS.  I KNOW NOW THE

13   HARD PART BEGINS, THE WAITING AND THE PACING.

14         I DO EXPECT COUNSEL TO BE PRESENT WHILE THE JURY IS

15   DELIBERATING TO ANSWER ANY NOTES PROMPTLY, AND WE, OF COURSE,     05:0

16   WILL BE MAKING SURE THAT YOU'RE MADE AWARE OF ANY NOTES THAT

17   COME OUT AS SOON AS THEY COME OUT.

18         I WOULD WAIT AROUND TONIGHT, FOR THE NEXT 20 MINUTES.

19   I PRESUME THE JURY IS GOING TO DISBURSE WITHOUT SENDING ANY

20   NOTE IN; BUT, NOT KNOWING THAT, I'D ASK YOU TO WAIT AROUND FOR     05:0

21   ABOUT 20 MINUTES OR SO.

22         I THINK THAT'S ALL I HAVE.

23         IS THERE ANYTHING FROM PLAINTIFF?

24         MR. PRICE:  WONDERING IF IT'S OKAY -- WE'LL STAY HERE

25   TONIGHT, BUT, IF IT'S OKAY ON THE OTHER DAYS, OR DAY, THAT WE     05:0

```
 1    BE WITHIN TEN MINUTES OF THE COURTHOUSE?

 2             THE COURT:  THAT'S FINE.  JUST MAKE SURE MR. HOLMES

 3    HAS A WAY OF CONTACTING YOU.

 4             THE COURT:  MR. ZELLER?

 5             MR. ZELLER:  NUMBER ONE, THE PEOPLE RESPONSIBLE FOR      05:0?

 6    THE TECHNICAL SIDE ARE INTERESTED IN KNOWING WHETHER THEY NEED

 7    TO ALSO REMAIN IN CASE THERE'S A PLAYBACK OF VIDEO.

 8             THE COURT:  FRANKLY, THEY ARE PROBABLY MORE IMPORTANT

 9    THAN THE LAWYERS.

10             MR. ZELLER:  THAT'S WHAT I TRIED TO EXPLAIN.           05:08

11             THE COURT:  THE TECHNICAL PEOPLE HAVE BEEN ABSOLUTELY

12    OUTSTANDING AND CRITICAL IN THIS PRODUCTION AS IT WERE, AND I

13    APPRECIATE THEIR EFFORTS, AND I CERTAINLY WOULD APPRECIATE IF

14    THEY WERE AVAILABLE FOR ANYTHING LIKE THAT, IF WE NEED TO FIND

15    ANYTHING QUICKLY OR IF THE JURY NEEDS ANY PLAYBACK.             05:0(

16             MR. ZELLER:  THANK YOU.

17             AND THEN THERE IS AN ISSUE CONCERNING WHAT GOES BACK

18    TO THE JURY WITH RESPECT TO ONE EXHIBIT, WHICH THE COURT MAY

19    RECALL IS THAT BINDER THAT I BELIEVE WAS SHOWN AND IT WAS

20    CONDITIONALLY ADMITTED IN CONNECTION WITH MS. GARCIA'S          05:0:

21    TESTIMONY, I BELIEVE.  IT IS EXHIBIT 17770.

22             THE COURT:  THESE ARE THE FABRIC SWATCHES.

23             MR. ZELLER:  YES.

24             THE COURT:  THIS WAS BACK ON MAY 30.

25             YOU'D HAVE TO REFRESH MY RECOLLECTION IN TERMS OF THE   05:0
```

1   CONDITION UPON WHICH IT WAS ADMITTED.

2        **MR. ZELLER:**  THE COURT WILL RECALL -- AND THIS IS

3   REFLECTED IN THE TRANSCRIPT AS WELL -- IS THAT IT'S A FAIRLY

4   SIZABLE BINDER.  IT HAS FABRIC SWATCHES, OTHER KINDS OF

5   DOCUMENTS, I THINK, THAT ARE MOSTLY RELATED TO THE FASHIONS.          05:09

6   IT COVERS A FAIRLY LENGTHY TIME PERIOD.  SOME OF IT IS

7   CERTAINLY THE RELEVANT TIME PERIOD EARLY ON IN THIS BINDER, AND

8   THEN IT GOES ON WELL INTO THE SUBSEQUENT TIME PERIODS.

9        MR. PRICE MADE AN OBJECTION, PARTLY, IN LARGE PART,

10  BECAUSE AT THAT POINT WE HAD NOT HAD AN OPPORTUNITY TO GO          05:09

11  THROUGH EVERY SINGLE PAGE OF THAT BINDER.

12       AND AGAIN, THERE'S NO DISPUTE THAT AT LEAST SOME OF

13  THAT BINDER IS RELEVANT BY BOTH PARTIES' LIGHTS.  BUT THEN

14  THERE ARE LATER MATERIALS THAT WE DO HAVE AN ISSUE WITH AND IT

15  BEING AVAILABLE TO THE JURY AND GOING BACK, IF THE JURY --          05:09

16       **THE COURT:**  WHAT'S THE CONCERN?

17       **MR. ZELLER:**  I THINK THE CONCERN IS, YOUR HONOR, THAT

18  IT GETS US OUTSIDE OF THE TIME PERIOD.

19       MATTEL HAS CERTAINLY TRIED TO PUT ON EVIDENCE AFTER

20  THE TIME PERIOD.  THE COURT HAS --          05:1

21       **THE COURT:**  CAN I SEE THIS BINDER IN QUESTION?

22       WHILE WE'RE DOING THAT, I HAVE RECEIVED AN ADMITTED

23  EXHIBIT LIST, STAMPED TODAY, JULY 10TH, 2008, WHICH I

24  UNDERSTAND HAS BEEN REVIEWED BY BOTH THE PARTIES AND IT HAS

25  BEEN AGREED TO AS THE FINAL EXHIBIT LIST AS TO WHAT HAS BEEN          05:1

1    ADMITTED.

2         IS THAT CORRECT?

3         **MR. NOLAN:**  THAT'S CORRECT.

4         **THE COURT:**  MATTEL?

5         **MR. ZELLER:**  I'M TOLD THAT THAT IS LIKELY THE ONE.                05:11

6         IF IT REFLECTS THAT 17770, WHICH WE'RE DISCUSSING,

7    WAS CONDITIONALLY ADMITTED, THAT WOULD APPEAR TO BE IT.

8         **THE COURT:**  I NEED SOMETHING A LITTLE MORE

9    UNEQUIVOCAL THAN THAT.

10        **MR. ZELLER:**  MR. GRANT HAS CONFIRMED TO ME THAT THIS          05:11

11   IS IT.

12        **THE COURT:**  VERY WELL.  THEN THIS WILL BE THE EXHIBIT

13   LIST.  AND MR. HOLMES, YOU'LL FILE THIS.

14        THIS IS THE BINDER HERE, 17770.

15        **MS. AGUIAR:**  MAY I BE HEARD?                                  05:11

16        **THE COURT:**  THE STANDARD THAT I HAVE EMPLOYED

17   THROUGHOUT ALL OF THESE, WHERE THERE ARE MULTIPLE SHEETS,

18   MULTIPLE DATES OR ENTRIES, THOSE PORTIONS THAT ARE PUT BEFORE A

19   WITNESS AND ARE THE SUBJECT OF TESTIMONY IS WHAT GOES IN, AND

20   EVERYTHING ELSE HAS BEEN REDACTED.  THAT IS WHAT WE'VE DONE IN     05:11

21   THE ARTICLES; THAT'S WHAT WE HAVE DONE WITH BOOKS; THAT'S WHAT

22   WE'VE DONE WITH MAGAZINES.  AND THAT WHAT IS WHAT I'LL PROBABLY

23   DO WITH THIS.

24        DO WE HAVE A RECORD OF WHAT PAGES WERE ACTUALLY SHOWN

25   TO THE WITNESS?                                                    05:12

```
 1              MS. AGUIAR:  THE RELEVANT PAGES OF THE TRANSCRIPT ARE
 2    PAGES 835 AND 836.  THE EXCHANGE WAS THAT I OFFERED IT FOR
 3    IDENTIFICATION, AND I EXPLAINED THAT IT CAN'T BE TAKEN APART
 4    BECAUSE OF THE NATURE OF IT, AS YOU CAN SEE THERE.  AND YOU
 5    THEN SAID THAT YOU UNDERSTOOD THAT AND THAT YOU WERE GOING TO
 6    ADMIT IT.  AND YOU SAID, "MR. PRICE, I'LL GIVE YOU AN
 7    OPPORTUNITY TO REVIEW THIS DURING THE BREAK.  IF THERE'S
 8    PARTICULAR PAGES THAT YOU OBJECT TO, I'LL GIVE YOU LEAVE TO
 9    RENEW YOUR OBJECTION."
10              THAT'S NUMBER ONE.
11              MR. PRICE DID REVIEW IT AT THE BREAK AND NEVER
12    RENEWED THAT OBJECTION OR MADE ANY OTHER OBJECTION WHATSOEVER
13    ON THE RECORD AT ANY TIME AFTER THAT.
14              MR. ZELLER MADE A PASSING REFERENCE TO THE FACT THAT
15    MATTEL HAD NOT BEEN ABLE TO REVIEW THIS EXHIBIT.  I'M SURE,
16    ACTUALLY, IF HE ASKS HIS PEOPLE WHO ARE ASSISTING IN THIS
17    PROCESS, THE ASSOCIATES WHO WORK WITH HIM, AND HIS SUPPORT
18    STAFF, THEY WILL TELL YOU THAT THEY HAD EVERY SINGLE PAGE OF
19    THIS.  THEY ACTUALLY LOOKED AT THIS TANGIBLE EXHIBIT PRIOR TO
20    TRIAL; SO IT'S NOT THE CASE THAT THEY DIDN'T HAVE THIS EXHIBIT.
21              I WOULD ALSO SAY, YOUR HONOR, THAT I ASKED TO BE ABLE
22    TO PUBLISH IT TO THE JURY; AND SO I PASSED THIS EXHIBIT AROUND
23    TO THE JURY MEMBERS WHO ACTUALLY, AS I RECALL, TOOK A
24    SIGNIFICANT AMOUNT OF TIME LOOKING AT IT.
25              SO I THINK TO NOW, AFTER, ONE, THEY SAW THIS EXHIBIT
```

1   AND HAD PLENTY OF TIME TO OBJECT TO IT; AND TWO, YOU SAID ON

2   THE RECORD THAT YOU WERE GOING TO GIVE HIM LEAVE TO LOOK AT IT

3   ON THE BREAK AND RENEW ANY OBJECTION, AND HE DIDN'T; AND YOU

4   LET ME PUBLISH IT TO THE JURY.  NOW, IF THEY DON'T SEE THIS

5   EXHIBIT, I THINK IT'S PREJUDICIAL TO US THAT ALL OF A SUDDEN AN

6   EXHIBIT THAT WASN'T JUST FLASHED UP ON THE SCREEN FOR A MOMENT

7   BUT THAT THEY PROBABLY SPENT BETWEEN FIVE AND TEN MINUTES

8   LOOKING AT, NOW DOES NOT GO BACK TO THE JURY.  SO I THINK THE

9   TIME TO OBJECT TO THIS EXHIBIT HAS PASSED.  AND THE NATURE OF

10  IT IS SUCH THAT IT SHOULD NOT BE TAKEN APART.

11          **THE COURT:**  MR. ZELLER?

12          **MR. ZELLER:**  YES.

13          IN TERMS OF WHAT I WAS REPRESENTING TO THE COURT IS

14  THAT THE REASON IT WAS CONDITIONALLY ADMITTED IS BECAUSE WE

15  DIDN'T HAVE THE OPPORTUNITY TO LOOK AT EVERY PAGE PRIOR TO THE

16  TIME IT WAS SHOWN TO MS. GARCIA.

17          **THE COURT:**  SINCE MAY 30TH, I TRUST YOU HAVE.

18          **MR. ZELLER:**  YES.

19          AND THAT'S SPECIFICALLY --

20          **THE COURT:**  WHAT PAGES ARE YOU OBJECTING TO?

21          THIS SEEMS LIKE A LOT OF FABRIC.

22          **MR. ZELLER:**  WHAT WE HAVE OFFERED TO DO, YOUR

23  HONOR -- AND I THINK THIS FAIRLY STATES WHAT OUR OBJECTION

24  WOULD BE AS WELL -- IS THAT ANYTHING AFTER A DATE CERTAIN -- WE

25  CAN BE SOMEWHAT FLEXIBLE ON THAT; IF IT WAS, SAY, AS OF OR

1  AFTER NOVEMBER 7TH, 2000, WE DON'T THINK SHOULD BE IN THERE.

2  THERE'S CLEARLY STUFF FROM LATER TIME PERIODS.  IT WOULD SEEM

3  LIKE THE MOST RATIONALE WAY OF DEFINING THIS EXHIBIT WOULD BE

4  BY TIME PERIOD.

5          THE COURT WILL ALSO RECALL, OF COURSE, THIS WAS

6  SOMEWHAT MORE -- THIS WAS EARLY ON THAT THERE WAS PERHAPS SOME

7  ADDITIONAL ISSUES ABOUT WHAT THE RELEVANT TIME PERIOD WAS

8  ULTIMATELY GOING TO BE AT THAT TIME.  BUT CLEARLY AT VARIOUS

9  TIMES, BOTH PARTIES, INCLUDING MATTEL, WERE PRECLUDED FROM

10  PUTTING ON EVIDENCE AS TO LATER TIME PERIODS.  AND I THINK

11  THAT'S THE STANDARD HERE.

12          I RESPECTFULLY DISAGREE WITH MGA'S POSITION THAT SOME

13  HOW IT WAS INCUMBENT ON US -- THIS WAS A CONDITIONALLY ADMITTED

14  EXHIBIT.  IT WAS INCUMBENT UPON THEM TO HAVE IT PROPERLY MOVED

15  INTO EVIDENCE.  AND I DON'T SEE HOW WE HAVE WAIVED IN ANY WAY

16  WHAT HAS BEEN CLEARLY STATED AS A RELEVANCE OBJECTION TO AT

17  LEAST PORTIONS OF THIS BINDER.

18          AND I'M SURE THAT LOGISTICALLY IT CAN BE WORKED OUT,

19  FOR PURPOSES OF WHAT GETS SHOWN TO THE JURY, AT A MINIMUM, JUST

20  SIMPLY BY PHOTOCOPYING THE RELEVANT PAGES, HAVING THAT MARKED

21  AS THE APPROPRIATE EXHIBIT, AND PROVIDING THAT TO THE JURY.

22          **THE COURT:**  THANK YOU, COUNSEL.

23          I HAD ASKED YESTERDAY FOR THERE TO BE A COMPREHENSIVE

24  REVIEW OF THE EXHIBITS COMPLETED YESTERDAY; AND THAT IF THERE

25  WERE ANY PROBLEMS WHATSOEVER, FOR THIS TO BE BROUGHT TO THE

```
 1     COURT'S ATTENTION AT 8:30 THIS MORNING.  NOT AT 5:15 TONIGHT.

 2             THE OBJECTION IS OVERRULED.  THE EXHIBIT IS ADMITTED.

 3             WE'RE DONE WITH THIS.

 4             THE JURY HAS RETURNED A NOTE.  APPARENTLY

 5     NOTWITHSTANDING MY REQUEST THEY USE NOTES IN ORDER, THE FIRST        05:16

 6     NOTE RECEIVED IS JURY NOTE NUMBER FOUR.

 7             (LAUGHTER.)

 8             THE COURT:  I ALSO RECEIVED JURY NOTE NUMBER ONE.

 9             THE ONLY GOOD NEWS IN THIS IS THAT THEY ARE

10     CONSISTENT.                                                          05:1

11             BOTH NOTES INDICATE THAT THE JURY WILL BE WORKING

12     TUESDAY THROUGH FRIDAY FROM 9:15 TO 5:00, TAKING A LUNCH AT

13     12:30.

14             THEY ARE GONE FOR THE DAY.

15             MR. PRICE:  CAN WE ASK HOW LONG LUNCH WOULD BE?              05:1

16             THE COURT:  THEY DIDN'T SAY THAT IN EITHER NOTE.

17             COUNSEL, THE PRACTICE OF THE COURT IS TO MAKE

18     PHOTOCOPIES OF THE NOTES AND PROVIDE THEM TO BOTH COUNSEL.

19             MR. HOLMES, IF YOU'LL DO THAT.

20             ANYTHING FURTHER FROM MATTEL?                               05:1

21             MR. ZELLER:  WE DO HAVE THE ORIGINAL OF THE NOTEBOOK,

22     1155-C, AND I'LL DELIVER THAT TO MR. HOMES.

23             THE COURT:  EXCELLENT.

24             ANYTHING FURTHER FROM MGA?

25             MS. AGUIAR:  WE ALSO NEED TO LODGE WITH YOUR HONOR           05:1
```

1    THE PORTFOLIOS THAT HAVE THE VERDICT FORM DRAWINGS IN THEM.

2    HOWEVER YOU HONOR THINKS IT'S APPROPRIATE TO DO THIS, I WAS

3    WONDERING IF THE JURY COULD BE INSTRUCTED THAT WITH REGARD TO

4    THESE ORIGINALS, THESE DRAWINGS, THAT THEY HAVE BEEN PUT INTO

5    THE PROTECTIVE SLIP SHEETS AND THAT THEY NOT REMOVE THEM,                   05:18

6    BECAUSE A LOT OF THEM ARE ON TRACING PAPER AND VERY THIN PAPER.

7             THE COURT:  VERY WELL.

8             MS. AGUIAR:  IF SOMEONE SPILLS THEIR LATTE ON LUPE,

9    IT'S NOT GOING TO BE A GOOD SCENE.

10            THE COURT:  I'LL INSTRUCT MR. HOLMES, WHEN HE                       05:1

11   DELIVERS THOSE TO THE JURY, TO SIMPLY INSTRUCT THEM TO NOT

12   REMOVE THEM WITHOUT COURT PERMISSION.  IF THEY NEED TO HAVE

13   THEM REMOVED FOR SOME PURPOSE, THAT WE WILL DO THAT HERE IN THE

14   COURTROOM.

15            MS. AGUIAR:  THANK YOU.  I APPRECIATE THAT.  WE'LL           05:1

16   LEAVE THESE WITH MR. HOLMES.

17            THE COURT:  VERY WELL.

18            ANYTHING FURTHER FROM MGA?

19            MR. NOLAN:  NOTHING FURTHER, YOUR HONOR.

20            THANK YOU.                                                         05:1

21            THE COURT:  COURT IS ADJOURNED.

22            GOOD AFTERNOON.

23            (CONCLUSION OF AFTERNOON SESSION.)

24   / / /

25   / / /

1                          CERTIFICATE

2

3    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
4    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
5    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

6

7

8    THERESA A. LANZA, RPR, CSR              7-14-08
     OFFICIAL COURT REPORTER                    DATE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

THURSDAY, JULY 10, 2008          TRIAL DAY 23, AFTERNOON SESSION