QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  (johnquinn@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:   (213) 443-3000
Facsimile:    (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with<br>Case No. CV 04-09059 and<br>Case No. CV 05-02727 |
| vs. | |
| MATTEL, INC., a Delaware corporation, | Hon. Stephen G. Larson |
| Defendant. | NOTICE OF MOTION AND MOTION OF MATTEL, INC. TO  STRIKE DECLARATION OF PAUL K. MEYER FILED IN SUPPORT OF THE MGA PARTIES' OPPOSITION TO MATTEL'S MOTION FOR PERMANENT INJUNCTION; AND |
| AND CONSOLIDATED ACTIONS | MEMORANDUM OF POINTS AND AUTHORITIES |
| | Date:          November 10, 2008<br>Time:          1:00 p.m.<br>Place:          Courtroom 1 |

2670592_6.DOC

1  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2        PLEASE TAKE NOTICE that on November 10, 2008, at 1:00 p.m., or as

3  soon thereafter as this matter may be heard, in the Courtroom of the Honorable Steven G.

4  Larson, located at 3470 Twelfth Street, Riverside California 92501, plaintiff and

5  counterclaimant Mattel, Inc. ("Mattel") will, and hereby does, move the Court for an

6  order striking the Declaration of Paul K. Meyer (the "Meyer Declaration") filed in

7  support of the MGA Parties' Opposition to Mattel's Motion for Permanent Injunction or,

8  in the alternative, for an order striking paragraphs 6 through 18 of the Meyer

9  Declaration.

10       This Motion is made pursuant to Federal Rules of Evidence 401, 402, 403

11 and 702 on the grounds that the testimony is not "scientific, technical, or other

12 specialized knowledge," is unreliable, lacks foundation and will not assist the Court.

13       This Motion is based on this Notice of Motion and Motion, the

14 accompanying Memorandum of Points and Authorities, the Supplemental Declaration of

15 Scott B. Kidman in Support of Mattel, Inc.'s (1) Motion for Constructive Trust and

16 Finding of Liability and Injunctive Relief Under Cal. Bus. & Prof. Code § 17200; and (2)

17 Motion for Declaratory Judgment of Ownership of Bratz Works ("Supp. Kidman Dec."),

18 the records and files of this Court, and all other matters of which the Court may take

19 judicial notice.

20       This motion is made following the conference of counsel pursuant to L.R. 7-

21 3 which took place on October 15, 2008.

22

23 DATED:  October 20, 2008        QUINN EMANUEL URQUHART OLIVER &
                                    HEDGES, LLP
24

25

26                                 By  /s/  John B. Quinn
                                      John B. Quinn
27                                    Attorneys for Mattel, Inc.

28

2670592_6.DOC

MATTEL'S MOTION TO STRIKE DECLARATION OF PAUL K. MEYER

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND ....................................................................................................................2

ARGUMENT..........................................................................................................................4

I.   EXPERT TESTIMONY MUST BE BASED ON SUFFICIENT FACTS, RELIABLE METHODS AND THE PROPER APPLICATION OF THOSE METHODS TO THE FACTS. ...................................................................4

II.  MR. MEYER'S OPINION CONCERNING A REASONABLE ROYALTY RATE IS INADMISSIBLE. .................................................5

    A.   Mr. Meyer's Opinion Does Not Satisfy Daubert. ....................................5

    B.   Mr. Meyer's Opinion Does Not Consider Any Generally Accepted Standards to Determine a Reasonable Royalty Rate. ..............................6

    C.   Mr. Meyer's Methodology Is Not Reliable. ..............................................9

    D.   Mr. Meyer's Opinion Lacks Foundation. ................................................11

III. MR. MEYER'S CONCLUSORY OPINION CONCERNING MGA'S ABILITY TO PAY IS INADMISSIBLE.........................................................13

CONCLUSION....................................................................................................................14

1

**TABLE OF AUTHORITIES**

2                                                                                          **Page**

3                                             **Cases**

4   In re Air Disaster at Lockerbie Scotland,
       37 F.3d 804 (2nd Cir. 1994) ...................................................................... 12
5

6   Bose Corp. v. JBL, Inc.,
       112 F. Supp. 2d 138 (D.Mass. 2000)....................................................... 6, 8
7

8   Champagne Metals v. Ken-Mac Metals, Inc.,
       458 F.3d 1073 (10th Cir. 2006)................................................................ 9, 10

9   DSU Medical Corp. v. JMS Co.,
       296 F. Supp. 2d 1140 (N.D. Cal. 2003)...................................................... 5
10

11  Daubert v. Merrell Dow Pharmaceuticals, Inc.,
       509 U.S. 579 (1993) .......................................................... 1, 4, 5, 6, 10, 11
12  Daubert v. Merrell Dow Pharmaceuticals, Inc.,
       43 F.3d 1311 (9th Cir. 1995)...................................................................... 4
13

14  Fedorczyk v. Caribbean Cruise Lines, Ltd.,
       82 F.3d 69 (3d Cir. 1996) .......................................................................... 9

15  Georgia-Pacific Corp. v. United States Plywood Corp.,
       318 F. Supp. 1116 (S.D.N.Y. 1970) ................................................. 6, 8, 9, 10
16

17  Guidroz-Brault v. Missouri Pac. R.R. Co.,
       254 F.3d 825 (9th Cir. 2001) ..................................................................... 9

18  Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am., Corp.,
       103 F. Supp. 2d 268 (S.D.N.Y. 2000) ..................................................... 4, 5
19

20  Kumho Tire Co. v. Carmichael,
       526 U.S. 137 (1999) ........................................................................... 4. 5. 9
21

22  McGlinchy v. Shell Chem. Oil,
       845 F.2d 802 (9th Cir. 1988)................................................................. 5, 12

23  McLean v. 988011 Ontario Ltd.,
       224 F.3d 797 (6th Cir. 2000) ..................................................................... 12
24

25  Micro Chemical, Inc. v. Lextron, Inc.,
       317 F.3d 1387 (Fed. Cir. 2003) ................................................................ 8

26  Micro International Limited v. Monolithic Power Systems, Inc.,
       399 F. Supp. 2d 1064 (N.D.Cal. 2005)...................................................... 9
27

28

Ralston-Purina Co. v. Bertie,
    541 F.2d 1363 (9th Cir. 1976) ............................................................................ 5

Riles v. Shell Exploration and Production Co.,
    298 F.3d 1302 (Fed. Cir. 2002) ..................................................................... 6, 8

Sands, Taylor & Wood v. The Quaker Oats Company,
    34 F.3d 1340 (7th Cir. 1994) ............................................................................ 8

TWM Mfg. Co. v. Dura Corp.,
    789 F.2d 895 (Fed. Cir. 1986) .......................................................................... 6

Talley v. Danek Med., Inc.,
    179 F.3d 154 (4th Cir. 1999) ......................................................................... 12

United States v. Sepulveda,
    15 F.3d 1161 (1st Cir. 1993) ......................................................................... 11

Utah Medical Products, Inc. v. Graphic Controls Corp.,
    350 F.3d 1376 (Fed.  Cir. 2003) ................................................................... 11

Vermont Microsystems, Inc. v. Autodesk, Inc.,
    88 F.3d 142 (2d Cir. 1996) .............................................................................. 6

## **Statutes**

Fed. R. Evid. 702 ................................................................................... 4, 9 11

2670592_6.DOC

MATTEL'S MOTION TO STRIKE DECLARATION OF PAUL K. MEYER

1

## **MEMORANDUM OF POINTS AND AUTHORITIES**

2

3

## **Preliminary Statement**

4    MGA has submitted the Declaration of Paul K. Meyer (the "Meyer

5  Declaration") in opposition to Mattel's Motion for Permanent Injunction.  The Meyer

6  Declaration purports to furnish a reasonable royalty rate as part of MGA's argument that

7  the Court should order royalty payments on MGA's infringing products rather than

8  permanently enjoin their sale.  However, the opinion expressed in the Meyer Declaration

9  does not satisfy *any* of the <u>Daubert</u> factors of reliability and it should be excluded as a

10  result.

11    As Mr. Meyer has admitted, he has no experience or expertise in matters

12  relating to the manufacture or sale of fashion dolls.  He thus offers no opinion tied at all

13  to toy industry practices relating to royalties on fashion dolls or even to the royalty rates

14  that MGA has been paid for Bratz.  Instead, Mr. Meyer invents his own unsupportable

15  "methodology" to derive an infinitesimal royalty rate that amounts to a fraction of a

16  single percent and that neither he nor MGA can even state bears any relation to real

17  world transactions.  As his starting point, Mr. Meyer takes the *revenues* he calculated for

18  the entire line of Bratz products -- including products that are not the subject of Mattel's

19  injunction request.  He then divides those total revenues by what he deems to be the

20  *profits* for the products that he speculates the jury found to be infringing.  From these

21  faulty premises, Mr. Meyer then divines a royalty rate for a third set of products, *i.e.* the

22  products that are the subject of Mattel's motion for a permanent injunction.  Mr. Meyer

23  does not cite *any* publication, treatise, study or other source to validate his

24  "methodology."  His opinion also lacks foundation because, among other things, it relies

25  on speculative assumptions of how the jury determined damages for copyright

26  infringement.

27    As the Court is aware, Mr. Meyer already has had several opinions excluded

28  because the Court found that they were indefensible and did not pass muster under

1  Daubert.  At trial, Mr. Meyer disavowed competence in basic accounting principles as

2  they relate to damages.  His opinion here is even less reliable than other opinions

3  previously excluded by the Court.

4              The Meyer Declaration lacks the reliability and foundation required for an

5  expert opinion and, accordingly, it should be stricken.

6

7                              **Background**

8              As the Court knows, Mr. Meyer is a certified public accountant who

9  testified for MGA at trial.  He advanced a number of apportionment approaches,[1]

10 including several that the Court excluded.  As to one of his approaches, the Court

11 commented:  "I understand what he did.  But I have no confidence that there's any

12 scientific basis for what he did. . . . I don't see how this is defensible at all."[2]  On another

13 approach, Mr. Meyer had to concede that, although MGA made profits from Bratz of

14 over $250 million from 2005 through 2007, according to his methodology no portion of

15 those profits was attributable to the intellectual property.[3]  And, as the Court will recall,

16 despite being a CPA, Mr. Meyer claimed to be unable to say whether compensatory

17 damages paid by a corporation would be tax deductible.[4]

18             Mr. Meyer has now advanced a similarly flawed opinion about a royalty

19 rate.  His methodology "is to accept the finding of the jury regarding the *value of the*

20 *copyrights* and convert that value into a running royalty rate to apply to future infringing

21 sales, if any."[5]  But the jury did not make a finding regarding the "value of the

22

23 ――――――――――――
       [1]  Mr. Meyer's apportionment approaches included royalties paid to Mr. Bryant
24 for his contributions to the Bratz doll line, work tasks to develop the original Bratz
       doll and sales variations among Bratz products.
25     [2]  Trial Tr. at 7754:4-19.
       [3]  Trial Tr. at 7779:7-7780:24.
26     [4]  Trial Tr. at 7771:10-7773:4.
27     [5]  Meyer Declaration, ¶ 15 (emphasis added).

28

2670592_6.DOC

                   MATTEL'S MOTION TO STRIKE DECLARATION OF PAUL K. MEYER

1  copyrights."[6] As his declaration shows on its face, Mr. Meyer speculates about what the

2  jury did find.[7]  Mr. Meyer obviously does not know the basis of the verdict, and his

3  various alternatives as to what the jury *may* have found -- which he tellingly calls

4  "possible interpretations" of the verdict -- are pure conjecture.  Importantly, Mr. Meyer's

5  speculation about what the jury did or did not do is a predicate to his opinion.  His lack

6  of knowledge renders his opinion useless.

7          As his declaration reveals, Mr. Meyer calculates his royalty rate "*[b]ased on*

8  *the jury's finding*" about which he speculates.[8]  He compares the purported "value of the

9  copyrights," based on his "possible interpretations" of the verdict, with the revenue from

10  the sale and licensing of the full line of Bratz-related products of $3.1 billion.[9]  In doing

11  so, not only does Mr. Meyer rely on inadmissible and incompetent "possible

12  interpretations" of the verdict, but he compares apples to oranges.  He has divided *profits*

13  by *revenues*.[10]  Moreover, these numbers may relate to different sets of products.  The

14  revenues are for the sale and licensing of all Bratz products, but it cannot be determined

15  whether the jury's verdict represents its calculation of MGA's profits on all of those

16  products or on some subset.  So, Mr. Meyer compares revenues on one defined set of

17  products to profits on an undefined set of products.

18          Even more problematical, Mr. Meyer uses these numbers to establish a

19  purported royalty rate for a distinct third set of products -- the products for which Mattel

20  seeks a permanent injunction.  Mattel does not seek to enjoin the sale and license of all

21  Bratz products (which included products that Mattel did not accuse of infringement but

22  instead sought indirect profits recovery on and on which Mr. Meyer bases the revenue

23

24      [6]   Phase B Verdict Form as Given, Question No. 11.
        [7]   Meyer Declaration, ¶¶ 12 and 13 (emphasis added).
25      [8]   Meyer Declaration, ¶ 16 (emphasis added).
        [9]   Meyer Declaration, ¶ 15.
26
        [10]  Had Mr. Meyer used his own calculation of profits rather than revenues in his
27  analysis, his royalty rate would have been approximately ten times higher.

28

1   numbers in his opinion); rather, it seeks to enjoin the sale and license of those products

2   which contain protectable elements of its copyrighted works.

3         Finally, Mr. Meyer addresses a separate subject, *i.e.* Mattel's argument that

4   it would suffer irreparable harm absent a permanent injunction because MGA does not

5   have the ability to pay the judgment, future damages or royalties.[11]  As shown below, his

6   testimony is immaterial and erroneous as to this issue because he relies on a statement by

7   a Mattel expert based on data through June 30, 2008.  This time period was not only

8   before the Phase 1(a) verdict that MGA claimed changed its financial condition, but

9   there is no evidence that pre-June 30 financial information has any relevance to MGA's

10   current financial condition.  In fact, in August 2008, MGA represented to the Ninth

11   Circuit and the Court that it was in dire financial straits and "may not be able to

12   survive."[12]  At trial MGA and Meyer urged the jury to reject the valuation of Mattel's

13   expert.  Surprisingly, Mr. Meyer, a purported valuation expert, does not do any analysis

14   or valuation of his own to show MGA's financial condition even though he surely has

15   access to such information from his client, MGA.

16

17   **Argument**

18   **I.**   **EXPERT TESTIMONY MUST BE BASED ON SUFFICIENT FACTS,**

19        **RELIABLE METHODS AND THE PROPER APPLICATION OF**

20        **THOSE METHODS TO THE FACTS.**

21        Federal Rule of Evidence 702 provides that an expert witness with

22   "scientific, technical, or other specialized knowledge" may testify in the form of an

23   opinion "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is

24   the product of reliable principles and methods, and (3) the witness has applied the

25   principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.  See also

26

27   [11]  Meyer Declaration, ¶ 18.
    [12]  Hutnyan Dec., Ex. 84 at ¶¶ 3 and 4.

28

2670592_6.DOC

4

MATTEL'S MOTION TO STRIKE DECLARATION OF PAUL K. MEYER

1   Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589-92 (1993) ( Rule 702

2   "establishes a standard of evidentiary reliability . . . as a precondition to admissibility");

3   Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149 (1999).   "[T]he trial judge must

4   ensure that any and all scientific testimony or evidence admitted is not only relevant, but

5   reliable."  Daubert, 509 U.S. at 589.

6           The burden of demonstrating that expert testimony is reliable rests with the

7   party offering the testimony.  Johnson Elec. N. Am., Inc. v. Mabuchi Motor Am. Corp.,

8   103 F. Supp. 2d 268, 279 (S.D.N.Y. 2000).  Assessment of the reliability of an expert's

9   opinion involves an examination of both the factual bases and assumptions underlying

10  the opinion, and the soundness of the expert's methodology.  See Johnson, 103 F. Supp.

11  2d at 284.  Accordingly, the Court must make a "preliminary assessment of whether the

12  reasoning or methodology underlying the testimony is scientifically valid and of whether

13  that reasoning or methodology properly can be applied to the facts in issue."  Daubert,

14  509 U.S. at 592-593.

15          Courts in the Ninth Circuit do not hesitate to exclude unreliable expert

16  testimony.  See, e.g., McGlinchy v. Shell Chem. Oil, 845 F.2d 802, 807 (9th Cir. 1988);

17  and Ralston-Purina Co. v. Bertie, 541 F.2d 1363, 1367 (9th Cir. 1976).  In particular,

18  where the proffered methodology is not grounded in established legal principles or is

19  divorced from economic realities, the Court is well within its discretion to exclude the

20  expert testimony.  See DSU Medical Corp. v. JMS Co., 296 F. Supp. 2d 1140, 1147

21  (N.D. Cal. 2003) (trial court should exclude opinion evidence based on "the *ipse dixit* of

22  the expert").

23

24  **II.   MR. MEYER'S OPINION CONCERNING A REASONABLE**

25        **ROYALTY RATE IS INADMISSIBLE.**

26        **A.   Mr. Meyer's Opinion Does Not Satisfy Daubert.**

27          In Daubert, the Supreme Court set out five factors relevant to determining

28  the reliability of expert opinion testimony:  (i) whether the technique can be, or has been,

2670592_6.DOC

1  tested; (ii) whether it has been subjected to peer review and publication; (iii) whether

2  there is a known or potential error rate; (iv) whether there are standards controlling the

3  technique's operation; and (v) whether there is "general acceptance" of the technique.

4  509 U.S. at 593-594.[13]

5          On remand from the Supreme Court, the Ninth Circuit in <u>Daubert v. Merrell</u>

6  <u>Dow Pharmaceuticals, Inc.</u>, 43 F.3d 1311 (9th Cir. 1995), identified other factors to

7  determine the reliability of expert opinion testimony, including whether the testimony

8  grew out of research conducted independent of the litigation and whether there is some

9  "objective source" such as a treatise, policy statement or published article supporting the

10  method.  43 F.3d at 1317-1319.  The Ninth Circuit found that the plaintiffs had made no

11  such showings and, therefore, the expert testimony was inadmissible.  43 F.3d at 1319.

12          Mr. Meyer's opinion testimony fails all these tests.  MGA presents no

13  evidence that (i) the technique can be, or has been, tested; (ii) it has been subjected to

14  peer review or publication; (iii) there is a known or potential error rate; (iv) there are

15  standards controlling its operation; or (v) there is "general acceptance" or any acceptance

16  of the technique.  MGA also has fails to show that Mr. Meyer's testimony arose out of

17  independent research or is supported by anything other than his *ipse dixit*.

18          Mr. Meyer's declaration does not satisfy, or even purport to satisfy, *any* of

19  the factors used to establish reliability of expert testimony.

20      **B.**    **<u>Mr. Meyer's Opinion Does Not Consider Any Generally Accepted</u>**

21          **<u>Standards to Determine a Reasonable Royalty Rate.</u>**

22          Although there are well-known and generally accepted methods to

23  determine reasonable royalty rates, Mr. Meyer does not purport to use any of them.

24  When there is no established royalty rate, a court "must retroactively construct a

25  hypothetical 'arms-length' negotiation between a willing licensor and a willing licensee

26  _____

27      [13]  <u>Daubert</u> is not limited to "scientific" testimony.  <u>Kumho</u>, 526 U.S. at 147-148.

28

1   to determine the royalty rate upon which the parties would have agreed." Bose Corp. v.

2   JBL, Inc., 112 F. Supp. 2d 138, 165 (D.Mass. 2000), citing TWM Mfg. Co. v. Dura

3   Corp., 789 F.2d 895, 898-899 (Fed. Cir. 1986). See also Riles v. Shell Exploration and

4   Production Co., 298 F.3d 1302, 1311 (Fed. Cir. 2002) ("'reasonable royalty' contemplates

5   a hypothetical negotiation"); Vermont Microsystems, Inc. v. Autodesk, Inc., 88 F.3d 142,

6   151 (2d Cir. 1996).

7          One well-established methodology to calculate a reasonable royalty is set

8   forth, for example, in Georgia-Pacific Corp. v. United States Plywood Corp., 318 F.

9   Supp. 1116 (S.D.N.Y. 1970), modified and aff'd, 446 F.2d 295 (2d Cir. 1971), where the

10  court set out fifteen factors to analyze as part of this hypothetical negotiation:

11          "1.     The royalties received . . . proving or tending to prove

12                  an established royalty.

13          "2.     The rates paid by the licensee for the use of other

14                  patents comparable to the patent in suit.

15          "3.     The nature and scope of the license, as exclusive or non-

16                  exclusive, or as restricted or non-restricted . . . .

17          "4.     The licensor's established policy and marketing program

18                  to maintain his patent monopoly by not licensing others . . . or

19                  by granting licenses under special conditions . . . .

20          "5.     The commercial relationship between the licensor and

21                  licensee, such as, whether they are competitors in the same

22                  territory in the same line of business . . . .

23          "6.     The effect of selling the patented specialty in promoting

24                  sales of other products of the licensee . . . .

25          "7.     The duration of the patent and the term of the license.

26          "8.     The established profitability of the product . . . ; its

27                  commercial success; and its current popularity.

28

2670592_6.DOC

MATTEL'S MOTION TO STRIKE DECLARATION OF PAUL K. MEYER

1     "9.    The utility and advantages of the patent property over

2            the old modes or devices . . . .

3     "10.   The nature of the patented invention; the character of the

4            commercial embodiment of it as owned and produced by the

5            licensor; and the benefits to those who have used the invention.

6     "11.   The extent to which the infringer has made use of the

7            invention; and any evidence probative of the value of that use.

8     "12.   The portion of the profit or of the selling price that may

9            be customary in the particular business or in comparable

10           businesses . . . .

11    "13.   The portion of the realizable profit that should be

12           credited to the invention as distinguished from non-patented

13           elements, the manufacturing process, business risks, or

14           significant features or improvements added by the infringer.

15    "14.   The opinion testimony of qualified experts.

16    "15.   The amount that a licensor (such as the patentee) and a

17           licensee (such as the infringer) would have agreed upon (at the

18           time the infringement began) if both had been reasonably and

19           voluntarily trying to reach an agreement . . . ."

20

21           Some courts have commented that the Georgia-Pacific factors are the

22    "standard approach to determining a royalty rate." Bose, 112 F. Supp. 2d at 165. See

23    also Micro Chemical, Inc. v. Lextron, Inc., 317 F.3d 1387, 1393 (Fed. Cir. 2003) (expert

24    properly applied the "accepted Georgia-Pacific methodology"); Sands, Taylor & Wood

25    v. The Quaker Oats Company, 34 F.3d 1340, 1352 (7th Cir. 1994). In Riles v. Shell

26    Exploration and Production Co., supra, 298 F.3d at 1313, the Federal Circuit held that

27    expert testimony as to a reasonable royalty rate was inadmissible because it "did not

28    reflect what royalty rate a hypothetical negotiation between Shell and Riles would have

MATTEL'S MOTION TO STRIKE DECLARATION OF PAUL K. MEYER

1    yielded . . . .  Riles did not provide any evidence or testimony to show that [the expert's]

2    models reflected what the parties might have agreed to . . . ."

3            Here, Mr. Meyer did not consider a hypothetical negotiation between Mattel

4    and MGA and did not discuss any standard, recognized methodology such as the

5    Georgia-Pacific factors.  Instead, he devised his own methodology which is unsupported

6    by any testing, peer review, independent research or other type of objective source.  Mr.

7    Meyer did so even though he is unquestionably aware of the standards commonly used to

8    determine a reasonable royalty rate, *i.e.*, the hypothetical negotiation and the Georgia-

9    Pacific factors, because he performed an analysis based on those standards in 02 Micro

10   International Limited v. Monolithic Power Systems, Inc., 399 F.Supp.2d 1064, 1078

11   (N.D.Cal. 2005), for example.  Because it is not based on any recognized methodology,

12   Mr. Meyer's opinion fails to meet Daubert's requirements.

13           **C.     Mr. Meyer's Methodology Is Not Reliable.**

14           A trial judge must ensure that an expert's testimony "is the product of

15   reliable principles and methods."  Fed. R. Evid. 702; Kumho, 526 U.S. at 152.  See also

16   Guidroz-Brault v. Missouri Pac. R.R. Co., 254 F.3d 825, 831 (9th Cir. 2001).

17   Accordingly, the Court should "assess the reasoning and methodology underlying the

18   expert's opinion, and determine whether it is both scientifically valid and applicable to a

19   particular set of facts."  Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073,

20   1079 (10th Cir. 2006).  See also Fedorczyk v. Caribbean Cruise Lines, Ltd., 82 F.3d 69,

21   75 (3d Cir. 1996).  Mr. Meyer's methodology is neither scientifically valid nor applicable

22   to the facts of this case.

23           Mr. Meyer says that his determination of the royalty rate is based on the

24   jury's finding of "the value of the copyrights."[14]  However, the jury determined damages

25   for infringement of Mattel's copyrights (*i.e.*, MGA's profits), not the "value of the

26

27    _____
         [14]   Meyer Declaration, ¶¶ 15 and 16.

28

1   copyrights."[15]  Nevertheless, based on his "possible interpretations" of the verdict, Mr.

2   Meyer adopts the profit figures of $6 million and $10 million from the jury verdict form

3   (respectively the amounts of damages for copyright infringement awarded against MGA

4   alone and against the three MGA defendants collectively) as the jury's purported finding

5   of the ostensible "value of the copyrights."[16]

6          Not only does Mr. Meyer groundlessly conflate infringement damages with

7   the value of the copyrights, Mr. Meyer proceeds to calculate a royalty rate by dividing

8   those "values of the copyrights" by the revenues of $3.1 billion from the past sale and

9   licensing of *all* Bratz-related products.  However, Mr. Meyer admittedly speculates about

10  which products the jury found to be infringing:  "[T]he jury *may* have found that the

11  number of infringing products was quite small."[17]  Likewise, he does not know how the

12  jury calculated profits or what apportionment analysis it used.  His methodology is based

13  on conjecture.

14         Mr. Meyer also fails to consider the scope of the products that are the

15  subject of Mattel's motion for permanent injunction.  At trial, Mattel sought damages for

16  copyright infringement as well as for indirect profits resulting from the infringement.

17  The $3.1 billion figure Mr. Meyer uses in his calculation represents the revenues from all

18  Bratz related products -- including products that Mattel did not accuse of direct copyright

19  infringement.  In contrast, Mattel's motion for permanent injunction concerns only

20  products that contain protectable elements of its copyrighted works.  Because Mr.

21  Meyer's calculation of the royalty rate is based on products whose sale or license Mattel

22  does not seek to enjoin, his calculation is not only speculative, but it fails to fit the facts

23  of this case as <u>Daubert</u> requires.  Mr. Meyer does not explain why it is appropriate or

24  defensible to use different measures from two possibly different sets of products to

25  ────────────────

26  [15]   See Court's Phase B Jury Instructions as Given, Jury Instruction No. 41 and
    Phase B. Verdict Form as Given, Question No. 11.

27  [16]   Meyer Declaration, ¶ 15.

28

MATTEL'S MOTION TO STRIKE DECLARATION OF PAUL K. MEYER

1 determine a royalty rate for yet a third set of products.  Nor does he cite any source to

2 validate this methodology.  See Champagne Metals, supra, 458 F.3d at 1079-1080

3 (expert testimony properly excluded where the allegedly anti-competitive conduct

4 occurred in one market while the expert testimony was based on a different market).

5        Thus, Mr. Meyer's methodology fails to meet any of the Daubert tests, fails

6 to use any accepted royalty calculation methodology such as the Georgia-Pacific factors,

7 and fails to meet any other standard of scientific validity.

8        **D.**     **Mr. Meyer's Opinion Lacks Foundation.**

9        The Court not only must determine that an expert's methodology is

10 scientifically valid, but also must ensure that the expert has sufficient foundation to

11 render an opinion.  Daubert, 509 U.S. at 592-593.  Courts should strike "opinions

12 advanced by an expert [that] rest on a wholly inadequate foundation." United States v.

13 Sepulveda, 15 F.3d 1161, 1183 (1st Cir. 1993).  Mr. Meyer asserts three bases for his

14 opinion, none of which establishes sufficient foundation.

15        First, Mr. Meyer states in conclusory fashion that he has worked on a

16 number of royalty claims, including claims involving intellectual property.[18] He fails to

17 disclose any information about the nature of the claims, what analysis or work he

18 performed, the results of his work or anything else about this experience.  An expert

19 witness who primarily relies on his or her experience must explain "how that experience

20 leads to the conclusion reached, why that experience is a sufficient basis for the opinion,

21 and how that experience is reliably applied to the facts." Jones, Rosen, Wegner & Jones,

22 Federal Civil Trials & Evidence (TRG 2007), ¶ 8:1522; see also Fed. R. Evid. 702, Adv.

23 Comm. Note (2000).  In fact, what is  known is that, as Mr. Meyer has conceded, he has

24 never previously performed an analysis involving the manufacture or sale of fashion

25

26

27 [17] Meyer Declaration, ¶ 12 (emphasis added).
[18] Meyer Declaration, ¶ 5.

28

2670592_6.DOC

1    dolls.[19]  Consequently, there is no basis to conclude that his previous experience bears on

2    the issues here.

3              Mr. Meyer also claims that he reviewed licensing information produced by

4    Mattel and MGA and had discussions with MGA licensing personnel.[20]  However, he

5    does not say what licensing information he reviewed, what products were involved, with

6    whom at MGA he had such discussions, how any of that information relates to the

7    royalty rate he derives or that any of the information he received involved products that

8    are comparable to the products that are the subject of Mattel's motion for permanent

9    injunction.  Accordingly, this cannot be sufficient foundation for his opinion.   See Utah

10   Medical Products, Inc. v. Graphic Controls Corp., 350 F.3d 1376, 1385 (Fed. Cir. 2003)

11   (upholding district court's exclusion of expert testimony concerning a royalty rate where

12   the expert did not show that license agreements relied upon were "comparable").

13   Equally troubling, a logical reading of his declaration suggests that his proffered opinion

14   is inconsistent with whatever actual royalty information he received because that

15   information does not figure in the methodology which he claims to have utilized.

16             Finally, although his opinion is admittedly "[b]ased on the jury's finding,"[21]

17   Mr. Meyer relies on his conjecture as to what the jury found:  "The relatively small size

18   of the copyright infringement award *may* indicate certain findings by the jury.  For

19   example, the jury *may* have found that the number of infringing products was quite

20   small. . . .   Alternatively, the jury *may* have concluded that the contribution of the

21   copyrights to MGA's Bratz profits associated with the infringing sales was quite low

22   . . . ."[22]  Mr. Meyer has to speculate both as to how the jury computed profits and the

23   scope of the products it found to be infringing.  Expert opinions are excluded if based on

24   speculative assumptions.  McGlinchy, 845 F.2d at 807; In re Air Disaster at Lockerbie

---

25   [19]   Meyer Tr. at 13:3-6, 14:14-22, Supp. Kidman Dec., Ex. Q.
26   [20]   Meyer Declaration, ¶ 14.
27   [21]   Meyer Declaration, ¶ 16.

28

1    Scotland, 37 F.3d 804, 824 (2nd Cir. 1994); McLean v. 988011 Ontario Ltd., 224 F.3d

2    797, 800-801 (6th Cir. 2000); Talley v. Danek Med., Inc., 179 F.3d 154, 162 (4th Cir.

3    1999).

4             Therefore, there is insufficient foundation for Mr. Meyer's opinion, and it

5    should be excluded for this reason as well.

6

7    **III.    MR. MEYER'S CONCLUSORY OPINION CONCERNING MGA'S**

8    **ABILITY TO PAY IS INADMISSIBLE.**

9             Mr. Meyer attempts to rebut Mattel's showing that it would suffer

10   irreparable harm absent a permanent injunction because MGA does not have the ability

11   to pay the judgment, future damages or royalties.  He declares that Mattel's expert, Mr.

12   Wagner, concluded that the *present value* of MGA's *projected future income* from Bratz

13   is $283.7 million based on data through June 30, 2008.  Mr. Meyer then opines that such

14   an amount should be sufficient to satisfy any past or future damage award.[23]

15            Mr. Meyer's opinion on this score fails under Daubert to establish MGA's

16   ability to pay.  Not only did Mr. Meyer and MGA criticize and urge the jury at trial to

17   ignore Mr. Wagner's testimony, but Mr. Wagner opined on future cash flows.  A possible

18   future income stream does not mean that MGA has the cash to pay a current judgment.

19   Equally importantly, the $283.7 million figure Mr. Wagner calculated was based on data

20   as of June 30, 2008.  This was before the Phase 1(a) verdict.  After the Phase 1(a) verdict

21   against MGA and Larian, both repeatedly claimed to the Court and the jury that the

22   verdict caused MGA catastrophic losses.  Indeed, in August 2008, MGA represented to

23   the Ninth Circuit and the Court that it was in dire financial straits.[24]  Mr. Larian declared

24   that MGA was "hemorrhag[ing] cash," had lost the use of existing lines of credit and had

25

26       [22]   Meyer Declaration, ¶¶ 12 and 13 (emphasis added).

27       [23]   Meyer Declaration, ¶ 18.
         [24]   Hutnyan Declaration, Ex. 84 at ¶ 5.

28

1  been unable to secure new lines of credit.  He swore that MGA "may not be able to

2  survive."[25]

3         Finally, if anything, Mr. Meyer's declaration tends to refute his own

4  conclusion and to confirm that MGA still remains in significant financial trouble and

5  cannot pay the judgment, let alone make future payments. Mr. Meyer, a purported

6  valuation expert for MGA who has interviewed MGA personnel, plainly has access to

7  MGA's actual financial information.  Indeed, MGA has now fronted him as its witness to

8  establish the supposed soundness of MGA.  Yet, Mr. Meyer does not offer any valuation

9  or analysis of his own, let alone a current one.  From this failure, the Court can

10 reasonably draw an adverse inference against MGA as to its financial condition.  See

11 Singh v. Gonzales, 491 F.3d 1019, 1024 (9th Cir. 2007)  (holding that "'[w]hen a party

12 has relevant evidence in his control which he fails to produce, that failure gives rise to an

13 inference that the evidence is unfavorable to him,'" quoting Int'l Union, United

14 Automobile, Aerospace and Agric. Implement Workers v. N.L.R.B., 459 F.2d 1329,

15 1336 (1972)).

16        Mr. Meyer's opinion as to MGA's current financial status and ability to pay

17 is not reliable and should be excluded.

18

19                              **Conclusion**

20        For the foregoing reasons, Mattel respectfully requests that the Court strike

21 the Meyer Declaration or, in the alternative, strike paragraphs 6 through 18 thereof.

22 DATED:  October 20, 2008          QUINN EMANUEL URQUHART OLIVER &
                                     HEDGES, LLP
23

24

25                                   By  /s/ John B. Quinn
                                         John B. Quinn
26                                       Attorneys for Mattel, Inc.

27 _____
        [25]  Hutnyan Declaration, Ex. 84 at ¶¶ 3 and 4.
28

2670592_6.DOC

                                     14
                MATTEL'S MOTION TO STRIKE DECLARATION OF PAUL K. MEYER