RECEIVED

MAR 0 8 2005

____ Priority
✓ Send
____ Clsd
____ Enter
____ JS-5/JS-6
____ JS-2/JS-3

FILED
CLERK, U.S. DISTRICT COURT

MAR – 4 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTEL, INC., a Delaware corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>CARTER BRYANT, an individual; and DOES 1 through 10, inclusive,<br><br>        Defendant.<br><br>AND RELATED COUNTERCLAIMS | CASE NO. CV 04-9059 NM (RNBx)<br><br><br>ORDER DENYING PLAINTIFF MATTEL, INC.'S MOTION TO REMAND AND CERTIFYING QUESTION FOR INTERLOCUTORY REVIEW |

DOCKETED ON CM

MAR 4 2005

BY _____ 006

## I. INTRODUCTION

On April 27, 2004, Mattel, Inc. ("Mattel"), the world's largest manufacturer and marketer of toys, dolls, games, and stuffed toys and animals, filed the instant Complaint against its former employee, Carter Bryant ("Bryant"), in the Superior Court for the County of Los Angeles. The Complaint fails to state the amount in controversy and asserts generically-phrased causes of action for: (1) breach of contract; (2) breach of fiduciary duty; (3) breach of duty of loyalty; (4) unjust enrichment; and (5) conversion. On May 14, 2004, Bryant filed a Notice of Removal. On August 20, 2004, the court granted Mattel's motion to remand,

EXHIBIT _I_

PAGE _63_

1   finding that Bryant had failed to demonstrate the presence of either federal

2   question jurisdiction or diversity jurisdiction.  On November 2, 2004, Bryant filed

3   a second Notice of Removal.  On December 7, 2004, MGA Entertainment

4   ("MGA"), pursuant to stipulation and order, intervened as a defendant.  Pending

5   before the court is Mattel's Motion to Remand.

6

7   ## II. FACTUAL & PROCEDURAL BACKGROUND

8   *A. Allegations in Mattel's Complaint*

9   Mattel employed Bryant as a product designer from September 1995

10   through April 1998, and from January 1999 through October 2000.  Compl. ¶ 9.

11   Upon starting his second term, Bryant signed an Employee Confidential

12   Information and Inventions Agreement, in which he agreed not to "engage in any

13   employment or business other than for [Mattel], or invest or assist (in any manner)

14   any business competitive with the business or future business plans of [Mattel]."

15   Id. ¶ 10.  Bryant assigned to Mattel all rights, title, and interest in the "inventions"

16   he conceived of, or reduced to practice, during his employment.  Id.

17   Bryant also completed Mattel's Conflict of Interest Questionnaire.  Id. ¶ 11.

18   Bryant certified that he had not worked for any of Mattel's competitors in the prior

19   twelve months and had not engaged in any business dealings creating a conflict of

20   interest.  Id.  Bryant agreed to notify Mattel of any future events raising a conflict

21   of interest.  Id.

22   The Complaint asserts that, "[i]n late November 2003, Mattel learned that

23   Bryant had secretly aided, assisted and worked for a Mattel competitor . . . by

24   entering into an agreement with the competitor, during the time [he] was employed

25   by Mattel . . . ."  Id. ¶ 12.  "Bryant's agreement with the competitor obligated

26   Bryant to provide product design services to the competitor on a 'top priority'

27   basis."  Id.  Furthermore, it "provided . . . that Bryant would receive royalties and

28

2

EXHIBIT ___*I*___

PAGE ___64___

1  other consideration for sales of products on which [he] provided aid or assistance;

2  that all work and services furnished by Bryant to the competitor under the

3  agreement would be considered 'works for hire'; and that all intellectual property

4  rights to preexisting work by Bryant purportedly would be assigned to the

5  competitor." Id. The Complaint also alleges that "Bryant converted,

6  misappropriated and misused Mattel property and resources for the benefit of, and

7  to aid and assist, Bryant personally and Mattel's competitor." Id.

8       In support of its first motion to remand, Mattel provided a copy of this

9  agreement between Bryant and MGA. See Zeller Decl., Ex. 9 (MGA Agreement).

10  Pursuant to the agreement, signed September 18, 2000, Bryant agreed to provide

11  product design services for MGA's line of "Bratz" dolls (the "Bratz"). Id.[1] In

12  return, MGA agreed to pay Bryant $5,500 per month for the first six months and

13  $5,000 per month for the next three months. Id. MGA also agreed to pay Bryant a

14  3% royalty on the Bratz he worked on. Id.

15                              *B. The First Notice of Removal*

16       On May 14, 2004, pursuant to 28 U.S.C. § 1441, Bryant filed his first notice

17  of removal.[2] Bryant argued that this court had subject matter jurisdiction under

18  both 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1332

19

20  _____

21       [1] Bryant's last day of employment at Mattel was October 20, 2000.

22       [2] 28 U.S.C. § 1441 provides in part:

23

24       (a) Except as otherwise expressly provided by Act of Congress, any civil
         action brought in a State court of which the district courts of the United
25       States have original jurisdiction, may be removed by the defendant or the
         defendants, to the district court of the United States for the district and
26       division embracing the place where such action is pending. For purposes of
27       removal under this chapter, the citizenship of defendants sued under
         fictitious names shall be disregarded.
28

EXHIBIT *I*

PAGE *65*

1  (diversity jurisdiction).[3]  First, Bryant asserted that the court had jurisdiction under

2  § 1331 because Mattel's claims likely implicated the rights to the Bratz and,

3  therefore, would "require construction of federal intellectual property laws . . . ."

4  Opp. to First Mot. to Remand at 11.  Second, Bryant contended that the court had

5  jurisdiction under § 1332 because he was of diverse citizenship from Mattel and

6  the rights to the Bratz, worth "millions," were in controversy.  Id. at 1-2, 5-6.

7       On June 14, 2004, Mattel filed a motion to remand, arguing it did not know

8  whether the Bratz were in controversy because it did not know whether Bryant

9  developed the Bratz while still employed by Mattel.  See, e.g., July 12, 2004 Rep.

10 at 4 (disclaiming knowledge of "whether rights to Bratz are indeed at stake here").

11                           C.  August 20, 2004 Order

12      On August 20, 2004, the court granted Mattel's motion to remand, finding

13 that Bryant had failed to demonstrate the presence of subject matter jurisdiction.

14 First, the court found that Bryant had failed to demonstrate federal question

15 jurisdiction because the face of the Complaint asserted only state law claims.  See

16 Aug. 20, 2004 Order at 8.  Second, the court found that Bryant had failed to

17 demonstrate diversity jurisdiction because he had not shown that the rights to the

18 Bratz were in controversy.  See id. at 6.

19

20 ─────────────

21      [3]  28 U.S.C. § 1331 provides:

22      The district courts shall have original jurisdiction of all civil actions arising

23      under the Constitution, laws, or treaties of the United States.

24      28 U.S.C. § 1332 provides:

25

26      (a) The district courts shall have original jurisdiction of all civil actions

27      where the matter in controversy exceeds the sum or value of $75,000,
        exclusive of interest and costs, and is between . . . citizens of different

28      States . . . .

4

EXHIBIT _____ I _____

PAGE _____ 66 _____

*D. Events Occurring Between the First and Second Notices of Removal*

On August 12, 2004, Mattel produced to Bryant a July 18, 2003 Wall Street Journal article that suggested Bryant had copied a scrapped Mattel project, known as "Toon Teens," in creating the Bratz.  Not. of.Removal ¶ 21.[4]

---

[4] This article provided:

The history of the Bratz is intertwined with Mattel.  MGA says the Bratz were designed by Carter Bryant, a former member of [Mattel's] Barbie team.  Inside Mattel, some are convinced the Bratz borrow liberally from a Mattel project that was scrapped at the testing stage in 1998.  Mattel declined to comment.

Mr. Bryant didn't work on the line that Mattel scrapped, according to former and current Mattel designers.  But most Barbie designers had seen the prototypes, his former colleagues say.  Mr. Bryant, through MGA, declined to be interviewed.

The Mattel doll line that was scrapped wasn't exactly like the Bratz, says a longtime Mattel designer who worked on the project.  But the Bratz's oversized heads – with their pursed lips and cartoonish eyes – are "virtually identical" to the heads of the dolls her team created, says the designer, who left Mattel in 2001.

Lily Martinez, a designer who still works at Mattel, came up with the idea for the big doll heads for Mattel, colleagues say.  Mattel declined to comment.  She even posted her sketch on her cubicle, colleagues say.  "Anyone who passed by her cubicle would see the picture up on the wall," says another designer who also left Mattel in 2001.  "The big heads, the big eyes, the big feet – they were all the same" as the Bratz.  Ms. Martinez declined to comment . . . .

This year, closely held MGA expects revenue of about $800 million – with 65% of that coming from the Bratz . . . .

Zeller Decl., Ex. 35 (Maureen Tkacik, <u>Dolled Up: To Lure Older Girls, Mattel Brings in</u>

(continued . . .)

5

EXHIBIT _____*I*_____

PAGE _____*67*_____

On August 16, 2004, upon Bryant's specific request, Mattel produced to Bryant drawings of the Toon Teens. Jacoby Decl. ¶ 5. Mattel also produced the copyright registration for the Toon Teens drawings filed November 28, 2003, four years after the drawings were allegedly created. Not. of Removal ¶ 21; Zeller Decl. ¶ 27.[5] Mattel had failed to produce these documents in response to Bryant's June 14, 2004 comprehensive Request for Production. Jacoby Decl. ¶ 5; Zeller Decl., Ex. 36; Second Zeller Decl., Ex. 6.[6] When Mattel eventually produced the Toon Teens documents in August, it maintained: "Mattel does not believe the Toon Teens drawings and documents . . . are responsive to defendant's propounded document requests." Zeller Decl., Ex. 36.

---

Hip-Hop Crowd; It Sees Stalwart Barbie Lose Market Share, So 'Flavas' Will Take on the 'Bratz', Wall St. J., July 18, 2003, at A1).

[5] Copyright registration is a prerequisite for bringing a copyright infringement action. 17 U.S.C. § 411(a).

[6] Bryant requested all documents: (1) "that support [the] contention . . . that Bryant . . . converted, used, sold, assigned or transferred any Mattel work product . . . created by any Mattel employee other than Bryant"; (2) "that support [the] contention . . . that any product sold at any time by [MGA] under the trade name 'Bratz' originated from, is derived from, is based on, copies, incorporates, or is substantially or confusingly similar to any design or work product owned at any time by Mattel . . . or created by any Mattel employee"; (3) "that [Mattel] contend[s] . . . [were] created by any employee of Mattel . . . and improperly used by Bryant for his own gain, or the gain of any third party"; (4) that evidence, relate, or refer to the contention that "Bryant misappropriated any property"; (5) that "evidence, relate or refer to any damages [Mattel] contend[s] to have suffered as the result of any act or omission of Bryant"; (6) that "evidence, relate or refer to the items or rights that [Mattel] contend[s] Bryant converted, improperly used, sold, assigned or otherwise transferred"; (7) that "evidence, relate or refer to the creation of 'Bratz' dolls"; and (8) that "evidence, relate or refer to any art work or other work product done at Mattel that [Mattel] contend[s] Bryant utilized in connection with his creation of anything for MGA, including but not limited to . . . 'Bratz.'" Second Zeller Decl., Ex. 6 (Request for Production of Documents).

EXHIBIT ___*I*___

PAGE ___*68*___

1      On September 8, 2004, Bryant filed a cross-complaint against Mattel

2  asserting claims for unfair competition, rescission, declaratory relief, and fraud.

3  See Cross-Compl.  On September 9 and 10, 2004, Bryant filed papers in state

4  court arguing that Mattel's action was implicitly premised upon the allegation that

5  Bryant copied the Toon Teens in developing the Bratz.  Zeller Decl., Exs. 8

6  (Bryant's Mot. for Protective Order) & 45 (Bryant's Case Management

7  Statement).

8      On October 8, 2004, Mattel again produced to Bryant the above-mentioned

9  Toon Teens documents, this time in response to Bryant's discovery request

10  seeking "[a]ll documents . . . that evidence, relate or refer to Toon Teen's [sic]

11  similarity to any toy sold under the trademark or trade name 'Bratz.'"  Jacoby

12  Decl. ¶ 8; Second Zeller Decl., Ex. 7.

13      On October 11, 2004, Mattel produced to Bryant evidence of a document-

14  exchange agreement it has with a company being sued by MGA for infringing the

15  copyrights to the Bratz.  Jacoby Decl. ¶ 9 & Ex. 7.  The company had requested

16  that Mattel send it documents relating to the Toon Teens "so that [it] [could]

17  challenge the originality of MGA's design [in the Bratz] and [MGA's]

18  corresponding claim to copyright."  Jacoby Decl., Ex. 7.

19      On October 13, 2004, Mattel produced to Bryant an anonymous letter

20  received by Mattel's CEO in August 2002, alleging that Bryant had stolen the idea

21  for the Bratz from Mattel.  Jacoby Decl. ¶ 10 & Ex. 8.  Mattel also produced

22  documents indicating that this letter triggered an investigation in 2002 into

23  Bryant's conduct.  Id.

24      Mattel has aggressively pursued discovery relating to the Bratz.  See Not. of

25  Removal ¶ 21.  In late October 2004, "Mattel[] . . . informed . . . Bryant it would

26  no longer honor a previously agreed upon discovery limitation[] that Mattel would

27

28

EXHIBIT     _I_

PAGE     _69_

1   seek only documents related to the 'first generation of Bratz designs.'" Not. of

2   Removal ¶ 21; Jacoby Decl. ¶ 13 & Exs. 9, 13, 14.

### E.  Second Notice of Removal

4         On November 2, 2004, Bryant filed a second Notice of Removal based upon

5   both § 1331 (federal question) and § 1332 (diversity) jurisdiction.[7]  Bryant asserts

6   that the Complaint presents a federal question because events occurring since the

7   first removal and remand demonstrate that Mattel's conversion claim involves the

8   rights to the Bratz and is completely preempted by the Copyright Act.  Not. of

9   Removal ¶¶ 10, 29, 34.  Bryant also contends that there is diversity jurisdiction

10  because he and Mattel are of diverse citizenship and the same facts demonstrate

11  that the amount in controversy exceeds $75,000.  See id. ¶¶ 9-24.

### F.  Events Occurring After Bryant Filed the Second Notice of Removal

13        On November 2, 2004, Bryant filed a Complaint in federal court seeking a

14  declaratory judgment that the Bratz do not violate Mattel's copyrights.

15        From November 4 through November 8, 2004, Mattel's lead counsel took

16  Bryant's deposition and questioned Bryant regarding not only the "substantial

17  similarity" between the Toon Teens and the Bratz, but also the amount of royalties

18  Bryant had received from the Bratz.  Jacoby Decl., Ex. 1 (Bryant Depo.) at 254-58,

19  564-67, 703.  When pressed for the relevance of the latter line of questioning,

20

21

---

22       [7] An hour before filing his second Notice of Removal, Bryant faxed Mattel an
23  offer to settle the case for an amount hundreds of thousands of dollars over the
    jurisdictional minimum. Not. of Removal ¶ 25; Zeller Decl. ¶ 35 & Ex. 51. The timing
24  of Bryant's offer, although suspicious, does not detract from the fact that Mattel has not
25  pursued the offer, which, by its own terms, remained open for seven days. Not. of
    Removal ¶ 25; Zeller Decl. ¶ 35 & Ex. 51. Furthermore, despite Mattel's arguments to
26  the contrary, the scope of the offer's releases do not render it meaningless, especially in
27  light of the fact that Mattel does not argue that the offer would have been acceptable if
    more narrowly tailored.
28

EXHIBIT _____ *I*

PAGE _____ *70*

1  Mattel's counsel stated: "Damages." Id. at 703.  Bryant testified that he had

2  received approximately $10 million in Bratz-related royalties. Id. at 705.

3       On December 1, 2004, Mattel filed the instant Motion to Remand.  On

4  December 7, 2004, by stipulation and order, MGA intervened as a defendant.[8]  In

5  the stipulation, MGA asserted that "it has a significantly protectable interest

6  relating to the subject matter of the action, . . . the disposition of the action may

7  impair or impede [its] ability to protect its interest absent intervention, and [its]

8  interest is not adequately represented by the existing parties."  Stip. & Order

9  Permitting Intervention at 1.[9]

10      Also on December 7, 2004, Mattel filed a Motion to Dismiss Bryant's

11  Complaint for Declaratory Relief arguing, in part, that Bryant's case regarding the

12  copyrights to the Bratz "attempts to get a federal court to preemptively decide

13  issues presented in [Mattel's action against Bryant]."  Mot. to Dismiss Comp. for

14  Decl. Rel. at 1.

15      After both Bryant and MGA filed Oppositions to the instant Motion to

16  Remand, Mattel filed two reply briefs.  Mattel argued, in part, that MGA's post-

17  removal intervention destroyed the possibility of diversity jurisdiction.  The court

18  ordered supplemental briefing on the issue.  See Jan. 12, 2005 Order.  On January

19  25, 2005, the court ordered further briefing on two issues: (1) whether MGA had

20  _____

21      [8] MGA, like Mattel, has its principal place of business in California. Compl. ¶ 1;

22  Second Zeller Decl. ¶ 8 & Exs. 14-15.  MGA is also incorporated in California.  Second
     Zeller Decl. ¶ 8 & Ex. 16.  28 U.S.C. § 1332(c)(1) provides that "a corporation shall be

23  deemed to be a citizen of any State by which it has been incorporated and of the State

24  where it has its principal place of business."

25      [9] MGA acquired the first Bratz drawings from Bryant in late 2000.  Woods Decl. ¶
     2.  In the first two years of sales of the Bratz, MGA earned "tens of millions of dollars."

26  Id. ¶ 10.  MGA employs over 200 people in Southern California.  Id.  "Of those, the

27  majority are directly or indirectly involved in production, marketing and sales of the
     'Bratz' product line."  Id.

28

9

EXHIBIT _____ *I*

PAGE _____ *71*

1  properly intervened under Rule 24 of the Federal Rules of Civil Procedure; and
2  (2) whether MGA was an "indispensable party" under Rule 19(b). See Jan. 25,
3  2005 Order. For the reasons set forth below, the court denies Mattel's Motion to
4  Remand.
5
6                              **III. ANALYSIS**
7       Generally, a state civil action is removable only if it could have been filed
8  originally in federal court. 28 U.S.C. § 1441. This "original jurisdiction" may be
9  based upon either the presence of a federal question or the diversity of the parties.
10 See Chesler/Perlmutter Prods., Inc. v. Fireworks Entm't Inc., 177 F. Supp. 2d
11 1050, 1054-55 (C.D. Cal. 2001) (Collins, J.). On removal, the removing defendant
12 bears the burden of proving the existence of the jurisdictional facts. See Gaus v.
13 Miles, Inc., 980 F.2d 564, 566 (9th Cir. 1992). There is a "strong presumption"
14 against removal. Id. When a plaintiff moves to remand, the removing party has
15 the burden of establishing by a preponderance of the evidence that removal was
16 proper. See Sanchez v. Monumental Life Ins. Co., 102 F.3d 398, 403-04 (9th Cir.
17 1996).
18      In its Motion to Remand, Mattel argues: (1) that Bryant was precluded from
19 removing this action without any "new evidence"; (2) that removal was untimely;
20 (3) that Bryant waived his right to remove; and (4) that Bryant's removal fails on
21 the merits.
22                              *A. Preclusion*
23      Mattel argues that Bryant was precluded from removing a second time
24 without any "new" evidence. Mot. at 1, 15. Successive removals are not
25 necessarily barred. 16 James Wm. Moore et al., Moore's Federal Practice
26 § 107.30[4] (3d ed. 2004); Green v. R.J. Reynolds Tobacco Co., 274 F.3d 263,
27 266-68 (5th Cir. 2001); Benson v. SI Handling Sys., Inc., 188 F.3d 780, 782-83
28

EXHIBIT ___*I*___

PAGE ___*72*___

1  (7th Cir. 1999); Doe v. American Red Cross, 14 F.3d 196, 198 (3d Cir. 1993).

2  "For example, if a district court remands a case to state court because the

3  defendant failed to prove the jurisdictional amount, but the plaintiff after remand

4  discloses that the amount in controversy is greater than the statutory amount in

5  controversy, the defendant may file a second notice of removal." 16 Moore et al.,

6  supra § 107.30[4] (citing Brierly v. Alusuisse Flexible Packaging, Inc., 184 F.3d

7  527 (6th Cir. 1999)). For the reasons discussed in detail below, the court finds

8  new evidence permitted Bryant to filed a second notice of removal. See infra Part

9  III.D.2.

10                                    *B. Timeliness*

11        Mattel argues that Bryant's second Notice of Removal was untimely. Mot.

12  at 2, 5-8. The timeliness of removal is governed by 28 U.S.C. § 1446(b), which

13  provides:

14        If the case stated by the initial pleading is not removable, a notice of
          removal may be filed within thirty days after receipt by the defendant,
15        through service or otherwise, of a copy of an amended pleading,
          motion, order or other paper from which it may first be ascertained
16        that the case is one which is or has become removable . . . .
17

18  28 U.S.C. § 1446(b). This time limit "is triggered only when the information

19  supporting removal is unequivocally clear and certain." Moore et al., supra

20  § 107.30[3][a][i][C] (citing Bosky v. Kroger Texas, LP., 288 F.3d 208, 211 (5th

21  Cir. 2002); Huffman v. Saul Holdings Ltd. P'ship, 194 F.3d 1072, 1078 (10th Cir.

22  1999)). See also Schwarzer et al., Cal. Prac. Guide: Fed. Civ. Pro. Before Trial

23  § 2:914.5 (2004) ("The information supporting removal (i.e., federal question or

24  diversity of citizenship) must be 'unequivocally clear and certain' to start the 30-

25  day removal period running.") (emphasis omitted) (quoting Bosky, 288 F.3d at

26  211)).

27

28

EXHIBIT _____ I
PAGE _____ 73

1       Without conceding the existence of any basis for removal, Mattel argues

2   that Bryant had "unequivocally clear and certain" information supporting removal

3   more than 30 days before he filed the notice of removal on November 2, 2004.

4   First, Mattel argues that the action became removable on federal question grounds

5   when Bryant received the Complaint.  Second, Mattel asserts that the action

6   became removable on diversity grounds more than 30 days before Bryant filed the

7   notice because prior to October 2004, Bryant: (1) had received the Wall Street

8   Journal article and the Toon Teens documents; and (2) had filed papers in state

9   court arguing that Mattel's case was premised upon the allegation that Bryant

10  "stole the 'Bratz' concept from Mattel."

11      As to federal question jurisdiction, Mattel's position contradicts its own

12  assertion – and this court's conclusion – that the Complaint failed to state a federal

13  question on its face. See Aug. 20, 2004 Order at 8; see also infra Part III.D.1.  It

14  also contradicts Mattel's assertion  – and this court's conclusion – that there is

15  insufficient pre-removal evidence to permit the court to find complete copyright

16  preemption and thus federal question jurisdiction. See infra Part III.D.1.

17  Accordingly, the 30-day removal period could not have been triggered by

18  "unequivocally clear and certain" evidence of federal question jurisdiction prior to

19  removal.

20      As to diversity jurisdiction, it was not "unequivocally clear and certain"

21  more than 30 days prior to Bryant's  November 2, 2004 removal that the rights to

22  the Bratz – and thus more than $75,000 – were in controversy.  Bryant's receipt of

23  the Wall Street Journal article provided no clear notice that Mattel would assert in

24  this litigation that Bryant stole the Bratz idea from Mattel.  Indeed, the article

25  twice noted that Mattel had declined to comment.  Similarly, the importance of

26  Mattel's August 16, 2004 document production was diminished by Mattel's own

27  disclaimer of the documents' relevancy.  Finally, as Mattel concedes, how Bryant

28

12

EXHIBIT <u>I</u>
<u>74</u>
PAGE

1    has characterized Mattel's case is not dispositive of this court's jurisdiction.  See

2    Mattel's Obj. to Torres Decl. at 4.  Because the removal period did not start

3    running more than 30 days before November 2, 2004, Bryant's removal was not

4    untimely.

5                                                C.  Waiver

6          Mattel argues that Bryant waived his right to remove by filing permissive

7    counter-claims in state court after the case had become removable.  Mot. at 2-3,

8    8-13.[10]  "[I]t is well established that a defendant 'may waive the right to remove to

9    federal court where, after it is apparent that the case is removable, the defendant

10   takes actions in state court that manifest his or her intent to have the matter

11   adjudicated there, and to abandon his or her right to a federal forum.'"  Acosta v.

12   Direct Merchs. Bank, 207 F. Supp. 2d 1129, 1131-32 (S.D. Cal. 2002) (Whelan,

13   J.) (quoting Resolution Trust Corp. v. Bayside Developers, 43 F.3d 1230, 1240

14   (9th Cir. 1994)).  A defendant so manifests his intent to remain in state court if he

15   files permissive counter-claims in state court after the case has become removable.

16   See Moore v. Permanente Med. Group, Inc., 981 F.2d 443 (9th Cir. 1992); Schmitt

17   v. Insurance Co. of N. Am., 845 F.2d 1546, 1548 (9th Cir. 1988); Acosta, 207 F.

18   Supp. 1131-33; California Republican Party v. Mercier, 652 F. Supp. 928, 931

19   _____

20         [10]  Mattel also argues that Bryant waived his right to remove by moving for a

21   protective order and engaging in discovery in state court.  Mot. at 2-3, 12-13.  A
     defendant does not waive his right to remove by engaging in this sort of litigation activity.

22   See 16 Moore et al., supra § 107.18[3][b] (defendant does not waive right to remove by

23   "moving for confidentiality order").  See also Acosta v. Direct Merchs. Bank, 207 F.
     Supp. 2d 1129, 1131 (S.D. Cal. 2002) (Whelan, J.) ("In general, the right of removal is

24   not lost by action in state court short of proceeding to an adjudication on the merits.")
     (quotation marks omitted).  Mattel cites only one case, Chavez v. Kincaid, 15 F. Supp. 2d

25   1118 (D.N.M. 1998), for the proposition that a defendant waives his right to remove by

26   engaging in discovery.  The Chavez court, however, focused on the fact that the
     defendant had filed a motion to dismiss, not that the defendant had engaged in discovery.

27   Id. at 1125.

28

                                                  13

                                        EXHIBIT _____ _I_

                                        PAGE _____ _75_

1  (C.D. Cal. 1986) (Pfaelzer, J.).  See also Moore et al., supra § 107.18[3][a] (a

2  defendant waives right to remove by "[p]articipating in state court proceedings,

3  such as seeking some form of affirmative relief, when the defendant is not

4  compelled to take the action").  "However, [for there to be a waiver,] it must

5  [have] be[en] unequivocally apparent that the case [was] removable [before the

6  defendant engaged in the litigation conduct], [] the intent to waive the right to

7  remove to federal court and to submit to state court jurisdiction must [have been]

8  clear and unequivocal, and the defendant's actions must be inconsistent with the

9  right to remove."  Moore et al., supra § 107.18[3][a] (citing numerous cases).  See

10  also Acosta, 207 F. Supp. 2d at 1131 ("A waiver of the removal right must be clear

11  and unequivocal.").

12        The instant action was not removable on September 8, 2004, when Bryant

13  filed his counter-claims.  As noted above, it was not "unequivocally apparent" that

14  the case was removable any time before October 2004.  See supra Part III.B.

15  Thus, Bryant did not waive his right to remove.

D.  The Merits of the Removal

17        Bryant asserts that removal was proper because this court has jurisdiction

18  under both § 1331 (federal question) and § 1332 (diversity).

1. Section 1331:  Federal Question Jurisdiction

20        Bryant and MGA contend that the court has federal question jurisdiction

21  under § 1331 because Mattel's conversion claim is completely preempted by the

22  Copyright Act.[11]

23

---

24        [11]  MGA also argues in its Opposition that Mattel's breach of fiduciary duty,
25  breach of loyalty, and unjust enrichment claims are completely preempted.  MGA Opp. at
   6-12.  Because these arguments did not appear in the Notice of Removal, the court need
26  not consider them.  14C Charles Alan Wright & Arthur Miller, Federal Practice and
27  Procedure § 3732 (3d ed. 1988) ("the district court may decline to assert jurisdiction over
28                                                              (continued . . .)

14

EXHIBIT ___*I*___
PAGE ___*76*___

1    Federal question jurisdiction is governed by the "well-pleaded complaint

2  rule." This rule provides that jurisdiction under § 1331 is proper only when a

3  federal question appears on the face of a well-pled complaint. See, e.g.,

4  Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987). As a result, a plaintiff – as

5  master of the complaint – "may avoid federal jurisdiction by exclusive reliance on

6  state law." Id. Further, a defendant cannot remove solely "on the basis of a

7  federal defense, including the defense of preemption, even if the defense is

8  anticipated in the plaintiff's complaint, and even if both parties concede that the

9  federal defense is the only question truly at issue." Id. at 393. Thus, the federal

10  question must appear on the face of the complaint, as alleged and controlled by the

11  plaintiff. Chesler/Perlmutter Prods., Inc., 177 F. Supp. 2d at 1055.

12    "There does exist, however, a corollary to the well-pleaded complaint rule,

13  known as the 'complete preemption' doctrine. The Supreme Court has concluded

14  that the preemptive force of some statutes is so strong that they 'completely

15  preempt' an area of state law. In such cases, any claim purportedly based on that

16  preempted state law is considered, from its inception, a federal claim, and

17  therefore arises under federal law." Balcorta v. Twentieth Century-Fox Film

18  Corp., 208 F.3d 1102, 1107 (9th Cir. 2000) (quoting Metropolitan Life Ins. Co. v.

19  Taylor, 481 U.S. 58, 65 (1987)). In these cases, even a well-pled state law

20  complaint may be removed to federal court.[12]

21

22  the case for reasons not averred in the removal notice"). Furthermore, consideration of

23  the arguments would not change the court's conclusion that there was no basis for federal

24  question jurisdiction at the time of removal.

25  [12] Moreover, "under the artful pleading rule a plaintiff may not defeat removal by

26  omitting to plead necessary federal questions in a complaint." ARCO Envtl.
Remediation, L.L.C. v. Dep't of Health & Envtl. Quality of the State of Montana, 213

27  F.3d 1108, 1114 (9th Cir. 2000) (quotation marks omitted). "Though 'artful pleading'

28                                                          (continued . . .)

EXHIBIT ___I___

PAGE ___77___

1    In determining whether a particular state law claim is completely preempted

2   by federal law for purposes of removal jurisdiction, the court may look to the

3   factual allegations in the complaint and the information included in the notice of

4   removal. Chesler/Perlmutter Prods., Inc., 177 F. Supp. 2d at 1058 ("[D]istrict

5   courts may consider the petition of removal 'to clarify the action plaintiff presents

6   and to determine if it encompasses an action within federal jurisdiction.") (quoting

7   Schroeder v. Trans World Airlines, Inc., 702 F.2d 189, 191 (9th Cir. 1983)). The

8   court cannot consider post-removal evidence. See id. (court cannot consider

9   evidence in motion to dismiss or opposition to motion to remand). This contrasts

10   with diversity jurisdiction, where the court can "consider post-removal evidence in

11   determining whether [the] requisite amount is in controversy." 16 Moore et al.,

12   supra § 107.14[2][g] n. 102.1.

13    The Copyright Act has complete preemptive force. See Rosciszewski v.

14   Arete Assocs., Inc., 1 F.3d 225 (4th Cir. 1993); Chesler/Perlmutter Prods., Inc.,

15   177 F. Supp. 2d 1050; Worth v. Universal Pictures, Inc., 5 F. Supp. 2d 816 (C.D.

16   Cal. 1997) (Baird, J.); Dielsi v. Falk, 916 F. Supp. 985 (C.D. Cal. 1996) (Collins,

17   J.). Furthermore, state law conversion claims are capable of being completely

18   preempted by the Copyright Act. See, e.g., Dielsi, 916 F. Supp. at 992; Worth, 5

19   F. Supp. 2d at 822-23. In order for there to be such preemption, the state law

20   claim must meet two requirements. First, the "work at issue" must come within

21   the subject matter of copyright. Del Madera Props. v. Rhodes & Gardner, Inc.,

22

23   _____

24   and 'complete preemption' ostensibly remain separate doctrines, they are so intertwined
     in the available case law that they appear to raise [the] same question: are Plaintiff's
25   claims so 'completely preempted' that it is only by 'artful pleading' that [it] manages to
     avoid a 'federal question' in the Complaint[?]" Braco v. MCI Worldcom
26   Communications, Inc., 138 F. Supp. 2d 1260, 1268 (C.D. Cal. 2001) (Collins, J.). "In
     other words, it seems that 'complete preemption' is a prerequisite of sorts to any finding
27   that a plaintiff has 'pled around' what would otherwise be a federal claim." Id.
28

16

EXHIBIT _____ I

PAGE _____ 78

1   820 F.2d 973, 976 (9th Cir. 1987); <u>Selby v. New Line Cinema Corp.</u>, 96 F. Supp.

2   2d 1053, 1057 (C.D. Cal. 2000) (Matz, J.).  Second, the rights granted under the

3   state law must be "equivalent to [one] of the exclusive rights within the general

4   scope of copyright."  <u>Del Madera</u>, 820 F.2d at 976; <u>see also Selby</u>, 96 F. Supp. 2d

5   at 1057.

6           The court cannot find that Mattel's conversion claim was completely

7   preempted at the time of removal because the Complaint and the Notice of

8   Removal fail to reveal what work is even "at issue," much less whether that work

9   falls within "the subject matter of copyright."  First, the Complaint is vague and

10  generalized; Mattel never mentions what items or works Bryant allegedly

11  converted.  As Bryant acknowledges, the Complaint's allegations are so generic

12  that "Mattel could conceivably be trying to recover the value of anything from a

13  pen or pad of paper to [a] truckload of collectible 'Barbie' dolls or more."  Not. of

14  Removal ¶ 18.  Second, although the information in the Notice of Removal sheds

15  some light on the nature of Mattel's claims, it does not necessarily demonstrate

16  what works are "at issue."  It was not until *after* removal – when Mattel admitted

17  that the Bratz are relevant to its damages and asserted that this action involves the

18  same issues as Bryant's declaratory relief action – that it became clear that

19  Mattel's conversion claim is rooted in the allegation that Bryant "stole" the Bratz

20  idea from Mattel.  The court, however, may not consider this post-removal

21  evidence for purposes of determining if there was complete preemption at

22  removal.  <u>See Chesler/Perlmutter Prods., Inc.</u>, 177 F. Supp. 2d at 1058.  Thus

23  constrained by the evidence it may consider, the court cannot find that Mattel's

24  conversion claim was preempted by the Copyright Act at the time of removal.

25  Consequently, Bryant has failed to show that the court has federal question

26  jurisdiction under § 1331.

27

28

17

EXHIBIT ___*I*___

PAGE ___79___

1            2. <u>Section 1332:  Diversity Jurisdiction</u>

2        Bryant and MGA argue that there is diversity jurisdiction under § 1332.

3 This presents two issues: first, whether diversity jurisdiction was present at the

4 time of removal; second, whether MGA's post-removal intervention as a non-

5 diverse defendant destroyed the possibility of diversity jurisdiction.

6               *a. Diversity Jurisdiction at Removal*

7        To demonstrate the existence of diversity jurisdiction at the time of removal,

8 Bryant must show that he and Mattel were of diverse citizenship and that it is more

9 likely than not that "the matter in controversy exceed[ed] the sum or value of

10 $75,000, exclusive of interest and costs." 28 U.S.C. § 1331; <u>Singer v. State Farm</u>

11 <u>Mut. Auto. Ins. Co.</u>, 116 F.3d 373, 376 (9th Cir. 1997); <u>Sanchez v. Monumental</u>

12 <u>Life Ins. Co.</u>, 102 F.3d 398, 403-4 (9th Cir. 1996).  Mattel was and is a citizen of

13 Delaware and California, and Bryant was and is a citizen of Missouri.  Not. of

14 Removal ¶¶ 12-13.  Therefore, Mattel and Bryant were of diverse citizenship at the

15 time of removal.

16        Further, Bryant has demonstrated that it is more likely than not that more

17 than $75,000 was in controversy at the time of removal.  Unlike federal question

18 jurisdiction, the court may "consider post-removal evidence in determining

19 whether [the] requisite amount is in controversy." 16 James Wm. Moore et al.,

20 <u>Moore's Federal Practice</u> § 107.14[2][g] n. 102.1 (3d ed. 2004) (citing <u>Singer v.</u>

21 <u>State Farm Mut. Auto Ins.</u>, 116 F.3d 373, 377 (9th Cir. 1997) (court may consider

22 plaintiff counsel's post-removal oral admission to court); <u>Williams v. Best Buy</u>

23 <u>Co., Inc.</u>, 269 F.3d 1316, 1319-20 (11th Cir. 2001); <u>Allen v. R & H Oil & Gas Co.</u>,

24 63 F.3d 1326, 1335-36 (5th Cir. 1995)).  <u>See also</u> <u>Sierminski v. Transouth Fin.</u>

25 <u>Corp.</u>, 216 F.3d 945, 947-49 (11th Cir. 2000) (court may consider, among other

26 post-removal evidence, plaintiff's post-removal admissions); <u>Harmon v. OKI Sys.</u>,

27

28

EXHIBIT   *I*

PAGE   80

1   115 F.3d 477 (7th Cir. 1997).  Cumulatively, the pre-removal and post-removal

2   evidence demonstrates that the rights to the Bratz were and are in controversy.

3        Specifically, Mattel's counsel has admitted that Bryant's royalties on the

4   Bratz are relevant to Mattel's claim for damages; Mattel has acknowledged the

5   similarity of the Toon Teens and the Bratz in its responses to discovery requests;

6   Mattel has sought discovery regarding the "substantial similarity" between the

7   Toon Teens and the Bratz; Mattel has agreed to provide a third party with

8   documentation regarding the Toon Teens to demonstrate the Bratz are knock-offs

9   of the Toon Teens; Mattel has admitted launching an investigation into the

10  allegation the Bryant stole the idea for the Bratz from Mattel; Mattel has

11  vigorously pursued discovery relating to the Bratz; and Mattel has admitted that its

12  case involves that same issues as Bryant's declaratory relief action regarding the

13  Bratz.  Because the value of the rights to the Bratz easily exceeds $75,000, Bryant

14  has demonstrated that it is more likely than not that the amount in controversy

15  exceeded the jurisdictional minimum at the time of removal.  See Jacoby Decl.,

16  Ex. 1 (Bryant Depo.) at 705 (testimony that Bryant has received approximately

17  $10 million in royalties from the Bratz).  Accordingly, Bryant has met his burden

18  in demonstrating that diversity jurisdiction existed at the time of removal.

19        *b.  The Effect of MGA's Intervention*

20        Mattel argues that MGA's post-removal intervention as a non-diverse

21  defendant destroyed diversity.  In contrast, Bryant and MGA contend that MGA's

22  intervention had no such effect, due to the long-standing rule that "[i]f a non-

23  diverse party enters a case by intervention as of right, his presence will not destroy

24  jurisdiction unless [he] was an indispensable party when the plaintiff filed the

25  complaint." Deutsche Fin. Serv. Corp. v. Schwartz Homes, Inc., 187 F.R.D. 542,

26  545 (N.D. Ohio 1999) (citing Dean v. Holiday Inns, Inc., 860 F.2d 670, 672 (6th

27  Cir. 1988)).  See also Wichita R.R. & Light Co. v. Pub. Utils. Comm'n, 260 U.S.

28

19

EXHIBIT ___*I*___

PAGE ___*81*___

1  48, 54 (1922); Am. Nat'l Bank & Trust Co. of Chicago v. Bailey, 750 F.2d 577,

2  582 (7th Cir. 1984); Gaines v. Dixie Carriers, Inc., 434 F.2d 52, 54 (5th Cir.

3  1970); Hardy-Latham v. Wellons, 415 F.2d 674, 676 (4th Cir. 1968); Black v.

4  Texas Employers' Ins. Ass'n, 326 F.2d 603 (10th Cir. 1964); Formulabs, Inc. v.

5  Hartley Pen Co., 318 F.2d 485, 492 (9th Cir. 1963); Mut. Fire, Marine & Inland

6  Co. v. Adler, 726 F. Supp. 478, 481-82 (S.D.N.Y. 1989).  Mattel responds: (1) that

7  MGA's intervention did not meet the requirements of this rule; and (2) that this

8  rule is no longer good law in light of the passage of 28 U.S.C. § 1447(e) in 1988

9  and 28 U.S.C. § 1367(b) in 1990.

10          i.  Application of the Rule Regarding Non-Diverse Intervenors

11      To intervene as "of right," one must meet the requirements of Rule 24(a)(2),

12  which provides:

13      Intervention of Right.  Upon timely application anyone shall be
        permitted to intervene in an action: . . . (2) when the applicant claims
14      an interest relating to the property or transaction which is the subject
15      of the action and the applicant is so situated that the disposition of the
        action may as a practical matter impair or impede the applicant's
16      ability to protect that interest, unless the applicant's interest is
17      adequately represented by existing parties.
18

19  Fed. R. Civ. P. 24(a)(2).  The court applies a four-part test under Rule 24(a)(2):

20  (1) the application for intervention must be timely; (2) the applicant must have a

21  "significantly protectable" interest relating to the property or transaction that is the

22  subject of the action; (3) the applicant must be so situated that the disposition of

23  the action may, as a practical matter, impair or impede the applicant's ability to

24  protect that interest; and (4) the applicant's interest must not be adequately

25  represented by the existing parties in the lawsuit.  Northwest Forest Res. Council

26  v. Glickman, 82 F.3d 825, 836 (9th Cir. 1996).  "In general, [courts] construe Rule

27  24(a) liberally in favor of potential intervenors."  Southwest Ctr. for Biological

28

20



EXHIBIT ___*I*___

PAGE ___*82*___

1   Diversity v. Berg, 268 F.3d 810, 818 (9th Cir. 2001).  "In addition to mandating

2   broad construction, [the court's] review is 'guided primarily by practical

3   considerations,' not technical distinctions." Id.

4        MGA's intervention met the requirements of Rule 24(a)(2).  First, MGA's

5   intervention was indisputably timely as the parties stipulated to allow MGA to

6   intervene.  See Southwest Ctr. for Biological Diversity, 268 F. 3d at 818 ("As the

7   parties agree that Applicants' motion to intervene was timely, we need not address

8   this factor.").  Second, MGA has a "significantly protectable" interest in Bryant's

9   services relating to the Bratz and in the drawings of and rights to the Bratz.  See

10  generally Moore et al., supra § 19.06[1] (assignees are usually "necessary parties"

11  under Rule 19(a), which employs same analysis as Rule 24(a)(2)).  Third, MGA is

12  so situated that the disposition of the action may, as a practical matter, impair or

13  impede its ability to protect these interests.  For example, MGA's interests could

14  be impacted by an injunction precluding Bryant from continuing to assist MGA in

15  developing the Bratz.  Similarly, as MGA notes: "[I]f Bryant somehow were held

16  to have copied Mattel's 'Toon Teens' work, MGA's acquisition of Bryant's

17  original 'Bratz' drawings could be challenged."  Bryant & MGA's Brief in

18  Response to Court's Questions at 5.  Finally, because MGA has broader rights to

19  the Bratz than Bryant, Bryant may not adequately protect MGA's interests.  See

20  generally Moore et al., supra § 24.03[4][a][i] ("the applicant's burden on this

21  matter should be viewed as minimal").  Thus, MGA intervened as "of right" under

22  Rule 24(a)(2).

23

24

25  / / /

26

27

28

EXHIBIT ___*I*___

PAGE ___*83*___

1     Consequently, unless it was "indispensable" under Rule 19(b) at the time

2   Mattel filed the Complaint, MGA did not destroy diversity by intervening.[13]   In

3

4   _____

5     [13]  Rule 19 provides:

6     (a) Persons to be Joined if Feasible.  A person who is subject to service of
      process and whose joinder will not deprive the court of jurisdiction over the
7     subject matter of the action shall be joined as a party in the action if . . .
      (2) the person claims an interest relating to the subject of the action and is
8     so situated that the disposition of the action in the person's absence may
      (i) as a practical matter impair or impede the person's ability to protect that
9     interest . . . .  If the person has not been so joined, the court shall order that
      the person be made a party . . . .
10

11

12    (b) Determination by Court Whenever Joinder not Feasible.  If a [party
      meeting the requirements of 19(a)] cannot be made a party, the court shall
13    determine whether in equity and good conscience the action should proceed
      among the parties before it, or should be dismissed, the absent person being
14    thus regarded as indispensable.  The factors to be considered by the court
      include: first, to what extent a judgment rendered in the person's absence
15    might be prejudicial to the person or those already parties; second, the
      extent to which, by protective provisions in the judgment, by the shaping of
16    relief, or other measures, the prejudice can be lessened or avoided; third,
      whether a judgment rendered in the person's absence will be adequate;
17    fourth, whether the plaintiff will have an adequate remedy if the action is
      dismissed for nonjoinder.
18

19

20

21  Fed. R. Civ. P. 19.
        An absent party is "necessary" if he meets the requirements of Rule 19(a).  He is
22  "indispensable" if he meets the requirements of Rule 19(b) and the court determines, in
23  equity and good conscience, that the case should be dismissed rather than proceed without
    him.
24      Although the factors in Rule 19(b) "overlap" with those in Rule 19(a), "[o]verlap .
25  . . should not be equated with redundancy."  Moore et al., supra § 19.05[1][a].  "While the
    necessary party analysis under Rule 19(a) and the indispensability analysis under Rule
26  19(b) look at similar issues, each has a different thrust which reflects its different
27  purpose."  Id.  "Under the former, the court is more or less concerned with whether
                                                                    (continued . . .)
28

                                        22

                        EXHIBIT ____*I*____

                        PAGE ____84____

1  this context, the court examines whether the intervenor was "indispensable" at the

2  time the original action was filed. See Mut. Fire, Marine & Inland Ins. Co., 726 F.

3  Supp. at 481 (an intervenor has to show an independent basis for jurisdiction only

4  if it "was indispensable to the action at the time it was brought"). See also Am.

5  Nat'l Bank & Trust Co. of Chicago, 750 F.2d at 582 (Posner, J.) ("[I]f the

6  nondiverse party comes into the case by intervening in it, his presence will not

7  deprive the court of jurisdiction unless the intervenor was an indispensable party

8  when the complaint was filed. Federal jurisdiction is determined by the facts as

9  they exist when the case is filed, and not by what happens later . . . . So the fact

10  that a resident of the plaintiff's state intervenes will not require the plaintiff to

11  abandon his suit unless the resident was an indispensable party at the time the suit

12  was filed – in which event the plaintiff should have joined him at the outset, and if

13  he had done so the court would have known that complete diversity was

14  lacking."). Examining whether the intervenor was "indispensable" when the

15  action was filed "prevent[s] collusion between parties to avoid jurisdictional

16  requirements." Mut. Fire, Marine & Inland Ins. Co., 726 F. Supp. at 481. "If the

17  rule were otherwise, the requirement of complete diversity could be avoided by

18  having one party bring an action while the indispensable party waits and then

19  intervenes as of right under the court's ancillary jurisdiction." Id.

20       Here, MGA was not "indispensable" to the lawsuit as Mattel chose to

21  characterize it in its Complaint. Mattel elected to sue Bryant in state court on what

22  Mattel – as master of its Complaint – asserted were purely state law claims.

23  Conspicuously absent from the Complaint was any mention of MGA or the Bratz.

24  Indeed, as late as July 2004, months after filing its Complaint against Bryant,

25

26  nonjoinder *could* have one of the adverse effects addressed by that Rule." Id. (emphasis

27  in original). "Under the indispensability analysis, the court . . . must determine whether

28  nonjoinder *actually will* result in . . . prejudice . . . ." Id. (emphasis in original).

EXHIBIT _____ _I_

PAGE _____ 85

1  Mattel claimed to be unable to determine "whether rights to Bratz are indeed at
2  stake here." See, e.g., July 12, 2004 Rep. at 4.  Thus, it cannot be said that MGA
3  was "necessary," much less "indispensable" to the action at the time Mattel filed
4  its Complaint against Bryant.

5  Furthermore, there is no indication that the parties colluded to avoid the
6  requirement of complete diversity.  First, the parties have submitted over 126
7  pages in briefing, 118 exhibits, and two *ex parte* applications in connection with
8  the instant motion to remand.  Second, because this case was removed by Bryant
9  from state court, there is a "*prima facie* absence of effort by the plaintiff to
10  circumvent the complete diversity requirement."  Joan Steinman, Supplemental
11  Jurisdiction in § 1441 Removed Cases: An Unsurveyed Frontier of Congress'
12  Handiwork, 35 Ariz. L. Rev. 305, 347 (1993).

13  Because MGA intervened as of right and was not "indispensable" at the
14  time Mattel filed its Complaint against Bryant, its intervention did not destroy
15  diversity jurisdiction under the rule as it existed prior to the enactment of
16  § 1447(e) and § 1367(b).

17                    ii.  The Effect of § 1447(e) and § 1367(b)

18  Mattel argues that § 1447(e) and § 1367(b) modified the application of the
19  rule that the intervention of a non-diverse, non-indispensable party does not
20  destroy diversity jurisdiction.

21  Section 1447(e) provides:

22  If after removal the plaintiff seeks to join additional defendants
23  whose joinder would destroy subject matter jurisdiction, the court
   may deny joinder, or permit joinder and remand the action to the State
24  court.

25
26  28 U.S.C. § 1447(e).  This section does not apply to the present case.  While
27  § 1447(e) discusses the court's options when a *plaintiff* attempts to *join* a non-
28

EXHIBIT _____ *I*_____

PAGE _____ *86*_____

1  diverse defendant, the present case involves the *intervention* of a non-diverse

2  *defendant*.  Therefore, § 1447(e) did not change the above-mentioned rule as it

3  applies here.

4       Section 1367 provides in pertinent part:

5       (a) Except as provided in subsection[] (b) . . . , in any civil action of

6       which the district courts have original jurisdiction, the district courts
        shall have supplemental jurisdiction over all other claims that are so

7       related to claims in the action within such original jurisdiction that

8       they form part of the same case or controversy under Article III of the
        United States Constitution.  Such supplemental jurisdiction shall

9       include claims that involve the joinder or intervention of additional

10      parties.

11

12      (b) In any civil action of which the district courts have original
        jurisdiction founded solely on section 1332 of this title, the district

13      courts shall not have supplemental jurisdiction under subsection (a)

14      over claims by plaintiffs against persons made parties under Rule 14,

15      19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims
        by persons proposed to be joined as plaintiffs under Rule 19 of such

16      rules, or seeking to intervene as plaintiffs under Rule 24 of such rules,

17      when exercising supplemental jurisdiction over such claims would be

18      inconsistent with the jurisdictional requirements of section 1332.

19  28 U.S.C. § 1367.  Mattel argues that because the court's jurisdiction is premised

20  upon § 1332 and MGA and Mattel are not diverse, the court is prohibited by

21  § 1367(b) from exercising supplemental jurisdiction over MGA.  This argument

22  fails to recognize the distinction between "parties" and "claims."  Section 1367(b)

23  is concerned with the assertion of new "claims," not the intervention alone of new

24  "parties."  As succinctly stated by one of the preeminent scholars in the field:

25      [W]hether the context is removal or not, there can be persons who

26      intervene on the side of the defendants . . . against whom the plaintiff
        has no claim to assert.  Indeed, the intervention of persons under Rule

27      24 typically will be at the instigation of the intervenors, and not at the

28

EXHIBIT _____*I*_____

PAGE _____87_____

1   urging of the plaintiff, and will be precipitated by the persons'
2   concern that disposition of the action in their absence will as a
3   practical matter impair or impede their ability to protect their interests
    . . . . In these situations where the plaintiff does not seek to assert a
4   claim against the defendant intervenor, the plaintiff has not sought to
5   circumvent the complete diversity requirement of § 1332, and
    § 1367(b) does not purport to limit the exercise of supplemental
6   jurisdiction over the involvement or interests of such intervening
7   parties.  Its limitations apply only to the *claims*, if any, that the
8   plaintiff would assert against such intervening defendants.

9   Joan Steinman, Supplemental Jurisdiction in § 1441 Removed Cases: An
10  Unsurveyed Frontier of Congress' Handiwork, 35 Ariz. L. Rev. 305, 344-45
11  (1993) (emphasis in original).[14]

12

13  ─────────────────────

    [14]  See also Wichita R.R. & Light Co., 260 U.S. 48 (1922) (allowing intervention
14  of non-diverse defendant); Home Ins. Co. v. Hughes, CIV. A. No. 95-1833, 1996 WL
15  109292, *2 (E.D. La. Mar. 11, 1996) (intervention of non-diverse defendant does not
    destroy diversity); Maryland Cas. Co. v. W.R. Grace & Co., No. 88 Civ. 4337 (JSM),
16  1996 WL 34154 (S.D.N.Y. Jan. 30, 1996) (intervention of non-diverse "cross-claim
17  defendant" does not destroy diversity); MCI Telecomms. Corp. v. Logan Group, Inc., 848
    F. Supp. 86, 89 & n. 2 (N.D. Tex. 1994) (suggesting that intervening defendant does not
18  trigger § 1367(b) concerns); Schwarzer et al., Cal. Prac. Guide: Fed. Civ. Pro. Before
19  Trial § 7:179 (2004) ("An independent basis for subject matter jurisdiction may not be
    required where one intervenes as a defendant as a matter of right."); 36 Suzanne J. Bailey
20  et al., Corpus Juris Secundum § 142 (2004) ("[J]urisdiction of an action between citizens
21  of different states ordinarily is not lost by the intervention of new parties who are citizens
    of the same state as the original parties to whom their interests are opposed."); Marilyn J.
22  Ireland, Supplemental Jurisdiction Over Claims in Intervention, 23 N.M. L. Rev. 57, 68-
23  69 (1993) ("Jurisdiction once acquired on [the] ground [of diversity] is not . . . defeated
    by the intervention . . . of a party whose presence is not essential to a decision of the
24  controversy between the original parties.  Section 1367 does not change this conclusion . .
25  . . [I]n the case of subject matter jurisdiction, it is jurisdiction over claims, not over
    parties, that is in issue . . . .  [D]efensive intervenors have never been considered to
26  violate the complete diversity rule in the past.  It does not now necessarily follow that
27  they will be held to be 'inconsistent with the requirements of section 1332.'") (quotation
28                                                                    (continued . . .)

                                        26

                            EXHIBIT ____*I*____

                            PAGE ____88____

1    Here, MGA has intervened as a defendant and Mattel has not attempted to

2    amend its Complaint to assert any claims against MGA.[15]  Therefore, MGA's

3    _____

4    marks and citations omitted); Abram Chayes, The Role of the Judge in Public Law

5    Litigation, 89 Harv. L. Rev. 1281, 1290 (1976) (the right to participate in a case has
     ceased to depend on having a right to relief or liability to satisfy a claim).  Mattel cites

6    Lumber Ins. Cos., Inc. v. Allen, 892 F. Supp. 31 (D.N.H. 1993), for the proposition that

7    the mere intervention of a non-diverse defendant destroys diversity.  Insofar as Lumber
     Ins. stands for this proposition, the court disagrees, as such a holding ignores the

8    distinction between claims and parties.

9    [15]  Mattel cites Uni Storebrand Ins. Co., UK Ltd. v. Star Terminal Corp., No. 96

10   CIV. 9556 (DLC), 1997 WL 391125 (S.D.N.Y. July 11, 1997), for the proposition that an
     intervening defendant "steps into the shoes" of a full-party defendant and, therefore,

11   "takes on" the plaintiff's original "claims" as if they were asserted against the intervening

12   party.  Uni Storebrand is distinguishable.  There, the original defendant had completely
     failed to appear in the action and Societe Generale Energie Corp., S.A. ("SGE") sought to

13   intervene as a defendant to protect its interests that were otherwise subject to default.  In

14   those specific circumstances, the court found that SGE, by intervening, "stepped into the
     shoes" of the original defendant and "took on" the claims asserted by the original

15   plaintiff.  See id. at *4 ("As a practical matter, the only live claim in this action is a non-

16   diverse claim between [the plaintiff] and SGE."); id. at *6 ("The unique posture of this
     case stems from the fact that . . . the nominal defendant[] is a dissolved corporation which

17   does not intend to appear.").  In contrast, Bryant, the original defendant, has appeared in

18   this action and has litigated his rights vigorously.

19       Furthermore, even if the court assumed that MGA "took on" Mattel's claims

20   against Bryant, the court would not be barred by § 1367(b) from retaining jurisdiction.
     After all, "[w]hen one turns to removed cases, . . . supplemental jurisdiction should be

21   liberally exercised – because of the prima facie absence of effort by the plaintiff to

22   circumvent the complete diversity requirement."  Steinman, supra at 347 (emphasis
     added).  Because this is a removed case, the court may liberally exercise supplemental

23   jurisdiction over the "claims" MGA might have "taken on" by intervening after removal.

24   This "[does] not expand federal jurisdiction beyond the bounds that the [Supreme] Court
     [has] recognized."  Id. at 347-48; see Phelps v. Oaks, 117 U.S. 236 (1886).  Additionally,

25   by exercising supplemental jurisdiction over these claims, the court can "simultaneously

26   adjudicate the original civil action, safeguard the defendant's removal, and allow all of
     plaintiff's related claims to be heard in one suit."  Steinman, supra at 348.  "All this serves

27   fairness and efficiency, without sacrificing enforcement of the jurisdictional requirements

28                                                                    (continued . . .)

27

EXHIBIT ___I___

PAGE ___89___

1   intervention did not implicate § 1367(b).  In short, because neither § 1447(e) nor

2   § 1367(b) precludes the court from exercising diversity jurisdiction over an action

3   involving the post-removal intervention of a non-diverse, non-indispensable

4   defendant, the court finds that MGA's intervention did not destroy diversity.[16]

5

6            **IV. CERTIFICATION UNDER 28 U.S.C. § 1292(b)**

7       "In circumstances where a district judge upholds subject matter jurisdiction

8   and denies a motion to remand, but has doubts about these rulings, the judge may

9   sometimes secure interlocutory review by certifying the rulings under 28 U.S.C.

10   § 1292(b)."  <u>Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 332 F.3d

11

12

13   of § 1332 . . . ."  <u>Id.</u>

14       Finally, to the extent Mattel argues its "claims" are asserted against MGA, it lends

     credence to the inference that its claims are actually related to the rights to the Bratz and

15   are likely preempted by the Copyright Act, thereby raising a federal question.

16   [16]  The cases cited by Mattel fail to address the situation before the court.  <u>See</u>

17   <u>Stevens v. Brink's Home Sec., Inc.</u>, 378 F.3d 944, 949 (9th Cir. 2004) (plaintiff's

     amending complaint to join non-diverse defendants); <u>TIG Ins. Co. v. Reliable Research</u>

18   <u>Co.</u>, 334 F.3d 630, 634 (7th Cir. 2003) (intervening plaintiff); <u>Doleac v. Michalson</u>, 264

19   F.3d 470, 473-77 (5th Cir. 2001) (plaintiff's amending complaint to add claims against

     non-diverse defendant); <u>Cobb v. Delta Exports, Inc.</u>, 186 F.3d 675, 677 (5th Cir. 1999)

20   (same); <u>Casas Office Mach., Inc. v. Mita Copystar Am, Inc.</u>, 42 F.3d 668, 672-78 (1st Cir.

21   1995) (same); <u>Yniques v. Cabral</u>, 985 F.2d 1031 (9th Cir. 1993) (plaintiff's amending

     complaint to join non-diverse defendant; holding based on 1447(e), which applies only to

22   efforts by plaintiffs to join non-diverse defendants); <u>Miller v. Grgurich</u>, 763 F.2d 372,

23   373 (9th Cir. 1985) (paraphrasing <u>Desert Empire Bank v. Ins. Co. of N. Am.</u>, 623 F.2d

     1371, 1374 (9th Cir. 1980), involving plaintiff's amending complaint to add claims

24   against non-diverse defendant); <u>Carolina Asphalt Paving, Inc. v. Balfour Beatty Constr.,</u>

25   <u>Inc.</u>, No. 9:04-1578-28, 2004 WL 3015177, at *3 (D.S.C. Nov. 19, 2004) (plaintiff's

     addition of claims against third-party defendant); <u>Diaz v. Allstate Ins. Group</u>, 185 F.R.D.

26   581, 595-96 (C.D. Cal. 1998) (plaintiff's joining non-diverse defendant); <u>Farm Bureau</u>

27   <u>Mut. Ins. Co., Inc. v. Eighmy</u>, 849 F. Supp. 40 (D. Kan. 1994) (pre-removal intervention

28   of non-diverse defendant).

EXHIBIT _____ *I*

PAGE _____ *90*

116, 132 (2d Cir. 2003) (Newman, J., concurring) (citing <u>Breuer v. Jim's Concrete</u>
<u>of Brevard, Inc.</u>, 538 U.S. 691 (2003)). 28 U.S.C. § 1292(b) provides:

> When a district judge, in making in a civil action an order not
> otherwise appealable under this section, shall be of the opinion that
> such order involves a controlling question of law as to which there is
> substantial ground for difference of opinion and that an immediate
> appeal from the order may materially advance the ultimate
> termination of the litigation, he shall so state in writing in such order.
> The Court of Appeals which would have jurisdiction of an appeal of
> such action may thereupon, in its discretion, permit an appeal to be
> taken from such order, if application is made to it within ten days
> after the entry of the order: *Provided, however*, That application for
> an appeal hereunder shall not stay proceedings in the district court
> unless the district judge or the Court of Appeals or a judge thereof
> shall so order.

28 U.S.C. § 1292(b).

No court of appeals has addressed whether § 1447(e) or § 1367(b) causes
the post-removal, Rule 24(a)(2) intervention of a non-diverse, non-indispensable
defendant to destroy diversity jurisdiction. This court's finding that neither
section does so is a controlling question of law critical to the court's exercise of
jurisdiction and as to which there is no precedent. Resolution of the issue will
both materially advance the litigation and avoid the needless expenditure of
judicial resources if the Court of Appeals concludes this court lacks jurisdiction.
<u>See, e.g.</u>, <u>Valdez v. Allstate Ins. Co.</u>, 372 F.3d 1115 (9th Cir. 2004) (raising issue
of jurisdiction *sua sponte* after case had proceeded to summary judgment in
district court). Accordingly, the court certifies the issue for interlocutory appeal
under § 1292(b). No later than 10 days from the date of this order, Mattel shall
file its application to appeal this court's order or notify this court, in writing, that
no such application will be made.

29

EXHIBIT ___*I*___

PAGE ___*91*___

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## V. CONCLUSION

Finding the presence of diversity jurisdiction under § 1332, the court **DENIES** Mattel's Motion to Remand. [17]

IT IS SO ORDERED.

DATED: March 4, 2005

Nora M. Manella
United States District Judge

_____

[17] Mattel's request for attorneys' fees is denied.

30

EXHIBIT _____I_____

PAGE _____92_____

1 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
    John B. Quinn (Bar No. 090378)
2 | johnquinn@quinnemanuel.com
    Michael T. Zeller (Bar No. 196417)
3 | (michaelzeller@quinnemanuel.com)
    Jon D. Corey (Bar No. 185066)
4 | (joncorey@quinnemanuel.com)
    865 South Figueroa Street, 10th Floor
5 | Los Angeles, California  90017-2543
    Telephone:  (213) 443-3000
6 | Facsimile:  (213) 443-3100

7 | Attorneys for Mattel, Inc.

8 |

9 |                UNITED STATES DISTRICT COURT

10 |               CENTRAL DISTRICT OF CALIFORNIA

11 |                      EASTERN DIVISION

12 | CARTER BRYANT, an individual,        CASE NO. CV 04-9049 SGL (RNBx)

13 |          Plaintiff,                   Consolidated with
                                           Case No. CV 04-09059
14 |     vs.                               Case No. CV 05-02727

15 | MATTEL, INC., a Delaware              Honorable Stephen G. Larson
     corporation,
16 |                                       **MATTEL, INC.'S OPPOSITION TO
              Defendant.                   THE MGA PARTIES' MOTION
17 |                                       FOR JUDGMENT AS A MATTER
                                           OF LAW**
18 | AND CONSOLIDATED ACTIONS

19 |                                       Hearing Date:  August 21, 2008
                                           Place:         Courtroom 1
20 |                                       Time:          10:00 a.m.

21 |                                       **Phase 1B:**

22 |                                       Trial Date:            July 23, 2008

23 |

24 |

25 |

26 |

27 |                    EXHIBIT ___J___

28 |                    PAGE ___93___

Case 2:04-cv-09049-DOC-RNB   Document 4381-2   Filed 10/21/08   Page 32 of 83   Page ID
#:121889
Case 2:04-cv-09049-SGL-RNB   Document 4269   Filed 08/20/2008   Page 2 of 16

1

## TABLE OF CONTENTS

2                                                                                               **Page**

3

4    INTRODUCTION ............................................................................................... 1

5    I.    MATTEL HAS PROVED DAMAGES FOR ITS STATE LAW
            CLAIMS ................................................................................................... 1

6          A.    The Jury and the Court Have Already Found Harm or Damage............ 1

7          B.    Mattel's State Law Claims Are Not Preempted. ..................................... 2

8          C.    Damages Are Not Limited to Bryant's Profits........................................ 5

9          D.    MGA Is Not Entitled to JMOL on Conversion. ..................................... 6

10   II.   MATTEL PRESENTED EVIDENCE OF DAMAGES AS TO MGA
            HK............................................................................................................ 7

11

12   III.  DEFENDANT'S PUNITIVE DAMAGES ARGUMENT IS
            MERITLESS .............................................................................................. 8

13
     IV.   MATTEL HAS VIABLE CLAIMS BASED ON THE "BRATZ"
14         NAME......................................................................................................... 9

15   V.    LATER GENERATION BRATZ DOLLS, OTHER BRATZ
            PRODUCT LINES, AND BRATZ-BRANDED MERCHANDISE
16         INFRINGE MATTEL'S COPYRIGHTS ..................................................... 10

17

18

19

20

21

22

23

24

25

26    EXHIBIT _____J_____

27    

28    PAGE _____94_____

Case 2:04-cv-09049-DOC-RNB    Document 4381-2    Filed 10/21/08    Page 33 of 83    Page ID
#:121890
Case 2:04-cv-09049-SGL-RNB    Document 4269    Filed 06/20/2008    Page 14 of 16

1    copyright remedies, even if the claims satisfy the "extra element" test. <u>Bucklew</u>, on

2    which defendants rely, found the state law claims preempted -- it does not support

3    the proposition that punitive damages cannot be awarded on state claims which

4    *survive* preemption, as Mattel's claims here have.    Neither does <u>Troensegaard v.</u>

5    <u>Silvercrest Indus. Inc.</u>, 175 Cal. App. 3d 218, 226-28 (1985), which does not even

6    address Copyright Act preemption.[22]    Where a state law claim is not preempted and

7    permits punitive damages, the fact that copyright law permits no such damages is

8    irrelevant.    <u>See, e.g.</u>, <u>Shuptrine</u>, 535 F. Supp. 2d at 897 (rejecting attack on punitive

9    damages claim because underlying state-law claim not preempted).

10    **IV.    MATTEL HAS VIABLE CLAIMS BASED ON THE "BRATZ" NAME**

11    MGA's arguments regarding the Bratz name are specious.    The "Bratz" name

12    is an invention assigned to Mattel and is part of the proprietary information Bryant

13    wrongfully disclosed to MGA, which MGA wrongfully obtained and used.    Under

14    Mattel's state law claims, MGA's continuing wrongful use of property stolen from

15    Mattel, under a name that belongs to Mattel, is actionable.    Mattel is entitled to

16    recover MGA's benefits from the use of the name under a disgorgement of benefits

17    theory and through a constructive trust.[23]    Indeed, the Court has already found that

18    "the Bratz name is part of what was claimed or was awarded by the jury to Mattel in

19

20

21

22    [22]    Instead, that case denied punitive damages because the state legislature did
not intend such recovery under the general civil remedy, <u>Cal. Civ. Code</u> § 1794, for
23    the same "willful, oppressive, malicious and oppressive acts" encompassed by the
punitive damages provisions of a separate section of the code.    <u>Cal. Civ. Code</u> §
24    3294.
[23]    <u>See, e.g.</u>, <u>Weiss v. Marcus</u>, 51 Cal. App. 3d 590, 600 (1975) ("[A]
25    constructive trust may be imposed in practically any case where there is a wrongful
acquisition or detention of property to which another is entitled."); Restatement of
26    Restitution, § 201 (2008) ("Where a fiduciary in violation of his duty to the
beneficiary communicates confidential information to a third person, the third
27    person, if he had notice of the violation of duty, holds upon a constructive trust for
the beneficiary any profit which he makes through the use of such information.").

28    **EXHIBIT    J**

Case 2:04-cv-09049-DOC-RNB   Document 4381-2   Filed 10/21/08   Page 34 of 83   Page ID
#:121896
Case 2:04-cv-09049-SGL-RNB     Document 4269     Filed 08/20/2008     Page 15 of 16

1 | the first phase. . . . The name and the conception both went to Mattel."[24]  MGA fails

2 | to even address this finding, let alone present grounds to disturb it.[25]

**V.   LATER BRATZ DOLLS, OTHER BRATZ PRODUCT LINES, AND
BRATZ-BRANDED    MERCHANDISE    INFRINGE    MATTEL'S
COPYRIGHTS**

MGA's motion as to Mattel's copyright claim fails.  If Mattel is not entitled to JMOL on its claim of infringement, which it is, at most this is a jury issue. Hundreds of Bratz products -- including later Bratz dolls, other Bratz product lines, and Bratz branded merchandise -- were admitted into evidence.[26]  The parties stipulated that these items were a representative sample of all Bratz products.[27]  The jury can compare this evidence to Mattel's copyrighted works to determine whether they are substantially similar.  See, e.g., Stromback v. New Line Cinema, 384 F.3d 283, 295 (6th Cir. 2004) (expert testimony was not necessary in a copyright infringement case because jury could compare two works to determine if they were substantially similar).[28]

Moreover, several MGA witnesses acknowledged the similarity between Bryant's drawings and later generation Bratz dolls, other Bratz product lines and Bratz-branded merchandise.   Isaac Larian himself testified that a later Bratz character had "more similarity to the first four Bratz dolls than [to Mini Trendy

---

[24]  Cole Dec. Ex. B (July 23, 2008 Tr.), at 5526:8-14.
[25]  MGA contends that it purchased the right to use the Bratz name from a third party.  What is at issue here was MGA's rights to the Bratz name vis-a-vis *Mattel*, not with respect to some third party.
[26]  Cole Dec. Ex. P (Stipulation Regarding Admission of Tangible Items, dated August 5, 2008) (listing more than 600 Bratz products admitted into evidence).
[27]  Cole Dec. Ex. P; id. at Ex. B (August 5, 2008 Tr.), at 5748:8-5749:12.
[28]  MGA claims Mattel must prove both that MGA copied original elements from Mattel's copyrighted works and that there is a substantial similarity between the allegedly infringing works and the copyrighted works.  Not so.  As the Court's jury instructions make clear, Mattel need only show that MGA copied original elements from Mattel's copyrighted works.  Mattel can prove that by *either* (1) showing that MGA actually copied a significant amount of protectable expression from the works, *or* (2) showing that there are substantial similarities between the (footnote continued)

EXHIBIT _____ J _____

PAGE _____ 96 _____    10

Case 2:04-cv-09049-DOC-RNB   Document 4381-2   Filed 10/21/08   Page 35 of 83   Page ID
#:121898
Case 2:04-cv-09049-SGL-RNB   Document 4269   Filed 08/20/2008   Page 16 of 16

1 | Teenz]," a doll that MGA claimed infringed its purported copyright in Bratz.[29]

2 | Carter Bryant testified that "all the Bratz dolls have an overall similar appearance."[30]

3 | And Debora Middleton, MGA's character art director, testified that the character art

4 | MGA created for its Bratz branded merchandise is similar to the Bratz dolls.[31]

5 | MGA's style guides -- the registrations for which list the Bratz designs created by

6 | Bryant as the works on which they were based -- mandated that licensed products

7 | look like their designs.[32]   In short, not only is the jury capable of determining

8 | substantial similarity through its own examination, but defendants' own admissions

9 | support such a finding with respect to every Bratz product that bears an image of the

10 | Bratz characters.  MGA's motion should be denied.

12 | DATED: August 20, 2008          QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

14 |                                By /s/ John B. Quinn

15 |                                John B. Quinn
Attorneys for Mattel, Inc.

25 | allegedly infringing works and original elements of Mattel's works.  Cole Dec. Ex.
D (Court's Phase B Jury Instructions as Given), at 27 (Jury Instruction No. 25).
[29] Cole Dec. Ex. B (August 6, 2008 Tr.), at 6159:13-18.
[30] Cole Dec. Ex. B (August 8, 2008 Tr.), at 6669:19-23.
[31] Cole Dec. Ex. B (August 13, 2008 Tr.), at 7200:3-6.
[32] Cole Dec. Ex. B (August 8, 2008 Tr.), at 6653:21-6658:22; id. at Exs. Q-Y
(Trial Exs. 513, 567-574).

EXHIBIT ____J____

97  -11-                    Case No. CV 04-9049 SGL (RNBx)
MATTEL'S OPPOSITION TO MGA PARTIES' MOTION FOR JUDGMENT AS A MATTER OF LAW

07209/2609633

Case 2:04-cv-09049-DOC-RNB   Document 4381-2   Filed 10/21/08   Page 36 of 83   Page ID
#:121893
Case 2:04-cv-09049-SGL-RNB   Document 3826   Filed 05/27/2008   Page 1 of 9

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
<u>CIVIL MINUTES – GENERAL</u>

Case No.    CV 04-09049 SGL(RNBx)                          Date:  May 27, 2008
Title:         CARTER BRYANT -v- MATTEL, INC.

<u>Consolidated With Related Actions</u>:
CASE NO. CV 04-09059 SGL(RNBx):  MATTEL, INC.,  v. CARTER BRYANT,
CASE NO. CV 05-02727 SGL (RNBx): MGA ENTERTAINMENT, INC., v. MATTEL, INC.,
==========================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

             Gina Guzman
             Courtroom Deputy Clerk

<u>ATTORNEYS PRESENT FOR CARTER BRYANT</u>:     <u>ATTORNEYS PRESENT FOR MATTEL</u>:

None Present                                          None Present


<u>ATTORNEYS PRESENT FOR MGA AND
ISAAC LARIAN</u>:

None Present

PROCEEDINGS:     **ORDER RE STATUTE OF LIMITATIONS DEFENSE**

          Each of the remaining parties to this action, Mattel and MGA, seek summary judgment on
the issue of statute of limitations.  Crucial to resolution of this issue, is application of California's
"discovery rule," which can delay the accrual of a claim.  Both parties have offered evidence in
support of their positions.[1]  For its part, Mattel contends that its claims against Carter Bryant arose
on November 24, 2003, and that its claims against the MGA entities, including MGA CEO Isaac
Larian, arose on November 4, 2004, the date of Carter Bryant's deposition, at which he testified
regarding MGA and Larian's involvement in his actions.

---

          [1]  Although he is no longer a party, the Court discusses at length the timeliness of the
claims asserted against Carter Bryant because it is relevant to the Court's relation-back analysis of
the claims asserted against MGA.

MINUTES FORM 90                                                      Initials of Deputy Clerk: gg
CIVIL -- GEN                          Page 1                         Time:  0/00

EXHIBIT ___K___

PAGE ___98___

Case 2:04-cv-09049-DOC-RNB   Document 4381-2   Filed 10/21/08   Page 37 of 83   Page ID
#:121894
Case 2:04-cv-09049-SGL-RNB   Document 3826   Filed 05/27/2008   Page 2 of 9

At oral argument and in its briefs, MGA argues at length that Mattel's claims against Bryant accrued some time shortly after Bryant left Mattel's employ in October, 2000.  In support of this argument, MGA offered evidence that Mattel has always believed that it took nine months to bring a doll through the stages of development and to market.  From that knowledge, in MGA's view, the sudden appearance of the Bratz dolls at a toy fair in Tokyo in January, 2001, should have aroused their suspicions.

MGA cites to the deposition of Bryant's co-worker, who had suspicions at the time Bryant resigned that Bryant was going to work for a competitor based on her subjective belief that Bryant would not pursue any other vocation other than doll designer.

MGA contends that Mattel could have looked at Bryant's phone records and determined that he had called MGA a number of times during the month pre-dating his resignation.

There is evidence that one of Bryant's co-workers believed it was "common knowledge," sometime in 2001, that Bryant probably designed Bratz.

The undisputed facts establish that in August, 2002, an anonymous letter was sent to Mattel's CEO stating that Bryant had designed Bratz.  This letter is the first indication that Bryant may have worked on Bratz during the period of his employment with Mattel.  See Zeller Decl. Ex. 63 ("While he was working with Mattel and working to create these dolls he worked out a deal with MGA that let him collect a large sum of money each year from MGA in exchange for his secrecy about the dolls and the fact that they are rightly Mattel dolls.").

The undisputed facts also establish that on July 18, 2003, the Wall Street Journal published an article entitled "Dolled Up:  To Lure Older Girls, Mattel Brings In Hip-Hop Crowd."  In that article, MGA's CEO Isaac Larian is attributed with a statement that Carter Bryant was the creator of Bratz.  The article states:

> Isaac Larian, chief executive of MGA, says he had never heard
> of a project similar to the Bratz at Mattel.  He says he chose Mr.
> Bryant's idea for Bryant over several others after holding a sort of
> fashion-doll design contest in late 1999.

Zeller Decl. Ex. 118.

At the close of the second hearing, held on May 19, 2008, MGA offered, for the first time, evidence in the form of a time line that showed that a "claim" from a lawsuit filed in Hong Kong by MGA was received by Mattel on September 23, 2003.  See Bogorad Supp. Decl. Ex. 145.  A copy of court documents from that litigation shows that MGA claimed ownership of Bratz fashion dolls and that, more specifically, at issue were "17 design drawings of various fashion dolls between the years 1998 and 2000."  Id. at Ex. 143.  Exhibit 143 is a ten-page document captioned as "STATEMENT OF CLAIM" and appears to the Court to be, under Hong Kong law, the equivalent of a complaint.  MGA's ownership to the 17 drawings referenced in the "STATEMENT OF CLAIM"

EXHIBIT ___K___

PAGE ___99___

Case 2:04-cv-09049-DOC-RNB   Document 4381-2   Filed 10/21/08   Page 38 of 83   Page ID
#:121895
Case 2:04-cv-09049-SGL-RNB      Document 3826      Filed 05/27/2008      Page 3 of 9

was based on Bryant's creation of the design drawings during a time period that includes his employment at Mattel.  Id.

Also at this time, MGA offered a letter, dated October 17, 2003, from Mattel's Hong Kong counsel to Mattel, that discusses the propriety of providing to Mattel certain documents relating to the City World litigation.  Within this letter, certain key details of the "STATEMENT OF CLAIM" were referenced.  See Supp. Bogorad Ex. 146 ("One of the exhibits referred to in such Affirmation was a set of coloured drawings described as '17 initial concept and design drawings of the Bratz dolls made by Mr. Carter Bryant in the year 2000.'").

After being given an opportunity to respond to this last-minute evidence, Mattel offered as evidence the documents it received on September 23, 2003, and that evidence did not include the document marked as Ex. 143.  See Supp. Moore Decl. Ex. A.  The documents Mattel received do not include any reference to Carter Bryant or the dates of creation of the 17 drawings.  See id. Instead, it consists of a copy of a "writ of summons" in that same litigation.

In responding to this evidence, counsel for MGA first incorrectly contended that the declaration of in-house counsel, Michael Moore, did not deny receiving a copy of the City World claim setting forth this key language.  Compare Reply at 1 ("**Mr. Moore, the only witness offered by Mattel, does _not_ deny that Mattel took possession of a copy of the City World claim on or about September 23, 2003**.") (emphasis in the original) with Supp. Moore Decl. ¶ 3 (attaching as Exhibit A all documents received from Mattel's Hong Kong counsel on September 23, 2003; noting that public access to court files in Hong Kong is limited; and verifying that the materials attached as Exhibit A (which does not include the key language regarding Carter Bryant's creation of Bratz drawings) "were the only ones relating to MGA's litigation that Mattel's Hong Kong counsel were allowed to obtain from the Hong Kong court files").

More disturbingly, however, counsel for MGA next lobbed unsubstantiated assaults on Mr. Moore's truthfulness.  Counsel states that the documents "appear to have been doctored or manipulated in some fashion."  Reply at 2.  Counsel does so because the fax itself has an anomalous pagination in the fax header line wherein the first ten pages are numbered "01, 02 . . . 10," and the numbers thereafter are numbered "11/46, 12/46 . . . 46/46."  Supp. Moore Ex. A.

This Court has indicated on a number of occasions, most strikingly in connection with its consideration of Mattel's motion to disqualify counsel for MGA, that it will not countenance unsubstantiated dispersions cast upon opposing counsel.  Where there is *evidence* of unethical behavior, the Court expects to be made aware of that evidence; where, however, there is mere *speculation* of such behavior, no legitimate purpose is served by its airing.

Nevertheless, focusing on the additional evidence offered by MGA on May 19, 2008, the time line produced in connection with the Simpson-Taylor deposition makes reference to a City World "claim" that was received by Mattel on September 23, 2003.  Although this time line stops short of acknowledging that the document entitled "STATEMENT OF CLAIM" was received in

EXHIBIT ___K___

PAGE ___100___

September, it is nevertheless sufficient to controvert Moore's declaration regarding whether the "STATEMENT OF CLAIM" was in fact received on this date. Moreover, the October 17, 2003, letter raises an inference regarding the full scope of Mattel's pre-November 23, 2003, knowledge of the contents of the "STATEMENT OF CLAIM."

It is uncontroverted that Mattel first received a copy of the Bryant-MGA contract, the effective date of which pre-dated the effective date of Bryant's resignation from Mattel, on November 24, 2003.

Where a plaintiff advances a state-law claim under California law, federal courts apply the California "discovery rule" to determine whether the state-law claim is time-barred. See, e.g., Orkin v. Taylor, 487 F.3d 734, 741 (9th Cir. 2007).

The Court's analysis begins with the unremarkable proposition that "[a] plaintiff must bring a claim within the limitations period after accrual of the cause of action." Fox v. Ethicon Endo-Surgery, Inc., 35 Cal.4th 797, 806 (Cal. 2005) (citation omitted). To apply this unremarkable proposition, however, the Court must determine what the California Supreme Court means by "accrual of the cause of action."

In that regard, the California Supreme Court has stated that, "[g]enerally speaking, a cause of action accrues at the time when the cause of action *is complete with all of its elements*," id. at 807 (emphasis added) (citation omitted), a phrase which itself must be expounded upon further to ascertain its meaning. When applying the discovery rule, those "elements" are not "specific legal element[s] of a particular cause of action"; rather, they are the "'generic' elements of wrongdoing, causation, and harm." Id. (citation omitted).

The definition of those terms gives a more comprehensive understanding to the California Supreme Court's statement that "the 'discovery rule' . . . postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." Id. (citation omitted). In turn, "[a] plaintiff has reason to discover a cause of action when he or she has reason at least to suspect a factual basis for its elements." Id. (internal quotation marks and citation omitted). Further refined, where a plaintiff has *knowledge* of at least one of the three generic elements, and *suspicion* of the remaining generic elements, the claim has accrued and the limitations period has begun to run. Id. (citation omitted).

This rule is designed to require plaintiffs to diligently investigate their potential claims. See id. at 808. To that end, in the context of a personal injury action, the California Supreme Court has stated that "plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation." Id. Of course, this statement must itself be viewed with the definition of "injury" the California Supreme Court considered: "At common law, the term 'injury,' as used in determining the date of accrual of a cause of action, means both a person's physical condition and its negligent cause. . . . Thus, physical injury alone is often insufficient to trigger the statute of limitations." Id. at 808 n.2 (internal quotation marks and citation omitted).

EXHIBIT ____K____

PAGE ____101____

This requirement of diligence, stated otherwise, prohibits California plaintiffs from passively waiting for the facts supporting their claim to find them and places on them an affirmative requirement to investigate:

> Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her.

Jolly v. Eli Lilly & Co., 44 Cal.3d 1103, 1111 (Cal.1988).

The Jolly court discussed two examples in explaining this standard. First, it cited to Miller v. Bechtel Corp., 33 Cal.3d 868, 874 (Cal.1983), which held time barred the fraud claim of a plaintiff who had suspicions that the value of her husband's stock was understated at the time of their dissolution agreement, but who failed to assert her claim until years later when the stock was sold. Id. In that case, the plaintiff's lawyer sought information, both before the dissolution and within a few months thereafter, regarding the method by which the stock was valued. Id. at 875. When the response was not forthcoming, the lawyer chose not to pursue this inquiry further, and thus plaintiff was charged with knowledge of the facts the investigation would have uncovered – that the stock was valued by the price attributed to it in the shareholders' agreement rather than by any objective valuation. Id.

Second, the Jolly court cited to Gray v. Reeves, 76 Cal.App.3d 567 (Cal. App.1977), which held that a plaintiff's claim based on his use of a prescription drug arose when the plaintiff understood the nature of his injury (deterioration of the hip socket) and the probable cause thereof (the use of the prescription drug prednisone) as well as the identity of the prescribing doctor and the drug's manufacturer.

Although the discovery rule has been largely developed in tort cases, the rule has also been applied in cases involving contract claims. See e.g., April Enterprises, Inc. v. KTTV, 147 Cal.App.3d 805, 832 (1983) ("Specifically, we hold the discovery rule may be applied to breaches which can be, and are, committed in secret and, moreover, where the harm flowing from those breaches will not be reasonably discoverable by plaintiffs until a future time."); Intermedics, Inc. v. Ventritex, Inc., 775 F.Supp. 1258, 1266-67 (N.D. Cal. 1991).

Thus, California's discovery rule is easily understood in the abstract; moreover, it is often easily applied in particular factual situations. Here, however, this Court's application of the rule in this case is not so clear cut, and the Court must consider the premises underlying the parties' respective analysis of this issue.

In substance, MGA contends that Mattel was on notice as early as February, 2001, of a potential claim that Carter Bryant breached the confidentiality provision of his contract by borrowing from or plagiarizing certain non-public Mattel projects. This date coincides with the display of the Bratz dolls at a New York Toy Fair and "speculation in the media started about

EXHIBIT ___K___

PAGE ___102___

Case 2:04-cv-09049-DOC-RNB   Document 4381-2   Filed 10/21/08   Page 41 of 83   Page ID
#:121898
Case 2:04-cv-09049-SGL-RNB   Document 3826   Filed 05/27/2008   Page 6 of 9

alleged similarities between the BRATZ and Mattel's internal projects." MGA Motion at 18. Alternatively, MGA posits March 15, 2002, the beginning date of an internal Mattel investigation into MGA and Larian's involvement in Bryant's creation and development of Bratz, as the date Mattel's current claims accrued.

Mattel, on the other hand, contends that MGA is essentially arguing that a claim Mattel chose not to bring – that Bratz infringed on the Mattel projects of Toon Teens and Diva Starz – is time barred. Mattel points out that it has previously disavowed, and that it continues to disavow, any intent to assert such a claim. Rather, Mattel contends that it is bringing a different claim, a claim that Mattel has rights to Bratz pursuant to the Inventions Agreement based on Bryant's actions during the period of his employment with Mattel.

In determining, under California law, which of the parties' diametrically opposed positions represent the better approach, the Court is guided by the California Supreme Court case cited above, Fox v. Ethicon Endo-Surgery, Inc., 35 Cal.4th 797, 806 (Cal. 2005). In that case, a plaintiff, suffering from complications following gastric bypass surgery, sued for medical malpractice. Id. at 802. During the course of discovery, she learned, through the testimony provided at the deposition of her surgeon, that she had a potential claim against the manufacturer of a surgical stapler. Id. at 804. Specifically, the plaintiff's surgeon testified that he had found on previous occasions that the particular stapler had caused post-surgery leaks. Id. When the plaintiff amended the complaint to assert a products liability claim, the trial court, on statute of limitations grounds, sustained a demmurrer without leave to amend, reasoning that "when a plaintiff sues based on knowledge or suspicion of negligence, . . . the statute of limitations begins to run as to all defendants, including manufacturers possibly liable under products liability theories." Id.

The Court of Appeal reversed, and the California Supreme Court affirmed the reversal. Id. at 812, 816. In doing so, the California Supreme Court rejected, as inconsistent with its precedent, the so-called "the Bristol-Myers Squibb rule that all claims arising from an injury accrue simultaneously, even if based upon distinct types of wrongdoing, is inconsistent with the generic elements approach . . . ." Id. at 815.

From this discussion, a parallel begins to emerge that MGA's position is like that of the demurring defendant who seeks to dismiss a products liability claim on the basis of plaintiff's discovery of a different claim of medical malpractice, and Mattel's position is like that of the plaintiff who seeks to assert the that products liability claim. In a sense, however, this analogy goes nowhere, as MGA's position is that the claim Mattel asserts in the current action is not different from the potential claim for which it was on notice of in 2001. After all, both would be based on breach of contract and/or copyright claims, both would involve the same defendants, and both would result in the same type of injury.

However, the Fox Court's elaboration on the rule it enunciates convinces the Court that Mattel's position is the stronger one. After discussing the application of its rule in the more narrow situation presented by the overlap of medical malpractice and products liability claims at issue in the case before it, the Fox Court explained:

MINUTES FORM 90                                                    Initials of Deputy Clerk: gg
CIVIL -- GEN                          Page 6                        Time:  0/00

EXHIBIT _____ K
PAGE _____ 103

Case 2:04-cv-09049-DOC-RNB    Document 4381-2    Filed 10/21/08    Page 42 of 83    Page ID
#:121899
Case 2:04-cv-09049-SGL-RNB    Document 3826    Filed 05/27/2008    Page 7 of 9

> More broadly stated, if a plaintiff's reasonable and diligent investigation
> discloses only one kind of wrongdoing when the injury was actually
> caused by tortious conduct of a wholly different sort, the discovery rule
> postpones accrual of the statute of limitations on the newly discovered
> claim.

Id. at 813. In analyzing the discovery rule, the term "wrongdoing" is used not in a technical or legal sense, but in its everyday meaning. Jolly v. Eli Lilly & Co., 44 Cal.3d 1103, 1111 (1988) ("In this context, 'wrong,' 'wrongdoing,' and 'wrongful' are used in their lay understanding.").

Here, on one hand, we have a breach of contract claim or copyright infringement claim based on alleged copying or "borrowing" of Mattel's undisputed rights in Toon Teens and/or Diva Starz to create Bratz that perhaps Mattel was on notice of as early as 2001, and which Mattel admittedly investigated as early as 2002, but upon which Mattel ultimately chose not to file suit. On the other hand, we have the claims asserted here, for breach of contract and copyright infringement, based on Mattel's (disputed) ownership rights to the Bratz drawings pursuant to Bryant's employment agreement with Mattel and in light of the (disputed) fact that Carter Bryant created these works during the period of his employment with Mattel. Applied to the present case, in the Court's view, the question the Court must ask is whether the first type of claim is based on qualitatively different type of "wrongdoing" – as that term might be understood by lay persons – than that which gives rise to the present claims.

Thus framed, the Court considers the two claims: Although they are similar in that they both include the wrongdoing of the failure to keep one's promise to maintain confidentiality, they are qualitatively different, however, in that the former situation involves the alleged taking of rights known to Mattel while the latter involves the alleged concealment of certain creations that belong to Mattel in the first instance in order to facilitate the taking of rights unknown to Mattel. This fundamental difference leads the Court to the conclusion that the latter claims, those asserted here, involve a different element of "wrongdoing" than do the unasserted claims based on Toon Teens and/or Diva Starz.

The burden of proof on the discovery rule issue is on Mattel.[2] Examining the claim Mattel asserts, rather than the claim Mattel chose not to assert, the Court must determine whether Mattel had knowledge of any one of the three generic elements of wrongdoing, causation, or damages, coupled with suspicion of the remaining generic elements. This determination cannot be made on the undisputed record before the Court.

Rather, MGA has raised triable issues of fact precluding summary judgment on the statute of limitations issue. Any of the following could be the date upon which MGA claims against Carter

---

[2] See Fox, 35 Cal.4th at 803 (imposing upon a plaintiff that seeks to take advantage of the discovery rule a requirement that it "plead[] and prove[] that a reasonable investigation at that time would not have revealed a factual basis for that particular cause of action).

EXHIBIT _____ K _____

PAGE _____ 104 _____

Case 2:04-cv-09049-DOC-RNB   Document 4381-2   Filed 10/21/08   Page 43 of 83   Page ID
#:121900
Case 2:04-cv-09049-SGL-RNB   Document 3826   Filed 05/27/2008   Page 8 of 9

Bryant accrued: The July 18, 2003, <u>Wall Street Journal</u> article; the September 23, 2003, date of receipt of the City World "claim"; the October 17, 2003, date of counsel's letter to Mattel regarding the City World litigation; or the November 24, 2003, date of receipt of the MGA-Bryant agreement that pre-dated Bryant's resignation of his employment.[3]

The accrual of a copyright claim, as the parties recognize, approximates the state-law standard discussed herein.  <u>See</u> <u>Polar Bear Productions, Inc. v. Timex Corp.</u>, 384 F.3d 700, 706 (9th Cir. 2004) ("Thus, . . . the statute of limitations does not prohibit recovery of damages incurred more than three years prior to the filing of suit if the copyright plaintiff was unaware of the infringement, and that lack of knowledge was reasonable under the circumstances.").  Accordingly, the Court makes the same conclusion regarding the accrual date of Mattel's copyright claim against Carter Bryant as it does regarding the accrual date of Bryant's state-law claims.

As stated earlier, although Bryant is no longer a party to this action, the parties recognize, as does the Court, that the timeliness of the claims asserted against Carter Bryant is relevant because of the potential that Mattel's claims against the MGA entities and Isaac Larian may, pursuant to Fed. R. Civ. P. 15(c), relate back to those claims.  Mattel embraces the concept of relation back; MGA rejects it.

Although such distinction has not been particularly important at other points in this litigation, the Court has referred to the MGA entities and Isaac Larian collectively as MGA.  More specifically, as to Phase 1, there are two separate MGA entities:  MGA Entertainment, Inc. and MGA Entertainment HK Limited.  There is also MGA's CEO, Isaac Larian.  This distinction is important to the Court's analysis of relation back.

MGA Entertainment, Inc., but <u>not</u> Isaac Larian or the other MGA entity, intervened in this action on December 7, 2004.  Therefore, based on the status of MGA Entertainment, Inc., as a party, the standard for whether the claims relate back differs from that governing the relation back of claims against MGA Entertainment HK Limited.  <u>See infra</u>.  As this Court has noted before, the Phase 1 claims against MGA sought to be asserted by Mattel on November 20, 2006, which arise out of the same factual allegations as do the claims asserted by Mattel against Carter Bryant on April 27, 2004, relate back to the date that complaint was filed.  <u>See</u> Court's Jan. 12, 2007, Order at 13-15.  The Court does not revisit that issue now.

MGA argues that "some courts have dis-allowed 'relation back' of claims against intervening <i>defendants</i>." MGA Opp. at 25 n.21 (emphasis in the original).  However, in support of this argument, MGA cites a two-page Texas appellate court decision which does not cite to or interpret Fed. R. Civ. P. 15(c), <u>Davis v. Outdoor Equip. Co.</u>, 551 S.W.3d 72, 73 (Tex. Ct. App. 1977), which the Court finds unpersuasive.

As to the new parties sought to be added on November 20, 2006 (MGA Entertainment HK

---

[3]   The analysis is slightly different for the conversion claim.  <u>See</u> <u>infra</u> at 9-10.

EXHIBIT _____K_____

PAGE _____105_____

Case 2:04-cv-09049-DOC-RNB   Document 4381-2   Filed 10/21/08   Page 44 of 83   Page ID
#:121091
Case 2:04-cv-09049-SGL-RNB   Document 3626   Filed 05/27/2008   Page 9 of 9

Limited and Isaac Larian), MGA challenges the timeliness of the amendment to add these parties based on whether their identities were known to Mattel at an earlier date. The Court has already held that the claims against them relate back to the April, 2004, complaint. See Court's Jan. 12, 2007, Order at 15-16 n.5. The Court will not revisit that issue either.

The Court rejects the proposition, however, that the claims against both MGA entities did not arise until the date of Carter Bryant's deposition. Whatever the date on which the claims against Carter Bryant arose is ultimately found to be, the August 2002 anonymous letter should have given Mattel a suspicion of that MGA Entertainment, Inc., participated in any wrongdoing by Carter Bryant. See Zeller Decl. Ex. 63 (alleging that Carter Bryant "worked out a deal with MGA that let him collect a large sum of money each year from MGA in exchange for his secrecy about the dolls").

The same is not true as to MGA Entertainment HK Limited and as to Isaac Larian, whom the anonymous letter did not implicate. Therefore, the claims against these defendants arose no earlier than November 4, 2004.

Intentional interference with contractual relations is subject to a two-year statute of limitations. MGA contends that the claim accrues upon the breach of contract, and therefore argues that the claim was untimely before it was asserted against Carter Bryant. They make a similar argument regarding Mattel's conversion claim, which carries with it a three-year statute of limitations.

However, the statute of limitations for breach of contract is tolled during a period of fraudulent concealment. Gryczman v. 4550 Pico Partners, Ltd., 107 Cal.App.4th 1, 5 (2003). The rationale for such tolling easily extends to intentional interference with contractual relations claim, which includes the element of a breach of a contract. The limitations period is likewise tolled during a period of fraudulent concealment as to a conversion claim. AmerUS Life Ins. Co. v. Bank of America, 143 Cal.App.4th 631, 639 (2006) ("To the extent our courts have recognized a 'discovery rule' exception to toll the statute, it has only been when the defendant in a conversion action fraudulently conceals the relevant facts or where the defendant fails to disclose such facts in violation of his or her fiduciary duty to the plaintiff.") Mattel has raised a triable issue of fact as to whether the evidence of the breach and the tortious interference thereof was fraudulently concealed from them before the July 18, 2003, Wall Street Journal article.

The Court will permit further briefing from the parties on the limited issue of what further conclusions regarding the timeliness of each claim should be drawn as a result of this Order. The parties' simultaneous briefs shall be limited to seven pages in length, and shall not re-argue any point upon which the Court has ruled in this Order or its previous two summary judgment Orders. The briefs shall be e-filed no later than 8:30 a.m., Thursday, May 29, 2008, and a courtesy copy must be provided to chambers at the same time. The parties shall also file, as exhibits thereto, their revised proposed special interrogatories on the issue of statute of limitations.

**IT IS SO ORDERED.**

EXHIBIT _____K_____

PAGE _____106_____

<u>CONFIDENTIAL</u>                                              1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA


MATTEL, INC., a Delaware corporation, )    CASE NO.
                                      )    CV 04-9059 DDP (AJWx)
                Plaintiff,            )
                                      )
        vs.                           )
                                      )
CARTER BRYANT, an individual, and     )
DOES 1 through 10, inclusive,         )
                                      )
                Defendants.           )
_____)
CARTER BRYANT, on behalf of himself,  )
all present and former employees of   )
Mattel, Inc., and the general public, )
                                      )
                Cross-Complainant,    )
                                      )
        vs.                           )
                                      )
MATTEL, INC., a Delaware corporation, )
                                      )
                Cross-Defendant.      )


VOLUME I
THE VIDEOTAPED DEPOSITION OF CARTER BRYANT,
produced, sworn, and examined on Thursday, November 4, 2004,
at 9:10 a.m. of that day, pursuant to Notice to Take
Deposition at the University Plaza, Executive Boardroom,
333 South John Q. Hammons Parkway, in the City of Springfield,
County of Greene, State of Missouri, before Sherrie L. Hunt,
Certified Court Reporter, and Notary Public, in a certain
cause now pending in the United States District Court for the
Central District of California, wherein the parties are as
above set forth; taken on behalf of the Plaintiff and
Cross-Defendant.


COURT REPORTERS OF THE MIDWEST, INC.
P.O. Box 4282
Springfield, MO 65808 (417) 889-2079

EXHIBIT _____L_____

PAGE _____107_____

CONFIDENTIAL                                                    2

A P P E A R A N C E S

For Plaintiff and                MR. JOHN B. QUINN
Cross-Defendant:                 MR. MICHAEL T. ZELLER
                                 MS. TANIA KREBS
                                 Quinn, Emanuel, Urquhart,
                                   Oliver & Hedges
                                 865 South Figueroa Street
                                 10th Floor
                                 Los Angeles, California 90017

For Defendants and               MR. DOUGLAS A. WICKHAM
Cross-Complainant:               Littler Mendelson
                                 2049 Century Park East
                                 5th Floor
                                 Los Angeles, California 90067

Also Present:                    Ms. Dale M. Cendali
                                 Mr. Michael Moore

Videotaped by:                   Mr. Donald Gifford
                                 Mr. Donald Gifford, II
                                 1528 East Glenwood
                                 Springfield, Missouri 65804


I N D E X

WITNESS:  CARTER BRYANT                                Page
Direct Examination by Mr. Quinn ..................    4
Notarial Certificate and Costs ...................  262

                              * * *


E X H I B I T S

DEPOSITION EXHIBIT          DESCRIPTION              IDENTIFIED
                             (NONE)


Phonetic spelling:  (Ph.)
Exactly as stated:  (Sic)

EXHIBIT ___L___
PAGE ___108___

CONFIDENTIAL                                            3

1          VIDEOGRAPHER:   This is the videotaped        09:10

2     deposition of Mr. Carter Bryant in the matter of Mattel,

3     Inc., a Delaware corporation, Plaintiff, versus Carter

4     Bryant, an individual, and Does 1 through 10, inclusive,

5     Defendants, and Carter Bryant on behalf of himself, all   09:11

6     present and former employees of Mattel, Inc., and the

7     general public, Cross-Complainant, versus Mattel, Inc., a

8     Delaware corporation, Cross-Defendant.  This deposition is

9     in the U.S. District for the Central District of

10    California.  The deposition is being held at the          09:12

11    University Plaza Hotel in Springfield, Missouri, on

12    November 4th, 2004.  The reporter is Ms. Sherrie Hunt.  My

13    name is Don Gifford, the videographer.  Will counsel

14    please state their appearance for the record.

15             MR. QUINN:  My name is John Quinn.  I'm           09:12

16    counsel for Mattel.

17             MR. ZELLER:  Mike Zeller on behalf of

18    Mattel, Inc.

19             MR. MICHAEL MOORE:  Michael Moore, in-house,

20    Mattel.                                                    09:12

21             MR. WICKHAM:  Douglas Wickham on behalf of

22    Defendant and Cross-Complainant Carter Bryant.

23             MS. CENDALI:  Dale Cendali on behalf of

24    nonparty MGA Entertainment.

25             VIDEOGRAPHER:  Thank you.  Madam Court            09:12

EXHIBIT ____L____

PAGE ____109____

1    Reporter, would you please swear in the witness.

2                    CARTER BRYANT,

3    being first duly sworn to testify the truth, the whole

4    truth, and nothing but the truth, testified as follows:

5                    VIDEOGRAPHER:  We're now on the record.  The     09:12

6    time is 9:14 a.m.

7                    MR. QUINN:  Thank you.

8                    DIRECT EXAMINATION

9    BY MR. QUINN:

10   Q    Good morning, Mr. Bryant.                                 09:13

11   A    Good morning.

12                   MR. WICKHAM:  John, just by way of

13   clarification so that we have an understanding that Mr.

14   Bryant is appearing today pursuant to Judge Alarcon's

15   order that ordered that his deposition proceed today on       09:13

16   November 4 and tomorrow on November 5; however, the action

17   has recently been removed to the U.S. District Court for

18   the Central District of California, and as a consequence,

19   the deposition is proceeding pursuant to the Federal Rules

20   of Civil Procedure, including its limitations on              09:13

21   discovery.

22        That said, even though the Federal rules do have a

23   seven-hour limitation on depositions, we have agreed that

24   Mr. Bryant will be here today and tomorrow and that we do

25   intend that he will be here until the deposition is           09:13

EXHIBIT ___L___

PAGE ___110___

CONFIDENTIAL                                    139

| | | | |
|---|---|---|---|
| 1 | | MS. CENDALI:   Objection. | 12:43 |
| 2 | A | I don't recall. | |
| 3 | Q | (By Mr. Quinn)   Did you review any yesterday? | |
| 4 | | MR. WICKHAM:   Objection.   If you reviewed | |
| 5 | | any documents in connection with preparation for your | 12:43 |
| 6 | | deposition for purposes of refreshing your memory -- you | |
| 7 | | know what, you've already asked this question about 14 | |
| 8 | | times.   Objection, attorney-client privilege.   Instruct | |
| 9 | | the witness not to respond.   Harassing, burdensome. | |
| 10 | | MR. QUINN:   Okay.   On that note why don't we | 12:44 |
| 11 | | break for lunch. | |
| 12 | | VIDEOGRAPHER:   We're off the record.   The | |
| 13 | | time's 12:40 -- | |
| 14 | | MR. QUINN:   Wait.   Wait.   One hour enough? | |
| 15 | | MR. WICKHAM:   That's fine. | 12:44 |
| 16 | | MR. QUINN:   Okay. | |
| 17 | | VIDEOGRAPHER:   The time is 12:44. | |
| 18 | | (Break in proceedings.) | |
| 19 | | VIDEOGRAPHER:   Back on the record.   Time is | |
| 20 | | 1:47. | 01:47 |
| 21 | Q | (By Mr. Quinn)   Good afternoon, Mr. Bryant. | |
| 22 | A | Good afternoon. | |
| 23 | Q | You've told us this morning that you first came up with | |
| 24 | | the Bratz concept, as I understand it, in 1998; is that -- | |
| 25 | A | Yes. | |

EXHIBIT _____∠_____

PAGE _____/ / /_____

CONFIDENTIAL                                            140

| | | | |
|---|---|---|---|
| 1 | Q | -- correct? | 01:47 |
| 2 | A | Yes. | |
| 3 | Q | We've used the "Bratz" name.  Did you come up with the | |
| 4 | | "Bratz" name as well? | |
| 5 | A | Yes. | 01:47 |
| 6 | Q | And when did you come up with the name? | |
| 7 | A | About the time of the creation of the Bratz.  About the | |
| 8 | | same time. | |
| 9 | Q | Can you tell me as best you can recall when it was that | |
| 10 | | you created the Bratz? | 01:47 |
| 11 | A | Yes.  Let's see.  I was driving by a high school.  I | |
| 12 | | believe it was on my way home from work, and there were -- | |
| 13 | | the kids were getting out of school and I was just kind of | |
| 14 | | struck by the way they looked.  They were wearing kind of, | |
| 15 | | you know, oversized clothes, big, baggy jeans.  They had | 01:48 |
| 16 | | on backpacks and -- I don't know.  There was just | |
| 17 | | something very interesting and exciting about their energy | |
| 18 | | and just got me to kind of thinking, you know, wouldn't it | |
| 19 | | be cool if there were some characters that kind of | |
| 20 | | accurately represented today's teenager. | 01:48 |
| 21 | | And so when I got home I started doing a little bit | |
| 22 | | of sketching and sketched some characters fairly quickly. | |
| 23 | | I had also kind of been looking at magazines and things | |
| 24 | | like that.  There were some advertising things that were | |
| 25 | | going on at the same time that kind of all melded together | 01:49 |

EXHIBIT _____ L _____

PAGE _____ 112 _____

CONFIDENTIAL                                    141

1    and kind of gave me the idea.   There was a Paris Blues ad.        01:49
2    There was -- 17 Magazine had a Steve Madden ad.   There was
3    an ad for the Dixie Chicks' album and it said "Chicks with
4    Attitude" on it, and it all just kind of came together and
5    it all just kind of really struck me when I drove by that        01:49
6    high school.
7    Q   Can you place this in a month in 1998?
8    A   It was in late August.
9    Q   And do you recall the high school?
10   A   I believe it was Kickapoo High.                               01:49
11   Q   Kickapoo?
12   A   Uh-huh.
13   Q   Is that here in Springfield?
14   A   Yes.
15   Q   And there is a street that you were driving on that          01:50
16       actually fronts right on this high school?
17   A   Yes.
18   Q   And do you recall what the name of that street is?
19   A   I think it's Primrose.
20   Q   So school was in session in late August?                     01:50
21   A   Yes, as far as I know.
22   Q   And did these kids seem to be coming out of school?
23   A   Yeah.   They seemed like they were getting out of school,
24       going to their cars, whatever.
25   Q   It wasn't just one or two kids?   There was a whole bunch    01:50

EXHIBIT _____L_____

PAGE _____113_____

CONFIDENTIAL                                        142

| | | |
|---|---|---|
| 1 | | of kids like the school was empty? |
| 2 | A | There were, yeah, quite a few kids. |
| 3 | Q | And this would have been what time of day? |
| 4 | A | I don't recall.  Maybe around -- I don't know -- two |
| 5 | | o'clock or so. |
| 6 | Q | And you said that you were coming home from work; is that |
| 7 | | right? |
| 8 | A | You know, I think I was coming home from work, but I'm not |
| 9 | | sure whether it was going or coming. |
| 10 | Q | And where were you working at that time? |
| 11 | A | I was working at Old Navy at the mall. |
| 12 | Q | Which mall would that -- would that be? |
| 13 | A | Battlefield Mall. |
| 14 | Q | Battlefield? |
| 15 | A | Uh-huh. |
| 16 | Q | Is that a yes? |
| 17 | A | Yes.  I'm sorry. |
| 18 | Q | And do you recall what shift you were working? |
| 19 | A | I don't. |
| 20 | Q | Did you sometimes work days, sometimes swing different |
| 21 | | hours or -- |
| 22 | A | Yes.  I think sometimes it was days, sometimes it was |
| 23 | | evenings, but I don't recall. |
| 24 | Q | And did you say that that very day you went home and |
| 25 | | actually did some sketches? |

01:50
01:50
01:51
01:51
01:51
01:51
01:51

EXHIBIT _____ L _____

PAGE _____ 114 _____

CONFIDENTIAL                                              154

```
 1           to see if this is a project that you could take forward        02:09
 2           and get some company interested in pursuing?
 3      A    I think that I sort of did think that.  I thought that
 4           maybe this Alaska Momma might be able to help me pitch it.
 5      Q    You told me the originals of these color provision -- or        02:09
 6           these color versions that you created in 1999 are now in
 7           the possession of MGA?
 8      A    As far as I know.
 9      Q    Did you give them to MGA?
10      A    Yes.                                                            02:09
11      Q    When was it that you gave them to MGA?
12      A    I think that I gave those to them in 2003.
13      Q    In what connection did you do that?
14      A    I think it was at the request of their in-house attorney.
15      Q    Did you have any understanding as to why they wanted them?      02:10
16                  MS. CENDALI:  Objection, attorney-client
17           privilege.
18      A    I don't know.
19      Q    (By Mr. Quinn)  All right.  But I think you've told me
20           this morning that you did decide in 1999 to send some           02:10
21           drawings to Alaska Momma?
22      A    Uh-huh.
23      Q    And --
24                  MR. WICKHAM:  You have to speak audibly.
25      A    I'm sorry.  Yes.                                                02:10
```

EXHIBIT _____L_____

PAGE _____115_____

CONFIDENTIAL                                                      155

```
 1   Q   (By Mr. Quinn)  And you sent them the color versions?        02:10
 2   A   Yes.
 3   Q   And you told us about that this morning, that nothing came
 4       of that?
 5   A   That's right.                                                02:11
 6   Q   And did they return those to you?
 7   A   I sent color copies and they returned them.
 8   Q   The color originals you kept in your possession at that
 9       time until you gave them to MGA sometime in 2003?
10   A   Yes.                                                         02:11
11   Q   All right.  Did you -- at any time during 1999 did you
12       take any other action to pursue the idea of seeing if this
13       is a -- you could move the Bratz project forward with some
14       company?
15   A   No.  After I got the rejection letter from Alaska Momma I    02:11
16       kind of -- I felt like I had had one too many rejection
17       letters and I just kind of shelved the whole thing.  I
18       just thought, you know, I don't want to keep trying to
19       send things out, so I just decided to shelve it.
20   Q   At this time when you were -- at the time you sent these     02:12
21       drawings to Alaska Momma, did you already have the name
22       "Bratz"?
23   A   Yes.
24   Q   And what was the inspiration that caused you to come up
25       with the idea of "Bratz"?                                    02:12
```

EXHIBIT _____ L _____

PAGE _____ 116 _____

CONFIDENTIAL                                      156

```
 1    A    I think from the -- just from the original drawings, it      02:12
 2         just seemed like as soon as I got them on paper the name
 3         just kind of came to me.  It just seemed appropriate.
 4         Just came to me and just seemed like the perfect name.
 5    Q    So that was the name -- as far as you were concerned that    02:12
 6         was the name that was always attached to this project was
 7         "Bratz"?
 8    A    Yes.
 9    Q    Okay.  Well, was there anything else that happened in 1999
10         in terms of potentially developing the Bratz project?        02:12
11              MR. WICKHAM:  Objection, vague, ambiguous.
12    A    Not that I can remember.
13    Q    (By Mr. Quinn)  What I've got at this point is you took
14         out your original tracings and you -- and you created
15         color versions with the use of a light box --               02:13
16    A    Yes.
17    Q    -- and you sent these to Alaska Momma.  Is there anything
18         else that you did with Bratz in 1999 other than those
19         things?
20              MR. WICKHAM:  Objection, vague, ambiguous,              02:13
21         overbroad.
22    A    Not that I can remember.
23    Q    (By Mr. Quinn)  All right.  In 2000 what was the first
24         activity that you had relating to Bratz?
25    A    Let's see.  Richard and I had just purchased a home, the     02:13
```

EXHIBIT _____ L _____

PAGE _____ 117 _____

CONFIDENTIAL                                                    157

```
 1        home that we had been renting, and we were setting up        02:13
 2        the -- there's a little back apartment.  We were setting
 3        that up to be sort of like a studio where I could go and
 4        draw, whatnot, and when we were moving boxes and things I
 5        found the drawings again and this time I was really struck   02:13
 6        by them and I thought -- you know, I thought, gosh, they
 7        still look great, I should really try and do something
 8        with these, and I think this was in -- gosh.  I don't
 9        remember the exact time frame but I think it was in June
10        or July and just really got me to thinking that this was,   02:14
11        after all these years, still a really good idea.
12   Q    Was Richard there with you when -- when you came across
13        these again?
14   A    Yes.
15   Q    So as a result of looking at them again and having this     02:14
16        thought that these still look really good to me --
17   A    Uh-huh.
18   Q    -- did you take any action?
19   A    Yes.  That was when I contacted my friend Veronica Marlow
20        and said, you know, I've had this great idea that's kind    02:15
21        of been sitting around for a while and I would like to
22        maybe try and do something with it, have you got any ideas
23        on how I might, you know, pursue this project.
24   Q    So she's the first person who you asked that question of?
25   A    Yes.                                                        02:15
```

EXHIBIT _____ L _____

PAGE _____ 118 _____

CONFIDENTIAL                                              261

DEPONENT'S SIGNATURE PAGE


RE:  Mattel, Inc., vs. Carter Bryant, et al.
     Carter Bryant vs. Mattel, Inc.
     Case No. CV 04-9059 DDP (AJWx)
     Deposition taken on November 4, 2004


     I do hereby certify that the foregoing is a true and

correct transcript of the deposition in the foregoing-styled

and numbered cause, and I now sign the same as true and

correct, with the exception of the corrections which I have

noted on the correction sheet provided.


_____
        CARTER BRYANT


     Subscribed and sworn to before me this 2ⁿᵈ day of

_____, 20 05 .


_____
        Notary Public


My Commission Expires:

Dec. 31, 2008


CECILY THOMAS-MCKOY
Commission # 1539977
Notary Public - California
Los Angeles County
My Comm. Expires Dec 31, 2008


EXHIBIT _____ L _____

PAGE _____ 119 _____

CONFIDENTIAL                                     262

NOTARIAL CERTIFICATE


STATE OF MISSOURI        )
                         )  ss.
COUNTY OF GREENE         )


    I, Sherrie L. Hunt, Certified Court Reporter, and
Notary Public within and for the State of Missouri, do
hereby certify that on November 4, 2004, pursuant to Notice,
the above witness, CARTER BRYANT, was by me first duly sworn
to testify the truth, the whole truth, and nothing but the
truth in the case aforesaid; and that the deposition by him
was reduced to writing by me in stenotype, and thereafter
transcribed by me, and is fully and accurately set forth in
the preceding pages; that presentment by me to the witness for
signature was waived; and that the deposition will be
thereafter by the witness read, signed, and sworn to on or
before the date of trial.

    I do further certify that I am not related to, nor
attorney for, nor employed by any of the said parties, nor
otherwise interested in the event of said action.


Sherrie L. Hunt
Notary Public
Greene County
State of Missouri
My Commission Expires May 17, 2005

Sherrie L. Hunt
Certified Court Reporter
C.C.R. Number 1027
Notary Public


My commission expires:  May 17, 2005


Costs:   To Plaintiff and Cross-Defendant $1,399.25
         To Defendants and Cross-Complainant $422.65


COURT REPORTERS OF THE MIDWEST, INC.
P.O. Box 4282
Springfield, MO 65808 (417) 889-2079


EXHIBIT ___L___
PAGE ___120___

**Confidential; Subject to Protective Order**

CORRECTIONS TO THE DEPOSITION OF

CARTER BRYANT

VOLUME I

---

RE:    Mattel, Inc., vs. Carter Bryant, et al.
       Carter Bryant vs. Mattel, Inc.
       Case No. CV 04-9059 NM (RNBx)
       Deposition taken on November 4, 2004

| Page/Line | Change Requested |
|---|---|
| 86:5 | Delete: "I may have." Insert: "I don't recall." |
| 124:1 and 3 | Delete: "No." Insert: "Other than my communications with Universal, I don't recall that I did." |
| 131:19 | Delete: "No, I did not." Insert: "Other than my communications with Universal, I don't recall that I did." |
| 132:3 | Delete: "I don't remember telling anybody that, no." Insert: "Other than my communications with Universal, I don't recall telling anybody that." |
| 132:18 | Delete: "To the best of my recollection that's true." Insert: "To the best of my recollection, other than my communications with Universal, that's true." |
| 195:24 | Insert: "I also received expense reimbursements from MGA and an advance against royalties." |
| 252:24 | Delete: "No." Insert: "No. I interpreted your question as asking whether I was employed by MGA at that time and the answer is no." |
| 253:20 | Delete: "I don't remember that, no." Insert: "Other than my communications with Universal, I don't remember that." |
| 253:22 | Delete: "That – as far as I can remember that never happened." Insert: "Other than my communications with Universal, as far as I can remember, that never happened." |

EXHIBIT ___2___

PAGE ___121___

253:25                          Delete: "No." Insert: "Other than my communications with Universal, no that I remember."

EXHIBIT ____*L*____

2

PAGE ____*122*____

 香港特別行政區政府知識產權署商標註冊處
Trade Marks Registry, Intellectual Property Department
The Government of the Hong Kong Special Administrative Region

商標記錄
**Trade Mark Records**

[210] 申請編號 :
] **Application No.:**                       300846612AA

狀況 :
**Status:**                                  Published

[540] 商標 :
**Mark:**                                    JADE

# JADE

[550] 商標種類 :
**Mark Type:**                               Ordinary

[730] 申請人
姓名／名稱、地址 :                             MGA Entertainment Inc.
**Applicant's Name,**                        16380 Roscoe Boulevard,
**Address:**                                 Van Nuys, California 91406,
                                             United States of America

[740/ 申請人的送達地址 :                         William W.L. Fan & Co.
750] **Applicant's Address**                  Room 1005, 10th Floor, Far East
**for Service:**                             Finance Centre,
                                             16 Harcourt Road,
                                             Hong Kong.

代理人地址 :                                    Room 1005, 10th Floor, Far East
**Agent's Address:**                         Finance Centre,
                                             16 Harcourt Road,
                                             Hong Kong.

[511] 類別編號 :
**Class No.:**                               16

[511] 貨品／服務說明 :                           Class 16
**Specification:**                           children's books; crayons; felt-tip
                                             markers; highlighting pens and
                                             markers; holiday cards; ink pens;
                                             magazines but not relating to the
                                             mineral jade, autograph books, baking
                                             books, blank journals, comic books,

EXHIBIT ___M___

PAGE ___123___

calendars, children's activity books,
graphic novels, napkins, novels,
posters but not relating to the
mineral jade, stationery; sticker
books and trading cards; patterns for
making clothes; pencils; and stickers.

[220]提交日期：                    04-04-2007
      (日-月-年)
      Date of Filing:
      (D-M-Y)

[442]公布獲接納註冊申請日期： 18-07-2008
      (日-月-年)
      Date of Publication
      of
      Application of
      Acceptance
      for Registration:
      (D-M-Y)

詳細背景資料：
Historical Details:

作出記項日期    事項
Date of entry Matters
29-06-2007      DIVISION

              Application No.        300846612
              before division:

              Application Nos.       300846612AA , 300846612AB
              after division:

EXHIBIT ____M____
PAGE ____124____



香港特別行政區政府知識產權署商標註冊處
**Trade Marks Registry, Intellectual Property Department**
**The Government of the Hong Kong Special Administrative Region**

商標記錄
**Trade Mark Records**

| | |
|---|---|
| [111] 商標編號：<br>**Trade Mark No.:** | 300846612AB |
| 狀況：<br>**Status:** | Registered |
| [540] 商標：<br>**Mark:** | JADE |

# JADE

| | |
|---|---|
| [550] 商標種類：<br>**Mark Type:** | Ordinary |
| [730] 擁有人<br>姓名／名稱、地址：<br>**Owner's Name,**<br>**Address:** | MGA Entertainment Inc.<br>16380 Roscoe Boulevard,<br>Van Nuys, California 91406,<br>United States of America |
| [740/ 擁有人的送達地址：<br>750] **Owner's Address**<br>**for Service:** | William W.L. Fan & Co.<br>Room 1005, 10th Floor, Far East<br>Finance Centre,<br>16 Harcourt Road,<br>Hong Kong. |
| 代理人地址：<br>**Agent's Address:** | Room 1005, 10th Floor, Far East<br>Finance Centre,<br>16 Harcourt Road,<br>Hong Kong. |
| [511] 類別編號：<br>**Class No.:** | 28 |
| [511] 貨品／服務說明：<br>**Specification:** | <u>Class 28</u><br>action figures and playsets therefor;<br>action skill games; arcade games;<br>athletic protective pads, arm pads,<br>knee pads, elbow pads and wrist pads<br>for cycling, skating and<br>skateboarding; balloons; baseballs; |

EXHIBIT _N_

PAGE _125_

baseball gloves; basketballs; beach balls; bean bag dolls; board games; body boards; card games; children's play cosmetics; Christmas tree ornaments, except confectionery or illumination articles; craft sets for decorating balloons; dolls; doll clothing; doll accessories; flying discs; footballs; hand held unit for playing electronic games; in-line skates; kites; mobiles for children; party favors in the nature of crackers and noisemakers; playground balls; playing cards; plush toys; puppets; puzzles; roller skates; skateboards; skim boards; snow sleds for recreational use; soccer balls; swim floats for recreational use; swim fins; toy action figures and accessories therefor; toy vehicles and playsets therefor; toy scooters; volleyballs; water wing, swim aids for recreational use; wind-up toys; and spinning discs incorporating string which rewinds and returns the disc to the hand when thrown.

[220] 提交日期：
(日-月-年)
Date of Filing:
(D-M-Y)

04-04-2007

[442] 公布獲接納註冊申請日期： 21-09-2007
(日-月-年)
Date of Publication of Application of Acceptance for Registration:
(D-M-Y)

[151] 註冊日期：
(日-月-年)
Date of Registration:
(D-M-Y)

04-04-2007

實際註冊日期：
(日-月-年)

14-03-2008

EXHIBIT ____N____

PAGE ____126____

Actual Date of
Registration:
(D-M-Y)

[180] 註冊屆滿日期:          03-04-2017
     (日-月-年)
     Expiry date:
     (D-M-Y)

詳細背景資料:
Historical Details:

作出記項日期   事項
Date of entry Matters
14-03-2008    REGISTRATION

作出記項日期   事項
Date of entry Matters
29-06-2007    DIVISION

              Application No.      300846612
              before division:

              Application Nos.     300846612AA  ,  300846612AB
              after division:

EXHIBIT _____N_____

PAGE _____127_____



**香港特別行政區政府知識產權署商標註冊處**
Trade Marks Registry, Intellectual Property Department
The Government of the Hong Kong Special Administrative Region

---

**商標記錄**
**Trade Mark Records**

---

| | |
|---|---|
| [111] **商標編號：**<br>**Trade Mark No.:** | 300443989AB |
| **狀況：**<br>**Status:** | Registered |
| [540] **商標：**<br>**Mark:** | JADE<br><br>**JADE** |
| [550] **商標種類：**<br>**Mark Type:** | Ordinary |
| [730] **擁有人**<br>**姓名／名稱、地址：**<br>**Owner's Name,**<br>**Address:** | MGA ENTERTAINMENT INC.<br>16380 ROSCOE BOULEVARD, VAN NUYS,<br>CALIFORNIA, 91406,<br>UNITED STATES OF AMERICA. |
| [740/ **擁有人的送達地址：**<br>750] **Owner's Address**<br>**for Service:** | William W.L. Fan & Co.<br>Room 1005, 10th Floor, Far East<br>Finance Centre,<br>16 Harcourt Road,<br>Hong Kong. |
| **代理人地址：**<br>**Agent's Address:** | Room 1005, 10th Floor, Far East<br>Finance Centre,<br>16 Harcourt Road,<br>Hong Kong. |
| [511] **類別編號：**<br>**Class No.:** | 25 |
| [511] **貨品／服務說明：**<br>**Specification:** | Class 25<br>clothing, belts, blouses, coats,<br>dresses, gloves, jackets, jeans, knit<br>tops, mittens, pajamas, pants,<br>ponchos, raincoats, robes, shirts,<br>shorts, skirts, socks, sweaters,<br>swimwear, underwear and vests; |

EXHIBIT ___O___

PAGE ___128___

Halloween costumes; hats; hosiery,
leggings, panty hose, stockings and
lights; masquerade costumes; and
shoes, athletic sneakers, bed
slippers, loafers, pumps and sandals.

[220]提交日期:                        22-06-2005
    (日-月-年)
    Date of Filing:
    (D-M-Y)

[442]公布獲接納註冊申請日期: 13-04-2006
    (日-月-年)
    Date of Publication
    of
    Application of
    Acceptance
    for Registration:
    (D-M-Y)

[151]註冊日期:                        22-06-2005
    (日-月-年)
    Date of
    Registration:
    (D-M-Y)

    實際註冊日期:                      25-07-2006
    (日-月-年)
    Actual Date of
    Registration:
    (D-M-Y)

[180]註冊屆滿日期:                     21-06-2015
    (日-月-年)
    Expiry date:
    (D-M-Y)

    詳細背景資料:
    Historical Details:

    作出記項日期     事項
    Date of entry Matters
    25-07-2006     REGISTRATION

    作出記項日期     事項
    Date of entry Matters
    06-04-2006     DIVISION

    Application No.        300443989

EXHIBIT _____O_____

before division:

Application Nos.        300443989AA , 300443989AB
after division:

_____

EXHIBIT _____ 0 _____

PAGE _____ 130 _____

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              EASTERN DIVISION

4                 - - -

5     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                 - - -

7   CARTER BRYANT,                    )
                                      )
8                   PLAINTIFF,        )
                                      )
9          VS.                        )    NO. ED CV 04-09049
                                      )    (LEAD LOW NUMBER)
10   MATTEL, INC.,                    )
                                      )
11                  DEFENDANTS.       )
                                      )
12   AND RELATED ACTIONS,             )
     _____   )
13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16             RIVERSIDE, CALIFORNIA

17            MONDAY, JUNE 11, 2007

18               10:49 A.M.

19

20

21

22

23          THERESA A. LANZA, RPR, CSR
         FEDERAL OFFICIAL COURT REPORTER
24          3470 12TH STREET, RM. 134
         RIVERSIDE, CALIFORNIA  92501
25              (951) 274-0844
          CSR11457@SBCGLOBAL.NET

CERTIFIED COPY

2

```
1   APPEARANCES:

2

3   ON BEHALF OF MATTEL, INC.:

4
                        QUINN EMANUEL
5                       BY:  JOHN B. QUINN
                        BY:  MICHAEL T. ZELLER
6                       BY:  DYLAN PROCTOR
                        865 S. FIGUEROA STREET,
7                       10TH FLOOR
                        LOS ANGELES, CALIFORNIA  90017
8                       (213) 624-7707

9

10  ON BEHALF OF CARTER BRYANT:

11                      KEKER & VAN NEST
                        BY:  MICHAEL H. PAGE
12                      BY:  CHRISTA MARTINE ANDERSON
                        710 SANSOME STREET,
13                      SAN FRANCISCO, CALIFORNIA  94111-1704
                        (415) 391-5400

14

15
    ON BEHALF OF MGA AND MGA MEXICO:
16
                        O'MELVENY & MYERS LLP
17                      BY:  STEVEN J. OLSON
                        BY:  DIANA M. TORRES
18                      400 SOUTH HOPE STREET
                        LOS ANGELES, CALIFORNIA  90071-2899
19                      (213) 430-6000

20
                        CHRISTENSEN, GLASER, FINK,
21                       JACOBS, WEIL & SHAPIRO, LLP
                        BY:  PATRICIA GLASER
22                      10250 CONSTELLATION BOULEVARD
                        LOS ANGELES, CALIFORNIA  90067
23                      (310) 553-3000

24

25
```

JUNE 11, 200 EXHIBIT _P_    BRYANT V MATTEL

PAGE __132__

3

```
 1          RIVERSIDE, CALIFORNIA; MONDAY, JUNE 11, 2007; 10:49 A.M.

 2                              -OOO-

 3              THE CLERK:  CALLING CALENDAR ITEM 9, CARTER BRYANT

 4      VERSUS MATTEL INC., ET AL., CASE NUMBER ED CV 04-09049.

 5              MAY WE HAVE COUNSEL PLEASE COME FORWARD AND STATE          10:49

 6      YOUR APPEARANCES FOR THE RECORD.

 7              MS. GLASER:  GOOD MORNING, YOUR HONOR.

 8              PATRICIA GLASER FROM MGA.

 9              THE COURT:  COUNSEL.

10              MR. PAGE:  GOOD MORNING, YOUR HONOR.                       10:49

11              MICHAEL PAGE, WITH KEKER & VAN NEST, FOR

12      CARTER BRYANT.  WITH ME IS CHRISTA ANDERSON; WE HAVE RECENTLY

13      SUBSTITUTED IN FOR MR. BRYANT.

14              MS. ANDERSON:  GOOD MORNING, YOUR HONOR.

15              THE COURT:  GOOD MORNING.                                  10:50

16              MR. OLSON:  GOOD MORNING, YOUR HONOR.

17              STEVEN OLSON FOR MGA AND MGA MEXICO.

18              MR. QUINN:  GOOD MORNING, YOUR HONOR.

19              JOHN QUINN, MIKE ZELLER, DYLAN PROCTOR FOR MATTEL.

20              THE COURT:  THERE ARE SIX MOTIONS THAT THE COURT HAS       10:50

21      ON CALENDAR THAT THE COURT IS PREPARED TO ADDRESS AT THIS

22      HEARING.

23              THE FIRST TWO ARE SOMEWHAT RELATED.  I HAVE MGA AND

24      LARIAN'S MOTION TO DISMISS; MATTEL'S AMENDED COUNTERCLAIMS; AND

25      THEN, OF COURSE, CARTER BRYANT'S MOTION TO DISMISS              10:51
```

JUNE 11, 20 EXHIBIT ___P___     BRYANT V MATTEL

PAGE ___133___

1      DO YOU HAVE ANOTHER POSITION?

2      MR. PAGE:  YES, YOUR HONOR.

3      THE COURT:  PLEASE.

4      MR. PAGE:  MICHAEL PAGE FOR CARTER BRYANT.

5      I THINK WE COULD USE SOME OF THE COURT'S GUIDANCE,      12:07

6   THOUGH, GOING INTO THOSE DISCUSSIONS.

7      FROM MR. BRYANT'S POINT OF VIEW, OUR CONCERN IS REAL

8   SIMPLE:  WE WANT HIM TO HAVE ONE TRIAL.

9      THE COURT:  THAT MIGHT BE HARD TO DO, THOUGH, UNDER

10  ANY SCENARIO.      12:07

11      MR. PAGE:  CERTAINLY ONE TRIAL AS OPPOSED TO

12  EVERYTHING THAT RELATES TO WHAT HE DID WHILE HE WAS A MATTEL

13  EMPLOYEE.  IF THEY HAVE RICO CLAIMS, THAT, THREE YEARS LATER

14  THE DOLLS (UNINTELLIGIBLE) ARE SOMEHOW PART OF A GRAND

15  CONSPIRACY, WE'LL DEAL WITH THAT.  WE DON'T THINK IT'S A      12:07

16  SERIOUS ISSUE.

17      BUT AS TO WHAT HE DID AT MATTEL AND WHAT HAPPENED UP

18  TO OCTOBER 20TH AND THE DAMAGES THAT FLOW FROM IT, MR. BRYANT

19  SHOULD HAVE ONE TRIAL.  IN FACT, IT'S A CONSTITUTIONAL

20  REQUIREMENT THAT HE DO.      12:07

21      ALL OF THE BRIEFS ON THIS ISSUE -- THEIR OPENING

22  BRIEF ON THIS ISSUE SAID THAT THEY WANTED TO DECIDE ALL OF THE

23  DAMAGES THAT FLOW FROM MR. BRYANT'S ACTIVITIES IN ONE TRIAL.

24      THE COURT:  IT'S A CONSTITUTIONAL REQUIREMENT THAT HE

25  HAVE ONLY ONE TRIAL?      12:07

JUNE 11, 200̶8̶ EXHIBIT _P_      B̶R̶Y̶A̶N̶T̶ ̶V̶ MATTEL

PAGE _134_

59

1          MR. PAGE:  IT'S A SEVENTH AMENDMENT ISSUE.  YOU CAN'T

2    TRY SOMEONE'S LIABILITY TO ONE JURY AND THEN THE DAMAGES THAT

3    FLOW FROM THAT LIABILITY TO ANOTHER JURY, AT LEAST WHERE THE

4    FACTS INTERTWINE AS TO THE TWO.  AND THEY CERTAINLY DO HERE,

5    BECAUSE WE HAVE PUNITIVE AND EXEMPLARY DAMAGE CLAIMS.          12:08

6          BUT THEIR REPLY, FOR THE FIRST TIME IN A FOOTNOTE,

7    LOGGED IN THE IDEA THAT 'OH, WAIT; WE DON'T WANT TO DO ANY

8    DAMAGES AT ALL IN THE FIRST TRIAL; THAT'S ALL IN THE SECOND

9    TRIAL.'

10          THAT'S A COMPLETE 180-DEGREE REVERSAL.  I CALLED THEM    12:08

11   AND SAID, 'WELL, DO YOU WANT DAMAGES IN THE FIRST TRIAL OR

12   NOT?'  I ASKED FOR CLARIFICATION, AND I WAS TOLD I WASN'T GOING

13   TO GET THAT CLARIFICATION.  I WAS TOLD THAT THE BRIEFS WERE

14   RIGHT.

15          WELL, THEY ARE DIAMETRICALLY OPPOSED TO EACH OTHER.      12:08

16          AS LONG AS WE HAVE A SITUATION WHERE MR. BRYANT ONLY

17   HAS TO BRING HIS FAMILY OUT TO TESTIFY; HE HAS TO COME OUT TO

18   TESTIFY; HIS LIVELIHOOD, HE IS ON THE LINE FOR THIS ONE SET OF

19   ACTS ONCE, AS TO WHO ELSE COMES IN, IT'S A QUESTION THAT CAN BE

20   WORKED OUT.  BUT THAT'S MY MAIN CONCERN.                       12:08

21          THE OTHER ISSUE THAT I THINK THAT WE NEED A LITTLE

22   BIT OF CLARITY FROM THE COURT ON IS, WE ALL KEEP SAYING

23   'OWNERSHIP OF BRATZ,' LIKE THAT WAS SOMETHING REAL.  AND I

24   THINK THAT'S GIVING RISE TO A CONSIDERABLE AMOUNT OF CONFUSION.

25   THERE IS NO SUCH THING AS 'OWNERSHIP OF BRATZ.'  THERE IS THE   12:09

JUNE 11, 2008   EXHIBIT ___*P*___   ~~BRYANT V~~ MATTEL

PAGE _____*135*_____

60

1    QUESTION OF COPYRIGHT IN THE DRAWINGS THAT MR. BRYANT DID.

2    THAT'S A COPYRIGHT QUESTION.   IT'S A CONTRACT QUESTION AS TO

3    WHO OWNED HIS WORK AT THE TIME.   THEN THERE'S, WELL, WHO OWNS

4    THE COPYRIGHTS IN LATER DOLLS?   THERE'S A TRADEMARK CLAIM HERE.

5    THERE'S NO MENTION OF THE NAME OF BRATZ.   THERE'S NO OWNERSHIP          12:09

6    OF THE ACTUAL OBJECTS.

7              IT'S IMPORTANT, AS WE GO FORWARD, TO TRY TO FIGURE

8    OUT WHAT'S IN TRIAL ONE AND WHAT'S IN TRIAL TWO, THAT WE TALK

9    PRECISELY ABOUT, ARE WE TALKING ABOUT A COPYRIGHT CLAIM?   WHAT

10   WORKS?   ARE WE TALKING ABOUT A COPYRIGHT INFRINGEMENT ACTION?        12:09

11   A CONTRACT ACTION?

12             'OWNERSHIP OF BRATZ' IS A CONVENIENT SHORT NAME, BUT

13   IT'S GETTING US REALLY CONFUSED IN TRYING TO WORK THIS OUT.

14             THE COURT:   VERY WELL.

15             MR. QUINN?                                                   12:10

16             MR. QUINN:   I THINK THIS PROPOSAL THAT WE'VE GOT

17   LOOKS PRETTY PROMISING, ACTUALLY, YOUR HONOR.

18             THE COURT:   ALL RIGHT.

19             MR. QUINN:   I WOULD JOIN IN COUNSEL'S REQUEST THAT WE

20   GET TOGETHER AND SEE IF WE CAN'T COME UP WITH SOMETHING BY            12:10

21   AGREEMENT.

22             IF WE ARE UNABLE TO, AND THERE ARE ANY OPEN ISSUES --

23   THIS REALLY IS PERHAPS EVEN MORE COMPLEX THAN IT LOOKS, AND I

24   DON'T KNOW IF THE COURT EVER DOES THIS, BUT I WAS WONDERING

25   WHETHER IT MIGHT BE POSSIBLE TO HAVE AN INFORMAL CHAMBER'S            12:10

JUNE 11, 2007        EXHIBIT ___*P*___                BRYANT V MATTEL

                     PAGE ___*130*___

61

1   CONFERENCE WITH THE COURT TO GO OVER SOME ISSUES IF WE'RE

2   UNABLE TO RESOLVE THEM AMONG OURSELVES.

3          THE COURT:  WE'LL CERTAINLY HAVE A HEARING IF YOU'RE

4   NOT ABLE TO RESOLVE IT.  I'M RELUCTANT TO DO IT IN CHAMBERS;

5   I'D LIKE TO KEEP IT ON THE RECORD.  WE CAN CERTAINLY DO IT IN     12:1(

6   CHAMBERS IF IT'S ON THE RECORD.

7          MR. QUINN:  OKAY.

8          YOUR HONOR, JUST A PLACEHOLDER, THEN, IN CASE

9   WE'RE --

10         THE COURT:  WHY DON'T I SUGGEST THIS, WHY DON'T YOU      12:11

11  SPEND THE NEXT WEEK TRYING TO WORK ON THIS.  THIS IS VERY

12  PROMISING.  WHY DON'T YOU SPEND THE WEEK, AND WHY DON'T YOU

13  SUBMIT SOMETHING IN WRITING TO THE COURT --

14         MR. QUINN:  OKAY.

15         THE COURT:  -- AS TO WHAT YOU ALL THREE AGREE ON, AND     12:11

16  THEN, PROBABLY EVEN MORE IMPORTANTLY, WHAT YOU DISAGREE ON.

17         I UNDERSTAND THAT MR. BRYANT HAS SOME UNIQUE

18  CONCERNS, BEING AN INDIVIDUAL.  AND I APPRECIATE YOUR COMMENTS

19  THERE, COUNSEL.  LET'S SEE IF WE CAN'T WORK SOMETHING OUT THAT

20  ADDRESSES EVERYONE'S CONCERNS.  AND THEN AFTER YOU HAVE          12:11

21  SUBMITTED THAT IN WRITING TO THE COURT NEXT WEEK -- WHY DON'T

22  YOU SUBMIT SOMETHING NEXT MONDAY -- THE COURT WILL TAKE A LOOK

23  AT IT; AND THEN IF THERE'S A NEED TO HAVE A HEARING, WE'LL HAVE

24  A HEARING.  IF YOU'RE CLOSE ENOUGH WHERE I CAN DO THE FINE

25  TUNING WITHOUT HAVING A HEARING, I WILL DO THAT AS WELL, AND      12:11

JUNE 11, 2007 EXHIBIT _____P_____
                                              BRYANT V MATTEL
             PAGE _____137_____

62

1   WE'LL GO FROM THERE.

2          I'LL TRY TO GET AN ORDER OUT ON THESE OTHER FIVE

3   MOTIONS SHORTLY.

4          MR. OLSON:   THANK YOU, YOUR HONOR.

5          MR. QUINN:   THANK YOU, YOUR HONOR.                    12:11

6          MS. ANDERSON:   THANK YOU, YOUR HONOR.

7          THE COURT:   THANK YOU.

8          WE'RE GOING TO TAKE A BRIEF RECESS, JUST TO GIVE THE

9   COURT REPORTER A BREAK.   WE HAVE A FEW OTHER MATTERS TO TAKE

10  UP.                                                          12:12

11         THE COURT IS IN RECESS.

12         THE CLERK:   THE COURT STANDS IN RECESS.

13

14

15

16

17                       CERTIFICATE

18

19  I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
    STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
20  THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
    ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
21  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
    THE UNITED STATES.
22

23  _____        7-9-07
    THERESA A. LANZA, CSR, RPR               _____
24  FEDERAL OFFICIAL COURT REPORTER           DATE

25

JUNE 11, 2007   EXHIBIT _P___        BRYANT V MATTEL

                PAGE _138___

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

--oOo--

CERTIFIED COPY

CARTER BRYANT, an individual,

       Plaintiff,

vs.                        No. CV 04-9049 SGL (RNBx)

MATTEL, INC., a Delaware
Corporation,

       Defendants.

_____/

Consolidated with MATTEL, INC.,
v. BRYANT and MGA ENTERTAINMENT,   No. 04-9059 NM (RNBx)
INC., v. MATTEL, INC.,

_____/


-- CONFIDENTIAL, ATTORNEYS' EYES ONLY --


Videotaped Deposition of

PAUL K. MEYER

_____

Monday, March 31, 2008


Reported by:
Leslie Rockwood
CSR No. 3462
Job No. 79584

ESQUIRE DEPOSITION SERVICES
800.770.3363

EXHIBIT ___Q___

PAGE ___139___

```
 1                        APPEARANCES:

 2


 3   For the Plaintiff MATTEL, INC.:

 4           Robert P. Feldman, Esq.
             Quinn Emanuel Urquhart Oliver & Hedges
 5           555 Twin Dolphin Drive, Suite 650
             Redwood Shores, California 94065
 6           (650) 801-5000
             Email: bobfeldman@quinnemanuel.com
 7


 8


 9   For the Defendant MGA ENTERTAINMENT, INC., and ISSAC
     LARIAN and THE WITNESS:
10
             Carl A. Roth, Esq.
11           Skadden Arps Slate Meagher & Flom LLP
             300 South Grand Avenue
12           Los Angeles, California 90071
             (213) 687-5000
13           Email: croth@skadden.com

14


15   Also present:  Carrie Hillen, CRA International
                    Colin Choi, Navigant Consulting
16


17


18   The Videographer:  Marty Majdoub

19

20

21

22

23

24

25
```

                                                      2

EXHIBIT __Q__

PAGE __140__

1          And they've included determining either value

2     and/or a damage number depending go on those facts and

3     circumstances.

4          Q.   Do you do some work -- do you do any work

5     that's not litigation related or with an eye toward

6     litigation?

7          A.   Yes, I to.

8          Q.   What percentage of your work over the last

9     ten years has that been, if you can say?

10         A.   It's -- it really varies, and the general

11    sort of trend has been 50/50.  But sometimes I'll get

12    involved in an assignment that's in litigation, like

13    right now with this matter, where a lot of my time has

14    been dedicated to this file.

15         So over the ten years, probably 50/50, maybe

16    60/40 litigation to non-litigation.  But I'll be asked at

17    times to go into a company and look at their intellectual

18    property portfolio and provide advice and consulting on

19    what to do with it, they think it's being underutilized,

20    and usually that's done outside of litigation.

21         Now, it may be that as part of that

22    consulting, there will be a call months later, and

23    they'll say, hey, by the way, we've brought this lawsuit,

24    can you now help us out.  So it's really hard to give a

25    hard percentage, but there's still a piece that relates

12

```
 1   to non-litigation.

 2           Q.   And are you a doll expert in any way?

 3           A.   If we're just focused on dolls, I would not

 4   say that I'm a doll expert.  If we're talking about how

 5   to make a doll and how to market a doll and things of

 6   that nature, I would not say I'm an expert in that.

 7           Q.   Okay.  Are you an expert in any industry that

 8   you consider to be the doll industry?

 9           MR. ROTH:  Objection.  Vague and ambiguous.

10           THE WITNESS:  If I understand the question, I

11   would -- the way I would view it is that I'm an expert in

12   analyzing the financial and accounting and economic

13   issues around a property like a doll.  And so I'm very

14   focused and comfortable on that issue.  But I wouldn't

15   say that I have industry expertise as someone that has

16   worked in the industry or a related industry.  So I can't

17   point to employment history where I've worked for a toy

18   company or a doll company.  And again, it's sort of a

19   distinction I would make.

20           Q.   BY MR. FELDMAN:  Have you ever analyzed any

21   other company that manufactured -- withdraw.

22           Have you ever analyzed any other situation

23   that involved the making and manufacturing and sale of

24   dolls?

25           A.   If it's just limited to only dolls, I would
```

13

EXHIBIT ___O___

PAGE ___14/2___

1    say that I have not done that just on dolls.  Now, if we

2    broadened it to -- and maybe it's related, it's how you

3    view it.  I've done work, a good bit of work around the

4    merchandising of -- of major league baseball and NFL

5    property, and part of the merchandising includes

6    figurines.  And so one would say those are maybe dolls

7    for fans of the NFL or major league baseball, but they

8    wouldn't be a fashion doll per se.

9           So maybe the way to cut it is that if we can

10   say fashion doll, I would not have specific experience

11   there if we're talking about figurines and merchandised

12   content, I would have experience in those areas related

13   to the economics and finance.

14        Q.  So would it be fair to say that you've never

15   analyzed the situation involving the manufacture, making,

16   sale of fashion dolls?

17           MR. ROTH:  Other than in this case?

18           MR. FELDMAN:  Other than in this case, of

19   course.

20           THE WITNESS:  It would be fair to say that

21   other than in this case, if we limit it to fashion dolls,

22   I would agree with that.

23        Q.  BY MR. FELDMAN:  Thank you.  You have

24   analyzed the National Football League figurines?

25        A.  As part of assignments, I've looked at the

14

EXHIBIT ___Q___

PAGE ___143___

1

2          I, the undersigned, a Certified Shorthand

3   Reporter of the State of California, do hereby

4   certify:

5          That the foregoing proceedings were taken

6   before me at the time and place herein set forth; that

7   any witnesses in the foregoing proceedings, prior to

8   testifying, were placed under oath; that a verbatim

9   record of the proceedings was made by me using machine

10  shorthand which was thereafter transcribed under my

11  direction; further, that the foregoing is an accurate

12  transcription thereof.

13         I further certify that I am neither

14  financially interested in the action nor a relative or

15  employee of any attorney of any of the parties.

16         IN WITNESS WHEREOF, I have this date

17  subscribed my name.

18

19  Dated: _____ APR 02 2008 _____

20

21

22

23  Leslie Rockwood
    Certified Shorthand Reporter
    State of California
    Certificate No. 3462

24

25

EXHIBIT    Q
PAGE    144

1

<u>**PROOF OF SERVICE**</u>

2      I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is Now Legal Service,

3 1301 W. 2nd Street, Suite 206, Los Angeles, CA 90026.

4 On October 20, 2008, I served true copies of the following document(s) described as **SUPPLEMENTAL DECLARATION OF SCOTT B. KIDMAN IN SUPPORT OF**

5 **MATTEL, INC.'S (1) MOTION FOR CONSTRUCTIVE TRUST AND FINDING OF LIABILITY AND INJUNCTIVE RELIEF UNDER CAL. BUS. & PROF. CODE § 17200;**

6 **AND (2) MOTION FOR DECLARATORY JUDGMENT OF OWNERSHIP OF BRATZ WORKS** on the parties in this action as follows:

7

8      Thomas Nolan, Esq.
       **Skadden, Arps, Slate, Meagher & Flom**

9      **LLP**
       300 So. Grand Ave.
       Suite 3400

10     Los Angeles CA  90071

11

12

13 **BY PERSONAL SERVICE:**  I delivered such envelope(s) by hand to the office of the person(s) being served.

14      I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

15

16      Executed on October 20, 2008, at Los Angeles, California.

17

18                          NOW LEGAL -- Dave Quintana

19

20

21

22

23

24

25

26

27

28

07209/2490733.1