QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  johnquinn@quinnemanuel.com
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Mattel, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with<br>CV 04-09059<br>CV 05-2727 |
| vs. | |
| MATTEL, INC., a Delaware corporation, | **[PUBLIC REDACTED] DECLARATION OF STEPHEN M. HAUSS IN SUPPORT OF MATTEL, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR A PERMANENT INJUNCTION** |
| Defendant. | |
| AND CONSOLIDATED ACTIONS | Date: November 10, 2008<br>Time: 1:00 p.m.<br>Place: Courtroom 1 |
| | **Phase 1(a):**<br>Trial Date: May 27, 2008 |
| | **Phase 1(b):**<br>Trial Date: July 23, 2008 |

07209/2676005.1

## DECLARATION OF STEPHEN M. HAUSS

I, Stephen M. Hauss, declare as follows:

1.     I am a member of the bar of the State of California and an associate with Quinn Emanuel Urquhart Oliver & Hedges, LLP, attorneys for Mattel, Inc.  I make this declaration of personal, firsthand knowledge, and if called and sworn as a witness, I could and would testify competently hereto.

2.     Attached as Exhibit 1 is a true and correct copy of Mattel's Notice of Motion and Motion for Judgment as a Matter of Law under <u>Federal Rule of Civil Procedure</u> 50(a), dated August 18, 2008.

3.     Attached as Exhibit 2 is a true and correct copy of an excerpt from the deposition transcript of Cassidy Park, dated March 2, 2005.

4.     Attached as Exhibit 3 is a true and correct copy of an excerpt from the deposition transcript of Robert Eckert, dated January 28, 2008.

5.     Attached as Exhibit 4 is a true and correct copy of MGA Entertainment's Complaint for False Designation of Origin, Association or Sponsorship; Unfair Competition; Dilution; and Unjust Enrichment, dated April 13, 2005.

6.     Attached as Exhibit 5 is a true and correct copy of Trial Exhibit 13932, a demonstrative used during the testimony of Michael Wagner.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 22, 2008, at Los Angeles, California.

Stephen M. Hauss

# EXHIBIT 1

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
    John B. Quinn (Bar No. 090378)
2    johnquinn@quinnemanuel.com
    Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
    Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
5  Los Angeles, California 90017-2543
   Telephone:  (213) 443-3000
6  Facsimile:   (213) 443-3100

7  Attorneys for Mattel, Inc.

8

9                    UNITED STATES DISTRICT COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11                        EASTERN DIVISION

12  CARTER BRYANT, an individual,        CASE NO. CV 04-9049 SGL (RNBx)

13              Plaintiff,               Consolidated with
                                         Case No. CV 04-09059
14         vs.                           Case No. CV 05-02727

15  MATTEL, INC., a Delaware             Honorable Stephen G. Larson
    corporation,
16                                       **MATTEL, INC.'S NOTICE OF
              Defendant.                 MOTION AND MOTION FOR
17                                       JUDGMENT AS A MATTER OF
                                         LAW UNDER FED. R. CIV. P.
18  AND CONSOLIDATED ACTIONS             50(A); AND**

19                                       **MEMORANDUM OF POINTS AND
                                         AUTHORITIES**
20
                                         Hearing Date: August 20, 2008
21                                       Time:            TBA
                                         Place:           Courtroom 1
22
                                         **Phase 1:**
23                                       Trial Date:      May 27, 2008

24

25

26

27

28

07209/2606540.4

MATTEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW

EXHIBIT 1
PAGE 2

1   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2       PLEASE TAKE NOTICE THAT, on August 20, 2008, or as soon as counsel

3   may be heard, in the Courtroom of the Honorable Stephen G. Larson, located at

4   Courtroom 1 of the United States District Court, 3470 Twelfth Street, Riverside,

5   California 92501, plaintiff Mattel, Inc. ("Mattel") will, and hereby does, move the

6   Court, pursuant to Fed. R. Civ. P. 50(a), for judgment as a matter of law against

7   defendants Isaac Larian, MGA Entertainment Inc. ("MGA"), and MGA

8   Entertainment (HK), Ltd. (collectively "Defendants"), on their independent creation

9   and statute of limitations defenses, and on the substantial similarity element of

10  Mattel's claim for copyright infringement.

11      · This Motion is based on this Notice of Motion and Motion, the accompanying

12  Memorandum of Points and Authorities, the Declaration of Oleg Stolyar filed

13  concurrently herewith, all evidence introduced at trial, the files and records of the

14  Court, and such matters of which the Court may take judicial notice.

15                     **Statement of Local Rule 7-3 Compliance**

16      This motion is made following the conference of counsel, which was held

17  pursuant to Local Rule 7-3 on August 15, 2008.

18

19

20  DATED: August 18, 2008          QUINN EMANUEL URQUHART OLIVER &
                                     HEDGES, LLP
21

22                                   By /s/ John Quinn
23                                      John B. Quinn
                                        Attorneys for Mattel, Inc.
24

25

26

27

28

07209/26065404

-i-
MATTEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW

EXHIBIT ___1___

PAGE ___3___

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ............................................................................................................ 1

I.    THE COURT SHOULD GRANT JMOL AS TO MGA'S CLAIM OF INDEPENDENT CREATION AND ITS STATUTE OF LIMITATIONS DEFENSE .......................................................................... 1

    A.    Independent Creation was Waived and Fails as a Matter of Law .......... 1

    B.    No Reasonable Juror Could Find That the Statute of Limitations on Mattel's Claims for Interference with Contract and Conversion Has Expired .............................................................................................. 3

II.    THE BRATZ DOLLS ARE SUBSTANTIALLY SIMILAR TO THE BRYANT DRAWINGS THAT ARE OWNED BY MATTEL ....................... 6

    A.    Defendants Are Judicially Estopped from Denying That the Bratz Dolls Are Substantially Similar to Bryant's Drawings .............................. 6

    B.    No Reasonable Jury Could Fail to Find That the Works at Issue Are Substantially Similar ........................................................................ 8

        1.    Mattel Has Satisfied the Extrinsic Test ......................................... 8

        2.    Mattel Also Clearly Satisfies the Intrinsic Test ........................... 10

CONCLUSION ...................................................................................................... 10

-i-

MATTEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW

EXHIBIT 1

PAGE 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

Applied Med. Resources Corp. v. U.S. Surgical Corp.,
  2008 WL 1901935 (C.D. Cal. 2008) .......................................................... 1

Berkic v. Crichton,
  761 F.2d 1289 (9th Cir. 1985) ................................................................ 11

Bethea v. Burnett,
  2005 WL 1720631 (C.D. Cal. 2005) .......................................................... 2

Dimmie v. Carey,
  88 F. Supp. 2d 142 (S.D.N.Y 2000) ........................................................... 3

Educ. Testing Serv. v. Simon,
  95 F. Supp. 2d 1081 (C.D. Cal. 1999) ......................................................... 9

Entm't Research Group, Inc. v. Genesis Creative Group, Inc.,
  122 F.3d 1211 (9th Cir. 1997) ................................................................ 3

Fox v. Ethicon Endo-Surgery, Inc.,
  35 Cal. 4th 797 (2005) ....................................................................... 6

Garamendi v. SDI Vendome SA,
  276 F. Supp. 2d 1030 (C.D. Cal. 2003) ....................................................... 5

Hamilton v. State Farm Fire & Cas. Co.,
  270 F.3d 778 (9th Cir. 2001) ................................................................ 8

Harbeson v. Parke Davis, Inc.,
  746 F.2d 517 (9th Cir. 1984) ................................................................ 2

Harper & Row Publishers, Inc. v. Nation Enters.,
  471 U.S. 539 (1985) ........................................................................ 11

Hernandez v. Spacelabs Medical Inc.,
  343 F.3d 1107 (9th Cir. 2003) ............................................................... 5

Ideal Toy Corp. v. Fab-Lu, Limited,
  261 F. Supp. 238, 242 (S.D.N.Y. 1966) ...................................................... 11

JCW Invs., Inc. v. Novelty, Inc.,
  289 F. Supp. 2d 1023 (N.D. Ill. 2003) ........................................................ 9

Jolly v. Eli Lilly & Co.,
  44 Cal. 3d 1103 (Cal. 1988) .................................................................. 6

Litchfield v. Spielberg,
  736 F.2d 1352 (9th Cir. 1984) ............................................................... 11

EXHIBIT _____1_____

PAGE _____5_____

1    <u>Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.</u>,
       2008 WL. 2952074 (C.D. Cal. 2008) ....................................................8
2
     <u>Payne v. Anvil Knitwear, Inc.</u>,
3       2007 WL. 1953438 (C.D. Cal. 2007) ...................................................3

4    <u>Three Boys Music Corp. v. Bolton</u>,
       212 F.3d 477 (9th Cir. 2000) ...............................................................2
5
     <u>United States v. Wilson</u>,
6       881 F.2d 596 (9th Cir. 1989) ...............................................................5

7    <u>Wagner v. Prof'l Eng'rs in Calif. Gov't</u>, ,
       354 F.3d 1036 (9th Cir. 2004) .............................................................7
8

9                                <u>**Statutes**</u>

10   <u>C.D. Cal. Local Rule</u> 16.7 ..........................................................................2

11   <u>Fed. R. Civ. P.</u> 50(a)(1) ..........................................................................1

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MATTEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW

07209/2606540.4

EXHIBIT _____ 1

PAGE _____ 6

**Preliminary Statement**

Pursuant to Federal Rule of Civil Procedure 50(a), Mattel respectfully requests that the Court grant judgment as a matter of law on the independent creation and statute of limitations defenses raised by MGA, and on the substantial similarity element of Mattel's copyright infringement claim. Defendants have been fully heard on these issues. Defendants waived any claim of independent creation by not pleading it in their answers or pretrial form, as required by Fed. R. Civ. P. 8(c) and Local Rule 16.7; it is contrary to the verdict already reached in Phase 1A; and no reasonable juror could find that the Bratz dolls were created independently of Carter Bryant's drawings and other works that he gave to MGA.

As to the statute of limitations defense, no reasonable juror could fail to find that Defendants fraudulently concealed that Bryant created the Bratz drawings, thus defeating the limitations defense. Finally, now that all the evidence has been heard, no reasonable juror could fail to find that the Bratz dolls are substantially similar to the Bratz drawings and other works created by Bryant.

**Argument**

**I.    THE COURT SHOULD GRANT JMOL AS TO MGA'S CLAIM OF INDEPENDENT CREATION AND ITS STATUTE OF LIMITATIONS DEFENSE.**

**A.    Independent Creation was Waived and Fails as a Matter of Law**

As a threshold, Defendants waived the independent creation defense by not asserting it either in answer to Mattel's counterclaims or in the Final Pretrial Conference Order.[1] See Local Rule 16.7 & Appendix A ("Defendant should identify [in the Pretrial Form] those matters on which the Defendant bears the burden of proof"); Three Boys Music Corp. v. Bolton, 212 F.3d 477, 486 (9th Cir. 2000) (holding that the burden of proving "independent creation" is on the party asserting

---

[1]    See generally Final Pretrial Conference Order, attached as Exhibit 1 to the concurrently filed Declaration of Oleg Stolyar ("Stolyar Dec.").

07209/2606540.4

-1-

MATTEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW

EXHIBIT _____1_____

PAGE_____7_____

1  that defense); Bethea v. Burnett,   2005 WL 1720631, at *15 (C.D. Cal. 2005)

2  (independent creation is an affirmative defense); Harbeson v. Parke Davis, Inc., 746

3  F.2d 517, 520 (9th Cir. 1984) (unasserted affirmative defenses are waived).  As this

4  Court held, failing to assert a claim or defense in the pretrial conference order

5  constitutes waiver and is grounds for striking the defense.[2]

6          Moreover, with their independent creation defense, Defendants ask the jury to

7  reconsider its verdict in Phase 1A.  Carter Bryant testified that the Bratz sculpt was

8  based on his drawings,[3] Isaac Larian and Paula Garcia testified that Bryant's drawings

9  were the inspiration for Bratz,[4] and MGA's counsel stressed that Bryant's drawings

10 were "the original concept drawings for Bratz" in MGA's Phase 1A Closing

11 Statement.[5]  MGA has failed to present any evidence that the infringing works were

12 based solely on source material other than Bryant's drawings.  Independent creation

13 requires that the accused infringer show that he created the work prior to or wholly

14 independent of the infringed work (*i.e.*, where the infringing work was created before

15 the infringed work or where two different people happen independently to create

16 similar works).  See, e.g., Payne v. Anvil Knitwear, Inc., 2007 WL 1953438, at *3

17 (C.D. Cal. 2007) (finding "independent creation" because alleged infringer created his

18 work "*before* plaintiff's copyrights were fixed") (emphasis added); Dimmie v. Carey,

19 88 F. Supp. 2d 142 (S.D.N.Y 2000) (sustaining defendants' independent creation

20 defense because they had produced working tapes and journal, which evidenced

21 creative steps taken independently to create the allegedly infringing hit song).  In

22  [2]    See Trial Tr. at 7490:21-7491:5 (noting that one of the grounds for striking the
23  joint authorship defense was because it was not plead in the Pretrial Conference
    Order), Stolyar Dec., Exh. 24.  Defendants also waived the affirmative defense of
24  independent creation by not pleading it in their answers.  See, e.g., Bethea v. Burnett,
    2005 WL 1720631, at *15 (C.D. Cal. 2005) ("[i]ndependent creation is an affirmative
25  defense to copyright infringement");
       [3]    Trial Tr. at 6664:14-6667:22 (Bryant's testimony that the sculpt for the Bratz
26  dolls was created based on his drawings and that the fashions in his drawings reflect
    "the final fashion designs for the original release Bratz"), Stolyar Dec., Exh. 24.
27     [4]    Trial Tr. at 1749:10-14 (Isaac Larian's testimony); Trial Tr. at 92:9-929:10,
    994:20-995:8 (Paula Garcia's testimony), Stolyar Dec., Exh. 24.
28     [5]    Trial Tr. at 4901:23-25, 4950:6-8 (MGA's Closing Statement for Phase 1A),
    Stolyar Dec., Exh. 24.

-2-
MATTEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW

EXHIBIT _____ 1

PAGE _____ 8

1  contrast, the infringing works (*i.e.*, Bratz dolls) were created after MGA had access to

2  the infringed works (*i.e.*, Bryant's drawings), and the author of the infringed works

3  (Bryant) also worked on the infringing works.[6] With that evidence, any reference to

4  "independent creation" fails as a matter of law.[7]

**B.   No Reasonable Juror Could Find That the Statute of Limitations on Mattel's Claims for Interference with Contract and Conversion Has Expired**

7  This Court granted summary judgment to Mattel on Defendants' statute of

8  limitations defenses except with respect to Mattel's claims for interference with

9  contract and conversion. The Court found that the discovery rule did not apply to

10  those claims and they are time barred. Mattel can prosecute those claims if it proves

11  that defendants fraudulently concealed from Mattel their conversion and interference

12  with Bryant's contract. The evidence adduced at trial has conclusively resolved this

13  dispute.

14  With the evidence at trial, no reasonable juror could fail to find that defendants

15  fraudulently concealed their conduct from Mattel. Both Isaac Larian and Paula

16  Garcia gave strict instructions that no one at MGA was to discuss Bryant's

---

19  [6]  See, e.g., Trial Exh. 502 (Bryant's Declaration to the U.S. Patent and Trademark

20  Office, wherein Bryant states under oath that he "was actively involved with the release of the Bratz dolls"), attached as Exhibit 8 to the concurrently filed Declaration

21  of Oleg Stolyar ("Stolyar Dec."); Trial Tr., at 6664:14-6667:22 (Bryant's testimony that the sculpt for the Bratz dolls was created based on his drawings and that his

22  fashions in his drawings reflect "the final fashion designs for the original release Bratz"), Stolyar Dec. Exh. 24.

23  [7]  Moreover, the law is clear that three-dimensional works (here, Bratz dolls) are not independent creations if they are recognizable as embodiments of two-

24  dimensional works (here, Bryant's drawings). See, e.g., Entm't Research Group, Inc. v. Genesis Creative Group, Inc., 122 F.3d 1211, 1223 (9th Cir. 1997) ("because [a

25  party's] costumes are 'instantly identifiable as embodiments' of the underlying copyrighted characters in 'yet another form,' no reasonable juror could conclude that

26  there are any 'non-trivial' artistic differences between the underlying cartoon characters and the immediately recognizable costumes"). Similarly, steps taken by

27  Defendants to translate Bryant's two-dimensional drawings into three-dimensional Bratz dolls are not sufficient to prove independent creation because they merely show

28  a *translation* -- not an independent creation -- of those drawings (which the jury has already found are owned by Mattel) into another medium.

-3-

MATTEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW

EXHIBIT _____1_____

PAGE _____9_____

1  involvement with Bratz outside of the company.[8]  Larian e-mailed MGA's personnel

2  dictating that "[t]here must be no mention about Mattel or any of their properties,

3  Carter, any MGA Bratz arts, etc."[9]  The MGA employees understood their mandate to

4  "keep Carter under wraps."[10]  Even more telling, Larian spread false information

5  about Bratz's creation by describing himself or his son -- rather than Bryant -- as the

6  creator of Bratz.  For example, Mr. Larian submitted a declaration in another case

7  stating that he (i.e., Larian) "was the inspiration behind the Bratz dolls."[11]  In an

8  interview with BusinessWeek magazine, he claimed that he "got the idea for Bratz

9  after seeing his own kids run around in navel-baring tops and hip-huggers."[12]  In

10  another newspaper interview, Mr. Larian claimed that, "It was Jason's [Mr. Larian's

11  son's] idea for Bratz."[13]  In a declaration to the Patent Office, Mr. Larian stated that

12  he was the "original, first and sole inventor" of a doll with removable feet (i.e., the

13  Bratz doll).[14]

14         In response, Defendants offered only evidence of conclusory denials.  As to the

15  article in which Mr. Larian told a reporter that Bratz was his son's idea, Mr. Larian

16  simply denied making the statement, and could not recall having spoken to the

17  reporter.[15]  Faced with overwhelming evidence, Mr. Larian simply stated, "We've

18  never tried to hide Carter Bryant's name."[16]  Conclusory denials are insufficient to

19  rebut concrete documentary evidence and eye-witness testimony of concealment from

20  numerous and unrelated sources.[17]  MGA's fraudulent concealment is beyond dispute.

21

22  [8]    Trial Tr., at 2375:22-2379:6; 2381:17-2383:16 (testimony of Rachel Harris),
23  Stolyar Dec., Exh. 24.
    [10]   See Trial Ex. 4507, Stolyar Dec., Exh. 17.
24  [11]   See Trial Ex. 4942, Stolyar Dec., Exh. 18.
    [12]   See Trial Exh. 947, Stolyar Dec., Exh. 14.
25  [13]   See Tr. Exh. 631, Stolyar Dec., Exh. 13.
    [13]   See Trial Exh. 12058, Stolyar Dec., Exh. 22.
26  [14]   See Trial Exh. 1701, Stolyar Dec., Exh. 16.
    [15]   Trial Tr. at 1858:16-22, Stolyar Dec., Exh. 24.
27  [16]   Trial Tr. at 1739:2-3, Stolyar Dec., Exh. 24.
    [17]   See United States v. Wilson, 881 F.2d 596, 601 (9th Cir. 1989) ("conclusory
28  statement of fact and self-serving declarations" insufficient to survive motion for
    summary judgment); Hernandez v. Spacelabs Medical Inc., 343 F.3d 1107, 1116 (9th
         (footnote continued)

07209/2606540.4                                    -4-

EXHIBIT ____1____

PAGE ____10____

1    The only remaining issue is timing.  Where defendants have attempted to
2    conceal their conduct, the statute of limitations is equitably tolled unless and until
3    Mattel has "near-actual" knowledge of its claims.  Garamendi v. SDI Vendome SA,
4    276 F. Supp. 2d 1030, 1042-3 (C.D. Cal. 2003).

5    At trial, Mattel offered evidence that it had no knowledge until November 2003
6    that Bryant worked on Bratz while a Mattel employee.  Its in-house counsel, Michael
7    Moore, testified that neither he, nor anyone else to his knowledge, knew that Carter
8    Bryant had a relationship with MGA while employed by Mattel,[18] or worked on Bratz
9    while a Mattel employee,[19] until he received Carter Bryant's agreement with MGA at
10   a meeting in November 2003.  A Mattel executive, Jill Nordquist, testified that she
11   did not learn of these facts until after this lawsuit was filed.[20]

12   Defendants introduced no evidence that Mattel had knowledge of Bryant's
13   disloyalty before November 2003.  Rather, they presented evidence of whether Mattel
14   knew Carter Bryant worked on Bratz (not *when* he worked on Bratz),[21] whether
15   Mattel knew that Bryant was going to work for a competitor,[22] whether Mattel
16   believed Bratz infringed Toon Teens,[23] and whether Mattel believed Bratz infringed
17   on Diva Starz.[24]  This evidence does not join the dispositive question: When Mattel
18   learned that Carter Bryant worked on Bratz and with MGA while a Mattel employee.
19   MGA's evidence of notice does nothing to counter the evidence related to Mattel's
20   claims: Mattel's evidence that it had no knowledge of Bryant's Mattel-era work on
21   Bratz, nor any reason to suspect it, until 2003.  No reasonable jury could reject such

22

23

24   Cir. 2003) ("[C]onclusory allegations, unsupported by facts, are insufficient to survive a motion for summary judgment.").
25   [18]  Trial Transcript at 6463:14-22, Stolyar Dec., Exh. 24.
     [19]  Trial Transcript at 6465:2-8, Stolyar Dec., Exh. 24.
26   [20]  Trial Transcript at 7430:24-7431:1; 7432:2-18, Stolyar Dec., Exh. 24.
     [21]  See, e.g., Trial Transcript at 6606:16-6608:2; 7413:21-7414:1, Stolyar Dec.,
27   Exh. 24.
     [22]  See, e.g., Trial Transcript at 7411:4-12, Stolyar Dec., Exh. 24.
28   [23]  Trial Transcript at 6605:3-21; 7787:15-7788:6, Stolyar Dec., Exh. 24.
     [24]  Trial Transcript at 7417:25-7418:12; 7425:13-7427:18, Stolyar Dec., Exh. 24.

MATTEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW

EXHIBIT _____ 1

PAGE _____ 11

1 | evidence in favor of no evidence at all.[25]

2 | **II.   THE BRATZ DOLLS ARE SUBSTANTIALLY SIMILAR TO THE
3 | BRYANT DRAWINGS THAT ARE OWNED BY MATTEL**

4 | In denying Mattel's motion for summary judgment on the question of

5 | substantial similarity, the Court concluded MGA had offered sufficient evidence,

6 | including from its design expert, to create a triable issue of fact as to whether the

7 | Bratz doll was substantially similar to the Bratz drawings.[26]   That expert did not

8 | testify at trial, and the evidence presented by Mattel has been overwhelming.   Given

9 | the totality of the evidence, no reasonable juror could fail to find substantial

10 | similarity.[27]   Moreover, MGA should be estopped as a matter of law from urging

11 | otherwise to the jury.

12 | **A.   Defendants Are Judicially Estopped from Denying That the Bratz
13 | Dolls Are Substantially Similar to Bryant's Drawings**

14 | Positions taken in prior litigation estop a party from asserting a contrary

15 | position in subsequent litigation.   See, e.g., Wagner v. Prof'l Eng'rs in Calif. Gov't,

16 | 354 F.3d 1036, 1044 (9th Cir. 2004) ("Judicial estoppel . . . precludes a party from

17 | gaining an advantage by taking one position, and then seeking a second advantage by

18 | taking an incompatible position" and "applies to a party's stated position whether it is

19 | [25]   Indeed, in addressing the application of the discovery notice rule, this Court
20 | relied on many of these same undisputed facts in concluding that Mattel could not
have discovered Bryant's wrongdoing until July 18, 2003.   See May 27, 2008 Order
21 | re Statute of Limitations Defense, at 8; see also Order dated July 2, 2008, at 2 ("there
is no evidence that Mattel had any knowledge of any one of the three generic
22 | elements of its claims.").   The standard of knowledge is *higher* on fraudulent
concealment than for the mere inquiry notice that is the subject of the discovery rule.
23 | Compare Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797, 807 (2005) ("a claim
accrues where a plaintiff has *knowledge of at least one* of the three generic elements
24 | of wrongdoing, causation, and harm") (emphasis added) with Jolly v. Eli Lilly & Co.,
44 Cal. 3d 1103, 1112 (Cal. 1988) ("a suspicion of wrongdoing, coupled with a
25 | *knowledge of the harm and its cause*, commences the limitations period") (emphasis
omitted and added).
26 | [26]   Order dated July 24, 2008, at 3, Stolyar Dec. Exh. 4.
[27]   Since the other two elements of Mattel's copyright infringement claim are
27 | established (Defendants' access to the drawings is undisputed and the jury in Phase
1A found that Mattel owns the drawings), granting Mattel judgment as a matter of
28 | law on the substantial similarity element entitles Mattel to judgment as a matter of
law on Defendants' liability for copyright infringement.

EXHIBIT _____ 1

PAGE _____ 12

1  an expression of intention, a statement of fact, or a legal assertion"); Hamilton v.
2  State Farm Fire & Cas. Co., 270 F.3d 778, 782 (9th Cir. 2001) (Ninth Circuit
3  "invokes judicial estoppel not only to prevent a party from gaining an advantage by
4  taking inconsistent positions," but also because of "regard for the dignity of judicial
5  proceedings," and to "protect against a litigant playing fast and loose with the
6  courts."); Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc., 2008 WL
7  2952074, at *9 (C.D. Cal. 2008).

8       MGA has repeatedly sued for copyright infringement of the very Bryant
9  drawings that the jury in phase 1A found are owned by Mattel, successfully asserting
10  that the Bratz dolls were based on Bryant's drawings, and that these dolls and
11  drawings were substantially similar to and infringed by competitors' dolls.    In
12  MGA v. Double Grand Corporation Limited, MGA's Lee declared under oath that
13  "[t]he designs of the Bratz dolls are all original drawings created by Mr. Bryant using
14  his own independent labour, skill and judgment."[28]   The court then held that "[t]he
15  substantial similarity between [Bryant's] drawings and the [Bratz] dolls produced
16  from them and the defendant's dolls are obvious on inspection."[29]   Similarly, in ABC
17  International Traders v. Toys & Trends, Isaac Larian swore under oath that an MGA
18  competitor's dolls "have infringed the 2-dimensional [Bryant] drawings which are
19  artistic works in which copyright subsists."[30]   Yet again, in MGA v. Multitoy, MGA
20  represented to the California Central District Court that a competitor's dolls infringed

21

22

23  [28]   Trial Exh. 952 (Affirmation of Lee Shiu Cheung, dated June 18, 2003), ¶ 8, Stolyar Dec., Exh. 15.
24  [29]   Trial Exh. 10176-0004, Stolyar Dec., Exh. 21. Although the Hong Kong court rulings were not introduced into evidence in this case on grounds of possible juror
25  confusion, Mattel respectfully submits that they are relevant and necessary evidence that can and should be considered to determine the legal issue of judicial estoppel.
26  [30]   See Trial Exh. 12 (Affidavit of Isaac Larian dated July 2, 2002, at ¶ 12, filed in ABC International Traders, Inc. (d/b/a MGA Entertainment) v. Toys & Trends (Hong
27  Kong) Limited, et al., High Court of the Hong Kong Special Administrative Region, Court of First Instance, Civ. Action No. 2152 (2002)), Stolyar Dec. Exh. 6; see also
28  Trial Exh. 10 (Bryant's Bratz drawings attached to Hong Kong filings), Stolyar Dec., Exh. 5.

1   the Bryant's drawings.[31]

2       As this Court has noted, "[f]or MGA to be able to go in one Court, whether its

3   Hong Kong or Oregon or wherever it is, and say, "Aha, you're infringing our

4   drawings; you're infringing our dolls . . . and then turn around in another court and

5   say [the dolls] don't look anything like the drawings . . . strikes the Court as a

6   fundamentally unfair position for MGA to be taking."[32]   Because MGA has

7   repeatedly argued before other courts that the Bratz dolls are based on Bryant's

8   drawings, and competitors' dolls are substantially similar to those drawings (dolls

9   which, as a matter of law, are <u>less</u> similar to the drawings than the Bratz dolls -- no

10  reasonable juror could find otherwise), it should be estopped from seeking an

11  advantage by taking an incompatible position in this case.

12      **B.     No Reasonable Jury Could Fail to Find That the Works at Issue Are
13             Substantially Similar**

14      Given the undisputed fact that MGA had access to Bryant's drawings before

15  the Bratz dolls were created, and Mattel's correspondingly reduced burden to show

16  substantial similarity, Mattel has met both the extrinsic and intrinsic tests for

17  substantial similarity and is entitled to judgment as a matter of law on this issue.[33]

18      **1.     Mattel Has Satisfied the Extrinsic Test**

19      With respect to the extrinsic test, Mattel has established that the body

20  proportions, facial features, eyes, lips, clothing, accessories, footwear and postures of

21  the the first-generation Bratz dolls are similar to the Bryant-created Bratz drawings

22

23

24  [31]  See generally Trial Exh. 13738, Stolyar Dec., Exh. 23.
25  [32]  Trial Tr. at 5385:7-18, Stolyar Dec., Exh. 24.
    [33]  Judgment as a matter of law on "substantial similarity" in favor of copyright
26  infringement plaintiffs is hardly a rarity.  See, e.g., Educ. Testing Serv. v. Simon, 95
    F. Supp. 2d 1081, 1083-88, 1090 (C.D. Cal. 1999) (finding that defendants' works
27  were substantially similar to plaintiff's and infringed plaintiff's copyright as a matter
    of law); JCW Invs., Inc. v. Novelty, Inc., 289 F. Supp. 2d 1023, 1039-1040 (N.D. Ill.
28  2003), aff'd, 482 F.3d 910 (7th Cir. 2007) (finding plaintiff's and defendant's works
    "substantially similar" as a matter of law).

EXHIBIT _____1_____

PAGE _____14_____

1  that the jury has found are owned by Mattel.[34]  This Court has already ruled that these
2  elements are fully protected, specifically referencing: (1) the particularized
3  expressions of the head, the lips, eyes, eyebrows, eye features, nose, chin, hairstyle,
4  and/or breasts; (2) accentuation or exaggeration of certain anatomical features relative
5  to others; (3) de-emphasis of certain anatomical features relative to others, such as the
6  doll nose or relatively thin torsos; (4) the particularized, non-functional doll clothes,
7  doll shoes, and doll accessories that express a distinct style; (5) the synergistic
8  combination of an oversized head, eyes, lips, feet and shoes, de-emphasized or absent
9  nose, and hip, and (6) urban clothing designs.[35]

10        Indeed, MGA has admitted substantial similarity by claiming under oath in its
11  filings with the U.S. Copyright Office that the BRATZ dolls are "derivative" of
12  Bryant's drawings.[36]  It is well established that "a work is not derivative unless it has
13  been substantially copied from the prior work." Litchfield v. Spielberg, 736 F.2d
14  1352, 1357 (9th Cir. 1984); see also Berkic v. Crichton, 761 F.2d 1289, 1291 n.1 (9th
15  Cir. 1985) (same).  Moreover, both MGA and Carter Bryant have repeatedly stated,
16  including under oath, that the Bratz dolls are based on and modeled from Bryant's
17  drawings; even if such statements do not support estoppel, they prove substantial
18  similarity.  In particular: (1) Carter Bryant admitted that he intended his Bratz
19  drawings to serve as guides for the creation of the Bratz dolls;[37] (2) Paula Garcia
20  stated that: "The four girls were already concepted [] when presented by the inventor
21  [Bryant] during our first meeting. I thought they were incredible and I tried to stay
22

23  [34]  See, e.g., Trial Tr. at 6664:14-6667:22 (Bryant's testimony that the sculpt for
the Bratz dolls was created based on his drawings and that the fashions in his
24  drawings reflect "the final fashion designs for the original release Bratz"); Trial Tr. at
6669:19-23 (Bryant's testimony that "all the Bratz dolls have an overall similar
25  appearance"); Trial Tr. at 6847:6-6848:1 (Leahy's testimony that "Bryant's drawings
have the factors that MGA say are unique to the [Bratz] dolls, which is the oversized
26  eyes, protrusive lips, and the diminished nose"), Stolyar Dec., Exh. 24.
        [35]  See Trial Tr. at 6197:14-6198:3, Stolyar Dec., Exh. 24.
27        [36]  See Trial Exhs. 558, 560, 562 and 564 (MGA's Supplementary Copyright
Registrations for the Jade, Sasha, Cloe and Yasmin dolls, identifying them as
28  "derivative" of Bryant's drawings), Stolyar Dec. Exhs. 9- 12.
        [37]  Trial Tr. at 6665:8-6666:10, Stolyar Dec., Exh. 24.

-9-

MATTEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW

EXHIBIT ___1___

PAGE ___15___

1 true [to] this inventor/creator's vision;"[38] (3) MGA described Bryant's drawings as

2 "the Bratz property;"[39] and (4) MGA's counsel and officers have repeatedly stated

3 under oath that Bryant's drawings are the artistic works upon which Bratz dolls are

4 modeled.[40]  Given these facts, no reasonable juror could find that Mattel had failed to

5 meet the extrinsic test.[41]

6       **2.  Mattel Also Clearly Satisfies the Intrinsic Test**

7      Mattel satisfies the intrinsic test because the similarities between Bryant's

8 drawings and the Bratz dolls are apparent upon first glance.  The body proportions,

9 facial features, eyes, lips, clothing, accessories, footwear, postures, and the attitude

10 projected are markedly similar, and no reasonable juror could find otherwise.  Indeed,

11 though MGA now claims that Bryant's drawings look nothing like the Bratz dolls,

12 MGA took the opposite position when it sued Hong Kong manufacturers infringing

13 those drawings.  "What's really troublesome about this is, in Hong Kong, MGA was

14 saying the drawings and the dolls, grouped together essentially look just like those

15 other dolls."[42]  As this Court has noted, because Hong Kong courts apply the same

16 "intrinsic analysis" as the Ninth Circuit, it is "entirely unfair" for MGA to take such

17 contrary positions.[43]  It is also entirely contrary to any reasonable comparison of the

18 drawings and the dolls.

19                  **Conclusion**

20      The Court should grant judgment as a matter of law for Mattel on MGA's claim

21

22 [38]   Trial Exh. 10001, Stolyar Dec. Exh. 20.

   [39]   Trial Exh. 17, Stolyar Dec. Exh. 7.

23    [40]   For example, in a sworn affidavit filed in MGA v. Double Grand Corp.,

Daphne Gronich (MGA's former general counsel) identified Bryant's drawings as the

24 "artistic works" upon which the Bratz dolls are modeled. Trial Exh. 5463, ¶¶ 6-7, 12,

Stolyar Dec. Exh. 19.

25    [41]   "As Judge Learned Hand cogently remarked, 'no plagiarist can excuse the

wrong by showing how much of his work he did not pirate.'" Harper & Row

26 Publishers, Inc. v. Nation Enters., 471 U.S. 539, 565 (1985) (cite omitted); see also

Ideal Toy Corp. v. Fab-Lu, Limited, 261 F. Supp. 238, 242 (S.D.N.Y. 1966) ("In

27 [youngsters'] enthusiasm to acquire Tammy or Pepper [dolls] they certainly are not

bent upon 'detecting disparities'....").

   [42]   Trial Tr. at 5387:9-15, Stolyar Dec., Exh. 24.

28    [43]   Trial Tr. at 5403:12-21, Stolyar Dec., Exh. 24.

EXHIBIT _____1_____

PAGE _____16_____



1  of independent creation and its statute of limitations defense, and on the substantial

2  similarity element of Mattel's copyright infringement claim.

3  DATED:  August 18, 2008          QUINN EMANUEL URQUHART OLIVER &
                                    HEDGES, LLP

4

5                                   By /s/ John Quinn
                                       John B. Quinn
6                                      Attorneys for Mattel, Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-11-
MATTEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW

**EXHIBIT** ___1___

**PAGE** ___17___

# EXHIBIT 2

# THIS EXHIBIT FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 3

# THIS EXHIBIT FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 4

FILED

DALE M. CENDALI
(of counsel, not admitted in California)
DIANA M. TORRES (S.B. #162284)
PAULA E. AMBROSINI (S.B. #193126)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA  90071-2899
Telephone:  (213) 430-6000
Facsimile:  (213) 430-6407
email:  dtorres@omm.com

PATRICIA GLASER (S.B. # 55668)
CHRISTENSEN, MILLER, FINK,
JACOBS, GLASER, WEIL &
SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, CA  90067
Telephone:  (310) 553-3000
Facsimile:  (310) 556-2920

Attorneys for Plaintiff
MGA Entertainment, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CV 05 - 02727  CBM(RZx)

| | |
|---|---|
| MGA ENTERTAINMENT, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MATTEL, INC., a Delaware Corporation, and DOES 1-10,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR FALSE DESIGNATION OF ORIGIN, AFFILIATION, ASSOCIATION OR SPONSORSHIP (15 U.S.C. § 1125 (a)); UNFAIR COMPETITION (15 U.S.C. § 1125 (a), Cal. Bus. & Prof. Code § 17200 *et seq.* and California Common Law); DILUTION (15 U.S.C. § 1125 (c), Cal. Bus. & Prof Code § 14330 and California Common Law); AND UNJUST ENRICHMENT**<br><br>**DEMAND FOR JURY TRIAL** |

EXHIBIT ___4___

PAGE ___32___

1            Plaintiff MGA Entertainment, Inc. for its complaint against

2   Defendants Mattel, Inc. and DOES 1-10 alleges and avers as follows:

3

4                          **PARTIES**

5       1.      Plaintiff MGA Entertainment, Inc. ("MGA") is a California

6   corporation organized and existing under the laws of the State of California, with a

7   principal place of business in Van Nuys, California.

8       2.      MGA is informed and believes, and based thereon alleges, that

9   Defendant Mattel, Inc. ("Mattel") is a Delaware corporation with a principal place

10   of business in El Segundo, California.

11       3.      MGA is ignorant of the true names and capacities of the defendants

12   sued herein under the fictitious names DOES 1 through 10 inclusive. MGA will

13   seek leave of court to amend this complaint to allege such names and capacities

14   when they are ascertained. MGA is informed and believes, and based thereon

15   alleges, that each of the fictitiously named DOE defendants is responsible in some

16   manner for the wrongful conduct alleged herein. MGA further alleges that each

17   defendant acted in concert with, as agent or representative for, or at the request or

18   on behalf of another or Mattel. Each charging allegation contained herein is,

19   therefore, also hereby alleged against each fictitiously named DOE defendant.

20

21                 **JURISDICTION AND VENUE**

22       4.      Through this action MGA asserts claims against Mattel arising under

23   the Lanham Act, 15 U.S.C. Sections 1125 (a) and (c), California Business and

24   Professions Code Sections 17200 *et seq.*, California Business and Professions Code

25   Section 14330 and California common law. This Court has original subject matter

26   jurisdiction over MGA's federal claims pursuant to 15 U.S.C. Sections 1116 and

27   1121, 28 U.S.C. Section 1338(a), and 28 U.S.C. Section 1331, and supplemental

28

1

EXHIBIT __4__

PAGE __33__

1    subject matter jurisdiction over MGA's state law claims pursuant to 28 U.S.C.

2    Section 1367(a).

3       5.    This Court has specific personal jurisdiction over Mattel, as it has

4    purposefully committed, within the State of California, the acts from which these

5    claims arise and/or has committed tortious acts outside California, knowing and

6    intending that such acts would cause injury to MGA within the state. The Court

7    also has general personal jurisdiction over Mattel, as it conducts continuous,

8    systematic and routine business within the State of California and the County of

9    Los Angeles.

10      6.    Venue is proper in the United States District Court for the Central

11    District of California pursuant to 28 U.S.C. Sections 1391(b) and 1391(c).

12

13                     **FACTUAL BACKGROUND**

14      7.    MGA seeks by this action to halt Mattel's habitual and unfair tactics of

15    competition-by-intimidation and serial copycatting of MGA's products, which

16    Mattel has used in an unbridled effort to cause confusion in the market place and

17    eliminate MGA as a competitor in the toy and fashion doll market long dominated

18    and controlled by Mattel.

19      8.    MGA is a privately-held company in the San Fernando Valley that

20    began in 1979 as a small consumer electronics business. In 1987, the company

21    made its first foray into the toy business when it secured rights to market handheld

22    LCD games featuring licensed Nintendo® characters. Building on that small

23    success, the company began marketing products for popular licensed properties

24    such as the "Power Rangers"® and "Hello Kitty"®. This little-known but

25    successful company, however, was propelled into the limelight after its daring

26    release in June 2001 of an innovative line of fashion dolls called "BRATZ".

27    "BRATZ" are multi-ethnic fashion dolls that sport a fresh new urban and

28    contemporary look and fashion. At the time of the release of "BRATZ", "Barbie"

2

EXHIBIT 4
PAGE 34

1   sales were in a slump, Mattel was in turmoil, and the market was ripe for something

2   new, exciting and inventive. "BRATZ" fit the bill. It is the first fashion doll that

3   has been able to seriously challenge "Barbie" for market share, and begin to loosen

4   Mattel's 50-year iron-fisted grip on the fashion doll market.

5         9.    Mattel has not taken kindly to the challenge. Either unable or

6   unwilling to compete against "BRATZ" fairly, and on a level-playing field, Mattel

7   has, instead, taken a more expeditious approach, resorting to unfair and anti-

8   competitive business practices. Wielding its substantial clout and influence in the

9   toy industry, Mattel has tried to muscle MGA out of business. MGA is informed

10   and believes that Mattel has intimidated, coerced and threatened retailers, licensees,

11   suppliers and others in the industry – both in the U.S. and internationally – in order

12   to inhibit and stifle MGA's ability to compete with Mattel and to prevent MGA

13   from obtaining licensees, contracts and supplies for its products. Mattel has also

14   serially imitated and copy-catted the look of MGA products, trade dress,

15   trademarks, themes, ideas, advertising and packaging, including for the "BRATZ"

16   line of dolls. MGA brings this action to stop Mattel's tortious, unfair and anti-

17   competitive conduct and to recover the extensive damage that Mattel's illicit

18   behavior has caused, and continues to cause, MGA. Mattel's own website states:

19   "As the global leader in the toy industry, we believe that how we achieve success is

20   just as important as the success itself." It also proclaims that "unwavering integrity

21   defines our corporate culture on every level, guiding how we work and how we do

22   business." Mattel's own corporate governance standards require it to "play by the

23   rules," complete fairly and be a good corporate citizen. Mattel's actions, however,

24   speak louder than its words.

25

26

27

28

EXHIBIT 4

PAGE 35

## Mattel History and Performance

10.    Mattel is the world's largest toy company, but it owes its immense success chiefly to a single product: "Barbie." Since her debut in 1959, "Barbie" has been the fuel for Mattel's growth and success, turning Mattel into an international powerhouse. By the late 1990's, Mattel's annual sales of the doll approached or topped $1.8 billion and Mattel stock reached a record high of approximately $45.00 a share. At that time, the average American girl had eight "Barbie" dolls, and "Barbie" was the world's best-selling toy.

11.    Mattel's reliance on a single, 40-year old product for as much as 50% of its business turned out to be a risky business model, however. Resting on its laurels, Mattel failed to react to the shifting tastes of consumers, changing dynamics in the industry, and an increasing focus on technologically advanced and interactive toys. "Barbie's" record sales fell into a tailspin. According to one report, Adrienne Fontanella, Mattel's "Barbie" brand president, would later be quoted as saying that, "The world changed very quickly, and we missed a beat... Barbie wasn't talking to girls. She just wasn't hitting it."

12.    Sales began to plunge in 1997, and Mattel began posting a series of net income losses. In the first quarter of 1998, sales of the "Barbie" brand dropped 17%. This steep slide was followed by another in the second quarter, when sales fell again, down by 15%. By the end of 1998, Mattel reported an overall 14% decline in "Barbie" sales for the year and analysts were using words such as "devastating" and "a catastrophe" to describe Mattel's earnings. The company's stock fell as much as 27% in a single day. "Barbie" was having a crisis.

13.    Jill Barad, who had taken over as Mattel's chairman and chief executive in January 1997, at the height of Mattel's success, had to do something fast. Instead of focusing on and investing in new product development, however, which would obviously take time, Mattel embarked on a series of acquisitions that were seemingly aimed at quickly diversifying the company's product line and

4

EXHIBIT ___4___

PAGE ___36___

1 reducing its reliance on "Barbie" and on traditional retailers, such as Toys-R-Us
2 and Wal-Mart. Mattel spent a reported $881 million in March 1997 to purchase
3 Tyco Toys and acquire the "Matchbox" toy car brand. Just more than a year later,
4 it spent $700 million for the Pleasant Co., a mail-order doll company and maker of
5 the "American Girl" doll collection. And in December 1998, Mattel announced
6 plans to fork out a monumental $3.5 billion to buy the Learning Company,
7 followed quickly by Mattel's purchase, in March 1999, of a software company,
8 Purple Moon.

9     14.    Despite these acquisitions, the company continued to struggle. The
10 retail environment and buying patterns had unquestionably changed, but Mattel had
11 not kept up. Despite Mattel's feverish acquisitions, Mattel's mainstay and primary
12 profit-generator was still "Barbie." But "Barbie" had grown stale, and sales
13 languished. Posting additional losses in the first quarter of 1999, Mattel announced
14 that it would lay off 3,000 employees — 10% of its work force.

15     15.    Mattel's stock plummeted again in late 1999, dropping 30% on
16 Mattel's announcement that it would fall as much as 55% short of analysts' earning
17 estimates for the third quarter. Mattel blamed its troubles primarily on its
18 expensive, $3.5 billion acquisition of the Learning Company, which had turned out
19 to be a disaster fraught with licensing and distribution problems, bad debt, high
20 product returns and high advertising costs.

21     16.    By early 2000, Mattel's stock had crashed to as low as $8 per share,
22 and some analysts considered Mattel vulnerable to a takeover. Investors clamored
23 for Ms. Barad's resignation, and got their wish.

24     17.    Jill Barad resigned from Mattel in February 2000.

25     18.    For three months, the company was without a permanent chief
26 executive until Robert Eckert took the helm in May 2000. Mr. Eckert had spent 23
27 years at Kraft Foods, a subsidiary of Altria Group, Inc., and was widely credited
28

EXHIBIT 4
PAGE 37

1   with reviving its ailing cheese business. Investors looked for him to do the same

2   for Mattel.

3        19.   Upon his arrival at Mattel, Mr. Eckert's promise, according to *Wall*

4   *Street Journal* reports, was to deliver a "leaner and meaner" Mattel.

5        20.   The "leaner" Mattel came quickly. Mr. Eckert laid off hundreds,

6   closed factories in the United States, shipped production to Mexico, and sold off the

7   Learning Company at a fraction of what Mattel had paid for it. It helped Mattel's

8   bottom-line, but did nothing to spur sales growth. Even under Mr. Eckert's "leaner

9   meaner" leadership, domestic "Barbie" sales remained in a slump into 2001. In an

10  industry that had become increasingly driven by consumer whims and fads, and the

11  hot, must-have toys of the moment, Mattel remained disinterested in devoting its

12  resources to searching for or developing a new blockbuster toy. Mr. Eckert's

13  business plan was not to diversify, but to build upon and expand sales of its existing

14  brands. Mattel was, after all, still generating billions in revenue despite the decline

15  of "Barbie." And so, Mattel remained committed to its age-worn icon and its two

16  other core brands, Fisher-Price and Hot Wheels, with each of the three accounting

17  for approximately a third of the company's sales.

18       21.   Then came the competition -- MGA's "BRATZ".

19

20  **"BRATZ" Dolls Revolutionize The Fashion Doll Market**

21       22.   "BRATZ" challenged "Barbie's" half-century domination of the

22  fashion-doll market like nothing ever before had been able to do.

23       23.   MGA unveiled a preliminary sample of the "BRATZ" doll at the Hong

24  Kong Toy Fair in January 2001, while continuing to finalize the product throughout

25  that spring. Finished products were first shipped in May 2001. MGA introduced

26  the line to consumers in June 2001.

27

28

EXHIBIT 4

PAGE 38

24.     Unlike "Barbie" dolls, the "BRATZ" line of dolls and branded products sported a hip, multi-ethnic urban look that appealed to contemporary teenage and pre-teen girls.

## MGA's "BRATZ"



 

 

25.     At approximately 9.5 to 10 inches tall, the "BRATZ" dolls were intentionally shorter than "Barbie" dolls and looked like no other, with disproportionately large heads, big, dramatic eyes and lips, small, thin bodies, oversized feet (to emphasize shoe fashion and to stand on their own, unlike "Barbie," which requires a stand), and up-to-date fashions.

7

EXHIBIT  4
PAGE  39

26.    Indeed, the classic "Barbie" look was nowhere to be seen in these dolls; they would never be confused with "Barbie".

**MGA's "BRATZ"**            **Mattel's "Barbie"**

        

27.    Featuring and embodying the slogan "The Girls With a Passion for Fashion!", "BRATZ" dolls revitalized, transformed and expanded the fashion doll market, in particular proving popular among "tween" age girls – those between childhood and adolescence – who had been all but abandoned as a market by Mattel.

28.    The "BRATZ" line – with its unique and distinctive look – is well recognized and has been critically acclaimed and praised by consumers, retailers and toy industry analysts alike. In 2001, the "BRATZ" line won the Toy Industry Association ("TIA") People's Choice Toy of the Year Award, the Family Fun Toy of the Year Award and Toy Wishes Hot Pick Award. In 2002, the "BRATZ" line again won the TIA People's Choice Toy of the Year Award and the Family Fun Toy of the Year Award. LIMA, the licensing industry's official arm, awarded MGA's "BRATZ" the best character license of the year as well as the overall best licensed property of the year for 2003. MGA's "BRATZ" also earned the coveted TIA "Property of the Year" and "Girl Toy of the Year" for 2003, as well as the Family Fun Toy of the Year Award. MSNBC named "BRATZ" the "Hottest Toy of the Year," and both MGA and "BRATZ" received several other accolades in

8

EXHIBIT ___4___

PAGE ___40___

1  2004, including the Suppliers Performance Award by Retail Category (the

2  "SPARC" award) in the Girls' Toys category sponsored by DSN Retailing

3  Today/Apparel Merchandising.

4      29.    Although but a tiny fraction of Mattel's size, with "BRATZ", MGA

5  was able to chip away at Mattel's stranglehold on the fashion doll market, gaining

6  shelf space and market share as "Barbie" sales remained flat or, at times, declined.

7      30.    The competition that MGA (once a licensee of Mattel!) and "BRATZ"

8  posed to Mattel was unexpected and unwelcomed by Mattel. Where "Barbie" had

9  once enjoyed a 90% share of the fashion doll market in 1997, that share had already

10  slipped to 85% or less by the time of the release of "BRATZ". With the company

11  still struggling under Mr. Eckert to overcome prior years of declining sales and

12  mounting debt, "Barbie," Mattel    and Mr. Eckert ·· simply could not afford the

13  untimely competition. Mr. Eckert's "leaner" Mattel was not enough to battle more

14  potential erosion in "Barbie's" market share. Mattel had to combat "BRATZ" and

15  MGA, and in the process revealed Mr. Eckert's "meaner" Mattel.

16

17  **Mattel's Response to "BRATZ" and Efforts to Thwart MGA's Competition**

18      31.    Mattel was not poised to nimbly respond to "BRATZ" with a new,

19  creative product of its own ·· indeed, it had been antithetical to Mattel's corporate

20  culture and mentality for Mattel to even conceive that a product might vie for shelf

21  space with "Barbie", let alone be available for sale to consumers mere months after

22  first being shown to retailers. Mattel had to take a more expeditious route.

23      32.    Instead of fairly competing, Mattel waged war against MGA using a

24  wide-array of tortious, unfair and anti-competitive practices including systematic,

25  serial copycatting and intellectual property infringement, aided by intimidation,

26  threats and other acts of unfair competition and anti-competitive conduct, all with

27  one goal in mind – to banish MGA from the market ·· or minimize its ability to

28  capture any meaningful share before it could do any real harm to Mattel.

9

EXHIBIT _4_

PAGE _41_

**Mattel's serial copycatting and intellectual property infringement**

33.     Mattel's serial copycatting of MGA's product lines began with the "BRATZ" dolls themselves, but quickly extended to MGA's packaging, themes, accessories, advertising and even other product lines.

34.     The first four "BRATZ" dolls that MGA launched in 2001, named Jade, Yasmin, Cloe and Sasha, met their wannabe "BRATZ PACK" members in October 2002 with Mattel's launch of three "My Scene" dolls named Madison, Chelsea and "Barbie." This was no ordinary "Barbie", however. Indeed, not even close. Mattel designed its "My Scene" dolls to evoke the unique and distinctive look of the "BRATZ" – also with disproportionately oversized heads, artfully made-up almond-shaped eyes, large, overly-lined and lipsticked lips, trendy, hip clothes and hair styles, and over-sized feet.

**Mattel's Traditional "Barbie"**          **Mattel's "My Scene" Doll**




circa 2002                    circa 2004






10

EXHIBIT 4
PAGE 42

35.   These confusingly similar "BRATZ" imitators may have been originally intended to buy Mattel time while it worked to release another product the following summer, called "Flavas". MGA's founder, Isaac Larian, was quoted by the media as having predicted that the move would backfire on Mattel, and it did. Released in July 2003, Mattel's "Flavas" dolls took the urban, "hip-hop" look too far, and were widely viewed as portraying a trampy, "bad-girl" image. The dolls were not well-received, and rumor has it that Mattel had to sell them at below cost prices to get rid of inventory. Most apparently wound up in discount bins, and Mattel has seemingly abandoned the line.

36.   Realizing that "My Scene" was its best bet for riding MGA's successful coattails and capitalizing on the unique and inherently distinctive look that MGA had developed in its "BRATZ" dolls · and MGA's substantial goodwill Mattel has systematically proceeded to modify the "My Scene" dolls since their original release, particularly their eyes, to increase their similarity to "BRATZ" more and more over time.

37.   Indeed, when Mattel found out that its initial line of "My Scene" dolls had trouble competing with "BRATZ", they simply *became* "BRATZ", in every version, whether blonde, brunette or African American. A few pictures here are worth a thousand words.

### BLONDE

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|
|  |  |  |

EXHIBIT ___4___

PAGE ___43___



Mattel's Traditional "Barbie"

Mattel's Original "My Scene"

Mattel's Recent "My Scene"

**BRUNETTE**

Mattel's Traditional "Theresa"

Mattel's Original "My Scene"

Mattel's Recent "My Scene"

12

EXHIBIT 4

PAGE 44



### AFRICAN AMERICAN

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |

38.    The original "My Scene" eye, as shown here, for example, has recently turned into a virtual carbon-copy of the "BRATZ" eye.

### Original Mattel "My Scene" Eye

13

EXHIBIT __4__

PAGE ___45___

39.   The "My Scene" eye pictured above, for instance, has lashes that radiate almost straight out, circumferentially, from the eyelids and, although the eye is more almond shaped than a "Barbie" eye, the eye is not so sleepy and heavy lidded as a "BRATZ" eye and is only lightly shadowed. The new "My Scene" eye, in contrast, is dramatically more similar to a "BRATZ" eye, as shown below in a side-by-side comparison. The doe-eyed innocent look of the "My Scene" eye shown above is gone; replaced with a sultrier look, characteristic of "BRATZ." The new "My Scene" eye, as shown below, boasts lashes that sweep out and away from the outer corner of the eye, just like the "BRATZ" eye. The new "My Scene" eye is also more heavy lidded and thickly lined, and the make-up is more markedly pronounced and dramatic.

**MGA's "BRATZ" Eye**                    **New Mattel "My Scene" Eye**

            

40.   Indeed, the progression of the "My Scene" eye, as it has departed from "Barbie" and edged closer and closer to "BRATZ", is readily apparent from virtually every angle, as shown here:

14

EXHIBIT _____ 4 _____

PAGE _____ 46 _____



15

EXHIBIT 4
PAGE 47



Mattel's
Traditional "Theresa"

Mattel's
Original "My Scene"

Mattel's
Recent "My Scene"

**AFRICAN AMERICAN**

Mattel's
Traditional "Barbie"

Mattel's
Original "My Scene"

Mattel's
Recent "My Scene"

16

EXHIBIT ____4____

PAGE ____48____

41.     Mattel has not stopped at the eyes, however.  Mattel has also incrementally but steadily modified its "My Scene" packaging, and the manner in which the dolls are displayed, to more closely mimic the packaging, trade-dress and overall look and total image of MGA's "BRATZ".

42.     To illustrate, Mattel's "My Scene" dolls were initially marketed like this:

### Mattel's Early "My Scene" Packaging

 

43.     Little by little, however, the packaging has changed, creeping ever closer and closer to the open and transparent style of the "BRATZ" packaging. First, the panels seen running down each side of the front of the "My Scene" box shown above, framing the doll and giving the packaging a closed-in look, were changed as shown here:

### Intermediate Mattel "My Scene" Packaging



17

EXHIBIT 4
PAGE 49

44.    Mattel replaced this intermediate packaging style with another that looked even more similar to the "BRATZ" packaging, as shown here in a side-by-side comparison:

| **MGA's "BRATZ"** **"Wintertime Wonderland" Packaging** | **Mattel's "My Scene"** **"Chillin' Out" Packaging** |
|---|---|
|  |  |

45.    Then later, Mattel changed its packaging and product display yet again to look even more closely and confusingly similar to MGA's packaging and "*tout ensemble*," as shown here

| **MGA's "BRATZ"** **"SPORTZ" Packaging** | **Mattel's Recent "My Scene"** **"MIAMI GETAWAY" Packaging** |
|---|---|
|  |  |

EXHIBIT 4

PAGE 50

46. In this incarnation, Mattel notably abandoned the signature figure-eight style design that had appeared on its prior "My Scene" packaging, making this recent version clearer and more transparent on the front and sides than ever before, and much more like "BRATZ", accordingly. Mattel also discarded its traditional, rectangular shaped box and, like "BRATZ", adopted an unusual, non-rectangular shaped box. Mattel even adopted the "flying banner" ribbon-style slogan running across the middle of the box, similar to that used on the "BRATZ" packaging.

47. As if these pointed and deliberate efforts to confuse and mislead consumers were not enough, Mattel exacerbated the confusion, and furthered the impression that the "My Scene" line and the "BRATZ" line are related, by taking up MGA's practice of regularly releasing new dolls in connection with a theme – but not just *any* theme, often *MGA's theme.*

48. For example, when MGA released its "Wintertime Wonderland" theme in Fall 2003, Mattel released its "Chillin Out!" theme. Each doll in MGA's line came with winter-sports accessories, such as a snowboard or skis and ski boots. Each doll in Mattel's line featured winter sports accessories, also including snowboards or ski and ski boots. Even MGA's color schemes and some of the clothing styles seemed to have made their way into the Mattel products.

49. When MGA released its "Formal Funk" theme, Mattel released its "Night on the Town" theme. "BRATZ Formal Funk" was an elaborately themed line with its dolls in hip formalwear; so was Mattel's "Night on the Town."

50. When MGA released its distinctive "Sun-Kissed Summer" theme, Mattel released its confusingly similar "Jammin' in Jamaica" theme. Each line featured a bright blue-and-orange color scheme, beach accessories, such as surfboards, and beachwear clothing. Mattel's "Jammin' in Jamaica" "Guava Gulch Tiki Lounge" playset also contained elements remarkably similar to MGA's "Sun-Kissed Summer" playset.

EXHIBIT 4

PAGE 51

51.  Mattel also began running television commercials for its "My Scene" dolls bearing a remarkable similarity to "BRATZ" commercials, combining live action with animated sequences set to similar sounding pop music and lyrics.

52.  Mattel even stooped so low as to mimic "BRATZ" accessories and related products in order to further create consumer confusion in the marketplace.

53.  For instance, when MGA came up with its distinctive "BRATZ" "Runway Disco", Mattel came out with a "My Scene" Sound Lounge with packaging that imitated MGA's trapezoidal box.

54.  Mattel's conduct cannot be explained by sheer coincidence, nor is it merely fair competition.  It is a calculated and intentional effort unquestionably designed to trade off of MGA's hard work and goodwill, create confusion in the marketplace, steal MGA's thunder and momentum, and dilute and blur away the novelty and distinctiveness of MGA's products.  Out of the seemingly endless possibilities that Mattel could have chosen for a new line of dolls, packaging, themes, color schemes, commercials, accessories and playsets, Mattel deliberately chose *not* to come out with something unique, new or different and has, instead, focused its efforts and resources on flooding the market with something so close to "BRATZ" that the public will, can, and does, simply mistake it for "BRATZ".

55.  As yet another example of this, when MGA came out with a "BRATZ" "Funky Fashion Makeover Head," Mattel came out with a confusingly similar -- indeed, practically identical -- "My Scene" styling head.

20

EXHIBIT  4

PAGE  52

| MGA's "BRATZ" | Mattel's "My Scene" |
|---|---|
| **"Funky Fashion Makeover Head"** | **"Stylin' Head"** |



56.     Indeed, Mattel's "My Scene" styling head is so close to the "BRATZ" styling head that even the press have mistakenly pictured and identified it as MGA's "BRATZ". The picture of Mattel's "My Scene" styling head shown below, for instance, appeared in the press with a caption indicating that the child was trying out different hairstyles "on a ***Bratz*** hair and makeup doll head."



Hairstyle practice

21

EXHIBIT 4
PAGE 53

57.   Creating further confusion, Mattel's television commercial for its "My Scene" styling head was like watching a re-run of MGA's commercial for its "Funky Fashion Makeover Head".

58.   At one point in time, Mattel also used a portion of the "BRATZ" dolls' now-famous trademarked tag line "The Girls With a Passion for Fashion" on Mattel's' website for its "Diva Starz" dolls, asking its website users: "Do you have a passion for fashion?"

59.   Mattel has even recently come out with a confusingly similar line of "My Scene" plush pets, which adopt the distinctive look of MGA's "BRATZ" line. The "My Scene" pets feature large, humanlike eyes and wear clothing making them remarkably and confusingly similar to "BRATZ" products, including "BRATZ PETZ", as seen in this example where the pets each wear a jacket, a cap and carry a purse:

<u>**MGA's "BRATZ Dogz"**</u>                <u>**Mattel's "My Scene" dog**</u>

 

60.   And here too, Mattel chose to package its pets the same way that MGA packaged its "BRATZ PETZ", sitting in an open box, with no top and with partial side panels that slope from a narrow front panel to a higher back panel.

61.   Indeed, the similarity of the "My Scene" pets to "BRATZ PETZ" has confused even sophisticated retailers who have mistakenly merchandised "My Scene" dogs in the middle of the "BRATZ" section of a retail display, next to and as if they were part of MGA's "BRATZ Petz" line.  It comes as no surprise that

22

EXHIBIT ___4___

PAGE___54___

1   customers too have been confused.

2       62.    Indeed, Mattel's television commercials and "My Scene" products
3   have become so confusingly similar to MGA's that even advertising executives
4   have expressed concern.  One went so far as to say that although imitation is the
5   best form of flattery, what the individual had seen at Mattel's showroom, and how
6   its "My Scene" dolls now look so confusingly similar to "BRATZ", was
7   "shocking."  This person further opined that it was clear that Mattel is intending to
8   confuse customers and capture "BRATZ" market share, and even asked MGA if it
9   was considering legal action.

10      63.    The press also has taken notice of Mattel's attempts to confuse
11  consumers.  On or about February 18, 2005, a visitor to MGA's showroom from a
12  prominent news publication stated, "Oh my, I just came from Mattel's showroom
13  and their new 'My Scene' packaging is just like 'BRATZ' minus the handle."
14  Another member of the press visiting MGA's showroom offered the unsolicited
15  comment, "have you seen the new 'My Scene' dolls eyes are exactly like
16  'BRATZ'?"  Yet another opined that Mattel's "My Scene" line was exactly like
17  "BRATZ", indeed, so much so that the reporter confusingly thought that Mattel had
18  bought "BRATZ", and still another has commented on Mattel's imitation of MGA.
19  On or about February 16, 2005, during an interview of a Mattel representative on
20  local network news in New York, "My Scene Barbie" was displayed by a Mattel
21  representative.  During conversation about the dolls, the interviewer exclaimed that
22  they looked like "BRATZ".  The Mattel representative just laughed – but this is no
23  laughing matter.  This colloquy was available for replay and viewing, and was even
24  transcribed, on the internet.

25      64.    Customers too have been similarly confused.  Some actually contacted
26  MGA seeking to purchase "My Scene" dolls.

27      65.    Mattel's conduct is planned, deliberate and intentional.  Mattel has
28  systematically, copied, imitated and liberally borrowed many of the distinctive,

23

EXHIBIT __4__

PAGE __55__

essential elements that identify and make "BRATZ" dolls "BRATZ" dolls, diluting the brand, creating customer confusion, and unfairly stifling competition.

66.   Ironically, Mattel sued one of its other competitors in Europe for doing much the same thing: "systematically copying and borrowing elements" from "My Scene", on grounds that "this conduct constitutes unfair competition and passing off." Indeed it does.

67.   What is more, Mattel's conduct has reached beyond "BRATZ" and "BRATZ"-related products to include other new MGA toy lines.

68.   For example, MGA's "4-Ever Best Friends" line was the obvious, and well-recognized model for Mattel's "Wee 3 Friends" line. Mattel even adopted changes to the color scheme of its similarly-shaped packaging to create confusion with MGA's distinctive packaging.

**MGA's "4-Ever Best Friends"**   **Mattel's "Wee 3 Friends"**







24

EXHIBIT 4

PAGE 50

69.   In the second half of 2002, MGA's "Mommy's Little Patient," originally designed as the first in a series of "Mommy's Little . . ." dolls, was followed by Mattel's "Little Mommy" doll.

**MGA's**
**"Mommy's Little Patient"**

**Mattel's**
**"Little Mommy Potty Training Baby Doll"**




70.   Sparing nothing, Mattel has also extended its monkey-see monkey-do behavior into its boys' line.  When MGA came out with its "Alien Racers" line of toy racing vehicles, for instance, Mattel rushed to revamp and rename one of its "Hot Wheels" lines.  Although well-known and clearly branded for decades as "Hot Wheels", Mattel's answer to MGA's "Alien Racers" was to re-brand and market its Hot Wheels Highway 35 line under an "AcceleRacerS" logo.  MGA's line consists of "extreme" radio controlled racing vehicles marketed in connection with a strong, almost battle-like, science fiction theme.  MGA's logo accentuates the "A", "R", and "S" in compressed block lettering.  Mattel's line also consists of extreme racing vehicles marketed in connection with a strong, almost battle-like, theme.  Mattel's logo too accentuates the "A", "R", and "S" in compressed block lettering.

25

EXHIBIT 4

PAGE 57

71.     Here, too, Mattel's mimicry has spilled over into Mattel's advertising and thematic presentation and marketing of this toy line. In particular, Mattel has adopted MGA's "other-worldly" theme in its commercials. For instance, in Mattel's commercials, the product, whose logo appears as "AcceleRacerS", now compete against alien-like Cyborgs engaged in a "race to save the world," mimicking MGA's alien theme and commercials in which MGA's "Alien Racers" are engaged in a "race to save the universe."

72.     None of this is coincidence. Mattel has deliberately adopted a pattern and practice of coming out with variations of MGA's products to create confusion in the marketplace, interfere with MGA's business and divert profits away from MGA. Mattel says, on its website, that it is in the business of creating "[t]he world's premier toy brands [of] today and tomorrow." It seemingly does so, however, by borrowing liberally from its competitors, even when it refreshes its own existing brands and products.

73.     MGA has suffered extensive injury from Mattel's conduct. Mattel's habitual, serial simulation of MGA's products, product lines and trade dress has allowed Mattel to take a free ride on the extensive amount of time, expense and creative development MGA expends on developing new products, product packaging and presentation, giving Mattel an unfair advantage, and making it virtually impossible for MGA to compete with Mattel on a level playing field.

**Mattel's additional unfair, manipulative, anti-competitive conduct**

74.     This already substantial injury has been exacerbated by the strong-arm tactics, and other illegitimate, unfair and anti-competitive means that Mattel has used to manipulate the market and ensure that its control and domination of the industry can continue unabated.

EXHIBIT  4

PAGE  58

75. For example, wielding the litigation privilege as a potential shield for intimidating conduct, Mattel has sent threatening letters to several of its former employees who now work for MGA warning them not to disclose *even publicly available information* about Mattel, including the names and positions of Mattel employees. Mattel even went so far as to sue one of its former senior executives, after he had the temerity to resign and join MGA in October 2004. Not only was Mattel's lawsuit dismissed for failure to state a viable claim, but Mattel thereafter seemingly could not muster up a shred of evidence sufficient to support an amended complaint. As a result, Mattel's case against its former executive was dismissed with prejudice.

76. Mattel has also warned a number of companies, including the biggest publishing entity in the United Kingdom, not to license MGA products, or risk retribution. The threats are not idle. In May 2004, Mattel terminated one of its licensees, apparently in retribution for licensing "BRATZ". While some companies have been courageous enough to take the risk, others have not, and MGA has lost valuable licensing opportunities as a result.

77. Mattel has used similar intimidation to pressure distributors and retailers, particularly in foreign countries, not to distribute "BRATZ", to reduce shelf and display space for "BRATZ" and to place "BRATZ" in unfavorable locations at retail outlets.

78. When MGA faced a shortage of doll hair in October 2002, MGA is informed and believes that the reason for that shortage was that Mattel had locked MGA out by buying up the supply from the two main hair supply companies.

79. Mattel has also manipulated the retail market. For instance, Mattel merchandisers have been caught tampering with MGA's retail displays, replacing favorably located MGA merchandise with Mattel merchandise instead. MGA is also informed and believes that Mattel has falsely told a major United States retailer that MGA was giving another major United States retailer below-market pricing

27

EXHIBIT 4

PAGE 59

1  and falsely told a United Kingdom retailer that MGA was discontinuing one of its

2  lines, in order to make such line less attractive to buyers and thereby attempt to

3  increase sales of the competitive Mattel product and improve its own sales, at

4  MGA's expense.

5       80.   Even supposedly unbiased and impartial industry organizations have

6  fallen prey to Mattel's abusive wield of power, to MGA's detriment.

7       81.   NPD Funworld ("NPD"), for one, is the leading supplier of sales

8  statistics in the toy industry.  Accurate NPD statistics are essential for efficient

9  product-line management.  Without these statistics, it is difficult, if not impossible,

10  for toy companies to assess and measure the relative success of their products in

11  key categories.  It is, however, a subscription service, and NPD restricts the manner

12  in which its subscribers may use the data it provides.

13       82.   Mattel has regularly ignored the restrictions – using NPD data about

14  Mattel's comparative standing relative to other companies in press releases and in

15  communications with retailers and financial investors who are not NPD subscribers.

16       83.   Mattel generates substantially more annual subscription revenue for

17  NPD than does MGA, and carries more clout.

18       84.   After MGA had subscribed to the service for more than 12 years, NPD

19  terminated MGA's subscription in 2003 theoretically on the grounds that MGA

20  misused NPD data in a press release.

21       85.   MGA is informed and believes that the termination was the result of

22  pressure from Mattel, notwithstanding Mattel's own frequent violations of NPD's

23  restrictions.

24       86.   In addition to this, the market share numbers that NPD generates are

25  heavily dependent on the category in which NPD places a particular product.  MGA

26  is informed and believes that Mattel also pressured NPD into changing certain

27  product classifications for its "BRATZ" products in order to manipulate the data

28

EXHIBIT  4

PAGE  100

1     and preserve Mattel's market share rankings in the critical fashion doll category –

2     and thereby lower MGA's.

3         87.     The Children's Advertising Review Unit ("CARU") is another

4     organization that, upon information and belief, appears to have been subject to

5     improper influence by Mattel. CARU is the toy industry's supposedly independent

6     self-regulatory body in charge of maintaining standards in advertising. CARU's

7     approval is considered critical within the toy industry to avoiding regulatory action

8     by the Federal Trade Commission.

9         88.     CARU is heavily subsidized by Mattel.

10        89.     Upon information and belief, Mattel has used its influence as a major

11     contributor to CARU's budget to induce CARU to place onerous restrictions on

12     MGA advertisements, and require MGA to amend aspects of commercials that have

13     gone unchallenged in other parties' commercials.

14        90.     As a result of CARU's restrictions, MGA has been forced to incur

15     unnecessary costs for reshooting and producing or re-editing its commercials.

16        91.     On several occasions, CARU has also either strongly suggested, if not

17     also required, that MGA respond to inquiries about its website policies and make

18     substantial changes to the "BRATZ" website notably and significantly in excess of

19     restrictions imposed on Mattel and others.

20        92.     Even TIA, the toy industry's trade association, is apparently not

21     untainted by Mattel's influence and power. Each year, TIA presents the Toy-of-

22     the-Year Awards, the most prestigious of which had been the award for Toy of the

23     Year. Winning the Toy of the Year Award is a significant achievement that not

24     only very likely increases the sales of the winning toy, but also denotes the winning

25     company as a leader in toy innovation and generates substantial goodwill with

26     retailers, distributors, licensees, and customers.

27        93.     For the years 2000 (the first year of the award), 2001 and 2002, the

28     Toy of the Year award was chosen by consumer vote. The awards ceremony was

EXHIBIT __4__

PAGE __61__

1  then held the following year, at a dinner in New York. (For example, the awards

2  dinner for the year 2000 award was held in February 2001). Leap Frog won the

3  2000 People's Choice Toy of the Year Award and MGA won the 2001 and 2002

4  People's Choice Toy of the Year Awards. With the 2003 Toy of the Year Award,

5  however, the rules suddenly changed. Now, the award is selected by members of

6  the industry.

7      94.    Upon information and belief, this change was orchestrated by a Fisher

8  Price (a Mattel subsidiary) executive who, until recently, served as the Chairman of

9  TIA.

10      95.    Perhaps not surprisingly given this change in the winner selection

11 procedures, "Hokey Pokey Elmo" ("Elmo"), a Fisher Price toy, won for the year

12 2003 (awarded in 2004), beating out the other leading nominee, "BRATZ Formal

13 Funk Super Stylin' Runway Disco."

14      96.    TIA has refused to provide MGA with the vote count procedure and

15 totals for this award, despite repeated requests.

16      97.    MGA is also informed and believes that Mattel was instrumental in

17 attempting to keep MGA from participating as a sponsor in this year's "Kids'

18 Choice Awards."

19      98.    Mattel has clearly engaged in tortious, illegal and unethical behavior in

20 its unfettered efforts to disrupt, if not destroy, MGA. Indeed, this is apparently

21 Mattel's current *modus operandi* when it comes to "competing" in the industry.

22 The once immensely successful "LeapFrog" interactive learning product, for

23 example, has apparently been one of Mattel's other recent victims.

24      99.    Mattel may not shield its illegal, unfair and unethical business practices

25 from the public eye. It is time for the truth to be told, and the world to know of

26 Mattel's unfair, unethical and illegal business practices and unfair competition.

27 "Barbie" does not "play nice" with others (particularly her competitors), and needs

28 to be taught how "to share" (at least in the fashion doll marketplace). She cannot be

EXHIBIT 4

PAGE 62

1    allowed to continue to be the playground bully and trample on the rights of others,
2    including MGA.

3         100.   As a result of Mattel's manipulative, illegal, unfair, unethical and anti-
4    competitive conduct, MGA has suffered and, unless abated, will continue to suffer
5    lost sales, lost licensing fees, lost contracts, lost relationships, lost business
6    opportunities and other damages and harm for which there is no adequate remedy at
7    law. Its ability to enter new markets and product lines has been hampered and
8    delayed. Its production costs have increased, its reputation and relationships with
9    important players in the industry have been negatively impacted, the value of its
10   business has been diminished, and its ability to attract, hire and retain employees
11   has been affected.

12

13                       **FIRST CLAIM FOR RELIEF**
14   **(False Designation of Origin or Affiliation in Violation of 15 U.S.C. § 1125 (a))**

15        101.   MGA repeats and realleges the allegations contained in paragraphs 1
16   through 100 of this Complaint and incorporates them by reference as though fully
17   and completely set forth herein.

18        102.   MGA's "BRATZ" line has a unique and distinctive style and
19   distinctive characteristics, such as the disproportionately large head, large dramatic
20   eyes with a distinctive presentation (including the eye shape, make-up and lashes),
21   pouty, plump lips with a distinctive presentation (including the lip shape and make-
22   up), small, thin bodies, oversized feet, and up-to-date fashions. MGA's "BRATZ"
23   line is known for and recognized by the total image that is presented by its product
24   and the style and arrangement of the packaging and display. This "*tout ensemble*"
25   is representatively described and depicted herein. The characteristics of MGA's
26   "BRATZ" line, alone or in combination, have come to identify the "BRATZ" line
27   and its source, MGA, and thus serve as protectable trade dress. MGA's trade dress
28   in its "BRATZ" line is purely aesthetic and non-functional or, if any utility exists, it

                                    31

EXHIBIT   4

PAGE   63

1   is not essential to the purpose, quality or source identifying attributes of the

2   aesthetics. MGA's trade dress in its "BRATZ" line is inherently distinctive or has

3   acquired distinction within the meaning of the Lanham Act.

4       103. Similarly, MGA's "BRATZ PETZ," part of the "BRATZ" line, also

5   has its own unique and distinctive characteristics, such as the humanlike eye and

6   unusual appearance of the animals dressed in clothing. MGA's "BRATZ PETZ"

7   line has become known for and recognized by the total image that is presented by

8   the product and the style and arrangement of its packaging. This "*tout ensemble*" is

9   representatively described and depicted herein. The characteristics of MGA's

10   "BRATZ PETZ", alone or in combination, have come to identify the "BRATZ

11   PETZ" line and its source, MGA, and thus serve as protectable trade dress. MGA's

12   trade dress in its "BRATZ PETZ" line is purely aesthetic and non-functional or, if

13   any utility exists, it is not essential to the purpose, quality or source identifying

14   attributes of the aesthetics. MGA's trade dress in its "BRATZ PETZ" line is

15   inherently distinctive or has acquired distinction within the meaning of the Lanham

16   Act.

17       104. Mattel's production, sale and marketing of "My Scene" dolls,

18   including styling heads and doll heads, and "My Scene" pets that are confusingly

19   similar to MGA's "BRATZ" line (including its "BRATZ PETZ"), without MGA's

20   permission or consent, constitutes designation and use of a term, symbol, device or

21   combination thereof that is false or misleading within the meaning of 15 U.S.C.

22   Section 1125 and is likely to cause confusion, or to cause mistake, or to deceive as

23   to the affiliation, connection, or association, or as to the origin, sponsorship, or

24   approval of Mattel's goods or commercial activities, within the meaning of 15

25   U.S.C. Section 1125. MGA has been damaged by Mattel's acts.

26       105. Mattel's conduct has been intentional and willful, and is calculated

27   specifically to trade off the goodwill that MGA has developed in its successful

28   "BRATZ" line. By its aforesaid acts, particularly its imitation of the distinctive

EXHIBIT   4

PAGE   104

1   features of MGA's "BRATZ" line in connection with goods sold and distributed in
2   interstate commerce, Mattel has infringed and is likely to continue to infringe on
3   MGA's substantial rights in and to the "BRATZ." line trade dress. In so doing,
4   Mattel has falsely represented and designated to the public generally and consumers
5   of fashion doll products specifically the source and origin of Mattel's "My Scene"
6   fashion doll products in violation of 15 U.S.C. § 1125(a).

7       106.  MGA has been damaged by, and Mattel has profited from, Mattel's
8   wrongful conduct in an amount to be proven at trial.

9       107.  For each act of infringement, MGA is entitled to recover its actual
10  damages as well as Mattel's profits from such infringement.

11      108.  Monetary relief alone, however, is not adequate to address fully the
12  irreparable injury that Mattel's illegal actions have caused and will continue to
13  cause MGA, if not enjoined. MGA is therefore entitled to preliminary and
14  permanent injunctive relief to stop Mattel's ongoing infringement of MGA's trade
15  dress.

16                      **SECOND CLAIM FOR RELIEF**

17      **(Unfair Competition in Violation of 15 U.S.C. § 1125 (a) and Unfair**
18   **Competition and Unfair Business Practices in Violation of Cal. Bus. & Prof.**
19          **Code § 17200 *et seq.* and California Common Law)**

20      109.  MGA repeats and realleges the allegations contained in paragraphs 1
21  through 108 of this Complaint and incorporates them by reference as though fully
22  and completely set forth herein.

23      110.  Mattel has deliberately and, indeed, repeatedly adopted, imitated and
24  mimicked the make-up, appearance, features, trade dress, and image of MGA's
25  products, packaging and advertising, including its repackaging and refreshing of
26  older Mattel toys. Mattel's actions were and are done with the intent to deceive
27  consumers, cause confusion and mistake, and interfere with the ability of
28  consumers to identify the source of goods by appearance and packaging. By this

33

EXHIBIT  4

PAGE  65

1    conduct, Mattel pirates and exploits, by subliminal or conscious association with
2    MGA, the goodwill and reputation of MGA and derives benefit therefrom.

3        111. Mattel has particularly and deliberately poached upon the commercial
4    magnetism of MGA's "BRATZ" and the success of "BRATZ". Mattel's conduct
5    has been intentional and willful, and is calculated specifically to trade off the
6    goodwill that MGA has developed in its successful "BRATZ" line.

7        112. By its acts, including its intentional imitation of the distinctive features
8    of MGA's "BRATZ" dolls, which has progressively become closer and closer, as
9    well as its imitation of "BRATZ" themes, packaging and the overall look, feel and
10   total image of the "BRATZ" line, imitation of other MGA products, packaging and
11   advertising, and other conduct alleged herein, Mattel has engaged in unfair
12   competition under both federal and California state law.

13       113. Mattel has also willfully and maliciously used its power, influence and
14   intimidation to threaten certain retailers, suppliers, licensees, distributors and
15   manufacturers so as to limit, if not prevent, MGA from doing business with these
16   retailers, suppliers, licensees, distributors and manufacturers, using its power and
17   influence to intimidate and manipulate industry bodies. Mattel has further used its
18   power and influence to attempt to, if not actually, intimidate and threaten MGA's
19   current and potential employees so as to cause MGA competitive injury.

20       114. Alone, in combination, or in totality, Mattel's actions discussed and
21   alleged herein constitute unfair competition and unfair business practices within the
22   meaning of federal law, California statutory law and/or California common law.

23       115. As a result of its conduct, Mattel has derived substantial monetary and
24   non-monetary benefit and business advantage. Mattel has also wrongfully diverted
25   profits away from MGA and to Mattel and, on information and belief, deprived
26   MGA of the patronage of a large number of actual and potential customers.

27       116. MGA has been damaged by, and Mattel has profited from, Mattel's
28   wrongful conduct in an amount to be proven at trial.

34

EXHIBIT 4

PAGE 106

1    117.  Monetary relief alone, however, is not adequate to address fully the

2  irreparable injury that Mattel's actions have caused and will continue to cause

3  MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent

4  injunctive relief to stop Mattel, and all persons acting in concert with Mattel, from

5  engaging in acts of unfair competition and unfair business practices.

6    118.  MGA is further entitled to relief whereby Mattel is ordered to pay

7  restitution for damages resulting from Mattel's unfair competition and unfair

8  business practices.

9                          **THIRD CLAIM FOR RELIEF**

10   **(Dilution in Violation of 15 U.S.C. § 1125 (c); Cal. Bus. & Prof. Code § 14330**

11                          **and California Common Law)**

12   119.  MGA repeats and realleges the allegations contained in paragraphs 1

13  through 118 of this Complaint and incorporates them by reference as though fully

14  and completely set forth herein.

15   120.  The look and trade dress of the MGA products referenced herein are

16  distinctive and famous, and have been since before Mattel launched its similar

17  versions.  By its aforesaid acts, Mattel caused and continues to cause blurring and

18  dilution of the distinctive look of MGA's products and trade dress, which

19  previously served as a unique source identifier for MGA, within the meaning of the

20  Lanham Act, California Business and Professions Code § 14330 and/or California

21  common law.

22   121.  Mattel's conduct has been intentional and willful, calculated

23  specifically to trade on MGA's goodwill and reputation and to cause dilution of

24  MGA's famous marks, particularly those connected with MGA's famous and

25  successful "BRATZ" doll head, "BRATZ" doll product line, "BRATZ Funky

26  Fashion Makeover Head" and "BRATZ PETZ" line.

27   122.  MGA has been damaged by, and Mattel has profited from, Mattel's

28  wrongful conduct in an amount to be proven at trial.

EXHIBIT __4__

PAGE __67__

1    123.  Monetary relief alone, however, is not adequate to address fully the
2  irreparable injury that Mattel's actions have caused and will continue to cause
3  MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent
4  injunctive relief to stop Mattel's ongoing dilution.

5                               **FOURTH CLAIM FOR RELIEF**
6                                    **(Unjust Enrichment)**

7    124.  MGA repeats and realleges the allegations contained in paragraphs 1
8  through 123 of this Complaint and incorporates them by reference as though fully
9  and completely set forth herein.

10    125.  As a result of the conduct alleged herein, Mattel has been unjustly
11  enriched to MGA's detriment.  MGA seeks a worldwide accounting and
12  disgorgement of all ill-gotten gains and profits resulting from Mattel's inequitable
13  activities.

14
15                               **PRAYER FOR RELIEF**
16    WHEREFORE, MGA prays for relief, as follows:
17    1.    That Mattel, its agents, servants and employees and all persons acting
18  in concert be restrained preliminarily and permanently from directly or indirectly:
19              a.    using confusingly similar trade dress;
20              b.    improperly influencing, or attempting to improperly influence,
21                    standard-setting and industry organizations;
22              c.    engaging in unfair competition and unfair business practices;
23                    and
24              d.    diluting MGA's trade dress;
25    2.    For general and actual damages, according to proof at trial but
26  believed to reach or exceed tens of millions of dollars;
27    3.    For the disgorgement of all profits derived by Mattel for its acts of:
28              a.    false designation of origin or affiliation;

                                          36

EXHIBIT 4
PAGE 68

1           b.    unfair competition and unfair business practices; and

2           c.    dilution;

3      4.    For costs of suit and reasonable attorneys' fees;

4      5.    For punitive and/or exemplary damages as a result of Mattel's willful

5 and malicious conduct to the extent allowable by law; and

6      6.    For such other and further relief as the Court deems just and proper.

7

8  Dated:     April 13, 2005        PATRICIA GLASER

9                               CHRISTENSEN, MILLER, FINK, JACOBS, GLASER, WEIL & SHAPIRO LLP

10

11                             DALE M. CENDALI
DIANA M. TORRES
PAULA E. AMBROSINI

12                             O'MELVENY & MYERS LLP

13

14

15                      By:_____
                               Diana M. Torres

16                      Attorneys for Plaintiff
MGA ENTERTAINMENT, INC.

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT _____4_____

PAGE _____109_____

1

## DEMAND FOR JURY TRIAL

2

3        MGA hereby demands a jury trial on all triable issues.

4

5   Dated:        April 13, 2005            PATRICIA GLASER
                                            CHRISTENSEN, MILLER, FINK,
6                                           JACOBS, GLASER, WEIL &
                                            SHAPIRO LLP
7
                                            DALE M. CENDALI
8                                           DIANA M. TORRES
                                            PAULA E. AMBROSINI
9                                           O'MELVENY & MYERS LLP

10
                                            By:
11                                             Diana M. Torres
                                            Attorneys for Plaintiff
12                                          MGA ENTERTAINMENT, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

38

EXHIBIT ____4____

PAGE ____70____

# EXHIBIT 5

# THIS EXHIBIT FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER