UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

**HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

- - -

| | |
|---|---|
| MATTEL, INC., | : PAGES 340 - 450 |
| PLAINTIFF, | : |
| VS. | : NO. ED CV04-09049-SGL |
| | : [CONSOLIDATED WITH |
| MGA ENTERTAINMENT, INC., | : CV04-9059 & CV05-2727] |
| ET AL., | : |
| DEFENDANTS. | : |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

WEDNESDAY, MAY 28, 2008

JURY TRIAL - DAY 3

MORNING SESSION

CERTIFIED COPY

MARK SCHWEITZER, CSR, RPR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
181-H ROYBAL FEDERAL BUILDING
255 EAST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012
(213) 663-3494

341

**Appearances of Counsel:**

On Behalf of Mattel:

    Quinn Emanuel
    By John B. Quinn, Esq.
      B. Dylan Proctor, Esq.
      Michael T. Zeller, Esq.
      Harry Olivar, Esq.
      John Corey, Esq.
      Diane Hutnyan, Esq.
      William Prince, Esq.
    855 South Figueroa Street
    10th Floor
    Los Angeles, CA 90017
    (213) 624-7707

On Behalf of MGA Entertainment:

    Skadden, Arps, Slate, Meagher & Flom LLP
    By Thomas J. Nolan, Esq.
      Carl Alan Roth, Esq.
      Jason Russell, Esq.
      Lauren Aguiar, Esq.
      David Hansen, Esq.
      Matthew Sloan, Esq.
    300 South Grand Avenue
    Los Angeles, CA 90071-3144
    (213) 687-5000

342

# I N D E X

IVY ROSS, PREVIOUSLY SWORN............................... 352

CROSS-EXAMINATION (CONTINUED) BY MR. NOLAN:  ........... 352

REDIRECT EXAMINATION BY MR. QUINN: ..................... 412

LILY MARTINEZ, SWORN.................................... 420

DIRECT EXAMINATION BY MR. QUINN: ....................... 421

# E X H I B I T S

(Exhibit 16002 received.)............................... 360

(Exhibit 16002-041 received.)........................... 362

(Exhibit 48-2 received.)................................ 383

(Exhibit 1291 received.)................................ 407

(Exhibit 271-1A received.).............................. 420

(Exhibits 257-2 through 257-9 received.)............... 432

(Exhibits 258-2 through 258-9 received.)............... 432

(Exhibits 259-2 through 259-8 received.)............... 433

(Exhibits 260-2 through 260-6 received.)............... 434

(Exhibits 263-1 through 263-9 received.)............... 446

1    **Riverside, California; Wednesday, May 28, 2008**

2                          **9:47 A.M.**

3            WHEREUPON THE CASE HAVING BEEN CALLED AND

4    APPEARANCES GIVEN, THE FOLLOWING PROCEEDINGS

5    WERE HELD:

6        **(HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)**

7            THE COURT:  Good morning.  The Court will be

8    issuing the statute of limitations order momentarily.  It's

9    someplace in E file land.  So the Court has submitted that.

10           The Court has also received the Nana Ashong.  When

11   will this witness be called?

12           MR. QUINN:  We expect to play that tomorrow, your

13   Honor.  There is one issue about that that we wanted to

14   discuss with the Court.

15           THE COURT:  What's that?

16           MR. QUINN:  We, of course, have designated our

17   portions of the transcript, the video that we propose to

18   play, and the defendants have designated theirs.  We have a

19   disagreement about whether it should be played through all at

20   once or whether we should play plaintiff's portions and then

21   the defense should play defendants' portions.

22           Your Honor, we think each side should play their

23   own portions.  Frankly, we think they have designated a lot

24   of fluff that our stuff will get buried in, and if they are

25   going to try the jurors' patience with the kind of stuff they

1   want to play, we would rather it's not associated with us.

2   Of course, if there's an objection to any designation under

3   the rule of completeness, that something designated really

4   needs to be played with it to put it in context, just like an

5   exam if we were doing a deposition reading in court, we're

6   prepared to do that.  But we don't think it should be played

7   all at once.  We think the jury should understand which party

8   is offering which portion of the testimony.

9          THE COURT:  What is the color coding here?  I

10  assume there's a key someplace.

11         MR. QUINN:  That's beyond my job description, your

12  Honor.

13         MR. NOLAN:  Your Honor, yellow is Mattel, and green

14  is MGA.

15         THE COURT:  I'm sorry?

16         MR. NOLAN:  Yellow is Mattel, and green is MGA.

17         THE COURT:  And green is MGA.

18         MR. NOLAN:  We used those colors because I'm

19  colorblind.

20         THE COURT:  What is orange?

21         MR. QUINN:  Those are Mattel's counters to

22  counters.

23         THE COURT:  I probably shouldn't be relying on

24  Mr. Nolan since he told everyone yesterday he was colorblind.

25         MR. NOLAN:  I couldn't see the orange.  That's why

1   I wasn't misrepresenting when I said it was yellow and green.

2   So I will have Mr. Roth handle this from now on.

3          THE COURT:  All right.  Very good.  If counsel

4   could just submit to my clerk a key for this, I would

5   appreciate that.  And I'll just have that with me as I'm

6   going through this.  Very well.  I'll take that issue up

7   along with the other issues.

8          Mr. Nolan, I trust you want all the fluff played at

9   once?

10          MR. NOLAN:  Your Honor, first of all, the

11   definition of fluff could be also irrelevant.  No, no.  I

12   appreciate it.  I just think that to have it done

13   chronologically in terms of the way the deposition was

14   conducted is frankly the better way, you know, to do it.  And

15   breaking it up, you know, I've done it both ways.  I don't

16   know what the Court's preference is in this regard, but it's

17   more of just a processing issue for us as to whether or not

18   we now need to separate.

19          THE COURT:  Generally, I have in the past, when

20   I've used this, I've done it all at once.  But I'll take a

21   look at it with Mattel's objection in mind, but generally the

22   practice I've used is to play it all at once.

23          MR. NOLAN:  That would be our preference, your

24   Honor.

25          MR. QUINN:  In that event, if the Court does end up

1   coming out that way, we would request that the jurors be told

2   that this includes everybody's designations so we're not

3   tagged with pressing play for all of this fluff.

4           THE COURT:  That makes sense.  I'll certainly

5   indicate that what we have is the combined offering of both

6   parties.

7           Anything else?

8           MR. QUINN:  One other.  This morning coming into

9   court, Ms. Thomas, house counsel for Mattel, and Lily

10  Martinez, were in an elevator with a juror.  The three of

11  them in the elevator.  The juror said good morning.

12  Ms. Thomas and Ms. Martinez said nothing.  They are concerned

13  that the juror will think that they are being unfriendly.

14  Since it's early in the trial, I'm wondering if the Court

15  could remind the jury that counsel and the parties will not

16  be communicating.

17          THE COURT:  Very good.

18          MR. NOLAN:  Could I raise one issue, your Honor?

19          THE COURT:  Yes, Mr. Nolan.

20          MR. NOLAN:  Thank you.  This is back to phasing

21  and what's in and what's out.  And I have to just say that I

22  was -- I expressed surprise over an objection that was made

23  and sustained during my opening statement, and I just wanted

24  some guidance from the Court.

25          I was making an argument with respect to the work

1  that Margaret Leahy did during the period of time of
2  September 1st through October 19th to set up what Carter
3  Bryant was doing on the sculpt while he was employed by
4  Mattel and what he wasn't doing on the sculpt.  And this is
5  how my statement went:  "So when she first saw the sculpt" --
6  and I'm talking about Paula Garcia -- "I think it was
7  sometime in December she looked at it and she cut back.  And
8  she said no, it's way too sexualized.  The concept is too
9  old."

10        I'm going to take out -- and Paula will testify to
11  that -- "I want to take out the va-va-voom in it.  She
12  narrows the waist a little bit, narrows the hips, cuts a
13  little bit out of the thigh, doesn't make it as voluptuous.
14  Paula is driving this.  Paula wants a doll the girls are
15  going to be attracted to."

16        Mr. Quinn said that is not relevant.  Then
17  sustained.  Move along, Counsel.

18        What we were talking about at that period of time,
19  your Honor, was solely the period when Carter is employed at
20  Mattel with respect to the sculpt, and that's what I thought
21  was kind of our bright line test, that at October 19th, when
22  he stopped those discussions and don't go beyond that, but
23  the changes to the hips, taking the va-va-va-voom out of the
24  sculpt was all done during a critical period of time that
25  they contend that Carter was working on the sculpt.  So today

1  with Paula Garcia coming up, I wanted some guidance.

2        THE COURT:   I appreciate that.  What I don't want

3  you getting into is developments by MGA on the doll post

4  departure.

5        Mr. Quinn, I'll hear from you on this.

6        MR. QUINN:   What I was concerned we were getting

7  into was -- we were going away from the question of who owns

8  the drawings.  The suggestion was getting out there that

9  Bratz dolls had ultimately evolved from something different

10  than the drawings.

11       THE COURT:   That's how I took it as well, but,

12  Counsel, you're correct, if you are in that time zone and you

13  are basically counterjuxtaposing basically what Carter was

14  doing versus what MGA may have been doing at the time, I

15  suppose that's proper.

16       MR. NOLAN:   That's correct.

17       THE COURT:   You use the October 19th date as the

18  date of demarcation, I think you'll be pretty safe.

19       MR. NOLAN:   Thank you very much, your Honor, and I

20  probably didn't set it up and be clear enough in my opening

21  statement.  So I won't ask to re-address the jury to explain

22  that portion of the evidence.

23       Your Honor, the other point, I'm loath to object if

24  Mr. Quinn wants to put in evidence in this case that I, you

25  know, for whatever reason, he has a purpose of doing it.

1          Yesterday, during the testimony of Ivy Ross, again,
2     there were many instances where Ivy Ross was asked to testify
3     concerning innovation at Mattel, you know, the success of
4     Barbie, her responsibility with the Barbie line.  We were
5     talking about blue sky reports, everybody coming in with
6     their ideas and designs and all of this innovative material.

7          This seems to me to be really pushing the envelope.
8     I don't think it's fair for me to have to be objecting if
9     Mr. Quinn is pushing that envelope to an area where we had
10    wanted that evidence in.  I wanted to have an opportunity to
11    develop it.  It seems to me that counsel knows the bright
12    line test that the courts have approved --

13         THE COURT:  Counsel, you can certainly rebut any
14    evidence that Mr. Quinn offers.

15         MR. NOLAN:  I appreciate that, your Honor.  And
16    then the other comment about not talking to the jurors, I'm
17    absolutely in agreement with that.  I think that all counsel
18    should be counseled as well to be careful about avoiding
19    contact with jurors, for instance, riding up in the elevator,
20    and I'm not in any way --

21         THE COURT:  It's a small courthouse.  It's
22    inevitable that we're going to have these types of
23    situations.  It sounds like Ms. Martinez did exactly what
24    she's supposed to do, and that's ignore the juror.

25         MR. NOLAN:  Exactly.  And that's what I understand,

1  too, that we should ignore the jurors.

2         THE COURT:  It's just too small a courthouse.

3  These things are going to happen.  They happen in every case.

4         MR. QUINN:  Your Honor, that last point about

5  innovation, Mr. Nolan referred to a bright line here, and if

6  there is a bright line, I've missed it.  There is a line

7  drawing exercise that I think we have to struggle with.  The

8  testimony that came out was that it's an innovative place

9  that they have creative people and bring out thousands of new

10 products every year.  That was basically it.

11        THE COURT:  And if he wants to impeach that

12 testimony, he can do so.

13        MR. QUINN:  But what I'm concerned about now is

14 this then becomes reasons for, you know, getting into

15 Barbie's loss of market share, the fact that Barbie was being

16 beaten because in the marketplace it hadn't adapted to, you

17 know, what children want to see today.  And house on fire and

18 the next thing we know we're going to be hearing about kill

19 Bratz.  That's my concern.

20        THE COURT:  I don't know what we're going to hear

21 and what we're not.  It is a moving target in a certain

22 sense.  And you basically define how far that goes.  I don't

23 think -- and I've said this numerous times.  I don't believe

24 Barbie is relevant to this at all.  To the extent that you

25 introduce evidence about Barbie and the Barbie line and about

1   what was going on and innovations, Mr. Nolan can respond to

2   that.

3           It's kind of in your hands at this point.  You have

4   the Court's initial ruling about motive and the Court's

5   initial ruling about Barbie being irrelevant.  But to the

6   extent you push that out, Mr. Nolan can come in and fill it

7   back in.

8           If there's nothing further, I'm going to take a

9   brief recess, and we'll start up with -- you still have

10  further cross-examination?

11          MR. NOLAN:  Yes.

12          THE COURT:  Very well.  Why don't we have the

13  witness on the stand, then.

14          Court is in recess.

15          (Recess taken.)

16          **(WHEREUPON THE JURY ENTERS.)**

17          THE COURT:  Good morning to you all.  Good morning,

18  members of the jury.  I think I mentioned this last week, and

19  I just wanted to mention it again, that it's a small

20  courthouse out here.  You're undoubtedly going to run into

21  counsel or the parties.  They have been strictly instructed

22  by the Court not to say anything to any of you, even a good

23  morning or a hello or anything of that sort.

24          So I just want to make sure that they are not being

25  rude or obnoxious, they are just following the Court's order.

352

1    It's just better that way that we don't have any risk of any

2    kind of communication.  They just don't want you to think

3    they are being rude or ignoring you.  They are following the

4    Court's orders.

5                Why don't we go ahead and pass out the notes, and

6    we'll continue with the cross-examination.

7                MR. NOLAN:  I believe Mattel and MGA stipulated to

8    a witness exclusion order.

9                MR. QUINN:  Yes.

10               THE COURT:  If there are any witnesses in the

11   courtroom, they should step outside.

12               All right, Counsel, you may again.

13                   **IVY ROSS, PREVIOUSLY SWORN.**

14                   **CROSS-EXAMINATION (CONTINUED)**

15   BY MR. NOLAN:

16   **Q.**   Good morning, Ms. Ross.

17   **A.**   Good morning.

18   **Q.**   In looking over your resume last evening, I noticed that

19   you had your own business designing toy cars for a museum; is

20   that correct?

21   **A.**   That was not my -- I had my own business doing jewelry

22   design, and as a separate event, I was invited to do a --

23   participate in an exhibition years ago in which I submitted

24   with my husband at the time some toy cars, yes.

25   **Q.**   Now, Mattel makes toy cars; correct?

353

1    **A.**   Correct.

2    **Q.**   When you came to work at Mattel and signed your

3    confidentiality agreement, did you assign your ideas and

4    concepts to any of your jewelry or toy cars that you had

5    designed?

6    **A.**   No, because they were done way before I had come to

7    Mattel, and they were not, for example, when I say toy car,

8    it was a museum gallery exhibition piece.  They were hundreds

9    of dollars.

10   **Q.**   Well, is the reason why in your opinion that Mattel

11   doesn't own the ideas because you did them a long time ago or

12   before you started your employment with Mattel?

13   **A.**   Before I started my employment with Mattel.

14   **Q.**   So that if Carter Bryant developed the idea and concept

15   for Bratz before he was employed by Mattel on January 4th,

16   1999, by signing his employment agreement at Mattel, he did

17   not automatically transfer that idea and concept to Mattel;

18   correct?

19   **A.**   Correct.  I guess I would have to understand what

20   started that concept really means, but if he created it prior

21   to coming to Mattel, my understanding is that Mattel doesn't

22   own it.

23   **Q.**   You still have a black notebook.  I wanted to go to the

24   floor plan we were talking about yesterday, this is

25   Exhibit 193.  And I believe --

354

1              Aaron, could I have this on the screen?

2              And you're going to the larger version of it, which

3    is fine.

4    A.    I can't read the smaller version.

5    Q.    Nor can I.  I don't know if I can even read the large

6    one.  But here's my point.  What is this document, if you

7    know?

8    A.    What is this document?  It is one of the many floor

9    plans from the design center.

10   Q.    And who prepared it?

11   A.    Usually facilities prepares it.

12   Q.    Do you know if Mattel facilities prepared that version?

13   A.    I can only assume.

14   Q.    And what is the basis for your assumption?

15   A.    Because it looks like the floor plans that I used to

16   review all the time, and that's what prepared the ones I

17   would review.

18   Q.    Do you know what year that floor plan represents?

19   A.    No, I do not.  It might be here.  No, I don't see it.

20   Oh, yes.  It says '90- -- I can't read it.  It's either

21   '98 -- I can't read it.  It has a date, Christy Smith, who I

22   think was in facilities, and then it says revised '99 maybe.

23   It's hard to read.

24   Q.    But without -- simply by looking at it, can you tell the

25   jury whether or not the seat assignments that are indicated

355

1  on that floor chart was in fact accurate or is in fact

2  accurate?

3  A.    At that particular time, I can't say at that particular

4  time.  I can't remember the exact -- things would say.  So I

5  can't say at that particular time, but I recognize it as one

6  of the floor plans while I was there.

7  Q.    So would it be fair to say that you don't even know

8  whether or not you actually saw this particular version of

9  the floor plan while you were at Mattel?

10 A.    Whether I reviewed this piece of paper?

11 Q.    Yes.

12 A.    No, I cannot say whether I reviewed this piece of paper.

13 I can say that the way this floor plan was laid out is one in

14 which, when I worked there, is familiar to me.

15 Q.    So the import of your testimony with respect to this

16 floor plan is that it generally displays how bull pens and

17 work centers were set out in the design center; correct?

18 A.    Correct.  And I recognize some of the names.  I know

19 that my office was where I said it is, and there are a few

20 people who I know were where they were.  But I'm not -- I

21 haven't scrutinized every single name, nor could I read it.

22 Q.    Would it be possible, or is it reasonable for you to say

23 that you knew exactly where any particular person was working

24 within the design center at any time?

25 A.    No, that would be unreasonable.

356

1    Q.   Do you know an individual by the name of Paula

2    Treantafelles?

3    A.   I know her name.  And I certainly know it affiliated

4    with this trial.  But no, I do not remember her from Mattel.

5    Q.   When you say regarding this trial, you know that Paula

6    Treantafelles is now married and also referred to as Paula

7    Garcia?  Is that what you understand from this litigation?

8    A.   Yes, I heard you say it yesterday.

9    Q.   You're not employed right now; correct?

10   A.   I'm technically employed with the Disney Stores until

11   May 27th.  What's today's date?

12   Q.   May 28th?

13   A.   So as of yesterday.

14   Q.   I didn't know that.  I wouldn't have asked it that way

15   had I known.

16        But here's my question.  Are you also serving as a

17   consultant for Mattel?

18   A.   No.

19   Q.   Have you been paid for your services at all in

20   connection with preparing for this trial?

21   A.   No.

22   Q.   When you left Mattel, was it a voluntary withdrawal?

23   A.   I resigned.

24   Q.   Was your position -- yesterday you gave us a litany of

25   the positions that you had at Mattel, including I believe you

357

1  were in charge of design and development for the Barbie

2  brand; is that correct?

3  **A.**   Yes, when I left.  That was my original title.

4  **Q.**   Correct.  And then you were elevated to be in charge of

5  product and development for all of the girls' division, as I

6  understand that?

7  **A.**   Yes, I forget the exact title.  It may have been called

8  design development for the girls' division.  I don't know the

9  exact wording, but it was all the girls' brands.

10  **Q.**   Now, in that position, you were familiar with most of

11  the brands that were being offered by Mattel in the girls'

12  division.  Is that true?

13  **A.**   Yeah, I should be.  I don't remember them all five years

14  later, but at the time, absolutely.

15  **Q.**   From your testimony yesterday, you said that Mattel had

16  a number of products.  What I wanted to focus on is in your

17  time period, isn't it true that of all of the brands that

18  were offered in the girls' division, Barbie was the largest

19  in terms of revenues generated by any brand you were

20  responsible for?

21  **A.**   The Barbie brand or the Barbie doll?

22  **Q.**   Barbie brand?

23  **A.**   Yeah, the Barbie brand was the largest revenue.

24  **Q.**   And you were in charge of the Barbie brand; correct?

25  **A.**   I was not in charge of the licensing.  I was in charge

1    of the toys, and I was -- I worked on the direct to home

2    videos, but it was a separate person that was in charge of

3    the licensed products.

4    **Q.**    Part of -- can you explain for the jury what you mean

5    when you say you were in charge of the development?  What did

6    that include?

7    **A.**    Not the manufacturing part, but getting things ready for

8    manufacturing.  So as I explained the other day, there's

9    preliminary designers and visual designers.  So visual

10   designers would prepare the packages to go over to Asia, and

11   I had some engineers that would find the most cost-effective

12   ways to create the prototypes and work with the factories to

13   develop.  I was not in charge of the manufacturing.

14   **Q.**    Were you involved at all with marketing?

15   **A.**    No.

16   **Q.**    As part of your responsibility for the Barbie brand, did

17   you feel that it was important for you to follow consumer

18   research with respect to the Barbie brand?

19   **A.**    It was, as I said yesterday, it was not my number one

20   priority.  It was -- I attended research sessions, when I

21   could, and would periodically read the documents, but there

22   was a whole team of people that were responsible for taking

23   the research into grading it and making decisions based on

24   it.

25   **Q.**    And did those individuals report to you?

359

1  **A.**   No, they did not.

2  **Q.**   Did you believe it was important, being in charge of the

3  brand and the development -- I'm sorry, the product and the

4  development, that you were aware of the consumer research or

5  focus group research that was being reported back to Mattel?

6  **A.**   Yes, it was important that I be aware of it.

7  **Q.**   Just so that we understand a little bit of the corporate

8  structure, if I could just ask you to look in the white

9  notebook for a moment -- and I think you can put away the

10  design drawing.

11        May I ask you to turn to Exhibit 16002.  The front

12  page is entitled Girls/Barbie.  And then if you turn inside,

13  it talks about June -- Girls/Barbie, June 2001.  As I recall

14  from your testimony, you were still at Mattel in June of

15  2001; correct?

16  **A.**   Yes.

17  **Q.**   Could you take a look at this and tell me whether or not

18  you recall the structure of this document?

19  **A.**   The structure of the document?  What do you mean?

20  **Q.**   Do you know what this document is?

21  **A.**   It appears to be an organization chart.

22  **Q.**   And it was customary at Mattel from time to time to

23  issue organizational charts; correct?

24  **A.**   Correct.

25  **Q.**   And in June of 2001, you were responsible for the

360

1   Girls/Barbie brand; correct?

2   **A.**   At one point I was originally responsible for Barbie and

3   then it expanded to all of girls' brands.   It may say in my

4   resume when this switch happened.

5   **Q.**   Can you take a look at this document and tell me whether

6   or not you think you have any reason to believe that it was

7   not an accurate description of the structure within the

8   Girls/Barbie division as of June 2001?

9   **A.**   I don't remember the exact -- that this reflects that

10  exact date.   But at one point in time, this was the case.

11              MR. NOLAN:   We'd offer Exhibit No. 16002.

12              MR. QUINN:   No objection.

13              THE COURT:   It's admitted.

14              **(Exhibit 16002 received.)**

15              MR. NOLAN:   16002-01 through --

16              MR. QUINN:   Your Honor, she's only been shown the

17  one page.

18              THE COURT:   Mr. Nolan, you've only presented the

19  first two pages to the witness.   You only have a foundation

20  for those two pages.

21  **Q.**   BY MR. NOLAN:   Then take a look at the document, and

22  look at the other pages for a moment.

23              THE COURT:   How far do you want her to go, Counsel?

24              MR. NOLAN:   What I want to know is whether or not

25  this is an accurate description of the organizational

361

1   structure.

2            THE WITNESS:  I can't remember.  With all of

3   these -- I can't remember that this was the exact structure.

4   Q.    BY MR. NOLAN:  Let's turn to page 42, 042 of this

5   exhibit, please.  And I'd ask you to take a look at the names

6   on that page.

7            Are you familiar with an individual by the name of

8   Cassidy Beal-Park?

9   A.    Yes, I am.

10  Q.    Who was Cassidy Park?

11  A.    She was one of the leaders under me.

12  Q.    And did Cassidy Park have people that reported to her?

13  A.    Yes.

14  Q.    And I'd ask you to take a look at this structure and ask

15  you whether or not, since Cassidy Park reported to you, does

16  this accurately reflect the structure of Cassidy Park's

17  department in or about June of 2001?

18  A.    I cannot be sure that this marries exactly.  The

19  structure changed a number of times.  This looks like one of

20  the potential structures, but I cannot verify that it's

21  exactly the structure at that point in time.

22  Q.    Can you turn to page 42.  Do you see this document?

23  A.    Yes.

24  Q.    Now, in the top of this organization chart, what's the

25  first name shown?

362

1   **A.**   My name.

2   **Q.**   All right.  As senior vice-president, product and visual

3   design; correct?

4   **A.**   Correct.

5   **Q.**   Now, can you take a look at this page and tell me

6   whether or not you remember this organizational chart and is

7   it accurate with respect to the names of the people that were

8   reporting to you?

9   **A.**   Yes.  At one point in time, I can't verify the exact

10  date, but this was my structure.

11          MR. NOLAN:   Your Honor, we'd offer 16002-041.

12          MR. QUINN:   No objection, your Honor.

13          THE COURT:   -041 is admitted.

14          **(Exhibit 16002-041 received.)**

15          MR. NOLAN:   And also with respect to Cassidy Park,

16  page 042, we'd offer that as well, your Honor.

17          MR. QUINN:   There's no foundation for that one,

18  your Honor.

19          THE COURT:   Well, what we have in so far is 001,

20  002, -041.  You're objecting on foundation to -042, Counsel?

21          MR. QUINN:   Yes.

22          THE COURT:   Lay a further foundation for -042.

23  **Q.**   BY MR. NOLAN:   Let's go back to Cassidy Park.  She

24  reported directly to you?

25  **A.**   Yes.

363

1    Q.   Are you familiar with what her responsibilities were?

2    A.   Yes.

3    Q.   And did you in fact play a role in the structure of her

4    department in terms of how it was organized?

5    A.   Yes, and it changed about 10 times in my tenure there.

6    Q.   Why so many changes?

7    A.   Because when we would get new people in, we would

8    move -- every team only needed a certain amount of industrial

9    designers to sample makers, and it depended on what projects

10   they were working on.  So we would move people around to

11   balance the groups.  So whereas Cassidy one year may have a

12   certain amount of stamp designers to project designers to

13   model makers, the next year that may change depending on what

14   projects her team was working on.

15   Q.   Was there a loss turnover at Mattel?

16   A.   No, not in terms of loss.  There was a lot of moving

17   people around to best serve the business needs.

18   Q.   If you go on to page -042 and -044, -045, -046, this is

19   more organizational charts for Cassidy Park.  And I'd ask you

20   to just take a look at them and ask you whether or not the

21   names are accurate, whether or not you believe that the

22   positions that are indicated in the organizational structure

23   is accurately depicted.  So, for instance, where there's an

24   assignment or a title under Cassidy Park for vice-president

25   product design, do you see that?

364

1   A.   Yes.

2   Q.   And that was her title; correct?

3   A.   That was her title, yes.

4   Q.   And then underneath her, she had a director, product

5   design; correct?

6   A.   At one point in time, Lindsay did report to her,

7   correct.

8   Q.   Okay.  And then there was a senior management product

9   design; correct?

10  A.   That's the one I was just referring to.  Lindsay.

11  Q.   And the director of product design, there was also a

12  director of product design; correct?

13  A.   I'm sorry.  I'm looking at page 44.  What page are you

14  on?

15  Q.   I'm on 42.  I want to start it back to 42.

16  A.   Okay.  So could you ask me the question again?

17  Q.   Of course.  If you look at 42, you see under Cassidy

18  Park her direct reports include a director of product design;

19  correct?

20        MR. QUINN:  Your Honor, the document isn't admitted

21  yet.  He seems to be getting into the content.

22        MR. NOLAN:  I'm trying to lay a foundation.

23        THE COURT:  I understand.  But not let's refer to

24  any names, Counsel.

25        MR. NOLAN:  It's just the titles.  I'm not

365

1    disclosing names.  I assume that they deal with functions.

2         THE COURT:  Counsel, is there any dispute that

3    these titles are correct?

4         MR. QUINN:  I actually don't know, your Honor.

5         THE COURT:  Fair enough.

6         MR. QUINN:  The witness would know.

7         THE COURT:  Fair enough.  I'll sustain the

8    objection.  Let's lay a foundation for this general document

9    without getting into the specifics.  If you can't, you'll

10   have to introduce it in some other capacity.

11   Q.   BY MR. NOLAN:  In your capacity in 2001, was it the

12   practice of Mattel, in the ordinary course of business, to

13   maintain organizational charts?

14   A.   It was not my goal to maintain organizational charts.

15   Q.   I understand that.  But is it your understanding that at

16   Mattel on an ordinary basis, Mattel would prepare

17   organizational structure documents with respect to the

18   division that you were responsible for?

19   A.   They should update them from time to time.  There were a

20   lot of times where they were -- I would find mistakes and

21   they wouldn't update it because we were moving people around.

22   So it was their job to update them, but with everything else

23   on their plate, there were oftentimes that they were not up

24   to date, and I would find that when I needed one, and I'd

25   make the change by hand.

1          So I cannot verify, nor do I remember that this was

2    exactly the structure at the time.

3    Q.    My point was more basic than that.  It was the practice

4    at Mattel to have published organizational charts for

5    divisions; yes?

6    A.    They kept the organizational charts, and my assistant

7    had whatever we thought was the latest at her desk in a book.

8    Q.    And you would maintain those organizational charts when

9    they became current.  You would update your binder at your

10   desk when they were issued as new ones?

11   A.    No.  HR was responsible for maintaining the

12   organizational charts.  I was not responsible for maintaining

13   them.  When there would be a new hire, HR would redesign the

14   chart, and then the next time that they would be issued,

15   there was no regular issuing schedule.  If I needed a chart,

16   I would call them.

17   Q.    Did you have your assistant maintain an organizational

18   chart at her desk?

19   A.    I'm sorry.  When you say maintain, do you mean keep?

20          THE COURT:  I think counsel is asking did you keep

21   the charts at your desk.

22          MR. NOLAN:  Yes.

23          THE WITNESS:  My assistant most of the time would

24   have a set of the organizational charts.

25   Q.    BY MR. NOLAN:  And those sets of organizational charts,

1   although the names would be different, generally it took the

2   format of the document that's been marked as 16002 in front

3   of you, yes?

4   A.   I can't be sure.  I mean, we had so many people --

5   you're talking about the layout when you say the format?  I

6   can't say that it always took the same format.

7   Q.   Whether or not it was the precise format, you maintained

8   organizational charts and kept them with your assistant from

9   time to time, yes?

10  A.   Correct.

11  Q.   And you relied on them in terms of maintaining your

12  responsibilities in charge of the division?

13  A.   I don't know what you mean by I relied on them to

14  maintain my responsibilities.  I didn't have to go to my

15  organizational chart.  I mean, did I use them as reference

16  when I needed to?  Yes.

17       MR. NOLAN:   Your Honor, we'd offer 16002, the

18  entire document.

19       MR. QUINN:   I still don't think the foundation has

20  been laid, your Honor.

21       THE COURT:   Sustained.

22  Q.   BY MR. NOLAN:  All right.  Let's go to -041 for a moment

23  and see whether or not this provision or page is accurate.

24  This is the one that has your name on it.  And now we're at

25  -041.  Do you have that?

1    A.    Yes.

2    Q.    Okay.   Your name is at the top.

3    A.    Yes.

4    Q.    I'd ask you to take a look at that page with those

5    titles and those names and ask --

6    A.    We already looked at this, and what I had said was I

7    can't verify that this was exactly the 2001 date, but these

8    people did report to me at one point in time and had the

9    titles that are listed here at one point in time.

10            MR. NOLAN:   Your Honor, we'd offer -041.

11            MR. QUINN:   I think that's been admitted, your

12    Honor.

13            THE COURT:   It's already been admitted.

14            MR. NOLAN:   All right.   Let me publish it, then.

15            THE COURT:   You may publish, yes.

16    Q.    BY MR. NOLAN:   Now, could you just very briefly walk

17    through and explain to the jury the various roles that the

18    individuals who reported to you had within your division?

19    A.    So let's see, at the time, Cassidy was in charge of the

20    Barbie doll design.   So she had a number of teams underneath

21    her that did various aspects of the Barbie doll design, but

22    not collector.

23            Joe Frank, again, I don't remember.   It's very

24    vague here and says V.P. of product design.   At one point he

25    had Barbie accessories.   At another point he had girls

```
 1   electronics.  So I don't know at this point in time which --
 2   whether this was a time when he was just Barbie accessories
 3   or whether he was also our girls electronics.
 4              Kelly O'Hearn was always packaging.
 5              Matt Phelps was product development, as it says.
 6              Abby Belknap was head of sculpting.
 7              Ann Driskill, she was head of collector.
 8              Suzanne Mills-Winkler was large and small dolls.
 9              And Evelyn at this time was only Polly Pocket.
10              Suzanne left, and she eventually became over large
11   and small dolls.  This was at the time when she was large and
12   small dolls, and I think Evelyn was only Polly Pocket, but
13   I'm not a hundred percent sure.
14              Caroline Collins did Barbie fashions.  Maria Redin
15   had come from M.I.T. and was kind of my electronic geek.  And
16   Cynthia Simmons, she took care of processing bills.  And so
17   Ruthie Smith was my executive assistant up at top.
18   Q.   Thank you, you can set that aside.  Have you ever heard
19   the term G jobs?
20   A.   Excuse me?
21   Q.   G jobs.  Have you ever heard that term?
22   A.   G jobs?
23   Q.   Yes.
24   A.   No, not to the best of my recollection.
25   Q.   Yesterday you were talking about how once or twice a
```

1   year you had what you called blue sky opportunities where you

2   would invite your designers to bring in their ideas and put

3   them on display; is that correct?

4   A.   No.   Blue sky I referred to was a slot, an open slot.

5   It would be called a blue sky slot where there were some

6   products where we were given boundaries, like price point,

7   and others were blue sky slots.   And I talked separately

8   about there were times once or twice a year where we would

9   invite the designers to come up with new brand ideas.

10  Q.   Did you ever have an instance where you asked your

11  designers to bring in their ideas for new dolls?

12  A.   How does that differ from what you just -- could you

13  reword the question?

14  Q.   Sure.   I just want to make clear that there were

15  opportunities when you asked your designers to bring in

16  within the design center their own ideas or concepts for

17  dolls, yes?

18  A.   Yes.

19  Q.   And those ideas and concepts that were done by the

20  designers, do you know whether or not those design concepts

21  were always done within the office, or were some of them done

22  at home?

23  A.   I can't be sure.   I think when you're a designer for a

24  company, you're anything 24 hours a day.   So I know for

25  myself, you can have an idea at home, and then you can bring

1  it to life at work.  So I think it's seamless.  It doesn't

2  matter.  I don't know where the idea gets generated, in which

3  place, about it doesn't matter.

4  Q.  On those days that you had the new ideas and new

5  concepts brought in by your designers and displayed, what

6  happened to the ideas and concepts that were not accepted by

7  Mattel?

8  A.  They get locked in the closet, or sometimes they get put

9  on, I think we saw in the picture -- as I said, they get

10  displayed on these L boards, and so the designers were very

11  proud of them, even if they didn't get accepted, so they'd be

12  out on their cabinets around their cubicles.  So they were

13  either locked up or out on display.

14  Q.  You were talking about displaying things in cubicles.

15  Are you familiar with the term tear sheets?

16  A.  Yes.

17  Q.  Could you explain to the jury what a tear sheet is?

18  A.  A tear sheet is something you rip out of a bag.

19  Q.  Would that include ads within magazines?

20  A.  It could be anything.

21  Q.  It could be ads.  Could it be fashions?

22  A.  It could be fashions, yes.

23  Q.  And while you were at Mattel, you knew that designers

24  were taking sheets, tear sheets out of various magazines and

25  posting them in their cubicle; is that correct?

1   **A.**   Some weren't doing it at all.  Sometimes when we would

2   do concept boards, they might use a tear sheet.  They might

3   use a piece of fabric.  So it was a possibility.

4   **Q.**   Now, these tear sheets or advertisements, as I

5   understand it, were of ideas or concepts that were out in the

6   public domain, yes?  They weren't just ads of Mattel

7   products?

8   **A.**   No, they weren't just ads of Mattel products.  I don't

9   know if they were out in the public domain or not.

10  **Q.**   What was the purpose of having tear sheets from various

11  magazines posted within some cubicles, if you know?

12  **A.**   I can't speak for that individual designer's choice.  So

13  I don't know.  I mean, I know when I choose for myself, for

14  example, when I was redoing Barbie's -- thinking about

15  redoing Barbie's body, you would rip out tear sheets of the

16  way models look today so you were influenced by what a

17  woman's body looks like.  So I think it is a very personal

18  thing why you choose to have something -- it's like having a

19  picture of your child in front of you.

20  **Q.**   Do you recall that -- well, let me ask you, when you

21  were redesigning Barbie, do you know whether you ever looked

22  at the magazine Seventeen?

23  **A.**   I have no idea.

24  **Q.**   Are you familiar with the magazine Seventeen?

25  **A.**   Yes.

1    Q.    How are you familiar with it?

2    A.    I used to get a subscription to it years and years ago.

3    I don't think I've gotten a subscription to it in the last

4    few years, but I can't be sure.

5    Q.    I assume that your subscription to the Seventeen

6    magazine was after you were 17, or was it before 17?   You

7    said a number of years ago.

8    A.    All I'm saying -- all I know is in my most recent job,

9    because of the nature -- I order magazines based on the

10   nature of the role I have at the time.   So in my most recent

11   job, the last two years, Seventeen magazine was not one that

12   I -- that was on my roster of 37 different magazines I might

13   get.

14   Q.    During the period of time you were employed by Mattel,

15   it's true you subscribed to Seventeen magazine, yes?

16   A.    No, I did not say that.   I don't know if that is true or

17   not.

18   Q.    Is it possible that you did?

19   A.    It's possible.

20   Q.    Do you know whether or not you ever saw Seventeen

21   magazine in the design center being looked at by any of your

22   other designers?

23   A.    I have no idea.

24   Q.    Do you know whether or not there was a prohibition for

25   any of your designers to look at Seventeen magazine ads?

1  **A.**   No, they were free to look at whatever magazines they

2  chose.

3  **Q.**   Were your designers also encouraged to do competitive

4  shopping?

5  **A.**   Yes.

6  **Q.**   And by competitive shopping, does that mean that you

7  were encouraging your designers to go out and buy

8  competitors' products that were out at retail?

9  **A.**   No, competitive shopping to me means encouraging them to

10  go out and be aware of what the competition is.  There's a

11  lot of competition today, and it's not from toys.  It's from

12  entertainment properties.  It's knowing -- to me, part of

13  their job is to know all the different possibilities the

14  girls have to choose from that occupy their share of mind.

15  So it's not to have them buy things, although they may.  It

16  was more to have them be aware of what was in the

17  marketplace.

18  **Q.**   Can you tell the jury when you were at Mattel, do you

19  ever recall a competitor's dolls being in the design center?

20  **A.**   Yeah, I can recall -- I remember -- I can recall a few

21  dolls.

22  **Q.**   Which ones?

23  **A.**   I think there was Simba.  I remember seeing some dolls

24  by a company called Simba.

25  **Q.**   Do you recall ever seeing the Bratz doll in the fashion

1   center?

2   A.   I was totally aware of it and saw it.  I don't know if I

3   ever saw it in the design center per se.  It's very possible.

4   Q.   What do you mean per se?

5   A.   It's very possible.  I can't remember the -- an exact

6   instance where I saw it, but it's possible.

7   Q.   Why would it be possible?  What would be the purpose of

8   having a Bratz doll within the fashion design center?

9   A.   Again, it's up to that designer who chose to bring it

10  in.  I don't know.  Probably because they thought it was

11  interesting or it was -- I don't know the timing of it, of

12  when they bought it.  Just like I don't know why, you know,

13  the Simba doll, these were things that they felt were

14  important to be aware of competitively.

15  Q.   We talked a lot yesterday about Toon Teens and Lily

16  Martinez.

17        Did you ever ask Lily Martinez what her inspiration

18  was for Toon Teens?

19  A.   No, it was obvious.

20  Q.   And what was obvious?

21  A.   They had come from the decals she did for the Barbie

22  Cool Skating.  When you saw how cool the decal was for the

23  Barbie skating, there was discussion about those should be

24  dolls.

25  Q.   I'll be more precise.  When you saw the initial drawing

1  of Toon Teens in the form of the decal, did you ever ask Lily

2  Martinez what her inspiration was for the decal?

3  **A.**   No.

4          MR. QUINN:  Your Honor, I was a little slow.  The

5  question as framed -- it's confusing and conflated, the decal

6  and Toon Teens.

7          THE COURT:  Overruled.

8  **Q.**   BY MR. NOLAN:  Just so that it's clear, before there was

9  a Toon Teens, there was a drawing that Lily Martinez did.

10  Yes?

11  **A.**   Yes.

12  **Q.**   And that appeared on a decal, yes?

13  **A.**   Yes.

14  **Q.**   That was used on a Barbie doll, yes?

15  **A.**   Yes.

16  **Q.**   That was offered for sale?

17  **A.**   Yes.

18  **Q.**   Consumers could buy it?

19  **A.**   Yes.

20  **Q.**   And you testified yesterday that those dolls that

21  contained the decal Lily Martinez drew were sold at retail, I

22  believe you said, like in around 1997, 1998; is that correct?

23  **A.**   I said it was very close to within two or three years

24  from when I -- to the best of my recollection, in two or

25  three years from when I started, which was either '96 or '97.

1    So that would bring it up to '99.  So it could go as late as

2    '99 or as late as '98.

3    **Q.**   So you're just not certain one way or the other?

4    **A.**   No, I'm not certain one way or the other.

5    **Q.**   You're familiar with an artist by the name of Steve

6    Madden?

7    **A.**   No, I'm familiar with him as a shoe brand, not as an

8    artist.

9    **Q.**   I was giving him maybe too much credit.  Are you aware

10   of a shoemaker by the name of Steve Madden?

11   **A.**   Yes, a brand of shoes called Steve Madden.

12   **Q.**   And how are you aware of Steve Madden?  Do you recall

13   when you first became aware of Steve Madden?

14   **A.**   No, I do not.

15   **Q.**   Do you ever recall seeing an ad for Steve Madden shoes?

16   **A.**   I just saw it the other day on your screen.

17   **Q.**   I appreciate that you were here in the opening

18   statement.  What I was just wondering, based on your many

19   years in design and fashion, can you tell the jury whether or

20   not you had ever seen an advertisement for Steve Madden

21   shoes?

22   **A.**   I'm aware of the brand, and so I'm assuming that I must

23   have seen an ad.  But I'm aware of the brand.

24   **Q.**   So in other words, yesterday when you were here in

25   opening statement and you saw the Steve Madden ad, you're not

378

1  testifying that that was the first time you ever saw a Steve

2  Madden ad for shoe wear; correct?

3  **A.**   Correct.

4  **Q.**   Did you think it was inappropriate for fashion designers

5  employed at Mattel to have competitor products within the

6  fashion design center?

7  **A.**   No.

8  **Q.**   We talked yesterday about the name Bratz.  And I just

9  want to go back for a moment and clear that up.  Mr. Quinn

10  showed you a list.  First of all, do you know an individual

11  by the name of Steve Linker?

12  **A.**   Yes.

13  **Q.**   Could you tell the jury who Steve Linker was?

14  **A.**   He was an independent contractor.  He was a graphic

15  designer that we used on some projects.

16  **Q.**   Was Mr. Linker ever employed by Mattel?

17  **A.**   I can't remember for certain, but I don't think he was

18  ever -- I don't think he was ever a full-time employee.  I

19  think he was always an independent contractor or maybe a

20  part-time employee, but he never appeared on my org charts.

21  **Q.**   Did Mattel have its own internal graphic design center?

22  **A.**   Graphic design center?  What do you mean?

23  **Q.**   Did you have graphic designers?

24  **A.**   We had some.

25  **Q.**   Steve Linker is an outside graphic artist; is that

1    correct?

2  **A.**    He's an outside studio, of which one of his services is

3  illustration of graphic design.  I don't know if he was

4  trained as a graphic designer, if he was trained as an

5  illustrator.  We used him to do logos and graphic design, but

6  often what one is isn't what one is necessarily doing.  So I

7  don't know exactly whether he was an illustrator or graphic

8  designer.

9  **Q.**    What I was trying to drive at is whether or not Mattel

10  had internally their own people that could do graphic logos.

11  **A.**    In packaging design, we had a few people who were

12  trained as graphic designers who from time to time would do

13  logos, but a lot of that work we jobbed out.

14  **Q.**    Why did you job it out?

15  **A.**    Because it's about efficiencies in terms of most of

16  those people were handling large volumes of package design,

17  and we used them as art directors to work with the -- bring

18  all the different components of the package together.  So we

19  didn't necessarily generate all the graphic design

20  internally.  We used them as design managers.

21  **Q.**    Isn't it true that about 20 percent of ideas that are

22  created by Mattel in fact are created by people outside of

23  Mattel, vendors that give you ideas?

24  **A.**    Not vendors.  I'd say inventors.  We have about 20

25  percent of Mattel, as well as many of the other toy companies

380

1   in the industry, it comes from outside inventors is what we

2   call them which, you know, outside inventors, yes.

3   **Q.**   The document with respect to Bratz that you were shown

4   yesterday by Mr. Linker was a list of names.  Do you know

5   whether or not it was Mr. Linker and his company that came up

6   with that list of names?

7   **A.**   It appears that those were the ones submitted by him.

8   We had many people contributing.  It was all hands on deck.

9   Because we were looking -- I know my internal people

10  submitted names.  Marketing people submitted names.  That

11  particular document appears to have come from his firm to us.

12  That's what it appears to be.

13  **Q.**   This is Exhibit No. 314.

14          It's in evidence, your Honor.  May I just put this

15  back up?

16          THE COURT:  You may.

17  **Q.**   BY MR. NOLAN:  Do you recall this document being shown

18  to you yesterday?

19  **A.**   Yes.

20  **Q.**   And I believe you testified that Liz Hogan worked for

21  Steve Linker; is that correct?

22  **A.**   That was the best of my recollection.  I know that Joni

23  and Sue were packaging designers.  Steve Linker -- I think

24  that this work was Steve Linker, but I didn't testify to

25  that.  I testified that I recognized the document.

1   **Q.**   Right.   And you see in the front it says Joni and Sue,

2   here are names in the tag lines from Steve and I.   And it's

3   signed by Liz.

4          Do you see Brats there?

5   **A.**   Yes.

6   **Q.**   Is it your testimony that before an outside vendor,

7   Steve Linker provided you the name Brats, B-R-A-T-S, that

8   Mattel internally had already been talking about the use of

9   the name Brats?

10  **A.**   Not necessarily.

11  **Q.**   Do you have any evidence that Carter Bryant was ever in

12  a meeting where the discussion of Brats as a name was ever

13  discussed?

14  **A.**   No, I have no evidence.   Is it possible?   Yes.   But I

15  have no evidence or recollection of him being at this

16  particular meeting.

17  **Q.**   Do you have any evidence to suggest that Mr. Carter

18  Bryant was part of the distribution list for these names

19  coming in from Steve Linker?

20  **A.**   No, there would be no reason for him to be part of that

21  distribution list to the best of my recollection.

22  **Q.**   Could I have 48-001 up on the screen.   Do you see this?

23  **A.**   Yes.

24  **Q.**   Do you recognize this from yesterday?

25  **A.**   Yes.

1   **Q.**   Can you describe for me the expression and attitude of

2   this particular drawing?   What's depicted here?

3   **A.**   She's got big eyes, big lips.   It looks like she's

4   either kind of showing off or balancing herself.   She has a

5   lot of pride and a lot of style.

6   **Q.**   Would you describe her as rebellious?

7   **A.**   I wouldn't use the word rebellious.   I would use that

8   she has attitude.

9   **Q.**   And what's the attitude that's depicted?

10  **A.**   It's probably her posture and her makeup.

11  **Q.**   And what is the attitude that's depicted by the posture,

12  just focusing on posture for a moment?

13  **A.**   Confident, I'd say.

14  **Q.**   Do you know -- when did Lily Martinez do this drawing,

15  do you know?

16  **A.**   No.

17  **Q.**   There's a date on here.   Can we blow that up?

18        You have this document in front of you, 48-001.   Do

19  you see the date on it?

20  **A.**   I can't read it.

21  **Q.**   It's poor resolution.   You can't read that?

22  **A.**   That?

23  **Q.**   Right.

24  **A.**   I see a 12, a 10, and I can't read the last two numbers.

25  Is that what you're saying as the date?

383

1   Q.   I'm just asking you, this appears to be a date on the
2   document.
3   A.   Yes.   What I'm saying is it's smeared.   It looks like
4   12/10, and then it could be a zero.   It could be a 9.   I
5   can't read -- it would be a 09 or a 99.   It's hard to read.
6   Q.   You have a smaller version in front of you.   Is it
7   clearer to you --
8   A.   No, you can look at it.   In fact, it's smaller, it's
9   less clear.
10  Q.   Can I ask you to look at 48-002, the next in order?   Do
11  you recognize this drawing?
12  A.   Yes.
13  Q.   What is this document?
14  A.   It's another one of the drawings for Toon Teens.
15          MR. NOLAN:   I don't believe this one was offered.
16          MR. QUINN:   No objection.
17          THE COURT:   It's admitted and published.
18          (Exhibit 48-2 received.)
19  Q.   BY MR. NOLAN:   Now, looking at your version, do you see
20  that date?
21  A.   It's worse on my version.   You can't -- well, on the
22  screen it looks like it's '99.   It looks like it's -- you can
23  see it better on the screen than I can on my copy.   It looks
24  like it's June or July something '99.
25  Q.   So do you know whether or not that date indicates that

1    Lily Martinez did the drawing in June of 1999?

2    A.    I have no idea if that's correct.

3    Q.    Did you require all of your artists at Mattel to date

4    their drawings?

5    A.    It wasn't a requirement.  It was suggested, I think.

6    But it wasn't a requirement.

7    Q.    Can we go back to 0048 for just a moment.  Dash 001,

8    please.  Yesterday you were talking about what I would

9    describe as the articulation of the hands and the pose.

10            Do you see that?

11   A.    Yes.

12   Q.    Is it your testimony before the jury that the

13   articulation of the hands on Lily Martinez's drawing was

14   unique in terms of the way it was posed?

15   A.    They remind me -- they remind me very much of the exact

16   same position that she had on her decal roller blading.  So

17   they were unique to Lily's drawing style as they appeared

18   earlier on the decal.

19   Q.    So you never -- before you saw the decal, is it your

20   testimony to this jury that you had never seen drawings or

21   sketches with similar hand poses?

22   A.    No, I didn't testify to that.

23   Q.    So you're not trying to suggest to this jury that the

24   articulation of the hands or the pose of the hands was unique

25   or creative to Lily Martinez?

1    **A.**    I think that was a signature of her style when she drew

2    people.  I cannot be sure that I have never seen anything

3    similar to that.  But I found it strikingly unique.

4    Certainly in the design center with all of the dolls being

5    done, I never saw anyone do that particular pose.

6    **Q.**    What was your impression of Carter Bryant as a designer?

7    **A.**    I know that he was always -- he was always high on the

8    list of great designers.

9    **Q.**    Within Mattel?

10   **A.**    Within Mattel.  That's why we took him back, and he was

11   very highly thought of.

12   **Q.**    While he was employed at Mattel, did anybody suggest to

13   you in any way that he was dishonest?

14   **A.**    Absolutely not.

15   **Q.**    You interviewed Carter Bryant when he reapplied to

16   Mattel; correct?

17   **A.**    I don't remember that for sure.  I remember Cassidy did

18   bring him into my office.  I don't know whether it was when

19   he was coming back in or whether we had already hired him,

20   but I do remember talking to him at some point.

21            MR. NOLAN:  Your Honor, if I might just approach

22   with a new document.

23            THE COURT:  You may.

24   **Q.**    BY MR. NOLAN:  I have placed in front of you a document

25   I marked as 15605.  It's the -- I'm sorry.  We just handed it

1    up to you?

2    **A.**    I didn't get it.

3    **Q.**    Oh, I apologize.  This is a package of sketches.  If

4    you'd take a moment and just look through those, if you

5    might.

6    **A.**    Okay.

7    **Q.**    Do you recognize 15605-001 as being a sketch of Jewel

8    Barbie?

9    **A.**    I remember that we ended up with a doll called Jewel

10   Barbie that looked similar to this.  I don't remember whether

11   this was the sketch that formed it or not.

12   **Q.**    Did you know that Carter Bryant was a free-lancer for

13   Mattel in the early part of 1998?

14   **A.**    I don't remember that in particular, no.

15   **Q.**    You don't recall ever being told that when you were

16   interviewing Mr. Bryant?

17   **A.**    No, I don't remember that.

18   **Q.**    I'd ask you to look at Exhibit -- within this package

19   now, 15391-001.

20           MR. QUINN:   I'm sorry.   15391?

21           MR. NOLAN:   15391-001.   It's about halfway through.

22   **Q.**    Do you recall, when you were interviewing Carter Bryant,

23   that he submitted to you a portfolio?

24   **A.**    No, I don't recall -- as I say, I don't recall whether I

25   actually interviewed him prior to him being hired.   I

1    remember Cassidy bringing him into my office and telling me

2    how talented he was and that she wanted me to meet him.  But

3    I don't remember the circumstances, whether he was with a

4    portfolio or without a portfolio.

5    **Q.**   Whether or not you remember seeing his portfolio at the

6    time, by looking at these pictures now, does that refresh

7    your recollection that you did see sketches, drawings

8    submitted by Carter Bryant before you authorized his rehire

9    by Mattel?

10   **A.**   No, it does not.

11   **Q.**   You can set that aside.  Thank you.

12          Do you know whether or not, before he was hired,

13   Carter -- rehired at Mattel, whether or not Carter was asked

14   to do a test project or drawing?

15   **A.**   No, I do not.

16   **Q.**   Just to wind this up, in your experience at Mattel, when

17   a designer was interviewing at Mattel, would it be uncommon

18   for that designer to bring a portfolio of their drawings or

19   sketches?

20   **A.**   No, it would be common during the interview process to

21   bring a portfolio.

22   **Q.**   And these would be pictures or drawings that they did on

23   their own before they came to Mattel, yes?

24   **A.**   Not necessarily.  It could represent things that were

25   done in previous jobs that were already on the market,

1  because we're not supposed to be sharing anything that isn't

2  on the market or proprietary.  So often a portfolio could

3  show jobs from past experience, or a portfolio could contain

4  ideas that the candidate would have done on their own, and

5  usually when they are going through the portfolio, they talk

6  you through that and explain it.

7  Q.    Right.  My point is that assume an applicant presents a

8  portfolio to you of drawings that represent work that he had

9  done before his employment at Mattel.  The question is by

10 signing the inventions agreement, did Mattel take possession

11 and ownership of those drawings that were submitted as part

12 of the interview process?

13 A.    The two things have nothing to do with each other.

14 Q.    Why not?

15 A.    In terms of the -- you're talking about the -- we would

16 never own -- as I said earlier, we don't own, have the rights

17 to product that was done prior to being employed by Mattel.

18 Q.    I'd like to have, and I believe this is in one of the

19 books up in front of you, maybe the white book,

20 Exhibit No. 1195.  This is an HR document that we were

21 referring to yesterday.

22        Do you have that in front of you?  It's 1195.

23 A.    1195-RS?

24 Q.    Yes.  I don't know what RS stands for, but 1195.

25        Do you have that?

1   **A.**   Yes.

2   **Q.**   And yesterday we were talking about the fact that when

3   Carter Bryant left Mattel and gave notice on October -- I'm

4   sorry.  When Carter Bryant gave notice on October 4th, 19 --

5   the year 2000, I'm sorry.  October 4, 2000, you were

6   disappointed to hear that he was leaving; correct?

7   **A.**   Correct.

8   **Q.**   At that point in time, you thought that Carter Bryant

9   was a talented designer, yes?

10   **A.**   Absolutely.  That's why I tried to convince him to stay.

11   **Q.**   Was there anything in his contract, Ms. Ross, that

12   compelled him contractually to tell you where he was going to

13   go to work?

14   **A.**   First of all, we don't have -- my understanding is we

15   don't have contracts.  You mean in his employment agreement?

16   **Q.**   In his employment agreement.

17   **A.**   I don't know the legalities around that.  I don't know

18   whether he has to tell us.  I have no idea.

19   **Q.**   You had the option, when Carter Bryant gave you notice

20   on October 4th, 2000, to exit him out of the building on that

21   very day; correct?

22   **A.**   Correct.

23   **Q.**   In fact, that was a policy that was applied by Mattel

24   often while you were employed at Mattel; correct?

25   **A.**   No, I wouldn't say often.  That was only the policy that

390

1    was enforced if someone told us that they were going to a

2    competitor.  And I had no reason to believe, because I

3    trusted Carter explicitly, I had no reason to believe

4    otherwise that he was telling me the truth when he said he

5    was not going to a competitor.  And therefore, I allowed him

6    to stay the two weeks.

7    Q.    Now, in your deposition in this case, you testified that

8    during your period at Mattel, you recall --

9              MR. QUINN:  Your Honor, I object to summarizing.

10             THE COURT:  Sustained.

11             MR. NOLAN:  I apologize.

12   Q.    While you were at Mattel, was there a time when there

13   were layoffs of designers within the Mattel design center?

14   A.    Yes, I can remember one.

15   Q.    Approximately how many designers were laid off at the

16   time, do you recall?

17             MR. QUINN:  Objection.  This is irrelevant, your

18   Honor.

19             THE COURT:  Overruled.

20             THE WITNESS:  I don't remember.  Maybe 15, 20 tops.

21   I think.

22   Q.    BY MR. NOLAN:  Now, prior -- how were the names selected

23   for on employee to be laid off at Mattel in the design

24   center, if you know?

25   A.    It depended on why the layoffs.  Sometimes the layoffs

1  would happen because of a structure reorganization.  And
2  therefore, it was picked based on what jobs we needed for the
3  new structure.  Other times it was -- it could be a financial
4  issue.  So it was looking at people -- if it was a pure
5  performance issue, it would be looking at peoples' ratings if
6  it was a performance issue.  And it was a restructuring, it
7  would be finding the right matches of skill sets to the jobs,
8  the structure that we were creating.
9  Q.   And was there a process in place where managers would be
10 involved in identifying which employees would be subject to
11 the layoff?
12 A.   There was some kind of a ranking that we did every year,
13 and there was some process -- I don't remember exactly.  I
14 remember HR sitting with me to make sure that we were making
15 the right decisions.  So I remember seeing my office and
16 there was paperwork and we were going through papers.
17 Q.   Were employees warned ahead of time that this process
18 was going on in terms of considering layoffs?
19 A.   I can't remember.
20 Q.   Do you recall, when you were involved in deciding about
21 the layoffs, whether or not you told any of the employees
22 that they were on a proposed list for layoffs?
23 A.   I doubt that I told them.  But I can't be sure.  I have
24 no idea one way or the other.
25 Q.   And isn't it true that the employees in the design

1  center, that when they were laid off, that they were exited

2  out of the building that day?

3  **A.**   No, I'm not sure of that day.  Could have been the next

4  day.  I know they went to HR.  There was a conversation.  I'm

5  not sure whether it was that exact day or it was the

6  following day.  Sometimes they would come back and get their

7  things the following day.  I can't be sure.

8  **Q.**   As you are sitting here, are you denying that on the day

9  a party -- a designer was laid off by Mattel, that they were

10  physically escorted out of the building by HR?

11  **A.**   I don't remember that they were each personally escorted

12  out.  I remember some people were escorted out.  I don't

13  remember that necessarily everyone was escorted out.

14  **Q.**   Was Carter Bryant -- let me ask you this:  Are you

15  familiar with the term at-will employee?

16  **A.**   Yes.

17  **Q.**   And can you describe for me what you understand at will

18  to mean?

19              MR. QUINN:  Your Honor, I think this is irrelevant.

20              THE COURT:  Counsel?

21              MR. NOLAN:  Your Honor, if I could just lay the

22  foundation, I think it goes to the whole issue of

23  Mr. Bryant's relationship at Mattel.

24              THE COURT:  I'll give you some leeway.  Overruled.

25              THE WITNESS:  My understanding, and it may not be

393

1    correct, is that at will means there is no contract.  At any

2    point in time, you could resign or the company could fire

3    you.

4    Q.   BY MR. NOLAN:  Was Carter Bryant an at-will employee?

5    A.   As was everybody, yes.

6    Q.   Were you an at-will employee?

7    A.   Yes.

8    Q.   We talked yesterday about concept drawings like Lily

9    Martinez, and concept drawing for Toon Teens.

10              Do you recall that concept?

11   A.   Yes.

12   Q.   And your testimony was that those drawings were similar

13   to floor plans for a house.  I think that was the way you

14   analogized it.  Is that a correct way to describe it?

15   A.   I wasn't saying those drawings in particular.  I was

16   saying in general, when a designer does a drawing, it's the

17   blueprint for the product to be built.

18   Q.   So at Mattel there were illustrators or designers that

19   were involved in doing sketches; correct?

20   A.   Not everyone did sketches, but they could be doing

21   sketches.

22   Q.   And in those sketches, they would have and be able to

23   express their idea and concepts of their idea; correct?

24   A.   That was the purpose of the sketch, yes.

25   Q.   Then the sketch would be turned over to a sculptor; is

1    that correct?

2    **A.**    Most of the time.  Depends on whether the sketch needed

3    sculptor.  If it was a soft body, it wouldn't necessarily

4    need a sculptor.  So if it would be appropriate, it would be

5    turned over to a sculptor.

6    **Q.**    There was a group of sculptors at Mattel; correct?

7    **A.**    Correct.

8    **Q.**    The designers -- and we'll use Lily Martinez as an

9    example -- would not be the sculptor of a design; correct?

10   **A.**    To the best of my knowledge, no.

11   **Q.**    So just to be clear, because I was inartful, the artist

12   who came up with the concept and the idea, reduced that to

13   drawing, would not be the person that sculpted the concept

14   and idea; correct?

15   **A.**    To the best of my knowledge, none of our illustrators --

16   designers did their own sculpting.  There could be a few that

17   I don't remember that had the gift of doing something rough.

18   I do remember -- a rough in clay and then giving the drawing

19   and the rough in clay to the sculptor.

20   **Q.**    Do you recall whether or not, at any time Carter Bryant

21   was employed at Mattel, either the first time or the second

22   time, that Carter Bryant was ever a sculptor for Mattel?

23   **A.**    I do not remember him ever being a sculptor, no.

24   **Q.**    In any discussion that you had upon which you formed the

25   opinion that Carter Bryant was a -- was one of the great

1  designers at Mattel, did anybody tell you that Carter Bryant
2  was also a sculptor?
3  **A.**    No, not that I remember.
4  **Q.**    Do you know an individual by the name of Margaret Leahy?
5  **A.**    Yes.
6  **Q.**    And who was Margaret Lahey?
7  **A.**    She was a sculptress at Mattel, and she actually worked
8  for me again at the Disney Store most recently.
9  **Q.**    Focusing for a moment to the time that Margaret Leahy
10  was a sculptress at Mattel, were you familiar with Margaret
11  Leahy while she was employed at Mattel?
12  **A.**    I knew of her, yes.
13  **Q.**    Do you know whether or not she had a good reputation as
14  a sculptress at Mattel?
15  **A.**    I remember her reputation being good.
16  **Q.**    Do you recall that -- do you recall a time came when
17  Margaret Leahy decided that she wanted to do free-lance work?
18  **A.**    I remember her wanting to leave because there was
19  something around her child.  I don't remember it being to do
20  free-lance work, but that makes sense.  I remember it more
21  around either she had adopted a child or had a child and
22  wanted to spend more time with her.
23  **Q.**    Just to be clear, when a Mattel employee leaves Mattel
24  and wants to free-lance, Mattel had a policy that they could
25  not do work for Mattel for the first six months; correct?

1    A.    Correct.

2    Q.    What was the purpose behind that policy, if you know?

3    A.    My understanding is that we didn't want people to feel

4    like that was a true option to employment at Mattel.  That

5    they could -- because sometimes you can make more money being

6    a contractor because you can charge by the piece versus a

7    salary.  So we wanted to discourage people from feeling like

8    they could set up their own company and come back and get --

9    make us your primary client again.  Because if we're your

10   primary client, you should be an employee of us.

11          There were exceptions.  If someone had a unique

12   skill set that we couldn't find anywhere else in the market,

13   I would go to HR or my team would go to HR and get approval

14   to kind of break that rule.

15   Q.    You recall whether or not you asked for an exception for

16   Margaret Leahy when she left Mattel?

17   A.    I don't remember whether I did.  It's possible.  Or

18   whether I did or someone else did.  Or if we worked with her

19   within the six months.  I don't remember.

20   Q.    But after leaving Mattel, do you have any evidence to

21   suggest that it would be inappropriate for Margaret Leahy, as

22   a sculptress, to do free-lance even for competitors of

23   Mattel?

24   A.    No, after she left Mattel, you are free to work for

25   anyone you choose.

1    Q.    You indicated that you had hired Margaret Leahy at the

2    Disney Store; is that correct?

3    A.    I didn't hire her.  I said she worked for me.  David

4    Harrison, who worked for me, prior to me joining the Disney

5    Store, had interviewed her, when I came on board, said do you

6    know Margaret Leahy, I'm about to hire her.  And I said yes.

7    Q.    Did he ask you whether or not he should go forward and

8    hire her?

9    A.    Yes, he asked me my opinion of her.

10   Q.    What did you tell Mr. Harrison your opinion of Margaret

11   Leahy?

12   A.    That she could be a difficult personality, but she was a

13   great sculptress.

14   Q.    Is Margaret Leahy a friend of yours?

15   A.    I wouldn't consider her a friend.  I know her.

16   Q.    Did you consider Margaret Leahy to be an honest person?

17   A.    Yeah, I have no reason to believe otherwise.

18   Q.    In fact, do you know that Margaret Leahy is married to a

19   person who still works at Mattel?

20   A.    She brought that to my attention recently when he came

21   to visit the Disney Store.  I think he was in the sound

22   studio or electronics.  I hadn't remembered that until she

23   introduced me.

24   Q.    The name Veronica Marlow has come up.  Did you know a

25   Veronica Marlow?

1    A.    It doesn't -- not to my recollection.  I don't remember

2    Veronica Marlow.

3    Q.    But again, if Veronica Marlow left Mattel to become a

4    free-lancer, you don't recall any prohibition on Veronica

5    Marlow working for a competitor as a consultant?

6    A.    No, I don't know of any -- we did not preclude people

7    from working for someone else after they left.

8    Q.    Do you ever recall participating in an interview with a

9    woman by the name of Maureen Tkaak, T-K-A-A-K, at the Wall

10   Street Journal?

11   A.    Yes, I do.

12   Q.    When was that interview?

13   A.    I don't know.

14   Q.    Do you recall that your interview was while -- I'm

15   sorry.  At that interview, were you accompanied by a

16   representative of the P.R. department at Mattel?

17   A.    Yeah, I remember Julia Jensen sitting with me in my

18   office.

19   Q.    What was the purpose of that interview, if you know?

20   A.    I remember it being around Flavas, the new doll line we

21   were launching.

22   Q.    Could you describe for us very quickly what Flavas was

23   all about?  What was the brand?

24   A.    It was a group of different ethnicities of characters

25   with very different body types and different movements and

1   articulation that were very urban looking.

2   **Q.**   And how many characters were in Flavas?

3   **A.**   I don't remember.

4   **Q.**   Do you know whether or not Flavas came out before Bratz

5   or after Bratz?

6   **A.**   I remember it came out after Bratz because it was toward

7   the end of my time.

8   **Q.**   Were you heavily involved in the introduction of Flavas?

9   **A.**   I wouldn't say heavily involved, no.

10  **Q.**   Were you involved?

11  **A.**   I was involved.

12  **Q.**   Was Flavas a success?

13  **A.**   Not to my recollection.

14  **Q.**   Is Flavas still being sold?

15  **A.**   No.

16  **Q.**   During the interview with the reporter at The Wall

17  Street Journal, did you mention to that reporter anything

18  with respect to Bratz?

19  **A.**   Not to the best of my recollection.

20  **Q.**   Do you recall whether or not you said that you believed

21  that Bratz had been copied from Lily Martinez's doll?

22  **A.**   No, I do not.

23  **Q.**   And just to be clear about Toon Teens, Toon Teens was

24  never made into a doll offered at retail; correct?

25  **A.**   Correct.

1  **Q.**  Another interview that you participated in was for a

2  book.  I just want to get that for just a moment.  Do you

3  remember being interviewed in connection with a book that was

4  published called The Real Toy Story?

5  **A.**  No, I do not.

6  **Q.**  Do you ever remember being interviewed by a gentleman

7  named Eric Clark?

8  **A.**  No, I do not.

9  **Q.**  Have you ever read the book The Real Toy Story?

10  **A.**  No, I do not recognize it.

11  **Q.**  In front of you, Ms. Ross, marked as 06300.

12  **A.**  In the white book?

13  **Q.**  In the white book.

14       Now, I don't want you to read anything out loud,

15  but I just wanted to ask you whether or not you have ever

16  read chapter 4 that is depicted in this exhibit.

17  **A.**  No, I have not.

18  **Q.**  Okay.  Directing your attention to page 78 for just a

19  moment.  I want you to just read to yourself the last

20  paragraph.  Starting with "In the meantime."

21  **A.**  Okay.

22  **Q.**  Now reading that, does that refresh your recollection

23  that you did sit for an interview with a gentleman by the

24  name of Eric Clark?

25  **A.**  No, it does not.

1  **Q.**   Do you know whether or not you were ever described as

2  the mastermind and the major innovation for the Millennium

3  Barbie?

4  **A.**   No, I never heard that until reading it in this right

5  now.

6  **Q.**   I ask you to turn to page 87, and directing your

7  attention to the paragraph that starts "Mattel's intelligence

8  machine."  And I just ask you to take a look at that for a

9  moment.

10  **A.**   Okay.

11  **Q.**   Okay.  What I want to -- do you remember telling anybody

12  that Mattel's intelligence machine had been picking up signs

13  that older girls were losing interest in Barbie?

14  **A.**   No, intelligence machine isn't even a word I used.

15  **Q.**   Mattel did have research departments within the girls'

16  division, yes?

17  **A.**   Yes.

18  **Q.**   And you received reports from those research

19  departments?

20  **A.**   Yes.

21  **Q.**   Did you ever, while you were at Mattel, hear the phrase

22  or the acronym KGOY, Girls Getting Older Younger?

23  **A.**   Not the acronym, but this was a fact.  There was nothing

24  to hide.  Girls were getting older younger.  And that's why

25  we started to do dolls for older girls.  As I said yesterday,

 1  as Barbie started to trade down younger, because girls were

 2  getting older younger, that's why we started brands like

 3  Generation Girl, Mystery Squad, et cetera, because we knew

 4  that we were losing the older girl, and we had to continue to

 5  create new aspects of Barbie that would speak specifically to

 6  her.

 7          So I don't know the acronym, but it was common

 8  knowledge that girls were getting older younger and that the

 9  older girls were playing with many different kinds of things,

10  including electronics.  So it was hard to grab their

11  attention.

12  Q.   Would you turn to page 88 of chapter 4 of this book and

13  look at the paragraph there.  And in particular, if you could

14  focus on the last paragraph where there are quotations

15  attributed to you.

16          MR. QUINN:   I object to the characterization.

17          THE COURT:   Just refer to the last paragraph.

18  Sustained.

19  Q.   BY MR. NOLAN:   Just read the last paragraph of this

20  page, starting with "sipping tea."

21  A.   Okay.

22  Q.   Do you see that there is a quote attributed to you on

23  this page?

24          MR. QUINN:   Your Honor, same objection.

25          THE COURT:   Counsel, lay a foundation for that.

1           THE WITNESS:  Yes, I see it.

2   **Q.**   BY MR. NOLAN:  If you did not meet with Eric Clark, the

3   author of The Real Toy Story, do you know why a chapter

4   contains words that are attributed to you in a quote?

5           MR. QUINN:  This is argumentative.

6           THE WITNESS:  I never said I --

7           THE COURT:  Stop, everybody.  I sustained the

8   objection.  The answer is stricken, Counsel.  Lay a

9   foundation for this properly.

10  **Q.**   BY MR. NOLAN:  Did you ever tell anyone that when you

11  first came to Barbie, people would design in a vacuum, and

12  they kind of come out when it was done and present their idea

13  of a doll, and they would cover their designs at night.  They

14  were very possessive.

15          Do you recall ever saying that to anyone?

16  **A.**   I don't recall ever saying it to them, but it was true,

17  and the gist of it was true.  I helped change the culture

18  because it was -- people did used to work more by themselves,

19  and I created a culture that was more collaborative.  So I

20  don't remember ever saying those exact words, but it's

21  possible because it was true.

22  **Q.**   How long after arriving at Mattel did you -- did it take

23  for you to change the culture of Mattel into a more

24  cooperative environment?

25  **A.**   I don't remember exactly, but it was very quick.  I was

```
1   the boss, and it was, you know, you don't -- we don't need to
2   cover our work at night.  Let's put it on the table and share
3   it.  So it was pretty instantaneous.
4            THE COURT:  Counsel, we're going to take our
5   morning recess at this time.
6            (WHEREUPON THE JURY WITHDRAWS.)
7            THE COURT:  Counsel, please be seated.  I've
8   communicated with Judge Infante during this morning's
9   proceedings concerning the discovery motions that are still
10  pending, and I received word, admittedly third hand from his
11  assistant to my assistant to me, that he indicated that he
12  has not ruled or intended to rule on the outstanding
13  discovery motions because they were not on the priority list
14  that the parties had submitted to him.
15           They were instructed to do a joint letter to Judge
16  Infante, one in February and one in April, listing the
17  motions which were to be ruled on before Phase 1 of the
18  trial, and these motions were not on that list.
19           I don't know if that's true or not.  I've asked to
20  receive a copy of these lists that are referred to, and I'll
21  take a look at it, but I suspect the parties may know what's
22  being referred to here.  And I'd like to hear on this a
23  little later.
24           I don't want to put you on the spot right now, but
25  perhaps at noontime, when we take our recess then, we can
```

1 take this up.  Because I don't want to -- if the parties have

2 agreed with Judge Infante that these motions don't need to be

3 ruled on, that kind of conflicts with what I understand from

4 our discussion a few days ago.  But I'd like to get that

5 straightened out before I issue any further guidance in terms

6 of these motions.  So I just wanted to relay that to you, and

7 I'll do some more homework myself.  Let's take a 15-minute

8 recess, and we'll resume at quarter till.

9           (Recess taken.)

10          **(WHEREUPON THE JURY ENTERS.)**

11          THE COURT:  Mr. Nolan, you may proceed.

12 **Q.**   BY MR. NOLAN:  Ms. Ross, by the time you left Barbie

13 toward the end of 2003, it's true that Barbie had lost

14 significant market share to Bratz; correct?

15 **A.**   I don't know if I'd use the word significant.  It

16 definitely lost some market share to Bratz.

17 **Q.**   Was it a concern within Mattel?

18 **A.**   It was something we were all aware of, like we were

19 aware of the competing issues, fighting for market share.  So

20 we were concerned, yes.

21 **Q.**   Did you know a gentleman by the name of Tim Kilpin?

22 **A.**   Yes.

23 **Q.**   Who is Tim Kilpin?

24 **A.**   He came toward the end when I was leaving.  I forget his

25 exact title.  Maybe senior vice-president of marketing.

1   **Q.**   Did you have any interaction with Mr. Kilpin regarding

2   the Barbie brand?

3   **A.**   A little bit.   There was a small time we overlapped.   So

4   a little bit.   He was in a different department than I, but

5   there was some interaction.

6   **Q.**   Did Mr. Kilpin ever tell you that he thought the Barbie

7   brand was a brand in crisis?

8   **A.**   I don't remember him ever saying that to me.

9   **Q.**   Do you ever remember Mr. Kilpin describing Mattel as a

10  house on fire?

11  **A.**   Absolutely not.

12  **Q.**   Did Mr. Kilpin ever tell you that he thought that Mattel

13  had been out thought and out executed?

14          MR. QUINN:   Your Honor, I object.   This is

15  irrelevant to this case.

16          THE COURT:   Overruled.   You may answer.

17  **Q.**   BY MR. NOLAN:   Did Mr. Kilpin ever tell you that Mattel

18  had been out thought and out executed by Bratz?

19  **A.**   No, I do not remember him ever telling me that.

20  **Q.**   The last document I'd like to show you, if you would

21  turn to 1291.

22          Do you recognize this document?

23  **A.**   Yes, I do.

24  **Q.**   What is it?

25  **A.**   It was an invitation for other people in the company to

1  join a brainstorm that we were having.

2  **Q.**  Is this a memo that you prepared?

3  **A.**  Yes, it is.

4  **Q.**  Was it issued around April 7th of 2003?

5  **A.**  It says that in the document.  So I have no reason to

6  believe it's wrong.

7          MR. NOLAN:  Your Honor, we'd offer 1291.

8          MR. QUINN:  No objection.

9          THE COURT:  Admitted.

10          **(Exhibit 1291 received.)**

11          MR. NOLAN:  Can we publish it?

12          THE COURT:  You may.

13  **Q.**  BY MR. NOLAN:  I want to have you focus on the first

14  paragraph for a moment.  It says:  "We envision creating a

15  cultural movement via a new doll for girls age seven to ten.

16  Some of you have already seen the beginning of this brand,

17  whose name will be kept confidential.  We will be launching

18  this brand at the pretoy fair in June.  We want to create a

19  cultural phenomenon that expands beyond the doll itself.  New

20  directions.  Ancillary products.  Cultural extension dollars.

21  A movement that extends the product's potential, especially

22  to trade, retail, and consumers and internally to our

23  organization.  The time is ripe to work differently at

24  Mattel.  To think differently at and more holistically, work

25  more collaboratively and change the culture inside and out."

1       Did you write that paragraph?

2   **A.**   Yes, I did.

3   **Q.**   So it's true that by April of 2003, you were thinking

4   that it was a ripe time for Mattel to work differently;

5   correct?

6   **A.**   This was before -- what this was referring to was not

7   the design department.  This was a new way to work.  This

8   invitation was to the marketing department.  Traditionally at

9   Mattel, design would do their job in isolation, and I had

10  already created a more collaborative environment within

11  design, and we would not think of all of the extensions to

12  the product line until after design had finished designing

13  the doll.  And then we would -- what I call baton passing.

14  Hand off the product to market, and they would do their job.

15      The call to action here that I was referring to

16  about working differently was specifically around the process

17  where I was inviting the marketing people to be part of this

18  initial meeting at the inception of the doll.  So that is

19  specifically what this is referring to, which would be a new

20  way to work.

21  **Q.**   Up until this time, Mattel was not organized that way;

22  correct?

23  **A.**   Up until this time, as I just explained to you, design

24  would do their job, hand it off to marketing, who would do

25  their job, and then there would be dialogue back and forth.

1   But it was a different sequence of how we would arrive at the

2   product line and the product launch.

3   Q.   And when you say to think differently and more

4   holistically, what did you mean, "holistically"?

5   A.   Think of all the product extensions from the very

6   beginning.  Think of the entire picture from the very

7   beginning as opposed to thinking of it in a linear way.

8   Q.   And why did you think that the culture had changed

9   inside and out?

10  A.   In order to be quick to market and to have -- at the

11  time we were thinking that this line was going to have

12  implications on the website and all of these different

13  components that we had never entered into before.  So it was

14  going to be the only way to actually make this happen.

15  Because of the unique idea that this was.

16  Q.   Isn't it true that at or about this time and throughout

17  2003, the retailers that were selling Barbie had lost

18  confidence in Barbie?

19              MR. QUINN:  This is irrelevant.

20              THE COURT:  Sustained as phrased.

21  Q.   BY MR. NOLAN:  Were you ever told in 2003 that people

22  within Mattel were reporting that retailers had lost

23  confidence in Barbie?

24              MR. QUINN:  Objection.  Relevance.

25              THE COURT:  Counsel, let me see you at sidebar.

1          **(SIDEBAR CONFERENCE HELD.)**

2              THE COURT:  Counsel, what is the relevance of

3      retailers' confidence in Barbie in 2003 to what Carter Bryant

4      did in 1999?

5              MR. NOLAN:  Your Honor, it goes directly to impeach

6      her testimony that Mr. Quinn elicited about the innovation at

7      Mattel, how creative people were, how collaborative the

8      department was, and how --

9              THE COURT:  Again, that was -- the relevant period

10     is 1999 through October of 2000.  How is 2003 relevant?

11             MR. NOLAN:  Your Honor, I believe that Mr. Quinn

12     did not limit it in any time.  He was talking about while she

13     was employed at Mattel.

14             THE COURT:  I will give you leave to focus on the

15     period in question, Counsel.  That's what Mr. Quinn was

16     doing, and that's what we need to do.

17             MR. NOLAN:  Thank you.

18             THE COURT:  Sustained on that basis.

19         **(CONCLUSION OF SIDEBAR CONFERENCE.)**

20  **Q.**  BY MR. NOLAN:  Your last project at Mattel, before you

21     left, was for Project Platypus; is that correct?

22  **A.**  No, Project Platypus was an ongoing project

23     simultaneously with all of my other duties.  So it wasn't my

24     last duty.  It was a simultaneously running project.

25  **Q.**  And why did you leave Mattel?

1    A.    Because that project -- I'm someone that needs to keep
2    moving forward, and this particular project was one that
3    we -- was a think tank, and I was really getting frustrated
4    with retailers, you know, where you're not able to control
5    when you're a wholesaler because the retailer then selects
6    what they show.  And I really wanted to be more in control
7    and work for someone that had their own retail environment.
8            Because what was happening in Project Platypus was
9    it was very hard in this day and age, without controlling
10   your own retail, to have a greater impact.
11           So I felt I couldn't get to the next level, and
12   Project Platypus was not going to be able to grow because it
13   was a think tank.  It wasn't -- which I totally, totally
14   understood.  So I left on very, very good terms and said you
15   know what?  It's time for me to move on, and I really would
16   like to work for someone that did both wholesale and retail,
17   which is why I went to Old Navy.
18   Q.    Did you ask anybody at Mattel just to reassign your
19   duties within Mattel to give you a job that you were not
20   going to be frustrated?
21   A.    I wasn't frustrated.  Mattel is a wholesaler.  What I
22   said is I wanted to take things to the next level and be in
23   charge of the retail as well.  Because we couldn't control
24   our own destiny because we don't have our own retail stores.
25           So it wasn't frustration.  It was a by-product of

 1  Mattel as a wholesaler, and not a retailer.  I loved working

 2  for Mattel.  If there was that possibility, if we owned our

 3  own retail stores, I would love to be in charge of that.

 4  **Q.**  Did you ask for a reassignment at Mattel to take on new

 5  responsibilities before you left?

 6  **A.**  No, I had no reason to.

 7          MR. NOLAN:  Thank you.

 8          THE COURT:  Redirect?

 9          MR. QUINN:  Thank you, your Honor.

10                  **REDIRECT EXAMINATION**

11  BY MR. QUINN:

12  **Q.**  Ms. Ross, Mr. Nolan asked you some questions and just

13  showed you Exhibit 1291.  And he asked you some questions

14  about the importance of collaboration and things like that as

15  reflected in that document, which is dated in 2003.

16          Did you just realize that collaboration was

17  important in 2003?

18  **A.**  No, as I stated earlier, from the moment I walked in the

19  door, I created a different culture where collaboration was

20  imperative.  This document was referring to collaboration

21  with all of these other ancillary departments in the company

22  at an earlier stage in the game based on the complexity of

23  this unique idea that required that we work differently.

24  **Q.**  This document referred to collaboration between folks in

25  the design center and folks in other departments?

1  **A.**  Absolutely.  In other buildings even, which had never

2  happened before at this early stage.  So it was entirely

3  different tasks.  It was a unique situation relating to this

4  particular idea which required all of these other components

5  to come together in the beginning.

6        So that is why that memo was written, because I was

7  inviting other people from around the company that had never

8  worked in my department before.

9  **Q.**  But collaboration among designers within the design

10  center was --

11  **A.**  Oh, huge.  That started within a week from when I walked

12  in the door.

13  **Q.**  You were asked questions by Mr. Nolan about girls

14  getting older younger.  Can you explain what that means?

15  **A.**  Yeah.  That's been a phenomena that's been going on for,

16  I don't know, the last 10 years.  I watched my own daughter.

17  It happened to my own daughter.  Girls are wearing makeup

18  earlier.  They are starting to grow up too quick in my mind.

19  So it was a phenomena that we were all watching happen.  And

20  with that comes, you know, new things that girls can do, like

21  electronic games, the computers, doing sports.

22        So they were growing out of traditional toys at an

23  earlier age, where they used to stay in them much longer.  So

24  it was a slow phenomena that we had kept our eyes on.  I was

25  aware of it even before I went to Mattel, but it was clearly

1   something to be monitored.

2   **Q.**   So that's something you are aware of before you joined

3   Mattel in, I think you said, '95, '96?

4   **A.**   Yes.   Again, I was aware of -- I watched my own daughter

5   and watched the phenomena with her friends.  And then I think

6   it was -- yeah, we constantly, once we were inside Mattel,

7   because it was a toy business, we were very aware of it.

8   **Q.**   And you were asked some questions also about the

9   sculptors, the role of a sculptor and the importance of

10  drawings to a sculptor.

11          Do you recall that?

12  **A.**   Yes.

13  **Q.**   And based on your experience, what is your understanding

14  of the importance of drawings for a sculptor?

15  **A.**   My understanding is that most sculptors, there may be a

16  few exceptions, but that most sculptors or sculptresses start

17  with a drawing to begin to create -- something, a guideline

18  to execute against.

19  **Q.**   You mean a guideline --

20  **A.**   Or a blueprint.  I mean, they have to -- there may be

21  some sculptors that are doing a project not for someone else.

22  When you're doing it for someone else, you need to see that

23  person's intent.  So you absolutely need a drawing in front

24  of you in order to create that creation.

25          There may be some sculptors that can do it who are

1    designing for themselves, but in our business and the way we

2    work is the designer would bring the sculptor or sculptress a

3    drawing, and that's what the sculptor would follow.

4    **Q.**    Do you know whether Margaret Leahy shares that

5    understanding of a sculptor's role in the use of drawings?

6                   MR. NOLAN:   Objection.   Lack of foundation, your

7    Honor.

8                   THE COURT:   Sustained.

9    **Q.**    BY MR. QUINN:   Have you ever discussed or heard

10   Ms. Leahy present her understanding of what she does as a

11   sculptor and how she uses drawings?

12   **A.**    Yeah, ironically very recently because she's been

13   working for me at the Disney Store.   And what happened is the

14   Walt Disney Company is taking back the stores.   The Walt

15   Disney Company has just recently taken back the Disney Stores

16   North America which, for the last two years, has been owned

17   by the Children's Place.   So because of that, I was asked to

18   give to the Walt Disney Company, have my team share with them

19   exactly what each of these people that I brought on the last

20   two years, what their jobs were and how they did the jobs

21   that they do.

22                   So I think it was about a month ago, five weeks ago

23   maybe, each of my teams prepared a presentation to the Walt

24   Disney executives as to how they do their job.   And I had

25   Margaret, who is a sculptress who does it by hand, and Tom, I

1  forget his last name, who does sculpting on computer.  And

2  when it came time for the demonstration, everyone knew that

3  their jobs were on the line in terms of the Walt Disney

4  people were going to make a determination of who they kept

5  and who they did not keep.

6         Margaret's demonstration was fantastic, and she

7  showed how she starts with a drawing and then goes to the

8  sculpting, and then she hands it off to Tom, who does the

9  digital sculpting and can size it up or down.  So it became

10 clear that that's how she expressed to me and to the Disney

11 team that she likes to work.

12 Q.  You were asked some questions about at-will employment

13 and whether employees, including yourself, have contracts.

14 And I think you were clear that you are not a lawyer.

15 A.  Right.

16 Q.  Count your blessings.  The concept of at-will

17 employment, if somebody is an at-will employee, that they

18 have an inventions agreement, are they still bound by the

19 inventions agreement?

20 A.  Absolutely.  There's an employee agreement.  And

21 anything that you sign is agreed upon during your time of

22 employment, absolutely you have to abide by it.

23 Q.  You mentioned that outside inventors supply about 20

24 percent of the ideas for new toys?

25 A.  Approximately 20 percent.  I'm not sure if the figure is

1   20 percent of the revenue or 20 percent of the actual

2   products.  It may be of the dollar or revenue.  I'm not sure.

3   **Q.**   Who are these outside inventors?  Are they people who

4   are employed by competitive companies who are submitting

5   products --

6   **A.**   No, most of them are inventor houses.  Some are

7   companies that all they do are create inventions that they

8   then license to other companies like ourselves.  They work on

9   a royalty basis.  There may be some individuals that also are

10  inventors.  But they are employed either by themselves or

11  their own company, and they live the life of an inventor.

12  They may come up with 15 ideas and be able to sell three of

13  them to companies, and they collect a royalty.  And that's

14  how they make their livelihood.

15  **Q.**   You were asked some questions about Exhibit 314 from

16  Mr. Linker's firm with the Bratz name, and you mentioned that

17  Mr. Linker's firm was an outside vendor.

18  **A.**   Correct.

19  **Q.**   Can you tell us whether or not outside vendors such as

20  Mr. Linker's firm would do that kind of work, whatever they

21  were doing coming up with names or whatever, pursuant to a

22  confidentiality and proprietary information agreement with

23  Mattel?

24  **A.**   Oh, yes, all of our work orders to outside contractors

25  have a part of it.  I'm not sure whether it's the actual work

1  order or a separate document that describes all the rules and
2  regulations about how the work they do for us is proprietary,
3  et cetera, and belongs to us.
4  Q.   So would you regard those name ideas that were submitted
5  by the vendor, in this case Mr. Linker's firm, as being
6  confidential and proprietary to Mattel for that purpose?
7  A.   Yeah, absolutely, because we contracted him to do that
8  work.   He -- that was contracted work.
9  Q.   Why would in the design center -- why would there might
10 be instances where you have examples of competitors' product,
11 like you mentioned the Simba dolls.   Why would they be there?
12 A.   Well, we have to make sure we are offering the right
13 price value.   So we would look at -- the marketing people
14 would say we want to create a doll that has the same
15 perceived price value.   So even size of the box.   In the toy
16 industry, it's how big is the box.   So sometimes we would
17 have things there to make sure that when we did something in
18 that category, that we were at least competitive with their
19 price value.
20 Q.   Would they be there to be copied?
21 A.   No, absolutely not.
22 Q.   You were also asked some questions about tear sheets
23 from magazines and other things that designers might bring in
24 and hang in their cubicles.   Do you have an understanding as
25 to why designers might post ads and things like that?

1  **A.**   Yeah, it's pure inspiration, like an artist or a fashion

2  designer.  I'm inspired by architecture.  So I have pictures

3  of houses.  As an artist and a creator, there's amazingly --

4  a different range, and it's very personal as to what inspires

5  you.  So it's inspiration.  Shape, color, things in the world

6  that you are excited about.  It's a very personal thing.

7  There's no rule about what job that does other than inspire

8  you.

9  **Q.**   You indicated that if an employee, as a part of this

10  blue sky effort, came up with a doll idea, and the company

11  did not go forward with it, that it would be kept at the

12  company or locked up, I think you said.

13  **A.**   Correct.

14  **Q.**   Can you explain why that is?

15  **A.**   Well, because it was the property of the company.  I

16  mean, we oftentimes pull back out something that we remember

17  even from two years ago and take parts of it and make it into

18  something else.  So it was the property of the company, and

19  we wanted it to be accessible because at times we would

20  revisit it or revamp it.

21  **Q.**   There are some questions about the date when the Cool

22  Skating Barbie came out.

23  **A.**   Yeah, I remember it was early on in my tenure, but I

24  didn't remember the date.

25  **Q.**   And as luck would have it, we have a Cool Skating Barbie

1   which, your Honor, I request be marked as Exhibit 257-1A.

2   The photocopy of this is already admitted as 257-1.

3              THE COURT:  Any objection?

4              MR. NOLAN:  No objection.

5              THE COURT:  Very well.  It will be admitted and you

6   pay publish.

7              **(Exhibit 271-1A received.)**

8   **Q.**   BY MR. QUINN:  Is this a package with a Cool Skating

9   Barbie in it?

10  **A.**   Yes, it is.

11  **Q.**   And is there a date on this?

12  **A.**   Yes, on the bottom it has copyright 1999, Mattel, Inc.

13             MR. QUINN:  Very well.  Thank you.

14             THE COURT:  Very well.  Anything further?

15             MR. NOLAN:  No.

16             THE COURT:  Very well.  You are excused.

17             Counsel, you may call your next witness.

18             MR. QUINN:  Your Honor, Mattel calls Lily Martinez.

19             THE CLERK:  Please raise your right hand.

20                        **LILY MARTINEZ, SWORN.**

21             THE CLERK:  Please take the stand.

22             MR. QUINN:  Your Honor, may we approach the witness

23  stand to give the witness a book of exhibits?

24             THE CLERK:  Please state your full name and spell

25  your last name for the record.

```
 1              THE WITNESS:  Liliana Martinez, but I go as Lily.

 2                        DIRECT EXAMINATION

 3   BY MR. QUINN:

 4   Q.    Good morning.

 5   A.    Good morning.

 6   Q.    Ms. Martinez, I take it you and your husband are

 7   expecting?

 8   A.    We are.

 9   Q.    Congratulations.

10   A.    Numero tres.

11   Q.    Is that counting your husband?

12   A.    That would be four.

13   Q.    What is your current job, please?

14   A.    I work for Mattel, and I'm a senior manager, product

15   design.

16   Q.    How long have you worked at Mattel?

17   A.    I was a temp for a year and a half.  So total, including

18   that, would be about 10 years.

19   Q.    And we know you are a designer.

20   A.    Yes.

21   Q.    Where were you born?

22   A.    I was born in Mexico.

23   Q.    And when did you come to this country?

24   A.    Like 1980.  Because I remember my little sister being

25   born here.  I was three.  So 1980.  I just dated myself,
```

1  didn't I?  Okay.

2  **Q.**  Have you always been interested in drawing?

3  **A.**  I have.

4  **Q.**  Since you were a little girl?

5  **A.**  Since I was very little.  Since I can remember to eat.

6  **Q.**  Have you always been interested in dolls and making

7  clothes for dolls?

8  **A.**  Oh, yes.

9  **Q.**  Can you remember doing that as a little girl?

10  **A.**  Yes.  I actually -- I've always drawn girls or dolls, as

11  my brother would say.  But I remember doing fashions for my

12  Barbie when I was about like eight or nine.  I was actually

13  in Mexico.  And I would do them out of leftover socks,

14  especially ones that had ruffles.  My dad's a tailor.  So we

15  always had like needle and thread readily available.  And I

16  would stick, you know, do my little thing and show them to

17  everybody, look, mom, look what I did.  But it was --

18          THE COURT:  Ma'am, slow down a little bit.

19          THE WITNESS:  Sorry.  I just get so excited.  So

20  yes, I've always...

21  **Q.**  BY MR. QUINN:  Where did you go to high school?

22  **A.**  Granada Hills, Kennedy High.

23  **Q.**  What year did you graduate?

24  **A.**  I graduated '95.

25  **Q.**  And after that, did you have any kind of training in

1  arts or design?

2  **A.**   Yes.   I actually entered design school, the Fashion

3  Institute of Design right after high school, like two weeks

4  after in L.A.

5  **Q.**   So you graduated like this time of year, and within two

6  weeks you were in design school?

7  **A.**   Yeah, so I didn't really have a summer after my senior

8  year.  But that was okay.

9  **Q.**   What was the art school or design school that you went

10  to?

11  **A.**   Fashion Institute of Design and Merchandising.

12  **Q.**   Where is that located?

13  **A.**   In downtown L.A.

14  **Q.**   How did you choose that design school to go to?

15  **A.**   Some recruiters actually came to one of my classrooms

16  when I was still at my senior year to talk about how to

17  present yourself when you're going for a job interview.   And

18  she gave out cards about the school and I was like oh,

19  information.   I like fashion.  Hm, I draw.  All right.

20  Let's -- let's meet with them and see what they have to say.

21  And I met with the coordinator, the advisor at the school,

22  and I was really, really interested.

23  **Q.**   And how long did you attend that school?

24  **A.**   A total of three years.

25  **Q.**   How did you come to work at Mattel?

1   **A.**   I -- on my third year, well, actually it's a two-year

2   program, and then at the third year, it's optional.  So when

3   I was doing my third year, which is to do a fashion show that

4   third year, some designers from Mattel came and gave a

5   presentation to my class.  And one of my classmates was like

6   Lily, have you got an interview?  Your style is, I think,

7   like Barbie-esque.

8          So I'm like no, I don't even drive.  I don't know

9   where this place is at.  I'm like no, no.  And when they were

10  done with their presentation, my friend had taken out my

11  sketch book and shown it to them.  She took it out of my tote

12  bag.

13  **Q.**   Without your knowing?

14  **A.**   No, without me knowing, and I'm going that looks like my

15  sketch book that they are looking at.  And sure enough, they

16  were interested in talking to me.  And a couple days later,

17  I -- they hired me, and I was still in school.  I was about

18  to show my fashion show.  So it happened really fast.  And it

19  was so exciting that -- because I loved Barbie.  So I was so

20  like oh, my God, I have a job.  And everybody was still

21  looking for a job, and I had a job while still in school.  So

22  it was really awesome.

23  **Q.**   You made reference to a fashion show you were working

24  on.  What was that?

25  **A.**   That was the whole -- the year is divided in quarters.

425

1   So basically we are to develop a fashion show of -- a

2   collection of, I think, eight designs.  And yeah, and then at

3   the end, there's like this big elaborate fashion show with

4   lights, music, models, very fabulous.

5   Q.   Is this something that all the students do, or do you

6   have to be selected to participate in that program?

7   A.   No, you have to be selected.  There's requirements.  You

8   definitely have to have finished your program, your two-year

9   program at the school, and submit a portfolio, references,

10  grades, recommendations, and then actually if you -- after

11  doing that, you might get called for an interview.  So it's a

12  handful of people, only like 10 people get to do it.

13  Q.   And did you get some type of scholarship along with

14  that?

15  A.   I did.  I got a full scholarship.  So it was a "yea" for

16  my parents.

17  Q.   All right.  So when you started at Mattel, what was the

18  first position that you had?

19  A.   I got hired as an assistant designer.

20  Q.   And do you recall what you were paid in your first

21  position?

22  A.   I think I was paid $15 an hour.

23  Q.   And who was your manager at the time when you first

24  started?

25  A.   I think at the time her name was Debbie Meyer.

1    **Q.**   And what month are we talking about here?

2    **A.**   I remember exactly because I -- my first day at work as

3    April 1st, which is April Fool's Day.  So April 1st, 1998.

4    **Q.**   Did that first position at Mattel -- you said assistant

5    designer?

6    **A.**   Yes.

7    **Q.**   And then at some point after that, did your position

8    change?

9    **A.**   Yes.

10   **Q.**   What was the next position you had?

11   **A.**   I became a designer.

12   **Q.**   Was that like a promotion?

13   **A.**   I believe so, yes.

14   **Q.**   Can you tell us what your job duties were, perhaps first

15   as an assistant designer and then what you were doing as a

16   designer?

17   **A.**   As an assistant I was brought in.  Obviously, they liked

18   my style of drawings.  So I did a lot of drawing sketches

19   for, you know, I think she was a project designer at the time

20   that was on my team.  And I did work orders.  Go to the

21   different departments in the design center, like hair

22   department, face, and talk to them.  Pretty much worked with

23   the designer and the manager as to what they needed.

24   Sometimes I would tidy up the area if I wasn't too busy.  But

25   yeah, anything they wanted me to do, I would do.

1  **Q.**  And as a designer, did your job duties change from

2  assistant designer?

3  **A.**  Yes, eventually I got more responsibility.  So I got to

4  work on -- because as an assistant, I would assist on

5  projects, and as a designer, I got to actually do my own

6  projects.

7  **Q.**  Did you become a salaried employee when you became a

8  designer?

9  **A.**  Yes.

10  **Q.**  And do you recall what your salary was when you became a

11  salaried employee?

12  **A.**  I don't.  I don't recall.

13  **Q.**  Did your position change again at some point after that?

14  **A.**  Yes.

15  **Q.**  And what was the next position you held?

16  **A.**  I think I became a senior designer.

17  **Q.**  And when was that approximately?

18  **A.**  I don't recall.

19  **Q.**  Is that the position that you hold now?

20  **A.**  No.

21  **Q.**  All right.  And so your job changed again?

22  **A.**  Yes.

23  **Q.**  And what was the next position that you held?

24  **A.**  I think I became then a project designer.

25  **Q.**  And were each of these in effect promotions?

1   A.   Yes.

2   Q.   Do you recall what your salary was when you became a

3   senior designer?

4   A.   I don't.

5   Q.   Do you mind if I ask what your salary is now?

6   A.   No.

7   Q.   Would you tell us, please?

8   A.   I think it's $125,000 a year.

9   Q.   While at Mattel -- what are your duties in your present

10  position?

11  A.   Right now I lead a team of designers and sample makers.

12  Q.   Can you tell us a little bit about who these folks are,

13  what their talents and backgrounds are on your team?

14  A.   Sure.   There's a handful of designers, and each one as a

15  different skill level and strength, and I lead them in design

16  ideas, visions, strategies, actually along with another

17  senior manager.   Two senior managers in our team that we

18  lead.   And I give guidance as to direction of where they are

19  headed with the concept.   I approve things and -- yeah.

20  Q.   And what is it that you are working on?   Are these new

21  concepts or new ideas for toys?   What is it?

22  A.   I work on older girl products, and yes, it's new ideas,

23  new concepts, and I work on the My Scene brand.

24  Q.   Can you tell us roughly how many different toy projects

25  you've worked on at Mattel?

1  **A.**    Wow.   10 years, it's a lot.   Especially because

2  depending on ones that have actually been produced to the

3  ones we've actually done, I can't even put a number.   It's a

4  lot.

5  **Q.**    Would it be fair to say that there are dozens of

6  different toy projects and ideas that you have worked on?

7  **A.**    I would say hundreds.   It's a lot of projects.   Yeah.

8  **Q.**    Have you worked on both Barbie and non-Barbie products?

9  **A.**    Yes.

10 **Q.**    Have you worked on the aesthetics for dolls in the

11 Barbie category?

12 **A.**    Yes, I have.

13 **Q.**    And also for dolls outside of Barbie?

14 **A.**    Yes.

15 **Q.**    You did some work on a doll project called Toon Teens?

16 **A.**    Yes.

17 **Q.**    What was Toon Teens?

18 **A.**    Toon Teens was, I call it my baby project because it

19 was, I think, one of the first big projects that I was, you

20 know, assigned to, you know, on my own.   I wasn't really

21 assisting anybody with it.   So Toon Teens was a project that

22 I worked on based on a decal that my manager really, really

23 liked.

24 **Q.**    And what was your role in the Toon Teens project?

25 **A.**    I was taking lead on that concept.

1    Q.   And was it based on something that you created?

2    A.   Yes.   On a decal I had done for a concept called Cool

3    Skating Barbie.

4    Q.   And can you recall when it was that you were asked to do

5    that decal for the Cool Skating Barbie?

6    A.   I don't remember.   I know that the package said it was

7    1999, and usually that's like when it's coming out.   So

8    usually I would say it was roughly a year before that.  So it

9    could have been late 1998, early '99.   I don't remember.

10   Q.   And in terms -- you told us that you started work at

11   Mattel in April of 1998.   Can you tell us whether or not you

12   were asked to come up with that decal figure shortly after

13   you had started at Mattel?   Was it close in time, in other

14   words?

15   A.   I don't remember.   It could have been a few months.

16   Q.   Does it seem to you that it was sometime in mid-1998?

17   A.   Excuse me?

18   Q.   Does it seem to you that it was sometime in mid-1998

19   that you began work on that decal?

20   A.   It's possible.   But I'm not sure.

21   Q.   And how did you -- how did you first get this assignment

22   to work on the Cool Skating Barbie decal?

23   A.   Well, it was like any -- I was just -- it was like any

24   other project that I was just helping the project designer,

25   assist her in various aspects of any -- I could be working on

1    assisting on numerous projects at the same time.  So that

2    could have been just like, hey, we need a decal.  We're

3    thinking something cool, funky.  See what you can come up

4    with.  And then I would just go from there.

5    Q.   Is that something you then did?  You were asked to come

6    up with something, did you say funky?

7    A.   Yeah, they wanted to go, you know, it was cool skating.

8    So something cool.

9    Q.   And as a result of that, what did do you?

10   A.   I remember doing a couple of drawings, and I remember

11   showing them to my manager.  And she picked the one that I

12   then further developed.

13   Q.   All right.  Let's put on the screen 257-1, which is

14   already in evidence.  This is the Cool Skating Barbie that

15   you referred to?

16   A.   Yes.

17   Q.   And if you could just quickly look at the pages behind

18   that tab, which are not yet in evidence.  They are 257-2

19   through 257-9.  And I'd ask you if you can identify those

20   other pages.

21   A.   Yes.

22   Q.   What are they?

23   A.   They are close-ups of the packaging.

24            MR. QUINN:  I'd offer those in evidence, your

25   Honor.

432

```
1              MR. NOLAN:  No objection.

2              THE COURT:  Admitted.  You may publish.

3         (Exhibits 257-2 through 257-9 received.)

4    Q.   BY MR. QUINN:  If we would maybe kind of quickly go

5    through those so the jury can see what we're referring to

6    here.  Were there other Cool Skating Barbie dolls as well?

7    A.   Yes.  Barbie has friends.

8    Q.   Do you remember their friends names?

9    A.   Teresa and Christie.

10   Q.   If we could look at Exhibit 258-1 in evidence, your

11   Honor.  And that's Teresa?

12   A.   Yes.

13   Q.   And if we could look at the other pages behind the tab

14   which are not yet in evidence.  258-2 through 258-9.  And my

15   question to you will be whether those are copies of the

16   packaging for the Teresa Cool Skating Barbie.

17   A.   Yes.

18              MR. QUINN:  I offer that in evidence, your Honor.

19              MR. NOLAN:  No objection, your Honor.

20              THE COURT:  Admitted.  You may publish.

21        (Exhibits 258-2 through 258-9 received.)

22   Q.   BY MR. QUINN:  And if we could quickly go through those

23   as well.  And while we're doing that, if you could turn,

24   please, to Exhibit 259.  And 259-1 is already in evidence.

25   If we could put that up on the screen.  And could you
```

433

```
 1   identify Exhibit 259 for us?
 2   A.    Yes.
 3   Q.    That's Christie?
 4   A.    Yes, correct.
 5   Q.    And each of these have a version of your decal?
 6   A.    They do.
 7   Q.    And if you'd look at the remaining pages behind
 8   Exhibit 259-1.  That is, 259-2 through -8.  And I'd ask you
 9   if those are copies of the images of Christie, the third Cool
10   Skating Barbie.
11   A.    Yes.
12         MR. QUINN:  I'd offer those in evidence, your
13   Honor.
14         MR. NOLAN:  No objection.
15         THE COURT:  Admitted.  You may publish.
16         (Exhibits 259-2 through 259-8 received.)
17   Q.    BY MR. QUINN:  You indicated that, when you were given
18   this assignment, you began to do some drawing.
19   A.    Yes.
20   Q.    Would you look, please, at Exhibit 260?
21   A.    Yes.
22   Q.    And I would ask you if you can identify -- there's
23   several pages behind 260.  260-1 through 260-6.  Let's stop
24   at 260-6.  And I'd ask you if you can identify those pages.
25   A.    Yes.
```

1    **Q.**   And what are they?

2    **A.**   They are some of my drawings for the decal.

3                MR. QUINN:   I'd offer in evidence 260-1 through

4    260-6.

5                MR. NOLAN:   No objection.

6                MR. QUINN:   And if we could --

7                THE COURT:   They are admitted.   You may publish.

8                **(Exhibits 260-2 through 260-6 received.)**

9    **Q.**   BY MR. QUINN:   If we could publish, and could you tell

10   us what that is?

11   **A.**   Yes, that's the original one for Barbie, the decal for

12   her Cool Skating Barbie.

13   **Q.**   All right.   And if we could look at the next -- is that

14   the first thing that you came up with, or did you have to do

15   some experimenting and drawing before you could come up with

16   that?

17   **A.**   Yeah, usually -- I mean -- this is on the other page.

18   **Q.**   Turn to the next page.

19   **A.**   Yeah.

20   **Q.**   If we could look at 260-2.

21   **A.**   On the two top ones, I remember showing them to my

22   manager, and she picked the one with the -- the more stylized

23   versus the more Barbie-esque one.   But I remember doing --

24   like I have to play with the lines and see how it's going to

25   really go.   It depends on the approach and the project.

1   Q.   You did both of these drawings that are depicted?

2   A.   Yes.

3   Q.   But the girl on the left looks like she's pretty good on

4   skates.

5   A.   Yes.

6   Q.   Whereas the other one has her hands out like this.

7   A.   Yeah, she's a little bit like a balancing, kind of like

8   "I'm not sure."

9   Q.   You know, now, the image on the left, that is what --

10  that's the final form of the -- of what you arrived at for

11  the decal?

12  A.   Yes.

13  Q.   And before you got to that point, did you do some

14  playing around to come up with the drawing?

15  A.   I do.   I have to play with the lines and see where they

16  take me.

17  Q.   Play with the lines and see where they take you?

18  A.   Yeah.

19  Q.   Is that a process -- I said the left, and I meant the

20  right.   I think you folks knew.

21  A.   Yeah.

22  Q.   Play with the lines and see where they take you.   Is

23  that -- is that a process that you can illustrate for the

24  jury?

25  A.   Like literally illustrate it?   Yes.

1   Q.   We just happen to have just by coincidence an easel up
2   there with some paper --
3   A.   I could draw all day if that's what you're asking me.
4            MR. QUINN:   With the Court's permission, your
5   Honor.
6            THE COURT:   Yes.
7            MR. QUINN:   Could you illustrate for the jury what
8   this process is, what it means to go with the -- what did you
9   say, with the line and play with it.   Would you mind standing
10  up?   There should be some magic markers there.   And let's
11  begin first with a fanciful figure.
12  A.   You mean like fashion?   What do you mean?
13  Q.   Well, not necessarily fashion, but something
14  imaginative.   Go with wherever the line takes you.
15  A.   They just talk to me.
16  Q.   Who is talking to you now?
17  A.   The lines.   I just let my mind just start to -- like my
18  hand move.   And since I really focus a lot on fashion, I do a
19  lot of girls and stuff.   So I'm pretty aware of the female
20  form.   So I just like -- I'm very PG; so I have to put shells
21  on my doll.
22            And I could just go on and on.   And I just pick the
23  lines that are the strongest, and what I would do is after I
24  do something really rough like this, I would probably come
25  back and pick my favorite lines that really tell the

1   structure, what I'm really going for.  You know, like -- I

2   could go on.

3   Q.    Are there some of those lines you like better than

4   others?

5   A.    Yeah.

6   Q.    Which ones do you like and why?

7   A.    Well, I'd probably go back with -- you know, because

8   it's a bunch of jumble, but to me it's like when I would go

9   back and redo it, I would just like define it more.  So, you

10  know, there's like a bunch of them.  So I would just pick one

11  and just go.  But at least I've create the basic thing that

12  I'm looking for.

13  Q.    Okay.  And would you call this a fashion design here?

14  A.    It's fashionable.  But to me right now it's just a basic

15  mermaid, very traditional.  If I were to put clothes on her,

16  she would definitely be fashion.

17  Q.    Can you do us a more conventional fashion drawing, just

18  pull the page over and show us a more traditional fashion

19  doll or fashion drawing?

20  A.    I could go into as much detail.  This is like really,

21  really rough.

22  Q.    How would you flesh out -- if you were to go further

23  with this, and fleshing out the fashions, how would you do

24  that?

25  A.    I'd probably put another piece of paper and start

1  cleaning it, and I could probably do that a couple of times

2  until I'm happy with it.  But usually I start with the pose,

3  so she would probably be -- I mean not naked.  In the

4  industry we call it a croqui.

5  Q.   What's a croqui?

6  A.   A croqui is when you would -- what they taught me in

7  fashion design school, it's like a fashion figure, and it's

8  defined by they call the nine-head figure.

9  Q.   Could you turn the page and illustrate that for us?

10  A.   Sure.  And it would be the basic, like, and then you can

11  move it around.  So you get nine heads, you know, about the

12  same size.  And you start designing your dolls.  I know it

13  doesn't look like much, but that's the basic.

14        So the first one is the head.  The second one is

15  the torso.  This is the neck.  Shoulders, waist, crotch,

16  knees, and ankles.  And then your elbows, your wrist, and

17  your hands.  And then this little head is the bust.  So I

18  don't know if you could see it.  You can see the long model

19  type body that is formed by doing the nine heads with the

20  long legs.  So that's like your basic.  And they teach you

21  how to move it around.

22  Q.   Thank you.  And if you can go take the seat again.

23        MR. NOLAN:   Your Honor, for the record, can we have

24  these three illustrations marked?

25        THE COURT:   They should be.  Can you identify a

1  number, Counsel?

2          MR. QUINN:  Next in order.  Maybe if we can do it

3  at a break, we can get that information.  I had the same

4  thought.

5          MR. NOLAN:  Oh, it wasn't my original?

6          And, your Honor, we think that they should be

7  offered.  We have no objection to them being offered into

8  evidence once they are marked.

9          THE COURT:  Very well.  We'll do that.

10          THE WITNESS:  Can I go back and date them?

11  Q.  BY MR. QUINN:  Thank you.  If we could look back at the

12  Exhibit 260-2, which is on the screen here.  You indicated

13  that that red-headed girl in the upper right hand was one of

14  the final forms of this decal?

15  A.  Yes.

16  Q.  And then did you -- and if we could go back to the full

17  page.  On the left-hand side, it looks like there's a couple

18  of them that are just black and white-out lines that look

19  very similar.  The hair is a little bit different and there

20  may be some other changes.  Was there some relation between

21  the color one, that one in the upper right, if we can go

22  back, between that one and those two?

23  A.  The two in the middle black and whites?

24  Q.  Yeah, those two black and whites that we just looked at.

25  A.  Yeah, those are two variations.  Since my manager

1    approved the first one, I needed to do variations for the

2    friends.  So these were two, and I decided on one of them.

3    And then I proceeded to color it.

4    Q.    All right.  And how did you create that one of the black

5    and whites, the variations?

6    A.    From the original, with the pom-poms on her hair, I put

7    a paper over it, and as I'm drawing, I'm changing the

8    clothes, but kept the croqui, or the body, the same.

9    Q.    So the colored one, you traced over to create black and

10   whites?

11   A.    Yes.

12   Q.    The black and white version?

13   A.    I don't recall if I traced it when it was colored

14   already or it was in black and white, too.

15   Q.    It might have been either?

16   A.    Yeah.

17   Q.    And your purpose in doing that is what?

18   A.    It's to get the same essence and feel of the original

19   but with different hair, makeup, and clothes.

20   Q.    That's for one of the other three dolls in the group,

21   for the decal?

22   A.    Yeah.

23   Q.    If we could look at the next page, please, 263.  Can you

24   tell us what we're looking at there?

25   A.    Yeah, that's the decal for Barbie.

1    **Q.**   And the one on the right that's black and white, do you

2    recall why that one specifically was created?

3    **A.**   I think that one was created after the visual designer

4    or development designer had done it graphically.  I was

5    trying to illustrate that it wasn't quite the same.

6    **Q.**   All right.  So who is the visual designer?

7    **A.**   Visual designer is like when I was doing this, I was a

8    prelim designer.  So I was in charge of preliminary ideas,

9    concepts.  And then after it gets approved, then we get the

10   visual designer or development designer, whatever it's

11   called, you can call it either way, to go ahead and then

12   prepare that for production.

13   **Q.**   Okay.  So is that like a different department?

14   **A.**   It's not a different department.  It's just a different

15   position.  Like it's just another person with that position.

16   It's like a partner.

17   **Q.**   And do they -- can you tell us whether they do work on a

18   computer, or do they use the same tools you do, or do they

19   work with different things?

20   **A.**   I believe they mostly work on the computer, but it

21   doesn't necessarily mean always.  For this particular one,

22   because my drawing was more organic, it had, you know, pencil

23   marks, like a drawing pencil and marker and stuff.  We needed

24   to get it more, a cleaner look, get it ready for processes

25   that will be done for the decal.  So he has to like simplify

1    it a little bit.

2    Q.   The visual designer has to?

3    A.   Like in the computer, with a program.

4    Q.   When you're tracing, as you indicated you did, do the

5    lines speak to you when you're tracing?

6    A.   Not when it's -- well, when it's already a drawing that

7    I am going to move forward, whether it's one that I liked or

8    something that got approved, I -- for this particular

9    project, I wanted to keep the same pose for all three because

10   usually what we do is when we do the two friends with Barbie,

11   she has -- usually they all have the same outfit in different

12   colors.  So I saw no difference to change the pose.  Just

13   keep the same pose, change the colors and the fashions and

14   the hair.  So yeah, I didn't -- I forgot what you asked.

15   Q.   I was asking about tracing.

16   A.   Oh, the tracing.

17   Q.   When you trace, we all saw you draw that with a marker

18   with a very free-flowing hand.  When you're tracing, are you

19   doing the same thing with a free hand?

20   A.   I am when I'm changing stuff, which is the clothes and

21   the hair.

22   Q.   But before you do the change, if you're just tracing the

23   outline.

24   A.   Right, like the only thing that's defined is the body.

25   So I could retrace that again because say if I did a new

1   hairdo, the lines might not be right, and I might retrace

2   that one again and clean that up.  So until I get it right, I

3   keep doing it.

4   Q.   All right.  If you'd look, please, at the next page,

5   260-4.  And we have three images there.  The bottom two are

6   cut off.  But they look like they are pretty much the same.

7   And it says visual design over the top.  Can you explain to

8   us what those are?

9   A.   So this was what visual design had done.  So this, I

10  believe, was done in the computer, and I wasn't satisfied

11  with it.  So that's what that is.  And you see the original

12  next to it.  And yeah.

13  Q.   You -- had you given the visual design folks your

14  initial drawing?

15  A.   Yes.

16  Q.   And they sent something back?

17  A.   Yes.

18  Q.   Which you weren't crazy about?

19  A.   No.   I felt they didn't capture the essence of what I

20  wanted.

21  Q.   And how did you deal with that?  There was apparently a

22  disconnect between you and visual design?

23          MR. NOLAN:  Your Honor, objection.  Leading.

24          THE COURT:  Sustained.  Rephrase, Counsel.

25  Q.   BY MR. QUINN:  How did you respond?

1  A.   So when he showed it to me, I was like, well, you know,

2  it's not quite what I'm looking for.  And I think I proceeded

3  to show him my original drawing again and say see how this is

4  like this and like that?  Because I understand he has this

5  process and the way he has to do it on the computer.  I

6  wasn't as computer savvy as him.

7       So I was trying to best explain that it can't be

8  exactly what I had come up with, because like I said, mine

9  was more organic.  So I proceeded to like verbally explain to

10 him and like look at the curve and see how it's like this, or

11 this is too pronounced, or X, Y, and Z.

12 Q.   In addition to verbally pointing it out, did you give

13 him another design?

14 A.   Yeah, I think that that's what that other one that we

15 had seen before was.

16 Q.   If we could turn to 260-3.  Are you referring to one of

17 these designs?

18 A.   Yes.  I think I remember trying to compromise because

19 this was more -- it was more -- the lines were more defined.

20 Q.   Are you referring to which one of these two?

21 A.   I'm sorry.  The black and white one.

22 Q.   On the right side?

23 A.   Yes.

24 Q.   How did this decal that you created relate to the Toon

25 Teens project?

1    **A.**    So you know, we had done this, and I recall my manager

2    at the time, Debbie, coming over to me and saying hey, I

3    talked to Ivy, or they were assigned some things to tell the

4    designers to come up with stuff, and she thought about me and

5    said hey, why don't you make this into a Flanker doll.

6    That's what Ivy had said, new ideas, new doll projects that's

7    not necessarily Barbie, and I said really?  She said yeah, I

8    think this would be really cool as a doll.  So I said all

9    right, I'm game.  You know, yeah.  So she just left it up to

10   me and what I wanted to do with it.

11   **Q.**    And how did you feel?  At that point you're at Mattel

12   roughly how long?

13   **A.**    I don't know.  I mean, maybe a little over a year.

14   **Q.**    How did you feel about being asked to develop a doll

15   project based on your decal?

16   **A.**    I was totally psyched.  I think I was still an assistant

17   designer.  So that was huge for me.  I was like, you know, a

18   little girl in a candy shop.  I was like okay.  I didn't

19   really know how I was going to do it, but I was going to try.

20   **Q.**    Could you look, please, at Exhibit 263.  And there's a

21   number of pages 4.  263-1 through -9.  And I'll ask you if

22   you can identify those.

23   **A.**    Yes.  These are my drawings for Toon Teens.

24             MR. QUINN:  We'd offer those, your Honor.

25             MR. NOLAN:  No objection.

446

1    THE COURT:  Very well.  They are admitted, and you
2    may publish.
3          **(Exhibits 263-1 through 263-9 received.)**
4    Q.   BY MR. QUINN:  And if we could walk through those,
5    please.  Why are some of them different?  Some of them have
6    hair and nothing else.  Some of them have clothes and are
7    fully colored in.  Could you explain that, please, to the
8    jury?
9    A.   Yeah, some of them, like these, for example, are a
10   little more developed because I think I liked them more.
11   Like the whole thing.  So what I would do, I call these my
12   working sketches because they, if they were fully colored,
13   that means I was going to go ahead and make copies of this to
14   give to the various departments for the -- in the design
15   center.  The ones that are not fully colored, like, say, one
16   of them had just the hair color, I think I was just going to
17   focus on giving that particular drawing to the hair
18   department so they can make me a wig.
19   Q.   Okay.  If we can continue going through these.
20   A.   And then those things are little swatches of fabric.
21   Q.   What are those little floating blocks of color?
22   A.   Those are little fabric swatches that I would specify to
23   the pattern maker and sample maker of what I wanted the
24   outfits to be made out of.
25   Q.   Continuing, you heard Ms. Ross say this yesterday.  Did

447

1   anybody ever tell that you they thought the Toon Teens

2   drawings looked like you?

3   **A.**   Yes.   It's just, you know, because it's a doll, and I

4   don't think I look like a doll, but it's flattering.   Yeah,

5   in fact, we actually -- the model makers used to tease me

6   about them and call them the Lily Pads.

7   **Q.**   Lily Pads?

8   **A.**   Yeah, like they just called oh, you're working on your

9   Lily Pads.

10  **Q.**   Was that kind of a nickname that you had?

11  **A.**   They used to call me Lily Pad.

12  **Q.**   And then Exhibit 262.   Could you identify these as well?

13  Are these the same thing?

14  **A.**   262?

15  **Q.**   Yeah.   Exhibit 262.

16  **A.**   I don't think I have 262.

17  **Q.**   You don't have a 262?

18  **A.**   I don't think so.

19  **Q.**   Okay forget about it, then?

20          MR. NOLAN:   We don't have it either.

21          MR. QUINN:   I'm the only one that has it.

22  **Q.**   All right.   So after you had done these drawings and you

23  were satisfied with the drawings for this Toon Teens project,

24  what did you do with them?

25  **A.**   With the drawings?

1  Q.   Yes.

2  A.   So like I said, I picked some -- picked my favorites,

3  and I went ahead and used these drawings to give to the

4  various departments that were going to help me bring these

5  dolls to life.  So I handed them off to -- I had meetings

6  or -- not meetings.  More like I would go to a certain person

7  in the department and talk to them about it.  So hair

8  department, face department, sculpting, our model makers, our

9  sample makers, our pattern makers.

10  Q.   Were you proud of these drawings?

11  A.   Yes.

12  Q.   Did you keep copies in your cubicle?

13  A.   I believe so, yes.

14  Q.   Were they sort of displayed at a place, in a way that

15  people could see them if they were walking by?

16  A.   Our cubes are like, you can pin things on them.  Like

17  the whole wall is like that.  So yeah, they were my babies.

18  They were up.

19  Q.   And did you reach a point where you actually developed

20  appropriate types of the dolls?

21  A.   Yes.

22  Q.   And where were they kept?

23  A.   In different stages of the process, I would get pieces

24  of the doll.  So I could have a wig on my desk.  A head.  So

25  yeah, I would have parts of them, parts of the doll.

1   Eventually I got all the parts that I would put it together,

2   and it would be a prototype.

3   **Q.**   And were these prototypes, when they were done, were

4   they ever out where people could see them in the design

5   center?

6   **A.**   Yes.

7   **Q.**   And where was that that they were displayed?

8   **A.**   They were in our -- in this area that we call -- like

9   every team has like a working table.  Like an open table for

10  like, you know, to put your projects there.  To either work

11  on or display, or like if we have a meeting, we can show them

12  there.

13  **Q.**   Did you know a person named Carter Bryant at Mattel?

14  **A.**   Yes, I did.

15  **Q.**   When did you first meet him?

16  **A.**   I met him -- I don't know the date exactly when I met

17  him, but I recall being introduced to him by Elise Cloonan.

18  **Q.**   Who is Elise Cloonan?

19  **A.**   Elise Cloonan, I think, was a visual designer who worked

20  with me.

21          THE COURT:  Counsel, you're getting into another

22  area.  I'm going to stop you here.  Why don't we take our

23  lunch break at this time.

24          Ladies and gentlemen, we're going to take a lunch

25  break until 1:30.  We'll see you back here at 1:30 sharp.

450

```
 1              (WHEREUPON THE JURY WITHDRAWS.)

 2              THE COURT:  Counsel, please be seated.  I'd like to

 3    see counsel back here at 1:15 to take up the discovery

 4    matter.  Are there any other matters that we need to take up

 5    this afternoon from counsel's perspective?  Mr. Nolan?

 6              MR. NOLAN:  Not for MGA.

 7              THE COURT:  Mr. Quinn?

 8              MR. QUINN:  No, your Honor.

 9              THE COURT:  Very well.  I'll see you at 1:15.

10

11              (Lunch recess taken at 12:00 P.M.)

12

13                   C E R T I F I C A T E

14

15

16         I hereby certify that pursuant to Title 28,

17    Section 753 United States Code, the foregoing is a true and

18    correct transcript of the stenographically reported

19    proceedings in the above matter.

20         Certified on May 28, 2008.

21

22

23    MARK SCHWEITZER, CSR, RPR, CRR
           Official Court Reporter
24         License No. 10514

25
```