1844

1   confessed that they were using workers of another company who

2   would be fired if they -- if it was learned they were working

3   for you and who had a hundred years of doll-making experience

4   between them?  Why wouldn't you expect her to tell you that?

5   **A.**   We have over 1,000 employees.  If everyone came to tell

6   me about every e-mail they have, I would never get any work

7   done.  So I expect them to do their jobs.

8   **Q.**   Mr. Larian, I want to show you some documents to see if

9   you can identify them.  And I'll identify the first as

10  Exhibit 11665 for identification.

11           MR. NOLAN:  These are not on the exhibit list.

12           One moment, your Honor.

13           THE COURT:  You may.

14           MR. PRICE:  Can we go to sidebar on this?

15           THE COURT:  Sidebar.

16           **(SIDEBAR CONFERENCE HELD.)**

17           THE COURT:  Can I see the document?  Thanks.

18           MR. PRICE:  I don't want to examine Mr. Larian on

19  these documents.  They are three documents.  They are e-mails

20  from Mr. Gronich saying preserve your e-mails.  We want them

21  authenticated in case they become relevant.  Because he's the

22  one to authenticate them.  So I suggested that we agree that

23  they are authentic.  They are not admitted into evidence.

24  But the authenticity is stipulated to, and if they become

25  relevant.

1845

1    THE COURT:   What's the objection?

2    MR. NOLAN:   We don't have an issue with respect to

3  the authenticity.  I was just handed this.  I'm assuming this

4  is the exact copy that was sent out.  I was just handed this.

5  This is in 2005.  This has nothing to do with Mr. Larian's

6  testimony right now, and I told Mr. Price that we could work

7  this out, and that Ms. Gronich is going to be a witness in

8  this case, and we're not going back on the basis of

9  authenticity, but it shouldn't be used with this witness in a

10  2005 document.

11    MS. AGUIAR:   And it also goes to basically what is

12  essentially discovery in this litigation.  And I don't want

13  to over-interpret the motion in limine, but we've been

14  objecting to each other's attempt to get into the discovery

15  in this case.  And so I also don't see how this even

16  conceivably could become relevant.

17    THE COURT:   Let me hear counsel.  I'm not really

18  sure.  I'm not finding what's relevant about these documents,

19  05, 06, and 07 regarding document retention as a result of

20  litigation.

21    MR. PRICE:   Two responses.  I'll let Mr. Zeller

22  respond to that particular question.

23    I don't plan to go into these with him.  So what

24  I'm saying --

25    THE COURT:   Let me hear from Mr. Zeller.

1    MR. ZELLER:  As the Court knows, there will be

2    spoliation issues.  Obviously, they may or may not come in.

3    But this would be a predicate in the event that these issues

4    of spoliation evidence come in, as we believe that they

5    should.

6        THE COURT:  I think this is premature at this point

7    in time.  Mr. Larian is not going anywhere.  The Court will

8    give you leave to recall him.

9        MR. NOLAN:  It's not going to be an issue.  Let's

10   move along.

11       **(CONCLUSION OF SIDEBAR CONFERENCE.)**

12       THE COURT:  You may proceed, Counsel.

13       MR. PRICE:  Thank you, your Honor.

14   **Q.**   By the way, so that we know what Ms. Garcia's position

15   was in 2005 when that e-mail, 13223, was sent to you and --

16   sent to her and copied to you, at that time she was a

17   vice-president of the company?

18   **A.**   Either director or vice-president.

19   **Q.**   Pardon?

20   **A.**   Either a director or vice-president.

21   **Q.**   And could you explain to the jury what a director of the

22   company is?

23   **A.**   It's basically she has people working for her

24   underneath.  She was promoted from a product manager to a

25   director.

1  Q.    And she reported directly to you?

2  A.    She did.

3  Q.    Switch topics now.

4        Did at any time MGA have a P.R. department?

5  A.    Yes, we do.

6  Q.    And for how long have you had a P.R. department?

7  A.    I believe since late 2000.

8  Q.    And one of your concerns back in, say --

9        THE COURT:  Counsel, identify the P.R. department.

10  Q.    BY MR. PRICE:  What does P.R. stand for?

11  A.    Public relations.

12  Q.    Thank you.  And one of your concerns, since the Bratz

13  dolls went on the market, was you wanted MGA to have a

14  consistent story about Bratz?

15        MR. NOLAN:  Objection as to the relevancy, when the

16  Bratz dolls come into the market.

17        THE COURT:  I'm going to sustain it.

18        Rephrase your question, counsel.  I'm not sure what

19  you mean by consistent story.

20  Q.    BY MR. PRICE:  Through your P.R. department, it was your

21  policy that no one talked to the press about Bratz unless

22  there was clearance in advance about what was to be said?

23        MR. NOLAN:  Objection.  Relevance.  Temporal

24  foundation.

25        THE COURT:  I'll sustain the temporal foundation.

1848

1    **Q.**    BY MR. PRICE:  Beginning in 2001, 2002, there were press

2    reports about Bratz; correct?

3    **A.**    Yes.

4    **Q.**    And you were quoted in press reports saying certain

5    things about who was the inspiration for Bratz, how Bratz was

6    created, et cetera; correct?

7    **A.**    There were press reports about Bratz, sure.

8    **Q.**    And in those press reports, for example, we saw The Wall

9    Street Journal article, which talked about the sort of

10   fashion doll contest.

11          Do you recall that?

12   **A.**    I do.

13   **Q.**    And I just want to establish that in talking to the

14   press about those topics, it was important to you that there

15   would be agreement in advance as to what was going to be said

16   to the press.

17   **A.**    We have a company policy that I don't want other

18   people's names to be -- who worked for MGA to be in the

19   press, and the reason for that is I don't want headhunters to

20   be calling them.

21          MR. PRICE:  Move to strike as nonresponsive.

22          THE COURT:  I suppose it is, Counsel.  I'll strike.

23   The question is whether or not there was a -- an agreement,

24   not what the agreement was or why the agreement existed.

25   Sustained.   Stricken.

1849

1    Q.    BY MR. PRICE:  Let me try to help move this along.  If

2    you look at Exhibit 633 for identification.  Have you found

3    that?

4    A.    Yes, go ahead.

5    Q.    Did you have a policy that no one was talking to the

6    press until they got clearance and they knew in advance what

7    was to be said?

8    A.    Yes.

9    Q.    And that policy is reflected in this e-mail; correct?

10   A.    No, that policy is not reflected in this e-mail.  But

11   that's the policy which I just explained to you, that I don't

12   want other people in the company to be talking to the press

13   or quoting to the press for the reason that I don't want

14   headhunters to be calling them.

15   Q.    There's nothing in this e-mail about headhunters, is

16   there?

17   A.    No, there's not.

18   Q.    And my question was this e-mail reflects your policy

19   that there be clearance and knowing in advance what people

20   are going to say so the same story comes out of everyone's

21   mouth.

22   A.    Yes, I can see that that's what's said in this.

23          MR. PRICE:  Your Honor, I move 633 into evidence.

24          MR. NOLAN:  No objection.

25          THE COURT:  It's admitted.  You may publish.

1    **(Exhibit 633 received.)**

2  Q.    BY MR. PRICE:  So this is June 19, 2001.  And perhaps

3  you can tell me there are some names we haven't seen.  Lon

4  Ross?

5  A.    I think he worked at MGA.  I don't know what position he

6  was in.

7  Q.    Dave Malacrida?

8  A.    He's our P.R. person, public relations person.

9  Q.    And in this e-mail, it attaches an article which you had

10 seen; correct?  Or that Mr. Malacrida, your public relations

11 person, had sent to you?

12 A.    Yes, I can see that.

13 Q.    And this is like some of your other e-mails where you

14 look at the e-mail and make your comments by writing things

15 in the attached e-mail.

16 A.    I do.

17 Q.    So for example, where it said the tween age is about 8

18 to 12, which is what Bratz is.

19        You have got your comment here about who said the

20 target is 8 to 12.

21 A.    I do.  I did that.  Those are my comments.

22 Q.    And this article quotes, for example, Mr. Ross; correct?

23 A.    Yes, I see his name there, yes.

24 Q.    And if we go to the next page, see up here, it quotes

25 Ms. O'Connor; correct?

1851

1   A.   Yes.

2   Q.   And then you have your little comments here about more

3   like real girls.

4        Do you see that?

5   A.   Yes.

6   Q.   And in the next few pages, it also quotes either

7   Mr. Ross or Ms. O'Connor; correct?

8   A.   Yes, it does.  I can see a couple of them.

9   Q.   And certainly at this time you regarded Ms. O'Connor --

10  what was her position at this time?

11  A.   She was in charge of licensing, and I believe she was --

12  I believe public relations reported to her at the same time.

13  Q.   And licensing obviously was an important activity of

14  MGA.

15  A.   As of 2001, no, we hadn't started licensing yet.

16  Q.   So at that point you're planning to license, obviously.

17  A.   That's right.

18  Q.   You predicted that it would be a large profit area for

19  MGA.

20  A.   We wanted to start the licensing department, and she

21  started it.

22  Q.   So let's go to the first page again.  Your response

23  here.  You'll agree that nothing in here says I don't want

24  Victoria O'Connor or Mr. Ross to be quoted.

25  A.   It doesn't say that.  I'm sorry.  It says that no one

1852

1  talks to the press.  I assume that means Victoria O'Connor

2  and Lon Ross.

3  **Q.**   What you say is we had a policy that no one talks to the

4  press until we get clearance and know in advance what we are

5  going to say; correct?

6  **A.**   Yes.

7  **Q.**   And your reason for saying you wanted to get clearance

8  and know what we're going to say is because we need to have

9  the same story come out of everyone's mouth.

10  **A.**   That's what it says.  That's what the paper says.

11  **Q.**   So you wanted the same story to come out of your mouth

12  that came out of Victoria O'Connor's mouth, that came out of

13  Mr. Ross's mouth; correct?

14  **A.**   We wanted to have consistency, yes.

15  **Q.**   Now, I'd like you to look at Exhibit 4941.

16  **A.**   Yes, go ahead.

17  **Q.**   And do you recognize 4941 as an e-mail which is Isaac

18  Larian to Isaac Larian, which includes an e-mail from a Chris

19  Palmeri to you?

20  **A.**   Yes.

21         MR. PRICE:  Move Exhibit 4941 into evidence, your

22  Honor.

23         MR. NOLAN:  No objection.

24         THE COURT:  It's admitted.  You may publish.

25         **(Exhibit 4941 received.)**

1  Q.   BY MR. PRICE:  Now, Chris Palmeri was a reporter at

2  Business Week; correct?

3  A.   Yes.  To the best of my recollection, he was, yes.

4  Q.   And these are your e-mail addresses?

5  A.   Yes.

6  Q.   And the subject of this is fact checking?

7  A.   Yes.

8  Q.   And what was going on here is Mr. Palmeri was sending

9  you an e-mail to fact check what he was going to put into his

10  article?

11  A.   That's correct.

12  Q.   And one thing he wanted to make sure is accurate, it

13  says:  "We describe you as a 49-year-old Iranian immigrant,

14  trained as a civil engineer, who modeled Bratz after your own

15  children, who wear midriff-baring shirts, low-rise jeans, and

16  baseball caps"; correct?

17  A.   I do see that, yes.

18  Q.   And actually the article was published which said the

19  Bratz were modeled, inspired by you seeing your own children

20  wearing these midriff-baring shirts?

21        MR. NOLAN:  Objection, your Honor.  Lack of

22  foundation.

23        THE COURT:  Sustained.

24  Q.   BY MR. PRICE:  Step back.  As we saw before, you were

25  concerned about the press that Bratz got; correct?

1854

1  A.    I was not concerned about the -- I am sorry.  Say that

2  again.  I'm getting tired.  So I'm sorry.

3  Q.    It's Friday afternoon.  I don't blame you.

4          You wanted a consistent story about Bratz to come

5  out through the press.

6  A.    Yes.

7  Q.    And you would monitor to make sure that that consistent

8  story came out through the press.

9  A.    I did not monitor every piece of press that came out on

10 Bratz.  It's not possible to do that.

11 Q.    Well, did you monitor, when you have reporters contact

12 you for fact checking, would you then -- when reporters would

13 contact you to fact check an article, would you then read the

14 article?

15 A.    I have no idea whether I did or not.

16 Q.    Did you read the Business Week article that came out as

17 a result of this fact checking?

18 A.    I don't recall that.  I might have.  It's very possible.

19 Q.    You did read the e-mail, however, that you got from

20 Mr. Palmeri.

21 A.    Again, my name is on it.  So I assume I have read it.

22 Q.    And it was your understanding that what was going to be

23 published in the article was that you were a 49-year-old

24 Iranian immigrant, trained as a civil engineer, who modeled

25 Bratz after your own children, who wear midriff-baring

1  shirts, low-rise jeans, and baseball caps?

2  **A.**   What's your question?

3  **Q.**   It's your understanding that that information was the

4  information that was going to go into the article published

5  by Business Week?

6  **A.**   Probably, yes.

7  **Q.**   And that's why the fact checking, to make sure they

8  should say that; right?

9  **A.**   I hope so.  I don't know what was in his mind to send me

10 that e-mail.  You should ask him.

11 **Q.**   You don't understand he's trying to accurately make sure

12 he's going to say the right thing?

13 **A.**   His e-mail says fact checking.

14 **Q.**   So that's what you understood he was doing; right?  He

15 was saying hey, can I publish this and would it be accurate?

16 **A.**   Yes.

17 **Q.**   Okay.  Now, we're talking here about midriff-baring

18 shirts, low-rise jeans.  If you'd look at Exhibit 302.

19 **A.**   Yes, go ahead.

20 **Q.**   These are the drawings that Mr. Bryant gave you in

21 September of 2000; correct?

22 **A.**   I believe so, yes.

23 **Q.**   And if we look at 302-003, for example, the drawings

24 included hiphugger jeans; right?

25 **A.**   Yes.

1856

1  **Q.**   Same as low-rise jeans?

2  **A.**   Yes, that's what my daughter wore.  That's what all the

3  other girls wore at that time.

4  **Q.**   Short T-shirt; right?

5  **A.**   Yes.

6  **Q.**   Midriff-baring?

7  **A.**   Yes.

8  **Q.**   In fact, a number of drawings in here like that.

9  **A.**   Yes, they are.

10  **Q.**   Where you have these hip hugging jeans and

11  midriff-baring shirt; right?

12  **A.**   Yes.

13  **Q.**   Mr. Bryant's drawings were the inspiration for Bratz.

14  **A.**   They were the inspiration for Bratz.

15  **Q.**   It's correct that -- if we can put up 4941 again.

16        Sitting here today, you consider that statement as

17  being partly true?

18        MR. NOLAN:  Objection, your Honor.  Foundation as

19  to what time.  2003?  Partly true of what?

20        THE COURT:  You are asking for foundation.

21  Sustained.

22  **Q.**   BY MR. PRICE:  Do you have an understanding as to

23  whether or not that statement is true or not?

24  **A.**   As of when?

25  **Q.**   Well, say, at the time of your deposition.

1  **A.**   Well, you know, this goes back to the 2000 -- September

2  2000.  And at that time my daughter Yasmin and her friends

3  were also wearing clothing that had midriff and -- I don't

4  even know how to say that.  I'm sorry.  Low-rise jeans,

5  et cetera.  And I put the two together.  That's what the kids

6  were wearing at that time.  And again, Carter Bryant's

7  drawings and -- look at my own kids -- was I put the two and

8  two together that I thought this kind of doll would be

9  successful.  That was one of the reasons we launched Bratz.

10 **Q.**   Were you trying to give the impression that you came up

11 with the Bratz look by just seeing the kind of clothes that

12 your daughter wore?

13 **A.**   No, I was not.

14 **Q.**   But you didn't tell Mr. Palmeri that the first time you

15 saw that look was associated with Bratz, was when Mr. Bryant

16 showed you these drawings?

17 **A.**   I did not.  Nor did I mention Paula Garcia or any other

18 designer who had worked on the Bratz.

19 **Q.**   Well, Ms. Garcia, are you saying she's the one who first

20 thought of these dolls having low-rise jeans, midriff-baring

21 shirts?

22 **A.**   No, she did not.  She was part of the whole design team

23 for the dolls.

24 **Q.**   It would be inaccurate to say that the Bratz dolls were

25 your son Jason's idea?

1858

1   **A.**   Absolutely they were not my son Jason's idea.

2   **Q.**   But you did tell a reporter that.

3   **A.**   I did not.

4   **Q.**   If you look at Exhibit 12058.

5   **A.**   I'm not sure I can find this in this folder.

6   **Q.**   Do you have it in front of you?

7   **A.**   I do.

8   **Q.**   Have you ever seen this article before?

9   **A.**   I don't recall if I have or not.

10   **Q.**   And let me clarify.  Have you seen this article before

11   this litigation?

12   **A.**   Before this litigation?  No, I have seen it during this

13   litigation.

14   **Q.**   Before it, do you not recall one way or the other?

15   **A.**   I do not.

16   **Q.**   Did you talk with a reporter named Wes Weiss?

17   **A.**   I don't recall him, no.  I don't remember.  Maybe I

18   have.  I don't know.

19   **Q.**   Did you tell a reporter that your 17-year-old son Jason

20   came up with the idea for Bratz?

21   **A.**   I did not.  My son came up with a product called

22   Commandobot, but not Bratz.

23   **Q.**   If you look at Exhibit 11209.

24   **A.**   Yes, go ahead.

25   **Q.**   Have you seen the article that's Exhibit 11259?

1859

1    **A.**    Only during the course of this litigation I have.

2    **Q.**    Did you ever tell a reporter that the idea for Bratz

3    came from when your daughter Yasmin and her cousins

4    complained that they were tired of Barbie?

5    **A.**    I don't recall -- I know that my daughter and her

6    friends were tired of Barbie.

7    **Q.**    The idea for Bratz came from Carter Bryant?

8    **A.**    It did.  The original idea for Bratz came from Carter

9    Bryant.

10   **Q.**    You weren't talking to your daughter, and then you came

11   up with the idea for Bratz.  That would be inaccurate;

12   correct?

13   **A.**    I did not come up with the idea for Bratz.  Bratz was

14   inspired by Carter Bryant's drawings.

15   **Q.**    So it would be false to say that you were the brain

16   child behind Bratz?

17   **A.**    For the Bratz drawings or Bratz dolls?

18   **Q.**    Say, for -- for however you use Bratz.

19   **A.**    No, I --

20   **Q.**    Let me finish.  It would be inaccurate to say that you

21   were the brain child behind Bratz?

22   **A.**    Absolutely.  I was the brain child behind the Bratz

23   dolls.  I created it.  I spent my money on it.  I put my

24   creative force into it.  I put my company's resources into it

25   to make it happen.  As far as the drawings were concerned

1860

1    that became the basis for the Bratz, no, I have nothing to do

2    with that.

3    **Q.**   You have testified a number of times that Mr. Bryant was

4    the inspiration behind Bratz.

5           Do you recall that?

6    **A.**   His drawings were the inspiration for Bratz.

7    **Q.**   So it would be less than the complete truth if you

8    stated that you were the inspiration for Bratz.

9    **A.**   I don't even understand what less than completely true

10   means.  So can you rephrase that question?

11   **Q.**   You would not be telling the whole truth if you said

12   that you were the inspiration behind Bratz?

13          MR. NOLAN:  Objection.  Vague and ambiguous as to

14   the doll or the drawings --

15          THE COURT:  Fair enough.  Rephrase, Counsel.

16   **Q.**   BY MR. PRICE:  Let me do it this way.  If you'd look at

17   Exhibit 947.  It appears to be an affidavit.

18   **A.**   It's about 52 pages, yes.

19   **Q.**   Is this your affidavit in the case of MGA Entertainment

20   versus Thomas Christopher Joseph Metson?

21   **A.**   Yes.

22          MR. PRICE:  Your Honor, move Exhibit 947 in

23   evidence.

24          MR. NOLAN:  Your Honor, we have objection with

25   respect to relevance of most of this affidavit.  If Mr. Price

1861

1   can point to it, it's a 52-page affidavit.

2         THE COURT:  You're not planning to complete the

3   examination this afternoon, are you?  Or is this your last

4   part?

5         MR. PRICE:  No, probably not.  I was going to

6   complete it on this topic.

7         THE COURT:  Very well.  Why don't we go ahead and

8   break for the day.

9         Ladies and gentlemen -- for the weekend, actually.

10  Well, this is your last document on this topic?

11        MR. PRICE:  The last document on this topic, yes.

12        THE COURT:  Let me see you at sidebar.

13        **(SIDEBAR CONFERENCE HELD.)**

14        THE COURT:  Mr. Nolan?

15        MR. NOLAN:  Your Honor, Exhibit No. 947, the

16  52-page document from Hong Kong, contains a lot of references

17  to stuff that is just totally irrelevant to 1-A and 1-B.  And

18  I think it raises a significant 403 --

19        THE COURT:  Can we identify particular paragraphs,

20  as we did with the last document?

21        MR. PRICE:  All I wanted to do is identify the

22  caption and identify that he swore under oath and identify --

23  it's actually just -- I think it's paragraph 14 at this

24  point.

25        THE COURT:  14?

1          MR. PRICE:  No, it's not 14.  If I had my copy me,

2   I could tell you.

3          8.   Paragraph 8.

4          MR. NOLAN:  That's the only one you want to use out

5   of the whole document?

6          MR. PRICE:  At this point.

7          MR. NOLAN:  Retract.

8          THE COURT:  Yes.  It's admitted except for that

9   paragraph and the front caption.

10         MR. PRICE:  And the statement under oath at the

11  end.

12         **(Exhibit 947, paragraph 8, received.)**

13         **(CONCLUSION OF SIDEBAR CONFERENCE.)**

14         THE COURT:  Counsel, you may proceed.

15         MR. PRICE:  Thank you, your Honor.

16  **Q.**   If you'd look at Exhibit 947, the caption, down to "I,

17  Isaac Larian, make oath and say as follows."

18         Mr. Larian, this is an affidavit you signed in this

19  case, in the case of MGA Entertainment and Thomas Christopher

20  Joseph Metson; correct?

21  **A.**   Yes.

22  **Q.**   And this was -- let me ask this:  Is this affidavit one

23  that you gave under oath?

24  **A.**   Yes.

25  **Q.**   Is this one of those affidavits you read before you

1  signed it under oath or one you did read before you signed it

2  under oath?

3  **A.**    For sure I didn't read this one.  It's 52 pages.  I

4  don't think I read it.  For sure I don't think I read it.  I

5  relied on my lawyers to prepare this.

6  **Q.**    What was MGA trying to accomplish by submitting under

7  oath to the court a 52-page affidavit signed by you?

8  **A.**    I don't remember the case.  I think it was about

9  somebody -- an infringement, I believe, in general.  In the

10 U.K.

11 **Q.**    And you didn't read any of these 52 pages to determine

12 whether what you were saying to the court under oath to get

13 legal relief was in fact accurate?

14 **A.**    I don't recall reading it, no.

15 **Q.**    Let's go to paragraph 8.

16          Before signing this affidavit under oath, did you

17 read this paragraph, saying, "I established the claimant and

18 was the inspiration behind the Bratz dolls"?

19 **A.**    Yes, I am absolutely the inspiration, the driving force

20 behind the Bratz dolls.  There's no question about it.  You

21 can ask anybody.  I think Victoria O'Connor even testified to

22 that.

23 **Q.**    My question was did you read this statement under oath

24 before you signed that affidavit?

25 **A.**    I don't recall if I read it or not, but that statement

1    is accurate.  I am the inspiration behind the Bratz dolls.

2    I'm the driving force behind the Bratz dolls.  And Victoria

3    O'Connor in this courthouse, your witness, testified to that.

4    Q.    Would you bet your case on that, that she said you were

5    the inspiration behind the Bratz dolls?

6              MR. NOLAN:  Objection, your Honor.  We're not

7    betting anything.

8              THE COURT:  Sustained.

9              Counsel, let's end for the day.  Ladies and

10   gentlemen, we're going to start Tuesday at 10:00.  We have

11   some matters to take up.  Remember, do not read about this

12   case in the paper.  Just a reminder.  And don't discuss it.

13             Enjoy your weekend, and we'll see you Tuesday

14   morning at 10:00.

15             **(WHEREUPON THE JURY WITHDRAWS.)**

16             THE COURT:  Counsel, please be seated.

17             Counsel, the Court is working on -- struggling with

18   trying to figure out what Judge Infante meant with his order

19   concerning the computer hard drives, and I need some

20   assistance from you in terms of some documents.  The

21   documents were filed with Judge Infante, and I'm referring to

22   the original motion before Judge Infante that triggered Judge

23   Infante's order.

24             I'm having trouble, and my law clerks are having

25   trouble retrieving for me those documents because the

1865

1    documents that were going to Judge Infante, while we were

2    sealing them, that was basically the last that we dealt with

3    them.  And so this is specifically what I need.  I need --

4    and I know this is someplace in the exhibits, but I just

5    can't find it.  The discovery master's January 25th, 2007,

6    order itself compelling production of the Carter Bryant hard

7    drives.

8        Both sides refer to it, but I can't seem to find

9    the actual order itself.

10       The second thing is the underlying briefs that were

11   filed by both sides motions for, opposing the motion to get

12   the order to compel the production of the hard drives.  And

13   the only other thing that might be helpful to the Court, if

14   it's possibly available, is a transcript of the hearing

15   before Judge Infante, and just the portion dealing with this

16   particular order.

17       I'm trying to figure out what the actual order

18   covered and didn't cover.  And I don't know, Mr. Zeller or

19   Mr. Nolan, how long it would take to put this together.  The

20   sooner I get to this, the better.  But I understand this is

21   Friday at 5:05.

22       MR. ZELLER:  I believe we can pull that together

23   very quickly for your Honor.  Just if you let us know when

24   and where you would like it delivered, we can arrange for

25   that.

```
 1          THE COURT:  When you say quickly, tomorrow?

 2          MR. ZELLER:  Yes, absolutely, we can have it done

 3  by tomorrow.

 4          THE COURT:  If you can have it delivered to my

 5  home, that would be fine.

 6          MR. ZELLER:  Absolutely.  Is there a preferred

 7  time?

 8          THE COURT:  I wouldn't use the word preferred.

 9          MR. ZELLER:  Is there an instructed time?

10          THE COURT:  That's probably better.  Well, I don't

11  want to impose unreasonable burdens on you.  When would be --

12  as long as I get it sometime before, say, three o'clock

13  tomorrow afternoon.

14          MR. ZELLER:  Sure, that's fine.  Just don't want to

15  unnecessarily disturb you.  Unnecessarily being the operative

16  word.

17          And one other point, your Honor.  Just so the Court

18  knows it's there.  Not trying to foist more material on the

19  Court to be sure, but there were additional motions filed in

20  the aftermath of the original order.  There were --

21          THE COURT:  Following the issuance of the order?

22          MR. ZELLER:  I'm sorry?

23          THE COURT:  Following the issuance of the order?

24          MR. ZELLER:  Correct.  There were motions to

25  enforce that were heard initially on the January 25th, 2007,
```

1   order where the -- there was some dispute about rarely the --

2   even two of the drives that were in our view compelled by

3   that order.

4          So there was at least two rounds of briefing on

5   that.

6          THE COURT:  Was there a subsequent order by Judge

7   Infante?

8          MR. ZELLER:  I would have to double-check on that.

9          THE COURT:  If there wasn't -- all I'm doing at

10  this point, what's before me is a motion to compel the

11  enforcement of the order, and what I'm having trouble doing

12  is deciding what that order required.  So what I want to know

13  is what was before Judge Infante when he issued the order.

14  Anything post, I'm not going to use that to base my decision

15  on.

16         MR. ZELLER:  I can double-check to make sure that

17  there were no actual orders.  It is possible --

18         THE COURT:  If there was.  Certainly if Judge

19  Infante clarified his order in any respect, I would certainly

20  want that as well, but I don't recall reading any reference

21  to that in your moving papers.

22         MR. ZELLER:  It's possible that it may have been

23  resolved by a stipulated order of some sort.  That's what I

24  cannot recall offhand.

25         THE COURT:  If that's the case, I'd like to see

1   that.  If not -- Mr. Corey didn't provide anything that

2   requires further elaboration?  A retraction, perhaps?

3               MR. ZELLER:  He just wanted to make sure it was

4   clear that the -- those initial motions to enforce dealt with

5   the two hard drives that have already been turned over.  He

6   just wanted to make sure of that.

7               THE COURT:  I am familiar that those hard drives.

8   The question is whether or not the order encompasses

9   something beyond those two additional hard drives.

10              MR. ZELLER:  Absolutely.  And I just wanted to

11  alert the Court that there were those subsequent issues.  I

12  will double-check and make sure there's no further orders on

13  that January 25th order.

14              THE COURT:  I hope to be able to resolve this on

15  Tuesday morning.  I'll see you here at 8:00 sharp.  Is there

16  anything else?

17              MS. AGUIAR:  We raised an issue with you before

18  regarding a witness that's on the list for Tuesday, and you

19  did indicate that we would wait to see how it came out with

20  his testimony.  My conversations with Mr. Zeller, though,

21  it's my understanding that that would be the sole area of

22  inquiry for this witness.  So I just wanted to get some

23  guidance, if we could, on the question of whether copyright

24  applications from subsequent years are in play at this point.

25  I think --

1    THE COURT:  Well, let me hear from Mr. Zeller,

2    first of all, as to why they would even be in play.  And I'll

3    give you a chance to respond so you don't have to anticipate

4    his argument.

5    Mr. Zeller, why would subsequent year copyright

6    applications have any relevance at this point?

7    MR. ZELLER:  I'm not sure that's really the

8    appropriate issue to determine with Mr. Armstrong.  Because I

9    assume that what she's referring to is to Mr. Armstrong's

10   testimony.

11   THE COURT:  Is that right, Ms. Aguiar?

12   MS. AGUIAR:  Yes.

13   THE COURT:  Very well.

14   MR. ZELLER:  Number one, Mr. Armstrong was a

15   designated 30(b)(6) witness on certain topics.  Some of those

16   topics in fact included the copyright registrations that the

17   Court will recall Mr. Nolan put in front of a witness

18   yesterday, Lucy Arant.  Those registrations, I mean, they are

19   clearly now in play.  They clearly relate to --

20   THE COURT:  Well, they are in play only to the

21   extent that they involve the date of creation and provide

22   evidence for that purpose.

23   MR. ZELLER:  Certainly I would agree --

24   THE COURT:  It doesn't open the door for -- I don't

25   think you want to get into copyright at this point.

1    MR. ZELLER:  That is correct, your Honor.  And I am

2  focused on those registrations, corrections made to them that

3  pertain to the dates.

4    THE COURT:  Okay.

5    MR. ZELLER:  I will say this, however, your Honor.

6  Obviously, both Mr. Larian and Ms. Garcia, not accusing

7  counsel of anything, but have certainly loaded their answers

8  with this wedge, this division between the dolls and the

9  drawings.  That is also addressed by these registrations.  So

10  I don't think it's fair to say that --

11    THE COURT:  Proffer for the Court in what way is

12  that addressed by these registrations?

13    MR. ZELLER:  Well, it is addressed by the

14  registrations, and we have expert testimony that can further

15  elaborate upon this in terms of copyright office procedure.

16  But the fact is what they obtained was a registration for the

17  doll.  They also have other registrations for those Bryant

18  drawings that list the dolls or make clear that the dolls are

19  derivatives of the drawings.

20    THE COURT:  Okay.  This is clearly 1-B, Counsel, on

21  this.

22    MR. ZELLER:  I don't necessarily disagree on one

23  level with the Court.

24    THE COURT:  I'm concerned.  I understand you want

25  to respond to what you perceive as this wedge, which I think

1   we addressed at sidebar on several occasions, and I believe

2   once we got past one particular witness, it seemed less and

3   less a problem.  If I allow you to then now use that wedge to

4   open up this entire issue and get into what's derivative and

5   what's not derivative, I've got to afford MGA the opportunity

6   to do the same thing.  And I think we'll just obliterate the

7   line between 1-A and 1-B.

8           MR. ZELLER:  I would put it this way, your Honor.

9   I think, you know, as we have -- as we've gone along, there

10  have been lines drawn.  You know, we have a 30(b)(6) witness

11  who has given testimony on this very issue about, you know,

12  about what the registrations cover and what was being

13  identified as being created at particular dates.

14          So, I mean, to some degree, these things are

15  intertwined.  We've heard Mr. Larian.  I mean, he was even

16  ending the day on this note of, well, absolutely I'm the

17  creator of the dolls.  Different somehow than the concept of

18  Bratz, different than the drawings.  I mean, they have been

19  consistently trying to draw this division.

20          THE COURT:  I think there is sufficient evidence

21  being presented just in what has been presented through a

22  number of witnesses, of the relationship between the drawings

23  and the dolls for purposes of 1-A.  Without going into a

24  legal discussion of copyright registrations, derivative

25  copyright registrations and the like.  I don't think you are

1872

1   without evidentiary material to respond to whatever limited

2   incursions have taken place already of 1-B issues into 1-A.

3               I think to do what you're suggesting now might take

4   it to another level altogether that I don't think is

5   warranted at this time.  And I'm not saying that as we go

6   forward, if this continues to be at issue and Mr. Larian

7   starts relying on this distinction in the same way that

8   Ms. Garcia did, that perhaps that door might not be opened.

9               But given where we're at right now, my inclination

10  would be to limit your copyright information to the issue of

11  the dates and the correction of the dates, and let's leave it

12  at that.

13              MR. ZELLER:  And I understand the Court's ruling on

14  that.  And so certainly Mr. Armstrong can address the date

15  issue that I think we all agree is in play for purposes of

16  Phase 1-A.  Another issue that Mr. Armstrong can address, and

17  he was a designated 30(b)(6) witness on this, was the patent

18  application for interchangeable feet.  The one that

19  Mr. Larian was shown today.

20              There are declarations that Carter Bryant made in

21  support of that.  There are other factual issues that

22  underlie that application that he can and has testified

23  about, that from our perspective, we, of course, believe that

24  it was an untrue statement for Mr. Larian to be saying to the

25  Patent Office that he was the sole inventor of that -- of the

1    invention that was set forth in the application.

2              THE COURT:  This is strictly for impeachment

3    purposes?

4              MR. ZELLER:  I'm sorry?

5              THE COURT:  This is for impeachment purposes?

6              MR. ZELLER:  No, your Honor.  It is part of the

7    pattern of misstatements and concealment that was done in

8    terms of where Bratz came from.  This is part of the series

9    of statements that, of course, many of which have been

10   highlighted today in which Mr. Larian made false statements

11   to the press, to the U.S. government, to other people that he

12   was in fact the person who came up with Bratz, invented

13   Bratz, any number of variations on this idea.

14             So it actually goes to this concealment, and it's

15   also intent.

16             THE COURT:  I guess the concern I have is by using

17   the copyright papers to do that, you get into the very legal

18   issues which we've been trying to keep out, the copyright

19   legal issues that we're trying to keep out of 1-A.

20             MR. ZELLER:  Actually, that's the patent

21   application, your Honor.

22             THE COURT:  This is the patent application.

23             MR. ZELLER:  It's a patent application.  It's

24   Exhibit 500 that was shown to Mr. Larian today and is now in

25   evidence.  It is entitled, and I'm sure I won't get the words

1    exactly right.  But it's --

2              THE COURT:  Doll with aesthetic changeable foot

3    gear.

4              MR. ZELLER:  Correct.  And there is also a

5    declaration by Mr. Larian, which is in evidence today, in

6    which he swore to the Patent Office that he was the sole

7    inventor.

8              Mr. Armstrong was the Rule 30(b)(6) designee on

9    that application and on the statements that were played to

10   the Patent Office.  So he does have testimony on that

11   subject.  It also relates to the fact that Carter Bryant,

12   too, was involved in that application, and he made certain

13   statements to the Patent Office.

14             So from our perspective, it goes to part of this

15   series of statements that were made up until certainly the

16   time of the Wall Street Journal article, and even somewhat

17   beyond, in which Isaac Larian took the lion's share.

18             Carter Bryant isn't mentioned as being the

19   inventor, and that's not only the concealment point, but it

20   also goes to intent.  He obviously can't continue to say

21   well, everyone else in the world has misunderstood me.  When

22   we have this series of statements, particularly when they are

23   trying to make distinctions like the kind they are today,

24   which is well, I really meant the dolls, or I really meant

25   something else.

1   THE COURT:  Let me hear from Ms. Aguiar on this.

2   MR. ZELLER:  I thought those were the major issues

3   that Mr. Armstrong would address.

4   THE COURT:  Very good.

5   MS. AGUIAR:  With regard to the date, I guess if I

6   have clarification from Mr. Zeller that what he means is the

7   June -- I think this is correct -- June of 2000 date of

8   creation that was on the copyright application and then the

9   correction of that date, because obviously the applications

10  themselves have a lot of dates on them, can I get that --

11  THE COURT:  That's what the Court is referring to.

12  So whether Mr. Zeller is referring to it or not, that's

13  what's going to come in.

14  MS. AGUIAR:  And then with regard to the patent

15  application, Mr. Armstrong was asked questions about the

16  patent application.  He was a 30(b)(6) witness.  He's a legal

17  assistant at MGA.  I guess what I would say on that is that

18  Mr. Larian was asked questions, and they are going to be

19  continuing to ask Mr. Larian questions on that.

20  I know that doesn't mean they can't ask another

21  witness those same questions, but they do have the person who

22  is really the person with firsthand knowledge of those

23  documents, of the patent application.

24  THE COURT:  I understand.  What I'm thinking of

25  doing, Ms. Aguiar, is limiting -- and I want to hear your

1876

1   response to this -- is limiting Mr. Armstrong as a 30(b)(6)

2   witness to covering exhibits and issues that have been

3   previously admitted.  To the extent that Exhibit 500 has been

4   admitted and Mr. Larian has discussed it, I think it's fair

5   game for them to bring up another witness to examine

6   Exhibit 500.  To the extent that the copyright applications

7   came in as rebuttal to basically your cross-examination or

8   Mr. Nolan's cross-examination of their witness, then it's

9   fair game for them to bring in this 30(b)(6) witness to

10  address those copyright applications.

11          What I'm going to limit, I think, is any foray into

12  any additional copyright material or intellectual property

13  material that I think gets us too far astray of the issues in

14  1-A, but I'll hear from both of you on that.  That's my

15  tentative thoughts in terms of how to proceed on this.

16          MR. PRICE:  Before I allow Mr. Zeller to speak, the

17  one exception I would like to that, your Honor, is Mr. Bryant

18  will be testifying, and there is, as Mr. Zeller referred to,

19  another document with respect to him and this patent

20  application.  And we know what his explanation is.  And the

21  30(b)(6) witness refutes that.  So with that, I believe we'll

22  be getting into evidence --

23          THE COURT:  I don't know if it will or it won't.

24  But the point I'm making is that by the time Mr. Armstrong

25  takes the stand, my thought will be to limit it to a

1   discussion of exhibits and issues that have already been

2   raised and not to use him as a means to go into further

3   copyright discussion absent a clear showing of relevance and

4   foundation.

5          MR. ZELLER:  If I may, first, just by way of

6   clarification, the June 2000 date is not from the copyright

7   applications.

8          THE COURT:  I understand.  It was from the

9   trademark application, but you're using this showing the

10  change of the trademark application -- on the copyright

11  application, the change there, that was their argument.  And

12  I understand that you disagree with that.

13         MR. ZELLER:  That was their argument.  But even

14  apart from that, we would still say that the fact that they

15  initially submitted copyright applications for the dolls

16  saying that they were done in the year 2000, and, of course,

17  we also have Nana Ashong's e-mail saying not only was it

18  2000, it was September 18, 2000, we would say that then for

19  them to go off and change after the litigation began,

20  changing that date, part of the concealment --

21         THE COURT:  That's further argument to be made.  I

22  understand.  But they are free to bring in evidence that the

23  change was made for innocent reasons or whatever.  And that's

24  part of why we're having a trial.

25         MR. ZELLER:  And part of what I would suspect that

1   Mr. Armstrong would be examined on would be the reasons for

2   the exchanges.  That was certainly part of the 30(b)(6)

3   testimony --

4           THE COURT:  The reasons for the changes of the

5   dates.  It's all tied to the date testimony.

6           MR. ZELLER:  Correct.

7           THE COURT:  Yes, Counsel.

8           MR. ZELLER:  Yes.  So the Court is certainly

9   correct that it is not our intention to get into a foray

10  about a bunch of other registrations, because there are many,

11  but I would ask the Court just somewhat to reserve judgment

12  as to what the full scope of this is.  We will know better,

13  of course, once Mr. Larian is done testifying.

14          THE COURT:  And after we hear from Mr. Bryant, as

15  Mr. Price points out.  Just so you know, I'm still

16  formulating this, but my touchstone is going to be are these

17  issues that have been raised by MGA or have been admitted

18  through evidence from Mattel and limit it to that.

19          MR. ZELLER:  It's certainly our intention not to go

20  broad.  It's to go narrow on these issues, and we understand

21  the Court's concern.

22          THE COURT:  Ms. Aguiar, does that give you enough

23  guidance in terms of where I am right now?  Because

24  admittedly, I have to wait to hear the actual testimony

25  itself.

1    MS. AGUIAR:  I understand.  I appreciate it.

2    THE COURT:  That's a general orientation.

3    Okay.  While we're on the topic of witnesses, who

4 are we hearing from -- we're going to hear from Mr. Larian, I

5 presume.  Mr. Price, you have another --

6    MR. PRICE:  Fifteen minutes.

7    THE COURT:  -- five, ten minutes?

8    MR. PRICE:  That's actually accurate.

9    THE COURT:  Mr. Nolan, you have cross-examination?

10   MR. NOLAN:  I don't think it's going to be that

11 lengthy.  I'm hoping maybe an hour, hour and a half.

12   THE COURT:  Very well.  Who's next?

13   MR. QUINN:  Mr. Eckert.

14   THE COURT:  Okay.

15   MR. QUINN:  And then?

16   MR. ZELLER:  We have Rachel Harris, who we

17 anticipate testifying.  There's Andreas Koch, who we believe

18 we have something of a resolution, to which is that we will

19 play what we would expect to be agreed to or largely agreed

20 to portions of his videotaped deposition.  The general

21 concept is it will involve his testimony about an initial

22 meeting that he participated in with Mr. Bryant.

23   There are other issues that have been raised with

24 respect to Mr. Koch's testimony.  They go into other issues

25 about the workplace environment, treatment of employees there

 1    at MGA, and a variety -- and without -- I understand the

 2    Court's -- where the Court's going already on this.  But we

 3    have decided to do, because contingent obviously on any door

 4    opening issues and that sort of thing --

 5              THE COURT:  Exactly.  And don't get me wrong.  I

 6    think there's a degree of relevance to all of this with the

 7    witnesses themselves for them to describe, you know, their

 8    relationship with their employer, how they felt about working

 9    there, whether they are disgruntled employees, whether they

10    are happy employees, I think there's a degree of that that's

11    relevant to the issue of witness credibility.  But to simply

12    bring in witnesses who are going to describe conditions at

13    Mattel or MGA, I think, I think whatever -- whatever

14    relevance that has is outweighed by the prejudice that would

15    be brought in through those types -- that type of testimony.

16              MR. ZELLER:  And what our intention was is that as

17    to those other issues, is that at this time we will not have

18    them as part of the videotaped deposition.  So that will

19    eliminate those issues.  Both sides are reserving their

20    rights.

21              Obviously, if we think it becomes relevant or

22    important to have the additional testimony in, you know, and

23    they are reserving their rights, of course, to oppose it, and

24    we would deal with it in that context.  The only thing that

25    would be waived is perhaps not the right word, but there's at

1   least agreement that people won't argue later on because

2   we've already had one segment played, that additional

3   segments can't be played again.

4          THE COURT:  Let me get through this list of

5   witnesses, and then I'll hear from Ms. Aguiar on any

6   particular objections they have.

7          So Mr. Eckert, Ms. Harris, Mr. Koch.  Who is next?

8          MR. ZELLER:  We have on the witness list for

9   Tuesday, whether we get to him beyond those witnesses, I

10  would say, is unlikely.  But Mr. Armstrong would potentially

11  be on that list.

12         THE COURT:  Okay.  And then where do we go from

13  there?

14         MR. ZELLER:  And then I think we're to Mr. Bryant.

15         THE COURT:  Okay.

16         MR. ZELLER:  There are maybe some additional things

17  that we would have in between.  There's the Kickapoo video,

18  which we're contemplating perhaps playing before.

19         THE COURT:  But nothing that's going to require --

20  the Court's inquiring more in terms of any hearings that I

21  need to hold, or morning hearings I need to hold relating to

22  motion in limine issues.  It sounds like the one we have on

23  Tuesday, which obviously goes to Carter Bryant in terms of

24  these hard drives and the Litler Mendleson (phonetic)

25  deposition and all of that, and Evidence Eliminator, that can

1  all be taken up on Tuesday morning.  There's nothing else

2  that needs to be addressed for any of your witnesses for

3  Tuesday or Wednesday; is that correct?

4         MR. ZELLER:  I'm not sure if this fully answers the

5  Court's question.  In general that's true.  The one thing I'm

6  not sure about is Mr. Menz.  He is one of the forensic

7  experts.  As a matter of timing, we were contemplating

8  calling him on Tuesday.  Again, I think at this point we're

9  into pretty theoretical territory, at least given the pace of

10  the past, that we would make it through all of these

11  witnesses, but we do have him on the list of people who

12  potentially would be called on Tuesday because it is our

13  intention after this sequence of witnesses, and maybe we

14  would shorten it up a bit, is then to have Mr. Bryant

15  testify.

16         THE COURT:  Well, Mr. Menz is something that we do

17  have to have a hearing for.  So if we find ourselves -- let

18  me take a look at my calendar and make sure I don't have

19  anything during the lunch hour.

20         I suppose if we have to, we'll know by noon, and

21  then we can do something during the lunch hour.

22         MR. ZELLER:  All right.  And we did have some

23  additional people on the Tuesday list.  Farhad Larian was

24  one.  I'm advised he's not really available next week.

25         THE COURT:  As long as you provide this to counsel.

1   I'm just really interested on anyone that would require a

2   hearing.

3            MR. ZELLER:  There is nobody else who -- well,

4   actually Farhad Larian would probably require a hearing, at

5   least in the sense of he had a U.S.B. device, and there were

6   spoliation issues that relate to Mr. Larian.  It does -- he

7   does start to get us into some of those issues.

8            THE COURT:  All right.  Very good.  Well, just keep

9   me posted on this.  Let me hear from Ms. Aguiar in terms of

10  any of the witnesses.

11           Is there anything else, Mr. Zeller?

12           MR. ZELLER:  One clarification of the materials

13  that the Court would like.  I know you would like the

14  underlying briefs related to the January 25th order.

15           THE COURT:  Well, not just the briefs, but anything

16  that was submitted.

17           MR. ZELLER:  That's what I was going to ask.  The

18  declarations as well.

19           THE COURT:  I'm afraid whenever I ask for that

20  stuff, but yeah, I need that as well.

21           MR. ZELLER:  Well --

22           THE COURT:  For whatever reason, we're having

23  trouble finding it.

24           MR. ZELLER:  To forewarn the Court that the January

25  25th, 2007, order covered an extremely broad range of

1  discovery issues.  I -- while I don't have a specific

2  recollection of the size of those declarations, I imagine

3  they are quite voluminous because that order covered an

4  entire range of discovery.

5          THE COURT:  Well, this might be a way, and

6  obviously I want both sides to look at what's being submitted

7  to me, and preferably you could run this also by the Keker

8  firm, Ms. Anderson.  You're going to need to do that before

9  you submit it because otherwise, it would be -- so you do

10  need to run this by them before you submit anything to the

11  Court.  But if you can go through there, and I will give you

12  an instruction -- submit the briefs in whole, but to the

13  extent that there are portions of the exhibits in the

14  declarations that are entirely irrelevant and you and counsel

15  for MGA and counsel for Carter Bryant can agree on it, I'd

16  just as soon not receive those.

17          MR. ZELLER:  We will do that, your Honor.

18          THE COURT:  Very well.  Anything further?

19          MR. ZELLER:  That was it for us.  Oh, actually, I

20  apologize.  Mr. Quinn handed me a note.  If we can get an

21  updated time count.

22          THE COURT:  I'll give that to you momentarily.

23          MR. NOLAN:  Could we charge the last half hour

24  against Mr. Zeller?

25          THE COURT:  Very good.  Give me a moment on this.

1   I have for the defense, I have approximately 12 hours and 15

2   minutes, and for the plaintiff, you've already gone around

3   the chess clock once, and now it's a total of 23 hours and 15

4   minutes.

5          MR. ZELLER:  I think that is it.  That's the last

6   note that was passed to me, and I think that is it.  Thank

7   you.

8          THE COURT:  Very well.

9          All right, Ms. Aguiar.  You've got complete control

10  of the floor now.

11         MS. AGUIAR:  With regard to Mr. Koch, I did say

12  that we would agree to the video and not require that he be

13  here live if it was limited in the way that Mr. Zeller just

14  described.  So we did reach that agreement, and so we were

15  able to work that out.

16         With regard to Mr. Menz, I am assuming that he

17  would obviously only be a witness if your Honor were to hold

18  that the Evidence Eliminator issues were relevant.

19         THE COURT:  So right.  That preliminary matter will

20  be decided Tuesday morning.

21         MS. AGUIAR:  Great.  And then the two nonparties

22  that were on their list for Tuesday were Farhad Larian, who I

23  understand he will not be on the table for Tuesday because

24  he's not available?

25         MR. ZELLER:  That's my understanding.

1    MS. AGUIAR:  And Elise Cloonan is also a nonparty.

2  And I'm guessing, based on what Mr. Zeller said, she's also

3  not on the table for Tuesday.

4    MR. ZELLER:  That's a little more difficult to say

5  for the moment.  But she is on our Tuesday list.  She's

6  represented by Larry McFarland.  We would expect her to

7  testify prior to the time that Carter Bryant starts.  It's a

8  little difficult, of course, to know how long Mr. Larian has

9  left on the stand.  And we obviously don't want to -- and

10  also whether or not --

11    THE COURT:  So she may be a Wednesday witness,

12  then?

13    MR. ZELLER:  Correct.

14    THE COURT:  So you are saying, though, that she

15  will be called before Carter Bryant?

16    MR. ZELLER:  That's our expectation.

17    MS. AGUIAR:  By my count, she would definitely be a

18  Wednesday witness.  And I think that's it.

19    THE COURT:  I think that's accurate, given that

20  we're going to have a late start on Tuesday.  We're not going

21  to start until 10:00.

22    MS. AGUIAR:  Right.  And they said they weren't

23  sure they were going to get to Armstrong.  And Cloonan would

24  be after him.

25    THE COURT:  Okay.   Anything further for MGA?

1887

```
 1              MR. NOLAN:   Your Honor, we start at 8:30 Tuesday

 2    morning?

 3              THE COURT:   8:00.   The order that I issued, I want

 4    Carter Bryant's attorneys here at 8:00 as well, and I'm

 5    planning to put us at 8:00 to 10:00 on the two motions

 6    outstanding, the Evidence Eliminator, the hard drives, all of

 7    this, and I hope to be well prepared myself to indicate my

 8    tentative thoughts, and then I'll hear further argument.

 9    I'll hear whatever witnesses that I need to hear, and make a

10    decision and go forward.

11              MR. NOLAN:   Your Honor, the last point was I wanted

12    to thank you on behalf of MGA for the manner which you

13    handled the order this morning.   That was very helpful.   And

14    two, we all wish we had the patience you have.

15              THE COURT:   The trial is not over yet.

16              Good evening.

17

18              (Proceedings concluded at 5:35 P.M.)

19

20

21

22

23

24

25
```

1

2

3

4

5

6                          C E R T I F I C A T E

7

8

9          I hereby certify that pursuant to Title 28,

10   Section 753 United States Code, the foregoing is a true and

11   correct transcript of the stenographically reported

12   proceedings in the above matter.

13          Certified on June 6, 2008.

14

15

16   _____
     MARK SCHWEITZER, CSR, RPR, CRR

17   Official Court Reporter
     License No. 10514

18

19

20

21

22

23

24

25