1    SAYING --

2              **THE COURT:**  LET ME HEAR FROM MATTEL NOW.

3              **MR. PRICE:**  FOR MY LEGAL POINT OF VIEW, FIRST, THE

4    CALL TO HER ASKING WHETHER OR NOT SHE WANTS TO BE REPRESENTED

5    BY COUNSEL IS IRRELEVANT.                                                09:5C

6              SECOND, ANY INFORMATION ABOUT WHAT WAS SAID TO HER

7    HUSBAND HAS GOT TO BE HEARSAY.  WHEN WE ASKED HER AT HER

8    DEPOSITION ABOUT COMMUNICATIONS WITH HER HUSBAND, I BELIEVE SHE

9    ASSERTED THE MARITAL PRIVILEGE.

10             **THE COURT:**  STOP RIGHT THERE.                              09:5C

11             THE FIRST QUESTION IS NOT IRRELEVANT, BECAUSE I'VE

12   ALLOWED BOTH SIDES TO GET INTO WHAT GOES TO BIAS AND

13   IMPEACHMENT, AND THAT'S ALL COME OUT IN THE WASH.  THE

14   OBJECTION IS OVERRULED TO HIS QUESTION.

15             HAS THE MARITAL PRIVILEGE BEEN ASSERTED AT THE                 09:5:

16   DEPOSITION?

17             **MR. ZELLER:**  IT WAS, YOUR HONOR.

18             **THE COURT:**  THEN THAT STOPS THAT.

19             **MR. NOLAN:**  BUT, YOUR HONOR, WHAT ABOUT THIS LETTER?

20   BECAUSE SHE IS COPIED ON THIS LETTER.                                    09:5:

21             **THE COURT:**  HOW IS THIS NOT HEARSAY?  SHE'S JUST

22   COPIED ON IT.  HOW IS IT NOT HEARSAY?

23             THINK ABOUT THAT ONE.  YOU ASKED THE QUESTION.

24             **MS. AGUIAR:**  THERE MAY BE A DISTINCTION -- I'M

25   THINKING ON THE FLY HERE -- BUT THE LETTER CAME IN YESTERDAY             09:5:

```
 1   FROM ONE LAW FIRM TO ANOTHER REGARDING MR. MARLOW'S LEGAL FEES.

 2   IS THAT DIFFERENT?

 3          THE COURT:  I'M SORRY?

 4       MS. AGUIAR:  A LETTER CAME IN YESTERDAY --

 5          THE COURT:  I DON'T KNOW IF AN OBJECTION WAS MADE ON      09:51

 6   THAT.

 7          MS. AGUIAR:  IT WAS.  MR. ROTH MADE AN OBJECTION ON A

 8   NUMBER OF GROUNDS.  THAT LETTER IS IN EVIDENCE.

 9       THE COURT:  I'M GOING TO HAVE TO GO BACK TO THAT.  I

10   KNOW THE LETTER YOU'RE TALKING ABOUT.                            09:52

11       MR. PRICE:  THAT'S FROM AN AGENT AT MGA.  THEIR

12   OUTSIDE COUNSEL IS OFFERING LEGAL FEES; SO THAT LETTER IS

13   IRRELEVANT.

14          THE COURT:  THIS IS THE ONE WHERE THE COUNSEL IS

15   IDENTIFIED AS THE PERSON TO WHOM THE INVOICES ARE TO GO THROUGH  09:52

16   THE BILLING?

17       MR. PRICE:  YES.

18       THE COURT:  THAT'S A PARTY OPPONENT.

19       MR. PRICE:  THIS IS HEARSAY.

20       THE COURT:  UNLESS THE OFFICER IS SOMEHOW                    09:52

21   REPRESENTING MGA AT THIS POINT -- MATTEL AT THIS POINT; THAT

22   WOULD HAVE TO BE MATTEL; AND THEY ARE NOT.

23       MR. NOLAN:  BUT I AM --

24       THE COURT:  WHO ARE THEY REPRESENTING?

25       MR. NOLAN:  MARGARET LEAHY; AND THEY ARE WRITING A           09:52
```

1    LETTER TO MATTEL ASKING --

2         **THE COURT:**  WHO IS SIDLEY AUSTIN HIRED BY?  WHO'S

3    PAYING SIDLEY AUSTIN'S BILLS?

4         **MR. NOLAN:**  MGA.

5         **THE COURT:**  SO THIS WAS A LETTER FROM MGA; SO THAT'S          09:52

6    NOT A PARTY OPPONENT.

7         **MR. NOLAN:**  BUT THIS LETTER HERE IS TALKING ABOUT --

8    THIS IS A CEASE AND DESIST LETTER ABOUT THIS REGARDING -- WE

9    ARE TROUBLED TO LEARN MICHAEL MOORE, IN-HOUSE COUNSEL, HAS HAD

10   CONTACT WITH OUR -- EVEN THOUGH --                                    09:53

11        **THE COURT:**  THIS IS TROUBLING, AND I GUESS THAT'S THE

12   BIGGER ISSUE.  IT'S HEARSAY.  BUT THIS IS SOMEWHAT TROUBLING ON

13   AN ETHICAL LEVEL, COUNSEL.

14        **MR. ZELLER:**  I WOULD LIKE TO ADDRESS THAT, BECAUSE WE

15   DO FEEL VERY STRONGLY ABOUT THIS.  IT IS NOT PROOF.  IT IS,          09:5

16   FROM OUR PERSPECTIVE, FACTUALLY BASELESS.  IT WAS BEING SENT AS

17   REALLY INTERFERENCE WITH MR. MOORE, AND WE CAN CERTAINLY SHOW

18   THAT.

19        BUT WHERE THAT LEAVES US, YOUR HONOR, IS THAT IT ALSO

20   SHOWS THE 403 PROBLEM HERE TOO.  TO THE EXTENT THEY REALLY          09:5

21   THOUGHT THERE WAS AN ETHICAL VIOLATION, THEY SHOULD HAVE

22   BROUGHT IT TO THE COURT'S ATTENTION.  THAT'S A LEGAL ISSUE FOR

23   THE COURT TO RULE ON.

24        **THE COURT:**  THE COURT IS GOING TO RAISE ITS OWN

25   ETHICAL CONCERNS WHEN IT SEES THEM, AND I'M SEEING THIS RIGHT       09:5

1    NOW.

2              ASK YOUR QUESTION.  WE'RE NOT GOING TO GET INTO THIS

3    NOW, BUT THE COURT IS GOING TO TAKE THIS UP.

4              **MR. PRICE:**  ON THAT QUESTION, YOU SAID IT'S RELEVANT

5    TO SHOW BIAS.  IT SHOWS BIAS TO HER IF SHE IS GOING -- TO SAY          09:54

6    HE PLACED A CALL TO HER.

7              **THE COURT:**  WE'RE NOT GOING TO GET INTO THE PRETEXT

8    CALL.

9              THE QUESTION THAT WAS JUST ASKED -- I CAN LOOK IT UP,

10   BUT THE QUESTION THAT WAS JUST ASKED WAS --                           09:54

11             **MR. NOLAN:**  DID YOU RECEIVE A PHONE CALL?  DO YOU

12   KNOW MICHAEL MOORE?  DID YOU RECEIVE A PHONE CALL FROM HIM?

13             **THE COURT:**  'DID MATTEL OFFER TO REPRESENT YOU?'

14             I THINK THAT'S A QUESTION THAT CAN BE ANSWERED.  BUT

15   WE'RE NOT GOING TO GET INTO -- YOU DIDN'T SAY ANYTHING ABOUT          09:54

16   PRETEXT IN THERE; THAT REQUIRES HEARSAY AND THERE'S NO

17   FOUNDATION FOR THAT AT THIS POINT.

18             YOU CAN CERTAINLY ASK ABOUT DID MICHAEL MOORE -- THE

19   ANSWER IS GOING TO BE 'YES.'  'WHAT DID MICHAEL MOORE ASK YOU?'

20             AND THAT'S IT.  AND THEN WE'LL TAKE THIS OTHER ISSUE        09:55

21   UP; SO WE MAY BE CALLING MARGARET LEAHY BACK.

22             **MS. AGUIAR:**  CAN WE ASK THE FOLLOWUP, WHICH IS IF SHE

23   ENDED UP HAVING A LAWYER BY MATTEL AT ANY POINT?

24             **THE COURT:**  YES.  THAT'S FINE; THAT MAKES SENSE.

25             (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)           09:55

1           **THE COURT:**  YOU MAY PROCEED, COUNSEL.

2           AND LET'S HAVE THE QUESTION REREAD, BECAUSE I'M

3    OVERRULING THE OBJECTION.

4           (WHEREUPON, THE LAST QUESTION WAS READ

5           BACK BY THE COURT REPORTER.)

6           **THE WITNESS:**  YEAH, I DID.

7    **BY MR. NOLAN:**

8    Q    DO YOU RECALL WHEN?

9    A    IT WAS EITHER RIGHT BEFORE OR RIGHT AFTER I HAD THE BABY;

10   I CAN'T REMEMBER; SO THAT WOULD HAVE BEEN IN JUNE OF 2004.

11   Q    AND WHO WAS IT FROM MATTEL'S LEGAL DEPARTMENT THAT CALLED

12   YOU?

13   A    IT WAS A MAN NAMED MICHAEL MOORE.

14   Q    AT THE TIME THAT YOU RECEIVED THE PHONE CALL FROM

15   MR. MOORE, WERE YOU REPRESENTED BY COUNSEL?

16   A    NO, I WASN'T.

17   Q    AT SOME POINT IN TIME, DID YOU RETURN THE PHONE CALL?

18   A    YEAH, I DID, BECAUSE HE LEFT A MESSAGE SAYING --

19   Q    JUST ANSWER THE QUESTION.

20          **THE COURT:**  COUNSEL, I THINK WE WENT OVER THESE

21   QUESTIONS AT SIDE-BAR.

22   **BY MR. NOLAN:**

23   Q    AT SOME POINT IN TIME, DID MATTEL OFFER TO RETAIN COUNSEL

24   TO REPRESENT YOU IN THIS MATTER?

25   A    HE WANTED ME TO COME IN AND TALK TO HIM.

1          **MR. PRICE:**  OBJECTION.  MOVE TO STRIKE AS

2    NONRESPONSIVE.

3          **THE COURT:**  SUSTAINED.

4    **BY MR. NOLAN:**

5    Q    DID YOU EVER MEET WITH HIM?                          09:57

6    A    NO, I DIDN'T.

7          **MR. PRICE:**  CAN WE GET AN ANSWER TO THE QUESTION,

8    YOUR HONOR?

9          **THE COURT:**  THE QUESTION THAT WAS ASKED WAS, "AT SOME

10   POINT IN TIME, DID MATTEL OFFER TO RETAIN COUNSEL TO REPRESENT   09:57

11   YOU IN THIS MATTER?"

12          THAT WAS A YES OR NO QUESTION.

13          **THE WITNESS:**  I DON'T THINK THEY MADE AN OFFICIAL

14   OFFER, IF THAT WORKS.

15   **BY MR. NOLAN:**

16   Q    DID THEY MAKE AN UNOFFICIAL OFFER?

17   A    I GOT THAT FEELING.

18          **MR. PRICE:**  OBJECTION.  MOVE TO STRIKE AS

19   SPECULATION.

20          **THE COURT:**  LAY A FOUNDATION.                    09:58

21   **BY MR. NOLAN:**

22   Q    WHAT WAS THE BASIS FOR YOUR FEELING THAT MATTEL WAS

23   OFFERING YOU COUNSEL?

24   A    I FELT -- I DON'T KNOW HOW TO SAY THIS, BECAUSE I KEEP

25   GETTING OBJECTED.                                        09:58

1          MR. PRICE:  HE'S GOT TO ASK THE RIGHT QUESTION.

2          THE COURT:  ANSWER THE QUESTION AS BEST YOU CAN,

3     MA'AM.

4          THE WITNESS:  CAN YOU ASK IT AGAIN.

5     BY MR. NOLAN:

6     Q    SURE.

7          WHAT WAS THE BASIS FOR YOUR FEELING THAT THEY WERE

8     UNOFFICIALLY ASKING YOU OR OFFERING TO PROVIDE COUNSEL FOR YOU

9     IN CONNECTION WITH THIS LITIGATION?

10    A    WELL, THAT FIRST MESSAGE FROM HIM SOUNDED LIKE HE SAID,          09:58

11    'I'M CALLING ABOUT SOME WORK'; SO I THOUGHT, 'GREAT, I GET

12    ANOTHER PERSON TO DO WORK FOR.'  SO I CALLED HIM BACK, AND THEN

13    FOUND OUT HE WAS A MATTEL LAWYER.  AND HE KEPT TALKING TO ME.

14    I'M LIKE, 'I DON'T KNOW, I DON'T KNOW, I DON'T KNOW WHAT TO SAY

15    TO YOU,' SO I HUNG UP AND THEN CALLED DAPHNE GRONICH FROM MGA.          09:59

16    Q    AND, THEREAFTER, DID MGA PROVIDE COUNSEL FOR YOU?

17    A    CORRECT.

18    Q    IF I COULD GO BACK TO EXHIBIT 1234.

19         MR. NOLAN:  MAY I HAVE A MOMENT TO TALK TO COUNSEL

20    ABOUT SOMETHING, YOUR HONOR?          09:59

21         THE COURT:  YOU MAY.

22         (BRIEF PAUSE.)

23    BY MR. NOLAN:

24    Q    DO YOU HAVE EXHIBIT 1234 IN FRONT OF YOU?

25    A    YES.          10:00

1      **MR. NOLAN:**  YOUR HONOR, WE'RE ASKING MR. PRICE TO

2  CHECK A FACT FIRST BEFORE WE GO FORWARD WITH THIS.

3          (BRIEF PAUSE.)

4      **MR. NOLAN:**  YOUR HONOR, IF I MIGHT -- AND I APOLOGIZE

5  FOR THE UNORTHODOX WAY THIS COMES UP -- WE HAVE A STIPULATION       10:01

6  THAT IF I WERE TO ASK MS. LEAHY QUESTIONS CONCERNING ITERATIONS

7  ON SCULPTS THAT SHE DID AFTER OCTOBER 19TH, MATTEL WOULD OBJECT

8  THAT IT GOES BEYOND THE TIME FRAME COVERED IN THIS LAWSUIT, AND

9  THEY WOULD OBJECT TO THE RELEVANCY OF THAT PERIOD.  THAT'S THE

10  STIPULATION.                                                        10:02

11      **MR. PRICE:**  PRETTY OBVIOUS.  YES.

12      **THE COURT:**  YOU'RE STIPULATING THAT THEY'RE GOING TO

13  OBJECT?

14      **MR. NOLAN:**  AND, YOUR HONOR, I GUESS, WE'LL FORECAST

15  THAT THE COURT'S RULING WILL BE THAT AREA IS NOT RELEVANT TO        10:02

16  1-A.

17      **THE COURT:**  AND YOU'RE STIPULATING TO THAT?

18      **MR. NOLAN:**  AND THEY'RE STIPULATING TO THAT.

19      **THE COURT:**  AND YOU'RE STIPULATING TO THAT?

20      **MR. NOLAN:**  NO.  I'M JUST SAYING THAT --                    10:02

21          CAN WE APPROACH SIDE-BAR?  I APOLOGIZE.

22      **THE COURT:**  YES.

23          (WHEREUPON, THE FOLLOWING PROCEEDINGS

24          WERE HELD AT SIDE-BAR:)

25      **THE COURT:**  COUNSEL?                                        10:03

1    **MR. NOLAN:**  WE WOULD LIKE TO GET INTO EVIDENCE THE

2    MOLDS THAT WERE DONE AFTER --

3            **THE COURT:**  RIGHT.  AND I HAVE SUSTAINED A NUMBER OF

4    OBJECTIONS FOR ANYTHING ABOUT THIS FINAL SCULPT, BECAUSE WHAT'S

5    RELEVANT IS WHAT CARTER BRYANT DID IN THE SEPTEMBER/OCTOBER          10:03

6    TIME PERIOD AND BEFORE THAT.  NOT WHAT HAPPENED TO THE DOLL

7    AFTER THAT, WHICH IS RESERVED FOR 1-B; SO THAT PROGNOSTICATION

8    IS ACCURATE.  UNLESS I'M MISSING SOMETHING.

9            IS THERE A REASON WHY THIS IS RELEVANT?

10           **MR. NOLAN:**  YES.                                         10:03

11           **THE COURT:**  OKAY.

12           **MR. NOLAN:**  AND WE'RE TALKING ABOUT THE VERDICT

13   FORMS -- I'M NOT PREDICTING HOW IT'S GOING TO COME OUT, BUT I

14   HAVE TO SAY THAT THEY HAVE ON THEIR VERDICT FORM EXHIBIT NUMBER

15   1234 AND 1234-A AS A SCULPT THEY WANT TO ASK THE JURY TO AWARD      10:03

16   TO MATTEL.

17           **THE COURT:**  THAT'S THE ONE SITTING UP THERE?

18           **MS. AGUIAR:**  NO.  THIS IS AT ANOTHER ONE.

19           EXHIBIT 1234 IS A SCULPT OR A CAST THAT POST-DATES

20   OCTOBER 19TH.  EVEN THOUGH IT POST-DATES OCTOBER 19TH, IT IS A      10:04

21   SCULPT THAT IS CURRENTLY ON MATTEL'S VERDICT FORM.

22           **THE COURT:**  YOU'RE GOING TO NEED TO EXPLAIN THAT.

23           I SEE YOUR POINT.

24           **MR. NOLAN:**  NOW ALL THINGS BECOME CLEAR.

25           **MR. PRICE:**  SO I ASKED MIKE, IS THAT A MISTAKE ABOUT     10:04

1   BEING ON THE VERDICT FORM, BECAUSE, OBVIOUSLY, THE RESPONSE IS

2   'RIGHT NOW, WE CAN'T TELL.'

3          SO MY SUGGESTION, THE STIPULATION WAS GOING TO BE

4   THAT IF I HAD THAT OUT AND IF IT'S ON THE VERDICT FORM, THAT WE

5   WILL STILL -- HER TESTIMONY WOULD BE THAT IT WAS AFTER            10:04

6   OCTOBER 19TH.  THE ONLY REASON IT WOULD BE ON THE FORM IS IF

7   THERE'S SOME DISPUTE.  I DON'T KNOW IF THERE IS.

8          **THE COURT:**  WAIT A SECOND.  I CAN DECIDE THIS RIGHT

9   NOW.  WAS THIS MOLD DONE AFTER OCTOBER 19TH?

10         **MR. ZELLER:**  THAT'S WHAT I'M SAYING.  I DON'T KNOW IF   10:05

11  THERE'S OTHER TESTIMONY FROM THE OTHER SIDE.  MR. NOLAN

12  PROFFERS SHE WAS SAYING IT WAS DONE AFTER OCTOBER 19TH.  I

13  CAN'T REMEMBER WHETHER MS. GARCIA OR MR. CARTER TESTIFIED ONE

14  WAY OR THE OTHER.

15         **THE COURT:**  NOW IS THE TIME TO LET THE COURT KNOW.      10:05

16         **MR. NOLAN:**  I'LL LAY THE FOUNDATION WITH HER,

17  YOUR HONOR, AND I'LL ASK HER WHETHER OR NOT SHE DID THE SCULPT

18  AFTER OCTOBER 19TH.

19         **MR. PRICE:**  THAT'S WHY I SAID WE'LL STIP TO THAT IF

20  THERE'S OTHER TESTIMONY AS WELL.                                 10:05

21         **MS. AGUIAR:**  BUT LET ME JUST SAY --

22         **THE COURT:**  BUT IF THAT'S THE CASE, HE WANTS TO ASK

23  QUESTIONS OF HER AND HE SHOULD BE ABLE TO, IF YOU'RE

24  INSISTING ON -- COUNSEL, YOU NEED TO KNOW AT THIS POINT IN TIME

25  WHAT IS OR IS NOT THE SUBJECT OF YOUR PROPOSED VERDICT FORM.     10:0

1      **MS. AGUIAR:**  I CAN TELL YOU, I LOOKED AT THE VERDICT

2  FORM, WROTE DOWN THE EXHIBIT NUMBERS AND THIS EXHIBIT NUMBER IS

3  ON IT.

4      **THE COURT:**  I'M GOING TO STOP THIS RIGHT HERE.

5      YOU MAY OBJECT.  IF YOU OBJECT ON TIMELINESS, THEN        10:05

6  IT'S NOT GOING TO BE ON THE VERDICT FORM.  IF YOU DON'T, AND IT

7  COMES IN, IT MAY OR MAY NOT BE ON THE VERDICT FORM.

8      **MR. PRICE:**  I'LL JUST OBJECT ON TIMELINESS, BECAUSE

9  HE'S RECOVERED --

10     **THE COURT:**  SUSTAIN THE OBJECTION.  IT'S OFF THE        10:06

11  VERDICT FORM.

12     **MR. NOLAN:**  SINCE WE WENT BACK TO THE SIDEBAR, AFTER

13  I SUGGESTED THERE WAS A STIPULATION, I DON'T WANT IT TO APPEAR

14  AS THOUGH THERE WASN'T A STIPULATION.

15     **THE COURT:**  I'LL CLARIFY IT TO THE JURY.        10:06

16     **MR. PRICE:**  YOU PROFFERED; I OBJECTED; YOU SUSTAINED

17  IT.

18     **THE COURT:**  I'LL TAKE CARE OF THIS, COUNSEL.

19     THANK YOU.

20     (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)        10:07

21     **THE COURT:**  THE JURY IS INSTRUCTED TO DISREGARD THAT

22  ENTIRE LAST INCIDENT AS IF IT NEVER HAPPENED AT ALL.

23     COUNSEL, YOUR NEXT QUESTION.

24     **MR. NOLAN:**  BUT NOBODY GOT IN TROUBLE.

25     **THE COURT:**  NOBODY GOT IN TROUBLE.        10:07

1          LET'S JUST MOVE ALONG.

2     **BY MR. NOLAN:**

3     Q    MS. LEAHY, AT ANY TIME, WERE YOU INSTRUCTED BY MGA TO

4     CONCEAL CARTER BRYANT'S INVOLVEMENTS IN THE BRATZ PROJECT?

5     A    NO.                                                          10:07

6     Q    AFTER YOU HAD FINISHED SCULPTING THE FINAL BRATZ SCULPT

7     AND THE BRATZ DOLL WAS OFFERED FOR RETAIL, DID ANYBODY FROM MGA

8     EVER COME BACK TO YOU AND SAY YOU HAD TO KEEP CARTER BRYANT

9     UNDER WRAPS?

10    A    NO.  NEVER.                                                  10:08

11    Q    DO YOU RECALL ANY CONVERSATION WITH ANYBODY AFTER YOU DID

12    THE FINAL BRATZ PROJECT WHERE YOU DISCUSSED CARTER BRYANT?

13    A    WELL, YEAH.  I TALKED TO VARIOUS FRIENDS ABOUT IT.  IT WAS

14    KIND OF EXCITING THAT IT CAME OUT.  IT WAS THE FIRST DOLL I

15    EVER DID.                                                         10:08

16    Q    DID YOU TALK TO ANYBODY EMPLOYED AT MATTEL?

17    A    YES.

18    Q    AND WHO WAS THAT?

19    A    WELL, THERE WAS MY GOOD FRIEND ROXANNA POWELL.  I TALKED

20    TO MY OLD BOSSES.                                                 10:09

21              **MR. PRICE:**  OBJECTION.  THIS IS IRRELEVANT TO THIS.

22              **THE COURT:**  OVERRULED.

23              IT'S A FOUNDATIONAL QUESTION, WHO SHE TALKED TO.

24              JUST IDENTIFY THE PEOPLE.

25              **THE WITNESS:**  MICHAEL HEBDEN, WHO WAS MY SUPERVISOR;  10:09

1  ABBO, WHO WAS MY MENTOR THERE.

2  **BY MR. NOLAN:**

3  Q    THESE LAST THREE PEOPLE ARE PEOPLE THAT WERE EMPLOYED AT

4  MATTEL?

5  A    YES.                                                          10:09

6  Q    WHEN DID YOU HAVE CONVERSATIONS WITH THEM?

7  A    IT WOULD HAVE BEEN AFTER IT CAME OUT, WHEN EVERYBODY KNEW

8  ABOUT IT.

9  Q    APPROXIMATELY WHAT TIME PERIOD?

10  A    2001, LATE 2001; FALL, PROBABLY.                             10:09

11  Q    ANY OTHER MATTEL EMPLOYEES THAT YOU DISCLOSED CARTER'S

12  INVOLVEMENT WITH BRATZ, OTHER THAN THE THREE YOU'VE IDENTIFIED

13  FOR THE JURY?

14  A    NOT THAT I REMEMBER SPECIFICALLY.  EVERYBODY KNEW ABOUT

15  CARTER AND THE BRATZ AT THE TIME.                                 10:10

16          **MR. PRICE:**  MOVE TO STRIKE THE LAST PART AS

17  NONRESPONSIVE.

18          **THE COURT:**  IT IS.

19          EVERYTHING AFTER "NOT THAT I REMEMBER SPECIFICALLY"

20  IS STRICKEN.                                                      10:10

21  **BY MR. NOLAN:**

22  Q    WHAT DID YOU TELL THESE THREE INDIVIDUALS ABOUT YOUR WORK

23  ON BRATZ, THESE MATTEL EMPLOYEES?

24          **MR. PRICE:**  OBJECTION.  COMPOUND.

25          **THE COURT:**  IT IS.                                    10:10

1          LET ME SEE YOU AT SIDE-BAR, COUNSEL.

2          ACTUALLY, LET'S TAKE OUR MORNING RECESS AT THIS TIME.

3          (WHEREUPON, JURORS DEPART COURTROOM.)

4          **THE COURT:**  COUNSEL, WHAT I WANT TO DISCUSS,

5   ACTUALLY -- I ASSUME WHERE THIS IS GOING TOWARDS IS REBUTTING          10:11

6   THE ALLEGATION OF A REQUIRED CLOAK OF SECRECY CONCERNING THIS.

7          **MR. NOLAN:**  THAT'S RIGHT.

8          **THE COURT:**  VERY GOOD.  I JUST WANTED TO MAKE SURE

9   THAT I UNDERSTOOD EXACTLY WHERE THIS IS GOING.

10          AND THE COMPOUND OBJECTION IS SUSTAINED.  JUST          10:11

11  REPHRASE YOUR QUESTION WHEN WE COME BACK.

12          **MR. NOLAN:**  I WILL, YOUR HONOR.

13          **THE COURT:**  I WAS JUST CONFUSED THERE FOR A SECOND.

14          THE COURT IS GOING TO HAVE TO TAKE A BIT OF A BREAK.

15  AND I KNOW YOU ASKED FOR THE PALMER RULINGS.          10:11

16          DO WE HAVE ENOUGH TO GET THROUGH TO LUNCHTIME, OR IS

17  THAT SOMETHING THAT YOU REALLY NEED IN THE NEXT HOUR AND A

18  HALF?

19          **MR. NOLAN:**  NO.  I THINK WE HAVE ENOUGH.

20          **THE COURT:**  TO GET THROUGH TO LUNCH?          10:12

21          **MR. NOLAN:**  RIGHT.  YES.

22          **THE COURT:**  BECAUSE I'VE MADE MY RULINGS ON PALMER

23  SUBJECT TO SOME ARGUMENT THAT I WANT TO HEAR, BUT I WANT TO

24  ADDRESS THIS.

25          **MR. NOLAN:**  WE CLEARLY CAN MAKE IT TO LUNCH, BECAUSE          10:12

1   WE HAVE OTHER VIDEOS.

2           THE COURT:  THAT'S RIGHT.

3           MR. NOLAN:  YOUR HONOR, ONE LAST MINUTE.

4           WE HAVE MR. DEANDA ON THE WITNESS STAND, AND I INTEND

5   TO CALL HIM.

6           THE COURT:  YES.

7           MR. NOLAN:  ONE OF THE AREAS THAT I WANT TO JUST

8   CLEAN UP -- AND IT WILL BE VERY QUICK -- BECAUSE IT CAME UP IN

9   THE TESTIMONY OF MR. MARLOW WITH RESPECT TO THE SEAMSTRESSES.

10          THE COURT:  YES.

11          MR. NOLAN:  I WANT TO ESTABLISH, THROUGH MR. DEANDA,

12  THAT THOSE SEAMSTRESSES WERE FIRED, AND I WANTED TO ALERT THE

13  COURT OF THAT AHEAD OF TIME, JUST AS AN OFFICER OF THE COURT.

14  WHAT I DIDN'T WANT TO HAVE IS A WHOLE BLOWUP --

15          THE COURT:  WHAT IS THE RELEVANCE OF THAT?

16          MR. NOLAN:  I THINK IT GOES TO THE WHOLE QUESTION OF

17  PETER MARLOW.  IN HIS TESTIMONY, THE COURT WILL RECALL THAT HE

18  DID CERTAIN THINGS WITHOUT MGA'S KNOWLEDGE CONCERNING HIDING OR

19  CONCEALING THEIR IDENTITY FROM MATTEL.  AND WE THINK THE FACT

20  THAT MATTEL, ONCE THEY LEARNED ABOUT THIS LATE-NIGHT, OFF-DUTY

21  WORK, FIRED THE MATTEL EMPLOYEES.  IT GIVES CREDENCE AS TO THE

22  EXPLANATION THAT PETER MARLOW WAS OFFERING UP WITH RESPECT TO

23  THE FEAR THAT THEY HAD THAT THERE WOULD BE SOME ACTION -- I'M

24  NOT GOING TO GO INTO DETAIL ON IT, BUT I THINK WE NEED TO

25  ESTABLISH ON THE RECORD THAT THEY WERE FIRED.

1    THE COURT:  LET ME HEAR FROM MATTEL ON THAT, BRIEFLY.

2    MR. ZELLER:  IT'S NOT RELEVANT.  AND NUMBER TWO,

3  MR. DEANDA -- AND I CAN MAKE THIS REPRESENTATION ON THE

4  RECORD -- MR. DEANDA DOES NOT HAVE PERSONAL KNOWLEDGE AS TO

5  WHAT HAPPENED WITH THE SAMPLE MAKERS, THESE DISLOYAL EMPLOYEES.      10:13

6  HE WAS NOT PART OF THAT DECISION.

7    SO HE IS NOT, IN ANY EVENT, THE PERSON TO COME IN AND

8  TESTIFY, AND THERE'S NO BASIS FOR EVEN ASKING HIM.

9    THE COURT:  WELL, IT SOUNDS LIKE A FOUNDATIONAL

10  OBJECTION.  WE'LL TAKE THEM UP IN THE COURSE OF THE WITNESS.      10:14

11    THE ISSUE I'M CONCERNED ABOUT IS THIS SIDLEY AUSTIN

12  LETTER THAT I SAW AT SIDE-BAR AND THE ETHICAL ISSUE RAISED BY

13  THAT COUNSEL.  I WANT TO GET TO THE BOTTOM OF THAT AS TO WHAT

14  HAPPENED WITH MICHAEL MOORE, OR ALLEGEDLY HAPPENED.

15    WHERE IS THAT AT?      10:1

16    MR. ZELLER:  IF I MAY, YOUR HONOR, JUST FOR THE

17  RECORD, ON THE LAST PART, WE WOULD HAVE A 403 OBJECTION, AS

18  WELL, TO THE WHOLE ISSUE.

19    THE COURT:  I'LL TAKE THOSE UP IN THE COURSE OF THE

20  TESTIMONY.      10:1

21    MR. ZELLER:  WITH RESPECT TO THE MICHAEL MOORE

22  ALLEGATIONS, MR. MOORE DISPUTES THEM; THAT HE DID NOT CONTACT

23  THEM OR, YOU KNOW, TALKED TO MS. LEAHY AT THE TIME THAT HE KNEW

24  SHE WAS REPRESENTED.

25    IN FACT, THE TESTIMONY --      10:1

 1          THE COURT:  SHE TESTIFIED THAT SHE WASN'T

 2   REPRESENTED.

 3          MR. ZELLER:  RIGHT.

 4          THE COURT:  CAN I SEE THAT LETTER AGAIN.

 5          (DOCUMENT PROVIDED TO THE COURT.)                    10:15

 6          THE COURT:  THERE'S NO QUESTION THAT HE DID CALL HER,

 7   THOUGH; RIGHT?

 8          MR. ZELLER:  I BELIEVE THAT'S CORRECT.

 9          MR. NOLAN:  FOR THE RECORD, IT'S 18572, THE LETTER

10   THAT YOU'RE READING NOW.                                    10:15

11          THE COURT:  THANK YOU.

12          (BRIEF PAUSE.)

13          THE COURT:  MR. NOLAN, WE DID HEAR FROM THE WITNESS

14   THAT SHE INDICATED THAT SHE WAS NOT REPRESENTED AT THE TIME OF

15   THE PHONE CALL.  THE LETTER HERE SUGGESTS THAT NOTICE WAS     10:16

16   PROVIDED TO MR. MOORE THAT SHE WAS REPRESENTED.

17          DO YOU HAVE THAT NOTICE?

18          MR. NOLAN:  I DON'T.  AND WHAT I WAS GOING TO ASK IS

19   IF MR. MCFARLAND, WHO IS HERE -- I WAS NOT INVOLVED IN THE CASE

20   AT THIS TIME.  I DO THINK THAT MR. MCFARLAND MAY HAVE MORE     10:16

21   BACKGROUND ON THIS THAN I DO, SINCE HE REPRESENTS MS. LEAHY.

22   BUT MAYBE NOT.  THAT WAS THE INFORMATION THAT I HAD.

23          THE COURT:  MR. MCFARLAND, DO YOU HAVE THE NOTICE

24   THAT'S REFERENCED IN THIS LETTER FROM SIDLEY AUSTIN TO

25   QUINN EMANUEL?  AND THE REFERENCE I'M MAKING -- IT INDICATES   10:16

```
 1    HERE THAT "WE ARE TROUBLED TO LEARN THAT MICHAEL MOORE,

 2    IN-HOUSE COUNSEL FOR MATTEL, HAS HAD CONTACT WITH OUR CLIENT,

 3    EVEN THOUGH HE HAD BEEN PREVIOUSLY ADVISED BY HER THAT SHE WAS

 4    REPRESENTED BY COUNSEL."

 5            WAS THERE ANY MEMORIALIZATION ON THAT?  BECAUSE THE        10:16

 6    WITNESS JUST TESTIFIED THAT SHE WAS NOT REPRESENTED AT THE TIME

 7    OF THE CONVERSATION.

 8            MR. MCFARLAND:  HERE'S MY UNDERSTANDING:

 9            I DIDN'T REPRESENT HER AT THE TIME.  AT THE TIME, THE

10    REPRESENTATION -- THE SIDLEY AUSTIN RETAINER LETTER IS DATED      10:17

11    DECEMBER 3RD OR 4TH.  THIS LETTER IS DATED JANUARY 5, 2005.  MY

12    UNDERSTANDING IS, THERE WAS MORE THAN ONE CONVERSATION WITH

13    MR. MOORE, AND WHAT YOU GOT INTO WAS THE FIRST CONVERSATION.

14            I THINK THAT THERE WAS SOME CONTINUING CONVERSATIONS,

15    EITHER DIRECTLY OR THROUGH THE HUSBAND, SOME OF WHICH FELL        10:17

16    DURING THIS REPRESENTATION PERIOD.

17            THE COURT:  THE COURT IS NOT GOING TO GET INTO THE

18    CONSERVATIONS WITH THE HUSBAND BECAUSE OF, AS DISCUSSED AT

19    SIDE-BAR, THE ASSERTION OF THE MARITAL PRIVILEGE; SO THAT'S

20    OFF, PURSUANT TO THIS WITNESS.                                    10:17

21            THE WITNESS ONLY INDICATED IN THE TESTIMONY THAT

22    THERE WAS THE ONE CONVERSATION DIRECTLY WITH HER AND SHE HAS

23    INDICATED THAT WAS PRIOR TO REPRESENTATION.

24            IS THERE ANY EVIDENCE TO THE CONTRARY THAT YOU WOULD

25    HAVE AT THIS POINT?                                               10:17
```

```
 1          AND I UNDERSTAND YOU DIDN'T REPRESENT HER AT THE

 2   TIME, BUT I'M JUST ASKING YOU --

 3          MR. MCFARLAND:  THERE'S NO WRITTEN EVIDENCE.

 4          THE COURT:  YOU DON'T HAVE ANYTHING?

 5          MR. MCFARLAND:  NO, WE DO NOT.

 6          THE COURT:  MR. NOLAN?

 7          MR. NOLAN:  WE DON'T HAVE IT HERE, BUT WE'LL DO A

 8   SEARCH RIGHT AWAY ON THE DATABASE TO SEE WHETHER OR NOT WE CAN

 9   BRING THIS TO CONCLUSION.

10          THE COURT:  IF YOU HAVE ANY EVIDENCE, BRING IT TO THE

11   COURT'S ATTENTION.  OTHERWISE, THE COURT IS GOING TO ACCEPT THE

12   REPRESENTATION OF THE WITNESS AT THIS TIME.

13          COURT IS IN RECESS.

14          (WHEREUPON A BRIEF RECESS WAS HELD.)

15          (JURORS ENTER COURTROOM.)

16          (WITNESS RESUMES STAND. )

17          MR. NOLAN:  YOUR HONOR, ONE ADMINISTRATIVE MATTER.

18       I'D MOVE INTO EVIDENCE 1140 A, B, C, AND D, THOSE MOLDS.

19          THE COURT:  THEY ARE ADMITTED.

20          (EXHIBITS 1140 A, B, C, AND D ARE RECEIVED.)

21   BY MR. NOLAN:

22   Q    JUST BEFORE THE BREAK, WE WERE TALKING ABOUT CONVERSATIONS

23   YOU HAD WITH THREE INDIVIDUALS IN THE SUMMER OF 2001.

24          DO YOU RECALL THAT?

25   A    YES.
```

10:18
10:18
10:36
10:37
10:38

4286

```
 1   Q    ONE OF THE NAMES WAS ROXANNA POWELL; CORRECT?

 2        DO YOU KNOW, WAS ROXANNA POWELL EMPLOYED AT MATTEL

 3   WHEN YOU HAD A CONVERSATION WITH HER?

 4   A    YES, SHE WAS.

 5   Q    DO YOU RECALL WHAT HER POSITION WAS?

 6   A    I DON'T KNOW HER TITLE, BUT SHE WAS A DESIGNER.

 7   Q    AND WHAT DID YOU SAY TO MS. POWELL?

 8   A    WELL, WE WERE DOING GYMNASTICS TOGETHER AT THE TIME AND WE

 9   WOULD GO OUT AFTERWARDS AND TALK ABOUT STUFF; SO I WOULD TELL

10   HER ABOUT HOW IT WORKED AND WHAT I DID AND THINGS LIKE THAT.

11   WE TALKED A LOT, SO IT'S HARD TO REMEMBER VERBATIM.

12   Q    DID YOU DISCUSS WITH ROXANNA POWELL CARTER BRYANT'S

13   INVOLVEMENT WITH THE PROJECT?

14   A    YEAH, WE TALKED ABOUT CARTER.

15   Q    WHAT DID YOU SAY ABOUT CARTER?

16   A    I REMEMBER ONE CONVERSATION WHERE SHE HAD ASKED, YOU KNOW,

17   WHAT PAULA'S ROLE WAS, WHAT CARTER'S ROLE WAS, ON THE DOLL.

18   Q    HOW DID YOU DESCRIBE PAULA'S ROLE WITH THE DOLL?

19   A    I WOULD DESCRIBE PAULA AS THE ONE THAT REALLY PUT IT

20   TOGETHER --

21        MR. PRICE:  OBJECTION, YOUR HONOR.  IRRELEVANT;

22   HEARSAY.

23        THE COURT:  I THINK YOU NEED TO REPHRASE YOUR

24   QUESTION AND FOCUS ON A PARTICULAR TIME FRAME.

25   / / /
```

10:38
10:38
10:38
10:39
10:39

**BY MR. NOLAN:**

Q    IN THIS CONVERSATION WITH ROXANNA POWELL, DID YOU DESCRIBE

FOR HER PAULA TREANTAFELLES' ROLE DURING THE PERIOD OF THE

EARLIER CREATION IN THE BRATZ CONCEPT?

        **MR. PRICE:**  OBJECTION.

        **THE COURT:**  SUSTAINED.

**BY MR. NOLAN:**

Q    DURING THE CONVERSATION, DID YOU TELL ROXANNA POWELL ABOUT

CARTER BRYANT'S INVOLVEMENT IN THE EARLY CONCEPT OF THE BRATZ?

        **THE COURT:**  COUNSEL, THE PART I'M OVERRULING IS --

I'LL ALLOW YOU TO EXPLORE THE RELATIVE ROLES OF ANY INDIVIDUALS

AT THE MEETINGS WITH MR. BRYANT IN THE TIME PERIOD OF SEPTEMBER

AND OCTOBER OF 2000; NARROW THE QUESTION TO THAT.

**BY MR. NOLAN:**

Q    SO GOING BACK, IF I COULD, TO THE CONVERSATION THAT YOU

HAD WITH ROXANNA POWELL IN JUNE OF 2001, WERE YOU RELATING BACK

TO MS. POWELL WHAT THE EARLY DEVELOPMENT OF BRATZ WAS?

A    I DON'T KNOW IF WE TALKED ABOUT THE EARLY DEVELOPMENT

SPECIFICALLY; IT WAS THE OVERALL, YOU KNOW, PHENOMENON OF IT.

Q    WHAT DID YOU SAY, IF ANYTHING, TO HER WITH RESPECT TO WHAT

CARTER'S ROLE WAS IN THE BRATZ CONCEPTION?

A    WELL, THAT CARTER CAME UP WITH THE CONCEPT DRAWINGS.

Q    WHAT DID MS. POWELL SAY IN RESPONSE TO THAT?

        **MR. PRICE:**  OBJECTION.  HEARSAY.

        **THE COURT:**  SUSTAINED.

**BY MR. NOLAN:**

1  Q    TURNING TO THE NEXT PERSON THAT YOU MENTIONED,

2  MICHAEL HEBDEN.  IS THAT H-E-B-D-O-N?

4  A    D-E-N.

5  Q    AND WHO IS MICHAEL HEBDEN?

6  A    HE WAS MY SUPERVISOR AT MATTEL.

7  Q    AND WHEN YOU HAD THIS CONVERSATION WITH MR. HEBDEN, WAS HE

8  STILL EMPLOYED AT MATTEL?

9  A    YES, HE WAS.

10  Q    DO YOU RECALL WHAT HIS ROLE WAS AT MATTEL AT THE TIME OF

11  THE CONVERSATION?

12         **MR. PRICE:**  OBJECTION.  FOUNDATION; AT THAT TIME.

13         **THE COURT:**  LAY FURTHER FOUNDATION.

14  **BY MR. NOLAN:**

15  Q    AT THE TIME YOU WERE HAVING THIS CONVERSATION WITH

16  MR. HEBDEN, WHAT TIME PERIOD ARE WE TALKING ABOUT?  WHEN DID

17  YOU HAVE THE CONVERSATION WITH MR. HEBDEN?

18  A    WELL, IT WOULD HAVE BEEN AFTER BRATZ CAME OUT AND AFTER

19  EVERYBODY KNEW ABOUT IT.

20  Q    DO YOU HAVE AN APPROXIMATION AS TO WHAT TIME THAT

21  CONVERSATION TOOK PLACE?

22  A    IT WOULD HAVE BEEN AROUND THE FALL OF 2001.

23  Q    AND WHAT DID YOU SAY TO MR. HEBDEN?

24  A    I THINK, YOU KNOW, WHEN I QUIT THE DEPARTMENT IT WAS A

25  HARD DECISION.  I REALLY FELT PROUD OF MYSELF BECAUSE I WAS

10:41
10:41
10:41
10:4
10:4

1    SUCCESSFUL AND I HAD A CHANCE TO WORK ON A VERY SUCCESSFUL --

2           **MR. PRICE:**  OBJECTION.  NONRESPONSIVE; AND TOO BROAD,

3    GIVEN THE NARROW RELEVANCE.

4           **THE COURT:**  JUST WHAT DID YOU SAY TO MR. HEBDEN?

5           **THE WITNESS:**  I DON'T KNOW THE ACTUAL WORDS.  I JUST            10:42

6    TALKED ABOUT DOING IT.

7    **BY MR. NOLAN:**

8    Q    CAN YOU RECALL IN SUBSTANCE WHAT YOU SAID TO MR. HEBDEN

9    ABOUT CARTER BRYANT'S INVOLVEMENT IN BRATZ?

10   A    I CAN'T REMEMBER.                                                     10:42

11   Q    DID MR. HEBDEN WORK AT THE DESIGN CENTER?

12   A    YES, HE DID.

13   Q    DID YOU TELL MR. HEBDEN THAT YOU HAD BEEN INVOLVED IN

14   SCULPTING THE BRATZ DOLL?

15   A    YES.                                                                  10:42

16   Q    DID YOU TELL MR. HEBDEN THAT CARTER BRYANT HAD DONE THE

17   CONCEPT DRAWINGS?

18          **MR. PRICE:**  OBJECTION.  LEADING.

19          **THE COURT:**  SUSTAINED.

20   **BY MR. NOLAN:**

21   Q    DID YOU SAY ANYTHING TO MR. HEBDEN ABOUT CARTER BRYANT

22   DOING THE CONCEPT DRAWINGS?

23          **MR. PRICE:**  OBJECTION.  ASKED AND ANSWERED; SHE SAID

24   SHE COULDN'T REMEMBER.

25          **THE COURT:**  SUSTAINED.                                         10:4

1   **BY MR. NOLAN:**

2   Q    DO YOU RECALL IN YOUR CONVERSATION WITH MICHAEL HEBDEN

3   WHETHER OR NOT CARTER BRYANT'S NAME CAME UP?

4   A    I DON'T KNOW IF HIS NAME CAME UP WITH MICHAEL.

5   Q    THE THIRD PERSON IS ABBO.  IS THAT ABBO HUSSEIN?          10:43

6   A    IT'S HUSSEIN ABBO.

7   Q    WHO IS HE?

8   A    HE WAS MY MENTOR AT MATTEL.  HE WAS ALSO A MANAGER.  HE

9   WAS THE MAIN SCULPTOR ON MOST OF THE BARBIE PRODUCTS THERE.

10  Q    WHEN DID YOU HAVE A CONVERSATION WITH HIM CONCERNING THE   10:43

11  BRATZ PROJECT?

12  A    IT WOULD HAVE BEEN A LITTLE BIT LATER.

13  Q    CAN YOU GIVE US YOUR BEST ESTIMATE AS TO THE TIME?

14  A    I CAN TELL YOU THE PLACE BUT I DON'T REMEMBER THE TIME.

15  Q    WHAT'S THE PLACE?                                          10:44

16  A    IT WAS AT A JAPANESE RESTAURANT IN EL SEGUNDO.

17  Q    CAN YOU RECALL THE YEAR?

18  A    IT WOULD HAVE BEEN 2001.

19  Q    AND DURING THAT CONVERSATION, DID YOU MENTION

20  CARTER BRYANT'S NAME TO HIM?                                    10:44

21  A    YEAH.  WE TALKED ABOUT CARTER AND THE DESIGNING AND THE

22  SCULPTING AND PAULA AND THE PROCESS.

23  Q    WHAT DID YOU SAY TO HIM CONCERNING CARTER BRYANT'S

24  INVOLVEMENT IN THE BRATZ PROJECT?

25  A    WELL, I WAS TALKING TO HIM ABOUT HOW CARTER CAME UP WITH   10:44

1   THE CONCEPT DRAWINGS AND HOW SOMEBODY FLEW THE NEST AT MATTEL,

2   YOU KNOW; EVERYBODY TALKED ABOUT IT.

3   Q    DID YOU SAY TO HIM ANYTHING ABOUT YOUR SCULPTING OF THE

4   BRATZ DOLL?

5            **MR. PRICE:**  OBJECTION.  HEARSAY, YOUR HONOR.          10:44

6            **THE COURT:**  YES.  SUSTAINED.

7   **BY MR. NOLAN:**

8   Q    CAN YOU RECALL ANYBODY ELSE OTHER THAN THESE THREE PEOPLE

9   THAT YOU HAD CONVERSATIONS WITH CONCERNING THE BRATZ

10  DEVELOPMENT, AND, IN PARTICULAR, CARTER BRYANT'S INVOLVEMENT?     10:45

11           **MR. PRICE:**  THAT MISSTATES THE EVIDENCE.

12           **THE COURT:**  REPHRASE, COUNSEL.

13  **BY MR. NOLAN:**

14  Q    WITH RESPECT TO CONVERSATIONS WITH ROXANNA POWELL AND

15  HUSSEIN ABBO, CAN YOU RECALL ANY OTHER PEOPLE THAT YOU SPOKE TO   10:45

16  WHERE YOU DISCUSSED THE FACT THAT CARTER BRYANT HAD DONE THE

17  CONCEPT DRAWINGS FOR BRATZ?

18  A    THAT'S ALL I REMEMBER.

19  Q    NOW, AT ANY TIME DID ANYBODY EVER COME TO YOU FROM MGA AND

20  TELL YOU, 'GEE, I WISH YOU HADN'T SAID ANYTHING ABOUT CARTER      10:45

21  BRYANT'?

22  A    NO.  NOT AT ALL.

23           **MR. NOLAN:**  THANK YOU.  NOTHING FURTHER.

24           **THE COURT:**  CROSS-EXAMINATION.

25  /  /  /

1                           **CROSS-EXAMINATION**

2    **BY MR. PRICE:**

3    Q    CONCERNING THAT LAST TESTIMONY, DO YOU RECALL YOUR

4    DEPOSITION TAKEN IN THIS CASE?

5    A    YES.                                                          10:46

6    Q    AND THAT WAS TAKEN DECEMBER 2007; CORRECT?

7    A    CORRECT.

8    Q    AND DO YOU RECALL AT THAT TIME THAT YOU WERE ASKED WHETHER

9    YOU HAD SPOKEN WITH ANYONE AT MATTEL ABOUT ANY LAWSUIT OR

10   LITIGATION WITH MGA OR ABOUT CARTER BRYANT?                       10:46

11           DO YOU RECALL THAT QUESTION?

12   A    I DON'T RECALL THE QUESTION SPECIFICALLY.

13   Q    SURE.

14           **MR. PRICE:**  YOUR HONOR, IF WE COULD PLAY FROM

15   MS. LEAHY'S DEPOSITION TESTIMONY, PAGE 93, LINES FOUR THROUGH     10:46

16   NINE.

17           **MR. NOLAN:**  YOUR HONOR, I JUST DON'T BELIEVE THAT IS

18   APPROPRIATE TO PLAY.

19           **THE COURT:**  THERE'S AN OBJECTION?

20           **MR. NOLAN:**  YES.                                      10:47

21           **THE COURT:**  COUNSEL, THE PAGE AND LINES AGAIN.

22           **MR. PRICE:**  PAGE 93, LINES FOUR THROUGH NINE.

23           **MR. NOLAN:**  YOUR HONOR, THE QUESTION IS DIRECTED TO

24   DISCUSSING LITIGATION BETWEEN MGA AND CARTER BRYANT AND THAT

25   LITIGATION WAS NOT ONGOING IN 2001, THE TIME PERIOD SHE           10:47

1    TESTIFIED TO.

2         **MR. PRICE:**  THAT'S NOT HOW SHE INTERPRETED THE

3    QUESTION, BECAUSE SHE LATER AMENDS HER ANSWER.

4         **THE COURT:**  LET'S ASK HER SOME QUESTIONS.

5         YOU'RE GOING TO HAVE TO LAY FOUNDATION BEFORE YOU GET    10:48

6    TO THIS.

7    **BY MR. PRICE:**

8    Q    MS. LEAHY, DO YOU RECALL AT YOUR DEPOSITION AT ONE POINT,

9    OR SOME POINTS THERE WERE BREAKS IN THE DEPOSITION TO GIVE YOU

10   A CHANCE TO CONSULT WITH YOUR ATTORNEY.  DO YOU RECALL THAT?    10:48

11   A    YES.

12   Q    AT ONE POINT YOU CAME BACK AND SAID YOU HAD AN ADDITION OR

13   SOME ADDITIONS TO MAKE TO YOUR TESTIMONY.  DO YOU RECALL THAT?

14   A    YES.

15   Q    AND ONE OF THE ADDITIONS THAT YOU MADE WAS YOU SAID THAT    10:48

16   YOU WANTED TO ADD THAT YOU HAD A CONVERSATION WITH I THINK IT

17   WAS ROXANNE POWELL.

18   A    ROXANNA.

19   Q    DO YOU RECALL THAT?

20   A    I RECALL SOMETHING LIKE THAT.    10:48

21   Q    AND IN DOING THAT, YOU WERE ADDING OR YOU WERE TRYING TO

22   MODIFY SOME TESTIMONY YOU HAD GIVEN EARLIER; CORRECT?

23        **MR. NOLAN:**  OBJECTION TO THE CHARACTERIZATION OF WHAT

24   SHE WAS TRYING TO DO, YOUR HONOR.

25        **THE WITNESS:**  CAN I READ IT?    10:4

1        THE COURT:  OVERRULED.

2        YOU MAY ANSWER.

3        MR. PRICE:  LET ME REFRESH YOUR RECOLLECTION.  LOOK

4    AT PAGE --

5        THE COURT:  COUNSEL, LET HER ANSWER THE QUESTION.          10:49

6    SHE HASN'T INDICATED SHE HAS FORGOTTEN.

7        THE WITNESS:  CAN YOU ASK THE QUESTION AGAIN?

8        MR. PRICE:  I KNOW YOU KIND OF POINTED, SO I THOUGHT

9    YOU WERE POINTING TO YOUR DEPOSITION TRANSCRIPT.

10       THE COURT:  COUNSEL, ASK THE QUESTION AGAIN.             10:49

11   BY MR. PRICE:

12   Q    THE QUESTION IS:  DO YOU RECALL AT ONE POINT, AFTER

13   SPEAKING WITH YOUR COUNSEL, YOU CAME INTO THE ROOM AND SAID

14   THAT THERE WAS SOMETHING YOU WANTED TO ADD TO YOUR PRIOR

15   TESTIMONY?                                                   10:4

16   A    YEAH.  I REMEMBER THAT.

17   Q    AND YOU WANTED TO ADD A CONVERSATION WITH ROXANNA POWELL;

18   CORRECT?

19   A    THIS IS TALKING ABOUT WHICH QUESTION, THOUGH?

20   Q    WELL, IF YOU WOULD LOOK AT PAGE 204 OF YOUR DEPOSITION,  10:4

21   LINE 22, DO YOU RECALL THAT YOU WANTED TO ADD TO YOUR PRIOR --

22       THE COURT:  COUNSEL, LET HER READ THE DEPOSITION.

23       MR. PRICE:  PAGE 204, LINE 22, TO 205, LINE FOUR; YOU

24   CAN READ FURTHER IF YOU NEED TO REFRESH YOUR MEMORY.

25       THE WITNESS:  OKAY.  I REMEMBER IT NOW, LOOKING AT        10:5

1  IT.

2  **BY MR. PRICE:**

3  Q    DO YOU RECALL THAT YOU WANTED TO TALK ABOUT -- ADD

4  TESTIMONY ABOUT A CONVERSATION WITH ROXANNA POWELL THAT YOU HAD

5  NOT PREVIOUSLY SAID IN RESPONSE TO AN EARLIER QUESTION;                10:50

6  CORRECT?

7  A    BUT WHAT WAS THE PRIOR TESTIMONY?

8  Q    WELL, THAT'S GOING TO BE MY NEXT QUESTION.

9        DO YOU SEE, YOU WERE SAYING THAT YOU WANTED TO ADD TO

10 YOUR PRIOR TESTIMONY ABOUT TALKING ABOUT THE CASE?  DO YOU SEE    10:50

11 THAT?  THIS IS 204, LINES 22 THROUGH 25.

12 A    IT JUST SAYS "PRIOR TESTIMONY."

13        WHERE IS THE PRIOR TESTIMONY?

14        I'M JUST TRYING TO GET A REFERENCE.

15 Q    FIRST I'M GOING TO ASK YOU TO LOOK AT THIS WHERE YOU SAY    10:51

16 YOU WANT TO ADD TO YOUR PRIOR TESTIMONY ABOUT TALKING ABOUT THE

17 CASE.

18        DO YOU SEE THAT?

19 A    AND THE PRIOR TESTIMONY ABOUT TALKING ABOUT THE CASE IS

20 WHERE?  CAN I READ THAT?                                         10:51

21 Q    LOOK AT PAGE 93 AND LOOK AT LINES FOUR THROUGH NINE.

22 A    RIGHT.

23 Q    IS IT YOUR BEST RECOLLECTION THAT'S THE ANSWER YOU WANTED

24 TO ADD TO?

25 A    YEAH, THE PART ABOUT 'OR CARTER BRYANT.'                    10:51

1          **MR. PRICE:**  AT THIS POINT, YOUR HONOR, IF I MAY PLAY

2    93, LINES FOUR THROUGH NINE.

3          **THE COURT:**  COUNSEL?

4          **MR. NOLAN:**  STILL THE SAME OBJECTION.  LACK OF

5    FOUNDATION, YOUR HONOR.  IT'S NOT PROPER IMPEACHMENT.          10:52

6          **THE COURT:**  COUNSEL, JUST ASK THESE QUESTIONS, NOW

7    THAT SHE'S REFRESHED HER RECOLLECTION WITH THE DEPOSITION.

8    LET'S SEE IF YOU CAN'T PROCEED IN THAT MANNER.

9    **BY MR. PRICE:**

10   Q    UP UNTIL THE TIME OF YOUR DEPOSITION, HAD YOU SPOKEN WITH   10:52

11   ANYONE AT MATTEL ABOUT ANY LAWSUIT OR LITIGATION WITH MGA OR

12   CARTER BRYANT?

13   A    WELL, I SPOKE ABOUT CARTER BRYANT BUT I DIDN'T SPEAK ABOUT

14   THE LAWSUITS OR THE LITIGATION.

15         I JUST UNDERSTAND THAT AS THEM ASKING IF I TALKED          10:52

16   ABOUT CARTER -- NOT ABOUT CARTER AND --

17   Q    YOU UNDERSTOOD THAT TO BEING ASKED WHETHER YOU TALKED WITH

18   HIM ABOUT CARTER BRYANT.

19         **THE COURT:**  THE PROBLEM IS IT'S COMPOUND, COUNSEL, AS

20   THE WITNESS HAS APTLY POINTED OUT; SO BREAK THE QUESTION DOWN    10:52

21   INTO SEPARATE --

22         **MR. PRICE:**  I THINK SHE SAID --

23   **BY MR. PRICE:**

24   Q    YOU UNDERSTOOD THAT QUESTION TO BE ASKING YOU NOT JUST

25   ABOUT THE CASE BUT WHETHER YOU HAD ANY CONVERSATIONS WITH       10:52

1   CARTER BRYANT.

2   A    ABOUT CARTER BRYANT.  ABOUT.

3           THE COURT:  COUNSEL, I'M GOING TO INTERJECT.

4           IT'S A COMPOUND QUESTION.  BREAK THE QUESTION UP AND

5   ASK THE WITNESS EACH COMPONENT SEPARATELY.                    10:53

6           MR. PRICE:  MAY I HAVE A SIDE-BAR ON THIS?

7           THE COURT:  YES.

8           (SIDE-BAR PROCEEDINGS AS FOLLOWS:)

9           THE COURT:  FIRST OF ALL, THIS IS A COMPOUND

10  QUESTION, AND THE WITNESS IS CLEARLY STRUGGLING BECAUSE SHE    10:53

11  WANTS TO ANSWER TO THE CARTER BRYANT PART BUT NOT TO THE MGA

12  PART.

13          MR. PRICE:  WHAT'S IMPORTANT, FIRST, THERE'S NO

14  OBJECTION IT WAS COMPOUND AT THIS TIME.

15          THE COURT:  I UNDERSTAND.  BUT IT'S A CONCERN WITH     10:53

16  THE CONFUSION HERE WITH THE WITNESS.  THE COURT IS TRYING TO

17  KEEP ORDER --

18          MR. PRICE:  LET ME CLARIFY.  WHAT SHE JUST SAID WAS

19  -- WHAT SHE UNDERSTOOD WAS RATHER THAN ASKING JUST ABOUT THE

20  CASE BUT ALSO ASKING ABOUT CARTER BRYANT.  SHE SAID NO, BUT    10:54

21  THEN SHE AMENDED HER ANSWER AND ADDED ONE PERSON.  NOT THREE.

22  SO THAT'S THE POINT.  SHE UNDERSTOOD THIS.  YOU CAN SEE BY THE

23  FACTS, SHE ADDED TO THE ANSWER.  SHE UNDERSTOOD THIS TO BE

24  ASKING WHETHER SHE HAD SPOKEN WITH ANYONE AT MATTEL ABOUT

25  CARTER BRYANT.  BECAUSE THEN SHE SAYS I HAD THIS CONVERSATION  10:54

1    WITH ROXANNA POWELL WHICH DIDN'T CONCERN THE CASE, IT JUST

2    CONCERNED CARTER BRYANT; SO THAT'S MY POINT.  HER UNDERSTANDING

3    IS IMPORTANT.

4           THE COURT:  I THINK THAT THIS IS STRUCTURED ON A

5    POORLY WORDED QUESTION AND I'M GOING TO SUSTAIN THE OBJECTION.                    10:54

6    MOVE ALONG TO THE NEXT QUESTION.

7           (SIDE-BAR PROCEEDINGS CONCLUDED.)

8    BY MR. PRICE:

9    Q    MS. LEAHY, IN ANY EVENT, AT SOME POINT IN YOUR DEPOSITION,

10   YOU CAME BACK AND SAID YOU WANTED TO ADD SOME INFORMATION ABOUT           10:55

11   ROXANNA POWELL; CORRECT?

12   A    CORRECT.  THAT'S THIS ONE, RIGHT, ON 204?

13   Q    YES.  AND AT THAT TIME WHEN YOU WANTED TO ADD INFORMATION,

14   YOU TALKED ABOUT A CONVERSATION YOU HAD WITH ROXANNA POWELL

15   ABOUT CARTER BRYANT; CORRECT?                                          10:55

16   A    CORRECT.

17   Q    NOT ABOUT THE CASE BUT ABOUT CARTER BRYANT; RIGHT?

18   A    CORRECT.  THERE WASN'T A CASE.

19   Q    WHEN YOU CAME BACK TO SAY YOU WANTED TO ADD INFORMATION

20   ABOUT WHO YOU TALKED TO ABOUT CARTER BRYANT, YOU ONLY MENTIONED       10:55

21   ROXANNA POWELL; YOU DIDN'T MENTION MR. HEBDEN OR HUSSEIN ABBO;

22   CORRECT?

23   A    NOT IN THE DEPOSITION, NO.

24   Q    AND THE REASON YOU CAME BACK FROM THE BREAK WAS TO MAKE

25   SURE THE RECORD WAS ACCURATE; YOU WANTED TO ADD SOME                   10:55

1   INFORMATION; RIGHT?

2   A    YEAH, AS MUCH AS I COULD REMEMBER.

3   Q    AND IT'S TRUE THAT -- BY THE WAY, IN YOUR TESTIMONY, AT

4   THAT TIME YOU SAID YOU SPOKE WITH MS. POWELL, WAS IT AT A BAR

5   AFTER ONE OF YOUR WORKOUTS?                                          10:56

6   A    GYMNASTICS.

7   Q    AND THAT SHE WAS THE ONE TO INITIATE THE CONVERSATION.

8   A    CORRECT.

9   Q    AND YOU WERE ASKED BY MR. NOLAN WHETHER OR NOT, WHEN YOU

10  WERE WORKING ON BRATZ, WHETHER YOU WERE TOLD TO KEEP QUIET          10:56

11  ABOUT MR. BRYANT.  CLEARLY WHEN YOU WERE WORKING ON BRATZ AND

12  BEFORE THE DOLL BECAME PUBLIC, YOU KNEW THAT AS OF VENDOR YOU

13  WERE SUPPOSED TO KEEP INFORMATION ABOUT BRATZ CONFIDENTIAL;

14  CORRECT?

15  A    CORRECT.                                                        10:56

16  Q    NOW, AFTER BRATZ CAME OUT, YOU SAID YOU HAD THIS

17  CONVERSATION WITH MS. POWELL; RIGHT?

18  A    CORRECT.

19  Q    AND IT'S TRUE, IS IT NOT, MA'AM, THAT IN THIS CONVERSATION

20  WITH MS. POWELL, AT NO TIME DID YOU TELL HER THAT MR. BRYANT        10:5

21  WAS WORKING ON BRATZ WHEN HE WAS EMPLOYED BY MATTEL; IS THAT

22  CORRECT?

23  A    WE DIDN'T TALK ABOUT THAT.  NO.

24  Q    SO IN FACT, IT'S TRUE YOU NEVER TOLD ANYONE AT MATTEL THAT

25  MR. BRYANT WAS WORKING ON BRATZ WHILE HE WAS EMPLOYED AT           10:5

1    MATTEL; RIGHT?

2            LET ME ASK THAT SO IT'S NOT A DOUBLE NEGATIVE?

3            **THE COURT:**  VERY WELL.  WITHDRAW THE QUESTION.

4    **BY MR. PRICE:**

5    Q    DID YOU EVER TELL ANYONE AT MATTEL THAT CARTER BRYANT WAS    10:57

6    WORKING ON BRATZ WHILE HE WAS EMPLOYED AT MATTEL?

7    A    IT DIDN'T COME UP IN ANY CONVERSATION, SO I DIDN'T THINK

8    ABOUT IT.

9    Q    SO THE ANSWER IS NO; CORRECT?

10   A    IT DIDN'T COME UP IN ANY CONVERSATION.    10:57

11   Q    SO LET'S TALK, THEN, ABOUT YOUR INTERACTION WITH

12   CARTER BRYANT.  AND FIRST, ACTUALLY I WANT TO ASK YOU QUESTIONS

13   ABOUT THE CALL YOU GOT FROM MR. MOORE IN I THINK IT WAS JUNE OF

14   2004, YOU SAID; IS THAT RIGHT?

15   A    SOMEWHERE AROUND THERE, EITHER BEFORE OR AFTER I HAD THE    10:57

16   BABY.

17   Q    AND AT THAT TIME YOU WERE NOT REPRESENTED BY COUNSEL;

18   CORRECT?

19   A    CORRECT.

20   Q    AND IN FACT, EARLIER IN 2004, IN ABOUT APRIL OR MAY, YOU    10:5

21   HAD DONE SOME THIRD-PARTY VENDOR WORK WITH MATTEL; IS THAT

22   CORRECT?

23   A    I DID A HANDFUL OF WORK WITH MATTEL, BUT I CAN'T REMEMBER

24   THE DATES.  I'D HAVE TO GO THROUGH AND LOOK AT MY INVOICES AND

25   MY NOTES.    10:5

1  Q    IF YOU WOULD LOOK, THERE'S A BLACK BINDER OF EXHIBITS, AND

2  LET'S SEE IF THIS REFRESHES YOUR RECOLLECTION.

3         IF YOU WOULD LOOK AT EXHIBIT 10022.  I BELIEVE THE

4  NAME OF YOUR COMPANY AT THAT TIME WAS 3-D DESIGNS, OR SOMETHING

5  LIKE THAT.                                                          10:59

6  A    YEAH.  3-D DESIGN.

7  Q    AND DO YOU RECALL THAT AROUND MAY OF 2004 THAT YOU WERE

8  APPROVED FOR A MATTEL PROJECT?  AND I'LL CALL YOUR ATTENTION TO

9  THE THIRD PAGE OF THIS DOCUMENT.

10  A    WHAT WAS YOUR QUESTION?                                       10:59

11  Q    THAT IT WAS AROUND MAY OF 2004 THAT YOU WERE APPROVED FOR

12  AN INDEPENDENT THIRD-PARTY PROJECT WITH MATTEL.

13  A    THIS WASN'T FOR A PROJECT.  THEY WOULD JUST OPEN UP, LIKE,

14  ALMOST LIKE ACCOUNTS SO, YOU KNOW, IF I DID DO A PROJECT WITH

15  THEM, THEY COULD PAY ME FROM THIS ALLOTTED MONEY; SO THIS ISN'T    11:00

16  ABOUT ANY SPECIFIC PROJECT.

17  Q    AND YOU HAD APPLIED FOR THAT ACCOUNT SOME TIME IN FEBRUARY

18  OF '94 WITH A BUSINESS VALIDATION APPLICATION; IS THAT RIGHT?

19  A COUPLE OF PAGES LATER, YOU'LL SEE IT, I THINK AT PAGE 4.

20  A    WHERE IS THE DATE ON HERE?                                    11:00

21  Q    I THINK THE DATE IS AT PAGE 6.

22  A    RIGHT.

23  Q    AND THEN THERE WAS -- DO YOU RECALL THERE WAS AN

24  ENGAGEMENT OF SERVICES FORM, IF YOU LOOK AT PAGE 7, DATED

25  JANUARY, 2004?                                                     11:0

```
 1  A    THIS IS A JUST-GETTING-ME-SET-UP-TYPE FORM.

 2  Q    DO YOU RECALL THERE WAS A SERVICES AGREEMENT --

 3  A    I'M ASKING, IS THAT WHAT THIS IS?

 4  Q    I'M ASKING YOU.

 5       THE COURT:  MA'AM, YOU NEED TO JUST ANSWER THE                11:01

 6  QUESTIONS?

 7       ANSWER THE NEXT QUESTION.

 8       THE WITNESS:  OKAY.

 9  BY MR. PRICE:

10  Q    IF YOU WOULD LOOK AT PAGE 10, DO YOU RECALL THERE BEING A     11:01

11  SERVICES AGREEMENT SIGNED SOME TIME IN 2004, AROUND APRIL OF

12  2004?

13  A    CORRECT.

14  Q    SO YOU HAD THESE INTERACTIONS WITH MATTEL IN THE APRIL OR

15  MAY 2004 TIME FRAME; CORRECT?                                      11:01

16  A    CORRECT.

17  Q    AND MR. MOORE CONTACTS YOU SOME TIME AROUND JUNE OF 2004;

18  CORRECT?

19  A    JUNE OR JULY.

20  Q    AND ONE OF THE THINGS YOU DO IN RESPONSE IS YOU CALLED UP     11:01

21  MS. GONRICH OF MGA; CORRECT?

22  A    GRONICH.

23  Q    IS THAT RIGHT?

24  A    CORRECT.

25  Q    SHE WAS THE ATTORNEY FOR MGA; CORRECT?                        11:02
```

```
 1    A    CORRECT.

 2    Q    AND THEN IT WAS IN FEBRUARY OF 2005 THAT YOU WERE ACTUALLY

 3    HIRED FULL-TIME AT MGA; CORRECT?

 4    A    CAN I ASK YOU TO REPEAT A QUESTION AGAIN?

 5    Q    DO YOU WANT ME TO REPEAT THAT QUESTION?                   11:02

 6    A    THE ONE ABOUT WHEN I CALLED DAPHNE GRONICH.

 7    Q    DIDN'T YOU TESTIFY IN RESPONSE TO MR. NOLAN'S QUESTIONS

 8    THAT AFTER MR. MOORE CALLED YOU, YOU CALLED MS. GRONICH, MGA'S

 9    GENERAL COUNSEL?

10    A    HE CALLED ME AND LEFT A MESSAGE AND THEN I CALLED HIM     11:02

11    BACK.   THEN I CALLED DAPHNE GRONICH.

12    Q    AND MY NEXT QUESTION IS, IT WAS THEN SEVERAL MONTHS AFTER,

13    IN FEBRUARY OF 2005, THAT YOU BECAME A FULL TIME EMPLOYEE OF

14    MGA; CORRECT?

15    A    IT WAS APRIL.                                             11:02

16    Q    IF YOU WOULD LOOK AT EXHIBIT 538.

17         DO YOU HAVE THAT?

18    A    YES.

19    Q    DO YOU RECOGNIZE THAT AS AN AGREEMENT EXECUTED BETWEEN YOU

20    AND MGA ON OR ABOUT FEBRUARY -- THIS IS FEBRUARY OF 2004;      11:03

21    RIGHT?

22    A    I DON'T SEE A DATE.

23    Q    IF YOU WOULD LOOK AT -- LET'S GO TO PAGE 4.

24    A    OKAY.  BUT THAT SAYS -- OKAY.  SORRY.

25         MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 538 INTO            11:03
```

1    EVIDENCE.

2          MR. NOLAN:  NO OBJECTION.

3          THE COURT:  IT'S ADMITTED.  YOU MAY PUBLISH.

4          (EXHIBIT 538 RECEIVED.)

5    BY MR. PRICE:                                         11:03

6    Q    IN ANY EVENT, IT'S ALSO TRUE THAT -- I THINK YOU SAID MGA

7    DID PROVIDE YOU WITH COUNSEL; CORRECT?

8    A    CORRECT.

9    Q    AND WHEN WAS THAT?

10   A    IT WOULD HAVE BEEN AFTER THE FIRST PHONE CALL WITH        11:04

11   MICHAEL MOORE.

12   Q    SO THE CHRONOLOGY IS MR. MOORE CALLED, AND YOU CALLED HIM

13   BACK; CORRECT?

14   A    CORRECT.

15   Q    HE DIDN'T OFFICIALLY OFFER TO GET YOU COUNSEL; CORRECT?   11:04

16   A    CORRECT.

17   Q    THEN YOU CALLED MS. GRONICH, THE GENERAL COUNSEL FOR MGA;

18   CORRECT?

19   A    CORRECT.

20   Q    THEN MGA PROVIDES YOU WITH COUNSEL; RIGHT?               11:04

21   A    CORRECT.

22   Q    AND THIS IS BEFORE YOU'RE A FULL-TIME EMPLOYEE WITH MGA;

23   CORRECT?

24   A    YES.

25   Q    AND SO THEY ARE PAYING THE ATTORNEYS' FEES FOR YOUR      11:04

1    ATTORNEY; CORRECT?

2    A    FROM WHAT I ASSUMED.

3    Q    AND THAT WAS FROM SOMETIME IN 2004 TO THE PRESENT; RIGHT?

4    A    CORRECT.

5    Q    AND YOU HAVE ALSO EARNED FEES FROM MGA PERSONALLY; RIGHT?    11:04

6         **MR. NOLAN:**  OBJECTION.  VAGUE AND AMBIGUOUS.

7         **THE COURT:**  REPHRASE.

8    **BY MR. PRICE:**

9    Q    YOU MADE MONEY BECAUSE YOU WORKED FOR MGA; THEY MADE YOU

10   PAID YOU MONEY; CORRECT?    11:05

11   A    YEAH, THEY PAID ME MONEY.

12   Q    SOMEWHERE IN EXCESS OF HALF A MILLION DOLLARS SINCE THE

13   FIRST TIME YOU BEGAN WORKING FOR THEM; CORRECT?

14   A    YEAH.  WELL, I DON'T KNOW, I NEVER ADDED IT UP, BUT --

15   Q    DOES THAT SOUND ABOUT RIGHT, THAT IT'S SOMEWHERE IN EXCESS    11:05

16   OF HALF A MILLION DOLLARS?

17   A    WELL, I DIDN'T ADD IT UP; I'D HAVE STICKER SHOCK.

18   Q    YOU HAVE A GENERAL IDEA OF WHAT YOU MADE OVER THE YEARS

19   WITH MGA, THOUGH, DON'T YOU?

20   A    YEAH.  I'D HAVE TO GO THROUGH AND ADD UP ALL MY THINGS.    11:05

21   Q    OKAY.

22         NOW, LET ME SWITCH, THEN, TO YOUR CONTACTS WITH

23   MR. BRYANT IN SEPTEMBER.

24         YOU GOT A CALL FROM MR. BRYANT IN SEPTEMBER; CORRECT?

25   A    THIS IS GOING BACK TO 2000?    11:05

1   Q    YES.  YOU'RE RIGHT.  IN SEPTEMBER OF 2000, YOU GOT A CALL

2   FROM MR. BRYANT; RIGHT?

3   A    RIGHT.

4   Q    AND PRIOR TO THAT, SIX YEARS PRIOR TO THAT, SEPTEMBER

5   2000, YOU HAD WORKED FOR MATTEL; RIGHT?

6   A    YEAH; SOMEWHERE IN '95; IT WAS RIGHT AFTER I GOT MARRIED,

7   SO SOMEWHERE LATE '94, EARLY '95.

8   Q    AND BEFORE BRATZ, YOU HAD NEVER DONE A FASHION DOLL FROM

9   START TO FINISH; CORRECT?

10  A    CORRECT.  I MAINLY DID THE HEADS.

11  Q    SO MR. BRYANT CALLED YOU WHEN YOU WERE AT YOUR HOME;

12  RIGHT?

13  A    CORRECT.

14  Q    AND I BELIEVE YOU TESTIFIED TO THE JURY YESTERDAY THAT YOU

15  WERE EXCITED BECAUSE THIS PROJECT GAVE YOU ARTISTIC FREEDOM.

16        DO YOU RECALL THAT?

17  A    YES.  I REMEMBER.

18  Q    BUT IN YOUR DEPO, YOU SAID YOU WERE EXCITED BECAUSE IT WAS

19  THE FIRST JOB YOU GOT; RIGHT?

20  A    BOTH ARE TRUE.

21  Q    BUT YOU DIDN'T MENTION THE THING ABOUT ARTISTIC FREEDOM,

22  DID YOU?

23  A    I'D HAVE TO GO THROUGH AND READ MY DEPOSITION.

24  Q    LETS GO TO PAGE 131, LINES TWO THROUGH 11.

25        ACTUALLY, IT SHOULD BE LINES SIX THROUGH 11.

1    A    OKAY.

2              MR. PRICE:   YOUR HONOR, IF I MAY PLAY THAT.

3              MR. NOLAN:   YOUR HONOR, FOR COMPLETENESS ON THIS

4    SUBJECT, THE SUBJECT IS ADDRESSED AGAIN AT PAGE 152, LINES

5    EIGHT THROUGH 11.                                              11:07

6              MR. PRICE:   THAT'S IRRELEVANT AND NOT REQUIRED.

7              THE COURT:   152, LINES 8 THROUGH 11 IS JUST --

8              MR. PRICE:   HE PROBABLY MEANS SEVEN, YOUR HONOR.

9    THERE'S A QUESTION ABOUT 'WHAT DO YOU MEAN BY INSPIRATION?'

10             THE COURT:   IT'S IRRELEVANT.                         11:08

11             MR. NOLAN:   IT'S 11; AND QUESTION NUMBER EIGHT --

12             MR. PRICE:   I DON'T THINK IT'S REQUIRED, YOUR HONOR.

13   IT'S NOT THE SAME QUESTION.

14             THE COURT:   COUNSEL, YOU'RE ON PAGE 152?

15             MR. NOLAN:   PAGE 152, QUESTION, LINE SEVEN, AND THE  11:08

16   ANSWER REFERS TO --

17             THE COURT:   IT REFERS TO INSPIRATION.  I JUST DON'T

18   SEE INSPIRATION ON PAGE 131.  I'LL LET YOU -- UNLESS I'M

19   MISSING SOMETHING.

20             MR. NOLAN:   IT'S THE FIRST SENTENCE THAT RELATES BACK 11:0

21   TO HER VIEW OF THE PROJECT.

22             THE COURT:   YOU MAY BRING THAT UP IN YOUR REDIRECT

23   EXAMINATION, COUNSEL.

24             OBJECTION.   OVERRULED.

25             (VIDEO DEPOSITION PLAYS; EXCERPTS PROVIDED            11:0

1           AS FOLLOWS BY COUNSEL; PAGE 131:06 TO 131:11:)

2           Q    DID YOU TELL MR. BRYANT DURING THAT

3       CONVERSATION WHETHER OR NOT YOU WOULD BE WILLING TO.

4       DO THE WORK?

5           A    I CAN'T REMEMBER VERBATIM.  I'M ASSUMING I

6       SAID THAT.  I WAS VERY EXCITED BECAUSE IT WAS ONE OF.

7       MY FIRST JOBS AS A VENDOR.

8           (EXCERPTS CONCLUDED.)

9   BY MR. PRICE:

10  Q    WHEN MR. BRYANT CALLED YOU IN THIS FIRST CALL, ONE OF THE       11:09

11  THINGS HE SAID WAS PAULA TREANTAFELLES WAS WORKING ON THIS

12  PROJECT; CORRECT?

13  A    CAN I LOOK AT MY NOTEBOOK?

14  Q    YOU MAY IF YOU LIKE.  I BELIEVE THAT'S 1137, PAGE 14, IS

15  WHERE YOU HAVE NOTES ABOUT SEPTEMBER 29TH.                            11:09

16  A    I DON'T REMEMBER TALKING TO HIM ABOUT PAULA IN THE FIRST

17  PHONE CALL.

18          MR. PRICE:  YOUR HONOR, I'D LIKE TO PLAY PAGE 129,

19  LINES NINE THROUGH 17.

20          THE COURT:  ANY OBJECTION?                                    11:10

21          MR. NOLAN:  WE'D LIKE TO RUN IT TO 130, LINE 3.

22          THE COURT:  COUNSEL?

23          MR. PRICE:  IT'S NOT REQUIRED FOR THE POINT THAT'S

24  BEING MADE.

25          THE COURT:  I THINK IT MAKES IT COMPLETE; IT'S CLOSE          11:11

1  ENOUGH; LET'S IMPROVE IT.

2       **MR. PRICE:**  129, LINES 9 TO 30, TO 130, LINE 3.

3       (VIDEO PLAYS; EXCERPTS PROVIDED BY

4       COUNSEL AS FOLLOWS:

5       Q   AND DURING THAT CONVERSATION IS WHEN CARTER

6       BRYANT BROUGHT UP THE NAME M.G.A.; IS THAT CORRECT?

7       A   YES.  I ASKED HIM WHO THE PROJECT WAS FOR.

8       Q   IF YOU COULD, PLEASE, TELL ME WHAT YOU AND

9       CARTER BRYANT DISCUSSED DURING THAT TELEPHONE

10      CONVERSATION?

11      A   FROM WHAT I REMEMBER, HE SAID HE HAD A

12      PROJECT, AND IT WAS FOR M.G.A. IN NORTH HILLS AND.

13      THAT PAULA TREANTAFELLES WAS WORKING ON IT AS WELL.

14      Q   DID HE SAY ANYTHING ELSE IN THAT CONVERSATION?

15      A   NOT THAT I REMEMBER.

16      Q   DID YOU HAVE AN UNDERSTANDING OR DID HE SAY

17      WHAT THE PROJECT FOR M.G.A. WAS?

18      A   NOT AT THAT TIME.

19      Q   THAT WAS SOMETHING YOU LEARNED SUBSEQUENTLY?

20      A   YES.

21      Q   AT THAT TIME, DID YOU UNDERSTAND THAT PAULA

22      TREANTAFELLES WAS AT M.G.A.?

23      A   THAT'S WHAT I ASSUMED BECAUSE I DIDN'T KNOW

24      HER NAME.

25      (EXCERPTS CONCLUDED.)

11:12

BY MR. PRICE:

Q    AND YOU HAD, THEN, A FACE TO FACE MEETING WITH MR. BRYANT ABOUT A WEEK TO A WEEK AFTER THIS; CORRECT?

A    CORRECT.

Q    IF YOU LOOK AT EXHIBIT 1137, PAGE 14 -- I THINK YOU WERE LOOKING AT THAT TO REFRESH YOUR MEMORY -- AND THAT'S IN EVIDENCE, YOUR HONOR -- IF WE COULD BLOW UP THE TOP PART HERE.

DO YOU SEE YOU HAVE THESE ENTRIES, "CARTER BRYANT," "X 6099" AND THEN "310-538-3615"?  DO YOU SEE THAT?

A    YES.

Q    AND THEN IT SAYS "DOLL PLAY FASHION, MGA ENTERTAINMENT."

DO YOU SEE THAT?

A    YES.

Q    DO YOU BELIEVE THOSE ARE YOUR NOTES FROM THIS FIRST TELEPHONE CALL?

A    YES.

Q    AND THIS "STAR 6099," YOU KNOW WHAT THAT REFERS TO; CORRECT?

A    YES; THAT'S CARTER'S EXTENSION.

Q    YOU SAY HIS EXTENSION; THAT WAS HIS EXTENSION WHERE?

A    AT MATTEL.

Q    SO MR. BRYANT CALLS YOU, HE TELLS YOU -- HE GIVES YOU HIS MATTEL EXTENSION; CORRECT?

A    CORRECT.

Q    HE SAYS THIS PROJECT IS FOR MGA; CORRECT?

1    A    CORRECT.

2    Q    AND HE TELLS YOU THAT MS. TREANTAFELLES, WHOSE NAME YOU

3    HAD NEVER HEARD BEFORE, WAS ALSO INVOLVED WITH THIS; RIGHT?

4    A    WELL, I DON'T KNOW IF HE DID IT ON THE FIRST PHONE

5    CONVERSATION OR ONE OF THE SECOND CONVERSATION.  HER NAME IS AT    11:14

6    THE BOTTOM OF THAT PAGE BECAUSE I NEEDED TO SPELL IT; SO, YES,

7    HE COULD HAVE GONE OVER THAT ON THE FIRST CONVERSATION OR A

8    LATER ONE.

9    Q    BUT THE LATER ONE, YOU'RE TALKING ABOUT THE ONE YOU MIGHT

10   HAVE HAD A WEEK OR A WEEK AND A HALF LATER; RIGHT?    11:14

11   A    OR A LATER PHONE CONVERSATION.

12   Q    WELL, A WEEK OR A WEEK AND A HALF LATER, YOU DID HAVE A

13   FACE-TO-FACE MEETING WITH MR. BRYANT; CORRECT?

14   A    CORRECT.

15   Q    WHEN YOU HAD YOUR MEETING WITH HIM, HE DIDN'T GIVE YOU A    11:1

16   WRITTEN DESCRIPTION OF THE BRATZ DOLLS, DID HE?  THAT IS,

17   SOMETHING IN HANDWRITING DESCRIBING THEIR PERSONALITY AND

18   CHARACTERISTICS?

19   A    YOU MEAN WITH WORDS?

20   Q    YES.    11:1

21   A    NO.  IT WAS JUST THE DRAWINGS.

22   Q    AND HE DIDN'T SAY HE WANTED THESE DOLLS TO LOOK LIKE

23   BARBIE, DID HE?

24   A    NO.

25   Q    HE DIDN'T SAY HE WANTED THEM TO LOOK LIKE A CABBAGE PATCH    11:1

1   DOLL; RIGHT?

2   A     RIGHT.

3   Q     HE INSTEAD GAVE YOU SOME DRAWINGS TO SHOW YOU HIS CONCEPT

4   OF HOW THESE DOLLS SHOULD LOOK; CORRECT?

5   A     HE GAVE ME A BINDER WITH DRAWINGS IN THIS.                    11:15

6   Q     AND HE SAID 'THIS IS MY CONCEPT OF HOW I WANT THE DOLLS TO

7   LOOK'; RIGHT?

8   A     HE SAID NOT 'THIS IS HOW I WANTED THE DOLLS TO LOOK' BUT

9   'THIS IS MY IDEA, MY CONCEPT DRAWINGS, FOR THE DOLLS.'

10  Q     AND HE WANTED YOU TO DO A SCULPT; CORRECT?                    11:15

11  A     RIGHT; HE WANTED ME TO START SCULPTING.

12  Q     HE GAVE YOU -- I THINK YOU WERE SHOWN EXHIBIT 302, WHICH

13  WAS SOME BRATZ SKETCHES BY MR. BRYANT.  DO YOU RECALL THAT?

14  MR. NOLAN SHOWED YOU THAT?  THAT WAS IN THE WHITE BINDER?

15  A     YES.                                                         11:15

16  Q     IN FACT, IN THIS CASE, YOU PRODUCED TO US SKETCHES THAT

17  MR. BRYANT HAD DONE OF BRATZ DOLLS.  DO YOU RECALL THAT?  YOU

18  GAVE THEM TO YOUR ATTORNEY AND THEN THEY WERE HANDED OVER TO

19  US.

20  A     RIGHT.  I GAVE THEM THE BINDER.                              11:16

21  Q     AND IF YOU WOULD LOOK AT EXHIBIT 1125, IN THE BLACK

22  BINDER.  YOU RECOGNIZE THESE DRAWINGS AS THE DRAWINGS YOU

23  PROVIDED TO YOUR COUNSEL TO PROVIDE TO US; CORRECT?

24  A     WELL, I GAVE THE BINDER.  I DON'T WANT TO SAY I RECOGNIZE

25  EACH INDIVIDUAL DRAWING BECAUSE I DON'T REMEMBER WHICH ONES I     11:1

```
 1   REMEMBER.  YOU KNOW WHAT I'M SAYING?

 2          I JUST WANT TO MAKE SURE I'M BEING CLEAR THAT I DON'T

 3   REMEMBER EACH SPECIFIC DRAWING BUT I REMEMBER THE BINDER FULL

 4   OF DRAWINGS.

 5   Q    AND YOU SEE THIS HAS THESE BATES ON IT "SABW-L."              11:17

 6          DO YOU SEE THAT?

 7   A    BATES?

 8   Q    AT THE BOTTOM, IT HAS A NUMBER.

 9   A    YEAH.

10   Q    DO YOU SEE THAT?                                             11:17

11   A    YES.

12   Q    AND YOUR COUNSEL WAS SIDLEY AUSTIN.

13          DO YOU RECOGNIZE THIS AS THE FILE YOU GAVE YOUR

14   COUNSEL?  DO YOU SEE THAT?

15   A    WHAT DO YOU MEAN, THE FILE?                                  11:1

16   Q    YOU SAID YOU GAVE A BINDER OF DOCUMENTS.  THIS IS THE

17   BINDER THAT YOU GAVE YOUR COUNSEL; CORRECT?

18   A    WELL, LIKE I SAID, I GAVE THEM A BINDER.  I CANNOT

19   HONESTLY IDENTIFY IF EACH WAS IN THERE OR NOT.

20   Q    DOES IT APPEAR TO BE CONSISTENT WITH WHAT YOU GAVE YOUR      11:1

21   COUNSEL?

22   A    YES.  IT APPEARS TO BE SIMILAR.

23          MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 1125 INTO

24   EVIDENCE.

25          MR. NOLAN:  NO OBJECTION.                                  11:1
```

1          **THE COURT:**  ADMITTED.  YOU MAY PUBLISH.

2          (EXHIBIT 1125 RECEIVED.)

3    **BY MR. PRICE:**

4    Q    SO, FOR EXAMPLE, AMONG THE DRAWINGS YOU GOT IN THE FILE

5    WERE, SAY, THE DRAWING ON THE FIRST PAGE.  DO YOU SEE THAT?          11:18

6    A    YES.

7    Q    AND THE DRAWING ON THE SECOND PAGE.

8          LET ME JUST FLIP THROUGH THESE QUICKLY AND GET AN

9    IDEA OF WHAT'S IN HERE.

10          ONE OF THE OTHER DRAWINGS YOU GOT FROM MR. BRYANT WAS       11:18

11    ALREADY IN EVIDENCE, 1139; IF WE COULD SHOW THAT.

12    A    I DON'T KNOW IF THAT WAS IN THE BINDER, BUT I DID GET THEM

13    AT SOME POINT.

14    Q    FROM MR. BRYANT?

15    A    CORRECT.                                                          11:1

16    Q    WHEN YOU MET AND HE GIVE YOU THESE DRAWINGS, DID HE ALSO

17    GAVE YOU AN AD BY STEVE MADDEN.  DO YOU RECALL THAT?

18    A    YES, I DO.

19    Q    AND I THINK YOU'VE ALREADY IDENTIFIED THAT AS 1127.

20          PERHAPS WE CAN SHOW THAT.                                       11:1

21          HE GAVE YOU THIS; CORRECT?

22    A    CORRECT.

23          **MR. PRICE:**  AND IF WE COULD SHOW YOU WHAT'S ALREADY

24    IN EVIDENCE, YOUR HONOR, IS EXHIBIT 10179-133; THAT'S A PAGE

25    FROM THE AUGUST 1999 SEVENTEEN MAGAZINE.  IF WE COULD PUT THAT     11:2

1   UP.

2        THE COURT:  YOU MAY.

3   BY MR. PRICE:

4   Q    DO YOU SEE EXHIBIT 10179-133 FROM THE AUGUST 1999

5   SEVENTEEN MAGAZINE; THAT'S THE SAME PHOTOGRAPH.                    11:2(

6        DO YOU SEE THAT?

7   A    DO I NEED TO TURN TO THE PAGE?

8   Q    SURE.  OR YOU CAN LOOK AT THE MONITOR.

9   A    COMPARE THIS TO WHAT?

10  Q    THE PICTURE IN 10179-133, THE AUGUST '99 SEVENTEEN          11:2(

11  MAGAZINE, IS THE SAME PHOTOGRAPH AS EXHIBIT 1127 THAT YOU SEE.

12       THE COURT:  COUNSEL, PUT WHAT YOU'RE ASKING THE

13  WITNESS TO COMPARE ON THE SCREEN.

14       MR. PRICE:  OKAY.

15  BY MR. PRICE:                                                    11:2(

16  Q    DO YOU SEE THAT NOW?

17  A    YES.

18  Q    YOU'LL AGREE THAT THE PHOTOGRAPH IS THE SAME PHOTOGRAPH

19  THAT WAS IN THE AUGUST '99 SEVENTEEN MAGAZINE AND WHAT

20  MR. BRYANT GAVE TO YOU IN SEPTEMBER.                             11:2

21  A    WELL, THERE'S DIFFERENT WORDS AT THE BOTTOM.

22  Q    RIGHT.  BUT I'M SAYING THE PHOTOGRAPHS ARE THE SAME;

23  CORRECT?

24       MR. NOLAN:  WELL, YOUR HONOR, I'M SORRY.

25       OBJECTION TO THE AMBIGUITY IN THE PHOTOGRAPH.               11:2

1          **THE COURT:**  SUSTAINED.

2     BY MR. PRICE:

3     Q    DISREGARDING THE PRINT THAT'S ON IT, THE PHOTOGRAPHS OF

4     THE TWO DOLLS, YOU'LL AGREE, ARE THE SAME.

5     A    YEAH, FROM THE SCREEN, FAR AWAY.                              11:23

6          I MEAN.  IF YOU WANT ME TO COMPARE THEM, LIKE, REALLY

7     HARD, THEN -- BUT, YEAH, THEY APPEAR TO BE THE SAME.  THERE'S

8     DIFFERENT THINGS ON THEM, BUT THE FIGURES APPEAR TO BE THE

9     SAME.

10         IS THAT WHAT YOU ARE ASKING?                                  11:2

11    Q    IN FACT, MY QUESTION IS, ON DIRECT, DID YOU TESTIFY THAT

12    THIS WAS WHAT CARTER BRYANT GAVE YOU?

13    A    WHICH ONE?

14    Q    THE 10179-0133.

15    A    THAT'S WHICH ONE?                                            11:2

16    Q    THE ONE ON THE LEFT.

17    A    SEEING THEM TOGETHER, I SEE THAT THERE'S DIFFERENT WORDS.

18    I DON'T REMEMBER WHAT YOU GUYS WERE SHOWING ME AT THE

19    DEPOSITION.

20    Q    I MEANT DURING YOUR EXAMINATION BY MR. NOLAN.               11:2

21    A    I'M CONFUSED.  I'M SORRY.

22    Q    I'LL MOVE ON.

23         YOU MENTIONED THAT YOU GOT A PHOTOGRAPH OF THESE

24    DOUBLE ANGEL PICTURES.  I'M GOING TO SHOW YOU SOMETHING ALREADY

25    MARKED IN EVIDENCE, IT'S EXHIBIT 17246-115.                       11:2

```
 1              THIS IS NOT SOMETHING MR. BRYANT GAVE YOU; CORRECT?

 2   A    CAN I LOOK IT UP IN HERE IN MY BOOK?

 3   Q    I'M NOT SURE IT'S THERE.  I MIGHT HAVE TO BRING THIS UP TO

 4   YOU.

 5              MR. PRICE:  IF I MAY, YOUR HONOR?                         11:23

 6              THE COURT:  YOU MAY.

 7   BY MR. PRICE:

 8   Q    THIS IS ALREADY IN EVIDENCE.  I'M JUST CONFIRMING.

 9              THIS IS NOT WHAT MR. BRYANT GAVE YOU IN SEPTEMBER;

10   RIGHT?                                                              11:23

11   A    NO, IT IS NOT.

12   Q    IF I COULD SHOW YOU 17246-126.  THIS ALSO IS NOT SOMETHING

13   THAT MR. BRYANT GAVE YOU IN SEPTEMBER OF 2000; CORRECT?

14   A    CORRECT.

15   Q    AND I'LL ASK YOU THE SAME QUESTIONS ABOUT 17246-127, AND     11:24

16   17246-193.  THIS SOMETHING MR. BRYANT GAVE YOU; CORRECT?

17   A    NO, IT IS NOT.

18   Q    AND IF YOU LOOK AT 17246-193, MR. BRYANT DIDN'T GIVE YOU

19   THIS EITHER; CORRECT?

20   A    NO, HE DID NOT.                                               11:24

21   Q    SO HE GAVE YOU WHAT APPEARS TO BE IN EXHIBIT 1125 AND THIS

22   STEVE MADDEN AD, EXHIBIT 1127; CORRECT?

23   A    WHAT'S THE 1125?

24   Q    THAT WAS THE BINDER, YOUR BINDER.

25              SO THOSE ARE THE THINGS HE GAVE YOU; CORRECT?           11:25
```

1    A    CORRECT.

2    Q    NOW, ONE OF THE OTHER DOCUMENTS HE GAVE YOU IS

3    EXHIBIT 1128; CORRECT?  IF YOU WOULD LOOK AT THAT.

4         AND I BELIEVE THAT WAS IN EVIDENCE AS WELL THROUGH

5    MR. NOLAN'S EXAMINATION.                                        11:2!

6         **MR. NOLAN:**  I THINK THAT'S A MISSTATEMENT,

7    YOUR HONOR.  I DON'T THINK I SHOWED THIS TO HER.

8    **BY MR. PRICE:**

9    Q    IF YOU LOOK AT EXHIBIT 1128, DO YOU SEE THAT?

10   A    UH-HUH.                                                    11:2!

11   Q    THAT'S ONE OF THE DRAWINGS MR. BRYANT GAVE YOU; IS THAT

12   CORRECT?

13   A    HE GAVE IT TO ME AT SOME POINT.  I'M NOT CLEAR IF IT WAS

14   IN THE BINDER OR NOT.

15        IS THAT WHAT YOU ARE ASKING?                               11:2

16   Q    SOME TIME IN SEPTEMBER OR OCTOBER, MR. BRYANT GAVE YOU

17   THIS DRAWING, 1128; CORRECT?

18   A    CORRECT.  I WOULD ASSUME.  I DON'T KNOW THE DATE.  I CAN'T

19   TELL YOU THE EXACT DATE.

20        **MR. PRICE:**  I'LL MOVE THAT INTO EVIDENCE, YOUR HONOR.  11:2

21        **THE COURT:**  IT'S ADMITTED.  YOU MAY NOW PUBLISH.

22        **MR. NOLAN:**  NO OBJECTION.

23        (EXHIBIT 1128 RECEIVED.)

24        **MR. PRICE:**  ACTUALLY, IF WE COULD PUT THAT UP, ALONG

25   WITH 1127 AND 1125-2.                                           11:2

1        THEY ARE ALL IN EVIDENCE, YOUR HONOR.  IT'S WHAT WE

2  JUST WENT THROUGH.

3        **THE COURT:**  VERY WELL.

4  **BY MR. PRICE:**

5  Q   SO SOME TIME IN SEPTEMBER AND OCTOBER 2000, YOU RECEIVED

6  FROM MR. BRYANT EACH OF THESE THREE DRAWINGS; CORRECT?

7        **MR. MCFARLAND:**  OBJECTION.  MISSTATES HER TESTIMONY.

8        **MR. NOLAN:**  I'LL JOIN IN THE OBJECTION.

9        **THE COURT:**  LET ME SEE ALL THREE COUNSEL AT SIDE-BAR

10  FOR A SECOND.

11        (SIDE-BAR PROCEEDINGS AS FOLLOWS:)

12        **THE COURT:**  WE'RE HAVING ONE ATTORNEY ON THE

13  OBJECTIONS.  YOU CAN CERTAINLY MAKE OBJECTIONS ON

14  ATTORNEY-CLIENT PRIVILEGE AND ON PERSONAL OBJECTIONS, BUT IN

15  TERMS OF DEFENDING MGA'S CASE, THEY ARE IN THE GOOD HANDS OF

16  MR. NOLAN.

17        **MR. MCFARLAND:**  APOLOGIZE.

18        **THE COURT:**  MR. NOLAN, DO YOU JOIN?

19        **MR. NOLAN:**  I JOIN IN THE SAME ONE.

20        **THE COURT:**  STATE THE OBJECTION.

21        **MR. NOLAN:**  IT MISSTATES HER TESTIMONY, THE PREAMBLE.

22        **THE COURT:**  REPHRASE YOUR QUESTION.

23        **MR. MCFARLAND:**  SO FOR CLARIFICATION, IF IT'S

24  ATTORNEY-CLIENT, THAT'S FINE.

25        **THE COURT:**  RIGHT.  YOU'RE REPRESENTING HER IN HER

1   PERSONAL CAPACITY.  I'M ONLY ALLOWING ONE ATTORNEY TO SPEAK FOR

2   MGA IN TERMS OF THE MERITS OF THE CASE.

3            **MR. MCFARLAND:**  VERY WELL.

4            **THE COURT:**  VERY WELL.

5            (SIDE-BAR PROCEEDINGS CONCLUDED.)                    11:27

6   **BY MR. PRICE:**

7   Q    THE GENTLEMAN WHO MADE THE OBJECTION, THAT'S YOUR ATTORNEY

8   MR. MCFARLAND.

9   A    WAS THAT YOU?

10           YES.                                                11:28

11  Q    AND YOU UNDERSTOOD THAT HE ALSO REPRESENTS MGA.

12  A    I DIDN'T KNOW THAT UNTIL RECENTLY.

13  Q    BUT DO YOU KNOW NOW THAT HE ALSO REPRESENTS MGA?

14  A    RIGHT.

15           **MR. NOLAN:**  YOUR HONOR, OBJECTION TO THE          11:28

16  CHARACTERIZATION OF THAT IN THIS LITIGATION.

17           **THE COURT:**  YOU CAN FOLLOW UP, THEN, COUNSEL.

18  **BY MR. PRICE:**

19  Q    AND MY QUESTION WAS -- WE'VE ALREADY BEEN THROUGH THIS, I

20  BELIEVE, BUT LET'S TRY.                                      11:28

21           YOU RECEIVED A PHOTOGRAPH WHICH HAD THIS

22  DRAWING/PHOTOGRAPH FROM MR. BRYANT IN SEPTEMBER OR OCTOBER OF

23  2000; CORRECT?

24  A    YEAH.  IT HAD THE TWO FIGURES ON IT.

25  Q    AND IN THE BINDER THAT YOU GAVE YOUR COUNSEL, WHICH YOU    11:28

1  RECEIVED FROM MR. BRYANT, WE HAVE THIS DRAWING; IT'S THE SECOND

2  PAGE OF 1125; CORRECT?

3  A    CORRECT.

4  Q    AND YOU SAID YOU RECEIVED 1128 SOME TIME IN SEPTEMBER OR

5  OCTOBER AS WELL; CORRECT?                                     11:29

6  A    CORRECT.

7  Q    SO YOU RECEIVED THESE THREE DRAWINGS FROM MR. BRYANT SOME

8  TIME IN SEPTEMBER OR OCTOBER OF 2000; CORRECT?

9  A    WELL, THE ONE ON THE LEFT ISN'T A DRAWING; IT'S AN AD.

10  Q    OKAY.   THIS DISTORTED PHOTOGRAPH?                       11:29

11  A    RIGHT.

12  Q    AND AFTER THIS INITIAL MEETING WHERE MR. BRYANT GAVE YOU

13  DRAWINGS AND GAVE YOU THIS STEVE MADDEN AD, YOU THEN WENT TO

14  WORK TO DO A SCULPT; CORRECT?

15  A    CORRECT.                                                 11:2

16  Q    AND MR. BRYANT DIDN'T LIVE AT YOUR HOUSE; RIGHT?

17  A    NO, HE DIDN'T.

18  Q    SO HE WASN'T THERE WHILE YOU WERE ACTUALLY DOING THE

19  SCULPT.

20  A    NO.                                                      11:2

21  Q    AND YOU WOULDN'T HAVE EXPECTED HIM TO BE; RIGHT?

22  A    RIGHT.

23  Q    THEN SOME TIME AROUND SEPTEMBER 29TH YOU HAD A MEETING

24  WITH MR. BRYANT.

25       MR. NOLAN:   YOUR HONOR, MY OBJECTION, IS THIS EXHIBIT   11:2

1    BEING PUBLISHED TO THE JURY OR IS IT --

2            **MR. PRICE:**  WE CAN TURN IT OFF NOW.

3            **THE COURT:**  THANK YOU, COUNSEL.

4    **BY MR. PRICE:**

5    Q    THEN YOU HAVE YOUR SECOND MEETING WITH MR. BRYANT, WHICH          11:30

6    IS SOMETIME AROUND SEPTEMBER 29TH; CORRECT?

7    A    CORRECT.

8    Q    AND AT THAT TIME, MS. TREANTAFELLES, MS. GARCIA, PAULA, IS

9    NOT AT THAT MEETING; CORRECT?

10   A    THERE WAS SEVERAL MEETINGS, I HONESTLY CAN'T REMEMBER WHO          11:30

11   WAS AT WHICH MEETING.  THEY COULD HAVE BEEN AT THAT MEETING;

12   THEY COULD HAVE NOT BEEN AT THAT MEETING.

13           **MR. PRICE:**  IF WE COULD PLAY FROM MS. LEAHY'S

14   DEPOSITION TESTIMONY, 211, LINE 20, TO 212, LINE 7.

15           **THE COURT:**  ANY OBJECTION?                                  11:30

16           **MR. NOLAN:**  NO OBJECTION, YOUR HONOR.

17           **THE COURT:**  YOU MAY PLAY IT.

18           (VIDEO PLAYS; EXCERPTS PROVIDED AS FOLLOWS: )

19           Q    WHEN IS IT THAT YOU HAD FIRST CONTACT WITH

20                ANYONE AT M.G.A. REGARDING THE BRATZ PROJECT?

21           A    WHEN PAULA CAME TO MY HOUSE.

22           Q    WHEN DID THAT OCCUR?

23           A    THE FIRST TIME I MET PAULA WAS OCTOBER 6TH.

24           Q    OF 2000?

25           A    YES.

```
 1              Q    YOU HAD MET PAULA TREANTAFELLES AT THAT TIME

 2         ON OCTOBER 6TH, 2000, AT YOUR HOUSE?

 3              A    YES.

 4              Q    DID YOU HAVE ANY SORT OF CONTACT WITH HER

 5         PRIOR TO THAT?

 6              A    NO.

 7         (EXCERPTS CONCLUDED.)

 8    BY MR. PRICE:

 9    Q    AND MS. LEAHY, IF YOU WOULD LOOK AT YOUR NOTES,

10    EXHIBIT 1137-14, IF WE CAN DISPLAY THAT, THAT'S IN EVIDENCE.    11:3:

11    YOU'VE SEE YOU'VE GOT AN ENTRY DATED SEPTEMBER 29TH.

12              DO YOU SEE THAT?

13    A    RIGHT.

14    Q    AND YOU SEE YOU HAVE NOTED -- YOU PRESENTED YOUR SCULPT

15    THAT YOU HAD DONE; CORRECT?                                    11:3:

16              MR. NOLAN:   OBJECTION TO TIME.

17    BY MR. PRICE:

18    Q    ON SEPTEMBER 29TH, YOU PRESENTED THE SCULPT THAT YOU HAD

19    DONE?

20    A    RIGHT; THE FIRST VERSION OF THIS ONE.                     11:3:

21    Q    AND WHAT WE HAVE HERE IN YOUR NOTES ARE FIVE LINES WHERE

22    YOU WROTE DOWN COMMENTS THAT WERE MADE ABOUT THAT SCULPT;

23    CORRECT?

24    A    CORRECT.

25    Q    AND THESE WERE COMMENTS THAT WERE ALL MADE BY             11:3:
```

1   CARTER BRYANT; CORRECT?

2   A    WELL, WHAT I'M SAYING IS WHEN I LOOK AT THESE NOTES, THEY

3   COULD HAVE BEEN MADE BY PAULA AND VERONICA; THEY COULD HAVE

4   BEEN MADE BY CARTER.  I DON'T REMEMBER IF THEY WERE THERE AT

5   THAT MEETING OR NOT.                                          11:33

6   Q    WELL, AT YOUR DEPOSITION YOU HAD THESE NOTES IN FRONT OF

7   YOU; CORRECT?

8   A    CORRECT.

9   Q    AND AT YOUR DEPOSITION, LOOKING AT THESE NOTES, YOU SAID

10  IT WAS CARTER BRYANT WHO GAVE YOU EACH ONE OF THOSE CRITICISMS;  11:33

11  CORRECT?

12  A    DID I SAY THAT IN MY DEPOSITION?

13          MR. PRICE:  LET'S PLAY PAGE 161, LINES 5 THROUGH 17.

14          THE COURT:  ANY OBJECTION?

15          MR. NOLAN:  YES.  IT'S NOT IMPEACHMENT.  SHE DOES NOT   11:33

16  IDENTIFY THOSE COMMENTS BEING FROM CARTER BRYANT.

17          THE COURT:  IS 1137 THE SAME AS 1133 IN THE

18  DEPOSITION?

19          MR. PRICE:  YES; IT WAS A REDACTED VERSION.

20          THE COURT:  THE OBJECTION IS OVERRULED.                11:3

21          YOU MAY PLAY IT.

22          (VIDEO PLAYS; EXCERPTS PROVIDED BY

23          COUNSEL AS FOLLOWS: )

24          Q SO YOU SAID THAT YOU NEEDED TO LOOK AT YOUR

25          BOOK IN ORDER TO DETERMINE WHEN IT IS THAT YOU.

1    STARTED WORKING ON THAT FIRST SCULPT FOR BRATZ, SO,.

2    PLEASE, TELL ME NOW THAT YOU HAVE YOUR BOOK IN FRONT.

3    OF YOU MARKED AS 1132 AND 1133 WHEN THAT WAS?

4    A   IT SAYS SEPTEMBER 29 HERE WHERE CARTER IS

5    CRITIQUING THE SCULPT ON PAGE 00078.01.  IT'S THE.

6    FIRST PAGE AFTER THE FIRST PAGE.

7    Q   SO, PLEASE, TELL US WHAT THAT MEANS?

8    A   THAT MEANS HE WAS CRITIQUING MY SCULPT.  IT

9    TOOK ME TWO DAYS TO DO THE SCULPT, SO THAT WOULD HAVE

10   BEEN TWO OR THREE DAYS BEFORE SO THE 26TH OR THE.

11   27TH, SOMEWHERE AROUND THAT TIME.

12   (EXCERPTS CONCLUDED.)

13   **MR. PRICE:**  AND, YOUR HONOR, IF I COULD READ INTO

14   EVIDENCE AT THE SAME TIME PAGES 162, LINES 21 -- ACTUALLY, WE

15   CAN PLAY IT, LINES 21 THROUGH LINE 24.                          11:3!

16   **THE COURT:**  ANY OBJECTION?

17   **MR. PRICE:**  162, LINE 21, TO 163, LINE 22.

18   **MR. NOLAN:**  NO OBJECTION, YOUR HONOR.

19   **THE COURT:**  VERY WELL.

20   (VIDEO PLAYS; EXCERPTS PROVIDED BY                             11:3

21   COUNSEL AS FOLLOWS:)

22   Q   THIS CRITIQUE THAT YOU MENTIONED THAT OCCURRED

23   ON OR ABOUT SEPTEMBER 29TH, 2000, OF THE FIRST BRATZ

24   SCULPT THAT YOU DID, MR. BRYANT WAS THAT?

25   A   YES.

1    Q    YOU WERE THERE, OF COURSE?

2    A    YES.

3    Q    WAS ANYONE ELSE THERE?

4    A    JUST MY DAUGHTER.

5    Q    YOUR INFANT DAUGHTER?

6    A    MY INFANT DAUGHTER AT THE TIME.

7    Q    AND WHERE DID THIS TAKE PLACE?

8    A    AT MY HOUSE.

9    Q    MR. BRYANT GAVE YOU THE COMMENTS THAT ARE

10   REFLECTED HERE IN YOUR BOOK, THE SECOND PAGE OF

11   EXHIBIT 1132?

12   A    CAN YOU SAY THAT AGAIN?

13   Q    SURE.  DIRECTING YOUR ATTENTION TO THE SECOND

14   PAGE OF EXHIBIT 1132, IT HAS THE ENTRY FOR SEPTEMBER

15   29TH, 2000.  IT HAS COMMENTS WHERE IT SAYS, "FIONA";

16   RIGHT?

17   A    YES.

18   Q    YOU MENTIONED THOSE WERE THE COMMENTS THAT

19   CARTER BRYANT GAVE YOU ON YOUR FIRST BRATZ SCULPT;

20   CORRECT?

21   A    CORRECT.

22   Q    DID HE GIVE YOU ANY OTHER COMMENTS?

23   A    NO.  THAT WAS IT.  I WROTE EVERYTHING DOWN.

24   (EXCERPTS CONCLUDED.)

25   **MR. PRICE:**  YOUR HONOR, THE SECOND PAGE, FOR THE

11:37

1    RECORD, 1132 IS THE SAME AS WHAT WE'VE HAD ON THE BOARD, WHICH

2    IS EXHIBIT 1137-14.

3         THE COURT:  IS THAT STIPULATED TO?

4         MR. NOLAN:  NO, YOUR HONOR.

5         WELL, NOW, THIS VERSION IS THE SAME BECAUSE IT HASN'T    11:38

6    BEEN REDACTED ON THE BOTTOM.  THE ONE SHOWN BEFORE, YOUR HONOR,

7    HAD A REDACTION.

8         MR. PRICE:  THAT'S TRUE.  THE ONE BEFORE HAD A

9    REDACTION.  THEN THEY GAVE US A COPY BUT BOTH HAD THESE

10   CRITIQUES HERE.                                              11:38

11        THE COURT:  IS THAT AGREED?

12        CAN SOMEONE HIGHLIGHT THE PORTION YOU'RE REFERRING

13   TO?

14        IS THAT THE SAME AS WHAT WAS BEING REFERRED TO IN

15   BOTH DEPOSITION TESTIMONY AND BEFORE THE JURY?             11:38

16        MR. NOLAN:  YES, YOUR HONOR.  BUT THAT DEPOSITION

17   EXHIBIT SHOWN TO MS. LEAHY HAD THE BOTTOM PART OF IT NOT THERE,

18   WHICH HAS PAULA TREANTAFELLES' NAME UNDER THE DATE; THAT'S THE

19   POINT; SO WHEN IT'S REPRESENTED THAT THEY ARE THE SAME, IT'S

20   NOT THE SAME.                                              11:38

21        THE COURT:  THE PORTION THAT'S HIGHLIGHTED IS THE

22   SAME; IS THAT CORRECT?

23        MR. NOLAN:  YES, YOUR HONOR.

24        THE COURT:  AND THE PORTION WITH THE NAME

25   "PAULA TREANTAFELLES" IS NOT THE SAME.                     11:38

1          MR. NOLAN:  CORRECT.

2          THE COURT:  THANK YOU.

3          MR. NOLAN:  THAT'S NOT ON THE EXHIBIT SHE WAS SHOWN

4   AT DEPOSITION.

5          MR. PRICE:  FOR THE RECORD, WE DID NOT REDACT THAT;          11:39

6   THAT WAS MGA'S REDACTION.

7          MR. NOLAN:  OBJECTION.  THAT'S NOT TRUE.  THAT WAS

8   NOT MGA'S REDACTION.

9          THE COURT:  WHO'S REDACTION WAS IT?

10         MR. ZELLER:  THEY WERE DONE BY MS. LEAHY'S COUNSEL AT          11:39

11  THE TIME, AND IT IS MY RECOLLECTION THAT AT THAT TIME, IT WAS

12  MR. MCFARLAND.

13         MR. NOLAN:  THAT WAS THE PRODUCT OF THE MEET AND

14  CONFER WE HAD WITH RESPECT TO DISCOVERY ISSUES INVOLVING THE

15  LAW FIRM OF QUINN EMANUEL THAT CERTAIN REDACTIONS WERE MADE.          11:39

16         THE COURT:  VERY WELL.

17         THE JURY IS TO AT THIS POINT DISREGARD THIS

18  DISCUSSION ABOUT THE REDACTION.  ALL THAT IS RELEVANT TO THE

19  CURRENT TESTIMONY IS THE HIGHLIGHTED AREA, AND BOTH PARTIES

20  STIPULATE THAT WAS THE SAME BEFORE THE WITNESS NOW AND AT THE          11:39

21  DEPOSITION.

22         IS THAT CORRECT, MR. PRICE?

23         MR. PRICE:  YES.

24         THE COURT:  MR. NOLAN?

25         MR. NOLAN:  YES.  EXCEPT FOR THE CHARACTERIZATION

1    THAT THE ONLY RELEVANCE IS THE TOP PART BECAUSE OF THE

2    INCLUSION OF THE NAME PAULA TREANTAFELLES UNDER THE DATE OF

3    SEPTEMBER 29TH.

4         THE COURT:  HOW IS THAT RELEVANT TO THE TESTIMONY WE

5    JUST HAD RIGHT NOW, COUNSEL?                                    11:40

6         MR. NOLAN:  YOUR HONOR, BECAUSE COUNSEL IS PLAYING A

7    REDACTED EXHIBIT OR SHOWING A REDACTED EXHIBIT THAT DID NOT

8    HAVE PAULA TREANTAFELLES' NAME.

9         THE COURT:  I UNDERSTAND THAT.  BUT HOW IS THAT

10   RELEVANT TO THE QUESTION THAT WAS POSED AND JUST PLAYED?        11:40

11        MR. NOLAN:  BECAUSE, YOUR HONOR, THEY ARE TRYING TO

12   IMPEACH MS. LEAHY WITH RESPECT TO HER RECOLLECTION ONE WAY OR

13   THE OTHER OF WHETHER OR NOT PAULA TREANTAFELLES WAS PRESENT.

14        THE COURT:  THAT WASN'T THE QUESTION THAT WAS JUST

15   POSED; THAT GOES TO AN EARLIER QUESTION.  AND THAT'S A POINT    11:40

16   THAT I'LL PERMIT YOU TO EXAMINE ON WHEN WE GET TO THAT.

17        FOR PURPOSES OF THE PENDING SERIES OF QUESTIONS, IS

18   THERE ANY OBJECTION?

19        IF THERE IS, THEN WE SHOULD JUST BRING BOTH EXHIBITS

20   IN.                                                             11:40

21        MR. NOLAN:  BOTH EXHIBITS ARE IN EVIDENCE, AND MY

22   OBJECTION IS --

23        THE COURT:  WHAT'S THE OTHER EXHIBIT?

24        MR. NOLAN:  1137.

25        MR. PRICE:  IT'S 1132 AND 1133.                            11:4

1        WE'RE REFERRING NOW TO 1132-2 AND 1132-3 ARE THE SAME

2   AS REDACTED VERSIONS OF 1137-14 AND 1137-15.

3        **THE COURT:**  LET'S PUT THEM UP NEXT TO EACH OTHER.

4        **MR. NOLAN:**  THANK YOU, YOUR HONOR.

5        **MR. PRICE:**  IF WE COULD GO TO 1137-14.                    11:41

6        **THE COURT:**  SO THE EXHIBIT ON THE LEFT IS WHAT

7   WAS BEFORE THE WITNESS AT THE DEPOSITION; IS THAT CORRECT?

8        **MR. PRICE:**  YES.

9        **MR. NOLAN:**  CORRECT.

10        **THE COURT:**  THE EXHIBIT ON THE RIGHT IS WHAT IS       11:42

11   BEFORE THE WITNESS PRESENTLY; CORRECT?

12        **MR. PRICE:**  CORRECT.

13        **THE COURT:**  WHO DID THE REDACTION TO THE ONE ON THE

14   LEFT?

15        **MR. ZELLER:**  MY RECOLLECTION IS THAT THE REDACTED    11:42

16   VERSION ON THE LEFT IS WHAT WE WERE GIVEN IN ADVANCE OF

17   MS. LEAHY'S DEPOSITION, WHICH WAS PRODUCED BY HER COUNSEL,

18   MR. MCFARLAND'S LAW FIRM.

19        **THE COURT:**  MR. NOLAN, FROM YOUR PERSPECTIVE, WHO DID

20   THE REDACTION ON THE LEFT?                                    11:4

21        **MR. NOLAN:**  I APOLOGIZE.

22        MR. MCFARLAND.  BUT I WAS MISTAKEN.  THEY HAVE NOW

23   SHOWN 1132 --

24        **THE COURT:**  THEY BOTH SEEM TO HAVE

25   PAULA TREANTAFELLES' NAME ON THEM.                            11:4

```
 1              MR. NOLAN:  NO.  THAT'S THE POINT.

 2              IF I COULD HAVE EXHIBIT 1133 WHICH IS THE EXHIBIT

 3   THAT WAS USED AT THE DEPOSITION, THAT PORTION HAS BEEN

 4   REDACTED; SO 1132, MY UNDERSTANDING, IS NOT EXHIBIT.

 5              THE COURT:  I'M GOING TO EXCUSE THE JURY AND WE'RE        11:42

 6   GOING TO GET TO THE BOTTOM OF THIS.

 7              (WHEREUPON JURORS DEPART COURTROOM.)

 8              THE COURT:  COUNSEL, I'LL GIVE YOU A FEW CHANCES TO

 9   TALK ABOUT THIS AMONGST YOURSELVES.

10              (WHEREUPON A LUNCH RECESS WAS HELD.)                     11:43

11              (MORNING SESSION CONCLUDED.)

12

13

14

15

16

17                         CERTIFICATE

18

19   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
20   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
21   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.
22

23

24   THERESA A. LANZA, RPR, CSR              DATE
     OFFICIAL COURT REPORTER
25                                                                      11:47
```

7-7-08