1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                              ---

4         **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                              ---

6   MATTEL, INC.,                    :   PAGES 4351 - 4517
                                     :
7             PLAINTIFF,             :
                                     :
8      VS.                           :   NO. ED CV04-09049-SGL
                                     :   [CONSOLIDATED WITH
9   MGA ENTERTAINMENT, INC.,         :   CV04-9059 & CV05-2727]
    ET AL.,                          :
10                                   :
             DEFENDANTS.             :
11   _____

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 RIVERSIDE, CALIFORNIA

17               THURSDAY, JULY 3, 2008

18               JURY TRIAL - DAY 20

19                 AFTERNOON SESSION

20

21

22                        MARK SCHWEITZER, CSR, RPR, CRR
                          OFFICIAL COURT REPORTER
23                        UNITED STATES DISTRICT COURT
                          181-H ROYBAL FEDERAL BUILDING
24                        255 EAST TEMPLE STREET
                          LOS ANGELES, CALIFORNIA 90012
25                        (213) 663-3494

CERTIFIED COPY

1   **Appearances of Counsel:**

2


3   On Behalf of Mattel:

4       Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
        By John B. Quinn, Esq.
5           B. Dylan Proctor, Esq.
            Michael T. Zeller, Esq.
6           Harry Olivar, Esq.
            John Corey, Esq.
7           Diane Hutnyan, Esq.
            William Price, Esq.
8       855 South Figueroa Street
        10th Floor
9       Los Angeles, CA 90017
        (213) 624-7707

10

11


12  On Behalf of MGA Entertainment:

13      Skadden, Arps, Slate, Meagher & Flom LLP
        By Thomas J. Nolan, Esq.
14          Carl Alan Roth, Esq.
            Jason Russell, Esq.
15          Lauren Aguiar, Esq.
            David Hansen, Esq.
16          Matthew Sloan, Esq.
            Robert Herrington, Esq.
17      300 South Grand Avenue
        Los Angeles, CA 90071-3144
18      (213) 687-5000

19

20

21

22

23

24

25

1                            I N D E X

2

3    MARGARET ANN LEAHY, PREVIOUSLY SWORN.................. 4361

4    CROSS-EXAMINATION (CONTINUED) BY MR. PRICE:........... 4361
     REDIRECT EXAMINATION BY MR. NOLAN: ................... 4369
5    RECROSS-EXAMINATION BY MR. PRICE:..................... 4381

6    TIM KILPIN, SWORN..................................... 4392

7    DIRECT EXAMINATION BY MR. NOLAN: ..................... 4393

8    RICHARD DE ANDA, SWORN............................... 4407

9    DIRECT EXAMINATION BY MR. NOLAN: ..................... 4408

10   CROSS-EXAMINATION BY MR. ZELLER:...................... 4421

11   DEPOSITION EXCERPTS OF
     RICHARD IRMEN WERE PLAYED............................. 4447

12

13                        E X H I B I T S

14

15    (Exhibit 1132 received.)............................. 4361

16    (Exhibits 1127-A and 1127-B received.)............... 4376

17    (Exhibit 12995 received.)............................ 4381

18

19

20

21

22

23

24

25

1       **Riverside, California; Thursday, July 3, 2008**

2                           **1:40 P.M.**

3           **(HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)**

4           MR. McFARLAND:  Before the break, I'm just

5    concerned because a statement was made that seemed to infer

6    that I had done something improper, and I wanted to clear it

7    up.

8           THE COURT:  Before we get to that, I want to just

9    clear up the record.  I hope the parties have had a chance to

10   figure out what happened here.  And I was given all kinds of

11   representations, and I'm not thinking ill of anybody, if

12   that's what you're concerned about.  I just want to know

13   what's going on.

14          MR. McFARLAND:  There's document No. 1133.  And

15   that is a document in which Paula Treantafelles is redacted.

16   That is document control number SABW, Sidley, Austin, Brown

17   and Wood.  All the documents we produced have a K alpha

18   identifier.  So when a statement was made that I produced the

19   document, that's not true.

20          So just so you know what happened, so that nothing

21   was improper, and it's been fully briefed, there was a

22   meet-and-confer process.  An attorney from Quinn came to

23   my offices, and I met with that attorney from Quinn and

24   showed that person the original notebook.  As part of the

25   meet-and-confer process, she said here's everything I want

1    and redacted the other portions and produced everything that

2    she asked for that is found at document production number

3    KMWL 78, Exhibit 1132.  And that was produced well ahead --

4              THE COURT:  Does that have Paula Treantafelles's

5    name redacted?

6              MR. McFARLAND:  No.  So it is not redacted.  This

7    was produced by our firm well prior to the deposition.

8              THE COURT:  Very good.  All right.

9              MR. McFARLAND:  And then just to fill the loop in,

10   there was still dissatisfaction even though in my view we had

11   met and conferred and resolved the issue, there was still

12   dissatisfaction on behalf of the Quinn firm and an ongoing

13   meet and confer about producing the unredacted planner.

14             THE COURT:  Maybe you don't know this because you

15   say Sidley, Austin did this, but why was Paula

16   Treantafelles's name ever redacted to begin with?

17             MR. McFARLAND:  I have no idea.  I assume it was a

18   mistake.  I have no idea.  It was back in '05.  I have no

19   idea.  I didn't do it.  But in any event, well, well before,

20   months before the deposition, the properly redacted in my

21   view document was produced, that had redacted irrelevant

22   information, but, of course, did not redact Paula

23   Treantafelles.

24             And then skipping ahead to the deposition of

25   Ms. Leahy, I brought with me the original planner, and there

1   were discussions, and during the deposition I said here it

2   is.  Make copies of the whole thing.  My important question

3   for purposes of this trial is what was shown to the witness

4   during the deposition.

5           MR. NOLAN:  Your Honor, Mr. Price and I talked

6   about it.  Both 1132 and 1133 are in the deposition room, and

7   she's directed to both of them.  Both, you know, both were at

8   the deposition.  She's asked to go to look at the second page

9   of a document.  Mr. Price thinks it's 1132.  I think it's

10  confusing, but in any event, both redacted versions are in

11  the deposition.

12          THE COURT:  Well, we've got to eliminate the

13  confusion.  I've not going to leave something hanging like

14  this.  According to the record, and that's what I'm going to

15  make my decision based on, what does the record indicate that

16  she was shown?  Is it 1132 which is, according to

17  Mr. McFarland, the not redacted version?

18          MR. NOLAN:  They have on the screen 1132.  It's

19  Exhibit 1132.

20          THE COURT:  And that is the one that did not have

21  Paula Treantafelles's name redacted?

22          MR. NOLAN:  That has the little corner that says

23  Paula Treantafelles.

24          THE COURT:  Very good.

25          MR. NOLAN:  One page before this or two pages

1   before it, they have both 1133 and 1132 on them.

2            THE COURT:   That's fine.

3            MR. NOLAN:   This clears it up.

4            THE COURT:   But here she was clearly directing your

5   attention to the second page of 1132 and Paula

6   Treantafelles's name was on it; correct?

7            MR. NOLAN:   That's correct.

8            THE COURT:   Excellent.

9            MR. PRICE:   And, your Honor, I'm going to move that

10  the second page of 1132 come into evidence because statements

11  have been made before the jury suggesting that maybe she did

12  not have that information.   So --

13           THE COURT:   When you say "that information," you

14  mean --

15           MR. PRICE:   Paula Treantafelles's name on there.

16           THE COURT:   That needs to be made clear because

17  that was becoming horribly muddled and confused around 11:45.

18  And that's why I stopped the testimony at that point, because

19  clearly the implication was being given to the jury that

20  Paula Treantafelles's name had been redacted.   And that needs

21  to be corrected.   So I will move in 1132.   You were using

22  1137 to examine; correct?

23           MR. PRICE:   Yes.   And this refers to 1132, page 2

24  actually.

25           THE COURT:   Of course, that's not in the -- does

1       someone have 1132?

2               So here's 1132, page 2, and it has Paula

3       Treantafelles's name on it.  And this is what was referred to

4       in the deposition transcript, and then 1137, page 14, also

5       has Paula Treantafelles's.  Does anyone have any idea why

6       Denise Saffron's name was redacted on 1132, page 2?

7               MR. NOLAN:  All of this was done before --

8               MR. QUINN:  I have no idea, your Honor.  Maybe on

9       privacy grounds because she wasn't involved in this case.  I

10      just have no idea.

11              But the clear point is that --

12              THE COURT:  I think the jury needs to understand

13      that.  Because this redaction business is really -- it's

14      casting a pall on documents that I think is not proper.

15              MR. NOLAN:  Your Honor, if I might just make a

16      suggestion.

17              THE COURT:  Please.

18              MR. NOLAN:  Thank you.  First of all, I just want

19      to make certain that it's clear that 1137, page 14, is the

20      copy of the original 1132-A is a redacted version of the

21      original as is --

22              THE COURT:  I understand that, but we're not going

23      to be dwelling on that distinction with the jury because I

24      think under 403 it's leading to confusion.  I'm going to try

25      to clarify this with the jury and make it clear that both the

1    version of the document before the witness at the deposition

2    and the version of the document before the witness at this

3    trial had the same material information that has been

4    questioned about.

5          MR. NOLAN:  Right.  And you might add, your Honor,

6    that because other matters unrelated to this case were

7    redacted by counsel before the production of the document.

8    So that they understand that there's nothing wrong with the

9    redaction.

10         THE COURT:  And they are going to see what was

11   redacted because they are going to have the original in 1137.

12   All right.  I think that's settled now.  We'll get back on

13   track.  That takes care of that issue.  Mr. McFarland has

14   addressed his issue.  We've kept the jury waiting long

15   enough.  Are there any other issues that we need to address

16   right now?

17         MR. NOLAN:  No, your Honor, not for MGA.

18         MR. ZELLER:  Briefly, your Honor, I do have one

19   person just for purposes of our scheduling, which is Cassidy

20   Park.  She's currently out of town.  I know that there was an

21   issue about whether she was going to be recalled.  That's

22   obviously not going to happen today.  I do need to let her

23   know at some point.

24         THE COURT:  We'll take it up later.  Let's bring

25   the jury in.

1          And, Mr. Quinn, I have signed off on the latest

2    application for a nonresident attorney to appear in the case.

3    I just want you to know so you won't be short-handed with

4    attorneys.

5          MR. QUINN:  I appreciate that.

6          **(WHEREUPON THE JURY ENTERS.)**

7          THE COURT:  Please be seated.

8          THE CLERK:  Ms. Leahy, please be advised that you

9    are still under oath.

10         THE COURT:  Members of the jury, we have amongst

11   other things resolved the issue concerning the entry on the

12   notebook that was redacted.  And as it turns out, both the

13   exhibit that has been introduced in this trial, 1137, which

14   is the complete unredacted version of the notebook which you

15   will have, as well as Exhibit 1132, page 2, which is what the

16   witness had before her during the deposition, both of those

17   contain the material parts of the notebook.

18         The comments on Fiona, the list of comments on

19   Fiona, as well as the name Paula Treantafelles down in the

20   bottom right-hand corner.  Both exhibits have that.  There

21   were some redactions on 1132, the one that was used in the

22   deposition, that are not redacted on 1137, the one that's in

23   here.  But they have nothing to do with this case, as you see

24   when you look at the document yourselves back in

25   deliberations, but there was no version of this that had

1    Paula Treantafelles that was before the witness at the time

2    the relevant questions were asked.

3              Is that consistent with your understanding,

4    Mr. Price?

5              MR. PRICE:  Yes, your Honor.

6              THE COURT:  Mr. Nolan?

7              MR. NOLAN:  Yes.

8              THE COURT:  Very well.

9              Mr. Price, you may proceed.

10             MR. PRICE:  Your Honor, if I could --

11             THE COURT:  And 1132 is introduced in evidence.

12             **(Exhibit 1132 received.)**

13             **MARGARET ANN LEAHY, PREVIOUSLY SWORN.**

14             **CROSS-EXAMINATION (CONTINUED)**

15   BY MR. PRICE:

16   **Q.**   If I could display 163, line 12, through 22.  And just

17   to clarify, Ms. Leahy, good afternoon.

18   **A.**   Hi.

19   **Q.**   So when you were asked the question about whether the

20   comments were comments Carter Bryant gave you, do you see

21   that?  That you had mentioned that those were comments that

22   Carter Bryant gave you on your first Bratz sculpt; correct?

23             Do you see that?

24   **A.**   Yes, I do.

25   **Q.**   At the time you were answering those questions, you were

1  looking at Exhibit 1132, the second page; correct?

2  A.   1132.

3  Q.   Do you see where it says directing your attention to the

4  second page of Exhibit 1132.

5        Do you see that?

6  A.   I see that there.  Should I look at it now?

7  Q.   We can display it.  So Exhibit 1132, the second page.

8        So when you were asked whether those comments were

9  comments made by Mr. Bryant, you had this copy in front of

10  you which had Paula Treantafelles's name on it; correct?

11  A.   Correct.

12  Q.   And if you could unhighlight that.

13        And, in fact, you see her name is written in a

14  different color pen.

15        Do you see that?

16  A.   Yes, I do.

17  Q.   Now, we've been talking now about this September 29th

18  meeting where you presented your sculpture and got those

19  comments; correct?

20  A.   Correct.

21  Q.   And that's sort of a typical pattern.  That is, you will

22  talk to a designer, go to a sculpt without them hovering over

23  you while you're doing it.

24  A.   Hopefully.

25  Q.   And then bring it to them and get comments; correct?

1   A.    Correct.

2   Q.    And that's what happened here for the first sculpt.

3   That is, you spoke with Mr. Bryant.  He gave you some

4   drawings.  You went and made a sculpt.  And then you met with

5   him, and he gave you comments; right?

6   A.    Correct.

7   Q.    And I believe your testimony is that with respect to the

8   September 29th meeting, you made the changes that Mr. Bryant

9   asked for; correct?

10  A.    Correct.

11  Q.    So having -- so after September 29th, you go back to

12  make the changes that Mr. Bryant asked for; correct?

13  A.    Right.  Just the thing I can't remember, you know, I

14  remember it was Carter alone at the 26th or whatever meeting.

15  He remember Veronica and Paula definitely and Carter with the

16  October 6th meeting.  But it's the meeting in the middle

17  where I cannot say for sure now.

18         I know I said in the deposition, but that being

19  eight years ago, I remember things in different kinds of

20  ways.

21  Q.    Okay.

22  A.    So now I'm just foggy on who was at the meeting.

23  Q.    Now you're fogged.  But as of December of 2007, your

24  testimony was that those comments were made by Carter Bryant,

25  and then you went and made the changes he suggested; correct?

1  A.   Correct.

2  Q.   So after making those changes, as would be your

3  practice, you then said come look at my sculpt now.  I've

4  made the changes you've suggested; correct?

5  A.   Correct.

6  Q.   And that meeting is the October 6 meeting; right?

7  A.   Right.

8  Q.   So by that time, you had had two face-to-face meetings

9  with Mr. Bryant and one telephone conversation; correct?

10  A.   I don't know how many exactly telephone conversations.

11  But I know we had two face-to-face meetings.

12  Q.   So you're saying it may have actually been more than one

13  telephone conversation.

14  A.   It may have been.  I don't remember.

15  Q.   At the October 6 meeting, Ms. Garcia, or Treantafelles,

16  was there; correct?

17  A.   Correct.

18  Q.   And as was Mr. Bryant?

19  A.   Yes.

20  Q.   And you think Veronica Marlow was there was well?

21  A.   I know she was there.

22  Q.   And they gave you comments on the sculpt that you had

23  done which had incorporated all of Mr. Bryant's comments;

24  correct?

25  A.   Correct.

1   Q.   And I believe you said that then, as of October 6th,

2   that those folks had, I think your words were, made all the

3   comments they could.

4   A.   Correct.

5   Q.   Because at that point your job was to -- was to try to

6   make this into a marketable, producible sculpt; correct?

7   A.   Well, producible, yes.

8   Q.   Let me rephrase that.  That is, having received the

9   comments, then your job as a sculptor is to incorporate those

10  in a way that makes these things actually producible; right?

11  A.   Correct.

12  Q.   And that's something uniquely that a sculptor knows how

13  to do, which is to know how to sculpt it so you can actually

14  mass produce this thing; correct?

15  A.   Correct.

16  Q.   And you showed us, then -- so after October 6th, I think

17  you mentioned that you would slice off the arms and legs and

18  make changes so that it could actually be manufactured in

19  Hong Kong; right?

20       MR. NOLAN:   Objection.  Vague and ambiguous.  Also

21  beyond the time frame.

22       THE COURT:   Sustained on the -- lay a further

23  foundation.

24       MR. PRICE:   Let me rephrase.

25  Q.   So after October 6th, I think you testified how you kind

1   of would cut off the arms and the legs and make alterations

2   to them; correct?

3          MR. NOLAN:  Your Honor, I'm sorry about the

4   characterization.  I object to the characterization and

5   preamble of the testimony summary.

6          THE COURT:  Sustained.

7   Q.  BY MR. PRICE:  After October 6th, when you had received

8   all the comments you could receive, at that point is it

9   correct that you then began making alterations to make it

10  producible?

11  A.  Well, I sent it to be molded first, which takes a while.

12  And then I had a wax poured.

13  Q.  And by the way, those molds that you first did have been

14  lost or destroyed?

15  A.  Lost or destroyed.

16  Q.  And then having done the mold, then, it's at that point

17  you made changes so that it would be producible, that is,

18  before October 25th or October -- before October 20th.

19  A.  Yes, it was after the 6th and before the 25th.

20  Q.  And by the way, one of those molds says October 23 on

21  it; correct?

22  A.  Right.  This is like a set, four out of four.

23  Q.  And so if October 23, I -- if that were a Monday, then

24  when would you have actually given them the sculpt so that

25  they could have made the mold?

1   A.   These molds are after I cut up this.  These aren't this

2   mold.

3   Q.   So they are made from something you gave Gentle Giant.

4   A.   These?

5   Q.   Yes.

6   A.   Yeah, these -- do you want me to tell you what it's

7   from?

8   Q.   I want to find out when you gave that to Gentle Giant

9   from which they made what is up there in front of you as

10  1140-A through -D.

11  A.   So you want to know when I gave this sculpt that's in --

12          THE COURT:  I'm going to stop you.  Counsel, that

13  is a poor question.  Don't say you want to find out.  Why

14  don't you ask a question.

15  Q.   BY MR. PRICE:  You had to give Gentle Giant something so

16  that they could create what has been marked as 1040-A through

17  -D; correct?

18  A.   1140.

19  Q.   1140?  I'm sorry.  1140-A through -D.  So you had to

20  give Gentle Giant something from which they could make that;

21  correct?

22  A.   Correct.

23  Q.   What was it you had to give them so that they could make

24  those molds?

25  A.   It was the sculpt in between.  It was the sculpt after I

1   had done this.  It was the sculpt from the big mold that

2   Gentle Giant did of this.  They poured the wax.  I started

3   cutting it up, put the joints in, and gave that to them so

4   they could make this mold.

5   Q.   So when did you give that to them so that they could

6   make the mold?

7   A.   It would have been somewhere around the 23rd.

8   Q.   So the 23rd is a Monday.  Would it be a few days before?

9   Would it be a few hours before?

10  A.   It wouldn't be hours.  It takes overnight to cure.

11  Q.   So do you have any idea whether it was the 15th, 16th,

12  17th, 18th, 19th, 20th, 21st?

13  A.   I don't know the actual date.

14  Q.   Okay.  Now, you testified about whether or not you gave

15  a head of a Bratz doll to be painted by Anna Rhee.

16       Do you recall that?

17  A.   Yes, I do.

18  Q.   And it's true that you don't really have any idea what

19  Carter Bryant was doing in the summer of 2000 prior to

20  contacting you in preparing for his pitch to MGA; correct?

21  A.   I didn't know -- yeah, I had no idea what he was doing

22  before he called me.

23  Q.   I mean, you don't know, for example, whether or not

24  Carter Bryant had Anna Rhee or some other face painter do

25  some face painting; correct?

1   A.    I don't know anything of what Carter did before the day

2   he called me.

3                MR. PRICE:   No further questions, your Honor.

4                THE COURT:   Further direct examination?

5                MR. NOLAN:   Thank you.

6                      **REDIRECT EXAMINATION**

7   BY MR. NOLAN:

8   Q.    With respect to that last question, did Carter Bryant

9   ever tell you that he had asked someone else to do a sculpt

10  of the Bratz head?

11               MR. PRICE:   Objection.   Hearsay.

12               THE COURT:   What's it going to besides the truth of

13  the matter, Counsel?

14               MR. NOLAN:   Let me rephrase it.

15               THE COURT:   Very well.   Withdrawn.

16  Q.    BY MR. NOLAN:   At any meeting that you had with Carter

17  Bryant between September 1st -- sorry, end of September,

18  around September -- whatever meetings you had, did Carter

19  Bryant ever bring to any of those meetings a sculpted head of

20  his concept?

21  A.    No.

22  Q.    Do you recall that Mr. Price asked you whether or not

23  you were excited when you got the phone call from Carter

24  Bryant?   Do you recall that line of questioning?

25  A.    Yes.

1   Q.   And then they showed you a portion of your deposition

2   where you said you were excited because it was your first job

3   in your free-lancing?

4   A.   One of my first jobs.

5   Q.   All right.   Was --

6           Your Honor, you suggested I play the other portion

7   of the deposition transcript.

8           THE COURT:   You may.   Why don't you designate that

9   for the record.

10          MR. NOLAN:   It's page 152 through 153, line 7.

11          THE COURT:   Any objection?

12          MR. PRICE:   I do, your Honor.   I believe 152, line

13  7 through 11, was what Mr. Nolan identified.   The rest goes

14  beyond the scope of my question.   It would be hearsay.

15          MR. NOLAN:   Your Honor, to avoid the hearsay and to

16  try to move this along, I'll just limit it to lines 7 through

17  11.

18          THE COURT:   Very well.

19  Q.   BY MR. NOLAN:   Now, before we do this, this question and

20  answer that I'm about to play comes from the same deposition

21  transcript that Mr. Price read from; correct?

22  A.   Correct.

23          MR. NOLAN:   All right.   Aaron, could you play that

24  for me.

25          "QUESTION:   What do you mean by inspiration?

1        "ANSWER:  I mean it's rare that you get a

2    designer that says here's my vision.  You know, do

3    your magic and run with it.  Carter gave me the

4    drawings and said here's what I've done.  Let's see

5    what you come up with."

6  Q.   Do you have your original notebook in front of you,

7  1137?

8  A.   A copy of the original one.

9  Q.   A copy of the original.  Thank you.

10       And I want to ask you to turn to September 29th,

11  the September 29th entry.

12  A.   Okay.

13       MR. NOLAN:  This is in evidence, your Honor.  May

14  we have it on the screen?

15       THE COURT:  Very well.

16       MR. NOLAN:  And, Aaron, do you mind, just where

17  it's Fiona at the bottom.  I'm sorry.  I apologize.  Can we

18  go to the very top of this.

19  Q.   Mr. Price pointed this out to you.  Do you recall this?

20  And he said Carter Bryant, it says extension 6099.

21       Do you see?

22  A.   Yes.

23  Q.   The other number, is that also in your handwriting?

24  A.   Yes, it is.

25  Q.   And did you -- what did you understand that number was?

1   **A.**   That's his home number.

2   **Q.**   So Carter Bryant gave you his home number as well?

3   **A.**   Correct.

4   **Q.**   And if we could just go down to the bottom of the page.

5   And these are comments that were made on September 29th,

6   2000?

7   **A.**   Correct.

8   **Q.**   Now, we've seen testimony, Mrs. Leahy, from your

9   deposition where you said these were Carter Bryant's

10   comments?

11   **A.**   Correct.

12   **Q.**   As you sit here today, are you absolutely certain in

13   your mind that these comments only come from Carter Bryant?

14   **A.**   Today I'm not absolutely certain that they only came

15   from him.

16   **Q.**   And why is that?  Have you been prompted to change your

17   testimony in that regard?

18   **A.**   No.

19   **Q.**   Well, why is it now that you are having a different

20   memory than you had at your deposition, if you know?

21   **A.**   I think it's because it's eight years ago.  There's

22   certain things I remember that are crystal clear.  Like

23   anything visual.  But when it comes to meetings and stuff

24   like that, it's a lot harder to remember.  So I remember

25   things at different times, you know.

1   Q.   Let me ask you something.  Regardless of the date, I

2   guess, do you recall any attention by Carter or direction to

3   you of a concern about the size of the waist?

4   A.   I know it's written here.  But I don't know if Carter

5   said that or if Paula said it from the other -- you know, if

6   Paula was at that meeting.  You know what I'm saying.  I'm

7   just foggy on what said, what comments.

8   Q.   And the second entry, smaller hips?  Am I reading that

9   right?

10  A.   Yes, smaller hips and thighs and ankles.

11  Q.   Okay.  Again, you, sitting here under oath, giving your

12  best memory, can you say with certainty that it was Carter

13  Bryant that made those comments to you on September 29th?

14  A.   No, I cannot say with certainty that it was him.

15  Q.   Now, going to the next entry, and I think this reads

16  neck longer.

17  A.   Thickness, okay.

18  Q.   Thickness, okay.

19       Can you say with certainty that it was only Carter

20  Bryant at that meeting who told you about measurements with

21  respect to the neck?

22  A.   No, I can't say that it was Carter.

23  Q.   The last point that I want to go to here.  Is that feet?

24  Can you read that?

25  A.   Feet bulkier on top.

1  Q.   Do you recall right now with certainty whether or not it

2  was only Carter Bryant -- that it was Carter Bryant, or was

3  it Carter Bryant that made that comment?

4  A.   I can't recall.

5  Q.   In any event, whether or not it was September 29th or

6  some eight days later, October 6th, are you certain that you

7  met with Paula Treantafelles?

8  A.   Yes, I am certain.

9  Q.   Concerning this sculpt?

10 A.   Correct.

11 Q.   And was Veronica Marlow also present?

12 A.   Correct.

13 Q.   And do you recall at that meeting additional comments

14 being made with respect to your sculpt?

15 A.   Which meeting?  The 26th, or the 6th?

16 Q.   October 6th.

17 A.   Yes, additional comments were made at that meeting.

18 Q.   And were those reflected in your notebook?

19 A.   Yes, they are.

20 Q.   Let's just turn to that page.  And this is

21 Exhibit 1137-0015.  And can we just highlight these comments?

22 And can you, sitting here now, recall comments that Paula

23 Treantafelles made?

24        MR. PRICE:  Objection, your Honor.  It's beyond the

25 scope of my examination, and it was asked and answered in her

1    direct.  She went through each one of these.

2           MR. NOLAN:  Okay.

3    Q.   In any event, these are comments that were made at that

4    meeting, yes?

5    A.   Yes.

6    Q.   Here's my question:  Following all of these meetings or

7    any of the meetings, either September 29th or the October 6th

8    meeting, did you, Mrs. Leahy, as the sculptor, exactly follow

9    the directions or comments that were being offered to you?

10   A.   I put in my interpretation of it the best I could.  But

11   I wouldn't say directly follow is the right words.

12   Q.   I want to direct your attention to Trial Exhibit 1127-A.

13   I think that's in your book.  Do you have it?

14           Your Honor, may I approach the witness?

15           THE COURT:  You may.

16   Q.   BY MR. NOLAN:  Now, I've placed in front of you Exhibits

17   1127-A and -B.  And do you recognize these two exhibits?

18   A.   As the Steve Madden ad that Carter gave me.

19   Q.   Okay.  And there are two different copies of that

20   exhibit of that Steve Madden ad; correct?

21   A.   Correct.

22   Q.   Are these the actual copies that were provided to you by

23   Mr. Bryant?

24   A.   I can't remember if he gave me the actual magazine page

25   or copies of the magazine page.

1   Q.   If you look in I think it's the lower left-hand corner,

2   that's actually a photograph of the advertisement, is it not?

3   I'm sorry.  A copy of the advertisement itself; correct?

4   A.   Correct.

5   Q.   And can you tell whether or not there's a piece torn out

6   on the bottom corner?

7   A.   Yes, there is.

8   Q.   Which corner is that?

9   A.   The bottom left-hand corner.

10          MR. NOLAN:  Your Honor, we'd offer 1127-A and

11   1127-B.

12          MR. PRICE:  No objection.

13          THE COURT:  They are both admitted.

14          **(Exhibits 1127-A and 1127-B received.)**

15   Q.   BY MR. NOLAN:  This is a pretty poor quality color.  I

16   apologize.  But if I just point to the lower left-hand

17   corner, which is dark there, is that the torn-out piece?

18   A.   Yes.

19          MR. NOLAN:  Your Honor, do you mind if she just

20   displays that to the jury, not to pass it out, but just to

21   hold up the color version?

22          THE COURT:  Very well.

23   Q.   BY MR. NOLAN:  Thank you.  Ms. Leahy, can you just hold

24   it up?

25          Okay.  Thank you.

1           Now, during the questioning, Mr. Price referred to

2    that as the 1999 Steve Madden ad.

3           Do you recall that?

4    **A.**   I don't recall that he referred to it as that.  But I

5    believe you.

6           MR. PRICE:  I'll object.  I believe I referred to

7    the other exhibit in Seventeen magazine.

8           THE COURT:  What exhibit did you refer to?

9           MR. PRICE:  That was 10179-133.

10          THE COURT:  Very well.

11   **Q.**   BY MR. NOLAN:  Okay.  Mrs. Leahy, when Carter Bryant

12   gave you 1127-A and 1127-B, did he ever tell you that he had

13   torn this out of an August 1999 Seventeen magazine?

14   **A.**   No, he never said anything about it.

15   **Q.**   In fact, did he ever tell you what date of a magazine

16   that he had pulled this ad out of?

17   **A.**   No, he didn't.

18   **Q.**   I'd like to have you open up to the exhibit that

19   Mr. Price just referenced, which is the ad that did appear in

20   the 1999 Seventeen magazine.  That's Trial Exhibit 10179-133.

21          Your Honor, I believe that we have the original of

22   this.

23          THE COURT:  Very well.

24          MR. NOLAN:  To make this easier, I'll put up the

25   spiral bound copy.  I don't think Seventeen magazine comes

1    this thick, but we just made separate copies of it.

2              THE COURT:   Very well.

3    Q.   BY MR. NOLAN:   By the way, Mrs. Leahy, did Mr. Bryant

4    ever tell you that this Steve Madden ad was the inspiration

5    for his concept drawing?

6    A.   No.   He said it was inspiration for me.

7    Q.   I want you to look now at the August -- your Honor, I'm

8    going to approach with the original.

9              Your Honor, Exhibit 10179-1 through -3 is in

10   evidence.   May I just have the front page shown first?

11             THE COURT:   Yes.

12   Q.   BY MR. NOLAN:   Mrs. Leahy, you have the actual original

13   August 1999 Seventeen magazine; correct?

14   A.   Correct.

15   Q.   And I want you to turn to page 133.   And do you see the

16   Steve Madden ad?

17   A.   Yes.

18   Q.   Okay.   Now, what I'd like to do is ask you, the

19   right-hand side is the ad that appears in the original of the

20   August 1999 Seventeen magazine; correct?

21   A.   Correct.

22   Q.   Can you compare it to the tear sheet copy of the Devil

23   Angel Steve Madden ad that Carter Bryant provided to you in

24   September of 2000?

25   A.   Compare it in which way?

1   Q.   Well, are they the same ads?

2   A.   No, they are not.

3   Q.   And why not?

4   A.   Because where it says Steve Madden in the upper

5   left-hand corner is a different color.  There's different

6   words at the bottom of it.

7   Q.   And when you say at the bottom different wording, what

8   do you mean?  I apologize for the poor copy.

9   A.   Well, down by their feet, the one -- the one that I have

10  says jeanswear.  And then the other one says footwear,

11  jeanswear, sportswear, outer wear, et cetera.  At the bottom.

12  And it has writing up the side, the web address.

13        MR. NOLAN:  Your Honor, may I have permission to

14  publish the original Seventeen magazine ad of the Steve

15  Madden shoe ad as well as Exhibits 1127-A and -B that

16  Mr. Bryant gave to Mrs. Leahy?

17        MR. PRICE:  No objection.

18        THE COURT:  You may.

19        MR. NOLAN:  May I circulate to the jury?

20        THE COURT:  You may.

21        MR. NOLAN:  Thank you.

22  Q.   Mrs. Leahy, the last topic I want to go to is Mr. Price

23  was talking to you about the amount of compensation you've

24  received from MGA over the course of years.

25        Do you recall that?

1   A.   Yes, I do.

2   Q.   Do you still have Mr. Price's black notebook in front of

3   you?

4   A.   Yes.

5   Q.   And can you turn to Exhibit 12995.

6   A.   12995?  Yes.

7   Q.   12995.

8   A.   Okay.  I have it.

9   Q.   Okay.  And do you see this as a list of payments made by

10  MGA to Margaret Leahy?

11  A.   It is hard for me to understand.  It's a lot of letters

12  and numbers.

13  Q.   Okay.  But on the top it says --

14  A.   Okay, yeah, I see that.  Sorry.

15  Q.   It says payments made by MGA to Margaret Hatch Leahy?

16  A.   I see that it says that.

17  Q.   Was Margaret Hatch your maiden name?

18  A.   Hatch was my maiden name, yes.

19  Q.   Thank you.  And is it true that you received payments

20  from MGA from approximately December of 2000 through and

21  including May 26, 2005, for various projects that you were

22  asked to do for MGA?

23  A.   That sounds about right.

24  Q.   And the total amount of compensation or total payments

25  appears to be $534,516.04?

1   A.   Correct.

2            MR. NOLAN:  Your Honor, we'd offer Exhibit 12995.

3            THE COURT:  Any objection?

4            MR. PRICE:  No objection.

5            THE COURT:  Admitted.  You may publish.

6            **(Exhibit 12995 received.)**

7   Q.   BY MR. NOLAN:  These payments were for work that you did

8   sculpting; correct?

9   A.   Correct.

10  Q.   And not all the -- was all the sculpting that you did

11  for MGA related to Bratz?

12  A.   No, it wasn't.

13  Q.   You did other projects for them?

14  A.   Yes, I did.

15           MR. NOLAN:  Nothing further.  Thank you very much.

16           THE COURT:  Very well.  Anything further?

17           MR. PRICE:  Yes.

18                    **RECROSS-EXAMINATION**

19  BY MR. PRICE:

20  Q.   Ms. Leahy, you were shown 1127 and then that <u>Seventeen</u>

21  magazine August 1999 ad.  I want to ask you this:  Yesterday,

22  when Mr. Nolan was examining you and he was asking you about

23  Exhibit 1127, did you notice that what he put on the screen

24  was 10179-133?

25  A.   Okay.  Let me get the numbers straight.

1   Q.   Fair enough.   I'll make it easy.   We'll put up 10179-133

2   because I'm asking you what was shown on the screen.   And my

3   question is yesterday, when Mr. Nolan was asking you about

4   the tear sheet, do you recall that the image he actually put

5   up was the one on the right, 10179-133?

6   A.   Well, I didn't know that because I didn't see them next

7   to each other.   I didn't know there were two different ones.

8   So I was just looking at the actual figures.

9   Q.   Sure.   And you understand what an ad campaign is?

10  A.   Yes.

11  Q.   And I take it before your deposition, you had time to

12  meet with your counsel; correct?

13  A.   Correct.

14  Q.   And did you meet with MGA's counsel as well?

15  A.   Which one was MGA's counsel?

16  Q.   Well, did you meet with some attorney other than your

17  own?

18  A.   Yes.

19  Q.   Okay.   Who was that?

20  A.   Do you want their names or the --

21  Q.   Yeah.

22  A.   It was Marcus.   When did we meet with them?

23  Q.   Before your deposition?

24  A.   Yeah, Marcus and Tom briefly and I can't remember the

25  other ones' names.

1  Q.   Marcus and Tom, are you referring to someone right

2  there?

3  A.   Marcus Mumford right there.

4  Q.   This gentleman here at counsel table?

5  A.   Yes.

6  Q.   And Tom, Mr. Nolan?

7  A.   And Tom Nolan, yes.  And Christian Dowell, D-O-W-E-L-L.

8  Q.   And prior to trial, did you meet with your counsel?

9  A.   Prior to trial, meaning today, did I meet with my

10 lawyer?

11 Q.   Yes.  Today or -- prior to yesterday, for example.

12 A.   Prior to yesterday, yes.

13 Q.   And did you meet with any counsel from MGA?

14 A.   Yes.

15 Q.   Who did you meet with from MGA?

16 A.   When?

17 Q.   Before you testified yesterday.

18 A.   Who did I meet with yesterday?

19 Q.   Before you testified yesterday, in preparing for your

20 trial testimony, what counsel from MGA did you meet with?

21 A.   I just need to know the date because there's different

22 people.

23 Q.   Between your deposition and the time you testified

24 yesterday, tell us the MGA attorneys that you met with.

25 A.   Well, I just did.

1   Q.   I mean after your deposition but before you took the

2   stand yesterday.

3   A.   Correct.

4   Q.   Okay.  So my question is at any time has anyone shown

5   you a picture from an ad campaign with those two figures on

6   it from 1998?

7   A.   Well, I don't know any of the dates.  I know I produced

8   this picture because I had it from when Carter gave it to me.

9   Q.   Well, you've seen the <u>Seventeen</u> magazine dated August

10  1999 that had that ad campaign in it; correct?

11          MR. NOLAN:  Objection.  Reference to the ad

12  campaign as being similar to this particular exhibit.

13          THE COURT:  Counsel, what's your objection?  No

14  speaking objections.

15          MR. NOLAN:  I'm sorry.  Mischaracterizes the

16  examples.

17          THE COURT:  Sustained.

18  Q.   BY MR. PRICE:  Let me ask it this way:  You said you are

19  familiar with an ad campaign; correct?

20  A.   Correct.

21  Q.   And you know that in ad campaigns, they will use similar

22  pictures and sometimes have different writing on those

23  pictures; right?

24  A.   Well, I never gave it any thought until yesterday or

25  today, wherever it was I saw the differences.

1    Q.    Okay.  Well, and that's because you didn't give it any

2    thought because your eye is drawn to the images, not the

3    little fine print; right?

4    A.    Correct.

5    Q.    Okay.  So my question is you've seen Exhibit 10179-133

6    taken from the August 1999 Seventeen magazine.

7    A.    That's the one with the pink circle.  Let's just say

8    that.

9    Q.    Okay.  Now, has anyone, up until now, shown you a copy

10   of that picture in an ad from 1998?  Has anyone shown you

11   anything like that?

12   A.    Which one is from 1998?

13   Q.    I can't answer questions.  I'd be glad to.

14          THE COURT:  As much as counsel would like to answer

15   that, you've got to answer questions, and not ask questions.

16   If you don't understand the question --

17          THE WITNESS:  Okay.  I don't understand the

18   question.

19   Q.    BY MR. PRICE:  Let me make it clear.  I've shown you and

20   Mr. Nolan has shown you Exhibit 10179, which is from an

21   August 1999 Seventeen magazine.

22   A.    The one with the pink circle.

23   Q.    Yeah.  So my question is has anyone ever shown you an ad

24   with the picture of those two figures in it in a magazine

25   dated 1998?  Has anyone shown you that?

1   A.   No, I have never seen this picture in any way, no matter

2   what version it is, in an actual magazine before today.

3   Q.   And Mr. Nolan also asked you whether or not

4   Ms. Treantafelles might have been there September 29th.   Do

5   you recall that?

6   A.   Correct.

7   Q.   And if we could put up pages 114 and 115.   I guess I

8   have just two questions.   Well, we'll see.

9           First, is it your testimony that it is possible,

10   although you don't remember it, but it's possible that on

11   September 29th Paula Treantafelles, a product manager at MGA,

12   attended a meeting with you and Carter Bryant, a Mattel

13   employee, before he even tendered his resignation to Mattel,

14   to give you comments about a sculpture for Bratz?   Are you

15   saying that's possible?

16           MR. NOLAN:   Objection, your Honor.   Argumentative,

17   argumentative, lack of foundation.

18           THE COURT:   As phrased, Counsel.   You've got to

19   rephrase the question.

20   Q.   BY MR. PRICE:   Let me put it this way:   I will represent

21   to you that the evidence is that Mr. Bryant didn't even

22   tender a resignation to Mattel until October 4th.

23           MR. NOLAN:   Your Honor, argumentative.   "He didn't

24   even tender."

25           THE COURT:   Rephrase.

1  Q.   BY MR. PRICE:   I'll represent to you that Mr. Bryant

2  doesn't claim to have tendered a resignation to Mattel prior

3  to October 4th.

4         So are you telling us that it's possible that

5  Mr. Bryant, before he even tendered a resignation to Mattel,

6  met with you and Paula Garcia, a product manager at MGA, to

7  give you comments on how to do a Bratz sculpt?  Are you

8  saying that's possible?

9  A.   Well, I'm saying it's possible that Carter and Paula

10  were there on the 29th.

11  Q.   And you're saying you got comments on your Bratz sculpt

12  on that day and then, to the best of your ability, made the

13  changes that were requested; right?

14  A.   Correct.

15  Q.   Now, I want to ask you this:  You see -- you look at

16  pages 1137-14 and 1137-15.  We've got them up here side by

17  side.

18         Do you see that on 1137-15, it looks like on the

19  October 6th entry, it looks like you're using a black pen.

20         Do you see that?

21  A.   Pen or a pencil.

22  Q.   Pen or pencil.  Okay.

23         And then on your September 29 entry, if we can get

24  the -- it looks like for the most part you're using a blue

25  pen; correct?

```
 1   A.    Yeah.   That was my favorite blue pen with sparkly ink.
     And it's purple.
 2
 3   Q.    Purple.
 4   A.    The -- oh, I'm sorry.  No, that's the blue one.
 5   Q.    These are copies.  So it may actually be purple.
 6           You notice that Paula Treantafelles appears to be
 7   in the same color pen or ink that you used on October 6th.
 8           Do you see that?
 9   A.    Um, well, it's black.
10   Q.    Do you have an explanation for that?
11   A.    It's just pens.
12           MR. PRICE:  Okay.  Nothing else.
13           THE COURT:  Mr. Nolan?
14           MR. NOLAN:  Nothing further.
15           THE COURT:  You are excused.  Thank you.
16           MR. NOLAN:  May we call our next witness?
17           THE COURT:  You may.
18           MR. NOLAN:  MGA calls Tim Kilpin.
19           MR. ZELLER:  Your Honor, may we be heard at sidebar
20   briefly?
21           THE COURT:  Very briefly.
22           (SIDEBAR CONFERENCE HELD.)
23           THE COURT:  Okay.  Yes.
24           MR. ZELLER:  A couple points, your Honor.  Number
25   one, I'm not sure it was fully resolved as to whether or not
```

1   they could use what we consider those collateral evidence to

2   try and impeach Ms. Ross.

3          THE COURT:  I did look at the most persuasive

4   argument that Mr. Nolan made that was the kind of goosey

5   gander rule because of the use of the collateral evidence

6   with Mr. Farhad Larian.  And I called for the transcript, and

7   no objection was made at that time.  The objection is being

8   made now.

9          It is an legitimate objection and does seem to be

10  collateral evidence to impeach given the time frame involved.

11  So I'll hear from you first on that before I make a final

12  ruling.

13         What you want to do is bring in the extra evidence

14  that he did tell Ivy Ross about the out thought and out

15  executed and brand in crisis.

16         MR. NOLAN:  Correct, your Honor.  It's same

17  argument that I made this morning.  Whether or not they are

18  now lodging an objection or not, in the beginning of the

19  case, testimony was elicited -- it's the same issue.

20         THE COURT:  Very well.  It was a fair basis for

21  exploring that on cross-examination.  And it's before the

22  jury.  I'm not going to allow collateral evidence in.  So

23  I'll sustain the objection on that.

24         However, these other areas that were discussed, it

25  all depends on your laying the foundation for getting into

1    them.   This is the secret meetings, the legal department

2    investigation, all of this apple apple to make sure we're

3    talking about a similar comparison here.   That's going to be

4    my guiding principle as best I can.

5            MR. NOLAN:   So just to be clear, I cannot ask him

6    whether or not it was his opinion, as the manager of the

7    girls division, that the Barbie brand was in a crisis?

8            THE COURT:   In 2004, no.   If he has an opinion and

9    you can lay a foundation for 2000 or 1999 at the time Carter

10   Bryant was there, I could see a potential relevant to this

11   case, but in years later, I am just really struggling to see

12   the relevance.

13           MR. NOLAN:   I understand.   We've made our

14   objection.

15           THE COURT:   And make sure, when I talk about the

16   foundation, just so you understand the Court's view of this,

17   there's nothing improper about recruiting.   There's nothing

18   improper about having interviews while you're still working

19   for another company.   And so evidence of that is not

20   relevant.

21           Now, doing work, if Mattel knowingly was engaged or

22   read through contracts to permit that, that might be

23   evidence, allowing work for a competitor, I suppose if that

24   foundation is laid; but simply the fact that someone is doing

25   an interview or was recruited, that's not what this case is

1   about, unless I'm missing something.

2          MR. NOLAN:   What if he says that he signed his

3   contract and continued to work at Disney for some period of

4   time?

5          THE COURT:   Depends what the contract provides.

6   And that's the foundation I'm talking about.   There's some

7   contracts that might provide it.   But if he did that, if he

8   worked at Disney before going to Mattel, while working at

9   Mattel, and Mattel doesn't know about that, it's shame on

10  him.   And that impeaches him.   And that may call into

11  question whether Disney approved of that or didn't.   But it

12  has no relevance to this case.

13         MR. ZELLER:   What I would suggest, your Honor, is I

14  think that in order to actually establish a proper

15  foundation, if he wants to go into that area, he has to

16  establish Disney didn't know.

17         THE COURT:   That Disney?

18         MR. ZELLER:   That Disney did not know.   I mean, in

19  the hypothetical situation he's talking about --

20         THE COURT:   I guess the problem I'm having is even

21  if Disney did not know and even if this guy, Kilpin here, is

22  not violating his contract, what relevance -- violating his

23  Disney contract -- what relevance would that have to Carter

24  Bryant's contract?   This is a breach of contract for selling

25  apples.   If a company breaches a contract for selling apples

1   and a company breaches a contract for selling oranges, I

2   think you understand the Court's ruling.

3           MR. ZELLER:  And the follow-on points I wanted to

4   make was that I assume we're not going to have a repeat of

5   the inflammatory language itself in front of the jury today?

6           THE COURT:  Mr. Nolan knows not to do that.

7           MR. ZELLER:  And the other point, and I would

8   probably request another sidebar, but so everyone is on

9   notice that in the event Mr. Nolan does go into these areas

10  and asks about the language, I think I'm entitled to elicit

11  from Mr. Kilpin his subsequent understandings of trade

12  secret --

13          THE COURT:  We're not going to go into that because

14  Mr. Nolan is not going to go into it.

15          MR. ZELLER:  Thank you.

16          **(CONCLUSION OF SIDEBAR CONFERENCE.)**

17          THE CLERK:  Would you please raise your right hand,

18  sir.

19                  **TIM KILPIN, SWORN.**

20          THE CLERK:  Please state your full name for the

21  record and spell the last name.

22          THE WITNESS:  Tim Kilpin, K-I-L-P-I-N.

23          THE CLERK:  Thank you, sir.

24  ///

25  ///

1                          DIRECT EXAMINATION

2   BY MR. NOLAN:

3   Q.   Mr. Kilpin, we met at your deposition, I guess, a few

4   months ago; correct?

5   A.   Yes.

6   Q.   And how are you employed?

7   A.   I work at Mattel.

8   Q.   What is your current position?

9   A.   I am the general manager of the boys and games business

10  unit.

11  Q.   And prior -- well, how long have you worked at Mattel?

12  A.   About 17 years all together.

13  Q.   Was that in one continuous stretch, or did you have any

14  breaks?

15  A.   No, I've come back a couple times.

16  Q.   Can you just tell us maybe in a narrative form, just

17  tell me what the dates were where you were working at Mattel

18  and then where did you go work after leaving Mattel, and when

19  did you come back?

20  A.   I started in 1984 and left in 1988.  I'm sorry.  To work

21  at Tonka Toys and then left Tonka Toys in 1991 to return to

22  Mattel.  And I was at Mattel then until 1999.  And then for a

23  year I worked at an Internet company, and I worked at Disney

24  from 2000 until 2003 and returned to Mattel then.

25  Q.   During period of 1991 through 1999, after you had come

1    back from Tonka Toys, what was your area of responsibility at

2    Mattel?

3    **A.**    I had a couple of different areas of responsibility.

4    From 1991 until 1994, I oversaw Hot Wheels.  And then in

5    1994, I ran the boys group for a while.  And then from 1995

6    until 1999, I was overseeing the Disney business.

7    **Q.**    When you were overseeing the Disney business between

8    1995 and 1999, did you have any responsibility for any of the

9    Barbie brand?

10   **A.**    No, I did not.

11   **Q.**    During the period of 1999, did you undertake any review

12   of the status of the Mattel Barbie line?

13   **A.**    No, I don't recall doing that.

14   **Q.**    During this period of time that -- during, let's say,

15   1984 through 1999, in your various positions at Mattel, did

16   you ever have an occasion to work with outside inventors with

17   respect to any of their creations?

18   **A.**    We would work with inventors, outside inventors from

19   time to time.  Although that responsibility was mostly with

20   the design group, and most of my time was in marketing.

21   **Q.**    With respect to when you came back to -- well, during

22   that period of time, what interaction would you have with

23   outside inventors?

24   **A.**    During -- I'm sorry.  During which time?

25   **Q.**    Sure.  During 1991 through 1999.

1   **A.**    During that time, I would have occasionally seen

2   presentations by outside inventors.

3   **Q.**    Would you become involved in the negotiations of an

4   agreement that would be entered into with the outside

5   inventor?

6   **A.**    I typically would not.

7   **Q.**    Is that something that you would typically leave to the

8   legal department?

9   **A.**    We would --

10          MR. ZELLER:   Objection.   The question is vague.

11  Also assumes facts.

12          THE COURT:   Rephrase the question.

13          MR. NOLAN:   Sure.

14  **Q.**   During this time, and I'm now focused 1991 through 1999,

15  Mr. Kilpin, on those occasions when you were having meetings

16  with outside inventors, were those outside inventors pitching

17  ideas or concepts to Mattel?

18  **A.**    Yes, for the most part they were.

19  **Q.**    And were some of those pitches successful in the sense

20  that Mattel did accept the concept?

21  **A.**    I'm sorry.   We're talking about that whole time frame?

22  **Q.**    Yes.

23  **A.**    Well, yeah, I can't recall specifics, but there probably

24  would have been some products that we would have accepted.

25  **Q.**    Do you recall ever personally being involved in signing

1   up the outside inventor for some agreement with Mattel?

2   A.   I was usually not involved in that specific part of the

3   process.

4   Q.   Do you know whether or not any written agreements were

5   entered into between Mattel and an outside inventor?

6   A.   Well, that was a responsibility that was belonging to

7   the inventor relations group and to the attorneys.

8   Q.   During the period of -- when you say the attorneys, are

9   you referring to the Mattel attorneys?

10   A.   Yes.

11   Q.   So they wouldn't task you with that responsibility

12   during the period of 1991 through 1999?

13          MR. ZELLER:  Relevance.

14          THE COURT:  It's foundational.  Overruled.

15          THE WITNESS:  Can you ask the question again?

16          MR. NOLAN:  Sure.

17   Q.   So it was not within your responsibility, between 1991

18   and 1999, for you to engage in negotiations with the outside

19   inventors and memorialize that into a written agreement;

20   correct?

21   A.   Typically I was not responsible for that.

22   Q.   Now, after you left Disney -- I'm sorry.  After you left

23   Mattel, you went into the Internet business; correct?

24   A.   That's correct.

25   Q.   And sometime later you entered or you joined Disney;

```
 1   correct?

 2   A.   Yes.

 3   Q.   Now, what was your starting date as Disney?  Do you

 4   recall?

 5   A.   I believe I started at Disney in November of 2000.

 6   Q.   And what was your position at Disney?

 7   A.   I was overseeing the toys business for Disney consumer

 8   products.

 9   Q.   And during this period of time, that is, November of

10   2000, when you were overseeing the toy division at Disney,

11   did you have responsibility for discussions with outside

12   inventors for Disney?

13          MR. ZELLER:  Relevance.

14          THE COURT:  That's foundational.  I'll permit it.

15   Overruled.

16          THE WITNESS:  We didn't really deal with inventors

17   at Disney.  We dealt primarily with, in that role, with

18   licensees, with other companies.

19   Q.   BY MR. NOLAN:  In your responsibility as head of the toy

20   group at Disney, would you be the one that would negotiate

21   the licensees for Disney?

22          MR. ZELLER:  Foundation.  Time period.

23          MR. NOLAN:  During the period he was employed at

24   Mattel -- at Disney.

25          THE COURT:  Overruled.
```

1          THE WITNESS:  For the period that I was at Disney

2     and responsible for the toy group, I was involved in the

3     negotiations with other companies' licensees.

4     Q.   BY MR. NOLAN:  When you say you were involve with it,

5     did you actually draft the license agreement?

6     A.   Typically, no, I did not.

7     Q.   Was there a particular department within Disney that you

8     would rely on for that?

9          MR. ZELLER:  Relevance.

10          THE COURT:  Counsel, where is this going in terms

11     of the time at Disney?

12          MR. NOLAN:  Just to his custom and practice with

13     respect to what type of investigation they would do before

14     they negotiated contracts.

15          THE COURT:  I'll sustain the objection.  Let's move

16     along to another area.

17     Q.   BY MR. NOLAN:  Turning your attention to the time that

18     you returned to Mattel, what year was that?

19     A.   I believe I said October of 2003.

20     Q.   And how long before you started working at Mattel were

21     you first contacted for this possible position?

22     A.   I'm sorry.  For the position at?

23     Q.   Mattel.

24     A.   At Mattel.  I had meetings at Mattel about that

25     position, I believe, in May of 2003.

1    Q.   Do you recall how many meetings you had at Mattel before

2    you accepted an offer from Mattel?

3              MR. ZELLER:  Your Honor, he hasn't laid the

4    foundation for this line of inquiry.

5              THE COURT:  Lay further foundation, Counsel.

6              No speaking objections, Mr. Zeller.

7    Q.   BY MR. NOLAN:  While you were interviewing at Mattel,

8    were you also employed at Disney?

9    A.   Yes, I was.

10   Q.   How many meetings or interviews did you have at Mattel

11   while you were still employed at Disney concerning possibly

12   returning to Mattel?

13             MR. ZELLER:  Foundation.

14             THE COURT:  Sustained.

15   Q.   BY MR. NOLAN:  Who did you interview with at Mattel

16   before accepting a position?

17   A.   I spoke with Alan Kaye and Matt Bousquette.

18   Q.   And who was Matt Bousquette?

19   A.   Matt was the president of Mattel brands.

20             MR. ZELLER:  Foundation.

21             THE COURT:  Counsel, the foundation you're

22   referring to is what we discussed at sidebar.

23             MR. ZELLER:  Yes.

24             THE COURT:  That was my indication.

25             MR. NOLAN:  I understand.

1    Q.   When you signed the contract or accepted the employment

2    at Mattel, did you continue to work at Mattel for some period

3    of time?

4              MR. ZELLER:   Foundation.

5              THE COURT:   I'm going to permit it.   I'm going to

6    instruct the jury if the foundation is not completed.   So

7    it's kind of a -- I'll permit the question.

8              THE WITNESS:   Can you ask the question again?

9    Q.   BY MR. NOLAN:   Did there come a time when you accepted a

10   position at Mattel?

11   A.   Yes.

12   Q.   And did you accept that offer while you were still

13   employed at Disney?

14   A.   Yes.

15   Q.   And after accepting the position at Mattel, did you

16   continue to work at Disney?

17   A.   After I accepted the position at Mattel, I resigned from

18   Disney.

19   Q.   Was the resignation effective immediately?

20   A.   Disney didn't want me to leave, and so they didn't

21   accept my resignation immediately.

22   Q.   And so how long did you continue to work at Disney after

23   you gave your resignation?

24   A.   I worked at Disney -- well, from May until October.

25             THE COURT:   Counsel, you're not done with that yet.

1        MR. NOLAN:   I know.   I'm getting there.

2        THE COURT:   I'm sorry.   I thought you were turning

3    to something else.

4    Q.   Now I want to turn your attention to the period after

5    you had accepted your offer from Mattel and while you were

6    still working at Disney.   You understand that's the limited

7    time period I'm asking you for?

8    A.   The time period between May -- help me understand.

9    Q.   May and October of 2003.

10   A.   Okay.

11   Q.   When you accepted the position at Mattel, you knew what

12   your title was going to be at Mattel?

13   A.   I did.

14   Q.   And that was going to be in charge of the girls

15   division?

16   A.   My role was going to be overseeing design and marketing

17   for the girls group.

18   Q.   During that period of time of the overlap, when you had

19   accepted your offer and you were still at Disney, did you

20   look at and follow the business activities of the girls

21   division at Mattel?

22        MR. ZELLER:   Objection.   Mischaracterizes the

23   testimony.

24        THE COURT:   The preamble there.   Why don't you

25   rephrase.

1   Q.   BY MR. NOLAN:   While you were still working at Disney

2   but had accepted your offer at Mattel and knew what your job

3   was going to be, did you do anything in terms of following or

4   understanding anything that was going on at Mattel regarding

5   the girls division?

6           MR. ZELLER:   Your Honor, foundation.   Sidebar,

7   relevance.

8           THE COURT:   Before we get into that, Counsel, let's

9   complete this foundational issue in terms of his ability to

10  do that, knowledge to the supervisors, et cetera, that we

11  spelled out at sidebar.

12  Q.   BY MR. NOLAN:   At what point in time in the interview

13  process did you advise Disney that you were starting to be

14  interviewed by Mattel?

15  A.   I don't really recall that.

16  Q.   Do you recall that you had actual interviews at Mattel

17  before you advised anybody at Disney?

18  A.   What I recall, talking to my boss at Disney at the time,

19  that I wasn't enjoying the role I had because I was no longer

20  involved in toys.   I had another role at Disney at that time.

21  Q.   And did you tell your boss at Disney that in fact you

22  were going to go out and look for a new job?

23  A.   I don't recall exactly how I phrased it to him.

24  Q.   Is it correct, though, that you accepted the position at

25  Mattel before you told Disney that you were going to accept

1   the position at Mattel?

2   **A.**   I did accept the position at Mattel.

3   **Q.**   Before you told Disney; correct?

4   **A.**   I believe so, yes.

5   **Q.**   Now, during the time that you were working at Disney for

6   that period of October through November of 2003, did Disney

7   tell you that you could do work for Mattel during that period

8   of time?

9   **A.**   I'm confused about the time line.  Can you ask that

10  again?

11  **Q.**   Again, it's October -- I'm sorry.  From the time that

12  you accepted the position at Mattel, which I believe you

13  testified was in May of 2003.

14  **A.**   Yes, that's correct.

15  **Q.**   Through the time that you started working at Mattel.

16  October -- I'm sorry.  May through October.

17          Do you understand the time period?

18  **A.**   Yes, I do.

19  **Q.**   And you resigned at Disney; correct?

20  **A.**   Yes.

21  **Q.**   And you've accepted your employment at Mattel; correct?

22  **A.**   Yes.

23  **Q.**   However, your resignation was not accepted, and you

24  continued to work at Mattel; correct?

25          THE COURT:  At Disney.

1    Q.   BY MR. NOLAN:   I'm sorry.   At Disney; correct?

2    A.   Well, what ultimately happened was I told Disney that I

3    wanted to go back to Mattel.   Disney didn't want me to leave

4    and asked me to stay.   And ultimately we decided for some

5    period of time that I was going to stay.

6    Q.   And during that period of time that it was decided that

7    you would stay at Disney, my question, sir, is did you have

8    permission from Disney to meet with people at Mattel and

9    start familiarizing yourself with what your new obligations

10   would be?

11             MR. ZELLER:   Foundation.

12             MR. NOLAN:   It is foundational, your Honor.   I'm

13   just asking as a foundational question.

14             THE COURT:   Very well.   But you're going to have to

15   close this loop soon, Counsel, or I'm going to cut this off.

16             THE WITNESS:   I didn't ask permission because I

17   didn't expect to do anything for Mattel while I was working

18   for Disney.

19   Q.   BY MR. NOLAN:   And, in fact, did you do anything in

20   connection with Mattel while you were also working at Disney

21   during that period of time?

22   A.   No, I did not.

23   Q.   Do you recall seeing Bratz -- when was the first time

24   you saw Bratz?

25             MR. ZELLER:   Your Honor, I would at this point move

1    that the entire line be stricken for lack of foundation, lack

2    of relevance.

3              THE COURT:  I think it is of no moment, but there

4    was no foundation laid.  That line of questioning is of no

5    moment.

6              Move along, Counsel.

7    Q.   BY MR. NOLAN:  When was the first time you saw Bratz?

8    A.   I don't recall exactly when the first time I saw Bratz

9    was.  I don't recall the exact time.

10   Q.   Do you recall meeting Mr. Larian at a New York Toy Fair?

11   A.   I recall touring Mr. Larian's showroom at Toy Fair in

12   2002.

13   Q.   And who were you employed with at that time?

14   A.   I would have been employed at Disney.

15   Q.   When you were at Mattel and returned to Mattel in your

16   last stint, did you have occasion to meet with and negotiate

17   employment agreements with outside inventors?

18   A.   I'm confused about time frame again.

19   Q.   Sure.  When you accepted your position and you go to

20   work at Mattel; all right?  Last time.

21   A.   Yeah.

22   Q.   During that period of time, when you were overseeing the

23   girls division, did you negotiate with outside inventors who

24   came to you with concepts?

25             MR. ZELLER:  Relevance.  Time period.

1        THE COURT:  Sustained.

2   Q.  BY MR. NOLAN:  Isn't it true that as an executive at

3   Mattel, in any of your dealings with outside inventors, you

4   would rely on the legal department at Mattel to negotiate the

5   terms of those contracts?  Yes or no?

6        MR. ZELLER:  Relevance.  Foundation.

7        MR. NOLAN:  Your Honor, industry custom and

8   practice.  Those questions were asked of Mr. Larian with

9   respect to what extended investigation was done in his

10  negotiations.

11       THE COURT:  Practice at the time in question in

12  this case.  If you lay that foundation for this witness, you

13  may ask the questions of this witness as well.

14       MR. NOLAN:  Okay.

15  Q.  During the period of 2000, do you recall ever

16  negotiating an agreement with an inventor and memorializing

17  that in writing yourself?

18       MR. ZELLER:  Your Honor, assumes facts not in

19  evidence.

20       THE COURT:  As to what?

21       MR. ZELLER:  Asking about the year 2000.  Assuming

22  he was doing any of this for anybody at that time.

23       THE COURT:  That's implicit in the question.  I'll

24  overrule the objection.  You may answer.

25       THE WITNESS:  In 2000 I was working for an Internet

1    company.

2    **Q.**   BY MR. NOLAN:   I understand.   Thank you.

3            My last question is during the -- at any time in

4    the 1999, 2000 time period, did you ever undertake any review

5    of the marketing efforts of Mattel for the Barbie line?

6    **A.**   In 1999, 2000?

7    **Q.**   During that time period.

8    **A.**   Well, I worked at Mattel up until October of 1999.

9    **Q.**   So up until that period of time.

10   **A.**   I don't recall ever doing that.

11           MR. NOLAN:   Thank you.

12           MR. ZELLER:   No questions, your Honor.

13           THE COURT:   You are excused.

14           MR. NOLAN:   Your Honor, MGA would call Mr. Richard

15   De Anda.

16           THE COURT:   Very good.

17           THE CLERK:   Please remain standing and raise your

18   right hand.

19                   **RICHARD DE ANDA, SWORN.**

20           THE CLERK:   Thank you, sir.   Please be seated.

21           THE WITNESS:   Thank you.

22           THE CLERK:   Please state your full name for record,

23   and spell the last name.

24           THE WITNESS:   Richard De Anda, D-E capital A-N-D-A.

25           THE CLERK:   Thank you.

4408

**DIRECT EXAMINATION**

BY MR. NOLAN:

Q.   Good afternoon, Mr. De Anda.  How are you employed?

A.   I'm employed at Mattel as vice-president of global security and investigations.

Q.   And how long have you been in that position?

A.   Approximately 10 years.

Q.   And before joining Mattel, where were you employed?

A.   I was the president of my own company that managed a high end financier for two years.

Q.   And what was the name of that company?

A.   Exec Pro.

Q.   Prior to that, how were you employed?

A.   Prior to that, I was employed by the Hagen Company, an REIT, a real estate investment company, which was located in Manhattan Beach.

Q.   Was there a period of time where you worked for the Los Angeles Police Department?

A.   Yes, that is correct.

Q.   For how long were you employed at the Los Angeles Police Department?

A.   Just a little over 20 years.

Q.   Now, during the period of time that you've been employed by Mattel as the vice-president of security and investigations -- I'm sorry -- security vice-president of

1  global security at Mattel, do you have any other business

2  activities?

3  A.    Yes, I do.

4          MR. ZELLER:  Foundation.

5          THE COURT:  Ordinarily, this would be background,

6  but given the issue involved, Counsel, let's lay the

7  foundation we discussed.  You are talking about current other

8  business activities, or are you talking about his background?

9          MR. NOLAN:  Current experience.

10          THE COURT:  Lay the foundation we discussed.

11  Q.    BY MR. NOLAN:  Mr. De Anda, when you signed on at Mattel

12  to be head of security, did you seek from Mattel permission

13  to do outside work unrelated to Mattel?

14  A.    I advised my direct report, Mr. Alan Kaye -- in fact I

15  have two corporations -- that I would be continuing with

16  that, would that be an issue.  And he said no, so long it's

17  not in conflict with Mattel's interest or impedes my ability

18  to perform at Mattel.

19  Q.    Now, did you receive written permission to engage in

20  those outside activities?

21  A.    You know, I don't recall if I did or didn't.  I don't

22  believe I did personally receive any written permission form.

23  Q.    From time to time -- let me approach it this way.  As

24  you have engaged in outside business activities, have you

25  gone back to Mattel and sought permission for each of those

1  assignments?

2  **A.**   It's not that I have sought permission.  I have pretty

3  much explained to Alan Kaye that I was either investigating a

4  case or working on a matter, yes and I don't know if it's for

5  every single one or not.  I couldn't be certain on that.

6  **Q.**   And would you notify Mr. Kaye before you accepted a

7  particular assignment from a client outside of Mattel to do

8  the work that was requested?

9  **A.**   I would say probably in most cases, but probably not all

10  cases, because some of them were so insignificant and had no

11  value of anything.

12  **Q.**   How do you assess whether or not it was significant or

13  not before you would seek permission or advise Mr. Kaye that

14  you were going to take on outside activities?

15  **A.**   Typically, if it was involved in any time, I would say.

16  Sometimes I would -- if I may.

17  **Q.**   Now, prior to joining Mattel, you had worked with

18  Mr. Kaye beforehand; correct?

19  **A.**   That's correct.

20        MR. ZELLER:  If I may, your Honor, there's no

21  foundation for that entire last line about --

22        THE COURT:  Overruled.  I think that's fine.

23  **Q.**   BY MR. NOLAN:  You had worked with Mr. Kaye beforehand;

24  correct?

25  **A.**   Yes.

1  Q.   And how long have you known Mr. Kaye?

2  A.   I believe I met Mr. Kaye in 1998.

3  Q.   Help me out with the math.  I'm just wondering, the math

4  by the time of when you first met Mr. Kaye before joining

5  Mattel.

6  A.   Probably nine years, nine to ten years.

7  Q.   Did you work with Mr. Kaye in any business?

8  A.   I provided services for him while he was at Kaufman &

9  Broad.  And I can't recall anything else.

10 Q.   And did you ever do any work with him in connection with

11 Columbia Savings?

12        MR. ZELLER:  Relevance.

13        THE COURT:  Counsel?

14        MR. NOLAN:  This is exploring the relationship

15 between the two, your Honor.  Foundation.

16        THE COURT:  All right.

17        THE WITNESS:  I reported to Alan Kaye at Columbia

18 Savings.  I don't know if I did work for him.  I did work for

19 the business.

20 Q.   What was your position at Columbia Savings?

21 A.   I was the vice-president of security and investigations.

22 Q.   What was Mr. Kaye's position?

23 A.   He was the senior vice-president of Human Resources.

24 Q.   And how long did the two of you work at Columbia

25 Savings?

1   A.   Probably just under three years.

2   Q.   Now, coming back to your time at Mattel, has there been

3   anyone else at Mattel other than Alan Kaye that you spoke to

4   concerning this business activity of yours on the side

5   outside of Mattel?

6   A.   I spoke to in what capacity?  In any capacity?

7   Q.   In a supervisory capacity.

8   A.   Being that he is my supervisor, I don't believe so, no.

9   Q.   Did you talk to -- do you recall any discussions with

10  any other person in management at Mattel other than Alan Kaye

11  concerning the outside services that you are engaged in?

12  A.   At the present time, over a 10-year period, I don't

13  believe I did.  I can't recall if I did or didn't, but I

14  don't believe I did.

15  Q.   Do you know a woman by the name of Isabel Cabrera?

16  A.   Yes.

17  Q.   Who is Isabel Cabrera?

18  A.   Excuse me.  Isabel Cabrera is a sample-maker.

19  Q.   Employed by whom?

20  A.   Was employed by Mattel, I believe.

21  Q.   During what period of time was she employed?

22          MR. ZELLER:  Foundation.

23          THE COURT:  Sustained.

24  Q.   BY MR. NOLAN:  Do you know how long Isabel Cabrera

25  worked at Mattel?

1   A.   I don't recall the exact period of time.

2   Q.   Isn't it true, Mr. De Anda, that you conducted an

3   interrogation --

4            MR. ZELLER:   Your Honor, this is exactly what we --

5            THE COURT:   Sidebar, Counsel.

6            **(SIDEBAR CONFERENCE HELD.)**

7            THE COURT:   Where is this going, Counsel?

8            MR. NOLAN:   Your Honor, I said that I was going to

9   ask him questions about Isabel Cabrera.   They said that he

10  wouldn't have personal knowledge as to --

11           THE COURT:   You indicated you were asking about

12  firing her.   Now we're into an interrogation.

13           MR. NOLAN:   Well, the investigation that he

14  conducted of Ms. Cabrera.

15           THE COURT:   Let's lay a foundation before we get

16  there.   I don't want you throwing -- and I'm going to

17  continue to maintain the belief that you're not doing this

18  intentionally.   Because it's bordering on a fictional belief

19  on the Court's part.   But please --

20           MR. NOLAN:   Your Honor --

21           THE COURT:   Please lay a foundation before you

22  blurt these things out.

23           MR. NOLAN:   Your Honor, there is no doubt that he

24  conducted an investigation.

25           THE COURT:   But that's not what's relevant.   What's

1    relevant and we established at sidebar was whether or not he

2    knows, and you can get evidence in that she was fired, an

3    inference made that it was in retaliation for --

4         MR. NOLAN:  Your Honor, I go directly to the

5    comment about this fictional belief.  I am honoring the

6    guidelines that I'm being provided.

7         THE COURT:  This is the first time you've mentioned

8    that you wanted to ask questions about interrogation.  I have

9    my notes.

10        MR. NOLAN:  I'm not up here giving you a proffer on

11   everything I'm getting into.  The reason why I want to ask

12   this gentleman questions is that we listened to testimony

13   from Peter Marlow that there were seamstresses at Mattel that

14   were concerned about their work at Mattel if they were doing

15   outside services.

16        THE COURT:  But the only relevance of the Peter

17   Marlow testimony is whether or not MGA knew that Mattel

18   employees were working for them.  That was it.

19        MS. AGUIAR:  May I add something, because I was the

20   one handling the Peter Marlow witness.

21        THE COURT:  Yes.

22        MS. AGUIAR:  Mr. Zeller stood here at numerous

23   sidebars and said that Mr. Marlow's credibility was very much

24   at issue.  And to the extent that Mr. Marlow's credibility

25   was put at issue by Mattel, not by us, but by Mattel, I

1   believe that we need to be able to elicit from this witness

2   or from any other appropriate witness testimony regarding

3   what in fact happened to those seamstresses once their names

4   were revealed to Mattel.

5           THE COURT:  I would agree with you, Counsel, if

6   that somehow rehabilitated Mr. Marlow's credibility.  How

7   does it do that?

8           MS. AGUIAR:  Because Mr. Marlow testified in detail

9   that he kept the names of those women secret and kept them

10  confidential for a reason and that they were -- there was

11  concern about what would happen if that wasn't the case.

12          THE COURT:  All right.  So let me think this

13  through.  So Marlow says we're keeping these secret because

14  we don't want them retaliated against.  You want to introduce

15  evidence that they were retaliated against to bolster his

16  position?

17          MR. NOLAN:  The moment that the names of the

18  seamstresses were disclosed in the Veronica Marlow --

19          THE COURT:  I understand.  They got fired.

20          MR. NOLAN:  A deposition that was marked AEO was

21  turned over to Mr. De Anda, who is not AEO.  And they

22  conducted an interrogation.  And I wanted to establish, as

23  Ms. Aguiar was getting into, that that bolsters the

24  credibility of Mr. Marlow, who we objected to, said it wasn't

25  relevant --

1        THE COURT:  Please, we don't have the time,

2    Counsel.  On the credibility issue alone.

3        MR. ZELLER:  Well, your Honor, number one, I will

4    say for the record because it has now happened repeatedly

5    over the course of two days.

6        THE COURT:  I said the credibility issue alone.

7        MR. ZELLER:  On the credibility issue, the fact is

8    it does not, as the Court has noted, do anything to

9    rehabilitate Peter Marlow.  We are well outside the time

10   period.  First and foremost.  The only reason we were into

11   the time period where these sample makers were terminated,

12   which was this year, is because MGA opened the door.  They

13   cannot use their opening the door and my attack on Peter

14   Marlow's credibility as a result of their opening the door,

15   then, to open the door further as to this witness.  It is

16   collateral and extrinsic.

17       THE COURT:  I don't know if I agree with that.  I

18   agree that -- I'll tell you what my concern is.  That this is

19   an effort just to basically go back and make, you know,

20   Mattel look bad.

21       And I am reserving all of these affirmative

22   defenses to Phase 1-B, and you are going to have your

23   opportunity to get into all of this stuff in Phase 1-B.  But

24   not now.

25       Now, in terms of the narrow issue of credibility,

1   if the seamstresses were in fact fired, which they were, and

2   I understand they were, and understanding they were, once

3   Mattel found out that they had basically been doing

4   something.  But that's not a point in contention.  Is there

5   any way we can simply stipulate to that?

6        MR. ZELLER:  If the Court is willing to take

7   judicial notice that there were in fact administrative law

8   determinations, that the terminations were with cause, we

9   will do it.  But to, you know, to open this door, because

10  then, of course, what the Court is going to have to allow us

11  to do is put on witnesses who actually do know what occurred,

12  and we will put on that evidence.

13        There are court decisions and a whole variety of

14  reasons why we were totally justified in doing it.  It would

15  be a complete side show, but we will do it.  But going

16  through this witness, this witness has no foundation for it.

17  And Mr. Nolan's question is interrogation.

18        THE COURT:  Does this witness know whether they

19  were fired?

20        MR. NOLAN:  Your Honor, I'm sure he does.  He said

21  he thought that they used to work there.

22        THE COURT:  Why don't we simply ask that one

23  question.  I'm not going to get into this interrogation --

24        MS. AGUIAR:  May I make a suggestion?  That we take

25  you up on the stipulation about them being fired.  I don't

1   think it's reasonably in dispute.

2           THE COURT:  Is that something you can do?

3           MR. ZELLER:  I would want to talk with the client,

4   obviously.  It's totally irrelevant first and foremost, your

5   Honor.  It is irrelevant.

6           THE COURT:  I --

7           MR. ZELLER:  It does nothing for the credibility,

8   and it is, by the way, as we were talking about earlier,

9   collateral.  And we can't be bolstering witnesses'

10  credibility through --

11          THE COURT:  That's an impeachment.  That's an

12  impeachment argument.  In this case, it's bolstering.

13          MR. ZELLER:  But bear in mind how we end up where

14  we are.  They opened the door to it, and now they are trying

15  to basically rehabilitate his credibility by opening the door

16  further.

17          THE COURT:  I think it's a fair point for the jury

18  to understand in a nonpejorative way towards Mattel that they

19  were terminated as a result of basically violating -- it's

20  not something that -- I don't see how that's prejudicial to

21  you.

22          MR. ZELLER:  I don't see how it's relevant, and I

23  do think it's prejudicial because then we're going to be

24  attacked for how they were treated, how they were terminated,

25  the whole bit, and we are going to have to bring a bunch of

1    witnesses in --

2            THE COURT:  I can instruct the jury that they are

3    not to consider any of that information.

4            MS. AGUIAR:  And we will, if we get the stip, leave

5    it at that.

6            THE COURT:  We're wasting a lot of time right here.

7    I'm going to sustain the objection.  I want to give you leave

8    perhaps to bring in this particular issue on the termination.

9    That's the only thing that may be relevant, and let's take

10   that up after this witness.

11           MR. ZELLER:  But I would ask that the Court

12   instruct that this be phrased in a neutral way, and not even

13   about termination.

14           THE COURT:  We'll work that out amongst ourselves.

15           MR. ZELLER:  But Mr. Nolan has been blurting these

16   things out repeatedly in front of the jury.

17           THE COURT:  We've got to stop with this.  The

18   interrogation, you're not going to come close to the

19   interrogation.  I thought I made it clear at sidebar that you

20   could lay the foundation with this witness about the

21   termination.  And that's all I said.  And that's all you

22   said.  And now to start with interrogation is -- it wasn't

23   even a completed question.  So let's make this of no moment.

24   I'm going to sustain the objection.

25           MR. NOLAN:  This is the last question.  So I don't

1   have to get back here.

2           THE COURT:  Is this your last question?

3           MR. NOLAN:  I want to ask this if I can.  Did you

4   conduct an interview of Isabela Cabrera.  Do you know whether

5   or not Isabela Cabrera is still employed at Mattel.  Those

6   are the two questions that I was going to ask.

7           THE COURT:  If you're willing to leave it, then, at

8   that and be done with this whole thing, that's fine.

9           MR. NOLAN:  I will be.

10           MR. ZELLER:  But understand he does not have the

11   foundation.  The only thing he knows is whether other people

12   told him.

13           THE COURT:  Then that's the end of this termination

14   discussion.

15           MR. NOLAN:  Yes.

16           THE COURT:  Very well.

17           MR. NOLAN:  Can we get a stipulation?

18           MR. ZELLER:  I have to talk with the client first

19   on something like this.  I do have some reservations about

20   the relevance.

21           THE COURT:  I understand.  We'll take that up

22   outside.

23           MR. NOLAN:  Did he interview her.

24           THE COURT:  And is she still with Mattel.

25           MR. NOLAN:  Thank you.

4421

1          (CONCLUSION OF SIDEBAR CONFERENCE.)

2  Q.   BY MR. NOLAN:   Mr. De Anda, have you ever interviewed

3  Isabela Cabrera?

4  A.   Yes.   I know her as Anna Cabrera.

5  Q.   I may be wrong.   Anna Cabrera.

6          Do you know whether or not Anna Cabrera is still

7  working at Mattel?

8  A.   I believe she is not.

9          MR. NOLAN:   Nothing further.

10          THE COURT:   Very well.   Cross-examination?

11                    **CROSS-EXAMINATION**

12  BY MR. ZELLER:

13  Q.   Mr. Nolan didn't ask you what it is that you have

14  done --

15          THE COURT:   Counsel, rephrase your question from

16  the start.

17          MR. ZELLER:   Thank you, your Honor.

18  Q.   There was some discussion during your examination about

19  some of the work that you have done over the years while at

20  Mattel.   I can't recall exactly how it was phrased, but the

21  idea was outside employment.

22          Do you recall those questions?

23  A.   Yes.

24  Q.   Why don't you tell us what it is that you've done as

25  this outside employment?

1   A.    Well, I've had -- I own a corporation by the name of

2   Richard De Anda and Associates.  I've owned it since the

3   70's, and basically what it provides is investigative and

4   security services.  Since I've been with Mattel, I do

5   virtually no work at all with Richard De Anda and Associates.

6   It amounts to just maybe 50 hours a year, if that.

7           But I'm very selective.  I have attorney friends,

8   believe it or not, that I do services for.  And mainly to do

9   with some of my cases have involved children.  And I

10  represent -- some of the cases involve children that I assist

11  the attorneys, assist in the cases.

12  Q.    Without going into the details, when you say involve

13  children, what are you talking about?

14  A.    I do expert witness testimony, and sometimes I provide

15  my expert opinions where a child has been assaulted, let's

16  say.

17  Q.    Now, does any of this activity have anything to do with

18  the toy business?

19  A.    No, none whatsoever.

20  Q.    Has it ever had anything to do with this line of

21  business that Mattel has been in?

22  A.    No.

23  Q.    And if I understand what you've been saying correctly,

24  the business that you've been talking about, this limited

25  outside activity, has involved testifying as an expert in

1    court and investigations?

2    A.   Yes.

3    Q.   And as far as you know, Mattel has never been in the

4    investigation business.  It doesn't have a private eye

5    business, does it?

6    A.   No, it doesn't.

7              MR. NOLAN:  Objection.  Lack of foundation.

8              THE COURT:  Sustained.

9    Q.   BY MR. ZELLER:  Well, do you know of any business, line

10   of business of MGA that -- of Mattel that competes with these

11   outside activities that you've done?

12   A.   No, I do not.

13   Q.   What is it that you did when you came out of high

14   school?

15   A.   I went to college for a short period of time.  Then I

16   went into the United States Marine Corps.

17   Q.   Now, in terms of the activities that you were

18   describing, expert services and these investigation services,

19   which I think you said mainly is related to children, were

20   you doing that prior to the time that you joined Mattel?

21   A.   Yes.

22   Q.   And at the time when you went to Mattel, did you tell

23   people at Mattel that you had those businesses?

24   A.   Alan Kaye was well aware because, as I recall, he knew

25   of it back in the Columbia Savings days and knew that I had

1  provided services for him at Kaufman & Broad also.

2  Q.   And, Mr. Kaye, as you were talking about, was the head

3  of HR there at Mattel?

4  A.   Yes.

5  Q.   And so you had discussions with him which you advised

6  him about these activities prior to the time that you began

7  working at Mattel?

8  A.   Yes.

9  Q.   And as far as you know, Mr. Kaye has been aware and has

10  given permission for these activities since the time you've

11  been at Mattel?

12         MR. NOLAN:   Objection.   Lack of foundation.

13  Misstates his testimony.

14         THE COURT:   As far as you know.   It's compound.

15  Let's rephrase it, Counsel.

16         MR. ZELLER:   Sure.   Thank you, your Honor.

17  Q.   Do you have any reason to believe that -- well, I'm

18  sorry.   Strike that.   I'll start it over again.

19         As far as you know, has Mr. Kaye been aware of the

20  investigation activities and the expert witness activities

21  that you've done since you've been at Mattel?

22  A.   For the most part.

23  Q.   Well, I'm not talking about on a specific assignment by

24  assignment basis.   I'm saying just generally speaking, he's

25  been aware that you've been doing this?

1   A.   Absolutely.

2          MR. ZELLER:  I have nothing further.  Thank you.

3          THE COURT:  Mr. Nolan?

4          MR. NOLAN:  Your Honor, I apologize for this.  Can

5   we have a two-minute sidebar?

6          THE COURT:  Why don't we take our afternoon break.

7          **(WHEREUPON THE JURY WITHDRAWS.)**

8          THE COURT:  Please be seated.

9          MR. NOLAN:  Your Honor, may I --

10         THE COURT:  Hold on a second.

11         All right.  Yes.

12         MR. NOLAN:  Could I do this outside the presence of

13   the witness?

14         THE COURT:  Yes, if you would step outside.  Thank

15   you.

16         (The witness withdraws from the courtroom.)

17         MR. NOLAN:  Your Honor, Mr. Zeller, in his

18   examination of Mr. De Anda, elicited from Mr. De Anda that

19   his private company on the side does not compete with Mattel.

20         THE COURT:  Yes.

21         MR. NOLAN:  For services.  And he specifically

22   asked whether or not Mattel does any investigations or

23   investigative surveillance.  He didn't use the word

24   surveillance.  But I think that -- and I think he has opened

25   the door for me to ask whether or not in fact Mattel has

1   hired his outside company to conduct investigations or

2   conduct surveillance.

3        THE COURT:  Why would it open the door for that,

4   Counsel?

5        MR. NOLAN:  Because for impeachment purposes,

6   Mr. Zeller knowingly raised an issue in this case by

7   suggesting that Mattel does not do any of these types of

8   services, and so therefore, he's allowed to do this.  But

9   what we want to establish --

10       THE COURT:  Wait a second.  Maybe I'm just missing

11  the logic of this.  But what he was asking was whether Mattel

12  itself does surveillance as opposed to -- that would compete

13  with his company's surveillance.  And what you're saying is

14  that Mattel wanted to do the surveillance, assuming they did,

15  and I'm not saying Mattel did, but assuming they did, they

16  didn't do it themselves.  They went to an outside source,

17  namely, this witness.

18       MR. NOLAN:  That's right.  Who is wearing two hats.

19  That's my proffer.  I wanted to get clearance from, but he

20  clearly opened the door just from a credibility point of

21  view --

22       THE COURT:  No.

23       MR. NOLAN:  -- for me to be able to say that when

24  Mattel hires outside private investigators, they do so

25  through his agency, or he hires them.

1        THE COURT:  How is that a conflict?

2        MR. NOLAN:  It doesn't go to the issue of conflict,

3    your Honor.  It goes to the fact that Mr. Zeller made this

4    point that Mattel doesn't do this.

5        THE COURT:  He made it for the purpose of showing

6    that there was not a conflict.  This was responding -- I

7    mean, you raised this whole thing to establish, I presume,

8    and it's not clear what evidentiary value it would have, but

9    that some other employee did exactly what -- let's not forget

10   that this case is about Carter Bryant and what Carter Bryant

11   did and what MGA knows or doesn't know that Carter Bryant

12   did.

13        And the argument is that Carter Bryant broke his

14   contract with Mattel, and you want to argue that somehow, and

15   it's a weak link to begin with, that because somebody else

16   may have broken their contract with Mattel, that that is

17   evidence that relates to Carter Bryant breaking his contract

18   with Mattel.

19        Nothing I heard from this witness suggests that he

20   was in violation of any contract, but rather, there was

21   acquiescence by Mattel in doing this outside, unrelated,

22   noncompetitive work.  How would evidence that Mattel actually

23   use that work?  If anything, that undercuts any potential

24   conflict, suggesting that not only was Mattel aware of his

25   outside work, but actually utilized his outside work.

1      I mean, the more I think about it, that actually

2  further undercuts any potential relevancy and bolsters the

3  credibility of the position that is being taken.

4      MR. NOLAN:  Well, your Honor, the record is what it

5  is.

6      What I understand is that he testified under oath

7  contrary to what your Honor just said, that he did not get

8  permission for every assignment that he got at Mattel.  We

9  know that Mr. Eckert didn't know he was doing outside work,

10  and so his friend has told him it's okay to do.  I guess --

11      THE COURT:  Obviously he had permission to do the

12  work that Mattel hired him to do.

13      MR. NOLAN:  On that part of it.

14      THE COURT:  So that part is not relevant to

15  impeach.

16      MR. NOLAN:  Your Honor, I just think that they

17  created --

18      THE COURT:  You had something else.  If there was

19  some other work that falls in this subcategory of things that

20  he did not tell Mattel about and that competes with Mattel,

21  that would be the type of impeachment that you would now

22  be -- that the door would be opened to, but certainly not

23  something that Mattel itself commissioned him to do, because

24  that would certainly be known to Mattel and wouldn't be a

25  conflict with Mattel.

1    MR. NOLAN:  Of course, I don't know that.  We don't

2    know that because we have not been allowed to take the

3    deposition or get the records from De Anda and Associates.

4         So we don't know whether or not they are doing any

5    business that is in conflict with Mattel.  I'm blocked in

6    that regard.  I've accepted -- I understand the Court's

7    ruling in that regard, and I also understand the Court's

8    ruling with respect to that.  I made my point.  I thought

9    the door was open.  I just have one brief question for

10   Mr. De Anda when he resumes.

11        THE COURT:  Very well.  Anything further,

12   Mr. Zeller?

13        MR. ZELLER:  No, your Honor.

14        MR. NOLAN:  Your Honor, would the Court entertain

15   at some point in time a ruling on Mr. Palmer?

16        THE COURT:  Sure.  Why don't we do that now.

17        My inclination on this is to let -- let me deal

18   with the general objection and hear the general objection

19   first.  I think that MGA is correct on this, that this should

20   come in.  I don't see any basis to keep missing October month

21   out.  So I'll hear from somebody on that.

22        MR. ZELLER:  I mean, I think the Court put it

23   perfectly well the other day, which is at MGA's behest, there

24   have been certain standards that have been applied before

25   this kind of evidence comes in.  We were precluded --

1          THE COURT:  Right.  But now I've read Mr. Palmer's

2    deposition.  And the Court has considered that testimony now,

3    and so now -- I mean, Mr. Price just asked a few minutes ago

4    about molds being -- that have disappeared.  The jury has

5    heard on both sides a lot of testimony about stuff that's no

6    longer available for whatever reason.  Mr. Palmer doesn't

7    know where they are.  I don't think there's any evidence that

8    anyone intentionally destroyed these.  I haven't seen any

9    evidence.  But they are missing.

10          MR. ZELLER:  Fair enough, your Honor.

11          THE COURT:  Certain molds are missing.  Certain

12   drawings are missing.  Certain what else?  I had another

13   thought.  Things are missing.

14          Now, I thought there was going to be something

15   about an intentional destruction here.  And there's no

16   evidence of that.  So there's no evidence -- there's not

17   going to be an adverse jury instruction with the Evidence

18   Eliminator thing, and we went through the hoops on that.

19   That was because there was an actual negative inference

20   implicit, if not explicit, in how that went along.

21          Here we're missing a month of telephone records.

22   We don't know why.  They are missing.  I think it's only fair

23   to MGA that a jury knows that they are missing.  It's not

24   like they are there.  If someone's got to account for why

25   they are missing, it's going to have to be Mattel.  Certainly

1   not MGA.  That's my reasoning up to this point.  But I'll

2   hear from you on this.

3          MR. ZELLER:  And you know, your Honor, taken in a

4   vacuum, I'm not sure that I would necessarily have a lot of

5   disagreement with what the Court had said.  If that had been

6   the standard that we applied since the beginning of the

7   trial.

8          THE COURT:  That is the standard to innocuous -- I

9   understand your concern about two standards here.  But I'm

10  not going to -- now that I've read what Palmer says, and I've

11  also made rulings on what I'm going to allow in and not allow

12  in.  Because there's no grounds for any negative -- any

13  suggestion or any question which implies that this was

14  somehow destroyed by Mattel or intentionally.

15          There's no evidence of that, and I don't take it

16  from MGA that they are suggesting that, at least not at this

17  point or not in the context of this trial.  But they are

18  missing.  And for innocuous, just like certain molds are

19  missing.  I think those are legitimate questions to ask a

20  witness and to have out before the jury.

21          MR. ZELLER:  And I can certainly address, say, for

22  example, the mold situation and the like.  But what I would

23  say as a global point, your Honor, is that in some ways it

24  kind of turns things on its head to have a standard that says

25  well, if it's unintentional and just missing, no inference of

1    anything unintentional, it can come in as a matter of course,

2    or at least some lower standard.  But if there is a tinge of

3    intentionality to it, that's where you have to meet a very

4    high hurdle.  That seems to me in some ways to be a

5    standard --

6              THE COURT:  Well, no, it all comes in if it's

7    missing, but just before I allow you to make arguments and

8    introduce that evidence that this was intentional, there is,

9    as the case law suggests, there needs to be a certain

10   standard.

11             MR. ZELLER:  And I would raise this point.  Because

12   there is a considerable amount of evidence we have not put in

13   related to missing, spoliated, whatever you want to describe

14   it, MGA evidence.  And I assume with this standard that we

15   will be permitted to do it in rebuttal, because that is not

16   the standard that was being applied previously.  There are

17   hard drives, tapes, things have been erased during time

18   periods that -- and if it doesn't matter anymore, as I had

19   understood the standard, then at least there was some

20   inference that there was something that was deliberately

21   afoot as there was with Evidence Eliminator.

22             Because the Court will recall that all we were

23   allowed to get into was the fact that it was on the laptop,

24   not even the fact that it was on the desktop because the

25   Court thought that there was less evidence of intentionality

1   there and less linkage, direct linkage or direct inference

2   that it was intentionality.

3           THE COURT:   I was trying to balance the prejudicial

4   effect of the Evidence Eliminator and all of the attendant

5   evidence that went along with it.   Recall, Counsel, it wasn't

6   just the fact that -- it wasn't just that -- and Mattel did

7   not want to draw the line and just simply say 9,400 files are

8   missing.   You wanted and you did introduce and the Court let

9   you introduce evidence of how the process worked.   There was

10  a stipulation.   We got into the description of what Evidence

11  Eliminator was and how it operated.

12          So there was a lot more to it than simply the fact

13  that files were missing.

14          MR. ZELLER:   I understand, and I completely

15  recognize that, your Honor.   But ultimately underlying all of

16  that was this point of the Court saying, you know, it wasn't

17  really intentional.   That is in the record, and that is a

18  large part of what we sought to explore.   Because certainly

19  just the abstract, things like the other prejudicial effects,

20  you know, there are plenty of ways of trying to mitigate

21  that.   You know, didn't call it Evidence Eliminator, used

22  euphemisms, diminish the impacts.

23          But ultimately, it had to do with intentionality.

24  And what I'm ultimately concerned about is sort of no good

25  deed goes unpunished.   There were obviously denials,

1    litigation, and back and forth about the intentionality of

2    what was done with Evidence Eliminator.

3         Now we're going to have basically, then, thrown in

4    at the end of the case oh, and Mattel is missing a tape, too.

5    Where, you know, those are going to be treated as equivalent.

6    There's no question.  And, in fact, they are going to say no

7    one has come in to deny from Mattel that they did this on

8    purpose.

9         THE COURT:  Mattel is going to admit that.

10   Mr. Palmer admits it's missing.  We don't know why.  There's

11   no explanation.  It's just gone.

12        MR. ZELLER:  But that's the point.  There's no

13   explanation.  We're going to have to call somebody in here to

14   explain.  That's what the jury is going to expect, is that

15   we're going to have to come in and explain why we don't have

16   that tape, and it's going to be painted during closing and

17   what is essentially an empty chair manner if we do not do so.

18        And that's why I'm saying in some respects this

19   seems to turn things on its head, because they will, of

20   course, say there is no evidence that MGA did anything wrong

21   with Evidence Eliminator.  Carter Bryant got up on the stand

22   and gave all of these explanations and these denials, but in

23   contrast, look what Mattel did.

24        There's the mysteriously missing October 2000 tape.

25   They didn't bring anyone in to explain it.