1        THE COURT:  What does that have?  It's not even

2  clear to me what -- so presumably there was no calls.  There

3  was one call.  There were two dozen calls from Carter Bryant

4  to MGA.  How is that one way or the other really make all

5  that much of a difference?

6        MR. ZELLER:  Your Honor, I mean, certainly we don't

7  think it's relevant at all.  I mean, the fact that we do or

8  do not have October records --

9        THE COURT:  Doesn't the lack of relevance minimize

10  the -- it's not like these were recorded conversations.  It's

11  just the frequency of conversations.  Can't you just as

12  easily argue that we would love to have this month of -- it's

13  unfortunate to us.  We're being hamstrung by not having this

14  month of calls because it probably would have shown that

15  Carter Bryant called MGA every day.  I don't know.  I guess I

16  don't -- precisely because the relevance value is so low, the

17  prejudicial impact of it being missing doesn't seem to be

18  that great.  I mean, these aren't --

19        MR. ZELLER:  But, I mean, the Court's point is

20  exactly right.  I mean -- and that's why it shouldn't come

21  in.  Because of the fact that its absence is the only

22  prejudice.  There's no dispute in this case that there were

23  communications between Carter Bryant and MGA during that time

24  period.  The only party that has been harmed by this, this

25  loss of evidence, is us.

1    You know, even if there wasn't a single phone call

2  between Carter Bryant and -- from Mattel to MGA, while he was

3  actually in that time period at Mattel, all that -- that

4  wouldn't prove anything.

5        THE COURT:  All right.  Let me hear from MGA.

6        MR. NOLAN:  Your Honor, all I'm trying to get in

7  through a video of a 30(b)(6) witness is the fact that there

8  are no October phone records.  There has been testimony and

9  question after question about -- to Carter Bryant about the

10  number of phone calls that he made in September.  He's still

11  working there in October.  I think the trier of fact may be

12  wondering, well, where is the October phone records?  I have

13  not asked this in the context an adverse inference.

14        Mr. Zeller, I know that he --

15        THE COURT:  But what are you planning to do?

16  Mr. Zeller is concerned about how this is going to play out

17  and be argued.  Can you proffer to the Court how it is?  I

18  don't see this as much moment either.  There's no phone calls

19  for October.  We don't have October phone calls; so we don't

20  know if Carter Bryant called zero times, one time, or one

21  hundred times from his phone at Mattel.

22        We know that he was working at MGA at some point in

23  time.  We know that he met with MGA while he was at Mattel

24  and that he communicated with people from MGA while he was

25  working at Mattel in the month of October.  Whether he used

1   his MGA phone or not --

2          MR. NOLAN:  Your Honor, I agree.  Mr. Zeller is

3   writing a closing argument that even I would not think of

4   arguing based on the strength of this.

5          THE COURT:  Well, give him some assurance --

6          MR. NOLAN:  I'm not going to say that it was

7   intentionally destroyed.

8          THE COURT:  You're not going to ask him anything

9   because it's a deposition.

10         MR. NOLAN:  No, no.  I meant in my closing

11  argument.  That we don't have the phone records.  The phone

12  records don't exist.

13         THE COURT:  And what's the import of that?  What's

14  the argument that you want to make?

15         MR. NOLAN:  That therefore, we can't produce

16  evidence that he wasn't dutifully working at Mattel.  Nor can

17  Mattel tell with certainty that while he was there during the

18  two-week overlap period of time, that he did anything at

19  Mattel other than his assigned projects.  Both of us can't

20  argue that because those phone records aren't there.

21         THE COURT:  But there were September phone calls;

22  correct?

23         MR. NOLAN:  The September phone records, but they

24  never introduced them, your Honor.  They questioned it

25  extensively to Carter Bryant about that.  I want to be able

4438

1   to show on the phone -- from the phone records the number of

2   phone calls that were actually made, the length of those

3   phone calls.  I think the jury is going to be surprised.  I

4   just want to get this into evidence.

5          THE COURT:  How many phone calls were made from

6   Carter Bryant --

7          MR. NOLAN:  In September?

8          THE COURT:  In September.

9          MR. NOLAN:  I don't know the exact number.  I've

10  been told that the total aggregate time is about 45 minutes.

11  And that the longest phone call is something less than a few

12  minutes.

13         THE COURT:  You're planning to introduce this?

14         MR. NOLAN:  Your Honor, I believe it's being

15  introduced through this video person.

16         I think the impression has been --

17         THE COURT:  Do you have any objection, Mr. Zeller,

18  to the September records coming in?

19         MR. ZELLER:  No, I don't think so, your Honor.  I

20  mean --

21         THE COURT:  Is there any question on the

22  authenticity or foundation of any of these records?

23         MR. NOLAN:  It's their records, your Honor.  Who

24  knows?

25         THE COURT:  Gentlemen, Counsel, let me suggest

1  this.  I say gentlemen because they are the two before me

2  right now.  I'm sorry, Ms. Aguiar.

3          MR. NOLAN:  I thought you were going to exclude me.

4          THE COURT:  Counsel, why don't we simply get the

5  records in.  We have records for September.  Records are

6  unavailable for October.  There is no explanation as to where

7  the records are, and call it a day on the phone records.

8          MR. ZELLER:  I do agree that certainly the

9  September records seem to be a different animal.  Presumably

10  we could do that by stipulation.  I don't think that's the

11  issue for us.

12          THE COURT:  You've got to go one step further,

13  because that begs the question.  Well, where are the October

14  records?  We have records from September.  And I'll even tell

15  it to the jury.  We have records from September that the

16  parties have stipulated to.  There are no records available

17  for October.  That's what we have.  That's all the evidence

18  before you.  And that's it.

19          MR. NOLAN:  Your Honor, that's what -- that's what

20  the 30(b)(6) witness was for.

21          THE COURT:  I understand that.

22          MR. NOLAN:  You know, earlier you said to me on

23  Jewel Barbie why didn't you take a 30(b)(6), Mr. Nolan, on

24  this one.  So I don't get that in.  Now I have a 30(b)(6)

25  witness on a particular subject, and they are objecting that

1   that's not good enough.  All we want is what they designated

2   as the person most knowledgeable --

3           THE COURT:  This is apples and oranges because

4   you're telling me now, and I'm accepting your representation

5   that you're not seeking to draw a negative or an adverse

6   inference from this.  There would be a real adverse inference

7   from this, Counsel.  And this one actually goes to an issue

8   in this case.  And I suppose this one does, as well.

9           MR. NOLAN:  Don't even go back to that one, your

10  Honor.

11          THE COURT:  Let's put that aside because that's a

12  different --

13          MR. NOLAN:  It sure is.  But these documents, your

14  Honor, I'm just saying we had a 30(b)(6) witness.  We have

15  them.  We've designated the videos.  There are objections

16  that have been made.  And I just don't know why we can't play

17  Mattel's own witness explaining the status of these records

18  for the jury.

19          THE COURT:  And I'm not --

20          MR. NOLAN:  I'm just saying rhetorically why

21  Mr. Zeller, when I say I'm not going to argue, like I guess

22  they are going to argue, about Evidence Eliminator --

23          THE COURT:  You're back to that, Counsel, then

24  you're back to exactly what Mr. Zeller is saying.

25          MR. NOLAN:  I said I'm not going to argue that.

1          THE COURT:  Oh, you're not.

2          MR. NOLAN:  No, I said that I'm not.

3          THE COURT:  Okay.

4          MR. NOLAN:  Mr. Zeller seems to suggest, and he

5    proffers that that's the reason why you shouldn't --

6          THE COURT:  If you're not going to argue that, then

7    my question is why are we having this discussion?  If it's

8    just a matter of foundation, let's get the records in and

9    argue on the records that we have.

10          MR. NOLAN:  I mean, that's what we thought we were

11    going to do through the video.  It's 17 minutes, very short.

12    It's in the process of how the evidence was presented in this

13    case by Mattel.  It's Mattel's representative explaining the

14    situation and laying the foundation for these records.

15          MR. ZELLER:  Your Honor, if we could cut to the

16    chase.  Mattel's viewpoint on this.  We would be agreeable to

17    what the Court has proposed in terms of just telling the

18    jury.  We think that an additional sentence ought to be added

19    that the jury isn't to draw any adverse inference from the

20    fact that October is missing.  But we think that that does

21    resolve a lot of these issues for the Court just simply to

22    provide it, or if it could be done in the form of a

23    stipulation that the parties agreed.

24          THE COURT:  And, Mr. Nolan, to make it clear on

25    Jewel Barbie, unlike this case, there's no contention by

1  either side about authenticity or foundation.

2          Here there is.

3          MR. NOLAN:  Oh, I know there is.

4          THE COURT:  Very good.

5          MR. NOLAN:  But only one party has objected to the

6  authenticity, and it's the party that produced that document,

7  your Honor.  It may be apples and oranges.

8          THE COURT:  Okay.

9          MR. NOLAN:  But I got to tell you the orange is

10  much larger than the apple.

11          THE COURT:  Perhaps.

12          MR. NOLAN:  And much more important.

13          THE COURT:  Very well.  Anything further the Court

14  needs to consider besides the Palmer deposition at this

15  point?

16          MR. ZELLER:  Well, just the last point on the

17  Palmer designation, your Honor.  Mattel would request in the

18  alternative that in the event that the Court does allow it to

19  go forward in this form of a video deposition and that it

20  comes out about that there's a missing October tape, we would

21  ask that the jury be explicitly instructed that it cannot

22  draw any adverse inference against Mattel as a result of that

23  missing tape.

24          THE COURT:  A reverse adverse inference

25  instruction?

1          MR. NOLAN:  Why don't we at the same time, your

2     Honor, then ask you -- maybe Mr. Zeller is going to want you

3     to just accompany me through the closing argument.  When

4     questions are asked about missing molds, I mean, it comes

5     out.  Things happen.  Things are missing here.

6              If they are going to say that Margaret Leahy threw

7     out the molds, I hope they make that argument, to be honest

8     with you.  Because I think she was a credible witness.

9     Listen, you know what?  We're both big sides here --

10         THE COURT:  Counsel, watch your tone a little bit.

11    The Court is listening.  You don't need to tell me to listen.

12         MR. NOLAN:  I'm sorry.

13         THE COURT:  That's all right.  It's a long day, and

14    we're nearing the end here.

15         MR. NOLAN:  No, it's more than that.

16             I'm not going to make these arguments.  But asking

17    you to make comments, you know, like the reverse adverse

18    inference shouldn't be applied, I respectfully submit that

19    that's not your role.  I just want the evidence to come in.

20    There will be a closing argument.  If I overstep the line,

21    not only will they yell at me, they will object.  I'm sure

22    I'll be taken to sidebar.  I don't intend to do that.  I just

23    want the evidence in.

24         THE COURT:  Very well.  Anything further on this

25    point?

1          MR. ZELLER:  I would just remind the Court that

2     when Evidence Eliminator was introduced, it was for a very

3     limited purpose, and the Court specifically instructed the

4     jury as to what inferences could be drawn and that they

5     couldn't be drawn against MGA.

6          THE COURT:  Very well.  Is there anything further

7     on this?

8          MR. NOLAN:  No, your Honor.

9          THE COURT:  All right.  Anything further that needs

10    to be taken up before this last hour of trial today?

11         MR. QUINN:  If I could ask, your Honor, we have a

12    document custodian who has been waiting.  It's a Mattel

13    attorney.  It's her day off.  She's been here all day.  I've

14    been told that it will be very brief.  I would ask that we do

15    that before we play a tape.  Rather than having her come back

16    next Tuesday.

17         THE COURT:  Mr. Nolan?

18         MR. NOLAN:  Your Honor, I was advised just before

19    the start of this that they wanted to put the Custodian of

20    Records on.  I have been interrupted in the presentation of

21    my case on so many times.  This is the last day before a long

22    holiday.  I have a video that I would rather play.  I

23    apologize to this person who is, you know, maybe it's her day

24    off, I don't know, but she's employed at Mattel.

25         A lot of people have been inconvenienced.  But we

1   have not had a day where we haven't been interrupted because

2   of some scheduling issue.  And I just want to play the video

3   and let the jury go home for the weekend.

4              THE COURT:  I take it that's a "no"?

5              MR. NOLAN:  That's right.

6              THE COURT:  Very well.  All right.  You may call,

7   after Mr. De Anda, you may call your next witness.

8              MR. NOLAN:  Thank you.

9              MR. ZELLER:  And I assume that Mr. De Anda is

10  excused?

11             THE COURT:  He's not.  I believe Mr. Nolan had

12  a few more questions.  So I'm going to take a break for

13  about six minutes.  We'll resume at 4:00, finish up with

14  Mr. De Anda.  And Mr. Nolan will call his next witness.

15  We'll go to five o'clock, and the Court will make its Palmer

16  rulings and any other rulings that it needs to make.

17             Court is in recess.

18             (Recess taken.)

19             **(WHEREUPON THE JURY ENTERS.)**

20             THE COURT:  Mr. De Anda.

21             Counsel, you may proceed.

22             MR. NOLAN:  Thank you.

23  **Q.**   Mr. De Anda, did you also interview Beatrice Morales?

24  **A.**   Yes.

25  **Q.**   Other than the interviews of Anna Cabrera and Beatrice

1    Morales, have you ever interviewed any other Mattel employees

2    who have moonlighted?

3            MR. ZELLER:   Foundation.

4            THE COURT:   Overruled.

5            THE WITNESS:   I'm sorry.   Could -- have I

6    interviewed?

7    Q.   BY MR. NOLAN:   Sure.   Other than your interviews of Anna

8    Cabrera and Beatrice Morales, have you ever interviewed any

9    other Mattel employees who have moonlighted?

10   A.   Regarding secondary employment?

11   Q.   I'm sorry, yes.   Secondary employment.

12   A.   I don't -- I don't recall that I have.

13   Q.   Is Beatrice Morales still employed at Mattel, if you

14   know?

15   A.   I don't believe she is.

16           MR. NOLAN:   Nothing further.

17           THE COURT:   Mr. Zeller?

18           MR. ZELLER:   Nothing, your Honor.

19           THE COURT:   Very well.   You are excused.

20           THE WITNESS:   Thank you, your Honor.

21           MR. NOLAN:   Your Honor, not to be rude to

22   Mr. De Anda, but while he's walking out, we'll call our

23   next witness by video.

24           THE COURT:   Please.

25           MR. NOLAN:   The next witness will be by deposition,

1    your Honor.  And timing should be 46 minutes.

2              THE COURT:  Very well.  That will work out

3    perfectly.

4              MR. NOLAN:  This is the deposition of Richard Irmen

5    conducted by Mr. Zeller on September 28, 2007, in

6    San Francisco, California.  And the running time is 46

7    minutes.

8                   WHEREUPON THE DEPOSITION EXCERPTS OF

9                   RICHARD IRMEN WERE PLAYED AS FOLLOWS:

10   Q.   Good morning.

11   A.   Good morning.

12   Q.   Please tell us your full name for the record.

13   A.   Richard William Irmen.

14   Q.   And what is your current residential address?

15   A.   1303 South Farm Road, 115, Springfield, Missouri 65802.

16   Q.   You mentioned that you had two office locations

17   currently.  One of them you described as a business that you

18   have called BT Associates?

19   A.   Um-hm.

20   Q.   And what's that business?

21   A.   Land development.

22   Q.   And then the other office that you mentioned was on

23   Sunset Street, which you said was for Dark Ops?

24   A.   Yes.

25   Q.   And what line of business is that?

4448

1   **A.**   It's tactical fighting knives.

2   **Q.**   Is it in, I guess, the design, the manufacturing, both?

3   **A.**   Everything above, yes.

4   **Q.**   Distribution as well?

5   **A.**   Yes.

6   **Q.**   When was Carter Bryant Enterprises started up?

7   **A.**   I believe it was 2000.

8   **Q.**   And as you mentioned, it's a general partnership.  Who

9  are the partners of Carter Bryant Enterprises?

10   **A.**   Carter Bryant and myself.

11   **Q.**   And who are the owners of BT Associates?

12   **A.**   Myself and Carter Bryant.

13   **Q.**   At some point you worked for Mattel; is that correct?

14   **A.**   That is correct.

15   **Q.**   And what time period did you work for Mattel?

16   **A.**   Approximately August of '96 through February of '98.

17   **Q.**   And did you work for Mattel continuously throughout that

18  time period?

19   **A.**   Yes.

20   **Q.**   And then have you worked for Mattel any other time

21  periods?

22   **A.**   No.

23   **Q.**   During the time that you worked at Mattel, what did you

24  do?

25   **A.**   I was a model maker.

1    Q.   And you were -- as you understood it, an actual

2    employee, or were you hired through an agency of some kind?

3    A.   I was not an actual Mattel employee.  I was hired

4    through their temporary agency.

5    Q.   Were you a model maker the whole time you worked for

6    Mattel?

7    A.   Yeah.

8    Q.   Do you remember the name of the agency?

9    A.   No.  It was their in-house agency.  I don't remember the

10   name.

11   Q.   And how is it you came to get a job there at Mattel?

12   A.   Through a recommendation from Carter Bryant.

13   Q.   So this was a time period when Carter was already

14   working for Mattel?

15   A.   Yes, I believe he had worked there almost a year.

16   Q.   So I take it you knew Carter prior to the time he

17   started at Mattel?

18   A.   Yes.

19   Q.   What year did you and Carter meet?

20   A.   1991.

21   Q.   And then so -- if you could maybe describe the

22   circumstances under which Carter suggested or recommended or

23   whatever the case was that perhaps you seek employment there

24   at Mattel.

25   A.   To my understanding, his supervisor let him know, or

4450

1    their general group, that they were looking for model makers,

2    and he said my friend Richard, you know, might be interested.

3    And then I called him and set up an interview.

4    **Q.**   So I take it, then, you had the interview and you

5    received an offer?

6    **A.**   Yes.

7    **Q.**   And you accepted it?

8    **A.**   Yes.

9    **Q.**   When you first started working there at Mattel, who did

10   you report to?

11   **A.**   Cassidy Park.

12   **Q.**   Is she the person you reported to the whole time you

13   worked at Mattel, or did it change?

14   **A.**   No, she was my supervisor.

15   **Q.**   And during that time period, did you work with Carter as

16   well?

17   **A.**   Yes, I did.

18   **Q.**   Were there other people you worked with?

19   **A.**   Yes.

20   **Q.**   Can you recall whether there were any instances in which

21   you worked on creating a model of a mainline Barbie doll?

22   **A.**   Yes.

23   **Q.**   And who did you do that with?

24   **A.**   Carter, I believe.

25   **Q.**   And I take it it was a three-dimensional prototype?

4451

1    A.    Yes.

2    Q.    And was this prototype a rotocast?

3    A.    Well, body was injection molded.

4    Q.    And I think you told me that you left Mattel in about

5    February of 1998?

6    A.    I believe so.

7    Q.    And what is it that occasioned your departure from

8    Mattel?

9    A.    I was laid off.

10   Q.    During the time you were working there at Mattel, did

11   you have any complaints or issues with your work there?

12   A.    No, not really.

13   Q.    Well, you say not really to a lawyer, it -- it means

14   I'll have to follow up.

15          I mean did you have any problems, or did you -- I

16   mean what was your general -- your general feeling about your

17   employment there at Mattel?

18   A.    I enjoyed working there, but I can't say there was never

19   a problem because you always have problems in any of your

20   work spaces or, you know, anybody you work for, not

21   everything is peachy all the time.

22   Q.    I know you mentioned that you left Mattel in February of

23   1998.  Was Carter still actually working there in the design

24   center as of that time?

25   A.    No.

1  Q.  At some point he moved to Missouri?

2  A.  Yes.

3  Q.  When did he do that?

4  A.  He moved in -- I believe it was December of '97.

5  Q.  Is that when he moved to that house in Kimberling,

6  Missouri, where his parents were living?

7  A.  I believe so.

8  Q.  That's your understanding?

9  A.  Yes.

10 Q.  Were you -- were you with Carter when he moved back from

11 Kimberling City to California?  In other words, did you

12 travel with him on that occasion?

13 A.  No, I did not.

14 Q.  So you were in California, and then Carter moved from

15 Kimberling City back to California, and you were already

16 there?

17 A.  Yes.

18 Q.  And where were you living at that time, then?

19 A.  I was living in the Palmdale-Lancaster area of

20 California.

21 Q.  And then when Carter moved back, was he living with you

22 again?

23 A.  No.  He was living in the house in Gardena with Elise

24 Cloonan, the house we eventually bought.

25 Q.  I see.  So when Carter moved back from Kimberling City

4453

1    to California in late 1998, he moved into the same house that

2    Elise was living in?

3    **A.**    Yes.

4    **Q.**    Elise Cloonan.

5    **A.**    Yes.

6    **Q.**    And that was the house on 160th Street in Gardena?

7    **A.**    Yes.

8    **Q.**    And then at some point later, you moved from the place

9    in Lancaster to the house in Gardena?

10   **A.**    Yes.

11   **Q.**    And can you recall when you first saw him after he had

12   moved back from Kimberling City to California?

13   **A.**    January 1st or 2nd, but I believe it was the 1st.

14   **Q.**    That was January 1st or 2nd, 1999?

15   **A.**    Yes.

16   **Q.**    And where did you see him?

17   **A.**    I was house sitting for a friend in Lancaster, and when

18   he drove in from Missouri, he stayed a couple days with me.

19   **Q.**    Oh, I see.  Before he actually moved into the Gardena

20   place?

21   **A.**    Yes.

22   **Q.**    And you said you were house sitting for a friend in

23   Lancaster.  So was that the house you'd been staying in, or

24   was that a separate house?

25   **A.**    Separate house.

4454

1   Q.   So you were living in Lancaster at that time, and during

2   that January 1st or 2nd, 1999, time period, you were house

3   sitting and, therefore, in another house in Lancaster?

4   A.   Yes.

5   Q.   And that's where Carter came and stayed with you once he

6   came back from Kimberling City?

7   A.   Yes.   He stayed like overnight with me and then went to

8   L.A. sometime before he started work.

9   Q.   Did there come a time when you became involved in a

10  request by Veronica Marlow or Peter Marlow that she receive

11  some royalties in connection with Bratz?

12  A.   Yes.

13  Q.   What was the first occasion in which you can recall that

14  occurring?

15  A.   It was -- Carter had told me of an agreement that he had

16  made with Veronica concerning the royalties.

17  Q.   And so you initially learned of it from Carter?

18  A.   Yes.

19  Q.   And what did he say about that agreement?

20  A.   He said that he had verbally promised Veronica a

21  percentage of his royalties for a thank you for the

22  introduction and gratitude.

23  Q.   Did he say anything else about it?

24  A.   Not that I recall.

25  Q.   Did he say what the percentage was?

4455

1    A.    Yes.

2    Q.    And what was that?

3    A.    10 percent of the dolls or the product that she works

4    on.

5    Q.    As of today, is Veronica Marlow being paid 10 percent of

6    the royalties that you described on Bratz?

7    A.    Yes.

8    Q.    And has that been true the whole time since the time

9    that she first raised this, by your understanding?

10   A.    Yes.

11   Q.    I think you mentioned that Carter had said that he had

12   made this agreement with Veronica Marlow as a thank you for

13   the introduction.

14           What did you mean by as a thank you for the

15   introduction?

16   A.    As I stated earlier, Veronica introduced -- made the

17   connection of MGA and Carter Bryant and for that, for her

18   setting up -- whatever she did, I don't really know, but it

19   was a thank you for the introduction.

20   Q.    The introduction to MGA?

21   A.    Yeah.

22   Q.    Prior to 2004 had you ever had any communications with

23   any MGA lawyers?

24   A.    I don't believe I ever had any conversations with MGA

25   lawyers.

1   Q.   Are you aware as to whether or not Carter hired any

2   attorney in connection with his deal with MGA?

3   A.   Yes.

4   Q.   And is that something you were aware of in the 2000 time

5   period?

6   A.   Yes.

7   Q.   Is that something that you discussed with Carter?

8   A.   Yes.

9   Q.   And the reason you knew that Carter had hired a lawyer

10  in the approximate 2000 time period in connection with this

11  deal with MGA is because Carter told you?  You can provide a

12  yes or no.

13  A.   Yes.

14  Q.   Do you have any knowledge as to when Carter first spoke

15  with or had any contact with that lawyer?

16  A.   I don't recall.

17  Q.   Do you know who the lawyer is?

18  A.   Yes.

19  Q.   Who was it?

20  A.   Her name, Ann Wang.

21  Q.   And how did you know Ms. Wang's name?

22  A.   'cause that's the lawyer we went and seen.

23  Q.   So you went with Carter?

24  A.   On one occasion.

25  Q.   Have you and Carter Bryant ever discussed the

1   circumstances under which he came to first become involved

2   with MGA when lawyers were not present at the conversation

3   you had with Carter?

4   **A.**   Yes.

5   **Q.**   Carter told you he was pitching an idea to a company in

6   the Valley; right?

7   **A.**   Right.

8   **Q.**   And did you have any idea at that time what the idea was

9   that he was pitching?

10   **A.**   No, I did not.

11   **Q.**   At some point did you -- you did learn that Carter was

12   negotiating a deal with MGA?

13   **A.**   Yes.

14   **Q.**   By that time did you know it was about Bratz?

15   **A.**   Yes.

16   **Q.**   So as far as you remember what happened was he told you

17   in the first conversation he was pitching an idea, but you

18   didn't know what the idea was, to the company in the Valley,

19   and the next thing you recall is that he was negotiating a

20   deal?

21   **A.**   No.  He had pitched -- he had pitched an idea to -- the

22   negotiation was at the very end.  So there was a few

23   different instances in that time frame that he had met with

24   MGA or something like that.  I'm not really sure.  I knew of

25   those because I'd get home and say hey, what did you do

1   today?  But I don't remember anything specific.  It was

2   summer, and I'm an air-conditioning mechanic.  So I was

3   pretty hashed out.

4   Q.   Do you have any time frame that you can tell me that

5   Carter first told you about this -- the fact he was pitching

6   this idea to the company in the Valley?

7   A.   I believe it was -- it was like 2000, September -- late

8   September, something like that.

9   Q.   And then what was the time frame in which you learned

10  that he was negotiating a deal with MGA?

11  A.   Would have been early October of 2000.

12  Q.   What is it that happened next after you learned about

13  Carter negotiating this deal with MGA as it pertained to

14  Bratz?

15  A.   Can you be a little more specific with your question?

16  Q.   I'm trying to find out what happened next with respect

17  to Bratz.

18  A.   I believe he signed the contract with MGA.

19  Q.   Is that something you learned from Carter as well, in

20  conversations you had with him?

21  A.   That he signed the contract and quit Mattel?  Yeah, we

22  had a house payment.  So I was really worried about all that.

23  Q.   So Carter -- Carter told you that he had signed the

24  contract with MGA?

25  A.   Yes.  He had quit Mattel, signed the contract with MGA,

4459

1   and then started working at home.

2   Q.   And did Carter tell you that he had quit Mattel and then

3   signed the contract with MGA?

4   A.   Yes, to my recollection that's what happened.

5   Q.   Did Carter ever tell you whether he showed Bratz or the

6   Bratz concept to anyone at Mattel?

7   A.   No.

8   Q.   He didn't tell you one way or another?

9   A.   No, I know he did not show anybody -- to the best of my

10  knowledge, he never showed anybody at Mattel.

11  Q.   Have you ever heard of a Mattel project called Toon

12  Teens?

13  A.   No, I haven't.

14  Q.   Did you ever have any discussions with Elise Cloonan

15  about the Toon Teens project there at Mattel?

16  A.   No.

17  Q.   Did you ever have any discussions with Carter regarding

18  the Toon Teens project?

19  A.   No.

20  Q.   Prior to April of 2004, had anyone ever contacted you in

21  connection with a lawsuit or potential lawsuit against

22  Mattel?

23  A.   No.

24  Q.   When did you first hear about Bratz, B-R-A-T-Z, as a

25  name?

4460

1   A.   I believe that was the January 1st when Carter visited

2   me in '99.

3   Q.   And that was the visit you described earlier where you

4   were staying and house sitting --

5   A.   Yes.

6   Q.   -- for someone there in Lancaster; is that correct?

7   A.   Yes, that is correct.

8   Q.   And what is it that -- what were the circumstances under

9   which you first heard the name Bratz?

10  A.   I believe Carter told me the name.   Excuse me.

11  Q.   What did he say?

12  A.   Something like "These are the Bratz."

13  Q.   I take it he was showing you something?

14  A.   Yes.

15  Q.   And what was he showing you?

16  A.   His portfolio.

17  Q.   Were these drawings?

18  A.   Yes.

19  Q.   In that portfolio, were there drawings of things other

20  than Bratz?

21  A.   Yes.

22  Q.   What other things do you recall being in that portfolio?

23  A.   Greeting cards, Christmas cards, fashion illustration

24  is.   All the stuff that he had been working on in '98.

25  Q.   Is there anything else that you can recall?

1  **A.**   And the Bratz.

2  **Q.**   No, I understand.  I'll assure you we'll talk some more

3  about that part of it.  But right now I'm trying to find

4  out -- you mentioned that you saw other things pertaining to

5  greeting cards, Christmas cards, and fashion illustrations in

6  his portfolio.

7  **A.**   Yes.

8  **Q.**   So my question is other than Bratz and other than those

9  three things that you just mentioned, was there anything else

10  that you saw in his portfolio at that time?

11  **A.**   No.

12  **Q.**   And at that time -- what is it that Carter showed you in

13  terms of written materials that pertained to Bratz?

14  **A.**   I don't recall.  Written materials?

15  **Q.**   Um-hm.

16  **A.**   I don't -- I'm not sure.

17  **Q.**   You remember seeing drawings?

18  **A.**   Yes.

19  **Q.**   Did you see anything that was written out as text that

20  pertained to Bratz?

21  **A.**   I could have.  I don't remember.

22  **Q.**   Is it fair to say you don't have a recollection of

23  seeing anything in text?

24  **A.**   No, I don't.

25  **Q.**   How many drawings did you see that pertained to Bratz?

4462

1   A.   I remember one.

2   Q.   Do you remember seeing more than one drawing as it

3   pertained to Bratz?

4   A.   As it pertained to Bratz, I don't recollect exactly.

5   Q.   So it's fair to say that you remember one Bratz drawing,

6   but you don't remember further Bratz drawings beyond that at

7   that time?

8   A.   Right.

9   Q.   And what did that one drawing look like?

10   A.   It was the four characters all together.

11   Q.   Were there faces on those characters?

12   A.   I believe so.

13   Q.   Were they -- did the drawings depict fashions on the

14   characters?  In other words, were they clothed?

15   A.   Yes, they had clothes on, yes.

16   Q.   Was the drawing in color?

17   A.   No.  It was more in sketch or pencil.

18   Q.   What kind of paper was it on?

19   A.   White.

20   Q.   Did you see it on any kind of tracing paper or

21   translucent kind of paper?

22   A.   I don't remember.

23   Q.   You do remember it being on white paper; is that

24   correct?

25   A.   Yes.  It was on a sheet of paper.

1  Q.   When you say white paper, you're referring to regular

2  printer paper?

3  A.   It was white paper.  I don't know if it was printer

4  paper or airplane paper or -- I don't remember.

5  Q.   Was it 8 by 10 regular-size paper?

6  A.   Yeah, something probably pretty close to that.

7  Q.   You mentioned that you remember it being in pencil.

8  A.   It wasn't colored in.  I don't know if it was in pencil

9  or pen or what medium he had used.

10  Q.   And when you saw this -- well, let me back up.

11         You mentioned Carter was showing you a portfolio of

12  the -- was it the traditional kind of artist portfolio where

13  it's literally a big portfolio that physically holds the

14  drawings?

15  A.   Yes.

16  Q.   And among the drawings that you'd mentioned was this

17  black and white sketch that you saw?

18  A.   Yes.

19  Q.   What I'm really driving at is it was part of the

20  portfolio, the physical portfolio that you saw.

21  A.   It was inside his portfolio when he was showing it to

22  me.

23  Q.   And you've mentioned so far that Carter said to you

24  these are the Bratz; right?

25  A.   Yes.

1   Q.   What, if anything else, did Carter say to you at that

2   time about Bratz?

3   A.   I don't remember.

4   Q.   You don't remember anything else?

5   A.   I don't remember anything specific.   We were thumbing

6   through his portfolio.

7   Q.   Well, do you recall anything else generally as it

8   pertained to Bratz?

9   A.   Not specifically.

10  Q.   Well, again, when you say specifically --

11  A.   I --

12  Q.   I'm trying to find out do you even have a general

13  recollection of you and Carter discussing anything else about

14  the Bratz other than what you told me?

15  A.   I believe he gave me the rundown of there is four

16  characters, different ethnicity.   They're funky with attitude

17  or however he would explain it.   Hip.

18  Q.   Anything else?

19  A.   No.

20  Q.   Did you say anything to him?

21  A.   I don't recall.

22  Q.   Have you told me now everything you can remember that

23  Carter said to you and that you said to him as it pertained

24  to Bratz?

25          MS. ANDERSON:   In that conversation?

1        MR. ZELLER:  Yes, in that conversation.

2        THE WITNESS:  Yeah, as we were flipping through the

3   portfolio.

4   Q.   BY MR. ZELLER:  Do you recognize what that other

5   reaction was?

6   A.   I remember -- they stuck out in my head because they

7   were -- the sketches and the way he had presented it was very

8   different than his other work.

9   Q.   When you say his other work, you're talking about the

10  other artistic and design work Carter had done?

11  A.   Yes, the other illustrations, et cetera.

12  Q.   When you saw that black and white sketch of the four

13  characters all together, was that one signed by Carter?

14  A.   I don't know.

15  Q.   Did it have a date on it?

16  A.   I don't remember.

17  Q.   You'd seen, prior to that time, other Carter Bryant

18  drawings that had dates on them; is that correct?

19  A.   Yes, he usually dates his drawings and illustrations.

20  Q.   And that's been true the whole time since you've known

21  him?

22  A.   Yeah.

23  Q.   When you saw the drawings that Carter showed you at that

24  time there in Lancaster, was the word Bratz written down on

25  any of the drawings?

1   A.   I'm not sure.

2   Q.   At that time, when Carter showed you the drawings when

3   you were in Lancaster, did Carter say anything about what the

4   inspiration was behind Bratz?

5   A.   I don't recall.

6   Q.   You'd said that Carter had mentioned to you how he came

7   up with Bratz.

8        Do you remember that?

9   A.   Yes.

10  Q.   Can you put a time of the year on it, a season of when

11  he said this?

12  A.   I believe it was September of 2000.

13  Q.   And what did Carter say to you in that regard?

14  A.   He told me the story of when he was in Springfield

15  driving to work, and he had thought of the idea of the Bratz.

16  Q.   Did he mention where he saw the teens that inspired him?

17  A.   I believe it was at the high school.

18  Q.   At the high school there in Springfield?

19  A.   Yeah.

20  Q.   And that was Kickapoo High School?

21  A.   Yes.

22  Q.   Is there anything else that Carter said with respect to

23  how it is that he came up with Bratz or was inspired to come

24  up with Bratz other than what you told me?

25  A.   I don't remember specifically, no, I don't.

1   Q.   You've told me everything you can recall?

2   A.   Yeah.

3   Q.   I guess maybe a simpler way of putting what I was

4   driving at is, you know, you've told me now this conversation

5   you had with Carter in September of 2000.

6   A.   Yes.

7   Q.   In which he described to you how he came up with Bratz

8   or the inspiration behind it.  Did he at any other time ever

9   say anything to you that was different from what he had told

10  you in September of 2000 regarding how he came up with Bratz?

11  A.   No.

12  Q.   Did Carter ever tell you how it is that he came up with

13  the name Bratz?

14  A.   Yes.

15  Q.   When did he do that?

16  A.   I don't recall exactly.

17  Q.   Do you recall generally?

18  A.   Probably in the time frame of 2000, September.

19  Q.   And what did Carter say to you about how he came up with

20  the name Bratz?

21  A.   The name Bratz, like I said, was the attitude and

22  personalities of the four characters because they were like

23  little brats.  If you guys have children, brats, that's where

24  he came up with the idea.  And the Z gave it a little more

25  attitude.  It looked cooler than an S.

1   Q.   And this is what Carter told you; is that true?

2   A.   Yes.

3   Q.   Did Carter say anything else about how he came up with

4   the name Bratz?

5   A.   No.

6   Q.   Let me try it this way.  Did Carter -- let's just start

7   with the time period when you were there in Lancaster and you

8   first saw that drawing.

9            Did Carter say anything to you about individual

10   doll names or potential names?

11   A.   I don't recall.

12   Q.   Did Carter ever discuss with you the potential name Cloe

13   in any way prior to October of 2000?

14   A.   No.

15   Q.   Did Carter ever discuss with you the potential name of

16   Zoe prior to October of 2000?

17   A.   No.

18   Q.   The name Yasmin?

19   A.   No.

20   Q.   Hallidae?

21   A.   No.

22   Q.   Fiona?

23   A.   No.

24   Q.   Kenesha?

25   A.   No.

1   Q.   Jade?

2   A.   No.

3   Q.   Any other individual name that he ever discussed with

4   you prior to that time?

5   A.   No.

6   Q.   You've had a chance to look at Exhibits 701 through 796?

7   A.   Yes.

8   Q.   Did you recognize any of those drawings as being any

9   drawing that you saw there in Lancaster that Carter showed

10  you in January of 1999 as you testified to earlier?

11  A.   Yes.

12  Q.   Which one?

13  A.   It was -- it was one of these.

14         MR. ZELLER:  For the record, the witness has handed

15  me Exhibits 4774, 778, and 779.

16  Q.   I'm going to show you, then, Exhibits 774, 778, and 779

17  and give these back to you.

18         Directing your attention to Exhibit 774, the one

19  below there.  That's a black and white sketch?

20  A.   Yes.

21  Q.   Is this the one that you recall seeing there in

22  Lancaster?

23  A.   It was -- I don't know if it was the exact one here, but

24  it was the four girls grouped together like this.  That's why

25  I -- they all look pretty much the same to me.  So it was --

1    but it was the group of the four girls is what I remember

2    seeing.

3    **Q.**   Is it fair to say that you can't be certain as to which

4    of those three drawings it was that you saw?

5    **A.**   No.   Whether it was this black and white drawing or that

6    one, I don't know which one it was.   It's four characters

7    standing there to me.

8    **Q.**   Well, let's see if we can be a little bit more precise

9    about some of this.

10   **A.**   Sure.

11   **Q.**   Exhibit 774 and 778, those are the black and white ones?

12   **A.**   779 is the black and white one.   777 and 779.

13   **Q.**   So let's focus on 778 for a second.

14   **A.**   778, yes.

15   **Q.**   That one is colored in?

16   **A.**   Yes.

17   **Q.**   And you're relatively confident that the drawing you

18   saw, the Bratz drawing that you saw there in Lancaster in

19   January of 1999, you testified to previously, was not in

20   color; right?

21   **A.**   No, it wasn't.

22   **Q.**   So you feel pretty confident that you could exclude

23   Exhibit 778 as being the actual drawing that you saw.

24   **A.**   Right.   It was -- it was just, this is the four

25   characters that I wanted to -- which specific one it is I

1    don't know.

2    Q.   Right.  I'm trying to, like I say, let's be a little bit

3    more precise just to see if we can narrow the candidates down

4    a little bit.

5    A.   Sure.

6    Q.   So you'll agree with me that at least, as it's shown

7    here, that Exhibit 778 is not one that you saw in Lancaster

8    in January of 1999; right?

9    A.   No, because it's colored in.

10   Q.   You would agree with my statement?

11   A.   Yes.

12   Q.   Directing your attention to -- since I can't see that

13   far.

14   A.   779.

15   Q.   779.  779 is the one that at least is, if not colored

16   in, at least is somewhat more finished than the other

17   exhibit; is that right?

18   A.   Yes.  There's more pencilling in.

19   Q.   Was the one that you saw there in Lancaster shaded in,

20   even if it was black and white?

21   A.   I don't recall.

22   Q.   So it might have been.  It might not have been.  You're

23   not sure?

24   A.   No, I'm not -- I -- I couldn't tell you.  I don't

25   remember.

1   Q.   Focusing first on 774, can you tell me under oath, you

2   know, where you're sworn to tell the truth, that that's the

3   drawing that you saw there in Lancaster in January of 1999?

4   A.   Under oath, I can tell you that these look very similar.

5   I don't know which one I've seen, but it was of the four

6   characters like they're presented here.   I don't know if it's

7   774 or 779 or one I missed, but this is -- this is what I

8   seen.

9   Q.   And what I'm now just following up to find out is about

10  something, and namely, do you know that the particular

11  drawing that's in front of you that we've marked as

12  Exhibit 774 is in fact the same drawing that you saw there in

13  Lancaster in January of 1999?

14  A.   No.

15  Q.   Focusing on the particular drawing that you have in

16  front of you as Exhibit 779, can you tell me that the

17  particular drawing that you saw there in Lancaster in January

18  of 1999 that you testified about earlier when Carter showed

19  you drawings is in fact the same drawing that you saw at that

20  time?

21  A.   Yes, it looks very much like the one that I remember

22  seeing.

23  Q.   And for the record, which one are we --

24  A.   779.

25  Q.   What was it, then, that you can remember happening next?

1   A.   Carter and I -- we were moving him into a studio, and he

2   had unpacked some of his -- well, his boxes of crap and the

3   Bratz were one of many that were in a box, and I remember

4   seeing then -- them then.

5   Q.   And when you say "them," are you talking about drawings?

6   A.   Yes.

7   Q.   And these were Bratz drawings?

8   A.   I believe it was something similar to this one, yes.

9   Q.   Well, they were additional Bratz drawings?

10  A.   They were Bratz drawings, yes.

11  Q.   You said that he was moving into a studio?

12  A.   Yes.

13  Q.   And this was in September of 2000?

14  A.   No, it was a little bit earlier than that.

15  Q.   When did that happen?

16  A.   Late August, early September of 2000.  Something like

17  that.

18  Q.   When you say he was moving into a studio, was this an

19  art studio?

20  A.   It was what we called his studio.  It was at the house

21  in Gardena that we had purchased.  We had fixed it up.  It

22  was an apartment out back that we had fixed up for him to set

23  up his drawing table and all that kind of stuff.

24  Q.   Oh, I see.  So this is where the tenant used to live but

25  apparently by that time was gone?

1    **A.**    Yes.

2    **Q.**    And so in that interim period, it got fixed up to be an

3    art studio for Carter to work in?

4    **A.**    Yes.

5    **Q.**    And so you said that in this late August, early

6    September 2000 time period you were unpacking boxes in that

7    studio?

8    **A.**    Yes.

9    **Q.**    And where had these boxes been?  Had they been in the

10   house?

11   **A.**    In the house, in the garage, in storage.

12   **Q.**    Was -- were some of them in a separate storage facility?

13   **A.**    No, I don't believe we had a storage facility.  I think

14   they were all in the garage or stacked up someplace.

15   **Q.**    But just when you said earlier that they were in

16   storage, what were you referring to?

17   **A.**    Storage in the garage or in a closet.

18   **Q.**    And so I take it, when you said you were unpacking the

19   boxes and then you saw those drawings, the Bratz drawings,

20   this was actually in the studio; right?

21   **A.**    Yes.

22   **Q.**    Because people were -- you and Carter were taking things

23   out of the boxes, and that's when you saw the Bratz boxes?

24   **A.**    No.  Cart was unpacking stuff.  I was moving it.

25   **Q.**    I see.  You got the good job.

1    A.    Yeah.

2    Q.    So just to be clear, then, you were moving the boxes

3    from the house into the studio.  Carter was in the studio,

4    and he was unpacking boxes?

5    A.    More or less.

6    Q.    Did you help unpack at all, or did you just move?

7    A.    I probably just moved.  He has a bad habit of unpacking

8    while we're moving and reminiscing, slowing the process down.

9    Q.    So I take it Carter was the one who actually unpacked

10   the Bratz drawings that he showed you?

11   A.    Yes.

12   Q.    And when he showed them to you, this was in the studio?

13   A.    Yes, as he was unpacking.

14   Q.    Anything else that you can remember?

15   A.    No, not -- no, I can't.

16   Q.    And just so it's clear, there's nothing else that you

17   can remember that he said to you or that you said to him

18   regarding these drawings?

19   A.    No, nothing regarding the drawings, no.

20   Q.    Anything else generally about Bratz as a concept?

21   A.    No.

22   Q.    Or just Bratz, period?

23   A.    No.

24   Q.    And then what is it you remember next happening with

25   respect to Bratz?

1   A.   I'm not really sure what happened next.  They were

2   unpacked, and that was -- I think the next thing was that he

3   had showed them to MGA.

4   Q.   Had Carter said to you specifically, back in the 2000

5   time period, that Veronica Marlow was the one who had

6   introduced him to MGA, or was that something that you first

7   learned later on?

8   A.   No.

9   Q.   Let me try it this way:  Do you remember learning that

10  more or less at the time that it first happened, or was that

11  sometime subsequent to it?

12  A.   What first happened?

13  Q.   When -- when Veronica Marlow had introduced Carter to

14  MGA.

15  A.   I believe I found out a little bit before they were

16  introduced.

17  Q.   And do you remember if that was something that occurred

18  before or after the move to the studio and when Carter

19  unpacked the drawings that you talked about?

20  A.   It was after the move into the studio.

21  Q.   On that day you described in which Carter unpacked the

22  Bratz drawings in his studio and he showed them to you, were

23  any of those drawings in color?

24  A.   I don't recall because it was more him looking at them.

25  I was moving boxes.

1  Q.   Can you give us an estimation of how many Bratz drawings

2  you saw on that day?

3  A.   I don't know.  I didn't really see that many -- I didn't

4  see -- he was going through them.  I was busy.

5  Q.   Is it fair to say that you wouldn't be able to identify

6  for us a particular drawing that you saw on that day?

7  A.   That would be fair to say.

8  Q.   I understand you have a clarification?

9       MS. ANDERSON:  Yes.

10      THE WITNESS:  I know that we kind of got confused

11  on which of these drawings, 774 to 779 earlier, and I just

12  wanted to clarify that I'm not sure which drawings I seen in

13  1999, but they were very similar, if not one of these, but

14  similar to it.

15  Q.   BY MR. ZELLER:  Similar to Exhibits 774 and 779?

16  A.   Yes.

17  Q.   But you can't be sure as to -- whether you saw those

18  exact drawings as they're depicted in Exhibit 774 and 779.

19  Is that true?

20  A.   Yes.

21  Q.   And as between those two, you can't be certain as to

22  which one you saw?

23  A.   Yes.

24  Q.   Does one of those two exhibits, 774 versus 779, look

25  closer to what you saw?

1    A.    I couldn't say either way.

2    Q.    Focusing on the time period of October of 2000.  At that

3    time Carter bought a new desktop computer; is that correct?

4    A.    Yes.

5    Q.    So it's the case that you didn't have a computer prior

6    to October of 2000 in that house?

7    A.    No, we did not.

8    Q.    Neither you nor Carter did?

9    A.    No, we didn't.

10   Q.    And we were talking about Carter bought a desktop

11   computer in October of 2000, but that was in the Gardena

12   house?

13   A.    Yes.

14   Q.    Did you use that computer?

15   A.    Yes.

16   Q.    Did Carter use that computer that you saw?

17   A.    Yes.

18   Q.    At some point on that desktop computer a program called

19   Evidence Eliminator was installed; is that correct?

20   A.    I believe so.

21   Q.    Was that something that you did or Carter did?

22   A.    I believe Carter did.

23   Q.    Were you involved in any way in the purchase of the

24   Evidence Eliminator program that was on the desktop computer?

25   A.    No, I wasn't.

1   Q.   Did you, yourself, ever run it?

2   A.   No.

3   Q.   At some time after Carter's purchase of the desktop

4   computer in October of 2000, did he buy a Compaq laptop?

5   A.   Yes.

6   Q.   And do you know when he bought that?

7   A.   I believe it was around February of 2002.

8   Q.   Did you install Evidence Eliminator on that laptop?

9   A.   No, I did not."

10          (End of deposition playing.)

11          MR. NOLAN:  We ran out of time today for witnesses,

12   your Honor.

13          THE COURT:  Thank you, Counsel.

14          Members of the jury, I will wish you all a happy

15   4th of July.  We will not have court tomorrow, but I'll see

16   you all at 9:00 on Tuesday morning.

17          **(WHEREUPON THE JURY WITHDRAWS.)**

18          THE COURT:  Please be seated.  Okay.  I'd like to

19   schedule a hearing for Monday afternoon.  We've got motions

20   on the criminal calendar taken care of.  There's a few

21   matters I need to take up at 2:00, which shouldn't last long.

22   So if everyone could be ready at 3:00, if that works for

23   everyone.  At that time I want to go through the jury

24   instructions and the verdict form.

25          Does everyone have in what the Court had asked from

1    each side in terms of the binders, the jury instructions, the

2    verdict forms?  I want to make sure I don't have any --

3    anything additional.

4         MR. ZELLER:  I believe that's the case.  But I can

5    double-check as soon as we are done here to make sure.  But

6    my last information is I thought we had done that.

7         THE COURT:  I'll be here for a while tonight.  So

8    before the Court leaves tonight, let me know that I have

9    everything.  Because when I leave tonight, I'm not coming

10   back to the courthouse until Monday.

11        MR. NOLAN:  Your Honor, I believe we have

12   everything.

13        THE COURT:  Very good.  So that's the jury

14   instruction issue, and the hearing on Monday at 3:00.

15        Mr. Nolan, where are we now on witnesses?  We've

16   gotten through Ms. Leahy.  The Court has to work out the

17   Palmer issue.  On the Custodian of Records --

18        MR. NOLAN:  We have the Custodian of Records and

19   Cassidy Park, your Honor.

20        THE COURT:  Is that it?

21        MR. NOLAN:  For the live witnesses.  We've got

22   Galvano.

23        THE COURT:  So Irmen is done, De Anda is done, and

24   Kilpin is done.

25        So Galvano, Cassidy Park.  What about Jill Thomas?

1      MR. NOLAN:  I had a meeting with Mr. Quinn.  And he

2 made a proffer, which I asked him to put on the record, and

3 based on that proffer, we would not call.

4      THE COURT:  Okay.  You need to put something on the

5 record?

6      MR. QUINN:  If you'd like to.

7      MR. NOLAN:  Just what you represented to me.

8      MR. QUINN:  That Ms. Thomas did meet with Rachel

9 Harris.  She had provided no documents to Ms. Harris.

10 Ms. Harris provided no documents to Ms. Thomas and did not

11 show any documents to her.  Neither showed any documents or

12 provided any documents to each other.

13      THE COURT:  Very good.  And you are accepting his

14 representation?

15      MR. NOLAN:  Yes.

16      THE COURT:  Very good.  Based on that, we won't be

17 calling Ms. Thomas.

18      All right.  So Jeanne Galvano, Cassidy Park, the

19 Custodian of Records, and Mr. Palmer.  Those are the four

20 that you have left; correct?

21      MR. NOLAN:  Correct, your Honor.

22      THE COURT:  All right.  As far as a rebuttal case,

23 we have --

24      MR. QUINN:  Your Honor, before we get to that,

25 Cassidy Park, we went back and looked at the transcript, and

1    she was excused.  We thought her testimony was concluded.

2    The transcript indicates that the Court did excuse her.  And

3    we don't think there's a basis for calling her again.  We can

4    provide the transcript citation.

5           THE COURT:  Okay.  I'll take up Cassidy Park and

6    Mr. Palmer, and we'll take up these matters in a moment.  But

7    I want to get a sense of at the outside, there are four

8    witnesses left for the defense; correct?

9           MR. NOLAN:  That's correct, your Honor.

10           THE COURT:  And from a rebuttal perspective, we

11   have Carter Bryant and then a motion from Mattel on that.

12   When should I anticipate an opposition from MGA to that

13   motion?

14           MS. AGUIAR:  I realize the timing is difficult

15   given the holiday.  And while I completely understand the

16   time pressures that Quinn Emanuel was under, I think we got

17   it like 2:30 in the morning.  So we essentially didn't have

18   it until this morning.  And obviously, I'm not being

19   critical.  But is there a way that we could get it to you

20   sometime between now and Monday?

21           THE COURT:  Yes.  Absolutely.  I'll be home

22   working.  I'm just not planning to be here.

23           MS. AGUIAR:  Of course.

24           THE COURT:  If the Court were to decide to permit

25   Carter Bryant to be recalled, how much lead time does he

1   reasonably need to get back out here?

2          MS. AGUIAR:  Mr. Nolan will address that.

3          MR. NOLAN:  Your Honor, obviously what's absent

4   here is Carter Bryant's counsel.  And we're not privy to the

5   communications between Quinn Emanuel and Ms. Anderson or

6   whomever is there.  I got an e-mail from Ms. Anderson during

7   the lunch break asking me when the matter was going to be

8   taken up.  And I said I didn't have any idea.  I believe they

9   are filing an opposition as well.

10         So the short answer is I have no idea.  We're not

11   in communication with Mr. Bryant.  And maybe counsel for

12   Quinn Emanuel can inform us on what the status of their

13   communications are with the Keker Van Nest firm because we

14   don't know that.

15         THE COURT:  Yes.

16         MR. QUINN:  We don't know exactly where he is.  One

17   of the things I was going to propose to your Honor is that,

18   at the end of the day today, we get in touch with his counsel

19   and just let his counsel know that this matter was set for

20   hearing, assuming that the Court is going to set it for

21   hearing sometime Monday morning.  And just alert them to the

22   possibility that depending upon the Court's ruling, he might

23   need to be here Tuesday morning.

24         THE COURT:  I'll take this in camera at sidebar if

25   you want.  But is there anything relevant to this in the

1    settlement agreement?

2            MR. QUINN:  Nothing that isn't also in the public

3    document.

4            THE COURT:  Okay.  All right.  Then why don't you

5    discuss it.  Is there -- basically what I'm asking is is part

6    of the settlement agreement an agreement to be available?

7            MR. QUINN:  There is a statement in the public

8    document, the dismissal, that he agrees to appear in our case

9    in chief, and so they are taking the position that that

10   exhausts his obligations.

11           THE COURT:  Who is "they"?

12           MR. QUINN:  Mr. Bryant.  His counsel is.

13           THE COURT:  I see.

14           MR. QUINN:  That they have informed us of that.

15           THE COURT:  So I probably should hear from them as

16   well, then, on this motion.

17           MR. QUINN:  It would seem.

18           THE COURT:  All right.  I would like to get,

19   then -- today is Thursday.  Tomorrow is Friday.  Do they

20   deliver on Sunday?

21           MR. NOLAN:  Anytime you want.  Unfortunately, your

22   Honor.  I mean not by public mail but by messenger.

23           THE COURT:  There's somebody who is out there

24   around the clock?

25           MR. NOLAN:  For a price, it can be done.

1          THE COURT:  All right.  Why don't we have delivered

2    to -- I'll give leave to both MGA and counsel for Mr. Bryant

3    to file a response to the motion to order Mr. Bryant to

4    return, and that can be filed -- delivered to the Court at

5    the Court's residence by 3:00 on Sunday.

6          Mr. Nolan, I believe you have my home residence

7    address?

8          MR. NOLAN:  Somewhere I do, yes, your Honor.  I

9    think you've provided it before for special deliveries.

10         THE COURT:  So you could provide that to Mr. Keker

11   or Ms. Anderson.  And have it delivered by three o'clock on

12   Sunday.

13         MR. NOLAN:  We'll try to coordinate the delivery.

14         THE COURT:  If you could.  That would be great.

15   And then I'll take a look at it.  And then I think it's

16   probably better that we have a hearing on this Monday morning

17   as opposed to the Monday afternoon.  We have a lot of

18   scheduling conferences scheduled for 9:30, I believe.  With

19   you we don't have much at 10:00.  We have five scheduling

20   conferences scheduled for 9:30.  And we have four hearings at

21   10:00.  Why don't we simply add this to the 10:00 calendar.

22         MR. NOLAN:  This limited issue, your Honor?

23         THE COURT:  This limited issue.  Just provide

24   notice.  So we'll hear this at 10:00, and then we'll hear

25   everything else at 3:00.

1     MR. NOLAN:  Your Honor, I have no reason to ask

2  this other than anticipation since I've not talked to them,

3  Keker Van Nest, as to whether or not they have other

4  commitments at ten or eleven o'clock.  Is there any

5  possibility, if they were to ask, that they could attend by

6  phone?

7     THE COURT:  You know, given these circumstances,

8  that would be appropriate.

9     MR. NOLAN:  It would be appropriate?

10    THE COURT:  That's fine, yes.

11    MR. NOLAN:  And it may not be necessary.  I just --

12    THE COURT:  Well, yes, that's fine with the Court.

13    MR. NOLAN:  All right.  Thank you.

14    THE COURT:  And, in fact, I'm not going to order

15  them to attend at all.  If they want to submit on the written

16  opposition and have you represent their interests, that's

17  fine as well on this limited point.  Because, quite frankly,

18  this affects -- the only reason I'm offering them is simply

19  to protect Carter Bryant's interests, and to the extent they

20  want to waive appearance, that's fine.

21    MR. NOLAN:  Your Honor, I know that a declaration

22  was submitted in camera.

23    THE COURT:  I have that, yes.  I did review that.

24    MR. NOLAN:  And I just want to --

25    THE COURT:  It puts you in an awkward position.

1    MR. NOLAN:  In any other case, any other situation,

2  any other factual situation we would now be in a situation

3  where we would know exactly why they are calling someone for

4  rebuttal, what the justification is.  And it's very difficult

5  for us to be shooting in the dark.

6    THE COURT:  Let me hear a response to that,

7  Mr. Quinn.

8    MR. QUINN:  Your Honor, I think if we are down to

9  their playing a videotape and calling a Custodian of Records,

10  and that's all, there's not going to be any response, then,

11  to our proffered rebuttal, I don't mind their seeing the

12  declaration.

13    THE COURT:  I'm sorry?

14    MR. QUINN:  If the remainder of their case, if they

15  will represent it's going to consist solely of the videotape

16  that hasn't been played --

17    THE COURT:  Maybe two videotapes.

18    MR. QUINN:  Or two, and calling the Custodian of

19  Records, and we have to deal with the Cassidy Park issue, and

20  that's another separate issue.

21    THE COURT:  They have already represented that's

22  all that's left in their case.

23    MR. QUINN:  I know.  But my agreement to this would

24  really depend on the Court's ruling on Cassidy Park.  I

25  wouldn't want that -- if they are going to get another live

1    substantive witness up there, it would be my preference that

2    they not see the declaration.

3         So perhaps if the Court could take a look at the

4    Cassidy Park issue, and depending on how that's resolved, we

5    may not have an objection to their seeing that.  If we're

6    just looking at tape and a Custodian of Records deposition,

7    and that's the end of the case.  What I'm concerned about is

8    that they see it and that that somehow then shapes the

9    remainder of their case.

10        THE COURT:  Your remark, Mr. Nolan, when you say

11   ordinarily you would know what the rebuttal witness is going

12   to be testifying to, I don't think that's necessarily

13   accurate.  By definition, rebuttal witnesses are normally not

14   decided upon until the end of the defense case.

15        MR. NOLAN:  My point is that we're at the end of

16   the case.  I would assume that we're going to be through on

17   Tuesday, and Mr. Bryant, if he's going to testify, would be

18   right there afterwards.

19        THE COURT:  Mr. Quinn is saying you're not quite

20   there.  If you really are at the end of the case, okay, I

21   think we've resolved this by removing the Cassidy Park issue

22   and going forward on that.

23        Okay.  So no other rebuttal from Mattel, I take it,

24   unless the Court rules in a certain way on the Palmer case;

25   correct?

1          MR. QUINN:  The only other possible rebuttal that

2   we're considering is some other witness on this Jewel doll

3   issue.

4          THE COURT:  Well, you mean this?

5          MR. QUINN:  Not that one, no.  Not on that.

6          THE COURT:  The Jewel doll issue that you raised

7   in --

8          MR. QUINN:  Yes.

9          THE COURT:  Yes.  Well, it sounds like we're going

10  to be able to wrap this up on Tuesday, even if all of this

11  comes in because of the limited nature of these rebuttal

12  witnesses.

13         MR. NOLAN:  If I could just go back on the comment

14  with respect to Jewel Barbie.  Our case, we didn't -- I mean,

15  Jewel Barbie was put on in their case.  The only time that we

16  tried to do something with respect to Jewel Barbie was with

17  respect to getting an authentication of this copyright

18  application, and I didn't get it in.

19         Now, to say that they are going to use that now in

20  rebuttal, I mean, I always do the -- the test for rebuttal

21  has got to be that it's something that shouldn't have been

22  anticipated --

23         THE COURT:  I understand.  It's helpful that we

24  could have the in camera declaration provided.  So let's deal

25  with the Cassidy Park issue.  Who wants to lead off on that?

1   And someone has to refresh my recollection on what Cassidy

2   Park has to do with any of this.

3           MR. NOLAN:  She was called as a witness, and the

4   date of her testimony really doesn't matter, but it was

5   sometime at page 3530, whatever date that was.  But here was

6   the gist of it.  They took Cassidy Park for just a few

7   minutes.  She was the supervisor of Carter Bryant during

8   the -- the corporate supervisor during the period back in

9   Missouri.  And you'll recall we were backing up on third

10  party witnesses.

11          I had been taking -- I went a little bit long.

12  They went short.  And you said to me during a period of time,

13  Mr. Zeller -- reading from page 3530 -- "Mr. Zeller is going

14  to get beat up at the end of the day by a bunch of third

15  party lawyers who are not going to have their witnesses on.

16  A 25-minute witness has now taken an hour and 20 minutes.

17  And I understand she's on your witness list.  All that's

18  relevant to the Court is that the chess clock is going as we

19  speak."

20          And then it is true, your Honor, I -- you know, I

21  asked a few more questions, and then I sat down.  I confess I

22  fully understood that the message was we're burning up time

23  that needs to be used for third parties.  If you've got her

24  on your witness list, she'll come back.  That's how I

25  interpreted.

1        THE COURT:  You're saying the Court rushed you?

2        MR. NOLAN:  No, I made a decision based on trying

3   to please the Court, in trying to accommodate the third party

4   witnesses.  But I will admit, your Honor, that at the end,

5   you did excuse the witness.  And at that time I did not say

6   time out.  But I did give them notice --

7        THE COURT:  What do you want to bring her back to

8   say?

9        MR. NOLAN:  I'm always faced with these proffers

10  that I'm giving.  There's certain topics that I'm going to

11  look at carefully to see whether or not we need to cover

12  them.  There were areas that I did not cover with her, and in

13  light of the Court's comments and rulings, I want to take

14  that in consideration.  I can't make a proffer right now,

15  nor, frankly, your Honor, they have never had to do this on a

16  particular witness.

17        THE COURT:  You are asking them do it with regard

18  to Carter Bryant.

19        MR. NOLAN:  That's a totally different subject.

20        THE COURT:  Right.  That's a rebuttal witness.

21  This is your case in chief.  But the difference here,

22  Counsel, is you're asking the Court to set aside the fact

23  that I excused a witness and reopen testimony.  I think the

24  Court is not out of line to ask why is it that you are asking

25  the Court to take what is extraordinary relief and recall a

1    witness who has been excused to have them recalled not as a

2    rebuttal witness, but just to come again in the case in

3    chief?

4              MR. NOLAN:  I understand, your Honor.  One of the

5    areas that I wanted to explore with her had to do with when

6    she first learned about Carter Bryant's involvement in Bratz.

7    I wanted to get into her involvement.  She's on the

8    inventions committee at Mattel during the relevant period of

9    time here.  I want to explore really what her status is as an

10   employee of Mattel because there's conflicting testimony on

11   that.

12             But, your Honor, I need -- I mean, that's my

13   proffer right now.  But I need to go back.  I mean, I can

14   take a few minutes and think about it more, but it's been a

15   long day, and I'm trying to assess where we're at.

16             We want to end this case, but I do think that the

17   standards -- you know what?  I agree.  You excused her.  I

18   misunderstood something because she was on our witness list,

19   that we would have the right to call her back.  And I gave

20   notice to Mr. Quinn.  Mr. Quinn raised the issue about gee, I

21   thought she was through.  We all looked at the transcript.

22   It is what it is.

23             I could think more about it and make a definitive

24   decision in a few minutes, if I could just have leave to do

25   that.

1          THE COURT:  Very well.  Let me hear a response from

2     Mattel.

3          MR. QUINN:  Your Honor, the transcript reflects

4     that Mr. Nolan did do a recross-examination.  He asked a

5     question, and then said, "Nothing further."

6          The Court asked us, "Anything further?"

7          "No, your Honor."

8          "All right.  You're excused, ma'am."

9          The two subjects that counsel has identified, when

10    she first learned about Bratz, that sounds like a statute of

11    limitations or laches issue, and conceivably he's going to

12    have a chance to question her about that if there is another

13    phase to this.

14          And then the question about her status as an

15    employee, she's an employee.  The CEO of a company that's got

16    30,000 employees didn't think she was an employee now.

17    Although he acknowledges he wouldn't necessarily know if

18    she's a part-time employee.  That doesn't really sound like a

19    significant enough issue that we should do this very unusual

20    procedure of bringing back somebody.

21          MR. NOLAN:  I made this argument irrelevant.  I

22    apologize for taking up the time.  Your Honor, we will not

23    call Cassidy Park.

24          THE COURT:  All right.

25          MR. NOLAN:  So we will accept the deal that Mattel

1    offered about giving us the declaration of Carter Bryant so

2    we can use that to respond.

3              THE COURT:  Very well.

4              MR. QUINN:  And so there won't be any other

5    witnesses, as I understand it.  We're looking at two tapes

6    and the Custodian of Records.

7              THE COURT:  Two tapes, the Custodian of Records,

8    yes.  Okay.  That takes care of everything except the Palmer

9    issue.  I'd like to speak a little bit more about the Palmer

10   issue tonight.  But besides the Palmer issue, is there

11   anything else?

12             MR. ZELLER:  If I could just get a clarification

13   and make sure I correctly communicate to Carter Bryant's

14   counsel the Court's expectations.  I understood the 3:00 P.M.

15   Sunday deadline, which I'll obviously advise them of.  And

16   I'll send them this portion of the transcript as well.

17             THE COURT:  And a 10:00 A.M. hearing, and it's up

18   to them whether they want to be there for the hearing or not.

19   They can either have Mr. Nolan or counsel for MGA represent

20   their interests, or they can participate by telephone, or

21   they can -- they are always certainly welcome to attend in

22   person.

23             MR. ZELLER:  And also to anticipate potentially a

24   question.  Is it okay for them to send by e-mail to you any

25   opposition brief that they have by 3:00 P.M. on Sunday?

1    THE COURT:  I'll tell you the problem is that my --

2  we really don't have a printer that works all that well at

3  home.  And there's only so much I can read.  I really would

4  rather have a hard copy.  So maybe you can e-mail it to

5  someone else who can print it out and give it to MGA and get

6  it in.  I would prefer a hard copy.

7    MR. ZELLER:  Very well.

8    THE COURT:  And then if there's a Phase 2 of this

9  trial, if there's an extra printer around here that the Court

10  can borrow --

11    MS. AGUIAR:  We'll chip in.

12    MR. QUINN:  Done, your Honor.

13    THE COURT:  In any event, yes, what else?

14    MR. ZELLER:  Also we were interested in the time

15  count.

16    THE COURT:  I'll get back to you on that.  I have a

17  pretrial service officer waiting in chambers since 5:00.

18  Somebody wants to get out for the weekend.  So I'll come back

19  and deal with Palmer and the time count.  And we've got a

20  couple dolls.

21    MS. AGUIAR:  I understand that you want to cut this

22  short.  So we can do this on Tuesday.

23    THE COURT:  That's what I'm trying to do now.  I

24  really want to know if there's anything else.

25    MS. AGUIAR:  I did want to raise it, and you can

1    tell me when you want to deal with it.  There's a couple

2    dolls that were marked with different witnesses.  There was

3    testimony elicited on both the My Scene and the Flavas doll

4    throughout the course of the testimony in 1-A.  And neither

5    one of these came into evidence.  There was discussion at a

6    sidebar regarding My Scene, not about Flavas.  I think Flavas

7    was just an oversight of not moving it in.  We can deal with

8    it on Tuesday, but we do want to move both of them into

9    evidence.

10          THE COURT:  We'll talk about the dolls when I come

11   back out.  Anything else?

12          MS. AGUIAR:  And we would like leave to submit a

13   supplemental expert report.  I can walk through with you what

14   the basis for that is, and there's one other exhibit that

15   needs to be moved in.  But again, nothing that can't wait.

16          THE COURT:  Supplemental expert report on?

17          MS. AGUIAR:  Sure.  It is on damages.

18          THE COURT:  Okay.  This is for the next phase.

19          MS. AGUIAR:  Well, it's for 1-B, yes.  But I wanted

20   to raise it because we want leave to file a motion to submit

21   it.

22          THE COURT:  Very good.

23          MS. AGUIAR:  So there are those three things which

24   we can deal with whenever your Honor thinks it is

25   appropriate.

1          THE COURT:  Just give me a few minutes here.  It's

2    not going to take me long in chambers.

3          MS. AGUIAR:  And in the midst of your time count,

4    we have the Irmen video.

5          THE COURT:  Oh, yes, please.  What is that?

6          MS. AGUIAR:  MGA is 32 minutes, five seconds.  And

7    Mattel is 14 minutes, 25 seconds.

8          THE COURT:  Got it.  All right.  I'll take a brief

9    recess.  We'll resume around 5:30.

10          (Recess taken.)

11          THE COURT:  Okay.  Let's deal with the most

12    difficult issue first.  Why don't we take up the Palmer

13    matter.  And now that we've all settled down a little bit,

14    I'd like to take the Palmer argument from the top.  So

15    whoever would like to proceed on that first.

16          MR. NOLAN:  Palmer was designated as the person

17    most knowledgeable with respect to the phone records.  We

18    took the deposition.  We want to play the video.  We would

19    like to have it sponsored by the person most knowledgeable at

20    Mattel.  We're not asking the Court to instruct the jury.  We

21    don't believe a 403 argument is appropriate.  We're not

22    attaching an intentional aspect to it.

23          As the Court noted, there's been a lot of testimony

24    about things that are missing.  But I don't want the jury to

25    be sitting there wondering I wonder whatever happened to the

1    October phone records.  And what I'd like, because they are

2    going to have the September phone records in evidence, I'd

3    like to have those in evidence.  That one sheet of paper that

4    shows the phone calls.  And I just think that they need to

5    know that this document does not exist.

6         So from the absence of proof, they don't have to

7    draw any conclusions.  I'm not going to say that it was

8    intentional by Mattel.  I am going to say that had these

9    records been available, and they are not, they likely would

10   have confirmed what the story is here, and that is that there

11   were meetings, some Friday afternoons.  I mean, I think the

12   Court understands our position in that respect.

13        THE COURT:  No, no.  Please elaborate.  That's

14   actually what I was listening for.  So what do you believe,

15   if we would have had the phone records, what do you believe,

16   best case scenario for MGA, those phone records would have

17   shown?

18        MR. NOLAN:  Carter Bryant never called MGA during

19   this period of time after he signed the contract and gave

20   notice that --

21        THE COURT:  And, of course, they don't

22   necessarily -- what they would show, then, in that instance

23   is that there is no evidence that Carter Bryant ever used his

24   phone at Mattel to call MGA; correct?

25        MR. NOLAN:  Correct.  That's correct.

1          THE COURT:  Would Mattel be willing to stipulate to

2    that fact, that there is no evidence that Carter Bryant used

3    his phone at Mattel to call MGA?

4          MR. ZELLER:  In October of 2000.

5          THE COURT:  In October of 2000.

6          MR. ZELLER:  I think with some wordsmithing, the

7    answer to that is yes.

8          THE COURT:  The Devil is always in the details.

9    What possible wordsmithing would you like?

10         MR. ZELLER:  It's a matter of what we would

11   stipulate to and what is told to the jury.

12         THE COURT:  This is what I would tell the jury.

13   The parties have stipulated that there is no evidence that

14   Carter Bryant called MGA -- that Carter Bryant called MGA

15   using his Mattel phone during the month of October.  And

16   assume there would be a further stipulation to admit the

17   phone records from September and all the other months that

18   you want to get in.

19         MR. NOLAN:  Right, your Honor.  And I think I would

20   just include no phone calls to MGA or Margaret Leahy.

21         THE COURT:  This is essentially the same thing that

22   the Court organized when it was -- when the ball was on the

23   other side on the Menz expert witness when it gets down to

24   the mechanics of it.  Because that's all Palmer is.  He can't

25   offer any opinion.  There's no issue of culpability or intent

1   with respect to Palmer.

2           Palmer is very much like Menz and the issue of the

3   Evidence Eliminator, and if there's no disagreement,

4   Mr. Nolan just told me that the best case scenario for MGA is

5   evidence that at the end of the day, there is no evidence of

6   these phone calls.  And if Mattel will stipulate to that, and

7   MGA is willing to stipulate to that, that not only saves

8   time, but it eliminates this issue.

9           MR. ZELLER:  I guess in a matter of preference, the

10  way the Court originally had it before the break, I think,

11  was really --

12          THE COURT:  I understand that.

13          MR. ZELLER:  Just a problem with the phrase there

14  is no evidence.  I mean, if something more specific --

15          THE COURT:  There is no evidence.  That's the

16  problem.  I think they are entitled to that.  Just like there

17  is no evidence of what the molds look like.  There's no

18  evidence that any number of things in this trial.

19          MR. ZELLER:  And that gets us into that very issue.

20  I mean, why are we talking about that?  We're just -- this

21  particular one, I mean, a stipulation or an instruction that

22  the October phone records do not exist, that seems

23  appropriate.

24          All I'm saying is in terms of, you know, the

25  particular wording used in front of the jury.  I mean, if the

1    Court is looking for, say, a stipulation in terms of what

2    will we argue or not argue, you know, I think we can

3    certainly say that in broader terms, we're not going to

4    argue, you know, that our case depends on or is based on or

5    rests on the fact that Carter Bryant was calling MGA from his

6    Mattel extension in October of 2000.  I mean, that's not an

7    issue that we have raised.

8           That's why I think it seems like a little bit of

9    overkill to be emphasizing to the jury well, there's a

10   missing piece.  You know, when it seems to emphasize

11   something where, you know, the same point could be made about

12   any number of other things that, as the parties have been

13   discussing and there is testimony about, that they are

14   missing.

15          THE COURT:  Like what?

16          MR. ZELLER:  Well, the missing molds.  I mean, we

17   could say, you know, there's --

18          THE COURT:  There's evidence.  There was a question

19   asked, where are the molds?  They are gone.  So that's out in

20   front of the jury.  And I'm basically trying to treat this in

21   the same way.  I haven't placed any limitation on any of the

22   questions that have been asked about evidence that -- or

23   items that are missing.  And I don't see any reason to do so

24   now.

25          I have some concerns, and this is what MGA needs to

1    be mindful of, of the -- of some of the testimony in the

2    Palmer deposition which I think goes beyond and gets into

3    this negative inference aspect of it.  And that's why I asked

4    the question that I did, and I'm satisfied with MGA's answer,

5    that all they are looking for is the statement of fact that

6    there are no phone records for October of 2000.  There's no

7    evidence of these communications, whereas there is evidence

8    for September.

9            And I agree with Mr. Nolan's point, that it does

10   seem odd that if there's going to be evidence introduced for

11   the September phone records, and I gather you have no

12   objection for the September records.

13           MR. ZELLER:  True.

14           THE COURT:  And if that comes in, there needs to be

15   an explanation.  I really think it is of moment at the end of

16   the -- frankly, it's a nonentity in my view at the end of the

17   day.  But it seems to be important to both sides.  So I'm

18   sure I'm missing something.

19           MR. ZELLER:  I would just point out, your Honor,

20   that the phraseology that the Court was suggesting most

21   recently, I mean, that could actually be consistent with the

22   idea that the phone records still exist but do not show that

23   there were calls.  That's part of, I guess, why, you know,

24   respectfully I would suggest that it's more, as the Court is

25   saying, the Devil is in the details.

1      I think conceptually we have absolutely no problem

2  with a stipulation, with the Court, you know, instructing the

3  jury and short-circuiting all of this.  But it is something

4  of a concern where it makes it sound, you know, not only a

5  matter of emphasis, but it makes it sound like, because this

6  jury is going to see the September records, they are not

7  going to have October records.

8      And then they are going to be told, you know,

9  there's no evidence suggesting that we have the records.  And

10  they show he did not call.  And I recognize this is a fine

11  line.  I mean, there's no question, but this is the

12  wordsmithing aspect of it.

13      THE COURT:  Let me suggest this:  The Court cannot

14  force anyone to stipulate.  So if I don't have both sides

15  agreeing, then I go back to the drawing board.  What if we

16  say the parties have stipulated that exhibit, whatever the

17  exhibit is that has the -- is it just the September -- well,

18  just the September records that you want to get in; is that

19  correct?

20      MR. NOLAN:  The September telephone records.

21      THE COURT:  So it's relatively short.  So that

22  exhibit, whatever it is that has the September records, is a

23  record of telephone calls from Carter Bryant's extension at

24  Mattel to MGA.  There are no records available for the month

25  of October.

1    So the Court's proposed stipulation would be the

2  parties have stipulated that exhibit, whatever it is, is a

3  record of telephone calls from Carter Bryant's extension at

4  Mattel to MGA for the month of September 2000.   There are no

5  records available for the month of October, 2000.

6    MR. PRICE:  We're not introducing the September

7  records.  I don't know if he wants them redacted to just

8  reflect Carter Bryant to MGA.

9    THE COURT:  I'm sure he can speak for his view on

10 that.

11    MR. PRICE:  I thought he said he didn't want that.

12    THE COURT:  Mr. Nolan, what are your thoughts?

13    MR. NOLAN:  Your Honor, this is a business record

14 of Mattel.  I don't want it to be redacted.  I think that it

15 should just come in in the form that it was presented to the

16 witnesses.

17    THE COURT:  Can I take a look at it?

18    MS. AGUIAR:  Sure.

19    THE COURT:  What about the Court's proposal,

20 though?  The parties have stipulated this is a record of

21 telephone calls from Carter Bryant's extension at Mattel to

22 MGA for the month of September 2000.  We can highlight the

23 ones that are going to MGA, and there are no records

24 available for the month of October 2000.  And that treats

25 this very much like all of the other missing stuff that's

1   come out during this trial.  There's no request for an

2   adverse inference to be made either in argument or

3   instruction, and we'll leave it at that.

4          MR. NOLAN:  The exhibit that's been handed up to

5   you is Exhibit 472.  The version you have may have all of the

6   months in it, and my intention would be only the month of

7   October.  We would take that out.  Your Honor, with respect

8   to the Court's proposal, I don't -- my concern is that the

9   Court is directing that these are the phone calls to MGA.  If

10  you -- if the stipulation was just saying that Exhibit 472

11  represents the phone calls made by Carter Bryant from his

12  extension at Mattel for September, there are no records

13  available for the period for October.

14         THE COURT:  Yes.  That's acceptable.

15         MR. NOLAN:  Yes.

16         THE COURT:  Acceptable?

17         MR. ZELLER:  It is, your Honor.

18         THE COURT:  Very well.

19         Regarding the dolls.

20         MS. AGUIAR:  The two exhibits, two tangible

21  exhibits, 18555, which is a Flavas doll.

22         THE COURT:  Yes.

23         MS. AGUIAR:  And 17378, which is a My Scene doll,

24  and I think in connection with a presentation that was made

25  earlier today to the Court, and as the Court is aware, as

1    you've been sitting here the whole time, there has been a lot

2    of evidence about Flavas and My Scene both in testimonial

3    evidence and also in documentary evidence.   So we would

4    move --

5              THE COURT:   Tell me what you think the relevance,

6    though, of actually seeing the dolls as to perhaps curiosity

7    or whatever.   The concern that Mr. Zeller expressed at

8    sidebar, or maybe it was Mr. Quinn, somebody expressed at

9    sidebar regarding the My Scene dolls is that we don't want to

10   get into a Phase 1-B type issue where the jury is comparing

11   the dolls to Bratz and wondering --

12             MS. AGUIAR:   Understood.   I think the jury,

13   though -- I don't really know or have any basis for saying

14   this other than observing them for the last six weeks.   I

15   think they have been paying attention and are savvy, and I

16   think they know what their task is going to be in this phase.

17   You have your instructions.

18             But specifically, your Honor, almost every time

19   there's been a doll mentioned specifically, there's been

20   testimony about it, it has come into evidence.   So for that

21   matter we could say that when -- and I think it is my memory

22   that Mattel actually was the one who offered a Bratz doll

23   into evidence, and so for that matter, we could say they are

24   going to be looking at the drawings and looking at the Bratz

25   doll.   So dolls have come into evidence that people have

1    testified about.

2         We've got Prayer Angel into evidence.  And I do

3    think that the jury is entitled to see these tangible items

4    about which there's been testimony.

5         THE COURT:  Again, the Court's question is for what

6    purpose?

7         MS. AGUIAR:  I think that -- I don't see that

8    there's any other -- to the extent that there was testimony

9    on the other dolls, and therefore, we wanted the jury to be

10   able to actually see the tangible item that people were

11   testifying about, presumably that was why a number of the

12   other dolls were introduced.  So I think it's for the same

13   reason --

14        THE COURT:  Well, the fact that the dolls were

15   passed around and there were particular reasons why they were

16   passed around.  There was no objection made, or if there was,

17   it was dealt with.  I can't remember them all at this point.

18   But there was a particularized reason.  What I'm asking you

19   for is let's do the same thing here.  What is the reason for

20   these dolls, outside of curiosity or completeness or

21   whatever?

22        MS. AGUIAR:  And I do think that -- both of these

23   dolls were introduced after Bratz, and there was testimony

24   elicited from witnesses that your Honor permitted on that

25   regarding the timing.  And that these would allow the jury to

1   know that and to see that because the dates on these boxes,

2   just like the dates on some of the other boxes, are what they

3   are, and the jury can see them.

4            THE COURT:  Don't the dates on these boxes render

5   them irrelevant for purposes of timing?

6            MS. AGUIAR:  I don't think this is a timing

7   question.

8            THE COURT:  I don't think so either.

9            MS. AGUIAR:  And I do think there are dolls that

10  have come into evidence, I don't think over objection that

11  have dates on there that have dates outside the time frame.

12  So that really is not a reason.  I really just think look,

13  the jury has seen dolls come into evidence when there's been

14  testimony about it.  So I just don't see any harm, and I

15  think it -- anyway.

16           THE COURT:  Okay.  Let me hear Mattel's thoughts.

17           MR. QUINN:  Your Honor, I think when other dolls

18  have come in, they have been for a particular reason because

19  they are relevant to issues in this case.

20           THE COURT:  Give me an example.

21           MR. QUINN:  Cabbage Patch dolls.  Would somebody

22  have been painting a Cabbage Patch head in the fall or summer

23  of 2000.  Is that an adequate explanation as to -- I mean,

24  Prayer Angel heads weren't available, and we had an invoice

25  which refers to Prayer Angel.  There was a whole question

1  about what is that.  There was testimony from Anna Rhee and

2  others.  I think there's a Cabbage Patch doll in evidence and

3  a Prayer Angel doll in evidence.  They were part of the story

4  about the development of Bratz, and there was testimony on

5  that.

6        These may be, you know, My Scene in particular is

7  going to be relevant to Phase 2.  I don't even think it's

8  relevant to Phase 1-B.  This one is a 2004 doll.  I mean,

9  that's what the date is on it.

10        It's not relevant to any issue in this case.  I

11  mean, what I'm hearing is there's really no harm.  There

12  should be a complete set of all the dolls that have ever been

13  referred to.

14        I think there is harm.

15        THE COURT:  Let me -- articulate that harm.  I'm

16  trying to get an articulated reason for either putting them

17  in or not putting them in.  Can you articulate a reason for

18  not putting them in?

19        MR. QUINN:  The Court knows that there are

20  contentions in this case and other claims which are not part

21  of this phase that My Scene is a knock-off of Bratz.  And

22  they point to certain features about the eyes in particular,

23  which are called out.  And you know, I think putting this

24  into evidence invites the jury to sort of speculate about

25  that and go off in directions which really aren't relevant to

1  this phase.   There has been no testimony about these

2  particular dolls.

3           THE COURT:   Anything else?

4           MR. QUINN:   Nothing, your Honor.

5           THE COURT:   Very well.   Okay.   I'll make a decision

6  on that on Monday when I'm not so tired.

7           And, Ms. Aguiar, if you're half as tired as I am,

8  you may need some sleep as well.   If you can come up with an

9  articulable reason as to why these dolls should come in, I'll

10  consider that on Monday.

11           MS. AGUIAR:   Fair enough.

12           THE COURT:   All right.   As it stands right now, I

13  don't see a justification at all for admitting them.   But if

14  there is a reason, I'll give you leave to bring that up.   The

15  expert reports, someone needs leave to file an expert report

16  for Phase 1-A?   Or 1-B?

17           MR. NOLAN:   Yes, I understand this has been the

18  subject of discussions with Mattel.   They know that we were

19  going to be -- we've had a supplemental report ready to go.

20  There were discussions.   We just need leave of the Court to

21  ask permission to file it.   It has to do with potential

22  damages in 1-B.

23           THE COURT:   Is there any objection to it being

24  filed?

25           MR. ZELLER:   No objection to them seeking leave.   I

1    don't know the details because I haven't been part of this

2    conversation, but I do understand we have some substantive

3    issues with what is being requested.

4              THE COURT:  Very good.

5              MR. ZELLER:  But the leave part is fine with us.

6              THE COURT:  If all you're seeking is permission to

7    seek leave to file, that's -- sure, and just to refresh,

8    Magistrate Infante had allowed a 30(b)(6) witness to be

9    taken.  It was actually taken either during the course of the

10   trial or immediately before, having to do with damages.  It

11   was a supplemental.  And that's why we had to add that

12   information out to the report.

13             THE COURT:  All right.

14             MR. NOLAN:  So we can file the motion for leave?

15             THE COURT:  Yes.  All right.  I think that wraps up

16   the list.  I know there's a few other exhibits.

17             And, Ms. Aguiar, I'll take those up on Monday after

18   we go through the jury instructions and the verdict form.

19   10:00 Monday, we will deal with the Carter Bryant issue.

20   Three o'clock we'll deal with jury instructions, verdict

21   form, and exhibits.  We will hear on Tuesday morning from --

22   not necessarily in this order -- Custodian of Records, Jeanne

23   Galvano, and the stipulation on Exhibit 472.

24             MS. AGUIAR:  Great.  I was just wondering, your

25   Honor, about one thing.  We are going to be filing our

1    judgment as a matter of law.  Were you hoping to take that

2    with you?  Did you want us to somehow --

3              THE COURT:  Do you have it done?

4              MS. AGUIAR:  Not right this minute, but we may have

5    it soon.  So not to get into your schedule too much, but how

6    long are you going to be here?

7              THE COURT:  I'll be here until 7:00.

8              MS. AGUIAR:  Okay.  And the same thing would be

9    true for the jury instructions.  We're making sure, and your

10   law clerk asked us to do that.

11             THE COURT:  I'm take all of those home with me this

12   evening.

13             MS. AGUIAR:  One last question regarding

14   scheduling.  Was your Honor anticipating that if everybody

15   rests on Tuesday, that we would run right Wednesday morning

16   into closing, or were you thinking -- or were you thinking a

17   day in between or what?

18             THE COURT:  We need to start on Wednesday.  I'm

19   pushing up against some commitments at the end of the month

20   of July.  I want this to move along here.  I don't know how

21   long the jury is going to take to deliberate.  So that's

22   something he can't say.  But we need to --

23             MR. NOLAN:  Your Honor, if we finish -- we'll have

24   the charging conference on Monday.  And if we finish Tuesday

25   morning, and let's assume, and now that we've seen the

1    declaration, we're going to have, I think, a vigorous

2    opposition as to why this wasn't dealt with in the case, in

3    their case in chief, because it's Jewel Barbie and Rainy Day

4    Rascals.  And I'm tired, but I think I remember hearing about

5    that in the case in chief.

6            But my question is this, your Honor.  If we finish

7    Tuesday morning, would it be the Court's intention to

8    instruct the jury Tuesday afternoon, and would we start --

9            THE COURT:  I don't think so.  What I'd like to do

10   is Wednesday, you know, fresh, give the instructions,

11   probably take an hour, hour and a half to get through the

12   instructions and the verdict form.  And counsel -- we are

13   going to get through closings all on one day.  So I say that

14   before I ask this, but what are your estimates on closing

15   arguments at this point?

16           MR. QUINN:  Can we give that on Monday, your Honor?

17           THE COURT:  You can.  But be mindful of the Court's

18   statement.  We will be getting through closings in one day.

19           MR. QUINN:  Right.  Understood.

20           THE COURT:  I'm not going to have --

21           MR. QUINN:  I assume one day meaning a day ending

22   at 5:00 P.M.

23           THE COURT:  Right.

24           MR. NOLAN:  And as sarcastic as this may sound,

25   it's the Irish and being tired, that's closing arguments from

 1  both of them.

 2            THE COURT:  Right.

 3            MS. AGUIAR:  One thing I forgot, and I apologize.

 4  With regard to the judgment as a matter of law, we are filing

 5  it, obviously, before Mattel has its rebuttal.  And I think

 6  this probably goes without saying, but whatever is in our

 7  motion will not be the subject of testimony by Mattel in its

 8  rebuttal case.  Because obviously, we're pretty much done.

 9  They know what our case is now.  It's a video, and it doesn't

10  have to do with their motion.  So I --

11            THE COURT:  They have identified what they are

12  calling their rebuttal witness for.

13            MS. AGUIAR:  Right.

14            THE COURT:  And you have that.  So worst case

15  scenario from your perspective is that that subject matter

16  comes in, but nothing beyond that.  So given what you've

17  indicated that the JMOL is on, that should be fine.

18            The only thing is if you're getting Mr. Bryant out

19  here on Tuesday -- and I'm not saying if he is or if he is

20  not -- but if he is, we need to make sure he's out here early

21  Tuesday morning.  Because it doesn't sound like there's going

22  to be a lot to do Tuesday.  How long is Jeanne Galvano?

23            MR. NOLAN:  An hour and two minutes.

24            THE COURT:  Okay.  And then the Custodian of

25  Records, probably a half hour or so.

1          MR. NOLAN:  With as much knowledge as they probably

2    have, maybe two hours.  I don't know.  No, I think you're

3    right.  A half hour would be generous.

4          THE COURT:  All right.  So very good.  I'm just

5    starting to think, if we are -- if we did get through the

6    jury instructions on Monday afternoon and we finish up early

7    enough on Tuesday, maybe I might instruct on Tuesday

8    afternoon so that we can start with the closing argument

9    first thing Wednesday morning.  I wouldn't start with closing

10   arguments any earlier than Wednesday morning.  But maybe it

11   might make sense.

12         Let's just see how we do.  We may need some more

13   time on Tuesday afternoon to finish up our charging

14   instruction, but let's see how that plays out.  But in any

15   event, closing arguments for Wednesday.

16         I'm getting a note.  See, you guys get notes all

17   the time.  I get them, too.

18         Anything else?

19         MR. QUINN:  No, your Honor.

20         MR. NOLAN:  No, your Honor.

21         THE COURT:  Getting back to this issue that I'm

22   concerned about about Carter Bryant getting out here, what I

23   don't want to do is if the Court does find in favor of Mattel

24   on that point, I don't want this to be an issue of having to

25   put the trial off another day to get him out here.

1          So I think perhaps what Mattel should do is arrange

2   to have a ticket for Mr. Bryant to come out here so that that

3   does not become an issue.  So that on Monday, if the Court

4   were to find some Mattel's favor, that we're scrambling

5   around and not have to continue the matter to another day.

6          MR. QUINN:  We will do that, your Honor.

7          THE COURT:  I'm sorry?

8          MR. QUINN:  We will do that.

9          THE COURT:  Very well.  That's a good suggestion.

10          MR. NOLAN:  Your Honor, they have a plane.

11          THE COURT:  I'm sorry?

12          MR. NOLAN:  They have a plane.  I know that from

13   taking the deposition of --

14          THE COURT:  Very good.  The last point I want to

15   make is that I know we're all getting -- we've been in trial

16   now seven weeks, and I say this to no one in particular and

17   everyone in general, including myself.  We've got to be

18   mindful of our tone and respect for everyone involved.  So

19   let's keep that in mind, particularly as we head into next

20   week.  Let's all have a good weekend.

21          Get some rest -- some rest, anyway -- and a Happy

22   Independence Day to everyone, and I will see you on Monday at

23   10:00.

24          MR. QUINN:  I'm sorry.  Your Honor, the time count?

25          THE COURT:  MGA is right at 37 1/2 hours.  And

1    Mattel is at 46 hours and 45 minutes.

2              MR. QUINN:  Thank you, your Honor.

3              THE COURT:  Approximately.

4              MR. NOLAN:  Your Honor, have a great weekend.

5              THE COURT:  You too.  Take care.

6

7              (Proceedings concluded at 6:10 P.M.)

8

9                   C E R T I F I C A T E

10

11

12              I hereby certify that pursuant to Title 28,

13   Section 753 United States Code, the foregoing is a true and

14   correct transcript of the stenographically reported

15   proceedings in the above matter.

16              Certified on July 3, 2008.

17

18              _____

19              **MARK SCHWEITZER, CSR, RPR, CRR**
                Official Court Reporter
20              License No. 10514

21

22

23

24

25