```
 1   TIME RESTRICTION IN THIS CASE.  WE MADE THE DECISION THAT ALL
 2   YOU NEEDED TO DO WAS HEAR ANOTHER TWO LAWYERS TALK.  YOU HAVE
 3   THE CONTRACT.  YOU HAVE THE CONTRACT IN EVIDENCE.  AND IN THAT
 4   CONTRACT, THERE ARE REPS AND WARRANTIES THAT WERE MADE TO US --
 5   THIS IS ON TRIAL EXHIBIT 15, PAGE 3 TO 4 -- REPS AND            03:36
 6   WARRANTIES.  CARTER BRYANT IS TELLING US, REPRESENTING TO US,
 7   THROUGH THE LAWYERS, THAT HE HAS THE RIGHT AND IS FREE TO
 8   EXECUTE THIS AGREEMENT TO GRANT THE RIGHTS GRANTED BY HIM TO
 9   MGA.  "NEITHER THE EXECUTION AND DELIVERY OF THIS AGREEMENT,
10   NOR THE PERFORMANCE BY BRYANT OF ANY OF HIS OBLIGATIONS         03:36
11   HEREUNDER, WILL CONSTITUTE A VIOLATION OR DEFAULT UNDER ANY
12   AGREEMENT.  THE BRYANT WORK PRODUCT SHALL BE FREE OF ALL LIENS
13   AND THERE WILL BE NO CLAIMS, DEMANDS, OR ACTIONS PENDING OR
14   THREATENED WITH RESPECT THERETO; AND THAT THE BRYANT WORK
15   PRODUCT IS ORIGINAL AND NO PART THEREOF INFRINGES OR SHALL      03:36
16   INFRINGE ON ANY COMMON LAW OR STATUTORY RIGHTS OR INTELLECTUAL
17   PROPERTY RIGHTS OF ANY THIRD PARTY, INCLUDING, WITHOUT
18   LIMITATION, CONTRACTUAL RIGHTS..."
19           "HE SHALL COMPLY WITH ALL LAWS.  HE SHALL INDEMNIFY
20   AND HOLD MGA HARMLESS FROM AND ASSIST AGAINST AND ALL CLAIMS,   03:37
21   LOSSES, COSTS, AND JUDGMENTS."
22           WE DID WHAT EVERY COMPANY DOES.
23           MATTEL -- YOU HEARD ME ASK MR. KILPIN THE SAME
24   QUESTIONS.  WHEN YOU'RE DEALING WITH AN INVENTOR, YOU GET WITH
25   THE LEGAL DEPARTMENT.  MGA DIDN'T HAVE A LEGAL DEPARTMENT,      03:37
```

1   PER SE.  THEY HAD OUTSIDE COUNSEL TO DEAL WITH THIS.  THIS IS A

2   LEGALLY-DRAFTED DOCUMENT.

3           I WANT TO TURN TO THE LAST PAGE OF THIS DOCUMENT.

4           THIS IS THE CONTRACT YOU'VE HEARD SO MUCH ABOUT; THIS

5   ALLEGATION THAT WE WHITED OUT, SEPTEMBER 18, 2000.                      03:37

6           DO YOU SEE THAT?  AND THEN ON THE RIGHT-HAND SIDE,

7   THE WHOLE IDEA OF WHITING OUT THE STUFF ON THESE CONTRACTS.

8           THERE IS NO DOUBT THERE WAS NO EFFORT TO TRY TO

9   CONCEAL THAT CARTER BRYANT HAD SIGNED THE CONTRACT WHILE HE WAS

10  AT MATTEL.  IT'S SIGNED AND DATED AS OCTOBER 4TH.                       03:38

11          BOTTOM LINE, THE FOOTER, IT'S DATED OCTOBER 4TH.  THE

12  DAY HE SIGNS THE CONTRACT, THERE'S NO DOUBT, WE'RE NOT TRYING

13  TO CONCEAL THE FACT HE SIGNS IT ON A DIFFERENT DATE.

14          WHY SEPTEMBER 18TH WAS NOT INCLUDED ON THE COPY THAT

15  WAS SENT TO PATTY GLASER, ISAAC LARIAN'S LONG-TIME ATTORNEY, WE         03:38

16  DON'T KNOW.  BUT IT DOESN'T MAKE ANY SENSE IF ALL THE OTHER

17  COPIES -- AND THEY'RE PRODUCED -- LOOK IN THE FILES BACK THERE;

18  LOOK AT THIS EXHIBIT; MGA PRODUCED A COPY OF THIS VERY

19  AGREEMENT WITH SEPTEMBER 18TH ON IT.

20          I HAVE NO EXPLANATION FOR THAT.  BUT I WILL SUBMIT            03:38

21  THIS:  IT DOESN'T MAKE ANY SENSE.  THERE'S NOTHING TO BE DRAWN

22  FROM IT.  BUT IT'S ALL PART OF THE CONSPIRACY.

23          IF WE WERE TRYING TO CONCEAL ANY OF THIS, WE WOULD

24  HAVE, I SUPPOSE, ERASED OUT -- OH, MY GOSH, THE FOOTER, WE

25  BETTER TAKE THAT OUT, BECAUSE THAT SAYS OCTOBER 4TH, AND WE             03:3

1   BETTER TAKE OFF THE FAX LINE THAT SAYS OCTOBER 4TH, THAT IT WAS

2   SIGNED BY ISAAC LARIAN.

3            LET'S TALK ABOUT CONCEALMENT.

4            BEFORE I GO THERE, ONE OTHER THING.

5            YOU KNOW WHAT, THERE IS NOT A SHRED OF EVIDENCE THAT          03:39

6   WE KNEW THAT CARTER BRYANT APPROACHED ANYBODY AT MATTEL TO FACE

7   PAINT.

8            WE DID NOT KNOW AND DID NOT ASK HIM TO GO TO A FACE

9   PAINTER AND PAINT SOMETHING.  WE DID NOT KNOW HE WAS GOING TO A

10  FRIEND TO GET HAIR ROOTING DONE ON A PROTOTYPE DOLL THAT WAS         03:39

11  NEVER USED, AND NOBODY REALLY LIKED IT, APPARENTLY, EXCEPT

12  VICTORIA O'CONNOR.  BUT WE KNOW SHE WAS FIRED BY MGA.  SO WAS

13  SHE BIASED?  SHE'S THE ONLY ONE WHO THOUGHT THIS DOLL MEANT

14  ANYTHING.

15           YOU SAW THAT TESTIMONY IN THEIR CLOSING ARGUMENT.           03:3

16           WE DID NOT KNOW ABOUT THE LETTER GOING TO UNIVERSAL

17  ABOUT THE HAIR.  WE CANNOT BE BLAMED FOR SOMETHING, LADIES AND

18  GENTLEMEN, WE DID NOT DIRECT OR ASK HIM TO DO.

19           WE DID NOT AUTHORIZE HIM TO SAY THAT HE WAS WORKING

20  FOR OR WITH US.  HE WASN'T.                                         03:4

21           ANOTHER PIECE OF EVIDENCE -- AND I THINK THIS WAS

22  INTERESTING -- YOU'LL HAVE THESE PHONE RECORDS.  WE MOVED THEM

23  IN.  MR. PRICE, A LOT OF QUESTIONS, A LOT OF PHONE CALLS, YOU

24  RECALL CONSTANTLY, EVERY DAY, YOU WERE ON THE PHONE, AND THEN

25  YOU GOT AN E-MAIL FROM PAULA TREANTAFELLES GARCIA, SAYING FOUR       03:4

```
 1   HOURS A DAY; HE HAD BEEN WORKING FOUR HOURS A DAY DURING THIS
 2   PERIOD OF TIME.
 3            YOU KNOW WHAT, LADIES AND GENTLEMEN?  IT'S TRUE.
 4            DID MGA MAKE TYPOGRAPHICAL ERRORS?
 5            YES.                                                    03:40
 6            THAT MANY?
 7            I DON'T KNOW.  BUT ONE THING FOR SURE, MATTEL, WITH
 8   ITS MACHINE, FOUND EVERY SINGLE ONE OF THEM.  THERE'S NO DOUBT
 9   ABOUT THAT.  DOES THAT ADD UP TO CRIMINAL, ILLEGAL, AS
10   MR. QUINN DESCRIBED IT, CONSPIRACY OF CONCEALMENT?              03:40
11            I RESPECTFULLY SUBMIT NOT.  I RESPECTFULLY SUBMIT
12   THAT'S NOT THE CASE AT ALL.
13            BUT YOU KNOW WHAT?  I'M NOT SAYING THAT MR. BRYANT
14   DIDN'T USE POOR JUDGMENT.  I'M NOT GOING TO PASS JUDGMENT ON
15   HIM.  NOR ARE YOU.  HE'S NOT A PARTY TO THIS CASE.  IF THAT     03:41
16   ISSUE WAS DEALT WITH, IT WAS DEALT WITH BY MATTEL AND HIM.
17            WE DID NOT KNOW IT.
18            WE SIGNED ON THE DOTTED LINE ON OCTOBER 4TH AND
19   THOUGHT HE HAD RESIGNED.  WE DID NOT ENCOURAGE A BREACH OF
20   LOYALTY.  WE DID NOT ENCOURAGE BREACH OF FIDUCIARY DUTY.  HE    03:41
21   HAD ALREADY, A YEAR BEFORE, THOUGHT ABOUT SELLING HIS IDEAS
22   ABOUT BRATZ.  WE'RE NOT PART OF THAT, LADIES AND GENTLEMEN.
23   WHEN YOU GET TO THE CONTRACT CLAIM HERE --
24            LET'S GO BACK TO THE VERDICT FORM WHILE WE'RE DOING
25   THAT.  I DROPPED MY THOUGHT -- I TALKED TO YOU ABOUT THE PHONE  03:42
```

| | |
|---|---|
| 1 | RECORDS.  PHONE CALL AFTER PHONE CALL AFTER PHONE CALL.  YOU'RE | |
| 2 | GOING TO SEE THEM.  IF I ADDED THIS UP RIGHT LAST NIGHT, IN THE | |
| 3 | ENTIRE MONTH OF SEPTEMBER, I THINK IT'S 47 MINUTES, THE LONGEST | |
| 4 | PHONE CALL IS, I BELIEVE -- ONE PHONE CALL, I THINK IT TOOK 11 | |
| 5 | MINUTES.  ALL OF THE REST OF THEM ARE ABOUT A MINUTE, MINUTE | 03:42 |
| 6 | AND A HALF.  THEY ARE STATED IN SECONDS, SO YOU CAN TELL. | |
| 7 | BUT WHEN MR. QUINN THREW AWAY THE BACK OF HIS HAND, | |
| 8 | "IT DOESN'T TAKE LONG WHEN YOU'RE TALKING TO YOUR BOSS..." | |
| 9 | THERE WAS NO EMPLOYMENT AGREEMENT.  THERE WAS NO CONSULTING | |
| 10 | AGREEMENT. | 03:42 |
| 11 | YOU KNOW WHAT WAS THERE? | |
| 12 | YOU KNOW, WHEN YOU THINK ABOUT THAT PITCH MEETING, IT | |
| 13 | WAS A GUY GOD BLESSED WITH A LOT OF ARTISTIC TALENT, WHO, | |
| 14 | FRANKLY, ALTHOUGH A GOOD EMPLOYEE, WANTED TO BRANCH OUT FROM | |
| 15 | BARBIE.  HE SIMPLY WANTED HIS OWN LIFE, HIS OWN FREELANCING. | 03:43 |
| 16 | HE LIKED HIS IDEA AND HIS CONCEPT.  HE HOOKED UP WITH VERONICA | |
| 17 | MARLOW.  SHE TOLD HIM ABOUT MGA.  WE DIDN'T GO OUT AND REACH | |
| 18 | HIM.  THIS IDEA THAT WE WERE SOME START-UP COMPANY, NO TALENT, | |
| 19 | AND WE HAD TO GO OUT AND STEAL FROM THE MIGHTY MATTEL TO GET | |
| 20 | THIS DESIGN IS BUNK, AND IT'S A DISSERVICE TO ALL OF THE HARD | 03:4: |
| 21 | WORK OF ISAAC LARIAN, AND, YES, EVEN FARHAD, HIS BROTHER, WHO | |
| 22 | WAS PART OF THE BUSINESS FROM THE BEGINNING.  AND IT'S A | |
| 23 | DISSERVICE TO ALL OF THE EMPLOYEES OF MGA WHO, UP UNTIL THE | |
| 24 | TIME OF SEPTEMBER 1ST, HAD ISSUED AND MANUFACTURED AND DESIGNED | |
| 25 | AWARD-WINNING DOLLS.  BUT IN ORDER FOR MATTEL TO MAKE THEIR | 03:4 |

```
 1   STORY WORK, THEY HAVE TO PUSH MGA DOWN.  THEY HAVE TO REMIND

 2   YOU THAT THEY HAVE FILED BANKRUPTCY.

 3        YOU KNOW WHY THEY FILED BANKRUPTCY.  THEY TOOK A

 4   DEFAULT ACTION IN TEXAS.  THEY HAD TO HAVE THAT SET ASIDE

 5   BECAUSE FARHAD HAD NOT ANSWERED THE COMPLAINT IN A TIMELY        03:44

 6   FASHION.  IT'S AS SIMPLE AS THAT.  BUT YET, THE PICTURE WAS

 7   PAINTED THAT WE WERE DESPERATE AND WE HAD TO REACH OUT FOR

 8   MATTEL IN THE YEAR 2000 BECAUSE WE DIDN'T HAVE THE DESIGN.

 9        WELL, WHEN YOU THINK ABOUT THAT ARGUMENT, LADIES AND

10   GENTLEMEN, REMEMBER THE TESTIMONY OF MR. ECKERT WITH RESPECT TO  03:44

11   WHAT HE FOUND IN THE SAME TIME PERIOD, SAME YEAR, 2000, WHEN WE

12   WERE SUPPOSED TO BE STEALING THE DESIGNS.

13        I ASKED MR. ECKERT -- REMEMBER -- FIRST IMPRESSION,

14   'MR. ECKERT, DID YOU SEE ANY SURVEYS?'

15        'YES, I DID.  I WAS QUITE IMPRESSED BY THEM.'              03:44

16        'WHAT IMPRESSED YOU?'

17        'WELL, THERE WAS A GOOD RESPONSE RATE.  AND THE

18   PEOPLE WERE COMMITTED TO MATTEL.'

19        MR. NOLAN:  THAT'S WHAT HE SAID.  BUT WHEN WE PUSHED

20   ON THAT AND WE SAID, 'OH, THAT'S INTERESTING.  LET'S LOOK AT    03:45

21   WHAT YOU WROTE IN OTHER PUBLICATIONS DESCRIBING HOW YOU

22   PERCEIVED MATTEL WHEN YOU WENT THERE...' -- BECAUSE REMEMBER,

23   WITH IVY ROSS, IT WAS BLUE SKIES FOR EVERYBODY; IT WAS

24   COLLABORATIVE.

25        QUESTION:  "MR. ECKERT, CEO, I SHOW HIM THE HARVARD        03:45
```

1  BUSINESS REVIEW.

2          "LIKE ANY NEW CEO WHO WALKS INTO A STRUGGLING

3  COMPANY, I WAS FACING UNREALISTIC EXPECTATIONS FROM ALL KINDS

4  OF PEOPLE WHO HAD NEVER MET ME.  NOT JUST WALL STREET ANALYSTS

5  AND CUSTOMERS, BUT ALSO MATTEL EMPLOYEES AROUND THE WORLD.'        03:45

6          "THAT'S HOW YOU FELT WHEN YOU TOOK THIS JOB; RIGHT?"

7          ANSWER:  "YES."

8          NEXT SLIDE, PLEASE.

9          QUESTION:  "SO IT'S TRUE THAT WHEN YOU CAME TO

10  MATTEL, YOU KNEW AND FOUND THAT YOU NEEDED TO FOCUS ON           03:45

11  CREATIVITY AT MATTEL; CORRECT?"

12          ANSWER:  "YES."

13          NEXT SLIDE.

14          QUESTION:  "MATTEL HAD LOST ITS FOCUS.  IT WAS LOSING

15  UP TO $1 MILLION A DAY ON THE LEARNING COMPANY, A SOFTWARE FIRM   03:46

16  ACQUIRED DURING MY PREDECESSOR'S REIGN.  MATTEL WAS BORROWING

17  MONEY TO STAY AFLOAT.  MORALE WAS AT AN ALL-TIME LOW, AND THE

18  STOCK PRICE WASN'T FAR BEHIND.  MATTEL NO LONGER KNEW WHAT IT

19  WAS OR WHAT IT STOOD FOR.  IT WAS TIME TO REFOCUS.  THAT'S HOW

20  YOU FELT WHEN YOU TOOK THIS JOB; RIGHT?"                         03:46

21          ANSWER:  "YES."

22          NEXT SLIDE.

23          QUESTION:  "YOU SAID THAT YOU WOULDN'T AGREE WITH MY

24  TERM 'STRUGGLE.'  USE YOUR OWN WORDS TO DESCRIBE BARBIE BRAND

25  IN 2000, 2001, WHEN YOU GOT THERE."                              03:46

1    ANSWER: "I BELIEVE THAT BARBIE SALES WERE DECLINING

2  IN THE U.S. IN 2000 AND 2001."

3    MR. NOLAN: LET'S GO TO IVY ROSS, FIRST WITNESS,

4  FORMER HEAD OF THE GIRLS' DIVISION AT MATTEL.

5    QUESTION: "MS. ROSS, BY THE TIME YOU LEFT BARBIE                              03:47

6  TOWARD THE END OF 2003, IT'S TRUE THAT BARBIE HAD LOST

7  SIGNIFICANT MARKET SHARE TO BRATZ; CORRECT?"

8    ANSWER: "I DON'T KNOW IF I WOULD USE THE WORD

9  'SIGNIFICANT.' IT DEFINITELY LOST SOME MARKET SHARE TO BRATZ."

10   QUESTION: "WAS IT A CONCERN WITHIN MATTEL?"                                   03:47

11   ANSWER: "IT WAS SOMETHING WE WERE ALL AWARE OF, LIKE

12  WE WERE AWARE OF THE COMPETING ISSUES, FIGHTING FOR MARKET

13  SHARE, SO WE WERE CONCERNED, YES."

14   MR. NOLAN: THIS CASE, LADIES AND GENTLEMEN, IS ABOUT

15  COMPETITION.                                                                  03:47

16   BUT THE LAST SERIES OF CHARTS -- WE TALKED ABOUT

17  MOTHERS AND WHETHER OR NOT THEY WOULD LIE, AND WE TALKED ABOUT

18  JANET BRYANT. SHE WAS ACCURATE AND HONEST. I DID DRAW FROM A

19  COMMENT THAT I USED TO BE TOLD GROWING UP BY MY OWN MOTHER:

20  PEOPLE WHO LIVE IN GLASS HOUSES SHOULDN'T THROW ROCKS.                        03:47

21   MATTEL HAS NO RIGHT, NO BUSINESS, IN THIS COURTROOM,

22  TO DISPARAGE THE ASPIRATIONS OF THE EMPLOYEES OF MGA AND MAKE

23  IT APPEAR TO YOU THAT THEY COULD NOT SHOOT STRAIGHT AND THEY

24  COULD NOT DESIGN A DOLL ON ITS OWN. IT WAS HARD WORK. IT TOOK

25  A LOT OF DEDICATION. AND THEY DID IT.                                         03:4

```
 1           THE LAST POINT I WANT TO GO TO, VERY LAST POINT,
 2    BECAUSE I HAVE -- I THINK I HAVE ABOUT TEN MINUTES, YOUR HONOR.
 3           THE COURT:  YOU HAVE 20 MINUTES, COUNSEL.
 4           MR. NOLAN:  CAN YOU PUT UP THE TIMELINE ON THE
 5    CONCEALMENT SOURCE.
 6           SPENT A LOT OF TIME ON NEWSPAPER ARTICLES.  WE WERE
 7    SUPPOSED TO HAVE CONCEALED CARTER BRYANT'S INVOLVEMENT.  NOT
 8    TRUE, LADIES AND GENTLEMEN.  THE LARGEST DISTRIBUTION BUSINESS
 9    MAGAZINE, NEWSPAPER ARTICLE, WALL STREET JOURNAL, WE DISCLOSED
10    CARTER BRYANT'S IDEA.
11           BUT YOU KNOW WHAT'S INTERESTING?  THEY WENT
12    AFTERWARDS -- I DON'T KNOW IF YOU NOTICED THIS; YOU'LL SEE IT
13    IN THE EVIDENCE -- AFTER WE DISCLOSED IN THE WALL STREET
14    JOURNAL ARTICLE CARTER BRYANT'S NAME, THEY ARE STILL CITING TO
15    YOU EVIDENCE IN THE BUSINESSWEEK, CHICAGO SUN-TIMES,
16    SAN FERNANDO VALLEY BUSINESS JOURNAL, MISSTATEMENTS, MISQUOTES,
17    TYPOGRAPHICAL ERRORS AS ALLEGATIONS OF CONCEALMENT.
18           GIVE ME A BREAK.  IT DOESN'T EXIST.
19           LET'S GO TO THE VERDICT FORM.
20           I'D LIKE TO GO TO QUESTION ONE.
21           ONE LAST PIECE ON THE CONCEALMENT ISSUE.
22           CAN I ASK FOR EXHIBIT 2006 FOR A MOMENT.
23           WHEN YOU'RE TALKING ABOUT THE QUALITY OF EVIDENCE AND
24    THE PROOF OF THE CONCEALMENT -- AND MR. QUINN EVEN DID THIS IN
25    HIS ARGUMENT TODAY -- THIS IS THE DOCUMENT, INTERNAL TO MGA,
```

03:48
03:48
03:49
03:49
03:50

1   THAT AFTER CARTER BRYANT'S NAME AND ANNA RHEE'S NAME, IT SAYS

2   "DON'T ASK."

3            DO YOU SEE THAT?  "DON'T ASK."

4            GO TO THE DATE, PLEASE, AARON.

5            THE DATE OF THE DOCUMENT IS 4-20-2006, 2006.  THE          03:5C

6   LAWSUIT HAS ALREADY BEEN FILED.  WHAT ARE WE CONCEALING?

7            DAPHNE GRONICH, GENERAL COUNSEL, WHO WAS AWARE OF THE

8   PREPARATION OF THIS DOCUMENT, CAME IN AND TOLD YOU THIS WAS IN

9   RESPONSE TO A REQUEST FOR DISCOVERY.  THEY WERE DOING THINGS

10  INTERNALLY. AND BECAUSE CARTER HAD HIS OWN LAWYER -- AND          03:5C

11  ANNA RHEE WAS ALSO REPRESENTED BY COUNSEL NOT CONNECTED TO

12  MGA -- THE POINT WAS, "DON'T ASK THEM FOR INFORMATION.  DON'T

13  CALL THEM DIRECTLY."

14           IT'S A SIMPLE AS THAT, LADIES AND GENTLEMEN.

15           AND YET, MR. QUINN AND MATTEL, WITH ALL ITS FANFARE,     03:5C

16  SAYS, 'THEY'RE EVEN SAYING DON'T ASK.'

17           IN 2006, WHEN THIS LAWSUIT IS PUBLISHED AROUND THE

18  WORLD, WHERE CARTER BRYANT HAS BEEN IN LITIGATION FOR TWO

19  YEARS, THEY ARE TRYING TO RELY ON AN INTERNAL LEGAL DOCUMENT.

20           WHY?                                                      03:51

21           WHERE WAS SOMEONE FROM MATTEL ON JEWEL BARBIE?  WHY

22  DID CUNNINGHAM NOT DISCLOSE RAINY DAY RASCALS?

23           LET'S GO TO THE VERDICT FORM.

24           QUESTION NUMBER 1.  ALL OF THESE DOCUMENTS, ALL OF

25  THESE EXHIBITS, ALL OF THEM WERE PREPARED IN KIMBERLING CITY,     03:5:

1   MISSOURI, 1998. THEY WERE NOT CONCEIVED OR REDUCED, THAT IS,

2   CREATED, BY CARTER BRYANT, ALONE OR JOINTLY WITH OTHERS, DURING

3   THE PERIOD OF TIME HE WAS EMPLOYED BY MATTEL, JANUARY 4, 1999,

4   TO OCTOBER 19, 2000.

5              I RESPECTFULLY SUBMIT, THE EVIDENCE IS OVERWHELMING.    03:51

6   ALTHOUGH WE DIDN'T HAVE THE BURDEN, WE HAVE ESTABLISHED THAT.

7   BUT REMEMBER, IT WAS MATTEL'S BURDEN TO PROVE THAT THESE

8   DRAWINGS WERE DONE WHILE EMPLOYED BY MATTEL.

9              WHEN YOU HAVE THIS PORTFOLIO, QUESTION NUMBER 1,

10  TRIAL EXHIBITS, WITH ALL OF THE MASTER DRAWINGS OF BRATZ, THE    03:52

11  OVERWHELMING AMOUNT OF EVIDENCE IN THIS CASE ESTABLISHES THAT

12  EACH AND EVERY SINGLE ONE OF THEM WAS DONE BY CARTER BRYANT

13  WHILE NOT EMPLOYED AT MATTEL.

14             THE SECOND PORTFOLIO WILL BE A BUNCH OF TRIAL

15  EXHIBITS THAT CONTAIN COLORED DOCUMENTS, COLORED DRAWINGS, OF    03:5

16  THE BRATZ CHARACTERS; AND THE QUESTION THAT YOU WILL BE ASKED

17  ON THIS FORM IS WHETHER OR NOT CARTER BRYANT CONCEIVED OR

18  REDUCED TO PRACTICE, THAT IS, CREATED, BY CARTER BRYANT, ALONE

19  OR JOINTLY WITH OTHERS, DURING THE PERIOD OF EMPLOYMENT BY

20  MATTEL.                                                         03:5

21             IF YOU BELIEVE THAT THEY HAVE MET THEIR BURDEN ON

22  THAT, THAT HE COLORED THIS WHILE HE WAS EMPLOYED AT MATTEL,

23  THEN MATTEL OWNS IT. IT'S UP TO YOU TO DETERMINE WHETHER OR

24  NOT THEY MET THAT BURDEN.

25             IT'S COLOR.                                          03:5

```
 1          EACH ONE OF THESE DRAWINGS IN ANSWER TO QUESTION
 2   NUMBER 2, PORTFOLIO TWO, WERE CONCEIVED IN 1998, AND, BY THE
 3   USE OF A LIGHT BOX PROCESS, COPIED BY CARTER BRYANT.
 4          MR. PRICE:  THAT'S IMPROPER ARGUMENT.  HE'S SAYING
 5   THEY SHOULD CHECK "NO."                                        03:54
 6          THE COURT:  YOU'LL HAVE YOUR CHANCE.
 7          OVERRULED AT THIS TIME.
 8          MR. NOLAN:  THEN THERE'S A THIRD PORTFOLIO THAT
 9   YOU'LL BE ASKED TO IDENTIFY, AND THESE ARE DRAWINGS THAT ARE
10   REPRESENTED AND REFERENCED IN QUESTION NUMBER 3 ON THE VERDICT  03:54
11   FORM, AND THESE ARE WHETHER OR NOT THESE PARTICULAR DRAWINGS
12   WERE DONE -- "THAT THE ITEMS CONCEIVED OR REDUCED TO PRACTICE,
13   THAT IS, CREATED, BY CARTER BRYANT, ALONE OR JOINTLY WITH
14   OTHERS, DURING THE PERIOD IN WHICH HE WAS EMPLOYED BY MATTEL."
15          THESE ARE THE DRAWINGS THAT CARTER BRYANT TESTIFIED      03:54
16   TO THAT WERE DONE AFTER HE LEFT MATTEL.  MATTEL, I WOULD
17   RESPECTFULLY SUBMIT, HAS THE BURDEN TO PROVE THAT THESE
18   DRAWINGS -- HAD THE BURDEN BY COMPETENCE EVIDENCE TO PROVE THAT
19   THESE DRAWINGS WERE DONE, CREATED, WHILE EMPLOYED AT MATTEL.
20          WE BELIEVE THE EVIDENCE IS THAT THEY WERE NOT CREATED    03:55
21   WHILE EMPLOYED BY MATTEL; THAT THEY WERE NOT REDUCED TO
22   PRACTICE OR CREATED WHILE EMPLOYED AT MATTEL.
23          IN THE REMAINING MOMENTS, I JUST WOULD LIKE TO ADMIT
24   TO YOU THAT PEOPLE WORKED VERY HARD IN PROVIDING THE REST OF
25   THE STORY, DAY IN AND DAY OUT, TO TRY TO PRESENT THE EVIDENCE   03:56
```

1   IN AS CLEAR AND CONCISE A FASHION AS POSSIBLE.  AT THE END OF

2   EVERY CASE, YOU GET TO THE POINT WHERE YOU HAVE, THANKFULLY,

3   SAID EVERYTHING YOU CAN.  YOU'VE MADE EVERY ARGUMENT YOU COULD

4   POSSIBLY MAKE.  YOU'VE TRIED TO MAKE EVERY POINT THAT YOU HAVE

5   MADE OR WANTED TO MAKE.  AND ALL OF THE LONG HOURS OF                03:56

6   ORGANIZATION, THE LATE NIGHTS OF TRYING TO ORGANIZE THE

7   EXHIBITS, TO LOOK SOMEWHAT ORGANIZED BEFORE YOU, COMES TO A

8   POINT WHEN I SIT DOWN.

9           NOW, MATTEL, BECAUSE THEY HAVE THEIR BURDEN, GETS A

10  SECOND SHOT.  MR. PRICE NOW WILL GET UP TO ARGUE.  SOMEONE          03:56

11  ASKED ME -- I DON'T KNOW IF IT WAS MY DAUGHTER OR SOMEONE

12  ELSE -- IS THAT FAIR?  THEY GET TWO LAWYERS ARGUING AGAINST

13  YOU?  AND YOU KNOW -- AND I DON'T MEAN TO BE FLIP ABOUT THIS,

14  BECAUSE I HAVE THE GREATEST RESPECT FOR MR. QUINN AND

15  MR. PRICE.  BUT WITH RESPECT TO EVIDENCE, TWO TIMES ZERO EQUALS     03:57

16  ZERO.  NO MATTER HOW MANY TIMES THEY TRY TO MAKE AN ARGUMENT,

17  THE EVIDENCE IS NOT THERE.  THEY DID NOT MEET THEIR BURDEN.

18          IF SOMEONE MADE A MISTAKE ON IDENTIFYING AN EXHIBIT

19  OR A DRAWING, I RESPECTFULLY SUBMIT TO YOU -- REMEMBER WHAT I

20  SAID TO YOU, TEN YEARS FROM NOW, IF SOMEONE COMES UP AND ASKS       03:5

21  YOU, DO YOU REMEMBER SEEING THIS DRAWING OR THAT DRAWING, THIS

22  DRAWING OR THAT DRAWING?

23          GOD FORBID IT WOULD BE MR. ZELLER ASKING YOU THOSE

24  QUESTIONS, BECAUSE HE WOULD HAVE ABOUT 15 EXHIBITS.  I HAVE THE

25  GREATEST RESPECT FOR MR. ZELLER.  BUT YOU, TOO, MIGHT NOT NAIL      03:5

1    IT.  BUT WHAT YOU WOULD REMEMBER, WHAT YOU WOULD REMEMBER FROM

2    THIS CASE, IS THAT CARTER BRYANT CONCEIVED THE IDEA OF FOUR

3    CHARACTERS; BRATZ.  HE DREW THEM IN KIMBERLING CITY, MISSOURI,

4    IN 1998.

5              LET'S GO BACK TO PORTFOLIO NUMBER ONE.          03:58

6              AARON, COULD YOU JUST HIGHLIGHT FOR THE JURY

7    EXHIBIT 62-15, 1152-1, 1152-2.

8              ONE OF THE POINTS I SHOULD MAKE IS, I WANT YOU TO

9    LOOK AT THESE NAMES WHEN YOU'RE TALKING ABOUT THE MASTER

10   DRAWINGS, THEIR NAMES; IT'S JADE, LUPE, ZOE, HALLIDAE.     03:59

11             WHEN YOU GO BACK AND YOU LOOK AT EACH ONE OF THESE,

12   YOU SEE THE ATTITUDE AND THE EXPRESSION IS ALL REFLECTED IN THE

13   MASTER DRAWINGS, AND EACH AND EVERY SINGLE ONE OF THESE

14   EXHIBITS DESERVES TO BE PUT IN THAT FIRST BUCKET AS BEING

15   CREATED NOT AT MATTEL, BUT IN KIMBERLING CITY, INCLUDING THE   03:59

16   ORIGINAL BRATZ DRAWING THAT HAD THE IMPRINT OF RAINY DAY

17   RASCALS BEHIND IT IN THE BLACK NOTEBOOK.

18             "MEET THE BRATZ.  THEY ARE FOUR COOL GIRLS FROM YOUR

19   SCHOOL, FOUR BEST FRIENDS, WITH TOTALLY TRANSFORMABLE LOOKS.

20   SIMPLY POP OFF THEIR HAIR AND SHOES AND TRADE FOR A NEW LOOK.   04:00

21   EACH DOLL COMES WITH TWO POP-OFF WIGS AND TWO PAIRS OF SHOES,

22   PLUS TWO HIP FASHIONS.  MEET ZOE, A/K/A ANGEL.  SHE'S THE QUEEN

23   OF THE CLASS IN HER SHORT DARK BROWN HAIR AND FUNKY-STOMPING

24   SNEAKS.  AT NIGHT, SHE LIKES TO GO LONG BLOND WITH A SKIRT AND

25   SANDALS, FOR A SWEETER LOOK."          04:01

1      "MEET LUPE, ALSO KNOWN AS PRINCESS. SHE'S THE

2  HISPANIC GIRL, WITH LOTS OF ATTITUDE. FOR SCHOOL, IT'S CASUAL,

3  IN WIDE-LEG KHAKIS AND A SWEATSHIRT, AND A FUN RED UPDO AT

4  NIGHT."

5      "MEET HALLIDAE, ALSO KNOWN AS HIP HOP."          04:01

6      "MEET JADE. SHE'S GOT THE LOCK ON FAR-OUT FASHION.

7  TWISTY BLACK HAIR WITH FUN BLUE STREAKS FOR SCHOOL ZONE AND FOR

8  TEARING UP WITH FRIENDS ON THE WEEKENDS. IT'S FANTASY TIME IN

9  LIGHT BLUE HAIR."

10     WITH RESPECT TO PORTFOLIO NUMBER TWO, THAT'S THE ONE     04:01

11 THAT HAS VARIOUS DATES IN 1999. MR. BRYANT EXPLAINED TO YOU

12 AND TESTIFIED AT LENGTH, AS I DID HERE FOR A FEW MOMENTS AT THE

13 LIGHT BOX, AS TO HOW HE CREATED EACH OF THOSE DRAWINGS BY

14 REFERENCE BACK TO THE MASTER DRAWINGS THAT HE DID IN 1998.

15 AGAIN, CONFIRMATION THAT THE MASTER DRAWINGS FOR THE CONCEPT OF     04:0:

16 BRATZ WAS IN 1998.

17     WHEN YOU SEE ON THIS QUESTION NUMBER 2, LINE 9, THE

18 VARIOUS EXHIBIT NUMBERS THAT FOLLOW IT -- A LOT OF TIMES IN

19 THIS CASE, YOU'LL KNOW THAT ONE DRAWING CAME IN WITH DIFFERENT

20 EXHIBIT NUMBERS. THAT'S JUST SIMPLY A GATHERING OF THE SAME     04:0.

21 DOCUMENT THAT HAS THE SAME EXHIBITS ON IT. SO MS. AGUIAR,

22 STANDING THERE, IS HOLDING UP COLOR VERSIONS THAT HAVE FASHIONS

23 THAT EXISTED IN 1998 AND NOW ARE COLORED IN IN 1999. IT WAS

24 MATTEL'S BURDEN, NOT OURS, TO PROVE TO YOU THAT THESE WERE

25 CONCEIVED AND/OR REDUCED TO PRACTICE, CREATED, AT MATTEL.     04:0

1    ON BEHALF OF MR. LARIAN AND HIS FAMILY, ALL OF THE

2  EMPLOYEES AT MGA, AND ALL OF THE LAWYERS THAT I HAVE BEEN

3  PRIVILEGED TO WORK WITH IN THIS CASE, I, WITHOUT ANY

4  HESITATION, GIVE YOU, HAND TO YOU, THE DEFENSE OF MGA.

5    MATTEL SHOULD NOT BE ALLOWED TO TAKE WHAT THEY DIDN'T    04:03

6  MAKE, WHAT THEY DIDN'T THINK OF, WHAT THEY DIDN'T DESIGN.

7    WE BRING YOU FROM BACKGROUNDS.  WE ASK YOU TO APPLY

8  YOUR COMMON SENSE.  AS THE LATE TIM RUSSERT SAID -- HE PASSED

9  AWAY DURING THE TRIAL, BUT HE HAD A SAYING OF 'WHAT A COUNTRY!'

10  WHAT A COUNTRY, RELYING ON YOU, TEN HONEST AND TRUE MEN AND    04:04

11  WOMEN, TO RENDER A FAIR VERDICT.  WE COME TO COURT SEEKING

12  JUSTICE.

13    THANK YOU VERY MUCH.

14    **THE COURT:**  THANK YOU, COUNSEL.

15    WE'LL TAKE OUR AFTERNOON BREAK AT THIS TIME, AND THEN    04:0

16  WE'LL RESUME.

17    (WHEREUPON, JURORS DEPART COURTROOM.)

18    (WHEREUPON, A BRIEF RECESS WAS HELD.)

19    (JURORS RE-ENTER COURTROOM.)

20    **THE COURT:**  COUNSEL, YOU MAY PROCEED.    04:1

21    **MR. PRICE:**  THANK YOU.

22    **FINAL CLOSING ARGUMENT - PLAINTIFFS**

23    **MR. PRICE:**  I WANT TO ADDRESS A FEW MANTRAS THAT YOU

24  HEARD DURING MR. NOLAN'S ARGUMENT, AND ONE WAS HOW MANY TIMES

25  DID YOU HEAR MR. NOLAN SAY MATTEL HAS THE BURDEN OF PROOF,    04:1

1    MATTEL HAS THE BURDEN OF PROOF.

2           WELL, MR. NOLAN AND I HAVE BOTH BEEN ON THE CRIMINAL

3    SIDE EARLIER IN OUR CAREERS, AND I THINK HE'S A LITTLE CONFUSED

4    HERE, BECAUSE THE INSTRUCTION ON BURDEN OF PROOF IN A CIVIL

5    CASE IS -- THAT INSTRUCTION IS A TIE BREAKER.                      04:15

6           WHAT BURDEN OF PROOF MEANS -- AND THE COURT HAS

7    INSTRUCTED YOU, AND WE CAN PUT THAT UP, IT'S INSTRUCTION NUMBER

8    TWO -- IS THAT IN CIVIL TRIALS, SUCH AS THIS ONE, "THE PARTIES

9    ARE REQUIRED TO PROVE SOMETHING BY A PREPONDERANCE OF THE

10   EVIDENCE NEED PROVE ONLY THAT IT IS MORE LIKELY TO BE TRUE THAN   04:16

11   NOT TRUE.  THAT IS, YOU NEED TO WEIGH THE EVIDENCE AND DECIDE

12   WHAT'S MORE LIKELY IS TRUE."

13          AND WHAT THE BURDEN OF PROOF KICKS IN IS IF, WHAT IF

14   IT'S A TIE?  WHAT IF YOU JUST CAN'T DECIDE WHICH SIDE IS MORE

15   LIKELY?  THEN MATTEL LOSES, BECAUSE THEN WE HAVE NOT SATISFIED    04:16

16   OUR BURDEN OF PROOF.

17          BUT THE QUESTION YOU NEED TO ASK ON THESE ISSUES

18   ISN'T 'WAS THIS PROVEN BEYOND A REASONABLE DOUBT?'  'DID ALL OF

19   THE WITNESSES COME IN IN THE WORLD THAT MIGHT HAVE?'

20          IT IS, 'GIVEN THE EVIDENCE YOU HEARD, WHAT DO YOU          04:1

21   THINK IS MORE LIKELY?'  AND IF YOU CAN ANSWER THAT QUESTION

22   EITHER WAY, YOU CAN COME TO A VERDICT.

23          NOW, IN DOING THAT, OF COURSE, IN WEIGHING THE

24   EVIDENCE, YOU HAVE TO ASSESS CREDIBILITY.  AND SO I WANT TO

25   ADDRESS SOMETHING ELSE THAT MR. NOLAN SAID, WHICH IS THAT         04:1

```
 1   MATTEL'S CALLING EVERYONE A LIAR.  AND THAT'S NOT TRUE.  WE'LL
 2   GET INTO THAT IN A SECOND.  BUT, YES, WE ARE SAYING CARTER
 3   BRYANT IS DISHONEST AND UNTRUTHFUL AND LIED.  WE'RE SAYING THAT
 4   PAULA GARCIA IS DISHONEST AND UNTRUTHFUL AND LIED.  WE'RE
 5   SAYING THAT MR. LARIAN WAS UNTRUTHFUL AS WELL.  YOU REMEMBER      04:17
 6   WHEN MR. QUINN GAVE YOU CHARACTER-DEFINING EXAMPLES ABOUT THAT
 7   DISHONESTY, BECAUSE THAT'S SOMETHING YOU MUST WEIGH.
 8        MR. NOLAN, AT LEAST WITH RESPECT TO MS. GARCIA AND
 9   MR. BRYANT, DIDN'T EVEN ATTEMPT TO TELL YOU THAT THEY WERE
10   BEING HONEST.                                                    04:17
11        SO, FOR EXAMPLE, REMEMBER MS. GARCIA -- PUT UP SLIDE
12   TEN -- YOU REMEMBER SHE SAID UNDER OATH, BEFORE YOU, THAT SHE
13   DIDN'T KNOW CARTER BRYANT WAS A MATTEL EMPLOYEE UNTIL SOME TIME
14   IN 2004.  AND MR. QUINN EXPLAINED WHY THAT WAS A CRITICAL
15   IMPORTANT LIE FOR MGA'S DEFENSE SO THEY COULD PRETEND WE DIDN'T  04:18
16   KNOW WHAT HIS OBLIGATIONS WERE UNDER HIS CONTRACTS.  BECAUSE
17   MS. GARCIA SAID SHE SIGNED THE SAME CONTRACTS AND SHE KNEW HIS
18   OBLIGATIONS.  NOT EVEN AN ATTEMPT TO DEFEND THAT ABSOLUTE
19   FALSEHOOD; DIDN'T EVEN TRY.
20        WITH RESPECT TO MR. BRYANT, DO YOU REMEMBER MR. QUINN       04:18
21   SHOWED YOU, I THINK IT WAS SLIDE 107.1, WHERE WE SHOWED HIM
22   THAT SEPTEMBER 8TH INVOICE AND WE ASKED HIM, WHERE IT SAYS --
23   NOT THE INVOICE, I'M SORRY, THE LETTER, WHERE IT SAYS "THE
24   COMPANY I'M WORKING WITH IS CALLED MGA ENTERTAINMENT," AND HE
25   SAID UNDER OATH, "I WASN'T TRYING TO GIVE THEM THE IMPRESSION    04:18
```

1   THAT I WORKED WITH MGA," AND HE SAID YOU COULD EVALUATE HIS

2   TESTIMONY ON THE TRUTHFULNESS OF THAT ANSWER.

3            WE'RE NOT ARGUING THAT.  HE TOLD YOU THAT UNDER OATH

4   THAT WAS SOMETHING YOU COULD LOOK AT TO SEE WHETHER OR NOT YOU

5   SHOULD TRUST HIM.                                                   04:19

6            HOW MANY TIMES IN HIS CLOSING DID MR. NOLAN SAY

7   'MR. BRYANT SAID'; 'MR. BRYANT SAID'; 'LOOK WHAT MR. BRYANT

8   SAID'?

9            WELL, I'M HERE TO TELL YOU WHATEVER MR. BRYANT SAYS,

10  YOU CANNOT TRUST.  YOU HAVE GOTTEN TO KNOW HIM FAIRLY WELL IN      04:19

11  THIS FIVE DAYS.  YOU'VE GOTTEN TO EVALUATE WHETHER OR NOT YOU

12  CAN TAKE HIS WORD ON ANYTHING.

13           DO YOU RECALL THAT IN MR. QUINN'S CLOSING, WE POINTED

14  OUT TO YOU HOW MR. BRYANT HAD PREVIOUSLY LIED UNDER OATH TO THE

15  U.S. PATENT OFFICE SO THAT MGA COULD GET A PATENT.  WE TOOK YOU    04:19

16  THROUGH ALL OF THAT.  AND HIS EXCUSES WERE 'I DIDN'T KNOW IT

17  WAS UNDER OATH...' -- EVEN THOUGH IT SAYS YOU CAN GO TO JAIL.

18  'I DIDN'T KNOW IT WAS THE PATENT OFFICE.'  YOU HEARD THAT

19  TESTIMONY.  YOU HEARD HIM TRY TO RUN FROM IT.  YOU HAVE BEEN

20  HERE AND BEEN ABLE TO EVALUATE HIS CREDIBILITY.                    04:19

21           AND ONE THING MR. NOLAN CANNOT DO IS GET UP HERE AND

22  ESTABLISH MR. BRYANT'S CREDIBILITY.  HE DIDN'T EVEN TRY.  ALL

23  HE COULD SAY IS 'THAT'S WHAT MR. BRYANT SAID'; 'THAT'S WHAT

24  MR. BRYANT SAID.'  WHENEVER YOU HEAR THAT IN YOUR MINDS WHEN

25  YOU ARE DELIBERATING, YOU SHOULD ASK YOURSELF, 'YES, BUT IS       04:20

1    THERE ANY PROOF OF IT?' BECAUSE THE MAN IS AN ADMITTED

2    PERJURER. THE MAN WILL LIE IF IT'S TO MGA'S BENEFIT AND TO HIS

3    OWN.

4         AND YOU HEARD MR. LARIAN, AND WE EXPLAINED HOW

5    MR. LARIAN SAID THAT AT NO TIME WAS HE TRYING TO HIDE CARTER          04:2C

6    BRYANT. WE SHOWED YOU THAT; WE SHOWED YOU THE DOCUMENTS WHICH

7    TALKED ABOUT HIDING CARTER BRYANT, AND WE SHOWED YOU MR. NOLAN

8    SAYING, WELL, AT TIMES HE WAS TRYING TO HIDE CARTER BRYANT

9    BECAUSE WE DIDN'T WANT PEOPLE TO KNOW THAT HE WORKED FOR US.'

10   AND MR. LARIAN SAID, WELL, YEAH, THERE WERE THOSE TIMES.            04:2C

11        AGAIN, IN EVALUATING THIS EVIDENCE, YOU'VE GOT TO

12   JUDGE THE CREDIBILITY OF PEOPLE. YOU'VE GOT TO JUDGE WHETHER

13   OR NOT IN THE SUMMER OF 2000, WHAT WAS HAPPENING WAS

14   COMPETITION, LEGITIMATE COMPETITION, OR WAS IT SOMETHING ELSE.

15   WAS IT THE STEALING OF IDEAS? WAS IT ENCOURAGING A MATTEL          04:21

16   DESIGNER?

17        DO YOU REMEMBER WHAT HAPPENED HERE? A MATTEL

18   DESIGNER CAME TO MGA WITH DESIGNS. AT THE TIME CARTER BRYANT,

19   THAT MATTEL DESIGNER, WORKED AT THE MATTEL DESIGN CENTER. ONE

20   OF THE KEY EXECUTIVES, PAULA GARCIA, KNEW WHAT OBLIGATIONS          04:21

21   CARTER BRYANT WOULD HAVE.

22        THEY SEE HIS DESIGNS; THEY KNOW HE'S A DESIGNER; THEY

23   KNOW HE WORKS IN THE DESIGN CENTER; THEY KNOW HE WORKS FOR A

24   COMPETITOR. AND WHAT DO THEY SAY? MR. LARIAN, YOU SAW HIS

25   TESTIMONY, HE SAID, "I DIDN'T SAY ANYTHING TO HIM ABOUT WHETHER     04:21

1  HE DID THOSE AT MATTEL."

2          IN FACT, YOU HEARD MR. LARIAN SAY -- I THINK IT WAS

3  SLIDE 151.  HE WAS ASKED:  "DID IT MATTER TO YOU, WOULD IT HAVE

4  BEEN A PROBLEM IF CARTER BRYANT CREATED OR MADE ANY OF HIS

5  DRAWINGS (UNINTELLIGIBLE)?"                                        04:22

6          HIS ANSWER WAS "NO, IT WOULDN'T HAVE MADE ANY

7  DIFFERENCE TO ME."

8          THESE ARE THE KIND OF PEOPLE THAT WE'RE DEALING WITH

9  HERE.  THIS ISN'T COMPETITION.  THIS IS ILLEGAL, INAPPROPRIATE

10 CONDUCT.  IT IS ENCOURAGING A MATTEL EMPLOYEE TO HELP YOU TO      04:22

11 CREATE A COMPETITIVE PRODUCT WHILE HE'S STILL WORKING FOR

12 MATTEL.

13         AND YOU HEARD MR. NOLAN SAY "WE THOUGHT HE RESIGNED

14 ON OCTOBER 4TH."

15         WELL, YOU HEARD, OF COURSE, MS. HARRIS SAY THAT IN        04:22

16 MID OCTOBER THAT CARTER BRYANT WOULD COME OVER AND MS. GARCIA

17 WOULD SAY 'DON'T TELL ANYONE HE'S COMING; IT'S HIS LUNCH HOUR,

18 BECAUSE HE'S STILL AT MATTEL.'

19         BUT EVEN MORE IMPORTANTLY, WHAT ABOUT ALL OF

20 SEPTEMBER OF 2000?  WHAT ABOUT WHAT WAS GOING ON THEN, AFTER      04:22

21 THIS MEETING, SEPTEMBER 1ST, WHERE IT WAS DECIDED, MS. O'CONNOR

22 SAID 'WE'RE GOING TO GO FORWARD WITH THIS DOLL IDEA.'

23         AND BY THE WAY, THERE'S NO EVIDENCE MS. O'CONNOR WAS

24 FIRED.  SHE DIDN'T TESTIFY TO THAT.  I HAVE TO ASSUME THAT WAS

25 A MISSTATEMENT BY MR. NOLAN, AND I WOULD HAVE NO OBJECTION IF     04:2:

```
 1   HE GOT UP HERE AND WAS GIVEN A MINUTE TO PROVE THAT STATEMENT
 2   IF HE STILL BELIEVES IT'S TRUE.  IT JUST ISN'T TRUE.
 3           SO WHAT HAPPENED IN SEPTEMBER?
 4           IF YOU LOOK AT THE EVIDENCE, YOU RECALL, YOU'VE SEEN
 5   THE SEPTEMBER 18TH LETTER TO THE HAIR VENDOR.  THERE'S A        04:23
 6   SEPTEMBER 27TH E-MAIL THAT PAULA GARCIA SENT TO HONG KONG
 7   SAYING 'WE'VE SELECTED THE HAIR VENDOR.'  THAT'S EXHIBIT 18.
 8           HOW DID SHE GET THAT INFORMATION?
 9           WHY, FROM CARTER BRYANT, OF COURSE, BECAUSE THEY ARE
10   WORKING TOGETHER TO COMPETE FOR MATTEL IN SEPTEMBER.           04:23
11           REMEMBER, MR. BRYANT CALLS MARGARET LEAHY WITH
12   MS. GARCIA'S APPROVAL.  AGAIN, THEY ARE STARTING ON THE SCULPT
13   FOR THE COMPETITIVE PRODUCT IN SEPTEMBER.  AND THERE'S NO
14   QUESTION THAT MGA KNOWS THIS.  THERE'S NO QUESTION THEY ARE
15   ENCOURAGING IT.                                                04:24
16           MR. NOLAN REFERRED TO THESE PHONE LOGS.  IF YOU LOOK
17   THROUGH THE PHONE LOGS -- AND I'VE GOT IT; THE PHONE LOG ITSELF
18   IS EXHIBIT 472, AND I'VE GOT ONE HERE; IT'S EXHIBIT 21-R -- IF
19   YOU GO THROUGH THOSE, THERE WERE, I GUESS, 24 CALLS TO THE MGA
20   MAIN OFFICE; TWO CALLS TO ISAAC LARIAN PERSONALLY; 21 CALLS TO  04:24
21   VERONICA MARLOW; AND 7 TO MARGARET LEAHY DURING THIS MONTH OF
22   SEPTEMBER, WHERE HE'S TALKING TO THE VENDORS WHO ARE GOING TO
23   WORK ON THIS COMPETITIVE PRODUCT; HE'S TALKING TO MGA; AND HE'S
24   TALKING TO ISAAC LARIAN.
25           AND THIS SHOWS IN EVIDENCE -- THIS IS MGA'S MAIN        04:24
```

```
 1   PHONE NUMBER:  894-2525; ISAAC LARIAN IS 894-3150;
 2   VERONICA MARLOW, (818)367-9158 MARGARET LEAHY, (626)791-2137.
 3   IN THE MONTH OF SEPTEMBER, CARTER BRYANT AND PAULA GARCIA, WHO
 4   IS IN CHARGE OF THIS PRODUCT, BRATZ DEVELOPMENT, ARE WORKING
 5   TOGETHER TO FIND HAIR; TO FIND A SCULPTOR.  IN EARLY OCTOBER,      04:25
 6   THEY ARE WORKING TO FIND PACKAGING, WITH MR. LINKER, I BELIEVE
 7   HIS NAME WAS.  SHE'S WORKING WITH VERONICA MARLOW AND
 8   MR. BRYANT DURING THE MONTH OF SEPTEMBER, ACTUALLY DOING THE
 9   SAMPLES, THE CLOTHES THAT WILL GO ON THE DOLLS. .THEY CANNOT,
10   WITH A STRAIGHT FACE, DENY THAT THEY WERE ENCOURAGING CARTER      04:25
11   BRYANT TO BREACH HIS DUTIES; TO BE DISLOYAL.
12         AND OF COURSE HE'S DOING THIS WHILE HE'S BEING PAID
13   BY MATTEL, WHICH HE SHOULDN'T BE DOING.
14         THE JURY INSTRUCTIONS SAY THERE HAS TO BE HARM SOME
15   WAY, AND WE'RE NOT QUANTIFYING IT HERE, BUT THAT'S ONE WAY.      04:26
16   BUT A MORE IMPORTANT WAY IS THAT CARTER BRYANT IS GIVING MGA
17   THAT HEAD START IN SEPTEMBER AND OCTOBER TO HELP THEM COME OUT
18   WITH A COMPETING DOLL FOR THE TOY FAIR AT THE BEGINNING OF THAT
19   YEAR.  HE'S HELPING THEM COMPETE WITH MATTEL WHILE HE'S STILL A
20   MATTEL EMPLOYEE.  AND MGA KNEW IT.  THE OVERWHELMING EVIDENCE.    04:26
21         WHAT DID MS. GARCIA TELL YOU THAT TELLS YOU ABOUT
22   SOMEONE?  THAT THEY ARE DISHONEST AND THEY CANNOT BE TRUSTED.
23   SO WHEN YOU HEAR ABOUT CARTER BRYANT, AND YOU THINK, 'OH, BUT
24   CARTER BRYANT SAID THIS,' THEN I SUGGEST THAT YOU SAY 'I DON'T
25   BELIEVE IT UNLESS IT'S SUPPORTED SOMEHOW.'                       04:26
```

```
 1              SO LET ME SWITCH NOW AND TALK VERY QUICKLY -- I GUESS
 2   I HAVE TO BE QUICK -- ABOUT THE CREATION OF BRATZ, THAT STORY.
 3              AND YOU REMEMBER MR. NOLAN CAME UP HERE AND WENT
 4   AFTER MR. CUNNINGHAM AGAIN.  AND WHAT YOU SAW IN MR. CUNNINGHAM
 5   WAS ONE OF THE MOST CYNICAL TRICKS I'VE EVER SEEN IN A          04:27
 6   COURTROOM.  MR. CUNNINGHAM TESTIFIED THAT THROUGH INDENTATION
 7   ANALYSIS THAT YOU CAN SEE THOSE FIRST BRATZ DRAWINGS, OR AT
 8   LEAST TWO OF THEM, IN THIS NOTEBOOK.
 9              HIS ASSIGNMENT AT THE TIME HE WAS GIVEN IT, HE KNEW
10   THE BRATZ DRAWINGS WERE RELEVANT.  YOU DON'T JUST TELL AN       04:27
11   EXPERT, 'GO FIND STUFF.'  IT'S LIKE, 'HEY, THIS CASE IS ABOUT
12   BRATZ.  WAS ANYTHING EVER IN HERE?'
13              SO HE DOES THAT ANALYSIS; AND WHILE HE DOES IT, HE
14   SEES OTHER INDENTATIONS TOO.  A GREETING CARD.  HE HAS NO
15   REASON TO THINK THAT IS RELEVANT TO THIS CASE AT ALL.  DO YOU   04:27
16   KNOW WHY?  BECAUSE IF YOU RECALL THE TESTIMONY, CARTER BRYANT
17   IN HIS PREVIOUS DEPOSITION TESTIMONY, HAS SAID 'I DID GREETING
18   CARDS ALL OF THE TIME.'  FROM 1995 UNTIL THE PRESENT, HE HAS
19   DONE GREETING CARDS.
20              HE NEVER TESTIFIED HE DID GREETING CARDS JUST IN '98. 04:28
21   HE NEVER TESTIFIED HE DID GREETING CARDS -- RAINY DAY RASCALS
22   GREETING CARDS IN '98.  THAT TESTIMONY DID NOT EXIST IN THIS
23   CASE, AT ALL, UNTIL HE TOOK THE STAND IN THIS TRIAL.
24              SO WHAT DID THEY DO WITH MR. CUNNINGHAM?
25              THEY SAID 'YOU DIDN'T TELL US -- DID YOU HEAR THAT    04:28
```

1   CARTER BRYANT SAID THIS WAS DONE IN '98?  YOU DIDN'T TELL US

2   ABOUT THAT.'

3           HE SAID, 'YEAH, I DIDN'T.'

4           HOW WOULD HE HAVE KNOWN THAT WOULD HAVE BEEN RELEVANT

5   AT ALL?  AND IT ONLY BECAME RELEVANT AFTER CARTER BRYANT                04:28

6   REALIZED THAT THE ORIGINAL DRAWINGS HE RIPPED OUT OF THIS BOOK

7   COULD BE PUT RIGHT BACK INTO IT THROUGH SCIENTIFIC ANALYSIS.

8   AND THAT ANALYSIS IS UNDISPUTED, ABSOLUTELY UNDISPUTED.

9           THEY DIDN'T CALL AN EXPERT TO SAY IT WAS INCORRECT.

10  IN FACT, MR. BRYANT EVENTUALLY ADMITTED AT TRIAL -- AFTER              04:28

11  MR. CUNNINGHAM'S REPORT, AND THAT'S SLIDE 30.3 -- HE ADMITS,

12  'YES, HIS DRAWINGS CAME OUT OF HERE.'

13          SO THEN, WITH THAT, WHAT WAS SURPRISING ISN'T THAT WE

14  HAD THIS NOTEBOOK, BECAUSE MR. BRYANT TESTIFIED 'I THREW AWAY

15  THE NOTEBOOK WITH THE DRAWINGS, AND HE THOUGHT WE COULDN'T            04:29

16  PROVE IT.  IT WAS OTHERWISE.  WHAT WAS SURPRISING TO MR. BRYANT

17  WAS THAT -- CSI, MAYBE YOU HAVEN'T SEEN ONE OF THOSE SHOWS --

18  YOU COULD ACTUALLY GO IN AND SEE THESE INDENTATIONS.  HE DIDN'T

19  KNOW YOU COULD DO THAT.

20          SO WE COME HERE AND WE SHOW YOU, THESE DRAWINGS ARE           04:29

21  HERE.  WE SHOW YOU A JULY 1999 CALCULATION FROM A BANK

22  STATEMENT THAT WERE IN HERE.  WE SHOWED YOU THAT ANGEL PAGE.

23  DO YOU REMEMBER THAT?  AND, IN FACT, I THINK THAT'S 1155-C-13,

24  AND YOU CAN SEARCH THAT.

25          WHAT YOU NEED TO DO IS REMEMBER WHAT MR. BRYANT SAID          04:2

1   BEFORE HE KNEW THE IMPORTANCE OF THIS NOTEBOOK AND WHAT HE SAID

2   AFTER HE REALIZED THE VERY FIRST DRAWINGS WERE HERE.  BECAUSE

3   AT HIS DEPOSITION WHEN WE SHADOWED THIS, HE SAID 'THAT'S IN

4   1999.'  MR. QUINN SHOWED YOU THAT TESTIMONY.

5           SO WHY DID MR. NOLAN GET UP HERE AND AGAIN SHOW YOU         04:30

6   ASHTON DRAKE AND AGAIN SHOW YOU AN ANGEL?

7           BY THE WAY, REMEMBER THE ANGEL DRAWING THAT HAS THIS

8   TUNIC THAT COMES DOWN HERE TO THE WAIST.  I DON'T REMEMBER IF

9   YOU REMEMBER THE FIRST QUESTION I ASKED MR. BRYANT AFTER

10  MR. NOLAN DID THAT.  I SAID, 'SO WHAT'S AN EMPIRE WAIST?          04:30

11          HE SAYS, OH, THAT'S A WAIST THAT COMES UP HERE.

12  THAT'S A WAIST THAT'S A LONG EVENING GOWN.'

13          AND I ASKED HIM THAT BECAUSE, OF COURSE, THIS TALKS

14  ABOUT AN EMPIRE WAIST.  AND THEN I ASKED MR. BRYANT, AND SAID

15  QUINN SHOWED YOU THIS TESTIMONY.  YOU TOLD US THIS RELATES TO    04:30

16  1999; RIGHT?

17          YES.

18          THIS DOESN'T REFER TO THE ASHTON DRAKE THING.

19          HE SAID NO.

20          THEN I ASKED, WHY IS YOUR ATTORNEY DOING THIS, EXCEPT    04:30

21  TO CONFUSE THE JURY?

22          AND THAT WAS AN IMPROPER QUESTION.

23          **MR. NOLAN:**  OBJECTION.  THIS IS IMPROPER ARGUMENT.

24          **THE COURT:**  OVERRULED.

25          **MR. PRICE:**  THAT WAS AN IMPROPER QUESTION.            04:31

1       YOU'RE NOT ALLOWED TO ARGUE WHEN YOU ARE EXAMINING

2   WITNESSES.  BUT I CAN ARGUE NOW.

3       WHAT WAS THE POINT OF THAT, EXCEPT TO CONFUSE YOU?

4   AND THERE'S NO ANSWER TO THAT.

5       AND MR. NOLAN SAYS, WHY DIDN'T WE BRING SOMEONE IN TO    04:31

6   SHOW YOU THAT THERE WAS AN ANGEL DOLL?

7       WE DIDN'T HAVE TO.  MR. BRYANT GAVE YOU -- IT'S HIS

8   TESTIMONY.  THIS IS 1999.

9       BUT WE HAVE TO FIND SOMETHING IN '98 HERE.

10      DO YOU REMEMBER, THEY DID THE JEWEL DRAWINGS.          04:31

11      AGAIN, MR. NOLAN SAYS, WHY DIDN'T YOU BRING IN

12  SOMEONE BESIDES CASSIDY PARK?

13      I'LL TELL YOU WHY WE BROUGHT HER IN.  BECAUSE

14  MR. BRYANT SAID CASSIDY PARK WAS HIS SUPERVISOR WHEN HE SAYS HE

15  DID JEWEL BARBIE DRAWINGS; THAT'S WHY.                     04:31

16      AND THEN MR. NOLAN SAID THAT MS. PARK SAID SHE WASN'T

17  FAMILIAR WITH HIS ASSIGNMENTS.

18      DO WE HAVE 3498?

19      THAT'S NOT WHAT SHE TESTIFIED.

20      WHAT SHE TESTIFIED TO WAS THAT EVERY ASSIGNMENT IN     04:3:

21  '98 WENT THROUGH HER.

22      "ANY PROJECTS HE HAD BEEN WORKING WENT THROUGH ME

23  BETWEEN JANUARY AND APRIL OF 1998, AND HE DIDN'T GET ANY JEWEL

24  BARBIE PROJECTS."

25      AND YOU KNOW SOMETHING ELSE?                           04:3

1        AT HIS DEPOSITION, UNDER OATH, BEFORE HE REALIZED HE

2   HAD PUT SOMETHING IN HERE IN 1998, WE SAID 'WHAT WERE YOUR

3   PROJECTS?'

4        HE DIDN'T MENTION JEWEL BARBIE.

5        WE SHOWED YOU THAT IN THE CLOSING.  WE ASKED HIM,                04:32

6   'WHAT DID YOU DO WHEN YOU STARTED IN '99?

7        WELL, I DID JEWEL BARBIE THEN.

8        THAT'S WHAT HE SAID BEFORE HE REALIZED HOW IMPORTANT

9   THIS WAS.

10       AND THEN WE SHOWED YOU THE FEBRUARY '99 JEWEL BARBIE            04:32

11  DRAWING, WHICH COMES FROM HERE, FEBRUARY '99 AND ALL HE CAN SAY

12  IS, OH, LOOK, THERE'S SOME DATED JANUARY '98; EVEN THOUGH

13  PREVIOUSLY MR. BRYANT SAID HE DIDN'T DO THEM IN '98; EVEN

14  THOUGH MS. CASSIDY PARK SAID HE DIDN'T DO THEM IN '98.

15       AND, YES, THERE IS AN EXPLANATION.  YOU SAW IT ON HIS          04:32

16  CONFLICT OF INTEREST QUESTIONNAIRE; WHEN HE WAS SUPPOSED TO PUT

17  JANUARY '99, HE PUT JANUARY '98.  AND THEN THERE WERE OTHER

18  DRAWINGS IN FEBRUARY WHERE HE GOT IT RIGHT, WHERE IT'S

19  FEBRUARY '99; NOTHING IN '98 IN HERE THEY CAN IDENTIFY.

20       SO HE SAYS RAINY DAY RASCALS; THAT'S IT; IT'S RAINY            04:3

21  DAY RASCALS.

22       AGAIN, SAYS WHO?

23       WHAT EVIDENCE DO YOU HAVE THAT RAINY DAY RASCALS WERE

24  DONE IN 1998?  ANYTHING BESIDES MR. BRYANT'S WORD?

25       NO.  YOU HAVE NOTHING.                                        04:3

```
 1          IN FACT, DO YOU RECALL, I ASKED MR. BRYANT HAS HE
 2   EVER SEEN A RAINY DAY RASCALS ANYWHERE DATED 1998?
 3          HIS RESPONSE WAS 'I MIGHT HAVE.  I DON'T KNOW.'
 4          SO THAT WAS A CHALLENGE TO THEM.  OKAY.  BRING IT ON.
 5   BRING IT ON.  SHOW US THIS GREETING CARD DONE IN '98.
 6          NO ONE ELSE HAS EVER TESTIFIED, NO ONE ELSE
 7   TESTIFIED; MR. IRMEN, NO ONE SAID THEY SAY A RAINY DAY RASCALS
 8   GREETING CARD IN '98.  BUT WE LOOKED AND LOOKED AND LOOKED, AND
 9   WE FOUND ONE DATED 1999, AND THAT'S EXHIBIT 10624.  WE CAN SHOW
10   YOU THAT.  AND MR. NOLAN DOESN'T DISPUTE THAT'S HIS SIGNATURE.
11   YOU HEARD HIM SAY THAT.  THIS IS PRODUCED BY MR. BRYANT FROM
12   HIS DOCUMENTS.  THIS IS THE ONLY RAINY DAY RASCALS DRAWING THAT
13   EXISTS THAT IS DATED.
14          AND ALTHOUGH MR. NOLAN REPEATED DOZENS OF TIMES,
15   RAINY DAY RASCALS 1998, RAINY DAY RASCALS 1998, HE REPEATS IT
16   AGAIN AND AGAIN, THERE'S NO PROOF OF IT.  NONE AT ALL.
17          MORE LIKELY THAN NOT, WHAT'S THE DATE OF THIS
18   NOTEBOOK?
19          AND THEN WE HAVE, OF COURSE, THE 'WADE' NOTE.
20          WELL, AGAIN, MR. BRYANT, THIS WASN'T TESTIFIED TO AT
21   HIS DEPOSITION, FOR THE FIRST TIME EVER, HE TAKES THE STAND AND
22   SAYS 'AH, THAT WAS 1998.'
23          IF WE COULD SHOW THAT NOTE; THAT'S 1155-C OF 87.
24          WHO DO WE HAVE TO TRUST WITH THAT?
25          WHAT PROOF IS THERE THAT WAS '98?
```

04:33
04:34
04:3
04:3
04:3

1          WE HAVE MR. BRYANT'S WORD.  OF COURSE, THAT'S A LOT

2     TO GO ON.

3          DO YOU RECALL, WHEN I SAID, 'THIS NOTE IS

4     INTERESTING.  IT SAYS WE'RE GOING TO BE BACK IN A FEW WEEKS.

5     HOW LONG OF A DRIVE IS THAT?'                                    04:3

6          I DIDN'T KNOW THE ANSWERS TO THIS STUFF, FOLKS.  IT'S

7     THE FIRST TIME HE HAD EVER SAID THIS WAS '98, IN FRONT OF YOU.

8     SO WHY WOULD YOU BE COMING BACK SO QUICKLY ON A 12-HOUR DRIVE?

9     WHY WOULD YOU LOOK FORWARD TO COMING BACK AGAIN IN THE NEXT FEW

10    WEEKS?  COULD BE BECAUSE OF THANKSGIVING AND CHRISTMAS.  YEAH,   04:3

11    THAT'S A POSSIBILITY.  THEIR FAMILIES GOT TOGETHER THANKSGIVING

12    AND CHRISTMAS.

13          DIDN'T THAT HAPPEN IN '99?

14          HE SAYS IT'S POSSIBLE.  I DON'T KNOW.  IT'S POSSIBLE

15    THAT WE WERE THERE IN '99, AS WAS WADE AND HIS FAMILY.  AND      04:3

16    THEN WE SHOWED YOU THE RECORDS.

17          AND MR. NOLAN SAYS WE'VE GOT TO PROVE IT WAS 1999.

18          NO, WE DON'T.  WE'VE PROVEN TO YOU THAT THE IMPORTANT

19    INFORMATION IN HERE IS 1999.  EVERYTHING WE CAN DATE

20    POSITIVELY, THE BANK RECORDS, FOR EXAMPLE, 1999; ANGEL, 1999;    04:3

21    THE JEWEL DRAWING, 1999.

22          HE DOESN'T GET TO SAY 'AH HA, 1998, YOU CAN'T PROVE

23    ME WRONG.'

24          YOU'VE GOT TO WEIGH THE EVIDENCE AND SAY IS THAT TRUE

25    OR NOT?                                                          04:3

```
 1          THAT INSTRUCTION SAYING YOU SHOULD BRING IN THE BEST
 2   EVIDENCE WE CAN; THAT IS IF YOU CONTROL THAT EVIDENCE.
 3          MR. BRYANT DIDN'T SAY THIS WAS 1998 UNTIL HE TOOK
 4   THAT STAND.  AND WE COULDN'T GO OUT AND TAKE WADE'S DEPO OR
 5   LISA'S.  WE CERTAINLY COULDN'T HAVE DONE IT IN SPRINGFIELD,
 6   BECAUSE THEY WERE 12 HOURS AWAY.
 7          BUT WHO COULD HAVE BROUGHT THEM?
 8          YOU DIDN'T HEAR ANY TESTIMONY ABOUT THAT THIS IS A
 9   1999 NOTEBOOK, AND THIS ESTABLISHES THAT THE VERY FIRST BRATZ
10   DRAWINGS WERE DONE IN 1999.  AND IF YOU LOOK AT THE EVIDENCE,
11   YOU'VE GOT TO LOOK AND SEE WHAT'S MORE LIKELY THAN NOT.
12          YOU'VE GOT MR. BRYANT'S STORY ABOUT 1998; RIGHT?
13          HE HAS NO DOCUMENTS TO BACK THAT UP AT ALL.  BUT
14   HERE'S THE EVIDENCE THAT WE DO KNOW.  WE KNOW THAT IN 1998, HE
15   WAS WORKING ON SOMETHING CALLED SABRINA.  AT LEAST THAT'S WHAT
16   HE SAYS.  AND YOU SAW SOME EXHIBITS OF THAT.  AND WE KNOW THAT
17   IN '98 HE HAD AN AGENT.  MR. NOLAN TOLD YOU THAT HE HAD AN
18   ARTIST AGENT IN '98.  REMEMBER THAT?  IN FACT, REMEMBER IN
19   SEPTEMBER OF '98, HE SAID HE LEARNED FROM ASHTON DRAKE ABOUT
20   ALASKA MAMA.  HE KNEW ABOUT ALASKA MAMA.
21          THEY DIDN'T BRING THOSE FOLKS IN TO SAY 'HEY, HE HAD
22   THIS EXCITING PROJECT CALLED BRATZ THAT HE TRIED TO SEND AROUND
23   IN 1999.'
24          NOT AT ALL.
25          WHAT WAS THIS AGENT DOING?
```

04:36
04:36
04:37
04:37
04:37
04:37

1  OTHER THINGS WHICH MR. BRYANT HAD CREATED AND WAS

2  TRYING TO SELL.  HE DIDN'T WANT TO BE AN OLD NAVY EMPLOYEE.  HE

3  WANTED TO BE A FREELANCER.  HIS TESTIMONY OF AUGUST OF '98:  'I

4  CAME UP WITH THIS GREAT IDEA, I PUT IT IN A FOLDER, AND I NEVER

5  SENT IT TO ANYONE UNTIL AUGUST OF '99.'                          04:3?

6  DOES THAT MAKE SENSE, GIVEN THE POSITION HE WAS IN

7  WERE HE WANTED TO BE A FREELANCER?  HE'S TRYING TO SELL THIS

8  STUFF?

9  NO.  IT DOESN'T MAKE SENSE AT ALL.

10  SO WE HAVE HIS '98 STORY.  LET'S COMPARE THAT WITH,       04:3?

11  THEN, WHAT HAPPENED IN '99.

12  IF WE COULD PUT UP EXHIBIT 25-R.

13  I CREATED THIS DEMONSTRATIVE JUST TO SHOW YOU.

14  IN '99, HERE'S WHAT WAS HAPPENING:

15  FIRST YOU HAVE THE TOON TEENS DRAWINGS DISPLAYED IN      04:3?

16  LILY'S CUBICLE; EXHIBIT 48.  MR. BRYANT DIDN'T DENY HE SAW

17  THEM; HE SAID, I DON'T REMEMBER.'  YOU HEARD MS. MARTINEZ'

18  TESTIMONY ABOUT ELISE BRINGING HIM BY.

19  THEN IN JULY WE HAVE THAT STEVE MADDEN AD, AUGUST

20  1999, SEVENTEEN MAGAZINE.  AND YOU'VE SEEN THAT OVER AND OVER    04:3

21  AGAIN.

22  MR. NOLAN'S ONLY RESPONSE IS, 'OH, THAT'S NOT EXACTLY

23  THE SAME ONE THAT MS. LEAHY GOT, BECAUSE IT HAS DIFFERENT

24  PRINTING AT THE BOTTOM.'

25  WELL, AGAIN, HE SAID HE READ SEVENTEEN.  WE BRING IN     04:3

```
 1    THE SEVENTEEN MAGAZINE.  IT LOOKS VERY MUCH LIKE BRATZ, DOES IT

 2    NOT?  EVEN THOUGH MR. BRYANT WOULDN'T ADMIT IT.  EVEN THOUGH

 3    IT'S WHAT MR. BRYANT GAVE MS. LEAHY FOR HER INSPIRATION; SO

 4    HE'S SEEN BOTH OF THESE IN THE JUNE/JULY TIME FRAME.

 5              THE EVIDENCE IS RIGHT THERE.

 6              AND THEN IN THAT SAME TIME FRAME, WE'VE GOT THESE

 7    INDENTATIONS IN THIS BLACK NOTEBOOK ABOUT THE BANKING

 8    STATEMENTS, JULY '99; RIGHT HERE IN THE SAME NOTEBOOK THAT HE

 9    HAS THOSE VERY FIRST DRAWINGS.

10              IN EARLY AUGUST, MS. GARCIA HAS DISPLAYED HER DOLLS

11    IN THAT DESIGN CENTER; IF YOU LOOK AT THE PICTURE, THE DATE OF

12    THAT IS AUGUST OF '99.

13              THEN AUGUST 26TH, HE HAS THESE DOCUMENTS NOTARIZED,

14    THESE DRAWINGS.  AND MR. NOLAN SAID WE HAVE TO PROVE THAT'S

15    FORGED TO PROVE OUR CASE?  TO THE CONTRARY, THAT PROVES OUR

16    CASE.  WE DON'T NEED TO SHOW THAT WAS FORGED.

17              YOU KNOW WHY YOU NOTARIZE DOCUMENTS IN '99?  TO PROVE

18    THE DOCUMENTS EXISTED IN EL SEGUNDO, CALIFORNIA, IN '99; THAT'S

19    THE REASON.  MARKING A DOCUMENT SHOWS THAT YOU HAD IT ON THE

20    DATE THAT YOU MARKED IT.

21              IF WE COULD PUT UP EXHIBIT 40-R.

22              FOR EXAMPLE, ONE OF THOSE COPYRIGHT WAYS OF DOING IT,

23    THE CHEAP WAY, IS TO SEND YOURSELF AN ENVELOPE SO IT WILL HAVE

24    A DATE ON IT, A STAMP ON IT; THAT'S ONE WAY OF SHOWING YOU DID

25    SOMETHING ON A CERTAIN DAY.
```

04:39

04:39

04:4

04:4

04:4

1    IF THAT'S IN AUGUST OF '99, IT WOULDN'T HELP YOU TO

2  PUT '98 DOCUMENTS IN THERE, WOULD IT?  IT WOULDN'T PROVE TO

3  ANYONE THAT YOU DID IT IN '98.  IT WOULD PROVE THAT YOU DID IT

4  IN '99.

5    IT MAKES NO SENSE TO HAVE THAT STAMP PUT ON THERE TO    04:4

6  PROVE YOU DID IT IN '98.  YOU WOULDN'T DO THAT WITH ANY FORGED

7  DOCUMENT.  SAME THING WITH NOTARIES.

8    IF WE COULD PUT UP 39-R.

9    IT'S STAMPING A DOCUMENT ON THE DATE THE NOTARY SAW

10  IT.  THAT'S WHAT YOU SEE IN EXHIBIT 62; DRAWINGS THAT ARE    04:4

11  STAMPED AT THAT TIME.  AND ALL THAT SHOWS -- IN FACT, IT SHOWS

12  DEFINITIVELY, IT PROVES THOSE DOCUMENTS EXISTED IN AUGUST OF

13  1999.

14    NOW, HE'S SENDING THEM TO ALASKA MAMA HERE AT THIS

15  TIME.  WHY HE DID HE CHOSE AUGUST '99?  I SUBMIT, BECAUSE    04:4

16  THAT'S WHEN HE DID THEM, AFTER ALL OF THE EVENTS I JUST SHOWED

17  YOU IN THE '99 TIME FRAME; THAT'S WHY HE SENT THEM.

18    SO HE WANTS TO NOTARIZE THEM AND SAY 'I HAD THEM

19  BEFORE ALASKA MAMA,' SO HE HAS THEM NOTARIZED.  THEN IF YOU

20  LOOK AT THE NOTARY BOOK -- AND MR. QUINN SHOWED IT TO YOU -- IF    04:4

21  THAT NOTARY BOOK STOPS AT THAT PERIOD WHERE -- IF IT STOPPED

22  THERE, THIS CASE WOULDN'T EVEN -- IT WOULD BE A SLAM DUNK.  IF

23  THIS STOPS HERE, THIS PERIOD, WE WOULD HAVE PROOF POSITIVE

24  THESE THINGS WERE DONE IN AUGUST OF '99.

25    AND MR. BRYANT IS NOT DUMB.  MR. BRYANT SAYS, "OH, MY    04:4

1  GOSH, THIS PROVES IT'S IN '99. COULD YOU PUT IN ALSO 'MISSOURI

2  1998,' BECAUSE I'M WORKING AT MATTEL NOW AND THESE BELONG TO

3  MATTEL."

4       THIS PART FROM '98 IS, AGAIN, MR. BRYANT'S WORD.

5  IT'S NOTHING MORE THAN HIS WORD, AND IT'S USELESS. IN FACT, IT    04:42

6  SHOWS HIS KNOWLEDGE OF GUILT. BECAUSE, 'OH, MY GOSH, LOOK WHAT

7  I'VE JUST PROVEN.'

8       IF WE COULD GO BACK TO THE TIMELINE, 25-R.

9       HE HAS THESE DRAWINGS NOTARIZED AFTER ALL OF THIS

10  THAT'S GOING ON IN '99. AND THEN THE NEXT DAY, AUGUST 27TH, HE    04:43

11  DRAWS ANOTHER ONE AND HE DATES IT, HE DATES IT, AUGUST 27TH,

12  '99.

13       IF WE CAN SHOW EXHIBIT 777.

14       HE'S GOT THE GROUP THAT HE SENDS TO ALASKA MAMA,

15  AUGUST 26, '99. AND THEN HE MAKES A CHANGE THE NEXT DAY, THE    04:43

16  VERY NEXT DAY. AUGUST 27, 1999 HE DECIDES TO CHANGE LUPE, GIVE

17  HER A DIFFERENT HAIRSTYLE. ALL OF THIS CREATIVITY IS TAKING

18  PLACE IN 1999.

19       AND THEN SOME TIME AFTER THAT, HE SENDS THE BRATZ

20  DRAWINGS TO ALASKA MAMA, AND THEN THOSE DRAWINGS ARE DATED.    04:43

21  ALSO SHORTLY AFTER THAT, SEPTEMBER 19TH, IF YOU LOOK AT

22  EXHIBIT 1327 AND 1328; DATED 1999, BECAUSE THAT'S WHEN THE

23  CREATIVITY WAS TAKING PLACE.

24       AND I DON'T MEAN TO MINIMIZE THIS, BUT THEY COME BACK

25  WITH HIS MOTHER, WHO, MR. NOLAN SAID, 'WELL, WHAT DO YOU    04:44

```
 1   EXPECT; SHE'S THINKING OF WHAT HAPPENED TEN, NINE YEARS AGO.'

 2          WELL, THAT'S RIGHT.  THAT'S THE POSITION MR. BRYANT

 3   PUT HER IN.  HE KNOWS HOW TO PROVE DOCUMENTS ARE DONE ON A

 4   CERTAIN DATE.  HE'S DONE COPYRIGHTS.  HE KNOWS HOW TO SEND

 5   SOMETHING TO YOURSELF.  HE KNOWS HOW TO GET THEM NOTARIZED.  HE    04:44

 6   DIDN'T DO THAT, SO HE HAS TO GO TO MOM AND SAY 'DO YOU REMEMBER

 7   THIS WAS IN '98?  DO YOU REMEMBER THAT, MOM?'

 8          AND IT'S LIKE, WHAT IS IT, THE STORY OF THE MOTHER

 9   WHO'S GOING TO A PARADE, HER SON IS IN THE PARADE, SHE'S

10   PROUDLY WATCHING JIMMY WALK BY AND SHE'S BEAMING WITH PRIDE.      04:44

11   AND SHE TURNS TO THE OTHER MOTHERS AND SAYS 'ISN'T IT

12   WONDERFUL, JIMMY IS IN STEP AND EVERYBODY ELSE IS OUT OF STEP.'

13   THAT'S HOW MOMS SEE THINGS; AND THAT'S WHAT HE PUT HER IN, AND

14   SHE WAS WRONG.

15          AND THEN WE HAVE MS. GALVANO, LADIES AND GENTLEMEN.        04:45

16   THEY BROUGHT IN MS. GALVANO, AND SHE COULDN'T SHOW YOU A SINGLE

17   DOCUMENT IN THE WORLD THAT SHE SAW IN AUGUST OF '98.  SHE MAY

18   HAVE SEEN SOMETHING.  SHE MAY HAVE SEEN SABRINA.  BUT THAT'S

19   LIKE HAVING A LINEUP, YOU KNOW, YOU ARREST SOMEONE; THE COPS

20   HAVE LINEUPS.  THEY SAY, MA'AM WHICH OF THOSE SIX WAS IT?  SHE    04:45

21   GOES, WELL, IT COULD HAVE BEEN NUMBER THREE.

22          WAS IT NUMBER THREE?

23          OH, ABSOLUTELY NOT; BUT IT KIND OF LOOKED LIKE NUMBER

24   THREE, EXCEPT HE DOESN'T HAVE A FACE.

25          AND THEN YOU PROSECUTE NUMBER THREE.                       04:45
```

```
 1        THAT'S WHAT MS. GALVANO -- SHE WANTS TO HELP, SHE
 2   REALLY DOES.  WE'RE NOT SAYING SHE'S LYING; WE'RE SAYING SHE
 3   HAS NOTHING TO ADD.
 4        THEN YOU HAVE HIS LIFE PARTNER -- I MEAN, THIS IS THE
 5   BEST THEY COULD DO -- WHO TOLD YOU, YEAH, I SAW SOMETHING THAT    04:45
 6   SAID BRATZ WHEN NO ONE ELSE HAS HEARD THE BRATZ NAME UNTIL IT'S
 7   PRESENTED TO MGA OVER A YEAR LATER, OR MORE THAN THAT,
 8   ACTUALLY.
 9        THAT'S THE QUALITY OF EVIDENCE THAT YOU HAVE TO WEIGH
10   IN DECIDING THIS CASE.  AND YOU WAY THAT AGAINST JUST THE UTTER   04:46
11   DISHONESTY OF THE PEOPLE WHO REALLY GOT CARTER BRYANT ON THIS
12   PATH.
13        NOW, I WANT TO TALK TO YOU A LITTLE ABOUT THE VERDICT
14   FORM, IF I COULD FIND IT HERE.  ON THE VERDICT FORM, IT'S
15   DIVIDED INTO THESE SPECIFIC QUESTIONS, AND YOU REMEMBER          04:46
16   MR. NOLAN SAYING THE FIRST QUESTION HERE LISTS ALL OF THE
17   DOCUMENTS THAT CARTER BRYANT SAYS HE DID IN 1998.  AND THE
18   QUESTION IS SIMPLE:  WHAT DO YOU THINK IS MORE LIKELY, GIVEN
19   THE PHYSICAL EVIDENCE, GIVEN THE DOCUMENTARY EVIDENCE, GIVEN
20   HIS TESTIMONY?                                                   04:46
21        WHAT DO YOU THINK IS MORE LIKELY?
22        IS HE TELLING THE TRUTH OR NOT?
23        YOU KNOW, MR. LARIAN SAID THAT HE WANTED TO DO AN
24   INVESTIGATION ABOUT WHETHER THESE WERE '98.
25        ASK YOURSELF THIS:  IF YOU WERE TO DO AN                    04:47
```

 1   INVESTIGATION OF THIS, MR. BRYANT IS THERE IN FRONT OF YOU,

 2   WOULD YOU SAY TO HIM, "DO YOU HAVE ANY DOCUMENTS THAT SAY IT?

 3   WHAT NOTEBOOK WAS IT THAT YOU PUT IT IN?"

 4        WOULD YOU SAY THOSE SORTS OF THINGS, OR WOULD YOU

 5   SAY, OKAY, SO WHAT'S THE NAME OF YOUR MOM?  HOW ABOUT YOUR        04:47

 6   LOVER?  HOW ABOUT YOUR MOM'S BEST FRIEND?

 7        YOU HAVE TO ASK YOURSELF, WHO DO YOU BELIEVE.

 8        I THINK THE ANSWER IS CLEAR.  YOU CAN'T BELIEVE

 9   MR. BRYANT IF ALL OF THE PHYSICAL EVIDENCE, THE SCIENTIFIC

10   EVIDENCE, TELLS YOU THIS WAS DONE IN 1999.  THE INSPIRATIONAL    04:41

11   EVIDENCE, THE MADMAN OF '99.

12        SO THEN WE HAVE THE SECOND QUESTION HERE.  THE SECOND

13   QUESTION IS, FOR EACH OF THE ITEMS LISTED BELOW, HAS MATTEL

14   PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT THESE WERE

15   CONCEIVED AND REDUCED TO PRACTICE.                              04:4'

16        THESE ARE, AS MR. NOLAN SAID, THE COLORED-IN

17   DOCUMENTS.  AND MR. BRYANT TESTIFIED THAT ALL OF THESE, IF YOU

18   SEE A DOCUMENT WHERE IT'S COLORED IN, THAT WAS DONE WHILE I WAS

19   AT MATTEL.

20        THAT'S ACTUALLY AT PAGE 2466, IT'S LINES 9 TO 11.          04:4

21        "QUESTION:  THAT PROCESS, PROJECTING IT, TRACING IT,

22   COLORING IN, THAT PROCESS WAS DONE WHILE YOU WERE AT MATTEL?

23        ANSWER:  YES."

24        **MR. PAGE:**  IN FACT, MR. BRYANT TESTIFIED THAT, IF YOU

25   SEE A DRAWING WITH A HEAD AND A FACE THAT ARE TOGETHER, THAT     04:4

```
 1   THAT WAS DONE SOME TIME AFTER 1998.

 2          HE WAS ASKED -- AND THIS IS THE FOLLOWING PAGE, 3246,

 3   LINE 15-23 --

 4          "QUESTION:  THE DRAWING WITH A BODY AND A FACE

 5   TOGETHER DIDN'T EXIST IN 1998; CORRECT?                          04:48

 6          ANSWER:  I DON'T REMEMBER THAT IT DID.

 7          QUESTION:  AND THAT'S TRUE OF THE OTHER EXHIBITS I

 8   WAS SHOWING YOU WHICH HAD THE CHARACTERS, YOU KNOW, WITH THE

 9   BODY AND THE FACE.  AND YOU WOULD SAY, OH, BUT THERE WAS A

10   MASTER DRAWING.  THE MASTER DRAWINGS IN AUGUST 1998 DIDN'T HAVE  04:49

11   THE FASHIONS AND THE FACE AND THE BODY ALL TOGETHER; RIGHT?

12          ANSWER:  NO.  I DON'T THINK SO."

13          MR. PAGE:  IF YOU SEE A PICTURE WITH A HEAD AND A

14   BODY AND FASHIONS TOGETHER, THAT'S DONE AFTER 1999.

15          THAT'S THE SECOND QUESTION YOU HAVE IN THE VERDICT       04:49

16   FORM, WHICH IS THIS GROUP OF THE DOCUMENTS, WHICH, REALLY,

17   MR. BRYANT ADMITS HE DID WHILE HE WAS AT MATTEL.

18          SO YOU HAVE A THIRD GROUP OF DOCUMENTS HERE, AND

19   THESE ARE ONES THAT MR. BRYANT SAYS HE DID AFTER MATTEL.  AND

20   IF YOU LOOK AT EXHIBIT, FOR EXAMPLE, 323-32, THIS DRAWING HERE,  04:4

21   REMEMBER, THIS IS A SCULPTOR DRAWING.  MR. BRYANT SAYS IT WAS

22   DONE AFTER HE LEFT MATTEL IN OCTOBER 19.  OF COURSE, HE ALSO

23   SAID HE KNOWS THAT IF HE SAYS IT'S BEFORE THEN, WE OWN THAT.

24          HOWEVER, MS. GARCIA TOLD YOU THIS WAS DONE BETWEEN

25   OCTOBER 4TH AND OCTOBER 19TH, IF WE CAN PUT UP HER TESTIMONY; I  04:5
```

```
 1   BELIEVE THAT'S SLIDE 12-R.  MS. GARCIA WAS ASKED:
 2          "QUESTION:  WHAT INFORMATION DO YOU HAVE ON THAT
 3   SUBJECT?
 4          ANSWER:  I KNOW THIS WAS CREATED PRIOR TO
 5   OCTOBER 19TH OF 2000."
 6        MR. PRICE:  THE REASON SHE KNOWS THAT IS BECAUSE IT
 7   WAS HANDED TO THE SCULPTOR TO BE USED BY MS. LEAHY TO SCULPT.
 8   SO THE EVIDENCE IS THAT THAT WAS DONE NOT AFTER HE LEFT MATTEL
 9   BUT WHILE HE WAS AT MATTEL.
10          THE NEXT THREE DRAWINGS; 1107, 1108, 1109, AND 1110,
11   I'LL SHOW YOU THOSE, BECAUSE THESE WERE FASHION DRAWINGS THAT
12   WERE DONE.
13          MR. BRYANT SAYS, OH, THESE WERE DONE AFTER I LEFT
14   MATTEL.  BUT WHEN YOU LOOK AT WHAT WAS GOING ON IN OCTOBER,
15   THAT MAKES NO SENSE.
16          IF WE CAN PUT UP 26-R.
17          REMEMBER, CARTER BRYANT WAS INSTRUCTED TO WORK
18   FULL-TIME STARTING OCTOBER 6TH.  MR. NOLAN SHOWED YOU THAT.
19   YET, YOU DON'T START SEWING AND DOING PATTERN MAKING FOR THE
20   DOLLS UNTIL YOU HAVE THE FASHIONS DESIGNED.  THE WORKERS DON'T
21   JUST MAKE UP STUFF.  THEY DON'T GO BUY THEIR OWN FABRIC.  THEY
22   DON'T CREATE THEIR OWN DESIGNS.  THEY ARE GIVEN THE DESIGNS BY
23   THE DESIGNER; THAT'S HOW IT WORKS.
24          VERONICA MARLOW STARTED SEWING AND PATTERN MAKING
25   BEGINNING OCTOBER 13TH; THAT'S WHEN SHE STARTED DOING THE
```

04:50
04:50
04:51
04:51
04:51

```
 1   ACTUAL PATTERNS; AND THAT'S EXHIBIT 606-5; THOSE ARE HER BILLS
 2   WHICH SHOW THAT BETWEEN OCTOBER 13TH AND OCTOBER 20, BUT
 3   STARTING WITH OCTOBER 13, SHE'S DOING SEWING AND PATTERN
 4   MAKING; SEWING AND PATTERN MAKING; AND BILLING THAT, THAT'S A
 5   HECK OF A LOT OF HOURS, I MIGHT SAY.  THIS WAS A RUSH JOB.          04:52
 6   WE'RE TALKING 81 HOURS HERE OF SEWING AND PATTERN MAKING.
 7               SHE HAD A PRIOR BILL WHICH WAS ANOTHER 80 HOURS
 8   LEADING UP TO OCTOBER 13TH WHICH WAS JUST DOING THE RESEARCH.
 9   BUT THEY DON'T DO THIS UNLESS YOU HAVE THE DESIGNS DONE.
10               AND THEN YOU'VE GOT MS. GARCIA, IN 26-R, MS. GARCIA    04:52
11   SENDS THE FINAL FASHIONS TO HONG KONG OCTOBER 24.  THAT MEANS
12   THEY ARE DONE.  THAT'S EXHIBIT 1236.  THIS IS THE ONE WHERE
13   MS. GARCIA SAID I DON'T KNOW WHAT YOU ARE TALKING ABOUT.  I
14   DON'T EVEN KNOW WHAT FINAL FASHION DESIGN MEANS.  BUT SHE'S
15   SENDING THIS ON THE 23RD.  WE KNOW IT WAS DONE BEFORE THEN.        04:52
16               AGAIN, WHAT'S MORE LIKELY?
17               IT WAS DONE BEFORE THEY ACTUALLY MADE THE FASHIONS.
18   YOU DON'T MAKE THE FASHIONS WITHOUT THE DESIGNS.
19               SO IF WE GO BACK TO 26-R.  SO MR. BRYANT HAD TO HAVE
20   COMPLETED THOSE DESIGNS IN ADVANCE OF THIS ACTIVITY TAKING         04:53
21   PLACE.
22               THOSE DRAWINGS THAT WE JUST SHOWED YOU WERE THE
23   DRAWINGS THAT WERE SHOWN TO THE CUSTOMER IN EARLY NOVEMBER.
24   REMEMBER HOW THEY WENT TO K-MART; WE'VE GOT THIS HERE, THE
25   FASHIONS, AND ALL THAT STUFF.                                      04:5
```

1        SO THOSE DRAWINGS, WE BELIEVE THAT THE EVIDENCE IS

2   MORE LIKELY THAN NOT CONSISTENT WITH THE DOCUMENTS THEY TRY TO

3   RUN AWAY FROM WERE DONE BEFORE HE LEFT MATTEL IN OCTOBER 19TH.

4        THE SAME IS TRUE, ACTUALLY, IF WE GO TO THE VERDICT

5   FORM, PAGE 4, IF YOU GO THROUGH THESE OTHER DRAWINGS, THEY ARE

6   THE SAME SORTS OF DRAWINGS AND FASHIONS, AND THEN YOU SEE 323,

7   18, 19, AND 26.  323 IS THE PACKAGE OF DOCUMENTS WHICH

8   MR. LINKER SAID HE WAS GIVEN IN MID OCTOBER SO THAT HE COULD

9   START DOING THE PACKAGING.  THAT'S EXHIBIT 323.  THAT, AGAIN,

10  IS BEFORE CARTER BRYANT LEAVES MATTEL.

11       SO WE THEN GO TO NUMBER FOUR:  "FOR EACH OF THE ITEMS

12  BELOW, HAS MATTEL PROVEN BY A PREPONDERANCE OF THE EVIDENCE..."

13  THERE ARE TWO PHYSICAL ITEMS HERE.  ONE IS THIS

14  THREE-DIMENTIONAL ITEMS PURSUANT TO THE PITCH, THE ONE THAT

15  MR. GARCIA AND MR. LARIAN SAID WAS UGLY, AND THE ONE

16  MS. O'CONNOR SAID WAS BEAUTIFUL IN 11 OUT OF TEN.

17       NO QUESTION THAT WAS DONE WHILE CARTER BRYANT WORKED

18  AT MATTEL.

19       THEN YOU HAVE EXHIBIT 1136, THAT'S THE SCULPT THAT

20  MS. LEAHY DID.  AND DO YOU REMEMBER MS. LEAHY'S TESTIMONY?  IT

21  TOOK AWHILE TO GET OUT, BUT DO YOU RECALL WHAT HAPPENED?

22       SHE MEETS WITH MR. BRYANT.  HE GIVES HER THE DESIGNS.

23  HE GIVES HER THE STEVE MADDEN AD.  HE SAYS I WANT YOU TO MAKE

24  BRATZ FOR ME.  AND IN JUST A 2-DAY PERIOD, SHE COMES UP WITH A

25  SCULPT ON SEPTEMBER 29TH.  AND YOU SAW HER NOTES OF

1   SEPTEMBER 29TH.  WHAT SHE DID WAS SHE WENT AND SHE MET WITH

2   MR. BRYANT; SHE SAID 'HERE'S THE SCULPT.'  AND HE SAID 'THAT'S

3   GREAT, BUT HERE ARE MY SPECIFIC COMMENTS...'"  AND YOU REMEMBER

4   HE LISTED ABOUT FOUR OR FIVE COMMENTS IN HER NOTES.

5        AND WHAT SHE TESTIFIED TO AT HER DEPOSITION WAS, YOU          04:55

6   KNOW, I TOOK HIS COMMENTS AND I INCORPORATED EACH AND EVERY ONE

7   OF THOSE COMMENTS.  AND SHE DOES A SCULPT, A SCULPT UNDER THE

8   ARTIST 'S GUIDANCE, MR. BRYANT'S GUIDANCE, TO BE A BRATZ DOLL,

9   TO BE A BRATZ SCULPT.

10       SO BECAUSE MR. BRYANT WAS THE DESIGNER OF THIS,              04:55

11  BECAUSE HE'S THE ONE WHO GAVE HER THE DRAWINGS, BECAUSE HE'S

12  THE ONE WHO GAVE HER THE COMMENTS, AS SHE ORIGINALLY SAID,

13  BECAUSE THIS WAS TO FULFILL HIS VISION; AND THIS IS DONE

14  BETWEEN -- SEPTEMBER 18TH WAS THE FIRST WAS WHEN HE FIRST

15  CONTACTED HER.  THIS ALSO WOULD BE MATTEL PROPERTY.             04:5

16       WHAT MS. LEAHY SAID SHE DID DO WAS SHE THEN TRIED TO

17  MAKE IT MANUFACTURABLE BECAUSE, YOU KNOW, YOU JUST HAVE TO DO

18  SOME THINGS TO MAKE IT MANUFACTURABLE.  BUT THAT'S

19  CARTER BRYANT'S DIRECTION, HIS VISION, HIS SCULPTOR FOR HIS

20  BRATZ.                                                          04:5

21       AND THEN YOU GET TO THE QUESTIONS WHICH DON'T HAVE

22  LONG NUMBERS AFTER THEM, LISTS AND LISTS AND LISTS, AND THAT IS

23  -- FIVE AND SIX IS WHETHER HE CONCEIVED THESE WHILE AT MATTEL;

24  AND, AGAIN, THAT'S THE '99 EVIDENCE.  AND THAT HE CONCEIVED THE

25  NAME BRATZ.  AND THAT'S, AGAIN, THE EVIDENCE YOU HEARD FROM,     04:5

1    FOR EXAMPLE, MS. RHEA, WHO SAID HE HADN'T EVEN COME UP WITH IT

2    BY JUNE, BUT HE DID COME UP BY THE SEPTEMBER 1ST MEETING WHEN

3    HE WAS AT MATTEL.

4            AND THEN WE HAVE INTENTIONAL INTERFERENCE AND THE

5    AIDING AND ABETTING AND THE DUTY OF LOYALTY.  REALLY, WHAT MORE      04:57

6    IS THERE TO SAY HERE ABOUT THIS?  IT'S REALLY UNDISPUTED WHAT

7    HAPPENED HERE.

8            DID MGA KNOW IT?

9            OH, COME ON, MS. GARCIA WAS IN THIS UP TO HER NECK.

10           IN FACT, THE BUILDER, I THINK MR. NOLAN SAID, 'WELL,        04:5

11   BUT HE PAID THIS MATTEL PAINTER, AND THERE'S NO EVIDENCE THAT

12   WE KNEW ANYTHING ABOUT THAT."

13           ACTUALLY, IF YOU LOOK AT THE EVIDENCE -- DO WE HAVE

14   THOSE EXHIBITS NUMBER -- THERE'S A CHECK WHICH MR. BRYANT WROTE

15   -- OH, LET'S TRY 1310, I THINK -- THERE'S A CHECK MR. BRYANT        04:5

16   WROTE FOR $150 TO SHEILA FOR HER FACE PAINTING.  I DON'T

17   REMEMBER THAT.  SHEILA WAS THE MATTEL EMPLOYEE.  AND YOU RECALL

18   TESTIMONY FROM MS. RHEA THAT THIS PROJECT HAD AN 'ANGEL' CODE

19   NAME.  DO YOU REMEMBER, I ASKED MR. BRYANT, DID ONE OF YOUR

20   DOLLS HAVE THE NICK NAME OF ANGEL?  HE SAID ABSOLUTELY NOT.        04:5

21   AND THEN WE SHOWED YOU HIS HANDWRITTEN DESCRIPTIONS OF THEM

22   WHERE, YES, ONE OF THEM'S NICK NAME WAS AKA ANGEL.

23           THIS IS MR. BRYANT'S CHECK.

24           AND THEN 593, THIS IS A COUPLE OF DAYS, A FEW DAYS

25   LATER.  WHAT DOES MR. BRYANT DO?  HE SENDS AN INVOICE TO          04:5

```
 1   MS. GARCIA FOR $150.  IT SAYS 'ANGEL FACE HAIR DESIGNS AND
 2   SKETCHES.'
 3          HEY, YOU KNOW, IT SAYS AUGUST 31ST FOR MR. BRYANT, BY
 4   THE WAY.  DO YOU SEE THIS?  HE'S A MATTEL'S EMPLOYEE.
 5          WHAT?  HE'S DOING WORK FOR MGA NOW IN AUGUST?          04:59
 6          DOES THAT MAKE ANY SENSE TO YOU?
 7          NO.
 8          MS. GARCIA:  THANKS, PAULA; A LITTLE SMILEY FACE
 9   THERE.  MS. GARCIA WAS IN ON THIS WITH MR. BRYANT AT THE TIME.
10   HE'S HELPING THEM CREATE A DOLL THAT WILL COMPETE WITH MATTEL.  04:59
11   HE'S HAVING FACES PAINTED FOR THE PITCH.  REMEMBER HIS INITIAL
12   PITCH, AUGUST 15TH, OR MID AUGUST; THAT'S WHAT MR. BRYANT SAYS;
13   THAT'S WHAT MRS. O'CONNOR SAYS; AND THEN THEY'RE GOING TO MEET
14   WITH MR. LARIAN.  AND IT'S DURING THAT TIME FRAME THAT
15   MR. BRYANT DOES THIS DOLL AND HAS IT PAINTED AND PAYS SHEILA.  04:59
16   BUT NOT BEFORE HE'S USING THE CODE NAME ASKING TO BE REIMBURSED
17   FOR IT.
18          AND THEN, OF COURSE, THE MOST COMPELLING EVIDENCE ON
19   THIS AIDING AND ABETTING IS THE DATE ON THE CONTRACT ITSELF.
20   AS OF SEPTEMBER 18, 2000, THAT'S WHEN MR. BRYANT WAS WORKING  05:00
21   FOR THEM.  EXHIBIT 30 IS THAT LETTER TO THE VENDOR, UNIVERSAL,
22   SEPTEMBER 18, 2000; THE FIRST CONTACT WITH MS. LEAHY
23   SEPTEMBER 17TH, SEPTEMBER 20TH OF 2000.
24          MGA RECOGNIZED WHAT IT WAS DOING AND INDUCING A
25   MATTEL EMPLOYEE WHO CREATED MATTEL DESIGNES TO BRING HIS      05:00
```

1   DESIGNS TO MGA. THEY DIDN'T GIVE A HOOT WHETHER THEY WERE DONE

2   AT MATTEL OR NOT. BUT THEY WANTED HIM TO MAKE SURE THEY COULD

3   COMPETE AS QUICKLY AS POSSIBLE WITH MATTEL.

4          YOU'RE MORE TIRED THAN I AM; YOU HAVE TO LISTEN TO

5   ALL OF THIS. BUT I WANT TO THANK YOU FOR YOUR PATIENCE. AND          05:00

6   BOTH PARTIES HAVE PUT A LOT OF EFFORT INTO THIS. OUR EFFORT

7   HAS BEEN GEARED TOWARDS ONE THING: IT'S UNFAIR IF A COMPANY

8   COMPETES WITH YOU BY STEALING FROM YOU. IT'S UNFAIR IF A

9   COMPANY COMPETES WITH YOU BY TAKING ONE OF YOUR BEST DESIGNERS,

10  WHILE HE STILL WORKS FOR YOU, AND GIVES YOU IDEAS, EFFORT, AND          05:01

11  HELPS YOU GET INTO THE MARKET TO COMPETE.

12         MATTEL ISN'T ANTI-COMPETITIVE. IT IS ANTI-FRAUD. IT

13  DOES BELIEVE YOU SHOULD COMPETE FAIRLY; THAT BOTH SIDES SHOULD

14  PLAY FAIRLY. AND THAT'S WHAT WE'RE ASKING YOU TO SAY TO THE

15  WORLD. MR. NOLAN SAID 'PEOPLE FORGET WHAT I SAID HERE AND WHAT          05:01

16  HE SAID HERE.' THAT'S A SAD TRUTH. BUT WHAT THEY WON'T FORGET

17  IS YOU SAYING THERE'S A RIGHT WAY AND A WRONG WAY TO COMPETE,

18  AND WHAT YOU DID HERE CROSSED THAT LINE. AND YOU HAVE A CHANCE

19  TO REMEDY IT.

20         WE THANK YOU.          05:01

21         **THE COURT:** THANK YOU, COUNSEL.

22         JUST A COUPLE OF THINGS BEFORE I EXCUSE THE JURY AT

23  THIS TIME.

24         I UNDERSTAND THAT WE HAVE TWO MEMBERS OF THE JURY WHO

25  NEED TO TAKE SMOKE BREAKS. WITHOUT COMMENTING ON THE HEALTH          05:02

```
 1   EFFECTS OF SMOKING, I WILL LEAVE THAT UP TO YOU AT THIS POINT.
 2           THAT'S PART OF THE SCHEDULE, THOUGH, THAT'S IN YOUR
 3   HANDS AT THIS POINT.  IF YOU NEED TO TAKE A BREAK FOR WHATEVER
 4   PURPOSE, THAT'S FOR YOU TO DECIDE.
 5           HOWEVER, WHEN ONE OF YOU OR TWO OF YOU OR ANY OF YOU
 6   ARE NOT PRESENT TOGETHER, WHEN YOU ARE NOT ALL TOGETHER, YOU
 7   SHOULD NOT BE DISCUSSING THE CASE; SO IF ONE OR TWO PEOPLE NEED
 8   TO TAKE A BREAK FOR WHATEVER PURPOSE, STOP DISCUSSING THE CASE,
 9   LET THEM TAKE THEIR BREAK, AND WAIT FOR THEM TO COME BACK AND
10   THEN RESUME YOUR DELIBERATIONS.  BUT DO NOT BE DELIBERATING
11   UNLESS ALL TEN ARE TOGETHER AT A TIME; SO IN TERMS OF
12   SCHEDULING YOUR BREAKS, I'LL LEAVE THAT UP TO YOU.
13           I'M GOING TO BE GIVING YOU THREE ENVELOPES; THE FIRST
14   ENVELOPE IS LABELED "JURY VERDICT FORM"; IT HAS THE JURY
15   VERDICT FORM; ONE COPY; AND THAT'S THE ONE THAT YOUR PRECEDING
16   JUROR WILL FILL OUT, SIGN, DATE, AND RETURN ONCE YOU HAVE
17   REACHED A UNANIMOUS VERDICT.
18           THE SECOND FORM ARE THE JURY NOTES.  I HAVE CORRECTLY
19   LISTED THEM, ONE THROUGH 15.  I DON'T KNOW WHY THE LAST JURY I
20   HAD DID THIS, BUT, FOR WHATEVER REASON, THEY JUST PICKED THEM
21   RANDOMLY AND THEY WEREN'T IN ORDER.  IT HELPS US IF YOU COULD
22   PICK NUMBER ONE, MAKE YOUR FIRST NOTE BE JUROR NUMBER ONE, TWO,
23   THREE, FOUR, FIVE, JUST BE MINDFUL OF THAT.
24           THE ONE JURY NOTE WE'D LIKE TO GET BACK AS SOON AS
25   POSSIBLE -- I KNOW WE'RE AT THE END OF THE DAY TODAY, SO I
```

```
 1   DON'T EXPECT IT TODAY, BUT TOMORROW MORNING -- IS JUST AN
 2   INDICATION OF YOUR SCHEDULE THAT YOU ARE GOING TO BE KEEPING
 3   TOMORROW AND THEREAFTER, JUST SO THAT I CAN LET THE ATTORNEYS
 4   KNOW.  BECAUSE I'LL EXPECT LEAD COUNSEL FOR BOTH SIDES TO BE
 5   PRESENT WHENEVER YOU ARE DELIBERATING.
 6        AND THEN THERE ARE COPIES OF THE JURY INSTRUCTIONS
 7   THAT I READ THIS MORNING.  THERE ARE TEN COPIES, ONE FOR EACH
 8   OF YOU, TO USE; SO THOSE ARE THE THREE FOLDERS THAT WILL BE
 9   GOING BACK WITH YOU TO THE JURY ROOM.
10        AT THIS TIME, I'D ASK THE BAILIFF TO COME FORWARD AND
11   BE SWORN IN.
12             THE CLERK:  PLEASE STATE YOUR NAME FOR THE RECORD.
13             BAILIFF:  SCOTT EVANS.
14             (CLERK GIVES OATH TO BAILIFF. )
15             BAILIFF:  I DO.
16             THE COURT:  VERY WELL.
17        LET'S EXCUSE THE JURY AT THIS TIME.
18        MR. HOLMES, IF YOU WOULD TAKE THESE THREE FOLDERS
19   WITH YOU.
20        ALL RISE FOR THE JURY.
21             (WHEREUPON JURORS DEPART COURTROOM.)
22             THE COURT:  COUNSEL, I CONGRATULATE BOTH SIDES ON
23   OUTSTANDING CLOSING ARGUMENTS.  IT WAS TRULY A PLEASURE.  BOTH
24   SIDES MADE OBJECTIONS, THAT I OVERRULED.  I THINK THAT THERE
25   MAY HAVE BEEN A NUMBER OF STATEMENTS MADE THROUGHOUT BOTH
```

05:03

05:04

05:04

05:04

05:0

1   CLOSINGS THAT CERTAINLY PUSHED THE LINE, PERHAPS, BUT I BELIEVE

2   OVERALL THAT YOU STAYED WELL WITHIN THE DEFINED PARAMETERS AND

3   REPRESENTED YOUR CLIENTS VERY ZEALOUSLY, BUT FAIRLY, AND ANY

4   CONCERNS WERE FULLY ADDRESSED BY THE JURY INSTRUCTIONS AND THE

5   REPEATED ADMONITIONS TO THE JURY ABOUT THE ROLE OF ARGUMENTS BY          05:06

6   COUNSEL AND THE PRIMARY ROLE, OF COURSE, OF THE EVIDENCE AND

7   THE COURT'S INSTRUCTIONS; SO I DID NOT INTERRUPT OR FURTHER

8   INTERVENE.

9           JUST FOR THE RECORD, PLAINTIFF USED ALL BUT ONE

10  MINUTE OF THEIR TWO AND A HALF HOURS, AND DEFENSE USED ALL BUT          05:06

11  FOUR MINUTES OF THEIR TWO AND A HALF HOURS, SO THEIR ESTIMATES

12  WERE PRETTY CLOSE.  I APPRECIATE YOUR EFFORTS.  I KNOW NOW THE

13  HARD PART BEGINS, THE WAITING AND THE PACING.

14          I DO EXPECT COUNSEL TO BE PRESENT WHILE THE JURY IS

15  DELIBERATING TO ANSWER ANY NOTES PROMPTLY, AND WE, OF COURSE,          05:07

16  WILL BE MAKING SURE THAT YOU'RE MADE AWARE OF ANY NOTES THAT

17  COME OUT AS SOON AS THEY COME OUT.

18          I WOULD WAIT AROUND TONIGHT, FOR THE NEXT 20 MINUTES.

19  I PRESUME THE JURY IS GOING TO DISBURSE WITHOUT SENDING ANY

20  NOTE IN; BUT, NOT KNOWING THAT, I'D ASK YOU TO WAIT AROUND FOR          05:07

21  ABOUT 20 MINUTES OR SO.

22          I THINK THAT'S ALL I HAVE.

23          IS THERE ANYTHING FROM PLAINTIFF?

24      **MR. PRICE:**  WONDERING IF IT'S OKAY -- WE'LL STAY HERE

25  TONIGHT, BUT, IF IT'S OKAY ON THE OTHER DAYS, OR DAY, THAT WE          05:07

1   BE WITHIN TEN MINUTES OF THE COURTHOUSE?

2        **THE COURT:**  THAT'S FINE.  JUST MAKE SURE MR. HOLMES

3   HAS A WAY OF CONTACTING YOU.

4        **THE COURT:**  MR. ZELLER?

5        **MR. ZELLER:**  NUMBER ONE, THE PEOPLE RESPONSIBLE FOR          05:07

6   THE TECHNICAL SIDE ARE INTERESTED IN KNOWING WHETHER THEY NEED

7   TO ALSO REMAIN IN CASE THERE'S A PLAYBACK OF VIDEO.

8        **THE COURT:**  FRANKLY, THEY ARE PROBABLY MORE IMPORTANT

9   THAN THE LAWYERS.

10       **MR. ZELLER:**  THAT'S WHAT I TRIED TO EXPLAIN.               05:08

11       **THE COURT:**  THE TECHNICAL PEOPLE HAVE BEEN ABSOLUTELY

12  OUTSTANDING AND CRITICAL IN THIS PRODUCTION AS IT WERE, AND I

13  APPRECIATE THEIR EFFORTS, AND I CERTAINLY WOULD APPRECIATE IF

14  THEY WERE AVAILABLE FOR ANYTHING LIKE THAT, IF WE NEED TO FIND

15  ANYTHING QUICKLY OR IF THE JURY NEEDS ANY PLAYBACK.              05:0(

16       **MR. ZELLER:**  THANK YOU.

17       AND THEN THERE IS AN ISSUE CONCERNING WHAT GOES BACK

18  TO THE JURY WITH RESPECT TO ONE EXHIBIT, WHICH THE COURT MAY

19  RECALL IS THAT BINDER THAT I BELIEVE WAS SHOWN AND IT WAS

20  CONDITIONALLY ADMITTED IN CONNECTION WITH MS. GARCIA'S          05:0:

21  TESTIMONY, I BELIEVE.  IT IS EXHIBIT 17770.

22       **THE COURT:**  THESE ARE THE FABRIC SWATCHES.

23       **MR. ZELLER:**  YES.

24       **THE COURT:**  THIS WAS BACK ON MAY 30.

25       YOU'D HAVE TO REFRESH MY RECOLLECTION IN TERMS OF THE        05:0

1  CONDITION UPON WHICH IT WAS ADMITTED.

2      **MR. ZELLER:** THE COURT WILL RECALL -- AND THIS IS

3  REFLECTED IN THE TRANSCRIPT AS WELL -- IS THAT IT'S A FAIRLY

4  SIZABLE BINDER.  IT HAS FABRIC SWATCHES, OTHER KINDS OF

5  DOCUMENTS, I THINK, THAT ARE MOSTLY RELATED TO THE FASHIONS.          05:09

6  IT COVERS A FAIRLY LENGTHY TIME PERIOD.  SOME OF IT IS

7  CERTAINLY THE RELEVANT TIME PERIOD EARLY ON IN THIS BINDER, AND

8  THEN IT GOES ON WELL INTO THE SUBSEQUENT TIME PERIODS.

9      MR. PRICE MADE AN OBJECTION, PARTLY, IN LARGE PART,

10  BECAUSE AT THAT POINT WE HAD NOT HAD AN OPPORTUNITY TO GO           05:09

11  THROUGH EVERY SINGLE PAGE OF THAT BINDER.

12      AND AGAIN, THERE'S NO DISPUTE THAT AT LEAST SOME OF

13  THAT BINDER IS RELEVANT BY BOTH PARTIES' LIGHTS.  BUT THEN

14  THERE ARE LATER MATERIALS THAT WE DO HAVE AN ISSUE WITH AND IT

15  BEING AVAILABLE TO THE JURY AND GOING BACK, IF THE JURY --          05:09

16      **THE COURT:**  WHAT'S THE CONCERN?

17      **MR. ZELLER:**  I THINK THE CONCERN IS, YOUR HONOR, THAT

18  IT GETS US OUTSIDE OF THE TIME PERIOD.

19      MATTEL HAS CERTAINLY TRIED TO PUT ON EVIDENCE AFTER

20  THE TIME PERIOD.  THE COURT HAS --                                  05:1

21      **THE COURT:**  CAN I SEE THIS BINDER IN QUESTION?

22      WHILE WE'RE DOING THAT, I HAVE RECEIVED AN ADMITTED

23  EXHIBIT LIST, STAMPED TODAY, JULY 10TH, 2008, WHICH I

24  UNDERSTAND HAS BEEN REVIEWED BY BOTH THE PARTIES AND IT HAS

25  BEEN AGREED TO AS THE FINAL EXHIBIT LIST AS TO WHAT HAS BEEN        05:1

```
 1    ADMITTED.

 2            IS THAT CORRECT?

 3            MR. NOLAN:   THAT'S CORRECT.

 4            THE COURT:   MATTEL?

 5            MR. ZELLER:   I'M TOLD THAT THAT IS LIKELY THE ONE.      05:11

 6        IF IT REFLECTS THAT 17770, WHICH WE'RE DISCUSSING,

 7    WAS CONDITIONALLY ADMITTED, THAT WOULD APPEAR TO BE IT.

 8            THE COURT:   I NEED SOMETHING A LITTLE MORE

 9    UNEQUIVOCAL THAN THAT.

10            MR. ZELLER:   MR. GRANT HAS CONFIRMED TO ME THAT THIS   05:11

11    IS IT.

12            THE COURT:   VERY WELL.   THEN THIS WILL BE THE EXHIBIT

13    LIST.  AND MR. HOLMES, YOU'LL FILE THIS.

14            THIS IS THE BINDER HERE, 17770.

15            MS. AGUIAR:   MAY I BE HEARD?                            05:11

16            THE COURT:   THE STANDARD THAT I HAVE EMPLOYED

17    THROUGHOUT ALL OF THESE, WHERE THERE ARE MULTIPLE SHEETS,

18    MULTIPLE DATES OR ENTRIES, THOSE PORTIONS THAT ARE PUT BEFORE A

19    WITNESS AND ARE THE SUBJECT OF TESTIMONY IS WHAT GOES IN, AND

20    EVERYTHING ELSE HAS BEEN REDACTED.   THAT IS WHAT WE'VE DONE IN  05:11

21    THE ARTICLES; THAT'S WHAT WE HAVE DONE WITH BOOKS; THAT'S WHAT

22    WE'VE DONE WITH MAGAZINES.  AND THAT WHAT IS WHAT I'LL PROBABLY

23    DO WITH THIS.

24            DO WE HAVE A RECORD OF WHAT PAGES WERE ACTUALLY SHOWN

25    TO THE WITNESS?                                                 05:12
```

1          **MS. AGUIAR:**  THE RELEVANT PAGES OF THE TRANSCRIPT ARE

2   PAGES 835 AND 836.  THE EXCHANGE WAS THAT I OFFERED IT FOR

3   IDENTIFICATION, AND I EXPLAINED THAT IT CAN'T BE TAKEN APART

4   BECAUSE OF THE NATURE OF IT, AS YOU CAN SEE THERE.  AND YOU

5   THEN SAID THAT YOU UNDERSTOOD THAT AND THAT YOU WERE GOING TO          05:12

6   ADMIT IT.  AND YOU SAID, "MR. PRICE, I'LL GIVE YOU AN

7   OPPORTUNITY TO REVIEW THIS DURING THE BREAK.  IF THERE'S

8   PARTICULAR PAGES THAT YOU OBJECT TO, I'LL GIVE YOU LEAVE TO

9   RENEW YOUR OBJECTION."

10          THAT'S NUMBER ONE.                                            05:12

11          MR. PRICE DID REVIEW IT AT THE BREAK AND NEVER

12   RENEWED THAT OBJECTION OR MADE ANY OTHER OBJECTION WHATSOEVER

13   ON THE RECORD AT ANY TIME AFTER THAT.

14          MR. ZELLER MADE A PASSING REFERENCE TO THE FACT THAT

15   MATTEL HAD NOT BEEN ABLE TO REVIEW THIS EXHIBIT.  I'M SURE,          05:13

16   ACTUALLY, IF HE ASKS HIS PEOPLE WHO ARE ASSISTING IN THIS

17   PROCESS, THE ASSOCIATES WHO WORK WITH HIM, AND HIS SUPPORT

18   STAFF, THEY WILL TELL YOU THAT THEY HAD EVERY SINGLE PAGE OF

19   THIS.  THEY ACTUALLY LOOKED AT THIS TANGIBLE EXHIBIT PRIOR TO

20   TRIAL; SO IT'S NOT THE CASE THAT THEY DIDN'T HAVE THIS EXHIBIT.      05:1.

21          I WOULD ALSO SAY, YOUR HONOR, THAT I ASKED TO BE ABLE

22   TO PUBLISH IT TO THE JURY; AND SO I PASSED THIS EXHIBIT AROUND

23   TO THE JURY MEMBERS WHO ACTUALLY, AS I RECALL, TOOK A

24   SIGNIFICANT AMOUNT OF TIME LOOKING AT IT.

25          SO I THINK TO NOW, AFTER, ONE, THEY SAW THIS EXHIBIT          05:1

```
 1   AND HAD PLENTY OF TIME TO OBJECT TO IT; AND TWO, YOU SAID ON
 2   THE RECORD THAT YOU WERE GOING TO GIVE HIM LEAVE TO LOOK AT IT
 3   ON THE BREAK AND RENEW ANY OBJECTION, AND HE DIDN'T; AND YOU
 4   LET ME PUBLISH IT TO THE JURY.  NOW, IF THEY DON'T SEE THIS
 5   EXHIBIT, I THINK IT'S PREJUDICIAL TO US THAT ALL OF A SUDDEN AN     05:1(
 6   EXHIBIT THAT WASN'T JUST FLASHED UP ON THE SCREEN FOR A MOMENT
 7   BUT THAT THEY PROBABLY SPENT BETWEEN FIVE AND TEN MINUTES
 8   LOOKING AT, NOW DOES NOT GO BACK TO THE JURY.  SO I THINK THE
 9   TIME TO OBJECT TO THIS EXHIBIT HAS PASSED.  AND THE NATURE OF
10   IT IS SUCH THAT IT SHOULD NOT BE TAKEN APART.                      05:1(
11             THE COURT:  MR. ZELLER?
12        MR. ZELLER:  YES.
13             IN TERMS OF WHAT I WAS REPRESENTING TO THE COURT IS
14   THAT THE REASON IT WAS CONDITIONALLY ADMITTED IS BECAUSE WE
15   DIDN'T HAVE THE OPPORTUNITY TO LOOK AT EVERY PAGE PRIOR TO THE     05:1(
16   TIME IT WAS SHOWN TO MS. GARCIA.
17             THE COURT:  SINCE MAY 30TH, I TRUST YOU HAVE.
18        MR. ZELLER:  YES.
19             AND THAT'S SPECIFICALLY --
20        THE COURT:  WHAT PAGES ARE YOU OBJECTING TO?                  05:1(
21             THIS SEEMS LIKE A LOT OF FABRIC.
22        MR. ZELLER:  WHAT WE HAVE OFFERED TO DO, YOUR
23   HONOR -- AND I THINK THIS FAIRLY STATES WHAT OUR OBJECTION
24   WOULD BE AS WELL -- IS THAT ANYTHING AFTER A DATE CERTAIN -- WE
25   CAN BE SOMEWHAT FLEXIBLE ON THAT; IF IT WAS, SAY, AS OF OR         05:1(
```

| | |
|---|---|
| 1 | AFTER NOVEMBER 7TH, 2000, WE DON'T THINK SHOULD BE IN THERE. |
| 2 | THERE'S CLEARLY STUFF FROM LATER TIME PERIODS.  IT WOULD SEEM |
| 3 | LIKE THE MOST RATIONALE WAY OF DEFINING THIS EXHIBIT WOULD BE |
| 4 | BY TIME PERIOD. |
| 5 | THE COURT WILL ALSO RECALL, OF COURSE, THIS WAS |
| 6 | SOMEWHAT MORE -- THIS WAS EARLY ON THAT THERE WAS PERHAPS SOME |
| 7 | ADDITIONAL ISSUES ABOUT WHAT THE RELEVANT TIME PERIOD WAS |
| 8 | ULTIMATELY GOING TO BE AT THAT TIME.  BUT CLEARLY AT VARIOUS |
| 9 | TIMES, BOTH PARTIES, INCLUDING MATTEL, WERE PRECLUDED FROM |
| 10 | PUTTING ON EVIDENCE AS TO LATER TIME PERIODS.  AND I THINK |
| 11 | THAT'S THE STANDARD HERE. |
| 12 | I RESPECTFULLY DISAGREE WITH MGA'S POSITION THAT SOME |
| 13 | HOW IT WAS INCUMBENT ON US -- THIS WAS A CONDITIONALLY ADMITTED |
| 14 | EXHIBIT.  IT WAS INCUMBENT UPON THEM TO HAVE IT PROPERLY MOVED |
| 15 | INTO EVIDENCE.  AND I DON'T SEE HOW WE HAVE WAIVED IN ANY WAY |
| 16 | WHAT HAS BEEN CLEARLY STATED AS A RELEVANCE OBJECTION TO AT |
| 17 | LEAST PORTIONS OF THIS BINDER. |
| 18 | AND I'M SURE THAT LOGISTICALLY IT CAN BE WORKED OUT, |
| 19 | FOR PURPOSES OF WHAT GETS SHOWN TO THE JURY, AT A MINIMUM, JUST |
| 20 | SIMPLY BY PHOTOCOPYING THE RELEVANT PAGES, HAVING THAT MARKED |
| 21 | AS THE APPROPRIATE EXHIBIT, AND PROVIDING THAT TO THE JURY. |
| 22 | **THE COURT:**  THANK YOU, COUNSEL. |
| 23 | I HAD ASKED YESTERDAY FOR THERE TO BE A COMPREHENSIVE |
| 24 | REVIEW OF THE EXHIBITS COMPLETED YESTERDAY; AND THAT IF THERE |
| 25 | WERE ANY PROBLEMS WHATSOEVER, FOR THIS TO BE BROUGHT TO THE |

05:15

05:15

05:15

05:1

05:1

```
 1   COURT'S ATTENTION AT 8:30 THIS MORNING.  NOT AT 5:15 TONIGHT.
 2            THE OBJECTION IS OVERRULED.  THE EXHIBIT IS ADMITTED.
 3            WE'RE DONE WITH THIS.
 4            THE JURY HAS RETURNED A NOTE.  APPARENTLY
 5   NOTWITHSTANDING MY REQUEST THEY USE NOTES IN ORDER, THE FIRST
 6   NOTE RECEIVED IS JURY NOTE NUMBER FOUR.
 7            (LAUGHTER.)
 8            THE COURT:  I ALSO RECEIVED JURY NOTE NUMBER ONE.
 9            THE ONLY GOOD NEWS IN THIS IS THAT THEY ARE
10   CONSISTENT.
11            BOTH NOTES INDICATE THAT THE JURY WILL BE WORKING
12   TUESDAY THROUGH FRIDAY FROM 9:15 TO 5:00, TAKING A LUNCH AT
13   12:30.
14            THEY ARE GONE FOR THE DAY.
15            MR. PRICE:  CAN WE ASK HOW LONG LUNCH WOULD BE?
16            THE COURT:  THEY DIDN'T SAY THAT IN EITHER NOTE.
17            COUNSEL, THE PRACTICE OF THE COURT IS TO MAKE
18   PHOTOCOPIES OF THE NOTES AND PROVIDE THEM TO BOTH COUNSEL.
19            MR. HOLMES, IF YOU'LL DO THAT.
20            ANYTHING FURTHER FROM MATTEL?
21            MR. ZELLER:  WE DO HAVE THE ORIGINAL OF THE NOTEBOOK,
22   1155-C, AND I'LL DELIVER THAT TO MR. HOMES.
23            THE COURT:  EXCELLENT.
24            ANYTHING FURTHER FROM MGA?
25            MS. AGUIAR:  WE ALSO NEED TO LODGE WITH YOUR HONOR
```

1   THE PORTFOLIOS THAT HAVE THE VERDICT FORM DRAWINGS IN THEM.

2   HOWEVER YOU HONOR THINKS IT'S APPROPRIATE TO DO THIS, I WAS

3   WONDERING IF THE JURY COULD BE INSTRUCTED THAT WITH REGARD TO

4   THESE ORIGINALS, THESE DRAWINGS, THAT THEY HAVE BEEN PUT INTO

5   THE PROTECTIVE SLIP SHEETS AND THAT THEY NOT REMOVE THEM,          05:18

6   BECAUSE A LOT OF THEM ARE ON TRACING PAPER AND VERY THIN PAPER.

7          THE COURT:  VERY WELL.

8          MS. AGUIAR:  IF SOMEONE SPILLS THEIR LATTE ON LUPE,

9   IT'S NOT GOING TO BE A GOOD SCENE.

10         THE COURT:  I'LL INSTRUCT MR. HOLMES, WHEN HE              05:10

11  DELIVERS THOSE TO THE JURY, TO SIMPLY INSTRUCT THEM TO NOT

12  REMOVE THEM WITHOUT COURT PERMISSION.  IF THEY NEED TO HAVE

13  THEM REMOVED FOR SOME PURPOSE, THAT WE WILL DO THAT HERE IN THE

14  COURTROOM.

15         MS. AGUIAR:  THANK YOU.  I APPRECIATE THAT.  WE'LL         05:1

16  LEAVE THESE WITH MR. HOLMES.

17         THE COURT:  VERY WELL.

18         ANYTHING FURTHER FROM MGA?

19         MR. NOLAN:  NOTHING FURTHER, YOUR HONOR.

20         THANK YOU.                                                 05:1

21         THE COURT:  COURT IS ADJOURNED.

22         GOOD AFTERNOON.

23         (CONCLUSION OF AFTERNOON SESSION.)

24  / / /

25  / / /

1                              CERTIFICATE

2

3     I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
      STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
4     THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
      ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
5     CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
      THE UNITED STATES.

6

7

8     THERESA A. LANZA, RPR, CSR                    7-14-08
      OFFICIAL COURT REPORTER                          DATE
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25