1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    ---

4     **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                    ---

6   MATTEL, INC.,                    :   PAGES 5490 - 5576
                                     :
7          PLAINTIFF,                :
                                     :
8      VS.                           :   NO. ED CV04-09049-SGL
                                     :   [CONSOLIDATED WITH
9   MGA ENTERTAINMENT, INC.,         :   CV04-9059 & CV05-2727]
    ET AL.,                          :
10                                   :
           DEFENDANTS.               :
11  _____ :

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               RIVERSIDE, CALIFORNIA

17            WEDNESDAY, JULY 23, 2008

18              JURY TRIAL - DAY 27

19               AFTERNOON SESSION

20

21

22                          MARK SCHWEITZER, CSR, RPR, CRR
                            OFFICIAL COURT REPORTER
23                          UNITED STATES DISTRICT COURT
                            181-H ROYBAL FEDERAL BUILDING
24                          255 EAST TEMPLE STREET
                            LOS ANGELES, CALIFORNIA 90012
25                          (213) 663-3494

CERTIFIED COPY

1   **Appearances of Counsel:**

2

3   On Behalf of Mattel:

4       Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
        By John B. Quinn, Esq.
5          B. Dylan Proctor, Esq.
           Michael T. Zeller, Esq.
6          Harry Olivar, Esq.
           John Corey, Esq.
7          Diane Hutnyan, Esq.
           William Price, Esq.
8       855 South Figueroa Street
        10th Floor
9       Los Angeles, CA 90017
        (213) 624-7707

10

11

12   On Behalf of MGA Entertainment:

13      Skadden, Arps, Slate, Meagher & Flom LLP
        By Thomas J. Nolan, Esq.
14         Carl Alan Roth, Esq.
           Jason Russell, Esq.
15         Lauren Aguiar, Esq.
           David Hansen, Esq.
16         Matthew Sloan, Esq.
           Robert Herrington, Esq.
17      300 South Grand Avenue
        Los Angeles, CA 90071-3144
18      (213) 687-5000

19

20

21

22

23

24

25

1                    **I N D E X**

2

3  **OPENING STATEMENT BY COUNSEL FOR THE DEFENSE**.......... 5498

4  **NINETTE PEMBLETON, SWORN**............................. 5559

5  **DIRECT EXAMINATION** BY MR. QUINN: ..................... 5560

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5493

| | |
|---|---|
| 1 | **Riverside, California; Wednesday, July 23, 2008** |
| 2 | **1:40 P.M.** |
| 3 | **(HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)** |
| 4 | THE COURT:  Okay.  We're back on the record outside |
| 5 | the presence of the jury.  The Court wants to take up this |
| 6 | issue raised by MGA concerning the appropriateness of |
| 7 | disgorgement of profits as a remedy for the stated court |
| 8 | claims. |
| 9 | Before the break, Mr. Nolan, I asked you what is |
| 10 | the authority for your proposition that disgorgement of |
| 11 | profits is not an appropriate remedy for -- is not the right |
| 12 | measure of damages for the state tort claims.  I asked you |
| 13 | where is it.  You said it's in the JMOL.  Show me. |
| 14 | MR. NOLAN:  Okay. |
| 15 | THE COURT:  I understand the preemption argument. |
| 16 | And that's separate.  Where is the authority that |
| 17 | disgorgement is not the right remedy?  I don't see it, and |
| 18 | I've read it twice now. |
| 19 | MR. NOLAN:  What I'm saying is that this Court, in |
| 20 | its order of April 25th, 2008, said that to the extent that |
| 21 | Mattel's intentional interference in and unfair competition |
| 22 | claims are preempted by the Copyright Act, to the extent that |
| 23 | they are based on Mattel's right to Bratz, they are |
| 24 | preempted. |
| 25 | THE COURT:  I understand that. |

```
 1          MR. NOLAN:  My point is that I think it is proper
 2    law that disgorgement might be the appropriate remedy in
 3    certain circumstances for aiding and abetting or the other
 4    tort claims, breach of fiduciary duty.  However, it cannot be
 5    the case in a situation where Mattel is presenting to this
 6    jury in effect two alternative theories by which they get a
 7    lot of money.
 8          THE COURT:  Now, that assumes the Court finds
 9    preemption on the breach of fiduciary duty; correct?  That's
10    your argument here.  You're not arguing, as you stated before
11    the break, that disgorgement is not an appropriate remedy for
12    a breach of fiduciary duty.  Because I've got to clean this
13    record up.  Because I'm going to quote here from
14    San Bernardino -- San Bernardino, 158 Cal.App. 4th at 543.
15    Quote, disgorgement of profits is particularly applicable in
16    cases dealing with breach of a fiduciary duty and is a
17    logical extension of the principle that public officials and
18    other fiduciaries cannot profit by a breach of their duty.
19          So beginning with a statement that Mr. Zeller cited
20    in 1937 right up until recent time, in California
21    disgorgement of profits is the right remedy for the breach of
22    fiduciary duty.
23          Now, there may be an argument separate and apart
24    from that on preemption.  But I just want to be clear.
25    Statements are being made, and I understand that we're
```

1  reaching a point where -- I'm sensing that we're reaching a

2  point from MGA's perspective that a lot of arguments are

3  being thrown up that are not being well thought through.   And

4  this is another example of that.   Please be careful in what

5  you're saying.

6           MR. NOLAN:   Your Honor?

7           THE COURT:   Yes.

8           MR. NOLAN:   Everything I said in the context of

9  this issue has always been framed in the fashion as I've just

10  described it now.   To the extent that before the lunch hour I

11  made the comment that the disgorgement profits analysis of

12  the remedy is not appropriate, I was talking about this case,

13  your Honor.   And I apologize if it was short-handed.   I was

14  trying to get the Court's attention.   I had always, from the

15  day that we filed or had the first argument on the JMOL to

16  last Friday to last night, framed the issue as it is being

17  framed in this.   And you know, to clear the record up, your

18  Honor --

19           THE COURT:   Actually, you didn't.   You did not move

20  for summary judgment on these two claims.   You moved for them

21  on the other two claims.   You've now moved for them on the

22  JMOL.

23           MR. NOLAN:   I meant the JMOL.   In the context of

24  the JMOL, we framed the argument --

25           THE COURT:   You're asking the Court to find that

 1    they are preempted.  And that's an entirely different

 2    argument than the one that was made on the telephone

 3    conference Monday evening and the one that was made before

 4    lunch, which said that disgorgement of profits and the one

 5    that was made at sidebar -- and I've reviewed the transcripts

 6    on this.  The argument that you've been pressing is that

 7    disgorgement of profits is not an appropriate or not the

 8    right measure of damages.  That's just not true.

 9              MR. NOLAN:  To the extent that the Court -- you're

10    right, your Honor.  To the extent that I framed the issue

11    that way, it was wrong.  But it was not unfounded in the

12    context of how we've been arguing this on the --

13              THE COURT:  Now I will address the issue of the

14    JMOL, and I'm going to defer final ruling on this, as I

15    indicated, until the trial is over because frankly, I think

16    further briefing needs to be done on both sides of the issue.

17    What was submitted is pursuant to the Court's directions, a

18    rather limited briefing on that, but frankly, the preemption

19    issue on the fiduciary duty, the Del Madera case I don't

20    think blocks the claim at this point.  That's my tentative

21    thoughts.  There is a clear additional element, that extra

22    element that I found on the Motion for Summary Judgment here,

23    and that's namely the confidential relationship, the

24    fiduciary relationship that's established by section 1 of the

25    contract, and that's what's been established in the first

 1    phase of the trial.

 2              I think there's sufficient evidence of that.

 3    That's my tentative thoughts.   I will revisit this at the

 4    end, but it certainly does not interfere at this point, given

 5    the jury's clear finding in pursuing these remedies.

 6              Mr. Zeller?

 7              MR. ZELLER:   I don't really have anything to add,

 8    your Honor.   It's just that if the Court is interested, I can

 9    certainly provide additional authority on the appropriateness

10    of the remedy, including in addition to the restatement,

11    there are a number of cases that I looked at --

12              THE COURT:   I just found one quickly.   There's no

13    authority to the contrary.   So that's a red herring as far as

14    the Court is concerned at this point.   The preemption

15    argument I don't think goes anywhere in light of the long

16    string of California cases which clearly hold that a breach

17    of fiduciary duty and a -- the elements of the breach of

18    fiduciary duty render it separate and apart from a claim for

19    copyright infringement, assuming that the breach and the duty

20    are established.   Those were the elements given to the jury,

21    and I think there's sufficient evidence to support that.

22              Outside of that, I don't know if there's anything

23    else left to argue here.

24              MR. NOLAN:   No, your Honor.   We'll submit it.

25              THE COURT:   Very well.   And the objection on that

```
 1    point is overruled.  We'll resume with the jury trial at

 2    2:00.

 3                (Recess taken.)

 4                (WHEREUPON THE JURY ENTERS.)

 5                THE COURT:  Good afternoon, members of the jury.

 6                Mr. Nolan, you may proceed with your opening

 7    statement.

 8                MR. NOLAN:  Thank you.

 9                OPENING STATEMENT BY COUNSEL FOR THE DEFENSE

10                MR. NOLAN:  May it please the Court, good

11    afternoon.

12                Well, it's been five days.  Thursday was a tough

13    night.  And I know on behalf of our team, we appreciate your

14    hard work and your dedication.  We accept your verdict.  We

15    fought hard for a different verdict.  We accept it.  I will

16    say it's those times when you most appreciate your family and

17    friends.

18                But you know, you sat through Mr. Price's argument,

19    and it brings me back right where I've always been about this

20    case.  As bad as Thursday evening was, I never understood

21    that you had convicted us of a crime when Mr. Price says

22    crime never pays.

23                I also think that a corollary to that is that the

24    punishment should fit the crime.  And Mr. Price used the

25    analogy.  I thought it was an interesting analogy in the
```

```
 1   sense that he said it's like someone stole a car and it

 2   doesn't matter what you sell the car for.  Whoever owned the

 3   car gets the price.

 4           I don't know if that's the perfect analogy for this

 5   case.  I think I can improve upon it.  I think the evidence

 6   in this case is going to show that it's much more like this.

 7           Somebody who never designed a car before, no one

 8   who had ever drawn engineering plans for a car, no one who

 9   had ever worked mechanically on an engine of a car

10   nevertheless draws a picture of a car.  And someone takes

11   that picture and looks at it and says it's a picture of a

12   car.  I'm going to risk millions of dollars, and I'm going to

13   hire engineers because these drawings don't tell me how this

14   car is supposed to run.  It doesn't tell me what size engine

15   it has.  It doesn't tell me really enough to get me started.

16           And so the person goes out and hires engineers,

17   mechanics, designers.  They test the car.  The car wins the

18   Indianapolis 500.  Much to the joy of everybody on the team

19   and much to the adoration of the world, and the guy comes in,

20   or the woman -- I'm sorry -- and says wow, the car is based

21   on my drawing.  I get it all.  And you might say well, wait a

22   minute.  What about the engineers?

23           MR. PRICE:  Your Honor, this is inappropriate

24   argument.

25           THE COURT:  Sidebar, Counsel.
```

1          **(SIDEBAR CONFERENCE HELD.)**

2          THE COURT:   Counsel?

3          MR. PRICE:   First, it is an extended argument.

4    Second, it's an argument contrary to the law.  What he's

5    saying is that you don't have to disgorge your profits.

6          THE COURT:   I am not so much concerned about the

7    first element.  Because Mr. Price did argue in his closing,

8    and I think he opened that up, and we're in the middle of

9    trial here.  But as to the second one, I am concerned.

10   That's exactly what I was thinking when he objected.

11         MR. NOLAN:   I'm making --

12         THE COURT:   The extended example that you're

13   giving, the fair implication for that is suggesting that it's

14   arguing against the law, but I'm going to be instructing at

15   the end of the case.

16         MR. NOLAN:   On copyright damages, we're entitled to

17   put forth evidence of apportionment.  What part led to the

18   success, if you would, in the analogy of my case, of winning

19   the Indianapolis 500.  It is akin to the effort the MGA team

20   did with respect to various components that the experts would

21   testify to.  They have a view as to how much value should be

22   put on branding versus character development versus

23   marketing, and all I'm saying in this analogy, it's like them

24   coming back and saying no, the driver doesn't get any money,

25   the engine -- that's what I'm working on.  The copyright --

1    MR. PRICE:  Actually, our analysis, we deduct the

2    costs.  The profit, the revenue minus the costs.  He just

3    said you don't pay the driver and all that stuff.  Yes, you

4    do.  We don't get it unless it's a profit.

5        THE COURT:  I'm concerned that the argument is

6    confusing at this point.  And it's better reserved for

7    closing argument as opposed to an opening statement.  I'll

8    give you some more leeway to prop it up, and let's move on

9    and get to what the evidence will show.

10       MR. PRICE:  Are we continuing with the analogy?

11       THE COURT:  Just wrap it up, and we'll move on.

12       **(CONCLUSION OF SIDEBAR CONFERENCE.)**

13       MR. NOLAN:  Thank you, your Honor.  May I proceed?

14       THE COURT:  Please.  Thank you, Counsel.

15       MR. NOLAN:  So just to finish this analogy,

16   Mr. Price's -- the testimony in this trial will talk about

17   apportionment of damages and what values should be as to

18   certain activities by MGA.  And what we're saying here is

19   that what Mattel would say is that nobody would get credit in

20   my analogy other than the person that did the drawings.

21       So let's talk about what this case is about.  We

22   heard eight weeks of testimony about the timing of drawings,

23   when they occurred, 1998, or was it while Mr. Bryant was

24   employed at Mattel.  And the time line or the story stopped

25   on October 19th of 2000.

5502

```
 1            This phase is not about Carter Bryant's drawings or

 2   the timing of them.  This phase doesn't stop at October 19th

 3   of 2000.  This case is about the rest of the story and what

 4   happened with respect to Bratz.

 5            There are two distinct portions of this case that I

 6   want to be addressing today.  One is what we described as the

 7   state law claims.  Those are the employment relationship type

 8   of claims that you rendered your verdict on, and then there's

 9   the copyright damages.

10            I want to address both of those separately and deal

11   with the damages separately with respect to both of these.

12            But up until now, you know Bratz as consisting of

13   four characters that Mr. Bryant had the idea for and the

14   drawings.  Today Bratz is a trademark, a name, a claim that

15   is not involved in this case.  Bratz, as you heard in Phase

16   1-A, was purchased by Mr. Larian, and we own the trademark.

17   This case is also --

18            MR. PRICE:  Objection.  That misstates the prior

19   evidence in the case.  Inappropriate legal argument.

20            THE COURT:  Sustained.  This is not about

21   trademark.  Let's move on, Counsel.

22            MR. NOLAN:  That was the point.  Thank you.

23            There are now 30 different characters.  There have

24   been more than 70 play themes introduced by MGA.  Hundreds of

25   different fashions.  Hundreds of accessories.  In the opening
```

5503

1   statement of Mattel, they pointed you to the bunny on the

2   backpack.  But today the accessories have grown from pets to

3   bicycles, sleeping bags, and bubble bath.

4           Mattel is claiming hundreds of millions of dollars

5   off of a series of drawings done by Carter Bryant.  Two

6   dimensional, that Mr. Bryant admitted he never provided any

7   engineering drawings for, never turnaround drawings.  In

8   fact, at the time when he turned over the drawings to

9   Ms. Leahy to do the sculpt, you'll recall that in addition to

10  his drawings, he turned over the double angel ad by Steve

11  Madden because that ad had a three-dimensional attitude

12  toward it.

13          And so the point about these drawings that I think

14  we need to focus on is the evidence will show that nobody

15  goes to Wal-Mart, Kmart, or any other toy store and pays

16  $14.99 for a set of drawings.

17          But yet, it's based on those drawings and those

18  drawings alone that Mattel wants to take the hard work of

19  1,700 employees of MGA around the world and say it all was

20  conceived by Carter Bryant.

21          Mr. Bryant's original drawings did not have any

22  play themes.  It did not have any packaging.  It had no ideas

23  connected to branding.  It had no set of instructions with

24  respect to licensing.

25          And as one of Mattel's own employees testified in

5504

 1   her deposition -- and she'll testify at trial.  Her name is

 2   Ann Driskill, she was one of the supervisors of Mr. Bryant at

 3   the design center.  She explained in her deposition it takes

 4   a big village to build a doll.

 5           I want to turn to the time line of what it took to

 6   turn Mr. Bryant's drawings into the Bratz development if I

 7   might.  On the left-hand side of the screen is the Phase 1-A

 8   trial.  And that was the evidence leading up to October 19,

 9   2000.  This phase of the trial starts at 5:00 P.M. on October

10   19th, the last day Mr. Bryant is working at Mattel.

11           Starting October 20th these are the efforts.  MGA's

12   development of the first generation Bratz dolls.  And by the

13   way, when I refer to the first generation Bratz dolls, those

14   are the dolls that you have seen depicted, the drawings that

15   you've seen depicted in the pitch book, Exhibit No. 302.  You

16   know the names.

17           It took, during this period of time, the

18   development and manufacture of the Bratz sculpt.  There was

19   the creation and the production of fashions and accessories,

20   designs and finalizing the face paint, brainstorming and

21   deciding on character names for the first generation dolls.

22           You know the evidence will show the names that

23   Carter Bryant came up with were changed.  A different idea

24   for those names, to convey a certain more focused target

25   market.  Mr. Bryant did not come up with those names while he

1    was employed at Mattel.  The evidence has been that MGA

2    considered a lot of names, considered and relied on the name

3    Bratz, not knowing, not knowing that it was one of over 50

4    names that had been submitted for a project within Mattel.

5    This name came to MGA.  We decided on it after we rejected a

6    number of other different names.

7            We also know, when you look at this time line, that

8    packaging was developed, and marketing plans were discussed.

9    Mr. Price even quoted the marketing plan.  That marketing

10   plan was not developed by Carter Bryant.  That marketing plan

11   did not exist within Mattel.  The drawings as of October 19th

12   were simply that, two-dimensional drawings.  And it takes so

13   much more than just drawings to make the successful doll.

14           Lily Martinez testified, and there was so much

15   evidence in the first phase of the trial about the fresh Toon

16   Teens drawings that Mattel argued was the inspiration for

17   Mr. Bryant.  Those were two-dimensional drawings.  But as you

18   know from the evidence, they were molded at Mattel by one of

19   the sculptors at Mattel into a 3D doll that was never sold.

20   Because it did not pass the supervisory levels within the

21   creativity section at Mattel.

22           So when you stop and look at the condition of what

23   we know today to be Bratz as of October 19th, the drawings

24   was an idea, but that idea was not terribly original in all

25   concepts.  I mean, think about this for a moment.  On the one

5506

1    hand Mattel will argue that the dolls look similar to Toon

2    Teens.  Big heads --

3              MR. PRICE:  Inappropriate argument about

4    originality which has been decided.

5              THE COURT:  Just rephrase, Counsel.

6              MR. NOLAN:  Thank you.  One of the things you will

7    be asked to decide in the copyright analysis will be to take

8    a look at the dolls and determine certain elements and

9    certain features of the dolls.  What makes them unique.  What

10   makes them creative.  And my point is that so much of the

11   idea, big head, big eyes, big feet, multi-ethnic, hip hop, is

12   really something that is not terribly unique to a Bratz

13   drawing.

14             MR. PRICE:  Objection.  Decided originality.

15             MR. NOLAN:  I'm not arguing that it's not original.

16   I'm talking about the protected elements and the creativity.

17             THE COURT:  Let's phrase it that way, Counsel.

18             MR. NOLAN:  Thank you.  Bratz was original, and it

19   was creative.  How Mr. Bryant assembled all of those

20   elements.  And there is no doubt that in a blink test, when

21   you look at a particular doll versus a drawing, you might get

22   a sense, wow, they look similar.  But in a sense, and we'll

23   go through this in a little bit.

24             So many of the fashion dolls that are sold in this

25   area bear similarities amongst them.  And so when we look at

1   and understand some of the examples that you have seen

2   already, whether or not it's My Scene or Flavas, those dolls

3   are different than the Bratz doll.  And they are different

4   because although I'm sure they had great designers and

5   possibly even great drawings, they weren't executed the same

6   way the Bratz dolls were by Mr. Larian and the team at MGA.

7   And that's the point I'm trying to make here.

8           Let me introduce you -- I told you about building

9   the Bratz brand.  And one of the questions you'll be

10  presented with is how MGA built a brand and why is it

11  successful.  Is it successful only because of the drawings.

12  And I'll submit to you that some of the factors that the

13  evidence will show which led to the success of Bratz was that

14  the brand name was easy for girls to pronounce, and they

15  understand the meaning of it.

16          The Bratz dolls appeal to older girls who have

17  outgrown Barbie, hip, cool, fun, trendy image, color scheme

18  is appealing and creates presence.  Fashions and accessories

19  are, quote, over the top, hip.  Packaging and innovative.

20  Themes are all fashion driven.

21          So when you look at a Bratz doll, much like

22  Mr. Price did in his opening statement, so much of the

23  presentation is on the first generation of Bratz and the

24  similarities with the fashions.

25          But in truth, since 2001, MGA has released two

5508

1    totally different lines of dolls, the spring and fall of each

2    year.  Each line has a different theme attached to it.  And

3    the whole creative process starts with the doll itself.  Face

4    paint change, attitudes, eye paints changed.  Every new line

5    has -- let's go to slide B 107, if I might.  Thanks.  Every

6    single theme that came up had a different theme than anything

7    that Carter Bryant's drawings had.  He had no play themes.

8              They have different fashions.  You have trial

9    Exhibits 17537 and 17581.  And Mr. Bryant had only the four

10   fashions.

11             Slide B 108, if I might.  Each of the follow-on

12   after the first generation, different face paint for the

13   characters.  Mr. Bryant had four faces.  Each of the lines

14   have different accessories.  Mr. Price talked to you about

15   the bunny rabbit on the backpack.  Here's examples of the

16   packaging and different accessories.  You can look long and

17   hard at Mr. Bryant's drawings, all of them, and you will not

18   see any of these accessories.

19             Each year, each character, different hair.  Slide

20   B 110.  Just examples that each of the dolls have different

21   hair.  You know, an interesting feature that Mr. Bryant had

22   in his drawings was the removable head.  You might recall the

23   removable head where you could change hair.  In truth, that

24   was rejected at MGA.  That doll with that idea and that

25   feature was never sold.  Every year afterwards the designers

1    at MGA come up with different hairstyles.  At times different

2    colors.  There's also different packaging.  Carter Bryant

3    never drew any packages.  He didn't have that idea when he

4    presented them in the drawing.  And as I said, different

5    themes.

6            Can I have a slide B 015.  These are just -- I'm

7    going to go through these.  You'll recall that Mr. Bryant's

8    drawings were straight-up characters, a little description of

9    different personalities, but nothing about play themes.  The

10   evidence in this case will be that play themes really play a

11   substantial role in selling the doll.  It makes sense.  Why

12   would a consumer buy 10 Sashas if they looked the same?  What

13   is the appealing nature of it?

14           And yet, Mr. Price and Mattel would argue that all

15   of the dolls are substantially similar.  Let's just go on

16   with some of the themes.  So from Bratz adventure girls,

17   upper left-hand corner, to Bratz extreme skate boarding.

18           Now, what they are going to say is, well, gee,

19   these are all substantially similar.  And there may be

20   substantial -- there may be similarities in the face or the

21   eyes on some of these, but certainly not all of them.  Ladies

22   and gentlemen, Mattel has the burden in this case of showing

23   you and proving to you each, each doll that has infringed,

24   allegedly infringed.  They cannot do it even though they are

25   limited to 12 hours.  They can't do it shorthand.  That's

1   their burden.

2         Let's continue.  Is that the last theme?  Thank

3   you.  Let's put up graphic 118, please.

4         I submit the evidence is going to pose an

5   interesting question.  Take Mattel's position that the

6   drawings are substantially similar to all of the dolls.  That

7   must beg the question, well, wow, then I would expect that

8   all the dolls would sell about the same amount.  Because if

9   you accept Mattel's version, they are substantially similar.

10   They all depend on Carter Bryant's drawings.

11         This is a graph, ladies and gentlemen, that takes

12   you through on the left-hand corner the amount of dollars and

13   the average revenue for themes, 22 through 77, and could I

14   look at Bratz Midnight Dance for a moment.  Do you have that?

15   Well, I'll come back to that in a moment.

16         But there are indications here that for each of

17   these claims allegedly with the same doll, they are not

18   selling the same.  And the reason for that is they are not

19   substantially similar.

20         We talked about characters.  I said you've already

21   known about how they -- well, there was Sasha, Yasmin, Jade,

22   and Cloe when Mr. Bryant did the drawings.  I'm sorry.  They

23   were Hallidae, Lupe, Jade, and Zoe.  I apologize.  But when

24   they were offered for sale in June of 2001, three of the

25   names had been changed.  Hallidae was changed to Sasha.  Lupe

5511

 1   was changed to Yasmin.  Jade remained the same.  And Cloe

 2   became Zoe.

 3            But after that first generation, those four

 4   characters -- and over the years MGA introduced 30 more

 5   characters.  Let's just introduce these for just a moment, if

 6   I could.  And again, when you look at the chart that I showed

 7   you about the success of the various theme dolls, Bratz sells

 8   differently, according to the character and the story theme.

 9   That would be the evidence in this case.  Mattel, with the

10   sweep of the arm, wants to tell you that they are all

11   substantially similar.

12            And here are some of the boxes.  You'll see these.

13   These will be in evidence.  Not one of these ideas are found

14   in Carter Bryant's drawings in the sense that Orianna and

15   Valentina, or Lilee, Tess, and Nona, you can look at dolls,

16   and then you can look at the drawings.  Mr. Bryant in his

17   drawings did not conceive of the idea of additional

18   characters.  MGA came up with these characters.  It's the

19   team at MGA that developed those characters, and they are not

20   substantially similar.

21            Mr. Price pointed to you the character art that

22   appeared on the box.  The impression that you may have been

23   left with is that original first generation artwork on the

24   package always remained the same.  But the evidence will be

25   that that's not the case.

1           If I could have up slide B 031.  This is character

2    art.  This is the various character arts that appear on

3    various packaging by MGA.  And you will hear testimony that

4    the character art is used on the packages.  It's used to

5    convey a look and a feel.  You'll hear testimony about how

6    MGA developed and stylized the complex character art.  These

7    drawings are not substantially similar to Carter Bryant's

8    drawings.

9           Mr. Bryant's drawings, when you look at them again,

10   there are no subbrands intended or conceived in those

11   drawings.  And yet MGA has introduced a number of subbrands.

12          Can I have B 001 up.

13          These are all of the subbrands of Bratz, built by

14   MGA, introduced into the marketplace.  Not while Mr. Bryant

15   was employed at Mattel, but on MGA time.  Mr. Bryant's

16   drawings did not include the idea for the concepts for any

17   subbrand logos.  And let's just go working through these for

18   a minute.

19          B 002.  We talked about in opening statement --

20   Mattel pointed out to you about the backpack.  Well, there's

21   no idea, no suggestion in these drawings that Mr. Bryant came

22   up with any ideas for a pet line related to Bratz.  Or B 003,

23   electronics, electronic games.  Or B 004, Bratz Games or

24   Bratz Kids, B 006.  Or Bratz babies.  Or Itsy Bitsy Bratz.

25   Or Little Angelz or Bratz Babyz.

1           These subbrands, these characters, these themes

2    were done at MGA, were not part of Mr. Bryant's organ

3    drawings, and they are the ideas.  Those are the designs that

4    drove the brand.

5           When you talk about the importance of the Bratz

6    brand, I was thinking just the other day, I think you'll have

7    this experience when you can talk to your friends after the

8    trial is over with and they ask you, you know, what case did

9    you sit on.  People ask me what case are you involved in.  I

10   think the answer will be the same.

11          I sat on the Bratz trial.  Or I tried the Bratz

12   case.  I don't think the answer is I tried the Carter Bryant

13   drawing case.  Or I sat on the Carter Bryant drawing trial.

14   The Bratz brand, the trademark Bratz is very, very powerful.

15   And it was developed by MGA.

16          Mr. Bryant had had no experience in building the

17   brand before he got to MGA.  It was built on the shoulders of

18   1,600 employees around the world for MGA.

19          You know, another thing that was not part of the

20   original idea was not in the drawings but yet is a driving

21   force in the success of MGA.  We live in the world of the

22   Internet, the websites.  Let's look at B 032 and B 036, if

23   you would.  These are the Bratz websites.  These are the

24   websites that our branding expert will tell you created the

25   environment to buy a Bratz doll for the young consumer.

1   Bratz dot com, the main website for Bratz, includes games,

2   videos, music, and many interactive features.

3              B 037.  Be-Bratz websites.  This is a website that

4   has over 300 million registered members.  It's an interactive

5   website so the girls can create and play with their

6   customized Bratz characters.  They name the Bratz characters

7   and chat with their friends.  It's through these types of

8   websites that MGA has driven the brand to the success that it

9   has.

10             There were no websites in Carter Bryant's drawings.

11             Over the years MGA has won many awards for the

12  Bratz fashion dolls, which also has helped with the branding

13  of the doll, the image that creates the need for young

14  consumers to want to have another Bratz doll.  Let's just go

15  to slides B 23 through B 29, if I could just briefly, and go

16  through it.  You've heard testimony on some of these awards

17  already.  2003.  Family fun toy of the year award.

18             MSN dot com Top Holiday Toy.

19             Yahooligans! Top 10 Toys.

20             NBC Today Show Toy Test Number 1 Winner, School Age

21  Toys.

22             2006.  Toy Wishes Hot Dozen, Bratz Forever Diamonds

23  dolls.  That was a toy theme that MGA came up with.

24             Australian girls' toy of the year.

25             Canadian toy testing council.  Three star ratings.

1          British toy awards doll of the year.

2          2005.  NBC today show Toy Test.

3          Canadian Toy Testing Council coveted three star

4    rating.

5          2005.  Best girl toy of the year by the United

6    Kingdom.

7          Back to the pictures depicted on Bratz Funk Out,

8    which is depicted next to the 2005 awards.  More than four

9    drawings.  Different.  Are they substantially similar?

10   That's what you'll be asked for.

11         And then the last slide.  Another series of awards.

12   I just wanted to complete that.

13         Then, of course, you know, Mr. Price made a comment

14   about the movie.  I think he said something about how long it

15   lasted in the movie theaters.  It's not how long it lasted in

16   the movie theater.  It involves how many compact disks or

17   DVD's have been purchased by young consumers.  It's one of

18   those things that created the revenues.

19         But you know, Mattel, their line in the opening

20   statement, crime doesn't pay, they want all of this.  Whether

21   or not it played for three days or three months, Mattel wants

22   it.  Notwithstanding that, if you look at this, the idea is

23   substantially different in concept and feel than really what

24   Carter Bryant ever could have imagined.

25         When Mr. Bryant came to our doorstep at that first

1    pitch meeting in late August of 2000, the most money he had

2    ever made, by his own testimony, in freelancing was $800 for

3    some work.  He had never developed, manufactured, never

4    sculpted a doll.  I think you'll see where the crime is.

5            Let's talk about licensed products.  So in addition

6    to the core for first generation dolls and the characters and

7    the subbrands, MGA and MGA alone has worked on its licensing

8    program to create a tremendous amount of demand for the Bratz

9    trademark.  And as a result, they were able to license items

10   from sleeping bags, small couches, bubble bath.

11           Mattel wants in this case and is demanding that you

12   give to them something that Carter Bryant doesn't even get.

13   Mr. Bryant doesn't earn royalties on any of the licensing

14   products.  Mr. Bryant only receives his royalties on products

15   that he worked on, that he designed the fashions for.  And

16   you'll see, ladies and gentlemen, when I talk about the

17   damages that Mattel -- MGA gets royalties on the sales of

18   these products, Mattel wants them.

19           Let's focus on the development of Bratz after June

20   of 2001.  Margaret Leahy will be a witness in this case.  You

21   met her in the first phase.  Margaret Leahy was a sculptor.

22   But Margaret Leahy's time line stopped as of October 19th in

23   the first phase trial.

24           In this trial she'll go, and she'll tell in great

25   detail what changes had to be made to the sculpt in order to

1    make it appealable, marketable.  You'll hear testimony that

2    she took some of the va-voom out of Mr. Bryant's original

3    drawings.

4         You know, Mr. Bryant's drawings as being 2D are

5    really fashion oriented in a sense because they were colorful

6    and had fashions on it.  But when you look at it, it really

7    doesn't give you much of an idea about dimensions or

8    proportions of the legs or the arms or how the shoulders

9    should be or the size of the bust line, waist, that type of

10   thing.  All of that was created through the creativity of

11   people employed at MGA.

12        You'll see the evidence, and let's just talk about

13   that real quickly.  If I could have 1136 A and trial

14   Exhibit 17732.  This is the tangible sculpt that in your

15   verdict you determined was done while Mr. Bryant was employed

16   at Mattel.  This is the sculpt on the left as of October 6th.

17   There will be a lot of testimony with respect to this sculpt

18   and the final Bratz sculpt that's depicted on the right-hand

19   side.

20        And Mr. Price described it as merely just

21   mechanical changes.  And he pointed to the crotch area to

22   show the difference.  But you know, it's that kind of effort

23   that we're going to ask you to make in this case to look at

24   the details.  To look at the similarities between this and

25   the Bratz sculpt.  The size of the waist, the size of the

1    breast, the shape of the thighs.  All of this made a

2    difference.

3              I never played with dolls.  I never manufactured a

4    doll.  So in this case I've learned a lot about that.  And

5    the testimony from the creative team will be that to make the

6    success it did, it became, the idea of Carter Bryant as

7    expressed in his drawings, as creative as it is, and I'm not

8    in any way backing off of that, and Mr. Price has suggested

9    to the contrary, is absolutely wrong.

10             Mr. Bryant's drawings were the inspiration for

11   Bratz.  But it was just that.  We couldn't sell that

12   inspiration at Wal-Mart.  We had to make it into a doll.

13             That's the doll that MGA made.  That's the doll on

14   the left-hand side that you found Carter Bryant, along with

15   others, either solely or with others, did while he was

16   employed at Mattel.

17             Sculpting is only one part of the task that you're

18   going to have to see during the next three weeks.  A lot of

19   what this case is going to be about is apportionment and

20   damages.  Mr. Price talked about that.

21             I want to put up, if I could, graphic 104.  And

22   you'll recall in the beginning of my opening statements, that

23   one of the questions you're going to have to come up and

24   address is what are the factors that contributed to the

25   success of Bratz.  Was it really just the drawings?  And I've

5519

1  put up this puzzle, if you would, and we'll use this during

2  the course of the trial as indicating the factors

3  contributing to the success of Bratz.   The doll design,

4  characters, themes, fashions, accessories, packaging, and

5  marketing.

6        Because when it comes to the copyright damages,

7  ladies and gentlemen, Mattel will argue that they are

8  entitled to whatever percentage of the profits of MGA is

9  derived from the infringing product.   And so your effort will

10  include trying to identify exactly what value did

11  Mr. Bryant's drawings have to the Bratz profits.   It's not

12  enough to rely now in this case on a trademark registration

13  or a statement in the papers or even statements that were

14  made over in Hong Kong about who's the creator of Bratz.

15        We're not denying that Carter Bryant drew those

16  drawings.   And we're not denying that Carter Bryant created

17  those drawings.   That's not the issue.   That was the issue in

18  1-A.

19        And Mattel can't drag us back to that phase.   This

20  is what they have to confront here.   They have to prove to

21  you, we have to prove to you what these contributing factors

22  are.   Let's go to doll design, if I might.   We talked about

23  the sculpt.

24        You're going to hear from Margaret Leahy a lot

25  about the changes that were made.   Carter Bryant never did

1    engineering drawings.  Lily Martinez testified that at Mattel

2    she's asked to do engineering drawings.  He never did

3    turnaround drawings.  At Mattel they do turnaround drawings.

4    Engineering.  We're going to be talking about engineering.

5    There's going to be evidence introduced as to what needed to

6    be done in order to make this doll marketable.  And then

7    there's face painting.  The face painting changed.

8              We talked about Anna Rhee.  But Anna Rhee is not

9    talking about a time period in June of 2000.  Anna Rhee is

10   talking about the face paint, the pallet that she came up

11   with on the face paint.

12             The evidence will not be, ladies and gentlemen,

13   that Margaret Leahy and others had on the wall or in all of

14   their cubicles Carter Bryant's drawings and used them like

15   the Bible.  Oh, wait, wait, wait a minute.  Mr. Bryant's

16   drawings tell us to do this.  We got to keep it this way.

17   We've got to do it exactly like that.

18             It's not there.  This was inspiration, much like

19   when he gave it to Margaret Leahy, his testimony is

20   consistent with Margaret's.  Here's my idea.  You do the

21   magic.

22             So face painting, engineering, hair rooting and

23   styling.  The evidence will be that the hair rooting and

24   styling changed year after year to meet the themes and

25   fashions.  And they never went back and said but you know,

5521

 1   that's not like Carter Bryant's drawings.  We got to keep

 2   them substantially similar.

 3            Let's go to No. 2, fashions.  Fashions are very big

 4   in this whole area.  In fact, when you looked at some of the

 5   examples that Mattel was showing to you on the screen shots

 6   of, let's say, Jade or Sasha, your eye is really taken to the

 7   fashions itself.  And fashions changed every year.  And when

 8   I get to the first generation, you know, I could take up a

 9   lot of time and tell you how the fashions on the first

10   generation are not substantially similar to Carter Bryant's

11   original drawings.

12            But you know, to me there's so many other changes

13   and there's so many other issues in this case, that when it

14   comes to those fashions, they do look similar enough.  But

15   not year after year after year.  MGA, MGA kept current on the

16   popular trends, swatch selections, pattern development,

17   graphic print applications.  You saw the fabric book that was

18   shown to you in the first phase of the trial.  Those fabrics

19   apply to dolls and fashions way down the line.  And yet even

20   those fashions that change, Mattel wants those, too.

21            Based on drawings only where Carter Bryant only had

22   four fashions.  Because they say well, the dolls were all the

23   same.  But every time they say that, please go back to that

24   one chart where I showed you the different volumes of sales

25   related to the dolls.  These differences are substantial.

1     They do matter.  They do drive sales, ladies and gentlemen.

2             Let's go to the next puzzle piece, and that's

3     accessories.  We all know it ties in with play themes, too.

4     You develop accessories to match the themes, and it increases

5     the play value, appealing number or piece count per doll.

6             There will be evidence in this case that at one

7     point in time, and many of us lived through this period of

8     time, it was all about the product.  It was all about the

9     doll.  Let's just look at the doll.  But we know from our own

10    life experience, and the evidence is going to establish that,

11    that that does not apply today.

12            What the young consumer wants, when they look at a

13    doll, is they want to know what the story is in that doll.

14    What is the play theme.  How am I going to interact with

15    that?  Is it a ski theme?  Is it riding a dune mobile in the

16    desert?  Is it taking you somewhere where I'm not living

17    right now?  That's the appeal.  That's what makes people who

18    collect dolls buy more than one doll, because they are

19    different.  Think about that for just a moment.

20            If they were all the same, if they were all

21    substantially similar, why would there ever be a need for a

22    mother to buy another doll?  It's an excuse that I'd love to

23    use and say wait a minute.  It's the same as the one that you

24    already have.

25            That's the test that you're going to be asked,

5523

 1   ladies and gentlemen, to look at this through the eyes of a

 2   consumer.  And I'm going to ask you, and the evidence is

 3   going to ask you to ask this question.

 4          If they are all substantially similar, why do you

 5   need another doll?  Why do you need another doll?  It's the

 6   same as all the rest of them.  It's not true.

 7          And when we're talking about accessories, Carter

 8   Bryant had a backpack.  Let's talk about characters, another

 9   piece of the puzzle.  Interests, hobbies, names, nicknames,

10   doll personalities, and friends.  That's what drives the

11   sale.  That's the question you'll be asked.  What is driving

12   the sale.  What made it possible for a company that Mattel

13   described as being rather inept, never having developed a

14   fashion doll, to turn it into a machine that has generated

15   through all of the various characters' themes and licensing

16   $3 billion?

17          And Mattel is going to tell you it's all because of

18   a series of drawings, many of which drawings you saw in

19   deliberations and labored over as to whether they were done

20   in 1998 or 2000.  It was never seen until this trial.  We saw

21   the pitch book on September 1st.  And they want to say that

22   that pitch book, those drawings, take them down, take them

23   anywhere, give them to someone, $3 billion in revenues.

24   Nothing else.

25          This case is about everything else.  It's not about

5524

 1    timing.  It's about the Bratz brand who made it and who built

 2    it.

 3              Closing argument, I'm going to come back, and I'm

 4    going to ask you to look long and hard into Carter Bryant's

 5    drawings, and you tell me where there's 30 characters.  And

 6    if Mattel says that they are all substantially similar, then

 7    the question that the evidence is going to beg is, well, why

 8    do you need another character?  If they are all substantially

 9    similar.

10              Packaging.  Let's go to G 110.  You all know this

11    from common sense.  When you walk into a market, something

12    grabs your eye.  It's the appeal.  It's the package.  And

13    you'll see that packaging in this case was particularly

14    important.  It's important for another reason, and that is

15    it's very expensive.  You'll find that the cost of the

16    packaging alone is almost amounting to one third of the total

17    product cost.  And MGA won awards.

18              Let's talk about marketing, if I could.  This is

19    the puzzle piece marketing.  And this is where we're talking

20    about branding, merchandising, advertising, promotions, and

21    customer research.

22              You can go and take as long as you need to over

23    your notes from the first phase of this trial.  Carter Bryant

24    had never been involved in branding, merchandising,

25    advertising, promotions, or customer research.  MGA did that.

1          The testimony in this case will be uncontroverted,

2   as your common sense will tell you, that marketing plays such

3   an important role in the appeal to the consumer.  Yes,

4   certainly you need a good product.  Mattel's My Scene is not

5   sold domestically --

6          MR. PRICE:  Objection, your Honor.  This is covered

7   by a court order.

8          THE COURT:  Sustained.  Move along.

9          MR. NOLAN:  It's not just the drawing that sells a

10  doll.  It's just not the plastic sculpt that sells the doll.

11  Because if it were, you could walk into Wal-Mart and be

12  charged $14 for the drawings.  Or you might go and look at

13  Toys-R-Us and say gee, if none of these other factors really

14  matter and they are all substantially similar, why don't the

15  markets just display naked dolls on the show.  Sell it that

16  way.

17         Because packaging doesn't drive sales, doesn't

18  improve the brand.  If you are Mattel in this case -- you

19  know, the evidence that we'll introduce through the experts

20  is that Bratz' success is that the execution on the brand

21  image was near perfect.  They executed when they needed to

22  execute, not simply because they had drawings.

23         The last remark I want to make on marketing is the

24  importance of the trademark.  There's two trademarks involved

25  in this case that are not being claimed by Mattel.  One, I

 1    said, is the Bratz name itself.  And the --

 2            MR. PRICE:  Objection, your Honor.  That is a

 3    misstatement.

 4            MR. NOLAN:  Your Honor, trademark is not an issue.

 5            MR. PRICE:  The jury's findings, your Honor.

 6            THE COURT:  Sidebar.

 7            **(SIDEBAR CONFERENCE HELD.)**

 8            THE COURT:  Trademark is not an issue, that is

 9    correct.  But the Bratz name is part of what was claimed or

10    was awarded by the jury to Mattel in the first phase.

11            MR. NOLAN:  Only that he conceived of the idea --

12    or the name Bratz.

13            THE COURT:  The name and the conception both went

14    to Mattel.

15            MR. NOLAN:  But, your Honor, that doesn't go to the

16    trademark issue.

17            THE COURT:  There is no trademark issue.

18            MR. NOLAN:  I know.  We own the trademark.  They

19    never went after the trademark.  This is a hearing that we

20    had before the start of the trial.  We own the trademark.

21            THE COURT:  I understand that.

22            MR. NOLAN:  That's the point that I'm making.

23            THE COURT:  Counsel?

24            MR. ZELLER:  Your Honor, the problem is that he is

25    misstating the law.  And part of it is because trademark is

1    not relevant, as the Court said.  What is pertinent is that

2    the Court -- excuse me.  The jury has made a finding that

3    Carter Bryant conceived of the name Bratz for these dolls.

4    That was part of what he disclosed to MGA --

5              THE COURT:  It goes to the state tort claims.

6              MR. ZELLER:  Correct.  And those are part of our

7    damages.  We can get disgorgement of those benefits.  So that

8    is not a correct statement --

9              THE COURT:  Not on a trademark theory, but on the

10   state tort theory.  And so I'm sustaining the objection.

11   Just move along.  We can clarify this in the instructions to

12   the jury later.

13             **(CONCLUSION OF SIDEBAR CONFERENCE.)**

14             THE COURT:  You may proceed, Counsel.

15             MR. NOLAN:  Thank you.  Another trademark that

16   you'll see --

17             MR. PRICE:  Objection, your Honor.  We're off

18   trademarks.

19             MR. NOLAN:  I'm talking about Passion for Fashion

20   and contributions to --

21             THE COURT:  Very well.

22             MR. NOLAN:  Passion for Fashion is the trademark

23   that's contained on the packaging.  It is part of the brand

24   concept which appeals to young girls.  In order to arrive at

25   what an appropriate measure of damages would be on whatever

5528

1   value Carter Bryant's drawings may have to the ultimate brand

2   of Bratz, you'll hear a lot of testimony from experts.  And

3   the graphic 104-2 that I can put back up there, all of these

4   factors go into a proper apportionment of damages, and each

5   one of these will be addressed in evidence, and our

6   experts --

7           MR. PRICE:  Object.  Misstates the law as to the

8   state claims.

9           MR. NOLAN:  This -- our last argument is limited to

10  the copyright.

11          THE COURT:  Very well.

12          MR. NOLAN:  With respect to the copyright damages

13  that you will be asked to award, there will be this effort of

14  breaking down an apportionment to attach the value that

15  Carter Bryant's drawings had to the entire Bratz brand.

16          And if I could have a graphic 103.  These experts

17  are going to talk about a range of apportionment to assign.

18  Graphic 103.

19          There's going to be -- there will be testimony

20  which will support a range from 5.2 percent to 25 percent.

21  And it's going to be based on various approaches and analysis

22  that the experts take.  One would be the measurement of the

23  amount of royalties that were paid to Carter Bryant, which

24  would represent 15 percent.  Or another would be looking at

25  MGA licensing, a licensing in and out.  That is, what we paid

1    to Carter Bryant in a licensing fee and what we earned with

2    respect to licensing of products outside of MGA.

3            The 5.2 actually comes from -- and we'll develop

4    this in the examination of Mr. Wagner, Mattel's own expert --

5    as being when you correct his approach for valuation of what

6    would be appropriate under the copyright, it actually comes

7    out that 5.2 percent would be the appropriate range to attach

8    to Mr. Bryant's drawings.

9            But ultimately it will be up to you to make a

10   determination.

11           Our expert in this case is a gentleman by the name

12   of Paul Meyer.  Mr. Price talked to you about their expert,

13   Mr. Wagner.  Let me introduce to you Paul Wagner for a

14   moment.  This is his background.  He's managing director of

15   Navigant Consulting, which is one of the leading national

16   economic consulting firms, Certified Public Accountant.  He's

17   accredited in business evaluation.  He's a consulting

18   professor at Stanford University, also a member of the

19   advisory board at the University of Virginia, and he lectures

20   at USC's intellectual property institute.

21           Mr. Meyer may be the last witness in the case for

22   us after all of the records have been introduced.  But let me

23   give you a sense of, Mr. Meyer reviewed all of MGA and

24   Mattel's financial and accounting records.  Reviewed MGA and

25   Mattel third party documents.  He spent tens, hundreds of

1    hours reviewing analyst reports, market research, MGA

2    personnel, reviewed other MGA and Mattel expert records,

3    reviewed deposition testimony of MGA, Mattel, and third party

4    witnesses in formulating his position that he'll represent to

5    you.

6          Let's look at the basic damages formula for the

7    copyright analysis.

8          The overview is pretty straightforward, and common

9    sense would probably tell you this is the appropriate way to

10   do it without even having a graphic.  But let me work through

11   it.

12         First of all, determine MGA's gross revenue.  And

13   then determine the total expenses associated with MGA's gross

14   revenue, which then would give you the definition of profit.

15   And you get to profit from deducting expenses.  The fourth

16   one is you multiply a profit by portion attributable to

17   copyrighted property.  And that's the apportionment analysis

18   that we've been talking about.

19         In other words, which portion of it within Carter

20   Bryant's drawings that you find are subject to copyright

21   protection, and then how, what percentage of that really

22   contributed to the gross revenues.  That would be the

23   exercise in this case.

24         Let's turn to the first step of gross revenues.

25   Now we're talking about the first generation.  Because,

1   ladies and gentlemen, the evidence will be that with respect

2   to the first generation fashions and the look, they are

3   similar to Carter Bryant's drawings.  We'll show you the

4   dissimilarities.  But where I submit would be an appropriate

5   line to draw in this case, and it's a really big difference

6   between the experts, will be whether or not damages should be

7   limited to the first generation Bratz dolls or whether or not

8   they should go to the entire brand, because that entire brand

9   is all substantially similar to Carter Bryant's drawings.

10          So the first step I want to go through will be

11  Mr. Meyer's analysis of the first generation, the four

12  characters depicted by Carter Bryant given to MGA at that

13  pitch meeting.

14          The gross revenues from that, ladies and gentlemen,

15  is $81.5 million.

16          And then from that, graphic 143, please.  You have

17  to deduct the revenues.  That's the formula.  And let's look

18  at how you come up with the expenses.  And Mr. Meyer will

19  talk about this.

20          First of all, you determine what the cost of goods

21  sold are, which includes manufacturing costs, returns, and

22  royalties.  And then you add to that the operating expenses

23  such as salaries, advertising, promotions, and development.

24  And then state and local taxes.

25          These are deductible.  I want to make a point real

```
 1    quickly.  And time remaining, I'll come back to this.
 2    Mr. Price showed you testimony from Mr. Larian's testimony in
 3    another matter with respect to whether or not he earned
 4    profits from MGA.  You may recall that testimony.
 5            What was not told to you is that MGA is what is
 6    known as a subchapter S corporation.  What that means, and
 7    Mr. Meyer will explain this to you, is that the entity itself
 8    doesn't pay the income tax.  Moneys are distributed to the
 9    shareholders, in this instance, Mr. Larian, from which he
10    pays the taxes for the company.  And so when the question --
11    and Mr. Larian will explain this to you.
12            When the question was asked in this other trial,
13    which, by the way, has nothing to do with this case, you
14    know, did you get a profit.  I think Mr. Larian's testimony
15    was when I get my distributions to pay my state and federal
16    taxes, I didn't consider them to be profits or a bonus.
17            And so that's why in this analysis it's appropriate
18    under the subchapter S analysis to look at the taxes that
19    have been paid.
20            And then, of course, we have to also determine
21    which expenses incurred by MGA relate to the first generation
22    Bratz dolls.
23            Not expenses related to other products being
24    manufactured and sold and distributed by MGA.  And so there
25    really isn't a lot of dispute between Meyer and Wagner about
```

1    the costs of goods sold.

2           Let's go to 136-02 if you don't mind.  This is the

3    analysis for the first generation of Bratz, ladies and

4    gentlemen.  Operating expenses, $34.4 million.  Taxes,

5    $12.8 million.  Costs of goods sold, $30 million, leaving a

6    profit of $4.3 million on the first generation Bratz that had

7    no themes, had fashions similar to those that are depicted in

8    Carter Bryant's drawings.

9           Before the introduction of any of the characters,

10   before the introduction of any new fashions, before the

11   introduction of any subbrands, before the introduction of any

12   additional hairstyles.  And before the addition of any

13   accessories other than the backpack.

14          Now, when we get to the experts, there's going to

15   be a lot of discussion about what is the amount of operating

16   expenses, and there will be dispute between the two experts.

17   Surprise, surprise.  I'm not going to get into it in this

18   limited time that I have for the opening statement.  But

19   Mr. Meyer does a regression analysis which is a statistical

20   analysis of associating costs with particular revenues.  And

21   we will be critiquing Mr. Wagner's approach.  He takes a

22   different approach.

23          We submit, ladies and gentlemen, that the best and

24   most accurate analysis is the one that's depicted on the

25   screen, which shows a profit of $4.3 million that MGA earned

 1   on that first generation.

 2          From that, you are also entitled, as a trier of

 3   fact, to determine how much of that profit is derived from

 4   the drawings itself or from all the effort that Mr. Larian

 5   and his team around the world did in promoting and

 6   advertising and marketing that first brand.  And you will be

 7   the ones that will determine on the first generation what is

 8   the appropriate apportionment of those profits that Mattel

 9   would be entitled to if you find copyright infringement.

10          I'm going to turn to what they really presented in

11   their opening statement was the later generation damages.  As

12   I've said to you before, they are asking for the whole

13   enchilada.  All $3.1 billion of revenues minus expenses,

14   apportioned out, very little, give them all the money.  I

15   think what the number was is over a couple hundred million

16   dollars as the value of the drawings at the pitch meeting.

17          Mr. Meyer will attack that.  He'll attack that

18   vigorously, and he will go through the same effort he did

19   with respect to the first generation dolls.  But in this

20   exercise, what he'll do, when he's talking about the later

21   generation sales, he'll talk about the importance of play

22   themes.  We'll use other evidence to demonstrate that in the

23   marketplace, those play themes are very, very critical, and

24   again, Carter Bryant didn't come up with those play themes.

25          Mr. Wagner -- and maybe this is the best way I can

1   explain one of the criticisms that will play out here, is

2   that Mr. Meyer, our expert, who, you know, is a professor at

3   Stanford, takes the effort to try to apportion out the costs

4   aligned with Bratz.

5          Mr. Wagner, on the other hand, assigns all of the

6   costs right across the board without factoring in such things

7   as seasonality.  And so I think that the evidence is going to

8   show that our expert, Mr. Meyer, made a much more careful and

9   studied approach as to the actual business in order to

10  present to you a fair characterization of the expenses.

11         But the evidence I think that's going to be the

12  strongest as to how Mattel's expert is overreaching here is

13  that in an effort to grab all of the money, what they do is,

14  Mr. Wagner says, well, you know, the proper approach is to

15  take excess profits and that should all go to Mattel.  And

16  how he calculates that excess profits, it's interesting.  And

17  this is where there's going to be a complete switch between

18  1-A and 1-B with respect to Mattel's version of MGA.

19         When it comes to analyzing damages, they are going

20  to compare MGA to such companies like Hasbro and Mattel.

21  Mr. Wagner even admits that, in making the comparison

22  regarding respective excess profits, he includes companies

23  that make products that MGA doesn't even make, like board

24  games and things like that.

25         Mr. Meyer, our expert, says wait a minute, wait a

1  minute.  That's not fair.  I mean, you can't compare MGA to

2  Hasbro, a public company, or Mattel, a public company.

3  Mr. Meyer says you know what we should do, just to test this,

4  is why don't we compare MGA to Mattel's doll line.  Let's

5  look at Bratz in comparison to the performance of products in

6  the same industry, the same market sold by Mattel.  Don't

7  include companies whose profits may be derived from selling

8  board games.  Let's just stay one on one.

9         Meyer's testimony will explain this in greater

10 detail.  It's just an improper way, but it's designed to grab

11 it all.

12        So could I go to graphic 121.02.  This will give

13 you the range of damages after all of the experts have

14 testified, and we'll have enough time for you to look at the

15 evidence and weigh who is being more credible with respect to

16 how the calculations are made.

17        But could I have up, Aaron, Exhibit 121.  Graphic

18 121-02.

19        So the ranges of damages from Mr. Meyer, using the

20 formula up here, profit plus apportionment equals damages for

21 the copyright claim.  First generation Bratz dolls,

22 $4 million times the apportionment, 5.2 on the low end, 25

23 percent on the top end.  The range of damages is somewhere

24 between 208,000 to just under a million dollars.

25        If you add in all of the Bratz core fashion dolls,

5537

1   that is, if you add in all of the characters over all of the

2   years with all the different themes and you conclude that

3   they are substantially similar to Mr. Bryant's original

4   drawings, that amount of profit would be 152 million, .4

5   times the apportionment range of between 5.2 percent and 25

6   percent for the value of Mr. Bryant's drawings.  That throws

7   a range out of $7.9 million to a range of $38.1 million.

8           And then the last one that I put up here, and this

9   is the one that I refer to as Mattel wanting the whole

10  enchilada based on the pitch drawings.  Those are the sales

11  claimed by Mattel.  And this is that $3 billion number.  The

12  profit from that number is $422.2 million times the range of

13  apportionment for the copyright, and that range would be

14  22 million to $105 million.

15          Now, having done that, I want to go back to one

16  chart that I intentionally skipped over, and now can I have

17  graph 142.

18          I was thinking last night as to how I could most

19  dramatically show to you the impact of later generations

20  licensing had on Bratz and the empire that Mr. Larian and his

21  team built.

22          And we came up with a chart like this.  It's a pie

23  chart.  It represents all of the revenues.  And you'll see

24  the breakdown.  We go through accessories, entertainment,

25  games, fashions, outdoor, life-style products, licensing,

1   electronic products, vehicles as accessories.  Play sets, the

2   Bratz kids dolls, boy Bratz dolls, baby Bratz, and then later

3   generation Bratz core fashion dolls.

4           The first generation Bratz dolls, the one that came

5   out within nine months of Carter Bryant presenting the

6   initial drawings to us, represent 2.6 percent of the entire

7   revenues.

8           Let's turn to the contract claims for just a

9   moment.

10          MR. PRICE:  Object to the characterization.  The

11  tort claims.

12          THE COURT:  Overruled.  Proceed.

13          MR. NOLAN:  Let's turn to the tort claims.  These

14  arise out of the employment relationship and your findings on

15  verdict form lead to an award of damages.  Aiding and

16  abetting, breach of fiduciary duty, breach of loyalty,

17  intentional interference with a contract, conversion of

18  intangible property.  You heard Mr. Price argue that for

19  those claims, they want everything.

20          Let's talk about conversion for just a moment.  The

21  evidence in the case was that Mr. Bryant brought with him to

22  the pitch meeting drawings on pieces of paper, not the design

23  drawings.  He brought with him a doll, Frankenstein doll,

24  it's referred to.  I know Mr. Price showed you testimony from

25  Victoria O'Connor, who said she thought the eyes looked just

1    like the eyes on Cloe.

2           We'll have a lot of testimony to show that that is

3    not the case.   In fact, at her deposition I believe she

4    testified, and we'll call her back to explain this, is that

5    she didn't think the doll itself was that attractive.   Kind

6    of ugly.   But nevertheless, the value of that Frankenstein

7    doll is measured in two respects, ladies and gentlemen.   The

8    source from where it came from, the trash can at Mattel, and

9    where it ended up, in the trash can.   Nobody ever referred to

10   that ever, ever, to make a Bratz doll.

11          We think the appropriate measurement of damages in

12   this area, when you think about it, is all right.   If you

13   find, as you did, that we aided and abetted in the breach of

14   fiduciary duty and the breach of loyalty, it was coming out

15   of the fact that he was working at Mattel while helping a

16   designer -- a competitor.   During the period of time,

17   September 1st to October 19th, Mr. Bryant was paid about

18   $7,000 by Mattel.

19          MR. PRICE:   That's improper legal argument for

20   measure of damages for breach of fiduciary duty.

21          THE COURT:   Overruled.

22          MR. NOLAN:   So you take that.   You take the amount

23   of the Frankenstein doll.   And you're not anywhere, ladies

24   and gentlemen, in the stratosphere where Mattel wants to be.

25          Mattel shows documents and statements that we have

1    made in court and other proceedings.  We'll show you

2    statements made by Mattel in this very litigation where they

3    assess the value of their tort claims as being less than

4    $75,000.

5          MR. PRICE:  Objection.  That misstates, and it's

6    irrelevant.

7          THE COURT:  That's not before the Court right now.

8    We'll take that up later.

9          MR. NOLAN:  I want to turn to, in the time

10   remaining, two remaining issues.  Now that I've set the

11   background for --

12         Your Honor, it's 3:30.  Would it be okay to take a

13   quick break?

14         THE COURT:  Sure.

15         MR. NOLAN:  Thank you.

16         (Recess taken.)

17         THE COURT:  Counsel, you may resume.

18         MR. NOLAN:  Thank you.  I needed the break more

19   than you did, probably.  I apologize.

20         I want to turn to copyright infringement.  And if I

21   might, this is an area that there will be a lot of testimony,

22   a lot of comparisons, and Mr. Price in his opening statement

23   kept referring to how substantially similar they are.  And I

24   thought it was interesting, when I was watching that, and

25   that is that he would sometimes use the drawings to make the

1    comparison, and sometimes he'd make comparisons between dolls

2    and dolls, dolls and dolls and dolls.

3            I want to go back to, Aaron, graphic 118.  Because

4    I think this frames this case in so many ways, as I said

5    before, and it also frames the copyright issues.  On the test

6    of substantial similarity.

7            Mr. Price and Mattel takes the position that all of

8    them are substantially similar.  I made this point before.

9    What I did not have available to me, and I apologize for

10   that, is when I showed you this graphic, I had Bratz Midnight

11   Dance at $3.2 million dollars, and then I had the Bratz

12   Formal Funk at 34.9 million, and so one of the issues in

13   dealing with the copyright infringement -- and you'll have

14   this as exhibits -- if we could have the pictures up here.

15   This is of Midnight Dance.  And this is Exhibit 17500 on the

16   left there.  And then we'll have the Formal Funk at 17529.

17           So Mattel will argue that these are substantially

18   similar.  And the evidence is going to beg the question that

19   if they are substantially similar, why did one sell so far

20   more -- substantially similar to the drawings.  Right.

21   Substantially similar to the drawings.  Why one is so much

22   more successful than the other.

23           During the case when those are in evidence, we'll

24   pass them around, and you can take a look at them.

25           This case is not about a blink test.  By that I

1    mean, ladies and gentlemen, it's not going to be sufficient

2    just to look at a screen and make a determination of

3    similarities based on a one-second presentation or a

4    two-second presentation.  That's real easy to do.  What

5    you're going to be required to do is take a harder look at

6    these dolls.

7              MR. PRICE:  Objection.  He's telling the jury how

8    they have to deliberate.  And that's inappropriate.

9              THE COURT:  Rephrase, Counsel.

10             MR. NOLAN:  The evidence will lead through experts

11   walking through similarities and dissimilarities between the

12   drawings and the dolls.  But again, the source is going to be

13   the drawings.  And I want to go back to a comment that was

14   made by Mr. Price, and that is that somehow we're taking

15   inconsistent positions here.  And you were shown an

16   Interrogatory Response.  I'd like to have up one of the --

17   another Interrogatory, same case, which wasn't shown to you.

18             MR. PRICE:  I would object.  We exchanged graphics.

19   This was not one of them.

20             MR. NOLAN:  Your Honor, this is --

21             THE COURT:  Why don't you show it to him, Counsel.

22             MR. NOLAN:  This is in response to the one he

23   showed.

24             MR. PRICE:  Objection is it's irrelevant, and it's

25   not among what was exchanged as required by the Court.

5543

1          THE COURT:  Is there any question that it's an

2     Interrogatory Response?

3          MR. PRICE:  It appears to be an MGA Interrogatory

4     Response.

5          THE COURT:  Very well.  You may proceed, Mr. Nolan.

6          MR. NOLAN:  Thank you.  May we publish it?

7          THE COURT:  You may.

8          MR. NOLAN:  All right.  Here is an Interrogatory

9     Response in this case by MGA.  The original concepts

10     contributed by Bryant to the creation of the Bratz dolls

11     represent only one of the many factors that combined to make

12     Bratz one of the most successful fashion dolls on the market.

13          So we're not walking away or running away from the

14     design of the drawings, but nevertheless, we're trying to put

15     them in proper perspective.  I told you that it's not a blink

16     test when you're looking at the various dolls in issue.

17          I'd like to put up slide 105 A.  This is a lineup

18     of different fashion dolls.

19          As I looked at this last night, one question that

20     came up to my mind is which one is the Bratz.  This design --

21          MR. PRICE:  Your Honor, I object.  This is

22     inappropriate comparison, which goes to protectability.

23     These are not Bratz dolls.

24          MR. NOLAN:  Your Honor, this goes to the

25     differences in fashion dolls and generalities in the

1    marketplace with respect to all fashion dolls and the general

2    similarities.

3              THE COURT:  This will be introduced in evidence?

4              MR. NOLAN:  Yes.

5              THE COURT:  And there's no objection to this?

6              MR. NOLAN:  There was not before, your Honor.

7              MR. PRICE:  Well, I didn't understand they weren't

8    Bratz dolls until just now.

9              THE COURT:  Counsel, let me see you at sidebar.

10             **(SIDEBAR CONFERENCE HELD.)**

11             THE COURT:  I did indicate that all charts and

12   graphics were to be exchanged beforehand, and if there was

13   objections, that objections were to be made.  I am assuming

14   that everything that is being put up counsel have raised with

15   themselves, and there was no objection.  I understand I just

16   made an exception with the Interrogatory.  Moving beyond

17   this, did you see this beforehand?

18             MR. PRICE:  This was in what they showed us.

19             THE COURT:  Did you make an objection?

20             MR. PRICE:  I did not.

21             MS. AGUIAR:  And to be frank, the fact that

22   Mr. Price looked at this slide and I'm sure looked at it

23   carefully, and I'm sure the people that he works with looked

24   at it carefully, and they didn't notice that these were not

25   all Bratz dolls is partly our point.

1          When you're trying to show the range of fashion

2     dolls that are on the market, there's only so many things you

3     can do with a big head or a big eye or the body of a ten-inch

4     doll, and we are entitled to make that argument based on all

5     of the stuff your Honor has already recognized is available

6     to us.

7          THE COURT:  This is opening statement.  So let's

8     not be talking too much about arguments.  Although both sides

9     have certainly crossed that line.

10          MR. PRICE:  And her first statement actually shows

11    why in a short period of time, in all of these documents, he

12    couldn't be expected to see this because the argument she's

13    making.  The only issue in this case is the drawing's

14    substantially similar to the dolls.  That's the issue.

15    Whether or not their dolls are similar to some other doll is

16    irrelevant and goes to protectability.  The only issue in

17    this case is our drawings substantially similar to their

18    dolls.  It doesn't matter if --

19          THE COURT:  Response?

20          MS. AGUIAR:  But within that question I think you

21    have already recognized is the question of human anatomy, for

22    example, and we have experts who were coming in to talk about

23    human anatomy and what is basic and what is not.  And for

24    Mr. Price to suggest that he only had a short time to look at

25    this, we exchanged graphics this morning at --

1          THE COURT:  I'm not interested in that.  I'm more

2    concerned about the fundamental objection to relevancy here.

3    So stay on that.

4          MS. AGUIAR:  I think your Honor has let in experts

5    on issues that specifically relate to anatomy, human anatomy

6    which is translated into a doll and about why some of these

7    similarities are attributable to basic human anatomy rather

8    than it came from the --

9          THE COURT:  The problem with this is this is

10   opening statement.  I'm going to just tell the jury that

11   we're going to revisit this issue later.  Because I want to

12   revisit another issue in terms of that $75,000.

13         Let's just move on, and I'm not going to ask one

14   way or another at this time.  I want to consider this

15   exhibit.  Frankly, I'm having trouble seeing this myself just

16   from the size of it.  And that's my eyesight.  But let's just

17   move along, and we'll come back to this point.

18         MR. NOLAN:  Thank you.

19         **(CONCLUSION OF SIDEBAR CONFERENCE.)**

20         THE COURT:  Members of the jury, I've indicated to

21   counsel that we're going to come back to this point later on.

22   I'm not deciding whether this is or is not part of the case.

23   But in the interests of efficiency, I'm going to request that

24   counsel continue with his opening statement, and then we'll

25   circle back with this outside the jury's presence, and we'll

5547

1    determine whether it is admissible.

2          Thank you, Mr. Nolan.

3          MR. NOLAN:   Thank you.

4          I want to take a look at, just for a moment, one of

5    the comparisons that was made.

6          Aaron, could I have up 11019.  Now, this, ladies

7    and gentlemen, you'll remember from Mr. Price's opening

8    statement, but also frankly through 1-A.  On the left-hand

9    side, we have Hallidae as depicted in the original concept

10   drawing by Carter Bryant.  And on the right-hand side, you

11   have the first generation Bratz doll known as Sasha.

12         Now, that's the comparison that they asked you to

13   make.  That's the first generation.  And as I said to you

14   before, I could argue, I suppose, that the fashions are

15   dissimilar because of the jean dress and the skirt is

16   different.  The cut is different.

17         I could talk to you about the rabbit being

18   different.  But I'm not going to do that.  But here's what I

19   do want to show you, which I think ties into that chart that

20   I showed you that dolls are different.

21         I want to -- and Aaron, if you would go to slide

22   036 just for a moment.  This is just a representative example

23   of how in the -- in this case people will be focusing on

24   particular elements of a particular doll.

25         My only point here is how influential it is when

1   you see fashions attached to this.  And I think the questions

2   that will be presented to the experts is whether or not the

3   similarities are so overwhelming, are so substantially

4   similar, that this is an infringement.  And I'll leave that

5   to you.  But the testimony will be, and I think it will be

6   uncontroverted, that the drawing on the left of Hallidae was

7   viewed by MGA as not being marketable, that it was not as

8   appealing to the mass audience that it was intended to be.

9           It's a 2D drawing.  It's edgier.  The eyes, the

10  lips more pronounced.  Skin tone is obviously different.  But

11  the expression, the look, the softness of this is different.

12  We're going to be going through a lot of this in this case.

13  And it will require that type of analysis from you.

14          I want to go to slide CR 57 and 58 just as further

15  example.  This is the comparison of the lip from Carter

16  Bryant's drawings.  Just for a moment, the evidence from the

17  experts will come in, and you'll able to listen to it.  I

18  just want to focus on these for just a moment.  I was struck

19  the other day by thinking, you know, if you were in Beverly

20  Hills, and you went to a plastic surgeon and you had a --

21          MR. PRICE:  I would object.  This is getting into

22  argument.

23          THE COURT:  It strikes me as argumentative.

24          MR. NOLAN:  Let me put it into an evidentiary

25  format.  I think this is what the experts will testify to.

1          THE COURT:  Very well.

2          MR. NOLAN:  Thank you.  The experts will testify in

3   this case hypothetically that this evidence that some person,

4   person A, would walk into a plastic surgeon and say, you

5   know, I love Sasha's lips.  I want the same.  And you wake

6   up, and the expert will testify that you absolutely end up

7   with the lips from Carter Bryant's drawings.  The experts

8   will testify that those are not substantially similar.

9          But if the complaint of the patient was to the

10  doctor, gee, I wanted lips like that, and I ended up with

11  lips like this, Mattel's answer would be they are

12  substantially similar.

13          We're going to do this a lot on various features.

14  And that's the kind of attention that the experts will be

15  bringing into this case.

16          I want to go to another thing, though, and we'll

17  skip over some of the other comparisons.  I want to go back

18  to Trial Exhibit 11019.  This is the graphic that Mr. Price

19  showed you.

20          Again, this is the one, Aaron, Trial Exhibit 11019.

21  This is it.  Again, Hallidae and Sasha.  That's the

22  comparison.  I'm never going to move this drawing for a

23  moment because that's the comparison.  But what I want to do,

24  Aaron, if you don't mind, because the evidence will show, do

25  you mind now, the comparison will be whether or not Sasha is

5550

1    substantially similar in all generations.

2            And, Aaron, do you mind going through the samples

3    of the Sashas for me.  Just keep going through these, please.

4            Okay.  Now let's do Lupe.  Can we do the same thing

5    for Lupe?  And what I'm doing here is freeze framing on the

6    left the drawing of the character, and then I'm going to the

7    doll.  So Lupe on Carter Bryant's drawing is released under

8    Mr. Larian's daughter's name, Yasmin.  And so this is the

9    facial comparison, but now Lupe is staying the same here.

10   Here are multiple generations.

11           Can we do Zoe.  Zoe is on the left.  Carter

12   Bryant's drawing presented at the pitch meeting.  And the

13   name is changed by MGA, not Carter Bryant.  Now it's Cloe.

14   And here is the facial comparison.  I'll leave it up to you

15   as the trier of fact that they are substantially similar.

16           But here's what I wanted to do.  Freeze frame

17   Carter Bryant's drawing on the left.  Cloe on the right.  Can

18   you go through some of the characters.  This is all Cloe.

19   This isn't the other characters that he came up with.  This

20   is Cloe.

21           And the last one I want to go through is Jade.  You

22   recognize Jade.  Carter Bryant's drawing on the left.  And

23   Jade did have a different version of hair in Mr. Bryant's

24   drawings.  Notice on the drawing her only accessory is this

25   purse or backpack on the left-hand side in that fashion.  Now

5551

1    what I want to do on the right-hand side is, Aaron, keeping

2    freeze frame.  Don't change the drawing on the left by Carter

3    Bryant.  But show me the various versions of Jade that have

4    come out.  And to each one of them you'll be asked if they

5    are substantially similar.

6           Okay.  Thank you.  I want to turn to -- there's

7    going to be a lot more evidence on the copyright stuff, but

8    enough for today in terms of comparison.  But that's the

9    test.  Each doll, each product has got to be viewed as

10   substantially similar to Carter Bryant's drawings.

11          And I've already told you that the fashions on the

12   first generation dolls -- I won't show it to you here.

13   You'll see it -- you'll look at the hero shot and the first

14   line of the generation Bratz.  So influential with those

15   fashions, but for purposes of this trial, those fashions are

16   similar.  But the other features of the design of the doll

17   are not.

18          I want to turn to Hong Kong in the few moments that

19   I have left, if you don't mind.

20          The evidence will include pleadings that were filed

21   in Hong Kong by MGA attempting to prevent knock-offs in

22   different jurisdictions.  And what I would submit to you

23   without creating a trial within a trial, is that you'll see

24   those statements.  You'll hear the witnesses' testimony with

25   respect to them.  And I respectfully submit that our

1   positions are not different.

2            In the Hong Kong documents, which I thought was

3   interesting when they were -- Aaron, I asked you to mark one.

4   Did you remember to mark that for me?

5            In the pleadings, they talk about the artistic

6   works, including Carter Bryant's drawings.  Ladies and

7   gentlemen, we are not taking the position in this litigation

8   that Carter Bryant's drawings were not the inspiration for

9   Bratz.  But it's not the only thing.  And it's not the only

10  thing we referenced in Hong Kong.

11           And if we highlight that page.  Okay.  Here's what

12  Mr. Price did not focus on.  All right.  The particulars of

13  the original artistic works.  A.  The 18 design drawings of

14  various Bratz fashion dolls made between the years 1998 and

15  2000.  Okay?  So that's the first one.

16           It's almost like if you're looking at kind of a

17  list of all of the things that lead up to the making of the

18  doll.  But then we don't say it's just the doll, the

19  drawings.  We then say over there, well, we're going to add

20  the wax models of the head, body, and shoes of the Bratz

21  fashion dolls made between the years 2000 and 2001.  Made by

22  MGA.  The sculptors at MGA.

23           C.  Silicone rubber molds, not polyurethane samples

24  made there from Bratz fashion dolls made between the years

25  2000 and 2001.

1          Four drawings of the facial decoration of the Bratz

2    fashion dolls made between the years 2000 and 2001.

3          Eight drawings, four of which are pantone color

4    guides of the facial decorations of the Bratz fashion dolls

5    made between the years 2000 and 2001.

6          Four hand-painted Deco masters on four rubber head

7    sculpts made between the years 2000 and 2001.  The evidence

8    will be uncontroverted that everything from B through F is

9    made after Mr. Bryant has left Mattel.

10          We didn't rely just simply on Mr. Bryant's drawings

11    to stop the infringement over in Hong Kong or any other

12    jurisdiction.  It's a series of things.  And you know what?

13    Mr. Bryant's drawings were inspiration for us.  They are just

14    2D.  You've got to make it into 3D.  I want to go to that

15    last point, if I could, for a moment.

16          You heard so much evidence in this case about Toon

17    Teens in the beginning of the case.  And all I want to make

18    the point here is that as talented as Ms. Martinez is and as

19    creative and fresh her drawings of Tune Teens were, when they

20    went from a 2D drawing, as they did in the first instance, to

21    a 3 --

22          MR. PRICE:  Objection.  This is improper argument

23    concerning Mattel.

24          THE COURT:  Counsel, this does appear to be

25    straight argument.  Is there a witness that will be

5554

1    testifying to this?

2                MR. NOLAN:  Ms. Martinez.  She's already testified.

3                THE COURT:  Then rephrase, Counsel.

4                MR. PRICE:  And the objection, your Honor, is that

5    you made a ruling concerning this phase and Mattel.  This is

6    absolutely irrelevant to any issue in this phase.

7                THE COURT:  Overruled.  I see where this is going.

8                MR. NOLAN:  Ms. Martinez in the first trial

9    testified -- first phase of this trial testified that she had

10   2D drawings, that she gave it to a sculptor at Mattel to

11   sculpt 3D version of the doll.  The 3D version of the doll

12   came out, was made within Mattel.  It wasn't a success.

13   Ms. Leahy is going to be here.  She's the sculptor.  She took

14   the 2D drawings.  She took from Mr. Bryant those 2D drawings.

15   She had no sense of the dimensions.

16                She was given the Devil Angel ad from Steve Madden

17   to take a look at, and then there was a series of other

18   meetings.  And you'll learn this, after October 19th, they

19   started over again, that the sculpts changed dramatically,

20   and it wasn't just functional or mechanical.  There were

21   other features that were changed.

22                The sculpts were made, eyes, ears, a number of

23   changes were made, all after Carter Bryant left Mattel, with

24   the intention of trying to make a doll that was more

25   pleasing, more softer looking, more appealing to the younger

1   version of the targeted market.

2          I want to turn to the last subject, if I might.   So

3   when I talked about Hong Kong -- just real quickly.   To me,

4   Hong Kong is like the blink test where we show up --

5          MR. PRICE:   Argument.

6          MR. NOLAN:   The evidence in this case will allow

7   testimony going into detail, what is said in those Hong Kong

8   pleadings, and you'll be able to put those statements into

9   context.

10          But it's the law that the Court will instruct you

11   here that applies.

12          I want to turn to statute of limitations for just a

13   very brief moment.   There was a lot of evidence in the first

14   phase of the case on concealment.   And efforts --

15          THE COURT:   You have four minutes left, Mr. Nolan.

16          MR. NOLAN:   Right.   Efforts by Mr. Larian to

17   conceal certain information from Mattel.   We think that the

18   evidence, however, that will be introduced in this phase of

19   the trial will in fact establish that Mattel was not the

20   subject of any concealment, that there was information within

21   Mattel.

22          Carter Bryant showed that actual drawings while

23   employed at Mattel to a fellow employee, face painter.   He

24   showed the drawings, his drawings, to a hair rooter.   They

25   had all of his phone records available.   They could have

 1   determined that he was talking to MGA.  Ivy Ross will testify

 2   that it takes about nine months to make a doll.  You do the

 3   math.

 4           All the evidence about how close Mr. Bryant was

 5   sitting to the cubicle of Toon Teens and how close it was,

 6   they weren't concealed.  They knew.

 7           Last point.  Punitive damages.  There is no need

 8   for punishment.  There is no need for a message.  No crime

 9   took place.  Mr. Larian and MGA was not convicted of any

10   crime.  And if Mr. Price wants to post up a high net worth of

11   an individual and use that to establish some shock value that

12   a punishment should be awarded by you, that's what this

13   system is.  We come here seeking justice and fairness.  We

14   did not steal the drawings.  What we did is we took drawings,

15   and we made a Bratz brand based on the hard work of nearly

16   1,800 employees stationed around the world.  Mattel is not

17   entitled to it.  Don't let them take it.

18           THE COURT:  Thank you, Counsel.

19           Mattel may call their first witness.

20           MR. QUINN:  Your Honor, on this first witness,

21   could we approach to talk about the logistics of this?  This

22   relates to this issue of the --

23           THE COURT:  Very well.

24           **(SIDEBAR CONFERENCE HELD.)**

25           THE COURT:  Yes.

1           MR. QUINN:  I'm sorry, your Honor.  We had hoped to

2    bring this up outside the jury's presence before.  We have

3    got -- the next witness will be Custodian of Records that MGA

4    has brought here.

5           THE COURT:  The toy store --

6           MR. NOLAN:  You're about to see a lot of dolls.

7           MR. QUINN:  Close to 900 products.  These are MGA

8    products, provided by MGA, which will be introduced into

9    evidence.  We spent a lot of time negotiating and agreeing on

10   how to do that over the last couple of days.  And I'm sure

11   counsel will correct me if I misstate something, but my

12   understanding is that the witness is going to take the stand.

13   It's very important to MGA that the products actually be out

14   there and in a way that the jury can view them when they are

15   presented to the witness.

16          There are so many of them, that we're going to have

17   to bring them out in traunches now.

18          THE COURT:  Right.

19          MR. QUINN:  It's going to take some time --

20          THE COURT:  We have 50 minutes with the jury right

21   now.  I hate to waste the time.  Is there any other witness

22   who can be called?

23          MR. QUINN:  No, unfortunately, your Honor.  And in

24   fact, my understanding is that we're not actually going to be

25   able to get through this today, that this will carry over to

 1   Friday.  But the question ultimately to the witness is just

 2   going to be are these Bratz products?  Yes.  Bring out the

 3   next batch.  Are these Bratz products?  Yes.

 4            At the end of that process, we have a list --

 5            THE COURT:  How many products are we talking about?

 6            MR. COREY:  It's between 800 and 900.

 7            MS. AGUIAR:  Today my understanding is that's not

 8   the case.

 9            MR. COREY:  It's -- today it's around 500.

10            THE COURT:  You're agreeing -- your witness is

11   agreeing that all of these are Bratz products; correct?

12            MS. AGUIAR:  Yes.  Everything that Mr. Quinn said

13   is correct.  Insofar as he went, that's right.  It is, as I

14   said on the call the other day, really important to us that

15   they are asking this jury to find infringement on every

16   single one of these products.  This is eight years of work of

17   our client.

18            And I understand that we have spoken about how they

19   could use their remaining time today.  They could have called

20   any witness.  They decided to go with this custodian and get

21   probably more than half of the products in today.

22            THE COURT:  Let's start bringing them in.

23            MS. AGUIAR:  I was just going to say I think it

24   might go faster than it sounds like it might.

25            THE COURT:  Let's just start bringing them.

```
 1              MR. QUINN:  The real punch line, though, is the
 2    questioning of the witness will be less than 60 seconds.
 3    We're doing this process because this is how MGA wants it.
 4    And I think it shouldn't be our time.  These are
 5    self-authenticating products.  There's no dispute they are
 6    authentic.  We should be able to just move them in, but MGA
 7    wants them here.
 8              THE COURT:  I'll take up the time issue later.
 9              MS. AGUIAR:  Because obviously I see it a different
10    way.
11              THE COURT:  Let's not argue over the time issue
12    because that's eating up time.
13              (CONCLUSION OF SIDEBAR CONFERENCE.)
14              THE COURT:  You may call your first witness.
15              MR. QUINN:  We call Ninette Pimbleton, who is being
16    provided by MGA as a Custodian of Records to authenticate
17    certain MGA products.
18              THE CLERK:  Please stop next to the court reporter
19    and raise your right hand.
20              NINETTE PEMBLETON, SWORN.
21              THE CLERK:  Thank you.  Please take the stand.
22    Please state your full name for the record, and spell your
23    full name.
24              THE WITNESS:  My name is Ninette, N-I-N-E-T-T-E,
25    Pembleton, P-E-M-B-L-E-T-O-N.
```

**DIRECT EXAMINATION**

1

2   BY MR. QUINN:

3   **Q.**   Good afternoon, Ms. Pembleton.

4   **A.**   Good afternoon.

5   **Q.**   It's my understanding you're the lucky one who has been

6   designated to identify some MGA products.

7   **A.**   That's correct.

8   **Q.**   You are presently employed by MGA?

9   **A.**   I am.

10  **Q.**   And what position do you hold at MGA?

11  **A.**   I am the vice-president of operations.

12  **Q.**   You see these toys that are being brought out on these

13  carts here, Ms. Pembleton?

14  **A.**   Yes, I do.

15  **Q.**   These are all MGA products?

16  **A.**   Yes, these are all MGA developed and made products.

17          MR. QUINN:  Your Honor, that's the first one.  And

18  then we need to take these back out, refill the carts.

19          THE COURT:  Does MGA wish to have -- how does MGA

20  wish to proceed?

21          MS. AGUIAR:  I didn't do a count, your Honor.  But

22  Mattel has asked to put into evidence today a list of about

23  500 different products.  Different dolls.  Every one of them

24  is a different character.  Differently built in a different

25  year.  I don't know how many are here now.

5561

```
 1              THE COURT:  Why don't we indicate that.  That's a
 2   good point, Counsel.  Mr. Quinn, why don't you indicate for
 3   the record what we have in front of us right here.  Perhaps
 4   you could identify by exhibit number.
 5              MR. QUINN:  Your Honor, we don't have -- what we
 6   have is a list of all the products which has been agreed to
 7   with a couple -- checking with a couple of last-minute
 8   corrections.  We have a list of all of them.  We don't have
 9   them broken down by these particular batches.  So in other
10   words, once we have brought them all in and Ms. Pembleton has
11   authenticated all of them, we'd be in a position to offer up
12   an agreed list.
13              THE COURT:  Very well.  Do we have any more carts
14   to bring in?
15              MR. QUINN:  Well, we have to take these back out,
16   fill them up, and bring them back in.
17              THE COURT:  Counsel, do you wish to have them
18   present in the courtroom for any other purpose?
19              MR. QUINN:  We also have two large tables that we
20   can bring in and put products on.
21              MS. AGUIAR:  May I make a proposal?  Because you
22   know, as we explained, it's important for us to have the jury
23   see all of the products that we made.  I understand that it's
24   logistically difficult.  We have to do the second batch of
25   these on Friday anyway because there are so many of them.  So
```

```
 1   I appreciate that the jury shouldn't have to sit here while

 2   carts are unloaded and then reloaded.

 3            Maybe what we can do is since we have to do this

 4   again Friday anyway, these can come in.  We started the

 5   process.  Now that we have seen how it plays out once we

 6   start, maybe we can actually get them all in here Friday

 7   morning before the jury comes in so that when they come in --

 8   I mean, if Mr. Quinn is amenable to this -- we can arrange

 9   for them all to actually be here when they arrive, and we can

10   do it that way.

11            THE COURT:  I gather there is no question regarding

12   the authenticity of these or any of the other products; is

13   that correct?

14            MS. AGUIAR:  There is no issue regarding

15   authenticity.

16            THE COURT:  Very well.  And this witness will be

17   testifying, as the jury just saw, with respect to all 900?

18            MR. QUINN:  Yes, your Honor.

19            THE COURT:  Is that correct?

20            MS. AGUIAR:  That's right.  And so I'm sure we can

21   work cooperatively to get everything in here so that --

22            THE COURT:  Actually, what I was going to suggest,

23   Counsel, is why don't we set up, since I don't know if we can

24   fully accommodate 900 toys in here at one time, and I want to

25   accommodate your request to have the jury view all of them,
```

```
 1   why don't we set them up.  We'll try to find a location in

 2   the courthouse here where we can set up all 900 toys, and

 3   then bring the jury, and they can inspect the toys.  There

 4   will be no testimony at that time.  They can look at them.

 5   And then we can resume with the trial.

 6            Is that acceptable to MGA?

 7            MS. AGUIAR:  That's fine by me if that's acceptable

 8   to Mr. Quinn.

 9            THE COURT:  For Mattel?

10            MR. QUINN:  That's fine by us.

11            THE COURT:  Is there any questions for the witness

12   from MGA?

13            MS. AGUIAR:  I do have a few.  But I think I'll

14   wait on that since she's going to be back on Friday.

15            THE COURT:  Any further questions at this time from

16   Mattel?

17            MR. QUINN:  No, your Honor.  This was the same

18   question I would ask as to all the toys once they are brought

19   in.

20            THE COURT:  Very well.  Subject to their display to

21   the jury in a room to be designated by the Court, I will

22   conditionally admit all of the exhibits.  Do we have exhibit

23   numbers for these?

24            MR. QUINN:  Yes.  They have all been tagged.  We

25   have exhibit numbers.
```

1          THE COURT:  What's the first and last exhibit

2    number?

3          MR. QUINN:  The problem is that there are some gaps

4    because duplicates were weeded out.

5          MS. AGUIAR:  We will provide the Court -- this was

6    actually a fairly difficult process.  I mean, we worked

7    collaboratively to do it.  But we will provide the Court with

8    a list.  They are not sequential.  So it would be difficult

9    for to us say the beginning and ending trial exhibit number,

10   but there are, as of Friday, there will be in the

11   neighborhood of about 8- to 900 of them.

12         THE COURT:  I'll let counsel provide that to the

13   Court.  And the Court will then admit them at that time.  We

14   will have all of these on display in a facility here in the

15   courthouse for the jury to inspect first thing Friday

16   morning.  We'll go forward on that.

17         Any further questions, Mr. Quinn, of this witness?

18         MR. QUINN:  No, your Honor.

19         THE COURT:  MGA may cross-examine.

20         MS. AGUIAR:  As I said, your Honor, I think I will

21   wait until Friday.  She will be coming back, and at that

22   time, once we have all of this better organized --

23         THE COURT:  Counsel, I'm not bringing this witness

24   back.  The witness -- we're bringing in all of the toys at

25   this point pursuant to the indication by counsel that there's

```
 1   no objection.  So all the toys are in once the jury has seen
 2   them.  If you want to re-call this witness, you may.
 3           MS. AGUIAR:  That's fine.  I did want to, your
 4   Honor.  Because what I wanted to do, but we weren't able to
 5   bring them all in, is at least let the jury take a few
 6   minutes to let them see even just representative samples so
 7   that they can appreciate what is on all of these carts, and I
 8   did want to take a few minutes to do that, but I'll wait
 9   until we have all of them, if that's okay with your Honor.
10           THE COURT:  Very well.  We'll have the jury do that
11   when they inspect them in the room.
12           Thank you, Counsel.
13           All right.  You may step down.
14           MR. QUINN:  May we approach, your Honor?
15           THE COURT:  You may.
16           (SIDEBAR CONFERENCE HELD.)
17           MR. QUINN:  Your Honor, we anticipated that going
18   further.
19           MS. AGUIAR:  Yes.
20           MR. QUINN:  The next three witnesses that we wanted
21   to call are not, we're informed, available, by MGA.
22   Mr. McFarland, Mr. Kamarck, and Ms. Gronich are not available
23   today.  So we're in a situation now where with a half hour
24   plus to go, we don't have a witness.
25           THE COURT:  You know what Judge Rafeedie did in the
```

5566

```
 1   same situation?
 2            MR. QUINN:  I have a pretty good idea.
 3            MS. AGUIAR:  And just to be clear about the
 4   non-party witnesses, Mr. McFarland, there's a motion to quash
 5   that was filed.  They responded to that yesterday, I believe.
 6   We were planning to reply by tomorrow first thing.  With
 7   regard to Ms. Gronich, we've exchanged e-mails.  I did tell
 8   them that she would be available either Friday or the very
 9   first court day, which is Tuesday.  And Mr. Kamarck just got
10   back to me saying he, too, cannot be available until Friday
11   because of something to do with his daughter, but can be
12   available the 5th.
13            So we didn't just say they are not available.
14            THE COURT:  Okay.  Very well.  This is both sides
15   have had problems getting non-party witnesses.  I understand
16   that.
17            And I am not going to force you to rest at this
18   point in time, Counsel.  But let's not let this happen again.
19            MR. QUINN:  Understood, your Honor.
20            THE COURT:  I'm going to have to send the jury home
21   now, and I don't want to have this happen again.
22            So let's find some other witnesses to start up
23   Friday morning.  It's not going to take that long for the
24   jury to inspect these.  I'm going to work right now on trying
25   to find a location here in the courthouse to set them up.
```

```
 1    There may be some space over in the Bankruptcy Court across

 2    the way that we could use.  And -- or maybe downstairs, but

 3    I'll work on that, and we'll have these set up, and then

 4    we'll have the jury go down, and they can spend as much time

 5    as they want perusing through the items.  And then I'm going

 6    to admit them.

 7              MS. AGUIAR:  I just want to add, we all, pointing

 8    to Mr. Quinn and to me, thought that this would take up the

 9    balance of the time today.  So that's what we were planning.

10              THE COURT:  Very well.  I assumed that.

11              MR. NOLAN:  Can I just ask my partner a question?

12    Because I think there's a disconnect.  The witness is not

13    going to be back tomorrow.

14              MS. AGUIAR:  What I thought I was making clear is

15    she is our employee.  So she is willing to come back Friday

16    morning after they inspect so that I can use a representative

17    sample of what they saw and have her explain the product.

18    It's our time to use.

19              THE COURT:  That's right.  That's fine.  Basically,

20    you want to have them see the product and then see the

21    exhibits and cross-examine.  I think that's a fair request.

22              MR. NOLAN:  I just wanted to make sure that's fair.

23              THE COURT:  All right.  I want to send the jury

24    home.  Back here at 9:00.

25              (CONCLUSION OF SIDEBAR CONFERENCE.)
```

1    THE COURT:  Members of the jury, counsel

2  understandably thought that this process might take us

3  through the rest of the day, and there's not another witness

4  available at this time, through no fault of anybody's.  What

5  we're going to do is use this time to work out where it is

6  that we're going to have these exhibits displayed.  When you

7  come in on Friday morning at 9:00, we will take you to that

8  location, and it will be someplace here in the courthouse.

9  You can go through the toys at that time, and then we'll

10  return to the courtroom for further examination.

11    But you are going to be excused for the day, and

12  we'll see you at 9:00 on Friday morning.

13    **(WHEREUPON THE JURY WITHDRAWS.)**

14    THE COURT:  Please be seated.  Okay.  I'm going to

15  take a brief recess here.  I'm going to coordinate with not

16  only the courtroom deputy, but the chief clerk of the court

17  downstairs to try and find out where we can view this in the

18  courthouse.  I think that's the better way, rather than

19  trying to set up all of these toys here in the courtroom, is

20  to find a location where we can make this display.  And then

21  we'll resume on Friday.

22    We do have the McFarland motion to take up.  And

23  counsel indicated that the Court has received a motion in the

24  opposition, but we're waiting for the reply?

25    MS. AGUIAR:  We can file that the first thing in

 1    the morning.

 2            THE COURT:  The Court will be here all day

 3    tomorrow.  So I'll be waiting for that.

 4            MS. AGUIAR:  Okay.  And before we close off on

 5    these tangibles, may I ask a question?

 6            THE COURT:  Sure.

 7            MS. AGUIAR:  I think you're absolutely right.  It

 8    would be very difficult to have all of them in here.  Would

 9    you entertain a small table during the course of 1-B that if

10    we did need to have a smaller universe of them here, we could

11    keep some here for reference?  Would that be okay?

12            THE COURT:  That would be fine.

13            There's an issue that came up that I passed over on

14    the -- during the opening statement.  And this relates to the

15    $75,000.

16            Mr. Nolan, can you speak to that?

17            MR. NOLAN:  Yes, your Honor.

18            THE COURT:  You made reference to it this morning

19    as billion and this representation that Mattel made to Judge

20    Manella concerning the value of the state tort claims.  I

21    presume that that was at the beginning of the case when the

22    case, as I understand it, Mattel filed a case against Carter

23    Bryant in State Court, and that was removed to Federal Court;

24    is that correct?

25            MR. NOLAN:  That's correct.  And they were -- those

1  statements were made in an effort to keep it from being

2  removed to Federal Court.

3          THE COURT:  At the time that the statement was

4  made, had MGA intervened in the case?

5          MR. NOLAN:  No, not at that time, your Honor.  I'll

6  double-check as to whether or not that argument was repeated

7  after we intervened in the case.

8          THE COURT:  But you don't know if it was repeated

9  after MGA had intervened in the case.

10          MR. NOLAN:  As I stand here, no, your Honor.

11          THE COURT:  I've a concern about this argument

12  because if in fact this was not made when MGA was in the

13  case, then this is going to have to be -- the jury is going

14  to have to be instructed to disregard that statement.  If it

15  was made when MGA was in the case, the Court will consider

16  legal argument on it.  But if MGA was not in the case, and

17  this was a prediscovery statement in any event, but I'm

18  particularly concerned if MGA was not in the case.

19          Carter Bryant is no longer in the case.  And that

20  was a representation regarding his breach of a fiduciary

21  duty, not necessarily the aiding and abetting done by --

22  well, I guess I don't know.  And that's the problem.  I don't

23  have it before me.  This was before Judge Manella.  It wasn't

24  before this Court.

25          MR. NOLAN:  I'll work out the chronology and be

1    able to address this first thing Mon-

2         THE COURT:  I'm somewhat concerned that you made

3    the statement to the jury without already knowing the answers

4    to these questions.

5         MR. NOLAN:  Your Honor, my state of knowledge is

6    that when Mattel sued Carter Bryant over this issue, the

7    issue at stake involved, you know, the Bratz idea.  And

8    whether or not MGA -- whether or not the statements were made

9    when MGA was actually a party or not, the claims all relate

10   back to that same period of time, and the value, if you

11   would, of the idea was clearly known to the parties at that

12   point in time.

13        The issue was framed whether or not MGA was a party

14   or not at that point in time.  Mattel took the position that

15   the value of what was converted, knowing that the information

16   was converted from Mattel, they represented that it wasn't

17   going to be more than $75,000, and it didn't involve the

18   Bratz royalties.  And it was on that basis that I made that

19   statement to the jury, your Honor.

20        I'll come back and get the exact chronology as to

21   when MGA actually intervened and whether or not that same

22   argument was made afterwards to block MGA from coming in.

23   But at some point in time, your Honor, I think from the very

24   beginning, it was always understood what the issues were

25   going to be about, whether or not it was Bratz.  It goes to

 1  what he had converted from Mattel.

 2          THE COURT:  Very well, Mr. Nolan.  Let me hear from

 3  Mr. Zeller.

 4          MR. ZELLER:  That statement was not made after the

 5  time that MGA had intervened in the case.  In fact, it was

 6  never made.  Mattel never said, quote, that the tort claims

 7  were not worth more than $75,000, end quote.  The statement

 8  that Mr. Nolan made to the jury is just not correct.

 9          The case was removed from State Court.  At that

10  point, what we had sued upon, and it was set forth explicitly

11  in the complaint, was that Carter Bryant was working with MGA

12  in some capacity while Mattel employed.  Carter Bryant bore

13  the burden of proving what the amount in controversy is.

14  That's black letter law.  We said we don't know what the case

15  is worth because we don't know what he did.  And it was

16  prediscovery.

17          At that point they were -- Bryant was required to

18  put forth evidence establishing that the amount in

19  controversy was met.  We took no position on what it was.  We

20  never said it wasn't worth more than that.  We just said we

21  didn't know because we hadn't had discovery.  Judge Manella

22  determined that the evidence that Carter Bryant put in was

23  insufficient to establish the amount in controversy, and it

24  was remanded.  And then it came back because they removed a

25  second time.

1    We basically said look, we still haven't had

2    discovery and don't know what this is worth.  And at that

3    point, in December of 2004, is when MGA intervened.  But

4    Mattel never took the position as to what the value of those

5    claims was.  In fact, the Court would see, from the very

6    first brief that we filed in this case on the remand issue,

7    we said we don't know what he worked on during the time he

8    was employed by Mattel with MGA.  But whatever it is he

9    created, we own it.  We said that.  It's on like the first

10   page of that brief.  It's in the preliminary statement.

11       So Mr. Nolan has said affirmatively that Mattel

12   denied, said that the tort claims were worth less than

13   $75,000.  And there is no such statement.  That never was our

14   position.

15       THE COURT:  Well, he said that to the Court, and

16   that's not of any moment.  He said that to the jury, and that

17   is of great concern.

18       MR. ZELLER:  That's what I'm referring to, your

19   Honor.

20       THE COURT:  All right.  I will expect the parties

21   to be prepared to provide evidence to the Court tomorrow as

22   to what was said or what wasn't said.  Transcripts, if

23   necessary.  And I know it's very hard.  I don't know if those

24   transcripts -- I know you've been getting all the transcripts

25   for quite a while.

1        I don't know if you started that practice quite

2   that early, but whatever evidence can be provided, if

3   transcripts are not available and we're going to have to rely

4   on declarations, I trust these will be declarations that the

5   Court is going to be able to hold whoever the declarant is

6   accountable for these statements.  And if this is a

7   misstatement, as you are suggesting, Mr. Zeller, I'll be

8   looking for proposed curative instructions.

9        MR. ZELLER:  Yes, your Honor.  And one thing is

10  that my memory, and I could be faulty on this, but I feel

11  pretty confident in my memory that we never had any oral

12  motions on this.

13       THE COURT:  If that's the case, that should make

14  the whole exercise quite easy.  We'll be able to see a copy

15  of the -- dig out the documents for the Court, and let's have

16  those available for three o'clock tomorrow afternoon.  I'll

17  want a copy of the transcript from Mr. Nolan's opening

18  statement.  That needs to be addressed.

19       I'll also address at 3:00 tomorrow afternoon the

20  McFarland motion -- the motion to quash the testimony of

21  Mr. McFarland brought by MGA.

22       Is there anything else that I need to get resolved

23  before we resume with this trial?

24       I'll take the silence as a negative.

25       The courtroom deputy has an outstanding suggestion

1   with respect to all of the dolls.  Judge Rayburn, the

2   magistrate judge in courtroom No. 4, is on jury duty this

3   week.  So there are no proceedings going before his

4   courtroom.  So that is wide open.  It's a courtroom, same

5   exact dimensions as this one here.  So there should be plenty

6   of space.

7          I'm going to go back and check with Judge Rayburn

8   to make sure that he doesn't mind, but I don't think he will,

9   and so just stand by, and that's probably where we're going

10  to set this up.  And we can bring the jury up through the

11  judges' elevator, and we can have them led by a CSO.  I'll

12  leave it up to counsel to set them up as they think is

13  appropriate.  But I'd like to have that done tomorrow so

14  that's ready to go Friday.

15         So let's do that tomorrow.  And then I'll leave it

16  to MGA if they want a table or something to set up here,

17  bring in something where demonstratives can be placed.

18  That's fine.  Once they are introduced in evidence and they

19  are all labeled and we have numbers and the clerk has all the

20  numbers for the exhibits, then we can refer to them by

21  exhibit numbers and go from there.

22         Otherwise, the Court is in recess until 3:00

23  tomorrow afternoon.

24

25         (Proceedings concluded at 4:37 P.M.)

**C E R T I F I C A T E**

I hereby certify that pursuant to Title 28, Section 753 United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings in the above matter.

Certified on July 23, 2008.

**MARK SCHWEITZER, CSR, RPR, CRR**
Official Court Reporter
License No. 10514