1  A.   Yes.

2  Q.   And right below that there are two more listings showing

3  the price of $15 each for Funky Tweens Emily and Funky Tweens

4  Alyssa, and the person listing these for sale on e-mail were

5  describing them as Bratz-like dolls; correct?

6  A.   Correct.

7  Q.   And if I could ask you to look at 112, which is another

8  photocopy of an eBay listing.  And under description, a list

9  of Bratz-like doll NIB.

10       Do you know that the term NIB, or acronym, refers

11 to New In Box?

12 A.   I didn't know that.

13 Q.   In any event, do you remember ever authorizing Funky

14 Tweens or anybody to describe a Funky Tweens as a Bratz-like

15 doll?

16 A.   No.

17 Q.   So this again is an exhibit that was attached in

18 Hong Kong?

19 A.   Correct.

20 Q.   And this is a description of the Funky Tweens doll to a

21 Bratz doll; correct?

22 A.   Yes.

23 Q.   And again, could we just look at -- go to page 0115 of

24 13707 just for a moment.

25 A.   Okay.

1  Q.  Again, this is an exhibit that's attached to the

2  document filed as part of the affirmation in Hong Kong;

3  correct?

4  A.  Yes.

5  Q.  All right.  And again, under the description, you see

6  Funky Tweens, Emily Bratz-like doll NIB?

7  A.  Yeah, new in box.

8  Q.  I think that's what it stands for.  I didn't mean to

9  testify.  But in any event, can you now turn to 117.

10  A.  Yes.

11  Q.  Again, do you see this is a copy that was attached to

12  the affirmation filed in Hong Kong where the description is a

13  Bratz-like doll describing the doll as a Funky Tweens?

14  A.  Yes, I see that.

15  Q.  And 118, the next page over.  Do you see that?

16  A.  Yes.

17  Q.  Similar copy of an eBay listing where the seller is

18  listing Funky Tweens Brittany Bratz-like doll?

19  A.  Yes.

20  Q.  Do you see that?

21  A.  I see that.

22  Q.  And again, the last one I want to show you in this

23  sequence would be 121.

24  A.  Okay.

25  Q.  Of this affirmation.

```
 1  A.    Okay.

 2  Q.    Again, the seller was listing this Funky Tweens doll

 3  which was the subject of the litigation in Hong Kong as

 4  Brittany Bratz-like doll; correct?

 5  A.    Correct.

 6  Q.    Now, in all of these, just to be clear, did you ever

 7  authorize or do you know of any instance where MGA had

 8  authorized Funky Tweens or anybody to be describing Funky

 9  Tweens as being a Bratz-like doll?

10  A.    No.

11  Q.    Now, I want to turn, again, still in the same

12  affirmation.  This is in the same lawsuit in Hong Kong.

13  Again, to 0129.  And if you're on the same page, it appears

14  to be a letter on the letterhead of William Fan.

15  A.    Yes, I see this.

16  Q.    And this is in the Cityworld Limited litigation;

17  correct?

18  A.    I'm sorry.  What?

19  Q.    This is in the Cityworld litigation?

20  A.    Yeah, I believe that's -- yes.

21  Q.    Just to put this into context, this was the litigation

22  where Mr. Quinn had pointed to the statement of claims as

23  only referring to Mr. Bryant's drawings as the artistic

24  works.

25         Do you recall that?
```

| | |
|---|---|
| 1 | **A.** Yes. |
| 2 | **Q.** All right. Now, this letter is attached as part of the |
| 3 | affirmation and was filed in Hong Kong; correct? |
| 4 | **A.** Correct. |
| 5 | **Q.** And this is a letter -- |
| 6 | Your Honor, this is in evidence by the procedure |
| 7 | we're outlining. |
| 8 | This is a letter by Mr. Fan to City World and dated |
| 9 | May 27, 2002; correct? |
| 10 | **A.** I see that. |
| 11 | **Q.** I just want you to keep your finger there for a moment, |
| 12 | Mr. Kamarck. Go back to the original statement of claims, |
| 13 | Exhibit 13705. The one Mr. Quinn showed you. |
| 14 | **A.** Okay. |
| 15 | **Q.** And looking at page 13705-0009, the date of this is what |
| 16 | date? |
| 17 | **A.** July 3rd, 2002. |
| 18 | **Q.** Okay. So that's the date of the claim that's filed; |
| 19 | correct? |
| 20 | **A.** Correct. |
| 21 | **Q.** Now, we've been looking at the letter that I've asked |
| 22 | you to take a look at from Mr. Fan to City World Limited. |
| 23 | And the date of this letter is May 27, 2002; correct? |
| 24 | **A.** Correct. |
| 25 | **Q.** Okay. So it's true that before the statement of claim |

 1 | is filed, Mr. Fan had sent a letter on behalf of MGA to City

 2 | World limited at an address in Hong Kong; correct?

 3 | MR. QUINN:   Lacks foundation, your Honor.

 4 | THE COURT:   Lay a further foundation for that,

 5 | Counsel.

 6 | **Q.** BY MR. NOLAN:   During this period of time, you were --

 7 | were you counsel in May of 2002 for MGA?

 8 | **A.** I don't believe so.

 9 | **Q.** Okay.

10 | In any event, the document and the affirmation is

11 | in evidence, your Honor.

12 | I would just ask Mr. Kamarck if he could just read

13 | a sentence that is contained in the letter that's submitted

14 | in Hong Kong.

15 | **A.** Okay.

16 | **Q.** Mr. Kamarck, just asking you to go down to one, two,

17 | three, four, five.

18 | **A.** Okay.

19 | **Q.** And you see, could you read that sentence?

20 | **A.** Sure.   "It has come to our clients' attention that you

21 | have been advertising, promoting, selling, or offering for

22 | sale, manufacturing and/or otherwise dealing with a series of

23 | dolls called Funky Tweens, the designs of which and of their

24 | accessories and packaging are substantially similar to MGA's

25 | Bratz dolls and their accessories and packaging.   Copy of an

```
 1    extract of your catalog of such dolls is also enclosed

 2    herewith and marked B."

 3  Q.    You didn't see any reference to Carter Bryant's

 4    drawings?

 5  A.    No, I didn't.

 6  Q.    I want to go to the last subject, which is the Bandai

 7    e-mail that you sent.

 8  A.    Yes.

 9  Q.    For your reference, Mr. Kamarck, it's 13730.  And this

10    is Volume 3.

11  A.    13730?

12  Q.    Yes.

13  A.    I've got it.

14  Q.    You recognize this.  This is in evidence.  So could we

15    have this on the screen.

16          This is the e-mail that you sent on behalf of MGA;

17    correct?

18  A.    Correct.

19  Q.    And this is sent regarding Glamma Jammaz; is that

20    correct?

21  A.    Yes, it looks like it.

22  Q.    Now, Cynthia Nishimoto, what was her position at Bandai?

23  A.    She was legal.  She was a connection to the licensing

24    group, as I recall.

25  Q.    Was Bandai at this time a distributor for MGA of the
```

1   Bratz dolls?

2   A.   I believe that is correct.

3   Q.   Now, the first paragraph, you say: "As discussed, MGA

4   maintains that the overall look and feel of the Glamma Jammaz

5   dolls are substantially similar to the Bratz dolls.   It is

6   clear to MGA that Bandai use the Bratz dolls as a model for

7   their Glamma Jammaz dolls and copied the detail down to even

8   a birthmark in the identical spot on your Mya doll as our

9   Yasmin Bratz."

10  A.   Yes.

11  Q.   "As you know, the fact your doll has such an identical

12  mark is convincing evidence of copying, if not copyright

13  infringement."

14  A.   Correct.

15  Q.   What I was curious about is can you explain the

16  distinction that you're making between copying and copyright

17  infringement?

18  A.   Yeah, when you get into copyright infringement, if there

19  is something that is identical between two works, take, for

20  instance, a book, and you have a passage that is identical,

21  sometimes a defendant will say I didn't have access to your

22  work.   I wasn't actually using your work.   I did this all

23  independently.   So when you have something that is identical,

24  I'm missing the phrase that they have for this, but it's --

25  strikingly similar, that means that the person who had it had

1   access to your work, which is one of the elements of

2   copyright infringement, is access. You can copy someone

3   else's work and not --

4               MR. QUINN: Your Honor, I object. Legal opinions.

5               THE COURT: Sustained.

6   Q.   BY MR. NOLAN: Mr. Quinn --

7               THE COURT: For the jury's benefit, the Court will

8   be instructing the jury on the law on copyright that you need

9   to make decisions in this case.

10              You may proceed, Counsel.

11  Q.   BY MR. NOLAN: You, I think, described this letter as a

12  shot across the bow?

13  A.   Yes.

14  Q.   In your position as counsel at MGA, did you think it was

15  one of your responsibilities to aggressively protect the

16  mark?

17  A.   Correct.

18  Q.   And to protect the copyright aspects of the Bratz dolls?

19  A.   Yes.

20  Q.   Now, as I understand it, you never filed a lawsuit or

21  authorized the filing of a lawsuit on behalf of MGA against

22  Bandai arising out of this particular doll; correct?

23  A.   Correct.

24  Q.   And Mr. Quinn showed you two exhibits and asked you to

25  make a comparison. One was 13732 and 13901.

1   **A.**   Okay.

2   **Q.**   Now, as I understand your testimony with respect to the

3   doll depicted on the left, that's --

4   **A.**   We're not going to start talking about wa-wa-san, are

5   we?

6   **Q.**   That's not on my hour.

7   **A.**   Okay.  Go.

8   **Q.**   This photograph that's depicted on the left, if I

9   understand correctly, when you wrote the e-mail, you were

10  writing based on a picture on a website; correct?

11              MR. QUINN:  Your Honor, this is leading.  They

12  represent him.

13              THE COURT:  Sustained.

14  **Q.**   BY MR. NOLAN:  Mr. Kamarck, when you wrote the e-mail

15  complaining to Bandai, what were you relying on in making

16  your observations?

17  **A.**   My recollection is that someone had sent me a link to a

18  website, whether it was a Bandai website or it might have

19  been one of the eBay things that people are always looking

20  on, and that that's what I was looking at, is a picture.  I

21  think it was on the Bandai website.  Though I'm not 100

22  percent certain of that.

23  **Q.**   Now, comparing the two photographs depicted on the

24  screen right now, and especially the birthmark itself, would

25  you describe the location of the birthmark as being

1    identical?

2    A.    You know, now that I saw the actual doll, I think I

3    pointed out before it's not an identical position.

4    Q.    Now, I know that you did not file a lawsuit based on

5    this, but now looking at the comparison and having the actual

6    doll in your possession, is it your view that you would have

7    authorized a lawsuit against Bandai alleging substantial

8    similarities between the Bratz doll and this doll?

9              MR. QUINN:   Your Honor, this calls for speculation.

10             THE COURT:   You'll have to lay more foundation or

11   rephrase the question.

12   Q.    BY MR. NOLAN:   Now that you have what is represented to

13   be a 3D model, the doll itself, and now comparing it to the

14   Bratz dolls, would you have filed the lawsuit contending that

15   they were substantially similar?

16             MR. QUINN:   Same objections, your Honor.

17             THE COURT:   It sounds like speculation, Counsel.

18   Q.    BY MR. NOLAN:   Do you believe that there is a

19   substantial similarity between the 3D doll and the Bratz

20   doll?

21             MR. QUINN:   Objection.   Legal opinion.

22             THE COURT:   Sustained.

23   Q.    BY MR. NOLAN:   Just as a lay observer, do you think that

24   there are substantial dissimilarities between the 3D doll

25   marked as the Glamma Jammaz doll and the Bratz dolls?

1   **A.**   Yeah, mainly, you know, having looked at the actual

2   doll, there are definitely a number of pointed

3   dissimilarities.

4   **Q.**   Do you recall being shown a document by Mr. Quinn, filed

5   in Hong Kong, stating words to the effect that certain

6   employees at MGA, including Margaret Leahy and Anna Rhee,

7   referred to Mr. Bryant's artistic works?

8             Do you recall that?

9   **A.**   I do.

10   **Q.**   And I believe that that's Exhibit No. 10234, which

11   should be in 3.

12   **A.**   10234?

13   **Q.**   Yes. And in particular, page -- I think it's 42 and 43.

14   **A.**   I'm sorry. I'm still looking for the exhibit. Okay. I

15   found the exhibit. Which page are we looking at?

16   **Q.**   Directing your attention to paragraph 43.

17   **A.**   Okay. We're on Exhibit 10234?

18   **Q.**   10234, yes.

19   **A.**   Okay. And we're looking at page?

20   **Q.**   0043.

21   **A.**   Okay.

22   **Q.**   You see where it says Margaret Leahy was commissioned by

23   the plaintiff to make the artistic works referred to in

24   subparagraph B hereof?

25             Do you see that?

1   A.   Yes, I do.

2   Q.   Now, just going back to Paragraph B, and Paragraph B is

3   wax models of the head, body, and shoes of the Bratz fashion

4   dolls?

5   A.   Yes.

6   Q.   Come back to 43 and see what it actually says.

7   "Margaret Leahy, hereinafter referred to as Ms. Leahy, was

8   commissioned by the plaintiff to make the artistic works

9   referred to in subparagraph B hereof."

10          Those are the wax models of the head, body, and

11  shoes.  Do you see that?

12  A.   Yes, I do.

13  Q.   Do you see anything in this pleading, Mr. Kamarck, where

14  MGA was taking the position that Margaret Leahy did an

15  identical duplication of the 2D Carter Bryant drawings when

16  she did the final 3D Bratz model?

17  A.   No.

18          MR. NOLAN:   Nothing further.

19          MR. QUINN:   Nothing further, your Honor.

20          THE COURT:   Very well.  You are excused.   Thank

21  you.

22          Plaintiff's next witness.

23          MR. QUINN:   The next witness is Daphne Gronich.

24          THE CLERK:   I just want to remind you that you are

25  still under oath, having been previously sworn.

1           **DAPHNE GRONICH, PREVIOUSLY SWORN.**

2                        **DIRECT EXAMINATION**

3   BY MR. QUINN:

4   **Q.**   Good afternoon, Ms. Gronich.  On the floor behind you

5   should be two binders.

6   **A.**   No.

7               THE CLERK:  Oh, did I pick them up?  I did.

8   **Q.**   BY MR. QUINN:  Now, we've heard your testimony before.

9   You were the chief attorney at MGA from about December 2003

10  to November 2007.  Is that roughly correct?

11  **A.**   That's roughly correct.

12  **Q.**   I'm sorry?

13  **A.**   Yes, it is.

14  **Q.**   There was -- one of the lawsuits that was pending when

15  you became the chief lawyer at MGA was a case involving

16  Cityworld in Hong Kong; correct?

17  **A.**   That is correct.

18  **Q.**   And if you can take a look at Exhibit 13705.  That's in

19  Volume 2.  This is in evidence.  And if I could ask you,

20  please, to turn to -- well, let's first look at the first

21  page, 13705-1.  This is the original statement of claim that

22  was filed in Hong Kong in the Cityworld case.  And that was

23  filed before you joined MGA; correct?  It was filed in July

24  2003, I believe.  I'm sorry.  2002.

25  **A.**   Yes, it says July 2002.

1  Q.   And if you'd look at page 13705-2, you will see there in

2  paragraph 3-A MGA in the original complaint identified the

3  MGA artistic works that were being sued on.

4           Do you see that?

5  A.   Reading it out of context, I can't say that that's

6  what's being sued on.  I think it justifies original artistic

7  works.

8  Q.   And the original artistic works it identifies are 17

9  design drawings of various fashion dolls; correct?

10 A.   That is what it says, yes.

11 Q.   And below that, if we could just scroll down a little

12 bit, Ken.  It goes then into particulars of ownership and

13 subsistence and talks about Mr. Bryant, et cetera.

14           Do you see that?

15 A.   Yes.

16 Q.   All right.  Now, after that, after that Cityworld case

17 was started where MGA brought this suit on the 17 drawings,

18 Mattel brought this suit where Mattel claimed that it owned

19 the very drawings that MGA was saying was the basis of its

20 suit against Cityworld; correct?

21 A.   I don't know if that's actually correct in terms of my

22 understanding.  My understanding is MGA -- Mattel sued Carter

23 Bryant.  I don't know that I recall any specifics about any

24 design drawings or drawings in particular in connection with

25 the actual lawsuit.

1   Q.   Well, there was for sure a suit against Mr. Bryant.  But

2   you are aware that Mattel brought claims against MGA.  That's

3   why we're all here.  You know that.

4   A.   Yes, I do.

5   Q.   And you know that one of the claims that Mattel asserted

6   was that it owned these very drawings, because Mr. Bryant,

7   Mattel contended and the jury has now found, created those

8   drawings while he was employed by Mattel.

9   A.   Well, I don't know which design drawings are at issue

10  specifically here.  Since this just refers to 17 drawings.

11  Q.   Well, I'll represent to you that's in evidence, and we

12  just went through that.  That it's Mr. Bryant's drawings.  I

13  will just represent that to you.  So my question to you is

14  isn't it true that after MGA brought this lawsuit, Mattel

15  brought a lawsuit, a claim against MGA saying it owned these

16  very drawings; correct?

17  A.   Well, the difficulty I'm having is when you're saying

18  these very drawings, I don't know that on the face of this

19  document.

20  Q.   All right.  Let me ask it this way.  You know that

21  Mattel claimed in this lawsuit, claims in this lawsuit, and

22  the jury has now found, that Mr. Bryant's original drawings

23  are owned by Mattel because they were created while he was

24  employed by Mattel.  You know that; correct?

25  A.   I don't know that for a fact because I have not -- if

1   that's what you are representing, I have to assume that's

2   true.

3   Q.   You were the chief lawyer for MGA right up to December

4   of 2007; correct?

5   A.   November 2007, but I have not been involved in this

6   trial.

7   Q.   All right.

8   A.   Except as a witness.

9   Q.   And as general counsel, as the top lawyer for MGA, you

10  had some responsibility for supervising this lawsuit;

11  correct?

12  A.   That is correct.

13  Q.   In fact, you attended hearings in this courtroom?

14  A.   Some, yes.

15  Q.   And you know that one of Mattel's claims were that it

16  owned certain original Bratz drawings that Mr. Bryant had

17  done.   You know that?

18  A.   Yes, I do.

19  Q.   Now, after Mattel brought that lawsuit saying it owned

20  the drawings, MGA amended its complaint against Cityworld in

21  Hong Kong to say that it was -- its claim was no longer based

22  on those drawings that Mattel claimed.   True?

23  A.   I don't recall that.

24  Q.   All right.   Let's take a look at the amended statement

25  of claim, Exhibit 13706.   It's in the same volume.   And if

1   you look at the page, this is a copy of a re-amended

2   statement of claim in the Cityworld case in Hong Kong?

3   **A.**   Yes.

4                MR. QUINN:   We'd offer Exhibit 13706.

5                THE COURT:   Pursuant to the same procedure?

6                MR. HANSEN:   Subject to the same procedure, your

7   Honor.

8                THE COURT:   Very well.   It's admitted.

9                **(Exhibit 13706 received.)**

10  **Q.**   BY MR. QUINN:   Now, in this amended claim, if we could

11  turn to dash 2.   That's the first page.   If we could turn to

12  dash 2, what they do there in Hong Kong is you kind of have

13  to -- when you amend your claim, you have to kind of red line

14  it to show where the track changes are.   You've seen that in

15  Hong Kong pleadings?

16  **A.**   Yes, I have.

17  **Q.**   All right.   And that's what you did in this case when

18  you amended this claim; correct?

19  **A.**   Yes.

20  **Q.**   And this claim was amended on January 5th, 2007;

21  correct?

22  **A.**   I have to look at the papers.   I don't recall.

23  **Q.**   You can take a look at dash 12.   It's page 12, and

24  you'll see a date there.

25  **A.**   Yes.

1   Q.   Dated the 5th of --

2   A.   Yes.

3   Q.   So this was done on January 5, 2007; correct?

4   A.   It appears from that, yes.

5   Q.   All right.  So if we can go back to the page that we

6   were just looking at, dash 2 with the track changes.  And one

7   of the things that MGA did after Mattel brought this case, if

8   we look at the track changes, is to delete all reference to

9   the original design drawings in its claim against Cityworld;

10  correct?  That's what it did.

11  A.   Yes.

12  Q.   And it added a number of other works.  It said our claim

13  is not based on the drawings.  It's based on molds.  It's

14  based on wax models.  It's based on four drawings of

15  racial -- of facial decoration, pantone color guides, Deco

16  masters; correct?

17  A.   That's correct.

18  Q.   And MGA did all of that after Mattel asserted its claim

19  that it owned these drawings; correct?

20  A.   In terms of chronologically, yes, that's correct.

21  Q.   It did add one drawing, and that is the second one

22  there.  One drawing of body sketch of the Bratz fashion dolls

23  made in around November 2000.  Do you see that?  That is

24  something that -- a drawing that MGA did add in this

25  amendment; correct?

1  A.    That is correct.

2  Q.    And MGA felt safe adding that because November 2000 was

3  after Mr. Bryant had left Mattel's employment; correct?

4  A.    I don't know of the characterization about feeling safe

5  about adding that.  It made these changes because it believed

6  that it needed to make these changes in connection with this

7  litigation.

8  Q.    Well, you know, based on your involvement with this case

9  and being general counsel of MGA for years as this case was

10  pending, you know that in November 2000, Mr. Bryant was no

11  longer employed by Mattel; correct?

12  A.    That is correct, yes.

13  Q.    And in your -- you filed an affirmation in this case in

14  Hong Kong, and that's Exhibit 13119.  13119.  That's in

15  Volume 1.

16  A.    You want me to turn to that?

17  Q.    If you would, please.  And Exhibit 13119 is a copy of

18  the affidavit of Daphne Gronich filed in the MGA versus

19  Cityworld case; correct?

20  A.    That's correct.

21        MR. QUINN:  We'd offer that, your Honor.

22        THE COURT:  Very well.

23        (Exhibit 13119 received.)

24  Q.    BY MR. QUINN:  And in your affidavit at dash 2, you

25  refer to this body sketch in 5-B, subparagraph 5-B.  You say

1  one drawing of a body sketch of the Bratz fashion dolls now

2  produced and shown to me marked as DG-2 is a true copy of the

3  body sketch.

4          Do you see that?

5  A.    I see that.  I'd like to look at the exhibit, though,

6  please.

7  Q.    Sure.  So let's take a look at DG-2.  And that's at dash

8  27 and 28.  It says DG-2.  Do you see that number?

9  A.    Yes.

10  Q.    And it says there true copy of body sketch.  And date

11  around November 2000.  That's what you said; correct?

12  A.    That's correct.

13  Q.    And then it's attached; correct?

14  A.    Yes.

15  Q.    And that's the body sketch that's referred to in the

16  complaint; right?

17  A.    Yes.

18  Q.    And you realize now that this jury has determined that

19  that body sketch was done by Mr. Bryant while he was employed

20  by Mattel and that it is owned by Mattel.

21          MR. HANSEN:  Your Honor, I would just object.  I

22  think that the verdict form actually has solely or jointly

23  with someone else.  The verdict form is actually stated

24  differently.

25          THE COURT:  Counsel?

1    **Q.**   BY MR. QUINN: You are aware that the jury

2   determination, that the jury determined that this sketch,

3   which is in evidence as Exhibit 323-33, that this was created

4   by Mr. Bryant during the time of his employment at Mattel --

5            THE COURT: Counsel, the solely or jointly with

6   others. The jury found that it was done by him or jointly

7   with others.

8            MR. QUINN: Thank you, your Honor.

9    **Q.**   Solely or jointly with others during the time of his

10   Mattel employment. You are aware of that?

11    **A.**   I actually wasn't specifically aware of that.

12    **Q.**   Let me ask you about another case. Are you familiar

13   with a case that MGA brought in this country against a

14   company called Multi Toy?

15    **A.**   I'm aware of that litigation. It was against a company

16   called Multi Toy and other defendants.

17    **Q.**   All right. And the complaint in that case is

18   Exhibit 13738 in Volume 2. If I could ask you, please, to

19   turn to Exhibit 13738. This is going to be real simple. I'm

20   going to ask you if this is a copy of the complaint filed in

21   this case?

22            MR. HANSEN: Your Honor, objection. It's not the

23   entirety of the complaint. It's missing exhibits.

24            THE COURT: Counsel?

25            MR. QUINN: This is how it was produced to us, I

1   believe, your Honor.  It's a copy of the complaint with two

2   exhibits.

3               THE COURT:  Are there more exhibits?

4               MR. HANSEN:  The copy produced has all the

5   exhibits.  There are multiple.  I have a copy that's maybe

6   three quarters of an inch thick.  I didn't go through this,

7   but I can tell by its size that it's not the complete

8   complaint.  And the entire complaint has been produced.

9               MR. QUINN:  Your Honor, I will offer the entire

10  complaint.  If counsel has a copy of it, I'll offer it with

11  all the exhibits.

12              MR. HANSEN:  And the Bates number and a Mattel

13  production number.  So I don't think it's fair to accuse --

14              THE COURT:  This is a complaint filed in this

15  court.  So we can obtain a copy for purposes of this

16  proceeding.  Let's proceed.

17              MR. HANSEN:  And actually, I have a copy.

18              MR. QUINN:  If there's a Bates number or some way I

19  can refer to it, I'd just like to move it into evidence, and

20  I'm not going to do anything further with it.

21              THE COURT:  The Court is prepared to take judicial

22  notice of it, if necessary.  So let's move along.

23              MR. HANSEN:  That's fine.

24              THE COURT:  Let's make sure we get a copy of the

25  complete complaint that goes to the jury in the exhibit book.

1          MR. HANSEN:  Yes.

2     Q.   BY MR. QUINN:  Could I ask you to turn to Exhibit 13783

3     in Volume 2?  13783.

4          Is this a copy of a complaint filed by MGA in

5     Hong Kong against a company called Wai Man International?

6     A.   I have to look at it.  I don't actually know if this is

7     the complaint itself.  I see that it references a writ of

8     summons, but there's some Chinese handwriting, and I'm not

9     really sure if that is the complaint.

10    Q.   Well, looking at the first page, this appears to be a --

11    it's addressed to the defendant Wai Man International.

12         Do you see that?

13    A.   Yes.

14    Q.   And it says this writ of summons.  So maybe it's a

15    summons or a writ of summons.

16    A.   Yes.

17    Q.   It was issued or entered in that case, MGA versus

18    Wai Man?

19    A.   It is a summons in terms of the first page, yes.

20    Q.   And then if you go forward to 0004, there's a page

21    entitled at the top Endorsement of Claim.

22         Do you see that?

23    A.   I see that, yes.

24    Q.   And it's signed by a William Fan.  That's the name of a

25    lawyer we've heard in Hong Kong.  Was he a lawyer that

     1  represented MGA in Hong Kong?

     2  A.   Yes, he was.

     3  Q.   And then over on 0006 there's an acknowledgment of

     4  service and writ of summons?

     5  A.   That's correct.

     6  Q.   And on 0012, there's a document, and this may have been

     7  lack of facing page that says writ of summons.

     8  A.   I'm sorry?

     9  Q.   0012.  It says writ of summons?

    10  A.   It says that, yes.

    11  Q.   So these appear to you to be pleadings entered in the

    12  MGA versus Wai Man case in Hong Kong?

    13  A.   The difficulty I'm having is the -- I'm not sure that

    14  this is the complaint.  You're referring to a complaint.  It

    15  has a writ of summons.  I can't read Chinese.  And then the

    16  rest of it is acknowledgment, but I don't see any signature.

    17  So I don't know that this was actually entered other than

    18  your representing it.

    19  Q.   I can't read Chinese either.  But do these appear to be

    20  various pleadings relating to the Wai Man litigation in

    21  Hong Kong?

    22  A.   That's what I don't know.  I don't know that they have

    23  been filed.

    24  Q.   I'm not asking whether they were filed.  You've got 003.

    25  It's signed by Mr. Fan.  He's your lawyer in Hong Kong;

1  right?

2  **A.**  Yes.

3  **Q.**  And the next page signed by Mr. Fan, your lawyer in

4  Hong Kong?

5  **A.**  The difficulty I have with the page that's signed by

6  Mr. Fan is that, which is dash 0003, is it has -- it starts

7  partway through the page.  The first paragraph is totally

8  crossed out.  And then it says this writ, and it's signed.

9  So I don't know that this is -- and it says endorsement of

10  claim.  Please see attached.  So I don't know that it's

11  complete.

12  **Q.**  Ma'am, these appear to be documents, pleadings, legal

13  documents relating to the Wai Man case in Hong Kong?

14  **A.**  They appear to be related to Wai Man.  That's all I can

15  say for sure.

16           MR. QUINN:  I'd offer this exhibit, your Honor.

17           MR. HANSEN:  Objection.  Foundation.

18           THE COURT:  These were produced by MGA?

19           MR. HANSEN:  Yes.  It's the Chinese part that --

20           THE COURT:  I'm sorry?

21           MR. HANSEN:  Subject to the same stipulation.

22           THE COURT:  Very well.  It's admitted pursuant to

23  that stipulation for procedure.

24           **(Exhibit 13783 received.)**

25  **Q.**  BY MR. QUINN:  In that case, we have an affidavit of a

```
 1   Lam Yuen Chak.  That's Exhibit 13742.  Same volume.  Have you
 2   found that?
 3   A.   Yes.
 4   Q.   And does this appear to be an affirmation of an
 5   investigator named Mr. Chak that was filed in the MGA versus
 6   Wai Man case?
 7   A.   I need to look at it.  I don't recall this name.
 8   Q.   In you'll look at dash 6, you'll see signatures and what
 9   appears to be like a notarization?
10   A.   Yes.
11           MR. QUINN:  Offer 13742, your Honor.
12           MR. HANSEN:  Same procedure.
13           THE COURT:  Okay.
14              (Exhibit 13742 received.)
15   Q.   BY MR. QUINN:  And if we could look at 13742-15.  This
16   is a copy of -- a photocopy of the dolls that were the
17   subject of this case?
18           Do you see that?
19   A.   I see the photograph.  I honestly don't know if that was
20   the subject of this case.
21   Q.   Now, I'd like to ask you some questions, Ms. Gronich,
22   about some filings with the copyright office, and these are
23   all in the first volume.  And if you could turn, please,
24   first to Exhibit 505.  And let me ask a general question
25   first.
```

1        You are aware that MGA made copyright filings

2   relating to the Bratz dolls:  Jade, Sasha, Cloe, and Yasmin.

3   You are aware that copyright filings were made related to

4   those dolls?

5   A.   At which point in time?

6   Q.   At any time.

7   A.   Yes.

8   Q.   And at some point after MGA made those copyright

9   filings, MGA made supplemental filings for each doll in which

10  MGA represented that those dolls were derivative of Carter

11  Bryant's drawings.  Isn't that true?

12  A.   I don't believe that's true, no.

13  Q.   All right.  Let's take a look at it.  Exhibit 505.   We

14  can start with that.

15  A.   Yes.

16  Q.   Exhibit 505 is a copy of the certificate of registration

17  with the United States copyright office relating to the

18  drawing for Jade; correct?

19  A.   Yes.

20  Q.   I think if you look at dash 2, item 1, it says Jade

21  drawing.

22        Do you see that?

23  A.   Yes.

24        MR. QUINN:   I'd offer Exhibit 505, your Honor.

25        THE COURT:   Any objection?

1              MR. HANSEN:  No objection.

2              THE COURT:  It's admitted.  You may publish.

3              **(Exhibit 505 received.)**

4    Q.   BY MR. QUINN:  And this is the certificate which you get

5    with a ribbon and a seal.

6              And if we could go to the next page.  Just enlarge

7    the top third of that if you can, Ken.

8              And it's for the Jade drawing.  And in the upper

9    right, what is that, where it says VA 1-218-487.  Do you know

10   what that is?

11   A.   That's the copyright registration number for --

12   Q.   For the Jade drawing.  So let's keep that number in

13   mind.  VA 1-218-487.  And I'd now like to look at

14   Exhibit 557.  This is in evidence.

15             Oh, I'm sorry.  If we could go back to Exhibit 505

16   and put up 505-5 on the screen.  Attached to that copyright

17   registration for the Jade drawing is the Jade drawing; right?

18   At dash 5?

19   A.   It appears to be.  By the way, the first page is not a

20   part of the copyright registration.  It's the facing page

21   they give when they give certified copies.

22   Q.   Okay.  That's why you have the ribbon and the seal?

23   A.   That's correct.  But the actual registration certificate

24   starts at dash 02.

25   Q.   That's the page we looked at which had that VA number on

```
 1  it?
 2  A.    That's correct.
 3  Q.    And if we could now look at Exhibit 557, which is in
 4  evidence.  This is the copyright registration for the Jade
 5  doll configuration, accessories and packaging.
 6             Do you see that?
 7  A.    Yes, I do.
 8  Q.    And copies are attached of the doll configuration, if we
 9  could look at dash 5.
10  A.    That's the original copyright registration and original
11  attachment, yes.
12  Q.    For the doll configuration, accessories, and the
13  packaging?
14  A.    As originally filed, yes.
15  Q.    And if we could go back to page dash 2 and look at the
16  VA number in the upper right-hand corner.  It's VA 1-090-287,
17  is it?
18  A.    Yes.
19  Q.    And after that, MGA submitted a correction to the
20  copyright configuration for this Jade doll configuration.  Do
21  you know that?
22  A.    Yes, I do.
23  Q.    And that's Exhibit 558, which is in evidence.  And if we
24  could blow up C here.  And what do you call this?  Is this an
25  amended filing, a corrected filing?  What would you call
```

1    this?

2    A.    A correction form.

3    Q.    All right.  You are familiar with this type of form and

4    how it's used?

5    A.    Yes.

6    Q.    And on this correction form, it corrected the previous

7    filings with respect to derivative work where it says line

8    6-A, derivative work.  It identified the Jade drawing as

9    being a derivative work for the Jade doll configuration

10   accessories and packaging; correct?

11   A.    Um, you need to read it in context.  It references back

12   to the original document, but it's -- what was done in this

13   amendment is that we added two-dimensional artwork, and that

14   should have been checked, and if you go up to under B, it

15   says only three-dimensional sculpture box checked.

16   Additional artwork -- additional box two-dimensional artwork

17   should be checked.

18   Q.    Let's first go up to A and make sure we know what we're

19   talking about here.  This is a supplemental filing made with

20   respect to that Jade doll configuration, accessories, and

21   packaging, VA 1-090-287; correct?

22   A.    That's correct.

23   Q.    And that's the registration we looked at just a few

24   moments ago; right?

25   A.    It is.  The only thing I would note on that is it's not

1  a complete copy of the registration because when you

2  reference boxes and numbers and line numbers, they don't

3  appear on the exhibit that you have.

4  **Q.** Okay. But, ma'am, this is a supplemental filing which

5  was made with respect to that Jade doll; correct?

6  **A.** Correct.

7  **Q.** All right. And then if we could go back down to --

8  **A.** No, actually, the doll configuration, accessories, and

9  packaging.

10 **Q.** Right. And if we could go back down to C.

11 **A.** That's correct, yes.

12 **Q.** What is a derivative work?

13 **A.** In a legal sense?

14 **Q.** Well, what did MGA mean here when it identified that

15 Jade drawing, the first one we looked at VA 1-218-487,

16 derivative work, what did MGA mean by derivative work?

17 **A.** What MGA meant was that the artwork that it identifies

18 as two-dimensional artwork was in some fashion derived from

19 the Jade drawing.

20 **Q.** Oh, so what you're telling us is that the Jade doll

21 configuration is derivative of the Carter Bryant drawing;

22 correct?

23 **A.** No. It's the Jade doll configuration, accessories, and

24 packaging. So all of it is the subject of the registration.

25 The only thing that is referenced and is intended to be

1  referenced by the derivative portion and referencing the Jade

2  drawing is the two-dimensional artwork being derivative of in

3  some fashion the Jade drawing.

4  Q.  Are you saying that MGA paid Carter Bryant over

5  $30 million for some two-dimensional packaging art?  Is that

6  what you're saying?

7           MR. HANSEN:  Object to the form, your Honor.

8           THE COURT:  Overruled.

9           THE WITNESS:  I'm not quite sure I understand your

10  question in relation to this document.  You asked what we

11  meant.

12  Q.  BY MR. QUINN:  My question is did MGA pay Carter Bryant

13  over $30 million just for some two-dimensional packaging art?

14  That's my question.

15  A.  Um, first of all, I don't know exactly how much MGA has

16  paid Carter Bryant.  Secondly, I think a lot goes into why

17  MGA paid Mr. Bryant.  Initially he came in, as I understand,

18  with drawings which were pitched, and those were the

19  inspiration for the dolls and the doll line.

20           So to the extent he participated in those

21  activities, he earned royalties.  So to say that he was paid

22  $30 million for packaging art is not appropriate.  He was

23  paid for his services.

24  Q.  In any event, this addition identifying the doll drawing

25  as a derivative work, this is something that was done with

1   respect to each of the doll -- each of the registrations for

2   the doll configuration, accessories, and packaging; correct?

3   A.   It was done in conjunction with the additional reference

4   to the two-dimensional artwork being added in each of the

5   amendments or corrections.

6   Q.   Ma'am, this additional filing which identifies

7   derivative work, the drawing as a derivative work, that was

8   done with respect to each of the doll configuration,

9   accessories, and packaging registrations.   True?  Yes, it

10  was, or no, it wasn't?

11  A.   Yes, it was.

12  Q.   And then just to get those into evidence, if you'd turn

13  to Exhibit 507.  507 is the copyright registration for the

14  Sasha drawing; correct?

15  A.   Starting at page 2, yes, it is.

16  Q.   The copyright registration for the Sasha doll

17  configuration, accessories, and packaging is already in

18  evidence as Exhibit 559.  There was a correction filed for

19  Sasha for that registration.  That's Exhibit 560, isn't it?

20  I believe this is already --

21  A.   I'm trying to catch up.  So you need to bear with me one

22  second.

23  Q.   560.

24  A.   Yes.

25  Q.   And then Exhibit 509 is the copyright registration for

```
 1  the Cloe drawing.  I'm not sure I moved into evidence
 2  Exhibit 507, your Honor.
 3            THE COURT:  Any objection?
 4            MR. HANSEN:  No objection.
 5            THE COURT:  Admitted.
 6            (Exhibit 507 received.)
 7  Q.  BY MR. QUINN:  Exhibit 509 is the copyright registration
 8  for the Cloe drawing; correct?
 9  A.  Starting at page 002.  Yes.
10            MR. QUINN:  We offer Exhibit 509.
11            MR. HANSEN:  No objection.
12            THE COURT:  Admitted.
13            (Exhibit 509 received.)
14  Q.  BY MR. QUINN:  And then Exhibit 511 is the copyright
15  registration for the Yasmin drawing.
16  A.  Yes, again, starting at page 2 of that exhibit.
17            MR. QUINN:  I'd offer that in evidence.
18            MR. HANSEN:  No objection.
19            THE COURT:  Admitted.
20            (Exhibit 511 received.)
21            MR. QUINN:  And I believe all the others are in
22  evidence, and I have nothing further.
23            THE COURT:  Further examination by the defense?
24            MR. HANSEN:  Thank you.
25            MR. QUINN:  I'm sorry, your Honor.  I forgot to
```

1    offer into evidence Exhibit 511, the copyright registration
2    for the Yasmin drawing.
3              MR. HANSEN:  No objection.
4              THE COURT:  It was admitted.
5                        **CROSS-EXAMINATION**
6    BY MR. HANSEN:
7    Q.   Ms. Gronich, I'm David Hansen, one of the counsel for
8    MGA.  We've met previously; right?
9    A.   That's correct, yes, we have.
10   Q.   I'd like to start with the copyright registrations that
11   we just went through.  Do you have those in front of you
12   still?
13   A.   No, I'll need to get them.
14   Q.   I'd like to do it in a slightly different order, though.
15   A.   Okay.
16   Q.   Ms. Gronich, if you could turn first to 557.  Do you
17   have 557 in front of you?
18   A.   Yes.
19   Q.   And if we could go to the second page of that exhibit,
20   please.  And this is -- if we could focus in on the top part
21   all the way down.  This is the Jade doll configuration,
22   accessories, and packaging registration; is that correct?
23   Excuse me.  Could you identify this for me as the Jade doll
24   configuration, accessories, and packaging registration?
25   A.   That's correct.

1   Q.   Now, if you would look, please, a little further down.

2   The registration here, do you see where it says nature of

3   authorship?

4   A.   Yes.

5   Q.   Can you tell us what is checked in terms of the nature

6   of authorship for this registration?

7   A.   It's three-dimensional sculpture.

8   Q.   Is anything else checked?

9   A.   No.

10  Q.   Do you see the box below that that says two-dimensional

11  artwork?

12  A.   Yes.

13  Q.   Is there a check for that box?

14  A.   No, there's not.

15  Q.   Okay.  And if we could look, please, at the dash 005

16  page, the first pictures.

17  A.   Yes.

18  Q.   And you are focused on -- let's just focus on the one on

19  the left, the picture on the left.

20       Do you see that?

21  A.   Yes.

22  Q.   And can you tell me is there anything in that picture

23  other than a three-dimensional sculpt?

24  A.   Yes, there is.  There's packaging.  There's actually

25  artwork on the front.  There's the Bratz logo, stylized logo.

1   Accessories for the doll.  So it's essentially the -- if you

2   call it the blister pack of the inside of the package.

3   Q.   And so if --

4   A.   And it doesn't show the back of it.  Excuse me.  So it

5   only shows the front as well.

6   Q.   But does it show a sculpt, a three-dimensional

7   sculpture?

8   A.   Only to the extent it's included as part of the doll.

9   But it doesn't specifically depict a three-dimensional

10  sculpt, no.

11  Q.   But it includes things other than a three-dimensional

12  sculpture?

13  A.   Absolutely.

14  Q.   In terms of registering the additional materials that

15  you referenced in this registration -- in this picture other

16  than the three dimensional sculpture, is this registration

17  accurate?

18  A.   No, it's not because it doesn't make reference to the

19  two-dimensional artwork that we added by the clarification

20  document that I identified previously.

21  Q.   So if we focus just for a moment on the lower right-hand

22  portion of the box.

23  A.   Yes.

24  Q.   Is that what you're referring to?

25  A.   Yes.

1    Q.    That's two-dimensional artwork?

2    A.    That's two-dimensional artwork, yes.

3    Q.    And as the registration that is submitted as Exhibit 557

4    went to the copyright office, it wouldn't cover that artwork;

5    is that right?

6              MR. QUINN:   Objection.  It's leading.

7              THE COURT:   Sustained.

8    Q.    BY MR. HANSEN:   Would the two-dimensional artwork be

9    covered by the registration that's shown in Exhibit 557 as

10   submitted to the copyright office?

11   A.    Not specifically, no.

12   Q.    All right.  So if we could turn, then, again briefly to

13   Exhibit 558, please.

14   A.    Yes.

15   Q.    And if we could focus in, I think you mentioned you were

16   focused on box B.  If we could focus on that just for a

17   minute.  And you see where -- can you read for us -- it says

18   incorrect information as it appears on basic registration.

19              Do you see that?

20   A.    Yes.

21   Q.    And that lists the only, quote, three-dimensional

22   sculpture box was checked?

23   A.    That is correct.

24   Q.    Can you tell me what the corrected information is shown

25   on this form?

1  **A.**    It says additional box, quote, two-dimensional artwork,
2  unquote, should be checked.

3  **Q.**    And in terms of, then, the correction that's found in C
4  that you were shown before, can you tell me what the purpose
5  of this correction was?

6  **A.**    Excuse me?

7  **Q.**    Can you tell me what the purpose was of the correction
8  that's shown in box C?  Why -- were you correcting something
9  with this registration?

10  **A.**    Yes.   The problem I was having before is it references
11  no box checked, 5-C box unchecked.  So when I was looking
12  back, it was hard to tell which was No. 5.  But what it says
13  is that it says previous registrations, no.  And then it
14  references the basic registration for the Jade doll
15  configuration, accessories, and packaging should cite to, and
16  it lists the registration number for the Jade drawing.

17          It lists line 6-A derivative work, Jade drawing,
18  line 6-B, material added, three-dimensional doll sculpt,
19  artwork, and packaging.

20          So as I explained earlier, the point of listing
21  that as -- listing the derivative work was to identify the
22  prior drawing.  But the purpose of it was to, in calling out
23  the two-dimensional artwork, it then was supposed to refer
24  back to the original Jade drawing because that was what was
25  being derived.

1   Q.   And the original Jade drawing is what's shown in the

2   registration number that's Exhibit 505?

3   A.   I'm afraid I don't recall all the numbers by heart.  So

4   I'll have to look at it.

5   Q.   That's all right.

6   A.   Yes, that's correct.

7   Q.   Let me ask you, you were shown a number of documents

8   today, Ms. Gronich.  Are you aware of what the issues are in

9   this part of the trial?

10  A.   I'm actually not because I haven't been involved in it

11  as much.

12  Q.   I'm sorry.  I didn't hear you.  I apologize.

13  A.   I have not been involved in specifically what's been

14  going on here in court.

15  Q.   Did any of the pleadings that you were shown today

16  elaborate at all on the similarities or differences between

17  the Bryant drawings and the Bratz dolls?

18  A.   Not in what I saw, no.

19  Q.   And to your knowledge, did any of the documents that you

20  were shown contradict the assertion that the Bryant drawings

21  served as an inspiration for the Bratz dolls?

22  A.   No.

23  Q.   Does that change your opinion on that at all, anything

24  you saw today?

25  A.   No.

1   Q.   Were you shown anything at all that discusses the value

2   of the Bryant drawings to MGA or Mr. Larian?

3   A.   No.

4   Q.   Are you aware of anything in the Hong Kong pleadings, at

5   least that you were shown, that address the value of the

6   Bryant drawings?

7   A.   No.

8   Q.   How about the profits of the sale of Bratz or

9   Bratz-related products attributable to Bryant's drawing?

10  Was any of that addressed in the materials that you were

11  shown today?

12  A.   No, not at all.

13  Q.   Let me ask you something about -- you were, I think,

14  briefly questioned about -- actually, before I go to that,

15  there's an additional -- here it is.  I apologize.  This is

16  not in the binder because I hadn't anticipated this.  But if

17  I can hand this over.

18          THE COURT:   You may proceed, Counsel.

19  Q.   BY MR. HANSEN:   I've handed you Exhibit 18829.

20          Do you see that?

21  A.   Yes.

22  Q.   Can you just look through that for me and identify it as

23  including a consent summons and then also a re-amended

24  statement of claim in the Cityworld action you were asked

25  about?

```
 1              MR. QUINN:  Your Honor, we have an objection to the
 2    use of this document.  We haven't seen it before.
 3              THE COURT:  You haven't seen it before?
 4              MR. QUINN:  No.
 5              THE COURT:  Counsel, was this produced in
 6    discovery?
 7              MR. HANSEN:  It's got a production number on it,
 8    yes.  It was produced in discovery.
 9              MR. QUINN:  Your Honor, that doesn't answer the
10    question.
11              THE COURT:  Let's go to sidebar.
12              (SIDEBAR CONFERENCE HELD.)
13              THE COURT:  Mr. Quinn?
14              MR. QUINN:  Your Honor, our concern is that this --
15    it's our recollection that this document was not produced in
16    discovery.  Bates numbers are added to documents that aren't
17    produced in the course of this trial.  The fact that there's
18    a Bates number here doesn't answer the question as to whether
19    it was timely produced in discovery.  And our recollection,
20    our team's recollection is we haven't seen this before.
21              THE COURT:  Was it on your exhibit list?
22              MR. HANSEN:  It's my understanding it was produced.
23    It was added to the exhibit list based on the questioning
24    today in terms of the timing.  This goes to the timing of the
25    addition of materials for artistic works other than the
```

 1   drawings.

 2           THE COURT:  It's just that we don't -- this is the

 3   first time we've had this.  I assume that you have a way of

 4   verifying that it was produced?

 5           MR. HANSEN:  I can't say specifically.  I was

 6   informed that it's been produced.

 7           THE COURT:  I assume somebody on the Skadden Arps

 8   team can somehow confirm that?

 9           MR. HANSEN:  I can do something else for a minute.

10           THE COURT:  Could you?  We've only got 10 minutes

11   left.

12           MR. QUINN:  The question is when.  It's been

13   produced.  The question is when.

14           MS. AGUIAR:  With due respect, we have been

15   producing, throughout the trial, documents to each of you.

16   We get documents from you guys even a day before testimony.

17   So all I'm saying is we will absolutely go back right now and

18   confirm that it's been produced.  The timing of when it's

19   been produced, as we all know, the practice is that we've

20   been doing a rolling production.  So why don't we go check.

21           MR. HANSEN:  And I didn't know that this issue was

22   going to arise until today, which is also why it wasn't in

23   the binder.

24           THE COURT:  Why don't you finish up the next 10

25   minutes, and we can take this up after hours.

1           MR. HANSEN:  I'll finish her off without this.

2           MS. AGUIAR:  We might be able to confirm that right

3    now.

4           MR. ZELLER:  Then for the record, your Honor, this

5    would have been a document the Court would have compelled

6    them to produce within five days of the May order dealing

7    with the other infringement litigation.  So if it's after

8    that cutoff, then we have a problem with it.

9           THE COURT:  If there was a specific order requiring

10   it to be produced in a specific time frame, that puts it in a

11   different category.  I just don't know.

12          MS. AGUIAR:  We'll try to confirm that.

13          (CONCLUSION OF SIDEBAR CONFERENCE.)

14          MR. HANSEN:  We're working to confirm.

15          THE COURT:  Very well.  Why don't you proceed with

16   another question.

17   Q.   BY MR. HANSEN:  You were asked about the Multi Toy case?

18   A.   Yes.

19   Q.   Are you familiar with that case?

20   A.   Yes, I am.

21   Q.   Can you just generally --

22   A.   In general terms.

23   Q.   Can you generally describe for me what the case was

24   about?

25   A.   The case was brought against three or four stores, as I

1    recall, or entities that were selling knock-offs of the Bratz

2    dolls in downtown Los Angeles.  So Multi Toy, as I recall,

3    was one of the defendants.  And there were others there.  And

4    they were selling dolls in packaging that looked very similar

5    to the Bratz packaging, coloring that looked similar to the

6    Bratz packaging, copying some of the artwork on their

7    counterfeit or knock-off packaging that would also appear on

8    the Bratz packaging of the original dolls.

9    Q.   Did MGA have issues with what you're calling knock-offs?

10   A.   Yes, they did.

11   Q.   Why was that?

12   A.   Well, generally whenever there's a product that's

13   successful in the marketplace, there tend to be imitators,

14   especially in the toy arena.  And there were a number of

15   them -- most of the products were made in China, and, for

16   instance, some of the things that came up in Multi Toy we

17   actually saw in South Africa and the U.K.

18        So the same dolls would appear in different places

19   around the world.  So that they were essentially -- they

20   along with others sort of jumped on the bandwagon to put out

21   dolls in packaging that looked like ours, lettering that

22   looked like ours.  When I say ours, MGA's.  Logos that looked

23   similar in order to capitalize on the popularity of the Bratz

24   brand and the dolls that people were buying.

25   Q.   Could you look, please, Ms. Gronich, in the white binder

1    that is there on the corner. And it's -- it's the second

2    tab. It's Exhibit No. 10877.

3    A.    Yes.

4    Q.    Could you identify this document for me, please?

5    A.    It's a declaration that I signed in connection with

6    MGA's application for a temporary restraining order against

7    the defendants in the Multi Toy litigation, and it lists all

8    the defendants.

9              MR. QUINN:   Your Honor, move Exhibit 10877 into

10   evidence.

11             THE COURT:   Any objection to that?

12             MR. QUINN:   No objection, your Honor.

13             THE COURT:   It's admitted. You may publish.

14             **(Exhibit 10877 received.)**

15   Q.    BY MR. HANSEN:   So could we look for a second -- if you

16   would flip to page 68 in that stack. It's about a third of

17   the way in. And it's actually pages 68 through 72. And

18   would you please tell me what those pages are?

19   A.    It's a photocopy of the copyright registration

20   certificate for the Sasha doll configuration, accessories,

21   and packaging.

22   Q.    So this is a copyright registration for the Sasha doll

23   configuration, accessories, and packaging?

24   A.    Yes.

25   Q.    Could we have Exhibit 559 on the screen, please. This

1   is already in evidence.  It's the -- this is the same

2   copyright registration for the Sasha doll packaging and

3   accessories?

4   **A.**   Yes.

5   **Q.**   And the -- I would like to use the -- the reason I'm

6   going to the registration is it has a better color picture.

7           If we could look at the -- just briefly, the page 5

8   of that.  Of the registration.  These are pictures of the

9   Sasha doll.

10  **A.**   Yes.

11  **Q.**   Okay.

12          And, Aaron, could we put up Exhibit 17558, which is

13  already admitted.

14          And can you identify this for me?

15  **A.**   The picture on the screen, on the left?

16  **Q.**   Yes.

17  **A.**   It's just a better picture of the picture on the right,

18  showing the Sasha packaging and artwork.

19  **Q.**   And so this is the Sasha doll that's in the copyright

20  registration?

21  **A.**   That is correct, yes.

22  **Q.**   Okay.

23  **A.**   It's the original doll.

24  **Q.**   Now, if we could look, please, at -- sorry for the

25  jumping around.  Exhibit 6.  Go back to your declaration for

```
 1  a second.  Exhibit 10877.  And if we could look at Exhibit 6,

 2  which starts at page 222 a little further in.

 3  A.    Yes.

 4  Q.    And if we could go to page 223.  Can you tell me what

 5  this is?  Identify this photo for us.

 6  A.    I don't recall.  I have to look at what my -- what

 7  specific entity sold this, but this is one of the dolls that

 8  was -- and packaging that was -- one of the products that was

 9  the subject of the litigation, the Multi Toy litigation.

10  Q.    So the Musical Trendy Teenies doll shown in this picture

11  was one of the dolls at issue, one of the packages that was

12  at issue in the litigation?

13  A.    Yes.

14  Q.    And if we go to the next page of this, which is page

15  224.  Do you see that?

16  A.    Yes.

17  Q.    And then if we jump to 225, we're basically zooming in

18  on the character art on the left.

19              Do you see that?

20  A.    Yes, I do.

21  Q.    And that is -- can you tell me what this is that's shown

22  in the screen that we're looking at now, page 225 of

23  Exhibit 10877?

24  A.    Right.  It's a closeup of the prior one, and it's the

25  actual character art that's taken directly from the Bratz
```

 1   packaging that you showed me earlier.  I don't know what the
 2   number was.  It was clear on the left, the new exhibit that
 3   you showed.  Exhibit 559.

 4          So the two-dimensional artwork which is on the
 5   bottom right of the Bratz Sasha doll was reproduced exactly
 6   on the Musical Trendy Teenies package.  And that shows the
 7   closeup of the four girls there.

 8   Q.  Could you put up Exhibit TX 18812, and if you could just
 9   look in your binder.  It's in the back.  Can you tell me what
10   these are?  Can you identify the three --

11   A.  It's actually a better color copy of Exhibit 6,
12   10877-223.  In slightly reverse order, they are essentially
13   the three pages that you showed me.  Second page is the third
14   page of the black and white, but it looks like from what I
15   can see, it says KMW.

16          So it would also be the lawyer who represented us
17   or the firm that represented us.  So the color pictures that
18   are depicted in this exhibit.

19   Q.  And the second page of Exhibit 18812 is the color
20   version of what's on the screen right now; is that right?

21   A.  Yes, that's correct.

22          MR. HANSEN:  Can we put up the second page of
23   18812, the color picture?  I'd like to move it into evidence.

24          THE COURT:  Any objection?

25          MR. QUINN:  No objection.

1            THE COURT:   It's admitted.

2            (Exhibit 18812 received.)

3   Q.   BY MR. HANSEN:   This is just a better color version of

4   what's attached to your declaration; right?

5   A.   Yes.

6   Q.   All right.   And if we could also just on the left, if we

7   could replace the black and white one with the picture that

8   we had before from the Sasha package, 17558.  Do you see any

9   relationship between the package art on the left and the

10  package art on the Mini Musical Teenies doll?

11  A.   Yes, that's what I referred to earlier, that they

12  essentially took that two-dimensional character art and just

13  copied it directly onto their product, which is the Musical

14  Trendy Teenies.

15  Q.   And were the other products at issue in that case, did

16  they similarly copy package art from the Bratz packaging?

17  A.   Package art or slogans, like the girls with a passion

18  for fashion, or the package shape and coloring.  Essentially

19  to varying degrees they included lots of different elements

20  from the MGA packaging or logos.

21           THE COURT:   Counsel, I'm going to stop you here.

22  We're past the hour.  We'll resume with this tomorrow morning

23  at 9:00.   Unless you have some further ground.

24           MR. HANSEN:   I have one question.

25           THE COURT:   I know you have further exam, but I'd

```
 1  like to let counsel --

 2          MR. QUINN:  I think I can finish in a minute and a

 3  half, your Honor.

 4          THE COURT:  A minute and a half?  The jury says go

 5  for it.

 6  Q.  BY MR. HANSEN:  Can you tell me how the Multi Toy

 7  litigation ultimately ended?

 8          THE COURT:  MGA prevailed.  Some of the defendants

 9  entered into a consent judgment early on, that they

10  acknowledged their liability.  And MGA ultimately obtained

11  summary judgment against the remaining defendant and

12  prevailed in the litigation as a result.

13          MR. HANSEN:  I have the letter.  The document's

14  already been produced.  May I?

15          THE COURT:  You may show it to counsel.  I assume

16  that obviates the objection.

17          MR. QUINN:  It does obviate the objection, your

18  Honor.

19          THE COURT:  Very well.

20          MR. QUINN:  But it means I can't finish in a minute

21  and a half, probably.

22          THE COURT:  We'll continue with this in the

23  morning.  Thank you, Counsel.

24          I'll see the jury tomorrow morning at 9:00.

25          (WHEREUPON THE JURY WITHDRAWS.)
```

1           THE COURT:  Counsel, I'd like a sense of how you

2    anticipate tomorrow playing out.

3           MR. QUINN:  If I could have one moment, your Honor.

4           THE COURT:  Yes.

5           MR. ZELLER:  What we intend to do is we have some

6    what we're hoping will be brief witnesses to discuss some of

7    these other cases in particular, the Double Grand case and

8    three other of the Hong Kong cases.  Without sounding

9    pejorative about it, obviously the Court has seen some of the

10   challenges we have in terms of trying to get clear, legible

11   copies, samples of the dolls that have been sued upon, and

12   really clear answers on what MGA itself did in some of this

13   litigation.

14          So what we did, because multiple roadblocks were

15   being thrown up within -- really after we had last met, we

16   contacted some of these litigants in Hong Kong and asked them

17   to come and testify briefly so that we can do things like get

18   the dolls admitted and the pleadings that we are unable to

19   get through MGA witnesses.

20          We've also subpoenaed MGA.  We have another

21   Custodian of Records subpoena, which MGA has moved to quash.

22   The topics, as far as we're concerned, are extremely

23   straightforward.  They are basically just saying bring the

24   originals of the dolls or photographs of the dolls that you

25   sued upon in these various cases that are at issue.  And so

1    there's still an issue outstanding on that.

2         It would be our intention to put on a combination

3    of those people to clear up really what is left in terms of

4    MGA's own litigation.  Pleadings, the dolls that were sued

5    upon or photographs, clear legible photographs of the dolls

6    that were being alleged.  And that's a combination of an

7    attorney named Edmond Yeung, Y-E-U-N-G, a representative from

8    Double Grand, which was one of the litigants.  And the

9    Custodian of Records who I referenced.

10        So that would be the index, to put those three

11   people on, and then Mr. Larian.  Unless, of course, we can

12   have something worked out or something stipulated to in terms

13   of what products were at issue in these other cases.  And I

14   understand from e-mails that MGA is in all likelihood taking

15   the position that we can't put any of these Hong Kong people

16   on either.

17        I mean, it's really no exaggeration to say that

18   multiple roadblocks have been put up in terms of our ability

19   to put on very simple evidence about what did MGA do in this

20   prior case, in these prior cases.  And I expect that's going

21   to be an additional issue that's going to have to be

22   resolved.

23        But those are the people we intend to put on.  And

24   I would also say that the Court has seen now the legibility

25   problems that we have faced from some of MGA's production,

 1  which was a production required by the Court's order back in
 2  May.

 3          As far as we're concerned, that's just simply a
 4  violation of the Court's order.  We have asked repeatedly for
 5  legible copies of photographs attached to MGA's own
 6  pleadings, and we still don't have them.

 7          MS. AGUIAR:  Can I just get clarification?  Is that
 8  the whole day tomorrow?

 9          THE COURT:  So Mr. Larian would take up the rest of
10  the day?

11          MR. ZELLER:  That really depends on MGA.  If
12  Mr. Larian is completed, we would expect to put Mr. Wagner
13  on, our damages expert.

14          THE COURT:  Very good.  There's also certainly a
15  number of -- when you say it depends on MGA, if depends on
16  how long MGA cross-examines or examines?

17          MR. ZELLER:  Correct.  And if that takes us to the
18  end of the day, that would be it.

19          MS. AGUIAR:  And it's definitely Mr. Wagner; right?
20  Because the order you've given us was quite different than
21  that.  Can I get clarification that you meant to say Wagner?
22  Because that's different from anything you told me last
23  night.

24          MR. ZELLER:  We're still caucusing a little bit.  I
25  apologize.  There's another witness, Mr. Keiser.  All these

```
 1   people are on our list that we've shared with MGA as to the
 2   potential witnesses for 1-B here.
 3              There is a Mr. Keiser who I know MGA has said that
 4   it has or intends to make some sort of motion over.  He is
 5   an expert who really is involved in digital scanning of
 6   three-dimensional items.  His testimony will be relatively
 7   brief, at least from our perspective.  But I know that MGA
 8   has raised some issues concerning his testimony.
 9              THE COURT:  And you intend to call him after
10   Mr. Larian?
11              MR. ZELLER:  I believe so, yes, your Honor.
12              THE COURT:  Very well.  Thank you, Counsel.
13              MR. ZELLER:  Thank you.
14              MS. AGUIAR:  Thank you, your Honor.  When
15   Mr. Zeller says, quote, it's no exaggeration to say that
16   roadblocks have been thrown up, it's not an exaggeration.
17   It's just false.  If we want to argue the motion to quash
18   now, I'm fully prepared to do that, and I'm wondering whether
19   you want to do that.
20              THE COURT:  Why don't we do that and get that
21   resolved now.
22              MS. AGUIAR:  I trust that your Honor has our motion
23   and the response by Mattel?
24              THE COURT:  I do.
25              MS. AGUIAR:  Here's the history.
```

1          THE COURT:  Let me just pull it up.  And I'm pretty

2    familiar with the history, Counsel.

3          MS. AGUIAR:  Okay.  I think if I could take 30

4    seconds to just give what I think are the very important

5    highlights, which are that Mattel served, as we all know,

6    both sides have served many document requests in this case.

7    And they served document requests that specifically asked for

8    samples of dolls.  This is in, your Honor, in the declaration

9    that we submitted in connection with our motion.  This is

10   Exhibit 1, page 12.  And these were requests that were

11   propounded back in October.

12         Requests 1 through 4 specifically relate to

13   tangible dolls and photographs of dolls.  We made objections,

14   and as your Honor is familiar with the history, Judge Infante

15   ruled on April 14th that those requests were grossly

16   overbroad and unduly burdensome.

17         Mattel appealed Judge Infante's order.  His order

18   addressed document requests 1 through 30.  They specifically

19   appealed only four of those.  They did not appeal the

20   requests that they made concerning dolls and tangibles and

21   photographs.

22         They appealed item number -- document request

23   Nos. 6, 15, 23, and 25.  That was a motion that they filed in

24   front of your Honor.  You overruled Judge Infante on two of

25   those.  And you ordered us, as we've discussed today, to

1  produce pleadings. That was document request No. 15 and

2  court orders from the Bratz lawsuit. That was request

3  No. 23. And in May, we made an expedited search and

4  production of pleadings and court orders from Hong Kong.

5           There was no mention from the time they made --

6  from the time Judge Infante ruled in April regarding

7  tangibles, dolls, and photographs, until they served trial

8  subpoenas on us on the 24th and 25th of July.

9           In their papers, which they submitted in response

10 to our motion to quash, they don't even -- they don't even go

11 there. They don't even contest that. They, I think,

12 implicitly acknowledge, yes, that is what we did. We didn't

13 appeal it. Their argument now is well, this is different.

14 Because this is trial. So now we're asking for stuff at

15 trial.

16          Let me cut right to the chase about whether or not

17 this is going to be practical or even possible. Mattel says

18 in its papers, well, MGA says these are subject to

19 undertakings, and they make the allegation that they don't

20 know what we're talking about, and this has come out of the

21 blue.

22          I would point your Honor to the transcript of the

23 hearing from February 4th. During that transcript, Mr. Nolan

24 and Mr. Corey were arguing to you an issue regarding

25 tangibles in Hong Kong. Your Honor will probably recall

1   that.   The issue of undertakings specifically came up at that

2   hearing.   And Mr. Corey acknowledged that he was aware of

3   this issue at least as of that date.

4           Your Honor, I also have letters from a colleague of

5   mine with another one of the Quinn lawyers starting in

6   December.   December 26th, January 10th, January 15th, and

7   February 7th, all discussing this issue that under Hong Kong

8   law, these items are subject to solicitors' undertakings.

9           So the allegation in Mattel's papers which were

10  filed several days ago, that they don't know from

11  undertakings and they think we're just pulling this out of

12  the blue, I can't quite fathom it.

13          But anyway, they know, and we all know that they

14  can't get this stuff out of Hong Kong.   I provided Mr. Zeller

15  this morning with a declaration from our Hong Kong counsel,

16  which I have copies and I will provide to the Court.   It is a

17  declaration from someone in William Fan's office.   His name

18  is Dexter Lam, L-A-M.

19          And as your Honor will see from that declaration,

20  which is consistent with the representations that we've made

21  to the Court starting as early -- well, certainly

22  representations we made to Mattel starting as early as

23  December of '07 and to your Honor as early as February of

24  '08, that there are solicitors' undertakings that prevent

25  tangible items such as these dolls and photographs from being

1  taken out of Hong Kong.

2          If such a request was made, a hearing date could be

3  obtained from the Court no earlier than September, given the

4  current circumstances.

5          So where that leaves us is that we have two

6  subpoenas served on MGA U.S. and MGA Hong Kong.  July 24th

7  and July 25th.  Those are in the declaration that we

8  submitted with our motion to quash, Exhibit 6, and it's page

9  165, thereabouts, in case you want to see them.  The

10  Exhibit A to both of those subpoenas is very specific.

11  Please produce originals of the following documents.  And

12  there's eight categories, and it says produce original dolls,

13  original tangibles, and original photographs.

14          It's not legally or practically possible for us to

15  do that at this point.  And so for Mr. Zeller to turn history

16  on its head and say that all of a sudden we are throwing up

17  roadblocks when, with all due respect, I feel like something

18  slipped through the cracks over there and they just didn't

19  ask for the stuff, to then hit us with subpoenas less than 10

20  days ago, when we know we can't get this stuff out of the

21  country, it just doesn't ring true.

22          So that's where we are.  We have since made, just

23  so you know, inquiries with both MGA in the U.S. and then MGA

24  Hong Kong to see if they have the dolls.  In other words,

25  separate and apart from what the solicitors have.  Does MGA

1   have any of those allegedly infringing dolls, and we have

2   confirmation from both of these entities that they do not.

3            So we have made strides to explore whether we can

4   comply with the subpoena since receiving them less than 10

5   days ago, and that's what I have to report to your Honor.  We

6   just don't have them.

7            THE COURT:  Very well.  Thank you, Counsel.

8            MR. ZELLER:  First of all, we certainly didn't

9   accuse them of stonewalling now, just now.  This has been

10  going on literally for months.  The Court ordered MGA to

11  produce all pleadings and other documents, a defined term,

12  filed, submitted, or served by you in the Bratz lawsuits,

13  which were identified.  And there was a list of them that

14  claim, allege, or assert that the appearance or features of

15  any doll or other product, whether in whole or in part,

16  infringes Bratz.  Infringe is a defined term as well.

17           As far as I can understand, the argument here

18  appears to be that they were not obligated to provide legible

19  copies, photos of the product that they were accusing and

20  that somehow that fell outside the scope of that request.  We

21  didn't move on other more narrow requests for the simple

22  reason we didn't have to.

23           That is the request that we thought best captured.

24  And for MGA to say that somehow they have no ability to

25  provide even legible copies of their own photographs that

```
 1   they filed in courts, I think it really belies the excuses
 2   that we're hearing here.  We've been asking for legible
 3   copies since the time we received these illegible ones.  The
 4   Court is aware that we have had to go to extraordinary
 5   lengths simply to try and find dolls that we think are the
 6   infringing ones and identify them and bring them to court.
 7              MGA does not say, and I have heard no
 8   representation from MGA that every single sample that they
 9   have of those infringing dolls from the other cases are
10   subject to any undertaking.  And, in fact, it's implausible
11   for them to say that that's the case.
12              THE COURT:  I'm of two minds on this issue.  With
13   respect to the dolls themselves, that was not before the
14   Court, as I understand it, in May, or when the Court
15   considered the appeal.
16              As far as -- and I agree with Ms. Aguiar there.  To
17   ask for the actual dolls at this point, to the extent that
18   Dexter Lam is saying that he has them, I have no reason to
19   question Ms. Aguiar's representation that she's inquired of
20   MGA USA and they don't have them.  We're not going to get
21   them.
22              Where I'm more sympathetic with Mattel's argument
23   is with respect to any pleadings, including certainly copies
24   of any exhibits, documents, photographs.  I mean, we talk
25   about a pleading.  We don't just talk about the complaint.
```

1   It's all pleadings. It was certainly my intention that, to
2   the extent that MGA had in its possession or control any
3   pleadings related to this, that they would get turned over so
4   that we could avoid this particular problem.

5           So I'm not sympathetic, Mr. Zeller, with respect to
6   the dolls themselves. I'm much more sympathetic with respect
7   to the photographs. And I'm hoping that we can work
8   something out here. Because quite frankly, I think it makes
9   MGA look terrible what's going on right here this afternoon
10  before this jury, before lawyers from MGA, general counsel
11  from MGA stand up here and not recognize what it was that
12  they were supervising.

13          I think MGA has every incentive at this point just
14  to produce the legible copies, and let's move on off of this.
15  This is really -- I don't understand what's going on here. I
16  don't understand why MGA is not just clearing this up and
17  moving this on. I mean, they have got some -- I'm hearing in
18  the last half hour here some fairly good responses to this.
19  Let's get this resolved. I don't get what's happening here,
20  Counsel. Certainly photographs attached as exhibits to a
21  pleading is part of the pleadings.

22          MS. AGUIAR: I don't disagree. Two separate
23  things. The motion to quash was directed at original dolls
24  and original photographs.

25          THE COURT: I'm with you -- well, right.

1          MS. AGUIAR:  Original photographs.  So let me then

2    address --

3          THE COURT:  Unless and to the extent the original

4    photographs were submitted -- I don't want to mince words

5    here.  What was submitted to the Court is what should have

6    been produced to Quinn Emanuel in May.  Period.

7          MS. AGUIAR:  I understand.  And MGA in its May 22nd

8    production -- and there may have been supplements to that --

9    but I do know that there was a large production made on

10   May 22nd.  We did produce the pleadings, and we didn't just

11   produce the complaint, for example.  We produced attachments.

12   The photographs are not of great quality, but the photographs

13   that were up today that we kept seeing are from the

14   production that we made.  These were attachments --

15         THE COURT:  Let me stop you there.  Are they of the

16   same quality that was submitted in the litigation in

17   Hong Kong?

18         MS. AGUIAR:  I can't speak to whether the quality

19   is exactly the same.  What I can say is that we will

20   undertake to figure out if there is somewhere a better

21   quality of that photograph, but we have produced what we were

22   required to produce.

23         THE COURT:  And I'm not faulting you on that.  Like

24   I said, I think this is quite frankly in your interests.

25   Because this, for what it's worth, I think this looks facial

1    from MGA's perspective.  But who am I?

2              MS. AGUIAR:  I'm not saying it wouldn't be in our

3    best interests.  So we will endeavor to do it.  But there are

4    two very separate issues.

5              THE COURT:  And I've identified them as two

6    separate issues.  And I'm with you on the dolls because that

7    was not -- if Mattel really needed these dolls from their

8    perspective, that aspect of Judge Infante's discovery order

9    should have been appealed, and it wasn't.

10             MS. AGUIAR:  We will inquire -- there's a pager

11   time difference, but it may be the next day in Hong Kong

12   already now.  So that may work in our favor.  We will inquire

13   tonight regarding these photographs.  I believe we have in

14   the past, because we've got in the request, but we will do it

15   again.  And so with regard, just to be clear, the subpoenas

16   were directed at these original documents.  So there's

17   nothing for the custodian to --

18             THE COURT:  That's what you're telling me.  There's

19   no blood from a radish.  If you say there's nothing there, I

20   believe you.

21             MS. AGUIAR:  I just want to make sure we don't have

22   to bring the custodian here.

23             THE COURT:  The Court accepts your representation.

24             MR. ZELLER:  I'm certainly glad I made the better

25   argument about the photographs, of course.  And just to focus

1   on that for a moment.  I mean, we have been asking for these

2   for quite some time.  We have never received any

3   representation that, number one, those are the best quality

4   that are available.  Number two, it's not within MGA's

5   possession, custody, or control to provide those.  I mean,

6   the Court saw the quality that we were confronted with.  It

7   forced us to waste time, which frankly, to put it out

8   there --

9            THE COURT:  I'm mindful of that.

10           MR. ZELLER:  Exhibit 13725 was Exhibit A of this.

11   I mean, just look indecipherable.  Almost black.

12           THE COURT:  And in terms of the timing, the Court

13   will take that into account.

14           MR. ZELLER:  I appreciate that, your Honor.  Thank

15   you.

16           MR. QUINN:  I'm wondering if the original dolls

17   can't be moved, whether it's possible to take digital

18   pictures of the original dolls and e-mail them.

19           THE COURT:  I don't know.  And perhaps that's

20   something you can talk with MGA about tonight.  This should

21   have been resolved by the Court's order in May.  To the

22   extent that the pleadings included pictures, legible copies

23   of the pleadings, the most legible copies of the pleadings

24   should have been provided.  And so that aspect of the trial

25   subpoena the Court will insist upon.  I accept counsel's

1   representations.  I accept Dexter Lam's representation.  I

2   have no reason to question any of that, that the dolls

3   themselves are simply not available at this point in time.

4              MR. ZELLER:  I understand.  I wasn't pressing that

5   because I recognize the Court thought that that was the

6   weaker of the two arguments.  But at a bare minimum, we have

7   raised this photograph issue and the quality of these

8   exhibits over and over again.  We have actually on more than

9   one occasion sent specific lists to MGA saying these are

10  illegible.  We need these.

11             So it wasn't just a broad based request to MGA

12  saying oh, your entire production from May 22nd was defective

13  because it's illegible.  We went to the trouble of

14  identifying the very things that we put in front of the jury

15  today and had to slog through because of the quality in large

16  part, too.  And we specifically asked for those, and we never

17  got a response.

18             THE COURT:  All right.  Well, let's see what can be

19  done tonight, tomorrow in Hong Kong.  And we'll take this up

20  again in the morning.  But I do think it's in the interests

21  of everyone to try to resolve this.

22             The other issue, if we're going to get to

23  Mr. Larian's testimony tomorrow, there's the issue of the

24  financial documents.  And I think I may have spoken to

25  Mr. Nolan and Mr. Quinn this morning.  Or Mr. Price, when we

1  were in chambers, to this. And there's no question that the

2  Court had ordered the production of Mr. Larian's financial

3  documents quite some time ago.

4          To the extent that the documents were in the

5  control, custody, possession of MGA or MGA's agents, and they

6  were not turned over in a timely fashion, they are not coming

7  in. To the extent that they are documents that were created

8  and were produced contemporaneous with the trial, they come

9  in. MGA is certainly correct and Mr. Larian is certainly

10 correct that the relevant documents, the relevant time period

11 for his net worth is now. And that's correct.

12         And so the documents that reflect his net worth now

13 are relevant, and I would expect that they would be produced

14 somewhat contemporaneously with this trial; however, to the

15 extent there are documents that were created back in October

16 of 2007 or January of 2008 or February of 2008 that were not

17 turned over, those documents aren't coming in now. And

18 that's going to be how I'm going to evaluate that in the

19 context of the trial. I'll hear further. But that's my

20 general sense of it after reading the papers on this.

21         MR. PRICE: We would disagree that his net worth

22 after the verdict is relevant because in that situation,

23 whenever you bifurcate, for example, punitives and actual

24 damages, then the defendant can come in and say the trial has

25 had an effect on me. And basically that's what they are

1  saying here.  They said because the jury ruled against us, I

2  am now impoverished.  And I'm not aware of any case saying

3  that that's the time period you look at.

4       THE COURT:  And perhaps I slightly misstated it.

5  I'm not saying that it's the post-verdict period.  We're not

6  talking about the last week of July of 2008.  When I say

7  contemporaneous with the trial, it's what Mr. Larian is worth

8  coming into trial, not what he was worth in 2006 or 2007.  Or

9  even in early 2008.  It's what he's worth at the time that

10 the trial is taking place.

11      MR. PRICE:  My fear is that Mr. Larian will blurt

12 out or be asked well, what's happened in the last week.  Or

13 he's going to say because of what this jury did, I'm a

14 pauper.  I think that would be inappropriate.

15      THE COURT:  I would actually like -- I don't think

16 there's any cases particularly on that point.  But I would

17 invite both sides to submit authority to the Court on that

18 particular point, if a change in financial position in a

19 bifurcated trial is relevant to that second phase.

20      I know this is not the first court to bifurcate a

21 case along these lines.  It's kind of an interesting point,

22 and that I don't think is addressed particularly, at least

23 not in any of the cases I took a look at.

24      But I'll invite both parties to provide something

25 to the Court tomorrow morning which addresses that particular

1    issue.  Otherwise, the standard I intend to use is
2    contemporaneous with the trial.  We're talking the May, June
3    period.  I'll certainly give MGA and Mr. Larian leave to
4    introduce evidence of his net worth that has been produced at
5    that time, provided that it has actually been calculated and
6    produced at that time and not -- the allegation, the concern
7    of sandbagging some of these documents, I think, is very real
8    based on at least the allegation of when the dates are.  I
9    don't have them before me.

10            I don't know what they are going to be relying on,
11   but I will exclude, my tentative is to exclude anything that
12   was created that should have been produced pursuant to this
13   Court's orders at a much earlier time period.  So that's --

14            MR. ROTH:  Your Honor, if I could address those two
15   issues.  Certainly, we will submit authorities to your Honor.
16   The one thing I would point out is you'll recall the list of
17   assets that was placed before the jury.  By far the largest
18   piece there is a value for the ownership of the company.  And
19   that value is nothing more than the present value of future
20   expected earnings.  That's the way those valuations are
21   created.  That's the way Mattel's expert has determined value
22   in this case.

23            So obviously, as events change, as the future
24   expectations change, that value changes.  That will affect
25   damage --

```
 1              THE COURT:  It's an interesting question, though.
 2   Because normally in a nonbifurcated trial, you wouldn't have
 3   the situation develop where there's full financial
 4   consequences of the verdict itself.  And, of course, the
 5   reality is there were financial consequences of the verdict.
 6   Mr. Nolan disclosed certain financial consequences in
 7   chambers.  There was reference made to stock prices.  There
 8   was -- I understand that there was an impact from the
 9   verdict, but I'd like to see some authority on that.
10              Is it that finely tuned to, you know, what does the
11   jury consider, particularly in the context of punitive
12   damages.  How finely tuned is that?  I'll look forward to
13   authority on that.
14              MR. ROTH:  If I could just forecast one bit more.
15   There was a verdict.  About a week later there was an opening
16   statement given by Mr. Price where he offered up an opinion
17   about the value of the company as of the time that he was
18   speaking.  Based on what he said Mr. Wagner would opine.
19              So he has said that there was a value of
20   approximately 605 million as of the time of that opening
21   statement.  So we believe, at least in that context, we have
22   the opportunity to test his expert, whether he agrees with
23   Mr. Price that that was the value as of that moment he was
24   speaking.
25              In the context of punitive damages, your Honor, we
```

 1    will provide the authority that the Court would like.

 2              In terms of --

 3              THE COURT:  Well, let me think about that.  I'm

 4    trying to recall exactly what Mr. Price said, and I don't

 5    recall exactly --

 6              MR. ROTH:  I can paraphrase.

 7              THE COURT:  Well, why don't you get the transcript

 8    in front of me.  In any event, I want to be governed here by

 9    what the law requires in terms of damages, compensatory

10    damages and punitive damages, and what do we do in a

11    bifurcated trial like this where the verdict has had an

12    impact.

13              And I'm not questioning that both sides should be

14    entitled to evaluate the impact of that verdict if in fact

15    that is a lawful consideration, or should the Court

16    alternatively just consider this as one trial and that we

17    take the start of the trial as the date.  I mean, I guess

18    that's what I -- we're going to need to come up with a date.

19    And it's an interesting question.

20              MR. ROTH:  Yes, your Honor.  Related to that, the

21    second point that your Honor raised in terms of the

22    timeliness of the production of financial information.  As

23    your Honor knows, the company, MGA, daily, weekly, quarterly

24    basis is ongoing.  We just passed June.  End of second

25    quarter.  We have very recently produced financial

1    information relating to the first two quarters of this year.

2         THE COURT:  And I'd expect you to have produced

3    that and to be able to use that at a trial like this.  I have

4    no issue with that.

5         What I have an issue with is there's allegations,

6    and I don't know how this is going to play out or exactly

7    what you're going to rely on.  There's allegations that there

8    were documents created as early as October of 2007 that were

9    not produced until the last seven weeks.  That's the type of

10   document that is not going to come in.

11        MR. ROTH:  Understood, and I think I know precisely

12   what you're referring to.  And frankly, at this point I think

13   that may not be so relevant, given the timing of the events.

14        THE COURT:  Let's take this other issue up tomorrow

15   morning.  I have work to do.  You have work to do.  And I'll

16   see you tomorrow morning at 8:00.  It doesn't sound like

17   we're going to get through any of these four.  Although I

18   have gone through and ruled on the objections of the

19   videotapes.

20        MR. QUINN:  Could we have a time count?

21        THE COURT:  I have you have remaining 9 hours and

22   17, 18 minutes and MGA having 19 hours and 20 minutes.

23        MR. QUINN:  Thank you, your Honor.

24        MR. NOLAN:  Your Honor, what time do we start

25   tomorrow?

```
 1              THE COURT:  Let's be here at 8:00.  This financial
 2   issue may take some time.  And I'd also like to hear what
 3   success you've had with Hong Kong.  So let's see you here
 4   tomorrow morning at 8:00.
 5
 6                   (Proceedings concluded at 5:37 P.M.)
 7
 8                   C E R T I F I C A T E
 9
10
11              I hereby certify that pursuant to Title 28,
12   Section 753 United States Code, the foregoing is a true and
13   correct transcript of the stenographically reported
14   proceedings in the above matter.
15              Certified on August 5, 2008.
16
17
18              MARK SCHWEITZER, CSR, RPR, CRR
                Official Court Reporter
19              License No. 10514
20
21
22
23
24
25
```