1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    - - -

4     **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                    - - -

6   MATTEL, INC.,                    :    PAGES 6048 - 6190
                                     :
7              PLAINTIFF,            :
                                     :
8        VS.                         :    NO. ED CV04-09049-SGL
                                     :    [CONSOLIDATED WITH
9   MGA ENTERTAINMENT, INC.,         :    CV04-9059 & CV05-2727]
    ET AL.,                          :
10                                   :
               DEFENDANTS.           :
11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               RIVERSIDE, CALIFORNIA

17            WEDNESDAY, AUGUST 6, 2008

18               JURY TRIAL - DAY 30

19               AFTERNOON SESSION

20

21

22                          MARK SCHWEITZER, CSR, RPR, CRR
                            OFFICIAL COURT REPORTER
23                          UNITED STATES DISTRICT COURT
                            181-H ROYBAL FEDERAL BUILDING
24                          255 EAST TEMPLE STREET
                            LOS ANGELES, CALIFORNIA 90012
25                          (213) 663-3494

CERTIFIED COPY

**Appearances of Counsel:**

On Behalf of Mattel:

    Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
    By John B. Quinn, Esq.
       B. Dylan Proctor, Esq.
       Michael T. Zeller, Esq.
       Harry Olivar, Esq.
       John Corey, Esq.
       Diane Hutnyan, Esq.
       William Price, Esq.
    855 South Figueroa Street
    10th Floor
    Los Angeles, CA 90017
    (213) 624-7707

On Behalf of MGA Entertainment:

    Skadden, Arps, Slate, Meagher & Flom LLP
    By Thomas J. Nolan, Esq.
       Carl Alan Roth, Esq.
       Jason Russell, Esq.
       Lauren Aguiar, Esq.
       David Hansen, Esq.
       Matthew Sloan, Esq.
       Robert Herrington, Esq.
    300 South Grand Avenue
    Los Angeles, CA 90071-3144
    (213) 687-5000

# I N D E X

**EDMOND YEUNG, PREVIOUSLY SWORN**........................ 6059

CROSS-EXAMINATION BY MR. HANSEN:  ...................... 6059
REDIRECT EXAMINATION BY MR. QUINN:  .................... 6074
RECROSS-EXAMINATION BY MR. HANSEN:  .................... 6082
FURTHER REDIRECT EXAMINATION BY MR. QUINN:  ........... 6084

**ISAAC LARIAN, PREVIOUSLY SWORN**........................ 6085

DIRECT EXAMINATION BY MR. PRICE:....................... 6085

1                           **E X H I B I T S**

2

3       (Exhibit 13520 received.)............................. 6094

4       (Exhibit 630 received.)............................... 6106

5       (Exhibit 1319 received.).............................. 6108

6       (Exhibit 12428 received.)............................. 6140~

7       (Exhibit 911 received.)............................... 6142

8       (Exhibit 13934 received.)............................. 6160

9       (Exhibit 13729 received.)............................. 6162

10      (Exhibit 13858 received.)............................. 6168

11      (Exhibit 13859 received.)............................. 6173

12      (Exhibit 13871 received.)............................. 6174

13      (Exhibit 13872 received.)............................. 6175

14      (Exhibit 13918 received.)............................. 6177

15      (Exhibit 13917 received.)............................. 6179

16      (Exhibits 13784 and 13785 received.).................. 6182

17

18

19

20

21

22

23

24

25

 1            Riverside, California; Wednesday, August 6, 2008

 2                             1:29 P.M.

 3           (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

 4            THE COURT:  We're back on the record outside the

 5    presence of the jury.  I just noticed there's a fifth binder

 6    here.  Have we added a videotaped deposition?  Somebody?

 7            MR. PROCTOR:  We may have.  Is it --

 8            MR. NOLAN:  Not guilty.

 9            THE COURT:  They are not spawning.  There's a fifth

10    binder here.

11            MR. PROCTOR:  Is the name Brode?  If yes, they have

12    added that one.

13            THE COURT:  It's Carter Bryant's.

14            MR. PROCTOR:  Then there's a sixth coming.  Carter

15    Bryant was No. 5, your Honor.

16            THE COURT:  That's No. 5 of the first four.  What's

17    going on?  Which would it be of benefit for me to start with?

18            MR. PROCTOR:  I would say Janet Bryant.

19            THE COURT:  Okay.

20            MR. PROCTOR:  I think your Honor's been through the

21    first four.  They are all fairly short.

22            THE COURT:  Janet Bryant's not going to take me too

23    long.

24            MS. AGUIAR:  I don't know whether the Court is

25    probably aware that the witness is here.

```
 1            THE COURT:  Actually, you may step down just for a
 2   few minutes.  I don't think this really touches upon anything
 3   the witness is covering.  But for a lot of these, there's a
 4   lot of pages between entries at times.  So if I skip over
 5   anything, please let me know.  But for Janet Bryant, if I'm
 6   correct, all I have basically is page 193.  I don't think
 7   there's anything before then.  And 194 and 195.  And I'm
 8   going to overrule the objections from line 12 through 25 on
 9   193 and lines 1 and 2, but sustain the objection from line 3
10   through 25 of page 194 and lines 1 through 7 of 195.
11            MR. PROCTOR:  If I may, your Honor, this is an
12   issue that I think you're going to see on the Brode
13   designations as well, which you don't have yet but which are
14   coming.
15            THE COURT:  Okay.
16            MR. PROCTOR:  It's relate testimony, testimony
17   where a witness, an MGA employee or someone in this case
18   affiliated with MGA, acknowledges that the drawings appear to
19   them to be Bratz dolls or to look like Bratz dolls.
20            THE COURT:  That's what the jury is going to
21   decide.  And I certainly can understand, but what I overruled
22   were the objections to her testimony as to what Carter Bryant
23   said.  Now, that's certainly important or relevant to the
24   extent that Carter Bryant, who actually did the drawings, for
25   him to say or allegedly say that the dolls look like my
```

1    drawings.

2           But for his mom or just to bring other people in

3    here, bring my mom or whatever, I mean that's not -- I don't

4    see where that moves the ball forward at all. These are just

5    people who think -- and again, if it was someone from MGA

6    saying, and I've let a whole bunch of evidence in in the form

7    of these -- the foreign litigation about MGA saying that the

8    drawings and the doll are connected. But Janet Bryant has

9    nothing to do with MGA other than being Mr. Bryant's mom.

10          MR. PROCTOR: Maybe that's a fair distinction. And

11   the next binder that's coming is a woman named Ms. Brode, who

12   is an MGA employee who makes such statements. They are

13   probative --

14          THE COURT: I've not going to rule on that until I

15   see that one. That's my reasoning behind the ruling on Janet

16   Bryant. I just don't think her saying this looks like it is

17   any more relevant than my mom saying it looks like it or

18   doesn't look like it.

19          MR. PROCTOR: Okay. And in terms of order, I

20   don't know if the Court is prepared to give us rulings on the

21   other three. I suspect we will play all of these back to

22   back.

23          THE COURT: We can proceed with Sasha Chui. Okay.

24   Beginning on page 16, I'll sustain objections on lines 9

25   through 16. It's really of no moment. She answers not sure,

 1  not aware of in any event.  So we'll start with line 17

 2  through line 25.  That's -- actually, that's not objected to.

 3  So that's of no moment.

 4          The problem I have with pages 17 and all is

 5  foundation in terms of Los Angeles.  This is someone who is

 6  in Hong Kong, and it's -- at least in terms of what's been

 7  designated -- it's not clear she has the foundation.  So I'll

 8  sustain the objection on 17 and 18.

 9          I'll overrule the objection, however, on 22 and 23.

10  Because she would know that based on the foundation issues --

11          MR. NOLAN:  Your Honor, I apologize.  I think there

12  was an objection to page 19.

13          THE COURT:  I'm sorry.  18?

14          MR. NOLAN:  19.

15          THE COURT:  19?

16          MR. NOLAN:  You ruled on 17 and 18, but I think

17  there was one on 19.

18          THE COURT:  There is no objection on 19.  There's

19  nothing designated on 19.

20          MR. NOLAN:  We must have a different page number.

21  At least not on my page 19 there's nothing.

22          MR. PROCTOR:  Mine neither.

23          THE COURT:  The next one, I guess, is page 52, 53.

24  We have a compound question, and her answer as to what

25  Hong Kong was involved in is fine, but the problem is the --

```
 1   I have sustained now as to form.  It was a poorly worded
 2   question.  I'm going to sustain the objection.
 3           Page 72 I have as the next one.  I overruled the
 4   objection there.
 5           86, overrule the objection.
 6           88, sustain the objection.
 7           I'm somewhat confused where there's the word
 8   deleted on page 95.  I'm looking here at pages 93 through 95.
 9   What is deleted?
10           MR. PROCTOR:  That is -- that's in the exchange
11   between the parties, that's a designation which we initially
12   made and withdrew.  So the Court with ignore that.
13           THE COURT:  So that is gone.  So there is an
14   objection, though, as I understand it, to lines 18 through
15   25, and the objection is improper designation.  And I guess
16   my question is it's not clear what's -- what was even
17   designated.
18           MR. PROCTOR:  Yeah, this --
19           THE COURT:  I'm confused.  Someone is going to have
20   to explain to me what's going on on page 95.
21           MR. PROCTOR:  I apologize.  This entire page has
22   been withdrawn.  It's out.
23           THE COURT:  Very good.  I overruled the objection
24   on 93.
25           Okay.  Turning to page 99, I don't have line 12 in
```

1   this binder so can't consider on how to rule on it. I'll

2   come back to that.

3           MR. PROCTOR: Your Honor, I'll short-circuit this.

4   Page 99 has also been withdrawn.

5           THE COURT: Withdrawn.

6           MR. PROCTOR: Yes.

7           THE COURT: All right. That takes care of that.

8   And I think that's just about it; is that correct? Or is it?

9           Okay. Bryan Armstrong. Do you have that,

10   Mr. Proctor?

11           MR. PROCTOR: Yes, sir.

12           THE COURT: I think page 157 is the first -- not

13   157, but rather 158, and that is overruled.

14           159 is overruled.

15           Mattel's objections on 161 are overruled.

16           163, overruled.

17           I believe the next objections are on page 265. And

18   that is overruled.

19           These are all basically the same objection to the

20   same line of questioning that I overruled.

21           Overrule on 267.

22           Sustain the objection on 268.

23           Calls for a legal conclusion concerning derivative

24   work.

25           269 I will overrule.

 1                    273, overrule.

 2                    277, overrule.

 3             I believe the next is 359.  359, the objections are

 4    overruled.

 5                    362, the objections are sustained.

 6                    363, overruled.

 7                    363, 364, 365, 366, 367, and 368 are all overruled.

 8                    As is 369 and 373 and 374.

 9                    The style guide comes in.

10                    386 and 387 is overruled.

11                    389 is sustained.

12                    391, overruled.

13                    392, overruled.

14                    393, 394, 395 are all overruled.

15                    397 is sustained.

16             411, I believe, is the next one.  That is

17    overruled, as is 412.

18             And I believe that brings us to the end unless I've

19    missed something.

20                    MR. PROCTOR:  I think that's it.

21                    THE COURT:  Very good.  Let's go ahead and bring

22    the jury in at this time.  I'll take up -- that's three of

23    the videotapes.  I have Edmond Lee, which I've completed.  I

24    have Carter Bryant, which I have not completed, and then you

25    indicated there's one more coming.

```
 1              MR. PROCTOR:  Correct.

 2              THE COURT:  And that will be the last one?

 3              MR. PROCTOR:  Yes.

 4              THE COURT:  Very well.

 5              MR. PROCTOR:  Thank you.

 6              (WHEREUPON THE JURY ENTERS.)

 7              THE COURT:  Counsel.

 8              MR. HANSEN:  Thank you.

 9              EDMOND YEUNG, PREVIOUSLY SWORN.

10                    CROSS-EXAMINATION

11   BY MR. HANSEN:

12   Q.   Good afternoon, Mr. Yeung.  I'm David Hansen, counsel

13   for MGA.  I'd like to ask you a few questions.  Do you have

14   the binder in front of you that has exhibit -- let's start

15   with Exhibit 13784.  It would be -- I'm not sure which --

16   it's in one of the dark ones.

17   A.   Yes.

18   Q.   13784.

19   A.   13784-A?

20   Q.   There should be one in front of it called 13784.  Let's

21   use 13784-A.  You have that?

22   A.   Yes.

23   Q.   I think you mentioned that you are counsel for Hung Lam?

24   A.   Yes.

25   Q.   Could you identify this for me as the statement and
```

```
 1  claim in Hung Lam?

 2  A.    Yes.

 3  Q.    You've seen this document before?

 4  A.    Yes.

 5  Q.    Could we put up 13784.  And this is the statement of

 6  claim in connection with MGA's claim against Hung Lam in

 7  Hong Kong?

 8  A.    Yes.

 9  Q.    And that's one of the actions in which you had a client

10  against MGA?

11  A.    Yes.

12  Q.    Could you look, please, at page dash 008.  You don't

13  have 13784?

14  A.    Just A.

15  Q.    Do you have 13785 in the binder?

16  A.    84 is here.

17  Q.    84 is there?

18  A.    Yes.

19  Q.    Okay.  So --

20  A.    08?

21  Q.    Yes.  And the date of this document is the 3rd of

22  November, 2003; is that correct?

23  A.    Yes.

24  Q.    Could you look, please, at -- back at the first page

25  under paragraph 3.
```

```
 1   A.   Yes.

 2   Q.   And that paragraph says, quote, the plaintiff is at all

 3   material times, has been the owner of the copyright

 4   subsisting in original artistic works in respect of the

 5   plaintiff's Bratz fashion dolls, paren, quote, the said

 6   artistic works, close quote.

 7             Do you see that?

 8   A.   Yes.

 9   Q.   And then if we look on the next page, page dash 002.

10   A.   Yes.

11   Q.   Do you have that?

12   A.   Yes.

13   Q.   And you see under a heading particulars of original

14   artistic works.

15   A.   Yes.

16   Q.   You see that?

17   A.   Yes.

18   Q.   And it lists items A through E; right?

19   A.   Yes.

20   Q.   And so item A is action models of the head of the Bratz

21   dolls?

22             Do you see that?

23   A.   Yes.

24   Q.   Item B is silicone rubber molds and polyurethane samples

25   of the head of the Bratz dolls?
```

```
 1  A.   Yes.

 2  Q.   Item C is four drawings of the facial decoration of the

 3  Bratz fashion dolls?

 4  A.   Yes.

 5  Q.   D is eight drawings, four of which are pantone color

 6  guides of the facial decorations of the Bratz fashion dolls?

 7  A.   Yes.

 8  Q.   And E is four hand-painted Deco masters on four rubber

 9  head sculpts.

10            Do you see that?

11  A.   Yes.

12  Q.   And those items A through E are defined collectively as

13  the artistic works; right?

14  A.   That's right.

15  Q.   And those would be the copyrighted works upon which

16  MGA's claims against Hung Lam would be based?

17  A.   Yes.

18  Q.   So MGA's claim against Hung Lam in Hong Kong is based on

19  all of those artistic works; correct?

20  A.   Yes.

21  Q.   The claim is not just based on the drawings; right?

22  A.   From what I can read from this statement of claim.

23  Q.   So do you have any reason -- have you seen this

24  statement of claim before?

25  A.   Yes.
```

1    Q.    Do you have some reason to believe this is inaccurate?

2    A.    No, no, no.

3    Q.    Okay.  So the claims that MGA made are based on all five

4    of these items, not just on drawings; right?

5    A.    Yes.

6    Q.    So any statement that MGA's claims against Hung Lam in

7    Hong Kong are just based on drawings would be incorrect; is

8    that right?

9    A.    I can't remember if there's an amended statement of

10   claim that's been filed subsequently.  But from reading this,

11   this seems to be the case.

12   Q.    Okay.  Could you look, then, please, at 73855 -- wait.

13   Pardon me.  In the same binder.  I'm sorry.  13785.

14   A.    Yes.

15   Q.    Do you have that document in front of you?

16   A.    Yes, I do.

17   Q.    And Union Top was another one of your clients; is that

18   correct?

19   A.    Did you say 13855?

20   Q.    I apologize.  It's 13785.

21   A.    13785.  Yes.

22   Q.    Do you have that?

23   A.    Yes.

24   Q.    And I think you mentioned that Union Top was another one

25   of your clients?

```
 1   A.    Yes.
 2   Q.    Can we put 13785 up.  Can you identify this for me, sir,
 3   as the statement of claim in MGA's claims against Union Top
 4   in Hong Kong?
 5   A.    Yes.
 6   Q.    And if you would look for me, please, at page 20 in this
 7   document.
 8   A.    Yes.
 9   Q.    And the date of this claim is September 2003.  Would you
10   agree?
11   A.    Yes.
12   Q.    And now if you would also look, please, at paragraph 6,
13   starting at the bottom of page 2.
14   A.    Yes.
15   Q.    And do you see under the heading copyright?
16   A.    Yes.
17   Q.    And the paragraph 6 is under the heading copyright;
18   correct?
19   A.    Yes.
20   Q.    And paragraph 6 states, quote, the plaintiff is the
21   owner of copyright subsisting in the following original works
22   relating to the design of the quote Bratz dolls.
23         Do you see that?
24   A.    Yes.
25   Q.    And that's defined as the copyright works?
```

```
 1   A.   Yes.

 2   Q.   Okay.  And then it lists on the next page, if you would

 3   turn, please, to page 3.

 4   A.   Yes.

 5   Q.   It lists items A through D.

 6            Do you see that?

 7   A.   Yes.

 8   Q.   Okay.  And item A is drawings made by Carter Bryant?

 9   A.   Yes.  That's right.

10   Q.   And then item B is wax models made by Margaret Leahy?

11   A.   Yes.

12   Q.   Do you know who Margaret Leahy is?

13   A.   Do I know who she is?

14   Q.   Yes.

15   A.   She is one of the designers.

16   Q.   Do you have any idea what work she did on the Bratz

17   doll?

18   A.   She made the wax models based on drawings --

19            MR. QUINN:  Your Honor, lacks foundation.

20            THE COURT:  Sustained.

21   Q.   BY MR. HANSEN:  Ms. Leahy has stated in this Paragraph B

22   that she worked on the head sculpt for the Bratz dolls.

23            Do you see that?

24            MR. QUINN:  Misstates the document.

25            MR. HANSEN:  Let me read it, your Honor.
```

```
 1              THE COURT:  Please.

 2              MR. HANSEN:  Quote, wax model made by Margaret

 3   Leahy in or about the winter of 2000-2001 in respect of the

 4   head sculpt of the Bratz dolls.

 5   Q.   Do you see that?

 6   A.   Yes.

 7   Q.   Have you ever spoken with Ms. Leahy?

 8   A.   Of course not.

 9   Q.   Have you ever deposed Ms. Leahy?

10   A.   No.

11   Q.   Okay.  In terms of item C.  Silicone rubber molds made

12   by Jessie Ramirez.

13              Do you see that?

14   A.   Yes.

15   Q.   And that's listed as one of the artistic works?

16   A.   Yes.

17   Q.   And then item D is decoration and Deco masters made by

18   Anna Rhee.

19              Do you see that?

20   A.   Yes.

21   Q.   So that's also listed as one of the copyright works,

22   excuse me, in this case?

23   A.   Yes.

24   Q.   So MGA's claims against Union Top were based on all four

25   of the artistic works listed here; right?
```

1   A.   Yes.

2   Q.   So the claims were not just based on the drawings listed

3   on item A; correct?

4   A.   Repeat, please.

5   Q.   I apologize.  The top of page 3.  Paragraph A, the

6   claims that MGA made against Union Top in this case were not

7   just based on the drawings; is that right?

8   A.   That's right.

9   Q.   So any statement to that effect would be incorrect?

10  A.   Sir, repeat, please.

11  Q.   Any statement that the claims that MGA made in Hong Kong

12  against Union Top being made solely on the Carter Bryant

13  drawings would be incorrect; right?

14  A.   Is that an opinion?

15  Q.   In your opinion.  Fine.  Well, in this document, all

16  four of these items are listed as artistic works; correct?

17  A.   Yes.

18  Q.   And the claim is based on all four of the items.

19  A.   Yes.

20  Q.   So any statement that the claims are based solely on one

21  of the items would be incorrect; right?

22  A.   Yes.

23  Q.   Okay.  Let me ask you, have you ever represented a

24  client that has been -- whose offices have been raided and

25  counterfeit Bratz dolls seized?

```
 1              MR. QUINN:  Objection.  Relevance.

 2              THE COURT:  It's a yes or no question.  Overruled.

 3              THE WITNESS:  I should answer?

 4              THE COURT:  Yes.

 5              THE WITNESS:  Yes.

 6   Q.   BY MR. HANSEN:  And --

 7   A.   Sorry, has been raided.

 8   Q.   And in connection with the raid, were counterfeit Bratz

 9   dolls seized?

10   A.   Yes.

11              MR. QUINN:  Relevance.

12              THE COURT:  Counsel, where is this going?

13              MR. HANSEN:  This is going to the fact that he's

14   also represented clients that have knock-off Bratz dolls.

15              THE COURT:  I'm not asking, Counsel, for you

16   disclose the content of the testimony you're trying to

17   elicit --

18              MR. HANSEN:  It relates to what specifically --

19   specifically to one of the issues that was discussed on

20   direct.  And --

21              THE COURT:  I'll give you some leeway.  Overruled.

22   Q.   BY MR. HANSEN:  The answer to my question was "yes"?

23   A.   The question is?

24   Q.   Counterfeit Bratz dolls were seized.

25   A.   Items were seized.  I don't know whether I can call it
```

```
 1   counterfeit or not.

 2   Q.   But items that had Bratz -- that looked like Bratz dolls

 3   and had the word Bratz on the packaging?

 4   A.   Yes.

 5   Q.   And those items were not authorized by MGA?

 6   A.   That's right.

 7   Q.   Okay.  And that would be Union Top; correct?

 8   A.   Yes.

 9   Q.   And that actually would also relate to another one of

10   your clients, wouldn't it?

11   A.   One of the cases of --

12        MR. QUINN:  Your Honor, I don't think anything has

13   been linked up here.

14        THE COURT:  I need to explore this at sidebar,

15   Counsel.  Thanks.

16             (SIDEBAR CONFERENCE HELD.)

17        THE COURT:  Counsel, help me out here, Mr. Hansen.

18        MR. HANSEN:  Correct and bias, your Honor, correct

19   and bias against MGA.

20        THE COURT:  That he has a bias against MGA?

21        MR. HANSEN:  Yes, because he represents a client

22   who had counterfeit Bratz dolls seized, and he filed an

23   affidavit in that case attempting to avoid summary judgment

24   based on matters in this case.  This is my last question on

25   this.
```

```
 1              MR. QUINN:  He's already got the fact that he

 2    represented multiple MGA adversaries.  To get into

 3    counterfeits and seizure implicitly, we're talking about

 4    questions of Hong Kong law.

 5              THE COURT:  Right.  But it's not for the purpose of

 6    the Hong Kong law.  It's for bias.  Overruled.

 7              (CONCLUSION OF SIDEBAR CONFERENCE.)

 8              THE COURT:  You may proceed, Counsel.

 9              MR. HANSEN:  Your Honor, may I approach the

10    witness?

11              THE COURT:  You may.

12    Q.   BY MR. HANSEN:  Mr. Yeung, I've handed you what's been

13    marked in this case as Trial Exhibit 32.

14              Do you see that?

15    A.   Yes.

16    Q.   And could you tell me -- identify this.  Have you seen

17    this document before?

18    A.   Yes.

19    Q.   And can you identify this for me, please, as the

20    statement of claim in the MGA versus Uni-Fortune toys case?

21    A.   It is.

22    Q.   And if we -- page 3 actually has the statement of claim

23    heading on it.

24    A.   Yes.

25    Q.   If you look, please, at page 15 of Exhibit 32, can you
```

```
 1   tell me that this -- confirm for me, please, that the

 2   statement of claim was filed on the 6th -- is dated the 16th

 3   day of October, 2003?

 4   A.    That's right.

 5   Q.    And could you also look, then, at page -- back to page

 6   3.

 7   A.    Yes.

 8   Q.    And here again, at the bottom we have a listing of what

 9   is called here particulars of original artistic works.

10          Do you see that?

11   A.    That's correct.

12   Q.    And this is the statement of claim, again, Uni-Fortune

13   was one of your clients?

14   A.    Yes.

15   Q.    And item A on page 3 lists 18 design drawings of various

16   Bratz fashion dolls; is that correct?

17   A.    Yes.

18   Q.    Item B lists wax models of the head, body, and shoes of

19   the Bratz fashion dolls; is that correct?

20   A.    Yes.

21   Q.    Item C lists silicone rubber molds and polyurethane

22   samples made there?

23   A.    Yes.

24   Q.    And D is four drawings of the facial decoration of the

25   Bratz fashion dolls; is that correct?
```

1  A.   Yes.

2  Q.   And then E is eight drawings, four of which are pantone

3  color guides of the facial decorations; is that right?

4  A.   Yes.

5  Q.   And then F is four hand-painted Deco masters on four

6  rubber head sculpts; is that correct?

7  A.   Yes.

8  Q.   And all of those items A through F together are defined

9  as the artistic works; is that right?

10  A.   Yes.

11  Q.   And those items all form the basis of MGA's claims

12  against Uni-Fortune toys; correct?

13  A.   Yes.

14  Q.   So the claims by MGA against Uni-Fortune toys were not

15  based just on Mr. Bryant's drawings; is that right?

16  A.   Yes.

17  Q.   And any statement to that effect would be untrue?

18  A.   Yes.

19  Q.   Okay.  Mr. Yeung, can you tell me -- you live in

20  Hong Kong; right?

21  A.   Yes.

22  Q.   When did you get to the United States?

23  A.   Sunday.

24  Q.   Sunday.  And are you staying in a hotel?

25  A.   Yes.

1   Q.   Who is paying for your hotel expenses?

2   A.   Mattel.

3   Q.   Mattel.  And who paid for your plane flight?

4   A.   Mattel.

5   Q.   Are you -- you're a solicitor in Hong Kong?

6   A.   I am.

7   Q.   That's a lawyer, basically?

8   A.   Yes.

9   Q.   And lawyers typically charge by the hour?

10  A.   Yes.

11  Q.   Do you charge by the hour?

12  A.   Yes, I do.

13  Q.   Are you expecting to be compensated for your time here

14  today?

15  A.   Yes, I am.

16  Q.   And who will pay you for that?

17  A.   Mattel.

18  Q.   And when was the first time that you spoke with Mattel

19  in connection with this lawsuit?

20  A.   Friday, the 1st.

21  Q.   Friday, the 1st.  And you had never spoken with anybody

22  from Mattel or Quinn Emanuel about this lawsuit prior to that

23  time?

24  A.   No.

25  Q.   Can you tell me what your hourly rate is?

6074

```
 1   A.    3,005.

 2   Q.    3,005?

 3   A.    Hong Kong dollars.

 4   Q.    That's a hundred thousand dollars here.  No, I'm

 5   kidding.  Strike that.

 6             Could you just tell me how much that is in U.S.

 7   dollars?

 8   A.    Divide it by eight.

 9   Q.    Okay.  So that's about $500, $400 an hour?

10   A.    Yes.

11             MR. HANSEN:  I have nothing further, your Honor.

12             THE COURT:  I was afraid we were going to lose all

13   the attorneys here and go to Hong Kong.

14             MR. QUINN:  I was going to ask if they are still

15   accepting applicants for Bar admission.

16                     REDIRECT EXAMINATION

17   BY MR. QUINN:

18   Q.    Could I ask you to take a look at 13572, which is in

19   evidence.  It's an answer for request for particulars.

20   A.    Yes.

21   Q.    This is a document that you served on behalf of

22   Uni-Fortune in that case, a request for particulars?

23   A.    13572.

24   Q.    Yes.

25   A.    That's an answer.
```

1  **Q.** It's an answer to a request for particulars.

2  **A.** Yes.

3  **Q.** And could you explain to the jury what a request for

4  particulars is under Hong Kong procedure just in general?

5  **A.** Right. The plaintiff files a statement of claim. If

6  the defendant believes the statement of claim is not -- does

7  not contain full particulars, then the defendant is entitled

8  to serve on the plaintiff a request for further and better

9  particulars. And the plaintiff has to file an answer to that

10 request.

11 **Q.** So it's a way of -- is it a way of requesting more

12 information about the plaintiff's claim?

13 **A.** Yes, it is.

14 **Q.** And on behalf of Uni-Fortune, did you serve in the

15 Uni-Fortune -- the MGA versus Uni-Fortune case a request for

16 particulars?

17 **A.** Yes.

18 **Q.** And is that what we're looking at here?

19 **A.** Yes, that's an answer to my request.

20 **Q.** All right. And if we could put the first page up on the

21 screen on the bottom there. Is what we're looking at here,

22 number one, first, when you get an answer to a request for

23 particulars, do they first include what the request was?

24 **A.** Yes.

25 **Q.** All right. And is this the request you served for more

```
 1   information about these artistic works?
 2   A.    Sorry.   That is a repetition of the statement of claim.
 3   Q.    Okay.
 4   A.    So I'll repeat what the statement of claim is.  And on
 5   the next page --
 6   Q.    If we could go to the next page, please.  Enlarge the
 7   top.
 8   A.    Give full particulars.  That's my request.  And
 9   underneath would be the answers.
10   Q.    So you first quote the statement of claim.
11   A.    Yes.
12   Q.    And then you ask the particulars, the information that
13   you wanted; is that correct?
14   A.    Yes.
15   Q.    And could you just tell the jury in general, just
16   describe in general terms, this is legal language, what in
17   general was the nature of the additional information you were
18   seeking about MGA's claim?
19   A.    Because in that case -- may I refer to the statement of
20   claim?
21   Q.    Yes.
22   A.    Okay.  Going back to the last page, please.  MGA claims
23   they own a copyright.  They are the copyright owner of item A
24   to E.  So I need to know whether B was based on A, C was
25   based on B, D was based on C, and so forth.
```

 1          So I need to know for each item whether any

 2   antecedent, that is, previous materials, will refer to when

 3   the author created that particular item.  So that's the

 4   purpose of my request.

 5          MR. HANSEN:  Your Honor, move to strike this.  This

 6   is -- now we're getting into discussions of Hong Kong law and

 7   Hong Kong procedures.  This is explaining what a --

 8          THE COURT:  I understand what he's doing.  He's

 9   placing the factual statements in context, not -- let me see

10   you at sidebar, Counsel.

11               (SIDEBAR CONFERENCE HELD.)

12          THE COURT:  I didn't want to get into this on the

13   record, but what I think he's doing is placing into context

14   what these statements mean.  Otherwise, this jury is going to

15   be confused.  It's not so much getting into -- it is

16   Hong Kong law or procedure as opposed to substantive law.

17          What I absolutely won't be allowing in is the

18   substantive copyright law.  This is more trying to explain

19   what these documents mean, and I think I'm going to give some

20   leeway on that.  But I wanted to hear your point.

21          MR. HANSEN:  One of the issues that we have is the

22   use of based on, which is sort of permeating a lot of the

23   issues in the case.  Based on, as you know, is part of the

24   derivative work definition.  And I am not certain if that's

25   where they are going, but they are attempting to bootstrap --

 1           THE COURT:   We're not there yet, and I haven't
 2   heard any explanation or definition of based on.  And if the
 3   definition that we heard, reproduction, earlier, and there's
 4   now evidence to using that more in a vernacular sense or
 5   common sense, I would give the jury the benefit of
 6   understanding the common usage of English words.

 7           What I'm not going to do is give them the benefit
 8   of the legal definition of words without the Court's
 9   instruction.  And I'm reluctant to start instructing at this
10   point.  So having said all of that, to the extent that we're
11   not using legal phraseology, this is simply trying to put
12   into context, I'm going to overrule the objection.

13           MR. NOLAN:   The last problem, his reference to the
14   antecedent works, I think that's the issue where we got
15   into --

16           THE COURT:   Why don't you have him explain what
17   that means.  Or let's try to avoid -- whenever either side
18   hears legal words, if it can't be explained -- if it can be
19   explained without getting into the law of copyright.

20           MR. NOLAN:   I don't think it can, your Honor.  My
21   point is that's the reason why we really objected on this
22   basis.  I would not want him to explore what antecedent works
23   are because we have no reason to believe that he wouldn't be
24   including an analysis under Hong Kong law.

25           THE COURT:   That's what was kind of opened up with

 1   Mr. Hansen's questioning, is what the claim is based on.  So

 2   that door has already been opened to a certain extent, and I

 3   think I've got to give Mr. Quinn an opportunity to try to

 4   explain that.  We're fine right now.  Objection is overruled.

 5              (CONCLUSION OF SIDEBAR CONFERENCE.)

 6   Q.   BY MR. QUINN:  When you asked for particulars of

 7   antecedent works, what do you mean by antecedent works?

 8   A.   Any work or materials the author based on which in

 9   creating his particular work.

10   Q.   So if it was based -- if an author's work is based on

11   some other previous work, that would be an antecedent work?

12   A.   Yes.

13   Q.   All right.  If we could look at the next page, please.

14   A.   Yes.

15   Q.   I'm sorry.  We were there.  And if we could now enlarge

16   the answer.  And what you were told -- and is this MGA's

17   answer now that we're looking at?

18   A.   Yes.

19   Q.   And could you help us understand what MGA told you here

20   in response to your question about whether any of these works

21   that they identified were based on any of the other works?

22   A.   Well, basically all the wax models, silicone rubber

23   models, four drawings and eight drawings were based on the 18

24   design drawings made by -- 18 design drawings listed under

25   item A.

```
 1              MR. HANSEN:  Your Honor, move to strike.  Now we're
 2   into legal conclusions.
 3              THE COURT:  Counsel, let's -- I'm going to strike
 4   this.  Let's go back to what the document says.
 5              MR. QUINN:  Okay.
 6              THE COURT:  The jury is to disregard that last
 7   answer.  Let's focus on the document.
 8   Q.    BY MR. QUINN:  When it says here in the second
 9   paragraph -- the second sentence, the author of the artistic
10   works pleaded in subparagraphs B, D, E, F, and G of the
11   particulars of original works referred to the drawings in
12   subparagraph A of the particulars of original works, what did
13   you understand that MGA was telling you?
14              MR. HANSEN:  Objection, your Honor.  We're going
15   outside of his interpretation of English.  It's either plain
16   English or it's not.
17              THE COURT:  That is overruled.  You may answer.
18   Your understanding of what that meant.
19              THE WITNESS:  My understanding is that the max
20   models, the four drawings of facial decoration, the eight
21   drawings, four of which are pantone color guides, and the
22   four hand-painted Deco masters all referred to the 18
23   drawings listed under item A.
24   Q.    BY MR. QUINN:  When you say they referred to, do you
25   mean that the author, authors of those works, Ms. Leahy,
```

1   referred to the drawings?

2           MR. HANSEN:  Objection, leading.

3           THE COURT:  Sustained.

4   Q.   BY MR. QUINN:  When you say referred to, who did you

5   understand referred to the original 18 drawings?

6   A.   I'll repeat.  The author of the wax models, the author

7   of the silicone rubber molds -- sorry.  The author of the

8   four drawings of facial decoration, the author of the eight

9   drawings, four of which are pantone color guides, and the

10  author of the four hand-painted Deco masters referred to the

11  18 design drawings when he or she created the respective

12  copyright works.

13  Q.   And you had asked the question whether any of these were

14  antecedent works.  Can you tell us whether or not you

15  understood MGA was telling you that those other items -- B,

16  D, E, and F -- that there was an antecedent work for all of

17  them, and that was the drawings?

18          MR. HANSEN:  Objection, your Honor.  Leading again.

19          THE COURT:  Sustained.  Rephrase.

20  Q.   BY MR. QUINN:  Was it your understanding that there was

21  an antecedent work for items B, D, E, and F?

22  A.   Yes.

23  Q.   And what were those?

24  A.   Item A.

25  Q.   And as to A itself, did MGA tell you whether or not that

```
 1   was an original work as to which there were no antecedent
 2   works?
 3   A.     There's no antecedent work to A.
 4          MR. QUINN:   Thank you.  Nothing further.
 5                     RECROSS-EXAMINATION
 6   BY MR. HANSEN:
 7   Q.     Very briefly, in terms of -- in connection with your
 8   testimony today, did you meet with my lawyers from Quinn
 9   Emanuel?
10   A.     Say that again.
11   Q.     In connection with your testimony today, did you meet
12   with any lawyers from Quinn Emanuel?
13   A.     Yes.
14   Q.     And how many times?
15   A.     Once on Sunday and another time on Monday.
16   Q.     Did you review your expected testimony at that time?
17   A.     No.   I was -- I was told what my -- how do you say it?
18   What I might be referred to in this -- in my understanding of
19   the pleadings and documents filed.
20   Q.     Let's look again for a second at the paragraph you were
21   just talking about.
22   A.     Yes.
23   Q.     1.   Number 1, little I.  Have you ever -- you've never
24   spoken with any of the authors of the works in any of these
25   works; right?
```

1   A.   No.

2   Q.   So you've never spoken with the authors of the works

3   that are the wax models?

4   A.   No.

5   Q.   Never spoke to the author of the silicone rubber molds?

6   A.   No.

7   Q.   Or any of the authors; right?

8   A.   No.

9   Q.   So you have no idea what use the authors of those

10  drawings --

11  A.   Use?

12  Q.   When they referred to the drawings, you have no idea

13  what they did in connection with that; right?

14  A.   I never asked.  I didn't understand your question.

15  Q.   You never deposed any of the authors of any of the works

16  involved in the case?

17  A.   Depose, that means?

18  Q.   Take a sworn statement.

19  A.   I don't think any of them has given a statement in any

20  of that.

21  Q.   So you have no knowledge as to what use any of these

22  authors may or may not have made of the drawings; right?

23  A.   That's right.

24  Q.   And were you asked to bring dolls from any of the cases

25  that you were involved in?

```
 1   A.    I have.
 2   Q.    You have.  Okay.  And was this one of the documents that
 3   you looked at when you met with the Quinn Emanuel lawyers,
 4   Exhibit 13572?
 5   A.    Yes.
 6               MR. HANSEN:  Okay.  I have nothing further.
 7               THE COURT:  Mr. Quinn?
 8                    FURTHER REDIRECT EXAMINATION
 9   BY MR. QUINN:
10   Q.    Mr. Hansen just asked you whether you had spoken to any
11   of the authors.  That answer to the request for particulars,
12   that's MGA's answer; correct?
13   A.    Yes.
14   Q.    Would you expect that MGA would have spoken to the
15   authors before they gave that answer under oath?
16               MR. HANSEN:  Objection, your Honor.  Calls for
17   speculation.
18               THE COURT:  Overruled.  You may answer.
19               THE WITNESS:  In Hong Kong, lawyers from one side
20   do not have a chance to depose or ask any of the witnesses
21   from the other side.  There's only on two occasions we'll
22   know what the witnesses will say.  One is what we call a
23   witness statement.  This is a written statement filed by each
24   side, which is supposed to be exchanged.  And the other
25   occasion would be at trial.  So there's no system of
```

```
 1    deposition or whatever in Hong Kong.

 2    Q.    BY MR. QUINN:  But would you expect that, before MGA

 3    gave an answer under oath to your request for particulars,

 4    that MGA would speak to the authors in order to get that

 5    information?

 6    A.    Yes.  And pleadings is part of a pleaded case.  So that

 7    is MGA's case as such.

 8                   MR. QUINN:   Thank you.

 9                   THE COURT:   Mr. Hansen?

10                   MR. HANSEN:  We have nothing further, your Honor.

11                   THE COURT:   You are excused, sir.   Thank you.

12                   THE WITNESS:  Thank you.

13                   THE COURT:   Plaintiff may call their next witness.

14                   MR. PRICE:   We call Mr. Larian.

15                   THE CLERK:   Please be advised you are still under

16    oath.

17                   THE WITNESS:  Yes.

18                   ISAAC LARIAN, PREVIOUSLY SWORN.

19                        DIRECT EXAMINATION

20    BY MR. PRICE:

21    Q.    Mr. Larian, when Mr. Bryant showed you the drawings he

22    created at Mattel in September of 2000, when he showed you

23    Mattel's confidential information, that day changed the

24    course of MGA, didn't it?

25    A.    No.
```

```
 1   Q.   Well, prior to that day, September 2000, I think you
 2   told the jury in the last phase that you had actually been
 3   looking for a fashion doll.
 4            Do you recall saying that?
 5   A.   Yes.
 6   Q.   You told the jury that you'd been looking for one ever
 7   since some buyer at Wal-Mart said he wanted something to
 8   compete with Barbie.
 9            Do you recall that?
10   A.   Yes.
11   Q.   You told the jury that you had done a sort of fashion
12   doll contest, and tried to find some ideas for a fashion
13   doll.
14            Do you recall that?
15   A.   That's one of the things I did.
16   Q.   Pardon?
17   A.   That's one of the things, yes.
18   Q.   And how long had this search for creative ideas for a
19   fashion doll been going on?
20   A.   I think for a couple years.
21   Q.   So as of September of 2000, if wasn't for lack of effort
22   that you didn't have any ideas for a fashion doll that you
23   wanted to pursue, was it?
24   A.   No.
25   Q.   What it was is you didn't have the creativity.  You
```

1  didn't have people who had the idea for a fashion doll that

2  MGA might want to make; right?

3  **A.**    That's not correct.

4  **Q.**    Well, are you aware of any documentation dated prior to

5  September of 2000 where you said you liked an idea for a

6  fashion doll and were going to pursue it?

7  **A.**    No.

8  **Q.**    Didn't you tell the jury in the first phase that prior

9  to September of 2000, MGA had never done a fashion doll?

10 **A.**    That's correct, yes, I did.

11 **Q.**    Didn't you tell them that in response to this search for

12 ideas, the only thing that was brought to you was Carter

13 Bryant?

14 **A.**    At that time I did say that, but subsequent to that, I

15 got a lot of letters and e-mails for support from people in

16 the industry, and one of those was from a lady named Maureen

17 Samparro (phonetic) who works for a company called San Pan

18 (phonetic). And she sent me a copy of a letter as well as a

19 DVD of a presentation for a fashion doll that she had made to

20 us in 1998. When I was here in front of you in Phase 1-A, I

21 did not recall that. She reminded me of that, and we have

22 turned over those documents to Mattel.

23 **Q.**    So you're saying that in this search for a creative

24 idea, that you actually got a response in 1998 from some

25 woman; correct?

1   A.   Yes, Maureen.

2   Q.   And in the last phase, you had forgotten about that

3   entirely?

4   A.   I did not recall.  It was so long ago.

5   Q.   And you didn't pursue that, did you?

6   A.   No, we did not.

7   Q.   You rejected it.

8   A.   I'm sorry.  You mean pursue her idea?

9   Q.   Yes.

10  A.   No, we did not pursue it.

11  Q.   You rejected that idea; right?

12  A.   Yes.

13  Q.   And so my question, then, is prior to Carter Bryant

14  coming in in September of 2000 and showing you Mattel's

15  confidential information, prior to that time, you had done a

16  two-year search for a good idea for a fashion doll and had

17  failed; right?

18  A.   I don't characterize it as a failure.  We just hadn't

19  come up with one.

20  Q.   And you finally came up with one when Mr. Bryant walked

21  through the door and showed you Mattel's confidential

22  information; right?

23  A.   That's not correct.  And that's not what I testified to.

24  Q.   Well, prior to Mr. Bryant showing you Mattel's

25  confidential information, you had not located in a two-year

```
 1   search any designs or any ideas for a fashion doll that you
 2   thought were acceptable; correct?
 3   A.   We had not done one, that's correct.
 4   Q.   You hadn't located one; right?
 5   A.   Yes.
 6   Q.   And then the designs you received in September of 2000
 7   were designs that were handed to you by a Mattel designer who
 8   was then working in the Mattel design center; right?
 9   A.   That's correct.
10   Q.   And you understand that in the first phase of this, the
11   jury has found that you knowingly assisted Mr. Bryant in
12   breaching his fiduciary duty.
13              You understand that?
14   A.   I do.
15   Q.   And that fiduciary duty pertained to Mattel's
16   confidential information.
17              You understand that?
18   A.   I'm not a lawyer.  But I understand that and respect
19   what the jury has found.
20   Q.   I want to look, then, at this information you got in
21   September, this confidential information that Mr. Bryant
22   showed you, okay?  If you look at Exhibit 302.  And you
23   recall the testimony is that this is the presentation that
24   Mr. Bryant made --
25   A.   Can you bear with me for a moment?  These exhibits start
```

1   with 6?

2   Q.   It's 302, sir.  It should be the third one in from the

3   binder.

4   A.   I don't find 302.

5           MR. PRICE:  May I approach, your Honor?

6           THE WITNESS:  Thank you.

7   Q.   BY MR. PRICE:  Now, the testimony is that this is the

8   presentation that Mr. Bryant made in September of 2000.  And

9   if we look at the second page, you recall one of the things

10  you were aware of was his dolls are going to be trendy.  They

11  were going to have trendy, hip outfits.  That presentation

12  was made to you?

13  A.   Where are you referring to?  Yes.

14  Q.   And if you look at the next page, you see it has a

15  drawing of Zoe.  And it talks about her being the queen of

16  cool, and she has funky stompin' sneaks.

17          That presentation was made to you; correct?

18  A.   Yes.

19  Q.   And if you look at the eighth page in, you see there's a

20  character at that point called Hallidae.  Ultra trendy street

21  wear.

22          Do you see that?

23  A.   I do.

24  Q.   And if you look at the tenth page, you see there's a

25  picture of Jade, talking about how she loves far-out fashion.

1  This is part of the presentation Mr. Bryant made to you;

2  right?

3  A.    Yes.

4  Q.    Trendy, hip, cool, funky, ultra trendy street wear,

5  far-out fashion.  These were part of the concepts, Mattel's

6  confidential information, that Mr. Bryant gave to you in

7  September 2000; right?

8          MR. NOLAN:  Your Honor, I'm going to object to the

9  term confidential information with respect to concepts.

10          THE COURT:  On what ground --

11          MR. NOLAN:  I think it's an improper

12  characterization of the finding.

13          THE COURT:  Overruled.

14          THE WITNESS:  Sir, can you repeat the question?

15  Q.    BY MR. PRICE:  Sure.  As part of the ideas and concepts,

16  confidential information that Mr. Bryant gave you in

17  September of 2000 was this idea for a doll that was trendy,

18  hip, cool, funky, with far-out fashions, ultra trendy street

19  wear.  All of that was in the presentation?

20  A.    These were in the presentation of drawing.  The dolls

21  came later from MGA.

22          MR. PRICE:  Move to strike as nonresponsive.

23          THE COURT:  Stricken.

24  Q.    BY MR. PRICE:  I'll ask the question again.

25          Part of the confidential information that

1  Mr. Bryant gave you was the concept, the idea of dolls that

2  were trendy, hip, cool, funky, far-out fashions and ultra

3  trendy street wear, all of that was in the presentation you

4  got from Mr. Bryant in September of 2000?

5  A.    Yes.

6  Q.    And when you looked at these drawings, you noticed some

7  things about the drawings themselves; correct?  Let me make

8  it more clear.  If we can go to page 3.  Zoe.

9            One thing you have noticed is that in the drawings,

10  the eyes were bigger than you would have on a normal human

11  being.

12            You noticed that; right?

13  A.    They had big eyes.  But I've seen human beings with big

14  eyes, too.

15  Q.    You noticed that lips were pronounced in the drawings;

16  right?

17  A.    Yes.

18  Q.    You noticed that the feet and the head were oversized in

19  proportion to the rest of the body; right?

20  A.    I don't see any feet, but I see the shoes are oversized.

21  Q.    And if you go through it, you'd see, for example, on the

22  fourth page, or the fifth page, you see these are oversized,

23  this area here, what you call the shoes; right?

24  A.    Yes.

25  Q.    And you noticed that the shoes were kind of chunky.  You

```
 1   said the shoes were oversized; correct?
 2   A.   You said oversized, and I said yes.
 3   Q.   And the fashions were trendy, hip, urban; correct?
 4   A.   Those fashions in there?
 5   Q.   Yes.
 6   A.   That's what it says.
 7   Q.   That's the presentation he made to you; correct?
 8   A.   That's correct.
 9   Q.   Prior to September of 2000, you didn't have doll designs
10   or doll ideas for dolls with pronounced lips, large eyes,
11   oversized feet and head that were trendy and urban; correct?
12   A.   What I think, if you look at the PC dolls, I think they
13   were called by Maureen Samparo (phonetic).  They had similar
14   features.
15   Q.   Prior to -- to?
16   A.   My recollection.
17   Q.   Prior to September 2000, after this two-year search for
18   some creative ideas so that you could do a fashion doll,
19   prior to that, you didn't have these ideas, did you?   The
20   ideas Carter Bryant gave to you in September 2000.
21   A.   That's correct.
22   Q.   And these features -- the large eyes, the pronounced
23   lips, the oversized feet, the oversized head, the urban
24   street wear -- those are the features that characterize the
25   Bratz dolls; correct?
```

1  **A.**    Those are some of the characteristics, some of the

2  features that characterize Bratz dolls, yes.

3  **Q.**    And your understanding is that those features were

4  unlike anything that was on the market.

5  **A.**    That's not my understanding.

6  **Q.**    Well, if you'd look at in your binder there in

7  Exhibit 13520.

8  **A.**    I'm sorry.   I'm having a tough time finding these.

9  **Q.**    You recognize that as a business plan for ABC

10  International Traders, which was doing business as MGA;

11  correct?

12  **A.**    That's what the document says, yes.

13  **Q.**    Pardon?

14  **A.**    That's what the document says, yes.

15            MR. PRICE:   Your Honor, move Exhibit 13520 into

16  evidence.

17            THE COURT:   Any objection?

18            MR. NOLAN:   No objection, your Honor.

19            THE COURT:   It's admitted.   You may publish.

20            **(Exhibit 13520 received.)**

21  **Q.**    BY MR. PRICE:   Look at the first page.   This a business

22  plan which you did in March of 2001; correct?

23  **A.**    I personally?

24  **Q.**    Someone at MGA on your behalf created this business

25  plan; correct?

 1  **A.**    I see my name on it.  I don't recall it.  But I think

 2  yes, it's a business plan of MGA.  It looks like a business

 3  plan that MGA did.

 4  **Q.**    And, in fact, go down a little bit, Ken, where you see

 5  it is a business plan does not imply offering of securities.

 6  It's correct, is it not, that this is a business plan that

 7  you were using to try to get funding for MGA in March of

 8  2001?

 9  **A.**    I don't recall that one way or another.  I do not recall

10  it.  It's possible, but I don't recall it.

11  **Q.**    As of March of 2001, in any event, the Bratz dolls

12  themselves had not been presented to the public; correct?

13  **A.**    At March 2001 to the public, that's correct, no, they

14  were not.

15  **Q.**    And if you'll look at page 15 of this document, you see

16  there's a section called Strengths.  You see that in your

17  business plan?

18  **A.**    Yes.

19  **Q.**    And you say, "In terms of product strength, Bratz has

20  several distinct advantages over the competition.  First is

21  its marked advancement in the physical appearance of the

22  dolls.  The Bratz are unique in many ways; their eyes are big

23  with a hint of anime style; their lips are more pronounced.

24  Their feet and heads are oversized.  There is no fashion doll

25  on the market that bears the resemblance to the Bratz."

1          That's what MGA wrote in its business plan of March

2   of 2001; correct?

3   A.   Yes.

4   Q.   Now, prior to September of 2001, when Mr. Bryant

5   presented you -- prior to September of 2000, when Mr. Bryant

6   presented you with Mattel's confidential information and

7   design, did MGA have any plans to introduce an advanced

8   design of a doll with big eyes, pronounced lips, where their

9   head and feet were oversized?

10  A.   Not that I recall, no.

11  Q.   And you'll agree that the designs, the drawings, the

12  confidential information Mr. Bryant gave you in September

13  2000, those drawings are drawings of dolls where the eyes are

14  big, the lips are pronounced, the feet and heads are

15  oversized; correct?

16  A.   Those were drawings that were the inspiration for the

17  Bratz dolls that MGA created, yes.

18          MR. PRICE:   Move to strike as nonresponsive.

19          THE COURT:   Would you rephrase your question,

20  Counsel.

21  Q.   BY MR. PRICE:  You'll agree that the drawings you saw in

22  September 2000, Mattel's confidential information, those

23  drawings showed, were drawings of figures where the eyes were

24  big, the lips were pronounced, and the feet and heads were

25  oversized.

```
 1              You'll agree with that; correct?
 2   A.    Those drawings had those features, yes.
 3   Q.    And by the way, the first phase, you described the
 4   contest you had as sort of a fashion doll contest.
 5              You recall that?
 6   A.    Yes.
 7   Q.    You didn't call it a fashion drawing contest; correct?
 8   A.    No.
 9   Q.    Okay.  That's correct?
10   A.    That's correct.
11   Q.    That's because you were looking for a fashion doll;
12   right?
13   A.    Yes.
14   Q.    Now, prior, in the first phase of this case, you recall
15   that you told the jury that if what you were shown in
16   September of 2000 were Mattel drawings, you wanted nothing to
17   do with them.
18              Do you recall that?
19   A.    Yes.
20   Q.    And that's because you had that thought, or you said
21   that because you knew that if what Carter Bryant was showing
22   you was Mattel property, their confidential information, you
23   shouldn't be looking at it; correct?
24   A.    I just didn't want to have anything to do with it.
25   Q.    Well, let me ask you.  You knew in September of 2000
```

```
 1    that if someone came to you with confidential information of
 2    a competitor, you shouldn't even look at it.
 3              You knew that, didn't you?
 4   A.    All I know is what I testified to.  That if they at that
 5    time, if I believed that they belonged to Mattel, I didn't
 6    want to have anything to do with it.  And that's the truth.
 7   Q.    And my question is different, sir.  I'm asking about
 8    your -- the way you practice as a businessman.
 9   A.    Yes.
10   Q.    In September of 2000, you knew that if what Carter
11    Bryant was showing you belonged to Mattel and was
12    confidential and proprietary, that you should not even be
13    looking at it.  You knew that, didn't you?
14   A.    I cannot answer that one way or another state of my mind
15    at that time.  So I cannot answer that truthfully beside what
16    I answered.
17   Q.    Well, I'm just asking you about the way you would do
18    business.  Are you telling the jury it was your understanding
19    it was okay to look at another company's confidential,
20    private information -- I'll stop the question there.  That
21    was okay?  That's even okay business practice?
22   A.    No, and I told the jury it's not.  And I told you on the
23    Phase 1-A that if they belonged to Mattel, I didn't want to
24    have anything to do with it.
25   Q.    Okay.  So you just told the jury it's not okay.  And my
```

```
 1   question is simple.  You knew in September 2000 that you
 2   should not be looking at a competitor's confidential
 3   information; right?
 4   A.   I shouldn't be looking at -- I guess you can say that,
 5   yes.
 6   Q.   And you told us that if you knew that that was Mattel's
 7   property, their confidential information, you wouldn't have
 8   looked at it; right?
 9   A.   I didn't say that.  I said that -- I said -- you're
10   asking me to speculate what would I have done.  And I said to
11   you and I said to this jury that if I believed those belonged
12   to Mattel, I wanted nothing to do with it.
13   Q.   And you say that because you know it would have been
14   wrong for you to build a business based upon Mattel's
15   proprietary confidential information.  You know that, don't
16   you?
17   A.   It is wrong -- I don't understand your question.  You
18   said it wouldn't be wrong?
19   Q.   It would be wrong.
20   A.   To do what?
21   Q.   It would be wrong to create a business based upon
22   Mattel's confidential proprietary information; right?
23   A.   Yes.
24   Q.   It would be wrong for you to profit a penny by using
25   Mattel's proprietary confidential information.
```

```
 1              You understand that?
 2   A.    Yes.
 3   Q.    Now, you said that these drawings, this Mattel
 4   confidential information inspired you.
 5              Do you recall saying that?
 6   A.    I said those drawings were the inspiration for what
 7   became the Bratz dolls, which MGA created through many, many
 8   changes and many employees.
 9   Q.    Well, you know --
10   A.    And a lot of investment.  Over seven years.
11   Q.    You also know, sir, that you shouldn't be inspired to
12   act by looking at a competitor's private confidential
13   information.  You know that, don't you?
14   A.    Yes.
15   Q.    So let's talk about how you were inspired to act based
16   upon this Mattel information.  Within a couple of weeks you
17   had decided you are going to spend millions to make Bratz
18   into a brand.
19              Do you recall that?
20   A.    Yes.
21   Q.    And if you look at Exhibit 16788.
22              And that's already admitted, your Honor, if we can
23   put that up.
24   A.    Go ahead.
25   Q.    And this is September 13th, not even two weeks after
```

1   Mr. Bryant has shown you his drawings and his concept for

2   this doll; correct?

3   A.    That's correct.

4   Q.    And by this time, September 13th, you don't have a doll,

5   do you?

6   A.    We don't.

7   Q.    You don't have sculpts; right?

8   A.    No, we don't.

9   Q.    You -- no one's come and done any face painting as far

10  as you know; correct?

11  A.    That's correct.

12  Q.    All you have looked at is Mattel's proprietary

13  confidential information concerning Mr. Bryant's designs and

14  ideas; correct?

15  A.    Yes.

16  Q.    And having looked just at that, you are writing an

17  e-mail to Ms. O'Connor saying we're going to risk and spend

18  millions making this brand and line happen.

19          You see that?

20  A.    Yes.

21  Q.    Now, in the toy business, making a brand is sort of the

22  Holy Grail, isn't it?

23  A.    I apologize.  I don't know that.

24  Q.    Creating a brand is the way to really be able to make

25  high profits; correct?

1  **A.**  Making a brand is building a brand from the ground up,

2  and that's what MGA did.

3  **Q.**  You heard Ms. Pembleton, you heard her testify about how

4  MGA had created this Bratz brand.

5          Do you recall that?

6  **A.**  Yes, and we did.

7  **Q.**  And you create the brand, and you can put the name on

8  things like flip-flops because it's associated with the

9  brand, and that will help sell it; correct?

10  **A.**  I don't understand your question.  Please repeat.

11  **Q.**  Well, creating a brand, a brand is something valuable;

12  right?

13  **A.**  Yes, it is.

14  **Q.**  And having seen just Mattel's confidential information

15  about Bratz and about those designs, you had decided a few

16  weeks later you were going to try to make Bratz into a brand;

17  correct?

18  **A.**  Yes, and I said maybe it does, maybe it doesn't.  We

19  have made the brand, and not him.  And that's a fact.  And

20  that's what I said on September 13th, 2000.

21  **Q.**  You would agree that it would be wrong for you to try to

22  make a profitable brand if the inspiration for that is

23  looking at Mattel's confidential information and designs.

24  You'll agree with that; right?

25  **A.**  Yes, if we knew that at that time that those drawings

```
 1   were from Mattel, that would be correct.

 2   Q.   And by the way, how long had you been in the toy

 3   business as of September 2000?

 4   A.   About 13 years.

 5   Q.   So in that 13 years' time frame, prior to seeing Carter

 6   Bryant's drawings, Mattel confidential information, had you

 7   spent millions trying to make a brand?

 8   A.   Make it what kind of brand?

 9   Q.   A brand, like Bratz or Hippity-hoppity Baby or anything

10   like that.  Had you taken a fashion doll, for example, and

11   tried to make a brand in those 13 years prior to meeting

12   Mr. Bryant?

13            MR. NOLAN:   Your Honor, with the lead-in, I think

14   it's compound.

15            THE COURT:   Sustained.

16   Q.   BY MR. PRICE:   Let me rephrase.

17            THE COURT:   Rephrase, Counsel.

18   Q.   BY MR. PRICE:   In those 13 years that you were in the

19   toy business prior to seeing Mattel's confidential

20   information, had you spent millions or done anything to try

21   to make a brand of a fashion doll?

22   A.   No.

23   Q.   In that time frame, had you spent millions to try to

24   make a brand of Hoppity Bouncy Baby?

25   A.   Yes.
```

1   **Q.**  And so let's talk about that.  So for Hoppity Bouncy

2   Baby and making that a brand, you want to make it a name so

3   you can sell accessories, so you can license, things like

4   that?

5   **A.**  When you launch a brand, you hope that you spend the

6   money and take a lot of risk to do that.  Sometimes it

7   happens; sometimes it doesn't happen.

8   **Q.**  And it hadn't happened prior to meeting Mr. Bryant;

9   correct?

10   **A.**  Prior to --

11   **Q.**  September of 2000.  You hadn't successfully made a brand

12   with the people who worked at MGA; right?

13   **A.**  That's not true.

14   **Q.**  Well, for example, we've seen some licensed products

15   here with Bratz on it like helmets and things like that.

16           Prior to Bratz, a licensed product is where someone

17   else wants to have permission to use your brand; right?

18   **A.**  That's correct.

19   **Q.**  Where it's so valuable, others are saying we will pay

20   you for the right to, for example, put Bratz on a pillow or

21   on a bicycle helmet; correct?

22   **A.**  Yes.

23   **Q.**  And that's --

24   **A.**  Because we build the brand.

25   **Q.**  Pardon?

```
 1  A.   Because MGA built the brand, seven years.

 2  Q.   And that's a very valuable thing to be able to do, to be

 3  able to license your brand that you built; correct?

 4  A.   I think it's very valuable first to build the brand with

 5  all the hard work of MGA employees and the investment we made

 6  and then license it, yes.

 7  Q.   And prior to meeting Mr. Bryant, prior to Bratz, MGA had

 8  not developed a single item that it was able to license;

 9  correct?

10  A.   That's not correct.

11  Q.   You had licensed items prior to that?

12  A.   Yes, we had.

13  Q.   Okay.  Sir, if you'll look at in your binder there, at

14  Exhibit 630.

15  A.   Go ahead.

16  Q.   Have you found it?

17  A.   Yes.

18  Q.   And you see this is an e-mail string.  The last one is

19  dated June 30, 2003, from Isaac Larian.

20            You see that?

21  A.   I do.

22            MR. PRICE:  Your Honor, move Exhibit 630 into

23  evidence.

24            MR. NOLAN:  No objection.

25            THE COURT:  It's admitted.
```

1                    **(Exhibit 630 received.)**

2    **Q.**    BY MR. PRICE:  If we could just blow this up.  Do you

3    see this is an e-mail where someone from License Europe

4    Magazine has asked questions, and then answers are being

5    supplied by MGA.

6              Do you see that?

7    **A.**    Yes.

8    **Q.**    And then you are sending it to yourself where it says

9    below?

10   **A.**    I'm sending it to myself?

11   **Q.**    Isaac Larian to Isaac Larian and Bonnie Blume?

12   **A.**    Yes.

13   **Q.**    And what you did is you wrote answers to this

14   gentleman's questions.

15             Do you see that?

16   **A.**    I can't tell you one way or -- yes, it looks like it,

17   yes, that's correct.

18   **Q.**    And let's go to the second page.  And one of the

19   questions you were asked is had you been a licensor before?

20             You see that?

21   **A.**    Yes.

22   **Q.**    And a licensor is where again, you have the rights to

23   something that you built with your people, and you are giving

24   someone else, the licensee, the right to do that?

25   **A.**    That's correct.

1  **Q.**   And the answer you wrote is no.  This is the first time.

2  But we have been a licensee many times; correct?  That's what

3  you wrote.

4  **A.**   I did.

5  **Q.**   And what a licensee means is that you go to someone

6  else, say, Marvel Comics, and say can I put Spiderman on my

7  stuff; right?

8  **A.**   Right.

9  **Q.**   And so getting back, then, to your September 13th

10  e-mail, which is Exhibit 16788.  Now, when you wrote that

11  e-mail saying that we're going to make this brand happen and

12  spend millions on it, at that time are you aware of any

13  e-mails or anything saying we're going to do that, but we're

14  going to make sure the dolls don't look like the confidential

15  information Carter Bryant gave us that's inspiring us to

16  create the line?

17  **A.**   The answer to your question, if I'm aware of an e-mail

18  like that, is no.

19  **Q.**   Or even a discussion as of September 13th, when you're

20  talking about risking malls to make Carter Bryant's line

21  happen.  Any discussion saying we don't like those drawings.

22  We want the dolls to look different.

23  **A.**   No, because we didn't have a contract as of September

24  13th.

25  **Q.**   Well, let's look, then, before then, actually, on

```
 1    September 8th, based just on the confidential information you
 2    have, you are talking within MGA about selling accessories to
 3    those dolls; correct?
 4    A.    I don't recall.  Do you have something?
 5    Q.    Sure.  If you look at Exhibit 1319.
 6    A.    Go ahead.  I have it.
 7    Q.    And you recognize that as an e-mail that you sent to
 8    Paula Garcia and Carter Bryant on September 8th of 2001?
 9    A.    Yes, I think before it says --
10    Q.    I'm going to correct that.
11    A.    You did it on purpose?
12    Q.    I'm going to correct that.  Is that something you said
13    on September 8th of 2001?
14    A.    I did, a year after.
15    Q.    But let's look at what you said.  On September 8th of
16    2001.
17              By the way, I move 1319 into evidence.
18              MR. NOLAN:  The one dated 2001, no objection.
19              THE COURT:  Very well.
20              (Exhibit 1319 received.)
21    Q.    BY MR. PRICE:  Now, look here, sir.  You're talking
22    about brands, Barbie, Amazon brands, Barbie.
23              Do you see that?
24    A.    I do.
25    Q.    Part of branding is you want to sell accessories to the
```

```
 1  dolls; correct?

 2  A.    That's correct.

 3  Q.    And you had seen prior to September 2000, that's what

 4  Barbie had done with its brand; correct?  It sold

 5  accessories?

 6  A.    Yes.

 7  Q.    And so having -- seeing the confidential information

 8  that Mr. Bryant gave you about Bratz -- ultra trendy, hip,

 9  et cetera -- you decided to make a brand; right?

10  A.    We decided to license that drawing from Carter Bryant

11  and then come up with Bratz dolls.  That's what we decided to

12  do.    And then later on make a brand.

13  Q.    But by making a brand, even when you were talking about

14  it in that prior e-mail, you're talking about creating a line

15  of accessories and licensing and all of that; correct?

16  A.    That's part of building a brand.

17  Q.    That's part of creating a brand; right?

18  A.    That's correct.

19  Q.    And so you had that in mind less than two weeks after

20  seeing Mattel's confidential information, that you were going

21  to make Bratz a line with accessories where you would license

22  the Bratz products; correct?

23            MR. NOLAN:  Objection, your Honor.

24  Mischaracterizes the testimony.  Lack of foundation.

25            THE COURT:  I don't think he's -- Counsel, are you
```

```
 1   referring to the document?

 2             MR. PRICE:  No.

 3             THE COURT:  I didn't think so.  Why don't we take

 4   that document off.  He's not referring to the document,

 5   Counsel.

 6             MR. NOLAN:  Thank you, your Honor.

 7             THE COURT:  Very well.

 8   Q.   BY MR. PRICE:  As of September 2000, as we discussed

 9   when you said we're going to pursue a Bratz line after seeing

10   Mattel's confidential information, when you had Bratz' line

11   in mind, you thought of something with accessories, something

12   we were going to license Bratz; correct?

13   A.   No.  At that time we were thinking about if we license

14   this drawing, it can be manufactured.  So A can be

15   manufactured to a doll, B, request we make it to a brand.

16   And this was just going to give you -- Carter Bryant brought

17   to us some seeds.  And he said that he owns.  MGA bought the

18   land.  MGA hired employees --

19             MR. PRICE:  Your Honor, move to strike as

20   nonresponsive.

21             THE COURT:  The question is -- next question,

22   Counsel.

23   Q.   BY MR. PRICE:  You knew those were Mattel's drawings and

24   confidential information at the time Mr. Bryant gave them to

25   you; right?
```

1   **A.**   No.

2   **Q.**   You understand the jury has found that you knowingly

3   assisted Mr. Bryant in breaching his fiduciary duty of

4   confidentiality; correct?

5   **A.**   Yes, that's what the jury has found.  I respect the

6   jury's decision.

7   **Q.**   My question, though, is this:  When you think of brand,

8   when you thought of that in 2000, I think you told us a brand

9   means you're going to have accessories and try to get

10  licensees; correct?

11  **A.**   No.   What I told you is that's part of building a brand.

12  **Q.**   Okay.  So in September of 2000, when you said you were

13  going to try to build the brand, what you had in mind was

14  inspired or based on Mr. Bryant's confidential information,

15  was to build a brand which had accessories and licensees;

16  correct?

17  **A.**   No.

18  **Q.**   Well, let's look at September 2001, then, where we have

19  this e-mail Exhibit 1319.  And you see, you say don't Bratz

20  need their own house and hotel and clubs to hang out in?

21          You see that?

22  **A.**   Yes.

23  **Q.**   Now, those are accessories; right?

24  **A.**   That's correct.

25  **Q.**   And you say look at what are the three top sellers for

```
 1  Barbie; correct?

 2  A.    Yes, on public, on Amazon dot com.

 3  Q.    So you're telling your people for ideas, let's look in

 4  the public for nonconfidential information; correct?

 5  A.    That's correct.

 6  Q.    And let's look at what Barbie's done; correct?

 7  A.    Yes.

 8  Q.    Okay to do that, to use public information; right?

 9  A.    I believe it is.

10  Q.    Okay.  And then you attached here, if we can go to the

11  next page, things such as Barbie Jam 'n Glam tour bus?  You

12  saw that?

13  A.    Looks like I just attached the link to the Amazon dot

14  com, where they had all of these products in it.  And I sent

15  it to Paula and other people.

16  Q.    By the way, did Bratz end up doing a bus at some point

17  as one of the accessories?

18  A.    We did.

19  Q.    And the next page, it has a grand hotel is a super

20  gymnast Barbie doll?

21  A.    Yes.

22  Q.    And Bratz ended up doing at some point a gymnast Bratz;

23  right?

24  A.    We did.

25  Q.    And if we go to the next page, it's got like a rock and
```

 1  roll radio house and further on down, it's got Harley

 2  Davidson.  Various types of accessories that Barbie was using

 3  for its brand; correct?

 4  A.   I'm sorry.  I don't understand your question.

 5  Q.   This lists various accessories that Barbie was using for

 6  its brand; correct?

 7  A.   Which was displayed on Amazon dot com.

 8  Q.   And part of branding is to try to sell accessories

 9  associated with the core of your brand; correct?

10  A.   That's one of the things, yes.  That's one of the

11  things.

12  Q.   And so your idea was I've got the Bratz doll now.  Part

13  of branding is then to make money by selling accessories;

14  correct?

15  A.   2001, you mean; right?  Not 23001.

16  Q.   Let's say 2001.

17  A.   No, let's not say 2001.  If was 2001.

18  Q.   That's my question.  2001.

19  A.   Right.

20  Q.   Although that's what you're going to do with the brand

21  when you think of it in 2000.  That's what you hope to

22  accomplish; right?

23  A.   You hope to launch first the dolls to make sure they do

24  well and then build something around it.  That's what you

25  hope to do every time you get in the toy business.  And you

```
 1   do hundreds of ideas.  One of them takes off.  99 of them
 2   doesn't.
 3   Q.   Getting back to 2000, before you ever had a doll, before
 4   you ever had a doll, you hired Veronica Marlow to do
 5   fashions; right?
 6   A.   I'm sorry.  Before 2000 we did have a doll.  We did not
 7   have a fashion doll.
 8   Q.   Let me be clear.  September, October 2000, before you
 9   had a doll, when all you had was the confidential information
10   for Mattel, you hired Veronica Marlow to do fashions; right?
11   A.   We hired Veronica Marlow, yes, to do some of the
12   fashions, yes.
13   Q.   And before you had --
14   A.   You're talking about Bratz; right?  You're not talking
15   about any doll.
16   Q.   I'm talking about Bratz.
17   A.   Right.
18   Q.   So in October -- September, October 2000, again, you
19   didn't have a Bratz doll, when all you had to inspire you was
20   Mattel's confidential information.  You hired Margaret Lahey
21   to do a sculpt; correct?
22   A.   Yes, we did.
23   Q.   And by the way, if you want to make the doll, even if
24   you want to make it look exactly like a drawing, to do that,
25   if you want to make it look like it to the millimeter, you've
```

```
 1  got to have someone sculpt it; right?

 2  A.    Yes.

 3  Q.    And you've got to make a mould of some sort; right?

 4  A.    Yes.

 5  Q.    And you've got to do face painting?

 6  A.    Right.

 7  Q.    There are various processes you always have to go

 8  through in going from a drawing to a doll; correct?

 9  A.    The dolls are just inspiration.  Whether it's Bratz or

10  another product, the drawings are just the basis, the

11  inspiration for making the product.  Usually products come

12  out to be a lot different than the drawings.  You cannot just

13  manufacture those drawings.

14  Q.    My question is different.  If you want to go from a

15  drawing to a doll, even if you want to do it identically, you

16  have to go through steps of making a sculpt, making a mould,

17  doing face painting, et cetera; right?  You have to do that

18  every time.

19  A.    Yes, you do.

20  Q.    And so getting back to, then, what you were doing after

21  seeing this confidential information, in addition you hired

22  Mercedeh Ward and Rachel Harris --

23  A.    Yes.

24  Q.    Both worked for Mattel for many years; correct?

25  A.    Rachel Harris, to the best of my knowledge, Rachel
```

1  Harris didn't work for Mattel.  I didn't know.

2  Q.  Let me ask you about Mercedeh Ward.  You put her in

3  charge of interacting with Hong Kong with respect to the

4  manufacture of the Bratz doll; correct?

5  A.  Yes.

6  Q.  And when you hired her, you told her that you had no one

7  at MGA capable of completing the Bratz doll, and that's why

8  you wanted to hire her.

9  A.  She was one of the people we needed to make the Bratz

10  dolls, yes.  She was instrumental.

11  Q.  And so you hired her, again, in October of 2000, when

12  all you had to, I'll use your words, inspire you, was the

13  confidential information and designs that Mr. Bryant had

14  given you; correct?

15  A.  We had -- all we had at that time were the drawings that

16  became the inspiration for making the Bratz doll.

17  Q.  In fact, you hired Ms. Ward in September of 2000;

18  correct?

19  A.  I don't remember exactly when we hired her.  I don't

20  think that's correct.  But I don't know.  I don't remember

21  exactly when we hired her.

22  Q.  If you look at -- moving on as to what you did as a

23  result of seeing these drawings, if you look at

24  Exhibit 16789.  And that's way toward the back of your binder

25  here.

```
 1            You see 15, 2000.  Now, as of this date, again, all
 2   you have as your inspiration, as you put it, is this
 3   confidential information that you received from Mr. Bryant;
 4   correct?
 5   A.    That's correct.
 6   Q.    So based on that, on Mattel's property and ideas, you
 7   are thinking of doing an entire new showroom for Bratz
 8   products; correct?
 9   A.    No, we had a new showroom.  We were going to get a new
10   showroom in New York because we were growing.  And she was
11   asking me where are we going to show it?  In the hallway?
12   And I said no, in the new showroom.
13   Q.    And let's look here in the bottom e-mail, where it says
14   Isaac to Carter Bryant and Paula, importance, high.  Where
15   you're talking about you need to think different, think
16   fashion, you know, basically put 16 hours a day.  That was
17   the e-mail that started all this; correct?
18   A.    Yes.  It started that e-mail chain.
19   Q.    Started the e-mail chain.  And then Ms. O'Connor asked
20   you in response, "Where do you think this catwalk is going to
21   be?  In the hallway?  I love the idea, but we don't have the
22   space."
23            Do you see that?
24   A.    Yes.
25   Q.    And the idea, we're talking about Bratz.
```

```
 1   A.   To show the Bratz line, right.

 2   Q.   Yes.  And your response is a new showroom for the Bratz

 3   line; correct?

 4   A.   No.  We didn't have one showroom just for the Bratz

 5   line.  We had one showroom that we showed all of our toys in.

 6   And we moved to a bigger showroom.

 7   Q.   If you'd look at exhibit -- by the way, this is -- all

 8   of this here in this e-mail, we were telling these folks to

 9   think accessories, think fashion, think commercial.  All of

10   this is to exploit that idea, the confidential idea that

11   belonged to Mattel that Mr. Bryant had given you in September

12   of 2000; right?

13   A.   It was just the idea when if we're going to make these

14   dolls, we need to design accessories.  We need to do a

15   commercial, have a showroom to show it.  That's what it was

16   saying.

17   Q.   Yes, but the idea that you're talking about exploiting

18   belonged to Mattel; right?

19   A.   I think this jury has found that those drawings belonged

20   to Mattel.

21   Q.   And you will agree that it would be wrong for MGA to

22   make any profits by exploiting an idea that belonged to

23   Mattel?

24              MR. NOLAN:  Your Honor, cumulative.  Asked and

25   answered.
```

```
 1              THE COURT:  Sustained.
 2   Q.    BY MR. PRICE:  And then based again just on Mattel's
 3   property that you had seen, you were saying we're going do
 4   start doing line extensions to Bratz; is that right?   In
 5   October of 2000.
 6   A.    October, I'm not sure if October 2000 or before.  Can
 7   you show me a document?
 8   Q.    Sure.  I'll put up 11276, which is already admitted.
 9   And you say there's an e-mail that begins with October 15 of
10   2000.   Talking about brainstorming, about sports activity,
11   dolls, et cetera, and then the response to that is from Paula
12   Garcia Treantafelles, what about the line extension to Bratz?
13              Do you see that?
14   A.    Yes, I do.
15   Q.    And then your response, yes, all caps, everything;
16   correct?
17   A.    Everything means all product line.
18   Q.    Including Bratz?
19   A.    That's correct.
20   Q.    So in October 2000, you were getting together to try to
21   figure out how to do line extensions based upon Mattel's
22   property?
23   A.    Based on -- we were going to launch a line of Bratz
24   dolls inspired by Carter Bryant's drawings, and we were going
25   to launch accessories and other products to go with it.
```

```
 1   Q.   Okay.  And you said based on Carter Bryant's drawings.
 2   Inspired by Carter Bryant's drawings.  That's all you had at
 3   the time, was Mattel's property to inspire you; right?
 4        MR. NOLAN:  Objection, your Honor.  Compound, based
 5   on, inspired --
 6        MR. PRICE:  I'll rephrase.
 7   Q.   Here you are in October 2000 talking about doing
 8   extensions to the Bratz line.  What you're talking about is
 9   doing extensions to a Bratz concept and idea that belonged to
10   Mattel.
11   A.   That's not correct.  The only thing that the jury has
12   found that belonged to Mattel are those drawings on a piece
13   of paper.
14   Q.   But you said that as of this date, all you had to
15   inspire you, all you had to create a line was the
16   confidential information that Carter Bryant gave you which
17   belonged to Mattel; correct?
18        MR. NOLAN:  Objection, your Honor.  Misstates his
19   testimony.  Also argumentative.
20        THE COURT:  Overruled.  You may answer.
21        THE WITNESS:  Can you repeat the question again,
22   please?
23   Q.   BY MR. PRICE:  As of October 2000, what was inspiring
24   this, and the only thing inspiring this, was the confidential
25   information, the design drawings you had seen which belonged
```

```
 1   to Mattel?
 2               MR. NOLAN:  Objection, your Honor.  Foundation as
 3   to the -- and ambiguous.  October.  There are 31 days in
 4   October.
 5               THE COURT:  Fair enough.  Rephrase, Counsel.
 6   Q.   BY MR. PRICE:  October 16, 2000.
 7   A.   That's correct.
 8   Q.   As of that date, the only thing that was inspiring this
 9   business, this idea of a line extension, was that you had
10   seen confidential information that belonged to Mattel;
11   correct?
12   A.   I don't know as of October 16 if we had other things
13   besides just those drawings.  I don't recall.  I got to look
14   at papers to say that.
15   Q.   You understand that the jury found that Mr. Bryant came
16   up with the name Bratz while he was at Mattel.  You
17   understand that?
18   A.   I'm not sure if we found out about that or not.  I know
19   we bought the name of Bratz from someone named --
20               MR. PRICE:  Move to strike as nonresponsive.
21               THE COURT:  Sustained.  It's stricken.
22   Q.   BY MR. PRICE:  And in fact, a sculpt had been done by
23   mid-October 2000; correct?
24   A.   It's possible, yes.
25   Q.   And you understand that the jury found that Mr. Bryant
```

```
 1   created that sculpt while he was at Mattel, along with
 2   others?
 3           Mr. Bryant by himself or jointly with others
 4   created that sculpt --
 5   A.   Excuse me.  I understood that the jury found that Carter
 6   Bryant, along with other people, such as Margaret Leahy and
 7   other people he worked with at MGA, came up with that sculpt.
 8   That's what I understood that they found.
 9   Q.   Okay.  Well, why don't you look at exhibit --
10   A.   I think the verdict says jointly.
11   Q.   If you'd look at Exhibit 11277.  That's admitted.  This
12   is October 31st.  As of October 31st, you didn't have a doll;
13   correct?
14   A.   We did not.
15   Q.   As of October 31st, what you had, again, to base your
16   business plans and projections on, were the designs of Carter
17   Bryant, which belonged to Mattel; correct?
18   A.   I believe by October 31st, 2000, we had more than just
19   those drawings.  Again, I think we had done at least some
20   preliminary sculpts that the jury found was done by Carter
21   Bryant jointly with MGA.  And some other things.
22   Q.   Well, certainly the jury knows what the jury meant to
23   do.  So let me ask you --
24           MR. NOLAN:  Objection, your Honor.  Motion to
25   strike.
```

```
 1              THE COURT:   It's stricken.
 2    Q.   BY MR. PRICE:   I'll ask you this:  As of October 31st,
 3    before you had -- before you had a doll, you were projecting
 4    25 million in sales; correct?
 5    A.   I was.
 6    Q.   The entire year before, all of your revenues over all of
 7    your products for 2000 was about 70 million; right?
 8    A.   I don't remember exactly.  But I think maybe more than
 9    that.  But I don't recall exactly how much it was.
10    Q.   And that's the year in which overall you lost money;
11    correct?
12    A.   I'm sorry?
13    Q.   In 2000 overall you lost money.
14    A.   We ended up losing money at the end of 2000; that's
15    correct.
16    Q.   So you were projecting in October 2000 that Bratz would
17    be far and away for the next year the most successful product
18    you had ever launched; correct?
19    A.   That is not correct.  I have -- that's not correct.
20    Q.   You had never launched a product which had made
21    $25 million in revenue in one year.
22    A.   I don't know if we have or not.  But your statement
23    before is not correct.  If we look at other projections we
24    had done at that time, if there were other brands we thought
25    was going to do better than Bratz, that they never happened.
```

1   Q.   Well, let's talk about what happened next.  You had

2   meetings with a major customer set up in November of 2000;

3   right?

4   A.   I'm not sure if we had major meetings.  I think we do,

5   as I explained to you last time, what we call pretoy fair,

6   prepresentation.

7   Q.   That was to Kmart in November of 2000?

8   A.   Yes.

9   Q.   And one of the things you were trying to do is see

10  whether or not they were interested in dolls you were

11  planning to come out with; correct?

12  A.   Yes, that's one of the things.

13  Q.   All right.  And you sent someone to Kmart to see if they

14  would be interested in Bratz dolls; correct?

15  A.   Amongst other products that we had made.

16  Q.   And what you used to see whether or not Kmart would be

17  interested in buying Bratz dolls, what you used to do that

18  was Mattel's property.

19  A.   I don't recall exactly what we showed them.  I know that

20  we showed them boards because there was not a doll in

21  November 2000.  But I don't remember what was on those

22  boards.

23  Q.   Well, you recall the previous testimony.  I'm going to

24  show you Exhibits 1107 -- if we can show that -- 1108, 1109,

25  and 1110.

1        When you went to Kmart to try to get customers to
2  buy Bratz dolls, what they were shown, as has been previously
3  testified, were the boards of Carter Bryant's drawings, which
4  are Mattel's property; right?

5  A.   Again, I wasn't in that presentation.  I know that our
6  salespeople showed to Kmart drawings.  I cannot tell you one
7  way or another if they were Carter Bryant's drawings or other
8  drawings that were done afterward.  I cannot testify to that.

9  Q.   You do understand that MGA had no right to try to get
10  customer interest in Bratz dolls by showing customers
11  Mattel's property.  You know that.

12  A.   Know that as of when?

13  Q.   At the time it did it.  You know that MGA had no right
14  to solicit customer interest in Bratz dolls by going out and
15  showing customers Mattel's property.

16  A.   I think this jury came to that verdict.  I believed that
17  Carter Bryant had done those drawings in 1998, when he was
18  not working at Mattel, and that's what he had represented to
19  us.  So I did not in November 2000 believe that he was lying
20  to us basically.  And you settled with him.

21  Q.   So let's ask it this way.  Certainly you would agree
22  that it would be in appropriate for MGA to make any profits
23  by soliciting customer sales by using Mattel's confidential
24  property.  You would agree that would be inappropriate?

25  A.   Yes, if you know about it, yes.

1   Q.   And by the way, you've always known that what was shown

2   to Kmart was drawings or boards, not dolls; right?

3   A.   That's correct.

4   Q.   But when you made the presentation to Kmart, I assume

5   you're telling them this is what the dolls are going to look

6   like; right?

7   A.   As I said --

8        MR. NOLAN:  Objection, your Honor.  Lack of

9   foundation, ambiguous as to what he would say, and also best

10  evidence rule, what was presented to --

11       THE COURT:  Overruled.  It's a question.  You may

12  answer it.

13       THE WITNESS:  I was, as I testified before, I was

14  not in that presentation to Kmart.  Or any of those

15  customers.  So I don't know what our salespeople showed and

16  presented.  I know that we didn't have a doll.  And I know

17  that they showed them boards.  What was on those boards, they

18  were drawings.  Were they Carter Bryant's drawings?  Were

19  they other drawings?  I cannot tell you.  I don't know.

20  Q.   BY MR. PRICE:  I take it you would have expected that

21  your salespeople would have shown a customer drawings that

22  were to be representative of the dolls that the customer's

23  going to be asked to buy; right?

24  A.   I think they were shown to them drawings that were going

25  to become the inspiration for the dolls.

```
 1              Your Honor?  I apologize.  But that lady back
 2   there, she is making faces at me, and I don't think it's
 3   appropriate.
 4              THE COURT:  Very good.  Why don't we take a break
 5   at this time, and I'll take that up during the break,
 6   Mr. Larian.
 7              (WHEREUPON THE JURY WITHDRAWS.)
 8              THE COURT:  You may step down.
 9              THE WITNESS:  That has been going on through the
10   trial, and I have not --
11              THE COURT:  Speak with your attorney.  Thank you,
12   Mr. Larian.
13              Mr. Nolan, I'd like to see you and your client,
14   Mr. Larian, along with Mr. Quinn and Ms. Martinez in
15   chambers.
16              (Hearing in chambers.)
17              THE COURT:  We're on the record outside the
18   presence of the jury.  Why don't you make your appearances of
19   who is here.
20              MR. QUINN:  John Quinn, Lily Martinez, who has been
21   Mattel's trial representative.
22              MR. NOLAN:  Tom Nolan and Isaac Larian.
23              THE COURT:  I understand very much that this is
24   a -- an important case to all sides.  And I understand it's
25   also a very emotional case because it not only goes -- it's
```