1  not just about dollars and cents, but it's about people's

2  sweat and ideas, and to a large extent, one's personality

3  becomes very much involved in one's ideas.

4       The individuals on both sides, or individuals on

5  both sides have shown emotion during this trial.

6  Ms. Martinez on numerous occasions has made facial reactions

7  to testimony, to statements during opening, statements during

8  close.

9       Mr. Larian, you and members of your family have

10  made reactions to statements made.  We're human.  That's

11  normal.  We can't -- we're not a bunch of computers.  The

12  jury is human.  It's a human system.  Perfect justice is not

13  of this world.  We all know that.

14       At the same time we do need to insist upon a

15  certain level of professionalism.

16       Ms. Martinez, you are representing not just

17  yourself and your own interest in this case, but you are

18  representing Mattel.  You are the face of Mattel.

19       And, Mr. Larian, of course, is not only

20  representing MGA, he very much is MGA.  And certainly he is

21  himself as a defendant.

22       My own experience has taught me, both as a trial

23  attorney and as a prosecutor and as a judge, that the

24  punishment for making facial reactions and expressions is

25  built into the reactions themselves.  Jurors uniformly hate

1   it.    They really feel uncomfortable when witnesses or

2   observers or participants make facial reactions.  They react

3   very negatively to them.  And I suspect Mr. Nolan and

4   Mr. Quinn, who have more years of trial experience than I do,

5   can corroborate that based just on their own interaction with

6   jurors.

7         So I say this to both of you and both your teams,

8   for the sake of professionalism and decorum in the courtroom,

9   let's knock it off.  But also be mindful of the fact that you

10  are your own worst enemy when you do it.

11        So I'm going to leave it at that.  I'm not going to

12  say anything further.  And I'll just expect, you know, we're

13  in a different phase of the trial now.  Certain findings have

14  been made which make it all the more difficult not to be

15  emotional one way or another on both sides.  It's tough on

16  the lawyers, and they are even held by the Court to a higher

17  standard than you as ordinary citizens are.

18        So I know it's difficult.  But we've got less than

19  two weeks left, and we have to bear with this process and do

20  the best we can.

21        Is there anything further from either counsel?

22              MR. QUINN:  Not from me.

23              THE COURT:  Mr. Larian?

24              MR. LARIAN:  Your Honor, I have tried to keep a

25  very -- it's very emotional for me, keep a poker face.  My

```
 1   family members sitting in the back, of course, they are very
 2   concerned and worried.  I don't know if they were, and I'm
 3   going to talk to them about this.  In regards to Lily
 4   Martinez, during the first phase of this trial, I told
 5   Mr. Quinn about this personally.  And Mr. Quinn says, "I
 6   appreciate you telling me that.  I will talk to her and make
 7   sure it doesn't happen again."  And it happened again.
 8            And also now today, frankly, I saw members of
 9   Mr. Quinn's law firm in the back making faces.  And I don't
10   think that's appropriate.  That's the only thing I would say.
11   Lawyers who work for Mr. Quinn.
12            THE COURT:  It's not appropriate.  I don't disagree
13   with you.  It's not appropriate.  Like I say, the punishment
14   is somewhat built in.  A -- the jury doesn't think it's
15   appropriate either.  And I certainly don't think it's
16   appropriate.  But it's something which -- what I'm trying to
17   balance here is natural human reaction versus maintaining
18   professional decorum.  I didn't see the particular incident,
19   but I am not -- I've seen other reactions.  And I trust I
20   have nothing further -- I won't have to have another
21   conversation like this.
22            Ms. Martinez?
23            MS. MARTINEZ:  Your Honor, I would like to say that
24   I am appalled that he would insinuate that I'm looking at
25   him.  He's talking.  I am looking at him.  It is not my fault
```

```
1   he feels uncomfortable by me looking at him.  I don't think I
2   am giving him a specific look or looks.  I am looking at him.
3   And it is very emotional because you know, he gets to sit
4   there and talk, oh, all this about, you know, MGA this.
5           You know, I'm representing my company, and all the
6   hard work of my employees, too.  And because we are a huge
7   corporation, you don't get to see that because it's not
8   family owned.  But it is -- we are a family.  And so I -- if
9   he feels uncomfortable by me looking at him, then I don't
10  know what to tell you.  But I cannot look -- I'm listening to
11  him.  I'm being alert as to what he's saying.
12          THE COURT:  Ms. Martinez, you certainly are
13  entitled to look at him.  There's nothing wrong with that.  I
14  have, however, seen the faces that Mr. Larian is referring
15  to.  I have seen you react in a very facially expressive way.
16  You are a very expressive person, which I suppose is not
17  surprising.  You're an artist.  So that's not inconsistent
18  with your personality.
19          But a trial is a time that one must try to express
20  a more stoic expression, and I say this to you at this time
21  for your respective own good.  Because I can assure you a
22  jury finds that distasteful.  And if you cannot sit there and
23  be stoic in your expression, then perhaps you, Mr. Quinn,
24  Mr. Eckert, might want to consider having someone else.
25          Mr. Eckert has sat in ever since he testified, and
```

```
 1   maybe it's more the nature of a CEO than a designer or an
 2   artist, but he's been very stoic, and that is the demeanor
 3   that is called for in a courtroom.  And I must insist upon
 4   this.
 5                MS. MARTINEZ:  I agree.
 6                THE COURT:  So, Counsel, I will leave it to you to
 7   appropriately instruct your team and everyone associated with
 8   your team and your side.  You have the Court's understanding,
 9   but it's the Court's tolerance only up to a point.
10                MR. QUINN:  Understood, your Honor.
11                THE COURT:  Very good.
12                (In chambers conference concluded.)
13                (Recess taken.)
14                (WHEREUPON THE JURY ENTERS.)
15                MR. NOLAN:  Your Honor, could we have a quick
16   sidebar?
17                THE COURT:  Very well.
18                (SIDEBAR CONFERENCE HELD.)
19                THE COURT:  Yes, sir.
20                MR. NOLAN:  Your Honor, I wanted to take a moment
21   and explain an objection that I made which has been repeated
22   over and over, and that is a constant use of "the jury has
23   found confidential information belonging to Mattel."  In
24   truth, your Honor, we believe that, looking back at the
25   summary judgment rulings, that the jury was asked to find
```

1   with respect to the designs that they were inventions, not

2   confidential information, that it could be proprietary.

3              THE COURT: Proprietary.

4              MR. NOLAN: And that has a significant difference,

5   because it only has value if disclosed outside -- I mean,

6   it's a nuance in the contracts and everything else, but

7   that's the basis for the objection. And I didn't want to

8   make a speaking one, obviously, but this repeat of the

9   reference to confidential information is not in the jury

10  instructions, at least a quick look. That was not part of

11  the elements that they were making a determination. It was

12  more a timing of an invention during that period of time of

13  his employment.

14             MR. PRICE: In the jury instructions, on the breach

15  of fiduciary duty, they were referring the jury to breach of

16  the confidentiality provision and the contract.

17             THE COURT: And there has been a finding that he

18  breached the confidentiality, but you're referring to the

19  drawings as being confidential information. It is true and

20  accurate to say that they are proprietary information, but

21  Mr. Nolan has a point that they may not be confidential in

22  the sense that --

23             MR. PRICE: I'm saying the drawings and the idea

24  for Bratz, his discussion of the Bratz dolls, the name Bratz.

25             THE COURT: Those might be --

1          MS. AGUIAR:  Can I take a stab at actually sort of

2     setting this out?  There's two different provisions in the

3     contract; right?  There's one --

4          THE COURT:  I'm painfully aware of that.

5          MS. AGUIAR:  But I'm saying one is proprietary.

6     And proprietary, I believe Mr. Price is using proprietary and

7     confidential almost synonymously.  So I was just wanting to

8     go back to what your Honor said about well, maybe it's

9     proprietary, but it's not confidential.  I actually disagree.

10    And I think that your Honor has held in your summary judgment

11    decision --

12         THE COURT:  The value of the proprietary

13    information depends on it remaining confidential.

14         MS. AGUIAR:  Right.  So, for example, the value of

15    the proprietary information, as we see from the definition

16    here and as you pointed out in your second summary judgment

17    ruling, for example, a customer list or trade secrets, it

18    remains private and confidential.  Therefore, it has value.

19    These drawings are almost the opposite.  These drawings have

20    value by remaining not confidential.  The only value in these

21    drawings is if someone actually --

22         THE COURT:  That's not the case at all.  If a

23    company comes up with drawings that they have not

24    manufactured, no, that's not even the case at all.  That's

25    not even close to the case.

```
 1              A company's drawings -- think about any company
 2   that has drawings.  We've almost got to think
 3   counterfactually here.  Imagine -- not counterfactually.  We
 4   know these drawings were now done, according to the jury,
 5   while he was working for -- Carter Bryant was working for
 6   Mattel.  Mattel has every right to expect that until and
 7   unless it publishes in the public its drawings or its dolls,
 8   that anything that is drawn, all the designs, formula,
 9   patterns, et cetera, are kept confidential.
10              MS. AGUIAR:  But what you just read from, designs,
11   et cetera, that --
12              THE COURT:  I read from up here in proprietary
13   information.
14              MS. AGUIAR:  It says formula, pattern, compilation,
15   device, method, technique, or process.  And, your Honor, you
16   made a distinction in your summary judgment ruling, and you
17   found that the drawings were a design under the definition of
18   invention.  So in your first ruling --
19              THE COURT:  That does not exclude them from being
20   part of the proprietary information.  I can't think of
21   anything more proprietary to a company than design drawings.
22   I can't think of anything being more important to a toy
23   company than their design drawings.
24              If MGA had some design drawings and they had a
25   similar confidentiality agreement and someone from Mattel
```

 1   broke in, stole them, and started passing them around at toy

 2   fairs, would that not be a violation of proprietary and

 3   confidential information?  And the list here, proprietary

 4   information means any information that derives independent

 5   economic value from being not generally known to the public.

 6            That's clearly design drawings that have not yet

 7   been turned into a product and published certainly derive

 8   their value from being -- they are trade secrets.  They are

 9   designs of Mattel.

10            MR. NOLAN:  Your Honor, I would just add that

11   this --

12            THE COURT:  I understand you don't like the phrase,

13   but I think given the findings, it's -- and I, you know,

14   could debate whether it's effective to keep saying it over

15   and over again or counterproductive.

16            MR. NOLAN:  I've already talked about that with my

17   team.  Because the jury -- I agree.  I may have taught the

18   same trial advocacy class.  My only point --

19            THE COURT:  Not to in any way impugn upon

20   Mr. Price's outstanding litigation skills.

21            MR. NOLAN:  No, no.  My point is by using this

22   definition of confidentiality, I know the Court has ruled

23   that we're not allowed to show that Mattel would not have

24   given an economic value to these drawings.  They wouldn't

25   have designed them.  That's sort of the testimony that has

```
 1    been brought up.  And all of that.  And I just want to
 2    consider coming back and making a pitch to you.  You may not.
 3    And I'm not going to take up any more time on this.
 4              THE COURT:  We have a jury waiting for us.
 5              MR. NOLAN:  I know.  But that's --
 6              THE COURT:  The objection in terms of him using
 7    that phrase is overruled.  You reserve your right to make
 8    that pitch.
 9              MR. NOLAN:  Thank you.
10              (CONCLUSION OF SIDEBAR CONFERENCE.)
11              THE COURT:  All right, Counsel.  You may proceed.
12    Q.   BY MR. PRICE:  Mr. Larian, we were talking about the
13    pitch to Kmart in November of 2000.  And to figure out where
14    we were, you'll agree that although you weren't there, you
15    knew that what was used at Kmart was some sort of boards, not
16    actual dolls; correct?
17    A.   That's correct.
18    Q.   But the way you characterized that, the way you
19    characterized it before this case, was that Kmart was shown
20    the Bratz dolls.
21    A.   I don't recall doing that.  We showed -- all I know is
22    that there were no dolls in 2000, all of 2000 there were no
23    dolls.
24    Q.   But the distinction you're making, that is, showing them
25    the drawings that they were based upon versus the dolls,
```

```
 1    prior to this case, the way you characterized it was that by
 2    showing Kmart those drawings, those Carter Bryant drawings,
 3    you described that as being the Bratz dolls; right?
 4  A.    I don't recall doing that.  There were no dolls in 2000.
 5  Q.    If you look at Exhibit 12 --
 6  A.    Exhibit?
 7  Q.    Exhibit 12, which is in evidence.  And remember, this
 8    was an affidavit you signed under penalty of perjury in your
 9    lawsuit against Cityworld.
10          Do you recall that?
11  A.    Do I recall what?
12  Q.    Do you recall that you signed this affidavit under
13    penalty of perjury, the same oath you're taking today, in the
14    Cityworld case?
15  A.    Yes.
16  Q.    And if we turn to page 5, paragraph 13, what you said
17    then under penalty of perjury was the Bratz dolls were first
18    exhibited in the USA in November 2000.  They were further
19    exhibited in Hong Kong in January 2001.  And then they were
20    made available for retail in August 2001.
21          You recall that that's a statement you made under
22    oath?
23  A.    That's a statement.  And may I explain?
24  Q.    Well, actually, I'll ask you, is it true that --
25  A.    May I explain or not?
```

1  Q.    No, I get to ask questions. Your attorney can ask you
2  questions.

3        It's true that in the first phase, what you told
4  the jury was that what you were referring to when you said
5  the Bratz dolls, that what you were referring to were the
6  drawing boards which had been presented to Kmart.

7  A.    I said they were boards, yes.

8  Q.    And those same drawing boards were presented not just to
9  Kmart, but later in the month, around mid-November, they were
10 also presented to Target, those same Carter Bryant drawings
11 owned by Mattel.

12 A.    It's possible. I don't recall. But it's very possible.

13 Q.    Well --

14 A.    But I'm not sure if they were those drawings or other
15 drawings. Again, I was not in the presentation. Any of
16 these presentations. But I believe there were boards shown
17 with drawings.

18 Q.    If you look at Exhibit 12428. This will refresh your
19 memory that there was a presentation to Target?

20 A.    Would you repeat the --

21 Q.    It's 12428.

22 A.    Are these in numerical order?

23 Q.    They are. Sometimes four digits. Sometimes there's
24 three. Would you like to have someone up there helping
25 you --

```
 1  A.    I got it.

 2  Q.    That's an e-mail from you to Julie Hamilton, for the

 3  Target file which attached meeting notes from the Target line

 4  review November 14, 2000.

 5        Do you see that?

 6  A.    Yes, I do.

 7        MR. PRICE:   Move Exhibit 12428 in, your Honor.

 8        MR. NOLAN:   No objection.

 9        THE COURT:   It's admitted.

10        (Exhibit 12428 received.)

11  Q.    BY MR. PRICE:   And if we look at the first page, you

12  see -- actually, let's go to the second page, Ken.

13        It says meeting notes from Target line review

14  November 14, 2000.   Do you see that?

15  A.    I do.

16  Q.    And down toward the bottom, in fact, the bottom bullet

17  point says:   "Bratz, Laura finally came to life when these

18  were shown."

19        Do you see that?

20  A.    Yes.

21  Q.    Do you know who Laura refers to?

22  A.    I have no idea.   This is note I think from Julie Choma

23  (phonetic), who is our salesperson.   And she was sending to

24  me, and I'm commenting back.

25  Q.    So as best as you know, in November of 2000, MGA was
```

1  going to prospective buyers and using Mattel's property to

2  try to get interest in a Bratz doll line; correct?

3  A.  Again, I am not sure as of November 14th, 2000, if we

4  were showing Carter Bryant's drawings or other drawings that

5  were done.  All I know, there were no dolls until 2001.

6  Q.  Let me call your attention, then, to there was something

7  called the Hong Kong toy fair.  Do you recall that?

8  A.  Yes.

9  Q.  And approximately when was that?

10  A.  It is usually in the first week of January.  Every year.

11  Q.  So that would have been in January 2001.  It would have

12  been a Hong Kong toy fair?

13  A.  That's correct.

14  Q.  And MGA had a showroom at that toy fair; correct?

15  A.  Yes, we have a showroom in there.

16  Q.  And I'm going to -- it's true, sir, that at that

17  showroom, you displayed both prototype Bratz dolls as well as

18  the Mattel drawings?

19  A.  I know that we had four prototypes that we had made.

20  That's what I remember.  I don't remember drawings.  There

21  could be drawings, but I don't remember that one way or

22  another.

23          MR. PRICE:  May I approach, your Honor?

24  Q.  I'd like to show you what's been marked as 911.  I'm

25  going to ask if you could look at the attachments.  Pages 2

```
 1   through 4.

 2             Do you see those?

 3   A.    I do.

 4   Q.    And do you see those -- in fact, if you look at the

 5   first page, you'll see this is an e-mail from a Sarah Chui to

 6   Paula Treantafelles and Victoria O'Connor, among others.

 7             Do you see that?

 8   A.    I do.

 9   Q.    Now, you were actually at the Hong Kong toy fair;

10   correct?

11   A.    To the best of my recollection, I was.

12   Q.    And if you look at these pictures, these are pictures

13   that were taken at the Hong Kong toy fair; correct?

14   A.    I am not sure if they are or not.  It says Hong Kong

15   showroom set up.  So I assume.  But I don't recall that many

16   years back.  It's very possible.

17   Q.    And your recollection, this is kind of what your

18   showroom looked like there; right?

19   A.    Frankly, going back, what, seven, eight years, I don't

20   recall it.  I don't.  It's possible.  It's very possible.

21             MR. PRICE:   Your Honor, I move Exhibit 911 into

22   evidence.

23             MR. NOLAN:   No objection.

24             THE COURT:   It's admitted.

25             (Exhibit 911 received.)
```

1 | Q. BY MR. PRICE: If we can put -- this is the cover page

2 | which, subject, Hong Kong showroom setup.

3 | Do you see that?

4 | A. Yes.

5 | Q. And let's go to the second page. And we can blow this

6 | up. And you can see that what we have here is you have these

7 | dolls; correct?

8 | A. Four dolls; that's correct.

9 | Q. And we have some large poster boards here. You see

10 | Cloe, Sasha, Yasmin, Sasha, and what's been called the hero

11 | shot.

12 | Do you see that?

13 | A. Yes.

14 | Q. And then at the bottom here, you see -- do you see this

15 | photograph here?

16 | A. I do.

17 | Q. And that's one of the Carter Bryant Mattel drawings;

18 | correct?

19 | A. I cannot make --

20 | MR. NOLAN: Your Honor, objection to the

21 | mischaracterization. Joint and solely.

22 | THE COURT: Yes. Counsel, rephrase.

23 | MR. PRICE: Let's blow this up.

24 | Q. Do you see this drawing here?

25 | A. It's very difficult.

 1   Q.   Well, let's see if we can refresh your memory, if we can

 2   put up 11 -- you see this is Cloe?

 3   A.   I'm sorry.  I had eye surgery, but I can't see that.

 4            THE COURT:  It is hard to see from this angle,

 5   Counsel.

 6   Q.   BY MR. PRICE:  How about over here?  You see this

 7   drawing?

 8   A.   Yes.

 9   Q.   You recognize that as the Jade drawing, which the jury

10   has found Carter Bryant -- was done while Carter Bryant was

11   at Mattel?

12   A.   It's very possible.  Again, very fuzzy picture.  It's

13   very possible.

14   Q.   You can see it in front of you on the screen?

15   A.   I can.  But again, it's very difficult to see.  But I

16   don't doubt if it is or not.

17   Q.   Okay.  Well, let's step back and see.  Perhaps we can

18   see over here.  Do you recognize this as the Sasha drawing

19   here?

20   A.   Again, I'm not trying to be difficult.  But those

21   pictures are very difficult for me to recognize.  It's

22   possible.

23   Q.   As far as you know, however, the Hong Kong toy fair,

24   when you first showed prototypes of the Bratz dolls, you also

25   displayed the drawings which Carter Bryant had done while he

1   was at Mattel?

2   **A.**   It is very possible.

3   **Q.**   And by the way, these dolls that were displayed in the

4   Hong Kong toy fair, I think you previously testified that

5   they didn't look like the dolls that went to market.

6              Do you recall that?

7   **A.**   I'm sorry?

8   **Q.**   You previously testified these dolls you showed at the

9   Hong Kong toy fair did not look like the dolls that went to

10  market.

11  **A.**   I think we made a lot of changes, yes.  We made changes

12  all the way to May, but I cannot make anything out of those

13  pictures.

14  **Q.**   Well, let's look, if you could, at Exhibit 912-B, which

15  is already in evidence.  And the testimony, sir, is that

16  these were the Hong Kong toy fair dolls that were displayed.

17  Look at the first page.

18  **A.**   Yes.

19  **Q.**   This is the Cloe doll, which was displayed at the time

20  at the Hong Kong toy fair when you were also displaying the

21  drawing Carter Bryant did while at Mattel; correct?

22  **A.**   It's very possible.

23  **Q.**   And if you look a few pages in, say, page -- these do

24  not have page numbers.  So it's Bates 45955.

25  **A.**   Yes.

1    Q.   Actually, let's look at 912B-14.

2    A.   What Bates number, sir?

3    Q.   It's 912B-14.  And you see this was the Jade doll which

4    was done at the Hong Kong toy fair?

5    A.   Can you tell me the Bates page on this Exhibit.

6    Q.   912B-14.  Bates number 45956.  This is the Jade doll

7    that was presented at the Hong Kong toy fair; correct?

8    A.   I don't recall exactly.  But that's what the front page

9    of this exhibit says.

10   Q.   And if we look at 912B-18.

11   A.   912B- -- can you just refer me to the Bates number?

12   Q.   Sure.  This was the Sasha doll shown to the Hong Kong

13   toy fair.

14   A.   Yes, I believe so.  Not the doll, just the prototype.

15   Q.   The prototype.  And then the 912B-24.

16   A.   I'm sorry.  Give me Bates --

17   Q.   This is the last page.  Do you recognize this as Yasmin?

18   A.   Again, this looks like a prototype that most likely we

19   were showing Hong Kong.

20   Q.   If I could, sir, I'd like to show you and ask you some

21   questions.  There are some exhibits which are in evidence

22   which I would like you to look at and compare.  And these

23   are -- the first are Cloe.  It's Exhibit 2-3, Exhibit 1109-B,

24   Exhibit 912 --

25   A.   I'm not going to be able to remember all of --

 1  **Q.**   No, I'm going to put them up for you.  912-B, page 5,
 2  and then the first generation Cloe doll, 13903.  See the far
 3  left, this is what you were shown by Carter Bryant in
 4  September of 2000; correct?
 5  **A.**   Yes.
 6  **Q.**   And to the right, this is another drawing which Carter
 7  Bryant did while he was employed at Mattel; correct?
 8  **A.**   Yes.
 9  **Q.**   And on the right here, that is the prototype Cloe doll;
10  correct?
11  **A.**   Yes.
12  **Q.**   And the one on the far right is the first wave Cloe doll
13  that came out; right?
14  **A.**   I believe so, yes.
15  **Q.**   And now if we could do for Sasha, and we'll go through
16  the same type of exhibits.
17          You see the far left is the drawing which
18  Mr. Bryant showed you in September of 2000; right?
19  **A.**   Yes.
20  **Q.**   The one from the second from the defendant is another
21  drawing he did while still employed at Mattel; correct?
22  **A.**   Yes.
23  **Q.**   And the one third from the left is the prototype?
24  **A.**   Yes.
25  **Q.**   And the final one is the Sasha doll, the first wave that

1   came out in its box; correct?

2   A.    Looks like it, yes.

3   Q.    And if we can do Jade.

4            So here we have far left, the first drawing shown

5   to you by Mr. Bryant; correct?

6   A.    That's right.

7   Q.    Next one is another drawing Mr. Bryant did while

8   employed at Mattel; correct?

9   A.    Yes.

10  Q.    The one that others have testified was shown to Kmart in

11  November; correct?

12  A.    I don't know what they have testified to.

13  Q.    And the third from the left, that's the prototype;

14  correct?

15  A.    Looked like it, right.

16  Q.    And by the way, when you were at the Hong Kong toy fair

17  showing them Mr. Bryant's drawings and the dolls, the idea

18  was to show them, you know, what you're going to be coming

19  out with when the dolls hit the market; correct?

20  A.    We were showing them the prototypes, and those

21  prototypes changed.

22  Q.    Well, my question, sir, is you were trying to -- you

23  were showing them, saying this is substantially what we think

24  the doll is going to look like.

25  A.    We never used the word substantially or anything like

1  that. We were showing everything we had.

2  **Q.**  Okay. But was the idea to show them something that

3  would mislead them, that would look different than what you

4  were actually going to be trying to be selling them later?

5  Was that the idea?

6  **A.**  We were showing them four dolls and those drawings. And

7  those dolls were not actually manufactured dolls. They were

8  prototypes that were changed. And I'd be happy to show the

9  jury what was shown.

10  **Q.**  Well, you got to admit the prototype for Jade and the

11  final doll for Jade look substantially similar, don't you

12  think?

13  **A.**  No, there are many differences. May I approach and show

14  the differences, your Honor?

15  **Q.**  I'm not going ask the many differences. I'm asking

16  about the overall look. Do we agree that the Jade doll

17  prototype and the Jade doll that came out look substantially

18  similar?

19  **A.**  They have similarities, but there are many differences

20  that I'll be happy to approach and show the jury.

21  **Q.**  Well, when you showed the prototype, was your intent to

22  inform the buyers that you planned to come out with a doll

23  that looks kind of like the doll you're showing them? Was

24  that your intent?

25  **A.**  Our intent was to show them that we're going to come out

6150

```
 1   with a line of fashion dolls.
 2   Q.   You didn't show them a Barbie doll, did you?
 3   A.   No, we did not.
 4   Q.   Okay.  So the reason you showed them this doll is you
 5   wanted to give the impression that's sort of what the doll is
 6   going to look like when it comes out; right?
 7   A.   No.
 8   Q.   Okay.  Let's go now to Yasmin.
 9   A.   Would you like me to approach and show the jury the
10   differences?
11   Q.   Your attorney can ask you questions.  I'm on a clock.
12        THE COURT:  Wait for the questions.
13   Q.   BY MR. PRICE:  And Yasmin, the one to the far left was
14   the drawing that Mr. Bryant gave you in September 2000;
15   correct?
16   A.   Yes.
17   Q.   And second from the left is the drawing which was done
18   by Mr. Bryant while at Mattel and testimony is shown at
19   Hong Kong; correct?
20   A.   Yes.
21   Q.   And then this one third over is the Yasmin doll
22   prototype; correct?
23   A.   Looks like the picture you showed me, yes.
24   Q.   And then on the far right, it's what actually hit the
25   market; correct?
```

1   A.    That's correct.

2   Q.    Now, it's true that when -- step back.

3          It's true that MGA did not want others selling

4   dolls that look substantially similar to Bratz?

5   A.    We didn't want infringement; that's correct.

6   Q.    And you would actually pay attention to, for example,

7   what was in the market to see whether or not, hey, this looks

8   like the Bratz dolls and should not be produced; correct?

9   A.    Yes.

10  Q.    And I can call your attention to -- I think it's in the

11  smaller binder.  There's an Exhibit 13561.

12         And this is one of those documents, your Honor,

13  which was in evidence, but the only part that will actually

14  go to the jury is what we bring up in front of the witness.

15         And I'd like you to look at 13561, pages 37, 38,

16  and 39.

17  A.    Can you repeat the pages, please?

18  Q.    37, 38, and 39.

19  A.    Not the Bates number, but the page number.

20  Q.    It will say at the bottom 13561, page 37, 38, and 39.

21         And if I may display those pages, your Honor.  And

22  this is an e-mail --

23  A.    Excuse me.  I'm not there.  I have to find that.  I'm

24  sorry.  13561?

25  Q.    13561, page 37, 38, and 39.  And you see this starts

```
 1   with an e-mail from Mr. Black to you talking about a company

 2   which produce Mini Trendy Teenz dolls, which I believe are

 3   similar to Bratz.

 4            Do you recall getting that e-mail?

 5   A.   I don't recall it, but my name is on it.  So I must have

 6   received it.

 7   Q.   And he sent you copies of the boxes of those dolls.

 8            Do you recall that?

 9   A.   I do not.  I do not recall it one way or another.

10   Q.   Who is Ray Black?

11   A.   He's an attorney for MGA in the U.K.

12   Q.   And your response to this, if we can go to the next

13   page, page 37.  I'm sorry.  The response down here to

14   Mr. Black is, "Damn these people."

15            Do you see that?

16   A.   Yes, I do.

17   Q.   And actually, if we can go to 38, your signature line on

18   your e-mails by this time is Isaac Larian, CEO, MGA

19   Entertainment.  And then it has "Meet the girls with the

20   passion for fashion, www.BratzPack dot com.

21            Do you see that?

22   A.   As of 2003, yes.

23   Q.   So that's something that automatically went on your

24   e-mails from MGA when that went out?

25   A.   I believe so, yes.
```

```
 1   Q.   Bratz was a pretty important part of the company?

 2   A.   Yes.  So was MGA dot com.

 3   Q.   Let's go back to page 37, then.  And blowing this up,

 4   you see the subject is Toy Depot Limited.  That was a

 5   distributor for Double Grand; correct?

 6   A.   I don't know.

 7   Q.   You weren't here this morning when there was testimony

 8   about Toy Depot being a distributor for Double Grand?

 9   A.   I was not.  I was attending some other business.

10   Q.   Okay.  And if we go further up here, you tell Mr. Black,

11   this e-mail here, where it says original message.  "Ray, we

12   need to hurt them so the word gets out.  Don't settle for

13   just stopping and paying 10,000 pounds."

14             That's what you told Mr. Black in March 2003 in

15   connection with these tweens, mini-tweens dolls that were in

16   the market?

17   A.   It looks like what I said, yes.

18   Q.   I'm sorry?

19   A.   It looks like what I said, yes.

20   Q.   And you said that because you thought there was

21   something on the market which looked similar to your Bratz.

22   A.   I don't remember the state of mind, but yes, very

23   possible.

24   Q.   And this is already in evidence.  And this is

25   Exhibit 13696.
```

1  A.    In the same book?

2  Q.    I'm sure it's in the book.  It's a photograph I want to

3  show you which is in evidence.  It came in evidence today.

4  So it may not be.  13696, I believe.

5            Now, this was the doll that was getting you so

6  upset because it was in the market and looked similar to your

7  Bratz dolls; correct?

8  A.    I don't recall it, but if you say that's the doll, then

9  I accept your representation.  I don't recall the doll.

10  Q.    Well, your view is that that looked similar to your

11  Bratz doll.

12  A.    I don't recall this.  This is Ray Black coming to us and

13  saying that that doll is similar to Bratz dolls.

14  Q.    Well, he sent you photographs; correct?

15  A.    I don't recall if he did or not.

16  Q.    Your response was damn these people.  And we need to

17  hurt them; correct?

18  A.    I did, yes.  That's the response.

19  Q.    And the reason you needed to hurt them is because they

20  had put on the market this Mini Trendy Teenz doll which you

21  thought looked substantially like your Bratz dolls?

22  A.    Again, I did not -- I don't see any correspondence in

23  here where I said they look substantially similar to Bratz

24  dolls.  I am responding to Ray Black who looks like -- who

25  found these dolls in the U.K. and came to us.

```
 1   Q.    Now, before you did your e-mail here, where you said you
 2   wanted to hurt these people, I take it you are not aware of
 3   anyone doing any scientific analysis to say, for example,
 4   whether or not the body sculpt on this Mini Trendy Teenz doll
 5   was the same as on your Bratz dolls?
 6   A.    I'm not aware of any scientific -- what did you call it?
 7   Scientific test, no.
 8   Q.    In fact, by the way, have you -- do you sell Bratz dolls
 9   that are without clothing?
10   A.    No, we don't.  Not that I'm aware of, anyway.
11   Q.    But the face is always visible; right?
12   A.    I'm sorry?
13   Q.    The face is always visible.  Even if the body is
14   clothed.
15   A.    Yes.
16   Q.    Okay.  And at the time, certainly it's fair to say that
17   you wouldn't have said damn these people, we need to hurt
18   them, if you thought their dolls weren't similar, you
19   wouldn't be saying that; right?
20   A.    Again, I was just relating back to what Ray Black has
21   found in the market and came back to us.  And I think -- I
22   didn't read the whole e-mail.  I don't want to waste time.
23   But I think he was representing that they were a knock-off or
24   something.  I got to go back to that exhibit to read it
25   exactly.  And I was accepting his representation as my
```

1  lawyer.

2  Q.  I'm going to show you what's in evidence as 13695.  This

3  is the actual doll which was so similar to Bratz, that you

4  wanted to hurt the company that was selling it; correct?

5  A.  Again, I don't recall ever seeing the doll.  So I don't

6  know.

7  Q.  If we could put up 13696 again.  You'll agree with me

8  that that doll has some similarities with Bratz?

9  A.  There are some similarities, yes.

10  Q.  I mean, for example, the head is oversized in proportion

11  to the rest of the body; correct?

12  A.  It's a big head, yes.

13  Q.  And the eyes are prominent; correct?

14  A.  I can see eyes, yes.

15  Q.  And you see that they seem to be prominent just as the

16  Bratz dolls are; correct?

17  A.  I'm not sure if these are prominent.  They are ugly.

18  But they are eyes.

19  Q.  They are bigger than on a human being.  The size in

20  proportion to the rest of the face, just as with the Bratz

21  dolls.

22  A.  Can you give me any human being, maybe, who like --

23  Angelina Jolie?

24  Q.  Let's go to Angelina Jolie.  Although I haven't gotten

25  to the lips yet.  I'm talking about the eyes.

```
 1   A.    I haven't looked at the eyes.

 2   Q.    If we could look at the face there.  Remember in your

 3   business plan, you talked about how the Bratz dolls had

 4   prominent eyes compared to anything else in the market.

 5         Do you recall that in your business plan?

 6   A.    Yes, I do.

 7   Q.    And these eyes are about the same size proportion as on

 8   the Bratz dolls; correct?

 9   A.    I don't think they are the same size as the Bratz dolls'

10   eyes, no.

11   Q.    Okay.  Well, what about this doll is similar to the

12   Bratz dolls, then?

13   A.    Well, first thing, you know, looking at this, the

14   packaging, I don't have a Bratz doll sample here.  So the

15   packaging, the overall look, the packaging is trapezoid also.

16   And there are similarities.  Are they exactly the same and

17   they are not.

18   Q.    I'm not asking you that.  I'm asking you what are the

19   similarities between this doll and the Bratz doll?

20   A.    Again, the oversized head -- can I take this out of the

21   box?

22   Q.    Feel free.

23   A.    I think the shoes are a little bit like platform and

24   big.

25   Q.    Yes.
```

 1  **A.**   And those are really the biggest similarities I see.

 2  **Q.**   And you thought that was among the unique

 3  characteristics that kind of defined the Bratz doll, was an

 4  oversized head and the oversize feet and chunky shoes;

 5  correct?

 6  **A.**   Well, no feet.  I said oversize -- did I say feet?  I

 7  apologize.  Oversize shoes.  But they are some of the

 8  characteristics of the Bratz dolls.  There are.  Those are

 9  some of the characteristics of the Bratz dolls.

10  **Q.**   Now, you remember another e-mail you sent was to a

11  company called Bandai concerning this Glamma Jammaz dolls.

12         Do you recall that?

13  **A.**   I don't.

14  **Q.**   If you'd look at 13729.

15  **A.**   Can you give me one minute to look at this.  I have

16  never seen it.

17  **Q.**   Actually, I don't want you to multi task, but if we can

18  put up 13696 again.  The Funky Tweens doll.  And also put up,

19  I believe this is already in evidence.  Let me show you

20  what's in evidence, Exhibit 14780.  And it's correct that

21  this is another Bratz character, Nevra?

22  **A.**   Yes, it is.

23  **Q.**   And I guess my question is it's fair to say that Nevra

24  looks more like the four original Bratz dolls than, say, the

25  doll you sued on in Hong Kong, this Mini Trendy Teenz?

```
 1   A.   I'm sorry.  Can you repeat that again?

 2   Q.   Sure.  It's accurate to say that Nevra, your other Bratz

 3   character that you created, looks more like the first four

 4   Bratz dolls than the Mini Trendy Teenz doll?

 5             MR. NOLAN:  Objection, your Honor.  403.  Also

 6   calls for legal conclusion with respect to Hong Kong.

 7             THE COURT:  Overruled.

 8             THE WITNESS:  I'm sorry.  Can you repeat the

 9   question?

10             THE COURT:  You're not asking under Hong Kong

11   standards.

12             MR. PRICE:  No.

13   Q.   You'll agree that Nevra, that new Bratz character, looks

14   more like the original four Bratz dolls than the Mini Trendy

15   Teenz doll?

16   A.   But Nevra looks different than the first original four

17   Bratz dolls, but it does have more similarity to the first

18   four Bratz dolls than what we're seeing there on the screen.

19   Q.   And maybe you could just turn that around.  I don't know

20   how well the jury can see that.

21             It's true that this other Bratz character, Nevra,

22   for example, has the same oversized head as the original four

23   Bratz dolls; correct?

24   A.   It does.

25   Q.   It has -- in fact, it's the exact same sculpt, facial
```

1    sculpt?

2    A.    I'm not sure if it's a -- if it's the same sculpt or

3    not.  But the face paint is for sure different.

4    Q.    My question is the sculpt is the same; right?

5    A.    I believe so, yes.

6    Q.    And certainly the face painting on the Nevra doll looks

7    more like the original four Bratz dolls than, say, the Mini

8    Trendy Teenz.

9              And perhaps, your Honor, if we could put up

10   Exhibit 13934.  If I may approach.

11             THE COURT:  You may.

12   Q.    BY MR. PRICE:  Do you recognize 13934 as a picture of

13   Nevra?

14   A.    Yes, looks like it, yes.

15             MR. PRICE:  Your Honor, move Exhibit 13934 into

16   evidence.

17             MR. NOLAN:  No objection.

18             THE COURT:  It's admitted.  You may publish.

19             (Exhibit 13934 received.)

20   Q.    BY MR. PRICE:  And if we could put that side by side

21   with the Mini Trendy Teenz.  You'll agree that the facial

22   decorations on this other Bratz doll look more like the four

23   original Bratz dolls than the facial decorations on the Mini

24   Trendy Teenz?

25   A.    Again, as I testified, I think Nevra has more

1    similarities than the first original four Bratz dolls, but

2    definitely the faces are different.

3    Q.  And actually, if we could put up maybe both 13934 and

4    13901.  If we compared the later Bratz characters to the

5    earlier ones, again, they have the same shape head; correct?

6    A.  Yes.

7    Q.  They have the same prominent lips; correct?

8    A.  The lips are prominent, yes.

9    Q.  Same --

10   A.  But there are differences.

11   Q.  Same oversized eyes?

12   A.  Yes, but there are differences.

13   Q.  And I'm talking about similarities.

14          What you told folks in your business plan was that

15   what made Bratz unique was the oversized head, oversized

16   feet, large eyes, prominent lips; correct?  That's what made

17   them unlike anything else out there.

18   A.  What I said was that -- I didn't write that business

19   plan.  Somebody wrote it and presented it, but that's what

20   that business plan says.

21   Q.  Your name is on the business plan; right?

22   A.  It's on the front of the business plan.

23   Q.  You approved what was on that business plan, that those

24   were the unique characteristics of Bratz, what made them

25   unique from the rest of the dolls?

```
 1   A.    I don't recall reading that business plan one way or
 2   another.  It was so many years ago, I cannot recall that.
 3   Q.    Well, if you look at Exhibit 13729.  I think you found
 4   your way to that.  And do you see this is an e-mail which you
 5   wrote to Nishimoto Cynthia around February 6, 2006?
 6   A.    Looks like it, yes.
 7         MR. PRICE:  Move Exhibit 13729 into evidence, your
 8   Honor.
 9         MR. NOLAN:  No objection.
10         THE COURT:  It's admitted.  You may publish.
11              (Exhibit 13729 received.).
12   Q.    BY MR. PRICE:  And here you wrote to Nishimoto Cynthia
13   that Bandai's Glamma Jammaz dolls are a shameful copyright
14   infringement of Bratz dolls.
15              Do you see that?
16   A.    I do.
17   Q.    And you say you have copied the Bratz dolls to the point
18   of copyrighted birthmark we have on the Yasmin doll, its
19   eyes, its nose, and much more; correct?
20   A.    I do.
21   Q.    And what you're referring to in this is -- I can show
22   you what's in evidence.  13732, the Glamma Jammaz doll.
23   That's a photo, if we can put that up.  What you're talking
24   about is that Mya doll, the Glamma Jammaz doll done in 2003
25   by Bandai; correct?
```

 1    A.    I'll not sure if that's the doll or something else.    To

 2    the best of my recollection, they did changes to the doll,

 3    but again, I don't recall that far back.

 4    Q.    Do you recall what the doll looked like that made you so

 5    upset, where you said it was a shameful copyright

 6    infringement?

 7    A.    Over six years ago, no.

 8    Q.    Can you deny that this is the doll, this 2003 Bandai

 9    Glamma Jammaz doll with the birthmark near the left side?

10    Can you deny that that's the doll that was causing you to

11    write your e-mail?

12    A.    I cannot deny or accept it because I do not remember it.

13    Q.    Well, sitting here looking at it, do you believe that

14    what we have up here, this photograph, is a copy of the Bratz

15    dolls?

16    A.    No, it's not.

17    Q.    Does it look similar enough that you wouldn't want it

18    being sold on the market?

19    A.    That doll here is not a copy of Bratz doll.

20    Q.    So I guess now your testimony is there's no way this was

21    the doll that you were writing about and saying you shouldn't

22    sell this because it's a copy?

23            MR. NOLAN:    Objection, your Honor.    Argumentative.

24            THE COURT:    Why don't you rephrase your question,

25    Counsel.

1    Q.    BY MR. PRICE:   You just said that doesn't look like

2    Bratz.

3    A.    It does not.

4    Q.    Does that lead you to now -- does that lead you to

5    testify that this couldn't be the doll that you were

6    referring to in your e-mail to Nishimoto Cynthia in February

7    of 2003?

8              MR. NOLAN:   Objection to lack of foundation.

9              THE COURT:   Lack of foundation?   Overruled.

10             THE WITNESS:   My testimony is that I don't recall

11   what I was referring to.   And I don't know if it's this doll

12   or another doll.

13   Q.    BY MR. PRICE:   Would you have been referring to a

14   doll --

15   A.    Can I finish my answer?

16             THE COURT:   Wait a second.   It was a yes-or-no

17   question.   Go ahead and finish your answer.

18             THE WITNESS:   I don't remember if it was a doll or

19   something in the website or a picture.   I don't recall what I

20   was looking at.

21   Q.    BY MR. PRICE:   Would you have sent an e-mail saying that

22   Bandai had copied the Bratz doll to the point of a

23   copyrighted birthmark we have on Yasmin doll, its eyes, its

24   nose, and much more?   Would you have sent that e-mail out if

25   you didn't think that the doll looked like Yasmin?

1  **A.**  I don't recall.  I don't know.  If what I was looking at

2  was similar, again, I don't remember what it was to Bratz,

3  then I would have sent it.  And I'm not a lawyer.

4          So I see I put here copyrighted birthmark.  I'm not

5  sure we can copyright birthmarks.  But that's what the

6  lawyers --

7  **Q.**  At any rate, is it true that MGA attempted to prevent

8  other companies from putting on the market dolls which look

9  similar to its Bratz dolls?

10  **A.**  Yes, I believe we did.

11  **Q.**  And if we could zoom in on this.  In your mind, would it

12  have been copying or inappropriate for Bandai to put this

13  birthmark on the Glamma Jammaz doll?

14  **A.**  No, it would not.

15  **Q.**  Let me switch topics and ask you about branding and

16  about what happened after the Hong Kong toy fair.  You

17  remember I had asked you to look at your business plan for

18  March of 2001.

19  **A.**  Right.

20  **Q.**  If you'd look at that again, that's 13520.

21  **A.**  135 --

22  **Q.**  13520.  It's almost right in the middle of the binder.

23  And I'm going to turn to page 16.  There's a section,

24  unexploited opportunities.

25          Do you see that?

1    A.    I do.

2    Q.    And you talk about ABC -- and that was the official

3    name?   The company was doing business as MGA?

4    A.    ABC International, right.

5    Q.    -- can effectively leverage the Bratz brand by

6    introducing not only apparel, but accessories such as

7    handbags, book bags, footwear, eyewear, headwear, jewelry,

8    watches, and luggage to name a few.

9             Do you see that?

10   A.    Yes.

11   Q.    And this was your concept, again, before the Bratz dolls

12   were even being sold to the public; right?

13            MR. NOLAN:   Objection, your Honor.   Lack of

14   foundation.

15            THE COURT:   Lay a foundation for that, Counsel.

16   Q.    BY MR. PRICE:   If you look at the first page of this,

17   this is March of 2001?

18   A.    It is.

19   Q.    That's before any Bratz dolls were being sold to the

20   public; correct?

21   A.    That's correct.

22   Q.    And so getting back to page 16, then, this was part

23   of -- you remember back in September 2000, you said we're

24   going to develop a Bratz brand.

25            Do you recall that?

```
 1  A.    I do.

 2  Q.    And this was part of the idea, that you could leverage

 3  that brand by putting out accessories, eyewear, headwear,

 4  et cetera; correct?

 5  A.    That's correct.

 6  Q.    And you have here the cost to do that is minimal.  The

 7  cost to begin licensing is minimal.

 8        Do you see that?

 9  A.    That's what the business plan says, yes.

10  Q.    And that's because basically someone is paying you to

11  use the brand; right?

12  A.    Somebody is paying us to use the brand; that's correct.

13  Q.    So you're not paying for their manufacturing costs or

14  anything.  They are just -- you're getting paid for the right

15  to use the Bratz brand; right?

16  A.    That's correct.

17  Q.    And you point out that the only risk involved is that

18  the Bratz dolls do not sell through at retail; correct?

19  A.    Yes.

20  Q.    So in other words, you're not going to be able to

21  license this very effectively unless the public goes for the

22  core of the brand Bratz dolls?

23  A.    The four Bratz dolls were originally what came out to

24  the market, and we spent a lot of money --

25        MR. PRICE:  Move to strike as nonresponsive.
```

1              THE COURT:  Sustained.  Stricken.

2              Mark, would you please read back the last question?

3         (Record read.)

4              THE WITNESS:  I'm not sure I can understand the

5    question.  I can't answer it the way you phrased it.

6    Q.   BY MR. PRICE:  Let me rephrase it, then.

7              You're not going to get the licensing revenue

8    unless the public accepts the Bratz dolls.

9    A.   No.  If the Bratz brand becomes successful, then we can

10   get licensing.

11   Q.   And the core, the core of the Bratz brand, what you are

12   leveraging off of here, is the dolls; right?

13   A.   No, we are leveraging the Bratz brand.  The Bratz brand

14   was launched with four dolls in 2001.

15   Q.   If you look at Exhibit 13858.  Do you recognize that as

16   an e-mail you sent in March 2002 to a Gariochi Dario Berte?

17   And I apologize for the pronunciation.

18   A.   Looks like an e-mail I send.

19             MR. PRICE:  Move Exhibit 13858 into evidence.

20             MR. NOLAN:  No objection.

21             THE COURT:  It's admitted.

22             (Exhibit 13858 received.)

23   Q.   BY MR. PRICE:  And you see.  E-mail is concerning

24   licensing products for Bratz.  Do you see it talks about we

25   will not over license this brand and make products that do

1   not fit within the core consumer need and our marketing

2   timing strategy.

3            Do you see that?

4   **A.**   Yes.

5   **Q.**   And if you go to the third to the last paragraph, which

6   again is at the same time:   "Please understand that we will

7   not license every category.   This is for every territory, and

8   not only Italy.   And every product right away.   The core of

9   the brand are the dolls, and we do not want to harm the sales

10  of the dolls."

11           That's what you were telling Mr. Gariochi Dario in

12  March of 2002; correct?

13  **A.**   That's correct.

14  **Q.**   Let's go back to your 13520, your business plan, and we

15  were at page 16.   We were talking about the only risk

16  involved is that the Bratz dolls do not sell through at

17  retail.

18           Do you see that?

19  **A.**   I do.

20           MR. PRICE:   And if I may approach the well, your

21  Honor, to pick up an exhibit.

22  **Q.**   I have Exhibit 18801, which you may have seen yesterday,

23  a bicycle helmet.   The point is if the core of the brand, the

24  Bratz dolls, aren't selling through, you're not going to have

25  anyone interested in putting Bratz names or pictures on a

1   bicycle helmet; right?

2   **A.**   If the brand is not successful, yes, you cannot license

3   the Bratz brand.  That's correct.

4   **Q.**   My question is a little more specific.  If the Bratz

5   dolls aren't selling through at retail, no one is going to be

6   interested in licensing a bicycle helmet that has Bratz on

7   it; right?

8            MR. NOLAN:  Objection.  Lack of foundation as to

9   time.  At what point?

10           THE COURT:  As to time, overruled.

11           THE WITNESS:  Again, the Bratz brand started with

12  four dolls.  The four dolls had to sell with marketing and

13  advertising to establish the brand, and then once the brand

14  became successful, we were able to license it, and that's how

15  the licensing business works.

16  **Q.**   BY MR. PRICE:  And with respect to --- actually, let's do

17  this.  If you look at page 17.  And if we look at the last

18  paragraph of your business plan.  It says, "If the fashion

19  dolls to (Sic) not sell through at retail, this can cause a

20  backlash with licensees who have already spent moneys in

21  advances and product development."

22           Do you see that?

23  **A.**   I do.

24  **Q.**   You're tying this to the dolls; correct?

25  **A.**   That's what the business plan is saying, yes, that if

1    the dolls that were -- basis of launching the Bratz brand

2    were not successful, then the licenses will not be

3    successful.

4    Q.    And then if we look at page 18, it says:   "To be

5    effective, other financial -- other licensed products depend

6    on the presence of our Bratz."

7              Do you see that?

8    A.    Bratz trademark, Bratz brand, yes.

9    Q.    And this is before a Bratz doll had ever been shown to

10   the retail public; correct?

11   A.    No, they were shown -- to the public.   They were not

12   shown to the public yet.   They were not in the market yet.

13   Q.    You wouldn't have gone down this road to develop a Bratz

14   brand with dolls that have oversized heads and prominent eyes

15   and prominent lips if Carter Bryant hadn't shown you Mattel's

16   confidential proprietary property in September of 2000;

17   right?

18   A.    I'm sorry.   Can you repeat the question?

19   Q.    You never would have gone down this road.   You never

20   would have been here trying to license Bratz, trying to sell

21   these dolls if Carter Bryant hadn't shown up at MGA and shown

22   you Mattel's confidential information, these designs, Bratz

23   designs, and the concept of these dolls with oversized heads

24   and prominent eyes and prominent lips?

25   A.    Again, as I said, Carter Bryant showed us some drawings

```
 1   that became the inspiration and basis for Bratz.  The Bratz
 2   dolls came to the market in many, many changes, and we
 3   marketed it and built it.  And that's what became the brand.
 4   So I don't know how else to answer your question.
 5   Q.  Without that inspiration, you never would have done what
 6   you did, which was create the Bratz dolls, license the Bratz
 7   name, create the Bratz brand; correct?
 8   A.  You ask so many questions all at the same time.  We
 9   could have -- theoretically we could have had the name Bratz
10   because it was in existence since 1984 and put it on another
11   product.  And it belonged to somebody else, didn't belong to
12   Mattel or Carter Bryant or MGA.
13   Q.  It's certainly correct to say that after a two-year
14   search leading up to September of 2000, you had not, even
15   with all your efforts, found a fashion doll like Bratz.
16   A.  Which was Carter Bryant's drawings as an inspiration to
17   launch the Bratz dolls.
18   Q.  Your definition of inspiration is you wouldn't have
19   done anything if not for Carter Bryant showing you that
20   confidential information; right?
21   A.  That's not correct.  We would have found something else.
22   Q.  And getting back to this branding.  You recall, I think
23   there was a Bratz pet that was shown to Ms. Pembleton.
24          You recall that?
25   A.  I do.
```

```
 1   Q.   And when you are developing something like that, one of

 2   the things you're trying to do is connect that extension,

 3   line extension, to the Bratz dolls; right?

 4   A.   The execution of it, yes.  For all the brand to

 5   basically mesh together, yes.

 6   Q.   So, for example, if you look at Exhibit 13859, you

 7   recognize this as an e-mail you sent in 2002?

 8   A.   November of 2002, yes.

 9            MR. PRICE:  Move 13859 into evidence, your Honor.

10            MR. NOLAN:  No objection.

11            THE COURT:  It's admitted.

12            (Exhibit 13859 received.)

13   Q.   BY MR. PRICE:  And you say -- you see this is talking

14   about Bratz pets, and you say:  "We want the pets to look

15   like Bratz, big face, big eyes, fantasy, and not like the

16   plush in slumber party"; correct?

17   A.   Yes.

18   Q.   And this is an example of tying kind of an unrelated

19   product back to the core of the brand, which are the Bratz

20   dolls.

21   A.   Again, it has to all -- it's mixed together.  It's like

22   Nike.  When you buy the shoes, the shirt has -- they all -- a

23   shirt doesn't look like a shoe, but as a brand, they all mesh

24   together.

25   Q.   And if you look at 13871, do you recognize this as an
```

1  e-mail string between you and Karen Bonde?

2  A.  Yes, looks like it, yes.

3       MR. PRICE:  Move 13871 into evidence, your Honor.

4       MR. NOLAN:  No objection.

5       THE COURT:  It's admitted.

6       (Exhibit 13871 received.)

7  Q.  BY MR. PRICE:  And you see e-mails to you concerning the

8  Bratz pets:  "I think we've done a good job of that.  Now we

9  have to make the most of the Bratz connection.  At one point

10 we talked about creating a cross-sell piece to be included in

11 the Tokyo Bratz dolls.  Did that happen?  Can we do something

12 on the website that explains where these little pets came

13 from and their connection to the Bratz girls?"

14      Do you see that?

15 A.  I do.

16 Q.  And your response is:  "Thanks for being proactive on

17 this.  Please follow through."

18      Do you recall that?

19 A.  Yes.

20 Q.  And then the ideas for commercials included having the

21 Bratz dolls, for example, with one of the pets.

22      Do you recall that?

23 A.  I'm sorry?

24 Q.  Ideas for commercials for the Bratz pets was to --

25 A.  What are you referring to, sir?

```
 1   Q.    I'll refer you to a document if we need to.  I'm just
 2   asking if you recall this.  That one of the ideas, then, was
 3   to -- well, you understood kids kind of wanted the owners of
 4   each pet associated with a pet?
 5   A.    I'm having a tough time understanding you.
 6   Q.    Your marketing people told you that the way to sell this
 7   commercial is to have a Bratz character in a commercial with
 8   a Bratz pet.
 9   A.    How do you sell a commercial?  I'm not sure if I
10   understand your question.  I'm sorry.
11   Q.    Let me see if I can just go -- look at Exhibit 13872.
12   It's dated February 8, 2006, an e-mail that you are copied on
13   from Shoreh Larian?  I know I mispronounced that.  How is
14   that pronounced, sir?
15   A.    It's okay.  Go ahead.
16   Q.    Okay.  Do you have 13872 in front of you?
17   A.    I do.
18   Q.    And is that an e-mail that you received?
19   A.    It has my name on it, yes.
20         MR. PRICE:  Move that into evidence, your Honor.
21         MR. NOLAN:  No objection.
22         THE COURT:  It's admitted.  You may publish.
23         (Exhibit 13872 received.)
24   Q.    BY MR. PRICE:  And the subject is hot button research
25   for ad development results for Bratz pets?
```

1  **A.** I see that.

2  **Q.** And if we go to the third page, there's a section:

3  "Commercial to include most kids want the owners of each pet

4  associated with the pet itself in the commercial, i.e., Sasha

5  could be displayed with Bunny Boo."

6  And was Bunny Boo the icon that was put on some of

7  Sasha's accessories?

8  **A.** I believe so, yes.

9  **Q.** And it says: "It will be good to have the owners

10  displayed with the pet so that people recognize them and buy

11  them together, so that people know who each pet belongs to,

12  so that if you have a specific doll, you know which pet to

13  buy for it."

14  Do you see that?

15  **A.** I do.

16  **Q.** The idea was to leverage the idea of the popularity of

17  the Bratz dolls so you can sell the Bratz dolls --

18  **A.** To leverage the Bratz brand in order to sell Bratz pets

19  and other products. It's all about branding, sir.

20  **Q.** And specifically you're talking about Bratz dolls;

21  correct?

22  **A.** Let me see that.

23  **Q.** Sasha is a doll; right?

24  **A.** Yes. But Sasha is also a TV character. Sasha is many

25  things. But Sasha is one of the dolls.

1   Q.   Now, again, Ms. Pembleton was talking about accessories

2   and such.  You remember she mentioned something about -- she

3   talked about doing Bratz twins.

4          Do you recall that?

5   A.   I'm sorry?

6   Q.   Do you recall she was talking about doing Bratz twins as

7   kind of an extension of the Bratz line?

8   A.   I don't remember exactly.  But she might have, yes.

9   Q.   And I'd like you to look, if you would, at

10  Exhibit 13918.

11  A.   Go ahead.

12  Q.   You found it?

13  A.   Yes.

14  Q.   There is an e-mail from you to Ms. Garcia?

15  A.   Yes.

16  Q.   This is an e-mail from you to Ms. Garcia?

17  A.   Yes, it is.

18  Q.   And Ms. Pembleton?

19  A.   Yes.

20          MR. PRICE:   Move 13918 into evidence.

21          MR. NOLAN:   No objection.

22          THE COURT:   Admitted.

23          (Exhibit 13918 received.)

24  Q.   BY MR. PRICE:  It says:  "Subject, Bratz twins," and an

25  attachment, "Olsen twins, TRST."

```
 1              Do you see that?
 2   A.    Yes, I do.
 3   Q.    And if we go all the way down, it says:  "Spreadsheet
 4   attached.  I'll bring pictures to you."
 5              Do you see that?
 6   A.    Yes.
 7   Q.    And do you know what TRST stands for?
 8   A.    Toy retail sales tracking.
 9   Q.    If we go to the attached spreadsheet, this is showing
10   you are tracking sales of a Mattel doll, the Olsen twins?
11   A.    TRST is toy retail sales tracking is a system that
12   tracks sales of not only Mattel products or MGA products.
13   All the toy products.
14   Q.    But when --
15   A.    And you can buy it, and we did buy.  So you can buy that
16   service.
17   Q.    But here what you're tracking is the Olsen twins, which
18   are manufactured by Mattel.
19   A.    They were licensed to Mattel.  Yes, Mattel was
20   manufacturing those; that's correct.
21   Q.    And if we go back to the first page of this, in addition
22   to getting these spreadsheets, what you wanted to get from
23   the Ninette in connection with this subject, Bratz twins, was
24   you wanted to get pictures of the Mattel product.
25   A.    They are available at retail.  You can get pictures of
```

```
 1  them.  You can go to Wal-Mart or Toys-R-Us and buy them and

 2  take pictures of them.

 3  Q.    And if you go to 13917, that's the same e-mail string,

 4  but Ms. Pembleton has sent you what you asked for, which are

 5  attachments which show pictures of the Olsen twins?

 6  A.    I'm sorry, I cannot find it.

 7  Q.    13917.  It's right before 13918.

 8  A.    I found it.  Go ahead.

 9  Q.    Is this the response from Ms. Pembleton to you, giving

10  you what you asked for?

11  A.    Looks like, yes, with a series of pictures attached

12  which she probably got from -- I don't know where she got it

13  from.

14          MR. PRICE:  Move Exhibit 13917 into evidence.

15          MR. NOLAN:  No objection.

16          THE COURT:  It's admitted.

17              (Exhibit 13917 received.)

18  Q.    BY MR. PRICE:  And this is the response.  "Here's a

19  start."  And then has attachments, and if you look at them,

20  those are pictures of the Olsen twins dolls; correct?

21  A.    As of 2004, yes.

22  Q.    And this --

23  A.    Looks like it.  Again, I don't remember the Olsen twins

24  dolls.  These are black and white pictures.  But it looks

25  like them, yes.
```

1   **Q.**   And this is something which you do with a brand.   You

2   look at competitors' ideas, and you come up with your own

3   ideas, and you compete; right?

4   **A.**   That's correct.   We come up with our own execution.

5   **Q.**   Another product you had was something called Bratz Big

6   Head.

7            Do you recall that?

8   **A.**   I don't think we have a product called Bratz Big Head.

9   **Q.**   Let me rephrase that.   Bratz Funky Fashion Makeover.

10           MR. NOLAN:   It's close but not --

11           MR. PRICE:   Yes.

12           THE WITNESS:   I hope it wasn't a southern

13  interpretation of a big head.   Go ahead.

14  **Q.**   BY MR. PRICE:   So Bratz Funky Fashion Makeover.   Let me

15  show you 17533, which is in evidence.   This is an example of

16  something else that MGA came out with to leverage the Bratz

17  brand; right?

18  **A.**   That's correct.

19  **Q.**   And in doing that --

20  **A.**   Hold on one second.   It says date of 2004, yes.

21  **Q.**   And doing that, one thing it did was sent to the

22  manufacturer enlarged Barbie heads; right?

23  **A.**   It's possible.   I don't know.

24  **Q.**   If you'd look at Exhibit 11179.

25  **A.**   Can you repeat that again?   119 --

1   Q.   11179.

2   A.   This is a series of e-mails.  You want me to read the

3   whole thing?

4   Q.   Well, if you'd turn 11179-0008 and -0010, you see there

5   are some photographs there?

6   A.   There is.

7   Q.   One being of a large Barbie head?

8   A.   Yes.

9   Q.   And you see this is an e-mail from Elly Shinohara to

10  Paula Treantafelles concerning Bratz Big Head?

11  A.   Yes.

12  Q.   And were you aware of this communication concerning the

13  development of this large head Bratz doll?

14  A.   I was not.  I'll not on the e-mail.

15  Q.   You never talked to Ms. Garcia about sending Barbie

16  large heads to the manufacturing company to assist in

17  developing the Bratz head?

18  A.   I might have.  I don't remember.  This is dated 2001.  I

19  don't recall that far back.

20            MR. PRICE:  I'd move in 11179 into evidence.

21            MR. NOLAN:  Your Honor, lack of foundation.

22            THE COURT:  Counsel?

23            MR. PRICE:  Best I can do with it.  It's an MGA

24  document produced by MGA.  They are calling Ms. Garcia.  We

25  could put it in through her, if necessary --

```
 1              MR. NOLAN:  Your Honor, I apologize.  We'll take a
 2    look at the document.  Right now --
 3              THE COURT:  It's past five o'clock.  Why don't we
 4    take it up in the evening, and we'll take it up first thing
 5    in the morning.
 6              Members of the jury, I'll see you at nine o'clock
 7    tomorrow morning.
 8              (WHEREUPON THE JURY WITHDRAWS.)
 9              THE COURT:  Please be seated.  The Court has a
10    conference call at 5:15 that I need to take up.  Is there
11    anything else that you need the Court to attend to this
12    evening that cannot wait until tomorrow morning at 8:00?
13    Mr. Proctor, are we all right?
14              MR. PROCTOR:  I think it can wait until tomorrow.
15              THE COURT:  There's another binder you were going
16    to get me for Brode, did you say?
17              MR. PROCTOR:  I believe it's in MGA's hands right
18    now.  I think we should have it, but it may not be here yet.
19              THE COURT:  Thank you.
20              MS. AGUIAR:  Very quickly, your Honor.  We reached
21    a stipulation with Mr. Quinn because during the exam of
22    Mr. Yeung, we meant to move in a couple of exhibits.  May I
23    read the numbers in?  13784 and 13785.
24              THE COURT:  Very well.  Those are admitted.
25              (Exhibits 13784 and 13785 received.)
```

```
 1              THE COURT:  You're still working on the other

 2    stipulation, though, concerning Ms. Gronich?

 3              MS. AGUIAR:  Yes, we'll read something in tomorrow.

 4              THE COURT:  Very good.

 5              MS. AGUIAR:  And two other things.  Just if we

 6    could get a time count, and I wanted to raise something

 7    regarding scheduling so that we could plan if your Honor had

 8    any indication of when you might want the parties in for the

 9    charging conference.  We wanted to make sure to start

10    thinking about that.

11              THE COURT:  I'm working on my Monday calendar on

12    that.  So I'll have information on that tomorrow.  It largely

13    depends on that.  Time count is 18:05 for MGA and 6:15 for

14    Mattel.

15              I assume the issue with respect to attorney

16    McFarland is resolved?

17              MR. QUINN:  Yes, it is, your Honor.

18              THE COURT:  We're past that?

19              MR. QUINN:  We are.

20              THE COURT:  Very well.  The Court is still waiting

21    for a proposed order on certain rulings I made pretrial in

22    this case from the parties.

23              MS. AGUIAR:  Oh, you know what?

24              THE COURT:  I see a lot of fingers going around.

25              MS. AGUIAR:  Pretrial, you mean pre 1-B?
```

```
 1              THE COURT:  The series of motions that I did
 2   telephonically.
 3              MS. AGUIAR:  We did give our comments to the Quinn
 4   firm about a week or so ago.  We're just waiting to hear
 5   back, I believe is the state of play.
 6              MR. ZELLER:  But I'll look into it, and we'll get
 7   it resolved.  We'll respond tonight.
 8              THE COURT:  Let's get those in tomorrow if we can.
 9              There are a few outstanding motions which I plan to
10   take up tomorrow morning at 8:00.  Do we have an opposition
11   at all?  Are there any additional briefs on any of the
12   motions that were submitted, the three motions submitted by
13   MGA and the ex parte?  I think I've ruled on most, except for
14   the motion for sanctions and the motion for clarification.
15              Is there anything further, any further briefing
16   that I should be expecting, or do I have everything that the
17   parties have submitted?
18              MR. ZELLER:  The second motion you mentioned was
19   the reconsideration motion?
20              THE COURT:  Reconsideration clarification.
21              MR. ZELLER:  One that MGA brought.
22              THE COURT:  Yes.
23              MR. ZELLER:  I know that there is the motion
24   concerning our expert, and I believe it's an oral motion.
25   I'm not aware of anything in writing.  But it's our expert,
```

1    Frank Keiser.

2            THE COURT:  It was referenced earlier today by

3    Mr. Quinn, I believe.

4            MR. ZELLER:  Right.  And that was something that

5    MGA was raising.  I believe it could probably be tabled for

6    the moment if only because we have decided we're not going to

7    call him in our case in chief.  We reserve to call him in

8    rebuttal, but at least the issue could be tabled at the

9    moment.

10           If the Court's question was have we filed an

11   opposition to the clarification/reconsideration motion, the

12   answer is that we have.  I know it was over at the court here

13   today, earlier today.

14           THE COURT:  If you'd provide a courtesy copy to the

15   courtroom deputy.

16           MR. ZELLER:  I believe we have.

17           THE COURT:  Maybe it was submitted outside?

18           MR. ZELLER:  I understand that it was provided to

19   Mr. Holmes earlier today.

20           THE COURT:  Very well.  So it should be sitting on

21   my desk, then.  I'll take up those two motions at least to

22   the extent that I'm going to take them up.  To a large

23   extent, as I already indicated, that clarification/

24   reconsideration motion is going to be largely decided in the

25   context of the jury instructions that Ms. Aguiar just

1   referred to.  But I will try to give some guidance for the

2   witnesses that you are calling.

3          As far as the motion for sanctions, I do want to

4   get that resolved tomorrow morning.  So we'll hear you on

5   that tomorrow morning at 8:00.  Because the Court has heard

6   testimony as well about the subject matter there.

7          MS. AGUIAR:  Okay, great.  We just, if we have time

8   to put in a short reply on the sanctions motion, we will try

9   to do that.  I didn't know when you were going to want to

10  rule on it.  So we have not had an opportunity, since I guess

11  we got the opposition yesterday morning.

12         THE COURT:  Okay.

13         MS. AGUIAR:  And so I --

14         THE COURT:  I haven't been having replies in these

15  motions during the trial.  I'll give you leave to make your

16  argument tomorrow morning.  I assume we're past all the

17  evidence on this point; is that correct?

18         MR. PRICE:  Yes, I think we're past the evidence on

19  that point.

20         THE COURT:  Yes, we are?

21         MR. PRICE:  Yes, we're past it.  And there is no

22  more evidence about the Hong Kong dolls.

23         THE COURT:  Very well.  I'll take that up tomorrow

24  morning and give both parties and opportunity to argue at

25  8:00.

```
 1              Anything else for Mattel?

 2              MR. QUINN:  No, your Honor.

 3              THE COURT:  Ms. Aguiar, Mr. Nolan, anything else

 4   from MGA?

 5              MS. AGUIAR:  Will your Honor be taking argument on

 6   the motion for clarification, or really at that point just

 7   telling us what your views are?

 8              THE COURT:  Right.

 9              MS. AGUIAR:  The latter?

10              THE COURT:  I'm going to -- I'll do that in the

11   morning.

12              MS. AGUIAR:  Right.  But I was just wondering

13   whether you were going to take argument on it or just say

14   look, this is what you plan to do.  Because Mr. Hansen, who

15   has been working with me on that, has a medical procedure in

16   the morning.  So I actually really do -- we obviously do want

17   to have resolution of it.  But I'm just trying to --

18              THE COURT:  I feel pretty comfortable at this point

19   explaining the Court's position without further argument.

20   But if you would rather me put it off until noon tomorrow, I

21   can.

22              MS. AGUIAR:  If you're comfortable with your

23   position, but certainly there are quite a few things, and I

24   just skimmed it at lunch today.  There are quite a few things

25   that Mattel says in its opposition which we really disagree
```

1    with.  But --

2         THE COURT:  We've had extensive argument on all of

3    these points up to this.  I think this is something that --

4    and ultimately, it's not going to be decided as much as I'm

5    going to give guidance on my previous order.  We will be

6    revisiting all of these issues in the context of the jury

7    instructions and the verdict form.

8         MS. AGUIAR:  That's what I thought.  So tomorrow

9    morning is fine.

10        THE COURT:  Very well.

11        MR. NOLAN:  Your Honor, real quick.  We may change

12   the procedure tomorrow in that I know that we have

13   historically taken our case and put it in through, let's say,

14   with Mr. Larian.  It may be that tomorrow, because of other

15   business commitments that he might have to attend to, that I

16   might just do the technical cross-exam to deal with the

17   issues that they raised but then reserve the right to call

18   him back in my case in chief, if that's okay.  And I just

19   wanted to alert the Court and Mattel for scheduling purposes.

20        THE COURT:  What time are Mr. Larian's business

21   commitments?

22        MR. NOLAN:  Later in the morning.  It won't

23   override the importance of what we're doing here.

24        THE COURT:  Very well.

25        MR. NOLAN:  There's other reasons why we may want

1   to do it in our case in chief rather than doing it at this

2   time.

3           THE COURT:  Okay.  We'll take that up in the

4   morning as well.

5           MR. PRICE:  When you said nothing further on the

6   doll, I assume you're talking about the doll we were talking

7   about in opening, the plush doll.

8           THE COURT:  Yes.

9           MR. PRICE:  Because there is still the issue about

10  photographs of other dolls and whether or not they are clear

11  enough.  You'll recall there's still that discussion going

12  on.

13          THE COURT:  I understand that.  But based on

14  Ms. Aguiar's statements this morning, that's been worked out.

15  We're making progress on that.

16          MR. PRICE:  I was trying to keep Mr. Zeller off the

17  podium.

18          MR. ZELLER:  That's substantially so.  There are

19  some issues.  I sent an e-mail.  Hopefully, we'll get that

20  issue resolved.

21          THE COURT:  Very good.  We'll revisit this in the

22  morning.  Okay.  If there's nothing further, I need to speak

23  very briefly with Mr. Nolan and Mr. Quinn off the record at

24  sidebar, and then we're done for the day, and then we'll see

25  the rest of you at 8:00 tomorrow morning.

1           Court is in recess.

2              (Proceedings concluded at 5:12 P.M.)

3

4

5                     C E R T I F I C A T E

6

7

8           I hereby certify that pursuant to Title 28,

9    Section 753 United States Code, the foregoing is a true and

10   correct transcript of the stenographically reported

11   proceedings in the above matter.

12             Certified on August 6, 2008.

13

14

15          MARK SCHWEITZER, CSR, RPR, CRR
                 Official Court Reporter
16               License No. 10514

17

18

19

20

21

22

23

24

25