1   UNITED STATES DISTRICT COURT

2   CENTRAL DISTRICT OF CALIFORNIA

3   EASTERN DIVISION

4   - - -

5   HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6   - - -

7   MATTEL, INC.,                    )

8                    PLAINTIFF,      )

9            VS.                     )   NO. CV 04-09049

10  MGA ENTERTAINMENT, INC., ET. AL., )

11                   DEFENDANTS.     )   TRIAL DAY 31
                                     )   MORNING SESSION
12  AND CONSOLIDATED ACTIONS,        )   PAGES 6191-6350
                                     )

13

14

15   REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16   RIVERSIDE, CALIFORNIA

17   THURSDAY, AUGUST 7, 2008

18   8:13 A.M.

19

20

21

22

23   THERESA A. LANZA, RPR, CSR
     FEDERAL OFFICIAL COURT REPORTER
24   3470 12TH STREET, RM. 134
     RIVERSIDE, CALIFORNIA  92501
25   951-274-0844
     WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2

 3   ON BEHALF OF MATTEL, INC.:

 4                        QUINN EMANUEL
                         BY:  JOHN QUINN
 5                            JON COREY
                              MICHAEL T. ZELLER
 6                            HARRY OLIVAR
                              TIMOTHY ALGER
 7                       865 S. FIGUEROA STREET,
                         10TH FLOOR
 8                       LOS ANGELES, CALIFORNIA  90017

 9

10   ON BEHALF OF MGA ENTERTAINMENT:

11                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                         BY:  THOMAS J. NOLAN
12                            JASON RUSSELL
                              RAOUL KENNEDY
13                            LAUREN AGUIAR
                              CARL ROTH
14                       300 SOUTH GRAND AVENUE
                         LOS ANGELES, CALIFORNIA  90071-3144
15                       213-687-5000

16

17

18

19

20

21

22

23

24

25
```

THURSDAY, AUGUST 7, 2008                TRIAL DAY 31, MORNING SESSION

```
 1                          I N D E X

 2

 3

 4    PLAINTIFF
      WITNESS              DIRECT      CROSS      REDIRECT      RECROSS
 5    ISAAC LARIAN (CONTINUED)

 6    BY MR. PRICE      6236                       6271
      BY MR. NOLAN                    6246                      6280
 7

 8

      PLAINTIFF
 9    WITNESS              DIRECT      CROSS      REDIRECT      RECROSS
      MICHAEL WAGNER
10
      BY MR. QUINN       6281
11

12

13

14          EXHIBITS              RECEIVED

15            655                   6236
              656                   6237
16            657                   6237
              658                   6238
17            659                   6238
            10188                   6239
18          10722                   6239
             4947                   6243
19          10195                   6243
            10219                   6286
20          13931                   6293
            13932                   6304
21          13908                   6312

22

23

24

25
```

THURSDAY, AUGUST 7, 2008                    TRIAL DAY 31, MORNING SESSION

1    RIVERSIDE, CALIFORNIA; THURSDAY, AUGUST 7, 2008; 8:13 A.M.

2                              -OOO-

3         THE COURT:   THERE'S A COUPLE OF MOTIONS I WANT TO

4    TAKE UP TO BEGIN WITH THAT THE COURT HAS WORKED ON OVERNIGHT.

5    THAT'S THE MOTION FOR CLARIFICATION OR RECONSIDERATION OF THE

6    COURT'S JULY 24, 2008 ORDER CONCERNING THE SCOPE OF THE

7    COPYRIGHT PROTECTION; THAT'S MGA'S MOTION, AS WELL AS MGA'S

8    MOTION FOR SANCTIONS.

9    BEGINNING WITH MGA'S MOTION FOR CLARIFICATION, I WANT TO

10   PROVIDE THE PARTIES WITH AS MUCH GUIDANCE AT THIS POINT AS I

11   CAN, UNDERSTANDING THAT WE MAY REVISIT A LOT OF THIS IN THE

12   CONTEXT OF THE JURY INSTRUCTIONS.  AND THE COURT IS ALSO

13   MINDFUL THAT THERE IS STILL ADDITIONAL EVIDENCE TO BE HEARD

14   WHICH THE COURT MIGHT HEAR BOTH DURING TRIAL AND AT A HEARING

15   OUTSIDE THE PRESENCE OF THE JURY.  WE'LL JUST SEE HOW THAT

16   PLAYS OUT.  BUT I DO THINK THAT GIVEN ALL THAT THE COURT HAS

17   HEARD AND CONSIDERED SO FAR, BOTH IN THE SUMMARY JUDGMENT STAGE

18   AND IN THE TRIAL, THE COURT IS ABLE TO FURTHER ELABORATE ON THE

19   ORDER THAT IT ISSUED ON JULY 24TH, AND AT LEAST CLARIFY WHAT

20   THE COURT THOUGHT IT HAD MADE CLEAR IN THE ORDER OF JULY 24TH.

21   LET ME SET FORTH -- I SUPPOSE THE EASIEST WAY FOR ME TO DO IS

22   SET FORTH MY LIST OF FINDINGS OR CLARIFICATIONS, AND THEN I'LL

23   CERTAINLY ENTERTAIN RESPONSES TO THAT.

24   FIRST, I THINK IT'S QUITE CLEAR FROM THE LAW, WHETHER IT'S

25   APPLE COMPUTER OR ANY OF THE OTHER CASES THAT HAVE BEEN

1  REFERENCED BY BOTH SIDES, THAT THE SCOPE OF COPYRIGHT

2  PROTECTION IS FOR THE COURT TO DECIDE AND NOT FOR THE JURY.  AT

3  VARIOUS TIMES, BOTH SIDES HAVE AGREED TO THIS.  ALTHOUGH MGA

4  SEEMS TO TAKE ISSUE WITH THIS IN THE MOST RECENT MOTION FOR

5  CLARIFICATION, THERE ARE NUMEROUS PREVIOUS OCCASIONS WHERE MGA

6  HAS AGREED WITH THAT PROPOSITION.

7  I CAN'T FIND ANY LAW WHICH SUGGESTS OTHERWISE.

8  IF IT'S OUT THERE, I EXPECT MGA WILL POINT IT OUT TO THE COURT.

9  SECOND, IN ACCORD WITH THAT PRINCIPLE, IT IS FOR THE COURT TO

10 DETERMINE THE APPROPRIATE DISSECTION OR FILTRATION OF THE

11 COPYRIGHTED DRAWINGS, AND THEREBY DETERMINE THE PROTECTABLE

12 ELEMENTS OF THE COPYRIGHTED MATERIALS.  AGAIN, THIS IS A

13 QUESTION OF LAW; THEREFORE, THERE IS GOING TO BE NO NEED TO

14 INSTRUCT THE JURY ON HOW TO DO THE FILTRATION DISSECTION; ONLY

15 ON WHAT THE PROTECTABLE ELEMENTS ARE AND WHAT THEY ARE TO DO

16 WITH THOSE IN APPLYING THE EXTRINSIC/INTRINSIC TEST OF THE

17 NINTH CIRCUIT.  BUT THE IDENTIFICATION OF THE PROTECTABLE

18 ELEMENTS IS FOR THE COURT.

19 NOW, THE JURY WILL BE INSTRUCTED ON THE EXTRINSIC AND INTRINSIC

20 TEST AND ASKED TO CONSIDER BOTH THE PROTECTABLE ELEMENTS

21 INDIVIDUALLY AS WELL AS THE WORK AS A WHOLE, THE EXTRINSIC AND

22 THE INTRINSIC TEST.  BUT AS I INDICATED, THE PROTECTABLE

23 ELEMENTS WILL BE IDENTIFIED BY THE COURT.  I'M REPEATING

24 MYSELF, AND THAT'S THE DANGER OF MAKING NOTES LATE AT NIGHT,

25 BECAUSE YOU DO THAT.

```
 1   I'M GOING TO SET FORTH -- AND THIS WILL BE -- I'LL BE ISSUING

 2   THIS IN AN ORDER IN FINAL FORM AT SOME POINT IN TIME.  I HAVE

 3   THIS WRITTEN OUT, TYPED OUT, WHICH I JUST DID RIGHT NOW; AND I

 4   THINK THIS WILL PROVIDE A GUIDELINE, ALTHOUGH, AGAIN, THIS IS

 5   NOT DEFINITIVE; THIS IS TENTATIVE.  AND ADDITIONAL EVIDENCE

 6   THAT MIGHT BE PRESENTED TO THE COURT MIGHT CAUSE THE COURT TO

 7   EXPAND, RETRACT, OR REVISE THIS LIST.  BUT THIS IS BASED ON

 8   EVERYTHING THAT'S BEFORE ME SO FAR IN TERMS OF WHAT ARE THE

 9   PROTECTABLE ELEMENTS OF THE COPYRIGHTED CARTER BRYANT DRAWINGS

10   AND WHAT ARE THE NONPROTECTABLE ELEMENTS OF THE COPYRIGHTED

11   CARTER BRYANT DRAWINGS.  AND WHAT I HAVE TRIED TO DO IS CONSULT

12   NOT ONLY WITH THE EVIDENCE THAT WE'VE HAD PRESENTED SO FAR, BUT

13   I'VE REVIEWED THE JURY INSTRUCTIONS THAT WERE SUBMITTED LAST

14   WEEK, AND I'VE TRIED TO MAKE THE BEST ASSESSMENT I CAN.

15   IN TERMS OF NONPROTECTABLE ELEMENTS OF THE COPYRIGHTED CARTER

16   BRYANT DRAWINGS, FIRST, THE RESEMBLANCE OR SIMILARITY TO HUMAN

17   FORM AND HUMAN PHYSIOLOGY, THE MERE RESEMBLANCE OF FORM AND

18   ANATOMY AND PHYSIOLOGY BETWEEN THE DOLLS AND THE HUMAN FORM,

19   JUST LIKE MOUNTAIN LIONS AND JELLYFISH AND EVERYTHING ELSE,

20   THAT'S CLEARLY NOT PROTECTABLE.  SECOND, THE PRESENCE OF

21   CERTAIN ANATOMICAL OR PHYSIOLOGICAL FEATURES; A HEAD, HAIR, TWO

22   EYES, EYEBROWS, LIPS, NOSE, CHIN, MOUTH, OR OTHER FEATURES THAT

23   TRACK HUMAN PHYSIOLOGY AND HUMAN ANATOMY ARE NOT PROTECTABLE.

24   THIRD, HUMAN CLOTHES, SHOES, ACCESSORIES ARE NOT PROTECTABLE AS

25   HUMAN {SIC} CLOTHES, SHOES, AND ACCESSORIES.
```

1   AGE, RACE, ETHNICITY, AN URBAN LOOK VERSUS A RURAL LOOK; THESE

2   ARE ALSO ELEMENTS THAT ARE NOT PROTECTABLE.  COMMON OR STANDARD

3   TREATMENTS OF THE SUBJECT MATTER -- AND I'M NOT EVEN GOING TO

4   ATTEMPT TO PRONOUNCE THE FRENCH -- MR. NOLAN, DID YOU TAKE

5   FRENCH BACK IN HIGH SCHOOL?

6          **MR. QUINN:**  *SCENES-A-FAIRE.*

7          **THE COURT:**  I'LL TYPE THAT OUT IN ITALICS AND I'LL

8   LEAVE IT AT THAT.  BUT I THINK EVERYONE UNDERSTANDS, AT LEAST I

9   HOPE THEY DO, WHAT I'M REFERRING TO.

10          SO THOSE ARE ALL NONPROTECTABLE ELEMENTS.  AND THERE

11   MAY BE MORE THAT MIGHT BE HELPFUL TO IDENTIFY GOING FORWARD.

12          WHAT IS PROTECTABLE?  WHAT ARE THE PROTECTABLE

13   ELEMENTS OF THE COPYRIGHTED CARTER BRYANT DRAWINGS?

14          FIRST, PARTICULARIZED SYNERGISTIC COMPILATIONS AND

15   EXPRESSIONS OF THE HUMAN FORM AND ANATOMY THAT EXPRESS A UNIQUE

16   STYLE AND/OR CONVEY A DISTINCT LOOK OR ATTITUDE ARE

17   PROTECTABLE.

18          SECOND, PARTICULARIZED EXPRESSIONS OF THE DOLL'S

19   HEAD, THE LIPS, EYES, EYEBROWS, EYE FEATURES, NOSE, CHIN,

20   HAIRSTYLE, AND BREASTS, INCLUDING THE ACCENTUATION OR

21   EXAGGERATION OF CERTAIN ANATOMICAL FEATURES RELATIVE TO OTHERS,

22   DOLL LIPS, EYES, EYEBROWS, AND EYE FEATURES, AS WELL AS THE

23   DEEMPHASIS OF CERTAIN ANATOMICAL FEATURES RELATIVE TO OTHERS,

24   THE DOLL NOSE, RELATIVELY THIN SMALL BODIES, ARE ALL

25   PROTECTABLE ELEMENTS OF THE CARTER BRYANT DRAWINGS.

1          THIRD, PARTICULARIZED NONFUNCTIONAL DOLL CLOTHES,

2    DOLL SHOES, AND DOLL ACCESSORIES THAT EXPRESS AGGRESSIVE,

3    CONTEMPORARY, YOUTHFUL STYLE ARE PROTECTABLE ELEMENTS.

4          THAT'S WHAT I HAVE SO FAR.

5          HAVING CONSIDERED THE VERY WIDE RANGE, ALMOST

6    LIMITLESS, OF POSSIBLE EXPRESSIONS FOR THESE PARTICULARIZED

7    EXPRESSIONS OF THE PROTECTABLE ELEMENTS, THE COURT FINDS, AS I

8    BELIEVE I ALREADY MADE CLEAR, BUT PERHAPS NOT CLEAR ENOUGH,

9    THAT THOSE ELEMENTS ARE TO BE AFFORDED BROAD PROTECTION.

10         THE COURT HAS ALREADY FOUND THAT THE VIRTUAL IDENTITY

11   STANDARD DOES NOT APPLY.  RATHER, THE ONLY OTHER STANDARD, OR

12   THE REGULAR STANDARD, TO BE APPLIED TO THESE PROTECTABLE

13   ELEMENT IS THE EXTRINSIC/INTRINSIC SUBSTANTIAL SIMILARITY TEST

14   OF THE NINTH CIRCUIT, AFFORDING BROAD PROTECTION TO THOSE

15   PARTICULARIZED PROTECTABLE ELEMENTS.

16         GOING THROUGH THE BRIEFS THEMSELVES, IN MGA'S BRIEF,

17   THE FIRST SUBSTANTIVE ARGUMENT IS MADE ON PAGE 2.  THEY TAKE

18   ISSUE WITH AN ARGUMENT MADE IN MATTEL'S PROPOSED JURY

19   INSTRUCTIONS, WITH WHICH I AGREE.  ON PAGE 2, LINES 13 THROUGH

20   18, MGA IS QUOTING AN OBJECTION MADE BY MATTEL IN WHICH MATTEL

21   STATES, "THE COURT HAS REJECTED MGA'S REPEATED ASSERTIONS THAT

22   BRYANT'S DESIGNS ARE SUBJECT TO ONLY THIN PROTECTION, AND

23   INSTEAD HELD, AS DEFENDANTS ACKNOWLEDGE, THAT THEY ARE SUBJECT

24   TO BROAD PROTECTION."

25         THE TWIST ON THAT IS, IT'S SUBJECT TO BROAD

1    PROTECTION ONLY AS TO THE PROTECTABLE ELEMENTS, AS I JUST SAID

2    FORTH.

3            MATTEL GOES ON TO WRITE THAT "HENCE, THERE'S NOTHING

4    TO FILTER OUT WHEN PERFORMING A SUBSTANTIAL SIMILARITY ANALYSIS

5    UNDER THE EXTRINSIC TEST."  I DISAGREE WITH THAT.  THE COURT

6    MUST CONDUCT THE FILTERING OUT OF THE NONPROTECTABLE ELEMENTS

7    AND IDENTIFY FOR THE JURY THE PROTECTABLE ELEMENTS THAT ARE TO

8    BE COMPARED.

9            THAT'S THE LIST THAT I'M COMING UP WITH HERE IN TERMS

10   OF PROTECTABLE ELEMENTS.

11           SO THERE IS A NEED FOR FILTERING, AS THE COURT HAS

12   PREVIOUSLY HELD, AND I WOULD TAKE ISSUE WITH THE STATEMENT THAT

13   THERE'S NO NEED FOR FILTERING.  BUT CERTAINLY, MATTEL IS

14   CORRECT THAT THE JURY IS NOT GOING TO BE CONDUCTING THIS

15   FILTERING ANALYSIS AND THE JURY IS NOT GOING TO BE HEARING

16   EVIDENCE OF THE FILTERING.  THAT'S SOMETHING WHICH IS FOR THE

17   COURT.

18           IF MGA OR MATTEL BELIEVES THAT THE COURT NEEDS TO

19   HEAR FURTHER TESTIMONY OR EVIDENCE TO PROPERLY CONDUCT THE

20   FILTERING, THE COURT AFFORDS LEAVE TO BOTH SIDES TO DO SO; BUT

21   AT THE END, IT IS GOING TO BE FOR THE COURT TO DO THAT

22   FILTRATION, AND THE COURT WILL BE INSTRUCTING, AS A MATTER OF

23   LAW, THE JURY AS TO WHAT PROTECTABLE ELEMENTS THEY ARE TO FOCUS

24   ON IN CONDUCTING THEIR EXTRINSIC ANALYSIS.

25           TURNING TO PAGE 3, TOWARDS THE BOTTOM, CERTAINLY -- I

1   CAN'T DISAGREE WITH MGA'S QUOTING OF THE COURT'S JULY 24TH

2   ORDER, BUT THE CONCLUSION THAT THEY REACH, I THINK, IS

3   MISTAKEN.

4          THEY WRITE, BEGINNING ON LINE 24, THAT "THUS,

5   CONTRARY TO THE ARGUMENTS MADE BY MATTEL, THE COURT'S ORDER

6   CLEARLY HELD THAT THE JURY WILL BE INSTRUCTED TO ANALYTICALLY

7   DISSECT THE BRYANT DRAWINGS AND FILTER OUT ELEMENTS NOT

8   PROTECTED BY COPYRIGHT LAW."

9          THAT'S NOT WHAT THE ORDER SAID.

10         ALL THE ORDER SAID IS THAT, APPLYING THE EXTRINSIC

11  TEST, THE COURT MUST FIRST EXAMINE THE SPECIFIC EXPRESSIVE

12  ELEMENTS OF THE WORKS AT ISSUE.  I DIDN'T INDICATE THAT THE

13  JURY MUST CONSIDER.

14         THAT'S ON LINES 10 AND 11 OF THE QUOTATION, OR THE

15  EXCERPT, THAT IS MADE BY MGA.  IT'S ONLY AFTER THE COURT HAS

16  CONDUCTED THE FILTRATION ANALYSIS THAT THE JURY WILL BE

17  INSTRUCTED AS TO WHAT THE PROTECTABLE ELEMENTS ARE, AS I

18  PREVIOUSLY INDICATED.

19         TURNING TO PAGE 4, MGA ASKS THE COURT TO CLARIFY, IN

20  LIGHT OF ITS LANGUAGE, THAT THE COURT CANNOT GO SO FAR AS TO

21  FIND THAT THE REGISTERED DRAWINGS ARE SUBJECT TO ONLY THIN

22  PROTECTION; THAT THE COURT DID NOT EXPRESSLY FIND THAT THEY ARE

23  ENTITLED TO BROAD PROTECTION.  BUT READING APPLE·COMPUTER,

24  READING THE OTHER CASES ASSOCIATED WITH THAT, THOSE ARE THE

25  ONLY TWO OPTIONS THAT THERE ARE.  YOU EITHER APPLY THIN

1    PROTECTION AND YOU APPLY THE VIRTUAL IDENTICAL ANALYSIS, OR YOU

2    AFFORD THE PROTECTABLE ELEMENTS BROAD PROTECTION AND YOU APPLY

3    THE INTRINSIC TEST ANALYSIS.

4         AND CLEARLY, WHAT WE'RE TALKING ABOUT HERE, WHEN

5    WE'RE TALKING ABOUT THESE PARTICULARIZED EXPRESSIONS OF THE

6    DOLL FACIAL FEATURES, FOR EXAMPLE -- AND THIS HAS REALLY BEEN

7    BORNE OUT TO THE COURT AS I'VE SEEN ALL OF THESE DOLLS -- IT

8    REALLY DOES MATTER.  AND I CAN SEE WHY CERTAIN DOLL LINES ARE

9    EXTRAORDINARILY SUCCESSFUL AND MANY, MANY OTHER DOLL LINES ARE

10   NOT.  BECAUSE GETTING THAT JUST PERFECT LOOK -- WE'VE HEARD

11   TESTIMONY OFFERED FROM WITNESSES FROM BOTH SIDES THAT EXPLAIN

12   JUST HOW IMPORTANT FACE PAINTING AND GETTING THAT RIGHT STROKE

13   IS.  ANNA RHEE, A FEW OTHERS, HAVE EXPLAINED IT IN CONVINCING

14   DETAIL; THAT IT'S REALLY A PARTICULARIZED EXPRESSION THAT CAN

15   CAPTURE THE IMAGINATION OF THAT EIGHT, NINE, TEN-YEAR-OLD

16   LITTLE GIRL OR BOY.  AND SOMETHING WHICH MAY LOOK TO US ADULTS

17   AS JUST ANOTHER DOLL DOESN'T QUITE DO IT.

18        AND THE MATTEL CASE QUOTED BY MGA, THE GOLDBERGER

19   DOLL MANUFACTURING CASE, I THINK REALLY CAPTURES THAT ELEMENT.

20   THERE'S THAT LINE -- I THINK IT'S QUOTED ON PAGE 7 OF MGA'S

21   BRIEF.  IT'S NOT IN THAT BRIEF.  IT'S IN A CASE ITSELF.

22        THERE'S A LINE THAT REALLY CAPTURES THIS IDEA.  HERE

23   IT IS.  IT'S FOOTNOTE NUMBER 5 IN MATTEL'S BRIEF, QUOTING FROM

24   THE SAME CASE, MATTEL V. GOLDBERGER.  IT'S ON PAGE 7,

25   FOOTNOTE 5.

1    "IN THE HIGHLY COMPETITIVE, BILLION-DOLLAR DOLL

2    INDUSTRY, GETTING THE DOLL'S FACE AND EXPRESSION EXACTLY RIGHT

3    IS CRUCIAL TO SUCCESS."

4        AND THAT FACT HAS BEEN CLEARLY ESTABLISHED FOR THIS

5    COURT, AND THAT'S WHAT CARTER BRYANT DID IN HIS DRAWINGS, AND

6    THAT'S WHAT MGA SUCCEEDED IN DOING IN THEIR DEVELOPMENT OF THE

7    BRATZ LINE.  THEY CLEARLY GOT THE LOOK JUST RIGHT.  AND THAT

8    ELEMENT IS PROTECTABLE.  THERE'S NO QUESTION THAT THAT IS --

9    AND, PERHAPS, THE WORDS I'M USING IN THESE TENTATIVE

10   PROTECTABLE ELEMENTS ARE NOT DOING JUSTICE TO IT, BUT THAT'S

11   THE STRUGGLE THAT I WANT ALL COUNSEL TO HELP THE COURT ENGAGE

12   IN, IS PRESENTING THAT PROTECTABLE ELEMENT TO THE JURY, BECAUSE

13   IT'S CLEARLY THERE; IT'S CLEARLY WHAT COPYRIGHT LAW IS DESIGNED

14   TO PROTECT.

15       ON PAGE 5 OF MGA'S BRIEF, AND THEN MOVING FORWARD

16   ONTO THE TOP OF PAGE 6, BOTTOM OF PAGE 5, TOP PAGE 6, THERE'S

17   THIS PRIOR ART ARGUMENT THAT THERE'S ELEMENTS OF THE BIG FEET,

18   THE OVERSIZED HEAD, ET CETERA, IN THE PARIS BLUES, COKE, AND

19   STEVE MADDEN ADS, AS WELL AS THE ADDITIONAL EVIDENCE, BEARING

20   ON LACK OF ORIGINALITY.  BUT THE COURT HAS ALREADY RULED ON

21   ORIGINALITY.  THIS HAS NOT EVEN BEEN SERIOUSLY CONTESTED UP

22   UNTIL THIS POINT BY ANY PARTY IN THIS CASE.  THE THRESHOLD FOR

23   ORIGINALITY, PARTICULARLY WHEN THE COURT IS AFFORDING BROAD

24   EXPRESSION, IS VERY LOW.  WHILE THE CASES THAT MGA CITES,

25   TALKING ABOUT ORIGINALITY REMAINING THE SINE QUA NON OF

1   COPYRIGHT, IS OBVIOUSLY SOMETHING OF CRITICAL IMPORTANCE.

2   THAT, TO ME, IS A NON ISSUE AT THIS POINT.   MGA, ISAAC LARIAN,

3   BELIEVES THESE WORKS ARE ORIGINAL.   THEY WENT AND HAD THEM

4   COPYRIGHTED.   THEY WENT AND DEFENDED THESE COPYRIGHTS.   MATTEL

5   RECOGNIZES THAT THEY ARE ORIGINAL.   THAT IS BEYOND DISPUTE AT

6   THIS POINT, AND THE COURT IS PREPARED TO FIND THAT AS A MATTER

7   OF LAW.

8            THE SERIES OF CASES THAT MGA CITES IN ADDITION TO

9   SATAVA JUST EXTENDS WHAT IS DONE IN THE CONTEXT OF JELLYFISH TO

10  DOLPHINS, MOUNTAIN LIONS, PLASTIC BREAKABLE TURKEYS, PLUMERIA

11  PLANT FLOWERS, AND OTHER PHYSIOLOGY OF ANIMALS; THOSE ARE

12  DISTINCT FOR THE SAME REASON THAT THE COURT DISTINGUISHED

13  SATAVA.   ALL OF THESE ARE ANIMAL PHYSIOLOGICAL AND

14  NATURED-BASED PHYSIOLOGICAL AND STRUCTURAL CASES, AND THEY JUST

15  DON'T APPLY TO THE CONTEXT OF DOLLS.

16           THE ONE THAT APPLIES TO DOLLS IS THE NEXT CASE THAT

17  MGA CITES, MATTEL V. GOLDBERGER; AND THAT, TO ME, IS DEAD-ON.

18  COPYRIGHT DOES NOT PROTECT IDEAS; IT PROTECTS ONLY THE AUTHOR'S

19  PARTICULARIZED EXPRESSION OF THE IDEA.

20           AND THAT IS EXACTLY WHAT THE COURT IS TRYING TO

21  IDENTIFY HERE, THROUGH ITS PARTICULARIZED ELEMENTS THAT ARE SET

22  FORTH.

23           I HOPE THAT ADDRESSES THE REQUEST FOR CLARIFICATION

24  FROM MGA ON THE ORDER.   I WILL ISSUE THIS IN WRITTEN FORM, AND

25  I ENCOURAGE BOTH COUNSEL TO ADVISE THE COURT IN TERMS OF

1    HELPING THE COURT BETTER IDENTIFY THESE PROTECTABLE ELEMENTS

2    AND DISTINGUISH THEM FROM THE NONPROTECTABLE ELEMENTS.  THAT'S

3    GOING TO BE AN ONGOING PROCESS THROUGH THE JURY INSTRUCTION

4    FORMULATION AND THE VERDICT FORM COMPILATION.

5             THAT'S WHERE I AM AT THIS POINT IN MY THINKING, SO I

6    INVITE COUNSEL FOR BOTH SIDES TO RESPOND NOW.  AND I WILL ALSO

7    INVITE YOU TO RESPOND LATER.  BUT THAT'S WHERE I AM ON THIS

8    MOTION.

9             **MR. NOLAN:**  THANK YOU, YOUR HONOR.

10            I'LL PROBABLY TAKE UP THE INVITATION TO RESPOND

11   BRIEFLY NOW, AND I'M SURE WE'LL REVISIT IT FROM TIME TO TIME.

12            I GUESS THE ONE QUESTION THAT I WANTED TO JUST FOCUS

13   ON FOR A MOMENT IS THE TREATMENT WITH RESPECT TO PRIOR ART.

14   MAYBE IT WASN'T AS CLEAR IN OUR BRIEF AS WE SHOULD HAVE MADE

15   IT, BUT WE CERTAINLY ARE NOT LOOKING AT PRIOR ART SIMPLY IN THE

16   CONTEXT OF ORIGINALITY OF THE WORK ITSELF, BUT RATHER TO TURN

17   IT OVER NOW AND TAKE A LOOK AT, AS GOLDBERGER TALKS ABOUT, THE

18   CENTRALIZED -- YOU CITE TO THE FOOTNOTE IN MATTEL'S BRIEF, BUT

19   ON PAGE 6, WE TALK ABOUT HOW -- NOT PAGE 6; IT'S PAGE 7 OF OUR

20   BRIEF -- THAT IT IS THE CENTRAL EXPRESSIVE FEATURES OF THE DOLL

21   FACE WHERE BARBIE'S FACE WAS ENTITLED TO COPYRIGHT PROTECTION.

22            NOW, IT'S IN THAT CONTEXT OF TRYING TO IDENTIFY

23   PROTECTABLE AND NOT PROTECTABLE AND WHAT PROTECTION SHOULD BE

24   AFFORDED.  WE DO THINK THAT PRIOR ART DOES PLAY A ROLE IN TERMS

25   OF -- FOR INSTANCE, IS THE EXPRESSIVE FEATURE THAT IS CLAIMED

1   IN THE COPYRIGHT REGISTRATION ENTITLED TO PROTECTION IN AN

2   INFRINGEMENT ACTION?  IN OTHER WORDS, IS IT REALLY THE

3   CENTRALIZED EXPRESSIVE FEATURES IN THE EYES THAT ARE ORIGINAL,

4   OR ARE THOSE FEATURES IN PRIOR ART?  AND IF THEY ARE IN PRIOR

5   ART, THOSE PARTICULAR FEATURES MAY NOT BE ENTITLED TO THE BROAD

6   PROTECTION.

7          AND I THINK IT'S AN ATTENTION BETWEEN THE PRIOR ART

8   AND THE PROTECTABILITY ELEMENTS, AS OPPOSED TO THE ORIGINALITY.

9   AND THAT'S WHERE I JUST WANT TO MAKE CERTAIN THAT --

10         **THE COURT:**  IF IT'S IN THAT CONTEXT, THAT'S FINE, AND

11  THE COURT WILL ENTERTAIN WHATEVER EVIDENCE YOU WANT.  IT'S NOT

12  BEING PRESENTED TO THE JURY.  AND YOU CAN PRESENT THAT FURTHER

13  EVIDENCE TO THE COURT, IF YOU WANT, IN REFINING THESE.

14         I HAVE SEEN THE PRIOR ART FROM THE BLUES AD, PARIS

15  BLUES, COKE, STEVE MADDEN, SEVENTEEN MAGAZINE IN GENERAL.  IF

16  THERE'S ANY ADDITIONAL PRIOR ART THAT YOU WANT TO PRESENT TO

17  THE COURT TO DETERMINE -- THERE IS A PARTICULARIZED LOOK FROM

18  CARTER BRYANT THAT IS DISTINCT FROM THOSE ADS THAT THE COURT

19  CAN READILY DISCERN FOR PURPOSES OF INSTRUCTING THE JURY ON

20  PROTECTABLE ELEMENTS.

21         HOWEVER, IF THERE'S ADDITIONAL EVIDENCE THAT YOU WANT

22  THE COURT TO HEAR, EITHER ON THOSE PARTICULAR PRIOR ART OR ON

23  ADDITIONAL PRIOR ART, I'M HAPPY TO DO SO.  WHAT I'M SAYING THIS

24  MORNING IS, THAT'S NOT GOING TO THE JURY.  THAT'S PART OF THE

25  FILTRATION ANALYSIS THAT IS TO BE PRESENTED TO THE COURT.

1      MR. NOLAN:  CORRECT.

2          JUST FOR CLARIFICATION, WE COULD DO IT, AND THAT WAS

3  GOING TO BE MY NEXT FOLLOW-UP POINT, THAT WE MIGHT SEEK LEAVE

4  OF THE COURT TO PRESENT THIS EVIDENCE OUTSIDE THE PRESENCE OF

5  THE JURY, AS SUGGESTED IN THE BRIEFS.  AND WE SHOULD THINK AND

6  CONSIDER THE BEST WAY TO DO IT.

7          BUT THE LAST POINT I WANT TO GET TO IS THAT -- I

8  REALLY THINK --

9      THE COURT:  AND MY THOUGHT ON THAT, JUST SO I DON'T

10  FORGET, IS THAT IN THE CONTEXT OF THE VILPPU DAUBERT HEARING

11  THAT WE'VE ALREADY TALKED ABOUT DOING, IT WOULD PROBABLY BE THE

12  BEST, TO THE EXTENT THAT MR. VILPPU IS GOING TO BE PRESENTING

13  THAT EVIDENCE, WE CAN DO THAT AT THE SAME TIME THAT WE DO THE

14  DAUBERT HEARING ON MR. VILPPU.

15      MR. NOLAN:  CORRECT, YOUR HONOR.

16          ON A DIFFERENT ISSUE, MR. LUTZ, IN HIS DEPOSITION,

17  WHICH IS PART OF THE RECORD OF THE -- I THINK WE SUPPLEMENTED

18  THE SUMMARY JUDGMENT PLEADINGS -- I THINK THE DEPOSITION WAS

19  ACTUALLY TAKEN AFTER WE FILED BUT I THINK BEFORE WE MADE THE

20  ARGUMENT -- THE COURT HAD ALL OF THOSE DEPOSITIONS IN FRONT OF

21  IT.

22      THE COURT:  YES.

23      MR. NOLAN:  MATTEL HAS INDICATED THEY ARE NOT GOING

24  TO PRESENT MR. LUTZ.  WE'VE ACTUALLY SUBPOENAED MR. LUTZ,

25  BECAUSE WE THINK THAT MR. LUTZ MADE --

1      **THE COURT:**  NOW THERE'S A MOTION TO QUASH THAT, WHICH

2   IS A NEW MOTION THAT WAS NOT ON MY RADAR SCREEN; BUT I SAW THAT

3   WHEN I WENT BACK IN CHAMBERS YESTERDAY.

4      **MR. NOLAN:**  THIS IS A FLUID SITUATION, OBVIOUSLY.

5      WE BELIEVE THAT MR. LUTZ MADE COMMENTS AND ADMISSIONS

6   IN HIS TESTIMONY WITH RESPECT TO HIS VIEW ON CERTAIN OF THESE

7   EXPRESSIONS.  ONE THAT COMES TO MY MIND IS THE FACE PAINT OR

8   THE COMPLEXION.  THE WOMEN WOULD CALL IT MAKEUP, OR THE FACE

9   PAINT, THE ROUGE THAT WOULD BE ON THE CHEEKS.  A LOT OF THOSE

10  STYLES, HE WOULD SAY, COULD BE FOUND READILY OUTSIDE OF THE

11  STAPLE CENTER.

12     **THE COURT:**  I DISTINCTLY DID NOT INCLUDE THAT IN A

13  PROTECTABLE ELEMENT.  I DON'T DISAGREE WITH THAT.

14     **MR. NOLAN:**  RIGHT.

15     AND THEN, AS WE SEE THE ORDER, WE'LL GET A BETTER

16  SENSE AND REFINE IT.  WE'RE JUST TRYING TO PROCESS IT.

17     **THE COURT:**  THAT IS SOMETHING WHICH I WOULD HAVE TO

18  BE CONVINCED FURTHER BY MATTEL TO INCLUDE AS A PROTECTABLE

19  ELEMENT.  THAT WAS NOT ONE OF THE FEATURES THAT I IDENTIFIED,

20  THE -- THAT ASPECT.

21     THE FACE PAINTING ON THE EYES, YES, THERE'S A

22  SUFFICIENT BASIS FOR THE COURT TO FIND THAT AS A PROTECTABLE

23  ELEMENT; BUT IF YOU'RE NOW TALKING ABOUT THE MAKEUP, THE SKIN

24  TONE, THE ETHNICITY, THAT, I THINK, IS OF A DIFFERENT ORDER.

25     NOW, IT WOULD PLAY IN, OF COURSE, IN THE INTRINSIC

```
 1   ANALYSIS, IN TERMS OF THE OVERALL LOOK; BUT IN TERMS OF THE
 2   EXTRINSIC ANALYSIS, WHERE WE'RE JUST EVALUATING THE PROTECTABLE
 3   ELEMENTS, AT LEAST AT THIS POINT, I'M NOT CONVINCED.
 4          KEEP IN MIND, ALL OF THIS IS SUBJECT TO PERMUTATION.
 5          MR. NOLAN:  AND WE APPRECIATE THE COURT'S GUIDANCE ON
 6   THIS.  WE KNOW IT'S WELL INFORMED, BUT THERE STILL WILL BE
 7   ADDITIONAL EVIDENCE.
 8          FOR EXAMPLE, I THINK THE OTHER POINT IS -- IT MAY BE
 9   MY LAST POINT -- I THINK THE COURT REALLY PUT ITS FINGER ON IT,
10   AND I CERTAINLY HAVE BEEN EDUCATED, I THINK ALL OF US HAVE
11   BEEN, WITH RESPECT TO DOLLS OVER THE COURSE OF THIS TRIAL, AND
12   CERTAINLY THE EXPRESSION AND HOW YOU NEED TO REALLY NAIL IT IN
13   ORDER TO BE SUCCESSFUL.
14          YOU KNOW, WHEN YOU LOOK AT MYSCENE AND FLAVAS VERSUS
15   BRATZ AND OTHER DOLLS THAT WE SEE HERE, SOME ARE SUCCESSFUL;
16   SOME ARE NOT.  SOME HAVE TO DO WITH BRANDING, BUT ALSO HAVE TO
17   DO WITH THE EXPRESSION.  I THINK IT'S IN THAT CONTEXT, YOUR
18   HONOR -- FOR INSTANCE, WHERE THE CHANGES THAT WERE MADE -- AND
19   YOU NOTED THIS IN YOUR RULING -- FOR INSTANCE, MARGARET LEAHY'S
20   TESTIMONY OR PAULA GARCIA'S TESTIMONY, EXPECTED TESTIMONY,
21   WHERE THEY'RE TALKING ABOUT LOOKING AT CARTER BRYANT'S DRAWINGS
22   AND THEN DECIDING, 'ALL RIGHT, LET'S REALLY LOOK AT
23   CARTER BRYANT'S DRAWINGS, AND THEN LET'S SEE WHETHER OR NOT THE
24   EXPRESSION OF CARTER BRYANT'S DRAWINGS WOULD MAKE IT IN THE
25   MARKETPLACE,' AND WHAT CHANGES, THEN, MGA MADE TO THOSE.
```

1       **THE COURT:** WELL, THIS IS THE SUBSTANTIAL SIMILARITY.

2  I MEAN, THIS IS PRECISELY THE ARGUMENT THAT I EXPECT MGA TO BE

3  MAKING, IS FOCUSING ON THAT.  ARE CARTER BRYANT'S -- IS THAT

4  THE EXPRESSION THAT ULTIMATELY ENDED UP IN THE DOLL?  THAT

5  CARTER BRYANT DIDN'T MAKE THE DOLL; HE DID THE DRAWINGS.  AND

6  THAT'S WHAT'S AFFORDED THE COPYRIGHT PROTECTION.

7       NOW, OF COURSE, HERE, WE'RE TALKING STRICTLY ABOUT

8  THE COPYRIGHT CLAIM.  I'M NOT TALKING ABOUT THE STATE TORT

9  CLAIMS, WHERE THE IDEA AND THE OTHER THINGS COME INTO PLAY, AND

10 TO THE EXTENT THAT THERE ARE DAMAGES ASSOCIATED WITH THAT.

11 THIS IS JUST THE COPYRIGHT INFRINGEMENT CLAIM.  SO I DON'T

12 WANT -- ONE OF THE THINGS THAT I'M GOING TO BE REALLY LOOKING

13 OUT FOR IN THE JURY INSTRUCTIONS IS THAT WE DON'T MISTAKENLY

14 CONFLATE THESE ISSUES, BECAUSE THE COPYRIGHT INFRINGEMENT IS

15 ONE TRACK, THE STATE TORT CLAIMS AND THE DAMAGES RELATED TO

16 THAT IS ANOTHER TRACK.  IDEAS HAVE NO PLACE IN COPYRIGHT LAW,

17 BUT WITH RESPECT TO THE CONTRACT LAW CLAIMS, THEY DO.

18      **MR. NOLAN:** YOUR HONOR, YES.  AND I DON'T WANT TO

19 ARGUE THOSE INSTRUCTIONS RIGHT NOW, BUT I DO -- IN DRAWING THE

20 DISTINCTION RIGHT NOW, I WOULD MAKE THIS NOTE:  THAT WITH

21 RESPECT TO THE IDEA OF FOUR ETHNIC, HIP GIRLS NAMED BRATZ --

22      **THE COURT:** RIGHT.

23      **MR. NOLAN:** -- WHETHER OR NOT THAT IS SO UNIQUE AND

24 SO CONFIDENTIAL TO MATTEL, OTHER THAN AS EXPRESSED BY

25 CARTER BRYANT, IS STILL, I THINK, RELEVANT ON THE STATE TORT

1  CLAIMS.

2         THE COURT:  THAT'S A SEPARATE ISSUE.

3         MR. NOLAN:  RIGHT.  SO I WASN'T TRYING TO CONFLATE

4  THOSE TWO ISSUES, YOUR HONOR.

5         THE COURT:  LET'S KEEP THOSE SEPARATE, RIGHT.  VERY

6  GOOD.

7         LET ME HEAR FROM MATTEL.

8         MR. ZELLER:  WHEN MR. NOLAN SAYS, ON MGA'S BEHALF,

9  THAT SOMEHOW COPYRIGHT PROTECTION IS LIMITED TO -- AND HE WAS

10 QUOTING FROM THE GOLDBERGER CASE -- CENTRAL EXPRESSIVE

11 FEATURES -- AND THEN HE EVEN WENT SO FAR AS TO INCLUDE THE

12 LANGUAGE OF THE FACE -- THAT'S, OBVIOUSLY, NOT WHAT IS THE

13 BEGINNING AND END OF COPYRIGHT PROTECTION.  WHAT HE'S QUOTING

14 IS WHAT WAS THE EXACT CLAIM THAT MATTEL WAS MAKING IN THAT

15 CASE, WHICH IS, THAT IS WHAT WAS COPIED.

16        SO THIS IS NOT SOMEHOW A -- THE SECOND CIRCUIT WASN'T

17 BEING EXCLUSIVE --

18        THE COURT:  I UNDERSTAND.

19        MR. ZELLER:  -- EXCLUSIVE ASPECTS OF PROTECTION.

20        THE COURT:  THEY WERE FOCUSING ON THOSE

21 PARTICULARIZED EXPRESSIVE ELEMENTS.  AND THAT'S WHY, IN THE

22 COURT'S FINDINGS, OR THE COURT'S TENTATIVE ELEMENTS, I INCLUDE

23 THINGS WELL BEYOND THE FACE.

24        MR. ZELLER:  AND WHAT I WOULD -- BEYOND THAT, YOUR

25 HONOR, I THINK WE LARGELY SUBMIT ON THIS.  I THINK THAT THE

1    COURT'S TENTATIVE IN TERMS OF PROTECTABILITY,

2    NONPROTECTABILITY -- OBVIOUSLY, THERE WILL HAVE TO BE FURTHER

3    DISCUSSIONS AND WORDSMITHING, AND EXPANDING, CONTRACTING, AS

4    THE EVIDENCE COMES IN AND THE PARTIES SUBMIT MORE EVIDENCE.

5         CERTAINLY, I WOULD EXPECT IT IN A SUBMISSION THAT

6    MATTEL WOULD MAKE -- WOULD BE THAT WE WOULD SAY, AND WE WOULD

7    WANT AN INSTRUCTION, THAT SAYS, OF COURSE, THE NEW

8    CONFIGURATION, WE'LL CALL IT, OF WHAT WOULD OTHERWISE BE

9    UNPROTECTABLE ELEMENTS.  THAT, TOO, CAN BE PROTECTED.  AND, OF

10   COURSE, THE COURT HAS SEEN, IN MGA'S OWN CASES, THAT IS

11   FREQUENTLY THE ROUTE THAT THEY HAVE GONE.  I MEAN, THEY HAVE

12   SAID, 'HERE IS THIS COMBINATION OF THESE FEATURES:  BIG HEAD,

13   BIG FEET...'  I'M NOT TRYING TO CHARACTERIZE IT.  THEY HAVE

14   VERY SPECIFIC LANGUAGE THAT THEY HAVE USED IN THESE CASES.

15        **THE COURT:**  WHAT ADDRESSES THAT IS THE FIRST

16   PROTECTABLE ELEMENT THAT I INDICATED, THE PARTICULARIZED

17   SYNERGISTIC COMPILATION AND EXPRESSION OF THE HUMAN FORM AND

18   ANATOMY THAT EXPRESSES A UNIQUE STYLE, CONVEYS A DISTINCT LOOK

19   OR ATTITUDE.  SO THE DOLL, TAKEN AS A WHOLE -- THE CONCERN I

20   HAVE WITH THAT IS, AM I CONFLATING EXTRINSIC AND INTRINSIC?

21   AND I DON'T THINK SO.  BECAUSE I THINK THAT THERE'S A CLEARLY

22   PARTICULARIZED EXPRESSIVE LOOK OF THE BRATZ DOLL AS IT

23   EXPRESSES THE HUMAN FORM THAT IS PROTECTABLE, SEPARATE AND

24   APART FROM THE INTRINSIC ANALYSIS THAT IS TO BE DONE IN THE

25   SECOND PHASE OF THAT TEST.  I THINK I'M AGREEING WITH YOU.  I'M

1    NOT SURE.

2            MR. ZELLER:  I THINK WE DO AGREE ON THIS.

3            I THINK TO HARKEN BACK TO WHAT MR. LARIAN HAS BEEN

4    TESTIFYING -- THEY HAVE MADE THESE CLAIMS -- AND ALSO IT

5    DOVETAILS WITH WHAT MGA HAS SAID WAS THE SUCCESS OF THESE

6    DOLLS, AND THAT IT'S REALLY THIS COMBINATION OF FEATURES.  WHAT

7    I GUESS -- I HEAR THE COURT IN TERMS OF THAT FIRST DESCRIPTION,

8    OF THE PROTECTABLE ELEMENTS MAYBE CAPTURING ONE PART OF IT.

9    WHAT I GUESS I'M ALSO RAISING IS THAT THERE'S A PARTICULAR

10   CONFIGURATION THAT MGA ITSELF IN THE PAST HAS SAID THAT THESE

11   ARE THE PROTECTABLE COMBINATIONS:  YOU KNOW, OVERSIZED HEAD,

12   PRONOUNCED LIPS -- AGAIN, I'M NOT TRYING TO QUOTE IT, BUT IT'S

13   JUST THAT THEY HAVE A PARTICULAR KIND OF FORMULATION THAT IS

14   MADE.  AND THEY'VE EVEN MADE IT IN THIS CASE, AS THE COURT WILL

15   RECALL, IN THEIR OWN CLAIMS AGAINST MATTEL.

16           THAT'S WHY, I THINK, WE WOULD EXPECT AND WE WOULD

17   LIKE TO PUT IN EVIDENCE -- AND WE CERTAINLY CAN, I THINK,

18   INCLUDING FROM DEPOSITIONS -- I THINK THERE'S BEEN TRIAL

19   EVIDENCE OF THIS ALREADY, THAT IT'S THAT COMBINATION.  AND EVEN

20   IF TAKEN IN ISOLATION, OVERSIZED LIPS OR OVERSIZED EYES, TAKEN

21   IN ISOLATION, MAYBE THAT WOULD BE TOO MUCH OF AN IDEA AND WOULD

22   NOT BE SUFFICIENTLY PARTICULARIZED EXPRESSION TO BE

23   PROTECTABLE, BUT EVEN ASSUMING THAT, ONCE YOU HAVE A

24   COMBINATION OF THOSE FIVE, SIX ELEMENTS TOGETHER, THAT WOULD BE

25   SOMETHING THAT WOULD AMOUNT TO PROTECTABLE EXPRESSION.

1          THE COURT:  I TEND TO AGREE, BUT UNDERSTAND, IT'S NOT

2    SIMPLY AN OVERSIZED HEAD.

3          MR. ZELLER:  CORRECT.

4          THE COURT:  THAT WOULD FALL TOO GENERIC.  IT'S THIS

5    PARTICULAR OVERSIZED HEAD THAT WE'RE TALKING ABOUT IN THE

6    CONTEXT OF THE INTRINSIC ANALYSIS.

7          MR. ZELLER:  WELL, I THINK MAYBE WE DO DEPART A

8    LITTLE BIT, BECAUSE I THINK THAT IT CAN STILL BE A PARTICULAR

9    COMBINATION OF FEATURES, BECAUSE ABSOLUTELY, THERE'S NO

10   QUESTION THAT THE PARTICULARIZED EXPRESSION OF IT IS KIND OF

11   ONE SIDE OF IT.  IT COULD BE THAT IT'S THE FACE.  YOU'RE NOT

12   LOOKING, NECESSARILY, AT THE OVERALL COMBINATION.  BUT JUST

13   FOCUSING ON PROTECTABILITY, YOU HAVE PARTICULARIZED WAYS IN

14   WHICH IT'S PUT.  THAT'S KIND OF ONE TRACK OF PROTECTION.  BUT

15   THEN ALSO ANOTHER TRACK OF PROTECTION OR PROTECTABILITY THAT'S

16   RECOGNIZED BY THE CASES IS THAT IF YOU TAKE ELEMENTS AND YOU

17   COMBINE THEM IN A NEW WAY -- I MEAN, THIS GOES BACK TO

18   ECCLESIASTES; THERE WAS NOTHING NEW UNDER THE SUN.

19         THE COURT:  I AGREE.  AND THAT'S -- WHAT YOU'RE

20   DESCRIBING THERE IS WHAT I'M TRYING TO CAPTURE IN THAT FIRST

21   ELEMENT.  I USE THE WORD "SYNERGISTIC" AS OPPOSED TO

22   "COMBINATION."  BUT TO ME, SYNERGISTIC CAPTURES IT MORE BECAUSE

23   IT IMPLIES THE WORKING TOGETHER OF THE ELEMENTS, AS OPPOSED TO

24   SIMPLY THE AMALGAMATION OF THE ELEMENTS.  BECAUSE IT'S THE WAY

25   THE OVERSIZED HEAD WORKS WITH THE OVERSIZED -- I DON'T WANT TO

```
 1    SAY FEET -- SHOES -- THAT WORKS WITH THE THIN BODY AND THE
 2    ACCENTUATED AND DEACCENTUATED OTHER FEATURES.  IT'S THAT --
 3    LIKE I SAY, I COULDN'T THINK OF A BETTER WORD LAST NIGHT THAN
 4    "SYNERGISTIC," BECAUSE IT'S NOT JUST AN AMALGAMATION OR A
 5    COMBINATION, BUT IT'S A WORKING TOGETHER OF THESE DIFFERENT
 6    ELEMENTS IN A PARTICULARIZED WAY.  AND I THINK THAT AFTER
 7    SEEING ENOUGH OF THESE BRATZ DOLLS, THAT BECOMES ALMOST
 8    SELF-EVIDENT.  THERE IS A BRATZ LOOK.  AND WHETHER THAT BRATZ
 9    LOOK MANIFESTS ITSELF IN THE FORM OF A BRATZ BOYS OR A BRATZ
10    PETS OR A BRATZ WHATEVER, YOU CAN LOOK AT IT -- WHEN YOU
11    COMPARE IT TO MANY OF THE ALLEGEDLY INFRINGING PRODUCTS, FROM
12    THE HONG KONG LITIGATION OR WHATEVER, I MEAN, YOU CAN READILY
13    SEE THAT ONE IS THE REAL MCCOY AND ONE IS NOT, PRECISELY
14    BECAUSE OF THESE PARTICULARIZED ELEMENTS.
15           AND I HAVE IT BROKEN DOWN INTO THREE PROTECTED
16    ELEMENTS.  THE FIRST ONE ATTEMPTS TO CAPTURE THAT SYNERGISTIC
17    LOOK OR ATTITUDE, WHICH IN A PARTICULARIZED FORM, CLEARLY UNDER
18    THE CASE LAW, CAN BE PROTECTED.  THE SECOND BREAKS IT DOWN INTO
19    PARTICULAR ELEMENTS THAT ARE PROTECTABLE:  THE OVERSIZED DOLL'S
20    HEAD, THE LIPS, THE EYES, THE EYEBROWS.  I DESCRIBE SOME AS
21    EXAGGERATED ANATOMICAL FEATURES, OTHERS AS DEEMPHASIZED
22    ANATOMICAL FEATURES.  BUT I THINK THIS CAPTURES THAT OVERSIZED
23    HEAD, AS YOU INDICATED, OR THAT NONEXISTENT NOSE, WHICH WE'VE
24    HEARD SO MUCH ABOUT IN PHASE 1-A.  AND THEN, FINALLY, THE THIRD
25    CATEGORY ARE PARTICULARIZED EXPRESSIONS SET FORTH IN THE
```

1  ACCESSORIES THAT ARE CAPTURED ON THE DRAWINGS.

2      BUT IN EACH CASE, IT HAS TO BE THE PARTICULARIZED

3  FORM OR EXPRESSION THAT IS PROTECTED, NOT THE GENERIC FORM.

4  AND THAT'S WHAT IS FILTERED OUT.  THAT'S WHAT CAN'T BE

5  PROTECTED.

6      THAT'S WHY SIMPLY SAYING AN OVERSIZED HEAD -- AND

7  MAYBE WE'RE MINCING WORDS HERE -- BUT IT'S THE OVERSIZED BRATZ

8  HEAD, AS OPPOSED TO SIMPLY ANY OVERSIZED HEAD, BECAUSE LOTS OF

9  DOLLS HAVE OVERSIZED HEADS, AND THAT DOESN'T GO FAR ENOUGH TO

10  CAPTURE THE PARTICULARIZED EXPRESSION THAT IS PROTECTED IN THE

11  BRATZ DRAWING.

12      MR. ZELLER:  ONE OTHER ISSUE, YOUR HONOR, THAT I SEE

13  HERE IS THAT WE ARE, OF COURSE, GOING TO HAVE -- I WOULD ASK

14  FOR SOME GUIDANCE, PERHAPS, IN WHAT WOULD BE MOST USEFUL FOR

15  THE COURT TO RECEIVE SOME OF THIS EVIDENCE -- BUT OBVIOUSLY,

16  THE VILPPU HEARING, THE DAUBERT HEARING, WOULD BE A GOOD

17  VEHICLE FOR SOME OF THAT.  PRESUMABLY SOME OF IT -- AND

18  CERTAINLY, I KNOW ADDITIONAL EVIDENCE WE WOULD WANT TO PUT IN

19  OFFHAND IS GOING TO BE FROM THE WRITTEN RECORD, TO SORT OF

20  EXPAND AND SUPPLEMENT, PERHAPS, ON SOME OF THE EVIDENCE THAT

21  WE'VE ALREADY PUT IN THE RECORD.  I DON'T KNOW IF ADDITIONAL

22  BRIEFING, SOME SORT OF, PERHAPS, INTERIM SUBMISSION OF

23  ADDITIONAL DECLARATION WITH THAT KIND OF EVIDENCE, BEFORE OR

24  AFTER THE HEARING THAT WE WOULD HAVE WITH VILPPU -- IT MAY BE

25  HELPFUL IF WE HAD A LITTLE BIT OF GUIDANCE AS TO WHAT WOULD BE

1    MOST USEFUL FOR THE COURT.

2         **THE COURT:**  WELL, TIMING IS SOMEWHAT OF THE ESSENCE.

3    THIS HAS TO WRAP UP NEXT WEEK.  WE'LL BE DOING THESE TYPES OF

4    HEARINGS OFF JURY TIME, EITHER IN THE MORNING OR IN THE

5    EVENING, OR DURING LUNCH.  I DON'T HAVE A SENSE, I GUESS -- I'M

6    GOING TO HAVE TO RELY ON THE PARTIES TO TELL ME HOW MUCH OF

7    THIS EVIDENCE YOU THINK I NEED TO HEAR.  SO MAYBE YOU CAN GET

8    TOGETHER SOMETIME TODAY AND GET A SENSE OF HOW MUCH TESTIMONY

9    TIME WE'RE TALKING ABOUT, AND THEN I CAN SCHEDULE THAT FOR YOU.

10        **MR. ZELLER:**  AND THEN, PERHAPS, THE LAST ISSUE I

11   WANTED TO MAKE, ALTHOUGH I DON'T KNOW THAT THERE'S A NEED TO

12   FULLY RESOLVE IT, BECAUSE IT'S A LITTLE BIT OF AN ABSTRACT

13   ISSUE, BUT MR. NOLAN RAISED IT IN HIS REMARKS.  HE WAS TALKING

14   ABOUT THE CHANGES THAT WERE MADE BY LEAHY OR GARCIA, OR WHOEVER

15   THE CASE MAY BE, AND THAT BEING, YOU KNOW, RELEVANT.

16        AND CERTAINLY, AT SOME LEVEL IT IS RELEVANT, AS THE

17   COURT HAS POINTED OUT.

18        **THE COURT:**  ULTIMATELY, WHAT THE JURY IS GOING TO BE

19   COMPARING TO DETERMINE SUBSTANTIAL SIMILARITY IS THE DRAWINGS

20   TO THE DOLLS.

21        **MR. ZELLER:**  CORRECT.  AND PART OF WHAT, I GUESS, I

22   WANTED TO RAISE -- AND, AGAIN, WITHOUT NECESSARILY DOING A FULL

23   BLOWN ARGUMENT ABOUT IT AT THIS POINT -- BUT, YOU KNOW, FROM MY

24   PERSPECTIVE, PRECISELY BECAUSE OF WHAT THE COURT JUST SAID, ALL

25   OF THE MECHANICS OF HOW ALL OF THESE CHANGES ARE MADE, AS FAR

1    AS WE'RE CONCERNED, ARE IRRELEVANT AND PROBABLY CONFUSING.

2    THAT'S REALLY CONFUSING THE LABOR THAT WENT INTO THIS, WHICH

3    CASES SAY OVER AND OVER AND OVER IS NOT PARTICULARLY RELEVANT

4    TO WHAT IS GOING TO BE THE JURY'S TASK AT THE END OF THE DAY.

5         IT'S ALMOST -- THE ANALOGY WOULD BE SOMETHING LIKE

6    THIS:  IF I TOOK A BOOK AND I PHOTOCOPIED IT, AND IT'S

7    IDENTICAL, PEOPLE CAN TELL THAT FROM LOOKING AT, ME PUTTING ON

8    A TWO-MONTH SERIES OF WITNESSES, TALKING ABOUT, IN GORY DETAIL,

9    THE MECHANICS OF HOW A PHOTOCOPIER WORKS, AND SOMEHOW ACTING

10   LIKE THAT'S A DEFENSE.

11        **THE COURT:**  YOU'RE CORRECT IN THE CONTEXT OF THE

12   SUBSTANTIAL SIMILARITY TEST ITSELF, BUT NOT WITH RESPECT TO

13   DAMAGES.

14        **MR. ZELLER:**  WELL, YOU SEE, THAT'S WHERE I DISAGREE.

15   BECAUSE I DON'T THINK THAT THE MECHANICS OF HOW IT'S DONE

16   EITHER -- AGAIN, THIS THREATENS TO CREATE CONFUSION WITH THE

17   JURY, THINKING THAT SOMEHOW THEY GET CREDIT FOR THEIR LABOR, IN

18   ADDITION TO THE DEDUCTION FOR COSTS, FOR EXAMPLE.

19        I MEAN, A LOT OF THAT WORK, THAT COMES OFF BECAUSE

20   THEY'RE ENTITLED TO MAKE DEDUCTIONS FOR COSTS.

21        **THE COURT:**  IF I HEARD YOU CORRECTLY, MR. ZELLER, YOU

22   JUST CONCEDED THAT THEY ARE ENTITLED TO BRING IN THEIR COSTS.

23        **MR. ZELLER:**  ABSOLUTELY THEY ARE.  BUT THAT DOES NOT

24   MEAN THAT THEY SAY, 'WELL, HERE'S ALL OF THE SWEAT THAT WENT

25   BEHIND IT.'  BECAUSE THE FACT IS, THAT'S A NUMBER.  THE NUMBER

1    IS, WE SPENT X AMOUNT ON THIS PARTICULAR KIND OF COST.   THAT'S

2    A NUMBER.   THAT'S A CALCULATION.   THAT IS NOT --

3            THE COURT:   I UNDERSTAND YOUR CONCERN.   IT CAN BE

4    ADDRESSED THROUGH A JURY INSTRUCTION, I SUPPOSE.   I DON'T KNOW

5    IF IT WOULD BE PROPER FOR THE COURT TO SAY, 'YOU CANNOT

6    INTRODUCE WHAT COSTS' -- THEY CAN PRESENT THAT HOWEVER THEY

7    WANT.

8            MR. ZELLER:   THEY CAN CERTAINLY PRESENT IT HOWEVER

9    THEY WANT, BUT IT STILL HAS TO BE A NUMBER.

10           THE COURT:   RIGHT.

11           MR. ZELLER:   THEY JUST CAN'T COME IN AND SAY, 'WELL,

12   MARGARET LEAHY PUT IN 1,000 HOURS OF WORK,' AND SOMEHOW THAT'S

13   REALLY RELEVANT.   THAT'S A NUMBER, ULTIMATELY; BUT HAVING HER

14   DESCRIBE THE 1,000 HOURS OF WORK SHE DID IS NOT PERTINENT,

15   BECAUSE IN SOME WAYS, THE END PRODUCT IS WHAT YOU HAVE.

16           YOU HAVE THAT TO COMPARE.   SHE CAN COME IN HERE AND

17   TALK FOR TWO HOURS ABOUT, 'HERE ARE ALL OF THE THINGS I DID

18   WHEN I MADE ALL OF THESE CHANGES,' ALLEGED CHANGES, BUT AT THE

19   END OF THE DAY, DESCRIPTION OF THEM IS BESIDE THE POINT ON

20   SUBSTANTIAL SIMILARITY.   THE JURY IS GOING TO COMPARE THE END

21   PRODUCT TO WHAT MATTEL OWNS AND IS ASSERTING A COPYRIGHT

22   INFRINGEMENT CLAIM OVER.

23           THE COURT:   BUT DOESN'T THAT HELP THE JURY UNDERSTAND

24   AND HELP THEM FOCUS ON WHAT DIFFERENCES EXIST?

25           MR. ZELLER:   I DON'T AGREE WITH THAT.   I THINK IT'S A

1  SITUATION THAT'S JUST RIPE FOR POTENTIAL CONFUSION, BECAUSE

2  WE'RE TALKING ABOUT, YOU KNOW, WHAT IS THE END PRODUCT, AND

3  WE'RE TALKING ABOUT EXPRESSION; HOW DO THESE THINGS LOOK?

4        BUT IT CAUSES POTENTIAL CONFUSION FOR THE JURY TO

5  THINK THAT SOMEHOW, 'WELL, MAYBE IT'S NOT REALLY INFRINGEMENT

6  IF YOU SPEND AN AWFUL LONG TIME DOING YOUR COPYING.'  I MEAN,

7  THIS IS NOT A LEGALLY PERTINENT INQUIRY.  AND IT, I THINK,

8  POTENTIALLY WILL CAUSE CONFUSION.

9        AND ONE THING THAT MGA HAS ALREADY BEEN SAYING

10  THROUGHOUT THIS CASE, AND DOING IT IN THE CONTEXT OF EVEN

11  OPENING, IS TALKING OVER AND OVER ABOUT, 'WELL, WHAT WAS THE

12  IMPORTANCE OF THE DRAWINGS TO THE PROJECT?'

13        THAT IS JUST ABSOLUTELY IRRELEVANT.  IT IS ABSOLUTELY

14  IRRELEVANT TO SUBSTANTIAL SIMILARITY.

15        **THE COURT:**  ANYTHING ELSE, MR. ZELLER, BEFORE I TURN

16  THIS OVER TO MGA?

17        **MR. ZELLER:**  NO, YOUR HONOR.

18        **THE COURT:**  THANK YOU VERY MUCH.

19        **MR. NOLAN:**  YOUR HONOR, I DON'T KNOW WHAT IS MORE

20  FUNDAMENTALLY KEY IN THIS CASE IN DETERMINING WHETHER OR NOT

21  THERE ARE SUBSTANTIAL SIMILARITIES OR DISSIMILARITIES BETWEEN

22  THE DRAWINGS AND THE DOLLS THAN -- AND GO BACK TO THE COURT'S

23  ORDER, WHERE THE COURT CITED TO THE VERY TESTIMONY IN THE

24  RECORD WITH RESPECT TO THE CHANGES THAT WERE MADE FROM THE

25  DRAWINGS TO THE DOLL TO MAKE IT HIT THAT MARK THAT YOU PUT YOUR

1   FINGER ON, THAT IT HAS TO BE SUCH IN ORDER TO MAKE IT SO

2   SUCCESSFUL AND SO APPEALING TO THE MARKETPLACE.

3           WHAT MATTEL SEEMS TO WANT TO DO IS JUST HANDCUFF US

4   IN PRODUCING ANY EVIDENCE THAT WOULD ESTABLISH THE CHANGES.

5           IF THIS WAS A CASE WHERE WE PUT CARTER BRYANT'S

6   DRAWINGS ON A COPY MACHINE AND THEN IT PRODUCED A DOLL, THEN I

7   COULD ARGUE THAT -- I COULD MAYBE ACCEPT HIS ARGUMENT THAT WE

8   SHOULDN'T BE ALLOWED TO SHOW HOW THE PHOTOCOPY MACHINE WORKS.

9   BUT THAT'S NOT WHAT HAPPENED IN THIS CASE.  WE ALL KNOW IT.

10          I THINK THE CONCERN THAT MATTEL HAS IS PREVENTING

11  EVIDENCE COMING INTO THIS CASE.  WE JUST CANNOT HAVE THIS

12  EVIDENCE EXCLUDED.

13          **THE COURT:**  LET'S EXPLORE YOUR ANALOGY, COUNSEL,

14  BECAUSE I AGREE WITH YOU THAT IF IT WAS A MATTER OF

15  PHOTOCOPYING, YOU WOULD NOT BE ABLE TO EXPLAIN -- IT WOULD BE

16  POTENTIALLY CONFUSING AND PREJUDICIAL FOR THE JURY TO HEAR HOW

17  THE PHOTOCOPY MACHINE OPERATES.

18          YOU COULD IMAGINE A SITUATION WHERE SOMEONE ACCUSED

19  OF PHOTOCOPYING -- I HAVE ANOTHER CASE.  IT'S ALL PART OF THE

20  PUBLIC RECORD; IT'S DOWN THE STREET, UNIVERSITY OF CALIFORNIA,

21  RIVERSIDE, WHERE THERE'S A PHOTOCOPY STORE THAT -- ALLEGEDLY,

22  THE OWNER OF THE PHOTOCOPY STORE IS MAKING COPIES OF TEXTBOOKS

23  AND SELLING THEM FOR AN EIGHTH OF WHAT THEY GO FOR ACROSS THE

24  STREET AT THE UNIVERSITY BOOKSTORE.  THAT WOULD BE --

25  OBVIOUSLY, IF TRUE, THAT'S ACTUAL COPYING, AND HE WOULDN'T BE

1    ABLE TO STAND UP BEFORE A JURY AND SAY, 'OH, WELL, I PUT

2    TOGETHER THIS INTRICATE COPY MACHINE AND I SPENT ALL OF THIS

3    MONEY ON A COPY MACHINE, AND THIS IS HOW I OBTAINED THIS COPY,

4    SO I SHOULD BE GIVEN SOME CREDIT FOR WHAT I PUT INTO THE COPY.'

5         IT'S STEALING THE WORK, SO IT'S WRONG.

6         UNDER MATTEL'S THEORY, YOU DIDN'T USE A COPY MACHINE.

7    BUT UNDER MATTEL'S THEORY, WHAT YOU DID DO IS YOU USED A VERY

8    INTRICATE PROCESS, A HUMAN PROCESS, AS OPPOSED TO A MECHANICAL

9    PROCESS, TO ACHIEVE, ESSENTIALLY, FROM THEIR PERSPECTIVE, THE

10   SAME EFFECT.

11        AND I THINK WHAT MR. ZELLER IS ARGUING IS THAT

12   PROCESS BY WHICH YOU ACHIEVED THE EFFECT IS NO MORE RELEVANT TO

13   THE ULTIMATE DETERMINATION OF WHETHER THERE'S A COPYRIGHT

14   INFRINGEMENT THAN THE WORKINGS OF THE PHOTOCOPY MACHINE.

15   THAT'S THE ANALOGY, I THINK, THAT MR. ZELLER IS PRESSING.

16        **MR. NOLAN:**  I UNDERSTAND THAT'S THE ANALOGY THAT HE

17   IS PRESSING.  BUT START FROM THE PROPOSITION THAT WE HAVE

18   CONTENDED THROUGHOUT THIS LAWSUIT, THAT THE DOLLS DO NOT

19   INFRINGE THE DRAWINGS -- THAT'S THE ARGUMENT THAT WE'RE MAKING.

20        **THE COURT:**  RIGHT.  I UNDERSTAND THAT.

21        **MR. NOLAN:**  IN SUPPORT OF THAT, USING THE TEST THAT

22   THE COURT WILL APPLY, WE'LL MEET THAT TEST; BUT IN ORDER TO

23   MEET THE TEST AND TO SHOW THE DIFFERENCES THAT ARE

24   SUBSTANTIALLY -- THAT MAKE THE FEATURES ON THE DOLL

25   SUBSTANTIALLY DIFFERENT IN THE DOLL WORLD, IN SELLING THE DOLL

1    WORLD, IT IS ABSOLUTELY ESSENTIAL THAT WE BE ABLE TO ESTABLISH,

2    FOR INSTANCE, THE CHANGES THAT WERE MADE BY MGA TO THE

3    EXPRESSION REFLECTED IN THE DRAWINGS AND HOW THOSE CHANGES WERE

4    MADE, WHETHER OR NOT -- LET'S USE MARGARET LEAHY FOR AN

5    EXAMPLE.  IT'S NOT SO MUCH THAT SHE PUT IN A LOT OF TIME.  THE

6    FACT OF THE MATTER IS THAT HER TESTIMONY WILL BE THAT SHE MADE

7    MATERIAL AND SUBSTANTIAL CHANGES.

8              **THE COURT:**  TO THE LOOK.

9              **MR. NOLAN:**  TO THE LOOK.

10             **THE COURT:**  YOU JUST HIT UPON IT.  IT'S NOT SO MUCH

11   WHETHER SHE SPENT 1,000 HOURS, 10,000 HOURS, OR ONE HOUR; IT'S

12   THE CHANGE, THE DIFFERENCE, THAT SHE MADE.  YOU'RE ABSOLUTELY

13   CORRECT, MR. NOLAN.  AND THAT'S, I THINK, THE POINT -- AND THIS

14   IS A GOOD WAY, PERHAPS, TO RESOLVE THIS ISSUE.  IT'S NOT HOW;

15   IT'S WHAT.  IT'S WHAT THE DIFFERENCES ARE.  AND CERTAINLY,

16   MARGARET LEAHY IS PROBABLY IN AN EXCELLENT POSITION TO EXPLAIN

17   TO THE JURY WHAT THOSE DIFFERENCES ARE, BECAUSE AS YOU JUST

18   INDICATED, SHE'S THE ONE THAT MADE THOSE DIFFERENCES.

19             HOW SHE DID IT, WHETHER SHE USED A PHOTOCOPY MACHINE

20   OR WHETHER SHE SPENT 1,000 HOURS WORKING IN HER STUDIO, AS YOU

21   JUST INDICATED, IS NOT -- THAT'S NOT THE CRITICAL QUESTION.

22   THE QUESTION IS, WHAT IS THE DIFFERENCE OR THE SIMILARITY, THE

23   SIMILARITY FROM MATTEL'S PERSPECTIVE, THE DIFFERENCE FROM MGA'S

24   PERSPECTIVE, BETWEEN THE DOLL AND THE PROTECTABLE ELEMENTS OF

25   THE DRAWINGS?

1      MR. NOLAN:  IT'S NOT OUR INTENT TO ASK MS. LEAHY IF

2  SHE PUT IN 1,000 HOURS, AND SAY, 'BOY, THAT'S A LOT OF TIME,

3  AND IT MUST MAKE A DIFFERENCE.'

4      THE EVIDENCE IS GOING TO BE WHAT HAS BEEN PRESENTED

5  OVER AND OVER TO THIS COURT ALREADY, WHICH, I BELIEVE, LED TO

6  THE REJECTION OF THE SUMMARY JUDGMENT AS TO WHAT THE CHANGES

7  WERE THAT WERE MADE.  WE'RE NOT TRYING TO PUT THIS AS A VALUE;

8  JUST THE CHANGES AND HOW THOSE CHANGES WERE MADE.

9      OTHERWISE, YOUR HONOR, I THINK WHAT MATTEL IS TRYING

10  TO AVOID IS THE SUGGESTION THAT THESE CHANGES MATTER.

11      THE COURT:  THAT'S NOT -- YOU'RE RIGHT ON THAT.

12      MR. NOLAN:  AND THAT'S OUR KEY.

13      THE COURT:  YOU'RE RIGHT ON THAT.

14      MR. NOLAN:  OKAY.  THANK YOU.

15      THE COURT:  ABSOLUTELY.

16      MS. AGUIAR:  I NEED TO ADD SOMETHING.

17      I JUST WANT TO MAKE SURE THAT WE'RE CLEAR ON A

18  DISTINCTION THAT YOU MADE REGARDING WHAT THE DIFFERENCES ARE

19  AND HOW IT HAPPENED.

20      THE COURT:  RIGHT.

21      MS. AGUIAR:  THIS IS NOT A CASE OF PHOTOCOPYING.

22  THIS IS NOT A CASE -- I REJECT HIS ANALOGY WHOLEHEARTEDLY.

23  THIS IS NOT A CASE WHERE WE TOOK A BOOK AND PHOTOCOPIED IT AND

24  ARE MAKING TEXTBOOKS FROM A PHOTOCOPY MACHINE.

25      THE COURT:  I UNDERSTAND THAT.

1        **MS. AGUIAR:**  WE NEED TO BE ABLE TO EXPLAIN THAT THERE

2   WAS CREATIVE INPUT INTO THIS PROCESS.

3        **THE COURT:**  LET ME STOP YOU THERE.

4        THERE'S A TREMENDOUS AMOUNT OF SCIENTIFIC AND

5   CREATIVE INPUT INTO THE PHOTOCOPYING.  IT'S NOT A PERFECT

6   ANALOGY, BECAUSE OBVIOUSLY, THE PHOTOCOPYING IS EVEN MORE

7   EGREGIOUS, BUT THE HOW IS NOT AS RELEVANT AS THE WHAT.

8        **MS. AGUIAR:**  BUT I DISAGREE.  LET ME EXPLAIN WHY.

9        **THE COURT:**  DO YOU HAVE AUTHORITY TO DISAGREE ON

10  THAT?  BECAUSE THE CONFUSING ASPECT -- THE 403 CONCERN IS THAT

11  THE ARGUMENT THAT'S BEING PITCHED IS, 'LADIES AND GENTLEMEN, WE

12  WORKED REALLY, REALLY HARD ON THIS, AND WE DESERVE TO KEEP THE

13  MONEY ON THIS.'

14       **MS. AGUIAR:**  ABSOLUTELY NOT.  IT'S NOT THAT WE WORKED

15  REALLY HARD TO COPY IT.

16       THEIR ARGUMENT IS THAT WE COPIED.

17       **THE COURT:**  RIGHT.

18       **MS. AGUIAR:**  WE'RE ABOUT TO START PUTTING ON OUR CASE

19  TO THIS JURY AS TO WHY THIS IS NOT A COPY --

20       **THE COURT:**  RIGHT.

21       **MS. AGUIAR:**  -- AND WHY WE DIDN'T JUST AIM TO TAKE A

22  TWO-DIMENSIONAL DRAWING AND COPY IT.  WE NEED TO BE ABLE TO

23  EXPLAIN, NOT THAT WE WORKED HARD, BUT THAT WE DIDN'T ACTUALLY

24  COPY; THAT WE SPECIFICALLY MADE CHANGES.  AND IT'S RELEVANT HOW

25  WE MADE THEM, BECAUSE MARGARET HAS TO BE ABLE TO EXPLAIN HOW

1    THE SCULPT EVOLVED, BECAUSE THAT DRAWING DID NOT SHOW HER HOW

2    TO MAKE A SCULPT.  SHE NEEDS -- WE NEED TO BE ABLE TO PUT ON A

3    DEFENSE, YOUR HONOR.  AND I CAN APPRECIATE THAT MR. ZELLER IS A

4    CREATIVE ADVOCATE, BUT MR. ZELLER IS TRYING TO SUGGEST TO YOU

5    THAT WE SHOULD NOT BE ABLE TO EXPLAIN TO THIS JURY THAT WE

6    DIDN'T USE A PHOTOCOPY MACHINE.

7            **THE COURT:**  DON'T MAKE THIS PERSONAL.

8            **MS. AGUIAR:**  I'M NOT MAKING IT PERSONAL, BUT HE'S

9    TRYING TO PREVENT US FROM PUTTING ON OUR CASE.  HE'S TRYING TO

10   SAY THAT WE SHOULDN'T BE ABLE TO PUT UP PAULA GARCIA AND

11   MARGARET LEAHY AND LOTS OF OTHER PEOPLE AT MGA -- NOT TO SAY,

12   'I WORKED REALLY HARD.'  THAT'S NOT THE POINT.

13           FRANKLY, I'LL REPRESENT TO YOU RIGHT NOW THAT WE'RE

14   NOT GOING TO ASK ONE WITNESS, 'HOW MANY HOURS DID YOU WORK ON

15   THIS?'  WE'RE GOING TO ASK THE WITNESSES, 'WHEN YOU LOOKED AT

16   THAT DRAWING AND YOU WERE ABOUT TO EMBARK ON THE PROCESS OF

17   MAKING A THREE-DIMENSIONAL DOLL FROM THAT DRAWING, WHAT PROCESS

18   DID YOU GO THROUGH TO DETERMINE WHETHER THOSE FEATURES IN THAT

19   DOLL WERE GOING TO BE MARKETABLE AND SELLABLE, AND WHETHER YOU

20   NEEDED TO MAKE CHANGES IN ORDER TO DO THAT?  AND WHEN YOU

21   LOOKED AT THAT DRAWING, COULD YOU TELL WHAT MR. BRYANT IMAGINED

22   THAT BODY WOULD LOOK LIKE?'  AND THEY'RE GOING TO SAY, 'NO, I

23   DIDN'T.  AND THAT'S WHY I NEEDED TO USE MY OWN CREATIVITY,

24   BECAUSE I WASN'T COPYING.'  WE WERE USING OUR OWN INTERNAL

25   CREATIVE SKILLS AND PROCESSES.  SO IT GOES TO THE CORE QUESTION

1   OF WHETHER WE WERE USING A PHOTOCOPY MACHINE OR WHETHER, IN

2   FACT, WE WERE NOT USING A PHOTOCOPY MACHINE.

3          SOMEONE WENT OUT AND CREATED THE PAPER.  SOMEONE WENT

4   OUT AND THOUGHT, 'GEE, THAT STORY THAT THEY WROTE IN THAT BOOK,

5   WAS THAT REALLY A GOOD STORY, DO WE LIKE THAT STORY, OR DO WE

6   WANT TO CHANGE THAT STORY?'  AND SOMEONE WENT OUT AND BOUGHT

7   THE INK TO PUT ON THE PAGE.  AND THEN WE ACTUALLY MADE A

8   TOTALLY NEW BOOK.  WE NEED TO BE ABLE TO PUT ON THAT CASE.

9          **THE COURT:**  I UNDERSTAND YOUR ARGUMENT, COUNSEL.

10         I WANT TO HEAR MR. ZELLER'S RESPONSE TO THAT.

11         **MR. ZELLER:**  A NUMBER OF DISTINCTIONS ARE BEING

12   BLURRED IN THE ARGUMENTS THAT ARE BEING MADE.

13         AT END OF THE DAY, WHAT MATTERS IS, ARE THE WORKS

14   SUBSTANTIALLY SIMILAR, THE BRATZ DOLLS?

15         **THE COURT:**  I AGREE WITH YOU, BUT COUNSEL'S POINT IS

16   THAT HOW YOU GOT THERE IS PROBATIVE OF WHETHER OR NOT THERE ARE

17   THOSE SIMILARITIES.

18         **MR. ZELLER:**  AND THAT IS WHAT I ACTUALLY REJECT,

19   YOUR HONOR, AND THAT IS THE ABSOLUTE DANGER OF ALLOWING THEM TO

20   MAKE THESE ARGUMENTS TO THE JURY.  WHAT THEY WANT TO DO IS

21   EFFECTIVELY CONTRACT THE LEGAL STANDARD OF SUBSTANTIAL

22   SIMILARITY BY PUTTING WITNESSES ON TO BASICALLY SAY, 'THE

23   CHANGES I MADE, HERE THEY ARE AND THEY ARE IMPORTANT.'

24         IT'S THE IMPORTANT PART.  AND THEY ARE COMMUNICATING

25   TO THE JURY THAT THEY ARE IMPORTANT, BECAUSE IT TOOK A LOT OF

1    LABOR OR EFFORT, OR CREATIVITY EVEN, TO MAKE THOSE CHANGES.

2    BUT THAT IS NOT THE LEGAL STANDARD.

3              **THE COURT:**  I LIKE THE ANALOGY THAT MS. AGUIAR USED.

4    OKAY.  YOU KNOW, YOU'RE COPYING A STORY -- AND, AGAIN, I

5    KNOW -- NONE OF THESE ANALOGIES ARE PERFECT ON EITHER SIDE, SO

6    I DON'T WANT ANYONE GETTING WORKED UP OVER THE ANALOGIES.  BUT

7    IF YOU'RE COPYING A STORY -- I SUPPOSE THAT'S ENTIRELY

8    DIFFERENT, BECAUSE THAT IS -- LET'S USE IT IN A VISUAL WORK.

9              **MR. ZELLER:**  IF I MAY.

10             ANOTHER WAY OF THINKING ABOUT THIS, FROM MY

11   PERSPECTIVE, IS, WHY CHANGES WERE MADE ARE IRRELEVANT.  WHAT

12   MATTERS IS, DID THEY TAKE YOU OUTSIDE THE SUBSTANTIAL

13   SIMILARITY STANDARD?

14             **THE COURT:**  LET ME ASK YOU THE SAME QUESTION I ASKED

15   MS. AGUIAR.  DO YOU HAVE ANY AUTHORITY ON THIS?  IS THERE

16   ANYTHING WHICH DESCRIBES -- ANY OTHER CASES THE COURTS HAVE

17   COME UP WITH THAT EXCLUDED TESTIMONY OF THE 'HOW' AND SAID 'ALL

18   WE FOCUS ON IS WHAT WE HAVE AT THE END OF IT'?

19             **MR. ZELLER:**  ABSOLUTELY, YOUR HONOR.  I CAN GET THE

20   COURT AUTHORITY ON THIS VERY POINT.

21             COURTS HAVE SAID OVER AND OVER -- ISSUES LIKE THE

22   AMOUNT OF LABOR THAT GOES INTO IT, THE SWEAT, ALL OF THESE

23   OTHER THINGS THAT THEY WANT TO POINT TO SUGGEST TO THE JURY,

24   LIKE -- THERE MUST BE SOME CHANGE.

25             THIS IS WHAT IS THE MOST PROBLEMATIC --

1     **THE COURT:**  MS. AGUIAR JUST SAID SHE'S NOT GOING TO

2   ASK A SINGLE QUESTION ABOUT HOW MANY HOURS, HOW MUCH SWEAT.

3   THAT CLEARLY IS NOT THE APPROPRIATE MEASURE, AND I CAN SEE HOW

4   THAT'S CONFUSING.

5     **MR. ZELLER:**  BUT THAT'S WHAT'S BEING COMMUNICATED.

6   YOU PUT MARGARET LEAHY ON THE STAND, AND THEY GO THROUGH THE

7   PROCESS OF, 'WHAT DID YOU DO?'  -- THAT'S GOING TO COMMUNICATE

8   TO THE JURY THAT THERE WAS A LOT OF THAT EFFORT.  WHETHER YOU

9   ASK THE ULTIMATE QUESTION, 'HOW MANY HOURS?' -- I MEAN, I'M

10   USING THAT, PERHAPS, AS AN OVERSIMPLIFICATION, BUT THAT GETS

11   COMMUNICATED TO THE JURY IN MANY WAYS, THAT THERE MUST HAVE

12   BEEN SOMETHING IMPORTANT SHE DID.  'I WENT THROUGH THIS

13   ELABORATE PROCESS, TO TAKE THE HEAD THAT MATTEL NOW OWNS, AND

14   SOMEHOW TURNED IT INTO THIS FINAL PRODUCT.  I CHANGED IT FROM

15   CLAY TO WAX.  I SPENT HOURS OR' -- EVEN IF SHE NEVER

16   COMMUNICATES THE TIME --

17     **THE COURT:**  THAT'S NOT WHAT MS. AGUIAR IS SAYING.

18   SHE'S SAYING THAT -- AND THIS IS THE PART THAT, I THINK, IS

19   PARTICULARLY -- MIGHT BE PARTICULARLY COMPELLING.  IF MARGARET

20   LEAHY SAYS, 'YES, I HAVE THE DRAWINGS' -- AND SHE'S GOING TO --

21   I THINK BASED ON THE EVIDENCE I'VE ALREADY SEEN, SHE HAS TO

22   ADMIT THAT SHE SAW THE DRAWINGS.  BUT CERTAINLY, YOU WOULD

23   AGREE THAT IT'S PROPER FOR HER TO SAY, 'I COULDN'T AND I DIDN'T

24   INCORPORATE THAT FEATURE.  I CAME UP WITH A DIFFERENT FEATURE

25   FOR...WHATEVER.'

1   MR. ZELLER:  WELL, THE "FOR WHATEVER" IS TROUBLING,

2   BUT WHAT I AGREE WITH -- AND I DON'T KNOW THAT THERE'S ANY

3   DISPUTE AT ONE LEVEL, WHICH IS THAT CERTAINLY PEOPLE CAN TALK

4   ABOUT DIFFERENCES.  THEY WANT TO PUT MARGARET LEAHY UP THERE TO

5   SAY -- AND AS THE COURT HAS SAID, MAYBE THERE'S FOUNDATION;

6   MAYBE SHE'S UNIQUELY SITUATED.  WHATEVER THE CASE MAY BE, WE'LL

7   FIND OUT FROM HER TESTIMONY.  BUT TO HAVE HER UP THERE AND

8   TESTIFY AND SAY, 'WELL, I CHANGED X, I CHANGED Y,' THAT'S NOT

9   WHAT I'M ARGUING AGAINST.  WHAT I'M ARGUING AGAINST IS HER

10  GOING THROUGH THIS PROCESS OF, 'I'M A SCULPTOR.  I'M AN ARTIST.

11  LET ME TELL YOU ABOUT ALL OF THE THINGS I DO WHEN I GO THROUGH

12  TO CHANGE SOMETHING FROM A CLAY TO A WAX.  AND THEN WHAT DO I

13  DO WHEN I DO A WAX.'

14          I MEAN, INHERENT IN THIS LONG --

15      THE COURT:  PART OF THAT IS FOUNDATIONAL.  SHE'S

16  ALREADY EXPLAINED WHAT SHE DOES.  I ASSUME SHE'S GOING TO DO SO

17  AGAIN, TO REMIND THE JURY OF WHAT SHE DOES, WHAT HER ROLE IS.

18  WHAT'S CERTAIN ABOUT THAT IS, IT'S BASIC FOUNDATIONAL

19  BACKGROUND.

20          IF I HEAR YOU CORRECTLY, YOU'RE CONCEDING -- YOU'RE

21  NOT DISPUTING THAT SHE CAN CERTAINLY EXPLAIN HOW SHE

22  DIFFERENTLY DID THE DOLL THAT SHE MADE, DISTINGUISHED FROM THE

23  DRAWINGS, INSTEAD OF HAVING, 'WHEN I DID THE EYES, OR WHEN I

24  DID THE NOSE, THERE WAS' -- 'THE DRAWINGS DIDN'T HAVE A NOSE.

25  I WANTED TO PUT A NOSE IN.  I HAD TO PUT A NOSE IN BECAUSE WE

THURSDAY, AUGUST 7, 2008                TRIAL DAY 31, MORNING SESSION

1    NEEDED TO HAVE A NOSE.'

2         THAT TYPE OF TESTIMONY GOES TO -- AND TO THE EXTENT

3    THAT THE ABSENCE OF A NOSE OR A PARTICULARIZED NOSE IN A

4    DRAWING IS A PROTECTABLE ELEMENT, THAT SEEMS CLEARLY RELEVANT

5    TESTIMONY.  THE PERMUTATIONS THAT TOOK PLACE, THE CREATIVE

6    PERMUTATIONS THAT TOOK PLACE, AFTER THE DRAWINGS DO SEEM

7    RELEVANT TO THE ISSUE OF WHETHER OR NOT THE DRAWINGS ARE

8    SUBSTANTIALLY SIMILAR TO THE DOLL, AT LEAST ON THE EXTRINSIC

9    TEST.

10         **MR. ZELLER:**  I DON'T THINK THAT'S --- I WOULDN'T

11   AGREE WITH THAT ENTIRELY, YOUR HONOR.

12         ONE THING THAT'S PROBLEMATIC ABOUT THIS IS THAT

13   THERE'S REALLY AT LEAST TWO THINGS GOING ON.  NUMBER ONE IS

14   HAVING SOMEBODY TESTIFY ABOUT WHY THEY MADE PURPORTED CHANGES.

15   THAT UNDULY, POTENTIALLY, EMPHASIZES AND CREATES THE IMPRESSION

16   IN THE JURY'S MIND THAT THE CHANGES ARE SUBSTANTIAL.  IN OTHER

17   WORDS, THAT IS AN ALTERATION OF WHAT IS REALLY A SET LEGAL

18   STANDARD THE COURT IS GOING TO BE INSTRUCTING THE JURY ON.  AND

19   THAT'S WHAT'S TROUBLING TO ME, IS THAT IT'S GOING TO -- SO

20   THAT'S ONE ISSUE, IS THAT IT'S GOING TO OVERSTATE THE

21   IMPORTANCE OF ANY ALLEGED CHANGES, EVEN THOUGH WHEN SOMEONE

22   APPLYING THE LAW, THE INTRINSIC AND EXTRINSIC TESTS, HAS TWO

23   THINGS TO COMPARE.  SO IT IS GOING TO MAGNIFY DIFFERENCES

24   BEYOND WHAT THE LAW PERMITS, BECAUSE YOU HAVE AN END PRODUCT.

25   IF YOU SAY, 'YOU KNOW, I MADE THAT SMALL CHANGE RIGHT HERE

1    BECAUSE IT WAS JUST THE MOST VITAL THING, FOR REASONS X, Y, AND

2    Z,' THAT IS ESSENTIALLY CHANGING THE LEGAL STANDARD, FROM MY

3    PERSPECTIVE.

4            SO I THINK THAT'S WHERE IT'S SOMEWHAT PROBLEMATIC.

5            THEN THE SECOND ASPECT OF WHAT'S TROUBLING ABOUT ANY

6    OF THIS IS THE IDEA THAT IT GETS COMMUNICATED TO THE JURY, AT

7    LEAST IMPLICITLY, THAT THERE WAS SO MUCH EFFORT, THAT ALL THIS

8    LABOR WENT INTO IT, ALL THIS WORK BY ALL THESE OTHER PEOPLE.

9    IF IT DIDN'T AMOUNT TO CHANGING THE PRODUCT FROM BEING

10   SUBSTANTIALLY SIMILAR TO THE DRAWINGS, IT'S IRRELEVANT.

11           **THE COURT:**  I AGREE WITH YOU ON THE SECOND POINT; I

12   TEND TO AGREE WITH MGA ON THE FIRST POINT; BUT I'D LIKE TO SEE

13   SOME AUTHORITY FROM BOTH SIDES.  I NEED TO EDUCATE MYSELF A

14   LITTLE BETTER ON THIS PARTICULAR AREA, AND I INVITE COUNSEL, IN

15   SHORT ORDER, TO GET ME APPROPRIATE LEGAL AUTHORITY ON THE

16   EVIDENCE, THE ADMISSIBLE EVIDENCE, THE RELEVANT EVIDENCE GOING

17   TO THE SUBSTANTIAL SIMILARITY TEST, ABOVE AND BEYOND THE

18   COMPARATIVE ASPECTS.

19           **MR. ZELLER:**  THANK YOU, YOUR HONOR.

20           **THE COURT:**  DO YOU UNDERSTAND WHAT I'M LOOKING FOR,

21   MR. ZELLER?

22           **MR. ZELLER:**  I DO, YOUR HONOR.

23           **THE COURT:**  MS. AGUIAR, DO YOU UNDERSTAND WHAT I'M

24   LOOKING FOR?

25           **MS. AGUIAR:**  I DO.  AND I DO JUST WANT TO ADD THAT TO

1    THE EXTENT THEY'RE ARGUING THAT WE COPIED, WE NEED TO BE ABLE

2    TO SHOW WHY WE DIDN'T COPY.  IN OTHER WORDS, IT'S AN IDEA OF

3    INDEPENDENT CREATION AND INDEPENDENT CREATIVITY.

4              **THE COURT:**  RIGHT.  BUT THIS IS NOT -- YOU'RE

5    CORRECT, THIS IS NOT A COPYING CASE LIKE THE ONE THAT I USED,

6    AND, PERHAPS, WAS A POOR ANALOGY TO USE.  I WAS TRYING TO GET

7    TO THE XEROX MACHINE AS OPPOSED TO THE PHOTOCOPY MACHINE.  I

8    DON'T WANT TO TRADEMARK THE PHOTOCOPY MACHINE.

9              (LAUGHTER.)

10             **THE COURT:**  BUT IT'S NOT A VIRTUAL IDENTITY STANDARD.

11   IF THIS WAS A VIRTUAL IDENTITY CASE, THEN YOU'D BE ABSOLUTELY

12   CORRECT.  IT'S A SUBSTANTIAL SIMILARITY CASE, ALTHOUGH I DON'T

13   KNOW HOW MUCH THAT CHANGES THE CALCULUS.  I REALLY WOULD

14   WELCOME -- YOU BOTH MAKE VERY STRONG ARGUMENTS.  I REALLY --

15   BUT THEY'RE BOTH, QUITE FRANKLY, NOW BEING DIVORCED FROM ANY --

16   AND I HAVE TO BELIEVE THAT THIS IS NOT THE FIRST COURT TO HAVE

17   TO GRAPPLE WITH THIS PARTICULAR ISSUE.

18             **MS. AGUIAR:**  I APPRECIATE THAT, YOUR HONOR.  AND WHEN

19   YOU COMMENTED BEFORE THAT MAYBE WHEN YOU STARTED THIS CASE, YOU

20   WERE THINKING, 'YOU KNOW, A BIG EYE IS A BIG EYE, OR BIG LIPS

21   ARE BIG LIPS,' AND NOW YOU'VE SEEN DOLLS, AND YOU'VE SEEN SOME

22   THAT HAVE BIG EYES AND BIG LIPS AND THEY'RE REALLY KIND OF

23   FREAKY LOOKING AND THEY'RE NOT SUCCESSFUL AND THEY'RE A LITTLE

24   SCARY.

25             **THE COURT:**  RIGHT.

1        MS. AGUIAR:  AND IT WOULD NOT APPEAL TO A

2   NINE-YEAR-OLD GIRL IN GREEN BAY, WISCONSIN.

3        SO IN ORDER FOR THE JURY TO UNDERSTAND THAT --

4        THE COURT:  I THINK THE JURY -- I THINK EVERYONE IN

5   THIS COURTROOM HAS FIGURED THAT OUT.

6        MS. AGUIAR:  THEY NEED TO HEAR TESTIMONY.  WE NEED TO

7   BE ABLE TO PUT ON OUR CASE AND EXPLAIN WHY, WHEN YOU'RE

8   MARKETING TO A NINE-YEAR-OLD GIRL, IT DOES MATTER, AND THERE

9   ARE STANDARDS AND IDEAS IN THE INDUSTRY IN TERMS OF WHY THAT

10  EYE, SPECIFICALLY THIS PARTICULARIZED EYE ON THE DOLL, IS NOT

11  THAT PARTICULARIZED EYE FROM THE DRAWING.

12       THE COURT:  WELL, THAT PART YOU'RE FREE TO MAKE.

13  THIS PARTICULARIZED EYE IS NOT THAT PARTICULARIZED EYE, OR IS

14  NOT SUBSTANTIALLY SIMILAR TO THAT PARTICULARIZED EYE.  THAT

15  ARGUMENT AND THAT EVIDENCE COMES IN.

16       MS. AGUIAR:  I UNDERSTAND.  BUT THE THOUGHT PROCESS

17  FROM THESE PEOPLE AS TO WHY THAT IS AND HOW THEY WENT THROUGH

18  THEIR PROCESS OF DETERMINING THAT AND DECIDING THAT AND PUTTING

19  THAT DOLL TOGETHER, OBVIOUSLY THIS IS A HUGE PART OF OUR CASE,

20  AND WE HAVE A SIGNIFICANT APPORTIONMENT ARGUMENT; SO THE

21  DIFFERENT ASPECTS OF WHAT GOES INTO MAKING A THREE-DIMENSIONAL

22  DOLL, WE CAN'T FORGET THAT OTHER PART OF THE CASE.

23       THE COURT:  I UNDERSTAND.

24       MS. AGUIAR:  THIS IS SERIOUSLY AND FUNDAMENTALLY PART

25  OF OUR APPORTIONMENT ARGUMENT, WHICH I DON'T THINK ANYONE WOULD

1    SUGGEST WE'RE NOT ENTITLED TO PUT ON.

2          **THE COURT:**  AND THAT'S WHAT I WAS REFERRING TO

3    EARLIER.  WHEN I MENTIONED DAMAGES, I DIDN'T USE THE WORD

4    "APPORTIONMENT."  THAT'S PRECISELY WHAT I'M REFERRING TO.

5          **MS. AGUIAR:**  SO LET'S NOT FORGET THAT IT'S NOT JUST

6    REGARDING THE DIFFERENCES AND THAT INDEPENDENT CREATIVE PROCESS

7    THAT WENT INTO DEVELOPING THIS DOLL; IT'S ALSO THE

8    APPORTIONMENT ARGUMENT.

9          **THE COURT:**  I RAISED THAT QUITE EARLY.  THAT'S WHAT I

10   MEANT WHEN I REFERRED TO DAMAGES.

11         WHY DON'T YOU ADDRESS THAT POINT, MR. ZELLER, HOW --

12         **MR. ZELLER:**  THAT IS JUST NOT THE LAW.  IT IS NOT THE

13   LAW THAT YOU CAN BASICALLY TALK ABOUT THOSE SORT OF THINGS AS

14   APPORTIONMENT.  IN FACT, THAT'S EXACTLY THE REASON WHY WE'RE

15   CONCERNED ABOUT JURY CONFUSION.

16         APPORTIONMENT BASICALLY SAYS -- I MEAN, IT'S

17   STATUTORY LANGUAGE.  IT DOESN'T SAY YOU GET TO PARSE OUT

18   DESIGN.  IT SAYS, IF YOU HAVE A -- LET'S ASSUME IT'S A CD,

19   WHICH IS SOMEWHAT OF A SIMPLER, EASIER ANALOGY.

20         **THE COURT:**  I UNDERSTAND; THAT THE CD, SEVEN TRACKS

21   NOT COPYRIGHTED; ONE THAT IS; YOU APPORTION THE DAMAGE BASED

22   ON THE --

23         **MR. ZELLER:**  RIGHT; SO THE WORK IS INFRINGING OR IT'S

24   NOT.  BUT YOU DON'T GET TO PARSE OUT HOW INFRINGING IS THE

25   WORK.  THAT'S WHAT THEY'RE REALLY TRYING TO SUGGEST.  YOU DON'T

1   GET TO APPORTION YOUR DESIGN.  THAT'S EXACTLY WHY I'M VERY

2   CONCERNED ABOUT THIS WHOLE ARGUMENT ABOUT RELATIVE WORTH OF THE

3   DRAWINGS.  I MEAN, THEY'RE TRYING TO MAKE THIS KIND OF

4   PROCEDURAL ARGUMENT IN A WAY.  I DON'T MEAN LEGAL PROCEDURE,

5   BUT DOLL-MAKING PROCEDURE, WHICH IS, 'WELL, YOU KNOW, YOU COULD

6   HAVE DRAWINGS; YOU MIGHT NOT.  AND YOU MAKE A DOLL, AND IT

7   TAKES ALL THIS EFFORT AND LABOR AND 1,000 PEOPLE, OR WHATEVER

8   THE CASE MAY BE, TO COME UP WITH THE DOLL.'

9          **THE COURT:**  AND WHAT YOU STATED THERE, YOU DON'T GET

10  APPORTIONMENT OF THE DESIGN.  I UNDERSTAND THAT.

11          LET'S CONTINUE THIS CONVERSATION WITH THE BENEFIT OF

12  SOME LEGAL AUTHORITY.

13          **MR. ZELLER:**  THANK YOU.

14          **THE COURT:**  I DIDN'T HAVE TIME TO GET TO THE OTHER

15  MOTION.  I'LL TAKE THAT UP AT THE BEGINNING OF THE LUNCH HOUR.

16          LET'S GET THE JURY IN HERE.  LET'S CONTINUE WITH

17  MR. LARIAN'S TESTIMONY, AND THEN WE'LL TAKE A BREAK.  THE COURT

18  HAS OTHER MATTERS TO ATTEND TO DURING THE BREAK.  I'LL TAKE UP

19  THE MOTION FOR SANCTIONS AT THE BEGINNING OF LUNCH.

20          LET'S BRING THE JURY IN.

21          WHEREUPON, JURORS ENTER COURTROOM.)

22          **THE CLERK:**  CALLING ITEM NUMBER ONE ON CALENDAR, CASE

23  NUMBER CV04-09049-SGL, MATTEL, INC., V. MGA, INC., ET AL.

24          COUNSEL, PLEASE STATE YOUR APPEARANCES FOR THE

25  RECORD.

THURSDAY, AUGUST 7, 2008          TRIAL DAY 31, MORNING SESSION

```
 1              MR. QUINN:  JOHN QUINN, BILL PRICE, MIKE ZELLER FOR

 2   MATTEL.

 3              MR. NOLAN:  TOM NOLAN, LAUREN AGUIAR,

 4   JONATHAN USLANER ON BEHALF OF MGA AND ISAAC LARIAN.

 5              THE COURT:  GOOD MORNING, COUNSEL.

 6         MR. PRICE, YOU MAY PROCEED.

 7              DIRECT EXAMINATION (CONTINUED)

 8   BY MR. PRICE:

 9   Q    MR. LARIAN, I'VE PROVIDED YOU WITH A SMALLER BINDER, SO

10   YOU CAN GET TO SOME DOCUMENTS FAIRLY EASILY.  I JUST NEED TO

11   GET SOME DOCUMENTS IDENTIFIED HERE.  IN THAT SMALL BINDER,

12   THERE'S AN EXHIBIT 655.

13         HAVE YOU FOUND IT?

14   A    YES.

15   Q    DO YOU RECOGNIZE THAT AS AN AUDITED CONSOLIDATED FINANCIAL

16   STATEMENT FOR MGA ENTERTAINMENT, INC., FOR THE YEARS ENDED

17   DECEMBER 31, 2002, AND 2001?

18   A    THAT'S WHAT IT SAYS, YES.

19              MR. PRICE:  MOVE EXHIBIT 655 INTO EVIDENCE.

20              MR. NOLAN:  NO OBJECTION.

21              THE COURT:  IT'S ADMITTED.

22         YOU MAY PUBLISH.

23         (EXHIBIT 655 RECEIVED.)

24   BY MR. PRICE:

25   Q    WE'RE GOING TO GO THROUGH THESE QUICKLY.
```

1    IF YOU'LL LOOK AT 656, DO YOU RECOGNIZE THAT AS

2  CONSOLIDATED FINANCIAL STATEMENTS FOR MGA ENTERTAINMENT, YEAR

3  ENDED DECEMBER 31, 2003, ALONG WITH THE REPORTED INDEPENDENT

4  AUDITORS?

5  A    YES.

6         **MR. PRICE:**  MOVE EXHIBIT 656 INTO EVIDENCE,

7  YOUR HONOR.

8         **MR. NOLAN:**  NO OBJECTION.

9         **THE COURT:**  IT'S ADMITTED.

10        YOU MAY PUBLISH.

11        (EXHIBIT 656 RECEIVED.)

12  **BY MR. PRICE:**

13  Q    DO YOU RECOGNIZE EXHIBIT 657 AS MGA'S AUDITED CONSOLIDATED

14  FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2004, AND

15  2003?

16  A    YES.  THAT'S WHAT IT SAYS.

17        **MR. PRICE:**  MOVE EXHIBIT 657 INTO EVIDENCE,

18  YOUR HONOR.

19        **MR. NOLAN:**  NO OBJECTION.

20        **THE COURT:**  IT'S ADMITTED.

21        YOU MAY PUBLISH.

22        (EXHIBIT 657 RECEIVED.)

23  **BY MR. PRICE:**

24  Q    DO YOU RECOGNIZE EXHIBIT 658 AS MGA'S AUDITED CONSOLIDATED

25  FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2005, AND

1    2004?

2    A    YES.

3              **MR. PRICE:**  MOVE EXHIBIT 658 INTO EVIDENCE,

4    YOUR HONOR.

5              **MR. NOLAN:**  NO OBJECTION.

6              **THE COURT:**  IT'S ADMITTED.

7              YOU MAY PUBLISH.

8              (EXHIBIT 658 RECEIVED.)

9    **BY MR. PRICE:**

10   Q    AND THEN IF YOU'LL LOOK AT 659.

11             DO YOU RECOGNIZE THAT AS MGA'S AUDITED CONSOLIDATED

12   FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2006, AND

13   2005?

14   A    YES.

15             **MR. PRICE:**  MOVE EXHIBIT 659 INTO EVIDENCE,

16   YOUR HONOR.

17             **MR. NOLAN:**  NO OBJECTION.

18             **THE COURT:**  IT'S ADMITTED.

19             YOU MAY PUBLISH.

20             (EXHIBIT 659 RECEIVED.)

21   **BY MR. PRICE:**

22   Q    THEN IF YOU'LL LOOK AT 10188.

23             DO YOU RECOGNIZE THIS AS THE AUDITED CONSOLIDATED

24   FINANCIAL STATEMENTS FOR THE YEARS ENDED 1999 AND 2000?

25   A    YES.

1          **MR. PRICE:**  MOVE EXHIBIT 10188 INTO EVIDENCE,

2     YOUR HONOR.

3          **THE COURT:**  IT'S ADMITTED.

4          YOU MAY PUBLISH.

5          (EXHIBIT 10188 RECEIVED.)

6     **BY MR. PRICE:**

7     Q     THEN IF YOU'LL LOOK AT EXHIBIT 10722.

8          DO YOU RECOGNIZE THIS AS MGA'S AUDITED CONSOLIDATED

9     FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2001, AND

10    2000?

11    A     IT DOESN'T HAVE A LOT OF PAGES, BUT THAT'S WHAT IT SAYS ON

12    THE DOCUMENT, SO I'D SAY YES.

13         **MR. PRICE:**  MOVE EXHIBIT 10722 INTO EVIDENCE,

14    YOUR HONOR.

15         **MR. NOLAN:**  NO OBJECTION.

16         **THE COURT:**  IT'S ADMITTED.

17         YOU MAY PUBLISH.

18         (EXHIBIT 10722 RECEIVED.)

19    **BY MR. PRICE:**

20    Q     MR. LARIAN, WHAT WE JUST WENT THROUGH, WE'VE DESCRIBED

21    THESE AS AUDITED FINANCIAL STATEMENTS.

22         FOR THESE STATEMENTS, IT'S TRUE THAT AN AUDITOR, A

23    THIRD PARTY, CAME IN AND AUDITED MGA'S FINANCIAL RECORDS;

24    CORRECT?

25    A     I'M NOT AN ACCOUNTANT, BUT I THINK THAT'S WHAT THEY DO.

```
 1   Q    IN OTHER WORDS, THESE AREN'T JUST THE NUMBERS AS YOU
 2   REPRESENTED THEM; THEY WERE THE NUMBERS AS AUDITED BY AN
 3   OUTSIDE AUDITOR; CORRECT?
 4   A    AGAIN, I'M NOT AN ACCOUNTANT, BUT MY UNDERSTANDING IS THAT
 5   THAT'S WHAT THE AUDITORS DO.
 6   Q    ONE THING THAT MGA DOES IN ITS BUSINESS IS TO GET
 7   FINANCING TO FINANCE ITS OPERATIONS; CORRECT?
 8   A    AT WHAT TIME?
 9   Q    WELL, THROUGHOUT MGA'S HISTORY.
10   A    I BELIEVE AT CERTAIN TIMES, WE DIDN'T HAVE -- AGAIN, I
11   DON'T REMEMBER.  I DON'T -- I'M MORE OF A CREATIVE PERSON THAN
12   A FINANCE PERSON.  BUT MY RECOLLECTION IS, MOST OF THE TIME WE
13   HAVE, BUT AT CERTAIN TIMES, I DON'T THINK WE HAD FINANCING
14   NEEDS.
15   Q    WELL, IT'S TRUE THAT, SAY, FOR EXAMPLE, FOR THE LAST FEW
16   YEARS, AT CERTAIN TIMES, MGA HAS HAD TO BORROW MONEY, AS ALL
17   BUSINESSES DO, TO FINANCE OPERATIONS?
18   A    THAT'S CORRECT.
19   Q    AND ONE OF THE THINGS THAT THESE OUTSIDE FINANCING
20   COMPANIES, SOMETIMES BANKS, REQUIRE IS THAT MGA HAVE AUDITED
21   FINANCIAL RECORDS AS OPPOSED TO JUST THE NUMBERS AS MGA WOULD
22   REPRESENT THEM?
23   A    SOMETIMES THEY DO; SOMETIMES THEY DON'T.  AGAIN, I'M
24   NOT -- I CANNOT SAY FOR SURE THAT THEY ALL REQUIRE THIS.
25   Q    SO IF YOU CAN'T SAY ALL, THEN YOU CAN'T SAY THE SUM OF THE
```

1   FINANCIAL INSTITUTIONS HAVE REQUIRED THAT MGA PRESENT AUDITED

2   FINANCIAL STATEMENTS RATHER THAN JUST MGA'S OWN

3   REPRESENTATIONS?

4   A    TO THE BEST OF MY KNOWLEDGE, THAT'S CORRECT.

5   Q    AND IT'S YOUR UNDERSTANDING THAT WHAT THE AUDITORS DO IS

6   GIVE AN INDEPENDENT OPINION OF MGA'S FINANCIAL SITUATION?

7   A    I BELIEVE THAT'S WHAT THEY DO.

8   Q    I'D ALSO LIKE YOU TO LOOK AT EXHIBIT 10195.

9   A    YES.

10  Q    HAVE YOU FOUND THAT?

11  A    YES.

12  Q    AND AT SOME POINT, YOU WERE GOING TO MAKE AN OFFER TO

13  MR. TOM PARKS FOR THE POSITION OF CHIEF OPERATIONS OFFICER OF

14  MGA; CORRECT?

15  A    YES.

16  Q    AND DID MR. PARKS BECOME THE CHIEF OPERATIONS OFFICER?

17  A    I BELIEVE HE DID, YES.

18  Q    SO HE ACCEPTED YOUR OFFER?

19  A    I BELIEVE HE DID.

20  Q    AND DO YOU RECOGNIZE EXHIBIT 10195 AS A LETTER THAT WAS

21  DRAFTED WITH RESPECT TO THE OFFER TO MR. PARKS?

22  A    IT'S JUST A LETTER.  I DON'T RECALL THIS DOCUMENT.  I SEE

23  IT THE WAY YOU SEE IT.  I DON'T RECALL THIS DOCUMENT, NOR IS IT

24  ON MGA'S LETTERHEAD, SO...

25  Q    YOU SEE IT CAME FROM MGA'S PRODUCTION; YOU SEE IT HAS

1  MGA'S BATES NUMBER ON IT?

2  A    YES, I DO.

3  Q    AND IT HAS YOUR NAME AT THE END OF IT?

4  A    MY NAME IS TYPED IN THERE, YES.

5          **MR. PRICE:**  YOUR HONOR, MOVE EXHIBIT 10195 INTO

6  EVIDENCE.

7          **MR. NOLAN:**  OBJECTION.  LACK OF FOUNDATION.

8          **THE COURT:**  MOVE ALONG, COUNSEL.  COME BACK TO IT.

9          DO YOU HAVE QUESTIONS ON THIS PARTICULAR DOCUMENT?

10         **MR. PRICE:**  I DO HAVE QUESTIONS ON THIS DOCUMENT.

11  THERE'S ONE OTHER DOCUMENT I NEED TO GET IN, BUT I CAN COME

12  BACK TO IT AFTER THAT.

13         **THE COURT:**  GO TO THAT, PLEASE.

14  **BY MR. PRICE:**

15  Q    FINALLY, MR. LARIAN, AT SOME IN THIS LITIGATION, YOU WERE

16  REQUESTED TO PROVIDE DOCUMENTS WHICH REFLECTED YOUR NET WORTH.

17         DO YOU RECALL THAT?

18  A    PRECISELY, NO.  BUT I TURNED EVERYTHING OVER TO MY

19  ATTORNEYS TO PROVIDE.

20  Q    THERE'S A WOMAN WHO WORKS AT MGA CALLED LISA TONNU?

21  A    YES.

22  Q    THERE CAME A TIME WHEN YOU ASKED MS. TONNU, OR SOMEONE

23  ELSE WITHIN MGA, TO PUT TOGETHER CERTAIN FINANCIAL INFORMATION

24  FOR YOU IN CONNECTION WITH THIS CASE; CORRECT?

25  A    I BELIEVE SO, YES.

1    Q    AND IF YOU WOULD LOOK AT EXHIBIT 4947.  IT SHOULD HAVE, I

2    BELIEVE, FOUR PAGES.

3    A    I SEE ONLY THREE PAGES.

4    Q    IT'S FRONT AND BACK.

5    A    THAT'S CORRECT.  I'M SORRY.

6    Q    IT'S YOUR UNDERSTANDING THAT EXHIBIT 4947 IS ONE OF THE

7    DOCUMENTS THAT WAS PUT TOGETHER BY MS. TONNU AS A RESULT OF

8    YOUR REQUEST; CORRECT?

9    A    I DON'T KNOW, BUT I HAVE NO REASON TO DOUBT IT.

10   Q    AND YOU RECALL THIS WAS PROVIDED TO MATTEL SOMETIME IN

11   JANUARY OF 2008?

12   A    I DON'T KNOW WHEN IT WAS OR IF IT WAS.  I DON'T KNOW.

13          **MR. PRICE:**  MOVE EXHIBIT 4947 INTO EVIDENCE.

14          **MR. NOLAN:**  NO OBJECTION.

15          **THE COURT:**  IT'S ADMITTED, AS IS 10195.

16          YOU MAY PUBLISH BOTH.

17          (EXHIBITS 4947 AND 10195 RECEIVED.)

18   **BY MR. PRICE:**

19   Q    LET'S GO BACK TO 10195.

20          THE DATE OF THIS DOCUMENT IS OCTOBER 2003; CORRECT?

21   A    YES.

22          EXHIBIT WHAT?

23   Q    10195.

24   A    THAT'S CORRECT, OCTOBER 26, 2003.

25   Q    AND ONE OF THE METHODS OF COMPENSATION YOU WERE GOING TO

1    USE WITH MR. PARKS WAS TO GIVE HIM STOCK OPTIONS; CORRECT?

2    A    THAT'S CORRECT.

3    Q    AND IN CONNECTION --

4    A    THAT'S WHAT THE DOCUMENT SAYS.

5    Q    AND IN CONNECTION WITH THE STOCK OPTIONS, THERE WAS A

6    VALUE PUT ON THE COMPANY, OF MGA, OF APPROXIMATELY $1.95

7    BILLION; CORRECT?

8    A    THAT'S WHAT THE DOCUMENT SAYS, YES.

9    Q    IF WE COULD TURN YOUR ATTENTION TO THE OTHER DOCUMENT THAT

10   WE JUST DISCUSSED BRIEFLY, 4947.

11        YOU RECOGNIZE THIS PREPARED BY MGA WHICH HAS YOUR NET

12   WORTH ON 2006 AND 2007?  DO YOU SEE THAT?

13   A    WHERE DO YOU SEE THAT?  MARCH, 2006.

14   Q    THAT'S THE FIRST FEW PAGES.

15   A    MY CONFUSION WAS THAT YOU SAID 2007.

16   Q    I'M GOING TO ASK YOU TO LOOK AT THE LAST PAGE.

17   A    YES.  IT SAYS 2006.

18   Q    SEE THE LAST PAGE, WHICH IS THE FOURTH PAGE.  THIS WAS

19   YOUR LIST OF ASSETS AS OF -- IF WE CAN LOOK AT THE BOTTOM DATE

20   THERE -- IT'S DATED OCTOBER 25, 2007.

21   A    I SEE THAT, YES.

22   Q    AND AMONG THE ASSETS LISTED ARE -- THERE'S A SECTION HERE

23   CALLED MARKETABLE SECURITIES FOR LARIAN LIVING TRUST AND

24   QUALIFIED ANNUITY TRUST.

25        THESE WERE ASSETS AS OF OCTOBER 25, 2007; CORRECT?

1  A    I AM NOT ONE HUNDRED PERCENT SURE, BUT I THINK SO, AGAIN.

2  Q    AND THESE TOTAL SOMEWHERE OVER $200 MILLION, JUST THE

3  MARKETABLE SECURITIES; CORRECT?

4  A    CORRECT.

5  Q    BY "MARKETABLE," WHAT YOU'RE SAYING IS, IF YOU WANTED TO

6  CASH OUT -- THIS WAS AT THE TIME, THE AMOUNT YOU COULD HAVE

7  RECEIVED FOR THESE SECURITIES?

8  A    I BELIEVE SO, YES.

9  Q    AND THEN WE HAVE HERE MGA ENTERTAINMENT.  WE HAVE A FIGURE

10  OF $1,636,380,000 AS PRORATED SHARE OF INVESTMENT.

11         DO YOU SEE THAT?

12  A    I DO.

13  Q    AND BY "PRORATED SHARE," YOU OWN -- YOUR OWNERSHIP OF MGA

14  ENTERTAINMENT IS 81.82 PERCENT; CORRECT?

15  A    THAT'S CORRECT.

16  Q    AND THEN WE HAVE TOTAL ASSETS HERE OF OVER $1.9 BILLION.

17         DO YOU SEE THAT?

18  A    YES.

19  Q    FROM THAT, YOU SUBTRACT LIABILITIES, SO THAT WE END UP

20  WITH NET ASSETS IN EXCESS OF $1.9 BILLION AS OF OCTOBER 25,

21  2007; CORRECT?

22  A    THAT'S WHAT THAT DOCUMENT SAYS.  I DON'T AGREE WITH THE

23  NUMBERS, BUT THAT'S WHAT THE DOCUMENT SAYS.

24  Q    THESE ARE THE NUMBERS THAT WERE PROVIDED TO MATTEL BY MGA

25  IN RESPONSE TO A REQUEST FOR ANY DOCUMENTS PERTAINING TO YOUR

1   NET WORTH; CORRECT?

2   A    AGAIN, TO THE BEST OF MY KNOWLEDGE, YES.

3   Q    AND THIS IS THE ONLY CALCULATION PROVIDED TO MATTEL PRIOR

4   TO THE START OF THIS TRIAL; CORRECT?

5   A    I DO NOT KNOW THAT.

6   Q    BY THE WAY, I WAS PREVIOUSLY ASKING ABOUT AUDITED

7   FINANCIAL RECORDS, AND I THINK THE LAST YEAR WE HAD WAS

8   EXHIBIT 659, WHICH WAS THE YEAR 2006.

9        THAT IS THE LAST INDEPENDENTLY-AUDITED FINANCIAL

10  RECORD THAT MGA HAS; IS THAT CORRECT?

11  A    I WOULD NOT KNOW IF THAT'S CORRECT OR NOT.  AGAIN, I DO

12  MOST OF THE CREATIVE WORK, AND WE HAVE AN ACCOUNTING

13  DEPARTMENT, SO I DON'T KNOW IF WE HAVE AN AUDITED FINANCIAL

14  STATEMENT AFTER THIS OR NOT.  I DO NOT KNOW.

15  Q    THANK YOU, MR. LARIAN.

16           **MR. PRICE:**  NO FURTHER QUESTIONS, YOUR HONOR.

17           **THE COURT:**  CROSS-EXAMINATION?

18                       **CROSS-EXAMINATION**

19  **BY MR. NOLAN:**

20  Q    GOOD MORNING, MR. LARIAN.

21        I WANT TO GO BACK TO WHAT MR. PRICE JUST SHOWED YOU.

22  THAT WAS EXHIBIT 4947, A LIST OF YOUR PERSONAL ASSETS.

23        DO YOU HAVE THAT?

24  A    GO AHEAD.

25  Q    DO YOU HAVE THAT IN FRONT OF YOU?

```
 1   A     I DO.

 2   Q     4947 WAS PRODUCED AS PART OF THIS LITIGATION; CORRECT?

 3   A     I DON'T KNOW IF IT WAS OR NOT.

 4   Q     DID YOU PERSONALLY PREPARE THIS LIST OF ASSETS?

 5   A     I DID NOT.

 6   Q     I WANT TO DRAW YOUR ATTENTION, IF I MIGHT, TO THE LINE

 7   ITEM ON THIS REFERRING TO THE VALUE OF MGA.

 8           DO YOU SEE THAT?

 9   A     I DO SEE IT ON MY PAPER.

10   Q     WE'LL HIGHLIGHT THAT.

11           NOW, FIRST OF ALL, IT REFERS TO MGA ENTERTAINMENT AS

12   AN S-CORP.

13           DO YOU SEE THAT?

14   A     YES, I DO.

15   Q     AND THEN THE VALUE THAT'S ATTACHED IS $1.2 BILLION;

16   CORRECT?

17   A     YES.

18   Q     TOTAL ASSETS OF ABOUT $1,347,000,000.

19           DO YOU SEE THAT?

20   A     I DO.

21   Q     SO THE GREATEST PERCENTAGE OF YOUR NET WORTH IS TIED TO

22   THE VALUE OF MGA; CORRECT?

23   A     CORRECT.

24   Q     NOW, DO YOU NOW HAVE KNOWLEDGE -- WELL, FIRST OF ALL, IS

25   THAT WHAT YOUR VALUE OF MGA WAS AS OF 2007?
```

1    A    I WOULD NOT KNOW.

2    Q    HAVE YOU HAD CONVERSATIONS WITH LISA TONNU ABOUT WHAT

3    INFORMATION WAS USED TO PREPARE THIS CALCULATION?

4    A    YES.

5    Q    AND DO YOU KNOW NOW WHAT THE $1.2 BILLIONS VALUE OF MGA

6    WAS BASED ON, WHAT YEAR?

7              **MR. PRICE:**  OBJECTION.  THAT'S HEARSAY.

8              **THE COURT:**  LAY A FOUNDATION, COUNSEL.

9    **BY MR. NOLAN:**

10   Q    I'LL GO BACK IN TIME.

11             IS IT TRUE, MR. LARIAN -- LET'S APPROACH IT THIS WAY:

12   THE FINANCIAL PERFORMANCE OF THE BRATZ LINE --

13   A    YES.

14   Q    -- AT THE END OF 2007, WAS IT YOUR UNDERSTANDING THAT THE

15   BRATZ LINE WAS PERFORMING, THAT IS SELLING, AS PROFITABLY AS IT

16   HAD IN THE YEAR 2005?

17   A    IT WAS NOT.

18   Q    AND CAN YOU EXPLAIN THE DIFFERENCE BETWEEN THE PERFORMANCE

19   OF BRATZ IN 2005 AND 2007.

20   A    TO THE BEST OF MY KNOWLEDGE, THE BRATZ LINE DROPPED ABOUT

21   30 TO 40 PERCENT IN 2007, DUE TO SEVERAL FACTORS.

22   Q    WHAT WERE THOSE FACTORS?

23             **MR. PRICE:**  OBJECTION.  SPECULATION; LACK OF

24   FOUNDATION.

25             **THE COURT:**  SUSTAINED.

1          LAY A FURTHER FOUNDATION, COUNSEL.

2   **BY MR. NOLAN:**

3   Q    AS THE CEO AND THE LARGEST MAJOR SHAREHOLDER OF AN

4   S CORPORATION KNOWN AS MGA, DO YOU HAVE INFORMATION WITH

5   RESPECT TO THE FINANCIAL PERFORMANCE AT VARIOUS TIMES?

6   A    I DO.

7   Q    AND DO YOU RECEIVE REGULAR REPORTS WITH RESPECT TO

8   REVENUES BY MGA, AND IN PARTICULAR, THE BRATZ LINE?

9   A    I DO.

10  Q    AND YOU REVIEW THAT INFORMATION?

11  A    SOMETIMES I DO.

12  Q    AND DO YOU MAKE ANY ATTEMPT TO DETERMINE WHETHER OR NOT

13  THE BRATZ LINE IS SELLING AT A CERTAIN LEVEL OR DECLINING OR

14  INCREASING?

15  A    I DO THAT REGULARLY.

16  Q    SO BASED ON YOUR REVIEW OF AVAILABLE FINANCIAL REPORTS, DO

17  YOU ALSO TRY TO ANALYZE WHAT IS CONTRIBUTING EITHER TO THE

18  SUCCESS OF THE LINE OR TO THE DECLINING NATURE OF THE LINE?

19  A    I DO ON A REGULAR BASIS.

20  Q    AND CAN YOU EXPLAIN TO THE JURY WHAT YOU DO IN THAT

21  REGARD.  WHAT DO YOU DO TO TRY TO FIGURE OUT WHAT'S AFFECTING

22  YOUR BUSINESS?

23  A    I LOOK AT COMPETITION, WHAT COMES IN THE MARKET.  I LOOK

24  AT WHAT WE CALL POS, RATE OF SALES AT RETAIL.  I LOOK AT THOSE

25  REGULARLY, AND THEN COMPARE IT TO THE YEAR BEFORE.  I LOOK AT

1    WHAT OTHER COMPETITORS ARE DOING WITH THE PRODUCT.  THOSE ARE

2    SOME OF THE THINGS I DO.  I LOOK AT OUR PRODUCT LINE VERSUS

3    WHAT WE HAVE DONE IN THE PAST, HOW SUCCESSFUL THEY WERE OR NOT.

4    Q    NOW, BASED ON THE INFORMATION THAT YOU WERE RECEIVING

5    REGARDING THE PERFORMANCE OF MGA AND BRATZ, AND YOUR REVIEW OF

6    COMPETITIVE AND INDUSTRY DATA, WERE YOU ABLE TO DETERMINE WHAT

7    FACTORS WERE LEADING TO A DECLINE IN OVERALL SALES FOR BRATZ?

8    A    YES, I WAS.

9    Q    AND WHAT WERE THE FACTORS THAT YOU BELIEVED WERE LEADING

10   TO THE DECLINE OF THE BRATZ SALES?

11        **MR. PRICE:**  OBJECTION.  LACK OF FOUNDATION.  BEST

12   EVIDENCE AS TO WHAT THOSE NUMBERS ARE.  AND IT'S IRRELEVANT.

13        **THE COURT:**  IT'S HARD TO RULE WITHOUT KNOWING THE

14   FACTORS.

15        LET'S TALK AT SIDE-BAR.

16        (WHEREUPON, THE FOLLOWING PROCEEDINGS

17        WERE HELD AT SIDE-BAR:)

18        **THE COURT:**  CAN YOU PROFFER WHAT THE FACTORS ARE HE'S

19   GOING TO GET INTO?  IT'S HARD FOR ME TO RULE WITHOUT KNOWING

20   WHAT THE FACTORS ARE.

21        **MR. NOLAN:**  SURE.

22        THE FOUNDATION HE'S LAID ABOUT LOOKING AT COMPETITIVE

23   INDUSTRY STANDARDS, WHAT'S GOING ON, HE TALKED ABOUT THE

24   DECLINING MARKET SHARE FOR BRATZ IS AFFECTED BY, FOR INSTANCE,

25   NEW PRODUCTS COMING TO THE LINE, HANNAH MONTANA, HIGH SCHOOL

1   MUSICAL, A CHANGING GENRE OF WHAT GIRLS ARE LOOKING AT AND

2   PLAYING WITH; THE DECLINE OF THE TOY INDUSTRY IN GENERAL SINCE

3   1998, WHICH I DON'T THINK CAN BE DISPUTED BY MATTEL.  IF IT IS,

4   MAYBE I SHOULD PUT ON MR. ECKERT BECAUSE HE MAKES REGULAR

5   STATEMENTS WITH RESPECT TO THE DECLINE OF THE SALE OF FASHION

6   DOLLS, AGE COMPRESSION OF THE TARGET MARKET; THAT'S A PHENOMENA

7   THAT CONTINUES TO GO ON.  THE INCREASING POPULARITY OF VIDEO

8   GAMES, JUST THE SWITCHING OF THE GIRLS, AND EVEN BOYS, AWAY

9   FROM STATIC DOLLS LIKE THIS TO MORE OF VIDEO INTERACTIVE GAMES.

10          THIS IS WHAT HE DID AS A CEO, ANALYZING TRENDS ON

11  WHAT'S GOING ON IN THE INDUSTRY.

12          **THE COURT:**  MR. PRICE?

13          **MR. PRICE:**  I THINK THERE'S AN ADEQUATE FOUNDATION

14  FOR IT.  IN FACT, I THOUGHT HE SAID HE DIDN'T PAY ATTENTION;

15  THAT HE WAS CREATIVE.  AND SECOND, THIS IS JUST IMPROPER LAY

16  OPINION ABOUT WHAT --

17          **THE COURT:**  HE'S A CEO.  BOB ECKERT STOOD UP THERE

18  AND TALKED ABOUT THE TOY -- WHO BETTER TO KNOW WHAT'S GOING ON

19  IN THE TOY INDUSTRY THAN A CEO OF A TOY COMPANY.

20          **MR. PRICE:**  ONE WOULD THINK.  EXCEPT FOR WHAT HE SAID

21  WHEN I WAS EXAMINING HIM, WHICH IS HE DOES NOT PAY ATTENTION TO

22  THESE THINGS; HE'S CREATIVE; SO I THINK SOME CEOS ARE INVOLVED,

23  SOME ARE NOT.

24          **THE COURT:**  THAT GOES MORE TO THE WEIGHT OF THE

25  EVIDENCE.  I'M MORE CONCERNED ABOUT THE RELEVANCE OF ALL OF

1    THIS.   THE BOTTOM LINE IS CERTAINLY SIGNIFICANT, I SUPPOSE.

2    THE VALUE OF MGA AND THE PROJECTED VALUE OF MGA IS RELEVANT.

3            MY INCLINATION IS TO OVERRULE THE OBJECTION.   IT'S

4    IMPEACHABLE; YOU HAVE OTHER EVIDENCE TO BRING IN IN TERMS OF

5    THE VALUE.

6            **MR. PRICE:**   ON RELEVANCE, YOUR HONOR, THE JURY CANNOT

7    MAKE ANY CONCLUSIONS ON THIS AS TO WHETHER THEY ARE GOING TO

8    CONTINUE USING -- OR WHETHER THEY ARE TO GET BETTER.

9            **THE COURT:**   YOU'RE RIGHT.

10           **MR. PRICE:**   THEY HAVE EXPERTS COME IN AND TESTIFY

11   ABOUT THAT, ABOUT FUTURE VALUE, AND IF THE EXPERT DOESN'T

12   CONNECT THIS UP, THEN THIS REALLY HAS NO RELEVANCE TO THE JURY.

13   IT'S JUST GENERAL OPINIONS.

14           **THE COURT:**   IT DOESN'T, AND AT THAT POINT IN TIME, I

15   WILL -- LET'S DO THIS VERY BRIEFLY.   THIS SHOULD NOT BE A

16   LONG -- I'M GOING TO OVERRULE THE OBJECTION.

17           (SIDE-BAR PROCEEDINGS CONCLUDED.)

18   **BY MR. NOLAN:**

19   Q    MR. LARIAN, GOING BACK TO MY QUESTION, COULD YOU EXPLAIN

20   TO THE JURY, BASED ON YOUR REVIEW, SOME OF THE FACTORS THAT

21   WERE CAUSING A DECLINE IN, AND ARE CAUSING A DECLINE IN, THE

22   BUSINESS OF BRATZ.

23   A    THERE WERE SEVERAL FACTORS, ESPECIALLY LAST YEAR.   A

24   PRODUCT CALLED "HANNAH MONTANA" CAME TO THE MARKET AS A FASHION

25   DOLL.   IT WAS VERY SUCCESSFUL.   IT TOOK BUSINESS AWAY FROM US.

1        ANOTHER PROPERTY, ANOTHER DOLL, CAME CALLED "HIGH

2   SCHOOL MUSICAL."  THAT WAS VERY SUCCESSFUL.  IT TOOK BUSINESS

3   AWAY.

4        ANOTHER PRODUCT THAT BECAME IN THE TOY MARKET FOR THE

5   SAME AGE GROUP THAT HAS BEEN VERY, VERY SUCCESSFUL IS CALLED

6   "WEBKINZ."  THAT HAS TAKEN THOSE DOLLARS AWAY FROM BRATZ

7   FASHION DOLLS.  KIDS ARE NOW COLLECTING WEBKINZ, WHICH IS A

8   PIECE OF PLUSH THAT YOU PLAY AT HOME, BUT YOU ALSO COLLECT

9   THEM.  BUT YOU CAN ALSO GO ON THE COMPUTER.

10       ANOTHER PROPERTY THAT BECAME VERY SUCCESSFUL FOR THAT

11  AGE GROUP IS CALLED "LITTLEST PET SHOP."  THAT'S BY A COMPANY

12  CALLED HASBRO.  IT'S BEEN VERY SUCCESSFUL.  KIDS IN GENERAL ARE

13  BUYING LESS FASHION DOLLS, WHETHER IT'S BRATZ OR BARBIE.  I

14  THINK BARBIE SALES HAVE DECLINED ALSO.  BECAUSE THE MONEY THAT

15  THE KIDS HAVE BASICALLY IS GOING TO OTHER PRODUCTS.

16       THE OTHER THING THAT ATTRIBUTED TO THE DECLINE OF

17  BRATZ DOLL WAS THAT WE LOST FOCUS ON WHAT IS THE CORE ESSENCE

18  OF THE BRATZ DOLL.  THAT WAS DIFFERENT FASHIONS FOR EACH

19  CHARACTER.  WE LOST FOCUS OF THAT.

20  Q   MR. LARIAN, ADDRESSING THAT LAST POINT, YOU LOST FOCUS,

21  THIS LAWSUIT HAS BEEN GOING ON FOR HOW MANY YEARS?

22  A   AT LEAST FOUR YEARS.

23           **MR. PRICE:**  OBJECTION.  THE LAWSUIT IS IRRELEVANT.

24           **THE COURT:**  I THINK THE JURY IS WELL AWARE OF WHEN

25  THE LAWSUIT WAS FILED.

THURSDAY, AUGUST 7, 2008              TRIAL DAY 31, MORNING SESSION

1    MR. NOLAN:  IN FACT, I BELIEVE THERE WAS A

2  STIPULATION TO THAT.

3    THE COURT:  I THINK THERE WAS A STIPULATION FOR THE

4  FILING OF THE LAWSUIT.

5    MR. NOLAN:  THANK YOU.

6    THE WITNESS:  MATTEL SUED CARTER BRYANT IN 2004 AND

7  SUED MGA IN 2007.  THEY SUED ME IN 2007 PERSONALLY, SEVERAL

8  YEARS.

9  **BY MR. NOLAN:**

10  Q    MR. LARIAN, DO YOU CONSIDER YOURSELF, OVER THE YEARS OF

11  THE BRATZ LINE, TO HAVE BEEN A CREATIVE FORCE IN PUSHING THE

12  BRAND?

13  A    I DO.

14  Q    DURING THE LAST FEW YEARS, HAVE YOU SPENT A CONSIDERABLE

15  AMOUNT OF TIME DEVOTED TO THIS LITIGATION?

16    MR. PRICE:  OBJECTION.  RELEVANCE.

17    THE COURT:  SUSTAINED.

18  **BY MR. NOLAN:**

19  Q    HOW MANY EMPLOYEES DOES MGA HAVE?

20  A    I THINK WE HAVE --

21    MR. PRICE:  OBJECT TO THE RELEVANCE.

22    THE COURT:  SUSTAINED.

23  **BY MR. NOLAN:**

24  Q    HAS MGA BEEN FORCED TO LAY OFF EMPLOYEES AS A RESULT OF

25  THE DECLINE IN THE MARKET?

1   A   YES.

2          **MR. PRICE:**  OBJECTION.  THERE'S A MOTION *IN LIMINE* ON

3   THIS, I'M TOLD IN MY RIGHT EAR.

4          **THE COURT:**  SIDE-BAR, COUNSEL.

5          (WHEREUPON, THE FOLLOWING PROCEEDINGS

6          WERE HELD AT SIDE-BAR:)

7          **THE COURT:**  MR. ZELLER?

8          **MR. ZELLER:**  THERE WAS A MOTION *IN LIMINE*, YOUR

9   HONOR, WHERE WE DISCUSSED, BASICALLY, TO EXCLUDE EVIDENCE

10  ARGUMENT, COMMENTARY, ABOUT BASICALLY CONSEQUENCES OF THE

11  LAWSUIT, THE VERDICT, TO MGA.  THIS IS RIGHT IN THE HEART OF

12  IT.  THEY HAVE SOMEBODY SAY MATTEL {SIC} BASICALLY, THROUGH

13  LITIGATION, HAD THESE LAYOFFS, I THINK IS EXACTLY THE CONCERN

14  THAT WE WERE EXPRESSING THROUGH THIS MOTION.  AND OF COURSE

15  IT'S IRRELEVANT; IT'S 403; IT DOES NOT HAVE ANY BEARING ON ANY

16  ISSUE IN THIS CASE.

17          **THE COURT:**  THE ONLY ISSUE I CAN SEE IT BEARING ON IS

18  THIS WHOLE ECONOMIC DOWNTURN IN THE DOLL MARKET.  BUT THE

19  QUESTION IS, ARE WE ABLE TO FACTOR OUT THE OTHER FACTORS THAT

20  MIGHT INFLUENCE THAT?  AND DOES THE PROBATIVE VALUE OUTWEIGH

21  THE PREJUDICIAL EFFECT FOUND IN THE MOTION *IN LIMINE*?

22          **MR. NOLAN:**  TWO, AT LEAST, MAYBE THREE RESPONSES,

23  YOUR HONOR.

24          FIRST OF ALL, MR. PRICE QUESTIONED MR. LARIAN

25  SUGGESTING THAT BECAUSE 2007 AND 2008 ARE NOT AUDITED FINANCIAL

THURSDAY, AUGUST 7, 2008                TRIAL DAY 31, MORNING SESSION

1    RESULTS; HE CALLED THEM -- I SUGGEST HE INFUSED INTO THIS CASE

2    A SUGGESTION THAT MAYBE THOSE NUMBERS ARE NOT ACCURATE.

3            IN VIEW OF THAT, I THINK WE SHOULD BE ABLE TO SAY

4    THAT IN RESPONSE TO THOSE MARKET CONDITIONS WE'VE IDENTIFIED,

5    MGA WAS FORCED TO LAYOFF EMPLOYEES; THAT'S NUMBER ONE.

6            NUMBER TWO, I DO THINK THAT IN ADDITION TO THIS

7    FINANCIAL ASPECT, IT GOES TO THE NOTION OF HOW MANY EMPLOYEES

8    WORLDWIDE CONTRIBUTE TO ALL OF THE ACTIVITIES THAT GO ON TO

9    MAKE THE BRAND, WHAT IT IS; SO I BELIEVE IT'S RELEVANT IN THAT

10   RESPECT TO SHOW THAT THIS IS NOT JUST ONE PERSON DOING THIS

11   JOB; SO I THINK TO HOLD US OFF FROM HOW MANY EMPLOYEES MGA HAS

12   JUST --

13           **THE COURT:**  YOU SAID THERE MAY BE A THIRD, BUT I'LL

14   GIVE YOU LEAVE TO MAKE THAT THIRD ARGUMENT.

15           THE SECOND ONE ACTUALLY TIES DIRECTLY INTO THE

16   ARGUMENT THAT MR. ZELLER WAS HAVING -- NOT ARGUMENT -- WITH

17   MS. AGUIAR HAVING WITH THE COURT CONCERNING THE -- THAT MAKES

18   THIS AN EASY DECISION TO SUSTAIN THE OBJECTION.  THAT'S

19   PRECISELY WHERE YOU CANNOT GO IN THIS CASE, AND WHERE YOU'RE

20   NOT GOING TO GO IN THIS PHASE, IS DESCRIBING ALL THESE PEOPLE

21   THAT ARE WORKING ON IT, LABORING SO HARD TO DO THIS WORK.  THIS

22   IS PRECISELY -- THAT IS THE PRECISE POINT MR. ZELLER WAS MAKING

23   THIS MORNING; SO THAT'S NOT COMING IN.

24           I CAN SEE SOME MARGINAL RELEVANCE ON YOUR FIRST

25   POINT, BUT I THINK THE PREJUDICIAL EFFECT OUTWEIGHS WHATEVER

1  PROBATIVE VALUE, BECAUSE LAYOFFS CAN HAPPEN FOR A VARIETY OF

2  REASONS.  AND WITHOUT HAVING A MINI TRIAL TO DETERMINE WHAT

3  FACTORS CAUSED THE LAYOFFS AND WHETHER OR NOT THEY ARE RELATED

4  TO THIS MARKET DOWNTURN OR RELATED TO OTHER FACTORS -- I SEE

5  THIS GOING NOWHERE.  I'M GOING TO SUSTAIN THE OBJECTION.

6          WE'RE GOING TO COME BACK TO THAT SECOND POINT,

7  BECAUSE THIS IS PRECISELY THE PROBLEM.  THE COURT HAS TO COME

8  UP WITH A WAY TO CLEARLY ARTICULATE THE DIVIDING LINE.  I'LL BE

9  LOOKING TO COUNSEL FOR ASSISTANCE ON THAT.

10          **MR. PRICE:**  THANK YOU.

11          (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

12          **MR. PRICE:**  MOVE TO STRIKE THE ANSWER MR. LARIAN

13  GAVE.

14          **THE COURT:**  IT'S STRICKEN.

15          YOU MAY PROCEED.

16  **BY MR. NOLAN:**

17  Q    MR. PRICE ASKED YOU ON DIRECT EXAMINATION WHETHER OR NOT

18  AT VARIOUS TIMES, MGA HAS SOUGHT FINANCING ARRANGEMENTS WITH

19  BANKS.

20          DO YOU RECALL THAT LINE OF QUESTIONS?

21  A    I DO.

22  Q    ARE YOU AWARE OF A FINANCING ORGANIZATION KNOWN AS

23  WACHOVIA SECURITIES?

24  A    I DO.

25  Q    COULD YOU IDENTIFY FOR THE JURY WHAT RELATIONSHIP MGA HAS

1  WITH WACHOVIA SECURITIES.

2  A    WACHOVIA -- I DON'T KNOW IF IT'S CALLED WACHOVIA

3  SECURITIES OR WACHOVIA BANK, BUT THEY ARE -- THE BEST I CAN

4  DESCRIBE IT, WE HAVE A SYNDICATED -- THEY'RE HEAD OF

5  SYNDICATION OF A CREDIT LINE THAT THEY PROVIDED TO MGA.  AND SO

6  BASICALLY, WHAT THEY DO IS, THEY GIVE YOU -- THEY SAY, 'WE'RE

7  GOING TO GIVE YOU A $300, $400 MILLION LOAN TO RUN YOUR

8  COMPANY,' BUT THEN THEY GO AHEAD AND GET OTHER BANKS AND THEY

9  DIVIDE THAT LOAN BETWEEN THOSE BANKS, AND THEN THEY PROVIDE THE

10  FINANCING TO THE COMPANY.

11       I DON'T KNOW IF I DESCRIBED IT...

12  Q    AS PART OF THE LOAN ARRANGEMENTS WITH WACHOVIA SECURITIES,

13  ARE THERE CERTAIN CONDITIONS BY WHICH WACHOVIA IS ALLOWED TO

14  ACCELERATE ITS LOANS TO MGA?

15       **MR. PRICE:**  YOUR HONOR, OBJECTION.  SIDE-BAR ON THIS.

16  THIS CONCERNS PRODUCTIONS.

17       **THE COURT:**  VERY WELL.

18       (WHEREUPON, THE FOLLOWING PROCEEDINGS

19       WERE HELD AT SIDE-BAR:)

20       **THE COURT:**  WHERE ARE WE ON THIS?

21       **MR. NOLAN:**  TO THE WACHOVIA LETTERS.

22       **THE COURT:**  I KNEW THIS WAS GOING TO BE A POINT OF

23  CONTENTION; THEY EVEN BROUGHT IN MR. COREY FOR THIS ONE.

24       **MR. NOLAN:**  AND I HAVE MR. ROTH, SO...

25       **MR. COREY:**  THE ISSUE HERE IS WE SOUGHT DISCOVERY.

1   WE ASKED FOR INFORMATION REGARDING CREDIT AGREEMENT

2   SPECIFICALLY WITH RESPECT TO THE 2006 CREDIT AGREEMENT AND THEY

3   OBJECTED, THIS MOTION PRACTICE, AND WE LOST.

4        SO NOW THEY WANT TO BRING IN THE AGREEMENT; BRING IN

5   WHAT HAPPENED RECENTLY.  WE DON'T KNOW, AND ALL WE HAVE ARE

6   THESE LETTERS, AND WE DON'T KNOW WHAT ELSE HAS HAPPENED.

7        **THE COURT:**  I THOUGHT ALL THAT WAS ORDERED TURNED

8   OVER.

9        **MR. ROTH:**  WE TURNED OVER LETTERS AND THE LOAN

10  AGREEMENT.

11       **MR. COREY:**  WE HAVE THE LOAN AGREEMENT.  WE GOT IT

12  TWO DAYS AGO.  IT WAS DESIGNATED THE HIGHEST TIER, AND THERE

13  ARE REFERENCES TO LETTERS TO AMENDMENT; THERE'S NO OTHER

14  CORRESPONDENCE THAT WE HAVE, OTHER THAN DEMAND LETTERS FROM

15  WACHOVIA; SO WE HAVE ABSOLUTELY NO IDEA WHAT REALLY IS THE

16  STATE OF PLAY WITH RESPECT TO THE DEMAND LETTERS.

17       **THE COURT:**  WHAT DO YOU WANT TO GET INTO HERE?

18       **MR. NOLAN:**  RECEIPT OF THE LETTERS.

19       **THE COURT:**  AND THE LETTERS SAY 'WE'RE CUTTING YOU

20  OFF.'

21       **MR. NOLAN:**  YES.

22       **MR. COREY:**  THE LETTERS SAY WE WANT $300 MILLION

23  BACK.  AND THEY INVOKED THE LOCK BOX PROVISION.  ONE OF THE

24  REVENUES JUST FLOW THROUGH THE WACHOVIA; THEY DON'T GO TO MGA.

25       **THE COURT:**  LET ME HEAR YOUR ARGUMENT.

1    **MR. NOLAN:**  YOUR HONOR, WE'VE RAISED THIS.  WE

2  PRODUCED THIS.  WE BROUGHT IT TO THE COURT'S ATTENTION TEN DAYS

3  AGO.  WE PRODUCED THE DOCUMENTS TO THEM.  THEY HAVE THE

4  LETTERS.  THEY HAVE THE LOAN AGREEMENTS.  WE SHOULD BE ENTITLED

5  TO SHOW RIGHT NOW THE EFFECT THE RECEIPT OF THESE LETTERS FROM

6  WACHOVIA THAT ENFORCE THE LOCK BOX AGREEMENT SUCH THAT ANYTHING

7  HAVING TO DO WITH THE OPERATIONS OF MGA ARE NOW SUBJECT TO

8  THESE CONDITIONS.  IT GOES TO THE IMMEDIATE VALUATION AND

9  FINANCIAL CONDITION OF MGA AND ITS BEARING ON MR. LARIAN'S NET

10  WORTH.

11    **THE COURT:**  PART OF THE CONCERN I HAVE FOR THIS IS

12  REPRESENTATIONS WERE MADE TO THE COURT THAT -- I ASSUME WE'RE

13  NOW -- YOU ASKED FOR CERTAIN THINGS REMAIN IN CHAMBERS; I

14  ASSUME THIS IS ALL NOW OUT IN THE OPEN?

15    **MR. NOLAN:**  YES.

16    **THE COURT:**  JUST WANTED TO MAKE SURE BEFORE I SAID

17  ANYTHING.

18    YOU HAD MADE AN INDICATION THAT ACCOUNTS HAD BEEN

19  FROZEN AND THERE'S BEEN AN ATTEMPT TO NEGOTIATE A RESOLUTION.

20    THIS IS SOMETHING WHICH IS AWKWARD, BECAUSE OBVIOUSLY

21  AT THIS POINT MR. LARIAN AND MGA HAS INCENTIVE NOT TO --

22  THERE'S A CONCERN HERE IN TERMS OF TRANSPARENCY.

23    I'M NOT SUGGESTING ANYBODY IS DOING ANYTHING WRONG.

24  BUT MATTEL IS IN A POSITION NOT TO KNOW WHAT IS GOING ON.  MGA

25  HAS EVERY INCENTIVE RIGHT NOW, AT LEAST FOR THE NEXT WEEK, TO

1    PORTRAY THEMSELVES IN THE WORST POSSIBLE LIGHT TO THIS JURY,

2    FINANCIALLY.  AND THE ONLY WAY TO ENSURE EVERYTHING IS ABOVE

3    BOARD IS TO HAVE COMPLETE DISCLOSURE OF ALL FINANCIAL RECORDS

4    RELATE TO WACHOVIA.

5            I ASSUME THAT'S WHAT YOU'RE --

6        **MR. COREY:**  YES.  FOR EXAMPLE, THE CREDIT AGREEMENT

7    HAS A $200 MILLION CAP ON THE ACCELERATION AMOUNT.

8        **THE COURT:**  YOU DON'T HAVE A COPY OF THAT?

9        **MR. COREY:**  I DO BUT IT HAS A $200 MILLION CAP.

10   THERE ARE THREE HUNDRED MILLION DOLLARS OF INDEBTEDNESS.  WHERE

11   DOES THAT COME FROM?

12           THAT'S THE KIND OF ISSUE WE'RE DEALING WITH.

13       **THE COURT:**  I LET YOU, MGA, GET IN ANY INFORMATION

14   LEGITIMATELY THAT SHOWS A FINANCIAL PROBLEM.  BUT THERE NEEDS

15   TO BE A FULL DISCLOSURE AT THIS POINT; THAT'S THE CONCERN I

16   HAVE GOING FORWARD.

17       **MR. PRICE:**  IF I COULD SUGGEST.  MR. NOLAN SAID HE

18   WAS GOING TO CALL MR. LARIAN IN THE CASE.  AGAIN, WE NEED TO

19   GET ALL OF THE DOCUMENTS, THE CORRESPONDENCE THAT'S BEEN GOING

20   ON.  THERE WAS A REPRESENTATION THEY ARE TRYING TO WORK THIS

21   OUT.  WE KNOW NOTHING ABOUT THAT.  WE NEED TO KNOW.

22       **THE COURT:**  YOU'RE GOING TO BE RECALLING MR. LARIAN

23   IN YOUR CASE.

24       **MR. NOLAN:**  I DIDN'T KNOW IF I COULD, BECAUSE I TRIED

25   TO ALERT YOU TO THIS ISSUE.

1          **THE COURT:**  I'LL PERMIT YOU TO DO THAT.

2          LET'S PUT THIS ISSUE OFF UNTIL YOU CALL MR. LARIAN IN

3   YOUR CASE.  AND THEN, IN THE MEANTIME, MR. ROTH AND MR. COREY

4   CAN GET TOGETHER ON THIS AND PROVIDE EVERYTHING THAT'S NEEDED.

5   BUT I AGREE WITH MR. COREY'S POINT, THEY NEED TO HAVE

6   EVERYTHING.

7          I'M NOT SUGGESTING ANYONE IS DOING ANYTHING WRONG.

8   IT'S JUST THE PROCESS.  WE NEED TO HAVE -- EVERYBODY NEEDS TO

9   HAVE ALL OF THE INFORMATION ABOUT THIS BEFORE WE GET INTO THIS

10  ANY FURTHER.

11         **MR. NOLAN:**  BACK TO ONE THING, YOUR HONOR.

12         THERE IS NO INCENTIVE ON OUR PART TO DELAY A

13  RESOLUTION OF THIS FOR TRANSPARENCY PURPOSES FOR THIS COURT OR

14  FOR THIS JURY.  AND I CAN'T STRESS THAT ENOUGH.  IT'S NOT IN

15  OUR BEST INTERESTS YOUR HONOR.  WE'RE TRYING TO SURVIVE.

16         AS THE COURT POINTED OUT YESTERDAY, THE COURT

17  APPOINTED MEDIATOR HAD A CHECK BOUNCE ON AN ACCOUNT THAT'S BEEN

18  LOCKED.  THAT'S NOT OUR DESIGN.

19         **THE COURT:**  I UNDERSTAND.  THAT'S WHY I BACKED AWAY

20  FROM THE COMMENTS.  I'M NOT SUGGESTING ANYTHING IS GOING ON.

21  IT'S JUST THAT, IF IT WAS THE OTHER WAY AROUND -- YOU JUST NEED

22  TO HAVE TRANSPARENCY HERE.  AND THE WAY TO DO THAT IS TO HAVE

23  ALL OF THE DOCUMENTS OUT ON THE TABLE AND HAVE EVERYONE SEE

24  WHAT'S GOING ON.  AND THEN I'LL LET YOU GET INTO IT.  IT'S A

25  LEGITIMATE AREA TO GET INTO.  MR. COREY'S POINT IS LEGITIMATE

1    AS WELL.  WE JUST NEED TO HAVE IT, SO THERE'S NO QUESTION.

2            MR. NOLAN:   JUST SO.

3            THE COURT:   AND SUBJECT TO APPROPRIATE PROTECTIVE

4    ORDERS, OF COURSE, BECAUSE THIS IS ALL --

5            MR. NOLAN:   JUST SO I CAN ROUND OFF THIS AND MOVE OFF

6    THE STAGE GRACEFULLY; I'D LIKE TO FINISH OFF WITH A SPIKE HERE.

7            THE COURT:   I'LL TAKE CARE OF IT.  I'LL TELL THE JURY

8    THERE ARE CERTAIN MATTERS -- THAT MR. LARIAN IS GOING TO BE

9    RECALLED AGAIN IN THE MGA CASE, AND THERE ARE CERTAIN MATTERS

10   THAT I'M RESERVING FOR THAT.  I'LL TAKE THE FALL FOR THAT.

11           MR. NOLAN:   I APPRECIATE THAT.

12           THEY MAY NOT BELIEVE IT TO BE HONEST WITH YOU, BUT

13   WHAT I WOULD LIKE TO DO IS MAYBE ASK THREE OR FOUR DIFFERENT

14   QUESTIONS, AND THEN SIT DOWN.

15           THE COURT:   ABSOLUTELY.  BUT I DON'T WANT THE JURY TO

16   BE -- BECAUSE YOU'VE ALREADY ASKED THAT QUESTION, I DON'T WANT

17   THEM TO THINK WE'RE SHUTTING YOU DOWN; WE'RE JUST PUTTING IT

18   OFF FOR ANOTHER TIME, AND THEN YOU GUYS CAN WORK OUT WHAT NEEDS

19   TO BE DONE.

20           (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

21           THE COURT:   MEMBERS OF THE JURY, THIS IS AN AREA THAT

22   MR. NOLAN IS GOING TO GET INTO WITH MR. LARIAN WHEN HE RECALLS

23   HIM IN HIS CASE-IN-CHIEF.  THE COURT HAS REQUESTED THE PARTIES

24   TO PUT OFF THIS PARTICULAR AREA UNTIL THAT TIME SO THAT CERTAIN

25   OTHER MATTERS CAN BE ADDRESSED.

1          MR. NOLAN:  THANK YOU, YOUR HONOR.

2          THE COURT:  MR. NOLAN, I UNDERSTAND YOU DO HAVE A FEW

3    OTHER QUESTIONS.

4          MR. NOLAN:  I DO.  THEN I'LL RESERVE THE RIGHT TO

5    CALL MR. LARIAN BACK IN OUR CASE-IN-CHIEF.

6          THANK YOU FOR THAT.

7          THE COURT:  YES.

8    BY MR. NOLAN:

9    Q    MR. LARIAN, I WANT TO GO BACK TO A COUPLE OF OTHER MATTERS

10   THAT WERE TOUCHED UPON YESTERDAY WITH MR. PRICE.

11         CAN YOU EXPLAIN TO THE JURY THE IDEA OF A BRATZ LIFE

12   BRAND.  WHEN THAT TERM IS USED BY MGA AND YOU, CAN YOU EXPLAIN

13   THE COMPONENTS OF THAT MGA BRATZ LINE, BRAND LINE.

14   A    BRATZ, WE LAUNCHED IT IN 2001 WITH FOUR DOLLS.  IT HAS

15   BECOME A MAJOR BRAND, FRANKLY THE ONLY BRAND THAT'S BEEN ABLE

16   TO COMPETE WITH THE MONOPOLY THAT BARBIE HAS HAD FOR 48 YEARS.

17         MR. PRICE:  MOVE TO STRIKE THE ANSWER AS

18   NONRESPONSIVE AT THIS POINT.  IT'S WITHOUT FOUNDATION.

19         THE COURT:  IT'S STRICKEN.  LET'S DO IT AGAIN.

20   BY MR. NOLAN:

21   Q    I WANT TO JUST FOCUS ON THE BRATZ LIFE BRAND AND THE

22   VARIOUS COMPONENTS OF IT, WITHOUT REFERENCE TO ANY OTHER

23   COMPETITIVE PRODUCTS.

24   A    I UNDERSTAND.

25         BRATZ, WE LAUNCHED IT IN 2001 WITH FOUR DOLLS, AND WE

```
 1    EXPANDED IT WITH OTHER PRODUCTS AS YEARS WENT ON.  WE SPENT A
 2    LOT OF MONEY IN MARKETING AND ADVERTISING.  WE GOT NEW
 3    LICENSEES.  IT BECAME A LIFESTYLE BRAND, BASICALLY, IN THE
 4    INDUSTRY.  AND IT BECAME A PHENOMENON SUCCESS FOR OVER SEVEN
 5    YEARS ALL OVER THE WORLD.
 6         SO NOW, FOR EXAMPLE, SOMEBODY WHO BOUGHT A DOLL
 7    FIRST; LATER ON, THEY WENT AHEAD AND BOUGHT OTHER DOLLS.  THEY
 8    BOUGHT ACCESSORIES.  THEY WENT AHEAD AND BOUGHT BEDDING, FOR
 9    EXAMPLE, TO DECORATE THEIR ROOMS, LIKE BRATZ.  THEY HAD
10    BIRTHDAY PARTIES, BRATZ CAKES.  AND THEY WORE BRATZ SHOES,
11    LITTLE GIRLS.  I'M SURE YOU HAVE -- YOUR GRANDDAUGHTERS.  AND
12    IT BASICALLY BECAME A LIFESTYLE BRAND, INSTEAD OF JUST BEING
13    THE FOUR DOLLS THAT WERE ORIGINALLY LAUNCHED.
14    Q    DEVELOPING THE BRATZ LINE, DID IT REQUIRE YOU TO MAKE
15    FINANCIAL INVESTMENTS?
16    A    WE MADE MAJOR FINANCIAL INVESTMENTS OVER SEVEN YEARS, FROM
17    2001 UNTIL 2007, WHEN MATTEL FINALLY SUED US, SUED ME, TO MAKE
18    THIS BRAND WHAT IT IS NOW, BOTH IN FINANCIAL RISK AND MONEY,
19    BOTH IN PEOPLE --
20         MR. PRICE:  OBJECTION, YOUR HONOR.  AT THIS POINT,
21    IT'S NONRESPONSIVE.
22         THE COURT:  IT IS.
23         NEXT QUESTION, COUNSEL.
24    BY MR. NOLAN:
25    Q    WHAT TYPE OF INVESTMENTS HAVE YOU MADE, FOR INSTANCE, IN
```

1   PRODUCT DEVELOPMENT?

2   A    FIRST OF ALL, WE HIRED A LOT OF PEOPLE TO MAKE NEW

3   PRODUCTS, NEW MARKETING, LICENSING.  WE CAME UP WITH -- ONE OF

4   THE THINGS WE DID, WE CREATED A BRATZ TV SERIES.  THAT WAS ON

5   FOX FOR A WHILE.  AND THAT COST A LOT OF MONEY TO DO IT.  WE

6   CAME UP WITH THE BRATZ HOME MOVIES.  THAT WAS DISTRIBUTED BY

7   FOX, AND NOW BY LIONS GATE.  WE MADE MAJOR, MAJOR INVESTMENTS,

8   MILLIONS AND MILLIONS OF DOLLARS, IN TOOLING, IN TV COMMERCIAL

9   PRODUCTION, IN ADVERTISING, IN PACKAGING, IN CREATING NEW SUB

10  BRANDS.

11        THOSE ARE SOME OF THE THINGS WE HAVE DONE.

12        OPENING UP OFFICES IN OTHER COUNTRIES SO WE CAN

13  DISTRIBUTE IT.

14  Q    MR. PRICE WAS ASKING YOU ABOUT THE EARLY MEETINGS WITH

15  MR. BRYANT IN SEPTEMBER.  I JUST WANT TO TAKE YOU BACK TO THE

16  PITCH MEETING FOR A MINUTE.

17        PRIOR TO MEETING CARTER BRYANT, MGA WAS IN THE TOY

18  BUSINESS; YES?

19  A    WE WERE.

20  Q    AND PRIOR TO MEETING CARTER BRYANT, HAD MGA OR YOU

21  RECEIVED ANY ACCOMMODATIONS OR AWARDS FOR PRODUCTS THAT YOU HAD

22  MANUFACTURED?

23        **MR. PRICE:**  OBJECTION.  IT WAS AWHILE AGO THIS WAS

24  ASKED AND ANSWERED.  AND I THINK BOTH PHASES ARE --

25        **THE COURT:**  OVERRULED.

1          YOU MAY ANSWER.

2          **THE WITNESS:**  YES.  WE'VE RECEIVED MANY, MANY AWARDS

3    FOR THE TOYS THAT WE CREATED.  FOR EXAMPLE, IN 1997, WE HAD A

4    DOLL CALLED "SINGING BOUNCY BABY."  THAT WON FAMILY FUN TOY OF

5    THE YEAR AWARD.  IT WAS A DOLL -- FAMILY FUN IS REFERRED TO IN

6    THE TOY INDUSTRY AS THE OSCARS OF THE TOY BUSINESS.  SO THAT

7    WAS VERY REWARDING.

8          AND WE HAVE WON MANY, MANY OTHER AWARDS FOR PRODUCTS

9    AND PACKAGING BEFORE BRATZ AND SINCE.

10   **BY MR. NOLAN:**

11   Q    MR. LARIAN, MR. PRICE WAS ASKING YOU DIRECT QUESTIONS

12   ABOUT CARTER BRYANT, AND WE WELL KNOW THAT CARTER BRYANT

13   ENTERED INTO A CONTRACT WITH MGA PURSUANT TO WHICH HE HAD A

14   ROYALTY RATE.

15         WHAT I WANT TO ASK YOU IS, SIR, WAS CARTER BRYANT THE

16   FIRST DESIGNER THAT MGA EVER MET WITH?

17   A    NO.  IN THE TOY INDUSTRY, ONE OF THE THINGS YOU DO IS, YOU

18   GET DESIGNS FROM OTHER DESIGNERS WHO BRING YOU IDEAS TO MAKE A

19   TOY.  IT'S NOT ONLY TO MGA.  IT'S TO MATTEL.  EVERYBODY.  AND

20   WE HAVE MANY OF THEM; MANY, MANY OF THEM.

21   Q    AND HAVE YOU ALWAYS, AFTER MEETING WITH THE DESIGNERS,

22   ENTERED INTO ROYALTY AGREEMENTS WITH THEM?

23   A    IF WE LIKE THE PRODUCT, WE HAVE.  IF WE LIKE THE IDEA THAT

24   THEY HAVE FOR THE PRODUCT, WE HAVE.  AND IF WE DIDN'T, WE DID

25   NOT.  NOT WITH ALL OF THEM, NO.

1    Q    CAN YOU TELL THE JURY WHAT THE RANGE OF THE ROYALTY RATE

2    WAS THAT YOU ENTERED INTO WITH VARIOUS DESIGNERS.

3              **MR. PRICE:**  OBJECTION.  RELEVANCE, YOUR HONOR.

4              ALSO OBJECT TO BEST EVIDENCE.

5              **THE COURT:**  COUNSEL, IT'S NOT CLEAR WHAT THE

6    RELEVANCE IS.

7              IS THIS GOING TO SOME FINANCIAL CALCULATION?

8              **MR. NOLAN:**  YES, YOUR HONOR.  IF I COULD AT SIDE-BAR,

9    RATHER THAN DOING IT IN FRONT OF THE JURY.

10             **THE COURT:**  WE'LL TAKE IT UP AT THE NEXT SIDE-BAR.

11             **MR. NOLAN:**  OKAY.

12             CAN WE MAKE A RESERVATION?

13             I APOLOGIZE.

14             **THE COURT:**  MOVE ALONG.

15             **MR. NOLAN:**  I HAVEN'T HAD A CHANCE TO MAKE A JOKE IN

16   AWHILE, SO...

17             **THE COURT:**  FAIR ENOUGH.

18   **BY MR. NOLAN:**

19   Q    I WANT TO TAKE A MOMENT AND ASK YOU, WHAT SIZE DOLL IS

20   BRATZ?

21   A    IT'S ABOUT NINE AND A HALF -- IT GOES -- WE HAVE SOME AT

22   NINE AND A HALF INCHES.  IT GOES UP TO ABOUT TEN AND A HALF.

23   Q    AND WAS THERE A PARTICULAR SIGNIFICANCE, IN YOUR VIEW,

24   WITH RESPECT TO THE SIZE OF BRATZ, THE LENGTH OF BRATZ?

25   A    YES.  TRADITIONALLY, FASHION DOLLS HAVE BEEN KNOWN AS

1    BARBIE, AND BARBIE IS ELEVEN AND A HALF INCHES TALL.  AND WHEN

2    WE LAUNCHED BRATZ, WE WANTED TO MAKE SURE THAT IT HAD DIFFERENT

3    PROPORTIONS THAN BARBIE, BECAUSE OTHERWISE, TRADITIONALLY,

4    BARBIE WAS SUCH A BIG PORTION OF THE BUSINESS THAT THEY WOULD

5    USE THE FASHIONS THAT WERE ON BARBIE TO PUT ON OTHER FASHION

6    DOLLS.  AND WE WANTED TO HAVE SPECIAL FASHIONS THAT OUR DOLLS

7    WORE.

8         AND THE OTHER THING THAT WE DIDN'T WANT TO DO IS --

9    WE WANTED BRATZ TO APPEAL TO GIRLS BETWEEN THE AGES OF 6 TO 11,

10   AND FOR THEM TO LOOK AT IT AS THEIR OLDEST SISTER, RATHER THAN

11   SOMEBODY -- I DON'T KNOW WHAT'S THE WORD THAT YOU WERE USING

12   YESTERDAY -- VOLUPTUOUS OR VAVAVOOM.  I DON'T KNOW WHAT THAT

13   WAS.

14   Q    EITHER ONE OF THEM HAVE BEEN USED.

15        MY QUESTION IS THIS, SIR:  THIS IDEA WITH RESPECT TO

16   THE COMPETITION FOR FASHION DOLLS AND THE PARTICULAR HEIGHT, IS

17   THAT SOMETHING THAT CAME SOLELY FROM CARTER BRYANT, OR WAS THAT

18   AN IDEA THAT YOU HAD ALSO BEEN THINKING ABOUT AND CONSIDERING?

19   A    WE HAD BEEN THINKING ABOUT A PRODUCT THAT WOULD BECOME A

20   FASHION DOLL FOR QUITE A WHILE.

21   Q    YESTERDAY YOU REFERENCED A WOMAN BY THE NAME MS. PANZERA.

22        DO YOU RECALL THAT?

23   A    YES.  MAUREEN.

24   Q    MAUREEN PANZERA?

25   A    YES.

THURSDAY, AUGUST 7, 2008                TRIAL DAY 31, MORNING SESSION

1    Q    COULD YOU REMIND THE JURY WHO MAUREEN PANZERA WAS, OR IS.

2    A    MAUREEN PANZERA IS ANOTHER DESIGNER, AGAIN SIMILAR TO

3    CARTER BRYANT.

4         **MR. PRICE:**  YOUR HONOR, OBJECT ON RELEVANCE.

5         **THE COURT:**  COUNSEL?

6         **MR. NOLAN:**  YOUR HONOR, IT GOES TO -- IT WAS OPENED

7    UP IN DIRECT EXAMINATION, AND IT WOULD BE OUR INTENT TO FOLLOW

8    UP AND SHOW THE ACTUAL PRESENTATION THAT WAS MADE.

9         **THE COURT:**  I'M SORRY?  MAUREEN?

10        **MR. NOLAN:**  MAUREEN PANZERA, P-A-N-Z-E-R-A.

11        **THE COURT:**  MR. PRICE REFERRED TO HER?

12        **MR. NOLAN:**  YES.  IT CAME OUT ON DIRECT EXAMINATION.

13        **MR. PRICE:**  MR. LARIAN SOMETIMES VOLUNTEERS STUFF.  I

14   DIDN'T ASK ABOUT THIS AT ALL.

15        **MR. NOLAN:**  THE ANSWER WAS NOT STRICKEN, YOUR HONOR.

16        **THE COURT:**  SUSTAIN THE OBJECTION.

17        LET'S MOVE ALONG.

18        REVISIT THIS IN YOUR RECALL.

19   **BY MR. NOLAN:**

20   Q    THERE WERE DOCUMENTS SHOWN TO YOU, MR. LARIAN, CONCERNING

21   HONG KONG LITIGATION.

22        DO YOU RECALL THAT?

23   A    I DO.

24   Q    NOW, DID BRATZ FACE A COMPETITIVE THREAT IN HONG KONG

25   THROUGH KNOCKOFFS?

```
 1   A     YES.

 2   Q     AND IN CONNECTION WITH TRYING TO ADDRESS THAT BUSINESS

 3   RISK, DID YOU RETAIN LAWYERS?

 4   A     WE DID.

 5   Q     WAS WILLIAM FAN ONE OF THOSE LAWYERS?

 6   A     YES, HE WAS.

 7   Q     AND HE WAS LOCATED IN HONG KONG; CORRECT?

 8   A     STILL IS LOCATED IN HONG KONG.

 9   Q     AND DID YOU HIRE ANYBODY IN THE UK TO ALSO ASSIST YOU?

10   A     YES, WE DID.

11   Q     WHO DID YOU RETAIN THERE?

12   A     RAY BLACK.  I THINK HE'S WITH THE LAW FIRM CALLED

13   SJ BERWIN, OR SOMETHING LIKE THAT.

14   Q     DO YOU HAVE ANY EXPERIENCE IN HONG KONG OR UK LITIGATION?

15   A     I DO NOT.

16         MR. NOLAN:  YOUR HONOR, WE'LL COME BACK TO THE OTHER

17   ISSUES WHEN WE RECALL MR. LARIAN, AND ALSO HAVE AN ABILITY TO

18   MAYBE ADDRESS SOME OF THESE ISSUES AT SIDE-BAR WITH YOU.

19         THE COURT:  VERY WELL.  LET'S TAKE THOSE UP WHEN YOU

20   RECALL HIM.

21         ANYTHING FURTHER FROM MATTEL?

22                    REDIRECT EXAMINATION

23   BY MR. PRICE:

24   Q     YOU WERE ASKED ABOUT THESE CASES IN HONG KONG, AND YOU

25   SAID THAT THERE WERE INSTANCES OF PEOPLE THAT WERE KNOCKING OFF
```

1    BRATZ.

2              DO YOU RECALL THAT?

3    A    YES.

4    Q    AND CERTAINLY, YOU WOULDN'T MAKE A CHARGE LIKE THAT

5    LIGHTLY; THAT IS, YOU WOULDN'T SAY SOMEONE IS KNOCKING OFF

6    BRATZ OR MAKING SOMETHING SIMILAR TO BRATZ OR COPYING BRATZ

7    UNLESS YOU HAD INFORMATION THAT WAS ACTUALLY HAPPENING; RIGHT?

8    A    PERSONALLY, ME?

9    Q    EITHER THROUGH YOU OR YOUR AGENTS OR SOMEONE TELLING YOU

10   ABOUT IT AND SHOWING YOU PHOTOGRAPHS; IS THAT RIGHT?

11   A    I THINK OUR HONG KONG OFFICE AND THE HONG KONG LAWYERS IN

12   THAT CASE, IN THE UK, THEY HANDLED IT, YES.  AND I WAS MADE

13   AWARE OF THOSE, THAT'S CORRECT.

14   Q    AND AS I SAID, YOU WOULD NOT MAKE ALLEGATIONS OF COPYING

15   OR REPRODUCING OR KNOCKING OFF LIGHTLY; YOU WOULD WANT TO MAKE

16   SURE THERE WAS SOMETHING TO SUPPORT IT; RIGHT?

17   A    YES.

18   Q    BY THE WAY, HOW MANY HONG KONG AND UK CASES WERE THERE

19   THAT WERE FILED?

20   A    I KNOW OF ONE IN THE UK.  I DON'T KNOW OF ALL OF THE ONES

21   IN HONG KONG.  MORE THAN THREE OR FOUR.

22   Q    IN ANY OF THOSE CASES, OR IN ANY CASE THAT YOU'RE AWARE

23   OF, HAS MGA EVER CONTENDED THAT THE CARTER BRYANT DESIGNS ARE

24   NOT PROTECTABLE BY COPYRIGHT?

25             **MR. NOLAN:**  OBJECTION.

```
 1              UNDER WHAT JURISDICTION, YOUR HONOR?

 2          MR. PRICE:  ANY JURISDICTION.

 3          MR. NOLAN:  LACK OF FOUNDATION.

 4          THE COURT:  REPHRASE, COUNSEL.

 5   BY MR. PRICE:

 6   Q   HAS MGA EVER TAKEN THE POSITION IN ANY COURT, OTHER THAN

 7   THIS CASE, THAT THE CARTER BRYANT DRAWINGS AREN'T PROTECTABLE

 8   BY COPYRIGHT?

 9          MR. NOLAN:  OBJECTION.  ALSO CALLS FOR A LEGAL

10   CONCLUSION; AND 403.

11          THE COURT:  SUSTAINED.

12   BY MR. PRICE:

13   Q   ARE YOU AWARE OF MGA, IN ANY COURT, TAKING THE POSITION

14   THAT THE CARTER BRYANT DRAWINGS ARE NOT PROTECTABLE IN ANY

15   RESPECT?  ARE YOU AWARE OF MGA EVER TAKING THAT POSITION?

16          I'M NOT ASKING FOR YOUR LEGAL OPINION, BUT WHETHER

17   YOU'RE AWARE WHETHER MGA HAS EVER TAKEN THAT POSITION.

18          MR. NOLAN:  YOUR HONOR, LACK OF FOUNDATION.  ALSO

19   403.  CALLS FOR A LEGAL CONCLUSION.

20          THE COURT:  LIMIT THAT, COUNSEL, TO AMERICAN COURTS.

21   BY MR. PRICE:

22   Q   YOU'VE FILED CASES IN AMERICAN COURTS FOR KNOCKOFFS;

23   CORRECT?

24   A   I THINK WE HAVE, YES.

25   Q   HOW MANY CASES HAVE YOU FILED IN AMERICAN COURTS?
```