```
 1   A    I CAN JUST RECALL ONE IN LOS ANGELES AGAINST A COMPANY

 2   CALLED MULTITOY.   THAT'S THE ONE I CAN RECALL.

 3   Q    AND IN THAT CASE, DO YOU KNOW WHETHER MGA EVER TOOK THE

 4   POSITION THAT CARTER BRYANT'S DRAWINGS WEREN'T PROTECTED BY

 5   COPYRIGHT?

 6   A    I DON'T KNOW.   I'M NOT A LAWYER.   I JUST HAND THIS OVER TO

 7   THE LAWYERS TO HANDLE.

 8   Q    BY THE WAY, TALKING ABOUT NOT BEING A LAWYER, YOU WERE

 9   ASKED QUESTIONS BY MR. NOLAN ABOUT THE FINANCIAL SITUATION OF

10   MGA AND BRATZ SINCE YOUR LAST AUDITED FINANCIAL STATEMENT OF

11   2006.

12            DO YOU RECALL THOSE QUESTIONS?

13   A    YES.

14   Q    AND DO YOU RECALL I WAS ASKING YOU QUESTIONS ABOUT THE

15   AUDITED FINANCIAL STATEMENTS, AND YOU SAID THAT YOU WERE A

16   CREATIVE GUY, NOT REALLY A FINANCIAL GUY; IS THAT RIGHT?

17   A    NO.   YOUR QUESTION WAS DIFFERENT.   YOU WERE ASKING ME

18   ABOUT AUDITED FINANCIAL STATEMENTS.   MR. NOLAN WAS ASKING ME

19   QUESTIONS ABOUT THE FINANCIAL STATUS AND SALES AND

20   PROFITABILITY OF BRATZ.   I DO FOLLOW AND MONITOR THE SALES AND

21   PROFITABILITY AND CREATIVITY OF BRATZ ON A REGULAR, ALMOST

22   DAILY, BASIS.   I DO NOT MONITOR THE WHOLE COMPANY -- OVERALL

23   FINANCES OF THE COMPANY.   SO THEY WERE TWO DIFFERENT QUESTIONS,

24   MR. PRICE.

25   Q    WHEN YOU WERE TELLING THE JURY ABOUT THE INDUSTRY
```

```
 1   TRENDS -- WHEN DID YOU BECOME AWARE OF THOSE TRENDS?  ABOUT
 2   WHAT TIME FRAME?
 3   A   I'M SORRY?
 4   Q   YOU WERE TALKING ABOUT THE TRENDS AND THE REASONS FOR
 5   TRENDS.
 6           WHEN DID YOU FIRST FIGURE THAT OUT AND BECOME AWARE
 7   OF THAT?
 8   A   SINCE WE BECAME A FORCE IN THE TOY BUSINESS, SOMETIME
 9   SINCE 1993.  WE TALKED ABOUT IT YESTERDAY, THAT THERE IS A
10   SERVICE THAT WE USE CALLED THRIFT TOY DATA SALES DATA, THAT
11   SHOWS THE MARKET SHARE OF SALES OF DIFFERENT BRANDS, DIFFERENT
12   PRODUCTS.  WE HAVE BEEN A SUBSCRIBER TO -- AND THE NAME OF THE
13   COMPANY WHO SELLS THAT -- IT'S CALLED NPD.  AND WE HAVE BEEN A
14   SUBSCRIBER TO THAT SERVICE FOR MANY, MANY YEARS, MORE THAN 10,
15   15 YEARS.  THAT'S ONE OF THE WAYS THAT I MONITORED THE TREND.
16   Q   MY QUESTION WASN'T CLEAR.  I APOLOGIZE.
17           YOU GAVE SPECIFIC CONCLUSIONS TO THE JURY ABOUT THE
18   MARKET DOWNTURNING, ABOUT FASHION DOLLS NOT HAVING AS MUCH
19   IMPACT IN THE MARKET.
20           MY QUESTION IS, CAN YOU GIVE ME A TIME FRAME WHEN YOU
21   FIRST CAME TO THAT CONCLUSION?
22   A   WELL, AGAIN, I HAVE BEEN MONITORING THE TOY BUSINESS, THE
23   FASHION DOLL, FOR MANY YEARS.  FOR EXAMPLE, IN --
24           **MR. PRICE:**  MOVE TO STRIKE AS NONRESPONSIVE.
25           **THE COURT:**  THE FIRST PART WAS.
```

1  BY MR. PRICE:

2  Q    I'M NOT ASKING ABOUT 2000.  I JUST WANT A DATE.  YOU TOLD

3  HIM YOU CAME TO THESE CONCLUSIONS ABOUT THERE'S REASONS WHY THE

4  FASHION MARKET IS DECREASING.

5          DO YOU HAVE A DATE WHERE YOU FIRST FIGURED THAT OUT?

6  2004?  2005?

7  A    EVERY YEAR I'VE BEEN MONITORING IT.  SINCE 2001, BARBIE

8  HAD OVER 90 PERCENT MARKET SHARE; SO I MONITORED THAT IN 2001.

9  AND I MONITORED IT EVER SINCE.  BARBIE HAD THE MONOPOLY.

10         MR. PRICE:  YOUR HONOR, MOVE TO STRIKE.

11         THE COURT:  IT'S STRICKEN.

12  BY MR. PRICE:

13  Q    MR. LARIAN, YOU TOLD THE JURY THAT THE FASHION DOLL MARKET

14  WAS DECREASING BECAUSE OF HANNAH MONTANA, BECAUSE OF ALL OF

15  THESE THINGS.  I'M TRYING TO FIND OUT WHEN YOU FIGURED THAT

16  OUT.  JUST GIVE ME DATE.

17  A    I'M TRYING TO GIVE YOU -- THAT HANNAH MONTANA, IT

18  SPECIFICALLY STARTED --

19  Q    MR. NOLAN ASKED YOU ABOUT THESE FACTORS, AND YOU SAID YOU

20  FIGURED OUT A BUNCH OF FACTORS THAT RESULTED IN MGA NOT MAKING

21  AS MUCH AS IT HAD.  I'M TRYING TO ASK WHEN YOU FIGURED THAT

22  OUT.

23  A    MR. NOLAN, TO THE BEST OF MY RECOLLECTION, ASKED IN 2007

24  WHAT WERE THE REASONS FOR THE DECLINE IN BRATZ, IF I UNDERSTOOD

25  HIS QUESTIONS CORRECTLY.  AND MY ANSWER WAS, IN 2007 OTHER

1   COMPETITIVE PRODUCTS BECAME SUCCESSFUL IN THE U.S.A. THAT TOOK

2   AWAY FROM BRATZ.  HANNAH MONTANA DOLL WAS ONE.  HIGH SCHOOL

3   MUSICAL WAS ANOTHER ONE.  WEBKINZ, WHO --

4          **MR. PRICE:**  YOUR HONOR, BEYOND THE SCOPE OF THE

5   QUESTION, WHICH WAS A DATE.

6          **THE COURT:**  LISTEN CAREFULLY TO THE QUESTION.  LET'S

7   NOT ADD ADDITIONAL INFORMATION.

8          **THE WITNESS:**  I THINK I DID SAY 2007.

9          **THE COURT:**  THANK YOU.

10  **BY MR. PRICE:**

11  Q    NOW THAT WE'VE GOT THE DATE, I'D LIKE YOU TO LOOK AT

12  EXHIBIT 4947.

13  A    YES.

14  Q    AND IF WE TURN TO THE LAST PAGE OF THIS, 4947, PAGE 4,

15  THIS WAS INFORMATION THAT WAS CREATED ON OCTOBER 25TH OF 2007;

16  CORRECT?

17  A    THAT'S THE DATE OF THAT DOCUMENT, YES.

18  Q    AND THIS WAS CREATED BY SOMEONE AT MGA AT YOUR REQUEST SO

19  MGA COULD RESPOND TO MATTEL AND GIVE US ALL DOCUMENTS RELATING

20  TO YOUR NET WORTH; CORRECT?

21  A    I KNOW THAT AT MY DEPOSITION, MR. ZELLER ASKED ME THAT

22  QUESTION.  I THOUGHT THAT WAS PREPARED IN REGARDS TO THIS

23  LITIGATION.  I SUBSEQUENTLY FOUND OUT THAT WAS NOT THE CASE,

24  AND I ALSO SUBSEQUENTLY FOUND OUT THAT SOME OF THIS INFORMATION

25  IN THIS PAPER IS INACCURATE AND RELATES BACK TO YEARS BEFORE.

1   Q    IN ANY EVENT, THIS WAS WHAT WAS PRODUCED BY MGA IN

2   RESPONSE TO THAT REQUEST FOR INFORMATION CONCERNING YOUR NET

3   WORTH; CORRECT?

4   A    TO THE BEST OF MY RECOLLECTION, YES.

5   Q    AND ON THIS DATE, OCTOBER 25, 2007 -- AND THIS IS FAR

6   ALONG INTO 2007 THAT YOU HAD NOTICED TRENDS AND WHAT WAS

7   HAPPENING WITH THE MARKET; CORRECT?

8   A    YES.

9   Q    SO AS OF THIS DATE, WHAT YOU GAVE TO MATTEL, IN JANUARY OF

10  2008, WAS THIS FIGURE HERE OF A NET WORTH OF $1.9 BILLION AND

11  THE VALUE OF MGA ENTERTAINMENT, YOUR PORTION, OF $1.6 BILLION;

12  CORRECT?

13          MR. NOLAN:  OBJECTION.  AND ALSO THE CHARACTERIZATION

14  THAT THIS WAS PREPARED FOR PURPOSES OF THIS LITIGATION.

15          THE COURT:  REPHRASE YOUR QUESTION.

16          MR. NOLAN:  IT'S ARGUMENTATIVE AND IT'S LACK OF

17  FOUNDATION.

18  BY MR. PRICE:

19  Q    WHAT WAS GIVEN TO MATTEL IN RESPONSE TO A REQUEST FOR

20  DOCUMENTS CONCERNING YOUR NET WORTH IN JANUARY OF 2008 WAS THIS

21  DOCUMENT, CORRECT, WHICH LISTED MGA'S VALUE -- YOUR PERCENTAGE

22  AS $1.6 BILLION AND YOUR NET ASSETS AS $1.9 BILLION?  THAT'S

23  WHAT YOU GAVE US; RIGHT?

24  A    YES.  AND I SAID THAT FIGURE IS A MISTAKE.

25          MAY I EXPLAIN?

1    Q    YOU WANT TO EXPLAIN SOMETHING NOW AS TO WHY THIS IS

2    INACCURATE.

3          HAVE YOU EXPLAINED TO MATTEL PRIOR TO 10:25 A.M. THIS

4    DATE WHY THE DOCUMENT YOU GAVE US, WHICH REFLECTED YOUR NET

5    WORTH, IS NOT ACCURATE?

6    A    I BELIEVE OUR ATTORNEYS HAVE; AND YOU KNOW ABOUT IT.

7    Q    SIR, I'M TALKING ABOUT EVENTS OCCURRING PRIOR TO THE START

8    OF THIS TRIAL -- LET ME ASK YOU, YOU'RE SAYING THAT THIS IS NOT

9    ACCURATE AS OF OCTOBER 25, 2007; RIGHT?

10   A    I'M SAYING THAT DOCUMENT, THAT VALUE OF MGA ENTERTAINMENT,

11   INC., AS OF 2007, IS INACCURATE.

12         AND IF YOU WANT THE JURY TO KNOW WHY, I WILL BE HAPPY

13   TO EXPLAIN IT.

14   Q    LET ME GIVE YOU A PRECISE QUESTION.

15         PRIOR TO RIGHT NOW, HAVE YOU EVER GIVEN ANY

16   EXPLANATION AS TO WHY, AS OF OCTOBER 25, 2007, THE DOCUMENT YOU

17   PREPARED, OR WAS PREPARED AT MGA, IS NOT ACCURATE?

18   A    I BELIEVE AUDITOR GAVE YOU FULL EXPLANATION AND

19   DOCUMENTATION WHY THAT THING IS NOT ACCURATE.  AND THOSE

20   HAPPENED WAY PRIOR TO 10:25 OR 10:30 TODAY.

21   Q    I'M SAYING NOT ACCURATE AS OF OCTOBER 25, 2007, NOT

22   CHANGES SINCE THEN.

23         I'M SAYING, HAVE YOU EVER, IN WRITING OR UNDER OATH

24   OR IN A PAPER, SAID ANYTHING AS TO WHY THIS NUMBER, AS OF THIS

25   DATE, WAS NOT ACCURATE?

1   A    BESIDES WHAT I TESTIFIED, I CANNOT ADD ANYTHING MORE.

2   AND, AGAIN, I WOULD LIKE TO GIVE AN EXPLANATION SO THE JURY

3   KNOWS THE FACTS.

4   Q    AND MR. NOLAN CAN ASK YOU, AND I CAN EXAMINE YOU ON THAT.

5           THE COURT:  MR. PRICE, WE'RE GOING TO TAKE A BREAK

6   HERE FOR THE COURT REPORTER.

7           (BRIEF RECESS TAKEN.)

8           (WHEREUPON, JURORS ENTER COURTROOM.)

9           THE COURT:  COUNSEL, YOU MAY CONTINUE.

10          MR. PRICE:  I'VE RUN OUT OF TIME, SO YOU CAN HIT

11  MGA'S SIDE NOW.

12          THE COURT:  MR. NOLAN.

13          MR. NOLAN:  THANK YOU.

14                     **RECROSS-EXAMINATION**

15  BY MR. NOLAN:

16  Q    JUST VERY BRIEFLY, MR. LARIAN.

17          THE LIST OF ASSETS, NET WORTH, THAT MR. PRICE WAS

18  ASKING YOU ABOUT, DO YOU BELIEVE THAT IS AN ACCURATE REFLECTION

19  OF YOUR NET WORTH AS OF TODAY?

20  A    IT IS NOT.

21          MR. NOLAN:  THANK YOU.  NOTHING FURTHER.

22          THE COURT:  ANYTHING FURTHER?

23          MR. PRICE:  NO.

24          THE COURT:  YOU MAY STEP DOWN.

25          PLAINTIFF'S NEXT WITNESS?

THURSDAY, AUGUST 7, 2008                TRIAL DAY 31, MORNING SESSION

1          **MR. QUINN:**  YOUR HONOR, MATTEL CALLS MIKE WAGNER.

2          (CLERK GIVES OATH.)

3          **THE CLERK:**  DO YOU SOLEMNLY STATE THAT THE TESTIMONY

4    YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT SHALL

5    BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO

6    HELP YOU GOD.

7          **THE WITNESS:**  YES, I DO.

8          **THE CLERK:**  PLEASE STATE YOUR FULL NAME AND SPELL

9    YOUR LAST NAME FOR THE RECORD.

10         **THE WITNESS:**  MICHAEL JOSEPH WAGNER, W-A-G-N-E-R.

11                    **DIRECT EXAMINATION**

12   **BY MR. QUINN:**

13   Q    GOOD MORNING, MR. WAGNER.

14   A    GOOD MORNING.

15   Q    WHAT IS IT THAT YOU DO?

16   A    I'M A MANAGEMENT CONSULTANT SPECIALIZING IN ANALYZING

17   FINANCIAL ISSUES, MATTERS THAT ARE IN DISPUTE.

18   Q    AS A FINANCIAL EXPERT, LITIGATION CONSULTANT, WHAT KINDS

19   OF THINGS DO YOU DO?

20   A    THE THINGS I NORMALLY DO ARE CALCULATE COMMERCIAL DAMAGES

21   IN CIVIL LITIGATION OR I VALUE BUSINESSES IN CASES THAT ARE IN

22   DISPUTE.

23   Q    HOW LONG HAVE YOU BEEN A FINANCIAL EXPERT?

24   A    FOR 31 YEARS.

25   Q    HAVE YOU TESTIFIED IN COURT AS AN EXPERT IN FINANCIAL

1  ANALYSIS?

2  A    BEFORE TODAY I'VE TESTIFIED 107 TIMES AT TRIAL.

3  Q    AND DO YOU TESTIFY JUST FOR PLAINTIFFS OR JUST FOR

4  DEFENDANTS OR FOR BOTH?

5  A    I TESTIFY FOR BOTH PLAINTIFFS AND DEFENDANTS.

6  Q    NOW, WERE YOU RETAINED BY MATTEL TO BE A FINANCIAL EXPERT

7  IN THIS CASE?

8  A    I WAS.

9  Q    CAN YOU BRIEFLY DESCRIBE WHAT YOUR ASSIGNMENT WAS, WHAT

10  YOU WERE ASKED TO DO, IN CONNECTION WITH THIS CASE?

11  A    I WAS ASKED TO CALCULATE DAMAGES TO MATTEL, ASSUMING THEY

12  PROVED THEIR CASE ON LIABILITY.

13  Q    WHAT INFORMATION DID YOU CONSIDER IN DOING THAT WORK?

14  A    I CONSIDERED ALL OF THE FINANCIAL INFORMATION PROVIDED BY

15  MGA TO UNDERSTAND THE SALES AND PROFITS THEY EARNED ON THEIR

16  PRODUCTS.  I OR MY STAFF READ THE DEPOSITIONS OF THE PEOPLE

17  DEPOSED IN THE CASE THAT DEALT WITH FINANCIAL ISSUES.  I

18  REVIEWED PUBLIC INFORMATION ABOUT THE TOY INDUSTRY TO

19  UNDERSTAND WHAT WAS HAPPENING DURING THE DAMAGE PERIOD.

20  Q    CAN YOU GIVE THE JURY AN ESTIMATE, APPROXIMATELY, OF THE

21  NUMBER OF PAGES OF INFORMATION THAT YOU AND YOUR STAFF REVIEWED

22  IN CONNECTION WITH THIS ASSIGNMENT?

23  A    IT WOULD BE OVER 50,000 PAGES.

24  Q    AND WHEN DID THIS PROCESS BEGIN?

25  A    IT BEGAN AROUND JANUARY OF THIS YEAR.

1   Q    AND WHEN DID IT CONCLUDE?

2   A    LAST NIGHT, AFTER I RECEIVED ABOUT 40,000 NEW PAGES OF

3   DOCUMENTS WITHIN THE LAST TWO WEEKS.

4   Q    WHO DID YOU RECEIVE THOSE 40,000 NEW PAGES OF DOCUMENTS

5   FROM?

6   A    WELL, FROM YOUR FIRM, BUT THEY WERE PRODUCED TO YOU BY

7   MGA.

8   Q    NOW, YOU OBVIOUSLY REVIEWED THESE ADDITIONAL 40,000 PAGES

9   OF DOCUMENTS.

10  A    I DIDN'T PERSONALLY, BUT I OR MY STAFF LOOKED AT ALL OF

11  THEM, YES.

12  Q    AS A RESULT OF THESE ADDITIONAL DOCUMENTS THAT MGA

13  PROVIDED WITHIN THE LAST COUPLE OF WEEKS, DID YOU ADJUST ANY

14  CONCLUSION THAT YOU HAD REACHED BEFORE?

15  A    YES, I DID.  IT CAUSED ME TO CHANGE MY OPINION OF DAMAGES

16  IN THIS CASE AND IT LOWERED THEM CONSIDERABLY.

17  Q    CAN YOU TELL US WHERE YOU WENT TO SCHOOL, WHAT DEGREES YOU

18  HAVE?

19  A    YES.  COLLEGE, I WENT TO THE UNIVERSITY OF SANTA CLARA; I

20  RECEIVED AN ENGINEERING DEGREE IN 1969.  I THEN WENT TO UCLA

21  AND GOT A MASTER'S IN BUSINESS ADMINISTRATION FROM THE GRADUATE

22  SCHOOL THERE IN 1971; THEN I WENT TO WYOMING UNIVERSITY SCHOOL

23  OF LAW AND RECEIVED MY JURIS DOCTORATE DEGREE.

24  Q    DO YOU HOLD ANY PROFESSIONAL LICENSES?

25  A    CURRENTLY I HAVE TWO; ONE, I'M A CERTIFIED PUBLIC

1    ACCOUNTANT, STATE OF CALIFORNIA; I'M ALSO A LICENSED ATTORNEY

2    IN THE STATE OF CALIFORNIA.

3    Q    I THINK A LOT OF PEOPLE KNOW, BUT SOME PEOPLE MAY NOT.

4    WHAT IS A CERTIFIED PUBLIC ACCOUNTANT?  WHAT DO THEY DO?

5    A    IT IS A CERTIFICATION BY THE STATE THAT ALLOWS YOU AS AN

6    ACCOUNTANT TO EXPRESS AN OPINION ON THE FINANCIAL STATEMENT OF

7    OTHERS; THAT IS THE MAIN JOB YOU'RE ENABLED TO DO BEING A

8    CERTIFIED PUBLIC ACCOUNTANT.  BUT MOST CERTIFIED PUBLIC

9    ACCOUNTANTS DO WORK BESIDES THAT.  THEY ARE VERY WELL KNOWN IN

10   PREPARING TAX RETURNS FOR COMPANIES AND INDIVIDUALS AND ALSO

11   DOING MANAGEMENT CONSULTING SERVICES.

12   Q    DO YOU BELONG TO ANY PROFESSIONAL ORGANIZATIONS?  ARE YOU

13   INVOLVED IN ANY PROFESSIONAL ACTIVITIES IN THOSE ORGANIZATIONS?

14   A    YES.  I AM ACTIVE IN BOTH THE CALIFORNIA SOCIETY OF CPA'S

15   AND ALSO THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC

16   ACCOUNTANTS, WHICH IS THE GOVERNING BODY FOR CPA'S IN OUR

17   COUNTRY.

18   Q    HAVE YOU DONE ANY PARTICULAR WORK IN CONNECTION WITH THE

19   AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS?

20   A    YES.  I'VE BEEN VERY ACTIVE IN THAT.

21   Q    CAN YOU GIVE US SOME EXAMPLES OF WHAT YOU'VE DONE WITH

22   THAT INSTITUTE?

23   A    YES.  I SERVED ON THE PRACTICE STANDARDS COMMITTEE OF THAT

24   ORGANIZATION AND ACTUALLY HELPED DRAFT THE STANDARDS FOR CPA

25   WHO DO MANAGEMENT CONSULTING SERVICES IN THE UNITED STATES.  I

1    ALSO SERVED ON THE NATIONAL LITIGATION SERVICES COMMITTEE,

2    WHICH IS THE COMMITTEE THAT ACTUALLY GIVES GUIDANCE AND

3    EDUCATION TO CPA'S WHO DO THE TYPE OF WORK I DO, WHICH IS

4    PROVIDE FINANCIAL CONSULTING ADVICE IN MATTERS THAT ARE IN

5    LITIGATION.

6          FOR A NUMBER OF YEARS, I WAS THE EDITOR OF THE CPA

7    EXPERT, WHICH IS THE PUBLICATION OF THE AICPA FOR CPA'S WHO DO

8    BOTH BUSINESS EVALUATIONS AND LITIGATION-SERVICES TYPE WORK.  I

9    WAS ON THE COMMITTEE THAT SET THE AGENDA FOR THE NATIONAL

10   CONFERENCE ON LITIGATION FOR FIVE YEARS.  AND CURRENTLY, I'M ON

11   A COMMITTEE THAT IS DEVELOPING A NEW CERTIFICATE OF THE

12   ORGANIZATION CALLED 'CERTIFICATE IN FINANCIAL FORENSICS.'  WE

13   ARE GOING TO SET STANDARDS FOR CPA'S WHO DO THE TYPE OF WORK I

14   DO.

15   Q    HAVE YOU AUTHORED ANY PUBLICATIONS THAT ARE REGARDED AS

16   AUTHORITATIVE IN YOUR FIELD?

17   A    I HAVE.  I HAVE 25 PROFESSIONAL PUBLICATIONS; AND MY

18   LEADING PUBLICATION IS A BOOK CALLED THE LITIGATION SERVICES

19   HANDBOOK; AND IT IS CONSIDERED AUTHORITATIVE BECAUSE IT IS

20   REFERENCED IN THE FEDERAL JUDICIAL CENTERS TREATISES AND

21   SCIENTIFIC EVIDENCE IN THEIR CHAPTER IN ECONOMIC DAMAGES.

22   Q    WE ARE ON A CLOCK, BUT IT'S IMPORTANT TO HAVE IT ALL IN

23   THE RECORD.

24          YOU SHOULD HAVE A BINDER THERE BEFORE YOU,

25   MR. WAGNER, AND I'D ASK YOU TO PLEASE TURN TO EXHIBIT 10219.

1   I'LL ASK YOU IF YOU CAN IDENTIFY THIS.

2   A    YES.  THIS IS MY CURRICULUM VITAE, OR RESUMÉ WHICH I

3   SUBMITTED IN CONNECTION WITH MY ORIGINAL REPORT IN THIS CASE.

4          MR. QUINN:  WE'D OFFER EXHIBIT 10219 INTO EVIDENCE,

5   YOUR HONOR.

6          MR. KENNEDY:  NO OBJECTION, YOUR HONOR.

7          THE COURT:  ADMITTED.

8          (EXHIBIT 10219 RECEIVED.)

9          MR. QUINN:  AT THIS POINT, WE'D TENDER MR. WAGNER TO

10  THE COURT AS AN EXPERT IN FINANCIAL ANALYSIS.

11         THE COURT:  ANY OBJECTION?

12         MR. KENNEDY:  NO, YOUR HONOR.

13         THE COURT:  SO DEDICATED.

14  BY MR. QUINN:

15  Q    MR. WAGNER, YOU'RE AWARE THAT THE JURY HAS MADE CERTAIN

16  DETERMINATIONS REGARDING LIABILITY FOR CERTAIN CLAIMS IN THIS

17  CASE.  YOU'RE AWARE OF THAT?

18  A    I AM.

19  Q    AND YOU'RE AWARE THAT DETERMINATIONS HAVE BEEN MADE ABOUT

20  AIDING AND ABETTING BREACH OF DUTY OF LOYALTY, AIDING AND

21  ABETTING BREACH OF FIDUCIARY DUTY CONVERSION, AND INTENTIONAL

22  INTERFERENCE WITH CONTRACT.

23         YOU'RE AWARE OF THAT?

24  A    YES.

25  Q    AND THERE'S ALSO, AS YOU KNOW, A COPYRIGHT CLAIM IN THIS

1    CASE AS WELL.

2    A    THAT IS WHAT I UNDERSTAND IS BEING TRIED IN THIS PHASE OF

3    THE TRIAL.

4    Q    NOW, LET ME BEGIN BY SETTING ASIDE, IF WE CAN, THE

5    COPYRIGHT CLAIM AND TALK ABOUT THOSE OTHER CLAIMS, THE DAMAGES

6    OR THE BENEFITS RECEIVED BY MGA AND MR. LARIAN UNDER THOSE

7    CLAIMS.  ARE YOU WITH ME?

8    A    YES.

9    Q    I'D LIKE TO ASK YOU FIRST, DID YOU REACH ANY CONCLUSION

10   CONCERNING WHAT MATTEL IS ENTITLED TO RECOVER ON THOSE CLAIMS?

11   A    I DID.

12   Q    HAVE YOU PREPARED SOME SLIDES THAT WILL HELP ILLUSTRATE

13   THE WORK YOU'VE DONE AND THE CONCLUSIONS YOU'VE REACHED?

14   A    YES.

15   Q    IF WE COULD DISPLAY ON THE SCREEN SLIDE NUMBER ONE.

16        WHAT CONCLUSION HAVE YOU REACHED ABOUT THE BENEFIT TO

17   WHICH MATTEL IS ENTITLED TO RECOVER ON THESE INITIAL CLAIMS

18   THAT WE'RE GOING TO BE SPEAKING ABOUT?

19   A    I HAVE DETERMINED THAT AS FAR AS MGA IS CONCERNED, MGA HAS

20   EARNED PROFITS BEFORE TAX OF $777.9 MILLION BETWEEN 2000 AND

21   JUNE 30, 2008 IN THEIR SALE OF BRATZ PRODUCTS.

22   Q    HOW ABOUT MR. LARIAN, THE FINANCIAL BENEFIT THAT

23   MR. LARIAN HAS RECEIVED.  DID YOU REACH ANY CONCLUSIONS

24   REGARDING THAT?

25   A    YES.

1   Q    WHAT CONCLUSION DID YOU REACH IN THAT REGARD?

2   A    THAT HE HAS TWO TYPES OF FINANCIAL BENEFITS.  FIRST, HE

3   HAS RECEIVED DISTRIBUTIONS, CHECKS WRITTEN TO HIM BY MGA; AND I

4   HAVE INFORMATION ON THAT SUBJECT THROUGH DECEMBER 31, 2007.

5   AND THEN I ALSO CALCULATED THE VALUE THAT HE HAS IN HIS STOCK

6   OWNERSHIP OF MGA IN THE PROPORTION OF MGA THAT IS CONSIDERED TO

7   BE THE BRATZ PRODUCT LINE.  THE TOTAL AMOUNT OF THOSE TWO

8   BENEFITS I HAVE CALCULATED AT $696 MILLION.

9   Q    NOW, THE JURY HAS SEEN SOME SLIGHTLY HIGHER NUMBERS BEFORE

10  THIS WITH BRATZ PROFITS OF ABOUT $815 MILLION.

11       IN THE RECENT PAST, HAVE YOU ADJUSTED YOUR NUMBER

12  DOWNWARDS?

13  A    YES.  WHEN I PREPARED MY ORIGINAL CALCULATIONS, I ONLY HAD

14  INFORMATION THROUGH OCTOBER OF 2007; I HAD TO ESTIMATE WHAT

15  WOULD OCCUR AT MGA IN THE WAY OF SALES AND PROFITS FOR THE

16  PERIOD NOVEMBER OF 2007 THROUGH JUNE 2008.

17       I NOW HAVE ACTUAL INFORMATION, SO I HAVE UPDATED MY

18  ANALYSIS WITH THE ACTUAL INFORMATION.

19  Q    WHEN DID YOU GET THAT ACTUAL INFORMATION?

20  A    WITHIN THE LAST TWO WEEKS.

21  Q    SO THESE NUMBERS THAT THE JURY SEES ON THE SCREEN HERE ARE

22  YOUR BOTTOM LINE NUMBERS CONCERNING THE BENEFITS THAT HAVE BEEN

23  RECEIVED AND WHAT MATTEL IS ENTITLED TO RECOVER FROM MGA AND

24  MR. LARIAN WITH RESPECT TO THE BRATZ BUSINESS?

25  A    YES.  BASED ON THE INFORMATION I HAVE UNTIL TODAY.

1   Q    LET'S TALK ABOUT HOW YOU CALCULATED THAT FIRST NUMBER

2   THERE, THE $777,900,000 NUMBER.  IF WE COULD TURN TO SLIDE TWO.

3   COULD YOU PLEASE EXPLAIN TO THE JURY HOW YOU CALCULATED THAT

4   NUMBER.

5   A    WELL, THE FIRST THING I HAD TO DETERMINE WAS THE AMOUNT OF

6   SALES OR REVENUES THAT MGA EARNED FROM THE SALE OF BRATZ

7   PRODUCTS FROM THE DATE IT WAS INTRODUCED THROUGH JUNE OF 2008.

8   I OBTAINED THAT INFORMATION FROM INTERNAL RECORDS AT MGA.  THEY

9   HAVE A DATABASE THAT THEY CALL THE TARGET DATA BASE WHICH

10  SUMMARIZES ALL THEIR SALES BY PRODUCTS, AND I USED THAT SOURCE

11  AND A REPORT CALLED THE SALES BY SKEW REPORT TO DETERMINE THE

12  TOTAL AMOUNT OF THEIR SALES.

13  Q    NOW, SALES BY SKEW REPORT, WHAT IS THAT?

14  A    THAT IS A REPORT FROM THE TARGET DATE BASE THAT SUMMARIZES

15  SALES BY PERIOD BY EACH PRODUCT THAT MGA SELLS.

16  Q    SO IN TERMS OF BRATZ SALES, THE $3.1 BILLION NUMBER

17  REPRESENTS WHAT?

18  A    THE TOTAL AMOUNT OF REVENUES MGA EARNED FROM THE SALE OF

19  BRATZ PRODUCTS.

20  Q    AND THAT TARGET DATA BASE, IS THAT SOMETHING THAT MGA

21  PROVIDED TO MATTEL IN CONNECTION WITH PRETRIAL DISCOVERY IN

22  THIS MATTER?

23  A    IT IS.

24  Q    AND YOU'RE AWARE THAT MGA HAS ALSO RETAINED A FINANCIAL

25  EXPERT TO DO A SIMILAR TYPE OF ANALYSIS?

1   A       I DO.

2   Q       A MR. MEYER?

3   A       YES.

4   Q       HAVE YOU REVIEWED THE REPORT THAT HE HAS PREPARED?

5   A       I HAVE.

6   Q       AND DO YOU KNOW WHETHER OR NOT HE USES THAT SAME TARGET

7   DATABASE IN DOING HIS CALCULATIONS?

8   A       HE USES THE SAME SOURCE OF INFORMATION THAT I DO.

9   Q       AFTER YOU DETERMINED WHAT THE TOTAL REVENUES WERE FOR

10  BRATZ, WHAT DID YOU DO NEXT?

11  A       I THEN HAVE TO SUBTRACT ALL OF THE COSTS THAT MGA INCURRED

12  IN ORDER TO MAKE THOSE SALES SO I CAN CALCULATE THE PROFITS,

13  WHICH IS THE REVENUES LESS THE COSTS.

14  Q       AND CAN YOU GIVE US SOME IDEA WHAT THOSE COSTS WOULD

15  INCLUDE?

16  A       THEY INCLUDE ALL OF THE COSTS TO MAKE THESE PRODUCTS THAT

17  THEY SELL; SO IT WOULD BE ALL OF THE MATERIAL USED TO MAKE THE

18  PRODUCTS; THE LABOR INVOLVED IN PUTTING THE PRODUCTS TOGETHER;

19  ALL OF THE OVERHEAD; THE EQUIPMENT THAT'S USED TO MAKE THE

20  PRODUCTS; THOSE ARE CALLED COST OF GOODS SOLD.

21          AND FROM THE SAME SOURCE MGA REPORTS THOSE COSTS.

22          I ALSO SUBTRACT ALL OF THE PRODUCT DEVELOPMENT COSTS

23  TO DEVELOP THESE PRODUCTS, AND ALL OF THE ADVERTISING AND

24  MARKETING EXPENSES TO SELL THESE PRODUCTS.   THEN I ALLOCATE THE

25  GENERAL AND ADMINISTRATIVE TYPE EXPENSES; THINGS LIKE SALARIES

1    AND RENTS AND PROFESSIONAL FEES THEY ALSO INCUR IN ORDER TO DO

2    BUSINESS.

3    Q    WHAT THAT INCLUDE COSTS INCURRED IN DEVELOPING AND

4    PROMOTING THE BRAND, LIKE ADVERTISING AND THINGS LIKE THAT?

5    A    YES.  AND MGA REPORTS THAT AND ACTUALLY CATEGORIZES IT BY

6    PRODUCTS; SO I JUST USED THE INFORMATION THAT MGA HAS COMPILED

7    OF THOSE TYPES OF COSTS.

8    Q    SO IS IT TRUE THAT IN CALCULATING THE BRATZ PROFITS, YOU

9    GIVE THEM CREDIT FOR ALL THOSE EXPENSES AND COSTS INCURRED IN

10   DEVELOPING THE BRAND?

11   A    I DO.

12   Q    AND WHAT IS THE SOURCE OF THIS COST INFORMATION?

13   A    IT IS THE INTERNAL RECORDS OF THE COMPANY THAT THEY CREATE

14   INCOME STATEMENTS FOR EACH PERIOD THEY SELL PRODUCT.

15   Q    IS THERE A PARTICULAR DATA BASE THAT'S COLLECTED UNDER AT

16   MGA?

17   A    I THINK IT ALL DERIVES FROM THIS ORIGINAL DATABASE, THE

18   TARGET DATABASE, AND THEN OTHER SYSTEMS WHERE THEY HAVE OTHER

19   COSTS.

20   Q    AND ONCE YOU'VE GOT THE REVENUES AND YOU'VE GOT THE COSTS,

21   WHAT DID YOU DO?

22   A    WELL, I THEN SUBTRACTED THE COSTS FROM THE REVENUES TO

23   DERIVE THE PROFITS OF $777,900,000.

24   Q    IN DOING THIS, DID YOU PREPARE SOME WORKSHEETS THAT

25   REFLECTED THE WORK YOU DID IN DOING THIS CALCULATION?

1    A    YES.  I HAVE A FINANCIAL MODEL THAT I USED TO CREATE THESE

2    NUMBERS; I THINK IT'S 243 PAGES IN LENGTH; IT'S JUST A BUNCH OF

3    EXCEL SPREADSHEETS THAT ACTUALLY CALCULATE THE NUMBERS.

4    Q    COULD WE TAKE A LOOK IN THE BOOK THERE, TAB 13931.

5         CAN YOU IDENTIFY THAT DOCUMENT THAT'S BEEN MARKED AS

6    EXHIBIT 13931?

7         **MR. KENNEDY:**  WE DON'T SEEM TO HAVE A 13931.

8         **THE COURT:**  CONSULT WITH COUNSEL, PLEASE.

9         **MR. KENNEDY:**  WE FOUND IT YOUR HONOR.  THANK YOU.

10   **BY MR. QUINN:**

11   Q    I THINK I ASKED YOU, WHAT IS EXHIBIT 13931?

12   A    YES.  THIS IS A PRINTOUT OF THE 243 PAGES OF SCHEDULES;

13   AND THANK YOU FOR DOUBLE-SIDING IT TO SAVE PAPER.

14   Q    AND THE SCHEDULE, CAN YOU GIVE US SOME IDEA OF THE VOLUME

15   OF DATA IS OR THE DOCUMENTS UNDERLYING THESE SCHEDULES?

16   A    YES.  THIS IS JUST A SUMMARY OF THE SCHEDULES.  THERE ARE

17   HUNDREDS OF THOUSANDS OF PAGES THAT SUPPORT THIS THAT ARE NOT

18   PART OF THIS.  THE UNDERLYING DATA WOULD FILL A NUMBER OF

19   BANKER'S BOXES AS WELL.

20   Q    IN DOING YOUR WORK IN PREPARING THE SUMMARY THAT YOU DID,

21   DID YOU ACTUALLY DO SUMMARIES BY REVENUE AND COST INFORMATION

22   FOR EACH PRODUCT?

23   A    YES.

24   Q    ALL RIGHT.

25        TO GO BACK TO EXHIBIT 13931, DOES THIS ACCURATELY

1    SUMMARIZE THE UNDERLYING DATA AND INFORMATION THAT YOU REFERRED

2    TO?

3    A    IT DOES.

4         **MR. QUINN:**  WE'D OFFER THAT INTO EVIDENCE, YOUR

5    HONOR.

6         **MR. KENNEDY:**  NO OBJECTION.

7         **THE COURT:**  IT'S ADMITTED.   YOU MAY PUBLISH.

8         **MR. QUINN:**  WE WON'T PUBLISH ALL 243 PAGES, JUST THE

9    FIRST PAGE, TO GIVE FOLKS THE FLAVOR OF WHAT THE DOCUMENT LOOKS

10   LIKE.

11        (EXHIBIT 13931 RECEIVED.)

12   **BY MR. QUINN:**

13   Q    I'M SURE WE'RE ALL ENLIGHTENED NOW.

14        THERE'S HOW MANY OF THESE PAGES?

15   A    243.

16   Q    THANK YOU FOR NOT BRINGING ALL OF THE UNDERLYING DATA.

17        IF WE COULD GO BACK TO THAT LAST SLIDE, THE SLIDE

18   NUMBER TWO.

19        IN ARRIVING AT MGA'S PROFITS FOR BRATZ, DID YOU

20   DEDUCT ANY AMOUNT FOR TAXES?

21   A    I DID NOT.

22   Q    WHY NOT?  WE ALL HAVE TO PAY TAXES; RIGHT?

23   A    WE DO.

24        ACTUALLY I SHOULD NOT SAY THAT.

25        I SUBTRACTED THE ONE AND A HALF PERCENT TAX THEY PAY

1    TO THE STATE OF CALIFORNIA, BUT NOT THE NORMAL TAXES THE

2    COMPANIES PAY.  AND THE REASON I DID NOT SUBTRACT TAXES IS

3    BECAUSE THIS IS WHAT'S CALLED A SUBCHAPTER S-CORPORATION, AND

4    THEY DO NOT PAY TAXES; THE TAXES ARE PAID BY THE SHAREHOLDERS

5    OF THE COMPANY, NOT THE COMPANY ITSELF.

6    Q    SO MR. LARIAN WOULD PAY THOSE TAXES?

7    A    HE AND THE OTHER SHAREHOLDER.

8    Q    TURN NOW TO SLIDE NUMBER THREE, DID YOU DO A CALCULATION

9    OF THE BENEFITS THAT MR. LARIAN RECEIVED FROM BRATZ?

10   A    YES.

11   Q    COULD YOU BACKUP FOR A SECOND.

12        IS A DAMAGE AWARD TAX DEDUCTIBLE?

13   A    IT IS TAX DEDUCTIBLE TO THE PARTY THAT PAYS THE DAMAGE

14   AWARD.

15   Q    AND DID THAT ENTER INTO YOUR CALCULATIONS AT ALL?  DID YOU

16   TAKE THAT INTO ACCOUNT?

17   A    I DID; JUST LIKE EVERY DAMAGE CLAIM I'VE EVER PRESENTED AT

18   TRIAL, I'VE DONE IT PRE-TAX.

19   Q    SO IF WE COULD GO BACK TO SLIDE THREE HERE, WHAT DOES THIS

20   REPRESENT?

21   A    THIS BREAKS OUT TWO PIECES OF THE BENEFITS I'VE CALCULATED

22   TO MR. LARIAN FROM THE SALE OF BRATZ PRODUCTS.

23   Q    WHAT ARE THOSE TWO PIECES?

24   A    THE FIRST IS WHAT I CALL DISTRIBUTIONS, AND THAT IS THE

25   CHECKS THAT ARE WRITTEN TO MR. LARIAN OR THE TRUSTS HE CONTROLS

1   THAT ARE RELATED TO THE PROFITS EARNED BY THE COMPANY FROM THE

2   SALE OF BRATZ PRODUCTS.

3   Q    HOW CAN YOU TELL WHICH CHECKS HE RECEIVES RELATES TO BRATZ

4   PRODUCTS?

5   A    YOU CAN'T.  I HAVE TO MAKE THAT DETERMINATION BASED ON MY

6   ESTIMATE OF THE PROFITS EARNED BY MGA EACH YEAR FROM THE SALE

7   OF BRATZ PRODUCTS VERSUS OTHER PRODUCTS.

8   Q    WE'RE GOING TO GET TO THAT?

9   A    YES.  IF YOU ASK ME.

10  Q    THE SECOND ITEM THERE, WHAT DOES THAT REPRESENT?

11  A    THAT REPRESENTS MY ESTIMATE OF THE VALUE AS OF JUNE 30,

12  2008, THAT MR. LARIAN HAS IN THE MGA CORPORATION THAT IS

13  RELATED TO THE BRATZ BUSINESS.

14  Q    HOW DID YOU ARRIVE AT THAT?

15  A    I PERFORMED A TRADITIONAL EVALUATION OF THE BRATZ

16  BUSINESS, AND I USED THREE GENERALLY ACCEPTED APPROACHES TO

17  ARRIVE AT THAT VALUE.

18  Q    DO YOU HAVE A SLIDE THAT ILLUSTRATES THIS?

19  A    YES.

20  Q    WHICH SLIDE WOULD THAT BE?  SLIDE NUMBER SIX?

21  A    I DON'T HAVE MY SLIDES WITH ME.

22         THAT IS THE ONE.

23  Q    SO WE'RE GOING TO COME TO THAT DOWN THE ROAD.

24         GO BACK TO SLIDE NUMBER THREE.

25         IF WE COULD LOOK AT SLIDE NUMBER FOUR, WHAT DOES THIS

1  SHOW?

2  A    THIS SHOWS THE DISTRIBUTIONS I HAVE CALCULATED BY YEAR

3  BETWEEN 2001 AND 2007.

4  Q    WHAT IS THE TOTAL AMOUNT OF BRATZ PROFIT DISTRIBUTIONS

5  THAT MR. LARIAN RECEIVED?

6  A    $385,220,741.

7  Q    IT'S OBVIOUS THERE'S RATHER A MARKET DECLINE IN THE

8  DISTRIBUTIONS THAT YOU IDENTIFIED IN 2007.  DO YOU SEE THAT?

9  A    YES.

10  Q    AND DO YOU KNOW WHY THERE IS THAT DECLINE?

11  A    YES.

12  Q    WHY IS THAT?

13  A    THAT IN LATE 2006, THE MGA COMPANY BORROWED MONEY FROM

14  WACHOVIA BANK PRINCIPALLY TO BUY THE LITTLE TIKES BUSINESS, AND

15  THERE WAS A CONDITION IN THAT LOAN AGREEMENT THAT THERE COULD

16  BE NO DISTRIBUTIONS TO THE SHAREHOLDERS EXCEPT FOR THE TAXES

17  THEY WOULD PAY ON THE PROFITS FROM MGA CORPORATION GOING

18  FORWARD.

19  Q    SO THE LENDER LOANED SOME MONEY WHICH WAS USED TO BUY

20  ANOTHER TOY COMPANY?

21  A    THAT, AND OTHER REASONS.

22  Q    AND THEY PUT A RESTRICTION IN THERE ABOUT THE AMOUNT OF

23  MONEY THAT COULD BE DISTRIBUTED TO MR. LARIAN IN THE CREDIT

24  AGREEMENT?

25  A    YES.

1   Q    IS THAT SOMETHING THAT'S COMMON OR UNUSUAL? HAVE YOU SEEN

2   THAT BEFORE?

3   A    THAT IS COMMON; I'VE SEEN IT BEFORE IN COMPANIES LIKE

4   THIS.

5   Q    AND WHY WOULD A LENDER WANT TO PLACE SUCH A RESTRICTION ON

6   THE AMOUNT OF MONEY GOING OUT TO SHAREHOLDERS?

7         **MR. KENNEDY:**  OBJECTION.  SPECULATION.

8         **THE COURT:**  LAY A FOUNDATION, COUNSEL.

9   **BY MR. QUINN:**

10  Q    YOU INDICATED THAT YOU'VE SEEN THIS TYPE OF PROVISION

11  BEFORE.

12  A    MANY TIMES.

13  Q    AND HAVE YOU HAD OCCASION TO INVESTIGATE WHY IT'S INCLUDED

14  OR GET AN UNDERSTANDING ABOUT WHAT WHY LENDERS ASK FOR THESE

15  PROVISIONS?

16  A    YES.

17  Q    BASED ON THAT, WHAT'S YOUR UNDERSTANDING ABOUT WHY LENDERS

18  WANT TO RESTRICT THE AMOUNT OF MONEY THAT IS GOING OUT TO

19  SHAREHOLDERS?

20  A    THAT THEY WANT TO MAKE SURE THE CORPORATION RETAINS ENOUGH

21  EARNINGS TO PAY BACK THEIR LOAN.

22  Q    THE SECOND COMPONENT OF MR. LARIAN'S FINANCIAL BENEFIT

23  FROM BRATZ IS THE VALUE -- IF WE GO BACK TO SLIDE 3 -- IS THE

24  VALUE OF MR. LARIAN'S STOCK ATTRIBUTABLE TO BRATZ; IS THAT

25  CORRECT?

1    A    YES.

2    Q    AND WHAT ARE YOU REFERRING TO THERE, EXACTLY?

3    A    THAT MR. LARIAN OWNS APPROXIMATELY 82 PERCENT OF MGA, AND

4    BRATZ IS ONE OF THEIR PRINCIPAL, IF NOT THE PRINCIPAL, PRODUCT

5    LINE OF THE COMPANY; SO A LOT OF THE VALUE OF THE COMPANY IS

6    RELATED TO THE PROFITS THAT HAVE BEEN EARNED AND WILL BE EARNED

7    FROM THE BRATZ PRODUCT LINE.

8    Q    DID YOU UNDERTAKE SOME ANALYSIS TO DETERMINE WHAT THE

9    VALUE OF BRATZ IS FOR MGA AS OPPOSED TO OTHER PRODUCTS THAT MGA

10   SELLS?

11   A    YES.

12   Q    IF WE COULD TAKE A LOOK AT SLIDE NUMBER FIVE, COULD YOU

13   TELL US WHAT THIS REFLECTS?

14   A    YES.  THIS IS A COMPILATION OF THE SALES OF THE TOP TEN

15   PRODUCTS THAT MGA SELLS OR SOLD BETWEEN 2001 AND 2007.  AND I'M

16   SURE THAT JUST AS I CAN'T READ IT, THE JURORS CAN'T READ THAT

17   EITHER, BUT YOU CAN SEE ONE LARGE BAR THAT IS ABOUT 80 PERCENT

18   OF THE SALES OF MGA DURING THAT PERIOD, AND THOSE ARE THE BRATZ

19   PRODUCT LINES.  THE NEXT NINE BIGGEST PRODUCTS ARE ALL LESS

20   THAN 10 PERCENT.

21   Q    IF WE COULD ENLARGE THAT BOTTOM THERE.

22        YOU CAN'T SEE IT, BUT THE FIRST ONE, THAT'S

23   SPIDERMAN?

24   A    YES.

25   Q    AND SHREK, LITTLE TIKES, AND THEN BRATZ.

```
 1   A    THOSE FOUR PRODUCTS ARE THE FIRST FOUR ON THAT CHART.

 2   Q    ALL RIGHT.

 3        THERE'S BEEN TESTIMONY THAT AT ABOUT THE TIME THAT

 4   BRATZ CAME OUT MGA WAS DEVELOPING ANOTHER PRODUCT CALLED PRAYER

 5   ANGEL.  DO YOU KNOW WHERE THAT FALLS IN TERMS OF MGA'S

 6   SUCCESSFUL PRODUCTS OR HOW SUCCESSFUL IT WAS COMPARED TO OTHER

 7   ONES?

 8   A    IT DIDN'T MAKE THE TOP TEN.  WHAT IT DID IS, OF ALL OF THE

 9   SALES IN THAT TIME PERIOD, WHICH IS 100 PERCENT, IT GENERATED

10   2/10TH OF ONE PERCENT OF THOSE SALES; SO IT IS HALF AS

11   SUCCESSFUL AS THE 10TH MOST SUCCESSFUL PRODUCT ON THIS CHART

12   HERE.

13   Q    TO MAKE THE TOP TEN, WHAT PERCENTAGE OF SALES DID A

14   PRODUCT HAVE TO REACH IN THESE YEARS?

15   A    4/10THS OF ONE PERCENT OF THEIR SALE DURING THAT PERIOD.

16   Q    WE'VE ALSO HEARD ABOUT ANOTHER MGA DOLL CALLED SINGING

17   BOUNCY BABY.  WHERE DOES THAT FALL IN THE TOP TEN?

18   A    THAT WAS ONLY -- WELL, IT ISN'T IN THE TOP TEN AT ALL.  IT

19   IS ACTUAL ONLY HALF AS SUCCESSFUL AS PRAYER ANGELS; IT'S ONLY

20   1/10TH OF ONE PERCENT OF THE SALES DURING THAT PERIOD.

21   Q    SO WOULD IT BE FAIR TO SAY BRATZ WAS FAR AND AWAY, BY

22   ORDERS OF MAGNITUDE, THE MOST SUCCESSFUL PRODUCT THAT MGA HAD

23   IN THIS TIME PERIOD?

24   A    YES.

25   Q    HOW DID YOU DETERMINE THE VALUE OF MR. LARIAN'S MGA STOCK
```

1   WHICH IS ATTRIBUTABLE TO BRATZ?

2   A    I MODELED THE BRATZ PRODUCT LINE AND THEN USED THREE

3   GENERIC ACCEPTED APPROACHES TO VALUE IT.

4   Q    THIS IS THE SLIDE I THINK WE LOOKED AT EARLIER, SLIDE

5   NUMBER SIX.

6        CAN YOU EXPLAIN WHAT WE'RE LOOKING AT ALONG THE LEFT

7   HAND SIDE HERE, WHERE IT SAYS "INCOME APPROACH," "COMPARABLE

8   COMPANIES," AND "COMPARABLE TRANSACTIONS."

9   A    THESE ARE THE THREE APPROACHES I USED TO VALUE THE

10  COMPANY.  THE INCOME APPROACH LOOKS AT THE CASH THAT WILL BE

11  GENERATED BY THIS PRODUCT LINE INTO THE FUTURE AND BRINGS IT

12  BACK TO A PRESENT VALUE AS OF JUNE 30, 2008.

13  Q    HOW DO YOU THAT?  HOW DO YOU VALUE SOMETHING THAT'S IN THE

14  FUTURE AND BRING IT BACK TO PRESENT VALUE?

15  A    WELL, I HAVE TO MAKE A PROJECTION OF THE FUTURE, AND I DO

16  THAT BASED ON THE PAST AND MY EXPECTATION OF WHAT WILL HAPPEN

17  IN THE FUTURE.

18  Q    SO THAT'S THE FIRST APPROACH THAT YOU USED?

19  A    YES.

20  Q    WHAT'S THE SECOND ONE?

21  A    THE SECOND IS WHAT'S CALLED MARKET APPROACH AND IT'S

22  CALLED COMPARABLE COMPANIES.  I LOOKED AT SIX OF THE LARGEST

23  PUBLICLY TRADED TOY COMPANIES AND LOOKED AT HOW THEY ARE VALUED

24  AND THEN USED THOSE SIX COMPANIES TO VALUE THE BRATZ PRODUCT

25  LINE.

1   Q      WHY DID YOU CHOOSE PUBLICLY TRADED COMPANIES?

2   A      TWO, BECAUSE THEY ARE SIMILAR OR LARGER SIZE THAN MGA; AND

3   ALSO, I HAVE INFORMATION THAT I CAN USE, BECAUSE THEY HAVE TO

4   REPORT THEIR RESULTS.

5   Q      WHAT'S THE THIRD APPROACH THERE?

6   A      IT'S ANOTHER MARKET APPROACH, AND IT'S CALLED COMPARABLE

7   TRANSACTIONS.  I LOOKED AT 22 TRANSACTIONS DURING THIS TIME

8   PERIOD OF FIVE YEARS BEFORE THIS VALUATION DATE IN THE TOY

9   INDUSTRY TO SEE HOW THESE TYPES OF COMPANIES WERE VALUED AND

10  USED METRICS FROM THOSE TRANSACTIONS TO VALUE BRATZ.

11  Q      SO YOU LOOKED AT THE PRICES THAT WERE PAID, AND FROM THAT

12  YOU DERIVED VALUATION INFORMATION FOR COMPANIES IN THE TOY

13  INDUSTRY?

14  A      YES.  I COMPARE THE PRICES PAID TO THINGS LIKE REVENUES

15  AND EARNINGS TO DETERMINE HOW TO VALUE BRATZ BASED ON THIS

16  INFORMATION.

17  Q      DID THIS THIRD APPROACH OF COMPARABLE TRANSACTIONS INCLUDE

18  TRANSACTIONS WHERE MATTEL WAS INVOLVED AND WHERE MGA WAS

19  INVOLVED?

20  A      YES.  BOTH THOSE COMPANIES MADE ACQUISITIONS DURING THIS

21  PERIOD THAT I HAVE USED.

22  Q      THE NEXT COLUMN IS VALUE.  CAN YOU EXPLAIN WHAT THAT

23  REFLECTS?

24  A      THESE ARE THE VALUE THAT I ESTIMATE THAT THE BRATZ PRODUCT

25  LINE IS AS OF JUNE 30, 2008, BASED ON THESE DIFFERENT

1  APPROACHES.

2  Q    SO USING THOSE APPROACHES, YOU ARRIVE AT SOME NUMBERS OR

3  FACTORS WHICH YOU THEN APPLY TO THE BRATZ PROFITABILITY

4  INFORMATION THAT YOU HAVE.

5  A    RIGHT.   THESE THREE APPROACHES GIVE ME DIFFERENT ANSWERS,

6  AND I HAVE TO COME UP WITH A POINT ESTIMATE; SO I HAVE TO

7  WEIGHT THEM TO COME UP WITH A SINGLE VALUE.

8  Q    AND THAT'S THE NEXT COLUMN THAT SAYS WEIGHT.

9  A    IT IS.

10  Q    NOW, WHY ARE YOU WEIGHING THESE DIFFERENT APPROACHES?

11  A    WELL, I HAVE TO DETERMINE IN MY OWN JUDGMENT AND

12  EXPERIENCE WHICH IS THE BEST OF THESE APPROACHES, WHICH GIVES

13  ME THE BEST INFORMATION; SO I WEIGHT THEM ACCORDINGLY.

14  Q    WHAT'S THE SOURCE OF THAT WEIGHT?

15  A    JUST MY EXPERIENCE AND JUDGMENT.

16  Q    AND BASED ON THIS ANALYSIS, WHAT DID YOU CONCLUDE WAS THE

17  WEIGHTED VALUE OF THE BRATZ BUSINESS?

18  A    WELL, I MULTIPLY EACH VALUE IN THAT COLUMN BY THE WEIGHT,

19  THE PERCENTAGE, TO GET THE WEIGHT VALUE.   YOU THEN ADD UP THOSE

20  THREE WEIGHTED VALUES TO GET WHAT I BELIEVE IS THE TOTAL VALUE

21  OF 100 PERCENT OF THE BRATZ BUSINESS, AND THAT IS $379,800,000.

22  Q    I THINK YOU INDICATED THAT MR. LARIAN DOES NOT OWN ALL OF

23  MGA'S STOCK; IS THAT TRUE?

24  A    TRUE.

25  Q    SO DO YOU HAVE TO DO SOMETHING TO TAKE THAT INTO ACCOUNT

1   IN DESCRIBING THE VALUE OF MR. LARIAN'S PORTION OF THIS

2   BUSINESS?

3   A    YES.  I HAVE TO USE THIS VALUE AND MULTIPLY BY HIS

4   INTEREST IN THE COMPANY.

5   Q    LET'S TAKE A LOOK AT THE NEXT SLIDE, SLIDE NUMBER SEVEN.

6   WHAT DOES THIS REFLECT?

7   A    THE CALCULATION OF THE TOTAL BRATZ VALUE THAT IS OWNED BY

8   MR. LARIAN.  WHAT I DID WAS I MULTIPLIED THE 379.8 MILLION BY

9   HIS 81.82 PERCENT INTEREST TO THEN GET HIS VALUE OF

10  $310,800,000.

11  Q    SO WHAT IS YOUR CONCLUSION REGARDING THE FINAL FINANCIAL

12  BENEFITS MR. LARIAN RECEIVED FROM BRATZ?

13  A    THAT IS THE $310,800,000.

14  Q    IF WE COULD GO BACK TO SLIDE THREE.

15       SO TAKING BOTH DISTRIBUTIONS AND THE VALUE OF THE

16  STOCK INTO ACCOUNT, WHAT'S YOUR CONCLUSION REGARDING THE TOTAL

17  BENEFITS THAT MR. LARIAN RECEIVED FROM BRATZ?

18  A    $696 MILLION.

19  Q    IN YOUR BOOK THERE, WOULD YOU PLEASE TAKE A LOOK AT

20  EXHIBIT 13932.  CAN YOU IDENTIFY THIS DOCUMENT FOR US?

21  A    YES.  THIS IS THE FINANCIAL MODEL THAT I USED TO CREATE

22  THE NUMBERS THAT WE'VE JUST BEEN TALKING ABOUT.

23  Q    WHO PREPARED THIS DOCUMENT?

24  A    IT WAS PREPARED BY MY STAFF, UNDER MY DIRECTION AND

25  CONTROL.

1   Q    THE SOURCE DOCUMENTS, THE UNDERLYING DATA THAT'S REFLECTED

2   HERE, THAT CAME FROM WHERE?

3   A    FROM MGA TO GET THE INFORMATION FOR MGA'S SUCCESS, BUT IT

4   ALSO CAME TO FROM PUBLIC RECORDS FOR THE COMPARABLE

5   TRANSACTIONS, THE COMPARABLE COMPANIES, THAT I AND MY STAFF

6   CHECKED.

7   Q    DOES IT ALSO INCLUDE SUMMARIES OF SOME PORTIONS OF THE

8   TENS OF THOUSANDS OF PAGES WHICH YOU AND YOUR HAVE STAFF

9   REVIEWED?

10  A    YES.

11       **MR. QUINN:**  WE'D OFFER, YOUR HONOR, EXHIBIT 13932.

12       **MR. KENNEDY:**  NO OBJECTION.

13       **THE COURT:**  ADMITTED.  YOU MAY PUBLISH.

14       (EXHIBIT 13932 RECEIVED.)

15  **BY MR. QUINN:**

16  Q    YOU'VE ALSO IN YOUR REPORT REFERRED TO PREJUDGMENT

17  INTEREST.  WHAT IS PREJUDGMENT INTEREST?

18       **MR. KENNEDY:**  OBJECTION, YOUR HONOR.  PREMATURE

19  QUESTION OF LAW.  IN ADDITION, WE WERE JUST GIVEN THESE NUMBERS

20  THIS MORNING AND HAVE NOT HAD A CHANCE TO --

21       **MR. QUINN:**  OBJECTION TO THE COMMENTS.

22       **THE COURT:**  COUNSEL, SIDE-BAR.

23       (SIDE-BAR PROCEEDINGS AS FOLLOWS:)

24       **THE COURT:**  THE CONCERN?

25       **MR. ROTH:**  ONE, AS A MATTER OF LAW, WE DON'T THINK

1    THEY, UNDER DISGORGEMENT THEORY, THEY GET IN PREJUDGEMENT

2    INTEREST ON ANY CLAIM.  THIS IS NOT A CLAIM WHERE THEY CLAIM

3    WE'VE TAKEN ANYTHING FROM THEM.  THEY HAVE LOST MONEY AND

4    PROPERTY.

5              NUMBER TWO, EVEN IF YOU ACCEPT IT AS A MATTER OF LAW,

6    THEY GET PREJUDGMENT INTEREST.  THIS IS A CALCULATION THEY GOT

7    TWO DAYS AGO AFTER MR. WAGNER'S DEPOSITION.  THEY IDENTIFIED IN

8    THE REPORT A CALCULATION THEY WERE GOING TO USE FOR

9    PREJUDGMENT INTEREST -- THEY IDENTIFIED IN THEIR EARLIER

10   REPORTS THE PROCESS THEY WERE GOING TO USE TO CALCULATE

11   PREJUDGMENT INTEREST.  FOLLOWING HIS DEPOSITION, INCLUDING THE

12   MOST RECENT DEPOSITION --

13             **THE COURT:**  ON FRIDAY.

14             **MR. ROTH:**  -- THEY FINALLY PROVIDED A SCHEDULE OF

15   WHAT THAT CALCULATION WAS.  IT'S DIFFERENT.  WE DIDN'T HAVE AN

16   OPPORTUNITY TO EXAMINE MR. WAGNER ABOUT THE CALCULATIONS THEY

17   USED TO COME UP WITH THESE NUMBERS.

18             **MR. COREY:**  I'LL ADDRESS THE FIRST COMMENT FIRST.

19             WHETHER OR NOT MATTEL'S ENTITLED TO PREJUDGEMENT

20   INTEREST SHOULD NOT BE AN ADMISSIBILITY QUESTION.  IT'S NOT AN

21   ADMISSIBILITY QUESTION.  IT'S A QUESTION WE CAN RESOLVE THROUGH

22   JURY INSTRUCTIONS.  WE'VE MADE A CLAIM FOR PREJUDGEMENT

23   INTEREST STARTING WITH THE VERY FIRST COMPLAINT.  THE ISSUE

24   WITH US BEING ENTITLED TO IT UNDER ADMISSIBILITY PERSPECTIVE

25   SHOULD HAVE BEEN RAISED BEFORE NOW.  ITS BEEN AN ISSUE IN OUR

1   JURY INSTRUCTIONS FOR MONTHS AND THE ARTICULATION OF A CLAIM

2   FOR PREJUDGEMENT INTEREST HAS BEEN IN MR. WAGNER'S REPORT FROM

3   THE TIME THAT HE SUBMITTED HIS FIRST REPORT.

4        **THE COURT:**  I'M NOT SO CONCERNED ABOUT THE FIRST

5   ISSUE, BECAUSE I'LL PROBABLY GIVE THE JURY A VERY QUICK

6   INSTRUCTION THAT SAYS YOU'RE GOING TO HEAR A LOT OF INFORMATION

7   ABOUT DAMAGES AND DIFFERENT TYPES OF DAMAGES.  THE COURT WILL

8   BE INSTRUCTING YOU ON DAMAGES AND THAT'S WHAT YOU'RE GOING TO

9   FOLLOW.

10        I'M MORE CONCERNED ABOUT THE SECOND ISSUE, THAT THEY

11   HAVE NOT HAD AN OPPORTUNITY TO EVALUATE THE CALCULATION OR THE

12   CHANGE IN THE CALCULATION.

13        **MR. COREY:**  THE CHANGE IS SOMETHING THEY SHOULD BE

14   ABLE TO EXAMINE MR. WAGNER ON.  MR. WAGNER IN HIS INITIAL

15   REPORT SAID HE WAS GOING TO USE A PRIME INTEREST RATE FOR

16   CALCULATION.  AFTER THE RULING CAME DOWN, IT'S JUST THE

17   PREJUDGEMENT INTEREST ON THE STATE COURT CLAIMS.  BY STATUTE,

18   WE HAVE TO USE 7 PERCENT INTEREST RATE; SO THAT'S A CHANGE.  IF

19   THEY WANT TO CROSS-EXAMINE HIM ON THAT, THEY CAN DO THAT.

20        **THE COURT:**  IS THAT THE ONLY CHANGE MADE IN THE

21   PREJUDGEMENT INTEREST IS THE CHANGE FROM PRIME RATE TO THE

22   STATE STATUTORY RATE?

23        **MR. COREY:**  YES.

24        **THE COURT:**  IS THAT IT?

25        **MR. COREY:**  NO.  THERE WAS A CHANGE BECAUSE HE

1   APPLIED THE RATE TO MR. LARIAN'S DISTRIBUTIONS BEFORE TAXES

2   WERE TAKEN OUT; THAT WAS A CHANGE HE HAD MADE TO HIS REPORT AND

3   THAT WAS PROVIDED TO MR. ROTH.  HE'S TAKEN MR. WAGNER'S

4   DEPOSITION AND HAD THE OPPORTUNITY TO ASK MR. WAGNER ABOUT THAT

5   CHANGE.  HE DID NOT DO THAT.

6          THE METHODOLOGY DID NOT CHANGE.

7          **THE COURT:**  ANY OTHER CHANGES?

8          **MR. ROTH:**  COMPOUNDING.

9          **MR. COREY:**  AND MR. ROTH THINKS THERE'S AN ISSUE

10  BECAUSE MR. WAGNER SAID IN HIS REPORT HE WAS GOING TO COMPOUND

11  MONTHLY BUT NOW IT'S YEARLY, WHICH IS ACTUALLY A BENEFIT TO

12  MGA; SO I DON'T SEE THAT AS BEING AN ISSUE.

13         **THE COURT:**  ANY OTHER CHANGES?

14         **MR. COREY:**  NOT THAT I KNOW.

15         **THE COURT:**  I'M GOING TO INSTRUCT THE JURY, AS I

16  INDICATED, ON THE ISSUE OF DAMAGES AND THEY WILL THEN RECEIVE

17  FURTHER INSTRUCTIONS.  I'LL GIVE YOU LEAVE, YOU'LL HAVE AN

18  OPPORTUNITY TO CROSS-EXAMINE HIM.  IF THERE IS SOME ADDITIONAL

19  NEED TO RECALL HIM ON THIS POINT, I'LL GIVE THAT TO YOU.

20         **MR. ROTH:**  PERHAPS I COULD PREVIEW AN ISSUE.

21         THERE ARE A NUMBER OF SLIDES WE'RE GOING TO BE SEEING

22  COMING UP IN THE PRESENTATION WHICH REFLECT, WE BELIEVE, NEW

23  ANALYSIS, INCLUDING NEW APPORTIONMENT ANALYSIS, THE NEW

24  ANALYSIS WE GOT LAST NIGHT.  WE THINK WE NEED AN OPPORTUNITY TO

25  EXAMINE MR. WAGNER ABOUT THOSE.  NOT TO TAKE DISCOVERY WHILE

1    HE'S ON THE STAND, BUT ACTUALLY HAVE A RENEWED DEPOSITION.

2            WHAT WE WOULD PROPOSE WITH RESPECT TO THOSE IS HAVE

3    THE ABILITY TO RECALL HIM IN OUR CASE AFTER WE'VE HAD THE

4    OPPORTUNITY TO EXAMINE THE DEPOSITION CONTENTS ABOUT WHAT WE

5    BELIEVE TO BE NEW ANALYSIS.

6            THE COURT:  I'M DEBATING WHETHER TO -- IS THERE ANY

7    OTHER NEW STUFF?

8            MR. COREY:  THIS IS THE FIRST TIME I'VE HEARD ABOUT

9    THIS.

10           THE COURT:  LET'S TAKE THIS UP AT THE END OF THE

11   EXAMINATION.  I'LL GIVE YOU LEAVE FOR THAT ARGUMENT; I'LL JUST

12   MAYBE DELAY YOUR CROSS-EXAMINATION UNTIL YOU HAVE HAD A CHANCE

13   TO TAKE APPROPRIATE DISCOVERY, IF I'M CONVINCED THERE'S BEEN

14   NEW INFORMATION THAT'S BEEN PRODUCED.

15           WOULD THAT ADDRESS YOUR CONCERN?

16           MR. ROTH:  IT MAY NOT, BECAUSE THEY HAVE A WITNESS

17   WHO'S PUTTING IN SOME LARGE NUMBERS RIGHT NOW.  WE FEEL IN

18   TERMS OF THE PRESENTATION OF THE CASE WE NEED THE OPPORTUNITY

19   NOW TO ADDRESS SOME OF THOSE FUNDAMENTAL ISSUES; SO WE BELIEVE

20   WE CANNOT --

21           THE COURT:  DO YOU WANT ME TO STOP THE WITNESS NOW?

22           MR. ROTH:  NO.  WE WANT THE OPPORTUNITY TO RECALL

23   HIM, TO BE ABLE TO CROSS-EXAMINE HIM NOW.

24           THE COURT:  LET ME TAKE THAT UP AT THE END.  LET'S

25   GET THROUGH THE DIRECT AND THEN WE'LL ADDRESS THIS.  BUT I'M

1    GOING TO LET THE PREJUDGMENT GO FORWARD.

2           **MR. COREY:**  THANK YOU, YOUR HONOR.

3           (SIDE-BAR PROCEEDINGS CONCLUDED.)

4           **THE COURT:**  LADIES AND GENTLEMEN OF THE JURY, BOTH

5    SIDES ARE GOING TO HAVE FINANCIAL EXPERTS, DAMAGES EXPERTS;

6    YOU'RE GOING TO BE HEARING FROM THEM.

7           AT THE END OF THE TRIAL, THE COURT IS GOING TO BE

8    GIVING YOU INSTRUCTION ON DAMAGES, ON THE ISSUE OF DAMAGES.

9    YOU SHOULD NOT TAKE ANYTHING THAT EITHER EXPERT IS PRESENTING

10   AS SUGGESTING WHAT DAMAGES ARE, UNDER THE LAW, REQUIRED TO BE

11   GIVEN OR NOT.  THAT'S SOMETHING WHICH IS GOING TO BE REFLECTED.

12   THIS IS SIMPLY A FINANCIAL CALCULATION.  AND I DON'T WANT YOU

13   TO TAKE ANYTHING THAT EITHER SIDE GIVES AS INDICATING WHAT THE

14   LAW IS WITH RESPECT TO THE DAMAGES.

15          **MR. QUINN:**  THANK YOU, YOUR HONOR.

16          **THE COURT:**  YOU MAY PROCEED.

17   **BY MR. QUINN:**

18   Q    I THINK YOU WERE TELLING US WHAT PREJUDGMENT INTEREST IS,

19   MR. WAGNER.

20          WOULD YOU PLEASE CONTINUE.

21   A    PREJUDGMENT INTEREST IS A CALCULATION THAT IS DESIGNED TO

22   MAKE THE PLAINTIFF HERE WHOLE ECONOMICALLY.

23          THESE PROFITS HAVE BEEN EARNED BY MGA IN THE PAST.

24          **MR. KENNEDY:**  OBJECTION.  NOW HE'S GETTING INTO LEGAL

25   -- IT DID NOT CALL FOR A LEGAL CONCLUSION, BUT WE'RE GETTING

1    ONE.

2            **THE COURT:**  SUSTAINED AS PHRASED.

3            REPHRASE THE QUESTION.

4    **BY MR. QUINN:**

5    Q    JUST FROM AN ECONOMIC ANALYSIS STANDPOINT, CAN YOU EXPLAIN

6    WHAT PREJUDGMENT INTEREST IS, TIME VALUED MONEY, HOWEVER YOU

7    CAN EXPLAIN IT FROM AN ECONOMIC STANDPOINT.

8    A    IT IS TO BRING BOTH DISTRIBUTIONS TO MR. LARIAN AND THE

9    PROFITS RECEIVED TO MGA UP TO A PRESENT VALUE AS OF TODAY.

10   Q    AND HAVE YOU CALCULATED PREJUDGMENT INTEREST ON MGA'S

11   PROFITS FROM BRATZ?

12   A    I HAVE.

13   Q    LOOK AT SLIDE NUMBER EIGHT.  WHAT DOES THIS REFLECT?

14   A    THIS REFLECTS THE AMOUNT OF PREJUDGEMENT INTEREST THAT I

15   HAVE CALCULATED ON BOTH THE PROFITS THAT MGA HAS EARNED FROM

16   THE SALE OF BRATZ AND THE DISTRIBUTIONS MADE TO MR. LARIAN FROM

17   THE DATES THEY RECEIVED THEM UP UNTIL AUGUST 15TH OF 2008.

18   Q    SO THOSE TOP LINE DAMAGES NUMBERS, THOSE ARE NUMBERS WE'VE

19   ALREADY LOOKED AT.

20   A    CORRECT.

21   Q    AND THEN BASICALLY YOU APPLY INTEREST RATES FROM THE TIME

22   THAT MONEY WAS RECEIVED OR DISTRIBUTED TO BRING IT UP TO DATE;

23   IS THAT RIGHT?

24   A    CORRECT.

25   Q    WHAT INTEREST RATE DID YOU USE?

1  A    7 PERCENT, COMPOUNDED ANNUALLY.

2  Q    WHY DID YOU CHOOSE 7 PERCENT?

3  A    IT'S THE STATUTORY RATE IN THE STATE OF CALIFORNIA FOR

4  NON-CONTRACT ACTIONS.

5  Q    WHY DID YOU COMPOUND THAT ANNUALLY?

6  A    BECAUSE THAT IS ECONOMICALLY CORRECT.

7  Q    SO SUPPOSE YOU HAD COMPOUNDED IT MONTHLY, WOULD THAT HAVE

8  RESULTED IN HIGHER INTEREST OR LOWER INTEREST?

9  A    HIGHER.

10 Q    SO COMPOUNDING IT LOW ANNUALLY, THE WAY YOU DID, IT

11 ACTUALLY RESULTED IN A LOWER NUMBER.

12 A    THAN IF I USED A SHORTER PERIOD TO DO MY COMPOUNDING.

13 Q    SO WHAT IS THE AMOUNT OF INTEREST THAT YOU CALCULATED ON

14 THE $779,900,000?

15 A    YOU MISSTATED; IT'S $777.9 MILLION, AND THE AMOUNT OF

16 PREJUDGEMENT INTEREST IS $226.2 MILLION.

17 Q    SO THE TOTAL BENEFIT TO MGA INCLUDING THE PREJUDGMENT

18 INTEREST IS WHAT?

19 A    $1,004,100,000.

20 Q    ON THE RIGHT SIDE, DO WE HAVE A PREJUDGMENT INTEREST WITH

21 RESPECT TO THE BENEFITS RECEIVED BY MR. LARIAN FROM BRATZ?

22 A    YES.

23 Q    AND HOW DO YOU ARRIVE AT THAT?

24 A    I DID THE CALCULATION THE SAME WAY; 7 PERCENT INTEREST,

25 COMPOUNDED ANNUALLY, UP UNTIL AUGUST 15, 2008.

THURSDAY, AUGUST 7, 2008                TRIAL DAY 31, MORNING SESSION

1    Q     WOULD YOU TAKE A LOOK AT EXHIBIT 13908.

2          CAN YOU IDENTIFY EXHIBIT 13908?

3    A     YES.  THIS IS A 2-PAGE SCHEDULE WHERE I MAKE THE

4    PREJUDGMENT INTEREST CALCULATIONS ON BOTH BRATZ PROFITS AND THE

5    LARIAN DISTRIBUTIONS.

6    Q     SO THAT SETS FORTH THE CALCULATION WE JUST LOOKED AT ON

7    THE SLIDE NUMBER EIGHT?

8    A     THESE ARE THE UNDERLYING CALCULATIONS.

9          **MR. QUINN:**  WE'D OFFER EXHIBIT 13908, YOUR HONOR.

10         **MR. KENNEDY:**  NO OBJECTION.

11         **THE COURT:**  ADMITTED.  YOU MAY PUBLISH.

12         (EXHIBIT 13908 RECEIVED.)

13   **BY MR. QUINN:**

14   Q     IF WE COULD GO BACK TO SLIDE EIGHT.

15         I DON'T THINK I PUT IN THE RECORD WHAT -- IN THE CASE

16   OF MR. LARIAN -- ADDING THE BENEFIT RECEIVED BY MR. LARIAN AND

17   THE PREJUDGMENT INTEREST; THAT CAME OUT TO A TOTAL OF WHAT FOR

18   THE BENEFIT FOR MR. LARIAN?

19   A     A TOTAL AMOUNT OF PREJUDGMENT INTEREST OF 93.5 MILLION,

20   FOR A TOTAL OF DAMAGES PLUS PREJUDGMENT INTEREST OF

21   $789,500,000.

22   Q     THANK YOU.

23         UP TO THIS POINT WE'VE BEEN TALKING ABOUT THE CLAIMS

24   I TOLD YOU WE WERE GOING TO BEGIN WITH; THE AID AND ABETTING,

25   BREACH OF FIDUCIARY DUTY, INTERFERENCE WITH A CONTRACT, DUTY OF

```
 1   LOYALTY, AND CONVERSION.  I'D LIKE TO CHANGE GEARS NOW AND TALK
 2   ABOUT THAT COPYRIGHT CLAIM.
 3            DID YOU CALCULATE THE AMOUNT THAT MATTEL SHOULD
 4   RECEIVE WITH RESPECT TO THE COPYRIGHT CLAIM?
 5   A    I DID.
 6   Q    AND WHY DID YOU CALCULATE THAT NUMBER SEPARATELY?
 7   A    BECAUSE UNDER THE CLAIM FOR COPYRIGHT, UNDER CERTAIN
 8   CIRCUMSTANCES, IT MAY BE APPROPRIATE TO APPORTION THE PROFITS
 9   EARNED BY MGA ON THE SALE OF BRATZ PRODUCTS BETWEEN THE ALLEGED
10   INFRINGING ACTIVITY AND OTHER FACTORS OR OTHER VALUE THAT MGA
11   BROUGHT TO THE SALE OF THAT PRODUCT, AND LIKEWISE FOR
12   MR. LARIAN'S DISTRIBUTIONS.
13   Q    WHAT DO YOU MEAN BY APPORTION?
14   A    THAT INSTEAD OF AWARDING 100 PERCENT OF THE PROFITS EARNED
15   ON BRATZ, THAT YOU DIVIDE THAT UP BETWEEN THE COPYRIGHT, THE
16   VALUE GENERATED BY THE COPYRIGHT INFRINGEMENT, VERSUS OTHER
17   THINGS.
18   Q    AND IS THIS APPORTIONMENT ANALYSIS SOMETHING THAT APPLIES
19   TO THE OTHER CLAIMS THAT WE JUST WENT THROUGH?
20   A    NO.
21   Q    IT APPLIES ONLY TO THE COPYRIGHT CLAIM?
22   A    THAT IS MY UNDERSTANDING.
23   Q    AND YOU INDICATE THAT IT MAY APPLY UNDER CERTAIN
24   CIRCUMSTANCES.
25   A    I DID.
```

1    Q    THAT'S A LEGAL QUESTION ON WHICH THE COURT WILL INSTRUCT

2    THE JURY?

3    A    I BELIEVE THAT'S CORRECT.

4    Q    IS THE APPORTIONMENT THAT YOU REFER TO, IS THAT SOMETHING

5    THAT'S DIFFERENT FROM DEDUCTING THE COSTS THAT WE LOOKED AT?

6    A    YES.  IT'S AFTER YOU DEDUCTED THE COSTS.

7    Q    RIGHT.

8         CAN YOU DESCRIBE FOR US HOW YOU WENT ABOUT THIS

9    APPORTIONMENT ANALYSIS OR THE POTENTIAL APPORTIONMENT ANALYSIS

10   THAT MIGHT APPLY TO A COPYRIGHT CLAIM?

11   A    YES.  I LOOKED AT A NUMBER OF WHAT I WOULD CALL YARDSTICKS

12   OR BENCHMARKS THAT I COULD USE TO DETERMINE WHAT IS THE NORMAL

13   AMOUNT OF PROFITS THAT TOY COMPANIES EARNED WHEN THEY SELL

14   THEIR PRODUCTS.

15   Q    WHAT'S YOUR OBJECTIVE IN DOING THAT?  WHY ARE YOU DOING

16   THAT?

17   A    TO TRY TO DETERMINE WHAT PROFITS ARE EARNED NORMALLY BY

18   COMPANIES THAT PROMOTE THEIR PRODUCTS, THAT DO QUALITY

19   MANUFACTURING, THAT HAVE GOOD BRAND IMAGE, TO DETERMINE THE

20   VALUE THAT THE COMPANIES RECEIVE FROM THOSE TYPES OF

21   ACTIVITIES.

22   Q    AND DID YOU USE JUST ONE BENCHMARK OR MORE THAN ONE

23   BENCHMARK IN TRYING TO ARRIVE AT THAT CALCULATION?

24   A    I DID MORE THAN ONE.

25   Q    CAN YOU EXPLAIN WHAT YOU DID.

1   A    WELL, THE TWO ONES THAT I THINK MOST SIGNIFICANT, FIRST I

2   LOOKED AT WHAT THE TOY INDUSTRY, ON AVERAGE, EARNED DURING THIS

3   PERIOD BETWEEN 2001 AND 2007, AND I HAD INFORMATION FROM THE

4   ELEVEN PURE TOY COMPANIES THAT ARE PUBLIC THAT ACTUALLY PUBLISH

5   THEIR FINANCIAL RESULTS.

6   Q    THAT'S ALL OF THEM?

7   A    THAT'S ALL OF THEM IN THE WORLD.  I USED THAT TO DETERMINE

8   WHAT TO TOY COMPANIES NORMALLY EARN WHEN THEY SELL TOYS.

9   Q    AND AGAIN, YOU'RE OBJECTIVE TO TRY TO FIND OUT WHAT TOY

10  COMPANIES NORMALLY EARN IS WHAT?

11  A    IT IS TO THEN SUBTRACT THAT OUT AND LEAVE MGA WITH THAT

12  PORTION OF THEIR PROFITS AND THEN ONLY AWARD THE AMOUNT ABOVE

13  THAT TO THE ALLEGED COPYRIGHT INFRINGEMENT.

14  Q    AND WHY WOULD YOU THEN AWARD THE AMOUNT ABOVE THAT?

15  YOU'RE ATTRIBUTING THAT TO WHAT?

16  A    TO SOMETHING THAT IS UNEXPLAINED THAT IS DIFFERENT AND

17  UNIQUE TO THIS PRODUCT.

18  Q    AND THAT WOULD BE PRESUMABLY WHAT'S ATTRIBUTABLE TO THE

19  INFRINGING ACTIVITY UNDER THIS THEORY.

20  A    CORRECT.

21  Q    THEN YOU SAID YOU HAD A SECOND BENCHMARK.

22  A    YES.  A SECOND BENCHMARK I USED IS I LOOKED AT THE THREE

23  MOST SUCCESSFUL AND PROFITABLE TOY COMPANIES THAT REPORT

24  PUBLICLY; AND THAT'S MATTEL, THE PLAINTIFF HERE; HASBRO; AND

25  JAKKS; THAT'S J-A-K-K-S.

```
1   Q    YOU SAY THESE ARE THE MOST SUCCESSFUL COMPANIES.  IN WHOSE

2   OPINION?  WHAT'S THE STANDARD YOU'RE USING TO MAKE THAT

3   JUDGMENT?

4   A    MY OWN JUDGMENT AND THE JUDGMENT OF ANYONE I HAVE SEEN

5   WHO'S REPORTED ON THIS INDUSTRY.

6   Q    SO WHAT DID YOU DO WITH THAT BENCHMARK WITH THE THREE TOP

7   COMPANIES?

8   A    I LOOKED AT THE RETURNS, THE PROFITABILITY OF THESE THREE

9   COMPANIES DURING THIS DAMAGE PERIOD.

10  Q    AND WHY ARE YOU WORKING WITH TWO DIFFERENT BENCHMARKS?

11  A    WELL, BECAUSE THE JURY MUST DETERMINE WHAT THEY THINK MGA

12  WOULD HAVE BEEN BUT FOR USING THE DESIGNS THAT ARE AT ISSUE IN

13  THIS CASE.  AND IF THEY BELIEVE THEY WOULD JUST BE ONE OF AN

14  AVERAGE COMPANIES, THEY SHOULD AT LEAST LEAVE THAT AMOUNT OF

15  MONEY WITH MGA.

16  Q    THAT IS, THE INDUSTRY STANDARD AMOUNT?

17  A    CORRECT.  AND IF THEY BELIEVE THIS COMPANY REALLY DOES

18  HAVE THE SAME TALENT AND THE SAME ABILITY AS THE TOP THREE TOY

19  COMPANIES, EVEN WITHOUT THIS BRATZ DESIGN, THEN THEY SHOULD

20  LEAVE THAT AMOUNT OF PROFITS WITH MGA.

21  Q    ALL RIGHT.

22       AND YOU SAID THE JURY SHOULD DETERMINE -- YOU'RE

23  ASSUMING NOW AT THIS POINT IN THIS DISCUSSION THAT THE JURY

24  DECIDES OR THE COURT INSTRUCTS THAT APPORTIONMENT IS

25  APPROPRIATE.
```

1    A    CORRECT.

2    Q    YOU'RE NOT EXPRESSING ANY OPINION AS TO WHETHER THIS IS IN

3    FACT ONE OF THOSE CIRCUMSTANCES WHERE YOU WOULD DO THIS

4    APPORTIONMENT EXERCISE; IS THAT TRUE?

5    A    I HAVE NO OPINION ON THAT SUBJECT.

6    Q    LET'S LOOK AT SLIDE NINE.

7          DOES THIS REFLECT THE ANALYSIS WHICH YOU JUST

8    DESCRIBED?

9          MR. KENNEDY:  OBJECTION, YOUR HONOR, TO THE BOTTOM

10   LINE.

11         THE COURT:  COUNSEL?

12         MR. QUINN:  YOUR HONOR, I'M NOT SURE I KNOW WHAT THE

13   OBJECTION IS.

14         MR. KENNEDY:  NEW ANALYSIS?

15         MR. QUINN:  I DON'T THINK IT IS.

16         THE COURT:  I'LL TAKE THIS UP ALONG WITH THE OTHER

17   ISSUES.  YOU MAY PROCEED.

18   BY MR. QUINN:

19   Q    THE BOTTOM LINE, WHAT DOES THAT REFLECT IN TERMS OF

20   APPORTIONMENT?

21   A    THAT IS REALLY NO APPORTIONMENT.  IT IS THE SAME NUMBER I

22   GAVE BEFORE THE TOTAL PROFITS EARNED BY BRATZ OF

23   $777.9 MILLION.  IF YOU WOULD DETERMINE THAT ALL OF THAT PROFIT

24   IS ATTRIBUTABLE TO THE INFRINGEMENT, THAT IS THE NUMBER.

25   Q    SO THAT IS JUST THE CASE WHERE THERE WOULD BE NO

```
 1   APPORTIONMENT AT ALL.

 2   A    CORRECT.  IF YOU WOULD ASSUME THAT BASICALLY ALL OF THIS

 3   PROFIT IS DUE TO THE ALLEGED INFRINGING ACTIVITY.

 4          MR. KENNEDY:  WITHDRAW THE OBJECTION.

 5          THE COURT:  VERY WELL.  YOU UNDERSTAND NOW.  OKAY.

 6   BY MR. QUINN:

 7   Q    THEN THE NEXT COLUMN UP, THE TOY INDUSTRY AVERAGE.  COULD

 8   YOU EXPLAIN THAT TO US.

 9   A    YES.

10          OUT OF THAT TOTAL PROFITS OF 777.9 MILLION, IF YOU

11   LEFT THE NORMAL RETURN THAT THE ELEVEN PUBLICLY TRADED PURE TOY

12   COMPANIES EARNED DURING THIS TIME, WHICH IS BETWEEN ONE AND TWO

13   PERCENT PROFITABILITY, YOU SHOULD LEAVE 74.8 MILLION, WHICH IS

14   THAT MIDDLE NUMBER ON THE BENCHMARK PROFITABILITY COLUMN WITH

15   MGA AND ONLY AWARD $703.1 MILLION TO MATTEL FOR THE ALLEGED

16   COPYRIGHT INFRINGEMENT.

17   Q    SO UNDER THAT CASE YOU'RE LEAVING THE TOY INDUSTRY AVERAGE

18   PROFITABILITY WITH THE COMPANY AND APPORTIONING THE REST TO THE

19   INFRINGEMENT IF THE JURY WOULD WERE TO DETERMINE THAT THAT'S

20   THE TYPE OF COMPANY THAT MGA IS, IN ESSENCE.

21   A    YES.

22   Q    AND THEN THE TOP CASE THERE; MATTEL, HASBRO, JAKKS.

23   A    THAT IF YOU LOOK AT THE AVERAGE PROFITABILITY OF THOSE

24   THREE COMPANIES, WHICH IS BETWEEN 11 AND 12 PERCENT DURING THIS

25   TIME PERIOD, YOU WOULD LEAVE, OF THE $777,900,000 WORTH OF
```

1    PROFITS, 354.9 MILLION WITH MGA, AND AWARD $423 MILLION WORTH

2    OF DAMAGES TO MATTEL.

3    Q    IN EACH CASE YOU'RE TRYING TO DECIDE HOW TO ALLOCATE THIS

4    $777,900,000 BASED UPON DIFFERENT ASSUMPTIONS AS TO WHAT TYPE

5    OF COMPANY OR HOW SUCCESSFUL A COMPANY MGA IS; IS THAT

6    ESSENTIALLY IT?

7    A    YES, OUT USING THE BRATZ DESIGN.

8    Q    AND ASSUMING IT'S DETERMINED THIS IS A CASE WHERE IT'S

9    APPROPRIATE TO DO APPORTIONMENT, HOW WOULD THE JURY DECIDE

10   WHICH ONE OF THESE THREE SCENARIOS WOULD APPLY TO MGA?

11   A    IT WOULD BE BASED ON THE EVIDENCE THEY HAVE HEARD AS TO

12   THE SUCCESS OF MGA BASED ON OTHER THINGS MGA HAS DONE.

13   Q    LET'S TALK ABOUT OTHER THINGS MGA HAS DONE, NON BRATZ

14   PRODUCTS.

15        HAVE YOU DONE ANYTHING TO DETERMINE WHETHER OR NOT

16   MGA MAKES PROFITS ON ITS NON BRATZ PRODUCTS?

17   A    YES.

18   Q    WHAT DID YOU CONCLUDE?

19   A    WELL, FIRST OFF, I LOOKED AT -- THAT WOULD BE WHAT I THINK

20   YOU PUT UP AS CHART NUMBER FIVE.

21   Q    LET'S PUT THAT UP.

22   A    THE SUCCESS MGA HAS HAD WITH THEIR TOP TEN PRODUCTS, AND

23   THEY HAVE ALL OF THE SAME PEOPLE, WITH ALL OF THE SAME SKILL

24   SET, TRYING TO SELL AND PROMOTE THESE OTHER PRODUCTS.  WHAT

25   THESE OTHER PRODUCTS DON'T HAVE IS THE BRATZ DESIGN.

```
 1          YOU CAN SEE THEY ARE VERY UNSUCCESSFUL AT SELLING

 2   ANYTHING ELSE BUT --

 3          MR. KENNEDY:  OBJECTION, YOUR HONOR.  LACK OF

 4   FOUNDATION.

 5          THE COURT:  SUSTAINED.

 6   BY MR. QUINN:

 7   Q    THIS DATA THAT'S REFLECTED HERE, WHERE DID YOU GET THIS

 8   DATA FROM?

 9   A    FROM THE INTERNAL RECORDS OF MGA.

10   Q    FOR EXAMPLE, THE FIRST COLUMN THERE, "SPIDERMAN," IT SAYS

11   1.3 PERCENT.  THAT'S 1.3 PERCENT OF THE TOTAL REVENUE?

12   A    FROM 2001 TO 2007.

13   Q    AND YOU DERIVED THAT FROM MGA'S OWN RECORDS?

14   A    YES.

15   Q    IS THAT TRUE FOR EVERY OTHER OF THE TEN PRODUCTS LISTED

16   THERE?

17   A    YES.

18   Q    NOW, OF THESE PRODUCTS LISTED HERE -- AND I APPRECIATE

19   THAT FOLKS CAN'T READ THEM; I'LL JUST READ THE NAMES ALONG THE

20   BOTTOM:  SPIDER-MAN, SHREK, LITTLE TIKES, BRATZ, RESCUE PETS,

21   4-EVER BEST FRIENDS, YUMMI-LAND, ZAPF, MIUCHIZ, SCOOTER

22   SAMANTHA.

23          LET'S FOCUS ON THE FIRST FOUR THERE, SPIDER-MAN,

24   SHREK, LITTLE TIKES, AND BRATZ.

25          WHICH OF THOSE DID MGA ITSELF ORIGINATE?
```

```
 1   A    NONE OF THOSE FOUR.

 2   Q    HOW ABOUT SPIDER-MAN?  DO YOU KNOW WHERE THAT COMES FROM?

 3   A    THAT'S LICENSED FROM ANOTHER COMPANY.

 4   Q    HOW ABOUT SHREK?

 5   A    THAT WOULD BE THE SAME FOR SHREK.

 6   Q    HOW ABOUT LITTLE TIKES?

 7   A    LITTLE TIKES WAS ACQUIRED BY MGA NEAR THE END OF 2006.

 8   Q    SO THAT REPRESENTS ANOTHER COMPANY THAT THEY ACQUIRED?

 9   A    IT DOES.

10   Q    THEN BRATZ, YOU'RE AWARE THAT SOME DESIGNS WERE LICENSED

11   FROM MR. BRYANT?

12   A    I DO.

13   Q    THE REMAINING SIX, THEIR BEST PRODUCT THERE -- DO YOU KNOW

14   WHETHER THOSE SIX ARE INTERNALLY-DEVELOPED MGA PRODUCTS?

15   A    IT IS MY UNDERSTANDING THAT THEY WERE.

16   Q    THE BEST OF THE LAST SIX, THEIR BEST PRODUCT -- DO ANY OF

17   THEM ACCOUNT FOR EVEN ONE PERCENT OF MGA'S SALES?

18   A    NOT DURING THAT TIME PERIOD.

19   Q    LET'S GO BACK NOW AND LOOK AT SLIDE 10.

20        WHAT DOES THIS SHOW?

21   A    THIS SHOWS MY CALCULATION OF WHAT I BELIEVE THE PROFITS

22   ARE EARNED BY BRATZ, WHICH ARE THE BLUE BARS, AND BY ALL OTHER

23   PRODUCTS, THE NON BRATZ PRODUCTS, DURING EACH YEAR BETWEEN 2001

24   AND 2006.

25   Q    AGAIN, WHERE DID YOU GET THIS INFORMATION?
```

1    A    THE UNDERLYING INFORMATION I RECEIVED FROM MGA.  BUT I HAD

2    TO MAKE MY OWN CALCULATIONS.

3    Q    IN TERMS OF THE NON BRATZ PRODUCTS, WHAT DOES IT SHOW IN

4    TERMS OF WHETHER OR NOT MGA HAS MADE PROFITS IN THESE YEARS ON

5    NON BRATZ PRODUCTS?

6    A    FIVE OUT OF THE SIX YEARS, I BELIEVE THEY LOST MONEY ON

7    THESE PRODUCTS.  IN ONE YEAR, 2005, I BELIEVE THEY MADE MONEY.

8    Q    SO IN TERMS OF THOSE RANKINGS THAT WE WERE LOOKING AT, IF

9    YOU TAKE BRATZ OUT OF THE MIX, DOES MGA PERFORM -- HAS IT

10   PERFORMED ON ITS PRODUCTS LIKE LEADING TOY COMPANIES SUCH AS

11   MATTEL, HASBRO, OR JAKKS.

12   A    THEY HAVE NOT.

13   Q    IF WE COULD GO BACK TO SLIDE NUMBER 9.

14        FOCUSING ON THE EXPERIENCE, THEN, WITH THE NON BRATZ

15   PRODUCTS, DO YOU HAVE AN OPINION AS TO WHICH CATEGORY MGA WOULD

16   BELONG IN?

17   A    I BELIEVE THEY WOULD BELONG IN THE BOTTOM CATEGORY.

18   Q    IF WE COULD GO NOW TO --

19        **THE COURT:**  COUNSEL, IF YOU'RE GOING TO ANOTHER AREA,

20   LET'S TAKE OUR LUNCH BREAK.

21        (WHEREUPON, JURORS DEPART COURTROOM.)

22        **THE COURT:**  THE MOTION FOR SANCTIONS.  I RECEIVED THE

23   MOTION AND THE OPPOSITION.  I INDICATED THAT THE REPLY COULD BE

24   MADE IN COURT, SO WE'LL START WITH MGA.

25        **MS. AGUIAR:**  AARON, IF YOU COULD PUT UP FOR ME ON THE

1   SCREEN ONE OF THE SLIDES THAT WAS USED BY MATTEL IN ITS OPENING

2   STATEMENT.  THE FIRST ONE IS 33-2.

3           YOUR HONOR, I DON'T THINK THAT THERE'S ANY DOUBT AT

4   THIS POINT THAT A DOLL THAT WAS SHOWN IN TWO DIFFERENT SLIDES

5   TO THE JURY DURING OPENING STATEMENT WAS THE WRONG DOLL.  IT

6   WILL ULTIMATELY BE UP TO YOUR HONOR TO DETERMINE, BASED ON OUR

7   BRIEF AND THE BRIEF SUMMARY THAT I'M GIVING YOU NOW, WHETHER

8   MATTEL ACTUALLY HAD A GOOD FAITH BASIS TO PRESENT THAT EVIDENCE

9   TO THE JURY IN OPENING STATEMENT, WHICH WE BELIEVE SET THE TONE

10  FOR THIS PHASE OF THE CASE BY UNFAIRLY PREJUDICING MGA AND

11  GIVING THE JURY A VERY CLEAR MESSAGE FROM MATTEL THAT MGA HAS

12  MADE INCONSISTENT AND UNREASONABLE ARGUMENTS AND POSITIONS IN

13  HONG KONG LITIGATIONS.

14          I THINK THE EVIDENCE IS VERY CLEAR THAT MATTEL HAD

15  ACCESS TO THE RIGHT INFORMATION IN ORDER TO HAVE PROVIDED THIS

16  JURY, IF MATTEL SO WISHED, WITH THE CORRECT IMAGES.  THEY CHOSE

17  NOT TO DO THAT.

18          THE TESTIMONY FROM MR. LEUNG YESTERDAY, IN

19  MR. QUINN'S EXAMINATION OF HIM, IS EXHIBIT A.

20          MATTEL HAD -- THIS IS JUST -- I WANTED TO REMIND YOUR

21  HONOR OF THE SLIDE, AT LEAST ONE OF THE SLIDES, THAT THEY USED

22  IN OPENING STATEMENT.  WE'LL PUT THAT BACK UP IN A SECOND.

23          LET ME TURN TO THE PLEADING THAT THEY HAD.

24          **THE COURT:**  YOU RAISE A VERY IMPORTANT POINT TO ME.

25  YOU SAID THAT THIS MR. LEUNG THAT THEY HAD YESTERDAY -- HE WAS

1    CONTACTED LAST FRIDAY.

2              MS. AGUIAR:  HE WAS CONTACTED LAST FRIDAY.

3              LET ME TIE IT UP FOR YOUR HONOR.

4              THE COURT:  WE NEED TO BACK UP TO WHERE WE WERE WHEN

5    MR. PRICE MADE HIS OPENING STATEMENT.

6              MS. AGUIAR:  ABSOLUTELY.  LET ME DO THAT.

7              I WAS JUST TRYING TO USE HIS TESTIMONY AS A WAY OF

8    SHOWING THAT THEY HAD THE INFORMATION, BUT YOU'RE ABSOLUTELY

9    RIGHT.

10             EXHIBIT 13561.

11             THE COURT:  YES.

12             MS. AGUIAR:  EXHIBIT 13561 IS A DOCUMENT SUBMITTED IN

13   THE DOUBLE GRAND CASE.  THAT EXHIBIT WAS PROVIDED TO MATTEL

14   MONTHS AGO.

15             THE COURT:  OKAY.

16             MS. AGUIAR:  AND IF YOU LOOK, FOR EXAMPLE, AT

17   PAGE 0124 OF THAT EXHIBIT, THERE'S A PHOTOGRAPH ATTACHED TO

18   THAT SUBMISSION WHICH WAS MADE IN THE HONG KONG LITIGATION, IN

19   THE DOUBLE GRAND CASE, SHOWING THE TRENDY TEENZ DOLL.

20             THE COURT:  WHY DOESN'T THE COPY THAT I HAVE HAVE

21   PAGE NUMBERS?  I HAVE 13561, BUT I DON'T HAVE PAGE NUMBERS.

22             MS. AGUIAR:  I CAN PROVIDE YOU MY COPY.

23             THE COURT:  IS THAT THE SAME PICTURE?

24             MS. AGUIAR:  YES, IT IS.

25             WOULD YOU LIKE A HARD COPY?

1          THE COURT:  PLEASE.

2          MS. AGUIAR:  IT'S PAGE 124.

3          THE OTHER FLAGGED PAGES THERE, YOUR HONOR, AND THE

4    HARD COPY THAT YOU HAVE ARE OTHER IMAGES OF THE ALLEGEDLY

5    INFRINGING PRODUCTS IN THAT CASE.

6          THE ONLY REASON THAT I WAS REFERENCING MR. LEUNG'S

7    TESTIMONY IS THAT HE WAS EASILY AND READILY ABLE, THROUGH THOSE

8    PHOTOGRAPHS, TO IDENTIFY THEM AS DOLLS THAT WERE MANUFACTURED

9    BY HIS COMPANY AND THAT WERE AT ISSUE IN THAT CASE.

10         WE PRODUCED THAT DOCUMENT THAT YOU HAVE IN FRONT OF

11   YOU MONTHS AGO.

12         THE COURT:  THIS WAS NOT THE ONLY DOLL THAT WAS

13   REFERENCED AS INFRINGING IN THIS CASE.

14         MS. AGUIAR:  THAT'S CORRECT.  THERE WAS A MINI TRENDY

15   TEENZ.  AND THERE'S ALSO A PHOTOGRAPH OF THAT THERE.  THERE WAS

16   A PEN, A BOBBLEHEAD PEN, THAT WAS ALLEGING INFRINGING.  HE ALSO

17   IDENTIFIED THAT.  THOSE ARE ATTACHED AS EXHIBITS TO THAT

18   SUBMISSION THAT WAS MADE IN THE HONG KONG CASE.

19         THE COURT:  THE ONE THAT MR. PRICE PUT UP WAS THE --

20   WHAT WAS THE NAME OF IT?

21         MS. AGUIAR:  YOU'RE ASKING WHICH ONE HE USED IN

22   OPENING?

23         THE COURT:  THE ONE THAT YOU'RE COMPARING THIS

24   ONE TO.

25         MS. AGUIAR:  I'M HOLDING UP, YOUR HONOR,

1    EXHIBIT 13703, WHICH IS ABOUT A FOOT TALL PLUSH DOLL.

2            THE COURT:  WHAT'S THE NAME OF IT?

3            MS. AGUIAR:  THE NAME ON IT IS TRENDY TEENZ, AND IT'S

4    MANUFACTURED -- THE FRONT OF IT, ACTUALLY RIGHT ON THIS

5    EXHIBIT, SAYS "WEST COVINA, CALIFORNIA, FUN TOYS," SO I KNOW

6    THAT YOUR HONOR --

7            THE COURT:  SO THIS IS ANOTHER TRENDY TEENZ THAT'S --

8            MS. AGUIAR:  APPARENTLY.

9            AND I KNOW THAT YOUR HONOR HAS BEFORE LOOKED TO THE

10   ACTUAL PACKAGE FOR INDICIA OF WHAT IS IT ABOUT THE DOLL, AND

11   THIS ONE SAYS IT'S A COMPANY BASED IN WEST COVINA, CALIFORNIA,

12   APPARENTLY.

13           MY POINT IS THAT THE PLEADING OR THE SUBMISSION THAT

14   WAS MADE IN THE DOUBLE GRAND CASE --

15           THE COURT:  COULD I SEE THE DOLL?

16           MS. AGUIAR:  SURE.  OF COURSE.

17           THE COURT:  BUT IT'S MADE IN CHINA.

18           MS. AGUIAR:  YES.  BUT THE NAME OF THE COMPANY --

19           THE COURT:  FUN TOYS.

20           MS. AGUIAR:  -- IS FUN TOYS.

21           THERE'S NOTHING ON THERE THAT INDICATES THAT WAS MADE

22   BY ANY OF THE PARTIES THAT WERE INVOLVED IN THIS LITIGATION.

23   THAT WAS THE ONLY POINT THAT I WAS MAKING.  IN OTHER WORDS,

24   THERE'S NO INDICATION ON -- MANY DOLLS, I BELIEVE, ARE -- WE'VE

25   SEEN IN THIS CASE -- MANY OF THEM ARE MADE IN CHINA.

1        THERE ARE ALSO, WHICH HAVE BEEN PRODUCED TO MATTEL,

2   PHOTOGRAPHS OF THE TRENDY TEENZ DOLLS THAT WERE AT ISSUE, AND

3   THERE'S ALSO A MINI ONE; THERE'S A MINI TRENDY TEENZ, LIKE I

4   SAID, AND THERE'S A PEN.  THOSE ARE NOT JUST ATTACHED TO THAT

5   ONE SUBMISSION, YOUR HONOR.  THERE ARE OTHERS.  THERE'S AN

6   AFFIRMATION OF LEE SHIU CHEUNG IN THAT CASE.  AND THAT'S

7   EXHIBIT NUMBER 13691.  AND ATTACHED TO THAT SUBMISSION, THERE

8   ARE ALSO PHOTOGRAPHS OF VARIOUS TRENDY TEENZ DOLLS.

9        MATTEL ALSO POINTS TO THE DEPOSITION OF

10  MITCHELL KAMARCK.

11       **THE COURT:**  THAT WAS RATHER EQUIVOCAL, BUT IT DID

12  GIVE SOME INDICATION.  HE WAS KIND OF --

13       **MS. AGUIAR:**  WELL, YOUR HONOR, I HAVE TO SAY HIS

14  FIRST ANSWER WAS, 'I HONESTLY CAN'T TELL ONE WAY OR THE OTHER,'

15  AND THEN HE SAID -- THE QUESTION WAS -- LET ME READ THE WHOLE

16  ANSWER:  "I HONESTLY CAN'T SAY ONE WAY OR THE OTHER.  IF YOU

17  HAVE THE LITIGATION PAPERS, I COULD PROBABLY RESPOND TO THAT.

18  BUT I DON'T KNOW WHETHER THIS HAPPENED WHILE I WAS AT MGA OR

19  NOT.  I DO VAGUELY RECALL THAT COMING IN."

20       AND THEN THE QUESTION:  "THAT COMING IN, MEANING YOU

21  SAW A COPY OF THAT DOLL?"

22       ANSWER:  "YEAH.  I SAW -- I THINK SO."

23       **MS. AGUIAR:**  AND I HAVE TO SAY THAT DEPOSITION WAS IN

24  JANUARY, AND THEN THERE WAS MOTION PRACTICE, AND THEN WE MADE A

25  PRODUCTION TO MATTEL IN MAY.  THAT WAS SEVERAL MONTHS BEFORE

1    MR. PRICE STOOD UP HERE AND SHOWED THE JURY THAT BIG PLUSH

2    DOLL.

3              LET ME JUST WALK THROUGH THE TIMELINE TOO.

4              WE MADE THE PRODUCTION IN MAY.  MR. PRICE STOOD UP

5    AND MADE HIS OPENING STATEMENT ON JULY 23RD.  SEVERAL DAYS

6    AFTER JULY 23RD, ON JULY 25TH, WE GOT A SUBPOENA ASKING US FOR

7    COPIES OF THE ORIGINAL DOLLS FROM HONG KONG.

8              SO TO ME, THE TIME FRAME HERE IS COMPLETELY FLIPPED.

9              IF MATTEL IS GOING TO STAND UP, MAKE ARGUMENTS TO THE

10   JURY, AND PRESENT EVIDENCE TO THEM ON JULY 23RD -- THINGS LIKE

11   SUBPOENAS AND REQUESTS FOR ORIGINAL DOLLS SHOULD HAVE COME

12   BEFORE JULY 23RD, NOT AFTER JULY 23RD.

13             **THE COURT:**  THERE WERE REQUESTS EARLY ON IN

14   LITIGATION --

15             **MS. AGUIAR:**  YES.  AND BY THE WAY, IN MAY, THEY DID

16   HAVE THAT DECLARATION WHICH I'VE SHOWN TO YOU, PLUS OTHER

17   PLEADINGS FROM THIS CASE.  I'M JUST MAKING THE POINT THAT IF

18   THEY WANTED TO CONFIRM IT, THEY COULD HAVE ASKED US PRIOR TO

19   JULY 23RD.  WE GOT AN E-MAIL ON JULY 28TH, WHICH WAS FIVE DAYS

20   AFTER THE OPENING STATEMENT.  SO MY POINT IS, WHEN YOUR HONOR

21   IS INQUIRING INTO -- I DON'T KNOW HOW YOU DETERMINE THIS, BUT

22   WHETHER THEY HAD A BASIS FOR DOING THIS --

23             **THE COURT:**  I'LL TELL YOU HOW I DETERMINE THIS.  I'VE

24   NEVER HAD THIS ISSUE COME UP LIKE THIS BEFORE, BECAUSE I'VE HAD

25   A RULE EVER SINCE I STARTED HEARING TRIALS EIGHT YEARS AGO

1    THAT -- I REPEAT THE MANTRA EVERY TIME AT THE PRETRIAL

2    CONFERENCE; I KNOW I SAID IT SEVERAL TIMES IN THIS CASE --

3    NOTHING IS SHOWN TO THE JURY IN OPENING STATEMENT UNLESS THE

4    OTHER SIDE DOES NOT OBJECT.  IF THERE'S ANY OBJECTION, IT DOES

5    NOT COME IN; IT'S WAIVED.

6             THAT IS MY MANTRA.  I USE IT TO AVOID THIS VERY

7    PROBLEM.

8             THE ONE ISSUE THAT YOU HAVE NOT ADDRESSED SO FAR IN

9    YOUR REPLY IS THAT PRIMARY ISSUE.  I HAVE A REPRESENTATION FROM

10   MATTEL THAT THEY ASKED COUNSEL FOR MGA WHETHER OR NOT THERE WAS

11   ANY OBJECTION TO IT AND THE ANSWER WAS NO.

12            **MS. AGUIAR:**  THEY ARE PARSING THE NATURE -- WE

13   GENERALLY OBJECTED TO THESE SLIDES -- WELL, LET ME START BY

14   CUTTING RIGHT TO THE CHASE.

15            DID WE SAY, AT 8:30 OR 8:45 A.M. ON THE MORNING --

16   BECAUSE THAT'S WHEN WE SAW THEIR SLIDES -- DID WE SAY, 'OH, I

17   NOTICED A THIRD OF THE WAY THROUGH YOUR PRESENTATION THERE IS A

18   SLIDE, AND THAT PARTICULAR DOLL WE KNOW RIGHT NOW ON THE SPOT

19   IS THE WRONG DOLL'?

20            WE DID NOT.  AND I'M NOT GOING TO TRY TO SUGGEST THAT

21   WE DID.

22            BUT, YOUR HONOR, I MYSELF TOOK THE BINDER THAT THEY

23   GAVE TO US, AND I FLAGGED THE ONES THAT WE HAD OBJECTIONS TO.

24   SO AS AN OFFICER OF THE COURT, I'LL REPRESENT TO YOU THAT THEY

25   WERE AWARE THAT MORNING THAT WE OBJECTED TO THESE SLIDES.  AND

1    WE OBJECTED ON THE BASIS THAT THIS IS PREJUDICIAL AND CONFUSING

2    TO THE JURY, AND WE HAD ARGUMENTS THAT WE WERE MAKING THAT THIS

3    WAS AN AREA -- I GUESS MY POINT IS, THIS WAS AN AREA --

4            **THE COURT:**  DID YOU EXPRESS THIS TO ME?

5            YOU CAN'T MAKE OBJECTIONS -- MY QUESTION IS, IS THERE

6    ANYTHING ON THE RECORD THAT THIS WAS OBJECTED TO EITHER BEFORE

7    THE OPENING STATEMENT OR DURING THE OPENING STATEMENT?  BECAUSE

8    I CAN'T -- I DON'T KNOW WHAT YOU PLEDGED TO EACH OTHER.  I

9    CAN'T GO DOWN THAT ROAD.  THAT WOULD BE A REALLY DANGEROUS ROAD

10   TO GO DOWN AT THIS POINT.

11           **MS. AGUIAR:**  UNDERSTOOD.

12           **THE COURT:**  IS THERE ANYTHING ON THE RECORD?  BECAUSE

13   I DON'T RECALL IT.

14           **MS. AGUIAR:**  I BELIEVE MR. NOLAN MADE AN OBJECTION.

15           **THE COURT:**  BUT YOU HAVE DAILIES, SO I KNOW THAT YOU

16   COULD CALL UP THE TRANSCRIPT.

17           **MS. AGUIAR:**  PERHAPS WHAT WE'LL DO IS, MR. PRICE CAN

18   MAKE HIS COMMENTARY, AND IF I CAN GET THE SPECIFIC CITE FOR

19   YOU -- I KNOW, YOUR HONOR, THAT DURING THE OPENING -- AND I

20   BELIEVE HE DID, AND I WILL GET THE PAGE CITATION FOR YOU, THAT

21   WE MADE AN ARGUMENT TO YOUR HONOR THAT THESE SLIDES REGARDING

22   THE COMPARISONS FROM OTHER JURISDICTIONS --

23           **THE COURT:**  I UNDERSTAND YOUR OBJECTION TO THAT, AND

24   THAT GOES BACK TO THE MOTION *IN LIMINE*.  YOU MADE THAT ARGUMENT

25   FOUR TIMES.  I'M REJECTING THAT.

1      THE OBJECTION I'M TALKING ABOUT IS REALLY SIMPLE;

2  IT'S REALLY STRAIGHTFORWARD, BECAUSE I WOULD BE SURPRISED AT

3  MYSELF IF AN OBJECTION WAS MADE ON AUTHENTICITY GROUNDS OR ON

4  THE GROUNDS THAT YOU'RE MAKING NOW -- IF THAT WAS MADE, I WILL

5  BE DISAPPOINTED IN MYSELF THAT I DIDN'T THROW IT OUT, BECAUSE

6  THAT'S JUST WHAT I DO IN TRIALS.

7      **MS. AGUIAR:**  AGAIN, THE DISTINCTION -- I'M NOT

8  SUGGESTING THAT WE SAID THE WRONG DOLL IS IN THIS SLIDE.  WE

9  GENERALLY OBJECTED.  NO, NOT JUST GENERALLY; WE OBJECTED TO

10  SPECIFIC SLIDES, INCLUDING THIS ONE, ON THE GROUNDS THAT

11  SHOWING THESE KINDS OF COMPARISONS WAS, IN THIS AREA, JUST

12  REALLY RIPE FOR PREJUDICING US AND CONFUSING THE JURY.

13      NOW --

14      **THE COURT:**  I REJECTED THAT OBJECTION.  THAT'S NOT

15  THE BASIS FOR THIS MOTION.

16      **MS. AGUIAR:**  I WOULD SAY, YOUR HONOR, HONESTLY,

17  THAT -- I UNDERSTAND YOUR RULE, AND YOUR RULE IS A FAIR ONE,

18  BUT TO IMPOSE ON MGA, OR ANY PARTY, THE BURDEN OF HAVING TO

19  POLICE POTENTIAL MISREPRESENTATIONS IN SOMEONE'S OPENING

20  SLIDES, I, FRANKLY -- I'M JUST NOT SURE THAT THAT'S FAIR.

21      WE LOOKED THROUGH THE SLIDES.

22      **THE COURT:**  I DO, COUNSEL, BECAUSE OF THE WAY I

23  ENFORCE THE RULE.  IF THERE IS ANY OBJECTION, I SUSTAIN IT, IN

24  TERMS OF WHETHER IT'S AUTHENTIC, WHETHER THERE'S A FOUNDATIONAL

25  OBJECTION, OR ANYTHING ELSE.  THAT IS -- I DON'T LIKE SEEING

1    EVIDENCE SHOWN -- DON'T SHAKE YOUR HEAD AT ME, COUNSEL.  I

2    REALLY HAVE GOT TO COUNSEL YOU ON YOUR DEMEANOR WITH THE COURT;

3    AND IT'S NOT THE FIRST TIME.

4         I'M GOING TO EXPLAIN MY RULING HERE.  IT IS NOT

5    UNFAIR.

6         THE COURT DOES NOT LIKE SHOWING EVIDENCE TO THE JURY

7    IN OPENING STATEMENT.

8         WHAT I COUNSEL COUNSEL TO DO IS TO DESCRIBE WHAT THEY

9    BELIEVE THE EVIDENCE IS GOING TO SHOW.

10        IF THERE IS A STIPULATION, IF THERE IS AN AGREEMENT

11   BETWEEN THE PARTIES THAT EVIDENCE CAN BE SHOWN, I PERMIT IT.

12   IF THERE IS A DISAGREEMENT ON IT, I DO NOT PERMIT IT.  ALL YOU

13   HAVE TO SAY, ALL MR. NOLAN HAS TO SAY, ALL YOU HAVE TO SAY, ALL

14   ANYONE HAS TO SAY IS, 'WE DO NOT STIPULATE.  WE OBJECT TO

15   THAT.'

16        THE GENERAL OBJECTION -- AND IT WAS A GENERAL

17   OBJECTION -- TO THE ENTIRE REIGN -- AND AS YOU POINTED OUT IN

18   YOUR BRIEF, IT WAS MADE THREE OR FOUR DIFFERENT TIMES, TO THE

19   IDEA OF FOREIGN EVIDENCE COMING IN.  THAT, I REJECT.  I RULED

20   ON THE MOTION *IN LIMINE*.  THAT HAS BEEN REMOVED AS A BASIS.

21        BUT IN TERMS OF 'THIS IS THE WRONG EVIDENCE, THIS IS

22   NOT THE RIGHT DOLL, THIS IS THE WRONG DOLL,' ANYTHING OF THAT

23   NATURE, THE WAY TO POLICE THIS, THE WAY THE COURT POLICES THIS,

24   I EXPECT COUNSEL TO OBJECT TO THE OTHER SIDE.

25        NOW, WHEN MR. NOLAN GOT UP AND WRONGLY STATED THAT

```
 1   MATTEL HAS VALUED THEIR CASE AT $75,000, THAT IS SOMETHING THAT
 2   COULD NOT BE CURED THROUGH THAT PROCESS, BECAUSE THAT WAS NOT A
 3   PHYSICAL PIECE OF EVIDENCE.  THAT WAS JUST AN ASSERTION THAT
 4   WAS STATED.  IT WAS OBJECTED TO, THE COURT SUSTAINED THE
 5   OBJECTION, AND I INSTRUCTED.
 6        WHEN MATTEL HAS MADE ERRORS IN PRESENTATION, THE
 7   COURT HAS GIVEN INSTRUCTION TO THE JURY.  WE CAN'T CONTROL
 8   THAT.  BUT THE PHYSICAL STUFF, THE STUFF THAT GOES UP THERE,
 9   THE DIAGRAMS, THE GRAPHS, ALL OF THAT, I DO EXPECT COUNSEL TO
10   POLICE THAT.  AND IF YOU HAVE AN OBJECTION TO IT, I EXPECT YOU
11   TO STATE IT.  IF THERE'S SOMETHING IN THE RECORD THAT GOES
12   BEYOND THE GENERAL BROAD-BASED OBJECTION TO THE ENTIRE CATEGORY
13   OF EVIDENCE, BECAUSE THAT -- I RULED ON THE MOTION *IN LIMINE*
14   BEFORE TRIAL -- THAT'S WHAT I WANT TO SEE.
15        IF IT'S NOT THERE, IT'S WAIVED, AND WE'RE GOING TO
16   MOVE ON.  IF YOU WANT TIME TO LOOK THROUGH THE TRANSCRIPTS AND
17   SEE WHAT YOU CAN FIND, THAT'S OKAY AS WELL.
18        MS. AGUIAR:  I THINK MR. NOLAN WILL ADDRESS THAT, AND
19   SOMEONE HAS PROVIDED HIM WITH THE TRANSCRIPT.  I WOULD JUST SAY
20   THAT FOR US TO HAVE TO ASSUME THAT THE IMAGES MAY NOT HAVE BEEN
21   CORRECT AND SOMEHOW VERIFY WHAT WERE PROBABLY 150 SLIDES PRIOR
22   TO THIS AND POLICE THAT IN THAT AMOUNT OF TIME AND ASSUME THAT
23   THEY WERE TRYING TO PUT EVIDENCE IN FRONT OF THE JURY THAT WAS
24   WRONG, I THINK AT THAT POINT IN TIME WAS NOT -- TO PUT THAT
25   TYPE OF BURDEN -- AND I UNDERSTAND; I'M NOT DISPUTING WHAT
```

1   YOU'RE SAYING -- THAT GENERALLY SPEAKING, IF THERE'S A PIECE OF

2   EVIDENCE, WE LOOKED AT IT, WE TRIED TO MAKE WHATEVER OBJECTIONS

3   WE COULD IN THE TIME THAT WE HAD, BUT TO ASSUME THAT THEY WERE

4   ACTUALLY GOING TO PUT THE WRONG DOLL IN THERE, WE DIDN'T GO

5   INTO THIS WITH THAT MINDSET.  SO I GUESS WE SHOULD HAVE.

6          **THE COURT:**  NEITHER DOES THE COURT.

7          IS THERE ANY EVIDENCE AT ALL THAT MR. PRICE

8   INTENTIONALLY PUT UP THE WRONG DOLL?  ANY EVIDENCE?

9          I UNDERSTAND YOUR ARGUMENT.  I UNDERSTAND YOU SAY

10  THIS IS A DIFFERENT TRENDY TEENZ.  BUT WE HAVE SOMEONE FROM --

11  A COUNSEL FOR MGA SAYING THAT IT MIGHT VERY WELL BE.  HE THINKS

12  THAT -- I ASSUME THAT WAS THE DOLL THAT WAS SHOWN TO HIM IN THE

13  DEPOSITION, THE ONE THAT MR. NOLAN HAS IN HIS HANDS RIGHT NOW.

14         **MS. AGUIAR:**  I BELIEVE IT WAS.

15         **THE COURT:**  SO COUNSEL FOR MGA SAYS THAT 'I THINK

16  THAT MIGHT BE THE DOLL THAT WAS THE SUBJECT OF THE LITIGATION.'

17  THERE ARE A BUNCH OF DIFFERENT PHOTOGRAPHS IN EXHIBIT 13561-B;

18  ADMITTEDLY, NONE OF THEM OF THAT PARTICULAR DOLL.  IT'S

19  DESCRIBED AS TRENDY TEENZ, AND THAT IS THE TRENDY TEENZ.  NO

20  QUESTION A MISTAKE WAS MADE HERE.  AND THERE'S NO QUESTION THAT

21  YOU CAN CAPITALIZE ON THAT MISTAKE IN CLOSING ARGUMENT BY

22  REVISITING WHAT MR. PRICE SAID IN OPENING STATEMENT AND

23  INDICATING THAT THE EVIDENCE DID NOT BEAR THAT OUT.  BUT IS

24  THERE ANY EVIDENCE THAT MR. PRICE DID THAT INTENTIONALLY?

25         **MS. AGUIAR:**  ALL I CAN TELL YOU -- I CAN'T GET INSIDE

 1   HIS MIND.  I DON'T KNOW.  ALL I CAN TELL YOU IS, TWO MONTHS

 2   BEFORE HE STOOD UP HERE TO MAKE OPENING STATEMENT, THEY HAVE

 3   THE PLEADING WITH ALL OF THE PHOTOGRAPHS ATTACHED, AND THAT

 4   DOLL WAS NOT IN THERE.  AND THAT DOLL IS SO DIFFERENT FROM THE

 5   OTHER DOLLS THAT BEFORE MR. QUINN EVER ASKED MR. LEUNG EVEN A

 6   QUESTION ABOUT THE DOLL, MR. LEUNG BLURTED OUT, 'THIS IS NOT

 7   THE ONE.'  THAT'S HOW OBVIOUS IT WAS TO HIM.

 8        LOOK, I UNDERSTAND YOUR HONOR'S RULING, AND I ACCEPT

 9   IT.

10        I DID WANT TO JUST MENTION --

11        **THE COURT:**  I'M NOT THERE YET.

12        IS THERE AN OBJECTION THAT WAS MADE?

13        **MR. NOLAN:**  YOUR HONOR, IF I MIGHT, BECAUSE I WAS THE

14   ONE WHO HAD THE CONVERSATION.

15        BEFOREHAND, WE FLAGGED A NUMBER OF THEM.  A LOT OF

16   THEM WENT TO THE GENERAL OBJECTION THAT YOU'VE REFERRED TO.

17        **THE COURT:**  YES.

18        **MR. NOLAN:**  THAT'S THE ONLY BASIS THAT I MADE THE

19   OBJECTION ON ON THE RECORD.

20        HOWEVER, YOUR HONOR, WHAT'S IMPORTANT IS, IN THIS

21   SITUATION, WE HAVE OPERATED UNDER CERTAIN RULES OF ENGAGEMENT,

22   IN THE SENSE THAT WHEN WE OBJECT, IT'S USUALLY HONORED.  THAT

23   HAPPENED IN THE FIRST PHASE.

24        ON THIS PARTICULAR DOLL, WHEN IT WAS SHOWN AT THE

25   LAST MINUTE, WHEN I LOOKED AT IT, IT JUST DIDN'T EVEN SEEM

1   PLAUSIBLE TO ME.  AND I SAID, 'THIS IS THE ONE?'  BECAUSE I

2   WAS, LIKE, 'OH, YOU KNOW' -- NOT TO DISCLOSE ANYTHING -- I WAS

3   SAYING, 'OH, MY GOD, THIS IS GOING TO BE TOUGH TO DEAL WITH.'

4   AND I WAS SPECIFICALLY TOLD, 'YES, THIS IS THE ONE THAT WAS

5   USED IN HONG KONG.'  AND I THINK THAT MR. PRICE SAID, 'THAT'S

6   WHAT I'VE BEEN TOLD.'

7           BUT, YOUR HONOR, I GUESS MY ONLY POINT, TO MAKE A

8   FINER POINT ON THIS, IS THAT WHEN WE ARE WORKING LIKE WE ARE, I

9   ACCEPT A REPRESENTATION, JUST LIKE I THINK MR. PRICE AND

10  MR. QUINN ACCEPTS A REPRESENTATION WHEN WE MAKE IT, THAT AT

11  LEAST I'VE HAD A FAIR BASIS UPON WHICH I AM MAKING THAT FACTUAL

12  REPRESENTATION, ESPECIALLY WITH RESPECT TO SUCH AN IMPORTANT

13  MATTER AS, 'ARE YOU GOING TO PUT SOME EVIDENCE IN?'

14          SO, LISTEN, THIS IS AN UNCOMFORTABLE --

15          **THE COURT:**  MR. NOLAN, DO YOU BELIEVE THAT MR. PRICE

16  INTENTIONALLY DID WHAT MS. AGUIAR IS SAYING HE DID?

17          **MR. NOLAN:**  NO.

18          **THE COURT:**  I DON'T EITHER.

19          **MR. NOLAN:**  PARDON ME?

20          **THE COURT:**  I DON'T EITHER.

21          **MR. NOLAN:**  I'M JUST SAYING THAT I DON'T BELIEVE THAT

22  MATTEL HAD A GOOD FAITH POSITION TO PUT MR. PRICE IN THE

23  POSITION OF BASICALLY SAYING, TO ME, 'THIS IS THE ONE THAT WAS

24  USED IN HONG KONG.'  THAT'S THE POINT WE'RE TRYING TO GO BACK

25  TO.  AND I THINK THAT REALLY UNDERSCORES THE IMPORTANCE OF

1   ENFORCING YOUR RULES.

2        YOU EXPECT US TO OBJECT.  WE DO.  BUT WHEN WE'RE

3   LOOKING AT PRODUCT IMMEDIATELY AND WE'RE BEING TOLD THAT IT IS

4   THE ONE THAT'S BEING USED OVER THERE, OUR ONLY POINT IS THAT

5   THEY WELL KNEW THAT IT WASN'T THE ONE.  THAT'S THE POINT I'M

6   MAKING.

7        **THE COURT:**  MR. NOLAN, THE SAME ARGUMENT COULD HAVE

8   BEEN MADE ABOUT YOUR TELLING THE JURY THAT MATTEL HAS SAID

9   THEIR CASE IS ONLY WORTH $75,000.

10        DID YOU HAVE A GOOD FAITH BASIS TO SAY THAT?

11        IF WE WENT BACK THROUGH THE RECORD -- I DON'T KNOW

12   HOW LONG IT WAS IN ADVANCE THAT YOU HAD DECIDED TO MAKE THAT

13   STATEMENT TO THE JURY, BUT -- YOU KNOW, I'M GIVING LEEWAY TO --

14   I AM EXPECTING AND I AM ASSUMING, AND I CONTINUE TO ASSUME,

15   THAT I HAVE ATTORNEYS BEFORE ME THAT HAVE NOTHING BUT THE

16   HIGHEST OF ETHICAL QUALITIES.  AND I SAY THAT ABOUT YOU AND

17   MR. AGUIAR AND MR. ROTH AND MR. KENNEDY, MR. QUINN, MR. ZELLER,

18   MR. COREY, MR. PRICE.  THERE'S NOTHING THAT'S HAPPENED -- THIS

19   IS A HARD-FOUGHT TRIAL, AND THERE IS A LOT AT STAKE, AND I

20   REALLY APPRECIATE THAT.  BOTH SIDES ARE PUSHING THE ENVELOPE.

21   YOU'RE REPRESENTING YOUR CLIENTS ZEALOUSLY, AS YOU SHOULD.  BUT

22   BEFORE ONE SIDE GETS UP AND SAYS THAT THE OTHER SIDE IS LYING

23   OR CHEATING, THAT'S -- IN LIGHT OF THE MISTAKES THAT BOTH SIDES

24   HAVE MADE AT VARIOUS TIMES, THAT'S A PRETTY SERIOUS ALLEGATION.

25        **MR. NOLAN:**  WELL, YOUR HONOR, ONE THING I REALLY FEEL

1  COMFORTABLE SAYING IS, IF THIS WAS OUR SITUATION, AND I HAD

2  DONE THIS, THIS WOULD HAVE BEEN CALLED TO YOUR ATTENTION.

3          I'M NOT IN ANY WAY TRYING TO ENFORCE A DIFFERENT RULE

4  OF ENGAGEMENT HERE.  AND THE JURY WAS TOLD THAT I MADE A

5  MISTAKE WITH RESPECT TO THE REFERENCE TO $75,000.

6          ALL I'M SAYING HERE, YOUR HONOR, IS THAT I STILL HAVE

7  NOT HEARD --

8          **THE COURT:**  ARE YOU SUGGESTING THAT QUINN EMANUEL

9  KNEW ABOUT THE MISTAKE AND THEY DIDN'T CALL IT TO MY ATTENTION?

10         **MR. NOLAN:**  YOUR HONOR, I BELIEVE THAT NO ONE AT

11 QUINN EMANUEL HAD A GOOD FAITH BASIS TO BELIEVE THAT THIS DOLL

12 WAS, IN FACT, THE ONE THAT WAS BEING USED IN THE HONG KONG

13 LITIGATION.  THAT'S THE ISSUE.

14         **THE COURT:**  I CAN DECIDE THIS CASE ON WAIVER BY

15 ITSELF, BUT THERE IS -- IF IT WASN'T FOR THE DEPOSITION OF YOUR

16 OWN COUNSEL -- MGA'S OWN COUNSEL, MR. KAMARCK, MADE THE SAME

17 MISTAKE IN HIS DEPOSITION.  HE SAW THAT DOLL, I ASSUME -- AND

18 NO ONE IS DISPUTING THE FACT THAT THAT IS THE DOLL THAT WAS

19 SHOWN TO MR. KAMARCK.  AND WHEN BEING QUESTIONED ON THE DOUBLE

20 GRAND LITIGATION, HE SAID, 'I THINK SO.'

21         DID HE EVER COME AROUND AND CORRECT HIS MISTAKE?  IS

22 THERE ANY LETTER FROM MGA SAYING, 'OH, MR. KAMARCK SAID THAT HE

23 THOUGHT THAT WAS THE DOLL THAT WE'VE NOW CHECKED, AND IT'S

24 NOT'?  IS THERE ANY RECORD INDICATING THAT YOU'VE COME FORWARD

25 TO CORRECT THAT ERROR?

1    **MR. NOLAN:**  NO, YOUR HONOR.  BUT I DON'T THINK THAT

2    THAT'S ACTUALLY THE TRUE TESTIMONY OF MR. KAMARCK.

3    **THE COURT:**  AM I TO ASSUME, TO SPECULATE, THAT YOU'RE

4    TRYING TO SET A TRAP FOR QUINN EMANUEL BY HAVING YOUR CORPORATE

5    COUNSEL SAY 'I THINK THAT MIGHT BE THE DOLL' AND YOU NEVER

6    CORRECTED IT?  OF COURSE I DON'T THINK THAT.  I DON'T THINK

7    THAT FOR A MOMENT.  I DON'T THINK THAT FOR A MOMENT ANY MORE

8    THAN I THINK BILL PRICE STOOD UP HERE AND LIED TO THE JURY, OR

9    I THINK THAT TOM NOLAN STOOD UP AND MADE A MISREPRESENTATION.

10   I DON'T THINK ANY OF THAT.  I THINK YOU'RE ALL IN A VERY TOUGH

11   SITUATION, FIGHTING HARD FOR YOUR RESPECTIVE CLIENTS, AND

12   MISTAKES HAPPEN.  WHEN MISTAKES HAPPEN, YOU PAY A PENALTY FOR

13   THAT.  AND YOU'RE GOING TO MAKE SURE THAT BILL PRICE PAYS A

14   PENALTY FOR THAT IN YOUR CLOSING ARGUMENT, JUST LIKE BILL PRICE

15   IS GOING TO MAKE SURE YOU PAY A PENALTY FOR A MISTAKE THAT YOU

16   MADE.  IT'S AN ADVERSARIAL PROCESS.

17   NOT IDEAL.  BUT IT'S THE BEST WE GOT.

18   **MR. NOLAN:**  I ACCEPT THAT, YOUR HONOR.

19   WE'LL SUBMIT.  THANK YOU.

20   **MS. AGUIAR:**  YOUR HONOR, WE HAVE PREPARED A SHORT

21   INSTRUCTION.  I KNOW YOU GAVE ONE WITH REGARD TO THE $75,000.

22   AND I GATHER BY WHAT YOU'RE SAYING THIS IS WHERE YOU WOULD GO

23   WITH THIS AS WELL; TO INSTRUCT THE JURY THAT STUFF HAD BEEN

24   EITHER SHOWN OR SAID TO THEM IN OPENING THAT WAS NOT CORRECT.

25   SO WE CAN -- I CAN SUBMIT THAT TO YOU, AND YOU CAN CONSIDER IT

1   OVER LUNCH.

2            THE COURT:  WHY DON'T YOU RESPOND TO QUINN EMANUEL'S

3   ARGUMENT ON THAT, AS TO WHY THIS IS DIFFERENT.  THEY SET THAT

4   FORTH IN THEIR BRIEF.

5            MS. AGUIAR:  I DON'T THINK IT'S DIFFERENT AT ALL,

6   YOUR HONOR.  I THINK IT'S THE SAME SITUATION.

7            THE COURT:  THEIR ARGUMENT IS THAT, UNLIKE THE

8   $75,000 STATEMENT THAT MR. NOLAN MADE, WHICH WAS NEVER GOING TO

9   COME UP IN THE COURSE OF TRIAL, BECAUSE IT'S TOTALLY

10  INADMISSIBLE AND COULD NEVER BE ADDRESSED THROUGH THE EVIDENCE,

11  THIS HAS BEEN ADDRESSED THROUGH THE EVIDENCE.  YOU NOW HAVE

12  EVIDENCE THAT YOU CAN USE TO SHOW THAT MR. PRICE MADE A

13  MISTAKE, BY THEIR OWN WITNESS.  SO IT'S BETTER ADDRESSED IN

14  THAT PROCESS, AND, THEREFORE, DOESN'T REQUIRE THE INSTRUCTION.

15  THAT WAS THEIR ARGUMENT, I THINK, IN THEIR OPPOSITION.  AND

16  THAT NEEDS TO BE ADDRESSED.

17            MS. AGUIAR:  WE THINK AN INSTRUCTION WOULD BE

18  APPROPRIATE.  BUT IF YOUR HONOR DOESN'T, WE'LL SUBMIT ON THIS.

19            THE ONE OTHER THING I WAS GOING TO SAY WITH REGARD TO

20  THIS MOTION, BECAUSE WE DID SAY THAT WE THINK THE ROAD WE'RE

21  GOING DOWN IN HONG KONG IN GENERAL IS CONFUSING, IS THAT IN THE

22  LAST DAY AND A HALF, THERE HAS BEEN -- I CAN POINT YOUR HONOR

23  TO EXAMPLES OF TESTIMONY WHERE WE'RE WELL BEYOND FACTUAL

24  ASSERTIONS AT THIS POINT.  AND YOUR HONOR MADE A COMMENT AT THE

25  HEARING ON JULY 23RD.  YOU SAID, "IT'S BECOMING CLEARER TO ME

1    AS WE GO THROUGH THIS DISCUSSION THAT FACTUAL STATEMENTS,

2    FACTUAL ASSERTIONS, PROVIDED THAT THEY ARE DIVORCED OF LEGAL

3    LANGUAGE IN WHICH THEY REFLECT LEGAL CONCLUSIONS, OR THAT THEY

4    REFLECT LEGAL PRINCIPLES, ARE GOING TO BE ADMITTED."

5            **THE COURT:**  WHAT ARE THOSE TWO EXAMPLES, COUNSEL?

6            **MS. AGUIAR:**  DURING MR. KAMARCK'S TESTIMONY, AT

7    TRANSCRIPT AT 5705, WE GOT INTO A DISCUSSION OF REPRODUCTION OF

8    A SUBSTANTIAL PART OF AN ARTISTIC WORK.

9            **THE COURT:**  THE OTHER EXAMPLE IS...

10           **MS. AGUIAR:**   THE OTHER EXAMPLE IS TESTIMONY FROM

11   MR. KAMARCK, AND ALSO FROM MR. LEUNG, REFERENCING ANTECEDENT

12   DESIGNS AND THE CONNECTION BETWEEN ANTECEDENT DESIGNS AND

13   ORIGINAL WORKS.

14           **THE COURT:**  REGARDING THE FIRST ONE, WE HAD A

15   SIDE-BAR OVER THE WORD "REPRODUCTION," AND I THINK AT THAT TIME

16   I INDICATED THAT I WAS CONCERNED ABOUT IT.  AND THE QUESTION

17   WAS WHETHER OR NOT "REPRODUCTION" WAS BEING USED IN A LEGAL

18   SENSE, IN WHICH I WOULD BLOCK IT PURSUANT TO MGA'S REQUEST, OR

19   IF IT WAS BEING USED IN A CONVENTIONAL SENSE.  I SAID, 'WELL,

20   LET'S PUT THAT OFF.'

21           AND THEN THERE WAS UNREBUTTED TESTIMONY SO FAR BY THE

22   ATTORNEY YESTERDAY FROM HONG KONG INDICATING THAT

23   'REPRODUCTION' IS USED IN THAT VERNACULAR, NONLEGAL SENSE.

24   THAT'S ALL I HAVE ON IT IN EVIDENCE AT THIS POINT.  IT'S AN

25   OPEN ISSUE, AS FAR AS I'M CONCERNED, AND WE CAN CIRCLE BACK TO

1   IT.

2        WITH RESPECT TO ANTECEDENT DESIGNS, I THOUGHT THERE

3   WAS -- I THOUGHT I DID ADDRESS THAT ONE AS WELL ON THE RECORD.

4   I JUST CAN'T REMEMBER RIGHT NOW WHAT I SAID.

5        **MS. AGUIAR:**  IT CAME UP WITH MR. KAMARCK, AND IT CAME

6   UP, I BELIEVE -- I JUST DON'T HAVE THE CITE FOR YOU -- I

7   BELIEVE IT CAME UP WITH MR. LEUNG AGAIN, WHEN HE WAS TALKING

8   ABOUT ANTECEDENT DESIGNS.

9        I GUESS MY POINT IS, WE FEEL A LITTLE BIT LIKE OUR

10   HANDS ARE TIED HERE, FRANKLY; THAT THE EVIDENCE REGARDING OUR

11   FACTUAL STATEMENTS IS COMING IN.  AND UNDERSTANDABLY, THOSE

12   FACTUAL STATEMENTS ARE ALMOST INEXTRICABLY INTERTWINED WITH

13   LEGAL PHRASEOLOGY AND THEY RELATE TO LEGAL CONCEPTS.  AND

14   YOUR HONOR'S RULING THAT NO LAW IS COMING IN, I FEEL LIKE THE

15   WAY THAT THAT'S DEVELOPING, AS THE EVIDENCE COMES OUT, IS,

16   WE'RE A BIT HAMSTRUNG, BECAUSE IF YOU CAN'T EXPLAIN TO THE JURY

17   ANYTHING ABOUT SOME OF EVEN THE BASIC LEGAL CONCEPTS, THEN THEY

18   ARE JUST LEFT HANGING THERE WITH FACTUAL STATEMENTS BUT YOU

19   CAN'T PUT THEM INTO CONTEXT.

20        **THE COURT:**  I DID PERMIT THE TESTIMONY CONCERNING

21   REPRODUCTION, AND I'LL CERTAINLY INVITE MGA TO DO THE SAME

22   THING.

23        YOU'RE GOING TO HAVE TO REFRESH -- DON'T PAINT WITH A

24   BROAD BRUSH HERE, BECAUSE I DO RECALL THAT THE COURT ADDRESSED

25   THE ANTECEDENT ISSUE AS WELL.  I'VE REALLY BEEN TRYING TO BE

1   ATTUNED TO ANYTHING WHICH BORDERS ON A LEGAL -- POTENTIALLY

2   CONCEIVABLY LEGAL ISSUE.  WHAT I'M NOT GOING TO PERMIT IS MGA

3   TO SIMPLY SAY, 'WELL, THIS IS ALL IN A LEGAL CONTEXT; IT'S ALL

4   INEXTRICABLY INTERTWINED; THEREFORE, ANYTHING THAT WE SAID

5   BEFORE DOESN'T COUNT.'  THAT, I'VE REJECTED FOUR OR FIVE TIMES

6   NOW.

7         **MS. AGUIAR:**  I UNDERSTAND.

8         **THE COURT:**  AT THE SAME TIME, I DO RECOGNIZE THE

9   DANGERS THAT YOU CONTINUE TO BRING TO THE COURT'S ATTENTION.

10  AND THOSE ARE THE ONLY TWO INSTANCES THAT I CAN THINK OF THAT

11  CAME CLOSE.  AND REPRODUCTION, I KNOW I DEALT WITH AT SIDE-BAR.

12  MR. NOLAN WAS PRESENT.  IT'S ON THE RECORD.  WE NOW HAVE

13  EVIDENCE ON IT.  ANTECEDENT, I JUST CAN'T REMEMBER.  I KNOW AN

14  OBJECTION WAS MADE, OR THE COURT INTERVENED.  I JUST CAN'T

15  REMEMBER WHAT HAPPENED THERE.  SO, PERHAPS, SOMEONE COULD BRING

16  THAT -- DOES SOMEBODY HAVE THAT?

17        **MS. AGUIAR:**  NO, I'M SPECIFICALLY NOT TRYING TO PAINT

18  WITH A BROAD BRUSH, YOUR HONOR.  I WAS GIVING YOU SPECIFIC

19  EXAMPLES, AND WE CAN LOOK AT IT.

20        I THINK REPRODUCTION OF ALL OR A SUBSTANTIAL PART OF

21  A WORK -- I HAVE A SECTION OF THE HONG KONG COPYRIGHT

22  ORDINANCE, AND WHILE THE WORD "REPRODUCTION" IS NOT IN THERE,

23  THIS CATCH PHRASE ABOUT "SUBSTANTIAL PART" IS RIGHT OUT OF THE

24  ACTUAL ORDINANCE.

25        **THE COURT:**  WHAT DOES IT MEAN UNDER HONG KONG LAW?

1          **MS. AGUIAR:**  AS I SAID, THE WORD "REPRODUCTION" IS

2     NOT IN THERE.

3          **THE COURT:**  I ASKED YOU ABOUT "SUBSTANTIAL PART."

4          THE PART THAT'S IN THE CODE, WHAT DOES IT MEAN?

5          **MS. AGUIAR:**  IT TALKS ABOUT REFERENCES IN THIS PART,

6     "THE DOING OF AN ACT, RESTRICTED BY THE COPYRIGHT IN A WORK,

7     ARE TO THE DOING OF IT IN RELATION TO THE WORK AS A WHOLE OR

8     ANY SUBSTANTIAL PART OF IT."

9          ALL I'M SAYING IS, THESE WORDS THAT KEEP APPEARING IN

10    THE PLEADINGS ARE WORDS OUT OF THE COPYRIGHT ORDINANCE; SO THE

11    ONLY POINT I'M MAKING IS THAT THESE ARE -- IT SEEMS TO ME, THEY

12    HAVE SOME LEGAL MEANING.  AND I GUESS --

13         **THE COURT:**  THERE'S LOTS OF WORDS THAT ARE USED IN

14    LEGAL STATUTES, COUNSEL.  JUST BECAUSE A WORD IS USED IN A

15    LEGAL STATUTE DOESN'T MEAN THAT IT DOESN'T HAVE -- IF THE LEGAL

16    STATUTE DEFINES IT IN A CERTAIN WAY, AND YOU CAN SHOW ME THAT,

17    AND IT DISTINGUISHES IT FROM THE COMMON UNDERSTANDING OF THE

18    WORD -- YOU HAVE AN ONGOING LEAVE TO BRING THAT TO MY

19    ATTENTION.

20         **MS. AGUIAR:**  DO I ALSO UNDERSTAND YOUR HONOR THAT IF

21    WE, IN OUR CASE-IN-CHIEF, WANT TO CALL SOMEONE TO PUT THESE

22    STATEMENTS -- THAT WITH REGARD TO EVIDENCE THAT HAS ALREADY

23    COME IN, PUT THEM INTO CONTEXT, WE WOULD BE ALLOWED TO DO THAT?

24         **THE COURT:**  AS LONG AS THERE IS A SEPARATE LEGAL

25    CONTEXT FOR THAT, YES.

1      I PERMITTED MR. QUINN TO ASK HIS ATTORNEY ABOUT THE

2  WORD "REPRODUCTION," AND IF THAT ATTORNEY IS WRONG, AND IF YOU

3  HAVE SOMEONE WHO CAN COME IN AND SAY, 'WELL, NO, IN HONG KONG

4  LAW, THE WORD "REPRODUCTION" HAS A PARTICULAR MEANING AND IT

5  REQUIRES AN EXTRINSIC OR AN INTRINSIC TEST,' OR SOMETHING WHICH

6  REALLY CHANGES THE MEANING OF THAT STATEMENT, ABSOLUTELY.

7      THAT'S WHAT I SAID AT SIDE-BAR, I THOUGHT.

8      **MS. AGUIAR:**  IT WASN'T TOTALLY CLEAR.  NOT BECAUSE OF

9  YOU; I JUST NOW WANTED TO MAKE SURE THAT WE WOULD BE ABLE TO DO

10 THAT IF WE NEED TO.

11     **THE COURT:**  I UNDERSTAND THIS IS A DIFFICULT AREA TO

12 NAVIGATE, AND WHAT I'M TRYING TO DO IS BALANCE THE INTEREST OF

13 MGA, NOT TO HAVE SOMETHING WHICH IS IN A DIFFERENT CONTEXT USED

14 AGAINST THEM, AND WITH THE INTEREST OF MATTEL, NOT ALLOWING MGA

15 TO ESCAPE THE NATURAL CONSEQUENCES OF COMMON LANGUAGE AND

16 STATEMENTS THAT HAVE BEEN MADE IN ANOTHER FORUM.

17     IT'S NOT AN EASY TIGHTROPE.

18     **MR. NOLAN:**  IT'S WAY PAST OUR LUNCH BREAK.  ONE LAST

19 POINT.

20     THIS MORNING, FOR THE FIRST TIME, MR. QUINN AND

21 MR. PRICE BOTH HAVE COMMENTED IN FRONT OF THE JURY, YOU KNOW,

22 'WE'RE ON THE CLOCK, SO LET'S PICK UP THE PACE.'

23     **THE COURT:**  I HAVEN'T GIVEN MATTEL A CHANCE TO

24 RESPOND TO ANYTHING THAT WE'VE HEARD.  BEFORE WE GET INTO

25 ANOTHER ISSUE, WE'LL COME BACK TO THAT.

```
 1              BEFORE WE MOVE ON -- I HAVEN'T GIVEN YOU A CHANCE TO

 2   RESPOND ON THE MOTION FOR SANCTIONS, OR NOW THIS SOMEWHAT

 3   RELATED ISSUE OF HONG KONG LAW.

 4              MR. PRICE:  OF COURSE, I WOULD LIKE TO SAY A LOT

 5   ABOUT THE MOTION ON SANCTIONS.  I THINK, GIVEN WHAT THE COURT

 6   SAID, I DON'T KNOW IF I NEED TO; BUT I THINK THE REASON

 7   MR. NOLAN SAID HE DOESN'T THINK I INTENTIONALLY LIED IS BECAUSE

 8   HE'S AN EXPERIENCED TRIAL ATTORNEY AND HE KNOWS THE SITUATION A

 9   MISTAKE HAS NOW PUT ME IN, WHICH IS THAT HE CAN EMBARRASS ME IN

10   HIS CLOSING ARGUMENT.  AND THAT'S NOT A POSITION A GOOD TRIAL

11   ATTORNEY EVER WANTS TO BE IN.  THAT'S THE POSITION I'M IN NOW,

12   BECAUSE WE MADE A MISTAKE; I MADE A MISTAKE.  I WOULD NEVER

13   HAVE SHOWN THAT TO THE JURY IF I DIDN'T THINK IT WAS GOING TO

14   COME INTO EVIDENCE.

15              THE COURT:  I UNDERSTAND THAT.

16              MR. PRICE:  SO GETTING OFF THAT AND JUST ONTO WHETHER

17   A JURY INSTRUCTION IS REQUIRED OR APPROPRIATE.  AGAIN, PEOPLE

18   MAKE MISTAKES IN OPENING STATEMENTS WHICH CAN BE CURED BY WHAT

19   COMES INTO EVIDENCE.  WHAT MR. NOLAN SAID COULD NOT, AS THE

20   COURT RECOGNIZED.  WHAT I SAID CAN.  AND, IN FACT, WE PUT THE

21   WITNESS ON, AND WE WERE GOING TO HAVE HIM SAY, 'NO, THAT WAS

22   NOT SOMETHING WHICH WE SUED ON.  WE SUED ON THESE INSTEAD,'

23   BECAUSE WE WANTED TO CONFRONT THAT MISTAKE.

24              THE WITNESS, OF COURSE, BLURTED OUT THE ANSWER BEFORE

25   MR. QUINN EVEN ASKED HIM THE QUESTION.  I THINK IT WOULD BE
```

1  PREJUDICIAL TO INSTRUCT THE JURY, BECAUSE IT'S KIND OF A DOUBLE

2  WHAMMY HERE.  IF AFTER THE EVIDENCE HAS COME IN THAT THIS DOLL

3  WAS NOT THE SUBJECT OF AN INFRINGEMENT ACTION, THEN TO HAVE THE

4  COURT COMMENT ON THAT TESTIMONY WOULD BE PREJUDICIAL.

5         YOUR HONOR, WE DO HAVE THE SECTION, BY THE WAY, ON

6  THE SIDE-BAR ON ANTECEDENT DESIGNS.

7         DO YOU WANT TO SEE THAT?

8         **THE COURT:**  PLEASE.

9         THIS IS AT SIDE-BAR; THIS IS THE COURT SPEAKING:

10        "I DIDN'T WANT TO GET INTO THIS ON THE RECORD, BUT

11  WHAT I THINK HE'S DOING IS PLACING INTO CONTEXT WHAT THESE

12  STATEMENTS MEAN.  OTHERWISE, THIS JURY IS GOING TO BE CONFUSED.

13  IT'S NOT SO MUCH GETTING INTO HONG KONG LAW AND PROCEDURE, AS

14  OPPOSED TO SUBSTANTIVE LAW.  WHAT I ABSOLUTELY WON'T BE

15  ALLOWING IN IS THE SUBSTANTIVE COPYRIGHT LAW.  THIS WAS MORE

16  TRYING TO EXPLAIN WHAT THESE DOCUMENTS MEAN, AND I THINK I'M

17  GOING TO GIVE SOME LEEWAY ON THAT, BUT I WANTED TO HEAR YOUR

18  POINT."

19        "MR. HANSEN:  ONE OF THE ISSUES THAT WE HAVE IS THE

20  USE OF 'BASED ON,' WHICH IS SORT OF PERMEATING A LOT OF ISSUES

21  IN THIS CASE.  'BASED ON,' AS YOU KNOW, IS PART OF THE

22  DERIVATIVE WORK DEFINITION, AND I AM NOT CERTAIN THAT THAT'S

23  WHERE THEY ARE GOING.  BUT THEY ARE ATTEMPTING TO BOOTSTRAP."

24        AND THEN MR. NOLAN PICKS UP A FEW PARAGRAPHS

25  LATER:  "THE LAST PROBLEM IS REFERENCE TO THE ANTECEDENT WORKS.

1    I THINK THAT'S THE ISSUE WHERE WE GOT INTO."

2         **"THE COURT:**  WHY DON'T YOU HAVE HIM EXPLAIN WHAT THAT

3    MEANS, OR LET'S TRY TO AVOID -- WHENEVER EITHER SIDE HEARS

4    LEGAL WORDS, IF IT CAN'T BE EXPLAINED -- IF IT CAN BE EXPLAINED

5    WITHOUT GETTING INTO THE LAW OF COPYRIGHT."

6         MR. NOLAN SAYS, "I DON'T THINK IT CAN, YOUR HONOR.

7    MY POINT IS THAT THAT'S THE REASON WHY WE REALLY OBJECTED ON

8    THIS BASIS.  I WOULD NOT WANT HIM TO EXPLORE WHAT ANTECEDENT

9    WORKS ARE, BECAUSE WE HAVE NO REASON TO BELIEVE THAT HE

10   WOULDN'T BE INCLUDING AN ANALYSIS UNDER HONG KONG LAW."

11        **"THE COURT:**  THAT'S WHAT WAS KIND OF OPENED UP WITH.

12   MR. HANSEN'S QUESTIONING IS WHAT THE CLAIM IS BASED ON; SO THAT

13   DOOR HAS ALREADY BEEN OPENED TO A CERTAIN EXTENT, AND I THINK I

14   HAVE TO GIVE MR. QUINN AN OPPORTUNITY TO TRY TO EXPLAIN THAT.

15   WE'RE FINE RIGHT NOW.  OBJECTION IS OVERRULED."

16        AND THEN WE GOT BACK INTO MR. QUINN BACK ON THE

17   RECORD:  "WHEN YOU ASKED FOR PARTICULARS OF ANTECEDENT WORKS,

18   WHAT DID YOU MEAN?"

19        "ANY WORK OR MATERIALS THE AUTHOR BASED ON IN

20   CREATING HIS PARTICULAR WORK."

21        "SO IF AN AUTHOR'S WORK WAS BASED ON PREVIOUS WORK,

22   THAT WOULD BE AN ANTECEDENT WORK?"

23        "YES."

24        **THE COURT:**  SO WE GET THAT DEFINITION.  THAT

25   DEFINITION IS WRONG.  IT DOES SEEM TO BE WHAT ANTECEDENT WORK

1    IS, AS COMMONLY UNDERSTOOD.  MGA MAY INTRODUCE EVIDENCE TO

2    CONTRADICT THAT.  BUT I THINK ON BOTH THOSE POINTS, ON

3    "REPRODUCTION" AND "ANTECEDENT," WE HAVE SIMPLE DEFINITIONS FOR

4    THE JURY.  IF THERE'S ANY CONCERN THAT THOSE DEFINITIONS ARE

5    INADEQUATE, BOTH SIDES ARE AFFORDED LEAVE TO SUPPLEMENT THE

6    EVIDENCE IN THE RECORD.

7          **MR. QUINN:**  YOUR HONOR, I WILL SAY THAT I THINK WE

8    DID TRY TO AVOID USE OF THE WORD "INFRINGEMENT," BUT IT WAS

9    MENTIONED A COUPLE OF TIMES BY BOTH --

10         **THE COURT:**  IT WAS.  AND THERE WAS NO OBJECTION BY

11   EITHER SIDE.

12         **MR. QUINN:**  AND, ALSO, MR. HANSEN ELICITED TESTIMONY

13   REGARDING INFRINGEMENT.

14         **THE COURT:**  HE DID.  BOTH SIDES DID THAT, AND THERE

15   WAS NO OBJECTION.  I'M NOT GOING TO START MAKING SUA SPONTE

16   OBJECTIONS AT THIS POINT.  I TRUST THAT BOTH SIDES ARE MORE

17   THAN CAPABLE OF DOING THAT ON THEIR OWN.

18         IS THERE ANYTHING FURTHER ON ANY OF THESE POINTS?

19         ALL RIGHT.  THE MOTION FOR SANCTIONS IS DENIED.

20         I'LL SEE YOU AT 1:30.

21

22

23   /  /  /

24   /  /  /

25                    CERTIFICATE

1

2    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
3    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
     ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
4    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

5

6    
     _____                    8-8-08
7    THERESA A. LANZA, CSR, RPR                          DATE
     FEDERAL OFFICIAL COURT REPORTER

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

THURSDAY, AUGUST 7, 2008                    TRIAL DAY 31, MORNING SESSION