1   UNITED STATES DISTRICT COURT

2   CENTRAL DISTRICT OF CALIFORNIA

3   ---

4   **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5   ---

6   MATTEL, INC.,                          :   PAGES 6363 - 6493
                                           :
7          PLAINTIFF,                      :
                                           :
8       VS.                                :   NO. ED CV04-09049-SGL
                                           :   [CONSOLIDATED WITH
9   MGA ENTERTAINMENT, INC.,               :   CV04-9059 & CV05-2727]
    ET AL.,                                :
10                                         :
           DEFENDANTS.                     :
11

12

13

14

15   REPORTER'S TRANSCRIPT OF PROCEEDINGS

16   RIVERSIDE, CALIFORNIA

17   THURSDAY, AUGUST 7, 2008

18   JURY TRIAL - DAY 31

19   AFTERNOON SESSION

20

21

22                                  MARK SCHWEITZER, CSR, RPR, CRR
                                    OFFICIAL COURT REPORTER
23   CERTIFIED                      UNITED STATES DISTRICT COURT
                                    181-H ROYBAL FEDERAL BUILDING
24   COPY                          255 EAST TEMPLE STREET
                                    LOS ANGELES, CALIFORNIA 90012
25                                  (213) 663-3494

**Appearances of Counsel:**

On Behalf of Mattel:

    Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
    By John B. Quinn, Esq.
        B. Dylan Proctor, Esq.
        Michael T. Zeller, Esq.
        Harry Olivar, Esq.
        John Corey, Esq.
        Diane Hutnyan, Esq.
        William Price, Esq.
    855 South Figueroa Street
    10th Floor
    Los Angeles, CA 90017
    (213) 624-7707

On Behalf of MGA Entertainment:

    Skadden, Arps, Slate, Meagher & Flom LLP
    By Thomas J. Nolan, Esq.
        Carl Alan Roth, Esq.
        Jason Russell, Esq.
        Lauren Aguiar, Esq.
        David Hansen, Esq.
        Matthew Sloan, Esq.
        Robert Herrington, Esq.
        Raoul Kennedy, Esq.
    300 South Grand Avenue
    Los Angeles, CA 90071-3144
    (213) 687-5000

1                          I N D E X

2   **MICHAEL WAGNER, PREVIOUSLY SWORN**....................... 6370

3   DIRECT EXAMINATION (CONTINUED) BY MR. QUINN: .......... 6370
    CROSS-EXAMINATION BY MR. KENNEDY:...................... 6379
4
    **MICHAEL WAGNER, PREVIOUSLY SWORN**....................... 6419
5
    VOIR DIRE EXAMINATION BY MR. KENNEDY:.................. 6419
6   REDIRECT EXAMINATION BY MR. QUINN:.................... 6446
    RECROSS-EXAMINATION BY MR. KENNEDY: .................. 6454
7   FURTHER REDIRECT EXAMINATION BY MR. QUINN: ........... 6458

8   **MICHAEL CHRISTOPHER MOORE, SWORN**...................... 6460

9   DIRECT EXAMINATION BY MR. ZELLER:..................... 6460
    CROSS-EXAMINATION BY MR.   SLOAN:...................... 6471
10

11                        E X H I B I T S

12   (Exhibits 13935 and 13953 received.)................... 6375

13   (Exhibits 13597 and 13596 received.)................... 6379
                                   (
14   Exhibits 13956 and 13957 received.)................... 6453

15   (Exhibits 13959-13969 received.)...................... 6454

16   (Exhibits 13873-13889 received.)...................... 6466

17   (Exhibits 13857-13900, 13757-13759,
     13912, and 13913 received.)........................... 6471
18

19

20

21

22

23

24

25

```
 1              Riverside, California; Thursday, August 7, 2008
 2                                  1:31 P.M.
 3                         (SIDEBAR CONFERENCE HELD.)
 4             THE COURT:  Yes, Counsel.
 5             MR. NOLAN:  The last point I was going to make
 6   before we ran overtime at lunch break, and that was this
 7   morning, Mr. Quinn and Mr. Price had been talking about we're
 8   on a clock.  We got to be fast in front of the jury.
 9             THE COURT:  Right.  I'm sorry.  I didn't circle
10   back to that.
11             MR. NOLAN:  My only point is that we're both on the
12   clock.  And I think it creates the potential for the jury
13   feeling as though because they are on the clock, they can
14   shortcut things or, you know, that the jury might feel sorry
15   for them.  And I would just ask the Court to either tell them
16   to stop doing it, number one, or number two, to remind the
17   jury, again, that both sides have been put on a clock, equal
18   time, and they have used the time however they wish.  Because
19   I do think there's a --
20             THE COURT:  I think I previously indicated that to
21   the jury, but Mr. Quinn, I think it probably is an
22   appropriate request.  It's not a question.
23             MR. QUINN:  We don't need to refer to it anymore.
24   I'll tell people that.
25             THE COURT:  Because I see the concern.
```

```
 1              Totally unrelated, a long time ago, someone from
 2    Mattel lodged the four original Bratz dolls with the Court.
 3    I went to look for them last night as I'm trying to draft up
 4    the protectable elements, and I've found that a paralegal for
 5    Mattel has come and retrieved the four original Bratz dolls.
 6              MR. QUINN:   That raises other concerns.
 7              THE COURT:   It would be helpful to the Court to
 8    have those.   And not that I need more dolls, but I don't want
 9    to take the ones that are in evidence.   Because that's
10    separate.   I'd like to have them just so I can use them as we
11    go through this process.   I'm trying to refine what are the
12    protectable elements.
13              MR. QUINN:   The first generation?
14              THE COURT:   All four of them.   Cloe, Yasmin --
15              MR. QUINN:   We know who you mean.
16              THE COURT:   And we had them on a shelf in our
17    chambers for the longest time, and I went to look for them
18    last night, and I found out that they were gone.
19              MR. NOLAN:   I think that's an absence of proof.
20              THE COURT:   Very good.   Let's have a good
21    afternoon.
22              (CONCLUSION OF SIDEBAR CONFERENCE.)
23              MR. ZELLER:   Your Honor, I think we expect we will
24    rest today.   There's videotape, of course, after Mr. Wagner,
25    and we have Mr. Moore.   And we intend to conclude our
```

```
 1   presentation of the case in chief.  We have asked a --
 2               THE COURT:  What about these two videotapes?  I'm
 3   ready to give you Edmond Lee.  Are you planning to play
 4   Edmond Lee?
 5               MR. ZELLER:  I think Mr. Lee -- we think that we
 6   would rather play as rebuttal.
 7               THE COURT:  Okay.
 8               MR. ZELLER:  It's not our intention that Mr. Lee
 9   would be played as part of our case in chief.
10               THE COURT:  What about Carter Bryant or ^Cary
11   Brode?
12               MR. ZELLER:  Our intention is that those would be
13   played as part of our case in chief.
14               THE COURT:  So you need those.
15               MR. ZELLER:  Yes.
16               THE COURT:  I'll be working on those.
17               MR. ZELLER:  And so what I would suggest is that
18   maybe we conditionally rest in the event that the video
19   doesn't get entirely sorted out, we can play whatever is
20   available.
21               THE COURT:  Let me sort it out.  I'll have it ready
22   for you.
23               MR. ZELLER:  The other contingency, we'll call it,
24   is that we have asked a witness - his name is George
25   Kesselring.  He is the head of Cityworld, to come in and
```

1   testify about the Hong Kong proceedings, pretty much in the

2   nature of what the Court saw yesterday.  Mr. Kesselring is

3   not available to come to the United States this week.  He has

4   indicated he is potentially available next week.  So we are

5   attempting to see if he can swing it to be here.

6         So we would ask that we be given an opportunity, in

7   the event that scheduling permits him to be here, to put him

8   on.  There were, I believe, about three dolls, ballparking

9   it, but there were a few dolls that Mr. Kamarck did not

10  authenticate and were not moved into evidence.  So we are --

11  we would be looking to potentially move some more of the

12  accused product in through Mr. Kesselring.

13        THE COURT:  Ms. Aguiar?

14        MS. AGUIAR:  What I would say in response to that,

15  your Honor, because we would like to be able to present our

16  case and do it in a fluid way, and if I can work out with

17  Mr. Zeller if they have these products and can provide them

18  to us and we can stipulate to it, then we may not need the

19  witness.

20        THE COURT:  I understand.

21        MR. ZELLER:  Thank you.

22        THE COURT:  Very good.  All right.  I appreciate

23  the heads up, and I'll get through Mr. Brode and Mr. Bryant's

24  testimony as long as Mr. Nolan doesn't make too many

25  objections to Mr. Wagner.

1          MR. NOLAN: It's going to be Mr. Kennedy. Your
2    Honor, I would just put on the record that although 1-A
3    conditionally rested, we did that. In this phase we would
4    object to that, your Honor. We will try to work out the
5    estimation, but we've all been under the gun and know about
6    the timing of this, and we would, when they are through and
7    out of witnesses or out of time, that's when the case --
8          THE COURT: Try to work it out. And if that's the
9    only thing, then it sounds like we're in a position to move
10   on to the defense case. Let's try to work out that
11   stipulation, if you can, this afternoon. I'm not indicating
12   one way or the other. Just try to work it out. Okay. Let's
13   bring the jury in.
14                    **(WHEREUPON THE JURY ENTERS.)**
15              THE COURT: You're on.
16              MR. QUINN: Thank you, your Honor.
17                 **MICHAEL WAGNER, PREVIOUSLY SWORN.**
18                 **DIRECT EXAMINATION (CONTINUED)**
19   BY MR. QUINN:
20   **Q.**   If we could go to slide No. 11, Mr. Wagner. And can you
21   tell us, please, what this reflects?
22   **A.**   This reflects the apportionment of profits under a
23   theory of willful infringement.
24   **Q.**   And how is that different? Not from a legal standpoint,
25   but from a -- from what you do, the financial analysis

1  standpoint?

2  **A.**   From a financial analyst standpoint, under this theory

3  of recovery, you do not include what's called general and

4  administrative expenses.   Those expenses are not subtracted

5  to a right of the profit that was earned from the allegedly

6  infringing product.

7  **Q.**   So this is something that if the jury finds that there

8  was willful infringement, these are the numbers that they

9  would pay attention to as it relates to MGA.

10  **A.**   Yes.

11  **Q.**   And could you tell us what this reflects?   If you would

12  walk us through it, please?

13  **A.**   Correct.   If you look at the bottom right-hand number,

14  which is $1,121,300,000, that is the amount of profits that I

15  believe MGA has earned on Bratz products, not including

16  general administrative expenses.

17  **Q.**   So you added that back in before you had that

18  $777,000,900 number?

19  **A.**   Yes.   That was a number I had when I subtracted general

20  administrative expenses.   If I do not do that, this number is

21  the correct number.

22  **Q.**   And what have you done here?   You have now apportioned

23  that number under those three different benchmarks?

24  **A.**   Right, I did it exactly the same way I did it in the

25  earlier chart.   It included the subtraction of general and

1  administrative expenses.  So I used the same toy industry

2  average and the same Mattel, Hasbro, Jakks standard and left

3  the profits of those two benchmarks under the benchmark

4  profitability, and the balance I awarded due to the alleged

5  infringement.

6  **Q.**  So for a company where there was no apportionment to

7  noninfringing activity, the number adding a GNA back in is

8  the full $1,121,300,000 number?

9  **A.**  It is.

10  **Q.**  And for the toy industry average, on that basis the

11  willful infringement number is the $1,020,600,000 number?

12  **A.**  It is.  After leaving MGA with approximately

13  $100.7 million of profits.

14  **Q.**  And then finally, if the jury decides that MGA should be

15  slotted in with the -- what you referred to as the top

16  performing toy companies, the willful infringement number

17  that you are left with is the $580,300,000 number; is that

18  correct?

19  **A.**  That is correct.

20  **Q.**  Now, up to this point in this discussion of the

21  copyright damages, to this point we've been talking about

22  MGA.

23  **A.**  We have.

24  **Q.**  All right.  Did you do a similar analysis about what the

25  copyright damages would be as to Mr. Larian?

1  A.  I did.

2  Q.  If we could look at slide No. 12, please.  What does

3  this reflect?

4  A.  This reflects the same analysis but applying it to the

5  combination of the distributions to Mr. Larian and the value

6  of his stock in MGA attributable to Bratz.

7  Q.  You have no willful infringement column here in this

8  analysis.

9  A.  I do not.

10  Q.  And why is that?

11  A.  I don't believe that Mr. Larian has any general

12  administrative expenses to subtract out.  So his number is

13  the same under either theory.

14  Q.  So there would be nothing to add back in if they -- if

15  willful infringement were found?

16  A.  That is correct.

17  Q.  Would you please take a look in your book at

18  Exhibits 13935 and 13936.  I'm reminded that we need to get

19  these numbers in the record, Mr. Wagner.  If we could put

20  slide 12 back up there.  The copyright damages for Mr. Larian

21  at the top level, if MGA is found to be on a par with Mattel,

22  Hasbro, and Jakks, the value of the infringement is

23  $378,400,000; correct?

24  A.  It is based on my calculation.

25  Q.  And for the average toy industry return, it's

1    $629 million?

2    A.    That is correct.

3    Q.    And for a company where there's no apportionment,

4    nothing attributable to the infringing activity, what you

5    call here the unsuccessful company, it's $696 million?

6    A.    It is.

7    Q.    And those are the same numbers for willful infringement

8    as well for the reasons you explained?

9    A.    They are.

10   Q.    Because Mr. Larian personally wouldn't have any general

11   administrative expenses.

12   A.    He does not.

13   Q.    All right.  If we can now go to Exhibits 13935, 13936 in

14   your book.  First, 13935.  Can you tell us what that document

15   is?

16   A.    Yes.  These are the schedules in which I compute the

17   amount of apportioned damages for copyright infringement to

18   MGA.

19   Q.    That's 13935?

20   A.    It is.

21            MR. QUINN:  We'd offer that exhibit, your Honor.

22            THE COURT:  Any objection?

23            MR. KENNEDY:  No objection, your Honor.

24            THE COURT:  And Exhibit 13953?

25            THE WITNESS:  These are the same types of schedules

1    but are for the willful infringement, which would not include

2    subtracting general and administrative expenses.

3              MR. QUINN:  We'd offer that exhibit as well, your

4    Honor.

5              MR. KENNEDY:  No objection subject to the Court's

6    prior ruling.

7              THE COURT:  Very well, it's admitted.  You may

8    publish.

9              **(Exhibits 13935 and 13953 received.)**

10   **Q.**   BY MR. QUINN:  Let me turn to the next subject, and that

11   is the subject of net worth, MGA and Mr. Larian.

12   **A.**   Net worth is the difference between all the assets that

13   you have, things of value, all your liabilities related to

14   those assets.  So it's your gross assets less your

15   liabilities, sometimes referred to as net assets, and that's

16   your net worth.

17   **Q.**   Now, have you calculated the net worth of MGA prior to

18   the receipt of these 40,000 additional documents that you

19   told us about within the last two weeks?

20   **A.**   I did.

21   **Q.**   And what was MGA's net worth work based on the

22   calculations you did, based on the documents and information

23   that MGA had given to you up until about two weeks ago?

24   **A.**   Well, based on a schedule of assets of Mr. Larian that

25   was dated October 25th, 2007, I estimate the total value of

1   MGA as of that date at $2 billion.

2   Q.   And the document you are referring to, is that 4947-4?

3   A.   I believe it is.

4   Q.   Which is in evidence.  I believe Mr. Price was

5   questioning Mr. Larian about this document earlier.  Is that

6   document that's on the screen the document that you are

7   referring to?

8   A.   It is.

9   Q.   And was it based on this that you calculated MGA's net

10  worth as approximately $2 billion?

11  A.   Yes.  On this schedule, it shows Mr. Larian's percentage

12  interest of MGA Entertainment at approximately 1.6 billion.

13  Making that a hundred percent rather than 81.82 percent would

14  be $2 billion.

15  Q.   And a $1.6 billion number is in the middle of the page

16  there where it says MGA Entertainment?

17  A.   It is.

18  Q.   And it was from that same document, this same document

19  that MGA prepared that you concluded that Mr. Larian had a

20  net worth of $1.9 billion?

21  A.   Correct.  That is the bottom number on the schedule.

22  Q.   Now, have those numbers changed in your analysis?

23  A.   They have.

24  Q.   Why?

25  A.   Because I received a new schedule in the documents that

1    I received that shows a significantly lower value of MGA as

2    owned by Mr. Larian.

3    Q.    And were those among the documents that you were given

4    within the last two weeks?

5    A.    Yes.

6    Q.    And based on those additional documents, did you make a

7    change in your calculations?

8    A.    I did.

9    Q.    Let's take a look at slide No. 13.  What does this

10   reflect?

11   A.    This reflects two estimates of value at two different

12   dates.  The first column are the numbers I've just previously

13   testified to, which I believe are approximately October of

14   2007.  And the right-hand column is my estimate of both MGA's

15   net worth and Mr. Larian's net worth as of last month.

16   Q.    And if you could just walk through those numbers for us

17   and put them in the record for us.

18   A.    Yes.  I have estimated that now MGA is worth only

19   $540.5 million and that Mr. Larian's net assets, both his

20   interest in MGA and his other assets, less his liabilities,

21   is $723.3 million.

22   Q.    And this reflects the adjustment you made for the

23   additional documents that MGA provided within the last two

24   weeks?

25   A.    It does.

1   Q.   And you adjusted those numbers down from the numbers you

2   had before of net worth for MGA of $2 billion and Mr. Larian

3   of $1.9 billion; is that correct?

4   A.   That is correct.

5   Q.   Now, do you have the document, Exhibit No. 13909?

6   A.   I do.

7   Q.   And is that the document that you referred to that you

8   received in the last two weeks that resulted in your

9   adjusting these net worth numbers down?

10  A.   This is the document.

11  Q.   Do you know whether the information in that document

12  that MGA just provided is accurate?

13  A.   I have no idea to know whether it's accurate or not.

14  I've seen no supporting information to confirm these numbers.

15  Q.   Are those numbers there audited?

16  A.   They are not.

17  Q.   Do you know where those numbers came from or how MGA or

18  Mr. Larian came up with them?

19  A.   I do not.

20        MR. QUINN:   Your Honor, we'd like to move into

21  evidence two of the slides.   Slide No. 5, which is MGA's top

22  10 produced documents by revenue, we have marked as

23  Exhibit 13597.   And slide No. 10, MGA's profits, Bratz versus

24  non-Bratz, we have marked as Exhibit 13596.   We would move

25  both of those into evidence, your Honor, as summaries of

1   voluminous documents.

2          MR. KENNEDY:  No objection, your Honor.

3          THE COURT:  They are admitted.

4          **(Exhibits 13597 and 13596 received.)**

5   Q.  BY MR. QUINN:  Now, this kind of work that you do, and

6   you've testified in court over 100 times.  I hope you don't

7   do this for free.

8   A.  I do not.

9   Q.  You charge for your time?

10  A.  Well, the firm that I work for charges for my time.

11  Q.  And on what basis are the charges made?

12  A.  On an hourly basis that I work on your matter.

13  Q.  And what are your hourly charges?

14  A.  My standard hourly rate which I charge in this case is

15  $695 an hour.

16          MR. QUINN:  Thank you very much.

17          THE WITNESS:  Thank you.

18          THE COURT:  You may proceed, Mr. Kennedy.

19          MR. KENNEDY:  Thank you very much, your Honor.

20                    **CROSS-EXAMINATION**

21  BY MR. KENNEDY:

22  Q.  Good afternoon, Mr. Wagner.  My name is Raoul Kennedy.

23  I'm another lawyer for MGA in this case.  As you told us,

24  your role in this case is really a fairly limited one, isn't

25  it?

1   A.   I agree with that statement.

2   Q.   And in particular, you have not been retained to offer

3   any causation opinions of any kind; correct?

4   A.   That is correct.

5   Q.   What you've been told is to assume that Mattel, through

6   other witnesses and through other evidence, is able to prove

7   various things or establish various things, and you have then

8   been asked to calculate various numbers based on the

9   assumption they can do that; correct?

10  A.   I'd agree with your statement.

11  Q.   Okay.  So I think you've told us there's somebody else

12  who is going to have to be the causal link witness in this

13  case.  You are the numbers guy?

14  A.   I've said that in my deposition.

15  Q.   Okay.  That's where I got it from, actually.  And

16  turning, if we could, back to slide 2 that Mr. Quinn showed

17  you, with regard to the first line revenues, it's correct, is

18  it not, that what you've done is taken all of what are called

19  SKUs, or stock keeping unit, relating to Bratz, and added

20  those all up; correct?

21  A.   That's true.

22  Q.   And there's something like, I'm told, 14,000 stock

23  keeping units?

24  A.   I don't know the number, but that seems to be about

25  right.

1   Q.   And as I understand it, there's a different SKU

2   established for each product.  Is that your understanding?

3   A.   There is.

4   Q.   If this pen were a MGA product, it would be a SKU and

5   all the pens like this that were sold would be one SKU;

6   correct?

7   A.   It could be any pen that looked just like that would be

8   a SKU, and one that was a different color might be a

9   different SKU.

10  Q.   Exactly.  If there were a green one just like this, it

11  would be a different one, which is why we get to so many

12  thousands and thousands of SKUs; right?

13  A.   That is true.

14  Q.   And within that $3.1 billion -- well, actually, do you

15  have your book in front of you?  If you'd turn to tab 13931.

16  Tab B-1 and Schedule 1.1-I, new.

17            THE COURT:  I'm there, starting at page 43?

18  Q.   BY MR. KENNEDY:  Yes.  And that's part of the materials

19  that you prepared in the course of your work on this case;

20  correct?

21  A.   It is.

22  Q.   And that, for example, shows that part of that 3.1

23  billion consists of --

24            And, Aaron, if we could put it up.

25            It shows that there's 59.4 million in gross sales

1  from home decor or home decorating; correct?

2  **A.**  That is correct.  That SKU, the number is the 200 series

3  of products.

4  **Q.**  And holding up Exhibit 17672, to the extent that this is

5  part of that 59 million, you are not expressing any opinion

6  here as to whether this child's bench is in any way the

7  product of Mr. Bryant's sketches, are you?

8  **A.**  I am not.

9  **Q.**  Or whether it's the result of any of the other

10  intellectual property that's in issue in this case.

11  **A.**  I have not been asked to render that opinion.

12  **Q.**  Somebody else is going to have to do that.  All you did

13  was add up the numbers, and if it's in a Bratz SKU, it goes

14  in the 3.1 billion; right?

15        MR. QUINN:  Objection.  Argumentative.

16        THE COURT:  Sustained.  Rephrase the last question,

17  Counsel.

18        MR. KENNEDY:  Certainly, your Honor.

19  **Q.**  Your task was to take all of the products that were

20  identified as being Bratz and adding up the total of those

21  numbers; correct?

22  **A.**  That is correct.

23  **Q.**  And that's how you got to the 3.1 billion?

24  **A.**  It is.

25  **Q.**  And staying with Exhibit 13931, that same Schedule 1.1,

1   that also includes some sales from Bratz Boyz, doesn't it?

2   **A.** It does.

3   **Q.** In fact, it includes $114 million worth of sales from

4   Bratz Boyz.

5   **A.** It does.

6   **Q.** And again, you're not here expressing any opinion as to

7   whether those revenues or any portion of them are or are not

8   attributable to Mr. Bryant's drawings or the name Bratz or

9   any of the intellectual property at issue in this case;

10  correct?

11  **A.** I am not.

12  **Q.** Okay. Now, turning next, if we could, to your valuation

13  of Mr. Larian's interests in Bratz.

14          And, Aaron, could we see slide 7 that Mr. Quinn was

15  asking you about.

16          And as I think you've explained, what you've done

17  here within the last two weeks, you took information through

18  June of 2008 and concluded from that that the total portion

19  of MGA stock that reflected Bratz was around $380 million.

20  **A.** That is correct.

21  **Q.** And you then took Mr. Larian's approximately 82 percent

22  interest in MGA and applied that to the 380 million. Fair?

23  **A.** That's fair.

24  **Q.** And came up with $310 million as representing the

25  current value, fair value of Mr. Larian's interest in Bratz;

1  correct?

2  A.  You said that correctly.

3  Q.  And when we talk about fair value, you'd agree with me

4  that that means the price --

5            And we have a slide here, your Honor, of the

6  definition from his deposition.

7            That would be the price at which an asset could be

8  exchanged in a current transaction between knowledgeable,

9  unrelated, willing parties; correct?

10 A.  That is the definition I used.

11 Q.  And that was in fact in your initial report in this case

12 back in February; right?

13 A.  It was.

14 Q.  Okay.  Now, since June of 2008, when you came up with

15 that $310 million evaluation for Mr. Larian's interests, you

16 are aware that there has been a jury verdict in this case;

17 correct?

18 A.  I am.

19 Q.  And you're aware that that verdict is against Mr. Larian

20 and MGA; correct?

21 A.  I am.

22 Q.  And you're aware, of course, that we're here today in

23 another portion of that trial where you and Mattel are

24 seeking to recover something in excess of a billion dollars

25 in real damages from MGA and Mr. Larian; right?

```
 1              MR. QUINN:  Objection.  Mischaracterization.
 2    Argumentative.
 3              THE COURT:  Rephrase your question, Counsel.
 4              MR. KENNEDY:  Sure.
 5    Q.   You're aware that in this phase of the case, the jury is
 6    going to be asked by Mattel to award potentially some very,
 7    very substantial numbers; correct?
 8    A.   I am.
 9    Q.   And you've calculated that if Mattel is able to prove
10    everything it hopes to prove, those numbers could be in
11    excess of a billion dollars.
12    A.   They could be.
13    Q.   Okay.  And then in addition, you are aware that Mattel
14    is seeking some additional amount of punitive damages;
15    correct?
16    A.   I am aware of that fact.
17    Q.   And you are also aware that at the end of this case,
18    depending on what the jury does, Mattel may seek an
19    injunction; correct?
20    A.   That is one of the remedies that are available to them.
21    Q.   And they could, among other things, seek an
22    injunction --
23              MR. QUINN:  Your Honor, I object.  This is for the
24    Court.  It's really purely a legal issue.
25              THE COURT:  The Court will be instructing on
```

```
1    damages, Counsel.

2              MR. KENNEDY:  I understand.

3              THE COURT:  What issue is this going to?

4              MR. KENNEDY:  The current value, the current fair

5    value of MGA.

6              THE COURT:  Very well.  In that context, overruled.

7    Q.   BY MR. KENNEDY:  Let me start again.

8              And one of the things that could happen, depending

9    upon how our jury decides things, is Mattel could seek an

10   injunction which would prohibit --

11             MR. QUINN:  Your Honor, again, I object to this.

12   This is something --

13             THE COURT:  Sidebar, Counsel.

14             (SIDEBAR CONFERENCE HELD.)

15             THE COURT:  I understand Mr. Kennedy's argument

16   that the prospect of an injunction hanging over the company

17   has an effect on its current value.

18             MR. QUINN:  Your Honor, that's something that the

19   jury can't possibly assess.  The factors that go into whether

20   or not --

21             THE COURT:  He's asking your expert witness to

22   assess the impact of that.

23             MR. KENNEDY:  That's exactly the argument, you'll

24   recall, I made in connection with my --

25             THE COURT:  I do.
```

1          MR. KENNEDY:  We're winning.  Keep quiet.

2          MR. QUINN:  Your Honor, we have this decision,

3     eBay, where it's not at all clear that an injunction can be

4     issued.  There's no way that this jury or anybody could

5     assess whether an injunction will issue --

6          THE COURT:  Again, it's not for the jury.  It's

7     this witness.  I -- it's a prospect.  And I don't know.  But

8     I presume that there's a good faith basis to ask this

9     question and that you anticipate that this witness is able to

10    offer an opinion concerning the effect, the measured effect

11    that that would have on a value of the company.  Is that --

12         MR. KENNEDY:  That's exactly it.

13         THE COURT:  Have you asked that in deposition, and

14    has this been fleshed out previously ?

15         MR. KENNEDY:  No, your Honor, because we didn't

16    have a verdict then.

17         MR. QUINN:  I'll represent to the Court he cannot

18    give any opinion.

19         THE COURT:  I understand the concern.  But we're

20    going to have to take this up outside the presence of the

21    jury.  If this hasn't been explored in deposition, and I

22    assumed it would have been, I'll let you do that with this

23    witness outside the presence before it goes before the jury.

24    So we'll take this up during the break, and then -- I assume,

25    Mr. Kennedy, how much longer do you have?

1          MR. KENNEDY:  At least a half hour, 45 minutes.

2          THE COURT:  Very good.  Okay.  I'll tell the jury

3     we're going to come back to this.

4               **(CONCLUSION OF SIDEBAR CONFERENCE.)**

5          THE COURT:  Ladies and gentlemen, we're going to

6     have to come back to this particular topic.  For the time

7     being, disregard the subject of an injunction or whatever.

8     The Court is going to have to take some testimony outside of

9     your presence to determine whether or not we can get into

10    this area before you.  We'll do that over the next break.

11    But for right now, I'm asked Mr. Kennedy to go on to his next

12    series of questions, and we'll circle back.

13    **Q.**   BY MR. KENNEDY:  Given what you've learned about MGA's

14    financial condition as of June 30, and knowing that there was

15    an adverse verdict against MGA earlier or late last month

16    earlier in this trial, and knowing that potentially as much

17    as a billion dollars in actual damages and some amount of

18    punitive damages could be assessed by this jury, going back

19    to our price at which an asset could be exchanged, that

20    involves a willing buyer and a willing seller; correct?

21    **A.**   It does.

22    **Q.**   And in this case, you've based your work on the

23    assumption that Mr. Larian would be the willing seller;

24    correct?

25    **A.**   At least for his 81.28 percent interest.

1  Q.   And who is the willing buyer?

2  A.   That's a hypothetical.  I don't know who would be

3  willing to buy his interest at this point.

4  Q.   Well, as a reality check on your work in this case, have

5  you made any inquiries to see if you could find any person or

6  company who would have any interest at all in buying

7  Mr. Larian's interest in Bratz today for $310 million?

8  A.   No.

9  Q.   Can you identify with any certainty anybody that would

10 be willing to buy his interest today for $210 million?

11 A.   This is a hypothetical willing buyer and willing seller.

12 I've done no actual world investigation of who you might

13 approach.  That isn't what valuation experts do.

14 Q.   Okay.  So you wouldn't -- you haven't made any attempt

15 to find out whether there are any real world people who do or

16 do not behave the way you've hypothesized; is that correct?

17 A.   That is correct.  I haven't done it here.  I've never

18 done it.  I've never seen another business valuation expert

19 do that in this type of exercise.

20 Q.   And you've never just as a cross-check on your own gone

21 out to see if there were people who were willing to buy or

22 sell something for the price that you've hypothesized they

23 should be willing to pay?

24 A.   I never have, and I never will.

25 Q.   So I take it, therefore, you also couldn't identify

```
 1   anybody who would be willing, if Mr. Larian said his interest
 2   is on sale today for 110 million, couldn't think of anybody
 3   who would buy it?
 4   A.   I haven't identified who the potential purchasers are.
 5   I assume it would be someone in the toy industry.
 6   Q.   But you can't tell us who that someone would be.
 7   A.   No, I've done no investigation of that.
 8   Q.   Can you say with certainty that there is anybody out
 9   there today knowledgeable, unrelated, and willing who would
10   pay $10 million for his interest?
11   A.   I think a lot of people would be interested at that
12   price, yes.
13   Q.   Who, for example?
14   A.   I think anyone in this industry that thought there was a
15   future to the Bratz product line.
16   Q.   So you think you can get 10-, not 110?
17   A.   Well, you asked me a certainty.  I haven't done the
18   exercise to establish certainty.
19   Q.   And if we go back to the slide 7 with the 310 assessment
20   on it, please.
21          This isn't the first time you've attempted to
22   calculate the value of Bratz or Mr. Larian's interests in it
23   in this case, is it?
24   A.   No.  I've been trying to do that since last January.
25   Q.   And you, if you want to check, it's tab 04552 MW, should
```

1   be the first tab there.  Your February 11, 2008 report.  And

2   as of February 11 of 2008, it was your opinion that the value

3   of Bratz was $945 million; correct?

4   A.   I believe that's correct.

5   Q.   And that Mr. Larian's 82 percent interest was

6   $773 million?

7   A.   I think that's accurate.

8   Q.   Okay.  And if this trial had taken place six months ago,

9   that's what you would have testified to you thought were what

10  a willing buyer and a willing seller would pay?

11  A.   Based on the information I had at that time, that was my

12  conclusion.

13  Q.   And then in July of this year, you revised your

14  valuations for Bratz and Mr. Larian's share; correct?

15  A.   I did.

16  Q.   Okay.  And at that time you decided that Bratz was now

17  worth 740 million, or about 200 million less than it had been

18  worth in February; correct?

19  A.   I did.

20  Q.   Okay.  And as a result of additional investigation and

21  developments, you also concluded that Mr. Larian's 82 percent

22  interest was now worth about 605 million as opposed to the

23  773- that you calculated back in February; correct?

24  A.   That's true as of the information I had available when I

25  issue that report.

1   **Q.**   And you may be aware, Mr. Price told us in opening

2   statement for this phase of the case, that you would testify

3   to that $605 million figure. And that was in good faith.

4   And that's what you would have testified to back on July 23;

5   right?

6                  MR. QUINN:   Compound, argumentative.

7                  THE COURT:   Sustained.   Rephrase, Counsel.

8                  MR. KENNEDY:   Certainly, your Honor.

9   **Q.**   If you had been called upon to testify back on July 22

10  or July 23, you would have testified that the value of

11  Mr. Larian's interest was approximately $605 million based on

12  the best information available to you; correct?

13  **A.**   I would have.

14  **Q.**   And in the intervening two weeks, you've been provided

15  with additional information which has now caused you to

16  believe that Bratz is worth just about half of what it was

17  worth two weeks ago; correct?

18  **A.**   That's true.

19  **Q.**   And against that pattern, do you have any concern as to

20  what would happen if this case -- I know the judge will kill

21  me -- were delayed for two weeks, and you had to take, say,

22  what the numbers were as of that point in time?

23  **A.**   If I have no more information, the opinion would be the

24  same.   You have to give me more information to change my

25  opinion.

 1   **Q.**   And if, for example, the jury were to agree with some of

 2   the numbers that you've calculated here, that could have a

 3   dramatic effect on MGA, couldn't it?

 4   **A.**   It's possible it would.

 5   **Q.**   That would be real dollars.  That wouldn't just be

 6   hypothetical; correct?

 7   **A.**   If they are paid; that is correct.

 8   **Q.**   Now, let's talk about the methodologies that you've used

 9   in attempting to evaluate Bratz.

10            And could we have slide 6, please, Aaron.

11            Again, this was another of the slides that we

12   talked about with Mr. Quinn.  And you explained that you used

13   the income approach and then comparable companies and

14   comparable transactions; correct?

15   **A.**   I did.

16   **Q.**   And none of your comparable companies involved a company

17   that was in trial where they had gotten hammered on a verdict

18   and were now in the damages phase, did they?

19   **A.**   I don't believe any of those companies were in that

20   situation.

21   **Q.**   And none of them were looking at as much as a billion in

22   actual damages plus punitive damages within the next week or

23   two, were they?

24            MR. QUINN:   Your Honor, I object.  Argumentative.

25            THE COURT:   This last question?

1          MR. QUINN:  Two before that.

2          THE COURT:  You're too late.

3          MR. KENNEDY:  I'll withdraw the hammer if that's

4     the problem, your Honor.

5          THE COURT:  Carry on, Mr. Kennedy.  You're fine.

6     Q.   BY MR. KENNEDY:  And similarly, you're not aware of any

7     comparable transactions that have taken place in recent times

8     that would be under the facts and circumstances of this case

9     with an adverse verdict and a damage trial going on.

10    A.   I'm not aware of any such situation.

11    Q.   Would you agree with me that those comparable companies

12    and comparable transactions really aren't comparable any

13    longer?

14    A.   I don't agree with that statement.

15    Q.   Going, then, to the income approach, and you've used the

16    same income approach back in February, and then in your July

17    numbers, and in your current opinion; true?

18    A.   I have not changed my methodology on any of my

19    calculations through the pendency of this case.

20    Q.   And one of the assumptions that you've made in your

21    income approach is that Bratz will grow at 2 percent in

22    perpetuity; correct?

23    A.   That is true.

24    Q.   Perpetuity, that's a fancy word for ever and ever.

25    A.   That's a correct statement.

1  **Q.** And you made that determination sometime during the

2  first quarter of 2008, that Bratz would grow at 2 percent in

3  perpetuity; correct?

4  **A.** Not in the current model, no, that's not correct. I've

5  used MGA's actual internal projections of how they are going

6  to do through 2008, and they have actually projected they are

7  going to do 55 percent worse in the second half of this year

8  as they did in 2007. And I've used that in my model.

9  **Q.** You used that in your February model?

10 **A.** No, I didn't have that information.

11 **Q.** In your February model, you projected they were going to

12 grow at 2 percent in perpetuity.

13 **A.** I did. From 2008 forward.

14 **Q.** Okay. And you did that during the first quarter of

15 2008.

16 **A.** I did.

17 **Q.** And sometime during the second quarter of 2008, you

18 found they weren't going to be growing at 2 percent this

19 year, didn't you?

20 **A.** No. That's not true.

21 **Q.** Well, what did you learn -- what's the --

22 **A.** I learned it in the third quarter of 2008, to be

23 precise.

24 **Q.** I stand corrected. In the third quarter of 2008, you

25 learned that rather than growing at 2 percent a year, they

```
 1   were going to be going down at the rate of 55 percent a year?
 2   A.    For the second half of the year.  That's current,
 3   today's management projections.
 4   Q.    And then in your most recent analysis, you've also
 5   concluded that between July of 2008 and July 2009, they are
 6   going to decline by about another 22 percent?
 7   A.    I think that's probably about right.
 8   Q.    And then you have concluded that between July of 2009
 9   and July of 2010, they are going to decline by another 36
10   percent?
11   A.    I don't know if that's accurate or not.  I don't know --
12   I don't believe that's correct.
13   Q.    Would you take a look at, again, Trial Exhibit 13932,
14   page 3, tab B-2, Schedule 2.1.
15   A.    Could you give me the page?
16   Q.    Page 3 of Trial Exhibit 13932.
17   A.    I'm sorry.  I was thinking of a different period than
18   you were describing.  I have that between July 1st of 2008
19   and June 30th of 2009, that for that entire period, it would
20   be a negative 36 percent.  That's a combination of the
21   decline of 55 percent in the first half and a growth of 2
22   percent in the second half.
23   Q.    And that takes us out to July of 2009?
24   A.    Yes, until the first day of July of 2009.
25   Q.    And then do you have a projection for what's going to
```

1   happen between July of 2009 and June of 2010?

2   **A.**   I do.

3   **Q.**   What is that?

4   **A.**   2 percent.

5   **Q.**   They are going to resort back to the 2 percent, and

6   that's then going to go on in perpetuity?

7   **A.**   That is my assumption.

8   **Q.**   And if we went back to February of 2008, it was your

9   assumption that it would be 2 percent throughout; correct?

10  **A.**   It would.

11  **Q.**   What happened?

12  **A.**   I've got new information from your client that they are

13  not doing as well as the rest of the industry.

14  **Q.**   And where did you get the 2 percent to start with?

15  **A.**   Well, I looked at what analysts -- the toy industry

16  analysts, the report on the public companies are predicting

17  for the future of this industry, and for the top companies,

18  which I assumed MGA was one of them, they are forecasting

19  growth in much higher amounts than 2 percent.  It was more

20  like in the 7 to 10 percent growth rate.  So I thought this

21  was a very reasonable assumption.

22  **Q.**   And it turns out, in light of subsequent developments,

23  it really wasn't; correct?

24  **A.**   For the actual period I have through June of 2008, it's

25  not correct for MGA.

1   Q.   Well, given the fact that in February you made a

2   prediction that was going to be 2 percent in perpetuity and

3   that prediction turned out not even to be correct in the

4   quarter in which you made it, do you have any suspicion or

5   doubts now about the validity of that 2 percent?

6   A.   No.  Based again on current today analyst expectations

7   for the industry, they expect dramatic turnaround in the toy

8   industry.  And 2 percent is less than inflation.  It's really

9   no growth at all.

10  Q.   So even though the 2 percent hasn't proved accurate so

11  far, you think it will eventually kick in?

12  A.   Yes.  And that's shown in the projections by management.

13  They are showing recovery by the end of this year.

14  Q.   Let's turn to net worth, if we can, for a minute.

15           And could I see slide 13, please.

16           And here you said that before trial you felt MGA

17  had a net worth of 2 billion.  Is that again what a willing

18  seller and a willing buyer would pay for it?

19  A.   At that time, yes.

20  Q.   And today it's your belief -- well, is the 540.5 million

21  Mr. Larian's recent claim, or is that also your current

22  assessment of what a willing buyer would pay for MGA?

23  A.   I can't speak for Mr. Larian.  It's based on the

24  information he provided.  I think that is the current value

25  of the company, which shows it's been permanently harmed.

1  **Q.** Permanently harmed by what?

2  **A.** By either events in the market or this litigation.

3  **Q.** And that 540.5 million doesn't take into account any

4  effect that the jury's verdict in this case may have had,

5  does it?

6  **A.** I don't believe that it does.

7  **Q.** And you'd agree with me that the jury's verdict was not

8  a good thing for MGA, was it?

9  **A.** I agree with that statement.

10  **Q.** So by process of elimination, it was a bad thing;

11  correct?

12  **A.** I agree with that.

13  **Q.** Okay. So therefore, whatever the company was worth the

14  day before the jury ruled, it's worth significantly less

15  afterwards; correct?

16  **A.** Depends on how much they award in damages.

17  **Q.** Now, going to that 2 billion figure, could I ask you to

18  turn back to Trial Exhibit 04552 MW. It's your February 11

19  expert witness report, and this time if I could ask you to go

20  to page 23, section G. And this was prepared on February 11,

21  2008.

22        It says net worth of MGA. I've been asked by

23  counsel to calculate MGA's net worth had it not made the

24  distributions to shareholders in excess of taxes due by

25  shareholders on MGA's profits. Net worth, adjusting for

1    distributions to shareholders in excess of taxes due by

2    shareholders on MGA's profits, as of December 31, 2006, is

3    $438,338,137.

4            Have I read that correctly?

5    A.    You did.

6    Q.    Did something happen between February and the start of

7    trial that caused MGA's worth to increase fivefold?

8    A.    No, this is a completely different measure.  This is

9    based on generally accepted accounting principles.  This is

10   the net book value on their financial statements.  That's

11   very different than market value.

12   Q.    When you say generally accepted accounting principles,

13   those are what -- those are what these big corporations are

14   required to keep their books by?

15   A.    Right.  And this number started with the retained

16   earnings of the company in their audited financial statements

17   for December 31st, 2006.

18   Q.    But you believe the market value was five times that

19   amount?

20   A.    Clearly.  And that's often the case.  Market value of

21   companies are significantly higher than their audited

22   statements say is their net worth on their books and records.

23   Q.    And again, whether we're talking about the -- well,

24   we're talking about the 2 million, we're back to talking

25   about what a willing buyer would pay and a willing seller

1   would take; correct?

2   **A.**   We are.

3   **Q.**   And as you told us, it is not your practice to go out

4   and see if there are people who are really willing to pay or

5   take what you think a company's market value is worth;

6   correct?

7   **A.**   That's true.

8   **Q.**   That's just not part of what you do.

9   **A.**   Well, given fact situations, if somebody, as an example,

10  bought a company six months before I have to value it, I

11  would use that information.  But otherwise, no.

12  **Q.**   So you do assist people in valuing companies in the real

13  sense, not the hypothetical?

14  **A.**   I do occasionally.  I try to do my work in this forum,

15  but sometimes clients ask me to do that.

16  **Q.**   If somebody comes around you today and says I ran into a

17  guy, Isaac Larian, he's willing to sell me his 82 percent in

18  Bratz for $310 million, are you going to advise that person

19  to pay it?

20  **A.**   I would, based on the information that I have.

21  **Q.**   As of today?

22  **A.**   Yes.

23  **Q.**   Uncertainties of the trial notwithstanding?

24  **A.**   I think if the buyer would put some caveats and

25  conditions in, but I think that's what the company is worth

1    today.

2    **Q.**    What kind of caveats?

3    **A.**    That the company -- that he will indemnify the company

4    if there is any consequences against the company going

5    forward.

6    **Q.**    So if somebody was willing to basically take over the

7    risk of this litigation and take that out of the calculous,

8    then you'd recommend they pay 3.1 billion?

9    **A.**    I never said they'd pay --

10   **Q.**    I apologize.   310 million.

11   **A.**    Yes.   Because this litigation deals with past behavior.

12   What I've valuing is the future of Bratz, and that future is

13   there in the marketplace if this product can still be sold.

14   **Q.**    Turning to Mr. Larian's net worth, you base that on a

15   financial statement which they did in the fall of last year;

16   correct?

17   **A.**    I believe October 25th, 2007, is the date it was

18   prepared.

19   **Q.**    And at that time of the 1.9 billion or whatever that was

20   shown on the statement, about a billion six of that

21   represented his ownership interest at MGA; correct?

22   **A.**    That is accurate.

23   **Q.**    And whatever his ownership interest in MGA may have been

24   worth in October of 2007, it's only a small fraction of that

25   today as we've already discussed; correct?

1  **A.**  As I've calculated today, I would agree with that

2  statement.

3  **Q.**  Now, in performing your work in this case, you started

4  with that 3.1 billion total revenue figure from all the SKUs

5  that we've talked about; correct?

6  **A.**  I did.

7  **Q.**  And then, as you've told us, you had to subtract the

8  cost of goods from that.

9  **A.**  Among other costs, yes.

10  **Q.**  So, for example, Exhibit -- Trial Exhibit 000930, super

11  styling Bratz skates, you'd subtract out whatever the actual

12  cost of the skates was and the box and that sort of thing;

13  correct?

14  **A.**  I would.

15  **Q.**  And then in addition to that, you'd have what are called

16  operating expenses; correct?

17  **A.**  Yes.

18  **Q.**  And there would be things like rent on a warehouse, the

19  receptionist's salary, the power bill, things of that sort;

20  correct?

21  **A.**  Those are all things that would be part of operating

22  expense.

23  **Q.**  And what you then attempted to do, given the fact that

24  MGA did things other than Bratz, was to try to determine

25  things like what portion of the rent or the light bill or the

1   receptionist salary should be chargeable to Bratz; correct?

2   **A.**   I did.

3   **Q.**   And in that regard, you used what's called a regression

4   analysis; correct?

5   **A.**   I did.

6   **Q.**   And help me.  I'll probably butcher this overly

7   simplified, but that's a tool where you take a number of

8   different data points and have a computer try to draw a line

9   through them, and depending on which way the line goes, that

10  shows whether you've really got a causative relationship or

11  just coincidence.  Is that too bad a distortion?

12  **A.**   It's pretty bad.  Some of the things you said were

13  pretty wrong, but most of it is right.

14  **Q.**   Okay.  But it's taking data points and trying to find

15  out whether because it's two things that are happening that

16  are really related to one another?

17  **A.**   That is the intent.  To find the relationship between

18  the variables you put in the statistical regression equation.

19  **Q.**   And you constructed a model; correct?

20  **A.**   I did.

21  **Q.**   Because a regression analysis, you just can't pull

22  something off the shelf.  You've got to create a model;

23  right?

24  **A.**   You have to make an assumption as to the relationship of

25  what variable would drive another variable before you do the

1    analysis.

2    Q.   And back in connection with your initial report in this

3    case, you performed a regression analysis on operating

4    expenses using data through the latter part of 2007; correct?

5    A.   No.   I don't think -- I think I only had cost data

6    through July of 2007 to do the analysis.   It wasn't the

7    latter part.

8    Q.   Okay.   Through some portion of 2007, you had data, and

9    you did a regression analysis based on that; correct?

10   A.   That is correct.

11   Q.   And your regression analysis came up showing operating

12   expenses that should be charged to Bratz of about

13   $477 million; right?

14   A.   I don't remember that level of detail, but if you

15   represent to me that that's what I did, I will agree with

16   you.

17   Q.   I will so represent.

18        And you then decided that there were some

19   adjustments that had to be made to the regression analysis;

20   correct?

21   A.   I did.   I was not satisfied with the results of that

22   scientific approach.

23   Q.   And you took the $477 million that the model had

24   generated, and you increased it by $126 million; correct?

25   A.   I did.

1  Q.   Did you have any thought that maybe there was something

2  wrong with the model and you ought to redo it?

3  A.   No, you can't redo the model.   The model is a good

4  model.   But cost accounting is not a pure science, and you

5  have to use your experience and judgment to look at the

6  results and conclude whether they are entirely accurate and

7  sufficient.   I did exactly what you were suggesting the

8  question.   I did not think it was sufficient alone.   So it

9  took additional analysis to come to a reasonable result.

10  Q.   So you took your regression analysis results and then

11  increased them by, what, about 27 percent, $126 million?

12  A.   I haven't done the calculation, but I'm assuming I did

13  it correctly, and that would be an accurate statement.

14  Q.   Is there any limit on the extent to which you can adjust

15  the regression analysis before you just say I have to throw

16  this whole thing out?

17  A.   No.   I don't think there's any bright line test for

18  that.

19  Q.   So you can do the analysis and get a result and then

20  double it?   That would be permissible under some

21  circumstances?

22  A.   Given certain facts, that could be acceptable.

23  Q.   Or you could take it and divide it by three, and that

24  would be acceptable?

25  A.   I don't think I'd ever divide it by three, but it's

1    possible, given a fact situation, if you give me a

2    hypothetical.

3    Q.   Did you give any thought as to whether there might be

4    some better tool for evaluating operating expenses in this

5    case than at least the kind of regression analysis you were

6    using?

7    A.   No, I've been using and doing cost analysis for 31

8    years.  I know all the tools available.  I know what is good

9    and what's not.  And I used what I thought were the best

10   tools available to me.

11   Q.   And then more recently, you did a second -- I'm not

12   trying to suggest different analysis -- but performed a

13   regression analysis a second time.

14   A.   I did.  I think I got some additional data.

15   Q.   Okay.  And this is a regression analysis you've done --

16   what? -- within the last two weeks?

17   A.   That would be true.

18   Q.   And again, you took your data points in the computer and

19   had it try to draw a line to show either causation or not,

20   and you came up with $549 million in operating expenses that

21   ought to be deducted from the 3.1 billion; correct?

22   A.   In the way of operating expenses, yes.

23   Q.   And as with the first regression analysis, you concluded

24   this one was insufficient; correct?

25   A.   I still thought it was not going to give me the results

1  that were appropriate.

2  **Q.** So you went ahead, and you upped it by 4 million for

3  2001; correct?

4  **A.** I did.

5  **Q.** And 5 million for 2002?

6  **A.** That is correct.

7  **Q.** And then reduced it by 17 million for 2003; correct?

8  **A.** Yes.

9  **Q.** And then reduced it by 2 million for 2004, and then left

10  it untouched for 2005 and 2006; correct?

11  **A.** No. I increased by 21 million in 2005 and 33 million in

12  2006. That's not untouched.

13  **Q.** I apologize. I was getting ahead of myself. You upped

14  it by 21 million for 2005 and then upped it for another 33

15  million in 2006?

16  **A.** I did.

17  **Q.** So you found the regression analysis in your opinion was

18  insufficient for all six of those years.

19  **A.** Yes. The pure science, I think, could not completely

20  form my opinion in this case.

21  **Q.** You say pure science?

22  **A.** Yes. The statistical relationship doesn't require any

23  judgment from me. It will tell me mathematically the

24  relationship between my variables and tell me the confidence

25  I have in my answer and whether I have a statistically

1   significant result.

2   Q.   And in this case, again, you haven't touched on that

3   term before.  In statistics work, statistically significant

4   means that it's probable to a certain level; right?

5   A.   That's correct.  Normally to a 95 percent level.

6   Q.   So what you try to do is test to see if what you found

7   is likely to occur at least 19 times out of 20.

8   A.   Right.  That it's not due to just pure chance.

9   Q.   And in this case, your original $549 million result,

10  what level of statistical significance did it have?

11  A.   I can't tell you because I didn't just run one

12  regression.  I ran many regressions on different cost

13  categories, and the answer would be different for each one.

14  I don't think I could answer that question looking just at

15  549 million.

16  Q.   And at the end of the process, you made a $44 million

17  increase in what the regression analysis had disclosed;

18  correct?

19  A.   I did.

20  Q.   And these were matters of judgment that you exercised?

21  A.   It is.

22  Q.   And if we had some other valuation expert take that same

23  regression analysis, they might or might not adjust it in the

24  same way.

25  A.   That's true.

1  Q.   And that's the process by which you concluded in this

2  case that in addition to the cost of goods, there's

3  $593 million in operating expenses that have to be taken

4  off before we get to profits; correct?

5  A.   I agree with that.

6  Q.   And in addition, you considered whether taxes ought to

7  be deducted before you get to profits, didn't you?

8  A.   I did.

9  Q.   Okay.  And if I could direct you back once again to your

10 February 11 report, Trial Exhibit 04552 MW, going this time

11 to page 10, if we can.  And section C, entitled Distribution

12 to Shareholders for Income Taxes.

13       And you explain there that MGA, like other

14 subchapter S corporations, distributes to its shareholders

15 amounts sufficient to allow the shareholders to pay income

16 taxes on their share of MGA income; correct?

17 A.   I did.

18 Q.   Stopping right there, a subchapter S corporation, unlike

19 a typical corporation, doesn't pay corporate income tax?

20 A.   Except for 1 percent tax to the State of California if

21 it's incorporated in California.

22 Q.   But there being no free lunch in America, the

23 shareholders of a subchapter S corporation are saddled with

24 the corporation's tax liabilities in effect; correct?

25 A.   They are.

1   Q.   So subchapter S corporations don't operate tax free.   I

2   share your bewilderment.   Let me withdraw the question.

3        Subchapter S corporations and their shareholders in

4   combination don't get away without paying taxes.

5   A.   That's true.

6   Q.   And in this case, you found that through 2005, coming

7   down to the bottom of paragraph C, the total amount

8   distributed to shareholders to meet tax liabilities at that

9   point was 130.2 million; correct?

10  A.   I did.

11  Q.   So you would agree with me that money that MGA pays to

12  its stockholders to pay the derivative taxes isn't part of

13  MGA's profits.

14  A.   It is part of their profits before taxes.   It is not

15  part of -- if they had a hypothetical statement that was

16  after taxes, you would subtract that amount.

17  Q.   When you talk about your net income, you talk about it

18  before or after taxes, but in terms of what you get to spend,

19  it's afterwards; right?

20  A.   I don't think I understand the question.

21  Q.   Let me try it again.

22        In terms of MGA's profits, it's the amount of money

23  that's left after you deduct the cost of goods and after you

24  deduct the operating expenses and after you deduct what they

25  have to pay to their shareholders because of the tax

1    liability.

2    **A.**    If you're trying to get at that, they don't have that

3    money after they have given the money to their shareholders

4    to pay the taxes.  The shareholders, MGA no longer has that

5    money.

6    **Q.**    You said it much better than I.  And it's pretty hard to

7    have profits that you don't have, isn't it?

8    **A.**    Well, it's really called retained earnings.

9    **Q.**    Okay.

10   **A.**    It's not profits.

11   **Q.**    Okay.  It's pretty hard to have retained earnings when

12   you've sent a check for that amount to the IRS.

13   **A.**    That's true.

14   **Q.**    Those are sort of incompatible.

15   **A.**    They are inconsistent.

16   **Q.**    Now, on direct you talked about both benefits to MGA and

17   benefits to Mr. Larian.  Could we see first slide 1.  And

18   there you showed us how you calculated MGA's profits to be

19   777.9 million; correct?

20   **A.**    No.  I didn't show them how I calculated.  That's just

21   the conclusion.

22   **Q.**    Okay.  And in this case you determined the profits were

23   that amount?

24   **A.**    I did.  Before taxes.

25   **Q.**    And then going to slide 3, you showed for Mr. Larian's

1    financial benefits, distributions, Bratz related, 385.2

2    million; correct?

3    **A.**    I did.

4    **Q.**    Okay.  That 385- on slide 3 is part of the 777- on slide

5    1; correct?

6    **A.**    I think there is overlap between those two numbers.

7    **Q.**    Okay.  We don't have both Mr. Larian and MGA making

8    profits off of Bratz in the first instance, do we?

9    **A.**    Well, we do, but they may be the same profit number if

10   it's been distributed to Mr. Larian.

11   **Q.**    Okay.  Well, MGA first has to make a profit off of Bratz

12   before there's anything to distribute; correct?

13   **A.**    I agree with that.

14   **Q.**    Okay.  And here you've concluded that MGA made profits

15   of 777.9 million; correct?

16   **A.**    I have.

17   **Q.**    And then you found -- picking up the chronology, first

18   they made those profits, 777-.  Now can we go back to slide

19   3.  And then 385 million of those profits got distributed to

20   Mr. Larian; correct?

21   **A.**    Through December of 2007.  I don't know what's been

22   distributed to him in the first six months of 2008.

23   **Q.**    Okay.  And so if you wanted to know what MGA's

24   end-of-the-day profits were, you'd have to subtract the 385-

25   from the 777-.

1  A.   The profits they have retained, yes.

2  Q.   Okay.  And you'd agree with me that this jury would be

3  giving a double recovery if they were to award both the 777-

4  and the 385-; correct?

5        MR. QUINN:  Object, your Honor.  I assume this is

6  going to be something handled by the Court in the verdict

7  form.

8        THE COURT:  As previously indicated, yes, and the

9  jury instructions.

10  Q.  BY MR. KENNEDY:  You'll agree with me, as you said in

11  your deposition, an element of duplication between MGA's

12  profits and what was distributed to Mr. Larian?

13  A.   I've said it then, and I've already said it today.

14  Q.   Now, you talked this morning some about apportionment.

15  And I want to get to that.  But before doing so, other than

16  for apportionment, was your analysis of the copyright claims

17  exactly the same as for the State Court tort claims?

18  A.   Yes.

19  Q.   Okay.  So both of them were based on the assumption

20  that, if Mattel can prove its claims about MGA's misuse of

21  their intellectual property, then here's what the resulting

22  damages would be, for each of those scenarios; right?

23  A.   Correct.

24  Q.   Okay.  And so the copyright and state tort claims

25  analysis that you performed is the same until you get to the

1   subject of apportionment.

2   **A.**   That is accurate.

3   **Q.**   Okay.  And there you performed an apportionment analysis

4   only for the copyright claims and not for the State Court

5   tort claims; correct?

6   **A.**   Correct.

7   **Q.**   And now let me do what I should have done 10 minutes

8   ago.  What's apportionment?

9   **A.**   I explained it on my direct examination.  That is

10   apportioning the total profits earned on the Bratz products

11   between the allegedly infringing amount which should be

12   awarded versus the other things of value that MGA brought to

13   bear on the sale of the Bratz products.

14   **Q.**   And in doing that analysis, you made some comparisons --

15   could we see slide 9, please.  I'm not going to ask you to

16   repeat your direct examination testimony, but you went

17   through, and you checked the profits of Mattel and Hasbro and

18   Jakks and then compared those with what you had calculated to

19   be MGA's profits?

20   **A.**   Yes.

21   **Q.**   And you calculated MGA's profits using, among other

22   things, the regression analysis and the adjustments to the

23   regression analysis that we've talked about here today?

24   **A.**   That's how I got the profits.

25   **Q.**   And you did it without including anything for taxes;

1    correct?

2    **A.**    Except for the state taxes, yes.

3    **Q.**    You didn't make any deduction for federal taxes.

4    **A.**    I did not.

5    **Q.**    Okay.  And you found, making that analysis, MGA was

6    doing better than a lot of the -- better than all of the toy

7    companies you compared it with; correct?

8    **A.**    During this period of time, they were.

9    **Q.**    Did you make any attempt to compare how MGA would be

10   doing if you backed out the taxes the comparators pay?

11   **A.**    No, because then I'd have to change my benchmark because

12   my benchmark for these companies are what they are earning

13   before they pay taxes.

14   **Q.**    And you took Mattel and Hasbro and Jakks.  Those are all

15   full line companies with multiple products; correct?

16   **A.**    They are.

17   **Q.**    And you compared those with Bratz in single brand within

18   a company; correct?

19   **A.**    I did.

20   **Q.**    Did you make any attempt to compare Bratz with any other

21   individual brands as opposed to entire companies?

22   **A.**    No.

23   **Q.**    Did you make any attempt to compare Bratz with Barbie?

24   **A.**    I did not.

25   **Q.**    Okay.  And in that analysis, you assumed that Mattel

1   would be able to prove that any profit that MGA makes that's

2   higher than whatever the comparisons are is due to MGA's use

3   of Mr. Bryant's -- or Mattel's intellectual property;

4   correct?

5   A.   That is correct.   There's no other reason why this

6   company for this product line was earning profits well in

7   excess of these yardsticks.

8   Q.   That's an assumption you've made, that if Mattel can

9   prove its claims in this case, then you'll be able to make

10  that deduction; correct?

11  A.   That is correct.

12  Q.   Because you, yourself, are not a doll expert.

13  A.   I am not.

14  Q.   You've told us you've never bought a doll in your life.

15  A.   That's true.   I have one girl, and she was a tomboy.

16  Q.   So as we know, you've got many talents, Mr. Wagner, but

17  testifying what goes into making of a successful doll isn't

18  one you profess to have.

19  A.   I do not profess to have that expertise.

20  Q.   And you're not purporting to grade what level any

21  particular person at MGA did or did not make a contribution.

22  That's just not part of your assignment in this case;

23  correct?

24  A.   That is true.

25  Q.   So the value of the infringement numbers that you have

 1   there are numbers that you've calculated on the assumption

 2   that Mattel, through some other witness or some other

 3   evidence, will be able to prove; correct?

 4   A.   They will draw the causal link.

 5   Q.   And that's true, as I think you said at the beginning,

 6   of your entire analysis in this case.  Somebody else is going

 7   to have to make the causal link between MGA's profits,

 8   Mr. Larian's receipts, and MGA's misuse of the intellectual

 9   property; correct?

10         MR. QUINN:   Objection.  Argumentative again, your

11   Honor.

12         THE COURT:   Rephrase.

13   Q.   BY MR. KENNEDY:   What you've been asked to do in this

14   case is to assume that Mattel is going to be able to

15   establish various matters to the satisfaction of this jury;

16   correct?

17   A.   That is correct.

18   Q.   And you have then been asked to say, assuming Mattel is

19   able to discharge that burden, what, then, would be the

20   resulting numbers calculations and damages.

21   A.   Yes, what is the amount of damages that are due.

22         MR. KENNEDY:   Thank you very much.

23         Your Honor, except for the one point, I have no

24   further questions at this point.

25         THE COURT:   Very good.  Actually, why don't we go

```
 1   ahead and take a brief break at this time.

 2              (WHEREUPON THE JURY WITHDRAWS.)

 3        THE COURT:  Please be seated.  Counsel,

 4   Mr. Kennedy, you may proceed.  Please be seated.  For the

 5   record, we're outside the presence of the jury.

 6              MICHAEL WAGNER, PREVIOUSLY SWORN.

 7                 VOIR DIRE EXAMINATION

 8   BY MR. KENNEDY:

 9   Q.   Mr. Wagner, you are aware that injunctive relief is

10   being prayed for in this case; correct?

11   A.   I am.

12   Q.   And obviously, none of us are in a position to know

13   whether it will actually be granted or not; correct?

14   A.   That is true.

15   Q.   And, in fact, you even acknowledge in your initial

16   report in this case that you were -- that you could, if

17   necessary, do additional analysis and calculations regarding

18   injunction if requested to do so.

19   A.   That's true.

20   Q.   Okay.  And clearly the prospect of having an injunction

21   imposed against a company like MGA, where you've shown that

22   80 percent of their profits over the last six years are from

23   the Bratz line, would have a significant impact on the

24   company; correct?

25   A.   What I showed was 80 percent of revenues, but I do agree
```

1   with your statement.

2   Q.    If his Honor were to order that MGA could no longer sell

3   anything that's part of the Bratz brand, that would have a

4   severe, perhaps even crippling impact on MGA; correct?

5   A.    It would.

6   Q.    And anybody deciding at this point in time, while that

7   issue is unresolved, what to pay for Bratz, would take that

8   into account?

9   A.    No, I don't think that's true.  I think that -- my

10  position or my opinion, and this is a lay opinion, not a

11  legal opinion, is that it needs to be awarded now.  If the

12  Court enters an injunction, I do not think that my future

13  valuation is correct, but if the judge does not award an

14  injunction, you need to have a measure of that value.

15  Q.    How about turning to your current net worth figures.  If

16  Mr. Larian or MGA tried to sell itself to somebody today in

17  determining a net worth market value for them, the prospect

18  of an injunction on the Bratz line would clearly be a major

19  factor in those negotiations.

20  A.    I agree with you.  I think they would, and I think the

21  buyer, what they would do was to say this deal is contingent

22  upon waiting to find out what the court does.

23  Q.    Okay.  So getting back to today, there really isn't a

24  market for MGA because of the inherent uncertainty posed by

25  this case.

1   **A.**  Well, again, I think it's possible you could find a

2 buyer who would look at that contingency and say I am willing

3 to pay $310 million if the Court does not enter an

4 injunction. If they -- if the Court does enter an

5 injunction, the deal is off. I'm not going to pay

6 $310 million.

7   **Q.**  Assuming that your willing seller were willing to agree

8 to that contingency, but if we're talking about a quitclaim

9 sale, here is what MGA is worth. It's up for auction. Take

10 it warts and all, the prospect of the injunction is going to

11 be a significant factor in determining what the price will

12 be.

13   **A.**  I agree with that statement.

14        MR. KENNEDY: I'll submit on this.

15        THE COURT: I'll hear argument from both sides on

16 this.

17        MR. KENNEDY: Your Honor, we're here talking about

18 valuing MGA and Mr. Larian's interest in it as of this point

19 in time. And Mattel is certainly free to argue what the

20 future holds. I think we're entitled to present all evidence

21 concerning what the current situation is and similarly argue

22 what the future holds.

23        But I submit that it's the proverbial having your

24 cake and eating it too. So on the one hand, come in here

25 with a valuation number that pretends there is no prospect of

```
 1   an injunction.  And potentially get a judgment for a monetary
 2   amount that bears no resemblance to reality because of the
 3   prospect.
 4        Your Honor, particularly, because we were heard at
 5   sidebar, if you have questions, I'd be pleased to try to
 6   respond, but you know my position.
 7        THE COURT:  Yes, I'll hear from Mattel.
 8        MR. QUINN:  Your Honor, I think the assignment
 9   here, the jury's task in what we most prove is the value of
10   the company now.  That's -- we simply can't get into the
11   speculative issue of what this court might decide after some
12   hypothetical verdict.
13        THE COURT:  Mr. Kennedy's point, and this is what
14   you need to address, is that right now, August 7, 2008, we're
15   sitting here with a return of a verdict on liability.  And as
16   the witness just indicated, that would have -- that does
17   have, not would, but that does have an effect on the August
18   7th, 2008, value of MGA.
19        MR. QUINN:  Well, your Honor ruled that that was
20   going to come in, that this is a fluid situation, that
21   verdict now has come in.  But the question of whether this
22   Court will enter an injunction or whether, for example, the
23   Court will in the alternative decide to impose a royalty,
24   which there's some case law now under the eBay decision, or
25   what the amount of that royalty would be, there is simply no
```

1  way to assess that.

2          I mean, we're assigning percentages to things that

3  are like two or three steps down the road.  The task now is

4  to value this company today, not value it after some

5  hypothetical future event where a court -- this court might

6  hear a motion some number of days after a verdict is

7  returned.  Also, we don't know what the scope of the

8  injunction would be.

9          THE COURT:  It is speculative.  And neither would a

10  prospective buyer.  But the point that Mr. Kennedy is making

11  is that a prospective buyer would be aware.  A real buyer

12  today would be aware that there is a potential for this

13  injunction, and that would affect the selling price, the

14  market price, of MGA today; is that correct?

15          THE WITNESS:  That is correct, your Honor.

16          MR. QUINN:  I mean, that's true in any of these

17  cases.

18          THE COURT:  It is.

19          MR. QUINN:  Where there's a potential for an

20  injunction.

21          THE COURT:  And that's the bigger problem I have.

22  I really don't know, I mean --

23          MR. QUINN:  I've never heard of a case where at the

24  time, when we're deciding issues for the jury and presenting

25  evidence for the jury, we're also trotting out in front of

1    the jury what other remedies a court might impose afterwards.

2              THE COURT:  Well, what's unique about this case is

3    that, as this witness has pointed out, the entire value of

4    this company turns on Bratz.  This is not like most companies

5    or a diversified company where, yeah, there's going to be

6    some impact.  This is all or nothing for MGA to a large

7    extent.

8              I'm not saying that there's some other products,

9    but accepting the analysis that was present, the other

10   products are of relatively minimal value.  The value of MGA

11   is Bratz.  If that's gone, any prudent buyer operating at

12   arm's length, using the definition that was provided by your

13   expert, would certainly factor this in.

14             MR. QUINN:  Your Honor, if I may, actually, that's

15   no longer true anymore.  As of the most recent numbers, Bratz

16   numbers only accounts for 30 percent of the profits, if I

17   understand what I'm -- 37 percent of the profits in the most

18   recent numbers that we were provided by MGA.

19             THE COURT:  I'm not going to test that.  That's up

20   to the experts to testify to.  The question is whether or not

21   this comes in and whether or not there's an effect.  I've

22   heard from the expert that yes, this would have an effect.

23             MR. QUINN:  We don't have a verdict form.  We don't

24   know exactly what the jury is going to be asked to decide.

25             THE COURT:  I agree with all of that, Counsel.  I

 1  just don't -- you are asking basically the jury or this

 2  witness essentially to put his head in the sand and ignore --

 3  if you are conceding that it is proper for this jury to have

 4  a valuation of this company as of August 7, 2008, you cannot

 5  ignore what happened in July of 2008.

 6          MR. QUINN:  Well, I mean, we thought, your Honor,

 7  that --

 8          THE COURT:  And maybe that's the way through this

 9  is to permit questions about the effect of the verdict but

10  not get into speculation about future action by the Court.

11  And I'm somewhat thinking out loud here.  But I mean there's

12  got to be a way of accommodating --

13          MR. QUINN:  I think Mr. Kennedy did ask some

14  questions about you're aware that a verdict has been entered

15  in this case.  There were some questions.

16          THE COURT:  But he didn't ask what the impact of

17  that was.  That's where we cut things off because it started

18  getting into the injunction and all of that.

19          I guess part of the problem that I see with this,

20  though, is that if this case had not been bifurcated, as

21  requested, then this would have been of no moment whatsoever.

22          MR. QUINN:  We wouldn't be having this discussion.

23          THE COURT:  We would not be having this discussion,

24  because we'd be looking at it --

25          MR. QUINN:  As you always do, as of the beginning

 1   of the trial.  So we've inserted one fact that's developed as
 2   a result of this trial.  And the witness has been asked about
 3   that.  But to go beyond that and to raise the prospect of
 4   something which the jury can't possibly evaluate.  The idea
 5   that there might be an injunction, by the way, whatever that
 6   means to them, and what the scope of some hypothetical --

 7               THE COURT:  But as I mentioned at sidebar, it's not
 8   so much for the jury being asked to evaluate, it's the
 9   expert.  Because they will infer the testimony from the
10   expert, but yes, it would have some effect.

11               MR. QUINN:  I don't know how anyone can assess
12   that, your Honor.

13               THE COURT:  Is there any way from your perspective
14   to assess that?

15               THE WITNESS:  Yes, your Honor.  And this is the
16   problem, that right now this is an expectancy.  No one knows
17   whether the Court will enter an injunction or not.  If the
18   jury awards, let's say worst case for MGA, my number for the
19   future value of this company, then if you do then later enter
20   an injunction, you should wipe out that 310 million.  That's
21   not already paid by them.  That's got to be paid at the time
22   you make the decision on the injunction.  But let's assume
23   you don't allow my testimony in now and you decide later not
24   to give an injunction.  Then Mattel has no remedy for the
25   future value of this product after this trial is over.

1           THE COURT:   Let me hear from Mr. Kennedy.

2           MR. KENNEDY:   Your Honor, they could have tried to

3    support their valuation claims by putting a real live human

4    being on the stand who said here's what I would be prepared

5    to pay for this company right now.   But they didn't.   They

6    didn't.   And they brought an expert who has told us in order

7    to evaluate it, he is the one that said we have to look into

8    the future.   I find it ironic that one of his key assumptions

9    is something will continue in perpetuity.   And in terms of

10   how is a jury supposed to assess something.

11          They look at his manner of testifying and

12   credentials.   And then we test it with cross-examination, and

13   I fumble around and try to impeach him.   And it's the same

14   thing with regard to every other aspect of what he thinks the

15   present value of unknown future events is.

16          This company could be facing a recall.   There could

17   be all kinds of other contingencies, and that's what final

18   argument is all about, to argue what is the likelihood of

19   this happening.   But I submit that the jury probably doesn't

20   understand fully the impact of an injunction.   That's for us

21   to explain.   But they certainly aren't in any better position

22   to evaluate whether the toy industry is going to grow at 2

23   percent in perpetuity.   That's why we have an expert.   It's

24   beyond their expertise, that's why we have cross-examination.

25          But these are the people who have said we have to

1   look to the future.  That's the only way we can know that.

2   That was their methodology.  And now saying except for this

3   part of the future --

4           THE COURT:  Let me hear from Mattel.  How does the

5   value of the company play into your theory of damages.  I

6   understand certainly how it plays into punitive damages.  How

7   else?

8           MR. QUINN:  Well, your Honor, a value has been

9   placed on the Bratz brand.  The Bratz products.  And, you

10  know, that's based on history and a present value back to

11  today of what those anticipated sales are.  And there's a

12  value that's been given to Mr. Larian's interest based upon

13  the three different approaches that the witness used.

14          But with all due respect, it sounds to me like what

15  we're being asked to do is litigate in effect this Court's

16  mental processes.  You know, what is the likelihood that this

17  Court is going to make a decision --

18          THE COURT:  But that's not it.  And that's what I'm

19  not getting -- I don't think we're communicating correctly

20  here.  And it's probably my fault.  We're not -- it's easy

21  enough to eliminate or to exclude evidence or testimony

22  concerning the likelihood of an injunction being issued or

23  not.  That's not it at all.  That would be entirely improper.

24  I completely agree with that.

25          As I understand MGA, they want to be able to

1   evaluate or have expert testimony address the value of the

2   company today, and this is a variable that is out there.  And

3   it's a -- it's a variable that is going to have, that does

4   have an effect on the value of the company as of today.  If

5   this were a publicly traded company on the New York Stock

6   Exchange, that verdict could have had an impact on the value

7   of the stock in part, not entirely, but in part because of

8   the prospect that that verdict is leading to an injunction;

9   correct?

10          MR. QUINN:  Correct.

11          THE COURT:  All right.  So it happens to be a

12  private company, but it still has, according to the expert,

13  an impact on the value of the stock.  On the company.

14          MR. QUINN:  We are bringing into the courtroom,

15  then, an eventuality which is simply impossible to frame or

16  arrive at or calculate a discount.  I mean, it's an

17  invitation to make arbitrary adjustments because no one can

18  possibly come in and assign a value to that number.  Their

19  witness, their expert witness doesn't do that.  This witness

20  can't do that.

21          THE COURT:  And I agree.  I understand that

22  problem.  But does that warrant, then, or does that justify

23  simply saying we're going to ignore it entirely?  I mean, if

24  we're all conceding, and I'm not hearing a cogent argument as

25  to why this is not something that does in fact effect the

1    value of the company as of August 7, 2008, and if the only

2    argument that can be made is that we can't put a precise

3    number on that, I don't know if that justifies saying that,

4    well, therefore, we should simply exclude any consideration

5    of that number, of that factor.  That doesn't seem right

6    either.

7             MR. QUINN:  May I have a moment, your Honor?

8             THE COURT:  You may.

9             MR. QUINN:  There are competing remedies here, your

10   Honor.  We're not both going to get -- I think this is

11   something that's going to be solved by the verdict form.  We

12   are not both going to get an injunction plus damages --

13            THE COURT:  That's the witness's suggestion here.

14   Your witness's suggestion is that I do exactly that.  I do

15   put our head in the sand and that we allow the jury to return

16   a verdict of damages without consideration of the injunction

17   and then make it an either/or.  If I don't issue an

18   injunction after this case, if I don't turn Bratz over to

19   Mattel as a result of the verdict, whatever it is in this

20   case, depending on how they come back on the copyright issue,

21   then --

22            MR. QUINN:  We should not both get a value for

23   Bratz which builds in future profits and also get an

24   injunction.  We shouldn't get that.

25            THE COURT:  Right.

1           MR. QUINN:  Both of those.

2           THE COURT:  No, you should not.  Everyone, I think,

3    would agree on that.  And the question is --

4           MR. QUINN:  And so the invitation here now is but

5    we need that number, uncontaminated by the prospect of the

6    injunction.  So then we have it.  And then there's a decision

7    to be made there.

8           THE COURT:  Let me hear from Kennedy, a response to

9    that.

10          MR. KENNEDY:  I suggest this is something that

11   perhaps can be taken care of by the verdict.  This witness

12   has already put on what he candidly, very forthrightly made

13   clear what is duplicative damage testimony.  There are

14   alternatives.  You can't get both MGA's profits in addition

15   to Mr. Larian's distributions.

16          But they were entitled to advance both of those

17   alternatives.  Concurrently, they are the ones that are

18   pursuing both damages and an injunction.

19          THE COURT:  Yes, but the difference between those

20   two things is the damages numbers on both counts have to be

21   returned by the jury.  The injunction, the jury is not going

22   to touch upon the injunction.  The Court is going do decide

23   the injunction issues at the end of this trial.

24          MR. KENNEDY:  Understood, but the jury's function

25   is still going to be to determine what the fair value --

1    there's a good chance you will not have ruled on the

2    injunction at the point -- it's almost certain, I assume,

3    that you will not have ruled on that.  And that is an

4    uncertainty that's out there.

5         THE COURT:  I'm feeling I'm reaching a conclusion

6    in terms of the compensatory damages.  Where I'm having a

7    trouble, Mr. Quinn, and I'd like to hear from you on the

8    punitive damages.  Because that, Mr. Larian is entitled to

9    have the jury consider his actual real life, real world net

10   worth as of today.  And that there's no dispute has been

11   impacted by the prospective of the injunction.

12        Do you understand the difference?  In terms of the

13   compensatory damages, the lost profits, the disgorgement, we

14   can engage in this fiction that the injunction hasn't

15   happened and there's no prospect of the injunction, and we

16   can have this either now or at the end.

17        But in terms of the punitive damage assessment, the

18   jury has to have -- has to make an assessment as one of the

19   factors as I've previously held.  The actual real net worth

20   of Mr. Larian, which the net worth of MGA is a big part.

21        MR. QUINN:  Well, it's the majority, obviously, of

22   the net worth number.  But that, again, is a value placed on,

23   you know, potential future profits.  Again, there's simply no

24   way for this jury to evaluate, or anyone to evaluate what the

25   effect is of the potential of an injunction.

1              I mean, this court doesn't have to issue an
2    injunction.  The jury is going to get instructions that
3    you've got to consider there's the possibility of an
4    injunction, and here are the factors as to whether there's
5    going to be an injunction?
6              THE COURT:  No, no.
7              MR. QUINN:  The only case law, I think, and we've
8    discussed this before, is a highly unusual situation where
9    there's been events in the course of the trial which, you
10   know, people can argue, make compelling arguments that it's
11   had these kinds of effects.  But the case law, the only cases
12   that people have been able to find is that net worth is
13   determined as of the start of trial.
14             THE COURT:  That's not -- the cases say at trial.
15   They don't say at the start of trial.
16             MR. QUINN:  Well, at trial.
17             THE COURT:  I have not seen anything which says at
18   the start of trial.
19             MR. QUINN:  No, I agree, your Honor.
20             THE COURT:  At trial.  At the time the jury is
21   considering this.  And this is -- I need to think about this.
22   This is not a decision -- I'm going to have to --
23             MR. QUINN:  It would be a different circumstance if
24   we were talking about a portfolio of marketable securities.
25   You had a trial that went on six months, and the market

6434

1    tanked.  I think there's a pretty compelling argument that

2    you can't put blinders on and ignore the fact that the net

3    worth has obviously been affected by those events.

4            THE COURT:  That's not much different than what we

5    have right here.  We have something, a commodity, the value

6    of which has been called into serious question by the

7    developments of the trial.

8            MR. QUINN:  But it's not something where there's

9    any way to calculate it or measure it.

10           THE COURT:  That is the problem.  That is the

11   problem.  I understand that.  There's no way -- it's

12   difficult to put a dollar figure on the injunction.  On the

13   potential for an injunction.

14           MR. KENNEDY:  Your Honor, I really have something

15   new to say.  It's not going to be the old stuff said louder.

16   I promise.  It took me a couple minutes.  I needed an assist

17   from Mr. Roth.  This is not a case about injunctive relief

18   versus future damages.

19           Reading from the last page of Mr. Wagner's February

20   11 report, Trial Exhibit 04552 MW, page 25, it's the first

21   full paragraph.  Maybe we can blow that up.  I have not

22   provided an opinion regarding the future damage that will be

23   incurred by Mattel in the event that the Court does not grant

24   an injunction against MGA, if it's determined, and that's

25   what I was asking him about on cross-examination.

1      They are talking purely about the existing value

2   based on a discounted future stream of profits.  But he's

3   expressly disavowed that there's any future damages that he's

4   calculated so far.  So I don't want the Court --

5             THE COURT:  Very good.  Then I suppose there's

6   nothing further to question this witness on, and we can take

7   this matter up later.

8             MR. KENNEDY:  Thank you very much.

9             THE COURT:  When we come back from the break,

10  Mr. Quinn, you can continue.  But I do want to revisit this

11  issue before any further testimony is made to the jury.  As

12  it stands to the jury right now, you instructed them to

13  disregard the testimony concerning the injunction.  We'll

14  take this up later.

15            Court's in recess.

16            (Recess taken.)

17            THE COURT:  These are my thoughts on this issue.  I

18  think MGA is correct that somehow we need to be in a position

19  to account for the impact of the prospect of injunctive

20  relief at this point.  At the point at the time of trial, the

21  time of the jury's verdict, should the jury find copyright

22  infringement and award damages, compensatory damages and/or

23  punitive damages.

24            At the same time, Mattel is correct that to simply

25  throw it out there, that injunctive relief is possible and

1    the Court may grant injunctive relief such that Bratz becomes
2    the property of Mattel and completely undermines a large
3    portion, anyway, of the value of MGA, without being able to
4    quantify either the likelihood of that happening or the
5    impact of that occurrence, is terribly confusing under 403 to
6    the jury on the issue of damages.

7              A further complicating wrinkle in the entire thing
8    is the bifurcation element.  On the one hand it was Mattel
9    who requested this bifurcation.  On the other hand, there
10   needs to be essentially you have to avoid a rewarding
11   essentially of having been found liable for the intentional
12   torts by allowing that to discount essentially damages that
13   otherwise would be considered by the jury.

14             But the bottom line, I think the best way to deal
15   with this, is the Court has heard the testimony of the expert
16   on this point.  The Court certainly will hear any additional
17   information on this point.  And perhaps the best procedure to
18   use is simply put the Court in a position to take into
19   account the value of the injunctive relief if and when the
20   Court were to grant that injunctive relief, and discount the
21   damages, both punitive and compensatory, accordingly.

22             But there is no other way of throwing that into the
23   black box of the jury and knowing what the jury or what
24   degree the jury is considering that information and having
25   that revealed on a verdict form that I can think of.

1           So I guess the bottom line is my tentative thoughts
2   at this point, after thinking about this for a few minutes
3   and hearing both sides, is to sustain the objection.
4   However, permit the evidence before the Court and then take
5   this up if and when we have a verdict.
6           I'll hear from both sides.
7           MR. QUINN:  We'll submit on that, your Honor.
8           THE COURT:  Do you think that's a sound way of
9   proceeding?
10          MR. QUINN:  I think it is, your Honor.
11          THE COURT:  Mr. Kennedy?
12          MR. KENNEDY:  I'd like to be able to say the same,
13  but doing the punitive damage aspect in particular concerns
14  me as well as just the right to jury trial and whether I'm
15  waiving some portion of Mr. Larian's rights in that regard.
16  And I've just heard it.
17          I don't think it's ever been proposed before, and
18  I'm just not quite sure how the Court, in trying to think
19  this through, confronted about some whopper both compensatory
20  and punitive damage award, is then going to be able to factor
21  this fact in.
22          THE COURT:  I think that's precisely whatever
23  damage verdict that comes back, if it's not supported by the
24  evidence, as I've demonstrated in previous trials, I will
25  certainly reduce the damages to reflect the evidence, be

1   it -- and courts rather routinely adjust punitive damages

2   when they are out of line. And this would be a particular

3   factor that the Court would be very mindful of.

4          I mean, in the context of compensatory damages, I

5   think it would be actually -- well, depending on how --

6   there's a lot of variables here. That's the bottom line, is

7   that I just don't see how we can go and throw this into the

8   jury without having any way of measuring or quantifying this

9   and then not knowing how or to what effect this is having on

10  their damage calculation. There's no way we could.

11         I think the better course is certainly to hear the

12  evidence. Because I do recognize that it is of relevance

13  here. What I'm finding on the 403 analysis is that the

14  confusing and -- the thoroughly confusing prejudice outweighs

15  it with respect to the jury. And that's how I would address

16  your right to trial issue, is that I'm ruling on a strictly

17  evidentiary basis here.

18         But I'm trying to compensate for the loss of that

19  by giving you leave not only to consider the evidence that

20  you've already elicited, but any additional evidence you have

21  concerning the impact of any injunctive relief on the value

22  of the company. And perhaps the best time to do that,

23  frankly, would be after the Court makes whatever decision

24  it's going to make on the injunctive relief.

25         I mean, if the Court decides not to grant any

1   injunctive relief at all, then this is of no moment, and this
2   should never have been before the jury, and the jury should
3   never have considered it.

4        If the Court decides to grant complete injunctive
5   relief, as being sought by Mattel, then a large portion of
6   the compensatory award, as already discussed, would go away
7   because now Mattel would control Bratz.

8        There is any number of permutations in between
9   those two, and to think that a jury is in the position to
10  comprehend that I think is just -- is fantasy.  What it would
11  do is simply serve to confuse and muddle up the jury's task.

12       So I think it's better for the Court to hear all of
13  that evidence and if necessary and to the extent necessary,
14  discount, adjust any award of damages that is returned.
15  That's the best -- I don't know.

16       If there is a better solution out there, and if
17  there is any authority, we don't have to make this decision
18  today.  And the Court will certainly entertain any authority
19  that counsel can find that would suggest that either this is
20  not proper, or if it is violating some other right or some
21  problem with this, please bring it to my attention.

22       I mean, this is something which has just arisen in
23  the last hour or so.  I need to make a decision so that the
24  trial can go forward.  And I think the best decision to make
25  to avoid irreparable harm at this point is to sustain the

1   objection on the injunction and proceed with this tentative,

2   and then I'll entertain any additional argument now or later

3   and certainly any authority now or later.

4           MR. KENNEDY:  Thank you, your Honor.  And that

5   would be with the possibility of recalling Mr. Wagner?

6           THE COURT:  Yes, yes, absolutely.  If you want to

7   have the testimony that was elicited here, and if I

8   ultimately decide that I'm mistaken on this point and the

9   jury should hear this, we'll recall Mr. Wagner so the jury

10  can hear the testimony that you elicited and go forward.

11          MR. KENNEDY:  Understood.  Your Honor, as you say,

12  clearly the amount of time -- this is a big issue.

13          THE COURT:  It is.  And I'm making this decision

14  without having had a lot of time to think about it.  So

15  that's why I'm just trying to proceed with -- I don't want to

16  do anything that's irreparable, and I think this is the best

17  course, and based on what I have before me right now, I think

18  it is the right decision.  But I will certainly obtain and

19  give leave for further argument and authority.

20          MR. NOLAN:  Your Honor, may I just have one second?

21          THE COURT:  Yes, of course.

22          MR. ROTH:  Your Honor, I apologize for

23  double-teaming.

24          THE COURT:  Don't apologize, Mr. Roth.

25          MR. ROTH:  The one observation we would make here

1    is that Mattel has made through Mr. Wagner assertions about

2    the future.  So if we're holding -- and there are assertions

3    about what profits and losses will be in the future.  So

4    that's the state of play.

5            If you are asking us for now, because your Honor

6    and the parties need to address the issue of how we deal with

7    one future contingency, we think that Mattel should not,

8    through this witness, until that issue has been resolved,

9    make assertions -- other assertions about the future,

10   assertions being, for instance, that the company will grow at

11   a 2 percent annum, per year.  This is in play because they

12   are seeking future profits.  They are making assertions about

13   the future.

14           We think we should have the opportunity to complete

15   the picture.  Part of the picture is the possibility of the

16   Court taking the action that it will.

17           Now, the fact that it's uncertain really is sort of

18   a problem about whether the analysis about future profits is

19   sufficient to pass muster in the first place.  Because the

20   issue is can you identify what will happen in the future with

21   sufficient certainty.  If you can't, then you don't get to

22   offer up the methodology, the analysis in the first place.

23           So they can't offer up analysis about the future,

24   talk about 95 percent of it, but not 5 percent of it.  And if

25   their position is well, it's just too uncertain, that means

1  the whole analysis doesn't work in our view.

2          They are offering opinion about future events.

3  That's why we should be --

4          THE COURT:   I guess I would be inclined to accept

5  that if you were willing to stipulate that to the extent that

6  there are to be future profits awarded, that you are

7  stipulating that the Court will determine that entirely.

8          If you are not, what I feel comfortable holding

9  back sua sponte is future profits attributable plus or minus,

10  to the Court's injunctive relief.  I don't feel comfortable

11  doing that in light of the right to trial, Seventh Amendment

12  issues, with respect to all future profits.  I would only do

13  that if there was a stipulation from all parties.

14          Do you understand what I'm saying?

15          MR. ROTH:   I think so, your Honor.

16          THE COURT:   I think they are of a different nature.

17  The problem that I'm having with the effect of the injunctive

18  relief is that that turns on legal decisions that the Court

19  is going to have to make and that are, I think, quite

20  frankly, so complicated and beyond the purview of the jury,

21  that it would be under 403 improper to introduce those to the

22  jury.

23          Perhaps the cleanest way to do this would be to set

24  aside the issue of future profits, and because they are, as

25  you are suggesting, somewhat intertwined with the Court's

Case 2:04-cv-09049-DOC-RNB Document 4385-32 Filed 10/22/08 Page 81 of 84 Page ID #:124608

1  ruling on injunctive relief, leave that as an issue for the

2  Court to decide.  And I say I would only do that entirely if

3  all three parties stipulated to that.

4      -       MR. ROTH:  One thing, obviously we'll need to

5  consult, but one thing just to clarify, and I was a little

6  confused about a comment made by Mr. Quinn, which was the

7  theory being offered in the compensatory context was not

8  being offered as a future profits theory.  That's the

9  reference that Mr. Kennedy made to in Mr. Wagner's report.

10         He said I might at some point offer a future

11  profits analysis.  I'm not doing that now.  This is being

12  offered in the compensatory context as an attempt to get past

13  profits based on the present value of what they think will be

14  made by Bratz in the future.

15         THE COURT:  Let me get a clarification from

16  Mr. Quinn on that.  Because if future profits are not at

17  issue and essentially, Mr. Corey, Mattel is simply relying on

18  injunctive relief for anything going forward, then that makes

19  this easy as well.

20         MR. COREY:  And that's not right.  I think the

21  portion that was quoted was from Mr. Wagner's initial report.

22  He did that analysis in his rebuttal report.  It is a portion

23  of the damages that we are claiming on a prospective basis.

24         THE COURT:  So you are seeking future compensatory

25  damages.

1          MR. COREY:  We are seeking damages attributable to

2   the benefit of Bratz to Mr. Larian.  One piece of that is the

3   value of the MGA stock, and we value that using future Bratz

4   profits.

5          THE COURT:  Okay.

6          MR. ROTH:  Your Honor, just to clarify, that's

7   actually not right.  The analysis that was in the initial

8   report.  That is where this is coming from.  This analysis

9   regarding the future benefits is coming from Mr. Wagner's

10  initial report.

11         THE COURT:  Okay.  In any event, Mattel has

12  clarified that it is seeking those.  So one solution that I'm

13  proposing is simply the Court holding back and deciding post

14  verdict the impact on injunctive -- of any injunctive relief

15  on a damages award returned by the jury in the verdict.  And

16  I'm comfortable doing that, sustaining the objection on 403

17  grounds, and simply doing that sua sponte.

18         I would go a step further with a stipulation of all

19  three parties, and that is resolve all future damages based

20  on all of the evidence in trial, both that which the jury

21  hears and that which the jury does not hear, after I've made

22  the decision on what, if any, injunctive relief to grant.

23  And I will hear back from the parties later in terms of how

24  they wish to proceed.

25         MR. ROTH:  I'm not trying to make this more

1  complex, but unfortunately, we do have the punitive damages
2  issue.
3          THE COURT:  Right.  And I would be doing the same
4  thing with that.  I think it is better for this Court to
5  factor in the impact of the injunctive relief on Mr. Larian's
6  net worth than leave that to the jury.
7          MR. ROTH:  Obviously, we'll have to consult
8  regarding that.
9          THE COURT:  I just don't know how the jury is going
10  to possibly do that based on the state of the evidence.  And
11  that's my tentative.  Let's take this up a little later.
12  Let's proceed and get through this testimony.  We can always
13  call back Mr. Wagner.  He's not going anywhere.  He's being
14  paid a decent amount of money where I suspect he'll certainly
15  hang around for a few more hours if he has to.  And I want to
16  give you a chance to think about it and get back to the
17  Court.
18          MR. ROTH:  Very good, your Honor.
19          THE COURT:  All right.  Let's bring the jury back
20  in.
21          **(WHEREUPON THE JURY ENTERS.)**
22          THE COURT:  Mr. Quinn.
23          MR. QUINN:  Thank you, your Honor.
24  ///
25  ///

1              **REDIRECT EXAMINATION**

2    BY MR. QUINN:

3    **Q.**   Mr. Wagner, I think you indicated, in response to

4    Mr. Kennedy's questions, that as you received additional

5    information from MGA over the last six, eight months, you

6    revised your calculations to take that information into

7    account?

8    **A.**   I did.

9    **Q.**   And is that true with respect to the information that

10   you received in the last two weeks?

11   **A.**   That is correct as well.

12   **Q.**   And has MGA provided to Mattel and Mattel provided to

13   you information concerning projections for MGA since the

14   first verdict in this case?

15   **A.**   They have.

16   **Q.**   And what document are you referring to?

17   **A.**   I believe it's Plaintiff's Exhibit 18837.

18   **Q.**   And what is that document?

19   **A.**   It is a projection by MGA as to what their sales, costs,

20   and profits will be for each month until the end of 2008.

21   **Q.**   And is that prepared by the management of MGA?

22   **A.**   It is.

23   **Q.**   And is that something that is -- does it have a date?

24   **A.**   The date is August 6th, 2008, of this internally

25   prepared document.