1   **Q.**   And that was provided by MGA after the first verdict in

2   this case?

3   **A.**   It was.

4   **Q.**   You were asked some questions about taxes and whether

5   you took them into account or why you didn't. In calculating

6   profits, why didn't you subtract taxes like other cost items?

7   **A.**   Because in damage calculations, commercial damage cases,

8   any damage award against the defendant is a tax deductible

9   event they can use to avoid paying taxes either in the past

10   or in the future.

11         Since this particular defendant, MGA, does not pay

12   taxes, this is only relevant to Mr. Larian. And based on the

13   tax rules, he can re-file his last two tax returns and

14   recover all the taxes that he's already paid, and he has 10

15   years that he can also deduct against his tax return any

16   judgment against him if he's earning profits in that time

17   period.

18         So it is entirely appropriate to not consider taxes

19   as a cost.

20   **Q.**   So if there is an award against Mr. Larian, that's tax

21   deductible?

22   **A.**   It is.

23   **Q.**   And if you had also deducted it in doing your analysis

24   and treated it as a cost, and Mr. Larian also deducted it

25   from his taxes, what would have been the consequences of

1   that?

2              MR. KENNEDY:  Objection, your Honor.  Deductibility

3   of what kind of damage?

4              THE COURT:  Sustained.  Rephrase.

5   Q.   BY MR. QUINN:  When we talk about damages being

6   detectable, what are we referring to?

7   A.   Compensatory damages.

8   Q.   Let's focus on the compensatory damage issue, then.  If

9   there were a compensatory damages award against Mr. Larian,

10  he would be able to deduct that from his taxes?

11  A.   He would, from the time period I just stated.

12  Q.   And he can go back in time and do that?

13  A.   For two years.

14  Q.   And if you had also deducted that amount in doing your

15  profits calculation, what would have been the consequence?

16  A.   Well, in fact, he doesn't pay taxes.

17  Q.   And is there a potential for double counting if you

18  exclude it as a cost item and there were an award and then

19  Mr. Larian also credited that against taxes?

20  A.   Yes.

21  Q.   If I can just go back to the document I was asking you

22  about, the MGA document that's been provided since the first

23  verdict.

24              Does that document reflect MGA becoming profitable

25  by the end of this year?

1  **A.**    Yes.  At the end of this year, they are showing that

2  they expect to be profitable again.

3  **Q.**    All right.  So that's the -- apparently the assessment

4  of MGA's management.

5  **A.**    It is.

6  **Q.**    You were asked some questions about whether there's some

7  double counting or an overlap between the MGA profits numbers

8  that you provided and the distributions to Mr. Larian.  Do

9  you recall that?

10  **A.**    I do.

11  **Q.**    Can you explain why there is some overlap there?

12  **A.**    Well, it's the same dollars.  When MGA earned the

13  profits, they then distributed to Mr. Larian.  That's the

14  same amount of money.

15  **Q.**    All right.  Does that mean that there's going to be, if

16  there is an award in Mattel's favor against Mr. Larian and

17  MGA, does that mean that there's going to be double recovery

18  for MGA?

19  **A.**    There better not be.

20  **Q.**    For Mattel.  I'm sorry.

21  **A.**    No, they are not entitled to a double recovery.  They

22  are entitled to try to collect it from each, but they cannot

23  collect it twice.

24  **Q.**    All right.  So that's really a legal issue.

25  **A.**    I believe that it is.

1   **Q.** You were asked some questions about, you know, whether

2 you went out into the real world and actually tried to find a

3 buyer for Mr. Larian's stock.

4         Do you recall that?

5   **A.** I do.

6   **Q.** I mean, are you a broker? Is that the sort of thing

7 that you do?

8   **A.** Well, no. Brokers do that. Investment bankers. That's

9 not my profession.

10   **Q.** What is it that you do?

11   **A.** I value businesses and calculate commercial damages.

12   **Q.** And how many times have you done that, roughly? You

13 told us you have testified over 100 times. Can you tell us

14 how many times you've done a valuation of a business?

15   **A.** It's in the hundreds.

16   **Q.** And in doing that, have you ever gone out and tried to

17 see if you could find buyers, hypothetical buyers or real

18 buyers for a business?

19   **A.** I have not.

20   **Q.** Why not?

21   **A.** Again, that would only be anecdotal evidence. And

22 again, I don't have the skill set to do that. I am a

23 financial analyst. I analyze the value of a company based on

24 their history and their projected future.

25   **Q.** All right. And you use certain techniques that you told

```
 1   us about, the income approach and the comparable companies
 2   approach and the comparable transactions approach in order to
 3   do the valuation.
 4   A.   I did.
 5   Q.   All right.  And are those standard sort of ways of
 6   valuing companies that people who do what you do employ?
 7   A.   Yes.
 8   Q.   Then you were asked some questions about a projected
 9   2 percent increase in profitability, was it?
10   A.   Well, no.  My assumption is 2 percent growth in sales.
11   Q.   2 percent growth in sales in perpetuity.  Why do you
12   make that assumption?
13   A.   Because that's the assumption that you always make in
14   business valuation.  You have to assume what is the growth of
15   the company into the future, because the way you do it is I
16   only project a couple years.  But this business will be in
17   business longer than that time period.  And this is the
18   assumption that business valuation people make when they do a
19   business valuation.
20   Q.   Is that a standard thing that's done, that you make such
21   an assumption projecting forward?
22   A.   It is.
23   Q.   And did you regard 2 percent as being sort of a
24   conservative number or less conservative, or how would you
25   characterize it?
```

1    **A.**    He think it's very conservative.  It's entirely

2    inconsistent with the history of the Bratz where the

3    company has seen growth significantly here not than that,

4    double-digit growth in many years.

5    **Q.**    Now, it was pointed out by Mr. Kennedy that in fact,

6    since you first made your assumptions and projecting 2

7    percent increase, that there have been dips downward?

8    **A.**    There have been.

9    **Q.**    All right.  I mean, is that unusual, that there would

10   be, you know, some business would go up and this would go

11   down?

12   **A.**    No, that in the real world is what happens.  It's never

13   a steady state.

14   **Q.**    And in particular with the toy business, in doing your

15   work in this case, did it come to your attention whether or

16   not the toy business is kind of a seasonal or a cyclical

17   business?

18   **A.**    It's clearly seasonable.  The vast majority of the sales

19   is for the Christmas season.  And yes, it has cyclicality

20   based upon what has happened in the economy, and it has been

21   tough on that industry for the last couple years.

22   **Q.**    But that doesn't mean necessarily that it will continue

23   to be tough forever.

24   **A.**    No, it's going to go up again, and it's going to be down

25   again.

1    **Q.**    But someone who does what you do, in valuing a business,

2    has to make some assumptions.

3    **A.**    They do.

4               MR. QUINN:  Your Honor, we made a mistake in moving

5    into evidence the two charts that I moved in, the Bratz

6    versus non-Bratz profits.  I need to correct the numbers on

7    the record.

8               THE COURT:  Very well.  Do so, please.

9               MR. QUINN:  The chart of MGA's profits, Bratz

10   versus non-Bratz was admitted as 13556.  This was in error.

11   It should be Exhibit 13956.

12               And the chart of MGA's top 10 products by revenue,

13   2001 to 2007, was admitted as 13557.  And it should be 13957.

14               THE COURT:  Any objection?

15               MR. KENNEDY:  No objection.

16               THE COURT:  Very well.  Those are noted for the

17   order.

18               **(Exhibits 13956 and 13957 received.)**

19               MR. QUINN:  Your Honor, we would also now like to

20   offer into evidence the remaining slides.  The Bratz profits

21   and benefits slide, slide No. 1, as Exhibit 13959.

22               The Bratz profits through June 2008, slide 2, as

23   13960.

24               Slide 3, Mr. Larian's financial benefits, as 13961.

25               Slide 4, distributions to Mr. Larian, as 13962.

1     Slide 6, value of Bratz, slide 6, as Exhibit 13963.

2     Slide 7, Mr. Larian's share of Bratz, as of June

3     2008, as Exhibit 13964.

4     Slide 8, the interest calculation, as

5     Exhibit 13965.

6     Slide 9, copyright damages, MGA, as 13966.

7     Slide 11, copyright damages MGA, as slide 13967.

8     Slide 12, copyright damages Mr. Larian as 13968.

9     And finally, net worth, as 13969, summaries of

10    voluminous records, your Honor.  We offer those exhibits.

11    THE COURT:  Any objection?

12    MR. KENNEDY:  No, your Honor.

13    THE COURT:  Very well.  All admitted.

14    **(Exhibits 13959-13969 received.)**

15    MR. QUINN:  Nothing further.

16                    **RECROSS-EXAMINATION**

17    BY MR. KENNEDY:

18    **Q.**  Going back to your discussion that you just had with

19    Mr. Quinn about your skill set, you state that you deal in

20    terms of trying to project in a hypothetical basis; correct?

21    **A.**  That is true.

22    **Q.**  That you are not a broker or investment banker or

23    anything of that sort?

24    **A.**  I am not.

25    **Q.**  So if Mattel wanted to present evidence to this jury

1    showing what people would really pay for Bratz as opposed to
2    what they might pay hypothetically, they should have gotten
3    somebody from another discipline; right?

4    A.    No, they would get somebody from my discipline.  I am a
5    business valuation expert.  But they would get people that
6    normally do it in real transactions rather than value
7    companies in litigation.

8    Q.    You're saying there are people Mattel could have brought
9    in instead of you that would have told the jury what people
10   would really pay for MGA or for Bratz as opposed to what
11   hypothetically might be paid; correct?

12   A.    No, they would have done the exact same analysis that I
13   would do.

14   Q.    But they would not do it normally in litigation.

15   A.    They would be a person hired to value a company so a
16   buyer could figure out what they could buy a company for.

17   Q.    Is there somebody who could come in and say what they
18   are really prepared to pay, for example, $10 million for
19   Mr. Larian's interests.  There are people like that, aren't
20   there?

21              MR. QUINN:  Compound, calls for speculation.

22              THE COURT:  Sustained.  Well, rephrase the
23   question, Counsel.

24              MR. KENNEDY:  Understood, your Honor.

25   Q.    There are people out there who could come in and say

1   whether there are real companies that are or are not prepared

2   to, for example, pay $10 million for Mr. Larian's interest in

3   Bratz; correct?

4   A.    There are investment bankers or brokers, that if they

5   have a client they would represent this is what my client

6   would be willing to pay.

7   Q.    And if there were an investment banker out there with a

8   client who was willing to pay $310 million for Mr. Larian's

9   interests, Mattel would be in a position to bring them in, if

10  they wanted, wouldn't they?

11          MR. QUINN:  Calls for speculation, your Honor.

12  That's an incomplete --

13          THE COURT:  As phrased, it does.

14  Q.    BY MR. KENNEDY:  If in fact there's anybody out there

15  who today would pay $310 million for Mr. Larian's interest,

16  you're not aware of any reason why Mattel couldn't call that

17  person as a witness in this case, are you?

18          MR. QUINN:  It assumes facts and calls for

19  speculation.

20          THE COURT:  As phrased, sustained.

21  Q.    BY MR. KENNEDY:  Do you have any idea how you would go

22  about finding out whether there is anyone out there who would

23  be willing to pay $310 million for Mr. Larian's interest?

24  A.    Yes.

25  Q.    What would you do?

1  **A.**    I would hire an investment banker who would then try to
2  market the company.  They would prepare a prospectus as to
3  what they thought the company would do in the future with a
4  lot of analyses, like I did, and then they would contact who
5  they thought were prospective buyers and try to generate
6  interest.
7  **Q.**    Do you know of any reason why that person couldn't be
8  called as a witness in this case?
9           MR. QUINN:  Calls for speculation, incomplete
10  hypothetical.
11          THE COURT:  Sustained.
12  **Q.**    BY MR. KENNEDY:  Now, you said that you've seen recent
13  information that MGA plans to be profitable again by the end
14  of the year; correct?
15  **A.**    Yes.
16  **Q.**    And have you seen information indicating that MGA
17  accurately predicted that Bratz sales would decline the way
18  they did in 2006 and 2007?
19  **A.**    I didn't see any internal projections for that time
20  period.
21  **Q.**    Have you seen anyplace for MGA got it right in terms of
22  the decline that you think Bratz is going to be undergoing
23  over the next year or two?
24  **A.**    No.  I didn't see that.  And if they did, it would be
25  just like me, because I misestimated as well.

1  Q.   So you haven't seen anything that indicates MGA always

2  calls it right where the future is concerned.

3  A.   I have no information about whether they do or do not.

4  Q.   And the only way we'll know whether the current

5  projections for the end of the year are or are not correct is

6  to wait and see what happens.

7  A.   That is true.

8  Q.   And I gather from your answer, if compensatory damages

9  only are taxable -- well, punitive damages are taxable;

10  right?

11  A.   You cannot claim a tax deduction for payment of punitive

12  damages.

13          MR. KENNEDY:   Thank you very much.

14                **FURTHER REDIRECT EXAMINATION**

15  BY MR. QUINN:

16  Q.   In your experience in the business world, are there any

17  financial analysts working at any companies that have crystal

18  balls that enable them to make projections that are right on,

19  at MGA or anywhere else?

20  A.   There is no one that can do that.  If they could, they

21  would be very rich people.

22  Q.   All right.  Now, in your experience, you were asked some

23  questions about could you find an investment banker who would

24  find a client and then that client could come to court and

25  talk to a jury and say I'm here, and tell the jury that they

1    want to buy this business.

2              Have you ever heard of that happening?

3    **A.**    Never.

4    **Q.**    You are aware, I think you've already indicated, that

5    MGA has retained somebody like you to give valuation

6    opinions.

7    **A.**    Mr. Meyer has similar credentials to me.

8    **Q.**    Is he a broker?

9    **A.**    He is not.

10   **Q.**    Did he go out -- you've read his report, and you know he

11   has some opinions, too, on valuation.

12   **A.**    He does.

13   **Q.**    All right.  And did you see any indication in that

14   report to support his reasons?  He went out in the

15   marketplace to try to see if there were buyers or offered

16   Mr. Larian's stock to anybody?

17   **A.**    He didn't do that, and I wouldn't expect that he would.

18              MR. QUINN:   Thank you.

19              THE COURT:   Anything further?

20              MR. KENNEDY:   Nothing further, your Honor.

21              THE COURT:   You are excused for the time being.

22   You may be recalled.

23              THE WITNESS:   Thank you, your Honor.

24              THE COURT:   Mr. Quinn, the plaintiff's next

25   witness.

```
 1              MR. QUINN:  Your Honor, the next witness -- we
 2    don't have the video to play yet.  It will be Michael Moore.
 3              THE COURT:  Very well.
 4              THE CLERK:  Please stand next to the court reporter
 5    and raise your right hand.
 6              MICHAEL CHRISTOPHER MOORE, SWORN.
 7              THE CLERK:  Please take the stand.
 8              Please state your full name for the record, and
 9    spell your last name.
10              THE WITNESS:  Michael Christopher Moore, M-O-O-R-E.
11              THE COURT:  Counsel, you may proceed.
12              MR. ZELLER:  Thank you, your Honor.
13                         DIRECT EXAMINATION
14    BY MR. ZELLER:
15    Q.   Good afternoon, Mr. Moore.  You are currently employed
16    by Mattel's law department as an attorney?
17    A.   Yes, I am.
18    Q.   And how long have you been with Mattel's law department?
19    A.   Since December of 2000.
20    Q.   And what's your current title there?
21    A.   My current title is expert counsel.
22    Q.   And do you work in a particular area of law, a legal
23    practice?
24    A.   My practice focuses on trademarks and copyrights.
25    Q.   And what is it that your duties were principally when
```

1    you first arrived there at Mattel back in December of 2000?

2    **A.**    My duties were principally to prosecute trademark

3    registrations, essentially register trademarks that Mattel

4    wanted to use in connection with its products.

5    **Q.**    And then at some point in around 2002 or so, did you

6    start having some kind of responsibility for litigation, the

7    lawsuits that Mattel was involved in?

8    **A.**    Yes, I did.

9    **Q.**    Now, prior to joining Mattel, did you have any legal

10   experience?

11   **A.**    Well, for two and a half years before I joined Mattel, I

12   was an attorney at the United States Patent and Trademark

13   Office in Washington, D.C.

14   **Q.**    And generally speaking, what did you do there?

15   **A.**    There I worked at the Trademark Office, and I reviewed

16   trademark applications which were filed at the office for

17   registration.

18   **Q.**    If you could, please, take a look at -- I believe it's

19   the smaller binder that you should have up there.  There's an

20   Exhibit 13109.  This is in evidence.  If we could please have

21   it published.

22   **A.**    Okay.

23   **Q.**    Do you have that exhibit, Mr. Moore?

24   **A.**    I do.

25   **Q.**    And for the record, this is a document I think we're all

1   familiar with, this is the Carter Bryant-MGA agreement dated

2   as of September 18, 2000.  And I'd ask you, Mr. Moore, you

3   have seen this document before, haven't you?

4   A.   Yes, I have.

5   Q.   And when is it you first saw it?

6   A.   I first saw this document in November of 2003.  I

7   believe November 24th, 2003.

8   Q.   And what were the circumstances under which you first

9   saw this?  In other words, where were you?

10  A.   I first saw this document at a meeting in Hong Kong that

11  I had with a toy company there called Cityworld.

12  Q.   And if you could please tell us who else was at this

13  meeting.  Obviously, you were there.

14  A.   I was at the meeting.  There was a gentleman by the name

15  of George Kesselring who represented Cityworld, and then

16  there was Cityworld's attorney, and there was also -- well,

17  you were there, Michael Zeller.

18  Q.   And did Cityworld give you a copy of this document, this

19  agreement?

20  A.   Yes.

21  Q.   And did you have an understanding as to how it is that

22  Cityworld got a copy of this agreement?

23  A.   I understood that had been sued by MGA in Hong Kong, and

24  this document had been provided to Cityworld in connection

25  with that litigation.

1  **Q.**  Now, at this meeting that you had there with Cityworld

2  in late November of 2003, did you see any other documents?

3  **A.**  I did.

4  **Q.**  If you'd please turn to Exhibit 10.

5        And this is in evidence as well, your Honor.

6        If we could publish that.

7  **A.**  I have it.

8  **Q.**  And you've seen Exhibit 10 before?

9  **A.**  I have.

10  **Q.**  Was this also one of the documents that you saw at that

11  meeting with Cityworld?

12  **A.**  This was another document that I saw at the meeting with

13  Cityworld.

14  **Q.**  Now, prior to the time that you had this meeting with

15  Cityworld there in late November of 2003, did you know that

16  Carter Bryant had been working with MGA while he was still a

17  Mattel employee?

18  **A.**  I did not.

19  **Q.**  Prior to the time of this meeting, when you saw these

20  documents that Cityworld showed you, to your knowledge did

21  anyone else at Mattel know that?

22  **A.**  Not to my knowledge.

23  **Q.**  Now, prior to the time that you had this meeting with

24  Cityworld, had you heard from any source that there was the

25  possibility Carter Bryant had some kind of relationship with

1  MGA during the time he was employed by Mattel?

2  **A.** I think there were rumors that Carter Bryant had created

3  Bratz.

4  **Q.** Maybe I should be a little bit more specific. Did you

5  read anything prior to the time that you had that meeting

6  with Cityworld that suggested to you the possibility that

7  Carter Bryant had had some kind of relationship with MGA

8  while he was still a Mattel employee?

9  **A.** Yes. There was a <u>Wall Street Journal</u> article that was

10  published in July of 2003, and in that article, I believe it

11  stated that Isaac Larian had seen the drawings for Bratz in

12  the fall of 1999.

13       MR. ZELLER: And if we could, please, pull up on

14  the screen Exhibit 1. And this is in evidence. If there's

15  1-A. If we could go to the second page. And blow up the

16  paragraph on the left-hand side. I'm sorry. My right.

17  **Q.** This is a little blurry, but I don't know if you can

18  make it out. It's that paragraph that starts off Isaac

19  Larian, chief executive of MGA. Is that passage you're

20  talking about where he says that he chose Mr. Bryant's idea

21  for the Bratz over several others after holding a sort of

22  fashion doll design contest in late 1999?

23  **A.** That's the portion I'm referring to.

24  **Q.** And did you read this article during the July of 2003

25  time period?

1   A.   I did.

2   Q.   Then going back to this meeting that you had with

3   Cityworld in late November of 2003, prior to the time of that

4   meeting, did you know that Carter Bryant had created Bratz

5   during the time he was employed by Mattel?

6   A.   I did not know that.

7   Q.   Did anyone at Mattel know that to your knowledge?

8   A.   Not to my knowledge.

9   Q.   Was there sometime later where it came to your attention

10  or you learned or knew that Carter Bryant had done at least

11  some sort of creation, creative work on Bratz when he was

12  employed by Mattel?

13  A.   In late 2004, I began to know the extent of what Carter

14  Bryant had done when he was at Mattel.  I attended his

15  deposition in Springfield, Missouri.  I believe he made

16  certain statements which caused me to believe that.

17  Q.   If you could direct your attention -- there's another

18  binder up there for you.  It's a larger binder.  In order to

19  save some time here in court today, you looked at these

20  documents before we came; is that right?

21  A.   I did.

22  Q.   If you could, please look at that group that has the tab

23  A.   And for the record, these are Exhibits 13873 through

24  13889.

25       Mr. Moore, are those certificates of registration

1  of copyright that Mattel obtained and the U.S. Copyright

2  Office issued?

3  A.   Yes.

4        MR. ZELLER:  Your Honor, I'd move into evidence

5  Exhibits 13873 through 13889.

6        THE COURT:  Any objection?

7        MR. SLOAN:  One moment, your Honor.

8        No objection.

9        THE COURT:  They are admitted.  You may publish.

10        **(Exhibits 13873-13889 received.)**

11  Q.   BY MR. ZELLER:  And the next group we have for you in

12  that binder is tab D.  Do you see that?  And for the record,

13  these are Exhibits 13890 through 13902.  Those are

14  certificates of registration that you reviewed in more detail

15  earlier today?

16  A.   Yes.

17  Q.   Do you recognize those documents as certificates of

18  registration of copyright that Mattel obtained and the U.S.

19  copyright office issued?

20  A.   Yes.

21        MR. ZELLER:  Your Honor, I move into evidence

22  Exhibits 13890 through 13900.

23        MR. SLOAN:  Objection, your Honor.  Can we have a

24  sidebar?

25        THE COURT:  Sure.

```
 1              MR. ZELLER:  If I could suggest one thing.  We have
 2   another group that I'd like to move in.  If it's going to
 3   involve the same issue, maybe we could deal with it at one
 4   time at the sidebar.
 5              THE COURT:  Is it?
 6              MR. SLOAN:  Yes.
 7              THE COURT:  Go ahead.
 8   Q.   BY MR. ZELLER:  Mr. Moore, also take a look at tab C.
 9   Do you see that there?
10   A.   I do.
11   Q.   And for the record, these are Exhibits 13757 through
12   -759 and 13912 and 13913.
13   A.   Okay.
14   Q.   And those are documents you reviewed earlier today, too,
15   to make sure you knew what they were; right?
16   A.   That's right.  These are documents I've seen earlier
17   today.
18   Q.   And do you recognize those as certificates of
19   recordation from the U.S. Copyright Office?
20   A.   I do.
21              MR. ZELLER:  And on that same basis, your Honor,
22   I'd move into evidence Exhibits 13757 through -759 and
23   Exhibits 13912 and 13913.
24              THE COURT:  Very good.  I'll see you at sidebar
25   concerning the objections.
```

1        **(SIDEBAR CONFERENCE HELD.)**

2            THE COURT:   Yes.

3            MR. NOLAN:   If I could address these, we were just

4    handed these.   I want to give you -- just show you an example

5    of 13893 that they were attempting to move in.   These are

6    certificate of registrations they had filed post verdict in

7    this case, July 25th, 2008.   I believe, Mr. Zeller, you might

8    represent that whole group was filed after the verdict in

9    this case.

10           MR. ZELLER:   Correct.   And that's why I actually

11   broke them out in groups.   So if there was an issue

12   concerning particular groups of them.   The group B, they were

13   the ones that we're talking about here, are ones that we

14   filed after the verdict.   Of course, the documents at that

15   point were public.   The jury's verdict was returned in our

16   favor.   We sought expedited registration of these materials.

17   We produced them, I believe, within hours of when we got them

18   back from the Copyright Office, and we're seeking to

19   introduce them.

20           MR. NOLAN:   Your Honor, I just think that

21   introducing into evidence legal filings that Mattel has taken

22   in response to the verdict is of no relevance to the claims

23   that they are now trying to enforce.   Your Honor will

24   instruct the jury as to the ownership requirements.   I think

25   this has a potential of confusing the jury.   I also wanted to

1   point out that I don't know whether or not this is in here,

2   but --

3           THE COURT:  I'm sorry.  Let me get a better sense

4   of what you plan to use this with.  I'm not really sure how

5   confusing the jury -- because you'll not really sure what

6   you're going to use it for.

7           MR. ZELLER:  I would start off with this, your

8   Honor.

9           THE COURT:  You are seeking copyright infringement

10  on these drawings.

11          MR. ZELLER:  Correct.  And furthermore, your Honor,

12  MGA has asserted a section 205(d) defense under the U.S.

13  Copyright Act.  They have taken the position that

14  registration is notice.  And recordation.

15          Now, we, of course, differ on that point.  We think

16  it's a very different kind of issue.  In fact, the

17  certificates of recordation are what in our view are required

18  by the statute in order to avail oneself of 205(d).  But, you

19  know, even if their legal argument were to be accepted

20  accounts, the fact is that then we would say we are the ones

21  who recorded first because if registrations are suitable

22  for -- as substitute or proxy for recordation, well, then,

23  we're first.

24          THE COURT:  Very well.  And besides confusing, what

25  are your other objections?

1    MR. NOLAN:  On the legal point they just made, that

2    they were the first to register this, I just think that to be

3    able to claim that you were the first as a result of pending

4    court proceedings that haven't even been completed and

5    there's no final judgment, your Honor, I think that's

6    inappropriate.  And that's where I think the confusion arises

7    from the jury, that all of a sudden it appears that Mattel

8    has certain rights, maybe independent from what the verdict

9    was in the first case.  And what I'm worried about is that

10   they are back there looking at that, and they don't

11   understand the nuances of the legal argument.

12        This whole case was tried on a timing point of view

13   and what they are going for, and we started this trial on the

14   basis of, and you asked going in, what were the drawings that

15   you were relying on, and that's what this case is being

16   litigated about.  Now we're going back to the entire bucket

17   of documents that were awarded, I guess, in the first

18   verdict.  First phase.

19        MR. ZELLER:  If I may, I actually think that

20   Mr. Nolan's prejudice argument is fairly easy to address.

21   There is in fact a very standard instruction that is given in

22   copyright cases where there has been contested ownership over

23   works, that presumptions don't apply.  I mean, obviously

24   there are many situations where, you know, courts will give

25   instructions, in a routine copyright case --

```
 1            THE COURT:  Are you planning to show that to the
 2   jury right now?
 3            MR. ZELLER:  No, I'm not.
 4            THE COURT:  I'm going to overrule the objection.
 5   However, I will give you leave.  I'm not seeking any legal
 6   objection; however, since there's no moment, and it's not
 7   going to the jury, it's in.  If you want to revisit the
 8   objection with legal authority, I will entertain it.
 9            MR. NOLAN:  Very well.
10            (CONCLUSION OF SIDEBAR CONFERENCE.)
11            THE COURT:  They are admitted, Mr. Zeller.  You may
12   proceed.
13            (Exhibits 13857-13900, 13757-13759,
14            13912, and 13913 received.)
15            THE COURT:  Very well.  Cross-examination.
16                    CROSS-EXAMINATION
17   BY MR. SLOAN:
18   Q.   Good afternoon, Mr. Moore.
19   A.   Good afternoon.
20   Q.   You testified that you've been a legal counsel in the
21   legal department at Mattel since December of 2000; correct?
22   A.   That's right.
23   Q.   And it's true, isn't it, that during the past couple of
24   years, you have personally participated in and supervised the
25   investigation and collection of documents in connection with
```

1    this case?

2    **A.**   I have with other attorneys, yes.

3    **Q.**   But you have been one of the principal people involved

4    in investigating this case and collecting documents, haven't

5    you, Mr. Moore?

6    **A.**   Yes.

7    **Q.**   You have?

8    **A.**   I have.

9    **Q.**   And you've spent hundreds of hours in the course of

10   investigating this case, haven't you, sir?

11   **A.**   I've spent a lot of time investigating.

12   **Q.**   I'm sorry.  You've spent a lot of time?

13   **A.**   I've spent a lot of time on the case, yes.

14   **Q.**   In fact, you have submitted declarations in this case in

15   which you have declared under oath that you've spent, I

16   believe, hundreds of hours combing through documents, talking

17   to various witnesses; is that correct?

18   **A.**   That's correct.

19   **Q.**   And so because of that, I assume that you are thoroughly

20   familiar with all of the investigative files that have been

21   prepared by Mattel in connection with this case.

22             Is that a fair assumption?

23             MR. ZELLER:   The question is vague.

24             THE COURT:   Sustained.  Clarify, Counsel.  All

25   investigative files.

1  Q.   BY MR. SLOAN:  Well, you are aware that Mattel has been

2  investigating this case for some time, aren't you, sir?

3          MR. ZELLER:  Objection, your Honor, as to "this

4  case."  It's actually contrary to the Court's rulings.

5          THE COURT:  Sustained.

6  Q.   BY MR. SLOAN:  Sir, are aware that Mattel has been

7  investigating whether the production and sale of Bratz dolls

8  by MGA in some way infringes on certain rights that Mattel

9  purports to own for some time?

10         MR. ZELLER:  Vague, foundation.

11         THE COURT:  Sustained.

12 Q.   BY MR. SLOAN:  Sir, have you been investigating for some

13 time whether Carter Bryant is the person who designed the

14 Bratz doll?

15 A.   I've been looking into that since sometime in 2003.

16 Q.   Since 2003?

17 A.   Yes.

18 Q.   Sir, are you aware that Mattel has been investigating

19 that issue since well before 2003?

20         MR. ZELLER:  Foundation, relevance, contrary to the

21 Court's rulings.

22         THE COURT:  Same question that I sustained the

23 objection to.  Sustained.

24 Q.   BY MR. SLOAN:  You said that you have been involved in

25 investigating whether Carter Bryant was involved in creating

 1  Bratz since 2003; is that correct?

 2  **A.**  Yeah, I've been involved in trying to understand whether

 3  Carter Bryant created Bratz since 2003.

 4  **Q.**  When in 2003?

 5  **A.**  The summer of 2003.

 6  **Q.**  So substantially before you traveled to Hong Kong with

 7  Mr. Zeller to meet with Cityworld's attorneys; is that right?

 8            MR. ZELLER:  The question is vague.

 9            THE COURT:  As to substantially.  Overruled.

10  **Q.**  BY MR. SLOAN:  Is that true, sir?

11  **A.**  It's true that I was investigating or looking into the

12  situation before I traveled to Hong Kong, yes.

13  **Q.**  You said since the summer of 2003; correct?

14  **A.**  That's right.

15  **Q.**  And you weren't the first person at Mattel who ever

16  began to investigate whether Carter Bryant was the person

17  involved with designing Bratz, were you, sir, to the best of

18  your knowledge?

19            MR. ZELLER:  Irrelevant, and foundation.

20            THE COURT:  To your knowledge.

21            THE WITNESS:  To my knowledge, I think I was the --

22  I think I was the first in some respects.

23  **Q.**  BY MR. SLOAN:  You were the first person at Mattel to

24  investigate whether Carter Bryant was involved in designing

25  Bratz?  Is that your testimony?

```
 1          THE COURT:  Counsel, we're going to have to have a
 2    sidebar on this.  I thought I made this clear pretrial.
 3               (SIDEBAR CONFERENCE HELD.)
 4          THE COURT:  I am hoping that this is the last time
 5    I'm going to have to say this statement in this case.  What
 6    is relevant is whether or not MGA knew that Carter Bryant
 7    developed Bratz while employed at Mattel.  Counsel, I'm not
 8    asking for a statement.  I'm making a statement.  It is not
 9    relevant, and I sustained the objection as to whether or not
10    Mattel was investigating Carter Bryant's involvement in
11    making Bratz.
12          MR. SLOAN:  Your Honor, when I read the Court's
13    last order, and I'm trying to remember, I think it was July
14    24th, if memory serves me.
15          THE COURT:  Okay.
16          MR. SLOAN:  My reading of that, and I would ask the
17    Court to revisit it, is that you distinctly said that the
18    standards with respect to fraudulent concealment are
19    different than the standards with respect to when the two
20    aiding and abetting claims accrued.  My understanding of the
21    ruling is that you ruled, as a matter of law, that the aiding
22    and abetting claims did not accrue -- I think I have this
23    right -- until July of 2003.  But what you positively said is
24    that they didn't accrue until Mattel knew that Carter Bryant
25    had created it while he was at Mattel.  I agree with you.
```

1          But with respect to fraudulent concealment, and

2    that's what this goes to, your Honor, you said the standard

3    was much looser.  That's my understanding of the order, and I

4    think it's a fair reading of the order, your Honor.

5          THE COURT:  The issue, though, is still whether or

6    not they knew the claim, the copyright claim -- they have no

7    copyright claim on Bratz that they are alleging in this case

8    unless and until they have knowledge or reasonable suspicion

9    that Carter Bryant developed it while an employee under the

10   inventorship agreement.

11         MR. SLOAN:  I agree with you.  This goes to the

12   fraudulent concealment which goes to the tortious

13   interference and conversion claims.  And with respect to

14   those claims, my understanding from your order is that you

15   said there was a much looser standard and you were not going

16   to hold the parties to as strict a standard.

17         THE COURT:  Let me take a look at my order.

18         MR. SLOAN:  It's from July 24th.

19         THE COURT:  Do we have a copy of the July 24th

20   order?  One moment.

21         (Pause.)

22         THE COURT:  Mr. Sloan, you are correct, I did

23   indicate in the order.  I also indicated, however, that I

24   would be very mindful of the 403 limitations, and I guess

25   what -- I don't want to confuse this jury.  Certainly

1    evidence of Mattel knowing -- the ultimate issue is still the
2    same, whether Mattel knew that Carter Bryant did this while
3    he was working at Mattel.

4         Part of that equation is whether or not Mattel knew
5    that Carter Bryant's involved in Bratz.  That's kind of a
6    subpart.  It's not the whole thing.  And I don't want the
7    jury -- and if I think the evidence and if I think the
8    testimony and I think the examination is going in the same
9    way as it started out, suggesting that the ultimate issue is
10   whether or not Mattel knew that Carter Bryant was involved,
11   was aware, was involved in the creation of Bratz, I'm going
12   to shut it down.

13        MR. SLOAN:  This only goes to fraudulent
14   concealment.  The only issue -- as I understand it, you have
15   ruled on all the statute of limitations issue.  So the only
16   issue --

17        THE COURT:  Is fraudulent concealment.  I
18   understand that.

19        MR. SLOAN:  And this is clearly relevant to
20   fraudulent concealment.

21        THE COURT:  I understand it's relevant.  But reread
22   my order, because there's a paragraph after the paragraph
23   that you are correctly referring to that says if it becomes
24   misleading under 403 grounds, I'm going to shut it down.

25        MR. SLOAN:  Your Honor, the other point I'd make is

1    that I think they have opened the door on this.  Because

2    Mr. Zeller elicited testimony not just on whether when he

3    knew that Carter Bryant had done it while he was still at

4    Mattel, but he also asked questions about when he first knew,

5    when they first knew and did anyone else know.

6              MR. ZELLER:  My questions were very specific.  They

7    went to two issues.  Number one, knowledge of whether or not

8    Carter Bryant was working with MGA while a Mattel employee.

9    Every question on that subject was phrased that way.  Number

10   two, whether or not knowledge of Carter Bryant developing or

11   working on Bratz while a Mattel employee.  Every single

12   question I asked --

13             THE COURT:  I'm going to permit Mr. Sloan to re-ask

14   the question.  I'm going to overrule the objection.  Please

15   take my warning seriously.  I don't want to have to

16   intervene.  I'm not going to allow this jury to be misled

17   into thinking that this issue is about when Mattel know that

18   Carter Bryant developed Bratz.

19             I'm giving you a fair warning.  You know what it's

20   like when I say be careful on something.  I am saying take

21   care.

22             MR. SLOAN:  Your Honor, I respectfully agree.  But

23   I don't understand where I'm supposed to draw the line.

24             THE COURT:  It's spelled out in the order.  We can

25   print out the pages of the order.

1          MR. SLOAN:  I mean, isn't it -- the jury will be

2    instructed in the jury instructions what they are to

3    consider.

4          THE COURT:  It's a very -- it's an issue that I

5    almost did not allow to go to the jury, but I think that it's

6    a proper thing to give to the jury.  But I am letting it go

7    to the jury under very particular circumstances.  We'll get a

8    copy of the order.  I'll even -- this is so important, and I

9    want this handled with such care that I'm going to take a

10   break right now.  I'm going to send the jury in, have both of

11   you read the record, and we'll have a discussion.  I don't

12   want there to be any problem on this.

13         MR. NOLAN:  Your Honor, this is why we wanted to

14   have this discussion at sidebar, too, on this.  In the

15   language of the concealment, for example, the issue of the

16   anonymous letter; all right?

17         THE COURT:  Let me excuse the jury.  Well, I'm

18   going to excuse them for the day.  We'll take this up.

19              **(CONCLUSION OF SIDEBAR CONFERENCE.)**

20         THE COURT:  Ladies and gentlemen, given that we're

21   almost at 5:00 and we had a few more matters to discuss

22   outside your presence, I'm going to go ahead and excuse you

23   for the day.  I will see you tomorrow morning at 9:00.

24              **(WHEREUPON THE JURY WITHDRAWS.)**

25         THE COURT:  Please be seated.  I've going to have

1  my courtroom deputy print out a copy of the order, provide it

2  to both sides, give you a chance to review it, and then we'll

3  discuss it on the record. Court is in recess.

4          MR. NOLAN: Your Honor, we should have the

5  discussion outside the presence of Mr. Moore?

6          THE COURT: Yes.

7          (Recess taken.)

8          THE COURT: All right, we're back on the record

9  outside the presence of the jury. I take it both sides have

10  had a chance to read the Court's order. Mr. Sloan was

11  correct, that the Court did indicate clearly that the

12  evidence comes in, but as I indicated on the order, for 403

13  purposes, we really need to make sure that we're not

14  confusing the jury. And just the way that last question was

15  phrased, it caused concern by the Court. And that's why I

16  called for the sidebar.

17          Clearly, the evidence that Mattel is aware of

18  Carter Bryant's work on Bratz is a piece of the puzzle in

19  terms of the MGA position on deliberate concealment. But by

20  no means is it dispositive of the issue. And there is a real

21  concern the Court has had from the get-go in considering this

22  issue on summary judgment of how this gets presented to the

23  jury.

24          Ultimately, I do think Mr. Sloan is correct, that

25  this can probably be addressed with clear jury instructions.

1   But I just want counsel to be aware of where we're going with

2   this issue.  And so that's -- I think that may be all I need

3   to say.

4           MR. ZELLER:  And I completely understand and agree

5   with what the Court has said.  There's no question -- we

6   understood the order to mean that to begin with, that

7   certainly that issue, because it goes to potentially relevant

8   evidence subject to relevance, cumulativeness, 403, and the

9   like.

10          And certainly the phraseology of the questions were

11  problematic from our perspective.  There are, however, I

12  think, a couple of additional problems in directing these

13  questions to Mr. Moore specifically.  I did not elicit

14  testimony about, you know, Carter Bryant being -- having some

15  involvement with Bratz as a free-floating matter.  I

16  specifically tied my questions to while he was employed by

17  Mattel.

18          Mr. Moore is an attorney.  He is predicating the

19  knowledge, information, things he is asking him, basically to

20  interpret things through the lens of investigation that

21  Mr. Moore did for this case.  And so that was also why I was

22  objecting on foundation grounds.  Because Mr. Moore, I think

23  the testimony would establish, and if the foundational

24  questions were asked, would really establish that it's work

25  product that they are now trying to invade, asking Mr. Moore

1  to interpret those early investigative files.  That, and
2  also, of course, conversations he's had with people and that
3  sort of thing.

4          So I think that there is a particular problem --
5  there's an overlay when these questions are being asked of an
6  attorney.

7          My second point is that they have a whole lineup of
8  witnesses, business people, who they are going to ask these
9  questions of.  To the extent that they are continuing to be
10  allowed to ask those general questions of when do you think
11  Carter Bryant had any involvement with Bratz, which as a
12  general matter I don't think is that interesting of an issue.

13          Frankly, there's already evidence in the record,
14  and at some point, maybe it already is, purely cumulative.
15  They certainly have already made points about people knowing
16  or suspecting or thinking that Carter Bryant had something to
17  do with Bratz.

18          So I mean to me in some ways, you know, the real
19  meat of the issue is their ability to sort of then try and
20  bootstrap this idea of, you know, you had some idea that
21  maybe Carter Bryant had some involvement with Bratz into, you
22  know, this idea that Mattel knew that ultimate fact.  And
23  that's -- that, I think, is very problematic.

24              THE COURT:  Let me hear from Mr. Sloan.

25              MR. SLOAN:  Your Honor, the reason that Mattel

1    called this witness is because they apparently think they
2    have a burden of showing that they weren't on notice, that
3    they had no idea of the possible existence of a claim until
4    November of 2003. That's why they called the witness. When
5    he testifies and suggests to the jury, and I would submit to
6    the Court that there is a suggestion to the jury that to some
7    extent Mattel was blind about this until November of 2003, I
8    think it's fair game for us to not only probe his credibility
9    by asking these types of questions, but also, as your Honor
10   has said, it does go directly to the issue of --

11          THE COURT: It does. The credibility issue, it
12   depends how you define this. This being clearly defined by
13   Mr. Zeller as -- you know the distinction. I've not going to
14   keep repeating it.

15          So the "this" in that sentence is what's critical.
16   Saying that Mattel knew that Carter Bryant was involved in
17   Bratz does not impeach at all the statement that Mattel
18   didn't find out until 2003 that Carter Bryant developed Bratz
19   or created Bratz while he worked at Mattel.

20          So that's not impeachment. It is relevant for the
21   issue, as a component of your defense or your response to the
22   deliberate concealment. And I will permit it, and I'll
23   permit the questions provided that there's a foundation and
24   mindful of the other 403 considerations that I set forth in
25   the Court's order.

1        So the objection is overruled subject to laying the

2   proper foundation and being mindful of the Court's ruling.

3   That's all.  You are basically correct on this.  But don't

4   read more into it than I indicated.

5        MR. SLOAN:  Thank you.

6        THE COURT:  Mr. Nolan?

7        MR. NOLAN:  Your Honor, having Mr. Sloan win the

8   objection, I don't want to lose it.  But just for

9   clarification, because we're going to go back and think about

10  this, and this guidance is helpful.

11       THE COURT:  Sure.

12       MR. NOLAN:  Two things that I just wanted to bring

13  out in the context of this concealment argument is we don't

14  know whether or not we're going to use these, but I'd like to

15  have the Court's guidance so we don't get into an issue

16  tomorrow.

17       THE COURT:  Yes.

18       MR. NOLAN:  We have now -- and it's surprising as

19  to why they brought Mr. Moore in in light of the Court's

20  rulings.  I was surprised that they called Mr. Moore to

21  establish this.  But having done that and then asked him the

22  yes, you know, did anybody -- I apologize.  This is from

23  Mr. Zeller's examination.  "Question:  Now, prior to the time

24  that you had this meeting" -- he's talking about the

25  Hong Kong meeting with Cityworld, "had you heard from any

1   source that there was the possibility that Carter Bryant had

2   some kind of relationship with MGA during the time he was

3   employed by Mattel."

4           THE COURT:   Right.

5           MR. NOLAN:   Then the answer was:   "I think there

6   were rumors that Carter Bryant had created Bratz."   That was

7   the answer.

8           THE COURT:   Right.

9           MR. NOLAN:   Now, that question, I submit, really

10  was not necessary in their case.   But having said that and

11  having asked the question that way, I point out a couple of

12  things.   And that is that the anonymous letter -- and I know

13  it's anonymous.   I want to just tie something to it -- the

14  anonymous letter that is written in August of 2002

15  specifically has a claim that in 2000, and I'm quoting now,

16  in 2000, a Mattel employee by the name of Carter Bryant was

17  working with Mattel to design dolls.   One of the dolls that

18  he was working on creating was the Bratz dolls.

19          Okay.   Now, it's anonymous, I agree.   But of

20  course, there's handwriting.   The Court remembers this

21  probably way more than I do, but there's handwriting to Alan

22  Kaye and then to Richard De Anda.   And then Mr. De Anda, in

23  receipt of the anonymous letter, writes the following e-mail

24  to Alan Kaye:   "I have received your anonymous letter

25  originally sent to Bob Eckert regarding Carter Bryant and

1    Bratz. I am aware of this situation and have been working on

2    it for several months."

3         And then it goes on. There's some redactions here,

4    your Honor. Now, I just want to make the obvious point. The

5    anonymous letter, Mr. De Anda reads it and says, "I have been

6    investigating this matter for several months." The anonymous

7    letter specifically says that he was an employee at Mattel

8    while working on Bratz.

9         Then that ties us back to the investigative report

10   that Mr. De Anda opens up, and I think it's February of 2002.

11   March of 2002. I think the interview starts February 28th,

12   when they first get the first allegation.

13        So my question really is -- but after nine weeks I

14   think I can ask the question. Just kind of guidance. It

15   seems to me that this now is open, but if the Court feels

16   otherwise, I want to know ahead of time so we don't -- the

17   last thing we want to do is have a problem in this. But now,

18   given the linkage on concealment, not on the statute of

19   limitation, but on concealment, your Honor, it does seem that

20   the fact that they were putting in evidence in Phase 1-A that

21   we were concealing for way out until like 2005 is the issue

22   for us.

23        MR. ZELLER: Mr. Nolan has made -- this latter part

24   of Mr. Nolan's argument is the same one that the Court has

25   heard over and over. The evidence that he is citing here is,

1 as the Court knows, not an accurate depiction or rendition of

2 it. The Court has seen Mr. De Anda's e-mail unredacted. The

3 Court knows what that e-mail is about. It is not about what

4 Mr. Nolan surmises that it is. And furthermore, Mr. De Anda

5 made perfectly clear at his deposition -- and the Court has

6 these deposition excerpts. It's been briefed extensively on

7 summary judgment and supplemental motions since then -- that

8 that is not what it means. And it's not a tie to the

9 anonymous letter, and so the evidence that they are --

10      THE COURT: Putting that aside, what about the

11 anonymous letter itself?

12      MR. ZELLER: Well, look, let me start, I guess,

13 with the question that Mr. Nolan quoted that I asked

14 Mr. Moore. Mr. Moore clearly misunderstood the question. I

15 rephrased it. And I asked him, "Well, did you read it

16 somewhere," and he said, "Yeah, I saw it in The Wall Street

17 Journal."

18      If they want to put the letter in front of

19 Mr. Moore, which -- and if they can lay a proper foundation,

20 then they can potentially, I think, use that to impeach him

21 if they want. The problem that they are going to have is

22 simply he saw it later.

23      So they can try and establish that, but -- so I

24 don't see it as a real issue with Mr. Moore, frankly, the

25 anonymous letter. It may rear its head, obviously, with

1   other witnesses, but they are not going to be able to lay a

2   foundation that says Mr. Moore was working on this stuff at

3   that time period. I asked the question, when did you begin

4   working in earnest in litigation.

5       So in any event, I think some of these issues, you

6   know, will probably be crystallized better with other

7   witnesses.

8       But just to reiterate my concern, we're talking

9   about a lawyer here. I don't think my questions in any way

10  opened up some general issue about privilege. The Court will

11  recall, we have been down this road about, you know,

12  knowledge of facts like that isn't privileged. And we have

13  been down that road repeatedly through discovery. And it

14  seemed to have worked out fairly well in terms of discovery.

15      I don't think we had done anything different than

16  we had done before, and, of course, Mr. Moore's factual

17  testimony is there, I was at this meeting. This is when we

18  got the agreement that set the events off that led to this

19  lawsuit.

20          THE COURT: Very well.

21          MR. SLOAN: Your Honor, may I respond to that for

22  just one second? Because with respect to the claim that

23  we're somehow trying to invade privilege or work product, the

24  documents we're talking about are the anonymous letter and

25  the e-mail from Mr. De Anda to Mr. Kaye. There's also the

1   investigative file which they produced, which is part of

2   the -- whether it's part of the legal record or not, it has

3   been produced.

4          There's no claim of privilege or work product.  And

5   this witness testified that he was one of the people who was

6   most involved in the investigation.  Spent hundreds of hours

7   on it.  I think it's fair to assume that he would have

8   examined an investigative report that was prepared by Mattel

9   which indicated that they were on notice of some of these

10  claims, knowledge that Carter Bryant may have been involved

11  in designing Bratz long before mid-2003, which is when he

12  claims Mattel -- he said he started working on it in

13  mid-2003.

14         But I think my questions after that were, well, are

15  you claiming that no one else at Mattel was involved in

16  investigating this or knew anything about it before 2003.

17  And I think his answers were, "I'm not aware of it."  I'm not

18  sure that we ever crystallized his answer, but that's the

19  gist of the answers as I heard them.  And I think that given

20  that, we're entitled to get into this information.  Again, if

21  he --

22         THE COURT:  What information?  The letter and the

23  file and the De Anda memo?  Is that what you are seeking

24  to --

25         MR. SLOAN:  Your Honor, I understand that there may

 1  be some issues with respect to the De Anda e-mail.

 2              THE COURT:   Yes.

 3              MR. SLOAN:   And I confess I'm not totally on top of

 4  those.   So I'll defer to Mr. Nolan on that.   But certainly

 5  with respect to the investigative file and the anonymous

 6  letter, I think we should be allowed to ask about those and

 7  see whether he knows about them.

 8              MR. ZELLER:   Just when it seems like we have some

 9  semblance of order to this, I hear something that's even more

10  troubling.   Now we hear that they are going to basically be

11  examining Mr. Moore on his interpretation of an investigative

12  file that he only saw for the first time -- he wasn't

13  involved in the 2002 Toon Teens matter.   He just was not

14  personally involved in it.   They are now going to ask him to

15  interpret --

16              THE COURT:   I think the best approach here,

17  Counsel, is for you to make whatever foundational objections

18  you want in the morning, and the Court will rule on those

19  foundational objections, and we'll see where this goes.

20              The other issue that I need to take up is these two

21  remaining deposition designations, Carter Bryant and Cary

22  Brode.   But I need the authority that I asked for this

23  morning to do that.   Because these designations really get

24  into this issue.   I think counsel would benefit from guidance

25  from the Court in terms of how far into the creative process,

1   doll development process, we're going.  Because a lot of

2   these designations on both sides, frankly, go into that

3   issue.

4         Mattel asks questions of Carter Bryant which gets

5   into the issue of the doll development process.  Then, of

6   course, MGA responds as well with their designations.  And

7   both sides are indicating that the other's are objectionable.

8   We need to figure out a principled way of doing this.  And

9   my -- I've been grappling with this, and this came to the

10  Court's attention this morning.  And on the one hand, I have

11  a concern that we're conflating apportionment and confusing

12  the jury by getting too far into the issue of doll

13  development.

14        On the other hand, I think that MGA's entitled to a

15  certain degree of understanding on the jury's part in that

16  doll development process in this phase.  So it's a matter of

17  striking the right balance.

18        But I invited counsel this morning to submit

19  authority to the Court, and I'll look for that first thing

20  tomorrow morning.  And that will be the pretrial motion of

21  the day.

22        MR. NOLAN:  You want us here at -- what time do you

23  want us?

24        THE COURT:  Let's meet at 8:00.  I'll be here at

25  7:30.  If you have something for me, I'd appreciate you

1  having something for me so I can take a look.

2          MR. NOLAN:  I think we will.  One point that you

3  put your finger on, and I saw this last night, is that in

4  looking at Carter Bryant's designations by Mattel, and they

5  are calling him as maybe next witness by video, that they

6  were putting this information in.

7          THE COURT:  I saw that.

8          MR. NOLAN:  So okay.

9          THE COURT:  And, Mr. Zeller, you know what I'm

10  looking for?

11          MR. ZELLER:  I'm sorry, your Honor?  We have

12  nothing further.  Unless the Court wants to address --

13          THE COURT:  No, in terms of authority on this issue

14  that we raised earlier today.

15          MR. ZELLER:  I understand people have been

16  researching it today.  When I get back, I will look at it,

17  and our intention is to try and get something put in order

18  for the Court tonight.

19          THE COURT:  Very well.  That's what I'm looking

20  for, and you understand what I'm looking for?

21          MR. NOLAN:  Right.

22          MR. PRICE:  Your Honor, most important question,

23  time count.

24          THE COURT:  You're down to four hours and 15

25  minutes or so, and MGA has 16 hours.

6493

```
 1            MR. NOLAN:   Thank you, your Honor.  See you in the
 2   morning.
 3
 4                 (Proceedings concluded at 5:15 P.M.)
 5
 6
 7
 8
 9                    C E R T I F I C A T E
10
11
12           I hereby certify that pursuant to Title 28,
13   Section 753 United States Code, the foregoing is a true and
14   correct transcript of the stenographically reported
15   proceedings in the above matter.
16           Certified on August 7, 2008.
17
18
19           MARK SCHWEITZER, CSR, RPR, CRR
             Official Court Reporter
20           License No. 10514
21
22
23
24
25
```