1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                         EASTERN DIVISION

4                             - - -

5            HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                             - - -

7    MATTEL, INC.,                    )

                                      )          CERTIFIED
8                      PLAINTIFF,     )             COPY
                                      )
9              VS.                    )  NO. CV 04-09049
                                      )
10   MGA ENTERTAINMENT, INC., ET. AL., )  TRIAL DAY 32
                                      )  MORNING SESSION
11                     DEFENDANTS.    )  PAGES 6494-6622
                                      )
12   AND CONSOLIDATED ACTIONS,        )
                                      )

13

14

15        REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                    RIVERSIDE, CALIFORNIA

17                   FRIDAY, AUGUST 8, 2008

18                        8:45 A.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
            FEDERAL OFFICIAL COURT REPORTER
24             3470 12TH STREET, RM. 134
            RIVERSIDE, CALIFORNIA  92501
25                 951-274-0844
               WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2
     ON BEHALF OF MATTEL, INC.:
 3
                         QUINN EMANUEL
 4                       BY:   JOHN QUINN
                               JON COREY
 5                             MICHAEL T. ZELLER
                               HARRY OLIVAR
 6                             TIMOTHY ALGER
                               WILLIAM PRICE
 7                       865 S. FIGUEROA STREET,
                         10TH FLOOR
 8                       LOS ANGELES, CALIFORNIA  90017
                         213-624-7707
 9

10
     ON BEHALF OF MGA ENTERTAINMENT:
11
                         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
12                       BY:   THOMAS J. NOLAN
                               JASON RUSSELL
13                             RAOUL KENNEDY
                               LAUREN AGUIAR
14                             CARL ROTH
                         300 SOUTH GRAND AVENUE
15                       LOS ANGELES, CALIFORNIA  90071-3144
                         213-687-5000
16

17

18

19

20

21

22

23

24

25
```

FRIDAY, AUGUST 8, 2008                        TRIAL DAY 32, MORNING SESSION

1                              I N D E X

2

3

4    PLAINTIFF
     WITNESS            DIRECT        CROSS       REDIRECT       RECROSS
5    **MICHAEL MOORE**

6    BY MR. SLOAN       6578

7

8

9

10
              EXHIBITS              RECEIVED
11
              1195                  6603
12            4434                  6615

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        RIVERSIDE, CALIFORNIA; FRIDAY, AUGUST 8, 2008; 8:45 A.M.

 2                               -OOO-

 3           THE CLERK:  CALLING ITEM NUMBER ONE ON CALENDAR, CASE

 4   NUMBER CV04-09049-SGL, MATTEL, INC., V. MGA, INC., ET AL.

 5           COUNSEL, PLEASE STATE YOUR APPEARANCES FOR THE

 6   RECORD.

 7           MR. ZELLER:  MIKE ZELLER AND BILL PRICE FOR MATTEL.

 8           MR. NOLAN:  TOM NOLAN, LAUREN AGUIAR, JORDAN FEIRMAN,

 9   PATRICK HAMMON, AND CARL ROTH.

10           WE'RE TRYING TO GET SOME FACE TIME FOR SOME OF THE

11   YOUNG ASSOCIATES THAT HAVE WORKED SO HARD ON THIS CASE.

12           THE COURT:  WE DISCUSSED THAT ISSUE AT THE NINTH

13   CIRCUIT CONFERENCE, THE IMPORTANCE OF FIRMS MAKING SURE THAT

14   THE YOUNGER ASSOCIATES ARE GETTING THE TRAINING AND THE

15   COURT-TIME EXPERIENCE; SO I APPRECIATE THAT.

16           MR. NOLAN:  I THOUGHT YOU MIGHT SAY THAT MAYBE IT'S

17   THE YOUNG ASSOCIATES WHO WROTE THE BRIEFS THAT SHOULD ARGUE.

18           THE COURT:  BELIEVE ME, THAT WAS DISCUSSED AS WELL.

19           MS. AGUIAR:  I ACTUALLY VOLUNTEERED.

20           THE COURT:  THERE'S ACTUALLY ONE JUDGE -- AND I CAN'T

21   QUITE GO THIS FAR -- UP IN THE NORTHERN DISTRICT WHO'S TAKING

22   THE POSITION THAT HE WILL GIVE ORAL ARGUMENTS AT HIS STANDARD

23   MOTION CALENDAR IF AN ASSOCIATE WITH LESS THAN THREE YEARS

24   EXPERIENCE COMES AND ARGUES IT.  OTHERWISE, HE WON'T HEAR ORAL

25   ARGUMENT.  I LIKE ORAL ARGUMENT, AND I WANT TO HEAR THE BEST
```

```
 1   THAT I CAN, BUT IT JUST SHOWS HOW FAR SOME JUDGES ARE GOING TO

 2   TRY TO GET YOUNGER ASSOCIATES INTO THE COURTROOM.

 3             MR. NOLAN:  CAN WE STOP THIS DISCUSSION NOW, BECAUSE

 4   I DON'T WANT THIS REFLECTED ON THE AMERICAN LAWYER SURVEY?

 5             THE COURT:  ALL RIGHT.  VERY GOOD.

 6             I KNOW I ASKED YOU TO BE HERE AT 8:00.  I WANT TO

 7   ASSURE YOU THAT THE COURT HAS BEEN HERE SINCE BEFORE THEN.

 8   I'VE BEEN READING YOUR BRIEFS AND LOOKING AT THE CASES.  BOTH

 9   BRIEFS ARE VERY WELL DONE.  I'VE GOT SOME QUESTIONS, THOUGH.

10             MR. ZELLER, I'D LIKE TO START WITH YOU, IF YOU WOULD.

11             WHAT ABOUT NON DOLL PRODUCTS THAT THE COURT CANNOT

12   FIND ARE INEXTRICABLY INTERTWINED?  I'M THINKING, FOR EXAMPLE,

13   SOFA, THE TENT.

14             MR. ZELLER:  I THINK THAT'S A DIFFERENT STANDARD.

15   AND I DON'T KNOW THAT THERE'S MUCH OF A DISPUTE OVER THAT.  I

16   MEAN, OBVIOUSLY, IF WHAT WE'RE TALKING ABOUT IS, SAY, WHAT'S

17   CLEARLY A NON DOLL PRODUCT, SAY A TENT, AND IT HAS A BRATZ

18   IMAGE ON IT, THE PRODUCT IS -- CERTAINLY, THERE'S AN

19   INFRINGEMENT.  IT REPRODUCES IN TWO-DIMENSIONAL FORM THE --

20             THE COURT:  THERE WOULD CLEARLY BE A TRADEMARK

21   INFRINGEMENT.  BUT I KNOW WE'RE NOT ANYWHERE NEITHER THERE.

22   AND I COULD ALSO SEE A DERIVATIVE INFRINGEMENT.  AND I KNOW

23   WE'RE NOT ANYWHERE NEITHER THERE.  I'M HAVING TROUBLE GETTING

24   TO -- AND I CAN SEE A CERTAIN COPYRIGHT INFRINGEMENT WITH

25   RESPECT TO THE PICTURE ON THE TENT, OR WHATEVER.
```

1        **MR. ZELLER:** RIGHT.

2        **THE COURT:** BUT UNLIKE THE DOLLS, WHICH I UNDERSTAND

3   YOUR INEXTRICABLY INTERTWINED ARGUMENT, I DON'T SEE HOW THE

4   TENT ITSELF -- I MEAN, ARGUABLY, THAT TENT WOULD HAVE SOLD

5   WHETHER OR NOT IT HAD ON THERE -- PERHAPS NOT AS WELL, BUT IT'S

6   A TENT, AND IT HAS A FUNCTION THAT'S COMPLETELY DIVORCED FROM

7   THE DOLL; AND ARGUABLY, A LOT OF CREATIVE PROCESS, OR SOME

8   CREATIVE PROCESS, WENT INTO MAKING THAT TENT SEPARATE AND

9   APART.  I CAN SEVER OUT THE ELEMENTS.

10       **MR. ZELLER:** I THINK I UNDERSTAND WHERE THE COURT IS

11  COMING FROM ON THIS.

12       I ACTUALLY THINK IF WE START GETTING INTO WHAT WE'LL

13  CALL THE CREATIVE DIMENSIONS OF WHAT ARE CLEARLY NON DOLL

14  PRODUCTS, SAY, A TENT -- I MEAN, THAT CLEARLY SEEMS LIKE 403 --

15  WE'LL BE HERE FOREVER.  I DON'T THINK IT'S PERTINENT.  MAYBE IF

16  WE TAKE SORT OF AN EXTREME CASE -- AND I'M NOT EVEN SURE TO

17  WHAT DEGREE THIS ACTUALLY EXISTS, BUT I'LL HYPOTHESIZE ONE.

18  SAY, FOR EXAMPLE, THE TENT HAS NO ART WORK ON IT; DOES NOT

19  REPRODUCE THE ACTUAL CHARACTERS; IT SIMPLY SAYS "BRATZ" ON IT.

20  NOW, MAYBE THE PACKAGING IS INFRINGING; MAYBE THE CHARACTERS

21  ARE ON THERE.  BUT LET'S SET ALL OF THAT ASIDE.  THERE'S A

22  DOCTRINE THAT ALLOWS US TO BASICALLY GET THESE KIND OF

23  CONFLATED SALES.

24       AS MR. LARIAN WAS TESTIFYING TO ON THE STAND -- AND I

25  DON'T KNOW THAT THERE'S A LOT OF DISPUTE CONCEPTUALLY BETWEEN

 1   THE PARTIES OVER THIS POINT -- YOU HAVE A BRAND.  AT THAT CORE

 2   ARE THE DOLLS.  AND, OF COURSE, THAT ALLOWS FOR ACCESSORIES,

 3   CERTAIN THINGS THAT ARE SOLD -- AND IN MANY INSTANCES, AND

 4   PERHAPS IN ALL, THOSE ACCESSORIES DON'T REALLY NECESSARILY HAVE

 5   AN EXISTENCE THAT'S INDEPENDENT OF THE DOLLS THEMSELVES.

 6   FASHIONS WOULD BE A VERY SIMPLE EXAMPLE OF THAT.  I MEAN, THE

 7   FASHIONS WOULD BE WORTHLESS WITHOUT THE DOLL.  THE DOLL IS

 8   INFRINGING.  AND THAT WOULD GET US INTO EXACTLY THE SITUATION

 9   OF THE KINDS OF CASES THAT I'M CITING.

10        **THE COURT:**  BUT THE TENT IS NOT WORTHLESS WITHOUT THE

11   DOLLS.

12        **MR. ZELLER:**  CORRECT.  THAT'S WHY I'M CREATING THIS

13   DISTINCTION.

14        SO ONCE WE GET TO, WE'LL CALL THEM THE LICENSED

15   PRODUCTS, THEN THERE ARE LICENSED PRODUCTS WITH IMAGES.  THOSE

16   ARE INFRINGING; THOSE WOULD BE DETERMINED BY THAT STANDARD.

17   BUT WHAT MGA IS OBTAINING FROM THE LICENSED PRODUCTS IS A

18   LICENSING FEE, WHICH THEY DON'T EVEN HAVE CREATIVE INPUT, OTHER

19   THAN REQUIRING THE LICENSEE TO USE THE ART WORK THAT IT

20   PROVIDES, WHICH IS BASED ON THE DOLL.

21        SO WE HAVE A STRAIGHT LINE THROUGH THIS.

22        **THE COURT:**  OKAY.  THIS GOES BACK TO MAYBE A SOLUTION

23   TO THIS THING THAT I WAS -- I'M TRYING TO EXPLORE.  I'VE BEEN

24   READING NIMMER ON INDEPENDENT CREATION.  IT'S NOT CLEAR AT ALL

25   TO THE COURT THAT AT THIS POINT THAT I HAVE EVIDENCE OF

1   INDEPENDENT CREATION. AND THERE'S A DISTINCTION, OF COURSE,

2   BETWEEN CREATIVE ASPECT, SWEAT AND BROW TOWARDS CREATING THE

3   DOLL THAT IS ALLEGED TO BE COPYING AND INDEPENDENT CREATION.

4           AND CERTAINLY, INDEPENDENT CREATION COULD BE USED TO

5   REBUT AND DEFEAT YOUR CLAIMS OF SUBSTANTIAL SIMILARITY IF THERE

6   WAS SUFFICIENT EVIDENCE OF INDEPENDENT CREATION.

7           THE COURT CAN CERTAINLY TAKE THAT UP OUTSIDE THE

8   PRESENCE OF THE JURY, TO DETERMINE, AS A THRESHOLD MATTER,

9   WHETHER THERE IS SUFFICIENT EVIDENCE OF INDEPENDENT CREATION,

10  AND THEN WE CAN DETERMINE WHETHER OR NOT IT COMES IN OR IT

11  DOESN'T COME IN.

12          I SUPPOSE WITH RESPECT TO THE LICENSED PRODUCT -- AND

13  I'M THINKING OUT LOUD HERE -- AGAIN, IF THIS WAS INDEPENDENTLY

14  CREATED BY MGA, AS OPPOSED TO SOMEBODY ELSE, THEN MGA MIGHT

15  HAVE A CLAIM TO THAT. BUT IF THE INDEPENDENT CREATIVE PROCESS

16  WAS SOMEBODY ELSE, WOULD THEY AS WELL IF IT WAS THEIR LICENSEE?

17          MR. ZELLER: WELL, THAT GETS INTO A VERY INTERESTING

18  QUESTION, BUT I'M NOT SO SURE WE HAVE TO NECESSARILY RESOLVE

19  THAT, BECAUSE ULTIMATELY WHAT OUR THEORY IS, FOR PURPOSES OF

20  THAT EXTREME CASE I WAS TALKING ABOUT, WHERE YOU HAVE A TENT,

21  JUST HAS THE BRATZ NAME ON IT, NO ART WORK, NOTHING THAT YOU

22  COULD POINT TO THAT WOULD SAY IT'S DIRECTLY INFRINGING BECAUSE

23  THERE'S NO VISUAL WORK ON IT -- WE'RE SEEKING INDIRECT PROFITS.

24  THAT'S OUR THEORY. THE FACT IS THAT THERE IS A CAUSAL

25  CONNECTION BETWEEN THE TWO.

1        **THE COURT:** I UNDERSTAND YOUR CONNECTION TO IT, BUT

2   I'M TRYING TO EVALUATE THEIR ABILITY TO DEFEND AGAINST THAT

3   THEORY.

4        **MR. ZELLER:** I THINK FOR PURPOSES OF INDIRECT

5   PROFITS, IT'S JUST A DIFFERENT DOCTRINE. I DON'T THINK THE

6   COURT NEEDS TO RESOLVE WHETHER CREATIVITY WENT INTO CREATING

7   THE TENT, FOR EXAMPLE, BECAUSE WE'RE LOOKING FOR THE INDIRECT

8   PROFITS THAT MGA OBTAINED AS A BENEFIT BECAUSE OF THE

9   INFRINGEMENT.

10        EVEN IF THERE'S NOT AN INFRINGEMENT, PER SE, THAT,

11   SAY, THE LICENSEE ENGAGED IN -- BECAUSE ALL OF THIS EXISTS

12   BECAUSE OF THE SUCCESS OF OUR WORKS WHICH WE SAY HAVE BEEN

13   INFRINGED. SO WE'RE KIND OF INTO A DIFFERENT -- AND MAYBE THE

14   BEST KIND OF ILLUSTRATION --

15        **THE COURT:** UNLESS MGA CAN SHOW THAT THEY

16   INDEPENDENTLY CREATED THIS APART FROM THOSE WORKS.

17        **MR. ZELLER:** EVEN IF THAT'S THE CASE, THE LICENSEE

18   HERE IS KEEPING THE REVENUE.

19        **THE COURT:** RIGHT.

20        **MR. ZELLER:** I MEAN, WE'RE NOT EVEN -- IT'S NOT LIKE

21   WE'RE SAYING --

22        **THE COURT:** YOU'RE NOT GOING AFTER THE LICENSEES AT

23   THIS POINT.

24        **MR. ZELLER:** CORRECT.

25        **THE COURT:** AT THIS POINT.

1          **MR. ZELLER:** EXACTLY. AND WE'RE NOT SAYING, 'MGA PAY

2   US THE EQUIVALENT OF DAMAGES OF WHAT THE LICENSEE EARNED.'

3          **THE COURT:** RIGHT. THAT'S CLEARLY NOT PART OF THIS

4   CASE.

5          **MR. ZELLER:** CORRECT.

6          AND KIND OF THE BEST ANALOGY IN THAT SITUATION IS

7   LIKE THAT CASINO CASE THE COURT MAY BE FAMILIAR WITH, WHERE

8   THEY WERE PIPING IN INFRINGING MUSIC AND THEY BASICALLY SAID,

9   'WELL, WE'LL TAKE FIVE PERCENT OF THE REVENUES.' THAT

10  SOMETIMES IS APPLIED IN ADVERTISING CASES AND THAT SORT OF

11  THING. THAT'S REALLY THE DOCTRINE WE'RE GOING UNDER FOR THOSE

12  KINDS OF --

13         **THE COURT:** NONE OF THIS -- I MEAN, YOU SAY MAY OR

14  MAY NOT BE PERMITTED, BUT CLEARLY, YOU RECOGNIZE THAT THEY ARE

15  PERMITTED TO HAVE THEIR EMPLOYEES, OR ANYBODY ELSE, POINT

16  OUT -- FOR WHICH SUFFICIENT FOUNDATION IS LAID, POINT OUT THE

17  DIFFERENCES BETWEEN THE PROTECTABLE ELEMENTS, AS I'VE SET

18  FORTH -- AND I'M JUST ABOUT DONE WITH THAT ORDER AS WELL. I DO

19  PROMISE, COME CLOSE TO PROMISING, THAT BOTH ORDERS WILL BE OUT

20  TODAY, THE ONE ON PROTECTABLE ELEMENTS AND THE ONE ON THE

21  MISTRIAL. I'M JUST ABOUT DONE. I'VE TURNED IN LAST REVISIONS.

22         SO, HOPEFULLY, WE'LL HAVE THAT VERY SHORTLY.

23         **MR. ZELLER:** IF I MAY INTERRUPT, YOUR HONOR.

24         **THE COURT:** -- PERMITTED TO POINT OUT DIFFERENCES

25  BETWEEN THE DRAWINGS AND THE -- THE PROTECTABLE ELEMENTS ON THE

```
 1   DRAWINGS AND THE INFRINGING WORKS.  THAT SEEMS TO BE FAIR GAME.
 2        MR. ZELLER:  I AGREE, YOUR HONOR.  JUST TO CLARIFY
 3   WHAT WE'RE SAYING IN THE BRIEF -- I MEAN, IT'S EXACTLY THE
 4   POINT THE COURT WAS MAKING; ASSUMING FOUNDATION, ASSUMING
 5   RELEVANCE, ASSUMING ANY NUMBER OF OTHER KINDS --
 6        THE COURT:  ASSUMING FOUNDATION.  THE QUESTION IS, IS
 7   IT RELEVANT?  AND I THINK IT IS RELEVANT.
 8        MR. ZELLER:  THERE'S NO DISAGREEMENT THAT, YOU KNOW,
 9   HAVING SOMEBODY -- PROPER WITNESS, PROPER TIME, DOING THE
10   PROPER QUESTIONING, IF THEY ARE ASKED QUESTIONS ABOUT POINTING
11   OUT DIFFERENCES IN THE RELEVANT PRODUCTS, THEN I THINK THAT'S
12   ACCEPTABLE.
13        THE COURT:  AND IT'S ALSO CLEAR THAT MGA NEEDS TO BE
14   ABLE TO REBUT EVIDENCE THAT YOU HAVE INTRODUCED TO ESTABLISH
15   THE SCOPE OF YOUR INDIRECT CAUSATION.  FOR EXAMPLE, YOU
16   INTRODUCE EVIDENCE SAYING MARGARET LEAHY BASED HER SCULPTING ON
17   THE DRAWINGS.  MARGARET LEAHY CAN STAND UP HERE AND SAY,
18   'IXNAY, I DID NOT BASE MY SCULPT ON THE DRAWINGS.'
19        THAT ALL COMES IN; RIGHT?
20        MR. ZELLER:  WELL, I THINK THAT SOMEWHAT DEPENDS.
21   AND THIS IS ANOTHER WAY OF CARVING THIS OUT, BECAUSE THERE'S
22   TWO DIMENSIONS TO THIS.
23        YOU KNOW, ARE WE TALKING ABOUT --
24        THE COURT:  SO TO SPEAK.
25        MR. ZELLER:  YEAH.
```

```
 1              I THINK THERE'S SORT OF THE NONCREATIVE ASPECT, WE'LL

 2    CALL IT LOOSELY, AND THEN THE CREATIVE ASPECT, WE'LL CALL IT

 3    LOOSELY.  SO IF WE HAVE SOMEBODY LIKE MARGARET LEAHY ON THE

 4    STAND -- NOW, IF SHE'S TALKING ABOUT THE NONCREATIVE WORK, I

 5    DON'T KNOW THAT THERE COULD BE A SERIOUS DISPUTE, BUT THAT

 6    STUFF IS JUST IRRELEVANT.  THE DETAIL THAT GOES INTO THE

 7    MANUFACTURING, 'WE DID X, Y, Z IN ORDER TO MAKE IT

 8    MANUFACTURABLE,' THAT JUST SEEMS AWFULLY DIFFICULT TO

 9    UNDERSTAND HOW THAT WOULD BE RELEVANT.

10              THE COURT:  THAT'S THE SWEAT AND BROW STUFF.

11              MR. ZELLER:  CORRECT.  SO I THINK THAT STUFF IS THE

12    EASIER CASE AND THAT THAT'S OUT.

13              IN TERMS OF WHAT WE'LL CALL THE CREATIVITY THAT GOES

14    INTO IT --

15              THE COURT:  INSPIRATION.

16              MR. ZELLER:  CORRECT.  INSPIRATION, CREATIVITY, OR

17    WHATEVER.

18              I THINK THERE'S A HUGE DIFFERENCE BETWEEN

19    MARGARET LEAHY SITTING UP THERE AND SAYING, 'LET ME POINT TO

20    YOU THE DIFFERENCES BETWEEN THIS DRAWING AND THE SCULPT THAT I

21    WORKED ON' --

22              THE COURT:  BUT SHE SHOULD BE ABLE TO GO FURTHER THAN

23    THAT AND SAY, 'LISTEN, I WAS NOT INSPIRED.  DRAWINGS?  WHAT

24    DRAWINGS?  I DON'T KNOW WHAT DRAWINGS YOU'RE TALKING ABOUT.'

25              I MEAN, YOU MAY BE ABLE TO IMPEACH HER.  THAT'S A
```

1  FACTUAL ISSUE FOR THE JURY TO DECIDE. AND IF SHE TAKES THE

2  POSITION THAT, 'YEAH, I SAW THE DRAWINGS. I TOSSED THEM IN THE

3  TRASH. I CAME UP WITH THE DOLL ON MY OWN' -- WHETHER THAT'S

4  TRUE OR NOT, I DON'T KNOW, BUT THAT'S THE TYPE OF EVIDENCE THAT

5  WOULD BE ADMISSIBLE.

6          **MR. ZELLER:** YOU SEE, THAT'S WHERE-- I DON'T THINK

7  IT'S ADMISSIBLE.

8          **THE COURT:** EXPLAIN.

9          **MR. ZELLER:** HERE'S WHY, YOUR HONOR:

10          EVEN ASSUMING THAT WHAT SHE IS TESTIFYING TO IS,

11  'THIS IS MY OWN CREATIVE INPUT; THIS IS WHAT I, MARGARET LEAHY

12  MYSELF, CAME UP WITH,' THE FACT IS, IT'S STILL NOT LEGALLY

13  RELEVANT.

14          **THE COURT:** WE'RE ALMOST TALKING TWO SIDES OF THE

15  SAME COIN.

16          SHE CERTAINLY CAN SAY, 'I DID NOT RELY ON THE

17  DRAWINGS.'

18          **MR. ZELLER:** THAT'S FAIR GAME.

19          **THE COURT:** HOW DO YOU SAY, 'I DID NOT RELY ON THE

20  DRAWINGS' -- ISN'T SAYING 'I RELIED ON SOMETHING ELSE' JUST

21  ANOTHER WAY OF SAYING 'I DID NOT RELY ON THE DRAWINGS'?

22          I THINK I'M WITH YOU IN TERMS OF GOING BEYOND THAT

23  AND GETTING INTO THE WHOLE PRODUCTION PROCESS, BUT IN TERMS OF

24  WHAT INSPIRED HER MOLD --

25          **MR. ZELLER:** AND I DON'T KNOW THAT THERE'S

```
 1   NECESSARILY -- AT THAT LEVEL, THAT THERE'S THAT MUCH AGREEMENT.

 2   IF THE COURT IS ASKING -- CLEARLY, IF SHE'S THERE TO REBUT AND

 3   SHE SAYS, 'I DIDN'T RELY ON THE DRAWINGS; I MYSELF DID IT,'

 4   THAT'S ONE THING.  AND CLEARLY, IF IT BECOMES AN ISSUE AS TO

 5   HOW WAS SHE ACTUALLY INSPIRED, THEN THAT OPENS THAT DOOR.  BUT

 6   WHAT I DON'T THINK IS PROPER -- I DON'T THINK IT'S PROPER FOR

 7   THEM TO PUT ANYONE UP ON THE STAND AND SAY, 'LET ME WALK YOU

 8   THROUGH THE THOUSAND CREATIVE CHOICES I MADE TO GET FROM THE

 9   BEGINNING OF THE PROCESS TO THE END.'  AND THE REASON IS

10   BECAUSE ULTIMATELY, NO MATTER HOW MUCH -- EVEN IF IT'S ALL

11   TRUE, EVEN IF THEY PUT CREATIVE PROCESS INTO IT, IT IS LEGALLY

12   IRRELEVANT, BECAUSE AT THE END OF THE DAY --

13            THE COURT:  I UNDERSTAND YOUR ARGUMENT ON THAT.

14            MR. ZELLER:  IT'S AN UNAUTHORIZED DERIVATIVE WORK AT

15   THE END OF THE DAY, AT BEST, BUT IT'S STILL AN INFRINGEMENT.

16            THE COURT:  I THINK THAT'S ALL OF THE QUESTIONS I

17   HAVE FOR YOU, MR. ZELLER.  THANK YOU.

18            MR. ZELLER:  THANK YOU.

19            THE COURT:  LET ME HEAR FROM MGA.  I HAVE SOME

20   QUESTIONS FOR MGA AS WELL.

21            THE FIRST ARGUMENT ON OBJECTIONS, YOU'RE CERTAINLY

22   NOT TAKING THE POSITION THAT A FAILURE TO OBJECT TO A STATEMENT

23   IN OPENING, OR A FAILURE TO OBJECT TO EXHIBITS PRIOR TO TRIAL,

24   WAIVES OBJECTIONS DURING TRIAL.

25            MS. AGUIAR:  I THINK THERE ARE SEVERAL ASPECTS TO
```

```
 1   THAT FIRST ARGUMENT IN OUR BRIEF, YOUR HONOR.

 2           IT ALL RELATES TO ONE PRIMARY POINT, WHICH IS THAT

 3   THIS IS THE FIRST TIME IN THE COURSE OF THIS LITIGATION THAT

 4   WE'RE HEARING THIS ARGUMENT FROM MATTEL.  IT IS ON THE EVE,

 5   LITERALLY ON THE EVE, OF WHEN WE'RE ABOUT TO START OUR

 6   CASE-IN-CHIEF.

 7           IN THE SUMMARY JUDGMENT BRIEFS, WE MADE IT CLEAR THAT

 8   WE WERE GOING TO ARGUE THIS.  MATTEL DID NOT RAISE ANY ISSUE IN

 9   THE SUMMARY JUDGMENT BRIEFING TO SAY, 'WELL, YOU CAN'T MENTION

10   THAT KIND OF STUFF; IT'S IRRELEVANT; AND, THEREFORE, YOU CAN'T

11   RAISE THOSE ISSUES TO REBUT SUMMARY JUDGMENT.'

12           THE COURT:  ARE THEY UNDER AN OBLIGATION TO DO SO?

13           MS. AGUIAR:  I WOULD THINK IF WE WERE RAISING IT IN

14   OPPOSITION TO SUMMARY JUDGMENT AND SAYING, 'WE ARE GOING TO

15   SHOW THIS AND SHOW THE DEVELOPMENT AND SHOW THE DIFFERENT STEPS

16   AND SHOW THE INDEPENDENT CREATION,' I WOULD THINK, YES,

17   ABSOLUTELY.  IF THEY THOUGHT THAT THIS WAS NOT AN ARGUMENT THAT

18   COULD LEGALLY BE MADE, OR AS MR. ZELLER IS NOW URGING, THAT IT

19   WAS TOTALLY IRRELEVANT, I FEEL PRETTY SURE THAT GIVEN THE

20   CALIBER OF ATTORNEYS IN THIS CASE, THEY WOULD HAVE SAID AT THE

21   TIME THAT THAT WAS NOT RELEVANT.

22           THE COURT:  I THINK THE CALIBER OF THE ATTORNEYS IN

23   THIS CASE SPEAKS TO WHY THEY DIDN'T SHAPE THE OPPONENT'S

24   LITIGATION STRATEGY.

25           MS. AGUIAR:  YOUR HONOR, THIS WAS LAID OUT IN THE
```

1   JURY INSTRUCTIONS.

2        **THE COURT:** I UNDERSTAND THAT. WE HAVEN'T GOTTEN TO

3   JURY INSTRUCTIONS YET.

4        CAN YOU GIVE ME ANY AUTHORITY THAT SUGGESTS THAT ONE

5   PARTY IS OBLIGED TO OBJECT, IN ADVANCE OF TRIAL, ON RELEVANCY

6   GROUNDS, TO ARGUMENTS THAT THEY KNOW ARE GOING TO BE MADE AT

7   TRIAL?

8        **MS. AGUIAR:** LET ME JUMP TO YOUR QUESTION ABOUT

9   OPENING STATEMENT.

10       BOTH MR. NOLAN AND MR. PRICE AND MR. QUINN -- WHEN

11   THEY WERE MAKING THEIR OPENINGS, THERE WERE OBJECTIONS BASED ON

12   RELEVANCE, ABSOLUTELY. I SPECIFICALLY RECALL MR. PRICE

13   OBJECTING AT LEAST ONCE WHEN MR. NOLAN WAS MAKING ARGUMENTS;

14   OBJECTION RELEVANCE.

15       **THE COURT:** BUT THERE WERE OTHER STATEMENTS MADE IN

16   OPENING TO WHICH OBJECTIONS WERE NOT MADE THAT BOTH SIDES HAVE

17   SUBSEQUENTLY OBJECTED, AND THE COURT HAS SUSTAINED THOSE

18   OBJECTIONS. MR. PRICE, FOR EXAMPLE, MADE STATEMENTS IN OPENING

19   THAT MR. NOLAN AND YOU AND OTHERS HAVE OBJECTED TO. WHEN WE

20   GOT AROUND TO IT, THE COURT HAS SUSTAINED THOSE OBJECTIONS.

21       JUST BECAUSE -- I GUESS I'M TRYING TO -- WHEN I READ

22   THIS, I COULDN'T THINK OF ANY AUTHORITY -- I'VE NEVER BEEN

23   PRESENTED WITH A SITUATION WHERE ONE SIDE HAS ARGUED THAT

24   BECAUSE AN OBJECTION WAS NOT MADE DURING AN OPENING STATEMENT

25   TO EVIDENCE THAT SOMEHOW NOW THAT OBJECTION IS WAIVED, LET

```
 1  ALONE AN ARGUMENT THAT BECAUSE A MOTION IN LIMINE WAS NOT
 2  BROUGHT OR A REPLY WAS NOT FILED TO A MOTION FOR SUMMARY
 3  JUDGMENT THAT SOMEHOW NOW THE OBJECTION IS WAIVED. I'VE NEVER
 4  SEEN THAT IN MY CAREER, BUT...
 5          MS. AGUIAR:  THE POINT I'M MAKING, THOUGH, YOUR
 6  HONOR, IS THAT WE HAVE MADE IT PERFECTLY CLEAR THROUGHOUT THAT
 7  THIS WAS AN ARGUMENT THAT WE WERE GOING TO BE MAKING.  WE MADE
 8  THAT STATEMENT IN OPENING.  HAVING DRAWN NO OBJECTION, WE WOULD
 9  BE PREJUDICED IF WE WERE PUT IN THE POSITION OF NOT BEING ABLE
10  TO MAKE GOOD ON THE STATEMENTS THAT MR. NOLAN MADE IN OPENING
11  REGARDING 'THE EVIDENCE WILL SHOW THIS' OR 'THE EVIDENCE WILL
12  SHOW THAT.'
13          THAT, TO ME, IS WHY THERE'S A PROCESS OF BEING ABLE
14  TO OBJECT TO STATEMENTS THAT ARE MADE IN OPENING.  BUT THAT'S
15  NOT MY PRIMARY ARGUMENT.
16          THE COURT:  I DON'T THINK IT'S OF ANY MOMENT AT ALL,
17  ACTUALLY, BECAUSE I -- IT'S THE FIRST ARGUMENT YOU PUT UP, SO
18  THAT'S WHY I'M ADDRESSING IT FIRST.  BUT THE PROCESS REQUIRES
19  DISCLOSURE OF EVIDENCE SO THAT THERE'S NOT TRIAL BY AMBUSH IN
20  TERMS OF DISCOVERY.  AND THE COURT WILL DO ITS BEST TO ADDRESS
21  THAT, WHILE AT THE SAME TIME, I'VE GIVEN BOTH SIDES LEAVE TO
22  PRODUCE DISCOVERY IN THE MIDDLE OF TRIAL BECAUSE OF THE UNUSUAL
23  CIRCUMSTANCES OF THIS TRIAL.  I'M PERMITTING MGA AND MR. LARIAN
24  TO PRODUCE UPDATED FINANCIAL INFORMATION IN THE MIDDLE OF
25  TRIAL.  I'VE ALLOWED MATTEL TO PROVIDE CERTAIN UPDATED AND NEW
```

 1   EVIDENCE IN THE MIDDLE OF TRIAL.  THAT'S GENERALLY DISFAVORED,

 2   AND I UNDERSTAND BOTH THE RULE AND STATUTORY AND CASE LAW BASIS

 3   FOR LIMITING THAT.  I'VE JUST NEVER HEARD -- AND MAYBE IT'S MY

 4   OWN INEXPERIENCE, BUT IN 18 YEARS, I'VE NEVER HEARD OF A

 5   POSITION THAT SOMEHOW AN OBJECTION IS WAIVED TO A LEGAL

 6   ARGUMENT OR TO EVIDENCE BECAUSE IT HAS NOT BEEN RAISED IN A

 7   MOTION *IN LIMINE* OR IN A REPLY TO A MOTION FOR SUMMARY

 8   JUDGMENT.  THAT, TO ME, IS JUST -- YOU CAN CALL IT STRATEGY,

 9   BUT, I MEAN, I JUST DON'T THINK A SIDE IS REQUIRED TO DO THAT.

10        **MS. AGUIAR:**  I UNDERSTAND.  LET ME CLARIFY THE FIRST

11   POINT AND SECOND POINT IN THE BRIEF, YOUR HONOR.

12        THE FIRST POINT WAS THAT THIS ISSUE HAS BEEN CLEARLY

13   RAISED ALL ALONG AND NEVER OBJECTED TO.

14        THE SECOND ONE WAS THAT MATTEL'S CASE-IN-CHIEF IN

15   1-B -- QUESTIONING STARTING WITH THE VERY FIRST WITNESS,

16   NINETTE PEMBLETON, AS WELL AS MR. LARIAN -- THE FOCUS CLEARLY

17   WAS, 'ALL YOU HAD WAS THESE DRAWINGS.'  THE QUESTIONS WERE,

18   'YOUR SOLE INSPIRATION' --

19        **THE COURT:**  I'M WITH YOU ON THAT.  I HAVE "FAIR GAME"

20   WRITTEN NEXT TO THAT ARGUMENT.  YOU CAN ABSOLUTELY REBUT THAT.

21   THAT'S FAIR GAME.  SO YOU'VE CONVINCED ME ON THAT.  THAT PART

22   OF THE FIRST SECTION, I'M WITH YOU.

23        **MS. AGUIAR:**  OKAY.  AND THE PURPOSE OF THAT FIRST

24   SECTION WAS TO SAY, BEFORE WE EVEN GET TO THE REASONS WHY THIS

25   IS LEGALLY RELEVANT, AS AN EQUITABLE MATTER, THIS ARGUMENT HAS

1    BEEN PRESSED BY MGA THROUGHOUT; AND FRANKLY, I THINK, BASED ON

2    THAT, MATTEL RECOGNIZED THAT THAT'S WHAT WE WERE GOING TO

3    ARGUE; SO THIS IS THEIR STRATEGY IN THEIR 1-B CASE, WHICH

4    THEY'RE ABOUT TO REST WITHIN THE HOUR, I SUSPECT.

5         SO THEIR STRATEGY, WE NOW KNOW, BECAUSE THEY'RE ABOUT

6    TO FINISH THEIR 1-B CASE -- THEIR STRATEGY WAS TO SAY, 'THIS IS

7    ALL YOU HAD.'  AND WE'RE ENTITLED TO DESCRIBE THAT THIS IS NOT

8    ALL WE HAD.  WE HAD MARGARET LEAHY.  MARGARET LEAHY, THROUGH

9    HER INDEPENDENT CREATIVITY --

10        **THE COURT:**  LET'S GO TO THAT.  THAT'S THE SECOND

11   ARGUMENT.

12        I DID REFRESH MYSELF WITH NIMMER'S CHAPTER ON

13   INDEPENDENT CREATION.

14        THE STANDARD FOR INDEPENDENT CREATION IS NOT QUITE AS

15   SIMPLE AS THE FEW CASES THAT YOU CITED.  I LOOKED AT THOSE

16   CASES IN GREATER DETAIL.

17        YOU CERTAINLY HAVE A RIGHT TO PRESENT A DEFENSE OF

18   INDEPENDENT CREATION.  AT THIS POINT, I DON'T HAVE THAT

19   EVIDENCE BEFORE ME.

20        **MS. AGUIAR:**  WE HAVE NOT PUT IN OUR CASE YET.

21        **THE COURT:**  I UNDERSTAND.  BUT YOU'RE NOT GOING TO

22   PUT IT BEFORE THE JURY UNTIL I'M SATISFIED THAT THERE IS A

23   SUFFICIENT BASIS TO PRESENT IT TO THE JURY; MUCH LIKE A

24   SELF-DEFENSE OR A DURESS-DEFENSE.  THE COURT NEEDS TO BE

25   SATISFIED THAT THERE IS SUFFICIENT EVIDENCE OF INDEPENDENT

1    CREATION BEFORE IT GOES TO THE JURY. AT LEAST THAT'S WHAT THE

2    AUTHORITY SEEMS TO SUGGEST.

3            BECAUSE OTHERWISE, YOU RUN INTO THE VERY DANGEROUS

4    WATERS, DESCRIBED IN THE CASE CITED BY MATTEL, OF CONFUSING THE

5    JURY ON THIS.

6            THE INDEPENDENT CREATION IS NOT JUST A MATTER OF,

7    'WELL, WE TOOK SOME OF THE COPYRIGHTED WORK, AND THEN WE ADDED

8    A WHOLE BUNCH OF STUFF TO IT OURSELVES.' THAT'S NOT

9    INDEPENDENT CREATION.

10           **MS. AGUIAR:** THAT'S NOT WHAT WE'RE ARGUING.

11           **THE COURT:** INDEPENDENT IS, 'YEAH, WE DID HAVE ACCESS

12   TO THE COPYRIGHTED WORK, BUT THAT'S NOT WHAT WE LOOKED AT. WE

13   INDEPENDENTLY CREATED THIS DOLL WHOLLY AND APART FROM THOSE

14   DRAWINGS.'

15           IF YOU HAVE EVIDENCE OF THAT, A, I'VE NOT HEARD IT;

16   B, I'VE HEARD EVIDENCE TO THE CONTRARY FROM THE CEO; AND, C,

17   I'LL GIVE YOU COMPLETE LEEWAY TO PRESENT AND PROFFER THAT

18   EVIDENCE TO THE COURT. THEN I'M GOING TO HAVE TO BE SATISFIED

19   BEFORE I LET THAT INTO THE JURY.

20           **MS. AGUIAR:** THE WAY I READ THE CASES, YOUR HONOR, IS

21   THAT WHEN MATTEL PUTS FORTH A PRIMA FACIE CASE OF ACCESS AND

22   SUBSTANTIAL SIMILARLY -- AND I'M ASSUMING FOR PURPOSES OF THIS

23   STATEMENT THAT YOU WILL CONCLUDE THAT THEY HAVE DONE THAT --

24           **THE COURT:** YES.

25           **MS. AGUIAR:** -- THEN WE ARE --

```
 1         THE COURT:  WELL, THE SUBSTANTIAL SIMILARITY, I'M
 2   GOING TO BE HEARING EVIDENCE OF THAT.  I DON'T KNOW ABOUT THE
 3   SUBSTANTIAL SIMILARITY.  YOU'VE GOT EXPERTS; YOU'VE GOT PEOPLE
 4   WHO SAY THAT THEY'RE NOT SUBSTANTIALLY SIMILAR AT ALL.  SO I'M
 5   NOT THERE ON THE SUBSTANTIAL SIMILARITY, AND THAT EVIDENCE
 6   CERTAINLY COMES IN.
 7         MS. AGUIAR:  I GUESS WHAT I'M SAYING IS, THE WAY THE
 8   CASES DISCUSS THE BURDEN-SHIFTING IS ALMOST LIKE A BURSTING
 9   BUBBLE, THAT MATTEL SAYS, 'OKAY, YOU HAD ACCESS AND THEY'RE
10   SUBSTANTIALLY SIMILAR.'
11         THE BURDEN AT SOME POINT COMES BACK TO US, AND WHEN
12   WE START OUR CASE LATER TODAY, THAT BURDEN WILL BE ON US TO
13   SHOW THAT WE DIDN'T COPY.  SO I ACTUALLY THINK THAT TO PRECLUDE
14   US FROM OFFERING EVIDENCE THAT WE DIDN'T COPY THE WORK PREVENTS
15   US FROM PUTTING ON A DEFENSE.
16         THIS IS NOT A CASE, YOUR HONOR, OF BURYING
17   COPYRIGHTED MATERIAL IN OTHER MATERIAL.  THIS IS JUST NOT
18   ANALOGOUS TO THE CASES WHERE YOU HAVE A 7-CD TRACT --
19         THE COURT:  I AGREE WITH THAT.
20         MS. AGUIAR:  SO THE 7-TRACK CD CASE OR THE CHAPTERS
21   IN A BOOK, WHERE WE COPIED ONE CHAPTER --
22         THE COURT:  WAIT A SECOND.
23         ACTUALLY, DEPENDING ON HOW YOUR EVIDENCE PLAYS OUT,
24   IT MAY BE LIKE THAT, ALTHOUGH IT'S A VISUAL WORK AND NOT A
25   BOOK.  THERE'S A DIFFERENCE BETWEEN -- THE EIGHT TRACKS OF A
```

 1  CD -- YOU HAVE SIX TRACKS THAT ARE NOT INFRINGING AND YOU HAVE

 2  ONE THAT IS INFRINGING, FOR APPORTIONMENT PURPOSES, IF THE

 3  WHOLE THING SELLS WITH THE SEVEN TRACKS, YOU'RE ONLY -- FOR

 4  DAMAGES PURPOSES, YOU'RE ENTITLED TO ONE-SEVENTH.  THAT'S THE

 5  APPORTIONMENT.  BUT IN TERMS OF DETERMINING WHETHER OR NOT THAT

 6  ONE TRACK IS COPYRIGHTED, IT MAY BE THAT TWO-THIRDS OF IT IS

 7  BORROWED FROM SOMETHING ELSE AND ONE-THIRD OF IT IS INNOVATIVE

 8  NEW WORDS OR SOMETHING ON THE TRACK.  BUT BECAUSE THE WHOLE

 9  THING IS -- THE WHOLE SONG IS INEXTRICABLY INTERTWINED WITH

10  COPYRIGHTED MATERIAL, YOU LOSE THAT ENTIRE SONG.  YOU DON'T GET

11  TO SEVER OUT OR, MIND YOU, PRESENT EVIDENCE THAT ONE-THIRD OR

12  TWO-THIRDS OR 48 PERCENT OF IT IS NEW AND CREATIVE WORK.

13          IF YOU TAKE THE VERSE, FOR EXAMPLE, TO USE THE

14  EXAMPLE, AND YOU COPIED THE REFRAIN BUT YOU ADD A FEW MORE

15  VERSES, YOU'VE STILL COPIED THE SONG, AS IT WERE, AND THERE'S A

16  COPYRIGHT INFRINGEMENT THERE.

17          NOW, TO USE YOUR BOOK ANALOGY, IF YOU -- IT'S

18  DIFFERENT BECAUSE IT'S LITERARY WORK AND NOT VISUAL WORK, BUT

19  THE IDEA OF THE WORK BEING PERMEATED WITH COPYRIGHTED INFRINGED

20  MATERIAL, THEN, DEPENDING ON OTHER CIRCUMSTANCES, THE WHOLE

21  BOOK GETS VIEWED AS AN INFRINGEMENT.  YOU DON'T GET TO SAY,

22  'OH, WELL, THERE'S THESE THREE CHAPTERS THAT WE WROTE

23  OURSELVES; AND, THEREFORE, WE GET THREE-FIFTHS,' IF THERE'S

24  FIVE CHAPTERS IN TOTAL.

25          **MS. AGUIAR:**  BUT OUR WHOLE POINT OF OUR CASE IS THAT

```
 1    HE HAD AN IDEA, WHICH IS NOT COPYRIGHTABLE, IN HIS DRAWINGS,

 2    AND THE COPYRIGHT LAW ENCOURAGES YOU TO BUILD ON IDEAS --

 3              THE COURT:  YES.

 4              MS. AGUIAR:  -- BUT NOT COPY THEM.

 5              THE COURT:  RIGHT.

 6              MS. AGUIAR:  OUR WHOLE POINT OF OUR CASE IS THAT WE

 7    DIDN'T COPY THEM.  WE WANTED OUR DOLLS TO LOOK DIFFERENT THAN

 8    THE DRAWINGS.

 9              THE COURT:  THAT EVIDENCE WOULD COME IN.  IF YOU HAVE

10    EVIDENCE -- IF YOU HAVE COMPETENT EVIDENCE THAT SAYS THAT YOU

11    WANTED YOUR DOLLS TO LOOK DIFFERENT THAN THE DRAWINGS, THAT

12    COMES IN.

13              MS. AGUIAR:  AND MARGARET LEAHY'S TESTIMONY IS

14    EXHIBIT A FOR INDEPENDENT CREATION.

15              THE COURT:  YOU'RE GROUPING HER -- I DON'T HAVE HER

16    TESTIMONY BEFORE ME, COUNSEL.  I'M GOING TO BE RULING ON

17    OBJECTIONS, AND I WANT TO GIVE YOU AS MUCH -- THE WHOLE POINT

18    OF THIS EXERCISE HERE IS NOT TO NECESSARILY EXCLUDE OR

19    DEFINITIVELY RULE ON ANY -- SAYING THAT THIS PERSON CAN TESTIFY

20    OR NOT TESTIFY.  I'M TRYING TO GIVE YOU INFORMED GUIDANCE AS TO

21    WHERE THE COURT IS GOING TO SUSTAIN OR NOT SUSTAIN OBJECTIONS

22    ON RELEVANCY GROUNDS.  THAT'S THE GUIDANCE I'M TRYING TO GIVE

23    YOU AND HAVE YOU INTERFACE WITH ME SO THAT WE CAN COME UP WITH

24    A WORKABLE STANDARD HERE.

25              MARGARET LEAHY IS GOING TO TESTIFY THIS AFTERNOON, I
```

```
1  PRESUME, AND THAT'S FINE.  THE POINT IS, HOW FAR INTO THE
2  PROCESS, PRODUCTION PROCESS, ARE WE GOING?  WHAT ARE THE
3  ELEMENTS THAT SHE'S GOING TO BE ABLE TO TESTIFY TO?  AND
4  EVIDENCE -- ANYWAYS...
5        MS. AGUIAR:  MAY I INTERJECT SOMETHING HERE AT THIS
6  POINT WHICH I THINK IS ESPECIALLY RELEVANT?
7        THE COURT:  SURE.
8        MS. AGUIAR:  WE'RE DEALING WITH HOW MGA, AND
9  MARGARET LEAHY BEING ONE OF THE MGA VENDORS, CREATED THIS WORK.
10 THIS IS NOT A QUESTION OF TAKING CARTER BRYANT'S DRAWINGS --
11 AND LET'S SAY THEY WERE A CARTOON -- AND INSTEAD OF TURNING
12 THEM INTO A DOLL, WE WERE TAKING THEM AND CREATING A CARTOON OF
13 THEM; AGAIN, A TWO-DIMENSIONAL THING.  THAT WOULD BE DIFFERENT,
14 BECAUSE THEN YOU'D JUST BE LOOKING AT, OKAY, DOES THE EYE IN
15 THE TWO-DIMENSIONAL DRAWING HERE LOOK LIKE THE EYE IN THE
16 TWO-DIMENSIONAL CARTOON?  SO WE TURNED THE BRATZ, BASICALLY,
17 INTO A COMIC BOOK.
18        THAT IS NOT AT ALL WHAT WE HAVE HERE.
19        THE COURT:  I UNDERSTAND THAT.
20        MS. AGUIAR:  AND THE REASON THAT WE -- I KNOW YOU
21 UNDERSTAND, BUT I WANT TO EXPLAIN HOW I THINK IT'S RELEVANT TO
22 THIS PARTICULAR ISSUE.  BECAUSE THE JURY IS GOING TO BE ASKED
23 TO COMPARE A THREE-DIMENSIONAL DOLL AND DECIDE WHETHER IT'S
24 SUBSTANTIALLY SIMILAR TO A DRAWING WHICH, BY DEFINITION,
25 DOESN'T HAVE THREE DIMENSIONS.  THAT'S NOT A SCULPT THAT YOU'RE
```

```
 1   LOOKING AT ON THAT PAGE.  THAT'S A FRONT VIEW, FLAT

 2   ILLUSTRATION.  IT DOES NOT SHOW HOW DEEP THE HEAD SHOULD BE.

 3           THE COURT:  ALL THAT EVIDENCE COMES IN, COUNSEL.

 4           MS. AGUIAR:  OKAY.

 5           THE COURT:  THE EVIDENCE OF HOW THE SCULPT WAS

 6   CREATED AND ALL THE PRODUCTION, THAT DOES NOT COME IN.

 7           MS. AGUIAR:  I JUST WANTED TO CONFIRM THAT BECAUSE

 8   THAT IS CRITICAL TO OUR CASE.

 9           THE COURT:  AND YOU MAKE THAT -- SOMETHING BEING

10   CRITICAL TO SOMEONE'S CASE GOES NOWHERE WITH THIS COURT ON

11   EITHER SIDE.  JUST TO SAY THAT 'IT'S CRITICAL TO OUR CASE' --

12           MS. AGUIAR:  I MEANT TO SAY THAT GETTING THAT

13   CONFIRMATION FROM YOU WAS IMPORTANT.

14           THE COURT:  I'M NOT -- OKAY.  I'M GOING TO RULE ON --

15   I BUY THE CASES, AND I THINK THEY'RE DEAD ON, THAT MR. ZELLER

16   PRESENTED ON SWEAT AND BROW.

17           MS. AGUIAR:  I WANT TO ADDRESS THAT.

18           THE COURT:  SO I DON'T WANT ANYTHING I'M SAYING NOW

19   TO BE VIEWED OR INTERRUPTED OR QUOTED BACK TO ME AS UNDERMINING

20   THAT, BECAUSE I THINK THE ANALYSIS IS DEAD-ON.

21           MS. AGUIAR:  I DISAGREE.  AND MAY I EXPLAIN WHY?

22           THE COURT:  PLEASE.

23           MS. AGUIAR:  SWEAT OF THE BROW RELATES TO A TOTALLY

24   DIFFERENT QUESTION.  SWEAT OF THE BROW IS AN ANALYSIS THAT

25   PERTAINS TO ORIGINALITY, NOT TO SUBSTANTIAL SIMILARITY AND
```

1    COPYING.

2         SWEAT OF THE BROW GOES TO SOMEONE TRYING TO MAKE AN

3    ORIGINALITY ARGUMENT AND PEOPLE SAYING, 'YOU KNOW, IT DOESN'T

4    MATTER HOW LONG IT TOOK YOU TO COPY SOMETHING.  IF YOU COPIED

5    IT, THEN IT'S NOT ORIGINAL, AND IT CAN'T BECOME ORIGINAL JUST

6    BECAUSE YOU PUT A LOT OF SWEAT ON YOUR BROW.'  TOTALLY, TOTALLY

7    DIFFERENT.  SO, FRANKLY, I THINK THAT THEY ARE USING A CONCEPT

8    FROM A COMPLETELY INAPPLICABLE LEGAL IDEA HERE.  WE DON'T

9    CONTEST ORIGINALITY.  WE'RE NOT CLAIMING THAT THE BRATZ DOLL --

10   WE'RE NOT TRYING TO SAY THAT WE HAVE ORIGINALITY IN THE BRATZ

11   DOLLS TO PROVE COPYRIGHT.

12        THE ERG CASE THAT THEY CITE TO YOU -- THAT'S ONE OF

13   THE CASES --

14        **THE COURT:**  YES.

15        **MS. AGUIAR:**  -- EXACTLY THE OPPOSITE.  THE DEFENDANT

16   IN THE ERG CASE WAS TRYING TO SHOW THAT THE THREE-DIMENSIONAL

17   PILLSBURY DOUGHBOY WAS JUST LIKE THE TWO-DIMENSIONAL CHARACTER.

18   SO SWEAT OF THE BROW IS A CONCEPT THAT THE COURTS TALK ABOUT

19   WHEN THEY'RE TRYING TO DETERMINE WHETHER YOU'VE SHOWN

20   ORIGINALITY.

21        THAT IS NOT AT ISSUE IN THIS CASE.  AND YOUR HONOR

22   HAS RECOGNIZED THAT IT'S NOT AT ISSUE IN THIS CASE.

23        **THE COURT:**  ORIGINALITY HAS BASICALLY BEEN CONCEDED,

24   YES.

25        **MS. AGUIAR:**  RIGHT.  SO SWEAT OF THE BROW IS AN

1   ORIGINALITY CONCEPT; IT IS NOT A COPYRIGHT INFRINGEMENT,

2   SUBSTANTIAL SIMILARITY/INDEPENDENT CREATION CONCEPT.

3        SO I WOULD RESPECTFULLY SUBMIT, YOUR HONOR, THAT THE

4   SWEAT-OF-THE-BROW CASES ARE TOTALLY INAPPLICABLE HERE.

5        NOW, WE DO NOT PLAN, AS I SAID YESTERDAY, TO TALK

6   ABOUT THE FACT THAT SOMEONE PUT IN X NUMBER OF HOURS IN THIS.

7   THAT'S NOT THE PURPOSE OF THE TESTIMONY.

8        THE PURPOSE OF THE TESTIMONY IS TO REBUT.  IT'S THE

9   OPPOSITE OF THE ERG CASE.  OUR CASE HERE IS, 'WE DID NOT COPY

10  YOUR DRAWINGS.'  THE DEFENDANT IN ERG WAS TRYING TO SAY -- AND

11  THE QUOTE THAT I THINK IS SO TELLING FROM THEIR BRIEF SAYS --

12  THIS IS ON PAGE 4 -- "THE ARTISTIC DECISIONS AS TO WHAT CHANGES

13  SHOULD BE MADE TO THE COSTUMES SO THAT THE ORIGINAL CHARACTER'S

14  ESSENCE WOULD NOT BE LOST..."

15       SO IN ERG, IT WAS A 180.  AND WE ARE SAYING,

16  'ORIGINALITY, PUT IT TO THE SIDE.'  THE CASES THEY CITE ON

17  SWEAT OF THE BROW ARE COMPLETELY INAPPLICABLE.

18       LET'S MOVE ON TO A COMPLETELY SEPARATE AND DIFFERENT

19  ANALYSIS:  SUBSTANTIAL SIMILARITY.

20       WHEN THEY HAVE SUGGESTED ACCESS AND SIMILARITY, WE

21  MUST, AS A MATTER OF LAW AND AS A MATTER OF EQUITY, BE ABLE TO

22  EXPLAIN WHY WE DIDN'T COPY THAT WORK AND WHY WE MADE CONSCIOUS

23  DECISIONS, ALL ALONG THE WAY, TO CHANGE THAT.

24       SO I WOULD SUBMIT THAT, ACTUALLY, SWEAT OF THE BROW

25  IS NOT DEAD-ON IN THIS CASE.  AND IN SOME OF THOSE CASES,

    1   YOU'LL SEE THE DISTINCTION.

    2          LET'S GO TO THE WAYLAND CASE.  THERE'S A FOOTNOTE IN

    3   WAYLAND, FOOTNOTE 23 -- AND I THINK YOUR HONOR HAS ALREADY

    4   RECOGNIZED THIS, BUT IT SAYS, "ALTHOUGH NOT AN ISSUE IN THIS

    5   CASE, IT'S IMPORTANT TO NOTE THAT EVEN THE SHOWING OF

    6   SUBSTANTIAL SIMILARITY IS NOT DISPOSITIVE, FOR IT STILL OPENS

    7   THE ALLEGED INFRINGER TO PROVE THAT HIS WORK IS AN ORIGINAL

    8   CREATION OR THAT THE SIMILARITIES BETWEEN THE WORK WAS NOT ON

    9   ACCOUNT OF COPYING."

   10          I THINK YOU'VE ALREADY RECOGNIZED THAT.

   11          WHAT I'M SAYING --

   12          **THE COURT:**  AND ORIGINALITY IS NOT AN ISSUE, SO

   13   YOU'VE CONCEDED ON THAT POINT.

   14          **MS. AGUIAR:**  I HAVE.  BUT WHAT I'M SAYING IS, THEY

   15   CITE WAYLAND FOR A PROPOSITION --

   16          **THE COURT:**  BE CAREFUL -- I SUPPOSE IT'S TOO LATE.  I

   17   THINK YOU'VE CONCEDED ORIGINALITY, COUNSEL, SO INDEPENDENT

   18   CREATION --

   19          **MS. AGUIAR:**  WE'VE CONCEDED ORIGINALITY OF THE

   20   DRAWINGS.

   21          **THE COURT:**  YES.

   22          **MS. AGUIAR:**  NOT THE DOLLS.

   23          **THE COURT:**  I UNDERSTAND.  SO THERE'S A QUESTION THAT

   24   REMAINS ABOUT SUBSTANTIAL SIMILARITY BETWEEN THE DRAWINGS AND

   25   THE DOLLS.  THAT'S THE QUESTION THAT REMAINS.  ORIGINALITY,

```
 1   INDEPENDENT CREATION, THAT, ON THE COPYRIGHTED DRAWINGS, IS
 2   GONE; RIGHT?
 3          YOU CERTAINLY DON'T CONTEND THAT YOU INDEPENDENTLY
 4   CREATED THE DRAWINGS?
 5          MS. AGUIAR:  NO, NO, NO.
 6          THE COURT:  AT BEST, YOU'RE ARGUING THAT YOU
 7   INDEPENDENTLY CREATED THE DOLLS.
 8          MS. AGUIAR:  RIGHT.
 9          THE COURT:  THAT'S AN INDEPENDENT CREATION.
10          MS. AGUIAR:  I THINK WE'RE SAYING THE SAME THING.
11          HERE'S THE DRAWINGS ON THE ONE SIDE.  THEY ARE NOW
12   THE WORK THAT IS -- YES, THEY ARE THE WORK THAT IS ALLEGED TO
13   HAVE BEEN INFRINGED.
14          THE COURT:  THAT'S RIGHT.
15          MS. AGUIAR:  WE HAVE NOT, FOR MANY MONTHS, CONTESTED
16   ORIGINALITY OF THOSE DRAWINGS.
17          THE COURT:  RIGHT.
18          MS. AGUIAR:  SWEAT OF THE BROW GOES INTO THE CONCEPT
19   OF WHETHER THERE WAS ORIGINALITY.  IN OTHER WORDS, IT'S
20   COMPLETELY FLIPPED IN THIS CASE.  IT WOULD BE AS IF MATTEL OR
21   SOMEBODY WAS SAYING -- IT WOULD BE AS IF CARTER BRYANT WAS THE
22   DEFENDANT AND TRYING TO ARGUE ORIGINALITY OF THE DRAWINGS.
23   THAT'S NOT THE CASE HERE.
24          THE COURT:  CAN YOU CITE ME TO THE PORTION OF WAYLAND
25   OR ANY OF THESE CASES THAT SUGGEST THAT SWEAT OF THE BROW IS
```

```
 1    LIMITED TO THE CONCEPT OF ORIGINALITY AND -- AS OPPOSED TO THE
 2    CONCEPT OF COPYRIGHT CLAIMS.
 3         MS. AGUIAR:  BECAUSE THEY ARE ALWAYS IN DIFFERENT
 4    SECTIONS OF THE OPINION.  AND FEIST, WHICH IS THE CASE THAT
 5    THIS CAME OUT OF, YOUR HONOR --
 6         THE COURT:  YES.
 7         MS. AGUIAR:  FEIST IS AN ORIGINALITY CASE.  THAT WAS
 8    THE ISSUE IN FEIST.  AND I THINK IT'S VERY CLEAR FROM THEIR
 9    CITATIONS THAT THE QUESTION OF SWEAT OF THE BROW RELATES TO
10    ORIGINALITY.  THE CASES DISCUSS ACTUAL COPYING AND HOW A
11    DEFENDANT REBUTS ACTUAL COPYING COMPLETELY SEPARATELY FROM
12    DISCUSSING CONCEPTS AND ARGUMENTS ABOUT ORIGINALITY.
13         AGAIN, IN ERG AND IN FEIST, THE ISSUE WAS, IS A WORK
14    SUFFICIENTLY ORIGINAL?  AND PEOPLE WERE TRYING TO ARGUE THAT IT
15    WAS BASED ON ALL OF THE WORK THEY PUT IN.  BUT THEY SAID, BUT
16    IF YOU COPY IT -- I MEAN, IF YOU LOOK AT THE CITATION, THE
17    QUOTATION, FROM WAYLAND --
18         THE COURT:  BUT, COUNSEL, INDEPENDENT CREATION, THAT
19    DEFENSE, WHAT THAT ULTIMATELY GOES TO IS ORIGINALITY.  THAT'S
20    WHY INDEPENDENT CREATION TRUMPS THE PRIMA FACIE CASE.
21         I UNDERSTAND THAT YOU'RE ORIGINALLY CONCEDING
22    ORIGINALITY OF THE DRAWINGS, BUT ONCE MATTEL HAS ESTABLISHED A
23    PRIMA FACIE CASE FOR COPYRIGHT INFRINGEMENT, THE ISSUE OF
24    ORIGINALITY, WHICH IS THE SINE QUA NON, AS THEY SAY -- AND MY
25    FRENCH IS AWFUL, AND I RECOGNIZE THAT -- I GUESS THAT'S LATIN,
```

 1  BUT IT'S BAD TOO.

 2          **MR. QUINN:** YOUR HONOR, NOBODY KNOWS HOW THAT WAS

 3  PRONOUNCED ORIGINALLY, SO...

 4          **THE COURT:** THAT GOES BACK MANY YEARS AGO.

 5          AND BASICALLY, WHAT THE INDEPENDENT CREATION DOES IS

 6  BRING A SECOND SHOT OF ORIGINALITY, BECAUSE NOW IT'S NOT -- NOW

 7  IT'S NOT THE ORIGINALITY OF THE DRAWINGS AT ISSUE; NOW IT'S THE

 8  ORIGINALITY OF THE DOLLS.  BECAUSE HAVING GONE THROUGH THE

 9  SUBSTANTIAL SIMILARITY PROCESS AND ESTABLISHING THE PRIMA FACIE

10  CASE, ASSUMING THAT THEY DO SO, MATTEL HAS NOW LAID CLAIM, AT

11  LEAST PRIMA FACIELY -- THEY HAVE ESTABLISHED A PRIMA FACIE CASE

12  THAT NOW THE DOLLS ARE COVERED BY THE COPYRIGHT.  AND WHAT

13  THESE CASES DO -- AND IF YOU GO BACK TO THE SUPREME COURT CASE,

14  THE FEIST CASE THAT YOU JUST STATED -- BASICALLY, THE DEFENDANT

15  GETS YET ANOTHER SHOT OF ESTABLISHING THEIR ORIGINALITY OF

16  THEIR DOLLS BY SAYING, 'NO, WE INDEPENDENTLY CREATED THOSE,

17  SEPARATE AND APART FROM THE DRAWINGS.'

18          SO YOU ARE CORRECT WHEN YOU SAY THAT THE SWEAT OF THE

19  BROW TALKS ABOUT ORIGINALITY, BUT IN A SLIGHTLY DIFFERENT

20  CONTEXT THAT YOU'RE SUGGESTING NOW.  YOU'RE CONFLATING THE

21  ORIGINALITY OF THE DRAWINGS WITH THE BROADER CONCEPT OF

22  ORIGINALITY THAT IS BEING DISCUSSED IN FEIST.

23          MAYBE I'M NOT ARTICULATING THAT ALL THAT WELL, BUT

24  THAT'S MY READING OF THESE CASES.

25          **MS. AGUIAR:** I JUST THINK FEIST DOES DISCUSS THE

```
 1   ORIGINALITY OF THE COPYRIGHTED WORK.

 2            THE COURT:  IT DOES.  BUT IT'S DIFFERENT.  YOU'RE

 3   RIGHT, IT DOES DISCUSS ORIGINALITY.  I'LL LEAVE IT AT THAT.

 4            MS. AGUIAR:  OKAY.

 5            THERE'S A CASE THAT -- WE'RE OBVIOUSLY DOING THIS IN

 6   A MATTER OF TEN HOURS LAST NIGHT, YOUR HONOR, AND I WANTED TO

 7   BRING TO YOUR ATTENTION A CASE FROM THE EIGHTH CIRCUIT, FROM

 8   2005.  AND I HAVE A COPY FOR YOU.  AND IT CITES THE THREE BOYS

 9   MUSIC CORP. V. BOLTON CASE, WHICH I'M SURE YOU'RE FAMILIAR WITH

10   BECAUSE IT'S A NINTH CIRCUIT CASE.

11            THE COURT:  YES.  PLEASE PASS THAT UP TO ME.

12            MR. ZELLER, DO YOU HAVE THIS?

13            MR. ZELLER:  I DO NOT.

14            MS. AGUIAR:  I'LL GIVE YOU MINE, BECAUSE I HAVE IT

15   WRITTEN DOWN.

16            ON THE FLAGGED PAGE, IN THE SECTION ON INDEPENDENT

17   CREATION, IT SAYS -- I DON'T KNOW IF YOU CAN SEE THAT

18   SECTION -- "FOUR SEASONS PRESENTED TESTIMONY FROM EACH ARTIST

19   EXPLAINING HOW THEY CREATED THE CARD DESIGNS.  THE ARTISTS ALSO

20   IDENTIFIED THE SOURCE MATERIAL THEY USED IN CREATING THE CARD

21   DESIGNS WHILE EMPLOYED BY FOUR SEASONS.  THE DISTRICT COURT AND

22   THE ADVISORY JURY EVALUATED ALL OF THIS EVIDENCE, INCLUDING THE

23   CREDIBILITY OF THE WITNESSES"; AND THEY FOUND COPYING IN THAT

24   CASE.

25            THE COURT:  THIS IS DEAD-ON.  THIS IS RIGHT.  I
```

1    COMPLETELY AGREE WITH EVERYTHING THIS STANDS FOR.

2              **MS. AGUIAR:** RIGHT. BECAUSE WE -- AND THEN IN THIS

3    PARTICULAR CASE, THIS SHOWS THAT WE ACTUALLY HAVE TO BE ABLE TO

4    PUT ON THE EVIDENCE. IT SHOWS THAT IT'S AN ISSUE OF FACT.

5    THEY SAID THE DISTRICT COURT AND THE JURY CONSIDERED AND

6    EVALUATED THIS EVIDENCE. AND IN THIS PARTICULAR CASE, THEY

7    DIDN'T -- IN THE CASE OF THE FOUR SEASONS, THEY DIDN'T CONVINCE

8    THE JURY.

9              **THE COURT:** THE TWO MATERIAL FACTORS HERE ARE

10   PRECISELY THE TWO LINES THAT YOU HIGHLIGHTED. AND THAT'S WHY I

11   SAY YOU'RE DEAD-ON. "FOUR SEASONS PRESENTED TESTIMONY FROM

12   EACH ARTIST EXPLAINING HOW THEY CREATED THE CARD DESIGNS." BUT

13   THE NEXT SENTENCE, "THE ARTISTS IDENTIFIED THE SOURCE MATERIAL

14   THEY USED IN CREATING THE CARD DESIGNS WHILE EMPLOYED BY FOUR

15   SEASONS."

16             YOU DON'T GET THE FIRST SENTENCE UNLESS THERE'S

17   EVIDENCE OF THE SECOND SENTENCE. AND THAT'S WHAT I'M SAYING

18   NEEDS TO BE THERE AS A THRESHOLD MATTER. THERE IS NO SOURCE

19   MATERIAL THAT I'VE HEARD YET. AND MAYBE IT'S OUT THERE. AND

20   IF IT'S THERE, THIS COMES IN. BUT THERE'S BEEN NO SOURCE

21   MATERIAL, OTHER THAN CARTER BRYANT'S DRAWINGS.

22             AND I'VE HEARD THAT FROM MR. LARIAN; I'VE HEARD THAT

23   FROM YOUR OTHER LITIGATION. I MEAN, THAT'S BEEN THE POINT.

24   AND THAT'S PART OF WHAT YOU NEED TO ESTABLISH FOR THIS

25   INDEPENDENT CREATION. THIS IS JUST YET ANOTHER CASE WHICH

```
 1   ILLUSTRATES THAT.

 2          MS. AGUIAR:   I WANTED TO POINT YOUR HONOR TO SOME

 3   EVIDENCE THAT CAME OUT IN PHASE 1-A, WHEN MARGARET LEAHY WAS ON

 4   THE STAND.

 5          THE COURT:   PLEASE.

 6          MS. AGUIAR:   SHE TESTIFIED THAT, IN FACT, THE STEVE

 7   MADDEN AD FROM THE PUBLIC DOMAIN WAS WHAT SHE USED PRIMARILY TO

 8   DO HER FIRST VERSION OF THE SCULPT.  SO I WOULD ACTUALLY

 9   DISAGREE WITH YOUR CHARACTERIZATION OF THE EVIDENCE THAT HAS

10   COME IN WHEN YOU SAID THAT THERE WAS NOTHING TO SHOW THAT THERE

11   WAS ANOTHER SOURCE.  THIS DOLL STARTED WITH MARGARET LEAHY.

12          THIS DOLL NEEDED TO COME INTO BEING THROUGH A SCULPT,

13   THROUGH A THREE-DIMENSIONAL ITEM.

14          THE COURT:   THAT WOULD CERTAINLY BE ADMISSIBLE

15   EVIDENCE.  IT ALREADY IS ADMISSIBLE.  IT'S ALREADY IN TRIAL.

16   IT'S ALREADY IN FRONT OF THE JURY.

17          IF YOU CAN COME UP WITH SOURCE MATERIAL, SUFFICIENT

18   SOURCE MATERIAL, THAT'S INDEPENDENT, THEN YOU'VE GOT AN

19   INDEPENDENT CREATION DEFENSE; AND I'LL CERTAINLY ENTERTAIN THAT

20   EVIDENCE.  I DON'T THINK THAT'S WHAT MR. ZELLER IS EVEN TRYING

21   TO KEEP OUT, BECAUSE IT'S ALREADY COME IN.

22          MS. AGUIAR:   OKAY.  AND INDEPENDENT SOURCE MATERIAL,

23   WHEN YOU'RE CREATING A DOLL, HAS TO ALSO BE PEOPLE.  SO, FOR

24   EXAMPLE, IF VERONICA MARLOW AND THE PEOPLE WHO DID THE

25   PACKAGING AND PAULA GARCIA WHO DIRECTED THE FACE PAINT HAD AN
```

```
 1   IDEA OF HOW THEY WANTED IT, THAT ALSO -- I MEAN, THAT IS

 2   INDEPENDENT, QUOTE, SOURCES.  IT'S ARTISTIC INPUT.  IT'S

 3   CREATIVE PEOPLE WITH SKILLS WHO ARE BRINGING TO THE PROCESS HOW

 4   THEY ARE INTERPRETING IT.

 5        SO OUR VIEW IS, THAT IS EVIDENCE TO SHOW THAT THIS

 6   DOLL WAS INDEPENDENTLY CREATED.

 7        THE COURT:  THERE'S DEFINITELY A BALANCING THE COURT

 8   MUST DO IN THIS.

 9        MS. AGUIAR:  I WANTED TO POINT OUT THAT I WANTED TO

10   ADDRESS THE FIRST ISSUE THAT YOU RAISED WITH MR. ZELLER, OR I

11   WANTED MGA TO BE ABLE TO, ABOUT THE LICENSED PRODUCTS.

12        MR. ROTH WAS GOING TO ADDRESS THE RELEVANCE OF ALL OF

13   THIS TESTIMONY TO APPORTIONMENT AND DAMAGES, SO I DIDN'T WANT

14   TO NOT ANSWER YOUR QUESTION.  I THINK ONE OF OUR POINTS IS THAT

15   THE EVIDENCE THAT WE'RE DISCUSSING COMING IN -- I'M NOT TRYING

16   TO CONFLATE APPORTIONMENT AND SUBSTANTIAL SIMILARITY; I'M

17   MERELY POINTING OUT THAT THE SAME EVIDENCE MAY BE RELEVANT, FOR

18   TWO DIFFERENT REASONS -- AND I THINK THAT'S WHAT WE SAID IN OUR

19   BRIEF -- THAT THE DEVELOPMENT OF THE DOLL VERY MUCH RELATES TO

20   HOW WE DIDN'T COPY THE DRAWINGS, BUT IT ALSO, AT THE SAME TIME,

21   RELATES TO APPORTIONMENT.  SO I WOULD URGE THAT --

22        THE COURT:  VERY WELL.

23        MS. AGUIAR:  -- HAVING THIS EVIDENCE COME IN IS

24   EXTREMELY -- IT RELATES TO TWO SEPARATE ISSUES.  SO I DON'T

25   KNOW IF YOU WANT MR. ROTH TO ADDRESS THAT FIRST, YOUR QUESTION
```

1   ABOUT THE LICENSED PRODUCTS.

2          **THE COURT:** WE'RE EATING UP JURY TIME RIGHT NOW.  THE

3   COURT NEEDS TO GET THIS RESOLVED.

4          MR. ROTH.

5          **MR. ROTH:** THIS REALLY RELATES TO ALL OF THE CLAIMS,

6   WHETHER IT BE COPYRIGHT OR STATE LAW CLAIMS.  FUNDAMENTALLY,

7   THERE'S A CAUSATION QUESTION THAT NEEDS TO BE ANSWERED.  IT'S

8   ANSWERED DIFFERENTLY, DEPENDING UPON THE PRODUCT AND THE

9   COPYRIGHT CONTEXT, AS MR. ZELLER INDICATED, AND IN THE CONTEXT

10  OF THE STATE LAW CLAIMS.  AT THE END OF THE DAY, THE QUESTION

11  IS, WHAT HARM, IN THE CONTEXT OF THE STATE LAW CLAIMS, OR

12  PROFITS, IN THE CONTEXT OF THE COPYRIGHT CLAIM, WAS CAUSED AS A

13  RESULT OF THE INFRINGING ACTIVITY, AS OPPOSED TO ANYTHING ELSE?

14          I STOOD UP -- AND I APOLOGIZE IF I DID IT -- AT ONE

15  POINT, BECAUSE THIS ANALOGY TO A CD, TEN SONGS -- IF ONE SONG

16  IS INFRINGING, YOU GET 1/10 OF THE PROFITS.

17          THE THREE BOYS MUSIC CASE DOESN'T SAY THAT.  IT

18  ACTUALLY SAYS YOU LOOK INTO THE ONE INFRINGING SONG AND YOU

19  IDENTIFY THE INFRINGING ELEMENTS WITHIN THAT SONG.

20          BEYOND THAT CONTEXT, THERE ARE A NUMBER OF CASES

21  WHICH WE'VE CITED TO YOUR HONOR WHERE YOU LOOK AT THE OTHER

22  CREATIVE AND -- WE'RE USING LOOSE TERMS HERE -- POTENTIALLY

23  NONCREATIVE ELEMENTS PUT INTO THE FINISHED PRODUCT.

24          FOR INSTANCE, THERE ARE A NUMBER OF CASES WHICH TALK

25  ABOUT THE PROMOTIONAL AND ADVERTISING EFFORTS OF THE INFRINGER

```
 1   AS BEING RELEVANT TO THE APPORTIONMENT CONTEXT.  SO WE WOULD
 2   NEED TO TAKE INTO ACCOUNT THE ADDITIONAL WORK DONE ON THE
 3   DRAWINGS, THE WORK DONE ON THE FASHIONS, ACCESSORIES,
 4   ET CETERA, IN ORDER TO ADDRESS THE APPORTIONMENT QUESTION.
 5           THEN IN THE CONTEXT OF THE STATE LAW CLAIMS, THEY
 6   HAVE ASSERTED -- WE OBVIOUSLY DISAGREE ON LEGAL GROUNDS, WHICH
 7   WE DON'T NEED TO BOTHER THE COURT WITH NOW -- BUT THEY'VE
 8   BASICALLY ASSERTED A CAUSAL CONNECTION EXISTS BETWEEN THE
 9   IMPROPER TRANSFER OF THE DRAWINGS TO MGA RESULTED IN A POT OF
10   PROFITS.
11           SO THE QUESTION IS -- THEY NOW HAVE A CAUSAL BURDEN
12   TO ESTABLISH WHAT PART OF THE POT OF PROFITS RESULTED FROM THAT
13   CONDUCT, AS OPPOSED TO ANYTHING ELSE.
14           WE HAVE THE OPPORTUNITY, IN THE CONTEXT OF THOSE
15   CLAIMS -- IF YOU ASSUME THAT THOSE POT OF PROFITS ARE EVEN
16   RELEVANT TO THOSE STATE LAW CLAIMS -- I JUST WANT TO SET THOSE
17   ARGUMENTS ASIDE; WE BELIEVE THEY ARE -- BUT IF YOU ACCEPT THAT
18   THEY ARE, THE TYPICAL TORT CAUSATION ANALYSIS HAS TO BE
19   UNDERTAKEN.  AND IN THAT CONTEXT, ALL OF THESE OTHER FACTORS
20   THAT MAY HAVE CONTRIBUTED TO THOSE PROFITS BEING GENERATED --
21   AND THE CASES ARE VERY CLEAR ON -- WHAT THEY GET ARE THE
22   ILL-GOTTEN PROFITS.  ANYTHING THAT IS NOT SUBJECT TO A
23   SUPERSEDING COST TYPE OF ARGUMENT, FOR INSTANCE, IS RELEVANT.
24   AND WE HAVE THE OPPORTUNITY TO PUT THAT IN.  THEY HAVE AN
25   OPPORTUNITY TO REBUT THAT, IF THEY CAN.
```

```
 1          THE COURT:  CAN YOU ADDRESS THE QUESTION I ASKED
 2   MR. ZELLER?
 3          I GUESS I'M GOING TO TAKE A LOOK AT THREE BOYS MUSIC
 4   AGAIN.
 5          CAN YOU REFER ME TO EXACTLY WHAT YOU WERE TALKING
 6   ABOUT ON THREE BOYS MUSIC, ABOUT LOOKING AT THE SONG ITSELF ON
 7   ATTRIBUTION OF PROFITS.  I'M READING PAGE 487, AND THAT DOES
 8   NOT SEEM TO BE THE CASE.
 9          MR. ROTH:  IN THREE BOYS MUSIC, THEY AWARDED -- AT
10   PAGE 487, THEY AWARDED APPROXIMATELY --
11          THE COURT:  THEY WENT INTO THE ALBUM, BUT THERE WAS
12   ONLY ONE SONG ON THE ALBUM, 'LOVE IS A WONDERFUL THING,' THAT
13   WAS INFRINGING.
14          MR. ROTH:  YES.  BUT THEY LOOKED AT THE SPECIFIC
15   ELEMENTS, IF YOU LOOK AT PAGE 487.
16          THE COURT:  THAT'S WHERE I'M AT, "ATTRIBUTION OF
17   PROFITS," SECTION D.
18          MR. ROTH:  I WISH I HAD THE CASE UP HERE.  I DON'T
19   HAVE THE CASE IN FRONT OF ME, YOUR HONOR.
20          THE COURT:  THIS IS JUST LIKE THE 7-TRACK THING THAT
21   WE WERE TALKING ABOUT EARLIER.  THIS IS AN ALBUM, AND THERE
22   WERE MULTIPLE SONGS ON THE ALBUM.  AND THERE WAS EVIDENCE THAT
23   WAS ALLOWED IN TO SAY HOW MUCH OF THE PROFITS WERE ATTRIBUTABLE
24   TO THE SONG.  BECAUSE IT WAS, LIKE, THE LEAD SONG -- YOU HAVE
25   SEVEN OR EIGHT SONGS ON A RECORD, AND ONE SONG IS THE LEAD
```

 1 | SONG, AND THAT'S THE REASON WHY EVERYONE BOUGHT THE ALBUM.

 2 |        THAT'S NOT WHAT WE HAVE HERE.

 3 |        AT LEAST WHEN WE'RE TALKING ABOUT THE DOLLS, THE

 4 | PROTECTABLE ELEMENTS THAT THE COURT IDENTIFIED YESTERDAY ARE SO

 5 | INEXTRICABLY INTERTWINED INTO THE DOLLS.  IF THIS JURY FINDS --

 6 | AND IT'S A BIG "IF," IT'S A HUGE "IF," BECAUSE YOU MAY VERY

 7 | WELL CONVINCE THIS JURY THAT EITHER, A, THERE'S NOT SUBSTANTIAL

 8 | SIMILARITY BETWEEN THE DRAWINGS AND THE DOLLS, FOR ALL OF THE

 9 | REASONS THAT MS. AGUIAR WAS JUST CITING, OR, IF THERE IS

10 | SUBSTANTIAL SIMILARITY, PERHAPS WE DO GET INTO AN INDEPENDENT

11 | CREATION.

12 |        LIKE I SAY, I HAVE NOT SEEN A LOT OF EVIDENCE.  I

13 | MEAN, THERE IS THE REFERENCE TO MARGARET LEAHY, AND WE'LL SEE

14 | HOW THAT PLAYS OUT.

15 |        BUT ASSUMING THAT WE GET TO THAT POINT, AT LEAST WITH

16 | RESPECT TO THE DOLLS THAT WE SAW UP THERE, THE PROTECTABLE

17 | ELEMENTS ARE SO INEXTRICABLY INTERTWINED WITH THE DOLLS THAT

18 | THAT KIND OF APPORTIONMENT IS NOT GOING -- LET ME JUST FINISH

19 | HERE.  THIS IS ALL -- YOU HAD TEN HOURS; I HAD LESS THAN THAT,

20 | SO I'M STILL WORKING THIS OUT MYSELF.

21 |        BUT WHERE I DO SEE A BIGGER ISSUE IS RESPECT TO SOME

22 | OF THE PRODUCTS, MOST NOTABLY THE ONE THAT MR. KENNEDY HELD UP

23 | YESTERDAY, THE SOFA, FOR EXAMPLE -- I REMEMBER SEEING THE TENT

24 | UPSTAIRS -- THERE'S SOME OF THESE PRODUCTS, AND MAYBE A GOOD

25 | NUMBER OF THESE PRODUCTS, WHERE I DON'T THINK YOU CAN QUITE

 1   REACH THE CONCLUSION OF THE CASES THAT MR. ZELLER TALKS ABOUT

 2   BEING INEXTRICABLY INTERTWINED.  AND THAT POSES A DIFFERENT

 3   QUESTION.

 4          HOWEVER, MR. ZELLER'S RESPONSE TO THAT, WHICH I'D

 5   LIKE YOU TO ADDRESS, IS THAT THESE ARE THE LICENSEE CASES AND

 6   THESE ARE NOT PROFITS THAT MATTEL IS GOING AFTER; SO MAYBE IT

 7   IS OF NO MOMENT, BECAUSE THAT'S NOT INCLUDED IN MR. WAGNER'S

 8   DAMAGE CALCULATION.  THEY ARE BASICALLY EXCLUDING THAT

 9   ALTOGETHER.

10          **MR. ROTH:**  THERE'S TWO QUESTIONS IN THERE, BUT I'D

11   LIKE TO ADDRESS THAT.

12          FIRST, WITH RESPECT TO THE LICENSEE -- LET ME ANSWER

13   YOUR DIRECT QUESTION -- THERE'S ACTUALLY THREE CATEGORIES OF

14   PRODUCTS THAT WE'RE TALKING ABOUT HERE.  THERE ARE -- ROUGHLY

15   SPEAKING, THERE ARE THE DOLLS, THE FOUR CHARACTERS, AND THEN

16   THE ADDITIONAL CHARACTERS.  THERE'S WHAT IS CALLED

17   BRATZ-BRANDED MERCHANDISE.  IT'S ACTUALLY MERCHANDISE THAT MGA

18   HAS MANUFACTURED AND SOLD THAT HAS A RELATIONSHIP OF SOME SORT,

19   TO BE DETERMINED IN THIS CASE, TO THE BRATZ BRAND.  THEN

20   THERE'S LICENSED GOODS.  THAT'S A SMALLER CATEGORY.  AND THEY

21   HAVE TALKED A LOT ABOUT IT.  BUT IN TERMS OF THE OVERALL

22   PROFITS OF THIS SORT OF INDIRECT PROFITS CATEGORY, IT'S

23   ACTUALLY QUITE SMALL.

24          OUR INDIRECT PROFITS WILL BE DIRECTED PRIMARILY AT

25   THIS.  BRATZ-BRANDED MERCHANDISE, SORT OF THE TERM WE USE,

1   WOULD BE -- YOU KNOW, YOU MIGHT HAVE SPORTING GOODS OR A SOFA.

2   THAT'S NOT ALL LICENSED GOODS.  MOST OF IT IS NOT LICENSED

3   GOODS.

4         **THE COURT:**  THEN MAYBE THE DIVISION IS NOT AS EASY AS

5   MR. ZELLER SUGGESTED.

6         WITH RESPECT TO THOSE PRODUCTS, I GUESS I DO

7   UNDERSTAND YOUR ARGUMENT THAT SOMEHOW, THERE, SOME KIND OF

8   APPORTIONMENT IS PROBABLY GOING TO HAVE TO GO ON.

9         **MR. ROTH:**  CAN I ADDRESS THE DOLL QUESTION?

10        **THE COURT:**  YES.

11        **MR. ROTH:**  AT THE END OF THE DAY, WHAT WE HAVE IS A

12  GIRL AND HER MOM OR A BOY AND HIS FATHER STANDING IN THE AISLE,

13  LOOKING AT A PACKAGE, BUYING IT.  THAT'S THE PRICE THEY PAY.

14  PROFITS ARE GENERATED OFF OF THAT TRANSACTION.

15        **THE COURT:**  RIGHT.

16        **MR. ROTH:**  IT IS NOT A PLASTIC DOLL.  IT IS A VARIETY

17  OF THINGS.  IT IS A PACKAGE.  IT IS THE FACT THAT THEY GOT

18  THERE IN THE FIRST PLACE BECAUSE OF BRANDING, PROMOTIONAL

19  ADVERTISING, ALL OF THAT WORK.  IT IS OTHER THINGS IN THE

20  PACKAGE.  IT'S ACCESSORIES.

21        **THE COURT:**  I UNDERSTAND YOUR ARGUMENT.

22        DO YOU HAVE ANY AUTHORITY ON THIS?  BECAUSE, LIKE,

23  FOR EXAMPLE, IN THREE BOYS MUSIC, WHICH DOES NOT STAND FOR THE

24  PROPOSITION THAT YOU JUST SUGGESTED A FEW MOMENTS AGO, YOU'RE

25  DEALING WITH A RECORD; AND I ASSUME THAT IN THAT RECORD, THERE

```
 1  IS A RECORD ALBUM.  WE REMEMBER BACK IN THE '70S THAT RECORD
 2  ALBUMS, ART, THAT WAS A BIG DEAL.  AND THAT'S NOT CONSIDERED
 3  HERE.  ALL THAT IS CONSIDERED IS THE SONG, WHICH IS AT THE CORE
 4  OF WHAT IS BEING PURCHASED.
 5       HERE, THE CORE OF WHAT IS BEING PURCHASED IS THE
 6  DOLL.  THE DOLL IS CERTAINLY INEXTRICABLY INTERTWINED WITH
 7  EVERYTHING SURROUNDING THE DOLL.
 8       IF THERE ARE CASES WHICH SUGGEST THAT IN A SITUATION
 9  WITH A PRODUCT LIKE THIS, THAT WE HAVE TO SOMEHOW SEVER OUT OR
10  APPORTION OUT FOR DAMAGES PURPOSES, I NEED TO SEE THAT
11  AUTHORITY; BECAUSE OTHERWISE, I'M NOT BUYING THIS ARGUMENT.
12       MR. ROTH:  YOUR HONOR, I CERTAINLY WON'T MAKE UP
13  SOMETHING.  THERE ISN'T -- FIRST, JUST TO -- WE HAVE NOW FOUND
14  IT.  I APOLOGIZE.
15       AT PAGE 487 OF THE THREE BOYS MUSIC, THERE'S A
16  PARAGRAPH THAT STARTS, "SONY MUSIC PRESENTED EVIDENCE THAT
17  MICHAEL BOLTON'S" -- THE LAST SENTENCE -- "THE JURY FOUND
18  28 PERCENT OF THE ALBUM'S PROFITS DERIVED FROM THE SONG AND
19  66 PERCENT OF THE SONG'S PROFIT RESULTED FROM THE INFRINGING
20  ELEMENTS."
21       THE COURT:  I SEE THAT.
22       MR. ROTH:  I APOLOGIZE THAT I DIDN'T HAVE THAT IN
23  FRONT OF ME WHEN I CAME TO THE LECTERN.
24       THE COURT:  VERY GOOD, COUNSEL.
25       MR. ROTH:  IN TERMS OF THE QUESTION THAT WE WERE LAST
```

```
 1   ADDRESSING, NEITHER SIDE HAS BEEN ABLE TO FIND A CASE INVOLVING
 2   A CONSUMER PRODUCT LIKE THIS.  I THINK AN APT EXAMPLE WOULD BE
 3   A MOVIE -- WE CITED A NUMBER OF THOSE CASES -- WHERE YOU HAVE A
 4   SCREENPLAY.  IT'S THE STORY OF THE MOVIE.  THAT MOVIE DOES NOT
 5   EXIST WITHOUT THE STORY.  IF IT'S A DIFFERENT SCREENPLAY, IT'S
 6   A DIFFERENT STORY.  IF IT'S A DIFFERENT DRAWING, IT'S A
 7   DIFFERENT DOLL.
 8          NEVERTHELESS, IN THAT CONTEXT, IN A VARIETY OF CASES
 9   THAT WE'VE CITED TO YOUR COURT, THE COURT LOOKS AT NOT JUST THE
10   ROLE OF THE SCREENPLAY PLAYED, BUT ALSO THE ROLE OF THE
11   DIRECTOR, THE ACTORS, EVEN THE PROMOTIONAL EFFORTS ASSOCIATED
12   WITH THE MOVIE.  ALL OF THOSE THINGS ARE TAKEN INTO ACCOUNT IN
13   THE CONTEXT OF DETERMINING THE PROFITABILITY OF THE MOVIE AND
14   APPORTIONING PROFITS BETWEEN THE ALLEGED INFRINGER AND THE
15   COPYRIGHT HOLDER.
16          THE COURT:  COULD I SEE THE DOLL YOU HAVE IN FRONT OF
17   YOU.
18          I ASKED YESTERDAY FOR FOUR ORIGINAL DOLLS, AND I'M
19   HOPING THAT SOMEBODY GETS THOSE TO ME AT SOME POINT IN TIME.
20          MR. NOLAN:  I THOUGHT --
21          THE COURT:  IF THE PARTIES WANT ME TO HEAR THIS
22   CASE -- I'VE ASKED FOR THAT.  I REALLY WANT THOSE.
23          DO WE HAVE THEM?
24          MS. AGUIAR:  RIGHT HERE.
25          THE COURT:  THANK YOU.
```

```
 1                  LET ME SEE THE ONE THAT YOU HAVE THERE TOO.

 2            MS. AGUIAR:  FOR THE RECORD, THIS IS EXHIBIT 17582.

 3            MR. ROTH:  YOUR HONOR, IF I MIGHT.  I HAVE ANOTHER

 4   EXAMPLE WHICH COULD BE HELPFUL.

 5            THE COURT:  PLEASE.

 6            MR. ROTH:  EXHIBIT 17369.

 7            THE COURT:  HOW DID THE JURY -- WHAT WAS THE EVIDENCE

 8   IN THREE BOYS THAT ALLOWED THE JURY TO SPLICE UP THE SONG INTO

 9   THIRDS?

10            MR. ROTH:  IF YOU LOOK AT PAGE 486, THE BOTTOM

11   PARAGRAPH THERE, THERE APPEARS TO HAVE BEEN EXPERT TESTIMONY

12   REGARDING THE VARIOUS ELEMENTS OF THE SONG.

13            THE COURT:  SO THEY BROKE THE ESSENTIAL ELEMENTS DOWN

14   INTO TITLE, BOOK, CHORUS, AND PITCHES, MUCH THE WAY THE COURT

15   HAS ESTABLISHED THE ELEMENTS OF THE DOLL ITSELF.

16            MR. ROTH:  YOUR HONOR, JUST TO BE CLEAR, IN OUR

17   APPROACH TO APPORTIONMENT, WE TAKE THE DOLL, WHICH WE VIEW AS

18   THE PLASTIC, AND WE SORT OF VIEW THAT AS A WHOLE FOR THE

19   PURPOSES OF APPORTIONMENT.

20            THE COURT:  SO WE'RE ALL ON THE SAME PAGE ON THAT.

21   THE DOLL -- WE CAN'T BREAK THE DOLL.

22            MR. ROTH:  YEAH.

23            THE COURT:  YOU'RE LOOKING AT PACKAGING AND ELEMENTS

24   LIKE THAT.

25            SO I GUESS THE QUESTION I HAVE -- AND THAT'S WHY I
```

```
 1   WANTED TO LOOK AT THESE -- IS -- IT'S A SIMPLER CASE TO RESOLVE

 2   A FIRST GENERATION BRATZ.  HERE, YOU LOOK AT THE PACKAGING

 3   THERE, AND BESIDES THE DOLL AND THE ACCESSORIES, WHICH ARE

 4   PROTECTABLE ELEMENTS, ALL YOU HAVE HERE, THAT I CAN SEE, IS THE

 5   BRATZ LOGO, WHICH IS MATTEL'S; THE HERO SHOT, WHICH IS

 6   MATTEL'S; THE NAME, WHICH IS MATTEL'S.  THERE'S NOTHING REALLY

 7   IN THIS PACKAGING THAT'S NOT INEXTRICABLY INTERTWINED WITH

 8   MATTEL'S WORK.

 9             MR. ROTH:  THERE'S THE PACKAGE.

10             I DON'T MEAN TO BE FLIP.

11             THE COURT:  YOU'RE TALKING ABOUT THE PHYSICAL

12   PACKAGE.

13             MR. ROTH:  THE PHYSICAL PACKAGE.

14             THE COURT:  THAT IT'S NOT QUITE A SQUARE; THAT IT'S

15   ALMOST IN A PYRAMIDAL SHAPE.

16             MR. ROTH:  EXACTLY.  WE WILL PRESENT EVIDENCE FROM

17   MATTEL --

18             THE COURT:  ON THE BACK -- MR. NOLAN GAVE ME THE

19   TURNAROUND SIGNAL, BUT, AGAIN, YOU HAVE FOUR DRAWINGS, THE

20   BRATZ LOGO -- THIS PACKAGE SEEMS TO BE MORE -- I'M NOT GOING TO

21   PRECLUDE NOW THAT IT'S INEXTRICABLY INTERTWINED WITH

22   COPYRIGHTED MATERIAL, OR ALLEGEDLY COPYRIGHTED MATERIAL.  YOU

23   GET TO "TOKYO A GO-GO," AND THE QUESTION BECOMES A LITTLE

24   DIFFERENT, PERHAPS.

25             THAT'S GOING TO BE A DIFFICULT ROAD TO NAVIGATE WITH
```

1   THE 910 EXHIBITS, PRODUCTS, THAT WE HAVE.

2         HOW DO YOU PROPOSE WE DO IT?

3         **MR. ROTH:**  LET ME GIVE YOU AN EXAMPLE OF THE TYPE OF

4   EVIDENCE THAT WE WOULD PRESENT.

5         **THE COURT:**  RIGHT.

6         **MR. ROTH:**  THIS, YOUR HONOR, IS SOMETHING CALLED A

7   MONTHLY BRAND TRACKING REPORT.  IT IS PRODUCED BY MATTEL;

8   THAT'S A WITNESS ON OUR WITNESS LIST NEXT WEEK.  THESE ARE

9   STUDIES DONE BY MATTEL EVERY MONTH, FOR A TWO-, THREE-YEAR

10  PERIOD.

11        WHAT WE'LL SEE IS MATTEL, AND TO A LESSER EXTENT MGA,

12  BECAUSE IT JUST HAS LESS RESEARCH CAPABILITY, WAS FOCUSED ON

13  THE IMPORTANCE OF A VARIETY OF ELEMENTS OF THE DOLL.  SO YOU'LL

14  SEE THE THIRD ELEMENT IS, "IT'S PRETTIER THAN OTHER DOLLS."

15  THAT'S, WE WOULD ARGUE, RELEVANT TO WHAT THE DOLL ITSELF LOOKS

16  LIKE.  BUT THEN YOU'LL LOOK AT THE FOURTH, "CLOTHES THAT YOU

17  MOST WANT TO WEAR."  "FASHIONS."  THEY ASKED A SET OF GIRLS --

18  AND THIS IS A COMPARISON BETWEEN, AS YOU CAN SEE OVER ON THE

19  RIGHT, BRATZ AND MYSCENE BARBIE.  SO THIS IS DOING WHAT A

20  COMPANY WOULD DO; THEY'RE TRYING TO DETERMINE THE RELATIVE

21  IMPORTANCE OF WHY SOMETHING IS SUCCEEDING AND WHY IT'S NOT.

22  THAT'S WHAT A COMPANY WOULD DO.

23        LOOK AT THE SIXTH -- "COMES WITH BETTER" -- THAT'S

24  ACCESSORIES.

25        NOW, YOU'VE HEARD --

1          **THE COURT:** EXPLAIN, COUNSEL, HOW THIS IS RELEVANT TO

2   THE COPYRIGHT ISSUES.

3          **MR. ROTH:** IT IS RELEVANT TO WHAT BOTH COMPANIES

4   THOUGHT WERE THE REASONS FOR THE SUCCESS OF THE BRATZ DOLLS, OF

5   FASHION DOLLS, OF FASHION DOLLS IN GENERAL, BECAUSE WE HAVE

6   MYSCENE BARBIE AND BRATZ, AND THEN WE HAVE A FOCUS ON BRATZ.

7          **THE COURT:** THERE'S NO QUESTION -- I UNDERSTAND THIS

8   IS A DYNAMIC PROCESS, AND THERE'S TINKERING THAT GOES ON WITH

9   THE DOLLS AND THE DOLL FASHIONS AND THE DOLL PRESENTATIONS AND

10  THE PACKAGING. BUT AT CORE IS A DOLL THAT HAS REMAINED

11  ESSENTIALLY UNCHANGED, AS I UNDERSTAND IT, FOR THE BETTER PART

12  OF THE LAST SEVEN OR EIGHT YEARS.

13         **MR. ROTH:** IT'S JUST A MATTER OF HOW YOU DEFINE THE

14  DOLL. WHAT HAS REMAINED UNCHANGED IS THE SCULPT, GENERALLY

15  SPEAKING. WHAT HAS CHANGED DRAMATICALLY, AFTER WHAT WE CALL

16  THE FIRST GENERATION, IS THE WAY THE SCULPT IS PAINTED. THE

17  CLOTHES ON THE SCULPT CHANGED CONSTANTLY. IT'S JUST LIKE

18  CALVIN KLEIN. THEY NEED TO SELL NEW FASHIONS EVERY YEAR.

19         **THE COURT:** YOU'RE GOING TO HAVE TO CONVINCE THIS

20  JURY THAT -- I'M LOOKING AT A FIRST GENERATION AND I'M LOOKING

21  AT TOKYO A GO-GO -- YOU'RE GOING TO HAVE TO CONVINCE A JURY,

22  BECAUSE YOU'D HAVE A HARD TIME CONVINCING ME, THAT THE FACE

23  PAINTING HAS CHANGED DRAMATICALLY, THAT THE PROTECTABLE

24  ELEMENTS THAT I IDENTIFIED YESTERDAY HAVE CHANGED DRAMATICALLY

25  BETWEEN THOSE TWO DOLLS.

 1          THAT'S YOUR POSITION, IS THAT THE EYES, THE

 2  PARTICULARIZED EYES IN MY RIGHT HAND, THE FIRST GENERATION, AND

 3  THE PARTICULARIZED EYE IN THE TOKYO A GO-GO HAVE CHANGED

 4  DRAMATICALLY?

 5          **MR. ROTH:**  WE WOULD FOCUS ON THE COLOR OF THE SKIN.

 6          **THE COURT:**  I JUST RULED YESTERDAY THAT COLOR OF THE

 7  SKIN IS A NONPROTECTABLE ELEMENT, SO YOU'RE NOT GOING TO FOCUS

 8  ON THAT AT ALL.  IT'S NOT PROTECTABLE.  IT'S OUTSIDE.

 9          **MR. ROTH:**  I UNDERSTAND THAT.

10          **THE COURT:**  NO.  ANSWER MY QUESTION, COUNSEL.  YOU

11  JUST TOLD ME IT CHANGED DRAMATICALLY.

12          LET'S IDENTIFY A PROTECTABLE ELEMENT.

13          HAS IT CHANGED DRAMATICALLY?  BECAUSE I DON'T SEE IT.

14  MAYBE THE JURY WILL.  I'M NOT RULING ON IT.  THE JURY HAS TO.

15  BUT YOUR CONTENTION IS, THE EYES HAVE CHANGED DRAMATICALLY.

16          **MR. ROTH:**  YOUR HONOR, I CANNOT IDENTIFY FOR YOU

17  PROTECTABLE ELEMENTS THAT HAVE CHANGED DRAMATICALLY.

18          **THE COURT:**  THAT'S WHAT'S RELEVANT.

19          **MR. ROTH:**  THE QUESTION IS, WHY DID THEY BUY THE

20  DOLL?  FOR THE PURPOSES OF DETERMINING DAMAGES, THAT'S THE

21  QUESTION.

22          SO IF SOMETHING NONPROTECTABLE CHANGED, AND IF THE

23  NONPROTECTABLE ELEMENT IS THE REASON WHY THEY BOUGHT THE DOLL,

24  THAT'S RELEVANT TO APPORTIONING PROFITS.

25          LET'S SAY HYPOTHETICALLY, THE REASON THEY BUY OUR

1   DOLLS HAS NOTHING TO DO WITH THE DOLLS; IT'S THE GREAT

2   PACKAGING.  WE GET A CHANCE TO PROVE THAT.

3          **THE COURT:**  I WANT TO HEAR A RESPONSE TO THAT.  I

4   UNDERSTAND THAT ARGUMENT.

5          WE'VE GOTTEN INTO A DIFFERENT ARGUMENT THAT YOU HAVE

6   NOT YET ADDRESSED, MR. ZELLER.

7          **MR. ZELLER:**  YES, I THINK WE HAVE; AND I THINK THERE

8   ARE REALLY TWO GLOBAL ISSUES THAT ARE ON THE TABLE.

9          ONE HERE IS THE LAST ONE THAT WE WERE DISCUSSING.

10  AND TO SAY THAT IT IS RELEVANT, WHY IT IS THAT CONSUMERS

11  WERE -- LET ME FIRST SAY THAT WHEN THEY PUT A DOCUMENT UP LIKE

12  THIS, IN SOME WAYS, I THINK WE PROBABLY HOPE THAT THIS STUFF

13  COMES IN, BECAUSE MR. ROTH ADMITTED THAT THEY ARE NOT DISPUTING

14  THAT THE DOLL IS SOMETHING -- THAT THE DESIGN IS SO INTERTWINED

15  THAT YOU CAN'T PARSE IT OUT.

16         SO WHY IT IS THAT PEOPLE ARE -- THE MOTIVATIONS FOR

17  PEOPLE BUYING THE DOLLS IS REALLY BESIDE THE POINT.  ALL OF

18  THAT CANNOT BE APPORTIONED.  IT'S IRRELEVANT.

19         **THE COURT:**  WHAT ABOUT THIS ARGUMENT THAT THE

20  NONPROTECTABLE ELEMENTS ARE WHAT'S -- AND CHANGES TO THE

21  NONPROTECTABLE ELEMENTS ARE WHAT'S DRIVING THE SALES OF THE

22  DOLLS?

23         **MR. ZELLER:**  FIRST OF ALL, IT IS A MATTER OF

24  COPYRIGHT LAW.  THAT'S COMPLETELY IRRELEVANT.  THAT'S, IN FACT,

25  THOSE CASES -- JUST TO -- AS THE FIRST PRINCIPLE THAT LED US

1   OFF ON ALL OF THIS.  IT DOESN'T MATTER HOW MUCH OF THEIR WORK

2   THEY HAVE KIND OF OVERLAID OVER MATTEL'S WORK.  WHAT MATTERS IS

3   THE AMOUNT OF OUR WORK THAT IS TAKEN.

4        SO TO FOCUS ON THEIR NONPROTECTABLE ELEMENTS,

5   FOCUSING ON THEIR WORK, IS EXACTLY THE WRONG INQUIRY, THE EXACT

6   WRONG INQUIRY, AS THE NINTH CIRCUIT HAS SAID MANY TIMES IN THE

7   CASES WE QUOTE.  MR. ROTH IS DOING EXACTLY WHAT CAUSES US

8   CONCERN, THAT THIS JURY, AFTER MGA IS DONE WITH THEM, IS GOING

9   TO THINK THAT THEIR PURPOSE, THEIR AGENDA, IS TO COMPARE

10  NONPROTECTABLE ELEMENTS.  DID THOSE THINGS CHANGE OVER TIME?

11  HOW MUCH?

12       **THE COURT:**  THAT'S THE FILTERING THAT'S CALLED BY THE

13  NINTH CIRCUIT.  I UNDERSTAND THAT, IN TERMS OF COPYRIGHT

14  INFRINGEMENT.

15       BUT LET'S LOOK AT DAMAGES IN THE THREE BOYS CASE,

16  WHERE THE COURT DID ULTIMATELY UPHOLD -- WHEN I READ IT QUICKLY

17  THIS MORNING, I DIDN'T CATCH THAT LAST LINE; THAT 66 PERCENT OF

18  THE SONG'S PROFITS RESULTED FROM INFRINGING ELEMENTS.  IT DOES

19  SEEM THAT THEY BROKE DOWN THE SONG ITSELF AND ATTRIBUTED THE

20  PROFITS TO INFRINGING ELEMENTS AND NONINFRINGING ELEMENTS IN

21  THE WAY THAT MR. ROTH IS SUGGESTING THAT I SHOULD BREAK DOWN --

22  TO THE EXTENT THAT WE CAN BREAK DOWN -- AND THAT MAY BE THE

23  ANSWER TO THE QUESTION, MY OWN QUESTION -- TO THE EXTENT THAT

24  WE CAN BREAK DOWN PACKAGING.

25       NOW, I LOOK AT THE PACKAGING, PARTICULARLY IN FIRST

```
 1   GENERATION, AND IT'S PERMEATED WITH WHAT THE JURY HAS NOW
 2   CONSIDERED TO BE MATTEL'S PROPERTY.  BUT THE SUGGESTION
 3   IS --AND I SUSPECT WE'RE GOING TO AT LEAST HAVE PROFFERED
 4   TESTIMONY -- THAT THE WAY THAT THE ACTUAL BOX IS DESIGNED --
 5   I'M SURE THERE'S THINGS I'M JUST NOT SEEING THAT ALSO GO INTO
 6   THIS -- ACCOUNTS FOR SOME OF THAT PROFIT, AND, THEREFORE, THERE
 7   SHOULD BE EVIDENCE OF THAT SO THAT THE JURY CAN MAKE THE
 8   PERCENTAGE CALCULATION THAT WAS DONE IN THREE BOYS.
 9            MR. ZELLER:  THERE'S NO AUTHORITY FOR THAT
10   PROPOSITION, YOUR HONOR, SIMPLY NONE, THAT MR. ROTH WAS
11   ADVOCATING, WHICH IS THAT SOMEHOW YOU LOOK AT THE PACKAGING AND
12   DECIDE -- PEOPLE -- '20 PERCENT OF THE PURCHASE DECISION IS
13   BECAUSE I LIKED THE PLASTIC THAT THE INFRINGING PRODUCT IS IN.'
14            THEY ARE ALLOWED TO CERTAINLY DEDUCT THE COST THAT
15   THEY HAD TO PUT INTO IT.  BUT MOTIVATION UNDER THESE
16   CIRCUMSTANCES IS NOT EVEN REMOTELY THE INQUIRY.  IT IS AN
17   INFRINGING PRODUCT.
18            AND THE COURT DID, I THINK, ANSWER ITS OWN QUESTION.
19   I MEAN, WHAT MATTERS TO -- LET'S MOVE BEYOND PACKAGING FOR A
20   MOMENT, BECAUSE THERE'S A SLIGHTLY DIFFERENT CONSIDERATION, I
21   THINK, THAT'S GOING ON THERE TOO.  BUT WHEN THE COURT IS
22   TALKING ABOUT -- AND MR. ROTH RAISED THIS IDEA OF A DOLL IN
23   PACKAGING WITH ACCESSORIES.  I MEAN, ALL OF THAT STUFF IS
24   INTERTWINED.  THAT IS JUST -- THAT'S EXACTLY THE KINDS OF CASES
25   WE WERE DISCUSSING AND THAT WE CITE IN OUR BRIEF, WHERE -- NO
```

```
 1   ONE BUYS SEPARATELY, OR WOULD BE BUYING SEPARATELY, THE LITTLE
 2   PARTICULAR ACCESSORY THAT'S INSIDE OF THE PACKAGING.  IT GOES
 3   WITH THE DOLL.  THE SAME THING IS TRUE OF THOSE FASHIONS.  YOU
 4   DO NOT SELL FASHIONS INDEPENDENT OF THE DOLL.
 5        SO, I MEAN, THEY ARE PROVING OUR VERY POINT:  THESE
 6   THINGS ARE INEXTRICABLY INTERTWINED.  AND JUST BECAUSE YOU PUT
 7   OTHER THINGS IN THERE, TECHNICALLY WHETHER THEY'RE INFRINGING
 8   OR NOT INFRINGING, IT DOES NOT GET YOU APPORTIONMENT.  IT IS A
 9   THING.  IT IS A THING THAT IS INEXTRICABLY INTERTWINED THAT
10   YOU'RE NOT ALLOWED TO APPORTION.
11        THEY'RE ACTUALLY CONFUSING, I THINK, TWO VERY, VERY
12   DIFFERENT CONCEPTS.  ONE IS, FROM THE DESIGN PERSPECTIVE, WHAT
13   REALLY MATTERS?  WHAT MATTERS IS, IS THERE AN INFRINGEMENT?
14   AND ANYTHING THAT'S BOUND UP IN THAT INFRINGEMENT, WE GET THE
15   PROFITS FROM.
16        THAT'S POINT ONE.
17        POINT TWO IS -- THEN THEY'RE TRYING TO SAY, 'WELL,
18   OKAY, SURE, THERE ARE LOTS OF REASONS WHY PEOPLE BUY THESE
19   INFRINGING PRODUCTS, BECAUSE THEY LOVE THE PLASTIC,' AS HE WAS
20   USING IN THE EXAMPLE.  BUT THIS IS AGAIN PRECISELY WHY WE'RE SO
21   CONCERNED.  TO HAVE THE JURY HEARING THAT SORT OF THING, IT
22   MAKES THEM THINK THAT THEY'RE GOING TO HAVE TO MAKE SOME
23   DETERMINATION AS TO, 'THE PARTICULAR KIND OF PLASTIC THAT MGA
24   WAS USING, WAS THAT DRIVING THE DOLL SALES AS OPPOSED TO THE
25   DOLLS?'
```

```
 1          THAT'S AN IRRELEVANT INQUIRY, FROM OUR PERSPECTIVE.
 2          THE COURT:  CIRCLING BACK TO MS. AGUIAR'S POINT ON
 3   INDEPENDENT CREATION AND ORIGINALITY.
 4          MR. ZELLER:  YES, YOUR HONOR.
 5          NUMBER ONE, THAT DEFENSE HAS BEEN WAIVED.  IT IS AN
 6   AFFIRMATIVE DEFENSE.  IT WAS NEVER PLED, AND IT WAS NEVER
 7   ASSERTED IN THE FINAL PRETRIAL CONFERENCE ORDER.  MGA SUBMITTED
 8   JURY INSTRUCTIONS, WHICH I BELIEVE IS THE FIRST TIME -- AND WE
 9   OBJECTED.  THERE IS NO INDEPENDENT CREATION DEFENSE.  THAT HAS
10   BEEN PLED AND IT'S BEEN WAIVED.  IT JUST FAILS AS A LEGAL
11   MATTER, RIGHT THEN AND THERE.
12          NUMBER TWO -- AND THE COURT HAS ALREADY MENTIONED
13   THIS -- THE FACT IS, IT IS LEGALLY IMPOSSIBLE FOR THEM, GIVEN
14   THEIR OWN TESTIMONY TO-DATE, TO ASSERT AN INDEPENDENT CREATION
15   DEFENSE.
16          THE COURT:  WHAT ABOUT MARGARET LEAHY'S TESTIMONY
17   THAT THIS HAD NOTHING TO DO WITH THE DRAWINGS?
18          MR. ZELLER:  HONESTLY, FIRST OF ALL, AT A BARE
19   MINIMUM, WE HAVE MGA AND CARTER BRYANT TESTIMONY EXACTLY TO THE
20   CONTRARY.  SO, I MEAN, WE CAN START WITH WHETHER OR NOT IT EVEN
21   MATTERS WHAT SHE HAS SAID.
22          BUT MY UNDERSTANDING -- AND MR. PRICE COULD PROBABLY
23   GIVE BETTER DETAILS, BECAUSE HE SEEMS TO HAVE A BETTER MEMORY
24   OF IT THAN I DO.  MR. PRICE DIDN'T THINK THAT IT WAS BEING
25   ACCURATELY CHARACTERIZED AS TO WHAT HER TESTIMONY IS.
```

1           BUT IN ANY EVENT, HERE'S THE PROBLEM WITH ANY

2   INDEPENDENT CREATION DEFENSE:  THE TYPICAL SITUATION, AS THE

3   COURT IS AWARE, WHERE INDEPENDENT CREATION COMES UP IS -- YOU

4   KNOW, YOU'VE GOT, MAYBE, A LARGE COMPANY.  THEY HAVE MULTIPLE

5   DEPARTMENTS.  SOMEONE DROPS OFF A SCRIPT AT A STUDIO,

6   DEPARTMENT A.  SO TECHNICALLY, THE CORPORATION HAS ACCESS.

7   MEANWHILE, IN SOME OTHER GROUP, PEOPLE ARE WORKING ON A SCRIPT,

8   AND THEN SIMILARITIES ARISE.

9           **THE COURT:**  YOU DON'T NEED TO HAVE A BIG COMPANY TO

10  HAVE AN INDEPENDENT CREATION.  IT COULD BE A SMALL COMPANY.  IT

11  COULD BE THE SIZE OF MGA.  AND IF SOMEBODY ELSE AT MGA HAD

12  INDEPENDENTLY CREATED THIS DOLL, WITHOUT INCORPORATING INTO IT,

13  AND USING AS A REFERENCE POINT THE CARTER BRYANT DRAWINGS, THEN

14  THAT WOULD BE INDEPENDENT CREATION.

15          **MR. ZELLER:**  THIS IS WHERE I HAVE DIFFICULTY

16  UNDERSTANDING MGA'S ARGUMENT, BECAUSE IF YOU'RE USING

17  SOMEBODY'S WORK, THE WORK THAT HAS BEEN INFRINGED, IF THE ONE

18  IS THE SUBJECT OF THE INFRINGEMENT CLAIM, IF IT'S BEING USED AS

19  A REFERENCE, BY DEFINITION, THAT IS NOT INDEPENDENT CREATION.

20  INDEPENDENT CREATION IS WHERE YOU'VE DONE IT ON YOUR OWN.

21          **THE COURT:**  IF IT WASN'T BEING USED AS A REFERENCE.

22          **MR. ZELLER:**  OH, I APOLOGIZE.  I MISUNDERSTOOD.

23          **THE COURT:**  IF IT WAS NOT BEING USED AS A REFERENCE,

24  IF SOMEBODY AT MGA HAD CREATED IT, OR EVEN A COMPANY SMALLER

25  THAN MGA -- IT DOESN'T TURN ON THE SIZE OF THE COMPANY -- BUT

```
 1   YOU'RE RIGHT, THAT'S WHERE IT NORMALLY COMES UP IN REAL LIFE.
 2            MR. ZELLER:  RIGHT.  AND THAT'S PRECISELY MY POINT.
 3            THEY HAVE ADMITTED -- WE SAW IT IN HONG KONG
 4   PLEADINGS; USED AS A REFERENCE; WE HEARD IT FROM MR. LARIAN
 5   YESTERDAY.  THEY WANT TO DANCE AROUND WITH THE WORD
 6   "INSPIRATION" -- ONE CAN DEBATE, I GUESS, THE NUANCES OF THAT,
 7   BUT WHATEVER IT MEANS, IT CERTAINLY DOES NOT MEAN INDEPENDENT
 8   CREATION.  SO I THINK FACTUALLY -- AND I THINK THE COURT IS
 9   ACTUALLY RIGHT.  I MEAN, THE NEXT STEP ON ANY ATTEMPT TO ASSERT
10   AN INDEPENDENT CREATION DEFENSE, EVEN IF THE COURT IS GOING TO
11   ALLOW IT, DESPITE THE RATHER, I THINK, DISPOSITIVE LEGAL
12   DEFECTS IN HAVING FAILED TO PLEAD IT OR PRESERVE IT IN THE
13   FINAL PRETRIAL CONFERENCE ORDER, WOULD BE AN EVIDENTIARY
14   HEARING; BECAUSE I THINK THE COURT'S SURMISE IS ABSOLUTELY
15   CORRECT, THAT IT IS NOT EVEN GOING TO BE FEASIBLE FOR THEM
16   FACTUALLY TO MOUNT AN INDEPENDENT CREATION DEFENSE.  I MEAN,
17   WHAT HAS BEEN DESCRIBED IS THIS WHOLE PROCESS.  AND THERE'S
18   CERTAINLY AMPLE EVIDENCE THAT -- I MEAN, NOTWITHSTANDING, I
19   SUPPOSE, THEIR CHARACTERIZATION OF WHAT MARGARET LEAHY SAID --
20   I DO THINK IT'S AN INCORRECT CHARACTERIZATION.  WE CAN GO BACK
21   AND LOOK AT IT.
22            THE COURT:  YOUR ARGUMENT THAT IT'S AN AFFIRMATIVE
23   DEFENSE, THAT'S SOMEWHAT UNDERCUT BY THE LANGUAGE IN THE CASES
24   WHICH, AS MS. AGUIAR POINTS OUT -- IS THAT THIS IS JUST PART OF
25   THE COMMON BURDEN-SHIFTING THAT TAKES PLACE IN THE CONTEXT OF
```

```
 1   COPYRIGHT INFRINGEMENT CASES, AS OPPOSED TO -- I MEAN, THERE'S

 2   OTHER INSTANCES IN EMPLOYMENT LAW AND OTHER AREAS WHERE THAT

 3   KIND OF BURDEN-SHIFTING GOES ON, THAT -- I'M GOING OUT ON A

 4   LIMB HERE, BUT I DON'T SEEM TO RECALL A REQUIREMENT THAT THE

 5   AFFIRMATIVE DEFENSE BE ACTUALLY PLED IN ADVANCE OF TRIAL.  I

 6   MAY BE MISTAKEN ON THAT.

 7            MR. ZELLER:  THERE ARE CASES THAT WE CITED IN OUR

 8   JURY INSTRUCTION OBJECTIONS THAT DO SPECIFICALLY SAY IT IS AN

 9   AFFIRMATIVE DEFENSE.

10            THE COURT:  THAT HAS TO BE PLED IN ADVANCE.

11            MR. ZELLER:  CORRECT.  THAT'S MY UNDERSTANDING.

12            THE COURT:  I HAVEN'T GOTTEN TO THOSE YET.

13            BUT YOU UNDERSTAND THE POINT THAT I'M MAKING?  THERE

14   ARE OTHER AREAS OF THE LAW WHERE THE COURT TALKS ABOUT THIS

15   BURDEN-SHIFTING IN THE EMPLOYMENT CONTEXT, WHERE I DON'T THINK

16   THAT'S REQUIRED.

17            MR. ZELLER:  I DO UNDERSTAND WHAT THE COURT IS

18   SAYING, AND I KNOW THE LANGUAGE THAT THE COURT IS POINTING TO,

19   AND I RECOGNIZE THAT IS --

20            THE COURT:  IN THE MCDONELL-DOUGLAS CASE, ONE OF THE

21   DISCRIMINATION CASES, I THINK THERE'S A BURDEN-SHIFTING THAT

22   GOES ON.

23            MR. ZELLER:  OH, ABSOLUTELY.  RIGHT.

24            THE COURT:  IT DOESN'T REQUIRE AN AFFIRMATIVE DEFENSE

25   PLEADING.
```

```
 1            MR. ZELLER:   THERE'S ANY NUMBER OF DOCTRINES WHERE
 2   YOU HAVE BURDEN-SHIFTING AND PRESUMPTIONS ARE BURST.  THERE ARE
 3   PLENTY OF THEM IN THE COPYRIGHT CONTEXT AS WELL.  BUT I DON'T
 4   THINK THERE'S ANYTHING WE CAN HANG OUR HAT ON AND SAY, FOR
 5   EXAMPLE, THREE BOYS, AS TO WHETHER OR NOT THEY ARE SAYING IT'S
 6   AN AFFIRMATIVE DEFENSE.  IT COULD HAVE BEEN PLED -- OBVIOUSLY,
 7   THAT DETAIL IS NOT SET FORTH.  BUT IN GENERAL, ONCE YOU HAVE
 8   ACCESS AND SUBSTANTIAL SIMILARITY, I MEAN, THAT USUALLY AMOUNTS
 9   TO INFRINGEMENT.  AND WHAT ALSO THOSE CASES COULD VERY WELL BE
10   SAYING IS, YOU DON'T EVEN GET TO INDEPENDENT CREATION UNLESS
11   INFRINGEMENT IS PROVED FIRST.
12            THE COURT:  ALL RIGHT.
13            I THINK I'M IN A POSITION TO MAKE RULINGS ON THE
14   RELEVANCY OF VARIOUS EVIDENCE AS IT COMES UP.
15            LAST THING, MR. ZELLER, ON THE CARTER BRYANT
16   DESIGNATIONS, YOU WANT QUESTIONS IN ABOUT THE PROCESS OF DOLL
17   CREATION?
18            MR. ZELLER:  I'M NOT SURE THAT I WOULD QUITE PUT IT
19   THAT WAY.
20            WE TALK ABOUT -- SOME OF IT'S ANTICIPATORY, IN TERMS
21   OF REBUTTING IT -- WE TALK ABOUT -- AND MAYBE MR. PROCTOR IS
22   BETTER SITUATED --
23            THE COURT:  I SEE HIM BACK THERE.
24            MR. ROTH, I'LL GIVE YOU A CHANCE TO RESPOND TO ALL OF
25   THIS.
```

1           YOU KNOW WHAT I'M REFERRING TO, MR. PROCTOR?

2           **MR. PROCTOR:** I DO. THAT IS THAT THOSE WERE

3    ANTICIPATORY DESIGNATIONS. AND, PERHAPS, HAVING THOUGHT IT

4    THROUGH BETTER, I THINK THE CARTER BRYANT DESIGNATIONS WOULD BE

5    BETTER SUITED AS REBUTTAL TESTIMONY, DEPENDING ON EXACTLY WHAT

6    COMES IN IN THEIR CASE-IN-CHIEF, BECAUSE THIS IS TESTIMONY.

7    THE BULK OF IT RESPONDS TO WHAT WE ANTICIPATE MARGARET LEAHY

8    WILL BE TESTIFYING TO. DEPENDING ON WHAT COMES IN, IT MAY OR

9    MAY NOT BE APPROPRIATE REBUTTAL TESTIMONY.

10          (BRIEF PAUSE.)

11          **MR. PROCTOR:** I'M BEING -- FROM MY RIGHT EAR --

12   PERHAPS THE WAY TO HANDLE THIS IN TERMS OF THE DESIGNATIONS --

13   AND I DON'T WANT TO INCONVENIENCE THE COURT IN TERMS OF THE

14   RULINGS ON IT. THERE IS TESTIMONY IN THE BRYANT TRANSCRIPT

15   THAT WOULD MORE PROPERLY FALL UNDER OUR CASE-IN-CHIEF;

16   TESTIMONY ABOUT THE DOLLS LOOKING LIKE THE DRAWINGS AND BEING

17   BASED ON THE DRAWINGS; TESTIMONY THAT GOES DIRECTLY TO

18   SUBSTANTIAL SIMILARITY. AND THEN THERE IS THIS OTHER TESTIMONY

19   WHICH WE DESIGNATED AT THE SAME TIME, WHICH UPON REFLECTION, IS

20   PROBABLY MORE PROPERLY REBUTTAL TESTIMONY. IF THE COURT WANTED

21   US TO HANDLE IT THIS WAY, I COULD TRY TO CARVE OUT THE

22   CASE-IN-CHIEF VERSUS REBUTTAL ASPECTS OF IT.

23          **THE COURT:** IT'S NOT FOR ME TO CARVE ANYTHING OUT,

24   AND IT'S NOT FOR ME TO ASK YOU TO HANDLE THINGS A CERTAIN WAY.

25   IT'S FOR YOU TO ASK THE COURT TO RULE ON DESIGNATIONS, AND I'LL

1    RULE ON THEM.  I'M NOT GOING TO TELL YOU OR MGA HOW TO RUN YOUR

2    CASE.

3              **MR. PROCTOR:**  I UNDERSTAND THAT.

4              IN TERMS OF --

5              **THE COURT:**  RIGHT NOW YOU'RE PRESENTING THIS TO ME AS

6    A REQUEST TO INTRODUCE THIS EVIDENCE IN YOUR CASE-IN-CHIEF.  IF

7    THAT'S NOT THE CASE, THEN YOU BETTER CLARIFY.

8              **MR. PROCTOR:**  THEN I WOULD, FOR THE PURPOSE OF

9    CASE-IN-CHIEF, WITH THE COURT'S PERMISSION, WITHDRAW THE

10   DESIGNATIONS THAT RESPOND --

11             **MR. PRICE:**  HERE'S WHAT I REQUEST:  AND THAT IS,

12   WE'VE OFFERED THESE DESIGNATIONS.  THERE'S ONE SECTION IN

13   PARTICULAR -- I DON'T KNOW IF WE'VE ALREADY WITHDRAWN -- WHICH

14   TALKS ABOUT THE PROCESS.

15             **THE COURT:**  YES.

16             **MR. PRICE:**  THAT, WE'LL WITHDRAW ONCE WE MAKE SURE

17   WE'RE ON THE SAME PAGE ON THAT.

18             HOWEVER, I THINK WHAT WE DO WANT TO PUT IN IS THE

19   ACCESS EVIDENCE, WHICH IS, 'I GAVE MARGARET LEAHY THIS, FOR

20   EXAMPLE, SCULPT DRAWING TO RESTART HER SCULPT.'  AND THEN

21   THERE'S ALSO EVIDENCE CONCERNING WHETHER OR NOT HE PROVIDED

22   DRAWINGS FOR THE HONG KONG TOY FAIR DOLLS AND WHETHER THOSE ARE

23   SIMILAR AND WHETHER THE HONG KONG TOY FAIR DOLLS ARE SIMILAR.

24             SO I THINK THE BEST THING TO DO IS TO RULE ON THE

25   OBJECTIONS.  AND I CAN TELL YOU, IF SOMEONE CAN HAND ME THE

 1   TRANSCRIPT -- I THINK WE ARE ON THE SAME PAGE -- THERE'S A

 2   SECTION WHERE HE TALKS ABOUT, YOU KNOW, YOU GIVE DRAWINGS AND

 3   THERE'S THIS PROCESS AND ALL THAT.

 4        **THE COURT:**  I'M GOING TO RULE ON WHAT YOU'VE

 5   SUBMITTED TO THE COURT, BUT UNDERSTAND, YOU MAY BE OPENING SOME

 6   DOORS IF YOU PLAY THIS.  AND I'VE SAID THAT TO MGA BEFORE; I'VE

 7   SAID THAT TO YOU.  YOU DECIDE WHAT YOU PLAY OR WHAT YOU DON'T

 8   PLAY.  I'M GOING TO RULE ON IT, THOUGH.  BUT UNDERSTAND THAT

 9   SOME OF MY RULING IS NOT BEING INFORMED BY THE DISCUSSION THAT

10   WE'VE HAD THIS MORNING, BUT BY SOME DOORS THAT ARE BEING OPENED

11   BY THIS TESTIMONY.

12        **MR. PRICE:**  RIGHT.

13        **THE COURT:**  MR. ROTH, I'LL NOW HEAR FROM YOU.

14        **MR. ROTH:**  IN TERMS OF THE APPORTIONMENT QUESTION, I

15   JUST REFER THE COURT TO TWO CASES.

16        **THE COURT:**  OF COURSE, THE IRONY OF THAT IS THAT MGA

17   IS OBJECTING TO THAT VERY TESTIMONY THAT WOULD OPEN THE DOOR

18   FOR THEM TO GET IN WHAT THEY WANT TO GET IN.  BUT I'LL TRY TO

19   SORT THROUGH ALL OF THAT.

20        **MR. ROTH:**  THE LEADING CASE ON THE APPORTIONMENT

21   QUESTION CITED BY BOTH SIDES IS THE <u>SHELDON</u> CASE.  IT'S A

22   SUPREME COURT CASE.  I THINK THE KEY LANGUAGE IS AT 406.  I'LL

23   JUST READ A COUPLE OF SENTENCES.

24        "THE CONTROLLING FACT IN THE DETERMINATION OF THE

25   APPORTIONMENT WAS THAT THE PROFITS HAD BEEN DERIVED NOT FROM

```
 1   THE MERE PERFORMANCE OF A COPYRIGHTED PLAY, BUT FROM THE

 2   EXHIBITION OF A MOTION PICTURE WHICH HAD DISTINCTIVE

 3   PROFIT-MAKING FEATURES, APART FROM THE USE OF ANY INFRINGING

 4   MATERIAL" -- APART FROM THE DOLL -- "BY REASON OF THE EXPERT

 5   AND CREATIVE OPERATIONS INVOLVED IN ITS PRODUCTION AND

 6   DIRECTION."

 7           THE COURT:  CAN I SEE THAT PARAGRAPH?

 8           WE'RE GOING TO WRAP THIS UP IN FIVE MINUTES, GIVE THE

 9   REPORTER A BREAK, AND THEN WE'RE GOING TO START WITH THE JURY

10   AT 10:30.  WE DO HAVE TO WRAP THINGS UP HERE.

11           THIS IS IMPORTANT, BUT WE'VE KEPT THE JURY WAITING

12   AWHILE.

13           (BRIEF PAUSE.)

14           THE COURT:  WHAT HAPPENED HERE?

15           MR. ROTH:  IT'S A MOVIE AND THE QUESTION IS,

16   WHAT'S -- THEY'RE APPORTIONING THE ROLE OF --

17           THE COURT:  THE MOVIE WAS BASED ON A PLAY, ON A

18   COPYRIGHTED PLAY.

19           MR. ROTH:  YES.

20           THE COURT:  "THE PROFITS WERE DERIVED NOT FROM THE

21   MERE PERFORMANCE OF A COPYRIGHTED PLAY."  SO YOU HAD A

22   COPYRIGHTED PLAY THAT GOT TURNED INTO A MOVIE; YOU'RE SAYING

23   KIND OF LIKE THE DRAWINGS GET TURNED INTO A DOLL.

24           MR. ROTH:  RIGHT.

25           THE COURT:  "IT WAS NOT FROM THE MERE PERFORMANCE OF
```

```
 1  THE COPYRIGHTED PLAY, BUT FROM THE EXHIBITION OF A MOTION

 2  PICTURE WHICH HAD ITS DISTINCTIVE PROFIT-MAKING FEATURES APART

 3  FROM THE USE OF ANY INFRINGING MATERIAL BY REASON OF THE

 4  EXPERT."

 5          OKAY.  I SEE WHAT YOU'RE SAYING.

 6          MR. ROTH:  THEN IF I COULD, THERE'S EVEN A MORE APT

 7  CASE.

 8          THE COURT:  THEN THE NEXT LINE, "IN THAT ASPECT OF

 9  CASES, A CERTAIN RESEMBLANCE TO THAT OF A PATENT INFRINGEMENT,

10  WHERE THE INFRINGER HAS CREATED PROFITS BY THE ADDITION OF

11  NONINFRINGING AND VALUABLE IMPROVEMENTS..."

12          MR. ROTH:  I THINK, YOUR HONOR -- AND WE CITED THIS

13  CASE AS WELL --

14          THE COURT:  THAT'S ON ONE SIDE.  AND THEN I HAVE ON

15  THE OTHER SIDE, THE CASES WHICH ALSO STAND FOR THE PROPOSITION,

16  WHEN IT IS INEXTRICABLY INTERTWINED, YOU CONSIDER IT AS A

17  WHOLE.  SO THE QUESTION GOING FORWARD, AS I LISTEN TO THIS

18  EVIDENCE, WILL BE, TO WHAT EXTENT IS THE EVIDENCE ESTABLISHING

19  THAT THIS IS ALL INEXTRICABLY INTERTWINED IN INFRINGING

20  MATERIAL, OR IS IT TO THE EXTENT THAT THERE IS SOMETHING THAT

21  IS IDENTIFIABLE HERE THAT IS NOT INFRINGING WHICH IS ADDING

22  VALUE TO IT SEPARATE AND APART?

23          MR. ROTH:  THAT'S EXACTLY THE POINT.  WHAT WE'LL SEE

24  IN THE EVIDENCE THAT WILL COME IN FROM BOTH SIDES, WE BELIEVE,

25  IS THAT THE PARTIES FOCUS ON THOSE INDIVIDUAL ASPECTS BESIDES
```

1   DESIGN AS BEING RELEVANT TO THE SUCCESS OF THE DOLL, BOTH ON

2   THE MATTEL SIDE AND THE --

3           **THE COURT:**  MR. ROTH, YOU'VE LED TO WHERE THE FOCUS

4   REALLY SHOULD BE; AND THIS HAS BEEN URGED; AND THIS GETS AWAY

5   FROM THIS POTENTIALLY CONFUSING DETAILED EVIDENCE.  AND MAYBE

6   I'VE GOT TO PLACE MORE CONFIDENCE IN MS. AGUIAR'S STATEMENT

7   THAT WE'RE NOT GOING TO GET INTO THE NUMBER OF HOURS AND ALL OF

8   THE WORK THAT'S GONE ON.  AT THE END OF THE DAY, THIS JURY IS

9   COMPARING THINGS.  THEY'RE COMPARING SUBSTANTIAL SIMILARLY IN

10  INFRINGING PRODUCTS, AND THEY'RE ALSO LOOKING AT THE END

11  RESULT, AND THEY MAY CONSIDER EVIDENCE THAT THINGS ENTIRELY

12  APART FROM THE DOLL ACCOUNT FOR THE SALE OF THE PRODUCT.  AND I

13  THINK THAT'S PARTICULARLY TRUE, AS I POINTED OUT, WITH RESPECT

14  TO THINGS WHICH, UNLIKE DOLLS, ARE REALLY AFIELD, LIKE THE

15  TENTS OR THE SOFAS.

16          BUT I HOPE MGA UNDERSTANDS, AND I HOPE MATTEL

17  UNDERSTANDS, THAT THAT'S THE FOCUS.  IT'S NOT IN HEARING

18  TESTIMONY ABOUT ALL OF THE HARD WORK, SWEAT OF THE BROW, THAT

19  WENT INTO DOING IT, BECAUSE THAT HAS THE DANGER OF APPEALING --

20  AS MUCH AS I CAN UNDERSTAND WHY MGA MIGHT WANT TO PRESENT THIS,

21  IT'S NOT A MATTER OF TRYING TO APPEAL TO THE JURY'S SENSE OF

22  SYMPATHY THAT, 'OH, MY GOSH, MGA HAS WORKED REALLY HARD ON THIS

23  PRODUCT FOR SEVEN OR EIGHT YEARS, AND THEY DESERVE MONEY FOR

24  THAT.'  I UNDERSTAND THAT MAY BE AN ARGUMENT YOU WANT TO MAKE,

25  BUT THAT'S AN ARGUMENT THAT'S FORECLOSED BY THE LAW.

1          **MR. ROTH:** UNDERSTOOD.

2          **THE COURT:** THAT'S THE SWEAT-OF-THE-BROW ARGUMENT

3    THAT IS FORECLOSED IN THIS, NOTWITHSTANDING THE ARGUMENT THAT

4    THAT ONLY APPLIES TO ORIGINALITY. IT DOESN'T. IT APPLIES TO

5    THE COPYRIGHT.

6          **MR. ROTH:** IF I COULD JUST -- ONE MORE CASE, BECAUSE

7    IT INVOLVE DRAWINGS, SO I THINK IT'S RELEVANT HERE.

8          THIS IS THE DANIELSON CASE, WHICH IS A CASE OUT OF

9    THE FIRST CIRCUIT, PAGE 48. READING, AGAIN, FROM A PARAGRAPH

10   THERE: "AT TRIAL, WCP PRESENTED EVIDENCE CONCERNING MANY

11   CONTRIBUTING FACTORS THAT HELPED THE WILLOWS AT WINCHESTER TURN

12   A PROFIT BESIDES DANIELSON'S SKELETAL SITE PLANS."

13         **THE COURT:** BUT, AGAIN, THE FOCUS IS ON FACTORS THAT

14   CAN BE POINTED TO IN THE PRODUCT THAT ACCOUNT FOR -- IT'S

15   NOT -- AGAIN, IT'S NOT -- YES. I UNDERSTAND.

16         **MR. ROTH:** LET ME JUST GO ON.

17         "IT POINTED TO FIVE VOLUMES OF SUBSEQUENT AND MORE

18   DETAILED ARCHITECTURAL DRAWINGS NECESSARY TO COMPLETE THE

19   PROJECT. OTHER EVIDENCE CONCERNED THE EXTENSIVE EFFORTS WCP

20   MADE TO COORDINATE LOGISTICS, SUPERVISE SUBCONTRACTORS, CHOOSE

21   AND INSTALL VARIOUS AMENITIES, MARKET THE DEVELOPMENT, AND SELL

22   THE CONDOMINIUM UNITS. WCP ALSO ARGUED THAT ASPECTS OF

23   DANIELSON'S SITE PLANS, SUCH AS THE PLACEMENT OF GARAGES AND

24   PARKING AREAS, ACTUALLY MIGHT HAVE DETRACTED FROM THE

25   DEVELOPMENT'S APPEAL. WC SUPPORTED MANY OF THESE CONTENTIONS

```
 1   WITH TESTIMONY FROM TWO EXPERTS."  AND THEY NAMED THE EXPERTS.

 2         SO, AGAIN, THIS IS THE TYPE -- OBVIOUSLY, WE'RE NOT

 3   TALKING ABOUT A CONDOMINIUM HERE, BUT WHAT WE'RE TALKING ABOUT

 4   IS -- IT'S NOT COMPARING ONE PROTECTABLE ELEMENT NECESSARILY TO

 5   ANOTHER; IT'S ANSWERING THE QUESTION, WHY THE PROFITS?

 6         AND WE NEED TO ADDRESS THAT QUESTION IN A WAY THAT WE

 7   CAN CONVINCE THE JURY AS TO WHY THE PROFITS.

 8              THE COURT:  MR. ZELLER?

 9         MR. ZELLER:  I THINK THE LAST ARGUMENT WE HEARD IS

10   REALLY INCONSISTENT WITH THE EARLIER CONCESSION BY MGA THAT

11   EVERYTHING IN THE DOLL IS INEXTRICABLY INTERTWINED.  IF WHAT

12   THEY ARE SAYING IS, HERE'S MARKET RESEARCH AS TO WHY PEOPLE BUY

13   THE DOLLS; IT'S NOT BECAUSE OF, SAY, THE FACIAL DECORATION, BUT

14   BECAUSE OF THE HAIRSTYLE OR THE BENDABLE KNEE, YOU KNOW, ANY

15   NUMBER OF FACTORS, THEY'VE ALREADY -- THAT SHIP HAS SAILED.

16   THEY'VE ALREADY CONCEDED THAT PROFITS THAT COME FROM THE

17   DOLLS --

18              THE COURT:  ON THE DOLLS, THE DOLL IS THE DOLL.  ONE

19   THING THEY HAVE IDENTIFIED THAT'S SEPARATE AND APART -- AND I

20   WILL ENTERTAIN EVIDENCE ON -- IS THIS ISSUE OF THE PACKAGING.

21   THAT'S SOMETHING -- TO THE EXTENT THAT THE PACKAGING IS APART

22   AND DISTINCT FROM THE COPYRIGHTED DRAWINGS -- MAYBE I SHOULD

23   GET A LIST FROM MGA.

24              WHAT ELSE IS THERE?

25              MR. ROTH:  IT WOULD NOT BE.
```

```
 1              THE COURT:  I'VE GOT PACKAGING.

 2          WHAT ELSE DO WE HAVE?

 3              MR. ROTH:  IF YOU LOOK AT THE PACKAGE -- YOU START

 4   WITH THE PACKAGING, BUT YOU'VE ALSO GOT -- INSIDE THE PACKAGE,

 5   YOU'VE GOT CLOTHES THAT CHANGE CONSTANTLY.

 6              THE COURT:  WELL, NO.

 7          TO THE EXTENT THE DOLL ACCESSORIES -- THERE ARE

 8   PROTECTABLE ELEMENTS OF DOLL ACCESSORIES AND CLOTHING AND

 9   SHOES, AND TO THE EXTENT THAT THOSE ARE COPYRIGHTED, THEN TO

10   THE EXTENT --

11              MR. ROTH:  WE WOULD AGREE THAT MAYBE SOME OF THE

12   CLOTHES ARE COPIES OF --

13              THE COURT:  ONES THAT ARE NOT, THAT THE JURY DOES NOT

14   FIND ARE SUBSTANTIALLY SIMILAR, THAT'S OUTSIDE.

15          SO WHAT ELSE BESIDES PACKAGING AND NONCOPYRIGHTED

16   ACCESSORIES?

17              MR. ROTH:  ACCESSORIES, FASHIONS.  THEN THERE ARE THE

18   PROMOTIONAL EFFORTS ASSOCIATED WITH GETTING THE GIRL AND THE

19   MOTHER IN THE STORE IN THE FIRST PLACE, JUST AS CITED IN THOSE

20   CASES.

21              THE COURT:  HOW IS THAT SEPARATE AND APART?  THE

22   ADVERTISING COSTS ARE TAKEN OUT OF THE DAMAGES.  MARKETING AND

23   ADVERTISING, THAT'S ALREADY ACCOUNTED FOR.

24              MR. ROTH:  THE CASES THAT I CITED TO YOUR HONOR

25   CLEARLY LOOK AT PROMOTIONAL ACTIVITY AND ADVERTISING AS PART OF
```

```
 1   THE APPORTIONMENT ANALYSIS.

 2        THE COURT:  I'LL TAKE A LOOK AT THAT CASE, BUT MY

 3   SENSE IS THAT PROMOTION AND MARKETING IS TAKEN -- WE'VE MOVED

 4   BEYOND WHERE THIS MOTION STARTED THIS MORNING.  WE'RE NOW JUST

 5   FOCUSING ON THE APPORTIONMENT DAMAGE ASPECT.  MY SENSE IS THAT

 6   PROMOTIONAL MARKETING IS TAKEN CARE OF BY SUBTRACTING THAT OUT.

 7   AND IF IT DOESN'T GET SUBTRACTED OUT, THEN IT NEEDS TO GET

 8   ADDED BACK IN.

 9        WHAT ELSE DO WE HAVE?

10        MR. ROTH:  WE THEN HAVE THE THEMES ASSOCIATED WITH

11   THE DOLLS.  THERE WILL BE EVIDENCE THAT WILL SHOW THAT DOLL

12   SALES VARY WIDELY DEPENDING UPON THE THEME ASSOCIATED WITH THE

13   DOLL.  THEREFORE, IT'S NOT THE DOLL; IT'S THE THEME.  IT HAS TO

14   BE.  AND YOU'LL SEE THAT IS CORE TO MATTEL AND MGA'S MARKETING

15   STRATEGIES.

16        THE COURT:  AGAIN, SOME OF THE THEMES, THE ATTITUDE,

17   THE LOOK, WAS CAPTURED AS A PROTECTABLE ELEMENT; BUT, AGAIN, TO

18   THE EXTENT THAT WE CAN GO BEYOND THAT, PERHAPS.

19        MR. ROTH:  TO THE EXTENT THAT THERE'S A DUPLICATION

20   OF A THEME IN CARTER BRYANT'S DRAWINGS, WHICH WE SUBMIT THERE

21   ISN'T, THAT MAY BE A DIFFERENT QUESTION.

22        THE COURT:  THE COURT IDENTIFIED THE THEME AS A

23   PARTICULAR LOOK OR ATTITUDE.  A MERE VARIATION ON THAT LOOK OR

24   ATTITUDE WOULD STILL FALL WITHIN A PROTECTABLE ELEMENT.  BUT

25   SOMETHING THAT GOES MARKEDLY OUTSIDE THAT, I SUPPOSE, MIGHT
```

1   NOT. THAT'S FOR THE JURY TO DECIDE. THAT'S THE WHOLE

2   SUBSTANTIAL SIMILARITY. WHETHER TOKYO A GO-GO AND CHLOE HERE

3   IN THE FIRST GENERATION IS SUBSTANTIALLY SIMILAR TO THE

4   PROTECTABLE ELEMENT IDENTIFIED AS THE FIRST PROTECTABLE

5   ELEMENT, THAT'S FOR THE JURY TO DECIDE.

6           **MR. ROTH:** BUT THE THEMES WE'RE TALKING ABOUT,

7   "WINTER WONDERLAND" AND "ROCKER GIRL," NONE OF THAT IS IN --

8           **THE COURT:** RIGHT. THE FIRE -- WHATEVER IT IS;

9   YOU'RE RIGHT. THAT THEME IS NOT WHAT I'M TALKING ABOUT. I'M

10  TALKING ABOUT THE ATTITUDE AND LOOK OF THE DOLL, AS OPPOSED TO

11  THE WINTERTIME WONDERLAND COLLECTION THEME. AND THIS IS WHERE

12  WE GET INTO A DIFFICULT -- HOW CONNECTED THOSE TWO ARE.

13          ANYWAY, WHAT ELSE BESIDES THEMES?

14          **MR. ROTH:** THE CHARACTERS, THE CHARACTERS THAT ARE

15  DEVELOPED. THERE WERE FOUR ORIGINAL CHARACTERS. THERE ARE

16  ADDITIONAL CHARACTERS DEVELOPED OVER TIME. THERE'S SOMETHING,

17  LIKE, 40 CHARACTERS NOW. THE WAY THE CHARACTERS INTERACT.

18          **THE COURT:** ANYTHING ELSE?

19          **MR. ROTH:** THAT'S IT.

20          **THE COURT:** BUT TO THE EXTENT THAT ANY OF THIS COMES

21  IN, THE FOCUS IS ON THESE ELEMENTS AND THESE FACTORS, NOT THE

22  SWEAT OF THE BROW THAT GOES INTO DEVELOPING THESE FACTORS.

23  THAT'S THE PREJUDICIAL ASPECT THAT I AM QUITE CONVINCED IS OUT.

24          **MR. ROTH:** WHAT I UNDERSTAND YOU TO BE SAYING IS,

25  WE'RE NOT LOOKING FOR SYMPATHY BECAUSE WE'RE UP LATE AT NIGHT,

```
 1   SWEATING A LOT, AND WE GET A LOT OF WORK.
```
```
 2         THE COURT:  SPENDING A LOT OF TIME COMING UP WITH
```
```
 3   THEMES.  IT'S THE QUESTION OF -- I AM NOT MAKING ANY FINAL
```
```
 4   DECISIONS ON THIS; BUT, YES, TO THE EXTENT THAT PACKAGING, FOR
```
```
 5   EXAMPLE, IS IDENTIFIABLE, THAT IS A SEPARATE COMPONENT OR
```
```
 6   ELEMENT OF THE PROFITABILITY OF THAT PARTICULAR SALE AND THERE
```
```
 7   ARE NONINFRINGING ELEMENTS OF THE PACKAGING THAT CAN BE
```
```
 8   ATTRIBUTED TO THAT PROFITABILITY, THAT'S SOMETHING WHICH
```
```
 9   TESTIMONY COMES IN, EVIDENCE, ARGUMENT, ALL OF THAT.  BUT THE
```
```
10   FACT THAT IT TOOK YOU 300 HOURS OF TIME AND THAT YOU SPENT ALL
```
```
11   OF THESE RESOURCES, AND GETTING INTO A DETAILED EXPLANATION OF
```
```
12   HOW YOU COME UP WITH THE PACKAGING, THAT'S THE 403 PROBLEM THAT
```
```
13   HAS BEEN IDENTIFIED.
```
```
14         MR. ROTH:  OKAY.  AND, AGAIN, THIS IS JUST A
```
```
15   CONVERSATION THAT RELATES TO THE DOLLS.  WE HAD A SEPARATE
```
```
16   DISCUSSION -- I'M NOT GOING TO RAISE IT AGAIN -- REGARDING
```
```
17   COUCHES AND UMBRELLAS, AND THAT'S A SEPARATE --
```
```
18         THE COURT:  RIGHT.  AND AGAIN THERE, IT'S FOCUSING ON
```
```
19   ELEMENTS AND NOT ON SWEAT OF THE BROW.
```
```
20         MR. ZELLER?
```
```
21         MR. ZELLER:  I WOULD SUGGEST, YOUR HONOR, THAT IS A
```
```
22   THRESHOLD MATTER.  FOR MGA TO BE ABLE TO GO INTO ANY OF THESE
```
```
23   OTHER ELEMENTS THAT THEY WANT TO POINT TO, THEY HAVE TO PROVE
```
```
24   THAT THEY'RE NOT INEXTRICABLY INTERTWINED WITH THE COPYRIGHTED
```
```
25   MATERIAL.
```

```
 1              I THINK THAT'S --

 2         THE COURT:  THAT'S THE BALANCE.  AND TO THE EXTENT

 3    THAT ANYTHING IS ACTUALLY COPYING A PROTECTABLE ELEMENT, OR IS

 4    INEXTRICABLY INTERTWINED WITH A PROTECTABLE ELEMENT -- THE

 5    CASES YOU SITE ON THAT ARE QUITE CLEAR -- THEN THAT IS PART OF

 6    WHAT MATTEL CONCEIVABLY CAPTURES IF THE JURY FINDS

 7    INFRINGEMENT.

 8              ON THE OTHER HAND, TO THE EXTENT THAT IT IS NOT A

 9    PROTECTABLE ELEMENT, SUCH AS PACKAGING, AND THAT PACKAGING IS

10    NOT INEXTRICABLY INTERTWINED, THEN IT IS SOMETHING WHICH MGA

11    RETAINS.  AND THAT IS HOW IT IS FRAMED.

12         MR. ZELLER:  I'M NOT SURE I WOULD AGREE WITH THE WORD

13    "RETAIN."  THAT STRIKES ME AS A LITTLE BIT LOADED, BECAUSE IT

14    COULD STILL BE A DERIVATIVE WORK THAT WOULD BE INFRINGING; BUT

15    WE CAN SET THAT ASIDE.

16         THE COURT:  WE FINALLY COME BACK TO DERIVATIVE WORKS.

17         MR. ZELLER:  YES.  BUT SETTING THAT ASIDE, IN TERMS

18    OF APPORTIONMENT--

19         THE COURT:  ONCE AGAIN --

20         MR. ZELLER:  WHAT I WOULD SUGGEST IS THAT THEY BE

21    REQUIRED TO LAY, AS A FOUNDATIONAL MATTER, THAT THOSE THINGS

22    ARE NOT INEXTRICABLY INTERTWINED BEFORE THEY'RE ALLOWED TO GET

23    INTO IT, BECAUSE OTHERWISE, WE'RE RIGHT BACK WHERE WE STARTED,

24    WHICH IS MGA IS ESSENTIALLY GOING TO BE POINTING AT, 'LOOK AT

25    THE 50 THINGS WE ADDED.'
```

```
 1          THAT'S WHAT'S NOT PROPER UNDER SUBSTANTIAL

 2   SIMILARITY.

 3          THE COURT:  IS DERIVATIVE WORKS GOING TO, DEPENDING

 4   ON THE OUTCOME OF THIS TRIAL, SURFACE POST TRIAL?

 5          MR. ZELLER:  YOU'RE GOING TO HAVE TO FLUSH THAT OUT A

 6   LITTLE BIT MORE FOR ME, YOUR HONOR.  I'M NOT QUITE FOLLOWING

 7   THE QUESTION ABOUT DERIVATIVE WORKS.

 8          THE COURT:  AGAIN, WHAT IS YOUR POSITION ON THE

 9   DERIVATIVE WORKS THEORY, VIS-À-VIS THIS CASE?

10          MR. ZELLER:  THE ONES THAT ARE ALREADY AT ISSUE?

11          THAT'S WHERE -- THE WAY, I GUESS, I WOULD START WITH

12   THIS -- I MEAN, IN TERMS OF JUST OUR THINKING ON IT AT THIS

13   JUNCTURE -- IS THAT WHETHER SOMETHING IS A DERIVATIVE WORK OR

14   NOT, IF IT IS SUBSTANTIALLY SIMILAR, IT IS STILL INFRINGING.

15   AND THIS IS ACTUALLY ONE OF THE REASONS WHY ADDING IN A BUNCH

16   OF NEW MATERIAL, WHICH WOULD ARGUABLY MAKE THE WORK A

17   DERIVATIVE, IS KIND OF LEGALLY IRRELEVANT.  IT'S STILL

18   INFRINGING.  AND BECAUSE IT'S AN UNAUTHORIZED DERIVATIVE, MGA

19   HAS NO RIGHTS.

20          THE COURT:  I UNDERSTAND THAT ARGUMENT, BUT THAT

21   ARGUMENT HAS NOT BEEN PRESSED, COUNSEL.

22          MR. ZELLER:  WELL, IT HASN'T BECAUSE, NUMBER ONE, AS

23   THE COURT IS AWARE, CONTRARY TO WHAT HAS BEEN REPRESENTED IN

24   COURT, THIS WHOLE ISSUE IS NOT SOMETHING THAT THEY PLED, AND

25   IT'S NOT SOMETHING THAT WAS IN THE FINAL PRETRIAL CONFERENCE
```

1    ORDER.  SO, REALLY, IT'S NOT FAIR TO SORT OF SUGGEST THAT

2    SOMEHOW WE HAD A FULL-BLOWN PREVIEW.  I MEAN, WE HEARD

3    MR. NOLAN MAKING THE OPENING STATEMENT ALL AT THE SAME TIME.

4    WE DIDN'T HAVE ANY INSIDE INFORMATION IN ADVANCE AS TO HOW HE

5    WAS GOING TO SO EMPHASIZE THIS ISSUE.

6         FUNDAMENTALLY, YOUR HONOR, I THINK OUR POSITION IS

7    VERY CLEAR ON THIS, IS THAT THE JURY SHOULD BE INSTRUCTED AT

8    THE END OF THE DAY THAT, YOU KNOW, IT DOESN'T MATTER WHETHER OR

9    NOT YOU TRANSLATE SOMETHING; IF IT'S STILL SUBSTANTIALLY

10   SIMILAR, IT'S AN INFRINGEMENT.  THERE ARE FIVE EXCLUSIVE

11   RIGHTS.  THERE'S REPRODUCTION, SAME STANDARD, SUBSTANTIALLY

12   SIMILAR -- PREPARING A DERIVATIVE WORK IS ONE OF THE FIVE

13   EXCLUSIVELY RIGHTS -- NOW, I GUESS, SIX, YOU COULD ARGUE -- BUT

14   ONE OF THE EXCLUSIVE RIGHTS UNDER THE COPYRIGHT ACT.  AND THAT

15   IS STILL AN INFRINGEMENT.  SO NO MATTER HOW YOU CARVE IT UP, IT

16   STILL GETS THE SAME RESULT.

17        **THE COURT:**  ARE YOU ASKING THE COURT TO INSTRUCT ON

18   DERIVATIVE WORKS?

19        **MR. ZELLER:**  WELL, YES, YOUR HONOR.  WE WOULD ASK

20   THAT IT BE INSTRUCTED THAT A DERIVATIVE WORK IS -- HERE'S A

21   DEFINITION OF IT, AND IT IS AN INFRINGEMENT.  BECAUSE THEIR

22   WHOLE STRATEGY NOW IS TO FOCUS ON, 'HERE ARE THE 50,000

23   ADDITIONAL THINGS WE HAVE DONE.  EVERYTHING FROM THE TRUCKS

24   THAT CONVEY THE PRODUCT TO THE STORES TO' --

25        **THE COURT:**  THERE'S FIVE THINGS.

```
 1          MR. ZELLER:  I THINK YOU HEARD MR. ROTH ALSO TALK
 2   ABOUT COORDINATING, MARKETING, SELLING.  THOSE WERE THE WORDS
 3   HE USED WHEN HE --
 4          THE COURT:  PACKAGING, NONCOPYRIGHTED ACCESSORIES,
 5   PROMOTIONAL THEMES, AND ADDITIONAL CHARACTERS.  THAT'S IT.
 6   IT'S ON THE PAPER.
 7          MR. ZELLER:  I'M GRATIFIED TO KNOW THAT THAT'S GOING
 8   TO BE THE UNIVERSE, THEN, YOUR HONOR.
 9          IN TERMS OF THE WORKS, WHETHER THEY GET CHARACTERIZED
10   AS DERIVATIVE OR JUST SIMPLY A COPY, IT'S STILL AN
11   INFRINGEMENT.  AND PART OF THIS HAS TO DO WITH THE -- AND THE
12   COURT OBVIOUSLY RECENTLY READ THE ERG CASE, WHICH TENDS TO
13   TREAT TRANSLATION OF TWO-DIMENSIONAL CHARACTERS INTO
14   THREE-DIMENSIONAL AS BEING A DERIVATIVE WORK.  SOME CASES
15   SIMPLY SAY, 'NO, IT DOESN'T REALLY MATTER; IT'S JUST A COPY.'
16   BUT AT THE END OF THE DAY, IT'S STILL AN INFRINGEMENT.  AND
17   THAT'S WHY, IF FOR A SECOND REASON, THE ADDITION OF FURTHER
18   MATERIAL DOESN'T REALLY GET MGA ANYWHERE.
19          THE COURT:  AND I UNDERSTAND THAT WITH RESPECT TO THE
20   ACTUAL COPYING ISSUE ITSELF, BUT WITH RESPECT, FOR EXAMPLE, TO
21   FASHIONS THAT ARE NOT PART OF THE FASHIONS THAT ARE CAPTURED OR
22   SUBSTANTIALLY SIMILAR TO THE DRAWINGS -- NOW WE'RE TALKING --
23   LET'S SAY THE WINTER WONDERLAND FASHIONS, FOR EXAMPLE -- I'M
24   NOT FINDING THAT THEY'RE NOT SUBSTANTIALLY SIMILAR, BUT LET'S
25   SAY FOR THE SAKE OF ARGUMENT FOR THIS DISCUSSION THAT THE JURY
```

1    WERE TO FIND THEY'RE NOT SUBSTANTIAL SIMILAR.  YOU'RE NOT GOING

2    TO FURTHER ARGUE THAT THEY'RE DERIVATIVE OF THE FASHIONS, ARE

3    YOU?

4              MR. ZELLER:  ASSUMING -- LET'S ASSUME THAT THEY LOOK

5    COMPLETELY DIFFERENT.  THEN, NO, WE WOULD NOT SAY --

6              THE COURT:  LET'S ASSUME THAT THEY'RE NOT

7    SUBSTANTIALLY SIMILAR.

8              MR. ZELLER:  THERE WE GO.  AND NO, IN THOSE

9    CIRCUMSTANCES, WE WOULD ABSOLUTELY NOT BE ARGUING THEY'RE

10   DERIVATIVE.  HOWEVER, WHAT OUR ARGUMENT WOULD BE IS THAT IT

11   DOES NOT MATTER, BECAUSE THOSE FASHIONS, WHEN THEY'RE SOLD WITH

12   THE DOLLS, DOLLS THAT ARE OUR DESIGNS, OUR COPYRIGHTED WORKS,

13   STUFF THAT IS INFRINGING OF OUR RIGHTS, BECAUSE THOSE FASHIONS

14   HAVE NO ECONOMIC LIFE, NO LIFE APART FROM THE DOLLS THEY ARE

15   SOLD WITH -- THAT GETS US BACK TO EXACTLY THOSE KIND OF

16   INEXTRICABLY INTERTWINED CASES.

17             THE COURT WILL RECALL ONE THAT WE CITED.  IT'S A

18   LITTLE BIT OF AN OLDER ONE.  I'M SURE WE CAN FIND SOME MORE

19   RECENT EXAMPLES, BUT IT GETS US INTO ALMOST A CONVOYED SALES

20   SITUATION.  BUT IT'S EVEN A CLOSER NEXUS.  IN THE CASE WE

21   CITED, THERE WAS BASICALLY AN INFRINGING INSTRUCTION MANUAL AND

22   A PHONOGRAPH RECORD THAT WERE SOLD AS PART OF A COURSE.  AND

23   BASICALLY, THE COURT JUST SAID, 'WELL, THE VALUE IS IN THE

24   COURSE.  THE PHONOGRAPH RECORD JUST DOESN'T HAVE ANY VALUE

25   APART FROM THE INSTRUCTION MANUAL.  ALL OF IT GOES.  ALL OF THE

1    PROFITS DO.'

2             THE COURT:  I SAW THAT CASE.  BUT THE PHONOGRAPH,

3    WHICH I PRESUME IT WAS A DANCE COURSE --

4             MR. ZELLER:  YES.

5             THE COURT: -- AND THE PHONOGRAPH IS THE MUSIC THAT

6    YOU DANCE TO.  THAT'S NOT -- IN ADDITION TO WHICH, THAT'S NOT

7    WHY PEOPLE ARE BUYING.  THEY ARE BUYING THE COURSE BECAUSE OF

8    ITS -- THE ARTHUR MURRAY, OR WHATEVER, DANCE INSTRUCTION

9    MANUAL.

10            MR. ZELLER:  RIGHT.

11            THE COURT:  MGA IS PROFFERING THERE'S EVIDENCE THAT

12   THE REASON WHY GIRLS ARE BUYING THIS PARTICULAR DOLL IS NOT

13   JUST BECAUSE OF THE DOLL ON THE RIGHT SIDE, BUT BECAUSE OF THE

14   FASHIONS ON THE LEFT SIDE.  AND IF THERE'S COMPETENT EVIDENCE

15   THAT THOSE FASHIONS ARE WHY THIS DOLL IS BEING PICKED OFF THE

16   SHELF AND PURCHASED, THAT WOULD SEEM TO DISTINGUISH IT FROM

17   THAT.

18            NO ONE IS GOING IN AND BUYING THAT MUSICAL DANCE

19   THING BECAUSE, 'OH, I WANT TO LISTEN TO THE TWO-STEP THAT'S

20   GOING ON AS BACKGROUND MUSIC TO THE INSTRUCTION.'  THEY ARE

21   BUYING IT SIMPLY BECAUSE OF THE INSTRUCTION MANUAL.  SO I DO

22   THINK EVIDENCE IS ADMISSIBLE THAT CAN SET UP THESE FIVE

23   ELEMENTS AS SEPARATE FROM.  AND I THINK THAT THREE BOYS

24   SUPPORTS THAT, AS MR. ROTH POINTS OUT.

25            I THINK THAT'S THE DIVIDING LINE THE COURT IS GOING

```
 1   TO TRY TO STRIKE HERE, WITH THE FOCUS ON, FOR THE REASONS THAT

 2   YOU WELL POINT IN YOUR BRIEF THIS MORNING, NOT TO PREJUDICE THE

 3   JURY WITH SYMPATHY THAT -- AND I UNDERSTAND, FROM MGA'S

 4   PERSPECTIVE AND MR. LARIAN'S PERSPECTIVE, WHY THEY THINK THAT,

 5   PERHAPS, THAT EVIDENCE SHOULD COME IN.  BUT UNDER THE LAW,

 6   THAT'S CLEARLY NOT ADMISSIBLE.  JUST BECAUSE THEY WORKED HARD

 7   ON IT -- THE JURY HAS FOUND THAT THEY STOLE THESE DRAWINGS,

 8   AND, THEREFORE, NO MATTER HOW HARD YOU WORK ON IT, IF YOU STOLE

 9   IT, IT DOESN'T MATTER.

10        I UNDERSTAND THAT.

11        MR. ZELLER:  JUST BRIEFLY ON THE CASE WE WERE

12   DISCUSSING.  I DON'T THINK THERE'S -- I WOULDN'T DISAGREE THAT

13   IT'S FACTUALLY DISTINGUISHABLE IN THE WAY THAT YOU TALKED ABOUT

14   IT.  BUT I STILL THINK -- IT STANDS FOR THE PROPOSITION THAT

15   "INEXTRICABLY INTERTWINED" IN THESE CIRCUMSTANCES MEANS THAT --

16   THEY DON'T HAVE TO BE PHYSICALLY INSEPARABLE.  THEY DON'T HAVE

17   TO EVEN BE INSEPARABLE IN THE SENSE THAT THEY ARE SOMEHOW THAT

18   CLOSELY CONNECTED, BUT RATHER, ONE JUST DOESN'T REALLY HAVE AN

19   INDEPENDENT EXISTENCE OF THE OTHER.  AND THAT'S PART OF MY

20   POINT.

21        THE COURT:  THIS CAN BE A GOOD QUESTION FOR THE JURY,

22   COUNSEL.

23        MR. NOLAN:  REAL QUICK ON --

24        THE COURT:  MR. NOLAN, IS THERE ANYTHING ELSE ON THIS

25   ISSUE?
```

```
 1              YOU'RE NOW THE THIRD MGA ATTORNEY TO STAND UP.

 2         MR. NOLAN:  I'M THE CLOSING ACT, AND IT'S 30 SECONDS.

 3         IT JUST GOES TO -- FIVE CATEGORIES.  I JUST WANT TO

 4    MAKE SURE WHEN YOU REFERENCE CHARACTERS THAT THEY ALSO

 5    INCLUDE THE SUB BRANDS, LIKE BOYZ, KIDZ, BABY TWINZ.  THERE ARE

 6    SUB BRANDS UNDERNEATH THAT.  I DIDN'T WANT THAT TO --

 7         THE COURT:  I GOT IT, COUNSEL.

 8         LET'S TAKE A 15-MINUTE BREAK AND BRING THE JURY IN.

 9         (BRIEF RECESS.)

10         THE COURT:  BACK ON THE RECORD, OUTSIDE OF THE

11    PRESENCE OF THE JURY.

12         I JUST RECEIVED WORD THAT THE JURY IS RESTLESS AND

13    ANXIOUS TO GET STARTED.  BUT, MR. SLOAN, I UNDERSTAND YOU

14    WANTED TO TAKE UP SOMETHING OUTSIDE OF THE JURY.

15         MR. SLOAN:  IN LIGHT OF THE FACT YOU SUSTAINED A

16    NUMBER OF OBJECTIONS TO QUESTIONS THAT I ASKED AT THE END OF

17    PROCEEDINGS YESTERDAY -- IN FACT, I THINK YOU SUA SPONTE

18    OBJECTED TO MY LAST QUESTION AND SUGGESTED THAT YOU HAD

19    ADDRESSED SOMETHING PRETRIAL -- I'M CONCERNED THAT THE JURY MAY

20    THINK THAT I'VE DONE SOMETHING INAPPROPRIATE, AND MAYBE EVEN

21    THAT THE DELAY THIS MORNING IS RELATED TO THAT.

22         I WOULD JUST ASK THAT YOU WOULD --

23         THE COURT:  DO YOU HAVE A COPY OF THE TRANSCRIPT AT

24    THE END OF THE DAY, BECAUSE I DON'T REMEMBER...

25         MR. SLOAN:  YES, I DO.
```

```
 1              MY RECOLLECTION IS THAT YOU ULTIMATELY SAID THE

 2    OBJECTION WAS OVERRULED, EVEN THOUGH I SENSE IT WAS YOUR

 3    OBJECTION.

 4              I'M JUST CONCERNED THAT THE JURY IS GOING TO THINK

 5    THAT I'VE DONE SOMETHING IMPROPER.  I THINK THAT WOULD BE AN

 6    UNFAIR INFERENCE.

 7              MR. ZELLER:  I KNOW I OBJECTED -- WHETHER IT'S

 8    REFLECTED ON THE TRANSCRIPT OR NOT, I DON'T KNOW; AND I DON'T

 9    KNOW IF THAT'S THE FINAL -- BUT THE FACT IS I ABSOLUTELY DID

10    OBJECT.

11              THE COURT:  YOU OBJECTED TO THE PREVIOUS QUESTION.

12              MR. ZELLER:  IT MAY HAVE BEEN THAT --

13              THE COURT:  THEN MR. SLOAN ASKED ANOTHER QUESTION,

14    AND I SAID "COUNSEL, WE'RE GOING TO HAVE TO HAVE A SIDE-BAR ON

15    THIS; I THOUGHT I MADE THIS CLEAR PRETRIAL. "

16              WHAT DO YOU WANT ME TO SAY, MR. SLOAN?  DO YOU WANT

17    ME TO SAY I MADE A MISTAKE IN CALLING A SIDE-BAR?

18              WHAT LANGUAGE ARE YOU PROPOSING?

19              MR. SLOAN:  NO, YOUR HONOR.

20              I THINK IF YOU JUST SAID THERE WAS AN OBJECTION AT

21    THE END OF TESTIMONY YESTERDAY AND WE EXAMINED IT AND I HAVE

22    OVERRULED THE OBJECTION --

23    THE COURT:  TO THE LAST QUESTION.

24              MR. SLOAN:  -- TO THE LAST QUESTION; AND, YOUR HONOR,

25    THAT THE DELAY THIS MORNING HAD TO DO WITH LEGAL MATTERS
```

```
 1   TOTALLY UNRELATED TO THIS WITNESS'S TESTIMONY.

 2          THE COURT:  I WAS PLANNING ON DOING THAT, COUNSEL,

 3   AND, YES, INDICATING THAT WE HAVE NOT SPENT THE LAST TWO HOURS

 4   WORKING ON THIS PARTICULAR ISSUE, CERTAINLY.

 5          MR. SLOAN:  IN LIGHT OF THE FACT -- I THINK YOU

 6   SUSTAINED A NUMBER OF OBJECTIONS.

 7          THE COURT:  WHAT OTHER OBJECTIONS ARE YOU SAYING,

 8   COUNSEL?

 9          MR. SLOAN:  IN LIGHT OF -- I'M NOT GOING TO --

10          THE COURT:  LET ME SEE THE TRANSCRIPT, BECAUSE THE

11   TWO OTHER ONES I'M SEEING ON THIS PAGE ARE FULLY APPROPRIATE.

12   THE FIRST ON THIS PAGE HERE IS "THE QUESTION IS VAGUE," AND I

13   OVERRULED IT; THE SECOND ONE WAS "IRRELEVANT AND FOUNDATION," I

14   JUST CLARIFIED "TO YOUR KNOWLEDGE"; SO THOSE WERE BOTH IN YOUR

15   FAVOR; SO YOU'RE GOING TO HAVE SHOW ME ALL THE OBJECTIONS I

16   RULED AGAINST YOU, COUNSEL.  UNLESS YOU'RE MISSTATING WHAT

17   HAPPENED.

18          MR. ZELLER:  THERE WERE OBJECTIONS I MADE PREVIOUS TO

19   THESE VERY ISSUES.  BUT I THINK MR. SLOAN MAY BE OVER

20   INTERPRETING WHAT HAPPENED.

21          THE COURT:  OH, I THINK SO AS WELL, BUT I WANT TO SEE

22   THE TRANSCRIPT.

23          MR. SLOAN:  YOUR HONOR, YOU KNOW, I --

24          THE COURT:  NO, MR. SLOAN.  YOU ASKED ME TO COME OUT

25   HERE; YOU ASKED ME TO DELAY BRINGING THE JURY OUT HERE; YOU
```

```
 1 | SAID I MADE A BUNCH OF OBJECTIONS THAT I SUSTAINED.
 2 |         I WANT TO SEE THE OBJECTIONS THAT I SUSTAINED.
 3 |         MR. SLOAN:  I THINK THE MAIN ONE WAS THE ONE THAT I
 4 | POINTED --
 5 |         THE COURT:  I WANT TO SEE ALL OF THE OBJECTIONS THAT
 6 | YOU JUST REFERRED TO, COUNSEL.
 7 |         I'M WAITING FOR THE TRANSCRIPT.
 8 |         MR. SLOAN:  I HAVE IT HERE.
 9 |         THE COURT:  THANK YOU.  BECAUSE THE TWO PREVIOUS TO
10 | THE ONE TO THE SIDE-BAR WERE IN YOUR FAVOR.
11 |         IT BEGINS ON PAGE 6471, LINE 18, BY MR. SLOAN SAYING
12 | "GOOD MORNING, MR. MOORE."  THE FIRST OBJECTION IS ON
13 | PAGE 6472; MR. ZELLER OBJECTED THAT THE QUESTION WAS VAGUE; THE
14 | COURT SUSTAINED AND ASKED MR. SLOAN TO "CLARIFY, COUNSEL, THAT
15 | YOU'RE REFERRING TO ALL OF THE INVESTIGATIVE FILES. "
16 |         THEN THERE WAS AN OBJECTION IN TERMS OF, AGAIN,
17 | VAGUENESS, A REFERENCE TO "THIS CASE"; THE COURT SUSTAINED
18 | THAT.  ANOTHER ONE WAS A VAGUENESS REFERENCE AND FOUNDATION,
19 | AND THAT WAS SUSTAINED.
20 |         AGAIN, THERE WAS ANOTHER OBJECTION; YOU KEPT
21 | REFERRING TO "THIS ISSUE" WITHOUT EVER EXPLAINING TO WHAT "THIS
22 | ISSUE" WAS; SO THERE WERE ESSENTIALLY FOUR OBJECTIONS ALL
23 | RELATED TO THE FORM OF YOUR QUESTION, NOT TO THE SUBSTANCE, AND
24 | THOSE WERE SUSTAINED, AND THE COURT BELIEVES ALL THOSE
25 | OBJECTIONS WERE APPROPRIATE.
```

1          THE FIFTH OBJECTION, AGAIN, "THE QUESTION IS VAGUE AS

2    TO SUBSTANTIALLY," AND I ACTUALLY OVERRULED THIS, ALTHOUGH THAT

3    MAY HAVE BEEN A MISTAKE; BECAUSE THAT WAS THE ONE, I KNOW I

4    PAUSED AND HESITATED SUBSTANTIALLY; I THINK I EVEN LOOKED AT

5    MR. ZELLER; MR. ZELLER LOOKED BACK AT ME; YOU MADE THAT SAME

6    KIND OF REACTION.  AND I OVERRULED IT.  "SUBSTANTIALLY," IT WAS

7    A POORLY WORDED QUESTION, BUT I OVERRULED THE OBJECTION.

8          THE NEXT ONE WAS THE OBJECTION ON "IRRELEVANT AND

9    FOUNDATION," AND I CLARIFIED "TO YOUR KNOWLEDGE"; AND THAT'S

10   IT; SO I DON'T SEE ALL OF THE OBJECTIONS OUTSIDE OF FORM

11   OBJECTIONS THAT YOU'RE TALKING ABOUT.

12          **MR. SLOAN:**  THERE'S ONE I THINK YOU MISSED.  IF YOU

13   LOOK AT THE BOTTOM OF 6473, THE QUESTION BEGINNING AT LINE 18:

14   "SIR, ARE YOU AWARE MATTEL HAS BEEN INVESTIGATING THAT ISSUE

15   SINCE?"

16          **THE COURT:**  RIGHT.  AND I CLARIFIED.  MR. ZELLER

17   OBJECTED ON FOUNDATION, RELEVANCE, AND CONTRARY TO THE COURT'S

18   RULING.  I SAID "SAME QUESTION THAT I SUSTAINED THE OBJECTION

19   TO."  I WAS REFERENCING THAT IT'S THE FORM; YOU'RE USING THAT

20   PHRASE "THAT ISSUE," AND IT WAS ESSENTIALLY, AS I JUST

21   INDICATED, A VAGUENESS OBJECTION; I WAS TRYING TO REFERENCE

22   BACK TO THE SAME QUESTION.  I WASN'T SUSTAINING HIS OBJECTIONS.

23          **MR. SLOAN:**  I UNDERSTAND IT THAT YOU WERE SUSTAINING

24   HIS OBJECTIONS IN PART ON THAT GROUND.  BUT I UNDERSTAND NOW

25   THAT I WAS MISTAKEN.

1    THE MAIN POINT I WAS TRYING TO RAISE IS THAT THE LAST

2    OBJECTION WAS ACTUALLY FROM THE COURT SUA SPONTE.

3         **THE COURT:**  I UNDERSTAND THE POINT, MR. SLOAN, BUT

4    YOU'VE MADE A -- AND THIS IS NOT THE FIRST TIME THAT YOU SPEAK

5    WITH A VERY BROAD BRUSH WHEN ADDRESSING THE COURT, AND,

6    FRANKLY, WHEN YOU'RE ADDRESSING WITNESSES; AND YOU'RE GOING TO

7    HAVE TO LEARN, ONE WAY OR ANOTHER, TO CHOOSE YOUR WORDS MORE

8    CAREFULLY.  YOU HAVE AN EXCELLENT ROLE MODEL IN MR. NOLAN, AND

9    I WOULD SUGGEST THAT YOU SPEND MORE TIME CONSULTING WITH HIM

10   BEFORE YOU STAND UP AND BRING THE COURT OUT AND WASTE OUR TIME

11   TALKING ABOUT THINGS THAT ARE GROSSLY OVERSTATED.

12        **MR. SLOAN:**  DULY NOTED, YOUR HONOR.

13        **THE COURT:**  VERY WELL.

14        AS FAR AS THE SINGLE ISSUE THAT YOU RAISE, THE COURT

15   DID INDICATE SIDE-BAR -- WHAT DID I SAY?  SIDE-BAR; I THOUGHT

16   WE MADE THIS CLEAR PRETRIAL.  AND AS I INDICATED TO YOU AT

17   SIDE-BAR, I DID MAKE A MISTAKE AND I DID NOT FULLY RECALL THAT

18   PORTION OF MY RULING, AND I'M HAPPY TO MAKE THAT ON THE RECORD.

19   AND IF YOU'RE ASKING ME TO MAKE THAT TO THE JURY AFTER

20   CONSULTING WITH MR. NOLAN, I WILL DO SO.

21        **MR. SLOAN:**  NO, YOUR HONOR.  I NEVER INTENDED TO

22   SUGGEST THAT.  THE ONLY THING I WAS INTENDING TO SUGGEST IS

23   THAT IF THERE WERE ANY SUGGESTIONS TO THE JURY THAT I HAD DONE

24   SOMETHING WRONG, I HAD STEPPED OVER THE LINE, I THOUGHT -- I

25   THINK ACTUALLY AT THE END OF THE HEARING YESTERDAY, YOU

```
 1    INDICATED -- AND I MAY BE WRONG ABOUT THIS -- THAT THE

 2    OBJECTION WAS OVERRULED ESSENTIALLY.

 3          THE COURT:  I WILL INDICATE THAT THE OBJECTION WAS

 4    OVERRULED; THE OBJECTION THAT THE COURT RAISED SUA SPONTE WAS

 5    OVERRULED.

 6          MR. SLOAN:  THAT'S FINE, YOUR HONOR.  THAT'S ALL I'M

 7    REQUESTING.

 8          THE COURT:  VERY WELL.

 9          LET'S BRING THE JURY OUT.

10          MR. ZELLER, I DIDN'T GIVE YOU A CHANCE TO RESPOND,

11    AND THAT'S NOT RIGHT.

12          MR. ZELLER:  FAIR ENOUGH.  I DON'T SEE ANY NEED TO

13    RESPOND.

14          MR. NOLAN:  YOUR HONOR, LET ME JUST INTERRUPT.

15          IT'S NOT NECESSARY TO SAY THAT THE COURT'S OBJECTIONS

16    SUA SPONTE -- I THINK IF THE ISSUE IS RESOLVED, THE QUESTION

17    CAN BE RE ASKED OR SOMETHING ELSE.  I'M NOT ASKING FOR --

18          THE COURT:  COUNSEL, WHEN I MAKE A MISTAKE, I'M THE

19    FIRST TO ADMIT IT.  I WISH EVERYONE WOULD DO THAT AS WELL WITH

20    ME.  AND I'LL BE HAPPY TO LET THE JURY KNOW THAT.

21          MR. NOLAN:  I JUST THINK FOR PURPOSES OF FRAMING THE

22    ISSUE THIS MORNING, THAT JUST TO SAY THAT THE DELAY WAS NOT

23    RELATED TO --

24          THE COURT:  MY ONLY POINT WAS THAT I DIDN'T SUSTAIN A

25    WHOLE BUNCH OF OBJECTIONS.
```

1    **MR. NOLAN:**  I APPRECIATE THAT, BUT I DIDN'T WANT TO

2    SUGGEST THAT NEITHER MR. SLOAN OR I WERE ASKING YOU TO CORRECT

3    YOURSELF IN FRONT OF THE JURY, OTHER THAN JUST TO SAY THAT THE

4    OBJECTION --

5          **THE COURT:**  MY REMARKS WERE NOT DIRECTED TO YOU,

6    MR. NOLAN.

7          LET'S BRING THE JURY IN.

8          (JURORS ENTER COURTROOM.)

9          **THE COURT:**  GOOD MORNING, MEMBERS OF THE JURY.  I

10   APOLOGIZE FOR KEEPING YOU WAITING FOR SO LONG.  I ASSURE YOU

11   WE'VE ALL BEEN WORKING VERY HARD THIS MORNING ON THIS

12   PARTICULAR MATTER, AND I THINK WE'VE MADE SOME IMPORTANT

13   HEADWAY IN TERMS OF MAPPING OUT THE REST OF THE CASE; SO THIS

14   HAS BEEN AN EFFICIENT USE OF YOUR TIME AS WELL.  BUT I DO

15   APOLOGIZE FOR THE DELAY.

16         AT END OF THE DAY -- I KNOW WE ENDED ABRUPTLY

17   YESTERDAY -- THE COURT HAD CALLED A SIDE-BAR.  THE COURT ENDED

18   UP OVERRULING ITS OWN OBJECTION; SO THAT SHOULD BE OF NO MOMENT

19   TO YOU.  WE'RE NOW GOING TO RESUME WITH MR. SLOAN'S

20   CROSS-EXAMINATION OF MR. MOORE.

21         JUST SO YOU KNOW, FOR TODAY, WE'RE GOING TO GO FROM

22   11:00 TO 12:00; WE'RE GOING TO RESUME AT 1:00.  THE COURT HAS A

23   NATURALIZATION CEREMONY THAT IT IS DOING AT 4 O'CLOCK.  IT'S

24   ONE OF THE MORE PLEASANT THINGS I GET TO DO AS A JUDGE.  IT'S

25   ONE OF THE FEW TIMES WHERE EVERYBODY LEAVES THE COURTROOM VERY

```
 1   HAPPY; SO WE'RE DOING THAT AT 4 O'CLOCK, SO WE'LL BE WRAPPING

 2   UP AT 4 O'CLOCK.  SO WE'LL HAVE A FULL THREE HOURS THIS

 3   AFTERNOON, I WANT TO START AT 1:00.

 4            SO, MR. SLOAN?

 5            MR. SLOAN:  THANK YOU, YOUR HONOR.

 6                     DIRECT EXAMINATION

 7   BY MR. SLOAN:

 8   Q    I WANT TO GO RIGHT BACK TO WHERE WE LEFT OFF YESTERDAY,

 9   BUT BEFORE THAT, I JUST WANT TO ASK YOU A COUPLE OF PRELIMINARY

10   QUESTIONS ABOUT YOUR PREPARATION FOR YOUR TESTIMONY HERE.

11            LET ME ASK YOU FIRST OFF, BEFORE YOU TESTIFIED

12   YESTERDAY, YESTERDAY AFTERNOON, HOW MUCH TIME DID YOU SPEND

13   PREPARING FOR YOUR TESTIMONY?

14   A    A FEW HOURS HERE AND THERE FOR THAT PARTICULAR TIME, YES.

15   Q    WAS THAT A FEW HOURS JUST THIS WEEK?

16   A    THAT'S RIGHT.

17   Q    AND WERE YOU PREPARED BY LAWYERS FROM QUINN EMANUEL IN

18   CONNECTION WITH YOUR TESTIMONY?

19   A    YES, I WAS.

20   Q    WHO HELPED PREPARE YOU FOR YOUR TESTIMONY YESTERDAY?

21   A    A GENTLEMAN NAMED SCOTT KIDMAN AND MICHAEL ZELLER.

22   Q    AND APPROXIMATELY HOW MUCH TIME DID YOU SPEND WITH

23   MR. KIDMAN AND MR. ZELLER?

24   A    BOY.  APPROXIMATELY, IN THE LAST WEEK, WITH THEM,

25   PROBABLY, LIKE, SIX HOURS, MAYBE.
```

1    Q    AND DID YOU REVIEW DOCUMENTS WITH THEM?

2    A    I DID.

3    Q    CAN YOU IDENTIFY WHAT DOCUMENTS YOU REVIEWED WITH THEM,

4    BRIEFLY?  I'M NOT ASKING FOR --

5    A    I REVIEWED --

6              **MR. ZELLER:**  THIS IS WORK PRODUCT AS IS ASKED;

7    THERE'S NOTHING.

8              **THE COURT:**  SUSTAINED.

9    **BY MR. SLOAN:**

10   Q    DID YOU MEET AGAIN WITH LAWYERS FROM QUINN EMANUEL TO

11   PREPARE FOR YOUR TESTIMONY AFTER THE SESSION THAT ENDED

12   YESTERDAY AFTERNOON?

13   A    NO.

14   Q    SO YOU HAVE NOT MET WITH ANYONE IN PREPARATION FOR YOUR

15   TESTIMONY THIS MORNING, OTHER THAN THE PREPARATION THAT YOU HAD

16   BEFORE YOU APPEARED YESTERDAY AFTERNOON.

17   A    WE DIDN'T DISCUSS MY TESTIMONY, IF THAT'S WHAT YOU MEAN.

18   Q    OKAY.  I'M ASKING YOU A DIFFERENT QUESTION.

19             AFTER YOUR TESTIMONY ENDED YESTERDAY AFTERNOON, DID

20   YOU SPEND MORE TIME WITH ANY LAWYERS FROM QUINN EMANUEL

21   PREPARING FOR TESTIMONY THIS MORNING?

22   A    A FEW MINUTES.

23   Q    WHO DID YOU MEET WITH?

24   A    MIKE ZELLER.

25   Q    DID YOU REVIEW ANY OF THE DOCUMENTS THAT WERE PROVIDED IN

```
 1   THE WITNESS BINDERS, THE WHITE WITNESS BINDERS THAT WERE
 2   PROVIDED BY ME?
 3   A    IN THIS BINDER HERE?
 4   Q    YES.
 5   A    YES, I DID.
 6   Q    AND HOW MUCH TIME DID YOU SPEND REVIEWING THOSE DOCUMENTS?
 7   A    A FEW MINUTES.
 8   Q    YOU TESTIFIED YESTERDAY THAT YOU BEGAN INVESTIGATING
 9   WHETHER CARTER BRYANT HAD CREATED BRATZ IN APPROXIMATELY THE
10   SUMMER OF 2003; CORRECT?
11   A    WELL, I'M TRYING TO UNDERSTAND WHAT YOU MEAN BY THAT
12   EXACTLY.
13   Q    WELL, YOU WERE INVOLVED IN THE INVESTIGATION THAT LED TO
14   THE FILING OF THIS CASE; IS THAT CORRECT?
15   A    YES.  I WAS LOOKING INTO FACTS WHICH BECAME THE FOUNDATION
16   OF THIS CASE, YES.
17   Q    AND ONE OF THE THINGS YOU WERE INVESTIGATING WAS WHETHER
18   OR NOT CARTER BRYANT HAD BEEN INVOLVED IN THE CREATION OF
19   BRATZ; CORRECT?
20            MR. ZELLER:  MISSTATES THE WITNESS'S TESTIMONY.
21            THE COURT:  REPHRASE THE QUESTION, COUNSEL.
22   BY MR. SLOAN:
23   Q    IRRESPECTIVE OF WHAT YOU SAID YESTERDAY, ISN'T IT TRUE
24   THAT YOU WERE INVOLVED IN INVESTIGATING WHETHER CARTER BRYANT
25   HAD BEEN INVOLVED IN CREATING BRATZ?
```