1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    ---

4    **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                    ---

6  MATTEL, INC.,                    :   PAGES 6627 - 6744
                                    :
7          PLAINTIFF,               :
                                    :
8    VS.                            :   NO. ED CV04-09049-SGL
                                    :   [CONSOLIDATED WITH
9  MGA ENTERTAINMENT, INC.,         :   CV04-9059 & CV05-2727]
   ET AL.,                          :
10                                  :
          DEFENDANTS.               :
11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17             FRIDAY, AUGUST 8, 2008

18              JURY TRIAL - DAY 32

19              AFTERNOON SESSION

20

21

22                              MARK SCHWEITZER, CSR, RPR, CRR
                                OFFICIAL COURT REPORTER
23    CERTIFIED                 UNITED STATES DISTRICT COURT
                                181-H ROYBAL FEDERAL BUILDING
24    COPY                      255 EAST TEMPLE STREET
                                LOS ANGELES, CALIFORNIA 90012
25                              (213) 663-3494

6629

1                    **I N D E X**

2

3  **MICHAEL CHRISTOPHER MOORE, PREVIOUSLY SWORN**............ 6648

4  VIDEOTAPED DEPOSITION EXCERPTS OF JANET BRYANT......... 6649

5  VIDEOTAPED DEPOSITION EXCERPTS OF KERRI BRODE.......... 6650

6  VIDEOTAPED DEPOSITION EXCERPTS OF BRYAN ARMSTRONG...... 6653

7  VIDEOTAPED DEPOSITION EXCERPTS OF SARAH CHUI.......... 6663

8   VIDEOTAPED DEPOSITION EXCERPTS OF CARTER BRYANT....... 6664

9  **MARGARET ANN LEAHY, SWORN**............................. 6672

10  DIRECT EXAMINATION BY MR. NOLAN:...................... 6672

11                    **E X H I B I T S**

12  (Exhibits 491, 513, 565, 566, 567, 568,
    569, 570, 571, 572, 5373, 574, 576, and
13  577 received.)........................................ 6659

14  (Exhibit 13738 received.)............................. 6671

15  (Exhibit 13958 received.)............................. 6671

16  (Exhibit 1141 A received.)............................ 6684

17  (Exhibit 1141 received.).............................. 6718

18  (Exhibit 1234 A received.)............................ 6723

19

20

21

22

23

24

25

1          **Riverside, California; Friday, August 8, 2008**

2                        **12:30 P.M.**

3          **(HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)**

4          THE COURT:  Okay.  We're back on the record outside

5    the presence of the jury.  I'm going to rule on the

6    deposition of Kerri Brode and the deposition of Carter

7    Bryant.  I think those are the two remaining ones.

8          I'll first hear argument from MGA on the general

9    objection that appears on the front of the Kerri Brode.  It

10   states that MGA objects to the entirety of the transcript on

11   the grounds that the witness is not an officer, director, or

12   Rule 30(b)(6) witness, and the designations are improper

13   under Rule 32.

14         MS. AGUIAR:  Your Honor, I apologize ahead of time.

15   I am only going to give you the information I know as of now,

16   and I understand that if I can't give you enough, then we

17   will have waived our objection.  I believe it's because of

18   the location of the witness.  In other words, that her

19   deposition can't be used because she's local, and therefore,

20   it can't be -- in other words, if she were a 30(b)(6)

21   witness, then it would be different.  But I believe it's due

22   to the fact that she is within the district.

23         THE COURT:  I'll hear from Mattel.

24         MR. COREY:  She is in fact a 30(b)(6) witness.  If

25   the Court would look at pages 8 and 9 of the transcript.

1    Starting on line 14.

2              THE COURT:  On page 8?

3              MR. COREY:  On page 8.

4              THE COURT:  Deposition is being taken on behalf of
5    the defendant.

6              MR. COREY:  Right, and on page 9 she acknowledges
7    that that's what she's there for.  So I think under Rule 32
8    it's proper.

9              THE COURT:  Very well.  All right.  Let me take up
10   the actual objections, then, to the -- well, in light of
11   that, then the objections are overruled.  Because essentially
12   what she's then shown, then, is a series of diagrams and
13   asked about whether or not they are a rendering of a Bratz
14   doll, and she recognizes them as such.  So those are
15   overruled, and those can be played.

16             MR. COREY:  Thank you, your Honor.

17             THE COURT:  Turning to Carter Bryant's deposition,
18   which is more extensive, I have a number of questions on
19   that.  And again, as I indicated earlier, if I was skipping
20   any, it's up to counsel to alert me.  The first one that I
21   came to is on page 74.  I didn't see anything before that.
22   Page 74, there's a question, and there's no answer.  So I'm
23   going to sustain the objection to the question.

24             Page 75, I will overrule the objection.

25             The next designation is on page 107, and I'll

```
 1   sustain the objection.

 2            108, overruled.

 3            109, overruled.

 4            Next designation, I believe, is on page 225.  This

 5   is -- I'm going to overrule MGA's objection, and as a result

 6   of introducing that, I'm going to overrule Mattel's objection

 7   because I think the door is then open to that limited extent.

 8            MR. PRICE:  Your Honor, I think there are some

 9   we're going to cut, and that will be one of them.

10            THE COURT:  Well, I was going to rule on the

11   designations that are before me.  It's up to you what

12   evidence you're going to play.  It's up to MGA to play

13   whatever they are going to play.  I will indicate when I am

14   admitting or overruling Mattel's objections predicated on --

15   I'll indicate when I've overruling Mattel's objections when

16   Mattel opens the door.

17            MR. PRICE:  And I assume that to the extent we cut

18   sections for which there are counterdesignations, then the

19   counterdesignations will or will not be played?

20            THE COURT:  Try to work that out among yourselves.

21   I'm going to rule on what I have before me at this point.

22   And if you're withdrawing something, now would be a really

23   good time.

24            MR. COREY:  Okay.

25            THE COURT:  But just too use the example that I
```

1   have before me, if Mr. Quinn is going to elicit the question
2   what do you understand face design to mean in that context, a
3   clear follow-up question to that is set forth right below
4   that.

5           MR. COREY:  That's the way I'd understood.  We had
6   understood, based on the conversation we had with Mr. Proctor
7   this morning that the Court would be ruling on the objections
8   and it would be up to counsel.  If the Court would prefer us
9   to withdraw now, more than happy to do that.  Whatever is
10  fastest and easiest for the Court.

11          THE COURT:  If you know that you're going to
12  withdraw them now, I think out of fairness you should let the
13  Court know that you're going to withdraw them.  So if I get
14  to something that's withdrawn, just stand up and indicate
15  that it's withdrawn.

16          MR. COREY:  I actually think that it may be faster
17  because of the quantity, is just to go to the ones that we
18  anticipate playing affirmatively.

19          THE COURT:  So there's very few ultimately.

20          MR. COREY:  There are not a lot of them.

21          THE COURT:  All right.  Then why don't we do that.

22          Of course, in defendant's case in chief, you can
23  resubmit, of course, Carter Bryant's deposition with your
24  designations and their counterdesignations, and you're not
25  waiving anything by not -- right.  You're not waiving

1    anything.

2              MS. AGUIAR:  With that understanding, I'll sit

3    down.

4              THE COURT:  Very good.  You're preserving all your

5    rights to introduce this testimony, any portion of it or all

6    of it.  So right now we're just dealing with Mattel's case in

7    chief.

8              MR. COREY:  And I think we just hit the point where

9    page 225, 23 through 26.

10             THE COURT:  Right.

11             MR. COREY:  225, line 23, through 226, line 1, and

12   we'll be going through the designations on page 350, which I

13   believe are about 8.

14             THE COURT:  You're withdrawing those?

15             MR. COREY:  No.  No.  Those are affirmative ones

16   that we will --

17             THE COURT:  All you're withdrawing is lines 7

18   through 15 on page 225; is that correct?

19             MR. COREY:  I apologize for being unclear, your

20   Honor.  We will withdraw all of the designations up to

21   starting on page 225.  Starting on page 225 and proceeding

22   through page 350 are the designations that we anticipate

23   playing.  And there are about seven or eight of those.

24             THE COURT:  And that's it?

25             MR. COREY:  And there are maybe seven or eight more

```
 1  clips through the following five volumes of the designation.
 2              THE COURT:  Okay.  Well, there's only -- between
 3  the pages that you just indicated, between pages 225 and 350,
 4  there's only two sets of clips.
 5              MR. COREY:  That's correct.
 6              THE COURT:  Okay.  So 225, are you or are you not
 7  withdrawing those?
 8              MR. COREY:  We are not.
 9              THE COURT:  Okay.  So the objections are overruled.
10  Both in terms of Mattel's designation and MGA's designation.
11              Turning to page -- and that's through 226.
12              On page 228, you are not withdrawing those; that's
13  correct?
14              MR. COREY:  That's correct.
15              THE COURT:  The objections are overruled.
16              The next series are on, as I understand it,
17  pages -- beginning on page 350.  There's nothing between 230
18  and 350.
19              MR. COREY:  That is correct, your Honor.
20              THE COURT:  All right.  The objections -- let me
21  hear from MGA on this.  You are indicating -- this is an
22  indication that I excluded this drawing during the pretrial
23  conference?  I don't recall doing it, but perhaps I did.  I'm
24  just not sure what the objection is there.
25              MS. AGUIAR:  Your Honor, this is the so-called
```

```
 1  control drawing that in the pretrial order you made a ruling

 2  prior to trial that it would not be part of the pretrial

 3  conference order.

 4            THE COURT:  Control drawing.

 5            MS. AGUIAR:  It's the drawing of like an outline of

 6  a body, essentially, and Mattel had made a request at some

 7  time right before the pretrial conference to amend the

 8  pretrial conference order and put that in there.  We heard

 9  argument on it.  And your Honor actually has ruled that it

10  was not going to be part of the pretrial order and that the

11  copyright claim would not be based on -- it would be based on

12  what was previously included in the pretrial conference

13  order, but not this drawing.

14            THE COURT:  And did this go to the -- did the jury

15  decide on this?

16            MS. AGUIAR:  It was one of the drawings that was

17  submitted to the jury as part of the different portfolios,

18  yes.

19            THE COURT:  But it's not part of the copyright

20  claim?

21            MS. AGUIAR:  Correct.

22            THE COURT:  It would only be part of the state tort

23  claims.

24            MS. AGUIAR:  I'll leave that to Mattel to argue,

25  but it's not a basis for the copyright claim in the pretrial
```

1  order.

2            THE COURT:  I'll hear from Mattel.

3            MR. COREY:  Well, I think the issue that Ms. Aguiar

4  is raising doesn't go to whether the testimony gets played or

5  not.  Because the purpose of the testimony, as I read it very

6  briefly, is whether or not this particular drawing was given

7  to Ms. Leahy.  And so I don't think we need to reach the

8  issue --

9            THE COURT:  That goes more to the issue -- I see.

10  I understand.  Very good.  So again you are preserving your

11  rights on that in terms of whether there's going to be

12  copyright infringement off of it, but it's evidence related

13  to what Ms. Leahy based her sculpts on, and I'm going to

14  permit both the MGA and the Mattel designations on page

15  350 --

16            MR. COREY:  Your Honor, with respect to the

17  objection, to Mattel's objection, the testimony that's being

18  proffered is actually -- it contradicts the jury's finding

19  about the date of creation.  Because at least on the bottom

20  of page -- on line 25, the testimony is that Mr. Bryant did

21  the drawing in November of 2000.

22            THE COURT:  And there's several times where you

23  designated information from Carter Bryant, your designations

24  of Carter Bryant made references where he talks about doing

25  the drawings in 1998.  The jury knows what they found and

1  what they didn't find.  You do the same thing later on in the
2  transcript.

3  -I don't know if that's part of what you're going
4  to withdraw or not, but you did indicate -- Carter Bryant
5  does refer to drawings; in fact, I think Mr. Quinn in
6  questioning Carter Bryant goes along just for the ease of
7  moving the deposition forward, referring to drawings that
8  were done in 1998.

9  MR. PRICE:  Your Honor, we can't obviously change
10  the deposition transcript.  That's how he referred to the
11  drawings he gave Margaret Leahy.  So we can't change that.
12  And the jury, I'm sure, will remember those that were found
13  to have been done in a different time frame.  There's no
14  reason, however, to put in this section except to confuse the
15  jury.  There's absolutely no reason for it at all.

16  The only reason -- it doesn't clarify any of his
17  statements.  It is simply to try to tell the jury, oh, this
18  was done in a time frame when they found it wasn't done.
19  It's irrelevant to anything else.

20  THE COURT:  Let me hear briefly from MGA on that.
21  All you're talking about here is page 350, lines 24 and 25,
22  and page 351, lines 1 through 4.

23  MS. AGUIAR:  Actually, it is relevant, your Honor,
24  in terms of the role that this drawing played, if at all, in
25  the development of the sculpts, number one.  And number two,

1   the jury found that it was created solely or jointly during a
2   time period. And there has not been a determination on that.
3   And the timing, I believe, is relevant in terms of who at MGA
4   gave comments, where the drawing came from, how it was
5   created, and the timing is all part of that.

6           THE COURT: So theoretically, it could have been
7   done in part by -- just theoretically here, by Bryant while
8   he was working for Mattel and then completed by Margaret
9   Leahy in November of 2000 and it's not necessarily
10  inconsistent.

11          MS. AGUIAR: And it also could have been that
12  Margaret Leahy's testimony will be that she had already done
13  several sculpts and that this drawing came at a time after a
14  certain sculpt so that the drawing was based on the input of
15  three or four people into the sculpt already.

16          THE COURT: That undermines the argument, Counsel,
17  because the only way that this works and is consistent with
18  the jury's verdict is if you somehow can back up this drawing
19  into the period that Carter Bryant was working for Mattel.
20  If you are suggesting it for another purpose, then it is a
21  contradiction to what the jury has already found. And that
22  issue -- we're done with that issue.

23          MS. AGUIAR: I don't think we're trying to convince
24  the jury that it was done earlier. So we accept their
25  verdict as to --

```
 1            THE COURT:  You're trying to convince the jury that
 2   it was done in November of 2000; right?
 3            MS. AGUIAR:  It's not -- no, we're not trying to
 4   convince them when it was done.  I just think the fact of
 5   when it fits into the chronology of the sculpts is relevant
 6   to who had input into it.
 7            THE COURT:  Maybe I'm not understanding, but
 8   fitting it into the chronology requires a finding that it was
 9   done in November of 2000 under your theory; right?
10            MS. AGUIAR:  We will not be asking your Honor to
11   include any sort of question in the jury verdict as to when
12   it was created, but we might consider asking the jury to find
13   and make a clearer indication as to whether it was done
14   solely or jointly.
15            THE COURT:  Thank you, Counsel.  The objection is
16   sustained on 24 and 25 and page 350, and lines 1 through 4,
17   page 351.
18            All right.  The next --
19            MR. COREY:  The next one, your Honor, is actually
20   on page 528.
21            THE COURT:  528.  That's what I have as well.  All
22   right.  Very well.
23            MS. AGUIAR:  Your Honor, did you do 352?
24            MR. PRICE:  When Mr. Corey said the next one is --
25            THE COURT:  You're withdrawing?
```

```
 1              MR. PRICE:   We're withdrawing 352, line 8, those
 2   sections up to --
 3              THE COURT:   I'm sorry.   You're withdrawing what
 4   page?
 5              MR. COREY:   After the designation on page 350,
 6   we're withdrawing the designations up to the designation that
 7   starts on page 528.
 8              THE COURT:   Very well.   All right.   So we're now at
 9   528.   The Court overrules the objections on 528.
10              The Court overrules the objections on 532, 533,
11   534.
12              MR. COREY:   And then, your Honor, I believe we're
13   on to --
14              THE COURT:   Then we go up to page 567.
15              MR. COREY:   And the Court can actually go to page
16   577.
17              THE COURT:   So you're withdrawing everything
18   between pages 535 and 577?
19              MR. COREY:   That's correct, your Honor.
20              THE COURT:   Very well.   The objections on 577 are
21   overruled, 578, 579, and 580 are overruled.
22              MR. COREY:   And then the next set would be starting
23   on page 922.
24              THE COURT:   All right.   So we are -- you are
25   withdrawing all the designations, for example, on 809 and
```

1  everything in between; correct?

2         MR. COREY:  That is correct, your Honor.

3         THE COURT:  So we're up to what was it?

4         MR. COREY:  Page 922.

5         THE COURT:  All right.  Yes, 922.  I need to hear

6  argument on pages 922 through 926 from both sides.  My

7  tentative is to overrule the objections on page 922.  These

8  are drawings and a connection to the Bratz model that were

9  shown in the Hong Kong toy fair.  What is Mattel's argument

10  with respect to the additional drawings that Carter Bryant

11  describes having done on pages 923 and the differences that

12  are set forth on pages 925 and 926?

13         MR. PRICE:  Your Honor, those drawings are the same

14  ones the jury said he did while he was working at Mattel.

15  It's 1107, 1108, 1109, 1110.  It's a continued discussion

16  about that, which is why the counterdesignation at 923, lines

17  1 through 3, would be inappropriate for the same reason,

18  because they are trying to put them in November of 2000.

19         THE COURT:  First of all, what time did we break?

20  We broke at noontime; correct?

21         MR. PRICE:  Yes.

22         THE COURT:  I have to stop the clock.  Let me back

23  it up an hour.  I hear the tick tock, tick tock, like in

24  Peter Pan.

25         I see the problem.  Let me hear from -- Ms. Aguiar,

1  do you want to speak to this? This is somewhat the same

2  issue that we just crossed off, and in a strange sort of way,

3  this almost -- I don't know who this benefits, because this

4  is Carter Bryant trying to distinguish these other drawings

5  and showing that they are different than the previous ones.

6          The jury has found that these were all done while

7  Carter Bryant was an employee at Mattel. Mattel now does own

8  these drawings. This kind of plays out kind of strangely.

9          MS. AGUIAR: And, your Honor, I think based on your

10 ruling regarding the control drawing, if you're inclined to

11 rule that if there's testimony that something was done in a

12 time period that the jury has already decided on then --

13 first of all, I would argue that I do think, again, that this

14 is relevant to even the timing -- even the timing is relevant

15 to joint, to the question of whether it's jointly owned.

16          Because that shows -- again, we're not going to

17 argue that they were done then. But I think it shows the

18 extent to which Mr. Bryant was working with MGA and the input

19 that MGA had.

20          THE COURT: I really don't understand that in this

21 context. These are drawings that he says he did himself. He

22 doesn't say that he did these jointly.

23          MS. AGUIAR: These drawings, the testimony will

24 show, were done at the specific direction and pursuant to

25 specific comments given to Mr. Bryant by MGA in terms of what

1  they wanted. The testimony will show that there were

2  iterations of these drawings before --

3       THE COURT: And MGA did that while he was working

4  at Mattel. The jury has already found that.

5       MS. AGUIAR: Right. But that doesn't mean they

6  weren't jointly done.

7       THE COURT: But they were jointly done while he was

8  working at Mattel.

9       MS. AGUIAR: The jury has found when they did them.

10  That's all they found. As your Honor said to me many times

11  before we finished this verdict form, that all we were doing

12  in 1-A was determining timing, and you made me very, very

13  aware of that.

14       THE COURT: Right.

15       MS. AGUIAR: This is a different question. This is

16  a question of whether they are jointly owned. And there is

17  an issue with regard to that on a couple of key pieces of

18  evidence in this case. And so whether he did them while he

19  was at Mattel or while he -- or after he left Mattel, if they

20  were done jointly, there is a legal issue there.

21       THE COURT: Let's strike lines 1 through 3 on page

22  923.

23       MS. AGUIAR: Okay.

24       THE COURT: Does that make sense?

25       MS. AGUIAR: And then -- I'm sorry, and then the

```
 1   objections are overruled with respect to the rest of it?
 2             THE COURT:  Right.
 3             MS. AGUIAR:  Thank you.
 4             THE COURT:  Take out lines 1 through 3 on page 923.
 5   That takes out the timing evidence.
 6             MR. COREY:  That does -- that takes care of the
 7   timing issue, but the separate issue is I don't -- I don't
 8   understand the joint authorship argument.  All they are
 9   saying is what Mr. Bryant did.
10             THE COURT:  Right.  Well, we also got to take
11   out -- I got to take out the timing questions because that's
12   been resolved.  So lines 24 to 25 on page 923 and lines 1 and
13   2 and 5 and 6 on page 924 are out as well because that refers
14   to November.
15             MR. COREY:  I'm sorry.  I think the Court got ahead
16   of me.  What page was that?
17             THE COURT:  This would have to be on 403 grounds.
18   To introduce evidence now regarding timing would not be
19   appropriate.  So page 923, lines 1 through 3 and lines 24 and
20   25, and then on page 924, lines 1 through 6 I'll sustain the
21   objection on 403.  Let me see if there's anything else
22   related to timing on this.
23             MS. AGUIAR:  I would just say, your Honor, that on
24   page 924, lines 5 and 6, he does give testimony that there
25   were just a lot of differences, which is not -- I understand
```

1    that it's tied to a question.

2            THE COURT:   And you can bring Carter Bryant out as

3    a witness.   I'll give you leave to bring Carter Bryant out to

4    re-ask the question, or we can do it by videotape, video

5    deposition, but that deposition testimony does not come in

6    with the timing on there because that's a big 403 problem.

7            Okay.   Moving along to 964.

8            MR. COREY:   964 is correct.

9            THE COURT:   Overruled on 964, 965 --

10           MS. AGUIAR:   Your Honor, I'm sorry.   Can I get a

11   clarification on whether 925 designations are in, then?

12           THE COURT:   925.   Well, 925 is fine.   Because these

13   are all based on his drawings that were done while he was at

14   Mattel.   I mean, it's strange, and I don't know why either

15   side is going here, but all I'm going to do is be a

16   gatekeeper on the timing issue.   I don't know what else to

17   do.   I'm not going to permit questions in that directly go to

18   issues that the jury has already resolved.

19           But I don't think there's any basis to sustain the

20   objections to the other questions.   I mean, it's clear what

21   he's trying to do in his answer to the questions.   I think we

22   all understand what Mr. Bryant is trying to do.   And he's

23   doing this thinking that he's answering a question describing

24   a drawing that was done in November of 2004, not a drawing

25   that was done while he was at Mattel.   I suspect based on the

```
 1    testimony that I've heard so far, he'd be giving a far

 2    different answer.  But it is what it is.

 3            MR. PRICE:  Just to be clear, we're withdrawing

 4    954, lines 11 through 14.

 5            MR. COREY:  I think the Court may have skipped over

 6    that one.

 7            THE COURT:  I must have.  I did.

 8            MR. COREY:  And the next one that we have starts on

 9    page 964 and goes through 965.

10            THE COURT:  Right.  Overrule those objections as

11    well as the follow-up questions on page 966 and 967.

12            MR. COREY:  And then the next one -- we'll be

13    withdrawing the ones on pages 1005 and 1006.

14            THE COURT:  All right.  And that should be it.

15            MR. COREY:  Actually, on 1141, there's a set.

16            THE COURT:  I missed that.  11 -- I see it here.

17    Any others?

18            MR. COREY:  Yes.  1169 and 1170.  And those are the

19    last ones, your Honor.

20            THE COURT:  So the 1141, 1142 are overruled, and

21    1169, overruled.

22            All right.  And like I say, MGA has full leave to

23    bring in Carter Bryant's testimony and bring in Carter Bryant

24    for all that matter, but based on what I have before me,

25    those are the rulings, the rest is withdrawn, and I think you
```

```
 1   have all the Court's rulings on the videotaped deposition.
 2              MR. COREY:   Thank you.
 3              THE COURT:   How soon will you be ready to finish
 4   with the witness?
 5              MR. COREY:   It will take about five minutes.
 6              THE COURT:   Very well.  We'll start at 1:15.  Court
 7   is in recess until then.
 8              (Recess taken.)
 9                       -  -  -  -  -
10                        1:40 P.M.
11               (WHEREUPON THE JURY ENTERS.)
12              THE COURT:   Was there anything further?
13              MR. SLOAN:   No, your Honor.
14              THE COURT:   Very well.  Mr. Zeller?
15        MICHAEL CHRISTOPHER MOORE, PREVIOUSLY SWORN.
16                   REDIRECT EXAMINATION
17   BY MR. ZELLER:
18   Q.    You testified that there was a difference between
19   looking into whether Carter Bryant was the creator of Bratz
20   as opposed to when Carter Bryant created Bratz.
21         Do you recall talking about that?
22   A.    Yes.
23   Q.    What you started looking into at some point was when
24   Carter Bryant created Bratz?
25   A.    That's right.
```

```
 1   Q.   And why was it important?  That is, why was the question
 2   of when Carter Bryant created Bratz important?
 3   A.   Well, because if Carter Bryant created Bratz while he
 4   was at Mattel, then Mattel would own Bratz.
 5               MR. ZELLER:  Nothing further.  Thank you.
 6               THE COURT:  Anything further, Mr. Sloan?
 7               MR. SLOAN:  No, your Honor.
 8               THE COURT:  You are excused, Mr. Moore.
 9               Plaintiff's next witness.
10               MR. QUINN:  Janet Bryant.  We will play some
11   videotaped deposition testimony, your Honor.
12               THE COURT:  Very well.
13               (Whereupon the videotaped deposition excerpts
14               of Janet Bryant, as provided by counsel, were
15               played for the jury as follows:)
16   Q.   And have you ever had a conversation with Carter as to
17   whether or not the actual three-dimensional Bratz dolls that
18   were created were created from his drawings?
19   A.   Yeah.
20   Q.   And what did you and Carter discuss in that regard?
21   A.   As far as how much they looked like his drawings, how
22   much they were going to look like his drawings?  Is that what
23   you're asking me?
24   Q.   Yes, that's part of it.
25   A.   He told me that when the prototype came out, he was very
```

 1   pleased because they did look so much like his drawing, and
 2   they did.
 3              (Conclusion of deposition excerpts.)
 4              MR. QUINN:  That's all of Mrs. Bryant, your Honor.
 5              THE COURT:  Very well.
 6              MR. QUINN:  The next witness is Kerri Brode, also
 7   by videotaped deposition.
 8              (Whereupon the videotaped deposition excerpts
 9              of Kerri Brode, as provided by counsel, were
10              played for the jury as follows:)
11   Q.   Good morning.  Please tell us your full name for the
12   record.
13   A.   Kerri Brode.
14   Q.   Are you currently employed?
15   A.   Yes, I am.
16   Q.   By whom?
17   A.   MGA Entertainment, Inc.
18   Q.   I'm going to show what you was previously marked as
19   Exhibit 323, just for the record, a series of pages bearing
20   Bates numbers SL 13 through SL 41.
21              Directing your attention to the next page, SL 17.
22   Do you recognize what this -- what's depicted here?
23   A.   I've seen this, but I don't -- I know it had to do
24   with -- with the Bratz.
25   Q.   This is a rendering or drawing of a Bratz doll?

```
 1   A.   I believe so.
 2   Q.   Directing your attention to the next page, which is
 3   SL 18 --
 4   A.   Yes.
 5   Q.   Do you recognize this as drawings or renderings of the
 6   Bratz dolls?
 7   A.   That's what it looks like.
 8   Q.   Directing your attention to the next page, SL 19.  Do
 9   you recognize this as a drawing or rendering of a Bratz doll?
10   A.   Yes.
11   Q.   Next page is SL 20.  Do you also recognize this as a
12   rendering or drawing of a Bratz doll?
13   A.   Yes.
14   Q.   Directing your attention to SL 21, do you recognize this
15   as a drawing or rendering of a Bratz doll?
16   A.   Yes.
17   Q.   Directing your attention to SL 22, do you recognize this
18   as a drawing or rendering of a Bratz doll?
19   A.   It looks like a Bratz doll, but I don't think I've ever
20   seen this one before.
21   Q.   The next page is SL 23.  Do you recognize this as a
22   drawing or rendering of a Bratz doll?
23   A.   Yes.
24   Q.   Next page is SL 24.  Do you recognize this as a drawing
25   or rendering of a Bratz doll?
```

6652

1    **A.**    That looks like a Bratz doll, but I don't think I've

2    ever seen this one.

3    **Q.**    SL 25 is the next page.  Do you recognize this as a

4    drawing or rendering of a Bratz doll?

5    **A.**    Yes.

6    **Q.**    Directing your attention to SL 26.  Do you recognize

7    this as a drawing or rendering of a Bratz doll?

8    **A.**    Yes.

9    **Q.**    Next page is SL 27.  Do you recognize this as a drawing

10   or rendering of a Bratz doll?

11   **A.**    It looks that way.

12   **Q.**    Directing your attention to SL 28 --

13   **A.**    Yes.

14   **Q.**    Is this something that you recognize as a drawing or

15   rendering of a Bratz doll?

16   **A.**    Yes.

17   **Q.**    The next page is SL 29.  Do you recognize this as a

18   drawing or rendering of a Bratz doll?

19   **A.**    Yes.

20   **Q.**    Next page is SL 44.  Do you recognize this as a drawing

21   or rendering of a Bratz doll?

22   **A.**    Looks that way.

23                  (Conclusion of deposition excerpts.)

24                  MR. QUINN:    Next witness, your Honor, is Bryan

25   Armstrong, also by videotaped deposition.

```
 1              THE COURT:  Very well.
 2              (Whereupon the videotaped deposition excerpts
 3              of Bryan Armstrong, as provided by counsel, were
 4              played for the jury as follows:)
 5   Q.   Could you please tell us your full name for the record.
 6   A.   Bryan Joseph Armstrong, with a Y.
 7   Q.   How long have you been employed by MGA?
 8   A.   Since November 3rd, 2003.
 9   Q.   What is your title there?
10   A.   Senior paralegal.
11   Q.   Have you ever had the title senior trademark paralegal?
12   A.   Sometimes my title gets morphed into that, yeah.
13   Q.   Just generally speaking, and I don't want you to
14   disclose, you know, communications that you have with -- with
15   MGA lawyers, but if you could tell me, just generally
16   speaking, what your responsibilities have been while at MGA?
17   A.   Generally, my responsibilities are to maintain the
18   records for the company's intellectual property
19   registrations, that being patents, trademarks, copyrights, to
20   do the day-to-day work on trademark on those registrations.
21   Q.   Take a look at the second page of Exhibit 491.
22              You'll see from the first paragraph that this
23   agreement pertains to, quote, "certain artwork for use in a
24   style guide based upon and derived from MGA's line of doll
25   products which are produced under the name 'Bratz'" --
```

6654

```
 1   A.   Yeah, I see that.

 2   Q.   End quote.

 3   A.   Yes, I see that.

 4   Q.   Do you have any reason to dispute that in agreement

 5   relates to a style guide that was based upon and derived from

 6   MGA's line of dolls sold or produced under the name Bratz?

 7   A.   No, I don't dispute it.

 8   Q.   Do you have any knowledge or information as to when any

 9   kind of work was first done on that style guide that was the

10   compilation for licensed products that you mentioned?

11   A.   No.

12   Q.   So you don't know whether that work was started in 2000

13   versus 2001; is that correct?

14   A.   That's correct.

15   Q.   Directing your attention back to the second page of

16   Exhibit 491.  The sentence we were talking about with respect

17   to, quote, certain artwork for use in a style guide based

18   upon and derived from MGA's line of doll products which are

19   produced under the name of Bratz, end quote.

20          Do you see that?

21   A.   Yes.

22   Q.   What's your understanding of what "based upon and

23   derived from MGA's line of doll products" means?

24   A.   Well, I believe that it refers to the -- the initial

25   Bratz doll line:  Cloe, Jade, Yasmin, and Sasha.
```

1   **Q.**   And that the style guide was based upon those dolls?

2   **A.**   Yes.

3   **Q.**   Is it true that MGA's style guides with respect to Bratz

4   are based upon the dolls?

5   **A.**   Yes.

6   **Q.**   And I believe you may have touched upon this earlier,

7   but the style guides are -- are put together to be provided

8   to licensees; is that correct?

9   **A.**   That's correct.

10   **Q.**   And the style guides provide, well, the guide that the

11   licensees follow in connection with the use of Bratz on a

12   licensed product. Is that true?

13   **A.**   That's true.

14   **Q.**   Do you recognize Exhibit 513 as a copyright registration

15   that MGA obtained on or about December 22nd, 2003, from the

16   U.S. copyright office?

17   **A.**   Yes.

18   **Q.**   And this is a registration that MGA obtained for a work

19   called Bratz group drawing?

20   **A.**   Yes.

21   **Q.**   Is the group drawing that's the subject of this

22   registration the last page of Exhibit 513?

23   **A.**   Yes.

24   **Q.**   Is this a drawing that Carter Bryant made?

25   **A.**   Yes.

1   **Q.**  Do you recognize Exhibit 565 as a copyright registration

2   that MGA obtained from the copyright office on or about March

3   25th, 2002, as it pertained to a Bratz doll sculpture?

4   **A.**  Yes.

5   **Q.**  Do you recognize Exhibit 566 as a correction form that

6   MGA submitted to the copyright office on or about March 28th,

7   2005, as it pertained to this Bratz doll's sculpture

8   registration that we previously marked as Exhibit 565?

9   **A.**  Yes.

10   **Q.**  Do you recognize Exhibit 567 as the registration form

11   for a Bratz Passion for Fashion packaging style guide from

12   the fall of 2006 that MGA obtained from the copyright office

13   on or about January 25th, 2006?

14   **A.**  Yes, I do.

15   **Q.**  Do you know what the deposit materials were for

16   Exhibit 567?

17   **A.**  Yes, it was a style guide.

18   **Q.**  Do you recognize what we marked as Exhibit 568?

19   **A.**  Yes.

20   **Q.**  This is the certificate of registration form for Bratz

21   Rock Angelz packaging style guide fall 2005 that MGA obtained

22   from the copyright office on or about January 25th, 2006?

23   **A.**  Yes, it is.

24   **Q.**  Do you recognize Exhibit 569 as a copyright registration

25   that MGA obtained from the copyright office on or about

1   January 25th, 2006, as it pertains to the Bratz Genie Magic

2   style guide?

3   **A.**   Yes, I do.

4   **Q.**   Do you recognize Exhibit 570 as a copyright registration

5   for form that MGA obtained from the U.S. copyright office on

6   for about January 25th, 2006, as it pertained to the Bratz

7   Genie Magic packaging style guy in spring of 2006?

8   **A.**   Yes.

9   **Q.**   Do you recognize Exhibit 571 as a copyright registration

10  that MGA obtained from the U.S. Copyright Office on or about

11  January 25th, 2006?

12  **A.**   Yes.

13  **Q.**   And that was a registration that pertains to the Bratz

14  Passion for Fashion style guide?

15  **A.**   Yes.

16  **Q.**   Do you recognize Exhibit 572 as a copyright registration

17  that MGA obtained from the U.S. Copyright Office on or about

18  February 1st, 2006?

19  **A.**   Yes.

20  **Q.**   And this is one that pertains to the Bratz Camp Fire

21  packaging style guide for holiday of 2005?

22  **A.**   Yes.

23  **Q.**   Do you recognize Exhibit 573 as a copyright registration

24  for the Bratz Ooh, La La packaging style guide Holiday 2005

25  that MGA obtained from the U.S. Copyright Office on or about

1   February 1st, 2006?

2   **A.**   Yes.

3   **Q.**   Do you recognize Exhibit 574 as a copyright registration

4   that MGA obtained from the copyright office on or about

5   March 19, 2004?

6   **A.**   Yes.

7   **Q.**   And this is a registration for the Bratz purse style

8   guide?

9   **A.**   Yes.

10  **Q.**   Do you recognize Exhibit 576 as a compilation of

11  correction forms that MGA submitted to the U.S. Copyright

12  Office in connection with various style guide registrations

13  it had previously obtained?

14  **A.**   Yes.

15  **Q.**   Are all of these correction forms that MGA submitted to

16  the U.S. copyright office in or about July of 2007?

17  **A.**   Yes.

18  **Q.**   Do you recognize Exhibit 577?

19  **A.**   Yes.

20  **Q.**   Is this the correction form for the articulated Bratz

21  doll sculpt registration that you talked about earlier today?

22  **A.**   Yes.

23              (Conclusion of deposition excerpts.)

24              MR. ZELLER:   Your Honor, I have some exhibits to

25  move in.

```
 1                    THE COURT:  Very well.

 2                    MR. ZELLER:  These are the documents testified to

 3   by Mr. Armstrong:  Exhibits 491, 513, 565, 566, 567, 568,

 4   569, 570, 571, 572, 5373, 574, 576, and 577.  We would offer

 5   those in evidence, your Honor.

 6                    MS. AGUIAR:  No objection.

 7                    THE COURT:  All are admitted.

 8                    (Exhibits 491, 513, 565, 566, 567, 568,

 9                    569, 570, 571, 572, 5373, 574, 576, and

10                    577 received.)

11                    MR. ZELLER:  As a second request, your Honor, we

12   would ask the Court to perhaps explain that these witnesses

13   are 30(b)(6) designees, and the purpose of them.  We can read

14   the topics that they were designated on.

15                    MS. AGUIAR:  At sidebar?

16                    THE COURT:  Let's do this at sidebar.

17                    (SIDEBAR CONFERENCE HELD.)

18                    THE COURT:  Yes, Counsel.  You want to have the

19   30(b)(6) designation explained or just the topics provided?

20                    MR. ZELLER:  I think it would be helpful for the

21   Court to have an explanation as to what it is -- what a

22   designee is.

23                    THE COURT:  What basis are we talking about?

24                    MR. ZELLER:  Kerri Brode, who was designated on two

25   topics, and Mr. Armstrong was designated on two topics.
```

```
 1              MS. AGUIAR:  Are you representing that Kerri Brode
 2   was specifically designated as a 30(b)(6) witness on the
 3   topic that she gave testimony on that was just played?
 4              THE COURT:  Good question.
 5              MR. ZELLER:  Yes.  And what would I -- let me just
 6   make sure I have the right ones.  So topics 4 and 5, the
 7   embodiment of any --
 8              I think it comes within the ambit as well.
 9              MS. AGUIAR:  I disagree.  She was asked to say
10   whether she thought the pitch book drawing was a
11   representation of a Bratz doll.  To me that's a question of
12   making sort of a subjective --
13              THE COURT:  Let me see this.  To each embodiment --
14   okay.  I guess you need to reference topic 3.  The identity
15   of each doll product, work, or item produced, developed,
16   manufactured, licensed, sold or offered for sale by or for
17   you or on your behalf that was based upon Bratz design which
18   Bryant created.  To the extent not covered by topic 3, each
19   embodiment of any doll, accessory, or toy that Bryant created
20   prior to June 30, 2001.  That's a very -- I understand that,
21   but I think it's very confusing to the jury.
22              MR. ZELLER:  Fair enough, your Honor.  Then let
23   me -- I'll move on to Bryan Armstrong.  He had two topics
24   that were designated.  And they were topics --
25              THE COURT:  Do we have anything in the Brode
```

```
 1   deposition or in the Armstrong deposition?  I just can't
 2   remember, that was not objected to, that just describes who
 3   they are?  Was there any foundational questions asked?
 4             MR. ZELLER:  I'm sure that there were, but
 5   obviously in the interests of time --
 6             THE COURT:  That's the best way to deal with this.
 7             MS. AGUIAR:  And to be honest, I didn't know that
 8   they were going to ask you to do this.  So when we
 9   counterdesignated, we didn't designate who the people were,
10   because I didn't know that Mr. Zeller was going ask the jury
11   to be instructed.
12             THE COURT:  If you want to take a minute, I always
13   think it's appropriate for any witness to be introduced to
14   the jury.  I think that's helpful to the jury.  I'm reluctant
15   to get into these legal descriptions of 30(b)(6) topics,
16   because I think that's confusing.  But if you can quickly
17   designate some testimony that would indicate an introduction,
18   I assume these questions were asked of both witnesses.  Who
19   are you?  I work for MGA.  I'm the toy designer, and then
20   move on.
21             MR. ZELLER:  That was done for Mr. Armstrong.  He
22   identified himself as senior paralegal.  But what was not
23   done --
24             THE COURT:  It was not done for Ms. Brode?
25             MR. ZELLER:  I don't believe it was with Ms. Brode.
```

1       MS. AGUIAR:  Can I make a suggestion?

2       THE COURT:  Please.

3       MS. AGUIAR:  Why don't we take a look at her depo.

4  She gives her title right at the beginning, and you can just

5  say the parties have stipulated that Ms. Brode's title is

6  blank.

7       THE COURT:  You can do that.  Thank you.

8       MR. ZELLER:  With that, your Honor, I would like if

9  maybe we could just simply say that Mr. Armstrong was

10  designated to address topics about licensing on MGA's behalf.

11  Because that is the subject.  And that was actually really

12  what prompted our request, was that the jury understand that

13  he was there to talk about licensing.  And that was his --

14  I'm sympathetic to the Court's points about stating topic 15

15  might sound too legalistic, but it is just licensing.

16       THE COURT:  I think it's appropriate to ask

17  foundational questions of a witnesses live or deposition.

18  I'm not going to go down this road because I don't want the

19  Court characterizing what a witness has been called for.

20       MR. ZELLER:  I understand.  We could play a snippet

21  from Mr. Armstrong, but it would just be reading this topic

22  or asking if he's designated on this topic.

23       THE COURT:  If it comes from the witness.  It's not

24  coming from the Court.  If you guys can work on something,

25  great.  I'll give you a few minutes.

```
 1            (CONCLUSION OF SIDEBAR CONFERENCE.)

 2            MR. QUINN:  Next witness, your Honor, Sarah Chui.

 3            (Whereupon the videotaped deposition excerpts

 4            of Sarah Chui, as provided by counsel, were

 5            played for the jury as follows:)

 6   Q.   When did you start working for MGA?

 7   A.   It was September 1st, 1999.

 8   Q.   What was your job title at that time?

 9   A.   Product designer.

10   Q.   Has your job title changed since then?

11   A.   Yes.

12   Q.   What is it now?

13   A.   Now it's design director.

14   Q.   What is MGA Hong Kong's role in the production of Bratz

15   dolls?

16   A.   Production.

17            THE INTERPRETER:  Production.

18   Q.   And what do you mean by production?

19   A.   To follow up on the project and also follow up with the

20   factory on the mass -- in the area of mass production.

21   Q.   Okay.  So when it comes to the Bratz dolls, the designs

22   for the dolls are coming from Los Angeles, and MGA Hong Kong

23   is involved in reproducing and mass producing the dolls?

24   A.   I would say so.

25   Q.   Are you aware of any design work that was done -- design
```

1  work, as opposed to development or engineering work, that was

2  done at MGA Hong Kong on Bratz in the year 2000?

3  A.    I believe you have asked this question.  No.

4         (Conclusion of deposition excerpts.)

5         MR. QUINN:  And then Carter Bryant, your Honor.

6         THE COURT:  Very well.

7         (Whereupon the videotaped deposition excerpts

8          of Carter Bryant, as provided by counsel, were

9          played for the jury as follows:)

10 Q.    For example, the Bratz -- did you have a particular --

11 were there some features of the Bratz head that, you know,

12 you thought were particularly characteristic or unique?

13 A.    Could you restate your question?

14 Q.    Well, I mean, are there some things like the features of

15 the Bratz face that you thought were distinctive?

16 A.    I think the eyes were distinctive.  I think the lips

17 were distinctive.

18 Q.    Anything else?

19 A.    I think those were the most distinctive features.

20 Q.    These features that you've described to me as being

21 distinctive to one degree or another, were they -- were they

22 reflected in the drawings that you did?

23 A.    Are you talking about the 1998 drawings?

24 Q.    Yeah.  Let's start with that.

25 A.    I think they were similar, yes.

1    Q.   And would have been carried forward to the color copies

2    you made in 1999?

3    A.   Yes, I suppose so.

4    Q.   And the drawings that you gave to Margaret --

5    A.   Yes.

6    Q.   Did that reflect these distinctive features also?

7    A.   I think it did.

8    Q.   Okay.  Let's turn to 278.  What are we looking at here?

9    A.   This is a drawing of the actual finished doll that I

10   gave to -- this drawing I gave to Margaret to have her

11   restart the sculpt.

12   Q.   Why had you -- had you made a decision to change the

13   form of the doll?

14   A.   After Margaret had done a little bit of work on the

15   preliminary sculpt and when Mercedeh came on board, we

16   realized that the work that Margaret had done was not going

17   to work.  So Paula and Margaret -- or, I'm sorry.  Paula and

18   Mercedeh basically said that we needed to start the sculpt

19   again.

20   Q.   But the drawing of the figure there is -- that's

21   something you drew?

22   A.   Yes.

23   Q.   To guide her in her sculpting?

24   A.   Yes.

25   Q.   And that became the -- that was used for the second

1   sculpt of Bratz?

2   **A.**   Yes.

3   **Q.**   Which became the final sculpt?

4   **A.**   This was the closest drawing that I had done to what

5   became the final sculpt, yes.

6   **Q.**   I mean, the sculpt that was created from this drawing,

7   did that become the final sculpt?

8   **A.**   To the best of my knowledge.

9   **Q.**   It did?

10   **A.**   Yes.

11   **Q.**   Did you -- I'm noticing in Exhibit 5 the page that's

12   numbered 278, it does have -- on that head there are

13   oversized eyes and oversized lips. Would you agree with

14   that?

15   **A.**   Yes.

16   **Q.**   Was one way that you had some input on the look of the

17   head of the second Bratz sculpt giving Margaret this page

18   that's numbered 278?

19   **A.**   That was the best way that I knew how to communicate,

20   was through drawing.

21   **Q.**   You say the best way you knew to communicate what you

22   wanted was to give a drawing?

23   **A.**   Yes.

24   **Q.**   And that -- and the best way you knew to communicate

25   your input was to give a drawing?

1 **A.** Yes.

2 **Q.** And that's what you did?  And that included the drawing

3 that was 278; correct?

4 **A.** Well, I don't remember what I said last week, but that

5 was the best way I knew how to communicate with her, was

6 through drawing.

7 **Q.** All right.  And the drawing you're referring to is 278?

8 **A.** And the drawings from 1998.

9 **Q.** And one way you had input into the look of the head was

10 by giving her those drawings?

11 **A.** Yes.

12 **Q.** Were any drawings used in creating the Bratz model that

13 was shown at the Hong Kong toy fair?

14 **A.** Well, sure, there has to be some way of communicating to

15 other people who need to do their part, you know.  And

16 drawing is just a tool.  A drawing is a tool to communicate

17 to the other people that need to do their part to create a

18 doll.  So yeah, there were drawings.

19 **Q.** And the drawings that were used in creating the model of

20 the Bratz that was shown at the Hong Kong toy fair, who

21 created those drawings?

22 **A.** I did.

23 **Q.** Why did you create some new drawings for that purpose?

24 **A.** Um, I wanted to create actual fashion designs for these

25 dolls.  I wanted to create -- well, that's basically it.  I

1   just wanted to create an actual fashion that would -- would

2   eventually be produced for these dolls.

3   Q.   Are you saying that the drawings that you showed to

4   Mr. Larian could not be used for that purpose?

5   A.   Well, it's not that they couldn't have been, I guess.

6   But they didn't reflect what I kind of ultimately wanted to

7   see on the dolls.

8   Q.   What were the differences between the drawings, the

9   drawings that you showed Mr. Larian, and the drawings that

10  you created in November?

11  A.   Well, there were just a lot of differences.

12  Q.   I'd like you please to give me a list of the

13  differences.

14  A.   Well, okay.  Again, as I said, without looking at the

15  drawings, I probably couldn't give you a list.

16  Q.   Is there any difference that you can identify for me?

17  A.   Um, sure.  Let me see.  For Zoe, who eventually became

18  Cloe, her outfit was completely changed.  Her hair color was

19  completely changed.  Her face was completely changed.  For

20  Jade, her outfit was completely changed.  Her hairstyle and

21  her face were completely changed.  For Sasha, I think who was

22  originally called Hallidae, her outfit was also completely

23  changed.  Her face and her hair were also completely changed.

24  And for Yasmin, who I believe was originally called Lupe, the

25  same.  Her outfit was completely changed, and her face and

1    hair were also completely changed.

2    Q.   How was Lupe's face changed from the drawings that you

3    showed Mr. Larian?

4    A.   I believe it was just given a slightly softer look.

5    Q.   And how was that done?  Bigger nose, smaller nose, wider

6    eyes?  Can you describe for us how that softer look

7    manifested itself?

8    A.   I don't know.  I mean, again, as I said, I'm not a face

9    painter.  I just said, you know, what I suggested that maybe

10   we could make the face look, you know, a little bit softer.

11   Q.   Do you believe that the Bratz doll line has a similar --

12   that all the dolls in the Bratz -- do you believe that all

13   the dolls in the Bratz doll line have a similar appearance?

14   A.   Well, if you're talking about -- what exactly are you

15   talking about?  Are you referring to the fashions, the dolls

16   themselves?

17   Q.   Say the dolls themselves.

18   A.   Yes, they are similar.

19   Q.   Do you believe that all the Bratz dolls have an overall

20   similar appearance?

21   A.   Again, if you're just talking about the doll, without

22   any fashions or accessories or anything like that, then yes,

23   they're similar.

24   Q.   How about the fashions?  Do you believe that there's an

25   overall similar appearance to the Bratz fashions?

1  A.    No.

2  Q.    Why not?

3  A.    Well, you know, as I've said earlier, we do different

4  themes.  And all those different themes reflect different,

5  different looks, different ideas.

6  Q.    Isn't it true that there's an overall similar appearance

7  to the fashions used with the Bratz doll line?  Isn't that

8  true?

9  A.    No, I don't think that's true.

10  Q.    Well, do you believe that those accessories have an

11  overall similar appearance?

12  A.    No.

13  Q.    Okay.  So this is 1107 through 1110.  Looking at these

14  exhibits now, Mr. Bryant, are these the drawings that the

15  original release Bratz dolls were based on?

16  A.    They reflect the fashions that were released and the

17  basic hairstyles.  And the basic -- the basic look of the

18  face.

19  Q.    Do these, the fashions reflected on Exhibits 1107

20  through 1110, are those the final fashion designs?

21  A.    Are you referring to the final fashion designs for the

22  original release Bratz?

23  Q.    Yes.

24  A.    Well, they appear to be.

25              (Conclusion of deposition excerpts.)

```
 1              MR. QUINN:  Your Honor, while we sort out one

 2   potential exhibit issue, we have a stipulation regarding a

 3   couple of exhibits.

 4              THE COURT:  Very well.

 5              MR. QUINN:  First, the parties have stipulated that

 6   Exhibit 13738, the complaint in MGA versus Multi-Toy, would

 7   be received in evidence.

 8              THE COURT:  So stipulated?

 9              MR. NOLAN:  So stipulated, your Honor.

10              THE COURT:  That's accepted.  It's admitted.

11              (Exhibit 13738 received.)

12              MR. QUINN:  We also have a stipulation that

13   Exhibit 13958 would be received in evidence, and that it

14   depicts the fashion doll products that MGA sued on in the MGA

15   versus Union Top case.

16              THE COURT:  So stipulated?

17              MR. NOLAN:  So stipulated, your Honor.

18              THE COURT:  Both are admitted.

19              (Exhibit 13958 received.)

20              MR. QUINN:  Your Honor, with that and subject to

21   one matter that we have addressed with the Court, Mattel is

22   prepared to rest this phase of the case.

23              THE COURT:  Very well.  The defense may call their

24   first witness.

25              MR. NOLAN:  Yes, your Honor.  We also, on behalf of
```

1    MGA, reserve all of our procedural rights for motion

2    practice, your Honor.

3              THE COURT:  Yes.  We'll take those up outside the

4    presence of the jury.

5              MR. NOLAN:  Of course.  I just wanted to reserve

6    that on the record.

7              MGA would call Margaret Leahy.

8              While we're setting up, your Honor, may I inquire

9    from a timing point of view?  We'll be ending at 4:00.  Will

10   the break take place at 3:00?

11             THE COURT:  Yes, we'll take it around 3:00.

12             MR. NOLAN:  All right.  Thank you.

13             THE CLERK:  Please raise your right hand.

14             **MARGARET ANN LEAHY, SWORN.**

15             THE CLERK:  Please state your full name, and spell

16   your last name.

17             THE WITNESS:  Margaret Ann Leahy, L-E-A-H-Y.

18             MR. NOLAN:  Thank you.  Your Honor, with the

19   Court's permission, can I just go back a little bit?  It's

20   been a couple, three weeks since Ms. Leahy testified.  I just

21   want to go through some background again.

22             THE COURT:  You may.

23                       **DIRECT EXAMINATION**

24   BY MR. NOLAN:

25   Q.   Welcome back.

1   A.   Thank you.

2   Q.   You testified in the first phase.  I just want to go

3   over a couple of background matters.  First of all, you are

4   employed where?

5   A.   The Disney Store.

6   Q.   And how long have you been employed at the Disney Store?

7   A.   I started there on March 20th, 2007.

8   Q.   And your profession is what?

9   A.   I'm a sculptor.

10  Q.   And for some period of time, you were previously

11  employed at Mattel?

12  A.   Yes, I was.  From 1994 to 2000.

13  Q.   When in 2000 did you leave Mattel?

14  A.   It was in September.

15  Q.   And to your knowledge, did you leave on good terms?

16  A.   Yeah, absolutely.

17  Q.   In fact, is your spouse still employed at Mattel?

18  A.   Yes, he is.

19  Q.   But he is not a sculptor?

20  A.   No, he's not.

21  Q.   Was there a period of time that you were doing

22  free-lance work for MGA?

23  A.   Yeah, I was doing free-lance work for everybody, but MGA

24  was one of my main clients.

25  Q.   And can you give us your estimate as to the time that

```
 1   you were serving as a free-lance sculptor?

 2   A.    It was September of 2000 until April of -- gosh, it was

 3   after my son was born.  So 2004, I think.  2004.

 4   Q.    Now, after you left Mattel in September of 2000, to your

 5   knowledge were you under any restriction from working as a

 6   free-lance sculptor for a competitor of Mattel?

 7   A.    Can you repeat the question?

 8   Q.    Sure.  After you left your full-time employment with

 9   Mattel, did you become a free-lancer?

10   A.    Yes.

11   Q.    And did you have any understanding that after you left

12   Mattel's full time employment, that you were not allowed to

13   do free-lance work for a competitor of Mattel?

14   A.    For a competitor?  I knew you weren't supposed to do

15   work --

16             MR. PRICE:  I'm going to object.  It's not an issue

17   in this case with respect to Ms. Leahy.

18             MR. NOLAN:  Background.

19             THE COURT:  Counsel?

20             MR. NOLAN:  It's not an issue.  I wanted to make

21   certain that that was not an issue.

22             THE COURT:  It's not.  Let's move along.

23             MR. NOLAN:  Okay.  Thank you.

24   Q.    And again, to just set the stage, you met with Carter

25   Bryant sometime in early September; is that correct?
```

1  A.    Correct.

2  Q.    And you did some sculpting work with relationship to

3  Bratz; correct?

4  A.    Correct.

5  Q.    Okay.  So now hopefully we've caught everybody up.

6        I want to go back to some of the testimony that you

7  referenced in the first trial.  And in particular, something

8  known as turnaround drawings.

9        Do you recall that term?

10  A.    Yes.

11  Q.    And you used it in your testimony?

12  A.    Yeah.  It's an industry term.

13  Q.    Okay.  And can you describe for the jury what a

14  turnaround drawing is?

15  A.    A turnaround drawing is when you have multiple views of

16  one character.  So to say there's Cinderella.  I'll use

17  Disney characters since I work for Disney.  You would have

18  a front view, a side view, three-quarter view, and then the

19  same on the other side.  So front view, side view,

20  three-quarter view.  So ideally it's different views to give

21  you an indication of how to translate your 2D into 3D.

22  Q.    And while you were here, when you were here last time,

23  you mentioned a designer at MGA by the name of Christine

24  Nogihoshen (phonetic)?

25  A.    Correct.

```
 1   Q.   And what role did she have at MGA?

 2   A.   She was a designer.

 3   Q.   Did you ever do any sculpting for Ms. Nogihoshen?

 4   A.   Yes, quite a bit.

 5   Q.   Did you ever receive from Ms. Nogihoshen any turnaround

 6   drawings?

 7             MR. PRICE:  Objection, your Honor.  Irrelevant.

 8             MR. NOLAN:  This is, again, background.

 9             THE COURT:  Let's move along, Counsel.  We've

10   already done the background in the first phase of this.  I'll

11   give you some more leeway, but let's move along.

12   Q.   BY MR. NOLAN:  You have in front of you

13   Exhibit No. 18817?  Do you have that in front of you?

14   A.   Yes.

15   Q.   And do you recognize this exhibit?

16   A.   Yes, I do.

17   Q.   And what is this exhibit?

18   A.   This is Christine's drawing of the Shrek doll that we

19   did.

20   Q.   And is this a particular type of drawing?

21   A.   This is a control drawing.

22   Q.   And would this also be referred to as a turnaround

23   drawing?

24   A.   Yes.

25             MR. NOLAN:  Your Honor, we'd offer --
```

1  Q.  And by the way, was this provided to you by

2  Ms. Nogihoshen?

3  A.  Yes.

4  Q.  And you recognize it as being a copy of the one that she

5  provided to you?

6  A.  Correct.

7          MR. NOLAN:  Your Honor, we'd offer Exhibit 18817.

8          MR. PRICE:  Object.  There's no relevance to this

9  case.

10         THE COURT:  I don't see the relevance, Counsel.

11         MR. NOLAN:  Let me try to lay a foundation and

12 relevance.

13         THE COURT:  Very well.

14         MR. NOLAN:  Thank you.

15 Q.  I want to turn to Mr. Bryant's drawings.

16 A.  Okay.

17 Q.  Mr. Bryant provided to you a series of drawings when you

18 met with him in early September; is that correct?

19 A.  Correct.

20 Q.  Could you please turn to Exhibit 302.

21 A.  Okay.

22         Mr. Nolan:  And this is in evidence, your Honor.

23 Can we have this on screen?

24         THE COURT:  Yes.

25         MR. NOLAN:  Thank you.

 1   **Q.**   And do you recognize this exhibit, and if so, what is

 2   it?

 3   **A.**   Yes, it's the first packet of things that Carter brought

 4   to me.

 5   **Q.**   When you referred to the first packet, was there a

 6   second packet that he delivered to you?

 7   **A.**   No.  It's just the first -- no.

 8   **Q.**   And this first packet, if you look at it, do you see any

 9   drawing in there that you would describe as a control

10   drawing?

11   **A.**   No, I don't.

12   **Q.**   Do you see any drawing in that packet that you would

13   describe as a turnaround drawing?

14   **A.**   No, I don't.

15   **Q.**   Did you see any -- do you see any drawings in this

16   packet that depict any 3D proportions for any of the

17   characters appearing in Exhibit 302?

18   **A.**   No.   These are all very graphic conceptual drawings.

19   **Q.**   So just referring back for a moment, and keep your

20   finger on this, back to Exhibit 18817.  But I think you

21   previously described it as a turnaround drawing.  Did you

22   ever receive from Mr. Bryant any drawings purportedly of any

23   Bratz character that you would characterize as control

24   drawing or a turnaround drawing?

25   **A.**   No, I didn't.

```
 1  Q.   And a control drawing or engineering drawing similar to
 2  that depicted in Exhibit 18817.
 3  A.   Can you repeat that, please?
 4  Q.   Sure.  Did you ever receive any drawing looking like, in
 5  terms of the format or the structure, of the drawing that's
 6  depicted in Exhibit 18817?
 7  A.   No, I did not.
 8            MR. NOLAN:  Your Honor, with that, just for
 9  clarification, I'd like to offer again Exhibit 18817.  There
10  was no objection to the foundation.
11            MR. PRICE:  I object.  It's not relevant to
12  copyright.
13            THE COURT:  We'll take that up at sidebar.  So
14  let's move on to another area.
15  Q.   BY MR. NOLAN:  I want to, if we could place in front of
16  you an exhibit that you identified for us in the first trial.
17  And that is the first sculpt, 1136 A.
18            And, your Honor, may I approach?
19            THE COURT:  You may.
20            MR. NOLAN:  Your Honor, for convenience, we also
21  have a photograph that's been previously identified in
22  evidence as a copy of that.
23            THE COURT:  Very well.
24  Q.   BY MR. NOLAN:  When you were last here, the testimony
25  stopped at a particular date.  And what I just want to do is
```

1   orient, for the record as well as the jury, the figure that

2   is before you, marked as Exhibit 1136 A, is a cast that you

3   worked on; correct?

4   A.   Correct.

5   Q.   And the date that that cast was completed and available

6   to you in the form that is depicted in 1136 A was what date?

7   A.   October 11th.

8   Q.   Is 1136 A the final Bratz sculpt?

9   A.   No, not at all.

10  Q.   Did you do any other sculpts or moulds after October

11  11th?

12  A.   Yes, I did.

13  Q.   Now, I want to place in front of you trial Exhibits 1040

14  A through D, which is also in evidence, your Honor.

15           THE COURT:   Very well.

16           MR. NOLAN:   Your Honor, I apologize.   I think I

17  said 1040.   I think it's 1140.

18           THE COURT:   Very well.

19           MR. NOLAN:   Your Honor, I'd like to approach the

20  witness with 1140 A through D, which is in evidence.   And

21  also place up Exhibit 1141 A, which I'll lay the foundation

22  for.   And it's not in evidence.

23           THE COURT:   You may.

24  Q.   BY MR. NOLAN:   Now, Ms. Leahy, first drawing your

25  attention to the molds that are in front of you.

1    A.    Okay.

2    Q.    These are in evidence.  You identified them before.  Do

3    you mind just taking a second again and explaining what they

4    are?

5    A.    This mould is a mould of this version of the doll.

6    Q.    And in the left hand, you're holding up what you took

7    out of the plastic bag that I just handed to you?

8    A.    Correct.

9    Q.    Okay.  And let's lay a foundation, because that's not in

10   evidence yet.  I don't want to publish that to the jury just

11   yet.  It's okay.  Before we get to the cast that you were

12   just looking at, just explain to us again the purpose of the

13   molds and when they were done.

14   A.    Like why I make the molds?

15   Q.    Yes.

16   A.    Okay.  When I make the molds, I have a wax or a clay

17   that I've sculpted, and then you have liquid silicone.  So

18   you kind of glue the piece down.  Like I'll use this arm.

19   You have this arm.  You glue it down like this.  And you put

20   a cup around it, and then you mix the liquid with a catalyst

21   and mix it up.  And then it turns blue and gets hard through

22   time.

23         But before it gets hard, you pour it into the cup,

24   and it gets hard around the piece.  After it hardens around

25   the piece, which is about 24 hours, you then cut it open with

1  a knife. You can see the knife marks. And inside you can

2  see the arm. And then you can pour wax, which is for me to

3  clean up after the clay or a hard resin like this. You can

4  have a hard model.

5  Q.  And what are the dates of the molds?

6  A.  These are all from October 23rd, 2000.

7  Q.  And how do you know that?

8  A.  Because it's written. The place that molded it for me

9  scribed it into the mold. It's common practice so you can

10  keep track of the molds.

11  Q.  And again, the name of the organization that did those

12  sculpts for you?

13  A.  It was Gentle Giants.

14  Q.  Now, the doll-like figure or sculpt that you held up a

15  minute ago, that's marked as 1141 A, what is that?

16  A.  This is my version after I had this made, we did this

17  rough version, kind of a 3D sketch. It was very fast to show

18  and see how it would work.

19  Q.  You're referring to the first sculpt, 1136?

20  A.  This first sculpt, the gray sculpt. So then I had to go

21  in, cut it up, and make it more a real working doll. Because

22  this in the industry is called a maquet.

23  Q.  Looking at the 1136 sculpt, that was the sculpt that was

24  presented at a meeting on what date? Do you recall?

25  A.  This sculpt?

1    Q.   Yes.

2    A.   That was presented on October -- can I look at the book?

3    Q.   Yes.

4    A.   Did you tell me what page it is?

5    Q.   I can't.

6    A.   That's okay.  But I found it.

7    Q.   Can you identify for us the exhibit number and the page

8    that you're referring to if that refreshes your recollection?

9    A.   Okay.  September 29.

10   Q.   Now, the question I have for you is at the meeting --

11   who was at the meeting when you presented the sculpt that's

12   been marked as 1136?

13   A.   This sculpt?

14   Q.   Yes.

15   A.   I know it was Carter.  Veronica and Paula may have been

16   there.

17   Q.   Now drawing your attention to the exhibit that we've now

18   introduced, 1141.  What was the date that that sculpt was

19   finished in the form that you are holding it now?

20   A.   In this form, it was finished on October 23rd.  That's

21   when I had it molded.

22   Q.   And so just to be clear, the doll-like feature that you

23   are holding in your hand, 1141 A, is from the molds that are

24   dated October 23rd; correct?

25   A.   Correct.  That's a resin cast from these molds.

 1  Q.   Those are 1140 A through D; correct?

 2  A.   Correct.

 3  Q.   Now, holding up 1141 next to 1136 for a moment, is it

 4  possible for to you hold up both together at the same time?

 5  A.   Yes.

 6        MR. NOLAN:   Your Honor, I'd offer 1141 A into

 7  evidence.

 8        MR. PRICE:   No objection.

 9        THE COURT:   Counsel, just to be clear, is the

10  sculpt 1141 or 1141 A?

11        MR. NOLAN:   It's 1141.

12        THE COURT:   Thanks.

13        **(Exhibit 1141 A received.)**

14  Q.   BY MR. NOLAN:   So you are holding up 1136 A and 1141?

15  A.   I'm holding 1141, and this is the stand.

16  Q.   Now, between the time that you worked on sculpt 1,

17  Exhibit 1136, and the receipt of the finished mold that's

18  marked as 1141, did you refer to Mr. Bryant's drawings in any

19  way?

20  A.   No, no, I didn't refer to his drawings.   They weren't

21  helpful in that way.

22  Q.   In what way?   Why weren't they helpful?

23  A.   They weren't helpful because they are concept drawings.

24  They are like cartoons.   They have no use for me as a

25  sculptor to translate them into three dimensions.

```
 1   Q.   Explain to the jury your best recollection of whether or
 2   not Carter Bryant, in addition to his concept drawings,
 3   Exhibit 302, did Mr. Bryant provide to you any other
 4   information before you started sculpting, any other
 5   inspiration work?
 6   A.   He gave me a Steve Madden ad from a magazine.  And that
 7   was actually more helpful than his drawings because it's an
 8   actual -- I mean, it was a manipulated photograph.  It still
 9   implies three dimensions, whereas Carter's don't imply that.
10            MR. NOLAN:   Your Honor, if I might, it's in
11   evidence, 1127.
12            THE COURT:   Yes.
13            MR. NOLAN:   Thank you.
14   Q.   This is something that we referred to as the Steve
15   Madden Devil Angel ad; is that correct?
16   A.   Correct.
17   Q.   When did Carter Bryant give you this independent source?
18   A.   He gave that to me with the packet.  It was the same
19   time.
20   Q.   And that's Exhibit 302, his drawings?
21   A.   Correct.
22   Q.   Did Mr. Bryant tell you that he personally had any
23   involvement in the design or the development of the features
24   depicted in Steve Madden's ad?
25   A.   No, he didn't have any involvement in the ad.  He just
```

1   gave it to me and said, you know, go for it.  Do your thing.

2   **Q.**   I think last time you were here, you referred to "do

3   your magic."

4   **A.**   Correct.  That's what I said.

5   **Q.**   All right.  I want to focus, if I might just now, on the

6   Steve Madden ad.  And you said words to the effect that this

7   was more helpful for you in doing the sculpt.  Can you

8   explain to the jury, drawing on your background, why it is

9   that you say that the Steve Madden ad was more helpful in

10  doing the sculpt rather than --

11          And Aaron, can I have up Exhibit 302, and just

12  quickly go through those pages of the pitch book?

13          MR. PRICE:  I want to object.  Irrelevant.  Lack of

14  foundation.

15          THE COURT:  Overruled.

16  **Q.**   BY MR. NOLAN:  Now, looking back to the Steve Madden ad,

17  from a sculptor's perspective, can you explain to us what

18  value, if any, you saw in the Steve Madden ad and that you

19  used in making the sculpts?

20          MR. PRICE:  I'm going to object.  Independent

21  creation defense has been waived.  This is irrelevant in this

22  phase.

23          THE COURT:  Let's do a sidebar.

24          **(SIDEBAR CONFERENCE HELD.)**

25          THE COURT:  Okay.  Mattel has introduced evidence

1   that Margaret Leahy relied on Mr. Bryant's sketches for the
2   sculpt. MGA is taking the position for Margaret Leahy that
3   she did not. I tentatively agree with Mattel. It is the
4   Shrek doll thing is irrelevant. But this seems to be
5   relevant. This is basically her saying, you know, these
6   other things I relied on, not what Mr. Bryant submitted to
7   me, not Mr. Bryant's drawings.

8          MR. ZELLER: Number one, your Honor, so it's clear,
9   this was a defense that was waived. We raised this issue.
10  It wasn't in the final pretrial conference order. It was not
11  raised as a defense. So even if one doesn't say technically
12  it's not an affirmative defense, he --

13         THE COURT: Wait a second. This is not independent
14  creation here.

15         MR. ZELLER: It is. I apologize. It is. When
16  Mr. Nolan used the magic words "independent source," he is
17  talking about independent creation.

18         MR. NOLAN: Your Honor, we had a --

19         THE COURT: Is that where you're going with this?

20         MR. NOLAN: No.

21         THE COURT: Because I agree with Mr. Zeller. The
22  independent creation thing, we're not going to get into that
23  until we have an out of presence discussion hearing, out of
24  the jury. I'm not sure if it's waived or not. But in any
25  event, this is simply to rebut --

```
 1            MR. NOLAN:   The argument that they made.   And we
 2    had a two-and-a-half-hour argument on this this morning, your
 3    Honor.   And we specifically mentioned the Angel Devil, Devil
 4    Angel ad, and what I'm going to do, because she doesn't refer
 5    to this but for a brief moment in her sculpting, and then go
 6    off to the changes that were made.

 7            But I have to say that for Mr. Price to stand up in
 8    front of this jury and make a legal argument objection, a
 9    speaking objection is wrong.

10            THE COURT:   Right.   And this is the second time
11    today that I've had to caution Mattel in doing that.   Stop
12    the speaking objections.   If you want a sidebar, I grant them
13    liberally.   I don't want speaking objections made.   I've
14    stated that to both sides during this trial.

15            MR. PRICE:   What they are saying here is that in
16    September she received Carter Bryant drawings and the Steve
17    Madden ad.   And she created the first sculpt.   That first
18    sculpt the jury has determined is ours.   So this is
19    irrelevant in this phase.

20            Now, she's going to argue, I think, that, well, I
21    made later sculpts that weren't based on any drawings.

22            THE COURT:   We have to address the first sculpt
23    that was been decided by the jury.

24            MR. NOLAN:   The point I wanted to make is that from
25    the sculpt, the big one, 1136 A, to the next sculpt,
```

1  Ms. Leahy does not refer to the drawings, to the Steve

2  Madden --

3  THE COURT: But the problem is, and I just missed

4  it. I did not hear you say independent source, because if I

5  would have heard that, I would have ordered a sidebar. And

6  that is exactly what I was getting at this morning.

7  MR. NOLAN: And I didn't see that as a -- I didn't

8  mean that as a term copyright --

9  THE COURT: However you mean it, it comes across

10 that it's independent and separate from Carter Bryant's

11 drawings.

12 MR. NOLAN: But they are much -- it's a tear sheet,

13 with all due respect. That's all we're doing is saying this

14 is a tear sheet from a magazine in addition to the drawings

15 that were provided to her.

16 MS. AGUIAR: May I add one thing?

17 THE COURT: Yes, and then explain to me how I can

18 correct this problem.

19 MS. AGUIAR: With regard to the verdict in Phase 1,

20 this goes back to an issue --

21 MR. PRICE: I think it should be taken down at this

22 point.

23 THE COURT: Please take it off.

24 MS. AGUIAR: Aaron, take it down.

25 The Court told the parties and made it very clear,

 1 | as I mentioned before on the record, that Phase 1-A was about
 2 | timing, timing, timing.

 3 |         THE COURT:  I understand.

 4 |         MS. AGUIAR:  All the jury determined was that at a
 5 | certain time jointly or solely.  There is not one piece of
 6 | evidence before this jury as of this moment that Mr. Bryant
 7 | created 1136 solely.  Not one piece of evidence.

 8 |         THE COURT:  That's correct.

 9 |         MS. AGUIAR:  We are entitled to put on evidence
10 | that this sculpt was created jointly and to get a
11 | clarification in the 1-B verdict form, that it was done
12 | jointly.

13 |         THE COURT:  Right.

14 |         MS. AGUIAR:  And if that is the case, that has
15 | legal implications, and it doesn't mean it's owned by Mattel.

16 |         THE COURT:  But the problem, though, is that when
17 | you talk about independent sources and it's being now
18 | presented as though it was not done jointly but solely by
19 | Margaret Leahy, that's the problem.

20 |         So I'm asking for a solution to that problem.
21 | That's an area that he should not have -- that question after
22 | our extensive, as you say, two and a half hours this morning.
23 | If I didn't make anything clearer, I'm not allowing in at
24 | this point an independent creation defense.  And we can't go
25 | there.  So now I got to unring that bell before this jury.

```
 1              MR. NOLAN:  Your Honor, respectfully, I think not,
 2   because what I established was that the gray sculpt that
 3   we're referring to here was the one where Carter was present.
 4   I'm not saying that she created that by herself.  You can
 5   look back at the record.  That that's not -- 1141 is going to
 6   be the next sculpt where there are no meetings with Carter
 7   Bryant or anybody.  And we're going to show --
 8              THE COURT:  1141 is this sculpt?
 9              MR. NOLAN:  I'm sorry, your Honor.  My questions
10   were directed preliminarily to 1136.
11              THE COURT:  The one that she has on the witness
12   stand.
13              MR. NOLAN:  She has two on the witness stand.  She
14   has the big one, which that was the first phase trial.  And I
15   said that this information was used with Carter Bryant in
16   producing that one.  That's already in evidence.
17              THE COURT:  So 1136 is the one that the jury came
18   back with.
19              MR. NOLAN:  Yes.
20              THE COURT:  All right.  I'm going to remind the
21   jury that they have already found and it has been established
22   that 1136 was created solely or jointly by Carter Bryant.
23   Period.
24              MS. AGUIAR:  Or jointly.
25              THE COURT:  Right.
```

```
 1              MR. PRICE:  Here's the problem.

 2              THE COURT:  Going forward, let's be careful on

 3    anything that the jury has found now, we're not calling that

 4    into question at this point.

 5              MR. NOLAN:  But your Honor, I apologize.  This may

 6    be the only time when the two exhibits are going to be

 7    referenced at the same point in time.  And I didn't want to

 8    tell the witness, by the way, you know, the jury has already

 9    awarded this to Mattel.  That's the reason why I didn't do

10    it.

11              THE COURT:  You probably should have let her know

12    that.  And in any event, you should not have asked a question

13    about independent source with respect to 1136 after the

14    two-and-a-half-hour discussion that we had this morning.  But

15    it's done now.  Let's move forward.  I can correct that by

16    making it clear that 1136 is not an independent creation

17    based on the jury's findings.

18              MS. AGUIAR:  Can I -- I do want to make a point,

19    though, your Honor, because I was arguing this morning, and

20    you said to me there has been no evidence in the record

21    that -- there's been no evidence of independent creation.

22    And I said I actually don't agree with that, and I pointed

23    out that from the very first day that Margaret Leahy started

24    working on this, her testimony was that she did not use his

25    drawings.
```

1    THE COURT:  I understand that.  And you're correct

2    the jury heard that, and they rejected that.  They found that

3    he was involved in the creation of that sculpt.

4    MS. AGUIAR:  That's not what I'm saying.  They

5    found that he gave comments on that sculpt, but that when she

6    did that first sculpt, she was working from --

7    THE COURT:  Do we have a copy of the jury verdict

8    as to what was said with respect to 1136?  Because I think it

9    was created solely or jointly by Carter Bryant while he

10   worked at Mattel.

11   MS. AGUIAR:  Right, but that doesn't mean that when

12   Margaret Leahy was actually making the sculpt, that when she

13   was making it, it doesn't speak to what her inspiration was

14   for making that sculpt.

15   MR. NOLAN:  We're not saying anything inconsistent

16   with the verdict, your Honor.

17   THE COURT:  I disagree.  We're done with this.  I'm

18   going to give the instruction.  You're not going to get into

19   this.  I would like to see the verdict form.  Is that coming

20   up?  I should have that.  I just want to make sure before I

21   go any further.

22   MR. ZELLER:  We can get that form.

23   THE COURT:  I want to do it before I make the

24   instruction.  Because my instruction is predicated entirely

25   on the verdict form and the fact that, as you pointed out,

1    the jury did have the evidence that Margaret Leahy claims

2    that she did do it independently, and notwithstanding that,

3    the jury came back and said it was done solely or jointly by

4    Carter Bryant while he worked for Mattel.

5              MR. NOLAN:  Respectfully, your Honor, she did not

6    testify in the first trial that she did 1136 by herself.

7    Quite to the contrary --

8              THE COURT:  What did you tell me this morning?

9              MS. AGUIAR:  You said was there any evidence that

10   she looked at things other than his drawings, and I said

11   absolutely.  She testified that she had the Steve Madden ad.

12             THE COURT:  For each item listed below, has Mattel

13   proven that the item was conceived or reduced to practice,

14   that is, created by Carter Bryant alone or jointly with

15   others during the period of time he was employed by Mattel.

16   And with respect to 1136, the answer is yes.

17             MR. NOLAN:  Right, but, your Honor, solely or

18   jointly by others.  It's Margaret Leahy, too.  We never took

19   the position that Carter Bryant wasn't involved in the

20   creation.

21             THE COURT:  By -- we're making more out of this

22   than we need to in a big way.  And I missed it.  And I should

23   have picked up on it when you made the statement an

24   independent source, you're taking it from solely or jointly

25   with Carter Bryant to solely by Margaret Leahy, and that's

```
 1    all I'm saying.  I'm saying nothing more than that.

 2              MR. NOLAN:  And I apologize for the inartful way of

 3    phrasing the question.  That's not the point that we are

 4    making with respect to 1136.

 5              THE COURT:  When was this made?

 6              MR. ZELLER:  I'm sorry?

 7              THE COURT:  When was the statement made, the

 8    independent source statement?

 9              MR. ZELLER:  My recollection is it was actually

10    made in connection with 1141, which is even more troubling.

11    But 1136, when the Angel Devil ad was put up and Mr. Nolan

12    said was this the independent source, she said yes.  And also

13    I would submit, your Honor --

14              THE COURT:  And we're sure of this?  Do you recall

15    making the statement?

16              MR. NOLAN:  I was saying it that -- what I recall

17    saying, and what I meant to, and I think this is all he said

18    was --

19              THE COURT:  I'm not concerned about what you meant

20    to say.  I want to know what's before the jury.  We're

21    wasting a lot of time here.  Can someone get a transcript if

22    we don't all agree?

23              MR. NOLAN:  What about just telling the jury if you

24    feel it's necessary, your Honor, to correct this issue,

25    because we're not taking the issue that 1136 was not found by
```

 1   them.   That's not what we were saying.

 2              THE COURT:  I don't want to do it if it's not

 3   warranted.  If you didn't say it, it's not warranted.  I'm

 4   not going to say something to the jury that's not warranted.

 5              MR. NOLAN:  My recollection, your Honor, and we can

 6   get the transcript here in a minute, was that I said that in

 7   addition to the drawings, did Mr. Bryant give you an

 8   independent source.  And that was --

 9              THE COURT:  I'm sorry.  The angel -- the

10   transcript.  We're going to get it in a minute here.  Because

11   I don't want to give an instruction if there's not -- I don't

12   like giving these instructions.  But I don't want it conveyed

13   to the jury -- we're not going down that road.

14              MR. ZELLER:  This is the part right here.

15              THE COURT:  That's objectionable.

16              MR. NOLAN:  Devil Angel.  To the ad.  I'm referring

17   to the ad.

18              THE COURT:  I know.  And you characterized it to

19   the jury as an independent source.  And you should not have

20   done that.

21              MR. NOLAN:  With all due respect, your Honor, not

22   to get into semantics, the Devil Angel is not Carter

23   Bryant's.  It was a tear sheet from a magazine.

24              MS. AGUIAR:  There were questions above this

25   question where he's already talking about Carter Bryant

```
 1   having given Margaret the drawings.

 2            MR. PRICE:  Which she said she did not rely on.

 3            THE COURT:  You asked about the drawing.  They

 4   weren't helpful.  And then he gave me a Steve Madden ad.

 5   When did he give you that independent source.  I think

 6   there's enough there.  Thank you.  I'll make a very brief

 7   instruction, and we'll continue.

 8            (CONCLUSION OF SIDEBAR CONFERENCE.)

 9            THE COURT:  Ladies and gentlemen, the jury has

10   already found that Exhibit 1136 was created by Carter Bryant

11   alone or jointly with others during the period in which he

12   was employed by Mattel from January 4th, 1999, to October

13   19th, 2000.  You are to disregard the reference made to the

14   independent source of the Steve Madden ad.

15            Counsel, you may proceed.

16   Q.   BY MR. NOLAN:  Now, with 1136 and 1141 still in front of

17   you, do you have that?

18   A.   Yes.

19   Q.   Okay.  Who created 1141?

20   A.   I did.

21   Q.   Can you tell us what changes you made after completing

22   1136?

23   A.   Well, I had this cast in wax, which in hindsight I wish

24   I hadn't, but this was the first body ever sculpted.  So, you

25   know, I made some different decisions than I would have now
```

 1   being more experienced.  This being so grossly oversized

 2   compared to this, I had to go in and make a lot of -- a lot

 3   of changes.  I had to take my saw and literally cut it into

 4   pieces, a lot of pieces, and take a lot of wax out, which is

 5   really hard.  It's not like candle wax.  Really hard wax.

 6   Almost like stone.  So it takes a long time.

 7            Once you cut it up, you have to weld it back

 8   together one drip at a time.

 9            So is that enough?  Is that a good answer?

10   **Q.**   In working on the sculpt that's in your hands, 1141, did

11   you refer to Carter Bryant's drawings?

12   **A.**   No.  I couldn't refer to Carter Bryant's drawings.

13   **Q.**   Why not?

14   **A.**   Because they made no sense in three dimension.  It

15   wasn't like Christine's drawings, where they are very exact,

16   almost architectural drawings.  You know, Paula had seen

17   this.  And she wanted it --

18            MR. PRICE:  Objection.  Beyond the scope and

19   hearsay.

20            THE COURT:  Next question, Counsel.

21   **Q.**   BY MR. NOLAN:  Just stay focused for a moment on 1141,

22   looking at 1141.

23   **A.**   Okay.

24   **Q.**   When was 1141 first exhibited by you to anyone?

25   **A.**   Well, I had it molded on October 23rd.  And then I

1    showed it to Paula and Mercedeh and Carter on the 25th.

2    Q.    And that's October 25th?

3    A.    October 25th.

4    Q.    Of 2000?

5    A.    Correct.

6    Q.    And where was that meeting, if you recall?

7    A.    That was at MGA.

8    Q.    Between the time that you did the sculpt, 1136 A, and

9    you did the sculpt that's marked as 1141, did you consult

10   with Carter Bryant?

11   A.    No, nobody saw it in between then.  I didn't talk to

12   anybody.

13   Q.    You referred earlier to cut up something.  What I wanted

14   to do is maybe we could just more or less divide it.

15         And Aaron, do we have a picture of this on the

16   screen?  1141.

17         The picture that we have here does not have the

18   head or the arms on it.

19         I apologize, your Honor.

20         But if I could just ask you first to talk about the

21   relative sizes.  1136 on the one hand and 1141 on the other

22   hand.  What are the differences in the sizes?

23   A.    Well, I mean aside from the obvious height, gosh, just

24   starting from the head, the head is smaller because I started

25   to clean it up more.  The neck's a lot thinner.  I had to

```
 1   bring the shoulders in because it needed to look more like a
 2   tween body rather than a mature high school or college
 3   student body.  This body is a little alienating for young
 4   girls.
 5   Q.   When you say this body, if you could just for the
 6   record, the body that you're referring to is the gray sculpt
 7   marked as 1136 A?
 8   A.   Correct.  1136.  The gray sculpt.  It's too mature.  Too
 9   fleshy.  This one I needed to make it more of a tween body.
10   And you know, personally, I love the tween body.  So I was
11   very excited about this because they still -- they are still
12   growing --
13              MR. PRICE:  Objection.  Beyond the scope.
14              THE COURT:  Sustained.
15   Q.   BY MR. NOLAN:  We'll break this up.  First of all, you
16   mentioned something about a tween body.
17   A.   Correct.
18   Q.   Help us out.  What do you mean by a tween body?
19   A.   It's girls from, say, age 11 to even 13.  It's supposed
20   to be like in between teenage stage.  It's like right before
21   they turn into a teenager.
22   Q.   So is 1141, for the jury's benefit, an example of what
23   you would call a tween body?
24   A.   Correct.
25   Q.   Now, looking at 1136, would you describe that as a tween
```

1   body?

2   **A.**   No, I would not.  It's more mature.

3   **Q.**   When you say more mature, describe that for me.

4   **A.**   I would say it's more like a 19, 20 year old.  Even

5   older.

6   **Q.**   Going back to 1141, looking at, because I know you

7   described size changes.  Let me just have you focus on the

8   sculpt for a moment of the head.

9   **A.**   Okay.

10  **Q.**   All right.  Did you make any changes, design changes in

11  the sculpt of the head?

12  **A.**   From 1136?

13  **Q.**   Yes.

14  **A.**   Yes, I made plenty of changes.

15  **Q.**   Can you explain those changes for us or identify those

16  changes for us?

17  **A.**   Well, I had to raise the cheek bones a little.  I had to

18  take out the jaw and, you know, overall to make this more

19  clear, I had to make it more humanistic.  This is more -- I

20  call it a super ball with eyes dug in.  And if you don't have

21  bone structure in a doll, if it doesn't have humanistic

22  qualities, if it's just a stylized thing like a cartoon, it

23  doesn't have longevity on the shelf.  It's just what we

24  learned in sculpting.

25          I had to put in brow bones, nose bridge,

 1  cheekbones.  I had to add a chin.  There's this part of the

 2  jaw that cuts in from the cheek here.  You can see it in the

 3  three-quarter view.  You know, I started to get it a lot more

 4  humanistic rather than this round piece of clay, wad of clay.

 5  Q.   And when you say the wad of clay, you're holding up --

 6  A.   1136.

 7  Q.   The sculpt head?

 8  A.   Correct.

 9  Q.   Just looking at 1141, the head sculpt, is there a nose

10  structure?

11  A.   Yes, there's a nose.

12  Q.   Do you recall, and you can refer back to 302, if you

13  wish, did Carter Bryant's original concept drawings have a

14  nose for those characters?

15  A.   No.  Carter Bryant's drawings had a little dot on them.

16  Some of them didn't even have the dot.  He didn't, when I

17  asked him about it, he didn't want the nose --

18           MR. PRICE:  Objection, your Honor.  This is hearsay

19  and irrelevant.

20           THE COURT:  Sustained on hearsay, the last

21  statement.

22  Q.   BY MR. NOLAN:  Carter Bryant's drawings, presented to

23  you in September, marked as Exhibit 302, did they have a nose

24  structure?

25  A.   No, they did not.

1  **Q.**   1141, the sculpt that you did and presented on October

2  25th, does it have a nose?

3  **A.**   Yes, it does.

4  **Q.**   Why did you add a nose to 1141?

5  **A.**   Well, just like I was saying before, you have to have a

6  nose or else it looks like a weird kind of alien crocodile

7  type creature.  Like imagine it without a nose.  It's not

8  human.  It looks really strange and is not believable.

9  **Q.**   Did you make any other changes to the face on 1141?

10 **A.**   I -- you want me to point out all the bone structure and

11 everything?

12 **Q.**   Do you mind?

13 **A.**   Yeah, like this doesn't have any temples.  Believe it or

14 not, the two most important things in sculpting are the nose

15 and the ears --

16         MR. PRICE:  Your Honor, I object to the -- the

17 question is why.

18         MR. NOLAN:  I'll rephrase it.

19 **Q.**   Can you just identify for us the --

20         THE COURT:  Very well.  You withdraw the last

21 question?

22         MR. NOLAN:  I'll withdraw the last question, your

23 Honor.  I'll do it a different way.

24 **Q.**   Can you describe for us, now focused on 1141, the bone

25 structure changes that you made in 1141 that were not present

1  in Carter Bryant's concept drawings?

2  **A.**  Yes, this one has temples that lead back to the ears.

3  This is a very important part of the head and of the bone

4  structure.  It's the way your muscles lay around your skull.

5  It has a brow bone right here.  Right on the corner where

6  your brows go.  It's smoothed into there.  It has more

7  definition.  Behind the ears are where the skull cuts in

8  behind your ear, like the nape of your neck.  The lips are

9  starting to get a little more believable.  These are kind of

10  just plopped on here.

11           I remember just taking a wad of -- little worm kind

12  of thing of clay and sticking them on there and smoothing

13  them in, and this is more kind of finessing the lips into the

14  face.  You see how the chin sticks out a little more here.

15  It leaves, you know, there's this like little indentation

16  under your lip.  This one doesn't have it.  I'll try to hold

17  it still.

18  **Q.**  And this one that you are holding up now is 1136?

19  **A.**  1136 does not have it.  It doesn't have a chin.  The

20  lips kind of go straight into the chin.  This one is starting

21  to evolve more.

22           The bridge of the nose is starting to get cut out

23  here a little bit more.  And those are the major things.

24  **Q.**  Now, is the -- were the ears changed at all?

25  **A.**  Yeah, the ears are starting to get more refined.  One of

1  the comments was to press them more into the head.  They were

2  sticking out too far.

3  Q.   Now, is the face that's depicted on the sculpt that you

4  created, Exhibit 1141, and presented on October 25th, the

5  same age depiction as 1136, or was it older, younger?

6  A.   This one is younger because they asked me to make it

7  younger, but it's also just plain more refined in every way.

8  Q.   And the one you're holding up is --

9  A.   1141 is more refined and younger looking.

10  Q.   Any other changes that you can recall making to the head

11  sculpt on 1141?

12  A.   I had to make it smaller, which is -- it's easier than

13  making things bigger in the sculpting world, because making

14  things bigger you have to add and add and contracted add, and

15  it changes everything.  Well, smaller also changes everything

16  because it's not just taking out around here.  It's moving

17  the eyes down, moving the nose back to the right position.

18          You have to kind of -- like stirring up an ant

19  hill.  You have it all there, but you have to change it all

20  to make it like I did before, but more refined.

21  Q.   Now, are the eyes on 1141 the same eyes as on 1136?

22  A.   No, the eyes are different.

23  Q.   In what ways?

24  A.   The eyes are more washed out.  And like I said, I

25  started to define the brow a little bit more.  These eyes,

```
 1   you can't see it from where you are, but they have the
 2   indication of an eyelash here.  Some eyes do that.  They
 3   sculpt the whole eyelash to give dramatic effect.  And that's
 4   what I was going for here, but, you know, as a sculptor, it
 5   progressed.  Everything started to get more washed out, which
 6   is easier to produce, and, you know, easier to make -- easier
 7   to maneuver and manipulate and things like that.
 8              MR. NOLAN:  Your Honor, could we either have
 9   Ms. Leahy use the laser to point out the differences here or
10   permission for her to have the microphone and go to the head
11   sculpts that are depicted?
12              THE COURT:  Whichever is easiest.
13   Q.   BY MR. NOLAN:  Would it be easier for you to come to the
14   screen, Ms. Leahy?
15   A.   Probably.
16   Q.   And why don't you bring the two heads with you at the
17   same time if you don't mind.
18              I think I was directing your attention to the eyes?
19   A.   Correct.
20   Q.   And can you explain now, with the benefit of your
21   standing by the screen, the changes?
22   A.   Just in the eyes?
23   Q.   Start with the eyes.
24   A.   The eyes here, I'll start with this one because it has a
25   little bit more light on it.  You can see this line of
```

```
 1    eyelash ridge goes all the way out like kind of towards the
 2    temple.  And it's a flatter -- flatter line under here.  As I
 3    moved to this one, here you can see that it's starting to get
 4    a little more rounder and more eye-shaped, not so flat and
 5    stylized.  It's getting a little more humanistic here.
 6    Q.   Why did you do that?
 7    A.   To make it more humanistic.  Like I was saying, this is
 8    just a rough sketch --
 9              MR. PRICE:  Objection as to why, your Honor.
10              THE COURT:  I'm sorry?
11              MR. PRICE:  Objection, irrelevant as to why.
12              THE COURT:  Sustained.
13              MR. PRICE:  Move to strike.
14              THE COURT:  It is stricken.
15    Q.   BY MR. NOLAN:  You can continue.  Any other changes on
16    the eyes?
17    A.   I was saying this line is also getting a lot softer, a
18    lot more washed out.  You know, that helps her look a little
19    less mature, too, a little younger.
20    Q.   And then I think -- anything else with respect to the
21    eyes?  Otherwise, I'll ask you to look at the ears.
22    A.   We can move to the ears.  Those are the major things.
23    Q.   Okay.  Now, you're talking about the ears before?
24    A.   Yeah, these -- the ears on the gray one are sticking out
25    a lot more.  We call it jug ears back home.  But yeah, they
```

1    are sticking out more, and it didn't look right.

2            And then there's this part of the cheekbone and the

3    temple, and it's a very -- very tricky thing to do.  And

4    people have spent a lot of time with me teaching me how to do

5    it, but there's a lot of mass here.  You really have to make

6    this lead back there or else it just doesn't look like the

7    eyes are sitting on the face right.  It's not believable.

8            So you can see how I took some out of the temple

9    here.  And you kind of leave the cheek bones so they go back

10   to the ear.

11   Q.   And what changes, if any, did you make to the cheek

12   bones?

13   A.   I defined them more and raised them more.  You know,

14   this is -- this is a very low mass of cheekbone right here,

15   which is, you know, as you get older, your face droops more,

16   unfortunately.  And --

17           MR. PRICE:  Your Honor, sadly true, but I'm also

18   going to object as being irrelevant.  We're only describing

19   the differences.

20           THE COURT:  Continue, Counsel.  We're going to be

21   taking a break in a few minutes.

22           MR. NOLAN:  Let me try to finish up with this, and

23   then we'll take a break.

24   Q.   We were talking about?

25   A.   Cheek bones.  So this is kind of like sagging too low.

1  So I took it, and I took a lot of the mass out here, and

2  accentuated it up here.

3  Q. You're referring to the cheek area?

4  A. Yeah, the cheek area, and kind of moved it up to the

5  cheekbone so it would make a smooth transition into the eye.

6  And I also started to work on the tear duct area, which is

7  also a tricky area, but putting it here and finesse down here

8  so it leads into the bridge of the nose.

9  Q. Now, with respect to the overall shape of the skull, did

10  you make any changes in terms of the size of the forehead or

11  anything?

12  A. The size of the forehead got a little flatter, and

13  contrary to what I was saying, younger, when you add

14  forehead -- like babies have really big foreheads. So

15  technically when you add forehead, it should look younger.

16  But this was just looking too round, and tweens don't have

17  big foreheads. So I did end up taking some of the forehead

18  off, because that was my mistake over there, to put too much

19  forehead on. Because it just looked off.

20  Q. And when you were sitting on the witness stand, you were

21  talking about the line of the jaw?

22  A. Yeah, we don't have a three-quarter view, but this line

23  in here is also a very subtle line yet very important when

24  you're sculpting a face. You can kind of see it here.

25  There's a shadow under here. A little mass of skin here, and

1   you have to carve out the shadow, just the way the skin lies

2   around the skull.  And you can see here, it's just almost a

3   perfect curved line.

4          MR. NOLAN:  This will be the last area, your Honor.

5   Q.  Looking at the lips on 1136 and comparing it to the lips

6   on 1141, did you make changes?

7   A.  Yes, I did.  This lip, this section from here to here is

8   bigger from top to bottom than this section.

9   Q.  And now you're referring to the lips on 1136?

10  A.  1136.  The bottom lip is a lot smaller, and then again,

11  you know, the lips kind -- all of kind of the lip area,

12  there's a lot of flesh right in here which I needed to take

13  out.  These lips started to get more refined.  These lips

14  have chunky clay area that I didn't clean up because I didn't

15  need to.  It would have been a waste of time.  It's just to

16  give an indication.

17  Q.  And then you had pointed out something about an

18  indention under the lips?

19  A.  Yeah, that's this part under the chin.  This has it by

20  default just because I stuck the lips on there literally.

21  But as I was showing the jury, there's no -- there's no chin.

22  This just goes straight back into the underside of her chin.

23  This one, the chin starts to pop out.  You can see a little

24  shadow where the chin starts to pop out more, and it starts

25  to cut in under the lip.

```
 1   Q.    And the nose structure on 1141 is different than on
 2   1136?
 3   A.    It is because I'm starting to define where the lips hit
 4   the face more, where the cartilage starts to mass up here.
 5   Q.    Last question, and we'll take a break right after this
 6   one.   And we'll turn to the torso, but my question again is
 7   in making the changes on 1141, did you refer to Carter
 8   Bryant's drawings?
 9   A.    No, not at all.
10            MR. NOLAN:   Thank you.   Is this a good time, your
11   Honor?
12            THE COURT:   Very well.   We'll take our afternoon
13   break.
14            All rise for the jury.
15            (WHEREUPON THE JURY WITHDRAWS.)
16            THE COURT:   Please be seated.
17            Mr. Nolan, I understand this is a difficult area to
18   traverse.   You will Avoid objections, and you will avoid
19   intervention by the Court if you clearly instruct your
20   witness not to get into why and how difficult and how tricky
21   or how much training or how much education and all of the
22   investment.   I want her to hear exactly what I'm saying.
23            MR. NOLAN:   I get so much coaching --
24            THE COURT:   I understand you.   Let me coach here.
25   I want her to hear this.   If I hear any more, I'm going to
```

```
 1   interrupt her and stop her.  I understand on a human level
 2   the pride of artistic ownership, of all of that, that she
 3   must feel towards these molds, but the Court has tried very
 4   clearly at sidebar and now in open court to make it clear
 5   that what is relevant are what the differences are, not how
 6   much time, energy, effort, training, skill, trickery, or
 7   anything else that had to be done in order to accomplish
 8   those changes.  Just the changes.
 9              MR. NOLAN:  Just the facts.
10              THE COURT:  Thank you very much.
11              (Recess taken.)
12              (WHEREUPON THE JURY ENTERS.)
13              MR. NOLAN:  Your Honor, with the Court's
14   permission, may Ms. Leahy go back into the well by the
15   screen?
16              THE COURT:  Yes.
17   Q.   BY MR. NOLAN:  Ms. Leahy, now I would like you to take
18   the torso.
19              For the record, we now have up photographs of the
20   two torsos.  On the left-hand side is 1136, and on the
21   right-hand side is 1141.
22              THE COURT:  Very well.
23   Q.   BY MR. NOLAN:  Mrs. Leahy, I was reminded during the
24   break, when you're pointing to a sculpt, would you identify
25   it for the record so that the reporter has it in the record?
```

1   A.   Okay.

2   Q.   Now, did you make any changes in the torso in 1141?

3   A.   Yes, I made a lot of changes.

4   Q.   Could you identify those changes?

5   A.   Well, number one, it's hard to tell because these are

6   both the same size.  But I think you guys -- I had to cut the

7   torso way down to get it to fit the right size.  This is a

8   more adult torso, like I was saying before.

9   Q.   And this is 1136?

10  A.   1136 is a more adult torso.  Number one, because it's

11  longer.  Number two, because the hips are lower.

12           This one, the waist is a little lower as well.

13           This one, the tween torso, the waist tends to be

14  higher because their upper torso is the last part to develop.

15  Q.   Any other changes 1234?

16  A.   The upper torso is smaller, and less developed.  It's

17  the last thing to develop on their body.  So I brought the

18  shoulders in even more and made the neck a little thinner as

19  well.

20           I put in the ball joints here so it could start to

21  be a doll play value, where you could move the legs and

22  things like that.  It's what you have to do to make a doll.

23           You know, I moved the chest area up because, as you

24  get older, you know, things start to --

25           MR. PRICE:  Object as to why.

```
 1                THE COURT:  I'm sorry?

 2                MR. PRICE:  I object as to why.

 3                THE COURT:  Sustained.

 4    Q.   BY MR. NOLAN:  All right.  Just explain the changes.

 5    A.   I'm sorry.  Well, I had to move the breasts up and kind

 6    of like fill in this area a little more because there's still

 7    baby fat with the tweens.

 8                And the bellybutton is up here now.

 9    Q.   Any changes to the shoulder?

10    A.   I made the shoulders smaller.  And these are a little

11    more slopey and less square.

12    Q.   Did you make any changes to the legs?

13    A.   Yes, I made a lot of changes to the legs as well.

14    Q.   And can you explain the changes that you made to the

15    legs?

16    A.   Yes.  First of all, as I've said before, I had to cut

17    them way down to get them to the right size.  The legs on

18    1136 are a lot longer than these legs.

19    Q.   On 1141?

20    A.   On 1141.  Another thing is I had to make the inner

21    thighs skinnier so you can get fashions on there.  As you can

22    see, it kind of added more musculature to make her look more

23    athletic and more believable as a humanistic character.  I

24    had to make the ankles a little bit thinner, and I put the

25    ball joints in the legs up there so they would fit in the
```

1   sockets and the hips.

2   **Q.**   Now, this is a -- we're looking at 2D photographs of

3   each of the exhibits.  Looking at the actual Exhibits, 1136

4   and 1141, did you make any changes to -- I don't know how

5   best to say this, the rear end?

6   **A.**   Yeah, you can't see it, but this one is more mature,

7   more developed, more voluptuous and older.  This one I just

8   kind of -- I kind of just had to make it perkier, younger,

9   smaller, more musculature.  Almost more boyish.

10  **Q.**   And this is 1141?

11  **A.**   This is 1141.  1136 is the one that's too mature, too

12  wide.  You can see here how it's more muscular up in this

13  area, where this one is kind of lower and starts down here,

14  like I keep saying, and I don't mean it as a joke, but as you

15  get older, things start to fall more.

16  **Q.**   The reference, the last reference was to 1136 and the

17  first reference was to 1141; correct?

18  **A.**   Correct.

19  **Q.**   What about any other changes that you made from this

20  perspective?

21  **A.**   You can see how I started to define the back of the

22  knees more.  And the musculature as well in the bone

23  structure -- and I won't go into a lecture on calves, but...

24  **Q.**   Did I interrupt you?

25  **A.**   A little bit, but that's okay.  You can see how this

 1    cuts in here, and it's starting to define this outer muscle

 2    in the calf, which is the bigger part of the calf is on the

 3    outer side.  This one is pretty straight here.  And then the

 4    ankles, 1136, this line is still pretty straight, and there's

 5    not a lot of muscle structure over here.  Whereas there is

 6    starting to be defined more here.

 7    Q.   What about any -- did you make any changes to the arms?

 8    A.   Yes, I made changes to the arms as well.

 9    Q.   Describe just the changes you made to the arm, or arms

10    plural.

11    A.   The arms had to get a lot smaller.  Whereas on a tween

12    body you want the legs to be more muscular --

13              MR. PRICE:  Objection, your Honor.  Again, the why.

14              THE COURT:  Sustained.

15    Q.   BY MR. NOLAN:  Just the changes?

16    A.   Sorry.  This was too muscular.  More adult.  This is

17    starting to get thinner and have a fleshy, baby fat feel to

18    it.

19    Q.   Any other changes to the arms or hands?

20    A.   I started to move -- the hands are still very rough at

21    this point.  I started to kind of move the wrist gesture to

22    make it -- it's a technical thing.  If the wrists are way

23    out, it's very hard to mold when you have very extreme poses.

24    Q.   As you are standing there, any other changes you can

25    identify between 1136 and 1141?  Otherwise, I'll have you go

1   back to the witness stand.

2   A.   I would say that's the gist of it.

3   Q.   Okay.  Thank you.  Why don't you go back to the witness

4   stand.

5           Now, Mrs. Leahy, we're now, if I understand your

6   testimony, Exhibit 1141 was first shown at a meeting on

7   October 25th; is that correct?

8   A.   Correct.

9   Q.   Now, previously, and it's in evidence now, and I think

10  you referred to it a few minutes ago, you kept a daily

11  calendar or notebook; is that correct?

12  A.   Correct.

13  Q.   I'd ask you to -- do you have Exhibit 1137 in front of

14  you?

15  A.   Yes, I do.

16  Q.   And 1137, again, is your notebook?

17  A.   Correct.

18  Q.   And do you know whether or not you made any notations of

19  comments that were made at the October 25th meeting?

20  A.   Yes.  It's on 1137-18.

21           MR. NOLAN:  Your Honor, we'd offer into evidence

22  that page, 1137-18.  I think it may be in evidence.

23           MR. PRICE:  At this point, your Honor, I object

24  that it's hearsay.

25           THE COURT:  1137-18.  Is it in evidence already?

1          MR. NOLAN:   Let me double-check on that.

2          THE CLERK:   I don't have it on my list.

3          MR. NOLAN:   It is in evidence, your Honor.

4          THE COURT:   Very well.  You may proceed.

5          MR. NOLAN:   And, your Honor, I believe I've already

6    done this.  1141, I move that into evidence.  That's the

7    sculpt that we were identifying before.

8          MR. PRICE:   No objection.

9          THE COURT:   It's admitted.

10         **(Exhibit 1141 received.)**

11   Q.   BY MR. NOLAN:   Is 1141 the resin sculpt we were just

12   talking about, is that the final Bratz sculpt?

13   A.   No, it's not.

14   Q.   At the meeting on October 25th, did you receive comments

15   on 1141?

16   A.   Yes, I did.

17   Q.   And again, this is October 25th of the year 2000;

18   correct?

19   A.   Correct.

20   Q.   And you were working for MGA as a free-lancer; correct?

21   A.   Correct.

22   Q.   And you were meeting in MGA's offices; correct?

23   A.   Correct.

24   Q.   Did you record the comments that were made at that

25   meeting?

1  **A.**  Yes, I wrote them down.

2  **Q.**  And can you read that -- you can either read it from the

3  actual notes or on the screen.  First of all, this is your

4  handwriting?

5  **A.**  Correct.

6  **Q.**  All right.  Could you walk us through what is written

7  down on your notebook?

8  **A.**  Okay.  It says make the breasts more natural.  Put ball

9  joints in the arms only.  Do you want me to explain what ball

10  joints and things like that are or just go through the --

11  **Q.**  Just go through the comments.

12  **A.**  Ball joints in the arms only.

13        The room in the pelvis, that means more muscle

14  calves and joining things, the leg joints needed to be a flat

15  joint, not a ball joint.

16        Make both legs the same.  Not one bent and one

17  straight.

18        The head size, we're finding out what the roto cast

19  shrinking rate is.  On November 27th was the due date for the

20  final wax.

21        The ears needed to be even more flush to the head.

22        The ankles needed to be perfectly round at the

23  disconnect area.

24        The feet as generic as possible, meaning no left

25  and right foot.  The other one says call Sesto.

1  Q.  Who is Mr. Sesto?

2  A.  Chris Sesto is a friend of mine that still worked at

3  Mattel in the model shop, and I needed to find where I could

4  find a vacuum pump so I could start pouring my own molds.

5  Q.  Did anybody at MGA ask you to call Mr. Sesto?

6  A.  They didn't.

7  Q.  What is the vacuum pump you're talking about?

8  A.  When you mix up the silicone, it's not a very viscous

9  fluid at all.  It's very thick, and it gets a lot of air

10  bubbles in this.  So a vacuum pump, a homemade yet very

11  expensive piece of machinery where you pour the silicone into

12  a plastic bubble, and you suck the bubbles out of it, and

13  then you're able to pour it.

14  Q.  Did you ever buy a vacuum pump?

15  A.  No, I didn't, because I had some friends tell me a

16  different way to do it.

17  Q.  Any other notations?

18  A.  Yes, the shoulders needed to be more square.  I had

19  gotten too much deltoid area.  The feet needed to be smaller.

20  The .60 wall thickness means you have to leave that much wall

21  thickness so that you can fit the joints in.  The plastic has

22  to be that thick just so it will work.

23      Upper arms needed to be meatier.  And the nose

24  needed to be rounder.

25  Q.  Any other comments you recall being made at the October

1   25th meeting?

2   **A.** No, that's all I remember or see.

3   **Q.** You referenced a woman, I believe, by the name of

4   Mercedeh being present at this meeting?

5   **A.** Correct.

6   **Q.** What was her full name?

7   **A.** Mercedeh Ward.

8   **Q.** And was she working at MGA at that time?

9   **A.** Yes, she was. She was working as an engineer.

10  **Q.** And had you met Mercedeh before the October 25th

11  meeting?

12  **A.** I hadn't met her, but I remembered her from Mattel.

13  **Q.** Prior to October 25th of the year 2000, had you ever had

14  conversations with Mercedeh Ward concerning the Bratz sculpt

15  you were working on?

16  **A.** No, I didn't.

17  **Q.** At this October 25th meeting at MGA's offices, were

18  Carter Bryant's drawings, the concept drawings, there?

19  **A.** No, they weren't.

20  **Q.** Ms. Leahy, between the time of September, when you met

21  with Carter Bryant and saw his concept drawings, through this

22  meeting on October 25th of the year 2000, do you recall how

23  many times you had actually looked at Mr. Bryant's drawings

24  in doing any of these sculpts or molds?

25  **A.** I looked at them when he first brought them to me. They

1   were in a binder, and then, because I couldn't use them, I

2   just closed the binder and put it away.  I hung the Steve

3   Madden up --

4           MR. PRICE:  Your Honor, I object.  It's

5   inconsistent with --

6           THE COURT:  Sustained.  Let's move along, Counsel.

7   Q.   BY MR. NOLAN:  Going back now after the October 25th

8   meeting, did you do another sculpt?

9   A.   Yeah, after Mercedeh's comments or the engineering

10  comments, which are more tangible things where you know where

11  to go from there, you know the ball joints to put in there,

12  you know what you have to do to make it a technical,

13  feasible, toolable doll, that is when the real work started.

14  That took a long time.

15  Q.   Now, I'd like to bring up --

16          MR. PRICE:  I move to strike the answer "that's

17  where the work started."  It's irrelevant.

18          THE COURT:  It's stricken.

19          MR. NOLAN:  Can I have 1234 A.  And may I approach?

20          THE COURT:  Just to be clear for the record, "that

21  is when the real work started," that is the portion that is

22  stricken.

23          MR. NOLAN:  May I approach, your Honor?

24          THE COURT:  You may.

25  Q.   BY MR. NOLAN:  Now, do you recognize what I've placed in

```
 1    front of and you marked as Exhibit 1234 A?
 2  A.   Yes, I do.
 3  Q.   And what is it?
 4  A.   It's -- this is the tooling model body.  There is the
 5  final Bratz body that I did.  And this is the final wax of
 6  the Bratz head.
 7  Q.   And you are holding up the roto cast of the sculpt as
 8  well as the torso?
 9  A.   This is the wax before it went to be roto cast.
10  Q.   I'm sorry.  The wax.  And who created that sculpt?
11  A.   I did.
12           MR. NOLAN:  Your Honor, we'd offer Exhibit 1234 A.
13           MR. PRICE:  No objection.
14           THE COURT:  It's admitted.  You may publish.
15               (Exhibit 1234 A received.)
16  Q.   BY MR. NOLAN:  Now, Ms. Leahy, 1136 A is sculpt 1, yes?
17  A.   Correct.
18  Q.   And then 1141 is sculpt 2; correct?
19  A.   That's the second version.
20  Q.   And that was one that was presented October 25th?
21  A.   Correct.
22  Q.   And now 1234 A is sculpt 3; correct?
23  A.   Correct.
24  Q.   When did you present sculpt 3?
25  A.   I don't know the exact date that I presented it, but I
```

1    know I didn't finish it until sometime in December.

2    Q.   Of the year 2000?

3    A.   Correct.

4    Q.   And you were still at that time working as a free-lancer

5    for MGA; correct?

6    A.   Correct.

7    Q.   Okay.  Now focusing on Exhibit 1234 A, sculpt 3, did you

8    make any changes in this sculpt from what we referred to as

9    sculpt 2, 1141?

10   A.   Yes, I did.

11   Q.   And can you describe for the jury -- and these are

12   smaller and may be easier to just hold them up like that.

13   Could you identify for us, first of all, let's start with the

14   head.  Were any changes made to the head sculpt?

15   A.   Yes, they were.  I made it a lot bigger, number one, for

16   the shrink rate, and number two, just for the overall doll

17   appearance.

18   Q.   And without explaining why you made the changes, I just

19   want you to identify the changes that were made.

20   A.   I'll try.  Just tell me.  The nose is a lot rounder.

21   This nose is a sharp, almost triangle in there, if you can

22   see the shadow.  This is starting to get rounder, a little

23   more washed out.  The lips don't have that hard line.  They

24   are starting to kind of finesse back into the cheekbone and

25   the marionette area.

1        MR. NOLAN: Your Honor, do you mind if we do this
2   at the screen? I think it's easier.
3   Q.   Ms. Leahy, do you mind? And for record, on the
4   left-hand side is 1141, and on the right-hand side is
5   Exhibit 1234 A.
6   A.   Okay.
7   Q.   Again, Ms. Leahy, I know it's hard to do, I always mess
8   up myself. Just when you are making the reference, just the
9   changes, please, and refer to the actual sculpt with the
10  exhibit number for the record, if you don't mind.
11  A.   And this is 1141, and this is --
12  Q.   1234 A?
13  A.   1234. So as I said, I made this head a lot bigger. You
14  can't see it from the picture. But I showed you. The lips,
15  everything is starting to get a little more washed out. I
16  wanted to make the eyes so they weren't so defined and
17  dedicated here. So this sculpt actually doesn't have any
18  eyes at all. It just has a flat area where the eye socket
19  is. The nose is a lot more washed out or rounder. It's not
20  so harsh and triangular as this one is. The lips are
21  finessed. This has a hard -- you can't see it on the
22  drawing, but this has a hard line drawn around it.
23  Q.   And again, you're referring to 1141?
24  A.   1141. These ears on -- what's this number again?
25  Q.   1234.

1    **A.**    On 1234 are even more flattened to the head.  So they

2    don't stick out as far.  Everything is softer and cleaned up

3    more much the ears are more defined.  I put in a rooting line

4    which, when you make toys, they have these machines that

5    basically sew the hair in the head, and this --

6              MR. PRICE:  Objection to the why.

7              THE COURT:  Sustained.

8              THE WITNESS:  Oh.

9    **Q.**    BY MR. NOLAN:  Just explain the changes.

10   **A.**    It's a rooting line where you put hair.  I kind of

11   separated the lips more.  These are very clearly closed and

12   pressed together.  It's a more natural look when you open the

13   mouth a little bit more.  In 1234, the mouth is opened a

14   little bit more.  And then there's this little expression in

15   here.

16   **Q.**    Any other changes that you made on 1234 A?

17   **A.**    Yes.  The area -- you can't see from this side, but

18   you'll just have to take my word for it.  The area under the

19   chin here has gotten even thinner and more defined.  So

20   there's an indication of a jaw line here.  And this area has

21   been kind of moved up even more on 1234.  This is the area

22   that's less defined on 1141 so this area on 1234 is more

23   defined in the jaw.  And it's this line from the cheekbone

24   that leads to the chin is more defined and narrower, not

25   quite as round on 1234.

```
 1              I carve the nose bridge in a little more on 1234

 2   because that helped her look younger.

 3              MR. PRICE:  Objection as to why.

 4              THE COURT:  Sustained.

 5              MR. PRICE:  Move to strike.

 6              THE COURT:  It's stricken.

 7              THE WITNESS:  Which part did I say why?  I'm sorry.

 8              MR. PRICE:  It started with because.

 9   Q.   BY MR. NOLAN:  So don't say because or why.  Just tell

10   us the changes you made.

11   A.   Okay.  On 1234 I pushed the bridge of the nose in.

12   Q.   By the way, did Carter Bryant have a bridge of a nose on

13   his concept drawings?

14   A.   No, he didn't have a nose.  I also started to add a

15   little bit more of the forehead back on 1234, more definition

16   up here to leave more into this temple cranium area.

17              The part outside of the bridge leading into the

18   corner of the mouth is more refined and smooth and less harsh

19   on 1234.

20              On 1141, it's hard to see in this shadow, but this

21   is kind of a very harsh defined line right here.  The upper

22   lip is quite a bit smaller on 1234.  And as I started to

23   define the corners of the mouth -- oops.  That was a why.  I

24   just started to define this.  She's smiling.

25              The upper lip in profile view protrudes out more
```

```
 1   from the lip, pushing her lower lip back on 1234.  This one
 2   is like the other, 1136, this one is more, still flat in
 3   1141.  It's still flat from a side view.  Okay.
 4   Q.   Did Carter Bryant present to you in his concept drawings
 5   a drawing of only one face?
 6   A.   No.  There were four different characters and four
 7   different faces.
 8   Q.   Did you copy any of those four faces?
 9   A.   No, I didn't.
10   Q.   And before we move to the torso, looking for a moment at
11   the final Bratz sculpt that you did, Exhibit 1234 A, and
12   looking back to 1136, there are changes between 1136 and 1234
13   A, yes?
14   A.   Correct.
15   Q.   Now let's turn to the torso on Exhibit No. 1234 A.  Do
16   you have that?
17   A.   Yes.
18   Q.   Okay.  Again here on the left we have 1136 and on the
19   right we have 1234 -- I did it myself.  1141.  I'm sorry.  On
20   the left-hand side is 1141 and 1234 on the right.
21            All right.  Can you identify for us any changes in
22   the final Bratz sculpt, 1234, that you made?
23   A.   Yes.  For starters, I'll start with the shoulders.  On
24   1141, the deltoids here, which is the neck muscle area above
25   the collarbone that leads into the top of the neck, was too
```

1    extreme, was too much of a slope.  I squared off the

2    shoulders in 1234.

3    Q.    By the way, just to correct myself, Exhibit 1234 is the

4    third sculpt; correct?

5    A.    Correct.

6    Q.    Okay.  Is that or is that not the final Bratz sculpt?

7    A.    It's not the final Bratz sculpt.

8    Q.    Thank you.  Okay.  Go ahead and continue to identify

9    just the changes that you made on 1234.

10   A.    Looking at the collarbone on 1141, it's a big mass

11   there.  So I defined the collarbone more on 1234, give an

12   indication.  The breasts on 1234 are more defined.  I put in

13   the ball joints in the shoulders for the arms on 1234.  The

14   ball joints are there.  I had them engineered because of

15   Mercedeh's control drawing.  The shoulders subsequently got

16   wider on 1234 than they are on 1141.

17          I took the area under the breasts of 1234, they are

18   more defined.  There's more of a rib cage put in there, more

19   of a natural rib cage put in there.

20          From the side view, and I'll try to explain it from

21   a front view, on 1141 you can see a shadow here which

22   indicates that this is a very, very strong line for a waist

23   on 1141.  Here it's more smooth.  On 1234 I gave her a little

24   less of a waist and made it a more smooth transition.  So she

25   has more material on 1234 in the waist area from the front

1   all the way to the -- not the side, but this area of the back

2   under the back of the rib cage.

3       I put in a joint -- on 1141 these are ball joints

4   that I had put in which are at an angle. Here I had a disk

5   joint or a U joint, because it's shaped like a U, but there's

6   just a flat disk where the legs just move up and down. Ball

7   joints move all over the place.

8       So in doing that, I had to change the structure of

9   the hips. When you have a ball joint, you can do this

10   smooth --

11       MR. PRICE: Objection again.

12       THE WITNESS: Oh, sorry, sorry.

13       THE COURT: Sustained.

14       THE WITNESS: Okay. This is at a slant because

15   it's a ball joint in 1141. Because this is a straight joint.

16   It's a disk joint. So I only can go straight up and down.

17   So the hips have to go up into the body in 1234. Whereas in

18   1141, it's more of a smooth transition.

19       The pelvis area is a lot wider because of the

20   nature of the joint.

21   **Q.**   BY MR. NOLAN: On Carter Bryant's concept drawings,

22   could you tell whether or not he had any dimensions for hips?

23   **A.**   He didn't.

24       MR. PRICE: Objection. That's irrelevant, your

25   Honor.

1        THE COURT:  On hips I believe it is irrelevant,
2   Counsel.  Sustained.
3   Q.   BY MR. NOLAN:  On Carter Bryant's drawings, did he have
4   any breasts?
5   A.   No.
6   Q.   Okay.  Keep going.  Any other changes?
7   A.   This joint is a tighter fit here.  Meaning there's less
8   space in between the pelvis area and the thigh area in 1234.
9   On 1141 there's a lot more of a gap in between the pelvic
10  area and the thigh area.
11       I added a slightly more voluptuous tummy area just
12  below the bellybutton on 1234 and in widening 1234 in the
13  pelvis area, I added -- it's hard to see from this photo, but
14  I added a little bit of the leg joint structure implied in
15  here.  So there's a little bit of a little, you know, thing.
16  Like there's a little bit of an indication, an indication of
17  like the stomach area down here.
18  Q.   In making any of these changes, did you look at Carter
19  Bryant's concept drawings?
20  A.   No, I did not.  Is there a side view?
21       MR. NOLAN:  Aaron, we have a side view?
22  Three-quarter view is the best.
23  Q.   Does that help?
24  A.   Yeah, that helps.  On 1141, from front to back is a very
25  large kind of rib cage, almost 50's style doll, and a big,

```
 1  big sway to her back, which you can't see here.
 2            On this doll, I took her back down significantly in
 3  this area under here.  And I -- you can go to her back view.
 4            MR. NOLAN:  Aaron, could you turn to the back view.
 5            THE WITNESS:  Also in 1234, from the side view, the
 6  pelvis is much, much narrower.
 7  Q.  By the way, stop for a moment.  If you look at 1234 and
 8  compared it to 1136, is the back, side view different?
 9  A.  It's completely different.
10  Q.  As well as 1141; correct?
11  A.  Yes.
12  Q.  Okay.  Go ahead.  Any other changes that you can note
13  here for us?
14  A.  Yes.  On 1141 the rear area is a lot thicker and it's a
15  lot more fleshy.
16            MR. PRICE:  Your Honor, I'm going to object to
17  relevance.  This is not protectable.  A nonprotectable
18  element.
19            MR. NOLAN:  I think it just goes to the changes
20  that were made, your Honor.  To the design.
21            THE COURT:  We're talking about relevant changes
22  here.  You're not going to finish today, are you, Counsel?
23            MR. NOLAN:  No, your Honor.
24            THE COURT:  Why don't we go ahead and end for the
25  day.  We have a four o'clock matter, and we'll continue with
```

1   this at 9:00 on Tuesday morning.

2                MR. NOLAN:   Thank you very much.

3                THE COURT:   Very well.

4                Ladies and gentlemen, I'll see you at 9:00 on

5   Tuesday morning.  Have a great weekend.

6                (WHEREUPON THE JURY WITHDRAWS.)

7                THE COURT:   All right.  Please be seated.  All

8   right.  Are there any matters that we need to take up at this

9   point that would stop us from going forward on Tuesday at

10  9:00?

11               MR. NOLAN:   Real quickly, any time for a charging

12  conference?

13               THE COURT:   Not on Monday.  We're going to have to

14  carve this out.  It won't be Monday.

15               MR. NOLAN:   That's all I wanted to know.  We'll

16  worry about that on Tuesday morning.

17               THE COURT:   Very well.  Is there anything that

18  precludes us from starting up, though, anything you plan on

19  introducing Tuesday morning that you think might be of

20  concern?

21               MR. ZELLER:   I would like leave, your Honor, to

22  file a short brief on some of these issues that have been

23  raised today.  In particular, the more recent assertions of

24  MGA that they have any potential ownership rights in the

25  sculpts.  Because that is just wrong as a matter of law.

1        THE COURT:  You're talking about 1136 or 1141 as
2    well?

3        MR. ZELLER:  Yes.  Well, I'm particularly talking
4    about 1136.  That was the one that was the subject of the
5    jury's verdict, you know, and obviously it would have
6    application to 1141 for other reasons that probably aren't
7    material right now, but they appear to be suggesting that it
8    is an open question as to whether or not Margaret Leahy could
9    be the author in some way, in some legal sense, of that
10   sculpt.  And that's just incorrect.

11       THE COURT:  What sculpt?

12       MR. ZELLER:  1136, the one that the jury found was
13   created by Carter Bryant alone or jointly with others, in
14   accordance with the contract language from Phase 1-A.

15       THE COURT:  Very well.  I'll give you leave to file
16   a brief on that.  What I'd like you to do, so I can have the
17   response by that time, is get that to -- today is Friday.
18   Tomorrow is Saturday.  Get it to Mattel over the weekend so
19   that by the end of the day on Monday, they can get a response
20   to the Court and I can take that up at 8:00 on Tuesday
21   morning.  There was another motion, and I haven't looked at
22   it, but I thought I saw it come across my desk this morning,
23   a motion to quash; is that correct?

24       MR. ZELLER:  Yes, I believe that that would be the
25   motion to quash a Custodian of Records subpoena that is

1    addressed to Mattel.

2              THE COURT: That's addressed to Mattel?

3              MR. ZELLER: The subpoena is to a Mattel custodian.

4    This is an MGA subpoena. So it's a Mattel motion. I believe

5    we're talking about the same one.

6              THE COURT: Very well. And I will expect a

7    response to that Monday.

8              MS. AGUIAR: Monday is fine.

9              THE COURT: All right. If you could fax in your

10   responses to chambers by five o'clock on Monday.

11             MR. NOLAN: Yes, your Honor.

12             THE COURT: And then I can work on those Monday

13   night. And I don't think there's anything else under

14   submission; is that correct?

15             MR. ZELLER: As far as I'm aware, your Honor.

16             THE COURT: I still haven't received that proposed

17   order that I asked for a couple days ago.

18             MS. AGUIAR: We're working on it. We're back and

19   forth.

20             THE COURT: Make sure I have that on Monday as

21   well.

22             MR. ZELLER: And while I have the information,

23   before I lose it, this is the video count information from

24   today.

25             THE COURT: Thank you.

```
 1              MR. ZELLER:   19 minutes, 30 seconds for Mattel.

 2              THE COURT:   Okay.

 3              MR. ZELLER:   Apparently MGA wants to double-check

 4   this first.

 5              MS. AGUIAR:   Aaron and Ken need to come to an

 6   agreed number.

 7              THE COURT:   Right now it's all credited towards

 8   Mattel.   Let me know -- what I need is MGA's amount to take

 9   that off Mattel and put it on MGA.

10              MR. ZELLER:   Thank you.

11              THE COURT:   So let me know when you have that.

12              MR. NOLAN:   Before that subtraction occurs, could

13   we just have a time count.

14              THE COURT:   Before that subtraction you have 13

15   hours left, and Mattel has three hours and 40 minutes about.

16   But added to that will be whatever time --

17              MS. AGUIAR:   3:40, you said?

18              THE COURT:   Right.   And you have 13.

19              MS. AGUIAR:   Two quick things.   There is a video

20   designation for a Kevin Farr, F-A-R-R.

21              THE COURT:   I saw that.

22              MS. AGUIAR:   And while it does not have to be first

23   thing on Tuesday, I just wanted to bring that to your

24   attention.   And can I just get some clarity.   So the brief

25   that Mattel wants to file, can we get that Sunday by five
```

```
 1   o'clock, which would be the same time we're going to file on

 2   Monday?

 3              THE COURT:   I think that's reasonable.

 4              Mr. Zeller, did you hear that?  Five o'clock on

 5   Sunday for your brief on the -- on 1136.  Does that work?

 6   That's a question.

 7              MR. ZELLER:   Yes, your Honor.  I was actually

 8   listening to you.

 9              THE COURT:   Very good.  So the brief on 1136 on

10   Sunday at five o'clock.

11              MR. QUINN:   Your Honor, several times during the

12   trial, we've raised the issue about the time count about

13   sidebars.  We've asked could this sidebar, that sidebar be

14   charged.

15              THE COURT:   I understand.  And I've been taking

16   notes, Counsel.

17              MR. QUINN:   And we spent a lot of time, I think,

18   authenticating documents and putting custodians on the stand

19   that I don't think was necessary.  We're now facing the

20   prospect of I don't know how many more witnesses they have.

21   We've got a list of another -- more than a dozen of them.

22   And three hours and something minutes in which to do it.

23              We would appreciate it if the Court would give some

24   thought to whether there might be some additional time or

25   some changes in the allocations based on the history.  I know
```

1    that the Court has always said all along it was taking that
2    under consideration.  I think we're going to get to a point
3    where, you know, we're really going to be asking the Court to
4    make a determination in that regard.

5         THE COURT:  I will continue to do so.  I appreciate
6    that, Counsel.

7         This trial is going to wrap up this week.  We're
8    going to have closing arguments on Friday.  We have three
9    days left where testimony can be given.  MGA certainly is
10   going to have all of their time, and we'll do what we can.
11   But this trial is ending on Friday.  And Friday itself will
12   be devoted entirely to closing arguments.  So that gives us
13   Tuesday, Wednesday, and Thursday.

14        MR. NOLAN:  Your Honor, I'll save my response to
15   Mr. Quinn's plea until next week when it may be more
16   appropriate to raise that.  Because I think we can go back
17   and forth on that.  Both counsel.

18        THE COURT:  The time management thing is entirely
19   under the discretion of the Court.  And this is not a
20   constitutional right or a procedural right or a statutory
21   right.  The Court is using the time to manage the trial.  I
22   assure you that you will have all the time you were promised.
23   60 hours plus.  And I will make sure that Mattel has at least
24   had all of the time that they were promised.  And I will also
25   assure to the defense attorneys in the U.S. Attorney's Office

1   that we are starting with the marine trial a week from

2   Tuesday.

3          So there's a lot of things that are going on the

4   Court's consideration, but no one has any statutory or

5   constitutional right to insist on any of this time.  This is

6   discretionary with the Court for court management.  We have

7   three court days left of testimony.  And I assure MGA and

8   Mr. Larian that they will have their full 13 hours of

9   testimony.

10         Worry about your own time and not the other

11  person's time.  This is not a tactical strategic thing on

12  anyone's part.

13         MS. AGUIAR:  And on that subject, just the last

14  thing, your Honor, when you just said that, that we have

15  three court days left, and we have between the two parties 16

16  hours and 40 minutes, we've roughly done the math.  And it's

17  not exact, but we tend to get about five hours of testimony

18  per day.  So with that, we would run out before -- we would

19  run out of days before we ran out of time.

20         THE COURT:  I understand.

21         MS. AGUIAR:  So I'm just raising it now rather than

22  saying something on Wednesday and I just wonder if there's

23  any way to take that into account to make sure both parties

24  get --

25         THE COURT:  Right.  I was actually doing the time

1   calculations myself. We're going to come close, but not --
2   and that's what Mattel needs to keep in mind. I can't create
3   another week here. I cannot create another day. We have
4   what we have. We have a jury that is going to be here
5   Tuesday, Wednesday, Thursday, and Friday. Friday is going to
6   have to be reserved for instruction and closing argument. So
7   we have three court days.

8           I may run the trial a little longer on Tuesday,
9   Wednesday, and Thursday. I just have to explain to the jury
10  that I made a commitment to you to get this in your hands by
11  the end of the day on Friday. And we may have to -- what we
12  can't do is do what we did this morning, is spend two and a
13  half hours on argument. We're going to have to get -- what
14  it may mean is that we may need to get in here earlier and
15  start at 7:00 as opposed to 8:00 and then plan to work into
16  the evening, which the Court is prepared to do because I'm
17  not going to compromise any jury time next week for hearings
18  and arguments as we had.

19          This next week is going to be a strenuous week on
20  everybody. And the Court is -- everyone needs to get rest
21  this weekend because we've got a big week ahead of us to
22  bring this thing in for a landing of some sort.

23          MR. ZELLER: If I may inquire, I know that it was
24  not necessarily settled when the issue was last raised, which
25  would be the charging conference, just for purposes of us

 1  being properly prepared to address those issues.

 2          THE COURT:  Right.  Well, what I plan to do, if I

 3  were you, is probably going to be Wednesday evening, to be

 4  honest.  We're probably just going to have to do this

 5  Wednesday evening.  Based on my experience the last time, I

 6  want to have two days before I actually give the instructions

 7  so that Wednesday evening I can go through and make the

 8  rulings, hear whatever further argument there is and have the

 9  parties -- have somebody -- fortunately we have lots of

10  attorneys here, draft up the changes for Thursday, and then

11  Thursday evening make a final review, and then have the

12  instructions begin on Friday morning.

13          MR. ZELLER:  Thank you.

14          THE COURT:  Can I get a sense of what witnesses I

15  should anticipate from MGA come Tuesday?

16          MS. AGUIAR:  Your Honor, I am doing this from

17  memory, and we were going to send a follow-up e-mail to

18  Mattel, as we usually do at the end of the day on Friday.  We

19  will finish up with Margaret Leahy.

20          THE COURT:  How much longer approximately,

21  Mr. Nolan, do you have with her?

22          MR. NOLAN:  I think about 15 minutes.  I want to go

23  over my notes.  I don't think more than a half hour.

24          THE COURT:  Very good.

25          MS. AGUIAR:  So Margaret Leahy, Paula Garcia.  We

```
 1  then have a number of Mattel witnesses.  Mr. -- we're still
 2  trying to work out when we would have Ms. Martinez testify.
 3  We've requested her testimony.
 4           THE COURT:  Ms. Lily Martinez?
 5           MS. AGUIAR:  Yes.  Tim Kilpin is another Mattel
 6  person.  Tim Kilpin.  And there's -- there are one or two
 7  more that if we have time on Tuesday, we would do at the end
 8  of the day, and we have the Farr video as well.
 9           THE COURT:  Very good.  All right.  Well, I will
10  really try to get through, I know it's been more like five
11  hours, five hours and 15 minutes a day.  We'll really push
12  hard to get through six hours of testimony on Tuesday.
13           MR. QUINN:  Your Honor, with respect to
14  Ms. Martinez, we told counsel last night that we were going
15  to lose her after today.
16           THE COURT:  I would assume so.  I know she's got to
17  be pretty close.
18           MR. QUINN:  She's got another project that she's
19  working on.
20           THE COURT:  I understand.
21           MR. QUINN:  And we got into a time jam today
22  because of the argument this morning.  And counsel asked me
23  over lunch is it possible to talk to Ms. Martinez to see if
24  it's -- if she could come back next week.  I haven't had a
25  chance to talk to her about that.  We would like to -- very
```

1   much like to have her here.  We would love to have her here

2   for closing argument.  She's -- my importunings in that

3   regard didn't get very far because she's experiencing some

4   discomfort.

5              THE COURT:  She's going to listen to her doctor

6   before she listens to you.

7              MR. QUINN:  I'm going to talk to her about this,

8   but I don't know what the answer is going to be, whether

9   she's going to be able to come back or not.

10             MR. NOLAN:  Your Honor, I told Mr. Quinn that we

11  would talk.  I mean we're mindful of it.

12             THE COURT:  Okay.  If there's nothing else, I will

13  see you -- why don't we say 7:30 on Tuesday.  Because I think

14  we may have some issues to go through.  I want to make sure

15  we're clear on the similarities, differences.  I think the

16  second part of this worked a lot better than before the

17  break.  So I think we're pretty much on track.  We'll take up

18  the issue of the sculpt, motion to quash, and go from there.

19             All right.  Thank you.

20

21             (Proceedings concluded at 4:10 P.M.)

22

23

24

25

6744

1

2

3  —

4

5

6

7                    **C E R T I F I C A T E**

8

9

10          I hereby certify that pursuant to Title 28,

11   Section 753 United States Code, the foregoing is a true and

12   correct transcript of the stenographically reported

13   proceedings in the above matter.

14          Certified on August 8, 2008.

15

16

17   **MARK SCHWEITZER, CSR, RPR, CRR**
     Official Court Reporter
18   License No. 10514

19

20

21

22

23

24

25