1            UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                   ---

4    **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                   ---

6  MATTEL, INC.,           :  PAGES 7163 - 7323

                         :

7        PLAINTIFF,     :

                         :

8    VS.               :  NO. ED CV04-09049-SGL

                         :  [CONSOLIDATED WITH

9  MGA ENTERTAINMENT, INC.,   :  CV04-9059 & CV05-2727]

  ET AL.,              :

10                     :

  _____DEFENDANTS._____:

11

12

13

14

15      REPORTER'S TRANSCRIPT OF PROCEEDINGS

16         RIVERSIDE, CALIFORNIA

17       WEDNESDAY, AUGUST 13, 2008

18         JURY TRIAL - DAY 34

19         AFTERNOON SESSION

20

21

22              MARK SCHWEITZER, CSR, RPR, CRR

                  OFFICIAL COURT REPORTER

23              UNITED STATES DISTRICT COURT

                  181-H ROYBAL FEDERAL BUILDING

24             255 EAST TEMPLE STREET

                  LOS ANGELES, CALIFORNIA 90012

25             (213) 663-3494

CERTIFIED COPY

1    **Appearances of Counsel:**

2

3    On Behalf of Mattel:

4        Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
         By John B. Quinn, Esq.
5            B. Dylan Proctor, Esq.
             Michael T. Zeller, Esq.
6            Harry Olivar, Esq.
             John Corey, Esq.
7            Diane Hutnyan, Esq.
             William Price, Esq.
8        855 South Figueroa Street
         10th Floor
9        Los Angeles, CA 90017
         (213) 624-7707

10

11

12   On Behalf of MGA Entertainment:

13       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
14           Carl Alan Roth, Esq.
             Jason Russell, Esq.
15           Lauren Aguiar, Esq.
             David Hansen, Esq.
16           Matthew Sloan, Esq.
             Robert Herrington, Esq.
17       300 South Grand Avenue
         Los Angeles, CA 90071-3144
18       (213) 687-5000

19

20

21

22

23

24

25

1                          **I N D E X**

2    **DEBORA MIDDLETON, SWORN**................................ 7187

3    DIRECT EXAMINATION BY MR. NOLAN: ..................... 7187
     CROSS-EXAMINATION BY MR. PRICE:...................... 7199

4    **LEON DJIGUERIAN, SWORN**................................. 7200

5    DIRECT EXAMINATION BY MS. AGUIAR .................... 7201

6    CROSS-EXAMINATION BY MR. PRICE:...................... 7218

7

8    **LUI DOMINGO, SWORN**.................................... 7222

9    DIRECT EXAMINATION BY MS. AGUIAR:.................... 7223

10   CROSS-EXAMINATION BY MR. PRICE: ..................... 7267

11   **TIMOTHY KILPIN, SWORN**................................. 7273

12   DIRECT EXAMINATION BY MR. NOLAN: .................... 7273

13                         **E X H I B I T S**

14    (Exhibit 18320-003 received.)........................ 7195

15    (Exhibit 18320-005 received.)........................ 7196

16   (Exhibits 18870, 18869, 18863, 18862, 18865,
     18866, 18860, 18861, 18864, 18868, 18867, 18857,
17   18858, 18859, 18871-73 received.)..................... 7218

18   (Exhibit 18929 received.)............................ 7226

19   (Exhibit 18921 received.)............................ 7233

20

21

22

23

24

25

1    **Riverside, California; Wednesday, August 13, 2008**

2                          **1:10 P.M.**

3        **(HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)**

4            THE COURT:  I want to take up the issue of Kevin

5    Farr first.

6            As they are coming in, is there an issue you want

7    to take up?

8            MR. NOLAN:  I'd like a sidebar on Jury Note 6, if I

9    might.

10           THE COURT:  All right.

11           **(SIDEBAR CONFERENCE HELD.)**

12           THE COURT:  Yes.

13           MR. NOLAN:  I had a thought about Juror No. 6.

14   This happened in another case I had.  It involves a little

15   bit of deception.  So I just wanted to warn you ahead of

16   time.

17           THE COURT:  All right.  I spent 10 years in the

18   U.S. Attorney's Office.  I understand deception is sometimes

19   used for a good purpose.

20           MR. NOLAN:  I don't know if it was Judge Walter who

21   suggested this one time, but there was a juror who had a

22   financial issue.  And what happened was that parties, without

23   the jury knowing it, contributed money to the fund and the

24   Court --

25           THE COURT:  I've heard of this before.  I don't

1    know if it was this case.

2            MR. NOLAN:  And the Court more or less said to the

3    jury, listen, I'll write a letter saying we have a special

4    fund so you would not lose any money.  And then we would, if

5    Mattel would agree, would contribute money anonymously, and

6    they would never know the parties did it.

7            THE COURT:  That's a good idea, actually.  But you

8    know, I don't want to create any -- a run on the fund.  So

9    perhaps this might be something I'll take up with Juror No. 6

10   separately.  And just indicate -- well, let me see what he

11   does.  Because if it's no moment to him and he doesn't ask

12   for a letter, but if he asks for a letter, at that time what

13   I might do is I'll let you know that I'm doing this, but I'll

14   pull him aside and indicate to him that --

15           MR. QUINN:  In principle, we have no problem with

16   that.  That's fine.

17           THE COURT:  All right.  That's a good idea.

18           **(CONCLUSION OF SIDEBAR CONFERENCE.)**

19           MR. NOLAN:  Your Honor, the right person is here.

20           THE COURT:  Let me talk about this a little bit

21   before I make these rulings.  This has been yet another river

22   to navigate.  I'm mindful of Motion in Limine No. 9.  And I'm

23   also mindful of the apportionment arguments.  On the one

24   hand, what these rulings reflect is the Court's attempt to

25   balance relevant evidence as to the significance of

1    packaging, of themes, of certain of the elements that MGA

2    wants to apportion.  And I certainly thinking having someone

3    from Mattel as the leading toy company talking about those

4    elements is relevant evidence in that regard.

5         . On the other hand, a lot of this evidence is of a

6    nature that gets into the type of 403 issues upon which the

7    Court ruled in its motion in limine.  So I've tried to go

8    through this and let the evidence in that is most probative

9    of the issue of the importance of branding and themes and the

10   like to Mattel or any other responsible toy manufacturer,

11   while at the same time preclude evidence that runs afoul of

12   the 403 ruling.

13         So just with that overview in mind, that's what the

14   Court is attempting to accomplish here in balancing this.

15   Let me get into the specifics.  And then after I've gone

16   through these rulings, if there's any particular rulings that

17   the Court has made that the parties feel don't strike that

18   right balance, I think it's best to wait until after the

19   Court has ruled on all of it and you see everything that's

20   coming in and everything that's not coming in before you make

21   your comments as opposed to hearing argument on each

22   individual one.  Because I think a lot of this has to be

23   taken as a whole.

24         All right.  And again, also, if I skip over any

25   objections, please let me know.  I think I caught them all.

1          All right.  Beginning on page 20 and 21, the

2    objections are overruled.

3          I think we now next go to 83.  And I'll sustain the

4    602 objection which is right in the middle of a page.  Lines

5    11 through 13.  It's fair enough to ask this witness what he

6    means by the word fashionable and his explanation.  There's

7    certainly a 602 problem, given how he responds to the

8    question on line 11.  So I'm going to strike that particular

9    sentence.

10          Turning to page 109, I'm going to overrule the

11    objections on 109, 110, and 111.  With respect to

12    Exhibit 2502, however, the only part that comes in, and it's

13    basically for reference by the witness, is the line that's

14    identified for the witness here in this transcript.  This is

15    not bringing in the entire exhibit.

16          So our tech people are going to have to work on

17    that.

18          So everything is overruled up to page 113, and then

19    I'm going to sustain the objection starting on line 21 of 113

20    through line 6 of 114.

21          I'll overrule the objections beginning on line 7 of

22    114 through line 8 of 115.

23          I'll then sustain the objections beginning on line

24    12 of page 115 through line 7 of 116.  Because there we get

25    into the whole Mattel is a struggling brand, et cetera,

1    et cetera.

2          Turning to page 138, I'll overrule the objections

3    to lines 21 through 25.  Again, Exhibit 2504 just comes in to

4    have reference to the line on page 7 which provides context

5    to the questions, not for the substance of the document

6    itself.

7          Overrule the objections on 139, lines 15 through

8    20, but sustain the objections starting on page 139, line 23,

9    through 140, line 21.

10          We then move, I believe, to page 229.  Oh, no.  I'm

11    skipping something here.  214 I think it is.  Turning to page

12    214.  Okay.  I'll again overrule the objections on pages 214

13    and 215, but the only portion of this 10K that's coming in is

14    the line that talks about the worlds of strategy within the

15    Barbie brand.  This lays foundation for some of the questions

16    that I'm going to permit coming up.

17          And the objections are overruled through page 218.

18          Then when we get to page 229, I'm going to sustain

19    the objections on 229, on 230, through line 1 of 231.

20          I'll overrule the objections on 231 beginning at

21    line 2, through 232, line 15.

22          I'll sustain the objection on page 233.  It doesn't

23    make any sense to me.  The question doesn't make any sense.

24          Turning to page 275, I will sustain the objections.

25          On 276, I'll sustain the objections on lines 1

1    through 6, overrule the objections on lines 22 through 25 of

2    page 276, and lines 1 through 17 of 277.

3           Sustain all objections on 278 and 279.

4           Sustain the objections on 285.

5           Sustain the objections on 281 from lines 1 through

6    13.

7           Overrule the objections from line 14 through the

8    bottom of the page.

9           Overrule the objections on 282 through the top of

10   283, line 1.

11          And I think that takes us to the end.  So those are

12   the Court's tentative rulings where I've tried to strike this

13   balance as I indicate.  I've tried to keep out any irrelevant

14   evidence about the Barbie brand or Mattel or what's going on

15   at Mattel, while at the same time permit evidence in

16   concerning the importance of themes and packaging and various

17   things that go to the apportionment.

18          I'll hear from either, both, or neither sides.

19          MR. COREY:  One question first, your Honor.

20          THE COURT:  Yes.

21          MR. COREY:  Going back to page 139.

22          THE COURT:  Very well.

23          MR. COREY:  The Court sustained the objection to

24   139 starting at line 23.

25          THE COURT:  That's correct.

1          MR. COREY:  And there's a reference there to

2     Exhibit 2505.  I just want to make sure that the Court is not

3     admitting that.

4          THE COURT:  That is not being admitted.  That's

5     correct.  And the only -- I mean, the only extent -- because

6     I think these exhibits are largely irrelevant, but they are

7     intertwined into the question.  And it's going to be hard to

8     ask the question without that reference in the exhibit, and

9     that's the only portion that's going to be shown or published

10    to the jury, is just that portion to give context to the

11    questions that follow.

12         MR. COREY:  And I appreciate that, your Honor.  I

13    just wanted to make sure that we were clear on that.  I think

14    with respect to -- and this may be unfortunately a little bit

15    late.  With respect to Mr. Farr, Mr. Farr is the Chief

16    Financial Officer.  I think there's kind of a fundamental

17    foundational problem with respect to any of his testimony

18    relating to these things because he's a financial person.

19    He's not a product design, marketing, or planning person, and

20    I think we are going to have to people on stand, including

21    this afternoon, who are going to be more well versed and more

22    qualified to speak to these particular issues than Mr. Farr

23    in his particular position as the Chief Financial Officer.

24         THE COURT:  And you know, you may be right in terms

25    of him being a financial officer, and he may not be the most

```
 1    qualified, but as the Chief Financial Officer of a company,
 2    and given the interconnectedness of understanding the
 3    importance of the themes and accessories and packaging to the
 4    bottom line, that's particularly the context of which this is
 5    relevant.  Because this is the impact that these elements
 6    have on damages that makes it relevant to MGA's defense in
 7    this case.
 8          So I think the CFO, even though he is in the
 9    financial aspect of the company, he's at a high enough level,
10    and he's got to understand the relationship between these
11    elements and the impact that they have on the financial
12    success of the product in question.  And that's ultimately
13    the relevance of this, it goes to damages.
14          MR. COREY:  And I think the Court would be exactly
15    right if that were the question or that were the type of
16    question that Mr. Farr was asked.  But he was not asked these
17    questions.  He was asked design and marketing questions.  I
18    think -- and I can find this in a minute.  I think what he
19    said was that Mattel does not quantify.
20          THE COURT:  As a general objection I'm going to
21    overrule it.  If there's a particular question that you think
22    that you want to focus on, Counsel, I will consider it.  When
23    I say that objection, I'm not going to use that objection
24    basically to strike all of his testimony.  If there's
25    particular questions that you think that he lacks foundation
```

1   on in -- questions where I've overruled your foundational

2   objection, I'll consider it at this time.

3           MR. COREY:  I don't have the specific question in

4   front of me, your Honor.

5           THE COURT:  Very well.

6           MR. HERRINGTON:  Your Honor, Robert Herrington on

7   behalf of MGA.  Just one note.  Pages 115 and 116.

8           THE COURT:  Yes.

9           MR. HERRINGTON:  You sustained the objection

10  beginning at line 12 on page 115.

11          THE COURT:  Right.  Through line 7 on 116.

12          MR. HERRINGTON:  I would ask your Honor, if you

13  could take a look starting at 25 of page 115 through line 7

14  of 116.  And if we could have that portion entered.  It

15  doesn't go to the 402.

16          THE COURT:  The problem I have with this, and it

17  really wasn't fleshed out or designated, I don't understand

18  the answer from lines 4 through 7.  I think it's the

19  execution of an individual SKU basis.  I know what a SKU is,

20  but what does that mean?

21          MR. HERRINGTON:  The point of this section is

22  differentiating again between the product.

23          THE COURT:  I understand the point.  But what does

24  that answer mean?

25          MR. HERRINGTON:  As I understand what he is

1  basically saying is that you can have a product that itself

2  is not a good product, but the brand is doing well and can

3  still carry the product along.  It's the differentiation

4  between the product and the brand that we're trying to have

5  the CFO of Mattel actually acknowledge here.

6       THE COURT:  You know, I'll give you line 25 and

7  lines 1 and 2, but this answer just doesn't make any sense to

8  me.  So line 25 on page 115 and lines 1 and 2, the question,

9  "Is it possible to have a strong brand and a weak product at

10  the same time?"  "Yes."  But as far as this answer, it

11  doesn't make any sense.  And the rest of what I sustained

12  there is designed towards talking about Mattel's -- it's so

13  intertwined with this whole notion of Mattel struggling, and

14  it runs into that 403 issue I described.

15       MR. HERRINGTON:  I understand.

16       MR. COREY:  And this is the kind of foundational

17  commentary I was talking about.  There's not an

18  identification of the brand.  They are really just asking him

19  to speculate about whether this is possible.  It's not in the

20  context of his experience.

21       THE COURT:  It's not the most convincing evidence.

22  I assume it's based on his experience, Counsel --

23       MR. COREY:  He is the CFO of Mattel.  And I didn't

24  finish my sentence.

25       THE COURT:  I'm sorry.

1          MR. COREY:  His experience with respect to specific

2     products at Mattel.  You can speculate about anything.  Is it

3     possible?  Of course, anything is possible.  But it's not

4     tethered to anything specific in his experience.

5          THE COURT:  Well, actually we know, based on what

6     the Court has kept out, exactly what he's talking about.  So

7     you are correct.  He's talking about the Mattel brand.  If

8     you look at the lines preceding this, and I'm striking that

9     because of the 403 issues, but I'm not concerned that this is

10    just a speculative statement.  He's actually talking about

11    the Mattel brand.  In context.  But I'm not allowing that in,

12    and this is part of the balancing that goes on.

13         MR. COREY:  Thank you, your Honor.

14         THE COURT:  Anything else on this?  Any other

15    questions?

16         Very well.  And please be careful on those

17    documents.  Only that portion that is referenced in the

18    statement here.

19         Okay.  You said I don't need to deal with Nordquist

20    now?

21         MS. AGUIAR:  Well, actually, your Honor, when you

22    had asked, at the beginning of the lunch break, if we had a

23    response, I had said if you wouldn't mind taking up at the

24    end of the lunch break, because Mr. Sloan is here, and if he

25    could address that.

1          THE COURT:   Mr. Sloan.

2          MR. SLOAN:   Do you want me to address the

3    objections now?

4          THE COURT:   I received the objections to the MGA

5    parties Phase 1-B designations of Jill Nordquist.   Before I

6    get into ruling on the individuals, I want to get an answer

7    to the general objection.

8          MR. SLOAN:   Your Honor, two general objections.

9    First is the 403 objection with respect to the issue that we

10   dealt with before, which is they are claiming that unless we

11   show a direct nexus between the knowledge of Ms. Nordquist

12   that Carter Bryant actually was working for MGA or drawing

13   the Bratz drawings while he was still at Mattel, that this

14   whole thing should be precluded on 403 grounds.   And our

15   argument is simply that that's -- that the inclusion of that

16   information is consistent with your Honor's July 24th order.

17         We understand the 403 considerations, but we

18   believe that this is appropriate.   It goes to Mattel's state

19   of knowledge as to the fact that Carter Bryant, they learned

20   fairly early on that Carter Bryant was working at MGA, and

21   that should have caused them to begin investigating.

22         THE COURT:   Are we ever going to get -- we're

23   further along now, of course, than we were when I ruled

24   previously about this in the trial.   And we're not quite done

25   yet, and I understand there's more we're -- we're going to

```
 1  hear from more witnesses.  Are we going to get to the point
 2  where we hear any evidence at all that Mattel had any
 3  knowledge or reason to believe that Carter Bryant did in fact
 4  do any of these drawings while he was at Mattel prior to
 5  2003?
 6           MR. SLOAN:  Well, your Honor, to some extent it's
 7  circumstantial evidence.  It's a number of building blocks.
 8  I think one of the main building blocks -- and I confess I
 9  wasn't here for Margaret Leahy's testimony yesterday -- but
10  my understanding of what she said, although I haven't read
11  it, is that one of the things that she spoke to certain
12  Mattel employees just after Bratz was released in the summer
13  of 2001.  Those employees knew, for instance, that she had
14  left Mattel in approximately September of 2000.
15           THE COURT:  I know you're expecting to get that in,
16  but that never came in, did it?
17           MR. NOLAN:  Your Honor, I -- I'll go back to the
18  transcript.
19           THE COURT:  Would you?  I'd like to see that.
20  You're right about the building blocks, and I understand the
21  circumstantial case, but I just don't want to continue down
22  this road if the building blocks -- if the circle is never
23  going to be completed.  And I don't recall that testimony.
24           MR. NOLAN:  Your Honor, we'll go back to the
25  testimony.  But my recollection is that she -- in the
```

7179

1    conversations that she was having, she was talking about how

2    each of them knew that she had left in September of 2000, her

3    employment at Mattel, that the Bratz was the first free-lance

4    project while at Mattel.  And so that combined indicates that

5    the work that she was doing --

6         THE COURT:  Mr. Sloan just said that there was a

7    communication made.  Maybe I misunderstood you.

8         MR. SLOAN:  Your Honor, my understanding is that

9    she had communications with -- I think there was two or three

10   employees from Mattel who at that time weren't Mattel

11   employees, who were friends of hers.  They knew that she had

12   left Mattel in approximately September of 2001.  She told

13   them that she was working on Bratz.  I believe she told them

14   that Carter Bryant was working on Bratz and that this was the

15   first project she had worked on afterwards.

16        THE COURT:  Submit that testimony to the Court.

17   Let me take a look at that when you get a chance.

18        Moving on to the second issue.  Basically they are

19   saying it exceeds the scope of her 30(b)(6) designation and

20   that she's a local witness here.  So just call her as a

21   witness.

22        MR. SLOAN:  Your Honor, our response to that is

23   first of all, I think under the rule she does qualify as a

24   managing agent of the company under Rule 32.  She has -- the

25   standards that the courts look at, it's a fairly flexible

1   standard.

2          But they look at whether she has the employee's

3   rank or title, whether she has supervisory powers.  She

4   testified that if she were Carter Bryant's supervisor in this

5   particular situation, she would have asked him to leave

6   immediately when he refused to disclose where he was going.

7          The extent of the corporate employee's power to

8   exercise judgment and discretion in dealing with corporate

9   matters.  I think the fact that they put her up as a 30(b)(6)

10  witness on very closely related issues suggests that they

11  felt she had the ability to bond the corporation.

12         THE COURT:  But you do concede some of the

13  testimony that you've designated here does go beyond the

14  scope of those designations?

15         MR. SLOAN:  Your Honor, if you're going to read

16  them very strictly, I think it does.  I think there's an

17  argument to be made that they are very closely connected.

18  For instance, topic 55, all acts, omissions, circumstances,

19  and/or evidence showing or tending to show that Bryant made

20  affirmative misrepresentations to Mattel employees upon his

21  departure.

22         There are two elements of affirmative

23  misrepresentation.  The first is what Mattel is actually

24  trying to introduce, which we didn't designate, which was the

25  fact that Mr. Bryant refused to disclose where he was going.

1   But part of the -- you know, when they are claiming that it's

2   a misrepresentation, it's only a misrepresentation if in fact

3   they find out at some point that he has in fact lied.  And

4   they found that out in part when they found out he had gone

5   over to MGA to work on Bratz.

6           So it goes to Mattel's knowledge that in fact this

7   statement, which they had suspected might not be accurate,

8   was a misrepresentation.  At some later point, Jill Nordquist

9   found out that it was in fact inaccurate, that he had gone

10  over to MGA.  So I think it's closely related.  I won't

11  claim, your Honor, that it's on all fours --

12          THE COURT:  That other question.  The fraudulent

13  concealment is on MGA's part allegedly.

14          MR. SLOAN:  Correct, your Honor.

15          THE COURT:  That Mattel figured out.  An element of

16  concealment isn't that the other person necessarily bought

17  off on the concealment; right?  You're guilty of lying to

18  someone even if the other person doesn't believe --

19          MR. SLOAN:  Actually, with respect to fraudulent

20  concealment, that's not the case.  If you in fact know, and

21  that's sort of what we're arguing on.  If Mattel knew in fact

22  that he was, assuming was lying about something, if they knew

23  in fact that he was working on Bratz drawings or he was going

24  over to MGA, that would defeat their fraudulent concealment

25  claim.  They have to prove both that there was an affirmative

1    concealment on behalf of MGA and that it succeeded actually.

2    And this goes directly to the fact that, you know, when she

3    was put on notice that perhaps --

4            THE COURT:  Assuming that MGA was lying or

5    concealing that Mattel had figured out.  Okay.  Well, find

6    that stuff from Margaret Leahy's transcript.

7            MR. NOLAN:  I have it.  And as a courtesy to

8    Mr. Price, let me show it to him.

9            THE COURT:  Show it to Mattel and hand it up.

10           MR. NOLAN:  Your Honor, let me say for the record

11   I've shown it to Mr. Price, and we're going to be directing

12   your attention to pages 6828, starting at line 20, through

13   6832, ending at line 12.  And then Mr. Price in his

14   cross-examination would point to page 6833, lines 18 through

15   24, and for the Court's convenience, I'm going to bring up a

16   little bit of a tab.

17           THE COURT:  Thank you.

18           2001; right?

19           MR. NOLAN:  Summer of 2001 she's having the

20   conversation.

21           MR. PRICE:  Your Honor, the first time Ms. Leahy

22   testified, she testified that when she left Mattel, she told

23   Mattel that she was leaving to become a mom, not to work.  So

24   that attenuates it even further.

25           THE COURT:  That's what she testified she said when

1  she was leaving Mattel, not what she said in the summer of

2  2001.

3          MR. PRICE:  Summer of 2001, she said, "One of the

4  first projects I worked on when I started working again was

5  Bratz."

6          THE COURT:  So what Mr. Sloan suggests is to

7  connect the dots in order to -- someone at Mattel would have

8  had to have been thinking back essentially, well, wait a

9  second, she left Mattel in September.  The first project she

10  worked on was Bratz.  Carter Bryant was still working for

11  Mattel in September.  Ergo, he could have been involved.

12          MR. PRICE:  And that she was not being honest when

13  she said she was quitting Mattel just to be a mom, not to

14  work.

15          MR. NOLAN:  We'll go back, and it's --

16          THE COURT:  This is a great factual issue for the

17  jury to figure out.

18          MR. NOLAN:  Right.  My only point, your Honor, is

19  the record is going to speak for itself.  I don't believe

20  that her testimony was anything other than she was leaving

21  full-time employment to be able to spend more time at home

22  and do free-lancing work, that she had discussions that she

23  could not work at Mattel as a free-lancer and she was

24  free-lancing out there.

25          THE COURT:  This reaffirms my conviction that this

```
 1    is a good factual issue for the jury to decide.

 2            Very well.  That will help me in deciding the

 3    Nordquist.  Does Mattel need to say anything further to the

 4    general objection?  Response to Mr. Sloan, or are we done

 5    with that?

 6            MR. COREY:  Just very quickly with respect to the

 7    second objection, with regard to the scope of the testimony.

 8    The real thrust of the objection is to put the topics in

 9    front of the Court so the Court can make a proper ruling on

10    that.  And with respect to the issue of whether she's an

11    officer, director, or managing agent.  She's an employee in

12    the licensing department.  She's not the person or the kind

13    of caliber of person that the Court considers -- that the

14    rules consider binding.

15            THE COURT:  Is Ms. Nordquist available?

16            MR. COREY:  Yes.

17            MR. SLOAN:  Just one thing, your Honor.

18    Ms. Nordquist has been an employee of Mattel for 11 years.

19    She's now a director of the consumer brands division.  I

20    believe at the time that Carter Bryant was working in the

21    second shift at Mattel, she was, I believe, also a director

22    position in the Barbie Collectibles unit where he was

23    working.  She does have some seniority.

24            They obviously felt that she has some experience

25    and ability to bind the company by the fact that they put her
```

1   up as their 30(b)(6) witness on a lot of these topics, which

2   are very closely related to the topics that we're introducing

3   evidence on.  And if you look at the flexible standards that

4   the courts have employed, I think that she appropriately fits

5   as a managing agent.

6         THE COURT:  Okay.  Very good.  If there was any

7   concern at all that she was not available, I think I probably

8   would go with Mr. Sloan's flexible interpretation and allow

9   in the deposition.  But since she's available, let's have her

10  come in.  Make her available.  You can use the deposition in

11  examining her.  And you can ask her whatever questions you

12  want.

13        MR. NOLAN:  Your Honor, is she available for

14  tomorrow morning?

15        THE COURT:  Mr. Corey gave me an unqualified

16  available.  So she's available whenever you want her,

17  Mr. Nolan.

18        MR. NOLAN:  Thank you, your Honor.

19        MR. ZELLER:  We're happy to have Ms. Nordquist here

20  at a reasonable time.  It's not a question of her

21  availability.  We already have two witnesses.  Mr. Eckert,

22  Mr. Kilpin, who have been waiting around to be called.  We

23  were given an order in which these witnesses with going to be

24  called.  Mr. Kilpin was supposed to be up next and then

25  Mr. Eckert.  In the late morning and over lunch, we were then

1    told there was going to be like three or four MGA employees

2    put on the stand instead.  So I mean --

3            THE COURT:  Mr. Zeller, I'm very sympathetic to

4    this, but this sounds very reminiscent of exactly what I

5    heard of MGA attorneys in Phase 1-A on behalf of

6    Mr. McFarland and on behalf of a number of other attorneys.

7            So I don't want to give short shrift to these

8    individuals because I know they are very busy, and this is a

9    tremendous burden and imposition on them, any more than I

10   wanted to give short shrift to MGA's witnesses and

11   Mr. Larian's witnesses.  But as I think you pointed out, it's

12   the nature of trial.

13           MR. ZELLER:  And I recognize that, your Honor, and

14   I'm not complaining about that.  What I am raising is that

15   there's a suggestion now that we need to have Ms. Nordquist

16   come out here and wait indefinitely.

17           THE COURT:  I am ruling essentially in Mattel's

18   favor in granting that, Counsel.  I mean, the alternative is

19   doing what Mr. Corey has been trying to stop, and that is

20   have the video deposition played.

21           MR. ZELLER:  Right.  I understand, your Honor.  But

22   again, the point is that what is being suggested is that

23   Mr. Nolan just said we want her here tomorrow.  And that

24   means -- we've already had Mr. Kilpin waiting for three days,

25   Mr. Eckert waiting for a period of time, and now we're going

1    to stack up another witness.  I'm just asking for some

2    actual, real reasonable estimate.  We can have her here, but

3    to have her then come tomorrow, not go on, you know, I mean,

4    that's --

5              THE COURT:  The worst case scenario would be that

6    she would have to come back on Friday.  We're done on Friday.

7              MR. ZELLER:  Thank you.

8              THE COURT:  Let's bring the jury in.  Quickly.

9              MR. NOLAN:  Your Honor, our next witness is Debbie

10   Middleton.  Can we have her take the stand?

11             **(WHEREUPON THE JURY ENTERS.)**

12             THE CLERK:  Please stand and raise your right hand.

13             **DEBORA MIDDLETON, SWORN.**

14             THE CLERK:  Please have a seat.

15             THE COURT:  Go ahead and state your name, and spell

16   your last name for the record, please.

17             THE WITNESS:  My name is Debora Middleton,

18   M-I-D-D-L-E-T-O-N.

19             **DIRECT EXAMINATION**

20   BY MR. NOLAN:

21   **Q.**   Ms. Middleton, how are you employed?

22   **A.**   I work for MGA.

23   **Q.**   And how long have you worked for MGA?

24   **A.**   I've worked there since July of 2003.

25   **Q.**   What is your current position or title?

7188

1    **A.**    It's director of creative development.

2    **Q.**    If you could just please explain for the jury's sake

3    what your educational background is, and for those of us who

4    have been here for several months or a lot of weeks, could

5    you speak into the microphone.   It's easier for everybody to

6    hear.   Thank you.

7    **A.**    I worked in animation for 15 years prior to starting at

8    MGA.   I worked for various companies, starting in, I guess,

9    the biggest company was -- well, the first big company was

10   Don Bluth.   I worked for them for two years in Ireland and

11   then moved to L.A., working for another two years with them.

12   Also did some work for Warner Brothers on a couple of their

13   features.

14              I worked for a company called Rich and Nation on a

15   feature film.   Did a little work for Disney, a little work

16   for Dream Works before going to Klasky-Csupo.   I worked there

17   for two years before starting at MGA.

18   **Q.**    And briefly explain to us your educational background.

19   **A.**    I went to Champlain College for a year studying fine

20   arts.   And then I went to Sheridan College in Toronto for

21   three years, studying animation.

22   **Q.**    Now, you testified that your current position is

23   director of creative development at MGA; correct?

24   **A.**    Yes.

25   **Q.**    What was your title when you first started at MGA?

7189

1   A.   It was character art manager.

2   Q.   And do you recall approximately the date of your first

3   employment with MGA?

4   A.   It was July 2003.

5   Q.   Now, when you say you were the character art manager,

6   first of all, what is character art?

7   A.   It's the artwork that we create to go on packages or use

8   in style guides.

9   Q.   Before you arrived at MGA in July of 2003, did MGA have

10   an in-house art department?

11   A.   No, they did not.

12   Q.   So after you joined, how many members were in your

13   department?

14   A.   I was the only person.

15   Q.   Prior to the time that you joined, had any character art

16   been created in by MGA?

17   A.   No, not to my knowledge.

18   Q.   And how long did you serve as character art manager for

19   MGA?

20   A.   For roughly two years.

21   Q.   And then what happened in 2005?

22   A.   I was promoted to director of character art.

23   Q.   And what were your responsibilities as the director of

24   character art at MGA?

25   A.   I was overseeing the character art team in creating all

1  the character art that we used at MGA for packaging, style

2  guides, and at that point we were also into the website.

3  **Q.**   And what was the date that you assumed your current

4  position as director of creative development?

5  **A.**   That was the summer of 2007.

6  **Q.**   And explain to the jury what your -- what are your

7  responsibilities as the director of creative development at

8  MGA?

9  **A.**   I work on our entertainment properties, our DVD's from

10  the beginning idea to the film is actually delivered to MGA.

11  I also work on our website creating the artwork that's used

12  on our various websites, and I work with our licensing team

13  on approvals for licensed product that get submitted to MGA.

14  **Q.**   Now, for the period of July 2003 through July 2007, were

15  you the person within MGA in charge of character art for the

16  MGA products?

17  **A.**   Yes.

18  **Q.**   And did you work on the Bratz line?

19  **A.**   Yes.

20  **Q.**   Did you work on other lines?

21  **A.**   Yes.

22  **Q.**   Could you give the jury a little bit of background when

23  we talk about -- first of all, is there a difference between

24  character art and package art for a doll?

25  **A.**   No.

7191

1   Q.   So could you just very briefly explain to the jury what

2   the purposes of character art or package art on a product?

3   A.   The children can relate to the drawings in the character

4   art.  So -- I'm sorry.  Can you repeat the question?

5   Q.   Sure.  Can you just explain to the jury what the

6   purposes of character art or package art are.

7   A.   So it's something that the children can relate to to see

8   a cartoon character.  It's also a way that we can bring some

9   life to the character, because a doll is very plastic and

10  isn't in a pose, but character art can actually be posed and,

11  you know, in a situation.  It gives it some life and some --

12  I think giving it life is really what it does.

13  Q.   Now, in developing the character art for a particular

14  doll package, do you try to make the character art look like

15  the doll in the box?

16  A.   It looks similar to the doll in the box, yes.

17  Q.   Is it identical?

18  A.   No.

19  Q.   Could you describe for us briefly the steps in

20  developing character art?

21  A.   While --

22  Q.   While at MGA.

23  A.   Paula comes up with a theme that she'd like to create,

24  and that theme is then given to Aileen, who is -- who works

25  on the packaging, and she comes up with the look that she'd

```
 1   like to create for a packaging for that certain theme.

 2           Then we're given some information on what the theme

 3   idea is.  We're also given usually a tear sheet which has a

 4   pose that they'd like us to reproduce.  We're also given a

 5   sketch from the fashion designer that shows the fashion that

 6   we're supposed to draw onto the character.  And those are the

 7   elements we're given to start the process of drawing.

 8   Q.   You used a term that we've heard before.  And I want to

 9   make certain.  You said tear sheet.  Could you give me an

10   example or definition of a tear sheet?

11   A.   A lot of times it's just a sheet that is torn out of a

12   magazine that is a live action, a person in a certain pose,

13   that they'd like to us draw something similar to that pose.

14   Q.   I think we have in front of you a white notebook.  I'd

15   ask you to look at Trial Exhibit 18320-004.

16           Can you identify that for us?

17   A.   That's a tear sheet.

18   Q.   So this is a sample of a tear sheet used at MGA?

19   A.   Yes.

20           MR. NOLAN:  Your Honor, we'd offer 18320-004.

21           MR. PRICE:  Objection.  Relevance.

22           THE COURT:  Counsel, what is this going to?

23           MR. NOLAN:  It goes to the differentiation and

24   changes and the process of how changes are made with respect

25   to the character art from package to package.  It's
```

1    foundational.

2             THE COURT:  Lay a further foundation for this,

3    Counsel.

4             MR. NOLAN:  Okay.

5    Q.   The particular tear sheet that you have in front of you,

6    18320, do you see that?

7    A.   Yes.

8    Q.   Are you familiar with this tear sheet?

9    A.   Yes.

10   Q.   And could you explain to us how you are familiar with

11   it?

12   A.   It's one of the pieces of information that I helped

13   gather.

14   Q.   And what was the purpose in gathering the tear sheet?

15   A.   To explain the process of how we create character art.

16   Q.   Was this tear sheet used at MGA to create character art?

17   A.   It was.

18   Q.   And was that character art created -- developed under

19   your supervision?

20   A.   Yes.

21            MR. NOLAN:  Your Honor, with that foundation...

22            THE COURT:  Counsel, may I see you at sidebar?

23            MR. NOLAN:  Sure.

24            **(SIDEBAR CONFERENCE HELD.)**

25            THE COURT:  I guess I'm struggling on the relevance

7194

1    of this, how this is not kind of like the Shrek thing.

2        MR. NOLAN:  Because one of the components of

3    apportionment, as we've identified it, is marketing,

4    packaging.  This is actually something affixed to the

5    package, and what we want to do is demonstrate that for each

6    of the boxes on the characters that come out, that there is

7    different --

8        THE COURT:  Okay.

9        MR. NOLAN:  And this was only simply, your Honor,

10   to lay -- you know, how artwork is created.  Frankly, I could

11   skip over it, but I thought it would be interesting for the

12   jury to understand the tear sheet process.

13       THE COURT:  Okay.  This is different than the Shrek

14   thing.  Okay.  Counsel?

15       MR. NOLAN:  I'm sorry.  It's completely different.

16       THE COURT:  No, I just wasn't -- yes.  I'll hear

17   your argument.

18       MR. PRICE:  My understanding is that they are

19   saying that the art on the packaging entitles them to certain

20   reduction of damages.  The process for doing that --

21       THE COURT:  I don't have the 403 concerns that I

22   had about Shrek because that was getting into actually how

23   the doll was created.  If he wants to use his time this way,

24   that's fine.  Overruled.

25       **(CONCLUSION OF SIDEBAR CONFERENCE.)**

```
 1              THE COURT:  The objection is overruled, Counsel.

 2              MR. NOLAN:  Thank you.  I'd like to just place it

 3    on the screen.

 4    Q.   You identified this as a tear sheet coming from a

 5    magazine; is that correct?

 6    A.   Yes.

 7    Q.   And for the jury's benefit, could you walk us through,

 8    describe quickly what use is made of the tear sheet and take

 9    us through to the development of the artwork.

10    A.   Well, the tear sheet just lets us know that they want us

11    to create a standing pose.  It's more of a profile pose with

12    the head turned towards camera.

13    Q.   And was this tear sheet used for a particular piece of

14    character art?

15    A.   It was.  It was used for the Sweetz line.

16    Q.   You have trial 18320-003 in front of you?

17    A.   Yes.

18    Q.   And what do you recognize that as?

19    A.   That was a -- the rough drawing that was done based on

20    this tear sheet reference.

21              MR. NOLAN:  Your Honor, we'd offer this exhibit.

22              MR. PRICE:  No objection.

23              THE COURT:  It's admitted.

24              (Exhibit 18320-003 received.)

25    Q.   BY MR. NOLAN:  Now asking you to -- what is the next
```

7196

 1   step in terms of developing particular character art?  And

 2   let's use this Sweetz line as an example.

 3   **A.**   Based on the first rough sketch, we sometimes have

 4   overlays that need to be done if something isn't drawn quite

 5   right.  So sometimes an overlay is done on top of this.

 6   **Q.**   Directing your attention to 18320-005.  Can you

 7   recognize that for us.

 8          What is 18320-005?

 9   **A.**   That's -- I believe that's the color.  The number is cut

10   off a little bit.  But I believe that's the color, the final

11   artwork that was created.

12          MR. NOLAN:  Your Honor, we'd offer this exhibit.

13   Just for my reference, I apologize, what is the number on the

14   bottom of that page?

15          THE WITNESS:  I have 18320-00, and the last number

16   is somewhat cut off.

17          MR. NOLAN:  Okay.  I believe it's 5, your Honor.

18          THE COURT:  Very well.  Admitted.

19          **(Exhibit 18320-005 received.)**

20   **Q.**   BY MR. NOLAN:  So that's the third step, adding color;

21   correct?

22   **A.**   Yes, we do the rough pencil, and then we do a tight

23   pencil line over the rough after any revisions are done, and

24   then the center shot shows the artwork once the line art has

25   been taken into the illustrator program in the computer and

7197

1    created into an illustrator file like this with flat color

2    inside.

3    Q.    Now, for the sweet lines, was the actual doll packaging

4    and character art use in the sweet lines actually made and

5    fully developed before you started doing the rendering?

6    A.    No.

7    Q.    Do you refer to the doll at any point while you're

8    drawing the character art?

9    A.    No.

10   Q.    How many different character art drawings have you been

11   involved in while employed at MGA?

12             MR. PRICE:  Objection.

13   Q.    BY MR. NOLAN:  With respect to Bratz.

14   A.    Hundreds.

15   Q.    Is that hundreds total, or is that on an annual basis?

16   A.    That would be on an annual basis.

17   Q.    Can you explain to the jury very quickly why there are

18   so many character art pieces that you are involved in?

19   A.    In each line there's four dolls or sometimes six dolls

20   with the main four characters and sometimes other characters.

21   So we do one piece of character art for each character.  In

22   our style guides there's often two poses for each character.

23   So there could be eight pieces of character art for one theme

24   or as many as 12 pieces of character art for one theme that

25   we create.  And there are many themes that are done every

7198

1   season, between five and I'd say ten.  So you just multiply

2   it.  It becomes a lot of different poses and pieces of

3   artwork that we create.

4   **Q.**   So the character art is driven by the various themes?

5   **A.**   Yes.

6   **Q.**   Ms. Middleton, so hundreds of character art drawings

7   each year you've been there; correct?

8   **A.**   Yes.

9   **Q.**   So there's -- you've been there for approximately five

10  years?

11  **A.**   Yes.

12  **Q.**   So is it safe to say that somewhere in the neighborhood

13  of 500 to whatever are the number of character art drawings

14  that you've been involved in and supervised?

15  **A.**   Yes.

16  **Q.**   For any one of those character art drawings, did you

17  ever make reference to the concept drawings of Carter Bryant?

18  **A.**   No, I did not.

19  **Q.**   Did you ever, in the five years you've been employed at

20  MGA, ever direct one of your employees to go back and look at

21  the concept drawings of Carter Bryant?

22  **A.**   No.

23  **Q.**   Do you know Carter Bryant?

24  **A.**   I've never met him, no.

25  **Q.**   Have you ever spoken with him?

1  A.   No.

2  Q.   Have you ever seen, in the five years that you've been

3  at MGA, Carter Bryant's concept drawings from 2000?

4  A.   No.

5           MR. NOLAN:  Nothing further.

6                     **CROSS-EXAMINATION**

7  BY MR. PRICE:

8  Q.   Ms. Middleton, I understand you began working in July of

9  2003?

10  A.   Yes.

11  Q.   By that time there had been some Bratz dolls in the

12  market; right?

13  A.   Yes.

14  Q.   Were you familiar with the Bratz dolls?

15  A.   Somewhat familiar.  I'd seen them in stores.

16  Q.   Did you become familiar with them once you worked at MGA

17  in July of 2003?

18  A.   I saw them.  I was in contact with them.

19  Q.   And in what context did you see these dolls or were you

20  in contact with them?

21  A.   I didn't actually have to use the dolls to do my job.

22  So you know, as you walk through MGA, there's all different

23  stages of production going on.  So we see the dolls around,

24  and oftentimes prototypes of the packaging because our

25  character art was used on packaging.  So I would see the

7200

```
 1    packages occasionally once they were being created with the

 2    character art on them.

 3    Q.    And I think you said, I wrote it down, that the

 4    character art looks similar but not identical to the doll in

 5    the box; is that right?

 6    A.    That's right.

 7               MR. PRICE:  No further questions.

 8               THE COURT:  Anything further?

 9               MR. NOLAN:  Nothing further, your Honor.

10               You are excused, ma'am.  Thank you.

11               Your next witness.

12               MS. AGUIAR:  That was quite unexpectedly short, but

13    we're going to be ready in a moment.  We need to set up a

14    table.

15               THE CLERK:  Please stand and raise your right hand.

16                    LEON DJIGUERIAN, SWORN.

17               THE CLERK:  Please be seated.

18               Please state your full name, and spell your last

19    name for the record.

20               THE WITNESS:  Leon Djiguerian, D-J-I-G-U-E-R-I-A-N.

21               MS. AGUIAR:  Your Honor, I can certainly wait until

22    we're done, or if it wouldn't be too distracting, we can

23    finish setting up the table --

24               THE COURT:  I don't want to --

25               MS. AGUIAR:  I don't want to distract the jury.
```

7201

```
 1              THE COURT:  Right.  So we can just wait a moment.
 2    That's all right.
 3              While we're doing this, Counsel, is there a binder
 4    on this?
 5              MS. AGUIAR:  There's not.
 6              THE COURT:  There's not.  All right.
 7                        DIRECT EXAMINATION
 8    BY MS. AGUIAR:
 9    Q.   Good afternoon.
10    A.   Good afternoon.
11    Q.   Mr. Djiguerian, would you tell us where you work,
12    please?
13    A.   I work at MGA Entertainment.
14    Q.   Okay.  And if you want, you can either move your --
15    scoot your chair up or -- this thing moves, so you can pull
16    it towards you if you want to be more comfortable.
17              Sorry.  You said you work at MGA?
18    A.   Yes.
19    Q.   What is your position?
20    A.   Currently Bratz brand manager.
21    Q.   And how long have you been with the company?
22    A.   Almost eight years.
23    Q.   Without going into each of the specific jobs or years,
24    can you tell us just generally in what areas you have worked
25    over the last seven to eight years?
```

7202

1   **A.**   I started off as a graphic designer, and I moved on to

2   structural engineering, production management, project

3   planning, design manager, and now Bratz brand manager.

4   **Q.**   Through the course of those different areas where you've

5   worked at MGA, have you become familiar with the various

6   Bratz products?

7   **A.**   Yes.

8   **Q.**   And do you also have familiarity specifically with the

9   sculpts that were developed at MGA for each of those

10  products?

11  **A.**   Yes.

12  **Q.**   Okay.   I'd actually like to go through those with you.

13          And, your Honor, with your permission, it might

14  just be easier, I have the microphone, and instead of going

15  back and forth, may I --

16          THE COURT:   Absolutely.

17          MS. AGUIAR:   Thank you.

18  **Q.**   Are you familiar with the Bratz Boyz product?

19  **A.**   Yes.

20  **Q.**   Okay.   And just for the record, what we've done is we've

21  put one of each of the products -- can you tell us, these

22  are, the things in the back, Bratz subbrands in their

23  packaging; is that correct?

24  **A.**   That's correct.

25  **Q.**   Okay.   And then for each of these, we have a sculpt that

1   corresponds to the doll in the box; correct?

2   **A.**   Yes.

3   **Q.**   And the sculpt -- can you describe -- in other words,

4   are we seeing sculpts fully decorated and clothed?

5   **A.**   No, you're seeing the naked sculpt, the raw sculpt.

6   **Q.**   Okay.  Let's start first with the Bratz boys, then.  Let

7   me hand you --

8          And your Honor, can I just move all of these in at

9   the end?

10          THE COURT:  You may.  I trust you've reviewed

11   these, Counsel?

12          MR. PRICE:  I have not seen the sculpts.  I think

13   everything else is in evidence.

14          MS. AGUIAR:  The products in the boxes are in

15   evidence, and the sculpts, they were given the opportunity to

16   inspect.

17          THE COURT:  Very well.  Why don't we do this.  If

18   you'd do this for the Court, Mr. Price, just take a quick

19   look at those, and let me know if you have any objections,

20   and this way we can get that out of the way and resolve that,

21   and then counsel can operate freely.

22          (Pause.)

23          MR. PRICE:  Your Honor, I don't know if they are

24   the sculpts to those products, but if that's what he's going

25   to testify to, I have no objection.

7204

```
 1              THE COURT:  Very well.  Conditionally, then, I will
 2   admit them, and you'll renew your objection if you have any
 3   concerns about foundation based on the testimony.
 4              You may proceed, Counsel.
 5              MS. AGUIAR:  Thank you.
 6   Q.   So the first product, do you recognize this as a Bratz
 7   Boyz product?
 8   A.   Yes, I do.
 9   Q.   And this is for the record Trial Exhibit 17477.
10              I'm going to hand you Trial Exhibit 18870.  And
11   when you are talking about these, it would be great if you
12   could hold them up in a way that the jury can see them.
13   Thanks.
14              Can you identify the Trial Exhibit 18870?
15   A.   Yeah, this is the Bratz Boyz body sculpt.  Head sculpt.
16   It's in raw form, not painted or rooted.
17   Q.   Was it a sculpt that was developed by MGA?
18   A.   Yes.
19   Q.   And I'll ask you the same questions for all of these
20   sculpts.  I'm sorry if it becomes a slight bit repetitive.
21   So I'm going to ask you some of the same questions for all of
22   these sculpts.  So is this sculpt the same as the sculpt for
23   the Bratz core fashion doll?
24   A.   No, it's different.
25   Q.   Can you tell us in what ways it's different?
```

**A.**   Well, first thing is there's a lot of muscular mass on the body defining it as a male figure.   There's muscle definition on the legs, the torso, the shoulders are broader, larger arms, has a six-pack, different head sculpt than the girls' doll.

**Q.**   Let me ask you this threshold question before we go any further.   In the years that you've been working at MGA, have you ever seen before today, have you ever seen Mr. Bryant's original concept drawings for Bratz that were presented to MGA in September of 2000?

**A.**   No, I have not.

**Q.**   To the best of your knowledge, is that sculpt that you're holding in your hand, the Bratz Boyz sculpt, were the drawings used to create that sculpt?   Were the drawings from the pitch book drawings from September 2000 used to create that sculpt?

**A.**   I don't believe so, no.

**Q.**   So you can just leave that one.   And we'll go on to the next one.   The next one is Lil Bratz.   Do you recognize this as a Lil Bratz product?

**A.**   Yes.

**Q.**   And this is Trial Exhibit 17491.   And I'm going to hand you Trial Exhibit 18869.   And can you tell us what we're looking at there?

**A.**   This is a Lil Bratz doll.   In its raw form, the sculpt.

7206

1   **Q.**   I'm trying to think how to get out of the way so you

2   guys can see the screen.

3           Okay.  And is this the -- I mean, this is a

4   fairly -- this may be an obvious question, but is this the

5   same sculpt as the core fashion doll sculpt?

6   **A.**   No, it's not.

7   **Q.**   What are the primary differences?

8   **A.**   The first thing is the size.  This is a miniature

9   microdoll.  The body sculpt is different.  The head size is

10  different.  The head sculpt is different.  Overall it's a

11  completely different doll.

12  **Q.**   Were Carter Bryant's drawings from September of 2000

13  used to create that sculpt?

14  **A.**   No.

15  **Q.**   The next product I wanted to talk about is Babyz.  And

16  can you explain to the jury, I'm going to show you two

17  different Babyz product.  One you'll see here is Trial

18  Exhibit 17775.  And the next one is 17471.  And can you

19  explain the difference between the two Bratz Babyz products

20  that we just looked at?

21  **A.**   Well, the first one you showed was the first launch of

22  the Babyz with the molded hair.  It has plastic hair.  And

23  the second one you showed has actual rooted hair.

24  **Q.**   And when you say rooted hair, I think we probably have

25  heard this already, but what do you mean by that?

7207

1    **A.**    Actual hair that you can brush and style.

2    **Q.**    So let me hand you 1863 and 18862.  Can you tell us what

3    we're looking at with 1863?

4    **A.**    This is the first Babyz sculpt, it's all molded hair.

5    There's no rooted hair.

6    **Q.**    Is this a sculpt that was created and by MGA?

7    **A.**    Yes, it was.

8    **Q.**    To your knowledge was it based in any way on Carter

9    Bryant's drawings from September of 2000?

10   **A.**    No, it's not.

11   **Q.**    Can you tell us the ways in which it's different, if at

12   all, from the core fashion doll sculpt?

13   **A.**    Well, this baby here is much smaller than the Bratz core

14   doll.  It has different proportions of the body, the legs,

15   the torso.  It has a different size head in relation to the

16   Boyz.  It's a completely different sculpt.

17   **Q.**    And then moving on to the next one in front of you,

18   which should be 18862.  And if you could tell the jury what

19   we're looking at there.

20   **A.**    And this is another generation of the Bratz Babyz.  And

21   this one here you can actually move the hair and have real

22   hair to style and brush.  Versus this one where it was molded

23   hair.

24   **Q.**    And so other than the molded versus the rooted hair, is

25   the sculpt the same?

1   **A.**   The body sculpt is the same.   The only difference is the

2   head.

3   **Q.**   So it's a different head sculpt?

4   **A.**   Correct.

5   **Q.**   Next one.   I'm holding up Trial Exhibit 17466.   Do you

6   recognize this?

7   **A.**   Yes.

8   **Q.**   As a Bratz Big Babyz?

9   **A.**   Yes.

10   **Q.**   I've just handed you two trial exhibits.   One is 18865

11   and 18866.   Can you tell us what we're looking at with 18865?

12   **A.**   -65 is this one here.   This is the Big Babyz with the

13   molded hair once again, the plastic hair.   You cannot you

14   brush it or style it.   It's plastic.   And the next one here

15   is the version with the rooted hair where you can actually

16   brush and style the hair that's being applied to the head.

17   **Q.**   Were both of these sculpts that were developed and

18   manufactured by MGA?

19   **A.**   Yes.

20   **Q.**   And to the best of your knowledge, were these sculpts

21   based on Mr. Bryant's drawings from September of 2000?

22   **A.**   No.

23   **Q.**   Can you walk us through the nature of these sculpts and

24   how they differ from the core fashion doll sculpts?

25   **A.**   Well, these are large dolls.   They are large babies.

7209

```
 1   The scale is much different than from the Bratz core.  Once
 2   again, the body proportions are different, the legs, the
 3   torso, the arms, and the head size is larger.
 4   Q.   Okay.  Great.
 5   A.   Completely different sculpt.
 6   Q.   Thank you.  The next product I'm going to hold up for
 7   you is Trial Exhibit No. 17478.  Do you recognize that as a
 8   Bratz Kidz product?
 9   A.   Yes.
10   Q.   And this particular one is a girl?
11   A.   Yes.
12   Q.   So I'm handing you two more exhibits.  Those are 18860
13   and 18861.  Can you tell us what we're looking at?
14   A.   The 18860 is the Bratz Kidz girls' doll.  And -861 is
15   the Bratz Kidz boys' doll.
16   Q.   And are these two sculpts that were developed and
17   manufactured by MGA?
18   A.   Yes.
19   Q.   To the best of your knowledge, were they based on
20   Mr. Bryant's concept drawings for Bratz pitched to MGA in
21   September of 2000?
22   A.   No.
23   Q.   Can you walk us through the differences between the
24   sculpts that we're looking at here and the Bratz fashion doll
25   sculpt?
```

7210

1   **A.**   Well, these dolls are also smaller than the Bratz core

2   fashion doll.  They have skinnier legs, skinnier torso,

3   different head sculpt.  Once again, the proportions are

4   different between the legs, the torso, the arms.  And the

5   boys sculpt is actually different than the girls sculpt.

6   **Q.**   Are there some ways in which you can tell that it's a

7   boy's body?

8   **A.**   The boy has little bit broader shoulders and also the

9   head sculpt is different.

10   **Q.**   Let's move on to -- do you recognize Trial Exhibit 18877

11   as a Bratz Big Kidz?

12   **A.**   Yes.

13   **Q.**   And I'm handing you 18864, and if you could tell the

14   jury what that is.

15   **A.**   That is a large scale of a Bratz Kidz.

16   **Q.**   And is this a sculpt that was developed by MGA?

17   **A.**   Yes, it was.

18   **Q.**   And was it developed based on Mr. Bryant's concept

19   drawings?

20   **A.**   No, it wasn't.

21   **Q.**   Can you tell us the differences between this sculpt,

22   18864, and the fashion doll sculpt?

23   **A.**   This sculpt is much taller than the Bratz fashion doll,

24   and the proportions are different between the legs, the arms,

25   the torso, the head sculpt is completely different.  It's a

7211

1    much larger doll.

2    **Q.**    Okay.  Let's keep moving here.  Okay.  I'm going to show

3    you two products here.  17486 and 18878.  And do you

4    recognize those as Bratz Lil Angelz?

5    **A.**    Yes.

6    **Q.**    Can you tell us the difference between the two Lil

7    Angelz products that I just held up?

8    **A.**    Well, one has molded hair and the other one has rooted

9    hair where it can actually be styled and brushed.  And they

10   also have different body poses.  Each one is in a different

11   stance.

12   **Q.**    So it's sort of the rooted versus plastic hair that we

13   you talked about before?

14   **A.**    Correct.

15   **Q.**    And let's identify these, then.  The first Trial Exhibit

16   is 18867 and 18868.  And if you could tell us what those two

17   are that you're holding.

18   **A.**    These are the Bratz Lil Angelz dolls.  This one here,

19   she's sitting in a stance like a little newborn would sit.

20   And it has -- it will have rooted hair.  This is the version

21   where you can actually apply hair to it and brush it and

22   style it.  And the other version here is a different --

23   different stance that the baby sitting in, a different body

24   pose.  And this one here actually has molded hair, plastic

25   hair.

1    Q.   And were these sculpts that were developed and created

2    by MGA?

3    A.   Yes, they were.

4    Q.   And as far as you know, were Mr. Bryant's concept

5    drawings for Bratz referenced in creating these sculpts?

6    A.   No.

7    Q.   This is Trial Exhibit 18875.  Do you recognize that as a

8    Bratz Star Singerz?

9    A.   Yes.

10   Q.   And now I'm bringing you Trial Exhibit 18857.  And if

11   you could explain to the jury what 18857 is.

12   A.   This is a different Bratz body sculpt used for the Bratz

13   Star Singerz.  She's actually a taller doll than our normal

14   Bratz core.  She has more articulation in the knees where you

15   can actually bend her knees and pose her in different ways.

16   Her arms actually raise up when you lift the leg to put her

17   in some dancing features.  And it has pointy feet.

18   Q.   And is the torso the same as the fashion doll sculpt?

19   A.   No, it's completely different.  This is a much taller

20   doll than the Bratz core doll.

21   Q.   Okay.  And the arms themselves, do you know if the arms

22   are different or the same than the core fashion doll?

23   A.   No, the arms are different sculpts, different posture.

24   Q.   And is this a sculpt that was developed by MGA?

25   A.   Yes.

1  Q.   And to the best of your knowledge, were Mr. Bryant's

2  concept drawings used to create this particular sculpt?

3  A.   No.  It wasn't.

4  Q.   I'm holding up -- this is Trial Exhibit 17731.  And do

5  you recognize it as a Bratz -- the movie star doll?

6  A.   Yes, I do.

7  Q.   And I'm going to hand you Trial Exhibit No. 18858.  And

8  if you could describe for the jury that one you have in your

9  hand right now, what is that?

10  A.   This is the Bratz moving body.  And it's in raw form,

11  the sculpt, and the differences between this and the core is

12  the articulation in the torso.  The arms are completely

13  posable.  You have elbow joints, wrist joints, forearm joints

14  and so forth to put her in different stances.  And the torso

15  is also articulated so you can actually move her left and

16  right also in the upper body.

17  Q.   And what about sort of the legs?

18  A.   The legs are similar to the Bratz.

19  Q.   And is this a sculpt that was developed by MGA?

20  A.   Yes, it was.

21  Q.   Were Mr. Bryant's concept drawings for Bratz used to

22  create this particular sculpt?

23  A.   No, it wasn't.

24  Q.   Trial Exhibit No. 17524.  Do you recognize that as a

25  Fashion Pixiez product?

7214

1    **A.**    Yes.

2    **Q.**    I'm going to hand you Trial Exhibit No. 18859, and if

3    you can tell us, is this -- tell us what's in your hands.

4    **A.**    This is the sculpt for the Bratz Pixiez line.  She is a

5    taller sculpt than the Bratz core.  She has different kinds

6    of arm posture where she's actually folding her arms.  In

7    this sculpt she has a different head sculpt, a different

8    face, completely different than the Bratz core.

9    **Q.**    Do her arms move as well?

10   **A.**    Yeah, her arms move and her legs also move.  It has

11   articulation in the hip joints and the shoulders.

12   **Q.**    Okay.  And is this a sculpt that was developed at MGA?

13   **A.**    Yes.

14   **Q.**    And to the best of your knowledge, were Mr. Bryant's

15   drawings referenced in order to make this particular sculpt?

16   **A.**    No.

17   **Q.**    This one is going to be -- I'm going to leave the fun

18   one for last.  Let's do the -- I'm holding up 17577 and

19   14188.  And do you recognize those as two versions of the

20   talking Bratz?

21   **A.**    Yes.

22   **Q.**    And I'm going to hand you two more trial exhibits, 18872

23   and 18876.  And why don't you do 18872 first.  And describe

24   what we're looking at there.

25   **A.**    This is one of the body sculpts for Bratz talking.

1    She's in a completely unique stance with one arm on the hip

2    and one arm straight down.  They don't have articulated hip

3    joints.  The lower half of the body is fixed.  You can't move

4    it.  They only have articulated shoulder joints.

5    **Q.**    And why don't we move to the next exhibit.

6    **A.**    And the next one is a completely different body sculpt.

7    Once again, she's standing in a different pose.  And on this

8    one also, you cannot move her legs.  The hip joints are not

9    articulated, but her arms are, the shoulders.

10   **Q.**    And are these two sculpts that you have in front of you,

11   18872 and -73, sculpts that were developed at MGA?

12   **A.**    Yes, they were.

13   **Q.**    And based on your knowledge working at the company, were

14   these sculpts -- were Mr. Bryant's drawings used to create

15   these sculpts?

16   **A.**    No.

17   **Q.**    And last but not least, Trial Exhibit No. 18879.  Do you

18   recognize that as a walking Bratz product?

19   **A.**    Yes.

20   **Q.**    And Trial Exhibit 18871, can you tell us what we're

21   looking at there?

22   **A.**    This is the sculpt for the walking Bratz doll.  She's

23   connected to a walking dog.  And the sculpt is much

24   different.  She has much larger feet here to fit the

25   mechanism inside the shoes to make her walk.  And she has an

1   articulated torso in the top to make her torso move also.

2   Her legs are not as articulated as the Bratz core doll, given

3   that there's mechanism inside.   And the knees, you cannot

4   bend them at the knees.

5   **Q.**   And I probably should have asked you this at the very

6   beginning, although I suspect that the jury already knows.

7   When you have been using the term articulated or

8   articulation, can you tell us, you know, in your world what

9   that means specifically?

10  **A.**   Sure.   It's the ability to move a joint or a part of the

11  body.   For instance, this is what we call a shoulder

12  articulation, where you can actually move the arm at the

13  shoulder, and then when we refer to the hip at the joint, the

14  joint at the hip where you can actually make the legs move

15  back and forth.

16  **Q.**   And is this a sculpt that was developed at MGA?

17  **A.**   Yes.

18  **Q.**   And were Mr. Bryant's drawings from September 2000

19  specifically referenced in creating this sculpt?

20  **A.**   No.

21  **Q.**   And just because I think it's a little bit funny, can

22  you make it walk?

23  **A.**   Sure.

24  **Q.**   I think it has a battery in it.

25  **A.**   Yes.

1  **Q.**   Just a little lightheartedness for the afternoon.   Okay.

2  Thank you.

3          Your Honor, I would move into evidence -- shall I

4  read the exhibit numbers?

5          THE COURT:   Please do.

6          MS. AGUIAR:   Okay.   Well, before I do that -- well,

7  should I do that first, or should we find out if there's any

8  objection?

9          MR. PRICE:   There's no objection.

10          THE COURT:   Very well.

11          MS. AGUIAR:   18870.

12          18869.

13          18863.

14          18862.

15          18865.

16          18866.

17          18860.

18          And 18861.

19          18864.

20          18868.

21          18867.

22          18857.

23          18858.

24          18859.

25          18871 through 73.   And I would move all of those

1    into evidence.

2              THE COURT:  Very well.  They are all admitted.

3              **(Exhibits 18870, 18869, 18863, 18862, 18865,**

4              **18866, 18860, 18861, 18864, 18868, 18867, 18857,**

5              **18858, 18859, 18871-73 received.)**

6              MS. AGUIAR:  Thank you.  That's all I have.

7                              **CROSS-EXAMINATION**

8    BY MR. PRICE:

9    **Q.**    Mr. Djiguerian?

10   **A.**    "Djiguerian."

11   **Q.**    Sir, you mentioned the phrase core information doll

12   sculpt.

13             Do you remember that?

14   **A.**    Yes.

15   **Q.**    And how many dolls have been created using that core

16   fashion doll sculpt?

17   **A.**    Please specify.  I don't understand what you mean by how

18   many dolls.

19   **Q.**    Well, let's just say how many dolls -- the sculpts used

20   to create dolls which are sold, that core fashion doll

21   sculpt, how many dolls have been created using that sculpt?

22   **A.**    I don't know.

23   **Q.**    A lot?

24   **A.**    I don't know.

25   **Q.**    Okay.  You referred to the sculpt that was used to

7219

1   create the original Bratz dolls; correct?   The core fashion

2   doll sculpt?

3   **A.**   As relating to the first -- the first Bratz sculpt.

4   **Q.**   Yes.

5   **A.**   Yes.

6   **Q.**   And that sculpt, other than the movie Bratz has been

7   used for the subsequent generations as well; correct?

8   **A.**   No.   Each one of these is a completely different sculpt.

9   **Q.**   I'm not talking about these sculpts.   I'm talking about

10  the core Bratz dolls.   Do you understand?

11  **A.**   Well, how do you define Bratz core dolls?

12  **Q.**   The dolls which are, if you look at Cloe, Jade, Yasmin,

13  that Bratz type doll.   There have been subsequent generations

14  of those; correct?

15  **A.**   Of the sculpt or the dolls?

16  **Q.**   Of the dolls.

17  **A.**   Yes.

18  **Q.**   It's what you referred to as the fashion dolls; right?

19  **A.**   Correct.

20  **Q.**   Okay.   And those dolls, except for the movie one, have

21  used that same, what you referred to as core fashion doll

22  sculpt; correct?

23  **A.**   No, not even the movie.

24  **Q.**   Pardon?

25  **A.**   Not even the movie doll.

7220

1    Q.    I know the movie doll.  I'm saying excluding that.

2    A.    I don't quite understand the question.

3    Q.    See behind you where they have these Bratz dolls?

4    A.    Yes.

5    Q.    Okay.  They were created with what you call the core

6    fashion doll sculpt; right?

7    A.    Yes, the sculpt, yes.

8    Q.    And, for example, I'll show you Exhibit 18729, which is

9    Sasha.  That's the core fashion doll sculpt; right?

10   A.    Correct.

11   Q.    So you know the names of these core fashion dolls?

12   A.    The names of the characters or the themes?

13   Q.    The names of the characters.  There are a number of

14   names associated with these core fashion dolls; correct?

15   A.    Correct.

16   Q.    Not just Sasha, Yasmin, Cloe.  And I missed one, but

17   Meegan and other names; correct?

18   A.    Yes.

19   Q.    And they are made all with the same sculpt?

20   A.    Yes.

21   Q.    And you also said you were a brand manager.  So you know

22   something about building a brand; right?

23   A.    Yes.

24   Q.    And the first thing you do is you build your core

25   product.  In this case, the Bratz dolls; right?

1    **A.**    Well, depends on the brand.  I mean, in this case, the

2    dolls were built first.

3    **Q.**    And they were called Bratz?

4    **A.**    Correct.

5    **Q.**    And you said you worked there for eight years.  Did you

6    work there in September of 2000?

7    **A.**    No.

8    **Q.**    In any event, none of these dolls which we're looking at

9    now, which Ms. Aguiar showed you, none of these existed

10    before Carter Bryant went to MGA and shared with MGA Mattel's

11    confidential information about Bratz; correct?

12    **A.**    Correct.

13    **Q.**    And certainly, for example, the Bratz boy, there

14    wouldn't have been a Bratz boy if there hadn't been initially

15    the core of the brand which was the Bratz girls; right?

16            MS. AGUIAR:  Objection.  Assumes facts, your Honor.

17            THE COURT:  Rephrase, Counsel.

18            MR. PRICE:  Sure.

19    **Q.**    Is it correct, your understanding, that the Bratz Boyz

20    was created because it was to be sold to girls who like the

21    Bratz girls, the Bratz dolls?

22    **A.**    I don't know why it was created back then.

23    **Q.**    Well, you are in charge, as the brand manager, of

24    strategy for the brand?

25    **A.**    No, not the strategy.

7222

1   **Q.**  So you don't decide what is going to be produced by MGA

2  or the types of things that might be associated with the

3  brand; is that right?

4  **A.**  Well, I mean, I'm aware of what's being done, and I'm

5  asked what I think about things.

6  **Q.**  Well, let's put it this way.  You have no reason to

7  think that there would have been a Bratz boy or a baby Bratz

8  or a movie Bratz without those Bratz dolls that are the core

9  of the brand; right?

10  **A.**  I don't agree with that, no.

11        MS. AGUIAR:  I'm sorry.  Objection.  Assumes facts.

12  We can go to sidebar if you'd like.

13        THE COURT:  You may.

14        MR. PRICE:  Your Honor, I'll withdraw the question.

15  I don't have time for a sidebar.

16        THE COURT:  Are you finished?

17        MR. PRICE:  I'm finished.

18        THE COURT:  Very well.  Anything further?

19        MS. AGUIAR:  Nothing further.  Thank you.

20        THE COURT:  You are excused, sir.

21        MS. AGUIAR:  We're getting our next witness, your

22  Honor, who is Lui Domingo.

23        THE CLERK:  Please raise your right hand.

24                **LUI DOMINGO, SWORN.**

25        THE CLERK:  Please take the stand.

1              Please state your full name, and spell your last

2      name for the record.

3              THE WITNESS:  Lui Domingo, D-O-M-I-N-G-O.

4                   **DIRECT EXAMINATION**

5      BY MS. AGUIAR:

6      **Q.**    Mr. Domingo, are you employed by MGA?

7      **A.**    Yes.

8      **Q.**    And before we go any further, I'm going to give you one

9      of the rules of the road to try to speak into the microphone.

10     **A.**    Okay.

11     **Q.**    What's your position at MGA?

12     **A.**    I'm a senior designer at MGA.

13     **Q.**    How long have you been with the company?

14     **A.**    Five years.

15     **Q.**    Are there other doll designers who have your same

16     position at MGA?

17     **A.**    Yes.

18     **Q.**    How many?

19     **A.**    There's --

20              MR. PRICE:  Objection.  That's irrelevant.

21              THE COURT:  I'm sorry, Counsel?

22              MR. PRICE:  That's irrelevant.

23              MS. AGUIAR:  I'll withdraw it.  It was just

24     foundational.  That's fine.

25              THE COURT:  Very well.

1  **Q.**   BY MS. AGUIAR:   Do you work on dolls other than the

2  Bratz fashion dolls?

3  **A.**   Currently I do.

4  **Q.**   Okay.   So what different dolls do you work on?

5  **A.**   I work on baby dolls for Zaph.   I work on licensed

6  products for top model, and Bratz.

7  **Q.**   You said you're a doll -- I think you said your position

8  was doll designer.   Senior doll designer.

9  **A.**   Yes.

10  **Q.**   Can you explain to the jury what that entails?

11  **A.**   Um, that's a concept person that generates preliminary

12  ideas and themes for dolls for every season.   So for spring

13  or fall, I come up with the look of the doll, the design of

14  the paint, the design of the hair, the colors that are used

15  for paint and hair, the fashions which I guess we call soft

16  goods in the industry.   Everything that has to do with the

17  product.   Accessories as well, and I even provide some input

18  or suggestions for how the packaging might look like in order

19  to interpret the concept.

20  **Q.**   So before we get into specific examples, let me just ask

21  you another background question.   Did you ever work at

22  Mattel?

23  **A.**   Yes, I did.

24  **Q.**   And for how long did you work there?

25  **A.**   I worked for five years.

7225

1   **Q.**   Why did you leave?

2          MR. PRICE:  Objection.  Irrelevant.

3          THE COURT:  Sustained.

4   **Q.**   BY MS. AGUIAR:  After you left Mattel, did you leave

5   Mattel voluntarily?

6   **A.**   No.

7   **Q.**   Where did you go after you left Mattel?

8   **A.**   I went to a small company that does children's consumer

9   products called Home Inspirations.

10  **Q.**   And how long did you work at Home Inspirations?

11  **A.**   I worked at Home Inspirations for two years.

12  **Q.**   Two years?

13  **A.**   Yes.

14  **Q.**   And where did you go after Home Inspirations?

15  **A.**   I worked for MGA.

16  **Q.**   And then that takes us to the present; is that correct?

17  **A.**   Yes, correct.

18  **Q.**   I've placed in front of you a couple of trial exhibits.

19  The first one, which should be on the top of the pile, is --

20  well, actually, you know what?  Before we do that, I'm sorry.

21  Let me ask a foundational question.

22          Have you designed a number of Bratz fashion dolls

23  over the years?

24  **A.**   Yes, quite a few.

25  **Q.**   How many would you say that you have designed in the

1    years that you've been with MGA?

2    A.    Just whole segment.  Each segment might contain four or

3    five dolls.  I must have designed at least about 50 over the

4    course of five years.

5    Q.    Okay.  So when you're saying 50, that's 50 dolls total?

6    A.    No, 50 themes.  And each theme might have three or four

7    dolls of different designs.

8    Q.    So now getting back to Trial Exhibit 18920.  And if you

9    could look through that exhibit and tell us if you recognize

10   what that is.

11   A.    Yes, I do.

12   Q.    And what are the -- what is in Trial Exhibit 18920?

13   A.    This is my original concept sketch for a Bratz segment

14   called Tokyo a Go-Go which I did when I first came to MGA.

15   That was in 2000.  And this is a 2004 product.

16   Q.    Did you create the drawings that are contained within

17   18920?

18   A.    Yes, I did.

19           MS. AGUIAR:  Your Honor, I move 18920 into

20   evidence.

21           THE COURT:  Any objection?

22           MR. PRICE:  No objection.

23           THE COURT:  It's admitted.  You may publish.

24           **(Exhibit 18929 received.)**

25   Q.    BY MS. AGUIAR:  If we could look at pages 9 and 10 of

1   that exhibit.

2           And, Aaron, if you could place 18920 on the screen.

3           THE COURT:  Counsel, do you have a copy of that by

4   chance?

5           MS. AGUIAR:  Oh, I'm sorry.  I thought I did.

6   Q.   So, Mr. Domingo, can you tell us what we're looking at

7   here on these two pages?

8   A.   Yes.  Those are two of my original concept sketches for

9   a Bratz segment, meaning a group of dolls that I did for MGA,

10  when I first came to work for them in 2003, called Tokyo a

11  Go-Go.  And those are the Bratz dolls wearing, I guess what

12  is called Tokyo funk.  You know, basically fashions that

13  are -- where the Tokyo teenagers or kids in Japan wear

14  T-shirts over another T-shirt.  They wear skirts over pants.

15  They wear leggings.  They kind of wear the whole kitchen

16  sink, so to speak.  And I thought it might be a good idea to

17  do it for Bratz.

18  Q.   So where did the initial idea to do a Tokyo-themed doll

19  come from?

20  A.   Isaac Larian was throwing the idea that probably we

21  should do something related to Tokyo.  And I actually agreed,

22  and I was looking at some pictures of, you know, streets of

23  Tokyo, and I saw some fashions that I thought would be very,

24  very interesting for -- to do for the Bratz dolls.

25  Q.   Were you looking at any other company's product when you

7228

1  started to develop these concept sketches for the Tokyo doll?

2  **A.**    No.

3  **Q.**    How would you characterize the look of the doll that you

4  were designing here?

5  **A.**    It is trendy, it's young, it's funky, but it's also very

6  different from what we're accustomed to looking at in

7  America.   It's a bit more international.   The hair is

8  colored.   And the inspiration, the graphics, the design that

9  I used for the T-shirt is inspired by Japanese animation.

10  **Q.**    And you're talking about the two T-shirts that the

11  characters are wearing in the drawing?

12  **A.**    Yes, correct.

13  **Q.**    And can you just describe them for us?

14  **A.**    Yes.   These are -- Japanese animation has become very

15  popular in this country, especially for a very specific age

16  group.   And I just used graphics that sort of emulate that

17  look.

18  **Q.**    So what was the next step in your process of designing

19  this particular doll after the concept drawings?

20  **A.**    Well, I present my ideas to Paula Garcia and Isaac

21  Larian.   And when they like the idea, I then proceed to

22  building the 3D model.   And I mean by that constructing the

23  little fashions, the garments.   I work with pattern makers,

24  seamstresses.   I work with a face painter, and I give them

25  specific directions by giving them drawings and pictures on

7229

1   how the face should be to correspond with the fashions, and I

2   also work with a hair designer, and I give specific

3   directions on how the hair should look like.

4          So I buy the fabric.  I go out and shop.  I buy the

5   fabric.  I bring it to the sample makers, and we start

6   through a lengthy process.  They first make preliminary

7   samples for me.  And I look at it.  Say that doesn't look

8   quite right.  The sleeves are too long or the pants too big.

9   They make corrections and do it again, and we do this process

10  over and over again until finally we capture the exact look

11  that I was going for.

12  **Q.**   And when you're talking about developing a look of the

13  face paint, for example, for the doll, and this one

14  specifically, did you have any sources that you looked to for

15  what you wanted the face decoration to look like?

16  **A.**   Yes, a bunch of things.  One of them, as I mentioned,

17  Japanese animation.  So I even watch cartoons sometimes to

18  look at Japanese animation.  I look at Japanese magazines,

19  among other things.

20  **Q.**   So we've talked about the fashions, the face paint, and

21  the hair.  Do you also have a role in designing the

22  accessories that go with the doll?

23  **A.**   Yes, definitely.  And for this particular product, it's

24  not on the sketch, but I wanted them to have electronic pets.

25  So they would have dogs and cats, but they are more robots.

7230

1  And little things that we traditionally associate with Japan

2  as a very technological country.  So little laptops, digital

3  camera, cell phone.  You know, that sort of thing that's kind

4  of very Japanese.

5  Q.   As of the time that you designed this doll, the Tokyo

6  doll, had you been shown Carter Bryant's pitch book drawings

7  for Bratz?

8  A.   No.

9  Q.   I'm going to show you the actual doll.

10 A.   Okay.

11 Q.   This is Trial Exhibit 14018.  Can you tell us what we're

12 looking at here?

13 A.   Yes.  This is one of the finished products of Tokyo a

14 Go-Go.  This particular character is Sasha, I believe.  And

15 so she's wearing Tokyo fashions.  She's wearing a skirt over

16 pants.  She's wearing fur.  She has a little plush animal

17 with her.  She's got a robotic dog.  She comes with extra

18 shoes and extra outfits that are similar to what the Tokyo

19 teenagers wear.  And she has a suitcase.  So she can travel

20 to Tokyo.

21 Q.   That's definitely an important element.

22      So what I wanted to do is maybe flash to another

23 one of the pages back to your drawings.  I was noticing she

24 has this kind of fur thing going on on the top, but that

25 wasn't shown in one of the drawings that we saw before.

1          So if we flip, Aaron, back to 18920, am I right

2     that -- page 5?

3     **A.**    Yes.

4     **Q.**    So if we look at page 5, do you sometimes mix and match?

5     **A.**    Yes, I do.  In fact, this was a preliminary concept.  I

6     then decided that she should wear pants and the skirt should

7     be changed and be made an extra skirt instead.  So the skirt

8     she's wearing on the sketch is actually the one that's packed

9     out to the side of the doll over here.  And I gave her

10    something else to wear.  Sometimes -- certain things work

11    well in a two-dimensional drawing, but when you actually look

12    at it in 3D, it doesn't really work well.  So, you know,

13    drawings are great, but you know, it doesn't always translate

14    well.  So then I make my changes.

15    **Q.**    So what I'm going to ask Aaron to try to do is

16    Exhibit 302, Trial Exhibit 302, let's leave the one here on

17    the left, if you can, Aaron, the 14018, and then I was going

18    to ask you to look through now Mr. Bryant's pitch book

19    drawings that were presented to MGA in September and then I'm

20    going to ask you a few questions.

21         So if you can maybe put the pitch book on the

22    right-hand side -- if you just want to look at them, and

23    Aaron will flip through them for you.

24         Incidentally, before today or before about an hour

25    ago, had you ever seen the series of drawings that's on the

7232

1   right-hand side there, the Carter Bryant pitch book drawings?

2   **A.**   No.

3   **Q.**   So let me ask you, are the fashions that you created for

4   the Tokyo a Go-Go Bratz doll different than the fashions that

5   are depicted in Mr. Bryant's drawings?

6   **A.**   Yeah, they are very different.

7   **Q.**   And let me ask you the same question for the face

8   decoration.   The face decoration that you concepted for the

9   Bratz doll, is that the same as what's depicted in

10  Mr. Bryant's drawings?

11  **A.**   They are not.   They are different.   They are not the

12  same at all.

13  **Q.**   And the accessories that you designed and created here

14  for the Tokyo a Go-Go doll, well, I guess are there even

15  accessories that you saw other than I guess they were

16  knapsacks or purses?

17  **A.**   Typically as designers, we are encouraged to use

18  existing molds, existing tools, because the molding process

19  is very costly.   But in the case of this product, Tokyo a

20  Go-Go, I decided to do something very different.   So I

21  sculpted the original items.   We created new molds, even

22  though it was costly.   And I don't know if you're familiar

23  with the process of painting the doll in production, you

24  create masks to mask maybe the lips and then you paint the

25  eyes.

1          So there's a series of metal masks that go on the

2    plastic.  Because of the cost of these masks, we are actually

3    encouraged to use the same mask, but in the case of Tokyo a

4    Go-Go, I went radically different.  I used new masks to make

5    it different than what had been done in the past, in the

6    previous seasons.

7    **Q.**   All right.  I want to do one other doll with you before

8    I let you go.  If you could look down at the drawings that

9    are Trial Exhibit 18291 and tell us what that is?

10   **A.**   It's another original concept sketch item done for Bratz

11   when I came in 2003.  It's called Nighty-Nite.  But the

12   working name back then was Bratz Intimates.

13          MS. AGUIAR:  Your Honor, I move 18921.

14          MR. PRICE:  No objection.

15          THE COURT:  It's admitted.  You may publish.

16          **(Exhibit 18921 received.)**

17          MS. AGUIAR:  Aaron, if we could look at pages 4 and

18   6.

19   **Q.**   Can you tell us what we're looking at here?

20   **A.**   Yes, that's actually Cloe and Yasmin, and they are my

21   original concept sketches for a sleep wear set.  We had

22   had -- we had a Bratz segment in the past where the theme was

23   about sleep.  But we wanted to do another sleep theme, but

24   different from the previous one.  And so I did something a

25   little bit more grown up.

1          The previous one was about bunny slippers and bath

2    robes.   And this one was a little bit more like -- like a

3    teenager who is trying to grow up.   So it's, you know, like

4    little camisoles and pajamas that are cargo pants.   A little

5    bit younger ad trendier.

6    **Q.**   So what happened in your process with creating -- did

7    you say that the final name of the doll was --

8    **A.**    Nighty-Nite.

9    **Q.**    Nighty-Nite.   What was the next step in your process?

10   **A.**    It's the same thing.   At the time that I had come to

11   MGA, the existing face paints were not exactly ones that I

12   thought were appropriate to use.   And so I had brought in my

13   own painter.   And I had asked Paula's permission if I could

14   use my own face painter, and she allowed me, and ultimately

15   they actually hired the painter, and she now works for MGA.

16   But I decided to make the face paint a little bit more

17   delicate, a lot less made up.

18          You know, smaller eye liners, a little bit more

19   expressive, sleepy looking.   And then for the fashions, I

20   actually went out and shopped for fabric, and the difficulty

21   is in that scale of a doll, sometimes a regular print doesn't

22   really work.   It's too big.   You only get two flowers on one

23   top.   So I actually had to look for prints that would be

24   appropriate --

25          MR. PRICE:   Objection.   At this point it's beyond

1    the scope of the question.

2            THE COURT:  It is.

3            MS. AGUIAR:  I can direct a specific question.

4    **Q.**  With regard to the fashions in particular, what was the

5    process you undertook?

6    **A.**  I built a 3D.  I worked with the seamstress.  I buy the

7    fabric.  We start with pattern making.  I correct the

8    samples.  We do it over and over again until it's done right.

9    And the same is true for face paint and hair.

10   **Q.**  When you were concepting this doll and drawing the

11   fashions and developing the other aspects of the doll, were

12   you looking at any other company's product as a specific

13   reference?

14   **A.**  No.  I was looking at our own products as a reference of

15   departure.

16   **Q.**  Let me ask you something.  There's been some testimony

17   today about companies sometimes looking to other companies'

18   products, looking to their competition.  Is that consistent

19   with your experience at MGA and at Mattel?

20   **A.**  Only as a process of research.

21   **Q.**  Explain what you mean by that.

22   **A.**  Um, when we're looking to put out a certain doll, we

23   are --

24           MR. PRICE:  Object to lack of foundation for all of

25   MGA.

1          THE COURT:  Further foundation.

2          MS. AGUIAR:  I think I said is it consistent with

3    his experience.

4          THE COURT:  Let's lay a foundation, Counsel.

5    **Q.**   BY MS. AGUIAR:  You were a doll designer at Mattel;

6    correct?

7    **A.**   I was, yes.

8    **Q.**   You were.  You were a doll designer at Mattel, and you

9    have been a doll designer at MGA; correct?

10   **A.**   Yes.

11   **Q.**   And you testified that looking at competitors' products

12   is a -- you said is something that you are familiar with,

13   something done at both of those companies; correct?

14   **A.**   Correct.

15         MR. PRICE:  Objection.  Irrelevant.

16         THE COURT:  Sustained.

17         MR. PRICE:  Move to strike.

18         THE COURT:  Let's get back to the question and the

19   foundation for that question, Counsel.

20         MS. AGUIAR:  If we need to go to sidebar, can I get

21   clarification on the relevance part of that question?

22         THE COURT:  Sure.

23         **(SIDEBAR CONFERENCE HELD.)**

24         THE COURT:  Counsel.

25         MR. PRICE:  The relevance part is that what Mattel

```
 1    does isn't relevant.  What MGA did is relevant because they
 2    are saying unique, it should go to apportionment.
 3              Now, we've already told the jury there's nothing
 4    wrong with it.  The question is is what MGA is doing unique.
 5    So the only relevant question is at MGA what was done.  My
 6    objection on foundation is that he can't speak for all of
 7    MGA.
 8              THE COURT:  I thought it was further than that.  I
 9    thought you were saying that all this witness could testify
10    to is what his experience was.
11              MR. PRICE:  Well, absolutely.  But he also worked
12    at Mattel, which is why she's asking about Mattel.
13              THE COURT:  Where this started, Counsel, is you
14    asked him for all of MGA.
15              MS. AGUIAR:  I thought -- I'll correct that, your
16    Honor.  I thought I then said his particular experience based
17    on what he did.  But I will clarify that.
18              THE COURT:  Based on his experience, what did all
19    of MGA do?
20              MS. AGUIAR:  No, just what he did.
21              THE COURT:  Okay.  That's particular aspect.
22              MS. AGUIAR:  Now, with regard to the Mattel
23    argument, that I can't understand.  Because Mr. Price stood
24    before you an hour ago and said that it's relevant that this
25    is something that companies do.  That they -- the competition
```

7238

1    looks at each other's products, and why do they do that, and

2    he claims there's nothing wrong with it, then it should be

3    relevant.   This particular witness has specific experience

4    having done that at Mattel.

5            The fact that MGA does this, this is a fact that

6    the jury should know through direct -- his direct experience

7    at Mattel specifically having done this particular thing,

8    namely, looking at competitors' products --

9            THE COURT:  But there's no indication that anything

10   is improper here.

11           MS. AGUIAR:  Respectfully, your Honor --

12           THE COURT:  I'm sorry?  I'll give an instruction to

13   the jury, if you want, on that.  I think it was made clear.

14   You asked a series of questions of the witness, of

15   Ms. Garcia.  Was this public information.  There's been no

16   allegation that there's anything improper here.  And I'll

17   give an instruction, if you want, on that.

18           MS. AGUIAR:  I think the implication that Mattel is

19   trying to draw here is fairly clear that this was not

20   something that was okay to do, that we were looking at their

21   products to copy their ideas.

22           THE COURT:  But if that's true, then what you're

23   trying to do is throw that back on Mattel instead of

24   clarifying the record and making it clear to the jury.  I'll

25   give an instruction, but I'm not going to go down a road if

7239

1   you believe, as you're telling me, that somehow -- which I

2   don't see on this record, that there's an allegation that MGA

3   has done something improper.

4          The way to cure that is by telling the jury that

5   they did not do anything improper, not to turn it around and

6   say well, Mattel is doing it too.

7          MS. AGUIAR:   Again, there was no value judgment in

8   the evidence.   I was trying to --

9          THE COURT:   I agree.   There's no value judgment in

10  the evidence.   I agree with that last statement.

11         Mr. Nolan.

12         MR. NOLAN:   Quickly.   I guess my point is that it's

13  one thing for Mattel to say that there's nothing wrong and

14  they are not contending that there's anything wrong, and then

15  they ask a series of questions to Mr. Larian or to Paula

16  Garcia.   And it's something that the Court could instruct

17  saying that there's no allegation of any wrongdoing here.

18  It's another thing, though, for this jury to understand an

19  industry practice without turning this into 403.   I mean,

20  just to show --

21         THE COURT:   It's relevant, and that's why I started

22  this whole thing by asking counsel what was it relevant to.

23  It's relevant for Mattel to introduce evidence that MGA did

24  not originate or come up with this unique particularized

25  expression of whatever we're talking about, the packaging,

1   the themes, or what have you.  It's relevant to the issue of

2   apportionment damages.  It's not relevant just to have

3   testimony about industry practices in general.

4            MR. NOLAN:  Right.

5            THE COURT:  If there is a negative inference -- I

6   agree with Ms. Aguiar, that there's no value suggestion in

7   that testimony.  If you believe there is, I'm willing to

8   clear it up with an instruction.

9            MS. AGUIAR:  Since I said that last, can I?  I'm

10  sorry.  We're the ones being accused here, your Honor, of

11  everything in this phase.  So frankly, I think that when

12  Mattel brings out this evidence, after having asked an hour's

13  worth of questions about stealing information and stealing

14  confidential stuff and then asks questions and shows

15  documents about us having looked at their products, when they

16  do that, your Honor, because of the nature of where we are

17  and that we're the defendants and what they have alleged in

18  their opening and how they have tried this 1-B case, I think

19  there absolutely is when that evidence comes out.  So if it's

20  an instruction --

21           THE COURT:  That's why I offered previously and I

22  offer again to give a clarifying instruction.

23           MR. NOLAN:  What would the Court's instruction be?

24           THE COURT:  That there was nothing illegal,

25  unlawful, unethical about copying elements, designs, themes,

7241

1    that are out in noncopyrighted in the market.  And we can

2    work on some language, but that's the instruction I offered

3    to give earlier, and I'm willing to give it.

4          I would ask counsel to submit some joint language

5    if you can.  If you can't, do what we've done before, and

6    I'll give the instruction.  That's the way to cure a problem

7    you've identified.  It's not to say you, too, and then leave

8    it hanging out there.  Because all that does is ratchet up

9    the concern that somehow there's something wrong about this,

10   and there's nothing wrong about it.  I don't think there's

11   any suggestion that any of this, Mr. Price in his

12   questioning, suggests that they stole the idea from Mattel or

13   anything of that nature.  If there's a concern, though, I'll

14   address it.

15         MR. NOLAN:  Your Honor, just while we're here, and

16   this is the point that I wanted to make, is that perhaps with

17   this witness, it's not particularly relevant, but another

18   witness, when we're going to go to Mr. Kilpin, for instance,

19   on the question of perception of the importance of Bratz

20   branding and packaging, the observations that have been made,

21   the foundation is that they did competitive shopping of Bratz

22   products.

23         We're not going to allege that there's anything

24   wrong with that, but that's going to be the foundation as to

25   how they knew to make the observations and do the research

7242

1     that they were doing.

2          So you know, in that sense I think I'm going to

3     make a proffer that I think in that limited sense,

4     competitive shopping that Mattel engaged in as the foundation

5     for what they were claiming or asserting with respect to the

6     importance of certain attributes of the Bratz product is

7     going to be --

8          THE COURT:  I'm sorry.  I'm not following this.

9     You're talking about competitive shopping by Mattel is

10    relevant to what?

11         MR. NOLAN:  They go out and buy a Bratz product.

12    They buy all the Bratz products.  They bring it into the

13    design center.

14         THE COURT:  I assume MGA does the same thing.

15         MR. NOLAN:  And Hasbro probably does, too.

16         THE COURT:  So what is this relevant to?

17         MR. NOLAN:  It's the basis upon which they then

18    make assessments.

19         THE COURT:  "They" being?

20         MR. NOLAN:  Mattel.

21         THE COURT:  Mattel makes assessments.

22         MR. NOLAN:  With respect to the factors that are

23    making Bratz successful.  Whether or not it's themes,

24    packaging.  It's our apportionment.  It goes back to my

25    argument earlier that if Mattel --

```
 1          THE COURT:  Wait, wait.  Okay.  I'm going to have
 2   to see this in context.  I don't understand where this is
 3   going.  I don't see how -- this case is not about what Mattel
 4   did.  This phase of the case is not about what Mattel did to
 5   MGA.  This phase is about what MGA did to Mattel.  You are on
 6   the defense side.  They are on the plaintiff's side.  I know
 7   that kind of creates a certain landscape.
 8          MR. NOLAN:  Let me come back to this when we're not
 9   on our time during a break.
10          MR. PRICE:  Your Honor, before, you said you would
11   give an instruction depending upon how I handled it.  And I
12   actually asked Ms. Garcia when I had the documents, I said
13   there's nothing wrong with this.  You're dealing with public
14   information, and you're competing.
15          THE COURT:  I thought it was handled well, and I
16   thought her responses to it made it clear that there was
17   nothing wrong.  I don't see the allegation.  But if there's
18   some confusion at the end of the day, I'll consider an
19   instruction.  I'm not going to make a big deal out of it.  I
20   don't see anything nefarious about this.  You talk about
21   stealing.  Stealing the Bratz drawings?  That's what the jury
22   found in Phase 1-A.  You are painting with a broad brush on
23   this.
24          MS. AGUIAR:  Well, frankly, I can pull out the
25   sections from the opening statement and from the questioning
```

```
 1    of our witnesses, they don't limit it just to the drawings.
 2    I wish I had a dollar at this point for every time Mr. Quinn
 3    or Mr. Price said, and when you had Mattel's confidential
 4    information and when you stole the confidential information.
 5            And frankly, I am not trying to paint with a broad
 6    brush.  I know that that is not an appropriate thing to do.
 7    I'm going by the questions that they have asked and the
 8    allegations that they have made that they are putting in
 9    their case in chief.
10            THE COURT:  That reference, and I understand
11    it's -- I mean, it's what former prosecutors do.  I'm sure,
12    Mr. Nolan, you did it yourself when you were a U.S. Attorney.
13            MR. NOLAN:  Never.
14            THE COURT:  Of course not.
15            MR. NOLAN:  I think this goes back to an earlier
16    issue that we raised with the Court with respect to the broad
17    scope of describing this confidential information and how
18    broad it is, and we talked about the effectiveness, and
19    Mr. Price almost wore that out.  And our only problem is the
20    confusion issue here, as Ms. Aguiar points out.  If there's
21    no issue here.
22            THE COURT:  The jury knows what they found and what
23    they didn't find.  At the end of the day, we all do it.  And
24    I'm probably more guilty than anybody.  We all put more stock
25    in what we say than what the evidence says, and we should be
```

 1   mindful that the jury understands what they found and what

 2   they didn't find.  And I think I indicated previously that

 3   there's a point where that kind of language becomes

 4   unproductive if the jury thinks it's being over used.

 5           The jury knows whether Mr. Price is or is not

 6   accurately conveying what they found or whether you are

 7   accurately conveying what they found.  And I trust the jury

 8   on this.  My offer regarding the instruction stands.  I will

 9   consider what you submit.  If it's appropriate, I'll give it;

10   if I don't think it's appropriate, I won't give it, and we'll

11   move on.

12           MS. AGUIAR:  Fair enough.

13           **(CONCLUSION OF SIDEBAR CONFERENCE.)**

14           THE COURT:  Counsel, you may proceed.

15           MS. AGUIAR:  Thank you.

16   Q.   I'm trying to get my thought process back.

17           Aaron, can we have back up on the screen, then, the

18   two images that we were looking at?  And I may have asked you

19   this, and I apologize, because I got turned around.

20           In designing this doll, were you looking

21   specifically at another company's product in referencing it?

22   A.   No.

23   Q.   And were you referencing Mr. Bryant's pitch book

24   drawings from September of 2000 when you designed this doll?

25   A.   No.

7246

1    **Q.**   I'm going to ask Aaron to do the same thing he did

2    before.   Oh, actually, you know what?   Sorry.   First things

3    first.   I got to show you the actual doll.   I'm going to

4    bring up to you Trial Exhibit 18665.

5             Can you tell us what we're look at here?

6    **A.**   This is the final product of a concept I had done for

7    MGA when I worked for them in 2003.   Or when I first came to

8    work for them in 2003.   It's called Nighty-Nite.   And this is

9    one of the characters.   I believe this is Fianna.   This is

10   one of the characters.

11            She's wearing a pajama and a camisole, and she

12   comes with an extra sleep outfit and bathrobe and sleep

13   accessories like powder puff, hair brush, an extra pillow.

14   **Q.**   Did you design the fashions that we're looking at for

15   the Nighty-Nite doll?

16   **A.**   I designed the concept.   So that would include the

17   fashions, the face paint, the hair, the accessories.   And

18   some input and direction on -- or suggestions on packaging.

19   **Q.**   And we've talked about how you designed the Tokyo a

20   Go-Go doll and designed the Nighty-Nite doll.   When you

21   designed that doll, is it correct that you're working with a

22   sculpt that is the core Bratz fashion doll sculpt?

23   **A.**   Correct.

24   **Q.**   And what is your intent in creating the different

25   fashions and the different accessories for each one of those

7247

1    blank sculpts?

2              MR. PRICE:  Object.  It's irrelevant.

3              THE COURT:  Intention.  Yes, rephrase, Counsel.

4    Q.   BY MS. AGUIAR:  When you design different fashions,

5    different face paint, different accessories to create a doll,

6    does that result in a different look?

7    A.   Yes, very much so.

8    Q.   And let me ask you something, too.  When you say that --

9    you mentioned that you are a doll designer.

10   A.   Yes.

11   Q.   And let me go back to that for a second.  Do you

12   actually design the actual three dimensional sculpt?

13   A.   Occasionally.

14   Q.   But is the majority of your responsibility at MGA to

15   design the fashions, the face paint, the accessories, to help

16   with the packaging?

17   A.   Yes.

18   Q.   Okay.  In other words, are you a sculptor?

19   A.   I'm not a sculptor.

20   Q.   And are you a person who works in engineering or

21   manufacturing to actually make the sculpt?

22   A.   No.

23   Q.   Okay.  Thanks.  I just wanted to clarify that.

24             So if we could, Aaron, put up Trial Exhibit 302

25   again.  I think having now seen it once, we won't flip

7248

1    through all of the pages again, but if we could just put up

2    the first page of Exhibit 302.

3              Are the fashions that you designed for the

4    Nighty-Nite doll different from the fashions in Mr. Bryant's

5    drawings?

6    **A.**    Very much so.

7    **Q.**    And is the face paint that you designed for the

8    Nighty-Nite doll different from the face paint in

9    Mr. Bryant's drawings?

10             MR. PRICE:  Object as ambiguous.

11             THE COURT:  Rephrase, Counsel.

12   **Q.**    BY MS. AGUIAR:  Is the face paint that you designed

13   different from the face paint in Trial Exhibit -- face paint

14   depicted on the dolls in Trial Exhibit 302?

15   **A.**    Yes, very much so.

16   **Q.**    And were any of the specific accessories that you

17   designed and developed for the Nighty-Nite doll taken from

18   Mr. Bryant's concept drawings?

19   **A.**    I have never seen the drawing on the right until about

20   an hour ago.  So I actually designed my own plastic parts for

21   the product.

22   **Q.**    Just a couple more questions.  You have mentioned that

23   you designed a number of dolls over the years at MGA; is that

24   correct?

25   **A.**    Yes.

1    **Q.**  Having now looked at the -- Mr. Bryant's pitch book

2    drawings, are any of the fashions that you have designed for

3    the different lines of Bratz dolls the same fashions that are

4    depicted in Mr. Bryant's drawings?

5    **A.**  No.

6    **Q.**  And in any of the face paint on any of the Bratz fashion

7    dolls that you have designed, were you referring to

8    Mr. Bryant's drawings in designing that face paint?

9    **A.**  No.

10   **Q.**  And, for example, you are setting down to concept what

11   you want the face decoration to look like, that what you want

12   the eye, let's say, on the Nighty-Nite doll to look like.

13   Were you looking at Mr. Bryant's drawings when you did that?

14   **A.**  No.

15   **Q.**  Did you have a specific idea in your mind of the

16   particular eye that you wanted to express in the Nighty-Nite

17   doll?

18   **A.**  Yes, I did.

19   **Q.**  And how would you describe what that eye was or the look

20   of the eye that you were going for in the Nighty-Nite doll?

21   **A.**  I wanted the eyes to be more expressive, to look a

22   little bit sleepier, and I also didn't want a lot of makeup

23   on the eye because she was going to bed.  And I wanted it

24   basically clean and youthful and just sort of healthy

25   looking.  That is what I wanted.

7250

1   Q.   And for any of the accessories that you've designed for

2   any of the Bratz fashion dolls, did you reference

3   Mr. Bryant's concept drawings in designing those accessories?

4   A.   No.

5   Q.   And these same questions that I've asked you about the

6   fashions, the face paint, and the accessories, versus

7   Mr. Bryant's drawings, would that be true for all of the

8   dolls, the Bratz fashion dolls that you have designed for

9   MGA?

10  A.   Yes.

11          MS. AGUIAR:   Your Honor, I don't have anything

12  further.

13          THE COURT:   Very well.

14          MR. PRICE:   Your Honor, would this be a good time

15  for break?

16          THE COURT:   Oh, yes, actually it is.   Thank you,

17  Counsel.

18          All rise for the jury.

19          (Recess taken.)

20          THE COURT:   Okay.   We're on the record outside the

21  presence of the jury.   And, Mr. Nolan, you have something you

22  wanted to take up.   I want the record to clearly reflect that

23  when Mr. Nolan gave the answer "never" at sidebar, he had an

24  enormous smile on his face.

25          You may proceed, Counsel.

1          MR. NOLAN:  It's only because, rest his soul,

2    Judge Byrne is not here anymore.  He would disagree with me.

3          A couple of practical problems that will add to the

4    efficiency of this afternoon.  And we're off the clock.  So

5    it's helpful.

6          First of all, we have our branding expert tomorrow

7    morning.  He has to testify because of a scheduling conflict.

8    And so one of the building blocks, if you would, that we

9    wanted to put in that we attempted to stipulate, but they

10   wouldn't agree to it.

11         So we asked Heather Polk, P-O-L-K, be on our

12   witness list and be available to put in a series of documents

13   simply almost as a custodian, if you would, because she's in

14   a department known as the worldwide consumer research

15   department at Mattel.  And these are internal consumer

16   research reports maintained by Mattel in the ordinary course

17   of business.  And they track attributes of Bratz and, you

18   know, make statistical analysis and track and whatever.

19   Mr. Quinn advised me that she's not here.

20         Now, I'm not casting any aspersions on why she's

21   not here.  That's not where I'm going with this, your Honor,

22   but I needed to raise it with the Court.  One of the thoughts

23   is to talk to them about a potential stipulation to try to

24   get the documents in.  I could raise a potential issue that

25   they are going to have, and that is that these internal

1   research reports, your Honor, they come out on a seasonal

2   basis.  We have about 12 of them.  And what they do is they

3   measure through their own consumer research various scores

4   that they attribute to various products.  Some internal, some

5   external.  But certainly Bratz.  They track Bratz.  And we

6   would attempt to offer them into evidence if Ms. Polk was

7   here from the department.

8          I don't know whether or not there is an objection

9   to the use of these documents.  It would be easier, and then

10  we wouldn't have to call the witness.  But it's a predicament

11  that we have now.  Because we wanted to make reference to

12  them with the expert.  And she was --

13          THE COURT:  Tomorrow morning.

14          MR. NOLAN:  Yes.

15          MR. ZELLER:  Well, your Honor, last night, 8:38

16  P.M., and I can provide the Court with my Blackberry with my

17  e-mail on it providing me with the witness list, the very

18  thing I was complaining about earlier today, or at least

19  raising.  The list I was given was Garcia, Kilpin.

20          THE COURT:  Wait a second.  I want to get this

21  pinned down.  Because we're now down to -- Mattel is down to

22  two hours.  MGA is down to less than six hours.  We're down

23  to less an eight hours to go here.  So we should know how

24  this all -- we have tomorrow morning and Friday.  So

25  basically we're just going to play out tomorrow morning and

1    Friday.  I'd like to get a sense of exactly the lineup at

2    this point.  We're at the very end of the trial.  So everyone

3    should know exactly what's happening at this point.

4                MR. ZELLER:  I actually have a printout now of the

5    e-mail.

6                THE COURT:  Why don't you provide that to the

7    Court.

8                MR. ZELLER:  And this was supposed to be in the

9    order in which people were going to be called.  As the Court

10   can see from this, I mean, there are three more witnesses who

11   are in this order who have not even been called yet:

12   Mr. Eckert, Mr. Kilpin, and Aileen Storer.

13               So we did not -- we sent Ms. Polk home.  She had

14   been waiting, just as Mr. Kilpin and Mr. Eckert had been

15   waiting.  We sent her home for the day.  She can be here

16   tomorrow morning.  But that's kind of the -- where we are on

17   this situation.  And we were --

18               THE COURT:  So you sent Ms. Polk home.

19               MR. ZELLER:  I'm sorry?

20               THE COURT:  You sent Ms. Polk home?

21               MR. ZELLER:  In Los Angeles.

22               THE COURT:  And, Mr. Nolan, this is for Mr. Vilppu?

23               MR. NOLAN:  For Joachimsthaler.

24               THE COURT:  And he has something tomorrow morning?

25               MR. NOLAN:  He's going to testify tomorrow morning.

7254

```
 1   He can't be here on Friday.  That's why we're going to have

 2   him testify tomorrow.

 3            THE COURT:  All right.  So we could have Polk go

 4   first tomorrow morning.  And how long is Mr. Joachimsthaler

 5   going to go?

 6            MR. NOLAN:  Possibly an hour, hour and a half, your

 7   Honor.

 8            THE COURT:  And Ms. Polk will take how long?

 9            MR. NOLAN:  It shouldn't take very long.  These are

10   just documents.

11            THE COURT:  Why don't we take care of that tomorrow

12   morning?

13            MR. NOLAN:  Well, your Honor --

14            THE COURT:  You have about an hour and half left.

15   Who are you calling this afternoon?

16            MR. NOLAN:  I want to check with respect to a

17   ruling that you made on Mr. Farr, which I think eliminates

18   the need to call Mr. Eckert.  I just need to confirm that,

19   and it would be Mr. Kilpin.  But I wanted to raise with the

20   Court a couple of issues with respect to Mr. Kilpin ahead of

21   time so we had some guidance.  And the next in order, your

22   Honor, would be -- we want to try to put Mr. Larian on --

23            THE COURT:  Not Ms. Storer?

24            MR. NOLAN:  Based on the testimony that came in

25   today, we're not going to put her on.
```

```
 1            THE COURT:  So Storer is gone.  Eckert, you say,
 2   Mr. Eckert is not going to be called, depending on your
 3   assessment?
 4            MR. NOLAN:  I've just got to confirm that.
 5            THE COURT:  And Mr. Kilpin is going to go for a
 6   while?
 7            MR. NOLAN:  He could, your Honor.
 8            THE COURT:  So if we get through Mr. Kilpin today,
 9   pick up tomorrow morning Joachimsthaler.  What about Kerner
10   and Mr. Larian?
11            MR. NOLAN:  We need Mr. Kerner for financial
12   documents related to the expert, Mr. Meyer, who will testify
13   on Friday.
14            THE COURT:  Okay.
15            MR. NOLAN:  And, your Honor, on Mr. Kerner, if I
16   could raise one point.  You know, there is a dispute between
17   the way the experts approach how you should make a comparison
18   between companies.  Their expert --
19            THE COURT:  I'm familiar with that.
20            MR. NOLAN:  We contend it should be addressed --
21   the profitability comparison should be made to rather than
22   Mattel as a whole, and all of its product line should be
23   limited to a particular fashion doll line.  So the financial
24   documents that we would be putting in, your Honor, are the
25   profitability numbers with respect to doll lines within
```

7256

1  Mattel.  But I would submit it's not in any way a violation

2  of the motion in limine because it goes to a core issue on

3  damages.

4           THE COURT:  We'll take that up when we get to

5  Mr. Kerner.

6           Mr. Larian -- how long do you anticipate calling

7  him for?

8           MR. NOLAN:  Probably a half hour.

9           THE COURT:  Okay.  And then you have Mr. Vilppu on

10 Friday?

11          MR. NOLAN:  Yes, your Honor.

12          THE COURT:  And we'll have that hearing early

13 Friday morning.  And how long do you anticipate for

14 Mr. Vilppu?

15          MR. NOLAN:  My best estimate is about a half hour,

16 your Honor.

17          THE COURT:  Mr. Arons?

18          MR. NOLAN:  And Mr. -- it's Ms. Arons.

19          THE COURT:  Ms. Arons.  Okay.  And I believe that

20 would be a short witness.

21          MR. NOLAN:  And then we have a survey expert and

22 Mr. Meyer.  And both of those would be longer.  So I think

23 that we're talking about -- I think last night I was

24 estimating for the expert testimony somewhere in the range of

25 about three hours total.

1      THE COURT:  Okay.

2      MR. NOLAN:  And we have some videos to play.

3      THE COURT:  All right.  Let's have Ms. Polk here

4  first thing tomorrow morning.  She's not here.  She's in

5  Los Angeles.  Obviously, she can't testify.  Let's have her

6  here first thing tomorrow morning.  And you'll have her go

7  before Mr. Joachimsthaler, and I'm going to release the jury

8  at noon tomorrow.  And then we'll have all day Friday to wrap

9  up.

10      MR. NOLAN:  Right.  And may I turn to Mr. Kilpin

11  for a moment?

12      THE COURT:  That's who you're going to be calling

13  next?

14      MR. NOLAN:  But Mr. Price isn't finished with this

15  witness.  But rather than going to sidebar --

16      THE COURT:  How much longer do you have with this

17  witness?

18      MR. PRICE:  I haven't started yet.  But I've got to

19  make it short.

20      THE COURT:  Very well.  Yeah.  I understand.

21      MR. NOLAN:  Why don't we raise the issue at

22  sidebar, then, and let's just get on with the evidence.

23      THE COURT:  No, we can do this now.  What is the

24  issue with respect to Mr. --

25      MR. NOLAN:  Your Honor, I just was a little bit

7258

1   confused by our last sidebar, and I'm sure it's just me,

2   because earlier in the day I thought that we had established

3   that within reason, being able to look to Mattel's comments

4   and observations with respect to Bratz would be relevant with

5   respect to some of the components of apportionment would be

6   relevant.   And what Mr. Kilpin and his department --

7          THE COURT:   What I ruled -- I'm not saying that I'm

8   not going to get there, but let's be careful about what I

9   ruled earlier.   You're talking about my decision on Farr?

10          MR. NOLAN:   My understanding about what the issue

11   would be that we would need to address when we got to

12   Mr. Kilpin, that his testimony would be relevant to the

13   apportionment issues.

14          THE COURT:   Yes.

15          MR. NOLAN:   And that Mattel's statements, if you

16   would, or beliefs or observations with respect to certain of

17   those components of apportionment would be relevant.

18          THE COURT:   Yes, depending on what the statements

19   are, right.

20          MR. NOLAN:   And what I was going to propose with

21   Mr. Kilpin, it's almost like going to Hong Kong for a moment,

22   if you would, and that is that what I would propose is that

23   we would try to be careful in what documents we put up and

24   that only those pages of a particular document that we

25   believe has a relevant statement with respect to Bratz would

 1   come in, and then we would later redact and put into

 2   evidence.   And I wanted to give the Court a heads up.

 3           THE COURT:   Right.   I did that earlier with the

 4   Farr deposition because there's really no way of doing the

 5   videotaped deposition which has language quoted from a

 6   document without having that document language quoted.

 7           If the document itself has no relevance other than

 8   it has introductory language, then I'm not likely to allow

 9   the document in.   If you can ask these questions without

10   reference to the documents that are only coming in to provide

11   a context or a basis to ask the question, kind of your good

12   faith basis to explore the area, that's not going to be a

13   sufficient basis to get the documents in.   I would --

14           MR. NOLAN:   I believe I understand that.

15           THE COURT:   I'm thinking in the abstract of the

16   Farr deposition.   All of those questions that were asked of

17   Mr. Farr could have been asked without a single reference to

18   those 10-K documents or anything else.   And they probably

19   should have been.   But because we're dealing with a video

20   deposition, there's nothing I can do.   Here it's live

21   testimony.   So I'm much less likely to allow documents in

22   that are not relevant.

23           MR. NOLAN:   Right.   Here is the proffer I'll make.

24   Mr. Kilpin is the author of marketing reports within Mattel

25   and that at various times, one purpose for offering this

1    evidence is to show that Mattel at some point in time was

2    recognizing that their brand was in a state of decline

3    similar to what Mr. Eckert was --

4           THE COURT:  It's not coming in.  I can tell you

5    that right now.  If that's what the document says, it's not

6    coming in.

7           MR. NOLAN:  Okay.  Let me just round it off --

8           THE COURT:  What I'm trying to say, it's not

9    relevant what's going on over at Mattel.  Certainly a Mattel

10   employee who is on record or a senior Mattel employee who is

11   on record saying that themes or branding or packaging is

12   important cannot now hide from that statement.  You have a

13   right to bring that out.

14          But in doing so, that doesn't give you a right to

15   bring out documents that go and comment on the state or the

16   condition of Mattel.  That's where we cross that 403 boundary

17   into something that is both confusing and prejudicial.

18          MR. NOLAN:  I understand that.  Your Honor, just so

19   I can make this record and make it in two sentences, I think.

20   One is that we believe that those kinds of comments, and the

21   Court is well aware of those documents because we've referred

22   to them before, are relevant to the weight, if you would, to

23   be given to packaging and promotional efforts and marketing

24   and all of that when Mattel was faced with difficulties in

25   the market concerning their sales.

```
 1              It shows the importance of doing the, what I would
 2   describe the apportionment side of the analysis.  And for
 3   instance, Mr. Kilpin, and I took his deposition, I believe
 4   his testimony would be that at no time while they were trying
 5   to address the declining market share did they ever make any
 6   changes in the physical appearance of the doll or the face.
 7              So my proffer would be that in addressing the
 8   issues that they were faced, Mattel did not make any changes
 9   to the facial expressions of either Barbie or My Scene or
10   Flavas.
11              THE COURT:  Counsel, I understand your position.
12   You've been urging this on the Court for months now and have
13   made every effort to get this evidence in.  The importance of
14   what you describe as the apportionment side of the analysis
15   can be completely explored with Mr. Kilpin and any number of
16   other witnesses without getting into the underlying Mattel is
17   in crisis.  Mattel is on fire.  Barbie is on fire.  Barbie is
18   a disaster.
19              All of that stuff is irrelevant and prejudicial.
20   You can get into this fully and have them explain what's
21   important and what's not important, why they think it's
22   important, all of that, how it affects the bottom line, how
23   it affects sales, how it affects marketability.  You can get
24   into all of that without getting into what you've been trying
25   to get in since your opening statement in Phase 1-A.
```

1          And I can't explain how that's not going to come in

2    any more than I have.

3          MR. NOLAN:  No, but this is the last --

4          THE COURT:  This is your last effort.  Okay.

5          MR. NOLAN:  I mean, I just wanted to make

6    absolutely clear.

7          THE COURT:  It's not coming in still.

8          MR. NOLAN:  I understand.  But he would also be

9    available -- I mean, he'd be able to testify to the

10   observations that he made with respect to the success of the

11   Bratz.

12         THE COURT:  I'm not really sure what those are, but

13   I'll consider those in context.

14         MR. NOLAN:  Would the Court entertain possibly a

15   redaction of everything out of the marketing reports,

16   everything out of the marketing reports except what is

17   referenced to Bratz and only Bratz?

18         THE COURT:  I'll have to take a look at that,

19   Counsel, but I think it would be the easier thing to do.

20         Mr. Zeller?

21         MR. ZELLER:  Briefly on the issue of Mr. Kilpin.

22   One thing that was said at sidebar is getting into all of

23   these other things about competitive shopping and that sort

24   of thing, that's obviously from our perspective, that's just

25   403 material.  If they want to ask the kinds of questions

1    that I think the Court has already made clear can be asked, I

2    mean, there's no need to go into that sort of thing.  And it

3    just leads us right back to the same problem of what we were

4    discussing at sidebar.  It's no answer to any of this.

5              THE COURT:  Well, again, it's something that the

6    Court is going to balance.  Part of the relevancy of this

7    might be in terms of foundation.  So the more you stipulate

8    to in terms of foundation, or the less you object to in terms

9    of foundation, the less likely we're going to have to go down

10   this particular road.

11             But you can't have your cake and eat it too, as

12   Mr. Nolan has stated before, and object on foundation,

13   because foundation could rip the covers off of this

14   basically, and then we'd have to get into, well, how do you

15   know this?  Well, we've had experience with Bratz and, you

16   know, et cetera, et cetera.

17             I'm trying to balance these things because I do see

18   the prejudice.  I do see the confusing nature of getting into

19   too much of this statement.  I believe these witnesses are

20   very competent based on precisely their experience with

21   Barbie, based on their experience with all of these other

22   things, to testify on these issues of apportionment which are

23   properly before the jury.  So that's the balancing.  Make

24   your objections, no speaking objections, I will rule on them,

25   and we will move forward.

             1          MR. ZELLER:  And what I would say, your Honor, is

             2    that Mr. Nolan isn't quite correct when he says that somehow

             3    that's based on, you know, looking at the products.  And even

             4    if it is, that I do wonder to what degree there is any basis

             5    for introducing such evidence, even with an experienced

             6    business person.  Saying well, I looked at a product, and I

             7    thought that it was successful for X, Y, and Z.  That is, I

             8    think, not only 403, it is itself a foundational problem.

             9          So I mean the issue wouldn't be so much, gee, you

            10    know, you looked at Bratz products.  I mean, that presumably

            11    is going to be a question, presumably would be something that

            12    as part of the foundation may or may not be discussed.  But I

            13    somewhat -- part of my concern is that if that's really the

            14    proffer for foundation, I'm highly skeptical that that is

            15    really admissible evidence.

            16          THE COURT:  No, the foundation goes well beyond

            17    that, Mr. Zeller.  It gets into precisely these issues that

            18    the Court has found is prejudicial to bring in.  But if we

            19    need to have the jury educated on precisely how Mr. Kilpin

            20    arrived at his conclusions, I think that would necessarily

            21    involve him getting into issues of the various downturns in

            22    Mattel and the problems that they have had.  And I think it

            23    should be avoided for the 403 grounds, but the conclusion of

            24    that is not to keep it out entirely because I think that

            25    would be unfair to MGA.

```
 1              MR. ZELLER:  And the other aspect --

 2              THE COURT:  You understand the balance I'm trying

 3    to strike here?

 4              MR. ZELLER:  I absolutely do, your Honor.  I

 5    absolutely see it.  And the other issue, your Honor, and if I

 6    could have the Court's guidance on this, is the Court is

 7    aware that they have determined that they are going down this

 8    path that is going to necessarily lead to the jury hearing

 9    about MGA's trade secret theft.  They are going to put

10    Mr. Kilpin on, and the questions that they are going to ask

11    him, based on everything that Mr. Nolan has said, is going to

12    put this in front of the jury.

13              So I would like some guidance as to whether, you

14    know, when this happens, you know, should we have a sidebar,

15    should we have further discussion about it, that they are

16    going to ask him questions that are going to elicit this.

17              THE COURT:  I don't know if he is or he's not.

18    Certainly the issue is out there.  You've fronted it.

19    There's not going to be any surprises.  We'll see how the

20    testimony plays out.

21              MR. ZELLER:  It was actually what Mr. Price had

22    explained earlier today, which is when they ask him this

23    question about the document that Mr. Nolan has repeatedly

24    referred to about, you know, out executed and out thought,

25    the phrase that Mr. Nolan uses over and over, that is exactly
```

```
 1    what's going to lead to it.  And Mr. Price had explained that
 2    earlier.  So --
 3              THE COURT:  I understand.
 4              MR. ZELLER:  I know obviously the Court wouldn't be
 5    surprised.
 6              THE COURT:  It's on the record.  And I hope we
 7    don't go down that road.  I've done everything I can to keep
 8    the -- to respect the boundaries of Phase 1 and Phase 2.  And
 9    it's up to counsel.
10              MR. ZELLER:  Thank you, your Honor.
11              The last point would I make, and this if it's an
12    administrative matter.  We're certainly hoping that we will
13    save some time for a very short rebuttal case.  We would
14    potentially put our damages expert back up as well as
15    Mr. Hollander.  The Court had made a ruling about
16    Mr. Hollander for purposes of our case in chief.  We think
17    that they have put at issue exactly what it is that that
18    survey goes to.
19              That's all I have.
20              MS. AGUIAR:  Then we need to schedule a time for a
21    hearing on Mr. Hollander because we have a motion in limine.
22              THE COURT:  We're not getting to it today.  We are
23    now eating jury time.  Please, let me bring in the jury.
24    Mr. Proctor, the same to you unless you've got something that
25    has to come up right now.
```

1        MR. PROCTOR:  There's one objection to Mr. Farr's

2  deposition which I believe may have been overlooked.

3        THE COURT:  Are we playing Mr. Farr's deposition?

4        MR. PROCTOR:  That's up to MGA.

5        MR. NOLAN:  Not this afternoon.

6        THE COURT:  Okay.  Not this afternoon.  So please,

7  let's bring the jury in.  I'll take up all of this at the end

8  of the day.

9        **(WHEREUPON THE JURY ENTERS.)**

10       THE COURT:  Counsel, you may proceed.

11               **CROSS-EXAMINATION**

12  BY MR. PRICE:

13  **Q.**    Mr. Domingo, when did you start working for MGA?

14  **A.**    That would be July 2003.

15  **Q.**    So that was a number of years after Mr. Bryant gave to

16  MGA these drawings; right?

17  **A.**    I'm not sure exactly when Mr. Bryant started.  I would

18  say a couple of years at the least.

19  **Q.**    And you told us that you didn't see his drawings, but

20  you were familiar with the dolls that MGA had, the Bratz

21  dolls; correct?

22  **A.**    From having been at the stores, correct.

23  **Q.**    And then once you started working there, you became

24  familiar with the dolls as well; right?

25  **A.**    Yes.

7268

1   **Q.**   And in your designs of the dolls, one thing you had to

2   do is make sure that whatever design you did, it still looked

3   like a Bratz doll; right?

4   **A.**   That it still fitted the 10-inch doll with the existing

5   sculpt, correct.

6   **Q.**   Well, and that it didn't look that much different from

7   the other Bratz dolls so that people would say that's not

8   even a Bratz doll.

9   **A.**   I wouldn't say that's accurate, sir.

10  **Q.**   For example, you couldn't do -- if you look at

11  Exhibit 13721, that's that big one there.  If we could put up

12  13722.  Assume that was the same size as a Bratz doll, the

13  same height.  If we can put up the photograph.

14          For example, you wouldn't do a face like that for a

15  Bratz doll; right?

16  **A.**   Well, this is not a pretty face.  So no, I wouldn't,

17  sir.

18  **Q.**   Well, luckily dolls can't speak.  Let's go to another

19  one.  We'll see if you think that's pretty.  Look at 13695.

20  That Mini Trendy Teens doll.  If we can put up 13696.

21  Assuming this were the same size as a Bratz doll, this is

22  still not something that you would consider doing, pretty or

23  ugly, as a Bratz concept; correct?

24  **A.**   Not this execution, sir, no.

25  **Q.**   And, in fact, if we look at your execution, and if we