1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    ---

4     **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                    ---

6   MATTEL, INC.,                    :   PAGES 7652 - 7873
                                     :
7          PLAINTIFF,                :
                                     :
8      VS.                           :   NO. ED CV04-09049-SGL
                                     :   [CONSOLIDATED WITH
9   MGA ENTERTAINMENT, INC.,         :   CV04-9059 & CV05-2727]
    ET AL.,                          :
10                                   :
              DEFENDANTS.            :
11   _____:

12

13

14

15       REPORTER'S TRANSCRIPT OF PROCEEDINGS

16            RIVERSIDE, CALIFORNIA

17         FRIDAY, AUGUST 15, 2008

18           JURY TRIAL - DAY 36

19           AFTERNOON SESSION

20

21

22                    MARK SCHWEITZER, CSR, RPR, CRR
                      OFFICIAL COURT REPORTER
23                    UNITED STATES DISTRICT COURT
                      181-H ROYBAL FEDERAL BUILDING
24                    255 EAST TEMPLE STREET
                      LOS ANGELES, CALIFORNIA 90012
25                    (213) 663-3494

CERTIFIED COPY

**Appearances of Counsel:**

On Behalf of Mattel:

    Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
    By John B. Quinn, Esq.
       B. Dylan Proctor, Esq.
       Michael T. Zeller, Esq.
       Harry Olivar, Esq.
       John Corey, Esq.
       Diane Hutnyan, Esq.
       William Price, Esq.
    855 South Figueroa Street
    10th Floor
    Los Angeles, CA 90017
    (213) 624-7707

On Behalf of MGA Entertainment:

    Skadden, Arps, Slate, Meagher & Flom LLP
    By Thomas J. Nolan, Esq.
       Carl Alan Roth, Esq.
       Jason Russell, Esq.
       Lauren Aguiar, Esq.
       David Hansen, Esq.
       Matthew Sloan, Esq.
       Robert Herrington, Esq.
       Raoul D. Kennedy, Esq.
    300 South Grand Avenue
    Los Angeles, CA 90071-3144
    (213) 687-5000

# I N D E X

**ISAAC LARIAN, PREVIOUSLY SWORN**......................... 7676

RECROSS-EXAMINATION (CONTINUED) BY MR. PRICE:.......... 7676
FURTHER REDIRECT EXAMINATION BY MR. NOLAN:............ 7678
FURTHER RECROSS-EXAMINATION BY MR. PRICE: ............ 7680
FURTHER REDIRECT EXAMINATION BY MR. NOLAN: ........... 7682
FURTHER RECROSS-EXAMINATION BY MR. PRICE: ............ 7682

**PAUL KEVIN MEYER, SWORN**.............................. 7683

DIRECT EXAMINATION BY MR. KENNEDY: ................... 7683
VOIR DIRE EXAMINATION BY MR. PRICE: .................. 7751
DIRECT EXAMINATION (RESUMED)BY MR. KENNEDY:........... 7757
CROSS-EXAMINATION BY MR. PRICE:....................... 7761
REDIRECT EXAMINATION BY MR. KENNEDY:.................. 7783
RECROSS-EXAMINATION BY MR. PRICE: ................... 7785

VIDEOTAPED DEPOSITION EXCERPTS OF LILY MARTINEZ........ 7787

VIDEOTAPED DEPOSITION EXCERPTS OF KEVIN FARR.......... 7789

**MICHAEL JOSEPH WAGNER, SWORN**.......................... 7807

DIRECT EXAMINATION BY MR. QUINN: .................... 7808
VOIR DIRE EXAMINATION BY MR. KENNEDY:................. 7815
DIRECT EXAMINATION (RESUMED) BY MR. QUINN:  .......... 7818
CROSS-EXAMINATION BY MR. KENNEDY:..................... 7836
REDIRECT EXAMINATION BY MR. QUINN: ................... 7844
RECROSS-EXAMINATION BY MR. KENNEDY: .................. 7845

**PAUL KEVIN MEYER, PREVIOUSLY SWORN**.................... 7847

DIRECT EXAMINATION BY MR. KENNEDY:.................... 7847
CROSS-EXAMINATION BY MR. PRICE:....................... 7848

1                          **E X H I B I T S**

2

3      (Exhibit 13861, Page 11, received.)................... 7781

4    (Exhibits 2502-A, 2504-A, 2514-A, and
     2517-A received.)................................. 7803

5

6    (Exhibits 18923, 1, 2, 4, 6, 7, 9, 10,
     11, 12, 13, 15, 16, 17, 18, 21, 24, 25,

7    26, and 32 received.)............................. 7807

8    (Exhibit 13991 received.)......................... 7818

9    (Exhibit 14626 received.)......................... 7833

10   (Exhibit 14663 received.)......................... 7834

11   (Exhibit 14664 received.)......................... 7835

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      **Riverside, California; Friday, August 15, 2008**

2                        **12:34 P.M.**

3          **(HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)**

4          THE COURT:  Okay.  There's a few issues the Court

5   wanted to take up from this morning that we never got around

6   to, but before I did that, I want to rule on --

7          Mr. Price, Mr. Zeller?  Mr. Price, is Mattel ready

8   to proceed?

9          MR. PRICE:  Yes, your Honor.

10         THE COURT:  Very well.  Let me first resolve the

11  issue that we discussed in chambers under seal.  The Court

12  has explored in length the competing issues and concerns that

13  it has with respect to the -- on the one hand, the testimony

14  of Mr. Larian that we heard concerning what he, his attorneys

15  at the time discussed and about the Carter Bryant's design

16  and development of the works in question, as well as the

17  e-mails that have been submitted to the Court in camera under

18  seal involving attorney-client work product.

19         It's a close case, but the Court believes that the

20  attorney-client privilege needs to be protected.  So the

21  Court is going to reseal those e-mails.  The Court is not

22  going to permit them to be introduced to the jury.

23  Furthermore, the Court itself will strike them from its

24  consideration of the evidence, both during the trial and, of

25  course, in any third phase where the Court must consider the

1    equitable defenses.   So they are not at issue.

2         However, some address or redress of the testimony

3    has to be made.   The Court is going to strike, pursuant to

4    Mr. Nolan's suggestion, Ms. Aguiar's suggestion.   The Court

5    is going to strike the testimony of Mr. Larian concerning his

6    conversations with his attorneys and instruct the jury that

7    they are not to consider that evidence for any purpose at

8    this point.   And leave it at that.   I think that strikes the

9    balance.

10        Given the whole host of issues that the Court needs

11   to weigh here, I think that strikes the balance.   And the

12   e-mails are resealed, and as indicated, they will be of no

13   moment to the jury.   They are no longer of any issue to the

14   Court.   And they will be disregarded.

15        Any questions concerning the Court's ruling,

16   Mr. Price?

17        MR. PRICE:   No questions, your Honor.   I'm

18   wondering whether, when the Court instructs the jury to

19   disregard Mr. Larian's testimony concerning any

20   communications he may have had with counsel, whether the

21   Court can say any testimony given in this phase or in the

22   prior phase.

23        THE COURT:   They are not to consider any evidence

24   of any of Mr. Larian's testimony regarding his communications

25   with counsel.   As I indicated in chambers, I probably should

1    have kept all of that out to begin with, and this is the best

2    that I can do.  I mean, I have two ways to go.  I either let

3    it all come in, or I keep it out.  I think given where we are

4    right now, to leave it part in, part out is not appropriate.

5            MR. PRICE:  I just think unless you specifically

6    tell them any testimony, whether given in the first phase or

7    this phase.  Because going forward, they can consider

8    obviously anything that happened in the prior --

9            THE COURT:  Obviously, the prejudicial impact to

10   Mattel on the earlier testimony is diminished.  The testimony

11   won't be heard in closing regarding the communication between

12   the attorneys.  And that was at this point frankly, months

13   ago.

14            So I'm less concerned about that earlier testimony

15   than the testimony now.  But the way I intend to do the

16   instruction is simply I am striking the testimony by

17   Mr. Larian concerning his communications with counsel.  You

18   are to disregard it.  I'm sure the jury will be focused on

19   the testimony today.  That certainly applies to any testimony

20   concerning communication with counsel.  I'm not going to

21   bring up the previous testimony because I think that quite

22   frankly just highlights evidence that we are actually asking

23   the jury to disregard.

24            MR. NOLAN:  Your Honor, just would the Court

25   consider saying, you know, the testimony is stricken.  You

1    are to disregard the comments with respect to the

2    communications with counsel.  And just say that MGA,

3    Mr. Larian, have asserted the attorney-client privilege, and

4    you are not to draw any adverse inference from the assertion

5    of the privilege?

6              THE COURT:  If I go down that road, to balance

7    that, I would have to say that all that is protected by the

8    attorney-client privilege, and you cannot -- and that

9    evidence one way or the other cannot be --

10             MR. NOLAN:  If the Court --

11             THE COURT:  I think it's better just to keep it

12   simple, Counsel.

13             MR. NOLAN:  Thank you.

14             THE COURT:  Thanks.  All right.  So that takes up

15   that issue.

16             Getting back to the jury instructions, the

17   substantial similarity instruction, I have two competing

18   instructions.  I have one from MGA and one from Mattel.  What

19   I wanted to hear is I have received also a trial brief

20   concerning unprotectable elements in the Bryant drawings from

21   MGA, which I'll review.

22             I guess I wanted to give -- I've held off in

23   issuing my order, which I tentatively announced several days

24   ago, concerning the Court's findings with respect to

25   protectable elements.  I've held off on that because I wanted

1    to give counsel an opportunity to explore that with the Court

2    and suggest any changes and additions.  And I don't think I

3    can hold off any further.

4         I need to issue that order because quite frankly,

5    those protectable elements need to be incorporated into the

6    instruction on substantial similarity.  So I guess I will

7    hear any further argument that counsel wishes to make.

8         I should just add that the points made in MGA's

9    brief are to a certain extent well taken.  I thought I

10   previously addressed them.  Words and short phrases are not

11   protected by copyright.  I don't think there's any issue on

12   that.  Mattel is not seeking copyright, obviously, on the

13   word Bratz or any of the character names.  And that's not --

14   to the extent the names are part of the copyrighted drawings,

15   the Court will include that amongst the list of

16   nonprotectable elements.

17        Similarly, the idea and concepts that are not

18   original to Bryant are not protected by copyright.  I think

19   that's fully addressed in a number of the instructions.  I am

20   giving the instruction that MGA requested that specifically

21   addresses the issue of ideas.

22        The third, the final point made was that common or

23   standard treatments of the subject matter, the scenes a

24   faire, that is certainly one that I'm adding.  And I think I

25   previously indicated that that would be part of the Court's

1    order.

2          Otherwise, I didn't take anything further from that

3    submission that needs to be added to the Court's order.   But

4    at this time I wanted to give both parties and opportunity to

5    address the Court for a time on this issue, and then I will

6    issue an order.

7          MR. NOLAN:   Your Honor, I don't intend to go beyond

8    the briefs.   We've briefed this.   The only other thing I

9    wanted to make absolutely clear on the record, though, is

10   that the submissions that have been previously made to the

11   Court in the context of both the summary judgment hearings,

12   which would include, obviously, the deposition testimony of

13   the various experts that have testified in this case

14   constitute part of this record upon which the Court is basing

15   its ruling.

16         THE COURT:   It is.   I think it's all inextricably

17   intertwined.   When I issue my ruling, and actually the order

18   is going to be issued pursuant to MGA's motion for

19   clarification of my earlier order, which itself was a --

20   basically a renewal of a motion that was initially brought as

21   part of the partial summary judgment.   This is all wrapped

22   up.

23         MR. NOLAN:   We refer to that motion internally,

24   your Honor, as the jellyfish motion.

25         THE COURT:   The jellyfish motion.   Okay.   I know

7662

1    exactly what you're talking about.

2         MR. NOLAN:  I'll also go for one more moment of

3    levity if I could.  We bought on line, and you can actually

4    buy on line T-shirts, "If you mess with the jellyfish, you

5    mess with me."  So too much insight probably, but we'll

6    submit on that, your Honor.

7         THE COURT:  The jellyfish is actually a pretty apt

8    metaphor for that particular motion, in more ways than one.

9    But I'll leave that alone.

10        MR. NOLAN:  Actually, after that hearing, that

11   weekend there was a report on the national news that there

12   was an attack of jellyfish in unprecedented numbers this

13   year.  And I sent an e-mail saying I didn't think it had

14   anything to do with your interpretation of Satava.

15        THE COURT:  I appreciate that, Counsel.

16        Mr. Zeller?

17        MR. ZELLER:  Thank you, your Honor.  One

18   administrative matter.  We have typed up an inverse ratio

19   revised instruction.

20        THE COURT:  I'm looking forward to seeing it.  I

21   trust you've given a copy to MGA?

22        MR. ZELLER:  We have.

23        THE COURT:  This should be interesting.  And,

24   Mr. Zeller, while I have you, particularly on this point, I

25   guess what I want to take up with you is in your submitted

1    instruction or Mattel's submitted instruction -- I don't want

2    to -- the three elements that you set forth as not

3    protectable do not track the language of the Court that I

4    issued.  And maybe it's because you didn't have the order.

5    But I want to hear you on that.

6              MR. ZELLER:  Well, it was our intention to track

7    the Court.  It may be just an administrative error.  But it

8    was our intention to track the Court.  I would say that

9    substantively, the main thing that we did want the Court to

10   instruct on and would ask the Court to instruct on is making

11   it clear that an original combination, even of otherwise

12   unprotected elements, can still itself be protected.

13             That was the one point we did want to get across,

14   and we added some elements, I know, into our jury

15   instruction.  Otherwise, it was largely our intent to simply

16   track what the Court had already ruled as a tentative matter.

17             THE COURT:  Just to make that clear, the elements

18   that are protectable, and the way I'm planning to write this,

19   is these are the elements that you should consider for the

20   purpose of your comparisons under the extrinsic test, and

21   then list the three that the Court identified.  The

22   particularized synergistic compilation and expression of the

23   human form and anatomy that expresses a unique style and

24   conveys a distinct or deliberate attitude.  That's, for lack

25   of a better phrase, that Bratz look as conveyed by the

7664

1    drawings.

2         Second is the particularized expression of the

3    doll's head, lips, eyes, eyebrows, eye features, nose -- I'm

4    tempted to say or lack thereof, but I'm sure the jury knows

5    what we're talking about -- chin, hairstyle, and breasts,

6    including the accentuation or exaggeration of certain

7    anatomical features relative to others, paren, doll lips,

8    eyes, eyebrows, and eye features, close paren.  And

9    deemphasis of certain anatomical features relative to others,

10   paren, doll nose, and thin small doll bodies, close paren.

11        And they, the third, is the particularized

12   nonfunctional doll clothes, doll shoes, and doll accessories

13   that express aggressive contemporary youthful style.

14        So that expands a little on language you both used,

15   and I've been tweaking with this all week long, so I know

16   that's somewhat different from what I actually articulated on

17   the record.  But those are the elements that are protectable.

18        Then in the next paragraph, I will identify those

19   certain nonprotectable elements of the works.  And I have

20   six.  The resemblance or similarity to human form and human

21   physiology, to the presence of hair, heads, two eyes,

22   eyebrows, lips, nose, chin, mouth, and other features that

23   track human anatomy and physiology.  Third, human clothes,

24   shoes, and accessories.  Fourth, age, race, ethnicity, and

25   urban or rural appearances.  Five, common or standard

 1   anatomical features relative to others.  Common or standard

 2   anatomical features.  And then, six, the scenes a faire.

 3          That's what I'm proposing to do.  And that's what I

 4   want to hear comment on.  If I'm missing something that's

 5   protectable or if I've included something that's protectable

 6   that you think shouldn't be, let me know.

 7          If you think that there's something nonprotectable

 8   that you want to be able to argue and you think that I have

 9   not included it, let me know that as well.  I've tried to

10   include everything that, based on the evidence in this case,

11   that is either being suggested as being protectable or

12   nonprotectable.

13          MR. NOLAN:  Your Honor, that sounds workable.  We

14   didn't have the live feed.  So it's hard to track.  So what I

15   would propose, if it's possible, is when we get it in written

16   form, your Honor, look at it.  Assume we're coming back on

17   Monday to address questions.

18          THE COURT:  You'll have from me today, and it's

19   almost done, a full draft of the instructions that I intend

20   to give.  And I should say this for the record now just in

21   case I forget before, the Court has fully considered all

22   objections by both sides, the responses thereto.  To the

23   extent that I have included instruction language proposed by

24   one side or the other, I am overruling the objections

25   thereto.  To the extent that I am not including proposed jury

1    instruction language, I am sustaining the objections thereto.

2    And for the reasons well set forth in both briefs.

3           I'm not going to go through and try to parse

4    through on the record every objection or every thought.  But

5    be assured that the Court has read several times now your

6    positions on these, and what I'm going to be producing today

7    will reflect essentially the Court's rulings on the

8    objections and the submissions.  And they are tentative, and

9    you are correct, and you're going to have an opportunity on

10   Monday, then, to come back, and that's when we'll do the

11   final instructions and verdict form.

12          MR. NOLAN:  And I accept that this is the court

13   order.  I just wanted to have the benefit of looking at it in

14   written form.

15          THE COURT:  You will.  It's right here.  And I'm

16   going to hopefully have the order issued today and the

17   instructions, and you'll find those elements both in the

18   order and in the instructions on substantial similarity.

19          MR. NOLAN:  And just to complete the -- complete

20   the -- what's sometimes called the Kabuki dance, which, as

21   the Court indicated, you're sustaining your position,

22   obviously just for the record, we preserve all of the

23   objections and stance, and we're not waiving anything.

24          THE COURT:  That's the nature of it.  When I

25   overrule an objection, you've made the objections.  The

 1    objections are certainly part of the record.

 2           MR. NOLAN:  Thank you.

 3           MS. AGUIAR:  There was one instruction, your Honor,

 4    that we had sort of talked about informally along the lines

 5    of the using competitive product, which we are in the process

 6    of providing to you.  There's another one on the whole

 7    Hong Kong issue, if you will.

 8           THE COURT:  Well, you submitted one, and I am

 9    planning to include one.

10           MS. AGUIAR:  Okay.  I just didn't know whether we

11    were addressing that separately.

12           THE COURT:  You'll see that the Hong Kong one, or

13    at least the Court's modification of the Hong Kong one is in

14    the instructions.

15           MS. AGUIAR:  And the parties are working on that.

16           THE COURT:  You didn't get quite everything you

17    were asking for on that.

18           MS. AGUIAR:  The parties are working on then, too,

19    I guess, separately.  That would maybe not be in the document

20    you have, and that would be the competitor product one and

21    the inverse ratio; right?  Those are sort of ones that came

22    up this morning.

23           THE COURT:  Right.  I just received the inverse

24    ratio one.

25           MS. AGUIAR:  And my understanding was that you had

7668

```
 1   asked the parties to see if we could do something, but we --
 2   we were still trying to do that.  So I'm wondering shouldn't
 3   we do that and try to --
 4            THE COURT:  I always encourage you to work
 5   together.  If you can agree, that's always better.
 6            MS. AGUIAR:  Because we are in the process of
 7   putting together something.  So if you want to give us until
 8   the end of the day and see if the parties can get closer,
 9   because we didn't have a chance get to give them our
10   response.
11            THE COURT:  I will.  All right.
12            Mr. Zeller, did you have anything further?  You
13   kind of got moved off.
14            MR. ZELLER:  I frankly think that, to echo
15   Mr. Nolan's thought, I think it's best we just get the new
16   language.  We can go through it and probably give the Court a
17   more considered response as to any further revisions or
18   requests.
19            THE COURT:  Very good.  Thank you.  All right.
20   Okay.  So I'll continue to work on that as best I can as we
21   will proceed forward.  Let's turn to the issue of this
22   afternoon.  And have you decided about the Custodian of
23   Record as to when the custodian is going to be called?
24            MS. AGUIAR:  Given the time considerations, your
25   Honor, we may do the custodian a bit later because obviously,
```

1   if we run out of time, we want to get our damages expert on.

2          THE COURT:  Excellent.

3          MS. AGUIAR:  I would still like to be able to

4   address the documents outside the presence of the jury and

5   sort of resolve the objections if we have time to do that,

6   but I'd rather not do that right now.

7          THE COURT:  We're starting right at one o'clock,

8   assuming that the jury is back.

9          All right.  Is there anything else for this

10  afternoon?

11         Mr. Corey.

12         MR. COREY:  I would like to talk about Mr. Meyer

13  before he takes the stand.

14         THE COURT:  Yes.  What exactly is your concern

15  about Mr. Meyer?  I know you've been harboring this for

16  several days now.

17         MR. COREY:  I have.  And I'm just so anxious to get

18  here.  No.  Mr. Roth stood in front of the Court and said

19  these are the six things that we're going to consider when we

20  talk about apportionment.  And there are two problems that he

21  created when he did that.

22         First, we understand that Mr. Meyer is going to be

23  offering a number of apportionment approaches that don't take

24  into consideration those factors at all, that are completely

25  separate and apart from --

1          THE COURT:  Additional apportionment factors.

2          MR. COREY:  Well, there are two problems here.

3    Actually, three problems.  The apportionment approaches are

4    not tied to the factors even a little bit.  They focus on

5    things like how much MGA paid Carter Bryant, the royalty

6    percentage.  And so we're really talking about two separate

7    universes of approaches to how we're going to apportion

8    things.

9          And so based on Mr. Roth's representation that the

10   Court has on the yellow sticky pad, I think that ship kind of

11   has sailed.

12         Now, with respect to these factors that Mr. Roth

13   identified, there's some pretty significant 702 and 703

14   problems there because they are really just created out of

15   whole cloth.  But one of the things that experts have to do

16   is rely on something that has some objective, reliable basis.

17   And Mr. Roth has articulated for you five or six factors that

18   he considers to be reasonable.  And those come out of

19   Mr. Meyer's report.

20         But Mr. Meyer's source for those factors is just

21   Mr. Tonner, who the Court has excluded, and Ms. Garcia, who

22   is just a fact witness of MGA.  So there's nothing empirical

23   or objective that Mr. Meyer is looking to say this is what

24   one should consider when valuing a doll or valuing any

25   consumer product.  He's not a doll expert.  And he admitted

7671

1  in his deposition that he has never been involved in anything

2  professionally that relates to the sales or marketing of

3  dolls.

4         And so he has to rely on Mr. Tonner and Ms. Garcia

5  for these particular factors.

6         Now, the other piece of this is these six factors

7  or these seven factors, they really are just picked out of

8  the air.

9         THE COURT:  Well, you said it a couple times, but

10  the Court has already heard evidence on a number of these

11  factors from other witnesses.  So I don't --

12         MR. COREY:  I'm not suggesting at all that these

13  are not relevant factors, not even a little bit, your Honor.

14  What I am saying is the selection of the seven or whatever

15  the number is is completely arbitrary.

16         THE COURT:  Six.

17         MR. COREY:  It's completely arbitrary.

18         THE COURT:  It was the original five that Mr. Roth

19  identified and one that the Court basically gleaned from the

20  evidence.

21         MR. COREY:  Right.  And the design of the doll I'm

22  assuming the Court is including.  Because I don't know that

23  that's on Mr. Roth's list.  But again, MGA is going --

24         THE COURT:  No, the design of the doll was not on

25  his list.  That was not submitted as a basis for

7672

1    apportionment.  And the Court made a strong mental note of

2    that, Counsel.

3              MR. COREY:  I appreciate that.  I won't address

4    that any further, then.

5              But Mr. Gruca, who I understand MGA will present,

6    has done a survey where he has two additional factors that

7    have no bearing, completely unrelated to those five factors,

8    MGA itself has presented evidence of Mattel documents where

9    Mattel says that there are other factors that are relevant

10   for considering -- which attribute to the value of the doll,

11   including is it funner to play with, does my mom like it,

12   things like that.

13             So the suggestion is the selection and the use of

14   these 11 factors really doesn't meet the standards required

15   by 702 or 703.  So there's no basis to use them that way as

16   the basis for expert testimony.

17             THE COURT:  It sounds like these are foundational

18   objections and, as I've indicated throughout, you reserve all

19   of your foundational objections.  And I think I've made the

20   statement before, that any side submitting any witness runs

21   the risk of that witness not testifying if they are not able

22   to establish a foundation.

23             So I -- just having your presentation right now, I

24   haven't heard from MGA on any of this, but I'll be mindful of

25   your concerns.

1          MR. COREY:  And I appreciate that, because I do

2    think this was something easier to do outside the presence of

3    the jury rather than trying to do it on the fly.

4          I was just passed a note, and I know this is

5    something that we had been attempting to raise with the

6    Court.  Mr. Gruca, who MGA intends to offer, was presented

7    solely as a rebuttal witness.  And Carol Scott, the witness

8    that he is purporting to rebut, was not called in our case.

9          THE COURT:  That reminds me.  We had a ruling on

10   this before.  What was the Court's ruling on that?

11         MR. ROTH:  Your Honor, I must object at this point.

12   That argument was offered and rejected.  I mean, we had a

13   series of hearings on this exact issue.

14         THE COURT:  I thought so.

15         MR. ROTH:  And you'll recall the result was that

16   Mattel was going to be permitted to offer up Mr. Kivetz.

17   That was the consult of three or four hearings on this issue.

18   That exact argument has been raised and frankly --

19         THE COURT:  I do recall that.

20         MR. ROTH:  Your Honor, with respect to -- if your

21   Honor is prepared to proceed, we can.  I will say --

22         THE COURT:  We don't have time for a hearing

23   outside the presence of the jury.  We need to start with the

24   jury at one o'clock.  So we're going to have to proceed and

25   call your witness, and the Court will rule on the objections

1    as they come up.  This is the last day of trial after three

2    months.  You are certainly aware of their objections, and you

3    are aware of your positions, and I assume both sides are

4    ready to proceed.

5              MR. ROTH:  The one thing I'd say is this is new.

6    Our approach, our apportionment factors were set out in a

7    report that was served in February.

8              THE COURT:  I understand that.

9              MR. ROTH:  And no Daubert --

10             THE COURT:  You're not backing away from the

11   apportionment factors that you gave the Court.

12             MR. ROTH:  No.  Just so we're clear, on the design

13   of the doll, just so you're not alarmed, we're distinguishing

14   that from the other factors that we believe to be

15   unprotected.  We're not saying the design of the doll is an

16   apportionment factor that's sort of on our side of the

17   ledger.

18             What we're distinguishing between is the design of

19   the doll on the one hand and things like accessories and

20   packaging and themes we've been talking about on the other

21   hand to measure those.

22             THE COURT:  I asked about what factors are you

23   seeking the apportionment on.  And I got a list, and that's

24   it.

25             MR. ROTH:  Your list is correct.

7675

```
 1          THE COURT:  Because doll design apportionment would
 2   have raised a whole bunch of issues that we would have had to
 3   get into, and I presume that you were not going down that
 4   road just because the complexities.
 5          I mean, Patry writes at length on this in his
 6   discussion of Sheldon, that this can be a very complicated
 7   analysis.  Putting doll design aside, and that's why when we
 8   start taking dolls apart and things of that nature, the Court
 9   sustained objections on relevancy grounds.
10          But I really did rely on these on packaging
11   noncopyrighted accessories, promotional themes, additional
12   characters.  I did get into mechanical maneuverability just
13   because I thought even though that goes to doll design,
14   that's so clearly divorced from doll design aspects of how
15   the doll looks and arguably the protectable element issues,
16   that I thought that was easily severed out.
17          So I've given you actually a sixth factor, but I'm
18   not -- doll design as a concept like that, that is waived.
19   That is gone.
20          MR. ROTH:  Not comparing arms to legs.
21          THE COURT:  Very good.  So we're good on that.
22          Anything else?  It's past one o'clock.  I really
23   want to bring the jury in because we only have two and a half
24   hours of testimony left, and we've got a rebuttal witness,
25   and we've got to get through here by 5:30.  So let's move
```

7676

```
 1   forward.
 2              MR. ROTH:  Very good, your Honor.
 3              THE COURT:  All right.  Let's bring the jury in.
 4          (WHEREUPON THE JURY ENTERS.)
 5              THE COURT:  Good afternoon, members of the jury.
 6   The Court has an instruction to provide concerning some
 7   testimony you heard earlier.  You heard testimony earlier
 8   about conversations between Mr. Larian and his counsel
 9   concerning when Carter Bryant did the drawings and the works
10   in question.
11              That testimony is stricken, and you are instructed
12   to disregard any testimony or evidence concerning
13   communications between Mr. Larian and his counsel.  That
14   should not affect your decision at all.
15              Counsel, you may continue.
16          ISAAC LARIAN, PREVIOUSLY SWORN.
17              RECROSS-EXAMINATION (CONTINUED)
18   BY MR. PRICE:
19   Q.   I think you said a couple times in your examination that
20   you respected the jury's verdict; is that right?
21   A.   I do.
22   Q.   The day of the jury's verdict, you spoke with The Wall
23   Street Journal, didn't you?
24   A.   I don't recall.  I might have.
25   Q.   And do you recall telling that reporter in connection
```

7677

1   with the jury's verdict that, quote, Mattel succeeded in

2   confusing the jury.

3   **A.**   I said that, yes.

4   **Q.**   You also -- Mr. Nolan asked you about whether you had

5   any malice toward Mattel.

6          Do you recall that?

7   **A.**   I'm sorry?

8   **Q.**   Mr. Nolan asked you whether you had any malice toward

9   Mattel.

10          Do you recall that?

11   **A.**   Do I have any malice toward Mattel?

12   **Q.**   Yes.  Do you recall Mr. Nolan's --

13   **A.**   In regards to what?

14   **Q.**   Mattel.

15   **A.**   Yes, I heard the question.

16   **Q.**   And you said you did not; correct?

17   **A.**   That's correct.

18   **Q.**   I believe your testimony was that the idea for a fashion

19   doll began when someone at Wal-Mart said they wanted

20   something to compete with Mattel?

21   **A.**   I believe one of the things that was -- that I said

22   created the idea for fashion doll was Ron Stover, who was a

23   Wal-Mart buyer, said bring me something that competes with

24   Barbie.

25   **Q.**   And in connection with that competition and talking with

1    employees at MGA, you have used the phrase that you want to,

2    quote, kick Mattel's ass; correct?

3    **A.**    I'm sorry?  Have I said that?

4    **Q.**    Yes, to your employees.

5    **A.**    Yes, I have.

6           MR. PRICE:  No further questions.

7                   **FURTHER REDIRECT EXAMINATION**

8    BY MR. NOLAN:

9    **Q.**    Mr. Larian, do you compete with Mattel in the

10   marketplace?

11   **A.**    Yes, fiercely.

12   **Q.**    For how long?

13   **A.**    For at least the past seven years.

14   **Q.**    Do you want to kick their ass in the marketplace?

15   **A.**    Yes, I do.

16           MR. NOLAN:  Nothing further.

17   **Q.**    Well, you know, Mr. Price asked you a series of

18   questions regarding percentages of effort with respect to

19   various product lines at MGA.

20           Do you remember that line of questioning?

21   **A.**    I do.

22   **Q.**    And he was asking you percentages.  Have you done any

23   analysis on the percentages --

24           MR. PRICE:  I'll object.  It is beyond the scope of

25   my recross.

1          THE COURT:  It is beyond the scope.

2          MR. NOLAN:  Your Honor, permission just to reopen

3    for one moment on this?

4          THE COURT:  Make it brief, Counsel.

5    **Q.**   BY MR. NOLAN:  Remember those questions and answers?

6    **A.**   I do.

7    **Q.**   Asking you various percentages?

8    **A.**   Yes.

9    **Q.**   Prior to today, have you done any calculations with

10   respect to the amount of expenses or allocation of expenses

11   on product lines?

12   **A.**   I have never done any calculation prior to today or

13   today.  I just was guessing.

14   **Q.**   And there's an expert that has been retained for MGA to

15   offer such an opinion; is that correct?

16   **A.**   I believe it is.  I don't know the exact.

17   **Q.**   Would you defer to his analysis of the actual records of

18   MGA on those points?

19          MR. PRICE:  Object.  Lack of foundation that

20   Mr. Larian knows the basis of that analysis.

21          THE COURT:  Sustained.

22   **Q.**   BY MR. NOLAN:  Have you met with the damage expert in

23   this case?

24   **A.**   I have met him, just somebody introduced me, as Paul

25   somebody.  But I don't even remember his last name.  If your

7680

1    question is I've met with him to discuss anything, I have

2    not.

3    Q.    Okay.   One way or the other, you've not done any factual

4    calculations, though, with respect to efforts on one product

5    versus another product; correct?

6    A.    I have not.   I'm not an accountant.

7            MR. NOLAN:   Thank you.   Nothing further.

8                    **FURTHER RECROSS-EXAMINATION**

9    BY MR. PRICE:

10   Q.    You said you just want to compete with Mattel in the

11   marketplace; right?

12   A.    Absolutely.

13   Q.    You have a website for MGA, don't you?

14   A.    Yes, called MGA dot com.

15   Q.    And if you go to that website, one of the questions it

16   asks is is Mattel racist.   That's still on your website right

17   now.   Isn't it?

18   A.    Yes.

19   Q.    And with respect to the expenses, I was asking you about

20   people's efforts on Bratz versus non-Bratz products.

21            Do you recall that?

22   A.    I'm sorry.   Can you repeat that?

23   Q.    I was asking you about folks' efforts, the time they

24   spent on Bratz versus non-Bratz product; correct?

25   A.    Yes.

1    **Q.**   And as the Chief Executive Officer of the company, you

2    gave me your best estimate; correct?

3    **A.**   I gave you my guess, yes.

4    **Q.**   Are you saying you don't know what your employees are

5    working on?

6    **A.**   We have 1,600 employees.  And I don't know what everyone

7    is working on.  Mr. Eckert didn't know what the senior

8    vice-president of Mattel was working on.

9    **Q.**   But you have an idea as to how your company is using its

10   resources so that you can try to make a profit.  You have

11   some general idea about that, don't you?

12   **A.**   I do.

13   **Q.**   Okay.  And that's what you were using when you were

14   telling me the percentage of MGA's time and effort that went

15   to non-Bratz products; right?

16           MR. NOLAN:  Objection, your Honor.  Misstates the

17   question that was asked in the first instance by Mr. Price.

18           THE COURT:  Rephrase your question, Counsel.  Watch

19   the speaking objections, please.

20   **Q.**   BY MR. PRICE:  When you were saying, when you were

21   testifying that, quote, a lot of time went into non-Bratz

22   products, do you recall saying that?

23   **A.**   Yes.

24   **Q.**   And you recall giving percentages between 50 percent to

25   30 to 50 percent to 60 to 70 percent.

7682

1          Do you recall that?

2    **A.**    That's my guess, yes.

3    **Q.**    And you said at the time that was your best estimate;

4    correct?

5    **A.**    Best estimate or best guess.  I have a language barrier.

6    **Q.**    And you were giving that best estimate of the amount of

7    time that was spent on non-Bratz products based on your

8    general understanding as to how MGA was allocating its

9    resources over those years; correct?

10   **A.**    I gave you just my best estimate.

11   **Q.**    Based upon your general understanding as the CEO of MGA;

12   correct?

13   **A.**    That's right.

14          MR. PRICE:  No further questions.

15                 **FURTHER REDIRECT EXAMINATION**

16   BY MR. NOLAN:

17   **Q.**    The actual acting and allocations would be best found in

18   the financial records of MGA; is that correct?

19   **A.**    100 percent accurate.

20          MR. NOLAN:  Thank you.  Nothing further.

21                 **FURTHER RECROSS-EXAMINATION**

22   BY MR. PRICE:

23   **Q.**    Those general expenses, people's salary, research and

24   development, you know, how much time they are working on

25   different products, that's not allocated in MGA's accounting

7683

1    records; right?

2             MR. NOLAN:  Objection, your Honor.  Lack of

3    foundation.

4             THE COURT:  Overruled.

5             THE WITNESS:  I don't know.  I'm not an accountant.

6             MR. PRICE:  Nothing further.

7             MR. NOLAN:  Nothing further.

8             THE COURT:  All right.  Mr. Larian, you may step

9    down.  Thank you.

10            Defendant's next witness.

11            MR. KENNEDY:  Your Honor, we call Paul K. Meyer.

12            THE CLERK:  Please raise your right hand.

13                    **PAUL KEVIN MEYER, SWORN.**

14            THE CLERK:  Please take the stand.

15            Please be seated.  State your full name for the

16   record, and spell your last name.

17            THE WITNESS:  Paul Kevin Meyer, M-E-Y-E-R.

18                      **DIRECT EXAMINATION**

19   BY MR. KENNEDY:

20   **Q.**   Good afternoon, Mr. Meyer.  Would you tell us where

21   you're currently employed.

22   **A.**   Yes.  I'm a managing director at a consultant company

23   called Navigant Consulting.

24   **Q.**   What does Navigant Consulting do?

25   **A.**   It's a large consulting company, about 2,000 people.

7684

1    And we do lots of financial, economic studies in many

2    industries from financial to banking to entertainment, to

3    construction.  I focus mostly on intellectual property.

4    **Q.**   What is your title at Navigant?

5    **A.**   I'm managing director.

6    **Q.**   How long have you been with Navigant?

7    **A.**   About four and a half years.

8    **Q.**   Have you been retained in this case by MGA to offer

9    certain expert opinions?

10   **A.**   Yes, I have been.

11   **Q.**   And are those generally regarding MGA's profits from

12   Bratz and Mattel's other damage claims?

13   **A.**   That would be correct.

14   **Q.**   And have you formed opinions in that regard?

15   **A.**   Yes, I have.

16   **Q.**   Before we get to those opinions, I'd like to start with

17   a brief overview of your educational background, with

18   particular emphasis upon how it bears on the opinions you've

19   reached in this case.

20          Can you give us a summary, please, of that

21   educational background starting at the college level.

22   **A.**   Yes.  I attended the University of Virginia in

23   Charlottesville.  I studied business there and received a

24   degree in business with a concentration in accounting and

25   quantitative methods.  That was in 1979.

7685

1      Since then, I've maintained my sort of training and

2  education through being a Certified Public Accountant, where

3  I've taken a variety of courses over the last almost 30

4  years.

5  **Q.**   In addition to being a CPA, you have a CPA accreditation

6  in business valuation?

7  **A.**   Yes, as part of being a CPA, I took a separate exam

8  about 10 years ago and was accredited in a business valuation

9  certification, which is focused on valuing businesses,

10  valuing divisions, product lines, that type of thing.

11  **Q.**   In addition to your consulting duties at Navigant, do

12  you have any teaching positions?

13  **A.**   Yes.  I've been teaching at Stanford University for

14  about 17 years.  And I teach there -- first it was two

15  full-time courses.  I'm now back to the fall quarter.  I

16  teach a class basically in financial analysis, in accounting

17  that really is focused on helping engineers when they go out

18  and run companies and divisions, understanding their

19  financial data, understanding how the company's finances

20  work, divisions to corporations to product lines.

21      So it's geared on a financial analysis.  That's

22  been the last 17 years in the fall quarter.

23  **Q.**   Have you testified before in court as an expert witness

24  with regard to those kinds of areas?

25  **A.**   Yes, I've been in about 60 trials.

7686

1  **Q.**   And have you also been deposed out of trial in other --

2  in those and other cases?

3  **A.**   Yes, in a wide variety of financial analysis and damage

4  cases, about 200 times.

5  **Q.**   Have you previously testified as an expert concerning

6  damages in copyright cases?

7  **A.**   Yes, I have.

8  **Q.**   Have you been hired by both plaintiffs and defendants in

9  copyright cases over the years?

10  **A.**   Yes, I have.

11  **Q.**   In the course of your experience, would you say that you

12  developed expertise -- tell us whether or not in analyzing

13  and reviewing financial statements?

14  **A.**   Yes, I've spent a lot of time over the last 30 years

15  analyzing, reviewing, preparing financial statements, and

16  also lecturing and teaching on the components and results of

17  financial statements.

18  **Q.**   And how about with regard to analyzing costs associated

19  with particular products.  What have you done in that regard?

20  **A.**   I've done a lot of product line analysis, and a big part

21  of my Stanford class each year, we pick one company and take

22  the company and break it down and study it -- all its

23  operations, all its financial results, all its financing --

24  and try to figure out where the company's been, where it's

25  going, look at product lines.  And that's really the big part

1    of the course for the students and that fall semester class

2    at Stanford.

3    **Q.**    And how about calculating profits earned for particular

4    products.   Is that something you've had occasion to do?

5    **A.**    Yes, on many occasions.

6    **Q.**    How about determining the value of businesses?   Have you

7    done that?

8    **A.**    Yes, I have.

9    **Q.**    And approximately how many hours have you personally

10   spent on this case?

11   **A.**    On this case, probably about 500 hours.

12   **Q.**    And in addition to the 500 hours you've spent

13   personally, have other people from Navigant assisted you on

14   this case?

15   **A.**    Yes, they have.

16   **Q.**    And approximately how many hours have you and your

17   colleagues at Navigant spent on this case in toto?

18   **A.**    I believe around in total, about 4,000.

19   **Q.**    And your personal billing rate is how much per hour?

20   **A.**    $550 an hour.

21   **Q.**    And the other people are less than that?

22   **A.**    That's correct.

23   **Q.**    But they are charging for their time as well?

24   **A.**    Yes, sir.

25          MR. KENNEDY:   Your Honor, we would offer Mr. Meyer

7688

1   as an expert in financial analysis.

2           THE COURT:   Any objection?

3           MR. PRICE:   No objection.

4           THE COURT:   So designated.

5   **Q.**   BY MR. KENNEDY:   Now, in the course of working on this

6   case, have you attempted to evaluate profits from MGA's sale

7   of Bratz-related products?

8   **A.**   Yes, I have.

9   **Q.**   Did you also review Mr. Wagner, the plaintiff's economic

10  damages expert's valuation of the Bratz franchise damages

11  theory?

12  **A.**   I've also done that.

13  **Q.**   And could you tell us whether you also reviewed

14  Mr. Wagner's distribution damages theory with regard to

15  Mr. Larian?

16  **A.**   I've looked at that also.

17  **Q.**   And have you also looked at Mr. Wagner's net worth

18  calculations for MGA and Mr. Larian?

19  **A.**   Yes, I have.

20  **Q.**   Okay.   Now, turning -- and in the course of analyzing

21  that material, could you give us a brief summary of the kinds

22  of information that you've considered and reviewed?

23  **A.**   Yes.   It's been quite comprehensive.   I wanted to come

24  to understand the financial operations of the MGA business.

25  So I spent a lot of time looking at their audited financial

7689

 1    statements.   We call it a profit-and-loss statement.   And

 2    then I went deeper than that and looked at a system that was

 3    basically their general ledger system of accounts.   That was

 4    called an Exacta (phonetic), and Great Plains was their

 5    summary of their general ledger account, which is all their

 6    accounts for their business.

 7            Then there's a system called Target, which tracks

 8    for MGA their -- for each product and what they call stock

 9    keeping unit, SKU, all the revenues and the costs of goods

10    and royalties and some tooling.   So I looked at those

11    financial records.

12            I spent a lot of time looking at marketing and

13    other business records of MGA for background on the Bratz

14    business.   I spent a lot of time going and looking at

15    Mattel's records and the records about marketing and selling

16    their fashion dolls and some surveys that were done for their

17    fashion doll purposes.

18            I interviewed persons at MGA about the business,

19    the product managers, the financial people, some of the tax

20    people, and I did some third party research to look at

21    analyst reports and outside information to help me

22    corroborate my findings.

23            So it was sort of three prongs, looking at MGA,

24    looking at Mattel, and then looking at third party outside

25    sources.

**Q.**   And have you prepared a graphic depicting the overall

methodology that you've employed in attempting to determine

both Bratz-related profits and the portion of those profits

that's attributable to Mattel's property?

**A.**   Yes, I have.

**Q.**   And calling your attention to slide 102, which we just

put up entitled Overview methodology.  Could you explain for

us what the steps are there and also the color coding that

you've used.

**A.**   Yes, I can.  It's a simple but important chart.  I start

at the top.  The first row is basically I come up with, in

this case, the total Bratz-related revenues, and I did a

bunch of work in addition to that to break out those

revenues.  And we'll discuss that.

     I then deduct from the revenues the costs and

expenses that it's taken MGA to both manufacture and market

and do product development and support those Bratz revenues.

So I deduct the expenses from the revenues to come up with

row 3 there, which is the profit.  And that would be the

overall profit on all the Bratz-related accounts.

     And then once I'm at the profit level, I then go

one step further, and I do an analysis that relates to

apportioning those profits to, in this case, what we call the

Mattel's protected property.  And I come up with an analysis

of that and a percentage.  And I multiply that percentage

7691

1    times the profits, the green box there.  And then come up

2    with what I call the total damages in this case based on my

3    analysis and my study.

4    Q.    And focusing in on the profits, the blue revenue, the

5    gold expenses and the green profit.  Have you prepared a

6    graphic depicting where you and Mr. Wagner disagree?

7    A.    Yes, I have.

8            MR. NOLAN:  Aaron, could we see 148-02, please.

9    Q.    And is it correct -- to try to move this along, you and

10   Mr. Wagner are basically in agreement concerning the total

11   revenues that were generated by Bratz products?

12   A.    Yes, sir.

13   Q.    You take all of the revenues from all of the stuff on

14   the floor here and all of the products upstairs in the other

15   courtroom, and you both agree the total revenues rounded are

16   about 3.1 billion?

17   A.    That's correct.

18   Q.    And then is it correct that you and Mr. Wagner are also

19   in agreement as to what should be subtracted from that 3.1

20   billion for costs of goods sold?

21   A.    That's correct.  There's some rounding there, but

22   basically we don't disagree with the $1.7 billion of the cost

23   of goods; that's correct.

24   Q.    And just as a reminder, what sorts of things are

25   included within costs of goods?

7692

1   **A.**   I think the picture you should have is that you think

2   about what it takes to actually assemble the doll and to

3   build the doll in terms of the manufacturing costs, the

4   contract costs, and to package it up and have it ready to be

5   shipped.  So it's the costs of all of the hair, the contract

6   manufacturing, and the molds and tooling and what not, but

7   that's basically the costs of goods, the cost of production.

8   **Q.**   And so far you and he are in agreement for the first two

9   lines there?

10  **A.**   I would say generally, that is correct.

11  **Q.**   Now we get to operating expenses.  And is it correct

12  that he believes the operating expenses that are attributable

13  to the Bratz line are about 600 million while you believe

14  they are more like 800 million?

15  **A.**   That's correct.

16  **Q.**   Okay.  And again, just as a reminder, what sorts of

17  things are included within operating expenses as opposed to

18  cost of goods sold?

19  **A.**   Well, that would be your selling and marketing expenses,

20  would be your advertising, producing your commercials and

21  buying the placement, the media.  It would include all your

22  premises and facility costs, of all your different warehouses

23  and home office.  It would include all the salaries of the

24  people that support the product line.  So it's all those

25  costs that are really the infrastructure of the company to

7693

1   help make its sales.

2   Q.   And to determine operating expenses in this case, does

3   that require some kind of allocation of MGA's total operating

4   expenses to get to the Bratz expenses?

5   A.   Yes.   Because MGA has the Bratz business and some other

6   businesses and so you have to make some determinations as to

7   how to divide the costs out between their businesses, between

8   Bratz and non-Bratz.   So that's part of the effort.

9   Q.   And you and Mr. Wagner both tried, and you came up with

10   different answers.

11   A.   That's correct.

12   Q.   We'll talk about that more in a minute.

13          Now, coming down to taxes, you're also in

14   disagreement with Mr. Wagner there; correct?

15   A.   That's correct.

16   Q.   Again, he doesn't feel that federal taxes should be

17   deducted.   You feel that they should.

18   A.   That's correct.

19   Q.   And when Mr. Wagner was here, he told us that applying

20   his methodology, the total Bratz profits were just under

21   $778 million.   777.9.   What in your opinion are Bratz' total

22   profits for the entire line?

23   A.   My figure is the bottom right-hand side there.   It's the

24   405 million.   It's actually 405.4 million would be my amount.

25   That's the profits on Bratz.

7694

1   **Q.**   Okay.  Now, let's focus in first on your disagreement

2   with Mr. Wagner about operating expenses.  And did you

3   prepare a slide showing the steps that you took in attempting

4   to determine what portion of MGA's operating expenses should

5   be ascribed to the Bratz line?

6   **A.**   Yes, I have.

7        MR. KENNEDY:  And, Aaron, could we see 194, please.

8   **Q.**   And could you briefly explain to the jury what the steps

9   are that you took, and this is with regard to the operating

10  expenses; is that right?

11  **A.**   Yes, it is.  I can do that.  I'll take this at a higher

12  level.  There's various steps here that allowed me to have a

13  methodology to come up with what I think is the right amount

14  for operating expenses.  The first line, I investigated how

15  MGA did its own accounting and its own overhead allocations

16  and confirmed I was consistent with that.

17       Secondly, he spent a lot of time looking at the

18  change in head count at MGA, between the year 2000 and the

19  year 2006.  And I saw a large increase in head count, that

20  was important to coming up with my operating expense opinion.

21       I spent a lot of time comparing the results of my

22  Bratz financial analysis versus MGA to be consistent amongst

23  all the financial records that I fully accounted for

24  everything to be consistent there.

25       The fourth step is probably one of the most

1  important.  And that is I looked at the MGA business before

2  and after the release of Bratz. And so I went back to the

3  calendar year 2000, studied all the operating expenses, and

4  then I documented how those expenses grew significantly after

5  2000 when Bratz was released, looking at the relationship of

6  the costs being spent to support the sales.  I had

7  discussions with MGA's financial people and talked a lot

8  about things with them.

9        And then in a moment, I'll talk about this in more

10 depth, but I ran a statistical model called a regression

11 analysis to confirm the relationship of the operating

12 expenses to sales.  I reviewed Mr. Wagner's approach.  And

13 then lastly, I determined that my analysis and the costs I

14 deducted were consistent with how Mattel accounts for its

15 costs with its Barbie product line.

16 **Q.**  And in the course of this, did you attempt to just

17 reconstruct how MGA's operating costs as a whole, operating

18 expenses as a whole changed between 2000 and 2006?

19 **A.**  I certainly documented that and reviewed those changes.

20 **Q.**  And did you prepare a graph showing those changes?

21 **A.**  Yes, I have.

22        MR. KENNEDY:  And, Aaron, if we could see 146.

23 **Q.**  Can you tell us first, if we can clarify, whose expenses

24 are we talking about here?  Is this MGA as a whole or just

25 Bratz?

7696

1   **A.**   This is MGA as a whole.

2   **Q.**   And can you --

3            MR. PRICE:  In that case, I object as being

4   argumentative, the title.  Given the testimony.

5            THE COURT:  Why don't you rephrase, Counsel.

6            MR. KENNEDY:  Your Honor, not to quarrel with the

7   Court, we've tried to remove the offending --

8            THE COURT:  Recharacterize it.

9   **Q.**   BY MR. KENNEDY:  Showing you part of Exhibit 142.

10           THE COURT:  There we go.

11  **Q.**   BY MR. KENNEDY:  Looking to the chart as it's now on the

12  board, can you explain what those columns represent?

13  **A.**   Yes.  In the lighter shade, that's the amounts in the

14  calendar year 2000 before Bratz was released.  And these are

15  operating expense accounts for MGA.  So you'll see those

16  amounts in the lighter shade.  So for example, the premise is

17  a million dollars, and the darker orange color is basically

18  in 2006 those same accounts and what those amounts are.  And

19  so, for example, with sales and marketing in 2006, it's about

20  $79.4 million.  And that compares with 13.4 million in the

21  calendar year 2000.

22           So the purpose was to analyze over time how those

23  accounts changed and then to match that up with the growth in

24  the Bratz sales.

25           And to give you a sense, there was no Bratz sales

7697

1   in the calendar year 2000.  And then by 2006, those sales

2   were $628 million.  And so as the sales went up, I tracked

3   how the costs changed.

4   Q.   Now, we've heard in this case that MGA acquired a

5   company called Little Tykes.  Is whatever happened because of

6   Little Tykes reflected on this chart?

7   A.   No.

8   Q.   Why not?

9   A.   That acquisition took place in late 2006.  And so those

10  amounts are not in these numbers.

11  Q.   From your review, the Little Tykes numbers don't start

12  showing up until 2007?

13  A.   In our analysis, that's correct.  In 2007.

14  Q.   In addition to seeing what happened to MGA's operating

15  expenses after the launch of Bratz, did you also check to see

16  what was the history with regard to MGA's head count, number

17  of employees during those years?

18  A.   Yes, I did.

19        MR. KENNEDY:  And, Aaron, could we see 147 without

20  the title.

21  Q.   And again, this is covering the period through 2006.  So

22  any head count of Little Tykes isn't included on here.

23  A.   That's correct.  This is MGA without Little Tykes, and

24  it shows the growth in the head count from 2001.  The 135

25  employees up to 837 as of 2006.  And so that's the growth

1  that I mapped out there.  And then it's compared against the

2  MGA total sales in that period.

3  **Q.**   Okay.  And then you've got a yellow staggered line.

4  What is that referring to?

5  **A.**   That's the MGA total sales for that period.  So

6  you'll see that by the end of that period, 2006, those sales

7  were $685 million, and they were back in 2001, they were

8  $25 million.  In fact, let me clarify.

9       Those are the Bratz sales.  And so Bratz sales in

10  2001 are about 25 million.  And by 2006, they are 685

11  million, and that's in gross revenues.

12  **Q.**   So the gray columns are showing the number of employees

13  each year, and the yellow or gold staggered bar is showing

14  Bratz sales; is that correct?

15  **A.**   That's correct.

16  **Q.**   Okay.

17       Having seen those numbers, there was nothing there

18  that established that growth was necessarily caused by Bratz,

19  was there?

20  **A.**   Well, there was two things.  First, those kinds of

21  comparisons, and I made many others, and my other work steps

22  indicated to me that these operating costs were highly

23  variable with the sales, but I wanted to go the next step and

24  say could I run a statistical model to take that one step

25  further and confirm that relationship of, as sales go up, do

7699

1    the costs go up in a certain relationship, and that's what I

2    did next.

3    **Q.**    And is there a statistical tool that allows us to

4    determine whether those increases are just coincidence or

5    whether they are causally related.

6    **A.**    You can run financial analyses.  It's called a

7    regression analysis.  And that's a financial model that

8    allows you to look at the relationship of two variables.  In

9    this case, the Bratz sales comparing it to the operating

10   costs.

11   **Q.**    And Mr. Wagner told us he also did a regression

12   analysis.  Did you two guys do exactly the same analysis?

13   **A.**    We both ran regression analyses.  We structured the

14   calculations differently.  So we have different formulas and

15   different approaches to actually doing the calculations.

16   **Q.**    We've heard the word model used in connection with a

17   regression analysis.  Is that what it is?

18   **A.**    It is a financial model.

19   **Q.**    And what do you do -- do you just get a book off a shelf

20   and that provides the model, or is there judgment involved in

21   how you do that?

22   **A.**    Well, the formulas are straightforward, but you have to

23   think about what you are analyzing, and you should set up the

24   model in a way that's consistent with the type of business

25   that you're looking at and the data you have and the time

7700

1    periods you have.

2        So you actually want to do some planning on the

3    front end to run the model in a way that will make the most

4    sense and fit your circumstances.

5    Q.   And is the $405 million profit figure that we talked

6    about earlier the product of your regression analysis?

7    A.   It's the product of two things.  It's the product of

8    looking at the relationship of sales and costs and then

9    confirming that by running the regression model and adopting

10   those results.  So it's the combination of the two.

11       MR. KENNEDY:  Aaron, could we put up 148.02 again,

12   please.

13   Q.   Going back to the third line, the operating expenses, is

14   the 800 million the product of your regression analysis?

15   A.   The regression analysis supports that, that's correct.

16   Q.   And then the 405 million is the product of the

17   regression analysis plus your assumptions?

18   A.   Plus the other analyses, that's correct.

19   Q.   And is it your understanding that Mr. Wagner's

20   600 million is the product of his regression analysis?

21   A.   That plus some other adjustments that he makes.

22   Q.   Okay.  You say adjustments that Mr. Wagner made.  Can

23   you explain what you're referring to?

24   A.   Yes.  He ran a regression model for the same time period

25   that I analyzed, and then he got the results of that model,

1    and then he overrode those results and made some adjustments,

2    and so he adjusted the result by, I believe, 125 million

3    dollars approximately.  And so in some respects he doesn't

4    really use his regression model.  He starts with it, and then

5    he makes deviations.

6    **Q.**    In your opinion, if you've come up with a proper

7    regression analysis model, and you run the regression

8    analysis, should you then have to adjust it upwards or

9    downwards by $125 million?

10   **A.**    I certainly don't believe that you should adjust it by

11   that much.  That was an approximate 30 percent adjustment to

12   his result.  And so that was a very significant adjustment.

13   And I wouldn't accept that kind of approach.

14   **Q.**    Okay.  And I believe Mr. Wagner testified that he then

15   did a second analysis -- same model, but using new numbers.

16   Are you familiar with that one?

17   **A.**    Yes, I am.

18   **Q.**    And I believe he testified he did about a $40 million

19   net adjustment on that one.  Are you familiar with that?

20   **A.**    Yes, I am.

21   **Q.**    And again, if you've got a properly constructed

22   regression model and you've made the right assumptions, in

23   your experience, should you have to make a $40 million

24   adjustment at the end?

25   **A.**    I wouldn't agree with that.  I think that he should not

1    have done that.

2    **Q.**   Recognizing you're getting paid by MGA and maybe your

3    opinion as to whose regression analysis might be something

4    other than totally objective, are there objective tests that

5    you can apply to regression analysis to determine which one

6    is more reliable?

7    **A.**   There's a couple of statistics that come out of the

8    model that tell you basically how good a formula, how good a

9    model is.   There's one that's called the t-stat, S-T-A-T, and

10   that gives you feedback on whether or not you should actually

11   be running the model.

12           So you need to have a t-stat that's greater than 2

13   and the higher the value, the better.   That's your first

14   metric.   And secondly, the one we probably all hear about is

15   called R squared, and that basically says how good of a

16   prediction are you getting with your formula.   In this case,

17   we're looking at the change in sales of Bratz versus the

18   operating costs of MGA.   So the higher the

19   R squared, the better equation, the better predicted value

20   you have of your formula.

21           So you want a high R squared, and you want a t-stat

22   that also is higher certainly than -- the higher the better.

23   So those are just metrics that you receive when you run your

24   formulas, and they allow to you grade out your results.

25   **Q.**   Okay.   And did you prepare a slide comparing the t-stat,

7703

1    that's small letter T, hyphen S-T-A-T, results for your

2    regression analysis and Mr. Wagner's first regression

3    analysis?

4    A.    Yes, I have.

5                MR. KENNEDY:   Aaron, could we see that, please.

6    Q.    The code here is Mr. Wagner's t-stat is in gray, and

7    you've decided to grade yourself in gold?

8    A.    Gold or orange.   Whatever your eyes tell you.

9    Q.    And is the right-hand side of the chart higher?

10   A.    Yes, it would go from zero up to 20.   So the right-hand

11   side, it's a higher value.

12   Q.    So did you find that the t-stat for your analysis versus

13   Mr. Wagner's original analysis was higher for each category?

14   A.    Yes.   If you track down by row, you'll see that the gold

15   or the orange bar is higher than the gray bars, and so it

16   indicates that I have a better predictive formula.

17   Q.    Did you compare and prepare a slide comparing your

18   regression analysis with Mr. Meyer's second regression

19   analysis, the one with the $40 million adjustment?

20   A.    Yes, I compared Mr. Wagner to my results also with his

21   second regression analysis.

22               MR. KENNEDY:   Aaron, could we see 243.02.

23   Q.    And again, in the interests of time, can you summarize

24   who came out better this time?

25   A.    Well, we have similar color schemes, and so you'll see

7704

1    the gray, and you'll see the orange or the gold, and once

2    again, the results are better for the T values in comparing

3    my calculations to his, the second calculation.

4    Q.    Did you also prepare a graph comparing the R squared

5    results for your regression analysis versus Mr. Meyer's first

6    regression analysis?

7    A.    I also compared Mr. Wagner to my results on the R

8    squared, a similar structure.

9            MR. KENNEDY:    Aaron, could we see 243.01 again,

10   please.

11   Q.    Mr. Meyer, it's been pointed out to me that at the

12   bottom of 243.01, we've got better headed towards zero and

13   worse headed towards the top.    Is that the way it should be?

14   A.    Better is to the right-hand side.    So those are actually

15   inverted.    Better is at the 20 and worse is at the zero.

16   Q.    So we've got an error in the graphic?

17   A.    I would agree with that.

18   Q.    Okay.    Thank you very much.

19            Sorry for the interruption.    Did you do a graph

20   depicting how your regression analysis compared with

21   Mr. Wagner's original analysis in terms of R squared?

22   A.    Yes, I have done that.

23            MR. KENNEDY:    Aaron, could we see 156 version 1.

24   Q.    First, have we got better and worse on the right sides

25   this time?

7705

1   **A.**   Yes, the worse is at 0 percent, and the better is at a

2   hundred percent.  So this one is set up in a similar fashion,

3   but it's a different scale.  Mr. Wagner's in the gray, and my

4   R squares are in the orange or the gold.  And you'll see the

5   orange or gold bars are higher than his gray bars, indicating

6   that I have a better predictive model, formula, for the

7   operating expenses.

8   **Q.**   Finally, did you do a similar analysis and graph for

9   Mr. -- or the R squared on Mr. Wagner's revised or second

10   regression analysis?

11   **A.**   Yes, I've done that also.

12          MR. KENNEDY:  Aaron, could we see 156.02, please.

13   **Q.**   And once again, who has the better R squared?

14   **A.**   It would be similar result.  And so you'll see once

15   again that the orange and gold bars are to the right-hand

16   side towards the higher hundred percent.  And the grays are

17   lagging behind.  This is on the updated analysis that he --

18   that Mr. Wagner did.

19   **Q.**   And did you make any attempt to determine why it was

20   that your regression analysis came out with better t-stats

21   and a better R squared than Mr. Wagner's?

22   **A.**   Yes, I did.

23   **Q.**   Okay.  And can you tell us in general what you found

24   that to be due to?

25   **A.**   It's my opinion that because we're talking about a

1   business that is highly seasonal.  It's a business that

2   provides dolls and toys that are sold in retail, and the vast

3   majority of the sales occur between August and really

4   November, some December.

5            So we have a very highly seasonal business.  And so

6   my analysis of regression was run on an annual basis.  So I

7   ran it year by year.  And it's my position you get a better

8   equation and a better result because we're looking at a

9   situation where costs are incurred throughout the year by MGA

10  to support the holiday rush, almost like selling Christmas

11  trees.  You may have all year long and have very little

12  revenue, but then you have lots of revenue in November and

13  December.

14           So it's important to look at the costs, I believe,

15  that are incurred all year and match them up with your sales

16  all year.  So, for example, selling and marketing early in

17  the year, product development early in the year for MGA

18  benefits the holiday season.  So by grouping the 12 months

19  together, sales and costs, you get a much better

20  relationship, and that's why I believe my results are

21  superior to Mr. Wagner's results.

22  Q.   You said you did yours on an annual basis.  What time

23  period did Mr. Wagner use for his?

24  A.   He ran it on a monthly basis.  So he compared the sales

25  to the costs each month.  And his formulas are based on

1    monthly results.  Not annual results.  And so we differ on

2    that sort of basic fundamental issue.

3    **Q.**    And did you prepare a graph summarizing what you believe

4    are the differences and the reason for the different scores

5    on the two regression analyses?

6    **A.**    Yes, I have.

7         MR. KENNEDY:  Aaron, could we see 154.

8    **Q.**    Briefly explain the significance of using annual versus

9    monthly data in this context.

10   **A.**    I believe this chart corroborates the position about the

11   seasonality.  And so you'll see that the left side, the axis

12   is millions of dollars, and then we go from January to

13   December, and what we track is the total operating expenses

14   are in the orange.  That's the lower line.  And you'll see

15   that how the sales change month to month, and this is for

16   2006, as an example, calendar year 2006.

17        You'll see that basically from June to November

18   there's a real -- I guess June to October -- a real up-tick

19   in the sales.  A little drop, and then back up in November.

20   And that's all the holiday shipments.

21        So it's my position that you get a much better

22   correlation of your sales and costs by looking at the whole

23   year knowing that some of the costs early in the year are

24   being incurred to help you sell later in the year.  And this,

25   I believe, backs up my regression formula in a qualitative

1    way.   It says I ran it correctly because I matched up this

2    business and its sales and costs to how it does its business

3    in contrast to Mr. Wagner.

4    Q.   Let's turn now to the other area of disagreement you've

5    identified with Mr. Wagner.   Taxes.   And tell us why you

6    think that taxes ought to be deducted to determine profits in

7    this case.

8    A.   I believe that taxes are amounts that now have been paid

9    to the IRS based on the results of MGA's business.   There are

10   amounts that are not retained by MGA.   In a sub-S corporation

11   like MGA, they are actually paid by the shareholders.   So

12   Mr. Larian has to pay the taxes on behalf of the company.

13   And that's the corporate issue.   But these amounts have been

14   provided to the IRS.   They are not profits.   They are

15   dispersed.   They are not retained earnings.   They are not

16   retained by MGA.   They are not retained by Mr. Larian.   And

17   from my perspective, they are detectable costs if you want to

18   come up with profits.

19           So the $200 million of taxes that I deduct, these

20   amounts have been paid to the IRS.   They are not sitting with

21   Mr. Larian or MGA.   And that is sort of my basic position on

22   it.   And it's also consistent with how Mattel accounts for

23   Barbie.   They deduct taxes in getting their product line

24   profitability for Barbie.

25   Q.   Okay.   Changing topics.   Going back to that full

1    3.1 billion in Bratz revenues, did you attempt to break

2    it down into percentage components?

3    **A.**    Yes, I have.

4    **Q.**    And did you prepare a graph showing the results of your

5    breaking down of the 3.1 billion by component?

6    **A.**    Yes, I have.

7             MR. KENNEDY:  Aaron, could we see 142, please.

8    **Q.**    Looking to the pie chart that's on the screen now, could

9    I ask you to start over in the bold blue that's been labeled

10   first generation Bratz fashion dolls we've been hearing about

11   in this case, and tell us what percentage you found there,

12   and then let's proceed on clockwise, if you could,

13   identifying the key areas here.

14   **A.**    Okay.  The entire pie, the value of the entire pie is

15   $3.1 billion.  And the first pie slice is that first

16   generation Bratz fashion dolls.  And that's 2 1/2 percent of

17   the total $3.1 billion.

18           Then I went to the next level and broke out for you

19   what I call the later generation Bratz fashion dolls.  And

20   that's where the arrow is, and that's about 38 percent.  And

21   those are fashion dolls beyond the original group of four.

22           And then if we continue on to the left-hand side of

23   the -- the low left-hand side of the pie, you'll see what I

24   call other product lines.  There's a variety of products in

25   there.  There's Bratz Boyz, Bratz Kidz, Bratz Pets, and

1   that's about 22 percent of the $3.1 billion.

2          And then if we move towards the top, we'll see play

3   sets.  That's about 8 percent.  And then the next item up

4   would be the vehicles at 5.9 percent.  Then we sort of change

5   gears and go into licensing revenues.  That's about 5.8

6   percent of the total 3.1 billion.  And then just moving

7   along, we see electronics at 5.7 percent.  And then what's

8   been called life-style products at 3.9 percent.  And then

9   outdoor at 2.7 percent.  Fashions are 1.6 percent.  Games at

10  1.4 percent.

11         Then we're down to a couple small categories.

12  There's an accessories there at .8 percent and entertainment

13  at 1 percent.  So that's a breakdown of the $3.1 billion on a

14  product line basis.

15         MR. KENNEDY:  Your Honor, Mr. Price and I have both

16  noticed that the jury is taking a lot of notes, which makes

17  me happy.  But he's agreed that everything so far will be

18  going into evidence.  So they will have the benefit of it,

19  for which I thank him.  So from here on, I assume Mr. Price

20  will make a suitable objection if there's anything here that

21  won't be for the jury to actually have in their possession.

22         MR. PRICE:  The only issue may be the title.

23         THE COURT:  Very well.  Thank you, Counsel.

24         MR. KENNEDY:  Thank you, Mr. Price.

25  Q.   In addition to breaking down the 3.1 billion by

7711

1   category, did you also break it down by dollar amounts?

2   **A.**   Yes, I have.

3   **Q.**   And let me guess.  Is there a graphic that just happens

4   to do that?

5   **A.**   Yes, there is.

6   **Q.**   How fortunate.

7           Could we have 168, please.

8           Starting at the bottom we've got 3 billion 68

9   million.  Is that the number rounded that comes to 3.1

10  billion that we've been talking about?

11  **A.**   Yes, it is.

12  **Q.**   It's the same number, but it's been rounded previously?

13  **A.**   That's correct.

14  **Q.**   Okay.  And you've taken first generation Bratz dolls,

15  and they represent how much of that 3.1 billion?

16  **A.**   The actual amount is 77.9 million, and I've rounded that

17  to 80 million elsewhere, but that's the first cut of the

18  fashion dolls.

19  **Q.**   Okay.  And I'm sure the jury would love us to go through

20  each of these numbers, but since they will have it, just

21  summarizing, you have a billion two total for Bratz fashion

22  dolls?

23  **A.**   That's correct.  Fashion dolls are the $1.2 billion

24  right there.  That's correct.

25  **Q.**   And then you've got these other product lines, 762

7712

1  million when you round it off?

2  **A.**   That's correct.

3  **Q.**   And Bratz-branded merchandise, 844 million?

4  **A.**   That's correct.

5  **Q.**   And then numbers for licensing and entertainment?

6  **A.**   Yes.

7  **Q.**   Let's focus in on that Bratz-branded merchandise line,

8  the fifth one up from the bottom that's the 844 million.

9       Did you also do a breakdown of that item by

10  component?

11  **A.**   Yes, I have.

12  **Q.**   And did you prepare a chart summarizing that?

13  **A.**   Yes, I have.

14       MR. KENNEDY:  Aaron, could we have 161, please.

15  **Q.**   And down in the lower right-hand corner, we've got our

16  844 million number.  And just to move this along, this starts

17  with, in the upper left-hand corner, fashion doll play sets

18  generate revenues of just under 150 million?

19  **A.**   That's correct.

20  **Q.**   And then in descending order, sales and TV is 13.7

21  million, and various other items coming down ultimately to

22  electronics and other audio, video of a million?

23  **A.**   That's right.  It goes from the top to the highest

24  revenue branded product and it wraps down to the right-hand

25  side to a million dollars for the electronics.  And so these

7713

1    are all of the breakouts for these different branded

2    merchandise categories.

3    Q.    Now, changing topics again, did your assignment in this

4    case also include a request to try to determine whether the

5    entirety of that $405 million in profits that you've

6    calculated was due to Mr. Bryant's drawings?

7    A.    Yes, that was part of my assignment.

8    Q.    Okay.  And in that regard, did you attempt to acquaint

9    or educate yourself at all with the elements that at least

10   MGA thought were important in creating the Bratz line, or the

11   Bratz fashion doll?

12   A.    Yes, as it relates to the Bratz profits, I did some

13   research to try to determine if there were other factors that

14   related and contributed to the profits at Bratz that were

15   other than Mr. Bryant's materials or his drawings.  And so I

16   studied a wide variety of records.

17          I looked at first MGA's records about its Bratz

18   products and what it believed was important as they went to

19   market and developed certain generations of fashion dolls

20   over the period of 2001 to 2007.  I spent a lot of time

21   looking at Mattel's documents and Mattel's surveys and what

22   they felt was important in selling their fashion dolls, both

23   Barbie and My Scene, and there was lots of information both

24   in MGA's records and Mattel's records about really what it

25   was called was themes, and the goal was to sell the fashion

1  dolls within these themes.

2          So I began to understand that themes were important

3  to creating profits and fashions and accessories and how the

4  products are packaged and the importance of selling --

5          MR. PRICE:  Your Honor, I'm going to object.  This

6  is improper expert testimony.

7          THE COURT:  Sustained, that last sentence is

8  stricken.  Next question, Counsel.

9          MR. KENNEDY:  Yes, your Honor.

10 **Q.**   You mentioned the word themes.  In the course of this

11 work, or your work, did you attempt to identify when --

12 first, did you attempt to identify when MGA first started

13 using themes in connection with the Bratz dolls?

14 **A.**   Yes, I did.

15 **Q.**   Okay.  And when did you find that was?

16 **A.**   That was November of 2001 and basically for the calendar

17 year of 2002.  It was a large part of their business.

18 **Q.**   And did you then attempt to track revenue by theme

19 coming forward after that?

20 **A.**   Yes, I have.

21 **Q.**   And were you able to do so?

22 **A.**   Yes, sir.

23 **Q.**   And did you -- were you able to prepare a graphic

24 showing the amount of revenue generated by theme over the

25 years?

1    A.   Yes, I have.

2         MR. KENNEDY:  Aaron, could we see 118, please.

3    Q.   Now, on 118, what does each of the horizontal gray bars

4    represent?

5    A.   These are fashion dolls that are sold within a theme or

6    thematic sort of offering, and so each one of these gray bars

7    represents the total sales for that theme.  And the total of

8    all the gray bars is about $1.1 billion.  And so I've mapped

9    out for the 77 themes by theme how much the sales were.

10   Q.   So there were 77 themes all together?

11   A.   That's correct.

12   Q.   And did you also make up a chart showing the themes by

13   name and amount of revenue generated?

14   A.   Yes, I have.

15        MR. KENNEDY:  Aaron, quickly to 165.02.

16   Q.   And we'll go back to the graph in a moment, but just to

17   put this in context, for example, starting up at No. 1, the

18   Bratz play sports theme generated revenues of $73 million?

19   A.   That's correct.

20   Q.   And at the other end of the line, No. 77, Bratz hair

21   play generated total revenues of how much?

22   A.   It was actually under a hundred thousand dollars.  So it

23   was -- that's .1.  That means a hundred thousand dollars.

24   Q.   You've listed the other 75 themes according to the

25   amount of revenue they generated; correct?

7716

1  **A.**    That's correct.

2         MR. KENNEDY:   Aaron, 118.01, the graph.

3  **Q.**    Now, based on the work you did in this case, did all of

4  those themes involve plastic dolls?

5  **A.**    Yes.

6  **Q.**    Did they also involve, as you understood it, whatever

7  other intellectual property Mattel owns in this case?

8  **A.**    That's my understanding.

9  **Q.**    And in looking at that variation in revenues, did that

10 cause you to form any working hypothesis with regard to

11 whether the intellectual property was responsible for the

12 entirety of the profits?

13 **A.**    Yes, it did.

14 **Q.**    And what was that?

15 **A.**    The position I adopted was that there was a factor, that

16 being themes, other than the property in this lawsuit that

17 was creating profits for the Bratz line.

18 **Q.**    And did you further try to drill down by examining the

19 themes when they first started getting released in 2002?

20 **A.**    Yes, I did.

21 **Q.**    And did you prepare a graphic summarizing your analysis

22 of that first set of themes in 2002?

23 **A.**    Yes, I did.

24        MR. KENNEDY:   Aaron, could we see 199 version 1.

25 **Q.**    And can you tell us what you found and are summarizing

7717

1   here?

2   **A.**   Yes.   This was in 2002.   I knew that the Bratz sales in

3   2001 in total were $25 million.   So I was trying to figure

4   out why the sales were so much higher in 2002.   I determined

5   that there was four themes released by MGA in 2002.   And

6   these are the total sales for the whole period.

7           So they are released in 2002, but they may sell for

8   several years, and I just aggregated it all together to show

9   you how each theme did.   It indicates to me that these were

10  all successful releases, and from the Funk 'N Glow to Holiday

11  and Strut It.   And the high was 53.7 for Bratz Strut It.   And

12  the low was for Funk 'N Glow 26.9 million, indicated to me

13  that the themes were successful.

14          It also indicated to me that there was variation

15  and wide variation in the success of the themes.   Because one

16  was double the others, or the first one.

17  **Q.**   Did you approach this part of your assignment on the

18  assumption that Mr. Bryant's original drawings, Mattel's

19  intellectual property, had made a contribution to the success

20  of the Bratz line?

21  **A.**   Yes, I did.   And I assume that that contribution was in

22  all of these releases.

23  **Q.**   Okay.   And assuming that Mr. Bryant's drawings, Mattel's

24  other intellectual property, are the sole reason for the

25  success of the Bratz line, were you able to find any

7718

1   explanation as to why every theme doesn't generate the same

2   sales?

3   **A.**   No, I wasn't.  And so I focused on the themes and looked

4   beyond the property that we're talking about.

5   **Q.**   And just while we're talking about themes, Bratz Strut

6   It, the 53.7 million for that one theme?

7   **A.**   That's correct.

8   **Q.**   And how much did the original first generation Bratz

9   dolls derive in all?  Do you need to see your pie chart in

10   all?

11   **A.**   I believe it was about $78 million for the first

12   generation.

13   **Q.**   And going back to 118, if we can for a moment.  The most

14   successful theme over on the far right-hand side is

15   generating about how much?

16   **A.**   I believe it was $73 million.

17   **Q.**   So that one theme generated within $5 million of the

18   total revenue of the first generation?

19   **A.**   That's correct.  That's Bratz play sports, $73 million.

20   **Q.**   Following your analysis of the 2002 themes, did you

21   attempt to do a similar analysis for the 2003 themes?

22   **A.**   Yes, I did.

23   **Q.**   And did you prepare a chart summarizing what you found

24   there?

25   **A.**   Yes, I did.

7719

1          MR. KENNEDY:  And, Aaron, could we see 199.

2  **Q.**   Now, this tells us that in 2003, sales from themes were

3  what, $218 million?

4  **A.**   Well, it was for the total sales for the themes released

5  in 2003 over their entire life for $218 million dollars.  And

6  so these were six themes released in 2003 that generated

7  about 220 million in total for MGA.

8  **Q.**   So we have six themes that year?

9  **A.**   Yes.

10  **Q.**   And once again, how much was it that the first

11  generation dolls generated totally?

12  **A.**   About $80 million in revenue.

13  **Q.**   So doing my arithmetic, these six themes generate about

14  two and a half times the total revenue of the first

15  generation dolls?

16  **A.**   I would agree with that.

17  **Q.**   Did that cause you to believe that themes might have

18  something to do with the overall profitability of the Bratz

19  dolls?

20          MR. PRICE:  Objection.  Beyond his expertise.

21          THE COURT:  Sustained.

22  **Q.**   BY MR. KENNEDY:  Following up on your analysis of

23  themes, did you attempt to -- strike that.

24          Following up on your analysis of themes you just

25  talked about, did you then attempt to apply your expertise to

7720

1   see if you could come up with any bases upon which the total

2   profits might be apportioned between the Carter Bryant

3   drawings on the one hand and other factors on the other hand?

4   **A.**   Yes, I did.

5   **Q.**   Okay.  And stop right there.  Is this something that's a

6   science that you were doing?

7   **A.**   It takes judgment, but I use financial techniques and

8   experience I've had for 30 years in doing those kinds of

9   analyses.

10  **Q.**   Were any of the opinions you formed something that can

11  be expressed with mathematical certainty?

12  **A.**   I don't believe that's the case.

13  **Q.**   Any of the methods you came up, with they gradable on

14  the basis or their R squared or their t-stat?

15  **A.**   They would not be.

16  **Q.**   Okay.  And given that admitted imprecision, did you come

17  up with what you thought were at least rational approaches

18  for attempting to apportion the Bratz profits in this case?

19  **A.**   Yes, I have.

20  **Q.**   And did you have one that involved the royalties that

21  MGA actually paid Mr. Bryant?

22  **A.**   Yes, I do.

23  **Q.**   And did you prepare a graph depicting that possible

24  method of apportionment?

25  **A.**   Yes, I have.

1            MR. KENNEDY:  Aaron, could we see 113.

2   **Q.**   And could you describe for the jury what it is that

3   you've done in this particular calculation.

4   **A.**   Yes.  In this calculation, I'm basing the apportionment

5   on -- I'm setting it up this way.

6            MR. PRICE:  Objection.  Irrelevant.  Not based on

7   the factors.

8            THE COURT:  Sustained.  Lay a foundation.

9            MR. PRICE:  And until the foundation is laid, your

10  Honor, I think this should come down.

11  **Q.**   BY MR. KENNEDY:  Have you done apportionment analyses in

12  previous intellectual property cases?

13  **A.**   Yes, I have.

14  **Q.**   Have you studied the literature with regard to

15  methodologies for doing apportionment among factors in

16  intellectual property cases?

17  **A.**   Yes, I have.

18  **Q.**   And can you tell us whether one of the accepted factors

19  is to look and see what the real parties in a true arm's

20  length transaction have done in terms of evaluating certain

21  properties?

22  **A.**   Yes, it would be.

23  **Q.**   And did you attempt to employ a real life arm's length

24  transaction analysis to the royalties that MGA actually paid

25  to Mr. Bryant?

1   **A.**   Yes.   There's techniques, one is called relief from

2   royalty.   And that's when you look at if somebody acquires a

3   property and can bring it into its company, what you paid for

4   that, and it's an accepted financial and economic technique.

5   And I've used that foundation, that theoretical foundation in

6   coming up with one of my apportionment analyses.

7   **Q.**   And in this instance, were you trying to apportion

8   between doll design, the entirety of the doll, not just the

9   drawings, on the one hand, and other possible factors that

10   could have contributed to profitability on the other hand?

11   **A.**   That was my objective.   That's correct.

12   **Q.**   And did you prepare a graphic summarizing your analysis

13   in that regard?

14   **A.**   Yes, I have.

15        THE COURT:   Counsel, why don't you approach

16   sidebar.   Let me take a look at this graphic.

17        **(SIDEBAR CONFERENCE HELD.)**

18        THE COURT:   Just while I have you at sidebar, MGA

19   has nine minutes left of its 60 hours.   The Court is going

20   to, as I indicated, afford additional time to both sides

21   today.   However, Mattel has an hour and 15 minutes of its

22   allotted time.   As I indicated a few days ago, I want to make

23   sure that both sides have their full allotted time.

24        So I don't know how much longer you have with this

25   witness, but Mattel, I know, has a rebuttal witness that's

7723

1    going to take at least an hour, or two rebuttal witnesses

2    that will take an hour.  And it's now 2:20.  So keep this in

3    mind.  I don't want to interrupt, but --

4              MR. KENNEDY:  Maybe I shouldn't fight too hard.

5              THE COURT:  No, let's just move along.

6              Okay.

7              MR. KENNEDY:  What he's done is taken the royalties

8    paid by Bryant as reflecting real life analysis of what the

9    Bryant contribution was worth on the one hand as opposed to

10   other factors on the other hand.

11             THE COURT:  The problem with all of this is the

12   royalties paid to Bryant are not identified as an

13   apportionment factor.  And this is not a foundational

14   argument so much as -- I'm glad Mr. Price didn't stand up and

15   say this violates the stipulation or the previous court

16   order.  But this was not a factor that was identified.

17             MR. ROTH:  Your Honor, what we're attempting to do

18   with these, we've identified seven factors, one of which is

19   doll design.

20             THE COURT:  Stop with the doll design.  I don't

21   know where this doll design comes in.  I have five.  I added

22   one.  Six.  I don't know where the seventh comes from.

23             MR. ROTH:  We're trying to value -- we're trying to

24   place a value on the design of the doll, which we agree --

25             THE COURT:  Okay.  I'm sorry.  I catch you.

1            The six nondoll design factors that you want to

2    apportion out.

3            MR. ROTH:  Versus doll design.

4            THE COURT:  Excellent.  With respect to royalties,

5    where in those six does that fall into ?

6            MR. ROTH:  Royalties is trying to place a value, a

7    percentage value on doll design as compared to everything

8    else.

9            THE COURT:  How does royalties --

10           MR. ROTH:  It's the value attributed by the

11   parties.

12           THE COURT:  It's how much was paid.  Not

13   necessarily for the value in terms of the value in terms of

14   the profits generated.

15           MR. ROTH:  But case law provides that royalties is

16   a factor that you can admit in the apportionment analysis.

17           THE COURT:  I'm not suggesting that it's not.  But

18   that's not identified as one of the factors that can be

19   apportioned out of.

20           MR. ROTH:  What we're trying to apportion is the --

21           THE COURT:  You're saying that royalties is a

22   substitute for the value of the infringing item itself.

23           MR. ROTH:  Yes.

24           THE COURT:  Where is that case authority?

25           MR. ROTH:  I'd be happy to get that for you.

```
 1              THE COURT:  Okay.

 2              MR. ROTH:  My notes.  This is the cite.

 3              THE COURT:  Guskin, G-U-S-K-I-N, versus

 4    G-U-R-A-L-N-I-K.  It's a 1988 Southern District of New York

 5    case which stands for the proposition that the Court based an

 6    award of 25 percent of the defendant's profits from the

 7    defendant as performance on the plaintiff's willingness to

 8    license his script for 10 percent of a performer's gross.

 9              MR. ROTH:  So what we're attempting to do is put in

10    a series of numbers which would provide a range of what we

11    think the apportioned percentage of profits should be.

12              THE COURT:  That the entire doll itself is worth.

13    Let me hear your response to this.  This is not so much an

14    apportionment argument.  But this is basically the value of

15    one of the apportioned factors, but as I understand it, this

16    is the value that they are trying to place on the doll design

17    itself, assuming that it's all inextricably intertwined.

18              MR. ROTH:  That's correct.

19              MR. COREY:  Well, I have a couple things to say

20    about that.  The first is we have to look back at what the

21    statute says.  The statute says let's figure out this is

22    504(b), what the profits are.  We're splitting up profits.

23    You can't go back and look at the costs of what somebody paid

24    for something years and years in the past and come up with a

25    value for the profit today.
```

1        So what we have done is strayed really far from

2   what the statute requires.  So there's not -- it really isn't

3   a reliability basis for that to come in --

4        THE COURT:  We're trying to apportion profits.

5        MR. COREY:  Right.

6        THE COURT:  And I guess my bigger question is how

7   could you have ever been close to establishing the entire

8   value of the doll based on what was paid to the doll

9   designer.  You're assuming for the sake of argument or for

10  the sake of this witness that Carter Bryant is the doll

11  designer.

12       MR. ROTH:  Um-hm.

13       THE COURT:  How -- I can see on an actor.  That's a

14  little different scenario, that Southern District of New York

15  case that you just cited.  But I'm thinking -- I just am not

16  seeing how royalties by itself could possibly give you the

17  value of the doll.  That doesn't make any sense to me, any

18  more than adding up -- let's say the costs of producing the

19  infringing item is somehow equal to the value of that

20  infringing item.  That doesn't make any sense.

21       MR. ROTH:  It's the market value placed on the

22  intellectual property, which is one factor the courts allow

23  in in gauging the apportionment analysis.  If this had been

24  bought.  This apportionment analysis has been in our reports

25  for six months.  We could have had -- they filed a Daubert

1    motion on it, we could have cited you a whole series of

2    cases.  They waited until --

3              THE COURT:  See, I've got to decide this on what's

4    before me right now.  I don't want to hear about what's out

5    there in the library.  On apportionment, the burden is on the

6    defense, not on the plaintiff.

7              MR. ROTH:  Understood.

8              THE COURT:  So this is your burden to come forward

9    with this.  If you have any other cases for me to look at,

10   now is the time.

11             MR. ROTH:  I just have the one case that I've cited

12   to you.  And I've got -- the Court found the expert testimony

13   regarding the standard royalties paid for usage of

14   photographs was admissible.  Seventh Circuit.

15             THE COURT:  For the purposes of apportioning

16   profits.

17             MR. ROTH:  Recognized Sixth Circuit case.

18             MR. COREY:  There's a difference between clearly

19   having an expert coming in to say this is what the market

20   value of this is right now.  That's a different animal.  And

21   that's what I'm hearing those cases say.  What they are

22   saying is we want to go back in time in this specific case,

23   and we want to base the value of the profits from this

24   product in 2008 from the costs --

25             THE COURT:  You already have evidence in there of

```
 1   how much royalties were paid.  $30 million.  So you can make

 2   whatever argument you want based on the royalties that were

 3   paid.  That's in there.

 4            MR. COREY:  This is not based on the amount of

 5   royalties paid.  This is just based on a percentage.  This is

 6   just based on the percentages.  The royalty rate.  So they

 7   are not even taking it to the dollar figure.

 8            MR. ROTH:  What Mr. Kennedy has handed me is

 9   another analysis.  And this is an attempt to compare the

10   value of what was paid to Mr. Bryant.  So what we paid for

11   the intellectual property versus what we license it out for.

12   So we license it out for 12-.  We paid Mr. Bryant 3-.  He

13   takes a percentage of that.  So again, this is --

14            THE COURT:  Well, I understand how this could be

15   relevant.  You're trying to value -- goes back to what you

16   said.  You're trying to come up with a fair market value of

17   the intellectual property that was contributed to the doll.

18            MR. ROTH:  We're conceding, in terms of the doll,

19   all of that intellectual property, that's Mattel's for the

20   purposes of the apportionment analysis.

21            THE COURT:  But that's what I'm missing right now.

22   It's not clear to me that that is the standard.  Do you have

23   any cases which suggest that that's how we calculate?

24            MR. ROTH:  I have the Guskin case, which suggests

25   that the amount that was in fact offered to the plaintiff was
```

7729

1    relevant in determining the apportionment percentage.

2         THE COURT:  Okay.  And you have the amount.  That's

3    in evidence.  So you've got that evidence in.  Now you want

4    to go one step further --

5         MR. ROTH:  Take that number, and make it clear what

6    the percentage --

7         THE COURT:  Do you have any authority, Counsel?

8         MR. COREY:  702 and 703 and 504(b).  What we have

9    to look at is the profits.

10        THE COURT:  That's for damages, right.

11        MR. COREY:  We're dividing the value of the IP.  If

12   you're dividing up within the profit the value of the

13   intellectual property versus the value of whatever those

14   factors are, so once you get away from the governments

15   profits and you start looking at costs, particularly costs

16   that were incurred eight years ago --

17        THE COURT:  I'm sorry.  I'm going to have to take a

18   brief recess and take a look at these cases.  I don't want to

19   get this wrong.  All right.

20        **(CONCLUSION OF SIDEBAR CONFERENCE.)**

21        THE COURT:  Ladies and gentlemen, I'm going to have

22   to send you on a brief recess.

23        (Recess taken.)

24        **(HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)**

25        THE COURT:  Okay.  We're outside the presence of

1    the jury.   The Court just wanted a minute to take up this

2    issue.   I've looked at the -- I certainly haven't read them

3    all, but I'm familiar with most of them, and I reviewed the

4    portions identified by counsel for MGA.   I'm somewhat

5    thinking out loud here.   So we'll see where this leads.

6            But first of all, the issue of the 3 percent, the

7    $30 million, is in evidence.   So certainly MGA to the extent

8    that they want to make some argument that that's it or that's

9    the value of Carter Bryant's contribution because that's what

10   he was paid, they are in a position to make that argument.

11           As far as having the expert or having further

12   evidence introduced that this is the fair market value and

13   that this is the measure by which the doll as opposed to the

14   other nondoll factors, for lack of a better phrase, are to be

15   evaluated, I guess part of the concern I have is the unique

16   nature of this case.

17           This isn't a case like the one cited here where the

18   agreements or the assessments are being made based on a true

19   fair market value assessment.   This jury has already found

20   that Carter Bryant -- the jury has found what they found.

21   Everybody knows what the jury found.

22           So what was going on here was not an aboveboard,

23   arm's length transaction.   So the Court is reluctant to place

24   too much emphasis on that 3 percent or that $30 million or

25   whatever it is as a real indicator of what the value of the

1    nonapportioned elements of the doll are.

2         Each one of these cases is unique in its own

3    respect in terms of how the Court goes about doing this.  And

4    you know, again, the information on the licensing is also in

5    the record.  Let me hear argument from either side.  We need

6    to move forward.  This isn't something that we have a

7    particularly large amount of time to discuss.

8         MR. ROTH:  Our basic position, your Honor, is that

9    as you've seen from these cases, in particular, the Guskin

10   case, the issue of the royalties paid either standard in the

11   industry or to the parties involved, is a piece of evidence

12   that can come in that an expert can take into account in

13   determining what the appropriate apportionment is.

14        THE COURT:  But these cases, I can certainly see in

15   a situation where a record -- a product brings in a hundred

16   dollars in revenue.  All right.  That's the profit from the

17   product.  And, well, we don't know how much profit to give to

18   one side or the other.  And you look back to the arrangement

19   that the two artists who were engaged in it agreed to, and

20   one artist agreed to take 20 percent of the profits, and the

21   other artist agreed to take 80 percent of the profits, and

22   then using that percentage as a basis to split up their

23   apportionment of profits.  And that makes sense.

24        But this is a much different situation, where the

25   allegation is here, it's unclear what the jury is going to

1   find with respect to copyright, but that the essential

2   contribution of Carter Bryant permeated essentially all of

3   the infringing works.  That's the allegation.  If, at the end

4   of the day, that's what the jury finds, to sit back and say

5   that all of Carter Bryant's contribution is this 3 percent, I

6   don't think it is quite frankly legally cognizable under

7   these bases as an argument for apportionment.  This is

8   different than the cases you argue.

9           MR. ROTH:  It is true that Mr. Bryant made

10  contributions to the doll line following his departure from

11  Mattel.  You know, he made contributions in terms of fashion

12  design and other matters.  That is not among the body of

13  property that Mattel is claiming ownership to.  What they are

14  claiming that they own is the body of intellectual property

15  that existed as of the time that Mr. Bryant left Mattel and

16  went to MGA.

17          THE COURT:  That's not the body of work that they

18  are claiming ownership to but the body of work for which they

19  are claiming copyright infringement and which they are

20  claiming alternatively may be derivative works over which

21  they have control goes far and beyond the first generation of

22  dolls.  For example, it goes far beyond arguably the value of

23  what Mr. Bryant was paid for.  It gets back to these cases

24  that you've submitted, again, they are trying to apportion

25  profits where you have a pie of profits, and the question is

 1    how much did the lyricist deserve.  How much does the

 2    individual actor, to use the case that you submitted at

 3    sidebar, deserve.  Well, out of the total profits, what did

 4    the actor agree to at the beginning.  I think that's much

 5    different than the situation we have here.

 6           MR. ROTH:  I respectfully submit that what we have

 7    here again is an agreement between the parties where Carter

 8    Bryant is transferring the intellectual property that is at

 9    issue here, and there's an agreement between the parties

10    about the value of that.  Expressed in percentage terms, in

11    percentage terms that we're simply trying to translate from

12    one body, that is, net sales, to --

13           THE COURT:  It wasn't between the parties.  It was

14    between Carter Bryant and MGA.  And that was done, as the

15    jury has found, under fraudulent circumstances.

16           MR. ROTH:  Well, I'm not sure that -- that's a

17    different argument.  I'll not sure that fraud has been found.

18           THE COURT:  Well, not fraud, but under intentional

19    interference of contractual relations, induce the breaches of

20    fiduciary duty and duty of loyalty, and under circumstances

21    of theft.

22           MR. ROTH:  But there's no suggestion that

23    Mr. Bryant's arrangement with MGA was anything other than an

24    arm's length transaction.  There's been no evidence here that

25    the nature of the relationship between Mattel and Mr. Bryant

```
 1   in some way entered into the terms that those two parties
 2   agreed to.
 3             So again, what we're trying to do here is to value
 4   doll design on the one hand versus all of the other factors
 5   that we've identified for the Court.  And one proxy for that
 6   is the royalty in fact agreed to by Mr. Bryant.  As the Court
 7   indicated, that evidence is already before the jury, and this
 8   expert is simply translating that to a pool of profits
 9   identified by the parties.
10             THE COURT:  And that's the part that I'm concerned,
11   just seeing the two charts that I've seen, is it gets
12   confusing.  All right.  Let me hear from Mattel.
13             MR. PRICE:  Your Honor, on the last point, the jury
14   has found that Carter Bryant didn't have the right to sell
15   these things and that MGA knowingly induced the breach of
16   fiduciary duty, knowingly converted.
17             THE COURT:  So you agree that this is not an arm's
18   length transaction?
19             MR. PRICE:  This is how much would a fence get for
20   stolen property.  The person buying is taking a risk that
21   they will get caught.
22             THE COURT:  I do think that makes it different than
23   the cases.  Are any of the cases similar, at all related?  As
24   I understand the ones that you've presented, these were --
25   there weren't these other allegations.
```

7735

1          MR. ROTH:  Well, no.  I mean, the cases simply

2     involved contexts where the court was willing to entertain

3     evidence regarding either industry royalty rates or the

4     royalty rates of the parties involved in the case.  And that

5     was admitted into evidence as one factor among many that

6     could be considered.

7          THE COURT:  Very well.  This Court has admitted

8     that into evidence, and I'm going to leave it at that.  We're

9     not going to hear anything further on this.

10         MR. COREY:  We're going to run into a similar issue

11    probably with Mr. Kennedy's next set of questions.

12         THE COURT:  Which are directed towards what?

13         MR. COREY:  Directed towards some proffered

14    apportionment theories that really have no bearing on the

15    factors that Mr. Roth articulated.

16         THE COURT:  Specifically what do they deal with?

17         MR. COREY:  There are two apportionment theories in

18    which Mr. Meyer is going to try to explain how he can discern

19    the value of the intellectual property associated with Bratz

20    by comparing it to Barbie's profitability without any effort

21    to segregate out the intellectual property associated with

22    either Bratz or Barbie.

23         THE COURT:  But didn't your expert do this with

24    respect to other toy companies?

25         MR. COREY:  What our expert did was remove

1    everything but the intellectual property.

2            Here, what Mr. Meyer is doing is not removing

3    anything.  He's saying there's a product here that has

4    valuable intellectual property, which is Barbie.  There's

5    another one that has valuable intellectual property, which is

6    Bratz.  And I'm going to compare the two and reach a

7    conclusion about value without segregating out intellectual

8    property related to either of those.

9            THE COURT:  Mr. Roth?

10           MR. ROTH:  Your Honor, what Mr. Corey is referring

11   to is a critique that Mr. Meyer has made of a valuation

12   apportionment analysis submitted by Mr. Wagner.  Mr. Wagner

13   made a comparison between what he determined were the excess

14   profits as between Bratz and a series of different

15   definitions of the toy industry.

16           Our critique of that was, well, those are much

17   different.  I mean, we've got diversified companies.  They

18   are going to have a different profit structure than a

19   specific fashion doll line.  So what we did in response to

20   that, accepting that model for the purposes of analysis, we

21   took the information that we received from Mattel across a

22   series of fashion dolls and made the same comparison, which

23   we think is more apt.  And that -- in using Mr. Wagner's

24   methodology, came up with a number that we think is more

25   appropriate.  So we have every right, after Mr. Wagner --

7737

```
 1              THE COURT:  Very well.  Thank you, Counsel.

 2              MR. COREY:  Just very briefly, but it's not even

 3   being offered as a critique of Mr. Wagner.  It's being

 4   offered affirmatively.  They are going to try to come up with

 5   a percentage that they think the jury should use to reduce

 6   Mattel's damages based on this analysis, this comparison

 7   of --

 8              THE COURT:  And you're going to have Mr. Wagner

 9   come back in rebuttal and respond to this.

10              MR. COREY:  Thank you, your Honor.

11              THE COURT:  Was there anything else?

12              MR. COREY:  I don't believe so.

13              THE COURT:  Very well.  So I'm going to sustain the

14   objection to the royalties at least -- any further evidence

15   of royalties at this point.  The evidence is already in.

16   I'll overrule the objection.

17              It's a quarter to 3:00 right now.  I'm going to

18   take five minutes myself.  As I indicated at sidebar, MGA has

19   used all 60 hours.  Mattel still has an hour and 15 minutes

20   left.  I'll permit MGA to continue, but only to four o'clock.

21   At four o'clock, we're going to turn this over to Mattel for

22   their rebuttal case, and we're going to wrap this up by 5:30.

23              MS. AGUIAR:  Your Honor, could we get a

24   clarification?  Are you saying that between 4:00 and 5:30 is

25   all allocated to Mattel?
```

1          THE COURT:  Well, they said they have two experts.

2   Each one is willing to last about a half hour.  So I figure a

3   half hour for each expert and a half hour of

4   cross-examination.

5          MS. AGUIAR:  But when your Honor said that if there

6   was time left over, and I asked would that time be allocated,

7   the quote, unquote, extra time be allocated evenly to both

8   parties.

9          THE COURT:  Mattel still has an hour and 20 minutes

10  left.  They get to use that.

11         MS. AGUIAR:  I understand that.  I was just

12  wondering once that time is used up, is the remaining time

13  equally divided?

14         THE COURT:  Something like that.  But, Counsel, if

15  Mattel uses an hour and 20 minutes, we'll be at -- I don't

16  know how much longer you have.

17         MS. AGUIAR:  I was just trying to get clarity.

18  Once we both run out of time, if there's anything else --

19         THE COURT:  The Court will handle it.

20         I'm going to take a very brief recess, and then

21  let's resume.

22         (Recess taken.)

23         **(WHEREUPON THE JURY ENTERS.)**

24         THE COURT:  Counsel, let's have Mr. Meyer back on

25  the stand, and we can proceed.

7739

1      MR. KENNEDY:  Your Honor, Mr. Quinn tells me we're

2  missing a lawyer.

3      THE COURT:  That's not good.

4      MR. QUINN:  Here he comes.

5      THE COURT:  All right, Counsel.

6      MR. KENNEDY:  Thank you, your Honor.

7  **Q.**   Mr. Meyer, in the course of your work on this case, did

8  you have occasion to consider Mr. Wagner's apportionment

9  method?

10 **A.**   Yes, I did.

11 **Q.**   And that involved comparing MGA's performance with

12 various other companies.

13      Do you recall that?

14 **A.**   Yes, I do.

15 **Q.**   And do you agree with that approach to apportionment?

16 **A.**   I believe it's proper at times to make comparisons to a

17 benchmark or to something else.  I didn't believe that

18 comparing to other companies like he did was appropriate.

19 But the overall method is okay.  To compare against some kind

20 of a benchmark standard.

21 **Q.**   How about as far as comparing the Bratz product line

22 portion of MGA with entire other companies?  In your opinion

23 is that an appropriate basis for comparison in this case?

24 **A.**   No, it would not be in my opinion.  Mr. Wagner compared

25 three companies.  So he compared the Bratz product line to

1   the companies of Hasbro, a company called Jakks, and also

2   Mattel.  That was one comparison he made.  And he compared

3   against those companies and across all their results.  And so

4   Hasbro, as an example, has many different products.  Mostly

5   board games.  And they have no fashion dolls.  As an example.

6   So I wouldn't think that's a proper comparison against a

7   Hasbro.

8          Jakks is a very large company that does a lot of

9   licensing in.  So it licensed in like the world wrestling

10  enterprise character, and they make dolls for that.  They are

11  a big licensing in company that makes sales, toys and dolls.

12  And it's very diverse.  And I wouldn't compare against Jakks.

13  And with Mattel's business, it's certainly a very diversified

14  business.  Certainly not just fashion dolls.  But looking at

15  Mattel, which I think is more appropriate, looking at Mattel

16  and that business.

17  **Q.**   And did you in fact perform a comparison between the

18  Bratz line and the overall Barbie line?

19  **A.**   Yes, I did.

20  **Q.**   And can you tell us what you did in that regard?

21  **A.**   What I did was I obtained information from Mattel that

22  was identified by Mr. Kerner, who was the controller and

23  senior vice-president at Mattel, and I provided information

24  in really two categories.

25          It had results for Barbie, and Barbie included the

1    My Scene doll.  And so I had the profits, revenues less costs

2    less taxes to get to the profits for the Barbie line.  I also

3    had the information for other girls brands at Barbie.

4            So outside of -- or at Mattel.  Outside of Barbie

5    and My Scene, I had other information from Mattel that I was

6    able to look at that was more closely related to like the

7    Bratz fashion doll.  So I first focused on making a

8    comparison against Barbie's profits which also included the

9    My Scene doll.

10   **Q.**    And what was the result of that analysis?

11   **A.**    I went back, and I compared the Barbie earnings, as I

12   mentioned, against the Bratz earnings.  In making that

13   comparison, I determined that if Barbie is the baseline, and

14   we're comparing Bratz against it, the question is do the

15   Bratz profits exceed the Barbie profits.  And if you recall

16   Mr. Wagner's comparison, he compared the Bratz profits

17   against the three companies, and he said since Bratz had

18   higher profits than those three companies, that an additional

19   amount of profits, he hypothesized, was due to in this case

20   the Carter Bryant materials, the drawings.  Then he said I'll

21   leave that to others to decide that, but that was my

22   comparison.

23           So in lieu of comparing against those companies, I

24   compared the Bratz product profits against Barbie's profits

25   and determined that it was a period of three years where

7742

1   Bratz's profits exceeded Barbie's profits.  I make those

2   mathematical calculations, I come up with a 5 percent

3   apportionment factor saying based on comparing against

4   Barbie, Bratz is 5 percent better off, and if I use

5   Mr. Wagner's methodology, he would say potentially that

6   relates to in this case the Carter Bryant materials.

7           That's that increment.  That's that increment over

8   and above Barbie's profitability.  So I did those

9   calculations.

10  **Q.**   And when you compared with Barbie, was that Barbie the

11  doll or Barbie the brand?

12  **A.**   That was Barbie the brand.  So it included the fashion

13  doll plus other things that are sold along with Barbie.  It

14  also includes the My Scene doll and related accessories and

15  fashions.

16  **Q.**   And similarly, did you make an attempt to compare Bratz

17  profits with the Mattel girls brand, including Barbie, My

18  Scene, Diva Starz, Flavas, and other girls products?

19  **A.**   Yes, I did.

20  **Q.**   And similar methodology to what you just described?

21  **A.**   Yes, I compared the Bratz profits against the

22  combination of profits for the Mattel girls brand.  And I

23  looked for the periods if the situation was where Bratz's

24  profits exceeded the girls brand profits.

25          Then I said well, if Bratz performed like the girls

7743

1   brand product line, they would have similar profitability.

2   So if it has additional profitability, it may provide insight

3   into apportioning to the Carter Bryant materials in this

4   case.

5   Q.   And what percentage did you find when you compared Bratz

6   with the entire Mattel girls line?

7   A.   It was three periods where the Bratz profits exceeded

8   the Mattel girls brand profits.  When I did those

9   calculations, it indicated an apportionment percentage of

10  about 11.9 percent, making that comparison against the girls

11  brand baseline.

12  Q.   Now, turning back to the analysis you did of the

13  performance of the 77 themes, did you conclude that there was

14  an apportionment analysis that would reflect the impact of

15  themes upon the overall profitability of Bratz?

16  A.   Yes, I have done that.

17  Q.   Okay.  And did you prepare a graph depicting what you

18  did in that regard?

19  A.   Yes, I have.

20       MR. KENNEDY:  Aaron -- don't put it up.  I feel an

21  objection coming up.

22       THE COURT:  Counsel?

23       MR. PRICE:  Foundation at this point.

24       THE COURT:  Lay a further foundation, Counsel.

25  With respect to the graph.

1          MR. KENNEDY:  I understand, your Honor.

2    **Q.**   Mr. Meyer, could you describe for us the methodology

3    that you employed in examining the comparative performance of

4    those 77 themes as providing a basis for overall profit

5    apportionment in this case?

6    **A.**   Yes.  What I did was as follows.  I examined the sales

7    of the 77 themes that I mentioned before.  And I made the

8    assumption that all of those 77 theme sales included the

9    Carter Bryant materials.  The infringing materials.  And so I

10   was interested in examining and comparing the differences

11   between the different themes that were released.

12          So I tracked all those sales from the lowest

13   performing theme, which was about under a hundred thousand

14   dollars of sales, to the highest performing, which was about

15   73 million for the Bratz play sports, and I said okay, if all

16   of these themes include the infringement, and they all

17   include the Carter Bryant materials, let's establish that

18   baseline.  And so what I did was I stratified all the

19   information 1 through 77.

20          I began to walk through all the sales.  And I

21   wanted to make certain that whatever comparison I made, that

22   the theme had finished selling so that I wasn't comparing

23   data for a product that was still selling.

24          So I had sort of a cutoff issue.  I didn't have all

25   the sales.  And so I examined all the themes that were fully

7745

```
 1    sold out, and I began walking through the data from the

 2    lowest selling up higher and higher.  And I determined that

 3    there were three themes that had been released that --

 4            MR. PRICE:  At this point I'll object as his

 5    methodology being irrelevant.

 6            THE COURT:  Are you still maintaining a

 7    foundational objection, Counsel?

 8            MR. PRICE:  I'm having -- having heard the

 9    foundation, I'd object to there being any relevance to this

10    analysis.

11            THE COURT:  Why don't you proceed with your next

12    question, Counsel.

13    Q.   BY MR. KENNEDY:  Had you completed your discussion of

14    the --

15            Your Honor, I'm sorry.  I need guidance whether I

16    need to continue laying foundation?

17            THE COURT:  I think you can proceed, yes.

18    Q.   BY MR. KENNEDY:  Mr. Meyer, had you finished your

19    discussion of the methodology that you employed with regard

20    to the themes?

21    A.   I was almost there.  I was going to wrap that up.

22    Q.   If you could, please.

23    A.   So what I did was I said okay, the first -- I start at

24    the bottom, and I said the first three lowest performing

25    themes had sales under a million dollars.  And if I
```

7746

1   compared -- if I said that was basically how all the themes

2   would sell, I would get basically a 5 percent apportionment

3   factor.   If I said let's keep going and go a little higher

4   because remember, I'm trying to establish a baseline, that

5   across all the themes, how would they -- they would -- they

6   sell consistently as they include the Carter Bryant

7   materials.

8           So I went up to two themes that sold between

9   1 million and $5 million and determined that if that became

10  the baseline to compare, that if all 77 included the Carter

11  Bryant materials, basically that means all 77 would sell

12  $3.2 million of sales.   I compared that $3.2 million of sales

13  against the average selling value for all the remaining

14  themes, which was 19.2 million.   I compared 3.2 million

15  against 19.2 million, and I said basically 16 percent of the

16  sales relate to --

17          MR. PRICE:   Objection, your Honor.   It's a

18  conclusion now.

19          THE COURT:   Next question, Counsel.

20  **Q.**   BY MR. KENNEDY:   And as a result of that methodology,

21  what did you conclude with regard to the discrepancy,

22  difference between the base and the average?

23          MR. PRICE:   I'll object at this point.   Foundation

24  and relevance to damages.

25          THE COURT:   Counsel?

1          MR. KENNEDY:  We have a graphic.  Would you like?

2     It will help put it in perspective.

3          THE COURT:  Very quickly at sidebar, Counsel.

4          **(SIDEBAR CONFERENCE HELD.)**

5          THE COURT:  You're not rearguing the position that

6     I ruled on during the break.  This is coming in.

7          MR. PRICE:  This is a different issue.

8          MR. ROTH:  This is a measurement of -- it goes to

9     the core of one of our apportionment factors, the use of

10    themes.  So it's how did the themes vary.  All the themes

11    have the same intellectual property.  Yet their sales vary.

12    So we wanted to translate that into -- use a baseline to

13    compare the -- what we expect an average theme to do versus

14    what --

15         THE COURT:  That's the foundation that Mr. Price

16    has objected to.  How do you know what you'd expect on

17    average?

18         MR. COREY:  Exactly.

19         MR. ROTH:  Because what we've done is we've taken

20    the baseline.

21         THE COURT:  What happened to be the average?  Is

22    that what it is?

23         MR. ROTH:  No.  We've taken what we thought was a

24    point in the sales --

25         THE COURT:  Where did you come up with that?

7748

1           MR. ROTH:  By looking at the various themes and

2    seeing how they performed.

3           THE COURT:  That's the foundation that's missing.

4    The foundation for the baseline.

5           MR. PRICE:  He's testified to -- the complete

6    foundation was he took a low selling theme, eliminated these

7    for various reasons and assumed that that's the value of the

8    intellectual property.  So anything sold above that must be

9    the theme.

10           THE COURT:  How does he come up with that?

11    Mr. Kennedy, why don't you lay the foundation for that.  It's

12    the baseline that I don't understand.

13           MR. KENNEDY:  Okay.  I'll have him explain it

14    again.

15           THE COURT:  Very well.

16           **(CONCLUSION OF SIDEBAR CONFERENCE.)**

17    **Q.**   BY MR. KENNEDY:  Mr. Meyer, I want to direct your

18    attention back to the baseline that you established in

19    preparing your theme based apportionment work.

20           And can you tell us again, go through the steps,

21    again in terms of how you settled on that particularly 3.2

22    million as the baseline.

23    **A.**   What I did was I focused on themes that had totally sold

24    through.

25    **Q.**   What does totally sold through mean?

1  **A.**   All the sales had been made.  So the product was off the

2  shelves, and I started with that.  I looked at it, and I went

3  from the lowest selling theme, and I began working through

4  the list.

5          And as I mentioned, the first three themes that had

6  totally sold through and were off the shelf had sold less

7  than 1 million sales.  And so I said if all of these themes

8  are practicing the Carter Bryant materials, you could

9  establish the baseline at a million dollars.  Because you had

10 three themes that basically had sold out at that level or

11 less.

12 **Q.**   Why didn't you stop there and make that your baseline?

13 **A.**   Because I wanted to be conservative and go a little

14 deeper, and I said basically if I stop there, I'd have a 5

15 percent apportionment, comparing the million dollar sales

16 level to the average for all the themes.

17          So I went deeper and said let's look at the next

18 level of sales, and there were two products that sold between

19 $1 million and $5 million.  And when I did that analysis, I

20 came up with the largest selling was $3.2 million, Midnight

21 Dance.  It was the 21st lowest selling.  So there were 20

22 other themes that had sold less than that.  Four had totally

23 come off the shelves.  And I said if that's the baseline, it

24 would be 16.7 percent by comparing 3.2 million dollars to the

25 average for all the other themes.

7750

1          MR. PRICE:  Move to strike.  Now he's talking about

2    conclusions.

3          THE COURT:  Counsel.  I'm going to permit you to

4    conduct some voir dire here.

5          Mr. Kennedy, you finish yours, and then I'm going

6    to let Mr. Price do his before I find on foundation.  Ask all

7    the foundational questions you want, and then I'll allow

8    Mr. Price to ask foundational questions.

9    **Q.**   BY MR. KENNEDY:  Mr. Meyer, is there anything further

10   that you did as far as your methodology and process you

11   haven't told us about so far?

12   **A.**   Well, I can wrap it up.  So basically I established

13   the baseline of $3.2 million and said if you compare that

14   against the average for all the remaining themes, which are

15   $19 million, it indicates that there's a 16.7

16   apportionment -- 16.7 percent apportionment factors, and

17   that's how I went through the process.  And so it was the

18   21st slowest selling theme, and it was the fifth lowest

19   selling, including ones that were off the shelves, and that's

20   what I did.

21          MR. KENNEDY:  Thank you.

22          THE COURT:  Counsel, limit it to this foundational

23   issue.

24   ///

25   ///

**VOIR DIRE EXAMINATION**

1

2  BY MR. PRICE:

3  **Q.**   Mr. Meyer, for the $39.2 million theme -- with me so

4  far?  You're assuming that that establishes the value of the

5  intellectual property for all themes sold; correct?

6  **A.**   What I'm saying is that becomes the baseline of the

7  value of whether we're calling it the accused property, the

8  intellectual property, whatever it may be, but whatever the

9  Carter Bryant materials are, since all of these 77 themes

10  include, assume, include that baseline property, that becomes

11  the average selling value of a theme.  That's what I'm

12  saying.

13  **Q.**   And for the sale of these themes, you didn't control for

14  seasonality, which you thought was a big deal; right?

15  **A.**   I wouldn't agree with that.  I look at all 77 over the

16  entire history of the company up and down, whatever year it

17  may be.  I get them all in there.

18  **Q.**   Don't dolls sell better in certain seasons than others?

19  **A.**   I think that the beauty we have here is that we have

20  themes that sell across many years.  And so, as we saw this

21  morning --

22  **Q.**   My question is --

23  **A.**   Let me finish.

24          MR. PRICE:  Nonresponsive.

25          THE COURT:  You have an attorney that will be able

1    to ask you questions.

2    **Q.**    BY MR. PRICE:   For foundation, my question was don't

3    some dolls sell better in certain seasons than others?

4    **A.**    I believe the biggest selling is the holiday season.

5    The dolls are released twice a year, late spring and then for

6    the fall season.

7    **Q.**    With respect to these themes, don't they have, for

8    example, different numbers in the themes?

9    **A.**    They would vary.   The lowest I saw was three characters,

10   and the highest I saw was six characters.   There's usually a

11   combination of different dolls in an offering.   They will be

12   sold individually and as part of an assortment.

13   **Q.**    And for some of these themes, doesn't MGA have an

14   exclusive on some of these themes, that they give only to

15   certain stores?

16   **A.**    I don't think that's a big issue.   I know at times for

17   some of the stores they have some of those arrangements.   I

18   didn't see that as being an issue that would impact the

19   analysis.

20   **Q.**    So can you tell us which one of these themes were

21   exclusive?

22   **A.**    Of the 77, I cannot do that.   But I determined, from

23   talking to persons at MGA, that that was not a major

24   restricting issue.   They would sell as much product as they

25   could to maximize sales.   That was one of the things they

7753

1    were trying to do.

2    **Q.**    And they also had themes that were limited edition

3    themes, collectibles?

4    **A.**    Some were collectibles.

5    **Q.**    And can you identify which of the 77 were collectibles?

6    **A.**    I can't tell you that specifically.

7    **Q.**    So given what you've told us, the basis for assuming

8    that $3.2 million is the value of the Carter Bryant property,

9    is that you identified a theme, a low-selling theme, that

10   sold 3.2 million?

11   **A.**    I wouldn't characterize -- I described my methodology.

12   I believe I could have gone lower.  I tried to come up with

13   some baseline that represented all the themes.  It included

14   the property that you're talking about in this case.  And I

15   thought about all of those issues of characters and

16   seasonality and I believe across all 77 were okay because

17   there's ups and downs.

18   **Q.**    You couldn't even tell us which themes had how many

19   characters sitting here right now?

20   **A.**    I generally have a feel for that.  I can't tell you

21   exactly which one.  But I know generally which ones have four

22   or five or six, and I can represent to the jury that across

23   all of them, you'll see a real mixed bag.  There are three to

24   six released individually and with assortments, and I believe

25   I've factored that into the analysis.

1              MR. PRICE:  Objection.  Foundation.

2              THE COURT:  Briefly at sidebar.

3          **(SIDEBAR CONFERENCE HELD.)**

4              THE COURT:  I understand what he did.  But I have

5      no confidence that there's any scientific basis for what he

6      did.  The $3.2 million he picked, he could have picked the

7      $1 million.  What he was basically saying is you have 10

8      products.  They sold at different rates.  Let's pick one of

9      the low ones and say that's -- that must capture Carter

10     Bryant's intellectual property.  And we'll use that as the

11     baseline.  But how it is expressed in different products

12     might be different.  And then for the value of the Carter

13     Bryant property as expressed in the different products can be

14     dramatically different.

15             So we don't know if the $3.2 million product was a

16     poorer, more accurate, or fuller use of the Carter Bryant

17     property or vice versa.  It could be less than 3.2.  It could

18     be more than 3.2.  He doesn't know which products.  I don't

19     see how this is defensible at all.

20             MR. PRICE:  If I can add one thing.  After 2003,

21     people are going in and they are having to choose among

22     themes.  All these dolls have themes.  So they are choosing

23     them on themes.  So some themes they don't like, and some

24     themes they do.  It doesn't mean that Carter Bryant's

25     intellectual property is valued at the worst theme they can

1   come up with.

2            THE COURT:  I understand the methodology.  I'm just

3   not following the logic.

4            MR. ROTH:  Obviously, it's not the worst theme.  He

5   picked a theme that he felt was reflective of the baseline

6   and did the calculations.

7            THE COURT:  Again, I understand how he came up with

8   this.  But why is that an accurate depiction?  How do we know

9   that that $3.2 million doll, with that theme, that that theme

10  is of any truly representative -- we don't know what it is.

11  He's just -- I'm not following the logic of this.

12           MR. ROTH:  Your Honor, we know that that is a --

13  it's not one of the worst themes.  We were being

14  conservative.  And we felt it was a baseline which was --

15           THE COURT:  Are you conceding, then, that all of

16  these dolls are the same?

17           MR. ROTH:  No.

18           THE COURT:  I didn't think so.  Each doll is

19  different.  Each doll to a certain extent, I assume you would

20  argue, I assume you're going to be arguing on Wednesday, has

21  more or less attributable aspects to Carter Bryant's work.

22           MR. ROTH:  Each doll is different, yes.

23           THE COURT:  How do we come up with a baseline

24  without taking into account the extent to which Carter

25  Bryant's work is involved in a particular expression of a

1    particular theme?

2           MR. ROTH:  I think the same amount --

3           THE COURT:  Unless the contribution isn't -- is

4    truly the same in each one.

5           MR. ROTH:  Well, we think the dolls are different

6    based upon nonprotectable elements.  In other words, the --

7    what makes each of them different is the nonprotectable

8    elements you see.

9           THE COURT:  So you are assuming, then, that each

10   doll, each theme has the same exact amount.  The only way

11   that this makes logical sense to me is if each theme has the

12   same amount of protectable elements in it.

13          MR. ROTH:  That's right.

14          THE COURT:  That's patently -- that's not supported

15   by the evidence in this case.  So I'm going to sustain the

16   objection.

17          MR. PRICE:  And I'd like to strike the testimony on

18   this because he gave the conclusion three or four times.

19          THE COURT:  I'm going to tell the jury we're moving

20   on.

21          **(CONCLUSION OF SIDEBAR CONFERENCE.)**

22          THE COURT:  Ladies and gentlemen, the Court is

23   sustaining that last objection.  That last analysis is to be

24   stricken.

25   ///

### DIRECT EXAMINATION (RESUMED)

1

2  BY MR. KENNEDY:

3  **Q.**  Mr. Meyer, did you also undertake to evaluate the value

4  of Mr. Larian's ownership interest in the Bratz line?

5  **A.**  Yes, I did.

6  **Q.**  And in that regard, did you see Mr. Wagner's opinion and

7  testimony?

8  **A.**  Yes, I did.

9  **Q.**  And do you agree with his definition of fair market

10  value?

11  **A.**  Not in these circumstances.

12  **Q.**  He told us the fair market value equals the price,

13  something which sells for between a willing buyer and a

14  willing seller, assuming they both knew the facts.

15  **A.**  I agree with that.  I thought you were asking about his

16  result.  I apologize.  I do accept that definition.

17  **Q.**  Okay.  And to make sure, eliminate any confusion, we

18  have a slide here with his definition.

19         139, Aaron.

20         The definition.  Fair market value is the price

21  something would sell for between a willing buyer and a

22  willing seller, assuming they both know the facts.  You're

23  comfortable with that definition?

24  **A.**  I can accept that.

25  **Q.**  Now, taking everything you've learned about Bratz sales

 1  and performance, including recent history in that regard, and

 2  including this jury's verdict so far in this case, and

 3  including what you understand to be the moneys that Mattel is

 4  seeking in this portion of the case, do you have an opinion

 5  as to what a willing buyer that knew all of the facts would

 6  be willing to pay for Mr. Larian's interest in the Bratz line

 7  portion of MGA today?

 8  **A.**    I do have an opinion.

 9  **Q.**    And what is that?

10  **A.**    That opinion --

11           MR. PRICE:  Your Honor, I object.  This is not only

12  irrelevant, but not in the report or deposition testimony.

13           THE COURT:  Is it?

14           MR. KENNEDY:  I have to let Mr. Roth speak.

15           THE COURT:  Counsel, why don't you confer among

16  yourselves.

17           MR. KENNEDY:  I think I know what your Honor's

18  concerned about, and we can clear it up in just a second.

19           THE COURT:  Very well.  Yes.

20           **(SIDEBAR CONFERENCE HELD.)**

21           THE COURT:  I didn't think that was in the report

22  myself.

23           MR. ROTH:  Your Honor, this is based upon the new

24  information that has come in since the verdict in this case.

25  And what he's going to say is he can't place a value on it.

1    He's not going to give the number.  It's exactly what I told

2    the Court that our expert would be saying.  He's not going to

3    give the precise number.

4             THE COURT:  Well, what's the answer?  What is he

5    going to say?

6             MR. ROTH:  He's going to say given the

7    uncertainties of the company, he cannot place a value on it

8    today.

9             THE COURT:  He cannot place a value?

10            MR. ROTH:  Right.

11            THE COURT:  Okay.

12            MR. COREY:  But that's the answer.  If he says you

13   can't put a value on it, they are going to say --

14            THE COURT:  If all he says is I can't place a

15   value, there are uncertainties.  I mean, the Court is going

16   to instruct the jury to do their best job to come up with a

17   value.

18            MR. PRICE:  But he's going to go further.

19            THE COURT:  I thought this was going to --

20            MR. PRICE:  I did, too.  But I think what he's

21   suggesting is that no one could.  So --

22            MR. ROTH:  Well, I will tell you --

23            THE COURT:  You know, this is fine.  That's

24   overruled.

25            **(CONCLUSION OF SIDEBAR CONFERENCE.)**

7760

1    **Q.**    BY MR. KENNEDY:  Given everything you've learned in this

2    case about sales performance of Bratz, including the first

3    half of 2008 and taking into account the jury's verdict

4    that's already been returned in this case, and taking into

5    account the fact that we are still in trial in this case, and

6    taking into account the monetary amounts that Mattel is

7    seeking in this phase of the case, do you have an opinion as

8    to whether it is presently possible to place a value on

9    Mr. Larian's interest in the Bratz line portion of MGA?

10   **A.**    With all those issues, it would be my opinion that you

11   could not place a value on Mr. Larian's interest at this

12   point in time.  You just could not do that.

13   **Q.**    And is that also true of MGA's interest in the Bratz

14   line?

15   **A.**    It would be my opinion with all those issues and

16   uncertainties, you could not place a value on MGA at this

17   point in time.

18   **Q.**    And finally, did you prepare a graphic providing a

19   breakdown of profits according to segments of the overall

20   revenue for the Bratz line?

21   **A.**    Yes, I have.

22        MR. KENNEDY:  Aaron, could we see Exhibit 162.

23   **Q.**    And knowing we're short on time here, is what you've

24   done here taking the 3.1 billion in revenues, when you round

25   it up and broken that down into at least five of the overall

1  components that go to make it up?

2  **A.**    That's right.  If you go back to the prior schedules,

3  you'll see how this summary aligns with those schedules that

4  I've grouped together for the jury, the revenues and profits

5  from the various products and subbrands for the Bratz line,

6  and the total is the 3.1 billion.  Revenue, the total

7  profits, 405, and you'll see that spread amongst the various

8  categories.

9           MR. KENNEDY:  Thank you very much.  I have no

10  further questions, your Honor.  And I would move in all of

11  the exhibits except for the ones that Mr. Price has objected

12  to.  I think he and I can reach closure on that.

13           THE COURT:  Very well.  Why don't you confer

14  afterwards.

15           Thank you, Mr. Kennedy.

16           Mr. Price?

17                    **CROSS-EXAMINATION**

18  BY MR. PRICE:

19  **Q.**   Mr. Meyer, I want to ask you a little bit about your

20  testimony about Stanford.  Do you recall about teaching

21  there?

22  **A.**    At Stanford?

23  **Q.**   And Stanford has a terrific business school.  Do you

24  teach in the business school?

25  **A.**    I teach in the engineering school.  I teach business to

7762

1    engineers.

2    **Q.**    So they have a good economics department, too.   You

3    don't teach there, do you?

4    **A.**    I'm not in the economics department.

5    **Q.**    And, in fact, you are not a tenured professor; is that

6    right?

7    **A.**    I would not have tenure; that's correct.

8    **Q.**    In fact, you're not even on a tenure track.

9    **A.**    I've never approached it that way.   I'm just a

10   consulting professor.   I've been there 17 years.

11   **Q.**    And the way that's often referred to is a guest

12   lecturer; right?

13   **A.**    That's not correct.   That is absolutely not correct.   I

14   was approached by the school in the late 80's, and they were

15   interested in having someone come in and teach their

16   engineers about finance and business and business analysis.

17   And they wanted someone that would invest the time to tailor

18   it to their engineering group, and I took on that assignment

19   and began teaching two classes in 1991.   Taught two quarters

20   for about seven or eight years, full time consulting to

21   business, and then had some young kids --

22            MR. PRICE:  Your Honor, move to strike.

23   Nonresponsive.

24            THE COURT:  It is.

25   **Q.**    BY MR. PRICE:  Mr. Meyer, you've heard the phrase in

1  academia "publish or perish"?

2  **A.**    I believe in a general sense.

3  **Q.**    Which means that professors, particularly at a

4  prestigious institution like Stanford, are expected to

5  publish in their fields of expertise so that they can become

6  professors and get tenured; correct?

7  **A.**    That may be.  I've never approached by teaching on a

8  tenure track.  I've approached it to give back to the

9  students, as I'm a consultant, and I do this to help out the

10  students.

11  **Q.**    And I was looking at your resume.  In all the years, it

12  appears as if you haven't published a single thing; is that

13  right?

14  **A.**    I don't write.  I consult.  And I teach.  And I have

15  young kids.  That's what I do.

16  **Q.**    So the answer to my question is yes, I haven't published

17  a single thing.

18  **A.**    The answer is yes, I don't have time to write.

19  **Q.**    And with respect to this teaching students in the -- I

20  think it's the civil and environmental engineering school; is

21  that right?

22  **A.**    That's correct.

23  **Q.**    So what percentage of your income per year over the last

24  five years has been doing that as opposed to being an expert?

25  **A.**    I reached an accommodation years ago where I donate my

1    fee back to the school.  So I basically do it for nothing.

2    I'm part of the faculty, but I teach for free.

3    **Q.**    And the benefit you get is you get to come into court

4    and tell people that you're a Stanford professor.

5    **A.**    No, the benefit I get is I get to talk to young people

6    about real issues every year, and it's very enjoyable talking

7    about these issues to people that are interested in hearing

8    about it.

9    **Q.**    In your report, do you recall saying something to the

10   effect of without Bratz sales, MGA would be an entirely

11   different business.  Do you recall writing that in your

12   report?

13   **A.**    I believe that's correct.  I believe that.

14   **Q.**    And if we could put up -- I believe it's Meyer 1.

15   Looking at your methodology, you see how you subtract from

16   revenue expenses, get a profit, and you have an apportionment

17   multiplied.

18            Do you see that?

19   **A.**    Yes.

20   **Q.**    And you understand that applies only to the causes of

21   action for copyright or intellectual property infringement.

22   You understand that; correct?

23            MR. KENNEDY:  Objection.  Legal conclusion.

24            THE COURT:  Rephrase, Counsel.

25   **Q.**    BY MR. PRICE:  See where it says total damages?

7765

1    **A.**    Yes, sir.

2    **Q.**    So obviously, to come up so that you can tell the jury

3    what damages were, you had to have some idea of what the --

4    some understanding of what the law required you to do to

5    calculate damages from a given cause of action; right?

6    **A.**    I can't speak to the law.  I know how to value

7    intellectual property.  I can't speak to legal issues.

8    **Q.**    So you thought that in evaluating intellectual property,

9    for example, if there had been some sort of infringement of

10   copyright or infringement of intellectual property, that you

11   did an apportionment analysis; correct?

12   **A.**    I believe what's asked is that one apportions the

13   profit.  You identify profits attributable to factors other

14   than the intellectual property.  So you look for other

15   reasons why the company is profitable.  You identify those

16   and you apportion to that.  That's my understanding from

17   working in intellectual property cases for 25 years.

18   **Q.**    And are you familiar with the cause of action breach or

19   aiding and abetting a breach of fiduciary duty?

20   **A.**    I would say from a nonlegal perspective, I am.

21   **Q.**    Okay.  And you don't purport to calculate damages for

22   that wrong, that is, for aiding and abetting a breach of

23   fiduciary duty; correct?

24            MR. KENNEDY:  Calling for a legal conclusion as

25   phrased.

1              THE COURT:  There's no foundation.

2    **Q.**    BY MR. PRICE:  Did you attempt to calculate damages for

3    anything other than an infringement of some sort of

4    intellectual property?

5              MR. KENNEDY:  Objection.  Lack of foundation.

6              THE COURT:  Well, as phrased, overruled.

7              Do you understand the question?

8              THE WITNESS:  I think in a general sense.  As I

9    testified in my deposition to one your colleagues, I believe

10   that my amounts relate to those causes of action, but I was

11   clear to say that I would defer to the lawyers in the case

12   and the judge to make that determination.  I've done those

13   calculations.  I believe they apply, but I'm not a lawyer.

14   So I would defer to those of you that are lawyers and judges.

15   **Q.**    BY MR. PRICE:  Okay.  Well, let me ask you, you recall

16   one of the things that you showed the jury was a number of

17   products.  I'm going to try to find the right graphic here.

18             It's graphic 142, Ken.

19             You did this breakdown of revenues?

20   **A.**    Yes, I remember that.

21   **Q.**    And you recall testifying -- for example, you've got

22   play sets, other product lines, licensing.

23             You see that?

24   **A.**    Yes, I do.

25   **Q.**    And you got fashions.

1              Do you see that?

2    **A.**    Yes.

3    **Q.**    And you recall testifying that your understanding in the

4    industry is that you wouldn't have any fashions sold without

5    a fashion doll.

6              Do you recall testifying to that?

7    **A.**    I believe in deposition I was asked if there was no

8    fashion doll, and that was the hypothetical, would there be

9    fashions, and I said I don't believe they would have fashions

10   if there was no doll.

11   **Q.**    And you also testified that the success of a fashion

12   doll directly leads to licensing opportunities.

13             Do you recall testifying to that?

14   **A.**    I believe in my report and at my deposition I said that

15   the company builds a brand, and part of that process they are

16   able to license, and part of that company is the fashion

17   doll.

18   **Q.**    Well, I didn't ask you about a brand.  Do you recall

19   saying, quote, the -- the fashion doll success directly leads

20   to additional licensing opportunities?

21   **A.**    That wouldn't surprise me in the context of my

22   deposition.  That wouldn't surprise me.

23   **Q.**    And you understand that Mattel is asking both for -- in

24   the infringement area, both direct profits from direct

25   infringement and indirect profits that result from that.