1          Do you understand that?

2   **A.**    I wouldn't know how you phrase them.  I believe that

3   there's a request for $3.1 billion of the Bratz revenues

4   however you decide to describe that.

5   **Q.**    And do you understand what is being asked for for

6   damages for the aiding and abetting the breach of fiduciary

7   duty of Mr. Bryant?  Do you have any idea of what's being

8   sought for that?

9   **A.**    What the damage claim is?

10  **Q.**    Yes.

11  **A.**    From what I can tell, reading the transcripts, it

12  appears that Mattel is seeking the same damages for those

13  state claims as it is for the intellectual property claims.

14  **Q.**    Do you understand that under that claim, Mattel is

15  seeking disgorgement of all benefit that resulted as a result

16  of the aiding and abetting and the breach of fiduciary duty?

17  **A.**    That may be.  I'm not a lawyer.  So I don't know how you

18  would phrase that, but I do understand that Mattel is asking

19  for profits on $3.1 billion is my understanding.

20  **Q.**    Any event, your analysis of the company, which I guess

21  was a number of hours, led you to the conclusion that without

22  the Bratz sales, MGA itself would be in your words, an

23  entirely different business; right?

24  **A.**    I believe it would be a different business if there

25  was -- if there wasn't a Bratz product.

1    **Q.**    Now, another calculation, I'd like you to look, if you

2    could, at -- this is where you compare yourself to

3    Mr. Wagner.

4             You recall that?

5    **A.**    Yes, sir.

6    **Q.**    And the difference here, we have these operating

7    expenses where Mr. Wagner subtracts 600 million and you

8    subtract 800 million.

9             You see that?

10   **A.**    Yes, I do.

11   **Q.**    And do you have any understanding as to whether or not,

12   if the jury finds willful infringement, whether or not any

13   amount is subtracted to come up with damages?

14   **A.**    I believe that's a legal question.  So I wouldn't have

15   an opinion under willful infringement.  I can tell you under

16   a financial analysis, this is the profits of the product

17   line.  If there's an issue for the judge or the lawyers, I

18   would defer to you on that.

19   **Q.**    So you aren't really testifying as to what legal damages

20   are or what sort of calculation the jury should make, at

21   least economically?

22   **A.**    I'm providing the economics for the jury to consider and

23   make their decision.

24   **Q.**    Okay.  So, for example, though, using your numbers,

25   you'll admit that if the jury finds willful infringement and

1    they are told that if there's willful infringement, you don't

2    subtract these operating expenses, you'll agree that your

3    number would increase by about 800 million?

4            MR. KENNEDY:  Your Honor, calling for a legal

5    conclusion.

6            THE COURT:  You're going to have to rephrase,

7    counsel.

8    **Q.**   BY MR. PRICE:  If you are asked, Mr. Meyer, to calculate

9    damages using these figures, and you were told that you could

10   not, should not subtract operating expenses, you'll agree

11   that your profits figure insurance creases by $800 million?

12   **A.**   I would agree that you should listen to the judge.  And

13   if that's what the judge determines, then that's what I would

14   tell the jury to do.

15   **Q.**   And here you have taxes of 200 million.  And one thing

16   you mentioned is that Mattel -- and I assume other companies

17   that you've seen, when they do financial reports, they

18   subtract taxes to get profits?

19   **A.**   They do deduct taxes to get profits, that's correct.

20   **Q.**   That's something you have probably seen in every

21   financial statement of a company you've looked at; right?

22   **A.**   If they are doing things in a legal fashion in this

23   country, that's correct.

24   **Q.**   But you understand the question here, the question is

25   how much damages should be awarded; right?

1    A.    Well, I believe we're focusing on in this case the

2    profits from the Bratz product line.  I think the Court and

3    the jury will decide damages, but as relates to profits,

4    these are the appropriate costs.

5    Q.    Well, in the Mattel information you saw, was it in the

6    context of there already having found liability in connection

7    with some sort of litigation that Mattel was taking the

8    position that you should subtract taxes?

9    A.    I don't follow that question.

10   Q.    Well, let me ask it this way:  You understand that an

11   award of compensatory damages in a case is tax deductible?

12   A.    You're getting into legal issues now.  Legal and tax

13   issues.  Tax planning issues.

14   Q.    Okay.  So maybe you're not the person to ask this.  So

15   what you're telling us is you don't have the expertise to be

16   able to tell us whether or not an award of compensatory

17   damages is tax deductible.

18   A.    I can tell you what the profits are on this product

19   line.  I think when you're talking about compensatory

20   damages, you want to define in the context of this profit

21   stream what that is going to be, that may help me a little

22   bit.

23   Q.    My question is different.  Are you telling us, because I

24   asked you whether or not compensatory damages are tax

25   deductible, are you telling us that you don't have the

1    expertise to tell the jury whether or not compensatory

2    damages are tax deductible?

3    **A.**    I need it broken down.  So we're moving away from the

4    profits, and now we're just talking about a damage award

5    that's compensatory versus punitive or something like that?

6    I'm not really clear on your question.

7    **Q.**    I'll try to make it clearer.

8          Compensatory damages, not punitive damages.  You

9    understand the difference?

10   **A.**    As a nonlawyer.

11   **Q.**    Okay.  And I'm just asking whether or not you have the

12   expertise to tell the jury whether or not compensatory

13   damages are tax deductible.

14         MR. KENNEDY:  Legal conclusion.

15         THE COURT:  I'm sorry?

16         MR. KENNEDY:  Legal conclusion.

17         THE COURT:  Overruled.

18         THE WITNESS:  I believe it's really an issue for

19   the tax lawyers and the tax planners, and it's a complicated

20   issue.  And I wouldn't have a separate opinion about that.  I

21   know that these are the taxes deducted in the course of this

22   business.  But with the damage award and how that's handled

23   vis-a-vis the tax authorities, I wouldn't want to be offering

24   opinions about that.

25   **Q.**    BY MR. PRICE:  So the answer to my question is yes, you

1    don't have the expertise to tell the jury whether or not a

2    damages award is tax deductible?

3    **A.**    I wouldn't have the expertise to walk the jury through

4    that and advise on that.

5    **Q.**    And as a CPA, you would not able to give an opinion as

6    to whether or not damages are tax deductible?

7    **A.**    I think we're getting back to another issue.  But I

8    wouldn't want to be giving advice on how to handing a damage

9    award in light of someone's tax requirements.

10   **Q.**    Now, you did talk about just some raw data that got into

11   evidence about how different themes sold at different

12   amounts.

13           Do you recall that?

14   **A.**    Yes, I believe I testified that there was a wide variety

15   of different sales for the themes of the Bratz dolls.

16   **Q.**    Now, is it your understanding that after, say, 2003,

17   that if you walked into a store to buy a Bratz doll, if you

18   wanted to buy a Bratz doll, you were confronted with themes;

19   right?

20   **A.**    It would be my understanding that most of the products

21   released after 2003 were on some thematic scale.  The company

22   was focusing on the releases around these different themes.

23   **Q.**    So in fact most months -- if not virtually all -- if you

24   walked into a store and you wanted to buy a Bratz doll, you

25   had to choose among themes; right?

1  **A.**   That's right.  Because the first generation had

2  basically sold out.  Demand was gone.  It was the same doll.

3  So the company was trying to extend the demand by augmenting

4  the product line, adding fashions and accessories and making

5  the theme so there were still sales.  You couldn't sell the

6  same old doll because they had already been sold.

7  **Q.**   The answer to my question is "yes"?

8  **A.**   I think it's a combination.  There were some

9  combinations of sales, and the company was trying to spurr on

10  sales, and they sold on themes.

11  **Q.**   My question is after 2003, if a child went into a store

12  and wanted to buy a Bratz doll, that child had to pick among

13  themes; right?

14  **A.**   I would say generally they were sold by themes; that's

15  correct.

16  **Q.**   And so when the child is confronted with wanting to buy

17  a Bratz doll and they are confronted with themes, some themes

18  they chose and some themes they didn't at different rates;

19  correct?

20  **A.**   Well, based on what the young girls were looking for,

21  they bought certain themes and didn't buy others.  And you

22  heard my points on direct.  But there was a vast difference

23  in terms of what was successful with those theme sales.

24  **Q.**   Now, one of the analyses that you did was that you said

25  in response to what Mr. Wagner did in making a comparison

1    among companies, you did your comparison using figures from

2    Mattel; is that right?

3    **A.**    Right.   I took his analysis and I believe improved it

4    with a better benchmark, a better baseline.

5    **Q.**    And this was not an analysis that was contained in your

6    first expert report; correct?

7    **A.**    That's correct.

8    **Q.**    I mean, this was you were critiquing Mr. Wagner's

9    analysis; correct?

10   **A.**    He put forth an apportionment methodology, and I picked

11   it up, and I said I believe it's not very good the way it is,

12   but I believe I can make it better, and that's what I did.

13   **Q.**    Okay.   So in your analysis, if we could look at your

14   supplemental report.   Is it up in front of you?   The

15   supplemental report dated July 1, 2008?   I think it's 13861.

16   **A.**    Yes, I have it in front of me.

17   **Q.**    And this is the report in which you make this analysis

18   compared to -- comparing Bratz to Mattel; correct?

19   **A.**    I do two things.   One, I address the Barbie

20   profitability, which we had just received, and then I also

21   update Mr. Wagner's analysis.

22   **Q.**    And I'm talking about the updating of Mr. Wagner's

23   analysis using Mattel's financials, in that you're including

24   the value of Mattel's intellectual property when looking at

25   their profits; right?

1    **A.**   I would agree if we're comparing against Mattel

2    products, we're comparing against their intellectual

3    property.   I agree with that.

4    **Q.**   And if you're looking at the Bratz figures, you're

5    looking at figures which include the value of Bratz

6    intellectual property; correct?

7    **A.**   I agree with that.

8    **Q.**   But the purpose of the analysis, I understand, was to

9    find out how much of those sales was due to something besides

10   intellectual property; correct?

11   **A.**   No, I believe the purpose was to establish a baseline.

12   If the hypothesis of Mr. Wagner was that let's compare

13   against companies that had strong brands, distribution

14   recognition, and then profits over and above that must be due

15   to something that's super.   In this case, it may be

16   Mr. Bryant's materials, the materials in front of the court

17   here.

18         So I said well, I can improve upon that, and I

19   think by doing it, by comparing it to a fashion doll.   And

20   then if there's a difference, to me that's a better way of

21   trying to identify or carve out what may be important to the

22   jury, those additional profits.

23   **Q.**   And as part of your analysis, you came up with a figure

24   which you labeled excess profitability.

25         Do you recall that?

1   **A.**   I believe I called it excess -- it was the amount

2   comparing the two products.   It's the difference.   And if

3   it's in the favor of Bratz, it's excess.   And if it was in

4   the favor of Barbie, I sort of set that aside.

5   **Q.**   And the purpose of that was you were trying to find out

6   how much of the profits generated by Bratz were due to the

7   design of the doll; correct?

8   **A.**   I was basically trying to improve upon Mr. Wagner's

9   approach and say if we compare fashion doll products, can we

10   find some baseline and potentially above that baseline that

11   would be related to the copyrighted materials and the other

12   items in front of the Court.

13   **Q.**   Let me ask you again.   What you were trying to do is

14   come up with a figure.   So you could determine what

15   percentage of the profits generated by profits were

16   attributable to the design of the doll; correct?

17   **A.**   If we can agree that design of the doll is the broad

18   definition of the property, Carter Bryant's materials and all

19   of that, I would say yes, that's true.

20   **Q.**   And if we look at attachment 3 to your report, this is

21   Exhibit 13861, you see your calculations as to how you come

22   up with your percentage as to what portion of Bratz profits

23   is due to the design of the doll.

24         Do you see that?

25   **A.**   I see the schedule.   I'm not certain I follow your

7778

 1    point.  But I'm on the schedule.

 2  **Q.**    You see the last line, apportion the percentage, and you

 3    arrange those out, and you get a percentage which you say is

 4    the percentage of Bratz profit attributable to the Bratz

 5    design or Mr. Carter's intellectual property; right?

 6  **A.**    I agree with that in a general sense.

 7  **Q.**    And in doing that, you see you calculated a raw figure

 8    as to what portion of the profits were due to the design of

 9    the doll.  That's under the excess profitability line.

10          Do you see that?

11  **A.**    The $31 million figure?

12  **Q.**    Total figure, yes.  Do you see that?

13  **A.**    Yes, I do.

14  **Q.**    Okay.  So let's look at that.  So in 2001, based on your

15    analysis, the amount of Bratz profits in total due to the way

16    the doll looks, that is, Mr. Carter Bryant's designs, the

17    total number of dollars of profit attributable to that were

18    zero.

19  **A.**    That's right.  That was a year of heavy costs for Bratz.

20    The Bratz line was ramping up, and there was a lot of heavy

21    costs.  So it is zero.

22  **Q.**    Were there no profits for Bratz in 2001?

23  **A.**    I believe we saw on the board it was about $4 million

24    total.

25  **Q.**    Okay.  So for $4 million, using your technique, $4

1   million of profits, according to your technique, zero

2   attributed to the design or look of the doll; correct?

3   **A.**   It you're going line by line, and I explained this in my

4   deposition differently, but I would agree based on that

5   comparison, there would be nothing assigned as additional

6   profitability.

7   **Q.**   Let's put on Exhibit 13861, page 11, on the screen.   And

8   we're looking here at the excess profitability figure here.

9   And if we can compare that along years.

10          So I talked about 2001.   So in 2005, now, on your

11   calculations, using your apportionment, using the way you did

12   it, what were the profits in 2005 for Bratz?   The total

13   profits?

14   **A.**   Under this methodology, since Barbie in that year

15   exceeded Bratz, there's nothing apportioned off to Bratz.

16   **Q.**   You're jumping ahead of me.   My question was different.

17   I'm asking to you tell the jury what, under your

18   calculations, were the Bratz profits for the year 2005.

19   **A.**   I'm sorry.   The profits.   They were $63 million.

20   **Q.**   Okay.   So using your technique, of that $63 million

21   profits, the amount that you attribute to the design and look

22   of the doll, to the intellectual property, is zero.

23   **A.**   That's right.   In that year, based on this methodology,

24   that's correct.

25   **Q.**   By the way, most methodologies you use, you have to do

1    kind of a gut check to see if they make any rational sense.

2            Would you agree with that?

3    **A.**    Well, now, we're backing up to the fact that I took

4    Mr. Wagner's methodology and, I believe, improved upon it.

5            MR. PRICE:  Move to strike as nonresponsive.

6            THE COURT:  Sustained.  It's stricken.

7    **Q.**    BY MR. PRICE:  You will agree that in evaluating

8    methodology, you want to use a gut check to see if it makes

9    rational sense?

10   **A.**    I wouldn't argue with that.

11   **Q.**    So then we are in the year 2006, under your

12   calculations, using the way you allocate expenses, you've got

13   Bratz profits of 117 million; correct?

14   **A.**    That's correct.

15   **Q.**    Okay.  And the amount of those profits of 117 million

16   that you use, that you say is attributable to the

17   intellectual property, is zero; correct?

18   **A.**    That's correct.

19   **Q.**    And then in 2007, you've got, according to your

20   calculations, 71 million in profits; correct?

21   **A.**    That's correct.

22   **Q.**    And the amount that you attribute to any intellectual

23   property is, again, zero; correct?

24   **A.**    That's correct.  Year by year, that's correct.

25            MR. PRICE:  Your Honor, I move page 11 of

7781

```
 1   Exhibit 13861 into evidence.
 2              THE COURT:  Any objection?
 3              MR. KENNEDY:  No objection, your Honor.
 4              THE COURT:  It's admitted.
 5              (Exhibit 13861, Page 11, received.)
 6   Q.   BY MR. PRICE:  And finally, Mr. Meyer, you were asked
 7   about the possibility of evaluating the value of MGA on a
 8   going forward basis at this time.
 9              Do you recall those questions?
10   A.   I believe I was asked about could one actually value the
11   company today based on where the verdict stands in this case
12   and the company's downward slide in 2008.  And I testified
13   that you could not value the company right now at this point
14   in time.
15   Q.   However, I guess it's your opinion that after there's a
16   verdict, then the business or Mr. Larian's going forward net
17   worth could be evaluated?
18   A.   It would depend a lot on what that verdict is and where
19   the company is.  If the sales -- company's sales and profits
20   are down from 2008, way down from 2006.  So a lot depends on
21   what the verdict is and what the company has to face in the
22   way of its cash flow.
23   Q.   You're aware that MGA gave us numbers and projections
24   after the jury's verdict as to profitability, et cetera;
25   correct?
```

1           MR. KENNEDY:  Objection, your Honor.  Lack of

2    foundation.

3           THE COURT:  It's a foundational, yes.  Overruled.

4           THE WITNESS:  Could the question be read back,

5    please?

6           (Record read.)

7           THE WITNESS:  I can't speak to when they provided

8    projections to you.

9    Q.    BY MR. PRICE:  If the jury came back with a very low

10   verdict, you would agree -- say because they thought MGA, we

11   can't figure out their value going forward.  You with me so

12   far, that hypothetical?

13   A.    So you're saying a low verdict.  So can you give me an

14   amount, for example?

15   Q.    What you would consider low.

16   A.    $10 million.

17   Q.    Okay.  So let's say the jury came back with a

18   $10 million verdict because, among other things, they thought

19   it was too difficult to value the value of MGA going forward.

20          You with me so far?

21   A.    I believe so.

22   Q.    So then after the verdict, because there was such a low

23   one, MGA's value would increase dramatically, wouldn't it?

24   A.    I don't follow that.  I mean, if you're asking me to

25   assume there's a $10 million verdict, could you then -- all

1    other things being considered equal, place a value on the

2    company?  Potentially, I'd have to know what else came out of

3    the court's decision.  But if all we're doing is talking

4    about a $10 million verdict and nothing else, I mean,

5    everything else is, I should say, pre this law suit.

6           So you could most likely place a value on the

7    company.

8    **Q.**  And if that's what the jury did, then Mr. Larian would

9    be able to profit from the wrong he committed because,

10    according to you, the jury can't make a calculation of his

11    net worth at this moment.

12           MR. KENNEDY:  Objection.  Lack of foundation, legal

13    conclusion.

14           THE COURT:  Overruled.  You may answer.

15           THE WITNESS:  If I understand the question, I think

16    that's all relative to what the jury finds.  I would defer to

17    the jury and trust their judgment.  I can't sit here and --

18    I'm not going to judge Mr. Larian.  That's up to the jury to

19    do.

20           MR. PRICE:  Nothing further.

21                   **REDIRECT EXAMINATION**

22    BY MR. KENNEDY:

23    **Q.**  Mr. Meyer, I'd like to direct your attention back to

24    the horizontal version of page 1 in attachment 3 to your

25    supplemental report that Mr. Price was just asking you about.

1             And first, I think you testified that in 2001, you

2    thought that Bratz made a profit of $4 million.  My question

3    is were you talking about what the first generation dolls did

4    or what happened in 2001?

5    **A.**    Excuse me.  That was the first generation dolls.

6    **Q.**    Okay.  So as you've told us during direct, when you take

7    the first generation dolls for all the years they were sold,

8    they made $4 million; is that correct?

9    **A.**    That is correct.

10   **Q.**    Okay.  However, if we look at Bratz for 2001, did it

11   make a profit?  It's up on the board here.  To speed things

12   along, is there a $4 million loss shown?

13   **A.**    That's correct.

14   **Q.**    And in this analysis, you were attempting to compare

15   Bratz profits with Barbie profits; is that correct?

16   **A.**    That is correct.  Barbie and My Scene.

17   **Q.**    Okay.  And you were attempting to determine to what

18   extent Bratz was making greater profits than Barbie.

19   **A.**    That was the objective of the comparison.  That's

20   correct.

21   **Q.**    In this analysis, were you making any attempt to decide

22   what Mr. Bryant's drawings contributions were in a particular

23   year?

24   **A.**    No, my focus was overall.  So I would take you to the

25   far right-hand side, and I would say I focused on those

1  totals over this whole period.  If you look at what happened

2  based on this methodology, there was excess profitability of

3  $31 million.  And that translates to a 5.22 percent

4  apportionment percentage.  And I felt across the whole

5  period, across all of the themes and characters that were

6  sold, that was the most appropriate focus point as opposed to

7  any one year.  I didn't focus on cut-off issues.  Just

8  overall.

9  Q.   Is it your opinion that for any of these years, the

10 Bryant drawings made absolutely no contribution to the Bratz

11 profits?

12 A.   No, I believe I recognize that the Bryant drawings were

13 an important first step, and I've recognized value to those

14 drawings going through the apportionment percentages and

15 through the profits I've laid out for the jury today.

16      MR. KENNEDY:  Thank you very much.  No further

17 questions.

18                    **RECROSS-EXAMINATION**

19 BY MR. PRICE:

20 Q.   You said what you were doing was coming to an overall

21 contribution, and then you pointed to this far right-hand

22 corner figure of 5.22; right?

23 A.   That's correct.  Across all the years.

24 Q.   So that's overall.  But the way you got that overall was

25 by adding up the percentages for the years and then doing

1    some math; right?

2    **A.**    Well, that's how the schedule works.

3    **Q.**    Right.  So when you said you weren't doing it year by

4    year, you were just doing it overall, your methodology

5    required you to go year by year; correct?

6    **A.**    I had to gather the data year by year and make the

7    comparisons.

8    **Q.**    And using your methodology, it shows that for three of

9    the years where the dolls make, according to your figures,

10   hundreds of millions of dollars, zero percent would be

11   apportioned to Mr. Bryant's intellectual property.  That's

12   what these numbers show; right?

13   **A.**    I don't agree with that.  I do not agree with that.  I

14   believe if we want to go down that route, I would focus the

15   jury on 2002, the 7.25 percent, 2008, the 8.83 percent, and

16   2004, the 10.07 percent.  To use those apportionment

17   parentages.

18          My focus was to try to compare Barbie to the Bratz

19   doll to see if there was any so-called super profits from the

20   intellectual property and identify it there.  I'm the last

21   one to say there's not value in Mr. Bryant's and the property

22   now that's been awarded to Mattel.  I recognize value in that

23   property.

24          MR. PRICE:  No other questions.

25          MR. PRICE:  Nothing further.

```
 1              THE COURT:  You are excused, sir.  Thank you.

 2              MR. NOLAN:  Your Honor, the next witness will be a

 3   two-minute video of Lily Martinez's deposition testimony.

 4              MR. QUINN:  Your Honor, would it be appropriate to

 5   explain why Ms. Martinez is necessary?

 6              THE COURT:  I suspect the jury has figured out why

 7   Ms. Martinez is no longer with us.  As important as this case

 8   might be to Ms. Martinez, there is one thing perhaps more

 9   important, and she's attending to that as we speak.

10              (WHEREUPON THE VIDEOTAPED DEPOSITION EXCERPTS

11              OF LILY MARTINEZ, AS PROVIDED BY COUNSEL, ARE

12              INCORPORATED HEREIN:)

13   Q.   Could you please state your full name for the record.

14   A.   Liliana Martinez.

15   Q.   Do you consider the decal reflected on Exhibit 257 to be

16   more cartoony than the features of Barbie?

17              MR. ZELLER:  And when you say Barbie, you're

18   talking about the particular doll that's in Cool Skating?

19   Q.   That's correct.

20   A.   You're asking me to compare them?

21   Q.   Yes.

22   A.   It's not the same thing.

23   Q.   And how are they different?

24   A.   One is 3D and one's 2D.

25   Q.   Do they differ in any other way other than one being 2D
```

7788

1    and one being 3D?

2    **A.**   One is -- I mean, you can't compare something that's

3    not -- you can't compare them.

4    **Q.**   Do you believe that the style of Barbie's face is the

5    same as the style of the decal?

6    **A.**   You already asked me that, and I had already told her I

7    think one is a doll and one is a cartoonish decal.

8    **Q.**   What did you do with the Toon Teens materials, the dolls

9    and accessories and et cetera after you heard that Toon Teens

10   was not selected?

11   **A.**   Materials, meaning the actual product that we presented?

12   **Q.**   Yes.

13   **A.**   I don't remember what I immediately did.   But

14   eventually, we put it in a box.

15   **Q.**   Are there Bratz dolls in the design area at Mattel?

16   **A.**   You already asked me that.

17   **Q.**   How did they get there?

18   **A.**   We buy them.

19   **Q.**   Have you ever bought a Bratz doll?

20   **A.**   Yes, I've bought a Bratz doll.

21   **Q.**   Have you bought many Bratz dolls?

22   **A.**   I wouldn't say many, but I bought some.

23           (END OF DEPOSITION EXCERPT.)

24           MR. NOLAN:   Your Honor, just a time count with

25   respect to their cross-examination deducted from the four

1   o'clock?  Because we have one video that's 13 minutes long.

2           MR. NOLAN:  Thank you.  The next video will be

3   Kevin Farr.

4           (WHEREUPON THE VIDEOTAPED DEPOSITION EXCERPTS

5           OF KEVIN FARR, AS PROVIDED BY COUNSEL, ARE

6           INCORPORATED HEREIN:)

7   **Q.**   Would you please spell your name for the record, sir.

8   **A.**   Kevin, K-E-V-I-N, Farr, F-A-R-R.

9   **Q.**   How long have you been with Mattel?

10  **A.**   I've been with Mattel since November of 1991.

11  **Q.**   What did you do in terms of employment between 1986 and

12  1991?

13  **A.**   I worked for Price Waterhouse at the time.

14  **Q.**   Are you a CPA?

15  **A.**   Yes, I am.

16  **Q.**   And you have an effective, operable license right now?

17  **A.**   I have a license, yes.

18  **Q.**   And what did you do for Price Waterhouse?

19  **A.**   I did auditing and did tax consulting.

20  **Q.**   And any other employment between 1986 and 1991 other

21  than Price Waterhouse?

22  **A.**   No.

23  **Q.**   Okay.  Was Mattel one of your clients?

24  **A.**   Yes.

25  **Q.**   Okay.  And that led to the employment at Mattel?

7790

1  **A.**   That's correct.

2  **Q.**   Okay.  And what was your initial position at Mattel?

3  **A.**   Director of tax.

4  **Q.**   Okay.  And can you explain generally the duties or jobs

5  you had between 1991 and 2000 at Mattel?

6  **A.**   Yeah.  I was director of tax.  Then I became the head of

7  the tax department shortly thereafter, and in 1996,

8  September, I became controller of Mattel, and then ultimately

9  I became CFO of Mattel in February of 2000.

10  **Q.**   Do you have a design background?

11  **A.**   No.

12  **Q.**   Marketing background?

13  **A.**   I've got a marketing major at Northwestern University,

14  but I don't really have marketing expertise, no.

15  **Q.**   As of November 2001, was there such a thing as the

16  management committee at Mattel?

17  **A.**   Yes.

18  **Q.**   Okay.  And were you part of that management committee?

19  **A.**   Yes, I was.

20  **Q.**   Could you explain what the management committee is?

21  **A.**   The management committee is Bob Eckert's direct reports,

22  the CEO of Mattel.

23  **Q.**   Other than the fact that these people are direct reports

24  to Mr. Eckert, does the committee have any other function?

25  Does it meet in a committee, for instance, to discuss

7791

1    particularly important policy issues for the company?

2    **A.**    No.

3    **Q.**    You know what I'm referring to when I say the Bratz

4    dolls?

5    **A.**    Yes.

6    **Q.**    What are the Bratz dolls?

7    **A.**    Bratz dolls are fashion dolls.

8    **Q.**    What's a fashion doll?

9    **A.**    Fashion doll, I believe, is an 11 1/2-inch doll that

10   looks like, you know, an adult or a teenager.

11   **Q.**    Okay.  What do you mean by fashionable?

12   **A.**    It's about on-trend fashion.  It's about fashion play

13   where you're playing with doll clothes and dressing up the

14   doll with doll clothes.

15   **Q.**    And that's an important element for Barbie?

16   **A.**    It's one element of Barbie.

17   **Q.**    Okay.

18   **A.**    It's one element of fashion doll play.

19   **Q.**    Okay.  And Bratz is also a fashion doll; is that right?

20   **A.**    Yes.

21   **Q.**    When did you first hear of Bratz?

22   **A.**    Probably around 2001, 2002.

23   **Q.**    How did you come to find out about that?

24   **A.**    Just in the competitive marketplace, keeping up with

25   what's happening in the toy business.

7792

1    **Q.**   Do you recall specifically how you heard about Bratz?

2    **A.**   No.

3    **Q.**   I'd like to mark as Exhibit 2502, I believe, a

4    multi-page document, Bates Nos. M 0356622 through -629.

5          This is a multi-page document with an e-mail cover

6    sheet and then some text attached from Julia Jensen to Kevin

7    Farr, Jerry Bossick, and Glen Bozarth.  I assume that Kevin

8    Farr is you?

9    **A.**   Yes.

10   **Q.**   Down at the bottom of the page, about three, four lines

11   from the bottom, it says the Barbie aisle completely stocked

12   with the new look.

13         Do you see that?

14   **A.**   Yes.

15   **Q.**   Do you know what that refers to?

16   **A.**   I think it was a change in packaging.

17   **Q.**   Okay.  And how was the packaging changed?

18   **A.**   Well, if you read on, it says the package changed with a

19   fresh, light, contemporary world look for girls.

20   **Q.**   Is packaging something that's important for Barbie?

21   **A.**   Well, I think packaging is part of the element of the

22   product.  So yeah, it's important.

23   **Q.**   Okay.  Does Mattel have a packaging department?

24   **A.**   Yes.

25   **Q.**   And their responsibility is to work on the packaging for

1    all of the -- all of Mattel's products; correct?

2    **A.**    Well, I think there's a packaging department responsible

3    for particular brands, and there is probably more than one

4    packaging group --

5    **Q.**    Okay.

6    **A.**    But yeah, it is responsible for packaging.

7    **Q.**    But that's something that Mattel puts a lot of focus and

8    energy on; correct?

9    **A.**    Well, I think Mattel puts a lot of focus on packaging,

10   but it's really the entire product that is the focus.

11   **Q.**    When you say the entire product, what do you mean by

12   that?

13   **A.**    The product in and of itself, the play value of the

14   product, and the packaging, and the advertising and the

15   marketing programs.

16   **Q.**    Would you go to page 7 of this document, please.  At the

17   very top, it says:  "We have seen a real impact with the new

18   packaging and fresh product offerings in the Barbie fashion

19   lines."

20         Do you see that?

21   **A.**    Yes.

22   **Q.**    Do you recall that in 2000 that there was an emphasis on

23   new packaging for Barbie?

24   **A.**    Yes.

25   **Q.**    Do you have an understanding as to why there was a new

7794

1    emphasis on packaging for Barbie back in 2000?

2    **A.**   Again, I think that we saw some declines in the prior

3    years, and I think people thought that refreshing the

4    packaging could have a positive impact on the product sales.

5    **Q.**   Has there been a focus on packaging as a way to generate

6    sales since 2000?

7    **A.**   Well, I think there's a focus on packaging every year

8    that, you know, is supposed to help sales.

9    **Q.**   Do you know whether the company tracks the effect of

10   packaging on sales?

11   **A.**   Well, I think that's a very difficult thing to determine

12   at the end of the day.  So I think it's a -- you know, you've

13   got a product.  Some products sell.  Other products can have

14   great packaging and not sell, and, you know, it's difficult

15   to isolate each of the factors that relate to why a product

16   sells well and why a product doesn't sell well.

17          In the individual components, which I look at, is

18   what is the overall sales of the product, and are those

19   products moving in the right direction.  If that's the case,

20   and presumably you've got the right product, you got the

21   right packaging, and you got the right marketing program

22   around it.  So it's difficult to isolate, you know, what one

23   component does relative to the entire product.

24   **Q.**   Have you ever heard the phrase life-style brand before

25   today?

1  **A.**   Yes, I have.

2  **Q.**   When did you hear that?

3  **A.**   I think over the years.  So, you know, I would say the

4  last five years or so, eight years.

5  **Q.**   Okay.

6  **A.**   Something like that.

7  **Q.**   Do you have an understanding of what that phrase means?

8  **A.**   Well, I think what it means is more than just a toy, and

9  it relates back to, you know, we do licensing business with

10  Barbie and Fisher-Price and Hot Wheels, and they include

11  products that are outside of just the traditional toy, the

12  doll, the accessory, things like apparel, things that

13  perfume.  So more of things that relate to everyday life is

14  my understanding of what that would mean.

15  **Q.**   Okay.  Are you familiar with the word "brand"?

16  **A.**   Yes.

17  **Q.**   Okay.  And what does the word mean to you?

18  **A.**   It refers to -- to me, it refers to -- you know,

19  recognizable brands like Barbie, like Chanel, like

20  Louis Vuitton.

21  **Q.**   And does brand have an existence in your mind separate

22  and apart from the products?

23  **A.**   No.

24  **Q.**   So it's possible to have a strong brand but a weak

25  product at the same time?

1    **A.**    Yes.

2    **Q.**    Turn to page 7.  About seven bullet points down the

3    page, it says:  "Focused on building brand equity versus just

4    selling a toy."

5              Do you see that?

6    **A.**    Yes.

7    **Q.**    Do you have any understanding of that concept generally?

8    **A.**    Again, I think it's about building brand equity, and

9    that's about the brand, and versus a toy means that a toy can

10   stand alone without a brand because there's play value with

11   that toy.  It's fun to play with whether it's a branded toy

12   or not.

13   **Q.**    Okay.  I would like to mark as next in order Mattel's

14   2003 Form 10-K.

15             Mr. Farr, do you recognize this document?

16   **A.**    Yes.

17   **Q.**    What is it?

18   **A.**    It's the Form 10-K for the year ended December 31st,

19   2003.

20   **Q.**    And you signed this document; correct?

21   **A.**    Yes, I did.

22   **Q.**    Did you review it to ensure it was accurate before you

23   signed it?

24   **A.**    Correct.

25   **Q.**    Okay.  If you would turn to page 4 of the document.  If

7797

1    you look in the upper right-hand corner, there's a 5 of 109,

2    but at the bottom, it's actually 4.

3    A.    Yes, yes.

4    Q.    All right.    The third paragraph there under domestic

5    segment, it says:    "In 2004, Mattel expects to expand its

6    existing products or introduce new products, including a new,

7    quote, words of, close quote, strategy within the Barbie

8    brand."    And then it goes on to explain the words of.    The

9    words are Ferry Topia, Happy Family, Cali Girl.

10            Do you see this?    Cali Girl.    Do you see that?

11   A.    Yes.

12   Q.    Do you know what the worlds of strategy was within the

13   Barbie brand?

14   A.    Yes.

15   Q.    Can you explain that, please?

16   A.    Basically, it was to have content which told a story and

17   then building a product line around that content or story so

18   the girls could buy the product line and play out the story.

19   Q.    So the word content in your business generally refers to

20   the story associated with the doll?

21   A.    Yes.

22   Q.    So if you could give me an example.

23   A.    One of these lines was Princess and the Pauper.    We did

24   a direct video, direct to consumer video which basically told

25   the Princess and Pauper story, and then we built a line

7798

1   around the princess and the story with regard to accessories,

2   like a carriage and other characters in the film so that our

3   little girl could bring that story to life with our toys and

4   replay the story in their living room.

5   **Q.**   Okay.  So a story around the doll, at least as of 2003,

6   2004, was an important element of that doll; is that correct?

7   **A.**   It was an important element of the play pattern

8   presumably.

9   **Q.**   Okay.  Can you explain that?

10   **A.**   Well, it was basically the play pattern was to play

11   around the story.  So the story was, you know, the element

12   that you wanted little girls to focus in on, buy the toy

13   line, and then replay the story.

14   **Q.**   Okay.  So a doll would have a particular life story; is

15   that right?

16   **A.**   Correct.

17   **Q.**   And this is something that Mattel would create for the

18   doll?

19   **A.**   Correct.

20   **Q.**   And is this something that was new as of 2003, 2004, is

21   this element of stories for dolls?

22   **A.**   It was new that it was -- that a major portion of the

23   line would be built around that.  It wasn't new in the

24   concept we had doing these direct to consumer DVD's for

25   several years, and that those particular -- having the DVD

1   and the toys around the story so that they could bring the

2   store toy life was very successful.  So the thought was why

3   not do that across the line to the extent that that made

4   sense.

5   **Q.**   So do you recall that in the 2003, 2004 time frame, this

6   concept of using stories with dolls was something that was

7   particularly focused on?

8   **A.**   Yes.

9   **Q.**   Okay.  Is that something that Matt Bousquette was the

10  primary driver behind?

11  **A.**   Yes.

12  **Q.**   Could you describe again what that world of strategy is?

13  **A.**   Again, it was our strategy to have a story, some type of

14  content around Barbie product line and have the product line

15  built around that story, and then kids, by buying the product

16  line, could bring that story to life in a play pattern.

17  **Q.**   And this is a strategy that was implemented in 2004?

18  **A.**   I believe so.

19  **Q.**   Across the broader part of the line?

20  **A.**   There was a strategy prior to that where we were doing

21  our entertainment properties around that strategy.  So when

22  we talk the words of strategy, it was around the broader part

23  of the line, Barbie line.

24  **Q.**   Okay.  So it was the use of the strategy which was

25  building stories around dolls directly with Barbie that was

7800

1    new in 2004; is that right?

2    **A.**    Correct.

3    **Q.**    Okay.  And did you do anything to familiarize yourself

4    with that strategy in preparation for this conference call?

5    **A.**    I saw the presentations that we, you know, made to

6    customers about the worlds of strategy, and I think we did at

7    one time present this strategy to the board.  So I understood

8    it with respect to it was building content and then building

9    a product line around the story.

10   **Q.**    You say you saw the presentations that were made to

11   customers.  Does that mean you were at presentations with

12   customers or that someone did a mock for you in a sense and

13   ran through a presentation that would then later be presented

14   to customers?

15   **A.**    I was at customer presentations of what we call -- where

16   we bring them into our offices and present the product line

17   to them.

18   **Q.**    Do you have a recollection today -- do you recall

19   understanding in 2004 that the world of strategy was working

20   in 2004?

21   **A.**    I believe some of the worlds were working, and I believe

22   some of them weren't working.

23   **Q.**    Uh-huh.  Do you recall --

24   **A.**    That's my recollection.

25   **Q.**    Do you recall which worlds of were working?

7801

1    A.    Specifically, no.

2    Q.    Okay.  Could you go to page No. M 0079735.  It's about

3    five pages back.  It says:  "Fight fire with fire."  Do you

4    see that?  And three sentences down, it talks about product

5    packaging, marketing, and sales.

6           Do you see that?

7    A.    Yes.

8    Q.    Okay.  Do you recall that, in the spring of 2004, the

9    focus with respect to Barbie was on product packaging,

10   marketing, and sales?

11   A.    Well, I think you know, over my history at Mattel, it's

12   been about product packaging, marketing, and sales.  So I

13   don't see this being any different than any other years, but

14   I think it's a focus across the entire product line.

15   Q.    Do you recall which worlds were working and which

16   weren't?

17   A.    I -- you know, I know that the entertainment specific

18   worlds were working such as in the prior year in the Princess

19   and the Pauper, I believe.  But I don't recall in this

20   particular year which worlds were working and which worlds

21   weren't working.

22   Q.    So in each of the worlds, you had a Barbie doll with a

23   different theme; right?

24   A.    Well, we had a story.

25   Q.    Okay.

1   **A.**   And then the Barbie doll would be developed -- the

2   Barbie product line would be developed around that story.   So

3   a girl could bring that story to life.

4   **Q.**   Okay.   So focusing just on the doll, not the fashions or

5   the accessories or the story, but just on the doll, what was

6   the difference between the doll in the various worlds, if

7   any?

8   **A.**   Again, that's not my area of expertise.   Again, it was

9   an 11 1/2-inch fashion doll, and it, you know, related back

10  to how does that fashion doll relate back to the story.

11  **Q.**   Do you recall discussing with Felicia Kantor Hendrix the

12  need to communicate the Barbie brand better?

13  **A.**   Yes.

14  **Q.**   What was said about that?

15  **A.**   Well, I think what we talked about with regard to the

16  Barbie brand is to have a more consistent description of the

17  brand in talking to consumers.   So it was really about taking

18  the -- having a more consistent message from both a brand

19  perspective in -- really with regard to speaking to consumers

20  and with regard to packaging; that we felt like the packaging

21  had gotten, you know, confusing because it wasn't

22  standardized packaging.   So I think it was more consistency

23  from that perspective.

24  **Q.**   So there was -- the focus, then, was on packaging?

25  **A.**   No, it was on the entire brand.   So it was packaging.

7803

```
 1   It was advertising.  It was about play patterns as opposed do

 2   just worlds.  We felt like the worlds were appropriate in

 3   certain circumstances but not across the line.  We felt like

 4   that we were trying to take good product with good play value

 5   and put it in a world, and it didn't have a place in the

 6   world.

 7            So we went back and said, "Look, we need to go back

 8   to some of the basic Barbie business," which is about, you

 9   know, basic play, which is fashion play, which is hair play,

10   which is role play, and put some of that back in line, and

11   also accessory play.

12            So Barbie just with a, say, a Barbie cruise ship,

13   that girls like to play with Barbie in a cruise ship, and

14   they don't need a whole world of product around that, or

15   Barbie with a car, a cool car.

16            (END OF DEPOSITION EXCERPT.)

17            MR. NOLAN:  Your Honor, MGA would move in the

18   redacted exhibits that are referenced in the video.  2502-A,

19   2504-A, 2514-A, 2517-A.

20            THE COURT:  Those are the redacted versions?

21            MR. NOLAN:  That's correct, your Honor.

22            THE COURT:  Very well.  They are admitted.

23            (Exhibits 2502-A, 2504-A, 2514-A, and

24             2517-A received.)

25            MR. NOLAN:  And real quickly, your Honor, last
```

 1   point is that we have provided to Mattel, pursuant to the

 2   earlier discussion the documents that have been redacted that

 3   we were otherwise going to do through a Custodian of Records.

 4   To those that they have an authenticity objection, we'll note

 5   that, but to those that are not authentic or if they have an

 6   authenticity objection to that, we would like to take that up

 7   at sidebar.

 8         But the rest of documents, your Honor, I think are

 9   Mattel documents, and we would offer those in evidence

10   instead of calling a Custodian of Records.  And then we would

11   rest on that, your Honor.

12         THE COURT:  Why don't we take this up at sidebar.

13         **(SIDEBAR CONFERENCE HELD.)**

14         THE COURT:  I'm sorry.  I guess I wasn't clear on

15   that.

16         MS. AGUIAR:  If this is going to take five minutes,

17   I was wondering if the jury wants to take a restroom break.

18         THE COURT:  We really don't have time for that.

19         MR. NOLAN:  Did I misunderstand?  Your Honor, these

20   are the documents.  And they have gone through them, and I

21   think they have an issue with respect to authenticity of some

22   of the documents, and some have 403 objections.

23         MR. ZELLER:  Well, I mean, as the Court is aware,

24   the custodians aren't sufficient to move in documents to

25   which there's an authenticity objection.

1          THE COURT:  Unless they can lay the authenticity.

2          MR. ZELLER:  Which this witness could not.

3          THE COURT:  I don't know if it could or not.  We're

4    not changing the rules at this late gauge.

5          MR. NOLAN:  And we're not asking to.  I accept the

6    representation that the custodian cannot --

7          THE COURT:  There's two ways it comes in.  One is

8    by stipulation, one is by a witness.  Are any of these

9    documents that you're stipulating to?

10         MR. ZELLER:  No.

11         THE COURT:  The only other way they come in is

12   through a witness.  And we're really out of time on that.

13         MR. NOLAN:  All right.

14         MR. ZELLER:  Thank you.

15         MR. NOLAN:  I will only point out, your Honor, that

16   earlier in our -- when we were raising the same issue, the

17   Court did in 1-B say listen, if it's authentic and it's a

18   business record, that it can come in subject to 403.

19         THE COURT:  I'm asking, are there stipulations on

20   authenticity?  Right.  I did say that.  I think I just asked

21   that question.

22         MR. NOLAN:  I'm sorry.  But that we weren't allowed

23   to withhold objections in bad faith.  In other words, to

24   cause a witness merely to take the stand to lay a foundation

25   for the authenticity of it.  These are not being objected to

1   on authenticity.

2           THE COURT:   That means there's a stipulation on

3   authenticity.   I just asked is there a stipulation on

4   authenticity.

5           MS. AGUIAR:   There is on all of them except for

6   one.

7           MR. ZELLER:   No, there is not.   There is not.   I

8   don't know what they are referring to when they say there's a

9   stipulation.   We've objected to these documents on a variety

10  of grounds.

11          THE COURT:   Okay.   To the extent there's not an

12  objection to authenticity, we can take that up later.

13          MS. AGUIAR:   That's the point.

14          THE COURT:   And just so I understand, if there is

15  an objection on authenticity grounds --

16          MR. NOLAN:   We accept that.

17          THE COURT:   Subject to that, then you rest?

18          MR. NOLAN:   Yes.

19          THE COURT:   Very well.   Why don't you state that

20  for the jury so it's clear.

21          **(CONCLUSION OF SIDEBAR CONFERENCE.)**

22          MR. NOLAN:   Subject to the sidebar, we're going to

23  work out the issue with respect to authenticity on a couple

24  of these documents.   I would also move in the slides that

25  were referenced with Mr. Wagner -- I'm sorry, Mr. Meyer --

7807

1   Trial Exhibits 18923, 1, 2, 4, 6, 7, 9, 10, 11, 12, 13, 15,

2   16, 17, 18, 21, 24, 25, 26, and 28, and 32.

3           THE COURT:  Any objection?

4           MR. NOLAN:  Strike 28.

5           THE COURT:  Very well.  Any objection?

6           MR. PRICE:  Your Honor, no objection subject to

7   eliminating some of the titles.

8           THE COURT:  Very well.

9           **(Exhibits 18923, 1, 2, 4, 6, 7, 9, 10,**

10          **11, 12, 13, 15, 16, 17, 18, 21, 24, 25,**

11          **26, and 32 received.)**

12          MR. NOLAN:  And subject to the offer that we made

13  with respect to these other exhibits that I referenced at

14  sidebar, your Honor, MGA rests.

15          THE COURT:  Very well.  Thank you, Counsel.  I

16  understand there's a brief rebuttal case.

17          MR. QUINN:  Yes, your Honor.  Mattel calls Mike

18  Wagner.

19          THE COURT:  Very well.

20          THE CLERK:  Please raise your right hand.

21          **MICHAEL JOSEPH WAGNER, SWORN.**

22          THE CLERK:  Please take the stand.  Please state

23  your full name for the record, and spell your last name.

24          THE WITNESS:  Michael Joseph Wagner, W-A-G-N-E-R.

25  ///

**DIRECT EXAMINATION**

BY MR. QUINN:

**Q.**   Welcome back, Mr. Wagner.  Couldn't stay away?

**A.**   I could stay away, but you asked me to come back.

**Q.**   You have been here and heard the testimony of MGA's damages expert, Mr. Meyer?

**A.**   I've been here during his entire examination.

**Q.**   And I take it there are some points on which you and Mr. Meyer have some areas of disagreement.

**A.**   There are.

**Q.**   Let's talk about the first one.  The question of these operating expenses, and if we could put up on the screen Meyer slide 2.  And there was testimony about this difference between the operating expense numbers here, the 600 million and the 800 million.  Could you please remind us what it is we're talking about here?

**A.**   We're talking about sales, general and administrative. It's the expenses that the company incurs besides the actual products cost to make the Bratz products.

**Q.**   Would they -- which of these, perhaps as overhead, is that a similar type of term to cover this?

**A.**   That's an ambiguous term because there's overhead and cost of goods sold as well.  But a lot of people call it overhead.

**Q.**   And what is the effort that you and Mr. Meyer were going

1  to here?  What was it you were trying to do with these

2  operating expense numbers?

3  **A.**   Well, the goal was to figure out how these costs

4  increase with an increase in Bratz sales.  We're trying to

5  get the cause and effect relationship between an increase in

6  Bratz sales and an increase in these types of expenses.

7  **Q.**   All right.  So these general administrative expenses,

8  and you're trying to figure out how much of them are fairly

9  allocated to, say, Bratz products?

10  **A.**   That's fair.

11  **Q.**   All right.  Now, if there's an issue -- in your

12  understanding, if there's a finding of willful infringement,

13  is there any deduction that is made from revenues at all on

14  this issue?

15         MR. KENNEDY:  Legal conclusion, your Honor.

16         THE COURT:  Lay a foundation.

17  **Q.**   BY MR. QUINN:  Do you know whether or not there's a

18  deduction for these general administrative expenses if

19  there's a finding of willful infringement?

20         MR. KENNEDY:  Still a legal conclusion.

21         THE COURT:  Actually, it's a yes or no question.

22         THE WITNESS:  I do.

23  **Q.**   BY MR. QUINN:  How is it that you know what you know?

24  **A.**   I'VE been calculating damages for 31 years.  I've done

25  many copyright cases.

1   Q.   Based on that knowledge and experience, if there's a

2   finding of willful infringement, is there any deduction for

3   these operating expenses at all?

4           MR. KENNEDY:   Legal conclusion.

5           THE COURT:   Counsel, there's a stipulated

6   instruction on this point, I believe.   Sidebar.

7           **(SIDEBAR CONFERENCE HELD.)**

8           THE COURT:   Willful infringement taxes come off.

9   That's an instruction the jury is going to hear.

10          MR. KENNEDY:   That's for your Honor.   This is

11  pre-instructing the jury.

12          MR. ROTH:   He's just reading the cases.   That's

13  just the witness providing instruction.

14          THE COURT:   Fair enough.   Let's move on.

15          **(CONCLUSION OF SIDEBAR CONFERENCE.)**

16          THE COURT:   The Court will instruct on the

17  deduction.   Let's move on, Counsel.

18          MR. QUINN:   Thank you, your Honor.

19          Let's put that slide back up, Ken.

20  Q.   Could you describe for the jury what the nature of your

21  disagreement with Mr. Meyer is concerning the calculation of

22  these operating expenses?

23  A.   Well, quantitatively, it's rounded to $200 million, and

24  I just think that there was far more costs being incurred in

25  the other unsuccessful product lines than Mr. Meyer does.

7811

**Q.**   And can you explain what you mean by that?

**A.**   Yes, the -- you have this very successful product.   And you are also trying to sell other products.   And I showed you a chart that had at least the top 10 products.   They have about 50 brands that they sell.   You're generating this cash in this one product line, and you're going to try to use that money, invest in your company, and try to develop other successful brands.

So you're spending money in the sales and general administrative expense and those other areas probably far beyond the sales you receive in these other products lines.

**Q.**   If we could take a look at Exhibit 13957.   This is the chart you were referring to?

**A.**   It is.

**Q.**   And could you explain -- just pick an example here. Explain with reference to one of these products what you mean about how a product may be less profitable but still have a substantial burden of general and administrative expenses.

**A.**   Well, I don't think the jury could read it, but the product -- it's the second to the right from the Bratz, which is the 80 percent bar, is Forever Best Friends.   Example, that is a brand that MGA was trying to sell.   And if they spent a lot of money trying to generate interest in that product but it didn't sell well, based on Mr. Meyer's approach, you're not going to allocate costs to that.   In

7812

1  fact, you'll actually allocate 80 percent of those costs to

2  Bratz because it has 80 percent of the sales.

3  **Q.**   So did he allocate costs, then, more in terms of where

4  the profits were?

5  **A.**   Yes, it's called an ability to bear methodology.   And

6  what it means is it's a fair way to allocate costs, but it's

7  not cause and effect.   You just have the most successful

8  products carrying most of the costs and the less successful

9  products carrying less of the costs.

10  **Q.**   And when you say it's a fair way to allocate costs, in

11  terms of figuring out the profitability of Bratz, is it a

12  fair way to allocate costs to determine the profitability of

13  Bratz?

14  **A.**   Not for a damage calculation.   It should be cause and

15  effect.

16  **Q.**   All right.   And how is -- what was your method for

17  allocating these general and administrative expenses in

18  contrast to Mr. Meyer?

19  **A.**   Well, I used, as I explained in my direct examination, a

20  statistical analysis, a regression analysis, which is

21  scientific, which proves the cause and effect relationship.

22  **Q.**   And how does it do that?   How does it prove it?

23  **A.**   It proves it because it tells you what the relation is,

24  and it also gives you these metrics, as Mr. Meyer explained,

25  a t-stat and an R squared that tells you whether you have a

1  valid relationship or not.  It's not based on judgment.  It's

2  based on science.

3  Q.    Now, have you been provided with some information that

4  Mr. Larian gave the jury earlier today in terms of how MGA

5  has allocated its efforts since 2001?

6  A.    Yes.

7  Q.    And based on Mr. Larian's testimony, have you done some

8  calculations concerning how these general and administrative

9  costs should be allocated?

10 A.    Yes.  I have used the percentages that Mr. Larian

11 testified this morning as to where the effort was placed in

12 MGA between Bratz and non-Bratz products by year during the

13 entire damage period and applied those to these operating

14 expenses to see what the result would be.

15 Q.    And why was Mr. Larian's testimony about where MGA

16 placed its efforts, why was that significant to you in terms

17 of deciding how to allocate general and administrative

18 expenses?

19 A.    Because that is some evidence of cause and effect.  If

20 they are spending 55 percent of their effort on non-Bratz

21 products in a year, you would expects 55 percent of their

22 costs to be in that area.

23 Q.    Do you have before you a copy of Exhibit 13991?

24 A.    I do.

25 Q.    And can you identify for us what that is?

1        We have a copy for the Court, your Honor.

2        THE COURT:  Please.

3   **Q.**   BY MR. QUINN:  Could you please explain to the jury what

4   Exhibit 13991 is?

5   **A.**   It's actually a replication of one of Mr. Meyer's

6   schedules that I had my staff prepare, which is basically his

7   calculation of the profitability of Bratz which he testified

8   to in his examination.  But instead of using his allocation

9   by sales methodology where he allocates 80 percent of all

10  operating expenses to Bratz, I used the percentages that

11  Mr. Larian testified to to see what effect it would have on

12  his numbers.

13  **Q.**   And this is data that you -- these are numbers that you

14  and your staff crunched since Mr. Larian testified this

15  morning.

16  **A.**   That is correct.

17        MR. QUINN:  Your Honor, I would offer

18  Exhibit 13919.

19        MR. KENNEDY:  Objection.  Lack of foundation.

20        THE COURT:  Lay further foundation, Counsel, on

21  where the numbers come from.

22  **Q.**   BY MR. QUINN:  Where do these numbers come from?

23  **A.**   They come from two sources.  First source is from

24  attachment 4.3-U to Mr. Meyer's March 17th, 2008, report.

25  And then the adjustments I made came from Mr. Larian's oral

1    testimony this morning in court, which broke out by year the

2    percent of effort of MGA between Bratz products and non-Bratz

3    products.

4    **Q.**   All right.  So the data here for revenues and expenses

5    is data that you took from MGA's damages expert's report; is

6    that true?

7    **A.**   That is correct.

8    **Q.**   And then you did another calculation adjusting the

9    allocation numbers based upon Mr. Larian's testimony; is that

10   correct?

11   **A.**   That is accurate.

12          MR. QUINN:  On that basis, your Honor, we would

13   offer this exhibit.

14          MR. KENNEDY:  Still object.  Lack of foundation.

15   May I voir dire?

16          THE COURT:  Foundation as to what aspect?  I'll see

17   you at sidebar, Counsel.  Thank you.

18          Actually, that's a better solution.  Why don't you

19   voir dire, Counsel.

20                    **VOIR DIRE EXAMINATION**

21   BY MR. KENNEDY:

22   **Q.**   What did Mr. Larian mean this morning when he used the

23   word "efforts"?

24   **A.**   He meant the effort that MGA, both he and the other

25   people at MGA, were putting into these different products.

7816

1    Q.   And you did a lot of analyses in this case before this

2    morning.  You never did one based on proportionate effort,

3    did you?

4    A.   Well, I had no information from the Chairman of the

5    company as to that statistic.  That statistic is not

6    reported.  So you're correct, I did not.

7    Q.   And in the 106 or 107 cases where you've testified in

8    court, you've never done an allocation on the basis of

9    effort; correct?

10   A.   Oh, I have.  I've done that a number of times.

11   Q.   Effort?

12   A.   Yes.  Usually it's when I can work with my client and

13   talk about level of effort.  I've done that a number of

14   times.

15   Q.   Okay.  And how do you measure a company's effort?  Do

16   you have somebody there keeping track of how people spend

17   their days?  How do you do that?

18   A.   Well, some companies do it.  It's a rare company that

19   they actually have their people in effect fill out --

20   professionals fill out timecards to say what they are doing.

21   Other times it's usually interviews with the management, like

22   Mr. Larian, and they have to give you those statistics.

23   Q.   In this case, what does effort mean?  What was happening

24   over at MGA?

25   A.   That they had 50 product lines that they were trying to

1    make successful, and they were putting efforts into each one

2    of those, and this was a breakout between all the other

3    product lines and Bratz by the Chairman of the company.

4    Q.    Does that mean money was being spent on that?  The

5    percentage of the employee's time?  The amount of time they

6    spent in meetings talking about it?  Where did the effort

7    come from?

8    A.    I would think it's all of those things.  I would agree

9    that everything would be relevant to that effort that you

10   just described.

11   Q.    Do you know if that in fact was the case?  Did you see

12   anything in the records to indicate that 70 percent of the

13   money in any given year was being spent on non-Bratz

14   products?

15   A.    I didn't ever use 70 percent in my numbers.

16   Q.    How about 30 percent?  50 percent?

17   A.    I've used those figures.  I am relying upon Mr. Larian's

18   sworn testimony.  I did not hear him explain the basis for

19   his decisions.

20   Q.    And you have no idea whether he had any kind of a

21   reasoned basis for his use of the word evident, do you?

22   A.    I have not talked to Mr. Larian.  So I would not be able

23   to answer the question.

24          MR. KENNEDY:  Your Honor, I submit there's a lack

25   of foundation.

 1          THE COURT:  The foundation is based on Mr. Larian's

 2    testimony.  The jury can consider the weight of that

 3    testimony since they heard it themselves this morning.

 4          Objection is overruled.

 5                **DIRECT EXAMINATION  (RESUMED)**

 6    BY MR. QUINN:

 7    **Q.**   And by the way, we talk about effort.  General and

 8    administrative expenses, did that include salaries of people

 9    working?

10    **A.**   That's the biggest expense in sales, general and

11    administrative expenses.

12    **Q.**   Reflecting efforts of people who are paid salaries?

13    **A.**   That is correct.

14          MR. QUINN:  So, your Honor, may I publish Exhibit

15    13991?

16          THE COURT:  It's admitted.

17          **(Exhibit 13991 received.)**

18          THE COURT:  Counsel, just to make sure I

19    understand.  Pull it down for a second.  All of the numbers

20    above the line are predicated -- can you clarify what all the

21    numbers above the line are predicated on?

22          MR. QUINN:  Yes, your Honor.

23          THE COURT:  Thank you.

24    **Q.**   BY MR. QUINN:  Mr. Wagner, the numbers above the line at

25    the bottom, those numbers come from where?

1   **A.**   Straight from Mr. Meyer's report.

2   **Q.**   Did you make any adjustments to the numbers at all?

3   **A.**   No.

4          THE COURT:  Very well.  It's admitted.

5   **Q.**   BY MR. QUINN:  And could we publish below the line here.

6   Can you tell us what this reflects?

7   **A.**   Well, this reflects an allocation of these operating

8   expenses that Mr. Meyer had on his schedule, which isn't 100

9   percent of the operating costs.  It's only the percent that

10  he allocated to Bratz and breaking it up in the percentages

11  between Bratz and non-Bratz as testified to by Mr. Larian.

12  **Q.**   We only have part of this exhibit here on the screen,

13  but each of these columns represent a year?

14  **A.**   That is correct.

15  **Q.**   And it goes from 2001 to Year to Date, June 2008?

16  **A.**   Right.  And I misspoke.  The last column is actually the

17  total of all the years.

18  **Q.**   This one over here is the total?

19  **A.**   Correct.

20  **Q.**   And the other one is each column represents that year

21  2001 to 2007?

22  **A.**   No, the second to the last column is half of the year

23  2008.

24          THE COURT:  Counsel, why don't we show the entire

25  exhibit, and then you can break it down.

1            MR. QUINN:   Okay.   Let's put up the whole document.

2    Q.    This is what we're referring to here.   We've got the

3    years here?

4    A.    We do.

5    Q.    And then perhaps if we could enlarge this at the bottom.

6    These are all expense items here that Mr. Meyer identified

7    along the left-hand side?

8    A.    Well, the top line in this bottom is the total operating

9    expenses that he has allocated to Bratz and is basically 80

10   percent of all of the operating expenses incurred by MGA

11   during this time period.

12   Q.    All right.   So where he says Meyer operating expense.

13   That's these numbers along here?

14   A.    Yes, and if you went up higher in the schedule, you'd

15   actually see those numbers under total operating expenses in

16   the schedule.

17   Q.    And then below that, you have operating expense based on

18   Larian's percentage of effort.   This says operating expense

19   based upon Larian's percentage of effort; is that correct?

20   A.    It does.

21   Q.    And what does that reflect?

22   A.    That reflects multiplying the operating expenses that

23   Mr. Meyer calculated for Bratz by the percent that Mr. Larian

24   testified MGA actually spent in the way of effort on Bratz in

25   that year.

7821

1   Q.   And when you do that, what does that yield?

2   A.   Well, it yields a significantly lower number than he had

3   in his calculation.

4   Q.   All right.  And below that, we have --

5            If we could just enlarge maybe say this much, Ken.

6            We have percentage of effort on non-Bratz products,

7   percentage of effort on Bratz products.  For those years.

8   Where do those percentages come from?

9   A.   The percentages come from the testimony of Mr. Larian

10  this morning.

11  Q.   All right.  And so you incorporated those percentages

12  into the calculation for each year?

13  A.   Yes.

14  Q.   And what did that -- using Mr. Larian's own allocation

15  about how efforts are divided between Bratz and non-Bratz

16  products, did that shed any light in your own mind as to

17  whether your calculation of general administrative expense

18  allocations was appropriate or whether Mr. Meyer's was

19  appropriate?

20  A.   Yes.  Basically using Mr. Larian's own estimates

21  confirms my numbers.  I am very close to him, and yet

22  Mr. Meyer is about $177 million off using his approach.

23  Q.   And using Mr. Larian's approach, what is the total

24  number that you got to for G and A?

25  A.   Well, it's actually not on the schedule because

7822

1    actually, I don't know why the last line of the schedule

2    is not printed.  But the total number is approximately

3    $177 million difference between what Mr. Meyer calculated and

4    what Mr. Larian's estimated would have happened.

5    **Q.**   All right.  And what does this total number reflect down

6    here in the bottom?  The 141,692,023.  What does it reflect?

7    **A.**   Well, it reflects the change -- only looking at what he

8    did for Bratz products, you have to divide that by .8 because

9    you really -- basically 80 percent, to really bring it up to

10   the total operating expenses to actually use Mr. Larian's

11   percentages.  And I did that on one line below this, which

12   didn't print out on your schedule.  And so the actual number

13   is $177 million overstatement if you use Mr. Meyer's

14   approach.

15   **Q.**   $177 million in Mr. Meyer's -- you're saying Mr. Meyer's

16   allocation was $177 million off based upon Mr. Larian's

17   testimony?

18   **A.**   Right.  He has included 177 million more in the way of

19   operating expenses to be allocated to the Bratz product line

20   than Mr. Larian's estimates today, which means, again, he has

21   understated damages by that amount.

22   **Q.**   All right.  So if we can go back to Mr. Meyer's slide

23   No. 2.  Are you saying if we were to adjust Mr. Meyer's

24   analysis to take into account Mr. Larian's testimony, we

25   would have to reduce this by $147 million approximately?

7823

1   A.    No.   I said 177-.   It would be rounded to 200 million.

2   Basically, he came up with the same number that I came up

3   with.

4   Q.    I'm sorry.   I misspoke.   177 million -- it would be much

5   closer to your 600 million than Mr. Meyer's 800 million?

6   A.    Well, again, my 600 million is rounded to hundreds of

7   millions as well.   But he would confirm my number.   Our

8   numbers would be basically the same.

9   Q.    All right.   So let's talk now about taxes.   You saw that

10  Mr. Meyer in doing his calculations of profits deducted taxes

11  when he calculated Bratz profits.   Do you agree with that?

12  A.    I absolutely disagree with that.

13  Q.    Why do you disagree with that?

14  A.    I disagree because I have been calculating damages for

15  31 years.   I have seen hundreds of other damage experts

16  calculate commercial damages as well.   I have never seen a

17  damage expert calculate damages after tax in a commercial

18  damage case in my career.   I've written on it.   It's in my 25

19  publications.   I've spoken on the topic to practitioners.   I

20  teach at the AICPA's national litigation services conference.

21  And I teach this type of information.   And no one I know

22  would do that.

23  Q.    Why?

24  A.    Because it's tax deductible to the defendant who pays

25  the compensatory damages.

1   Q.   Was it surprising to you that Mr. Meyer, as a CPA, and

2   said he has testified over a hundred times doesn't know that

3   compensatory damages are tax deductible?  Was that surprising

4   to you?

5            MR. KENNEDY:  Irrelevant.

6            THE COURT:  Sustained.

7   Q.   BY MR. QUINN:  Let me just ask it this way:  Is that

8   common knowledge in your field?  Do you believe that

9   compensatory damages are tax deductible?

10  A.   It is.

11  Q.   What would be the result, if you did what Mr. Meyer

12  suggests and deducted taxes?  What would be the result in

13  terms of what it would mean for Mattel and MGA and

14  Mr. Larian?

15  A.   Well, it would reduce by approximately $200 million

16  rounded the damages you should award Mattel, and it would

17  give that money to Mr. Larian, who then would not pay taxes

18  with that money because he gets basically 12 years of use of

19  that money.  He can go back two years and recapture those

20  actual taxes he's paid in the last two years, but he can go

21  forward 10 years and not pay taxes until he has recouped all

22  of this money.  So he'll be paying no taxes for 12 years.

23  Q.   You say go back two years.  What do you mean by that?

24  A.   He can re-file his last two years' tax returns and

25  basically get all the taxes that he's paid back.

1    **Q.**   And when you say go forward, are you saying that that's

2    a tax deductible item that he can carry forward in future

3    years?

4    **A.**   Yes, for another 10 years.

5    **Q.**   And if we deduct the taxes in arriving at the damage

6    figure here, would that result in effect in a double recovery

7    for Mr. Larian?

8    **A.**   I don't know if it's a double recovery.  What it means

9    is MGA or Mr. Larian has this money any his pocket.  And the

10   U.S. government and Mattel do not have that money in their

11   pocket.

12   **Q.**   Let's turn now to the issue of apportionment.  I

13   believe -- if I could back up for a second before we leave

14   the subject of these general administrative expenses.

15            Mr. Meyer said that his results are more

16   statistically significant.  He gives you very low grades on R

17   squared and t-stats.  You heard that testimony?

18   **A.**   I did.

19   **Q.**   And what is your response to that, sir?

20   **A.**   First off, his charts are accurate.  I'm not going to

21   dispute that at all.  But this is a tool, a scientific tool

22   that you have to use as a professional and apply your

23   judgment.  And there's one reason why his results are better

24   than mine, and that is because I use monthly data, and he

25   showed you a chart that sees there's a lot of variation in

7826

1  monthly data.  He will compress 12 months of data into two

2  points.  And when you smooth data, you automatically get a

3  better R squared and a higher T-stat.  That is not surprising

4  to me.

5          And when he says he takes into consideration

6  seasonality, actually he's disguising it.  He's assuming it's

7  not there because he only uses annual data points.  And the

8  real problem with using annual data points in this case is

9  that he only has 10 data points.  Normally, you want far more

10  than that to do a regression analysis.  The more data, the

11  better.  That's why I did a monthly analysis.  And four and a

12  half of his data points that he uses predates Bratz being

13  sold by MGA.  So they are really irrelevant data points.

14          What we are looking for is the cost behavior of

15  what happens when Bratz is part of MGA's business.  So he

16  only has five pure data points that you can actually run his

17  regression with if he really wanted to use this tool on an

18  annual basis.  And if you do that, which I have done, you get

19  nonsensical results.  Many of the cost relationships become

20  statistically insignificant, and also you get crazy results

21  like negative fixed expenses.  So it really makes no sense to

22  do what he did, in my opinion.

23  Q.  What's a negative fixed expense?

24  A.  Which means if you actually believe the science that

25  you're using, if MGA did no business, they'd actually be

7827

 1   making money, which makes no sense.

 2   **Q.**   You said a number of things there.   You said that you --

 3   they used 10 data points?   What are the 10 data points you

 4   are referring to?

 5   **A.**   It's the annual results of MGA from 1997 through 2006.

 6   And remember, Bratz only was introduced in this company in

 7   the second half of 2001.   So using information from 1997 and

 8   1998 and 1999 and 2000 and the first half of 2001 is really

 9   irrelevant.

10   **Q.**   You said by using annual data, one data point for each

11   year, he smoothed the data.   What do you mean by that?

12   **A.**   That you take a lot of variation out of the data.

13   There's a lot less up and down on your two-dimensional chart.

14   And by definition, the smoother the line, the better fit

15   you're going to have with your line you draw through it.

16   **Q.**   You indicated that you use monthly data points.

17   **A.**   I did.

18   **Q.**   All right.   Now, he criticized your saying you didn't

19   take into account seasonality.

20   **A.**   He did.   I don't agree with that.

21   **Q.**   Why not?

22   **A.**   Because my data does look at the seasonality of the

23   business.   I realize it's going to give me worse results.

24   But it is the best measure of what's actually happening in

25   that company.

7828

1   Q.   Taking data bi-monthly points rather than smoothed out

2   data for the whole year, does that take into account

3   seasonality?

4   A.   I think my approach does consider seasonality.  I think

5   his approach ignores it.

6   Q.   All right.  Let's turn now to what's been referred to as

7   apportionment.  I think you testified, when you were here

8   before, that you understand that apportionment is something

9   that may apply in some circumstances to a copyright claim.

10  A.   That is correct.

11  Q.   And you saw some numbers that Mr. Meyer used where he

12  compared Barbie profitability to Bratz profitability, and he

13  came up with a 5 percent apportionment factor, that 5 percent

14  is attributed to the design of the doll.

15          Did you hear that?

16  A.   I did.

17          MR. KENNEDY:  Object.  Mischaracterization of the

18  testimony.

19          THE COURT:  Rephrase, Counsel.

20  Q.   BY MR. QUINN:  Did you hear Mr. Meyer say he compared

21  Barbie profitability and came up with a 5 percent

22  apportionment factor?

23  A.   That's wrong.  Your earlier question was wrong.  And he

24  was right.  It's actually 5.22.

25  Q.   I defer to both of you.

1          Do you agree with that approach, an allocation of

2    5.2 percent to the value of the design?

3    **A.**    I do not.

4    **Q.**    Why?

5    **A.**    Because what he is doing, he's comparing the most

6    successful brand of all time in the toy industry and saying

7    if you took away this Bratz design, that's what MGA would

8    earn.   That is not appropriate in my professional opinion.

9    He is trying to measure what is the value of the Bratz brand

10   or the Bratz design, I should say.

11          So you have to isolate out that from your

12   yardstick, and his yardstick does include that.   And I'll

13   admit that my yardsticks include that as well, but I've

14   diluted it to such a degree that I think I'm comfortable with

15   my yardsticks, although my yardsticks still overstate the

16   issue -- I should say understate the contribution of these

17   other companies to their product lines based on their

18   intellectual property.

19   **Q.**    Can you tell from Mr. Meyer's own charts that his

20   analysis is flawed?

21   **A.**    Yes.   I was here during the cross-examination by

22   Mr. Price, and his results don't make sense.   Four out of the

23   seven years, there is no attribution to the Bratz design

24   based on his approach.

25   **Q.**    Let's take a look at Exhibit 13861-11.   This is

7830

1    Mr. Meyer's schedule.  Is this the schedule you are referring

2    to?

3    **A.**    It is.

4    **Q.**    And you indicated that this leads to a nonsensical

5    result, this analysis?

6    **A.**    Right.  Four out of the seven years they are saying

7    there's no value to the Bratz design to MGA.  It's either

8    there all the time or it's not there at all.  This doesn't

9    make any sense.

10   **Q.**    And your approach, as we recall, you came up with a

11   couple different apportionment approaches based upon what

12   type of company the jury concluded MGA was, which was the

13   most appropriate comparators; is that correct?

14   **A.**    I gave two yardsticks.

15   **Q.**    And what were those?

16   **A.**    One, I used the three top leading toy companies in the

17   world:  Mattel, Hasbro, and Jakks.  And then I used the

18   average of the publicly reporting toy industry 11 companies.

19   And I think my testimony was mischaracterized.  I don't think

20   Bratz is a diversely identified company like these other

21   companies.

22         All I'm saying is if you use the average

23   performance of those companies and said they could produce a

24   product like the average product that those companies or

25   yardsticks use, that's a good measure.

1    **Q.**   There was also some testimony about apportionment

2    regarding themes and putting a value of intellectual

3    property, attaching a value based on themes.

4    **A.**   I was here for that testimony.

5    **Q.**   All right.  Did you agree with that?

6           MR. KENNEDY:  Objection.  Lack of foundation.  Move

7    to strike.

8           THE COURT:  Lay a foundation, Counsel.  And I will

9    strike the testimony until we've had a foundation on themes.

10          MR. QUINN:  May I approach?

11          THE COURT:  Okay.

12          **(SIDEBAR CONFERENCE HELD.)**

13          THE COURT:  Okay.

14          MR. QUINN:  Your Honor, there were some numbers.  I

15   know the Court struck some of Mr. Meyer's testimony around

16   this issue of themes.  I'm concerned that there were some

17   numbers that did come in.  He did mention before the sidebar,

18   he got out that 18.6 number.

19          MR. PRICE:  Mr. Quinn was at the sidebar.  At

20   sidebar I said he gave his conclusion, and you said I'm going

21   to tell the jury to disregard.

22          THE COURT:  I did.

23          MR. PRICE:  And I don't think Mr. Quinn was aware

24   of that, and just for the record, that is stricken?

25          THE COURT:  Yes.

7832

```
 1              MR. QUINN:  I'll move on.

 2              THE COURT:  Mr. Price is correct, Mr. Quinn.

 3              MR. QUINN:  He usually is.

 4              (CONCLUSION OF SIDEBAR CONFERENCE.)

 5   Q.    BY MR. QUINN:  There were some questions that you were

 6   asked or that Mr. Meyer was asked about whether it's possible

 7   to value MGA or Mr. Larian's interest in MGA.

 8              You heard that testimony?

 9   A.    I did.

10   Q.    And are you aware of any additional information

11   concerning valuation being provided by MGA other than the

12   documents that you referenced in your testimony before that

13   were received after the first verdict?

14   A.    No.

15   Q.    And the information that was received after the

16   first verdict, where you opine that MGA's net worth was

17   $540.5 million, and Mr. Larian's, the value of Mr. Larian's

18   interest was $723.3 million; is that correct?

19   A.    No, that's not quite correct.  The 723 million is

20   Mr. Larian's net worth, and only a portion of his net worth

21   is due to his interest in MGA.

22   Q.    All right.  And of that amount, how much of that, based

23   upon the numbers provided after the first verdict, is

24   attributable to Mr. Larian's interest in MGA?

25   A.    It's 81.82 percent of the value of MGA.
```

7833

1   **Q.**   Have you -- we saw a pie chart here.  Have you prepared

2   some slides showing MGA's profits on Bratz by profit center?

3   **A.**   I have.

4   **Q.**   And what is a profit center?

5   **A.**   A profit center is a collection of products that are all

6   related, as an example, all the fashion dolls is a profit

7   center, and all the fashion doll accessories would be another

8   profit center.

9   **Q.**   And based upon your review of MGA's financial records,

10   does MGA itself track its profits from Bratz by profit

11   center?

12   **A.**   Only down to what's called the standard gross margin

13   level.  Not all the way to the profit number we need.

14   **Q.**   All right.  Do you have Exhibit 14664 up there with you?

15   **A.**   I do.

16   **Q.**   And what is this, 14626?

17   **A.**   I have that.

18   **Q.**   What is that?

19   **A.**   That is my calculation expressed in a pie chart of the

20   Bratz profits by major profit center from 2000 through June

21   of 2008.

22             MR. QUINN:  We'd offer that, your Honor.

23             THE COURT:  Any objection?

24             MR. KENNEDY:  No objection, your Honor.

25             THE COURT:  It's admitted.

1          **(Exhibit 14626 received.)**

2                 MR. QUINN:  If we may publish, your Honor?

3                 THE COURT:  You may.

4    **Q.**   BY MR. QUINN:  What does this reflect, Mr. Wagner?

5    **A.**   This reflects my calculation of the profits from Bratz

6    products by profit center as reported by the company.

7    **Q.**   And have you also done a calculation of these profits

8    that the jury should take into account in the event that

9    there's a determination of willful infringement?  You

10   testified to that previously.

11   **A.**   I did, and I do have such a chart.

12   **Q.**   And is that Exhibit 14663?

13   **A.**   It is.

14                MR. QUINN:  We'd offer that as well, your Honor.

15                MR. KENNEDY:  No objection, your Honor.

16                THE COURT:  It's admitted.  You may publish.

17         **(Exhibit 14663 received.)**

18   **Q.**   BY MR. QUINN:  And how is this one different than the

19   one we just looked at?

20   **A.**   It basically does not subtract sales, general and

21   administrative expenses to arrive at the profits.

22   **Q.**   That's the operating expense item that we began this

23   examination discussing?

24   **A.**   It is.

25   **Q.**   And both of these slides that we've just looked at,

1   these are based on your review and your staff's review of the

2   thousands of pages of financial information that MGA

3   provided?

4   A.   It is.

5   Q.   And then if you'd take a look at Exhibit 14664.  What is

6   this?

7   A.   This is an allocation of copyright damages to Mr. Larian

8   based on a starting point of $990.2 million of benefit that

9   he has received from the sale of the Bratz products.

10  Q.   And where did that number come from?

11  A.   That was my number that I calculated before receiving

12  the information right before my testimony that updated their

13  information through June of 2008.

14  Q.   All right.  So this is the number, the calculation

15  concerning the -- Mr. Larian's willful infringement, the

16  apportionment based upon the earlier October 2007 information

17  that MGA had provided?

18  A.   Well, it's both willful infringement and nonwillful

19  infringement.  The number is not different.

20           MR. QUINN:  I'd offer Exhibit 14664, your Honor.

21           MR. KENNEDY:  No objection.

22           THE COURT:  It's admitted.  You may publish.

23           **(Exhibit 14664 received.)**

24  Q.   BY MR. QUINN:  And could you just briefly walk us

25  through these numbers?

1   A.   Well, I'll start at the bottom.   The bottom is just if

2   there's no allocation at all.   That's the total amount that I

3   calculated based on his distributions and also what I

4   calculated the value of MGA to be, as of the date I did this

5   analysis.

6          The toy industry return is giving MGA and

7   Mr. Larian the benefit of earning the typical profits earned

8   by the 11 toy companies I used as the yardstick, and the

9   average profits that they earn on a product.   And I

10  subtracted that from the $990.2 million.

11  Q.   So this reflects an apportionment analysis with respect

12  to Mr. Larian's own benefit in the event the jury decides

13  apportionment is appropriate, based upon the numbers from

14  October of 2007?

15  A.   Correct.

16          MR. QUINN:   Thank you.

17          THE COURT:   Any cross-examination?

18                    **CROSS-EXAMINATION**

19  BY MR. KENNEDY:

20  Q.   Mr. Wagner, I take it from your testimony that you've

21  been continuing to update your work on this case since we

22  were last together on July 23; correct?

23  A.   That is accurate.

24  Q.   And, in fact, the continuing updating has even continued

25  right up until minutes before you took the stand here;

7837

1   correct?

2   **A.**   I'd say it would be an hour, but that's close.

3   **Q.**   Okay.  And between July 23 and today, have you happened

4   to be able to find anybody who would be willing to buy

5   Mr. Larian's interest in Bratz right now for any price?

6   **A.**   I didn't do that before then.  I still haven't done it.

7   **Q.**   You didn't include that in your updated efforts.

8   **A.**   That's correct.  Because that would be a waste of my

9   time.

10  **Q.**   Even though you knew I was going to ask you about that

11  if you took the stand?

12  **A.**   I was certain you were going to ask me that.

13  **Q.**   Okay.  When you were first retained in this case, you

14  were given relative freedom as to whatever you thought would

15  be the best methodology for establishing what portion of

16  MGA's operating costs were due to Bratz; right?

17  **A.**   That's true.

18  **Q.**   And you decided regression analysis was the way to go?

19  **A.**   I did.

20  **Q.**   And you got to draft your own model of a regression

21  analysis; correct?

22  **A.**   I did.

23  **Q.**   And you ran that analysis, and you found it was

24  unsatisfactory by over a hundred million dollars; correct?

25  **A.**   In the first calculation I did, I agree with you.

1   **Q.**   Okay.  And you then took this scientific method that you

2   had selected and built and altered it by over a hundred

3   million dollars; right?

4   **A.**   That is true.

5   **Q.**   Okay.  And then, when you got additional information in

6   the case earlier this year, you took that same model that you

7   got to create and did the science again; correct?

8   **A.**   Right.  I got more data and it gave me better science,

9   but it still wasn't good enough.

10  **Q.**   So the science wasn't good enough for you.

11  **A.**   Yes, science often isn't good enough for me.

12  **Q.**   So basically your job is to improve on science?

13  **A.**   Based on my experience and judgment, yes.

14  **Q.**   What's wrong with science?

15  **A.**   There's nothing wrong with science.  But unfortunately,

16  damages is not a hard science.  I'm not a physicist.  I'm not

17  a chemist.  I am a financial expert.  Our science isn't

18  perfect.

19  **Q.**   So regression analysis is science, but it's soft

20  science?

21  **A.**   Well, it's mathematics.  It's good mathematics, but the

22  data you apply to it isn't perfect.

23  **Q.**   But you get to choose the model for the data to apply to

24  it, don't you?

25  **A.**   You do.

7839

1  **Q.**   And in this case, apparently you were imperfect, weren't

2  you?  Because there was nothing wrong with the math, but

3  there was something wrong with the regression analysis, and

4  that leaves you; right?

5  **A.**   That leaves my judgment, and then I have been validated

6  by Mr. Larian that my judgments were accurate.

7  **Q.**   Sticking with your regression analysis, you decided what

8  the analysis would be, and then the numbers spoke for

9  themselves, and you found the results were unsatisfactory;

10  right?

11  **A.**   Right.  If I had not done anything more, I would have

12  greatly overstated the damages to Mattel.  I do not want to

13  do that.

14  **Q.**   Okay.  So therefore, we can agree there was something

15  wrong with the judgment that you used in creating your

16  regression analysis; right?

17  **A.**   No.  I still think it's a good tool.  I'd use it again

18  with hindsight.  I don't think I'd change my analysis at all.

19  **Q.**   Except you have to adjust it because in and of itself,

20  it isn't sufficient?

21  **A.**   Right, because of the unique aspects of this case.

22  **Q.**   And you decided that the same guy who had gotten the

23  inadequate model is the one who should decide how to fix it;

24  right?

25  **A.**   Yeah, I don't think that the jury, unfortunately, has

7840

```
 1   this expertise that they have, and they need my expertise.
 2   Q.   And you do agree, as you told us in deposition, the R
 3   squared is important, isn't it?
 4   A.   I said it -- I said everything else being equal.
 5   Q.   And that in general, it's better to have an R squared
 6   that's higher; correct?
 7   A.   I absolutely agree with that statement.
 8   Q.   And likewise, it's better to have a t-stat that's
 9   higher; correct?
10   A.   I agree with that statement as well.
11   Q.   And you agree in this case that Mr. Meyer's R squares
12   and T stats are both higher than yours; correct?
13   A.   That is absolutely correct.
14   Q.   And you also agree that Mr. Meyer's regression analyses,
15   he didn't find any need to adjust them after he ran them,
16   didn't he?
17   A.   Well, he didn't use them.  That's what's perplexing to
18   me.  What he did, and I think is what he testified to the
19   jury, is he used it as a reasonableness check.  The
20   methodology he used wasn't a regression at all.  All he did
21   was allocate operating expenses to Bratz based on the amount
22   of sales that Bratz made each year.  There was no science
23   done.
24   Q.   There was no regression analysis?
25   A.   Not if you look at the financial numbers he presented to
```

7841

1   this jury.  He never told us what the numbers are if he used

2   a regression analysis rather than the methodology he actually

3   did use.

4   **Q.**   So Mr. Meyer really didn't run a regression analysis?

5   **A.**   That's not what I said.  He did it to criticize me, and

6   he said that he got very different results than I got, which

7   I agree with, but he didn't use them affirmatively in this

8   case.

9   **Q.**   We do agree he ran something that had a better R squared

10  than you got?

11  **A.**   We do.

12  **Q.**   And he ran something that got a better t-stat than you

13  did?

14  **A.**   I agree with that as well.

15  **Q.**   And that something was a regression analysis?

16  **A.**   Clearly.

17  **Q.**   Now, turning to Mr. Larian, as you told us when you were

18  here before, your role is a fairly limited one.  You take --

19  you're not here to sponsor the facts; correct?

20  **A.**   That's true.

21  **Q.**   You take factual data that other witnesses provide, and

22  then you do the math or arithmetic as the case may be?

23  **A.**   That's something that I do, yes.

24  **Q.**   And what you did today was, after Mr. Larian said in a

25  given year, effort was 50 percent Bratz, 50 percent

1  non-Bratz, you took MGA's total operating expenses and

2  divided them in half?

3  **A.**   Correct.

4  **Q.**   And said that therefore, 50 percent of them go to Bratz,

5  50 percent of them don't; correct?

6  **A.**   Yes.

7  **Q.**   And your arithmetic is only as good as the factual

8  assumptions, i.e., Mr. Larian's testimony; correct?

9  **A.**   I agree with that statement.

10 **Q.**   And if this jury hypothetically should conclude that

11 Mr. Larian was just pulling figures out of the air this

12 morning and giving estimates on the stand, that would also

13 impact on your arithmetic, wouldn't it?

14 **A.**   It doesn't impact the arithmetic.  I think it impacts

15 the weight the jury should give to those numbers.

16 **Q.**   Are you aware of any discovery in this case where MGA

17 was ever asked to apportion the effort that had been done on

18 Bratz versus non-Bratz?

19 **A.**   Not before the questions that were asked in court this

20 morning.

21 **Q.**   Okay.  So as far as you know, Mr. Larian's answers this

22 morning are the entirety of what you've ever heard about any

23 attempt to allocate Bratz and non-Bratz effort; correct?

24 **A.**   That is correct.

25 **Q.**   Turning to taxes, you're aware that the damages that are

1   being sought in this case are a disgorgement of MGA's

2   profits?

3   **A.**   I do.

4   **Q.**   Okay.  And we're all familiar with personal injury cases

5   where the damages consist of the chiropractor bill and the

6   lost wages and things of that sort; correct?

7   **A.**   That's correct, but you're getting into an area where

8   taxes are treated differently in employment cases.

9   **Q.**   But this case is a little bit different in that Mattel

10   isn't claiming that it was harmed, that its profits were less

11   than what they otherwise would have been; correct?

12   **A.**   I think they firmly believe that they have been

13   impacted, but they are not asking for lost profits as a

14   remedy.

15   **Q.**   But what they are seeking here is MGA's profits.

16   **A.**   That is correct.

17   **Q.**   And it's your belief that there's no financial analyst

18   or damages expert in the world besides Mr. Meyer who feels

19   that in determining what the profits were that should be

20   disgorged, you subtract the money that went to the IRS.

21   **A.**   That is correct.  If it's a compensatory damage award.

22   **Q.**   And finally, on apportionment, it's your belief that

23   it's more accurate instead of comparing the Bratz doll line

24   with another doll line, to compare it with whole companies

25   that do such things as making the Monopoly board game; is

1    that correct?

2    **A.**    I do.

3         MR. KENNEDY:  Your Honor, I would move to strike

4    the gratuitous comment that Mattel believes they were harmed

5    even though they are not seeking damages for it.

6         THE COURT:  Fair enough.  It's stricken.

7         MR. KENNEDY:  With that, I have nothing further.

8         THE COURT:  Mr. Quinn.

9                    **REDIRECT EXAMINATION**

10   BY MR. QUINN:

11   **Q.**    So Mr. Meyer's t-stat numbers and R squared numbers are

12   higher than yours.  Well, how come?

13   **A.**    Well, I think I explained it.  It's because he smooths

14   the data.  I know enough about statistics that I can improve

15   my results by things that I do.  And I'm not saying he's

16   manipulated the data in any way intentionally to improve his

17   R squares.  It's the result of his work.

18   **Q.**    It's the result of the smoothing of the data you

19   referred to?

20   **A.**    Correct.

21   **Q.**    And taking just one annual data point?

22   **A.**    Right.

23   **Q.**    You indicated that Mr. Meyer didn't actually make

24   affirmative use of his regression analysis.  What did you

25   mean by that?

1  **A.**   That once he decided that here's a useful tool, I'm

2  going to use it to calculate what I think the profits are to

3  be earned, or was earned by Bratz, he didn't ever do that.

4  **Q.**   What did he do?

5  **A.**   Again, he used this ability to bear methodology that has

6  nothing to do with cause and effect and just said that if 80

7  percent of the sales in this year are by Bratz, then I'm

8  going to allocate 80 percent of all the operating expenses to

9  that product line.

10  **Q.**   If you had not made the adjustments that you made after

11  you ran the regression analysis and just left the results the

12  way they were, the way the program, the model kicked the

13  numbers out, would that have resulted in a benefit to MGA or

14  a benefit to Mattel?

15  **A.**   A benefit to Mattel.  It would have increased my damages

16  numbers by over a hundred million dollars.

17  **Q.**   So by making the adjustments that you made, you

18  actually -- those were in MGA's favor.

19  **A.**   Yes, it was.

20        MR. QUINN:  Nothing further.

21        THE COURT:  Mr. Kennedy?

22                    **RECROSS-EXAMINATION**

23  BY MR. KENNEDY:

24  **Q.**   And you didn't make those adjustments because you

25  thought you owed MGA a favor, did you?

7846

1    **A.**   No, I'm trying to do what I think is correct.

2    **Q.**   And you knew without those adjustments, the numbers that

3    had come from your regression analysis would have been

4    totally indefensible?

5    **A.**   I agree with that.  I would have not wanted to defend

6    those numbers.

7                  MR. KENNEDY:  Thank you very much.  No further

8    questions, your Honor.

9                  THE COURT:  Very well.

10                  MR. QUINN:  No further questions.

11                  THE COURT:  You are excused, sir.

12                  Mr. Quinn, do you have one further witness?

13                  MR. QUINN:  I'm not sure we could do it justice,

14   your Honor, frankly.  You know.  That commercial you see

15   where the guy talks really, really fast, I can't do that.

16   We're prepared to rest, your Honor.

17                  THE COURT:  Very well.

18                  Anything further?

19                  MR. KENNEDY:  Yes, your Honor, we would recall

20   Mr. Meyer for a very brief, I promise, inside of a

21   six-and-a-half-minute rebuttal.

22                  THE COURT:  All right.  You made the promise to the

23   jury.

24                  MR. QUINN:  Cross?

25                  THE COURT:  You'll have a chance to cross.

7847

1              **PAUL KEVIN MEYER, PREVIOUSLY SWORN.**

2                   **DIRECT EXAMINATION**

3    BY MR. KENNEDY:

4    **Q.**   Mr. Meyer, are you the only damage expert that believes

5    profits need to be deducted in determining -- excuse me --

6    taxes need to be deducted in determining profits?

7    **A.**   I don't believe so.  I think the confusion is that

8    when -- if I could take a moment.

9              When one looks at a lost profit calculation,

10   something that didn't happen and project revenues and costs,

11   because in that situation, taxes have not been paid, the

12   damage number is gross tax.  And so you basically leave the

13   tax out because those moneys are not taxable.

14             In our situation, the question really is what were

15   the profits that were made on Bratz.  And that $200 million

16   of taxes has been paid to the IRS.  It's been paid.  It's

17   deducted.  MGA doesn't have it.  Mr. Larian doesn't have it.

18   So those are the profits of MGA.  I've testified to that.

19   I'll leave it up to the Court and the lawyers to figure out

20   where it goes from there, but those are costs that basically

21   have been paid to the IRS.

22   **Q.**   I realize you've told us you're not a tax accountant.

23   Are you aware of the concept that in order to have a

24   deduction, you've got to have income to deduct it from?

25   **A.**   I do understand that.

7848

1          MR. PRICE:  Object.  Beyond his expertise.  Based

2   upon earlier testimony.

3          THE COURT:  Sustained, based on the earlier

4   testimony.

5          MR. PRICE:  Move to strike.

6          THE COURT:  It's stricken.

7   **Q.**   BY MR. KENNEDY:  Mr. Meyer, as a real person, rather

8   than an expert witness, do you pay taxes?

9          MR. PRICE:  Objection.  Irrelevant.

10          THE COURT:  Sustained.

11          MR. KENNEDY:  Thank you, I have nothing further.

12          THE COURT:  Very well.  Mr. Price?

13                   **CROSS-EXAMINATION**

14   BY MR. PRICE:

15   **Q.**   Having heard Mr. Wagner's testimony, you certainly

16   cannot dispute, can you, that a compensatory damages award is

17   tax deductible?  You're in no position to dispute that

18   because it's not within your expertise; correct?

19   **A.**   I cannot address the issue of the ultimate tax issue.

20   What I can address is were taxes paid and deducted to get to

21   the profits of the Bratz line for what I call a disgorgement

22   claim.  I can address that.

23   **Q.**   My question is different.  In doing your analysis, you

24   could not tell the jury or dispute what Mr. Wagner said,

25   which is that compensatory damages awards are deductible;

1    correct?

2    **A.**    I believe that's a legal issue.  But I can't speak to

3    that.

4    **Q.**    But do you understand that whether something is or is

5    not tax deductible has economic impact; correct?  That you do

6    know.

7    **A.**    I'm not sure I follow that question.  I don't follow

8    that.

9    **Q.**    When you deduct taxes, you do know that that has an

10   economic impact on the person that's deducting?

11   **A.**    I would agree with that.

12            MR. PRICE:  Nothing further.

13            THE COURT:  Anything further, Counsel?

14            MR. KENNEDY:  Nothing further.

15            THE COURT:  Very well.  You may step done.

16            Both sides rest?

17            MR. QUINN:  Mattel rests.

18            MR. NOLAN:  MGA rests subject to the documents that

19   are still at issue.

20            THE COURT:  I understand.

21            All right.

22            MR. QUINN:  Mr. Larian rests as well, I assume?

23            MR. NOLAN:  Let me be clear.  MGA and Isaac Larian

24   rest.

25            THE COURT:  Very well.  Thank you, Counsel.

```
 1            All right, ladies and gentlemen of the jury, you've
 2   now heard all of the evidence in this second phase of the
 3   trial.  As I indicated to you earlier, we are not going to
 4   have closing arguments until Wednesday.  I will again,
 5   Wednesday morning at 9:00 sharp, be instructing you on the
 6   law that will govern your deliberations both with respect to
 7   copyright infringement and the damages issues.
 8            Between now and then, do not discuss this case with
 9   anybody.  Do not read about the case.  Just put it aside for
10   the time being.  When you come here at 9:00 Wednesday, you
11   will be assembling in your normal place.  After I've read the
12   instructions to you and you've heard the closing arguments,
13   I'm going to move you to a different -- actually, I take that
14   back.  We'll assemble in your normal place on Wednesday
15   because we will not have the other jury here on Wednesday.
16            Starting Thursday, there will be another jury using
17   your jury room in a criminal trial that I'm selecting on
18   Tuesday.  So you'll be moved to a jury room adjacent to the
19   courtroom, where all of the physical exhibits will be located
20   for your use during the deliberations.
21            So I will see you on Wednesday.  That will be
22   August 20th at 9:00 A.M.  Until then, you are excused.
23            **(WHEREUPON THE JURY WITHDRAWS.)**
24            THE COURT:  Counsel, please be seated.  I want to
25   take a brief recess before I take up these other matters.
```

1          (Recess taken.)

2          THE COURT:  Okay, counsel.  Are there some

3    additional documents you want to move in?

4          MR. NOLAN:  Yes, your Honor.  And I believe you've

5    been provided the notebook.

6          THE COURT:  I think I was.  It's entitled Custodian

7    of Records.

8          MR. NOLAN:  It's white.  I thought I did have that

9    notebook.  Here they are.  Right here.  Custodian of Records.

10   Okay.

11         MR. NOLAN:  Your Honor, the first one is

12   Exhibit 1805.  And Mattel takes the position that they attack

13   the authenticity of the document.  I'll withdraw that

14   exhibit, your Honor.

15         THE COURT:  Very well.

16         MR. NOLAN:  In light of that, the next document is

17   Exhibit 1811-A, which is a document.  I believe there's no

18   issue of authenticity.  It was produced by Mattel in this

19   litigation.  It's a business record similar to the ones that

20   we've introduced over the past week.

21         The next Exhibit, your Honor, and maybe I would

22   just go through the exhibits, and Mr. Zeller can make his

23   comments, because they are all general, the same kind of

24   issue.  Is that okay?

25         THE COURT:  Very well.



```
 1            MR. NOLAN:  Exhibit 15676-A is the redacted
 2   version.  And what we've done, your Honor, from this internal
 3   business record of Mattel which was produced to us, redacted
 4   out those pages that only pertain to Bratz, and those are set
 5   forth in 15676-A, consistent with the pattern that we were
 6   doing with, for instance, Mr. Kilpin.
 7            15788 is a business record of Mattel, produced in
 8   this case.  I don't think there's an issue with respect to
 9   authenticity.  The redacted version is 15788-A.  And that,
10   your Honor, I submit, only refers to the Bratz data that
11   Mattel had.
12            The next document is Exhibit 16074.  And the
13   related redacted version is 16074-A.  And again, business
14   record produced by Mattel redacted to only apply to the data
15   that they had on Bratz.
16            And then the last -- I have two more.  I'm sorry.
17   No, this is the last exhibit.  18286.  Again, this is a
18   worldwide consumer research report maintained in the ordinary
19   course of business, produced by Mattel in this case for the
20   relevant period of time.  And we had submitted an earlier one
21   redacted in a similar fashion, and this was, you know,
22   Heather Polk.
23            So we've redacted only to reflect data that Mattel
24   maintains with respect to the Bratz products.
25            THE COURT:  Counsel, a number of these reflect data
```

7853

```
 1    that Mattel was maintaining with regard to Bratz.  What
 2    relevance does that have to anything that Mattel was
 3    maintaining certain data regarding Bratz?
 4         MR. NOLAN:  When I say data, making comments and
 5    observations.
 6         THE COURT:  Well, with respect to the last one, for
 7    example, we can go through these one by one, but you're going
 8    to have to give me some proffer on relevancy.  Given the
 9    Court's earlier rulings on these types of documents --
10         MR. NOLAN:  Your Honor, for instance, on the last
11    one, 18286 --
12         THE COURT:  I don't see any comments.  I see a
13    bunch of redacted categories, and I previously kept out these
14    types of charts that are incomplete.  I mean, this just
15    says -- it has a list of attributes.
16         MR. NOLAN:  Your Honor, this goes to the question
17    of what they were tracking at that period of time, what are
18    the attributes that they were talking about.  It doesn't
19    reflect -- and I agree, your Honor, we've cut out here the
20    Bratz is the only brand that's reflected, and it shows that
21    during this period of time for transitional girls five to
22    seven, they were tracking those attributes for each of the
23    years of the girls in question.
24         It just goes more to the point that in July of
25    2005, they were including in their brand tracking study Bratz
```

1    performance during that year, for those attributes.

2              THE COURT:  All right.  With respect to 16074.

3              MR. NOLAN:  16074, your Honor, is, again, redacted

4    e-mail, marketing is ultimately the keeper of the brand, but

5    no one functional group can or should manage alone.

6              THE COURT:  Who is Adrian Fontanella?

7              MR. NOLAN:  She was the former president of the

8    girls division at Mattel, senior management person.  She

9    talks about the various components and functions.  And the

10   one previous to that is 15788-A.  And there you do have

11   specific references to Bratz and the various attributes

12   covered for the period of months covered in this report,

13   similar to what we were able to put in through Mr. Kilpin.

14             But, of course, Mr. Kilpin was only there for a

15   particular period of time, and that's why we needed a

16   Custodian of Records for that period of time.

17             Same with the other exhibit, 15676-A.  Again,

18   similar.  This shows -- I think shows consistent with

19   Mr. Kilpin the retail display of Bratz, the fact that they

20   were tracking that goes to the importance of, for instance,

21   in the business report of -- business plan of MGA, where the

22   Court may recall that in 2001 we were talking about retail

23   presence.

24             In fact, Mr. Kilpin talked about the importance of

25   retail presence.  This is just a fact set forth in their own

1    reports that they were tracking the retail presence of Bratz.

2    And then the last one again is similar to the others that

3    I've talked about, which is 1811-A.  I'm sorry.  15676-A.

4    No, I did.  That was the retail display.  I'm reading that

5    upside down.

6          The last one, your Honor, is an internal document

7    by Mattel.  Bratz, what's working, what's not.  It's only

8    related to Bratz.

9          THE COURT:  Very well.

10          Mr. Zeller?

11          MR. ZELLER:  Thank you, your Honor.  As a threshold

12    matter, I think that the rules really preclude the

13    introduction of these exhibits.  I mean, we had to live with

14    a regime, a rule that was in fact initially advocated by MGA,

15    which is that documents don't come in unless there's a

16    stipulation or a live witness it comes through.  There are

17    many documents in this case.  We could undoubtedly have

18    several binders of them, of documents that we wish we had

19    gotten in as well if we had the time and we had live

20    witnesses to get them in through.

21          So I think as a threshold matter, you know, that

22    both sides have run out of time.  This is, you know, the

23    parties are in parity with this situation.  I mean, if it

24    didn't come in through a live witness or a stipulation, they

25    are not admissible.  And I don't think Mr. Nolan has really

7856

 1    addressed that.   Or why it is that the rules should be

 2    changed at this juncture.

 3             THE COURT:   The rules aren't changed.   I said just

 4    a few minutes ago at sidebar, if there's a stipulation to

 5    authenticity, and I did modify it slightly at this phase, I

 6    indicated if there's a stipulation for authenticity, that the

 7    Court would consider relevancy or foundation or any other

 8    objections.   If you are stipulating to authenticity, they

 9    come in.   If you're not, they are not.

10             MR. ZELLER:   I mean, I can certainly address these,

11    but I don't think that was entirely consistent with at least

12    our understanding.   We put up live witnesses to put in the

13    documents that we thought we had to have in.

14             THE COURT:   Well, why don't you go through these,

15    Counsel.

16             MR. ZELLER:   Certainly, your Honor.   I think with

17    respect to Exhibits 1811, and this is the redacted version, I

18    think is the one that focuses on Bratz.   We have objected to

19    this as not being a business record.   And so I don't see how

20    that objection is overcome.   Particularly if there's no live

21    witness and there's no basis in the record for establishing

22    that this is a business record.

23             The other thing I would say, and this will be a

24    theme, as I go through these other documents, we do have 402

25    and 403 issues with each of them.   Bottom line is that, of

1    course, they don't track the factors that MGA itself is

2    touted for apportionment.  And without that connection,

3    without that nexus, they are irrelevant or at best going to

4    cause confusion.  And, of course, in some respects, some of

5    this looks highly cumulative of, you know, of the testimony

6    that has already been provided.

7            So I'm not really sure why it's a basis for

8    introducing a document when, as Mr. Nolan pointed out at

9    least with respect to one of them --

10           THE COURT:  Counsel, why don't we just go through

11   the exhibits and state your objections.

12           MR. ZELLER:  So with respect to Exhibit 1811, we

13   have objections based on proper business record.  It's

14   therefore hearsay.  And we also don't think it's relevant,

15   and we think it's 403 for that very reason I was just

16   discussing, which is there's no basis for saying that it

17   lines up with those factors.

18           THE COURT:  Next, Counsel.

19           MR. ZELLER:  The next one that I have is

20   Exhibit 15676-A, which is the retail experience one.  I

21   assume that the principal basis for why MGA wants to rely

22   upon it is the key findings page on the second page of the

23   exhibit.  That column in the far left-hand side.  And again,

24   this goes -- this clearly includes, just even on its face

25   matter, matters that do not fall within the factors that MGA

7858

1   says should give rise to apportionment.  So it's therefore

2   irrelevant and also should be excluded under 403 for that

3   reason as well.

4          The next one that I have is 15788.  And this is a

5   redacted version that I'm looking at, which is the A version.

6   This really is the same comments as the other exhibits.  And

7   moreover, it does have these categories, whether these

8   categories line up with the testimony, you know, it's just

9   pure speculation at this point.  There's no basis for

10  introducing it.  And so we again object on 402 and 403

11  grounds as to that document.

12         THE COURT:  What about the statements on page 3 of

13  this document?  If appears to be Mattel's statements to the

14  effect that Bratz equals cool friends having fun and Bratz

15  spreading its fashion excitement, energy, and --

16         MR. ZELLER:  I think it's the same point, which is

17  there's no demonstrable nexus to the factors that MGA itself

18  is saying are relevant to apportionment.  And to the extent

19  that it is, they already have that kind of testimony.  They

20  already have those documents in.

21         I mean, that is something that they did explore at

22  great length with Mr. Kilpin.  And I think introducing these

23  documents, you know, is at best cumulative and at worst is

24  something that doesn't have that kind of connection.

25         THE COURT:  Next one is 18 -- 16074-A.

1          MR. ZELLER:  Yes.  And this one is, I think -- I

2    mean, among all of them, probably the clearest one that is

3    403 material and largely irrelevant under 402.  I mean, this

4    is clearly discussing Mattel's internal organization and

5    saying what it is that Mattel does.

6          I mean, I don't see a basis, unless I'm

7    misunderstanding this document, for saying that this is

8    anything to do with Bratz.  This appears to be reflecting

9    some sort of either actual or potential or considered

10   organization within Mattel.  And on that basis, we don't

11   think it has any relevance at all.

12         And then the last one that I have is 18286, and

13   these are these tracking studies that, you know, that we went

14   through at sidebar previously.  And it seems to be -- first

15   of all, redacted in a way that is not consistent with what

16   the Court did in excluding charts previously.  I guess it

17   takes out the chart portion itself, but it still leaves

18   numbers there, or I guess at least categories, categories

19   that are already in evidence to the extent that they have any

20   relevance.

21         So I don't think that this document, you know, adds

22   anything, and certainly has the potential just simply to

23   cause confusion because of the way that it's being presented

24   here.

25         THE COURT:  Very well.

7860

1          Mr. Nolan?

2          MR. NOLAN:  Your Honor, Mr. Zeller's painting with

3    a broad brush when he says that none of this relates to any

4    of the factors.  I mean, most of these comments go to

5    marketing or packaging or the themes, the presentation of

6    Bratz and Mattel's comments with respect to that.  You know,

7    there's instances where there's references to cool packaging.

8    And so I respectfully submit, your Honor, that they fall

9    squarely within evidence that has been already received.

10   It's not cumulative.  It's different time periods.

11         THE COURT:  It does strike me as cumulative,

12   Counsel, almost across the board.  I don't think there's

13   anything really unique here that I can see.

14         MR. NOLAN:  Your Honor, it goes to different

15   periods of time to show that this pattern continues.  If they

16   only have certain documents in there and they relate to,

17   let's say Mr. Kilpin --

18         THE COURT:  Just because -- there's no substance.

19   Any of this stuff.  There's a bunch of labels.  And I'm not

20   seeing any substance.  There's no question that all of these

21   issues are important to Mattel and they have been discussed

22   in some detail by witnesses in this case.  Most fun to play

23   with, cooler than other dolls, prettier than other dolls.

24   All of that has come in.  And the packaging and retail

25   experience, there's no substance here.  It's just that Mattel

 1   is concerned about packaging and material and advertising and

 2   how the dolls look.

 3            Is there anything substantive that you can point me

 4   to in any of these exhibits?  If there's some -- is there

 5   something in particular here that I'm missing?  I just don't

 6   see it.

 7            MR. NOLAN:  Your Honor, for example, and by way of

 8   example, go to 1811 for a minute.

 9            THE COURT:  Hold on.  1811.  I'm there.

10            MR. NOLAN:  My Scene and Bratz, what's working,

11   what's not.  What's working, Mattel's commentary or

12   observations that what is working is bling, aesthetic --

13            THE COURT:  I was painting with a broad brush

14   there.  1811-A is the one that is substantive.  Let's come

15   back to that one.  Any of these others.  By problem with

16   1811-A is that I have no idea who is saying this or what they

17   are saying or what this is based on.  These are just

18   statements, and they are not even coherent statements.  They

19   are just bullet points.

20            MR. NOLAN:  Well, your Honor, I would submit

21   that --

22            THE COURT:  Several of which end in question marks.

23            MR. NOLAN:  But okay.  This is what I'm going to

24   say, is there are many times when a document was produced to

25   us -- I'm sorry -- came out of our records where we would say

```
 1   gee, it's not a business record.  This document from Mattel
 2   was produced in response to discovery on specific topics.  It
 3   is authentic.  It is included in the business records of the
 4   company.  And you had sometimes challenged me, you know, is
 5   my objection really in good faith as to a foundational point.
 6   I'll a little surprised and bewildered to have Mr. Zeller
 7   say --
 8           THE COURT:  I'm beyond the authenticity.  I'm not
 9   challenging -- I'm talking about what this means.  I mean,
10   this is --
11           MR. NOLAN:  Well, for instance, if you go to -- if
12   we're now -- are you on 15676-A?  Is that the one?  I just
13   want to make certain I'm on the same one you are.
14           THE COURT:  I was on 1811-A.  Most of them don't
15   have any substance to them really.
16           MR. NOLAN:  I want to go back to 1811, your Honor.
17   The subsignificance there is the marketing and the product
18   and the content.  And this is obviously an issue that the
19   jury will be looking at.  And Mattel is breaking down and
20   analyzing just -- I don't think there's any dispute from the
21   record evidence that Mattel, through its worldwide research
22   group and the marketing department, made monthly assessments
23   and observations on, for instance, Bratz packaging and --
24           THE COURT:  How can you connect that to the
25   worldwide marketing group?  That's --
```

1          MR. NOLAN:  How can I tie this to it?

2          THE COURT:  This is why I have tried to sift

3    throughout this trial on having a witness that can at least

4    tell us what the document is.  This jury has never seen this

5    document.  The jury has been excused for the day.  And come

6    Wednesday, you're going to have this up on the screen, and

7    you're going to be telling them about a document that they

8    have no idea and I have no idea other than it came from

9    Mattel.  And I'm not questioning that it came from Mattel and

10   somebody in the thousands of workers at Mattel put this

11   together on some basis.

12          But what that is, I am not saying that there's

13   other documents that I haven't pressed you on, but it's been

14   self-evident either who has done them or -- I'm going to

15   sustain the objections, Counsel.

16          MR. NOLAN:  My only other point, your Honor, was

17   that since it came out of the marketing department at Mattel,

18   I would think it would be self-authenticating --

19          THE COURT:  How do we know that it came out of the

20   marketing department?

21          MR. NOLAN:  We have other reports, your Honor,

22   where they have admitted through Mr. Kilpin that on a monthly

23   basis they were tracking such things as product and marketing

24   and content of Bratz.

25          THE COURT:  We have Mr. Kilpin, who testified in

1    this case.

2            MR. NOLAN:  That's correct.

3            THE COURT:  Why --

4            MR. NOLAN:  I made my point on this, your Honor.

5            THE COURT:  If this was that important to get in, I

6    suspect you could have taken 15 seconds to bring this in.

7            MR. NOLAN:  I accept that.

8            THE COURT:  I'm going to sustain the objections.

9            MR. NOLAN:  To all of them, your Honor?

10           THE COURT:  I'm sorry?

11           MR. NOLAN:  To all of them?

12           THE COURT:  I am.  I don't see -- that was the only

13   one that seemed to have any substance on it.  If you want to

14   go through them briefly, 15676-A is nothing but pictures and

15   some bullet points here which say key findings, but they are

16   not any -- they are not sentences.  They are just

17   observations.  And there was a bunch of pictures of Bratz

18   products.

19           15788-A is some statements that we already have in

20   evidence several times over.

21           And 16074 is a -- is just a statement about

22   marketing and a pie chart that just shows there's a bunch of

23   different departments at Mattel.  And then there is yet

24   another tracking study, and again, that's Exhibit 18286.  And

25   we already had all of these elements introduced into

```
 1    evidence.

 2            So between 402 and 403 concerns and -- the 403

 3    concern being cumulative, I'm going to sustain the

 4    objections.

 5            MR. NOLAN:  Your Honor, on the point that you made

 6    with respect to 15676-A, that it's just simply pictures --

 7    I'm sorry.  You said it's just pictures of retail space.

 8            THE COURT:  I said two things.  I said there's key

 9    findings which are incomplete sentences.  I assume they are

10    observations on the pictures.  Metallic and bright colors,

11    cohesive color pallet, edgy and appealing.  They are

12    statements, not even sentences.  I don't know what this

13    means.  Smaller to bigger sizes of packages from top to

14    bottom.

15            I would assume that these are good things, but

16    that's not expressly stated.  I really don't know what it is.

17    It's just pictures and descriptive adjectives as to what the

18    pictures depict.  If these were critical, Counsel, we've had

19    lots of witnesses over the last three months who could have

20    discussed these.

21            MR. ROTH:  Just one document, your Honor.  I

22    apologize.  It's the very last document.  It's the monthly

23    brand tracking reports which have --

24            THE COURT:  18286-A?

25            MR. ROTH:  Yes.  Mr. Kilpin did, in fact, as I
```

1   recall, identify this form of work.   And --

2         THE COURT:   All this came in previously in

3   evidence.

4         MR. ROTH:   Although what I understand is that the

5   categories, if you look on the second page, there are a bunch

6   of categories, most fun to play with, do you see that?   In

7   its unredacted form, it actually had bars, and it was

8   measuring.

9         THE COURT:   It was up there on the screen.

10         MR. ROTH:   That was up on the screen, actually, in

11   argument, not in front of the jury, when I was discussing it

12   with the Court.   We understood from your Honor that the

13   concern was the comparison between Bratz, Barbie, and My

14   Scene.   So what we have attempted to do was take all of that

15   out and simply lay out the categories.

16         THE COURT:   But these categories have been

17   described in court.

18         MR. ROTH:   But not in these documents.   And, your

19   Honor, here's what we're getting at.

20         THE COURT:   But in the context of a worldwide

21   consumer research report.

22         MR. ROTH:   I don't believe that the documents with

23   these categories have come in.

24         THE COURT:   What do the documents with -- what does

25   the document with these categories, what does that prove to

```
1    the jury?  We're now on Wednesday.  It's up there, the jury
2    is there.  What's the argument?
3              MR. ROTH:  As you recall, we've been discussing
4    with respect to apportionment.  Mattel's argument that if the
5    various factors are inextricably intertwined, then there's an
6    issue on apportionment.
7              THE COURT:  Yes.
8              MR. ROTH:  Our argument is they can be and are
9    measured separately as proven by these reports.  These
10   reports measure these various factors.  And these line up to
11   a certain extent --
12             THE COURT:  There was testimony on that very point.
13   And I don't think there's foundation for that conclusion.
14   And if that's how you're going to use the -- well, there was
15   a discussion from Mr. -- it was the Mattel employee explained
16   that that's not what that reflects.  I'm going to sustain the
17   objection to that.
18             All right.  I have the jury instructions.  These
19   are not final.  I'll write draft on it.  I anticipate certain
20   objections from both sides concerning some of the
21   instructions that are proposed.  And I will entertain those
22   on Monday.
23             I have a busier criminal calendar than a civil
24   calendar.  So why don't we take this up at 11:00 on Monday
25   morning.  And I'll hear any further objections to the
```

1    proposed instructions.  And we'll also take up the issue of

2    the verdict form.

3              MR. ZELLER:  Your Honor, may I make a request?

4    Since I've been handling the charging conferences, I actually

5    have to be in front of Judge Matz at 1:30 on Monday

6    afternoon.  Otherwise, my schedule is entirely yours.  But

7    that is a scheduling conference that, as lead counsel there,

8    I'm obligated to attend.

9              THE COURT:  Why don't we advance it in the morning,

10   then.  Why don't we start at 9:00 and get through this.  Will

11   that work for you, Mr. Zeller?

12             MR. ZELLER:  Yes, that will be fine.

13             THE COURT:  We have a status conference at 9:00 in

14   the MGA insurance cases.

15             MS. AGUIAR:  Do you want us at 9:30?

16             THE COURT:  No, 9:00.  It's not going to be long.

17             MS. AGUIAR:  We have three things to submit to you.

18   Sorry to end on a note where the parties were not able to

19   agree, but we will each submit our own instruction on the

20   competitive products and the so-called inverse ratio rule.

21             THE COURT:  The Court has included somewhat of a

22   modified version of the inverse ratio rule based on what's

23   been submitted.  I'll consider this as well.

24             MS. AGUIAR:  Okay.  So we can submit these to you?

25             THE COURT:  Go ahead, and we'll take this up on

 1    Monday morning.

 2            MS. AGUIAR:  And there's a supplemental instruction

 3    on willful infringement.

 4            THE COURT:  Let me take a look at these right now.

 5    Does Mattel have a competitive product?

 6            MR. ZELLER:  I'm sorry?

 7            THE COURT:  Do you have a proposed competitive

 8    product instruction?

 9            MR. ZELLER:  We had proposed one to the other side.

10    We have not submitted it to the Court just yet.  We'll do

11    that as soon as we're done.

12            THE COURT:  Okay.  The Court also had put in a

13    willful infringement instruction, but I'll take this up as

14    well.  Just so that you know, obviously what's being handed

15    out does not reflect my receipt of these, and we'll revisit

16    these on Monday morning.  And then the same thing with the

17    inverse ratio rule.  I haven't had a chance to consider this,

18    but I'll take all three of these with me, and at least the

19    proposed instructions that I'm handing out will give us a

20    starting place.

21            Anything else?

22            MR. ZELLER:  Yes, your Honor.  If we could have

23    leave to file a JMOL.

24            THE COURT:  Yes.  When will you have that filed?

25            MR. ZELLER:  I would suspect that we can probably

1    have it filed, I would say, end of Tuesday.

2              THE COURT:  Okay.  And, of course, MGA will have

3    leave to file an opposition.  Are you in a position -- what

4    will this be directed towards?

5              MR. ZELLER:  I'm sorry?  That was directed to me?

6              THE COURT:  Yes.  What is the motion being directed

7    toward?

8              MR. ZELLER:  Well, it's still a work in progress,

9    of course.  What I would say is that we do intend to move for

10   judgment as a matter of law on substantially the grounds that

11   were articulated in the summary judgment motions.  I would

12   certainly say that substantial similarity on at least some of

13   the dolls is going to be a basis for the JMOL.  And I know

14   that we were intending to move against certain of the

15   affirmative defenses.

16             Obviously, a number of them were withdrawn

17   yesterday.  So that will undoubtedly require some revamping.

18   And so that I'm not a hundred percent sure of.  But I

19   certainly know that on the merits of the copyright

20   infringement claim, we'd be seeking judgment as a matter of

21   law.  At least in part.

22             THE COURT:  Anything else from Mattel?

23             MR. ZELLER:  Nothing, your Honor.

24             THE COURT:  Mr. Proctor?

25             MR. PROCTOR:  Could we have the Court's jury

1    instructions e-mailed like you did last time?

2           THE COURT:  I was working on them all afternoon

3    during the testimony, and the headings disappeared when I

4    sent them over to Ms. North to print them out.  And they had

5    to go and hand put them in.  But we'll get them to you.

6           MR. NOLAN:  Your Honor, I indicated, when Mattel

7    rested, we'd also ask for leave to file a JMOL motion.

8           THE COURT:  What will yours be directed towards?

9           MR. NOLAN:  We're look at considering this weekend

10   doing more research is the preemption argument under the

11   Uniform Trade Secret Act.  And then there's another argument

12   that is directed to the punitive damage claim.  And the

13   absence of economic harm to Mattel.  We'll try to get

14   those -- did we talk about filing them on Monday?

15          THE COURT:  Why don't we have both of them filed by

16   five o'clock on Monday, the 18th, and let's have oppositions

17   by five o'clock -- or responses five o'clock on the 20th.

18   That way if the Court does not decide to take them under

19   submission -- and I actually think that something needs to be

20   ruled on -- I can do so before the jury starts substantive

21   deliberations on the 21st.

22          MR. NOLAN:  My last point, your Honor, is just for

23   leave, similar to how Mr. Quinn and Mr. Price divided their

24   argument, could Mr. Kennedy and I divide our closing

25   argument?

1          THE COURT:  I think -- between damages and

2   copyright?

3          MR. NOLAN:  Yes.

4          THE COURT:  I generally don't do that, but this

5   isn't my normal case.  So I suppose I'll give you leave to do

6   so.

7          MR. NOLAN:  I appreciate the courtesy.  We

8   understand it's not the typical --

9          THE COURT:  No slapping hands, though.

10          MR. NOLAN:  We'll try to make the switch as

11   efficient as possible.

12          THE COURT:  That makes sense in a case of this

13   nature.  That's fine.  I look forward to hearing from

14   Mr. Kennedy as well.

15          All right.  If there's nothing further, I thank you

16   for your tremendous efforts on bringing this case to a close

17   this afternoon.  And I'll look forward to your closing

18   arguments on Wednesday.  In the interim, we'll have our

19   charging instruction on Monday morning at 9:00.  Court is

20   adjourned for the day.

21

22          (Proceedings concluded at 6:15 P.M.)

23

24

25

C E R T I F I C A T E

    I hereby certify that pursuant to Title 28, Section 753 United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings in the above matter.

    Certified on August 15, 2008.


**MARK SCHWEITZER, CSR, RPR, CRR**
Official Court Reporter
License No. 10514