1   UNITED STATES DISTRICT COURT

2   CENTRAL DISTRICT OF CALIFORNIA

3   EASTERN DIVISION

4   - - -

5   HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6   - - -

CERTIFIED COPY

7   MATTEL, INC.,                          )
                                           )
8                      Plaintiff,          )
                                           )
9         vs.                              )   No. CV 04-09049
                                           )
10  MGA ENTERTAINMENT, inc., et. Al.,      )   Trial Day 37
                                           )   morning session
11                     Defendants.         )   Pages 8069-8171
    _____       )
12  AND CONSOLIDATED ACTIONS,              )
    _____       )

13

14

15   REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16   RIVERSIDE, CALIFORNIA

17   Wednesday, August 20, 2008

18   8:33 A.M.

19

20

21

22

23   THERESA A. LANZA, RPR, CSR
     Federal Official Court Reporter
24   3470 12th Street, Rm. 134
     RIVERSIDE, CALIFORNIA  92501
25   951-274-0844
     WWW.THERESALANZA.COM

8070

```
 1    APPEARANCES:

 2

 3    On behalf of MATTEL, INC.:

 4                        QUINN EMANUEL
                          By:  JOHN QUINN
                               JON COREY
 5                             MICHAEL T. ZELLER
                               HARRY OLIVAR
 6                             TIMOTHY ALGER
                               WILLIAM PRICE
 7                        865 S. FIGUEROA STREET,
                          10TH FLOOR
 8                        LOS ANGELES, California  90017
                          213-624-7707
 9


10

11    ON BEHALF OF MGA ENTERTAINMENT:

12                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                          BY:  THOMAS J. NOLAN
13                             JASON RUSSELL
                               RAOUL KENNEDY
14                             LAUREN AGUIAR
                               CARL ROTH
15                        300 SOUTH GRAND AVENUE
                          LOS ANGELES, CALIFORNIA  90071-3144
16                        213-687-5000

17

18

19

20

21

22

23

24

25
```

Wednesday, August 20, 2008          Trial Day 37, morning session

1                              I N D E X

2                                                        PAGE

3

4    Jury instructions...........................    8084

5    Closing arguments - plaintiff...............    8118

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Wednesday, August 20, 2008              Trial Day 37, morning session

8072

```
 1        Riverside, California; Wednesday, August 20, 2008; 8:33 A.M.

 2                              -oOo-

 3              THE CLERK:  Calling Case Number CV04-09049-SGL,

 4   Mattel, Inc., v. MGA, Inc., et al.

 5              Counsel, please state your appearances for the

 6   record.

 7              MR. QUINN:  John Quinn, Bill Price, Mike Zeller for

 8   Mattel.

 9              MR. NOLAN:  Tom Nolan, Lauren Aguiar, Raoul Kennedy

10   on behalf of MGA and Isaac Larian.

11              THE COURT:  Good morning, Counsel.

12              I received overnight the request for a change to the

13   verdict form as to the damages for the Phase A claims.  Mattel

14   is seeking to specify what portion is to MGA, what portion is

15   to Mr. Larian, with respect to the intentional interference

16   with contractual relations, aiding and abetting breach of

17   fiduciary duty, aiding and abetting breach of duty of loyalty;

18   and then with respect to the conversion, a breakout with

19   respect to all three defendants as to which the jury has found

20   liability.

21              I understand from the same communication that MGA

22   opposes the specification.

23              Let me hear the argument for that.

24              MR. NOLAN:  Your Honor, I can be brief.

25              We had several hearings yesterday.  It was the time
```

```
 1   set for everybody to raise last-minute objections.  That was
 2   the time and place to make comments.  Mattel accepted the
 3   verdict form.  We made objections to it.  I'm not one to stand
 4   on form, but at 9:50 at night, we received an e-mail saying
 5   that Mattel had a concern and they wanted to change one of the
 6   answers.  Our point was, this is on the eve of closing
 7   argument; we do graphics; everything is prepared.  If this was
 8   a substantive issue or objection, there was a time and place to
 9   establish that.  Those are the rules of engagement here, and I
10   think changes of this type are substantial enough that they
11   should have been raised at a proper time.
12         THE COURT:  Is there any substantive reason not to do
13   this?
14         MR. NOLAN:  Your Honor, they made independent
15   findings in the first phase.  I can't deny that.  I mean, they
16   were broken out separately in the first phase.
17         THE COURT:  My concern is, actually, how am I going
18   to avoid the double-counting or -- making sure that there's not
19   double-counting and set aside if I don't have this breakdown.
20         MR. NOLAN:  If that's the concern that's being
21   expressed by the Court, I certainly understand that concern.
22         THE COURT:  That's all I can think of.  Maybe there's
23   other reasons to do it, but I'm concerned about -- that's why
24   we broke down the -- for example, on Question 11, we did the
25   breakdown on the copyright infringement to make sure that we
```

8074

1    had MGA, Isaac Larian, and MGA Hong Kong; and then to the

2    extent that MGA and Isaac Larian's distributions of profit

3    duplicate each other, I can cut it.  Without having these in

4    here, I'm not going to be able do that.

5            **MR. NOLAN:**  In light of the Court's comments, those

6    changes should be modified.

7            **THE COURT:**  Was there ever an opposition filed to the

8    JMOL that was submitted by -- specifically on the issue of

9    independent creation?

10           I had my law clerk check as of 5:00 yesterday,

11   because I wanted to take that home with me when I took home the

12   motion last night, and she said that it had not yet been filed.

13           **MS. AGUIAR:**  We were under the impression that

14   oppositions to both of the JMOL's were due today.

15           Was that wrong?

16           **THE COURT:**  That may be the case.

17           **MR. ZELLER:**  We did also have the understanding,

18   after looking at the transcript, Your Honor, that the written

19   oppositions would be due today.

20           **THE COURT:**  You're probably right.  I was just

21   wondering if there was something out there.

22           There actually was case authority that was cited.  It

23   was in the context of the jury instructions and earlier.  And

24   maybe I need to take this up with Mr. Zeller, because my

25   tentative, actually, it is to rule in MGA's favor and keep the

1    independent creation.

2           Mr. Zeller, where I am on this and where I was

3    yesterday, actually, is that I understand your argument that

4    there are serious questions about the sufficiency of the

5    evidence for independent creation.  I also understand that

6    there is an issue as to whether or not independent creation was

7    properly raised.

8           Unlike joint authorship, where I think it is

9    abundantly clear that is an affirmative defense that needs to

10   be raised in advance, the law is not so settled on the issue of

11   independent creation.  There are a string of cases which

12   suggest that independent creation is not an affirmative

13   defense, but rather is simply an element, essentially, that can

14   be argued by the defense in answer to a claim establishing

15   copyright.

16          I think the more prudent or cautious course to take

17   is to leave the independent creation instruction in as written.

18   And this issue can certainly be reconsidered as a matter of

19   law, regardless of what the jury does post verdict in terms of

20   your JMOL.  But notwithstanding the fact that I haven't really

21   received an opposition, I'm relying on the cases that I looked

22   at when this issue first came up during the trial with

23   Margaret Leahy's testimony.  That's my sense, but I'll hear

24   from you.

25          **MR. ZELLER:**  Thank you, Your Honor.

1      I think the Court's comment is certainly well taken

2 that there is conflicting law on whether or not independent

3 creation needs to be plead as an affirmative defense.  We think

4 that the cases saying that it is are better reasons.  But from

5 our perspective, more importantly whether it's characterized as

6 an affirmative defense or merely a theory or a position, it was

7 not in the final pretrial conference order.  They asserted all

8 manner of arguments, theories, everything else; but independent

9 creation was not one of them.

10      And even if it's not characterized or even if the

11 Court reaches the conclusion that it need not be plead as an

12 affirmative defense, from our perspective, since it's clearly

13 something that they have to establish, at a bare minimum, in

14 order to -- you know, even if one treats it sort of in the

15 context of bursting presumptions and that sort of thing, we

16 still think it should have been in the final pretrial

17 conference order.  We objected promptly when it was raised, and

18 on that basis, that it wasn't in the final pretrial conference

19 order.

20      There's certainly validity to the Court's point that

21 it's something that can be taken up after the verdict,

22 depending on what the jury does.  My concern, however, with

23 that kind of approach is that if they come back and they say

24 there's no liability on copyright infringement, we're not

25 necessarily going to know why.

1    **THE COURT:** Right.  I understand that.

2    **MR. ZELLER:** And I'm also concerned because the

3    instruction is such -- and it was one that MGA proposed; we

4    didn't think there should be any instruction at all -- but one

5    problem with their instruction is that it really doesn't give

6    very much guidance as to what independent creation is.

7    Typically, one would have to show that the two works came from

8    a common source and that's what explains the similarity.  And

9    that's just not really gotten across, I think, by the

10   independent creation instruction that's being proposed here.

11        And that's another reason, just to go to the merits

12   of it, why we don't think that they've really satisfied

13   substantively and there's not sufficient evidence to show that

14   there was independent creation.  I mean, Margaret Leahy has

15   never said and -- well, I should start with this, that there is

16   certainly testimony about it being the inspiration.  I mean,

17   that's MGA's own position.  Carter Bryant certainly said that

18   even what he provided to Margaret Leahy, that those drawings

19   that Mattel now owns were the basis for the sculpt.  So I just

20   don't think that Margaret Leahy's comment, that is basically

21   conclusory at best, really is sufficient to substantiate or

22   sustain even an argument or a theory that it was independently

23   created.

24        So that's the nub of our position, but I am somewhat

25   concerned that, you know, kind of the combination of the

1    instruction not providing a whole lot of guidance on what the

2    defense -- or not necessarily the defense, but the theory --

3    really is, conjoined with the fact that we won't know if that

4    was really where things went awry in the event that they come

5    back and find that there was no infringement.  Because I would

6    say, under normal circumstances -- I mean, if we had a separate

7    question, I suppose, that would clear it up, but I think that

8    gives it too much credence to have a separate --

9          THE COURT:  So you're not seeking a separate

10   question?

11         MR. ZELLER:  I don't think so, Your Honor.  It's sort

12   of a difficult position for us, because we don't think it

13   should be in there at all; but I am concerned that MGA is going

14   to come back and say, Well, maybe the jury found that they just

15   didn't look sufficiently alike, as opposed to this kind of

16   independent creation motion.

17         THE COURT:  Very well.  Thank you.

18         Ms. Aguiar?

19         MS. AGUIAR:  I understand it would be preferable for

20   Mattel if we didn't have any specific questions regarding the

21   copyright claim on the verdict form, which we don't; we just

22   have a general one now.  And now they're saying, Well, because

23   we have a general question, we might not know where things go

24   awry.  We've been there.  We've done that.  You've decided.

25   There's going to be one question regarding copyright



Wednesday, August 20, 2008                    Trial Day 37, morning session

1    infringement, and that's it.  That is the verdict form.  That

2    is the final verdict form that you approved.

3         With regard to whether this is an affirmative

4    defense, there is a strong line of cases, as you have noted,

5    that independent creation is not an affirmative defense.  I

6    think this is all tied up in the extensive arguments that we've

7    had on the jury instructions, and we've been down this road.

8    At some point, I would respectfully submit that we have to just

9    draw the line and be done.  It's in there.  It's in the

10   instructions.

11        There is sufficient case law to support the fact that

12   this is a rebuttable presumption that we were not required to

13   put in evidence on until they put on this their prima facie

14   case.  The question of whether Mattel believes that the

15   evidence we did put on is sufficient is not for Mattel to

16   decide.  It's for the jury to decide.  And so I think the

17   instruction should stay in there.  And with regard to how you

18   rule on the JMOL after the jury's verdict, that's a separate

19   issue.

20        **THE COURT:**  I agree, Counsel.

21        I'm going to leave the instruction in and leave the

22   verdict form as it is with respect to the copyright

23   infringement.  I think the instructions, in combination with

24   the questions that are asked, 5 through 10, are sufficient.  I

25   will, though, pursuant to the stipulation, modify the first



Wednesday, August 20, 2008              Trial Day 37, morning session

1   four questions to include the amounts as to each of the

2   defendant's for which the jury found liability.

3           Is there anything else that we need to take up prior

4   to closing arguments at 9:00?  Everyone understands the ground

5   rules in terms of the length of closing arguments and

6   objections during closing arguments, et cetera?

7           **MR. QUINN:**  Yes, Your Honor.

8           There are some exhibits we wanted to retrieve from

9   the courtroom upstairs.  And I understand that there was a

10  prisoner being moved through there, or for some reason, we

11  couldn't get access to get the exhibits --

12          **THE COURT:**  We've had a crowded courtroom these last

13  few days; and then, ironically, some of the witnesses in the

14  Aryan Brotherhood case have been held up in the toy room

15  upstairs, which raises --

16          **MR. QUINN:**  Maybe it will change their lives,

17  Your Honor.

18          **THE COURT:**  Maybe it will be a life-changing

19  experience.  Who knows.

20          I will get with court security, and we'll make sure

21  you have access in the next few minutes to get whatever

22  exhibits you need.

23          **MR. QUINN:**  Thank you, Your Honor.

24          **MR. ZELLER:**  Then with respect to the Hong Kong

25  pleadings, there is some agreement on the exhibits and how they

8081

1    should be redacted and presented.

2            **THE COURT:**  Yes.

3            **MR. ZELLER:**  But there's not complete agreement.

4            There are some that are in dispute.  I don't know

5    what would be easiest for the Court.  We can provide --

6            **THE COURT:**  Are any of these going to be shown during

7    the closing argument?

8            **MR. ZELLER:**  I believe that there are at least three

9    or four of them that have portions that we showed in opening;

10   we plan on showing in closing.

11           **THE COURT:**  Let me rephrase my question.

12           Are there any disputed portions that are intended to

13   be shown in closing?

14           **MR. ZELLER:**  Yes.

15           **THE COURT:**  Let's get those resolved now.

16           Can somebody identify the exhibits, and I'll rule on

17   them.  Let's get this done.

18           **MR. ZELLER:**  Your Honor, some of them were resolved

19   just within a few minutes of when we came into court, and some

20   were not.

21           **THE COURT:**  Why don't you continue.  I'm going to

22   take a brief recess.  Let me know if there's a need and we'll

23   do that very briefly at side-bar or something.

24           Mr. Nolan, anything from MGA before we have closings?

25           **MR. NOLAN:**  One quick question, Your Honor.

8082

 1          I've never seen this done.  This may be a unique

 2    case, such that it will be helpful.  The Court is going to read

 3    the jury instructions.

 4          THE COURT:  Right.  And the verdict form.

 5          MR. NOLAN:  Is the Court going to read the verdict

 6    form questions that they will be asked at the end?

 7          Oftentimes, jurors really don't know what questions

 8    are going to be asked on the test that they are given, and I

 9    wonder in this case whether or not it would be helpful --

10          THE COURT:  To read the verdict form first?

11          MR. NOLAN:  After the jury instructions.

12          THE COURT:  What I was planning to do was read the

13    jury instructions and then the verdict form and then have

14    closing.

15          MR. NOLAN:  I did not realize you were going to read

16    the verdict form as well.  That clears it up.

17          THE COURT:  I think that's what I did in Phase A as

18    well.  So that's what I'll do in this phase.  I will read the

19    verdict form.

20          I have not confirmed this yet, but I trust the copy

21    that I was given by Mattel this morning with those changes

22    is -- the only changes that were made to the verdict form were

23    the addition of those.

24          Okay.  I'll make a copy.  I want MGA just to

25    double-check that to make sure they're satisfied that that's

8083

1    the case.

2            Anything else outside of these Hong Kong exhibits?

3            Very well.

4            Why don't you work amongst yourselves, and I'll call

5    you at side-bar in about five minutes.  I do want to bring the

6    jury in at 9:00, or as soon as the jury is ready.

7            Court is in recess.

8            (Whereupon, a brief recess was held.)

9            (Whereupon, jurors enter courtroom.)

10           **THE CLERK:**  Calling Case Number CV04-09049-SGL,

11   Mattel, Inc., v. MGA, Inc., et al.

12           Counsel, please state your appearances for the

13   record.

14           **MR. QUINN:**  John Quinn, Bill Price, Mike Zeller for

15   Mattel.

16           **MR. NOLAN:**  Tom Nolan on behalf of MGA and

17   Isaac Larian.

18           **MS. AGUIAR:**  Lauren Aguiar on behalf of MGA.

19           **MR. KENNEDY:**  Raoul Kennedy, also on behalf of MGA.

20           **THE COURT:**  Good morning, Counsel.

21           Good morning, members of the jury.

22           As promised, we are at the stage where the Court is

23   prepared to provide you the jury instructions for this second

24   and final phase of the trial.  I will also review with you the

25   verdict form that will govern your verdict in the second phase.

Wednesday, August 20, 2008          Trial Day 37, morning session



1            We will then have closing arguments.  I have allotted

2     both sides two hours to use as they see fit.  I understand that

3     Mr. Quinn and Mr. Price will be giving the closing arguments

4     for Mattel, and Mr. Nolan and Mr. Kennedy will be giving the

5     closing arguments for MGA and Isaac Larian.  After that, the

6     case will be yours to decide.

7            At this time, I'm going to read the jury

8     instructions.

9            Members of the jury, now that you have heard all of

10    the evidence and the arguments, and will hear the arguments of

11    the attorneys, it is my duty to instruct you as to the law of

12    the case.  A copy of these instructions will be sent with you

13    to the jury room when you deliberate.

14            You must not infer from these instructions or from

15    anything I may say or do as indicating that I have an opinion

16    regarding the evidence for what your verdict should be.

17            It is your duty to find the facts from all of the

18    evidence in the case.  To those facts, you will apply the law

19    as I give it to you.  You must follow the law as I give it to

20    you whether you agree with it or not, and you must not be

21    influenced by any personal likes or dislikes, opinions,

22    prejudices, or sympathy.  That means that you must decide the

23    case solely on the evidence before you.  You will recall that

24    you took an oath to do so.

25            In following my instructions, you must follow all of

1    them and not single out some and ignore others.  They are all

2    important.

3         You should decide the case as to each party

4    separately.  Unless otherwise stated, the instructions apply to

5    all parties.

6         Whether or not you have taken notes, you should rely

7    on your memory of the evidence.  Notes are only to assist your

8    memory.  You should not be overly influenced by your notes or

9    those of your fellow jurors.

10        The evidence you are to consider in deciding what the

11   facts are consist of the sworn testimony of any witness, the

12   exhibits which are received into evidence, and any facts to

13   which the lawyers have agreed or stipulated.  In reaching your

14   verdict, you may consider only the testimony and exhibits

15   received into evidence.  Certain things are not evidence and

16   you may not consider them in deciding what the facts are.  I

17   will once again list them for you.

18        One:  Arguments and statements by lawyers are not

19   evidence.  The lawyers are not witnesses.  What they have said

20   in their opening statements, will say in their closing

21   arguments and at other times, is intended to help you interpret

22   the evidence, but it is not evidence.  If the facts as you

23   remember them differ from the way the lawyers have stated them,

24   or do state them, your memory of them controls.

25        Two:  Questions and objections by lawyers are not




1   evidence.   Attorneys have a duty to their clients to object

2   when they believe a question is improper under the rules of

3   evidence.   You should not be influenced by the objection or by

4   the Court's ruling on it.

5           Three:   Testimony that has been excluded or stricken,

6   or that you have been instructed to disregard, is not evidence

7   and must not be considered.   In addition, sometimes testimony

8   and exhibits are received only for a limited purpose.   When I

9   have given a limiting instruction, you must follow it.

10          Four:   Anything you may have seen or heard when the

11  court was not in session is not evidence.   You are to decide

12  the case solely on the evidence received at trial.

13          Evidence may be direct or circumstantial.   Direct

14  evidence is direct proof of a fact, such as testimony by a

15  witness about what that witness personally saw or heard or did.

16  Circumstantial evidence is proof of one or more facts from

17  which you can find another fact.   You should consider both

18  kinds of evidence.   The law makes no distinction between the

19  weight to be given to either direct or circumstantial evidence.

20  It is for you to decide how much weight to give to any

21  evidence.

22          As you know, there are rules of evidence that control

23  what can be received into evidence.   When a lawyer asks a

24  question or offers an exhibit into evidence and a lawyer on the

25  other side thinks that is not permitted by the rules of



1   evidence, that lawyer may object.  If I overruled the

2   objection, the question could be answered and the exhibit could

3   be received.  If I sustained the objection, the question could

4   not be answered and the exhibit could not be received.

5   Whenever I have sustained an objection to a question, you must

6   ignore the question and must not guess what the answer might

7   have been.

8           Sometimes I have ordered that evidence be stricken

9   from the record.  That means that when you are deciding the

10  case, you must not consider that evidence.

11          In deciding the facts in this case, you may have to

12  decide which testimony to believe and which testimony not to

13  believe.  You may believe everything a witness says, or part of

14  it, or none of it.  Proof of a fact does not necessarily depend

15  on the number of witnesses who testify about it.

16          In considering the testimony of any witness, you may

17  take into account, one, the opportunity and ability of the

18  witness to see or hear or know the things testified to; two,

19  the witness's memory; three, the witness's manner while

20  testifying; four, the witness's interest in the outcome of the

21  case, and any bias or prejudice; five, whether other evidence

22  contradicted the witness's testimony; six, the reasonableness

23  of the witness's testimony in light of all of the evidence; and

24  seven, any other factors that bear on believability.

25          The weight of the evidence as to a fact does not



Wednesday, August 20, 2008                    Trial Day 37, morning session

 1  necessarily depend on the number of witnesses who testify about

 2  it.

 3          I will now once again say a few words about your

 4  conduct as jurors.  I have previously instructed you on this.

 5          First, as you know, you are not to discuss this case

 6  with anyone, including members of your family, people involved

 7  in the trial, or anyone else.  This includes discussing the

 8  case in Internet chat rooms or through Internet blogs, Internet

 9  bulletin boards or e-mails, nor are you allowed to permit

10  others to discuss the case with you.  If anyone approaches you

11  and tries to talk to you about the case, please let me know

12  about it immediately.

13          Second, do not read or listen to any news stories,

14  articles, radio, television, or on-line reports about the case

15  or about anyone who has anything to do with it.

16          Third, do not do any research, such as consulting

17  dictionaries, searching the Internet, or using other reference

18  materials, and do not make any investigation about the case on

19  your own.

20          Fourth, again, if you need to communicate with me,

21  simply give a signed note to the bailiff to give to me.

22          And fifth, do not make up your mind about what the

23  verdict should be until after you have gone to the jury room to

24  decide the case and you and your fellow jurors have discussed

25  the evidence.  Keep an open mind until then.



8089

 1          Finally, until this case is given to you for your

 2   deliberation, you are not to discuss the case with your fellow

 3   jurors.

 4          During deliberations, you will have to make your

 5   decision based on what you recall of the evidence.  You will

 6   not have a transcript of the trial.

 7          You must not make any assumptions about a witness

 8   based solely upon the use of an interpreter to assist that

 9   witness.

10          From time to time during trial, it became necessary

11   for me to talk with the attorneys out of the hearing of the

12   jury, either by having a conference at the bench when the jury

13   was present in the courtroom or by calling a recess.  Please

14   understand, as I know you have, that while you were waiting, we

15   were working.  The purpose of these conferences is not to keep

16   relevant information from you, but to decide how certain

17   evidence is to be treated under the rules of evidence and to

18   avoid confusion and error.

19          Of course, we have done what we could to keep the

20   number and length of these conferences to a minimum.  I did not

21   always grant an attorney's request for a conference.  Do not

22   consider my granting or my denying a request for a conference

23   as any indication of my opinion of the case or what your

24   verdict should be.

25          The parties have agreed to concern facts that were

1    stated to you.  You should, therefore, treat those facts as

2    having been proved.  A deposition is the sworn testimony of a

3    witness taken before trial.  The witness is placed under oath

4    to tell the truth and lawyers for each party may ask questions.

5    The questions and answers are recorded.  When a person is

6    unavailable to testify at trial, the deposition of that person,

7    including a videotaped deposition, may be used at the trial.

8            Some witnesses, because of education or experience,

9    are permitted to state opinions and the reasons for those

10   opinions.  Opinion testimony should be judged just like any

11   other testimony.  You may accept it or reject it, and give it

12   as much weight as you think it deserves, considering the

13   witness's education and experience, the reasons given for the

14   opinion, and all of the other evidence in the case.

15           Certain charts and summaries not received into

16   evidence have been shown to you in order to help explain the

17   contents of books, records, documents, or other evidence in the

18   case.  They are not themselves evidence or proof of any facts.

19   If they do not correctly reflect the facts or figures shown by

20   the evidence in the case, you should disregard these charts and

21   summaries and determine the facts from the underlying evidence.

22           Other charts and summaries have been received into

23   evidence to illustrate information brought out in trial.

24   Charts and summaries are only as good as the underlying

25   evidence that supports them.  You should, therefore, give them

1  only such weight as you think the underlying evidence deserves.

2        You have heard evidence that both Mattel and MGA

3  purchased and evaluated each other's existing products and had

4  those products in their respective facilities.  In this trial,

5  there is no allegation that it is illegal or improper for a

6  company or a person to purchase, possess, or evaluate the

7  publicly-available product of a competitor.

8        When a party has the burden of proof on any claim by

9  a preponderance of the evidence, it means that you must be

10  persuaded by the evidence that the claim is more probably true

11  than not true.  You should base your decision on all of the

12  evidence, regardless of which party presented it.

13        Mattel claims that the defendants, MGA Entertainment,

14  MGA; Isaac Larian; and MGA Entertainment HK, referred to as MGA

15  Hong Kong, engaged in copyright infringement of certain items

16  that you found in Phase A of this trial were created by

17  Carter Bryant when he worked at Mattel.  The defendants deny

18  that claim.

19        Copyright is the exclusive right to copy.  This right

20  to copy includes the exclusive rights to, one, authorize or

21  make additional copies, or otherwise reproduce the copyrighted

22  work; two, recast, transform, or adopt the work, that is, to

23  prepare derivative works based upon the copyrighted work;

24  three, distribute copies of the copyrighted work to the public,

25  by sale or other transfer of ownership; and four, display

1    publicly a copyrighted work.

2            It is the owner of a copyright who may exercise these

3    exclusive rights to copy.

4            As a matter of law, Mattel is the owner, by

5    assignment, of the Bratz-related items that you found were

6    created by Carter Bryant, alone or jointly with others, while

7    employed by Mattel, which items have been registered by Mattel

8    at the U.S. copyright office.  In general, copyright law

9    protects against production, adaptation, and distribution of

10   substantially similar copies of the owner's copyrighted work

11   without the owner's permission.  An owner may enforce these

12   rights to exclude others in an action for copyright

13   infringement.

14           You must consider each defendant's act separately to

15   determine whether that defendant has engaged in an act that is

16   an infringement of Mattel's copyright.

17           Now, copyright law allows the author of an original

18   work to prevent others from copying the way or form the author

19   used to express the ideas in the author's work.  Only the

20   particular way of expressing an idea can be copyrighted.

21   Copyright law does not give the author the right to prevent

22   others from copying or using the underlying ideas contained in

23   the work, such as any procedures, processes, systems, methods

24   of operation, concepts, principals, or discoveries.

25           The right to exclude others from copying extends only

Wednesday, August 20, 2008                    Trial Day 37, morning session

1    to how the author expressed the ideas in the copyrighted work.

2    The copyright is not violated when someone uses an idea from a

3    copyrighted work as long as the particular way of expressing

4    that idea in the work is not copied.

5            Anyone who copies original elements of a copyrighted

6    work without the owner's permission infringes the copyright.

7            Mattel claims that the defendants have infringed

8    copyrights for the Bratz-related items described above.  On

9    Mattel's copyright infringement claim, Mattel has the burden of

10   proving both of the following by a preponderance of the

11   evidence:  One, that Mattel is the owner of a valid copyright;

12   and, two, the defendants copied original elements from the

13   copyrighted work.

14           If you find that Mattel has proved both of these

15   elements, your verdict should be for Mattel.  If, on the other

16   hand, Mattel has failed to prove either of these elements, your

17   verdict should be for the defendant.

18           As a matter of law, the first element is satisfied

19   because Mattel is the owner of each of the items you found were

20   created by Carter Bryant, alone or jointly with others, while

21   employed by Mattel and which Mattel has registered with the

22   U.S. copyright office.

23           Whether or not the second element is satisfied is for

24   you to decide.

25           A copyright owner is entitled to exclude others from

8094

1    creating derivative works based upon the owner's copyrighted

2    works.  The term "derivative work" refers to a work based on

3    one or more preexisting works.  Accordingly, Mattel is entitled

4    to exclude others from recasting, transforming, or adapting,

5    without Mattel's permission, the copyrighted works you found

6    were created by Carter Bryant, alone or jointly with others,

7    while he was employed by Mattel.

8            An owner is entitled to copyright protection of a

9    compilation.  A compilation is a work formed by the collection

10   and assembling of preexisting materials or of data that are

11   selected, coordinated, or arranged in such a way that the

12   resulting work as a whole constitutes an original work of

13   authorship.

14           The owner of a compilation may enforce the right to

15   exclude others in an action for copyright infringement.

16           Now, as explained above, Mattel has the burden of

17   proving that the defendants copied original elements from

18   Mattel's copyrighted work.  There are two ways in which Mattel

19   may meet that burden.

20           First, Mattel may show that the defendants copied

21   from the work by showing by a preponderance of the evidence

22   that the defendants actually copied a significant amount of

23   protectable expression from the work.

24           Second, in the alternative, Mattel may also show the

25   defendants copied from the work by showing by a preponderance

Wednesday, August 20, 2008          Trial Day 37, morning session

1   of the evidence that the defendants had access to Mattel's

2   copyrighted works and that there are substantially similarities

3   between the defendants' works and original elements of Mattel's

4   works.

5          It is undisputed in this case that defendants had

6   access to Mattel's copyrighted works.  Whether there are

7   substantial similarities between the defendants' works and

8   original elements of Mattel's works is for you to decide.

9          You are to make a determination regarding substantial

10  similarity according to a two-step process, which includes

11  application of the extrinsic test and the intrinsic test.  To

12  prevail on its claims for copyright infringement, Mattel must

13  satisfy both of these tests.

14         First, you must apply the extrinsic test.  Under the

15  extrinsic test, Mattel must establish that specific ideas and

16  expressive elements of the works Mattel owns and the

17  Bratz-related products that Mattel claims are infringing are

18  substantially similar.

19         The Court has determined what elements of the work

20  that you found were created by Carter Bryant, solely or jointly

21  while working at Mattel, are protectable under copyright law.

22  These are the elements that you should consider for the purpose

23  of your comparisons to each of the allegedly infringing

24  products under the extrinsic test:

25         First, the particularized synergistic compilation and

1    expression of the human form and anatomy that expresses a

2    unique style and conveys a distinct look or attitude;

3         Second, the particularized expression of a doll's

4    head, lips, eyes, eyebrows, eye features, nose, chin,

5    hairstyle, and breasts, including the accentuation or

6    exaggeration of certain anatomical features relative to others

7    (doll lips, eyes, eyebrows, and eye features), and deemphasis

8    of certain anatomical features relative to others (doll nose

9    and thin, small doll bodies);

10        And third, the particularized doll clothes, doll

11   shoes, and doll accessories that express aggressive,

12   contemporary, youthful style.

13        In contrast, certain basic elements of

14   Carter Bryant's works are not protectable.  Specifically,

15   copying of protected expression or ideas cannot be established

16   by the mere fact that both Carter Bryant's works and the

17   allegedly infringing designs bear a resemblance or similarity

18   to human form and human physiology; that they have hair, heads,

19   two eyes, eyebrows, lips, nose, chin, mouth, and other features

20   that track human anatomy and physiology; that they wear or have

21   human clothes, shoes, and accessories; that they depict a

22   certain age, race, ethnicity, or have an urban appearance; that

23   they possess common or standard anatomical features relative to

24   others, or depict common or standard treatment of fashion doll

25   subject matter.  Nevertheless, particular compilations or

1    combinations of these otherwise nonprotectable elements in the

2    works which express a particular style or convey a distinct

3    look or attitude are protectable.

4         You should consider only the elements that I have

5    just listed for purposes of the extrinsic test.  Focusing on

6    the protectable elements of the works by Carter Bryant as

7    compared to those elements in the allegedly infringing

8    Bratz-related works, you must determine whether Mattel has

9    proven by the preponderance of the evidence that the works are

10   substantially similar.  If you so find, you must next consider

11   the intrinsic test.  If you do not so find, you must find for

12   the defendants.

13        Now, the intrinsic test looks at the overall

14   similarity of ideas and expression in the works from the

15   perspective of an ordinary observer.  You should ask yourself

16   whether the ordinary, reasonable audience, in this case girls

17   between the ages of 7 and 12, would determine or recognize the

18   defendants' products as reflecting the total concept and feel,

19   or as a picturization, of the Bratz-related works that you have

20   found Carter Bryant created, alone or jointly with others,

21   while employed by Mattel.

22        Mattel does not need to establish that the works it

23   alleges are infringing are identical or virtually identical to

24   the works it owns, nor that the allegedly infringing works do

25   not contain any noninfringing material.  However, Mattel does

1   need to establish that, focusing on the protectable elements of

2   Carter Bryant's designs which I have identified under the

3   extrinsic test and the overall look and feel of the works under

4   the intrinsic test, there are substantial similarities between

5   the copyright-protected works and the allegedly infringing

6   works.

7          You will have a copy of these instructions.

8          The degree of similarity required to support a

9   finding of substantial similarity is affected by the degree of

10  access that MGA, Isaac Larian, and MGA Hong Kong had to

11  Carter Bryant's works.  The greater the level of access, the

12  lower the showing of similarity required to support a finding

13  of substantial similarity.  However, the burden of proving

14  substantial similarity by a preponderance of the evidence

15  always remains with Mattel.

16         Now, copyright law protects distinctive characters.

17  Defendants' works infringe Mattel's copyrights if they copy

18  recognizable and distinctive traits, attributes, and elements

19  of the personalities of the characters portrayed in

20  Carter Bryant's works.

21         If you find that defendants had access to the

22  copyrighted works and substantial similarity between the

23  copyrighted works and the allegedly infringing works, you must

24  find that defendants infringed Mattel's copyrights.

25         Defendants contend that certain Bratz-related works

Wednesday, August 20, 2008                    Trial Day 37, morning session

8099

were created independently; that is, that defendants did not

actually copy or prepare derivative works from Carter Bryant's

works when they created these Bratz-related works,

notwithstanding their admitted access to these works.  A claim

of independent creation applies where a defendant can prove

that he or she created the allegedly infringing work without

copying or adapting or preparing derivative works from the

original to which he or she had access.

Defendants bear the burden of proof on this issue of

independent creation.

If you find that Mattel has shown the elements of

infringement and defendants have not established independent

creation by a preponderance of the evidence, then you must find

for Mattel on its claim of copyright infringement.

A two-dimensional work, such as a drawing, can be

infringed by a three-dimensional work, such as a doll.  A doll

which consists of different materials or includes aspects that

are not visible in a copyrighted drawing nevertheless will

infringe the drawing when the works are substantially similar

in their appearance under the extrinsic and intrinsic tests.  A

three-dimensional work is not an independent creation merely

because it includes or is a result of artistic or nonartistic

work not included in the copyrighted work.  Rather, the

question is whether the three-dimensional work is substantially

similar to the two-dimensional work as a whole, using the

 1   extrinsic/intrinsic test described above.

 2           A copyright can be infringed by intermediate or

 3   preparatory works, including works prepared in the product

 4   development or marketing stage, that are substantially similar

 5   to a copyrighted work, regardless of whether the end product of

 6   the copying also infringes the copyright.

 7           Mattel has presented evidence concerning certain

 8   copyright infringement lawsuits brought by MGA in Hong Kong,

 9   pursuant to Hong Kong law.  The Court has excluded, and you may

10   not consider, any reference to any legal arguments or legal

11   conclusions associated with those lawsuits.  You may, however,

12   consider any factual statements or factual representations that

13   MGA made in those lawsuits.  It is for you to decide how much

14   weight, if any, to give to those factual statements or factual

15   representations.

16           Now, if you find that MGA infringed Mattel's

17   copyright in the Bratz work, you may consider Mattel's claim

18   that Isaac Larian vicariously infringed that copyright.  Mattel

19   has the burden of proving each of the following by a

20   preponderance of the evidence:

21           One, Isaac Larian profited directly from the

22   infringing activity of MGA; two, Isaac Larian had the right and

23   the ability to supervise or control the infringing activity of

24   MGA; and three, Isaac Larian failed to exercise that right and

25   ability.

 1          If you find that Mattel proved each of these

 2    elements, your verdict should be for Mattel, if you also find

 3    that MGA infringed Mattel's copyright.  If, on the other hand,

 4    Mattel has failed to prove any of these elements, your verdict

 5    should be for Isaac Larian on Mattel's claim for copyright

 6    infringement, unless you find that Isaac Larian is liable for

 7    contributory infringement under the instruction that follows:

 8          A defendant may be liable for copyright infringement

 9    engaged in by another if he or it knew or had reason to know of

10    the infringing activity and intentionally materially

11    contributes to that infringing activity.

12          If you find that MGA infringed Mattel's copyright in

13    Bratz works, but that MGA Hong Kong and/or Isaac Larian did not

14    directly or vicariously engage in acts of infringement, you

15    should proceed to consider Mattel's claims that MGA Hong Kong

16    and Isaac Larian contributorily infringed that copyright.  To

17    prove contributory copyright infringement, Mattel must prove

18    both of the following elements by a preponderance of the

19    evidence:

20          One, Isaac Larian and/or MGA Hong Kong knew or had

21    reason to know of the infringing activity of MGA; and, two,

22    Isaac Larian and/or MGA Hong Kong intentionally materially

23    contributed to MGA's infringing activity.

24          If you find that MGA infringed Mattel's copyright,

25    and you also find that Mattel has proved both of these



1    elements, your verdict should be for Mattel.  If, on the other

2    hand, Mattel has failed to prove either or both of these

3    elements as against MGA Hong Kong and/or Isaac Larian, and also

4    failed to prove direct or vicarious infringement by MGA Hong

5    Kong and/or Isaac Larian, your verdict should be for those

6    defendants.

7             Mattel claims that defendants fraudulently concealed

8    the facts underlying Mattel's claims of intentional

9    interference with contract and the claim for conversion.

10   Defendants deny these allegations.

11            To prove fraudulent concealment, Mattel must show the

12   following by a preponderance of the evidence:

13            One, defendants took affirmative steps to conceal the

14   facts that could have led Mattel to discover that Carter Bryant

15   created Bratz-related works while employed by Mattel, or that

16   Carter Bryant entered into a contract with and worked with MGA

17   while he was still employed by Mattel; and, two, Mattel was not

18   aware of such facts that either did or would have, with

19   diligence, led Mattel to discover that Carter Bryant created

20   Bratz works while employed by Mattel, or that Carter Bryant

21   entered into a contract with and worked with MGA while he was

22   still employed by Mattel.

23            If you so find by the preponderance of the evidence,

24   you should find for Mattel on its allegation of fraudulent

25   concealment.  If not, you should find for defendants on the



 1    allegations of fraudulent concealment.

 2            Now, it is the duty of the Court to instruct you

 3    about the measure of damages.  By instructing you on damages,

 4    the Court does not mean to suggest for which party your verdict

 5    should be rendered.  It is for you to determine what damages,

 6    if any, have been proved.

 7            Your award must be based upon evidence and not upon

 8    speculation, guesswork, or conjecture.

 9            In Phase A of this trial, you determined that Mattel

10    had proved its claim for intentional interference with

11    contractual relations against the defendants, MGA and

12    Isaac Larian.  You must now decide how much money, if any,

13    should be awarded as damages.

14            The amount of damages must include an award for each

15    item of harm that was caused by MGA and Isaac Larian's wrongful

16    conduct, even if the particular harm could not have been

17    anticipated.

18            Mattel must prove the amount of damages.  However,

19    Mattel does not have to prove the exact amount of damages that

20    will provide reasonable compensation for the harm.  You must

21    not speculate or guess in awarding damages.

22            The following are the specific items of damages

23    claimed by Mattel:

24            One, compensatory and general damages, including

25    disgorgement of profits earned by MGA and Isaac Larian as a

1    result of their wrongful conduct; two, prejudgment interest at

2    the maximum rate, which is 7 percent, calculated from the date

3    Mattel's claim arose; and three, punitive damages.

4            In Phase A, you determined that Mattel had proved its

5    claims against the defendants, MGA and Isaac Larian, for aiding

6    and abetting Carter Bryant's breach of fiduciary duty and

7    breach of the duty of loyalty.  You must now decide how much

8    money, if any, should be awarded as damages.  The amount of

9    damages must include an award for each item of harm that was

10   caused by MGA and Isaac Larian's wrongful conduct, even if the

11   particular harm could not have been anticipated.

12           Mattel must prove the amount of its damages.

13   However, Mattel does not have to prove the exact amount of

14   damages that will provide reasonable compensation for the harm.

15   You must not speculate or guess in awarding damages.

16           The following are the specific items of damages

17   claimed by Mattel:

18           One, compensatory and general damages, including

19   disgorgement of profits earned by MGA and Isaac Larian as a

20   result of the wrongful conduct; two, prejudgment interest at

21   the maximum rate, which is 7 percent, calculated from the date

22   Mattel's claim rose; and three, punitive damages.

23           Mattel is entitled to obtain disgorgement of profits

24   as an element of its damages for the wrongful acts of aiding

25   and abetting breach of fiduciary duty and duty of loyalty that



Wednesday, August 20, 2008                    Trial Day 37, morning session

1  you have found.  Accordingly, if you find that MGA and/or

2  Isaac Larian obtained profits or advantages because of these

3  specific wrongful acts, those profits and advantages should be

4  awarded to Mattel.

5        In Phase A of this trial, you found that Mattel had

6  proved its claim for conversion of tangible property against

7  MGA, Isaac Larian, and MGA Hong Kong.  You must now decide how

8  much money will reasonably compensate Mattel for the harm.

9  This compensation is called damages.

10        Mattel must prove the amount of its damages.

11  However, Mattel does not have to prove the exact amount of

12  damages that will provide reasonable compensation for the harm.

13  You must not speculate or guess in awarding damages.

14        The following are the specific items of damages

15  claimed by Mattel:

16        One, the fair market value of the tangible Bratz

17  works created by Carter Bryant while he was employed by Mattel;

18  two, prejudgment interest at the maximum rate, which is

19  7 percent, calculated from the date Mattel's property was

20  converted; and three, punitive damages.

21        Fair market value is measured as of the time the

22  tangible item was converted.  Fair market value is the highest

23  price that a willing buyer would have paid to a willing seller,

24  assuming that there's no pressure on either one to buy or sell,

25  and that the buyer and seller know all of the uses and purposes

1  for which the tangible items are reasonably capable of being

2  used.

3       If you find for the plaintiff, Mattel, on any of its

4  copyright infringement claims against the defendants, you must

5  determine Mattel's damages on those claims.  Mattel is entitled

6  to recover any profits of the defendants attributable to the

7  infringement.  Mattel must prove damages by a preponderance of

8  the evidence.

9       You may make an award of the defendants' profits only

10  if you find that the plaintiff showed a causal relationship

11  between the infringement and the defendants' gross revenue.

12       The defendants' profit is determined by deducting

13  expenses from the defendants' gross revenue.  The defendants'

14  gross revenue is all of the defendants' receipts from sale of a

15  product containing or using the copyrighted work or associated

16  with the infringement.  Mattel has the burden of proving the

17  defendants' gross revenue by a preponderance of the evidence.

18       Expenses are all operating costs and production costs

19  incurred in producing the defendants' gross revenue.  The

20  defendants have the burden of proving the defendants' expenses

21  by a preponderance of the evidence.

22       Indirect profits are the defendants' profits with a

23  less direct connection or link to the infringement.  A

24  plaintiff, such as Mattel, may be entitled to indirect profits

25  in addition to direct profits.  To recover indirect profits,



Wednesday, August 20, 2008              Trial Day 37, morning session

8107

1    Mattel must establish a causal relationship between the
2    infringement and the profits generated indirectly from such
3    infringement.  In other words, Mattel must offer some evidence
4    that the infringement at least partially caused the profits
5    that the infringer generated as a result of the infringement.

6           Unless you find that a portion of the profit from the
7    sale of a product containing or using the copyrighted work is
8    attributable to factors other than use of the copyrighted work,
9    all of the profit is to be attributed to the infringement.
10   Defendants have the burden of proving the portion of the
11   profit, if any, attributable to factors other than infringing
12   the copyrighted work.  Defendants are not required to prove
13   with precision the percentage of its profits attributable to
14   factors other than infringement, so long as the apportionment
15   is reasonable and just.  However, in determining what portion
16   of the defendants' profits are attributable to copyright
17   infringement, the benefit of the doubt should be given to
18   Mattel and not defendants.

19          If the copyrighted portions are so intermingled with
20   the rest of the infringing work that they cannot well be
21   distinguished from it, the entire profits realized by the
22   defendants are to be given to the plaintiff.  At the same time,
23   defendants do not need to demonstrate that the profits not
24   attributable to infringement are completely free of infringing
25   material.

Wednesday, August 20, 2008                 Trial Day 37, morning session

1    Mattel also claims that defendants engaged in willful

2    infringement of Mattel's copyrights.  An infringement is

3    considered willful when the plaintiff has proved both of the

4    following elements by a preponderance of the evidence:

5        One, the defendants engaged in acts that infringed

6    the copyright; and two, the defendants knew that those acts

7    infringed the copyright.

8        A defendant cannot deduct overhead expenses,

9    operating expenses, or taxes from his or its gross revenue when

10   the copyright infringement is willful.

11       Mattel seeks damages under more than one legal claim

12   or theory, and as to three defendants.  In awarding damages as

13   to any particular claim or defendant, you should not consider

14   or discount your award based on amounts, if any, that you award

15   as to any other claim or defendant.  That is, you should award

16   the full amount of damages you find appropriate, if any, as to

17   each separate claim against each defendant.  The Court will

18   ensure, once your verdict has been reached, that the plaintiff

19   does not obtain duplicative damages.

20       If you decide that Isaac Larian's, MGA's, or MGA

21   Hong Kong's conduct caused Mattel harm, you must decide whether

22   that conduct justifies an award of punitive damages.

23       The purposes of punitive damages are to punish a

24   wrongdoer for the conduct that harmed the plaintiff and to

25   discourage similar conduct in the future.

1        You may award punitive damages against Isaac Larian

2   only if Mattel proves by clear and convincing evidence that

3   Isaac Larian engaged in that conduct with malice, oppression,

4   or fraud.

5        When a party has the burden of proving any claim or

6   defense by clear and convincing evidence, it means you must be

7   persuaded by the evidence that the claim or defense is highly

8   probable.  That is, this is a higher standard of proof than

9   proof by a preponderance of the evidence.

10       You should base your decision on all of the evidence

11  regardless of which party presented it.  You may award punitive

12  damages against MGA or MGA Hong Kong only if Mattel proves that

13  MGA or MGA Hong Kong acted with malice, oppression, or fraud.

14  To do this, Mattel must prove one of the following by clear and

15  convincing evidence:

16       One, that the malice, oppression, or fraud was

17  conduct of one or more officers, directors, or managing agents

18  of MGA or MGA Hong Kong who acted on behalf of MGA or MGA

19  Hong Kong; or, two, that an officer, a director, or a managing

20  agent of MGA or MGA Hong Kong had advanced knowledge of the

21  unfitness of another officer, director, or managing agent of

22  MGA or MGA Hong Kong, and employed that person with a knowing

23  disregard of the rights or safety of others; or three, that the

24  conduct constituting malice, oppression, or fraud was

25  authorized by one or more officers, directors, or managing

1   agents of MGA or MGA Hong Kong; or four, that one or more

2   officers, directors, or managing agents of MGA or MGA Hong Kong

3   knew of the conduct constituting malice, oppression, or fraud

4   and adopted or approved that conduct after it occurred.

5          Malice means that a defendant acted with intent to

6   cause injury or that a defendant's conduct was despicable and

7   was done with a willful and knowing disregard of the rights or

8   safety of another.  A defendant acts with knowing disregard

9   when the defendant is aware of the probably dangerous

10  consequences of his or its conduct and deliberately fails to

11  avoid those consequences.

12         Oppression means that a defendant's conduct was

13  despicable and subjected Mattel to cruel and unjust hardship in

14  knowing disregard of its rights.  Despicable conduct is conduct

15  that is so vial, base, or contemptible that it would be looked

16  down on and despised by reasonable people.

17         Fraud means that a defendant intentionally

18  misrepresented or concealed a material fact and did so

19  intending to harm Mattel.

20         An employee is a managing agent if he or she

21  exercises substantial independent authority and judgment in his

22  or her corporate decision-making, such that his or her

23  decisions ultimately determine corporate policy.

24         There is no fixed formula for determining the amount

25  of punitive damages, and you are not required to award any

Wednesday, August 20, 2008              Trial Day 37, morning session

1  punitive damages.  If you decide to award punitive damages, you

2  should consider all of the following separately for each

3  defendant in determining that amount:

4       A:  How reprehensible was that defendant's conduct?

5       B:  Is there a reasonable relationship between the

6  amount of punitive damages and Mattel's harm or between the

7  amount of punitive damages and potential harm to Mattel that

8  the defendant knew was likely to occur because of his or its

9  conduct?

10      Punitive damages may not be used to punish a

11  defendant for the impact of its alleged misconduct on persons

12  other than Mattel.

13      C:  In view of that defendant's financial condition,

14  what amount is necessary to punish him or it and discourage

15  future wrongful conduct?

16      You may not increase the punitive award above an

17  amount that is otherwise appropriate merely because a defendant

18  has substantial financial resources.  Any award you impose may

19  not exceed that defendant's ability to pay.

20      Now, you have heard testimony in this trial regarding

21  the prospect of an injunction being issued in this case.  It is

22  for the Court to decide what, if any, injunctive relief to

23  order.

24      When you begin your deliberations, your foreperson

25  will preside over the deliberations and will speak for you here

1    in court.  You will then discuss the case with your fellow

2    jurors to reach agreement, if you can do so.  Your verdict must

3    be unanimous.

4         Each of you must decide the case for yourself, but

5    you should do so only after you have considered all of the

6    evidence, discussed it fully with the other jurors, and

7    listened to the views of your fellow jurors.

8         Do not hesitate to change your opinion if the

9    discussion persuades you that you should.  Do not come to a

10   decision simply because other jurors think it is right.

11        It is important that you attempt to reach a unanimous

12   verdict, but, of course, only if each of you can do so after

13   having made your own conscientious decision.  Do not change an

14   honest belief about the weight and effect of the evidence

15   simply to reach a verdict.

16        If it becomes necessary during your deliberations to

17   communicate with me, you may send a note through the bailiff,

18   signed by your presiding juror or by one or more members of the

19   jury.  No member of the jury should ever attempt to communicate

20   with me except by a signed writing.  I will communicate with

21   any member of the jury on anything concerning the case only in

22   writing or here in open court.  If you send out a question, I

23   will consult with the parties before answering it, which may

24   take some time.  You may continue your deliberations while

25   waiting for the answer to any questions.



Wednesday, August 20, 2008                    Trial Day 37, morning session



 1          Remember that you are not to tell anyone, including

 2    me, how the jury stands, numerically or otherwise, until after

 3    you have reached a unanimous verdict or have been discharged.

 4    Do not disclose any vote count in any note to the Court.

 5          A verdict form has been prepared for you.  After you

 6    have reached unanimous agreement on a verdict, your presiding

 7    juror will fill in that form that has been given to you, sign

 8    and date it, and advise the Court that you are ready to return

 9    to the courtroom.

10          I will now go over the verdict form.  It has the same

11    type of cover sheet.  It says Phase B verdict form, as given.

12    It's divided into four sections.  It says, "Verdict Form

13    Phase B:  We answer the questions submitted to us as follows."

14          The first section is damages for Phase A claims, and

15    you're instructed to answer all four questions in this section.

16    The first deals with intentional interference with contractual

17    relations.  Question 1:  In Phase A of this trial, you found

18    that MGA Entertainment and Isaac Larian are liable to Mattel

19    for intentional interference with contractual relations.  What

20    amount of damages, if any, should be awarded to Mattel?

21          And there's a line for MGA, and there's a line for

22    Isaac Larian.

23          Second is the aiding and abetting breach of fiduciary

24    duty.  Question 2:  In Phase A of this trial, you found that

25    MGA and Isaac Larian are liable to Mattel for aiding and

1    abetting Carter Bryant's breach of fiduciary duty.  What amount

2    of damages, if any, should be awarded to Mattel?

3            And there's a line for MGA, and there's a line for

4    Mr. Larian.

5            The third is aiding and abetting breach of the duty

6    of loyalty.  Question 3:  In Phase A of this trial, you found

7    that MGA and Isaac Larian are liable to Mattel for aiding and

8    abetting Carter Bryant's breach of the duty of loyalty.  What

9    amount of damages, if any, should be awarded to Mattel?

10           Again, two lines; one for MGA one for Mr. Larian.

11           The fourth is the conversion claim.  Question 4:

12   In Phase A of this trial, you found that MGA, Isaac Larian, and

13   MGA Hong Kong are liable to Mattel for conversion.  What amount

14   of damages, if any, should be awarded to Mattel?

15           And there's a line for each of the three defendants.

16           The second section of the verdict form is copyright

17   infringement.  That will be governed by the instructions on

18   copyright infringement that I gave you.

19           And I know those are complicated; and you really need

20   to carefully look at those, and all of the instructions, of

21   course.

22           Question 5:  Has Mattel proven by a preponderance of

23   the evidence that MGA is liable to Mattel for copyright

24   infringement?  Yes or no?

25           And then there's instructions as to where to go from

8115

 1    there.  If you answer "yes," you go to Question 6.  If you

 2    answer "no," you go to Question 7.

 3              Question 6:  Was MGA's copyright infringement

 4    willful?  Yes or no?

 5              And then there's the same two questions for

 6    Isaac Larian.

 7              Question 7:  Has Mattel proven by a preponderance of

 8    the evidence that Isaac Larian is liable to Mattel for

 9    copyright infringement?

10              Question 8:  Was Mr. Larian's copyright infringement

11    willful?

12              And then Questions 9 and 10 relate to MGA Hong Kong.

13              Question 9:  Has Mattel proven by a preponderance of

14    the evidence that MGA Hong Kong is liable to Mattel for

15    copyright infringement?

16              And Question 10:  Was MGA Hong Kong's copyright

17    infringement willful?

18              If you find copyright infringement, you then go to

19    Question Number 11:  What amount of damages, if any, should be

20    awarded to Mattel for the defendant's copyright infringement?

21              And they are broken out in three sections.

22              A, for copyright infringement by MGA.  If you found

23    that copyright infringement, you place that award there.

24              If you find copyright infringement by Isaac Larian,

25    then there are two questions asked.  One is the amount of

Wednesday, August 20, 2008                    Trial Day 37, morning session

1    distributions Mr. Larian received from MGA attributable to

2    Bratz-related works; and a second question, the value of

3    Mr. Larian's ownership percentage of MGA attributable to

4    Bratz-related works.

5         And then, finally, there's a question for copyright

6    infringement by MGA Hong Kong.

7         The third section is punitive damages.

8         Question 12:  Has Mattel proven by clear and

9    convincing evidence that MGA acted with malice, oppression, or

10   fraud?  You answer "yes" or "no."

11        If you answer "yes," you then answer Question 13:

12   What amount of punitive damages, if any, should be awarded

13   against MGA?

14        And then there's a similar series of questions for

15   Isaac Larian and MGA Hong Kong, the first question asking

16   whether Mattel has proven by clear and convincing evidence that

17   Isaac Larian or MGA Hong Kong acted with malice, oppression, or

18   fraud; and if you find "yes," what amount of punitive damages,

19   if any, should be awarded.

20        And then, finally, the fourth section relates to this

21   issue of fraudulent concealment.  And there are five questions

22   that are asked.  And all you are asked to do here is answer

23   "yes" or "no" to each of the five questions.

24        Question 18:  Has Mattel proven by a preponderance of

25   the evidence that MGA fraudulently concealed the basis for

 1   Mattel's claim of intentional interference with contract

 2   against it until at least April 27, 2002?

 3              Question 19:  Has Mattel proven by a preponderance of

 4   the evidence that Isaac Larian fraudulently concealed the basis

 5   for Mattel's claim of intentional interference with contract

 6   against him until at least April 27, 2002?  Yes or no?

 7              Question 20:  Has Mattel proven by a preponderance of

 8   the evidence that MGA fraudulently concealed the basis for

 9   Mattel's claim of conversion against it until at least

10   April 27, 2001?

11              Question 21:  Has Mattel proven by a preponderance of

12   the evidence that Mr. Larian fraudulently concealed the basis

13   for Mattel's claim of conversion against him until at least

14   April 27, 2001?

15              Finally, Question 22:  Has Mattel proven by a

16   preponderance of the evidence that MGA Hong Kong fraudulently

17   concealed the basis for Mattel's claim of conversion against it

18   until at least April 27, 2001?

19              There are no damages questions related to those.

20   They're just simple interrogatories.  You answer "yes" or "no."

21              Once you have completed the verdict, you date it, the

22   foreperson signs it, and you notify the Court.

23              I will provide back the verdict form.  Each of you

24   will have a copy of the Court's jury instructions.  They are to

25   govern your deliberations.

1    I'm going to provide these to Mr. Holmes.  He's going

2    to start making the copies of the instructions and file them

3    with the Court.  The verdict form will be placed in a folder,

4    along with copies of notes.

5        The notes are going to be numbered sequentially, one,

6    two, three, four, five.  Try to use that sequence in using the

7    notes.  It's easier for us to keep track of the notes that way.

8        So I'm done talking.  Those are the instructions, and

9    that's the verdict form.

10       I now get to sit back and listen to the outstanding

11   closing arguments of Mattel and MGA and Isaac Larian.  As I

12   indicated, I'm giving two hours, and no more than two hours, to

13   each side.  I'll have the chess clock going here.

14       Mr. Price and Mr. Quinn will be giving the closing

15   arguments for Mattel.  Mr. Nolan and Mr. Kennedy will be giving

16   the closing arguments for MGA and Mr. Larian and MGA Hong Kong.

17   It's up to them to divide it up.  And I think we're ready.

18       Counsel.

19                  **CLOSING ARGUMENT - PLAINTIFF**

20       **MR. QUINN:**  Good morning.

21       In some ways, this part of the case is simple.  It's

22   about righting a wrong.  There's a right way to compete, and

23   there's a wrong way.  And if you compete the right way, you get

24   to keep the profits that you earn.  But if you compete the

25   wrong way, then you have to give them up.

1    And you have found that MGA and Isaac Larian competed

2    in a way that was wrong, in a way that was dishonest, unfair,

3    and unacceptable.

4    Among other things, you found that MGA and

5    Isaac Larian joined forces with Carter Bryant, and that in

6    doing so, they aided and abetted Mr. Bryant in the breach of

7    his contractual obligations to Mattel and his obligations as a

8    fiduciary to Mattel.

9    Carter Bryant delivered to Isaac Larian and to MGA

10   Mattel's confidential proprietary information:  The idea for a

11   unique, ground-breaking line of dolls, the fundamental design

12   for those dolls.  MGA used that information, Mattel's

13   confidential information, to create the Bratz line, a Bratz

14   brand, and profited in the hundreds of millions of dollars.

15   As a result of using that information, Mr. Larian

16   became one of the wealthiest people in the United States, a

17   billionaire.  MGA itself was transformed.  Back in 2000, based

18   upon an independent evaluation, Isaac Larian paid his brother

19   $8.8 million to buy his 45 percent interest in the company.

20   You will recall that.  That puts a value on the whole company,

21   100 percent of the company, in 2000, at a little less than

22   $20 million.  By Mr. Larian's own valuation, in October of

23   2007, the company was worth $2 billion.  $2 billion.  That's an

24   increase in value of $1.98 billion dollars in seven years, or

25   $280 million per year.





1       What caused this dramatic increase?

2       It was caused by the theft that you found in this

3  case.  And the law provides that MGA and Mr. Larian must give

4  up those ill-gotten gains.

5       By the way, Mr. Larian knows he can't be permitted to

6  keep any of the profits he made as a result of obtaining

7  Mattel's confidential information.  He told you as much when he

8  took the stand.  Here is his testimony:

9       He told you it would be wrong for him to profit even

10  a penny based on using Mattel's proprietary confidential

11  information.  And that is, in fact, the law.  You've just heard

12  the instruction from the Court on the law.

13       Here's the instruction on aiding and abetting breach

14  of fiduciary duty or breach of duty of loyalty:

15       If you find that MGA and/or Isaac Larian obtained

16  profits or advantages because of these specific wrongful acts,

17  those profits and advantages should be awarded to Mattel.

18       Now, importantly here, the law here does not concern

19  itself with apportionment or how hard MGA worked or how much

20  they spent or how successful they were at exploiting the theft.

21  None of that matters in righting this wrong.

22       As I'll explain later, we're not asking MGA to return

23  any of the salaries or development costs or marketing costs or

24  advertising costs.  We're not asking MGA to return any of the

25  costs that they incurred in developing the Bratz, in coming up



1    with the Bratz profits, even Mr. Larian's salary.  These are

2    all deducted from the total revenues in arriving at the

3    profits.

4            The law here is simple:  You don't get to keep the

5    profits.  You don't benefit from your wrong.

6            So MGA's defense to this, the only thing that they

7    can say, is:  We didn't benefit by our wrongful conduct.

8    Mr. Bryant's ideas and designs didn't have anything to do with

9    what we did.  That confidential stolen information -- and this

10   was a mantra that you heard from witness to witness -- it was

11   just an inspiration, an inspiration.  That's all.  An

12   inspiration that resulted in hundreds of millions of dollars in

13   profits.

14           Ladies and gentlemen, I submit to you that

15   "inspiration" is just another way of saying this:  We did this

16   because we saw Mattel's designs.

17           It's just semantics.  It's just playing with words.

18           Even Mr. Larian recognized that it would be wrong to

19   profit.  He was asked:  That you shouldn't be inspired, even

20   inspired, to act by looking at a competitor's confidential

21   information?  And he had to agree with that.

22           That's not an excuse.  But there was no inspiration

23   here.  For 40 years, Mattel had shown, with its Barbie brand,

24   how you go about exploiting a successful fashion doll design.

25   Mr. Larian's inspiration, claimed inspiration, isn't something

Wednesday, August 20, 2008                    Trial Day 37, morning session



1    to give him credit for.  It's simply the completion of the

2    crime.

3            A jewel thief doesn't steal diamonds just to keep

4    them in the safe.  He steals them to sell them.  And

5    Isaac Larian did not steal the Bratz drawings just to admire

6    them in the privacy of his office.  He stole them to sell them

7    to the public, to build a brand with them, to sell tents, to

8    sell bicycle helmets, to follow the Barbie playbook.

9            All of these things that MGA points to as evidence of

10   their contributions are simply what it did to exploit the

11   stolen property.  They aren't something separate from the

12   theft; they are the means by which MGA profited from the theft.

13           What happened as a result of Mr. Larian's and

14   Mr. Bryant's illegal alliance?  What happened because they

15   brought the concept and idea and design for Bratz over to MGA?

16           Well, one thing we know for sure is that if

17   Carter Bryant had not delivered the Bratz to MGA, there would

18   have been no Bratz line at MGA.  You've heard Isaac Larian and

19   Paula Garcia suggest that they would have come up with the

20   Bratz on their own.  But you know that isn't true.  Mr. Larian

21   tells you he had searched for a couple of years trying to come

22   up with a fashion doll design to compete with Barbie, and he

23   came up with nothing.

24           Ms. Garcia, on the other hand, said something

25   different.  She told you in the first phase of this trial that

1   no one else had expressed an interest in the fashion doll

2   market prior to her talking to Mr. Larian just a few days after

3   she had met with Mr. Bryant.

4          Who knows which one of them is telling you the truth,

5   if either of them are.  But what we do know is that

6   Mr. Larian's testimony proves that MGA couldn't have come up

7   with a fashion doll before its theft.  Ms. Garcia's testimony

8   would prove that MGA wouldn't have developed a fashion doll

9   before its theft.  Either way, it's clear, and you know, that

10  MGA did not develop a fashion doll before the theft of Mattel's

11  designs.

12         And by the way, MGA is not alone.  No toy company has

13  ever been able to come up with a successful competitor to

14  Barbie.  There have been only two very successful fashion doll

15  designs in history:  Barbie and Bratz.  And Mr. Bryant and

16  Mr. Larian brought Bratz to MGA.

17         MGA had never seen anything like Bratz.  They were

18  selling products like Singing Bouncy Baby, Prayer Angels; and

19  well lost over $6 million in 2000.  In fact -- and this is

20  Exhibit 13956 -- since 2000, MGA has lost money on all its

21  nonBratz products in every year we have data for, except one.

22  And this wasn't disputed.  On its nonBratz products over that

23  time period it lost over $66 million in total losses.

24         But within just few weeks of seeing the Bratz

25  designs, Mr. Larian had decided already that he was going to





1   build a brand with Bratz.  As early as September 13, 2000, long

2   before there was ever a doll, based only on seeing Mattel's

3   designs, Mr. Larian already planned to risk and spend millions

4   to make this brand and line happen.  That's Exhibit 16788-1.

5           And by making this brand happen, he meant the

6   standard playbook, the standard routine, by which you build a

7   brand.  That was his testimony.  He was asked what you do.  A

8   line of accessories and licensing, that's all part of creating

9   a brand.

10          Mr. Larian is planning all of this right at the very

11  beginning, based just on receiving Mattel's confidential

12  designs.

13          Now, to repeat myself, Mattel is not seeking the

14  return of the money MGA spent.  Rather, Mattel is simply asking

15  that MGA and Mr. Larian not be allowed to benefit from their

16  wrongdoing.  And make no mistake, they believed from the very

17  beginning they were going to benefit by exploiting Mattel's

18  confidential information.

19          In October 2000 already, Mr. Larian projected

20  $25 million in sales in the first year alone.  This tells you

21  what?  This tells you what he thought of the designs.  All he

22  had seen at this point are the designs.  It tells you he knows

23  this product is going to transform his company.

24          Let's take a look at MGA's March 2001 business plan,

25  a plan based on the very concept that Mr. Larian had taken from

1    Mattel, written before any dolls had been brought to market.

2            As this plan makes clear, the strength of the Bratz

3    would come from its unique features, which he identified:  The

4    oversized eyes, with a hint of anime style; pronounced lips;

5    oversized feet and head; features which came directly from

6    Mr. Bryant's drawings.

7            Mr. Larian had to admit this.  He had to admit that

8    the Bratz unique features came from the drawings.  The drawings

9    had those features.  They were all there in the beginning.  And

10   they knew they would build a business around it.

11           Ms. Leahy told you the same thing.  That was her

12   testimony as well.  That these features that were unique to the

13   dolls, the oversized lips, protrusive lips, and the diminished

14   nose, all of those were in the drawings already.

15           Exploiting these unique features, Mr. Larian

16   implemented what he had planned from the beginning:  To build a

17   brand based upon Mattel's proprietary information.  Everything,

18   the advertising, the brand extensions, the accessories, the

19   licensing opportunities, all followed from this.

20           As he stated in his business plan, the cost to begin

21   licensing is minimal.  The success -- the only risk involved is

22   that the Bratz dolls would not sell through at market.  That's

23   what it all depended on.  He thought they would; and, of

24   course, they did.

25           Now let's take a look at how Mr. Larian and MGA went

Wednesday, August 20, 2008              Trial Day 37, morning session



1    about building the Bratz brand.  First, of course, it all

2    started with the dolls:  Cloe, Sasha, Jade, Yasmin.  You've

3    seen them all.  Dolls that were created only with Mr. Bryant's

4    drawings that had those unique features.

5         MGA may try to tell you that they shouldn't have to

6    give up profits on anything other than those four original

7    Bratz dolls.  But that's not the law, as the Court told you.

8         Remember, the law is, if you find that MGA and/or

9    Isaac Larian obtained profits or advantages because of the

10   specific wrongful acts, those profits and advantages should be

11   awarded to Mattel.  They cannot keep any profits that were

12   earned as a result of the theft of Mattel's proprietary

13   information.  And copyright law, as I'll get to in a little

14   bit, is the same thing.

15        Whether applied to the breach of fiduciary duty and

16   the other wrongdoing you found in the first phase of the trial

17   or the copyright claims, the concept is the same:  Crime

18   doesn't pay, directly or indirectly.

19        How else did MGA exploit Mattel's property?

20        Well, they came out with clothing and accessories for

21   the dolls.  As Mr. Meyer, MGA's expert, told you, there would

22   be no fashions, there would be no accessories without the

23   dolls.  And MGA extended the line, just as they had planned to

24   and said they would in October.  They came out with the

25   Bratz Boyz accessory, another accessory for the dolls.

 1              They, of course, don't look like the original Bratz

 2    dolls.  The Bratz Boyz don't necessarily look like the original

 3    Bratz dolls.  But neither do the other extensions or

 4    accessories or licensed products.  The point is, without the

 5    original Bratz dolls, none of them would even exist.

 6              Carter Bryant, and unknowingly Mattel, put MGA in the

 7    position where they were able to sell Bratz Boyz and all of the

 8    Bratz-branded products.

 9              Bratz Petz, same story.  Wouldn't exist, wouldn't

10    have Bratz Petz, without the original Bratz dolls.  Without the

11    Bratz dolls, no one would buy a Bratz pet.  And MGA knows this.

12    They showed the pet with the doll.  And this is an internal

13    e-mail, Exhibit 13872-003, and the testimony of Mr. Larian.

14    The suggestion was, they recognized it would be good to have

15    the owners displayed with the pet so people could recognize

16    them and buy them together, so people would know each pet, who

17    each pet belonged to, so you have a specific doll and you know

18    which pet to buy for.

19              Mr. Larian even told Mr. Bryant to make the Petz look

20    like the dolls; as Exhibit 13859:  We want them to look like

21    Bratz; big face, big eyes, fantasy.

22              They also took advantage of licensing opportunities.

23    I mean, this is how you build that brand.  Like, this helmet

24    here.  Nobody would be buying Bratz helmets today but for those

25    original Bratz doll designs.

1      A license means that someone wants to be associated

2   with your idea, so much that they will pay you money in order

3   to be associated with it, to be able to put the Bratz name and

4   the Bratz brand on their product.  That Bratz helmet only

5   exists because of the Bratz concept.

6      And while MGA will try to tell you that Bratz Boyz or

7   Bratz Petz or Bratz whatever had nothing to do with

8   Mr. Bryant's drawings, the truth is that none of them would

9   have sold except for their association with Bratz.

10      As Dr. Joachimsthaler, MGA's brand expert, told you,

11   MGA followed the standard playbook for branding:  It took the

12   designs from Mattel, which were a success in the marketplace,

13   and it used them to build the Bratz brand.

14      MGA's vice president of operations, Ms. Pembleton,

15   the first witness in this stage of the trial, admitted this.

16   She told you that the brand starts with the dolls.  The success

17   of the Bratz brand let MGA sell other products.  That was the

18   plan all along.

19      As you saw in that March 2001 business plan, they

20   knew there would be an opportunity to leverage the brand.  It

21   just depended upon whether the original four dolls would sell

22   at retail.  And, of course, they did.  And MGA then tied them

23   to other products in order to leverage Mattel's designs

24   further.

25      But, of course, all of these sales turned on the

8129

1    success of the original four dolls.  MGA admitted this in

2    litigation in Hong Kong.  This is Exhibit 13691-4 and -10,

3    statements that MGA made in suits that it brought.  Talked

4    about the major source of revenue generated by Bratz is income

5    derived from licenses, lucrative business of supplying

6    accessories to owners of the Bratz dolls.

7              Now, MGA had never done a license before.  They

8    never, in Mr. Larian and MGA's 13 years in the toy business,

9    had they come up with an idea that was good enough that anyone

10   would want to pay them in order to use it, or to use the name.

11             Mr. Larian ultimately admitted this; it's the first

12   time.  Although they had been a licensee, they had paid other

13   people in order to use other people's name, they had never come

14   up with an idea that was good enough that other people wanted

15   to pay them in order to use the name of an MGA product.  In

16   other words, you didn't have Singing Bouncy Baby or Prayer

17   Angels bicycle helmets or other products.

18             No one wanted to license any MGA product until MGA

19   stole Mattel's confidential information.

20             So what was the result of exploiting Mattel's

21   property?

22             As MGA's damages expert testified, without the Bratz

23   sales, it would be an entirely different company.

24             That's what we're asking you to do here, ladies and

25   gentlemen.  We're asking you to return MGA to the position they

8130

1    were in before the theft, or without the theft.

2              Let's talk about the benefits.

3              You've seen the jury instruction.  It says the

4    benefits received have to be returned from breach of fiduciary

5    duty, breach of duty of loyalty, interference with contract.

6              Let's talk about the benefits that were received

7    here.

8              Mr. Larian personally -- first, the benefits he

9    received.  And what I'm talking about now has nothing to do

10   with copyright.  We're only talking about the wealth that

11   Mr. Larian actually received as a result of wrongfully

12   obtaining Mattel's confidential information.

13             First, there are the checks that Mr. Larian caused

14   MGA to write to himself, using the profits from Bratz.  I don't

15   think there's any dispute about this number.  That's money in

16   the bank that Mr. Larian took out of MGA and put in his pocket.

17   The numbers are staggering.  Remember, Mr. Wagner showed you

18   Exhibit 13962, which is on the screen here.  Between 2002 and

19   2007, Mr. Larian took $385.2 million out of MGA.  If you want

20   to see the backup for that, for Mr. Wagner's calculation,

21   although I don't think this was disputed at all, it's

22   Exhibit 13932-23.  And by the way, this does not include

23   salary.  This is just distributions to him as a stockholder in

24   MGA.

25             Remember that last year, you will recall the

1   explanation, the numbers went down because MGA entered into a

2   credit agreement with the bank, where the bank required as a

3   term of it, to loaning the money, that Mr. Larian would agree

4   to certain caps on taking cash out.  They took out a loan from

5   a bank, in part to buy another toy company; that's why you see

6   that number going down there.

7          Now, you heard testimony that MGA has supposedly been

8   declining in value.  That has nothing to do with this number

9   here.  Even if MGA were to close its doors today, it would not

10  affect this number.  This number is money that Mr. Larian has

11  already taken home.  And this doesn't include the millions of

12  dollars that members of Mr. Larian's family has taken out of

13  MGA.  Mattel is not asking for any of that money back.  All

14  Mattel is seeking is the distributions that Mr. Larian received

15  as an owner of the company.  So that's one benefit that

16  Mr. Larian received.

17         The second benefit:  The value of Mr. Larian's

18  interest in MGA.  He owns more than 80 percent of MGA, over

19  80 percent of this company that he built with Mattel's designs.

20  And you have heard the testimony from Mr. Wagner about the

21  value of MGA that's attributable to Bratz.  You'll recall that

22  Mr. Wagner testified, and it was not disputed, that after the

23  first verdict, after you gave your first verdict, MGA came to

24  us and gave us tens of thousands of pages of additional

25  financial records.  The records weren't audited.  Some were





1    labeled "preliminary" or "draft."  We have no idea whether they

2    are accurate.  The records showed, Surprise, that the value of

3    MGA had supposedly gone down.  It showed it was worth far less

4    than the documents they had given us before trial.

5           By the time we got that new data in the middle of

6    trial, there was no way we could check it, but we asked

7    Mr. Wagner to run the numbers on the valuation, using this new

8    data anyway.  And based on that new data, produced after the

9    verdict, Mr. Wagner calculated that the value of MGA

10   attributable to Bratz, assuming the value had gone down as they

11   claimed in these new documents, was $379.8 million -- I'm

12   sorry -- that the value of MGA attributable to Bratz is $379.8

13   million, and Mattel's entitled to Mr. Larian's 80 percent share

14   of that, which is $310.8 million.  So if you add the

15   distribution number together with the Bratz-related value of

16   the stock, the total amount that Mattel is entitled to for

17   damages from Mr. Larian is $696 million.

18          Mattel is also entitled to damages against MGA.  Now,

19   there are billions of dollars that Mattel is not seeking here,

20   by the way.  MGA has generated $3.1 billion in revenue from

21   Bratz.  Mattel is not asking for all of that.  Rather, Mattel

22   is only seeking the profits from Bratz.

23          MGA paid Paula Garcia; it paid Carter Bryant; it paid

24   a receptionist; it paid advertising agencies; it paid hundreds

25   of people.  We're not asking you to give to Mattel any of those

1     costs related to Bratz.   Just the profits.

2          I want to take a minute to talk about how we have

3     calculated those general administrative costs, or operating

4     costs, the GNA, which you've heard testimony about from

5     Mr. Meyer and from Mr. Wagner.   Those are mostly salaries.

6     MGA did not track those administrative costs on a

7     product-by-product basis internally, so there's no simple way

8     to determine how to allocate them to Bratz or other products.

9     But as you can see, the more costs that are allocated to Bratz

10    projects at MGA, the lower the profits on Bratz are.   MGA has

11    every incentive to get that number up and mislead you about the

12    actual costs attributable to Bratz and make them seem large

13    than they are.   And that's exactly what they did here.   You

14    heard how Mr. Meyer allocated costs to Bratz.

15         Mr. Meyer, you will recall, was MGA's damages expert.

16    You'll recall, although he talked something about what he

17    called a regression analysis, he admitted that's not what he

18    did at all.   He only used the regression analysis to critique

19    Mr. Wagner's approach, and he said, to confirm his methodology.

20    What he actually did, the way he allocated these costs, was to

21    assume that MGA incurred costs, these costs, in direct

22    proportion to the revenue.   In other words, he assumed that the

23    projects that generated the most revenue also cost the most to

24    develop and to make.

25         He used this rule of thumb even though he had access

to all of MGA's records and employees, including Mr. Larian.

If he had bothered to look and ask, he would have learned that

MGA spent much more than 20 percent of its general

administrative costs on nonBratz products.

Remember what Mr. Larian said:  You look at hundreds

of ideas; you try to develop hundreds of ideas; and only one of

them will way pay off; 99 will fail.

That doesn't mean that you don't spent time and

effort.  That doesn't mean that you don't incur costs on those

99 products that fail.  In fact, the development costs will be

high.  Because the products generate little revenue, Mr. Meyer

would assume that there was very little cost associated with

them.  But Mr. Meyer's analysis ignores the reality that even

products that don't pan out, that aren't profitable, cost

money.

Mr. Wagner's cost allocation employs the correct

methodology.  He allocated the costs based on those actually

attributable to the product line.  And as it turns out, he did

a very good job.  How do we know that?  Mr. Larian told us

that.  You will recall that on the last day of trial, we asked

Mr. Larian what percentage of MGA's time and effort was focused

on developing nonBratz products.  Mr. Price asked him the

question.  We had no idea what he was going to say.  We hadn't

asked him that question in deposition.

We suspected that Mr. Larian wouldn't guess where we

1    were going.  We knew that Mr. Meyer's methodology was wrong and

2    that if Mr. Larian was caught unaware and answered candidly, he

3    would confirm it.  And sure enough, that's exactly what

4    happened.

5         He testified that in most years since 2000, MGA

6    devoted 30 to 50 percent of its efforts -- remember, we're

7    talking about salaries here; most of these GNA costs are

8    salaries -- to nonBratz products; and, in fact, some years up

9    to 60 to 70 percent.  Mr. Meyer's assumptions were directly

10   contradicted by Mr. Larian's testimony.  And Mr. Wagner's

11   analysis, as it turned out, was very close to Mr. Larian's

12   estimate.

13        You'll recall that Mr. Wagner ran the numbers.  And

14   as he told you, Mr. Meyer understated the profits of Bratz by

15   $200 million under his analysis and understated them by

16   $177 million under Mr. Larian's estimate.  So when you are

17   trying to decide which numbers to use, remember that

18   Mr. Larian's own testimony supports Mattel's approach to the

19   indication of these general and administrative expenses.

20        Mattel is also entitled to prejudgment interest on

21   the profits received from Bratz, both as to MGA and Mr. Larian.

22   The Court has instructed you on this.  So to recap the interest

23   calculation:  MGA's profits from Bratz were $777.9 million.

24   The prejudgment interest, at 7 percent on that, is

25   $226.2 million.  Mattel is also entitled to prejudgment



1    interest on the amount that Mr. Larian took home.  And that

2    interest is $93.5 million.  So the total damages that Mattel is

3    entitled to on the breach of fiduciary duty and other claims,

4    that wrongdoing that you already found in the first phase, is

5    $1,004,100,000 as against MGA and $789.5 million against

6    Mr. Larian.

7            And I want to take a moment to address a question

8    that may have occurred to some of you.  Included in MGA's

9    $777.9 million in profits is money that went to Isaac Larian.

10   You might be concerned that Mattel is trying to double-count by

11   asking for it to be awarded against both Mr. Larian and MGA.

12           Rest assured, as the Court has already indicated, the

13   Court will not let that happen.  Mattel does not seek to

14   recover twice, and Mattel will not be allowed to recover twice.

15   But Mattel is entitled to an accurate judgment against both MGA

16   and Mr. Larian.  The issue of collection, which defendant pays

17   which or how much, is something that you don't need to be

18   concerned about in arriving at your verdict.

19           Everything I've talked to you so far about relates to

20   Mattel's damages on the breach of fiduciary duty and the other

21   wrongdoing that you have already found.  I'm going to turn now

22   to the copyright damages and the copyright issues, which raise

23   some slightly different damages issues.

24           These are the damages that Mattel is seeking because

25   of Mr. Larian and MGA's infringements of Mattel's copyright in

Carter Bryant's drawings.  If you find that MGA's products have

infringed those drawings, then Mattel is entitled to copyright

damages.

First, let's talk about copyright infringement.

There are two elements to copyright infringement, as the Court

has told you.  First, Mattel has to show that MGA had access to

Mattel's drawings.  And here, it's not disputed, MGA had total,

complete, undisputed access.  They had possession of the

drawings since 2000; in fact, have possession of them to this

day.

The second element is substantial similarity.  And as

the Court has told you, the degree of similarity required in

order to support a finding of substantial similarity is

affected by the degree of access that MGA and Mr. Larian had to

the drawings.  The greater the access, the lower Mattel's

burden in proving similarity.

So here, we have total and complete access to the

copyrighted work.  They had the drawings.  Still have them.

Accordingly, the level of similarity that must be

found is correspondingly lower.

The Court also instructed you on substantial

similarity.  One of the things you have to decide is whether

any of the Bratz dolls or other works are infringing, whether

they are substantially similar to Mattel's designs.  And I want

to spend a few minutes now talking to you about that.

Wednesday, August 20, 2008                    Trial Day 37, morning session

1        You've heard a lot in this case from MGA about what

2   they did with Mattel's drawings, the work they did on them, the

3   themes they added, the fashions they added, the accessories

4   they added.  None of that matters for purposes of infringement.

5   As the Court instructed you, the Court has determined what

6   elements of the works created Carter Bryant are protected under

7   copyright law.  These are the elements that you should consider

8   for the purpose of your comparison of each of the allegedly

9   infringing works under the extrinsic test.

10       So understand the first part of the test, the

11  extrinsic test, your job is to look at these elements that the

12  Court identified to you in the drawings, the head, the lips,

13  and the combination of all of the elements in the drawings --

14  to look at them and decide if they are substantially similar to

15  those elements that appear in the dolls.

16       There are, to be sure, other elements in the dolls,

17  dissimilar elements; but they don't matter for the purpose of

18  this test.  The question is whether MGA substantially copied

19  protectable elements from the drawings, not whether it added

20  other material.

21       As the Court instructed you, Mattel does not need to

22  establish that the works it alleges are infringing are

23  identical or virtually identical to the works that it owns, nor

24  that the allegedly infringing works do not contain any

25  noninfringing material.



1    If you look at the images, you can see that every

2    single Bratz doll, ever single one of them, has elements that

3    are substantially similar to those things that the Court has

4    identified to you as being protectable.  And I'll show you that

5    in a moment.

6        The second step that the Court talked to you about is

7    the intrinsic test.  And under that test, you have to ask

8    yourself if a child would think the drawings have the same

9    overall look and feel as the dolls.

10       And they clearly do.  But I want to call two things

11   to your attention.

12       It is illegal for MGA, under the Court's instructions

13   of the law, to make what are called derivative works from the

14   Bryant drawings.  As this instruction makes clear, a derivative

15   work is something that is based on a copyrighted work.  MGA is

16   liable if you think a doll was based on or adapted from

17   Mr. Bryant's drawings.  It doesn't have to be a copy of the

18   drawings.  And there's no question that all of the Bratz

19   characters that MGA has touted to you as their creations are

20   derived from Mr. Bryant's drawings.

21       As this instruction makes clear, recasting,

22   transforming, or adapting Mattel's drawings is prohibited also.

23   So MGA cannot avoid Mattel's claims by pointing to things they

24   added to the Bryant designs or simply putting the designs or

25   the drawings in another form.

1    During the course of this trial, you've seen an

2    amazing change in position by MGA and Mr. Larian.  For six

3    weeks, they were here before you, battling, telling you, We own

4    the drawings, fighting over the drawings.  It's very important.

5    And now they're telling you, in the last two weeks, the

6    drawings don't matter at all; we did something entirely

7    different.  In essence, they've said, We own them; we own them;

8    we own them.  We don't own them?  Oh, it doesn't matter.  We

9    didn't use them anyway.

10    That's what you've seen in the course of this trial.

11    You've heard them, for the last two weeks, vigorously

12    deny to you that Carter Bryant's drawings aren't images of the

13    dolls at all.  I submit that the far more compelling evidence

14    is the position they took before this lawsuit ever even

15    started.  Then they took the exact opposite position.

16    Nana Ashong, for example -- this is Exhibit 551 --

17    recognized that the creation date for Bratz was September 18,

18    2000.  In other words, the drawings that Mr. Bryant created

19    prior to that date, Mattel's confidential information, defines

20    the Bratz dolls.

21    Mr. Larian agreed -- this is Exhibit 11907 -- you'll

22    recall him telling a reporter that the Bratz dolls were born in

23    September of 2000.

24    Mr. Larian testified in the first phase of this trial

25    that he had changed a presentation to state that the Bratz

1    dolls were launched in October 2000, long before the dolls were

2    ever on the market, when only drawings existed.

3         And in the first phase of this trial, Paula Garcia

4    told you that MGA's intention, the exercise, was to create a

5    3-D version of those 2-D drawings.  Do you remember what

6    Ms. Garcia told MGA's branding expert?  She told him that his

7    ability to create this amazing trend was very impressive, that

8    he started the Bratz trend; it all started with his drawings.

9         Now, of course, to avoid infringement, MGA has to

10   deny that the drawings and the dolls are substantially similar

11   in their appearance.  And as they have done throughout this

12   trial, they have told you what they think they need to tell you

13   in order to keep profiting from Mattel's designs in the future,

14   because -- and this is very important -- if MGA is not found to

15   be infringing, that's exactly what they will do:  Attempt to

16   keep profiting from these designs in the future.

17        But the truth is easy to see.  And we just ask that

18   you trust your own eyes on this.  Let's look at some of the

19   dolls and drawings side by side.

20        First, this is Sasha, who Mr. Bryant had named

21   Hallidae.  On the left is Mr. Bryant's drawing from his pitch

22   to MGA.  Then the second from the left is the final fashion

23   drawing.  The third from the left is the Sasha doll presented

24   at the Hong Kong toy fair in January of 2001.  And on the far

25   right is the final Sasha doll, in packaging, as sold by MGA in

1   2001.

2          As you can see, Mr. Bryant's Sasha drawings are

3   substantially similar to the Sasha doll.  The eyes, the lips

4   the diminished nose; they are all the same, all of those

5   protectable elements that the Court identified to you.  They

6   all have the unique characteristics that were identified in

7   MGA's business plan.

8          And aside from the overall similarities, which are

9   obvious, you can even see that the untied shoelace on the right

10  shoe is the same on the drawing and on the doll; the faces are

11  very similar; the proportions are almost identical.  If you

12  look at the fashions on this work, they are identical to the

13  fashions on the doll as sold by MGA.  MGA can tell you all they

14  want that Mr. Bryant's drawings were simply an inspiration and

15  that they didn't use them in making the dolls, but you can see,

16  trust your own eyes and what your own eyes tell you.  MGA

17  created the dolls directly from Mr. Bryant's drawings, and they

18  are very, very similar.

19         The same is true for the other dolls.  This is Cloe.

20  Next is Jade.  Finally, Yasmin, the doll that Mr. Bryant had

21  named Lupe.  And you can see that these dolls even have the

22  mole on the eye that Mr. Bryant had drawn on Yasmin's eye.

23         Let's take a closer look at the heads.

24         Mr. Bryant's drawings of Cloe's head are

25  substantially similar to the Cloe doll head.  The details of

Wednesday, August 20, 2008              Trial Day 37, morning session

8143

1    the drawings make this clear.  On the left-hand side, you have

2    the drawings.  Mr. Bryant made the two on the left.  MGA made

3    the one on the right.  These faces all share those unique

4    signature protectable Bratz qualities.

5            Next is Jade.  Then Sasha.  And finally, Yasmin.

6            What best, probably, shows this is a comparison of

7    just the faces so that you can just see the proportions and the

8    details.  You'll recall that one of the drawings that

9    Mr. Bryant notarized in 1999 when he was at Mattel was a

10   drawing just of faces.  And one of those drawings,

11   Exhibit 5-0074, is on the left.  And just for comparison

12   purposes, we blocked out the back portion of the head and the

13   hair.  And on the right is the face of the actual Yasmin doll

14   as sold by MGA in 2001.  Again, we blocked out the hair so that

15   all you can see is the face.  Look at the eyes, the shape of

16   the lips, even the jaw line.  Looking at this, you can see the

17   face of the Bratz dolls sold by MGA is the very face that comes

18   from Mr. Bryant's drawings.

19           But the similarities aren't limited to the face.  In

20   fact, the body sculpt of the Bratz doll is directly based on

21   Mr. Bryant's drawing and the sculpt that he helped create while

22   he was at Mattel.

23           Take a closer look.  On the left-hand side there, we

24   have Exhibit 3230032.  That's Mr. Bryant's sculpt drawing, a

25   drawing he intended Ms. Leahy to use to create the sculpt.  And

Wednesday, August 20, 2008              Trial Day 37, morning session




1  as you can see, the proportions of the Bratz sculpt come

2  directly from Mr. Bryant.  The relationship between the big

3  feet, the lower legs, the upper legs, the waist, the torso, the

4  arms, and the head; all are the same in the doll and the

5  drawing.

6        MGA's talk about, This was just an inspiration,

7  becomes irrelevant when you look at the dolls.  This wasn't

8  evolution.  It was execution.  It wasn't inspiration.  It was

9  duplication.  The doll MGA came out with is the doll that MGA

10 came in with.  When they spend their time trying to tell you

11 anything else, they are not showing you something about the

12 dolls.  They are telling you something about themselves.

13       They are telling you that they are still denying the

14 wrong that they committed.

15       Now, MGA has spent last week showing you in which

16 they made changes from the drawings to the dolls, changes that

17 you can only see by blowing them up to an 8-foot image and

18 having a professional sculptor get up there and point them out.

19       In the end, the issue is not how many small changes

20 MGA made along the way.  That is not the test.  It's a question

21 of substantial similarity.  The only question is, is the

22 finished product, as it finally comes to market, substantially

23 similar to the drawings?

24       Mr. Nolan told us in the Phase 1-A closing what kind

25 of little changes that they have made, that they have been

1    focusing on, don't make any difference at all.  You will recall

2    he told us this, that you can change the dress, you can change

3    the evening wear, you can change the color, you can add color;

4    it doesn't change the characters.  They are to remain the same,

5    despite these little changes.

6           And also, please remember that when you're assessing

7    substantial similarity, as the Court instructed you, you have

8    to judge this not from the standpoint of a professional

9    sculptor who has some pride of authorship and can stand in

10   front of an 8-foot-high blown-up image of a head, but from the

11   standpoint of a child.  That's the law.  Is a child going to

12   consider it to be substantially similarity?

13          All of MGA's testimony last week about the small

14   changes that Ms. Leahy and Ms. Garcia made are simply

15   irrelevant to that inquiry.

16          Before this phase of the trial, MGA's own witnesses

17   admitted that the dolls looked just like the drawings.  You

18   will remember this testimony.  First, Janet Bryant testified

19   that Carter Bryant was so pleased that they did look so much

20   like his drawings.  Kerri Brode, MGA employee, she recognized

21   in drawing after drawing -- and these are just a few examples

22   we're going to show you here -- that the drawings were the

23   Bratz dolls.  "Do you recognize this as a rendering of a Bratz

24   doll?"  And her answer, in every case, was "Yes."  These

25   included drawings she had never seen before.  But she

1    recognized them as a Bratz doll, like any consumer would.

2           And remember, Ms. Garcia told a reporter -- and this

3    is Exhibit 100001-0001 and 2 -- she said, when she talked to

4    the reporter, "I tried to stay true to this inventor/creator's

5    vision."  MGA's plan from the very beginning was to make these

6    dolls as similar as they could to these astonishing drawings

7    that Mr. Bryant brought them.  And they succeeded.

8           Let's look now at what MGA told the United States

9    copyright office, when it claims that it owned the drawings.

10          You'll recall that in 2005, MGA amended its copyright

11   registrations for each of the dolls; and when they did that,

12   when they amended the dolls' copyright registrations, they

13   amended them to state that they were derivative works,

14   derivative of Mr. Bryant's drawings.

15          Let me show you an example to remind you of this.

16   This is Exhibit 558-1.  This is the correction to the Jade

17   copyright registration for the Jade doll configuration.

18   Remember, it had the package; it had the doll in it.  Down at

19   Line 6-A, they identified the amendment as a derivative work of

20   the Jade drawing, VA1218487.  That's the copyright registration

21   number for the Jade drawing.

22          Let's take a look at that.

23          There it is.  That's the 1218487, the Jade drawing.

24   They amended it to say it was derivative of the Jade drawing.

25   And they did that with each of the other three dolls.  They



Wednesday, August 20, 2008          Trial Day 37, morning session



1  filed amendments to say that they were derivative of the

2  original drawings which had been filed.

3          So that's what MGA said to the U.S. copyright office

4  when they still claimed that they owned the drawings.

5          Now let's look at what they said when they tried to

6  use those drawings to stop others from making dolls.

7          One thing they said about other companies' dolls was

8  that their dolls were reproductions of the drawings that Mattel

9  now owns.  Reproductions of the drawings.

10          The City World case -- you'll remember this -- in

11  City World, MGA brought a lawsuit in Hong Kong against the

12  manufacturer of the dolls called Funky Tweenz.  And as you can

13  see, MGA said in their complaint in that case that the

14  Funky Tweenz dolls were reproductions of its original artistic

15  works.  They identified 17 design drawings.

16          And on the next page, MGA actually says that the

17  Funky Tweenz are reproductions of the drawings.  "Fashion dolls

18  known as Funky Tweenz which are reproductions or a reproduction

19  of a substantial part of the said artistic works."

20          We just looked at those.  The only artistic works

21  identified were Carter Bryant's 17 design drawings.

22          Now, we knew they had said these things in these

23  cases in Hong Kong, because we could get copies of the

24  pleadings.  But what we didn't know is what the dolls were, the

25  Funky Tweenz that they had sued over.  So we tried to figure



1   that out.  You'll recall we called Mr. Kamarck and

2   Mrs. Gronich, both former chief lawyers for MGA; and we asked

3   them, What dolls did you sue on?  And I'm sure you can remember

4   that very long day, when both of MGA's former chief lawyers

5   were on the witness stand and they couldn't remember anything,

6   couldn't remember what they had sued on, the dolls, about these

7   lawsuits that they had brought.

8          In fact, in opening, we guessed wrong about one of

9   these Trendy Teenz dolls.  We showed you what we thought was

10  one of the Trendy Teenz that MGA had sued on.  And it turns out

11  that they had sued on a different Trendy Teenz doll, but we

12  couldn't get -- you know, we got the lawyers on the stand; we

13  got that straightened out, ultimately, because we had to fly in

14  lawyers from Hong Kong, you'll recall, to tell you what those

15  cases were about and what the dolls were that were sued on

16  there.

17         But if you go back to that City World case and you

18  look at the dolls, you can see why Mr. Kamarck fought so hard

19  and claimed not to remember anything about the doll they sued

20  on.

21         Here on this slide on the left, Exhibit 13709, is the

22  Funky Tweenz doll that they sued on, that they said was a

23  production of Mr. Bryant's drawings.  And it is substantially

24  similar to Mr. Bryant's drawing of Sasha there in the middle.

25  But the Bratz doll on the far right-hand side is clearly far

more similar to the drawings than the Funky Tweenz.  Most
telling of all, after Mattel filed this case, ladies and
gentlemen, they amended their complaint in <u>City World</u> to drop
all reference to the drawings.  When you do an amendment in
Hong Kong, you'll recall the testimony was that you have to do
a red-line-it or track changes.  And you can see there at the
top, they took out -- they said, No, we're not suing on the
drawings; and they brought in this other stuff about the
sculpts and the models of the head and the molds.  They went to
all this trouble amending their complaint to delete reference
to the drawings, having their chief lawyers not remember the
lawsuits that they had sued on and supervised, because they
know how important it is, what they said to the courts in Hong
Kong.  Because they admitted, back when they thought no one
would ever discover the theft, that the company which owns
these drawings can stop others from making dolls that look like
the drawings, dolls which don't look near as similar to the
drawings as MGA's Bratz dolls.

     Now MGA has to run from those statements.  And you
watched them do it.  You saw Mr. Kamarck.  You saw Ms. Gronich.
They said what they thought they needed to say in order to keep
Bratz.  MGA knew if it admitted to you what it had claimed was
similar in Hong Kong, you would hold them to the same standard
and they would be found to have infringed Mattel's copyrights
and the drawings.  When confronted with the dolls that the


Wednesday, August 20, 2008          Trial Day 37, morning session

1    suits were based on, you'll recall, they went so far -- and I

2    found this astonishing -- to say in two cases, Oh, having seen

3    the doll, I wouldn't have brought that suit.  Do you recall

4    that?  In two cases.

5            In other cases, MGA added molds, sculpts, face

6    paints, and other works to their complaints.  One instance of

7    that is the Unifortune case.  But you'll recall the testimony

8    on this, and the complaint, that MGA admitted that when they

9    added these sculpts, molds, and the other things, each of these

10   other works were based on the 18 design drawings.  And

11   Mr. Young, the attorney for Unifortune and Double Grand,

12   explained that that language meant exactly that, that all of

13   the works that MGA identified, all of these other things, the

14   molds, the sculpts, were based on Mr. Bryant's drawings,

15   drawings that you found were created by Mr. Bryant at Mattel

16   and which are owned by Mattel.

17           In the Double Grand case, MGA's cease-and-desist

18   letter to Double Grand made it clear that MGA was suing on the

19   design drawings.  The letter they wrote to Double Grand, it

20   refers only to the drawings, not to the molds, not to the

21   sculpts, not to anything else.  They even made it clear that --

22   they said the same thing about this pen, when they brought the

23   lawsuit about the pen.  That's Exhibit 13561208.  We showed you

24   other lawsuits where MGA said that products copied Mr. Bryant's

25   drawings.

1    Here are other examples of what MGA said were
2    reproductions of Mr. Bryant's drawings.  This on the left-hand
3    side is one of the Glitter Girls that they sued Unifortune on,
4    next to a Cloe doll and drawing.  They said it's a reproduction
5    of it.
6        Here's a different little girl, next to the Jade
7    drawing.  And you can see, this doll on the left-hand side,
8    this Glitter Girl, was sort of meant to follow the elements of
9    the Bratz design.  Look at the large boots, the accessory
10   clothes, the signature pet logo.  But look, too, at the smaller
11   eyes, lips, feet, and head.  The Glitter Girls, obviously, are
12   not Bratz.  But MGA readily alleged, had no problem alleging,
13   that this was a reproduction of a substantial part of the said
14   artistic works.
15       And look at Glitter Girls here on the left-hand side.
16   Look at this and ask yourself how MGA can seriously contend
17   that while that doll, while Unifortune's dolls, were
18   substantial reproductions, as they claimed, of the Bryant
19   drawings, MGA's dolls are not.
20       The Glitter Girls are certainly similar to Bryant's
21   drawings, but not nearly as similar as the Bratz dolls
22   themselves.
23       Here on the upper left is the Mini Trendy Teenz made
24   by Double Grand before MGA drove it out of business.  MGA said
25   that the Mini Trendy Teenz copied Cloe.  Next on the upper

1    right there is the Cloe doll's face, and below is Mr. Bryant's

2    drawings of Cloe.  And, again, the Bratz doll is clearly more

3    similar to the Bryant drawing of Cloe than the doll MGA claimed

4    was a copy of the drawing.

5            And here is the Scamps doll, next to the Yasmin doll.

6    MGA said this doll, the Scamps, was, apart from its size -- and

7    I quote -- "virtually the same as Bratz," and called it "a

8    slavish copy of Bratz."

9            And finally, we come to the Glamajamas.  Now, MGA

10   never sued on the Glamajamas doll.  But both Mr. Larian and

11   Mr. Kamarck wrote to Bandai, the company that made the

12   Glamajamas.  Mr. Larian accused Bandai of shameful copyright

13   infringement, pointing to the birthmark, the eyes, and the nose

14   of the Yasmin doll.  Mr. Kamarck's letter pointed out other

15   similarities:  The disproportionately large head and feet, the

16   shape of the face, the nose, the lips, the eyes.  He said it

17   was obvious even to a casual observer, and he threatened Bandai

18   America, Do not test MGA's resolve in this matter.

19           Well, here's that doll, the Bandai Glamajamas doll,

20   on the left-hand side, Exhibit 13732, which MGA said was a

21   shameful copy of Yasmin, on the right side here.  Neither

22   Mr. Kamarck nor Mr. Larian would admit, to you at least, that

23   this was the doll they were talking about.  But the doll has

24   the same manufacturer; it's got the same date on it, the same

25   year, the same name, Maya, and the same birthmark.  You can



     1   see, from all these dolls that they brought these cases on,

     2   that MGA understood that to copy the Bratz drawings, a doll

     3   need not be identical to them.  While these dolls did not look

     4   exactly like Mr. Bryant's drawings, each of them was designed

     5   to share the unique characteristic of Bratz:  That large head,

     6   the large eyes, the large lips, the diminished nose, the

     7   oversized feet.

     8            Remember what Mr. Larian told his lawyers about the

     9   Double Grand cases?  He said he wanted to hurt them.  He said,

    10   Damn them.  But MGA is no different; they're just the same as

    11   the counterfeiters they pursued in Hong Kong.  MGA is just one

    12   more company that makes dolls that look like the drawings,

    13   drawings they don't own.  That's Exhibit 13561-37.

    14            And the dolls that MGA makes are much closer to

    15   Mr. Bryant's drawings than the dolls they claimed were

    16   reproductions, that they sued on in Hong Kong.

    17            I submit that in assessing this issue of similarity,

    18   it's fair to take into account the factual statements regarding

    19   copying, reproduction, and similarity which MGA made when they

    20   claimed that they owned the drawings.

    21            In light of what MGA said regarding those dolls in

    22   Hong Kong, it's easy to see that the later Bratz dolls are

    23   infringing.  The later-wave dolls -- let's take a look at the

    24   first Cloe doll versus the 2002 Cloe doll.  The similarities

    25   here are striking:  The head, the face, the body.  MGA admits



1    that the sculpt never changed.  It's the same sculpt.

2            Let's look at the later-wave Cloe dolls that came out

3    in 2002 and 2008.  Again, these all share those unique

4    characteristics of the Bratz design.  The change in hair,

5    makeup, or clothes does not change the later-wave Bratz dolls.

6    The later-wave Bratz dolls are still Cloe.  These fashions

7    dolls, they are supposed to change.  You're supposed to be able

8    to change the clothes; you're supposed to be able to change the

9    hair.  That's the whole point of them.  That's the play pattern

10   with a fashion doll.  And that's exactly what Mr. Bryant

11   envisioned in his original pitch.

12           Remember what Mr. Nolan said:  Changing the fashions

13   or the hair doesn't change the dolls.

14           This is true of the later-generation Jades, Sashas,

15   and Yasmins.  You've got Sashas, Yasmins, and Jades from one

16   2001, 2007.  They don't change.  Even the new characters are

17   infringing.  They're substantially the same.  They share the

18   same sculpt.

19           Here's Yasmin and new characters, Dana and Nevra.

20   The face, the lips, the eyes, all are similar, far more similar

21   than the dolls that Mr. Larian damned Double Grand for.

22           MGA knew that it was the size and style of the eyes,

23   the size of the head, the pronounced lips, that made Bratz

24   unique.  Remember, it was in that March 2001 business plan,

25   Exhibit 13520-1 and 15 -- they knew those were the unique





 1   characteristics.  The dolls they sued on in Hong Kong, while

 2   different in other respects, shared these unique Bratz

 3   characteristics.  Because whatever other differences existed in

 4   those products, they shared the core protectable Bratz

 5   characteristics that make them unique.  And it's true of every

 6   single Bratz doll that MGA has made.  Not just the first four.

 7   Every single one of them.

 8           Now, of course, MGA seizes on little differences

 9   between the dolls and the drawings.  But as MGA insisted when

10   it thought it owned the drawings, the test is not identity.

11   The dolls don't have to be identical.  They just have to be

12   substantially similar.  And that's why MGA's argument that

13   their Bratz dolls don't infringe the Bryant drawings is wrong.

14   Of course MGA changed little things on the later dolls.  Of

15   course they changed the hair color, the makeup, the clothes.

16   They want repeat customers.  They want customers to buy more

17   than one doll.  If they change nothing, that's not going to

18   happen.  But if they change too much, if they depart too much

19   from that unique Bratz look, it won't happen either.

20           Customers have to be able to readily identify the

21   later lines of Bratz dolls as Bratz line extensions and as

22   Bratz products.

23           MGA cannot sell a new product as part of the Bratz

24   brand unless each new product stays true to the core Bratz

25   look.  MGA knows this.  You'll remember, MGA's designer, Louis

Wednesday, August 20, 2008              Trial Day 37, morning session

 1    Domingo, who took the stand last week, showed you his drawing

 2    for the Bratz Tokyo A Go-Go dolls that were released in 2004.

 3           Now, MGA could have made a doll that looked exactly

 4    like this.  It could have.  But it didn't, as Mr. Domingo

 5    testified.  Instead, the final Bratz Tokyo A Go-Go doll, Sasha

 6    doll, was readily identifiable as a Bratz Sasha doll.  It

 7    needed to share the basic characteristics.  They could have

 8    made a doll like this, but they didn't, as Mr. Domingo

 9    acknowledged.

10           MGA's later dolls can't be exactly the same or there

11    will be no new sales.  But they still have to be identifiably

12    Bratz; they have to be substantially the same, or there will be

13    no sale at all.  MGA knows that, but they have to deny it now.

14           MGA's argument is so strange that Ms. Garcia made the

15    remarkable statement when she was on the stand that the Bratz

16    Twins were identical but totally different.  You'll recall

17    that testimony.  And that really cuts to the heart of the

18    matter here, as far as when MGA talks about later-generation

19    Bratz.  They have the same sculpt, the same large head, the

20    same unique eyes, the same diminished nose, the same large

21    lips, the same oversized feet.  But MGA says they are totally

22    different, just like the Bratz Twins.  Identical, but totally

23    different.

24           Now, let me repeat, if you do not find that the later

25    Bratz dolls infringed Mr. Bryant's drawings, then MGA will be

1    free to profit from their theft in the future.  Whatever

2    damages you award, if you don't find that the Bratz dolls are

3    infringing, MGA will be able to continue copying the ideas and

4    drawings which they wrongfully induced Mr. Bryant to bring over

5    from Mattel.

6         MGA says they are a great toy company.  They say they

7    can package, market, brand, sell anything.  Fine.  Then tell

8    them to sell anything else, anything other than the dolls they

9    stole from Mattel.

10        If you find copyright infringement, then you have to

11   determine what the damages are that have resulted from that

12   infringement.  And the starting point for copyright damages,

13   like the damages on the other claims, are the profits that MGA

14   and Mr. Larian have made on Bratz.  And remember, as I told you

15   earlier, copyright law also says that Mattel is entitled to

16   indirect profits in addition to direct profits, indirect

17   profits that result, at least in part, from infringement of

18   Mattel's copyrights in Carter Bryant's drawings.

19        On copyright damages, there's a threshold question

20   you have to consider; and that's whether the infringement was

21   willful.  In other words, did MGA know that they were making

22   dolls that infringed drawings that they had no business owning?

23   And I think it's pretty clear that MGA knew exactly what they

24   were doing.  The importance of finding willfulness is it

25   means -- and you heard testimony about this -- that MGA is not

1   entitled to deduct those general and administrative expenses

2   from its revenues for purposes of calculating copyright

3   damages.  The Court instructed you on this.

4          If you find that MGA's infringement was not willful,

5   then the profits number you should use is this $777.9 million.

6   But if you find that MGA willfully infringed, then those

7   general and administrative expenses are not deducted, and the

8   number you should use is $1,121,300,000.  And here on the

9   screen, we have put both of those numbers.

10          With regard to Mr. Larian, it doesn't matter whether

11   you find willful infringement, because he doesn't have

12   overhead; he doesn't have those general and administrative

13   expenses.

14          The measure of damages is the value of Mr. Larian's

15   benefits received from Bratz, his distributions and the

16   Bratz-related value of his interest in the company.

17          And remember that we gave Mr. Larian the benefit of

18   the doubt and calculated that value based upon those tens of

19   thousands of documents, late-produced financial documents, that

20   we received after your verdict.

21          So, as to Mr. Larian, the copyright damages are

22   $696 million.

23          **THE COURT:**  Mr. Quinn, I'm sorry to interrupt you,

24   but one of the jurors has indicated a need for a quick break;

25   so we're going to take a brief break here.



1        (Jurors exit courtroom.)

2        (Brief recess taken.)

3        (JURORS ENTER COURTROOM.)

4        **THE COURT:**  Counsel, you may resume.

5        **MR. QUINN:**  Thank you, Your Honor.

6        We were talking about the copyright damages.

7        MGA is going to ask you to apportion the copyright

8    damages; that means to assign some of the Bratz profits to

9    things that they did which they say are not intermingled with

10   the infringement.  They want credit for other work they did to

11   exploit the Bratz drawings.

12        And I submit when you hear this evidence -- or when

13   you hear the argument, you're to see, it's like asking for

14   credit for being good thieves, frankly; for doing a good job

15   exploiting the theft.  It's like a guy who steals a television;

16   he says that he should get a good break because he sold it at a

17   good price so he should get to keep some of the price.  Really,

18   here, they could be making one of two arguments.  They could be

19   saying that because of their hard work and skill, they profited

20   from their theft more than someone else would have.

21        But there's no reason to reward them for being good

22   at infringing Mattel's designs, even if they were.  And we've

23   already deducted all of the costs for the packaging, the themed

24   development, the brand building activities; that was all

25   deducted from the costs.  We gave them credit for that, and

Wednesday, August 20, 2008          Trial Day 37, morning session

```
 1    we're not asking that they pay that again.
 2            Alternatively, they could be saying that what they
 3    did was so valuable that consumers were buying the Bratz for
 4    that contribution, those other things that they were doing,
 5    rather than the doll; like the packages.  But obviously, that
 6    makes no sense.  Nobody buys Bratz for the packaging.  They buy
 7    them for the dolls, the dolls which came from Mattel's designs.
 8    And the law recognizes this concept.  It's one of the
 9    instructions that the Court gave you; that if the copyrighted
10    portions are so intermingled with the rest of the infringing
11    works that they cannot well be distinguished from it, the
12    entire profits realized by the defendants are to given to the
13    plaintiff.
14            In other words, could they have sold their
15    contributions separately, or is it so intermingled with the
16    infringing work?
17            And if you look at MGA'S claimed contributions, it is
18    clear that they are intermingled with Mattel's designs.
19            Could MGA have sold the package without the doll, or
20    the fashions without the Bratz doll?
21            Of course not; the consumers bought the doll, and
22    everything followed from that.
23            This might make sense, for example, in a situation
24    where you're talking, for example, about a music CD that has
25    eight songs on it, and there's only one song on it that's an
```





 1  infringing song, infringes somebody's copyrighted song and

 2  seven that don't.  In that situation there is value added by

 3  the other seven songs.  In that case it would make sense to let

 4  the infringer keep the value of his contribution, the other

 5  seven songs.  But it does not make sense here when the entire

 6  value of the product comes from the infringement.

 7      No one bought a Bratz for the package or the label

 8  art, they bought it for the dolls.  MGA is like a seller of a

 9  music CD who steals all eight songs; claims they should really

10  get credit because people bought it for the liner notes; that's

11  really the analogy here.

12      What MGA was describing when they talked about

13  everything that they did to develop and market was only a

14  description of their copying process.  Of course, they had to

15  create and refine sculpts; they had to have a package; they had

16  to do these things just to sell what they wrongfully took.

17  That's the Infringement.  They shouldn't get credit for that.

18      In fact, one of the things that MGA wants credit for

19  here, the packaging, is itself infringing.  The packaging

20  itself is infringing.  It's primarily designed, in the first

21  place, just to show the dolls; it's basically clear and it

22  shows off the dolls, which are infringing.  Then it's got the

23  name all over it, which was brought over by Mr. Bryant from

24  Mattel.

25      Remember that Paula Garcia told you that MGA did not

1    use anything -- this is the testimony on the left-hand side --

2    from Mr. Bryant's drawings to create the Bratz packaging; that

3    was her testimony.  But once again this simply isn't true.

4         You see this image here, this is the package here,

5    and it's got the symbol of this doll which appears on the back,

6    the bunny on the back part.  In fact, that's picked up on the

7    packaging, that Mr. Bryant came up with these images -- if we

8    can show the next slide -- there's a symbol for each of those

9    core characters which came from Mr. Bryant's drawings which are

10   on the top here and then how they have been incorporated into

11   the packaging.

12        The symbol for each of the core characters infringes

13   the drawings also.  If we could go back to that previous slide.

14   This appears on each of the drawings, the so-called "hero

15   shot."  The group shot of all four Bratz itself infringes and

16   appears on the packaging; so I submit to you that the packaging

17   is not something they should get some extra credit for; it's

18   part of the infringement itself.

19        MGA gets to deduct its costs from the revenue it

20   generated.  We're not trying to take back that money; we're

21   just saying they should not be allowed to make money on these

22   things they did with Mattel's ideas.

23        Even if you determine that MGA has met its burden and

24   its burden of proof on this to show that apportionment is

25   appropriate, if you determine that MGA proved that its



 1    contribution is really like the seven non infringing songs on a

 2    music CD, then they also have to prove the amount of that extra

 3    value that they added above and beyond the infringement.  And

 4    they have not done that.

 5         The only evidence that MGA offered as to how much

 6    should be apportioned was through Mr. Meyer.  And to establish

 7    a benchmark, you remember his testimony, he said you should

 8    assume that MGA would be able to achieve the same rate of

 9    return on Bratz as Mattel achieves on Barbie and that MGA

10    should only have to pay damages on profits it made on a rate of

11    return that is above a rate of return equal to Barbie.

12         Now, Barbie, of course, is one of the most successful

13    toys in history, and using Barbie as a benchmark, Mr. Meyers

14    concludes that MGA should be able to keep 95 percent of all

15    Bratz profits; really, 95 percent of the profits are not

16    attributable to the infringement, to the appearance of the

17    doll, to the design.  That was his testimony doing this analogy

18    to Barbie.  Here's how absurd that is.

19         You saw this chart when Mr. Meyer was on the stand,

20    and it showed his calculations; it's 13861-11.  He looked at

21    seven years of Bratz' profits and using his analysis, he

22    concluded that in four years of the seven, not a single dollar

23    of profit was attributable to the design or the appearance of

24    the dolls; it was all packaging and themes and other things.

25         Not $1 of the $747,300,000 MGA -- I'm sorry, the

1    $247,300,000 MGA made on Bratz in those years came from the

2    design of the dolls according to his analysis.

3            I think that tells you all you need to know about

4    Mr. Meyers' analysis of what the right amount of apportionment

5    would be, if you assume that any amount is all.  You obviously

6    should not rely on this kind of obviously flawed analysis to

7    allow MGA to keep the proceeds of their infringement.

8            Now I'd like to turn to the concept of fraudulent

9    concealment, which you heard some instructions on.  As the

10   Court has told you, unless Mattel can demonstrate that MGA

11   fraudulently concealed that Mr. Bryant created Bratz while he

12   worked at Mattel, then two of Mattel's claims would be barred

13   by the statute of limitations:  That's the claim for conversion

14   and the claim for tortious interference with contractual

15   relations.  The other tort claims and the copyright claims are

16   not affected by this.

17           MGA and Mr. Larian sat here in front of you and

18   fraudulently concealed what they had done.  The evidence on

19   this, I submit, of fraudulent concealment and how it was

20   hidden, that he had worked on this while he was at Mattel, is

21   overwhelming.  You watched MGA'S witnesses trying to hide the

22   fact that he had done this at Mattel.

23           You recall that Michael Moore, MATTEL'S in-house

24   lawyer, told you that it was not until November of 2003 when he

25   went to Hong Kong that Mattel got a copy of Mr. Bryant's



8165

1   contract with MGA; that the lawyers at City World gave it to

2   him that said that contract dated in September of 2000, when he

3   was still employed by Mattel.  It was not until then that

4   Mattel first realized that Mr. Bryant had been working for

5   Mattel and MGA at the same time.  It had been fraudulently

6   concealed up until then.

7        Until the time of the verdict, until the time of your

8   verdict in the first phase, Mr. Larian and MGA were hiding the

9   truth.  Remember what Mr. Nolan told you in the very first

10  opening in this case?  He told you that they would prove that

11  at all times Carter Bryant abided by his obligations in that

12  contract.  And then he went on to say that Carter Bryant did

13  his drawings in 1998, while not employed by Mattel.

14       That concealment continued right into this trial.

15       You recall the testimony of Rachel Harris, that she

16  had to keep Carter Bryant's lunchtime visits a secret; that

17  people weren't to know about this.  And of course you remember

18  all of the newspaper articles in which Mr. Larian told

19  different stories about where Bratz came from, none of them

20  true.  He even told you here, he repeated to you his fashion

21  doll design contest story while he was on the stand at this

22  trial; that was all fraudulent concealment.

23       Is there any question that MGA hid the truth?

24       Now, MGA has tried to cloud this issue.  You heard

25  testimony about 'didn't people at Mattel know or suspect or



Wednesday, August 20, 2008          Trial Day 37, morning session



1   weren't there rumors that Mr. Bryant was involved with Bratz or

2   had created Bratz?'

3           Do you recall that testimony?

4           'Didn't people know that he was involved with Bratz?'

5           That's not the question.

6           The question is, 'When did Mattel know not that he

7   was involved with Bratz or that he had created Bratz, but when

8   did Mattel know that he had done it while he was employed at

9   Mattel and had a contract that said that anything he created in

10  Mattel's line of business would be owned by Mattel?'

11          That is what was fraudulently concealed.

12          Now finally I'll turn to the topic of punitive

13  damages.

14          Up to now, as I've told you, the damages we were

15  talking about are of the crime-doesn't-pay variety.  You can

16  award Mattel every dollar I've asked you to award up until now,

17  and all you will have done is take away the profits that were

18  wrongfully earned.  Punitive damages are your opportunity to

19  say not only does crime not pay, but it needs to be deterred so

20  that it won't happen again.

21          You may award punitive damages, as the Court told

22  you, if you find Mattel has proven by clear and convincing

23  evidence that MGA or Isaac Larian acted with malice, fraud, or

24  oppression.  What that means is that they acted with an intent

25  to injure Mattel or without regard to whether Mattel would be



1    injured; that they acted despicably or fraudulently.  And, of

2    course, they have, all three.

3              MGA and Mr. Larian acted with malice, because at the

4    least, they didn't care about injuring Mattel.  Remember what

5    Mr. Larian said at his deposition?  It didn't matter to him if

6    Mr. Bryant had created Bratz while employed by Mattel.  MGA and

7    Mr. Larian both knew, they knew, that they were taking

8    something that belonged to Mattel.

9              We have fraud also because Isaac Larian, Paula Garcia

10   and other MGA employees lied to Mattel, to newspaper reporters,

11   and even to you from the witness stand, about what they had

12   done.

13             We have oppression, because, surely, if any man, any

14   company, ever acted despicably in business, it's Isaac Larian

15   and MGA.  He stole these designs from Mattel.  He hid what he

16   had done.  He instructed Victoria O'Connor to alter documents

17   to hide what he had done; and when she told the truth at her

18   deposition, he fired her brother.  He knowingly and willfully

19   employed Mattel's sample makers through people who used fake

20   Social Security numbers to hide their wrongdoing for years.

21   And when Mr. Price asked him about that, he had a rare moment

22   of honesty.  Do you remember what he said?  He admitted that he

23   would not have done anything about it.  That's just the way he

24   does business.  And I'm sure, I'm sure, we've only seen the tip

25   of the iceberg.

1    Mr. Larian lied to you when he told you on the

2  witness stand last week that he accepted your verdict.  Do you

3  remember that?  He lied to you.  He told a reporter that very

4  same day that Mattel's lawyers had just succeeded in confusing

5  him.  He admitted to that.  He hasn't accepted your verdict.

6    When you are deliberating about whether to award

7  punitive damages, here's what you should ask yourself.  If

8  Mr. Larian has a chance to steal someone else's idea, someone

9  else's design in the future, and he knows, 'best case, I make a

10 fortune; worst case, I just have to give it back,' what will he

11 do in the future?  What will he think?

12    I'll tell you what he'll think, if that's all he has

13 to do is give it back:  He'll think 'no e-mails next time.'

14    You have an opportunity to teach him that if you get

15 caught taking what is not yours, people won't just let you

16 break even.  And in deciding punitive damages, the court is

17 going to instruct you to take into account the net worth of

18 Mr. Larian and MGA because the amount of the award that you

19 have to make to get someone's attention to teach them a lesson

20 depends on how much money they have.

21    Here is the net worth of MGA and Mr. Larian; this is

22 in evidence, it's Exhibit 13969.  I'd like you to please

23 remember that in calculating the value of MGA and Mr. Larian's

24 ownership interest in MGA, we used those numbers that they gave

25 us, the late-produced financial information, the lower numbers.

1    We gave them the benefit of the doubt.

2              According to MGA, its value has gone down as a result

3    of your verdict.  But rest assured, if you do not find

4    infringement, they will continue to be able to make these dolls

5    and the value will go right back up, and you should take that

6    into account in making your decision regarding punitive

7    damages.

8              To conclude now, I'm well aware that the numbers

9    we're talking about here are very substantial.  When we first

10   met back in May and we all selected you as jurors in this case

11   and you came to this courtroom, you had been pre-cleared as

12   folks who could serve on a long-term jury; you had no idea what

13   kind of case this would be; you had no idea the dollar amounts

14   that might be involved; in voir dire, there was discussions and

15   questions about are verdicts too high in the United States

16   today.  I think I brought that up.

17             These are substantial numbers, no question about it.

18   And, frankly, that's my biggest concern here is standing before

19   you with these kinds of numbers.

20             But what are we talking about here?

21             In history, there have only been two successful

22   fashion dolls:  Barbie and Bratz.  And Mr. Larian and

23   Mr. Bryant stole one of those.  It was a unique, highly

24   valuable, extraordinarily profitable, wealth-generating design.

25   The numbers are what they are; a lot of them are undisputed.

Wednesday, August 20, 2008                    Trial Day 37, morning session

1          The law says that when you profit by taking someone

2    else's confidential information, you have to give it back.

3          When you infringe their copyrights, you don't get to

4    just keep the money and run.  And it doesn't matter how much

5    money it is; $10, $100, $100 million, $100 billion; the law

6    doesn't distinguish.  MGA should be put in a position they

7    would have been in but for their theft.  Because the law,

8    ladies and gentlemen, tells you what you already know:  Crime

9    doesn't pay, shouldn't pay.  And it shouldn't pay for MGA and

10   Isaac Larian.

11         Thank you very much.

12         **THE COURT:**  We'll take our lunch break at this time.

13   The jury is going to be held together by the court security

14   officer; we're going to begin the procedure of keeping you

15   together.  The lunch reservation has been made for you over at

16   the Royal Falconer; so I'll ask that anybody else associated

17   directly with the case not go to the Royal Falconer; find

18   another one of Riverside's many fine restaurants to dine at.

19   I'll turn the jury over to the CSO.

20         It's a quarter to 12:00 right now.  I'm go to direct

21   that the jury be back and ready to hear Mr. Nolan's closing

22   arguments at 1:30 sharp.

23         (Whereupon jurors depart courtroom.)

24         (Morning session concludes.)

25   /  /  /

Wednesday, August 20, 2008          Trial Day 37, morning session

CERTIFICATE

I hereby certify that pursuant to section 753, title 28, united states code, the foregoing is a true and correct transcript of the stenographically recorded proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the united states.

_____                    8-21-08
THERESA A. LANZA, RPR, CSR                          _____
Official COURT Reporter                                  Date

Wednesday, August 20, 2008                    Trial Day 37, morning session