1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                              ---

4           **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                              ---

6    MATTEL, INC.,                  :    PAGES 6363 - 6493
                                     :
7              PLAINTIFF,            :
                                     :
8       VS.                         :    NO. ED CV04-09049-SGL
                                     :    [CONSOLIDATED WITH
9    MGA ENTERTAINMENT, INC.,       :    CV04-9059 & CV05-2727]
     ET AL.,                        :
10                                   :
               DEFENDANTS.          :
11

12

13

14

15               REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                    RIVERSIDE, CALIFORNIA

17                  THURSDAY, AUGUST 7, 2008

18                   JURY TRIAL - DAY 31

19                   AFTERNOON SESSION

20

21

22                              MARK SCHWEITZER, CSR, RPR, CRR
                                OFFICIAL COURT REPORTER
23                              UNITED STATES DISTRICT COURT
                                181-H ROYBAL FEDERAL BUILDING
24                              255 EAST TEMPLE STREET
                                LOS ANGELES, CALIFORNIA 90012
25                              (213) 663-3494

CERTIFIED COPY

6364

1    **Appearances of Counsel:**

2

3    On Behalf of Mattel:

4        Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
         By John B. Quinn, Esq.
5            B. Dylan Proctor, Esq.
             Michael T. Zeller, Esq.
6            Harry Olivar, Esq.
             John Corey, Esq.
7            Diane Hutnyan, Esq.
             William Price, Esq.
8        855 South Figueroa Street
         10th Floor
9        Los Angeles, CA 90017
         (213) 624-7707

10

11

12   On Behalf of MGA Entertainment:

13       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
14           Carl Alan Roth, Esq.
             Jason Russell, Esq.
15           Lauren Aguiar, Esq.
             David Hansen, Esq.
16           Matthew Sloan, Esq.
             Robert Herrington, Esq.
17           Raoul Kennedy, Esq.
         300 South Grand Avenue
18       Los Angeles, CA 90071-3144
         (213) 687-5000

19

20

21

22

23

24

25

1

# I N D E X

2    **MICHAEL WAGNER, PREVIOUSLY SWORN**........................ 6370

3    DIRECT EXAMINATION (CONTINUED) BY MR. QUINN: .......... 6370
     CROSS-EXAMINATION BY MR. KENNEDY:...................... 6379
4
     **MICHAEL WAGNER, PREVIOUSLY SWORN**........................ 6419
5
     VOIR DIRE EXAMINATION BY MR. KENNEDY:.................. 6419
6    REDIRECT EXAMINATION BY MR. QUINN:..................... 6446
     RECROSS-EXAMINATION BY MR. KENNEDY: ................... 6454
7    FURTHER REDIRECT EXAMINATION BY MR. QUINN: ............ 6458

8    **MICHAEL CHRISTOPHER MOORE, SWORN**....................... 6460

9    DIRECT EXAMINATION BY MR. ZELLER:...................... 6460
     CROSS-EXAMINATION BY MR.  SLOAN:....................... 6471
10

11

# E X H I B I T S

12    (Exhibits 13935 and 13953 received.)................... 6375

13    (Exhibits 13597 and 13596 received.)................... 6379
                                    (
14    Exhibits 13956 and 13957 received.)................... 6453

15    (Exhibits 13959-13969 received.)...................... 6454

16    (Exhibits 13873-13889 received.)...................... 6466

17   (Exhibits 13857-13900, 13757-13759,
      13912, and 13913 received.)........................... 6471
18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **Riverside, California; Thursday, August 7, 2008** |
| 2 | **1:31 P.M.** |
| 3 | **(SIDEBAR CONFERENCE HELD.)** |
| 4 | THE COURT: Yes, Counsel. |
| 5 | MR. NOLAN: The last point I was going to make |
| 6 | before we ran overtime at lunch break, and that was this |
| 7 | morning, Mr. Quinn and Mr. Price had been talking about we're |
| 8 | on a clock. We got to be fast in front of the jury. |
| 9 | THE COURT: Right. I'm sorry. I didn't circle |
| 10 | back to that. |
| 11 | MR. NOLAN: My only point is that we're both on the |
| 12 | clock. And I think it creates the potential for the jury |
| 13 | feeling as though because they are on the clock, they can |
| 14 | shortcut things or, you know, that the jury might feel sorry |
| 15 | for them. And I would just ask the Court to either tell them |
| 16 | to stop doing it, number one, or number two, to remind the |
| 17 | jury, again, that both sides have been put on a clock, equal |
| 18 | time, and they have used the time however they wish. Because |
| 19 | I do think there's a -- |
| 20 | THE COURT: I think I previously indicated that to |
| 21 | the jury, but Mr. Quinn, I think it probably is an |
| 22 | appropriate request. It's not a question. |
| 23 | MR. QUINN: We don't need to refer to it anymore. |
| 24 | I'll tell people that. |
| 25 | THE COURT: Because I see the concern. |

1          Totally unrelated, a long time ago, someone from

2    Mattel lodged the four original Bratz dolls with the Court.

3    I went to look for them last night as I'm trying to draft up

4    the protectable elements, and I've found that a paralegal for

5    Mattel has come and retrieved the four original Bratz dolls.

6          MR. QUINN:  That raises other concerns.

7          THE COURT:  It would be helpful to the Court to

8    have those.  And not that I need more dolls, but I don't want

9    to take the ones that are in evidence.  Because that's

10   separate.  I'd like to have them just so I can use them as we

11   go through this process.  I'm trying to refine what are the

12   protectable elements.

13         MR. QUINN:  The first generation?

14         THE COURT:  All four of them.  Cloe, Yasmin --

15         MR. QUINN:  We know who you mean.

16         THE COURT:  And we had them on a shelf in our

17   chambers for the longest time, and I went to look for them

18   last night, and I found out that they were gone.

19         MR. NOLAN:  I think that's an absence of proof.

20         THE COURT:  Very good.  Let's have a good

21   afternoon.

22         **(CONCLUSION OF SIDEBAR CONFERENCE.)**

23         MR. ZELLER:  Your Honor, I think we expect we will

24   rest today.  There's videotape, of course, after Mr. Wagner,

25   and we have Mr. Moore.  And we intend to conclude our

1    presentation of the case in chief.  We have asked a --

2              THE COURT:  What about these two videotapes?  I'm

3    ready to give you Edmond Lee.  Are you planning to play

4    Edmond Lee?

5              MR. ZELLER:  I think Mr. Lee -- we think that we

6    would rather play as rebuttal.

7              THE COURT:  Okay.

8              MR. ZELLER:  It's not our intention that Mr. Lee

9    would be played as part of our case in chief.

10             THE COURT:  What about Carter Bryant or ^Cary

11   Brode?

12             MR. ZELLER:  Our intention is that those would be

13   played as part of our case in chief.

14             THE COURT:  So you need those.

15             MR. ZELLER:  Yes.

16             THE COURT:  I'll be working on those.

17             MR. ZELLER:  And so what I would suggest is that

18   maybe we conditionally rest in the event that the video

19   doesn't get entirely sorted out, we can play whatever is

20   available.

21             THE COURT:  Let me sort it out.  I'll have it ready

22   for you.

23             MR. ZELLER:  The other contingency, we'll call it,

24   is that we have asked a witness - his name is George

25   Kesselring.  He is the head of Cityworld, to come in and

1   testify about the Hong Kong proceedings, pretty much in the

2   nature of what the Court saw yesterday.  Mr. Kesselring is

3   not available to come to the United States this week.  He has

4   indicated he is potentially available next week.  So we are

5   attempting to see if he can swing it to be here.

6          So we would ask that we be given an opportunity, in

7   the event that scheduling permits him to be here, to put him

8   on.  There were, I believe, about three dolls, ballparking

9   it, but there were a few dolls that Mr. Kamarck did not

10  authenticate and were not moved into evidence.  So we are --

11  we would be looking to potentially move some more of the

12  accused product in through Mr. Kesselring.

13         THE COURT:  Ms. Aguiar?

14         MS. AGUIAR:  What I would say in response to that,

15  your Honor, because we would like to be able to present our

16  case and do it in a fluid way, and if I can work out with

17  Mr. Zeller if they have these products and can provide them

18  to us and we can stipulate to it, then we may not need the

19  witness.

20         THE COURT:  I understand.

21         MR. ZELLER:  Thank you.

22         THE COURT:  Very good.  All right.  I appreciate

23  the heads up, and I'll get through Mr. Brode and Mr. Bryant's

24  testimony as long as Mr. Nolan doesn't make too many

25  objections to Mr. Wagner.

1           MR. NOLAN: It's going to be Mr. Kennedy. Your
2   Honor, I would just put on the record that although 1-A
3   conditionally rested, we did that. In this phase we would
4   object to that, your Honor. We will try to work out the
5   estimation, but we've all been under the gun and know about
6   the timing of this, and we would, when they are through and
7   out of witnesses or out of time, that's when the case --

8           THE COURT: Try to work it out. And if that's the
9   only thing, then it sounds like we're in a position to move
10  on to the defense case. Let's try to work out that
11  stipulation, if you can, this afternoon. I'm not indicating
12  one way or the other. Just try to work it out. Okay. Let's
13  bring the jury in.

14          **(WHEREUPON THE JURY ENTERS.)**

15          THE COURT: You're on.

16          MR. QUINN: Thank you, your Honor.

17          **MICHAEL WAGNER, PREVIOUSLY SWORN.**

18          **DIRECT EXAMINATION (CONTINUED)**

19  BY MR. QUINN:

20  **Q.** If we could go to slide No. 11, Mr. Wagner. And can you
21  tell us, please, what this reflects?

22  **A.** This reflects the apportionment of profits under a
23  theory of willful infringement.

24  **Q.** And how is that different? Not from a legal standpoint,
25  but from a -- from what you do, the financial analysis

1    standpoint?

2    **A.**    From a financial analyst standpoint, under this theory

3    of recovery, you do not include what's called general and

4    administrative expenses.   Those expenses are not subtracted

5    to a right of the profit that was earned from the allegedly

6    infringing product.

7    **Q.**    So this is something that if the jury finds that there

8    was willful infringement, these are the numbers that they

9    would pay attention to as it relates to MGA.

10   **A.**    Yes.

11   **Q.**    And could you tell us what this reflects?  If you would

12   walk us through it, please?

13   **A.**    Correct.   If you look at the bottom right-hand number,

14   which is $1,121,300,000, that is the amount of profits that I

15   believe MGA has earned on Bratz products, not including

16   general administrative expenses.

17   **Q.**    So you added that back in before you had that

18   $777,000,900 number?

19   **A.**    Yes.   That was a number I had when I subtracted general

20   administrative expenses.  If I do not do that, this number is

21   the correct number.

22   **Q.**    And what have you done here?  You have now apportioned

23   that number under those three different benchmarks?

24   **A.**    Right, I did it exactly the same way I did it in the

25   earlier chart.   It included the subtraction of general and

1  administrative expenses.  So I used the same toy industry

2  average and the same Mattel, Hasbro, Jakks standard and left

3  the profits of those two benchmarks under the benchmark

4  profitability, and the balance I awarded due to the alleged

5  infringement.

6  **Q.**  So for a company where there was no apportionment to

7  noninfringing activity, the number adding a GNA back in is

8  the full $1,121,300,000 number?

9  **A.**  It is.

10  **Q.**  And for the toy industry average, on that basis the

11  willful infringement number is the $1,020,600,000 number?

12  **A.**  It is.  After leaving MGA with approximately

13  $100.7 million of profits.

14  **Q.**  And then finally, if the jury decides that MGA should be

15  slotted in with the -- what you referred to as the top

16  performing toy companies, the willful infringement number

17  that you are left with is the $580,300,000 number; is that

18  correct?

19  **A.**  That is correct.

20  **Q.**  Now, up to this point in this discussion of the

21  copyright damages, to this point we've been talking about

22  MGA.

23  **A.**  We have.

24  **Q.**  All right.  Did you do a similar analysis about what the

25  copyright damages would be as to Mr. Larian?

6373

1   **A.** I did.

2   **Q.** If we could look at slide No. 12, please. What does

3   this reflect?

4   **A.** This reflects the same analysis but applying it to the

5   combination of the distributions to Mr. Larian and the value

6   of his stock in MGA attributable to Bratz.

7   **Q.** You have no willful infringement column here in this

8   analysis.

9   **A.** I do not.

10  **Q.** And why is that?

11  **A.** I don't believe that Mr. Larian has any general

12  administrative expenses to subtract out. So his number is

13  the same under either theory.

14  **Q.** So there would be nothing to add back in if they -- if

15  willful infringement were found?

16  **A.** That is correct.

17  **Q.** Would you please take a look in your book at

18  Exhibits 13935 and 13936. I'm reminded that we need to get

19  these numbers in the record, Mr. Wagner. If we could put

20  slide 12 back up there. The copyright damages for Mr. Larian

21  at the top level, if MGA is found to be on a par with Mattel,

22  Hasbro, and Jakks, the value of the infringement is

23  $378,400,000; correct?

24  **A.** It is based on my calculation.

25  **Q.** And for the average toy industry return, it's

1   $629 million?

2   **A.**   That is correct.

3   **Q.**   And for a company where there's no apportionment,

4   nothing attributable to the infringing activity, what you

5   call here the unsuccessful company, it's $696 million?

6   **A.**   It is.

7   **Q.**   And those are the same numbers for willful infringement

8   as well for the reasons you explained?

9   **A.**   They are.

10  **Q.**   Because Mr. Larian personally wouldn't have any general

11  administrative expenses.

12  **A.**   He does not.

13  **Q.**   All right.   If we can now go to Exhibits 13935, 13936 in

14  your book.   First, 13935.   Can you tell us what that document

15  is?

16  **A.**   Yes.   These are the schedules in which I compute the

17  amount of apportioned damages for copyright infringement to

18  MGA.

19  **Q.**   That's 13935?

20  **A.**   It is.

21          MR. QUINN:   We'd offer that exhibit, your Honor.

22          THE COURT:   Any objection?

23          MR. KENNEDY:   No objection, your Honor.

24          THE COURT:   And Exhibit 13953?

25          THE WITNESS:   These are the same types of schedules

1    but are for the willful infringement, which would not include

2    subtracting general and administrative expenses.

3              MR. QUINN:  We'd offer that exhibit as well, your

4    Honor.

5              MR. KENNEDY:  No objection subject to the Court's

6    prior ruling.

7              THE COURT:  Very well, it's admitted.  You may

8    publish.

9              **(Exhibits 13935 and 13953 received.)**

10   **Q.**   BY MR. QUINN:  Let me turn to the next subject, and that

11   is the subject of net worth, MGA and Mr. Larian.

12   **A.**   Net worth is the difference between all the assets that

13   you have, things of value, all your liabilities related to

14   those assets.  So it's your gross assets less your

15   liabilities, sometimes referred to as net assets, and that's

16   your net worth.

17   **Q.**   Now, have you calculated the net worth of MGA prior to

18   the receipt of these 40,000 additional documents that you

19   told us about within the last two weeks?

20   **A.**   I did.

21   **Q.**   And what was MGA's net worth work based on the

22   calculations you did, based on the documents and information

23   that MGA had given to you up until about two weeks ago?

24   **A.**   Well, based on a schedule of assets of Mr. Larian that

25   was dated October 25th, 2007, I estimate the total value of

1    MGA as of that date at $2 billion.

2    Q.    And the document you are referring to, is that 4947-4?

3    A.    I believe it is.

4    Q.    Which is in evidence.  I believe Mr. Price was

5    questioning Mr. Larian about this document earlier.  Is that

6    document that's on the screen the document that you are

7    referring to?

8    A.    It is.

9    Q.    And was it based on this that you calculated MGA's net

10   worth as approximately $2 billion?

11   A.    Yes.  On this schedule, it shows Mr. Larian's percentage

12   interest of MGA Entertainment at approximately 1.6 billion.

13   Making that a hundred percent rather than 81.82 percent would

14   be $2 billion.

15   Q.    And a $1.6 billion number is in the middle of the page

16   there where it says MGA Entertainment?

17   A.    It is.

18   Q.    And it was from that same document, this same document

19   that MGA prepared that you concluded that Mr. Larian had a

20   net worth of $1.9 billion?

21   A.    Correct.  That is the bottom number on the schedule.

22   Q.    Now, have those numbers changed in your analysis?

23   A.    They have.

24   Q.    Why?

25   A.    Because I received a new schedule in the documents that

1   I received that shows a significantly lower value of MGA as

2   owned by Mr. Larian.

3   Q.   And were those among the documents that you were given

4   within the last two weeks?

5   A.   Yes.

6   Q.   And based on those additional documents, did you make a

7   change in your calculations?

8   A.   I did.

9   Q.   Let's take a look at slide No. 13.   What does this

10  reflect?

11  A.   This reflects two estimates of value at two different

12  dates.   The first column are the numbers I've just previously

13  testified to, which I believe are approximately October of

14  2007.   And the right-hand column is my estimate of both MGA's

15  net worth and Mr. Larian's net worth as of last month.

16  Q.   And if you could just walk through those numbers for us

17  and put them in the record for us.

18  A.   Yes.   I have estimated that now MGA is worth only

19  $540.5 million and that Mr. Larian's net assets, both his

20  interest in MGA and his other assets, less his liabilities,

21  is $723.3 million.

22  Q.   And this reflects the adjustment you made for the

23  additional documents that MGA provided within the last two

24  weeks?

25  A.   It does.

6378

1   **Q.**   And you adjusted those numbers down from the numbers you

2   had before of net worth for MGA of $2 billion and Mr. Larian

3   of $1.9 billion; is that correct?

4   **A.**   That is correct.

5   **Q.**   Now, do you have the document, Exhibit No. 13909?

6   **A.**   I do.

7   **Q.**   And is that the document that you referred to that you

8   received in the last two weeks that resulted in your

9   adjusting these net worth numbers down?

10   **A.**   This is the document.

11   **Q.**   Do you know whether the information in that document

12   that MGA just provided is accurate?

13   **A.**   I have no idea to know whether it's accurate or not.

14   I've seen no supporting information to confirm these numbers.

15   **Q.**   Are those numbers there audited?

16   **A.**   They are not.

17   **Q.**   Do you know where those numbers came from or how MGA or

18   Mr. Larian came up with them?

19   **A.**   I do not.

20           MR. QUINN:  Your Honor, we'd like to move into

21   evidence two of the slides.  Slide No. 5, which is MGA's top

22   10 produced documents by revenue, we have marked as

23   Exhibit 13597.  And slide No. 10, MGA's profits, Bratz versus

24   non-Bratz, we have marked as Exhibit 13596.  We would move

25   both of those into evidence, your Honor, as summaries of

1   voluminous documents.

2              MR. KENNEDY:  No objection, your Honor.

3              THE COURT:  They are admitted.

4              **(Exhibits 13597 and 13596 received.)**

5   Q.  BY MR. QUINN:  Now, this kind of work that you do, and

6   you've testified in court over 100 times.  I hope you don't

7   do this for free.

8   A.  I do not.

9   Q.  You charge for your time?

10  A.  Well, the firm that I work for charges for my time.

11  Q.  And on what basis are the charges made?

12  A.  On an hourly basis that I work on your matter.

13  Q.  And what are your hourly charges?

14  A.  My standard hourly rate which I charge in this case is

15  $695 an hour.

16             MR. QUINN:  Thank you very much.

17             THE WITNESS:  Thank you.

18             THE COURT:  You may proceed, Mr. Kennedy.

19             MR. KENNEDY:  Thank you very much, your Honor.

20                     **CROSS-EXAMINATION**

21  BY MR. KENNEDY:

22  Q.  Good afternoon, Mr. Wagner.  My name is Raoul Kennedy.

23  I'm another lawyer for MGA in this case.  As you told us,

24  your role in this case is really a fairly limited one, isn't

25  it?

1  A.   I agree with that statement.

2  Q.   And in particular, you have not been retained to offer

3  any causation opinions of any kind; correct?

4  A.   That is correct.

5  Q.   What you've been told is to assume that Mattel, through

6  other witnesses and through other evidence, is able to prove

7  various things or establish various things, and you have then

8  been asked to calculate various numbers based on the

9  assumption they can do that; correct?

10  A.   I'd agree with your statement.

11  Q.   Okay.  So I think you've told us there's somebody else

12  who is going to have to be the causal link witness in this

13  case.  You are the numbers guy?

14  A.   I've said that in my deposition.

15  Q.   Okay.  That's where I got it from, actually.  And

16  turning, if we could, back to slide 2 that Mr. Quinn showed

17  you, with regard to the first line revenues, it's correct, is

18  it not, that what you've done is taken all of what are called

19  SKUs, or stock keeping unit, relating to Bratz, and added

20  those all up; correct?

21  A.   That's true.

22  Q.   And there's something like, I'm told, 14,000 stock

23  keeping units?

24  A.   I don't know the number, but that seems to be about

25  right.

 1  Q.   And as I understand it, there's a different SKU

 2  established for each product.  Is that your understanding?

 3  A.   There is.

 4  Q.   If this pen were a MGA product, it would be a SKU and

 5  all the pens like this that were sold would be one SKU;

 6  correct?

 7  A.   It could be any pen that looked just like that would be

 8  a SKU, and one that was a different color might be a

 9  different SKU.

10  Q.   Exactly.  If there were a green one just like this, it

11  would be a different one, which is why we get to so many

12  thousands and thousands of SKUs; right?

13  A.   That is true.

14  Q.   And within that $3.1 billion -- well, actually, do you

15  have your book in front of you?  If you'd turn to tab 13931.

16  Tab B-1 and Schedule 1.1-I, new.

17        THE COURT:  I'm there, starting at page 43?

18  Q.   BY MR. KENNEDY:  Yes.  And that's part of the materials

19  that you prepared in the course of your work on this case;

20  correct?

21  A.   It is.

22  Q.   And that, for example, shows that part of that 3.1

23  billion consists of --

24        And, Aaron, if we could put it up.

25        It shows that there's 59.4 million in gross sales

6382

1   from home decor or home decorating; correct?

2   **A.**   That is correct.   That SKU, the number is the 200 series

3   of products.

4   **Q.**   And holding up Exhibit 17672, to the extent that this is

5   part of that 59 million, you are not expressing any opinion

6   here as to whether this child's bench is in any way the

7   product of Mr. Bryant's sketches, are you?

8   **A.**   I am not.

9   **Q.**   Or whether it's the result of any of the other

10   intellectual property that's in issue in this case.

11   **A.**   I have not been asked to render that opinion.

12   **Q.**   Somebody else is going to have to do that.   All you did

13   was add up the numbers, and if it's in a Bratz SKU, it goes

14   in the 3.1 billion; right?

15            MR. QUINN:   Objection.   Argumentative.

16            THE COURT:   Sustained.   Rephrase the last question,

17   Counsel.

18            MR. KENNEDY:   Certainly, your Honor.

19   **Q.**   Your task was to take all of the products that were

20   identified as being Bratz and adding up the total of those

21   numbers; correct?

22   **A.**   That is correct.

23   **Q.**   And that's how you got to the 3.1 billion?

24   **A.**   It is.

25   **Q.**   And staying with Exhibit 13931, that same Schedule 1.1,

1  that also includes some sales from Bratz Boyz, doesn't it?

2  **A.**  It does.

3  **Q.**  In fact, it includes $114 million worth of sales from

4  Bratz Boyz.

5  **A.**  It does.

6  **Q.**  And again, you're not here expressing any opinion as to

7  whether those revenues or any portion of them are or are not

8  attributable to Mr. Bryant's drawings or the name Bratz or

9  any of the intellectual property at issue in this case;

10  correct?

11  **A.**  I am not.

12  **Q.**  Okay.  Now, turning next, if we could, to your valuation

13  of Mr. Larian's interests in Bratz.

14       And, Aaron, could we see slide 7 that Mr. Quinn was

15  asking you about.

16       And as I think you've explained, what you've done

17  here within the last two weeks, you took information through

18  June of 2008 and concluded from that that the total portion

19  of MGA stock that reflected Bratz was around $380 million.

20  **A.**  That is correct.

21  **Q.**  And you then took Mr. Larian's approximately 82 percent

22  interest in MGA and applied that to the 380 million.  Fair?

23  **A.**  That's fair.

24  **Q.**  And came up with $310 million as representing the

25  current value, fair value of Mr. Larian's interest in Bratz;

1  correct?

2  A.  You said that correctly.

3  Q.  And when we talk about fair value, you'd agree with me

4  that that means the price --

5        And we have a slide here, your Honor, of the

6  definition from his deposition.

7        That would be the price at which an asset could be

8  exchanged in a current transaction between knowledgeable,

9  unrelated, willing parties; correct?

10  A.  That is the definition I used.

11  Q.  And that was in fact in your initial report in this case

12  back in February; right?

13  A.  It was.

14  Q.  Okay.  Now, since June of 2008, when you came up with

15  that $310 million evaluation for Mr. Larian's interests, you

16  are aware that there has been a jury verdict in this case;

17  correct?

18  A.  I am.

19  Q.  And you're aware that that verdict is against Mr. Larian

20  and MGA; correct?

21  A.  I am.

22  Q.  And you're aware, of course, that we're here today in

23  another portion of that trial where you and Mattel are

24  seeking to recover something in excess of a billion dollars

25  in real damages from MGA and Mr. Larian; right?

1          MR. QUINN: Objection. Mischaracterization.

2 Argumentative.

3          THE COURT: Rephrase your question, Counsel.

4          MR. KENNEDY: Sure.

5 **Q.** You're aware that in this phase of the case, the jury is

6 going to be asked by Mattel to award potentially some very,

7 very substantial numbers; correct?

8 **A.** I am.

9 **Q.** And you've calculated that if Mattel is able to prove

10 everything it hopes to prove, those numbers could be in

11 excess of a billion dollars.

12 **A.** They could be.

13 **Q.** Okay. And then in addition, you are aware that Mattel

14 is seeking some additional amount of punitive damages;

15 correct?

16 **A.** I am aware of that fact.

17 **Q.** And you are also aware that at the end of this case,

18 depending on what the jury does, Mattel may seek an

19 injunction; correct?

20 **A.** That is one of the remedies that are available to them.

21 **Q.** And they could, among other things, seek an

22 injunction --

23          MR. QUINN: Your Honor, I object. This is for the

24 Court. It's really purely a legal issue.

25          THE COURT: The Court will be instructing on

```
 1   damages, Counsel.

 2              MR. KENNEDY:  I understand.

 3              THE COURT:  What issue is this going to?

 4              MR. KENNEDY:  The current value, the current fair

 5   value of MGA.

 6              THE COURT:  Very well.  In that context, overruled.

 7   Q.   BY MR. KENNEDY:  Let me start again.

 8         And one of the things that could happen, depending

 9   upon how our jury decides things, is Mattel could seek an

10   injunction which would prohibit --

11              MR. QUINN:  Your Honor, again, I object to this.

12   This is something --

13              THE COURT:  Sidebar, Counsel.

14              (SIDEBAR CONFERENCE HELD.)

15              THE COURT:  I understand Mr. Kennedy's argument

16   that the prospect of an injunction hanging over the company

17   has an effect on its current value.

18              MR. QUINN:  Your Honor, that's something that the

19   jury can't possibly assess.  The factors that go into whether

20   or not --

21              THE COURT:  He's asking your expert witness to

22   assess the impact of that.

23              MR. KENNEDY:  That's exactly the argument, you'll

24   recall, I made in connection with my --

25              THE COURT:  I do.
```

1    MR. KENNEDY:  We're winning.  Keep quiet.

2    MR. QUINN:  Your Honor, we have this decision,

3    eBay, where it's not at all clear that an injunction can be

4    issued.  There's no way that this jury or anybody could

5    assess whether an injunction will issue --

6    THE COURT:  Again, it's not for the jury.  It's

7    this witness.  I -- it's a prospect.  And I don't know.  But

8    I presume that there's a good faith basis to ask this

9    question and that you anticipate that this witness is able to

10   offer an opinion concerning the effect, the measured effect

11   that that would have on a value of the company.  Is that --

12   MR. KENNEDY:  That's exactly it.

13   THE COURT:  Have you asked that in deposition, and

14   has this been fleshed out previously?

15   MR. KENNEDY:  No, your Honor, because we didn't

16   have a verdict then.

17   MR. QUINN:  I'll represent to the Court he cannot

18   give any opinion.

19   THE COURT:  I understand the concern.  But we're

20   going to have to take this up outside the presence of the

21   jury.  If this hasn't been explored in deposition, and I

22   assumed it would have been, I'll let you do that with this

23   witness outside the presence before it goes before the jury.

24   So we'll take this up during the break, and then -- I assume,

25   Mr. Kennedy, how much longer do you have?

1          MR. KENNEDY:  At least a half hour, 45 minutes.

2          THE COURT:  Very good.  Okay.  I'll tell the jury

3    we're going to come back to this.

4                **(CONCLUSION OF SIDEBAR CONFERENCE.)**

5          THE COURT:  Ladies and gentlemen, we're going to

6    have to come back to this particular topic.  For the time

7    being, disregard the subject of an injunction or whatever.

8    The Court is going to have to take some testimony outside of

9    your presence to determine whether or not we can get into

10   this area before you.  We'll do that over the next break.

11   But for right now, I'm asked Mr. Kennedy to go on to his next

12   series of questions, and we'll circle back.

13   **Q.**  BY MR. KENNEDY:  Given what you've learned about MGA's

14   financial condition as of June 30, and knowing that there was

15   an adverse verdict against MGA earlier or late last month

16   earlier in this trial, and knowing that potentially as much

17   as a billion dollars in actual damages and some amount of

18   punitive damages could be assessed by this jury, going back

19   to our price at which an asset could be exchanged, that

20   involves a willing buyer and a willing seller; correct?

21   **A.**  It does.

22   **Q.**  And in this case, you've based your work on the

23   assumption that Mr. Larian would be the willing seller;

24   correct?

25   **A.**  At least for his 81.28 percent interest.

1  Q.  And who is the willing buyer?

2  A.  That's a hypothetical.  I don't know who would be

3  willing to buy his interest at this point.

4  Q.  Well, as a reality check on your work in this case, have

5  you made any inquiries to see if you could find any person or

6  company who would have any interest at all in buying

7  Mr. Larian's interest in Bratz today for $310 million?

8  A.  No.

9  Q.  Can you identify with any certainty anybody that would

10  be willing to buy his interest today for $210 million?

11  A.  This is a hypothetical willing buyer and willing seller.

12  I've done no actual world investigation of who you might

13  approach.  That isn't what valuation experts do.

14  Q.  Okay.  So you wouldn't -- you haven't made any attempt

15  to find out whether there are any real world people who do or

16  do not behave the way you've hypothesized; is that correct?

17  A.  That is correct.  I haven't done it here.  I've never

18  done it.  I've never seen another business valuation expert

19  do that in this type of exercise.

20  Q.  And you've never just as a cross-check on your own gone

21  out to see if there were people who were willing to buy or

22  sell something for the price that you've hypothesized they

23  should be willing to pay?

24  A.  I never have, and I never will.

25  Q.  So I take it, therefore, you also couldn't identify

1    anybody who would be willing, if Mr. Larian said his interest

2    is on sale today for 110 million, couldn't think of anybody

3    who would buy it?

4    A.    I haven't identified who the potential purchasers are.

5    I assume it would be someone in the toy industry.

6    Q.    But you can't tell us who that someone would be.

7    A.    No, I've done no investigation of that.

8    Q.    Can you say with certainty that there is anybody out

9    there today knowledgeable, unrelated, and willing who would

10   pay $10 million for his interest?

11   A.    I think a lot of people would be interested at that

12   price, yes.

13   Q.    Who, for example?

14   A.    I think anyone in this industry that thought there was a

15   future to the Bratz product line.

16   Q.    So you think you can get 10-, not 110?

17   A.    Well, you asked me a certainty.  I haven't done the

18   exercise to establish certainty.

19   Q.    And if we go back to the slide 7 with the 310 assessment

20   on it, please.

21          This isn't the first time you've attempted to

22   calculate the value of Bratz or Mr. Larian's interests in it

23   in this case, is it?

24   A.    No.  I've been trying to do that since last January.

25   Q.    And you, if you want to check, it's tab 04552 MW, should

```
 1   be the first tab there.  Your February 11, 2008 report.  And
 2   as of February 11 of 2008, it was your opinion that the value
 3   of Bratz was $945 million; correct?
 4   A.   I believe that's correct.
 5   Q.   And that Mr. Larian's 82 percent interest was
 6   $773 million?
 7   A.   I think that's accurate.
 8   Q.   Okay.  And if this trial had taken place six months ago,
 9   that's what you would have testified to you thought were what
10   a willing buyer and a willing seller would pay?
11   A.   Based on the information I had at that time, that was my
12   conclusion.
13   Q.   And then in July of this year, you revised your
14   valuations for Bratz and Mr. Larian's share; correct?
15   A.   I did.
16   Q.   Okay.  And at that time you decided that Bratz was now
17   worth 740 million, or about 200 million less than it had been
18   worth in February; correct?
19   A.   I did.
20   Q.   Okay.  And as a result of additional investigation and
21   developments, you also concluded that Mr. Larian's 82 percent
22   interest was now worth about 605 million as opposed to the
23   773- that you calculated back in February; correct?
24   A.   That's true as of the information I had available when I
25   issued that report.
```

1  Q.  And you may be aware, Mr. Price told us in opening

2  statement for this phase of the case, that you would testify

3  to that $605 million figure.  And that was in good faith.

4  And that's what you would have testified to back on July 23;

5  right?

6          MR. QUINN:  Compound, argumentative.

7          THE COURT:  Sustained.  Rephrase, Counsel.

8          MR. KENNEDY:  Certainly, your Honor.

9  Q.  If you had been called upon to testify back on July 22

10  or July 23, you would have testified that the value of

11  Mr. Larian's interest was approximately $605 million based on

12  the best information available to you; correct?

13  A.  I would have.

14  Q.  And in the intervening two weeks, you've been provided

15  with additional information which has now caused you to

16  believe that Bratz is worth just about half of what it was

17  worth two weeks ago; correct?

18  A.  That's true.

19  Q.  And against that pattern, do you have any concern as to

20  what would happen if this case -- I know the judge will kill

21  me -- were delayed for two weeks, and you had to take, say,

22  what the numbers were as of that point in time?

23  A.  If I have no more information, the opinion would be the

24  same.  You have to give me more information to change my

25  opinion.

1  Q.  And if, for example, the jury were to agree with some of

2  the numbers that you've calculated here, that could have a

3  dramatic effect on MGA, couldn't it?

4  A.  It's possible it would.

5  Q.  That would be real dollars.  That wouldn't just be

6  hypothetical; correct?

7  A.  If they are paid; that is correct.

8  Q.  Now, let's talk about the methodologies that you've used

9  in attempting to evaluate Bratz.

10       And could we have slide 6, please, Aaron.

11       Again, this was another of the slides that we

12  talked about with Mr. Quinn.  And you explained that you used

13  the income approach and then comparable companies and

14  comparable transactions; correct?

15  A.  I did.

16  Q.  And none of your comparable companies involved a company

17  that was in trial where they had gotten hammered on a verdict

18  and were now in the damages phase, did they?

19  A.  I don't believe any of those companies were in that

20  situation.

21  Q.  And none of them were looking at as much as a billion in

22  actual damages plus punitive damages within the next week or

23  two, were they?

24       MR. QUINN:  Your Honor, I object.  Argumentative.

25       THE COURT:  This last question?

 1          MR. QUINN:  Two before that.

 2          THE COURT:  You're too late.

 3          MR. KENNEDY:  I'll withdraw the hammer if that's

 4   the problem, your Honor.

 5          THE COURT:  Carry on, Mr. Kennedy.  You're fine.

 6   Q.   BY MR. KENNEDY:  And similarly, you're not aware of any

 7   comparable transactions that have taken place in recent times

 8   that would be under the facts and circumstances of this case

 9   with an adverse verdict and a damage trial going on.

10   A.   I'm not aware of any such situation.

11   Q.   Would you agree with me that those comparable companies

12   and comparable transactions really aren't comparable any

13   longer?

14   A.   I don't agree with that statement.

15   Q.   Going, then, to the income approach, and you've used the

16   same income approach back in February, and then in your July

17   numbers, and in your current opinion; true?

18   A.   I have not changed my methodology on any of my

19   calculations through the pendency of this case.

20   Q.   And one of the assumptions that you've made in your

21   income approach is that Bratz will grow at 2 percent in

22   perpetuity; correct?

23   A.   That is true.

24   Q.   Perpetuity, that's a fancy word for ever and ever.

25   A.   That's a correct statement.

1  **Q.**  And you made that determination sometime during the

2  first quarter of 2008, that Bratz would grow at 2 percent in

3  perpetuity; correct?

4  **A.**  Not in the current model, no, that's not correct.  I've

5  used MGA's actual internal projections of how they are going

6  to do through 2008, and they have actually projected they are

7  going to do 55 percent worse in the second half of this year

8  as they did in 2007.  And I've used that in my model.

9  **Q.**  You used that in your February model?

10  **A.**  No, I didn't have that information.

11  **Q.**  In your February model, you projected they were going to

12  grow at 2 percent in perpetuity.

13  **A.**  I did.  From 2008 forward.

14  **Q.**  Okay.  And you did that during the first quarter of

15  2008.

16  **A.**  I did.

17  **Q.**  And sometime during the second quarter of 2008, you

18  found they weren't going to be growing at 2 percent this

19  year, didn't you?

20  **A.**  No.  That's not true.

21  **Q.**  Well, what did you learn -- what's the --

22  **A.**  I learned it in the third quarter of 2008, to be

23  precise.

24  **Q.**  I stand corrected.  In the third quarter of 2008, you

25  learned that rather than growing at 2 percent a year, they

1    were going to be going down at the rate of 55 percent a year?

2    **A.**    For the second half of the year.  That's current,

3    today's management projections.

4    **Q.**    And then in your most recent analysis, you've also

5    concluded that between July of 2008 and July 2009, they are

6    going to decline by about another 22 percent?

7    **A.**    I think that's probably about right.

8    **Q.**    And then you have concluded that between July of 2009

9    and July of 2010, they are going to decline by another 36

10   percent?

11   **A.**    I don't know if that's accurate or not.  I don't know --

12   I don't believe that's correct.

13   **Q.**    Would you take a look at, again, Trial Exhibit 13932,

14   page 3, tab B-2, Schedule 2.1.

15   **A.**    Could you give me the page?

16   **Q.**    Page 3 of Trial Exhibit 13932.

17   **A.**    I'm sorry.  I was thinking of a different period than

18   you were describing.  I have that between July 1st of 2008

19   and June 30th of 2009, that for that entire period, it would

20   be a negative 36 percent.  That's a combination of the

21   decline of 55 percent in the first half and a growth of 2

22   percent in the second half.

23   **Q.**    And that takes us out to July of 2009?

24   **A.**    Yes, until the first day of July of 2009.

25   **Q.**    And then do you have a projection for what's going to

1    happen between July of 2009 and June of 2010?

2  **A.**   I do.

3  **Q.**   What is that?

4  **A.**   2 percent.

5  **Q.**   They are going to resort back to the 2 percent, and

6    that's then going to go on in perpetuity?

7  **A.**   That is my assumption.

8  **Q.**   And if we went back to February of 2008, it was your

9    assumption that it would be 2 percent throughout; correct?

10 **A.**   It would.

11 **Q.**   What happened?

12 **A.**   I've got new information from your client that they are

13   not doing as well as the rest of the industry.

14 **Q.**   And where did you get the 2 percent to start with?

15 **A.**   Well, I looked at what analysts -- the toy industry

16   analysts, the report on the public companies are predicting

17   for the future of this industry, and for the top companies,

18   which I assumed MGA was one of them, they are forecasting

19   growth in much higher amounts than 2 percent.  It was more

20   like in the 7 to 10 percent growth rate.  So I thought this

21   was a very reasonable assumption.

22 **Q.**   And it turns out, in light of subsequent developments,

23   it really wasn't; correct?

24 **A.**   For the actual period I have through June of 2008, it's

25   not correct for MGA.

1   **Q.**  Well, given the fact that in February you made a

2   prediction that was going to be 2 percent in perpetuity and

3   that prediction turned out not even to be correct in the

4   quarter in which you made it, do you have any suspicion or

5   doubts now about the validity of that 2 percent?

6   **A.**  No.  Based again on current today analyst expectations

7   for the industry, they expect dramatic turnaround in the toy

8   industry.  And 2 percent is less than inflation.  It's really

9   no growth at all.

10  **Q.**  So even though the 2 percent hasn't proved accurate so

11  far, you think it will eventually kick in?

12  **A.**  Yes.  And that's shown in the projections by management.

13  They are showing recovery by the end of this year.

14  **Q.**  Let's turn to net worth, if we can, for a minute.

15          And could I see slide 13, please.

16          And here you said that before trial you felt MGA

17  had a net worth of 2 billion.  Is that again what a willing

18  seller and a willing buyer would pay for it?

19  **A.**  At that time, yes.

20  **Q.**  And today it's your belief -- well, is the 540.5 million

21  Mr. Larian's recent claim, or is that also your current

22  assessment of what a willing buyer would pay for MGA?

23  **A.**  I can't speak for Mr. Larian.  It's based on the

24  information he provided.  I think that is the current value

25  of the company, which shows it's been permanently harmed.

1    **Q.**   Permanently harmed by what?

2    **A.**   By either events in the market or this litigation.

3    **Q.**   And that 540.5 million doesn't take into account any

4    effect that the jury's verdict in this case may have had,

5    does it?

6    **A.**   I don't believe that it does.

7    **Q.**   And you'd agree with me that the jury's verdict was not

8    a good thing for MGA, was it?

9    **A.**   I agree with that statement.

10   **Q.**   So by process of elimination, it was a bad thing;

11   correct?

12   **A.**   I agree with that.

13   **Q.**   Okay.  So therefore, whatever the company was worth the

14   day before the jury ruled, it's worth significantly less

15   afterwards; correct?

16   **A.**   Depends on how much they award in damages.

17   **Q.**   Now, going to that 2 billion figure, could I ask you to

18   turn back to Trial Exhibit 04552 MW.  It's your February 11

19   expert witness report, and this time if I could ask you to go

20   to page 23, section G.  And this was prepared on February 11,

21   2008.

22           It says net worth of MGA.  I've been asked by

23   counsel to calculate MGA's net worth had it not made the

24   distributions to shareholders in excess of taxes due by

25   shareholders on MGA's profits.  Net worth, adjusting for

1    distributions to shareholders in excess of taxes due by

2    shareholders on MGA's profits, as of December 31, 2006, is

3    $438,338,137.

4            Have I read that correctly?

5    A.   You did.

6    Q.   Did something happen between February and the start of

7    trial that caused MGA's worth to increase fivefold?

8    A.   No, this is a completely different measure.  This is

9    based on generally accepted accounting principles.  This is

10   the net book value on their financial statements.  That's

11   very different than market value.

12   Q.   When you say generally accepted accounting principles,

13   those are what -- those are what these big corporations are

14   required to keep their books by?

15   A.   Right.  And this number started with the retained

16   earnings of the company in their audited financial statements

17   for December 31st, 2006.

18   Q.   But you believe the market value was five times that

19   amount?

20   A.   Clearly.  And that's often the case.  Market value of

21   companies are significantly higher than their audited

22   statements say is their net worth on their books and records.

23   Q.   And again, whether we're talking about the -- well,

24   we're talking about the 2 million, we're back to talking

25   about what a willing buyer would pay and a willing seller

1    would take; correct?

2    **A.**    We are.

3    **Q.**    And as you told us, it is not your practice to go out

4    and see if there are people who are really willing to pay or

5    take what you think a company's market value is worth,

6    correct?

7    **A.**    That's true.

8    **Q.**    That's just not part of what you do.

9    **A.**    Well, given fact situations, if somebody, as an example,

10    bought a company six months before I have to value it, I

11    would use that information.  But otherwise, no.

12    **Q.**    So you do assist people in valuing companies in the real

13    sense, not the hypothetical?

14    **A.**    I do occasionally.  I try to do my work in this forum,

15    but sometimes clients ask me to do that.

16    **Q.**    If somebody comes around you today and says I ran into a

17    guy, Isaac Larian, he's willing to sell me his 82 percent in

18    Bratz for $310 million, are you going to advise that person

19    to pay it?

20    **A.**    I would, based on the information that I have.

21    **Q.**    As of today?

22    **A.**    Yes.

23    **Q.**    Uncertainties of the trial notwithstanding?

24    **A.**    I think if the buyer would put some caveats and

25    conditions in, but I think that's what the company is worth

1  today.

2  **Q.** What kind of caveats?

3  **A.** That the company -- that he will indemnify the company

4  if there is any consequences against the company going

5  forward.

6  **Q.** So if somebody was willing to basically take over the

7  risk of this litigation and take that out of the calculous,

8  then you'd recommend they pay 3.1 billion?

9  **A.** I never said they'd pay --

10 **Q.** I apologize. 310 million.

11 **A.** Yes. Because this litigation deals with past behavior.

12 What I've valuing is the future of Bratz, and that future is

13 there in the marketplace if this product can still be sold.

14 **Q.** Turning to Mr. Larian's net worth, you base that on a

15 financial statement which they did in the fall of last year;

16 correct?

17 **A.** I believe October 25th, 2007, is the date it was

18 prepared.

19 **Q.** And at that time of the 1.9 billion or whatever that was

20 shown on the statement, about a billion six of that

21 represented his ownership interest at MGA; correct?

22 **A.** That is accurate.

23 **Q.** And whatever his ownership interest in MGA may have been

24 worth in October of 2007, it's only a small fraction of that

25 today as we've already discussed; correct?

1   A.   As I've calculated today, I would agree with that

2   statement.

3   Q.   Now, in performing your work in this case, you started

4   with that 3.1 billion total revenue figure from all the SKUs

5   that we've talked about; correct?

6   A.   I did.

7   Q.   And then, as you've told us, you had to subtract the

8   cost of goods from that.

9   A.   Among other costs, yes.

10  Q.   So, for example, Exhibit -- Trial Exhibit 000930, super

11  styling Bratz skates, you'd subtract out whatever the actual

12  cost of the skates was and the box and that sort of thing;

13  correct?

14  A.   I would.

15  Q.   And then in addition to that, you'd have what are called

16  operating expenses; correct?

17  A.   Yes.

18  Q.   And there would be things like rent on a warehouse, the

19  receptionist's salary, the power bill, things of that sort;

20  correct?

21  A.   Those are all things that would be part of operating

22  expense.

23  Q.   And what you then attempted to do, given the fact that

24  MGA did things other than Bratz, was to try to determine

25  things like what portion of the rent or the light bill or the

1  receptionist salary should be chargeable to Bratz; correct?

2  **A.**  I did.

3  **Q.**  And in that regard, you used what's called a regression

4  analysis; correct?

5  **A.**  I did.

6  **Q.**  And help me.  I'll probably butcher this overly

7  simplified, but that's a tool where you take a number of

8  different data points and have a computer try to draw a line

9  through them, and depending on which way the line goes, that

10  shows whether you've really got a causative relationship or

11  just coincidence.  Is that too bad a distortion?

12  **A.**  It's pretty bad.  Some of the things you said were

13  pretty wrong, but most of it is right.

14  **Q.**  Okay.  But it's taking data points and trying to find

15  out whether because it's two things that are happening that

16  are really related to one another?

17  **A.**  That is the intent.  To find the relationship between

18  the variables you put in the statistical regression equation.

19  **Q.**  And you constructed a model; correct?

20  **A.**  I did.

21  **Q.**  Because a regression analysis, you just can't pull

22  something off the shelf.  You've got to create a model;

23  right?

24  **A.**  You have to make an assumption as to the relationship of

25  what variable would drive another variable before you do the

1   analysis.

2   Q.   And back in connection with your initial report in this

3   case, you performed a regression analysis on operating

4   expenses using data through the latter part of 2007; correct?

5   A.   No.   I don't think -- I think I only had cost data

6   through July of 2007 to do the analysis.   It wasn't the

7   latter part.

8   Q.   Okay.   Through some portion of 2007, you had data, and

9   you did a regression analysis based on that; correct?

10  A.   That is correct.

11  Q.   And your regression analysis came up showing operating

12  expenses that should be charged to Bratz of about

13  $477 million; right?

14  A.   I don't remember that level of detail, but if you

15  represent to me that that's what I did, I will agree with

16  you.

17  Q.   I will so represent.

18        And you then decided that there were some

19  adjustments that had to be made to the regression analysis;

20  correct?

21  A.   I did.   I was not satisfied with the results of that

22  scientific approach.

23  Q.   And you took the $477 million that the model had

24  generated, and you increased it by $126 million; correct?

25  A.   I did.

6406

1  Q.  Did you have any thought that maybe there was something

2  wrong with the model and you ought to redo it?

3  A.  No, you can't redo the model.  The model is a good

4  model.  But cost accounting is not a pure science, and you

5  have to use your experience and judgment to look at the

6  results and conclude whether they are entirely accurate and

7  sufficient.  I did exactly what you were suggesting the

8  question.  I did not think it was sufficient alone.  So it

9  took additional analysis to come to a reasonable result.

10  Q.  So you took your regression analysis results and then

11  increased them by, what, about 27 percent, $126 million?

12  A.  I haven't done the calculation, but I'm assuming I did

13  it correctly, and that would be an accurate statement.

14  Q.  Is there any limit on the extent to which you can adjust

15  the regression analysis before you just say I have to throw

16  this whole thing out?

17  A.  No.  I don't think there's any bright line test for

18  that.

19  Q.  So you can do the analysis and get a result and then

20  double it?  That would be permissible under some

21  circumstances?

22  A.  Given certain facts, that could be acceptable.

23  Q.  Or you could take it and divide it by three, and that

24  would be acceptable?

25  A.  I don't think I'd ever divide it by three, but it's

1    possible, given a fact situation, if you give me a

2    hypothetical.

3    Q.   Did you give any thought as to whether there might be

4    some better tool for evaluating operating expenses in this

5    case than at least the kind of regression analysis you were

6    using?

7    A.   No, I've been using and doing cost analysis for 31

8    years.  I know all the tools available.  I know what is good

9    and what's not.  And I used what I thought were the best

10   tools available to me.

11   Q.   And then more recently, you did a second -- I'm not

12   trying to suggest different analysis -- but performed a

13   regression analysis a second time.

14   A.   I did.  I think I got some additional data.

15   Q.   Okay.  And this is a regression analysis you've done --

16   what? -- within the last two weeks?

17   A.   That would be true.

18   Q.   And again, you took your data points in the computer and

19   had it try to draw a line to show either causation or not,

20   and you came up with $549 million in operating expenses that

21   ought to be deducted from the 3.1 billion; correct?

22   A.   In the way of operating expenses, yes.

23   Q.   And as with the first regression analysis, you concluded

24   this one was insufficient; correct?

25   A.   I still thought it was not going to give me the results

```
 1   that were appropriate.
 2   Q.   So you went ahead, and you upped it by 4 million for
 3   2001; correct?
 4   A.   I did.
 5   Q.   And 5 million for 2002?
 6   A.   That is correct.
 7   Q.   And then reduced it by 17 million for 2003; correct?
 8   A.   Yes.
 9   Q.   And then reduced it by 2 million for 2004, and then left
10   it untouched for 2005 and 2006; correct?
11   A.   No.   I increased by 21 million in 2005 and 33 million in
12   2006.   That's not untouched.
13   Q.   I apologize.   I was getting ahead of myself.   You upped
14   it by 21 million for 2005 and then upped it for another 33
15   million in 2006?
16   A.   I did.
17   Q.   So you found the regression analysis in your opinion was
18   insufficient for all six of those years.
19   A.   Yes.   The pure science, I think, could not completely
20   form my opinion in this case.
21   Q.   You say pure science?
22   A.   Yes.   The statistical relationship doesn't require any
23   judgment from me.   It will tell me mathematically the
24   relationship between my variables and tell me the confidence
25   I have in my answer and whether I have a statistically
```

1   significant result.

2   Q.   And in this case, again, you haven't touched on that

3   term before.  In statistics work, statistically significant

4   means that it's probable to a certain level; right?

5   A.   That's correct.  Normally to a 95 percent level.

6   Q.   So what you try to do is test to see if what you found

7   is likely to occur at least 19 times out of 20.

8   A.   Right.  That it's not due to just pure chance.

9   Q.   And in this case, your original $549 million result,

10  what level of statistical significance did it have?

11  A.   I can't tell you because I didn't just run one

12  regression.  I ran many regressions on different cost

13  categories, and the answer would be different for each one.

14  I don't think I could answer that question looking just at

15  549 million.

16  Q.   And at the end of the process, you made a $44 million

17  increase in what the regression analysis had disclosed;

18  correct?

19  A.   I did.

20  Q.   And these were matters of judgment that you exercised?

21  A.   It is.

22  Q.   And if we had some other valuation expert take that same

23  regression analysis, they might or might not adjust it in the

24  same way.

25  A.   That's true.

1  **Q.**  And that's the process by which you concluded in this

2  case that in addition to the cost of goods, there's

3  $593 million in operating expenses that have to be taken

4  off before we get to profits; correct?

5  **A.**  I agree with that.

6  **Q.**  And in addition, you considered whether taxes ought to

7  be deducted before you get to profits, didn't you?

8  **A.**  I did.

9  **Q.**  Okay.  And if I could direct you back once again to your

10  February 11 report, Trial Exhibit 04552 MW, going this time

11  to page 10, if we can.  And section C, entitled Distribution

12  to Shareholders for Income Taxes.

13        And you explain there that MGA, like other

14  subchapter S corporations, distributes to its shareholders

15  amounts sufficient to allow the shareholders to pay income

16  taxes on their share of MGA income; correct?

17  **A.**  I did.

18  **Q.**  Stopping right there, a subchapter S corporation, unlike

19  a typical corporation, doesn't pay corporate income tax?

20  **A.**  Except for 1 percent tax to the State of California if

21  it's incorporated in California.

22  **Q.**  But there being no free lunch in America, the

23  shareholders of a subchapter S corporation are saddled with

24  the corporation's tax liabilities in effect; correct?

25  **A.**  They are.

1    Q.    So subchapter S corporations don't operate tax free.    I

2    share your bewilderment.    Let me withdraw the question.

3          Subchapter S corporations and their shareholders in

4    combination don't get away without paying taxes.

5    A.    That's true.

6    Q.    And in this case, you found that through 2005, coming

7    down to the bottom of paragraph C, the total amount

8    distributed to shareholders to meet tax liabilities at that

9    point was 130.2 million; correct?

10   A.    I did.

11   Q.    So you would agree with me that money that MGA pays to

12   its stockholders to pay the derivative taxes isn't part of

13   MGA's profits.

14   A.    It is part of their profits before taxes.    It is not

15   part of -- if they had a hypothetical statement that was

16   after taxes, you would subtract that amount.

17   Q.    When you talk about your net income, you talk about it

18   before or after taxes, but in terms of what you get to spend,

19   it's afterwards; right?

20   A.    I don't think I understand the question.

21   Q.    Let me try it again.

22          In terms of MGA's profits, it's the amount of money

23   that's left after you deduct the cost of goods and after you

24   deduct the operating expenses and after you deduct what they

25   have to pay to their shareholders because of the tax

1  liability.

2  **A.**   If you're trying to get at that, they don't have that

3  money after they have given the money to their shareholders

4  to pay the taxes.  The shareholders, MGA no longer has that

5  money.

6  **Q.**   You said it much better than I.  And it's pretty hard to

7  have profits that you don't have, isn't it?

8  **A.**   Well, it's really called retained earnings.

9  **Q.**   Okay.

10  **A.**   It's not profits.

11  **Q.**   Okay.  It's pretty hard to have retained earnings when

12  you've sent a check for that amount to the IRS.

13  **A.**   That's true.

14  **Q.**   Those are sort of incompatible.

15  **A.**   They are inconsistent.

16  **Q.**   Now, on direct you talked about both benefits to MGA and

17  benefits to Mr. Larian.  Could we see first slide 1.  And

18  there you showed us how you calculated MGA's profits to be

19  777.9 million; correct?

20  **A.**   No.  I didn't show them how I calculated.  That's just

21  the conclusion.

22  **Q.**   Okay.  And in this case you determined the profits were

23  that amount?

24  **A.**   I did.  Before taxes.

25  **Q.**   And then going to slide 3, you showed for Mr. Larian's

1   financial benefits, distributions, Bratz related, 385.2

2   million; correct?

3   **A.**   I did.

4   **Q.**   Okay.  That 385- on slide 3 is part of the 777- on slide

5   1; correct?

6   **A.**   I think there is overlap between those two numbers.

7   **Q.**   Okay.  We don't have both Mr. Larian and MGA making

8   profits off of Bratz in the first instance, do we?

9   **A.**   Well, we do, but they may be the same profit number if

10  it's been distributed to Mr. Larian.

11  **Q.**   Okay.  Well, MGA first has to make a profit off of Bratz

12  before there's anything to distribute; correct?

13  **A.**   I agree with that.

14  **Q.**   Okay.  And here you've concluded that MGA made profits

15  of 777.9 million; correct?

16  **A.**   I have.

17  **Q.**   And then you found -- picking up the chronology, first

18  they made those profits, 777-.  Now can we go back to slide

19  3.  And then 385 million of those profits got distributed to

20  Mr. Larian; correct?

21  **A.**   Through December of 2007.  I don't know what's been

22  distributed to him in the first six months of 2008.

23  **Q.**   Okay.  And so if you wanted to know what MGA's

24  end-of-the-day profits were, you'd have to subtract the 385-

25  from the 777-.

1   **A.**   The profits they have retained, yes.

2   **Q.**   Okay.  And you'd agree with me that this jury would be

3   giving a double recovery if they were to award both the 777-

4   and the 385-; correct?

5          MR. QUINN:  Object, your Honor.  I assume this is

6   going to be something handled by the Court in the verdict

7   form.

8          THE COURT:  As previously indicated, yes, and the

9   jury instructions.

10  **Q.**   BY MR. KENNEDY:  You'll agree with me, as you said in

11  your deposition, an element of duplication between MGA's

12  profits and what was distributed to Mr. Larian?

13  **A.**   I've said it then, and I've already said it today.

14  **Q.**   Now, you talked this morning some about apportionment.

15  And I want to get to that.  But before doing so, other than

16  for apportionment, was your analysis of the copyright claims

17  exactly the same as for the State Court tort claims?

18  **A.**   Yes.

19  **Q.**   Okay.  So both of them were based on the assumption

20  that, if Mattel can prove its claims about MGA's misuse of

21  their intellectual property, then here's what the resulting

22  damages would be, for each of those scenarios; right?

23  **A.**   Correct.

24  **Q.**   Okay.  And so the copyright and state tort claims

25  analysis that you performed is the same until you get to the

1    subject of apportionment.

2    **A.**    That is accurate.

3    **Q.**    Okay. And there you performed an apportionment analysis

4    only for the copyright claims and not for the State Court

5    tort claims; correct?

6    **A.**    Correct.

7    **Q.**    And now let me do what I should have done 10 minutes

8    ago. What's apportionment?

9    **A.**    I explained it on my direct examination. That is

10   apportioning the total profits earned on the Bratz products

11   between the allegedly infringing amount which should be

12   awarded versus the other things of value that MGA brought to

13   bear on the sale of the Bratz products.

14   **Q.**    And in doing that analysis, you made some comparisons --

15   could we see slide 9, please. I'm not going to ask you to

16   repeat your direct examination testimony, but you went

17   through, and you checked the profits of Mattel and Hasbro and

18   Jakks and then compared those with what you had calculated to

19   be MGA's profits?

20   **A.**    Yes.

21   **Q.**    And you calculated MGA's profits using, among other

22   things, the regression analysis and the adjustments to the

23   regression analysis that we've talked about here today?

24   **A.**    That's how I got the profits.

25   **Q.**    And you did it without including anything for taxes;

1  correct?

2  **A.**    Except for the state taxes, yes.

3  **Q.**    You didn't make any deduction for federal taxes.

4  **A.**    I did not.

5  **Q.**    Okay.  And you found, making that analysis, MGA was

6  doing better than a lot of the -- better than all of the toy

7  companies you compared it with; correct?

8  **A.**    During this period of time, they were.

9  **Q.**    Did you make any attempt to compare how MGA would be

10  doing if you backed out the taxes the comparators pay?

11  **A.**    No, because then I'd have to change my benchmark because

12  my benchmark for these companies are what they are earning

13  before they pay taxes.

14  **Q.**    And you took Mattel and Hasbro and Jakks.  Those are all

15  full line companies with multiple products; correct?

16  **A.**    They are.

17  **Q.**    And you compared those with Bratz in single brand within

18  a company; correct?

19  **A.**    I did.

20  **Q.**    Did you make any attempt to compare Bratz with any other

21  individual brands as opposed to entire companies?

22  **A.**    No.

23  **Q.**    Did you make any attempt to compare Bratz with Barbie?

24  **A.**    I did not.

25  **Q.**    Okay.  And in that analysis, you assumed that Mattel

1    would be able to prove that any profit that MGA makes that's

2    higher than whatever the comparisons are is due to MGA's use

3    of Mr. Bryant's -- or Mattel's intellectual property;

4    correct?

5    A.    That is correct.   There's no other reason why this

6    company for this product line was earning profits well in

7    excess of these yardsticks.

8    Q.    That's an assumption you've made, that if Mattel can

9    prove its claims in this case, then you'll be able to make

10   that deduction; correct?

11   A.    That is correct.

12   Q.    Because you, yourself, are not a doll expert.

13   A.    I am not.

14   Q.    You've told us you've never bought a doll in your life.

15   A.    That's true.   I have one girl, and she was a tomboy.

16   Q.    So as we know, you've got many talents, Mr. Wagner, but

17   testifying what goes into making of a successful doll isn't

18   one you profess to have.

19   A.    I do not profess to have that expertise.

20   Q.    And you're not purporting to grade what level any

21   particular person at MGA did or did not make a contribution.

22   That's just not part of your assignment in this case;

23   correct?

24   A.    That is true.

25   Q.    So the value of the infringement numbers that you have

1  there are numbers that you've calculated on the assumption

2  that Mattel, through some other witness or some other

3  evidence, will be able to prove; correct?

4  **A.**     They will draw the causal link.

5  **Q.**     And that's true, as I think you said at the beginning,

6  of your entire analysis in this case.  Somebody else is going

7  to have to make the causal link between MGA's profits,

8  Mr. Larian's receipts, and MGA's misuse of the intellectual

9  property; correct?

10          MR. QUINN:  Objection.  Argumentative again, your

11  Honor.

12          THE COURT:  Rephrase.

13  **Q.**     BY MR. KENNEDY:  What you've been asked to do in this

14  case is to assume that Mattel is going to be able to

15  establish various matters to the satisfaction of this jury;

16  correct?

17  **A.**     That is correct.

18  **Q.**     And you have then been asked to say, assuming Mattel is

19  able to discharge that burden, what, then, would be the

20  resulting numbers calculations and damages.

21  **A.**     Yes, what is the amount of damages that are due.

22          MR. KENNEDY:  Thank you very much.

23          Your Honor, except for the one point, I have no

24  further questions at this point.

25          THE COURT:  Very good.  Actually, why don't we go

1   ahead and take a brief break at this time.

2                    **(WHEREUPON THE JURY WITHDRAWS.)**

3           THE COURT:  Please be seated.  Counsel,

4   Mr. Kennedy, you may proceed.  Please be seated.  For the

5   record, we're outside the presence of the jury.

6                    **MICHAEL WAGNER, PREVIOUSLY SWORN.**

7                    **VOIR DIRE EXAMINATION**

8   BY MR. KENNEDY:

9   **Q.**   Mr. Wagner, you are aware that injunctive relief is

10  being prayed for in this case; correct?

11  **A.**   I am.

12  **Q.**   And obviously, none of us are in a position to know

13  whether it will actually be granted or not; correct?

14  **A.**   That is true.

15  **Q.**   And, in fact, you even acknowledge in your initial

16  report in this case that you were -- that you could, if

17  necessary, do additional analysis and calculations regarding

18  injunction if requested to do so.

19  **A.**   That's true.

20  **Q.**   Okay.  And clearly the prospect of having an injunction

21  imposed against a company like MGA, where you've shown that

22  80 percent of their profits over the last six years are from

23  the Bratz line, would have a significant impact on the

24  company; correct?

25  **A.**   What I showed was 80 percent of revenues, but I do agree

1    with your statement.

2    **Q.**    If his Honor were to order that MGA could no longer sell

3    anything that's part of the Bratz brand, that would have a

4    severe, perhaps even crippling impact on MGA; correct?

5    **A.**    It would.

6    **Q.**    And anybody deciding at this point in time, while that

7    issue is unresolved, what to pay for Bratz, would take that

8    into account?

9    **A.**    No, I don't think that's true.  I think that -- my

10   position or my opinion, and this is a lay opinion, not a

11   legal opinion, is that it needs to be awarded now.  If the

12   Court enters an injunction, I do not think that my future

13   valuation is correct, but if the judge does not award an

14   injunction, you need to have a measure of that value.

15   **Q.**    How about turning to your current net worth figures.  If

16   Mr. Larian or MGA tried to sell itself to somebody today in

17   determining a net worth market value for them, the prospect

18   of an injunction on the Bratz line would clearly be a major

19   factor in those negotiations.

20   **A.**    I agree with you.  I think they would, and I think the

21   buyer, what they would do was to say this deal is contingent

22   upon waiting to find out what the court does.

23   **Q.**    Okay.  So getting back to today, there really isn't a

24   market for MGA because of the inherent uncertainty posed by

25   this case.

1  **A.**   Well, again, I think it's possible you could find a

2  buyer who would look at that contingency and say I am willing

3  to pay $310 million if the Court does not enter an

4  injunction.  If they -- if the Court does enter an

5  injunction, the deal is off.  I'm not going to pay

6  $310 million.

7  **Q.**   Assuming that your willing seller were willing to agree

8  to that contingency, but if we're talking about a quitclaim

9  sale, here is what MGA is worth.  It's up for auction.  Take

10  it warts and all, the prospect of the injunction is going to

11  be a significant factor in determining what the price will

12  be.

13  **A.**   I agree with that statement.

14            MR. KENNEDY:  I'll submit on this.

15            THE COURT:  I'll hear argument from both sides on

16  this.

17            MR. KENNEDY:  Your Honor, we're here talking about

18  valuing MGA and Mr. Larian's interest in it as of this point

19  in time.  And Mattel is certainly free to argue what the

20  future holds.  I think we're entitled to present all evidence

21  concerning what the current situation is and similarly argue

22  what the future holds.

23            But I submit that it's the proverbial having your

24  cake and eating it too.  So on the one hand, come in here

25  with a valuation number that pretends there is no prospect of

```
 1   an injunction.  And potentially get a judgment for a monetary
 2   amount that bears no resemblance to reality because of the
 3   prospect.
 4        Your Honor, particularly, because we were heard at
 5   sidebar, if you have questions, I'd be pleased to try to
 6   respond, but you know my position.
 7        THE COURT:  Yes, I'll hear from Mattel.
 8        MR. QUINN:  Your Honor, I think the assignment
 9   here, the jury's task in what we most prove is the value of
10   the company now.  That's -- we simply can't get into the
11   speculative issue of what this court might decide after some
12   hypothetical verdict.
13        THE COURT:  Mr. Kennedy's point, and this is what
14   you need to address, is that right now, August 7, 2008, we're
15   sitting here with a return of a verdict on liability.  And as
16   the witness just indicated, that would have -- that does
17   have, not would, but that does have an effect on the August
18   7th, 2008, value of MGA.
19        MR. QUINN:  Well, your Honor ruled that that was
20   going to come in, that this is a fluid situation, that
21   verdict now has come in.  But the question of whether this
22   Court will enter an injunction or whether, for example, the
23   Court will in the alternative decide to impose a royalty,
24   which there's some case law now under the eBay decision, or
25   what the amount of that royalty would be, there is simply no
```

 1  way to assess that.

 2          I mean, we're assigning percentages to things that

 3  are like two or three steps down the road.  The task now is

 4  to value this company today, not value it after some

 5  hypothetical future event where a court -- this court might

 6  hear a motion some number of days after a verdict is

 7  returned.  Also, we don't know what the scope of the

 8  injunction would be.

 9          THE COURT:  It is speculative.  And neither would a

10  prospective buyer.  But the point that Mr. Kennedy is making

11  is that a prospective buyer would be aware.  A real buyer

12  today would be aware that there is a potential for this

13  injunction, and that would affect the selling price, the

14  market price, of MGA today; is that correct?

15          THE WITNESS:  That is correct, your Honor.

16          MR. QUINN:  I mean, that's true in any of these

17  cases.

18          THE COURT:  It is.

19          MR. QUINN:  Where there's a potential for an

20  injunction.

21          THE COURT:  And that's the bigger problem I have.

22  I really don't know, I mean --

23          MR. QUINN:  I've never heard of a case where at the

24  time, when we're deciding issues for the jury and presenting

25  evidence for the jury, we're also trotting out in front of

1   the jury what other remedies a court might impose afterwards.

2           THE COURT:  Well, what's unique about this case is

3   that, as this witness has pointed out, the entire value of

4   this company turns on Bratz.  This is not like most companies

5   or a diversified company where, yeah, there's going to be

6   some impact.  This is all or nothing for MGA to a large

7   extent.

8           I'm not saying that there's some other products,

9   but accepting the analysis that was present, the other

10  products are of relatively minimal value.  The value of MGA

11  is Bratz.  If that's gone, any prudent buyer operating at

12  arm's length, using the definition that was provided by your

13  expert, would certainly factor this in.

14          MR. QUINN:  Your Honor, if I may, actually, that's

15  no longer true anymore.  As of the most recent numbers, Bratz

16  numbers only accounts for 30 percent of the profits, if I

17  understand what I'm -- 37 percent of the profits in the most

18  recent numbers that we were provided by MGA.

19          THE COURT:  I'm not going to test that.  That's up

20  to the experts to testify to.  The question is whether or not

21  this comes in and whether or not there's an effect.  I've

22  heard from the expert that yes, this would have an effect.

23          MR. QUINN:  We don't have a verdict form.  We don't

24  know exactly what the jury is going to be asked to decide.

25          THE COURT:  I agree with all of that, Counsel.  I

1  just don't -- you are asking basically the jury or this

2  witness essentially to put his head in the sand and ignore --

3  if you are conceding that it is proper for this jury to have

4  a valuation of this company as of August 7, 2008, you cannot

5  ignore what happened in July of 2008.

6          MR. QUINN: Well, I mean, we thought, your Honor,

7  that --

8          THE COURT: And maybe that's the way through this

9  is to permit questions about the effect of the verdict but

10  not get into speculation about future action by the Court.

11  And I'm somewhat thinking out loud here. But I mean there's

12  got to be a way of accommodating --

13          MR. QUINN: I think Mr. Kennedy did ask some

14  questions about you're aware that a verdict has been entered

15  in this case. There were some questions.

16          THE COURT: But he didn't ask what the impact of

17  that was. That's where we cut things off because it started

18  getting into the injunction and all of that.

19          I guess part of the problem that I see with this,

20  though, is that if this case had not been bifurcated, as

21  requested, then this would have been of no moment whatsoever.

22          MR. QUINN: We wouldn't be having this discussion.

23          THE COURT: We would not be having this discussion,

24  because we'd be looking at it --

25          MR. QUINN: As you always do, as of the beginning

1   of the trial.  So we've inserted one fact that's developed as

2   a result of this trial.  And the witness has been asked about

3   that.  But to go beyond that and to raise the prospect of

4   something which the jury can't possibly evaluate.  The idea

5   that there might be an injunction, by the way, whatever that

6   means to them, and what the scope of some hypothetical --

7            THE COURT:  But as I mentioned at sidebar, it's not

8   so much for the jury being asked to evaluate, it's the

9   expert.  Because they will infer the testimony from the

10  expert, but yes, it would have some effect.

11           MR. QUINN:  I don't know how anyone can assess

12  that, your Honor.

13           THE COURT:  Is there any way from your perspective

14  to assess that?

15           THE WITNESS:  Yes, your Honor.  And this is the

16  problem, that right now this is an expectancy.  No one knows

17  whether the Court will enter an injunction or not.  If the

18  jury awards, let's say worst case for MGA, my number for the

19  future value of this company, then if you do then later enter

20  an injunction, you should wipe out that 310 million.  That's

21  not already paid by them.  That's got to be paid at the time

22  you make the decision on the injunction.  But let's assume

23  you don't allow my testimony in now and you decide later not

24  to give an injunction.  Then Mattel has no remedy for the

25  future value of this product after this trial is over.

1           THE COURT:   Let me hear from Mr. Kennedy.

2           MR. KENNEDY:   Your Honor, they could have tried to

3    support their valuation claims by putting a real live human

4    being on the stand who said here's what I would be prepared

5    to pay for this company right now.   But they didn't.   They

6    didn't.   And they brought an expert who has told us in order

7    to evaluate it, he is the one that said we have to look into

8    the future.   I find it ironic that one of his key assumptions

9    is something will continue in perpetuity.   And in terms of

10   how is a jury supposed to assess something,

11          They look at his manner of testifying and

12   credentials.   And then we test it with cross-examination, and

13   I fumble around and try to impeach him.   And it's the same

14   thing with regard to every other aspect of what he thinks the

15   present value of unknown future events is.

16          This company could be facing a recall.   There could

17   be all kinds of other contingencies, and that's what final

18   argument is all about, to argue what is the likelihood of

19   this happening.   But I submit that the jury probably doesn't

20   understand fully the impact of an injunction.   That's for us

21   to explain.   But they certainly aren't in any better position

22   to evaluate whether the toy industry is going to grow at 2

23   percent in perpetuity.   That's why we have an expert.   It's

24   beyond their expertise, that's why we have cross-examination.

25          But these are the people who have said we have to

1    look to the future.  That's the only way we can know that.

2    That was their methodology.  And now saying except for this

3    part of the future --

4              THE COURT:  Let me hear from Mattel.  How does the

5    value of the company play into your theory of damages?  I

6    understand certainly how it plays into punitive damages.  How

7    else?

8              MR. QUINN:  Well, your Honor, a value has been

9    placed on the Bratz brand.  The Bratz products.  And, you

10   know, that's based on history and a present value back to

11   today of what those anticipated sales are.  And there's a

12   value that's been given to Mr. Larian's interest based upon

13   the three different approaches that the witness used.

14              But with all due respect, it sounds to me like what

15   we're being asked to do is litigate in effect this Court's

16   mental processes.  You know, what is the likelihood that this

17   Court is going to make a decision --

18              THE COURT:  But that's not it.  And that's what I'm

19   not getting -- I don't think we're communicating correctly

20   here.  And it's probably my fault.  We're not -- it's easy

21   enough to eliminate or to exclude evidence or testimony

22   concerning the likelihood of an injunction being issued or

23   not.  That's not it at all.  That would be entirely improper.

24   I completely agree with that.

25              As I understand MGA, they want to be able to

1   evaluate or have expert testimony address the value of the

2   company today, and this is a variable that is out there. And

3   it's a -- it's a variable that is going to have, that does

4   have an effect on the value of the company as of today. If

5   this were a publicly traded company on the New York Stock

6   Exchange, that verdict could have had an impact on the value

7   of the stock in part, not entirely, but in part because of

8   the prospect that that verdict is leading to an injunction;

9   correct?

10         MR. QUINN: Correct.

11         THE COURT: All right. So it happens to be a

12   private company, but it still has, according to the expert,

13   an impact on the value of the stock. On the company.

14         MR. QUINN: We are bringing into the courtroom,

15   then, an eventuality which is simply impossible to frame or

16   arrive at or calculate a discount. I mean, it's an

17   invitation to make arbitrary adjustments because no one can

18   possibly come in and assign a value to that number. Their

19   witness, their expert witness doesn't do that. This witness

20   can't do that.

21         THE COURT: And I agree. I understand that

22   problem. But does that warrant, then, or does that justify

23   simply saying we're going to ignore it entirely? I mean, if

24   we're all conceding, and I'm not hearing a cogent argument as

25   to why this is not something that does in fact effect the

1    value of the company as of August 7, 2008, and if the only

2    argument that can be made is that we can't put a precise

3    number on that, I don't know if that justifies saying that,

4    well, therefore, we should simply exclude any consideration

5    of that number, of that factor.  That doesn't seem right

6    either.

7            MR. QUINN:  May I have a moment, your Honor?

8            THE COURT:  You may.

9            MR. QUINN:  There are competing remedies here, your

10   Honor.  We're not both going to get -- I think this is

11   something that's going to be solved by the verdict form.  We

12   are not both going to get an injunction plus damages --

13           THE COURT:  That's the witness's suggestion here.

14   Your witness's suggestion is that I do exactly that.  I do

15   put our head in the sand and that we allow the jury to return

16   a verdict of damages without consideration of the injunction

17   and then make it an either/or.  If I don't issue an

18   injunction after this case, if I don't turn Bratz over to

19   Mattel as a result of the verdict, whatever it is in this

20   case, depending on how they come back on the copyright issue,

21   then --

22           MR. QUINN:  We should not both get a value for

23   Bratz which builds in future profits and also get an

24   injunction.  We shouldn't get that.

25           THE COURT:  Right.

1           MR. QUINN: Both of those.

2           THE COURT: No, you should not. Everyone, I think,

3  would agree on that. And the question is --

4           MR. QUINN: And so the invitation here now is but

5  we need that number, uncontaminated by the prospect of the

6  injunction. So then we have it. And then there's a decision

7  to be made there.

8           THE COURT: Let me hear from Kennedy, a response to

9  that.

10          MR. KENNEDY: I suggest this is something that

11  perhaps can be taken care of by the verdict. This witness

12  has already put on what he candidly, very forthrightly made

13  clear what is duplicative damage testimony. There are

14  alternatives. You can't get both MGA's profits in addition

15  to Mr. Larian's distributions.

16          But they were entitled to advance both of those

17  alternatives. Concurrently, they are the ones that are

18  pursuing both damages and an injunction.

19          THE COURT: Yes, but the difference between those

20  two things is the damages numbers on both counts have to be

21  returned by the jury. The injunction, the jury is not going

22  to touch upon the injunction. The Court is going do decide

23  the injunction issues at the end of this trial.

24          MR. KENNEDY: Understood, but the jury's function

25  is still going to be to determine what the fair value --

1   there's a good chance you will not have ruled on the

2   injunction at the point -- it's almost certain, I assume,

3   that you will not have ruled on that.  And that is an

4   uncertainty that's out there.

5          THE COURT:  I'm feeling I'm reaching a conclusion

6   in terms of the compensatory damages.  Where I'm having a

7   trouble, Mr. Quinn, and I'd like to hear from you on the

8   punitive damages.  Because that, Mr. Larian is entitled to

9   have the jury consider his actual real life, real world net

10  worth as of today.  And that there's no dispute has been

11  impacted by the prospective of the injunction.

12         Do you understand the difference?  In terms of the

13  compensatory damages, the lost profits, the disgorgement, we

14  can engage in this fiction that the injunction hasn't

15  happened and there's no prospect of the injunction, and we

16  can have this either now or at the end.

17         But in terms of the punitive damage assessment, the

18  jury has to have -- has to make an assessment as one of the

19  factors as I've previously held.  The actual real net worth

20  of Mr. Larian, which the net worth of MGA is a big part.

21         MR. QUINN:  Well, it's the majority, obviously, of

22  the net worth number.  But that, again, is a value placed on,

23  you know, potential future profits.  Again, there's simply no

24  way for this jury to evaluate, or anyone to evaluate what the

25  effect is of the potential of an injunction.

6433

1          I mean, this court doesn't have to issue an

2   injunction.  The jury is going to get instructions that

3   you've got to consider there's the possibility of an

4   injunction, and here are the factors as to whether there's

5   going to be an injunction?

6          THE COURT:  No, no.

7          MR. QUINN:  The only case law, I think, and we've

8   discussed this before, is a highly unusual situation where

9   there's been events in the course of the trial which, you

10  know, people can argue, make compelling arguments that it's

11  had these kinds of effects.  But the case law, the only cases

12  that people have been able to find is that net worth is

13  determined as of the start of trial.

14         THE COURT:  That's not -- the cases say at trial.

15  They don't say at the start of trial.

16         MR. QUINN:  Well, at trial.

17         THE COURT:  I have not seen anything which says at

18  the start of trial.

19         MR. QUINN:  No, I agree, your Honor.

20         THE COURT:  At trial.  At the time the jury is

21  considering this.  And this is -- I need to think about this.

22  This is not a decision -- I'm going to have to --

23         MR. QUINN:  It would be a different circumstance if

24  we were talking about a portfolio of marketable securities.

25  You had a trial that went on six months, and the market

1    tanked.  I think there's a pretty compelling argument that

2    you can't put blinders on and ignore the fact that the net

3    worth has obviously been affected by those events.

4           THE COURT:  That's not much different than what we

5    have right here.  We have something, a commodity, the value

6    of which has been called into serious question by the

7    developments of the trial.

8           MR. QUINN:  But it's not something where there's

9    any way to calculate it or measure it.

10          THE COURT:  That is the problem.  That is the

11   problem.  I understand that.  There's no way -- it's

12   difficult to put a dollar figure on the injunction.  On the

13   potential for an injunction.

14          MR. KENNEDY:  Your Honor, I really have something

15   new to say.  It's not going to be the old stuff said louder.

16   I promise.  It took me a couple minutes.  I needed an assist

17   from Mr. Roth.  This is not a case about injunctive relief

18   versus future damages.

19          Reading from the last page of Mr. Wagner's February

20   11 report, Trial Exhibit 04552 MW, page 25, it's the first

21   full paragraph.  Maybe we can blow that up.  I have not

22   provided an opinion regarding the future damage that will be

23   incurred by Mattel in the event that the Court does not grant

24   an injunction against MGA, if it's determined, and that's

25   what I was asking him about on cross-examination.

1          They are talking purely about the existing value

2  based on a discounted future stream of profits. But he's

3  expressly disavowed that there's any future damages that he's

4  calculated so far. So I don't want the Court --

5          THE COURT: Very good. Then I suppose there's

6  nothing further to question this witness on, and we can take

7  this matter up later.

8          MR. KENNEDY: Thank you very much.

9          THE COURT: When we come back from the break,

10 Mr. Quinn, you can continue. But I do want to revisit this

11 issue before any further testimony is made to the jury. As

12 it stands to the jury right now, you instructed them to

13 disregard the testimony concerning the injunction. We'll

14 take this up later.

15         Court's in recess.

16         (Recess taken.)

17         THE COURT: These are my thoughts on this issue. I

18 think MGA is correct that somehow we need to be in a position

19 to account for the impact of the prospect of injunctive

20 relief at this point. At the point at the time of trial, the

21 time of the jury's verdict, should the jury find copyright

22 infringement and award damages, compensatory damages and/or

23 punitive damages.

24         At the same time, Mattel is correct that to simply

25 throw it out there, that injunctive relief is possible and

1  the Court may grant injunctive relief such that Bratz becomes

2  the property of Mattel and completely undermines a large

3  portion, anyway, of the value of MGA, without being able to

4  quantify either the likelihood of that happening or the

5  impact of that occurrence, is terribly confusing under 403 to

6  the jury on the issue of damages.

7       A further complicating wrinkle in the entire thing

8  is the bifurcation element. On the one hand it was Mattel

9  who requested this bifurcation. On the other hand, there

10  needs to be essentially you have to avoid a rewarding

11  essentially of having been found liable for the intentional

12  torts by allowing that to discount essentially damages that

13  otherwise would be considered by the jury.

14       But the bottom line, I think the best way to deal

15  with this, is the Court has heard the testimony of the expert

16  on this point. The Court certainly will hear any additional

17  information on this point. And perhaps the best procedure to

18  use is simply put the Court in a position to take into

19  account the value of the injunctive relief if and when the

20  Court were to grant that injunctive relief, and discount the

21  damages, both punitive and compensatory, accordingly.

22       But there is no other way of throwing that into the

23  black box of the jury and knowing what the jury or what

24  degree the jury is considering that information and having

25  that revealed on a verdict form that I can think of.

1          So I guess the bottom line is my tentative thoughts

2     at this point, after thinking about this for a few minutes

3     and hearing both sides, is to sustain the objection.

4     However, permit the evidence before the Court and then take

5     this up if and when we have a verdict.

6          I'll hear from both sides.

7          MR. QUINN:  We'll submit on that, your Honor.

8          THE COURT:  Do you think that's a sound way of

9     proceeding?

10         MR. QUINN:  I think it is, your Honor.

11         THE COURT:  Mr. Kennedy?

12         MR. KENNEDY:  I'd like to be able to say the same,

13    but doing the punitive damage aspect in particular concerns

14    me as well as just the right to jury trial and whether I'm

15    waiving some portion of Mr. Larian's rights in that regard.

16    And I've just heard it.

17         I don't think it's ever been proposed before, and

18    I'm just not quite sure how the Court, in trying to think

19    this through, confronted about some whopper both compensatory

20    and punitive damage award, is then going to be able to factor

21    this fact in.

22         THE COURT:  I think that's precisely whatever

23    damage verdict that comes back, if it's not supported by the

24    evidence, as I've demonstrated in previous trials, I will

25    certainly reduce the damages to reflect the evidence, be

1  it -- and courts rather routinely adjust punitive damages

2  when they are out of line.  And this would be a particular

3  factor that the Court would be very mindful of.

4        I mean, in the context of compensatory damages, I

5  think it would be actually -- well, depending on how --

6  there's a lot of variables here.  That's the bottom line, is

7  that I just don't see how we can go and throw this into the

8  jury without having any way of measuring or quantifying this

9  and then not knowing how or to what effect this is having on

10  their damage calculation.  There's no way we could.

11        I think the better course is certainly to hear the

12  evidence.  Because I do recognize that it is of relevance

13  here.  What I'm finding on the 403 analysis is that the

14  confusing and -- the thoroughly confusing prejudice outweighs

15  it with respect to the jury.  And that's how I would address

16  your right to trial issue, is that I'm ruling on a strictly

17  evidentiary basis here.

18        But I'm trying to compensate for the loss of that

19  by giving you leave not only to consider the evidence that

20  you've already elicited, but any additional evidence you have

21  concerning the impact of any injunctive relief on the value

22  of the company.  And perhaps the best time to do that,

23  frankly, would be after the Court makes whatever decision

24  it's going to make on the injunctive relief.

25        I mean, if the Court decides not to grant any

1   injunctive relief at all, then this is of no moment, and this

2   should never have been before the jury, and the jury should

3   never have considered it.

4          If the Court decides to grant complete injunctive

5   relief, as being sought by Mattel, then a large portion of

6   the compensatory award, as already discussed, would go away

7   because now Mattel would control Bratz.

8          There is any number of permutations in between

9   those two, and to think that a jury is in the position to

10  comprehend that I think is just -- is fantasy.  What it would

11  do is simply serve to confuse and muddle up the jury's task.

12         So I think it's better for the Court to hear all of

13  that evidence and if necessary and to the extent necessary,

14  discount, adjust any award of damages that is returned.

15  That's the best -- I don't know.

16         If there is a better solution out there, and if

17  there is any authority, we don't have to make this decision

18  today.  And the Court will certainly entertain any authority

19  that counsel can find that would suggest that either this is

20  not proper, or if it is violating some other right or some

21  problem with this, please bring it to my attention.

22         I mean, this is something which has just arisen in

23  the last hour or so.  I need to make a decision so that the

24  trial can go forward.  And I think the best decision to make

25  to avoid irreparable harm at this point is to sustain the

1   objection on the injunction and proceed with this tentative,

2   and then I'll entertain any additional argument now or later

3   and certainly any authority now or later.

4          MR. KENNEDY:  Thank you, your Honor.  And that

5   would be with the possibility of recalling Mr. Wagner?

6          THE COURT:  Yes, yes, absolutely.  If you want to

7   have the testimony that was elicited here, and if I

8   ultimately decide that I'm mistaken on this point and the

9   jury should hear this, we'll recall Mr. Wagner so the jury

10  can hear the testimony that you elicited and go forward.

11         MR. KENNEDY:  Understood.  Your Honor, as you say,

12  clearly the amount of time -- this is a big issue.

13         THE COURT:  It is.  And I'm making this decision

14  without having had a lot of time to think about it.  So

15  that's why I'm just trying to proceed with -- I don't want to

16  do anything that's irreparable, and I think this is the best

17  course, and based on what I have before me right now, I think

18  it is the right decision.  But I will certainly obtain and

19  give leave for further argument and authority.

20         MR. NOLAN:  Your Honor, may I just have one second?

21         THE COURT:  Yes, of course.

22         MR. ROTH:  Your Honor, I apologize for

23  double-teaming.

24         THE COURT:  Don't apologize, Mr. Roth.

25         MR. ROTH:  The one observation we would make here

1    is that Mattel has made through Mr. Wagner assertions about

2    the future.  So if we're holding -- and there are assertions

3    about what profits and losses will be in the future.  So

4    that's the state of play.

5           If you are asking us for now, because your Honor

6    and the parties need to address the issue of how we deal with

7    one future contingency, we think that Mattel should not,

8    through this witness, until that issue has been resolved,

9    make assertions -- other assertions about the future,

10   assertions being, for instance, that the company will grow at

11   a 2 percent annum, per year.  This is in play because they

12   are seeking future profits.  They are making assertions about

13   the future.

14          We think we should have the opportunity to complete

15   the picture.  Part of the picture is the possibility of the

16   Court taking the action that it will.

17          Now, the fact that it's uncertain really is sort of

18   a problem about whether the analysis about future profits is

19   sufficient to pass muster in the first place.  Because the

20   issue is can you identify what will happen in the future with

21   sufficient certainty.  If you can't, then you don't get to

22   offer up the methodology, the analysis in the first place.

23          So they can't offer up analysis about the future,

24   talk about 95 percent of it, but not 5 percent of it.  And if

25   their position is well, it's just too uncertain, that means

1   the whole analysis doesn't work in our view.

2          They are offering opinion about future events.

3   That's why we should be --

4          THE COURT:  I guess I would be inclined to accept

5   that if you were willing to stipulate that to the extent that

6   there are to be future profits awarded, that you are

7   stipulating that the Court will determine that entirely.

8          If you are not, what I feel comfortable holding

9   back sua sponte is future profits attributable plus or minus,

10  to the Court's injunctive relief.  I don't feel comfortable

11  doing that in light of the right to trial, Seventh Amendment

12  issues, with respect to all future profits.  I would only do

13  that if there was a stipulation from all parties.

14         Do you understand what I'm saying?

15         MR. ROTH:  I think so, your Honor.

16         THE COURT:  I think they are of a different nature.

17  The problem that I'm having with the effect of the injunctive

18  relief is that that turns on legal decisions that the Court

19  is going to have to make and that are, I think, quite

20  frankly, so complicated and beyond the purview of the jury,

21  that it would be under 403 improper to introduce those to the

22  jury.

23         Perhaps the cleanest way to do this would be to set

24  aside the issue of future profits, and because they are, as

25  you are suggesting, somewhat intertwined with the Court's

1  ruling on injunctive relief, leave that as an issue for the

2  Court to decide.  And I say I would only do that entirely if

3  all three parties stipulated to that.

4      -    MR. ROTH:  One thing, obviously we'll need to

5  consult, but one thing just to clarify, and I was a little

6  confused about a comment made by Mr. Quinn, which was the

7  theory being offered in the compensatory context was not

8  being offered as a future profits theory.  That's the

9  reference that Mr. Kennedy made to in Mr. Wagner's report.

10      He said I might at some point offer a future

11  profits analysis.  I'm not doing that now.  This is being

12  offered in the compensatory context as an attempt to get past

13  profits based on the present value of what they think will be

14  made by Bratz in the future.

15      THE COURT:  Let me get a clarification from

16  Mr. Quinn on that.  Because if future profits are not at

17  issue and essentially, Mr. Corey, Mattel is simply relying on

18  injunctive relief for anything going forward, then that makes

19  this easy as well.

20      MR. COREY:  And that's not right.  I think the

21  portion that was quoted was from Mr. Wagner's initial report.

22  He did that analysis in his rebuttal report.  It is a portion

23  of the damages that we are claiming on a prospective basis.

24      THE COURT:  So you are seeking future compensatory

25  damages.

1          MR. COREY:  We are seeking damages attributable to

2   the benefit of Bratz to Mr. Larian.  One piece of that is the

3   value of the MGA stock, and we value that using future Bratz

4   profits.

5          THE COURT:  Okay.

6          MR. ROTH:  Your Honor, just to clarify, that's

7   actually not right.  The analysis that was in the initial

8   report.  That is where this is coming from.  This analysis

9   regarding the future benefits is coming from Mr. Wagner's

10  initial report.

11         THE COURT:  Okay.  In any event, Mattel has

12  clarified that it is seeking those.  So one solution that I'm

13  proposing is simply the Court holding back and deciding post

14  verdict the impact on injunctive -- of any injunctive relief

15  on a damages award returned by the jury in the verdict.  And

16  I'm comfortable doing that, sustaining the objection on 403

17  grounds, and simply doing that sua sponte.

18         I would go a step further with a stipulation of all

19  three parties, and that is resolve all future damages based

20  on all of the evidence in trial, both that which the jury

21  hears and that which the jury does not hear, after I've made

22  the decision on what, if any, injunctive relief to grant.

23  And I will hear back from the parties later in terms of how

24  they wish to proceed.

25         MR. ROTH:  I'm not trying to make this more

1  complex, but unfortunately, we do have the punitive damages

2  issue.

3          THE COURT:  Right.  And I would be doing the same

4  thing with that.  I think it is better for this Court to

5  factor in the impact of the injunctive relief on Mr. Larian's

6  net worth than leave that to the jury.

7          MR. ROTH:  Obviously, we'll have to consult

8  regarding that.

9          THE COURT:  I just don't know how the jury is going

10  to possibly do that based on the state of the evidence.  And

11  that's my tentative.  Let's take this up a little later.

12  Let's proceed and get through this testimony.  We can always

13  call back Mr. Wagner.  He's not going anywhere.  He's being

14  paid a decent amount of money where I suspect he'll certainly

15  hang around for a few more hours if he has to.  And I want to

16  give you a chance to think about it and get back to the

17  Court.

18          MR. ROTH:  Very good, your Honor.

19          THE COURT:  All right.  Let's bring the jury back

20  in.

21          **(WHEREUPON THE JURY ENTERS.)**

22          THE COURT:  Mr. Quinn.

23          MR. QUINN:  Thank you, your Honor.

24  ///

25  ///

1 **REDIRECT EXAMINATION**

2 BY MR. QUINN:

3 **Q.** Mr. Wagner, I think you indicated, in response to

4 Mr. Kennedy's questions, that as you received additional

5 information from MGA over the last six, eight months, you

6 revised your calculations to take that information into

7 account?

8 **A.** I did.

9 **Q.** And is that true with respect to the information that

10 you received in the last two weeks?

11 **A.** That is correct as well.

12 **Q.** And has MGA provided to Mattel and Mattel provided to

13 you information concerning projections for MGA since the

14 first verdict in this case?

15 **A.** They have.

16 **Q.** And what document are you referring to?

17 **A.** I believe it's Plaintiff's Exhibit 18837.

18 **Q.** And what is that document?

19 **A.** It is a projection by MGA as to what their sales, costs,

20 and profits will be for each month until the end of 2008.

21 **Q.** And is that prepared by the management of MGA?

22 **A.** It is.

23 **Q.** And is that something that is -- does it have a date?

24 **A.** The date is August 6th, 2008, of this internally

25 prepared document.

1   **Q.** And that was provided by MGA after the first verdict in

2   this case?

3   **A.** It was.

4   **Q.** You were asked some questions about taxes and whether

5   you took them into account or why you didn't. In calculating

6   profits, why didn't you subtract taxes like other cost items?

7   **A.** Because in damage calculations, commercial damage cases,

8   any damage award against the defendant is a tax deductible

9   event they can use to avoid paying taxes either in the past

10  or in the future.

11          Since this particular defendant, MGA, does not pay

12  taxes, this is only relevant to Mr. Larian. And based on the

13  tax rules, he can re-file his last two tax returns and

14  recover all the taxes that he's already paid, and he has 10

15  years that he can also deduct against his tax return any

16  judgment against him if he's earning profits in that time

17  period.

18          So it is entirely appropriate to not consider taxes

19  as a cost.

20  **Q.** So if there is an award against Mr. Larian, that's tax

21  deductible?

22  **A.** It is.

23  **Q.** And if you had also deducted it in doing your analysis

24  and treated it as a cost, and Mr. Larian also deducted it

25  from his taxes, what would have been the consequences of

1    that?

2           MR. KENNEDY:  Objection, your Honor.  Deductibility

3    of what kind of damage?

4           THE COURT:  Sustained.  Rephrase.

5    Q.    BY MR. QUINN:  When we talk about damages being

6    detectable, what are we referring to?

7    A.    Compensatory damages.

8    Q.    Let's focus on the compensatory damage issue, then.  If

9    there were a compensatory damages award against Mr. Larian,

10   he would be able to deduct that from his taxes?

11   A.    He would, from the time period I just stated.

12   Q.    And he can go back in time and do that?

13   A.    For two years.

14   Q.    And if you had also deducted that amount in doing your

15   profits calculation, what would have been the consequence?

16   A.    Well, in fact, he doesn't pay taxes.

17   Q.    And is there a potential for double counting if you

18   exclude it as a cost item and there were an award and then

19   Mr. Larian also credited that against taxes?

20   A.    Yes.

21   Q.    If I can just go back to the document I was asking you

22   about, the MGA document that's been provided since the first

23   verdict.

24           Does that document reflect MGA becoming profitable

25   by the end of this year?

1  **A.**   Yes.  At the end of this year, they are showing that

2  they expect to be profitable again.

3  **Q.**   All right.  So that's the -- apparently the assessment

4  of MGA's management.

5  **A.**   It is.

6  **Q.**   You were asked some questions about whether there's some

7  double counting or an overlap between the MGA profits numbers

8  that you provided and the distributions to Mr. Larian.  Do

9  you recall that?

10  **A.**   I do.

11  **Q.**   Can you explain why there is some overlap there?

12  **A.**   Well, it's the same dollars.  When MGA earned the

13  profits, they then distributed to Mr. Larian.  That's the

14  same amount of money.

15  **Q.**   All right.  Does that mean that there's going to be, if

16  there is an award in Mattel's favor against Mr. Larian and

17  MGA, does that mean that there's going to be double recovery

18  for MGA?

19  **A.**   There better not be.

20  **Q.**   For Mattel.  I'm sorry.

21  **A.**   No, they are not entitled to a double recovery.  They

22  are entitled to try to collect it from each, but they cannot

23  collect it twice.

24  **Q.**   All right.  So that's really a legal issue.

25  **A.**   I believe that it is.

1   Q.   You were asked some questions about, you know, whether

2   you went out into the real world and actually tried to find a

3   buyer for Mr. Larian's stock.

4        Do you recall that?

5   A.   I do.

6   Q.   I mean, are you a broker?  Is that the sort of thing

7   that you do?

8   A.   Well, no.  Brokers do that.  Investment bankers.  That's

9   not my profession.

10  Q.   What is it that you do?

11  A.   I value businesses and calculate commercial damages.

12  Q.   And how many times have you done that, roughly?  You

13  told us you have testified over 100 times.  Can you tell us

14  how many times you've done a valuation of a business?

15  A.   It's in the hundreds.

16  Q.   And in doing that, have you ever gone out and tried to

17  see if you could find buyers, hypothetical buyers or real

18  buyers for a business?

19  A.   I have not.

20  Q.   Why not?

21  A.   Again, that would only be anecdotal evidence.  And

22  again, I don't have the skill set to do that.  I am a

23  financial analyst.  I analyze the value of a company based on

24  their history and their projected future.

25  Q.   All right.  And you use certain techniques that you told

1  us about, the income approach and the comparable companies

2  approach and the comparable transactions approach in order to

3  do the valuation.

4  A.   I did.

5  Q.   All right.   And are those standard sort of ways of

6  valuing companies that people who do what you do employ?

7  A.   Yes.

8  Q.   Then you were asked some questions about a projected

9  2 percent increase in profitability, was it?

10  A.   Well, no.   My assumption is 2 percent growth in sales.

11  Q.   2 percent growth in sales in perpetuity.   Why do you

12  make that assumption?

13  A.   Because that's the assumption that you always make in

14  business valuation.   You have to assume what is the growth of

15  the company into the future, because the way you do it is I

16  only project a couple years.   But this business will be in

17  business longer than that time period.   And this is the

18  assumption that business valuation people make when they do a

19  business valuation.

20  Q.   Is that a standard thing that's done, that you make such

21  an assumption projecting forward?

22  A.   It is.

23  Q.   And did you regard 2 percent as being sort of a

24  conservative number or less conservative, or how would you

25  characterize it?

1  **A.**   He think it's very conservative.  It's entirely

2  inconsistent with the history of the Bratz where the

3  company has seen growth significantly here not than that,

4  double-digit growth in many years.

5  **Q.**   Now, it was pointed out by Mr. Kennedy that in fact,

6  since you first made your assumptions and projecting 2

7  percent increase, that there have been dips downward?

8  **A.**   There have been.

9  **Q.**   All right.  I mean, is that unusual, that there would

10  be, you know, some business would go up and this would go

11  down?

12  **A.**   No, that in the real world is what happens.  It's never

13  a steady state.

14  **Q.**   And in particular with the toy business, in doing your

15  work in this case, did it come to your attention whether or

16  not the toy business is kind of a seasonal or a cyclical

17  business?

18  **A.**   It's clearly seasonable.  The vast majority of the sales

19  is for the Christmas season.  And yes, it has cyclicality

20  based upon what has happened in the economy, and it has been

21  tough on that industry for the last couple years.

22  **Q.**   But that doesn't mean necessarily that it will continue

23  to be tough forever.

24  **A.**   No, it's going to go up again, and it's going to be down

25  again.

6453

1  **Q.**   But someone who does what you do, in valuing a business,

2  has to make some assumptions.

3  **A.**   They do.

4         MR. QUINN:  Your Honor, we made a mistake in moving

5  into evidence the two charts that I moved in, the Bratz

6  versus non-Bratz profits.  I need to correct the numbers on

7  the record.

8         THE COURT:  Very well.  Do so, please.

9         MR. QUINN:  The chart of MGA's profits, Bratz

10  versus non-Bratz was admitted as 13556.  This was in error.

11  It should be Exhibit 13956.

12         And the chart of MGA's top 10 products by revenue,

13  2001 to 2007, was admitted as 13557.  And it should be 13957.

14         THE COURT:  Any objection?

15         MR. KENNEDY:  No objection.

16         THE COURT:  Very well.  Those are noted for the

17  order.

18         **(Exhibits 13956 and 13957 received.)**

19         MR. QUINN:  Your Honor, we would also now like to

20  offer into evidence the remaining slides.  The Bratz profits

21  and benefits slide, slide No. 1, as Exhibit 13959.

22         The Bratz profits through June 2008, slide 2, as

23  13960.

24         Slide 3, Mr. Larian's financial benefits, as 13961.

25         Slide 4, distributions to Mr. Larian, as 13962.

1          Slide 6, value of Bratz, slide 6, as Exhibit 13963.

2          Slide 7, Mr. Larian's share of Bratz, as of June

3    2008, as Exhibit 13964.

4          Slide 8, the interest calculation, as

5    Exhibit 13965.

6          Slide 9, copyright damages, MGA, as 13966.

7          Slide 11, copyright damages MGA, as slide 13967.

8          Slide 12, copyright damages Mr. Larian as 13968.

9          And finally, net worth, as 13969, summaries of

10   voluminous records, your Honor.  We offer those exhibits.

11          THE COURT:  Any objection?

12          MR. KENNEDY:  No, your Honor.

13          THE COURT:  Very well.  All admitted.

14          **(Exhibits 13959-13969 received.)**

15          MR. QUINN:  Nothing further.

16                   **RECROSS-EXAMINATION**

17   BY MR. KENNEDY:

18   **Q.**   Going back to your discussion that you just had with

19   Mr. Quinn about your skill set, you state that you deal in

20   terms of trying to project in a hypothetical basis; correct?

21   **A.**   That is true.

22   **Q.**   That you are not a broker or investment banker or

23   anything of that sort?

24   **A.**   I am not.

25   **Q.**   So if Mattel wanted to present evidence to this jury

1   showing what people would really pay for Bratz as opposed to

2   what they might pay hypothetically, they should have gotten

3   somebody from another discipline; right?

4   **A.**   No, they would get somebody from my discipline.  I am a

5   business valuation expert.  But they would get people that

6   normally do it in real transactions rather than value

7   companies in litigation.

8   **Q.**   You're saying there are people Mattel could have brought

9   in instead of you that would have told the jury what people

10  would really pay for MGA or for Bratz as opposed to what

11  hypothetically might be paid; correct?

12  **A.**   No, they would have done the exact same analysis that I

13  would do.

14  **Q.**   But they would not do it normally in litigation.

15  **A.**   They would be a person hired to value a company so a

16  buyer could figure out what they could buy a company for.

17  **Q.**   Is there somebody who could come in and say what they

18  are really prepared to pay, for example, $10 million for

19  Mr. Larian's interests.  There are people like that, aren't

20  there?

21          MR. QUINN:   Compound, calls for speculation.

22          THE COURT:   Sustained.  Well, rephrase the

23  question, Counsel.

24          MR. KENNEDY:   Understood, your Honor.

25  **Q.**   There are people out there who could come in and say

6456

1  whether there are real companies that are or are not prepared

2  to, for example, pay $10 million for Mr. Larian's interest in

3  Bratz; correct?

4  A.    There are investment bankers or brokers, that if they

5  have a client they would represent this is what my client

6  would be willing to pay.

7  Q.    And if there were an investment banker out there with a

8  client who was willing to pay $310 million for Mr. Larian's

9  interests, Mattel would be in a position to bring them in, if

10  they wanted, wouldn't they?

11         MR. QUINN:  Calls for speculation, your Honor.

12  That's an incomplete --

13         THE COURT:  As phrased, it does.

14  Q.    BY MR. KENNEDY:  If in fact there's anybody out there

15  who today would pay $310 million for Mr. Larian's interest,

16  you're not aware of any reason why Mattel couldn't call that

17  person as a witness in this case, are you?

18         MR. QUINN:  It assumes facts and calls for

19  speculation.

20         THE COURT:  As phrased, sustained.

21  Q.    BY MR. KENNEDY:  Do you have any idea how you would go

22  about finding out whether there is anyone out there who would

23  be willing to pay $310 million for Mr. Larian's interest?

24  A.    Yes.

25  Q.    What would you do?

1  **A.**    I would hire an investment banker who would then try to

2  market the company.  They would prepare a prospectus as to

3  what they thought the company would do in the future with a

4  lot of analyses, like I did, and then they would contact who

5  they thought were prospective buyers and try to generate

6  interest.

7  **Q.**    Do you know of any reason why that person couldn't be

8  called as a witness in this case?

9        MR. QUINN:  Calls for speculation, incomplete

10 hypothetical.

11       THE COURT:  Sustained.

12 **Q.**    BY MR. KENNEDY:  Now, you said that you've seen recent

13 information that MGA plans to be profitable again by the end

14 of the year; correct?

15 **A.**    Yes.

16 **Q.**    And have you seen information indicating that MGA

17 accurately predicted that Bratz sales would decline the way

18 they did in 2006 and 2007?

19 **A.**    I didn't see any internal projections for that time

20 period.

21 **Q.**    Have you seen anyplace for MGA got it right in terms of

22 the decline that you think Bratz is going to be undergoing

23 over the next year or two?

24 **A.**    No.  I didn't see that.  And if they did, it would be

25 just like me, because I misestimated as well.

1    Q.    So you haven't seen anything that indicates MGA always

2    calls it right where the future is concerned.

3    A.    I have no information about whether they do or do not.

4    Q.    And the only way we'll know whether the current

5    projections for the end of the year are or are not correct is

6    to wait and see what happens.

7    A.    That is true.

8    Q.    And I gather from your answer, if compensatory damages

9    only are taxable -- well, punitive damages are taxable;

10    right?

11    A.    You cannot claim a tax deduction for payment of punitive

12    damages.

13              MR. KENNEDY:    Thank you very much.

14                 **FURTHER REDIRECT EXAMINATION**

15    BY MR. QUINN:

16    Q.    In your experience in the business world, are there any

17    financial analysts working at any companies that have crystal

18    balls that enable them to make projections that are right on,

19    at MGA or anywhere else?

20    A.    There is no one that can do that.  If they could, they

21    would be very rich people.

22    Q.    All right.  Now, in your experience, you were asked some

23    questions about could you find an investment banker who would

24    find a client and then that client could come to court and

25    talk to a jury and say I'm here, and tell the jury that they

1  want to buy this business.

2  Have you ever heard of that happening?

3  **A.** Never.

4  **Q.** You are aware, I think you've already indicated, that

5  MGA has retained somebody like you to give valuation

6  opinions.

7  **A.** Mr. Meyer has similar credentials to me.

8  **Q.** Is he a broker?

9  **A.** He is not.

10  **Q.** Did he go out -- you've read his report, and you know he

11  has some opinions, too, on valuation.

12  **A.** He does.

13  **Q.** All right. And did you see any indication in that

14  report to support his reasons? He went out in the

15  marketplace to try to see if there were buyers or offered

16  Mr. Larian's stock to anybody?

17  **A.** He didn't do that, and I wouldn't expect that he would.

18  MR. QUINN: Thank you.

19  THE COURT: Anything further?

20  MR. KENNEDY: Nothing further, your Honor.

21  THE COURT: You are excused for the time being.

22  You may be recalled.

23  THE WITNESS: Thank you, your Honor.

24  THE COURT: Mr. Quinn, the plaintiff's next

25  witness.

6460

1          MR. QUINN:  Your Honor, the next witness -- we

2     don't have the video to play yet.  It will be Michael Moore.

3          THE COURT:  Very well.

4          THE CLERK:  Please stand next to the court reporter

5     and raise your right hand.

6                    **MICHAEL CHRISTOPHER MOORE, SWORN.**

7          THE CLERK:  Please take the stand.

8          Please state your full name for the record, and

9     spell your last name.

10          THE WITNESS:  Michael Christopher Moore, M-O-O-R-E.

11          THE COURT:  Counsel, you may proceed.

12          MR. ZELLER:  Thank you, your Honor.

13                         **DIRECT EXAMINATION**

14     BY MR. ZELLER:

15     **Q.**  Good afternoon, Mr. Moore.  You are currently employed

16     by Mattel's law department as an attorney?

17     **A.**  Yes, I am.

18     **Q.**  And how long have you been with Mattel's law department?

19     **A.**  Since December of 2000.

20     **Q.**  And what's your current title there?

21     **A.**  My current title is expert counsel.

22     **Q.**  And do you work in a particular area of law, a legal

23     practice?

24     **A.**  My practice focuses on trademarks and copyrights.

25     **Q.**  And what is it that your duties were principally when

1   you first arrived there at Mattel back in December of 2000?

2   **A.**   My duties were principally to prosecute trademark

3   registrations, essentially register trademarks that Mattel

4   wanted to use in connection with its products.

5   **Q.**   And then at some point in around 2002 or so, did you

6   start having some kind of responsibility for litigation, the

7   lawsuits that Mattel was involved in?

8   **A.**   Yes, I did.

9   **Q.**   Now, prior to joining Mattel, did you have any legal

10   experience?

11   **A.**   Well, for two and a half years before I joined Mattel, I

12   was an attorney at the United States Patent and Trademark

13   Office in Washington, D.C.

14   **Q.**   And generally speaking, what did you do there?

15   **A.**   There I worked at the Trademark Office, and I reviewed

16   trademark applications which were filed at the office for

17   registration.

18   **Q.**   If you could, please, take a look at -- I believe it's

19   the smaller binder that you should have up there.   There's an

20   Exhibit 13109.   This is in evidence.   If we could please have

21   it published.

22   **A.**   Okay.

23   **Q.**   Do you have that exhibit, Mr. Moore?

24   **A.**   I do.

25   **Q.**   And for the record, this is a document I think we're all

1  familiar with, this is the Carter Bryant-MGA agreement dated

2  as of September 18, 2000. And I'd ask you, Mr. Moore, you

3  have seen this document before, haven't you?

4  A.  Yes, I have.

5  Q.  And when is it you first saw it?

6  A.  I first saw this document in November of 2003.  I

7  believe November 24th, 2003.

8  Q.  And what were the circumstances under which you first

9  saw this?  In other words, where were you?

10  A.  I first saw this document at a meeting in Hong Kong that

11  I had with a toy company there called Cityworld.

12  Q.  And if you could please tell us who else was at this

13  meeting.  Obviously, you were there.

14  A.  I was at the meeting.  There was a gentleman by the name

15  of George Kesselring who represented Cityworld, and then

16  there was Cityworld's attorney, and there was also -- well,

17  you were there, Michael Zeller.

18  Q.  And did Cityworld give you a copy of this document, this

19  agreement?

20  A.  Yes.

21  Q.  And did you have an understanding as to how it is that

22  Cityworld got a copy of this agreement?

23  A.  I understood that had been sued by MGA in Hong Kong, and

24  this document had been provided to Cityworld in connection

25  with that litigation.

6463

1  Q.  Now, at this meeting that you had there with Cityworld

2  in late November of 2003, did you see any other documents?

3  A.  I did.

4  Q.  If you'd please turn to Exhibit 10.

5          And this is in evidence as well, your Honor.

6          If we could publish that.

7  A.  I have it.

8  Q.  And you've seen Exhibit 10 before?

9  A.  I have.

10 Q.  Was this also one of the documents that you saw at that

11 meeting with Cityworld?

12 A.  This was another document that I saw at the meeting with

13 Cityworld.

14 Q.  Now, prior to the time that you had this meeting with

15 Cityworld there in late November of 2003, did you know that

16 Carter Bryant had been working with MGA while he was still a

17 Mattel employee?

18 A.  I did not.

19 Q.  Prior to the time of this meeting, when you saw these

20 documents that Cityworld showed you, to your knowledge did

21 anyone else at Mattel know that?

22 A.  Not to my knowledge.

23 Q.  Now, prior to the time that you had this meeting with

24 Cityworld, had you heard from any source that there was the

25 possibility Carter Bryant had some kind of relationship with

1  MGA during the time he was employed by Mattel?

2  **A.**   I think there were rumors that Carter Bryant had created

3  Bratz.

4  **Q.**   Maybe I should be a little bit more specific.  Did you

5  read anything prior to the time that you had that meeting

6  with Cityworld that suggested to you the possibility that

7  Carter Bryant had had some kind of relationship with MGA

8  while he was still a Mattel employee?

9  **A.**   Yes.   There was a Wall Street Journal article that was

10  published in July of 2003, and in that article, I believe it

11  stated that Isaac Larian had seen the drawings for Bratz in

12  the fall of 1999.

13          MR. ZELLER:   And if we could, please, pull up on

14  the screen Exhibit 1.  And this is in evidence.   If there's

15  1-A.   If we could go to the second page.  And blow up the

16  paragraph on the left-hand side.   I'm sorry.  My right.

17  **Q.**   This is a little blurry, but I don't know if you can

18  make it out.   It's that paragraph that starts off Isaac

19  Larian, chief executive of MGA.   Is that passage you're

20  talking about where he says that he chose Mr. Bryant's idea

21  for the Bratz over several others after holding a sort of

22  fashion doll design contest in late 1999?

23  **A.**   That's the portion I'm referring to.

24  **Q.**   And did you read this article during the July of 2003

25  time period?

6465

```
 1  A.    I did.

 2  Q.    Then going back to this meeting that you had with

 3  Cityworld in late November of 2003, prior to the time of that

 4  meeting, did you know that Carter Bryant had created Bratz

 5  during the time he was employed by Mattel?

 6  A.    I did not know that.

 7  Q.    Did anyone at Mattel know that to your knowledge?

 8  A.    Not to my knowledge.

 9  Q.    Was there sometime later where it came to your attention

10  or you learned or knew that Carter Bryant had done at least

11  some sort of creation, creative work on Bratz when he was

12  employed by Mattel?

13  A.    In late 2004, I began to know the extent of what Carter

14  Bryant had done when he was at Mattel.  I attended his

15  deposition in Springfield, Missouri.  I believe he made

16  certain statements which caused me to believe that.

17  Q.    If you could direct your attention -- there's another

18  binder up there for you.  It's a larger binder.  In order to

19  save some time here in court today, you looked at these

20  documents before we came; is that right?

21  A.    I did.

22  Q.    If you could, please look at that group that has the tab

23  A.  And for the record, these are Exhibits 13873 through

24  13889.

25           Mr. Moore, are those certificates of registration
```

6466

1   of copyright that Mattel obtained and the U.S. Copyright

2   Office issued?

3   **A.**   Yes.

4           MR. ZELLER:  Your Honor, I'd move into evidence

5   Exhibits 13873 through 13889.

6           THE COURT:  Any objection?

7           MR. SLOAN:  One moment, your Honor.

8           No objection.

9           THE COURT:  They are admitted.  You may publish.

10          **(Exhibits 13873-13889 received.)**

11  **Q.**   BY MR. ZELLER:  And the next group we have for you in

12  that binder is tab D.  Do you see that?  And for the record,

13  these are Exhibits 13890 through 13902.  Those are

14  certificates of registration that you reviewed in more detail

15  earlier today?

16  **A.**   Yes.

17  **Q.**   Do you recognize those documents as certificates of

18  registration of copyright that Mattel obtained and the U.S.

19  copyright office issued?

20  **A.**   Yes.

21          MR. ZELLER:  Your Honor, I move into evidence

22  Exhibits 13890 through 13900.

23          MR. SLOAN:  Objection, your Honor.  Can we have a

24  sidebar?

25          THE COURT:  Sure.

1          MR. ZELLER:  If I could suggest one thing.  We have

2     another group that I'd like to move in.  If it's going to

3     involve the same issue, maybe we could deal with it at one

4     time at the sidebar.

5               THE COURT:  Is it?

6               MR. SLOAN:  Yes.

7               THE COURT:  Go ahead.

8     Q.   BY MR. ZELLER:  Mr. Moore, also take a look at tab C.

9     Do you see that there?

10    A.   I do.

11    Q.   And for the record, these are Exhibits 13757 through

12    -759 and 13912 and 13913.

13    A.   Okay.

14    Q.   And those are documents you reviewed earlier today, too,

15    to make sure you knew what they were; right?

16    A.   That's right.  These are documents I've seen earlier

17    today.

18    Q.   And do you recognize those as certificates of

19    recordation from the U.S. Copyright Office?

20    A.   I do.

21              MR. ZELLER:  And on that same basis, your Honor,

22    I'd move into evidence Exhibits 13757 through -759 and

23    Exhibits 13912 and 13913.

24              THE COURT:  Very good.  I'll see you at sidebar

25    concerning the objections.

1           **(SIDEBAR CONFERENCE HELD.)**

2                THE COURT:   Yes.

3                MR. NOLAN:   If I could address these, we were just

4    handed these.   I want to give you -- just show you an example

5    of 13893 that they were attempting to move in.   These are

6    certificate of registrations they had filed post verdict in

7    this case, July 25th, 2008.   I believe, Mr. Zeller, you might

8    represent that whole group was filed after the verdict in

9    this case.

10               MR. ZELLER:   Correct.   And that's why I actually

11   broke them out in groups.   So if there was an issue

12   concerning particular groups of them.   The group B, they were

13   the ones that we're talking about here, are ones that we

14   filed after the verdict.   Of course, the documents at that

15   point were public.   The jury's verdict was returned in our

16   favor.   We sought expedited registration of these materials.

17   We produced them, I believe, within hours of when we got them

18   back from the Copyright Office, and we're seeking to

19   introduce them.

20               MR. NOLAN:   Your Honor, I just think that

21   introducing into evidence legal filings that Mattel has taken

22   in response to the verdict is of no relevance to the claims

23   that they are now trying to enforce.   Your Honor will

24   instruct the jury as to the ownership requirements.   I think

25   this has a potential of confusing the jury.   I also wanted to

1   point out that I don't know whether or not this is in here,

2   but --

3           THE COURT:  I'm sorry.  Let me get a better sense

4   of what you plan to use this with.  I'm not really sure how

5   confusing the jury -- because you'll not really sure what

6   you're going to use it for.

7           MR. ZELLER:  I would start off with this, your

8   Honor.

9           THE COURT:  You are seeking copyright infringement

10  on these drawings.

11          MR. ZELLER:  Correct.  And furthermore, your Honor,

12  MGA has asserted a section 205(d) defense under the U.S.

13  Copyright Act.  They have taken the position that

14  registration is notice.  And recordation.

15          Now, we, of course, differ on that point.  We think

16  it's a very different kind of issue.  In fact, the

17  certificates of recordation are what in our view are required

18  by the statute in order to avail oneself of 205(d).  But, you

19  know, even if their legal argument were to be accepted

20  accounts, the fact is that then we would say we are the ones

21  who recorded first because if registrations are suitable

22  for -- as substitute or proxy for recordation, well, then,

23  we're first.

24          THE COURT:  Very well.  And besides confusing, what

25  are your other objections?

```
 1          MR. NOLAN:  On the legal point they just made, that
 2  they were the first to register this, I just think that to be
 3  able to claim that you were the first as a result of pending
 4  court proceedings that haven't even been completed and
 5  there's no final judgment, your Honor, I think that's
 6  inappropriate.  And that's where I think the confusion arises
 7  from the jury, that all of a sudden it appears that Mattel
 8  has certain rights, maybe independent from what the verdict
 9  was in the first case.  And what I'm worried about is that
10  they are back there looking at that, and they don't
11  understand the nuances of the legal argument.

12          This whole case was tried on a timing point of view
13  and what they are going for, and we started this trial on the
14  basis of, and you asked going in, what were the drawings that
15  you were relying on, and that's what this case is being
16  litigated about.  Now we're going back to the entire bucket
17  of documents that were awarded, I guess, in the first
18  verdict.  First phase.

19          MR. ZELLER:  If I may, I actually think that
20  Mr. Nolan's prejudice argument is fairly easy to address.
21  There is in fact a very standard instruction that is given in
22  copyright cases where there has been contested ownership over
23  works, that presumptions don't apply.  I mean, obviously
24  there are many situations where, you know, courts will give
25  instructions, in a routine copyright case --
```

```
 1              THE COURT:  Are you planning to show that to the
 2    jury right now?
 3              MR. ZELLER:  No, I'm not.
 4              THE COURT:  I'm going to overrule the objection.
 5    However, I will give you leave.  I'm not seeking any legal
 6    objection; however, since there's no moment, and it's not
 7    going to the jury, it's in.  If you want to revisit the
 8    objection with legal authority, I will entertain it.
 9              MR. NOLAN:  Very well.
10              (CONCLUSION OF SIDEBAR CONFERENCE.)
11              THE COURT:  They are admitted, Mr. Zeller.  You may
12    proceed.
13              (Exhibits 13857-13900, 13757-13759,
14              13912, and 13913 received.)
15              THE COURT:  Very well.  Cross-examination.
16                     CROSS-EXAMINATION
17    BY MR. SLOAN:
18    Q.   Good afternoon, Mr. Moore.
19    A.   Good afternoon.
20    Q.   You testified that you've been a legal counsel in the
21    legal department at Mattel since December of 2000; correct?
22    A.   That's right.
23    Q.   And it's true, isn't it, that during the past couple of
24    years, you have personally participated in and supervised the
25    investigation and collection of documents in connection with
```

1  this case?

2  **A.**    I have with other attorneys, yes.

3  **Q.**    But you have been one of the principal people involved

4  in investigating this case and collecting documents, haven't

5  you, Mr. Moore?

6  **A.**    Yes.

7  **Q.**    You have?

8  **A.**    I have.

9  **Q.**    And you've spent hundreds of hours in the course of

10  investigating this case, haven't you, sir?

11  **A.**    I've spent a lot of time investigating.

12  **Q.**    I'm sorry.  You've spent a lot of time?

13  **A.**    I've spent a lot of time on the case, yes.

14  **Q.**    In fact, you have submitted declarations in this case in

15  which you have declared under oath that you've spent, I

16  believe, hundreds of hours combing through documents, talking

17  to various witnesses; is that correct?

18  **A.**    That's correct.

19  **Q.**    And so because of that, I assume that you are thoroughly

20  familiar with all of the investigative files that have been

21  prepared by Mattel in connection with this case.

22          Is that a fair assumption?

23          MR. ZELLER:  The question is vague.

24          THE COURT:  Sustained.  Clarify, Counsel.  All

25  investigative files.

1    Q.    BY MR. SLOAN:  Well, you are aware that Mattel has been

2    investigating this case for some time, aren't you, sir?

3              MR. ZELLER:  Objection, your Honor, as to "this

4    case."  It's actually contrary to the Court's rulings.

5              THE COURT:  Sustained.

6    Q.    BY MR. SLOAN:  Sir, are aware that Mattel has been

7    investigating whether the production and sale of Bratz dolls

8    by MGA in some way infringes on certain rights that Mattel

9    purports to own for some time?

10             MR. ZELLER:  Vague, foundation.

11             THE COURT:  Sustained.

12   Q.    BY MR. SLOAN:  Sir, have you been investigating for some

13   time whether Carter Bryant is the person who designed the

14   Bratz doll?

15   A.    I've been looking into that since sometime in 2003.

16   Q.    Since 2003?

17   A.    Yes.

18   Q.    Sir, are you aware that Mattel has been investigating

19   that issue since well before 2003?

20             MR. ZELLER:  Foundation, relevance, contrary to the

21   Court's rulings.

22             THE COURT:  Same question that I sustained the

23   objection to.  Sustained.

24   Q.    BY MR. SLOAN:  You said that you have been involved in

25   investigating whether Carter Bryant was involved in creating

```
 1   Bratz since 2003; is that correct?
 2   A.    Yeah, I've been involved in trying to understand whether
 3   Carter Bryant created Bratz since 2003.
 4   Q.    When in 2003?
 5   A.    The summer of 2003.
 6   Q.    So substantially before you traveled to Hong Kong with
 7   Mr. Zeller to meet with Cityworld's attorneys; is that right?
 8              MR. ZELLER:    The question is vague.
 9              THE COURT:    As to substantially.    Overruled.
10   Q.    BY MR. SLOAN:    Is that true, sir?
11   A.    It's true that I was investigating or looking into the
12   situation before I traveled to Hong Kong, yes.
13   Q.    You said since the summer of 2003; correct?
14   A.    That's right.
15   Q.    And you weren't the first person at Mattel who ever
16   began to investigate whether Carter Bryant was the person
17   involved with designing Bratz, were you, sir, to the best of
18   your knowledge?
19              MR. ZELLER:    Irrelevant, and foundation.
20              THE COURT:    To your knowledge.
21              THE WITNESS:    To my knowledge, I think I was the --
22   I think I was the first in some respects.
23   Q.    BY MR. SLOAN:    You were the first person at Mattel to
24   investigate whether Carter Bryant was involved in designing
25   Bratz?    Is that your testimony?
```

```
 1            THE COURT:  Counsel, we're going to have to have a
 2   sidebar on this.  I thought I made this clear pretrial.
 3            (SIDEBAR CONFERENCE HELD.)
 4            THE COURT:  I am hoping that this is the last time
 5   I'm going to have to say this statement in this case.  What
 6   is relevant is whether or not MGA knew that Carter Bryant
 7   developed Bratz while employed at Mattel.  Counsel, I'm not
 8   asking for a statement.  I'm making a statement.  It is not
 9   relevant, and I sustained the objection as to whether or not
10   Mattel was investigating Carter Bryant's involvement in
11   making Bratz.
12            MR. SLOAN:  Your Honor, when I read the Court's
13   last order, and I'm trying to remember, I think it was July
14   24th, if memory serves me.
15            THE COURT:  Okay.
16            MR. SLOAN:  My reading of that, and I would ask the
17   Court to revisit it, is that you distinctly said that the
18   standards with respect to fraudulent concealment are
19   different than the standards with respect to when the two
20   aiding and abetting claims accrued.  My understanding of the
21   ruling is that you ruled, as a matter of law, that the aiding
22   and abetting claims did not accrue -- I think I have this
23   right -- until July of 2003.  But what you positively said is
24   that they didn't accrue until Mattel knew that Carter Bryant
25   had created it while he was at Mattel.  I agree with you.
```

1          But with respect to fraudulent concealment, and
2    that's what this goes to, your Honor, you said the standard
3    was much looser. That's my understanding of the order, and I
4    think it's a fair reading of the order, your Honor.

5          THE COURT: The issue, though, is still whether or
6    not they knew the claim, the copyright claim -- they have no
7    copyright claim on Bratz that they are alleging in this case
8    unless and until they have knowledge or reasonable suspicion
9    that Carter Bryant developed it while an employee under the
10   inventorship agreement.

11         MR. SLOAN: I agree with you. This goes to the
12   fraudulent concealment which goes to the tortious
13   interference and conversion claims. And with respect to
14   those claims, my understanding from your order is that you
15   said there was a much looser standard and you were not going
16   to hold the parties to as strict a standard.

17         THE COURT: Let me take a look at my order.

18         MR. SLOAN: It's from July 24th.

19         THE COURT: Do we have a copy of the July 24th
20   order? One moment.

21         (Pause.)

22         THE COURT: Mr. Sloan, you are correct, I did
23   indicate in the order. I also indicated, however, that I
24   would be very mindful of the 403 limitations, and I guess
25   what -- I don't want to confuse this jury. Certainly

1   evidence of Mattel knowing -- the ultimate issue is still the

2   same, whether Mattel knew that Carter Bryant did this while

3   he was working at Mattel.

4           Part of that equation is whether or not Mattel knew

5   that Carter Bryant's involved in Bratz.  That's kind of a

6   subpart.  It's not the whole thing.  And I don't want the

7   jury -- and if I think the evidence and if I think the

8   testimony and I think the examination is going in the same

9   way as it started out, suggesting that the ultimate issue is

10  whether or not Mattel knew that Carter Bryant was involved,

11  was aware, was involved in the creation of Bratz, I'm going

12  to shut it down.

13          MR. SLOAN:  This only goes to fraudulent

14  concealment.  The only issue -- as I understand it, you have

15  ruled on all the statute of limitations issue.  So the only

16  issue --

17          THE COURT:  Is fraudulent concealment.  I

18  understand that.

19          MR. SLOAN:  And this is clearly relevant to

20  fraudulent concealment.

21          THE COURT:  I understand it's relevant.  But reread

22  my order, because there's a paragraph after the paragraph

23  that you are correctly referring to that says if it becomes

24  misleading under 403 grounds, I'm going to shut it down.

25          MR. SLOAN:  Your Honor, the other point I'd make is

1   that I think they have opened the door on this.  Because

2   Mr. Zeller elicited testimony not just on whether when he

3   knew that Carter Bryant had done it while he was still at

4   Mattel, but he also asked questions about when he first knew,

5   when they first knew and did anyone else know.

6          MR. ZELLER:  My questions were very specific.  They

7   went to two issues.  Number one, knowledge of whether or not

8   Carter Bryant was working with MGA while a Mattel employee.

9   Every question on that subject was phrased that way.  Number

10  two, whether or not knowledge of Carter Bryant developing or

11  working on Bratz while a Mattel employee.  Every single

12  question I asked --

13         THE COURT:  I'm going to permit Mr. Sloan to re-ask

14  the question.  I'm going to overrule the objection.  Please

15  take my warning seriously.  I don't want to have to

16  intervene.  I'm not going to allow this jury to be misled

17  into thinking that this issue is about when Mattel know that

18  Carter Bryant developed Bratz.

19         I'm giving you a fair warning.  You know what it's

20  like when I say be careful on something.  I am saying take

21  care.

22         MR. SLOAN:  Your Honor, I respectfully agree.  But

23  I don't understand where I'm supposed to draw the line.

24         THE COURT:  It's spelled out in the order.  We can

25  print out the pages of the order.

1       MR. SLOAN: I mean, isn't it -- the jury will be

2    instructed in the jury instructions what they are to

3    consider.

4       THE COURT: It's a very -- it's an issue that I

5    almost did not allow to go to the jury, but I think that it's

6    a proper thing to give to the jury. But I am letting it go

7    to the jury under very particular circumstances. We'll get a

8    copy of the order. I'll even -- this is so important, and I

9    want this handled with such care that I'm going to take a

10   break right now. I'm going to send the jury in, have both of

11   you read the record, and we'll have a discussion. I don't

12   want there to be any problem on this.

13      MR. NOLAN: Your Honor, this is why we wanted to

14   have this discussion at sidebar, too, on this. In the

15   language of the concealment, for example, the issue of the

16   anonymous letter; all right?

17      THE COURT: Let me excuse the jury. Well, I'm

18   going to excuse them for the day. We'll take this up.

19          **(CONCLUSION OF SIDEBAR CONFERENCE.)**

20      THE COURT: Ladies and gentlemen, given that we're

21   almost at 5:00 and we had a few more matters to discuss

22   outside your presence, I'm going to go ahead and excuse you

23   for the day. I will see you tomorrow morning at 9:00.

24          **(WHEREUPON THE JURY WITHDRAWS.)**

25      THE COURT: Please be seated. I've going to have

1    my courtroom deputy print out a copy of the order, provide it

2    to both sides, give you a chance to review it, and then we'll

3    discuss it on the record.  Court is in recess.

4              MR. NOLAN:  Your Honor, we should have the

5    discussion outside the presence of Mr. Moore?

6              THE COURT:  Yes.

7              (Recess taken.)

8              THE COURT:  All right, we're back on the record

9    outside the presence of the jury.  I take it both sides have

10   had a chance to read the Court's order.  Mr. Sloan was

11   correct, that the Court did indicate clearly that the

12   evidence comes in, but as I indicated on the order, for 403

13   purposes, we really need to make sure that we're not

14   confusing the jury.  And just the way that last question was

15   phrased, it caused concern by the Court.  And that's why I

16   called for the sidebar.

17             Clearly, the evidence that Mattel is aware of

18   Carter Bryant's work on Bratz is a piece of the puzzle in

19   terms of the MGA position on deliberate concealment.  But by

20   no means is it dispositive of the issue.  And there is a real

21   concern the Court has had from the get-go in considering this

22   issue on summary judgment of how this gets presented to the

23   jury.

24             Ultimately, I do think Mr. Sloan is correct, that

25   this can probably be addressed with clear jury instructions.

1   But I just want counsel to be aware of where we're going with

2   this issue. And so that's -- I think that may be all I need

3   to say.

4           MR. ZELLER: And I completely understand and agree

5   with what the Court has said. There's no question -- we

6   understood the order to mean that to begin with, that

7   certainly that issue, because it goes to potentially relevant

8   evidence subject to relevance, cumulativeness, 403, and the

9   like.

10          And certainly the phraseology of the questions were

11   problematic from our perspective. There are, however, I

12   think, a couple of additional problems in directing these

13   questions to Mr. Moore specifically. I did not elicit

14   testimony about, you know, Carter Bryant being -- having some

15   involvement with Bratz as a free-floating matter. I

16   specifically tied my questions to while he was employed by

17   Mattel.

18          Mr. Moore is an attorney. He is predicating the

19   knowledge, information, things he is asking him, basically to

20   interpret things through the lens of investigation that

21   Mr. Moore did for this case. And so that was also why I was

22   objecting on foundation grounds. Because Mr. Moore, I think

23   the testimony would establish, and if the foundational

24   questions were asked, would really establish that it's work

25   product that they are now trying to invade, asking Mr. Moore

1   to interpret those early investigative files.  That, and

2   also, of course, conversations he's had with people and that

3   sort of thing.

4           So I think that there is a particular problem --

5   there's an overlay when these questions are being asked of an

6   attorney.

7           My second point is that they have a whole lineup of

8   witnesses, business people, who they are going to ask these

9   questions of.  To the extent that they are continuing to be

10  allowed to ask those general questions of when do you think

11  Carter Bryant had any involvement with Bratz, which as a

12  general matter I don't think is that interesting of an issue.

13          Frankly, there's already evidence in the record,

14  and at some point, maybe it already is, purely cumulative.

15  They certainly have already made points about people knowing

16  or suspecting or thinking that Carter Bryant had something to

17  do with Bratz.

18          So I mean to me in some ways, you know, the real

19  meat of the issue is their ability to sort of then try and

20  bootstrap this idea of, you know, you had some idea that

21  maybe Carter Bryant had some involvement with Bratz into, you

22  know, this idea that Mattel knew that ultimate fact.  And

23  that's -- that, I think, is very problematic.

24          THE COURT:  Let me hear from Mr. Sloan.

25          MR. SLOAN:  Your Honor, the reason that Mattel

1    called this witness is because they apparently think they

2    have a burden of showing that they weren't on notice, that

3    they had no idea of the possible existence of a claim until

4    November of 2003.  That's why they called the witness.  When

5    he testifies and suggests to the jury, and I would submit to

6    the Court that there is a suggestion to the jury that to some

7    extent Mattel was blind about this until November of 2003, I

8    think it's fair game for us to not only probe his credibility

9    by asking these types of questions, but also, as your Honor

10   has said, it does go directly to the issue of --

11          THE COURT:  It does.  The credibility issue, it

12   depends how you define this.  This being clearly defined by

13   Mr. Zeller as -- you know the distinction.  I've not going to

14   keep repeating it.

15          So the "this" in that sentence is what's critical.

16   Saying that Mattel knew that Carter Bryant was involved in

17   Bratz does not impeach at all the statement that Mattel

18   didn't find out until 2003 that Carter Bryant developed Bratz

19   or created Bratz while he worked at Mattel.

20          So that's not impeachment.  It is relevant for the

21   issue, as a component of your defense or your response to the

22   deliberate concealment.  And I will permit it, and I'll

23   permit the questions provided that there's a foundation and

24   mindful of the other 403 considerations that I set forth in

25   the Court's order.

1          So the objection is overruled subject to laying the

2   proper foundation and being mindful of the Court's ruling.

3   That's all. You are basically correct on this. But don't

4   read more into it than I indicated.

5          MR. SLOAN: Thank you.

6          THE COURT: Mr. Nolan?

7          MR. NOLAN: Your Honor, having Mr. Sloan win the

8   objection, I don't want to lose it. But just for

9   clarification, because we're going to go back and think about

10  this, and this guidance is helpful.

11         THE COURT: Sure.

12         MR. NOLAN: Two things that I just wanted to bring

13  out in the context of this concealment argument is we don't

14  know whether or not we're going to use these, but I'd like to

15  have the Court's guidance so we don't get into an issue

16  tomorrow.

17         THE COURT: Yes.

18         MR. NOLAN: We have now -- and it's surprising as

19  to why they brought Mr. Moore in in light of the Court's

20  rulings. I was surprised that they called Mr. Moore to

21  establish this. But having done that and then asked him the

22  yes, you know, did anybody -- I apologize. This is from

23  Mr. Zeller's examination. "Question: Now, prior to the time

24  that you had this meeting" -- he's talking about the

25  Hong Kong meeting with Cityworld, "had you heard from any

1   source that there was the possibility that Carter Bryant had

2   some kind of relationship with MGA during the time he was

3   employed by Mattel."

4               THE COURT: Right.

5               MR. NOLAN: Then the answer was: "I think there

6   were rumors that Carter Bryant had created Bratz." That was

7   the answer.

8               THE COURT: Right.

9               MR. NOLAN: Now, that question, I submit, really

10  was not necessary in their case. But having said that and

11  having asked the question that way, I point out a couple of

12  things. And that is that the anonymous letter -- and I know

13  it's anonymous. I want to just tie something to it -- the

14  anonymous letter that is written in August of 2002

15  specifically has a claim that in 2000, and I'm quoting now,

16  in 2000, a Mattel employee by the name of Carter Bryant was

17  working with Mattel to design dolls. One of the dolls that

18  he was working on creating was the Bratz dolls.

19              Okay. Now, it's anonymous, I agree. But of

20  course, there's handwriting. The Court remembers this

21  probably way more than I do, but there's handwriting to Alan

22  Kaye and then to Richard De Anda. And then Mr. De Anda, in

23  receipt of the anonymous letter, writes the following e-mail

24  to Alan Kaye: "I have received your anonymous letter

25  originally sent to Bob Eckert regarding Carter Bryant and

1   Bratz. I am aware of this situation and have been working on

2   it for several months."

3        And then it goes on. There's some redactions here,

4   your Honor. Now, I just want to make the obvious point. The

5   anonymous letter, Mr. De Anda reads it and says, "I have been

6   investigating this matter for several months." The anonymous

7   letter specifically says that he was an employee at Mattel

8   while working on Bratz.

9        Then that ties us back to the investigative report

10   that Mr. De Anda opens up, and I think it's February of 2002.

11   March of 2002. I think the interview starts February 28th,

12   when they first get the first allegation.

13        So my question really is -- but after nine weeks I

14   think I can ask the question. Just kind of guidance. It

15   seems to me that this now is open, but if the Court feels

16   otherwise, I want to know ahead of time so we don't -- the

17   last thing we want to do is have a problem in this. But now,

18   given the linkage on concealment, not on the statute of

19   limitation, but on concealment, your Honor, it does seem that

20   the fact that they were putting in evidence in Phase 1-A that

21   we were concealing for way out until like 2005 is the issue

22   for us.

23        MR. ZELLER: Mr. Nolan has made -- this latter part

24   of Mr. Nolan's argument is the same one that the Court has

25   heard over and over. The evidence that he is citing here is,

1   as the Court knows, not an accurate depiction or rendition of

2   it.  The Court has seen Mr. De Anda's e-mail unredacted.  The

3   Court knows what that e-mail is about.  It is not about what

4   Mr. Nolan surmises that it is.  And furthermore, Mr. De Anda

5   made perfectly clear at his deposition -- and the Court has

6   these deposition excerpts.  It's been briefed extensively on

7   summary judgment and supplemental motions since then -- that

8   that is not what it means.  And it's not a tie to the

9   anonymous letter, and so the evidence that they are --

10          THE COURT:  Putting that aside, what about the

11  anonymous letter itself?

12          MR. ZELLER:  Well, look, let me start, I guess,

13  with the question that Mr. Nolan quoted that I asked

14  Mr. Moore.  Mr. Moore clearly misunderstood the question.  I

15  rephrased it.  And I asked him, "Well, did you read it

16  somewhere," and he said, "Yeah, I saw it in The Wall Street

17  Journal."

18          If they want to put the letter in front of

19  Mr. Moore, which -- and if they can lay a proper foundation,

20  then they can potentially, I think, use that to impeach him

21  if they want.  The problem that they are going to have is

22  simply he saw it later.

23          So they can try and establish that, but -- so I

24  don't see it as a real issue with Mr. Moore, frankly, the

25  anonymous letter.  It may rear its head, obviously, with

1 | other witnesses, but they are not going to be able to lay a
2 | foundation that says Mr. Moore was working on this stuff at
3 | that time period. I asked the question, when did you begin
4 | working in earnest in litigation.

5 | So in any event, I think some of these issues, you
6 | know, will probably be crystallized better with other
7 | witnesses.

8 | But just to reiterate my concern, we're talking
9 | about a lawyer here. I don't think my questions in any way
10 | opened up some general issue about privilege. The Court will
11 | recall, we have been down this road about, you know,
12 | knowledge of facts like that isn't privileged. And we have
13 | been down that road repeatedly through discovery. And it
14 | seemed to have worked out fairly well in terms of discovery.

15 | I don't think we had done anything different than
16 | we had done before, and, of course, Mr. Moore's factual
17 | testimony is there, I was at this meeting. This is when we
18 | got the agreement that set the events off that led to this
19 | lawsuit.

20 | THE COURT: Very well.

21 | MR. SLOAN: Your Honor, may I respond to that for
22 | just one second? Because with respect to the claim that
23 | we're somehow trying to invade privilege or work product, the
24 | documents we're talking about are the anonymous letter and
25 | the e-mail from Mr. De Anda to Mr. Kaye. There's also the

1   investigative file which they produced, which is part of

2   the -- whether it's part of the legal record or not, it has

3   been produced.

4           There's no claim of privilege or work product.  And

5   this witness testified that he was one of the people who was

6   most involved in the investigation.  Spent hundreds of hours

7   on it.  I think it's fair to assume that he would have

8   examined an investigative report that was prepared by Mattel

9   which indicated that they were on notice of some of these

10  claims, knowledge that Carter Bryant may have been involved

11  in designing Bratz long before mid-2003, which is when he

12  claims Mattel -- he said he started working on it in

13  mid-2003.

14          But I think my questions after that were, well, are

15  you claiming that no one else at Mattel was involved in

16  investigating this or knew anything about it before 2003.

17  And I think his answers were, "I'm not aware of it."  I'm not

18  sure that we ever crystallized his answer, but that's the

19  gist of the answers as I heard them.  And I think that given

20  that, we're entitled to get into this information.  Again, if

21  he --

22          THE COURT:  What information?  The letter and the

23  file and the De Anda memo?  Is that what you are seeking

24  to --

25          MR. SLOAN:  Your Honor, I understand that there may

1    be some issues with respect to the De Anda e-mail.

2         THE COURT:   Yes.

3         MR. SLOAN:   And I confess I'm not totally on top of

4    those.  So I'll defer to Mr. Nolan on that.  But certainly

5    with respect to the investigative file and the anonymous

6    letter, I think we should be allowed to ask about those and

7    see whether he knows about them.

8         MR. ZELLER:   Just when it seems like we have some

9    semblance of order to this, I hear something that's even more

10   troubling.  Now we hear that they are going to basically be

11   examining Mr. Moore on his interpretation of an investigative

12   file that he only saw for the first time -- he wasn't

13   involved in the 2002 Toon Teens matter.  He just was not

14   personally involved in it.  They are now going to ask him to

15   interpret --

16        THE COURT:   I think the best approach here,

17   Counsel, is for you to make whatever foundational objections

18   you want in the morning, and the Court will rule on those

19   foundational objections, and we'll see where this goes.

20        The other issue that I need to take up is these two

21   remaining deposition designations, Carter Bryant and Cary

22   Brode.  But I need the authority that I asked for this

23   morning to do that.  Because these designations really get

24   into this issue.  I think counsel would benefit from guidance

25   from the Court in terms of how far into the creative process,

1    doll development process, we're going.  Because a lot of

2    these designations on both sides, frankly, go into that

3    issue.

4         Mattel asks questions of Carter Bryant which gets

5    into the issue of the doll development process.  Then, of

6    course, MGA responds as well with their designations.  And

7    both sides are indicating that the other's are objectionable.

8    We need to figure out a principled way of doing this.  And

9    my -- I've been grappling with this, and this came to the

10   Court's attention this morning.  And on the one hand, I have

11   a concern that we're conflating apportionment and confusing

12   the jury by getting too far into the issue of doll

13   development.

14        On the other hand, I think that MGA's entitled to a

15   certain degree of understanding on the jury's part in that

16   doll development process in this phase.  So it's a matter of

17   striking the right balance.

18        But I invited counsel this morning to submit

19   authority to the Court, and I'll look for that first thing

20   tomorrow morning.  And that will be the pretrial motion of

21   the day.

22        MR. NOLAN:  You want us here at -- what time do you

23   want us?

24        THE COURT:  Let's meet at 8:00.  I'll be here at

25   7:30.  If you have something for me, I'd appreciate you

1    having something for me so I can take a look.

2            MR. NOLAN:   I think we will.  One point that you

3    put your finger on, and I saw this last night, is that in

4    looking at Carter Bryant's designations by Mattel, and they

5    are calling him as maybe next witness by video, that they

6    were putting this information in.

7            THE COURT:   I saw that.

8            MR. NOLAN:   So okay.

9            THE COURT:   And, Mr. Zeller, you know what I'm

10   looking for?

11           MR. ZELLER:   I'm sorry, your Honor?  We have

12   nothing further.  Unless the Court wants to address --

13           THE COURT:   No, in terms of authority on this issue

14   that we raised earlier today.

15           MR. ZELLER:   I understand people have been

16   researching it today.  When I get back, I will look at it,

17   and our intention is to try and get something put in order

18   for the Court tonight.

19           THE COURT:   Very well.  That's what I'm looking

20   for, and you understand what I'm looking for?

21           MR. NOLAN:   Right.

22           MR. PRICE:   Your Honor, most important question,

23   time count.

24           THE COURT:   You're down to four hours and 15

25   minutes or so, and MGA has 16 hours.

6493

1     MR. NOLAN:  Thank you, your Honor.  See you in the

2  morning.

3

4              (Proceedings concluded at 5:15 P.M.)

5

6

7

8

9              **C E R T I F I C A T E**

10

11

12         I hereby certify that pursuant to Title 28,

13  Section 753 United States Code, the foregoing is a true and

14  correct transcript of the stenographically reported

15  proceedings in the above matter.

16         Certified on August 7, 2008.

17

18

19  **MARK SCHWEITZER, CSR, RPR, CRR**
    Official Court Reporter
20  License No. 10514

21

22

23

24

25